1 | DANIEL M. PETROCELLI (S.B. #97802)
  |   dpetrocelli@omm.com
2 | MATTHEW T. KLINE (S.B. #211640)
  |   mkline@omm.com
3 | CASSANDRA L. SETO (S.B. #246608)
  |   cseto@omm.com
4 | O'MELVENY & MYERS LLP
  | 1999 Avenue of the Stars, 7th Floor
5 | Los Angeles, CA 90067-6035
  | Telephone: (310) 553-6700
6 | Facsimile: (310) 246-6779

FILED
CLERK, U.S. DISTRICT COURT

MAY 1 4 2010
10:23 am

CENTRAL DISTRICT OF CALIFORNIA
BY                           DEPUTY

7 | Attorneys for Plaintiff DC COMICS

8 |

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

Case No. **CV10 3633**

| | |
|---|---|
| DC COMICS, | Case No. |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | (1) Declaratory Relief re: Invalidity of Copyright Termination Notice; |
| PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JOANNE SIEGEL, an individual, LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive, | (2) Declaratory Relief re: Scope of Copyright Termination Notice; |
| | (3) Declaratory Relief re: DC Comics Period of Exclusivity re: Shuster; |
| | (4) Interference with 1992 Shuster Agreement; |
| | (5) Interference with Prospective Economic Advantage re: Siegel-DC Comics Agreement; and |
| Defendants. | (6) Declaratory Relief re: Invalidity of Copyright Assignment and Consent Agreements |
| | **DEMAND FOR JURY TRIAL** |

# I.  STATEMENT OF THE CASE

1.      This lawsuit challenges a scheme by Marc Toberoff and companies under his control to violate the U.S. Copyright Act and other laws by trafficking in federal copyright interests and interfering with contractual rights and other interests of plaintiff DC Comics related to the iconic property "Superman."[1]  By this scheme, Toberoff has sought to enrich himself by wrongfully laying claim to purported rights to control the exploitation of Superman to the substantial detriment of DC Comics and in violation of rights it has held, significantly invested in, and expanded upon for over 70 years.  DC Comics brings this suit to confirm its rights to the Superman property and seek redress for the wrongful conduct of Toberoff and entities he controls.  This Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. §§ 1331, 1338, and 1367, under the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, and under the Court's supplemental jurisdiction.

2.      Under certain narrowly defined circumstances, the Copyright Act permits authors and specified heirs to terminate copyright grants and recapture those interests from the original grantees.  These provisions of the Copyright Act also protect original grantees—such as DC Comics—by confining termination rights to certain classes of individuals in a specified time frame and manner, limiting the types of works that may be terminated, and creating an exclusive statutory period during which only the original grantee may enter into new agreements with the author or heirs to continue creating new works under the recaptured copyrights.

3.      In derogation of these provisions of the Copyright Act and the rights of DC Comics, Toberoff and entities he controls orchestrated a web of collusive agreements concerning the Superman copyrights with the heirs to the co-creators of

---

[1] Throughout this introductory statement and in other parts of the Complaint, the term "DC Comics" is used as shorthand for both DC Comics and its predecessors in interest.  The specific identities of relevant corporate entities are identified *infra*.

COMPLAINT

Superman, Jerome Siegel and Joseph Shuster.  By these agreements, Toberoff purported to secure a majority and controlling financial stake in copyright interests in Superman assertedly held by the Siegel and Shuster heirs and preclude the heirs from freely entering into new agreements with DC Comics for the continued exploitation of Superman.  As detailed below, these agreements are unlawful under the copyright laws, are void as against public policy, and both violate DC Comics' rights and threaten the ongoing viability of the Superman property.

4.      During their lifetimes, Jerry Siegel and Joe Shuster—both well aware of the termination provisions in amendments to the Copyright Act—never once sought to terminate any of DC Comics' copyright interests.  Instead, Siegel and Shuster rightly honored their agreements with DC Comics, under which they and their families enjoyed lifetime compensation and other benefits.  After their deaths, Siegel and Shuster's heirs reached similar agreements with DC Comics—the Shuster heirs in 1992, and the Siegel heirs in 2001.  These agreements provided the heirs substantial compensation and fully and finally resolved any claims of termination to any rights in Superman and confirmed that DC Comics owned all right, title, and interest in and to Superman.

5.      In or about 2001, Toberoff learned of these agreements between DC Comics and the Siegel and Shuster heirs and engineered a course of conduct to induce the heirs to repudiate those agreements, file invalid and erroneous copyright termination notices, and enter into new agreements with Toberoff and his companies netting him the controlling stake in the heirs' asserted interests in Superman.

6.      Toberoff induced the Shuster heirs to repudiate their 1992 agreement with DC Comics and enter into a 50/50 joint venture with defendant Pacific Pictures Corporation, a company wholly owned and controlled by Toberoff, pursuant to which the heirs conveyed the entirety of their purported Superman copyright termination rights to the venture.  The stated purpose of the venture was

1    to secure and exploit DC Comics' copyright interest in Superman.  Toberoff
2    procured this joint-venture agreement even though he knew that the Shusters' 1992
3    agreement with DC Comics operated to grant any and all of the heirs' interest in
4    Superman to DC Comics and extinguish any termination rights the heirs might have
5    held.  Toberoff also induced the Shuster heirs to serve a notice of termination
6    purporting to terminate and recapture alleged interests they had granted to DC
7    Comics under the parties' 1992 agreement.  This termination notice was invalid:
8    among other defects, it was filed by a party lacking the necessary majority interest
9    to terminate.  Furthermore, any putative right to terminate held by Joe Shuster
10   ceased to exist when he died having elected not to exercise it during his lifetime and
11   having died without leaving a surviving spouse, child, or grandchild to inherit and
12   exercise it.

13          7.       Toberoff similarly induced the Siegel heirs to repudiate their 2001
14   agreement with DC Comics.  After years of negotiations following a termination
15   notice sent by the Siegel heirs in 1997, DC Comics and the Siegel heirs reached an
16   agreement providing that DC Comics would retain all rights to Superman and
17   entitling the Siegels to receive a significant portion of the Superman profits.

18          8.       Toberoff became aware of the existence of the 2001 agreement
19   between the Siegels and DC Comics and understood it diminished his stake in the
20   putative Superman rights held by his joint venture with the Shusters.  In pursuit of
21   his plan to corner and control all potential Superman termination rights and thereby
22   block further exploitation of the property by DC Comics, Toberoff set out to derail
23   the 2001 Siegel agreement.  Among other things, Toberoff falsely represented to
24   the Siegels that if they repudiated their agreement with DC Comics and entered into
25   an agreement with him instead, a "billionaire investor" was prepared immediately
26   to pay the Siegels $15 million for their Superman rights, plus a generous back-end
27   profit participation in any future exploitations of the Superman property.  Toberoff
28   also falsely represented that he would help the Siegels produce their own Superman

COMPLAINT

motion picture that would compete successfully with a Superman motion picture that Warner Bros.—DC Comics' licensee—was then developing.  Based on Toberoff's inducements, the Siegels repudiated their 2001 agreement with DC Comics, terminated the employment of their then-law firm Gang, Tyre, Ramer & Brown, and entered into agreements with Toberoff and defendant IP Worldwide LLC, an entity controlled by Toberoff.  Under these agreements, Toberoff and his company received a 45% interest in any recovery by the Siegels—an 800% increase over the 5% fee in the Siegels' agreement with the Gang Tyre firm.

9.     As a result of his arrangements with both the Shuster and Siegel heirs, Toberoff secured control of the largest financial stake in the collective, putative Superman termination rights (*i.e.*, Toberoff—47.5%; Siegel heirs—27.5%; Shuster heirs—25%).  Toberoff sought further control, however.  In order to assert that DC Comics had *no* further rights to exploit the derivative Superman character "Superboy"—including in the highly popular *Smallville* network television series— Toberoff manufactured the position that Jerry Siegel *alone*—to the exclusion of Shuster—was the sole creator of Superboy.  Toberoff did so with full knowledge that his 2001 agreement with the Shusters explicitly confirmed the *Shusters'* asserted joint rights in Superboy, consistent with the long-held view of Shuster, Siegel, and their heirs that Superboy was jointly created by Shuster and Siegel.[2]

10.     Despite these incontestable facts concerning Superboy's creation— facts which Joe Shuster, Jerry Siegel, their heirs, and even Toberoff and his companies ratified and affirmed over time—Toberoff caused to be filed in 2002, on behalf of the Siegels, a copyright termination notice falsely stating that Siegel was the *sole* creator of Superboy.  He then induced the Shusters in 2003 to amend their joint venture agreement with Pacific Pictures to *delete* all references to Superboy.

---

[2] As explained below, DC Comics fully agrees that Shuster and Siegel jointly contributed to Superboy.  It is DC Comics' position, however, that Superboy is a work entirely derivative of Superman and that Superboy is not subject to termination under the Copyright Act's termination regime.

The deletion of Superboy was directly contrary to the Shusters' interests and occurred solely to park *all* of the alleged Superboy rights with the Siegels.  Having manipulated the Superboy rights in favor of the Siegels, and directly contrary to copyright filings that the Siegels and Shusters had previously made, Toberoff then filed a termination notice on behalf of the Shusters that purported to terminate only Superman rights, leaving out all mention of Superboy.  These artifices positioned the Siegels to claim 100% ownership of Superboy in order to bring a copyright infringement claim against DC Comics, Warner Bros., and the *Smallville* series, which they filed in 2004—and which remains pending today.

11.     Yet another component of Toberoff's scheme to gain complete control over the heirs to the putative Superman termination rights was preventing the Siegel and Shuster heirs from freely entering into agreements with DC Comics—even if it was in their respective economic interest to do so.  In violation of DC Comics' statutory period of exclusivity under the copyright laws, Toberoff induced the Siegels and Shusters to enter into agreements transferring their respective interests to his companies and preventing them from conveying any rights to DC Comics without each other's—and Toberoff's—consent.  As a result of these illicit agreements, DC Comics has been deprived of its ability to enter into agreements with the heirs to secure their purported termination rights, in violation of the Copyright Act, other laws, and public policy promoting the free and fair settlement of legal claims.

12.     To protect its rights under the copyright laws, agreements, and interests with the Siegels and Shusters and remove the cloud that Toberoff's actions have unlawfully placed over the Superman property and its future, DC Comics brings this action to seek declaratory judgments and other relief as set forth below.

## II.  PARTIES

13.     Plaintiff DC COMICS ("DC Comics") is a general partnership organized and existing under the laws of the State of New York and has its

1   principal place of business in the State of New York.  DC Comics is the successor-

2   in-interest to all rights, including rights under copyright, relating to the Superman

3   works and character.

4        14.    Defendant PACIFIC PICTURES CORPORATION ("Pacific

5   Pictures") is a New York corporation organized under the laws of the State of New

6   York, and was registered as a foreign corporation doing business in the State of

7   California, with its principal place of business in the State of California and the

8   County of Los Angeles.  Upon information and belief, Toberoff is the sole

9   shareholder and registered agent for service of process of Pacific Pictures.  Upon

10   information and belief, Pacific Pictures forfeited its active status as a New York

11   corporation and as a registered foreign corporation in California as of early 2009.

12        15.    Defendant IP WORLDWIDE, LLC ("IP Worldwide") is a Delaware

13   limited liability company organized and existing under the laws of the State of

14   Delaware, and registered as a foreign entity doing business in the State of

15   California, which has its principal place of business in the State of California and

16   the County of Los Angeles.  Upon information and belief, Toberoff is the managing

17   and controlling member of IP Worldwide and owns the controlling interest therein.

18        16.    Defendant IPW, LLC ("IPW") is a California limited liability

19   company organized and existing under the laws of the State of California, which

20   has its principal place of business in the State of California and the County of Los

21   Angeles.  Upon information and belief, Toberoff is the managing and controlling

22   member of IPW, is its registered agent for service of process, and owns the

23   controlling interest in IPW.  Upon information and belief, IPW is a successor-in-

24   interest to all or part of IP Worldwide's interests.

25        17.    Defendant MARC TOBEROFF ("Toberoff") is an individual who

26   resides in the County of Los Angeles in the State of California, and upon

27   information and belief, is and at all times has been a citizen of the United States.

28

COMPLAINT

1   Upon information and belief, Toberoff is a shareholder and member of defendants

2   PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; and IPW, LLC.

3       18.    Defendant MARK WARREN PEARY ("Mark Peary" or "Peary") is

4   an individual who resides in the State of New Mexico and is, and at all times has

5   been, a citizen of the United States.  Peary is the nephew of Joseph Shuster, and a

6   California court appointed him as the personal representative of the Shuster Estate.

7       19.    Defendant ESTATE OF JOSEPH SHUSTER ("Shuster Estate") is a

8   probate estate established by the Los Angeles Superior Court on August 25, 2003

9   (Case No. BP-080635).

10      20.    Defendant JOANNE SIEGEL ("Joanne Siegel") is an individual who

11  resides in the County of Los Angeles in the State of California and is, and at all

12  times has been, a citizen of the United States.  Joanne Siegel is the widow of

13  Jerome Siegel.

14      21.    Defendant LAURA SIEGEL LARSON ("Laura Siegel Larson") is an

15  individual who resides in the County of Los Angeles in the State of California and

16  is, and at all times has been, a citizen of the United States.  Laura Siegel Larson is

17  the daughter of Jerome Siegel and Joanne Siegel.

18      22.    Upon information and belief, Toberoff is, and at all relevant times has

19  been, the sole shareholder and principal of Pacific Pictures and a member and

20  principal of IP Worldwide and IPW.  Upon information and belief, Toberoff is the

21  alter ego of Pacific Pictures, IP Worldwide, and IPW, in that there is, and at all

22  relevant times has been, such unity of interest between Toberoff, Pacific Pictures,

23  IP Worldwide, and IPW that any individuality and separateness between them did

24  not and does not exist, and adherence to the fiction of the independent and separate

25  existence of Pacific Pictures, IP Worldwide, and IPW distinct from each other and

26  Toberoff would promote injustice and inequity.

27      23.    Upon information and belief, the fictitiously-named DOES 1-10 are in

28  some manner responsible for the events giving rise to the claims set forth herein.

COMPLAINT

1  The true names and capacities of such fictitiously-named defendants, whether

2  individual, corporate, or otherwise, are presently unknown to DC Comics.  DC

3  Comics will amend this Complaint to assert the true names and capacities of such

4  fictitiously-named defendants when this information has been ascertained.  Each

5  reference herein to a named defendant shall also refer to DOES 1-10.

### III.  JURISDICTION AND VENUE

7       24.    As noted, the Court has subject matter jurisdiction over the claims set

8  forth herein pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.  The Court has original

9  jurisdiction over DC Comics' claims arising under the Copyright Act and

10 supplemental jurisdiction over its related state-law claims.

11      25.    The Court has personal jurisdiction over defendants, *inter alia*,

12 because a substantial part of the events giving rise to the claims set forth herein

13 occurred in the State of California and the defendants have extensive contacts with

14 the State, including the following:

15          a.    Defendants Marc Toberoff, the Shuster Estate, and Peary

16          established a joint venture in California under California law for the

17          purpose of terminating and recapturing prior grants of the copyrights at

18          issue in this action.

19          b.    On behalf of the Shuster Estate, Peary filed a probate action in

20          Los Angeles Superior Court—which, upon information and belief,

21          remains pending—in order to effectuate the purpose of the California

22          joint venture.  A California court appointed Peary as executor of the

23          Shuster Estate, and Peary serves in that capacity as a matter of

24          California law.  In that capacity, Peary served one of the copyright

25          termination notices at issue in this action.

26          c.    Upon information and belief, defendants Pacific Pictures and IP

27          Worldwide are foreign entities registered as doing business in the State

28          of California, and they have their principal places of business and are

1    headquartered in the State of California and the County of Los

2    Angeles.

3         d.     Upon information and belief, defendant IPW is a California

4    limited liability company organized and existing under the laws of the

5    State of California and has its principal place of business and

6    headquarters in the State of California and the County of Los Angeles.

7         e.     Defendants Toberoff, Joanne Siegel, and Laura Siegel Larson

8    reside and conduct business in the State of California and the County

9    of Los Angeles.

10         f.     Defendants Joanne Siegel and Laura Siegel Larson filed two

11    related actions against DC Comics in this District and Court to resolve

12    ownership of the rights in Superman and Superboy.  (Case Nos. CV-

13    04-8400 ODW, CV-04-8776 ODW).

14        26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

15    Defendants are subject to personal jurisdiction in this District, and a substantial part

16    of the events giving rise to the claims set forth herein occurred in this District.

17        **IV.  FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

18    **A.    DC Comics' Development of Superman**

19        27.     In the 1930s, Jerome Siegel (a story writer in Cleveland) and Joseph

20    Shuster (an illustrator, and Siegel's peer) conceived of a fictional character named

21    "Superman," whom they originally envisioned as a criminal mastermind, and then

22    reconceived as a hero fighting for social justice.  Aside from the name, the

23    character shared little similarity with the figure that would later become known

24    throughout the world as Superman.  Between 1933 and 1937, Siegel and Shuster

25    submitted the Superman comic strips to a number of prospective publishers and

26    newspaper syndicates, all of which rejected them.

27        28.     A company that would come to be known as DC Comics—and for

28    whom Siegel and Shuster worked for hire developing fictional characters—would

COMPLAINT

eventually decide to publish a 13-page comic story featuring "Superman" in the first issue of a 64-page comic book entitled "Action Comics." This original version of Superman had few, limited powers, and his fictional world and back-story were not well developed.

29.    Months before this "Action Comics" book ("Action Comics No. 1") was published, Siegel and Shuster entered into, on December 4, 1937, an "Agreement of Employment" with Detective Comics, Inc. ("DCI"), a predecessor-in-interest to DC Comics (the "December 4, 1937 Agreement"). Siegel and Shuster renewed their employment arrangement with DCI in agreements on September 22, 1938 (the "DCI September 22, 1938 Agreement" and "McClure September 22, 1938 Agreement") and December 19, 1939 (the "December 19, 1939 Agreement").

30.    In 1938, at the instance and expense of DCI and subject to its right of control, Siegel and Shuster adapted the preexisting Superman comic strips they had created and added new material to create the 13-page comic book story entitled "Superman." This story—like all the Superman works that Siegel and Shuster thereafter created—was created for DC Comics as a work made for hire. Moreover, Siegel and Shuster only contributed to a part of this work. Upon information and belief, Shuster submitted black-and-white illustrations to DCI that were later colorized by printers or engravers working at DCI's direction. DCI also prepared one or more cover illustrations for Action Comics No. 1, which depicted Superman and was published in other comic books prior to the publication of Action Comics No. 1. Action Comics No. 1 itself was published in April 1938.

31.    To the extent Siegel and Shuster created any copyrightable Superman-related works outside their work-for-hire relationship with DC Comics, those works consisted solely of certain panels and portions of the Action Comics No. 1 comic book and other minor creations in the 1930s, which Siegel and Shuster conveyed to DC Comics in 1937 and 1938. In an agreement dated March 1, 1938 (the "March 1, 1938 Agreement"), and as required by the December 4, 1937 Agreement, Siegel

COMPLAINT

1   and Shuster again assigned to DCI all of their rights in Superman, including "all
2   good will attached thereto and exclusive right to the use of the characters and story,
3   continuity and title of strip."  Siegel and Shuster confirmed DCI's sole and
4   exclusive ownership of all Superman rights in the DCI September 22, 1938
5   Agreement and December 19, 1939 Agreement.

6          32.    The initial appearance of Superman in Action Comics No. 1 presented
7   a limited view of the character.  The readers learn only that Superman was sent to
8   Earth as an infant aboard a space ship from an unnamed planet that was destroyed
9   by old age.  He secretly possessed five super-human powers:  the abilities to leap
10  1/8 of a mile; hurdle a twenty-story building; raise tremendous weights; run faster
11  than an express train; and repel bullets and knives by virtue of his "tough skin."  In
12  his alter-ego life, Superman was depicted as Clark Kent, a mild-mannered
13  newspaper reporter for "The Daily Star," with a female co-worker named "Lois,"
14  whose last name is not mentioned.  In his life as Superman, he was depicted as a
15  costumed figure who uses his super-human abilities to fight crime.  In Action
16  Comics No. 1, Superman is said to have grown up in an orphanage and is depicted
17  (both in words and images) as a child with super-human strength.

18         33.    Since the publication of Action Comics No. 1 in 1938, DC Comics—
19  with its teams of work-for-hire writers and artists (including Siegel and Shuster)—
20  has added more than 70 years of material defining, updating, expanding, and
21  improving upon the Superman myth and creating a continuous flow of new exploits
22  and characters, resulting in a vast Superman "universe."  DC Comics has authored,
23  published, and distributed hundreds of millions of copies of thousands of comic
24  book issues throughout the United States and abroad depicting the adventures of
25  Superman.  These comic books have been authored and illustrated by dozens of DC
26  Comics' talented staff writers and artists.  DC Comics has also created, developed,
27  distributed, and licensed numerous feature-length motion pictures, motion-picture
28  serials, radio serials, television shows, novels, and live theatrical presentations

COMPLAINT

based on Superman. Indeed, the radio, television, and motion-picture projects in particular—with which Siegel and Shuster had nothing or little to do—were largely responsible for spreading the Superman myth and popularity and expanding the Superman storyline.

34.     As a result of DC Comics' significant and sustained investment in and stewardship of Superman—and 70-plus years of character and story development by some of the most creative and talented minds in the comic-book, radio, television, and motion-picture industries—Superman has remained constantly in the public's eye and has become one of the most famous and beloved fictional characters in the world. Over these 70 years, Superman has evolved from the few black-and-white illustrations originally drawn by Shuster into a full-blown, color character inhabiting a multi-dimensional universe.

35.     DC Comics' development of Superman over many decades has represented a continuous and ever-evolving portrayal of the character, featuring new elements in the Superman back-story, new super-powers, new characters, and changes in Superman's appearance. Many of the most famous story elements and characters associated with Superman were developed long after 1938 and by illustrators and story writers other than Shuster and Siegel working for hire for DC Comics. These include stories about and depictions of: (a) "Smallville," the town where Superman grew up; (b) "Kryptonite," or surviving fragments of the destroyed planet Krypton, which have the power to harm or affect Superman; (c) the "Fortress of Solitude," Superman's secret headquarters outside Metropolis (traditionally located in the Arctic, but also placed in the Andes and Amazon rainforest); (d) the "Daily Planet" newspaper, where Clark Kent would go to work; (e) Jimmy Olsen and Perry White, Kent's co-workers at the Daily Planet; (f) love interests, such as Lana Lang; (g) villains, such as Lex Luthor and Brainiac; (h) Superman's adoptive parents, the Kents; and (i) other allies, such as "Krypto" the Superdog as well as Supergirl. Other aspects of Superman's evolution included

COMPLAINT

1   the development of new super-powers, including:  (a) the ability to fly (a key

2   component, especially of the Superman motion pictures); (b) super-vision, which

3   enables him to see through walls ("X-ray" vision); (c) telescopic vision, which

4   allows him to see across great distances; (d) "heat vision," which empowers him to

5   aim rays of extreme heat with his eyes; (e) super-hearing, which enables him to

6   hear conversations at great distances; (f) invulnerability to injury; and (g) the ability

7   to survive in outer space without protective gear.  It is this constant and

8   uninterrupted evolution of the Superman mythology that allows Superman to

9   remain a force in popular consciousness decades after so many contemporary

10  characters have been forgotten or deemed old-fashioned.

11  **B.**      **Early Disputes Regarding the Superman Rights**

12       36.    Siegel and Shuster served in a work-for-hire capacity for DCI from the

13  early 1930s through the late 1940s, helping draw and write Superman comic strips

14  and comic books.  Though paid substantial sums for their work—several million

15  dollars in today's economic terms—the relationship eventually became contentious.

16       37.    In 1947, Siegel and Shuster filed an action against DCI's successor,

17  National Comics Publications, Inc. ("National"), in the New York Supreme Court

18  in Westchester County (the "Westchester Action").  In the Westchester Action,

19  Siegel and Shuster sought to invalidate the March 1, 1938 Agreement.  They also

20  sought to recapture all rights in Superman, arguing that the DCI September 22,

21  1938 Agreement was obtained by duress.  Siegel and Shuster further challenged as

22  unauthorized DCI's publication in November 1944 of a series of comic-book

23  stories entitled "Superboy," which featured the adventures of Superman as a youth.

24       38.    On November 21, 1947, a referee in the Westchester Action issued an

25  opinion after trial (the "Westchester Opinion") holding that the March 1, 1938

26  Agreement assigned "all" of the Superman rights to DCI, and that the DCI

27  September 22, 1938 Agreement was valid and not obtained under duress.  The

28  referee found that DCI had acted improperly in publishing Superboy.

- 13 -

39.     At the referee's request, the parties to the Westchester Action submitted proposed findings of fact and conclusions of law.  On April 12, 1948, the referee adopted findings of fact and conclusions of law and issued an interlocutory judgment (collectively, the "Westchester Action Interlocutory Judgment"), in which he made statements based on a script that Siegel had submitted that Siegel originated and owned the comic strip Superboy to the exclusion of DC Comics. National filed a notice of appeal, and the Westchester Action Interlocutory Judgment was stayed pending appeal.

40.     Shortly thereafter, the parties to the Westchester Action entered into two separate agreements:  (a) a stipulation dated May 19, 1948 (the "May 19, 1948 Stipulation"); and (b) a consent judgment dated May 21, 1948 (the "May 21, 1948 Consent Agreement").  Under both documents, *inter alia*, Siegel and Shuster: (a) agreed to vacate the Westchester Action Interlocutory Judgment; (b) acknowledged that, pursuant to the March 1, 1938 Agreement, they transferred to DCI all rights in and to Superman, including "the title, names, characters, concept and formula" as set forth in Action Comics No. 1; and (c) agreed that National was the sole and exclusive owner of all rights in Superman and Superboy. In exchange, Siegel and Shuster were paid nearly $900,000 in today's dollars.

41.     Following the commencement of the Westchester Action, Siegel attempted to launch a new comic book and syndicated strip feature entitled "Funnyman."  The *Funnyman* comic book, however, was cancelled after only six issues, and the syndicated *Funnyman* strip was only picked up by a few newspapers and dropped prior to the end of 1949.  By the late 1950s, Siegel was unable to find employment in the comic book field and needing to support his family, he approached DC Comics asking for work.  Despite Siegel's prior lawsuit and challenge to DC's rights in Superman, DC Comics agreed to hire Siegel and thereafter employed him continuously as a work-for-hire writer until the mid-1960s, when Siegel once again challenged DC Comics' rights to Superman.

COMPLAINT

42.     In April 1965, Siegel (while still working for DC Comics) and Shuster (who was being paid a monthly stipend by DC Comics) filed copyright renewal notices in their own names, claiming to own the renewal copyrights in the Superman character and in Action Comics No. 1. This was followed by a lawsuit filed by Siegel and Shuster against National in 1969 in the District Court for the Southern District of New York, seeking a declaration that they owned the "renewal" copyright terms for Superman and Action Comics No. 1. (Under the then-applicable 1909 Copyright Act, the period of copyright protection for a work included an initial term of 28 years and an optional renewal term of 28 years.) Again, Siegel and Shuster's arguments were rejected, and the federal district court held, *inter alia*, that the agreements between Siegel and Shuster, on the one hand, and DCI (later National), on the other, had assigned "all" rights in Superman to DCI and National, including all renewal copyrights. *See Siegel v. Nat'l Periodical Publ'ns, Inc.*, 364 F. Supp. 1032 (S.D.N.Y. 1973). The Court of Appeals for the Second Circuit affirmed the district court's ruling that National owned all rights in Superman. *See Siegel v. Nat'l Periodical Publ'ns, Inc.*, 508 F.2d 909 (2d Cir. 1974). Siegel and Shuster did not further appeal that ruling.

43.     Following the failure of their second lawsuit to recapture copyrights in Superman, Siegel and Shuster ran into financial difficulties. Siegel publicized their financial plight, and there were calls for companies like National (and even for Congress) to help such artists. On December 23, 1975, and despite Siegel and Shuster's two prior lawsuits against National, Warner Communications, Inc. ("WCI"), National's then-parent company, agreed to provide them financial assistance. Under an agreement entered into in 1975 (the "1975 Agreement"), Siegel and Shuster again acknowledged that DC Comics was the sole and exclusive owner of "all right, title and interest in and to the 'Superman' concept, idea, continuity, pictorial representation, formula, characters, cartoons and comic strips, title, logo, copyrights and trademarks, including any and all renewals and

COMPLAINT

1   extensions of such rights, in the United States and throughout the world, in any and
2   all forms of publication, reproduction and presentation, whether now in existence or
3   hereafter devised." In exchange, WCI agreed to provide Siegel and Shuster with,
4   *inter alia*, annual payments of $20,000 each (around $80,000 in current dollars),
5   annual payments to their heirs after their death, medical insurance coverage, and a
6   lump sum of $17,500 each. With respect to Shuster's heirs, WCI agreed that after
7   Shuster's death, it would make annual payments to his brother, Frank Shuster, of
8   $10,000 until December 31, 1985, and then $5,000 a year for the rest of his life.

9       44.    In the years following the 1975 Agreement, DC Comics increased the
10   annual payments to Siegel and Shuster, made periodic cost-of-living increases,
11   provided insurance, and paid special bonuses. During the last several years,
12   Siegel's widow, for example, has received $135,000 per year plus reimbursement
13   for all medical expenses. In all, DC Comics has paid Siegel, Shuster, and their
14   heirs nearly $4 million pursuant to the 1975 Agreement and other arrangements—
15   benefits that DC Comics continues to pay, and the Siegel and Shuster heirs continue
16   to accept.

17       45.    In 1976, Congress amended the Copyright Act to give authors and
18   certain of their heirs certain limited rights to terminate prior grants of copyright.
19   *See* 17 U.S.C. § 304(c) (1976). This amendment did not apply to works-made-for
20   hire (the company paying for the production of those works would always own
21   them), and entitled authors and certain heirs to recapture copyrighted interest only
22   in works that the *author* actually created (*e.g.*, it did not entitle authors to recapture
23   derivative works the grantee may have developed pursuant to the original grant,
24   such as the original Superman radio and television shows, or Superman-related
25   characters, such as "Superboy" or "Lex Luthor"). Despite their previous legal
26   battles with National and the widespread publicity surrounding this legislation,
27   neither Jerry Siegel nor Joe Shuster ever endeavored to exercise any termination
28   rights under the statute. Instead, for the rest of their lives, Siegel and Shuster

1   accepted and enjoyed the benefits under the 1975 Agreement.  This decision made

2   sense, given Siegel and Shuster's work-for-hire relationship with DC Comics, the

3   narrow sliver of rights (if any) to which they might claim an interest, and the

4   significant contributions made to Superman in the past 70 years to which they could

5   claim no interest.  Moreover, the 1975 Agreement paid Shuster and Siegel an

6   annual pension and medical insurance for the rest of their lives and, upon their

7   death, paid annual pensions to their heirs.  Although Shuster's and Siegel's

8   "window of time" in which to attempt to terminate prior grants of copyright

9   interests in Superman theoretically opened in 1984, at no time during their lives did

10  they attempt to exercise any such right.

11  **C.     Joe Shuster's Death and the Shuster Heirs' 1992 Agreement**

12  46.     Joe Shuster passed away on July 30, 1992.  He was survived only by

13  his brother Frank Shuster, sister Jean Peavy, and Jean's two children, Mark Peary

14  and Dawn Peavy (the "Shuster Heirs").  (Mark Peary changed his last name from

15  "Peavy" to "Peary.")  Shuster did not leave a widow and never had children or

16  grandchildren.  Shuster's purported will names Jean Peavy the sole beneficiary of

17  his estate.  (An alleged copy of this will surfaced and was probated in 2001, only

18  after Toberoff intervened.  In addition to certain irregularities in the will, probate

19  papers filed by the Shuster Heirs falsely represented that Joe Shuster was never

20  married and omitted that Joe had a sibling, Frank, who had also survived him.)

21  47.     On August 21, 1992, Jean Peavy sent a letter to Time Warner and DC

22  Comics explaining that Shuster had "left his family with a crushing burden of

23  unpaid debts and bills and only a tiny estate."  Jean stated:  "It's unbelievable to me

24  that Joe could have so little considering the generosity shown by Time Warner in

25  raising the pension income of Siegel and Shuster."  She also disclosed that 20% of

26  Shuster's income had been taken by Joanne Siegel, Jerome Siegel's widow, "as an

27  agent's commission for getting pay raises for Siegel and Shuster" following the

28  December 23, 1975 Agreement.  Much of the remainder of Shuster's income was

- 17 -

COMPLAINT

spent by him during "compulsive buy[ing]" and "shopping sprees" and on expensive stereo equipment and other personal items.  As a result, Shuster had accumulated "almost $20,000 in credit card debts and unpaid bills."  Jean asked that Time Warner and DC Comics "pay his final debts and expenses."

48.    In September 1992, Time Warner and DC Comics offered to pay off Shuster's debts and expenses, totaling approximately $20,000, plus increase Frank Shuster's annual survivor payments under the 1975 Agreement from $5,000 to $25,000 per year.

49.    In a September 10, 1992 letter sent to DC Comics (the "September 10, 1992 Letter"), Frank Shuster, on behalf of himself and Jean, requested that the annual payments due and owing Frank be made to Jean Peavy in order to take advantage of certain tax benefits.  Frank and Jean further promised that, if an agreement could be reached, Jean "would not pursue the termination of the Superman copyright as provided for to creators' heirs in the 1976 U.S. Copyright Act."

50.    Based on Jean and Frank's letter and the parties' further discussions, DC Comics, Jean, and Frank entered into a written agreement on October 2, 1992 (the "1992 Agreement").  The 1992 Agreement confirmed that it "fully settles all claims to any payments or other rights or remedies which you may have under any other agreement or otherwise, whether now or hereafter existing regarding the copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon," and that the Shuster Heirs "covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever."  The 1992 Agreement operated to revoke, rescind, and replace Shuster's prior copyright grants and agreements.

51.    After the 1992 Agreement, DC Comics and the Shuster Heirs enjoyed an amicable relationship with the Shuster Heirs.  To date, DC Comics and its affiliates have paid the Shuster Heirs close to $500,000 under the 1992 Agreement.

COMPLAINT

1   On April 27, 1995, Jean Peavy sent a letter to DC Comics expressing gratitude for

2   their generosity and concluding: "You know we appreciate your thoughtfulness."

3   Even after Frank Shuster's death in 1996, DC Comics has continued to this day to

4   pay $25,000 per year to Jean Peavy.

5   **D.   Toberoff Induces the Shusters to Repudiate the 1992 Agreement with**

6   **DC Comics and Acquires a 50% Interest in the Shusters' Putative Rights**

7         52.   This state of affairs remained undisturbed for almost a decade.  In

8   2001, Toberoff and his production company, Pacific Pictures, induced the Shuster

9   Heirs to violate their 1992 Agreement and wrongfully attempt to acquire and

10   exploit future copyright interests in Superman.

11         53.   Toberoff is a self-described "intellectual property entrepreneur."  His

12   business—conducted through a variety of corporate entities like Pacific Pictures—

13   is to locate the authors of valuable copyrighted works or their heirs and acquire, or

14   prevent them from conveying to others asserted rights to present or future copyright

15   interests.  To convince these authors and heirs to go into business with him,

16   Toberoff holds himself out as a producer with the financial resources and

17   connections to exploit recaptured rights in all media in the entertainment industry.

18         54.   In or around 2001, Toberoff made contact with the Shuster Heirs and

19   embarked on a course of conduct with them to disrupt their relationship with DC

20   Comics, including DC Comics' rights under the 1992 Agreement.  On November

21   28, 2001, the Shuster Heirs formed a joint venture with Toberoff's company Pacific

22   Pictures ("2001 Pacific Pictures Agreement") for the stated "purpose of retrieving,

23   enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims,

24   copyrights, property, title and interests in and to Joe Shuster's creations."  The 2001

25   Pacific Pictures Agreement provided that this purpose would be realized "via the

26   establishment of Joe Shuster's estate" in a California probate court "and the estate's

27   termination pursuant to [17 U.S.C. § 304] of any and all grant or transfers by Joe

28   Shuster of any copyright interest in his creations."

55.     The 2001 Pacific Pictures Agreement defined the Shuster Heirs' rights being assigned as including all "rights, claims, title, copyrights and interests in and to each character, story element, and indicia associated with … 'SUPERMAN' [and] *Superboy*." (Italics added.)

56.     Pursuant to the 2001 Pacific Pictures Agreement, Jean and her son Mark Peary "transfer[red] and assign[ed] to the Venture their rights, title, and interest" in Shuster's Superman and Superboy rights. The Agreement provided that "[a]ny and all moneys and proceeds [of the Venture] will be shared, divided and payable: fifty percent (50%) to [the Shuster Heirs] and fifty percent (50%) to PPC [Pacific Pictures]," and that upon "winding-up of the Venture or in the event of termination of the Venture *for any reason*, all Rights, property or assets of the Venture will be held fifty percent (50%) by the [Shuster Heirs] and fifty percent (50%) by PPC." (Emphasis added.)

57.     The 2001 Pacific Pictures Agreement also provided that the Shuster Heirs could not enter into any agreement with respect to the Superman and Superboy rights "without the express written consent" of Pacific Pictures, an entity controlled solely by Toberoff. The 2001 Pacific Pictures Agreement further provided that the joint venture would "retain Marc Toberoff, Esq. to render legal services in connection with the Rights and the Venture."

58.     Pursuant to the 2001 Pacific Pictures Agreement, the Shuster Heirs filed a probate action in Los Angeles Superior Court to establish the Shuster Estate. That action remains open. (*See* LASC Case No. BP-080635.)

**E.     Toberoff Induces the Siegels to Repudiate the Siegel-DC Comics Agreement and Acquires a 45% Interest in the Siegels' Putative Rights**

59.     Having orchestrated this joint venture, Toberoff used the Shuster Heirs to gain access to the heirs of Jerry Siegel, Joanne Siegel and Laura Siegel Larson (collectively, the "Siegel Heirs"). Toberoff sought to corner the other putative "half" of putative Superman termination rights. Toberoff knew, however, that the

COMPLAINT

1   Siegels had reached an agreement with DC Comics in 2001 resolving their putative

2   termination claims.  Nevertheless, Toberoff and his companies set out to interfere

3   with this agreement in order to acquire a stake in the Siegel Heirs' putative

4   copyright interests in Superman.

5         60.    In 1997—and after Jerry Siegel's death in 1996—the Siegel Heirs had

6   employed counsel and served notices to terminate grants of Superman rights that

7   Siegel had conveyed to DC Comics (the "Siegel Superman Termination Notice").

8   The Siegel Superman Termination Notice, which was prepared by prior counsel,

9   listed Superboy works and elements as among the "character[s], story element[s], or

10  indicia reasonably associated with SUPERMAN," in recognition of the fact that

11  Superboy was a complete derivative of Superman rather than a stand-alone, non-

12  derivative work based upon Superman.

13        61.    The Siegel Heirs and DC Comics began negotiations, and in these

14  talks the Siegel Heirs were represented by Kevin Marks of the Gang Tyre

15  entertainment law firm.  As the parties' negotiations progressed, and as

16  expectations grew that an agreement would soon be reached, DC Comics paid the

17  Siegels a non-refundable advance of $250,000.

18        62.    On October 16, 2001, DC Comics made a proposal to the Siegel Heirs.

19  On October 19, 2001, Kevin Marks sent a letter to DC Comics confirming that the

20  Siegel Heirs "accepted D.C. Comics' offer of October 16, 2001."  On October 26,

21  2001, DC Comics sent a return letter confirming the parties' agreed-upon terms.

22  DC Comics then began drafting a long-form agreement.  DC Comics sent the Siegel

23  Heirs a copy of the long-form document on February 1, 2002.  As a result of the

24  parties' agreement (the "Siegel-DC Comics Agreement"), the Siegels were now on

25  the brink of receiving significant portions of the Superman profits—sums that

26  would immediately and dramatically change their lives.  Moreover, virtually all of

27  the money would be theirs alone to keep, as the Gang Tyre firm had agreed to

28  represent the Siegels for the standard 5% fee.

63.     Toberoff has admitted that he closely tracked the progress of the Siegel Heirs' termination attempt.  On learning of the Siegel-DC Comics Agreement, he knew his company's joint-venture interest in the Shuster rights was limited and that he could assert greater leverage only if he could disrupt the Siegel-DC Comics Agreement and corner both "halves" of the putative Superman termination rights. Given that Joe Shuster and his heirs held whatever Superman copyright interests they owned (*if any*) jointly with Jerome Siegel, Toberoff understood that if DC Comics obtained the rights from the Siegels to exploit new Superman properties, it could do so freely without any ability on the part of the Shusters to claim their interests were being infringed.

64.     With knowledge that his actions would interfere with DC Comics' actual and prospective economic advantages under the Siegel-DC Comics Agreement, beginning in or around late 2001, Toberoff—identifying himself as a film producer—approached the Siegel Heirs, including and/or through their representative Kevin Marks, for the purpose of acquiring their rights.

65.     Marks informed Toberoff that the Siegel Heirs had already reached a binding agreement with DC Comics, which was in the process of being further documented in a long-form agreement.  Undeterred, Toberoff continued to contact the Siegel Heirs and their representatives in an effort to induce them to repudiate the Siegel-DC Comics Agreement and enter into a production agreement with Toberoff or one of his companies.

66.     On May 9, 2002, as a result of Toberoff's improper interference and inducements, Joanne Siegel sent a letter to DC Comics' affiliate acknowledging the Siegel Heirs had accepted DC Comics' October 16, 2001 offer, but purporting to object to certain unspecified portions of the long-form document.  DC Comics objected to the Siegel Heirs' sudden and unfounded objections, but continued working with their counsel to finalize the long-form agreement.

COMPLAINT

67.     In or around August 2002, as Marks was finalizing the Siegels' revisions to the long-form document, Toberoff contacted Marks again regarding the Siegel-DC Comics Agreement.  Upon information and belief, Marks informed Toberoff he could not discuss the matter, including the terms of the agreement, because of a confidentiality agreement between DC Comics and the Siegel Heirs. Toberoff reiterated interest in purchasing the Siegel Heirs' Superman rights.  On August 8, 2002, Toberoff conveyed an offer to Marks for presentation to the Siegels, which Marks said he would convey.

68.     Upon information and belief, Toberoff's offer stated that he had found a billionaire investor willing to purchase the Siegel Heirs' Superman rights. Toberoff claimed the investor would give the Siegel Heirs $15 million cash up front, plus generous royalty and "back-end" rights on any properties developed, including a new Superman motion picture.  Upon information and belief, Toberoff also falsely offered to help the Siegel Heirs produce a movie that would compete directly with the Superman movie in development at the time at Warner Bros., DC Comics' licensee, even though he knew that the Siegels' limited rights in the recaptured copyright, if any, would make such a competing motion picture all but impossible to produce and distribute.

69.     Upon information and belief, although Marks conveyed Toberoff's offer to the Siegels, he advised them that they had already reached a binding agreement with DC Comics.  Nonetheless, as a result of Toberoff's inducements, the Siegel Heirs stated that they would repudiate their agreement with DC Comics and accept Toberoff's offer.

70.     On or around September 21, 2002, the Siegel Heirs sent a letter to Marks terminating him as their attorney.  On or around September 21, 2002, based on Toberoff's inducements, the Siegel Heirs sent a letter to DC Comics repudiating the Siegel-DC Comics Agreement.  On October 23, 2002, the Siegel Heirs formalized an agreement with defendant IP Worldwide for the purpose of

- 23 -

"arrang[ing] and negotiat[ing] the sale, lease, license and all other dispositions or exploitations" of the Siegel Heirs' Superman rights (the "IP Worldwide Agreement"). The Siegel Heirs agreed to pay IP Worldwide a fee of 10% of the gross proceeds generated by those rights. Upon information and belief, the fee was subsequently reduced to 5%.

71.   Upon information and belief, in or around September 2004, the Siegel Heirs entered into an agreement with Toberoff granting him 40% of their Superman rights and retaining him as their attorney (the "Siegel-Toberoff Agreement").

72.   Upon information and belief, as a result of the Siegel-Toberoff Agreement and IP Worldwide Agreement, Toberoff now owns a 45% financial interest in the Siegel Heirs' purported Superman rights.

**F.    Toberoff Manipulates the Siegel Heirs and Shuster Heirs into Falsely Claiming that Superboy Was the Sole Creation of Jerry Siegel**

73.   After inducing the Siegel Heirs to repudiate the Siegel-DC Comics Agreement, on November 8, 2002, Toberoff caused the Siegel Heirs to serve a second copyright termination notice on DC Comics directed at the character Superboy (the "Siegel Superboy Termination Notice"). The notice not only erroneously stated that Superboy was a copyrightable work not derivative of Superman, but falsely recited that Superboy was created *solely* by Siegel (without contribution from Shuster), thereby entitling the Siegel Heirs to terminate and recapture 100% of the putative Superboy rights.

74.   Defendants knew these claims were false. To begin, in the Siegel Superman Termination Notice served by the Siegel Heirs in 1997—the one served prior to Toberoff's intervention—the Siegel Heirs expressly identified the Superboy works and elements as among the "character[s], story element[s], or indicia reasonably associated with SUPERMAN." This earlier notice acknowledged—as is in fact the case—that Superboy was a derivative work of Superman, rather than a separately copyrightable work.

- 24 -

75.     As to the representation that Superboy was created solely by Jerry Siegel, defendants knew that claim was untrue as well.  Among other reasons:

- One year earlier, through defendant Pacific Pictures, Toberoff had entered into the 2001 joint venture agreement with the Shuster Heirs, specifying that the *Shuster Heirs* owned an interest in "Superboy."

- The original Superboy "script" on which the Siegel Heirs' ownership claims rely openly contains the byline:  "By Jerry Siegel *and Joe Shuster*"—not just Jerry Siegel alone.  (Emphasis added.)

- In 1972 and 1973, Siegel and Shuster together filed their own copyright renewal notices with the copyright office for Superboy, in which they identified Superboy as a work that they had *jointly* created.

- And long before the alleged first publication of "Superboy" in November 1944, Shuster illustrated works for DC Comics that included various depictions of Superman as a boy, exhibiting super-human strength.  Several examples are reproduced below.  In "Action Comics No. 1," for example, Shuster drew Superman as a very young boy displaying an "astonish[ing] feat[]" of super-human strength, holding a chair above his head:



Action Comics No. 1 (1930)

COMPLAINT

Shuster also depicted Superman as a youth with super-powers in "Superman No. 1," a work allegedly terminated by Shuster in the notice filed by Toberoff on behalf of the Shuster heirs,



Superman No. 1 (May 1939)

as well as in a 1942 Sunday comic strip, in which Superman as a "youth" discovers that his "amazing powers" are "multiplied with the years" and that, as a boy, he could "outrace the fastest streamline train":



Superman Sunday Strip (May 31, 1942)

76.     Through Pacific Pictures, Toberoff manipulated the Siegel and Shuster Heirs into falsely positioning Siegel as the sole creator of any putative

- 26 -

copyrightable elements in Superboy.  They did so to enable the Siegels to claim a sole ownership interest in Superboy elements allegedly subject to recapture and thereby prevent DC Comics from exploiting Superboy without the Siegels' authorization and without being subject to claims of copyright infringement. (Again, to be clear, DC Comics disputes that Superboy is not a derivative work of Superman and disputes that it is a work that Shuster and Siegel owned.)

77.    To manufacture this claim of sole ownership by the Siegels, Toberoff (acting through Pacific Pictures) caused the *Shuster Heirs* to remove from the 2001 joint venture between Pacific Pictures and the Shuster Heirs all claims by the Shusters to alleged rights in any and all Superboy elements.  Toberoff accomplished this by creating a new joint venture agreement—signed October 30, 2003—that *deleted* any reference to Superboy.  Defendant Mark Peary signed this agreement (the "2003 Pacific Pictures Agreement"), which omitted all references to Superboy in its description of the Shuster Heirs' rights.  Toberoff induced the Shuster Heirs to disclaim any interest in Superboy so that Toberoff could position the Siegel Heirs to recapture 100% of these rights and assert a copyright infringement action against DC Comics—and seek an injunction against the television program *Smallville* on that basis.

78.    In October 2004, the Siegels filed two actions in this Court seeking declaratory relief as to the validity of the Superman and Superboy termination notices, and in April 2005, the Siegels supplemented their pleadings in the Superboy action to assert copyright infringement.  (Case Nos. CV-04-8400 ODW; CV-04-8776 ODW.)  Both actions remain pending before this Court.

G.    **The Shusters' Flawed Termination Notice**

79.    On November 10, 2003, one week after the 2003 Pacific Pictures Agreement was signed, defendant Mark Peary served on DC Comics a "Notice of Termination of Transfer Covering Extended Copyright Renewal Term of 'Superman'" (the "Shuster Termination Notice").

80.     The form submitting the Shuster Termination Notice for recordation in the U.S. Copyright Office was certified under penalty of perjury by Toberoff on behalf of "IP Worldwide/Estate of Joseph Shuster."  IP Worldwide is the Toberoff entity which, upon information and belief, holds a portion of the Siegel Heirs' Superman and Superboy rights pursuant to the IP Worldwide Agreement.

81.     The Shuster Termination Notice purports to terminate, under 17 U.S.C. § 304(d), effective October 26, 2013, the following Shuster copyright grants: (a) the December 4, 1937 Agreement; (b) the March 1, 1938 Agreement; (c) the DCI September 22, 1938 Agreement; (d) the McClure September 22, 1938 Agreement; (e) the December 19, 1939 Agreement; (f) the May 19, 1948 Stipulation; and (g) the December 23, 1975 Agreement.

82.     The Shuster Termination Notice does *not* purport to terminate the copyright grants in the May 21, 1948 Consent Agreement or, even more importantly, the 1992 Agreement between the Shuster Heirs and DC Comics.

83.     The Shuster Termination Notice purports to apply to the following works:  (a) certain unpublished material created before Action Comics No. 1; (b) Action Comics No. 1; (c) Action Comics No. 2; (d) Action Comics No. 3; (e) Action Comics No. 4; (f) Action Comics No. 5; (g) Action Comics No. 6; (h) Action Comics No. 7; (i) Superman No. 1; and (j) Superman No. 3.

84.     The Shuster Termination Notice does not purport to terminate any copyright grant in pre-Action Comics No. 1 promotional materials or any materials relating to Superboy.

85.     The Shuster Termination Notice states that defendant Mark Peary "is the person entitled to exercise Joseph Shuster's termination interest" and that the Notice was "signed by all persons whose signature is necessary to terminate."  The Notice makes no mention of the joint venture that the Shuster Heirs and Pacific Pictures formed or its putative ownership stake in the to-be terminated Superman rights.  Nor does the Notice mention Pacific Pictures or its putative ownership stake

COMPLAINT

in the joint venture, despite the grant of 50/50 rights in the joint venture to Pacific Pictures pursuant to Pacific Pictures' 2001 and 2003 agreements with the Shusters.

86.   On September 10, 2004, Pacific Pictures and the Shuster Heirs signed a one-page letter (the "September 10, 2004 Letter") purporting to cancel their joint venture and providing that the 2001 Pacific Pictures Agreement and 2003 Pacific Pictures Agreement "have been cancelled." However, because the Shuster Heirs and Pacific Pictures had agreed that all rights held by their joint venture would be divided 50/50 upon termination of the joint venture "for any reason," the apparent effect of the September 10, 2004 Letter was to transfer 50% of the Shuster Heirs' purported share of Shuster's rights to Toberoff or his companies.

87.   DC Comics is informed and believes that Toberoff (or his companies) now own 50% of the Shuster Heirs' putative rights as well as the 45% share of the Siegel Heirs' putative rights. This gives Toberoff the largest financial stake among defendants' collective asserted rights in Superman and in the pending legal disputes concerning those rights (i.e., Toberoff—47.5%; Siegel Heirs—27.5%; Shuster Heirs—25%).

88.   DC Comics is also informed and believes that Toberoff, Pacific Pictures, IP Worldwide, the Siegels, and the Shusters have entered into one or more agreements preventing the Siegels or Shusters from conveying rights to DC Comics or entering into other agreements with DC Comics, including for the settlement of their putative termination claims or litigation, without the consent of other parties. For example, in the 2003 Pacific Pictures Agreement, the Shuster Heirs agreed not to settle any claims with respect to the Superman rights without Pacific Pictures' or Toberoff's consent. Such consent agreements are void as against public policy, violate DC Comics' rights, and impede the administration of justice.

**H.    Toberoff's Wrongful Conduct Is Revealed to DC Comics in the Toberoff Timeline**

89.    Pursuant to federal court orders dated September 26, 2008 and December 4, 2008, Toberoff was compelled to produce to DC Comics a document titled "Superman – Marc Toberoff Timeline" ("Toberoff Timeline," attached hereto as Exhibit A), which Toberoff has acknowledged was written by an attorney he previously employed.  To prevent DC Comics from obtaining and using the document, Toberoff asserted to the federal court that it was privileged, but his position was rejected.  Toberoff produced the Toberoff Timeline to DC Comics on December 10, 2008.

90.    The Toberoff Timeline describes and discloses Toberoff's wrongful activities in pursuing the Siegel and Shuster Heirs' putative interests in the Superman rights.  It lays out Toberoff's scheme to induce the Siegel Heirs to repudiate the Siegel-DC Comics Agreement with DC Comics (*e.g.*, "It [is] clear at this juncture that [Toberoff] thwarted the earlier deal with Time Warner and DC Comics in 2002 for his own personal gain"); his efforts to acquire as "much ownership of the Superman copyright <u>personally</u> as he can"; and his attempt to conceal certain of his illicit activities from the Siegel and Shuster Heirs.  (Emphasis in original.)  As a result, "***the single person who would stand to gain the MOST in a settlement with Time Warner [and DC Comics] regarding the ongoing SUPERMAN legal dispute would not be the heirs themselves, but Marc Toberoff.***"  (Emphasis in original.)

91.    The Toberoff Timeline discloses many of the facts alleged herein, and concludes:  "[Toberoff] is solely motivated *at all times* not by his clients' interests, but manipulating pieces of the puzzle so that he may receive the greatest percentage from a very possible large Time Warner settlement, through part ownership and unconscionable fees."  (Emphasis in original.)  The Toberoff Timeline explains that "[a]t least 7 attorneys have come and gone at the Law Offices of Marc Toberoff,

COMPLAINT

and many have left due to ethical issues." Many of these and other disturbing, salient facts detailed herein have only recently come to light in the past 18 months.

## V.  CLAIMS FOR RELIEF

**A.**   **First Claim for Relief:  Declaratory Relief re: Invalidity of Copyright Termination Notice (Against Defendants Shuster Estate and Peary)**

92.   DC Comics re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

93.   The Shuster Termination Notice is invalid, and thus ineffective, for at least five separate, independent, and alternative reasons:

### (1) There Is No Statutory Basis for the Shusters to Terminate

94.   The Copyright Act does not provide any basis for the Shuster Estate to terminate.  Shuster's termination right was lost when he died in 1992 without having exercised it and without leaving a statutory heir to inherit it under the then-applicable provisions of the Copyright Act.

95.   The 1976 Copyright Act gave authors the ability to terminate certain pre-1978 copyright grants.  According to the original termination provisions: "Where an author is dead, his or her termination interest is owned, and may be exercised, by his widow or her widower and his or her children or grandchildren." 17 U.S.C. § 304(c)(2) (1976).  In other words, the right of termination could only be exercised by an author during his or her lifetime, or by a widow, child, or grandchild after the author's death.  As the language of the statute establishes, and its legislative history confirms, the right of termination was lost if an author died without exercising it and without leaving a widow, child, or grandchild to inherit it.

96.   Shuster could have exercised his putative termination right beginning in April 1984.  The 1976 Copyright Act provided that a copyright grant could be terminated 56 years after the date copyright was first secured (*i.e.*, April 1994, or 56 years after the April 1938 publication of Action Comics No. 1), and that notice of

1  termination could be served 10 years before the termination date (*i.e.*, April 1984,

2  or 10 years before April 1994).  17 U.S.C. § 304(c)(3)-(4).

3         97.    During his lifetime, Shuster chose not to exercise his termination right.

4  Shuster died in 1992, and did not leave a widow, child, or grandchild to succeed to

5  his termination right under section 304(c) of the 1976 Copyright Act.  As a result,

6  Shuster's termination right ceased to exist on his death.

7         98.    The 1999 Copyright Term Extension Act ("CTEA") extended the term

8  of copyright by 20 years and also provided an opportunity to authors and selected

9  heirs to terminate for this new extended time period in circumstances where the

10  "[t]ermination rights provided for in subsection (c) have expired on or before the

11  effective date of the [CTEA]," or October 27, 1998, and the "author or owner of the

12  termination right has not previously exercised such termination right."  17 U.S.C.

13  § 304(d).  Where section 304(d) applies, section 304(c)(2) provides that if an author

14  is dead, the termination right can be exercised by his widow, children, or

15  grandchildren or, "[i]n the event that the author's widow or widower, children or

16  grandchildren *are not living*, the author's executor, administrator, personal

17  representative, or trustee…."  (Emphasis added).  These are the provisions that

18  defendant Mark Peary, the executor of the Shuster Estate, purports to rely on in the

19  Shuster Termination Notice, but they have no application here.  By its own terms,

20  section 304(d) only applies where an author's window for exercising the

21  termination right opened and closed or "expired" (*not* when an author died while

22  the window was open without exercising the right or leaving any heirs to do so),

23  and where a deceased author's widow, child, or grandchild is "not living," but who

24  did at some time live.  Shuster never had a widow, child, or grandchild, and Peary,

25  acting on behalf of the Shuster Estate, has no right to file the invalid notice of

26  termination that he did.

27

28

COMPLAINT

### (2) **The 1992 Agreement Bars the Shusters from Pursuing Termination**

99.    The 1992 Agreement that Frank Shuster and Jean Peavy entered into with DC Comics bars the Shuster Estate from pursuing termination because, *inter alia*, in exchange for valuable consideration, the 1992 Agreement effected a rescission, revocation, and re-grant of all prior copyright grants, which eliminated any pre-1978 grant that could be subject to termination under section 304 of the Copyright Act.

100.    The 1992 Agreement, which was executed on October 2, 1992, provides that Shusters' heirs "fully settle[]" and forfeit any and all of rights under Joseph Shuster's prior "agreements or otherwise," thereby revoking and rescinding those prior, pre-1992 instruments.  It also "*grant[s] to us* [DC Comics] any … copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon."  (Emphasis added.)

101.    Section 304(d) of the Copyright Act only allows for termination of copyright grants "executed before January 1, 1978."  Because the 1992 Agreement left intact no pre-1978 copyright grant to terminate, section 304(d) does not apply, and the Shuster Estate has no copyright grant that it may terminate.

102.    Shuster's heirs approached DC Comics in 1992 seeking increased annual payments, certain tax benefits, and payment of Shuster's debts and expenses.  At the time, Shuster's heirs recognized the value of Superman as a property.  As the result of DC Comics' development, promotion, and exploitation of Superman from 1938 to 1992, Superman had evolved from the black-and-white figure drawn by Shuster for Action Comics No. 1 to a global, multi-media industry.  Moreover, in correspondence with DC Comics, the Shusters adverted to the termination rights provided for under the Copyright Act.  As Shuster's heirs requested, the 1992 Agreement provided that DC Comics would:  (a) increase its annual payments to the Shuster Heirs to $25,000 per year—five times higher than

COMPLAINT

the amount it was obligated to pay under the December 23, 1975 Agreement;
(b) make these annual payments to Jean Peavy for purposes of a tax benefit; and
(c) pay the approximately $20,000 representing Shuster's final debts and expenses.
DC Comics continues to make annual payments under the 1992 Agreement, and
has paid Shuster's heirs close to $500,000 to date.  The 1992 Agreement confirms
that it "fully settles *all claims to any payments or other rights or remedies* which
you may have under any other agreement or otherwise, *whether now or hereafter
existing* regarding the copyrights, trademarks, or other property right in any and all
work created in whole or in part by your brother, Joseph Shuster, or any works
based thereon." (Emphasis added.)  Shuster's heirs agreed "not to assert any claim
of right, by suit or otherwise, with respect to the above, now and forever."

103.   By effectively rescinding, revoking, and re-granting any and all prior
grants of Joe Shuster's rights, the Shuster Heirs have no right to terminate any of
the Superman copyrights.

104.   At the very least, because of DC Comics' continued performance
under the 1992 Agreement, and the Shusters' continued acceptance of benefits
under the Agreement—even after filing the Shuster Termination Notice—the
Shusters are estopped from disputing that the 1992 Agreement remains in full force
and effect, which operates to preclude the assertion of any termination right.

### (3) The Shusters Lack the Majority Interest Necessary to Terminate

105.   The Shuster Termination Notice is also invalid because the party that
filed it—if defendants' own contractual documents are to be believed—lacked
authority to do so.  Section 304(c)(1) of the Copyright Act provides that termination
of a grant executed by an author who is not living may be exercised only "by the
person or persons who … own and are entitled to exercise a total of *more than one-
half of that author's termination interest*."  17 U.S.C. § 304(c)(1) (emphasis added).
Copyright Office regulations require that a termination notice include "specific
indication of the person or persons executing the notice who constitute more than

1   one-half of that author's termination interest" and "shall be signed by the number

2   and proportion of the owners of that author's termination interest required under

3   section 304(c)."  37 C.F.R. § 201.10(b)(1)(vii), (c)(2).

4        106.   According to the Pacific Pictures agreements (to the extent they are

5   valid and enforceable), the Shuster Estate does not own—and did not own at the

6   time the Shuster Termination Notice was executed—the "more than one-half"

7   majority interest necessary to terminate under section 304(c)(1) of the Copyright

8   Act.

9        107.   Pursuant to the 2001 Pacific Pictures Agreement, defendant Mark

10  Peary and Jean Peavy "transfer[red] and assign[ed] … their rights, title, and

11  interest" in all of Shuster's copyrights and creations to their joint venture with

12  Pacific Pictures.  In the 2003 Pacific Pictures Agreement, Peary confirmed the

13  terms of the 2001 Pacific Pictures Agreement on behalf of the Shuster Estate.

14       108.   One week later, on November 10, 2003, Peary served the Shuster

15  Termination Notice on behalf of the Shuster Estate.  At the time, the Shuster Estate

16  did not own *any* of the purported termination right, as this and all other rights had

17  been transferred to the joint venture with Pacific Pictures.[3]  The Shuster

18  Termination Notice is therefore invalid under section 304(c)(1) of the Copyright

19  Act.

20       109.   The Shuster Termination Notice represents that Peary "is the person

21  entitled to exercise Joseph Shuster's termination interest" and that the Notice had

22  been "signed by all persons whose signature is necessary to terminate."  Peary's

23  _____

24       [3] At most, the Shuster Estate owned only a 50% interest in that joint venture.
This is still the case.  As a result of the September 10, 2004 Letter purporting to

25  cancel the 2001 and 2003 Pacific Pictures Agreements and by the terms of the 2001
and 2003 agreements themselves, any putative rights held by the joint venture

26  were split 50/50 between the Shuster Heirs and Pacific Pictures on cancellation of the
joint venture agreement:  "[Upon] winding-up of the Venture or in the event of

27  termination of the Venture *for any reason*, *all Rights, property or assets of the*
*Venture will be held* fifty percent (50%) by the [Shuster Heirs] *and fifty percent*

28  *(50%) by PPC*."  (Emphasis added.)

COMPLAINT

1     failure to disclose that he had purported to transfer this putative termination right to

2     the joint venture with Pacific Pictures, or include a signature on behalf of the joint

3     venture or Pacific Pictures, violated 37 C.F.R. § 201.10(b)(1)(vii) and 37 C.F.R. §

4     201.10(c)(2).

5        110.   Peary's failure to disclose the requisite information in the Shuster

6     Termination Notice was not harmless.  Upon information and belief, these

7     omissions were not inadvertent, but were intended to conceal material information

8     from DC Comics, including:  (a) the various conflicts of interest arising from

9     Toberoff's and his companies' significant ownership interest in the Shuster Estate's

10    and the Siegel Heirs' purported rights; and (b) consent agreements that Toberoff

11    procured limiting the Shuster and Siegel Heirs' freedom to enter into agreements

12    with DC Comics regarding those rights.

13       111.   The Copyright Act's termination provisions were crafted to avoid the

14    trafficking in future interests by third parties like Toberoff and his companies, yet

15    that is exactly what his agreements with the Shuster and Siegel Heirs accomplish,

16    and what Toberoff and Shusters failed to disclose to DC Comics and the Copyright

17    Office by serving and filing the Shuster Termination Notice.

18               **(4) The Shusters Do Not Attempt to Terminate Certain**

19                  **All-Encompassing Copyright Grants**

20       112.   The 1992 Agreement includes a "grant" by Shuster's heirs to DC

21    Comics of, *inter alia*, all "copyrights, trademarks, or other property right in any and

22    all work created in whole or in part by … Joseph Shuster, or any works based

23    thereon."  In the Shuster Termination Notice, defendants did not terminate (or even

24    mention) the 1992 Agreement.

25       113.   The May 21, 1948 Consent Agreement also includes a grant by Siegel

26    and Shuster to National, DC Comics' predecessor-in-interest, of all of Siegel and

27    Shuster's rights in Superman and Superboy.  (If the 1992 Agreement is not read as

28    a rescission, revocation, and re-grant of all prior agreements between Shuster and

COMPLAINT

1  DC Comics (and it should be), then the May 21, 1948 Consent Agreement remains

2  in effect.)

3      114.   Defendants do not attempt to terminate the May 21, 1948 Consent

4  Agreement, and do not identify the May 21, 1948 Consent Agreement in the

5  Shuster Termination Notice.

6      115.   As the result of defendants' failure to terminate the 1992 Agreement

7  and May 21, 1948 Consent Agreement, the grants contained therein remain in full

8  force and effect.  Thus, DC Comics is and continues to be the sole owner of all

9  rights, including rights under copyright, in Superman pursuant to the 1992

10  Agreement and May 21, 1948 Consent Agreement.

11      **(5) <u>The Doctrine of Unclean Hands Bars the Shusters from Terminating</u>**

12      116.   The doctrine of unclean hands requires that the Shuster Termination

13  Notice be deemed invalid because it contains material misrepresentations intended

14  to mislead the courts, Copyright Office, and DC Comics—all to the detriment of

15  DC Comics.

16      117.   The Shuster Heirs did not disclose Pacific Pictures' purported

17  ownership interest in the rights sought to be terminated.  Just one week before filing

18  the Shuster Termination Notice, the Shuster Estate signed the 2003 Pacific Pictures

19  Agreement, reaffirming its transfer of 100% of its rights in any Superman-related

20  copyrights to the joint venture with Pacific Pictures.  Copyright Office regulations

21  require that a termination notice include "specific indication of the person or

22  persons executing the notice who constitute more than one-half of that author's

23  termination interest" and "shall be signed by the number and proportion of the

24  owners of that author's termination interest required under section 304(c)."  37

25  C.F.R. § 201.10(b)(1)(vii), (c)(2).  Yet Pacific Pictures is conspicuously absent

26  from the Shuster Termination Notice.  This omission was not inadvertent, as

27  explained above.

28

COMPLAINT

118.   Induced by Toberoff, the Shuster Heirs also falsely disclaimed any interest in the Superboy rights in the Shuster Termination Notice.  This permitted Toberoff to assert on behalf of the Siegel heirs a baseless Superboy-related copyright infringement claim against DC Comics.  Prior to these manipulations by Toberoff, Shuster and the Shuster heirs had truthfully maintained for over 50 years that Shuster had co-created Superboy.  For example, the findings submitted by Siegel and Shuster's counsel in the 1940s Westchester Action, specified that Shuster had drawn the first "Superboy" denominated story in More Fun Comics No. 101.  Similarly, in 1972 and 1973, during the Superman renewal litigation, Siegel and Shuster jointly filed copyright renewal notices asserting joint authorship both in the Superboy character, and in More Fun Comics No. 101, which contained the first comic book story denominated "Superboy."

119.   Additionally, in the 2001 Pacific Pictures Agreement, entered into before Toberoff had secured an agreement with the Siegel Heirs, Toberoff and the Shuster Heirs expressly identified "Superboy" as among the universe of rights that Shuster had jointly created with Siegel.  Yet just two years later in 2003, and only *after* Toberoff had entered into an agreement with the Siegel Heirs securing control over their rights, did the Shuster Heirs suddenly reverse course.  The 2003 Pacific Pictures Agreement omitted all reference to Superboy, and the Shuster Termination Notice filed one week later avoided any overt mention of Superboy elements or works.[4]  But even the termination notice served by the Shuster Heirs, while carefully drafted to avoid any mention of Superboy, could not completely rewrite history.  The Shuster Termination Notice expressly identifies Action Comics No. 1 and Superman No. 1 as terminated works.  Both of these works, however, clearly depict Superman as a boy with super-powers: *i.e.*, a "Superboy."  For example,

---

[4] As noted, DC Comics maintains that Superboy is a derivative work based upon the preexisting Superman, and in any event, is owned solely and exclusively by DC Comics, *inter alia*, because it is a work-for-hire or because the script submitted by Siegel and Shuster is unpublished and, thus, is not terminable.

1    Action Comics No. 1 features Superman as a very young boy exhibiting super

2    strength, and Superman No. 1 depicts Superman as a youth leaping over a building.

3         120.   After the Shuster Termination Notice was filed, the Siegel Heirs

4    brought a copyright infringement claim against DC Comics on the frivolous ground

5    that Superboy was the sole creation of Siegel, entitling the Siegel Heirs to terminate

6    and recapture 100% of the Superboy rights (as opposed to the 50% share they

7    would be entitled to recapture if Superboy was a joint work).  The Siegel Heirs

8    threatened to enjoin the popular *Smallville* television series, which they wrongly

9    claimed infringed their exclusive rights in Superboy.  As a result, DC Comics has

10   incurred substantial expenses defending against the claim Toberoff manufactured

11   and the Shusters facilitated.  Defendants compromised the integrity of the

12   Copyright Office and judicial system by crafting the Shuster Termination Notice in

13   this way, and the Shuster Termination Notice should be held invalid on this and the

14   other related grounds set forth herein.

15                    *        *        *

16        121.   Each of the foregoing reasons is a separate, independent, and

17   alternative basis for declaring the Shuster Termination Notice to be invalid and thus

18   ineffective.  A declaration by this Court regarding the validity of the Shuster

19   Termination Notice is warranted under the Declaratory Judgment Act, 28 U.S.C.

20   §§ 2201 *et seq.*, to establish the parties' respective rights and obligations with

21   respect to the copyright interest in the Superman material.

22   **B.   Second Claim for Relief:  Declaratory Relief re: Limited Scope of**

23         **Copyright Termination Notice (Against Defendants Shuster Estate and**

24         **Peary)**

25        122.   DC Comics re-alleges and incorporates by reference each and every

26   allegation contained in the paragraphs above.

27

28

123.   This Second Claim for Relief is advanced in the alternative—*i.e.*, if the Court does not grant DC Comics' First Claim for Relief set forth above and hold that the Shuster Termination Notice is invalid.

### (1) Additional Factual Background

124.   Upon information and belief, in or around 1933, Siegel and Shuster began co-creating comic strips, some of which included stories featuring a character named Superman.  The materials created by Siegel and Shuster during this time are believed to include: (a) 24 days of Superman comic strips intended for newspapers; (b) a seven-page synopsis of the last 18 days (weeks two through four) of such comic strips; (c) a paragraph previewing future Superman exploits; (d) a nine-page synopsis of an additional two months of daily comic strips; and (e) 15 daily comic strips (collectively, the "Unpublished Superman Works").  None of these materials was published in its original form, most were never published at all, and some are apparently lost.

125.   Upon information and belief, between 1933 and 1937, Siegel and Shuster submitted the Unpublished Superman Works to a number of prospective publishers and newspaper syndicates, all of which rejected them.

126.   On December 4, 1937, Siegel and Shuster entered into the December 4, 1937 Agreement with DCI.  Siegel and Shuster agreed to "give their exclusive services" in producing certain comic features for a period of two years.  Siegel and Shuster were required to submit any new continuity to DCI, which reserved the right to accept or reject them for a period of sixty days.

127.   In early 1938, DCI was seeking material for use in a new comic book it was developing entitled "Action Comics."  Pursuant to the December 4, 1937 Agreement, the 24 days of Superman comic strips from the Unpublished Superman Works were provided to DCI for review.  DCI decided to publish a Superman story in Action Comics No. 1, but the materials submitted by Siegel and Shuster to DCI were neither in a form that was acceptable for publication in a comic book, nor

1    were they complete.  Therefore, at the instance and expense of DCI and subject to

2    its right of control, Siegel and Shuster adapted the 24 days of comic strips, and

3    added certain new material, to create a 13-page uncolored comic book story entitled

4    "Superman."  Cover art featuring Superman that was used for Action Comics No. 1

5    was thereafter created by DCI.  DCI's printers or engravers, working at the

6    direction of DCI, chose colors for the Superman character and colored the 13-page

7    story and cover.

8        128.   Siegel and Shuster assigned to DCI all of their rights in Superman in

9    the March 1, 1938 Agreement.  This included "all good will attached thereto and

10   exclusive right to the use of the characters and story, continuity and title of strip."

11   Siegel and Shuster agreed not to use Superman or any other character featured in

12   the strip "by their names contained therein."

13       129.   Before the April 1938 publication of Action Comics No. 1, which was

14   cover-dated June 1938, DCI promoted the upcoming Superman story in some of its

15   other publications, including "More Fun Comics No. 31" and "Detective Comics

16   No. 15."  These publications were cover-dated May 1938 and were published prior

17   to Action Comics No. 1.  The promotions (the "Promotions") depict Superman in

18   his costume—including a cape, boots, leotard, and inverted triangular "S" crest on

19   his chest—exhibiting his super-strength by holding a car over his head as

20   bystanders watch in awe.  The Promotions show almost the entirety of what would

21   become the cover of Action Comics No. 1 in clarity and detail.

22       130.   Action Comics No. 1 was comprised not only of the 24 days of

23   Superman comic strips from the pre-existing Unpublished Superman Works (as

24   modified and edited by Siegel and Shuster), but of additional new material created

25   by Siegel and Shuster at DCI's instance and expense and subject to its right of

26   control.

27       131.   Upon information and belief, after the publication of Action Comics

28   No. 1, Siegel and Shuster supplied further original Superman stories to DCI, at

COMPLAINT

1   DCI's instance and expense and subject to its right of control.  On September 22,

2   1938, Siegel and Shuster entered into another employment agreement with DCI

3   confirming that Siegel and Shuster had "been doing the art work and continuity for

4   said comics [including Superman comics] for us.  We wish you to continue to do

5   said work and hereby employ and retain you for said purposes."  The DCI

6   September 22, 1938 Agreement also contained an acknowledgement that DCI was

7   the "exclusive" owner of Superman.

8        132.   Also on September 22, 1938, Siegel and Shuster entered into the

9   McClure September 22, 1938 Agreement with DCI and the McClure Newspaper

10   Syndicate concerning the use of Superman in newspaper strips.

11        133.   All of Siegel and Shuster's contributions to Superman comic books

12   and comic strips were made pursuant to the March 1, 1938 Agreement, the DCI

13   September 22, 1938 Agreement, the McClure September 22, 1938 Agreement,

14   contemporaneous oral agreements confirmed by one or more of those agreements,

15   or certain subsequent agreements affirming those agreements, as employees of DCI

16   (or its successors) and at DCI's instance and expense and subject to its right of

17   control.  As a result, all of these materials constitute works for hire under the 1909

18   Copyright Act, and the copyrights therein are owned exclusively by DC Comics

19   and are not subject to termination under later amendments to the Copyright Act.

20        134.   On November 30, 1938, Siegel wrote a letter to DCI (the "November

21   1938 Letter") suggesting that it publish a comic book entitled "Superboy," "which

22   would relate to the adventures of Superman as a youth."  The November 30, 1938

23   Letter does not contain any discussion of plot, dialogue, appearance, or any other

24   copyrightable material relating to Superboy.  DCI decided not to publish a

25   Superboy comic book at that time, and had already published comic books,

26   discussed *supra*, that showed Superman as a young boy and exhibiting super-

27   human strength.  For example, in 1939, among the Superman material prepared by

28   Siegel and Shuster at the instance and expense of DCI and subject to its right of

control was Superman No. 1.  In Superman No. 1, Clark Kent is depicted as a boy with super-powers.

135.   On December 19, 1939, Siegel and Shuster entered into the December 19, 1939 Agreement with DCI, which modified the DCI September 22, 1938 Agreement by, *inter alia*, doubling Siegel and Shuster's compensation for Superman comic books and newspaper strips and providing for payment to Siegel and Shuster for uses of Superman in media such as radio, motion pictures, and toys. Under the December 19, 1939 Agreement, Siegel and Shuster again acknowledged DCI's sole ownership of Superman.

136.   Upon information and belief, in December 1940, Siegel, on behalf of himself and Shuster, submitted to DCI a 13-page script of continuity for Superboy (the "Unpublished 1940 Superboy Script") and renewed his suggestion that DCI publish a comic book depicting Superman as a youth.  The Unpublished 1940 Superboy Script, which includes the credit line "By Jerry Siegel and Joe Shuster," states:  "So many faithful followers of today's leading adventure comic strip, SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth ...  And so here he is at last ... the answer to your requests ... America's outstanding boy hero:  SUPERBOY!"  The Unpublished 1940 Superboy Script explains that "[i]n later years [Superboy] was to become the might[y] figure known as SUPERMAN!" The Unpublished 1940 Superboy Script was derived entirely from pre-existing Superman elements and ideas that had been published by DCI as part of works for hire, and contained no original copyrightable element.  Again, DCI decided not to publish a Superboy comic book at that time.

137.   Upon information and belief, sometime prior to November 18, 1944, DCI published a comic book depicting the adventures of Superman as a youth, called Superboy, in "More Fun Comics No. 101," which had a cover date of January-February 1945 and was illustrated at least in part by Shuster.  Upon information and belief, Siegel did not participate in the creation of this comic book

1   or the Superboy story it contained.  Other than retelling the Superman origin story

2   from Action Comics No. 1 and Superman No. 1, this Superboy story bore no

3   resemblance to the Unpublished 1940 Superboy Script.

4       138.   In the more than 70 years since the publication of Action Comics No.

5   1 in 1938, DC Comics has created a vast universe of Superman material spanning

6   virtually all media, including comic books, graphic novels, live action pictures,

7   feature-length motion pictures, motion picture serials, radio and television serials,

8   and live theatrical presentations.  DC Comics' extensive development and

9   exploitation of Superman has generated new characters, new super-powers, new

10   components to the Superman universe, new elements in the Superman back story,

11   and new changes in Superman's appearance.

### (2) Claim for Declaratory Relief re: Limited Scope of Copyright Termination Notice

14       139.   In the event that the Shuster Termination Notice challenged in the First

15   Claim for Relief above is deemed to be effective, the scope and reach of the Notice

16   must be declared limited in the following ways:

### a. Unpublished Superman Works

18       140.   The Shuster Termination Notice purports to terminate certain portions

19   of the Unpublished Superman Works, including: (a) "twenty-four days ... of

20   previously unpublished SUPERMAN newspaper comic strips, created c. 1934,"

21   (b) "SUPERMAN story in comic book form ... created c. 1933," and (c) "15

22   SUPERMAN daily comic strips ... created c. 1934."

23       141.   To the extent that any portion of the Unpublished Superman Works

24   may be considered published for purposes of the Copyright Act (and this is

25   disputed), those portions were published only as a result of their adaptation for

26   inclusion in Action Comics No. 1, which was a work made for hire.  The Copyright

27   Act expressly provides that "a work made for hire" cannot be subject to

28

1   termination.  17 U.S.C. § 304(c)-(d).  As a result, the Shuster Termination Notice is

2   ineffective as to the Unpublished Superman Works.

3                    **b.  Pre-Action Comics No. 1 Promotions**

4          142.   The Shuster Termination Notice does not attempt to terminate DC

5   Comics' rights in the Promotions published before Action Comics No. 1.

6          143.   Moreover, upon information and belief, the Promotions, depicting in

7   sum and substance what was subsequently published as the cover of Action Comics

8   No. 1, were not prepared by Siegel or Shuster, but rather by others either employed

9   by DCI or at the instance and expense of DCI and subject to its right of control.  As

10   a result, the Promotions were works made for hire and any copyright therein was

11   owned by DCI *ab initio* and cannot be subject to termination.  17 U.S.C. § 304(c)-

12   (d).

13         144.   DC Comics remains the sole owner of the Promotions, all copyrights

14   therein, and the various copyrightable elements contained therein.  The Shusters

15   may not seek to terminate copyright interests comprised in the Promotions.

16                          **c.  Works for Hire**

17         145.   The Shuster Termination Notice purports to recapture the rights in

18   Action Comics Nos. 1-7, Superman No. 1, and Superman No. 3 ("Superman

19   Works").  Each of the Superman Works was prepared at the instance and expense

20   of DCI and subject to its right of control.  As a result, the Superman Works were

21   works made for hire and any copyright therein was owned by DCI *ab initio* and

22   cannot be subject to termination.  17 U.S.C. § 304(c)-(d).

23         146.   DC Comics remains the sole owner of the Superman Works, all

24   copyrights therein, and the various copyrightable elements contained therein.[5]

25   ───────────────
        [5] In the related action filed by the Siegel Heirs against DC Comics, the federal
26   court agreed with this position almost entirely, ruling that other than a handful of
     pre-1938 materials authored by Siegel, all of Siegel's Superman works were created
27   as "works for hire" on behalf of DC Comics.  The court ruled that all material
     created by Siegel after his 1938 employment agreement with DCI, including Action
28   Comics Nos. 2, 3, 5-61, Superman Nos. 1-23 (other than pages 3-6 of Superman

                                            - 45 -

#### d. Derivative Works

147.   All Superman-related works prepared after the publication of Action Comics No. 1 were derivative works based on pre-existing copyrightable material and created under the authority of valid copyright grants (the "Derivative Works").

148.   The Derivative Works include new characters, new super-powers, new components to the Superman universe, new elements in the Superman back-story, and changes in the appearance of Superman.

149.   Regardless of whether the Shuster Termination Notice is deemed valid, DC Comics remains the sole owner of the Derivative Works and retains the continuing right to exploit the Derivative Works under section 304 of the Copyright Act, 17 U.S.C. § 304(c)(6)(A).

#### e. Scope of Shuster Notice

150.   The Shuster Termination Notice, in addition to specifying works to be terminated, also describes certain elements purportedly encompassed by the works sought to be recaptured.  Many of these elements do not appear in the specified works.  In addition to identifying elements that are not present, the Shuster Termination Notice is also notable for its failure to specify elements that are present.  For example, although both the purportedly terminated works Action Comics No. 1 and Superman No. 1 depict Superman as a boy with super-powers, the Shuster Termination Notice is silent on this element.  Accordingly, a dispute has arisen between the parties regarding the scope of the Shuster Termination Notice with respect to the elements that appear, or which do not appear, in the allegedly terminated identified in the Shuster Termination Notice, including, but not limited to, the following:

---

No. 1), and post-1938 newspaper strips, were works-for-hire and thus could not be terminated.  DC Comics reserves all rights with respect to these interim rulings in the Siegel case.

a.    Superman's "telescopic vision"

b.    Superman's "super hearing"

c.    Superman's "super ... sense of smell"

d.    Superman as a boy with super-powers (*i.e.*, "Superboy")

e.    "[D]iamond-shaped "S" insignia on [Superman's] chest"

f.    "[L]ove triangle between Superman, Lois Lane and Clark Kent"

g.    "Perry White"

h.     "Daily Planet newspaper"

i.    "Metropolis"

j.    "Jor L"

k.    "Krypton"

151.   A declaration by this Court regarding the scope of the Shuster Termination Notice is warranted under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, to establish the parties' respective rights and obligations with respect to the copyright interest in the Superman material.  The Shusters may not seek to terminate copyright interests owned by DC Comics, including those materials listed above.

**C.    Third Claim for Relief:  Declaratory Relief re: Shuster Period of Exclusivity (Against All Defendants)**

152.   DC Comics re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

153.   This Third Claim for Relief is advanced in the alternative—*i.e.*, if the Court does not grant DC Comics' First Claim for Relief set forth above and hold that the Shuster Termination Notice is invalid.

154.   The Copyright Act establishes an exclusive period between the time a copyright termination notice is served and the effective termination date in which the original copyright grantee may enter into an agreement with the original copyright author or their heirs regarding the rights sought to be recaptured.  Section

304(c)(6)(D) provides: "A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination." 17 U.S.C. § 304(c)(6)(D).  While the statute bars third parties (like Toberoff and his companies) from trafficking in such future copyright interests during this exclusive time period, it protects the rights and interests of original grantees like DC Comics, providing that "an agreement for such a further grant may be made between the author or [his heirs] and the original grantee or [its successor (*e.g.*, DC Comics)], after the notice of termination has been served." *Id.*

155.   Section 304(c)(6)(D) of the Copyright Act establishes a right of DC Comics from November 10, 2003 (when the Shuster Heirs served the Termination Notice) until October 26, 2013 (the effective date of the Notice), during which DC Comics is the sole party that can enter into an agreement with the Shuster Heirs for the rights sought to be terminated.  This right has been described by Congress, in its legislative history, and the United States Court of Appeals as a "right of first refusal."  Any restriction or limitation on this period of exclusivity must be deemed unenforceable under section 304(c)(6)(D).

156.   Upon information and belief, the Shuster Heirs have entered into agreements that frustrate and impede DC Comics' period of exclusivity.  For example, the 2003 Pacific Pictures Agreement grants and assigns the Shuster Heirs' putative present and future copyright interests and provides that "any and all agreements regarding any of the Rights [in Shuster's creations, including copyright] shall be subject to the express written approval" of Pacific Pictures.  This improperly allowed Pacific Pictures (and Toberoff) to prevent the Shuster Heirs from entering into an agreement with DC Comics concerning their purported rights—in clear violation of section 304(c)(6)(D).  Although Pacific Pictures and the Shuster Heirs purported to cancel the 2001 and 2003 Pacific Pictures Agreements in their September 10, 2004 Letter, this improper agreement was in effect at least from the time it was executed on October 30, 2003 through

COMPLAINT

September 10, 2004, which means that it improperly eliminated most of the first year of DC Comics' period of exclusivity. Moreover, the original 2001 Pacific Pictures Agreement provides that if the Shusters' joint venture with Pacific Pictures is terminated "for any reason," then Pacific Pictures will hold 50% of "the property or assets of the Venture," including all the alleged Shuster Superman copyright interests, as a "tenant[] in common," meaning that Pacific Pictures and Toberoff still have improperly encumbered, to this day, DC Comics' period of exclusivity.

157.   Upon information and belief, Toberoff has induced the Siegel and Shuster Heirs to enter into additional agreements, which prohibit either family from entering into agreements conveying rights to DC Comics without the express approval of all stakeholders in the heirs' rights—*i.e.*, the Siegel Heirs, Shuster Heirs, and Toberoff and his companies. These agreements and others like it that may exist—which upon information and belief remain in effect to this day—violate section 304(c)(6)(D) and impede DC Comics' ability to settle any and all disputes with the Shusters and Siegels and lawfully pursue its business.

158.   The Shuster Heirs' agreements with Toberoff, his companies, and the Siegels improperly interfere with DC Comics' period of exclusivity with the Shuster Heirs regarding their purported Superman rights.

159.   A declaration by this Court is warranted under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, to establish the parties' respective rights and obligations with respect to the copyright interest in the Superman material. This declaration should establish that:  (a) DC Comics is the sole party with whom the Shuster Heirs can enter into an agreement to convey their putative Superman rights during the exclusivity period, through and including October 26, 2013; (b) any agreement with any third party regarding those putative rights during the exclusivity period is invalid and unenforceable; and (c) any agreements requiring consent of other parties to settle termination claims violate the exclusivity period and, therefore, are invalid and unenforceable.

COMPLAINT

1    160.    DC Comics seeks an injunction (a) barring the Shuster Heirs from

2    entering into any agreement with any third party regarding the rights sought to be

3    recaptured in the Shuster Termination Notice until October 26, 2013; and

4    (b) restoring to DC Comics its 10-year period of exclusivity.

5    **D.    Fourth Claim for Relief:  Intentional Interference with 1992 Shuster**

6    **Agreement (Against Defendants Toberoff and Pacific Pictures)**

7    161.    DC Comics re-alleges and incorporates by reference each and every

8    allegation contained in the paragraphs above.

9    162.    In October 1992, the Shuster Heirs and DC Comics executed a final

10   written agreement "fully settl[ing] all claims" as to "right[s] in any and all work[s]

11   created in whole or in part by … Joseph Shuster" (the "1992 Agreement").  Since

12   1992, DC Comics has paid the Shuster Heirs nearly half a million dollars under the

13   1992 Agreement.  To DC Comics' knowledge, the Shuster Heirs have never

14   disputed the validity or existence of the 1992 Agreement, which operated to

15   rescind, revoke, and re-grant all of the Shusters' prior grants of rights in the

16   Superman properties to DC Comics.  In that 1992 Agreement, the Shuster Heirs

17   further agreed that they would not—either then or in the future—make any claim of

18   right to any work created in whole or part by Joe Shuster.

19   163.    DC Comics' 1992 Agreement with the Shuster Heirs was both a valid

20   contract and had the probability of future economic benefit to DC Comics.  The

21   Shuster Heirs fully relinquished their rights under any prior agreement and re-

22   granted to DC Comics all of their Superman-related rights.  This confirmation

23   allowed DC Comics to continue freely developing and exploiting those rights

24   without the risk of termination of the alleged Shuster rights or expensive and

25   protracted legal disputes regarding the ownership of those rights.[6]

26   _____

27   [6] DC Comics maintains that the 1992 Agreement is a binding, enforceable
     agreement with the Shuster Heirs.  Even assuming this agreement was deemed
28   invalid, DC Comics also has a long-established economic relationship with the
     Shusters giving rise to an interference with prospective economic advantage claim.

164.   Toberoff and Pacific Pictures were aware of the 1992 Agreement and DC Comics' ongoing business relationship with the Shusters.  Toberoff knew that his actions in having his company enter into a joint venture with the Shusters for the purpose of terminating DC Comics' rights were substantially certain to interfere with DC Comics' 1992 Agreement with the Shusters.  Toberoff's ultimate purpose in approaching the Shuster Heirs was to induce them to repudiate the 1992 Agreement and attempt to terminate prior grants of Shuster's rights.  For this reason, Toberoff and the Shusters formed a joint venture with Pacific Pictures for the express purpose of "retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations" through "termination pursuant to [17 U.S.C. § 304] of any and all grant or transfers by Joe Shuster of any copyright interest in his creations."

165.   Toberoff and Pacific Pictures engaged in independently wrongful conduct to achieve this goal.  They induced the Shuster Heirs to breach the 1992 Agreement and enter into the illegal copyright-assignment and settlement-consent agreements described above.  Toberoff also induced the Shusters to manipulate claims of ownership in Superboy.

166.   As the direct result of Toberoff's and Pacific Pictures' actions, the Shuster Heirs have breached the 1992 Agreement, causing DC Comics to lose the value of the Agreement and forcing DC Comics to incur substantial attorneys' fees and costs in an amount to be proven at trial.

---

This relationship dates back to 1935, when DC Comics' predecessor hired the unknown artist Joseph Shuster to illustrate comic strips for its publications.  Even after their employment arrangement ended, Shuster continued to benefit from his early work on Superman under the 1975 Agreement, which provided him with an annual pension, medical insurance, and a lump-sum payment in exchange for acknowledgement of DC Comics' sole and exclusive ownership of the Superman rights.  At the time Toberoff approached the Shuster Heirs in 2001, DC Comics and the Shuster Heirs had an agreement in place for almost 10 years, which resolved all claims concerning Shuster's putative share of the Superman rights.  DC Comics' agreement with the Shusters and the economic relationship they contemplated had the probability of future economic benefit to DC Comics.

COMPLAINT

1   **E.**   **Fifth Claim for Relief**:  **Intentional Interference with Prospective**

2   **Economic Advantage re: Siegel-DC Comics Agreement (Against**

3   **Defendant Toberoff)**

4   167.   DC Comics re-alleges and incorporates by reference each and every

5   allegation contained in the paragraphs above.

6   168.   DC Comics reached a binding, enforceable agreement with the Siegel

7   Heirs.  After the Siegel Heirs served the Superman Termination Notice in 1997,

8   they engaged in negotiations with DC Comics for four years.  On October 16, 2001,

9   DC Comics made a settlement offer to the Siegel Heirs.  On October 19, 2001, the

10   Siegel Heirs' attorney at the time, Marks, sent a letter to DC Comics outlining the

11   material terms and confirming that the Siegel Heirs "accepted D.C. Comics' offer

12   of October 16, 2001."  On October 26, 2001, DC Comics sent a return letter

13   confirming the parties' agreed-upon terms.  DC Comics then drafted a long-form

14   contract memorializing the agreement, which it sent to the Siegel Heirs on February

15   1, 2002.  Marks has confirmed that all parties understood that they had a binding

16   agreement.[7]

17   169.   Even in the event that this agreement is finally adjudicated and deemed

18   to be invalid, DC Comics had a long-established economic relationship with the

19   Siegel Heirs giving rise to an interference with prospective economic advantage

20   claim.  This relationship dates back as far as 1935, when DC Comics' predecessor

21

22   [7] The district court in the Siegel Actions determined that this agreement was not
binding because there was no "meeting of the minds" between the parties.  Of
23   course, this was before the Toberoff Timeline had been produced, which confirmed,
*inter alia*, that Marks—who negotiated the agreement on behalf of the Siegel
24   Heirs—understood that the 2001 agreement was final and binding.  Indeed, Marks
communicated his position to the Siegel Heirs in August 2002, in an attempt to
25   convince them to reject Toberoff's attempts at interference.  DC Comics reserves
all rights to challenge the district court's ruling in the Siegel Actions based on this
26   newly discovered evidence and otherwise, and DC Comics respectfully submits that
the district court's interim ruling on this issue is contrary to fact and law.  If DC
27   Comics' claims are accepted, it will amend this Complaint to include a claim for
interference with contract arising out of Toberoff's tortious interference with this
28   binding agreement.

COMPLAINT

1   hired an unknown writer named Jerome Siegel to write comic strips for its

2   publications.  Over the years, Siegel worked on-and-off as an employee of DC

3   Comics and its predecessors.  Even after the employment arrangement ended,

4   Siegel continued to benefit from his early work on Superman under the 1975

5   Agreement, which provided him and his family with an annual pension, medical

6   insurance, and lump payment in exchange for acknowledgement of DC Comics'

7   sole and exclusive ownership of the Superman rights.  When a dispute arose in

8   1997 over the Siegel Heirs' attempt to terminate prior grants of Siegel's share of

9   Superman rights, DC Comics and Siegel commenced negotiations, which lasted

10  over four years.  At the time Toberoff approached the Siegel Heirs in 2001, DC

11  Comics and the Siegel Heirs had finally reached an agreement resolving their

12  claims to the Superman and Superboy rights.

13      170.   The economic relationship that the Siegel Heirs and DC Comics had

14  contemplated and agreed to had the probability of future economic benefit to DC

15  Comics.  The Siegel Heirs recognized DC Comics' sole and exclusive ownership of

16  all rights in Superman and Superboy, allowing it to continue freely developing and

17  exploiting those rights, and avoid the possibility of an expensive and protracted

18  lawsuit regarding ownership of those rights.

19      171.   Toberoff was well aware of the agreement between DC Comics and

20  the Siegel Heirs.  Toberoff has admitted that he tracked the Siegel Heirs'

21  termination efforts through Internet reports.  Moreover, upon information and

22  belief, when Toberoff approached the Siegel Heirs and their representatives in late

23  2001 and 2002 to express interest in purchasing their Superman rights, he was

24  informed that the Siegel Heirs had already reached an agreement with DC Comics.

25      172.   Toberoff knew his actions were substantially certain to interfere with

26  the Siegel Heirs' agreement and ongoing business dealings with DC Comics.

27  Toberoff intentionally engaged in independently wrongful conduct to carry out his

28  interference by, among other things:  falsely misrepresenting to the Siegel Heirs

1  that he had a billionaire investor ready to purchase their Superman rights if they

2  repudiated their settlement agreement with DC Comics; falsely representing to the

3  Siegels that he would help them produce a competing Superman motion picture;

4  and wrongly inducing the Siegels to repudiate their agreement and business

5  relationship with DC Comics.

6      173.   As a direct result of Toberoff's misdeeds, the Siegel Heirs repudiated

7  the Siegel-DC Comics Agreement with DC Comics and ended all further

8  discussions, causing DC Comics to lose the value of the agreement, to lose their

9  ongoing business relationship with the Siegels, and to incur millions of dollars in

10  subsequent legal fees in disputes with the Siegel Heirs.  DC Comics has suffered

11  actual damages in an amount to be proven at trial.

12  **G.**   **Sixth Claim for Relief:** **Declaratory Relief re: Invalidity of Copyright**

13      **Assignment and Consent Agreements (Against All Defendants)**

14      174.   DC Comics re-alleges and incorporates by reference each and every

15  allegation contained in the paragraphs above.

16      175.   The various copyright assignment and consent agreements between

17  Toberoff and/or his companies, the Siegel Heirs, and the Shuster Heirs are void and

18  unenforceable, including under California's unfair competition laws, *e.g.*, CAL.

19  BUS. & PROF. CODE §§ 17200 *et seq*.  The copyright assignments secured by

20  Toberoff and/or his companies are unlawful and violate DC Comics' rights and

21  interests for the reasons set forth above.  The consent agreements Toberoff has

22  procured are void as a matter of law and public policy because they strip the Siegels

23  and Shusters of their right freely to settle their claims and violate DC Comics'

24  concomitant right freely to negotiate settlement of such claims.

25      176.   A declaration by this Court is warranted under the Declaratory

26  Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, to establish the parties' respective rights

27  and obligations with respect to the copyright interest in the Superman material.

28

# VI.  **PRAYER FOR RELIEF**

WHEREFORE, DC Comics prays for judgment against defendants as follows:

177.  A declaration that the Shuster Termination Notice is invalid, and thus ineffective, for one or more of the reasons set forth in DC Comics' First Claim for Relief;

178.  In the event that the Shuster Termination Notice is deemed valid and effective, a declaration that the scope and effect of the Notice is limited as set forth in DC Comics' Second Claim for Relief;

179.  A declaration that:  (a) DC Comics was entitled to a period of exclusivity regarding the Shuster Heirs' purported Superman rights from November 10, 2003 through October 26, 2013; (b) any agreement interfering with that period of exclusivity is invalid and unenforceable; and (c) the consent agreements impermissibly interfere with DC Comics' period of exclusivity and require restoration of the 10-year period free of interference;

180.  A declaration that the various consent agreements between Toberoff and/or his companies, the Siegel Heirs, and the Shuster Heirs are void and unenforceable as a matter of public policy;

181.  An injunction that:  (a) bars the Shuster Heirs from entering into any agreement with any third party regarding the rights sought to be recaptured in the Shuster Termination Notice until October 26, 2013; and (b) restores DC Comics' 10-year period of exclusivity with respect to the Shuster Termination Notice;

182.  As to the tort claims against Toberoff and his entities as sued herein, damages in amounts to be determined at trial;

183.  An award of reasonable attorneys' fees and costs; and

184.  Such other and further relief as this Court deems just and proper.

# VII.   **DEMAND FOR JURY TRIAL**

185.   Plaintiff DC Comics hereby demands a trial by jury on all issues triable by a jury.


Dated:  May 14, 2010                    Respectfully submitted,

                                        O'MELVENY & MYERS LLP


                                        By:_____
                                             Daniel M. Petrocelli
                                        Attorneys for Plaintiff DC Comics


Of counsel:

   PATRICK T. PERKINS (*pro hac vice*
   application pending)
   pperkins@ptplaw.com
   PERKINS LAW OFFICE, P.C.
   1711 Route 9D
   Cold Spring, New York 10516
   Telephone: (845) 265-2820
   Facsimile:  (845) 265-2819

CC1:829569.6

- 56 -

COMPLAINT

# EXHIBIT A

# SUPERMAN – MARC TOBEROFF TIMELINE

*Please read closely. We have enclosed several supporting documents in our package to you, and very much hope you will spend some time reviewing them before you come to any potential settlement with Marc Toberoff, who represents the Siegels and the Schuster heirs in the ongoing Superman legal dispute with Time Warner and DC Comics.*

*The below information should save Time Warner potentially millions and millions of dollars, and, if you so choose, - have Marc Toberoff suspended, disgraced, --- if not ultimately disbarred --- from practicing law.*

*Toberoff being labeled as the "relentless crusader for artists' rights" is hardly that: he has devised a strategy whereas he has ultimately claimed much ownership of the Superman copyright personally as he can. And of course, he has done so without the knowledge and full disclosure to the Siegels and Schuster heirs, creators of Superman.*

*As it stands right now, the single person who would stand to gain the MOST in a settlement with Time Warner regarding the ongoing SUPERMAN legal dispute would not be the heirs themselves, but Marc Toberoff.*

*What you do with the below information is up to you. You should most certainly conduct your own investigation. We believe there are details within this timeline that will be of strong interest to you.*

*Consider it an early holiday gift.*

*(Also, please be aware that this timeline is written with the assumptions that the reader(s) are aware of the characters involved within the ongoing Superman legal dispute between Time Warner/DC Comics. The heirs to the SUPERMAN copyright are: the Siegels (Joanne, Laura & Michael), Jerry Siegel's heirs, who collectively have claims to 50% of the copyright to Superman, while the Schuster estate has claims on the other 50%.) Marc Toberoff currently represents both parties in ongoing litigation.*

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

In 2000 MT established a separate corporation entitled "Pacific Pictures Corporation" (PPC), with an address of 23852 Pacific Coast Hwy, Suite 555, Malibu, CA 90265. Tel: (310)-589-5151. You will see below that he established this business to solicit his services as an attorney.

In 2001, Marc Toberoff (MT) began researching Superman, who had rights, etc.

MT initially contacts Kevin Marks at Gang, Tyre, who represented Joanne and Laura Siegel with an offer for the Siegel rights. Marks discourages Toberoff from any advances, and does not tell Siegels initially of the interaction because he believes it is not in their best interest.

1

Q 0001

EXHIBIT A
57

On Nov. 23, 2001, MT entered into a joint venture agreement between his own outside corporation Pacific Pictures Corp. (NOT a law firm), and Mark Warren Peavy, and his mother Jean Peavy, heirs to the Joe Schuster estate. For the purposes of this document, we do not know the content of that agreement.

MT and Ari Emanuel, partner and agent at Endeavor, contacts Kevin Marks at Gang, Tyrer, Ramer, & Brown again, (who represented Joanne and Laura Siegel), on August 8, 2002. MT approaches the Siegels, *not as an attorney but as a film producer*, stating that he is "allied" with Emanuel, hoping such a claim will legitimize him.

On August 8th 2002, MT tells Marks that he and Emanuel have a billionaire ready to offer $15 million dollars up-front, plus what they promise to be meaningful participation from proceeds for exploitation of the Siegels' rights to SUPERMAN and some continued royalties on an ongoing basis in all media. Kevin Marks says to the Siegels, "Don't do it." Gang, Tyrer tells the Siegels that they believe MT has brokered a confidential agreement with the Joe Schuster estate. Marks also tells the Siegels that the Schuster estate will have termination rights in approximately 2013. Schuster missed termination notices.

Within their offer, MT appeals to the Siegels' sense of ownership and encourages them to take this deal. MT says he can help them make a movie in direct competition to the one being made at Warner Brothers (MT makes this argument to Joanne and Laura, all the while knowing full well that no one would ever go near making such an attempt; no other studio would go for it because of the division of rights, and no one outside of the studio system would attempt such an endeavor for all the enormous costs attributable to the making, marketing and distribution of such a film.) In other words, MT displays "predatory intent" in his initial approach to the Siegels from the very beginning.

In their very first conversation, Kevin Marks tells MT "no go" — that the Siegels have already reached an agreement with Time Warner and DC Comics.

Marks conveys MT's offer to the Siegels, and Marks does say to the Siegels, it is a better offer than the one you have. However, Marks also tells the Siegels that he would testify in court against the Siegels if they accepted this offer because he believes there has already been an agreement reached.

The Siegels are angry at Kevin Marks that he said he would testify against them if they took MT's offer, and relations break down between the Siegels and Gang, Tyrer. They fire Gang, Tyrer. And, because the Siegels believed that MT was sympathetic to their plight, and because MT appealed to their sense of ownership of SUPERMAN, they decide to enter into an agreement with Intellectual Properties Worldwide, otherwise known as "IPW", Marc Toberoff's film production company, for 10% for any kind of deal he got to make a movie or exploit the rights. (as you know, the Siegels submitted termination notices on the Superman copyright in 1997).

2

Q 0002

**EXHIBIT A**
58

The Siegels' agreement with IPW is an agreement that mirrors the earlier Pacific Pictures agreement that MT makes with the heirs to Joe Schuster (*see more information on this below*). In other words, Marc Toberoff is named as their attorney within the agreement (which is masked as a retainer agreement) in the event that they go to litigation over anything (*please see enclosed document*). Upon the Siegels signing the agreement, MT then tells Joanne and Laura that his mysterious billionaire has decided to invest elsewhere. In other words, MT makes himself the Siegels' attorney of record while he solicited them as a film producer, violating the rule that no lawyer may directly solicit business, with the double violation of doing it under the auspices of doing separate business dealings. MT's sole intent was to become the Siegels' attorney, not to help the Siegels (as he had alleged) to make a movie in competition to *Superman Returns*, which was then in development at Warner Brothers. MT also never divulges his previous direct dealings with the Schuster heirs, and his Nov.23, 2001 joint agreement with the Peavys (the Schuster heirs) in which he is named their attorney of record.

In 2002, MT set his sights on acquiring the passive interest to Michael Siegel's rights, who, as you know, is Jerry Siegel's son from his first marriage, and is Laura's half-brother. Michael Siegel has an interest of 12.5% in SUPERMAN and SUPERBOY. The Siegels total have 50% interest (Joanne holds 50%, Laura 25%. Michael 25%). So, in essence, Joanne has 25%, Laura 12.5, Michael 12.5. MT used to his advantage the strained relationship between Joanne and Laura, and Michael; as well as strained communication with the Schusters.

Here comes Ari Emanuel, and he is going to finance the purchase of Michael Siegel's interest. But Michael Siegel turns him down flat. MT discloses the intent to purchase to Joanne and Laura, admitting it is a possible conflict of interest. MT is fully aware of what he is doing is wrong.

On December 16, 2002, there is another letter from MT and Ari Emanuel to Joanne and Laura Siegel, saying they are re-approaching Michael again about purchasing his interest. MT tells Michael Siegel that they have an investor ready to buy out his interest, though the amount is significantly less than what DC showed as his share.

March 3, 2003 – letter from Paul Levitz/DC Comics to the Siegels, and MT is messing up relationships for his own personal benefit. DC is trying to understand why they backed out of the deal. The reason is MT who is interfering in all the relationships up to this point.

May 2003 -- MT is continuing to make business arrangements with the Schuster heirs, unbeknownst to Joanne and Laura Siegel .

May 13, 2003: Michael Siegel sends a very concerned letter to Laura Siegel about Marc Toberoff's actions. *(please see enclosed letter; this letter lays out well MT's scheme).* Among other things, Michael Siegel tells her of how Toberoff is now controlling the whole of the SUPERMAN copyright, how he may have bought a substantial portion of the Schuster interest for himself, and he brings to light MT's utter lack of opening a

3

Q 0003

dialogue with anyone regarding making another SUPERMAN movie, in partnership with Ari Emanuel. Also that MT has not even made contact with Time Warner. Lastly, Michael conveys that MT seems to have an agenda of "someone" buying him out, and that MT is pressing for an answer.

In May-June 2003. **STATUE OF LIMITATIONS is coming close on for filing of the SUPERMAN complaint. Both Joanne and Laura Siegel are now very ill.** MT starts saying to the Siegels that the statue of limitations is coming up, and they would have waived their right to sue based on the termination notices. *This is the very seed MT meant to mine all along.* He sends them the research on the statue of limitations, and concerned, the Siegels contact Art Levine in Washington, D.C. to have independent research done on the matter. The research confirms that they should file by September.

In June, Ari Emanuel through IPW is still trying to buy Michael Siegel's interest but can't come to terms on price.

End of June 2003, MT gets a law firm to represent the Schusters to assist with the SUPERMAN copyrights. They determine the value of the estate is $0, and California Probate Code will not be applicable, such that the estate attorney will not be entitled to any future settlement regarding the Superman interest. Estate attorney is only receiving an hourly rate. MT "graciously" pays all legal fees.

In other words, MT helped probate the estate, but hired an attorney to do the dirty work. Fittingly, the Joe Schuster will was "lost", so the will had no value. So, the court writes the will for him, and includes the rights to proceed with the termination. And since the firm receives an hourly rate, and the estate is valued at $0, it does not effect any future settlement. The estate attorney will thereby not be entitled to statutory compensation. Another example of showing that MT is solely motivated *at all times* not by his clients' interests, but manipulating pieces of the puzzle so that he may receive the greatest percentage from a very possible large Time Warner settlement, through part ownership and unconscionable fees (*see below*).

**Absolutely nothing is moving ahead with Siegel/Schuster rights and agreements because MT was never intending to do anything with rights other than litigate.**

July 5, 2003. Laura Siegel reveals her ignorance of Toberoff's dubious actions in her return letter back to Michael --- MT has NOT told them he is about to enter into the PPC agreement, whereby MT *personally* will have a 50% of the Schuster interest in Superman. He will shortly own equal to what Joanne owns (25% of entire copyright), and double what Laura owns, *but MT has failed to disclose this.* The Schusters – through the Pacific Pictures Corp agreement – gave MT half of what they had. MT never had the intention to make a movie in competition to the one at Warners – it is tantamount to throwing $$$ away, but it does appeal to the heirs' sense of lost ownership. MT never did want to make a movie, and exploit the rights. MT knows no one is going to invest in an outside movie project outside of Warner Brothers, though he uses Ari Emanuel, the agent, to legitimize his claims. *(please see enclosed letter)*

4

Q 0004

Also, in the letter back to Michael Siegel, that MT helped Laura Siegel draft --- in response to Michael's accusations of Toberoff, Laura clearly states that MT does *not* have a production company. (This is false – Marc Toberoff's IPW has been in existence, partly funded by Ari Emanuel, since at least 2002). In the draft of the letter, MT crossed out the statement that he does not have a production company, and writes " MT has not plans to produce a SUPERMAN movie, nor is this feasible given the division of ownership of the rights." (please see enclosed letter). **This clearly delineates that Toberoff never had the intention of making a movie, and approached the Siegels and Schusters separately — not for the exploitation of rights as he initially asserted,** but to gain an unconscionable fee from a very large possible settlement with Time Warner.

August 7, 2003 --- Letter from Rodi-Pollock, who is the attorney in the Schuster estate – who says the Schuster Will would be written by the court August 25, 2003, since the Schuster Will had been "lost".

Sept-Oct 2003 ---- Letter with Ari Emanuel in which he would receive $2.5 million flat fee for "negotiating services"

On October 27, 2003, MT uses PPC to enter into another agreement with the Joe Schuster's heirs: Mark Warren Peavy and Jean Peavy, in which PPC is "engaged as the Executor of the recently probated estate of Joeseph Schuster." The agreement purports that PPC is the Peavys exclusive advisor "for the purpose of retrieving, enforcing, and exploiting all of Joe Schuster's rights ....in all of his creations...".    In this agreement, MT also names himself their attorney for any and all litigation or questions that should arise in regards to these Rights. MT also clearly delineates that PPC is NOT a law firm. And, lastly but most significantly, MT defines that any and all moneys and proceeds, in cash or in kind, received from the enforcement, settlement, or exploitation of any of the Rights, ...any monies would be split 50/50.  **IN ESSENCE, MARC TOBEROFF NOW HAS A 25% STAKE IN SUPERMAN PERSONALLY BECAUSE OF HIS DEAL WITH THE SCHUSTERS THAT WAS MADE IN 2003. He gets – under the guise of Pacific Pictures Corp – the rights to retrieve and enforce and exploit Joe Schuster's interest in SUPERMAN.** MT's alleged "firewall" between film producing and soliciting business as an attorney comes tumbling down. *(please see enclosed signed agreement, dated October 27, 2003).*

In 2013 MT will own Schuster's side of it; but it does not matter, they will settle before.

MT inquires into the legality of entering into the Pacific Pictures Corporation agreement with the Peavys, heirs to Schuster estate, using law firm Armstrong, Hirsch, Jackoway, Tyerman, & Wertheimer. The inquiry raises strong eyebrows, and questions of legality as to MT's actions in regards to the Schusters, and strongly discourages further involvement with MT and this matter.

5

Q 0005

August 2003 – Michael Siegel wants an annuity of $200,000, which equaled $3.5 million. MT tells him that "no investor is going to go for that." MT says Warners' estimation was $2 million less; such a bad risk for an investor, MT says. MT is tenaciously going after the 12.5%, and of course, the investor MT "has" is himself.   He is trying to get Michael to lower the price.

**MT is also trying to convince Michael Siegel not to sell his interest to another outside party.  MT is lying to Michael Siegel to make sure he can still draw a fee from Michael's 12.5% interest. If Michael went away, he would only draw from remaining 37.5%, instead of 50%.   In the final letter, MT tells Michael Siegel that he cannot sell without our approval because Michael did not take part in the termination, but "we will give you (Michael Siegel) approval, *if you sell it to a third party, monitored by Marc Toberoff*." MT is lying to Michael Siegel about Siegel's ability to sell his interest in the SUPERMAN copyright.**

**Significantly, MT admits to Laura Siegel that there never was a billionaire willing to invest $15 million when he first approached them. But by then the Siegels were concerned about appearing flaky for changing lawyers a few times. They decide to stick it out.**

October 2, 2004 — MT files the complaint with the court against Time-Warner. There is disgruntlement in the Siegel camp, regarding the contingency fee.  MT pushes hard for 33.3% contingency fee to go up to 40% if it falls within 60 days of trial (which, of course, he would make sure that it would...).  In the contingency agreement they signed for SUPERMAN, IPW (Marc Toberoff's *film production company*) would have received a 10% negotiating fee (thus most likely bolstering Ari Emanuel's take in the settlement from Time Warner as well). Thus, Toberoff used the "film production arm" of his company to use as a shell to elicit larger contingency fees from his clients despite the fact that Toberoff maintains that there is a "firewall" between his law firm and his production company. (see John Lippman, *Wall Street Journal* article enclosed.)

MT "graciously" agrees to decrease IPW's take by 5%, which will be deducted from the firm's % fee, applicable to the gross proceeds of any settlement or outcome of the litigations.

**\*\*\*\*In other words, MT decreases his contingency fee by 5% -- instead of getting 50%, he will get 45%. Combined with the Schuster interest, the aggregate of any outcome in SUPERMAN litigation for Marc Toberoff *personally* becomes 47.5% of the entire Superman interest.\*\*\*\*\*** It becomes clear at this juncture that MT thwarted the earlier deal with Time Warner and DC Comics in 2002 for his own personal gain.

And lastly, on the DUKES OF HAZZARD case, MT pocketed $8.5 million personally, more than any single plaintiff involved in the case (each plaintiff pocketed around $1.7 million).   According to the settlement amount, he received an unconscionable 50% contingency fee.

6

Q 0006

**EXHIBIT A**
62

Very strong likelihood that Marc <u>created an entity for the purposes of the lawsuit</u> (Moonrunners Limited, or Moonrunners LLP), which allegedly held the rights at issue and ultimately led to the injunction. Christensen-Miller, Kevin Leichter, or the like need explore in greater detail the existence of the entity in which the rights were allegedly held. It is strongly believed this entity was created only to bolster the lawsuit – that the rights were never conveyed at all.

**MT had his President of Production of IPW, J. Todd Harris, leak the confidential settlement on the DUKES OF HAZZARD case to Variety ($17.5 million). He then called Larry Greenfield, another attorney in his office at the time who has since left, to cover his tracks, "demanding" to know who leaked the amount, and to act as if he was portraying shock and dismay at the leak. MT did it himself to attract more business in town. At least 7 attorneys have come and gone at the Law Offices of Marc Toberoff, and many have left due to ethical issues.**

And lastly, MT is charging 50% in another Allison Giannini case involving real estate. The reason this fact is included is to show a history of charging unconscionable fees.

It should be noted for those at Time Warner that Marc Toberoff has still managed to set up SKYPORT as a producer at Warners, and he has a tangential hold on GILLIGAN'S ISLAND. Fyi.

*****************

cc:    Alan F. Horn
        Jeff Robinov
        John Schulman
        Patti Connolly

7

Q 0007

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Jacqueline Nguyen and the assigned discovery Magistrate Judge is Suzanne H. Segal.

The case number on all documents filed with the Court should read as follows:

## CV10- 3633 JHN (SSx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=======================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[X] Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | **[ ] Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | **[ ] Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)     NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

dpetrocelli@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779
(see attachment for complete list)

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DC COMICS,<br><br>                                       PLAINTIFF(S)<br><br>                        V.<br>PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JOANNE SIEGEL, an individual, LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive,<br>                        DEFENDANT(S). | CASE NUMBER<br><br>**CV 10 3633** *JHN*<br><br><br><br>**SUMMONS** |

TO: PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JOANNE SIEGEL, an individual, LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive,

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint ☐ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, Daniel M. Petrocelli, whose address is O'Melveny & Myers LLP, 1999 Avenue of the Stars, 7th Floor, Los Angeles, CA 90067-6035. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:        1 4 MAY 2010                    By:                          **SEAL**
                                                       Deputy Clerk

                                                   *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

**Complete List of Attorneys for Plaintiff DC Comics**

DANIEL M. PETROCELLI (S.B. #97802)
 dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
 mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
 cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067-6035
Telephone: (310) 553-6700
Facsimile:  (310) 246-6779

Attorneys for Plaintiff DC COMICS

**COPY**

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| DC COMICS | PACIFIC PICTURES CORPORATION et al. |

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Daniel M. Petrocelli, Matthew T. Kline, and Cassandra L. Seto
O'Melveny & Myers LLP, 1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035, Telephone: (310) 553-6700, Fax: (310) 246-6779

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No   ☑ **MONEY DEMANDED IN COMPLAINT: $** To be proved at trial

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
17 U.S.C. §§ 101 et seq. (Copyright Act) - invalidity of copyright termination notice; limited scope of copyright termination notice; violation of rights under Copyright Act

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☑ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **REAL PROPERTY** | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | **IMMIGRATION** | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | ☐ 462 Naturalization Application | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 463 Habeas Corpus-Alien Detainee | | **FEDERAL TAX SUITS** |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 290 All Other Real Property | ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | | ☐ 871 IRS-Third Party 26 USC 7609 |

**FOR OFFICE USE ONLY:**   Case Number:   CV10 3633

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s):

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑ Yes
If yes, list case number(s): Case No. CV-04-8400 ODW (RZx) (Hon. Otis D. Wright); Case No. CV-04-8776 ODW (RZx) (Hon. Otis D. Wright)

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply) ☑ A. Arise from the same or closely related transactions, happenings, or events; or
☑ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☑ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☑ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | New Mexico |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | New York |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR PRO PER):**                                          Date May 14, 2010

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |