KENDALL BRILL & KLIEGER LLP
Richard B. Kendall (90072)
  rkendall@kbkfirm.com
Laura W. Brill (195889)
  lbrill@kbkfirm.com
Nicholas F Daum (236155)
  ndaum@kbkfirm.com
Nathalie E. Cohen (258222)
  ncohen@kbkfirm.com
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067
Telephone: 310.556.2700
Facsimile: 310.556.2705

Attorneys for Defendants Marc Toberoff,
Pacific Pictures Corporation, IP
Worldwide, LLC, and IPW, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DC Comics,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JOANNE SIEGEL, an individual, LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive,<br><br>　　　　Defendants. | Case No. CV 10-3633 ODW(RZx)<br><br>**DECLARATION OF NICHOLAS F. DAUM IN SUPPORT OF MOTION TO STRIKE PLAINTIFF'S STATE LAW CAUSES OF ACTION PURSUANT TO CALIFORNIA'S ANTI-SLAPP LAW (CAL. CODE CIV. PROC. § 425,16)**<br><br>*Filed concurrently with MOTION TO STRIKE PURSUANT TO CALIFORNIA'S ANTI-SLAPP LAW, MOTION TO DISMISS, REQUEST FOR JUDICIAL NOTICE and NOTICE OF JOINDER*<br><br>Hon. Otis D Wright, II<br><br>Date:　October 18, 2010<br>Time:　1:30 p.m.<br><br>Complaint Filed:　May 14. 2010 |

**DECLARATION OF NICHOLAS F. DAUM IN SUPPORT OF MOTION TO STRIKE PURSUANT TO ANTI-SLAPP LAW**

## DECLARATION OF NICHOLAS F. DAUM

I, Nicholas F. Daum, declare as follows:

1. I am an attorney at the law firm of Kendall Brill & Klieger LLP, counsel of record for Defendants Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC, and IPW, LLC in the above-captioned action. I am a member in good standing of the State Bar of California and am admitted to practice before this Court. Except where otherwise stated, I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2. Attached hereto as Exhibit A is a true and correct copy of the April 30, 2007, Declaration of Marc Toberoff in support of Plaintiffs' Motion for Summary Judgment and Exhibits Q and Z thereto, filed in *Joanne Siegel et al. v. Warner Bros. Entertainment Inc., et al*., USDC Case No. CV-04-8400-SGL (RZx) (the "Superman Litigation").

3. Attached hereto as Exhibit B is a true and correct copy of excerpts of the November 17, 2006, Deposition of Marc Toberoff in the Superman Litigation and *Joanne Siegel et al. v. Warner Bros. Entertainment Inc., et al.*, USDC Case No. CV 04-08776-SGL (RZx) (the "Superboy Litigation") (together, the "Siegel Litigation") ("Toberoff Depo.").

4. Attached hereto as Exhibit C is a true and correct copy of Exhibit 13 to the Toberoff Depo., which is authenticated in the deposition excerpts attached hereto as Exhibit B (Toberoff Depo. 50:4-13).

5. Attached hereto as Exhibit D is a true and correct copy of Exhibit 14 to the Toberoff Depo., which is authenticated in the deposition excerpts attached hereto as Exhibit B (Toberoff Depo. 68:20-69:11).

6. Attached hereto as Exhibit E is a true and correct copy of Exhibit 15 to the Toberoff Depo., which is authenticated in the deposition excerpts attached hereto as Exhibit B (Toberoff Depo. 75:19-24).

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1

DECLARATION OF NICHOLAS F. DAUM IN SUPPORT OF MOTION TO STRIKE
PURSUANT TO ANTI-SLAPP LAW

7.      Attached hereto as Exhibit F is a true and correct copy of Exhibit 18 to the Toberoff Depo., which is authenticated in the deposition excerpts attached hereto as Exhibit B (Toberoff Depo. 111:25-112:23).

8.      Attached hereto as Exhibit G is a true and correct copy of excerpts of the November 11, 2006, Deposition of Mark Warren Peary in the Siegel Litigation ("Peary Depo.").

9.      Attached hereto as Exhibit H is a true and correct copy of Exhibit 7 to the Peary Depo., which is authenticated in the deposition excerpts attached hereto as Exhibit G (50:14-51:10).

10.     Attached hereto as Exhibit I is a true and correct copy of Exhibit 8 to the Peary Depo., which is authenticated in the deposition excerpts attached hereto as Exhibit G (59:1-8).

11.     Attached hereto as Exhibit J is a true and correct copy of Exhibit 10 to the Peary Depo., which is authenticated in the deposition excerpts attached hereto as Exhibit G (64:15-24).

12.     Attached hereto as Exhibit K is a true and correct copy of excerpts of the August 2, 2006, Deposition of Joanne Siegel in the Siegel Litigation ("Siegel Depo.").

13.     Attached hereto as Exhibit L is a true and correct copy of Exhibit 43 to the Siegel Depo., which is authenticated in the deposition excerpts attached hereto as Exhibit K (Siegel Depo. 44:14-21).

14.     Attached hereto as Exhibit M is a true and correct copy of excerpts of the August 1, 2006, Deposition of Laura Siegel Larson in the Siegel Litigation ("Larson Depo.").

15.     Attached hereto as Exhibit N is a true and correct copy of Exhibit 17 to the Larson Depo., which is authenticated in the deposition excerpts attached hereto as Exhibit M (Larson Depo. 107:1-4)

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

DECLARATION OF NICHOLAS F. DAUM IN SUPPORT OF MOTION TO STRIKE PURSUANT TO ANTI-SLAPP LAW

16.     Attached hereto as Exhibit O is a true and correct copy of Exhibit 23 to the Larson Depo., which is authenticated in the deposition excerpts attached hereto as Exhibits K, M  (Siegel Depo. 32:18-23; Larson Depo. 133:19-134:10).

17.     Attached hereto as Exhibit P is a true and correct copy of Exhibit 25 to the Larson Depo., which is authenticated in the deposition excerpts attached hereto as Exhibit K (Siegel Depo. 27:14-28:7).

18.     Attached hereto as Exhibit Q is a true and correct copy of Exhibit 41 to the Larson Depo., which is authenticated in the deposition excerpts attached hereto as Exhibit M (Larson Depo. 261:9-262:3).

19.     Attached hereto as Exhibit R is a true and correct copy of excerpts of the October 7, 2006, Deposition of Kevin Marks in the Siegel Litigation ("Marks Depo.").

20.     Attached hereto as Exhibit S is a true and correct copy of Exhibit 3, page GTRB 0604, to the Marks Depo., which is authenticated in the deposition excerpts attached hereto as Exhibit R (Marks Depo. 13:10-15:15).

21.     Attached hereto as Exhibit T is a true and correct copy of Exhibit 5 to the Marks Depo., which is authenticated in the deposition excerpts attached hereto as Exhibit R (Marks Depo. 44:6-13).

22.     Attached hereto as Exhibit U is a true and correct copy of Exhibit 6 to the Marks Depo., which is authenticated in the deposition excerpts attached hereto as Exhibit R (Marks Depo. 46:11-16).

23.     Attached hereto as Exhibit V is a true and correct copy of excerpts of the November 10, 2006, Deposition of John Schulman in the Siegel Litigation ("Schulman Depo.").

24.     Attached hereto as Exhibit W is a true and correct copy of excerpts of the November 10, 2006, Deposition of Jean Peavy in the Siegel Litigation ("Peavy Depo.").

Kendall Brill & Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

3
DECLARATION OF NICHOLAS F. DAUM IN SUPPORT OF MOTION TO STRIKE PURSUANT TO ANTI-SLAPP LAW

25.     Attached hereto as Exhibit X is a true and correct copy of Exhibit 16 to the Peavy Depo., which is authenticated in the deposition excerpts attached hereto as Exhibit W (Peavy Depo. 25:21-26:13).

26.     Attached hereto as Exhibit Y is a true and correct copy of Exhibit 17 to the Peavy Depo., which is authenticated in the deposition excerpts attached hereto as Exhibit W (Peavy Depo. 28:16-24).

27.     Attached hereto as Exhibit Z is a true and correct copy of Defendants' Notice of Motion and Joint Stipulation re: Motion to Compel Production of Whistle Blower Documents in the Siegel Litigation.

28.     Attached hereto as Exhibit AA is a true and correct copy of the March 23, 2007, Declaration of Marc Toberoff in Opposition to Defendants' Motion to Compel Production of Whistle Blower Documents and Exhibit P thereto, filed in the Siegel Litigation.

29.     Attached hereto as Exhibit BB is a true and correct copy of the September 20, 2007, Declaration of Marc Toberoff Filed Pursuant to the Court's September 17, 2007 Order in the Siegel Litigation.

30.     Attached hereto as Exhibit CC is a true and correct copy of an August 17, 2004, letter from Marc Toberoff to Tom McGuire and enclosed Winding-Up Agreement for IP Worldwide, LLC.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed August 13, 2010, at Los Angeles, California.


_____
Nicholas F. Daum

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

4

# EXHIBIT A

1  Marc Toberoff (CA State Bar No. 188547)
   Nicholas C. Williamson (CA State Bar No. 231124)
2  LAW OFFICES OF MARC TOBEROFF, PLC
   2049 Century Park East, Suite 2720
3  Los Angeles, CA 90067
   Telephone: (310) 246-3333
4  Facsimile: (310) 246-3101
   Email: MToberoff@ipwla.com
5
   Attorneys for Plaintiffs and Counterclaim Defendants
6  JOANNE SIEGEL and LAURA SIEGEL LARSON

7              UNITED STATES DISTRICT COURT

8      CENTRAL DISTRICT OF CALIFORNIA- EASTERN DIVISION

9

| | |
|---|---|
| 10  JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual, | Case No. CV 04-8400 SGL (RZx) |
| 11 | [Honorable Stephen G. Larson] |
| 12              Plaintiffs, | |
|         vs. | **DECLARATION OF MARC TOBEROFF IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| 13 | |
| 14  WARNER BROS. ENTERTAINMENT INC., a corporation; TIME WARNER INC., a corporation; DC COMICS, a general partnership; and DOES 1-10, | |
| 15 | **VOLUME I** |
| 16 | [Complaint filed: October 8, 2004] |
| 17 | |
| 18              Defendants. | Date: ~~TBD~~ July 16, 2007 Time: 10:00 a.m. Place: Courtroom 1 |
| 19 | |
| 20  DC COMICS, | [Notice of Motion; Memorandum of Points and Authorities In Support of Motion For Partial Summary Judgment; Statement of Uncontroverted Facts and Conclusions Of Law; Request For Judicial Notice And [Proposed] Order Filed Concurrently Herewith] |
| 21              Counterclaimant, | |
| 22         vs. | |
| 23  JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual, | |
| 24 | |
| 25 | |
| 26              Counterclaim Defendants. | |

27

28

Declaration Of Marc Toberoff In Support Of Plaintiffs' Motion For Partial Summary Judgment

EXHIBIT A

Page 5

# DECLARATION OF MARC TOBEROFF

I, Marc Toberoff, declare as follows:

1.      I am an attorney at the Law Offices of Marc Toberoff, PLC, counsel of record for plaintiffs Laura Siegel Larson and Joanne Siegel ("Plaintiffs"). I am a member in good standing of the State Bar of California and submit this Declaration in support of Plaintiff's Motion for Partial Summary Judgment. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.      Attached hereto as "Exhibit A" is a true and correct certified copy of the Opinion, dated November 21, 1947, of the Official Referee Judge Addison Young (hereinafter, "Judge Young") in the action entitled *Jerome Siegel and Joseph Shuster v. National Periodical Publications, et al.* in the Supreme Court of the State of New York, Westchester County (hereinafter, the "1947 Action").

3.      Attached hereto as "Exhibit B" is a true and correct certified copy of Judge Young's Findings of Fact and Conclusions of Law dated April 12, 1948, in the 1947 Action.

4.      Attached hereto as "Exhibit C" is a true and correct copy of the Stipulation of settlement dated May 19, 1948 ("1948 Stipulation") between the parties to the 1947 Action (Jerome Siegel, Joseph Shuster and National Periodical Publications, *et al.*) which I had copied from the Joint Appendix in *Siegel v. National Periodical Publications, Inc. et al.*, 508 F.2d 909 (2d Cir. 1974).

5.      Attached hereto as "Exhibit D" is a true and correct certified copy of Judge Young's corresponding Final [Consent] Judgment dated May 21, 1948 in the 1947 Action.

1

6.      Attached hereto as "Exhibit E" is a true and correct copy of the agreement dated March 31, 1938 between Jerome Siegel and Joseph Shuster on the one hand and Detective Comics, Inc. on the other hand ("March 31, 1938 Grant").

7.      Attached hereto as composite "Exhibit F" are true and correct copies of the June 1, 1965 Certificates of Registration of a Claim to Renewal Copyright regarding Action Comics No. 1 and "Superman."

8.      Attached hereto as "Exhibit G" is a true and correct copy of relevant excerpts from Plaintiffs' Notice of Termination of Transfer Covering Extended Renewal term for "Superman" dated April 3, 1997 regarding the March 31, 1938 Grant.

9.      Attached hereto as "Exhibit H" is a true and correct copy of relevant excerpts from Plaintiffs' Notice of Termination of Transfer Covering Extended Renewal term for "Superman" dated April 3, 1997 regarding a purported December 4, 1937 agreement.

10.     Attached hereto as "Exhibit I" is a true and correct copy of relevant excerpts from Plaintiffs' Notice of Termination of Transfer Covering Extended Renewal term for "Superman" dated April 3, 1997 regarding a purported September 22, 1938 agreement with DC Comics, Inc.

11.     Attached hereto as "Exhibit J" is a true and correct copy of relevant excerpts from Plaintiffs' Notice of Termination of Transfer Covering Extended Renewal term for "Superman" dated April 3, 1997 regarding a purported September 22, 1938 agreement with the McClure Newspaper Syndicate.

12.     Attached hereto as "Exhibit K" is a true and correct copy of relevant excerpts from Plaintiffs' Notice of Termination of Transfer Covering Extended Renewal term for "Superman" dated April 3, 1997 regarding the 1948 Stipulation.

2

13.    Attached hereto as "Exhibit L" is a true and correct copy of relevant excerpts from Plaintiffs' Notice of Termination of Transfer Covering Extended Renewal term for "Superman" dated April 3, 1997 regarding a purported December 19, 1939 agreement.

14.    Attached hereto as "Exhibit M" is a true and correct copy of relevant excerpts from Plaintiffs' Notice of Termination of Transfer Covering Extended Renewal term for "Superman" dated April 3, 1997 regarding a purported December 23, 1975 agreement.

15.    Attached hereto as composite "Exhibit N" are a true and correct copies of the Certificates of Recordation dated September 17, 1998 from the United States Copyright Office for Plaintiffs' April 3, 1997 Notices of Termination regarding "Superman."

16.    Attached hereto as "Exhibit O" is a true and correct copy of an April 16, 1997 letter from John A. Schulman to Joanne Siegel.

17.    Attached hereto as "Exhibit P" is a true and correct copy of an October 10, 1997 letter from Paul Levitz to Joanne Siegel and Laura Siegel Larson.

18.    Attached hereto as "Exhibit Q" is a true and correct copy of an April 15, 1999 letter from DC Comic's counsel to Plaintiffs' former counsel Arthur Levine.

19.    Attached hereto as "Exhibit R" is a true and correct copy of Defendants' First Amended Counterclaim for case no. CV 04-8400 SGL (RZx).

20.    For the Court's convenience, a true and correct copy of the decision in *Siegel v. National Periodical Publications, Inc. et al.*, 364 F. Supp. 1032 (S.D.N.Y. 1973) is attached hereto as Exhibit "S."

21.    For the Court's convenience, a true and correct copy of the decision in *Siegel v. National Periodical Publications, Inc. et al.*, 508 F.2d 909 (2d Cir. 1974) is attached hereto as Exhibit "T."

3

22.     Attached hereto as "Exhibit U" is a true and correct copy of Judge Ronald S. W. Lew's March 24, 2006 order in civil case no. 04-08776 RSWL (RZx).

23.     Attached hereto as "Exhibit V" is a true and correct copy of Judge Ronald S. W. Lew's May 23, 2006 order in civil case no. 04-08776 RSWL (RZx).

24.     Attached hereto as "Exhibit W" is a true and correct copy of the appellate brief of Defendants' alleged predecessors, defendants-appellees National Periodical Publications, Inc. *et al.* in *Jerome Siegel and Joseph Shuster v. National Periodical Publications, et al.* 508 F.2d 909 (2d Cir. 1974), which was produced in this action by Defendants.

25.     Attached hereto as "Exhibit X" is a true and correct copy of Plaintiffs' October 8, 2004 complaint for case no. CV 04-8400 (SGL (RZx).

26.     Attached hereto as "Exhibit Y" is a true and correct of a December 23, 1975 agreement between Warner Communications, Inc. and Jerome Siegel and Joseph Shuster.

27.     Attached hereto as "Exhibit Z" is a true and correct copy of a tolling agreement dated April 6, 2000 between Plaintiffs and DC Comics.

28.     Attached hereto as "Exhibit AA" is a true and correct copy of a letter dated September 21, 2002 from Joanne Siegel to Kevin S. Marks and Bruce M. Ramer.

29.     Attached hereto as "Exhibit BB" is a true and correct copy of a letter dated October 19, 2001 from Plaintiffs' former counsel Kevin Marks ("Marks") to Defendants' general counsel John Schulman ("Schulman").

30.     Attached hereto as "Exhibit CC" is a true and correct copy of a letter dated October 26, 2001 from Schulman to Marks.

1      31.   Attached hereto as "Exhibit DD" is a true and correct copy of a

2  letter dated February 1, 2002 from Defendants' counsel Patrick Perkins to

3  Marks.

4      32.   Attached hereto as "Exhibit EE" is a true and correct copy of

5  excerpts from the October 7, 2006 deposition of Marks.

6      33.   Attached hereto as "Exhibit FF" is a true and correct copy of a

7  March 15, 1982 letter from Martin D. Payson, Senior Vice President and

8  General Counsel for Warner Communications, Inc. to Joanne Siegel.

9      34.   Attached hereto as "Exhibit GG" is a true and correct copy of

10  Plaintiffs' First Amended Complaint for case no. CV 04-8400 (SGL (RZx).

11

12      Executed on April 30, 2007 in Los Angeles, California.

13

14

15                          Marc Toberoff

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration Of Marc Toberoff In Support Of Plaintiffs' Motion For Partial Summary Judgment



APR 16 '99 10:39 FR FINNEGAN HENDERSON    202 408 4400 TO 13108277227    P.02

## FROSS ZELNICK LEHRMAN & ZISSU, P.C.

866 UNITED NATIONS PLAZA
AT FIRST AVENUE & 48TH STREET
NEW YORK, N.Y. 10017

TELEPHONE: (212) 813-5900
FACSIMILE: (212) 813-5901
E-MAIL: info@frosszelnick.com

April 15, 1999

VIA FACSIMILE AND MAIL

Arthur J. Levine, Esq.
Finnegan, Henderson, Farabow,
Garrett & Dunner, L.L.P.
1300 I Street, N.W.
Washington, D.C.

Re:   Superman

Dear Arthur:

I am writing with respect to your clients' notices purporting to terminate under Section 304 of the Copyright Act ("the Notices"), Jerome Siegel's grant to DC Comics' predecessor in interest of his copyright rights in the Superman character and story depicted in Action Comics No. 1.

Following your conversation earlier this month with John Schulman, to the effect that your clients still intend to negotiate a settlement with respect to the Notices and that someone acting on their behalf would be contacting us shortly for that purpose, we were, once again, hoping to be able to engage in a dialogue to resolve this matter. We still take you at your word regarding your clients' intention to negotiate. Our client's relationship with your clients remains a highly valued one and the door is obviously open for what we hope will be a fruitful dialogue leading to an amicable accord on this matter. However, the absence of any steps towards negotiation for two years, particularly on the "eve" of the April 16, 1999 purported "effective" date of the termination, leaves us concerned. Thus, our client has no alternative but to move to the stage of putting your clients on clear notice, as set out below, of DC Comics' rights and of its determination, if it becomes necessary, to take all appropriate and necessary steps to protect those rights.

First, your clients are hereby put on notice that DC Comics rejects both the validity and scope of the Notices and will vigorously oppose any attempt by your clients to exploit or authorize the exploitation of any copyrights, or indeed any rights at all, in Superman. After a careful review of the Notices and background facts, we have concluded that your clients' attempt

171

From :    PHONE No. :    Jan. 28 1997  4:41AM  P03 

APR 16 '99 10:39 FR FINNEGAN HENDERSON    202 408 4400 TO 13108277227    P.03

Arthur J. Levine, Esq.
April 15, 1999
Page 2

to effect a termination of Mr. Siegel's grant fails to meet the clearly stated requirements set out by Congress in Section 304 of the Copyright Act and therefore the Notices are invalid and of no force and effect.   The notices were untimely and excessive in scope.  As you know, we have been trying, without success, to meet and discuss this with you and your clients for two years. Thus, Mr. Siegel's grant has not been, and now cannot be, terminated, and all rights granted by him are still owned exclusively by DC Comics.

Please be further advised that, even if, *arguendo*, the Notices were valid, DC Comics would be a joint owner with the Siegels of any limited copyright rights they would have, based upon Mr. Schuster's grant to DC Comics' predecessor, which grant is still in effect. Thus, DC Comics has the absolute right to continue to exercise all the existing rights of a copyright owner with respect to such rights, including the right to republish pre-existing works and to create and publish new ones based thereon.

Please be further advised that as discussed more fully below, even if, *arguendo*, the Notices were valid, your clients' rights would be extremely limited in any event.  Specifically, DC Comics' sole copyright ownership of all Superman derivative works created since Mr. Siegel's and Mr. Schuster's first story, and sole trademark ownership of the name and mark "Superman" and all other related Superman symbols and indicia of origin would remain unaffected by the termination. Thus, your clients would have no rights of any kind in, and would be strictly prohibited from any use of, the vast library of comic books, motion pictures, television and radio shows, product embodiments and the like which portray the evolution of the original Superman into the modern hero he is today, including a multitude of significant creative elements associated with the Superman legend which were created by many talented writers and artists employed by DC Comics during these years and which would remain exclusively owned by DC Comics. Thus, your clients would also have no rights in, and would be strictly prohibited from any use, in a manner that is likely to cause public confusion, of any Superman trademarks, including the name and mark Superman, the character's image or any of the well known slogans or other indicia which have come to be exclusively associated with Superman.

Indeed, even if, *arguendo* the notices were valid, your clients' rights would be narrowly confined to the copyrightable aspect of what Mr. Siegel originally granted to DC Comics, namely, his individual one-half interest in the original, but now stylistically dated portrayal of Superman as depicted in Action Comics No. 1, but, again, without use of the Superman name or image as a title or mark, or any elements created subsequent to Action Comics No. 1.  Your clients and any licensees or assignees would have the strict burden of presenting their adaptations of Mr. Siegel's work in a manner which did not dilute our clients' famous marks or create any association between their work and the famous Superman mark and legend or DC Comics' Superman business or properties, and of avoiding any confusion with respect to the source of their works or products.

Further, even if, *arguendo*, the Notices were valid, DC Comics' sole ownership of the copyrights in the Superman character and stories outside of the United States would remain

172

E 3    ON 7797    FECT    APR 15 1999 9:34PM

THURS NO.                    Mar. 28 1997  4:42AM  P04

APR 16 '99 10:40 FR FINNEGAN HENDERSON    202 408 4400 TO 13108277227      P.04

Arthur J. Levine, Esq.
April 15, 1999
Page 3

undisturbed by your clients' Notices. Thus, your clients could not exploit or authorize the exploitation of Superman in any form outside of the United States.

Please be further advised that DC Comics will vigorously enforce its rights to Superman as it has done for 60 years. For that period, Superman has been flawlessly nurtured and developed by DC Comics, which has both protected and created value in the property. All necessary and appropriate steps to continue to protect its business, and to preserve the rich legacy of Superman, will be taken. Your clients may want to show this letter to anyone to whom your clients intend to purport to grant any rights or permissions, to avoid any misunderstanding as to what steps DC Comics intends to take to protects its interests.

This letter does not exhaustively set forth all of DC Comics' rights with respect to the Notices or Superman and is written without prejudice to any of our client's rights or remedies, including with respect to the parties' continuing rights and obligations under their agreements providing, among other things, compensation and other benefits to Mrs. Siegel, all of which are expressly reserved.

Very truly yours,

Carol F. Simkin

**173**

FROM : LARSON                          FAX NO. : 310-827-7227                    Apr. 25 2008 03:18PM  P2
    SENT BY:                              4- 5- 0 : 0:31PM :                      +010 827 7127         :6  8/12

## TOLLING AGREEMENT

THIS AGREEMENT is made and entered into this ____ day of April, 2000, by and between DC COMICS ("DC") and JOANNE and LAURA SIEGEL ("SIEGEL").

WHEREAS, SIEGEL served upon DC and other parties the Notices of Termination of Transfer Covering Extended Renewal Term listed in Exhibit A hereof, which contain certificates stating that these were mailed on April 3, 1997 (the "Notices");

WHEREAS, DC by letter dated April 15, 1999 rejected the validity and scope of the Notices;

WHEREAS, at this time, DC and SIEGEL are in negotiations to find an amicable resolution in respect of the Notices;

NOW, THEREFORE, in consideration of the mutual covenants and conditions herein contained and to encourage continued negotiations between the parties, DC and SIEGEL for themselves, their predecessors, successors, past and present subsidiaries or affiliates, and legal representatives agree as follows:

1.  The parties agree not to assert any statute of limitations or laches defenses relating to or rights claimed based upon, the validity, invalidity, or legal effect of the Notices, or any one of them, where such defenses become available because of the passage of time during the period from the date hereof until cancellation of this Tolling Agreement pursuant to paragraph 7 hereof (the "Tolling Period"). The parties agree that this Agreement shall not be construed as, nor considered to be, a waiver of any other claims or defenses in any lawsuits or actions, including such defenses available because of the passage of time prior to the date hereof.

2.  The parties acknowledge that nothing in this Agreement (nor its execution) is, or shall be construed as an admission or acknowledgement of liability or an admission or

308

FROM : LARSON
SENT BY:                          FAX NO. : 310-527-7227                Apr. 05 2008 03:10PM P3
                              4- 5- 0 : 6:31PM :                  -310 527 7227           10 6/12

acknowledgement that any laches or statute of limitations claim is or would be valid. Nor shall this Agreement constitute a litigation standstill agreement by any of the parties hereto under which any of them agrees not to institute litigation to protect or enforce their rights except that, if a party terminates a negotiations under Paragraph 7 hereof, no party shall initiate litigation for a period of 10 business days.

3.   The parties irrevocably acknowledge and agree that they are now and forever estopped and precluded from contesting or denying the validity and enforceability of this Agreement, and have been advised of the legal effect of this Agreement by their respective legal counsel.

4.   The parties acknowledge and agree that this Agreement is not admissible in any litigation proceedings for any purpose other than enforcement of the terms hereof, nor shall it otherwise be considered an admission by any party hereto.

5.   This Agreement constitutes the entire agreement among the parties hereto and sets forth all promises, covenants, agreements, conditions, and understandings between the parties with respect to the tolling of any statute of limitations or laches defense.

6.   Any controversy regarding this Agreement shall be decided without regard to rules of construction regarding indemnity.

7.   The Tolling Period provided for in this Agreement shall remain in effect until 10 business days after the earlier of: (a) one of the parties terminating negotiations, in writing, relating to the Notices, or (b) the parties reaching an amicable resolution of the disputes between them relating to the Notices. Cancellation of the Tolling Period by one of the above events shall not alter or extinguish the parties' other rights hereunder. Any notices required under this Agreement shall be sent by United States Certified Mail, Return Receipt Requested to:

2

309

EXHIBIT A
Page 15

FROM : LARSON
SENT BY:
DC + ICS LEGAL
FAX NO. : 318-337-7227
4- 5- 0 : 6:22PM :

To DC Comics

To The Siegels

Lillian I. Laserson
General Counsel
DC Comics
1700 Broadway
New York, New York 10019

Joanne Siegel
11900 Peavy Way, R-115
Marina Del Rey, CA 90292

Laura Siegel Larson
2600 Pacific Avenue, No. 106
Playa del Rey, CA 90293

With a copy to:

With a copy to:

Carol F. Simkin/Roger L. Zissu
From Zelnick Lehrman & Zissu, P.C.
866 United Nations Plaza
New York, New York 10017

Bruce Ramer/Kevin S. Marks
Gang, Tyre, Ramer & Brown, Inc.
132 South Rodeo Drive
Beverly Hills, CA 90212-2403

8. The terms of this Agreement apply to Michael Siegel as between Michael Siegel and

DC.

AGREED:

DC COMICS

JOANNE SIEGEL

By: _____

_____

Date: 4/7/2000

_____

LAURA SIEGEL LARSON

_____

Date: April 6, 2000

3

EXHIBIT A
Page 16

# EXHIBIT B

ORIGINAL SHIPPED    DEC 0 1 2006

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA    )
SIEGEL LARSON,             )
                           )
        Plaintiffs,        )
                           )
    vs.                    )    No. 04-8400 (RSWL)(RZx)
                           )
WARNER BROS. ENTERTAINMENT )         -and-
INC., et al.,              )
                           )    No. 04-8776 (RSWL)(RZx)
        Defendants.        )
_____)
AND RELATED COUNTERCLAIMS.

**CERTIFIED
ORIGINAL**

DEPOSITION OF MARC TOBEROFF

Beverly Hills, California

Friday, November 17, 2006

Reported by:

DAVID S. COLEMAN

CSR No. 4613

**U.S. LEGAL**
*Support*
*Certified Shorthand Reporters*

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA 91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

Los Angeles • Orange County • San Diego • Inland Empire • ... Jose • San Francisco • Sacramento ... and across the nation

02:33 1    Q    What are the top talent agencies that are

02:33 2    referred to in that sentence?

02:33 3    A    I don't know.  I didn't write this.

02:33 4    Q    Does IP Worldwide have any strategic

02:33 5    partnerships with top talent agencies?

02:33 6    A    IP Worldwide, LLC, yes.

02:33 7    Q    Okay.  And what agencies are those?

02:33 8    A    IP Worldwide, LLC is no -- it still exists, but

02:33 9    it's not active in the entertainment...

02:34 10    Q    In what area, if any, is it active?

02:34 11    A    It's not active right now.

02:34 12    Q    When IP Worldwide was active, what top talent

02:34 13    agencies did it have strategic partnerships with?

02:34 14    A    Endeavor.

02:34 15    Q    Any others?

02:34 16    A    I wouldn't call it a strategic partnership, no.

02:34 17    Q    And with what production companies did IP

02:34 18    Worldwide have strategic partnerships with?

02:34 19    A    I don't know what that means.  In other words,

02:34 20    this is -- I wouldn't have written this.  I don't know

02:34 21    what that means, a strategic partnership with a

02:34 22    production company.  It's silly.

02:34 23    Q    Do you know how long this website has been on

02:34 24    the Internet, Mr. Toberoff?

02:34 25    A    I do not.

32

U.S. LEGAL SUPPORT

03:00 1    I'm the majority owner of IPW, LLC.

03:01 2        Q    Do you have any further answer to my question?

03:01 3        A    No.

03:01 4        Q    So that you decline to tell me what the relative

03:01 5    ownership interests between you and Mr. Karsh are?

03:01 6        A    IPW, LLC has very -- its only relevance to this

03:01 7    action is as is set forth in the documents that were

03:01 8    produced, which is, namely, IP Worldwide at one point had

03:01 9    an agreement with the Siegels, and that agreement has

03:01 10   long ago expired, but at the time when IP Worldwide was

03:01 11   wound up and its various agreements were -- or rights

03:01 12   were assigned to IPW, LLC, that agreement had a few

03:02 13   months left on it, and it was assigned.  So there is very

03:02 14   little connection between IPW, LLC and this lawsuit.  I

03:02 15   would say no connection.

03:02 16       Q    Mr. Toberoff, you know as well as I do that

03:02 17   there is no relevance privilege which enables a witness

03:02 18   to decline to answer a question.

03:02 19       A    No, but I think it has bearing on privacy issues

03:02 20   and trade secret issues, and I don't believe you're

03:02 21   entitled to go into every aspect, particularly financial

03:02 22   aspects, of any company that I'm involved with.

03:02 23       Q    And do you therefore refuse to answer that

03:02 24   question?

03:02 25       A    Yes.

45

**U.S. LEGAL SUPPORT**

03:09 1    five-minute break.

03:09 2            (Recess.)

03:15 3    BY MR. BERGMAN:

03:15 4        Q    Referring to the last page of Exhibit 13,

03:15 5    Mr. Toberoff, I note that this copy does not bear your

03:15 6    signature.  It bears the Peary and Peavy signatures.

03:15 7            To your recollection did you ever sign a copy of

03:16 8    Exhibit 13?

03:16 9        A    I recall a joint venture agreement that was

03:16 10   signed, I believe -- I recall because I believe that

03:16 11   document was produced, but I don't know -- I would have

03:16 12   to compare this to that document to know whether there

03:16 13   were any changes between the two.

03:16 14       Q    I know that the parties to this agreement are

03:16 15   Ms. Peavy and Mr. Peary on the one hand and Pacific

03:16 16   Pictures Corporation on the other.

03:16 17           Am I correct that you've identified Pacific

03:16 18   Pictures Corporation as a loan-out company?

03:16 19       A    I said I believe as it was initially conceived

03:16 20   in whenever it was in the '80s, that's how I conceived

03:16 21   it:  As a loan-out company.

03:16 22       Q    Well, did the nature of Pacific Pictures'

03:17 23   business ever change from being a loan-out company to

03:17 24   being something else?

03:17 25       A    To determine that, I'd have to know what the

                                                                    50

03:18 1        A    It's not active since -- I think -- didn't you

03:18 2    ask me earlier about Pacific, and I said at the end of

03:19 3    2000 -- -- towards the end of 2003 I stopped using it?

03:19 4    So it doesn't -- you know, I guess there is a distinction

03:19 5    between a technical office for purposes of registration

03:19 6    with the Secretary of State and active offices.  I used

03:19 7    to work out of my home in Malibu, and this was the

03:19 8    mailing address used for myself and Pacific Pictures.

03:19 9        Q    When was your first communication with either

03:1910    Miss Peavy or Mr. Peary concerning the Joe Shuster

03:1911    interest, if any, in Superman?

03:1912        MR. WILLIAMSON:  Objection.  Assumes facts not

03:1913    in evidence.  Vague and ambiguous.

03:2014        THE WITNESS:  Sometime around mid 2001.

03:2015    BY MR. BERGMAN:

03:2016        Q    And how did that initial communication come

03:2017    about?

03:2018        A    Warren Peary -- the last name is P E A R Y --

03:2019    called me up and -- he called me up.

03:2020        Q    And what did he say?

03:2021        A    He said he wanted -- was interested in -- I

03:2022    think he said that he got my name off of some article he

03:2023    had read on the Internet and that he wanted a lawyer to

03:2024    help him to figure out what rights the Joe Shuster estate

03:2125    would have in Superman.

52

U.S.  LEGAL  SUPPORT

from the Shusters to date or any compensation in

connection with this or any other agreement.

    Q    They have subsequent to this --

    A    Since 2001.

    Q    They have subsequent to this agreement retained

you as an attorney, have they not?

    A    Yes.

    Q    And when was that?

    A    I don't -- I know it was at some time before the

lawsuit was filed in the Siegel case.  I also know that

this agreement was cancelled.  I am not sure when the

legal retainer agreement was entered into, but I believe

it was definitely entered into before this agreement was

cancelled.

    Q    In connection with the Joint Venture Agreement,

Exhibit 13, did either Peary or Peavy ask you whether 50

percent was a customary amount for an entity such as PPC

to receive?

    A    I don't recall them saying that.

    Q    Do you recall any negotiation at all about the

50 percent?

    A    Not specifically.  I believe there was some

negotiation or discussion regarding the fee stated in

this agreement.

    Q    I didn't hear that last.

62

Q   Well, you testified earlier that you were

initially contacted in your capacity as a lawyer.

Somehow that shifted by November 23, 2001, to your

becoming a joint venturer with the Shuster heirs.

How did that change in the relationship evolve?

MR. WILLIAMSON:  Objection.  Misstates your

testimony.

THE WITNESS:  What you're saying is incorrect.

It didn't shift.  A lot of my work prior to this

agreement, particularly as I've described in the

entertainment industry, to varying degrees would require

a certain amount of legal work, legal analysis, research,

because it was all rights based in the entertainment

industry.  Rights were the platform for doing business in

the entertainment industry, and I -- you know, instead of

having two separate agreements, a legal retainer

agreement that covered the legal and then a business

arrangement to cover the aspects of making deals in the

entertainment industry, at least at that time I was just

using Pacific Pictures and I would have one agreement,

but that's not to say there was no legal relationship.  I

just didn't have a legal retainer agreement, but they

were definitely, and particularly in this case, seeking

my legal advice, giving my legal advice, doing legal

research.  When the Shuster estate was probated, you

65

U.S. LEGAL SUPPORT

know, arranging for an estate lawyer, overseeing that

lawyer.

BY MR. BERGMAN:

    Q   So is it your testimony that this Joint Venture

Agreement was merely a disguised legal retainer

agreement?

    A   No.   Those are your words.

    Q   It was a business arrangement, was it not?

    A   No --

        MR. WILLIAMSON:   Objection.   Misstates prior

testimony.

        THE WITNESS:   -- as I said, can I didn't have a

separate -- I had a joint venture agreement -- in other

words, there is not a particular -- this is what I was

doing with regard to other things, and I did -- that were

probably less legal in nature, and I used the same

general structure for the Miss Jean Peavy and Warren

Peary -- we'll call them the Shusters -- I used the same

general structure at that time.   And it's not that this

is a legal retainer agreement.   It's just that I didn't

have a separate legal retainer agreement.   And I don't

think there is a...

BY MR. BERGMAN:

    Q   Is it your testimony that because you didn't

have a legal retainer agreement, you utilized this Joint

66

U.S. LEGAL SUPPORT

EXHIBIT B

Page 24

03:44 1    A    The assertion of the attorney-client privilege

03:44 2    goes to matters where you start to ask questions that go

03:44 3    to the giving of legal advice or legal strategies, mental

03:44 4    impressions, things protected by the work product

03:44 5    doctrine.

03:44 6    Q    The record will speak for itself on that.

03:44 7        In paragraph 11 there is the sentence about four

03:44 8    lines up from the bottom of the page that begins, "The

03:44 9    parties have mutually participated in the negotiation and

03:44 10   drafting of this Agreement..."

03:45 11       Did either Peary or Peavy engage in the drafting

03:45 12   of this agreement?

03:45 13   A    Only to the extent -- remember I told you

03:45 14   earlier that I believe it went through a few drafts in

03:45 15   response to requests, revisions, comments by Warren?  So

03:45 16   to that extent, yes.

03:46 17       MR. BERGMAN:  Would you mark as Exhibit 14,

03:46 18   please, a document on Pacific Pictures Corporation

03:47 19   letterhead dated October 27, 2003?

03:47 20       (Deposition Exhibit 14 marked.)

03:47 21   BY MR. BERGMAN:

03:47 22   Q    My first question is going to be whether that

03:47 23   is your signature on the last page of Exhibit 14,

03:47 24   Mr. Toberoff.

03:47 25   A    Yes, it is.

68

03:47 1        Actually, looking at the date of this document,

03:47 2  I can narrow the other question you asked:  When we

03:47 3  entered into a legal or retainer agreement.  Still I

03:47 4  think it might be between the date of this and the date

03:47 5  of the cancellation of these two agreements.

03:47 6     Q   Okay.

03:47 7     A   I'm not positive, but that's...

03:48 8     Q   Am I correct that you drafted Exhibit 14?

03:48 9     MR. WILLIAMSON:  Objection.  Vague and

03:48 10  ambiguous.

03:48 11     THE WITNESS:  Yes, I did.

03:48 12  BY MR. BERGMAN:

03:48 13     Q   Were --

03:48 14     A   With input from Warren.

03:48 15     Q   What input did you receive from Mr. Peary?

03:48 16     A   I don't recall specific items, but we discussed

03:48 17  it.

03:48 18     Q   Okay.  So am I correct you formed the -- you

03:48 19  probated the estate of Joseph Shuster and then entered

03:48 20  into this agreement with the executor of his estate?

03:48 21     MR. WILLIAMSON:  Objection.  Assumes facts not

03:48 22  in evidence.  It's vague and ambiguous.

03:49 23     THE WITNESS:  What's the question?

03:49 24  BY MR. BERGMAN:

03:49 25     Q   The question is, were you involved in the

69

U.S. LEGAL SUPPORT

case here.

I would say this instance is probably, as it unfolded, more of a legal nature, and that's why in retrospect, and of course everyone's a genius in retrospect, I decided that it should be a simple legal retainer agreement, and in retrospect it would have been better off just being that from the outset. And that's it.

BY MR. BERGMAN:

Q   Do you believe that there is an inherent ethical conflict in being both a business partner and a lawyer for individuals regarding the same matter?

A   It could pose potential conflicts, yes. That's one of the reasons I changed it.

MR. BERGMAN:  Would you mark as Exhibit 15, please, a one-page document dated September 10, 2004.

(Deposition Exhibit 15 marked.)

BY MR. BERGMAN:

Q   Exhibit 15 is the cancellation agreement that you referred to earlier, Mr. Toberoff?

A   I don't know if I referred to it as a cancellation agreement, but this Exhibit 15 is the document whereby we cancelled Exhibit 13 and Exhibit 14, yes.

Q   What led up to the decision to cancel the

75

U.S. LEGAL SUPPORT

(Unanswered question.)

Q   Who initiated the cancellation of the two prior agreements with the Shuster heirs?

A   I did.

Q   And what did you tell them with respect to that, why you wanted to cancel those agreements?

A   I don't recall.

Q   Did they object to the cancellation?

A   No.

Q   Are there any presently operative agreements between either or both Peavy and Peary on the one hand and Pacific Pictures on the other?

MR. WILLIAMSON:  Objection.  Vague and ambiguous.

THE WITNESS:  Not to my knowledge.

BY MR. BERGMAN:

Q   Are there presently any operative agreements between Peary --

A   Oh, wait.  These two agreements had been cancelled, and there are no other agreements.  The only agreement is a legal retainer agreement between myself and the Shusters.  There are no other agreements.  And the two prior agreements have been cancelled.

Q   Okay.  There are no other agreements between them and any of your entities?

78

U.S. LEGAL SUPPORT

A    I had seen on the Internet I think it was one of these comic book -- like a comic book journal had posted the Siegels' termination notice or a copy of one of their termination notices, and at the end of that notice the name of their attorney who had done the termination notice, Arthur Levine, and I believe I had his name and address.  I'm not sure if the phone number was there, but it may be.  And I spoke to Arthur Levine, and he in sum and substance told me that he wasn't -- you know, had done the termination but wasn't very active at that point and said the lawyer representing the Siegels was Kevin Marks.

Did you mention the date of that call?

Q    His phone log showed November 29, 2001.

A    I just want to check the date of my agreement with the Shusters, the first one.

Q    That was November 23, 2001.

A    Yeah.

Q    So this came six days after --

A    I believe it was shortly after -- I called him shortly after I made an agreement with the Shusters.

Q    Had you learned from the Shuster heirs that there was -- that Kevin Marks represented the Siegels?

A    No.

Q    Okay.

86

U.S. LEGAL SUPPORT

A   It was from Arthur Levine.

Q   What was it that prompted you to call Mr. Marks?

A   I believe at that time I was just trying to find out the status.

Q   Prior to the November 29, 2001 initial call to Mr. Marks, had you and Mr. Emanuel discussed the Siegel interest in Superman?

MR. WILLIAMSON:   Objection.   Attorney-client.

THE WITNESS:   Yeah.   Actually, at IP Worldwide I was general counsel to IP Worldwide.   I handled all of the contracts, anything legal, any negotiations, you know, just like any other general counsel would for a company, and so Ari's lawyer has asserted, and I believe that's correct, that there was an attorney-client relationship there and that my communications with Ari as to, you know, things that he wanted to do would be protected by the attorney-client privilege and attorney work product.

BY MR. BERGMAN:

Q   Once again, you were a joint venturer with Mr. Emanuel, were you not?

A   That's correct, but I was also part of the company.   In other words, what I did for the company and whether or not I was a joint venturer, the underlying organization of those companies are different issues.

87

U.S. LEGAL SUPPORT

about, you can answer.

THE WITNESS:  Yeah, I'm not -- in -- I had the opportunity to look over Mr. Marks' transcript after his deposition, and there were certain -- it's not a major point, but there were certain testimony as to dates where he would say, "I believe we spoke one or two days after," and he would say "or subsequently," and so it wasn't really -- I recall in reading his transcript that on some of these conversations it was around that time, but it wasn't really firm.  In other words, he would start to give you the impression in his testimony that he spoke on the next day or two days after, but then he would say "or subsequently," so I have -- only to that extent I don't know if the dates are correct.

BY MR. BERGMAN:

Q   What do you recall being said by the two of you during your first telephone conversation?

A   I -- to put it simply, he blew me off very politely.

Q   What had you requested that he blew off?

A   I don't specifically recall what I asked him, but it was similar to the first call where I was calling to know what the status was of the Siegels' rights, what the status was of their rights, and he politely blew me off, didn't want to tell me or talk to me, and got off

90

U.S. LEGAL SUPPORT

the phone.

Q   Did you ask him what the status of the Siegels' discussions with DC Comics were?

MR. WILLIAMSON:  Objection.  Assumes facts not in evidence.

THE WITNESS:  No, I don't believe I asked him about that.

BY MR. BERGMAN:

Q   Do you recall Mr. Marks telling you in that first conversation that he was very far along with DC Comics and at a documentation phase?

A   I don't recall --

MR. WILLIAMSON:  Objection.  Marc, let me object.  Assumes facts not in evidence.  Vague and ambiguous.

THE WITNESS:  I don't recall him -- whether or not he said DC Comics, and I don't recall him using those specific words.  He may have, but I don't recall that.  I don't recall the specifics of what he said, but I just recall the end result of him blowing me off.

BY MR. BERGMAN:

Q   What were the specifics of what you said?

A   I just told you.  I was inquiring as to the status of the rights.  I didn't ask him about something specific.

91

been -- what was the date you mentioned?

BY MR. BERGMAN:

    Q   July 30.

    A   May have been July 30th, or it may have been in early August.

    Q   Okay.  Whether it was --

    A   I'm not -- I remember, in reading his transcript, it was unclear to me what the dates were, and I didn't have a specific recollection of the dates.

    Q   Okay.  Whether it was the last week in July or the first week in August, what do you recall saying and what do you recall Mr. Marks saying in that second phone conversation?

    A   I do not recall the specific words that were said.  I recall the substance of the conversation.

    Q   And what was the substance?

    A   And the substance or effect of the conversation was that whereas before he had totally, as I would say, blew me off, now, even though he chose his words carefully and was somewhat guarded, he was clearly -- his body language, if you will, to the extent there is body language in a telephone conversation, was make an offer. In other words, he indicated that the Siegel rights were available, and if there was an interest in those rights, you can make an offer, but he can't discuss anything with

94

me. That was the sort of the substance and effect of the conversation, but I don't recall the specific words used.

Q    At page 166 of Mr. Marks' deposition commencing at line 10, I asked him the following question:

"Q    Can you tell me to the best of your recollection what was said by each of you and Mr. Toberoff in that conversation?

"A    I think Mr. Toberoff said he was -- wanted to check in with me to see where we were in our dealings with DC Comics."

Stopping at that point, do you recall asking him where he was in his dealings with DC Comics?

A    No, I don't recall referring to dealings.  I was referring to the rights and whether those rights were available.

Q    He goes on to say, quote, "And I think I told him then that -- and I may have also said it in our first conversation -- that we had a confidentiality agreement with DC Comics, and I didn't feel at liberty to discuss the status of our dealings with him."

Do you recall Mr. Marks telling you that?

A    I don't specifically recall him mentioning that. He may have.

Q    Mr. Marks then goes on at line 20 of his deposition at page 166, quote --

95

U.S. LEGAL SUPPORT

A    When I say, "He may have," he may have mentioned

to me that the reason he was -- in other words, he may

have said something like, "I'm not trying to be cagey,

but we have a confidentiality agreement," but I don't

specifically recall him saying that.  If he did, it was

in that context.

Q    He goes on to say, quote, line 20, page 166,

"Mr. Toberoff said, 'Can you tell me what DC Comics

offered you,' and I said, 'No.  We have a confidentiality

agreement,'" close quote.

Did you ask Mr. Marks in that conversation to

tell you what DC Comics offered him?

A    I -- again, I don't believe there were

references to DC Comics.  I don't believe I knew at the

time who -- I don't -- in other words, I don't believe at

that time I knew that he was negotiating with DC Comics,

so I don't believe there was a mention of DC Comics.

Q    Mr. Marks' testimony goes on, line 23 of that

same page, quote, "And I believe Mr. Toberoff said,

'Would you be willing to enter into negotiations with

me,' and I believe I said, 'Initiating negotiations, no.

That's something that makes me very uncomfortable.  If

you have an offer, present it to me, and I'll present it

to the client,'" close quote.

Do you recall saying to Mr. Marks whether he

96

U.S. LEGAL SUPPORT

would be willing to enter into negotiations with you?

    A   Yeah, I don't speak that way, so I doubt that I said, "Would you be willing to enter into negotiations with me?" It's just not my style. I would speak more directly.

    Q   Well --

    A   In other words, if you invite somebody to dance, I would never say, "Would you be willing to dance with me?" I would say, "Do you want to dance?"

    Q   What did you say to Mr. Marks in substance as to whether he wanted to dance with you?

    A   I was using that as a metaphor.

    Q   I understand.

    A   The thrust of the conversation was I wanted to know -- I was interested in the rights, and I wanted to know if the rights were available or not, and, if they were available, would make an offer with respect to those rights, and he in essence said, "Yes, they are available. Make an offer."

    Q   As of July --

    A   And I may have inquired as to what his clients wanted for the rights or something of that nature, and he wouldn't give me any information. He just said, "Make an offer."

    Q   As of the end of July 2002, had you had any

97

**U.S. LEGAL SUPPORT**

The date of that conference call as set by Mr. Marks with reference to his phone logs which were marked GTRB 616 was that the conversation occurred within a day or two of August 7, 2002.

Prior to the time -- you do recall having a conference call with Mr. Marks and Mr. Emanuel, don't you?

A    I do.  As far as a date, again the date -- I have a -- I originally called -- this is just commenting on the date.  I originally recall that my assistant I had mentioned before, Andrew, I had asked him to set up a conference call, and I believe that was the reference in Marks' -- the exhibit to Marks' deposition, and that was noted -- that initial referenced conference call, that's the one where he talks about it's "20," and it's crossed out and says, "5 to 10 minutes," something like that, on the exhibit.  That was Andrew calling to set up a conference call.

But I have a specific recollection that after I tried to get dates from the Marks side -- or Andrew tried to get dates from Kevin Marks' office, it was very hard to pin down Ari Emanuel for that conference call.

So just talking about the date, I know he said it would have happened one or two days after that.  I think that conference call could have happened 10 days

99

after that.

Q    Okay.

A    Because I remember specifically being a little frustrated with Ari Emanuel's assistant because they kept saying, "Yes, and I'll have to speak to him," and he wouldn't come back to me with a date.  So that's all.

Q    Prior to that conference call, whether it occurred on August 7 or 10th or 15th or whenever --

A    Right.  Let's say mid August.

Q    Okay.

     -- had you taken any steps to place a monetary value on the Siegel interest?

     MR. WILLIAMSON:  Objection.  Vague and ambiguous, and objection on attorney-client, work product grounds.

     Instruct you not to answer.

     (Instruction not to answer.)

     THE WITNESS:  I'm going to follow that instruction.

BY MR. BERGMAN:

Q    To your knowledge had Mr. Emanuel taken any steps to place a monetary value on the Siegel interest in Superman prior to the conference call?

     MR. WILLIAMSON:  Objection to the extent it calls for attorney work product, and objection on the

100

U.S. LEGAL SUPPORT

Do you recall calling Mr. Marks following the

conference call?

A    I don't.  When I read that in the transcript, I

was trying to think what that was and whether we spoke,

but I don't have any -- I don't have a recollection of

speaking to him after that.

Q    Okay.  He testifies that you and he did not

speak after that but that you had called him, according

to his phone logs, on August 29.

A    I don't have a specific recollection of calling

him.  I may have.

Q    Following the conference call -- strike that.

Had Mr. Emanuel discussed the $15 million figure

with you prior to the conference call?

MR. WILLIAMSON:  Objection --

THE WITNESS:  I --

MR. WILLIAMSON:  -- attorney -- objection.

Attorney-client privilege.  Work product.  I instruct you

not to answer.

(Instruction not to answer.)

THE WITNESS:  I'm going to follow that

instruction.

BY MR. BERGMAN:

Q    In relation to -- and you can answer this in

relation to the mid August conference call if you want or

105

U.S. LEGAL SUPPORT

in reference to any other facts if you want.  When did

you have your very first conversation with either Laura

or Joanne Siegel?

    A    What was the first part of the question?  In

relation to what?

    Q    I was suggesting that if you could answer that

question with respect -- in relation to the mid August

telephone conversation that you had, whether it was a

month or two months afterwards, but my --

    A    Are you talking about the conversation with --

the conference call with Ari Emanuel and Kevin Marks?

    Q    Correct.

    A    It was long after that.  I believe it was the

end of October of that year.

    Q    End of October 2002?

    A    Yes, mid to end, sometime in October.  I'm

not -- I believe it was sometime in October, and the

basis of that belief is the agreement between the Siegels

and IP Worldwide --

    Q    Is dated October -- as of October 3.

    A    Right.  And it was signed towards the end of

October.  So I believe the initial contact was early

October.

    Sometimes when I do agreements, when they're

dated as of -- when they're dated as of, I -- that's when

106

there were sort of the parties came together.  So I
believe the initial conversation may have been like right
at the beginning of August -- I mean, excuse me, right at
the beginning of October 2003.

    Q    How did that initial conversation, whenever it
occurred, come about?  Who called who?

    A    Joanne Siegel called me.

    Q    And did she say how she had gotten your name or
number?

    A    Yes.  She said she had gotten it from Jean, Jean
Peavy.

    Q    And what in substance did Laura Siegel say to
you at that time?

    A    It was Joanne, actually.

    Q    Oh, I'm sorry.

    MR. WILLIAMSON:  Objection.  Attorney-client.

    THE WITNESS:  Without waiver of the privilege, I
can just tell you the introductory remarks were that she
had gotten my number from Jean Peavy, something to the
effect that "Jean Peavy likes you a lot and is very --
highly recommended you," something of that nature, and
that she was looking for an attorney and would be
interested to talk to me about representing her.  That
was the sum and substance of it.

BY MR. BERGMAN:

107

U.S.  LEGAL SUPPORT

MR. WILLIAMSON: Objection. Vague and ambiguous.

THE WITNESS: I don't specifically recall, but it may have been that -- what was in his log where he said he didn't believe we spoke, but there was a call registered, so I may have called him for that purpose, but I don't specifically recall that phone call, probably because he didn't return it.

BY MR. BERGMAN:

Q    What else do you recall of the first conversation with Joanne Siegel?

A    That's it.

Q    How many days -- how did the conversation end?

A    I believe we set an appointment to meet. I'm not certain, but I believe -- I have a vague recollection of meeting with Joanne and I believe Laura for lunch.

Q    Approximately --

A    We met in person.

Q    Approximately how long after that first call from Joanne?

A    Right away.

Q    Within a day or two?

A    I believe so.

Q    And where did you meet with them for lunch?

A    I don't recall.

109

**U.S. LEGAL SUPPORT**

Q    Would you tell me to the best of your recollection what was said by each of you at that meeting?

MR. WILLIAMSON:  Objection.  Attorney-client.

THE WITNESS:  No, I'm not going to tell you that, because after she told me she's interested in my providing legal services to her, even at that stage those conversations are protected by the attorney-client privilege.  I gave you the subject matter, but...

(Unanswered question.)

BY MR. BERGMAN:

Q    Did you at any time tell either Joanne or Laura Siegel that Mr. Emanuel had offered $15 million to acquire their rights?

A    Again, our -- those conversations at that point would be privileged.  Those communications between me and her would be privileged.

(Unanswered question.)

Q    Did you at any time disclose to either of the Siegels that you had been inquiring to purchase their rights?

A    Again, my -- you just asked me this same question, so I would say my answer is the same, but I believe, without disclosing my communications or their communications to me on that subject, I believe Mr. Marks

110

U.S. LEGAL SUPPORT

05:13 1    testified that he had disclosed that to them.  I believe.

05:14 2    I'd have to review his transcript.

05:14 3        Q    Okay.

05:14 4        A    So I believe they knew about that, but I'm not

05:14 5    going to disclose the substance of my communications with

05:14 6    them.

05:14 7            (Unanswered question.)

05:14 8        Q    What had occurred in the period between mid

05:14 9    August to early October which changed your intentions

05:1410    from acquiring the Siegel interest to representing the

05:1411    Siegel interest?

05:1412            MR. WILLIAMSON:  Objection.  Misstates

05:1413    testimony.

05:1414            THE WITNESS:  Yeah, I wouldn't -- you say

05:1515    changed my intentions.

05:1516    BY MR. BERGMAN:

05:1517        Q    Well --

05:1518        A    Like I said, I received a phone call from Joanne

05:1519    Siegel, and she was looking for new representation, and

05:1520    it was her intention, and I agreed to represent her.

05:1521            Off the record.

05:1622            (Discussion off the record.)

05:1623            MR. BERGMAN:  I previously marked a document as

05:1624    Exhibit 17, and I will get back to it in a moment, but

05:1625    for now I am going to ask the court reporter to mark as

111

U.S. LEGAL SUPPORT

Exhibit 18 the October 3, 2002 agreement between the
Siegels and an entity identified as IPW.

     (Deposition Exhibit 18 marked.)

     MR. WILLIAMSON:  I would just like to state for
the record that the caption on the page is actually "IP
Worldwide" for Exhibit 18.

     MR. BERGMAN:  Well, that is what appears at the
top of the page, and the first paragraph refers to "IPW."
I don't know if they're the same company, and I am going
to ask Mr. Toberoff that question in a moment.

     THE WITNESS:  Actually, the first paragraph
says, "...agreement and understanding between you
('Owner') and us..."  it merely uses "IPW" as a defined
term referring to us, and us is IP Worldwide.

BY MR. BERGMAN:

    Q   So this agreement -- the IP party to this
agreement is IP Worldwide, LLC --

    A   Correct.

    Q   -- as opposed to IPW, LLC.

     Is that correct?

    A   Correct.

    Q   Okay.  And that is your signature at IPW 4?

    A   Correct.

    Q   And I note that the agreement was signed by the
Siegels on October 23, and is it your best recollection,

112

U.S. LEGAL SUPPORT

05:19 1    counsel in connection with this agreement?

05:19 2        A    I believe, yes.

05:19 3        Q    Who was that?

05:19 4        A    George -- last name starts with a Z, George

05:20 5    Zadorozny.  I'm not sure how to spell it.

05:20 6        Q    And did you negotiate with that lawyer?

05:20 7        A    I can't say for sure.  I believe so, but I...  I

05:20 8    believe so.  The reason I can't say for sure is I also --

05:20 9    when I entered into the retainer agreement with the

05:21 10   Siegels, I specifically recall negotiating with

05:21 11   Mr. Zadorozny, and I believe Mr. Zadorozny was involved

05:21 12   in this agreement as well, but I don't -- I don't recall

05:21 13   if -- I believe I did, but I don't have a specific

05:21 14   recollection of it.

05:21 15       Q    And when did you enter into a retainer agreement

05:21 16   with the Siegels?

05:21 17       A    Before -- definitely before we filed suit, and I

05:21 18   believe it was...  I can't give you a date.

05:22 19       Q    Were there any prior drafts --

05:22 20       A    I'd have to look at the -- I'd have to check my

05:22 21   file.

05:22 22       Q    Okay.  Were there any prior drafts of the

05:22 23   October 3, '02 agreement prior to Exhibit 18?

05:22 24       A    Yes.  It went through various drafts.

05:22 25       Q    And --

114

**U.S. LEGAL SUPPORT**

record --

Q     Okay.  I didn't want to modify the text of the document.

Who was IP Worldwide's support staff at that point?

A     As I said, we had two employees at the time, but since Ari Emanuel had the entire Endeavor agency, three floors of the -- of offices filled with people --

Q     And were --

A     -- even though they were not technically employees of IPW -- IP Worldwide, IP Worldwide could draw on that staff for support services.

Q     And did it in fact draw upon that staff for support?

A     Yeah.  Yes, I should say.

Q     And who at Endeavor did it draw upon?

A     As needed, certain questions about transactional things, meaning of terms.  You know, Tom McGuire was very knowledgeable in making entertainment deals, a transactional lawyer, their general counsel.  They had a video game person.  They had a television person.  They had a statistical analyst.  They had an in-house investment banker.

Q     As of the time that you signed Exhibit 18, Mr. Toberoff, had you seen Marks' October 19, 2001 letter

116

like that, no.  I recall her saying that I was highly

recommended by Jean Peavy and that she wanted to talk to

me about representing her, and that soon thereafter we

met for lunch with I believe it was her and Laura, but it

wasn't with reference to -- it was that she wanted a

lawyer.

BY MR. BERGMAN:

    Q   When you got together with them at lunch --

    A   It didn't appear -- I can just tell from the

context it did not appear to me that at the time we were

speaking, she was currently represented.

    Q   When you met Joanne and Laura for lunch a few

days after the initial telephone conversation, did you

tell them that you had been speaking with Kevin Marks?

    A   You asked me that three times already.

    Q   Did you?

    A   I don't believe I told them that.  I don't have

a rec- -- I don't know.  I don't have a recollection of

that, but I may have referenced it.

    Q   Did you ask them if they were currently

represented by counsel?

    A   I already answered that question also.  No, I

don't believe I asked them that.  I believe it was

implicit in her asking -- saying that she wanted to talk

to me about representing her or needing a lawyer that she

135

U.S. LEGAL SUPPORT

STATE OF CALIFORNIA        )
                           ) ss
COUNTY OF LOS ANGELES      )


        I, DAVID S. COLEMAN, a Certified Shorthand

Reporter, do hereby certify:

        That prior to being examined, the witness in the

foregoing proceedings was by me duly sworn to

testify to the truth, the whole truth, and nothing

but the truth;

That said proceedings were taken before me at

the time and place therein set forth and were taken

down by me in shorthand and thereafter transcribed

into typewriting under my direction and supervision;

I further certify that I am neither counsel

for, nor related to, any party to said proceedings,

nor in anywise interested in the outcome thereof.

        In witness whereof, I have hereunto subscribed

my name.


Dated:    NOV 3 0 2006


        _____

        DAVID S. COLEMAN
        CSR No. 4613


**U.S. LEGAL SUPPORT**