# EXHIBIT P

FROSS ZELNICK LEHRMAN & ZISSU, P.C.

866 UNITED NATIONS PLAZA
AT FIRST AVENUE & 48TH STREET
NEW YORK, N.Y. 10017

RECEIVED
FEB 0 4 2002

TELEPHONE: (212) 813-5900
FACSIMILE: (212) 813-5901
E-MAIL: fzlz@frosszelnick.com

February 1, 2002

VIA FEDEX

Kevin Marks, Esq.
Gang, Tyre, Ramer & Brown, Inc.
132 South Rodeo Drive
Beverly Hills, CA 90212-2403

    Re:   Superman

Dear Kevin:

    I am pleased to enclose a draft agreement between your clients and DC Comics concerning the Superman property.  As our clients have not seen this latest version of the agreement, I must reserve their right to comment.  In addition, you will note that the draft agreement makes reference to certain "Stand Alone Assignments."  We are finalizing those and, as soon as they are ready we will forward them to you.

                              Very truly yours,

                              Patrick T. Perkins

Encls.

cc:    John Schulman, Esq.
       Paul Levitz
       Lillian J. Laserson, Esq.
       Carol F. Simkin, Esq.

I:PPERKINS:DCC:SUPER:020201 Ltr-K. Marks.doc

000000754

02/01/02
4:51 PM

# AGREEMENT

AGREEMENT made this __ day of ___ 2002, by and between DC COMICS, a New

York General Partnership comprised of Time Warner Entertainment, Co. L.P. and Warner

Communications, Inc. (hereinafter "DC COMICS"), having its principal office at 1700

Broadway, New York, New York 10019, and Joanne Siegel, residing at ~~13900 Panay Way, R-~~ 13929 Marquesas Way #201-A,

~~115,~~ Marina del Rey, CA 90292, Laura Siegel Larson, residing at 6400 Pacific Avenue, No. 106,

Playa del Rey, CA 90293, the Estate of Jerome Siegel, (collectively "SIEGEL") and Michael

Siegel, residing at _____ (except as otherwise indicated, hereinafter Joanne Siegel,

Laura Siegel Larson and Michael Siegel are referred to collectively and individually as "The

SIEGELS").

## DEFINITIONS

1.    The term "Works" is hereinafter defined collectively and individually as follows:

any and all works, creations, material, matter, contributions, adaptations, modifications,

derivative works and all other works of any kind whatsoever, including but not limited to all

stories, literary and/or graphic works, episodes, elements, characters, treatments, likenesses,

images, depictions, drawings, renderings, sketches, notes and/or indicia, and/or any component,

draft of, or part or portion of any of the foregoing, regardless of whether or not subject to

copyright protection, regardless of whether or not published, regardless of whether or not any

person knows of the existence of the foregoing, wherever in the world created, and whenever

created , and regardless of the medium or form of expression or exploitation (whether or not now

existing).

000000755

2.    The term "SUPERMAN" is hereinafter defined as the original comic book character now known as "SUPERMAN," jointly created by JEROME SIEGEL (the writer) and JOSEPH SHUSTER (the artist), whether or not called Superman at the time of creation.

3.    The phrase "SUPERMAN Works" is hereinafter defined collectively and individually as follows: all Works (including but not limited to SUPERMAN and the first story in which SUPERMAN appeared in Action Comics No. 1, dated June, 1938, "Action Comics No. 1" and in Action Comics No. 2, dated July, 1938, "Action Comics No. 2") that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and/or arise out of SUPERMAN, that were ever created (in whole, in part or jointly) by JEROME SIEGEL, regardless of whether they were created for or provided or furnished to, or paid for by DC COMICS or any of its predecessor(s), regardless of whether they were created on a work for hire basis for DC COMICS, or any of its predecessor(s), regardless of whether any or all rights therein were granted by JEROME SIEGEL to DC COMICS, its predecessors, or any other entity, and regardless of whether The SIEGELS have sought to terminate any such grant. The phrase "SUPERMAN Works" therefore includes, by way of example only, and without any limitation whatsoever, any and all Works referred to in the "Superman Notices" referenced infra in definition paragraph number __.

4.    The phrase "ACTION COMICS NO. 1 SUPERMAN Works" is hereinafter defined collectively and individually as those Works comprising the SUPERMAN Works created simultaneously with or before the creation of, whether or not included in, Action Comics No. 1 and/or Action Comics No. 2.

000000756

2

EXHIBIT P
Page 198

5.    The phrase "POST ACTION COMICS NO. 1 SUPERMAN Works" is hereinafter defined collectively and individually as those Works comprising the SUPERMAN Works created after the creation of Action Comics No. 1 and Action Comics No. 2.

6.    The phrase "SUPERMAN Notices" is hereinafter defined as the seven (7) notices SIEGEL served upon DC COMICS purporting to terminate pursuant to Section 304 (c) of the U.S. Copyright Act as of April 16, 1999, grants by Jerome Siegel to DC COMICS's predecessor(s) of copyright rights in some or all of the SUPERMAN Works (copies of the SUPERMAN Notices, excluding the voluminous listing of SUPERMAN Works referenced therein, are attached hereto as Exhibits A - G).

7.    The phrase "SUPERMAN Derivative Works" is hereinafter defined as collectively and individually as follows: all Works that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or derive from, are based upon and/or arise out of the ACTION COMICS NO. 1 SUPERMAN Works and all Works that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and/or arise out of the POST ACTION COMICS NO. 1 SUPERMAN Works, that were not created (in any part) by JEROME SIEGEL, regardless of who created them, regardless of whether they were created for or provided or furnished to, or paid for by DC COMICS or any of its predecessor(s), regardless of whether they were created on a work for hire basis for DC COMICS or any of its predecessor(s), and regardless of whether any or all rights therein were granted to DC COMICS or any of its predecessor(s).

8.    The phrase "SUPERMAN Marks" is hereinafter defined as all trade and service marks, including but not limited to characters, character names, fictional elements, words,

000000757

2

phrases, logos, images, symbols, indicia and/or other designations of origin of any kind, and all goodwill therein, throughout the world, in any way related or appurtenant to, associated with, or arising out of or relating to the use and/or exploitation of the SUPERMAN Works and/or the SUPERMAN Derivative Works.

9.    The term "SUPERMAN Property" is hereinafter defined to mean the following: (i) each of the pre-existing characters and elements which first appeared in the SUPERMAN Works; and (ii) such other characters and/or elements, if any, that may be created hereafter and meet the following criteria:

A.    (1) First appearance in a story or programming (including comics, television, film and other media) with Superman and/or Superman logo as predominant component of its title; provided, however, that planted spin-offs (as such term is understood in the entertainment industry), including without limitation Jack Kirby's Fourth World and its related characters, shall be excluded; or

(2) First appearance in a story or programming (including comics, television, film and other media) without Superman and/or Superman logo as predominant component of its title and which, if not authorized by DC COMICS, would constitute an infringement of the copyright or trademark of DC COMICS in or to either any of the characters or elements covered under subparagraph 9(A)(1) above or any of the characters or elements which appear in the SUPERMAN Works; and

B.    Such character and/or element is sufficiently developed so as to be distinguished from mere stock characters or scenes a faire.

000000758

10.     The term "SPECTRE" is hereinafter defined as the original character known as "SPECTRE," created by JEROME SIEGEL.

11.     The phrase "SPECTRE Works" is hereinafter defined collectively and individually as follows:  all Works (including but not limited to SPECTRE and the first Spectre stories launched: (1) in an ad in More Fun Comics issue No. 51, dated January 1940 (the appearance of the SPECTRE character); (2) in More Fun Comics issue No. 52, dated February 1940 (illustrated 10-page comic book story); (3) in More Fun Comics issue No. 53, dated March 1940 (illustrated 10 page comic book story); and (4) in More Fun Comics issue No. 54, dated April 1940 (illustrated 10 page comic book story)) that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and/or arise out of SPECTRE, that were ever created (in whole, in part or jointly) by JEROME SIEGEL, regardless of whether they were created for or provided or furnished to, or paid for by DC COMICS or any of its predecessor(s), regardless of whether they were created on a work for hire basis for DC COMICS, or any of its predecessor(s), regardless of whether any or all rights therein were granted by JEROME SIEGEL to DC COMICS, its predecessors, or any other entity, and regardless of whether The SIEGELS have sought to terminate any such grant.  The phrase "SPECTRE Works" therefore includes, by way of example only, and without any limitation whatsoever, any and all Works referred to in the "Spectre Notices" referenced infra in definition paragraph number __.

12.     The phrase "MORE FUN COMICS SPECTRE Works" is hereinafter defined collectively and individually as those Works comprising the SPECTRE Works created

5

000000759

EXHIBIT P
Page 201

simultaneously with or before the creation of, whether or not included in More Fun Comics issue No. 51, dated January 1940 and More Fun Comics Issue No. 52, dated February 1940.

13.    The phrase "POST MORE FUN COMICS SPECTRE Works" is hereinafter defined collectively and individually as those Works comprising the SPECTRE Works created after the creation of More Fun Comics issue No. 52, February 1940.

14.    The phrase "SPECTRE Notices" is hereinafter defined as the four (4) notices SIEGEL served upon DC COMICS purporting to terminate as of November 27, 2000 pursuant to Section 304 (c) of the U.S. Copyright Act, grants by Jerome Siegel to DC COMICS' predecessor(s) of copyright rights in some or all of the SPECTRE Works (copies of the SPECTRE Notices are attached hereto as Exhibits _ - _.).

15.    The phrase "SPECTRE Derivative Works" is hereinafter defined as collectively and individually as follows:  all Works that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or derive from, are based upon and/or arise out of the MORE FUN COMICS SPECTRE Works and all Works that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and/or arise out of the POST MORE FUN COMICS SPECTRE Works, that were not created (in any part) by JEROME SIEGEL, regardless of who created them, regardless of whether they were created for or provided or furnished to, or paid for by DC COMICS or any of its predecessor(s), regardless of whether they were created on a work for hire basis for DC COMICS or any of its predecessor(s), and regardless of whether any or all rights therein were granted to DC COMICS or any of its predecessor(s).

000000760

6

16.     The phrase "SPECTRE Marks" is hereinafter defined as all trade and service marks, including but not limited to characters, words, phrases, logos, images, symbols, indicia and/or other designations of origin of any kind, and all goodwill therein, throughout the world, in any way related or appurtenant to, or arising out of or relating to the use and/or exploitation of the SPECTRE Works and/or the SPECTRE Derivative Works.

17.     The term SPECTRE Property is hereinafter defined to mean the following: (i) each of the pre-existing characters which first appeared in the SPECTRE Works; and (ii) such other characters and/or elements, if any, that may be created hereafter and meet the following criteria:

A.  (1)  First appearance in a story or programming (including comics, television, film and other media) with Spectre as predominant component of its title; provided, however, that planted spin-offs (as such term is understood in the entertainment industry), including without limitation Jack Kirby's Fourth World and its related characters, shall be excluded; or

(2)  First appearance in a story or programming (including comics, television, film and other media) without Spectre as predominant component of its title and which, if not authorized by DC COMICS, would constitute an infringement of the copyright or trademark of DC COMICS in or to either any of the characters or elements covered under subparagraph 17(A)(1) above or any of the characters or elements which appear in the SPECTRE Works; and

B.  Such character and/or element is sufficiently developed so as to be distinguished from mere stock characters or scenes a faire.

7

**000000761**

18.    The phrase "OTHER SIEGEL Works" is hereinafter defined individually and collectively as those Works, other than the SUPERMAN Works or the SPECTRE Works, if any, that were created in whole or in part by Jerome Siegel, with respect to which he received any payment or compensation from DC COMICS and/or its predecessor(s), regardless of the terms surrounding, or amount of, such payment or compensation  or whether such Works were created on a work-for-hire basis for DC COMICS and/or its predecessor(s) and regardless of whether or not any or all rights were granted by Jerome Siegel to DC COMICS and/or its predecessor(s) in such Works, and regardless of whether The SIEGELS have sought to terminate any such right.

19.    The phrase the "OTHER Marks" is hereinafter defined as all trade and service marks, including but not limited to characters, words, phrases, logos, images, symbols, indicia and/or other designations of origin of any kind, and all goodwill therein, throughout the world, in any way related or appurtenant to, or arising out of, or relating to the use and/or exploitation of the OTHER SIEGEL Works.

20.    The phrase "The WORKS" is hereinafter defined collectively and individually as the SUPERMAN Works, the SPECTRE Works, the SUPERMAN Derivative Works, the SPECTRE Derivative Works and the OTHER SIEGEL Works.  (It is intended that the definition of The WORKS includes all elements, parts and/or portions of the SUPERMAN Works, the SPECTRE Works, the SUPERMAN Derivative Works, the SPECTRE Derivative Works and the OTHER SIEGEL Works and all material and/or matter contained therein.)

21.    The phrase "The MARKS" is hereinafter defined collectively and individually as the SUPERMAN Marks, the SPECTRE Marks and the OTHER Marks.

22.    The "Tolling Agreement" refers to the Agreement dated April 6, 2000 between DC COMICS and the SIEGELS tolling the statute of limitations claims of the respective parties.

8

000000762

23.    The terms "Licensing" and "License(s)" refer to DC COMICS authorizing any third party to commercially exploit the SUPERMAN Property and the SPECTRE Property.

24.    The term "Revenues" is hereinafter defined as all amounts actually received by DC COMICS in United States Dollars from the Licensing of rights in the SUPERMAN Property and the SPECTRE Property, less any unrecouped foreign taxes, import duties and/or currency exchange losses.  Revenues shall not include any sums received by DC Comics for providing any services or materials in connection with the licensing of rights in the SUPERMAN Property and the SPECTRE Property.  Any advance against royalties paid to DC COMICS by a licensee shall be considered actually received by DC COMICS when the advance becomes nonreturnable.  Notwithstanding the foregoing, in such cases where an advance is paid in respect of multiple properties which include the SUPERMAN Property or the SPECTRE Property, the advance shall be considered received when and as it is allocated among all such properties.

25.    The term "Net Sales" is hereinafter defined as the number of copies or units which are actually sold by DC COMICS through DC COMICS' wholesale and retail distribution channels, less the number of copies or units which are returned, damaged, lost, distributed by DC COMICS as premiums or promotions and/or distributed to uncollectible accounts or sold at discounts in excess of seventy percent (70%) off of cover price.

26.    The term "Dispute" shall mean any and all controversies, Claims or disputes arising out of or related to The WORKS, The MARKS, or to this Agreement or to the Stand Alone Assignments, or any one of them, or the interpretation, performance or breach thereof, including, but not limited to, alleged violations of the state or federal statutory or common law rights or duties.

000000763

9

27.    "Reversionary" rights shall mean:

a.    any and all reversionary rights and interests similar in effect to and including those referred to in the proviso to section 5(2) of the U.K. Copyright Act 1911 and/or those referred to in paragraph 27 of Schedule 1 to the U.K. Copyrights, Designs and Patents Act 1988;

b.    any and all reversionary rights and interests similar in effect to and including those referred to in Section 14 of the Canadian Copyright Act;

c.    any and all termination rights and renewals and extensions of the term of copyright similar in effect to and including those provided for under the laws of the U.S.;

d.    any all reversionary rights and interests similar in effect to and including those which arise in countries with compulsory heirs or inheritance provisions such as in Columbia, Spain, Cuba or Panama;

e.    any and all rights of whatsoever kind or nature (whether now existing or hereafter created or conferred) similar in effect to reversionary rights which have vested absolutely or contingently or which might hereafter vest absolutely or contingently by operation of law or otherwise in any part of the world in The SIEGELS and/or any heir, successor, assign or personal representative of The SIEGELS;

f.    any and all rights of whatsoever kind or nature (whether now existing or hereafter created or conferred) including any copyright rights or rights in the nature of copyright rights which at any time revert to or are acquired by The SIEGELS or any heir, successor, assign or personal representative of The SIEGELS for any reason at any time and/or which form part of or accrue to Jerome Siegel's residuary estate;

000000764

      g.      in each case, for all countries or jurisdictions, present and future, throughout the world, affected by such rights or in which such rights exist, for the full term thereof including all renewals, extensions, revisions, and revivals thereof, whenever arising and including all vested and future reversionary rights whether now existing or hereafter created or conferred and together with all rights of action (including without limitation the right to use for past infringements), powers and benefits belonging or accrued to the foregoing or any of them or to The SIEGELS or any heir, successor, assign or personal representative of The SIEGELS in respect thereof.

<u>WHEREAS CLAUSES</u>

WHEREAS, it is the parties' intent and DC COMICS' desire to acknowledge and honor the contributions made by Jerome Siegel by granting to The SIEGELS the benefits and payments provided herein; and

WHEREAS, it is the parties' intent and The SIEGELS' desire to vest in DC COMICS, forever, exclusive enjoyment and control over and all right, title and interest in, and arising out of The WORKS and The MARKS, including all future use thereof by DC COMICS and any and all future versions and adaptations thereof in any form or medium, including all rights The SIEGELS own, have ever owned or could ever claim to own on any basis in and to The WORKS and The MARKS (including any rights The SIEGELS could claim as members of the public, whether upon the expiration of any copyrights relating to The WORKS or otherwise, and/or whether upon the cancellation, loss or abandonment of any of The MARKS), including but not limited to all copyright and trademark rights and good will associated therewith throughout the world, whenever and wherever any of said rights arise; and

000000765

WHEREAS, for the purposes of this Agreement and to effectuate the parties' intent as set forth herein, the parties acknowledge that the SUPERMAN Derivative Works and the SPECTRE Derivative Works were created as works made for hire for DC COMICS and/or its predecessor(s) in interest but that if for any reason, any one of the SUPERMAN Derivative Works or the SPECTRE Derivative Works, or any portion thereof was not a work made for hire for any reason whatsoever: (i) the SIEGELS hereby simultaneously terminate any existing grant therein, if any, and make a new grant to DC COMICS of all rights without limitation whatsoever throughout the world therein, and (ii) such shall have no effect whatsoever on the fact that the remaining SUPERMAN Derivative Works and/or SPECTRE Derivative Works, or any portion thereof are works made for hire;

WHEREAS, for the purposes of this Agreement and to effectuate the parties' intent as set forth herein, the parties wish simultaneously to terminate contractually all grants by Jerome Siegel, and or any other person or entity claiming rights directly or indirectly through Jerome Siegel, to DC COMICS and/or its predecessor(s) relating to the SUPERMAN Works and SPECTRE Works to the extent, for whatever reason whatsoever such grants were not terminated by the SUPERMAN AND SPECTRE Notices, and to make a new grant to DC COMICS of all rights, without any limitation whatsoever throughout the world with respect to the SUPERMAN Works and SPECTRE Works; and

WHEREAS, for the purposes of this Agreement and to effectuate the parties' intent as set forth herein, the parties hereby wish simultaneously to terminate contractually all grants (if any) relating to the OTHER SIEGEL Works by Jerome Siegel and or any other person or entity claiming rights directly or indirectly through Jerome Siegel, to DC COMICS and/or its

000000766

predecessor(s) and  make a new grant to DC COMICS of all rights, without any limitation whatsoever throughout the world with respect to such works, and

WHEREAS, it is the parties' intent that this Agreement supersede all prior agreements, negotiations, and/or understandings between DC COMICS and/or its predecessors on the one hand and Jerome Siegel and/or The SIEGELS on the other;

NOW, THEREFORE, in consideration of good and valuable consideration, receipt of which The SIEGELS hereby acknowledge, it is mutually agreed by and between The SIEGELS and DC COMICS as follows.

TERMS

1.  <u>GRANT OF RIGHTS</u>.  The parties expressly agree that in order to effectuate the parties' intent as set forth herein, the "Stand Alone Assignment" documents attached hereto as Exhibits -__- (hereinafter "Stand Alone Assignment(s)") shall be executed simultaneously with the execution of this Agreement.  The parties further agree that upon execution of this Agreement each of the Stand Alone Assignments shall be a separate transfer of rights and forever after shall be irrevocable and remain effective, independent of, and separate and apart from the other text and provisions set forth in this Agreement and shall have full force and effect, irrevocably and in perpetuity, regardless of the enforceability, validity, invalidity of or compliance by DC COMICS with any of such other text and provisions.

a)  <u>Grant Of All Rights In The SUPERMAN Works.</u>

i)  <u>Grant Of All Rights In The ACTION COMICS NO. 1 SUPERMAN Works.</u>  If for any reason whatsoever any grant made at any time by Jerome Siegel, or any other person or entity claiming rights directly or indirectly through him in the SUPERMAN Works, to DC COMICS and/or its predecessor(s) in interest concerning the

13

000000767

ACTION COMICS NO. 1 SUPERMAN Works was not terminated by the SUPERMAN Notices, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS' compliance with the other provisions in this sub-paragraph, and their execution of the Stand Alone Assignment attached hereto as Exhibit __, simultaneous with their execution of this Agreement, The SIEGELS have the right to, and are, hereby, contractually terminating any grant made by Jerome Siegel (and/or any such other person or entity) at any time to DC COMICS and/or its predecessor(s) in interest concerning the ACTION COMICS NO. 1 SUPERMAN Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective as of April 15, 1999, upon the signing hereof, and forever after, all rights, title and interest of every kind whatsoever, including but not limited to all copyright rights, throughout the world, in and to the ACTION COMICS NO. 1 SUPERMAN Works, for all terms of protection, including any renewals and extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto that The SIEGELS or Jerome Siegel, or those claiming through any of them, own, or have ever owned or claimed, or could possibly ever claim, including as members of the public when the copyright(s) or any of them expire in the SUPERMAN Works or SUPERMAN Derivative Works.

   ii) <u>Grant Of All Rights In The POST ACTION COMICS NO. 1</u>
<u>SUPERMAN Works.</u> The SIEGELS acknowledge that all of the POST ACTION COMICS NO. 1 SUPERMAN Works were created as works made for hire for DC COMICS's predecessor(s)-in-interest. The SIEGELS, therefore, acknowledge that they do not have and will never come into any rights, title or interest in such works or any part thereof and thus, hereby, expressly waive and release any and all claim of any rights or interest therein. If for any reason, the POST

14

**000000768**

EXHIBIT P
Page 210

ACTION COMICS NO. 1 SUPERMAN Works are deemed not to be works made for hire, and to the extent, for whatever reason whatsoever that any grant made at any time by Jerome Siegel, or any other person or entity claiming rights directly or indirectly through him in the SUPERMAN Works, to DC COMICS and/or its predecessor(s) in interest concerning the POST ACTION COMICS NO. 1 SUPERMAN Works was not terminated by the SUPERMAN Notices, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS' compliance with the other provisions in this subparagraph, and their execution of the Stand Alone Assignment attached hereto as Exhibit __, simultaneous with their execution of this Agreement, The SIEGELS have the right to, and are, hereby, contractually terminating any grant made by Jerome Siegel (and/or any such other person or entity) at any time to DC COMICS and/or its predecessor(s) in interest concerning the POST ACTION COMICS NO. 1 SUPERMAN Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective April 15, 1999 upon the signing hereof, and forever after, all rights, title and interest of every kind whatsoever, including but not limited to all copyright rights, throughout the world, in and to the POST ACTION COMICS NO. 1 SUPERMAN Works, for all terms of protection, including all renewals and extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto that The SIEGELS or Jerome Siegel or those claiming through any of them, own, or have ever owned or claimed, or could possibly ever claim, including as members of the public when the copyright(s) or any of them expire in the SUPERMAN Works or SUPERMAN Derivative Works.

b) <u>Acknowledgement/Grant Of All Rights In The SUPERMAN Derivative Works</u>. The SIEGELS hereby represent, warrant and acknowledge that they own no rights of

000000769

15

any kind and can never claim any rights of any kind in the SUPERMAN Derivative Works as such works were prepared as works made for hire for DC COMICS and its predecessors in interest and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the SUPERMAN Derivative Works or in any portion thereof, including as members of the public anywhere in the world when the copyright(s) (or any of them) in the SUPERMAN Works or SUPERMAN Derivative Works expire, as set forth in the Stand Alone Assignment attached as Exhibit _ hereto, they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS, effective April 15, 1999 upon the signing hereof, and forever after, all rights, title and interest throughout the world in and to the SUPERMAN Derivative Works, including but not limited to all copyright rights, for all terms of protection, including any renewals or extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto.

c) <u>Acknowledgement/Grant Of All Rights In The SUPERMAN Marks.</u> The SIEGELS hereby represent, warrant and acknowledge that they own no rights of any kind and can never claim any rights of any kind in the SUPERMAN Marks and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the SUPERMAN Marks for whatever reason whatsoever (including as members of the public anywhere in the world should the SUPERMAN Marks or any one of them become cancelled, abandoned or otherwise lost to DC COMICS), they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS, effective April 15, 1999 upon the signing hereof, and forever after, all rights, title and interest in the SUPERMAN Marks, including any good will associated therewith and all claims or causes of action of any kind relating or appurtenant thereto.

000000770

d) <u>Grant Of All Rights In The SPECTRE Works.</u>

   i)    <u>Grant Of All Rights In The MORE FUN COMICS SPECTRE</u>

<u>Works.</u> If for any reason whatsoever any grant made at any time by Jerome Siegel, or any other

person or entity claiming rights directly or indirectly through him in the SPECTRE Works to DC

COMICS and/or its predecessor(s) in interest concerning the MORE FUN COMICS SPECTRE

Works was not terminated by the SUPERMAN Notices, the parties hereby agree for the purpose

of this Agreement that, contingent upon The SIEGELS' compliance with the other provisions in

this sub-paragraph, and their execution of the Stand Alone Assignment attached hereto as Exhibit

__, simultaneous with their execution of this Agreement, The SIEGELS have the right to, and

are, hereby, contractually terminating any grant made by Jerome Siegel (and/or any such other

person or entity) at any time to DC COMICS and/or its predecessor(s) in interest concerning the

MORE FUN COMICS SPECTRE Works. In any event, The SIEGELS hereby simultaneously

and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to

DC COMICS, effective as of November 23, 2000, upon the signing hereof, and forever after, all

rights, title and interest of every kind whatsoever, including but not limited to all copyright

rights, throughout the world, in and to the MORE FUN COMICS SPECTRE Works, for all terms

of protection, including any renewals and extensions thereof, and all claims or causes of action

of any kind relating or appurtenant thereto that The SIEGELS or Jerome Siegel, or those

claiming through any of them, own, or have ever owned or claimed, or could possibly ever

claim, including as members of the public when the copyright(s) or any of them expire in the

SPECTRE Works or SPECTRE Derivative Works.

   ii)    <u>Grant Of All Rights In The POST MORE FUN COMICS</u>

<u>SPECTRE Works.</u>  The SIEGELS acknowledge that all of the POST MORE FUN COMICS

17

000000771

SPECTRE Works were as works made for hire for DC COMICS' predecessor(s)-in-interest. The SIEGELS, therefore, acknowledge that they have no and will never come into any such rights, title or interest in such works or any part thereof and thus, hereby, expressly waive and release any and all claim of any rights or interest therein. If for any reason, the POST MORE FUN COMICS SPECTRE Works are deemed not to be works made for hire, and to the extent, for whatever reason whatsoever that any grant made at any time by Jerome Siegel , or any other person or entity claiming rights directly or indirectly through him in the SPECTRE Works, to DC COMICS and/or its predecessor(s) in interest concerning the POST MORE FUN COMICS SPECTRE Works was not terminated by the SPECTRE Notices, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS' compliance with the other provisions in this subparagraph, and their execution of the Stand Alone Assignment attached hereto as Exhibit __, simultaneous with their execution of this Agreement, The SIEGELS have the right to, and are, hereby, contractually terminating any grant made by Jerome Siegel (and/or any such other person or entity) at any time to DC COMICS and/or its predecessor(s) in interest concerning the POST MORE FUN COMICS SPECTRE Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective November 23, 2000, upon the signing hereof, and forever after, all rights, title and interest of every kind whatsoever, including but not limited to all copyright rights, throughout the world, in and to the POST MORE FUN COMICS SPECTRE Works, for all terms of protection, including all renewals and extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto that The SIEGELS or Jerome Siegel or those claiming through any of them, own, or have ever owned or claimed, or

18

000000772

EXHIBIT P
Page 214

could possibly ever claim, including as members of the public when the copyright(s) or any of them expire in the SPECTRE Works or SPECTRE Derivative Works.

e) Acknowledgement/Grant Of All Rights In The SPECTRE Derivative Works. The SIEGELS hereby represent, warrant and acknowledge that they own no rights of any kind and can never claim any rights of any kind in the SPECTRE Derivative Works and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the SPECTRE Derivative Works, including as members of the public anywhere in the world when the copyright(s) (or any of them) in the SPECTRE Works or SPECTRE Derivative Works expire, as set forth in the Stand Alone Assignment attached as Exhibit _ hereto, they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS, effective November 23, 2000, upon the signing hereof, and forever after, all rights, title and interest throughout the world in and to the SPECTRE Derivative Works, including but not limited to all copyright rights, for all terms of protection, including any renewals or extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto.

f) Acknowledgement/Grant Of All Rights In The SPECTRE Marks. The SIEGELS hereby represent, warrant and acknowledge that they own no rights of any kind and can never claim any rights of any kind in the SPECTRE Marks and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the SPECTRE Marks for whatever reason whatsoever, (including as members of the public anywhere in the world should the SPECTRE Marks or any one of them become cancelled, abandoned or otherwise lost to DC COMICS) they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS,

000000773

effective November 23, 2000, upon the signing hereof, and forever after, all rights, title and interest in the SPECTRE Marks, including any good will associated therewith and all claims or causes of action of any kind relating or appurtenant thereto.

g)  Grant Of All Rights In The OTHER SIEGEL Works.  To the extent that any OTHER SIEGEL Works exist, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS's compliance with the next sentence in this paragraph, The SIEGELS have the right to, and are, contractually terminating any grant made at any time to DC COMICS and/or its predecessor(s) in interest by Jerome Siegel, or any other person or entity claiming rights directly or indirectly through him in The OTHER SIEGEL Works, concerning such OTHER SIEGEL Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective upon the signing hereof, and forever after all rights, title and interest of every kind whatsoever, including but not limited to copyright rights, throughout the world for all terms of protection, including any renewals or extensions thereof, The SIEGELS or Jerome Siegel or those claiming through any of them, own, or have ever owned or claimed, or could possibly ever claim, including as members of the public with respect to the OTHER SIEGEL Works when the copyright(s) or any of them therein expire and all claims or causes of action of any kind relating or appurtenant thereto.

h)  Acknowledgement/Grant Of All Rights In The OTHER Marks.  The SIEGELS hereby represent, warrant and acknowledge that they own no rights of any kind and can never claim any rights of any kind in the OTHER Marks and that all such rights are owned solely and exclusively by DC COMICS.  However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the OTHER Marks for whatever reason

20

000000774

whatsoever, (including as members of the public anywhere in the world should the OTHER Marks or any one of them become cancelled, abandoned or otherwise lost to DC COMICS), they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS, effective April 15, 1999 upon the signing hereof, and forever after, all rights, title and interest in the OTHER Marks including any goodwill associated therewith and all claims or causes of action of any kind relating or appurtenant thereto.

2.  Payments To The Siegels And Other Financial And Related Terms.  In complete consideration to The SIEGELS for any and all rights arising out of Jerome Siegel's contributions and authorship, and the other understandings and agreements herein made by The SIEGELS, DC COMICS shall pay (or shall provide, where applicable) to The SIEGELS the following:

a)  Initial Payments

i)  Upon full execution of this Agreement, a non-recoupable payment of $1,000,000;

ii)  Upon full execution of this Agreement, an advance of $2,000,000 against The SIEGELS' royalty payments under ¶2(d) hereof;

iii)  Upon full execution of this Agreement , the payment of $250,000 heretofore made to the SIEGELS pursuant to the agreement of November 20, 2000 between SIEGEL and DC COMICS, receipt of which is hereby acknowledged by The SIEGELS, shall become non-recoupable.

b)  Annual Payments (Advances)

i)  For ten years commencing in 2002, payable on March 31st of each year, an annual, recoupable advance of $500,000 against any amount due to The SIEGELS hereunder.

000000775

ii)  Commencing in 2012, and annually thereafter, DC COMICS shall pay The SIEGELS an advance payment calculated as follows:

(A) For each year in which DC COMICS has fully recouped all previously paid advances, including those provided under subparagraphs 2(a)(ii) and 2(b)(i),  the following year's advance shall be an amount equal to 75% of the average of the last three years of The SIEGELS' royalty payments received under subparagraphs 2(d)(iii) hereof and 2(d)(iv) hereof, payable on March 31st of each year and recoupable against any amount due to The SIEGELS hereunder.

(B) For each year in which DC CCOMICS shall not have fully recouped all previously paid advances, including those provided under subparagraphs 2(a)(ii) and 2(b)(i), then until such time, if ever, as DC COMICS shall have fully recouped all the foregoing advances, the following year's advance shall be an amount equal to the greater of $100,000 or 25% of the average of the last three years of The SIEGELS' royalty payments received under subparagraphs 2(d)(iii) hereof and 2(d)(iv) hereof, payable on March 31st of each year and recoupable against any amount due to The SIEGELS hereunder.

iii)     All payments made under this paragraph shall be non-interest bearing for the year in which each such payment is made. Thereafter, interest shall be calculated at 100% of the prime interest rate charged from time to time by The Bank of America or, if such institution is defunct, any other commercially recognized financial institution designated by DC COMICS on amounts paid that remain unrecouped as of December 31st of the year of payment, and shall be recoupable against any amount due to The SIEGELS hereunder.

000000776

iv)    The Siegels shall receive no further payments under this paragraph 2(b) after March 31 of the year immediately following the year in which the copyright in Action Comics No. 1 expires;

c)  Widow's Benefits

i)  For each year of Joanne Siegel's life, a non-assignable, non-transferable annual payment to Joanne Siegel of $135,000, payable periodically, but not less frequently than in equal monthly installments and The SIEGELS acknowledge such payments have been paid through 2001 and through _____, 2002;

ii)  Medical benefits will be provided to Joanne Siegel for the duration of her life with terms comparable to those provided to her in the past [include exhibit with details]. DC COMICS shall cooperate with Joanne Siegel in her efforts to obtain a medical identification card.

d)  Royalties

i)    Commencing for Revenues received on or after January 1, 2000;

ii)    6% of DC's Revenues from all media Licenses, including Licenses for motion pictures, television, radio, legitimate stage, sound recordings, and electronic media, for use of the SUPERMAN Property and/or the SPECTRE Property, except:

(A)    with respect to Licenses which commingle the SUPERMAN Property and/or the SPECTRE Property with another DC COMICS property similar in stature and used in a like manner (e.g., a Superman and Batman film video), the 6% shall be reduced to 3%;

(B) with respect to Licenses which commingle the SUPERMAN Property and/or the SPECTRE Property with multiple other DC COMICS properties and where

23

000000777

EXHIBIT P
Page 219

the SUPERMAN Property and/or the SPECTRE Property is neither the predominant creative element nor the sole predominant identity or title of the Media product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%;

      iii)    6% of DC COMICS' Revenues from all publishing Licenses and merchandising Licenses for use of the SUPERMAN Property and/or the SPECTRE Property (including but not limited to product Licensing, promotional Licensing, and Licenses for the sale of entertainment goods and services such as theme parks or publications), except:

      (A)    with respect to Licenses which commingle the SUPERMAN Property and/or the SPECTRE Property with another DC property and the properties are used and/or marketed in a like manner (e.g., a Superman and Batman action figure set), the 6% shall be reduced to 3%;

      (B)    with respect to Licenses which commingle the SUPERMAN Property and/or the SPECTRE Property with multiple other DC properties and where the SUPERMAN Property and/or the SPECTRE Property is neither the predominant creative element nor the sole predominant identity or title of the product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%;

      (C)    with respect to Licenses wherein the licensee is granted rights to utilize a number of DC properties as well as the SUPERMAN Property and/or the SPECTRE Property, DC shall allocate Revenues derived from the License based on the actual sales of individual products based on information reasonably available from the licensee, but to the extent such information is not available, the 6% shall be reduced to not less than 1%;

      (D)    with respect to merchandise relating to the SUPERMAN Property and/or the SPECTRE Property actually produced by DC Comics, 10% of Revenues

24

000000778

less costs, and subject to the pro rata allocations set forth above, shall be deemed DC Comics' Revenues for purposes of royalty computation.

iv)    1% of Revenues derived from extraordinary mixed Licenses, such as the License agreement dated April 1, 1998 by and between Warner Bros. Consumer Products, DC COMICS, Premier Parks Inc., and Six Flags Theme Parks Inc. (which involves numerous characters, including DC COMICS and Looney Toons characters), and other Licenses where Revenues from such licenses are not specifically attributed to royalties earned by the sale of character merchandise that can be directly allocated either to the SUPERMAN Property and/or the SPECTRE Property or to other properties in which The SIEGELS do not share, or are not specific fees calculated on a per ride or per show or other similar basis which can also be directly allocated either to the SUPERMAN Property and/or the SPECTRE Property or to other properties in which The SIEGELS do not share.

v)    1% of the cover price of Net Sales of DC COMICS' own editions of publications based on the SUPERMAN Property and/or the SPECTRE Property. A publication shall be considered based on the SUPERMAN Property when one of the characters that comprises the SUPERMAN Property shall be the title of the publication (e.g., Superman) or shall be the title of all the features within the publication (e.g., Action Comics containing only Superman stories). A publication shall be considered based on the SPECTRE Property when one of the characters that comprises the SPECTRE Property shall be the title of the publication (e.g., Spectre) or shall be the title of all the features within the publication (e.g., More Fun Comics containing only Spectre stories). However:

(A)    with respect to publications which commingle the SUPERMAN Property and/or the SPECTRE Property with multiple other DC properties and

25

000000779

where the SUPERMAN Property and/or the SPECTRE Property is neither the predominant creative element nor the sole predominant identity or title of the publication in question (e.g., Justice League, Superfriends, Superman and Batman team up stories), the 1% shall be reduced to ½ %;

(B)     with respect to publications which are comprised of multiple stories and include one or more stories based on the SUPERMAN Property and/or the SPECTRE Property, the 1% shall be calculated on DC Comics' pro rata allocation of Net Sales among all stories which comprise the publication;

(C)     with respect to publications which are sold to the public through DC COMICS' customary distribution channels and that do not have a cover price or a suggested retail price, the 1% (as may be reduced in accordance with subparagraphs (A) and (B) above) shall be calculated on an amount equal to twice the wholesale price received by DC COMICS on account of such publications.

(D)     with respect to publications which are sold to the public through distribution channels other than DC COMICS' customary distribution channels, whether or not with a cover price or suggested retail price, the 1% (as may be reduced in accordance with subparagraphs (A) and (B) above) shall be calculated upon an amount equal to 10% of revenues received by DC COMICS on account of such publications;

(E)     with respect to publications which are given away to the public without charge for a purpose other than for providing the equivalent of a public service announcement, or for advertising, promoting or publicizing DC COMICS and/or AOLTW Companies, their businesses, products or services, the 1% (as may be reduced in accordance

26

000000780

with subparagraphs (A) and (B) above) shall be calculated upon an amount equal to 10% of revenues received by DC COMICS on account of such publications.

(F)     there will be no reduction of the royalties payable hereunder for the appearance of characters from other properties in publications or stories based on the SUPERMAN Property and/or the SPECTRE Property when those other characters do not appear in the title of the publication or feature in question;

(G)     there will be no royalties payable hereunder when the SUPERMAN Property and/or the SPECTRE Property appears in publications or stories based on other properties and the characters do not appear in the title of the publication or feature in question.

vi)     All royalties hereunder shall cease to be earned by The SIEGELS for Revenues received after the expiration of the U.S. Copyright in Action Comics No. 1, except on motion pictures released in the last five years before the end of the copyright term of Action Comics No. 1, which shall earn royalties for five years from the date of the release, and except on television series, which shall earn royalties for three years from the last initial television broadcast of consecutive years of original episodes, even if such goes beyond the term of copyright of Action Comics No. 1. It is expressly understood and agreed that royalty payments made under this subparagraph shall be due only on Revenues received directly from the Licensing of exhibition and/or broadcast rights to the above motion pictures and television series and not from Revenues received indirectly, such as from the sale of any goods or provision of any services ancillary or collateral thereto.

vii) The SIEGELS acknowledge that DC COMICS, and/or other companies either wholly or partially controlled by DC COMICS' corporate parent AOL Time

000000781

Warner, Inc. (the "AOLTW Companies"), shall have the unlimited right to use the WORKS, and the MARKS in all forms of advertising, promotion and publicity to promote DC COMICS, AOLTW, their businesses, products and services without any payment obligation to The SIEGELS.

  e) <u>Payment Designations</u>  All monies due The SIEGELS hereunder, except the widow's benefit, shall be paid in the following manner:

   47.5% to Joanne Siegel

   23.75 to Laura Siegel Larson

   23.75 to Michael Siegel

   5.00 to Gang Tyre Ramer & Brown

Notwithstanding the foregoing, each of the first three persons listed above may designate one or more persons to receive money due to him or her with a limit of up to three such persons during the life of DC COMICS' payment obligations hereunder.  Such designations shall not be an assignee/beneficiary of contract rights and shall carry no rights against DC Comics.

  f) <u>Medical Insurance For Michael Siegel, Laura Siegel Larson, James Larson and Michael Larson</u>  DC Comics shall provide medical and dental insurance, or reimbursement for the cost of the same at DC COMICS's then current cost, for Laura Siegel Larson and Michael Siegel for their lives, and for James Larson and Michael Larson for the period of their minority (in the form of conventional insurance programs consistent with those offered to DC Comics employees, although it is understood that neither Laura Siegel Larson nor Michael Siegel is an employee of DC Comics) (Attached as Exhibit __ hereto is a copy of the medical coverage guidelines that currently apply).  DC Comics shall reimburse Laura Siegel Larson for premiums

000000782

she has paid for medical and dental insurance for her and James and Michael Larson from November 20, 2000 through the date of commencement of the insurance provided hereunder.

g)    Acknowledgement Of No Entitlement To Any Further Or Additional Payment.  The SIEGELS hereby acknowledge and agree that, but for the payments provided for in paragraph 2 herein, they are not entitled to, and never shall be entitled to, and shall not receive any other payments or consideration of any kind whatsoever from DC COMICS and/or its descendants, ancestors, dependents, heirs, predecessors, successors and assigns and/or past, present or future parents, subsidiaries, divisions, affiliates, related companies, executors, administrators, agents, trustees, affiliates, employees, officers, directors, partners, shareholders, consultants, representatives, servants, attorneys or licensees.

3.   DC COMICS Exclusive Ownership Of All Rights In The WORKS And The MARKS.  The SIEGELS acknowledge that, by the grant set forth in Paragraph 1 above, or otherwise, DC COMICS retains the sole and exclusive enjoyment and control and continuous, sole and exclusive ownership of, and sole and exclusive right to exploit The WORKS, to make such changes therein as DC COMICS in its sole discretion may determine, to exploit the same by means of any possible derivative works in any and all media or otherwise and to copyright such derivative works in its own name and the name of its nominee(s), for all terms of protection, including any renewals or extensions thereof, throughout the world, in all languages and forms, in all media now known or hereafter known, along with all claims or causes of action appurtenant thereto.  DC COMICS also retains the sole and exclusive enjoyment and control over, and sole ownership of, and sole and exclusive right to exploit The MARKS as DC COMICS in its sole discretion may determine, including all goodwill associated therewith, along with all claims or causes of action appurtenant to The MARKS.

29

**000000783**

4.   <u>The SIEGELS Reserve No Rights With Respect To The WORKS Or The MARKS.</u>
The SIEGELS acknowledge and agree that it is the intent of this Agreement to vest in DC COMICS _____ exclusively, all rights of any kind in The WORKS and The MARKS, and all future depictions and forms of exploitation based thereon, for DC COMICS's sole and exclusive use, enjoyment, control, and benefit. The SIEGELS acknowledge and agree that effective with the grant made herein, and regardless of anything that occurs or does not occur in the future, including but not limited to, any change(s) in law(s) applicable in any manner whatsoever to this Agreement or its terms, whether facts are, or evidence is, learned or claimed to have been learned relating in any manner whatsoever to this Agreement or its terms, whether any person or entity believes for whatever reason, justified or otherwise, that this Agreement and/or its terms are in any manner just or unjust to The SIEGELS or any of them, and/or whether or not any of the works that are the subject of this Agreement fall into the public domain for any reason whatsoever, The SIEGELS have no right to use nor any right, title, or interest of any nature in The WORKS or The MARKS.  By way of example only and without limitation, as of the effective date hereof and forever thereafter, The SIEGELS have no, and shall have no right to, and covenant not to, exploit, or enter into any negotiations or transactions with respect to, or related to, or to terminate any grant in or relating to The WORKS and/or The MARKS, and own no and shall own no rights, title or interest, including but not limited to any Reversionary Rights, of any kind whatsoever anywhere in the world in The WORKS and/or The MARKS or have any right to use or authorize the use of any of the foregoing on any basis.

5.   <u>The SIEGELS Shall Not Challenge DC Comics's Rights Granted Hereunder Or Under The Stand Alone Assignments.</u>  The SIEGELS covenant not to and shall not challenge, make any claim against or concerning, or take any action, directly or indirectly, to interfere with

30

000000784

or reduce DC COMICS's ownership or exclusive benefit from, control over, and enjoyment of, or exclusive right to exploit The WORKS or The MARKS, including but not limited to the rights granted in The WORKS or The MARKS hereunder, or authorize, aid, abet or assist any other person or entity in doing so.

6. <u>No Right To Terminate New Grant.</u> Further to paragraph 4, The SIEGELS hereby acknowledge that, by serving the SUPERMAN AND SPECTRE Notices, they have sought to terminate any and all earlier grants by Jerome Siegel to DC COMICS and/or its predecessors in interest in the SUPERMAN and SPECTRE Works pursuant to Section 304(c) of the Copyright Act and they know of no such grants which were not identified in said Notices. The SIEGELS further acknowledge and represent and warrant that, within the meaning of the Copyright Act, this Agreement is a new grant in the SUPERMAN and SPECTRE Works and OTHER SIEGEL Works (and the SUPERMAN and SPECTRE Derivative Works), and that pursuant to this Agreement, neither they nor anyone claiming rights under or through them or Jerome Siegel have any right(s) or will ever have any right(s) whatsoever to terminate the grants contained herein or to claim any Reversionary Rights in The WORKS or The MARKS under any provision of the Copyright Act, or under any other statute, regulation, common law principle, body of law or otherwise throughout the world. The SIEGELS hereby designate DC COMICS as the administrator, personal representative, and/or trustee of Jerome Siegel for the purposes of termination of copyright grants with respect to the SUPERMAN and SPECTRE Works.

7. <u>Third Party And Intercompany Licenses.</u>

a) DC COMICS shall enter into any and all Licenses with unaffiliated third parties with respect to the SUPERMAN Property and the SPECTRE Property as DC COMICS, in its sole discretion, elects to and The SIEGELS shall have no right whatsoever to challenge any such

31

**000000785**

License or any of the terms thereof entered into by DC COMICS, its parents, affiliates, subsidiaries, licensees or sub-licensees, for any reason whatsoever or to make any claim for breach of this Agreement or liability hereunder on account of any such License or the terms thereof.

(b)    The SIEGELS hereby acknowledge their awareness and acceptance that DC COMICS, in the normal course of its operations, does business on an arm's length basis with AOLTW Companies and, in so doing, may License, *inter alia*, the SUPERMAN Property. The SIEGELS shall have no right whatsoever to challenge any such License or any of the terms thereof, on any basis, provided that: (i) the terms of such License are commercially reasonable and fair as if entered into with an unaffiliated third party at the time entered into: or (ii) DC COMICS' share of proceeds on account of such License are no less favorable to DC COMICS than its share of proceeds in the applicable safe harbor agreement identified below which safe harbor agreements are hereby acknowledged to be commercially reasonable and fair within the meaning of subparagraph (i) above; or (iii) if DC COMICS' share of proceeds is less favorable to DC COMICS than under the applicable safe harbor agreement identified below, if DC COMICS pays The SIEGELS royalties based on imputed Revenues calculated pursuant to the financial terms of the applicable safe harbor agreement identified below. If DC COMICS enters into an intercompany agreement that is not covered by an applicable safe harbor agreement or if DC COMICS elects not to pay The SIEGELS royalties based on imputed Revenues calculated pursuant to the financial terms of the applicable safe harbor agreement identified below, , then The SIEGELS may challenge such agreement under the procedures set forth in the Dispute Resolution section paragraph __, but only on the basis that the agreement is not commercially reasonable and fair in light of all the circumstances. In no event shall The SIEGELS have the

000000786

right to challenge any intercompany deal on the basis that it is a transaction with an AOLTW Company, or on the basis of whether or not there is an advance or guarantee, or because DC COMICS did not hold an auction in respect thereof.

    c)      The applicable safe harbor agreements are as follows:

        i)      For live action and animated feature length theatrical motion pictures: the larger of 5% of worldwide gross revenues or 7.5% of domestic gross revenues received by an affiliated motion picture distributor in the United States in U.S. Dollars from exploitation of the motion pictures, less taxes (including duties and other governmental fees), collection costs and trade association dues.  Notwithstanding the foregoing, in respect of Licenses of exhibition or distribution rights by means of video discs, cassettes or similar devices or delivered electronically to the consumer, gross revenues shall mean 20 % of (i) gross wholesale rental income received therefrom by an affiliated distributor and (ii) gross wholesale sales income received therefrom by an affiliated distributor, less a reasonable amount for returns.

        ii)      For animated direct to home video productions:  $80,000 for each hour of the direct to home video production (pro rata for longer or shorter) and 30% of Defined Proceeds received by an affiliated animation production company in the United States in U.S. Dollars from exploitation of the home video production.  As used herein, Defined Proceeds shall mean the then standard definition of Defined Proceeds used by Warner Bros. Animation (or any successor in interest thereto).

        iii)      For live action television programs: 3% of the first 1.5 million dollars of Gross Receipts received by an affiliated television production company in the United States in U.S. Dollars from exploitation of each program , and 4.5% of Gross Receipts on all

33

000000787

amounts in excess of 1.5 million dollars received by an affiliated television production company in the United States in U.S. Dollars from such exploitation. As used herein, Gross Receipts shall mean the then standard definition of Gross Receipts used by Warner Bros. Television (or any successor in interest thereto).

iv)    For animated television programs: a flat fee of $35,000 per episode for the first 65 episodes; $40,000 per episode thereafter; and 30% of Defined Proceeds received by an affiliated animation production company in the United States in U.S. Dollars from exploitation of the programs. As used herein, Defined Proceeds shall mean the then standard definition of Defined Proceeds used by Warner Bros. Animation (or any successor in interest thereto).

v)    For video games:

(A)    For products intended for PC/Mac platforms: 10% of net sales of up to 150,000 units of each product received by an affiliated video game company in the United States in U.S. Dollars, and 13% of such sales in excess of 150,000 units. As used in this paragraph (v), "net sales" shall mean the affiliated video game company's then standard definition of net sales.

(B)    For Products intended for all other platforms: 5% of net sales received by an affiliated video game company in the United States in U.S. Dollars for each such product.

vi)    For licensed merchandise excluding any of the other categories set forth in this safe harbor provision: Arrangement between DC COMICS and Warner Bros. Consumer Products, pursuant to which Warner Bros. Consumer Products deducts a 25% fee

000000788

34

from gross revenues received in the United States in U.S. Dollars on account of licensed merchandise agreements, and remits 75% of such gross revenues to DC COMICS.

vii)    For licensed publishing: 10% of net wholesale sales received by an affiliated publishing company in the United States in U.S. Dollars for each licensed publication. As used herein, "net wholesale sales" shall mean the affiliated publishing company's then standard definition of net wholesale sales.

viii)    For website uses of Flash Animations and collateral material intended to supplement or support the Flash Animations: 5% of an affiliated online production company's Gross Proceeds received in the United States in U.S. Dollars from its exploitation of the animations and collateral material after it has recouped its Production Costs. As used herein, Gross Proceeds and Production Costs shall mean the then standard definition of Gross Proceeds and Production Costs used by Warner Bros. Online (or any successor in interest thereto).

8.    Accounting.  Royalties due in accordance with paragraph 2(d) hereof (i.e., amounts in excess of recoupable Annual and Initial Advances and interest, if applicable) shall be payable annually on March 31 of the year following the close of the annual accounting period. All payments shall be accompanied by a statement of account. The year 2000 statement and payment, if any, shall be made on March 31, 2002

9.    Audit.  The SIEGELS may audit the books and records of DC COMICS solely in order to verify statements issued to The SIEGELS hereunder. Any such audit shall be at The SIEGELS' expense. Any audit shall be conducted only upon reasonable notice by a certified public accountant during regular business hours at DC COMICS' offices and in such manner as not to interfere with DC COMICS' normal business activities. In no event shall an audit with

000000789

respect to any statement start later than twelve (12) months after the date of that statement nor shall any audit continue for longer than five (5) consecutive business days, nor shall audits be made more frequently than once a year, nor shall the books and records supporting any statement be audited more than once. All statements shall be binding upon The SIEGELS and not subject to any claims or proceedings unless objection is made in writing by a majority of The SIEGELS stating the basis thereof and delivered to DC COMICS within twelve (12) months of the date of the statement to which objection is made, or if an audit is started within that period, then within thirty (30) days of the completion of that audit. The SIEGELS and their certified public accountant (and any employee thereof) shall keep confidential all information received from DC COMICS during the Audit.

10.    Appointment Of DC COMICS As Attorney-in-Fact; Provision And Filing Of Documents.

a) The SIEGELS Shall Furnish DC COMICS With Documents And Shall File Assignments and Execute Documents. Within _____ of the effective date hereof, and thereafter, The SIEGELS shall at all times cooperate with and furnish DC COMICS with copies of all documents in their custody, possession or control or that of their attorneys pertaining to the rights in and history and creation of The WORKS and/or The MARKS. The SIEGELS further undertake that they shall within ____ of the effective date hereof file with the United States Copyright Office and serve true and correct copies on DC COMICS of the Stand Alone Assignments attached hereto as Exhibit _ and shall execute any and all other documents as requested by DC COMICS to confirm DC COMICS' ownership of The WORKS and The MARKS. The parties hereto each agree to execute and deliver any and all further documents as may be required to carry out the terms and intentions of this Agreement, including but not

36

000000790

limited to all assignments, powers of attorney and other appropriate documents relating to the copyrights, trademarks and all other rights at issue and/or which DC COMICS may reasonably request for filing and recording or other purposes.

b) The SIEGELS Appoint DC COMICS as Their Attorney-In-Fact. The SIEGELS hereby further irrevocably appoint DC COMICS, and/or any persons designated by it, as their attorney-in-fact, coupled with an interest therein, with respect to The WORKS and The MARKS. DC COMICS is, thus, hereby made fully authorized to execute any and all such documents for and in the name of The SIEGELS, or any of them, and to bind The SIEGELS and their heirs, successors and assigns thereby with respect to The WORKS and The MARKS.

11.     Conduct Of The Business.

a) No Disparagement By Parties. The SIEGELS shall not disparage or criticize DC COMICS, its parent, related companies, affiliates, subsidiaries, employees, officers, directors, attorneys, agents, predecessors, successors, assigns, or licensees or their properties. DC COMICS shall not disparage or criticize and shall not authorize the disparagement or criticism of The SIEGELS or their employees, officers, directors, attorneys, agents, predecessors or successors.

b) Press Releases And Promotion. The SIEGELS and DC COMICS shall issue a joint press release in the form attached as Exhibit _ announcing their entry into this Agreement. Thereafter, The SIEGELS:

(i)     upon DC COMICS' request, shall continue to positively publicize The WORKS, including making themselves reasonably available for public appearances (with any travel or related expenses paid by DC COMICS and subject to their health and availability);

000000791

(ii)    shall not make any personal appearances, issue statements, grant interviews, and/or engage in other activities they may wish to conduct relating to The WORKS (and/or The MARKS) without the prior written consent of DC COMICS, not to be unreasonably withheld;

(iii)    shall not contact or cause any third party to contact any licensee or sublicensee of DC COMICS of any of The WORKS or The MARKS.

c)    <u>The SIEGELS Shall Refer Inquiries.</u>  The SIEGELS shall not, directly or indirectly, indicate to any other person or entity, that they own any rights in, or have any role with respect to the future exploitation of The WORKS and/or The MARKS in any manner, or have any role in DC COMICS' business in relationship to The WORKS and/or The MARKS. However, if The SIEGELS should receive inquiries concerning The WORKS and/or The MARKS, they shall promptly and fully refer any and all such inquiries to DC COMICS.

d)    <u>Advise.</u>  DC COMICS shall provide the opportunity for The SIEGELS who sign this Agreement to be informed about major developments (e.g. motion pictures, television programs, theme park attractions, major changes planned in publications), concerning The SUPERMAN Works and The SIEGELS will have an opportunity to give their input with respect thereto, but this does not rise to the level of a consultation right. The SIEGELS will be informed of such developments periodically. To facilitate this, The SIEGELS will appoint one of them to receive occasional written updates from DC COMICS and with whom, upon request, a DC COMICS representative will meet once a year to provide a broader overview of current developments. The SIEGELS may not at any time or for any reason, assign or transfer to any other person or entity the right to receive the information or provide the input described

000000792

EXHIBIT P
Page 234

herein. Further, The SIEGELS shall at all times keep the information provided to them by DC COMICS confidential and not disclose it to any other person or entity.

e)    Credit.

(i) On new works based upon the SUPERMAN Works, and/or the SUPERMAN Derivative Works first created after the effective date hereof (excluding later episodes of ongoing television series) DC COMICS shall provide a credit along the lines of "Superman created by Jerry Siegel and Joe Shuster", "Created by Jerry Siegel and Joe Shuster", or "Based on the characters created by Jerry Siegel and Joe Shuster" (as applicable) on motion pictures (main titles on screen only) television programs (main titles only), print publications (such as comics and/or books), and on all other works where credit to creators is customary. The size and placement of the foregoing credit shall be subject to DC COMICS' sole discretion, and shall be consistent with guild and other obligations.  DC COMICS shall be allowed a commercially reasonable period of time within which to commence the phase-in of this credit.

(ii)    On new works based upon the SUPERMAN Works, and/or the SUPERMAN Derivative Works first created after the effective date hereof (excluding later episodes of ongoing television series) and initially released during the term of the copyright of Action Comics No. 1, DC COMICS shall provide the following credit: "By Special Arrangement with the Jerry Siegel Family". The size and placement of the foregoing credit shall be subject to DC COMICS' sole discretion, and shall be consistent with guild and other obligations. DC COMICS shall be allowed a commercially reasonable period of time within which to commence the phase-in of this credit.

000000793

EXHIBIT P
Page 235

(iii) On new works based upon the SPECTRE Works first created after the effective date hereof (excluding later episodes of ongoing television series) DC COMICS shall provide a credit along the lines of "Spectre created by Jerry Siegel and Bernard Bailey", "Created by Jerry Siegel and Bernard Bailey", or "Based on the characters created by Jerry Siegel and Bernard Bailey"(as applicable) on motion pictures (main titles on screen only) television programs (main titles only), print publications (such as comics and/or books), and on all other works where credit to creators is customary. The size and placement of the foregoing credit shall be subject to DC COMICS' sole discretion, and shall be consistent with guild and other obligations. DC COMICS shall be allowed a commercially reasonable period of time within which to commence the phase-in of this credit.

(iv) No failure to comply with the provisions of this paragraph nor any failure of any other person to comply therewith shall constitute a breach by DC COMICS of this Agreement, such as to entitle The SIEGELS to injunctive relief; provided, upon notice by The SIEGELS, DC COMICS shall use reasonable efforts to prospectively cure any such failure to comply with the provisions of this paragraph.

f)    DC COMICS Right To Use Materials. DC COMICS shall have the right at its sole discretion to use photos and "bios" of or concerning Jerome Siegel in publicity or advertising materials concerning its properties, including The WORKS and/or The MARKS.

g)    DC COMICS Shall Have Exclusive Control Over The WORKS And The MARKS. DC COMICS shall have exclusive control over the manner, forum, medium, and all other exploitation of The WORKS and The MARKS, and such matters will be within its sole discretion and The SIEGELS shall have no right of approval whatsoever in regard thereto. Nothing in this Agreement shall be construed as requiring DC COMICS to exploit, or continue to

40

000000794

exploit, The WORKS and The MARKS nor shall anything in this Agreement be construed so as to create a fiduciary duty owed to The SIEGELS.

h)     First Opportunity To Negotiate. The SIEGELS shall offer DC COMICS, or such parent, related company, affiliate, subsidiary and/or division as it may designate a first opportunity to negotiate for the rights in any biographical works in any media pertaining to Jerome Siegel.

12. Representations And Warranties, Covenant Not To Sue And Indemnification.

a)    The SIEGELS Have The Right and Power To Enter Agreement. The SIEGELS hereby represent, warrant, agree and covenant that (i) they have the right and power to enter into this Agreement and to grant all rights which are granted by them herein and covered by this Agreement, (ii) neither they nor Jerome Siegel have granted any right, license, or permission, or entered into any transaction or agreement in relation to or with respect to, the subject matter hereof, to any other party or encumbered any of The SIEGELS' (or Jerome Siegel's) rights or interests in The WORKS or The MARKS in any way, (iii) they know of no other party with any rights of any kind to or that claim to have any rights of any kind to The WORKS or The MARKS, (iv) they shall not, at any time hereafter, solicit, initiate or enter into any negotiation, transaction or agreement or grant any right, license, or permission in relation or with respect to the subject matter covered by this Agreement to any other party or otherwise encumber, in any way, any rights granted to DC COMICS herein, including, but not limited to, any copyright termination interest or any Reversionary Rights in any rights relating to The WORKS; (iv) they shall not at anytime hereafter, regardless of whether The WORKS fall into the public domain, or any other occurrence or non-occurrence, exploit The WORKS or The MARKS, or license or authorize anyone else to do so, except to the extent provided herein; (v)

**000000795**

41

any and all rights that they own, owned, claim or claimed in The WORKS or The MARKS,

including but not limited to all trademark rights (if any) and copyright rights, and all

termination rights arising under the U.S. Copyright Act and Reversionary Rights, if any, derive

and flow directly and only from Jerome Siegel; (vi) no person or entity other than The

SIEGELS and/or DC COMICS own any rights or could possibly claim any rights of any nature

in, or arising out of, any Works created by Jerome Siegel; (vii) they know of no Works other

than the SUPERMAN Works and SPECTRE Works (notwithstanding and without diminishing

in any manner the provisions in this Agreement relating to The OTHER SIEGEL Works and

the OTHER Marks) created by Jerome Siegel in which they claim any rights; (viii) they know

of no Works included among the SUPERMAN Works that were not listed in the SUPERMAN

Notices (ix) Joanna Siegel is the sole executor, trustee, administrator and personal

representative of Mr. Siegel and his estate.

      b)  <u>Release And Covenant Not To Sue By The SIEGELS.</u>

    i)    As of the date of execution of this Agreement, The SIEGELS and their

descendants, ancestors, dependents, estates, heirs, predecessors, successors and assigns and

past, present and future, executors, administrators, agents, trustees, affiliates, employees,

officers, directors, partners, shareholders, consultants, representatives, servants, attorneys and

licensees (hereinafter individually and collectively referred to as "RELEASOR"), hereby

release and discharge now and forever DC COMICS and its descendants, ancestors,

dependents, heirs, predecessors, successors and assigns and past, present and future parents,

subsidiaries, divisions, affiliates, related companies, partners, executors, administrators, agents,

trustees, affiliates, employees, officers, directors, partners, shareholders, consultants,

representatives, servants, attorneys and licensees (hereinafter individually and collectively

000000796

EXHIBIT P
Page 238

referred to as "RELEASEE") from any and all past, present, future, actual and/or potential claims, demands, entitlements, obligations, actions, injuries, causes of action, suits, debts, dues, sums of money, accounts, reckonings, losses, (including but not limited to lost earnings, revenues, fees and/or royalties) bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, settlements, expenses, counsel fees, costs, extents and executions (hereinafter referred to collectively and individually as "Claim(s)") throughout the world that exist as of, or existed prior to, the last date of execution hereof, that RELEASOR could have asserted or could assert against RELEASEE relating in any manner to The WORKS and/or The MARKS, regardless of whether or not such Claim(s) are in law, admiralty, equity, or otherwise, regardless of whether or not such Claim(s) were known, foreseen or unforeseen, patent or latent, and whether or not such Claim(s) involve real, personal and/or intangible property, including but not limited to any Claim(s) to benefit in any manner, other than as provided for herein from any transactions, understandings and agreements made with respect to The WORKS and/or The MARKS as of the date of execution of this Agreement.

    ii)    In addition to the foregoing and except as otherwise provided herein, RELEASOR hereby irrevocably warrants and covenants now and forever that it shall not, now or ever, sue or otherwise assert a Claim of any nature, in any manner, or in any forum, anywhere in the world, whatsoever, against the RELEASEE arising out of any of RELEASEE'S past, present or future acts relating to The WORKS and/or The MARKS or out of any other claim of rights or from facts acquired by RELEASOR, subsequent to the last date of execution hereof.

    RELEASOR expressly and forever waives any and all rights and benefits conferred on it (if any) by the provisions of any State, Federal or other domestic or foreign law

000000797

(including but not limited to any Reversionary Rights, and/or any rights and benefits under California Civil Code, Section 1542, and any and all other provisions of all comparable, equivalent, analogous, similar or related statutes and principles in common law of the United States and all foreign jurisdictions) and expressly agrees that the releases and covenants in this paragraph extend to claims that it did not know of, or suspect to exist, in its favor at the time of executing this Agreement that, if known, may have materially affected this Agreement..

     c)  <u>Release And Covenant Not To Sue By DC COMICS.</u>

    i)    As of the date of execution of this Agreement, RELEASEE hereby releases and discharges now and forever RELEASOR from any and all Claim(s) throughout the world that exist as of, or existed prior to, the last date of execution hereof, that RELEASEE could have asserted or could assert against RELEASOR relating in any manner to The WORKS and/or The MARKS, regardless of whether such Claim(s) are in law, admiralty, equity, or otherwise, regardless of whether or not such Claim(s) were known, foreseen or unforeseen, patent or latent, and whether or not such Claim(s) involve real, personal and/or intangible property.

    ii)    In addition to and in accordance with the foregoing, and except as otherwise provided herein, RELEASEE hereby irrevocably warrants and covenants now and forever that it shall not, now or ever, sue or otherwise assert a Claim of any nature, in any manner whatsoever, or in any forum, anywhere in the world, against the RELEASOR arising out of any of RELEASOR'S acts as of, or prior to, the last date of execution hereof, relating to The WORKS and/or The MARKS.

    RELEASEE expressly and forever waives any and all rights and benefits conferred on it (if any) by the provisions of any State, Federal or other domestic or foreign law (including but not limited to California Civil Code, Section 1542, and any and all other provisions of all

44

000000798

comparable, equivalent, analogous, similar or related statutes and principles in common law of the United States and all foreign jurisdictions) and expressly agrees that the releases and covenants in this paragraph extend to claims that it did not know of, or suspect to exist, in its favor at the time of executing this Agreement that, if known, may have materially affected this Agreement.

d)    The SIEGELS Indemnify DC Comics.  RELEASOR shall jointly and severally indemnify, defend and hold harmless RELEASEE against any and all Claim(s)  at the time such Claim(s) are incurred, resulting or arising from any claim(s), allegation(s), assertion(s), challenge(s), objection(s), demand(s), proceeding(s), action(s) or suit(s) by:

(i)    RELEASEE  against RELEASOR  arising out of a breach or claimed breach by RELEASOR  (or any of the successors, assigns, heirs, estates, trustees, administrators or executors  of Jerome Siegel) of any of the terms of this Agreement;

(ii)    RELEASOR, the estate and/or heirs of Jerome Siegel, Dennis Larsen, and/or any other person or entity, without any limitation whatsoever,

(a)    asserting any right in The WORKS and/or The MARKS;

(b)    seeking to terminate any grant(s) made, or right(s) granted herein or in the Stand Alone Assignments;

(c)    claiming any Reversionary Rights in The WORKS or The MARKS;

(d)    that in any manner interferes with DC COMICS' exclusive rights in and/or ownership of The WORKS and/or The MARKS, including but not limited to any claim or challenge to DC COMICS' right and power to enter into this Agreement with The SIEGELS and/or to DC COMICS' exercise, to the full extent authorized, of the right to exploit

45

000000799

the rights granted to it herein and to deliver as compensation to The SIEGELS the payment and options set forth herein;

         (e)    relating to The SIEGELS representations and warranties herein, including but not limited to:  i) their representations and warranties of ownership; and ii) their right or power to enter into this agreement and to grant to DC COMICS the rights granted herein;

         (iii)    Dennis Larsen against RELEASEE in any manner relating to compensation or payments under this Agreement.

RELEASOR's obligation to indemnify RELEASEE  hereunder is fully binding regardless of whether or not any of the aforementioned claim(s), allegation(s), assertion(s), challenge(s), objection(s), demand(s), proceeding(s), action(s) or suit(s) are founded, valid, established in law or fact, or based on evidence.

    e)    DC COMICS Indemnifies The SIEGELS.  DC COMICS agrees to and shall defend and indemnify those members of the Siegel family who sign this Agreement against any claims or damages incurred by them arising out of or relating to claims brought by third parties against The SIEGELS due to wrongful acts by DC COMICS and/or Warner Bros. concerning The WORKS and/or The MARKS.  DC COMICS shall do this, at its option, by adding those members of the Siegel family who sign this Agreement as named insured(s) on any applicable Errors & Omissions Insurance policy, or through direct indemnification, subject to the limitations set forth in this Agreement.

13. Confidentiality.  Except for the agreed upon press release and the information contained therein referred to in paragraph __ above, The SIEGELS shall keep confidential all contents of this Agreement.

000000800

46

14.    Dispute Resolution.

a)    Choice of Law.  This Agreement, and all claims of any nature or type whatsoever related to or concerning the subject matter of this Agreement, shall be governed by New York law

b)    DC COMICS' Equitable Remedies Unlimited.  The SIEGELS agree that this Agreement and all rights granted herein by them to DC COMICS may be specifically enforced by DC COMICS, including by an action seeking temporary, preliminary and/or permanent injunctive relief.  It is further agreed that any attempt by the SIEGELS to use, authorize others to use, or to attempt to prevent others from using the SUPERMAN Property and the SPECTRE Property will cause immediate and irreparable harm to DC COMICS and that the SIEGELS are estopped from making any argument that DC COMICS is not irreparably harmed by such action. Any Dispute asserted by DC COMICS may, at the sole option of DC COMICS, be adjudicated in any court of competent jurisdiction, including but not limited to, the courts of the State of New York, in the borough of Manhattan.  The SIEGELS hereby consent to the jurisdiction of New York state and federal courts in the borough of Manhattan.

c)    Arbitration As Sole Remedy To Address Disputes By The SIEGELS.  Any Dispute raised by The SIEGELS shall be resolved exclusively by arbitration according to the procedures set forth in the "Arbitration Procedures Rider" attached as Exhibit __ hereto and incorporated herein by reference. The remedies of The SIEGELS under or with respect to this Agreement shall be strictly and irrevocably limited to arbitration for an accounting of moneys due.  The SIEGELS shall have no right to, and irrevocably waive and release any rights they may

47

000000801

otherwise have or obtain in the future to seek, any injunctive or other equitable relief of any kind, for any reason whatsoever. Under no circumstances, including the failure of DC COMICS to keep or perform any of its duties or obligations under this Agreement, shall The SIEGELS, or any of them or anyone claiming rights through or under them or Jerome Siegel, have the right to rescind, revoke, cancel or terminate this Agreement, the Stand Alone Assignments, or any of the rights granted in any of those documents to DC COMICS and covenant not to do so. Further, in no event shall any such rights revert to or be possessed by The SIEGELS or anyone claiming rights through or under them.

     d)     Limit On Remedy Available To The SIEGELS. If for any reason whatsoever this Agreement and/or The SIEGELS' grant of rights to DC COMICS provided herein is claimed to be, or is, ineffective, void, voidable or revocable, in whole or in part, or if for any reason The SIEGELS and/or any of their heirs, trustees, attorneys, executors, administrators, successors and/or assigns and/or those of Jerome Siegel make any future claim against or challenge to DC COMICS' sole and exclusive ownership of and right to exploit any and all rights in The WORKS or any other works owned by DC COMICS throughout the world, or any part thereof, on any basis or on any theory, or somehow obtain any Reversionary Rights in The WORKS or The MARKS it is expressly understood and agreed that the sole remedy is to seek compensation due under this Agreement pursuant to the Arbitration Procedures set forth in Exhibit __ hereto. The SIEGELS further agree that in the event any such claim or challenge results in any liability or damage to DC COMICS, except for the amount provided in paragraph _ below (i.e. annual compensation to ____ of $100,000), any amounts that might otherwise be due to The SIEGELS under this Agreement shall be reduced by an amount equivalent to any liability or damage suffered by DC COMICS on such claim or challenge, which DC COMICS may offset against

000000802

any sums due to The SIEGELS herein.  The parties acknowledge that the financial benefit flowing to The SIEGELS under this Agreement represents a greater amount than what The SIEGELS would have received from a court of competent jurisdiction in an attempt to enforce the Notices and any purported rights thereunder.  As consideration for this, The SIEGELS expressly agree that in any event, including but not limited to any change in law or otherwise, the compensation owing to The SIEGELS pursuant to paragraphs ___ of this Agreement shall constitute a cap upon the amount DC COMICS shall ever be liable for or obligated to pay to The SIEGELS or anyone else claiming under or through The SIEGELS and/or Jerome Siegel regardless of the basis of any such claim.

e)      No Payment Due Unless Provided For Herein  Except as provided in paragraph 2(e), The SIEGELS acknowledge that any right to payment for any use of the SUPERMAN or SPECTRE Works to which Michael Siegel may be entitled shall be limited to a percentage of sums paid pursuant to this Agreement and to be negotiated directly between SIEGEL and Michael Siegel.  None of The SIEGELS or their heirs, executors, trustees, administrators, successors or assigns are due, or ever will be due, anything whatsoever from DC COMICS to the extent it is not expressly provided for herein.

f)      Suspension Of Payments To The SIEGELS.  If for any reason The SIEGELS and/or any of their heirs, trustees, attorneys, executors, administrators, successors and/or assigns and/or those of Jerome Siegel make any future claim against, or challenge to, or in any manner diminish, or interfere with, whether directly, indirectly or by operation of law, DC COMICS' sole and exclusive ownership and enjoyment of and right to exploit in any manner it so chooses in The WORKS and/or The MARKS or any other works or marks owned by DC COMICS throughout the world and/or any and all rights therein, or any part thereof, on any basis or on any

000000803

49

theory (including but not limited to claiming any Reversionary Rights in The WORKS or The

MARKS), it is expressly understood and agreed that all payments to The SIEGELS shall be

suspended until the claim is finally resolved.

15.     Non Assignability Of Rights Granted To The Siegels.   The SIEGELS shall not assign,

transfer, sell, license, or give away any of the rights provided to them under this Agreement, and

any such assignment shall be null and void.  The SIEGELS expressly agree that their heirs and/or

all person(s) or entity or entities claiming rights under or through The SIEGELS or Jerome

Siegel with respect to any of the subject matter of this Agreement are expressly bound by this

Agreement to the same extent to which The SIEGELS are bound by it.  The SIEGELS shall

expressly notify in writing (in their wills and/or other documentation as appropriate) their heirs

and/or all person(s) or entities claiming rights under or through The SIEGELS or Jerome Siegel

with respect to any of the subject matter of this Agreement that such person(s) or entity or

entities are bound by the terms hereof to the same extent to which The SIEGELS are bound by it.

16. MISCELLANEOUS

        a)   Severability.  In the event any provision hereof affecting The SIEGELS' grant

of rights to DC COMICS under or pursuant to this Agreement is determined for any reason by

any competent court to be unenforceable, such determination shall not affect the effectiveness of

any other provision hereof providing for the grant of rights by The SIEGELS to DC COMICS, so

that The SIEGELS's grant of rights shall be enforced to the fullest extent allowable by law in

accordance with the parties' intent hereunder.

        b)   Successors.  This Agreement is enforceable against and binding upon the

parties' heirs, executors, trustees, administrators, agents, attorneys, licensees, officers,

employees, directors, consultants, successors and assigns.

000000804

50

c) <u>Amicable Resolution.</u> This Agreement represents the amicable resolution of the dispute between DC COMICS and The SIEGELS referenced in paragraph 7 of the Tolling Agreement.

d) <u>Modification in Writing.</u> This Agreement may be modified only by a writing signed by each party hereto.

e) <u>Entire Agreement.</u> This Agreement contains the complete understanding between the parties concerning the subject matter hereof and all prior representations, agreements and understandings are merged herein.

f) <u>Arms Length.</u> The parties hereto mutually acknowledge and agree that this Agreement and the terms and provisions memorialized herein have been fully negotiated with the assistance of qualified legal counsel at "arms length" and, consequently, no rule of interpretation or construction which would result in any interpretation or construction in favor, or to the detriment of, one party over another party shall apply.

g) <u>Counterparts.</u> The parties shall execute this Agreement in 4 counterparts so that each party may retain an original.

h) <u>Captions.</u> The captions of this Agreement are for convenience only and shall not be construed as part hereof or affect the construction or interpretation of any provisions of this Agreement.

<u>AGREED AND ACCEPTED</u>:

DC COMICS, a division of Warner Bros., a          By: _____

Time-Warner Entertainment Company                          Joanne Siegel


By: _____                              Date: _____


51

**000000805**

EXHIBIT P
Page 247

Title: _____

Date: _____

By: _____

      Laura Siegel Larson

Date: _____

The Estate of Jerome Siegel

By:_____
Joanne Siegel as sole executor, trustee,
administrator and personal representative of
Jerome Siegel and his estate

Date: _____

By: _____

      Michael Siegel

Date: _____

**000000806**

EXHIBIT P
Page 248

## ACKNOWLEDGMENT

STATE OF         )

                SS.:

COUNTY OF     )

On _____ __, 2001 before me _____ personally came _____ to me known, by me duly sworn, did depose and say that deponent resides at _____ that deponent is the _____ of DC COMICS, a division of Warner Bros., a Time-Warner Entertainment Company, the entity described in, and which executed the foregoing Agreement that [deponent knows the seal of the corporation, that the seal affixed thereto is the corporate seal, that it was affixed by order of the board of the corporation; and that deponent signed deponent's name thereto by like order.]

53

000000807

## ACKNOWLEDGMENT

State of            )

                :ss:

County of            )


On        2001 before me personally came Joanne Siegel to me known, and known to me to be the individual described in, and who executed the foregoing Agreement, and duly acknowledged to me that she executed the same.


_____
Notary Public

54

000000808

EXHIBIT P
Page 250

# EXHIBIT Q

CONFIDENTIAL

**Joanne Siegel**
13929 Marquesas Way #201A
Marina Del Rey, CA 90292

**Laura Siegel Larson**
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

Redacted

September 21, 2002

Kevin S. Marks, Esq.
Bruce M. Ramer, Esq.
Gang, Tyre, Ramer & Brown, Inc.
132 South Rodeo Drive
Beverly Hills, CA 90212

Dear Kevin and Bruce,

As we previously discussed with you and hereby affirm, we rejected DC Comics' offer for the Siegel Family interest in Superman and other characters sent to us by you on February 4, 2002. We similarly reject your redraft of the February 4, 2002 document which you sent to us on July 15, 2002. Therefore due to irreconcilable differences, after four years of painful and unsatisfying negotiations, this letter serves as formal notification that we are totally stopping and ending all negotiations with DC Comics, Inc., its parent company AOL Time Warner and all of its representatives and associates, effective immediately.

This letter is also notification that, effective immediately, we are terminating Gang, Tyre, Ramer & Brown, Inc., and all of your firm's partners, associates and employees as representatives of the Siegel Family interest regarding Superman, Superboy, the Spectre and all related characters and entities. We instruct you to take no further actions on our behalf.

Please return all materials regarding the above including but not limited to files, correspondence, notes and documents to us forthwith. These should be sent to Joanne Siegel at the above address.

It is a shame that four years were wasted due to DC Comics and AOL Time Warner's greed. We have no intention of publically disparaging DC or any individual in the parent company. However, should DC or its parent company, officers, attorneys, representatives or spokespersons disparage us or our rights, we will vigorously respond in kind.

Sincerely,

*Joanne Siegel*

Joanne Siegel

Sincerely,

*Laura Siegel Larson*

Laura Siegel Larson

CC: Michael Siegel
     Don Bulson, Esq.
     Paul Levitz

41

8-1-06     44

Larson

EXHIBIT Q
Page 251

WB005768

fidential

# EXHIBIT R

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA )
SIEGEL LARSON, )
)
      Plaintiffs. )
)
   vs. )     No. 04-8400 (RSWL)(RZx)
)
WARNER BROS. ENTERTAINMENT )         -and-
INC., et al., )
)    No. 04-8776 (RSWL)(RZx)
      Defendants. )
_____)
AND RELATED COUNTERCLAIMS.

DEPOSITION OF KEVIN S. MARKS

Beverly Hills, California

Saturday, October 7, 2006

Volume 1

Reported by:

DAVID S. COLEMAN

CSR No. 4613



10:14 1      Q    And to the best of your knowledge, are the

10:14 2    handwritten entries correct?  Do they actually reflect

10:14 3    meetings at the designated times and dates?

10:14 4           MR. MARMARO:  Each and every one?

10:14 5           MR. BERGMAN:  Yes.

10:14 6           MR. MARMARO:  Take a moment to look through them

10:14 7    and review it.

10:14 8           THE WITNESS:  The answer is I don't know.

10:14 9    BY MR. BERGMAN:

10:14 10      Q    Okay.  With respect to Exhibit 3, are these

10:14 11   telephone call registers which reflect calls received and

10:14 12   placed by you?  And when I say "by you," I mean to

10:15 13   distinguish you from Mr. Ramer.

10:15 14          MR. MARMARO:  The question is vague.

10:15 15          THE WITNESS:  Well --

10:15 16   BY MR. BERGMAN:

10:15 17      Q    Let's take it --

10:15 18      A    May I ask -- I have to ask a question.

10:15 19      Q    Surely.

10:15 20      A    This is what I was handed as Exhibit 3, GTRB

10:15 21   0515 through 0625 and GTRB 0626 through GTRB 0635.  These

10:15 22   are different types of documents.  So it may be easier to

10:15 23   actually have these as separate exhibits to respond to

10:15 24   the question, but if you would -- but I think for the

10:16 25   pending question, these documents both reflect calls made

                                                                    13

10:16 1    to me and calls made or placed by Bruce Ramer.

10:16 2        Q    Okay.  Then as they were produced, they were

10:16 3    stapled together, and let me go through them one by one

10:16 4    as I received them.  Okay?

10:16 5        The first package that I received was 0515

10:16 6    through 0522.  Could you tell me, please, whether that

10:16 7    reflects calls involving you or to your knowledge

10:16 8    Mr. Ramer?

10:16 9        A    These involve calls to me.

10:16 10       Q    The second grouping I received is marked GTRB

10:16 11   0523 through 530.  Are those -- does that reflect your

10:17 12   calls or Mr. Ramer's?

10:17 13       A    This reflects calls to me.

10:17 14       Q    The next grouping is Bates stamped 0531 through

10:17 15   0549.  Does this reflect calls to and from you or to and

10:17 16   from Mr. Ramer?

10:17 17       A    This reflects calls to me.

10:17 18       Q    The next grouping is Bates stamped 0550 through

10:17 19   566.  The same question, sir.

10:17 20       A    Same answer.

10:17 21       Q    The next grouping is 0567 through 0588.  Are

10:18 22   these your calls or Mr. Ramer's?

10:18 23       A    These reflect calls to me.

10:18 24       Q    The next is 0589 through 0597.  Are these your

10:18 25   registers or Mr. Ramer's?

                                                              14

| | | |
|---|---|---|
| 10:18 | 1 | A    These are mine. |
| 10:18 | 2 | Q    The next grouping is 0598 through 0605.  Are |
| 10:18 | 3 | these your registers or Mr. Ramer's? |
| 10:18 | 4 | A    These are mine. |
| 10:18 | 5 | Q    The next grouping is 0606 through 0625.  Are |
| 10:19 | 6 | these your registers or Mr. Ramer's? |
| 10:19 | 7 | A    These are mine. |
| 10:19 | 8 | Q    And the final grouping, if I may reach over, |
| 10:19 | 9 | 0626 through 0634.  As I see from the top -- |
| 10:19 | 10 | MR. MARMARO:  35, I think. |
| 10:19 | 11 | MR. TOBEROFF:  25.  Which one are we looking at? |
| 10:19 | 12 | MR. BERGMAN:  35.  0626 through 0635. |
| 10:19 | 13 | Q    And I notice on 0626 the name Bruce Ramer.  Do |
| 10:19 | 14 | those reflect Mr. Ramer's calls? |
| 10:19 | 15 | A    Yes. |
| 10:19 | 16 | MR. TOBEROFF:  The last one, I don't have a copy |
| 10:19 | 17 | of. |
| 10:19 | 18 | MR. MARMARO:  I'm sorry? |
| 10:19 | 19 | MR. TOBEROFF:  Do you have an extra copy of this |
| 10:19 | 20 | for me? |
| 10:19 | 21 | MR. BERGMAN:  No, I...  Excuse me.  Off the |
| 10:20 | 22 | record one moment. |
| 10:20 | 23 | (Pause in the deposition.) |
| 10:21 | 24 | BY MR. BERGMAN: |
| 10:21 | 25 | Q    With respect to the documents of Exhibit 3 which |

15

10:18 1        A    These are mine.

10:18 2        Q    The next grouping is 0598 through 0605.    Are

10:18 3   these your registers or Mr. Ramer's?

10:18 4        A    These are mine.

10:18 5        Q    The next grouping is 0606 through 0625.    Are

10:19 6   these your registers or Mr. Ramer's?

10:19 7        A    These are mine.

10:19 8        Q    And the final grouping, if I may reach over,

10:19 9   0626 through 0634.  As I see from the top --

10:19 10            MR. MARMARO:  35, I think.

10:19 11            MR. TOBEROFF:  25.  Which one are we looking at?

10:19 12            MR. BERGMAN:  35.  0626 through 0635.

10:19 13        Q    And I notice on 0626 the name Bruce Ramer.  Do

10:19 14   those reflect Mr. Ramer's calls?

10:19 15        A    Yes.

10:19 16            MR. TOBEROFF:  The last one, I don't have a copy

10:19 17   of.

10:19 18            MR. MARMARO:  I'm sorry?

10:19 19            MR. TOBEROFF:  Do you have an extra copy of this

10:19 20   for me?

10:19 21            MR. BERGMAN:  No, I...  Excuse me.  Off the

10:20 22   record one moment.

10:20 23            (Pause in the deposition.)

10:21 24   BY MR. BERGMAN:

10:21 25        Q    With respect to the documents of Exhibit 3 which

                                                          15

11:14 1          MR. MARMARO:  July.

11:14 2          THE WITNESS:  In July?  I'm sorry.

11:15 3     BY MR. BERGMAN:

11:15 4          Q    Yes.

11:15 5          A    Yes, that was the first meeting.

11:15 6          MR. BERGMAN:  Would you now mark as Exhibit 6 a

11:15 7     letter dated July 9, 1999, from Mr. Ramer to

11:15 8     Mr. Schulman, Bates stamped number 11 through 13.

11:15 9          (Deposition Exhibit 6 marked.)

11:15 10    BY MR. BERGMAN:

11:15 11         Q    Do you recall receiving a copy of this letter on

11:15 12    or about the date it bears?

11:15 13         A    Yes.

11:15 14         Q    My primary purpose in showing this letter to you

11:16 15    is to address item number 3 that Mr. Ramer states -- and

11:16 16    to assure you that as we go through these documents and

11:16 17    as I intend on going through the documents, I have no

11:16 18    intention of using them or attempting to use them later

11:16 19    in violation of Evidence Code 1152.  I am simply trying

11:16 20    to record the nature and extent of what I think was a

11:16 21    rather long negotiation that followed.

11:16 22         Do you understand that, sir?

11:16 23         MR. MARMARO:  I don't.

11:16 24         MR. BERGMAN:  Okay.

11:16 25         MR. MARMARO:  I don't know that a response is --

44

11:16 1    I'm not sure exactly what you're asking, so I'll object

11:17 2    to the question, but I appreciate your comment.

11:17 3            MR. BERGMAN:    Then I'll -- okay.

11:17 4        Q    What, if anything, did you understand Mr. Ramer

11:17 5    to mean by the sentence that reads, quote, "The scope of

11:17 6    any evidentiary privilege is no more and no less than

11:17 7    that embodied in California Evidence Code 1152," close

11:17 8    quote?

11:17 9            MR. MARMARO:    Unless Mr. Toberoff has an

11:17 10    objection, I'll let the witness answer that question.

11:17 11            MR. TOBEROFF:    I'm okay with it.

11:17 12            THE WITNESS:    The context for Mr. Ramer's

11:17 13    response to Mr. Schulman is, of course, Exhibit 5,

11:17 14    Mr. Schulman's letter saying that our -- in general

11:17 15    fashion, we'd like an agreement that our communications

11:17 16    are confidential.

11:17 17            The reference to California Evidence Code 1152

11:18 18    is, as I recall, a provision of the Evidence Code which

11:18 19    generally states that communications of parties in the

11:18 20    course of settlement discussions can't be used as

11:18 21    admissible evidence in legal proceedings, and in this

11:18 22    matter litigation was always looming over it and always

11:18 23    looming in the horizon, and -- from the beginning, and

11:18 24    what this section 3 is saying is that to the extent that

11:18 25    settlement discussions are accorded confidentiality, the

45

11:18 1    scope of that confidentiality is defined by this

11:18 2    provision of the Evidence Code.  It's not more; it's not

11:18 3    less, and, for example, if this does turn into a matter

11:18 4    that's litigated, our confidentiality agreement wouldn't

11:19 5    in any way impinge upon the Siegels' discovery process.

11:19 6    BY MR. BERGMAN:

11:19 7        Q    Am I correct that Mr. Schulman agreed to that

11:19 8    concept as expressed in Exhibit 6, that he manifested his

11:19 9    agreement?

11:19 10       A    I recall that he did.

11:19 11            MR. BERGMAN:  Just so the record is clear, let

11:19 12   me ask the reporter to mark as Exhibit 7 GTRB 16 and 17.

11:19 13            (Deposition Exhibit 7 marked.)

11:19 14   BY MR. BERGMAN:

11:19 15       Q    Do you recall receiving a copy of this letter?

11:20 16       A    Yes, I do.

11:20 17       Q    Okay.

11:20 18       A    Although it was not addressed to me.

11:20 19       Q    I understand.

11:20 20            In fact, your counsel produced three copies of

11:20 21   that letter, 16, 17 -- two copies.  I'm sorry.

11:20 22            Did the meeting, the first meeting between you,

11:20 23   Mr. Ramer and Mr. Schulman, take place on July 12th,

11:20 24   1999?

11:20 25       A    This letter leads me to believe that the meeting

46

1  inconsistency between your October 19 letter and his

2  October 26 letter?

3      A   I don't believe so.

4      Q   Your incoming phone log at GTRB 600 reflects a

5  call from Mark Toberoff on November 29, 2001.

6          MR. TOBEROFF:  What page is that on?

7          MR. BERGMAN:  600.

8      Q   Was that call completed?

9      A   No.

10     Q   Did you at any time return that call?

11     A   No.

12     Q   May I ask why?

13         MR. MARMARO:  I think you're going to be

14  invading his mental processes and work product, and I'll

15  object and instruct on that basis.

16         (Instruction not to answer.)

17         MR. BERGMAN:  Okay.

18     Q   If you would turn, please, Mr. Marks, to GTRB

19  604, that reflects a call from Mark Toberoff, quote, "Re:

20  Superman - potential buyout (end of November)."

21         Did you speak with Mr. Toberoff on that day?

22     A   I don't know if I spoke with Mr. Toberoff that

   day.

23     Q   Did you return that call at some subsequent

   time?

                                                        151

A    I returned that call that day or subsequently, yes.

Q    Can you tell me to the best of your recollection what Mr. Toberoff said during that conversation and what you said?

A    Yes.  I think Mr. Toberoff started the call by saying that he had called me earlier and that I hadn't returned his call, for which I apologized, and then he introduced himself.  He said he was a lawyer and that he represented individuals that had interests in rights to movie and other properties that had come into those rights either by way of reversions under the law or reversions under Guild agreements.  I also recall him saying that he had a separate company that was in the business of acquiring intellectual property rights.  I recall him saying that he was interested in the Superman property and the Superboy property and had understood that I was representing the Siegel family interest, and he asked if he could talk to me about that.

My recollection is that my response was that we were very far along with DC Comics and at a documentation phase.  I may have said DC Comics or Warner Bros. because I do think that part of the conversation, I have a recollection of Mr. Toberoff saying that he had dealt with Warner Bros. before, the people at Warner Bros., in

152

connection with the "Wild Wild West" and rights involving
the "Wild Wild West" in which some deal had been made
that led to the making of the feature film.

    Q    Do you recall anything else of that
conversation?

    A    That's my best recollection as I sit here today.

    Q    Do you recall telling Mr. Toberoff that you had
closed a deal with DC regarding the Siegel interest?

    MR. TOBEROFF:  Leading.

    THE WITNESS:  My best recollection is how I
described it, but I think I said we were in the process
of -- in the documentation phase, were trying to document
a deal.

BY MR. BERGMAN:

    Q    And do you recall what response, if any,
Mr. Toberoff made?

    A    I don't.

    Q    And do you recall anything further about the
conversation or how it ended?

    A    I don't recall how it ended.

    Q    Did you as of February 6, '02 believe that you
had closed a deal with DC for the Superman interest?

    MR. MARMARO:  The question is vague and
ambiguous, calls for a legal conclusion, and again I am
going to defer to Mr. Toberoff whether he has any

153

records, that what must have happened is I returned the

call, didn't reach Mr. Toberoff; he called back, and

we -- on the 30th, and we spoke subsequent, either on

that day or subsequent to that day.

BY MR. BERGMAN:

    Q    Would it be accurate to say that you do not

recall speaking -- actually speaking with Mr. Toberoff

twice during the last week of July '02?

    A    I recall one conversation.

    Q    Okay.  Can you tell me to the best of your

recollection what was said by each of you and

Mr. Toberoff in that conversation?

    A    I think Mr. Toberoff said he was -- wanted to

check in with me to see where we were in our dealings

with DC Comics, and I think I told him then that -- and I

may have also said it in our first conversation -- that

we had a confidentiality agreement with DC Comics, and I

didn't feel at liberty to discuss the status of our

dealings with him.

        Mr. Toberoff said, "Can you tell me what DC

Comics offered you," and I said, "No.  We have a

confidentiality agreement."

        And I believe Mr. Toberoff said, "Would you be

willing to enter into negotiations with me," and I

believe I said, "Initiating negotiations, no.  That's

166

something that makes me very uncomfortable.  If you have an offer, present it to me, and I'll present it to the client."

    Q    Do you recall what he said in response?

    A    I think that was the summary of the substance of the conversation other than goodbyes.

    Q    If you turn the page to 616, you will see a reference to a conference call, quote, "with Mark, Kevin, and Ari Emanuel at Endeavor," close quote.  There also appears to be a notation, "approximately 20 minutes."

    Do you see that?

    A    Yes, and it looks like the "20" is crossed out, and it says "5 to 10" above it.

    Q    I see.  Okay.

    Off the record.

    (Discussion held off the record.)

BY MR. BERGMAN:

    Q    Would you describe to the best of your recollection and as specifically as possible what was said by each of the three of you during that conversation?

    A    I think this record may actually be setting up a conference call rather than the conference call, but ultimately there was a conference call at this time period.

167

Q    I see.  Okay.

Do you recall how long after August 7 that conference call took place?

A    Within the next day or two.

Q    I see.

Would you tell me --

A    If not on that date.

Q    -- what was involved and what was said in that conversation?

A    Yes.  Mr. Toberoff and Mr. Emanuel both spoke. I can't completely tell you who said what, but I think Mr. Toberoff may have very briefly referenced past conversations, and then I believe it was Mr. Emanuel who explained that either they or some other people or perhaps some members of the Endeavor Talent Agency had set up a fund or were in the process of setting up a fund to acquire intellectual property rights which they would then package with clients from the Endeavor Talent Agency, then take those to studios to exploit the package, and they understood that the Siegel family had an interest in the termination rights and viewed that as perhaps the most valuable of properties and wanted to make a proposal.

Q    Okay.  What did you say?

A    I said in substance and effect, "I'm listening."

168

And I'm not sure who spoke, but they made a proposal of

$15 million and what was described as a meaningful back

end, which I understood to be a contingent compensation

position or a royalty position in the exploitation of the

property.

Q    And was that for the entire Siegel Superman

interest?  Did it include Michael's?

A    I don't think that was discussed, but that's how

I understood it.

Q    Did they say -- attempt to quantify what that

meaningful back end would be?

A    They did not.  I believe I asked, but they did

not.

Q    And what else did you say?

A    I asked if there was anything else, and they

said "No," and then I asked if this was a proposal that

was conditioned on their doing due diligence about the

rights, and they said again in substance and effect, "No,

it's not.  We've done our due diligence already.  This is

the offer."

Q    Anything else you can recall of that

conversation?

A    I think I said, "Thank you, and I will

communicate this to the client" or "take this back to the

client."

169

Q   And did you in fact do that?

MR. MARMARO:  Before you answer the question, is there any objection to the answer?  The question calls for a communication between Mr. Marks and the clients.

MR. TOBEROFF:  Without a waiver, no, whether or not you communicated that to the client.

MR. MARMARO:  A yes or a no.

THE WITNESS:  Yes.

BY MR. BERGMAN:

Q   And was that a communication within let's say a week of the conference call?

A   Yes.

Q   Your phone register, 617, indicates a call from Mr. Toberoff on August 29.  Was that call returned?

A   I -- was it returned.  I don't know.

MR. TOBEROFF:  Which number -- Bates number?

MR. BERGMAN:  617.

Q   Do you recall having a telephone conversation with Mr. Toberoff subsequent to the conference call?

A   The best I can say is that it may be that Mr. Toberoff called to see if I had a response, and I could only have said at that time that the clients had been away, and I don't have a response.  I have -- I am not certain about that.

Q   Did there ever come a time when you communicated

170

to Mr. Toberoff either your clients' acceptance,

rejection or comments upon the offer that had been made?

　　　　MR. MARMARO:  Is your question limited to the

time when Mr. Marks was acting as counsel for the

Siegels?

　　　　MR. BERGMAN:  No.

　　　　MR. MARMARO:  Even after that time?

　　　　MR. BERGMAN:  At any time.

　　　　MR. MARMARO:  That potentially calls for the

invasion of attorney-client communications if it's at a

time when Mr. Toberoff was representing the clients.

　　　　MR. BERGMAN:  Okay.  Then let me reframe the

question.

　　Q    Did you, prior to the time that Mr. Toberoff

undertook his representation of the Siegels, communicate

to him either your client, the Siegels' acceptance,

rejection or comments upon the offer?

　　　　THE WITNESS:  May I answer?

　　　　MR. MARMARO:  I assume so.  I am hearing no

objection from Mr. Toberoff.

　　　　THE WITNESS:  No.

BY MR. BERGMAN:

　　Q    Up until the time that your -- the

representation of Gang, Tyre was terminated, did you ever

learn from any source that Mr. Toberoff had spoken

directly with either Joanne or Laura Siegel?

   MR. MARMARO:  I think you misspoke in the question.  Let me hear the question again.  I think you said representation of Gang, Tyre, but maybe I misheard.

   (Record read.)

   MR. MARMARO:  I'm sorry.  Was it "your represent of Gang, Tyre"?

   THE REPORTER:  There is a dash.  "Your" and then dash "the representation."

   MR. MARMARO:  Okay.  As long as you can answer this question without divulging attorney-client information, you can answer it as far as I'm concerned.  If you can't, then I would object and instruct.

   THE WITNESS:  I did not hear from any source that Mr. Toberoff had spoken directly to Joanne Siegel and/or Laura Larson -- Laura Siegel Larson up until the time of Gang, Tyre's termination.

BY MR. BERGMAN:

  Q Thank you.

   Did you learn at any time prior to the termination of Gang, Tyre's representation of the Siegels that Mr. Toberoff had spoken directly with Michael Siegel?

   MR. MARMARO:  Again, if you can answer that question without divulging attorney-client information,

172

you may answer it.   If it calls for you to divulge

information protected by the attorney-client privilege,

I'll object to that extent and instruct you not to

answer.

        (Instruction not to answer.)

        THE WITNESS:   I think I cannot answer that

question in view of Mr. Marmaro's instruction.

BY MR. BERGMAN:

   Q    Okay.   Did you communicate to Mr. Bulson the

offer that Mr. Emanuel and Mr. Toberoff had made to you?

        MR. MARMARO:   I am going to again ask

Mr. Toberoff whether he objects to that question being

answered because Mr. Bulson, based on the prior

testimony, would be in the zone of somebody whose

communications between Mr. Marks and Mr. Bulson would be

covered by the attorney-client privilege.   So you asked

for a communication, so I am going to pass to

Mr. Toberoff.

        MR. TOBEROFF:   I'll allow it.

        THE WITNESS:   Yes.

BY MR. BERGMAN:

   Q    Did Mr. Bulson at any time prior to the

termination of Gang, Tyre communicate to you that he had

in turn communicated to Mr. Siegel, Michael Siegel, the

offer made by Mr. Toberoff?

MR. MARMARO:  Again, I'm going to make the same objection.  You are asking for a communication by Mr. Bulson to Mr. Marks.  If Mr. Toberoff has no -- well, I think Mr. Bulson may have an objection.

THE WITNESS:  It's Michael Siegel's privilege.

MR. MARMARO:  Yes, it's Michael Siegel's privilege.  I am going to object and instruct.

(Instruction not to answer.)

THE WITNESS:  Mr. Bulson was representing Michael Siegel, so I don't think anybody in this room can actually waive that privilege.

MR. BERGMAN:  Off the record.

(Discussion held off the record.)

BY MR. BERGMAN:

Q   Looking again at your phone logs, there are calls indicated from Mr. Schulman -- no.  Strike that.

Aside from the conference call that you've described with Mr. Emanuel and Mr. Toberoff, did you have any other communications with Mr. Emanuel regarding the Siegel interest?

A   No.

Q   Did you have any communication -- prior to early February when you actually received the proposed long form, did you have any communication with anyone at the Gross Zelnick firm concerning the long form or any other

174

Word Index

```
STATE OF CALIFORNIA      )
                         ) ss
COUNTY OF LOS ANGELES    )
```

I, DAVID S. COLEMAN, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, nor in anywise interested in the outcome thereof.

In witness whereof, I have hereunto subscribed my name.

Dated:    **OCT 1 7 2006**

_____
DAVID S. COLEMAN
CSR No. 4613

# EXHIBIT S



| TIME | NAME | MESSAGE | CALL COMPLE |
|---|---|---|---|

DATE 9/5

**INCOMING CALLS**

NAME

REDACTED

9/25   /schick Perkins/   (212) 813-5953 0   ✓

EXHIBIT 3
FOR IDENTIFICATION
DAVID S. COLEMAN, CSR #4613
DATE 10-7-06
WITNESS Marks

REDACTED

GTRB 0515

| DATE | | | NAME | |
|------|---|---|------|---|
| 2/6/02 | INCOMING CALLS | | | |

| TIME | NAME | MESSAGE | CALL COMPLETED |
|------|------|---------|----------------|

**REDACTED**

| 1/08 | Mark Toberoff re: Superman | #310-589-5151 Potential Buyout (end of Nov.) | |

**REDACTED**

GTRB 0604

AVERY FORM NO. 50-111

# EXHIBIT T

Jul-07-99  10:20am  From-JOHN SC    N                    +1818954476'        T-105  P.02/03  F-753



**WARNER BROS.**

4000 Warner Boulevard
Burbank, California 91522-0022
(818) 954-4223 Fax: (818) 954-4768
E-Mail: john_schulman@warnerbros.com

John A. Schulman
Executive Vice President
and General Counsel

July 7, 1999

**VIA FACSIMILE**

Bruce M. Ramer, Esq.
Gang, Tyre, Ramer & Brown, Inc.
132 South Rodeo Drive
Beverly Hills, CA  90212-2403

　　　　Re:  "Superman"

Dear Bruce:

　　　　I write in anticipation of our meeting next week regarding the Siegels' claims.

　　　　In order to encourage full and open discussions and to protect each side's legal positions and maintain the confidential information that I believe will be exchanged, this letter, when signed by both of us, will confirm the parties' agreement that all of the communications, proposals and offers made on either party's behalf in the upcoming settlement negotiations, including any communications regarding valuations, will be considered confidential, without prejudice and inadmissible in any judicial proceeding between the parties in the event the upcoming negotiations do not result in an agreement.

　　　　If the foregoing is acceptable, please sign and return to me one copy of this letter.

EXHIBIT ___5___
FOR IDENTIFICATION
DAVID S. COLEMAN, CSR #4613
DATE _10-7-06_ 19___
WITNESS _MARKS_

A Time Warner Entertainment Company

GTRB 0018

Jul-07-99  10:21am  From-JOHN '    VAN                    +18180544'          T-105   P.03/03   F-753

July 7, 1999
Page 2


We look forward to meeting with you.

Sincerely,

John A. Schulman

On behalf of DC Comics and all related
Time Warner entities


JAS:dk

AGREED AND ACCEPTED:

_____
Bruce M Ramer

On behalf of Joanne Siegel
and Laura Siegel Larson
and any related parties


Enclosure


cc:   Lillian J. Laserson, Esq.
      Paul Levitz
      Carol F. Simkin, Esq.

GTRB 0019

# EXHIBIT U

## GANG, TYRE, RAMER & BROWN, INC.

ATTORNEYS AT LAW

NORMAN R. TYRE
HERMIONE K. BROWN
BRUCE M. RAMER
CHARLES A. SCOTT
DONALD S. PASSMAN
HAROLD A. BROWN
TOM R. CAMP
LAWRENCE D. ROSE

JEFFREY M. MANDELL
KEVIN S. MARKS
GREGG HARRISON
NANCY L. BOXWELL
BARBARA SILBERBUSCH
THOMAS J. KIM
M. DEAN NEWTON
TIM CONNORS

MARTIN GANG (1901-1968)

132 SOUTH RODEO DRIVE
BEVERLY HILLS, CALIFORNIA 90212-2403
(310) 777-4800
FAX (310) 777-4801

July 9, 1999

**VIA TELECOPIER**

John A. Schulman, Esq.
Executive Vice President/General Counsel
Warner Bros. Pictures
4000 Warner Boulevard
Main Administration, Room 226
Burbank, CA 91522-0022

            Re:    Siegel – "Superman"

Dear John:

        Our clients are agreeable to treating the details of our discussions, and the information exchanged, as confidential, subject to the following (which should be non-controversial):

    1.    We and they must be in a position to provide Michael Siegel and/or his representatives with status reports of our discussions and relevant information;

    2.    Information obtained independently or available to or from third parties is not restricted; and

    3.    The scope of any evidentiary privilege is no more and no less than that embodied in California Evidence Code 1152. Nothing contained herein shall limit our client's rights to obtain information through audit and/or discovery processes, and to utilize the same.

        Finally, I must note that you've characterized our upcoming meetings as dealing with the Siegels' "claims." Our view is that we will be meeting with you to respond to the offer of DC Comics to the Siegels (as set forth in the October 10, 1997 letter from Paul Levitz), naturally with the understanding that all parties are reserving their rights and remedies.

**REDACTED**

207051.1

EXHIBIT 6
FOR IDENTIFICATION
DAVID S. COLEMAN, CSR #4613
DATE 10-7-06  19
WITNESS Marks

GTRB 0011

## GANG, TYRE, RAMER & BROWN, INC.

John A. Schulman, Esq.
July 9, 1999
Page 2

Once you have a chance to look this over, please give me a call to finalize this arrangement. There is also another matter I would like to discuss with you in advance of our meeting.

Sincerely,

GANG, TYRE, RAMER & BROWN, INC.

By   Bruce M. Ramer

BMR:mm

cc:   Joanne Siegel
     Laura Siegel Larson
     Dennis Larson
     Arthur Levine
     Kevin Marks

207051.1

EXHIBIT U
Page 278

GTRB 0012

GANG, TYRE, RAMER & BROWN, INC.
ATTORNEYS AT LAW
132 South Rodeo Drive
Beverly Hills, CA 90212
(310) 777-4800

**DIRECT FAX NUMBER:** (310) 777-7000

General Fax Number: (310) 777-4801

**FAX COVER SHEET**

**PLEASE DELIVER THE FOLLOWING MATERIAL AS SOON AS POSSIBLE**

DATE:        July 9, 1999

TO:          JOHN A. SCHULMAN

FROM:        BRUCE M. RAMER

FAX NUMBER:           (818) 954-4768

NUMBER OF PAGES TRANSMITTED:            3

COMMENTS:

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS ATTORNEY PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

WE ARE TRANSMITTING ON A XEROX TELECOPIER MODEL 7020
IF DOCUMENT IS NOT RECEIVED PROPERLY,
PLEASE CALL 310-777-4800 IMMEDIATELY
THANK YOU

---

## TRANSMISSION REPORT

## THIS DOCUMENT WAS CONFIRMED
## (REDUCED SAMPLE ABOVE - SEE DETAILS BELOW)

### ** COUNT **
## TOTAL PAGES SCANNED    :   3
## TOTAL PAGES CONFIRMED  :   3

*** SEND ***

| No. | REMOTE STATION | START TIME | DURATION | #PAGES | MODE | RESULTS |
|-----|----------------|------------|----------|--------|------|---------|
| 1 | +18189544768 | 7- 9-99  4:53PM | 0'53" | 3/  3 | EC | COMPLETED 14400 |
| | | TOTAL | 0:00'53" | 3 | | |

NOTE:
No. : OPERATION NUMBER   48 : 4800BPS SELECTED   EC : ERROR CORRECT    G2 : G2 COMMUNICATION
PD : POLLED BY REMOTE   SF : STORE & FORWARD   RI : RELAY INITIATE   RS : RELAY STATION
MB : SEND TO MAILBOX    PG : POLLING A REMOTE   MP : MULTI-POLLING    RM : RECEIVE TO MEMORY

GTRB 0013

# EXHIBIT V

1                UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                                          CERTIFIED COPY

4    JOANNE SIEGEL, an individual;      )
     and LAURA SIEGEL LARSON, an        )
5    individual,                        )
                                        )
6                        PLAINTIFFS,    )
                                        )   CASE NOS.
7             VS.                       )   04-8400 SGL (RZx)
                                        )   04-8776 SGL (RZx)
8    TIME WARNER, INC., a corporation;  )
     WARNER COMMUNICATIONS, INC.;  a    )
9    corporation; WARNER BROS.          )
     ENTERTAINMENT, INC., a corporation;)
10   WARNER BROS. TELEVISION PRODUCTION,)
     INC., a corporation; DC COMICS, a  )
11   general partnership,               )
                                        )
12                       DEFENDANTS.    )
     _____)

13

14

15                      DEPOSITION OF

16                      JOHN SCHULMAN

17                 LOS ANGELES, CALIFORNIA

18                   NOVEMBER 10, 2006

19

20

21   ATKINSON-BAKER, INC.
     COURT REPORTERS
22   (800) 288-3376
     www.depo.com

23

24   REPORTED BY:     CHRISTY A. CANNARIATO, CSR #7954

25   FILE NO.:        A009CB6

1

EXHIBIT V
Page 280

1    Q.    Do you recall faxing a copy of this letter to

2    Kevin Marks on or about May 16th, 2002?

3    A.    Don't think I did.

4    Q.    If you turn to Bate stamp GTRB 474.  On the

5    last page of this exhibit there is a fax cover sheet.  It

6    says from John Schulman to Kevin Marks.  Based on this fax

7    cover sheet do you have any reason to believe that you did

8    not send this letter to Kevin Marks?

9    A.    Yes.

10    Q.    What's the basis for your belief?

11    A.    I wouldn't have sent it.  Somebody in the

12    office would.

13    Q.    So you directed somebody else to send it?

14    A.    Probably.

15    Q.    Do you have any reason to believe that Warner

16    Bros. did not send a copy of this letter to Kevin Marks?

17    A.    No.

18    Q.    Previously you affirmed that settlement

19    negotiations had taken place with the Siegels after they

20    served their Superman termination notices; is that

21    correct?

22    A.    Yes.

23    Q.    On defendants' side, who was the lead

24    negotiator regarding the Siegels' termination interest in

25    Superman?

94

EXHIBIT V
Page 281

1        A.    For a while it was conducted in New York, and

2    then when Gang, Tyre got involved I got involved.

3        Q.    So at that point when you got involved did you

4    become the lead negotiator in settlement negotiations with

5    the Siegels?

6        A.    The way a lawyer is, yes.  I wasn't a

7    principal.

8        Q.    What do you mean "the way a lawyer is"?

9        A.    Have you negotiated for your clients before

10   where you've done the negotiations with the lawyer or

11   agent or representative on the other side?  You're not the

12   principal.  You're not making the decisions.  You're doing

13   the negotiation.

14       Q.    So you were negotiating on behalf of Warner

15   Bros. and DC?

16       A.    DC.

17       Q.    You were acting as DC's lawyer in those

18   negotiations?

19       A.    Yes.

20       Q.    How does that work?  Aren't you exclusive to

21   Warner Bros. as general counsel of Warner Bros.?

22       A.    I'm exclusively employed by them.  On occasions

23   I've done work in the interests of HBO.  Or occasionally

24   I've done work in the interests of New Line.  Or

25   occasionally I've done work in the interest of even Time

95

EXHIBIT V
Page 282

WEISSMANN WOLFF FF 2762  Fax:3105507191          Dec 22 2006 04:09pm P005/010

DEC-11-2006  14:05          STEVE SPIRA                    818 954 2487    P.04/13

1    STATE OF _____ }
                                         } SS.
2    COUNTY OF _____ Los Angeles _____ }

3

4

5

6

7          I, the undersigned, declare under penalty

8    of perjury that I have read the foregoing transcript,

9    and I have made any corrections, additions or

10   deletions that I was desirous of making; that the

11   foregoing is a true and correct transcript of

12   my testimony contained therein.

13          EXECUTED this __12th__ day of __December__,

14   __2006__, at ___Los Angeles___, ___California___.
                    (City)              (State)

15

16

17

18   _____
19              JOHN SCHULMAN

20

21

22

23

24
25

REPORTER'S CERTIFICATE

1

2

3

4          I, CHRISTY A. CANNARIATO, CSR #7954, Certified

5     Shorthand Reporter, certify:

6          That the foregoing proceedings were taken before

7     me at the time and place therein set forth, at which time

8     the witness was put under oath by me;

9          That the testimony of the witness, the questions

10    propounded, and all objections and statements made at the

11    time of the examination were recorded stenographically by

12    me and were thereafter transcribed;

13         That the foregoing is a true and correct

14    transcript of my shorthand notes so taken.

15         I further certify that I am not a relative nor

16    employee of any attorney of the parties, nor financially

17    interested in the action.

18         I declare under penalty of perjury under the laws

19    of California that the foregoing is true and correct.

20         Dated this 28 day of November , 20 06 .

21

22

23

24               CHRISTY A. CANNARIATO, CSR #7954

25

                                                          1

EXHIBIT V
Page 284

# EXHIBIT W

1

1         UNITED STATES DISTRICT COURT

2       FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4   JOANNE SIEGEL,                  )
    LAURA SIEGEL LARSON            )        ORIGINAL
5                                   )
                    Plaintiffs,    )
6                                   )
       v.                          )   CASE NO. CV 04-8400
7                                   )            CV 04-8776
    WARNER BROS, et al.            )
8                                   )
                    Defendants.    )
9

10

11

12

13              DEPOSITION OF JEAN ADELE PEAVY
                    November 11, 2006
14                     1:26 p.m.
                   317 Paseo de Peralta
15                  Santa Fe, New Mexico

16

17      PURSUANT TO THE FEDERAL RULES OF CIVIL
    PROCEDURE, this deposition was:

18  TAKEN BY:  MR. PATRICK PERKINS
               Attorney for the Defendants
19

20

21

22  REPORTED BY:  MABEL JIN CHIN, NM CCR #81
                  Bean & Associates, Inc.
23                Professional Court Reporting Service
                  500 Marquette, Northwest, Suite 280
24                Albuquerque, New Mexico 87102

25  (3520B) MC



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT W Page 285

25

1    payments were made to you instead of to your brother?

2        A.    Yes.

3        Q.    Were they, in fact, made to you?

4        A.    Uh-huh.

5            MR. TOBEROFF:  Wait a moment for me to

6    object.

7            THE WITNESS:  Okay.

8            MR. TOBEROFF:  Also, let him finish the

9    question before you answer --

10           THE WITNESS:  Okay.

11           MR. TOBEROFF:  -- even though you think you

12   know what he is asking --

13           THE WITNESS:  Okay.

14           MR. TOBEROFF:  -- let him finish the

15   question.

16           THE WITNESS:  Uh-huh.

17           MR. TOBEROFF:  You are doing fine.

18           THE WITNESS:  Uh-huh.

19           (Exhibit 16 marked.)

20           THE WITNESS:  Okay.

21       Q.    (By Mr. Perkins)  All right.  I have had the

22   court reporter mark as Exhibit 16 a two-page

23   document.  I have -- I have copied them together.

24   They really don't go together, I'm sorry about that.

25   Actually, you may even take off the back page.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT W    Page 286

26

1    MR. TOBEROFF:  Just the page 1 we should

2  keep?

3    MR. PERKINS:  Yes.

4    MR. TOBEROFF:  I'll do it for you.

5    THE WITNESS:  All right.

6    MR. PERKINS:  The other one doesn't -- it's

7  not very --

8    Q.  (By Mr. Perkins)  Did you -- is this your

9  signature at the bottom of the page?

10    A.  Yes.  Uh-huh.

11    Q.  Did you review this document before you

12  signed it?

13    A.  I probably glanced at it, yes.

14    Q.  Now, in the agreement, the second full

15  paragraph, the last sentence says, quote, "In any

16  event, you now grant to us any such rights and release

17  us" -- let me try that again.

18    "In any event, you now grant to us any such

19  rights and release us, our licensees and all others

20  acting with our permission, and covenant not to assert

21  any claim of right, by suit or otherwise, with respect

22  to the above, now and forever."

23    In the following paragraph it states, and I

24  quote, "If, despite the terms of this agreement,

25  either of you assert any such claim of right, for any

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT W  Page 287

28

1      Q.    Now, to your knowledge, had you made any
2    claim to --
3      A.    Huh-uh.
4      Q.    -- own or to be able to recapture the
5    copyrights of your brother, Joseph Shuster?
6           MR. TOBEROFF:  Objection, calls for a legal
7    conclusion, vague and ambiguous.  You can answer the
8    question if you understand it.
9      A.    Yes.  No, I haven't made any claim.
10     Q.    Are you aware as to whether or not the
11   estate of your brother has made any claim?
12     A.    My son handles everything legal, so I
13   don't -- I don't know what's going on there.
14     Q.    Okay.
15           (Exhibit 17 marked.)
16     Q.    I have asked the court reporter to mark as
17   Exhibit 17 the document, one-page document appears to
18   be a letter that bears Bates number 53 on it.
19     A.    Uh-huh.  Um.  Okay.  I remember that.
20     Q.    Did you -- is this -- did you write this
21   letter?
22     A.    Uh-huh.
23     Q.    And this is your signature at the bottom?
24     A.    Yes.  Yes.
25     Q.    Do you have regular contact with Joanne

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT W          Page 288

39

1    I FURTHER CERTIFY that the recoverable cost of the
original and one copy of the deposition, including
2    exhibits to Mr. Perkins is $ 268.49        .

3    I FURTHER CERTIFY that I did administer the oath
to the witness herein prior to the taking of this
4    deposition; that I did thereafter report in
stenographic shorthand the questions and answers set
5    forth herein, and the foregoing is a true and correct
transcript of the proceeding had upon the taking of
6    this deposition to the best of my ability.

7    I FURTHER CERTIFY that I am neither employed by
nor related to nor contracted with (unless excepted by
8    the rules) any of the parties or attorneys in this
case, and that I have no interest whatsoever in the
9    final disposition of this case in any court.

10

11

12   MABEL JIN CHIN
Certified Court Reporter #81
13   License expires:  12/31/2006

14

15

16

17

18

19

20   (3520B) MC
Date taken:  November 11, 2006
21   Proofread by: LR

22

23

24

25



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

# EXHIBIT X

Jul-14-08   05:22pm   From-                                          T-873   P.010/010   F-356

DC COMICS INC.
1325 Avenue of the Americas
New York, New York 10019
(212) 636-5555
FAX (212) 636-5401



Paul Levitz/Executive Vice President & Publisher

Dated as of August 1, 1992

Mr. Frank Shuster                        Ms. Jean Shuster Peavy
98-120 Queens Blvd., Apt. 4K             316 Horton Lane, NW
Rego Park, NY   11374                    Albuquerque, NM  87114

Dear Mr. Shuster and Ms. Peavy:

        This is to confirm our agreement to pay you, collectively, a total of
$25,000 a year, payable to Jean Shuster Peavy, commencing as of August 1,
1992, for as long as either one of you is alive.  Such amounts shall be
payable in accordance with Warner Communication Inc.'s customary payroll
practices and shall be subject to all applicable withholding taxes.  If Jean
Shuster Peavy shall predecease Frank Shuster, then the foregoing payments
shall be made to Frank Shuster for as long as he shall live.

        We ask you to confirm by your signatures below that this agreement fully
settles all claims to any payments or other rights or remedies which you may
have under any other agreement or otherwise, whether now or hereafter
existing regarding any copyrights, trademarks, or other property right in any
and all work created in whole or in part by your brother, Joseph Shuster, or
any works based thereon.  In any event, you now grant to us any such rights
and release us, our licensees and all others acting with our permission, and
covenant not to assert any claim of right, by suit or otherwise, with respect
to the above, now and forever.

        If, despite the terms of this agreement, either of you assert any such
claim of right, for any reason, you agree to refund to us, upon the making of
any such assertion, all amounts previously paid to you hereunder, and we will
have no obligation to make any further payments under this agreement.  We
also reserve all of our other rights, remedies and defenses in such an event.

        If after full consideration of the foregoing, you accept and agree to
all of the above, please so indicate by signing below where indicated.

                                        Very truly yours,

                                        DC Comics

                                        By: _____
                                            Paul Levitz

                                                              EXHIBIT
                                                              Shuster 16

                                                              BEAN
                                                              ASSOCIATES
                                                              X

ACCEPTED AND AGREED TO:

*Frank Shuster*
Frank Shuster                           Dated:  10/2/92

*Jean Shuster Peavy*
Jean Shuster Peavy                      Dated:  10/2/92

                                                                        8

EXHIBIT X
Page 290

# EXHIBIT Y

505-466-4551                    51 Camino Cabo
                                Santa Fe, N.M. 87505

                                March 31, 2001



Dear Joanne:

    I was very pleased to hear from you.  I was with my daughter
and grandchildren for the Christmeas holidays and only wrote a
few Christmas cards.  Since I hadn't received one from you which I
thought you had my new address from the card I sent to you the
year before, I wasn't sure you wanted to keep in touch with me.
Perhaps Mike Catron thought you didn't want to keepian touch
with me as I had told him I had not heard from you at the last
Christmas, he might have been hesitant to give my address.  I
don't know.  Maybe he too didn't have my new address but I do
know he likes you and admires you.  I remember how he commented
on how pretty you looked when we had seen you at the COMIC CON.
I thought we did a good panel together and represanted Jerry and
Joe well, except for perhaps some memories I had and memories
that you had were different in our own experiences.  It is natural
that we each remember things from our own point of view.  But I
enjoyed hearing how you first met Joe as a young model and then
how you met Jerry.

    There was so much injustice done that I am hoping the wrongs
will be righted and that your attorney will get a fair deal for
you.  I knew how Joe suffered during the years after they sued
DC, or rather NATIONAL COMICS, I believe.  Joe told me what a
hard time you and Jerry had, especially with a child to take care
of.  I know Jerry worked in a Post Office.  I don't know if you
know that although Frank got the credit for taking care of Joe
because he was paying the rent and buying the food in the apartment
but I sent Joe a weekly check for a number of years so he would
have some pocket money.  I was in show business and traveling a
lot but visited home as often as I could.  Joe said it was only
a loan and he would pay me back when things became better but he
never did.  Maybe he forgot.  But he was generous after he received
the pension by paying for my trip to New York to visit with Frank
and sent a gift of money for us to enjoy ourselves, eating out and
seeing Broadway shows, etc.  I didn't know if you knew that he had
owed me a lot of money but thank God I am benefiting by the small
pension from DC that was given to Frank and now to me.  I remember
that you fought for Frank to receive it so I am grateful to you for
your fighting spirit.

    I thought you might like to see a picture of my new home.  The
view from the diningroom shows the Superman poster I have.  I don;t
believe you ever met my daughter, nor did I ever meet Laura.  Strange.
But here's a view of my livingroom amd than one with my daughter,
Dawn.  You can keep the pics or return them some day.  They are extra.

    Certainly hope you find a suitable place to live within your means,
or better yet, to have the means to live in a suitable place.

                              Loving memories,

                              Jean

53

# EXHIBIT Z

1   WEISSMANN WOLFF BERGMAN
      COLEMAN GRODIN & EVALL LLP
2   Michael Bergman (SBN 37797)
    Anjani Mandavia (SBN 94092)
3   Adam Hagen (SBN 218021)
    9665 Wilshire Boulevard, Ninth Floor
4   Beverly Hills, California 90212
    Telephone: (310) 858-7888
5   Fax: (310) 550-7191

6   FROSS ZELNICK LEHRMAN & ZISSU, P.C.
    Roger L. Zissu (Admitted *pro hac vice*)
7   James D. Weinberger (Admitted *pro hac vice*)
    866 United Nations Plaza
8   New York, New York 10017
    Telephone: (212) 813-5900
9   Fax: (212) 813-5901

10  PERKINS LAW OFFICE, P.C.
    Patrick T. Perkins (Admitted *pro hac vice*)
11  1711 Route 9D
    Cold Spring, New York 10516
12  Telephone: (845) 265-2820
    Fax: (845) 265-2819

13

14  Attorneys for Defendants and Counterclaimant

15         **UNITED STATES DISTRICT COURT**
           **CENTRAL DISTRICT OF CALIFORNIA**

16

|  |  |
|---|---|
| 17  JOANNE SIEGEL and LAURA SIEGEL LARSON, | Case Nos. [Consolidated for Discovery]: |
| 18      Plaintiffs, | CV 04-8400 SGL (RZx) |
|     vs. | CV 04-8776 SGL (RZx) |
| 19  WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; DC | Hon. Steven G. Larson, U.S.D.J. |
| 20  COMICS; and DOES 1-10, | Hon. Ralph Zarefsky, U.S.M.J. |
|          Defendants. | **NOTICE OF MOTION AND JOINT STIPULATION RE: DEFENDANTS'** |
| 21  JOANNE SIEGEL and LAURA SIEGEL LARSON, | **MOTION TO COMPEL PRODUCTION OF WHISTLE-** |
| 22      Plaintiffs, | **BLOWER DOCUMENTS** |
| 23      vs. | **DISCOVERY MATTER** |
| 24  TIME WARNER INC.; WARNER COMMUNICATIONS INC.; WARNER | **LOCAL RULE 37** |
| 25  BROS. ENTERTAINMENT INC.; WARNER BROS. TELEVISION | Time: 10:00 a.m. |
| 26  PRODUCTION INC.; DC COMICS; and DOES 1-10, | Date: April 16, 2007 |
|          Defendants. | Courtroom: 540 |
| 27  AND RELATED COUNTERCLAIMS | Mag. Judge Ralph Zarefsky |
| 28  | Discovery Cutoff: Nov. 17, 2006 |

{F0029699 1 }

**270**

1  TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

2      PLEASE TAKE NOTICE THAT on April 16, 2007 or as soon thereafter as

3  the matter may be heard in the above-entitled action before the Honorable Ralph

4  Zarefsky, United States Magistrate Judge, United States District Court for the

5  Central District of California, Western Division, Roybal Federal Building, 225 East

6  Temple Street, Los Angeles, California, Courtroom 540, defendants Warner Bros.

7  Entertainment Inc., Time Warner Inc., Warner Communications Inc., Warner Bros.

8  Television Production Inc. and defendant and counterclaimant DC Comics

9  ("Defendants"), will and hereby do move the Court to rule on this jointly filed

10  stipulation pursuant to L.R. 37-3.  Defendants have met and conferred with counsel

11  for Plaintiffs Joanne Siegel and Laura Siegel Larson ("Plaintiffs" or the "Siegels")

12  in writing on October 13, 2006 and by telephone conference on October 26, 2006, in

13  accordance with Local Rule 37-1 of the Local Rules of the United States District

14  Court for the Central District of California ("L.R."), and the parties were unable to

15  resolve their discovery dispute regarding the failure to produce certain documents,

16  copies of which were sent to defendant Warner Bros., apparently by an unidentified

17  former employee of Plaintiffs' counsel, purporting to perform a "whistle-blower"

18  function relative to Plaintiffs' counsel's conduct in this litigation and other matters

19  (the "Whistle-blower Documents").  Some or all of the Whistle-blower Documents,

20  which were segregated by a member of defendant Warner Bros. Entertainment

21  Inc.'s legal department consistent with applicable law and which have not been used

22  or relied upon in the litigation by Defendants to date, are likely to lead to the

23  discovery of admissible evidence and should be produced by Plaintiffs and their

24  counsel.

25      By this motion, Defendants request that the Court: (1) order Plaintiffs and

26  their counsel to produce all of the non-privileged Whistle-blower Documents; and

27  (2) order Plaintiffs and their counsel to produce all of the Whistle-blower documents

28

[F0029699 1 ]                                    1                                    **271**

1  they now claim are privileged but that have not been identified on any privilege log,

2  including but not limited to, the privilege logs Plaintiffs were ordered by this Court

3  to turn over no later than September 29, 2006.

4      This motion is made pursuant to Rules 26 and 37 of the Federal Rules of Civil

5  Procedure and L.R. 37. Defendants contend that the discovery sought hereby is

6  likely to lead to the discovery of admissible evidence, and good cause therefore

7  exists for it. Defendants have made good faith and reasonable attempts to resolve

8  this matter without Court intervention, pursuant to L.R. 37, through numerous phone

9  conferences and correspondence, and the parties conducted a conference of counsel

10  pursuant to L.R. 37-1 on October 26, 2006, without success. (*See* Declaration of

11  Michael L. Bergman, filed herewith, ¶¶ 16-19 & Exs. O-Q).

12      This motion is based on this notice of motion; the Joint Stipulation Re: DC's

13  Motion to Compel Production of Whistle-blower Documents; the declarations

14  submitted by the parties; any supplemental memoranda that may be filed in

15  connection with the Joint Stipulation; the pleadings and papers on file in this action;

16  and on such oral argument and other matters as the Court may properly consider at

17  the time of the hearing of this motion.

18  DATED: March 26, 2007        FROSS ZELNICK LEHRMAN & ZISSU, P.C.

19                              PERKINS LAW OFFICE, P.C.

20                                      -and-

21                              WEISSMANN WOLFF BERGMAN
                                COLEMAN GRODIN & EVALL LLP
22

23                              By
24                                  Michael Bergman

25                              Attorneys for Defendants and Counterclaimant

26

27

28

[F0029699 1 ]

EXHIBIT 2
Page 294

272

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iv

I.   DEFENDANTS' AUTHORITIES ............................................................. iv

II.  PLAINTIFFS' AUTHORITIES .............................................................. iv

JOINT STIPULATION ................................................................................. 1

I.   DEFENDANTS' INTRODUCTORY STATEMENT ................................... 1

II.  PLAINTIFFS' INTRODUCTORY STATEMENT ..................................... 2

III. DEFENDANTS' CONTENTIONS ........................................................... 3

A.   STATEMENT OF FACTS ..................................................................... 3

  1.   The Relevant Pleadings and Defenses in the Actions ..................... 3

  2.   Warner Bros.'s Receipt of the Whistle-blower Documents ............. 6

  3.   Defendants' Attempt s to Obtain from Plaintiffs and their Counsel the
       Whistle-blower Documents to Which they Are Entitled .................. 11

B.   THE DOCUMENT PRODUCTION REQUESTS
     DEFENDANTS ASK THE COURT TO ENFORCE .................................. 13

  1.   The Request and Plaintiffs' Response ........................................... 13

  2.   The Subpoena and Plaintiffs' Response ......................................... 14

C.   PLAINTIFFS' OBLIGATION AND FAILURE TO SERVE
     REQUIRED AND COURT ORDERED PRIVILEGE LOGS .................... 15

D.   THE PARTIES' MEET AND CONFER EFFORTS ................................ 16

E.   ARGUMENT ...................................................................................... 16

  1.   Plaintiffs Should be Compelled to Produce the Non-
       Privileged Whistle-blower Documents ........................................... 16

    a.   Plaintiffs' Objections are Without Merit ................................ 17

      1)   There Is No Ambiguity As To The Documents
           Responsive To The Request And To the Subpoena ....... 18

i

{F0029699 1 }

| | | | | |
|---|---|---|---|---|
| | | 2) | Plaintiffs And Their Counsel's Objections On The Basis Of Overbreadth, Burdensomeness, And Oppressiveness Are Without Merit | 18 |
| | | 3) | The Circumstances Of The Whistle-blower Documents' Delivery Does Not Render The Documents Immune From Discovery | 19 |
| | 2. | | Plaintiffs Should Be Compelled to Produce Any of the Whistle-blower Documents That Have Not Been Identified on Any Privilege Log | 20 |
| IV. | | | PLAINTIFFS' CONTENTIONS | 22 |
| A. | | | FACTUAL AND PROCEDURAL BACKGROUND | 22 |
| | 1. | | Documents Stolen From The Office Of Plaintiffs' Counsel | 24 |
| | 2. | | Document Production and Privilege Logs | 27 |
| B. | | | ARGUMENT | 27 |
| | 1. | | Plaintiffs Have Properly Responded To Defendants' Requests For Production, Produced Non-Privileged Responsive Documents In Their Possession And Listed Privileged Documents In A Privilege Log | 27 |
| | 2. | | Defendants Improperly Seek To Gain An Advantage Through Their Illicit Receipt Of Documents Stolen From The Offices Of Plaintiffs' Counsel | 28 |
| | 3. | | The Stolen Documents Have Been Produced Or Listed In Extensive Privilege Logs | 30 |
| | 4. | | Defendants Have Brought This Motion For Unspecified Documents Based On Speculative Accusations But No Credible Evidence | 31 |
| | 5. | | Defendants' Review, Retention And Handling Of The Stolen Documents Was Improper | 33 |

1  V.     DEFENDANTS' CONCLUSION.................................................................40

2  VI.    PLAINTIFFS' CONCLUSION.................................................................40

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[F0029699 1 ]

iii

275

1

# TABLE OF AUTHORITIES

2  **I.   Defendants' Authorities**

3  *Aerojet-General Corp. v. Transport Indemnity Ins.,*
      18 Cal.App.4th 996 (1993)...................................................................... 8, 19

4

5  *American Dental Ass'n v. Korrhami,*
      No. CV 02-03853 DT (RZx), 2003 WL 24141018
      (C.D. Cal. May 9, 2003) (Zarefsky, M.J.),
6     *aff'd in part, rev'd in part on other grounds,*
      No. CV 02-3853 DT(CTx), 2003 WL 24141019
7     (C.D. Cal. July 14, 2003)........................................................................ 11

8  *Burlington Northern & Santa Fe Railway Co. v. United States Dist. Ct.,*
      408 F.3d 1142 (9th Cir. 2005)................................................................. 20

9
   *Clarke v. American Commerce Nat'l Bank,*
10    974 F.2d 127, 129 (9th Cir. 1992)........................................................... 22

11 *Eureka Fin. Corp. v. Hartford Accident & Indem. Co.,*
      135 F.R.D. 179 (E.D. Cal. 1991)............................................................. 20

12
   *Long v. Landvest Corp.,*
13    No. Civ. A. 04-2025-CM-DL,
      2006 WL 897612 (D. Kan. Mar. 31, 2006)............................................. 18

14
   *Rico v. Mitsubishi Motors Corp.,*
15    116 Cal.App.4th 51 (2004) (*review granted* June 9, 2004) ...................... 8, 19

16 *State Compensation Ins. Fund v. WPS, Inc. (State Fund),*
      70 Cal.App.4th 644 (1999)...................................................................... 8, 19

17
   *Waddell & Reed fin., Inc. v. Torchmark Corp.,*
18    222 F.R.D. 450 (D. Kan. 2004)............................................................... 18

19 *Weil v. Investment Indicators Mgm't, Inc.,*
      647 F.2d 18 (9th Cir. 1981)..................................................................... 20

20
   Fed. R. Civ. P. 26.................................................................................... 16-17

21
   Local Rule 37-1 ...................................................................................... 16

22
   **II.   Plaintiffs' Authorities**

23
   **Federal Cases**

24
   *Gomez v. Vernon,*
25    255 F3d 1118 (9th Cir. 2001)..............................................33-34, 39

26
   *In re Grand Jury Proceedings Involving Berkley & Co., Inc.,*
27    466 F. Supp. 863 (D. Minn. 1979).............................................36

28 *Kenyatta v. Kelly,*

1    375 F. Supp. 1175 (E.D. Pa. 1974)................................................36

2   Mayman v. Martin Marietta Corp.,
3       886 F. Supp. 1243 (D. Md. 1995)......................................35-36

4   Nardone v. United States,
5       308 U.S. 338 (1939)................................................35

6   Sackman v. Ligget Group, Inc.,
        173 F.R.D. 358 (E.D.N.Y. 1997)......................................35

7
8   Shell Oil Refinery v. Shell Oil Co.,
        143 F.R.D. 105 (E.D.La. 1992)........................................34

9   Smith v. Armour Pharmaceutical Co.,
10      838 F. Supp. 1573 (S.D.Fla. 1993)....................................35-36

11  Spacone v. Burke (In re Truck-A-Way),
12      300 B.R. 31 (E.D. Cal. 2003)..........................................34

13  United States ex rel. Mayman v. Martin Marietta Corp.,
        886 F. Supp. 1243 (D. Md. 1995)......................................35

14
15  Upjohn Co. v. United States,
        449 U.S. 383 (1981).................................................33

16  State Cases

17  Aerojet-General Corp. v. Transport Indemnity Ins.,
18      18 Cal. App. 4th 996 (1993).........................................39-40

19  Cooke v. Superior Court,
20      147 Cal. Rptr. 915 (1978)............................................35

21  Rico v. Mitsubishi Motors Corp.,
22      116 Cal. App. 4th 51 (2004)..........................................34

23  State Compensation Ins. Fund. v. WPS, Inc.(State Fund),
        70 Cal. App. 4th 644 (1999).........................................35, 39

24  Federal Statutes

25
26  17 U.S.C. § 304(c)................................................22-23

27  Rules

28  37 C.F.R. § 201.10..................................................22

[F0029699 1 ]

Fed. R. Civ. Proc. 34...........................................................................29

**Miscellaneous**

159 *American Law Reports Federal* 153.............................................35

3-24 *Bender Practice Guide: Fed. Pretrial Civ. Proc. in Cal.* § 24.40...........34

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

{F0029699.1}

vi

**278**

1                                    **JOINT STIPULATION**

2    **I.      DEFENDANTS' INTRODUCTORY STATEMENT**

3            After almost two years of litigation, and through a complete twist of fortune,

4    Defendants discovered that Plaintiffs had secreted and improperly suppressed copies

5    of a series of documents that were clearly requested and should have been produced

6    or identified in discovery. Defendants neither know about nor sought out these

7    documents. Rather they were sent to executives at defendant Warner Bros.

8    Entertainment Inc. ("Warner Bros.") unsolicited and anonymously, by what appears

9    to be a whistle-blower intent on exposing alleged misconduct engaged in by

10   Plaintiffs' counsel. The documents are relevant to the subject matter of this

11   litigation, but had neither been produced in response to any discovery request, nor

12   identified on Plaintiff's court-ordered privilege logs.

13           The anonymously sent documents are a mix of privileged and non-privileged

14   material. In accordance with procedures laid out under applicable case law they

15   were initially reviewed for privilege by a legal representative of Warner Bros.

16   Then, all copies of the documents were turned over to a neutral third party for

17   preservation and identification, who thereafter provided a Bates numbered copy to

18   Plaintiffs' counsel. Defendants have not maintained copies of any of the documents,

19   nor have they used them in any manner in the case. Indeed, Defendants' counsel

20   have never seen the documents.

21           Defendants thereafter served discovery on Plaintiffs and their counsel to

22   compel production of the non-privileged material, and identification of the

23   remainder, but Plaintiffs have refused to produce documents or provide a privilege

24   log. Even though there is also no dispute concerning the relevance of the

25   documents, Plaintiffs object to their identification and production *solely* on the

26   ground that their existence (and improper withholding) was revealed to Defendants

27   by a former employee of Plaintiffs' counsel without his approval. Plaintiffs have

28

[F0029699 1 ]                                    1

1  steadfastly refused to produce even the admittedly *non-privileged* materials

2  contained in the documents sent to Warner Bros.  And their refusal to provide a

3  privilege log contravenes this Court's Order of August 14, 2006, which required

4  Plaintiffs to "produce all privilege logs, including any revisions, by September 29,

5  2006."

6       Whatever the provenance of the documents at issue, there can be no dispute

7  that (i) Defendants had nothing to do with their anonymous whistle-blower who sent

8  them to Warner Bros., (ii) their identification and production were clearly required

9  under Defendants' document production requests, and (iii) under these

10  circumstances, there is no basis for their continuing to be withheld.  Thus, by this

11  motion Defendants move to compel Plaintiffs: (1) to produce all of the non-

12  privileged Whistle-blower Documents; and (2) to produce all of the Whistle-blower

13  documents they now claim are privileged but that were not included on any

14  privilege log.[1]

15  **II.     PLAINTIFFS' INTRODUCTORY STATEMENT**

16       After attempting without success to obtain privileged information in

17  redundant motions to compel, Defendants seek by this motion to benefit from the

18  wholesale theft and disclosure of legal files stolen from the law offices of Plaintiffs'

19  counsel.  Defendants' disingenuously refer to the documents as "Whistleblower

20  Documents" and purport to have engaged in a series of sanitizing protocols.  Yet, as

21  Defendants well know, the documents in question, which they admit are mostly

22  privileged, were *stolen* by a former attorney at the firm of Plaintiffs' counsel and

23  turned over to Defendants during this litigation in shocking violation of the

24  confidential attorney-client relationship and all ethical standards.

25

26  [1] Concurrent with the filing of this motion, Defendants are filing a separate
    motion requesting additional discovery because, in part, Plaintiffs have waived the

27  attorney-client and work product privileges with respect to Defendants' affirmative
    defense that the parties entered into a binding settlement agreement that would

28  dispose of all of Plaintiffs' claims.

[F0029699 1 ]

1    Incredibly, Defendants call this theft and unethical disclosure – a "twist of

2    fortune." Without a shred of credible evidence, and based solely on speculation and

3    innuendo, they proceed to accuse Plaintiffs and their counsel of secreting documents

4    to prop up their distasteful attempt to gain an advantage from this theft in this

5    litigation.

6    Plaintiffs have properly responded to Defendants' requests for production;

7    produced the non-privileged responsive documents in their possession and listed the

8    privileged documents in a privilege log. Plaintiffs' counsel even double checked not

9    only Plaintiffs' files, but the files of subpoenaed third parties he represents, against

10   the stolen documents, and produced or listed in a privilege log the four unaccounted

11   for documents so located, even though they are largely irrelevant to these actions.

12   Plaintiffs will demonstrate herein that Defendants failed to abide by even the

13   mild standards applicable to *inadvertently* disclosed documents when receiving

14   privileged legal files clearly stolen from Plaintiffs. Instead of immediately

15   informing Plaintiffs of this outrageous theft and returning the documents to

16   Plaintiffs' counsel forthwith, Defendants in-house counsel took several days to sift

17   through the documents while devising a strategy to benefit from the theft.

18   **III.    DEFENDANTS' CONTENTIONS**

19   **A.    STATEMENT OF FACTS**

20   **1.    The Relevant Pleadings and Defenses in the Actions**

21   Jerome Siegel ("Siegel"), together with Joseph Shuster ("Shuster"), co-

22   authored the first comic book story featuring the original Superman character, which

23   was published in 1938 by Detective Comics, Inc. ("Detective"), the predecessor of

24   defendant DC Comics ("DC"). The 1976 Copyright Act enacted a right of authors

25   and their families to terminate previous grants of rights under copyright within a

26   specific statutory framework. Plaintiffs – Siegel's widow and daughter ("Plaintiffs"

27   or "the Siegels") – have instituted two actions seeking to recapture Siegel's

28

**281**

1    copyright rights with respect to the Superman character under the termination

2    provisions contained in Section 304(c) of the Act, 17 U.S.C. § 304(c).

3         The first action, Case No. CV 04-8400 PA (RZx) (the "Superman Action"), is

4    based on notices purporting to terminate a number of Siegel's copyright grants to

5    Detective dating back to 1937 (the "Superman Termination Notices").  The

6    Superman Termination Notices relate only to Siegel's – but not his co-author

7    Shuster's – 50% participation in these grants.  Because the Superman works at issue

8    in the first action are joint works, and the Shuster grants of rights have not been

9    terminated, the Superman Action is principally an action for an accounting.  It does

10   not attempt to prevent Defendants' continued exercise of rights in Superman works,

11   but instead seeks only a declaration of the effectiveness of the termination notices

12   and an accounting for the Siegel allocable share of the profits from exploitation of

13   rights in Superman works created following the purported effective date of the

14   termination.

15        The second action, Case No. CV 04-8776 PA (RZx) (the "Superboy Action"),

16   is based on a separate notice of termination under section 304(c) relating only to

17   Superboy (the "Superboy Termination Notice"), and purporting to terminate grants

18   allegedly made only by Siegel in the Superboy works.  The Superboy Action seeks a

19   declaration that Plaintiffs have recaptured all rights in Superboy, and further alleges

20   that after the purported effective date of the Superboy Termination Notice,

21   Defendants' "ongoing exploitation of the 'Superboy' mythology," including the

22   production and distribution of the *Smallville* television series, infringes Plaintiffs'

23   copyright rights in certain identified Superboy works.

24        Defendants have, *inter alia*, denied the effectiveness of Plaintiffs' termination

25   notices.  They also have denied Plaintiffs' claim for an accounting in the Superman

26   Action, as well as their claims of copyright infringement in the Superboy Action.

27   Additionally, defendant DC has filed counterclaims in both actions seeking

28

1  enforcement of a prior settlement agreement between the parties. If DC's
2  counterclaims are successful, all of Plaintiffs' claims in both cases are moot.

3       DC's settlement claim is based in large part on a letter sent by Plaintiffs' prior
4  counsel on October 19, 2001, which unequivocally states that "the Siegel Family has
5  accepted D.C. Comics' offer of October 16, 2001," and which outlines all of the
6  material terms of the parties' agreement. (*See, e.g.*, Exhibit A to the Declaration of
7  Michael L. Bergman submitted herewith ("Bergman Decl."), ¶¶ 47-56.) In reply to
8  DC's counterclaims, Plaintiffs have denied that the parties reached any valid
9  settlement agreement. (*See, e.g., id.* Exh. B, ¶¶ 47-56.) Moreover, Plaintiffs have
10  asserted, as an affirmative defense, that their lawyers did not have authority, or
11  exceeded the scope of their authority, with respect to the settlement being asserted
12  by Defendants. In particular, Plaintiffs have taken the position that their counsel did
13  not have prior authority to send the October 19, 2001 letter as it was written. (*Id.* ¶
14  183.)

15       Additionally, Plaintiffs have argued that a draft of the long-form agreement
16  prepared by Defendants and submitted to Plaintiffs on February 1, 2002 added to
17  and materially changed the terms of the settlement they had accepted, and thus
18  justified their decision to not consummate their agreement with Defendants. (*Id.* ¶
19  53.) Indeed, on May 9, 2002, plaintiff Joanne Siegel – without the assistance or
20  participation of counsel – wrote letters to Time Warner's chief executives stating
21  that Defendants' draft long-form agreement had "stabbed us in the back" and "just
22  like the Gestapo" sought to "strip us naked of our legal rights." (*Id.* Exh. A, ¶ 55.)
23  Plaintiffs' prior counsel, Kevin Marks of the Gang Tyre firm, has testified that on or
24  about August 8, 2002, he received a telephone call from Plaintiffs' current counsel,
25  Marc Toberoff (who at the time was not yet Plaintiffs' lawyer) in which Mr.
26  Toberoff with another person made an offer to buy Plaintiffs' termination rights at
27  issue in the settlement and in this case for $15 million plus a "meaningful back end"
28  royalty percentage. (*Id.* Exh. C at 168-69.) Mr. Marks transmitted this offer to

{F0029699.1}
                              5

**283**

1  Plaintiffs and it was not accepted. (*Id.* at 169-70.) But six weeks later, in

2  September of that year, Plaintiffs dismissed Mr. Marks as counsel, in a letter which

3  they copied to DC's president. (*Id.* Exh. A, ¶ 56.)

4          **2.  Warner Bros.'s Receipt of the Whistle-blower Documents**

5          During the afternoon of June 28, 2006, Wayne Smith, Vice President, Senior

6  Litigation and Chief Patent Counsel of defendant Warner Bros. ("Smith"), received

7  a telephone call from John A. Schulman, General Counsel of Warner Bros., who

8  asked that Smith come to his office. (Declaration of Wayne M. Smith submitted

9  herewith ("Smith Decl."), ¶ 2.) Upon arriving at his office, Mr. Schulman advised

10 Smith that a set of documents (the "Whistle-blower Documents," referred to by

11 Smith in his declaration as the "Superman Documents") addressed to him and

12 apparently relating to the instant litigation had arrived from an anonymous source at

13 his office that day. (*Id.* ¶ 2.) Mr. Schulman informed Smith that the cover letter

14 contained with the documents indicated that other executives at Warner Bros. may

15 have received the same set of documents, and that he had called the offices of those

16 executives to see if they had received anything. (*Id.* ¶ 2.) He further advised Smith

17 that he had asked those executives to send the documents to his office without

18 reviewing them, and that one set of documents had already been delivered to him.

19 (*Id.* ¶ 2.) Mr. Schulman handed Smith the stack (approximately an inch high) of

20 Whistle-blower Documents that he had received and asked Smith to wait outside his

21 office while he completed a meeting, after which they would discuss them. (*Id.* ¶ 2.)

22 The stack did not include any envelope or packaging in which the documents may

23 have arrived. (*Id.* ¶ 2.) This was not unusual as it has been Smith's experience that

24 the practice of Mr. Schulman's office staff is to dispose of envelopes and packaging

25 upon opening mail. (*Id.* ¶ 2.)

26          While Smith was waiting, he looked at what might be characterized as the

27 "cover letter" that came with the Whistle-blower Documents. (*Id.* ¶ 3.) The cover

28 letter, which was not signed, alleged various types of ethical misconduct on the part

{P0029699.1}

EXHIBIT 2
Page 306

284

1   of the Plaintiffs' counsel in connection with this case. (*Id.* ¶ 3.) The cover letter

2   also asserted ethical misconduct – violating the terms of a confidentiality agreement

3   by leaking settlement information to the press – in connection with another litigated

4   matter where Plaintiffs' counsel had also represented a party adverse to Warner

5   Bros. (*Id.* ¶ 3.) The letter appeared designed to right wrongs caused by Plaintiffs'

6   counsel's misconduct. (*Id.* ¶ 3.) The letter also referenced the documents enclosed,

7   providing an overview of their contents and their connection to Plaintiffs' counsel's

8   alleged wrongdoing. (*Id.* ¶ 3.)

9       Smith also thumbed through the Whistle-blower Documents contained with

10  the letter, but did not read any of them in detail. (*Id.* ¶ 3.) Meanwhile, an assistant

11  for another Warner Bros. executive delivered what appeared to be another set of

12  Whistle-blower Documents to Mr. Schulman's office. (*Id.* ¶ 3.) Smith did not

13  observe that any of the three sets of Whistle-blower Documents – (i) the set Mr.

14  Schulman handed to me; (ii) the other set in his office; or (iii) the set that was

15  delivered while Smith was waiting outside his office – was contained in an envelope

16  or other packaging. (*Id.* ¶ 3.)

17      Smith then met with Mr. Schulman. (*Id.* ¶ 4.) Smith told Mr. Schulman that

18  based on the contents of the cover letter and my brief thumbing through the

19  documents, it appeared that certain of the documents in the package were privileged.

20  (*Id.* ¶ 4.) Smith said that before he looked at the documents he wanted to review the

21  case law in the area to determine what level of review, if any, of the Whistle-blower

22  Documents was appropriate. (*Id.* ¶ 4.) Mr. Schulman agreed with this approach,

23  gave Smith one set of the documents, retained the other two sets that he had

24  received, and advised me that he had only looked at the cover letter that came with

25  the documents and would not review the documents at all. (*Id.* ¶ 4.)

26      Smith the returned to his office with the set of documents. (*Id.* ¶ 5.) He

27  initially went on the internet and performed a Google search relating to the issue of

28  what obligations, if any, governed the handling of the Whistle-blower Documents

1  Warner Bros. had received. (*Id.* ¶ 5.)  His initial search located an article from the
2  June 2006 Los Angeles Lawyer magazine entitled "On the Receiving End," by Kurt
3  L. Schmalz (*id.* Ex. <u>A</u>) which was posted on the Los Angeles County Bar
4  Association web site. (*Id.* ¶ 5.)  The article concerns the obligations of lawyers who
5  unwittingly receive privileged documents from opposing counsel's files and
6  discusses various California cases that have dealt with the issue, including the *Rico*
7  *v. Mitsubishi Motors Corporation* case pending before the California Supreme
8  Court. (*Id.* ¶ 5.)

9          Smith read the Schmalz article and then downloaded and studied the three
10  principal California cases it identifies: *Aerojet-General Corporation v. Transport*
11  *Indemnity Insurance*, 18 Cal.App.4th 996 (1993), *State Compensation Insurance*
12  *Fund v. WPS, Inc. (State Fund)*, 70 Cal.App.4th 644 (1999) and the Court of Appeal
13  decision in the case under review, *Rico v. Mitsubishi Motors Corporation*, 116
14  Cal.App.4th 51 (2004) (*review granted* June 9, 2004). (*Id.* ¶ 6.)  Based on his
15  review of the relevant California authorities, it appeared that a conservative
16  approach to handling the Whistle-blower Documents was to follow the procedure
17  laid out by the Court in *State Fund*, specifically: (i) to review each document but to
18  cease the review once it became apparent that the document was privileged; (ii) to
19  contact opposing counsel and advise that the documents have been received; and
20  (iii) to refrain from using any information in the documents until there was either an
21  agreement with opposing counsel, or the court had determined the documents'
22  disposition. (*Id.* ¶ 6.)

23          Following his review of the law, Smith called Mr. Schulman and advised him
24  of the results of his research. (*Id.* ¶ 7.)  Smith said that he intended to review the
25  Whistle-blower Documents in accordance with *State Fund*. (*Id.* ¶ 7.)  At Mr.
26  Schulman's request, he also sent copies of the three key cases and the article to Mr.
27  Schulman's office. (*Id.* ¶ 7.)

28          That evening, Smith took the Whistle-blower Documents home and spent

{F0029699 1 }

1   approximately a half hour reviewing them. (*Id.* ¶ 8.) Certain of the documents –
2   such as executed agreements relating to Superman and correspondence between the
3   Plaintiffs and non-lawyer third parties – did not appear subject to any applicable
4   privilege. (*Id.* ¶ 8.) As he was going through the documents, Smith placed them
5   into three piles: (i) "non-privileged," (ii) "privileged," and (iii) "?" (where either he
6   could not tell whether it was privileged or he believed the document covered subject
7   matter where privilege may have been waived in the case, as explained below). (*Id.*
8   ¶ 8.) In reviewing each document, where it first appeared to Smith that it was
9   entirely privileged, he ceased reading it, placed the document in the "privileged"
10  pile and did not look at it further. (*Id.* ¶ 8.) After going through the documents,
11  Smith placed a post-it note on the top of each pile (indicating "privileged," "non-
12  privileged," or "?"), and fastened each pile together. (*Id.* ¶ 8.) Smith did not look at
13  the documents further. Because he did not conduct a detailed review of the Whistle-
14  blower Documents, and because of the passage of time, Smith does not recall their
15  specific contents. (*Id.* ¶ 8.) He does, however, recall generally the subject matter of
16  certain of the documents. (*Id.* ¶ 8.)

17       The non-privileged pile was the second largest of the three. (*Id.* ¶ 9.) It
18  contained what appeared to be agreements between, *inter alia*, the Siegels and/or
19  Shusters and various entities, as well as correspondence concerning the interest in
20  Superman that might be owned by Plaintiff Laura Siegel's estranged step-brother,
21  Michael Siegel. (*Id.* ¶ 9.) To Smith's knowledge, this last category of documents
22  has never been produced in the litigation. (*Id.* ¶ 9.)

23       The "?" pile was the smallest. (*Id.* ¶ 10.) Smith believes that one or two of
24  the documents in this category potentially fall within the scope of a privilege waiver
25  based Plaintiffs' reliance on an affirmative defense that their predecessor counsel
26  did not have authority to accept a settlement proposal made by Defendants.
27  Defendants position on this privilege waiver is the subject of a separate Motion to
28  Compel filed concurrently herewith. (*Id.* ¶ 10.)

**287**

1        The pile of documents labeled "privileged" was the largest. (*Id.* ¶ 11.)

2        Even from the brief review made, it appeared to Smith that, with the

3    exception of the cover letter (which also addressed the other litigation involving

4    Plaintiffs' counsel), all of the Whistle-blower Documents related to the subject

5    matter of the instant litigation and were responsive to document requests the

6    Defendants had previously served on Plaintiffs. (*Id.* ¶ 12.) However, it did not

7    appear to Smith at the time that any of the "non-privileged" documents had been

8    produced in the litigation. (*Id.* ¶ 12.) Moreover, at least some (and perhaps

9    virtually all) of the privileged documents, as well as those in the "?" pile, were, to

10    the best of Smith's knowledge, never identified in any privilege log served by the

11    Plaintiffs. (*Id.* ¶ 12.)

12        The next morning, June 29, 2006, Smith returned with the Whistle-blower

13    Documents to see Mr. Schulman in his office. (*Id.* ¶ 13.) Mr. Schulman and Smith

14    discussed having a neutral third party hold the documents pending either the parties'

15    agreement as to their disposition or order of the Court. (*Id.* ¶ 13.) They decided to

16    ask John Quinn, then with Arnold & Porter, and former president of the Los Angeles

17    County Bar Association, to act as the neutral based on his reputation and legal ethics

18    experience. (*Id.* ¶ 13.) He agreed and the following morning, June 30, 2006, the

19    three sets of the Whistle-blower Documents, including the set that Smith had

20    categorized, were handed over to Mr. Quinn. (*Id.* ¶ 13.) Out of an abundance of

21    caution Warner Bros. handed over *all* the documents to Mr. Quinn, not just those

22    that were clearly or potentially privileged. (*Id.* ¶ 13.) Further, Warner Bros. has not

23    shared the contents of the Whistle-blower Documents with any of the outside

24    counsel representing the Defendants in this action, nor has it used the contents of the

25    documents in the litigation. (*Id.* ¶ 13.)

26

27

28

**288**

### 3. Defendants' Attempts to Obtain from Plaintiffs and their Counsel the Whistle-blower Documents to Which they Are Entitled.

On July 5, 2006, Quinn wrote to Plaintiffs' counsel and to Defendants' outside counsel to inform them of Warner Bros.'s receipt of the Whistle-blower Documents and what Warner Bros. had done with them. (Bergman Decl. Ex. D.) The letter further suggested the following procedure for proper review and handling of the Whistle-blower Documents; (1) the Documents would be Bates stamped by an independent court reporter, a court appointed individual, or independent copy service under supervision; (2) counsel for Plaintiffs and Defendants would contact the Court to advise it of the existence of the Documents and the circumstances of their receipt; (3) if the Court agreed, the Documents would be deposited with the Court, otherwise, they would remain in Quinn's possession; and (4) the Documents would be reviewed by the Court or other individual agreed upon to determine whether any of the documents are protected by any claim of privilege or work product. Non-privileged documents would then be released to Defendants' litigation counsel. (*Id.*)

On July 11, 2006 Quinn and Plaintiffs' counsel had a conversation to discuss the Whistle-blower Documents. (*Id.* Ex. E.) According to Quinn, during that conversation, Plaintiffs' counsel agreed to the protocol set forth in Quinn's letter of July 5, 2006 and further agreed to send written confirmation of such. (*Id.*) On July 13, 2006, having heard nothing from Plaintiffs' counsel, including in response to subsequent calls, Quinn wrote to Plaintiffs' counsel confirming agreement to the protocol outlined in the July 5, 2006 letter and informing Plaintiffs' counsel that Quinn would: (1) have all sets of the Whistle-blower Documents Bates stamped by a paralegal from Quinn's office and have copy sets made; (2) personally retain a copy of the Bates stamped Documents; and (3) send a set of the Bates stamped Whistle-blower Documents to Plaintiffs' counsel. (*Id.*)

289

IF0029699 1 |

11

1    Plaintiffs' counsel did not respond to the July 13, 2006 letter. On July 18,
2  2006, Quinn wrote another letter to Plaintiffs' Counsel and enclosed a Bates
3  stamped set of the Whistle-blower Documents. (*Id*. Ex. F) In the letter Quinn also
4  stated that he assumed that the next step in the process would be for Plaintiffs'
5  Counsel to prepare and serve a privilege log on Defendants' counsel. (*Id*.)

6    On July 19, 2006, Plaintiffs' counsel wrote in response to Quinn's July 13 and
7  July 18 letters. (*Id*. Ex. G.) In his letter, Plaintiffs' counsel took issue with Quinn's
8  view that Plaintiffs' counsel had agreed to the protocol set forth in Quinn's letter of
9  July 5, 2006. (*Id*.) Rather, Plaintiffs' counsel asserted that during the July 11
10 telephone conference he had suggested a different protocol, namely, that: "(1) an
11 independent shop copy and bate stamp the documents and provide [Quinn] with
12 only the total bate stamp number range; (2) all such documents including Warner
13 Bros.' 'originals' then be returned to [Plaintiffs' counsel's] office and (3) Plaintiffs'
14 counsel review the documents and provide Warner Bros. with a privilege log as
15 appropriate." (*Id*.)

16    Plaintiffs' counsel further alleged that the Whistle-blower Documents were
17 stolen legal files from his office that were "in large part, clear attorney-client
18 communications." (*Id*.) Plaintiffs' counsel went on to allege that Smith, Warner
19 Bros.'s in-house counsel, should not have reviewed the Whistle-blower Documents
20 in any manner. (*Id*.) Finally, Plaintiffs' counsel requested that he be furnished with:
21 "(1) the date(s) each set of documents was received; (2) copies of all envelopes or
22 packages enclosing the documents; (3) the method by which the documents were
23 sent and, in the unlikely event the documents were delivered by hand, the name of
24 the messenger (and messenger service) logged at Warner Bros' security gate and (4)
25 any other pertinent information regarding Warner Bros' receipt of these
26 documents." (*Id*.) Plaintiffs' counsel further requested to review the original
27 documents and that all copies of the Whistle-blower Documents be returned to him.
28 (*Id*.)

**290**

1    On July 24, 2006, Quinn wrote back to Plaintiffs' counsel, expressing regret
2  over the disagreement about the telephone conversation between them on July 11,
3  2006 but pointing out that the only area of disagreement that remained between
4  them was over the fact that Quinn had retained a copy of the Whistle-blower
5  Documents. (*Id.* Ex. H.) Quinn reiterated that no one had read the documents and
6  that the only reason he had suggested that a copy be retained by him or by the Court
7  was so that no claim could be made that the documents were incomplete. (*Id.*)
8  Quinn further urged Plaintiffs' counsel to get the Court involved in a resolution of
9  the matter. (*Id.*)

10    On July 24, 2006, Defendants' counsel in these actions wrote to Plaintiffs'
11  counsel and requested that Plaintiffs (1) provide Defendants with copies of each of
12  the Documents as to which Plaintiffs were not asserting any attorney/client or work
13  product privilege and (2) provide Defendants with a detailed privilege log. (*Id.* Ex.
14  I.) Plaintiffs' counsel did not comply with the requests. (*Id.* ¶ 10.) As a result, on
15  August 7, 2006, Defendants served Defendants'/Counterclaimant's Third Set Of
16  Requests For The Production Of Documents And Things (the "Request") (*Id.* Ex. J)
17  and on August 10, 2006 Defendants served a subpoena *duces tecum* on Plaintiffs'
18  counsel (the "Subpoena") (*Id.* Ex. K). .The Request consisted of one document
19  request and the subpoena was identical in scope. (*Id.* Exs. J, K.) Defendants'
20  instant motion requests the Court to order production in compliance with these two
21  discovery devices, both of which are set forth below along with the objections
22  asserted by Plaintiffs and counsel.

23  **B.    THE DOCUMENT PRODUCTION REQUESTS
       DEFENDANTS ASK THE COURT TO ENFORCE**

24

25    **1.    The Request and Plaintiffs' Response**

26    **Request No. 66**

27    All Writings referenced in the July 5, 2006 letter from
      John J. Quinn, Esq. to, among others, Marc Toberoff, Esq. (a
      copy of which is attached hereto as Exhibit A), and which
28    were attached to or enclosed with the July 18, 2006 letter from

1       John J. Quinn, Esq. to Marc Toberoff, Esq. (a copy of which is
        attached hereto as Exhibit B).

2   (*Id.* Ex. J at 3.)

3       On September 6, 2006, Plaintiffs served their written objection to the Request

4   (the "Request Objection"), which asserted boilerplate general objections and, in

5   response to the specific document request read:

6       **Response to Request No. 66**

7           Plaintiffs object to this Request on the grounds that it is
        vague and ambiguous as to the phrase "all Writings

8       referenced." Plaintiffs further object to this Request on the
        grounds that it is overbroad, burdensome and oppressive.

9       Plaintiffs further object to this Request because it seeks
        documents or communications clearly protected by the

10      attorney/client privilege and the attorney work product
        doctrine. Plaintiffs further object to this Request on the

11      ground that Defendants are seeking to impermissibly gain an
        advantage in this litigation from their illicit receipt of clearly

12      confidential and privileged documents clearly *stolen* from the
        files of Plaintiffs' counsel's law offices. In an effort to

13      capitalize on this theft, Defendants improperly reviewed these
        *stolen files* well before notifying Plaintiffs' counsel of the theft

14      or returning the *stolen files* to Plaintiffs' counsel. Defendants
        also improperly retained a copy of the *stolen files*. But for

15      Defendants' receipt of these *stolen files*, Defendants would not
        have issued this Request.

16

17  (*Id.* Ex. L at 5.)

18      **2.    The Subpoena and Plaintiffs' Response**

19      The Subpoena to Plaintiffs' counsel contained the identical request as that set

20  forth in Document Request 66 served on Plaintiffs:

21          All Writings referenced in the July 5, 2006 letter from John
        J. Quinn, Esq. to, among others, Marc Toberoff, Esq. (a copy of

22      which is attached hereto as Exhibit A), and which were attached to
        or enclosed with the July 18, 2006 letter from John J. Quinn, Esq.

23      to Marc Toberoff, Esq. (a copy of which is attached hereto as
        Exhibit B).

24  (*Id.* Ex. K.)

25      On August 23, 2006, Plaintiffs' counsel served a written objection (the

26  "Subpoena Objection" to the Subpoena. The Subpoena Objection was virtually

27

28

[P0029699.1]

**292**

1  identical to the Request Objection, with the same boilerplate general objections and

2  then the following specific response to the Request:

3          Toberoff objects to this Subpoena on the grounds that it is
       vague and ambiguous as to the phrase "all writings referenced."
4       Toberoff further objects to this Subpoena on the grounds that it is
       overbroad, burdensome and oppressive. Toberoff further objects
5       to this Subpoena because it seeks documents or communications
       clearly protected by the attorney/client privilege and the attorney
6       work product doctrine. Toberoff further objects on the ground
       that Defendants are seeking to impermissibly capitalize on their
7       receipt of clearly confidential and privileged documents stolen
       from Toberoff's law offices, which Defendants improperly
8       reviewed before notifying Toberoff of the issue. But for the
       receipt of the stolen documents, Defendants would not have issued
9       this subpoena.

10  (*Id.* Ex. M.)

11  **C.   PLAINTIFFS' OBLIGATION AND FAILURE TO SERVE
       REQUIRED AND COURT ORDERED PRIVILEGE LOGS**

12

13         While the parties attempted to work out their dispute with respect to the

14  Whistle-blower documents, this Court issued an August 14, 2006 order on a motion

15  by Defendants to compel Plaintiff to produce documents not identified on a

16  privilege log. (*Id.* Ex. N.) In that Order, the Court held that "Plaintiff shall produce

17  all privilege logs, including any revisions, by September 29, 2006." (*Id.*)

18  Pursuant to the Court's Order of August 14, 2006, on September 29, 2006, Plaintiffs

19  produced a 46-page privilege log. (*Id.* Ex. P) However, to the best of Defendants'

20  knowledge, the vast bulk of the Whistle-blower Documents are not identified on the

21  privilege log. (Smith Decl. ¶ 12).

22         On September 28, 2006, the day before the Court-ordered deadline to produce

23  "all privilege logs," Defendants' counsel wrote a letter to Plaintiffs' counsel

24  pointing out that, notwithstanding Plaintiffs' counsel's invocation of the attorney-

25  client and work product privileges in the Subpoena Objection, he had failed to

26  produce a privilege log. (Bergman Decl. Ex. Q.) The September 28 letter requested

27  that Plaintiffs' counsel produce a privilege log. (*Id.*) To date, Plaintiffs' counsel

28  has failed to do so. (*Id.* ¶ 16.)

**293**

**D.    THE PARTIES' MEET AND CONFER EFFORTS**

Pursuant to Local Rule 37-1, on October 13, 2006, Defendants' counsel sent Plaintiffs' counsel a letter setting forth their position on the issues presented in this motion and outlining the relief sought in an attempt to avoid the need for Court intervention. (Bergman Decl. Exh. Q)  Counsel subsequently conducted a conference by telephone on October 26, 2006 in which Plaintiffs' counsel steadfastly refused to produce any of the non-privileged Whistle-blower Documents and further refused to produce a privilege log.  Plaintiffs' counsel's justification for this position was that the documents were stolen.  (*Id.* ¶ 19).  Plaintiffs' counsel has not swayed from his mantra that since the Whistle-blower documents were "stolen" from his office, neither he nor Plaintiffs have any obligation to produce them or identify them on a privilege log, even to the extent that the documents are neither privileged nor previously produced, notwithstanding their responsiveness to outstanding requests.  (*Id.* ¶ 19).  Thus, the parties have not been able to resolve the dispute.  (*Id.* ¶ 19.)

**E.    ARGUMENT**

**1.    Plaintiffs Should be Compelled to Produce the Non-Privileged Whistle-blower Documents**

There is no serious dispute here that all of the Whistle-blower Documents sought by the Request and by the Subpoena are within the scope of discovery as set forth by Rule 26 of the Federal Rules of Civil Procedure, which sets a broad standard for what is discoverable:

> Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

**294**

1    Fed. R. Civ. P. 26(b)(1).  Although Rule 26(b)(2) sets forth limitations on discovery

2    that may be ordered following motion practice, Plaintiffs have sought no protective

3    order or other relief with regard to the discoverability of the testimony at issue.

4    Moreover, although Plaintiffs and their counsel make passing reference to relevance

5    in boilerplate objections, neither the specific Request Objection nor the specific

6    Subpoena Objection asserts any relevance objection.  (Bergman Decl.; Exs. L, M.)

7    Any such objection would be frivolous as the documents at issue are unquestionably

8    related to these litigations are thus "likely to lead to the discovery of admissible

9    evidence."  (Smith Decl. ¶¶ 2, 8-12.)

10        Nor is there any dispute that some of the Whistle-blower Documents

11    unquestionably are not protected by any privilege.  (*Id.* ¶¶ 8-9.)  Indeed, Plaintiffs'

12    counsel conceded this in his letter of July 19, 2006, stating only that the Whistle-

13    blower Documents were in "*large part*, clear attorney-client communications."

14    (Bergman Decl. Ex. G (emphasis added).)  Notably, he did not say that "all" of the

15    documents were privileged.  Moreover, during the meet and confer he did not take

16    the position that all of the Whistle-blower Documents were privileged.  (*Id.* ¶ 19.)

17            **a.    Plaintiffs' Objections are Without Merit**

18        Plaintiffs' and their counsel's asserted objections as to non-privileged

19    documents are without merit.  They are: (1) the Subpoena and the Request are

20    "vague and ambiguous" as they relate to the phrase "all writings referenced;" (2) the

21    Subpoena and the Request are "overbroad, burdensome and oppressive;" and (3)

22    Defendants are seeking to "gain an advantage in this litigation from [Defendants']

23    illicit receipt of clearly confidential and privileged documents clearly *stolen* from

24    the files of Plaintiffs' counsel's law offices."  Plaintiffs and their counsel go on to

25    argue that "but for" Defendants' receipt of the Whistle-blower Documents,

26    Defendants would never have issued either the Request or the Subpoena.  (Bergman

27    Decl. Exs. L, M.)

28        Each of these objections if entirely without merit.

1

### 1)   There Is No Ambiguity As To The Documents Responsive To The Request And To the Subpoena.

The Request and the Subpoena seek production of "all writings" that are: (1) referenced in the July 5, 2006 from Quinn to Plaintiffs' counsel and (2) copies of which were attached to or enclosed with the July 18, 2006 letter from Quinn to Plaintiffs' counsel. (Bergman Decl. Exs. J, K.)  In other words, Defendants seek production of the Whistle-blower Documents.  Plaintiffs cannot seriously contend that they do not understand what documents Defendants seek through the Request and the Subpoena.

### 2)   Plaintiffs And Their Counsel's Objections On The Basis Of Overbreadth, Burdensomeness, And Oppressiveness Are Without Merit.

"[P]arties asserting undue burden . . . have the burden to support their objection, by showing not only undue burden or expense, but that the burden or expense is unreasonable in light of the benefits to be secured from the discovery.  This typically requires providing an affidavit or other evidentiary proof of the expense or time involved in responding to the discovery request." *Long v. Landvest Corp.*, No. Civ. A. 04-2025-CM-DJ, 2006 WL 897612, *5 (D. Kan. Mar. 31, 2006).[2]

Here, production of the requested documents – the Whistle-blower Documents – would cause no burden to Plaintiffs or their counsel, let alone an unreasonable burden in light of the benefits to be secured from the discovery.  The Whistle-blower documents are not voluminous and have all been already collected, copied, and numbered. (Smith Decl. ¶¶ 8-13; Bergman Decl. Exs. E, F, H, I.)  Literally, all that would need to happen is for the Court to order Mr. Quinn to turn over the Whistle-blower Documents to Defendants.  No burden or oppression exists to Plaintiffs or anyone else in producing the responsive documents.

---

[2] *See also, Waddell & Reed fin., Inc. v. Torchmark Corp.*, 222 F.R.D. 450, 454 (D. Kan. 2004).

296

3)   **The Circumstances Of The Whistle-blower
     Documents' Delivery Does Not Render The
     Documents Immune From Discovery.**

The only substance of Plaintiffs' and their counsel's final non-privilege objection to producing the Whistle-blower Documents is that, because the Documents were allegedly "stolen" from Plaintiffs' counsel's office, the documents should be immune to discovery. As Plaintiffs and their counsel see it, "but for" this allegedly illicit taking of Documents by an unidentified former employee of Plaintiffs' counsel, Defendants would never have known about the existence of the Whistle-blower Documents and thus never would have served the Request and the Subpoena. This perverse reasoning is unsupported by the law.

While it is unfortunate that an apparent former employee of Plaintiffs' counsel felt the need to "blow the whistle" on his or her former employer by disclosing documents that, up to that point, had been hidden and not disclosed by Plaintiffs' counsel, this has no effect on whether the Whistle-blower Documents are discoverable. Indeed, none of the leading cases in California that discuss documents produced due to the inadvertence of counsel, ever hold or even suggest that such documents are *per se* not discoverable due to the circumstances of their production. *Aerojet-General Corp. v. Transport Indem. Ins.*, 18 Cal.App.4th 996 (1993), *State Comp. Ins. Fund v. WPS, Inc.*, 70 Cal.App.4th 644 (1999), and *Rico v. Mitsubishi Motors Corp.*, 116 Cal.App.4th 51 (2004) (*review granted* June 9, 2004).

In fact, the case law holds quite the opposite. "If the underlying information which respondents sought to prevent plaintiffs from using is not privileged, and if such information was revealed to plaintiffs' counsel through no fault or misconduct of his own, plaintiffs and their counsel were entitled to use it." *Aerojet*, 18 Cal.App.4th at 1005. That is the case here with respect to the non-privileged Whistle-blower Documents – the documents are not privileged and, notwithstanding Plaintiffs' baseless assertion of "illicit receipt," they were revealed to Warner Bros. through no fault or misconduct of its own. The documents literally appeared at

1 Warner Bros.'s doorstep, and were forwarded to in-house counsel immediately upon
2 receipt. (Smith Decl. ¶¶ 2-3). The materials were handled in accordance with
3 California law and no outside counsel for Defendants have ever seen the documents.
4 (*Id.* ¶¶ 4-13).

5      Moreover, as troubling as the apparent theft of documents from Plaintiffs'
6 counsel's office, is the fact that the Whistle-blower Documents were clearly
7 responsive to previously served document requests and that they were neither
8 produced nor identified on a privilege log. (*Id.* ¶ 8-12.) Now that these clearly
9 relevant and responsive documents have come to light, through no fault of
10 Defendants, to permit Plaintiffs to continue to withhold the documents would be a
11 perverse result. Plaintiffs would thereby be empowered to shield from discovery
12 clearly discoverable documents that have been heretofore improperly withheld,
13 whose existence has been secreted, and which were never identified in a requested
14 and court ordered privilege log. In sum, the circumstances of the Whistle-blower
15 Documents coming to Defendants' attention cannot be a bar to their production.

16     **2.**   **Plaintiffs Should Be Compelled to Produce**
                **Any of the Whistle-blower Documents That**
17                 **Have Not Been Identified on Any Privilege Log**

18      "As with all evidentiary privileges, the burden of proving that the attorney-
19 client privilege applies rests not with the party contesting the privilege, but with the
20 party asserting it." *Weil v. Investment Indicators Mgm't, Inc.*, 647 F.2d 18, 25 (9th
21 Cir. 1981). As the Ninth Circuit has held, a privilege log is an absolute requirement
22 for the proper assertion of a privilege, including the attorney-client privilege and
23 work product doctrine; mere boilerplate objections or blanket refusals incorporated
24 into discovery responses are insufficient to assert a privilege. *Burlington Northern*
25 *& Santa Fe Railway Co. v. United States Dist. Ct.*, 408 F.3d 1142, 1149 (9th Cir.
26 2005). *See also Eureka Fin. Corp. v. Hartford Accident & Indem. Co.*, 135 F.R.D.
27 179, 184-85 (E.D. Cal. 1991) (failure to "comply with a well settled requirement of
28

[F0029699.1 ]

1  specifically identifying the evidence to which a privilege applies" constitutes a

2  waiver of the attorney-client privilege).

3      Plaintiffs and their counsel have stubbornly refused to produce a privilege log

4  of the Whistle-blower documents, not withstanding several requests both in writing

5  and on the telephone. (Bergman Decl. ¶¶ 16-19 & Exs. O-Q.) Making matters

6  worse in this instance is the fact that Plaintiffs are repeat offenders – they have

7  already been found on at least one occasion to have failed to fulfill their obligation

8  to produce a privilege log. As a result, this Court ordered Plaintiffs on August 14,

9  2007 to produce "all privilege logs, including any revisions, by September 29,

10  2006." (*Id.* Ex. N.) Notwithstanding the obligation imposed by this standing order

11  of the Court, Plaintiffs have continued to refuse to produce a privilege log for the

12  Whistle-blower Documents. What's more, to the best of Warner Bros.'s in-house

13  counsel's memory, the vast majority of potentially privileged documents in the stack

14  of Whistle-blower Documents are not identified on any of Plaintiffs' privilege log.

15  (Smith Decl. ¶ 12.) Moreover, neither in response to correspondence or in

16  connection with the meet and confer process on this motion have Plaintiffs or their

17  counsel ever pointed to any entry in the existing privilege log that identifies any of

18  the Whistle-blower Documents. (*Id.* ¶ 12; Bergman Decl. ¶ 16-19 & Exs. O-Q.)

19      At this point, because Plaintiffs and their counsel have purposely refused to

20  fulfill their obligation to provide a privilege log for the Whistle-blower Documents,

21  and because they have violated this Court's Order of August 14, 2006, they should

22  be deemed to have waived the privilege with respect to the Whistle-blower

23  Documents and should be ordered to produce such documents.[3]

24

25      [3] If the Court is unwilling to order a blanket waiver of privilege as a result of
Plaintiffs' failure to list the documents at issue on a privilege log and resulting

26  violation of its August 14, 2006 order, Defendants respectfully request that the
Court conduct an in camera review of the remaining documents to determine which,

27  if any, may be privileged. This task cannot be performed by Defendants' counsel in
view of the measures taken by Defendants to prevent disclosure without prior

28  approval of the Court.

[F0029699.1]                    21                              **299**

1 IV.   **PLAINTIFFS' CONTENTIONS**

2   A.   **FACTUAL AND PROCEDURAL BACKGROUND**

3 Plaintiffs' Terminations regarding "Superman" and "Superboy" complied

with all the requirements of 17 U.S.C. § 304(c) and 37 C.F.R. § 201.10, the

4 regulations promulgated by the Register of Copyrights.  Shortly after receiving the

5 "Superman" Termination notices, the general counsel of Defendant Warner Bros.

6 Entertainment Inc. ("Warner") and the President of Defendant DC, a wholly owned

7 Warner subsidiary, each acknowledged the validity of the "Superman" Termination,

8 and the parties began negotiations for Defendants' to license or purchase Plaintiffs'

9 recaptured copyrights. (*See* Plaintiffs' First Amended Supplemental Complaint

10 ("FASC"), ¶¶ 46-48). When these negotiations broke down due to Defendants'

11 excessive demands, Defendants reversed their prior admissions two years earlier,

12 and contested Plaintiffs' "Superman" Termination on April 15, 1999, one day before

13 it became effective.

14

15

16    As established in the Smith Declaration, the scope of review is quite narrow as it
would encompass a review of an estimated 85-150 pages of possibly privileged
17 documents.  Moreover, because of Plaintiffs' purposeful failure to disclose the
existence of these discoverable Whistle-blower Documents on a privilege log, the
18 integrity of this case risks being compromised.  This fact, combined with the fact
that, at least with respect to the Documents in the "?" pile segregated by Smith, by
19 separate motion brought concurrently, the enforcement of a settlement agreement is
an issue as to whether Plaintiffs have waived the privilege as to a subject matter
20 pertaining to one of Defendants' main defenses in the cases, makes in camera
review of the Whistle-blower Documents crucial to the ends of justice. If, after in
21 camera inspection of the Whistle-blower Documents Plaintiffs claim are privileged,
the Court finds that there are documents therein that are either not privileged or
22 where such privilege has been waived, Defendants respectfully submit that Plaintiffs
and their counsel should be ordered to produce such documents.
23    Such a narrow review is supported by the law of this Circuit. "A district court
may conduct an in camera inspection of alleged confidential communications to
24 determine whether the attorney-client privilege applies." *Clarke v. American
Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992).  While Defendants are
25 mindful that in camera review of documents is generally disfavored, it is permitted
where the party seeking such review has submitted "detailed affidavits and other
26 evidence narrowing the scope of the review to the extent reasonably possible."
*American Dental Ass'n v. Korrhami*, No. CV 02-03853 DT (RZx), 2003 WL
27 24141018, *21 (C.D. Cal. May 9, 2003) (Zarefsky, M.J.), *aff'd in part, rev'd in part
on other grounds*, No. CV 02-3853 DT(CTx), 2003 WL 24141019, (C.D. Cal. July
28 14, 2003).

{P0029699.1}

**300**

1    Defendants thereafter also claimed that the "Superboy" Termination was
2    somehow invalid.  On October 8, 2004, Plaintiffs filed their action for declaratory
3    relief and an accounting regarding the "Superman" Termination; and on October 22,
4    2004 filed their action for declaratory relief and copyright infringement regarding
5    the "Superboy" Termination.  The two actions were consolidated for purposes of
6    discovery only.

7    Plaintiffs moved for partial summary adjudication on February 15, 2006 to
8    establish that Plaintiffs had successfully recaptured and own Siegel's "Superboy"
9    copyrights pursuant to 17 U.S.C. §304(c).  Defendants cross-moved for summary
10   judgment claiming the "Superboy" Termination was invalid based largely on the
11   same purported claims and defenses they asserted with respect to "Superman."  On
12   March 23, 2006, the Court *granted* Plaintiffs' motion in its entirety and *denied*
13   Defendants' motion in its entirety.  Defendants' subsequently moved to have this
14   order certified for appeal, which motion was also *denied* by the Court.

15   Following the Court's ruling against them, Defendants, under the aegis of
16   discovery, embarked on a very aggressive campaign marked by a series of
17   exaggerated assaults on Plaintiffs' *attorney-client privilege and work product*, and
18   by numerous unwarranted motions to compel.  This motion is but one of a series of
19   Defendants' overreaching motions. Defendants filed a motion to compel regarding
20   the communications between Plaintiffs and their former counsel regarding the
21   termination of their services by Plaintiffs in September, 2002.  This motion was
22   denied by the Court on August 18, 2006.  *See* Declaration of Marc Toberoff in
23   Opposition to Defendants Motion to Compel Whistle-Blower Documents ("Toberoff
24   Decl.") Ex. A.  Defendants moved to have this order reconsidered; this too was
25   denied by the Court on September 25, 2006.  Toberoff Decl., Ex. B. Defendants then
26   sought to retake Laura Siegel Larson and Joanne Siegel's depositions on the ground
27   they had been hindered in the deposition by Plaintiffs' counsel's assertion of
28   privilege regarding communications concerning the purported October, 2001

[F0029699.1]

23

**301**

1    settlement agreement. The Court denied this motion on November 7, 2006.

2    Toberoff Decl., Ex. C.

3        Undeterred, Defendants now seek to exploit to their advantage *legal files*

4    *stolen from Plaintiffs' counsel.*

5            **1.    Documents Stolen From The Office Of Plaintiffs'**

6                    **Counsel**

7        On July 5, 2006, Plaintiffs' counsel Marc Toberoff ("Toberoff") received a

8    cryptic letter from John J. Quinn ("Quinn"), an attorney with the firm, Arnold and

9    Porter LLP, notifying Toberoff on behalf of Defendants in the vaguest of terms that

10   Defendants had received three sets of documents (delivered to Warner's General

11   Counsel, John Schulman and two Warner executives, respectively) from an

12   unidentified source and that these documents had been reviewed by Wayne Smith,

13   Warner's Senior Litigation Counsel and segregated into three piles: "'Privileged,'

14   'Non-privileged' and '?.'" *See* Declaration of Michael Bergman in Support of

15   Defendants' Motion to Compel Whistle-Blower Documents ("Bergman Decl."), Ex.

16   D. The letter further stated that Quinn was in possession of the documents and

17   suggested a "protocol" for dealing with them. *Id*. Curiously the letter did not

18   identify what it was referring to and, in particular, omitted that the documents had

19   obviously been *stolen* from Toberoff's law firm. *Id*. Nor did the letter offer to

20   return the documents to Toberoff, as is required, and stated instead "I will keep the

21   documents in my possession and allow access to them only upon your joint or the

22   Court's instructions." *Id*.

23       The next day, Defendants' counsel Michael Bergman ("Bergman") sent an *ex*

24   *parte* letter to this Court regarding the documents, without notifying Plaintiffs

25   beforehand. Toberoff Decl., Ex. D. Bergman's letter *also omitted* that the

26   documents in question, reviewed by Defendants' counsel, Wayne Smith, had

27   obviously been lifted from the office of Plaintiffs' counsel. The Court rejected this

28   *ex parte* letter by minute order dated July 6, 2006. *Id.,* Ex. E.

1   On July 11, 2006, Quinn and Toberoff spoke telephonically regarding the

2   stolen documents. *Id.* ¶ 8.  Toberoff inquired as to the nature of the documents

3   referred to in Quinn's July 5, 2006 letter and was informed *for the first time* that the

4   documents apparently came from Toberoff's own legal files. *Id.* Toberoff thereupon

5   demanded that the documents be returned immediately and rejected the "protocol"

6   outlined in the July 5 letter as geared to exploiting the documents in this litigation.

7   *Id.* Toberoff suggested instead that an independent shop copy and bate stamp all the

8   documents; that Arnold and Porter be provided with this bates stamp number range,

9   but not retain the stolen documents and that *all* of the documents, including the

10  'originals,' withheld by Warner Bros., be returned to Plaintiffs' counsel

11  immediately.  *Id.*  On July 13, by letter, Quinn announced, contrary to the wishes of

12  Plaintiffs' counsel, that he would have the documents bates stamped by his office,

13  send a copy of the bates stamped documents to Plaintiffs' counsel, and *retain the*

14  *originals* and a bates stamped set.  Bergman Decl., Ex. E.  On July 18, 2006, Quinn

15  delivered three sets of the stolen documents that had been bates stamped, but kept

16  the originals. Toberoff Decl. ¶ 10.

17       By letter dated July 19, 2006, Toberoff reiterated Plaintiffs' demand and

18  further requested that Warner Bros. furnish:

19

20       "(1) the date(s) each set of documents was received; (2) copies of all
         envelopes or packages enclosing the documents; (3) the method by
21       which the documents were sent and, in the unlikely event the
         documents were delivered by hand, the name of the messenger (and
22       messenger service) logged at Warner Bros. security gate and (4) any
         other pertinent information regarding Warner Bros.' receipt of these
23       documents. We would also like to inspect the "original" documents
         and enclosing envelopes or packages as received by Warner Bros."
24
    *Id.*, Ex. F.
25       In response to Plaintiffs' July 19 letter, Bergman insisted by letter dated July

26  20, 2006 that Quinn retain possession of the three sets of the stolen documents (even

27  though Quinn had already done so on Warner's behalf), but Bergman provided no

28  information regarding Warner's receipt of the documents.  *Id.*, Ex. G.  Quinn

{F002969/ 1 }

25

303

1  responded to Plaintiffs' July 19 letter by letter dated July 24, 2006 wherein Quinn

2  again insisted he would keep the original stolen documents pending further

3  instructions from Defendants or a court order, but again the information Plaintiffs

4  had requested regarding Warner's receipt of the stolen documents was not provided.

5  *Id.*, Ex. H.

6      On July 24, 2006, Defendants demanded that Plaintiffs specifically account to

7  them for each of the stolen documents by production and/or a privilege log keyed to

8  the stolen documents retained by Quinn. Again, despite Plaintiffs' request, no

9  information was provided regarding the circumstances under which Warner received

10  the stolen documents. Bergman Decl., Ex. I.

11      By letter dated July 26, 2007, Toberoff reiterated Plaintiffs' July 19 demand

12  for information regarding Warner's receipt of the stolen documents which

13  Defendants continued to ignore. Toberoff Decl., Ex. I. Defendants finally

14  responded by letter dated July 27, 2006, repeating merely that three apparently

15  identical sets of documents addressed to three different high placed Warner

16  executives had mysteriously arrived in envelopes on June 28, 2006; but that Warner

17  did not retain any of the three envelopes (or a copy of any envelopes) and that

18  Warner had no mailroom, security or executive office records, notes or logs of the

19  three substantial packages ever being signed in or received. *Id.*, Ex. J. In short,

20  Warner claimed to have no information whatsoever, concerning the purportedly

21  anonymous receipt by three high ranking Warner executives of substantial packages

22  containing numerous confidential documents relating to this lawsuit. All such

23  information commonly kept by Studio security, mailrooms and executive offices

24  had mysteriously vanished.

25      On August 7, 2006, Defendants served a Third Set of Requests for Production

26  seeking the stolen documents. Bergman Decl., Ex. J. Plaintiffs objected to this

27  document request on September 6, 2006. Bergman Decl., Ex. L. On August 10,

28  2006 Defendants served a subpoena duces tecum on Plaintiffs' counsel also seeking

1  the stolen documents.  Bergman Decl., Ex. K.   On August 23, 2006, Plaintiffs'

2  counsel served written objections to the subpoena.   Bergman Decl., Ex. M.

3         **2.**   **Document Production And Privilege Logs**

4       Plaintiffs produced documents on September 29, 2005 and supplemented this

5  production on October 6, 2006, November 6, 2006 and November 17, 2006.  *Id.*, Ex.

6  K.  Plaintiffs produced a privilege log on July 20, 2006 and provided supplemental

7  privilege logs on September 29, 2006. *Id.*, Ex. L, M.

8       Documents were produced by third parties Jean Peavy and Warren Peary (the

9  "Shusters") on July 18, August 11 and August 14, 2006 in response to Defendants'

10  subpoena.  *Id.*, ¶ 19.  The Shusters served a privilege log on August 11, 2006.  *Id.*

11  Shusters served a supplemental privilege log on October 16, 2006. *Id.*, Ex. N.  Third

12  party IPW, LLC produced documents on November 15, 2006 in response to

13  Defendants' subpoena.  *Id.*, ¶ 21.  Third party Pacific Pictures Corporation produced

14  documents on November 15, 2006 in response to Defendants' subpoena.  *Id.*   Third

15  party Don Bulson produced a privilege log on October 23, 2006 in response to

16  Defendants' subpoena.  *Id.*, Ex. O.

17  **B.**   **ARGUMENT**

18      **1.**   **Plaintiffs Have Properly Responded To Defendants' Requests For**

19          **Production, Produced Non-Privileged Responsive Documents In**

20          **Their Possession And Listed Privileged Documents In A Privilege**

21          **Log**

22       Plaintiffs have readily complied with Defendants' discovery requests. As

23  stated above, Plaintiffs have produced over 2000 pages of documents in this action

24  on September 29, 2005, October 6, 2006, November 6, 2006 and November 17,

25  2006, collectively. *Id.*, Ex. K.  Plaintiffs also produced a 25 page privilege log with

26  342 entries on July 20, 2006, properly setting forth with respect to each

27  communication, the date, sender, recipient, the nature of the privilege claimed, the

28  document type and present location of the document. *Id.*, Ex. L.

305

1    Defendants filed a motion to compel claiming, in part, that Plaintiffs' July 20,
2    2006 privilege log was insufficient. This motion was denied in its entirety by the
3    Court on August 18, 2006. *Id.*, Ex. A. The Court found that the format used by
4    Plaintiffs was sufficient and thus Plaintiffs had adequately asserted the attorney-
5    client privilege and work product doctrine.[4]   *Id.* at 5.  Defendants moved to have
6    this order reconsidered, which was denied by the Court on September 25, 2006. *Id.*,
7    Ex. B.  Thereafter, Plaintiffs provided supplemental privilege logs on September 29,
8    2006, containing 585 entries. *Id.*, Ex. M.

9        Plaintiffs Laura Siegel Larson and Joanne Siegel had their depositions taken
10   in early August, 2006. Defendants moved to retake both of these depositions on the
11   ground they had been hindered by Plaintiffs' counsel's assertion of privilege
12   regarding communications about the purported October, 2001 settlement agreement.
13   The Court denied this motion on November 7, 2006. *Id.*, Ex. C.

14        **2.    <u>Defendants Improperly Seek To Gain An Advantage</u>**
15             **<u>Through Their Illicit Receipt Of Documents Stolen From</u>**
16             **<u>The Offices Of Plaintiffs' Counsel</u>**

17        When one peels away the layers of their motion, Defendants impermissibly
18   seek to gain an advantage in this litigation from their receipt of documents *stolen*
19   *from the legal files of Plaintiffs' counsel*. Defendants call this shocking theft a
20   "twist of fortune." This is all quite improper, if not reprehensible. To make matters
21   much worse, the majority of the stolen documents, as admitted by Defendants, are
22
23   _____
[4] Rather than cite to and fairly describe the Court's August 18, 2006 order,
24   Defendants misleadingly exaggerate, out of context, the Court's August 14 minute
     order regarding Plaintiffs' privilege log, which was modified by the Court's August
25   18 order. (*See* Sec. III. Plaintiffs' Contentions at 15:12-15). Plaintiffs were not
     "ordered" to produce a supplemental log as Defendants proclaim; they informed the
26   Court at the hearing on Defendants' motion that given the long background history
     of this case Plaintiffs' were in the process of supplementing their log to cover
27   additional time periods. The Court merely set a deadline for Plaintiffs to submit
     their supplemental log. Toberoff Decl., Ex. A.
28

**306**

1   classic attorney-client privileged communications.   Declaration of Wayne Smith

2   ("Smith Decl."), ¶ 11.

3         Both parties are bound by FRCP 34 with respect to the discovery and

4   production of documents responsive to each other's requests and the service of

5   privilege logs listing documents withheld by either on the basis of privilege.

6   However, Defendants, by their motion, claim special benefits and advantages due to

7   a theft of documents stolen from the law offices of Plaintiffs' counsel.  At

8   Defendants' direction the stolen documents were both retained and bates numbered

9   in order to force Plaintiffs to jump through hoops and satisfy tests non-applicable to

10  Defendants or any other parties to a lawsuit under the FRCP or Local Rules.

11  Perversely, Plaintiffs, who were victimized and prejudiced by this theft, covert

12  disclosure and Defendants' *review* of privileged communications, are the target of

13  Defendants' motion.

14        Defendants use terms like "Whistle-blower Documents," "neutral" attorneys

15  (retained and compensated by them) and purportedly sanitized protocols to mask the

16  uneasy appearance of their conduct and overreaching motion.  One need only think

17  about Defendants' admission that the majority of stolen documents are *clearly*

18  *attorney-client privileged* to realize that their theft and wholesale disclosure to the

19  other side in this litigation has none of the ethical attributes of "whistle-blowing."  It

20  is believed that these documents were stolen by a disgruntled former attorney of

21  Plaintiffs, in shocking violation of the confidential attorney-client relationship and

22  privilege.[5]  Toberoff Decl., ¶ 23.

23        Faced with this illegal and onerous theft of documents, Defendants stoop to

24  smearing Plaintiffs' counsel by speculation and innuendo, *without a shred of*

25

26

27  [5] The same would apply to any employee of the law firm of Plaintiffs' counsel, as
    their work is conducted within the ambit of counsel's confidential attorney-client
28  relationship.

[P0029699.1]

1   *evidence*, to somehow justify their conduct or cleanse the theft from which they

2   eagerly seek to benefit. *See* Smith Decl., ¶ 12.

3            **3.   The Stolen Documents Have Been Produced Or Listed In**
4                   **Extensive Privilege Logs**

5        Plaintiffs' counsel has reviewed the stolen documents and compared them to

6   Plaintiffs' legal files. Plaintiffs' counsel has found that all but 2 non-privileged

7   documents in Plaintiffs' legal files had long ago been produced or listed by

8   Plaintiffs in their privilege logs. Toberoff Decl., ¶ 22. The documents, consisting

9   of 2 letters from Plaintiff Joanne Siegel to DC Comics' executive Paul Levitz,

10  although clearly already in Defendants' possession, have recently been produced.

11  *Id.* There are also 2 privileged e-mail communications between Plaintiffs and their

12  present counsel dated after the commencement of this action which were not listed

13  in Plaintiffs' privilege logs because the parties have agreed not to list post-complaint

14  attorney-client communications on their respective privilege logs. *Id.*

15       Additionally, Plaintiffs' counsel searched the files of other persons or entities

16  it represents that have been subpoenaed in this case, in search of any stolen

17  documents that had not been produced or listed in a privilege log *even though this*

18  *motion to compel is only directed at Plaintiffs. Id.*, ¶ 23.

19       Plaintiffs' counsel found in the files of IPW, LLC, one IP Worldwide fax

20  cover page having little relevance to this action, which it has nonetheless recently

21  produced to Defendants. *Id.*

22       Plaintiffs' counsel re-searched the files of Jean Peavy, Warren Peary, and the

23  Estate of Joe Schuster (the "Shusters") and found 3 irrelevant, but non-privileged

24  documents regarding the probating of Joe Shuster's Estate, that Plaintiffs do not

25  believe were previously produced. Plaintiffs recently produced these documents.

26  *Id.* ¶ 24. Plaintiffs' counsel found 1 privileged document from the Shuster files,

27  again concerning probate, which he has listed on behalf of the Shusters on a

28  supplemental privilege log. *Id.*

{F0029699 1 }

EXHIBIT 2
Page 330

308

1

2

3

**4.**     <u>Defendants Have Brought This Motion For Unspecified</u>

<u>Documents Based On Speculative Accusations But No</u>

<u>Credible Evidence</u>

4     Defendants wrongfully accuse Plaintiffs and their counsel of secreting

5 unspecified documents based on vague statements and innuendo without any

6 credible evidence to back up their accusations. Defendants rely solely on the

7 vague, purported recollections of attorney Wayne Smith ("Smith"), Warner's Senior

8 VP, Litigation, who oversees this litigation on Defendants' behalf. While claiming

9 that he did not read, but only "brief[ly]" glanced at the documents to quickly

10 conclude that the bulk were attorney-client privileged, Smith asserts that "[t]o my

11 knowledge, [the non-privileged] documents have never been produced in this

12 litigation." Smith Decl., ¶¶ 8, 9, 12.

13     Mr. Smith's claim that he now recalls from a clipped 30 minute review

14 (purportedly, nine months ago in June, 2006) whether these documents were

15 produced in Plaintiffs' 2000 page production is highly dubious. Smith states in his

16 declaration: "at least some (and perhaps virtually all) of the privileged documents,

17 as well as those in the "?" pile, were, to the best of my knowledge, never identified

18 in any privilege log served by Plaintiffs." Smith Decl., ¶ 12. This statement is odd

19 as Smith claims to have briefly reviewed the documents on June 28, 2006 and to

20 have turned *all* of them over to John Quinn on June 30, 2006. *Id.* ¶ 8, 13. However,

21 Plaintiffs did not serve their first privilege log until July 20, 2006 and served their

22 supplemental privilege log on September 29, 2006. Toberoff Decl., Exs. L, M. The

23 privilege logs list the simple information (date, sender, recipient, etc.) in the form

24 approved by the Court's August 18, 2006 order. *Id.* Ex. A. It seems strange that

25 after a 30 minute review, Smith could now recall, or even recall in late July and late

26 September, the dates of documents missing from Plaintiffs' subsequent privilege

27 logs (containing hundreds of entries). Tellingly, Smith does not even mention the

28 document production and privilege logs of subpoenaed third parties (*i.e.*, the

1  Shusters, Don Bulson, Pacific Pictures Corporation and IPW, LLC) provided
2  subsequent to his purported review, though many of the stolen documents were
3  obviously lifted from such files. Toberoff Decl., ¶ 22.

4  According to Smith, "[i]n reviewing each document when it first appeared to
5  me that it was entirely privileged, I ceased reading it, placed the document in the
6  "privileged" pile and did not look at it further." Smith Decl, ¶ 8. Moreover,
7  "because of the passage of time, I do not recall the specific documents." *Id.* If
8  Smith is taken at his word, he could not possibly have concluded that the stolen
9  documents were not included among the nearly 2000 documents produced by
10  Plaintiffs or documents produced by subpoenaed third parties, nor could he
11  reasonably assess the hundreds of entries on Plaintiffs' subsequently produced
12  privilege logs and the privilege logs of such third parties. For instance, the privilege
13  log of Don Bulson, Esq., the attorney of Michael Siegel, Laura Siegels' now
14  deceased step-brother, contains 422 entries. Toberoff Decl., Ex. O.

15  Again, Smith claims "I did not conduct a detailed review of the Superman
16  Documents, and because the passage of time, I do not recall their specific contents.
17  I do, however, recall generally the subject mater of certain documents." Toberoff
18  Decl., ¶ 8. However, Smith's declaration only cites one subject – irrelevant to this
19  action [6]: "correspondence concerning the interest in Superman that might be owned
20  by plaintiff Laura Siegel's estranged step-brother, Michael Siegel [now deceased]."
21  *Id.*, ¶ 9. Smith conveniently makes no reference to the lengthy privilege log of
22  Michael Siegel's attorney, Don Bulson, that naturally encompassed this subject.
23  Toberoff Decl., Ex. O.

24  Thus, Defendants' motion to compel is based entirely on Plaintiffs' alleged
25  failure to have produced or have listed in their privilege log documents purportedly

26  _____
27  [6] Under 17 U.S.C.§ 304(c), Plaintiffs' control author Jerry Siegel's termination
interest and Michael Siegel had only a passive beneficial interest and right to share
28  in any monies paid to Plaintiffs with respect to this interest.

{F0029699 1.}

1  responsive to Defendants' document requests; but Defendants and Smith fail to

2  identify which requests and any non-privileged documents or even document

3  categories that were not produced, except documents relating to the single barely

4  relevant subject discussed above.[7]

5      Without any credible evidence, Defendants are content to brazenly accuse

6  Plaintiffs of "secreting documents."  Defendants inconsistently claim that Smith

7  merely "thumbed through" the stolen documents, "but did not review them in

8  detail," yet base their entire motion and accusations on Smith's vague unspecified

9  recollections of the documents in comparison to the thousands of documents

10  produced by Plaintiffs and multiple third parties or listed on their respective

11  privilege logs.

12      **5.   Defendants' Review, Retention And Handling Of The Stolen**

13      **Documents Was Improper**

14      The attorney-client privilege has been recognized as "the oldest of the

15  privileges for confidential communications known to the common law." *Upjohn Co.*

16  *v. United States*, 449 U.S. 383, 389 (1981).  Practicing attorneys recognize the

17  importance of the privilege and the safe harbor that it provides to encourage "full

18  and frank communication between attorneys and their clients and thereby promote

19  broader public interest in the observance of law and administration of justice." *Id.*

20      A lawyer who receives materials that on their face appear to be subject to the

21  attorney-client privilege or otherwise confidential, under circumstances in which it

22  is clear that the materials were not intended for the receiving lawyer, should refrain

23  from examining the materials, notify the sending lawyer, and abide by the

24  instructions of the lawyer who sent them. *Gomez v. Vernon*, 255 F3d 1118, 1131-

25  1132 (9th Cir. 2001); 3-24 *Mathew Bender Practice Guide: Federal Pretrial Civil*

26  *Procedure in California* § 24.40.

27  ────────────────
[7] *See* November 7, 2006 Order, p. 2, Toberoff Decl., Ex. C (the parties, as required by
28  Local Rule 37 must "set forth seriatim particular disputed discovery responses"

311

1       In *Gomez*, over a period of nine months, the Idaho Department of Corrections

2  implicitly authorized and encouraged department employees to search for and

3  photocopy letters regarding litigation strategies from opposing counsel that were

4  kept in inmates' legal files. The Court found this behavior highly improper as these

5  documents were plainly privileged: "the most sensitive kind – the kind that any trial

6  lawyer would recognize as privileged, highly valuable, very confidential, and

7  potentially devastating in the wrong hands." The court, in imposing sanctions, held

8  that the Department ignored their ethical duties to gain an advantage in the

9  litigation. *Gomez*, 255 F3d at 1131-1132

10       Similarly, in *Rico v. Mitsubishi Motors Corp.*, 116 Cal. App. 4th 51

11  (2004)(review granted June 9, 2004), cited by Defendants, a lawyer was

12  disqualified from further representation after perusing opposing counsel's work

13  product while at a deposition *which he should have known he was not entitled to see*

14  *or possess. Rico* reasoned, "a brief look [at the document] and simple phone call

15  could have resolved the matter. Instead [counsel] 'studied the document carefully,

16  made his own notes on it...and based his litigation strategy'" on it. *Id.* at 71.

17  Having failed to briefly review the document and contact opposing counsel when it

18  became obvious it was privileged, the court felt disqualification was necessary as

19  "plaintiffs' counsel...had information that inevitably would have been used in

20  preparing for trial." *Id.* at 73.  *See Spacone v. Burke(In re Truck-A-Way)*, 300 B.R.

21  31, 39 (E.D. Cal. 2003)(lawyer disqualified because, upon discovery of an

22  opponent's privileged documents, he *conditioned the documents release upon his*

23  *opponent providing a privilege log); see also Shell Oil Refinery v. Shell Oil Co.*, 143

24  F.R.D. 105, 108 (E. D. La. 1992)(plaintiff subject to sanctions for improperly

25  obtaining proprietary documents from one of defendant corporation's employees).[8]

26

27  [8]  It should also be noted that the unauthorized receipt by an opposing party of
privileged documents does not waive the privilege. *See United States ex rel.*

28  *Mayman v. Martin Marietta Corp.*, 886 F. Supp. 1243, 1246 (D. Md.

1       Defendants purport to rely on *State Compensation Ins. Fund. v. WPS, Inc.*

2   *(State Fund)*, 70 Cal. App. 4th 644, 656 (1999)(lawyer receiving privileged materials

3   "should refrain from examining the materials any more than is essential to ascertain

4   if the materials are privileged, and shall immediately notify the sender that he or she

5   possesses material that appears to be privileged") and on the ABA Formal Opinion

6   94-382.  However, State Fund and the ABA Formal Opinion deal with a common

7   occurrence – the *inadvertent disclosure* by counsel of a couple privileged documents

8   – *not the wholesale theft of legal files from an opposing counsel's law firm.*

9       Defendants must not be permitted to benefit *in any respect* from the "fruits"

10  of this outrageous theft.[9]  *See Sackman v. Ligget Group, Inc.*, 173 F.R.D. 358, 365

11  (E.D.N.Y. 1997) (prohibiting the deposition testimony of an expert who would base

12  his opinion on a privileged document that was stolen and disseminated to the

13  public); *Cooke v. Superior Court*, 147 Cal. Rptr. 915 (Cal. Ct. App. 1978) (evidence

14  excluded in divorce action when receipt of confidential information about husband,

15  including confidential communications between husband and his lawyer, was

16  purloined and passed to lawyer by husband's unfaithful agent without complicity of

17  receiving lawyer); 159 *American Law Reports Federal* 153 (Courts "will not

18  condone conduct which is condemned for public policy reasons, even if the result of

19  judicial action is to harm the innocent recipient of the unlawfully disclosed

20  information.  This is especially so when the information is released as a result of a

21  crime"); *Mayman v. Martin Marietta Corp.*, 886 F. Supp. 1243, 1246 (D. Md.

22  1995)(court refused to consider records stolen by a party's former employee); *Smith*

23

24  1995)(privilege deemed not waived as to document stolen by fired employee); *see*
    *also Smith v. Armour Pharmaceutical Co.*, 838 F. Supp. 1573, 1576 (S.D.Fla. 1993).

25

26  [9] The exclusionary "fruit of the poisonous tree" doctrine, though applicable to
    criminal cases is analogous.  The exclusionary rule extends not only to primary

27  evidence obtained illegally, but also evidence later discovered and found to be
    derivative of an illegality or "fruit of the poisonous tree." *Nardone v. United States*,

28  308 U.S. 338, 341 (1939).

[F0029699 1 ]

35

313

1   *v. Armour Pharmaceutical Co.*, 838 F. Supp. 1573, 1576 (S.D. Fla. 1993)(court
2   denied use of memorandum widely distributed after its *unauthorized* release); *In re*
3   *Grand Jury Proceedings Involving Berkley & Co., Inc.*, 466 F. Supp. 863, 869 (D.
4   Minn. 1979)(court precluded documents retained without authorization by a
5   terminated employee); *Kenyatta v. Kelly*, 375 F. Supp. 1175 (E.D. Pa. 1974) (court
6   precluded documents stolen by a third party from defendants, even though the
7   documents had already been produced by defendants to the plaintiffs).

8       Here, Defendants conduct regarding the stolen documents, aimed at
9   exploiting what they view as a "twist of fortune," is highly improper. (*See* Sec. III.
10  Defendants' Contentions at 1:3-6). They did not immediately notify Plaintiffs upon
11  receipt of the stolen documents, nor did they honor Plaintiffs' wishes with respect
12  thereto. While Defendants go to great lengths to cleanse their conduct and create
13  the appearance of propriety, their improper objectives and the crime at the root of
14  this matter color their actions and elicit many uneasy questions that are the subject
15  of an ongoing investigation.

16      Defendants and Smith highlight the special detailed attention and care
17  allegedly given to the stolen documents: first, legal research; second, a carefully
18  circumscribed review, and third, the hiring of an alleged "neutral" to hold *all* the
19  documents. Yet, despite this studious attention and Defendants' astonishing receipt
20  in the middle of a heated lawsuit (by three high ranking Warner executives, two of
21  which were legal counsel) of documents plainly from the files of opposing counsel,
22  Warner claims not to have kept *any* of the three or more envelopes in which the
23  delivery was made and claims to have *no corroborating record whatsoever of the*
24  *date of the delivery* (*e.g.*, Studio mailroom, security or executive office logs or
25  notes). This is all the more incredulous as Studios and attorneys commonly keep
26  records of such deliveries.

27      Plaintiffs' question the date Defendants claim to have "anonymously"
28  received the stolen documents. Defendants claim that the documents were first

1  received on June 28, 2006.  Smith Decl., ¶ 2.   Yet, the anonymous cover letter [10]
2  referred to by Smith, which enclosed the documents, ends by stating "consider this
3  an early Christmas present."   Toberoff Decl., ¶ 27.   It is hard to imagine that the
4  sender would refer to Christmas *in June*.

5        Notably absent is a declaration from Warner's General Counsel John
6  Schulman ("Schulman"), who directly received the stolen documents, testifying as
7  to the date of his receipt.  Smith Decl., ¶ 2.  Instead, Defendants present Smith's
8  declaration offering pure hearsay that "Schulman advised me that… [the documents]
9  had arrived from an anonymous source at his office that day [June 28, 2006]."
10  Smith Decl., ¶ 2.

11        Plaintiffs' counsel believe that an attorney formerly employed by Plaintiff's
12  counsel for a short term lifted the documents from the firm's legal files while
13  employed and thereafter furnished the documents to Warner.   Toberoff Decl., ¶ 25.
14  This attorney was terminated in November, 2005.  *Id*. at ¶26.  After this attorney
15  was terminated, he contacted Plaintiffs and other Toberoff clients in December,
16  2005 and tried to convince them to retain him and to terminate Toberoff by falsely
17  disparaging Toberoff and by offering a reduced contingent fee.  *Id*.  By all accounts,
18  the attorney's motives were financial.   He was rejected by Plaintiffs and Toberoff's
19  other clients in December, 2005.  *Id*.  It is believed that soon thereafter he
20  communicated with Warner and disclosed the privileged documents he had stolen
21  from Toberoff's legal files – hence, his reference to an "early Christmas present."

22        Questions remain and an investigation is still underway regarding this
23  disgraceful event.   For instance, we do not yet know the full extent of this
24  attorney's communications with Warner.

25

_____

26  [10]  This letter by a disgruntled and misguided attorney formerly employed by
      Plaintiff's counsel was not attached by Defendants and is not attached by Plaintiffs
27  because it is defamatory, potentially violates the attorney-client privilege and work
      product doctrine and should not be further published through the public record of
28  this action.  Toberoff Decl., ¶ 27.

1    It is believed that Warner may have well received their "early Christmas

2  present" in December, 2005, and waited, deciding whether or when to disclose this

3  very troubling matter.  Moreover, even if Defendants received the stolen documents

4  in June, 2006, they did not bring this to Plaintiffs' immediate attention, as even

5  "inadvertent disclosure" case-law dictates.  *See State Fund*, 70 Cal. App. 4th 644 at

6  656.  They belatedly mention the "anonymous" receipt of documents in a letter

7  dated July 5, 2006 and then in only the vaguest of terms as "certain documents."

8  Bergman Decl., Ex. D.  Plaintiffs did not learn that the documents were *their*

9  documents, until July 11, 2006 (two weeks after Defendants purportedly received

10  them) and only when Plaintiffs' counsel was able to press Defendants as to the

11  nature of the "certain documents" referred to by them.  Toberoff Decl., ¶ 8.

12    Defendants refer to Quinn as a "neutral," and seek to purify their objectives

13  through his stature as former head of the Los Angeles Bar Association; but it is clear

14  that Quinn and his law firm have been *retained* by Warner to "advise" it with

15  respect to the stolen documents.  Bergman Decl., Ex. D.  Unsurprisingly, the

16  protocol suggested in Quinn's July 5, 2006 letter (and subsequent letters) regarding

17  the documents favor or protect Warner's interests.  *Id.*  Quinn, to his credit, never

18  presented himself as a "neutral."  Toberoff Decl., ¶ 8.

19    After Quinn's July 5, 2006 letter, on July 6, like clockwork, Defendants' lead

20  counsel, Bergman, wrote to this Court *ex parte* in an effort to place the stolen

21  documents before the judges adjudicating this case. Id., Ex. D.  Tellingly, neither,

22  Quinn, nor Bergman, state in their letters to Plaintiffs and the Court, respectively,

23  what at this point was blatantly obvious to Defendants – *the documents had been*

24  *stolen from the law offices of Plaintiffs' counsel.*

25    Only after Plaintiffs demanded the return of the stolen documents did

26  Defendants finally return *bates stamped copies* to them to Plaintiffs' counsel on July

27  18, 2006, *three weeks* after their purported receipt on June 28, 2006, and six months

28

[F0029699 1 ]

316

1 after "Christmas." *Id.*, ¶ 10. However, Defendants insisted on retaining the
2 originals of the stolen documents. Bergman Decl., Ex. F.

3      Even by its own account, Warner's conduct was improper. Upon receipt of
4 the stolen documents, Warner should have *immediately* contacted Plaintiffs' counsel
5 and returned all copies of the stolen files to him upon his request. *Gomez v. Vernon*,
6 255 F3d 1118, 1131-1132 (9th Cir. 2001); *State Fund*, 70 Cal. App. 4th 644 at 656.
7 Instead, Defendants waited a full week to notify Plaintiffs' counsel and then, only in
8 the vaguest of terms, and after *three weeks* provided Plaintiffs with alleged copies of
9 the documents, while retaining the original of the stolen documents, though the
10 majority of the documents were clearly privileged.

11      Warner also improperly read and analyzed the stolen documents. Defendants
12 claim that they did not read or review the documents *in any detail*; and yet Warner's
13 Senior Litigation Counsel, Smith, admits reviewing the documents *twice* (once
14 outside Schulman's office and again, at his home) and to segregating the documents
15 into three categories – clearly "privileged," potentially privileged ("?") and "non-
16 privileged." Smith Decl. ¶¶ 3, 8. It is logically impossible to have performed this
17 detailed segregation without reviewing and analyzing *the substance* of the stolen
18 documents, which was improper. *Gomez v. Vernon*, 255 F3d 1118, 1132 (9th Cir.
19 2001)("The confidential status of the letters was facially evident – they were on
20 legal letterhead easily identifiable as that of opposing counsel").

21      Defendants' rely on *Aerojet-General Corp. v. Transport Indemnity Ins.*, 18
22 Cal. App. 4th 996 (1993) for the purported principle that a party has no duty to
23 inform opposing counsel of the *inadvertent* disclosure of privileged and
24 unprivileged documents, but instead can use any *unprivileged* information contained
25 in the document advantageous to their case. Firstly, *Aerojet* has been roundly
26 criticized and its holding severely curtailed by *State Fund*, 70 Cal. App. 4th at 656
27 (1999). *State Fund* imposes the exact opposite requirement: an ethical duty
28 *immediately* to disclose inadvertently received privileged information to the other

{F0029699 1 }          39         **317**

1  side. [11]  *Id.*  Secondly, *Aerojet* like *State Fund* concerns the *inadvertent* disclosure of
2  documents by opposing counsel not the deliberate theft of documents from opposing
3  counsel.

4        Even by their own account Defendants contravened *State Fund,* (applicable to
5  an innocent *inadvertent* disclosure) by failing to contact Plaintiffs' counsel for
6  several days despite the *obvious* appearance that a large number of privileged
7  documents had been stolen from Plaintiffs' legal files. Instead, they carefully
8  reviewed the documents and segregated them into separate "privileged," "non
9  privileged" and even "?" piles. The delay appears to have been deliberate – to allow
10  Defendants' in-house counsel to devise a strategy to maximize their chances of
11  benefiting from what they and their outside counsel view herein as a "twist of
12  [good] fortune." Their efforts must not be rewarded.

13  **V.     DEFENDANTS' CONCLUSION**

14        For the reasons set forth herein, Defendants respectfully request that their
15  motion be granted.

16  **VI.    PLAINTIFFS' CONCLUSION**

17        For the reasons set forth herein, Plaintiffs respectfully request that
18  Defendants' motion to compel be denied in its entirety; that Defendants be ordered
19  to return all originals and copies of the stolen documents to Plaintiffs forthwith, and
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26

27  [11] More precisely, an attorney who inadvertently receives plainly privileged
documents *must refrain from examining the materials any more than is necessary to*
28  *determine that they are privileged,* and must immediately notify the sender. *Id.*

1   that Defendants be barred from using the stolen documents in any fashion in this

2   litigation.

3   DATED: March 26, 2007                    WEISSMANN WOLFF BERGMAN
                                             COLEMAN GRODIN & EVALL LLP
4                                            FROSS ZELNICK LEHRMAN & ZISSU, P.C.

5                                                        -and-

6                                            PERKINS LAW OFFICE, P.C.

7

8                                            By: Michael Bergman

9                                            Attorneys for Defendants and Counterclaimant

10  DATED: March 25, 2007                    LAW OFFICES OF MARC TOBEROFF, P.C.

11

12                                           By: Marc Toberoff

13

14                                           Attorneys for Plaintiffs/Counterclaim-Defendants

15

16

17

18

19

20

21

22

23

24

25

26

27

28

#PERKINS 239 1 1                        41                        **319**

# EXHIBIT AA

 

1  Marc Toberoff (CA State Bar No. 188547)
   Nicholas C. Williamson (CA State Bar No. 231124)
2  LAW OFFICES OF MARC TOBEROFF, PLC
   2049 Century Park East, Suite 2720
3  Los Angeles, CA 90067
   Telephone: (310) 246-3333
4  Facsimile: (310) 246-3101

5  Attorneys for Plaintiffs and Counterclaim Defendants
   JOANNE SIEGEL and LAURA SIEGEL LARSON
6

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> TIME WARNER INC., a corporation; WARNER COMMUNICATIONS INC., a corporation; WARNER BROS. ENTERTAINMENT INC., a corporation; WARNER BROS. TELEVISION PRODUCTION INC., a corporation; DC COMICS, a general partnership; and DOES 1-10, <br><br> Defendants. <br><br> DC COMICS, <br><br> Counterclaimant, <br><br> vs. <br><br> JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual, <br><br> Counterclaim Defendants. | Case Nos.: <br> CV 04-08400 SGL (RZx) <br> CV 04-08776 SGL (RZx) <br><br> [Hon. Stephen G. Larson, U.S.D.J.] <br> [Hon. Ralph Zaresky, U.S.M.J.] <br><br> **DECLARATION OF MARC TOBEROFF IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL PRODUCTION OF WHISTLE BLOWER DOCUMENTS** <br><br> **DISCOVERY MATTER LOCAL RULE 37** <br><br> Date: April 16, 2007 <br> Time: 10:00 a.m. <br> Place: Courtroom 540 <br> Mag. Judge Ralph Zarefsky <br> Discovery Cutoff: Nov. 17, 2006 |

Declaration Of Marc Toberoff In Opposition To Defendants' Motion To Compel

 

I, Marc Toberoff, declare as follows:

1.     I am an attorney at the Law Offices of Marc Toberoff, PLC, counsel of record for plaintiffs Joanne Siegel and Laura Siegel Larson ("Plaintiffs"). I am a member in good standing of the State Bar of California and submit this declaration in opposition to defendants' ("Defendants") motion to compel production of purported "whistle-blower" documents. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.     On February 15, 2006, Plaintiffs moved for partial summary adjudication that their statutory "Superboy" termination is valid and that Plaintiffs thereby recaptured Siegel's "Superboy" copyright. Defendants cross-moved for summary judgment claiming the "Superboy" termination was invalid based in large part on the same purported claims and defenses asserted with respect to "Superman." On March 23, 2006, the Court granted Plaintiffs' motion in its entirety and denied Defendants' motion in its entirety. On March 24, 2006, Plaintiffs moved to have their order certified for appeal, which motion was denied by the Court.

3.     Attached hereto as Exhibit "A" is a true and correct copy of this Court's order dated August 18, 2006 denying Defendants' motion to compel which alleged that Plaintiffs purportedly had waived the attorney-client privilege.

4.     Attached hereto as Exhibit "B" is a true and correct copy of this Court's order dated September 25, 2006 denying Defendants' motion for reconsideration of the aforesaid August 18, 2006 order.

5.     Attached hereto as Exhibit "C" is a true and correct copy of this Court's order dated November 7, 2006 denying Defendants' motion for compel the re-deposition of each of the Plaintiffs.

6.     Attached hereto as Exhibit "D" is a true and correct copy of Michael Bergman's July 6, 2006 letter to the Court.

1




7.    Attached hereto as Exhibit "E" is a true and correct copy of this Court's July 6, 2006 minute order.

8.    On July 11, 2006 I spoke telephonically with John J. Quinn ("Quinn") of the law firm Arnold & Porter, LLP regarding his July 5, 2006 letter to me (*see* Declaration of Michael Bergman ("Bergman Decl."), Ex. D). At no time did Quinn present himself as a "neutral" and at all times he appeared to me to be acting on behalf of Warner Bros. I inquired as to the nature of the documents vaguely referred to in Quinn's July 5, 2006 letter and was informed for the first time that the documents apparently came from my own legal files. I demanded that the documents be returned immediately. I further rejected the "protocol" outlined in Quinn's July 5 letter. I suggested instead that an independent print shop copy and bate stamp all the documents; that Arnold and Porter be provided with this bates stamp number range, but not retain the stolen documents and that *all* of the documents, including defendant Warner Bros' "originals,' be returned to me immediately.

9.    By letter dated July 13, 2006 (see Bergman Decl., Ex. E) Quinn announced, that he would have the documents bates stamped by his office, send a copy of the bates stamped documents to me, and retain a bates stamped set and the originals, contrary to my wishes.

10.    On July 18, 2006, Quinn delivered three sets of copies of the stolen documents to my offices. These sets had been bates stamped. The "originals" have never been returned to my offices or to Plaintiffs.

11.    Attached hereto as Exhibit "F" is a true and correct copy of my July 19, 2006 letter to Quinn.

12.    Attached hereto as Exhibit "G" is a true and correct copy of a letter dated July 20, 2006 from Defendants' other counsel, Michael Bergman ("Bergman"), to Quinn.

13.    Attached hereto as Exhibit "H" is a true and correct copy of a letter dated July 24, 2006 from Quinn to me.

2

Declaration Of Marc Toberoff In Opposition To Defendants' Motion To Compel

14. Attached hereto as Exhibit "I" is a true and correct copy of a letter dated July 26, 2007 from me to Quinn.

15. Attached hereto as Exhibit "J" is a true and correct copy of a letter dated July 27, 2006 from Bergman to me.

16. Plaintiffs produced documents in this case on September 29, 2005 and supplemented this production on October 6, 2006, November 6, 2006 and November 17, 2006. Attached hereto as composite Exhibit "K" are true and correct copies of the September 29, October 6, November 6 and November 17, 2006 cover letters accompanying Plaintiffs' document production.

17. Attached hereto as Exhibit "L" is a true and correct copy of Plaintiffs' July 20, 2006 privilege log.

18. Attached hereto as composite Exhibit "M" are true and correct copies of Plaintiffs' supplemental privilege logs served on September 29, 2006.

19. Documents were produced by third parties Jean Peavy and Warren Peary (the "Shusters") on July 18, August 11 and August 14, 2006 in response to Defendants' subpoena. The Shusters served a privilege log on August 11, 2006. Shusters served a supplemented privilege log on October 16, 2006. Attached hereto as Exhibit "N" is a true and correct copy of the Shuster's October 16, 2006 privilege log.

20. On behalf of Don Bulson, the former attorney of Laura Siegel Larson's stepbrother, Michael Siegel, I served a privilege log on October 23, 2006 in response to Defendants' subpoena. Attached hereto as Exhibit "O" is a true and correct copy of October 23, 2006 privilege log.

21. Third party IPW, LLC produced documents on November 15, 2006 in response to Defendants' subpoena. Third party Pacific Pictures Corporation produced documents on November 15, 2006 in response to Defendants' subpoena. Attached hereto as Exhibit "P" is a November 15, 2006 letter from my office to Defendants' counsel concerning their respective document production.

3

22.   I have reviewed the stolen documents and compared them to my firm's legal files. I found that all but two non-privileged documents in Plaintiffs' legal files had long ago been produced or listed by Plaintiffs in a privilege log. The documents, consisting of two letters from Plaintiff Joanne Siegel to DC Comics' executive Paul Levitz although already in Defendants' possession, have recently been produced. I also cross-referenced two privileged e-mail communications between Plaintiffs and me dated after the commencement of this action which were not listed in Plaintiffs' privilege logs because the parties to this action have agreed not to list post-complaint attorney-client communications on their respective privilege logs.

23.   Additionally, I searched the files of other persons or entities which my firm represents that have been subpoenaed in this case, in search of any stolen documents that had not either been produced or listed in a privilege log, even though this motion to compel is only directed at Plaintiffs. As a result of this search I found in the files of IPW, LLC, one IP Worldwide fax cover sheet having little relevance to this action, which I nonetheless also recently produced to Defendants.

24.   I also re-searched the files of Jean Peavy, Warren Peary, and the Estate of Joe Schuster (the "Shusters"), cross-referencing the stolen documents, and found three irrelevant, but non-privileged documents, regarding the probating of Joe Shuster's Estate, that I believe had not been previously produced. I therefore also recently produced these documents. In this search I also found one privileged document from the Shuster files, again concerning probate, and on the Shusters' behalf I listed this document on a supplemental privilege log which I recently provided to Defendants.

25.   As a result of my law firm's ongoing investigation, I believe that the documents to which this motion applies were stolen from my law firm's files by a disgruntled former *attorney* employed by the firm who thereafter furnished the documents to Warner Bros. under circumstances of which I am not yet aware. The

4

1    attorney is not named by me herein so as not to jeopardize my firm's ongoing

2    investigation or that of the authorities.

3       26.    This attorney/employee was terminated by my firm in November, 2005.

4    Our investigation has revealed that in late November and early December, 2005, after

5    the attorney was terminated, he contacted Plaintiffs and another client of my firm and

6    tried to convince them to terminate the firm, and to retain him instead, by falsely

7    disparaging me and by offering to work for a reduced fee. I am advised by Plaintiffs

8    and my other client that they both rejected this attorney's overtures in early

9    December, 2005.

10      27.    On July 18, 2006, when Arnold & Porter furnished me with bates

11    stamped copies of the stolen documents they also furnished me with a copy of an

12    allegedly undated and anonymous cover letter to Warner Bros. purporting to enclose

13    the stolen documents ("Cover Letter"). The Cover Letter was not attached by

14    Defendants and is not attached by Plaintiffs because it is defamatory, in other respects

15    potentially violates the attorney-client privilege and work product doctrine, and

16    should not be further published through the public record of this action. The Cover

17    Letter ends by stating to Warner Bros.: "consider this an early Christmas present."

18      I declare under penalty of perjury of the laws of the United States of America

19    that the foregoing is true and correct.

20      Executed on March 23, 2007 in Los Angeles, California.

21

22

23                             _____

24                                 Marc Toberoff

25

26

27

28

5

Declaration Of Marc Toberoff In Opposition To Defendants' Motion To Compel

# EXHIBIT P

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
ALEXANDER M. MERINO

* ALSO ADMITTED IN NEW YORK

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

November 15, 2006

Via Facsimile

Adam Hagen, Esq.
Weissman Wolff Bergman Coleman Grodin & Evall LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, CA 90212

Re: *Joanne Siegel & Laura Siegel Larson v. Time Warner, Inc. et al.*
USDC Central District of CA, Case No. 04-08400 SGL (RZx)
*Joanne Siegel & Laura Siegel Larson v. Time Warner, Inc. et al.*
USDC Central District of CA, Case No. 04-08776 SGL (RZx)

Dear Adam:

Enclosed please find IPW, LLC's production of documents, numbered IPW 00001-00016. In addition, enclosed please find Pacific Pictures Corporation's production of documents, numbered PPC 00001-00009.

Very truly yours,

Alexander M. Merino

cc:     Patrick T. Perkins, Esq.
        James D. Weinberger, Esq.

EXHIBIT AA
Page 349



*** SEND SUCCESSFUL ***

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
ALEXANDER M. MERINO

* ALSO ADMITTED IN NEW YORK

## FACSIMILE COVER PAGE

| TO: Adam Hagen, Esq., James D. Weinberger, Esq., Patrick T. Perkins, Esq. | FAX: 310-550-7191, 212-813-5901, 845-265-2819 |
|---|---|
| FROM: Marc Toberoff | PAGES ( including cover ): 27 |
| DATE : 11/15/06 | RE: Superman (Case Nos. 04-CV-8400 SGL (RZx) and 04-CV-8776 SGL (RZx)) |

COMMENTS:

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.



## Group Send Report

Page          : 001
Date & Time: Nov-15-06  10:47pm
Line 1      :
Machine ID :

Job number              :   045

Date                    :   Nov-15 10:32pm

Number of pages         :   027

Start time              :   Nov-15 10:32pm

End time                :   Nov-15 10:47pm

Successful nbrs.

    Fax numbers

        ☎13105507191
        ☎12120135901
        ☎18452652819


Unsuccessful nbrs.                                          Pages sent

# EXHIBIT BB

Marc Toberoff (CA State Bar No. 188547)
Nicholas C. Williamson (CA State Bar No. 231124)
LAW OFFICES OF MARC TOBEROFF, PLC
2049 Century Park East, Suite 2720
Los Angeles, CA 90067
Telephone: (310) 246-3333
Facsimile: (310) 246-3101
Email: MToberoff@ipwla.com

Attorneys for Plaintiffs and Counterclaim Defendants
JOANNE SIEGEL and LAURA SIEGEL LARSON

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA-EASTERN DIVISION

| | |
|---|---|
| JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>TIME WARNER INC., a corporation; WARNER COMMUNICATIONS INC., a corporation; WARNER BROS. ENTERTAINMENT INC., a corporation; WARNER BROS. TELEVISION PRODUCTION INC., a corporation; DC COMICS, a general partnership; and DOES 1-10,<br><br>Defendants.<br><br>DC COMICS,<br><br>Counterclaimant,<br><br>vs.<br><br>JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual,<br><br>Counterclaim Defendants. | Case Nos.: CV 04-08400 SGL (RZx)<br>             CV 04-08776 SGL (RZx)<br><br>[Hon. Stephen G. Larson, U.S.D.J.]<br>[Hon. Ralph Zaresky, U.S.M.J.]<br><br>**DECLARATION OF MARC TOBEROFF FILED PURSUANT TO THE COURT'S SEPTEMBER 17, 2007 ORDER**<br><br>**DISCOVERY MATTER LOCAL RULE 37** |

I, Marc Toberoff, declare as follows:

1.     I am an attorney at the Law Offices of Marc Toberoff, PLC, counsel of record for plaintiffs Joanne Siegel and Laura Siegel Larson ("Plaintiffs"). I am a member in good standing of the State Bar of California and submit this declaration pursuant to the Court's September 17, 2007 order. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.     On April 30, 2007 I participated in a hearing before Magistrate Zarefsky concerning Defendants' motion to compel the production of a large number of documents, many clearly confidential attorney-client communications, stolen from my law offices and delivered to Defendants, which Defendants then placed with Arnold & Porter, as "escrow holder" (the "Escrow Holder") of the stolen documents (the "Escrow Documents").

3.     At the April 30 hearing, Magistrate Zarefsky ordered me to furnish the Escrow Holder with a declaration specifically referencing, by the bates numbers, which "Escrow Documents" had already been produced and which had not been produced and listed on a privilege log, so that the Escrow Holder could appropriately disburse the Escrow Documents by the bates numbers referenced in my declaration – returning the privileged documents to my offices and releasing the non-privileged documents to Defendants' counsel. ("April 30, 2007 Order"). A true and correct copy of the transcript of the April 30, 2007 hearing is attached hereto as Exhibit "1".

4.     I drafted and furnished to Mr. Eisen a declaration which fully complied with the April 30, 2007 Order, as admitted by Defendants. Attached hereto as Exhibit "2" is a true and correct copy of my May 21, 2007 declaration. *See* the parties' September 17, 2007 Joint Stipulation at 13, a true and correct copy of which is attached hereto as Exhibit "3." ("September 17, 2007 Joint Stipulation").

5.     The vast majority of the "Escrow Documents" are privileged or have already been produced, and were designated as such in my declaration. However, 9

1

1  documents (4 of which are merely fax cover or confirmation sheets) of the 839 pages

2  of "Escrow Documents" (many duplicates) did not fit squarely within the Order in the

3  context of the April 30 hearing, and, pursuant to this Court's order of September 17,

4  2007, are to be reviewed by the Court *in camera*.

5       6.     This handful of documents fall into three categories that slipped between

6  the "cracks" of the Order but are clearly privileged:  (i) 6 *post-litigation attorney-*

7  *client communications*, which, pursuant to the parties' standing agreement (admitted

8  by Defendants herein) need not have been listed in a privilege log to preserve the

9  privilege (*see* Exhibit 3 (September 17, 2007 Joint Stipulation) at 32- 34); (ii) the

10  "defamatory cover letter" enclosing and describing the contents of the stolen Escrow

11  Documents, including many of the attorney-client communications that are identified

12  on the privilege logs of Plaintiffs and non-party witnesses (*see* Exhibit 3 at 34-37);

13  and (iii) 2 letters between me and Don Bulson, Esq., the attorney for Plaintiff Laura

14  Siegel Larson's half-brother, Michael Siegel, who is a statutory beneficiary of the

15  "Superman" termination notices, which were listed in Mr. Bulson's privilege log and

16  properly identified as such in my May 21, 2007 declaration (*see* Exhibit 3 at 37-42).

17       7.     To put the anonymous "defamatory cover letter" in context, my

18  investigation has revealed that in late 2005 the Escrow Documents were stolen from

19  my law firm's files by a disgruntled *attorney* formerly employed by my firm, who

20  thereafter furnished the documents to Defendant Warner Bros. Entertainment, Inc.

21  ("Warner") under circumstances that Warner has not disclosed.

22       8.     This attorney, after working at my firm for just three months,

23  disappeared without notice in November, 2005.  My investigation has revealed that in

24  late November and early December, 2005, he then contacted Plaintiffs and tried to

25  convince them to terminate my firm, and to retain him instead, by disparaging me

26  with false, and often nutty, statements, and by offering to work for a reduced fee,

27  suggesting that his actions were financially motivated.  I am informed that he did the

28  same with another female client of mine (and that he additionally harassed her by

2

1  repeated phone calls and messages asking her out). I am advised by these clients that
2  that they rejected this attorney's overtures in early *December, 2005.*

3       9.     The "defamatory cover letter" is rife with highly prejudicial ranting and
4  conspiratorial speculation. More troubling, this attorney, without regard for his oath
5  as an officer of the court, disclosed without authorization confidential attorney-client
6  communications and work product (pre-meditatively assembled after hours) to the
7  opposing party in the midst of a lawsuit.

8      10.   The "defamatory cover letter," which Warner alleges enclosed the stolen
9  documents, states: "consider it an early holiday gift." Notwithstanding this, I was
10  not contacted by Warner (via Arnold & Porter) about these stolen documents until
11  July 5, 2006. Warner claimed that on June 28, 2006, three very high level executives
12  – Alan Horn, Warner President and COO; Jeff Rabinov, President of Production, and
13  John Schulman, Warner's General Counsel – each anonymously received packages
14  consisting of the of the documents.

15     11.   I requested by letter dated July 19, 2006 to Arnold & Porter and copied
16  to Defendants' counsel, Michael Bergman ("Bergman"), that Warner furnish the
17  following:

18         "(1) the date(s) each set of documents was received; (2) copies of all
19         envelopes or packages enclosing the documents; (3) the method by
            which the documents were sent and, in the unlikely event the
20         documents were delivered by hand, the name of the messenger (and
21         messenger service) logged at Warner Bros. security gate and (4) any
            other pertinent information regarding Warner Bros.' receipt of these
22         documents. We would also like to inspect the "original" documents
23         and enclosing envelopes or packages as received by Warner Bros."

24  *See* Exhibit F of my Declaration in Opposition to Defendants' Motion to Compel
25  Production of Whistleblower Documents, dated March 23, 2007, a true and correct
26  copy of which is attached hereto as Exhibit "4."

27     12.   I thereafter received letters dated July 20, 2006 and July 24, 2006 from
28  Mr. Bergman, and on July 24, 2006 from Arnold & Porter, but neither provided the

3

1 requested information. *See* Exhibit 4; Exs. G, H. By letter dated July 26, 2007 to
2 Mr. Bergman, I reiterated Plaintiffs' demand for information regarding Warner's
3 receipt of the stolen documents. *See* Exhibit 4, Ex. I. Mr. Bergman finally
4 responded by letter dated July 27, 2006, repeating that the packages mysteriously
5 arrived in envelopes at the desks of three high placed Warner executives on June 28,
6 2006; but claiming that Warner did not retain any of the three envelopes (or a copy of
7 any envelopes) and stating that Warner had no mailroom, security or executive office
8 records, notes or logs of the three substantial packages ever being signed in or
9 received, despite the extraordinary nature of their contents. *See* Exhibit 4, Ex. J. All
10 such information, commonly kept by Studio security, mailrooms and executive
11 offices, had vanished.

12     13. The undated, anonymous cover letter discusses and discloses the
13 substance and contents of many, if not most, of the privileged documents enclosed by
14 the cover letter and listed in the privilege logs of Plaintiffs and alleged non-party
15 witnesses. Specifically, the letter contains, directly and indirectly, the substance of
16 privileged attorney-client communications and attorney work product that were
17 contained within the confidential files at my law firm.

18     14. The "defamatory cover letter" is irrelevant to the subject matter of this
19 action, and is obviously highly prejudicial; nor is it likely to lead to the discovery of
20 admissible evidence, particularly as discovery in this action is closed. It is not subject
21 to authentication by the author, as it was anonymous. It is also riddled with
22 inadmissible hearsay statements. Finally, the letter refers to documents and
23 information protected by, *inter alia*, the attorney-client privilege and work product
24 doctrine, and would therefore be inadmissible in any event.

25     15. The cover letter was clearly not the subject of Defendants' March 26,
26 2007 Joint Stipulation regarding the escrow documents, as throughout their initial
27 motion Defendants drew a clear line between the "Whistle-blower documents" that
28 were the subject of its motion and the "cover letter" contained with the documents,

4

1  which was not. *Compare Defendants' March 26, 2007 Joint Stipulation* at 2:6-14

2  (requesting production of the "Whistle-blower documents") with 6:13-14 (referring to

3  "the cover letter contained with the documents"); 6:26-27 (characterizing "the 'cover

4  letter' that *came with* the Whistle-blower documents") (emphasis added); 7:9-10

5  (referring to "Whistle-blower Documents contained with the letter"); 7:17-19

6  (referring to attorneys perusal of "the contents of the cover letter and my brief

7  thumbing through the documents"); and 16:17-21:28 (referring repeatedly to the

8  "Whistle-blower Documents" and never mentioning the cover letter.)   Attached

9  hereto as Exhibit "5" is a true and correct copy of the parties' March 26, 2007 Joint

10  Stipulation Re: Defendants' Motion to Compel Production of Whistleblower

11  Documents.

12      16.   Plaintiffs' opposition to Defendants' original motion to compel

13  specifically states at page 37, footnote 10, that the cover letter, in discussing the

14  stolen attorney-client communications accompanying it, discloses information

15  protected by the attorney-client privilege and the work product doctrine. *See* Exhibit

16  5 at 37.  However, the cover letter was not discussed by either party at the April 30,

17  2007 hearing before Magistrate Zarefsky, as it did not appear to be a part of

18  Defendants' motion to compel. *See* Exhibit 1 at 7:25- 20:5.

19      17.   Plaintiffs and I did not authorize this illicit letter.  Plaintiffs cannot be

20  held to have consented to the release of the privileged information and work product

21  contained therein, or to have waived the privilege, as the unauthorized disclosure of

22  protected attorney-client information or documents does not waive attorney-client

23  privilege. *See* Exhibit 3 at 35-37.

24      18.   The cover letter, in disclosing privileged information contained in the

25  attorney-client communications *listed in Plaintiffs' and third party privilege logs*,

26  falls within the rationale and spirit of Magistrate Zarefsky's April 30, 2007 order as a

27  document that should not be released to Defendants.

28

5

1    19.    Defendants have also demanded that the Escrow Holder, David Eisen,

2  Esq., turn over two obviously privileged communications between Plaintiffs and me

3  from *after the commencement of litigation*. Defendants cling to the absurd and

4  inequitable position that there has been a waiver of these plainly privileged

5  communications because such were not listed on a privilege log, even though

6  Defendants admit, as they must, that *the parties have a longstanding agreement*

7  *pursuant to which neither side was supposed to list post-litigation attorney-client*

8  *communications on a privilege log*. *See* Exhibit 3 at 13. Per this agreement,

9  Defendants and Plaintiffs have not listed hundreds of post-litigation communications

10  on any privilege log. These two communications are clearly subject to this standing

11  agreement, and the fact they were stolen from my law offices in no way changes this.

12    20.    These privileged e-mails were specifically discussed on page 30 of

13  Plaintiffs' portion of the parties' March 26, 2007 Joint Stipulation regarding the

14  escrow documents as follows: "There are also 2 privileged e-mail communications

15  between Plaintiffs and their present counsel dated after commencement of this action

16  which were not listed in Plaintiffs' privilege logs because the parties have agreed not

17  to list post-complaint attorney-client communications on their respective privilege

18  logs." *See* Exhibit 5 at 30.

19    21.    Additionally, in paragraph 22 of my March 23, 2007 declaration in

20  opposition to defendants' motion to compel, I specifically mentioned the two

21  privileged e-mails, and explained to the Court that these post-litigation

22  communications were not listed on a privilege log because "the parties to this action

23  have agreed not to list post-complaint attorney-client communications on their

24  respective privilege logs." *See* Exhibit 4.

25    22.    It is my belief that Magistrate Zarefsky did not intend by his April 30,

26  2007 Order that such clearly privileged communications be produced. No fair

27  reading of the Order's rationale, as well as common sense, could give Defendants

28

6

1 access to privileged communications, to which they would not otherwise be entitled,
2 because such documents were pilfered from my legal files.

3     23. On behalf of Don Bulson ("Bulson"), the former attorney of Laura
4 Siegel Larson's stepbrother, Michael Siegel, I served a privilege log on October 23,
5 2006 in response to Defendants' subpoena. The items listed on this privilege log
6 included two letters we wrote to each other. *See* Exhibit 4, Ex. O.

7     24. Magistrate Zarefsky's April 30, 2007 Order encompassed and protects
8 documents such as these two communications listed on third party privilege logs and
9 referenced in my March 23, 2007 declaration. *See* Exhibit 1, at 19:16- 20:6. In fact,
10 my declaration referenced several Escrow Documents by bates numbers on third
11 party privilege logs that Defendants acknowledge are covered by the Order and have
12 not challenged. *See* Exhibit 2 at 6:13-14, 22; *see also* Declaration of Michael
13 Bergman in Support of Defendants' Motion to [sic] Compliance With the Court's
14 4/30/07 Order and Motion For Sanctions ("Bergman Decl."), Ex. E, a true and correct
15 copy of which is attached hereto as Exhibit 6. Defendants, nonetheless, belatedly
16 chose to impermissibly challenge the assertion of the joint interest privilege with
17 respect to these two communications.

18     25. Mr. Bulson's privilege log was served on Defendants long ago on
19 October 23, 2006, and listed the two documents as communications between Mr.
20 Bulson and myself. Exhibit 4, Ex. O. Plaintiffs' privilege logs were also served long
21 ago on July 20 and September 29, 2006. Exhibit 4, Exs. L, M. Defendants could
22 easily have moved in this Court to compel Plaintiffs' production of these two
23 documents within the discovery and motion deadlines. They did not do so, and
24 instead attempted to "bootstrap" this new motion to compel after the cut-off into their
25 September 17, 2007 Joint Stipulation regarding the April 30, 2007 Order *after the*
26 *deadline for discovery motions has long passed. See* Stipulation Regarding
27 Scheduling Order entered March 19, 2007. For the Court's information, Defendants

28

1   did file a motion to compel against Mr. Bulson in the United States District Court for

2   the Northern District of Ohio, which motion is pending.

3       26.    The two letters exchanged between me and Mr. Bulson were designed to

4   further a joint legal strategy between my clients, Joanne Siegel and Laura Siegel

5   Larson, and Mr. Bulson's then-client, Michael Siegel, with respect to the "Superman"

6   termination notices ("Terminations"), of which both Mr. Bulson's and my clients

7   were beneficiaries under 17 U.S.C. § 304(c). These communications necessarily

8   concerned prior settlement discussions with Defendants and anticipated litigation

9   regarding the Termination. Considering the financial value of the "Superman"

10  property, such litigation was a virtual inevitability in the absence of settlement.

11      27.    Such communications amongst the attorneys of Jerome Siegel's

12  statutory heirs under 17 U.S.C. § 304(c) (*i.e.*, Plaintiffs and Michael Siegel) in

13  anticipation of litigation regarding the Termination, of which they are the

14  beneficiaries, is precisely the sort of communications the joint interest privilege is

15  designed to protect. *See* Exhibit 3 at 38-42. Therefore, the Bulson documents are

16  protected by the applicable joint interest privilege and work product doctrine, which

17  are not waived by disclosure to Mr. Bulson.

18      28.    In compliance with Magistrate Zarefsky's April 30, 2007 Order, my

19  declaration matched the escrow bates numbers of the two Bulson letters to the

20  corresponding entries on Mr. Bulson's *privilege log. See* Exhibit 2; Exhibit 4, Ex. O.

21  There was certainly no requirement in the Order that privileged documents/privilege

22  log listings be cross-referenced on multiple privilege logs to sustain the privilege.

23  *See* Exhibit 1 at 19:8- 20:5. As such, the Bulson documents were to be returned and

24  not released to Defendants by the Escrow Holder, per the April 30, 2007 Order.

25      29.    In response, Defendants' counsel, Michael Bergman, wrote to the

26  Escrow Holder on May 22, 2007, improperly challenging the assertion of the joint

27  interest privilege in Bulson's log, as if the Escrow Holder were the Court, and

28

1  demanding the release of the documents on this alleged newfound basis. *See* Exhibit

2  6, Ex. E.

3      30.    In his May 22, 2007 letter, Mr. Bergman *admits* that "'escrow

4  documents' originally listed on the privilege logs of non-party witnesses should not

5  be released." *Id.* However, one paragraph later, he claims that the two documents

6  listed on the privilege log of Mr. Bulson, a non-party attorney, must be turned over,

7  while citing no rationale or authority for this exception to the April 30, 2007 Order.

8  *Id. See* Exhibit 3 at 39-42.

9      31.    On July 24, 2006, Defendants filed a motion to compel challenging the

10  sufficiency and format of Plaintiffs' privilege logs. By order dated August 18, 2006,

11  Magistrate Zarefsky denied Defendants' motion, ruling that "the Court notes that the

12  log appears to follow the form suggested in a commonly used treatise, W. Schwarzer,

13  W. Tashima and J. Wagstaffe, Federal Civil Procedure Before Trial, Form 11:A

14  (Rutter 2006). Moreover, the log appears to have the same information which the

15  Court found sufficient in *Dole v. Milonas*, 889 F.2d 885 (9th Cir. 1989). Accordingly,

16  this Court finds that by providing this log, the Plaintiffs have sufficiently asserted the

17  attorney-client privilege and the work product doctrine." *See* Exhibit 4, Ex. A. Mr.

18  Bulson's privilege log followed the same standard format approved by Magistrate

19  Zarefsky. *See* Exhibit 4, Ex. O.

20      32.    Thus, the Bulson documents are protected by the applicable joint interest

21  privilege and work product doctrine, as properly noted on his privilege log.

22      I declare under penalty of perjury of the laws of the United States of America

23  that the foregoing is true and correct.

24      Executed on September 20, 2007 in Los Angeles, California.

Marc Toberoff

9

# EXHIBIT CC

# IPW



AUG 19 2004

Tom McGuire

August 17, 2004

<u>Via 1st Class Mail</u>

Tom McGuire, Esq.
Endeavor Talent Agency
9601 Wilshire Boulevard
3rd Floor
Beverly Hills, CA 90212

Dear Tom:

Enclosed please find the amended Winding-Up Agreement for IP Worldwide, LLC executed by all parties on August 17, 2004.

Thank you for assistance in getting this done.

Regards,

Marc Toberoff

IPW 00005

1999 Avenue of the Stars, Suite 1540 Los Angeles, CA 90067
Tel: (310) 246-3100; Fax: (310) 246-3101; mtoberoff@ipwla.com

EXHIBIT CC
Page 362

CONFIDENTIAL

## WINDING-UP AGREEMENT FOR IP WORLDWIDE, LLC

The following sets forth the terms of the agreement between Pacific Pictures Corporation ("PPC"), on the one hand and Ariel Emanuel ("AE") and the Endeavor Talent Agency ("Endeavor"), on the other hand with respect to the limited liability company, IP Worldwide, LLC ("Company"), formed by PPC and AE to acquire and exploit intellectual property rights ("IP") pursuant to their agreement dated February 12, 2002 (the "JV Agreement").

Whereas, the two year Term of the JV Agreement was heretofore extended by the Parties from March 15, 2004 until June 30, 2004 ("Extended Term");

Whereas, during the Term the Company entered into a number of contracts pursuant to which the Company has varied interests in intellectual property rights and/or claims, which contracts PPC hereby warrants and represents are all included in and set forth in Exhibit "A" attached hereto ("Company Contracts");

Whereas, during the Term the Company entered into contracts with entertainment Studios which contracts PPC hereby warrants and represents are all included in and set forth in Exhibit "B" attached hereto ("Company Receivables") pursuant to which the Company would be entitled to certain contingent payments;

Whereas, for the Term plus the Extended Term the Company incurred costs totaling $        (of which $        was invested by AE, $        was advanced by Endeavor, and $        . was advanced by PPC for remaining costs accounts payable for the Extended Term), plus Endeavor advanced $        to cover Company salaries for the period July 1-15, 2004 (bringing the total advance from Endeavor to $        ).

Whereas, in the first year of the Company's Term (i.e. March 15, 2002 to March 15, 2003), AE has heretofore received distributions from Company totaling $

Whereas, PPC has heretofore received its deferred salary for Year 1 of the Company's operations.

Whereas, the Parties have mutually decided not to renew or further extend the Term of the JV Agreement and to wind up the business of the Company;

The Parties, therefore, agree as follows:

REDACTED

1

IPW 00006

EXHIBIT CC
Page 363

CONFIDENTIAL

1.  <u>Newco</u>

PPC has established a new California limited liability company named IPW, LLC ("Newco").

2.  <u>Assignment of Assets to Newco</u>

The Company and the Parties hereby assign and transfer to Newco (IPW, LLC) in perpetuity throughout the world all right, title and interest in all Company assets, including without limitation all Company Contracts, Company Receivables, agreements, rights, interests and claims.

3.  <u>Bookkeeping Adjustments</u>

Upon execution hereof, (i) AE will reimburse to PPC the sum of $       ( for remaining costs and accounts; (ii) AE will reimburse to Endeavor the sum of $       (the money Endeavor advanced during the Extended Term minus (iii) below); and (iii) PPC will (or will cause Newco to) reimburse Endeavor the sum of $       (advanced by Endeavor for Company salaries for July 1-July 15, 2004).

4.  <u>Distribution of Revenues</u>

One hundred percent (100%) of the Company's gross revenues from the Company Contracts for the full duration of each respective contract and Company Receivables, but excluding any producing fees as under the JV Agreement ("Revenues") will be payable in the following order and priority:

a.  The sum of $       to PPC (f/s/o Marc Toberoff) as deferred accrued salary for Year 2; thereafter,

b.  The sum of $       to AE in recoupment of Year 2 and Extended Term Expenses; thereafter

c.  The sum of $       to PPC (f/s/o Marc Toberoff) as deferred accrued salary for the Extended Term.

d.  One-third (1/3) of the sums payable per paragraph 4 (a-c) to IPW,LLC (as the agreed deferred overhead factor).

e.  Thereafter, after the deduction and retention by Newco of one-third (1/3) of such Revenues (as the agreed overhead factor), Revenues will be divided and payable fifty percent (50%) to Newco and fifty percent (50%) to the AE.

REDACTED

2

IPW 00007

EXHIBIT CC
Page 364

CONFIDENTIAL

AE will be solely responsible for payments, if any, to Endeavor arising under the JV Agreement, including without limitation, Endeavor's interest, if any, in the monies received pursuant to paragraph 3 above.

4.     Supercession of JV Agreement

Upon execution of this Agreement by all the Parties, the JV Agreement will automatically terminate and be superceded by the terms and conditions of this Agreement.

5.     Mutual Releases.

Except as to the rights and obligations of the parties created by this Agreement and any other agreement(s) executed by the Company and/or any party prior to July 1, 2004 (other than the JV Agreement which is hereby superceded) and in consideration of the terms of this Agreement and the promises and payments referenced herein, PPC, Ariel Emanuel, IP Worldwide, LLC and Endeavor hereby forever relieve, release and discharge each other, IPW, LLC and, without limitation, their respective present, former and future representatives, including without limitation, predecessors, successors, partners, officers, directors, shareholders, attorneys, parent and subsidiary corporations and entities, the officers, directors, employees, agents, and shareholders of each of them, from any and all claims, cross-claims, demands, debts, liabilities, obligations, promises, acts, agreements, costs, offsets, expenses, damages, actions and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected which exist, or have existed arising out of, or in connection with all matters relating to or arising out of the Company and/or the JV Agreement. The Parties further acknowledge that they may hereafter discover facts different from or in addition to those which they now know or believe to be true with respect to any release herein made, and agree that every release herein made is now and will remain effective notwithstanding such different or additional facts or the discovery thereof.

The Parties hereto expressly waive and relinquish any and all rights and benefits conferred upon them by the provisions of section 1542 of the California Civil Code, which are as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

The Parties acknowledge that the foregoing waiver of the provisions of section 1542 of the California Civil Code is part of the consideration hereunder. The Parties expressly consent that the mutual general releases set forth herein shall be given full force and effect in accordance with each and all of their express

3

**IPW 00008**

EXHIBIT CC
Page 365

CONFIDENTIAL

terms and provisions, including those terms and provisions relating to unknown and unsuspected Claims, demands and causes of action, if any, to the same effect as those terms and provisions relating to any other Claims, demands and causes of action hereinabove specified.

6.    Dispute Resolution

    a.    In the event of any controversy, dispute or claim arising out of or related to this Agreement, that cannot be settled through informal negotiation between the parties, the parties shall first attempt to settle such dispute or claim via non-binding mediation chaired by a mutually approved mediator. If the parties are unsuccessful in resolving the dispute at mediation, the matter shall be settled exclusively by final and binding arbitration which may be initiated at the request of either party.

    b.    The arbitration shall be conducted before a retired judge on the ADR Services panel in Los Angeles, California familiar with the entertainment business. in accordance with the provisions of Sections 1280 et seq. of the California Code of Civil Procedure.

    c.    The parties agree to be bound by the decision of the arbitrator(s) and the decision thereof to be entered into any appropriate court. The expenses of the arbitrators shall be divided equally between and payable by the parties.  Notwithstanding the procedures set forth in this Section, any party hereto may apply to the Los Angeles Superior Court: (i) to enforce this agreement to arbitration in this Agreement; (ii) to seek injunctive relief so as to enforce, or assist in the enforcement of, any agreements in this Agreement; (iii) to avoid the expiration of any applicable limitation period; or (iv) to challenge or seek to have vacated any final judgment, award or decision of the arbitrators that does not comport with express provisions of this section.

7.    General

The parties will in good faith execute such further documents as are necessary or desirable to carry out the purposes and intent of this Agreement.

This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. The parties acknowledge that they have not signed this agreement in reliance on any promise or representation not expressly set forth herein. This Agreement shall bind and inure to the benefit of the parties and their respective heirs, executors, successors and assigns. Executed facsimile copies

4

IPW 00009

EXHIBIT CC
Page 366

CONFIDENTIAL

of this agreement shall be valid and acceptable with the same force and effect as executed originals.

This Agreement shall be construed and applied pursuant to the laws of the State of California applicable to agreements made and to be performed therein.

AGREED, UNDERSTOOD AND ACCEPTED:

_____    Date: 8.17.04
Ariel Emanuel

Pacific Pictures Corporation

_____    Date: 8.17.04
By: Marc Toberoff, President

IP Worldwide, LLC

By: _____    Date: 8.17.04
       Marc Toberoff, Member

By: _____
       Ariel Emanuel, Member

Agreed, insofar as this Agreement concerns the Endeavor Talent Agency:

Endeavor Talent Agency

_____    Date: 8.17.04
By: Tom McGuire, General Counsel

5

IPW 00010

EXHIBIT CC
Page 367

CONFIDENTIAL

## EXHIBIT "A"

## IP Worldwide, LLC Contracts

1.  Agreement:    IP Worldwide and Joanne Siegel and Laura
                  Siegel Larson
    Date:         As of October 3, 2002 (extended March 29, 2004)
    RE:           Superman (Jerome Siegel's 50% interest in US Copyright
                  via section 304 termination)
    Term:         Until 4/23/05.

    Agreement:    IP Worldwide and Joanne Siegel and Laura
                  Siegel Larson
    Date:         As of October 3, 2002
    RE:           Superboy (Jerome Siegel's 100% interest in US Copyright
                  via section 304 termination)
    Term:         Until 4/23/05.

    Agreement:    IP Worldwide and Joanne Siegel and Laura
                  Siegel Larson
    Date:         January 21, 2002
    RE:           Conflict waiver re purchase of Michael Seigel's Rights to
                  Superman, Superboy and Spectre

REDACTED

6

IPW 00011

EXHIBIT CC
Page 368