1  Marc Toberoff (State Bar No. 188547)
   Nicholas C. Williamson (State Bar No. 231124)
2  Keith G. Adams (State Bar No. 240497)
   TOBEROFF & ASSOCIATES, P.C.
3  2049 Century Park East, Suite 2720
   Los Angeles, California, 90067
4  Telephone:  (310) 246-3333
   Fax:          (310) 246-3101
5  MToberoff@ipwla.com

6  Attorneys for Defendants Mark Warren
   Peary, as personal representative of the
7  Estate of Joseph Shuster, Joanne Siegel and
   Laura Siegel Larson

8                    UNITED STATES DISTRICT COURT

9        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

10 DC COMICS,                          Case No: CV 10-03633 ODW (RZx)

11              Plaintiff,             Hon. Otis D. Wright II, U.S.D.J.

12        vs.                          **DEFENDANTS JOANNE
                                       SIEGEL AND LAURA SIEGEL
13 PACIFIC PICTURES CORPORATION;       LARSON'S NOTICE OF
   IP WORLDWIDE, LLC; IPW, LLC;        MOTION AND MOTION TO
14                                     DISMISS AND/OR STRIKE
   MARC TOBEROFF, an individual;       PLAINTIFF'S COMPLAINT
15 MARK WARREN PEARY, as personal      PURSUANT TO FED.R.CIV.P.
                                       12(b)(6); MEMORANDUM OF
16 representative of the ESTATE OF     POINTS AND AUTHORITIES
   JOSEPH SHUSTER; JOANNE SIEGEL,
17 an individual; LAURA SIEGEL         Complaint filed:  May 14, 2010
                                       Trial Date:  None Set
18 LARSON, an individual,
   and DOES 1-10, inclusive,           Date:    October 18, 2010
19                                     Time:    1:30 p.m.
                                       Place:   Courtroom 11
20              Defendants.

21

22

23

24

25

26

27

28

SIEGEL DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS AND/OR STRIKE THIRD
AND SIXTH CLAIMS FOR RELIEF

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on October 18, 2010 at 1:30 p.m., or as soon thereafter as counsel may be heard, in Courtroom 11 of the above-captioned Court, located at 312 N. Spring Street, Los Angeles, California, 90012, defendants Joanne Siegel and Laura Siegel Larson will and hereby do move to dismiss and strike the third and sixth claims for relief in plaintiff DC Comics' complaint pursuant to Fed. R. Civ. P. 12(b)(6) and (f).

Plaintiff bases its Third and Sixth Claims for Relief on the erroneous position that it was entitled under 17 U.S.C. § 304(c)(6)(D) to a so-called "period of exclusivity" to negotiate with the executor of the estate of Joseph Shuster to purchase his Superman copyright termination interest under 17 U.S.C. § 304(d). The statute provides no such "right," and DC's reading of the statute has been specifically rejected by the courts and leading authorities. Moreover, the Third and Sixth Claims are barred by the "litigation privilege," codified in California Civil Code § 47(b).

The Sixth Claim for Relief under California's unfair competition law is also preempted by federal copyright law insofar as plaintiff has not (and could not) allege the requisite "extra" element that would avoid preemption.

Plaintiff's allegations in the Third and Sixth Claims relating to the alleged "consent agreements" (Complaint, ¶ 175), the existence and purpose of which was disclosed to DC during a confidential mediation between DC and the Siegels, must be stricken from the complaint pursuant to Fed. R. Civ. P. 12(f), as plaintiff's use of this information violates (i) the mediation privilege, (ii) the May 1, 2008 JAMS Confidentiality Agreement between the Siegels and DC, and (iii) this Court's January 14, 2009 order in the related Superman action (Case No. 04-CV-8400).

This motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on July 13, 2010. Defendants seek dismissal of the Third and Sixth Claims for Relief based on this Notice of Motion and Motion, the attached

1   memorandum of points and authorities, the pleadings and records on file in this

2   action, such additional authority and argument as may be presented in any reply and

3   at the hearing on this motion, and such other matters of which this Court may take

4   judicial notice.

5   DATED:  August 13, 2010          TOBEROFF & ASSOCIATES, P.C.

6

7   By _____
                                 Marc Toberoff

8   Attorneys for Defendants Mark Warren Peary,
    as personal representative of the Estate of
9   Joseph Shuster, Joanne Siegel and Laura Siegel
    Larson

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SIEGEL DEFEENDANTS' NOTICE OF MOTION & MOTION TO DISMISS THIRD AND SIXTH
CLAIMS FOR RELIEF

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ....................................................................................1

ARGUMENT ..........................................................................................3

   I.    LEGAL STANDARD ....................................................3

   II.   PLAINTIFF'S THIRD AND SIXTH CLAIMS FOR RELIEF MUST BE DISMISSED ....................................4

      A.   Plaintiff's Third and Sixth Claims for Relief Regarding a Purported "Period of Exclusivity" Are Barred as a Matter of Law ....................................4

          1.   Section 304(c)(6)(D) Does Not Give DC Any "Rights" ....................................4

          2.   Courts and Commentators Have Rejected DC's Arguments ....................................5

          3.   As the Statute Gives DC No Rights, DC Lacks Standing ....................................7

          4.   The Cancelled 2001 and 2003 Pacific Pictures Agreements Are Moot, and DC Does Not Even Allege That the Purported "Consent Agreements" Violate Section 304(c)(6)(D) ....................................8

      B.   The Sixth Claim is Preempted by the Copyright Act ....................................9

          1.   DC's Unfair Competition Claim Contains No "Extra Element" ....................................10

      C.   DC's Allegations Do Not Sustain a UCL Claim, Because DC Does Not and Cannot Plead Any "Unlawful, Unfair or Fraudulent" Conduct ....................................12

      D.   The Sixth Claim Is Also Barred by California's Litigation Immunity and Mediation Confidentiality Statutes ....................................15

          1.   Litigation Immunity ....................................15

          2.   Mediation Confidentiality ....................................17

      E.   DC's Allegations in Paragraphs 157 and 175 of the Complaint Must Be Stricken as Violative of Its JAMS Confidentiality Agreement ....................................18

          1.   Procedural Background ....................................18

          2.   DC's Use of the Settlement Strategy Contravenes the Court's Prior Order and Is Barred By the "Law of the Case" ....................................21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3.    DC's Allegations in the Complaint Once Again Violate the JAMS Confidentiality Agreement and Must Be Struck ........................................................21

4.    The Third and Sixth Claims Necessarily Fail, Once Such Privileged Settlement Information Is Struck ........................................................23

CONCLUSION ................................................24

# TABLE OF AUTHORITIES

<u>**Federal Cases**</u>                                                                     **Pages**

*Altera Corp. v. Clear Logic, Inc.*,
424 F.3d 1079 (9th Cir. 2005) ..................................................................10

*Ashcroft v. Iqbal*,
129 S.Ct. 1937 (2009)...................................................................................3

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................................................3

*Benesch v. Green*,
2009 U.S. Dist. LEXIS 117641 (N.D. Cal. Dec. 17, 2009)........................17

*Blue Nile, Inc. v. Ice.com, Inc.*,
478 F. Supp. 2d 1240 (W.D. Wash. 2007) ................................................12

*Bourne Co., v. MPL Commc'ns, Inc.*,
675 F. Supp. 859 (S.D.N.Y. 1987) ....................................................... *passim*

*Del Madera Properties v. Rhodes & Gardner, Inc.*,
820 F.2d 973 (9th Cir. 1987) ....................................................................12

*Disimone v. Browner*,
121 F.3d 1262 (9th Cir. 1997) ..................................................................21

*Fantasy, Inc. v. Fogerty*,
984 F.2d 1524 (9th Cir. 1993) ..................................................................23

*Fraker v. Bayer Corp.*,
2009 U.S. Dist. LEXIS 125633 (E.D. Cal. Oct. 2, 2009)...........................23

*Gardner v. Nike, Inc.*,
279 F.3d 774 (9th Cir. 2002) ......................................................................7

*Idema v. Dreamworks, Inc.*,
162 F. Supp. 2d 1129 (C.D. Cal. 2001) ..............................................10, 12

*In re Connetics Corp. Secs. Litig.*,
542 F. Supp. 2d 996 (N.D. Cal. 2008)........................................................23

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) ..................................................................14

*Kodadek v. MTV Networks*,
152 F.3d 1209 (9th Cir. 1998) .............................................................. 10-11

*Laws v. Sony Music Entm't, Inc.*,
448 F.3d 1134 (9th Cir. 2006) ..................................................................10

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)......................................................................................7

*Mason v. Texaco, Inc.*,
741 F. Supp. 1472 (D. Kan. 1990)..................................................21

*MEECO Mfg. Co. v. True Value Co.*,
Copy. L. Rep. (CCH) P29,368,
2007 U.S. Dist. LEXIS 25986 (W.D. Wash. Apr. 3, 2007) ..............12

*Mills Music, Inc. v. Snyder*,
469 U.S. 153 (1985)............................................................................9

*Moss v. Crawford & Co.*,
201 F.R.D. 398 (W.D. Pa. 2000) ......................................................21

*Motown Record Corp. v. George A. Hormel & Co.*,
657 F. Supp. 1236 (C.D. Cal. 1987) .................................................12

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*,
469 U.S. 189 (1985)............................................................................5

*Preminger v. Peake*,
536 F.3d 1000 (9th Cir. 2008) ...........................................................7

*Ridgeway v. Mont. High School Ass'n*,
858 F.2d 579 (9th Cir. 1988) ...........................................................21

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*,
806 F.2d 1393 (9th Cir. 1986) ...........................................................4

*Shroyer v. New Cingular Wireless Servs.*,
606 F.3d 658 (9th Cir. 2010) ...........................................................15

*Sleep Sci. Partners v. Lieberman*,
2010 U.S. Dist. LEXIS 45385 (N.D. Cal. May 10, 2010)................15

*Symantec Corp. v. McAfee Assoc., Inc.*,
No. C-97-20367, 1998 WL 740798 (N.D. Cal. June 9, 1998) ..........11

*Thomas v. Bible*,
983 F.2d 152 (9th Cir. 1993) ...........................................................21

*United States v. American Trucking Addn's Inc.*,
310 U.S. 534 (1940)............................................................................6

*United States v. Granderson*,
511 U.S. 39 (1994)..............................................................................6

*United States ex. rel. Burroughs v. DeNardi Corp.*,
167 F.R.D. 680 (S.D. Cal. 1996) .....................................................20

**Federal Statutes and Rules**

F.R.C.P. 8 ............................................................................................3

F.R.C.P. 9 ..........................................................................................14

iv
TABLES OF CONTENTS AND AUTHORITIES

F.R.C.P. 12 ............................................................................................. *passim*

17 U.S.C. § 304 ..................................................................................... *passim*

H.R. Rep. No. 94-1476 (1976) .............................................................. 9

**<u>State Cases</u>**

*Asia Inv. Co. v. Borowski,*
133 Cal. App. 3d 832 (1982) ............................................................. 16

*Bernardo v. Planned Parenthood Federation of America,*
115 Cal. App. 4th 322 (2004) ........................................................... 13

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Telephone Co.,*
20 Cal. 4th 163 (1999) .................................................................. 13-14

*Copeland v. Baskin Robbins U.S.A.,*
96 Cal. App. 4th 1251 (2002) ........................................................... 14

*Durell v. Sharp Healthcare,*
183 Cal. App. 4th 1350 (2010) ......................................................... 13

*Foxgate Homeowners' Assn. v. Bramalea California, Inc.,*
26 Cal. 4th 1 (2001) ...................................................................... 3, 17

*GeneThera, Inc. v. Troy & Gould Professional Corp.,*
171 Cal. App. 4th 901 (2009) ........................................................ 3, 16

*Khoury v. Maly's of Cal., Inc.,*
14 Cal. App. 4th 612 (1993) ............................................................. 14

*McClain v. Octagon Plaza, LLC,*
159 Cal. App. 4th 784 (2008) ........................................................... 14

*Morgan v. AT&T Wireless Services, Inc.,*
177 Cal. App. 4th 1235 (2009) ......................................................... 13

*Olszewski v. Scripps Health,*
30 Cal. 4th 798 (2003) ..................................................................... 12

*People's Choice Wireless v. Verizon Wireless,*
131 Cal. App. 4th 656 (2005) ........................................................... 13

*Racine & Laramie, Ltd. v. Department of Parks & Recreation,*
11 Cal. App. 4th 1026 (1992) ........................................................ 2, 14

*Rosenthal v. Irell & Manella,*
135 Cal. App. 3d 121 (1982) ............................................................. 16

*Rusheen v. Cohen,*
37 Cal. 4th 1048 (2006) ................................................................... 15

*Schnall v. Hertz Corp.,*
78 Cal. App. 4th 1144 (2000) ........................................................... 13

*Seltzer v. Barnes*,
182 Cal. App. 4th 953 (2010) ...................................................................16

*Silberg v. Anderson*,
50 Cal. 3d 2052 (1990) ...............................................................15, 17

*Simmons v. Ghaderi*,
44 Cal. 4th 570 (2008) ...........................................................................17

## **State Statutes and Rules**

Cal. Bus. & Prof. Code § 17200 ..................................................... *passim*

Cal. Code of Civil Procedure §1775.10..................................................3

Cal. Evid. Code § 1115 .......................................................... 3, 17-18

Cal. Evid. Code § 1119 ...........................................................................17

Cal. Evid. Code § 1126 ...........................................................................17

## **Other Authorities**

61 CAL. JUR. 3d Unfair Competition § 3 (2008)....................................12

3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 11.08..............................7

3 W. Patry, *Patry on Copyright* ("*Patry*") § 7:47 .................................7

3 *Patry* § 21:18 (2010) ..........................................................................7

18 Wright, Miller & Cooper,
Federal Practice and Procedure § 4478 (1981)...................................21

# **INTRODUCTION**

DC Comics' ("DC") Third and Sixth Claims for Relief distort the Copyright Act and fundamentally misconstrue the obligations of the defendants thereunder. Defendants Joanne Siegel and Laura Siegel Larson (the "Siegels"), the heirs of Jerry Siegel, and defendant Mark Warren Peary, the duly appointed personal representative (the "Shuster Executor") of the Estate of Joseph Shuster (the "Shuster Estate"), have properly exercised their rights under 17 U.S.C. §§ 304(c) and (d), respectively, to terminate prior grants to DC's predecessors by Jerome Siegel ("Siegel") and Joseph Shuster ("Shuster") of the copyright to their famed comic book creation Superman (the "Siegel Termination" and "Shuster Termination," respectively).

DC's Third and Sixth Claims are both premised on the erroneous legal position that DC has a statutory right to a so-called "period of exclusivity" to negotiate the purchase of the Shuster Estate's recaptured *Superman* copyrights under 17 U.S.C. § 304(c)(6)(D). *See* Complaint, ¶¶ 154-55. However, it is clear from the plain language of § 304(c)(6)(D) that it does not provide grantees or their successors (like DC) with any "rights," let alone a right to an exclusive period of negotiation. It simply provides that a "further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination," but that an "agreement for such a further grant may be made between the author or [his heirs] and the original grantee or such grantee's successor in title, after the notice of termination has been served." The statute invalidates any conveyance of terminated rights to a party other than the original grantee before the effective date of the termination, but it does not require the grantor to negotiate with the grantee, contrary to DC's incorrect claims.

> "Nor does the statute provide for an exclusive period of negotiation. The statute neither compels the terminating party to negotiate with the terminated grantee, nor forbids him from negotiating with anyone else."

*Bourne Co., v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 865 (S.D.N.Y. 1987). As DC's Third and Sixth Claims are both falsely premised on a fictitious "right" of

1  negotiation, both fail as a matter of law, and must be dismissed.

2      Furthermore, DC's claims to an exclusive period of negotiation are moot.  DC

3  argues that two sets of agreements violate its supposed "right":  (1) agreements

4  between defendant Pacific Pictures Corporation and the Shuster Executor

5  (Complaint, ¶ 156), which, as DC is aware, were cancelled six years ago (*id.*, ¶ 86)

6  and, in any event, were void *ab initio* under § 304(c)(6)(D) as elsewhere alleged by

7  DC (*id.*, ¶ 154); and (2) alleged "consent agreements" between various defendants.

8  *Id.*, ¶ 157.  Such "consent agreements," as alleged, are clearly permitted under §

9  304(c)(6)(D), which invalidates only "a further grant, or agreement to make a further

10 grant" of copyright but does not limit the rights of terminating parties in any other

11 way.  DC has not alleged and cannot allege that the purported "consent agreements"

12 constitute "a grant or an agreement to make a further grant."

13     DC's vaguely pled Sixth Claim for Relief under California's "Unfair

14 Competition Law" (Cal. Bus. & Prof. Code §§ 17200 *et seq.*) ("UCL") is also clearly

15 preempted by the Copyright Act, because it is premised on DC's allegations that

16 defendants' conduct is "unlawful" under the Copyright Act.  Complaint, ¶¶ 174-76.

17 To the extent the Sixth Claim alleges that defendants' conduct is somehow "unfair"

18 because it "impedes" DC's settlement (*i.e.*, purchase) of the Superman termination

19 interests, it also fails:  the Siegels' or Shuster Executor's alleged agreements amongst

20 themselves as to how they wish to negotiate with DC cannot constitute an "unfair"

21 practice because they have the right to negotiate with DC as they see fit.  *See Racine*

22 *& Laramie, Ltd. v. Department of Parks & Recreation*, 11 Cal. App. 4th 1026, 1034

23 (1992).

24     In addition, any such "consent agreements" constitute understandings between

25 the Siegels and the Shuster Estate regarding settlement strategy, which were

26 disclosed to DC solely in connection with mediation proceedings and pursuant to a

27 JAMS Confidentiality Agreement with DC.  DC's references to "consent

28 agreements" in its Complaint must be stricken pursuant to F.R.C.P. 12(f).

1   Communications and statements made in the course of settlement and mediation

2   discussions are absolutely privileged under California CCP § 1775.10, California

3   Evidence Code § 1115 *et seq.* and California Civil Code § 47(b), and cannot form the

4   basis of liability. *See GeneThera, Inc. v. Troy & Gould Professional Corp.*, 171 Cal.

5   App. 4th 901, 909-10 (2009); *Foxgate Homeowners' Assn. v. Bramalea California,*

6   *Inc.*, 26 Cal. 4th 1, 14 (2001). Moreover, DC's references to "consent agreements"

7   constitute a willful breach by DC of the JAMS Confidentiality Agreement it entered

8   into. Once DC's improper allegations are struck, DC's Third and Sixth Claims –

9   based on such allegations – necessarily fail to state a claim and must be dismissed.

10                                  **ARGUMENT**

11   **I.   LEGAL STANDARD**

12           Pursuant to F.R.C.P. 8(a)(2), a complaint must contain "a short and plain

13   statement of the claim showing that the pleader is entitled to relief." However, to

14   survive a motion to dismiss under F.R.C.P. 12(b)(6), "a complaint must contain

15   sufficient factual matter … to 'state a claim to relief that is plausible on its face.'"

16   *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v.*

17   *Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the

18   plaintiff pleads factual content that allows the court to draw the reasonable inference

19   that the defendant is liable for the misconduct alleged." *Ashcroft*, 129 S.Ct. at 1949.

20   In determining whether the complaint states a "plausible" claim, "labels and

21   conclusions" are meaningless and a "formulaic recitation of the elements of a claim

22   will not do." *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to

23   raise a right to relief above the speculative level." *Id*.

24           "Where the well-pleaded facts do not permit the court to infer more than the

25   mere possibility of misconduct, the complaint has alleged – but it has not 'shown' –

26   that the pleader is entitled to relief." *Ashcroft,* 129 S.Ct. at 1950 (quoting F.R.C.P.

27   8(a)(2)). Mere legal conclusions "are not entitled to an assumption of truth."

28   *Ashcroft,* 129 S.Ct. at 1950.

Leave to amend a complaint must be denied when the "court determines that the allegations of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

## II.   PLAINTIFF'S THIRD AND SIXTH CLAIMS FOR RELIEF MUST BE DISMISSED

### A.   Plaintiff's Third and Sixth Claims for Relief Regarding a Purported "Period of Exclusivity" Are Barred as a Matter of Law

#### 1.   Section 304(c)(6)(D) Does Not Give DC Any "Rights"

DC's Third and Sixth Claims for Relief are both premised on the erroneous legal position that DC has an exclusive "right" under 17 U.S.C. § 304(c)(6)(D) to negotiate the purchase of the Siegels' and Shuster Estate's recaptured Superman copyrights.  DC contends that the Shuster heirs, the Siegels, as well as their attorney Marc Toberoff and entities allegedly controlled by him ("Toberoff") have "violate[d]" DC's purported statutory right by having "agreements, which prohibit either family from entering into agreements [with DC] without the express approval of all stakeholders."  Complaint, ¶ 157; *see id.*, ¶ 175 ("The consent agreements Toberoff has procured … violate DC Comics'…right freely to negotiate settlement of such claims.").[1]  According to DC, any alleged agreements with Toberoff's Pacific Pictures Corporation (*id.*, ¶ 156) or so-called "consent agreements" between the defendants (*id.*, ¶ 157) "frustrated and impede[d]" DC's purported right of exclusive negotiation, even though such right is neither provided by statute nor recognized by the courts.  *Id.*, ¶¶ 155-57, 175.

DC argues that its purported "right" somehow arises from 17 U.S.C. § 304(c)(6)(D), which merely provides that a "further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination," but that an "agreement for such a further grant may be made between the author or [his heirs] and the original grantee or such

---

[1] DC references to "settlement," in practice, equate to DC's purchase of the Superman copyrights duly recaptured by the Siegels and Shuster Executor under the Copyright Act.

1  grantee's successor in title, after the notice of termination has been served." *Id.  See*

2  Complaint, ¶¶ 154-55.

3         DC labels its allegations as based on a "period of exclusivity" in an attempt to

4  shoehorn its claims into the statute; however, it is clear that what it actually alleges is

5  that § 304(c)(6)(D) gives DC an exclusive right to negotiate the purchase of the

6  recaptured Superman copyrights, when the statute says no such thing.  *See*

7  Complaint, ¶¶ 155-58.  Section 304(c)(6)(D) plainly does not provide a terminated

8  grantee with any "right" of negotiation or otherwise.  The statute also does not

9  mandate any action by the terminating party; it merely invalidates certain agreements

10 that grant or promise to make a grant, under specified circumstances.

11        DC's Third and Sixth Claims thereby misapprehend the law and contravene the

12 plain meaning of the statute's unambiguous language, and must be rejected.  *See*

13 *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985) ("Statutory

14 construction must begin with the language … and the assumption that the ordinary

15 meaning of that language accurately expresses the legislative purpose.").

16              **2.    Courts and Commentators Have Rejected DC's Arguments**

17        DC's claims were expressly addressed and rejected in *Bourne Co. v. MPL*

18 *Commc'ns, Inc.* ("*Bourne*"), 675 F. Supp. 859, 865 (S.D.N.Y. 1987).  *Bourne*

19 involved a termination under the Copyright Act with respect to the musical standard

20 "Cecilia."  The widow of one of the song's co-authors was induced by a third party to

21 serve a termination notice on Bourne, the successor to the original grantee.  *Id.*

22 Before the effective date of termination, the widow then entered into an agreement

23 granting another third party all rights to the song for the extended renewal period.  *Id.*

24 Like DC here, Bourne sued both third parties on the purported ground that such

25 agreement violated Bourne's alleged "exclusive period of negotiation" and "right of

26 first refusal" under § 304(c)(6)(D) with respect to the widow's termination interest,

27 as the successor to the original grantee.  *Id*. at 864-867.

28        The *Bourne* Court expressly rejected the same argument made by DC here, *i.e.*

that § 304(c)(6)(D) creates an "exclusive period of negotiation":

> "***Nor does the statute provide for an exclusive period of negotiation. The statute neither compels the terminating party to negotiate with the terminated grantee, nor forbids him from negotiating with anyone else.*** All it requires is that prior to the effective date of termination, the terminated grantee is the only person with whom the author or his successor can make an enforceable and effective agreement to transfer those rights. The provision does give the terminated grantee a preferred competitive position but '[i]f the author can afford to wait for competitive offers until after the effective date of termination, he can overcome any advantage the grantee or successor may seek to gain from the preferential position.'"

*Id*. at 865 (citations omitted) (emphasis added). The Court further noted that "[i]ndeed, the statute merely provides that a grant to someone other than the original grantee is valid 'only if it is *made* after the effective date of termination,' not that such a grant is valid only if *negotiated* after the termination date." *Id.* at 865, n.11 (emphasis in original).

The *Bourne* Court rejected as unpersuasive Bourne's legislative history argument, parroted here by DC, that § 304(c)(6)(D) is "in the nature of a right of first refusal." Complaint, ¶ 155; *Bourne,* 675 F. Supp. at 866. "If Congress had intended to create a right of first refusal, it would have done so in clear language." *Id*. The Court explained:

> "[Section 304(c)(6)(D)] provides merely that an agreement between the terminating party and the terminated grantee prior to the effective date of termination is the only one that is valid and enforceable against the former. *The statute does not provide that any agreement negotiated by the terminating party must first be offered on the same terms to the terminated grantee*, which is what a right of first refusal, as it is commonly understood, would require."

*Id*. at 865 (emphasis added). Moreover, when the statutory language is clear, as it is in § 304(c)(6)(D), such language governs. *United States v. Granderson*, 511 U.S. 39, 74 n.7 (1994) ("Where the language of a statute is clear, that language, rather than 'isolated excerpts from the legislative history,' should be followed.").[2]

---

[2] *See Bourne,* 675 F. Supp. at 866 ("'It is a well-known canon of construction that the language of the statute is the best indication of legislative intent.'") (citations omitted); *United States v. American Trucking Addn's Inc*., 310 U.S. 534, 543 (1940) ("There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes.").

SIEGEL DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

The leading copyright treatise *Nimmer on Copyright* ("*Nimmer*") also states

that the legislative history's "first refusal" characterization is "not entirely accurate,"

and, citing *Bourne*, states that "it is inaccurate to refer to this advantage as 'an

exclusive period of negotiation.'"  3 M. Nimmer & D. Nimmer, *Nimmer* § 11.08[A],

n.6 (2010).  *Nimmer* notes that *Bourne* properly "rejected the claim [made here] that a

prior grantee enjoys a private right of action for damages against one who induces the

grantor to make a (necessarily invalid) grant to a third party prior to the termination

date of the original grant."  *Id.*  The Siegels and the Shuster Executor were not

"compelled" to negotiate with DC, much less "exclusively," either before or after

they served their respective termination notices.  *Bourne*, 675 F. Supp. at 865.

### 3.    As the Statute Gives DC No Rights, DC Lacks Standing

Because DC has no "rights" under § 304(c)(6)(D), it has no basis nor standing

to sue for an alleged "violat[ion] of section 304(c)(6)(D)."  Complaint, ¶157, 175.

*Patry on Copyright*, the other leading copyright treatise, is in accord:

> "[Section 304(c)(6)(D)], sometimes erroneously described as a 'right of
> first refusal,' does not give the original grantee a right to conclude such
> an agreement; it only means that if such an agreement is made, it will be
> enforceable.  Most importantly, if the original grantee is not provided a
> first crack, there is no remedy."

3 W. Patry, *Patry on Copyright* ("*Patry*") § 7:47 (2010).  A terminated party receives

"no rights under [§ 304(c)(6)(D)], cannot sue for failure to comply, and the provision

therefore does not provide a basis for standing."  3 *Patry* § 21:18.  *See Preminger v.*

*Peake*, 536 F.3d 1000, 1005 (9th Cir. 2008) (stating that standing requires a

demonstration of "an invasion of a legally protected interest" that is "actual or

imminent," not "conjectural" or "hypothetical") (quoting *Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 560-61 (1992)); *Gardner v. Nike, Inc.*, 279 F.3d 774, 777 (9th

Cir. 2002) (holding that a copyright licensee "lacked standing to bring the action

because they had no legally cognizable interest in the suit").

It is clear that, as § 304(c)(6)(D) grants no "right" and thus no standing to DC,

DC's Third and Sixth Claims therefore fail to state a claim as a matter of law.

4.  **The Cancelled 2001 and 2003 Pacific Pictures Agreements Are
    Moot, and DC Does Not Even Allege That the Purported
    "Consent Agreements" Violate Section 304(c)(6)(D)**

DC alleges that the 2001 and 2003 Pacific Pictures Agreements violated its
alleged right of exclusivity.  Complaint, ¶ 156.  But to the extent the 2001 and 2003
Pacific Pictures Agreements had granted any Shuster termination interest prior to
October 26, 2013 (the effective date of the Shuster Termination), such transfers were
void *ab initio* under § 304(c)(6)(D), as alleged by DC, and had no legal force or
effect.  *Id.*, ¶¶ 154-58.  The Pacific Pictures Agreements are further moot, as such
were duly and voluntarily cancelled on September 10, 2004.  *Id.*, ¶ 86.[3]

The sole remaining agreements complained of by DC with respect to its
purported right of exclusivity are the alleged "consent agreements."  *Id.,* ¶¶ 157, 175.
However, DC has not alleged and cannot allege that such "consent agreements"
constitute "a further grant, or agreement to make a further grant" of the recaptured
Superman copyrights, barred by § 304(c)(6)(D).  DC alleges that the agreements
"prohibit either family from entering into agreements conveying rights … without the
express approval of all stakeholders in the heirs' rights."  *Id.*, ¶ 157.  DC's own
allegations thus demonstrate that the "consent agreements" are not covered or
prohibited by the plain wording of § 304(c)(6)(D) as a matter of law.

In essence, what DC alleges is that the Siegels and Shuster Executor, by such
"consent agreements," agreed to enhance their bargaining position by acting together
in negotiations with DC, but not that any of them thereby granted any right that was
the subject of termination, or promised to convey such rights in the future.  *See* 17
U.S.C. § 304(c)(6)(D).  There is no statutory basis whatsoever to impede the Siegels
and the Shuster Executor, the intended beneficiaries of the termination right, from
acting together to better realize market value for their recaptured copyrights.  On the
contrary, this is consistent with the Congressional purpose of the termination right "to

---

[3] As the Shuster Termination was served on November 10, 2003, DC is, at best,
complaining about an alleged loss of 10 months out of 10 years of an alleged, but non-
existent, right of exclusive negotiations.  *Id.,* ¶¶ 79, 81.

SIEGEL DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

1  provide added benefits to authors…. [and] to relieve authors of the consequences of

2  ill-advised and unrenumerative grants…." *Mills Music, Inc. v. Snyder*, 469 U.S. 153,

3  185 (1985) (*citing* H.R. Rep No. 94-1476 at 124 (1976)).

4       DC's claim that "consent agreements" between the Siegels, the Shuster

5  Executor and their counsel somehow "impede [DC's] ability to settle any and all

6  disputes with the Shusters and Siegels," is equally flawed as a matter of law.

7  Complaint, ¶ 157. While the goal of settlement is shared by the Siegels and the

8  Shuster Executor, DC has no statutory or other "right" to settle (i.e., purchase) the

9  termination interests. *See* 17 U.S.C. § 304(c)(6)(D); *Bourne,* 675 F. Supp. at 865.[4]

10      **B.**    **The Sixth Claim is Preempted by the Copyright Act**

11       In addition to the above, DC's Sixth Claim, brought under California's "Unfair

12  Competition Law" (Cal. Bus. & Prof. Code §§ 17200 *et seq.*) ("UCL") is clearly

13  preempted by the Copyright Act. It asks for declaratory relief that alleged

14  agreements between defendants regarding the Siegels' and the Shuster Estate's

15  termination interests under the Copyright Act are void under "California's unfair

16  competition laws." Complaint ¶ 175, *citing* Cal. Bus. & Prof. Code §§ 17200 *et seq*.

17  However, the Copyright Act specifically preempts "all legal or equitable rights that

18  are equivalent to any of the exclusive rights within the general scope of copyright."

19  17 U.S.C. § 301(a).[5] If a "state law unfair competition claim is based solely on rights

20  equivalent to those protected by the federal copyright laws," then such a claim is

21

22  [4] DC's argument that it is somehow entitled to a "restoration" of a purported "10-year period of exclusivity" (Complaint, ¶¶ 160, 179), is equally absurd. Even if DC had a "right" to exclusive negotiations (it does not), DC would still not be entitled to a "10-year" exclusive negotiating period. Pursuant to 17 U.S.C. § 304(c)(4)(A), a termination notice *may* be served no "less than two or more than ten years before" its effective date. *Id.* The Shuster Termination, with an effective date of October 26, 2013, happens to have been served ten years in advance on November 10, 2003 (Complaint, ¶¶ 79-81), but could just as well have been served two years in advance on October 25, 2011. It would be inequitable to impose a supposed 10-year "period of exclusivity" on the Shuster Executor simply because he happened to have diligently served the termination notice well in advance of § 304(c)(4)(A)'s minimum two-year notice requirement.

23

24

25

26

27  [5] "[S]ection 301 is intended …. to avoid the development of any vague borderline areas

28  between State and Federal protection." H.R. Rep. No. 94-1476, at 120 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5746.

1  preempted.  *Kodadek v. MTV Networks*, 152 F.3d 1209, 1213 (9th Cir. 1998).

2

3
### 1.   DC's Unfair Competition Claim Contains No "Extra Element"

4  To avoid preemption, the plaintiff must demonstrate that its "state law claim

5  includes an 'extra element' that makes the right asserted qualitatively different from

6  those protected under the Copyright Act."  *Altera Corp. v. Clear Logic, Inc.*, 424

7  F.3d 1079, 1089-90 (9th Cir. 2005).  *See also Laws v. Sony Music Entm't, Inc.*, 448

8  F.3d 1134, 1143 (9th Cir. 2006) (same).

9  DC's Sixth Claim is preempted because it concerns the Siegels' and the

10  Shuster Executor's special termination interests under § 304(c) and (d) of the

11  Copyright Act and DC's purported "exclusive" right to negotiate the purchase of

12  those interests under § 304(c)(6)(D) of the Act, and DC has not alleged and cannot

13  allege the requisite "extra element" to avoid preemption.  In analyzing whether a state

14  claim contains such "extra element," courts look to "whether the gravamen of the

15  state law claim is the same as the rights protected by the Copyright Act."  *Idema v.*

16  *Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1190 (C.D. Cal. 2001).  In so doing the

17  Court looks to "the state law claims *as they are asserted*."  *Id.*  (emphasis in original).

18  Here, DC's "state-law" unfair competition claim is a mere regurgitation of

19  DC's Third Claim for declaratory relief under the Copyright Act, which asserts that

20  the same alleged "consent agreements" are void because they purportedly "frustrate

21  and impede DC Comics' period of exclusivity" under 17 U.S.C. § 304(c)(6)(D) to

22  negotiate with the Siegels and the Shuster Executor and "violate section

23  304(c)(6)(D)."  Complaint, ¶¶ 156-157.  *Compare* Complaint, Sixth Claim, ¶ 175

24  ("The consent agreements Toberoff has procured are void as a matter of law and

25  public policy because they strip the Siegels and Shusters of their right to freely settle

26  their claims and violate DC Comics' concomitant right to freely negotiate settlement

27  of such claims.") *with* Complaint, Third Claim, ¶ 158 ("The Shuster Heirs'

28  agreements with Toberoff, his companies, and the Siegels improperly interfere with

1    DC Comics' period of exclusivity [to negotiate under § 304(c)(6)(D) of the

2    Copyright Act] with the Shuster Heirs regarding their purported Superman rights.").

3    DC's anticipated argument that California's unfair competition laws are purportedly

4    broader than the Copyright Act will not salvage its Sixth Claim.  *See Symantec Corp.*

5    *v. McAfee Assoc., Inc.*, No. C-97-20367, 1998 WL 740798, at *4-5 (N.D. Cal. June 9,

6    1998) ("The fact that the state-created right is either broader or narrower than its

7    federal counterpart will not save it from preemption.").

8         DC even admits that it seeks by its Sixth Claim to "establish the parties'

9    respective rights and obligations *with respect to the copyright interest in the*

10   *Superman material*."  *Id.*, ¶ 176 (emphasis added).  The Sixth Claim for declaratory

11   relief is facially equivalent to DC's Third Claim for declaratory relief under the

12   Copyright Act: "A declaration by this Court is warranted … to establish the parties'

13   respective rights and obligations with respect to the copyright interest in the

14   Superman material."  *Id.*, ¶ 159.  However, the determination of a party's respective

15   rights and obligations regarding the special "termination" interest provided by the

16   Copyright Act is plainly the province of copyright law, not state unfair competition

17   law.  *Id.*, ¶¶ 92-120.  *See Kodadek,* 152 F.3d at 1212-13 (dismissing California unfair

18   competition claim where allegations were "within the 'subject matter' of the

19   Copyright Act").

20        In fact, DC in its short Sixth Claim incorporates by reference "each and every

21   allegation contained in the paragraphs above" under the Copyright Act, and asserts

22   that "[t]he copyright assignments procured by Toberoff and/or his companies are

23   unlawful and violate DC Comics' rights and interests *for the reasons set forth above*"

24   – that is, DC bases its Sixth Claim on purported violations of the Copyright Act set

25   forth above in its Complaint.  Complaint ¶¶ 174-75 (emphasis added); *see id.*, ¶¶ 155-

26   59 ("the reasons").  By *incorporating by reference* such alleged violation of the

27   Copyright Act's termination provisions previously raised in its Complaint, but

28   alleging no other facts in support of its short claim under state unfair competition

law, DC has conceded that the "gravamen of the state law claim is the same as the rights protected by the Copyright Act." *Idema,* 162 F. Supp. 2d at 1190. *See Motown Record Corp. v. George A. Hormel & Co.*, 657 F. Supp. 1236, 1239 (C.D. Cal. 1987) (dismissing California unfair competition claim that incorporated by reference plaintiff's copyright claim).[6] Accordingly, DC's Sixth Claim is preempted by the Copyright Act. *See Del Madera Properties v. Rhodes & Gardner, Inc.*, 820 F.2d 973, 977 (9th Cir. 1987) (finding preemption of unfair competition claim where "[t]he argument is constructed upon the premise" of a Copyright Act violation, and "does not add any 'extra element' which changes the nature of the action").

### C.   DC's Allegations Do Not Sustain a UCL Claim, Because DC Does Not and Cannot Plead Any "Unlawful, Unfair or Fraudulent" Conduct

"'The UCL defines unfair competition as any unlawful, unfair or fraudulent business practice….' A business practice is unlawful 'if it is forbidden by any law….'" *Olszewski v. Scripps Health*, 30 Cal. 4th 798, 827 (2003). As set forth above, the only purportedly "unlawful" conduct is alleged under the Copyright Act and is thereby ***preempted*** – specifically, that alleged assignments to Pacific Pictures Corporation violate 17 U.S.C. § 304(c)(6)(D) (Complaint, ¶¶ 156, 158-59, 174-76) and that alleged "consent agreements" between the Defendants also violate DC's purported "period of exclusivity" under § 304(c)(6)(D). *Id.*, ¶¶ 157-59, 174-76.

Furthermore, conduct that is "neither required nor proscribed by law does not constitute an 'unlawful' business activity under the [UCL]." 61 CAL. JUR. 3d Unfair Competition § 3 (2008). The statute in question does not "require" or "proscribe" any conduct, but instead simply states the conditions under which a transfer of the termination interest will be valid. 17 U.S.C. § 304(c)(6)(D) ("[A] further grant, or

---

[6] *See also Blue Nile, Inc. v. Ice.com, Inc.*, 478 F. Supp. 2d 1240, 1249 (W.D. Wash. 2007) ("Plaintiff's unfair competition claim is dismissed as preempted because by incorporating the copyright claims by reference, the unfair competition claim is based on rights equivalent to those protected by copyright."); *MEECO Mfg. Co. v. True Value Co.*, Copy. L. Rep. (CCH) P29,368, 2007 U.S. Dist. LEXIS 25986 at *14 (W.D. Wash. Apr. 3, 2007) ("[The unfair competition] claim is preempted because it incorporates the copyright claim by reference and is therefore based on rights equivalent to those protected by copyright.").

agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after effective date of the termination.").  As section 304(c)(6)(D) concerns the enforceability of a contract, it cannot form the basis for a claim of "unlawful" business activity under the UCL.

If a "practice" is not "unlawful," it is only considered to be "unfair" in violation of the UCL if it significantly threatens or harms competition:

> "When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means ***conduct that threatens an incipient violation of an antitrust law***, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, ***or otherwise significantly threatens or harms competition***."

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 187 (1999) (emphasis added).[7]  *See People's Choice Wireless v. Verizon Wireless*, 131 Cal. App. 4th 656, 662–63 (2005) ("Injury to a competitor is not equivalent to injury to competition; only the latter is the proper focus of antitrust laws.").[8]

Here, aside from DC's claims regarding purportedly unlawful conduct under the Copyright Act,  DC's complaint merely asserts that purported "consent agreements" are somehow "void and unenforceable … under California's unfair competition laws," because "they strip the Siegels and Shusters of their right freely to settle their claims and violate [DC's] concomitant right freely to negotiate settlement of such claims."  Complaint, ¶ 175.  *First*, as set forth above, this too is preempted for it refers to settlement of the Siegels and the Shuster Executor's termination interests under the Copyright Act.  *Id.*, ¶¶ 155-59, 174-75.  *Second*, as shown in section II.A, *supra*, DC simply has no exclusive "right" under the Copyright Act to

---

[7] *See also Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1364 (2010) ("[A]ny finding of unfairness to competitors under section 17200 [must] be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition."); *Bernardo v. Planned Parenthood Federation of America*, 115 Cal. App. 4th 322, 353 (2004) (same); *Schnall v. Hertz Corp.*, 78 Cal. App. 4th 1144, 1166 (2000) (same).

[8] A somewhat broader standard applies to UCL claims filed by a consumer.  *See Morgan v. AT&T Wireless Services, Inc.*, 177 Cal. App. 4th 1235, 1255 (2009).  However, DC has not pled its UCL claim as a consumer because DC is obviously a "competitor" of the defendants with respect to the copyrights at issue.

1   negotiate for the purchase of the Siegels and the Shuster Executor's termination

2   interest.  *Third*, and notwithstanding the preemption of DC's UCL claim, the Siegels

3   and the Shuster Executor are not otherwise prohibited from making agreements

4   amongst themselves as to the manner and terms under which they will negotiate with

5   DC regarding their termination interests under the Copyright Act.  *See Bourne*, 675

6   F. Supp. at 865 ("The statute neither compels the terminating party to negotiate with

7   the terminated grantee, nor forbids him from negotiating with anyone else.").[9]

8       Moreover, DC's allegations certainly do not amount to "conduct that threatens

9   an incipient violation of an antitrust law…or otherwise significantly threatens or

10  harms competition" so as to sustain an unfair competition claim.  *Cel-Tech*

11  *Communications, Inc.*, 20 Cal. 4th at 187.  In fact, DC's concocted claims as to an

12  exclusive "right" of negotiation, or "right of first refusal" attempt to *squelch*

13  competition.  Thus, the Siegels' or the Shuster Executor's negotiation on certain

14  terms, or alleged "consent agreements" as to how they will negotiate with DC, cannot

15  constitute an unfair "practice" that can sustain an unfair competition claim.

16      Finally, any claim of fraudulent practices under the UCL, like fraud in general,

17  is subject to a heightened pleading standard and must be pled with specificity.  *See*

18  F.R.C.P. 9(b) ("[A] party must state with particularity the circumstances constituting

19  fraud or mistake."); *Khoury v. Maly's of Cal., Inc.*, 14 Cal. App. 4th 612, 619 (1993)

20  ("A plaintiff alleging unfair business practices under these statutes must state with

21  reasonable particularity the facts supporting the statutory elements of the

22  violation.").[10]  DC's extremely general allegations as to "various copyright

23  ────────────────

24  [9] *See Racine & Laramie, Ltd.*, 11 Cal. App. 4th at 1034 ("The fact that parties commence
    negotiations looking to a contract … does not by itself impose any duty on either party" as
    to such negotiations); *Copeland v. Baskin Robbins U.S.A.*, 96 Cal. App. 4th 1251, 1260

25  (2002) ("When two parties, under no compulsion to do so, engage in negotiations to form or
    modify a contract neither party has any obligation [to the other].");  *McClain v. Octagon*

26  *Plaza, LLC*, 159 Cal. App. 4th 784, 799 (2008) (same).

27  [10] *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) ("Rule 9(b) demands
    that the circumstances constituting the alleged fraud [under the UCL] 'be 'specific enough

28  to give defendants notice of the particular misconduct … so that they can defend against the
    charge and not just deny that they have done anything wrong.' 'Averments of fraud must be
    accompanied by 'the who, what, when, where, and how' of the misconduct charged.' A

1    assignment and consent agreements" fail to plead "fraudulent" conduct with the

2    requisite specificity.  Complaint, ¶ 175.  *See Sleep Sci. Partners v. Lieberman*, 2010

3    U.S. Dist. LEXIS 45385, at *26-27 (N.D. Cal. May 10, 2010) ("Plaintiff must

4    identify the conduct … that is actionable under a theory of liability that applies the

5    UCL in a manner that avoids preemption…. If fraud is alleged, it must be ple[d] with

6    particularity under Federal Rule of Civil Procedure 9(b).")

7
8         **D.**     **The Sixth Claim Is Also Barred by California's Litigation Immunity and Mediation Confidentiality Statutes**

9              **1.**    **Litigation Immunity**

10            DC's UCL allegations based on alleged "consent agreements" between the

11   Siegels and Shusters are also barred as a matter of law by the litigation immunity set

12   forth in California Civil Code § 47(b).  Complaint, ¶¶ 88, 157, 175.  Section 47(b)

13   provides ***absolute immunity*** against all torts for "any communication (1) made in

14   judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized

15   by law; (3) to achieve the objects of the litigation; and (4) that have some connection

16   or logical relation to the action."  *Silberg v. Anderson*, 50 Cal. 3d 205, 211-12 (1990).

17   In addition, "where the claim is based on a communicative act, the litigation privilege

18   extends to those noncommunicative actions which are necessarily related to that

19   communicative act."  *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1052 (2006).

20            DC alleges that the Siegels and Shusters have entered into "consent

21   agreements" that "prohibit either family from entering into agreements conveying

22   rights to DC Comics without the express approval of all stakeholders in the heirs'

23   rights."  Complaint, ¶¶ 157, 175.  However, DC fails to mention that the alleged

24   understandings between the Siegels and Shusters regarding their settlement strategies

25   were solely disclosed in connection with Court-ordered settlement mediation in the

26   ───────────────

27   party alleging fraud must 'set forth more than the neutral facts necessary to identify the transaction.'")(citations omitted); *Shroyer v. New Cingular Wireless Servs.*, 606 F.3d 658, 665-67 (9th Cir. 2010) (applying Rule 9(b) to dismiss UCL "fraud" claim as "[i]n order to

28   plead fraud with particularity, the complaint must allege the time, place, and content of the fraudulent representation; conclusory allegations do not suffice").

1    related *Siegel* case (C.D. Cal. Case No. 04-08400).  DC previously admitted that an

2    alleged "consent agreement" was disclosed on May 2, 2008 by the Siegels' counsel

3    *during settlement "mediation*."  *See* Request for Judicial Notice ("RJN"), Ex. A.[11]

4         Such communications and statements made in the course of settlement

5    negotiations cannot support a claim, because they are communications to "achieve

6    the objects of the litigation" and, as such, are absolutely privileged under California

7    Civil Code § 47(b).  *See GeneThera, Inc. v. Troy & Gould Professional Corp.*, 171

8    Cal. App. 4th 901, 909-10 (2009) ("A settlement letter directed to counsel falls

9    within the category of communications to which the [§ 47(b)] privilege attaches

10   regardless of appellants' perception [that] it is divisive and purportedly precipitates a

11   conflict of interest.  Our conclusion does not change even if the communications in

12   question were, as appellants claim, substantively at variance with the Rules of

13   Professional Conduct."); *Seltzer v. Barnes*, 182 Cal. App. 4th 953, 972 (2010) (where

14   the "alleged conduct was the negotiation of the settlement …. [the] Civil Code

15   section 47 litigation privilege applies as a matter of law"); *Rosenthal v. Irell &

16   Manella*, 135 Cal. App. 3d 121, 128 (1982) (letter sent by an attorney to induce

17   plaintiff's professional liability insurers to settle a malpractice action against him was

18   absolutely privileged under § 47(b)); *Asia Inv. Co. v. Borowski*, 133 Cal. App. 3d

19   832, 842 (1982) (settlement proposal that was an alleged "threat to coerce" through

20   legal action was absolutely privileged under § 47(b)).

21        DC's claim is therefore barred by the litigation immunity as both the alleged

22   "consent agreements" and discussions regarding the Siegels' and Shusters' settlement

23   objectives and strategies were clearly communications made in the course of "judicial

24   or quasi-judicial proceedings"; "by litigants or other participants authorized by law";

25   "to achieve the objects of the litigation"; and "have some … logical relation to the

26   _____

27   [11] As discussed more fully in Section II.E below, DC's declaration was submitted in
connection with Defendants' December 30, 2008 motion to compel the production of the
alleged "consent agreement."  That motion was denied by Judge Larson, in part because it

28   involved information exchanged during settlement  mediation  and subject to the parties'
May 1, 2008 JAMS Confidentiality Agreement.  RJN, Ex. B at 12:15-19.

1    action." *Silberg,* 50 Cal. 3d at 211-12.  As DC's Sixth Claim alleges liability based

2    on communications in the course of litigation the claim is barred by § 47(b).

3                    **2.        Mediation Confidentiality**

4            DC's use of the alleged "consent agreement" in this, or any other matter, is

5    also expressly barred by the mediation confidentiality privilege promulgated in

6    California Evidence Code § 1115 *et seq.*:

7            "[The] Legislature designed the mediation confidentiality statutes [§ 1115 *et
        seq.*] to promote 'a candid and informal exchange regarding events in the past
8        …. This frank exchange is achieved only if the participants know that what is
        said in the mediation will not be used to their detriment through later court
9        proceedings and other adjudicatory processes.'"

10   *Simmons v. Ghaderi*, 44 Cal. 4th 570, 578 (2008) (quoting *Foxgate Homeowners'*

11   *Assn. v. Bramalea California, Inc.*, 26 Cal. 4th 1, 14 (2001)).  Section 1119

12   "prohibits any person, mediator and participants alike, from revealing any written or

13   oral communication made during mediation."  *Foxgate Homeowners' Assn.*, 26 Cal.

14   4th at 14 (2001).  Sub-section 1119(a) states, in pertinent part, that "[n]o evidence of

15   anything said or any admission made for the purpose of, in the course of, or pursuant

16   to, a mediation … is admissible or subject to discovery."  Sub-section 1119(b) states,

17   in pertinent part, that "[n]o writing … that is prepared for the purpose of, in the

18   course of, or pursuant to, a mediation or a mediation consultation, is admissible or

19   subject to discovery."  Accordingly, "statements made during mediation and

20   mediation materials are confidential not only during the mediation, but also after the

21   mediation ends."  *Simmons*, 44 Cal. 4th at 580.  *See also Benesch v. Green*, 2009

22   U.S. Dist. LEXIS 117641, at *11 (N.D. Cal. Dec. 17, 2009) ("Courts strictly apply

23   [California's] mediation confidentiality statutes….").

24           The disclosure of the "consent agreement" was solely "for the purpose of, in

25   the course of, or pursuant to" the JAMS mediation sessions in *Siegel*, as admitted by

26   DC.  RJN, Ex. A.  Therefore, no evidence regarding this disclosure "is admissible or

27   subject to discovery," nor may it used "after the mediation ends."  *Simmons*, 44 Cal.

28   4th at 580; § 1119(a); § 1126.  As DC's Sixth Claim rests on a confidential

disclosure, plainly shielded by § 1115 *et seq*., and which cannot be used as evidence, the Sixth Claim must fail as a matter of law.

### E.   DC's Allegations in Paragraphs 157 and 175 of the Complaint Must Be Stricken as Violative of Its JAMS Confidentiality Agreement

DC's reference in its Complaint to the Siegels' and the Shuster Executor's alleged settlement strategy and objectives in the form of alleged "consent agreements" constitutes a deliberate breach of not only the mediation privilege of California Evidence Code § 1115 *et seq.*, but also of the parties' JAMS Confidentiality Agreement dated May 1, 2008 between DC and the Siegels and the Shuster Executor ("Confidentiality Agreement") regarding the parties' settlement negotiations.  RJN, Ex. C.

### 1.   Procedural Background

After Judge Larson issued the March 26, 2008 order upholding the validity of the Siegel Terminations as to *Action Comics, No. 1*, he ordered on March 31, 2008 that the parties participate in settlement discussions with a JAMS mediator.  RJN, Ex. E.  The parties thereafter retained the services of the Honorable Daniel Weinstein (Ret.).  In anticipation of the parties' court-ordered mediation, the parties negotiated and entered into a JAMS Confidentiality Agreement on or about May 1, 2008.  RJN, Ex. C.  This agreement substantially strengthened the provisions of the standard "JAMS Confidentiality Agreement," and was specifically negotiated by the parties' counsel to ensure that the parties could speak freely during settlement discussions, and that such discussions would not be used by either side in litigation "in any way, shape or form."  The Confidentiality Agreement provides, in relevant part:

> "The provisions of the Central District of California Local Rule 16-15…also apply to this mediation. Pursuant to Local Rule 16-5.8, the mediation and any settlement conference or discussion ("Settlement Conference") shall be confidential, and no part of any Settlement Conference shall be reported, or otherwise recorded, without the consent of the parties. With respect to California Evidence Code § 1122, any agreement to disclose under subsections (a)(1) or (a)(2) of that section must expressly be made in writing. THIS CONFIDENTIALITY AGREEMENT… EXTENDS TO ALL PRESENT AND FUTURE

CIVIL, JUDICIAL, QUASI-JUDICIAL, ARBITAL,
ADMINISTRATIVE OR OTHER PROCEEDINGS."

RJN, Ex. C at 1 (emphasis in original).  Paragraph 4 provides that "[t]he privileged character of any information or documents is not altered by the disclosure to the mediator or the disclosure in any Settlement Conference."  *Id.*  Paragraph 5 provides:

> "All parties, counsel and any other persons attending any Settlement Conference shall treat all such discussions as strictly confidential in every respect, including without limitation, the contents or substance of any oral or written statements made at the Settlement Conference, and all other substantive aspects of such Settlement Conference ('Confidential Settlement Information').  ***Without limitation, any document that is marked 'Confidential – For Settlement Purposes Only' and is disclosed or produced at or in connection with a Settlement Conference shall be treated as Confidential Settlement Information.  Confidential Settlement Information shall not be*** disclosed to anyone other than the parties, their counsel or the mediator or ***used in any way, shape or form for any purpose, including impeachment, in any pending or future proceeding in any court, in whole or in part, directly or indirectly***, orally or in writing, except as set forth in paragraph 6 below."

*Id.* at 2 (emphasis added).  Paragraph 6 provides that information will not be considered Confidential Settlement Information *only* if it is:

> "(a) publicly available, (b) already in possession of the adverse party or their counsel prior to its disclosure by a party or their counsel at a Settlement Conference, or (c) is developed independently of any Settlement Conference and without reference thereto."

*Id.*  Paragraph 7 expressly limits disclosures to the Court regarding the parties' settlement communications, demonstrating the parties' sensitivity to the abuse of any aspect of their settlement discussions in Court, and it even specifies the limited language to be used in the "joint report" to the Court outlining the parties' settlement efforts if the parties did not succeed in settling this case.  *Id.*

On May 2, 2008, the Siegels' counsel disclosed a settlement strategy of the Siegels and Shusters and briefly described its general nature ("Settlement Strategy") in a letter to Defendants' counsel marked "CONFIDENTIAL – FOR SETTLEMENT PURPOSES ONLY," thus qualifying it as "Confidential Settlement Information" under the parties' Confidentiality Agreement.  RJN, Ex. A.  The first sentence of the letter expressly states:  "This letter is sent pursuant to the 'JAMS Confidentiality

Agreement' and solely in connection with the upcoming settlement mediation sessions." *Id.* The Settlement Strategy – contained in a communication between the Siegels, the Shuster Executor and their mutual counsel, Mr. Toberoff, concerning settlement – is also clearly protected by the attorney-client privilege, the joint interest privilege and the attorney work-product doctrine. RJN, Ex. F at 9-13. The Settlement Strategy was made shortly before and solely for purposes of the parties' settlement mediation, which commenced on May 8, 2008. *Id.* at 13-15. Pursuant to the parties' longstanding discovery agreement, acknowledged by DC, the Siegels had no obligation to disclose this post-litigation communication on a privilege log, or otherwise, as it was created after the commencement of this litigation and for purposes of a settlement mediation. RJN, Ex. D at 13:16-18.

Nonetheless, on December 30, 2008, DC moved to compel the production of the Settlement Strategy in flagrant breach of the parties' JAMS Confidentiality Agreement. The Siegels asserted that their Settlement Strategy was protected by the Confidentiality Agreement, as well as the attorney-client privilege, joint-interest privilege[12] and the work product doctrine. RJN, Ex. F at 9-15.

At the January 14, 2009 hearing on DC's motion, its counsel went so far as to try to describe the Settlement Strategy to the Court but was stopped in his tracks:

> MR. BERGMAN: Would your Honor permit me to use the one-word adjective with which Mr. Toberoff described the letter?
> ***
> THE COURT: No.

RJN, Ex. B at 11:7-16. The Court thereafter denied DC's motion:

> THE COURT: Part of this is motivated simply by the Court's commitment to maintaining the settlement privilege. It was the Court that encouraged you to engage in that settlement effort, and I want to maintain the confidences that were agreed to during that period. So that motion is denied.

---

[12] *See United States ex. rel. Burroughs v. DeNardi Corp.*, 167 F.R.D. 680, 685 (S.D. Cal. 1996) ("[W]hether the jointly interested persons are defendants or plaintiffs, and whether the litigation or potential litigation is civil or criminal, the rationale for the privilege is clear: Persons who share a common interest in litigation should be able to communicate confidentially with their respective attorneys, and with each other, to more effectively prosecute or defend their claims."); RJN, Ex. F at 9-13.

1    *Id.* at 12:15-19.  *See also* RJN, Ex. G.

2          **2.     DC's Use of the Settlement Strategy Contravenes the Court's Prior Order and Is Barred By the "Law of the Case"**

3    DC is also precluded from re-litigating the issue of the Settlement Strategy by

4    the "law of the case" doctrine, as such was already litigated and held to be privileged

5    by Judge Larson as described above.  *See Siegel,* Docket Nos. 395, 442.  The "law of

6    the case" doctrine stands for the common-sense principle that the same *issue*

7    presented a second time in the same court should lead to the same result, as to do

8    otherwise "would create intolerable instability for the parties."  *Ridgeway v. Mont.*

9    *High School Ass'n*, 858 F.2d 579, 587-88 (9th Cir. 1988).  Thus, "a court is generally

10   precluded from reconsidering an issue that has already been decided by the same

11   court, or a higher court."  *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993).  The

12   law of the case doctrine applies with equal force to related cases.  *See also Disimone*

13   *v. Browner*, 121 F.3d 1262, 1266-67 (9th Cir. 1997).[13]

14

15         **3.     DC's Allegations in the Complaint Once Again Violate the JAMS Confidentiality Agreement and Must Be Struck**

16   Eighteen months after DC's motion to compel was denied, DC and its

17   attorneys have once again willfully breached the JAMS Confidentiality Agreement,

18   violated the mediation privilege as described in Section II.D.2 above, *and* defied this

19   Court's January 14, 2009 order by purporting to disclose the Settlement Strategy in

20   paragraph 157 of the Complaint.  The Settlement Strategy was indisputably

21   Confidential Settlement Information under the parties' agreement and was disclosed

22   "at or in connection with a Settlement Conference" after the Confidentiality

23   Agreement was signed.  RJN, Ex. C at 2.  As noted above, the first sentence of the

24   May 2, 2008 letter disclosing the Settlement Strategy expressly states:  "This letter is

25   sent pursuant to the 'JAMS Confidentiality Agreement' and 'solely in connection

26   _____

27   [13] *See also* 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4478 at 788 (1981) (the "law of the case" doctrine reflects "the respect that one judge or court owes the rulings of another judge or court in the same or closely related cases"); *Moss v. Crawford & Co.*, 201 F.R.D. 398, 401 n.1 (W.D. Pa. 2000) ("law of the case" doctrine applies to issues

28   determined in "closely related" cases); *Mason v. Texaco, Inc.*, 741 F. Supp. 1472, 1492 (D. Kan. 1990) ("law of the case doctrine 'encompasses … the rulings of another judge or court in … a closely related case.'").

1    with the upcoming settlement mediation sessions.'" RJN, Ex. A. Pursuant to

2    paragraph 7 of the Confidentiality Agreement, the letter was clearly marked

3    "CONFIDENTIAL – FOR SETTLEMENT PURPOSES ONLY." *Id*. The

4    Settlement Strategy does not qualify for any of the exceptions in paragraph 6 of the

5    Confidentiality Agreement as it has never been publicly available, was not already in

6    DC's possession, nor "developed independently" of the Settlement Conference.

7    By express agreement of the parties, the Settlement Strategy, and even its

8    existence and subject matter, therefore constitutes Confidential Settlement

9    Information, which is confidential to all except the parties and the mediator. RJN,

10   Ex. C at 2. Accordingly, per the parties' Confidentiality Agreement, the Settlement

11   Strategy cannot be "used in any, way shape or form for any purpose, including

12   impeachment, in any pending or future proceeding in any court, in whole or in part,

13   directly or indirectly, orally or in writing." *Id*.

14   The Siegels and their counsel obviously relied on the Confidentiality

15   Agreement and the sanctity of the settlement and mediation privileges when they

16   made their disclosure. Indeed, the whole purpose of the Confidentiality Agreement

17   was to enable the parties to comfortably make disclosures in the course of a

18   settlement mediation that they would not otherwise make, including privileged or

19   confidential information that, when disclosed, might further settlement.

20   DC and its counsel have shamelessly chosen with their Complaint to breach

21   the Confidentiality Agreement, and the mediation privilege, and have defied this

22   Court's January 14, 2009 Order. RJN, Ex. B at 11:7-16, 12:15-19. They have done

23   so willfully even though the parties' Confidentiality Agreement expressly applies to

24   "ALL PRESENT AND FUTURE CIVIL, JUDICIAL … PROCEEDINGS." RJN,

25   Ex. C at 1 (emphasis in original). This Court, as before, should not countenance

26   DC's brazen gamesmanship. Defendants hereby move that such allegations be

27   stricken from the Complaint (Complaint, ¶¶ 88, 157-160, 175-176, 179-80) pursuant

28   to F.R.C.P. 12(f), and that DC be enjoined from any further use of such settlement

1   discussions in this litigation or otherwise, pursuant to the mediation privilege and the

2   express terms of the Confidentiality Agreement.  *See Fantasy, Inc. v. Fogerty*, 984

3   F.2d 1524, 1527 (9th Cir. 1993) (*rev'd on other grounds*, 510 U.S. 517 (1994))

4   (F.R.C.P. 12(f)'s essential function is to "avoid the expenditure of time and money

5   that must arise from litigating spurious issues by dispensing with those issues prior to

6   trial.").[14]

7

8   ### 4.    The Third and Sixth Claims Necessarily Fail, Once Such Privileged Settlement Information Is Struck

9         DC's Third and Sixth Claims are inexorably based on allegations purporting to

10  disclose privileged Confidential Settlement Information in willful violation of the

11  mediation privilege, the parties' JAMS Confidentiality Agreement, and this Court's

12  January 14, 2009 Order.  *See* Complaint, ¶¶ 88, 157-60, 175-76, 179-80.  Once such

13  allegations are properly struck by the Court pursuant to F.R.C.P. 12(f), the Third and

14  Sixth Claims necessarily fail to state a claim.  *See In re Connetics Corp. Secs. Litig.*,

15  542 F. Supp. 2d 996, 1006 (N.D. Cal. 2008) (granting motion to dismiss where "the

16  complaint cannot possibly make sufficient allegations against these defendants in the

17  absence of the stricken paragraph"); *Fraker v. Bayer*, 2009 U.S. Dist. LEXIS 125633,

18  at *25 (E.D. Cal. Oct. 2, 2009) (where "portion of the [complaint] that alleges a

19  factual basis for Plaintiff's claim … has been order[ed] stricken from the [complaint]

20  … [the] claim must fail for failure to state a claim").

21  ///

22  ///

23  ///

24

25  ─────────────
    [14] Moreover, DC's willful breach entitles Defendants to an injunction against DC's
    disclosure of Confidential Settlement Information pursuant to the Confidentiality

26  Agreement. RJN, Ex. C at 3 (stating that "any breach of this Agreement would cause
    irreparable injury" and that "any [party] to this Agreement may obtain an injunction to

27  prevent disclosure of any such confidential information").  Defendants therefore will
    respectfully request that DC as well as the closely affiliated defendants in the related

28  *Superman* and *Superboy* cases be enjoined from any further use of such privileged
    "Confidential Settlement Information."

1

## CONCLUSION

2          For the foregoing reasons, Plaintiff's Third and Sixth Claims for Relief should

3    be dismissed with prejudice.

4    DATED:  August 13, 2010          TOBEROFF & ASSOCIATES, P.C.

5
                                      By_____
6                                              Marc Toberoff

7                                     Attorneys for Defendants Mark Warren Peary,
                                      as personal representative of the Estate of
8                                     Joseph Shuster, Joanne Siegel and Laura Siegel
                                      Larson
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28