EXHIBIT 1

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10    JOANNE SIEGEL and LAURA SIEGEL    )
      LARSON,                          )    CASE NO. CV-04-8400-SGL (RZx)
11                                     )
                                       )    [Consolidated for pre-trial and discovery
12                    Plaintiffs,      )    purposes with CV-04-8776-SGL (RZx)]
                                       )
13    v.                               )    ORDER GRANTING IN PART AND
                                       )    DENYING IN PART PLAINTIFFS'
14    WARNER BROS. ENTERTAINMENT       )    MOTION FOR PARTIAL SUMMARY
      INC.; TIME WARNER INC.; and DC   )    JUDGMENT; ORDER GRANTING IN
15    COMICS,                          )    PART AND DENYING IN PART
                                       )    DEFENDANTS' MOTION FOR PARTIAL
16                    Defendants.      )    SUMMARY JUDGMENT
                                       )
17    _____ )

18        The termination provisions contained in the Copyright Act of 1976 have aptly

19    been characterized as formalistic and complex, such that authors, or their heirs,

20    successfully terminating the grant to the copyright in their original work of authorship

21    is a feat accomplished "against all odds."  2 WILLIAM F. PATRY, PATRY ON COPYRIGHT

22    § 7:52 (2007).

23        In the present case, Joanne Siegel and Laura Siegel Larson, the widow and

24    the daughter of Jerome Siegel, seek a declaration from the Court that they have

25    overcome these odds and have successfully terminated the 1938 grant by Jerome

26    Siegel and his creative partner, Joseph Shuster, of the copyright in their creation of

27    the iconic comic book superhero "Superman," thereby recapturing Jerome Siegel's

28    half of the copyright in the same.  No small feat indeed.  It requires traversing the

EXHIBIT 1

Page 8

Case 2:10-cv-03633-ODW-RZ     Document 42-4     Filed 08/30/10     Page 3 of 199   Page
ID #:1373
Case 2:04-cv-08400-SGL-RZ     Document 293     Filed 03/26/2008     Page 2 of 72

1   many impediments — many requiring a detailed historical understanding both

2   factually and legally of the events that occurred between the parties over the past

3   seventy years — to achieving that goal and, just as importantly, reckoning with the

4   limits of what can be gained through the termination of that grant.

5       Any discussion about the termination of the initial grant to the copyright in a

6   work begins, as the Court does here, with the story of the creation of the work itself.

7       In 1932, Jerome Siegel and Joseph Shuster were teenagers at Glenville High

8   School in Cleveland, Ohio.  Siegel was an aspiring writer and Shuster an aspiring

9   artist; what Siegel later did with his typewriter and Shuster with his pen would

10  transform the comic book industry.  The two met while working on their high

11  school's newspaper where they discovered their shared passion for science fiction

12  and comics, the beginning of a remarkable and fruitful relationship.

13      One of their first collaborations was publishing a mail-order fanzine titled

14  "Science Fiction: The Advance Guard of Future Civilization."[1]  In the January, 1933,

15  issue, Siegel and Shuster's first superman character appeared in the short story

16  "The Reign of the Superman," but in the form of a villain not a hero.  The story told

17  of a "mad scientist's experiment with a deprived man from the breadlines" that

18  transformed "the man into a mental giant who then uses his new powers — the

19  ability to read and control minds — to steal a fortune and attempt to dominate the

20  world."  (Decl. Michael Bergman, Ex. HH at 1126).  This initial superman character

21  in villain trappings was drawn by Shuster as a bald-headed mad man.

22      A couple of months later it occurred to Siegel that re-writing the character as

23  a hero, bearing little resemblance to his villainous namesake, "might make a great

24  comic strip character."  (Decl. Michael Bergman, Ex. HH at 1126).  Much of Siegel's

25  desire to shift the role of his protagonist from villain to hero arose from Siegel's

26  exposure to despair and hope:  Despair created by the dark days of the Depression

27

28      [1]  A fanzine is a publication, usually distributed at no or nominal cost,
produced by fans of a particular topic (such as comic books, opera, murder
mystery stories, etc.) for others who share their interest.

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 4 of 199   Page
ID #:1374
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 3 of 72

1   and hope through exposure to the "gallant, crusading heros" in popular literature

2   and the movies. (Decl. Michael Bergman, Ex. HH at 1126). The theme of hope

3   amidst despair struck the young Siegel as an apt subject for his comic strip:

4   "Superman was the answer — Superman aiding the downtrodden and oppressed."

5   (Decl. Michael Bergman, Ex. HH at 1126).

6           Thereafter, Siegel sat down to create a comic book version of his new

7   character. While he labored over the script, Shuster began the task of drawing the

8   panels visualizing that script. Titling it "The Superman," "[t]heir first rendition of the

9   man of steel was a hulking strongman who wore a T-shirt and pants rather than a

10   cape and tights." (Decl. Michael Bergman, Ex. HH at 1129). And he was not yet

11   able to hurdle skyscrapers, nor was he from a far away planet; instead, he was

12   simply a strong (but not extraordinarily so) human, in the mold of Flash Gordon or

13   Tarzan, who combated crime. Siegel and Shuster sent their material to a publisher

14   of comic books — Detective Dan — and were informed that it had been accepted

15   for publication. Their success, however, was short-lived; the publisher later

16   rescinded its offer to publish their submission. Crestfallen, Shuster threw into the

17   fireplace all the art for the story except the cover (reproduced below), which Siegel

18   rescued from the flames.

19

20

21

22

23

24

25

26

27

28



Undaunted, Siegel continued to tinker with his character, but decided to try a different publication format, a newspaper comic strip. The choice of crafting the material in a newspaper comic strip format was influenced both by the failure to get their earlier incarnation of the Superman character published by <u>Detective Dan</u> in a comic book format, and by the fact that, at the time, black-and-white newspaper comic strips — not comic books — were the most popular medium for comics. As one observer of the period has commented:

> It is worth noting the extent to which early comic books were conjoined with newspaper strips of the day. The earliest comic books consisted of reprints of those newspaper strips, re-pasted into a comic book page format. When original material began appearing in comic book format, it was generally because companies that wished to publish comic books were unable to procure reprint rights to existing newspaper strips. The solution to this . . . was to hire young [comic strip artists] to simulate the same kind of newspaper strip material.

Case 2:10-cv-03633-ODW-RZ     Document 42-4     Filed 08/30/10     Page 6 of 199     Page
ID #:1376
Case 2:04-cv-08400-SGL-RZ     Document 293     Filed 03/26/2008     Page 5 of 72

(Decl. Mark Evanier, Ex. A at 5-6).

On a hot summer night in 1934, Siegel, unable to sleep, began brainstorming over plot ideas for this new feature when an idea struck him: "I was up late counting sheep and more and more ideas kept coming to me, and I wrote out several weeks of syndicate script for the proposed newspaper strip. When morning came, I dashed over to Joe [Shuster]'s place and showed it to him." (Decl. Michael Bergman, Ex. HH at 1129). Siegel re-envisioned his character in more of the mythic hero tradition of Hercules, righting wrongs in present-day society. His inspiration was to couple an exaggeration of the daring on-screen acrobatics performed by such actors as Douglas Fairbanks, Sr., with a pseudo-scientific explanation to make such fantastic abilities more plausible in the vein of Edgar Rice Burroughs' John Carter of Mars stories, and placing all of this within a storyline that was the reverse of the formula used in the Flash Gordon serials. The end product was of a character who is sent as an infant to Earth aboard a space ship from an unnamed distant planet (that had been destroyed by old age) who, upon becoming an adult, uses his superhuman powers (gained from the fact that his alien heritage made him millions of years more evolved than ordinary humans) to perform daring feats for the public good.

· Siegel named his character "Superman." Unlike his previous incarnation, Siegel's new Superman character's powers and abilities were much more extraordinary and fantastic: Superhuman strength; the ability to leap 1/8th of a mile, hurdle a twenty-story building, and run faster than an express train; and nothing less than a bursting shell could penetrate his skin. Siegel placed his character in a very cosmopolitan environment that had the look and feel of mid-thirties America. He also humanized his character by giving his superhero an "ordinary person" alter ego: Mild-mannered, big-city newspaper reporter Clark Kent. Siegel developed this concept of Superman's secret identity both as a means for his superhero to maintain an inconspicuous position in everyday society and as a literary device to

1  introduce a conflict — and the potential for story lines centered around that conflict

2  — between the character's dual identities, a conflict played out no more

3  dramatically than in the love "triangle" between the character's dual identities and

4  another newspaper reporter, Lois Lane.

5      Shuster immediately turned his attention to giving life and color to Siegel's

6  idea by drawing illustrations for the story.  Shuster conceived of the costume for

7  Siegel's Superman superhero — a cape and tight-fitting leotard with briefs, an "S"

8  emblazoned on an inverted triangular crest on his chest, and boots as footwear.  In

9  contrast, he costumed Clark Kent in a nondescript suit, wearing black-rimmed

10  glasses, combed black hair, and sporting a fedora.  He drew Superman and his

11  alter ego Clark Kent with chiseled features, gave him a hairstyle with a distinctive

12  curl over his forehead, and endowed him with a lean, muscular physique.  Clark

13  Kent hid most of these physical attributes behind his wardrobe, which he could

14  quickly doff revealing his Superman costume underneath when he was called to

15  action by someone in need of his superpowers.  One of the earliest of Shuster's

16  sketches of Superman and Clark Kent from this 1934 or 1935 period are depicted

17  below:

18

19

20

21

22

23

24

25

26

27

28

Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 7 of 72



CLARK KENT        SUPERMAN
ONE AND SAME!

The two then set about combining Siegel's literary material with Shuster's graphical representations. Together they crafted a comic strip consisting of several weeks' worth of material suitable for newspaper syndication. Siegel typed the dialogue and Shuster penciled in artwork, resulting in four weeks of Superman comic strips intended for newspapers. (Decl. Michael Bergman, Ex. H at 1). The art work for the first week's worth "of daily [comic] strips was completely inked" and thus ready for publication. (Decl. Michael Bergman, Ex. H at 1). The "three additional weeks of 'Superman' newspaper comic strip material" differed from the first week's material "only in that the art work, dialogue and the balloons in which the dialogue appeared had not been inked," instead consisting of no more than black-and-white pencil drawings. (Decl. Michael Bergman, Exs. G at 2 & H at 1-2).

Siegel also wrote material to which Shuster provided no illustrations: A paragraph previewing future Superman exploits, and a nine-page synopsis of the storyline appearing in the three weeks of penciled daily Superman newspaper comic strips. (Decl. James Steranko, Ex. A at 4; Decl. Michael Bergman, Ex. H at

7

EXHIBIT 1   Page 14

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 9 of 199    Page
ID #:1379
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 8 of 72

2).

The two shopped the character for a number of years to numerous publishers but were unsuccessful. As Siegel later recalled: One publisher "expressed interest in Superman," but preferred that it be "published in comic book form where it would be seen in color" rather than "a black-and-white daily strip," a suggestion to which he and Shuster balked given their earlier experience with the comic book publisher of Detective Dan. (Decl. Michael Bergman, Ex. H at 2).

In the meantime, Siegel and Shuster penned other comic strips, most notably "Slam Bradley" and "The Spy," that were sold to Nicholson Publishing Company. When Nicholson folded shop in 1937, Detective Comics acquired some of its comic strip properties, including "Slam Bradley" and "The Spy."

On December 4, 1937, Siegel and Shuster entered into an agreement with Detective Comics whereby they agreed to furnish some of these existing comic strips for the next two years, and further agreed "that all of these products and work done by [them] for [Detective Comics] during said period of employment shall be and become the sole and exclusive property of [Detective Comics,] and [that Detective Comics] shall be deemed the sole creator thereof . . . ." (Decl. Michael Bergman, Ex. A). The agreement further provided that any new or additional features by Siegel and Shuster were to be submitted first to Detective Comics, who was given a sixty-day option to publish the material.

Soon thereafter Detective Comics decided to issue a new comic book magazine titled Action Comics and began seeking new material. Inquiry was made of many newspaper comic strip publishers, including McClure Newspaper Syndicate. Amongst the material submitted by McClure to Detective Comics was the previously rejected Siegel and Shuster Superman comic strip. Detective Comics soon became interested in publishing Siegel and Shuster's now well-traveled Superman material, but in an expanded thirteen-page comic book format, for release in its first volume of Action Comics.

8

EXHIBIT 1  Page 15

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 10 of 199    Page
ID #:1380
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 9 of 72

On February 1, 1938, Detective Comics returned the existing Superman newspaper comic strip material to Siegel and Shuster for revision and expansion into a full-length, thirteen-page comic book production. Detective Comics' desire to place Superman in a comic book required that Siegel and Shuster reformat their existing Superman newspaper material by re-cutting the strip into separate panels and then re-pasting it into a comic book format.

An issue emerged due to Detective Comics' additional requirement that there be eight panels per page in the comic book. Siegel and Shuster's existing Superman newspaper material did not have enough drawings to meet this format. In response, portions of the thirteen-page comic went forward with fewer than eight panels per page, and in the remaining pages Shuster either trimmed or split existing panels to stay within the page size, or drew additional panels from the existing dialogue to meet the eight-panel requirement. As Shuster later recounted:

> The only thing I had to do to prepare Superman for comic book publication was to ink the last three weeks of daily strips which I had previously completely penciled in detail. In addition, I inked the lettering and the dialogue and story continuity and inked in the balloons containing the dialogue. Certain panels I trimmed to conform to Detective's page size. I drew several additional pictures to illustrate the story continuity and these appear on page 1 of the first Superman release. This was done so that we would be certain of having a sufficient number of panels to make a thirteen page release. Finally, I drew the last panel appearing on the thirteenth page. Detective's only concern was that there would be panels sufficient for thirteen complete pages. Jerry told me that Detective preferred having eight panels per page but in our judgment this would hurt the property. I specifically refer to the very large panel appearing on what would be page 9 of the thirteen page release. We did not want to alter this because of its dramatic effect. Accordingly, on this page but six panels appeared.

(Decl. Michael Bergman, Ex. G at 2). Siegel similarly recollected:

> Upon receiving word from Detective that we could proceed, Joe Shuster, under my supervision, inked the illustrations, lettering and dialogue balloons in the three weeks of daily strips that had been previously penciled. In addition, he trimmed certain pictures to meet Detective's panel specifications and extended others. To assure ourselves of having the proper number of

9

EXHIBIT 1  Page 16

1

2

3

> panels we added several pictures to illustrate the story continuity, I had already written. Added as well for this reason was the scientific explanation on page 1 of the release and the last panel at the foot of page 13.

(Decl. Michael Bergman, Ex. H at 5).

On or around February 16, 1938, the pair resubmitted the re-formatted Superman material to Detective Comics. Soon thereafter Detective Comics informed Siegel that, as he had earlier suggested to them, one of the panels from their Superman comic would be used as the template (albeit slightly altered from the original) for the cover of the inaugural issue of Action Comics. (Decl. Michael Bergman, Ex. I).

On March 1, 1938, prior to the printing of the first issue of Action Comics, Detective Comics wrote to Siegel, enclosing a check in the sum of $130, representing the per-page rate for the thirteen-page Superman comic book release and enclosing with it a written agreement for Siegel and Shuster's signatures. The agreement assigned to Detective Comics "all [the] good will attached . . . and exclusive right[s]" to Superman "to have and hold forever." (Decl. Michael Bergman, Ex. F). Siegel and Shuster executed and returned the written assignment to Detective Comics.

This world-wide grant in ownership rights was later confirmed in a September 22, 1938, employment agreement in which Siegel and Shuster acknowledged that Detective Comics was "the exclusive owner[]" of not only the other comic strips they had penned for Nicholson (and continued to pen for Detective Comics), but Superman as well; that they would continue to supply the artwork and storyline (or in the parlance of the trade, the "continuity") for these comics at varying per-page rates depending upon the comic in question for the next five years; that Detective Comics had the "right to reasonably supervise the editorial matter" of those existing comic strips; that Siegel and Shuster would not furnish "any art copy . . . containing the . . . characters or continuity thereof or in any wise similar" to these comics to a third party; and that Detective Comics would have the right of first refusal (to be

10

EXHIBIT 1    Page 17

1  exercised within a six-week period after the comic's submission) with respect to any

2  future comic creations by Siegel or Shuster.

3      Detective Comics announced the debut of its <u>Action Comics</u> series with full

4  page announcements in the issues of some of its existing publications.  Specifically,

5  in <u>More Fun Comics</u>, Vol. 31, with a cover date of May, 1938, Detective Comics

6  placed the following black-and-white promotional advertisement on the comic's

7  inside cover, which reproduced the cover of the soon-to-be published first issue of

8  <u>Action Comics</u>, albeit in a greatly reduced size:



25      Similarly, <u>Detective Comics</u>, Vol. 15, with a cover date of May, 1938, had a

26  full-page black-and-white promotional advertisement on the comic's inside cover

27  which contained within it a reproduction of the cover (again in a reduced scale) of

28  the soon-to-be published first issue of <u>Action Comics</u>:

11

EXHIBIT 1    Page 18



To provide some context and contrast, the cover of the first issue of <u>Action Comics</u> is notable for its difference from the promotional advertisements both in its scale and its colorized format.



Superman itself was published by Detective Comics on April 18, 1938, in Action Comics, Vol. 1, which had a cover date of June, 1938. A full reproduction of the original Superman comic contained in Action Comics, Vol. 1, is attached as an addendum to this Order. See Attachment A to this Order. The Superman comic became an instant success, and Superman's popularity continues to endure to this day as his depiction has been transferred to varying media formats.

The Superman character has evolved in subsequent works since his initial depiction in Action Comics, Vol. 1. These additional works have added decades of new material to further define, update, and develop the character (such as his origins, his relationships, and his powers and weaknesses) in an ongoing flow of new exploits and supporting characters, resulting in the creation of an entire fictional Superman "universe." For instance, absent from Action Comics, Vol. 1, was any

13

EXHIBIT 1     Page 20

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 15 of 199    Page
ID #:1385
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 14 of 72

1   reference to some of the more famous story elements now associated with

2   Superman, such as the name of Superman's home planet "Krypton." Many of

3   Superman's powers that are among his most famous today did not appear in Action

4   Comics, Vol. 1, including his ability to fly (even through the vacuum of space); his

5   super-vision, which enables him to see through walls ("x-ray" vision) and across

6   great distances ("telescopic" vision); his super-hearing, which enables him to hear

7   conversations at great distances; and his "heat vision," the ability to aim rays of

8   extreme heat with his eyes. The "scientific" explanation for these powers was also

9   altered in ensuing comics, initially as owing to differences in gravity between Earth

10  and Superman's home planet (the latter being much larger in size than the former),

11  and later because Krypton orbited a red sun, and his exposure to the yellow rays of

12  Earth's sun somehow made his powers possible. In a similar Earth-Krypton

13  connection, it was later revealed that Superman's powers could be nullified by his

14  exposure to Kryptonite, radioactive mineral particles of his destroyed home planet.

15      Aside from the further delineation of Superman's powers and weaknesses,

16  many other elements from the Superman story were developed in subsequent

17  publications. Some of the most famous supporting characters associated with

18  Superman, such as Jimmy Olsen and rival villains Lex Luthor, General Zod, and

19  Brainiac, were created long after Action Comics, Vol. 1, was published. Moreover,

20  certain elements contained in Action Comics, Vol. 1, were altered, even if slightly, in

21  later publications, most notably Superman's crest. In Action Comics, Vol. 1, the

22  crest emblem was a small, yellow, inverted triangle bearing the letter "S" in the

23  middle, shown throughout the comic as solid yellow in most instances and as a red

24  "S" in two instances. Thereafter, the emblem changed, and today is a large yellow

25  five-sided shield, outlined in the color red, and bearing the letter "S" in the middle,

26  also in the color red.

27      The acclaim to which the release of Action Comics, Vo. 1, was greeted by

28  the viewing public quickly made Superman not only the iconic face for the comic

14

EXHIBIT 1    Page 21

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 16 of 199    Page
ID #:1386
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 15 of 72

1   book industry but also a powerful super-salesman for his publisher.  Detective

2   Comics oversaw the creation, development, and licensing of the Superman

3   character in a variety of media, including but not limited to radio, novels, live action

4   and animated motion pictures, television, live theatrical productions, merchandise

5   and theme parks.  From such promotional activity, Detective Comics came to "own[]

6   dozens of federal trademark registrations for Superman related indicia, such as

7   certain key symbols across a broad array of goods and services."  (Decl. Paul Levitz

8   ¶ 10).  The most notable of these marks that are placed on various items of

9   merchandise are "Superman's characteristic outfit, comprised of a full length blue

10  leotard with red cape, a yellow belt, the S in Shield Device, as well as certain key

11  identifying phrases[,]" such as "'Look! . . . Up in the sky! . . . It's a bird! . . . It's a

12  plane! . . . It's Superman!"  (Decl. Paul Levitz ¶ 10).

13          Meanwhile, Siegel continued to submit other comic book characters to

14  Detective Comics that were also published.  Sometimes these submissions were

15  without Shuster serving as an illustrator and sometimes, such as in the case of

16  Superman's youthful persona "Superboy," see Siegel v. Time Warner Inc., 496 F.

17  Supp. 2d 1111 (C.D. Cal. 2007), without illustrations accompanying the submission.

18  Among these subsequent creations was "The Spectre," a comic written by Siegel

19  and illustrated by Bernard Baily, which first appeared in 1940 in Detective Comics'

20  More Fun Comics, Vol. 52.  The comic told the story about a superhero with a

21  supernatural bent — the character being the spirit of a police officer killed in the line

22  of duty while investigating a gangland overlord and who, after meeting a higher

23  force in the hereafter, is sent back to Earth with nearly limitless abilities but offered

24  eternal rest only when he has wiped out all crime.

25          With Superman's growing popularity, a growing rift developed between the

26  parties.  Siegel and Shuster believed that Detective Comics' poached the artists

27  apprenticing out of Siegel and Shuster's studio in Cleveland by moving them in-

28  house to its New York offices, and further believed that Detective Comics had not

15

EXHIBIT 1  Page 22

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 17 of 199    Page
ID #:1387
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 16 of 72

1   paid them their fair share of profits generated from the exploitation of their

2   Superman creation and from the profits generated from copycat characters that

3   they believed had their roots in the original Superman character. As a result, in

4   1947, Siegel and Shuster brought an action against Detective Comics' successor in

5   interest in New York Supreme Court, Westchester County, seeking, among other

6   things, to annul and rescind their previous agreements with Detective Comics

7   assigning their ownership rights in Superman as void for lack of mutuality and

8   consideration.

9       After a trial, official referee J. Addison Young issued detailed findings of fact

10   and conclusions of law wherein he found that the March 1, 1938, assignment of the

11   Superman copyright to Detective Comics was valid and supported by valuable

12   consideration and that, therefore, Detective Comics was the exclusive owner of "all"

13   the rights to Superman. The parties eventually settled the Westchester action and

14   signed a stipulation on May 19, 1948, whereby in exchange for the payment of over

15   $94,000 to Siegel and Shuster, the parties reiterated the referee's earlier finding

16   that Detective Comics owned all rights to Superman. Two days later, the official

17   referee entered a final consent judgment vacating his earlier findings of fact and

18   conclusions of law, and otherwise reiterating the recitals contained in the stipulation.

19       The feud between the parties did not end after the Westchester action. In

20   the mid-1960s, the simmering dispute boiled anew when the expiration of the initial

21   copyright term for Superman led to another round of litigation over ownership to the

22   copyright's renewal term.[2] In 1969, Siegel and Shuster filed suit in federal district

23   court in New York seeking a declaration that they, not Detective Comics' successor

24   _____

25       [2] Under the Copyright Act of 1909 (the "1909 Act"), which was in effect at
26   the time of Siegel and Shuster's creation of Superman and later assignment of
     rights in the same to Detective Comics, an author was entitled to a copyright in his
27   work for twenty-eight years from the date of its publication. See 17 U.S.C. § 24,
     repealed by Copyright Act of 1976, 17 U.S.C. § 101 et seq. Upon the expiration of
28   this initial twenty-eight year term, the author could renew the copyright for a
     second twenty-eight year period (the "renewal term").

EXHIBIT 1    Page 23

1   (National Periodical Publications, Inc.), were the owners of the renewal rights to the

2   Superman copyright.  See Siegel v. National Periodical Publications, Inc., 364

3   F.Supp. 1032 (S.D.N.Y. 1973), aff'd by, 508 F.2d 909 (2nd Cir. 1974).  The end

4   result of the litigation was that, in conformity with United States Supreme Court

5   precedent at the time, see Fred Fisher Music Co. v. M. Witmark & Sons, 318 U.S.

6   643, 656-59 (1943), in transferring "all their rights" to Superman in the March 1,

7   1938, grant to Detective Comics (which was reconfirmed in the 1948 stipulation),

8   Siegel and Shuster had assigned not only Superman's initial copyright term but the

9   renewal term as well, even though those renewal rights had yet to vest when the

10  grant (and later the stipulation) was made.

11           After the conclusion of the 1970s Superman litigation, the New York Times

12  "ran a story about how the two creators of Superman were living in near destitute

13  conditions":

14               Two 61-year-old men, nearly destitute and worried about
                 how they will support themselves in their old age, are
15               invoking the spirit of Superman for help. Joseph Shuster,
                 who sits amidst his threadbare furniture in Queens, and
16               Jerry Siegel, who waits in his cramped apartment in Los
                 Angeles, share the hope that they each will get pensions
17               from the Man of Steel.

18  Mary Breasted, Superman's Creators, Nearly Destitute, Invoke His Spirit, N.Y.

19  TIMES, Nov. 22, 1975, at 62.

20           Apparently in response to the bad publicity associated with this and similar

21  articles, the parties thereafter entered into a further agreement, dated December

22  23, 1975.  See id. ("'There is no legal obligation,' Mr. Emmett[, executive vice-

23  president of Warner Communications, Inc.,] said, 'but I sure feel that there is a

24  moral obligation on our part'").  In the agreement, Siegel and Shuster re-

25  acknowledged the Second Circuit's decision that "all right, title and interest in"

26  Superman ("including any and all renewals and extensions of . . . such rights")

27  resided exclusively with DC Comics and its corporate affiliates and, in return, DC

28  Comics' now parent company, Warner Communications, Inc. ("WCI"), provided

17

EXHIBIT 1    Page 24

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 19 of 199    Page
ID #:1389
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 18 of 72

1    Siegel and Shuster with modest annual payments for the remainder of their lives;

2    provided them medical insurance under the plan for its employees; and credited

3    them as the "creators of Superman." In tendering this payment, Warner

4    Communications, Inc. specifically stated that it had no legal obligation to do so, but

5    that it did so solely "in consideration" of the pair's "past services . . . and in view of

6    [their] present circumstances," emphasizing that the payments were "voluntary."

7    The 1975 agreement also made certain provisions for Siegel's spouse Joanne,

8    providing her with certain monthly payments "for the balance of her life if Siegel"

9    died before December 31, 1985. Finally, Warner Communications, Inc. noted that

10   its obligation to make such voluntary payments would cease if either Siegel or

11   Shuster (or their representatives) sued "asserting any right, title or interest in the

12   'Superman' . . . copyright." As the years went by Warner Communications, Inc.

13   increased the amount of the annual payments, and on at least two occasions paid

14   the pair special bonuses.

15        As the time grew nearer to the December 31, 1985, cutoff date for surviving

16   spouse benefits, Joanne Siegel wrote the CEO for DC Comics expressing her

17   "terrible worry" over the company's refusal to provide Jerome Siegel life insurance

18   in the 1975 agreement. (Decl. Michael Bergman, Ex. NN). She voiced her concern

19   that, should anything happen to her husband after the cutoff date, she and their

20   daughter "would be left without any measure of [financial] security." (Decl. Michael

21   Bergman, Ex. NN). The parties thereafter agreed by letter dated March 15, 1982,

22   that Warner would pay Joanne Siegel the same benefits it had been paying her

23   husband if he predeceased her, regardless of the time of his death. (Decl. Michael

24   Bergman, Ex. OO). Jerome Siegel died on January 28, 1996, and Joanne Siegel

25   has been receiving these voluntary survival spouse benefits since that time.

26        In the meantime, changes in the law resurrected legal questions as to the

27   ownership rights the parties had to the Superman copyright. With the passage of

28   the Copyright Act of 1976 (the "1976 Act"), Congress changed the legal landscape

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 20 of 199    Page
ID #:1390
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 19 of 72

1    concerning artists' transfers of the copyrights in their creations. First, the 1976 Act

2    expanded by nineteen years the duration of the renewal period for works, like the

3    initial release of Superman in Action Comics, Vol. 1, that were already in their

4    renewal term at the time of the Act's passage. See 17 U.S.C. § 304(b).

5        Second, and importantly for this case, the 1976 Act gave artists and their

6    heirs the ability to terminate any prior grants of the rights to their creations that were

7    executed before January 1, 1978, regardless of the terms contained in such

8    assignments, e.g., a contractual provision that all the rights (the initial and renewal)

9    belonged exclusively to the publisher. Specifically, section 304(c) to the 1976 Act

10   provides that, "[i]n the case of any copyright subsisting in either its first or renewal

11   term on January 1, 1978, other than a copyright in a work made for hire, the

12   exclusive or nonexclusive grant of a transfer or license of the renewal copyright or

13   any right under it, executed before January 1, 1978, . . . is subject to termination . . .

14   notwithstanding any agreement to the contrary . . . ."

15       It is this right of termination that Joanne Siegel and Laura Siegel Larson now

16   seek to vindicate in this case.[3]  In pursuing such a claim, the two heirs, initially

17   sought the legal assistance of a highly regarded copyright expert, Mr. Arthur J.

18

19       [3]  Although the present case only concerns the Siegel heirs' efforts to
     terminate the 1938 grant, it has come to the Court's attention that the estate of
20   Superman co-creator Joseph Shuster has recently filed termination notices to
     reclaim the rights to the Superman copyright. According to documents filed with
21   the United States Copyright Office, Mark Warren Peary, the son of Shuster's sister
     and the court-appointed representative of the Shuster estate, has given notice of
22   the estate's intent to terminate the 1938 grant of the Superman copyright to
     Detective Comics and its successors effective 2013. As executor of the Shuster
23   estate, Peary is entitled, under changes made to the 1976 termination provisions
     by the 1998 Sonny Bono Copyright Term Extension Act, to make the same
24   termination claims for the Superman copyright that Shuster or his heirs would have
     been entitled to bring beforehand. See 17 U.S.C. § 304(c)(2); 3 NIMMER ON
25   COPYRIGHT § 11.03[A][2][a] at 11-40.1 (noting that when the 1976 Act was
     originally passed if an author died without leaving heirs before exercising the right
26   to termination "the result was that no one could exercise [that] right," but this
     "harsh result" was "ameliorated" through the passage of the 1998 Act by providing
27   that, "instead of lapsing," the termination right could be exercised by "the author's
     executor, administrator, personal representative, or trustee").

28

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 21 of 199    Page
ID #:1391
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 20 of 72

1   Levine, in compiling the information necessary to draft the termination notice itself.[4]

2       On April 3, 1997, the two heirs served seven separate notices of termination

3   under section 304(c) of the 1976 Act, purporting to terminate several of Siegel's

4   potential grant(s) in the Superman copyright to defendants, including the March 1,

5   1938, assignment; the May 19, 1948, stipulation; and the December 23, 1975,

6   agreement. The termination notices also specified that they covered hundreds of

7   works, with the added proviso that the intent was for the termination notice to apply

8   "to each and every work . . . that includes or embodies" Superman, and the failure

9   to list any such work in the notice was "unintentional and involuntary." Each of the

10  termination notices had an effective date of April 16, 1999. A flurry of settlement

11  discussions between the parties quickly ensued, but just as quickly fizzled out.

12  Nearly two years then passed without much discussion between the parties.

13      The day before the purported termination was to take effect, defendants sent

14  a letter to Siegel's counsel, Mr. Levine, rejecting "the validity and scope" of the

15  termination notices. (Decl. Marc Toberoff, Ex. Q at 171). The same day DC

16  Comics Executive Vice President and Publisher Paul Levitz wrote to Joanne Siegel

17  that his company would "continue to provide the income and insurance benefits you

18  . . . have been receiving under the 1975 agreement, without prejudice to [the

19  company's] rights under that agreement, as long as we all continue to pursue the

20  goal of working together." (Decl. Michael Bergman, Ex. P).

21      Not long after the termination notices' effective date passed, the Siegel heirs

22  retained new counsel and the parties re-entered into settlement discussions to

23  resolve their respective claims to the Superman copyright. Towards that end, DC

24  Comics (and its "successors, past and present subsidiaries or affiliates") and the

25  Siegel heirs executed a tolling agreement on April 6, 2000, whereby it was agreed

26  that neither would "assert any statute of limitations . . . defense[] relating to . . . the

27

28          [4] Before going into private practice, Mr. Levine served as General Counsel
        for the United States Copyright Office and also as Executive Director for the
        National Commission on New Technological Uses of Copyrighted Works.

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 22 of 199    Page
ID #:1392
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 21 of 72

1    [Termination] Notices" based on "the passage of time during the period from the

2    date hereof until cancellation of this Tolling Agreement pursuant to paragraph 7

3    hereof (the 'Tolling Period')" while the parties attempted "to find an amicable

4    resolution in respect of the [Termination] Notices." (Reply Decl. Marc Toberoff, Ex.

5    A at 1).  The agreement further provided that the tolling period would remain in

6    effect "until 10 business days after the earlier of: (a) one of the parties terminating

7    negotiations, in writing, relating to the [Termination] Notices, or (b) the parties

8    reaching an amicable resolution of the disputes between them relating to the

9    Notices." (Reply Decl. Marc Toberoff, Ex. A at 2).

10        At some point the broad outline of a global settlement concerning the

11    copyright to the Superman material, as well as to other works Siegel either authored

12    or contributed material to Detective Comics (notably, Superboy and The Spectre

13    properties), was reached.  Specifically, on October 19, 2001, counsel for Joanne

14    Siegel and Laura Siegel Larson sent a six-page letter to Warner Bros.' General

15    Counsel confirming and summarizing the substance of the settlement.  The letter

16    concluded that "if there is any aspect of the above that is somehow misstated,

17    please let me know by [October 22, 2001] at 2:00, as I will be out of the office —

18    and likely difficult to reach — for the following four weeks." (Decl. Marc Toberoff,

19    Ex. BB).

20        A week later, on October 26, 2001, Warner Bros' General Counsel John

21    Shulman responded with a letter, stating that he had "reviewed" the summary set

22    forth in the October 19 letter, and then "enclose[d] . . . a more fulsome outline of

23    what we believe the deal we've agreed to is"; the outline was five pages long.

24    (Decl. Marc Toberoff, Ex. CC).  The letter concluded that Warner Bros. was

25    "working on the draft agreement" so as to "have this super-matter transaction in

26    document form." (Decl. Marc Toberoff, Ex. CC).

27        A few months later, on February 1, 2002, outside counsel for Warner Bros.

28    provided a copy of the promised draft agreement (spanning fifty-six pages), with the

21

EXHIBIT 1    Page 28

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 23 of 199    Page
ID #:1393
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 22 of 72

1   proviso that, "[a]s our clients have not seen this latest version of the agreement, I

2   must reserve their right to comment." (Decl. Marc Toberoff, Ex. DD). Mention was

3   also made in the draft agreement for the need of certain "Stand Alone Assignments"

4   that had as yet not been finalized, something which Warner's outside counsel

5   promised would be forthcoming. (Decl. Marc Toberoff, Ex. DD).

6       Three months later, on May 9, 2002, Joanne Siegel wrote a letter to Time

7   Warner's Chief Operating Officer Richard Parsons, recounting that she and her

8   daughter had "made painful concessions and reluctantly accepted John Shulman's

9   last [settlement] proposal [in October, 2001]," but upon reading the proposed draft

10  agreement learned that they had been "stabbed in the back," as it "contained new,

11  outrageous demands that were not in the [October, 2001] proposal," such as

12  "condition[ing] recei[pt of] financial compensation for our rights on demands which

13  were not in the proposal we accepted." (Decl. Michael Bergman, Ex. Z). The letter

14  concluded that "[a]fter four years we have no deal and this contract makes an

15  agreement impossible." (Decl. Michael Bergman, Ex. Z).

16      Time Warner's CEO quickly responded with a letter of his own on May 21,

17  2002, expressing shock and dismay as "each of the major points covered in the

18  draft agreement . . . accurately represented the agreement previously reached" by

19  the parties. (Decl. Michael Bergman, Ex. AA). The letter continued by

20  acknowledging that, as with all lengthy negotiations, Time Warner "expected" that

21  the submission of the draft agreement would result in further "comments and

22  questions on the draft" by Siegel family's representatives that "would need to [be]

23  resolve[d]." (Decl. Michael Bergman, Ex. AA). The letter concluded by reaffirming

24  Time Warner's continued interest "that this agreement can be closed based upon

25  the earlier discussions with [the Siegel family's] lawyers." (Decl. Michael Bergman,

26  Ex. AA).

27      Not long thereafter, the Siegel heirs' lawyers submitted for the family's review

28  and approval a re-draft of the February 4, 2002, agreement the lawyers had crafted.

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 24 of 199    Page
ID #:1394
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 23 of 72

1    (Decl. Marc Toberoff, Ex. AA). The Siegel heirs, on September 21, 2002, rejected

2    the redraft and fired their attorneys. (Decl. Marc Toberoff, Ex. AA). That same day

3    Joanne Siegel and Laura Siegel Larson sent a letter to DC Comics' General

4    Counsel Paul Levitz notifying the company that they were "stopp[ing] and end[ing]"

5    negotiations with DC Comics, Inc., its parent company AOL Time Warner and all of

6    its representatives and associates concerning" their rights to, among other things,

7    Superman. (Decl. Michael Bergman, Ex. DD).

8        Joanne Siegel and Laura Siegel Larson thereafter filed the present action,

9    with the assistance of new counsel, Marc Toberoff, on October 8, 2004. Both sides

10    have since filed cross-motions for partial summary judgment.

11        Reduced to their essentials, the legal questions at stake in the parties' cross-

12    motions are two-fold:

13        (1) The validity and enforceability of the termination notices in light of

14    (a) whether any copyrightable Superman material contained in the promotional

15    advertisements for Action Comics, Vol. 1, lies outside the reach of the termination

16    notice (and hence, the termination notice is not enforceable against it); (b) whether

17    certain portions of the Superman comic in Action Comics, Vol. 1, are in the nature of

18    a work for hire (and hence, not subject to termination); (c) whether the failure to list

19    the 1948 consent judgment in the notices as one of the grants sought to be

20    terminated materially affects the notices of termination; (d) whether the post-

21    termination receipt of benefits under the 1975 agreement acts as a novation to re-

22    grant the Superman copyright; (e) whether the statute of limitations ran out before

23    the instant action was instituted thereby forestalling this lawsuit; and (f) whether the

24    settlement negotiations that took place between the parties resulted in an

25    enforceable agreement disposing of the claims asserted in the present action; and,

26        (2) The parameters of what was recaptured (and the rights flowing therefrom)

27    through the termination notices, namely, (a) whether plaintiffs have a right to

28    defendants' post-termination foreign profits from the exploitation of the Superman

1   copyright; (b) whether plaintiffs are entitled to profits from any of the various

2   trademarks that defendants have procured since the grant in marketing Superman;

3   (c) whether plaintiffs are entitled to profits from the derivative works of the

4   Superman material published by Detective Comics and its successors in interest

5   prior to the termination notice's effective date; and (d) whether any recovery of

6   profits extends beyond those made through DC Comics' exploitation of the

7   Superman copyright to that of its corporate siblings and parent who are licensees to

8   that copyright's movie and television rights, be it based on an alter-ego theory or

9   other notion of equity.

10          I.      Validity and Enforceability of Termination Notices

11          The 1976 Act created a new right allowing authors and their heirs the ability

12   to terminate a prior grant to the copyright in their creations. See 17 U.S.C.

13   § 304(c). The 1976 Act also set forth specific steps concerning the timing and

14   contents of the notices that had to be served to effectuate the termination of a prior

15   grant. One of the most important steps was placing a limit on the temporal reach

16   such a notice could have on what was subject to being recaptured. Specifically, the

17   "[t]ermination of the grant may be effected at any time during a period of five years

18   beginning at the end of fifty-six years from the date copyright was originally

19   secured." 17 U.S.C. § 304(c)(3) (emphasis added). Moreover, the notice is

20   required to be "served not less than two or more than ten years before" its effective

21   date.

22          Taken together, someone seeking to exercise the termination right must

23   specify the effective date of the termination, and that effective date must fall within a

24   set five-year window which is at least fifty-six years, but no more than sixty-one

25   years, from the date the copyright sought to be recaptured was originally secured,

26   and such termination notice must be served two to ten years before its effective

27   date. The purpose of this time window for terminating pre-1978 grants was so that

28   the only rights to the copyright affected thereby were those to the 19-year extension

24

EXHIBIT 1    Page 31

Case 2:10-cv-03633-ODW-RZ   Document 42-4   Filed 08/30/10   Page 26 of 199   Page
ID #:1396
Case 2:04-cv-08400-SGL-RZ   Document 293   Filed 03/26/2008   Page 25 of 72

1   in the renewal term created by the 1976 Act, leaving undisturbed the grantee's

2   vested interest to the original 28-year renewal term as set forth in the 1909 Act, the

3   governing statute at the time the grant itself was made.

4        Additional procedures required to be followed to make the termination notice

5   effective were specified as well:  The author or his or her heirs had to serve "an

6   advance notice in writing upon the grantee or the grantee's successor in title"; the

7   notice had to be signed by the author or his or her heirs; the notice was required to

8   "state the effective date of the termination"; and the notice must be "recorded in the

9   Copyright Office before the effective date of termination."  17 U.S.C. § 304(c)(4).

10       Beyond these statutory requirements, the notice was also required to

11   "comply, in form, content, and manner of service, with [the] requirements that the

12   Register of Copyrights . . . prescribe[s] by regulation."  17 U.S.C. § 304(c)(4)(B).

13   Toward that end, the Register promulgated regulations implementing this statutory

14   proviso.  See 37 C.F.R. § 201.10.  Among those regulations was one requiring the

15   terminating party to identify in the notice "each work as to which the notice of

16   termination applies."  37 C.F.R. § 201.10(b)(1)(ii).

17       As one noted author has commented, "[i]t is difficult to overstate the

18   intricacies of these [termination] provisions, the result of which is that they are

19   barely used, no doubt the result desired by lobbyists for assignees."  William Patry,

20   Choice of Law and International Copyright, 48 Am. J. Comp. L. 383, 447 (2000);

21   see also Burroughs v. Metro-Goldwyn-Mayer, Inc., 683 F.2d 610, 621 (2nd Cir.

22   1982) (commenting that the steps necessary to make a termination effective

23   oftentimes create "difficult, technical questions").  Those intricate provisions

24   oftentimes create unexpected pitfalls that thwart or blunt the effort of the terminating

25   party to reclaim the full measure of the copyright in a work of authorship.  This case

26   is no different.

27

28

25

EXHIBIT 1    Page 32

1       1.    Promotional Announcements

2            Plaintiffs gave notice that the effective date of the termination notices was

3    April 16, 1999, meaning that, backdating from that date sixty-one years, the

4    termination notices would leave unaffected (or better said, beyond their reach) any

5    statutory copyright that had been secured in the Superman material before April 16,

6    1938.  Defendants contend that the promotional announcements for Action Comics,

7    Vol. 1, featuring a graphical depiction of Superman, fall just a few days outside the

8    five-year effective window of plaintiffs' termination notices; therefore, they argue,

9    any copyright material contained in those promotional announcements, notably the

10   illustration of Superman on the cover of Action Comics, Vol. 1, is unaffected by the

11   termination notices and remains theirs to exploit exclusively.  As defendants frame

12   it, section 304(c)(3)'s five-year effective window "is tantamount to a statute of

13   limitations[;] . . . if any work falls outside the five-year window established by the

14   [termination] effective date, it cannot be recaptured, and the original copyright grant

15   remains in force for that work, allowing the grantee to continue exercising the

16   granted rights without liability."  (Defs' Mot. Partial Summ. J. at 29).  Thus, any work

17   that was published with notice prior to April 16, 1938, i.e., sixty-one years before the

18   stated effective date, remains untouched by the termination notice.[5]

19           Plaintiffs do not dispute the legal consequence section 304(c)'s five-year

20   window has in this case on the effective reach of their termination notices.  As

21   drafters of the notice, Siegel's heirs were given carte blanche in identifying the

22   termination notices' effective date.  Once they chose a date, certain consequences

23   flowed therefrom, the most important of which is to cabin the five-year window

24   _____

25           [5] Defendants also contend that the promotional advertisements are not
26   effected by the termination notices because plaintiffs failed to list those works in
     their notices.  As the Court finds that the promotional advertisements fall outside
27   the five-year window during which those notices could effectively terminate the
     grant in the copyright contained in them, the Court will not pass on the
28   consequences, if any, stemming from plaintiffs' additional failure to list those
     promotional announcements in their notices.

EXHIBIT 1    Page 33

Case 2:10-cv-03633-ODW-RZ     Document 42-4     Filed 08/30/10     Page 28 of 199     Page
ID #:1398
Case 2:04-cv-08400-SGL-RZ     Document 293     Filed 03/26/2008     Page 27 of 72

1   within which the notice can recapture any copyright secured in the material to which

2   the grant was directed.  A copyright in a work statutorily secured even just days

3   outside this five year window is beyond the effective reach of the termination notice,

4   in much the same way a tardily-filed renewal registration has been held to be

5   ineffective.  Cf. 3 NIMMER ON COPYRIGHT § 9.05[b][1] at 9-44 ("a variance of even

6   several days is fatal and that the purported renewal is void to rescue the subject

7   work from the public domain, whether filed after expiration of the one year or prior to

8   its initiation").  A leading treatise supports such a calculation and the consequences

9   flowing from it:

10              The appropriate dates for termination notices are
                measured from "the date copyright was originally
11              secured, or beginning on January 1, 1978, whichever is
                later."  In the case of pre-January 1, 1978 works,
12              "secured" means the actual date the work was first
                published with notice (or in the case of unpublished
13              works, the date of registration), e.g., April 15, 1970, not
                December 31, 1970.  Failure to pay attention to the
14              differences between the date the copyright was originally
                secured for purposes of section 304(c) termination of
15              transfer and section 305 expiration of term may lead to
                an untimely notice of termination.

16

17   2 PATRY ON COPYRIGHT § 7:43; see also 3 NIMMER ON COPYRIGHT § 11.05[B][1] at

18   11-40.11 ("Suppose that statutory copyright for a song were first secured on May

19   21, 1925.  Based on the statutory provision that termination may be effected

20   'beginning at the end of fifty-six years from the date copyright was originally

21   secured,' the first effective date for termination should be May 21, 1981"); 3 JAY

22   DRATLER, JR. AND STEPHEN M. MCJOHN, INTELLECTUAL PROPERTY LAW: COMMERCIAL

23   CREATIVE AND INDUSTRIAL PROPERTY § 6.04A[3][a] (2008) ("If the year in which a

24   work was so published predates the current year by more than sixty-one years, then

25   the termination right [to that work] under section 304(c) has expired.  The statute

26   apparently requires calculation of all these termination periods from the exact date

27   of publication, rather than from the end of the publication year, as is appropriate for

28   determining copyright terms under the 1976 Act").

27

EXHIBIT 1     Page 34

1   It is in this sense that one can say whether a termination notice is timely or

2   not, a question that does not go to the notice's validity (the notice remains valid with

3   respect to a copyright in works that was secured during the five year window) but as

4   to its enforceability against a copyright in a particular work pre- or post-dating that

5   window. Thus, the key in deciding this timeliness question begins with a

6   determination of when the copyright in the work in question was secured, and not

7   when the work itself was created.

8   The determination of when the copyright in a work is secured is when the

9   material was protected by statute, meaning when the copyright in such a work

10   secured protection under this country's copyright laws. Under the 1909 Act, "works

11   could have obtained statutory copyright . . . , without the necessity of registration,

12   simply by the act of publishing copies of the work bearing a proper copyright notice.

13   As to such works, registration did not create the copyright, but merely recorded it."

14   2 NIMMER ON COPYRIGHT § 7.16[A][2][b] at 7-148 (emphasis added); see also 17

15   U.S.C. § 10 (repealed). Thus, the initial question is whether the comic books

16   containing the promotional announcements bore such a copyright notice upon

17   them.

18   Section 19 of the 1909 Act delineated what constituted proper notice: "The

19   notice of copyright required by section 10 of this title shall consist either of the word

20   'Copyright', the abbreviation 'Copr.', or the symbol ©, accompanied by the name of

21   the copyright proprietor, and if the work be a printed literary, musical, or dramatic

22   work, the notice shall include also the year in which the copyright was secured by

23   publication." If the comic books in question contained such a notice, then the date

24   of publication is also the date the copyright in the material contained therein was

25   secured. If not, then any of the copyrightable material in the works (including the

26   promotional announcements) was never secured (absent evidence that the material

27   had been registered beforehand with the Copyright Office when it was in an

28   unpublished state) but instead was injected into the public domain.

28

EXHIBIT 1   Page 35

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 30 of 199    Page
ID #:1400
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 29 of 72

1    Here, the material submitted by defendants (the cover page for the magazine

2    and the page on which the promotional announcements is displayed) does contain

3    such a notice.  At the bottom of the promotional announcement itself is the

4    following:  "Entire contents copyright 1938 by Detective Comics, Inc."  (Decl.

5    Michael Bergman, Ex. C at 10 & Ex. D at 14).  Thus, the copyright for any of the

6    works contained in the comic books in question was secured on the date they were

7    published.

8    This leads to the next question:  What are the publication dates for the two

9    comic books that contained the promotional announcements for Action Comics,

10   Vol. 1, featuring an illustration of Superman?  Defendants have submitted the initial

11   copyright registrations for these comics, which indicate that More Fun Comics,

12   Vol. 31, was published on April 5, 1938, eleven days before the effectiveness of the

13   plaintiffs' termination notices, and that Detective Comics, Vol. 15, was published on

14   April 10, 1938, six days outside the temporal reach of the termination notices.

15   Under the 1909 Act the initial (as opposed to the renewal) copyright registration

16   constituted prima facie evidence of the publication date for a work.[6]  See 17 U.S.C.

17

18         [6]  Defendants' suggestion that the addition of section 304(a)(4)(B) by the
     Copyright Amendments Act of 1992 somehow altered this rule by extending the
19   prima facie imprimatur to renewals like those in this case is simply mistaken.
     (Defs' Reply at 40 & n.16).  That section provides that, so long as the renewal
20   occurred "within 1 year before [the] expiration" of the initial term, then "the
     certificate of such registration shall constitute prima facie evidence as to the . . .
21   the facts stated in the certificate."  However, the 1992 Act's provisions placed one
     very important proviso on its applicability — its provisions applied only where a
22   party was filing a renewal registration to the "extended term of copyright in a work."
     Thus, the amendments' provisions were limited to renewal claims to works that
23   were still in their initial term when the 1976 Act became effective, January 1, 1978,
     meaning for copyrights whose first term of copyright was secured on or after
24   January 1, 1950.  That is to say, section 304(a)(4)(B)'s provisions only applies to
     works that had yet reached the time for renewal before the 1976 Act extended the
25   term of the renewal period (unlike Superman in Action Comics, Vol. 1, or the
     comics containing the promotional announcements).  For those works, the 1992
26   amendments allowed such renewal to be made at anytime, but provided incentives
     for prompt renewal, the most notable being the extension of the prima facie rule to
27   such promptly filed renewal claims.  See 2 PATRY ON COPYRIGHT § 7:50 ("Effective
28

1  § 209 (repealed) (providing that a "certificate of registration" issued by the Register

2  of Copyrights "shall be admitted in any court as prima facie evidence of the facts

3  stated therein"); see also Epoch Productions Corp. v. Killiam Shows, Inc., 522 F.2d

4  737, 745-46 (2nd Cir. 1975); 5 PATRY ON COPYRIGHT § 17:115 (observing that the

5  reason that renewal certificates issued during the 1909 Act were not accorded

6  prima facie status was because of the "minimal attention" the Register of Copyrights

7  paid to the information contained therein; "[a]s long as original registration for a

8  work has been made, the Copyright Office accept[ed] it at face value").

9      Plaintiffs attempt to refute this prima facie evidence through expert testimony

10  and by legal argument.

11      As to the latter, plaintiffs seek to discredit the value of the initial copyright

12  registration for More Fun Comics, Vol. 31, because Detective Comics' successor

13  did not obtain that registration until nearly 28 years after its publication, on the eve

14  of the expiration of the initial copyright term. The 1909 Act required that, once

15  copyright had been secured by publication with notice, "there shall be promptly

16  deposited" the required copies of the published work and the registration claim

17  itself. 17 U.S.C. § 13 (repealed). Plaintiffs suggest that such a "late" initial

18  registration raises questions as to the trustworthiness of any of the information

19  contained in that registration. (Pls' Opp. at 48-49). Plaintiffs correctly point out that

20  Professor Nimmer in his treatise has commented that, "where there was a failure to

21

22  June 26, 1992, Congress abolished the requirements that works in their first term
    of copyright published or registered between 1964 and 1977 must be timely

23  renewed in order to enjoy the (now) 67-year renewal term. Instead, these works
    are now automatically renewed for the full term of 75 years. Copyrights whose

24  first term of copyright was secured between January 1, 1950, and December 31,
    1963, still had to have been renewed according to the requirements of the 1909

25  Act. Failure to do so resulted in the work falling into the public domain. . . .
    Renewal claims may still be filed at any time during the renewal period, and a

26  number of incentives have been added to encourage filing. [One such] incentive[]
    for renewing provided in the Copyright Act of 1992 are the prima facie status that

27  is accorded to the validity of the work"). Given that none of the comics in question
    fall within the class affected by section 304(a)(4)(B), that section's expansion of

28  the prima facie status to renewal claims does not apply here.

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 32 of 199    Page
ID #:1402
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 31 of 72

1    promptly register and deposit, under the 1909 Act, some questions as to the viability

2    of the copyright might be raised." 2 NIMMER ON COPYRIGHT § 7.16[A][2][b] at 7-150.

3    But Professor Nimmer's comments as to the collateral consequences flowing from

4    such a delay were not geared toward the validity of the copyright itself, but to the

5    existence of an impediment to bringing an action for infringement. See id. at 7-149

6    (noting that Supreme Court's Washingtonian decision effectively read the "words

7    'promptly deposited' in Section 13 . . . not . . . as a condition subsequent that, if not

8    satisfied, would result in destruction of the copyright," but rather "[t]he deposit . . .

9    requirement was (as it still is) clearly a condition precedent to the right to bring an

10    infringement action").

11            Although the general line of reasoning plaintiffs seek to draw from such a

12    "late-in-time" registration makes sense from a policy perspective, plaintiffs have

13    cited no authority that such long delays in registration vitiates or otherwise

14    diminishes the statutorily conferred prima facie presumption to which such

15    registration claims (and the information contained therein) are entitled, especially

16    once a registration has (as here) been tendered.  Moreover, even were the Court to

17    entertain plaintiffs' invitation, there remains the initial registration for the other comic

18    book in question — Detective Comics, Vol. 15 — which was obtained shortly after

19    that comic book's publication and, hence, the problem pressed by defendants with

20    the promotional announcement contained therein falling outside the effective reach

21    of the termination notice remains.

22            Plaintiffs next contend that the copies of the registration certificates

23    submitted by defendants have not been authenticated by the declarant to whose

24    declaration they are affixed, and hence, are not admissible as proof of the comic

25    books' publication date.  (Pls' Opp. at 48-49 ("the certificate is not properly

26    authenticated, but is merely attached to the declaration of defendants' attorney, who

27    appears to have no personal knowledge of it").  Such extrinsic evidence of

28    authenticity by the declarant is unnecessary for these copyright registration

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 33 of 199    Page
ID #:1403
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 32 of 72

1    certificates.  Under Federal Rule of Evidence 902(1), a "document bearing a seal

2    purporting to be that of the United States . . . or of a . . . department, officer, or

3    agency thereof," with "a signature purporting to be an attestation or execution," is

4    considered self-authenticated.  Close inspection of the copyright registration

5    certificates submitted by defendants clearly reveals the seal issued by the United

6    States Copyright Office, signed by the Register of Copyrights, and bearing the

7    following legend: "[A]ttached are additional certificates for the [comics in question]

8    which were registered in accordance with provisions of the United States Copyright

9    Law."  (Decl. James Weinberger, Ex. B & C).  The requirements of Rule 902(1)

10    have been met, rendering the copies of the copyright registration certificates as self-

11    authenticated and, thus, admissible.

12        The obscure nature of these promotional announcements does not alter this

13    analysis.  It is undoubtedly true that the existence of these announcements was not

14    widely recognized even by comic book aficionados.  That, however, does not

15    change the effect their existence has vis-à-vis the termination notices' effective

16    reach.  Once a termination effective date is chosen and listed in the notice, the five-

17    year time window is an unbendable rule with an inescapable effect, not subject to

18    harmless error analysis.  See 37 C.F.R. § 201.10(e) (limiting application to

19    "[h]armless errors in a notice" that does not "materially affect the adequacy of the

20    information") (emphasis added).  That good cause may have existed for failing to

21    structure the termination notices so as to sweep the announcements within its reach

22    does not obviate application of the rule itself.

23        The importance such promotional announcements may have on the reach of

24    a termination notice that has been tendered was not lost on plaintiffs' counsel, Mr.

25    Levine, who drafted the termination notices in this case.  He also drafted plaintiffs'

26    termination notice with respect to The Spectre copyright, and structured it in such a

27    way so as to include among the works affected by the notice's five-year window a

28    promotional announcement for The Spectre contained in a comic published a month

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 34 of 199    Page
ID #:1404
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 33 of 72

1   before the one containing the first comic book story of the character. (Decl. Michael

2   Bergman, Exs. WW-YY (termination notice describing among the works affected by

3   the notice the promotional announcement as "Spectre character appearing in

4   costume in an ad in issue No. 51 of More Fun Comics, copyrighted November 28,

5   1939, as Copyright Registration No. B437786, publication date January 1940") &

6   Decl. Paul Levitz, Ex. A (containing picture of The Spectre ad)).

7       Having provided prima facie evidence of the comic books' publication dates,

8   the burden shifts to the plaintiffs to produce some evidence calling into question

9   those dates.  The burden of production is not a heavy one (in large measure owing

10  to the fact that so little is proffered by the applicant or scrutinized by the Copyright

11  Office in the application process to procure the registration in the first instance), but

12  it is one that must be met nonetheless.  See 3 PATRY ON COPYRIGHT § 9:14 ("the

13  Copyright Office has no ability to verify facts stated in the certificate, and not

14  surprisingly makes no effort to do so. . . .  At the most, the Office can take notice of

15  any inconsistent facts that appear on the deposit copy and request clarification from

16  the claimant . . . .  In any event, [the opposing party] should be required to present

17  only a small degree of evidence calling into question the fact at issue in order to

18  rebut the certificate's presumption").

19      On that point all that plaintiffs have submitted is the opinion of a comic book

20  historian, Mark Evanier, who was retained by DC Comics in the 1970s to, among

21  other things, assist it "in attempting to determine approximate dates of past

22  publication" of its comics.  (Decl. Mark Evaier ¶ 12).  From this particular

23  experience, as well as his long history in the comic book industry, Mr. Evanier seeks

24  to cast doubt on the veracity of the asserted publication dates for the comics

25  containing the promotional announcements.  The general thrust of his expert

26  opinion is that, outside the first printing of certain famous comic superheros such as

27  Superman in Action Comics, Vol. 1,  a particular "run of the mill" comic book's exact

28  date of publication during the 1930s and 1940s is difficult to determine, rendering

33

EXHIBIT 1    Page 40

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 35 of 199    Page
ID #:1405
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 34 of 72

1   the dates listed on the certificates as nothing more than "mere guesstimates" by the

2   publisher.  (Decl. Mark Evanier ¶ 10).  Furthermore, Mr. Evanier downplays the

3   significance of the fact that the comic books in question contained promotional

4   announcements for Action Comics, Vol. 1, as necessarily meaning that their

5   publication must have preceded Action Comics publication.  As Mr. Evanier

6   explains, the dates provided by publishers were often the dates initially scheduled

7   or intended for publication, but the actual dates often varied with printing, delivery,

8   and other delays.  (Decl. Mark Evanier ¶ 11).

9        Mr. Evanier's expert opinion is chalk full of information on the publication of

10  comic books in general during this time period, but is void of any specific evidence

11  or opinion as to the publication of the particular comic books in question in this

12  case.  He offers no evidence of any specific printing, delivery, or other problems that

13  may have affected the publication of More Fun Comics, Vol. 31, or Detective

14  Comics, Vol. 15.  His general opinion thus does not sufficiently refute the prima

15  facie evidence set forth in the initial copyright registration certificates for these

16  particular comic books.  At most, his opinion raises some doubts as to the precision

17  of the dates contained in initial copyright registrations for comic books in general

18  from this period.  However, those copyright notices were completed at a time which,

19  by Mr. Evanier's own opinion, the copyright holder was attempting to be as accurate

20  as possible in listing those dates and long before any incentive to provide

21  inaccurate dates by virtue of contemplating this present litigation or the termination

22  provisions of the 1976 Act existed.  Plaintiffs evidence does no more than inform the

23  Court that, despite efforts to be precise about publication dates for comic books

24  during this particular period, mistakes could be made; it is not at all probative on the

25  issue of whether mistakes were in fact made with respect to the information

26  contained in the particular registration certificates at issue in this case.  The Court

27  therefore finds that the promotional announcements containing an illustration of

28  Superman from the cover of Action Comics, Vol. 1, are outside the effective reach

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 36 of 199    Page
ID #:1406
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 35 of 72

1    of the termination notices.

2    Perhaps anticipating this finding, plaintiffs next seek to downplay the

3    significance of the promotional announcements themselves by arguing that, legally

4    and factually, little, if any, copyrightable Superman material is contained in those

5    announcements.  Specifically, plaintiffs submit that Siegel and Shuster's material

6    was an indivisible joint work, and that the advertisements were a derivative work of

7    the authors' material.  Thus, they claim that none of the Superman material

8    contained in the promotional announcements (namely, the cover artwork from

9    Action Comics, Vol. 1) could be copyrighted, and thus, defendants cannot continue

10   to exploit the same, regardless of the termination notice.  As framed by plaintiffs:

11   "Defendants' entire argument is falsely premised on the erroneous assumption that

12   they can take the cover of Action Comics, No. 1, one of many illustrated panels in

13   Siegel and Shuster's first 'Superman' comic book story, rip it from this copyrighted

14   joint work, and own a separate copyright in the illustration in the form of a mere 'in

15   house announcement' depicting a reduced image of the illustration.  [Moreover,]

16   Detective's 'in-house announcements,' at best, are derivative works based on the

17   pre-existing cover and interior panel of Siegel and Shuster's pre-existing

18   'Superman' story."  (Pls' Opp. at 44, 46).

19   This emphasis on the joint nature of Siegel and Shuster's Superman material

20   is rendered nugatory by the fact that Siegel and Shuster granted the copyright in

21   their material to Detective Comics on March 1, 1938, well before the promotional

22   advertisements were published by Detective Comics in April of that year.  Thus, by

23   the time the promotional announcements were published, Siegel and Shuster's

24   Superman material was owned solely by Detective Comics to do with it as it saw fit,

25   whether it be as a full-length comic or as artwork in its advertising.  That Siegel and

26   Shuster intended their work to be combined together and depicted as a unitary

27   whole is a separate and distinct question from whether, in later using some of

28   Shuster's artwork from that combined material it had acquired, Detective Comics

35

EXHIBIT 1    Page 42

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 37 of 199    Page
ID #:1407
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 36 of 72

1   somehow unraveled the copyrightability in that portion of the work. The manner of a

2   work's authorship is entirely separate from the way in which an assignee may

3   exploit that material once it has acquired exclusive ownership of the same and,

4   correspondingly, whether there were anything copyrightable in the work the

5   assignee subsequently published using only parts of that material.

6        In this respect it is important to remember that a joint work can consist of

7   either inseparable or interdependent parts, the latter example of which include "the

8   collaborative musical works of Gilbert and Sullivan . . . ., [t]hese works are the result

9   of the interdependent contributions of the collaborators, i.e., one person wrote the

10  lyrics and the other the music, either of which could on its own [stand] as an

11  independent work, but which, when combined, form a single[, separate]

12  'interdependent' joint work." 2 PATRY ON COPYRIGHT § 5:6. The original Superman

13  material was the product of the story and dialogue written by Siegel and the art work

14  drawn by Shuster; each on its own could have been a work in its own right subject

15  to copyright protection, but when merged together they formed a single new and

16  unified interdependent work. See Siegel v. Time Warner, Inc., 496 F.Supp.2d 1111,

17  1145 (C.D. Cal. 2007) (where this Court held, in regard to Superboy, "the copyright

18  to [the same] (if a joint work) would be considered comprised of interdependent

19  parts — Siegel's dialogue and storyline . . . and Shuster's artwork giving life and

20  color to those words").

21        At most, Detective Comics took a part of Shuster's independently

22  copyrightable art work out of the joint work and utilized it, in conjunction with other

23  material (namely, the advertising slogan), in a promotional announcement. There is

24  no rule preventing a publisher or others from publishing portions or excerpts of

25  works, joint or otherwise, that it solely owns, and then seeking a separate copyright

26  in the same. Indeed, the opposite is true — the holder of a copyright is expressly

27  entitled to prepare derivative works based upon a copyrighted work it owns or to

28  utilize portions of that work in other materials. See 17 U.S.C. § 106(2); see

generally 17 U.S.C. § 1 (repealed). Detective Comics could just as well have decided to split up the Superman material for publication into two or three installments as it could (and did) decide to publish a portion of that material in an advertisement to promote the comic.

This leads to plaintiffs' contention that the "derivative nature" of the promotional advertisement itself works to exclude any of the copyright in the pre-existing Superman material (notably, the art work for the Action Comics, Vol. 1 cover) contained therein from enuring to the benefit of the defendants to continue to exploit. Generally, if an author contributes additional original material to a pre-existing work so as to recast, transform, or adapt that work, then the copyright protection afforded to the author of that derivative work extends only to that additional material and in no way extends to the underlying, pre-existing material. See 17 U.S.C. § 103(b) (specifying that a derivative work's copyright does not extend to any part of that work using "preexisting material in which copyright subsists"); 1 NIMMER ON COPYRIGHT § 3.03, at 3-10. Thus, it is asserted that the author of the pre-existing material work (here Siegel and Shuster) would continue to retain ownership in the same despite its use in the derivative work (the promotional announcement).

Even assuming that the changes made to the cover page for Action Comics, Vol. 1, in the promotional announcements is not merely a reproduction, but sufficiently "recast, transform, or adapts" the pre-existing material so as to be considered a derivative work thereof (e.g, the cover is shown in black and white instead of color, the scale of the artwork itself is diminished, and text is placed alongside the artwork), there remains a complicating wrinkle. At the time the promotional announcements were placed in Detective Comics' existing comic book publications, the underlying pre-existing Superman material from which a portion of the announcements were derived (again the artwork for the cover) had yet to be published, and, hence, copyright in the same was protected at the time under state

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 39 of 199    Page
ID #:1408
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 38 of 72

1  common law.  See 17 U.S.C. § 2 (repealed).

2  Given that the portion of the pre-existing material at issue had yet to achieve

3  statutory copyright protection when it was first published in More Fun Comics, Vol.

4  31, and Detective Comics, Vol. 15, it was injected into the public domain upon the

5  publication of the promotional announcements themselves, absent investiture of

6  statutory copyright protection through its publication.  See 17 U.S.C. § 10

7  (repealed).  That is to say, the copyright in the cover of Action Comics, Vol. 1, itself

8  first achieved statutory protection, if at all, upon its publication in the

9  announcements, not its later publication in Action Comics, Vol. 1.  See 2 PATRY ON

10  COPYRIGHT § 6:35 ("where an investitive publication occurs, the derivative work

11  copyright covers the unpublished material").

12  This fact has repercussions on plaintiffs' derivative works argument, as it

13  alters the general rule described above.  Once Detective Comics published a

14  portion of the previously unpublished pre-existing material — as was its right as

15  owner of the material at that time — its continued protection resided exclusively

16  under statutory copyright in the derivative work itself lest that portion of the pre-

17  existing material (the art work for the cover) be injected into the public domain.  See

18  Batjac Productions Inc. v. GoodTimes Home Video Corp., 160 F.3d 1223, 1233 (9th

19  Cir. 1998); 2 PATRY ON COPYRIGHT § 6:35 ("to the extent that previously unpublished

20  material is included in an authorized published derivative work, the derivative work

21  publishes the previously unpublished material").  As Professor Nimmer explains:

22
> Because a derivative work by definition to some extent
> incorporates a copy of the pre-existing work, publication
23  > of the former necessarily constitutes publication of the
> copied portion of the latter.  Of course, an article that
24  > merely describes a pre-existing work but does not
> incorporate any substantial portion of it is not a
25  > derivative work and hence, does not publish the pre-
> existing work.  Unless the basic work is reproduced in
26  > the published work, it is not published.  If only the broad
> outlines or other fragmentary portion of the pre-existing
27  > work are copied and published in the derivative work,
> then only to that extent is the pre-existing work
28  > published.

38

EXHIBIT 1    Page 45

Case 2:10-cv-03633-ODW-RZ   Document 42-4   Filed 08/30/10   Page 40 of 199   Page
ID #:1410
Case 2:04-cv-08400-SGL-RZ   Document 293   Filed 03/26/2008   Page 39 of 72

1 NIMMER ON COPYRIGHT § 4.12[A] at 4-59 to 4-60; see also id. § 4.13[A] at 4-73

("any work published prior to January 1, 1978, was not only thereby divested of

common law copyright; it was also injected into the public domain, unless at the

moment of publication copies of the work bore a proper copyright notice").

Thus, included in defendants' right to continue to exploit the copyright in the

derivative work (the promotional announcements) is the right to the copyright in that

part of the pre-existing work (the illustration from the cover) that was published for

the first time in that derivative work.

     The cases cited by plaintiffs as standing for the contrary are all

distinguishable, as either the act of publication in question fell within the "limited"

publication exception because the material was distributed for promotional purposes

to members in the trade and not, as here, the general public itself, see Rushton v.

Vitale, 218 F.2d 434 (2nd Cir. 1955); Hub Floral Corp. v. Royal Brass Corp., 454

F.2d 1226 (2nd Cir. 1972); or because the underlying work reproduced in the

derivative work was itself in the public domain (unlike here where the underlying

material was in an unpublished state protected by common law copyright), thereby

mooting any question about divestiture of the underlying work through publication.

See Alfred Bell & Co. v. Catalda Fine Arts, 191 F.2d 99 (2nd Cir. 1951).

     Here, the promotional announcements represent the first time Superman

appeared to the public, and consequently, the first time any of Siegel and Shuster's

Superman material was protected by statutory copyright, albeit in conjunction with

the other material contained in the advertisement itself. Thus, all of the material in

the promotional announcement (which included the graphic depiction of Superman

later portrayed on the cover of Action Comics, Vol. 1) obtained statutory copyright

protection before the earliest possible date covered by the plaintiffs' termination

notices. The Court therefore finds that the publication date for at least one of the

comics containing the promotional announcements falls outside the reach of the

termination notice and, therefore, any copyrightable material contained therein

1    (including that found in the cover to Action Comics, Vol. 1, as depicted in those

2    announcements) remains for defendants to exploit.

3         This leads to the question of the scope of the copyrighted material remaining

4    in defendants' possession by way of the promotional announcements, a question

5    that defendants themselves acknowledge "is most obviously answered by [looking

6    at] the ads which speak for themselves" and that does not require some "special

7    'lens'" to resolve.  (Defs' Reply at 44).

8         The Court begins by observing what is not depicted in the announcements.

9    Obviously, nothing concerning the Superman storyline (that is, the literary elements

10   contained in Action Comics, Vol. 1) is on display in the ads; thus, Superman's

11   name, his alter ego, his compatriots, his origins, his mission to serve as a champion

12   of the oppressed, or his heroic abilities in general, do not remain within defendants

13   sole possession to exploit.  Instead the only copyrightable elements left arise from

14   the pictorial illustration in the announcements, which is fairly limited.

15        The person in question has great strength (he is after all holding aloft a car).

16   The person is wearing some type of costume, but significantly the colors, if any, for

17   the same are not represented, as the advertisement appears only in black and

18   white.  The argument that the "S" crest is recognizable in the promotional

19   advertisement is not persuasive.  What is depicted on  the chest of the costume is

20   so small and blurred as to not be readily recognizable, at best all that can be seen is

21   some vague marking or symbol its precise contours hard to decipher.  The Court

22   thus concludes that defendants may continue to exploit the image of a person with

23   extraordinary strength who wears a black and white leotard and cape.  What

24   remains of the Siegel and Shuster's Superman copyright that is still subject to

25   termination (and, of course, what defendants truly seek) is the entire storyline from

26   Action Comics, Vol. 1, Superman's distinctive blue leotard (complete with its

27   inverted triangular crest across the chest with a red "S" on a yellow background), a

28   red cape and boots, and his superhuman ability to leap tall buildings, repel bullets,

40

EXHIBIT 1    Page 47

Case 2:10-cv-03633-ODW-RZ   Document 42-4   Filed 08/30/10   Page 42 of 199   Page
ID #:1412
Case 2:04-cv-08400-SGL-RZ   Document 293   Filed 03/26/2008   Page 41 of 72

1   and run faster than a locomotive, none of which is apparent from the
2   announcement.

3        2.    Work Made for Hire Aspect of Portions of Action Comics, Vol. 1

4        Under the 1976 Act, an author's (or his or her heirs') ability to terminate a

5   prior grant in the copyright to a creation does not apply to a "work made for hire,"

6   because the copyright in such a creation was never the artist's to grant, belonging

7   instead to the one who employed the artist to create the work.  See 17 U.S.C.

8   § 304(c); Playboy Enterprises, Inc. v. Dumas, 53 F.3d 549, 554 (2nd Cir. 1995)

9   ("Once it is established that a work is made for hire, the hiring party is presumed to

10  be the author of the work").  The manner in which Siegel and Shuster's Superman

11  material was submitted, then re-submitted in a reformatted version, and finally

12  accepted for publication by Detective Comics raises questions about the work for

13  hire status of the re-formatted material (but not the initial material submitted to the

14  publisher) later published in Action Comics, Vol. 1.

15       Defendants argue that portions of the copyrightable material contained in

16  Action Comics, Vol. 1, are unaffected by the termination notice because those

17  portions belong exclusively to them as "works for hire," arguing that certain material

18  found in the comic book was created by Detective Comics' in-house employees, or

19  that the material was added to the underlying Superman material by Siegel and

20  Shuster at the publisher's direction.  (Defs' Opp. at 27).  Specifically, the alleged

21  "additional" material provided by Detective Comics' in-house employees is the color

22  choices made throughout the comic, notably, the red color of the letter "S" on

23  Superman's crest and the art work for the cover to the magazine itself (albeit

24  modeled after a interior panel in the Superman comic illustrated by Shuster).

25  Similarly, the additional material supplied in response to the publisher's February 1,

26  1938, letter is Shuster's admitted (and as acknowledged by Siegel) drawing of

27  "several additional pictures to illustrate the story continuity" appearing "on page 1 of

28  the first Superman release" and "the last panel appearing on the thirteenth page."

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 43 of 199    Page
ID #:1413
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 42 of 72

1    (Decl. Michael Bergman Ex. G at 2 & Ex. H at 5).

2         The thrust of defendants' argument was made and rejected by the Second

3    Circuit in the 1970s Superman copyright renewal litigation, and is thus precluded as

4    a matter of collateral estoppel here.  In that litigation, defendants' predecessors-in-

5    interest presented much of the same evidence now submitted in this case to argue

6    that this additional material transformed the entirety of Siegel and Shuster's

7    pre-existing Superman material published in Action Comics, Vol. 1, into a work

8    made for hire.  The Second Circuit rejected this argument, elaborating: "In the case

9    before us, Superman and his miraculous powers were completely developed long

10   before the employment relationship was instituted.  The record indicates that the

11   revisions directed by the defendants were simply to accommodate Superman to a

12   magazine format.  We do not consider this sufficient to create the presumption that

13   the [comic book] strip was a work for hire." Siegel, 508 F.2d at 914.  This

14   conclusion forecloses any further litigation on the point of whether Shuster's

15   additional drawings when reformatting the underlying Superman material into a

16   comic book format or other facts related to such a theory such as the colorization

17   process for Action Comics, Vol. 1, or the party responsible for the illustration of the

18   cover to the magazine, rendered all or portions of the resulting comic book a work

19   made for hire.

20        Defendants seek to avoid the collateral estoppel effect of the Second

21   Circuit's decision by arguing that the only issue concerning the work for hire status

22   of Action Comics, Vol. 1, related to Siegel and Shuster's 1934-1935 "contributions,"

23   and not what was "added to the first Superman story by Detective's employees,"

24   amongst whom defendants count Siegel and Shuster after they executed the

25   December, 1937, contract.  (Defs' Opp. at 36).  Such a reading conflicts with the

26   record.  The evidence that was proffered during the 1970s litigation in the trial court

27   on the work for hire question included declarations from Siegel and Shuster

28   discussing what took place during the reformatting process.  This is the same

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 44 of 199    Page
ID #:1414
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 43 of 72

1    evidence that defendants now seek to use in this case to argue that the reformatted
2    material was a work made for hire.

3          Moreover, the circumstances surrounding the reformatting of the underlying
4    Superman material was not only mentioned by the Second Circuit, but discounted
5    by that court in passing on the work for hire nature of <u>Action Comics</u>, Vol. 1, itself,
6    not just the initial contributions made by Siegel and Shuster back in 1934 and 1935.
7    It would be incongruous for the Court, in respecting as it must the Second Circuit's
8    judgment, to now hold that, while that reformatted material did not transform the
9    entirety of the material in <u>Action Comics</u>, Vol. 1, into a work made for hire, some
10    subpart thereof (and, indeed, a very limited subpart, consisting of but a few panels)
11    was somehow excised out and should be accorded work made for hire status.  The
12    litigation of the larger question sweeps within it defendants' opportunity to litigate a
13    subpart thereof.

14          A contrary holding would transgress certain core principles of collateral
15    estoppel: "A new contention is not necessarily a new issue.  If a new legal theory or
16    factual assertion raised in the second action is relevant to the issues that were
17    litigated and adjudicated previously, the prior determination of the issue is
18    conclusive on the issue despite the fact that new evidence or argument relevant to
19    the issue was not in fact expressly pleaded, introduced into evidence, or otherwise
20    urged." 18 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 132.02[2][c] at 132-25
21    (3rd ed. 2007).  Significantly, much of the evidence underlying defendants'
22    arguments was presented in the Second Circuit litigation (notably Siegel and
23    Shusters' declarations submitted in that litigation) or, if not, was certainly available
24    to be used in that case (the colorization process for the initial printing of
25    <u>Action Comics</u>, Vol. 1, or that in-house employees supposedly drew the cover to the
26    magazine).  "A party may be precluded from re-litigating an issue if evidence
27    supporting the party's position on the issue could have been submitted in previous
28    litigation but, for whatever reason, was not properly raised.  Evidence that is not the

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 45 of 199    Page
ID #:1415
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 44 of 72

1    result of a different factual situation or changed circumstances, but is instead

2    historical in nature and could have been admitted at the first trial if properly

3    submitted, cannot be introduced in subsequent litigation of the same issue." Id. §

4    132.02[2][d] at 132-25 to 132-26 (citing Yamaha Corp. v. United States, 961 F.2d

5    245, 257 (D.C. Cir. 1992)).

6         Nowhere have defendants explained why they did not bring up the question

7    of the colorization process for Action Comics, Vol. 1, or the cover art work for the

8    magazine, before the courts handling the 1970s Superman litigation.  The question

9    about the legal effect the reformatting of the underlying Superman material had on

10   the work for hire question was litigated by the parties and resolved by the courts

11   during the 1970s Superman matter.  Similarly, the question about the colorization

12   and cover art work (and who was responsible for the same) could have been raised

13   in conjunction with the work for hire question, but defendants failed or decided not

14   to do so.  Having litigated the question and having the opportunity to present all the

15   evidence that pressed on the issue, defendants are now barred from seeking to

16   relitigate it anew even under the purported limited guise that it is now being offered.

17        Some noted treatise writers have commented that the Second Circuit's

18   analysis focusing on the work for hire nature of the additional reformatted material

19   should have been analyzed as a derivative work, that is, that the additional material

20   was derivative of the underlying Superman material.  See 1 NIMMER ON COPYRIGHT

21   § 5.03[B] [1][b][I] at 5-33 n.92.  ("The Siegel decision . . . may be understood as

22   holding that the first expression of the Superman character was the underlying

23   work, and the later development of the character was a derivative work.  Because

24   only the derivative work was produced in a for-hire relationship, the underlying work

25   remains the property of the creators").  However, this analysis does not benefit

26   defendants.

27        First, no additional literary material was supplied in re-formatting the

28   underlying Superman material into a comic book format.    All the dialogue and

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 46 of 199    Page
ID #:1416
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 45 of 72

1   storyline contained in Action Comics, Vol. 1, was present before Detective Comics

2   requested the pair to provide a reformatted version of the material, and that literary

3   material remained unchanged through the reformatting process.  All that is left was

4   supplying some additional illustrations by Shuster, the precise ones specified in his

5   declaration.  From the Court's review of these additional illustrations, it appears that

6   the material is completely derivative of other panels in the Action Comics, Vol. 1,

7   comic, with its origins in the underlying Superman material.  Thus, for instance,

8   while the final panel on page 13 shows Superman's crest with a red "S" on a yellow

9   background, so, too, does another panel containing the underlying, pre-existing

10  material.  Similarly, while the panels on the first page to the comic show Superman

11  leaping skyscapers, running at high rates of speed, and demonstrating feats of

12  great strength, so, too, do other panels containing the pre-existing material.  Indeed,

13  the earliest sketches by Shuster from 1934 and 1935 demonstrate that the graphical

14  depiction of Superman was well on its way to being completely developed before

15  the re-formatted material in question was created some three years later.  Thus,

16  even if the additional material in question was tendered as a derivative work that

17  was made for hire by Shuster, all the potentially copyrightable material contained

18  therein is completely derivative of the pre-existing material and, hence, is not

19  subject to independent copyright protection in the first instance.  This, then, lends

20  strong support to the Second Circuit's observation: "Superman and his miraculous

21  powers were completely developed long before the employment relationship was

22  instituted."  Siegel, 508 F.2d at 914.

23      Defendants also argue that the coloring for Action Comics, Vol. 1, was not

24  created or chosen by Siegel or Shuster, but was instead the product of some of

25  Detective Comics' in-house employees working in the printing department.  Even if

26  this argument was not otherwise precluded by collateral estoppel, the evidence

27  produced in support is less than persuasive.  According to "eye-witness" Jack Adler,

28  the material contained in comic books "at the time" was provided by artists to the

45

EXHIBIT 1    Page 52

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 47 of 199    Page
ID #:1417
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 46 of 72

1   Detective Comics' production staff in black and white. (Decl. Jack Adler ¶ 3).

2   "Typically," members of the staff then decided upon the color that would be applied

3   throughout the magazine, something that defendants argue is an additional element

4   added to the underlying Superman material that is itself subject to copyright

5   protection. (Decl. Jack Adler ¶ 3). Defendants' argument depends entirely upon

6   Mr. Adler's declaration, which is not as clear as they suggest.

7        Mr. Adler does not state that he worked on the colorizing of <u>Action Comics</u>,

8   Vol. 1, itself. Instead he states that he "worked for the engraving company that

9   made the metal plates for printing of, among other things, comic books for Detective

10  Comics." (Decl. Jack Adler ¶ 3). He then states that, "[a]t the time, comic book

11  artists . . . submitted drawn and inked comic book work in black and white." (<u>Id</u>.).

12  Mr. Adler further states that the black-and-white pages "were then photographed by

13  the engraver and a photo print was hand[-]colored by staff at Detective and by the

14  engravers." (<u>Id</u>.). Of course, nothing in this statement precludes the possibility that,

15  even if the Superman material was so submitted, Siegel and Shuster may have also

16  placed certain color directions with their material to be utilized in the engraving

17  process. In fact, that the earlier incarnation of Superman as hulking strongman in

18  the tradition of Tarzan was created by the pair as a comic book with color

19  illustrations lends to the possibility that they already had pre-conceived color

20  choices in mind for the later comic if it were later reformatted into a comic book,

21  rather than a newspaper comic strip.

22        Moreover, viewed in context, Mr. Adler's declaration appears to describe

23  procedures generally employed in the printing process, not as evidence of what

24  actually occurred with respect to the printing of <u>Action Comics</u>, Vol. 1, itself. His

25  statement (and, in fact, the entire Adler declaration) is of dubious evidentiary value

26  in light of his candid admission that he has "no knowledge of Siegel and Shuster

27  selecting any of the color in <u>Action Comics</u>, No.1." (<u>Id</u>. ¶ 4). Mr. Adler attempts to

28  temper his admission of lack of knowledge by stating, without any basis, that he is

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 48 of 199    Page
ID #:1418
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 47 of 72

1  "aware that Detective staff member, Ed Eisenberg, selected the color for

2  Superman's 'S' in Shield on his costume." (Id.) Of course, Mr. Adler's statement on

3  this point is inadmissible as it is based on hearsay. Without any direct link between

4  Mr. Adler's work and the printing of Action Comics, Vol. 1, in particular, there exists

5  an insufficient evidentiary foundation for his conclusions concerning the manner in

6  which the Superman material was supplied to the printer and the colorization of the

7  same was handled.

8        Finally, defendants argue that the cover for Action Comics, Vol. 1, was drawn

9  by Detective Comics' in-house artists. However, the scant evidentiary basis

10  provided in support of this argument is ambiguous. In a letter sent to Jerome Siegel

11  dated February 22, 1938, Detective Comics' editor, Vin Sullivan, enclosed "a

12  silverprint of the cover of Action Comics," with the observation that Detective

13  Comics "used one of those panel drawings of SUPERMAN, as you suggested in

14  your recent letter." (Decl. Michael Bergman, Ex. I). The inference sought to be

15  drawn by defendants is that when Mr. Sullivan stated that the publisher "used" an

16  interior illustration from the Superman comic for the cover artwork he was stating

17  that one of the publisher's in-house artists saw the interior panel in question and

18  then drew the cover using the interior panel as inspiration. Of course, given the

19  limited nature of the information contained in the passage it could also be argued

20  that, in his earlier letter, Siegel enclosed an illustration by Shuster as a suggestion

21  for the comic book's cover and Detective Comics decided to "use" this suggestion.

22  This alternative reading is not implausible. As demonstrated by the pair's attempt to

23  have their earlier incarnation of Superman published by Detective Dan, Shuster had

24  in the past drawn exemplars for the cover illustration for his comics well before they

25  were ever accepted for publication.

26        In conclusion, the Court finds that the question of the work-for-hire nature of

27  certain portions of the Superman material published in Action Comics, Vol. 1, is

28  precluded from further litigation by operation of the 1974 Second Circuit decision.

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 49 of 199    Page
ID #:1419
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 48 of 72

1    Accordingly, the binding nature of that court's decision leads to the conclusion that

2    all the Superman material contained in <u>Action Comics</u>, Vol. 1, is not a work-made-

3    for-hire and therefore is subject to termination.

4         3.    <u>Failure to Include 1948 Consent Judgment</u>

5         Among the regulatory requirements promulgated by the Register of

6    Copyrights concerning the termination notice's "form, content, and manner of

7    service," 17 U.S.C. § 304(c)(4)(B), is the requirement that the notice must

8    "reasonably" identify "the grant" to which it applies.  37 C.F.R. § 201.10(b)(1)(iv).

9    Thus, if the author entered into five separate grants of rights for the same work, and

10   a notice of termination identifies only four of those grants, the fifth grant remains

11   "intact," and the grantee's rights thereunder remain unaffected.  <u>See</u> 3 NIMMER ON

12   COPYRIGHT § 11.06[B] at 11-40.22(1) n.63 ("if a grant was not effectively terminated,

13   then the rights licensed under such grant remain").

14        Here, defendants argue that plaintiffs' failure to identify the 1948 consent

15   judgment from the Westchester action is fatal to their attempts to terminate their

16   grant to the copyright in Superman, as that consent judgment was among the

17   grants leading to the transfer of ownership from the artists to Detective Comics.

18   Such argumentation is predicated upon the notion that, notwithstanding the

19   plaintiffs' act of identifying the stipulation between the parties from the Westchester

20   litigation that resulted in the consent judgment, identification of the consent

21   judgment from the Westchester action itself as (or part of) a "grant" was necessary

22   because it constituted the final step in "effectuat[ing] the transfer to [Detective

23   Comics] of the sole and exclusive ownership of all rights relating to 'Superman'";

24   "without it the rights identified in the Stipulation would not have been transferred."

25   (Defs' Opp. at 39).  The Court disagrees.

26        Although the 1976 Act nowhere defines the term "grant," the central question

27   raised is plainly one of transfer:  Did Siegel and Shuster transfer any rights to

28   Superman through or in conjunction with the 1948 consent judgment?  If so, then it

48

EXHIBIT 1   Page 55

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 50 of 199    Page
ID #:1420
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 49 of 72

1  operated as a grant by the artists in the same.

2      On that point, the 1976 Act is helpful as it defines a "transfer of copyright

3  ownership" as "an assignment, mortgage, exclusive license, or any other

4  conveyance, alienation, or hypothecation of a copyright." 17 U.S.C. § 101; see

5  Melville B. Nimmer, Termination of Transfers under the Copyright Act of 1976, 125

6  U. PA. L. REV. 947, 951-52 (1977) ("In general, the termination provisions apply to

7  any 'transfer' of copyright and to nonexclusive licenses of copyright or of any right

8  comprised in a copyright. [Thus, a] 'transfer' includes not only assignments (as

9  understood under the [1909] Act), but also exclusive licenses and any other

10  conveyance of copyright or of any exclusive right comprised in a copyright").

11      The consent judgment at issue did not effectuate any transfer of rights from

12  Siegel and Shuster to Detective Comics.  If any rights were transferred as a result of

13  the Westchester action, such a transfer was effectuated by the execution of the

14  earlier stipulated agreement of the parties, not a document created two days later

15  which simply memorialized the transfer that the stipulation itself had accomplished.

16  The binding nature of the transfer contained in the stipulation was completed the

17  moment that agreement was executed.  The consent judgment was a mere

18  formality whose execution (or lack thereof) did not detract from the otherwise

19  binding nature of the parties' earlier agreement.  It merely parroted what was

20  already agreed to by the parties in the stipulation itself.

21      Finally, even if the 1948 consent judgment is a "grant" separate and apart

22  from (or part and parcel with) the 1948 stipulation, the regulations recognize that not

23  all errors in compliance with its terms impact the validity of the termination notice:

24  "Harmless errors in a notice that do not materially affect the adequacy of the

25  information required to serve the purposes of . . . section 304(c) . . . shall not render

26  the notice invalid." 37 C.F.R. § 201.10(e)(1).  Here, viewing the issue in the light

27  most favorable to the defendants, the 1948 consent judgment simply served to

28  culminate or otherwise finalize the transfer of the Superman copyright achieved

Case 2:10-cv-03633-ODW-RZ   Document 42-4   Filed 08/30/10   Page 51 of 199   Page
ID #:1421
Case 2:04-cv-08400-SGL-RZ   Document 293   Filed 03/26/2008   Page 50 of 72

1   through the stipulation the parties reached two days earlier.  That plaintiffs only

2   identified the latter rather than the former does not materially affect defendants'

3   understanding of the "grant" sought to be affected by the notice.  Indeed, courts

4   have required much less in meeting the regulation's requirement of providing "a

5   brief statement reasonably identifying the grant being terminated."  See Music Sales

6   Corp. v. Morris, 73 F.Supp.2d 364, 378 (S.D.N.Y. 1999) (holding that description of

7   the grant in the termination notice as the "grant or transfer of copyright and the

8   rights of the copyright proprietor " was sufficient as "it appears to be boilerplate on

9   termination notices customarily accepted by the Register of Copyrights"); see also 2

10  PATRY ON COPYRIGHT § 7:45 (approving Music Sales).  Nowhere do defendants

11  argue why the harmless error rule should not apply in a situation such as this where

12  one document that is a part in the process leading to the "transfer" of rights is

13  identified, but its necessary corollary was not.

14       Accordingly, the Court concludes that, even if the consent judgment is

15  viewed as integral to the transfer of rights, plaintiffs' failure to identify it as a grant

16  subject to the termination notice was a harmless error that did not diminish the

17  notice defendants received regarding the nature of the grant (and resulting transfer

18  of rights) that plaintiffs intended to terminate.

19       4.   Continued Acceptance of Benefits Under 1975 Agreement

20       Defendants argue that Joanne Siegel's continued acceptance of benefits

21  under the parties' 1975 agreement constitutes, "as a matter of equity," a de facto

22  post-termination grant of rights in the Superman copyright to defendants under the

23  terms of that agreement (or as phrased by defendants, plaintiffs have "effectively re-

24  accepted the terms of the grant").  (Defs' Opp. at 41).  The legal premise of their

25  argument is that the 1976 Act recognizes that, once a termination notice has been

26  served and thereby vested, see 17 U.S.C. § 304(c)(6)(B), the terminating party is

27  free to make "a further grant . . . of any right covered by a terminated grant" to the

28  original grantee or its successor in title.  17 U.S.C. § 304(c)(6)(D).  The Court

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 52 of 199    Page
ID #:1422
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 51 of 72

1    ultimately rejects this argument as unpersuasive because it mistakenly assumes the

2    1975 agreement was a "grant" to the Superman copyright.

3        A look at the context leading up the execution of the 1975 agreement

4    illuminates in what way the parties believed (and just as importantly did not intend)

5    for that agreement to bind them.  The 1975 agreement appears to have been

6    drafted in response to bad publicity (apparently due to the juxtaposition of the

7    creators' misfortune and the Superman character's commercial success), and not

8    as a means to transfer or convey the party's rights to the Superman copyright.  The

9    agreement observed that nothing therein should be construed as undermining the

10   rights defendants had been conferred by virtue of the March 1, 1938, assignment,

11   rights which were later vindicated in the Westchester action and the 1970s Second

12   Circuit litigation.  Indeed, the agreement reaffirmed defendants' existing rights to

13   Superman and provided plaintiffs with annual payments, medical insurance, and

14   screen credits.  Such conferral of benefits was identified in the agreement as a

15   "voluntary" act by defendants in recognition of Siegel and Shuster's "past services."

16   The 1982 codicil, in turn, removes the condition for the promised benefits to Siegel's

17   widow on the timing of her husband's death.

18        This context and the language in the agreement itself demonstrate that the

19   1975 agreement was not a "grant."  The agreement's execution did not result in the

20   transfer or assignment of the Superman copyright.  Indeed, the agreement itself

21   expressly disavows such an interpretation by including language that the conferring

22   of benefits by defendants to Siegel and Shuster was simply a "voluntary" act in

23   recognition of the pair's "past services," and that nothing therein should be

24   construed as undermining the rights defendants had been conferred in the March 1,

25   1938, assignment as vindicated in the Westchester action and the 1970s Second

26   Circuit litigation.   Thus, by its own terms, no rights were transferred through the

27   execution of that agreement.  A reaffirmation of existing rights without more is no

28   more "an assignment" or "conveyance" of rights to a copyright than it would if

51

EXHIBIT 1        Page 58

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 53 of 199    Page
ID #:1423
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 52 of 72

1  Detective Comics had instead issued a press release declaring that previous court

2  rulings had recognized its existing ownership rights to that copyright.

3       Similarly, the 1982 codicil under which Joanne Siegel continued to receive

4  annual payments and benefits did not transfer any rights.  The codicil consists of

5  five paragraphs.  The first merely notes that the letter is in response to a letter

6  written by Joanne Siegel to the company's executive officer regarding her concern

7  over how she would provide for herself after her husband's death.  The second

8  referenced the 1975 agreement, noted the increase in the amount of the annual

9  payments from $20,000 to $50,000 thereunder, and the payment of an additional

10  bonus.  The third clarified a royalty policy that applied to creators <u>other than</u> Siegel

11  and Shuster.  The fourth set forth the agreement to continue to pay benefits to

12  Joanne Siegel for the balance of her life in the event her husband predeceased her

13  before 1985.  The fifth and final paragraph merely wishes Joanne Siegel and her

14  family well.  Nowhere in these five humble paragraphs is a transfer of rights to be

15  inferred, much less explicitly found.

16       Thus, even if Joanne Siegel's continued receipt of the benefits of the bargain

17  contained in the 1975 agreement post-termination somehow operated as a <u>de facto</u>

18  re-acceptance of the agreement itself (and the obligations flowing thereunder),

19  nowhere among those re-accepted "obligations" or "commitments" in that

20  agreement was there a grant to the Superman copyright.  Defendants protest the

21  Court drawing this conclusion, arguing that plaintiffs have admitted in their

22  pleadings (their complaint, and by filing a  termination notice directed at the 1975

23  agreement) that the 1975 agreement contained a grant to the Superman copyright.

24  It certainly is true that "[f]actual assertions in pleadings and pre-trial orders . . . are

25  considered judicial admissions" that bind the party who made them.  <u>American Title</u>

26  <u>Ins. Co. v. Lacelaw Corp.</u>, 861 F.2d 224, 226 (9th Cir. 1988).  That being said,

27  "courts still have discretion not to apply the doctrine in particular cases."  18 JAMES

28  WM. MOORE, MOORE'S FEDERAL PRACTICE § 134.33[6] at 134-84 (3rd. ed. 2007)

1  (citing New Hampshire v. Maine, 532 U.S. 742, 750 (2001) ("Because the rule is

2  intended to prevent 'improper use of judicial machinery,' judicial estoppel 'is an

3  equitable doctrine invoked by a court at its discretion'")).

4       As noted at the outset, the termination provisions contained in the 1976 Act

5  are among the most complex and technical ones in the statute.  Given this

6  complexity, it is not surprising that a party seeking to harness its machinery may,

7  out of an abundance of caution, be more "over-inclusive" in terms of listing the

8  possible "grants" it seeks to terminate.  To penalize a party for being over-inclusive

9  rather than under-inclusive is all the more inequitable given the high hurdles the

10  termination provisions put in place.  Here, plaintiffs were represented by highly

11  experienced counsel who decided to list the 1975 agreement as a "grant" so as to

12  leave no stone unturned; an approach all the more justified given the extremely

13  technical and arcane arguments that have been advanced in this litigation

14  concerning the efficacy and enforceability of the termination notices themselves.

15  The Court therefore concludes that in these circumstances discretion counsels

16  against applying the judicial estoppel doctrine in the manner advocated by

17  defendants.

18       Accordingly, the Court concludes that Joanne Siegel's continued receipt of

19  payments and benefits under the 1975 agreement and 1982 codicil thereto does not

20  constitute a "further grant" or "an agreement to make a further grant" pursuant to 17

21  U.S.C. § 304(c)(6)(D).

22       5.    Statute of Limitations

23       Defendants contend that the present action was filed untimely.  The statute

24  of limitations itself is clear enough.  The Copyright Act of 1976 provides that "[n]o

25  civil action shall be maintained under the provisions of this title unless it is

26  commenced within three years after the claim accrued."  17 U.S.C. § 507(b).  The

27  issue raised by defendants implicates the latter clause and requires the Court to

28  determine when plaintiffs' claims accrued.

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 55 of 199    Page
ID #:1425
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 54 of 72

1    At the outset, a clarification of terms is in order.  The instant matter, although

2    couched in terms of terminating the 1938 grant, is in effect one for co-ownership of

3    the copyright in the Superman material contained in Action Comics, Vol. 1,

4    because, if successful, plaintiffs would gain only a joint ownership interest in that

5    material with DC Comics, owing to the fact that Shuster left no heirs who could

6    simultaneously seek to terminate his half of the grant in the material.  Claims of co-

7    ownership accrue when there is a "plain and express repudiation of co-ownership

8    . . . communicated to the claimant."  Zuill v. Shanahan, 80 F.3d 1366, 1369 (9th Cir.

9    1996).

10    Here, defendants assert that such a repudiation was expressed by a letter

11    submitted to plaintiffs' counsel dated December 18, 1997, during the whirlwind of

12    negotiations that took place between the parties shortly after the submission of the

13    termination notices.  The Court finds to the contrary.  As explained more fully below,

14    although the letter stated a position that the termination notices were "defective," the

15    letter addressed only the scope of the rights that could be recaptured by the

16    termination notices and left unchallenged the notices' validity and enforceability,

17    thus falling short of the required repudiation.[7]

18

19    [7] One could quibble with whether any date other than the termination
effective date itself can serve as the accrual date in a case involving the right to

20    termination of a grant.  Much like having to await a judicial determination whether
one is a heir (as opposed to instances when an ownership claim is based on

21    whether or not someone is a creator) has been held to be the earliest instant for
an accrual date, see Stone v. Williams, 970 F.2d 1043 (2nd Cir. 1992) (Hank

22    Williams' putative daughter's claim to be an owner had to await judicial
determination that she was in fact his daughter and heir, thus accrual date was not

23    triggered when Hank Williams' first contested her putative status but instead when
state court made determination that she was his heir), so too a claim of ownership

24    by way of termination of a grant cannot be realized unless and until after the
termination's effective date.  Stated another way, a party's status as a creator is a

25    factual question subject to being challenged by the other putative co-owner at any
time, and hence, the accrual date for the same would begin at that instant.  The

26    same, however, is not true of a putative co-owner by way of termination.  Their
status as co-owner is not predicated upon a pre-existing factual scenario, like

27    whether they were involved in jointly creating the material per se.  Instead, their
status as a co-owner is predicated upon a legal mechanism — the exercise of a

28

54

EXHIBIT 1
Page 61

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 56 of 199    Page
ID #:1426
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 55 of 72

1       Specifically, the letter upon which defendants rely notified plaintiffs' counsel,

2    Mr. Levine, that they considered "the Superman Notices to be defective in several

3    respects." (Defs' Opp. at 50). What is telling is that the areas of defect elaborated

4    upon in the letter did not relate to the validity or enforceability of the termination

5    notices themselves, but pointed to areas curtailing the scope of what could be

6    recaptured even assuming the notice to be properly presented. These defects thus

7    did not call into question plaintiffs asserted right to termination contained in the

8    notices. For example, the letter remarks that defendants would still retain its rights

9    in trademarks that it had secured over the years to certain Superman-related

10    material, and that the termination would not give plaintiffs access to an accounting

11    of the foreign profits defendants gained from exploiting the copyright. Far from

12    repudiating plaintiff's co-ownership to the copyright, the letter acknowledged the

13    validity of that ownership interest. Thus, the letter remarked that, "if the Siegels do

14    not execute a re-grant to DC, beginning in April of 1999, DC and the Siegels will be

15    joint owners of the United States copyright in the 'Superman' comic published in

16    Action Comics No. 1 in June, 1938." (Decl. Michael Bergman, Ex. U at 2).

17       Even more telling was DC Comics' subsequent conduct. The parties'

18    negotiations quickly broke down and not much of substance was communicated

19    between the parties thereafter. Then, the day before the termination effective date,

20    DC Comics sent a letter to plaintiffs' counsel denying the validity of the termination

21

22    new statutory right revoking an earlier transfer in the copyright in question, be it
one they solely or jointly created — that takes place at a certain defined point in

23    time. Unless and until that legal triggering point is passed, there is nothing for the
other co-owner to reject or challenge. This is particularly the case given that

24    termination notices can be served up to ten years before the effective termination

25    date. Defendants' position would, as a matter of logic, countenance scenarios
where due to an early "rejection" of the termination notice, the passage of the

26    limitations period would occur well before the termination effective date even

27    arrived (and with it the putative co-owner's rights even vested). Nonetheless, the
Court need not resolve this question as the letter in question does not constitute a

28    plain and express repudiation of plaintiffs' termination notice (and, hence, its right
to co-ownership the copyright in the Siegel and Shuster Superman material).

Case 2:10-cv-03633-ODW-RZ     Document 42-4     Filed 08/30/10     Page 57 of 199     Page
ID #:1427
Case 2:04-cv-08400-SGL-RZ     Document 293     Filed 03/26/2008     Page 56 of 72

1  notice, proclaiming:

2      The absence of any steps towards negotiation for two
       years, particularly on the 'eve' of the April 16, 1999
3      purported 'effective' date of the termination, leaves us
       concerned.  Thus our client has no alternative but to
4      move to the stage of putting your clients on clear notice,
       as set forth below, of DC Comics' rights and of its
5      determination, if it becomes necessary, to take all
       appropriate and necessary steps to protect those rights.
6      First, your clients are hereby put on notice that DC
       Comics rejects both the validity and scope of the Notices
7      . . . .

8  (Decl. Marc Toberoff, Ex. Q (emphasis added)).

9      If, as defendants contend, such notice of intent had been so clearly and

10 unmistakably communicated over a year and half earlier, it is odd for them to have

11 to repeat it and then state that they were "putting" plaintiffs "on notice" about it.

12 Accordingly, the Court finds that the present action seeking declaratory relief

13 regarding plaintiffs' termination of the 1938 grant accrued on April 16, 1999, the

14 effective date of that termination.  DC Comics' submission of the letter the day

15 before that date denying the validity of the termination notice gave a plain and

16 express indication to plaintiffs that a claim for declaratory relief vis-à-vis the validity

17 of their termination notice was now ripe.  See 28 U.S.C. § 2201 ("In a case of actual

18 controversy within its jurisdiction, . . . any court of the United States, upon the filing

19 of an appropriate pleading, may declare the rights and other legal relations of any

20 interested party seeking such declaration, whether or not further relief is or could be

21 sought.")

22     Applying both the date of the accrual of the claim, the parties' tolling

23 agreement to the three-year statute of limitations, and the filing date of this action,

24 the Court concludes that it is timely.  The effective date of the termination notice,

25 and therefore the date of accrual, is April 16, 1999.  The parties entered into a

26 tolling agreement on April 6, 2000, which amounts to nine days less than one year

27

28

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 58 of 199    Page
ID #:1428
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 57 of 72

that the limitations clock ran before being tolled.[8]  The tolling agreement lasted until ten business days after plaintiffs' September 21, 2002, letter providing written notice that they were ending settlement negotiations, that is, October 4, 2002, at which time the limitations clock started ticking once more.[9]  The present action was filed two years and four days later, on October 8, 2004.  Adding the periods of time the limitations period was running together, it is clear that they add up to a period of time just short of the three-year period set forth in § 507(b).

Accordingly, the Court concludes that the present action is timely.

### 6.    The 2001-2002 Settlement Negotiations

Defendants contend that plaintiffs' termination notice is no longer effective as the parties' settlement negotiations led to them entering into a binding post-termination agreement that resolved the issues presently before the Court.  A brief review of the time line regarding those negotiations is helpful to the Court's analysis of the present issue:

October 19, 2001    Pursuant to the parties' negotiations, plaintiffs' counsel sent to defendants' counsel a six-page letter outlining the substance of a settlement offer from defendants that

---

[8]  Defendants' argument that the tolling agreement does not apply to plaintiffs' claims against Time Warner, Inc., and Warner Bros. Entertainment, Inc., because neither was a "party to" or bound by that agreement is disingenuous. (Defs' Opp. at 52).  The tolling agreement expressly provides that its terms bound not only DC Comics but also its "past and present subsidiaries or affiliates." (Decl. Marc Toberoff, Ex. Z).  Being the parent company (Time Warner, Inc.) or corporate sibling (Warner Bros. Entertainment, Inc.,) of another (DC Comics) certainly qualifies as a corporate affiliate to the same; a point defendants later admit when speaking to the alter ego question presented in the pleadings. (Defs' Mot. Summ. J. at 79 ("the following is a chart of the current corporate structure and affiliations between DC, WBEI and TWI")).  Moreover, representatives for both companies were actively involved in the settlement negotiations themselves, further undermining any suggestion that they were bystanders to the process.

[9]  Defendants argue that the tolling period concluded much earlier based on the parties earlier having reached "an amicable resolution of the dispute." (Defs' Opp. at 51 (emphasis in original)).  Given that the Court finds that no such "resolution," as opposed to a naggingly close potential for the same, occurred through the parties settlement discussion post-termination, see infra A.6, their argument is without merit.

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 59 of 199    Page
ID #:1429
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 58 of 72

1       was "accepted" by the plaintiffs.

2   October 26, 2001    Defendants responded, noting they were working on a
                        draft agreement and enclosing "a more fulsome outline"
3                       of "what" they "believe the deal" they have "agreed" to is.

4   February 1, 2002    Defendants' counsel provided a fifty-six page draft
                        agreement that reserved the right to have their clients
5                       comment upon it and noted that certain, related "stand
                        alone" assignments were in the process of being
6                       finalized.

7   May 5, 2002         Plaintiffs responded to defendants' draft by stating that
                        the proposed agreement contained new, unacceptable
8                       terms to which they had not agreed.

9   May 21, 2002        Defendants sent a letter to plaintiffs stating that they
                        believed that each of the major points in the settlement
10                      had already been agreed upon.

11  Sept 21, 2002       Plaintiffs rejected their counsel's proposed draft
                        agreement and advised defendants in writing that they
12                      were ending negotiations.

13          The parties are in agreement that California law should be applied in

14  deciding this question, but disagree as to its application. "California law is clear that

15  there is no contract until there has been a meeting of the minds on all material

16  points." Banner Entertainment v. Superior Court, 62 Cal.App.4th 348, 358 (1998).

17  The failure to reach a meeting of the minds on all material points prevents the

18  formation of a contract even if the parties have orally agreed upon some of the

19  terms, or have taken some action related to the contract. Grove v. Grove Valve &

20  Reg. Co., 4 Cal.App.3d 299, 311-12 (1970). Similarly, the terms proposed in an

21  offer must be met exactly, precisely, and unequivocally for its acceptance to result

22  in the formation of a binding contract. See Panagotacos v. Bank of America, 60

23  Cal.App.4th 851, 855-56 (1998); Apablasa v. Merritt & Co., 176 Cal.App.2d 719,

24  726 (1959). A qualified acceptance constitutes a rejection terminating the original

25  offer and the making of a counteroffer to the original offeror, which must also be

26  unequivocally accepted by the former offeror for a binding contract to form. See

27  Panagotacos, 60 Cal.App.4th at 855-56; Glende Motor Co. v. Superior Court, 159

28  Cal.App.3d 389, 396 (1984) ("California law has generally held that a qualified

58

EXHIBIT 1 Page 65

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 60 of 199    Page
ID #:1430
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 59 of 72

1   acceptance . . . affects the viability of the offer itself, so that 'a qualified acceptance

2   amounts to a new proposal or counteroffer putting an end to the original offer'"); In

3   re Pago Pago Air Crash, 637 F.2d 704, 706 (9th Cir. 1981); see also CAL. CIV. CODE

4   § 1585 ("A qualified acceptance is a new proposal.").

5          The parties disagree over whether the terms contained in plaintiffs' October

6   19, 2001, letter differ in substance from those set forth in defendants' later letter of

7   October 26, 2001 (and accompanying outline), such that there was no unequivocal

8   acceptance of an offer and, thus, no agreement.  As with much in both life and law,

9   materiality is in the eye of the beholder.  From the Court's reading of the parties'

10  correspondence, it is clear that the parties went well beyond reaching a settlement

11  in principle regarding their respective positions to the Superman property.  Rather,

12  as suggested by the time line above, the parties' correspondence, and the actions

13  taken in response thereto, illustrates that they found themselves in the all-too-

14  familiar situation in which verbal settlement negotiations result in what the parties

15  believe to be an agreement on all the major points of dispute, but which, upon

16  further discussion, falls short of the agreement needed to resolve their dispute.  The

17  devil, as it often is, was in the details.

18         That material details remained is evidenced by defendants' response to

19  plaintiffs' initial letter, enclosing "a more fulsome outline" of what it "believed the

20  deal" they had "agreed to."   Moreover, defendants' February, 2002, draft

21  agreement was not even considered final by its authors, who reserved the right for

22  their clients to "comment" on it, and would also require the further submission of a

23  number of "stand alone" agreements yet to be finalized.  Indeed, Time Warner's

24  CEO later commented that submission of the draft agreement was "expected" to

25  result in further "comments and questions" from the Siegel heirs that "would need to

26  be resolved."

27         This give and take reveals that the parties, while close to agreeing to a

28  complete and comprehensive settlement of their dispute, had not passed the

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 61 of 199    Page
ID #:1431
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 60 of 72

1   threshold where they had finalized and assented to all material terms of such a

2   settlement.  Rather, as they attempted to sketch in the finer details of a settlement

3   from the broad outlines contained in the October 19 letter, more and more issues

4   arose upon which they could not reach agreement, resulting in the negotiations

5   falling apart.  In this respect, the present case is not unlike Callie v. Near, 829 F.2d

6   888 (9th Cir. 1987), and Weddington Prods. v. Flick, 60 Cal.App.4th 793 (1998), in

7   which the courts held that no enforceable agreement was reached when the parties

8   had agreed to a rough outline of an agreement, but were thereafter unable to reach

9   agreement on the finer details and the negotiations fell apart.

10      Defendants' argument to the contrary is premised on the notion that they can

11  limit the scope of the legal analysis to the October 19, 2001, letter and call it a

12  contract, regardless of their materially different October 26, 2001, letter in reply ("I

13  enclose . . . a more fulsome outline of what we believe the deal . . . is") and their

14  vastly different February 1, 2002, draft, which were both part and parcel of the same

15  settlement negotiation.  Ignoring these contemporaneous communications is at

16  odds with the requirement in contract formation that courts must consider "all the

17  surrounding circumstances."  Donovan v. RRL Corp., 26 Cal.4th 261, 271 (2001).

18  These subsequent efforts to sketch in a more fulsome outline of the parties' alleged

19  agreement provides context and meaning as to the understanding the parties had

20  about the effect of the October 19 letter itself.

21      Defendants further seek to create issues of fact through post hoc testimony

22  and rationalizations.  None of this subjective belief is sufficient to defeat the

23  objective manifestation of the parties' intent relayed in the documents referenced

24  above that aptly demonstrate that there was no "meeting of the minds" on all

25  material terms.  See Meyer v. Benko, 55 Cal.App.3d 937, 942-43 (1976) ("The

26  existence of mutual consent is determined by objective rather than subjective

27  criteria, the test being what the outward manifestations of consent would lead a

28  reasonable person to believe.  Accordingly, the primary focus in determining the

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 62 of 199    Page
ID #:1432
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 61 of 72

1    existence of mutual consent is upon the acts of the parties involved"); Stewart v.

2    Preston Pipeline Inc., 134 Cal.App.4th 1565, 1587 (2005) ("mutual assent to a

3    contract is based upon objective and outward manifestations of the parties"); CAL.

4    CIV. CODE § 1639.

5        One need only review the language of the parties' correspondence, their

6    conduct in reaction thereto, and the numerous material differences between the

7    terms relayed in the October 19 and 26, 2001, letters and the February 1, 2002,

8    draft to reach the conclusion that the parties failed to come to an agreement on all

9    material terms.  See Grove v. Grove Valve & Reg. Co., 4 Cal.App.3d 299, 311-12

10   (1970) (failure to reach meeting of the minds on all material points prevents contract

11   formation even though parties orally agreed on many terms, or have taken action

12   relating to the contract). Far from signifying that the parties' "negotiations . . .

13   result[ed] in a binding contract" leaving nothing more than the drafting of more

14   formal documentation memorializing that agreement, see Louis Lesser Enterprises,

15   Ltd. v. Roeder, 209 Cal.App.2d 401, 404 (1962), these submissions between the

16   parties went far beyond that by adding in or further refining areas from what was

17   contained in the October 19 letter.  That after the submission of the October 19

18   letter defendants began the process of creating a settlement trust account and the

19   parties negotiated about providing Siegel and Shuster screen credits in the then

20   upcoming movie Superman Returns could as much be seen as goodwill gestures

21   on defendants' part while the negotiations continued as it could reflect an indication

22   on their part that they thought they were contractually bound to do the same.

23        From all of this there is no document or set of documents reflecting

24   agreement by the parties to singular, agreed terms.  Defendants cannot explain to

25   the Court what from the parties' differing exchange constitutes this purported

26   contract; rather, it appears that defendants wish to take the plaintiffs' "acceptance"

27   reflected in the October 19 letter and either festoon upon it all the terms contained

28   in the February 1, 2002, draft settlement agreement (even though Joanne Siegel

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 63 of 199   Page
ID #:1433
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 62 of 72

1   clearly and unequivocally rejected that latter draft agreement), or have the Court

2   perform that task. The Court's responsibility is not to create a patch-quilt agreement

3   by stringing together certain expressions of assent made at one point (October 19),

4   and attaching to it material terms spelled out later in time (and to which the

5   supposedly assenting party promptly rejected). See Industrial Indemnity v. Superior

6   Court, 224 Cal.App.3d 828, 832 (1990) ("courts will not write a new contract").

7       Accordingly, the Court concludes that the parties' settlement negotiations did

8   not result in an enforceable agreement resolving the issues presently before the

9   Court.

10  B.    Limitations on Scope of Recaptured Rights

11      The principal purpose behind the creation of the termination right was to give

12  authors (and their heirs) a chance to retain the extended renewal term in their work

13  and then re-bargain for it when its value in the marketplace was known. See H.R.

14  REP. NO. 1476, 94th Cong., 2d Sess. 124 (recognizing as the justification for the

15  termination right "safeguarding authors against unremunerative transfers . . .

16  because of the unequal bargaining position of authors, resulting in part from the

17  impossibility of determining a work's prior value until it has been exploited").

18      The need for such a second bite at the apple flowed from the fact that the

19  1909 Act created a dual term in the copyright to a work, one realized upon the

20  work's publication and the second occurring twenty-eight years later with the

21  copyright's renewal. Justification for this splitting of terms was based, in part, on the

22  understanding that an author's ability to realize the true value of his or her's work

23  was often not apparent at its creation, but required the passage of time (and the

24  marketing efforts by a publisher) to materialize. The renewal term in the copyright

25  to the work thus served as a mid-course re-valuation tool allowing the author, by

26  giving him or her the right of renewal in the work, leverage in re-negotiating a better

27  deal with the original grantee or any other suitor who desired to continue to market

28  the copyright. See Patry, Choice of Law, 48 Am. J. Comp. L. at 446 ("The main

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 64 of 199    Page
ID #:1434
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 63 of 72

1    theory behind a dual system of term was that it gave the author or the author's heirs

2    a 'second bite at the apple;' when the renewal term came around, the value of the

3    copyright would be better known than at the time of initial publication. With this

4    information, a new bargain could be struck that would more accurately reflect the

5    market rate"). This re-valuation mechanism provided by the renewal term under the

6    1909 Act was largely frustrated by the Supreme Court's decision in Fred Fisher

7    Music, 318 U.S. at 656-59, allowing authors to assign away at the outset all of their

8    rights to both the initial and the renewal term.

9        Although the termination right contained in the 1976 Act sought to correct the

10   damage done by Fred Fisher to an author's ability to renegotiate through the

11   reversion of rights, it did not revert to the author the full panoply of rights he or she

12   would have enjoyed upon renewal under the 1909 Act. Owing in large measure to

13   objections by publishers seeking to minimize the disruption to "existing contracts

14   and authorized derivative works already in distribution" that such a recapture right

15   would engender, see 2 PATRY ON COPYRIGHT § 7:43, Congress placed certain

16   limitations on what authors (or their heirs) gained from exercising the termination

17   right. It is to these limits on the termination right that the Court now turns.

18       1.    Foreign Profits

19       Section 304(c)(6)(E) to the 1976 Act provides that "[t]ermination of a grant

20   under this subsection affects only those rights covered by the grant that arise under

21   this title[, Title 17 of the United States Code, governing copyrights], and in no way

22   affects rights arising under any other Federal, State, or foreign laws." Defendants

23   read from this a statutory limitation on the scope of any accounting arising from the

24   termination notices in this case to those profits realized by the domestic exploitation

25   of the Superman copyright contained in Action Comics, Vol. 1, excluding those

26   realized from foreign sources. The Court finds this argument persuasive.

27       Although the Court can locate no case that has specifically addressed the

28   issue of accounting profits from the foreign exploitation of a copyright that is subject

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 65 of 199    Page
ID #:1435
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 64 of 72

1    to a valid termination notice, the statutory text could not be any clearer on this

2    subject. Through this section, Congress expressly limited the reach of what was

3    gained by the terminating party through exercise of the termination right;

4    specifically, the terminating party only recaptured the domestic rights (that is, the

5    rights arising under title 17 to the United States Code) of the grant to the copyright

6    in question. Left expressly intact and undisturbed were any of the rights the original

7    grantee or its successors in interest had gained over the years from the copyright

8    through other sources of law, notably the right to exploit the work abroad that would

9    be governed by the copyright laws of foreign nations. Thus, the statute explains

10   that termination "in no way affects rights" the grantee or its successors gained

11   "under foreign laws."

12        Such a reading is supported by leading commentators, who are in agreement

13   as to the effect of § 304(c)(6)(E) has in a case such as this.

14        Professor Nimmer states:

15             A grant of copyright "throughout the world" is
        terminable only with respect to uses within the
16        geographic limits of the United States. Because
        copyright has no extraterritorial operation, arguably
17        American law is precluded from causing the termination
        of rights based upon foreign copyright laws. A response
18        to this argument is that the nonextraterritoriality of
        copyright is irrelevant because the question here is one
19        of contract law, not copyright law, in that it concerns the
        effect of a contract granting certain rights. The contract
20        law of one nation may be applicable in another nation
        under the latter's conflict-of-laws rule. The conclusive
21        answer to this problem lies in the text of the termination
        provisions of the Copyright Act, which expressly provide
22        that statutory termination "in no way affects rights arising
        under . . . foreign laws" — that is, under foreign copyright
23        (not contract) laws. Thus, even if the conflicts rule of a
        foreign nation were to call for application of the American
24        termination rule as a rule of contract law, that rule by its
        own terms excepts from termination the grant of those
25        rights arising under foreign copyright laws.

26   3 NIMMER ON COPYRIGHT § 11.02[B][2] at 11-19.

27        Professor Patry agrees: "Accordingly, where a U.S. author conveys

28   worldwide rights and terminates under either section, grants in all other countries

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 66 of 199    Page
ID #:1436
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 65 of 72

1   remain valid according to their terms or provisions in other countries' laws." 7

2   PATRY ON COPYRIGHT § 25:74.

3        Plaintiffs argue, however, that the section also allows for the possibility that

4   the terminating party gains not only the domestic rights to the copyright in question

5   (the "rights covered by the grant that arise under this title"), but also retains

6   whatever other rights it may have under "Federal, State, or foreign laws."  From this

7   premise, plaintiffs argue that, because an accounting between co-owners in a

8   copyright is governed by state law, and California state law allows for the sharing of

9   foreign profits between tenants in common, so, too, should defendants be forced to

10   account for their foreign profits.  This argument misses the fact that all plaintiffs

11   have gained from the termination right is a recapturing of the <u>domestic</u> copyright in

12   the Superman material published in <u>Action Comics</u>, Vol. 1.  Defendants continue to

13   hold, unaffected, separate rights to that copyright arising under <u>foreign</u> copyright

14   laws.  This distinction is important for two reasons.

15        First, such an open effort to extend the reach of U.S. copyright law overseas,

16   as plaintiffs' reading of the statute avows, would be in direct contradiction to not only

17   the plain terms of the statute (stating that termination does <u>not</u> affect another

18   parties' rights arising under the copyright laws of "foreign" nations), but stands in

19   stark juxtaposition to the longstanding rule "that the copyright laws [of this country]

20   have no application beyond the U.S. border."  <u>Los Angeles News Serv. v. Reuters</u>

21   <u>TV Intern.</u>, 340 F.3d 926, 931 (9th Cir. 2003).  If Congress contemplated the ability

22   to attach or otherwise force the accounting of foreign profits to which the original

23   grantee or its successors are legally entitled under the copyright laws of other

24   nations through the backdoor of applying state law tenant in common principles,

25   one would have expected such an intention to have been made expressly, and

26   certainly with some explanation given the incongruity that arises from the statutory

27   language's notation that termination did <u>not</u> affect another's rights under "foreign

28   laws."

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 67 of 199    Page
ID #:1437
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 66 of 72

1    Second, the cases cited by plaintiffs requiring one co-owner to account to the

2    other for both domestic and foreign profits involved parties who were co-owners to

3    the "world-wide" copyright in the work and, not as with the termination right, to only

4    the domestic copyright.  See Goodman v. Lee, 78 F.3d 1007, 1010 (5th Cir. 1996)

5    (noting that declaratory action was filed after other co-owner obtained a "renewal of

6    the copyright" listing himself as the sole author in the song "Let the Good Times

7    Roll").  Plaintiffs have directed the Court to no case wherein a co-owner of the

8    domestic copyright in a work was allowed an accounting of a co-owner's foreign

9    profits.  See 3 NIMMER ON COPYRIGHT § 11.02[B][1] at 11-17 ("Only such rights as

10    were originally the subject of a grant will revert upon the termination of that grant.

11    [T]o the extent that a grant includes rights based upon federal law other than the

12    Copyright Act, state law, or foreign law, such rights are not subject to termination").

13    Accordingly, the Court holds that the termination notice affects only the

14    domestic portion of Siegel's and Shuster's 1938 worldwide grant ("all rights") to

15    Detective Comics of the copyright in the Superman material contained in Action

16    Comics, Vol. 1.  The termination notice is not effective as to the remainder of the

17    grant, that is, defendants exploitation of the work abroad under the aegis of foreign

18    copyright laws.  Thus, although defendants retain the unfettered right to exploit the

19    works (and retain the profits derived therefrom) in foreign nations, they may do so

20    domestically only as a co-owner (through Shuster's share) of the works.  See Oddo

21    v. Ries, 743 F.2d 630, 632-33 (9th Cir. 1984) (""[E]ach co-owner has an

22    independent right to use or license the use of the copyright. . . . . A co-owner of a

23    copyright must account to other co-owners for any profits he earns from licensing or

24    use of the copyright . . . .").  As such, defendants must account to plaintiffs only for

25    the profits from such domestic exploitation of the Superman copyright.

26    2.    Trademark Rights and Ownership of Pre-Termination Derivative

27         Works

28    As noted in the previous section, the right to termination leaves undisturbed

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 68 of 199    Page
ID #:1438
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 67 of 72

the original grantee or its successors in interests rights arising under "federal law."

17 U.S.C. § 304(c)(6)(E). Among the rights based on federal law that defendants

secured over the years were several trademarks that utilized or incorporated

portions of the copyrighted material found in Action Comics, Vol. 1. Defendants

seek a declaration from the Court that, even if successful in terminating the

Superman copyright contained in Action Comics, Vol. 1, plaintiffs cannot share in

defendants' profits "purely attributable to [Superman] trademark rights." (Defs'

Reply at 11). Plaintiffs admirably concede the point in their briefs, but argue that

they are "entitled to profits from mixed trademark uses to the extent such exploit

recaptured copyright elements (e.g., 'Superman costume')." (Pls' Reply at 49 n.28).

Similarly, defendants seek a declaration that, to the extent plaintiffs are

entitled to an accounting as a result of their successfully terminating the 1938 grant,

it should not include any profits attributable to the "post-termination exploitation of

derivative works [of Action Comics, Vol. 1,] prepared prior to termination." (Defs'

Mot. Summ. J. at 28). Again, plaintiffs concede, as they should, this point. (Pls'

Reply at 49 n.28). Section 304(c)(6)(A) provides that derivative works created

during the grant (meaning up until the termination effective date) may continue to be

exploited after termination. Again, however, plaintiffs hold out as a separate

question the existence of pre-termination derivative works that are "altered so as to

become post-termination derivative works." (Pls' Reply at 49 n.28).

Given that these contentions by plaintiffs — the recapture or accounting from

the mixed use of trademark and copyright and what to do with any alteration in pre-

termination derivative works — are not the subject of the present motion, the Court

will not address them in this Order. Even though it is clear that these issues will

impact the accounting of profits in some manner, they cannot be fully adjudicated

based on the narrow record currently before the Court and absent a full briefing of

the particular mixed uses or altered pre-termination derivative works that are

specifically at issue.

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 69 of 199    Page
ID #:1439
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 68 of 72

1    Accordingly, the Court holds that the profits defendants garner from the use

2    of Superman trademarks that "are purely attributable to [those] trademark rights,"

3    and from its use of unaltered pre-termination derivative works are not subject to

4    accounting.

5        3.    <u>Accounting for Profits of Warner Bros. Entertainment, Inc., and Time</u>

6            <u>Warner, Inc.</u>

7          The parties are in disagreement over whether plaintiffs may directly share in

8    the profits from the exploitation of the works by DC Comics corporate sibling,

9    Warner Brothers Entertainment, Inc. ("WBEI"), and its corporate parent, Time

10    Warner, Inc. ("TWI").  The genesis for this claim stems from certain inter-corporate

11    transactions amongst these actors concerning the Superman copyright.  In the

12    same year that plaintiffs' termination notices became effective, DC Comics

13    executed an exclusive license in favor of WBEI (and a year later a separate

14    exclusive license with WBEI's television division) to exploit the Superman copyright

15    for the remainder of its extended renewal term in certain media formats, notably

16    movies, television, and home video.  (Decl. Marc Toberoff, Exs. E & F).  Defendants

17    contend that, as co-owners of the joint works at issue, plaintiffs are entitled to an

18    accounting of the profits made by DC Comics (in the form of the licensing fees it has

19    collected), but that plaintiffs are not entitled to an accounting of the profits WBEI has

20    made pursuant to the license.[10]

21          Defendants' argument is not without support.  The Court  starts with the

22    general principle that "each co-owner has an independent right to use or license the

23    use of the copyright[, but that a] co-owner of a copyright must account to other

24    co-owners for any profits he earns from licensing or use of the copyright." <u>Oddo</u>,

25    743 F.2d at 633.  Licensees, on the other hand, are accountable only to their

26    

_____

27        [10]  It appears to the Court that because TWI is not a licensee of the works, it
28    may not have any profits to account for; however, absent evidence of this fact from
either side (or the representation that such is not the case), the Court cannot rule
on this issue at this time.

EXHIBIT 1    Page 75

Case 2:10-cv-03633-ODW-RZ    Document 42-4    Filed 08/30/10    Page 70 of 199    Page
ID #:1440
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 69 of 72

1    licensors, and owe no duty of accounting to the non-licensor co-owner of a

2    copyright the licensee exploits. See Ashton-Tate Corp. v. Ross, 916 F.2d 516, 523

3    (9th Cir. 1990).

4            Plaintiffs, however, take a different view of the licenses, arguing that "Warner

5    has stepped exclusively into DC's shoes with respect to such motion picture and

6    television copyrights." (Pls' Opp. at 30). In other words, the exclusive license had

7    the net effect of substituting WBEI for DC Comics as a joint owner with plaintiffs

8    (assuming the successful termination of the 1938 grant) insofar as the exploitation

9    of the copyright in the mediums in which those licenses are concerned.

10           This theory, however, requires large legal leaps that are not countenanced

11   by current law. To begin, in order for an exclusive license in the entirety of the

12   interest in a joint work itself (such as Superman) to be effective, the consent of both

13   joint owners in the copyrighted work is required. See 2 PATRY ON COPYRIGHT § 5:7

14   ("A joint author (or co-owner) may not, however, transfer all interest in the work

15   without the other co-owner's express (and written) authorization, since that would

16   result in an involuntary transfer of the other joint owner's undivided interest in the

17   whole"). The same requirement for prior consent holds true even with respect to the

18   wholesale transfer of exclusive licenses in subparts to a copyright, such as a license

19   transferring all the stage rights (not just the joint owner's rights) to a novel but not

20   the movie or literary rights. Cf. 1 NIMMER ON COPYRIGHT § 6.12[C][3] at 6-38.8 to 6-

21   39.

22           Such consent simply did not occur here. DC Comics unilaterally sought to

23   give an exclusive license to the entirety in the Superman property's movie and

24   television rights to WBEI post-termination. As a result, the attempt to provide an

25   exclusive license was ineffective. At best, all that was conveyed was a non-

26   exclusive license, and, at worst, a license agreement whose terms are null and void

27   absent ratification by plaintiffs. See 3 NIMMER ON COPYRIGHT § 10.03[A][7] at 10-51.

28           Applying these principles in a vacuum, the Court would readily reach the

EXHIBIT 1    Page 76

1   conclusion championed by defendants:  WBEI, as a licensee, is answerable only to

2   DC Comics as its licensor; that DC Comics is the only entity that must account for

3   profits to plaintiffs; and, absent exploitation of the works by DC Comics itself, that

4   DC Comics' accounting to plaintiffs is limited to those profits derived from licensing

5   the Superman copyright to WBEI.

6       However, the Court's analysis does not occur in vacuum; rather, it must take

7   into account the relevant facts of this case, particularly given that the accounting

8   sought by plaintiffs in this action is an equitable remedy, and the Court must

9   conduct its inquiry accordingly.  See Oddo, 743 F.2d at 633 ("A co-owner of a

10  copyright must account to other co-owners for any profits he earns from licensing or

11  use of the copyright, . . . but the duty to account does not derive from the copyright

12  law's proscription of infringement.   Rather, it comes from equitable doctrines

13  relating to unjust enrichment and general principles of law governing the rights of

14  co-owners.") (internal quotation marks and citations omitted).

15      Here, the relatedness of the transferor and the transferee entities cannot be

16  ignored.  The evidence before the Court reveals that the relevant entities are all

17  closely related entities — parent corporations, wholly and partially-owned

18  subsidiaries, partners, sibling business entities (owned directly or indirectly by the

19  same parent) — although it is not entirely clear to the Court exactly what those

20  relationships have been at all relevant times.  This fact alone raises a specter of a

21  "sweetheart deal" entered into by related entities in order to pay a less than market

22  value fee for licensing valuable copyrights.  If such were the case, the related entity

23  might be able to exploit the copyrights without the responsibility of answering to the

24  co-owner of a joint work, and the licensor co-owner would thereby be relieved of the

25  responsibility of accounting for any profits (other than a greatly reduced licensing

26  fee) to the non-licensor co-owner.  This result would be inequitable.

27      This concern is bolstered by the declaration of Paul Levitz, President and

28  Publisher for DC Comics, which states that under the post-2003 corporate

70

EXHIBIT 1    Page 77

Case 2:10-cv-03633-ODW-RZ   Document 42-4   Filed 08/30/10   Page 72 of 199   Page
ID #:1442
Case 2:04-cv-08400-SGL-RZ   Document 293   Filed 03/26/2008   Page 71 of 72

1   restructuring of Time Warner's business, "for operating management purposes, DC

2   reports" not to immediate corporate parent WCI, but to its sibling corporation

3   "WBEI," the licensee of the rights at issue in this action.  (Decl. Paul Levitz ¶ 17).

4   As Levitz explains, "I report to and obtain approvals from WBEI's President and

5   Chief Operating Officer before making significant acquisitions or certain financial

6   decisions or investments that are outside the scope of DC's customary acquisitions

7   and investments; before implementing meaningful strategic changes; and before

8   embarking on something substantially outside DC's normal course of business."

9   (Id.).  Although this is not evidence of what occurred at the time of the license, it is

10  still probative evidence of the relatedness of the licensee and licensor that could

11  result in an extremely favorable licensing arrangement that works to the detriment of

12  the non-licensor co-owner.  These open issues also touch upon factors to be

13  considered in analyzing alter ego claims.  See Sonora Diamond Corp. v. Superior

14  Court, 83 Cal.App.4th 523 (2000); Mesler v. Bragg Management Co., 39 Cal.3d 290

15  (Cal.1985) ("The essence of the alter ego doctrine, in which it is claimed that an

16  opposing party is using the corporate form unjustly, is that justice be done. What the

17  formula comes down to, once shorn of verbiage about control, instrumentality,

18  agency and corporate entity, is that liability is imposed to reach an equitable result").

19        Whether the license fees paid represents the fair market value therefor, or

20  whether the license for the works between the related entities was a "sweetheart

21  deal," are questions of fact that are not answered on summary judgment, certainly

22  not without the benefit of expert testimony which has not been presented by either

23  party on this topic.  The Court therefore concludes that summary judgment on this

24  issue is inappropriate at this time.[11]

25

26  _____

27      [11]  Because the Court concludes that defendants' motion for summary
    adjudication of this issue must be denied for the reasons stated above, the Court
28  does not at this time resolve other arguments raised by plaintiffs regarding this
    issue.

**CONCLUSION**

After seventy years, Jerome Siegel's heirs regain what he granted so long

ago — the copyright in the Superman material that was published in <u>Action Comics</u>,

Vol. 1.  What remains is an apportionment of profits, guided in some measure by

the rulings contained in this Order, and a trial on whether to include the profits

generated by DC Comics' corporate sibling's exploitation of the Superman

copyright.

DATE:  March 26, 2008

STEPHEN G. LARSON
UNITED STATES DISTRICT JUDGE

72

EXHIBIT 1     Page 79

EXHIBIT 2

Case 2:10-cv-03633-ODW-RZ   Document 42-4   Filed 08/30/10   Page 75 of 199   Page
ID #:1445
Jerry Siegel, Superman's Creator, Dies at 81 - Obituary; Biography - NYTimes.com



# Jerry Siegel, Superman's Creator, Dies at 81

By ROBERT McG. THOMAS Jr.
Published: January 31, 1996

Jerry Siegel, whose teen-age yearning for girls gave the world
Superman, died in Los Angeles on Sunday. He was 81 but was
remembered less as the Cleveland visionary who dreamed up the
greatest superhero of all time than as the naive young man who sold
the rights to a billion-dollar cultural and commercial juggernaut for
$130.

It was Mr. Siegel's partner, Joe Shuster, who eventually gave
Superman his familiar skin-tight costume and accompanying cape,
but it was Mr. Siegel who had imagined Superman whole, from his
birth on the doomed planet Krypton and his rocket arrival on Earth to
his superhuman powers and his mild-mannered alter ego, Clark Kent.

The vision, as he later told it, came to him in a jumble all at once, during a sleepless
summer night in Cleveland in 1934 after his graduation from Glenville High School, where
he and Mr. Shuster had already teamed up to produce a stream of comic strip characters,
including an earlier Superman, whom Mr. Siegel had imagined as a bald mad scientist.

But for all of the instant-imagined detail of the second Superman's extraterrestrial origins,
his upbringing by doting foster parents and his decision to dedicate his awesome powers
"to assist humanity," Mr. Siegel made no secret that the focus of his creative vision, the real
creature of his dreams, was Lois Lane, Kent's fellow reporter on The Daily Planet.

She was the woman who would yearn for Superman even as she shunned Kent, not
knowing that beneath his mild-mannered exterior was in fact the very man of steel, not to
mention the longing heart of Jerry Siegel.

Even discussing Superman's origins 40 years later, Mr. Siegel, who said he had thought of
becoming a reporter, seemed still to feel the stings he had suffered as a scrawny,
bespectacled high school student:

"I had crushes on several attractive girls who either didn't know I existed or didn't care I
existed," he said. "It occurred to me: what if I had something going for me, like jumping
over buildings or throwing cars around or something like that?"

Even after Mr. Shuster had rendered Mr. Siegel's fantasy in ink, it took the partners several
years to find a publisher willing to accept their creation.

And when they did, in New York, where they had been hired to produce other comic book
characters, their dream of cashing in was quickly shattered.





EXHIBIT 2

Page 80

7/27/2010

Jerry Siegel, Superman's Creator, Dies at 81 - Obituary, Biography - NYTimes.com

In March 1938, in exchange for $130 in cash, they signed away all rights to Superman to DC Comics, the company that brought Superman to commercial life that June.

When the character proved an immediate sensation and the partners sought a share of the profits, they were dismissed and lived the rest of their lives near the poverty line. After a series of lawsuits to recover their creative property failed, Mr. Shuster was eventually reduced to becoming a messenger in Manhattan and Mr. Siegel worked as a clerk typist in Los Angeles for $7,000 a year.

In 1978, after the first Superman movie made more than $80 million, DC, which over the years has received more than $250 million of the more than $1 billion that Superman has earned from movies, television and an incredible array of commercial products, bowed to public opinion, restored their bylines and gave each man a $20,000-a-year annuity, later raised to $30,000.

In their final years, the two men lived within a few blocks of each other in Los Angeles, where Mr. Shuster, blind in the last years of his life, died in 1992.

Mr. Siegel may have been the man who created Superman, but his failure to safeguard his rights soured him on the man from another planet.

"I can't stand to look at a Superman comic book," he said in 1975. "It makes my physically ill. I love Superman, and yet to me he has become an alien thing."

He is survived by his wife, Joanne, their daughter, Laura Carter Larson of Los Angeles; a son, Michael, by a previous marriage, and two grandchildren.

Photo: Jerry Siegel and the first Superman cover from 1938. (DC Comics)

**Times Reader 2.0:** Daily delivery of The Times - straight to your computer. Subscribe for just $4.62 a week.

www.BoltInsurance.com

**Buy A DVD Rental Machine**
DVDNow Kiosks Offer Big Returns Recession Proof Formula! Apply Now.
www.DVDNowKiosks.com

**VA Loans for Veterans**
Veteran Loans up to $729,000. $0 Down. Learn More & Apply Online...
www.VAMortgageCenter.com

**Band of Horses Live**
Band of Horses NYC Concert at Grand Central - See Videos, Pics & More!
Spinner.com

Advertise on NYTimes.com

RECOMMEND

E-MAIL

PRINT



INSIDE NYTIMES.COM ◄ ►

HEALTH »



Following a Script to Escape a Nightmare

N.Y. / REGION »



Raising Coffee in Ethiopia, With Help From Harlem

OPINION »

**Op-Ed: Getting Lost in the Fog of War**
The WikiLeaks documents don't add to our understanding — they further confuse a complex conflict.

BUSINESS »



Reality Show Payrolls Rise With Stardom

OPINION »



Letters: Must One C-Section Beget Another?

BOOKS »



A Supersad, Superfunny Novel by Shteyngart

Home | World | U.S. | N.Y. / Region | Business | Technology | Science | Health | Sports | Opinion | Arts | Style | Travel | Jobs | Real Estate | Autos | Back to Top

Copyright 2010 The New York Times Company | Privacy | Terms of Service | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Advertise | Site Map

EXHIBIT 2

Page 81

7/27/2010

EXHIBIT 3




1  Marc Toberoff (CA State Bar No. 188547)
   Nicholas C. Williamson (CA State Bar No. 231124)
2  LAW OFFICES OF MARC TOBEROFF, PLC
   2049 Century Park East, Suite 2720
3  Los Angeles, CA 90067
   Telephone: (310) 246-3333
4  Facsimile: (310) 246-3101

5  Attorneys for Plaintiffs and Counterclaim Defendants
6  JOANNE SIEGEL and LAURA SIEGEL LARSON

7              UNITED STATES DISTRICT COURT

8            CENTRAL DISTRICT OF CALIFORNIA

9   JOANNE SIEGEL, an individual; and       Case Nos.:
10  LAURA SIEGEL LARSON, an                  CV 04-08400 SGL (RZx)
    individual,                              CV 04-08776 SGL (RZx)
11
              Plaintiffs,                    [Hon. Stephen G. Larson, U.S.D.J.]
12      vs.                                  [Hon. Ralph Zaresky, U.S.M.J.]

13  TIME WARNER INC., a corporation;
14  WARNER COMMUNICATIONS               DECLARATION OF MARC
    INC., a corporation; WARNER         TOBEROFF IN OPPOSITION TO
15  BROS. ENTERTAINMENT INC., a         DEFENDANTS' MOTION TO
    corporation; WARNER BROS.           COMPEL PRODUCTION OF
16  TELEVISION PRODUCTION INC.,         WHISTLE BLOWER
    a corporation; DC COMICS, a general DOCUMENTS
17  partnership; and DOES 1-10,
18                                       DISCOVERY MATTER
                                         LOCAL RULE 37
19            Defendants.
20                                       Date:  April 16, 2007
    DC COMICS,                           Time:  10:00 a.m.
21                                       Place: Courtroom 540
              Counterclaimant,           Mag. Judge Ralph Zarefsky
22      vs.                              Discovery Cutoff: Nov. 17, 2006
23
24  JOANNE SIEGEL, an individual; and
    LAURA SIEGEL LARSON, an
25  individual,
26
27            Counterclaim Defendants.
28

Declaration Of Marc Toberoff In Opposition To Defendants' Motion To Compel

EXHIBIT 3
Page 82

 

I, Marc Toberoff, declare as follows:

1.      I am an attorney at the Law Offices of Marc Toberoff, PLC, counsel of record for plaintiffs Joanne Siegel and Laura Siegel Larson ("Plaintiffs"). I am a member in good standing of the State Bar of California and submit this declaration in opposition to defendants' ("Defendants") motion to compel production of purported "whistle-blower" documents. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.      On February 15, 2006, Plaintiffs moved for partial summary adjudication that their statutory "Superboy" termination is valid and that Plaintiffs thereby recaptured Siegel's "Superboy" copyright. Defendants cross-moved for summary judgment claiming the "Superboy" termination was invalid based in large part on the same purported claims and defenses asserted with respect to "Superman." On March 23, 2006, the Court granted Plaintiffs' motion in its entirety and denied Defendants' motion in its entirety. On March 24, 2006, Plaintiffs moved to have their order certified for appeal, which motion was denied by the Court.

3.      Attached hereto as Exhibit "A" is a true and correct copy of this Court's order dated August 18, 2006 denying Defendants' motion to compel which alleged that Plaintiffs purportedly had waived the attorney-client privilege.

4.      Attached hereto as Exhibit "B" is a true and correct copy of this Court's order dated September 25, 2006 denying Defendants' motion for reconsideration of the aforesaid August 18, 2006 order.

5.      Attached hereto as Exhibit "C" is a true and correct copy of this Court's order dated November 7, 2006 denying Defendants' motion for compel the re-deposition of each of the Plaintiffs.

6.      Attached hereto as Exhibit "D" is a true and correct copy of Michael Bergman's July 6, 2006 letter to the Court.

1

Declaration Of Marc Toberoff In Opposition To Defendants' Motion To Compel

EXHIBIT 3

1      7.     Attached hereto as Exhibit "E" is a true and correct copy of this Court's

2  July 6, 2006 minute order.

3      8.     On July 11, 2006 I spoke telephonically with John J. Quinn ("Quinn") of

4  the law firm Arnold & Porter, LLP regarding his July 5, 2006 letter to me (*see*

5  Declaration of Michael Bergman ("Bergman Decl."), Ex. D.). At no time did Quinn

6  present himself as a "neutral" and at all times he appeared to me to be acting on

7  behalf of Warner Bros.  I inquired as to the nature of the documents vaguely referred

8  to in Quinn's July 5, 2006 letter and was informed for the first time that the

9  documents apparently came from my own legal files. I demanded that the documents

10  be returned immediately. I further rejected the "protocol" outlined in Quinn's July 5

11  letter. I suggested instead that an independent print shop copy and bate stamp all the

12  documents; that Arnold and Porter be provided with this bates stamp number range,

13  but not retain the stolen documents and that *all* of the documents, including defendant

14  Warner Bros' "originals,' be returned to me immediately.

15      9.     By letter dated July 13, 2006 (see Bergman Decl., Ex. E) Quinn

16  announced, that he would have the documents bates stamped by his office, send a

17  copy of the bates stamped documents to me, and retain a bates stamped set and the

18  originals, contrary to my wishes.

19     10.    On July 18, 2006, Quinn delivered three sets of copies of the stolen

20  documents to my offices.  These sets had been bates stamped.  The "originals" have

21  never been returned to my offices or to Plaintiffs.

22     11.    Attached hereto as Exhibit "F" is a true and correct copy of my July 19,

23  2006 letter to Quinn.

24     12.    Attached hereto as Exhibit "G" is a true and correct copy of a letter

25  dated July 20, 2006 from Defendants' other counsel, Michael Bergman ("Bergman"),

26  to Quinn.

27     13.    Attached hereto as Exhibit "H" is a true and correct copy of a letter

28  dated July 24, 2006 from Quinn to me.

2

Declaration Of Marc Toberoff In Opposition To Defendants' Motion To Compel

EXHIBIT 3

14.     Attached hereto as Exhibit "I" is a true and correct copy of a letter dated July 26, 2007 from me to Quinn:

15.     Attached hereto as Exhibit "J" is a true and correct copy of a letter dated July 27, 2006 from Bergman to me.

16.     Plaintiffs produced documents in this case on September 29, 2005 and supplemented this production on October 6, 2006, November 6, 2006 and November 17, 2006.  Attached hereto as composite Exhibit "K" are true and correct copies of the September 29, October 6, November 6 and November 17, 2006 cover letters accompanying Plaintiffs' document production.

17.     Attached hereto as Exhibit "L" is a true and correct copy of Plaintiffs' July 20, 2006 privilege log.

18.     Attached hereto as composite Exhibit "M" are true and correct copies of Plaintiffs' supplemental privilege logs served on September 29, 2006.

19.     Documents were produced by third parties Jean Peavy and Warren Peary (the "Shusters") on July 18, August 11 and August 14, 2006 in response to Defendants' subpoena.  The Shusters served a privilege log on August 11, 2006.  Shusters served a supplemented privilege log on October 16, 2006.  Attached hereto as Exhibit "N" is a true and correct copy of the Shuster's October 16, 2006 privilege log.

20.     On behalf of Don Bulson, the former attorney of Laura Siegel Larson's stepbrother, Michael Siegel, I served a privilege log on October 23, 2006 in response to Defendants' subpoena.  Attached hereto as Exhibit "O" is a true and correct copy of October 23, 2006 privilege log.

21.     Third party IPW, LLC produced documents on November 15, 2006 in response to Defendants' subpoena.  Third party Pacific Pictures Corporation produced documents on November 15, 2006 in response to Defendants' subpoena.  Attached hereto as Exhibit "P" is a November 15, 2006 letter from my office to Defendants' counsel concerning their respective document production.

3

Declaration Of Marc Toberoff In Opposition To Defendants' Motion To Compel

EXHIBIT 3



22.    I have reviewed the stolen documents and compared them to my firm's legal files. I found that all but two non-privileged documents in Plaintiffs' legal files had long ago been produced or listed by Plaintiffs in a privilege log. The documents, consisting of two letters from Plaintiff Joanne Siegel to DC Comics' executive Paul Levitz although already in Defendants' possession, have recently been produced. I also cross-referenced two privileged e-mail communications between Plaintiffs and me dated after the commencement of this action which were not listed in Plaintiffs' privilege logs because the parties to this action have agreed not to list post-complaint attorney-client communications on their respective privilege logs.

23.    Additionally, I searched the files of other persons or entities which my firm represents that have been subpoenaed in this case, in search of any stolen documents that had not either been produced or listed in a privilege log, even though this motion to compel is only directed at Plaintiffs. As a result of this search I found in the files of IPW, LLC, one IP Worldwide fax cover sheet having little relevance to this action, which I nonetheless also recently produced to Defendants.

24.    I also re-searched the files of Jean Peavy, Warren Peary, and the Estate of Joe Schuster (the "Shusters"), cross-referencing the stolen documents, and found three irrelevant, but non-privileged documents, regarding the probating of Joe Shuster's Estate, that I believe had not been previously produced. I therefore also recently produced these documents. In this search I also found one privileged document from the Shuster files, again concerning probate, and on the Shusters' behalf I listed this document on a supplemental privilege log which I recently provided to Defendants.

25.    As a result of my law firm's ongoing investigation, I believe that the documents to which this motion applies were stolen from my law firm's files by a disgruntled former *attorney* employed by the firm who thereafter furnished the documents to Warner Bros. under circumstances of which I am not yet aware. The

4

Declaration Of Marc Toberoff In Opposition To Defendants' Motion To Compel

EXHIBIT 3
Page 86

1  attorney is not named by me herein so as not to jeopardize my firm's ongoing

2  investigation or that of the authorities.

3      26.    This attorney/employee was terminated by my firm in November, 2005.

4  Our investigation has revealed that in late November and early December, 2005, after

5  the attorney was terminated, he contacted Plaintiffs and another client of my firm and

6  tried to convince them to terminate the firm, and to retain him instead, by falsely

7  disparaging me and by offering to work for a reduced fee. I am advised by Plaintiffs

8  and my other client that they both rejected this attorney's overtures in early

9  December, 2005.

10     27.    On July 18, 2006, when Arnold & Porter furnished me with bates

11  stamped copies of the stolen documents they also furnished me with a copy of an

12  allegedly undated and anonymous cover letter to Warner Bros. purporting to enclose

13  the stolen documents ("Cover Letter"). The Cover Letter was not attached by

14  Defendants and is not attached by Plaintiffs because it is defamatory, in other respects

15  potentially violates the attorney-client privilege and work product doctrine, and

16  should not be further published through the public record of this action. The Cover

17  Letter ends by stating to Warner Bros.: "consider this an early Christmas present."

18     I declare under penalty of perjury of the laws of the United States of America

19  that the foregoing is true and correct.

20     Executed on March 23, 2007 in Los Angeles, California.

21

22

23                                    _____

24                                    Marc Toberoff

25

26

27

28

                                    5

Declaration Of Marc Toberoff In Opposition To Defendants' Motion To Compel

EXHIBIT 3
Page 87

# EXHIBIT D

EXHIBIT 3
Page 88



WWBCGE



**VIA MESSENGER**

July 6, 2006

Magistrate Judge Ralph Zarefsky
United States District Court of California
Edward R. Roybal Federal Building
Courtroom 540
255 E. Temple Street
Los Angeles, CA 90012

**Michael Bergman**
a professional corporation
mbergman@wwllp.com

Our File No. 2231.811

Re:   *Joanne Siegel, etc., Laura Siegel Larson, etc. v. Time Warner Inc., et al.*
      USDC Central District of CA Case No. 04-08776 RSWL (AJWx);
      *Joanne Siegel, etc., Laura Siegel Larson, etc. v. Warner Bros. Entertainment*
      USDC Central District of CA Case No. CV 04-8400 DDP (RZx)

Dear Magistrate Judge Zarefsky;

I am one of the trial counsel for the defendants in the above actions.  I am taking the liberty of writing to you, with a copy to opposing counsel, under rather unusual circumstances.

I am enclosing a copy of a letter dated July 5, 2006 from John Quinn, Esq. of Arnold & Porter that was sent to all counsel of record.  As Mr. Quinn's letter indicates, defendant Warner Bros. has received certain unsolicited documents from an unidentified source; it appears that some or all of these documents may relate in some way to the above actions and that some of the documents may be protected by a privilege held by plaintiffs or their counsel.  Neither I nor my co-counsel have seen these documents or discussed their contents with Mr. Quinn or any of the defendants.  However, I believe that the procedure suggested by Mr. Quinn is both reasonable and consistent with standards of professional responsibility.

I have attempted to reach opposing counsel, Marc Toberoff, Esq., but have had to leave word with his assistant after being advised that Mr. Toberoff is out of the city for the balance of this week.  I concur with Mr. Quinn that these documents should be reviewed by Judge Lew or Your Honor in order to determine which documents, if any, are privileged, and will discuss the procedure with Mr. Toberoff as soon as we make contact.  In the interim, by copy of this letter I am requesting

WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP
9665 WILSHIRE BLVD. NINTH FLOOR. BEVERLY HILLS, CA 90212  T. 310.858.7888 F. 310.550.7191 WWW.WWLLP.COM
LAWYERS

322217_1.DOC

EXHIBIT 3

Page 89



Magistrate Judge Ralph Zarefsky
July 6, 2006
Page 2


Mr. Quinn to arrange, as he suggests in item "1" of his letter, for the Bates numbering of these documents under such circumstances as he deems appropriate.

Thank you.

Sincerely,

Michael Bergman


MB:jra
Encl.

cc:    Marc S. Toberoff, Esq. *(via messenger)*
       John J. Quinn, Esq. *(via messenger)*
       John A. Schulman, Esq. *(via e-mail)*
       Roger L. Zissu, Esq. *(via e-mail)*
       Patrick T. Perkins, Esq. *(via e-mail)*


WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP

322217_1.DOC                EXHIBIT 3

# EXHIBIT F

EXHIBIT 3

Page 91

 

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
ALEXANDER M. MERINO

* ALSO ADMITTED IN NEW YORK

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

July 19, 2006

<u>Via Fax and US Mail</u>

John J. Quinn
Arnold & Porter, LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017

Re:  *Joanne Siegel and Laura Siegel Larson v. Time Warner, Inc. et al.*
     USDC Central District of CA, Case No. 04-08776 RSWL (AJWx)
     *Joanne Siegel and Laura Siegel Larson v. Time Warner, Inc. et al.*
     USDC Central District of CA, Case No. 04-08400 RSWL (AJWx)

Dear John:

     I am writing with respect to your letter dated July 13, 2006 and your subsequent delivery of documents to my office on July 18, 2006.

     As a preliminary matter, your July 13 letter mistakenly states that I agreed in our conversation on July 11, 2006 to follow the protocol outlined in your letter of July 5, 2006. I presumed from the tenor of your July 5 letter that the privileged documents referred to were documents to which *my clients* hold the privilege. I therefore requested in our July 11 teleconference that the documents be promptly disclosed and turned over to us. As a protocol I suggested that (1) an independent shop copy and bate stamp the documents, and provide you with only the total bate stamp number range; (2) all such documents including Warner Bros.' "originals" then be returned to my offices and (3) I review the documents and provide Warner Bros. with a privilege log as appropriate. We concluded with my stating that I would memorialize the above in an e-mail to you, however, I was pulled into another urgent matter, whereupon you sent your July 11 letter.

     Upon opening the document package sent to my office yesterday, it was immediately apparent that the documents had been *stolen* from my legal files and are, in large part, clear attorney-client communications. Such illegally obtained documents should *not* have been reviewed in any manner by Wayne Smith, Warner Bros.' Senior Litigation Counsel.

EXHIBIT 3



**LAW OFFICES OF MARC TOBEROFF**

John J. Quinn, Esq.
July 19, 2006
Page 2

Your letter of July 5 states that Wayne Smith did not read or review the documents in detail but nonetheless somehow segregated the documents in three separate categories – "Privileged," "Non-Privileged" and "?." This segregation was passed on to me in the form of clipped copies marked with "post-its." It is logically impossible for Wayne Smith to have made this detailed segregation without reviewing the stolen documents in substance, which was improper. Upon realizing, as is plainly evident, that these documents had been stolen from my law offices, Warner Bros. should have immediately re-sealed the documents, notified me of this security breach and returned the documents to my offices, together with all pertinent details regarding its receipt of the documents.

We are understandably conducting an investigation into this shocking and unconscionable theft of confidential legal files from my offices and their disclosure at an important juncture in the above referenced litigations.

In connection with our investigation of this matter, request is hereby made that Warner Bros. furnish us with the following: (1) the date(s) each set of documents was received; (2) copies of all envelopes or packages enclosing the documents; (3) the method by which the documents were sent and, in the unlikely event the documents were delivered by hand, the name of the messenger (and messenger service) logged at Warner Bros.' security gate and (4) any other pertinent information regarding Warner Bros.' receipt of these documents. We would also like to inspect the "original" documents and enclosing envelopes or packages *as received* by Warner Bros.

Lastly, request is hereby made that any and all copies of these stolen documents (e.g., the retained set mentioned in your July 13 letter) be immediately returned to my law offices.

Warner Bros.' anticipated cooperation with respect to this very troubling matter is appreciated.

Very truly yours,

Marc Toberoff

cc: Michael Bergman, Esq.

EXHIBIT 3

Page 93

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
ALEXANDER M. MERINO

* ALSO ADMITTED IN NEW YORK

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

## FACSIMILE COVER PAGE

| **TO:** John J. Quinn, Esq., Michael Bergman, Esq. | **FAX:** 213-243-4199, 310-550-7191 |
|---|---|
| **FROM:** Marc Toberoff | **PAGES ( including cover ):** 3 |
| **DATE :** 7/19/06 | **RE:** Superman (Case Nos. 04-CV-8400, 04-CV-8776 RSWL (RZx)) |

**COMMENTS:**

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

EXHIBIT 3



Job number    : 379    *** SEND SUCCESSFUL ***

## LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
ALEXANDER M. MERING
* ALSO ADMITTED IN NEW YORK

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

### FACSIMILE COVER PAGE

| TO: John J. Quinn, Esq., Michael Bergman, Esq. | FAX: 213-243-4199, 310-550-7191 |
|---|---|
| FROM: Marc Toberoff | PAGES ( Including cover ): 3 |
| DATE : 7/19/06 | RE: Superman (Case Nos. 04-CV-8400, 04-CV-8776 RSWL (RZx)) |

COMMENTS:

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

EXHIBIT 3

Page 95

 

## Group Send Report

Page      : 001
Date & Time: Jul-19-06  08:29pm
Line 1    :
Machine ID :

Job number          :  379

Date                :  Jul-19 08:26pm

Number of pages     :  003

Start time          :  Jul-19 08:26pm

End time            :  Jul-19 08:29pm

Successful nbrs.

   Fax numbers

        ☎12132434199
        ☎13105507191

Unsuccessful nbrs.                                    Pages sent

EXHIBIT 3

## LAW OFFICES OF MARC TOBEROFF, PLC

A PROFESSIONAL CORPORATION

2049 Century Park East, Suite 2720
Los Angeles, CA 90067

John J. Quinn, Esq.
Arnold & Porter, LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017



EXHIBIT 3

Page 97

# EXHIBIT G

EXHIBIT 3

Page 98



**VIA FACSIMILE AND U.S. MAIL (213) 243-4199**

July 20, 2006

John J. Quinn, Esq.
Arnold & Porter, LLP
777 South Figueroa St., 44th Floor
Los Angeles, CA 90017

**Michael Bergman**
a professional corporation
mbergman@wwltip.com

Re:  *Joanne Siegel and Laura Liegel Larson v. Time
Warner, Inc., et al.*
USDC Central District of CA, Case No. 04-08776 RSWL (AJWx)
*Joanne Siegel and Laura Siegel Larson v. Time Warner, Inc., et al.*
USDC Central District of CA, Case No. 04-08400 RSWL (AJWx)

Dear Mr. Quinn:

I have received a copy of Mr. Toberoff's letter to you dated July 19, 2006.

Without commenting on any other portion of Mr. Toberoff's letter, I do want to address two of its concluding paragraphs. With respect to the four numbered categories of information requested in the third to last paragraph, Warner Bros. will provide Mr. Toberoff with whatever pertinent information is available to it. However, Warner Bros. objects to Mr. Toberoff's request, made in the second to last paragraph of his letter, that you furnish to him the remaining set of documents presently in your possession. Rather, consistent with the procedure suggested in your letter of July 5, Warner Bros. requests that you retain possession of the remaining set of documents pending either joint instructions from Mr. Toberoff and myself, or a Court Order, as to the appropriate disposition of those documents.

Thank you for your continuing cooperation.

Sincerely,

Michael Bergman

MB:jra
cc:  Marc Toberoff, Esq.
John A. Schulman, Esq.

**WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP**
9665 WILSHIRE BLVD, NINTH FLOOR, BEVERLY HILLS, CA 90212  T: 310.858.7888 F: 310.550.7191 WWW.WWLLP.COM
LAWYERS

WEISSMANN WOLFF ETAL    Fax:310550     Jul 20 2006 05:15pm    P001/002



**WWBCGE**

# FACSIMILE TRANSMISSION

**Date:**          July 20, 2006

**From:**          Michael Bergman
**E-mail:**        mbergman@wwllp.com
**Pages:**         2   (Including cover)
**Subject:**       Siegel v. Warner Bros.

| Recipient(s): | Fax Number(s): | Phone Number(s): |
|---|---|---|
| John J. Quinn | 213-243-4199 | |
| cc:   Maro Toberoff, Esq. | 310-246-3101 | |
| John Schulman, Esq | 818-954-4768 | |

**Message:**

**WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP**
9665 WILSHIRE BLVD. NINTH FLOOR, BEVERLY HILLS, CA 90212 T: 310.858.7888 F: 310.550.7191 WWW.WWLLP.COM
LAWYERS

ATTORNEY-CLIENT PRIVILEGE/ATTORNEY WORK PRODUCT
This fax is intended solely for the use of the individual or entity to which it is addressed, and may contain information that is privileged,
confidential, or exempt from disclosure under applicable law. If you are not the intended recipient, any dissemination, distribution,
disclosure, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us
immediately by telephone and return the original fax to us at the above address. Thank you.

USER ID:  4887                                                                CLIENT MATTER: 2231.811

EXHIBIT 3
Page 100

# EXHIBIT H

EXHIBIT 3
Page 101

07/24/2006 16:04 FAX  213 2  199        ARNOLD & PORTER, LLP⁵        ☒002/003



# ARNOLD & PORTER LLP

John J. Quinn
John.Quinn@aporter.com

213.243.4080
213.243.4199 Fax

44th Floor
777 South Figueroa Street
Los Angeles, CA 90017-5844

July 24, 2006

*By Facsimile and Messenger*

Marc Toberoff, Esq.
2049 Century Park East, Suite 2720
Los Angeles, CA 90067

Re:   *Joanne Siegel, etc., Laura Siegel Larson, etc. v. Time Warner Inc., et al.*
      USDC Central District of CA Case No. 04-08776 RSWL (AJWx);
      *Joanne Siegel, etc., Laura Siegel Larson, etc. v. Warner Bros. Entertainment*
      USDC Central District of CA Case No. CV. 04-8400 DDP (RZx)

Dear Marc:

This will acknowledge receipt of your letter of July 19, 2006.

I regret that we have a disagreement about our conversation of July 11, 2006.

Regardless of our disagreement, it appears the only issue which now exists is my retention of a copy of the documents. You will recall in my letter of July 5, 2006, I suggested the documents might be deposited with the Judge or Magistrate Judge while a procedure for the review was planned.

I then received a copy of a letter under date of July 6, 2002 from Michael Bergman to Magistrate Judge Ralph Zarefsky on which you were copied. I learned that day or the next that the Magistrate Judge had returned Mr. Bergman's letter. Not having heard from you, I corresponded with you under date of July 13, 2006 to the effect that I would have the documents copied in my office, I would retain a copy of the Bates stamped documents and I would send you a copy of the Bates stamped documents. These documents were sent to you by messenger on July 18.

It appears the only quarrel you have is that I have retained a copy of the documents. I can assure you the documents in my possession have not been read by anyone. The only reason I suggested that I or someone retain a copy of the documents or that they be deposited with the Court was to insure no claim was made that the documents were not complete.

As I stated previously, I would be happy to comply with any instructions from the Court or any agreement that you and Mr. Bergman may work out. My suggestion would be to have a hearing before the Judge or Magistrate Judge. I would be happy to appear at any court hearing

Washington, DC    New York    London    Brussels    Los Angeles    Century City    Northern Virginia    Denver

EXHIBIT 3

Page 102

07/24/2006 18:05 FAX  213 2   188        ARNOLD & PORTER,LLP        ☒003/003



# ARNOLD & PORTER LLP

Marc Toberoff
July 24, 2006
Page 2


which is scheduled on this matter. Perhaps you and Mr. Bergman can agree on a process for the handling of the documents. If not, I would urge that the Court be involved and we seek directions on how to proceed. Frankly, I am trying to be constructive and thought my suggestions carried out your goals, namely, prompt delivery of a copy of the documents to you and further protection of the integrity of the documents for the benefit of the parties to the litigation.

With respect to your request for information from Warner Bros. regarding the delivery and handling of the documents, I will inquire and see what information I can supply to you.


Yours very truly,

John J. Quinn

JJQ:rn

cc:    Michael Bergman (by facsimile and U.S. Mail)
       Roger Zissu (by U.S. Mail)
       Patrick Perkins (by U.S. Mail)
       John A. Schulman (by U.S. Mail)

EXHIBIT 3

Page 103

07/24/2006 18:04 FAX  213 2   199      ARNOLD & PORTER,LLP              ☒001/003

# ARNOLD & PORTER LLP

213.243.4000
213.243.4199 Fax

44ᵗʰ Floor
777 South Figueroa Street
Los Angeles, CA 90017-5844

<table>
<tr><td colspan="3" align="center">**Fax Transmittal**<br>July 24, 2006</td></tr>
<tr><td align="center">**RECIPIENT NAME(S)**</td><td align="center">**RECIPIENT<br>FAX NUMBER(S)**</td><td align="center">**RECIPIENT<br>TELEPHONE NUMBER(S)**</td></tr>
<tr><td>Marc Toberoff, Esq.<br>Michael Bergman</td><td>(310) 246-3101<br>(310) 550-7191</td><td>(310) 246-3333<br>(310) 858-7888</td></tr>
<tr><td align="center">**SENDER**</td><td colspan="2" align="center">**SENDER'S TELEPHONE NUMBER**</td></tr>
<tr><td>John Quinn</td><td colspan="2">(213) 243-4080</td></tr>
<tr><td align="center">**CLIENT/MATTER NUMBER**</td><td align="center">**TIMEKEEPER NUMBER**</td><td align="center">**NUMBER OF PAGE(S)**</td></tr>
<tr><td>01791.002</td><td></td><td>We are transmitting 3 page(s) (including this cover sheet)</td></tr>
<tr><td colspan="3" align="center">If you experience difficulty receiving this fax transmission, please contact the operator at 213.243.4032.</td></tr>
<tr><td colspan="3" align="center">**MESSAGE**</td></tr>
<tr><td colspan="3"></td></tr>
</table>

**PRIVILEGED AND CONFIDENTIAL**
Information intended only for the use of the addressee named above. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, please note that any dissemination, distribution or copying of this communication is strictly prohibited. Anyone who receives this communication in error should notify us immediately by telephone and return the original message to us at the above address via the U.S. Mail.

Received  Jul-24-06  02:42pm     From-213 243 4199          To-               Page  001

EXHIBIT 3

# EXHIBIT I

EXHIBIT 3

Page 105

 

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
ALEXANDER M. MERINO

* ALSO ADMITTED IN NEW YORK

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

July 26, 2006

<u>Via Fax and US Mail</u>

John J. Quinn, Esq.
Arnold & Porter, LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017

Re: *Joanne Siegel and Laura Siegel Larson v. Time Warner, Inc. et al.*
    USDC Central District of CA, Case No. 04-08776 RSWL (RZx)
    *Joanne Siegel and Laura Siegel Larson v. Time Warner, Inc. et al.*
    USDC Central District of CA, Case No. 04-08400 RSWL (RZx)

Dear John:

It is seven days since my simple request by letter to you dated July 19, 2005 that Warner Bros. supply us with information and evidence regarding the delivery and handling of the files stolen from my law offices. Given the shocking nature of this theft, Warner Bros. failure to provide this simple information is very troubling.

I therefore repeat the request in my July 19 letter that Warner Bros. please furnish us with: "(1) the date(s) each set of documents was received; (2) copies of all envelopes or packages enclosing the documents; (3) the method by which the documents were sent and, in the unlikely event the documents were delivered by hand, the name of the messenger (and messenger service) logged at Warner Bros.' security gate and (4) any other pertinent information regarding Warner Bros.' receipt of these documents. We would also like to inspect the "original" documents and enclosing envelopes or packages *as received* by Warner Bros."

Very truly yours,

Marc Toberoff

cc: Michael Bergman, Esq.

EXHIBIT 3

Page 106

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
ALEXANDER M. MERINO

* ALSO ADMITTED IN NEW YORK

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

## FACSIMILE COVER PAGE

| **TO:** John J. Quinn, Esq., Michael Bergman, Esq. | **FAX:** 213-243-4199, 310-550-7191 |
|---|---|
| **FROM:** Marc Toberoff | **PAGES ( including cover ):** 2 |
| **DATE :** 7/26/06 | **RE:** Superman (Case Nos. 04-CV-8400, 04-CV-8776 RSWL (RZx)) |

**COMMENTS:**

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

EXHIBIT 3

Job number    : 428          *** SEND SUCCESSFUL ***

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS D. WILLIAMSON
ALEXANDER M. MERING
* ALSO ADMITTED IN NEW YORK

TELEPHONE
(310) 246-3333
FACSIMILE
(310) 246-3101

## FACSIMILE COVER PAGE

| TO: John J. Quinn, Esq., Michael Bergman, Esq. | FAX: 213-243-4199, 310-550-7191 |
|---|---|
| FROM: Marc Toberoff | PAGES ( including cover ): 2 |
| DATE : 7/26/06 | RE: Superman (Case Nos. 04-CV-8400, 04-CV-8776 RSWL (RZx)) |

COMMENTS:

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THIS ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

EXHIBIT 3

 

## Group Send Report

Page      : 001
Date & Time: Jul-26-06  09:02am
Line 1    :
Machine ID :

Job number          :   428

Date                :   Jul-26 09:00am

Number of pages     :   002

Start time          :   Jul-26 09:00am

End time            :   Jul-26 09:02am

Successful nbrs.

    Fax numbers

        ☎12132434199
        ☎13105507191

Unsuccessful nbrs.                                          Pages sent

EXHIBIT 3

# EXHIBIT J

EXHIBIT 3

Page 110



**WWBCGE**

**VIA FACSIMILE (310) 246-3101
AND FIRST CLASS MAIL**

July 27, 2006

Marc Toberoff, Esq.
Law Offices of Marc Toberoff
2049 Century Park East, Suite 2720
Los Angeles, CA 90067

**Michael Bergman**
a professional corporation
mbergman@wwllp.com

Our File No. 2231.811

Re:   *Joanne Siegel, etc., Laura Siegel Larson, etc. v. Time Warner Inc., et al.*
USDC Central District of CA Case No. 04-08776 RSWL (AJWx);
*Joanne Siegel, etc., Laura Siegel Larson, etc. v. Warner Bros. Entertainment*
USDC Central District of CA Case No. CV 04-8400 DDP (RZx)

Dear Marc:

I have obtained the following information from Warner Bros. in response to the inquiries raised in your correspondence to Jack Quinn:

On or about June 28, 2006 three envelopes were received at the Warner Bros. offices in Burbank; one envelope being addressed to each of Alan Horn, Patti Connolly, and John Schulman. There is no record of any of the envelopes being signed for from either a courier or special mail delivery service. The envelopes received at the offices of Mr. Horn and Ms. Connolly were forwarded by their respective administrative personnel to Mr. Schulman's office. Each envelope contained a number of documents; however, Warner has no knowledge as to whether the documents contained in each of the envelopes were identical since no one at Warner compared them.

Mr. Schulman gave one set of the documents to Wayne Smith, who made a cursory review of them, segregating the documents into the categories identified in Mr. Quinn's July 5 letter to all counsel. After consulting with Mr. Quinn as to the appropriate handling of these documents, Warner turned all of the documents over to him. None of the three envelopes was copied or retained and all of the documents received were turned over to Mr. Quinn. Warner has no copies of any of the documents.

**WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP**
9665 WILSHIRE BLVD, NINTH FLOOR, BEVERLY HILLS, CA 90212 T: 310.858.7888 F: 310.550.7191 WWW.WWLLP.COM
LAWYERS

**EXHIBIT 3**




Marc Toberoff, Esq.
July 27, 2006
Page 2


Finally, Warner has no information whatever as to the identity of the person who
mailed these three envelopes to it.

Very truly yours,

Michael Bergman

cc:    Roger Zissu, Esq.
       Patrick Perkins, Esq.


WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP

322802v1                    EXHIBIT 3

EXHIBIT 4

Marc Toberoff (CA State Bar No. 188547)
Nicholas C. Williamson (CA State Bar No. 231124)
LAW OFFICES OF MARC TOBEROFF, PLC
2049 Century Park East, Suite 2720
Los Angeles, CA 90067
Telephone: (310) 246-3333
Facsimile: (310) 246-3101
Email: MToberoff@ipwla.com

Attorneys for Plaintiffs and Counterclaim Defendants
JOANNE SIEGEL and LAURA SIEGEL LARSON

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA-EASTERN DIVISION

| | |
|---|---|
| JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> TIME WARNER INC., a corporation; WARNER COMMUNICATIONS INC., a corporation; WARNER BROS. ENTERTAINMENT INC., a corporation; WARNER BROS. TELEVISION PRODUCTION INC., a corporation; DC COMICS, a general partnership; and DOES 1-10, <br><br> Defendants. <br><br> DC COMICS, <br><br> Counterclaimant, <br><br> vs. <br><br> JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual, <br><br> Counterclaim Defendants. | Case Nos.: CV 04-08400 SGL (RZx) <br> CV 04-08776 SGL (RZx) <br><br> [Hon. Stephen G. Larson, U.S.D.J.] <br> [Hon. Ralph Zaresky, U.S.M.J.] <br><br> **DECLARATION OF MARC TOBEROFF FILED PURSUANT TO THE COURT'S SEPTEMBER 17, 2007 ORDER** <br><br> **DISCOVERY MATTER LOCAL RULE 37** |

I, Marc Toberoff, declare as follows:

1.     I am an attorney at the Law Offices of Marc Toberoff, PLC, counsel of record for plaintiffs Joanne Siegel and Laura Siegel Larson ("Plaintiffs"). I am a member in good standing of the State Bar of California and submit this declaration pursuant to the Court's September 17, 2007 order. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.     On April 30, 2007 I participated in a hearing before Magistrate Zarefsky concerning Defendants' motion to compel the production of a large number of documents, many clearly confidential attorney-client communications, stolen from my law offices and delivered to Defendants, which Defendants then placed with Arnold & Porter, as "escrow holder" (the "Escrow Holder") of the stolen documents (the "Escrow Documents").

3.     At the April 30 hearing, Magistrate Zarefsky ordered me to furnish the Escrow Holder with a declaration specifically referencing, by the bates numbers, which "Escrow Documents" had already been produced and which had not been produced and listed on a privilege log, so that the Escrow Holder could appropriately disburse the Escrow Documents by the bates numbers referenced in my declaration – returning the privileged documents to my offices and releasing the non-privileged documents to Defendants' counsel. ("April 30, 2007 Order"). A true and correct copy of the transcript of the April 30, 2007 hearing is attached hereto as Exhibit "1".

4.     I drafted and furnished to Mr. Eisen a declaration which fully complied with the April 30, 2007 Order, as admitted by Defendants. Attached hereto as Exhibit "2" is a true and correct copy of my May 21, 2007 declaration. *See* the parties' September 17, 2007 Joint Stipulation at 13, a true and correct copy of which is attached hereto as Exhibit "3." ("September 17, 2007 Joint Stipulation").

5.     The vast majority of the "Escrow Documents" are privileged or have already been produced, and were designated as such in my declaration. However, 9

1

1   documents (4 of which are merely fax cover or confirmation sheets) of the 839 pages
2   of "Escrow Documents" (many duplicates) did not fit squarely within the Order in the
3   context of the April 30 hearing, and, pursuant to this Court's order of September 17,
4   2007, are to be reviewed by the Court *in camera.*

5       6.     This handful of documents fall into three categories that slipped between
6   the "cracks" of the Order but are clearly privileged:  (i) 6 *post-litigation attorney-*
7   *client communications*, which, pursuant to the parties' standing agreement (admitted
8   by Defendants herein) need not have been listed in a privilege log to preserve the
9   privilege (*see* Exhibit 3 (September 17, 2007 Joint Stipulation) at 32- 34); (ii) the
10  "defamatory cover letter" enclosing and describing the contents of the stolen Escrow
11  Documents, including many of the attorney-client communications that are identified
12  on the privilege logs of Plaintiffs and non-party witnesses (*see* Exhibit 3 at 34-37);
13  and (iii) 2 letters between me and Don Bulson, Esq., the attorney for Plaintiff Laura
14  Siegel Larson's half-brother, Michael Siegel, who is a statutory beneficiary of the
15  "Superman" termination notices, which were listed in Mr. Bulson's privilege log and
16  properly identified as such in my May 21, 2007 declaration (*see* Exhibit 3 at 37-42).

17      7.     To put the anonymous "defamatory cover letter" in context, my
18  investigation has revealed that in late 2005 the Escrow Documents were stolen from
19  my law firm's files by a disgruntled *attorney* formerly employed by my firm, who
20  thereafter furnished the documents to Defendant Warner Bros. Entertainment, Inc.
21  ("Warner") under circumstances that Warner has not disclosed.

22      8.     This attorney, after working at my firm for just three months,
23  disappeared without notice in November, 2005.  My investigation has revealed that in
24  late November and early December, 2005, he then contacted Plaintiffs and tried to
25  convince them to terminate my firm, and to retain him instead, by disparaging me
26  with false, and often nutty, statements, and by offering to work for a reduced fee,
27  suggesting that his actions were financially motivated.  I am informed that he did the
28  same with another female client of mine (and that he additionally harassed her by

2

1  repeated phone calls and messages asking her out). I am advised by these clients that

2  that they rejected this attorney's overtures in early *December, 2005*.

3        9.      The "defamatory cover letter" is rife with highly prejudicial ranting and

4  conspiratorial speculation. More troubling, this attorney, without regard for his oath

5  as an officer of the court, disclosed without authorization confidential attorney-client

6  communications and work product (pre-meditatively assembled after hours) to the

7  opposing party in the midst of a lawsuit.

8        10.     The "defamatory cover letter," which Warner alleges enclosed the stolen

9  documents, states: "consider it an early holiday gift." Notwithstanding this, I was

10  not contacted by Warner (via Arnold & Porter) about these stolen documents until

11  July 5, 2006. Warner claimed that on June 28, 2006, three very high level executives

12  – Alan Horn, Warner President and COO; Jeff Rabinov, President of Production, and

13  John Schulman, Warner's General Counsel – each anonymously received packages

14  consisting of the of the documents.

15       11.     I requested by letter dated July 19, 2006 to Arnold & Porter and copied

16  to Defendants' counsel, Michael Bergman ("Bergman"), that Warner furnish the

17  following:

18           "(1) the date(s) each set of documents was received; (2) copies of all
19           envelopes or packages enclosing the documents; (3) the method by
             which the documents were sent and, in the unlikely event the
20           documents were delivered by hand, the name of the messenger (and
21           messenger service) logged at Warner Bros. security gate and (4) any
             other pertinent information regarding Warner Bros.' receipt of these
22           documents. We would also like to inspect the "original" documents
23           and enclosing envelopes or packages as received by Warner Bros."

24  *See* Exhibit F of my Declaration in Opposition to Defendants' Motion to Compel

25  Production of Whistleblower Documents, dated March 23, 2007, a true and correct

26  copy of which is attached hereto as Exhibit "4."

27       12.     I thereafter received letters dated July 20, 2006 and July 24, 2006 from

28  Mr. Bergman, and on July 24, 2006 from Arnold & Porter, but neither provided the

Declaration Of Marc Toberoff Filed Pursuant to the Court's September 17, 2007 Order

EXHIBIT 4    Page 116

1  requested information. *See* Exhibit 4; Exs. G, H.   By letter dated July 26, 2007 to

2  Mr. Bergman, I reiterated Plaintiffs' demand for information regarding Warner's

3  receipt of the stolen documents. *See* Exhibit 4, Ex. I.   Mr. Bergman finally

4  responded by letter dated July 27, 2006, repeating that the packages mysteriously

5  arrived in envelopes at the desks of three high placed Warner executives on June 28,

6  2006; but claiming that Warner did not retain any of the three envelopes (or a copy of

7  any envelopes) and stating that Warner had no mailroom, security or executive office

8  records, notes or logs of the three substantial packages ever being signed in or

9  received, despite the extraordinary nature of their contents. *See* Exhibit 4, Ex. J.   All

10  such information, commonly kept by Studio security, mailrooms and executive

11  offices, had vanished.

12      13.   The undated, anonymous cover letter discusses and discloses the

13  substance and contents of many, if not most, of the privileged documents enclosed by

14  the cover letter and listed in the privilege logs of Plaintiffs and alleged non-party

15  witnesses.  Specifically, the letter contains, directly and indirectly, the substance of

16  privileged attorney-client communications and attorney work product that were

17  contained within the confidential files at my law firm.

18      14.   The "defamatory cover letter" is irrelevant to the subject matter of this

19  action, and is obviously highly prejudicial; nor is it likely to lead to the discovery of

20  admissible evidence, particularly as discovery in this action is closed.  It is not subject

21  to authentication by the author, as it was anonymous.  It is also riddled with

22  inadmissible hearsay statements.  Finally, the letter refers to documents and

23  information protected by, *inter alia*, the attorney-client privilege and work product

24  doctrine, and would therefore be inadmissible in any event.

25      15.   The cover letter was clearly not the subject of Defendants' March 26,

26  2007 Joint Stipulation regarding the escrow documents, as throughout their initial

27  motion Defendants drew a clear line between the "Whistle-blower documents" that

28  were the subject of its motion and the "cover letter" contained with the documents,

4

1  which was not. *Compare Defendants' March 26, 2007 Joint Stipulation* at 2:6-14

2  (requesting production of the "Whistle-blower documents") with 6:13-14 (referring to

3  "the cover letter contained with the documents"); 6:26-27 (characterizing "the 'cover

4  letter' that *came with* the Whistle-blower documents") (emphasis added); 7:9-10

5  (referring to "Whistle-blower Documents contained with the letter"); 7:17-19

6  (referring to attorneys perusal of "the contents of the cover letter and my brief

7  thumbing through the documents"); and 16:17-21:28 (referring repeatedly to the

8  "Whistle-blower Documents" and never mentioning the cover letter.)   Attached

9  hereto as Exhibit "5" is a true and correct copy of the parties' March 26, 2007 Joint

10 Stipulation Re: Defendants' Motion to Compel Production of Whistleblower

11 Documents.

12      16.    Plaintiffs' opposition to Defendants' original motion to compel

13 specifically states at page 37, footnote 10, that the cover letter, in discussing the

14 stolen attorney-client communications accompanying it, discloses information

15 protected by the attorney-client privilege and the work product doctrine. *See* Exhibit

16 5 at 37.  However, the cover letter was not discussed by either party at the April 30,

17 2007 hearing before Magistrate Zarefsky, as it did not appear to be a part of

18 Defendants' motion to compel. *See* Exhibit 1 at 7:25- 20:5.

19      17.    Plaintiffs and I did not authorize this illicit letter.  Plaintiffs cannot be

20 held to have consented to the release of the privileged information and work product

21 contained therein, or to have waived the privilege, as the unauthorized disclosure of

22 protected attorney-client information or documents does not waive attorney-client

23 privilege. *See* Exhibit 3 at 35-37.

24      18.    The cover letter, in disclosing privileged information contained in the

25 attorney-client communications *listed in Plaintiffs' and third party privilege logs*,

26 falls within the rationale and spirit of Magistrate Zarefsky's April 30, 2007 order as a

27 document that should not be released to Defendants.

28

19.     Defendants have also demanded that the Escrow Holder, David Eisen, Esq., turn over two obviously privileged communications between Plaintiffs and me from *after the commencement of litigation.*  Defendants cling to the absurd and inequitable position that there has been a waiver of these plainly privileged communications because such were not listed on a privilege log, even though Defendants admit, as they must, that *the parties have a longstanding agreement pursuant to which neither side was supposed to list post-litigation attorney-client communications on a privilege log.*  *See* Exhibit 3 at 13.  Per this agreement, Defendants and Plaintiffs have not listed hundreds of post-litigation communications on any privilege log.  These two communications are clearly subject to this standing agreement, and the fact they were stolen from my law offices in no way changes this.

20.     These privileged e-mails were specifically discussed on page 30 of Plaintiffs' portion of the parties' March 26, 2007 Joint Stipulation regarding the escrow documents as follows:  "There are also 2 privileged e-mail communications between Plaintiffs and their present counsel dated after commencement of this action which were not listed in Plaintiffs' privilege logs because the parties have agreed not to list post-complaint attorney-client communications on their respective privilege logs."  *See* Exhibit 5 at 30.

21.     Additionally, in paragraph 22 of my March 23, 2007 declaration in opposition to defendants' motion to compel, I specifically mentioned the two privileged e-mails, and explained to the Court that these post-litigation communications were not listed on a privilege log because "the parties to this action have agreed not to list post-complaint attorney-client communications on their respective privilege logs."  *See* Exhibit 4.

22.     It is my belief that Magistrate Zarefsky did not intend by his April 30, 2007 Order that such clearly privileged communications be produced.  No fair reading of the Order's rationale, as well as common sense, could give Defendants

6

1    access to privileged communications, to which they would not otherwise be entitled,
2    because such documents were pilfered from my legal files.

3        23.    On behalf of Don Bulson ("Bulson"), the former attorney of Laura
4    Siegel Larson's stepbrother, Michael Siegel, I served a privilege log on October 23,
5    2006 in response to Defendants' subpoena. The items listed on this privilege log
6    included two letters we wrote to each other. *See* Exhibit 4, Ex. O.

7        24.    Magistrate Zarefsky's April 30, 2007 Order encompassed and protects
8    documents such as these two communications listed on third party privilege logs and
9    referenced in my March 23, 2007 declaration. *See* Exhibit 1, at 19:16- 20:6. In fact,
10   my declaration referenced several Escrow Documents by bates numbers on third
11   party privilege logs that Defendants acknowledge are covered by the Order and have
12   not challenged. *See* Exhibit 2 at 6:13-14, 22; *see also* Declaration of Michael
13   Bergman in Support of Defendants' Motion to [sic] Compliance With the Court's
14   4/30/07 Order and Motion For Sanctions ("Bergman Decl."), Ex. E, a true and correct
15   copy of which is attached hereto as Exhibit 6. Defendants, nonetheless, belatedly
16   chose to impermissibly challenge the assertion of the joint interest privilege with
17   respect to these two communications.

18       25.    Mr. Bulson's privilege log was served on Defendants long ago on
19   October 23, 2006, and listed the two documents as communications between Mr.
20   Bulson and myself. Exhibit 4, Ex. O. Plaintiffs' privilege logs were also served long
21   ago on July 20 and September 29, 2006. Exhibit 4, Exs. L, M. Defendants could
22   easily have moved in this Court to compel Plaintiffs' production of these two
23   documents within the discovery and motion deadlines. They did not do so, and
24   instead attempted to "bootstrap" this new motion to compel after the cut-off into their
25   September 17, 2007 Joint Stipulation regarding the April 30, 2007 Order *after the*
26   *deadline for discovery motions has long passed.* *See* Stipulation Regarding
27   Scheduling Order entered March 19, 2007. For the Court's information, Defendants
28

7

1  did file a motion to compel against Mr. Bulson in the United States District Court for

2  the Northern District of Ohio, which motion is pending.

3      26.    The two letters exchanged between me and Mr. Bulson were designed to

4  further a joint legal strategy between my clients, Joanne Siegel and Laura Siegel

5  Larson, and Mr. Bulson's then-client, Michael Siegel, with respect to the "Superman"

6  termination notices ("Terminations"), of which both Mr. Bulson's and my clients

7  were beneficiaries under 17 U.S.C. § 304(c). These communications necessarily

8  concerned prior settlement discussions with Defendants and anticipated litigation

9  regarding the Termination. Considering the financial value of the "Superman"

10  property, such litigation was a virtual inevitability in the absence of settlement.

11      27.    Such communications amongst the attorneys of Jerome Siegel's

12  statutory heirs under 17 U.S.C. § 304(c) (*i.e.*, Plaintiffs and Michael Siegel) in

13  anticipation of litigation regarding the Termination, of which they are the

14  beneficiaries, is precisely the sort of communications the joint interest privilege is

15  designed to protect. *See* Exhibit 3 at 38-42. Therefore, the Bulson documents are

16  protected by the applicable joint interest privilege and work product doctrine, which

17  are not waived by disclosure to Mr. Bulson.

18      28.    In compliance with Magistrate Zarefsky's April 30, 2007 Order, my

19  declaration matched the escrow bates numbers of the two Bulson letters to the

20  corresponding entries on Mr. Bulson's *privilege log*. *See* Exhibit 2; Exhibit 4, Ex. O.

21  There was certainly no requirement in the Order that privileged documents/privilege

22  log listings be cross-referenced on multiple privilege logs to sustain the privilege.

23  *See* Exhibit 1 at 19:8- 20:5. As such, the Bulson documents were to be returned and

24  not released to Defendants by the Escrow Holder, per the April 30, 2007 Order.

25      29.    In response, Defendants' counsel, Michael Bergman, wrote to the

26  Escrow Holder on May 22, 2007, improperly challenging the assertion of the joint

27  interest privilege in Bulson's log, as if the Escrow Holder were the Court, and

28

1  demanding the release of the documents on this alleged newfound basis. *See* Exhibit

2  6, Ex. E.

3       30.    In his May 22, 2007 letter, Mr. Bergman *admits* that "'escrow

4  documents' originally listed on the privilege logs of non-party witnesses should not

5  be released." *Id.*  However, one paragraph later, he claims that the two documents

6  listed on the privilege log of Mr. Bulson, a non-party attorney, must be turned over,

7  while citing no rationale or authority for this exception to the April 30, 2007 Order.

8  *Id. See* Exhibit 3 at 39-42.

9       31.    On July 24, 2006, Defendants filed a motion to compel challenging the

10  sufficiency and format of Plaintiffs' privilege logs.  By order dated August 18, 2006,

11  Magistrate Zarefsky denied Defendants' motion, ruling that "the Court notes that the

12  log appears to follow the form suggested in a commonly used treatise, W. Schwarzer,

13  W. Tashima and J. Wagstaffe, Federal Civil Procedure Before Trial, Form 11:A

14  (Rutter 2006). Moreover, the log appears to have the same information which the

15  Court found sufficient in *Dole v. Milonas*, 889 F.2d 885 (9th Cir. 1989). Accordingly,

16  this Court finds that by providing this log, the Plaintiffs have sufficiently asserted the

17  attorney-client privilege and the work product doctrine." *See* Exhibit 4, Ex. A.  Mr.

18  Bulson's privilege log followed the same standard format approved by Magistrate

19  Zarefsky.  *See* Exhibit 4, Ex. O.

20       32.    Thus, the Bulson documents are protected by the applicable joint interest

21  privilege and work product doctrine, as properly noted on his privilege log.

22       I declare under penalty of perjury of the laws of the United States of America

23  that the foregoing is true and correct.

24       Executed on September 20, 2007 in Los Angeles, California.

25

26                         _____
                                    Marc Toberoff
27

28

                                    9

EXHIBIT 5

1  WEISSMANN WOLFF BERGMAN
      COLEMAN GRODIN & EVALL LLP
2  Michael Bergman (SBN 37797)
   Anjani Mandavia (SBN 94092)
3  Adam Hagen (SBN 218021)
   9665 Wilshire Boulevard, Ninth Floor
4  Beverly Hills, California 90212
   Telephone: (310) 858-7888
5  Fax: (310) 550-7191

6  FROSS ZELNICK LEHRMAN & ZISSU, P.C.
   Roger L. Zissu (Admitted *pro hac vice*)
7  James D. Weinberger (Admitted *pro hac vice*)
   866 United Nations Plaza
8  New York, New York 10017
   Telephone: (212) 813-5900
9  Fax: (212) 813-5901

10 PERKINS LAW OFFICE, P.C.
   Patrick T. Perkins (Admitted *pro hac vice*)
11 1711 Route 9D
   Cold Spring, New York 10516
12 Telephone: (845) 265-2820
   Fax: (845) 265-2819

13

14 Attorneys for Defendants and Counterclaimant

15           **UNITED STATES DISTRICT COURT**

16          **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 17 JOANNE SIEGEL and LAURA SIEGEL LARSON,<br>18           Plaintiffs,<br>19 vs.<br>20 WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; DC COMICS; and DOES 1-10,<br>21           Defendants. | Case Nos. [Consolidated for Discovery]:<br>CV 04-8400 SGL (RZx)<br>CV 04-8776 SGL (RZx)<br>Hon. Steven G. Larson, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J. |
| 22 JOANNE SIEGEL and LAURA SIEGEL LARSON,<br>23           Plaintiffs,<br>vs.<br>24 TIME WARNER INC.; WARNER COMMUNICATIONS INC.; WARNER<br>25 BROS. ENTERTAINMENT INC.; WARNER BROS. TELEVISION<br>26 PRODUCTION INC.; DC COMICS; and DOES 1-10,<br>27           Defendants.<br>28 AND RELATED COUNTERCLAIMS | **DECLARATION OF WAYNE M. SMITH IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL PRODUCTION OF WHISTLE-BLOWER DOCUMENTS**<br><br>**DISCOVERY MATTER LOCAL RULE 37**<br><br>Time: 10:00 a.m.<br>Date: April 16, 2007<br>Courtroom: 540<br>Mag. Judge Ralph Zarefsky<br>Discovery Cutoff: Nov. 17, 2006 |

{F0010672.3 }

EXHIBIT 5
Page 123

1     I, Wayne M. Smith, declare and state as follows:

2     1.    I am an attorney, admitted to practice before the Supreme Court of the

3 State of California and before this Court, and am employed by defendant Warner

4 Bros. Entertainment Inc. ("Warner Bros.") as Vice President, Senior Litigation and

5 Chief Patent Counsel. I submit this declaration in support of Defendants' Motion to

6 Compel Production of Whistle-blower Documents. I have personal knowledge of

7 the facts contained within this declaration, and, if called upon as a witness, I could

8 and would testify competently thereto.

9     2.    During the afternoon of June 28, 2006, I received a telephone call from

10 John A. Schulman, General Counsel of Warner Bros., who asked that I come to his

11 office. Upon arriving at his office, Mr. Schulman advised me that a set of

12 documents (the "Superman Documents") addressed to him and apparently relating

13 to the Siegel litigation had arrived from an anonymous source at his office that day.

14 Mr. Schulman informed me that the cover letter contained with the documents

15 indicated that other executives at Warner Bros. may have received the same set of

16 documents, and that he had called the offices of those executives to see if they had

17 received anything. He further advised me that he had asked those executives to send

18 the documents to his office without reviewing them, and that one set of documents

19 had already been delivered to him. Mr. Schulman handed me the stack

20 (approximately an inch high) of Superman Documents that he had received and

21 asked me to wait outside his office while he completed a meeting, after which we

22 would discuss them. The stack did not include any envelope or packaging in which

23 the documents may have arrived. This was not unusual as it has been my experience

24 that the practice of Mr. Schulman's office staff is to dispose of envelopes and

25 packaging upon opening mail.

26     3.    While I was waiting, I looked at what might be characterized as the

27 "cover letter" that came with the Superman Documents. The cover letter, which

28

{F0010672.3 }

1

EXHIBIT 5

1  was not signed, alleged various types of ethical misconduct on the part of the
2  Plaintiffs' counsel in connection with the Siegel litigations. The cover letter also
3  asserted ethical misconduct -- violating the terms of a confidentiality agreement by
4  leaking settlement information to the press -- in connection with another litigated
5  matter where Plaintiffs' counsel had also represented a party adverse to Warner
6  Bros. The letter appeared designed to right wrongs caused by Plaintiffs' counsel's
7  misconduct. The letter also referenced the documents enclosed, providing an
8  overview of their contents and their connection to Plaintiffs' counsel's alleged
9  wrongdoing. I also thumbed through the Superman Documents contained with the
10 letter, but did not read any of them in detail. Meanwhile, an assistant for another
11 Warner Bros. executive delivered what appeared to be another set of Superman
12 Documents to Mr. Schulman's office. I did not observe that any of the three sets of
13 Superman Documents -- (i) the set Mr. Schulman handed to me; (ii) the other set in
14 his office; or (iii) the set that was delivered while I was waiting outside his office --
15 was contained in an envelope or other packaging.
16      4.    I then met with Mr. Schulman. I told Mr. Schulman that based on the
17 contents of the cover letter and my brief thumbing through the documents, it
18 appeared that certain of the documents in the package were privileged. I said that
19 before I looked at the documents I wanted to review the case law in the area to
20 determine what level of review, if any, of the Superman Documents was
21 appropriate. Mr. Schulman agreed with this approach, gave me one set of the
22 documents, retained the other two sets that he had received, and advised me that he
23 had only looked at the cover letter that came with the documents and would not
24 review the documents at all.
25      5.    I returned to my office with the set of documents. I initially went on
26 the internet and performed a Google search relating to the issue of what obligations,
27 if any, governed the handling of the Superman Documents we had received. My
28 initial search located an article from the June 2006 Los Angeles Lawyer magazine

{F0010672.1 }

2

EXHIBIT 5     Page 125

1  entitled "On the Receiving End," by Kurt L. Schmalz (a true and correct copy of

2  which is attached as Exhibit "A" hereto) which was posted on the Los Angeles

3  County Bar Association web site. The article concerns the obligations of lawyers

4  who unwittingly receive privileged documents from opposing counsel's files and

5  discusses various California cases that have dealt with the issue, including the *Rico*

6  *v. Mitsubishi Motors Corporation* case pending before the California Supreme

7  Court.

8      6.    I read the Schmalz article and then downloaded and studied the three

9  principal California cases it identifies: *Aerojet-General Corporation v. Transport*

10  *Indemnity Insurance*, 18 Cal.App.4th 996 (1993), *State Compensation Insurance*

11  *Fund v. WPS, Inc. (State Fund)*, 70 Cal.App.4th 644 (1999) and the Court of Appeal

12  decision in the case under review, *Rico v. Mitsubishi Motors Corporation*, 116

13  Cal.App.4th 51 (2004) (*review granted* June 9, 2004). Based on my review of the

14  relevant California authorities, it appeared that a conservative approach to handling

15  the Superman Documents was to follow the procedure laid out by the Court in *State*

16  *Fund*, specifically: (i) to review each document but to cease the review once it

17  became apparent that the document was privileged; (ii) to contact opposing counsel

18  and advise that the documents have been received; and (iii) to refrain from using any

19  information in the documents until there was either an agreement with opposing

20  counsel, or the court had determined the documents' disposition.

21      7.    Following my review of the law, I called Mr. Schulman and advised

22  him of the results of my research. I said that I intended to review the Superman

23  Documents in accordance with *State Fund*. At Mr. Schulman's request I also sent

24  copies of the three key cases and the article to Mr. Schulman's office.

25      8.    That evening, I took the Superman Documents home with me and spent

26  approximately a half hour reviewing them. Certain of the documents – such as

27  executed agreements relating to Superman and correspondence between the

28  Plaintiffs and non-lawyer third parties – did not appear subject to any applicable

{F0010672.3 }

3
EXHIBIT 5
Page 126

1   privilege.  As I was going through the documents I placed them into three piles:  (i)

2   "non-privileged," (ii) "privileged," and (iii) "?" (where either I could not tell

3   whether it was privileged or I believed the document covered subject matter where

4   privilege may have been waived in the case, as explained below).  In reviewing each

5   document, where it first appeared to me that it was entirely privileged, I ceased

6   reading it, placed the document in the "privileged" pile and did not look at it further.

7   After going through the documents, I placed a post-it note on the top of each pile

8   (indicating "privileged," "non-privileged," or "?"), and fastened each pile together.

9   I did not look at the documents further.  Because I did not conduct a detailed review

10   of the Superman Documents, and because of the passage of time, I do not recall

11   their specific contents.  I do, however, recall generally the subject matter of certain

12   of the documents.

13         9.    The non-privileged pile was the second largest of the three.  It

14   contained what appeared to be agreements between, *inter alia*, the Siegels and/or

15   Shusters and various entities, as well as correspondence concerning the interest in

16   Superman that might be owned by Plaintiff Laura Siegel's estranged step-brother,

17   Michael Siegel.  To my knowledge, this last category of documents has never been

18   produced in the litigation.

19         10.    The "?" pile was the smallest.  I believe that one or two of the

20   documents in this category potentially fall within the scope of a privilege waiver

21   based Plaintiffs' reliance on an affirmative defense that their predecessor counsel

22   did not have authority to accept a settlement proposal made by Defendants.

23   Defendants position on this privilege waiver is the subject of a separate Motion to

24   Compel filed concurrently herewith.

25         11.    The pile of documents I labeled "privileged" was the largest.

26         12.    Even from the brief review made, it appeared to me that, with the

27   exception of the cover letter (which also addressed the other litigation involving

28   Plaintiffs' counsel), all of the Superman Documents related to the subject matter of

[P0010672.3 ]

EXHIBIT 5

4

1  the instant litigation and were responsive to document requests the Defendants had

2  previously served on Plaintiffs.  However, it did not appear to me at the time that

3  any of the "non-privileged" documents had been produced in the litigation.

4  Moreover, at least some (and perhaps virtually all) of the privileged documents, as

5  well as those in the "?" pile, were, to the best of my knowledge, never identified in

6  any privilege log served by the Plaintiffs.

7     13.    The next morning, June 29, 2006, I returned with the Superman

8  Documents to see Mr. Schulman in his office.  Mr. Schulman and I discussed having

9  a neutral third party hold the documents pending either the parties' agreement as to

10  their disposition or order of the Court.  We decided to ask John Quinn, then with

11  Arnold & Porter, and former president of the Los Angeles County Bar Association,

12  to act as the neutral based on his reputation and legal ethics experience.  He agreed

13  and the following morning, June 30, 2006, the three sets of the Superman

14  Documents, including the set that I had categorized, were handed over to Mr. Quinn.

15  Out of an abundance of caution we handed over *all* the documents to Mr. Quinn, not

16  just those that were clearly or potentially privileged.  Further, we have not shared

17  the contents of the Superman Documents with any of the outside counsel

18  representing the Defendants in this action, nor have we used the contents of the

19  documents in the litigation.

20     I declare under penalty of perjury of the laws of the United States of America

21  that the foregoing is true and correct.

22     Dated this 26th day of March 2007 at Burbank, California.

23

24                              Wayne M. Smith

25

26

27

28

[F0010672.4]

5

EXHIBIT 5     Page 128

EXHIBIT 6

1            UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    **CERTIFIED COPY**

4  JOANNE SIEGEL, an individual;     )
    and LAURA SIEGEL LARSON, an     )

5  individual,                      )
                              )

6               PLAINTIFFS, )
                             )   CASE NOS.

7       VS.              )   04-8400 SGL (RZx)
                             )   04-8776 SGL (RZx)

8  TIME WARNER, INC., a corporation; )
  WARNER COMMUNICATIONS, INC.; a   )

9  corporation; WARNER BROS.        )
  ENTERTAINMENT, INC., a corporation;)

10  WARNER BROS. TELEVISION PRODUCTION,)
   INC., a corporation; DC COMICS, a  )

11  general partnership,           )
                              )

12               DEFENDANTS. )
  ---------------------------------)

13

14

15              DEPOSITION OF

16             JOHN SCHULMAN

17         LOS ANGELES, CALIFORNIA

18          NOVEMBER 10, 2006

19

20

21  ATKINSON-BAKER, INC.
   COURT REPORTERS

22  (800) 288-3376
   www.depo.com

23

24  REPORTED BY:    CHRISTY A. CANNARIATO, CSR #7954

25  FILE NO.:      A009CB6

1      A.      For a while it was conducted in New York, and

2   then when Gang, Tyre got involved I got involved.

3      Q.      So at that point when you got involved did you

4   become the lead negotiator in settlement negotiations with

5   the Siegels?

6      A.      The way a lawyer is, yes.  I wasn't a

7   principal.

8      Q.      What do you mean "the way a lawyer is"?

9      A.      Have you negotiated for your clients before

10  where you've done the negotiations with the lawyer or

11  agent or representative on the other side?  You're not the

12  principal.  You're not making the decisions.  You're doing

13  the negotiation.

14     Q.      So you were negotiating on behalf of Warner

15  Bros. and DC?

16     A.      DC.

17     Q.      You were acting as DC's lawyer in those

18  negotiations?

19     A.      Yes.

20     Q.      How does that work?  Aren't you exclusive to

21  Warner Bros. as general counsel of Warner Bros.?

22     A.      I'm exclusively employed by them.  On occasions

23  I've done work in the interests of HBO.  Or occasionally

24  I've done work in the interests of New Line.  Or

25  occasionally I've done work in the interest of even Time

EXHIBIT 6
Page 130

95

1    Warner.

2         Q.    When you say you do work in their interests,

3    are you retained by them to act as their lawyer with

4    respect to that work?

5         A.    Yes and no.  I gave you that answer not to be

6    quipy.  But while there is no retention agreement, when

7    I'm asked to do something at the end of the year I talk

8    with the general counsel about some allocation of cost or

9    charge that we work out.  I don't keep time sheets and say

10   you owe me $3 as a preagreed hourly rate, but I will sit

11   down with Peter Haje, Paul Cappuccio, whoever the general

12   counsel at Time Warner is and, say, look, we did this for

13   New Line.  Here is how much I spent, or Wayne spent, or

14   one of my other lawyers.  Let's work out something

15   equitably.  So you tell me what the answer to "retained"

16   is.

17        Q.    So in settlement negotiations you were merely

18   representing DC, not Warner Bros' interests; is that

19   correct?

20        A.    Well, Warner Bros. was a licensee, so we wanted

21   DC Comics to be in a good position.  Yes, sir.  I was very

22   interested -- Warner Bros. was very interested in the

23   results of the negotiations, but the party negotiating was

24   DC Comics.  Yes, sir.

25        Q.    So is it correct to say that Warner Bros. had a

1    vested interest in the negotiations?

2        A.    Time Warner had a vested interest.  The

3    shareholders of Time Warner had a vested interest,

4    including Warner Bros.  Yes, sir.

5        Q.    And in these negotiations you didn't have

6    decision-making authority to agree to financial terms, did

7    you?

8        A.    Absent checking with DC Comics between myself

9    and the other side, yes, I was the representative, but I

10   talked to my principal and got an okay first.

11       Q.    Right, but you on your own didn't have

12   decision-making authority to agree to financial terms, did

13   you?

14       A.    I'm just a poor working lawyer, sir.

15       Q.    So, in other words, just by way of example, if

16   you offered the Siegels $2,000,000 and they said we want

17   $4,000,000 would you have authority to say yes without

18   first getting the approval of DC?

19       A.    No, but I might have gotten a preapproved range

20   so that that fell in it.

21       Q.    Other than an instance where you had a

22   pre-approved range where that fell in --

23       A.    No.

24       Q.    -- would you have to go to DC for its approval?

25       A.    I'd go back to them.  Sure.

EXHIBIT 6
Page 132

97

1   STATE OF _____ }
2   COUNTY OF ___Los Angeles___ } SS.

3

4

5

6

7          I, the undersigned, declare under penalty
8   of perjury that I have read the foregoing transcript,
9   and I have made any corrections, additions or
10  deletions that I was desirous of making; that the
11  foregoing is a true and correct transcript of
12  my testimony contained therein.

13          EXECUTED this __12th__ day of __December__.
14  __2006__, at __Los Angeles__, __California__
                 (City)              (State)

15

16

17

18

19  _____
    JOHN SCHULMAN

20

21

22

23

24
25

EXHIBIT 6    Page 133

REPORTER'S CERTIFICATE

    I, CHRISTY A. CANNARIATO, CSR #7954, Certified Shorthand Reporter, certify:

    That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

    That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

    That the foregoing is a true and correct transcript of my shorthand notes so taken.

    I further certify that I am not a relative nor employee of any attorney of the parties, nor financially interested in the action.

    I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

    Dated this 28 day of November , 20 06 .

CHRISTY A. CANNARIATO, CSR #7954

1

EXHIBIT 6

Page 134

EXHIBIT 7

1   WEISSMANN WOLFF BERGMAN
      COLEMAN GRODIN & EVALL LLP
2   Michael Bergman (SBN 37797)
    Anjani Mandavia (SBN 94092)
3   9665 Wilshire Boulevard, Ninth Floor
    Beverly Hills, California 90212
4   Telephone: 310-858-7888
    Fax:        310-550-7191
5   Email:      mbergman@wwllp.com

6   FROSS ZELNICK LEHRMAN & ZISSU, P.C.
    Roger L. Zissu (Admitted *pro hac vice*)
7   James Weinberger (Admitted *pro hac vice*)
    866 United Nations Plaza
8   New York, New York 10017
    Telephone: 212-813-5900
9   Fax:        212-813-5901

10  PERKINS LAW OFFICE, P.C.
    Patrick T. Perkins (Admitted *pro hac vice*)
11  1711 Route 9D
    Cold Spring, NY 10516
12  Telephone: 845-265-2820
    Fax:        845-265-2819

13
    Attorneys for Defendants and Counterclaimant
14
                    UNITED STATES DISTRICT COURT
15
          CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION
16

17  JOANNE SIEGEL and LAURA          )  Case No. SA CV 04-8400 SGL (RZx)
    SIEGEL LARSON,                   )  Case No. SA CV 04-8776 SGL (RZx)
18                                   )
                                     )  Hon. Stephen G. Larson, U.S.D.J.
19          Plaintiffs,              )  Hon. Ralph Zarefsky, U.S.M.J.
                                     )
20      vs.                          )  **NOTICE OF MOTION AND**
                                     )  **JOINT STIPULATION RE:**
21  TIME WARNER INC., WARNER         )  **DEFENDANTS' MOTION TO**
    COMMUNICATIONS INC. WARNER       )  **COMPEL COMPLIANCE WITH**
22  BROS. ENTERTAINMENT INC.,        )  **THE COURT'S 4/30/07 ORDER**
    WARNER BROS. TELEVISION          )  **AND MOTION FOR SANCTIONS**
23  PRODUCTION INC., DC COMICS,      )
    and DOES 1-10,                   )  Time:    10:00 a.m.
24                                   )  Date:    October 15, 2007
                                     )  Place:   Courtroom 540
25          Defendants.              )  Mag. Judge Ralph Zarefsky
                                     )  Discovery Cutoff: Nov. 17, 2006
26                                   )
                                     )
27  AND RELATED COUNTERCLAIMS.       )
                                     )
28

                              EXHIBIT 7
                              Page 135

# TABLE OF CONTENTS

I.    DEFENDANTS' INTRODUCTORY STATEMENT .....................................1

II.   PLAINTIFFS' INTRODUCTORY STATEMENT .......................................3

III.  DEFENDANTS' CONTENTIONS .............................................................6

    A.   RELEVANT BACKGROUND ........................................................6

    B.   ARGUMENT ...............................................................................10

       1.  The "Defamatory" Cover Letter To The Escrow Documents...................................................................................12

       2.  Post-Litigation Attorney-Client Communications. ...................13

       3.  Plaintiffs and Mr. Toberoff Cannot Use An Entry On a Third Party's Privilege Log To Prevent the Escrow Officer From Releasing Documents That Were Unlisted On Their Own Privilege Logs. ................................................14

       4.  The Escrow Holder Cannot Fulfill The Court's Order Without Matching Up The Escrow Documents With the Documents and Privilege Log Entries Identified in Mr. Toberoff's Declaration. .......................................................20

    C.   CONTEMPT SANCTIONS ARE WARRANTED HERE ................23

IV.   PLAINTIFFS' CONTENTIONS .............................................................24

FACTUAL AND PROCEDURAL BACKGROUND................................24

       1.  Documents Stolen from Plaintiffs' Attorneys' Files ...........................25

       2.  The Court's April 30, 2007 Order.........................................28

ARGUMENT...............................................................................................31

    A.   Plaintiffs' Counsel Fully Complied With the Court's April 20, 2007 Order ..................................................................31

       1.  Plaintiffs Attorney-Client Communications After Commencement of Litigation Retain Their Privilege........................32

       2.  The "Defamatory Cover Letter" Discussing The Contents Of Privileged Communications Listed In The Privilege Logs Should Not Be Disclosed Per The Order's Rationale ...............................34

EXHIBIT 7    i

Page 136

3.   Per The Order, The Two Letters Listed On The Privilege Log Of Non-Party Attorney, Don Bulson, Should Not Be Disclosed ...................37

B.   Defendants' Improper Attempt To Influence And Interfere With The "Escrow" Process Should Not Be Countenanced ..............................42

C.   Sanctions Against Plaintiff Are Improper.............................................44

D.   Defendants Should Be Sanctioned For Their Attempt to Influence the Escrow Process.........................................................................................45

V.   DEFENDANTS' CONCLUSION.................................................................45

VI.  PLAINTIFFS' CONCLUSION....................................................................46

EXHIBIT 7
ii
Page 137

# TABLE OF AUTHORITIES

## I.    DEFENDANTS' AUTHORITIES

**CASES**                                                          **PAGE(S)**

*Cunningham v. Connecticut Mut. Life Ins.*
    845 F. Supp. 1403 (S.D. Cal. 1994) ..................................................18

*Fox v. California Sierra Fin. Servs.*
    120 F.R.D. 520, 525 (N.D. Cal. 1988) ................................................18

*In re HBOC, Inc., ERISA Litig.*
    2005 U.S. Dist. LEXIS 7098 at *22 (N.D. Cal. Mar. 31, 2005) ...................17

*Housing Rights Center v. Sterling*
    2004 U.S. Dist. LEXIS 28879, *10 (C.D. Cal. Dec. 29, 2004) ....................23

*NIDEC Corp. v. Victor Co. of Japan*
    2007 U.S. Dist. LEXIS 48841 at *9 (N.D. Cal. July 3, 2007) ...............17, 19

*Thelen Reid & Priest L.L.P. v. Marland*
    2007 U.S. Dist. LEXIS 17482 at *26-*28 (N.D. Cal. Feb. 21, 2007) ..........18

*Weil v. Investment Indicators Mgm't, Inc.*
    647 F.2d 18, 25 (9th Cir. 1981) (*Id.* at ¶ 27) ..................................12

**STATUTES**

Fed. R. Civ. Pro. 37(b) ......................................................................23

Fed. R. Civ. Pro. 37(b)(1) ..................................................................23

Fed. R. Civ. Pro. 37(b)(2) ..................................................................23

Fed. R. Civ. Pro. 72(a) .......................................................................8

Local Rule 72-2.1 .............................................................................8

**TREATISES**

1 Paul R. Rice, *Attorney-Client Privilege*, § 4:35 at 192-95 (2d ed. 1999)............14

EXHIBIT 7
iii
Page 138

## II.   PLAINTIFFS' AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Burlington Northern & Santa Fe Ry. Co. v. U.S. Dist. Court for Dist. of Mont.*
    408 F.3d 1142 (9th Cir. 2005) ................................................................42

*Cunningham v. Connecticut Mut. Life Ins.*
    845 F. Supp. 1403 (S.D. Cal. 1994) ........................................................41

*Fox v. California Sierra Fin. Servs.*
    120 F.R.D. 520, 525 (N.D. Cal. 1988) .....................................................41

*Gomez v. Vernon*
    255 F.3d 1118 (9th Cir. 2001) ................................................................42

*Hewlett-Packard Co. v. Bausch & Lomb Inc.*
    115 F.R.D. 308 (N.D. Cal. 1987) ............................................................40

*Imperial Corporation of America v. Durkin*
    174 F.R.D. 475 (S.D.Cal.1997) ..............................................................42

*In re Dayco Corp. Derivative Sec. Litig.*
    102 F.R.D. 468 (S.D.Ohio 1984) ............................................................35

*In re Grand Jury Proceedings Involving Berkley and Co., Inc.*
    466 F.Supp. 863 (D. Minn. 1979) ..........................................................35

*In re Regents of the Univ. of Cal.*
    101 F.3d 1386 (Fed.Cir.1996) ................................................................39

*Massachusetts Mut. Life Ins. Co. v. Cerf*
    177 F.R.D. 472 (N.D.Cal. 1998) ............................................................36

*NIDEC Corp. v. Victor Co. of Japan*
    ___ F.Supp.2d ____, 2007 WL 1994171, 2007 U.S. Dist. LEXIS 48841 at
    *9, *10 (N.D. Cal. July 3, 2007) ........................................................39, 40

*Resolution Trust Corp. v. Dean*
    813 F.Supp. 1426 (D.Ariz. 1993) ...........................................................35

*Shamis v. Ambassador Factors Corp.*
    34 F.Supp.2d 879 (S.D.N.Y. 1999) .........................................................42

EXHIBIT 7
iv
Page 139

1
2
*Tennenbaum v. Deloitte & Touche*
    77 F.3d 337 (9th Cir. 1996) ........................................................... 35

3
*Thelen Reid & Priest L.L.P. v. Marland*
    2007 WL 578989, 2007 U.S. Dist. LEXIS 17482 at *26-*28 (N.D. Cal. Feb.
4
    21, 2007) ..................................................................................... 41, 42

5
*United Phosphorus, Ltd. v. Midland Fumigant, Inc.*
6
    164 F.R.D. 245 (D.Kan.1995) ..................................................... 36

7
*United States v. Chen*
8
    99 F.3d 1495 (9th Cir. 1996) ....................................................... 36

9
*United States ex. rel. Mayman v. Martin Marietta Corp.*
10
    886 F. Supp. 1243 (D. Md. 1995) .............................................. 36

11
**STATUTES**
12
Fed. R. Civ. Pro. 37(b)(2) ...................................................................... 45

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 7

v

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

    **PLEASE TAKE NOTICE** that on October 15, 2007, or as soon thereafter as the matter may be heard, Defendants Time Warner Inc., Warner Communications Inc., Warner Bros. Entertainment Inc., Warner Bros. Television Production Inc. and Defendant and Counterclaimant DC Comics ("Defendants") will move to enforce Magistrate Zarefsky's April 30, 2007 Order and for contempt before the Honorable Ralph Zarefsky, United States District Court, Central District of California, Western Division, Roybal Federal Building, 255 East Temple Street, Los Angeles, California 90012, Courtroom 540. The grounds for this Motion are that Plaintiffs and their counsel Mr. Toberoff have failed to comply with Magistrate Zarefsky's April 30, 2007 Order regarding the Escrow Documents.

    This Motion is made following the conferences of counsel pursuant to L.R. 37-1, which took place on July 5, 2007 and on July 31, 2007. This Motion is based on this Notice; the accompanying Joint Stipulation re: Defendants' Motion to Compel Plaintiffs and Mr. Toberoff to Comply with the Court's 4/30/07 Order and Motion for Sanctions; the declarations submitted by the parties; all prior pleadings and proceedings in this matter; and all oral and written evidence to be presented at the hearing, if any, on this motion.

DATED:    September ___, 2007    Respectfully submitted,

                                  WEISSMANN WOLFF BERGMAN
                                  COLEMAN GRODIN & EVALL, LLP
                                  -and-
                                  FROSS ZELNICK LERMAN ZISSU, LLP
                                  -and-
                                  PERKINS LAW FIRM, PLC

                                  By_____
                                      Michael Bergman
                                    Attorneys for Defendants

EXHIBIT 7

1

Page 141

# JOINT STIPULATION

## I.    DEFENDANTS' INTRODUCTORY STATEMENT

Defendants bring this motion for contempt and to enforce the Court's April 30, 2007 Order requiring that any "Escrow Documents" that were not previously produced or listed by Plaintiffs or their counsel on any privilege logs should be produced to Defendants.

As the Court will recall, this dispute began in June 2006, when Defendants received several anonymous packages containing copies of documents apparently from the files of Plaintiffs' counsel Marc Toberoff. Given the unusual receipt of these documents, which appeared to include both privileged and non-privileged communications, Defendants turned them over to a neutral third party pending an agreement with Mr. Toberoff or an order of the Court regarding their proper disposition. Defendants and Mr. Toberoff were not able to reach a resolution, however; indeed, even after Defendants served discovery requests on both Plaintiffs and on Mr. Toberoff seeking those exact documents, Plaintiffs and Mr. Toberoff refused not only to produce non-privileged documents but also to provide Defendants with any privilege logs addressing those documents. Defendants therefore were forced to seek the help of the Court, filing a motion to compel the production of the documents.

During the April 30, 2007 hearing on that motion, the Court chose a neutral designation for the documents, calling them "Escrow Documents," and ruled that Defendants are entitled to receive from the escrow holder any Escrow Documents that are not privileged or that were not listed on a privilege log. The Court's Order was based upon Mr. Toberoff's unequivocal representation during the hearing that each Escrow Document had been either previously produced in the litigation or listed on a privilege log; a representation that was intended to clarify the apparent "wiggle room" in the declaration Mr. Toberoff submitted to the Court in support of Plaintiffs' portion of the joint stipulation. Thus, the Court ordered Mr. Toberoff to

EXHIBIT 7
1

1   submit a sworn declaration listing each Escrow Document by Bates number and

2   matching up each Escrow Document with a corresponding production number or

3   privilege log entry.

4        Although there were no objections filed to the Court's April 30, 2007 Order,

5   Mr. Toberoff nevertheless thereafter took it upon himself to inject additional

6   wiggle room into the purportedly unequivocal statement he made to the Court

7   during the hearing, violating both the spirit and the letter of the Court's Order.  On

8   the court-mandated date of May 21, 2007, Mr. Toberoff submitted a declaration

9   that is contrary to the representation he made to the Court, listing a number of

10  Escrow Documents that had neither been produced nor listed on a privilege log.

11  Most critically, Mr. Toberoff prefaced that declaration with a letter containing

12  instructions to the escrow holder that effectively prevents the escrow holder from

13  turning over the documents that Defendants are entitled to under the Court's Order

14  without further Court intervention.

15       As justification for his position, Mr. Toberoff has claimed a number of

16  "implied exceptions" to the Court's Order, and has insisted that the escrow holder

17  either honor these exceptions, or refrain from releasing any documents to the

18  Defendants.  At this point, since this matter has been resolved by the Court's April

19  30, 2007 Order, Mr. Toberoff's arguments come too late.  The Court's bright-line

20  Order did not leave room for dispute, and Plaintiffs and Mr. Toberoff should have

21  filed timely objections to that ruling if they disagreed with it in any way.  Having

22  forgone their right to file objections, they cannot be heard to complain now.

23  Furthermore, none of Mr. Toberoff's purported "exceptions" to the Order are valid;

24  in fact, each purportedly excepted category of documents was subsumed within the

25  Court's ruling and specifically contemplated by the Order. Accordingly,

26  Defendants have brought this motion for contempt and to enforce this Court's

27  April 30, 2007 Order.

28

EXHIBIT 7
2
Page 143

II.    **PLAINTIFFS' INTRODUCTORY STATEMENT**

Plaintiffs' have fully complied with Magistrate Zarefsky's April 30, 2007 order ("Order").  The Court ordered Plaintiffs' counsel to produce a declaration specifically referencing, by the bates numbers, which "Escrow Documents" had already been produced and which had already been listed on a privilege log, so that the escrow agent, David Eisen, Esq., of Arnold and Porter LLP, could appropriately disburse the Escrow Documents.  Defendants admit, as they must, that Plaintiffs' counsel, Marc Toberoff, drafted and furnished to Mr. Eisen a declaration which fully complied with the Court's Order.

The vast majority of the "Escrow Documents" were privileged or had already been produced, and were designated as such in Mr. Toberoff's declaration. However, 9 documents (4 of which are merely fax cover or confirmation sheets) of the 839 pages of "Escrow Documents" did not fit squarely in the Order.  This small handful of documents fall into three categories that fell between the "cracks" of the Order and at the hearing, but are clearly privileged:  (i) 6 *post-litigation attorney-client communications*, which, pursuant to the parties' standing agreement (admitted by Defendants herein) need not have been listed in a privilege log; (ii) the "defamatory cover letter" enclosing and describing the contents of many of the attorney-client communications, held in escrow, that were identified on the privilege logs of Plaintiffs and non-party witnesses; and (iii) 2 letters between Mr. Toberoff and the attorney for Plaintiff Laura Siegel Larson's half-brother, Michael Siegel, both statutory beneficiaries of the "Superman" termination notices, which were listed on Bulson's privilege log and identified as such in Mr. Toberoff's declaration.

Examining each of the categories in turn, Defendants' overreaching becomes apparent.  With respect to the post-litigation attorney-client communications, both sides had agreed to not list such communications in their privilege logs, yet two examples of such communications were included in the "Escrow Documents."

EXHIBIT 7
3
Page 144

1    This very point was raised in Plaintiffs' submissions on the original motion, but

2    was inadvertently not addressed by either party or the Court at the hearing.  Yet

3    now the defendants wish to use the phrase "not listed on a privilege log" as a

4    crowbar to pry into documents clearly subject to attorney-client privilege and

5    which, as Defendants admit, need not have been listed on a privilege log pursuant

6    to the parties standing agreement.  Defendants' overreaching and hyper-technical

7    application should be rejected as contrary to the obvious spirit of the Order and the

8    parties' express agreement.

9         The "defamatory cover letter," which contains and discloses the substance of

10   confidential attorney-client communications, was not the subject of Defendants'

11   motion to compel, nor was it addressed at the hearing or in the Order, as

12   acknowledged by Mr. Eisen in his May 24, 2007 letter.  Moreover, Defendants, in

13   their original moving papers, drew repeated and clear distinctions between the

14   "cover letter" and the subject of their motion -- the so-called "whistleblower

15   documents," and should not be permitted to now conflate the two.  If Defendants

16   desired access to the cover letter, they should have sought such access in their

17   original joint stipulation.  Moreover, the cover letter discloses the contents of

18   privileged communications and work product identified in the privilege logs of

19   Plaintiffs and non-party witnesses and, in turn, identified in Mr. Toberoff's Court

20   ordered declaration.

21        The third category of disputed documents were identified in Mr. Toberoff's

22   declaration as being listed in the privilege log of non-party witness, Mr. Bulson,

23   and fall squarely within the Order as not subject to disclosure by Mr. Eisen.

24   Moreover, the correspondence embodies settlement and litigation strategies

25   between Plaintiffs and Michael Siegel, both statutory beneficiaries of the

26   "Superman" termination notices at issue in this litigation, and, as such, are

27   protected by the joint interest privilege and work product doctrine.

28

EXHIBIT 7
4
Page 145

1      Plaintiffs have not kept the "neutral" Mr. Eisen from discharging his duties.

2   In fact, Mr. Eisen's May 24, 2007 letter, specifically acknowledges the validity of

3   Plaintiffs' concerns that the documents are not the direct subjects of the Order. On

4   the contrary, the record reflects that Defendants, led by their counsel, Michael

5   Bergman, once obtaining the Court's Order by touting the purportedly "neutral"

6   protocol they followed, immediately embarked on an overreaching campaign to

7   improperly influence Mr. Eisen, abusing his position and the Court's Order.

8      Defendants' entire motion is little more than a "hit piece," and is falsely

9   premised on the notion that Plaintiffs' counsel intentionally misrepresented to the

10   Court that all of the "Escrow Documents" had been produced or listed in a

11   privilege log. As set forth above, Mr. Toberoff's statement was accurate with

12   respect to the *vast majority* of the 839 pages of "Escrow Documents" documents.

13   The omission of seven documents (four of which are fax cover sheets), comprised

14   of post-litigation attorney-client communications (which need not have been listed

15   on a privilege log) pursuant to the parties' standing agreement, and the

16   "defamatory cover letter," which was not the subject of Defendants' motion to

17   compel, was obviously inadvertent. For Plaintiffs' counsel to inadvertently neglect

18   at the hearing to bring up the special circumstances surrounding this very limited

19   number of documents is entirely understandable. However, Plaintiffs' opposition

20   to defendants' motion to compel *did* contain specific references to these privileged

21   documents. The only documents *not* addressed in Plaintiffs' papers were the two

22   Bulson letters, which are clearly covered by the Order, as they are listed in Mr.

23   Bulson's privilege log and identified as such in Mr. Toberoff's declaration.

24      Defendants' naked attempt to manipulate and overreach to gain access to

25   privileged material should not be countenanced as it violates both the spirit,

26   rationale and the letter of the Court's Order. Accordingly, Defendants' motion

27   should be denied in its entirety.

28

EXHIBIT 7    5
Page 146

III.    **DEFENDANTS' CONTENTIONS**

    A.    **RELEVANT BACKGROUND**

As described in detail in Defendants' prior motion, in June 2006, Defendant Warner Bros. Entertainment Inc, ("Warner Bros.") received several anonymous packages containing what are now known as the Escrow Documents. Because it was apparent that the Escrow Documents came from Mr. Toberoff's files, Wayne Smith, Vice President, Senior Litigation and Chief Patent Counsel at Warner Bros. consulted the applicable ethics opinions and, after undertaking a cursory review of the Escrow Documents and consulting with Warner Bros. General Counsel John Schulman ultimately concluded that he should turn them over to a neutral third party, John Quinn, who was then with the firm of Arnold & Porter.

Mr. Quinn attempted to broker a resolution that would suit both parties, but the parties were unable to reach any understanding. During that process, Mr. Quinn Bates-stamped and copied the Escrow Documents, sending one copy set to Mr. Toberoff and retaining one for himself. After Mr. Quinn provided Mr. Toberoff with the set of Escrow Documents, Defendants served a document request on Plaintiffs and a separate subpoena on Mr. Toberoff personally, each requesting the production of the Escrow Documents. Plaintiffs and Mr. Toberoff refused to provide Defendants with copies of any of the non-privileged Escrow Documents or serve privilege logs supporting any assertions of privilege. As a result, Defendants brought a motion to compel production of the Escrow Documents.

Magistrate Judge Zarefsky heard Defendants' motion to compel on April 30, 2007. During that hearing, Mr. Toberoff represented that, with the exception of two documents he had recently provided to Defendants, each Escrow Document either had previously been produced to Defendants or been previously listed on a privilege log. (Bergman Decl. Exh. A at 10:17 - 11:23; 15:12 - 15:15.) The Court questioned Mr. Toberoff on the declaration that he filed in support of Plaintiffs'

EXHIBIT 7
6
Page 147

1   portion of the Joint Stipulation on the motion, noting that the declaration didn't

2   appear to go that far, and pointing out that it saw some "wiggle room" in the

3   declaration. (Bergman Decl. Exh. A at 19:8 - 19:15.)  The Court therefore sought

4   Mr. Toberoff's confirmation on the ultimate issue:  Had all of the Escrow

5   Documents been either listed on a privilege log or produced in this litigation?  Mr.

6   Toberoff responded with an emphatic and unequivocal *yes*. (Bergman Decl. Exh.

7   A at 11:14 - 11:23.)[1]

8          After receiving that unequivocal response from Mr. Toberoff, the Court

9   issued its Order, outlining the procedure that the parties were to follow in dealing

10  with the Escrow Documents:

11          THE COURT:  Now, I told you, Mr. Toberoff, that I saw a little
            wiggle room in your declaration.  You tell me you didn't mean for
12          there to be any.  So, here's what I'm going to do.  Not later than
            May 7th, that's a week from today, I want you to submit a
13          declaration that does identify by the Bates numbers of the escrow
            documents and the corresponding Bates numbers of documents
14          already produced, those among the escrow documents which are
            unprivileged and have already been produced.
15
            So, you take the Bates numbers of the escrow documents and
16          say, 'Here are the corresponding Bates numbers of the documents
            that have already been produced.'  Take the Bates numbers of the
17          escrow documents and correspond to the listings on the privilege
            log of the documents which have not been produced because they
18          were privileged.  All right?  So, put that in your declaration.
            Then the escrow holder, Mr. Bergman [sic], is to return to the
19          plaintiffs any documents which are identified in the declaration as
            being privileged and having been identified on the privilege logs.
20          The others can be delivered to trial counsel for defendants because
            they're either unprivileged, or, if they were privileged, privilege has
21          been waived because they weren't listed on the privilege log.

22  (Bergman Decl. Exh. A at 19:8 - 20:5.)

23

24  _____

25  [1]    THE COURT:  . . .  What your declaration doesn't say is that you
            went through these, let's call them 'whistleblower' documents, . . .
26          and that you verified that each of the whistleblower documents either
            had been produced or had been listed on the privilege log.  It doesn't
27          say that.

28          MR. TOBEROFF:  That is the case, your Honor, and that was
            certainly my intention to say that, and I'm saying that now.

EXHIBIT 7
7

1    The Court later reiterated and explained its Order, and extended Mr.

2  Toberoff's time to respond to May 21, 2007. (Bergman Decl. Exh. A at

3  30:7 - 34:6.) Neither Plaintiffs nor Mr. Toberoff sought review of the

4  Order.[2]

5    Defendants' counsel Michael Bergman followed up with Jack Quinn, the

6  original caretaker of the Escrow Documents who had since left Arnold & Porter to

7  take a position as a neutral at JAMS/Endispute. In Mr. Bergman's May 16, 2007

8  letter to Mr. Quinn, he observed that the Escrow Documents were likely still in the

9  possession of Arnold & Porter, but proposed that Defendants continue to retain Mr.

10  Quinn's escrow services to carry out the Court's Order. (Bergman Decl. Exh. B.)

11    On May 18, 2007, David Eisen, Mr. Quinn's former partner at Arnold &

12  Porter, responded to Mr. Bergman's letter, informing him and Mr. Toberoff that he

13  had assumed custody of the escrow documents after Mr. Quinn's departure from

14  the firm, and that he was "prepared to fulfill the terms of Magistrate Zarefsky's

15  order." (Bergman Decl. Exh. C.) In order to assist him in that process, Mr. Eisen

16  requested that one of the parties send him "the briefs on the relevant motion and

17  the transcript of the hearing." (*Id.*)

18    On the Court-ordered deadline of May 21, 2007, Mr. Toberoff served a

19  declaration that was accompanied by a cover letter raising a number of exceptions

20  to the unequivocal representation he made to the Court that all of the Escrow

21  Documents had been either listed on a privilege log or had been produced. Indeed,

22  in his letter Mr. Toberoff explained that -- contrary to his representation to the

23  Court -- there were several documents that had not been produced or listed on

24  privilege logs that he nonetheless claimed should be protected by the attorney-

25  client privilege. (Bergman Decl. Exh. D.)

26

27  _____

28  [2] Local Rule 72-2.1 states that a party objecting to a Magistrate Judge's non-dispositive ruling under F.R.Civ.P. 72(a) must file a motion for review with the District Judge within 10 days.

On May 22, 2007, Mr. Bergman responded to Mr. Toberoff's apparent retraction of the representation he made to the Court and asked that Mr. Eisen comply with the Court's Order. (Bergman Decl. Exh. E.) In that May 22 letter, he outlined certain misstatements in Mr. Toberoff's letter and attached the following documents to assist Mr. Eisen in his review of Mr. Toberoff's declaration:

- the April 30, 2007 hearing transcript;
- the documents Mr. Toberoff had identified in his declaration as having previously been produced, so that Mr. Eisen could compare them to the Escrow Documents Mr. Toberoff claimed were corresponding;
- the privilege logs Mr. Toberoff cited in his declaration so that Mr. Eisen could compare the pertinent entries to the Escrow Documents Mr. Toberoff claimed he had listed on those privilege logs; and
- the briefing on Defendant's motion to compel that Mr. Eisen requested in his May 18th letter.

Mr. Toberoff then sent another letter which, among other things, instructed Mr. Eisen that he was not to use Mr. Toberoff's declaration to confirm that the Escrow Documents he would be releasing actually matched up to the production documents and privilege log entries listed in Mr. Toberoff's declaration. (Bergman Decl. Exh. F.) That is, he contended that Mr. Eisen should not undertake the task of verifying the accuracy of his declaration regarding what Escrow Documents had already been produced or listed on Plaintiffs' or other Toberoff clients'[3] privilege logs.

After receiving the competing correspondence from Mr. Toberoff and Mr. Bergman, Mr. Eisen responded on May 24, 2007, observing that the protocol the Court articulated for handling the Escrow Documents appeared to be simple: "documents which appear on the privilege logs are protected and should not be

---

[3] Mr. Toberoff failed to serve a privilege log in response to the Rule 45 subpoena Defendants issued to him.

EXHIBIT 7

1    turned over to defendants, and documents not on the privilege logs are not

2    protected and should be produced to defendants." (Bergman Decl. Exh. G.)

3    Nonetheless, given the parties' competing interpretations of the Court's Order, Mr.

4    Eisen concluded that he should retain all of the Escrow Documents until the parties

5    reached some sort of agreement or until the Court issued a further order. (Id.)

6         Accordingly, on June 25, 2007, Mr. Bergman sent Mr. Toberoff a meet and

7    confer letter attempting to reach an agreement on the issues that were preventing

8    Mr. Eisen from carrying out the Court's Order. (Bergman Decl. Exh. H.)  Mr.

9    Bergman and Mr. Toberoff spoke on July 5, 2007, and later that day Mr. Toberoff

10   sent a letter following up on that conversation. (Bergman Decl. ¶ 10; Exh. I.)  Mr.

11   Bergman's partner Anjani Mandavia had a later conversation with Mr. Toberoff on

12   July 31, 2007, but the parties were not able to resolve the dispute. (Bergman Decl.

13   ¶ 11.)

14   **B. ARGUMENT**

15        Mr. Toberoff has now raised three distinct categories of Escrow Documents

16   which he contends should not be turned over by the escrow holder to Defendants

17   notwithstanding the fact that they fall within the scope of this Court's Order:  (1)

18   the supposedly "defamatory" cover letter which accompanied the documents

19   delivered to Warner Bros. in June 2006, and which purportedly contains or

20   references privileged material; (2) allegedly privileged documents that were not

21   listed on any privilege log because they are claimed to consist of communications

22   with Mr. Toberoff's clients after the inception of litigation; and (3) documents

23   purportedly covered by a "joint interest" privilege which, although they were

24   independently in Plaintiffs' possession, had never been listed on any privilege log

25   created by Plaintiffs but had, after the fact, been listed on the third party's privilege

26   log.

27        In the sections that follow, we analyze each of Plaintiffs' and Mr. Toberoff's

28   newly raised exceptions to the procedures outlined in the Court's ruling and

EXHIBIT 7    10
Page 151

1   explain why their position is incorrect.  At base, Mr. Toberoff cannot be permitted

2   to continue to avoid his discovery obligations by submitting illusory declarations

3   and representations that are rendered meaningless by their unreasonable

4   exceptions.  Before addressing those issues, however, it is important to point out

5   several factors that impact the analysis of each of Plaintiffs' and Mr. Toberoff's

6   arguments.

7        Unlike Defendants' counsel and the Court, who were not able to review the

8   Escrow Documents prior to the hearing, Plaintiffs and Mr. Toberoff have now been

9   in possession of the Escrow Documents for close to a year.  Accordingly, there can

10  be no doubt that Mr. Toberoff knew the contents of those documents when he

11  served discovery responses on behalf of the Plaintiffs and himself, when he

12  decided not to submit privilege logs listing the privileged Escrow Documents that

13  were responsive to Defendants discovery requests, and -- most importantly -- when

14  he represented to the Court that *all* of the Escrow Documents had been either

15  produced or had been listed on Plaintiffs' (or those of another party represented by

16  Mr. Toberoff) privilege log.  Mr. Toberoff has now backtracked on that

17  representation, raising various purported exceptions to his all-inclusive

18  representations to the Court.

19       The problem with this attempt to litigate the issue after-the-fact is twofold.

20  First, the Court was rightfully concerned with the wiggle room Mr. Toberoff left in

21  his declaration, and Mr. Toberoff made an express representation to the Court to

22  assuage that concern.  Had Mr. Toberoff acknowledged that his seemingly all

23  inclusive declaration actually had some exceptions, the Court might have taken a

24  firmer or more hands-on approach when it crafted its Order.  Moreover, by

25  obscuring the true nature of the Escrow Documents until after the hearing, Mr.

26  Toberoff prevented Defendants and the Court, both of whom had no prior

27  knowledge of the contents of the Escrow Documents, from addressing the merits of

28  his newfound exceptions.  For instance, because Mr. Toberoff stated that all of the

EXHIBIT 7        11
Page 152

1    Escrow Documents had been either produced or listed on a privilege log, the Court
2    did not need to consider whether Mr. Toberoff's failure to serve a privilege log in
3    response to his personal subpoena acted as a waiver of the right to assert that any
4    non-listed documents were privileged.

5        As a matter of basic fairness, Plaintiffs and Mr. Toberoff cannot be allowed
6    to adopt a knowingly erroneous position during the hearing, let the time for
7    appealing the Court's Order lapse, and then raise their belated objections to the
8    Court's Order in a letter attached to Mr. Toberoff's declaration.  This underlying
9    principle should guide the analysis of each of Plaintiffs' and Mr. Toberoff's
10    purported exceptions to the Court's Order.

11            **1.    The "Defamatory" Cover Letter To The Escrow**
12                    **Documents.**

13        There is no valid reason for preventing the escrow holder from releasing to
14    Defendants the undated cover letter that accompanied the rest of the Escrow
15    Documents.  First and foremost, the letter falls directly within the purview of the
16    Court's Order requiring the escrow holder to turn over any documents not
17    previously produced or listed on any of Plaintiffs' or Mr. Toberoff's privilege logs.
18    This document, like the rest of the Escrow Documents, was in Plaintiffs' and Mr.
19    Toberoff's possession when Defendants served the applicable requests for
20    production and subpoena seeking the production of all of the Escrow Documents.
21    But neither Plaintiffs nor Mr. Toberoff -- who chose to forego serving a privilege
22    log -- listed the cover letter on any privilege log.  Under the Court's Order, the
23    cover letter must be turned over to Defendants.

24        Furthermore, even assuming the Court's Order had made an exception for
25    privileged Escrow Documents that had not been previously listed on a privilege
26    log, which it did not, Plaintiffs and Mr. Toberoff did not meet their burden of
27    demonstrating that the cover letter should be withheld on the basis of the attorney-
28    client privilege.  *See Weil v. Investment Indicators Mgm't, Inc.*, 647 F.2d 18, 25

1   (9th Cir. 1981) (party asserting the attorney-client privilege has the burden of

2   establishing that it applies).  The first specific mention they made of the

3   document's potentially or purportedly privileged nature was during the briefing of

4   Defendants' original motion to compel, at which time Mr. Toberoff made an

5   equivocal reference to the document.  (Bergman Decl. Exh. J.)  However, Mr.

6   Toberoff did not demonstrate or even affirmatively state that that the document is

7   privileged; rather, he contended that the letter "is defamatory and in other respects

8   *potentially violates* the attorney-client privilege."  (*Id.* at ¶ 27) (emphasis added.)

9   It was not until the correspondence leading up to the present motion that Mr.

10  Toberoff took a firm stance by asserting that the cover letter is protected by the

11  attorney-client privilege.  These circumstances demonstrate that Plaintiffs and Mr.

12  Toberoff cannot make the showing required to withhold a document from

13  production, and for this independent reason, that letter should be turned over to

14  Defendants.

15          **2.     Post-Litigation Attorney-Client Communications.**

16          While Defendants do not dispute that the parties to the litigation had an

17  understanding that they would not list post-litigation documents on their privilege

18  logs, that is not the issue here.  Because the Court's Order was clear and required

19  the Escrow Holder to release *any* documents not previously listed on a privilege

20  log, the sole issue is whether each Escrow Document -- post-litigation

21  communication or not -- was listed on a privilege log.  Under a straightforward

22  analysis of what that Order required, therefore, the Escrow holder should turn over

23  the documents purportedly containing post-litigation attorney-client

24  communications regardless of whether the plaintiffs and defendants to the

25  litigation had a prior understanding, since those documents had not been

26  previously produced or listed on any privilege log.

27          It is now too late to contemplate what might have happened if Mr. Toberoff

28  had declared this objection to the Court during the hearing and given Defendants

EXHIBIT 7    13
Page 154

1    an opportunity to be heard on the issue.  It is important to note that Defendants'

2    motion to compel concerned not only one of their document requests to Plaintiffs,

3    but also their subpoena to Mr. Toberoff personally.  Thus, if Mr. Toberoff had

4    identified this issue during the hearing, Defendants and the Court could have

5    addressed whether Mr. Toberoff's failure to provide Defendants with any privilege

6    log waived any assertion that these post-litigation documents can be protected by

7    the attorney-client privilege, especially since Mr. Toberoff personally (as opposed

8    to Plaintiffs) had never made any arrangements with Defendants regarding the

9    content of his privilege log.  Given Mr. Toberoff's unequivocal representation,

10   however, neither the Court nor Defendants had any reason to undertake that

11   analysis during the hearing, and the escrow holder must comply with the plain

12   language of the Court's Order.

13   **3.    Plaintiffs and Mr. Toberoff Cannot Use An Entry On a**

14   **Third Party's Privilege Log To Prevent the Escrow Officer**

15   **From Releasing Documents That Were Unlisted On Their**

16   **Own Privilege Logs.**

17   Plaintiffs and Mr. Toberoff have also taken the untenable position that

18   Escrow Documents -- which they had in their possession but had omitted from

19   their own privilege logs -- should be nonetheless protected because copies of those

20   documents were later listed as privileged under the joint (or common)-interest

21   exception[4] on the privilege log of third-party Don Bulson,[5] an attorney who had

22   represented Plaintiff Laura-Siegel Larson's estranged half-brother Michael Siegel.

---

[4] The "joint defense," "common interest" or "community of interest" rule is "an exception to the general principle that communications in the presence of, or shared with, third-parties destroys the confidentiality of the communications and the privilege protection that is dependent upon that confidentiality."  1 Paul R. Rice, *Attorney-Client Privilege*, § 4:35 at 192-95 (2d ed. 1999).  If the parties to a communication share some common legal goal, then they may share otherwise privileged communications without concern that they will later have to disclose them as waived. *Id.*

[5] Mr. Bulson had not been subpoenaed in these actions, was not represented by Mr. Toberoff and had not produced documents or a privilege log at the time Defendants received the Escrow Documents.

14

1  As explained below, this proposition is incorrect and is yet another attempt to use

2  sleight of hand to avoid the clear mandate of the Court's Order.

3      The primary fallacy of Plaintiffs' and Mr. Toberoff's position is that Mr.

4  Toberoff neither represented Mr. Bulson nor had any of Mr. Bulson's files when

5  the Escrow Documents were sent to Defendants.  Given these circumstances, the

6  Court's statement that Mr. Toberoff could comply with the Court's Order by

7  identifying entries on not just Plaintiffs' privilege log, but also on other parties'

8  privilege logs as well, simply doesn't apply here.  It's absurd to argue -- as Mr.

9  Toberoff does -- that a privilege log entry listing a document that was not in Mr.

10  Toberoff's possession when the Escrow Documents were sent to Defendants can

11  provide the basis for withholding any of the Escrow Documents.  Any such

12  argument is an improper attempt to distort the Court's ruling and to take advantage

13  of the Court's and Defendants' lack of knowledge about the content of the Escrow

14  Documents during the hearing.

15      To understand the problem with Mr. Toberoff's position, it is first necessary

16  to examine the timing of Defendants' receipt of the Escrow Documents and the

17  date of service of Defendants' requests for production to Plaintiffs and subpoena to

18  Mr. Toberoff, both of which requested the Escrow Documents, and to compare

19  those dates with the date Mr. Toberoff first obtained documents from Mr. Bulson

20  and the ultimate date Mr. Toberoff served a privilege log on behalf of Mr. Bulson.

21      As detailed in Defendants' initial Joint Stipulation, Warner Bros. received

22  the undated Escrow Documents from an unidentified sender in **June 2006**.  Then,

23  after turning those documents over to attorney Quinn to be held in escrow,

24  Defendants served plaintiffs with the pertinent request for production on **August 7,**

25  **2006** and served Mr. Toberoff with a personal subpoena on **August 10, 2006**.

26      The following day, on **August 11, 2006**, Defendants served an unrelated

27  subpoena duces tecum, issued out of the United States District Court for the

28  District of Ohio, on Don Bulson, the attorney of Michael Siegel, Jerry Siegel's

EXHIBIT 7    15
Page 156

1   deceased son. *At the time, however, Mr. Bulson was not represented by Mr.*

2   *Toberoff.* It was only sometime after Defendants served the subpoena on Mr.

3   Bulson (and served a copy of the subpoena on Plaintiffs) that Mr. Toberoff's

4   associate Nicholas Williamson contacted Mr. Bulson. (Bergman Decl., Ex. K at

5   ¶ 3.)   During that conversation, Mr. Bulson indicated to Mr. Williamson that the

6   relevant files had been forwarded to attorney Melvin Bancheck. (*Id.*) Mr.

7   Williamson subsequently contacted Mr. Bancheck, who provided him with the

8   relevant documents some time after **September 7, 2006**. (*Id.* at ¶¶ 4-5.)

9        Because Mr. Toberoff refused to produce any documents or privilege log on

10  Mr. Bulson's behalf, Defendants filed a motion to compel before the District Court

11  of Ohio on October 20, 2006.  Waiting until after Defendants had undertaken the

12  effort to draft and file their motion, on **October 23, 2006**, Mr. Toberoff's office

13  provided Defendants with Mr. Bulson's privilege log, which purportedly listed all

14  of the documents *from Mr. Bulson's files*.  Defendants nonetheless kept their

15  motion on calendar because they disputed several of Mr. Bulson's privilege claims

16  -- including his claim of a common interest privilege.  The District Court in Ohio

17  has yet to issue a ruling on that motion.

18       Based on these dates, Mr. Toberoff's position cannot stand.  He is, in effect,

19  claiming that a privilege log detailing documents that were not in his possession

20  until sometime after ***September 7, 2006*** listed Escrow Documents that were sent to

21  Warner Bros. more than two months earlier, on ***June 28, 2006***.

22       A closer examination of the Bulson privilege log entries explains why Mr.

23  Toberoff attempted to sneak the pertinent Escrow Documents under them.  Those

24  entries, each of which asserts the common interest privilege,[6] list correspondence

25  between Mr. Toberoff and Mr. Bulson.  Thus, one copy of each document would

26  have been *in Mr. Toberoff's files* when the Escrow Documents were sent to Warner

27  Bros., and the corresponding copy of those documents would have been in Mr.

28

---

[6] Defendants' pending motion in Ohio has challenged this assertion of privilege.

16

EXHIBIT 7    Page 157

1    Bulson's files that were provided to Mr. Toberoff several months later. Critically,

2    however, the copies of the documents in Mr. Toberoff's files -- the only copies that

3    could have been included among the Escrow Documents -- *were never listed on*

4    *any privilege log*. That is, if Defendants had not served their subpoena on Mr.

5    Bulson, they would never have known that these documents even exist --

6    notwithstanding the fact that they were clearly in the files of Plaintiffs' counsel,

7    and were responsive to outstanding document requests.

8        Under these facts, there are three reasons why Mr. Toberoff's citation to the

9    Bulson privilege log does not satisfy the Court's Order. The first reason is that Mr.

10    Toberoff's position presents a matter of physical impossibility. The Escrow

11    Documents could not have come from Mr. Bulson's files because Mr. Toberoff did

12    not have Mr. Bulson's files in June 2006, when the Escrow Documents were sent

13    to Warner Bros. Therefore Mr. Toberoff cannot comply with the Court's Order by

14    citing to Mr. Bulson's privilege log. Because Mr. Toberoff cannot identify an

15    entry on his or on Plaintiffs' privilege log referencing those documents, the Court's

16    Order requires that they be produced to Defendants.

17        There is a second reason that those documents must be released to

18    Defendants: because they were not listed on Plaintiffs' and Mr. Toberoff's

19    privilege logs, they do not meet the criteria for asserting the attorney-client

20    privilege. That is because the "common interest privilege" is not a privilege in and

21    of itself. Rather, as noted above, it is an "exception to the rule on waiver when

22    communications are disclosed to third parties." *NIDEC Corp. v. Victor Co. of*

23    *Japan*, 2007 U.S. Dist. LEXIS 48841 at *9 (N.D. Cal. July 3, 2007). Since "it is

24    an anti-waiver exception, it comes into play only if the communication at issue is

25    privileged in the first instance." *Id.* at *10. And as the proponent of the privilege,

26    Plaintiffs and Mr. Toberoff have the burden of establishing that it exists. *In re*

27    *HBOC, Inc., ERISA Litig.*, 2005 U.S. Dist. LEXIS 7098 at *22 (N.D. Cal. Mar. 31,

28    2005). Plaintiffs' and Mr. Toberoff's failure to assert the common interest

EXHIBIT 7        17

1  exception, *or any privilege*, with respect to the documents in Mr. Toberoff's files

2  belies any assertion of the claim. *See Fox v. California Sierra Fin. Servs.*, 120

3  F.R.D. 520, 525 (N.D. Cal. 1988) (party asserting that a communication is

4  protected by the attorney-client privilege must show that it claimed the privilege);

5  *see also Thelen Reid & Priest L.L.P. v. Marland*, 2007 U.S. Dist. LEXIS 17482 at

6  *26-*28 (N.D. Cal. Feb. 21, 2007) (privilege waived with respect to documents not

7  listed on privilege log); *Cunningham v. Connecticut Mut. Life Ins.*, 845 F. Supp.

8  1403 (S.D. Cal. 1994) (same).

9      Finally, even assuming Mr. Toberoff could theoretically cite to entries on the

10  Bulson privilege log to protect Escrow Documents that were in Mr. Toberoff's and

11  Plaintiffs' files, Plaintiffs and Mr. Toberoff cannot meet their burden of

12  establishing that their communications with Mr. Bulson fall within the common

13  interest privilege. Because Plaintiffs never identified these documents (which were

14  clearly responsive to Defendants' discovery requests) on any of their privilege

15  logs, *Defendants never had the opportunity to contest Plaintiffs' current assertion*

16  *of the common-interest privilege in front of this Court.*

17      As discussed above, the "common interest privilege" is an exception to the

18  general rule that the attorney-client privilege is waived if communications are

19  revealed to a third party. In this instance, Plaintiffs and Mr. Toberoff are asserting

20  that they did not waive their attorney-client privilege when they initiated

21  communications with third party Mr. Bulson. Given the relationship between

22  Plaintiffs and Mr. Bulson's client Michael Siegel, however, they cannot meet their

23  burden.

24      Michael Siegel (now deceased), owned a vested 25% share of the copyright

25  termination interest that is the subject of the current litigation. His position vis-à-

26  vis Plaintiffs' ownership shares is certainly adversarial, as it has been at least since

27  Plaintiffs' September 21, 2002 letter purported to repudiate Plaintiffs' October

28

EXHIBIT 7
18
Page 159

1   2001 settlement with Defendants.[7]  After Plaintiffs repudiated that settlement

2   agreement, Plaintiffs retained a California company, IP Worldwide, LLC ("IPW")

3   (in which Mr. Toberoff was a principal) to represent them in connection with

4   efforts to exploit their termination interest.  (Bergman Decl. Exh. L.)  Then in

5   January 2003, Plaintiffs and IPW entered into a second agreement in which they

6   acknowledged certain "risks and potential problems regarding Michael Siegel" and

7   agreed that IPW partner Ariel Emanuel "will attempt to purchase all of Michael

8   Siegel's rights, title and interest" in his termination rights in connection with

9   IPW's representation of Plaintiffs.  (Bergman Decl. Exh. M.)

10          These agreements strongly suggest that Mr. Toberoff's communications with

11  Mr. Bulson on Plaintiffs' behalf were not made in the pursuit of a common legal

12  interest.  Rather, Mr. Toberoff, as Plaintiffs' representative and on behalf of IPW,

13  was attempting to negotiate a purchase of Michael Siegel's rights in the copyright

14  termination interest.  This type of relationship does not fall within the sort that are

15  protected by the common interest privilege.  The common interest privilege applies

16  only when a party establishes: "(1) the communication is made by separate parties

17  in the course of a matter of common legal interest; (2) the communication is

18  designed to further that effort; and (3) the privilege has not been waived."  *NIDEC*

19  *Corp.*, 2007 U.S. Dist. LEXIS 48841 at *10 (citation and internal quotations

20  omitted).  Notably, to qualify for that exception, the parties must share a common

21  *legal* interest, not a common *commercial* interest.  *See Id.* at *14.  In *NIDEC Corp.*,

22  as in this case, a party sought communications exchanged during a negotiation --

23  namely a litigation abstract that the Defendant had exchanged with a third party

24  during the negotiation of a stock sale.  The Court refused to accept the Defendants'

25  position that it fell within the common interest privilege: "While the JVC litigation

26  abstract might have been helpful to facilitate the potential commercial transaction,

27  it did not further a common legal strategy in connection with the instant litigation. . .

28

---

[7] Michael Siegel stood to benefit from the Settlement Agreement and his interests were arguably aligned with the Plaintiffs' interests with respect to that settlement.

1    . . Defendants provided the litigation abstract in order to facilitate the TPG fund's

2    and other potential bidders' commercial decision whether to buy the majority share

3    in JVC.  Thus, it was designed to further not a joint defense in this litigation, but to

4    further a commercial transaction in which the parties, if anything, have opposing

5    interests.  The litigation abstract thus would not qualify for the common interest

6    exception."  *Id.* at *15 - *16.

7        Mr. Toberoff's communications with Michael Siegel's attorney Mr. Bulson

8    suffer from the same problem and accordingly do not meet the criteria for falling

9    within the common interest privilege.  Given Plaintiffs' January 2003 agreement

10    with Mr. Toberoff and IPW, there is little doubt that Mr. Toberoff's

11    communications with Mr. Bulson were to further Plaintiffs' potential acquisition of

12    Michael Siegel's share of the termination interest.  Because Plaintiffs and Mr.

13    Toberoff cannot satisfy their burden of establishing that these documents fall

14    within that exception, they should be turned over to Defendants.

15        **4.    The Escrow Holder Cannot Fulfill The Court's Order**

16              **Without Matching Up The Escrow Documents With the**

17              **Documents and Privilege Log Entries Identified in Mr.**

18              **Toberoff's Declaration.**

19        On May 22, 2007, Defendants sent Mr. Eisen copies of each privilege log

20    served by Plaintiffs (and the third parties represented by Mr. Toberoff) as well as

21    copies of each document identified in the declaration Mr. Toberoff served on May

22    21, 2007.  (Bergman Decl. Exh. E.)  With the benefit of these privilege logs and

23    documents, Mr. Eisen could have then cross-referenced the entries on the

24    declaration to confirm that the Escrow Documents matched up with the listed

25    production documents or privilege log entries.  This would have facilitated Mr.

26    Eisen's compliance with the Court's mandate that he return any Escrow

27    Documents that had been listed on privilege logs to Plaintiffs and Mr. Toberoff and

28    release the remaining Escrow Documents to Defendants.  *However, Mr. Toberoff*

EXHIBIT 7
20
Page 161

1  *instructed Mr. Eisen that he was not to confirm whether the documents and*

2  *privilege entries listed in the declaration correspond with the Escrow Documents*

3  *identified by Mr. Toberoff.*

4        Mr. Toberoff's instruction was not only improper, but it is the clearest

5  example yet that Mr. Toberoff's representations of compliance are far less than

6  they appear to be.  Under any rational reading of the Court's Order, Mr. Eisen is

7  permitted, if not required, to compare the Escrow Documents to the privilege log

8  entries and documents listed in Mr. Toberoff's declaration to confirm that he is

9  returning to Plaintiffs *only* the Escrow Documents that were listed on privilege

10  logs and then releasing the remainder of the Escrow Documents to Defendants.  If

11  the Court had intended that Mr. Eisen release the Escrow Documents without

12  verification, it would have allowed Mr. Toberoff to stand by the representation he

13  made during the hearing without ordering him to submit a further declaration.  Or

14  the Court could have issued a less stringent Order requiring Mr. Toberoff to submit

15  a declaration identifying only whether or not an Escrow Document had been listed

16  on a privilege log.  Instead, the Court Ordered that Mr. Toberoff submit a

17  declaration listing specific Bates numbers and privilege log entries matching up to

18  each Escrow Document.  (Bergman Decl. Exh. A at 19:8 - 19:22; 30:7 - 30:20.)

19  Put another way, now that Mr. Eisen has Mr. Toberoff's Court-Ordered declaration

20  and each specific documents and privilege log listed therein, there is no reason for

21  him not to use that information ensure that the Escrow Documents he releases are

22  the right ones.[8]

23        Even assuming the Court's Order did not explicitly or implicitly require Mr.

24  Eisen to make sure that the Escrow Documents match up with the actual

25  documents and privilege log entries listed in Mr. Toberoff's declaration,

26

27  [8] Moreover, if Mr. Eisen does not undertake a review to ensure that he is releasing
    the proper Escrow Documents to Mr. Toberoff, there will be no way to go back

28  and subsequently determine whether the Order has been complied with once those
    Escrow Documents are out of Mr. Eisen's possession.

EXHIBIT 7

1    Defendants respectfully ask that the Court modify its Order to account for the

2    inaccurate oath Mr. Toberoff made to the Court.

3         The Court's Order was founded on the representation Mr. Toberoff made

4    during the hearing that each Escrow Document had either been produced or listed

5    on a privilege log. Now that Mr. Toberoff has significantly retracted that oath,

6    introducing exceptions that he failed to raise at the hearing, there is even more

7    reason for Mr. Eisen to cross-reference the documents and privilege log entries

8    listed in the declaration with the Escrow Documents.

9         Finally, it is necessary for Mr. Eisen, in his capacity as a neutral third party,

10   to compare the Escrow Documents with the listed documents and privilege log

11   entries because there is at least one category of non-privileged Escrow Documents

12   that has not been produced to Defendants. As Wayne Smith explained in the

13   declaration that Defendants submitted in support of their original motion to compel

14   production of the Escrow Documents, Mr. Smith undertook an initial review of the

15   Escrow Documents and divided them into three categories: "non-privileged,"

16   "privileged," and "?" Among the "non-privileged" Escrow Documents was

17   correspondence concerning the interest in Superman that might be owned by

18   Michael Siegel.[9] That correspondence has never been produced to Defendants. By

19   using Mr. Toberoff's declaration to confirm that the listed documents and privilege

20   log entries match up with the Escrow Documents he is releasing, Mr. Eisen will

21   ensure that Defendants receive the non-privileged Escrow Documents to which

22   they are entitled.

23        In sum, Mr. Eisen has a responsibility to fulfill the Court's Order by

24   releasing any Escrow Documents that were not listed on privilege logs to

25   Defendants. Mr. Eisen cannot fulfill that Court-Ordered responsibility without

26   utilizing Mr. Toberoff's declaration as an essential tool.

27

28

---

[9] It is possible that these documents are the ones that were listed on Mr. Bulson's privilege log and addressed in more detail in Section III (B) (3), *supra*.

22

EXHIBIT 7    Page 163

### C.    CONTEMPT SANCTIONS ARE WARRANTED HERE

Whether the express representation made by Mr. Toberoff during the hearing was deliberately misleading or the misguided result of overly zealous advocacy, one thing is certain -- Mr. Toberoff's failure to appeal the Court's ruling and his subsequent declaration attempting to modify that representation have forced Defendants to bring this motion. Accordingly, Defendants respectfully request that the Court sanction Mr. Toberoff pursuant to Rule 37(b)(2).

Under the Federal Rules of Civil Procedure, when a party disobeys a Court's Order requiring discovery, the court may sanction the party in a manner that the Court deems just. Fed. R. Civ. Pro. 37(b). While Mr. Toberoff certainly submitted the declaration required by the Court's Order, his cover letter to that declaration and subsequent correspondence prevented Mr. Eisen from carrying out the Court's mandate, thereby thwarting Defendants' discovery efforts. Under these circumstances, sanctions are proper.

Mr. Toberoff, as the only person at the hearing who knew the contents of the Escrow Documents, must accept the blame for any misrepresentations he made and for failing to raise the issues outlined in this motion during the hearing. His misleading oath has forced Defendants to take a piecemeal approach to litigating their right to the Escrow Documents. Defendants are now arguing about topics they could have addressed during the hearing without the need for undertaking a letter-writing campaign, conducting several conferences of counsel, or drafting this motion. Rule 37 permits the Court to grant Defendants sanctions to compensate them for the costs of these additional efforts. *Housing Rights Center v. Sterling*, 2004 U.S. Dist. LEXIS 28879, *10 (C.D. Cal. Dec. 29, 2004) ("Rule 37(b)(1) of the Federal Rules of Civil Procedure provides: 'the court . . . may make such orders in regard to the failure [to obey an order to provide discovery] as may seem just.' Certainly, an award of costs, including attorneys' fees is an appropriate

EXHIBIT 7
23
Page 164

1   sanction."). Defendants therefore respectfully request that the Court enter an order

2   granting them sanctions in the amount of $7,440. (Bergman Decl. ¶ 16.)

3   **IV.    PLAINTIFFS' CONTENTIONS**

4   **FACTUAL AND PROCEDURAL BACKGROUND**

5   　　　Plaintiffs' detailed termination notices ("Termination") regarding

6   "Superman" and "Superboy" complied with all the requirements of 17 U.S.C. §

7   304(c) and 37 C.F.R. § 201.10, the regulations promulgated by the Register of

8   Copyrights. Shortly after receiving the "Superman" Termination notices, the

9   general counsel of Defendant Warner Bros. Entertainment Inc. ("Warner") and the

10  President of Defendant DC, a wholly owned Warner subsidiary, each

11  acknowledged the validity of the "Superman" Termination, and the parties began

12  negotiations for Defendants' to license or purchase Plaintiffs' recaptured

13  copyrights. (*See* Plaintiffs' First Amended Supplemental Complaint ("FASC"), ¶¶

14  46-48). When these negotiations broke down due to Defendants' excessive

15  demands, Defendants reversed their prior admissions of two years earlier, and

16  contested Plaintiffs' "Superman" Termination on April 15, 1999, one day before it

17  became effective. Defendants thereafter also claimed that the "Superboy"

18  Termination was somehow invalid.

19  　　　On October 8, 2004, Plaintiffs filed their action for declaratory relief and an

20  accounting regarding the "Superman" Termination, and on October 22, 2004 filed

21  their action for declaratory relief and copyright infringement regarding the

22  "Superboy" Termination. The two actions were consolidated for purposes of

23  discovery only.

24  　　　Plaintiffs produced documents responsive to Defendants' requests for

25  production on September 29, 2005 and supplemented this production on October 6,

26  2006, November 6, 2006 and November 17, 2006. *See* Declaration of Marc

27  Toberoff In Opposition to Defendants' Motion To Compel Production of

28  Whistleblower Documents (filed March 26, 2007)("Toberoff Decl. I"), Ex. K.

EXHIBIT 7
Page 165.    24

1   Plaintiffs produced a privilege log on July 20, 2006 and provided supplemental

2   privilege logs on September 29, 2006. *Id.*, Ex. L, M.  Documents were further

3   produced by third parties Jean Peavy and Warren Peary (the "Shusters") on July

4   18, August 11 and August 14, 2006 in response to Defendants' subpoena. *Id.*, ¶

5   19.  The Shusters served a privilege log on August 11, 2006 (*Id.*) and a

6   supplemental privilege log on October 16, 2006. *Id.*, Ex. N.  Third party IPW,

7   LLC produced documents on November 15, 2006 in response to Defendants'

8   subpoena. *Id.*, ¶ 20.  Third party Pacific Pictures Corporation produced documents

9   on November 15, 2006 in response to Defendants' subpoena. *Id.*  Third party Don

10   Bulson, attorney for Michael Siegel, Plaintiff Laura Siegel Larson's half-brother,

11   and a 25% beneficiary of the recaptured copyrights pursuant to the Terminations,

12   produced a privilege log on October 23, 2006 in response to Defendants'

13   subpoena. *Id.*, Ex. O.

14                 1.   **Documents Stolen From Plaintiffs' Attorneys' Files**

15          On July 5, 2006, Plaintiffs' counsel Marc Toberoff ("Toberoff")  received a

16   letter from John J. Quinn ("Quinn"), an attorney with the firm Arnold and Porter

17   LLP, notifying Toberoff on behalf of Defendants and in the vaguest of terms, that

18   Defendants had received three sets of documents (delivered to Warner's General

19   Counsel, John Schulman and two Warner executives, respectively) from an

20   unidentified source and that these documents had been reviewed by Wayne Smith,

21   Warner's Senior Litigation Counsel and segregated into three piles: "'Privileged,'

22   'Non-privileged' and '?.'"  *See* Declaration of Michael Bergman in Support of

23   Defendants' Motion to Compel Whistle-Blower Documents (filed March 26, 2003)

24   ("Bergman Decl. I"), Ex. D. *Arnold and Porter LLP was neither a "neutral," nor*

25   *an "escrow agent" but had been retained by its longstanding client, Warner, and*

26   *was being compensated for its services by Warner.*

27         Mr. Quinn's letter stated that Arnold and Porter, LLP was in possession of

28   the documents and suggested a "protocol" for dealing with them. *Id.*  Curiously

EXHIBIT 7

25

Page 166

1    the letter did not identify what exactly it was referring to and, in particular, omitted

2    that the documents, including *numerous privileged attorney-client*

3    *communications*, had obviously been *stolen*, lifted from the ransacked files of

4    Toberoff's law firm. *Id.* Nor did the letter offer to return the documents to

5    Toberoff, as is required, or for Toberoff to review the stolen documents, and stated

6    instead "I will keep the documents in my possession and allow access to them only

7    upon your joint or the Court's instructions." *Id.*

8         The next day, Defendants' counsel Michael Bergman ("Bergman") sent an

9    *ex parte* letter to this Court regarding the documents, without notifying Plaintiffs

10   beforehand.  Toberoff Decl. I, Ex. D.  Bergman's letter *also omitted* that the

11   documents in question -- reviewed by Defendants' VP, Litigation, Wayne Smith,

12   who is in charge of these actions -- had obviously been stolen from the legal files

13   of Plaintiffs' counsel.  Defendants only now belatedly omit that "it was apparent

14   that the Escrow Documents came from Mr. Toberoff's files."  Motion at 6 (III.A).

15   The Court rejected this *ex parte* letter by minute order dated July 6, 2006. *Id.,* Ex.

16   E.

17        On July 11, 2006, Quinn and Toberoff spoke telephonically regarding the

18   stolen documents. *Id.* ¶ 8.  Toberoff inquired as to the nature of the documents

19   referred to in Quinn's July 5, 2006 letter and was informed *for the first time* that

20   the documents came from Toberoff's own legal files. *Id.* Toberoff thereupon

21   demanded that the documents be returned immediately and rejected the "protocol"

22   outlined in the July 5 letter as geared to exploiting the documents in this litigation.

23   *Id.*  Toberoff suggested instead that an independent service copy and bate stamp all

24   the documents, that Arnold and Porter be provided with the complete bates stamp

25   numerical range, but not retain the stolen documents and that *all* of the documents,

26   including the 'originals,' withheld by Warner Bros., be returned to Plaintiffs'

27   counsel immediately. *Id.*  On July 13, by letter, Mr. Quinn announced, contrary to

28   the wishes of Plaintiffs' counsel, that he would have the documents bates stamped

EXHIBIT 7
Page 167    26

1   by his office, send a copy of the bates stamped documents to Plaintiffs' counsel,

2   but would *retain the originals* and a bates stamped set.  Bergman Decl. I, Ex. E.

3   On July 18, 2006, Quinn delivered three sets of the stolen documents, now bates

4   stamped, keeping the originals. Toberoff Decl. I, ¶ 10.

5        By letter dated July 19, 2006, Toberoff reiterated Plaintiffs' demand and

6   further requested that Warner Bros. furnish:

7        "(1) the date(s) each set of documents was received; (2) copies of all
         envelopes or packages enclosing the documents; (3) the method by which
8        the documents were sent and, in the unlikely event the documents were
         delivered by hand, the name of the messenger (and messenger service)
9        logged at Warner Bros. security gate and (4) any other pertinent
         information regarding Warner Bros.' receipt of these documents. We would
10       also like to inspect the "original" documents and enclosing envelopes or
         packages as received by Warner Bros."

11

12  *Id.*, Ex. F.

13       In response to Plaintiffs' July 19 letter, Bergman demanded by letter dated

14  July 20, 2006 that Arnold and Porter retain possession of the stolen documents

15  (even though Quinn had already done so on Warner's behalf), but Bergman

16  provided no information regarding Warner's receipt of the documents in response

17  to Plaintiffs' specific inquiry. *Id.*, Ex. G.  Quinn also responded to Plaintiffs' July

18  19 letter by letter dated July 24, 2006 wherein he insisted he would keep the

19  original stolen documents pending further instructions from Defendants or a court

20  order, but again the information Plaintiffs had requested regarding Warner's

21  receipt of the stolen documents was not provided. *Id.*, Ex. H.

22       On July 24, 2006, Defendants demanded that Plaintiffs specifically account

23  to them for each of the stolen documents by production and/or a privilege log

24  keyed to the stolen documents retained by Quinn, and again, despite Plaintiffs'

25  request, no information whatsoever was provided regarding the circumstances

26  under which Warner received the stolen documents.  Bergman Decl. I, Ex. I.

27       By letter dated July 26, 2007, Toberoff reiterated Plaintiffs' July 19 demand

28  for information regarding Warner's receipt of the stolen documents, which

EXHIBIT 7

27

1   Defendants continued to ignore.  Toberoff Decl. I, Ex. I.  Defendants' counsel

2   Michael Bergman ("Bergman") finally responded by letter dated July 27, 2006,

3   repeating merely that three apparently identical sets of documents addressed to

4   three different high placed Warner executives had mysteriously arrived in

5   envelopes on June 28, 2006.   Mr. Bergman claimed that Warner did not retain any

6   of the three envelopes (or a copy of any envelopes) and that Warner purportedly

7   had no mailroom, security or executive office records, notes or logs, of the three

8   substantial packages ever being signed in or received, despite the shocking nature

9   of the theft and disclosure.  *Id.*, Ex. J.  In short, Warner claimed to have no

10  information whatsoever concerning the purportedly anonymous receipt by three

11  high ranking Warner executives of substantial packages containing numerous

12  privileged documents relating to this lawsuit.  All such information commonly kept

13  by Studio security, mailrooms and executive offices had mysteriously vanished.

14          On August 7, 2006, Defendants served a Third Set of Requests for

15  Production seeking the stolen documents.  Bergman Decl. I, Ex. J.   Plaintiffs

16  objected to this document request on September 6, 2006.  Bergman Decl. I, Ex. L.

17  On August 10, 2006 Defendants served a subpoena duces tecum on Plaintiffs'

18  counsel also seeking the stolen documents.  Bergman Decl., Ex. K.   On August 23,

19  2006, Plaintiffs' counsel served written objections to the subpoena.   Bergman

20  Decl. I, Ex. M.

21          **2.**      **The Court's April 30, 2007 Order**

22          The parties filed their joint stipulation regarding the stolen documents on

23  March 23, 2007.  Magistrate Zarefsky heard the parties' motion on April 30, 2007.

24  In the course of the hearing, the Court instructed plaintiffs' counsel to submit a

25  declaration that identifies, by the Bates numbers of the escrow documents, the

26  corresponding Bates numbers of the documents already produced and take the

27  "Bates numbers of the escrow documents and correspond to the listings on the

28  privilege log of the documents which have not been produced because they were

EXHIBIT 7
28
Page 169

1    privileged." *See* Declaration of Michael Bergman In Support of Defendants'

2    Motion To [sic] Compliance With the Court's 4/30/07 Order and Motion For

3    Sanctions ("Bergman Decl. II") Ex. A at 19: 11-14, 19:18-21.  The Court further

4    clarified:

5        "So, you take the Bates numbers of the escrow documents and say, 'Here are
         the corresponding Bates numbers of the documents that have already been
6        produced.' Take the Bates numbers of the escrow documents and correspond
         to the listings on the privilege log of the documents which have not been
7        produced because they were privileged. All right? So, put that in your
         declaration. Then the escrow holder, Mr. Bergman, is to return to plaintiffs
8        any documents which are identified in the declaration as being privileged
         and having been identified on the privilege logs. The others can be delivered
9        to trial counsel for defendants…"

10       "For example, Bates number, let's call it 'escrow'…Escrow document
         00004 corresponds to previously produced document 00006.  Escrow
11       document 00007 corresponds to previously produced document 00009, and
         so on…Privilege escrow document 00015 is a privilege   document which
12       was listed on the privilege log as document such and such… Privilege
         documents get returned.  The privilege documents  that were listed on the
13       privilege log get returned.  The others get sent to defense counsel."

14   Bergman Decl. II, Ex. A at 19:16- 20:3; 30:7-24.

15       On May 18, 2007, David Eisen, Esq., ("Eisen") of Arnold and Porter LLP

16   sent a letter to the parties' counsel stating he had replaced his partner, Jack Quinn,

17   in serving as the custodian of the "Escrow Documents". Bergman Decl. II, Ex. C.

18   On May 21, 2007, Mr. Toberoff served Mr. Eisen and Defendants' counsel with

19   his declaration pursuant to, and in full compliance, with Magistrate Zarefsky's

20   April 30, 2007 order ("Order").  Bergman Decl. II, Ex. D.

21       On May 22, 2007, Defendants' counsel Michael Bergman ("Bergman") sent

22   Eisen a letter improperly disputing the contents of Mr. Toberoff's declaration.

23   Bergman Decl. II, Ex. E.  As noted in the letter, Defendants also improperly sent

24   Mr. Eisen the produced documents and privilege logs identified in Mr. Toberoff's

25   declaration.  *Id.*  Copies of the documents Defendants provided to Eisen were not

26   furnished to Plaintiffs, despite their written request for same.  Bergman Decl. II,

27   Ex. F at 3.  *See* Declaration of Marc Toberoff in Opposition to Defendants' Motion

28

EXHIBIT 7
29
Page 170

1  to Compel Compliance With The Court's 4/30/07 Order And Motion For Sanctions

2  ("Toberoff Decl. II") ¶ 2.

3        Once Defendants and Mr. Bergman had convinced the Court to issue its

4  Order on the basis of the neutral protocol they had purportedly followed, Bergman,

5  in his May 22, 2007 letter, improperly instructed Eisen to search through the

6  "escrow documents" for correspondence that Warner's VP, Litigation, Wayne

7  Smith, allegedly remembered seeing during his purported cursory review of the

8  documents.  Bergman Decl. II, Ex. E.  Lastly, Mr. Bergman, while admitting that

9  escrow documents originally "listed on the privilege logs of non-party witnesses

10  should not be released," nevertheless argued to Mr. Eisen (as if to a Court) that

11  documents listed on the privilege log of non-party attorney, Don Bulson, were not

12  protected by the joint interest privilege and must be released to Defendants.  *Id.*

13  No part of the Court's Order permitted Defendants to contact Eisen in this fashion

14  -- a blatant attempt to invade and influence what Defendants' previously had

15  touted as a purely passive, neutral function.  Bergman Decl. II, Ex. A at 19:8- 20:5.

16        On May 23, 2007, Plaintiffs sent Mr. Eisen a letter responding to

17  Defendants' overreaching demands and intrusive tactics.  Bergman Decl. II, Ex. F.

18  Plaintiffs further highlighted the ambiguity in the Order and hearing with respect to

19  two post-litigation communications that need not be listed on a privilege log per

20  the parties' agreement, and the "undated defamatory cover letter" which disclosed

21  the contents of enclosed documents identified in the privilege logs.  *Id.*

22        On May 24, 2007, Mr. Eisen, after reviewing the parties original motion

23  papers, the transcript of the motion hearing and the Order, sent a letter to the

24  parties' counsel that acknowledged the ambiguities pointed out by Plaintiffs'

25  counsel and that these particular documents had  fallen through the cracks and

26  were not addressed at the hearing or by the Order.  Bergman Decl. II, Exs. F, G.

27  On this basis, Mr. Eisen reasonably refused to release the documents without

28

EXHIBIT 7
30
Page 171

1  further clarification from the Court or an agreement between the parties.  Bergman

2  Decl. II, Ex. G.

3      In response to Eisen's position, Defendants sent Plaintiffs an initial "meet

4  and confer" letter on June 25, 2007.  Bergman Decl. II, Ex. H.  Plaintiffs responded

5  by letter dated July 5, 2007.  Bergman Decl. II, Ex. I.  The parties further met and

6  conferred, without success, on July 31, 2007.

7                    **<u>ARGUMENT</u>**

8  **A.**   **<u>PLAINTIFFS COUNSEL FULLY COMPLIED WITH THE COURT'S</u>**

9      **<u>APRIL 30, 2007 ORDER</u>**

10      As evidenced by Mr. Toberoff's May 21, 2007, declaration ("Declaration"),

11  Plaintiffs' counsel fully complied with Magistrate Zarefsky's April 30, 2007

12  Order.  Bergman Decl. II, Ex. D.  In the Declaration, Toberoff accounted to

13  Defendants and the Court for each of the documents stolen from his law firm files

14  by matching the Bates numbers, as designated by Mr. Quinn, with the

15  corresponding Bates numbers of the documents produced by Plaintiffs and third

16  party witnesses or by matching the bates numbers to the numbered listings in the

17  privilege logs furnished to Defendants.  Bergman Decl. II, Ex. D.

18      Far from keeping Mr. Eisen from discharging his duties, as Defendants

19  falsely claim, Plaintiffs responded to Defendants' overreaching attempt to distort

20  the obvious rationale of Magistrate Zaresky's ruling, and to abuse Mr. Eisen's role

21  as an alleged independent custodian of escrow documents.  Bergman Decl. II, Exs.

22  B, D, E, F.  Plaintiffs pointed out the problems and ambiguity presented by 9

23  documents (out of 839 pages of stolen documents)[10], inadvertently not addressed at

24  the hearing or in the Order -- mistakes which Defendants sought to exploit rather

25  than to reasonably resolve in light of the Order's rationale. Mr. Eisen essentially

26  agreed with Plaintiffs as evidenced by his May 24, 2007 reply letter:

27

28  [10] Four of these nine documents are non-substantive fax confirmation pages and duplicates
    thereof. *See* Bergman Decl. II, Ex. D (Bates numbers Q0010, 0278, 0285-89, 0361).

1    "In the transcript, Magistrate Zarefsky does seem to announce a
2    simple protocol for the so-called Escrow Documents: documents which
     appear on privilege logs are protected and should not be turned over to
     defendants, and documents not on privilege logs are not protected and
3    should be produced to defendants. Unfortunately, there are some documents,
     and you have each made certain agreements, which do not seem to be
4    directly encompassed by the transcript or Magistrate Judge Zarefsky's
     Order."

5

6    Bergman Decl. II, Ex. G.

7          Defendants self-servingly distort the position taken by Mr. Eisen in his May

8    24, 2007 letter to the parties. Bergman Decl. II, Ex. G.  Eisen's letter is quite clear

9    that he is continuing custody of the "escrow documents" because certain

10   documents fall between the cracks and "do not seem to be encompassed by the

11   transcript or Magistrate Judge Zarefsky's Order." *Id*. These documents are (1) two

12   privileged communications between Toberoff and Plaintiffs *after* the start of the

13   present litigations, which were not listed on a privilege log pursuant to a standing

14   agreement with Defendants; (2) two documents listed on the privilege log of

15   Michael Siegel's attorney, Don Bulson; and (3) the "defamatory cover letter" that

16   allegedly accompanied the packages delivered to Warner and described the

17   contents of stolen attorney-client communications listed on privilege logs.

18       1.    **Plaintiffs' Attorney-Client Communications After**

19             **Commencement Of Litigation Retain Their Privilege**

20          Defendants' unreasonable overreaching stance is no better exemplified than

21   their demand that Mr. Eisen turn over two attorney-client communications *after the*

22   *commencement of litigation* between Plaintiffs and their attorney, Mr. Toberoff.

23   Defendants cling to the absurd and inequitable position that there has been a

24   waiver of these plainly privileged communications because such were not listed on

25   a privilege log even though Defendants admit, as they must, that the parties have a

26   longstanding agreement pursuant to which neither side was supposed to list post-

27

28

EXHIBIT 7
Page 173    32

1   litigation attorney-client communications on a privilege log.[11]  Per this agreement,

2   Defendants and Plaintiffs have not listed hundreds of post-litigation

3   communications on any privilege log.

4        Defendants ignore this reality and instead make the bald unreasonable claim

5   that Magistrate Zarefsky's "bright line" Order sweeps away this privilege, even

6   though this obviously was not intended or addressed, as pointed out in Mr. Eisen's

7   May 24, 2007 letter:

8        "Mr. Toberoff refers to two post-litigation, attorney client emails (Q10
         and Q278) and related fax transmittal documents (Q285-289), which he
9        says were subject to a 'standing agreement' that such communications
         need not be listed on privilege logs. This issue was not referred to at the
10       hearing by Magistrate Zarefsky or counsel…"

11  Bergman Decl. II, Exs. D at 51; G.

12       Defendants erroneously state that this issue was never brought to their or the

13  Court's attention and that they were prevented from addressing it. However, as

14  Defendants well know, these privileged e-mails were specifically discussed on

15  page 30 of Plaintiffs' portion of the parties' March 26, 2007 Joint Stipulation

16  regarding the escrow documents as follows: "There are also 2 privileged e-mail

17  communications between Plaintiffs and their present counsel dated after

18  commencement of this action which were not listed in Plaintiffs' privilege logs

19  because the parties have agreed not to list post-complaint attorney-client

20  communications on their respective privilege logs."

21       Additionally, in paragraph 22 of Mr. Toberoff's March 23, 2007 declaration

22  in opposition to defendants' motion to compel, Mr. Toberoff specifically

23  mentioned the two privileged e-mails and explained to the Court that these post-

24  litigation communications were not listed on a privilege log because "the parties to

25  this action have agreed not to list post-complaint attorney-client communications

26  on their respective privilege logs."  Toberoff Decl. I, ¶ 22.

27

28

---

[11] "Defendants do not dispute that the parties to the litigation had an understanding that they would not list post-litigation documents on their privilege logs…" Motion at 13.

EXHIBIT 7

1    No reasonable person would conclude that the Court nonetheless intended

2    that such clearly privileged communications be produced given the rationale of its

3    Order.  No fair reading of the Order, as well as common sense, could give

4    Defendants access to privileged communications they would not otherwise be

5    entitled to, simply because such documents were pilfered from Toberoff's legal

6    files.  It is mere sophistry to insist it was Magistrate Zarefsky's intention that,

7    despite the parties' standing agreement, Plaintiffs must list such post-litigation

8    attorney-client communications on a privilege log, whereas Defendants need not.

9    **2.    The "Defamatory Cover Letter" Discussing The Contents Of**

10    **Privileged Communications Listed In The Privilege Logs Should**

11    **Not Be Disclosed Per The Order's Rationale**

12    Defendants also claim that the anonymous "undated defamatory letter"

13    enclosing the stolen documents must be released because it has not been listed on a

14    privilege log.  Bergman Decl. II, Ex. D at 51.  Firstly, this letter was clearly not the

15    subject of Defendants' motion to compel which dealt with the stolen documents

16    enclosed by the letter, as throughout their initial motion defendants drew a clear

17    line between the "Whistle-blower documents" that were the subject of its motion

18    and the "cover letter" contained with the documents, which was not.  *Compare*

19    *Defendants' Motion at* 2:6-14 (requesting production of the "Whistle-blower

20    documents") with *Defendants' Motion at* 6:13-14 (referring to "the cover letter

21    contained with the documents"); 6:26-27 (characterizing "the 'cover letter' that

22    *came with* the Whistle-blower documents") (emphasis added); 7:9-10 (referring to

23    "Whistle-blower Documents contained with the letter"); 7:17-19 (referring to

24    attorneys perusal of "the contents of the cover letter and my brief thumbing

25    through the documents"); and 16:17-21:28 (referring repeatedly to the "Whistle-

26    blower Documents" and never mentioning the cover letter.)

27    As noted by Mr. Eisen, the cover letter "also was not discussed" at the

28    hearing before Magistrate Zarefsky.  Bergman Decl. II, Exs. A ,G.  However, the

EXHIBIT 7
34
Page 175

1   letter discusses and discloses the substance of documents listed on the privilege

2   logs of Plaintiffs and third parties that were addressed and are protected under

3   Magistrate Zarefsky's Order. *See* Toberoff Decl. II, ¶ 3.

4         Plaintiffs can hardly be accused of failing to assert the existence of

5   privileged information in the letter, as Defendants contend. Plaintiffs' opposition

6   to Defendants' motion to compel specifically states that the cover letter, discussing

7   the stolen attorney-client communications accompanying it, discloses information

8   protected by the attorney-client privilege and the work product doctrine. *See* Joint

9   Stipulation Re: Defendants' Motion to Compel Production of Whistle-blower

10  Documents at 37, fn. 10. *See also* Toberoff Decl. I, ¶ 27.

11        Plaintiffs and their counsel obviously did not authorize this illicit letter.

12  They cannot be held to have consented to the release of the privileged information

13  contained therein or to have waived the privilege. Toberoff Decl., II ¶ 3.

14  Unauthorized disclosure of protected attorney-client information or documents

15  does not waive attorney-client privilege. *See Tennenbaum v. Deloitte & Touche*,

16  77 F.3d 337, 341 (9th Cir. 1996) ("the focal point of privilege waiver analysis

17  should be the *holder's* disclosure of privileged communications to someone outside

18  the attorney-client relationship."). *See also Resolution Trust Corp. v. Dean*, 813

19  F.Supp. 1426, 1430 (D.Ariz. 1993) (finding that where disclosure was

20  unauthorized and possibly criminal, the party "did not voluntarily waive any

21  attorney-client privilege it would have possessed, but for the disclosure."); *In re*

22  *Dayco Corp. Derivative Sec. Litig.*, 102 F.R.D. 468, 469-70 (S.D.Ohio 1984)

23  (where no indication that party voluntarily gave otherwise privileged diary to

24  reporter, publication of excerpts of diary should not be considered waiver of

25  attorney-client privilege.); *In re Grand Jury Proceedings Involving Berkley and*

26  *Co., Inc.*, 466 F.Supp. 863, 870 (D. Minn. 1979) ("To the extent the documents

27  can be viewed as stolen, following the modern trend mentioned above, they should

28  not lose the protection of the privilege.")   The courts have also consistently held

EXHIBIT 7      35
Page 176

1   that only those authorized to do so may waive attorney-client privilege, and that

2   unauthorized disclosures or leaks do not do so.  *See, e.g., U.S. v. Chen*, 99 F.3d

3   1495, 1502 (9th Cir. 1996) ("since a corporate employee cannot waive the

4   corporation's privilege, that same individual as an ex-employee cannot do so.");

5   *United States ex. rel. Mayman v. Martin Marietta Corp.*, 886 F. Supp. 1243, 1246

6   (D. Md. 1995) (privilege deemed not waived as to document stolen by fired

7   employee).

8        Defendants nonetheless insist that the cover letter must be turned over along

9   with the privileged information contained therein because Plaintiffs and their

10  counsel did not provide a new privilege log in response to Defendants' August 10,

11  2006 subpoena and Defendants' Third Set of Requests For Production of

12  Documents and Things.  Bergman Decl. I, Ex. K, L.  Firstly, it is inappropriate to

13  seek discovery from opposing counsel in litigation except in very limited

14  circumstances wherein the party has *shown* that there is no other way to obtain

15  non-privileged information crucial to the preparation of a case. *Massachusetts Mut.*

16  *Life Ins. Co. v. Cerf*, 177 F.R.D. 472, 478-49 (N.D.Cal. 1998).  "The burden of

17  establishing the right to discovery from opposing counsel is upon the requesting

18  party" under this standard. *Id.  See, e.g., United Phosphorus, Ltd. v. Midland*

19  *Fumigant, Inc.*, 164 F.R.D. 245, 248 (D.Kan.1995) ("The burden of establishing

20  the criteria set forth in Rule 26(b)(3) is upon the party seeking discovery.").  This

21  burden has not been met by Defendants.

22        *The privileged attorney-client communications discussed in detail in the*

23  *cover letter enclosing same are listed in Plaintiffs' privilege logs, and remain*

24  *protected by the Court's Order*.  It would have been redundant for Plaintiffs to re-

25  list these privileged documents.  Toberoff Decl. I, Exs. L. M.

26        The illicit cover letter also does not fit squarely into the parameters of a

27  privilege log:  the recipient was Warner and the author was a disgruntled former

28  employee of Plaintiffs' counsel.  As such, it is understandable that Plaintiffs did

EXHIBIT 7
36
Page 177

1   not list such a peculiar document on an additional privilege log. The listing of

2   such a document on a supplemental privilege log would surely have invited the

3   same response from Defendants, highlighting the "straw-man" nature of their

4   arguments.

5       As pointed out by Mr. Eisen, it is clear that Magistrate Zarefsky's ruling did

6   not consider this cover letter, particularly because it was not dealt with directly by

7   Defendants in *their* motion to compel. Having dropped the ball, Defendants are

8   seeking to squeeze any advantage they can on hyper-technical grounds to grab

9   what they previously ignored. In reality, because this letter was not addressed by

10   Defendants' motion, nor discussed at the hearing, it obviously fell through the

11   cracks. Remarkably, Defendants nonetheless insist that Magistrate Zarefsky found

12   that the privileged information contained in the letter has been waived even though

13   the privilege is obviously maintained for the documents/information to which it

14   refers. Eisen properly assessed the situation and declined to turn the letter over to

15   Defendants. Bergman Decl., II, Ex. G.

16       **3.**   **<u>Per The Order, The Two Letters Listed On The Privilege Log Of</u>**

17           **<u>Non-Party Attorney, Don Bulson, Should Not Be Disclosed</u>**

18       Defendants erroneously argue that two communications between Plaintiffs'

19   attorney and Michael Siegel's attorney, Bulson ("Bulson Documents"), that were

20   properly accounted for in Mr. Toberoff's May 21, 2007 declaration as listed on a

21   privilege log (keying the documents' escrow bates numbers to corresponding

22   listings in a privilege log) in full compliance with the Court's Order, must

23   nonetheless must be turned over to Defendants by Mr. Eisen, based on Defendants'

24   newfound attack on the joint interest privilege. *See* Bergman Decl. II, Ex. D.

25   Pursuant to the Order, however, the documents are not to be disclosed by Mr.

26   Eisen as they have been keyed to and identified on a privilege log. Thus,

27   Defendants, while blindly making illogical hyper-technical arguments (see above)

28   under "a bright line Order," simply ignore the Order with respect to these two

EXHIBIT 7   37
Page 178

1  documents and *for first time in this Court*, assail the privileged status of the

2  documents well after the deadline for such discovery motions.

3      As set forth above, the Court ordered Mr. Toberoff to submit a declaration

4  that identifies by the Bates numbers of the escrow documents, the corresponding

5  Bates numbers of the documents already produced and"[t]ake the Bates numbers of

6  the escrow documents and correspond to the listings on the privilege log of the

7  documents which have not been produced because they were privileged."

8  Bergman Decl. II, Ex. A at 19: 11-14, 19:18-21; *see also* Ex. A 19:16- 20:3; 30:7-

9  24. "Privilege documents get returned. The privilege documents that were listed

10  on the privilege log get returned." *Id.* at 30:7-24.

11      In compliance, Mr. Toberoff's declaration matched the escrow bates

12  numbers of the two Bulson Documents to the corresponding entries on Mr.

13  Bulson's *privilege log*. Bergman Decl., II., Ex. D, at 52.  There was certainly no

14  requirement in the Order that privileged documents/privilege log listings be cross-

15  referenced on multiple privilege logs to sustain the privilege.   Bergman Decl. II,

16  Exs. A at 19:8- 20:5, G.  As such, the Bulson Documents were not to be released to

17  Defendants by their custodian, Mr. Eisen, per the Court's Order.

18      In response, Defendants' counsel, Mr. Bergman, oddly wrote to Mr. Eisen

19  on May 22, 2007, improperly challenging the assertion of privilege in Bulson's

20  log, as if Mr. Eisen were the Court, and demanding the release of the documents.

21  Bergman Decl. II, Ex. E.  In so doing, Mr. Bergman ran afoul both of the Court's

22  Order and abused Mr. Eisen's position as an allegedly neutral custodian of

23  "escrowed" documents.  In his May 22, 2007 letter, Mr. Bergman admits that

24  "'escrow documents' originally listed on the privilege logs of non-party witnesses

25  should not be released." *Id.*   However, one paragraph later, he claims that two

26  documents listed on the privilege log of Mr. Bulson, a non-party attorney, must be

27  turned over, while citing no rationale or authority for this exception to the Order.

28  *Id.*

EXHIBIT 7

1      Bulson's privilege log was served on Defendants long ago on October 23,

2    2006, and listed the two Bulson Documents as communications between Mr.

3    Bulson and Mr. Toberoff. Toberoff Decl. I, Ex. O.  Defendants could well have

4    moved in this Court to compel Plaintiffs' production of these two documents as

5    easily within the discovery and motion deadlines as Defendants do now for the first

6    time, long after the passing of such deadlines.  Defendants failed to do so,

7    presumably because they had filed instead a motion to compel in the United States

8    District Court for the Northern District of Ohio, which is still pending. Defendants'

9    belated bootstrapping of their mini-motion attacking the "joint interest" privilege

10   into a purported motion to compel compliance, does not alter the fact that it is

11   impermissibly beyond the Court ordered deadline for such discovery motions.

12      Defendants present the Court with an elaborate time line in an effort to paint

13   Plaintiffs' counsel as "sneaking" documents into a third party's privilege log.

14   Defendants contend that because documents are listed on a third party attorney's

15   privilege log, but not listed on Plaintiffs' privilege log, that this waives any claim

16   of the joint interest privilege.

17      Notwithstanding the above, which is fatal to Defendants' newfound

18   arguments and motion, the joint interest privilege applies to the Bulson

19   Documents.  "The common interest privilege ... applies where (1) the

20   communication is made by separate parties in the course of a matter of common

21   [legal] interest; (2) the communication is designed to further that effort; and (3) the

22   privilege has not been waived."  *United States v. Bergonzi*, 216 F.R.D. 487, 495-96

23   (N.D. Cal. 2003). *See also In re Regents of the Univ. of Cal.*, 101 F.3d 1386, 1389

24   (Fed.Cir.1996) (common interest privilege is "an exception to the general rule that

25   the attorney-client privilege is waived upon disclosure of privileged information to

26   a third party.")  It is applicable to works protected by attorney-client, work

27   product, or any other privilege. *See, e.g., Nidec Corp. v. Victor Co. of Japan*, __ F.

28   Supp.2d __, 2007 WL 1994171 at *2-3 (N.D. Cal. 2007) (discussing the "common

EXHIBIT 7   39
Page 180

1   interest privilege" as an anti-waiver exception when other privileges waived.)

2   Moreover, as the "common interest privilege" also extends to works protected by

3   the work product doctrine, "the disclosure to a third party does not necessarily

4   constitute a waiver of work product privilege." *Id.* at *4 ("For work product,

5   'protection is waived where disclosure of the otherwise privileged documents is

6   made to a third party, and that disclosure enables an adversary to gain access to the

7   information.  The work product privilege provides protection against adversaries

8   and is not as easily waived as the attorney-client privilege").

9         Thus, when parties are negotiating matters that likely will lead to a joint

10  legal interest that will result in litigation, the first two factors listed in *Bergonzi* are

11  met, and the common interest privilege applies, as such communications constitute

12  protectible work product created in anticipation of litigation.  *See, e.g., Nidec*

13  *Corp.,* 2007 WL 1994171 at *4 (N.D. Cal. 2007) (requiring a "common legal

14  interest," including "anticipated joint litigation," for the common interest exception

15  to apply); *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 115 F.R.D. 308, 310 (N.D.

16  Cal. 1987) (common interest applies where "at the time defendant and [the third-

17  party] were negotiating it seemed quite likely that defendant and [the third-party]

18  would be sued by plaintiff and that in that litigation … would be identically

19  aligned.")  So long as the communications are designed to further that common

20  legal interest, rather than "to facilitate [a] potential commercial transaction," the

21  common interest privilege will apply. *Nidec Corp.*, 2007 WL 1994171 at *4.

22        Defendants have cited no authority for the proposition that, because a

23  document that is the subject of work-product and common interest privileges is

24  listed in one privilege log and not another, privilege is waived with respect to that

25  document.  All of Defendants' authorities cited for the proposition that Plaintiffs'

26  privilege claims have been waived relate to cases either where the documents in

27  question were not listed on *any* privilege log, or where waiver occurred through

28  other means; moreover, none of the cited cases even consider an assertion of

EXHIBIT 7
Page 181    40

1   common-interest or joint-litigant privileges. *See, e.g., Fox v. California Sierra*

2   *Fin. Servs.*, 120 F.R.D. 520, 525 (N.D. Cal. 1988) (failure to *establish* privilege,

3   not waiver); *Thelen Reid & Priest LLP v. Marland*, 2007 WL 578989 at *9 (N.D.

4   Cal. 2007) (finding that attorney-client privilege waived for documents not listed

5   on *any* privilege log); *Cunningham v. Connecticut Mut. Life Ins.*, 845 F.Supp. 1403

6   (S.D. Cal. 1994) (waiver occurred after application of a multi-factor test where

7   document was not listed on any privilege log).

8       The Bulson Documents contain documents protected by the common interest

9   privilege and work product doctrine.  Defendants' conspiratorial statements aside,

10  the correspondence between Toberoff and Bulson was designed to further a joint

11  legal strategy with respect to the issue of the "Superman" terminations.  Toberoff

12  Decl. II, ¶ 4.  Notwithstanding Defendants' unproven speculation regarding

13  whether the two Bulson Documents concerned negotiations to buy Michael

14  Siegel's Termination interest, even this would naturally entail discussions of

15  litigation strategy and the odds of Plaintiffs succeeding in this litigation.  Plaintiffs

16  and Michael Siegel were closely aligned in their legal interests vis à vis Warner,

17  otherwise Michael Siegel and his attorney Bulson would have nothing of value.

18      Considering the importance of the "Superman" property to Warner, such

19  litigation was a virtual inevitability in the absence of settlement.  Such

20  communications amongst the attorneys of Jerome Siegel's statutory heirs under 17

21  U.S.C. § 304(c) (i.e., Plaintiffs and Michael Siegel) in anticipation of pending

22  litigation regarding the Termination, of which they are the beneficiaries, is

23  precisely the sort of communications the joint interest privilege is designed to

24  protect.  Thus, the Bulson Documents were protected by the applicable joint

25  interest privilege and work product doctrine, which were not waived by disclosure

26  to Mr. Bulson or by virtue of the fact that they were stolen from the files of

27  Plaintiffs' counsel.

28

EXHIBIT 7
Page 182   41

1    Nor is the fact that the documents were not listed on Plaintiffs' privilege log

2    -- as opposed to Mr. Bulson's privilege log -- dispositive. *See, e.g., Burlington*

3    *Northern & Santa Fe Ry. Co. v. U.S. Dist. Court for Dist. of Mont.*, 408 F.3d 1142.

4    1147 (9th Cir. 2005) ("we reject the *per se* waiver rule" that failure to list

5    documents on a privilege log automatically waives privilege); *Thelen Reid &*

6    *Priest LLP v. Marland*, 2007 WL 578989 at *10 (N.D. Cal. 2007) ("production of

7    an inadequate privilege log *may* be deemed waiver of the privilege" where

8    "fail[ure] to log the additional documents" on *any* privilege log on multiple

9    occasions); *Imperial Corporation of America v. Durkin*, 174 F.R.D. 475, 478

10   (S.D.Cal.1997) (recognizing that document-by-document privilege log is not a

11   rigid requirement where circumstances make less detailed assertion appropriate.)

12    Courts are to apply a "holistic reasonableness analysis" to claims of

13   privilege and waiver thereof, "subject to any … agreements or stipulations among

14   the litigants." *Burlington Northern & Santa Fe Ry. Co.*, 408 F.3d at 1148.

15   Moreover, it is not improper to rely on a third-parties' assertion of privilege. *See*

16   *Shamis v. Ambassador Factors Corp.*, 34 F.Supp.2d 879 (S.D.N.Y. 1999) (only

17   where subpoenaed third-party's privilege log "fails to identify the nature of the

18   privilege being claimed and is thus insufficient," could plaintiff not rely on it for an

19   invocation of common-interest privilege.). *See also Gomez v. Vernon*, 255 F.3d

20   1118, 1131-32 (9th Cir. 2001)(The attorney-client privilege remains protected even

21   in the event of *inadvertent* disclosure, provided that the holder "has made efforts

22   … reasonably designed to protect the privilege.")

23   **B.    DEFENDANTS' IMPROPER ATTEMPT TO INFLUENCE AND**

24   **INTERFERE WITH THE "ESCROW" PROCESS SHOULD NOT BE**

25   **COUNTENANCED**

26    After having convinced the Court to issue its Order based on Defendants'

27   purported adherence to a measured "neutral" protocol, Mr. Bergman improperly

28   attempted to influence the process, contravening the Order and abusing Mr. Eisen's

EXHIBIT 7
Page 183  42

1   role as a purported custodian of "escrow documents."  Defendants took it upon

2   themselves to send Mr. Eisen documents identified in Mr. Toberoff's Court

3   ordered declaration "as having been previously produced so that you can compare

4   them to the Escrow Documents in your file."  Bergman Decl. II, Ex, E.

5   Defendants also sent Mr. Eisen privilege logs cited in Mr. Toberoff's declaration

6   requesting that Mr. Eisen "compare the privilege entries to the Escrow Documents

7   in your file" to test the validity of the assertion of privilege.  *Id.*

8        Magistrate Zarefsky long ago approved the format of Plaintiffs' privilege

9   logs in response to a challenge by Defendants. [12]  Moreover, the time for

10  Defendants to have brought a properly noticed motion to contest the sufficiency of

11  particular entries on plaintiffs' privilege log has long ago passed with the motion

12  cut-off.  Defendants' motion regarding the stolen documents could easily have

13  been brought sufficiently in advance to allow for any follow-up motions

14  challenging Plaintiffs' and third-parties' privilege logs.  Defendants opted instead

15  to bring their motion with respect to the stolen documents *on March 26, 2007, the*

16  *very last day of the prior motion cut-off.*

17       Mr. Bergman went so far as to describe, and instruct Mr. Eisen to fish

18  through and search for, particular stolen documents which Warner's VP,

19  Litigation, Wayne Smith, recalled (though Mr. Smith had attested in support of

20  Defendants' motion to compel that he had merely glanced at the documents to

21  assess whether any were privileged) so that Defendants could collaterally attack

22  Plaintiffs' privilege logs, previously upheld by the Court. Bergman Decl., II, Ex. E.

23  As Eisen notes in his May 24, 2007 letter, the Order does not provide for this sort

24  of scouring and testing of plaintiffs' privilege log entries. Bergman Decl. II, Ex. G.

25

26

---

27   [12] Defendants previously brought a motion attacking the form and sufficiency of plaintiffs'
     privilege logs which was denied by Magistrate Zarefsky's order dated August 18, 2006, holding
28   that "by providing this log, the Plaintiffs have sufficiently asserted the attorney-client privilege
     and the work product doctrine." Toberoff Decl. I, Ex. A.

EXHIBIT 7
Page 184   43

1    Defendants' falsely accuse Plaintiffs of improperly "preventing" Eisen from

2   discharging his duties, when it is Defendants, led by Mr. Bergman, who attempted

3   to improperly influence and abuse Mr. Eisen's passive role and the Court's Order

4   in a classic example of unbridled gamesmanship and overreaching.  The Court's

5   Order certainly does not countenance or permit Mr. Bergman's highly improper

6   conduct.   Bergman Decl. II, Ex. A.  In fact, the Order indicates that Defendants

7   are to await the escrow holder's dispersal of the documents.  Bergman Decl. II, Ex.

8   A. 19:16- 20:3.  To his credit, Mr. Eisen, though retained and compensated by

9   Warner, was thoroughly uncomfortable with the position Mr. Bergman had placed

10  him in, refused to participate, acknowledged the latent ambiguities in the Order in

11  light of the nature of the documents and the hearing on Defendants' motion, and

12  deferred the matter to the Court.  Bergman Decl. II, Ex. G.

13    Pursuant to the Order, Plaintiffs' counsel in his declaration properly keyed

14  by bates numbers those documents corresponding to numerical listings on

15  designated privilege logs and then turned all this information over to Mr. Eisen.

16  Bergman Decl. II, Ex. D.  Instead of waiting for Mr. Eisen to discharge his duties,

17  Defendants improperly attempted to persuade Mr. Eisen to read through the

18  privileged documents on Defendants' behalf to hunt for particular documents to

19  assess their privileged status and the sufficiency of Plaintiffs' privilege logs, and

20  then sent over hand picked documentation to guide him, which was never provided

21  to plaintiffs.  Bergman Decl. II, Ex. E.

22    **C.    SANCTIONS AGAINST PLAINTIFFS ARE IMPROPER**

23    Defendants' demand for $7,440 in sanctions is baseless in light of Plaintiffs'

24  admitted compliance with the Court's Order.  Plaintiffs' counsel drafted and served

25  a declaration in strict compliance with the Court's Order, as admitted by

26  Defendants.  As noted above, latent ambiguities in the Order reasonably came to

27  light in this process with respect to 9 documents, out of the 839 pages of stolen

28  documents at issue.  These ambiguities were duly noted and acknowledged by the

EXHIBIT 7
44
Page 185

1   escrow holder, Mr. Eisen, in his May 24, 2007 letter.  Bergman Decl. II, Ex. G.

2   Defendants' hyperbolic accusations that Mr. Toberoff "prevented" Mr.

3   Eisen from discharging his duties and their other unfounded efforts to "tar and

4   feather" Mr. Toberoff transparently attempt to prejudice the Court and are

5   demonstrably false.  Mr. Eisen's refusal to follow Defendants' attempts to interfere

6   with the execution of his duties, his acknowledgement of latent ambiguities in the

7   Order and his desire for clarification from the Court belies Defendants' hollow call

8   for sanctions.  *Id.*

9   **D.   DEFENDANTS SHOULD BE SANCTIONED FOR THEIR**

10  **ATTEMPT TO INFLUENCE THE ESCROW PROCESS**

11  Defendants' transparent gamesmanship of touting the neutrality of the

12  protocol they followed regarding stolen legal files to obtain the Court's Order, and

13  then baldly trying to manipulate and influence the escrow process once the Order *is*

14  sanctionable.  Federal Rule of Civil Procedure 37(b)(2).  It is Defendants'

15  meddling in the escrow process, coupled with their thoroughly unreasonable

16  position regarding documents within the obvious rationale of the Court's Order

17  that has multiplied the parties' attorney's fees and saddled the Court with yet

18  another motion regarding these documents, which in the first place were illegally

19  pilfered from the files of Plaintiffs' counsel. Therefore, Plaintiffs respectfully

20  request that the Court enter an order granting them sanctions in the amount of

21  $5,600 to recompense attorneys' fees attributable to Plaintiffs' opposition to this

22  motion.  Toberoff Decl. II, ¶ 5.

23  **V.   DEFENDANTS' CONCLUSION**

24  For the foregoing reasons, Defendants respectfully request that the Court

25  grant their motion, and (1) order the Escrow holder Mr. Eisen to carry out the

26  Court's April 30, 2007 Order and turn over to Defendants any Escrow Document

27  that was not listed on a privilege log, including the Bulson documents; (2) inform

28  Mr. Eisen that he may use the documents and privilege log entries listed on Mr.

EXHIBIT 7   45
Page 186

1    Toberoff's declaration to confirm that he is releasing the proper Escrow

2    Documents to Plaintiffs and Defendants; and (3) grant sanctions to Defendants in

3    the amount of $7,440.

4    **VI.**    **PLAINTIFFS' CONCLUSION**

5      For the reasons set forth herein, Plaintiffs respectfully request that

6    Defendants' unfounded motion be denied in its entirety and that the Court grant

7    Plaintiffs sanctions in the amount of $5,600.

8

9

10    DATED: September 17, 2007    Respectfully submitted,

11      WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL, LLP

12      -and-
     FROSS ZELNICK LERMAN ZISSU, LLP

13      -and-
     PERKINS LAW FIRM, PLC

.14

15      By _____

16      Michael Bergman
     Attorneys for Defendants

17

18    DATED: September __, 2007    LAW OFFICES OF MARC TOBEROFF, PLC

19

20      By _____

21      Marc Toberoff

22      Attorneys for Plaintiffs JOANNE SIEGEL
     and LAURA SIEGEL LARSON

23

24

25

26

27

28

EXHIBIT 7   46

EXHIBIT 8

**RECEIVED**

MAY 2 8 2003

**Marc Toberoff**

## TELECOPIER COVER PAGE

**DATE:**            **May 28, 2003**

**RECIPIENT:**       **Marc Toberoff**

**SENDER:**

**FAX NUMBER:**

**NUMBER OF PAGES:**

REDACTED

EXHIBIT 8

Page 188

**Q 0090**



RECEIVED

MAY 3 0 2003

Marc Toberoff

**TELECOPIER COVER PAGE**

DATE:                     May 30, 2003
RECIPIENT:                Marc Toberoff
SENDER:
FAX NUMBER:
NUMBER OF PAGES:

REDACTED

Q 0096

EXHIBIT 8
Page 189

RECEIVED

MAY 3 0 2003

Marc Toberoff

**TELECOPIER COVER PAGE**

| | |
|---|---|
| **DATE:** | **May 30, 2003** |
| **RECIPIENT:** | **Marc Toberoff** |
| **SENDER:** | |
| **FAX NUMBER:** | |
| **NUMBER OF PAGES:** | |

REDACTED

Q 0105

EXHIBIT 8
Page 190

EXHIBIT 9

Ethics Opinion 318: Disclosure of Privileged Material by Third Party    Page 1 of 7
Case 2:10-cv-03633-ODW-RZ    Document 44    Filed 09/30/10    Page 193 of 199    Page
ID #:1563



Home > For Lawyers > Ethics > Legal Ethics > Opinions

## Opinion 318

**Disclosure of Privileged Material by Third Party**

When counsel in an adversary proceeding receives a privileged document from a client or other person that may have been stolen or taken without authorization from an opposing party, Rule 1.15(b) requires the receiving counsel to refrain from reviewing and using the document if: 1) its privileged status is readily apparent on its face; 2) receiving counsel knows that the document came from someone who was not authorized to disclose it; and 3) receiving counsel does not have a reasonable basis to conclude that the opposing party waived the attorney-client privilege with respect to such document. Receiving counsel may violate the provisions of Rule 8.4(c) by reviewing and using the document in an adversary proceeding under such circumstances and should either return the document to opposing counsel or make inquiry of opposing counsel about its status prior to determining what course of action to take.

Receiving counsel would not violate Rules 1.15(b) and 8.4 (c) by reviewing and using the document whose source is unknown if: 1) its privileged status is not readily apparent on its face, or if privileged, receiving counsel has a reasonable basis to conclude that the privilege has been waived; and 2) receiving counsel did not know that the document came from someone who was not authorized to disclose it. Rule 1.3(a)'s emphasis on zealous representation may provide support for receiving counsel to review and use the document in such a situation. The Committee takes no position with reference to the question whether review and use of documents that are confidential but non-privileged would violate Rules 1.15(b) and 8.4(c) because it is outside the scope of the inquiry.

Counsel who created the opportunity for the disclosure or was otherwise responsible for maintaining the confidentiality of the document may violate Rules 1.1(a) and (b) and 1.6(a) and (e) by failing to exercise reasonable care to prevent the unauthorized disclosure of the client's confidences and secrets.

Applicable Rules

- Rule 1.1(a) and (b) (Competence)
- Rule 1.3(a) (Diligence and Zeal)
- Rule 1.6(a) and (e) (Confidentiality of Information)
- Rule 1.15(b) (Safekeeping Property)
- Rule 8.4(c) (Dishonesty, Fraud, Deceit, or Misrepresentation)

### Inquiry

The inquirer, inside corporate counsel for an entity involved in a contested administrative proceeding, states that a temporary employee of the entity obtained a copy of an attorney-client privileged document containing client confidences and secrets either by theft or without authorization and disclosed it to the opposing party in the proceeding. The actual manner in which the temporary employee gained access to the document is not known. The document was not marked "attorney-client

WHO'S WATCHING YOUR FIRM'S 401(k)?

ABA Retirement Funds

Unique 401(k) Plans for Law Firms

(CLICK HERE FOR MORE INFORMATION)

EXHIBIT 9
Page 191

privileged," "attorney work product" or "confidential," but the information contained at the top of the first page of the six page document makes it clear that the document was from the entity's inside counsel, was sent to members of its management team, and addressed a number of legal questions and concerns. Some of the legal analysis in the document was pertinent to the dispute that was the subject of the administrative proceeding.

After receiving the document, the opposing party gave it to its litigation counsel, who reviewed the document and then used it as part of a filing with the administrative tribunal without first contacting opposing counsel. It is not known whether the receiving counsel knew the source of the document or the manner in which his client received it. When the inquirer learned of the pleading, he challenged the admissibility of the document on grounds that it was privileged and that the privilege was not waived. Receiving counsel filed an opposition, asserting that the document was admissible because it was relevant to an issue in the proceedings, had not been marked "confidential," and had been "leaked" by a temporary employee to his client. The dispute over the admissibility of the document was never resolved in the administrative proceeding because the matter was settled, but the inquirer has asked for our opinion regarding the ethical implications of its submission to the tribunal.

**Discussion**
In 1995, this Committee adopted Opinion No. 256, which determined that a receiving lawyer did not violate the D.C. Rules of Professional Conduct by reviewing privileged documents inadvertently delivered by opposing counsel during discovery so long as receiving counsel was unaware of the inadvertent disclosure prior to the time the documents were examined. The Committee has now been asked to review a related issue: Does receiving counsel violate the D.C. Rules of Professional Conduct by reviewing and using what may be a privileged document in an adversary proceeding that receiving counsel's client or other person obtained from a third party who may have stolen the document or taken it without authorization?

This is a matter of some importance because, as Judge Royce Lamberth noted in *Wichita Land & Cattle v. American Federal Bank*, 148 F.R.D. 456, 458-59 (D.D.C. 1992), efforts are more commonly being used to "surreptitiously gain access to confidential communications." Despite some obvious differences from, situations involving inadvertent disclosures, the Committee finds that the conclusions reached in Opinion No. 256, with some modifications, apply to this inquiry as well.

The ethics rules are silent on the review and use of privileged materials which may have been stolen or otherwise acquired without permission from their rightful owners by third parties. In the absence of precise direction from the rules, the Committee must begin its analysis by looking for guiding principles that will help shape the ways in which the ethics rules are interpreted. The guiding principles most pertinent to our problem relate to the primacy given in the ethics rules to confidentiality, zeal, and fair dealing with opposing counsel.

To begin with, the need to protect the confidentiality of the attorney-client relationship permeates the ethics rules. As noted in Comment [4] to Rule 1.6: "A fundamental principle in the client-lawyer relationship is that the lawyer holds inviolate the client's secrets and confidences." Comment [4] further reflects that knowing that this confidential relationship exists encourages a client "to communicate fully and frankly with the lawyer even as to embarrassing or legally damaging subject matter." Maintaining confidentiality is so essential that a lawyer is required to exercise reasonable care to prevent others with whom the lawyer works from disclosing or using a client's

EXHIBIT 9    Page 192

confidences or secrets. Rule 1.6(e). A lawyer is arguably also obliged to protect client confidentiality under his or her broader mandate to "serve a client with skill and care." *See* Rule 1.1 (b). There clearly is a tension between these ethical and evidentiary principles and the notion that in their efforts to seek the truth, tribunals should, for the most part, have unfettered access to relevant evidence. See *Wichita Land & Cattle*, 148 F.R.D. at 462.

While fidelity to the principle of protecting client confidentiality is a basic tenet of the rules, so is the notion that in the exercise of professional judgment, a lawyer should act in a manner consistent with the best interests of the client. Rule 1.3(a), Comment [5]. The rules require that a lawyer represent a client zealously within the bounds of the law. Rule 1.3(a). This may have implications for a lawyer who gains access to a document that can beneficially be used on a client's behalf in an adversary proceeding without first being aware that it is privileged. But such an attorney is also constrained by ethical principles of fair dealing. Rule 1.15(b), for example, requires a lawyer who receives property in which third persons have an interest to notify these persons and promptly deliver the property to them. This is consistent with commentary to Rule 1.3 that the duty of a lawyer to represent a client wall zeal "does not militate against the concurrent obligation to treat with consideration all persons involved in the legal process and to avoid the infliction of needless harm." Rule 1.3, Comment (6). A lawyer who reviews and uses material that he knows is privileged may be engaging in a dishonest act in violation of Rule 8.4(c). *See* D.C. Ethics Opinion 256 n.8.

In its assessment of the inadvertent disclosure of privileged material to opposing counsel, the Committee previously concluded that receiving lawyers engage in no ethical violation by retaining and using those materials if they review them in good faith before the inadvertence of the disclosure is brought to their attention. D.C. Ethics Op. 256. Under that Opinion, however, receiving lawyers must return privileged documents without reviewing them if they learn about their privileged nature before reviewing the documents. Opinion 256 further reflects that lawyers who make the inadvertent disclosures may violate Rule 1.1 if they do so by failing to exercise diligence and care during a representation. The conclusions reached in Opinion 256 were largely consistent with earlier ABA Formal Opinions, Formal Opinions 92-368[1] and 94-382 and with case precedents in this circuit. *See In re Sealed Case*, 877 F.2d 976 (D.C. Cir. 1989), and *Wichita Land & Cattle v. American Federal-Bank*, 148 F.R.D. 456 (D.D.C. 1992) (inadvertent disclosure of privileged documents waives the attorney-client privilege).

The question of what ethical obligations exist when privileged material *may have been* stolen or taken without authority is not addressed in either Opinion 256 or in ABA Formal Opinion 92-368. ABA Formal Opinion 94-382, however, did address the issue of the unsolicited receipt of privileged or confidential materials. It concluded that a lawyer who receives such materials of an adverse party should refrain from using them if she *knows* that they are privileged. The District of Columbia Circuit specifically reserved decision on the issue of the unsolicited receipt of privileged documents in *In re Sealed Case* when it stated that "[w]e do not face here any claim that the information was acquired by a third party despite all possible precautions, in which case there might be no waiver at all." 877 F.2d at 980, n.5.

This issue was addressed, however, in *In re Grand Jury Proceedings Involving Berkeley & Co.*, 466 F. Supp. 863 (D. Minn. 1979). In *Berkeley*, a former employee allegedly stole corporate documents and turned them over to the government. The company argued that the documents should be returned because they were privileged. The court noted initially that it

EXHIBIT 9    Page 193

had long been assumed that the privilege was deemed waived for all involuntary disclosures of privileged documents, even those that were stolen. This had been the position taken in Dean Wigmore's highly respected treatise on evidence. *See* 8 *Wigmore on Evidence* §§ 2325-26 (McNaughton rev. 1961).

But *Berkeley* concluded that the privileged status of document should not be lost in such circumstance if "the attorney and client take reasonable precautions to ensure confidentiality." The approach taken in *Berkeley* has been largely adopted by the American Law Institute in the Restatement of the Law Governing Lawyers. Under § 129 of the Restatement, the attorney-client privilege is waived only if "the client, the client's lawyer, or another authorized agent of the client *voluntarily* discloses the communication in a non-privileged communication." Restatement of the Law Governing Lawyers § 129 (2000). *See* comment *g*. And, in one of the illustrations interpreting § 129, the Reporter states that the privilege is not waived if a burglar steals privileged files.

The Restatement comment also adopts the same basic approach taken in our Opinion 256 and ABA Formal Opinion 92-368 with reference to inadvertent disclosures of privileged materials. The Restatement concludes that waiver does not result from inadvertent disclosures as long as the client or any other disclosing person "took precautions reasonable in the circumstances to guard against such disclosure." Restatement of the Law Governing Lawyers § 129, comment *h*.

These sources provide us with a basis for responding to this Inquiry. First, a lawyer cannot, consistent with the Rules of Professional Conduct, solicit or otherwise encourage a client or other person to obtain privileged or documentary evidence in an unlawful or unauthorized manner. If a lawyer receives materials that are privileged on their face, having a reasonable basis to conclude that the privilege has not been waived and that they have been obtained without authorization, he may violate Rules 1.15(b) and 8.4(c) by reviewing the material or by using it in an adversary hearing.[2] This is consistent with the position taken in ABA Formal Opinion 94-382. But the ethics rules are not violated unless the receiving lawyer acts knowingly.[3]

Other state ethics opinions have reached contrary results. *See, e.g.,* Maryland Bar Ass'n, Op. 89-53 (1989), Virginia Bar Ass'n Op. 1076 (1988); and Michigan Bar Ass'n, Op. CI-970 (1983). These opinions conclude that lawyers who receive privileged materials unsolicited have no obligation to make disclosure to a tribunal or an adverse party and may review and use such materials. But such a result is inconsistent with the conclusion reached by this Committee in Opinion 256.

The more difficult questions relate to situations in which a receiving lawyer does not have such knowledge of the document's origin prior to conducting a review, or if the status of a document is unclear. A lawyer may still violate the ethics rules if the source and status of documents can be inferred from circumstances at the time he received them because "knowingly" is so defined in the Terminology Section of the Rules, Definition 6. Whether knowledge can be inferred from circumstances is fact specific. But if a lawyer receives what appears to be a privileged document under highly suspicious circumstances, such as from a client or other person who says with a wink, "don't ask me how I got this," the prudent receiving lawyer, would make further inquiry prior to reviewing or using the document.[4]

If, prior to his review, receiving counsel determines that a privileged document was obtained surreptitiously and without the knowledge or approval of the opposing party and its counsel, and has a reasonable basis to conclude that the privilege was not waived as to this document, receiving counsel should either return the document to opposing counsel, or make inquiry about its source and status prior to determining

EXHIBIT 9    Page 194

what course of action to take. This is consistent with the approach taken in ABA Formal Opinion 94-382.[5]

A receiving lawyer would not violate Rules 1.15(b) and 8.4 (c) by reviewing and using the document whose source is unknown if: 1) its privileged status is not readily apparent on its face; and 2) receiving counsel did not know that the document came from someone who was not authorized to disclose it. If the privileged status of the document does not become apparent to receiving counsel until after the document has been reviewed, as reflected in D.C. Opinion 256, it is too late for receiving counsel to take corrective action because the information cannot be purged from his mind and his obligation of zealous representation under Rule 1.3 at that point trumps confidentiality concerns. The Committee takes no position with reference to the question whether review and use of documents that are confidential, but non-privileged would violate Rules 1.15(b) and 8.4(c) because it is outside the scope of the inquiry.

In the matter that is the subject of this Inquiry, there is no indication what the receiving lawyer's client said about the document or its source at the time it was given to him. Receiving counsel asserted in a pleading that the document was not marked "confidential" and that it was leaked to his client by a temporary employee of the opposing entity. Even though the document was not marked "attorney-client privilege," "attorney work product," or "confidential," the information at the top of the first page of the document made it clear that it was from the opposing entity's inside counsel and that counsel was analyzing legal questions and concerns for members of the management team.

The Committee concluded in Opinion 256 that a receiving attorney could reasonably presume that documents were intended for him when they are disclosed to him by opposing counsel. This may not be the case when documents are disclosed to a lawyer by a third party. In such a situation, a receiving counsel may violate the ethics rules if he knowingly received privileged documents, had no basis to conclude that the privilege had been waived, and reviews and uses them anyway.

But again this responsibility only exists if the privileged nature of the document is apparent on its face. There is no indication in this Inquiry whether the receiving counsel knew about the nature of the document, other than that it was not marked "confidential," at the time he received it. In the absence of additional facts, we can only reiterate the general guidance provided in Opinion 256: it would be unethical to read a document if the lawyer knew before reading it that it was privileged and that it had been sent inadvertently. The same would be true if receiving counsel reads a document that he knows is privileged and was either stolen by a third party or taken without authorization, unless he has a reasonable basis to conclude that the privilege was waived as to that document. *See also* ABA Formal Opinion 94-382.

On the other hand, Opinion 256 states that a receiving lawyer commits no breach of ethics if he reads a document that "has no facial or contextual indication of privilege and the receiving lawyer has not learned of its inadvertent disclosure." Again, the Committee reaches the same conclusion for documents improperly taken by third parties.

The determination of what a receiving lawyer knows about the source of a document and about its privileged status, as noted above, is fact specific. A document is not necessarily privileged on its face even when it is marked "privileged" or "confidential," as markings like this often are used indiscriminately. Opinion 256 at n 12. But a receiving attorney

EXHIBIT 9
Page 195

proceeds at his own risk if indicia of a privileged document do exist and there is not a reasonable basis to conclude that the privilege has been waived. This can often be gleaned by seeing on the face of a document the sending and receiving parties and the nature of the subject matter.

If, for example, sending and recipient parties are counsel and members of corporate management, respectively, the subject relates to the results of attorney-client communications or legal advice, and the document is marked "attorney-client privilege," then the ethics rules are implicated. But, where the source of the document and/or its privileged status is less clear, as indicated in ABA Formal Opinion 94-382, the prudent course for a receiving lawyer might be to contact the opposing party and raise the issue directly, have another lawyer not working on the matter assess the document separately to help determine whether it is privileged, or refrain from reviewing the materials until a definitive resolution of the proper disposition of the materials is obtained from a tribunal. For comparable suggestions, *see* Opinion 256 at n.13. *See also* ABA Formal Opinion 94-382.

It also bears repeating that internal (or outside) counsel having the responsibility for protecting privileged documents that subsequently are "leaked" may violate Rules 1.1(a) and (b) and 1.6(a) and (e) if they fail to exercise reasonable care to prevent the unauthorized disclosure of their client's confidences and secrets.[6]

Again, any such determination is fact specific. There is no indication in the Inquiry what steps had been taken to protect the confidentiality of the document at issue prior to the time it was obtained by the third party.

In summary, given the importance of preserving the confidentiality of privileged documents, lawyers have an ethical responsibility to take reasonable measures to ensure that confidential documents are protected so that they do not fall into the hands of third parties. The failure of counsel to take reasonable measures to protect a client's confidences and secrets can both waive the privilege and result in ethics violations.

Adopted: December 2002

---

1. Opinion 256, however, rejected the position taken in ABA Formal Opinion 92-368 that a document must be returned even if the receiving lawyer learns about the inadvertent disclosure after the document had been reviewed.
2. This Opinion does not address the question of whether all or just a portion of a particular document is privileged.
3. This requires actual knowledge of the fact in question. *See* definition of "knowingly" in Terminology Section of the Rules, Definition [6]. As the Definition of "knowingly" indicates, however, knowledge can be inferred from circumstances.
4. This is consistent with the admonition in Opinion 256 of what an ambivalent lawyer should do when receiving documents from another lawyer when there are conflicting indications as to whether the disclosure of privileged documents was inadvertent or not. D.C. Opin. 256 at n.13.
5. As reflected in Opinion 256, a lawyer may also decline to review or use documents that may not be the subject of ethical restraints, and that he may otherwise be entitled to use, as a matter of "courtesy." *See* Opin. 256 at n.7. Depending on the significance of the documents,

EXHIBIT 9
Page 196

however, a lawyer may be required to consult with the client and Rules 1.2(a) and 1.4(b) prior to making such a determination.

6. Opinion 256 provides some general guidance on the factors to be taken into account in making such assessments. If a lawyer fails to use reasonable care in instructing those who work for him on the handling of confidential material, that lawyer may violate Rule 1.6 (e), if, as a result of his failure, the confidential material falls into the hands of a third party. A lawyer may also violate Rule 1.1 if he fails to devote sufficient care and attention to the protection of privileged documents. Both of these rules may be implicated, for example, if a lawyer fails to train his employees to properly mark and file confidential documents and to avoid leaving them in areas exposed to the general public.





In search of an economist?

The District of Columbia Bar | 1101 K Street NW, Suite 200 | Washington DC 20005 | 202-737-4700 | **Directions/Parking**
©2010 D.C. Bar **Restrictions on Use** All rights reserved. **Mobile site** | **Privacy Policy** | **Accessibility Policy** | **Disclaimer** | **Author guidelines**

EXHIBIT 9
Page 197