EXHIBIT 20

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | |
|---|---|
| Case No.: CV 04-08400-RSWL(RZx) <br> CV 04-08776-RSWL(RZx) | Date: AUGUST 14, 2006 |
| Title: JOANNE SIEGEL, ET AL. v. WARNER BROS. ENTERTAINMENT INC., ET AL. <br> JOANNE SIEGEL, ET AL. v. TIME WARNER INC., ET AL. | |

**Present: The Honorable:** RALPH ZAREFSKY, U.S. MAGISTRATE JUDGE

| Ilene Bernal | | CV06-16 & CV06-17 |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:

Micholas Williamson
Mark Toberoff

Attorneys Present for Defendants:

Michael Bergman
Anjani Mandavia

**Proceedings:**    HRG: DEFENDANTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS

Plaintiff shall produce all privilege logs, including any revisions, by September 29, 2006.

The remainder of the motion is taken under submission.

Priority ____
Send   X
Enter  ____
Closed ____
JS-5/JS-6 ____
JS-2/JS-3 ____
Scan Only ____

DOCKETED ON CM
AUG 18 2006
BY ____ 049

cc: The Honorable Ronald S. W. Lew
    parties

Initials of Preparer    igb

:    50

57

EXHIBIT 20
Page 590

EXHIBIT 21



Priority
Send   X
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOANNE SIEGEL and LAURA SIEGEL LARSON, | CASE NO. CV 04-8400-RSWL (RZx) |
| Plaintiff, | **ORDER ON DEFENDANTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS** |
| vs. | |
| WARNER BROS. ENTERTAINMENT INC., et al., | |
| Defendants. | |

This matter came before the Court on August 14, 2006 on Defendants' Motion to Compel. Defendants appeared through their attorneys, Michael Bergman and Anjani Mandavia. Plaintiffs appeared through their attorneys Marc Toberoff and Nicholas C. Williamson. The Court heard argument of counsel and took the matter under submission.

Defendants seek to compel Plaintiffs to produce documents falling within five categories, identified as Requests 52-59. In general, these categories concern writings involving certain settlement negotiations between the parties in 2001 and 2002. Plaintiffs apparently have produced documents responsive to these requests, but the documents currently sought all involve attorney-client communications, and the Defendants assert that those documents should be produced because Plaintiffs have waived the privilege.

EXHIBIT 21     Page 591

1    Defendants assert that Plaintiffs have waived the privilege by putting in issue

2    the authority of their prior counsel to negotiate a settlement.  The privilege may be

3    impliedly waived where a party to a lawsuit places into issue a matter that is normally

4    privileged, if the gravamen of the lawsuit is so inconsistent with the continued assertion

5    of the privilege as to compel the conclusion that the privilege has in fact been waived.

6    *Wilson v. Superior Court,* 63 Cal. App.3d 825,134 Cal. Rptr. 130 (1976).  Defendants

7    assert the alleged settlement in a counterclaim, responding to Plaintiffs' claim to recapture

8    their copyright. At oral argument, both sides confirmed that Plaintiffs had not *pleaded* any

9    lack of authority when they filed the reply to the counterclaim called for by FED. R. CIV.

10   P. 7(a).  Thus, as a matter of pleading, Plaintiffs have not themselves taken steps to bring

11   into issue a matter that is so inconsistent with maintenance of the attorney-client privilege

12   that it requires disclosure of attorney-client communications.

13       Instead, Defendants argue that Plaintiffs have done so by their response and

14   supplemental response to a request to admit.  Defendants requested that Plaintiffs admit

15   that their prior counsel was authorized to send a letter of October 19, 2001, the letter

16   which, at oral argument, Defendants stated constituted the contract of settlement.  In

17   response to the request to admit, Plaintiffs asserted various objections, including (by

18   apparent incorporation of introductory objections) the objection of attorney-client

19   privilege, and then denied the request subject to those objections.  In a supplemental

20   response, Plaintiffs qualified their denial further.

21       From these responses, Defendants assert that Plaintiffs have denied that their

22   prior counsel had authority to negotiate a settlement, and therefore have placed the matter

23   in issue and necessarily have waived the privilege with respect to that issue.  This

24   argument makes the request to admit do too much work.  To begin with, the response was

25   not an unqualified denial; it was a denial accompanied by objections.  Whatever the

26   meaning of "subject to" in this context, and whatever the validity of incorporating general

27   objections into specific responses — neither matter of which Defendants address — it is

28   hard to read the response as a denial without limitation. And assuming that the objections

EXHIBIT 21     Page 592

2

1    *are* properly stated, Defendants never moved to determine the sufficiency of the

2    objections. *See* FED. R. CIV. P. 36(a).

3            More importantly, however, Defendants misconstrue the office of a request

4    to admit.  A request to admit is not a discovery device in the customary sense of

5    "discovery."  8A WRIGHT, MILLER & MARCUS, FEDERAL PRACTICE AND PROCEDURE

6    §2253 at 524 (1994)  Rather, it is a method of short-circuiting proof for trial.  Those

7    matters which are admitted do not have to be proved otherwise.  Those which are denied

8    require proof.  FED. R. CIV. P. 36(b).  And if a party denies a matter he should have

9    admitted, the remedy is to require him, upon appropriate motion, to reimburse the party

10   who propounded the request for the expenses incurred in proving up the matter at trial.

11   FED. R. CIV. P. 37(c); *see, e.g., Marchand v. Mercy Medical Center*, 22 F.3d 933 (9th Cir.

12   1994).  In short, responding to a request to admit by denying the request is not the same

13   as affirmatively placing the matter in issue, and certainly not the same as the situation

14   where the gravamen of the action necessarily is inconsistent with maintaining the

15   privilege.

16           Defendants also assert that Plaintiffs waived the privilege explicitly, by

17   sending a copy of a letter, dated September 21, 2002, to a Vice President of DC Comics.

18   That letter, signed by both Plaintiffs, and addressed to their then counsel, states:

19

20               As we previously discussed with you and hereby affirm,

21           we rejected DC Comics' offer for the Siegel Family interest in

22           Superman and other characters sent to us by you on February 4,

23           2002.  We similarly reject your redraft of the February 4, 2002

24           document which you sent to us on July 15, 2002.  Therefore due

25           to irreconcilable differences, after four years of painful and

26           unsatisfying negotiations, this letter serves as formal

27           notification that we are totally stopping and ending all

28           negotiations with DC Comics, Inc., its parent company AOL

EXHIBIT 21        Page 593
3

1    Time Warner and all of its representatives and associates,
2    effective immediately.
3           This letter is also notification that, effective immediately,
4    we are terminating Gang, Tyre, Ramer & Brown, Inc., and all of
5    your firm's partners, associates and employees as
6    representatives of the Siegel Family interest regarding
7    Superman, Superboy, the Spectre and all related characters and
8    entities.  We instruct you to take no further actions on our
9    behalf.
10          Please return all materials regarding the above including
11   but not limited to files, correspondence, notes and documents to
12   us forthwith.  These should be sent to Joanne Siegel at the above
13   address.
14          It is a shame that four years were wasted due to DC
15   Comics and AOL Time Warner's greed.  We have no intention
16   of publically disparaging DC or any individual in the parent
17   company.  However, should DC or its parent company, officers,
18   attorneys, representatives or spokespersons disparage us or our
19   rights, we will vigorously respond in kind.
20
21   Weinberger Declaration, Ex. B.  Disclosure of materials previously held in confidence can
22   waive the attorney-client privilege.  Here there is no doubt that the privilege, if any exists,
23   has been waived as to this letter.  The Court does not agree that it has been waived any
24   more broadly than that.
25          The first paragraph of this letter appears to refer to irreconcilable differences
26   between Plaintiffs and Defendants, not irreconcilable differences between Plaintiffs and
27   their counsel.  The entire subject of the paragraph is the settlement negotiations, and how
28   DC Comics' proposal is not acceptable and the underlying negotiations have not been

EXHIBIT 21        Page 594

Case 2:10-cv-03633-ODW-RZ    Document 42-9    Filed 08/30/10    Page 8 of 171    Page
ID #:1978
Case 2:04-cv-08400-ODW -RZ   Document 86   Filed 08/18/06   Page 5 of 6   Page ID #:83

1   fruitful. While it is possible to read the reference to "irreconcilable differences" as a

2   reference instead to differences with Plaintiffs' counsel, that reading is not the one

3   supported by the context in which the statement is made.

4           More importantly, the letter does not open the door to an exploration of the

5   reasons that Plaintiffs discharged their counsel, or just what the irreconcilable differences

6   may have been, or what conversations they had with their counsel about settlement. These

7   topics are all mentioned in the briefest of terms, as slight incidents to the overall message

8   of the letter, which is Plaintiffs' disagreement with Defendants and Plaintiffs' decision to

9   end negotiations. Plaintiffs have not revealed a significant portion of the communications,

10  and that is what is required to create a waiver based on sending the communication to

11  someone other than counsel. *See Mitchell v. Superior Court,* 37 Cal.3d 591, 602, 208 Cal.

12  Rptr. 886, 691 P.2d 642 (1984); *Travelers Ins. Companies v. Superior Court,* 143 Cal. App.

13  3d 436, 444, 191 Cal. Rptr. 871 (1983); *People v. Hayes,* 21 Cal.4th 1211, 1266 (2000).

14  Accordingly, the Court finds that Plaintiffs have not waived the privilege, other than with

15  respect to the letter itself.

16          Finally, Defendants assert that the privilege log prepared by Plaintiffs is

17  insufficient. At oral argument, Plaintiffs agreed to review the log, and verify that they had

18  listed all recipients for any memoranda or letters referenced in the log. They also agreed

19  to provide, not later than September 30, 2006, a supplement to the log, covering other

20  periods of time. The only remaining issue is whether the descriptions in the log are

21  sufficient. The Court notes that the log appears to follow the form suggested in a

22  commonly-used treatise, W. SCHWARZER, W. TASHIMA AND J. WAGSTAFFE, FEDERAL

23  CIVIL PROCEDURE BEFORE TRIAL, Form 11:A (Rutter 2006). Moreover, the log appears

24  to have the same information which the Court found sufficient in *Dole v. Milonas,* 889

25  F.2d 885 (9th Cir. 1989); *see in re Grand Jury Investigation,* 974 F.2d 1068, 1071 (9th Cir.

26  1992 ). Accordingly, this Court too finds that by providing this log, the Plaintiffs have

27  sufficiently asserted the attorney-client privilege and the work product doctrine.

28  ///

EXHIBIT 21        Page 595

1    In accordance with the foregoing, with the exception of the September 21,

2    2002 letter, Defendants' Motion to Compel is denied.

3

4    IT IS SO ORDERED.

5

6    DATED: August 18, 2006

7

8

9    UNITED STATES MAGISTRATE JUDGE
     RALPH ZAREFSKY

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 21

Page 596

EXHIBIT 22

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 04-8400-SGL(RZx) / CV 04-8776-SGL(RZx) | Date | APRIL 30, 2007 |
| Title | JOANNE SIEGEL, ET AL. v. TIME WARNER, INC., ET AL | | |

Present: The Honorable  RALPH ZAREFSKY, U.S. MAGISTRATE JUDGE

| Ilene Bernal | | Recorded on Courtsmart |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:

Marc Toberoff

Attorneys Present for Defendants:

Michael Bergman

**Proceedings:**    DISCOVERY MOTIONS

1) Plaintiffs' Motion to Compel Defendants to Answer Plaintiffs' Special Interrogatories: Motion is denied. Both requests for sanctions are denied. No further order will issue.

2) Defendants' Motion to Compel Production of Whistle-Blower Documents: Motion is granted in part. Plaintiff shall submit a declaration re already produced and privileged escrow documents as directed by the court to Defendant no later than May 21, 2007, and documents may be released by the escrow, or returned to Plaintiffs, as stated on the record. No further order will issue.

3) Defendants' Motion to Compel 3rd Parties Kevin Marks and Plaintiff Laura Siegel Larson to Answer Questions at Deposition: Matter is submitted.

4) Defendants' Motion to Compel 3rd Parties Kevin Marks and Gang Tyre, Ramer and Brown, Inc. To Produced Documents Relating to Authority: Matter is submitted.

DOCKETED ON CM

MAY - 2 2007

BY _____ 049

(158)

| Priority | |
|---|---|
| Send | X |
| Enter | |
| Closed | |
| JS-5/JS-6 | |
| JS-2/JS-3 | |
| Scan Only | |

:    45

Initials of Preparer    igb

EXHIBIT 22    Page 597

EXHIBIT 23

1   WEISSMANN WOLFF BERGMAN
      COLEMAN GRODIN & EVALL LLP
2   Michael Bergman (SBN 37797)
    Anjani Mandavia (SBN 94092)
3   Adam Hagen (SBN 218021)
    9665 Wilshire Boulevard, Ninth Floor
4   Beverly Hills, California 90212
    Telephone: (310) 858-7888
5   Fax: (310) 550-7191

6   FROSS ZELNICK LEHRMAN & ZISSU, P.C.
    Roger L. Zissu (Admitted *pro hac vice*)
7   James D. Weinberger (Admitted *pro hac vice*)
    866 United Nations Plaza
8   New York, New York 10017
    Telephone: (212) 813-5900
9   Fax: (212) 813-5901

10  PERKINS LAW OFFICE, P.C.
    Patrick T. Perkins (Admitted *pro hac vice*)
11  1711 Route 9D
    Cold Spring, New York 10516
12  Telephone: (845) 265-2820
    Fax: (845) 265-2819

13

14  Attorneys for Defendants and Counterclaimant

15           UNITED STATES DISTRICT COURT
             CENTRAL DISTRICT OF CALIFORNIA
16

17  JOANNE SIEGEL and LAURA          Case Nos. [Consolidated for Discovery]:
    SIEGEL LARSON,                        CV 04-8400 SGL (RZx)
18           Plaintiffs,                   CV 04-8776 SGL (RZx)
                                      Hon. Steven G. Larson, U.S.D.J.
19       vs.                          Hon. Ralph Zarefsky, U.S.M.J.
    WARNER BROS. ENTERTAINMENT
20  INC.; TIME WARNER INC.; DC        **NOTICE OF MOTION AND JOINT**
    COMICS; and DOES 1-10,           **STIPULATION RE: DEFENDANTS'**
             Defendants.              **MOTION TO COMPEL**
21  _____       **PRODUCTION OF WHISTLE-**
    JOANNE SIEGEL and LAURA           **BLOWER DOCUMENTS**
22  SIEGEL LARSON,
             Plaintiffs,              **DISCOVERY MATTER**
23       vs.                          **LOCAL RULE 37**
    TIME WARNER INC.; WARNER
24  COMMUNICATIONS INC.; WARNER       Time: 10:00 a.m.
    BROS. ENTERTAINMENT INC.;         Date: April 16, 2007
25  WARNER BROS. TELEVISION           Courtroom: 540
    PRODUCTION INC.; DC COMICS;       Mag. Judge Ralph Zarefsky
26  and DOES 1-10,                    Discovery Cutoff: Nov. 17, 2006
             Defendants.
27  _____
    AND RELATED COUNTERCLAIMS
28

{F0029699.1}                                         **270**

EXHIBIT 23
Page 598

1    TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

2        PLEASE TAKE NOTICE THAT on April 16, 2007 or as soon thereafter as

3    the matter may be heard in the above-entitled action before the Honorable Ralph

4    Zarefsky, United States Magistrate Judge, United States District Court for the

5    Central District of California, Western Division, Roybal Federal Building, 225 East

6    Temple Street, Los Angeles, California, Courtroom 540, defendants Warner Bros.

7    Entertainment Inc., Time Warner Inc., Warner Communications Inc., Warner Bros.

8    Television Production Inc. and defendant and counterclaimant DC Comics

9    ("Defendants"), will and hereby do move the Court to rule on this jointly filed

10   stipulation pursuant to L.R. 37-3.  Defendants have met and conferred with counsel

11   for Plaintiffs Joanne Siegel and Laura Siegel Larson ("Plaintiffs" or the "Siegels")

12   in writing on October 13, 2006 and by telephone conference on October 26, 2006, in

13   accordance with Local Rule 37-1 of the Local Rules of the United States District

14   Court for the Central District of California ("L.R."), and the parties were unable to

15   resolve their discovery dispute regarding the failure to produce certain documents,

16   copies of which were sent to defendant Warner Bros., apparently by an unidentified

17   former employee of Plaintiffs' counsel, purporting to perform a "whistle-blower"

18   function relative to Plaintiffs' counsel's conduct in this litigation and other matters

19   (the "Whistle-blower Documents").  Some or all of the Whistle-blower Documents,

20   which were segregated by a member of defendant Warner Bros. Entertainment

21   Inc.'s legal department consistent with applicable law and which have not been used

22   or relied upon in the litigation by Defendants to date, are likely to lead to the

23   discovery of admissible evidence and should be produced by Plaintiffs and their

24   counsel.

25       By this motion, Defendants request that the Court: (1) order Plaintiffs and

26   their counsel to produce all of the non-privileged Whistle-blower Documents; and

27   (2) order Plaintiffs and their counsel to produce all of the Whistle-blower documents

28

[F0029699 1 ]                                    1                                    **271**

EXHIBIT 23

Page 599

1  they now claim are privileged but that have not been identified on any privilege log,

2  including but not limited to, the privilege logs Plaintiffs were ordered by this Court

3  to turn over no later than September 29, 2006.

4      This motion is made pursuant to Rules 26 and 37 of the Federal Rules of Civil

5  Procedure and L.R. 37.  Defendants contend that the discovery sought hereby is

6  likely to lead to the discovery of admissible evidence, and good cause therefore

7  exists for it.  Defendants have made good faith and reasonable attempts to resolve

8  this matter without Court intervention, pursuant to L.R. 37, through numerous phone

9  conferences and correspondence, and the parties conducted a conference of counsel

10  pursuant to L.R. 37-1 on October 26, 2006, without success.  (*See* Declaration of

11  Michael L. Bergman, filed herewith, ¶¶ 16-19 & Exs. O-Q).

12      This motion is based on this notice of motion; the Joint Stipulation Re: DC's

13  Motion to Compel Production of Whistle-blower Documents; the declarations

14  submitted by the parties; any supplemental memoranda that may be filed in

15  connection with the Joint Stipulation; the pleadings and papers on file in this action;

16  and on such oral argument and other matters as the Court may properly consider at

17  the time of the hearing of this motion.

18  DATED:  March 26, 2007      FROSS ZELNICK LEHRMAN & ZISSU, P.C.

19           PERKINS LAW OFFICE, P.C.

20           -and-

21           WEISSMANN WOLFF BERGMAN

22           COLEMAN GRODIN & EVALL LLP

23           By

24           Michael Bergman

25           Attorneys for Defendants and Counterclaimant

26

27

28

{F0029699.1}

2

272

EXHIBIT 23

Page 600

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. iv

I.    DEFENDANTS' AUTHORITIES ............................................................... iv

II.   PLAINTIFFS' AUTHORITIES ................................................................... iv

JOINT STIPULATION ...................................................................................... 1

I.    DEFENDANTS' INTRODUCTORY STATEMENT ................................... 1

II.   PLAINTIFFS' INTRODUCTORY STATEMENT .................................... 2

III.   DEFENDANTS' CONTENTIONS ............................................................ 3

A.   STATEMENT OF FACTS ......................................................................... 3

    1.    The Relevant Pleadings and Defenses in the Actions ........................... 3

    2.    Warner Bros.'s Receipt of the Whistle-blower Documents ................. 6

    3.    Defendants' Attempt s to Obtain from Plaintiffs and their Counsel the Whistle-blower Documents to Which they Are Entitled .................... 11

B.   THE DOCUMENT PRODUCTION REQUESTS

    DEFENDANTS ASK THE COURT TO ENFORCE ..................................... 13

    1.    The Request and Plaintiffs' Response ............................................. 13

    2.    The Subpoena and Plaintiffs' Response ........................................... 14

C.   PLAINTIFFS' OBLIGATION AND FAILURE TO SERVE

    REQUIRED AND COURT ORDERED PRIVILEGE LOGS ..................... 15

D.   THE PARTIES' MEET AND CONFER EFFORTS ................................. 16

E.   ARGUMENT ......................................................................................... 16

    1.    Plaintiffs Should be Compelled to Produce the Non-

        Privileged Whistle-blower Documents ............................................ 16

        a.    Plaintiffs' Objections are Without Merit ................................. 17

            1)    There Is No Ambiguity As To The Documents

                Responsive To The Request And To the Subpoena ....... 18

{F0029699.1}

i

2)      Plaintiffs And Their Counsel's Objections On The Basis Of Overbreadth, Burdensomeness, And Oppressiveness Are Without Merit .......................................................... 18

3)      The Circumstances Of The Whistle-blower Documents' Delivery Does Not Render The Documents Immune From Discovery ............................................................ 19

2.   Plaintiffs Should Be Compelled to Produce Any of the Whistle-blower Documents That Have Not Been Identified on Any Privilege Log ............................... 20

IV.   PLAINTIFFS' CONTENTIONS ........................................................... 22

A.    FACTUAL AND PROCEDURAL BACKGROUND ................................ 22

1.   Documents Stolen From The Office Of Plaintiffs' Counsel............ 24

2.   Document Production and Privilege Logs............................... 27

B.    ARGUMENT....................................................................... 27

1.   Plaintiffs Have Properly Responded To Defendants' Requests For Production, Produced Non-Privileged Responsive Documents In Their Possession And Listed Privileged Documents In A Privilege Log.................................................................... 27

2.   Defendants Improperly Seek To Gain An Advantage Through Their Illicit Receipt Of Documents Stolen From The Offices Of Plaintiffs' Counsel................................................................ 28

3.   The Stolen Documents Have Been Produced Or Listed In Extensive Privilege Logs ................................................... 30

4.   Defendants Have Brought This Motion For Unspecified Documents Based On Speculative Accusations But No Credible Evidence.................................................................. 31

5.   Defendants' Review, Retention And Handling Of The Stolen Documents Was Improper.................................................... 33

1F0029699 1 }

V.    DEFENDANTS' CONCLUSION.................................................................40

VI.    PLAINTIFFS' CONCLUSION.................................................................40

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

{F0029699 1 }

iii

**275**

EXHIBIT 23

**TABLE OF AUTHORITIES**

**I.      Defendants' Authorities**

*Aerojet-General Corp. v. Transport Indemnity Ins.,*
        18 Cal.App.4th 996 (1993) ................................................. 8, 19

*American Dental Ass'n v. Korrhami,*
        No. CV 02-03853 DT (RZx), 2003 WL 24141018
        (C.D. Cal. May 9, 2003) (Zarefsky, M.J.),
        *aff'd in part, rev'd in part on other grounds,*
        No. CV 02-3853 DT(CTx), 2003 WL 24141019
        (C.D. Cal. July 14, 2003) ........................................................ 11

*Burlington Northern & Santa Fe Railway Co. v. United States Dist. Ct.,*
        408 F.3d 1142 (9th Cir. 2005) ................................................ 20

*Clarke v. American Commerce Nat'l Bank,*
        974 F.2d 127, 129 (9th Cir. 1992) .......................................... 22

*Eureka Fin. Corp. v. Hartford Accident & Indem. Co.,*
        135 F.R.D. 179 (E.D. Cal. 1991) ............................................. 20

*Long v. Landvest Corp.,*
        No. Civ. A. 04-2025-CM-DL,
        2006 WL 897612 (D. Kan. Mar. 31, 2006) ............................. 18

*Rico v. Mitsubishi Motors Corp.,*
        116 Cal.App.4th 51 (2004) (*review granted* June 9, 2004) ...... 8, 19

*State Compensation Ins. Fund v. WPS, Inc. (State Fund),*
        70 Cal.App.4th 644 (1999) ................................................... 8, 19

*Waddell & Reed fin., Inc. v. Torchmark Corp.,*
        222 F.R.D. 450 (D. Kan. 2004) .............................................. 18

*Weil v. Investment Indicators Mgm't, Inc.,*
        647 F.2d 18 (9th Cir. 1981) .................................................. 20

Fed. R. Civ. P. 26 ................................................................. 16-17

Local Rule 37-1 ........................................................................ 16

**II.      Plaintiffs' Authorities**

**Federal Cases**

*Gomez v. Vernon,*
        255 F3d 1118 (9th Cir. 2001) ......................................... 33-34, 39

*In re Grand Jury Proceedings Involving Berkley & Co., Inc.,*
        466 F. Supp. 863 (D. Minn. 1979) ......................................... 36

*Kenyatta v. Kelly,*

375 F. Supp. 1175 (E.D. Pa. 1974)...............................................36

Mayman v. Martin Marietta Corp.,
    886 F. Supp. 1243 (D. Md. 1995)........................................35-36

Nardone v. United States,
    308 U.S. 338 (1939)........................................................35

Sackman v. Ligget Group, Inc.,
    173 F.R.D. 358 (E.D.N.Y. 1997)..........................................35

Shell Oil Refinery v. Shell Oil Co.,
    143 F.R.D. 105 (E.D.La. 1992)...........................................34

Smith v. Armour Pharmaceutical Co.,
    838 F. Supp. 1573 (S.D.Fla. 1993)......................................35-36

Spacone v. Burke (In re Truck-A-Way),
    300 B.R. 31 (E.D. Cal. 2003)............................................34

United States ex rel. Mayman v. Martin Marietta Corp.,
    886 F. Supp. 1243 (D. Md. 1995).........................................35

Upjohn Co. v. United States,
    449 U.S. 383 (1981).....................................................33

**State Cases**

Aerojet-General Corp. v. Transport Indemnity Ins.,
    18 Cal. App. 4th 996 (1993).............................................39-40

Cooke v. Superior Court,
    147 Cal. Rptr. 915 (1978)...............................................35

Rico v. Mitsubishi Motors Corp.,
    116 Cal. App. 4th 51 (2004).............................................34

State Compensation Ins. Fund. v. WPS, Inc.(State Fund),
    70 Cal. App. 4th 644 (1999).............................................35, 39

**Federal Statutes**

17 U.S.C. § 304(c)..........................................................22-23

**Rules**

37 C.F.R. § 201.10..........................................................22

1   Fed. R. Civ. Proc. 34.................................................................29

2   **<u>Miscellaneous</u>**

3   159 *American Law Reports Federal* 153...................................35

4
    3-24 *Bender Practice Guide: Fed. Pretrial Civ. Proc. in Cal.* § 24.40...........34
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[F0029699 1 ]

# JOINT STIPULATION

## I.    DEFENDANTS' INTRODUCTORY STATEMENT

After almost two years of litigation, and through a complete twist of fortune, Defendants discovered that Plaintiffs had secreted and improperly suppressed copies of a series of documents that were clearly requested and should have been produced or identified in discovery. Defendants neither know about nor sought out these documents. Rather they were sent to executives at defendant Warner Bros. Entertainment Inc. ("Warner Bros.") unsolicited and anonymously, by what appears to be a whistle-blower intent on exposing alleged misconduct engaged in by Plaintiffs' counsel. The documents are relevant to the subject matter of this litigation, but had neither been produced in response to any discovery request, nor identified on Plaintiff's court-ordered privilege logs.

The anonymously sent documents are a mix of privileged and non-privileged material. In accordance with procedures laid out under applicable case law they were initially reviewed for privilege by a legal representative of Warner Bros. Then, all copies of the documents were turned over to a neutral third party for preservation and identification, who thereafter provided a Bates numbered copy to Plaintiffs' counsel. Defendants have not maintained copies of any of the documents, nor have they used them in any manner in the case. Indeed, Defendants' counsel have never seen the documents.

Defendants thereafter served discovery on Plaintiffs and their counsel to compel production of the non-privileged material, and identification of the remainder, but Plaintiffs have refused to produce documents or provide a privilege log. Even though there is also no dispute concerning the relevance of the documents, Plaintiffs object to their identification and production *solely* on the ground that their existence (and improper withholding) was revealed to Defendants by a former employee of Plaintiffs' counsel without his approval. Plaintiffs have

[F0029699 1 ]

1

EXHIBIT 23

**279**

1  steadfastly refused to produce even the admittedly *non-privileged* materials

2  contained in the documents sent to Warner Bros.  And their refusal to provide a

3  privilege log contravenes this Court's Order of August 14, 2006, which required

4  Plaintiffs to "produce all privilege logs, including any revisions, by September 29,

5  2006."

6        Whatever the provenance of the documents at issue, there can be no dispute

7  that (i) Defendants had nothing to do with their anonymous whistle-blower who sent

8  them to Warner Bros., (ii) their identification and production were clearly required

9  under Defendants' document production requests, and (iii) under these

10  circumstances, there is no basis for their continuing to be withheld.  Thus, by this

11  motion Defendants move to compel Plaintiffs: (1) to produce all of the non-

12  privileged Whistle-blower Documents; and (2) to produce all of the Whistle-blower

13  documents they now claim are privileged but that were not included on any

14  privilege log.[1]

15  **II.**   **PLAINTIFFS' INTRODUCTORY STATEMENT**

16        After attempting without success to obtain privileged information in

17  redundant motions to compel, Defendants seek by this motion to benefit from the

18  wholesale theft and disclosure of legal files stolen from the law offices of Plaintiffs'

19  counsel.  Defendants' disingenuously refer to the documents as "Whistleblower

20  Documents" and purport to have engaged in a series of sanitizing protocols.  Yet, as

21  Defendants well know, the documents in question, which they admit are mostly

22  privileged, were *stolen* by a former attorney at the firm of Plaintiffs' counsel and

23  turned over to Defendants during this litigation in shocking violation of the

24  confidential attorney-client relationship and all ethical standards.

25

---

26    [1] Concurrent with the filing of this motion, Defendants are filing a separate
motion requesting additional discovery because, in part, Plaintiffs have waived the

27  attorney-client and work product privileges with respect to Defendants' affirmative
defense that the parties entered into a binding settlement agreement that would

28  dispose of all of Plaintiffs' claims.

1    Incredibly, Defendants call this theft and unethical disclosure – a "twist of
2  fortune." Without a shred of credible evidence, and based solely on speculation and
3  innuendo, they proceed to accuse Plaintiffs and their counsel of secreting documents
4  to prop up their distasteful attempt to gain an advantage from this theft in this
5  litigation.

6    Plaintiffs have properly responded to Defendants' requests for production;
7  produced the non-privileged responsive documents in their possession and listed the
8  privileged documents in a privilege log. Plaintiffs' counsel even double checked not
9  only Plaintiffs' files, but the files of subpoenaed third parties he represents, against
10  the stolen documents, and produced or listed in a privilege log the four unaccounted
11  for documents so located, even though they are largely irrelevant to these actions.

12    Plaintiffs will demonstrate herein that Defendants failed to abide by even the
13  mild standards applicable to *inadvertently* disclosed documents when receiving
14  privileged legal files clearly stolen from Plaintiffs. Instead of immediately
15  informing Plaintiffs of this outrageous theft and returning the documents to
16  Plaintiffs' counsel forthwith, Defendants in-house counsel took several days to sift
17  through the documents while devising a strategy to benefit from the theft.

18  **III.  DEFENDANTS' CONTENTIONS**

19  **A.    STATEMENT OF FACTS**

20    **1.    The Relevant Pleadings and Defenses in the Actions**

21    Jerome Siegel ("Siegel"), together with Joseph Shuster ("Shuster"), co-
22  authored the first comic book story featuring the original Superman character, which
23  was published in 1938 by Detective Comics, Inc. ("Detective"), the predecessor of
24  defendant DC Comics ("DC"). The 1976 Copyright Act enacted a right of authors
25  and their families to terminate previous grants of rights under copyright within a
26  specific statutory framework. Plaintiffs – Siegel's widow and daughter ("Plaintiffs"
27  or "the Siegels") – have instituted two actions seeking to recapture Siegel's
28

281

1    copyright rights with respect to the Superman character under the termination

2    provisions contained in Section 304(c) of the Act, 17 U.S.C. § 304(c).

3        The first action, Case No. CV 04-8400 PA (RZx) (the "Superman Action"), is

4    based on notices purporting to terminate a number of Siegel's copyright grants to

5    Detective dating back to 1937 (the "Superman Termination Notices"). The

6    Superman Termination Notices relate only to Siegel's – but not his co-author

7    Shuster's – 50% participation in these grants. Because the Superman works at issue

8    in the first action are joint works, and the Shuster grants of rights have not been

9    terminated, the Superman Action is principally an action for an accounting. It does

10   not attempt to prevent Defendants' continued exercise of rights in Superman works,

11   but instead seeks only a declaration of the effectiveness of the termination notices

12   and an accounting for the Siegel allocable share of the profits from exploitation of

13   rights in Superman works created following the purported effective date of the

14   termination.

15       The second action, Case No. CV 04-8776 PA (RZx) (the "Superboy Action"),

16   is based on a separate notice of termination under section 304(c) relating only to

17   Superboy (the "Superboy Termination Notice"), and purporting to terminate grants

18   allegedly made only by Siegel in the Superboy works. The Superboy Action seeks a

19   declaration that Plaintiffs have recaptured all rights in Superboy, and further alleges

20   that after the purported effective date of the Superboy Termination Notice,

21   Defendants' "ongoing exploitation of the 'Superboy' mythology," including the

22   production and distribution of the *Smallville* television series, infringes Plaintiffs'

23   copyright rights in certain identified Superboy works.

24       Defendants have, *inter alia*, denied the effectiveness of Plaintiffs' termination

25   notices. They also have denied Plaintiffs' claim for an accounting in the Superman

26   Action, as well as their claims of copyright infringement in the Superboy Action.

27   Additionally, defendant DC has filed counterclaims in both actions seeking

28

1    enforcement of a prior settlement agreement between the parties.  If DC's

2    counterclaims are successful, all of Plaintiffs' claims in both cases are moot.

3        DC's settlement claim is based in large part on a letter sent by Plaintiffs' prior

4    counsel on October 19, 2001, which unequivocally states that "the Siegel Family has

5    accepted D.C. Comics' offer of October 16, 2001," and which outlines all of the

6    material terms of the parties' agreement.  (*See, e.g.,* Exhibit A to the Declaration of

7    Michael L. Bergman submitted herewith ("Bergman Decl."), ¶¶ 47-56.)  In reply to

8    DC's counterclaims, Plaintiffs have denied that the parties reached any valid

9    settlement agreement.  (*See, e.g., id.* Exh. B, ¶¶ 47-56.)  Moreover, Plaintiffs have

10   asserted, as an affirmative defense, that their lawyers did not have authority, or

11   exceeded the scope of their authority, with respect to the settlement being asserted

12   by Defendants.  In particular, Plaintiffs have taken the position that their counsel did

13   not have prior authority to send the October 19, 2001 letter as it was written.  (*Id.* ¶

14   183.)

15       Additionally, Plaintiffs have argued that a draft of the long-form agreement

16   prepared by Defendants and submitted to Plaintiffs on February 1, 2002 added to

17   and materially changed the terms of the settlement they had accepted, and thus

18   justified their decision to not consummate their agreement with Defendants.  (*Id.* ¶

19   53.)  Indeed, on May 9, 2002, plaintiff Joanne Siegel − without the assistance or

20   participation of counsel − wrote letters to Time Warner's chief executives stating

21   that Defendants' draft long-form agreement had "stabbed us in the back" and "just

22   like the Gestapo" sought to "strip us naked of our legal rights."  (*Id.* Exh. A, ¶ 55.)

23   Plaintiffs' prior counsel, Kevin Marks of the Gang Tyre firm, has testified that on or

24   about August 8, 2002, he received a telephone call from Plaintiffs' current counsel,

25   Marc Toberoff (who at the time was not yet Plaintiffs' lawyer) in which Mr.

26   Toberoff with another person made an offer to buy Plaintiffs' termination rights at

27   issue in the settlement and in this case for $15 million plus a "meaningful back end"

28   royalty percentage.  (*Id.* Exh. C at 168-69.)  Mr. Marks transmitted this offer to

[F0029699.1]                                    5                                              **283**

EXHIBIT 23
Page 611

1 | Plaintiffs and it was not accepted. (*Id.* at 169-70.)  But six weeks later, in

2 | September of that year, Plaintiffs dismissed Mr. Marks as counsel, in a letter which

3 | they copied to DC's president. (*Id.* Exh. <u>A</u>, ¶ 56.)

4 | **2.  Warner Bros.'s Receipt of the Whistle-blower Documents**

5 | During the afternoon of June 28, 2006, Wayne Smith, Vice President, Senior

6 | Litigation and Chief Patent Counsel of defendant Warner Bros. ("Smith"), received

7 | a telephone call from John A. Schulman, General Counsel of Warner Bros., who

8 | asked that Smith come to his office. (Declaration of Wayne M. Smith submitted

9 | herewith ("Smith Decl."), ¶ 2.)  Upon arriving at his office, Mr. Schulman advised

10 | Smith that a set of documents (the "Whistle-blower Documents," referred to by

11 | Smith in his declaration as the "Superman Documents") addressed to him and

12 | apparently relating to the instant litigation had arrived from an anonymous source at

13 | his office that day. (*Id.* ¶ 2.)  Mr. Schulman informed Smith that the cover letter

14 | contained with the documents indicated that other executives at Warner Bros. may

15 | have received the same set of documents, and that he had called the offices of those

16 | executives to see if they had received anything. (*Id.* ¶ 2.)  He further advised Smith

17 | that he had asked those executives to send the documents to his office without

18 | reviewing them, and that one set of documents had already been delivered to him.

19 | (*Id.* ¶ 2.)  Mr. Schulman handed Smith the stack (approximately an inch high) of

20 | Whistle-blower Documents that he had received and asked Smith to wait outside his

21 | office while he completed a meeting, after which they would discuss them. (*Id.* ¶ 2.)

22 | The stack did not include any envelope or packaging in which the documents may

23 | have arrived. (*Id.* ¶ 2.)  This was not unusual as it has been Smith's experience that

24 | the practice of Mr. Schulman's office staff is to dispose of envelopes and packaging

25 | upon opening mail. (*Id.* ¶ 2.)

26 | While Smith was waiting, he looked at what might be characterized as the

27 | "cover letter" that came with the Whistle-blower Documents. (*Id.* ¶ 3.)  The cover

28 | letter, which was not signed, alleged various types of ethical misconduct on the part

1 of the Plaintiffs' counsel in connection with this case. (*Id.* ¶ 3.) The cover letter
2 also asserted ethical misconduct – violating the terms of a confidentiality agreement
3 by leaking settlement information to the press – in connection with another litigated
4 matter where Plaintiffs' counsel had also represented a party adverse to Warner
5 Bros. (*Id.* ¶ 3.) The letter appeared designed to right wrongs caused by Plaintiffs'
6 counsel's misconduct. (*Id.* ¶ 3.) The letter also referenced the documents enclosed,
7 providing an overview of their contents and their connection to Plaintiffs' counsel's
8 alleged wrongdoing. (*Id.* ¶ 3.)

9     Smith also thumbed through the Whistle-blower Documents contained with
10 the letter, but did not read any of them in detail. (*Id.* ¶ 3.) Meanwhile, an assistant
11 for another Warner Bros. executive delivered what appeared to be another set of
12 Whistle-blower Documents to Mr. Schulman's office. (*Id.* ¶ 3.) Smith did not
13 observe that any of the three sets of Whistle-blower Documents – (i) the set Mr.
14 Schulman handed to me; (ii) the other set in his office; or (iii) the set that was
15 delivered while Smith was waiting outside his office – was contained in an envelope
16 or other packaging. (*Id.* ¶ 3.)

17     Smith then met with Mr. Schulman. (*Id.* ¶ 4.) Smith told Mr. Schulman that
18 based on the contents of the cover letter and my brief thumbing through the
19 documents, it appeared that certain of the documents in the package were privileged.
20 (*Id.* ¶ 4.) Smith said that before he looked at the documents he wanted to review the
21 case law in the area to determine what level of review, if any, of the Whistle-blower
22 Documents was appropriate. (*Id.* ¶ 4.) Mr. Schulman agreed with this approach,
23 gave Smith one set of the documents, retained the other two sets that he had
24 received, and advised me that he had only looked at the cover letter that came with
25 the documents and would not review the documents at all. (*Id.* ¶ 4.)

26     Smith the returned to his office with the set of documents. (*Id.* ¶ 5.) He
27 initially went on the internet and performed a Google search relating to the issue of
28 what obligations, if any, governed the handling of the Whistle-blower Documents

1   Warner Bros. had received. (*Id.* ¶ 5.)  His initial search located an article from the

2   June 2006 Los Angeles Lawyer magazine entitled "On the Receiving End," by Kurt

3   L. Schmalz (*id.* Ex. <u>A</u>) which was posted on the Los Angeles County Bar

4   Association web site. (*Id.* ¶ 5.)  The article concerns the obligations of lawyers who

5   unwittingly receive privileged documents from opposing counsel's files and

6   discusses various California cases that have dealt with the issue, including the *Rico*

7   *v. Mitsubishi Motors Corporation* case pending before the California Supreme

8   Court. (*Id.* ¶ 5.)

9       Smith read the Schmalz article and then downloaded and studied the three

10  principal California cases it identifies:  *Aerojet-General Corporation v. Transport*

11  *Indemnity Insurance*, 18 Cal.App.4th 996 (1993), *State Compensation Insurance*

12  *Fund v. WPS, Inc. (State Fund)*, 70 Cal.App.4th 644 (1999) and the Court of Appeal

13  decision in the case under review, *Rico v. Mitsubishi Motors Corporation*, 116

14  Cal.App.4th 51 (2004) (*review granted* June 9, 2004). (*Id.* ¶ 6.)  Based on his

15  review of the relevant California authorities, it appeared that a conservative

16  approach to handling the Whistle-blower Documents was to follow the procedure

17  laid out by the Court in *State Fund*, specifically: (i) to review each document but to

18  cease the review once it became apparent that the document was privileged; (ii) to

19  contact opposing counsel and advise that the documents have been received; and

20  (iii) to refrain from using any information in the documents until there was either an

21  agreement with opposing counsel, or the court had determined the documents'

22  disposition. (*Id.* ¶ 6.)

23      Following his review of the law, Smith called Mr. Schulman and advised him

24  of the results of his research. (*Id.* ¶ 7.)  Smith said that he intended to review the

25  Whistle-blower Documents in accordance with *State Fund.* (*Id.* ¶ 7.)  At Mr.

26  Schulman's request, he also sent copies of the three key cases and the article to Mr.

27  Schulman's office. (*Id.* ¶ 7.)

28      That evening, Smith took the Whistle-blower Documents home and spent

1    approximately a half hour reviewing them. (*Id.* ¶ 8.) Certain of the documents –
2    such as executed agreements relating to Superman and correspondence between the
3    Plaintiffs and non-lawyer third parties – did not appear subject to any applicable
4    privilege. (*Id.* ¶ 8.) As he was going through the documents, Smith placed them
5    into three piles: (i) "non-privileged," (ii) "privileged," and (iii) "?" (where either he
6    could not tell whether it was privileged or he believed the document covered subject
7    matter where privilege may have been waived in the case, as explained below). (*Id.*
8    ¶ 8.) In reviewing each document, where it first appeared to Smith that it was
9    entirely privileged, he ceased reading it, placed the document in the "privileged"
10   pile and did not look at it further. (*Id.* ¶ 8.) After going through the documents,
11   Smith placed a post-it note on the top of each pile (indicating "privileged," "non-
12   privileged," or "?"), and fastened each pile together. (*Id.* ¶ 8.) Smith did not look at
13   the documents further. Because he did not conduct a detailed review of the Whistle-
14   blower Documents, and because of the passage of time, Smith does not recall their
15   specific contents. (*Id.* ¶ 8.) He does, however, recall generally the subject matter of
16   certain of the documents. (*Id.* ¶ 8.)

17       The non-privileged pile was the second largest of the three. (*Id.* ¶ 9.) It
18   contained what appeared to be agreements between, *inter alia*, the Siegels and/or
19   Shusters and various entities, as well as correspondence concerning the interest in
20   Superman that might be owned by Plaintiff Laura Siegel's estranged step-brother,
21   Michael Siegel. (*Id.* ¶ 9.) To Smith's knowledge, this last category of documents
22   has never been produced in the litigation. (*Id.* ¶ 9.)

23       The "?" pile was the smallest. (*Id.* ¶ 10.) Smith believes that one or two of
24   the documents in this category potentially fall within the scope of a privilege waiver
25   based Plaintiffs' reliance on an affirmative defense that their predecessor counsel
26   did not have authority to accept a settlement proposal made by Defendants.
27   Defendants position on this privilege waiver is the subject of a separate Motion to
28   Compel filed concurrently herewith. (*Id.* ¶ 10.)

**287**

1    The pile of documents labeled "privileged" was the largest. (*Id.* ¶ 11.)

2    Even from the brief review made, it appeared to Smith that, with the

3    exception of the cover letter (which also addressed the other litigation involving

4    Plaintiffs' counsel), all of the Whistle-blower Documents related to the subject

5    matter of the instant litigation and were responsive to document requests the

6    Defendants had previously served on Plaintiffs. (*Id.* ¶ 12.) However, it did not

7    appear to Smith at the time that any of the "non-privileged" documents had been

8    produced in the litigation. (*Id.* ¶ 12.) Moreover, at least some (and perhaps

9    virtually all) of the privileged documents, as well as those in the "?" pile, were, to

10   the best of Smith's knowledge, never identified in any privilege log served by the

11   Plaintiffs. (*Id.* ¶ 12.)

12   The next morning, June 29, 2006, Smith returned with the Whistle-blower

13   Documents to see Mr. Schulman in his office. (*Id.* ¶ 13.) Mr. Schulman and Smith

14   discussed having a neutral third party hold the documents pending either the parties'

15   agreement as to their disposition or order of the Court. (*Id.* ¶ 13.) They decided to

16   ask John Quinn, then with Arnold & Porter, and former president of the Los Angeles

17   County Bar Association, to act as the neutral based on his reputation and legal ethics

18   experience. (*Id.* ¶ 13.) He agreed and the following morning, June 30, 2006, the

19   three sets of the Whistle-blower Documents, including the set that Smith had

20   categorized, were handed over to Mr. Quinn. (*Id.* ¶ 13.) Out of an abundance of

21   caution Warner Bros. handed over *all* the documents to Mr. Quinn, not just those

22   that were clearly or potentially privileged. (*Id.* ¶ 13.) Further, Warner Bros. has not

23   shared the contents of the Whistle-blower Documents with any of the outside

24   counsel representing the Defendants in this action, nor has it used the contents of the

25   documents in the litigation. (*Id.* ¶ 13.)

26

27

28

{F0029699.1}

**288**

EXHIBIT 23
Page 616

3.     **Defendants' Attempts to Obtain from Plaintiffs and their Counsel the Whistle-blower Documents to Which they Are Entitled.**

On July 5, 2006, Quinn wrote to Plaintiffs' counsel and to Defendants' outside counsel to inform them of Warner Bros.'s receipt of the Whistle-blower Documents and what Warner Bros. had done with them.  (Bergman Decl. Ex. D.) The letter further suggested the following procedure for proper review and handling of the Whistle-blower Documents; (1) the Documents would be Bates stamped by an independent court reporter, a court appointed individual, or independent copy service under supervision; (2) counsel for Plaintiffs and Defendants would contact the Court to advise it of the existence of the Documents and the circumstances of their receipt; (3) if the Court agreed, the Documents would be deposited with the Court, otherwise, they would remain in Quinn's possession; and (4) the Documents would be reviewed by the Court or other individual agreed upon to determine whether any of the documents are protected by any claim of privilege or work product.  Non-privileged documents would then be released to Defendants' litigation counsel.  (*Id.*)

On July 11, 2006 Quinn and Plaintiffs' counsel had a conversation to discuss the Whistle-blower Documents.  (*Id.* Ex. E.)  According to Quinn, during that conversation, Plaintiffs' counsel agreed to the protocol set forth in Quinn's letter of July 5, 2006 and further agreed to send written confirmation of such.  (*Id.*)  On July 13, 2006, having heard nothing from Plaintiffs' counsel, including in response to subsequent calls, Quinn wrote to Plaintiffs' counsel confirming agreement to the protocol outlined in the July 5, 2006 letter and informing Plaintiffs' counsel that Quinn would: (1) have all sets of the Whistle-blower Documents Bates stamped by a paralegal from Quinn's office and have copy sets made; (2) personally retain a copy of the Bates stamped Documents; and (3) send a set of the Bates stamped Whistle-blower Documents to Plaintiffs' counsel.  (*Id.*)

289

{F0029699 1 }

11

EXHIBIT 23
Page 617

1    Plaintiffs' counsel did not respond to the July 13, 2006 letter.  On July 18,

2  2006, Quinn wrote another letter to Plaintiffs' Counsel and enclosed a Bates

3  stamped set of the Whistle-blower Documents.  (*Id.* Ex. F)  In the letter Quinn also

4  stated that he assumed that the next step in the process would be for Plaintiffs'

5  Counsel to prepare and serve a privilege log on Defendants' counsel.  (*Id.*)

6    On July 19, 2006, Plaintiffs' counsel wrote in response to Quinn's July 13 and

7  July 18 letters.  (*Id.* Ex. G.)  In his letter, Plaintiffs' counsel took issue with Quinn's

8  view that Plaintiffs' counsel had agreed to the protocol set forth in Quinn's letter of

9  July 5, 2006.  (*Id.*)  Rather, Plaintiffs' counsel asserted that during the July 11

10  telephone conference he had suggested a different protocol, namely, that: "(1) an

11  independent shop copy and bate stamp the documents and provide [Quinn] with

12  only the total bate stamp number range; (2) all such documents including Warner

13  Bros.' 'originals' then be returned to [Plaintiffs' counsel's] office and (3) Plaintiffs'

14  counsel review the documents and provide Warner Bros. with a privilege log as

15  appropriate." (*Id.*)

16    Plaintiffs' counsel further alleged that the Whistle-blower Documents were

17  stolen legal files from his office that were "in large part, clear attorney-client

18  communications." (*Id.*)  Plaintiffs' counsel went on to allege that Smith, Warner

19  Bros.'s in-house counsel, should not have reviewed the Whistle-blower Documents

20  in any manner.  (*Id.*)  Finally, Plaintiffs' counsel requested that he be furnished with:

21  "(1) the date(s) each set of documents was received; (2) copies of all envelopes or

22  packages enclosing the documents; (3) the method by which the documents were

23  sent and, in the unlikely event the documents were delivered by hand, the name of

24  the messenger (and messenger service) logged at Warner Bros' security gate and (4)

25  any other pertinent information regarding Warner Bros' receipt of these

26  documents." (*Id.*)  Plaintiffs' counsel further requested to review the original

27  documents and that all copies of the Whistle-blower Documents be returned to him.

28  (*Id.*)

**290**

1      On July 24, 2006, Quinn wrote back to Plaintiffs' counsel, expressing regret

2  over the disagreement about the telephone conversation between them on July 11,

3  2006 but pointing out that the only area of disagreement that remained between

4  them was over the fact that Quinn had retained a copy of the Whistle-blower

5  Documents. (*Id.* Ex. H.)  Quinn reiterated that no one had read the documents and

6  that the only reason he had suggested that a copy be retained by him or by the Court

7  was so that no claim could be made that the documents were incomplete. (*Id.*)

8  Quinn further urged Plaintiffs' counsel to get the Court involved in a resolution of

9  the matter. (*Id.*)

10      On July 24, 2006, Defendants' counsel in these actions wrote to Plaintiffs'

11  counsel and requested that Plaintiffs (1) provide Defendants with copies of each of

12  the Documents as to which Plaintiffs were not asserting any attorney/client or work

13  product privilege and (2) provide Defendants with a detailed privilege log. (*Id.* Ex.

14  I.)  Plaintiffs' counsel did not comply with the requests. (*Id.* ¶ 10.)  As a result, on

15  August 7, 2006, Defendants served Defendants'/Counterclaimant's Third Set Of

16  Requests For The Production Of Documents And Things (the "Request") (*Id.* Ex. J)

17  and on August 10, 2006 Defendants served a subpoena *duces tecum* on Plaintiffs'

18  counsel (the "Subpoena") (*Id.* Ex. K).  .The Request consisted of one document

19  request and the subpoena was identical in scope. (*Id.* Exs. J, K.)  Defendants'

20  instant motion requests the Court to order production in compliance with these two

21  discovery devices, both of which are set forth below along with the objections

22  asserted by Plaintiffs and counsel.

23  **B.**    **THE DOCUMENT PRODUCTION REQUESTS DEFENDANTS ASK THE COURT TO ENFORCE**

24

25      **1.**    **The Request and Plaintiffs' Response**

    **Request No. 66**

26      All Writings referenced in the July 5, 2006 letter from

27  John J. Quinn, Esq. to, among others, Marc Toberoff, Esq. (a copy of which is attached hereto as Exhibit A), and which

28  were attached to or enclosed with the July 18, 2006 letter from

[F0029699.1]

1    John J. Quinn, Esq. to Marc Toberoff, Esq. (a copy of which is
     attached hereto as Exhibit B).

2

3    (*Id.* Ex. J at 3.)

     On September 6, 2006, Plaintiffs served their written objection to the Request

4    (the "Request Objection"), which asserted boilerplate general objections and, in

5    response to the specific document request read:

6            **Response to Request No. 66**

7            Plaintiffs object to this Request on the grounds that it is

8    vague and ambiguous as to the phrase "all Writings
     referenced." Plaintiffs further object to this Request on the

9    grounds that it is overbroad, burdensome and oppressive.
     Plaintiffs further object to this Request because it seeks

10   documents or communications clearly protected by the
     attorney/client privilege and the attorney work product

11   doctrine. Plaintiffs further object to this Request on the
     ground that Defendants are seeking to impermissibly gain an

12   advantage in this litigation from their illicit receipt of clearly
     confidential and privileged documents clearly *stolen* from the

13   files of Plaintiffs' counsel's law offices. In an effort to
     capitalize on this theft, Defendants improperly reviewed these

14   *stolen files* well before notifying Plaintiffs' counsel of the theft
     or returning the *stolen files* to Plaintiffs' counsel. Defendants

15   also improperly retained a copy of the *stolen files*. But for
     Defendants' receipt of these *stolen files*, Defendants would not

16   have issued this Request.

17   (*Id.* Ex. L at 5.)

18   **2.    The Subpoena and Plaintiffs' Response**

19   The Subpoena to Plaintiffs' counsel contained the identical request as that set

20   forth in Document Request 66 served on Plaintiffs:

21           All Writings referenced in the July 5, 2006 letter from John
             J. Quinn, Esq. to, among others, Marc Toberoff, Esq. (a copy of

22   which is attached hereto as Exhibit A), and which were attached to
     or enclosed with the July 18, 2006 letter from John J. Quinn, Esq.

23   to Marc Toberoff, Esq. (a copy of which is attached hereto as
     Exhibit B).

24

25   (*Id.* Ex. K.)

     On August 23, 2006, Plaintiffs' counsel served a written objection (the

26   "Subpoena Objection" to the Subpoena. The Subpoena Objection was virtually

27

28

1  identical to the Request Objection, with the same boilerplate general objections and

2  then the following specific response to the Request:

3         Toberoff objects to this Subpoena on the grounds that it is
       vague and ambiguous as to the phrase "all writings referenced."

4       Toberoff further objects to this Subpoena on the grounds that it is
       overbroad, burdensome and oppressive. Toberoff further objects

5       to this Subpoena because it seeks documents or communications
       clearly protected by the attorney/client privilege and the attorney

6       work product doctrine. Toberoff further objects on the ground
       that Defendants are seeking to impermissibly capitalize on their

7       receipt of clearly confidential and privileged documents stolen
       from Toberoff's law offices, which Defendants improperly

8       reviewed before notifying Toberoff of the issue. But for the
       receipt of the stolen documents, Defendants would not have issued

9       this subpoena.

10  (*Id*. Ex. <u>M</u>.)

11  **C.    PLAINTIFFS' OBLIGATION AND FAILURE TO SERVE
        REQUIRED AND COURT ORDERED PRIVILEGE LOGS**

12
        While the parties attempted to work out their dispute with respect to the

13
   Whistle-blower documents, this Court issued an August 14, 2006 order on a motion

14
   by Defendants to compel Plaintiff to produce documents not identified on a

15
   privilege log. (*Id*. Ex. <u>N</u>.) In that Order, the Court held that "Plaintiff shall produce

16
   all privilege logs, including any revisions, by September 29, 2006." (*Id*.)

17
   Pursuant to the Court's Order of August 14, 2006, on September 29, 2006, Plaintiffs

18
   produced a 46-page privilege log. (*Id*. Ex. <u>P</u>) However, to the best of Defendants'

19
   knowledge, the vast bulk of the Whistle-blower Documents are not identified on the

20
   privilege log. (Smith Decl. ¶ 12).

21
        On September 28, 2006, the day before the Court-ordered deadline to produce

22
   "all privilege logs," Defendants' counsel wrote a letter to Plaintiffs' counsel

23
   pointing out that, notwithstanding Plaintiffs' counsel's invocation of the attorney-

24
   client and work product privileges in the Subpoena Objection, he had failed to

25
   produce a privilege log. (Bergman Decl. Ex. <u>Q</u>.) The September 28 letter requested

26
   that Plaintiffs' counsel produce a privilege log. (*Id*.) To date, Plaintiffs' counsel

27
   has failed to do so. (*Id*. ¶ 16.)

28

[F0029699 l ]                                    15                           **293**

EXHIBIT 23

Page 621

**D.    THE PARTIES' MEET AND CONFER EFFORTS**

Pursuant to Local Rule 37-1, on October 13, 2006, Defendants' counsel sent Plaintiffs' counsel a letter setting forth their position on the issues presented in this motion and outlining the relief sought in an attempt to avoid the need for Court intervention. (Bergman Decl. Exh. Q)  Counsel subsequently conducted a conference by telephone on October 26, 2006 in which Plaintiffs' counsel steadfastly refused to produce any of the non-privileged Whistle-blower Documents and further refused to produce a privilege log.  Plaintiffs' counsel's justification for this position was that the documents were stolen.  (*Id.* ¶ 19).  Plaintiffs' counsel has not swayed from his mantra that since the Whistle-blower documents were "stolen" from his office, neither he nor Plaintiffs have any obligation to produce them or identify them on a privilege log, even to the extent that the documents are neither privileged nor previously produced, notwithstanding their responsiveness to outstanding requests.  (*Id.* ¶ 19).  Thus, the parties have not been able to resolve the dispute.  (*Id.* ¶ 19.)

**E.    ARGUMENT**

   **1.    Plaintiffs Should be Compelled to Produce the
            Non-Privileged Whistle-blower Documents**

There is no serious dispute here that all of the Whistle-blower Documents sought by the Request and by the Subpoena are within the scope of discovery as set forth by Rule 26 of the Federal Rules of Civil Procedure, which sets a broad standard for what is discoverable:

> Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

[F0029699.1]

**294**

EXHIBIT 23 16

1  Fed. R. Civ. P. 26(b)(1).  Although Rule 26(b)(2) sets forth limitations on discovery

2  that may be ordered following motion practice, Plaintiffs have sought no protective

3  order or other relief with regard to the discoverability of the testimony at issue.

4  Moreover, although Plaintiffs and their counsel make passing reference to relevance

5  in boilerplate objections, neither the specific Request Objection nor the specific

6  Subpoena Objection asserts any relevance objection.  (Bergman Decl.; Exs. L, M.)

7  Any such objection would be frivolous as the documents at issue are unquestionably

8  related to these litigations are thus "likely to lead to the discovery of admissible

9  evidence." (Smith Decl. ¶¶ 2, 8-12.)

10       Nor is there any dispute that some of the Whistle-blower Documents

11  unquestionably are not protected by any privilege.  (*Id.* ¶¶ 8-9.)  Indeed, Plaintiffs'

12  counsel conceded this in his letter of July 19, 2006, stating only that the Whistle-

13  blower Documents were in "*large part*, clear attorney-client communications."

14  (Bergman Decl. Ex. G (emphasis added).)  Notably, he did not say that "all" of the

15  documents were privileged.  Moreover, during the meet and confer he did not take

16  the position that all of the Whistle-blower Documents were privileged.  (*Id.* ¶ 19.)

17              a.    **Plaintiffs' Objections are Without Merit**

18       Plaintiffs' and their counsel's asserted objections as to non-privileged

19  documents are without merit.  They are: (1) the Subpoena and the Request are

20  "vague and ambiguous" as they relate to the phrase "all writings referenced;" (2) the

21  Subpoena and the Request are "overbroad, burdensome and oppressive;" and (3)

22  Defendants are seeking to "gain an advantage in this litigation from [Defendants']

23  illicit receipt of clearly confidential and privileged documents clearly *stolen* from

24  the files of Plaintiffs' counsel's law offices."  Plaintiffs and their counsel go on to

25  argue that "but for" Defendants' receipt of the Whistle-blower Documents,

26  Defendants would never have issued either the Request or the Subpoena.  (Bergman

27  Decl. Exs. L, M.)

28       Each of these objections if entirely without merit.

[F0029699.1 ]

17

**295**

EXHIBIT 23
Page 623

1

### 1)    There Is No Ambiguity As To The Documents Responsive To The Request And To the Subpoena.

The Request and the Subpoena seek production of "all writings" that are: (1) referenced in the July 5, 2006 from Quinn to Plaintiffs' counsel and (2) copies of which were attached to or enclosed with the July 18, 2006 letter from Quinn to Plaintiffs' counsel. (Bergman Decl. Exs. <u>J</u>, <u>K</u>.)  In other words, Defendants seek production of the Whistle-blower Documents.  Plaintiffs cannot seriously contend that they do not understand what documents Defendants seek through the Request and the Subpoena.

### 2)    Plaintiffs And Their Counsel's Objections On The Basis Of Overbreadth, Burdensomeness, And Oppressiveness Are Without Merit.

"[P]arties asserting undue burden . . . have the burden to support their objection, by showing not only undue burden or expense, but that the burden or expense is unreasonable in light of the benefits to be secured from the discovery. This typically requires providing an affidavit or other evidentiary proof of the expense or time involved in responding to the discovery request." *Long v. Landvest Corp.*, No. Civ. A. 04-2025-CM-DJ, 2006 WL 897612, *5 (D. Kan. Mar. 31, 2006).[2]

Here, production of the requested documents – the Whistle-blower Documents – would cause no burden to Plaintiffs or their counsel, let alone an unreasonable burden in light of the benefits to be secured from the discovery.  The Whistle-blower documents are not voluminous and have all been already collected, copied, and numbered.  (Smith Decl. ¶¶ 8-13; Bergman Decl. Exs. <u>E</u>, <u>F</u>, <u>H</u>, <u>I</u>.) Literally, all that would need to happen is for the Court to order Mr. Quinn to turn over the Whistle-blower Documents to Defendants.  No burden or oppression exists to Plaintiffs or anyone else in producing the responsive documents.

_____

[2] *See also, Waddell & Reed fin., Inc. v. Torchmark Corp.*, 222 F.R.D. 450, 454 (D. Kan. 2004).

{F0029699.1}

18

296

EXHIBIT 23
Page 624

3)    **The Circumstances Of The Whistle-blower Documents' Delivery Does Not Render The Documents Immune From Discovery.**

The only substance of Plaintiffs' and their counsel's final non-privilege objection to producing the Whistle-blower Documents is that, because the Documents were allegedly "stolen" from Plaintiffs' counsel's office, the documents should be immune to discovery. As Plaintiffs and their counsel see it, "but for" this allegedly illicit taking of Documents by an unidentified former employee of Plaintiffs' counsel, Defendants would never have known about the existence of the Whistle-blower Documents and thus never would have served the Request and the Subpoena. This perverse reasoning is unsupported by the law.

While it is unfortunate that an apparent former employee of Plaintiffs' counsel felt the need to "blow the whistle" on his or her former employer by disclosing documents that, up to that point, had been hidden and not disclosed by Plaintiffs' counsel, this has no effect on whether the Whistle-blower Documents are discoverable. Indeed, none of the leading cases in California that discuss documents produced due to the inadvertence of counsel, *ever* hold or even suggest that such documents are *per se* not discoverable due to the circumstances of their production. *Aerojet-General Corp. v. Transport Indem. Ins.*, 18 Cal.App.4th 996 (1993), *State Comp. Ins. Fund v. WPS, Inc.*, 70 Cal.App.4th 644 (1999), and *Rico v. Mitsubishi Motors Corp.*, 116 Cal.App.4th 51 (2004) (*review granted* June 9, 2004).

In fact, the case law holds quite the opposite. "If the underlying information which respondents sought to prevent plaintiffs from using is not privileged, and if such information was revealed to plaintiffs' counsel through no fault or misconduct of his own, plaintiffs and their counsel were entitled to use it." *Aerojet*, 18 Cal.App.4th at 1005. That is the case here with respect to the non-privileged Whistle-blower Documents – the documents are not privileged and, notwithstanding Plaintiffs' baseless assertion of "illicit receipt," they were revealed to Warner Bros. through no fault or misconduct of its own. The documents literally appeared at

1  Warner Bros.'s doorstep, and were forwarded to in-house counsel immediately upon

2  receipt. (Smith Decl. ¶¶ 2-3). The materials were handled in accordance with

3  California law and no outside counsel for Defendants have ever seen the documents.

4  (*Id.* ¶¶ 4-13).

5         Moreover, as troubling as the apparent theft of documents from Plaintiffs'

6  counsel's office, is the fact that the Whistle-blower Documents were clearly

7  responsive to previously served document requests and that they were neither

8  produced nor identified on a privilege log. (*Id.* ¶ 8-12.) Now that these clearly

9  relevant and responsive documents have come to light, through no fault of

10 Defendants, to permit Plaintiffs to continue to withhold the documents would be a

11 perverse result. Plaintiffs would thereby be empowered to shield from discovery

12 clearly discoverable documents that have been heretofore improperly withheld,

13 whose existence has been secreted, and which were never identified in a requested

14 and court ordered privilege log. In sum, the circumstances of the Whistle-blower

15 Documents coming to Defendants' attention cannot be a bar to their production.

16        **2.    Plaintiffs Should Be Compelled to Produce
                  Any of the Whistle-blower Documents That**
17                <u>**Have Not Been Identified on Any Privilege Log**</u>

18        "As with all evidentiary privileges, the burden of proving that the attorney-

19 client privilege applies rests not with the party contesting the privilege, but with the

20 party asserting it." *Weil v. Investment Indicators Mgm't, Inc.*, 647 F.2d 18, 25 (9th

21 Cir. 1981). As the Ninth Circuit has held, a privilege log is an absolute requirement

22 for the proper assertion of a privilege, including the attorney-client privilege and

23 work product doctrine; mere boilerplate objections or blanket refusals incorporated

24 into discovery responses are insufficient to assert a privilege. *Burlington Northern*

25 *& Santa Fe Railway Co. v. United States Dist. Ct.*, 408 F.3d 1142, 1149 (9th Cir.

26 2005). *See also Eureka Fin. Corp. v. Hartford Accident & Indem. Co.*, 135 F.R.D.

27 179, 184-85 (E.D. Cal. 1991) (failure to "comply with a well settled requirement of

28

1    specifically identifying the evidence to which a privilege applies" constitutes a

2    waiver of the attorney-client privilege).

3        Plaintiffs and their counsel have stubbornly refused to produce a privilege log

4    of the Whistle-blower documents, not withstanding several requests both in writing

5    and on the telephone. (Bergman Decl. ¶¶ 16-19 & Exs. O-Q.) Making matters

6    worse in this instance is the fact that Plaintiffs are repeat offenders – they have

7    already been found on at least one occasion to have failed to fulfill their obligation

8    to produce a privilege log. As a result, this Court ordered Plaintiffs on August 14,

9    2007 to produce "all privilege logs, including any revisions, by September 29,

10   2006." (*Id.* Ex. N.) Notwithstanding the obligation imposed by this standing order

11   of the Court, Plaintiffs have continued to refuse to produce a privilege log for the

12   Whistle-blower Documents. What's more, to the best of Warner Bros.'s in-house

13   counsel's memory, the vast majority of potentially privileged documents in the stack

14   of Whistle-blower Documents are not identified on any of Plaintiffs' privilege log.

15   (Smith Decl. ¶ 12.) Moreover, neither in response to correspondence or in

16   connection with the meet and confer process on this motion have Plaintiffs or their

17   counsel ever pointed to any entry in the existing privilege log that identifies any of

18   the Whistle-blower Documents. (*Id.* ¶ 12; Bergman Decl. ¶ 16-19 & Exs. O-Q.)

19       At this point, because Plaintiffs and their counsel have purposely refused to

20   fulfill their obligation to provide a privilege log for the Whistle-blower Documents,

21   and because they have violated this Court's Order of August 14, 2006, they should

22   be deemed to have waived the privilege with respect to the Whistle-blower

23   Documents and should be ordered to produce such documents.[3]

24

25   _____

     [3] If the Court is unwilling to order a blanket waiver of privilege as a result of
     Plaintiffs' failure to list the documents at issue on a privilege log and resulting

26   violation of its August 14, 2006 order, Defendants respectfully request that the
     Court conduct an in camera review of the remaining documents to determine which,

27   if any, may be privileged. This task cannot be performed by Defendants' counsel in
     view of the measures taken by Defendants to prevent disclosure without prior

28   approval of the Court.

{F0029699.1}

**299**

EXHIBIT 23
Page 627

IV.    **PLAINTIFFS' CONTENTIONS**

A.    **FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiffs' Terminations regarding "Superman" and "Superboy" complied with all the requirements of 17 U.S.C. § 304(c) and 37 C.F.R. § 201.10, the regulations promulgated by the Register of Copyrights. Shortly after receiving the "Superman" Termination notices, the general counsel of Defendant Warner Bros. Entertainment Inc. ("Warner") and the President of Defendant DC, a wholly owned Warner subsidiary, each acknowledged the validity of the "Superman" Termination, and the parties began negotiations for Defendants' to license or purchase Plaintiffs' recaptured copyrights. (*See* Plaintiffs' First Amended Supplemental Complaint ("FASC"), ¶¶ 46-48). When these negotiations broke down due to Defendants' excessive demands, Defendants reversed their prior admissions two years earlier, and contested Plaintiffs' "Superman" Termination on April 15, 1999, one day before it became effective.

---

As established in the Smith Declaration, the scope of review is quite narrow as it would encompass a review of an estimated 85-150 pages of possibly privileged documents. Moreover, because of Plaintiffs' purposeful failure to disclose the existence of these discoverable Whistle-blower Documents on a privilege log, the integrity of this case risks being compromised. This fact, combined with the fact that, at least with respect to the Documents in the "?" pile segregated by Smith, by separate motion brought concurrently, the enforcement of a settlement agreement is an issue as to whether Plaintiffs have waived the privilege as to a subject matter pertaining to one of Defendants' main defenses in the cases, makes in camera review of the Whistle-blower Documents crucial to the ends of justice. If, after in camera inspection of the Whistle-blower Documents Plaintiffs claim are privileged, the Court finds that there are documents therein that are either not privileged or where such privilege has been waived, Defendants respectfully submit that Plaintiffs and their counsel should be ordered to produce such documents.

Such a narrow review is supported by the law of this Circuit. "A district court may conduct an in camera inspection of alleged confidential communications to determine whether the attorney-client privilege applies." *Clarke v. American Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992). While Defendants are mindful that in camera review of documents is generally disfavored, it is permitted where the party seeking such review has submitted "detailed affidavits and other evidence narrowing the scope of the review to the extent reasonably possible." *American Dental Ass'n v. Korrhami*, No. CV 02-03853 DT (RZx), 2003 WL 24141018, *21 (C.D. Cal. May 9, 2003) (Zarefsky, M.J.), *aff'd in part, rev'd in part on other grounds*, No. CV 02-3853 DT(CTx), 2003 WL 24141019, (C.D. Cal. July 14, 2003).

1    Defendants thereafter also claimed that the "Superboy" Termination was
2    somehow invalid.  On October 8, 2004, Plaintiffs filed their action for declaratory
3    relief and an accounting regarding the "Superman" Termination; and on October 22,
4    2004 filed their action for declaratory relief and copyright infringement regarding
5    the "Superboy" Termination.  The two actions were consolidated for purposes of
6    discovery only.

7    Plaintiffs moved for partial summary adjudication on February 15, 2006 to
8    establish that Plaintiffs had successfully recaptured and own Siegel's "Superboy"
9    copyrights pursuant to 17 U.S.C. §304(c).  Defendants cross-moved for summary
10   judgment claiming the "Superboy" Termination was invalid based largely on the
11   same purported claims and defenses they asserted with respect to "Superman."  On
12   March 23, 2006, the Court *granted* Plaintiffs' motion in its entirety and *denied*
13   Defendants' motion in its entirety.  Defendants' subsequently moved to have this
14   order certified for appeal, which motion was also *denied* by the Court.

15   Following the Court's ruling against them, Defendants, under the aegis of
16   discovery, embarked on a very aggressive campaign marked by a series of
17   exaggerated assaults on Plaintiffs' *attorney-client privilege and work product*, and
18   by numerous unwarranted motions to compel.  This motion is but one of a series of
19   Defendants' overreaching motions. Defendants filed a motion to compel regarding
20   the communications between Plaintiffs and their former counsel regarding the
21   termination of their services by Plaintiffs in September, 2002.  This motion was
22   denied by the Court on August 18, 2006.  *See* Declaration of Marc Toberoff in
23   Opposition to Defendants Motion to Compel Whistle-Blower Documents ("Toberoff
24   Decl.") Ex. A.  Defendants moved to have this order reconsidered; this too was
25   denied by the Court on September 25, 2006.  Toberoff Decl., Ex. B. Defendants then
26   sought to retake Laura Siegel Larson and Joanne Siegel's depositions on the ground
27   they had been hindered in the deposition by Plaintiffs' counsel's assertion of
28   privilege regarding communications concerning the purported October, 2001

{F0029699.1 }

23

**301**

EXHIBIT 23

Page 629

1   settlement agreement.  The Court denied this motion on November 7, 2006.

2   Toberoff Decl., Ex. C.

3        Undeterred, Defendants now seek to exploit to their advantage *legal files*

4   *stolen from Plaintiffs' counsel.*

5        1.   <u>**Documents Stolen From The Office Of Plaintiffs'**</u>

6             <u>**Counsel**</u>

7        On July 5, 2006, Plaintiffs' counsel Marc Toberoff ("Toberoff") received a

8   cryptic letter from John J. Quinn ("Quinn"), an attorney with the firm, Arnold and

9   Porter LLP, notifying Toberoff on behalf of Defendants in the vaguest of terms that

10  Defendants had received three sets of documents (delivered to Warner's General

11  Counsel, John Schulman and two Warner executives, respectively) from an

12  unidentified source and that these documents had been reviewed by Wayne Smith,

13  Warner's Senior Litigation Counsel and segregated into three piles: "'Privileged,'

14  'Non-privileged' and '?.'"  *See* Declaration of Michael Bergman in Support of

15  Defendants' Motion to Compel Whistle-Blower Documents ("Bergman Decl."), Ex.

16  D.  The letter further stated that Quinn was in possession of the documents and

17  suggested a "protocol" for dealing with them.  *Id.*  Curiously the letter did not

18  identify what it was referring to and, in particular, omitted that the documents had

19  obviously been *stolen* from Toberoff's law firm. *Id.*  Nor did the letter offer to

20  return the documents to Toberoff, as is required, and stated instead "I will keep the

21  documents in my possession and allow access to them only upon your joint or the

22  Court's instructions." *Id.*

23        The next day, Defendants' counsel Michael Bergman ("Bergman") sent an *ex*

24  *parte* letter to this Court regarding the documents, without notifying Plaintiffs

25  beforehand.  Toberoff Decl., Ex. D.  Bergman's letter *also omitted* that the

26  documents in question, reviewed by Defendants' counsel, Wayne Smith, had

27  obviously been lifted from the office of Plaintiffs' counsel.  The Court rejected this

28  *ex parte* letter by minute order dated July 6, 2006.  *Id.*, Ex. E.

[F0029699.1]

24

**302**

EXHIBIT 23
Page 630

1   On July 11, 2006, Quinn and Toberoff spoke telephonically regarding the
2   stolen documents. *Id.* ¶ 8.  Toberoff inquired as to the nature of the documents
3   referred to in Quinn's July 5, 2006 letter and was informed *for the first time* that the
4   documents apparently came from Toberoff's own legal files. *Id.* Toberoff thereupon
5   demanded that the documents be returned immediately and rejected the "protocol"
6   outlined in the July 5 letter as geared to exploiting the documents in this litigation.
7   *Id.*  Toberoff suggested instead that an independent shop copy and bate stamp all the
8   documents; that Arnold and Porter be provided with this bates stamp number range,
9   but not retain the stolen documents and that *all* of the documents, including the
10  'originals,' withheld by Warner Bros., be returned to Plaintiffs' counsel
11  immediately.  *Id.*  On July 13, by letter, Quinn announced, contrary to the wishes of
12  Plaintiffs' counsel, that he would have the documents bates stamped by his office,
13  send a copy of the bates stamped documents to Plaintiffs' counsel, and *retain the*
14  *originals* and a bates stamped set.  Bergman Decl., Ex. E.  On July 18, 2006, Quinn
15  delivered three sets of the stolen documents that had been bates stamped, but kept
16  the originals. Toberoff Decl. ¶ 10.
17  By letter dated July 19, 2006, Toberoff reiterated Plaintiffs' demand and
18  further requested that Warner Bros. furnish:
19
20      "(1) the date(s) each set of documents was received; (2) copies of all
        envelopes or packages enclosing the documents; (3) the method by
21      which the documents were sent and, in the unlikely event the
        documents were delivered by hand, the name of the messenger (and
22      messenger service) logged at Warner Bros. security gate and (4) any
        other pertinent information regarding Warner Bros.' receipt of these
23      documents. We would also like to inspect the "original" documents
        and enclosing envelopes or packages as received by Warner Bros."
24  *Id.*, Ex. F.
25  In response to Plaintiffs' July 19 letter, Bergman insisted by letter dated July
26  20, 2006 that Quinn retain possession of the three sets of the stolen documents (even
27  though Quinn had already done so on Warner's behalf), but Bergman provided no
28  information regarding Warner's receipt of the documents. *Id.*, Ex. G.   Quinn

1  responded to Plaintiffs' July 19 letter by letter dated July 24, 2006 wherein Quinn

2  again insisted he would keep the original stolen documents pending further

3  instructions from Defendants or a court order, but again the information Plaintiffs

4  had requested regarding Warner's receipt of the stolen documents was not provided.

5  *Id.*, Ex. H.

6          On July 24, 2006, Defendants demanded that Plaintiffs specifically account to

7  them for each of the stolen documents by production and/or a privilege log keyed to

8  the stolen documents retained by Quinn.  Again, despite Plaintiffs' request, no

9  information was provided regarding the circumstances under which Warner received

10  the stolen documents.  Bergman Decl., Ex. I.

11          By letter dated July 26, 2007, Toberoff reiterated Plaintiffs' July 19 demand

12  for information regarding Warner's receipt of the stolen documents which

13  Defendants continued to ignore.   Toberoff Decl., Ex. I. Defendants finally

14  responded by letter dated July 27, 2006, repeating merely that three apparently

15  identical sets of documents addressed to three different high placed Warner

16  executives had mysteriously arrived in envelopes on June 28, 2006; but that Warner

17  did not retain any of the three envelopes (or a copy of any envelopes) and that

18  Warner had no mailroom, security or executive office records, notes or logs of the

19  three substantial packages ever being signed in or received.  *Id.*, Ex. J.  In short,

20  Warner claimed to have no information whatsoever, concerning the purportedly

21  anonymous receipt by three high ranking Warner executives of substantial packages

22  containing numerous confidential documents relating to this lawsuit.  All such

23  information commonly kept by Studio security, mailrooms and executive offices

24  had mysteriously vanished.

25          On August 7, 2006, Defendants served a Third Set of Requests for Production

26  seeking the stolen documents.  Bergman Decl., Ex. J.  Plaintiffs objected to this

27  document request on September 6, 2006.  Bergman Decl., Ex. L.  On August 10,

28  2006 Defendants served a subpoena duces tecum on Plaintiffs' counsel also seeking

1  the stolen documents.  Bergman Decl., Ex. K.  On August 23, 2006, Plaintiffs'

2  counsel served written objections to the subpoena.   Bergman Decl., Ex. M.

3            **2.     Document Production And Privilege Logs**

4        Plaintiffs produced documents on September 29, 2005 and supplemented this

5  production on October 6, 2006, November 6, 2006 and November 17, 2006.  *Id.*, Ex.

6  K.  Plaintiffs produced a privilege log on July 20, 2006 and provided supplemental

7  privilege logs on September 29, 2006. *Id.*, Ex. L, M.

8        Documents were produced by third parties Jean Peavy and Warren Peary (the

9  "Shusters") on July 18, August 11 and August 14, 2006 in response to Defendants'

10  subpoena. *Id.*, ¶ 19.  The Shusters served a privilege log on August 11, 2006.  *Id.*

11  Shusters served a supplemental privilege log on October 16, 2006. *Id.*, Ex. N.  Third

12  party IPW, LLC produced documents on November 15, 2006 in response to

13  Defendants' subpoena. *Id.*, ¶ 21.  Third party Pacific Pictures Corporation produced

14  documents on November 15, 2006 in response to Defendants' subpoena.  *Id.*   Third

15  party Don Bulson produced a privilege log on October 23, 2006 in response to

16  Defendants' subpoena. *Id.*, Ex. O.

17  **B.     ARGUMENT**

18       **1.     Plaintiffs Have Properly Responded To Defendants' Requests For**

19            **Production, Produced Non-Privileged Responsive Documents In**

20            **Their Possession And Listed Privileged Documents In A Privilege**

21            **Log**

22        Plaintiffs have readily complied with Defendants' discovery requests. As

23  stated above, Plaintiffs have produced over 2000 pages of documents in this action

24  on September 29, 2005, October 6, 2006, November 6, 2006 and November 17,

25  2006, collectively. *Id.*, Ex. K.  Plaintiffs also produced a 25 page privilege log with

26  342 entries on July 20, 2006, properly setting forth with respect to each

27  communication, the date, sender, recipient, the nature of the privilege claimed, the

28  document type and present location of the document. *Id.*, Ex. L.

1    Defendants filed a motion to compel claiming, in part, that Plaintiffs' July 20,

2    2006 privilege log was insufficient.  This motion was denied in its entirety by the

3    Court on August 18, 2006. *Id.*, Ex. A. The Court found that the format used by

4    Plaintiffs was sufficient and thus Plaintiffs had adequately asserted the attorney-

5    client privilege and work product doctrine.[4]  *Id.* at 5.  Defendants moved to have

6    this order reconsidered, which was denied by the Court on September 25, 2006. *Id.*,

7    Ex. B.  Thereafter, Plaintiffs provided supplemental privilege logs on September 29,

8    2006, containing 585 entries. *Id.*, Ex. M.

9    Plaintiffs Laura Siegel Larson and Joanne Siegel had their depositions taken

10    in early August, 2006.  Defendants moved to retake both of these depositions on the

11    ground they had been hindered by Plaintiffs' counsel's assertion of privilege

12    regarding communications about the purported October, 2001 settlement agreement.

13    The Court denied this motion on November 7, 2006. *Id.*, Ex. C.

14        **2.    Defendants Improperly Seek To Gain An Advantage**

15            **Through Their Illicit Receipt Of Documents Stolen From**

16            **The Offices Of Plaintiffs' Counsel**

17    When one peels away the layers of their motion, Defendants impermissibly

18    seek to gain an advantage in this litigation from their receipt of documents *stolen*

19    *from the legal files of Plaintiffs' counsel*.  Defendants call this shocking theft a

20    "twist of fortune."  This is all quite improper, if not reprehensible.  To make matters

21    much worse, the majority of the stolen documents, as admitted by Defendants, are

22

23    _____

24    [4] Rather than cite to and fairly describe the Court's August 18, 2006 order,
Defendants misleadingly exaggerate, out of context, the Court's August 14 minute

25    order regarding Plaintiffs' privilege log, which was modified by the Court's August
18 order.  (*See* Sec. III. Plaintiffs' Contentions at 15:12-15).  Plaintiffs were not

26    "ordered" to produce a supplemental log as Defendants proclaim; they informed the
Court at the hearing on Defendants' motion that given the long background history

27    of this case Plaintiffs' were in the process of supplementing their log to cover
additional time periods.  The Court merely set a deadline for Plaintiffs to submit

28    their supplemental log.  Toberoff Decl., Ex. A.

[F0029699 1 ]

1    classic attorney-client privileged communications.   Declaration of Wayne Smith

2    ("Smith Decl."), ¶ 11.

3          Both parties are bound by FRCP 34 with respect to the discovery and

4    production of documents responsive to each other's requests and the service of

5    privilege logs listing documents withheld by either on the basis of privilege.

6    However, Defendants, by their motion, claim special benefits and advantages due to

7    a theft of documents stolen from the law offices of Plaintiffs' counsel.  At

8    Defendants' direction the stolen documents were both retained and bates numbered

9    in order to force Plaintiffs to jump through hoops and satisfy tests non-applicable to

10   Defendants or any other parties to a lawsuit under the FRCP or Local Rules.

11   Perversely, Plaintiffs, who were victimized and prejudiced by this theft, covert

12   disclosure and Defendants' *review* of privileged communications, are the target of

13   Defendants' motion.

14         Defendants use terms like "Whistle-blower Documents," "neutral" attorneys

15   (retained and compensated by them) and purportedly sanitized protocols to mask the

16   uneasy appearance of their conduct and overreaching motion.  One need only think

17   about Defendants' admission that the majority of stolen documents are *clearly*

18   *attorney-client privileged* to realize that their theft and wholesale disclosure to the

19   other side in this litigation has none of the ethical attributes of "whistle-blowing."  It

20   is believed that these documents were stolen by a disgruntled former attorney of

21   Plaintiffs, in shocking violation of the confidential attorney-client relationship and

22   privilege.[5]  Toberoff Decl., ¶ 23.

23         Faced with this illegal and onerous theft of documents, Defendants stoop to

24   smearing Plaintiffs' counsel by speculation and innuendo, *without a shred of*

25

26

27   [5] The same would apply to any employee of the law firm of Plaintiffs' counsel, as
     their work is conducted within the ambit of counsel's confidential attorney-client
28   relationship.

1 | *evidence*, to somehow justify their conduct or cleanse the theft from which they
2 | eagerly seek to benefit. *See* Smith Decl., ¶ 12.

3 |         **3.    The Stolen Documents Have Been Produced Or Listed In**
4 |                      **Extensive Privilege Logs**

5 |         Plaintiffs' counsel has reviewed the stolen documents and compared them to
6 | Plaintiffs' legal files. Plaintiffs' counsel has found that all but 2 non-privileged
7 | documents in Plaintiffs' legal files had long ago been produced or listed by
8 | Plaintiffs in their privilege logs. Toberoff Decl., ¶ 22. The documents, consisting
9 | of 2 letters from Plaintiff Joanne Siegel to DC Comics' executive Paul Levitz,
10 | although clearly already in Defendants' possession, have recently been produced.
11 | *Id.* There are also 2 privileged e-mail communications between Plaintiffs and their
12 | present counsel dated after the commencement of this action which were not listed
13 | in Plaintiffs' privilege logs because the parties have agreed not to list post-complaint
14 | attorney-client communications on their respective privilege logs. *Id.*

15 |         Additionally, Plaintiffs' counsel searched the files of other persons or entities
16 | it represents that have been subpoenaed in this case, in search of any stolen
17 | documents that had not been produced or listed in a privilege log *even though this*
18 | *motion to compel is only directed at Plaintiffs*. *Id.*, ¶ 23.

19 |         Plaintiffs' counsel found in the files of IPW, LLC, one IP Worldwide fax
20 | cover page having little relevance to this action, which it has nonetheless recently
21 | produced to Defendants. *Id.*

22 |         Plaintiffs' counsel re-searched the files of Jean Peavy, Warren Peary, and the
23 | Estate of Joe Schuster (the "Shusters") and found 3 irrelevant, but non-privileged
24 | documents regarding the probating of Joe Shuster's Estate, that Plaintiffs do not
25 | believe were previously produced. Plaintiffs recently produced these documents.
26 | *Id.* ¶ 24. Plaintiffs' counsel found 1 privileged document from the Shuster files,
27 | again concerning probate, which he has listed on behalf of the Shusters on a
28 | supplemental privilege log. *Id.*

{F0029699.1 }

EXHIBIT 23    30    308
Page 636

1      **4.      Defendants Have Brought This Motion For Unspecified**
2              **Documents Based On Speculative Accusations But No**
3              **Credible Evidence**

4          Defendants wrongfully accuse Plaintiffs and their counsel of secreting

5  unspecified documents based on vague statements and innuendo without any

6  credible evidence to back up their accusations.   Defendants rely solely on the

7  vague, purported recollections of attorney Wayne Smith ("Smith"), Warner's Senior

8  VP, Litigation, who oversees this litigation on Defendants' behalf.  While claiming

9  that he did not read, but only "brief[ly]" glanced at the documents to quickly

10  conclude that the bulk were attorney-client privileged, Smith asserts that "[t]o my

11  knowledge, [the non-privileged] documents have never been produced in this

12  litigation." Smith Decl., ¶¶ 8, 9, 12.

13          Mr. Smith's claim that he now recalls from a clipped 30 minute review

14  (purportedly, nine months ago in June, 2006) whether these documents were

15  produced in Plaintiffs' 2000 page production is highly dubious.   Smith states in his

16  declaration: "at least some (and perhaps virtually all) of the privileged documents,

17  as well as those in the "?" pile, were, to the best of my knowledge, never identified

18  in any privilege log served by Plaintiffs."  Smith Decl., ¶ 12.  This statement is odd

19  as Smith claims to have briefly reviewed the documents on June 28, 2006 and to

20  have turned *all* of them over to John Quinn on June 30, 2006. *Id.* ¶ 8, 13.  However,

21  Plaintiffs did not serve their first privilege log until July 20, 2006 and served their

22  supplemental privilege log on September 29, 2006.  Toberoff Decl., Exs. L, M.  The

23  privilege logs list the simple information (date, sender, recipient, etc.) in the form

24  approved by the Court's August 18, 2006 order. *Id.* Ex. A.  It seems strange that

25  after a 30 minute review, Smith could now recall, or even recall in late July and late

26  September, the dates of documents missing from Plaintiffs' subsequent privilege

27  logs (containing hundreds of entries).  Tellingly, Smith does not even mention the

28  document production and privilege logs of subpoenaed third parties (*i.e.*, the

1 | Shusters, Don Bulson, Pacific Pictures Corporation and IPW, LLC) provided
2 | subsequent to his purported review, though many of the stolen documents were
3 | obviously lifted from such files.  Toberoff Decl., ¶ 22.

4 | According to Smith, "[i]n reviewing each document when it first appeared to
5 | me that it was entirely privileged, I ceased reading it, placed the document in the
6 | "privileged" pile and did not look at it further." Smith Decl, ¶ 8.  Moreover,
7 | "because of the passage of time, I do not recall the specific documents." *Id*.  If
8 | Smith is taken at his word, he could not possibly have concluded that the stolen
9 | documents were not included among the nearly 2000 documents produced by
10 | Plaintiffs or documents produced by subpoenaed third parties, nor could he
11 | reasonably assess the hundreds of entries on Plaintiffs' subsequently produced
12 | privilege logs and the privilege logs of such third parties.  For instance, the privilege
13 | log of Don Bulson, Esq., the attorney of Michael Siegel, Laura Siegels' now
14 | deceased step-brother, contains 422 entries.  Toberoff Decl., Ex. O.

15 | Again, Smith claims "I did not conduct a detailed review of the Superman
16 | Documents, and because the passage of time, I do not recall their specific contents.
17 | I do, however, recall generally the subject mater of certain documents."  Toberoff
18 | Decl., ¶ 8.  However, Smith's declaration only cites one subject – irrelevant to this
19 | action [6]: "correspondence concerning the interest in Superman that might be owned
20 | by plaintiff Laura Siegel's estranged step-brother, Michael Siegel [now deceased]."
21 | *Id*., ¶ 9.  Smith conveniently makes no reference to the lengthy privilege log of
22 | Michael Siegel's attorney, Don Bulson, that naturally encompassed this subject.
23 | Toberoff Decl., Ex. O.

24 | Thus, Defendants' motion to compel is based entirely on Plaintiffs' alleged
25 | failure to have produced or have listed in their privilege log documents purportedly

26 | _____
[6] Under 17 U.S.C.§ 304(c), Plaintiffs' control author Jerry Siegel's termination
27 | interest and Michael Siegel had only a passive beneficial interest and right to share in any monies paid to Plaintiffs with respect to this interest.
28 |

1  responsive to Defendants' document requests; but Defendants and Smith fail to

2  identify which requests and any non-privileged documents or even document

3  categories that were not produced, except documents relating to the single barely

4  relevant subject discussed above.[7]

5       Without any credible evidence, Defendants are content to brazenly accuse

6  Plaintiffs of "secreting documents."  Defendants inconsistently claim that Smith

7  merely "thumbed through" the stolen documents, "but did not review them in

8  detail," yet base their entire motion and accusations on Smith's vague unspecified

9  recollections of the documents in comparison to the thousands of documents

10  produced by Plaintiffs and multiple third parties or listed on their respective

11  privilege logs.

12       **5.    Defendants' Review, Retention And Handling Of The Stolen**

13            **Documents Was Improper**

14       The attorney-client privilege has been recognized as "the oldest of the

15  privileges for confidential communications known to the common law." *Upjohn Co.*

16  *v. United States*, 449 U.S. 383, 389 (1981).  Practicing attorneys recognize the

17  importance of the privilege and the safe harbor that it provides to encourage "full

18  and frank communication between attorneys and their clients and thereby promote

19  broader public interest in the observance of law and administration of justice." *Id.*

20       A lawyer who receives materials that on their face appear to be subject to the

21  attorney-client privilege or otherwise confidential, under circumstances in which it

22  is clear that the materials were not intended for the receiving lawyer, should refrain

23  from examining the materials, notify the sending lawyer, and abide by the

24  instructions of the lawyer who sent them. *Gomez v. Vernon*, 255 F3d 1118, 1131-

25  1132 (9th Cir. 2001); 3-24 *Mathew Bender Practice Guide: Federal Pretrial Civil*

26  *Procedure in California* § 24.40.

27  _____

[7] *See* November 7, 2006 Order, p. 2, Toberoff Decl., Ex. C (the parties, as required by

28  Local Rule 37 must "set forth seriatim particular disputed discovery responses"

1F0029699 1 1

1      In *Gomez*, over a period of nine months, the Idaho Department of Corrections

2  implicitly authorized and encouraged department employees to search for and

3  photocopy letters regarding litigation strategies from opposing counsel that were

4  kept in inmates' legal files.  The Court found this behavior highly improper as these

5  documents were plainly privileged: "the most sensitive kind – the kind that any trial

6  lawyer would recognize as privileged, highly valuable, very confidential, and

7  potentially devastating in the wrong hands."  The court, in imposing sanctions, held

8  that the Department ignored their ethical duties to gain an advantage in the

9  litigation. *Gomez*, 255 F3d at 1131-1132

10      Similarly, in *Rico v. Mitsubishi Motors Corp.*, 116 Cal. App. 4th 51

11  (2004)(review granted June 9, 2004), cited by Defendants,  a lawyer was

12  disqualified from further representation after perusing opposing counsel's work

13  product while at a deposition *which he should have known he was not entitled to see*

14  *or possess.*  *Rico* reasoned, "a brief look [at the document] and simple phone call

15  could have resolved the matter.  Instead [counsel] 'studied the document carefully,

16  made his own notes on it…and based his litigation strategy'" on it.  *Id.* at 71.

17  Having failed to briefly review the document and contact opposing counsel when it

18  became obvious it was privileged, the court felt disqualification was necessary as

19  "plaintiffs' counsel…had information that inevitably would have been used in

20  preparing for trial." *Id.* at 73.   *See Spacone v. Burke(In re Truck-A-Way)*, 300 B.R.

21  31, 39 (E.D. Cal. 2003)(lawyer disqualified because, upon discovery of an

22  opponent's privileged documents, he *conditioned the documents release upon his*

23  *opponent providing a privilege log); see also Shell Oil Refinery v. Shell Oil Co.*, 143

24  F.R.D. 105, 108 (E. D. La. 1992)(plaintiff subject to sanctions for improperly

25  obtaining proprietary documents from one of defendant corporation's employees).[8]

26

27  _____

[8]  It should also be noted that the unauthorized receipt by an opposing party of privileged documents does not waive the privilege. *See United States ex rel.*

28  *Mayman v. Martin Marietta Corp.*, 886 F. Supp. 1243, 1246 (D. Md.

{F0029699.1}

1    Defendants purport to rely on *State Compensation Ins. Fund. v. WPS, Inc.*

2  *(State Fund),* 70 Cal. App. 4th 644, 656 (1999)(lawyer receiving privileged materials

3  "should refrain from examining the materials any more than is essential to ascertain

4  if the materials are privileged, and shall immediately notify the sender that he or she

5  possesses material that appears to be privileged") and on the ABA Formal Opinion

6  94-382.  However, State Fund and the ABA Formal Opinion deal with a common

7  occurrence – the *inadvertent disclosure* by counsel of a couple privileged documents

8  – *not the wholesale theft of legal files from an opposing counsel's law firm.*

9    Defendants must not be permitted to benefit *in any respect* from the "fruits"

10  of this outrageous theft.[9]  *See Sackman v. Ligget Group, Inc.*, 173 F.R.D. 358, 365

11  (E.D.N.Y. 1997) (prohibiting the deposition testimony of an expert who would base

12  his opinion on a privileged document that was stolen and disseminated to the

13  public); *Cooke v. Superior Court*, 147 Cal. Rptr. 915 (Cal. Ct. App. 1978) (evidence

14  excluded in divorce action when receipt of confidential information about husband,

15  including confidential communications between husband and his lawyer, was

16  purloined and passed to lawyer by husband's unfaithful agent without complicity of

17  receiving lawyer); 159 *American Law Reports Federal* 153 (Courts "will not

18  condone conduct which is condemned for public policy reasons, even if the result of

19  judicial action is to harm the innocent recipient of the unlawfully disclosed

20  information.  This is especially so when the information is released as a result of a

21  crime"); *Mayman v. Martin Marietta Corp.*, 886 F. Supp. 1243, 1246 (D. Md.

22  1995)(court refused to consider records stolen by a party's former employee); *Smith*

23

24  1995)(privilege deemed not waived as to document stolen by fired employee); *see
    also Smith v. Armour Pharmaceutical Co.*, 838 F. Supp. 1573, 1576 (S.D.Fla. 1993).

25

26  [9] The exclusionary "fruit of the poisonous tree" doctrine, though applicable to
    criminal cases is analogous.  The exclusionary rule extends not only to primary

27  evidence obtained illegally, but also evidence later discovered and found to be
    derivative of an illegality or "fruit of the poisonous tree."  *Nardone v. United States*,

28  308 U.S. 338, 341 (1939).

1    *v. Armour Pharmaceutical Co.*, 838 F. Supp. 1573, 1576 (S.D. Fla. 1993)(court

2  denied use of memorandum widely distributed after its *unauthorized* release); *In re*

3  *Grand Jury Proceedings Involving Berkley & Co., Inc.*, 466 F. Supp. 863, 869 (D.

4  Minn. 1979)(court precluded documents retained without authorization by a

5  terminated employee); *Kenyatta v. Kelly*, 375 F. Supp. 1175 (E.D. Pa. 1974) (court

6  precluded documents stolen by a third party from defendants, even though the

7  documents had already been produced by defendants to the plaintiffs).

8        Here, Defendants conduct regarding the stolen documents, aimed at

9  exploiting what they view as a "twist of fortune," is highly improper.  (*See* Sec. III.

10  Defendants' Contentions at 1:3-6).  They did not immediately notify Plaintiffs upon

11  receipt of the stolen documents, nor did they honor Plaintiffs' wishes with respect

12  thereto.  While Defendants go to great lengths to cleanse their conduct and create

13  the appearance of propriety, their improper objectives and the crime at the root of

14  this matter color their actions and elicit many uneasy questions that are the subject

15  of an ongoing investigation.

16        Defendants and Smith highlight the special detailed attention and care

17  allegedly given to the stolen documents: first, legal research; second, a carefully

18  circumscribed review, and third, the hiring of an alleged "neutral" to hold *all* the

19  documents.  Yet, despite this studious attention and Defendants' astonishing receipt

20  in the middle of a heated lawsuit (by three high ranking Warner executives, two of

21  which were legal counsel) of documents plainly from the files of opposing counsel,

22  Warner claims not to have kept *any* of the three or more envelopes in which the

23  delivery was made and claims to have *no corroborating record whatsoever of the*

24  *date of the delivery* (*e.g.*, Studio mailroom, security or executive office logs or

25  notes).  This is all the more incredulous as Studios and attorneys commonly keep

26  records of such deliveries.

27        Plaintiffs' question the date Defendants claim to have "anonymously"

28  received the stolen documents.  Defendants claim that the documents were first

1   received on June 28, 2006.  Smith Decl., ¶ 2.  Yet, the anonymous cover letter [10]

2   referred to by Smith, which enclosed the documents, ends by stating "consider this

3   an early Christmas present."  Toberoff Decl., ¶ 27.  It is hard to imagine that the

4   sender would refer to Christmas *in June*.

5        Notably absent is a declaration from Warner's General Counsel John

6   Schulman ("Schulman"), who directly received the stolen documents, testifying as

7   to the date of his receipt.  Smith Decl., ¶ 2.  Instead, Defendants present Smith's

8   declaration offering pure hearsay that "Schulman advised me that… [the documents]

9   had arrived from an anonymous source at his office that day [June 28, 2006]."

10  Smith Decl., ¶ 2.

11       Plaintiffs' counsel believe that an attorney formerly employed by Plaintiff's

12  counsel for a short term lifted the documents from the firm's legal files while

13  employed and thereafter furnished the documents to Warner.  Toberoff Decl., ¶ 25.

14  This attorney was terminated in November, 2005.  *Id.* at ¶26.  After this attorney

15  was terminated, he contacted Plaintiffs and other Toberoff clients in December,

16  2005 and tried to convince them to retain him and to terminate Toberoff by falsely

17  disparaging Toberoff and by offering a reduced contingent fee.  *Id.*  By all accounts,

18  the attorney's motives were financial.  He was rejected by Plaintiffs and Toberoff's

19  other clients in December, 2005.  *Id.*  It is believed that soon thereafter he

20  communicated with Warner and disclosed the privileged documents he had stolen

21  from Toberoff's legal files – hence, his reference to an "early Christmas present."

22       Questions remain and an investigation is still underway regarding this

23  disgraceful event.  For instance, we do not yet know the full extent of this

24  attorney's communications with Warner.

25

26  [10]  This letter by a disgruntled and misguided attorney formerly employed by
    Plaintiff's counsel was not attached by Defendants and is not attached by Plaintiffs

27  because it is defamatory, potentially violates the attorney-client privilege and work
    product doctrine and should not be further published through the public record of

28  this action.  Toberoff Decl., ¶ 27.

1      It is believed that Warner may have well received their "early Christmas

2  present" in December, 2005, and waited, deciding whether or when to disclose this

3  very troubling matter.  Moreover, even if Defendants received the stolen documents

4  in June, 2006, they did not bring this to Plaintiffs' immediate attention, as even

5  "inadvertent disclosure" case-law dictates.  *See State Fund*, 70 Cal. App. 4th 644 at

6  656.  They belatedly mention the "anonymous" receipt of documents in a letter

7  dated July 5, 2006 and then in only the vaguest of terms as "certain documents."

8  Bergman Decl., Ex. D.  Plaintiffs did not learn that the documents were *their*

9  documents, until July 11, 2006 (two weeks after Defendants purportedly received

10  them) and only when Plaintiffs' counsel was able to press Defendants as to the

11  nature of the "certain documents" referred to by them.  Toberoff Decl., ¶ 8.

12      Defendants refer to Quinn as a "neutral," and seek to purify their objectives

13  through his stature as former head of the Los Angeles Bar Association; but it is clear

14  that Quinn and his law firm have been *retained* by Warner to "advise" it with

15  respect to the stolen documents.  Bergman Decl., Ex. D.  Unsurprisingly, the

16  protocol suggested in Quinn's July 5, 2006 letter (and subsequent letters) regarding

17  the documents favor or protect Warner's interests.  *Id.*  Quinn, to his credit, never

18  presented himself as a "neutral."  Toberoff Decl., ¶ 8.

19      After Quinn's July 5, 2006 letter, on July 6, like clockwork, Defendants' lead

20  counsel, Bergman, wrote to this Court *ex parte* in an effort to place the stolen

21  documents before the judges adjudicating this case. Id., Ex. D.  Tellingly, neither,

22  Quinn, nor Bergman, state in their letters to Plaintiffs and the Court, respectively,

23  what at this point was blatantly obvious to Defendants – *the documents had been*

24  *stolen from the law offices of Plaintiffs' counsel.*

25      Only after Plaintiffs demanded the return of the stolen documents did

26  Defendants finally return *bates stamped copies* to them to Plaintiffs' counsel on July

27  18, 2006, *three weeks* after their purported receipt on June 28, 2006, and six months

28

1    after "Christmas." *Id.*, ¶ 10.  However, Defendants insisted on retaining the

2    originals of the stolen documents.  Bergman Decl., Ex. F.

3         Even by its own account, Warner's conduct was improper.   Upon receipt of

4    the stolen documents, Warner should have *immediately* contacted Plaintiffs' counsel

5    and returned all copies of the stolen files to him upon his request.  *Gomez v. Vernon*,

6    255 F3d 1118, 1131-1132 (9th Cir. 2001); *State Fund*, 70 Cal. App. 4th 644 at 656.

7    Instead, Defendants waited a full week to notify Plaintiffs' counsel and then, only in

8    the vaguest of terms, and after *three weeks* provided Plaintiffs with alleged copies of

9    the documents, while retaining the original of the stolen documents, though the

10   majority of the documents were clearly privileged.

11        Warner also improperly read and analyzed the stolen documents.  Defendants

12   claim that they did not read or review the documents *in any detail*; and yet Warner's

13   Senior Litigation Counsel, Smith, admits reviewing the documents *twice* (once

14   outside Schulman's office and again, at his home) and to segregating the documents

15   into three categories – clearly "privileged," potentially privileged ("?") and "non-

16   privileged." Smith Decl. ¶¶ 3, 8.  It is logically impossible to have performed this

17   detailed segregation without reviewing and analyzing *the substance* of the stolen

18   documents, which was improper. *Gomez v. Vernon*, 255 F3d 1118, 1132 (9th Cir.

19   2001)("The confidential status of the letters was facially evident – they were on

20   legal letterhead easily identifiable as that of opposing counsel").

21        Defendants' rely on *Aerojet-General Corp. v. Transport Indemnity Ins.*, 18

22   Cal. App. 4th 996 (1993) for the purported principle that a party has no duty to

23   inform opposing counsel of the *inadvertent* disclosure of privileged and

24   unprivileged documents, but instead can use any *unprivileged* information contained

25   in the document advantageous to their case.  Firstly, *Aerojet* has been roundly

26   criticized and its holding severely curtailed by *State Fund*, 70 Cal. App. 4th at 656

27   (1999).  *State Fund* imposes the exact opposite requirement: an ethical duty

28   *immediately* to disclose inadvertently received privileged information to the other

1    side. [11] *Id.* Secondly, *Aerojet* like *State Fund* concerns the *inadvertent* disclosure of

2    documents by opposing counsel not the deliberate theft of documents from opposing

3    counsel.

4        Even by their own account Defendants contravened *State Fund,* (applicable to

5    an innocent *inadvertent* disclosure) by failing to contact Plaintiffs' counsel for

6    several days despite the *obvious* appearance that a large number of privileged

7    documents had been stolen from Plaintiffs' legal files.  Instead, they carefully

8    reviewed the documents and segregated them into separate "privileged," "non

9    privileged" and even "?" piles.  The delay appears to have been deliberate – to allow

10   Defendants' in-house counsel to devise a strategy to maximize their chances of

11   benefiting from what they and their outside counsel view herein as a "twist of

12   [good] fortune."  Their efforts must not be rewarded.

13   **V.**     <u>**DEFENDANTS' CONCLUSION**</u>

14        For the reasons set forth herein, Defendants respectfully request that their

15   motion be granted.

16   **VI.**    <u>**PLAINTIFFS' CONCLUSION**</u>

17        For the reasons set forth herein, Plaintiffs respectfully request that

18   Defendants' motion to compel be denied in its entirety; that Defendants be ordered

19   to return all originals and copies of the stolen documents to Plaintiffs forthwith, and

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26

27   [11] More precisely, an attorney who inadvertently receives plainly privileged

28   documents *must refrain from examining the materials any more than is necessary to determine that they are privileged*, and must immediately notify the sender. *Id.*

[F0024699 1 ]

40

**318**

EXHIBIT 23

Page 646

1  that Defendants be barred from using the stolen documents in any fashion in this

2  litigation.

3  DATED:  March 2 ̲0̲, 2007          WEISSMANN WOLFF BERGMAN
                                    COLEMAN GRODIN & EVALL LLP
4                                   FROSS ZELNICK LEHRMAN & ZISSU, P.C.

5                                           -and-

6                                   PERKINS LAW OFFICE, P.C.

7

8                                   By: Michael Bergman

9                                   _____
                                    Michael Bergman

10                                  Attorneys for Defendants and Counterclaimant

    DATED:  March 2 ̲5̲, 2007        LAW OFFICES OF MARC TOBEROFF, P.C.
11

12

13                                  By: _____
                                    Marc Toberoff

14                                  Attorneys for Plaintiffs/Counterclaim-Defendants

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 23

Page 647

EXHIBIT 24

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


| | |
|---|---|
| JOANNE SIEGEL, ET AL, | ) CASE NO(s): CV 04-8400-SGL(RZx) |
| | )                       CV 04-8776-SGL(RZx) |
| Plaintiffs, | ) |
| | )           CIVIL |
| vs. | ) |
| | )     Los Angeles, California |
| TIME WARNER, INC, ET AL, | )     Monday, April 30, 2007 |
| | )     (10:45 a.m. to 11:28 a.m.) |
| Defendants. | ) |

1)   DEFENDANTS' MOTION TO COMPEL THIRD-PARTY KEVIN MARKS
AND PLAINTIFF LAURA SIEGEL LARSON TO ANSWER QUESTIONS
AT DEPOSITION;

2)   DEFENDANTS' MOTION TO COMPEL THIRD PARTIES KEVIN MARKS
AND GANG TYRE, RAMER & BROWN, INC TO PRODUCE DOCUMENTS
RELATING TO AUTHORITY;

3)   DEFENDANTS' MOTION TO COMPEL PRODUCTION
OF WHISTLE-BLOWER DOCUMENTS;

4)   PLAINTIFFS' MOTION TO COMPEL DEFENDANTS
TO ANSWER PLAINTIFFS' SPECIAL INTERROGATORIES

BEFORE THE HONORABLE RALPH ZAREFSKY,
UNITED STATES MAGISTRATE JUDGE


Appearances:   (See next page)




Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

2

APPEARANCES FOR:


Plaintiffs:                      MARC TOBEROFF, ESQ
                                 1999 Avenue of the Stars
                                 Suite 1540
                                 Los Angeles, CA 90067


Defendants:                      MICHAEL BERGMAN, ESQ
                                 Weissmann Wolff Bergman, et al.
                                 9665 Wilshire Blvd., Suite 900
                                 Beverly Hills, CA 90212


Court Reporter:                  Recorded; FTR

Courtroom Deputy:                Ilene Bernal

Transcribed by:                  Exceptional Reporting Services, Inc.
                                 14493 S. Padre Island Drive
                                 Suite A-400
                                 Corpus Christi, TX 78418-5940
                                 361 949-2988

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

3

1     Los Angeles, California; Monday, April 30, 2007; 10:45 a.m.

2                          (Call to Order)

3          THE COURT:  Let's call the next case.

4          THE CLERK:  Item number five.  Case Number CV-04-

5     8400-SGL-RZX, and related case, CV04-8776-SGL-RZX; *Joanne*

6     *Siegel, et al. versus Time Warner, Inc., et al.*

7          Counsel, please make your appearances.

8          MR. TOBEROFF:  Good morning, your Honor.  Marc

9     Toberoff for the plaintiffs.

10         THE COURT:  Good morning.

11         MR. BERGMAN:  Good morning, your Honor.  Michael

12    Bergman for the defendants.

13         THE COURT:  Good morning.  All right, we've got four

14    motions on.  Let's start with Plaintiff's Motion to Compel the

15    Answers to Interrogatories.  I read the materials.  Don't need

16    to repeat anything.

17         Do you wish to be heard, Mr. Toberoff?

18         MR. TOBEROFF:  Yes, your Honor.  I just want to

19    highlight a couple points if I may.  Essentially, when I

20    drafted these four Interrogatories on behalf of plaintiffs, I

21    did so with the *Safeco* case in mind and with Federal Rule of

22    Civil Procedure 33(a).  Essentially, each party, each

23    plaintiff, asked one question to each of the defendants.

24         THE COURT:  I read them.

25         MR. TOBEROFF:  Okay.

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

4

1          THE COURT:  I really have -

2          MR. TOBEROFF:  All right.

3          THE COURT:  - read this material.

4          MR. TOBEROFF:  Okay, thank you.

5              So, what I do want to point out is that *Safeco*, which

6   is now being used by the defendants to claim that, essentially,

7   each single Interrogatory pertaining to a single RFA and asking

8   for the basis of the RFA is actually three Interrogatories,

9   does not stand for that proposition.

10             In *Safeco*, the Interrogatory in question was already

11  divided into three Interrogatories, so the Court never

12  addressed the question of whether the Interrogatory consists of

13  three subparts, which is the question here.  Instead, the Court

14  simply said that when an Interrogatory is tied to a Request for

15  Admission response, then that counts for one Interrogatory.

16             And the Court even went so far to say that sometimes

17  an Interrogatory focusing on multiple RFAs can stand for one

18  Interrogatory as opposed to multiple Interrogatories if the

19  RFAs are related to a common theme and logically connected to

20  one another.  So, actually, *Safeco* has language, as we set

21  forth in our motion, that very much supports our motion.

22             And finally, defendants' stonewalling response is

23  evidenced by the fact that after we served these

24  Interrogatories, they used this as an excuse not to answer the

25  Interrogatories, and we've had major problems with their

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

5

1   discovery, their failure to respond to our discovery, which is

2   the subject now of multiple motions which we would like to have

3   avoided.

4           THE COURT:  All right, thank you.

5           Mr. Bergman?

6           MR. BERGMAN:  Thank you, your Honor.

7           Your Honor, on that last point I would like to note

8   that when the defendants responded to these Interrogatories, we

9   offered to do what Mr. Toberoff had offered to do when the

10  tables were turned, and that is to have him select the

11  Interrogatories that he wanted to have answered within the 25

12  limitation of Rule 33.

13          I'd just like to emphasize, your Honor, that the

14  problem with these Interrogatories begins with the Request for

15  Admission on which they're based.  As we've quoted in our

16  moving papers, there are Requests for Admission that ask us to

17  admit, for example -

18          THE COURT:  I read this, Mr. Bergman.  You don't need

19  to reiterate it.

20          MR. BERGMAN:  Okay.  The other point I would like to

21  make, Judge, is that these are not logically subsumed within

22  each other; that there is no primary question; there is no

23  secondary question.  Reasons are one thing; facts are another;

24  evidence is another.

25          And finally, your Honor, the burdensome nature of

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

6

1    these Interrogatories is compounded by the fact that we're

2    talking about events that occurred 70 years ago. Why didn't we

3    admit, why did we deny, that we paid other people to work with

4    Mr. Siegel 70 years ago? Well, that's quite a burden. Why do

5    we deny that the Adventures of Super Boy appeared in hundreds

6    of comic books? Facts, evidence, reasons; that's quite a

7    burden. We believe that they're burdensome. We attempted to

8    have Mr. Toberoff select those Interrogatories that he felt

9    were essential, and he declined to do so.

10          THE COURT: All right, thank you.

11          MR. BERGMAN: Thank you, your Honor.

12          THE COURT: All right. On this motion, in the

13    Court's view, the motion does raise issues which at least are

14    discussed in *Safeco*. It's 183 Federal Rules Decision 669, a

15    1998 case from this district.

16          Now, to begin with, the Court has great concern about

17    the propriety of even asking these kinds of Interrogatories,

18    which, as defense counsel's indicated, spin off of Requests for

19    Admissions.

20          Now, in the Court's view they spin off Requests for

21    Admissions with a 'gotcha' kind of mentality, and Professors

22    Wright and Miller have stated, and the Court agrees, Rule 36 is

23    not, strictly speaking, a discovery device. It's a device for

24    shortening the proof required at trial.

25          And the rule has its own remedy if there is a problem

7

1 with a Request to Admit.  The propounding party can move to

2 determine the sufficiency of the answers or objections.  But

3 Interrogatories which take a party's failure to unqualifiedly

4 admit and then ask, argumentatively, for the party to justify

5 such a failure, those are questionable discovery devices.

6   And beyond that, these Interrogatories do in fact, as

7 in *Safeco*, ask more than single questions.  Even considering

8 that questions which are related, such as a witness's name and

9 address, for example, those are properly considered part of the

10 same question; but asking for reasons as well as evidence as

11 well as all facts in this Court's view does impermissibly ask

12 for several distinct answers, and any one of them might be

13 objectionable as overbroad, burdensome, calling for work

14 product, and a whole host of other objections.

15   But for the moment, all that the Court does conclude

16 is that the allowed number has been exceeded.

17   Plaintiffs' Motion to Compel is denied.

18   Both Requests for Sanctions are denied.

19   All right, let's move to what has so elegantly been

20 called the 'whistleblower' documents and the Motion to Compel

21 with respect to them.

22   It seems to me there's a lot of noise about this

23 motion, but I don't know how much substance there is.

24  MR. BERGMAN:  Frankly, your Honor, I don't think

25 there's any substance to it in the sense that it could be

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

8

1    avoided today. It could have been avoided months ago.

2            Mr. Toberoff keeps taking the position that these

3    documents have been - non-privileged documents have been

4    produced; privileged documents have been listed in a privilege

5    log. All we have been saying, and what I said to Mr. Toberoff

6    during a meet and confer, what one of my associates wrote to

7    him in a letter, is 'show it to us'. Identify the documents,

8    the unprivileged documents that you have produced, by reference

9    to the Bate stamp numbers that Mr. Quinn's office put on the

10   document, and identify the documents which are listed on a

11   privilege log, once again, by reference to the Bate stamp

12   numbers that Mr. Quinn put on. If that is done and we see

13   that, yes, indeed, all unprivileged documents have been

14   produced, all privileged documents have been listed, then

15   there's no further dispute.

16           If, on the other hand, we see that all unprivileged

17   documents have not been produced, well, we should be able to

18   see those documents. And if all of the privileged documents

19   have not been produced or, rather, put on an exhibit list, a

20   privilege log, that would be a waiver of the privilege as to

21   those documents and we should be entitled to see those

22   documents, too.

23           The question is: How do we resolve this? Well,

24   there's an easy way, and that is what we're suggesting, Judge,

25   and what we've been suggesting from the beginning.

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

Page 655

9

1          THE COURT:  All right.  Mr. Toberoff?

2          MR. TOBEROFF:  Your Honor, I want to make sure the

3    Court understands what we're talking about here, which he

4    claims is just a simple discovery matter that should be easily

5    resolved under Rule 34, the way you deal with Requests for

6    Production in which you produce responsive documents and you

7    list in the privilege log any that are privileged.

8          First of all, plaintiffs have done so and so have I,

9    in full compliance with Rule 34.  We're talking about here an

10   arrival -

11         THE COURT:  No, I know what we're talking about.

12         MR. TOBEROFF:  Right.

13         THE COURT:  The documents showed up at Warner

14   Brothers -

15         MR. TOBEROFF:  Right.

16         THE COURT:  - and I read what Warner Brothers did

17   with them.  They segregated them into three piles; they sent

18   them over to Mr. Quinn; Mr. Quinn Bate stamped them; he made a

19   copy; he sent the copy to you, and now we're stuck with what to

20   do with the ones that are left in Mr. Quinn's office.  I

21   understand what we're talking about.

22         MR. TOBEROFF:  I understand that, your Honor.  These

23   documents are a pile about this high (indicates) -

24         THE COURT:  Okay.

25         MR. TOBEROFF:  - where a former attorney of mine, who

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

10

1    was terminated in November, went through not just the

2    plaintiffs' files in this case but the files of Joe Schuster's

3    family and other witnesses and other companies that I

4    represent, selected documents, and, after trying to essentially

5    steal not only the plaintiffs' clients in this case and other

6    clients of mine by disparaging me, and after he was rejected in

7    early December of 2005, he sent these documents to John

8    Schulman, the general counsel -

9              THE COURT:  I understand all that, Mr. Toberoff.

10             MR. TOBEROFF:  - and two other executives.  These are

11   documents -

12             THE COURT:  But that's not important to this

13   resolution.

14             MR. TOBEROFF:  Well, it's important -

15             THE COURT:  The question is -

16             MR. TOBEROFF:  It's important to me.

17             THE COURT:  They have documents.  The question is:

18   Have you otherwise produced them?  That's all that's at issue,

19   isn't it?

20             MR. TOBEROFF:  I have, your Honor.  I have put in a

21   declaration unequivocally that even though I'm not obligated to

22   do so, and jump through hoops of having to respond and own up

23   to documents stolen from my legal files, an obligation that

24   does not apply to the defendants in this case and does not

25   apply to parties under Rule 34, I nonetheless went through

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

11

1  every single one of those documents, which they, instead of

2  returning the originals, returned to me with Bate stamps,

3  checked it against our production, and found two documents that

4  were non-privileged that hadn't been produced that consisted of

5  letters from plaintiffs to DC Comics, which I produced.

6         THE COURT:  See, your declaration doesn't quite say

7  that, Mr. Toberoff.  I read your declaration.

8         MR. TOBEROFF:  The intention of the declaration is to

9  say exactly what I'm saying now; that I went through my files,

10 not just the plaintiffs' files, which is all the motion

11 pertains to, but all my files, all the third-party witness

12 files -

13        THE COURT:  Forgive me for interrupting.  Your

14 declaration does say that.  What your declaration doesn't say

15 is that you went through these, let's call them 'whistleblower'

16 documents, even though that may not be an accurate statement,

17 you went through these whistleblower documents, and that you

18 verified that each of the whistleblower documents either had

19 been produced or had been listed on the privilege log.  It

20 doesn't say that.

21        MR. TOBEROFF:  That is the case, your Honor, and that

22 was certainly my intention to say that, and I'm saying that

23 now.

24        THE COURT:  All right, then we can get that cleared

25 up immediately.

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

12

1          MR. TOBEROFF:  I'd be happy to take an oath and say

2    that, because that is precisely what I did.

3          THE COURT:  Okay.

4          MR. TOBEROFF:  And that was definitely my intention

5    in the declaration.  They claim my declaration doesn't say

6    that.  That was certainly my intention.  That's exactly what I

7    did.  And I also put in my declaration, with the utmost

8    specificity, what documents I found that had not been produced

9    and how I produced those documents.

10          THE COURT:  Yes, you did that.  I agree with that.

11          MR. TOBEROFF:  But the point here, your Honor, is

12    that there are certain procedures which plaintiffs and

13    defendants have to follow.  If the situation was reversed,

14    where I was suddenly sent a stack of documents from the general

15    counsel's files at Warner Brothers or from Mr. Bergman's files,

16    and I sat on those documents, and we believe they sat on these

17    documents from November or December of 2005, even from the date

18    that they say, they sat on these documents, and their letters

19    suggest this uneasy, queasy way in which they dealt with the

20    documents where they didn't say, 'We received documents that

21    are attorney-client privileged that are obviously from your

22    files.'  They referred vaguely to certain documents.

23          They retained another lawyer which they purported to

24    say was a 'neutral', even though that lawyer is obviously not a

25    neutral, because all his suggestions protect defendants, and

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

13

1  he's under a retainer and undoubtedly paid by the defendants.

2  They retained this neutral -

3       THE COURT:  I'm sure Mr. Quinn would enjoy receiving

4  money from you as well, Mr. Toberoff.

5       MR. TOBEROFF:  Well, I understand, but I did not

6  retain him.  And to his credit, he never said that he was a

7  neutral in this matter.

8       THE COURT:  No.  He's not neutral in the sense that

9  he is retained by the defendants, but what he did, as I

10  understand it, and there's no suggestion otherwise, is that he

11  acted as an escrow.  That is, Mr. Bergman didn't look at these

12  documents.  Trial counsel didn't look at these documents,

13  right?

14       MR. BERGMAN:  That's correct, your Honor.

15       THE COURT:  The in-house counsel took these

16  documents, probably consulted with Mr. Bergman, 'I don't know,

17  what do we do?', the decision was made, 'Let's give them to a

18  third party and let's try and get the Court involved'.  And

19  then there was that little problem of not following the local

20  rules where there was an *ex parte* communication with the Court,

21  which you pointed out in your papers here.  But the procedure

22  does not seem unreasonable to me.

23       MR. TOBEROFF:  Let me ask this.  There are rules why

24  a police officer can't march into your house without a warrant

25  and rifle through your house looking for things.  And the

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

14

1   answer to the objection to him doing so is not, 'Well, what do

2   you have to hide?'  There's a simple procedure here.  If you

3   have nothing to hide, why can't I rifle through your house?

4   The analogy may not be exact, but it's comparable.

5           This has an unseemly feel to it, because when you add

6   up all of the supposedly sanitizing procedures, and I have

7   great doubts that they received these documents when they said

8   they did, and when I asked for them to substantiate when they

9   received the documents, they had absolutely no information.

10  And I know from my experience with big studios that they have

11  guards and mail rooms and executives and people at their beck

12  and call who keep track of these sorts of things meticulously.

13  They have no evidence whatsoever to support the claim as to

14  when they received documents.

15          I believe they got these documents, the cover letter

16  said, 'This is an early Christmas present.'  You don't write a

17  letter like that in June.  And so they sat on these documents

18  for three or four months figuring, 'How can we use this

19  theft'?, which is an outrageous act.  I'm not hiding behind

20  hyperbole.  It is outrageous.  If it happened to any lawyer, if

21  it happened to Mr. Bergman, you would be outraged.

22          They are saying, 'How do we use this outrageous act

23  as a tactical advantage?'

24          **THE COURT:**  If they were doing all that, why would

25  they go through this process?  Why wouldn't they just -

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

15

1          MR. TOBEROFF:  Because, they can't -

2          THE COURT:   - keep the documents and spring them on

3    you?

4          MR. TOBEROFF:  Because they can't use the documents.

5    They need to first sanitize it by saying, 'You need to jump

6    through these additional hoops that are not applicable to the

7    defendants; that would not be applicable to you or the

8    plaintiffs, but because we have what they call a 'twist of

9    fortune' of receiving documents stolen wholesale from your

10   files, we are now going to take advantage of that, and we have

11   a right to take advantage of that.'

12         THE COURT:  But Mr. Toberoff, you tell me that

13   everything that's not privileged has been produced except for

14   two small items, and everything that is -

15         MR. TOBEROFF:  We produced those items, your Honor.

16         THE COURT:  Right.  Okay.  So, what huge advantage is

17   there for the defendants to gain if what you say is true?

18         MR. TOBEROFF:  I'm objecting to this procedure, and

19   you are asking me what I said before.  Why not illegally search

20   your house if you have nothing to hide?  What do you have to

21   hide?  I have nothing to hide.

22         I find this whole process frankly outrageous, and I

23   am standing here, your Honor, and lawyers may speak this way

24   just as a cover or to muddy the waters.  I am not.  I am

25   standing here with a firm conviction that, as a matter of

16

1   principle, when they received these documents, they should have

2   immediately picked up the phone.  It was obvious these

3   documents had been stolen from my files.  It is obvious from

4   the cover letter what had happened.

5        There's nothing whistleblower about a lawyer who is

6   bound by the attorney-client privilege taking documents and

7   communications with a client and sending them over to the

8   opposing side in the middle of a heated litigation where each

9   side is supposed to be able to rely on the confidential

10  attorney-client privilege and work product doctrine.  Doing

11  that in the middle of a lawsuit, they should have picked up the

12  phone, immediately called me and immediately returned the

13  documents.  That's not what they did.

14       Wayne Smith wrote in his declaration that he looked

15  at these documents twice.  First. he looked at them outside the

16  office of John Schulman.  Then he took them home with him.  And

17  although he didn't look at the documents or really review them

18  in any substance, and there's been no supposed communications

19  with defense counsel, he marked them 'privileged', 'non-

20  privileged', and 'potentially privileged'.  You can't do that

21  without reviewing the substance of these documents.

22       And now they're pushing for me to have to account and

23  atone, by their Bates numbers, the documents illegally stolen

24  from my offices.  And they are claiming to me that, 'Well, why

25  not do this?  Isn't it your obligation under Rule 34 to produce

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

17

1   documents?'  And my answer to that is, 'It is my obligation.

2   I've satisfied that obligation.  I've put in a declaration, and

3   I'm saying here and I'm willing to swear the oath that we have

4   produced all those documents.'  More than that, we do not have

5   to do.

6           And so I'm standing here on principle, your Honor,

7   and I believe if you look closely into those principles, you'll

8   find that it's improper for the defendants and defendants'

9   counsel to seek to take advantage of this theft of legal files

10  in the middle of a lawsuit.  And if it was the other way

11  around, they would be screaming bloody murder.  And I don't

12  believe they would be compelled to have to atone, by my Bate

13  stamps, on documents lifted from their legal files.  And I

14  guarantee you if I had that opportunity, considering that they

15  have stonewalled us in discovery, I would find a great deal of

16  useful information.

17          If it was the reverse and I received a package like

18  that, I would have picked up that phone, I would have called

19  them, and I would have returned the documents.  And that's what

20  they should have done, and they didn't do that.  And it's

21  outrageous, your Honor.

22          THE COURT:  All right.  Thank you, Mr. Toberoff.

23          Anything further, Mr. Bergman?

24          MR. BERGMAN:  Just a couple of things, your Honor.

25          As your Honor has probably seen from the papers,

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

18

1    Warner Brothers did exactly what the cases and the ABA 1994

2    opinion tells it to do.

3         THE COURT: I read the papers, Mr. Bergman.

4         MR. BERGMAN: Okay. The other point, your Honor, is,

5    one of two things happened here. Either Mr. Toberoff is

6    absolutely correct and this person sent documents which have

7    been produced and which have been listed, or he is not correct,

8    in which event there may not have been documents that should

9    have been produced, produced. All we want to do is put an end

10   to the issue by having him go through what is certainly not a

11   burdensome or oppressive task of coordinating the documents

12   produced and placed on the privilege list with the Bate stamps.

13        THE COURT: All right.

14        MR. TOBEROFF: If I may, your Honor?

15        THE COURT: I think we've exhausted it, Mr. Toberoff.

16             And I will say that I don't agree with the

17   designation of these as 'whistleblower' documents either, Mr.

18   Toberoff. And to the extent I have used that term, I use it

19   only as a shorthand version of referring to the documents that

20   are at issue. If we want to call them the 'escrow' documents,

21   that's fine, too. I mean, I don't think it qualifies as

22   classic whistleblower in the sense that that term is used in

23   the law. The defendants used that in their application, and I

24   don't think even they used it in the classic term.

25             But in any event, you know, I'm not making any

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

19

1   finding that these are in fact in the nature of whistleblower

2   documents.

3          But in my view, I think the defendants have acted

4   professionally, and I think they've acted reasonably.  The

5   record does establish that trial counsel has not reviewed the

6   documents.  They set up a procedure to segregate them, deposit

7   them with an escrow, and seek a resolution of this dispute.

8          Now, I told you, Mr. Toberoff, that I saw a little

9   wiggle room in your declaration.  You tell me you didn't mean

10   for there to be any.  So, here's what I'm going to do.  Not

11   later than May 7th, that's a week from today, I want you to

12   submit a declaration that does identify by the Bates numbers of

13   the escrow documents and the corresponding Bates numbers of

14   documents already produced, those among the escrow documents

15   which are unprivileged and have already been produced.

16          So, you take the Bates numbers of the escrow

17   documents and say, 'Here are the corresponding Bates numbers of

18   the documents that have already been produced.'  Take the Bates

19   numbers of the escrow documents and correspond to the listings

20   on the privilege log of the documents which have not been

21   produced because they were privileged.  All right?  So, put

22   that in your declaration.

23          Then the escrow holder, Mr. Bergman, is to return to

24   the plaintiffs any documents which are identified in the

25   declaration as being privileged and having been identified on

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

20

1   the privilege logs.

2          The others can be delivered to trial counsel for

3   defendants because they're either unprivileged, or, if they

4   were privileged, privilege has been waived because they weren't

5   listed on the privilege log.

6          Now, is it clear what I want done?

7          MR. BERGMAN:  Yes.

8          MR. TOBEROFF:  Are you going to put this in a written

9   order, your Honor?

10          THE COURT:  No, this is it.

11          MR. TOBEROFF:  Okay.  So you would like me to set

12   forth, you would like me essentially to prove that I'm not

13   lying by setting forth in a declaration -

14          THE COURT:  Mr. Toberoff.

15          MR. TOBEROFF:  - this is -

16          THE COURT:  Do you understand what I've ordered you

17   to put in the declaration?

18          MR. TOBEROFF:  I do, your Honor.

19          THE COURT:  All right.  Then that's it.  We're not -

20   You and I are not having an argument.

21          MR. TOBEROFF:  I'm not arguing.  I'm - Okay.

22          THE COURT:  All right?

23          MR. TOBEROFF:  I'm sorry, your Honor, if I'm upset

24   about this.  I think most lawyers would be upset with a

25   situation like this.

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

21

1           THE COURT:  Okay.  It's fine to be upset.  It's not

2   fine to argue.  All right?

3           Mr. Bergman, do you understand what you're to do?

4           MR. BERGMAN:  Yes, I do, your Honor.

5           THE COURT:  All right.

6           All right, that leaves two motions which are related.

7           MR. TOBEROFF:  Your Honor, how much time do we have

8   to do this, because we're in the middle of -

9           THE COURT:  May 7th.

10          The remaining two motions, in my view, are related.

11  These are the Motions to Compel Answers to certain deposition

12  questions by Mr. Marks and Ms. Larson, and to require Mr. Marks

13  to produce documents relating to his authority.

14          Mr. Bergman, do you wish to be heard on these?

15          MR. BERGMAN:  Yes, your Honor.  I'll be very brief.

16  Your Honor is familiar with this problem.

17          THE COURT:  Yes.

18          MR. BERGMAN:  To this day, we have not received an

19  unequivocal answer as to whether Mr. Marks was authorized by

20  the plaintiffs to convey to Mr. Schulman the statement that is

21  contained in the October 19 letter; that is that the Siegel

22  family has accepted.

23          Mr. Toberoff is going around the bush.  He says that

24  there is no issue as to Marks' authority to have conducted

25  settlement negotiations on plaintiffs' behalf.  We're not

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

22

1    questioning that. We just want to know, because it's an

2    essential element of what may be a dispositive counterclaim,

3    did the Siegels authorize Mr. Marks to say to Mr. Schulman

4    they've accepted the offer. It's not privileged. It's not

5    confidential. It's intended, by definition, to be conveyed to

6    the other side, and we believe that we're entitled to it. We

7    believe that for these same reasons we're entitled to any

8    documents that pertain to the authority. After all, that

9    affirmative defense still lingers on in the pleadings. It

10   hasn't been dismissed. And I believe that we're entitled to

11   resolve it one way or another as we proceed to trial.

12          THE COURT: All right, thank you.

13          MR. BERGMAN: Thank you, Judge.

14          THE COURT: Mr. Toberoff? Let me just ask you at the

15   start, Mr. Toberoff. I guess I must be confused, because I

16   thought you had told me you were going to dismiss those

17   affirmative defenses.

18          MR. TOBEROFF: Yes, we were, your Honor, and we in

19   fact drafted amended pleadings, and I sent them over to Mr.

20   Bergman and they refused to stipulate to -

21          THE COURT: No, I remember that.

22          MR. TOBEROFF: Okay. But after that -

23          THE COURT: But after that you told me that you were

24   going to make a motion to dismiss those.

25          MR. TOBEROFF: After that we didn't make the motion

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

23

1    to dismiss.  We decided that we could just simply drop it in

2    our joint pretrial order, and it was suggested by one of the

3    attorneys that works for me that, to make this motion based on

4    this simple amendment a full-blown motion to the Court, that

5    would be unnecessary since we could drop it in the pretrial

6    order.  That was initially pled among some multiple affirmative

7    defenses.

8            THE COURT:  No, no, no, I know.  We've been over this

9    before.

10           MR. TOBEROFF:  I understand, your Honor.  But the

11   fact is that plaintiffs signed verified Interrogatory answers

12   on the question of Mr. Marks' authority.  They said he had

13   authority.  He obviously had authority to send the letter as

14   their attorney in the negotiations.  We have not once in this

15   litigation stood by or asserted the claim or defense, and

16   again, you mentioned earlier that you don't know that it even

17   is an affirmative defense.

18           THE COURT:  No, I don't think that's the way it came

19   up.  I think Mr. Bergman said he wasn't sure if it was an

20   affirmative defense.  That's my recollection of it.

21           MR. TOBEROFF:  Okay.

22           THE COURT:  But I could be wrong.

23           MR. TOBEROFF:  I think there was some mention of it

24   in -

25           THE COURT:  We had a colloquy on it.

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

24

1          MR. TOBEROFF:  Right.  I don't think I was going by a

2   transcript; I think I was going by something in the order.  But

3   be that as it may, we've never asserted this.  They've asked,

4   as I said, Interrogatories, verified answers, answered the

5   question as to authority.  They asked the question specifically

6   in Laura Siegel's deposition; she answered the question

7   specifically.  I can read you the answer.

8          The question was, again, put in two prior motions,

9   and for procedural reasons, because this is a retread and

10  essentially a motion of reconsideration without being a motion

11  of reconsideration with respect to re-deposing Laura Siegel,

12  that's also relevant.  But they've asked the question over and

13  over again.  They know the answer to the question.  He had

14  authority to send that letter.  That's not what this is about.

15         This is about using this as a red herring or an

16  excuse to enter and invade the sanctum of the attorney-client

17  privilege so that they could rephrase the question of authority

18  in legal buzz words to try and formulate, from an answer,

19  something that they can then claim will form an agreement.

20  That's all they're doing here.

21         There's no issue of whether Mr. Marks had authority

22  to send that letter.  He absolutely had the authority.  We've

23  said so over and over again.  I don't believe the fact that it

24  remains as an affirmative defense in our original complaint,

25  filed two years ago, when we've asked them to stipulate to

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

25

1   allow us to amend it and are simply going to do this in a joint

2   - and I will represent to the Court that we're going to do this

3   in our joint pretrial order, we'll drop that affirmative

4   defense, that that becomes the lynch pin to open the door to

5   start asking questions about their communications about this

6   authority.

7          The case law - Excuse me.  May I just get a glass of

8   water?

9      **(No audible response)**

10     **(Pause)**

11         **MR. TOBEROFF:**  Their theory that authority is

12  something that one intends to communicate to the other side,

13  and therefore they can ask questions about that authority with

14  respect to a settlement negotiation, doesn't work, because

15  during the settlement negotiation the authority to agree to any

16  one term or a number of terms in a complex negotiation, which

17  this was, is necessarily linked to your settlement strategy.

18  How much do you ask up front?  How much do you settle for?  All

19  those things are linked.  Just because the ultimate authority

20  of the attorney to represent you in the settlement negotiations

21  or to send a letter is necessarily communicated to the other

22  side, that doesn't implicate the substance of your settlement

23  discussions with that attorney.

24         **THE COURT:**  Let me just ask you a question, Mr.

25  Toberoff.  I just want to make sure I'm clearly understanding

**EXCEPTIONAL REPORTING SERVICES, INC**

EXHIBIT 24

Page 672

26

1    you.  Are you saying that the October - was it October 19th

2    letter?

3              MR. TOBEROFF:  October 19th, 2001, yes.

4              THE COURT:  All right, which was signed by Mr. Marks,

5    right?

6              MR. TOBEROFF:  Yes.

7              THE COURT:  That that represents the statement of the

8    plaintiffs?

9              MR. TOBEROFF:  Yes.

10             THE COURT:  Okay.  All right.  Go ahead, if you have

11   anything further.

12             MR. TOBEROFF:  So, I'll just give you the question

13   that was already posed to Laura Siegel in her deposition.

14             THE COURT:  You don't need to read that again.

15             MR. TOBEROFF:  Okay.  I was going to give you her

16   answer to show that she's answered that question.

17             THE COURT:  You don't need to do that.  I've seen it.

18             MR. TOBEROFF:  Okay.

19             Now, the questions that they seek to - First of all,

20   as an initial matter, their motion with regard to Laura Siegel

21   is improper because it constitutes a motion for

22   reconsideration.

23             THE COURT:  Yeah, I read your argument on that.  I'm

24   familiar with that.

25             MR. TOBEROFF:  Do you have any questions for me about

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

27

1    that argument?

2              THE COURT:  I don't.

3          MR. TOBEROFF:  Okay.  They ask -

4              THE COURT:  I really don't need the two of you to

5    rehash what's in this (indicates).

6          MR. TOBEROFF:  Okay.

7              THE COURT:  And I'm holding up an eight-inch stack of

8    papers.  I really don't.

9          MR. TOBEROFF:  All right.  Well, I would just like to

10   point out one thing to you.

11             THE COURT:  Okay.

12         MR. TOBEROFF:  They have a question, they have only

13   two questions for Laura Siegel.

14             'Did you ever instruct Mr. Marks to communicate to

15             the lawyers for DC Comics that there should be a

16             correction made in this letter?'

17             And they put the cart before the horse, and they pre-

18   suppose that if a communication had taken place, then therefore

19   that was intended to be communicated to the other side, and

20   therefore, because it was intended to be communicated to the

21   other side, she has to answer this question.

22             There's no evidence that there was any such

23   communication to the other side objecting, and therefore, their

24   logic is flawed.  Without any evidence of this third-party

25   communication, they can't say there was any intention to

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

28

1   communicate this to the other side, and therefore you have to

2   answer questions as to whether such communication took place.

3          Do you see? It's illogical. And they're using this

4   one thought in a case which is curtailed, and we've

5   distinguished the case, to try and open the door to the whole

6   attorney-client privilege. They've already done this with

7   Laura Siegel. They already made this motion. They made a

8   motion for reconsideration. All these issues have been before

9   the Court before, and I don't -

10         **THE COURT:** Yes, these issues do seem to have a

11   certain familiarity to them.

12         **MR. TOBEROFF:** And I don't believe that because of

13   this vestigial 37th affirmative defense, which we've asked

14   could we please remove, and we didn't want to make a full-blown

15   motion, and we haven't asserted and we've constantly restated

16   that, no, this is not an issue, that that should be able to

17   open the door for them to invade the attorney-client privilege.

18         It's clear also from their papers they do not just

19   want to ask two questions, because they're constantly asserting

20   'and reasonable follow-up questions'. And to the extent the

21   Court is inclined to grant any of this, and I don't think it

22   should be, these things can easily be posed in Interrogatories,

23   and in fact the cases say that these types of questions that

24   are mixed questions of law and fact are better posed in

25   contention Interrogatories which, if you find it necessary, we

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

29

1  would answer.

2           Thank you, your Honor.

3           THE COURT:  All right.  Thank you, Mr. Toberoff.

4           Mr. Bergman, anything further?

5           MR. BERGMAN:  One very quick point, your Honor.

6           Your Honor's question to Mr. Toberoff and his

7  response to you brought him closer than he's ever been before

8  to where we believe he has to go.  But he's just the attorney.

9           Throughout his argument, he kept saying that the

10 plaintiffs gave Mr. Marks authority to send the letter.  All we

11 want to know is whether they gave him authority to say 'the

12 family has accepted the October 16 offer'.

13          Thank you, your Honor.

14          THE COURT:  All right.  These two motions I'm going

15 to take under submission.  I will get a ruling out very

16 shortly.

17          MR. TOBEROFF:  Thank you, your Honor.

18          MR. BERGMAN:  Thank you, sir.

19          THE COURT:  All right, thank you.

20          I assume Ms. Larson is no relation to Judge Larson.

21          MR. TOBEROFF:  No relation.

22          Your Honor, I'm sorry, could I just ask you to

23 clarify, even though it's simple, because I'm emotional on this

24 issue, obviously, and I want to make sure what we are to do in

25 a declaration.

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

Page 676

30

1           It's my understanding that we are to take the Bates

2   numbers of the stolen documents and put in a declaration that

3   such and such a range of numbers we have produced?

4           THE COURT:  No.

5           MR. TOBEROFF:  Okay.  Could you please repeat it for

6   me, because I want to make sure I'm clear.

7           THE COURT:  For example, Bates number, let's call it

8   'escrow'.  Let's try and take pejoratives out of it either way,

9   all right?  So I won't call them whistleblower documents; I

10  won't call them stolen documents.  I'm not denying they're

11  stolen, I'm not saying they're whistleblower documents; I'm

12  just trying to find a neutral term, so I'm calling it 'escrow'.

13  Escrow is usually a neutral term.  All right.

14          Escrow document 00004 corresponds to previously

15  produced document 00006.  Escrow document 00007 corresponds to

16  previously produced document 00009, and so on.

17          MR. TOBEROFF:  Okay.

18          THE COURT:  Privilege escrow document 00015 is a

19  privilege document which was listed on the privilege log as

20  document such and such.

21          MR. TOBEROFF:  Okay.

22          THE COURT:  Privilege documents get returned.  The

23  privilege documents that were listed on the privilege log get

24  returned.  The others get sent to defense counsel.

25          MR. TOBEROFF:  The others get sent to defense

31

1 counsel?

2          THE COURT: From the escrow.

3          MR. TOBEROFF: Right. Even though we've produced

4 them, but because we're saying they're not privileged, they

5 will get sent to defense counsel. Okay.

6          If we have to match it up that way, could we have a

7 little more time to do that, your Honor, because it will take –

8          THE COURT: How much time do you need?

9          MR. TOBEROFF: We're in the middle of opposing a

10 massive summary judgment motion, so as much time as I can get

11 would be appreciated.

12          THE COURT: Yes, I noticed you were in the middle of

13 all that, because there was some question as to when these

14 motions would be heard, and we were told that it was too

15 difficult to hear them on the 23rd because motions needed to be

16 filed on the 23rd. And then they were set on the 30th, and then

17 you stipulated to have your motions filed on the 30th.

18          MR. TOBEROFF: Right.

19          THE COURT: How much time do you need?

20          MR. TOBEROFF: Three weeks.

21          THE COURT: Three weeks? But you've been through

22 this already, right? You had to to know –

23          MR. TOBEROFF: They're a stack like this (indicates),

24 and if we're matching up all the numbers, it means we've

25 produced 2,000 documents, so going through those and finding the

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

32

```
 1   production, the 2000 documents.  Also, this doesn't just

 2   involve plaintiffs' production, and that's another question,

 3   frankly, because the motion is directed at plaintiffs, but what

 4   do we do to the extent that there are documents in the stolen

 5   documents that don't belong to plaintiffs; that they are

 6   documents of the Schusters or documents of other third parties,

 7   or documents that appear on the privilege log of Don Bolson,

 8   the attorney for Michael Siegel?

 9          THE COURT:  Well, now, Mr. Toberoff, didn't you tell

10   me there were only two documents that hadn't been produced that

11   were unprivileged?

12          MR. TOBEROFF:  That's correct, but the ones that have

13   been produced, we still need to match up, and the ones that

14   were listed on the privilege log we would still need to match

15   up.  And we've produced the two documents that haven't been

16   produced.

17          THE COURT:  So, the fact that they're not documents

18   of the plaintiffs, they might be of some other parties, that

19   doesn't have anything to do with - You're just saying it would

20   take longer to match them up?

21          MR. TOBEROFF:  No.  What I'm saying is, this motion

22   only applies to plaintiffs.  It was a motion to compel

23   plaintiffs to do something regarding documents that are their

24   documents in their possession or control.  But out of an

25   abundance of caution and to satisfy everyone, I went through
```

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

33

1    the documents and privilege logs, pursuant to four or five

2    subpoenas of third parties, where I have documents pertaining

3    to those third parties.

4         THE COURT:  And are you saying that in the escrow

5    documents there are some documents that came from third

6    parties?

7         MR. TOBEROFF:  Absolutely.  Well, they're actually –

8         THE COURT:  Excuse me.  But documents that

9    nevertheless had already been produced?

10        MR. TOBEROFF:  Yes.

11        THE COURT:  So you are just talking about it taking a

12   little more time to get it done?

13        MR. TOBEROFF:  No.  I'm just talking about the fact

14   that in matching this up, I have to match it up to the

15   production not only –

16        THE COURT:  I understand that.  I understand that.

17        MR. TOBEROFF:  First of all, do you want me to –

18        THE COURT:  So it'll take three weeks you say?

19        MR. TOBEROFF:  Well, there's another question and

20   I'll get to it.  Their motion does not apply to these other

21   documents; it only applies to the plaintiffs.

22        MR. BERGMAN:  Right.

23        MR. TOBEROFF:  Because it's a motion to compel

24   plaintiffs' production, not a motion to compel a third party's

25   production.

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

34

1    **MR. BERGMAN:**  Your Honor, there is also a Rule 45

2    subpoena that was issued to Mr. Toberoff seeking the identical

3    documents which is included within the motion.

4    **THE COURT:**  All right.  You can have three weeks.

5    So, that'll be May 21st.  Match them up from whoever's files,

6    Mr. Toberoff.

7    All right, anything further?

8    **MR. BERGMAN:**  No, your Honor.

9    **MR. TOBEROFF:**  Thank you, your Honor.

10    **THE COURT:**  All right.  Thank you.

11    Any other matters?

12    **THE CLERK:**  No, that completes the calendar.

13    **THE COURT:**  All right.  We'll be in recess.

14    **(This proceeding was adjourned at 11:28 a.m.)**

15

16

17

18

19

20

21

22

23

24

25

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    May 15, 2007

### TONI HUDSON

### FEDERALLY-CERTIFIED TRANSCRIBER

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT 24

EXHIBIT 25

1  Marc Toberoff (CA State Bar No. 188547)
   Nicholas C. Williamson (CA State Bar No. 231124)
2  LAW OFFICES OF MARC TOBEROFF, PLC
   2049 Century Park East, Suite 2720
3  Los Angeles, CA 90067
   Telephone: (310) 246-3333
4  Facsimile: (310) 246-3101

5  Attorneys for Plaintiffs and Counterclaim Defendants
   JOANNE SIEGEL and LAURA SIEGEL LARSON
6

7                    UNITED STATES DISTRICT COURT

8                   CENTRAL DISTRICT OF CALIFORNIA

9   JOANNE SIEGEL, an individual; and
10  LAURA SIEGEL LARSON, an               Case Nos.:
    individual,                           CV 04-08400 SGL (RZx)
11                                        CV 04-08776 SGL (RZx)
              Plaintiffs,
12                                        [Hon. Stephen G. Larson, U.S.D.J.]
         vs.                              [Hon. Ralph Zaresky, U.S.M.J.]
13
    TIME WARNER INC., a corporation;
14  WARNER COMMUNICATIONS
    INC., a corporation; WARNER          DECLARATION OF MARC
15  BROS. ENTERTAINMENT INC., a          TOBEROFF PURSUANT TO
    corporation; WARNER BROS.            MAGISTRATE ZAREFSKY'S
16  TELEVISION PRODUCTION INC.,          APRIL 30, 2007 ORDER
    a corporation; DC COMICS, a general
17  partnership; and DOES 1-10,
18
19            Defendants.
20
    DC COMICS,
21
22            Counterclaimant,
         vs.
23
    JOANNE SIEGEL, an individual; and
24  LAURA SIEGEL LARSON, an
    individual,
25
26
              Counterclaim Defendants.
27
28

EXHIBIT 25

Declaration Of Marc Toberoff

I, Marc Toberoff, declare as follows:

1.      I am an attorney at the Law Offices of Marc Toberoff, PLC, counsel of record for plaintiffs Joanne Siegel and Laura Siegel Larson ("Plaintiffs"). I am a member in good standing of the State Bar of California and submit this declaration pursuant to Magistrate Zarefsky's order at the April 30, 2007 hearing ("Order") on defendants' motion to compel the production of documents stolen from my law offices ("Documents"). I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.      Pursuant to the Order, I have accounted for each of the Documents as bate stamped by John Quinn, Esq. (designated by "Q") and identified by bates numbers the Documents produced to defendants by Plaintiffs or third party witnesses, as applicable, or listed in a privilege log furnished to defendants by Plaintiffs and/or such third parties:

| | |
|---|---|
| Q 0001- 7 | Un-dated defamatory cover letter |
| Q 0008-9 | Plaintiffs' Kevin Marks ("Marks") Privilege Log # 325 |
| Q 0010 | Privileged communication between Law Offices of Marc Toberoff and Plaintiff Laura Siegel Larson dated October 10, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. |
| Q 0011-13 | Produced by Plaintiffs- 000001888-90 |
| Q 0014-18 | Produced by IPW, LLC- 17-20 |
| Q 0019-20 | Produced by Plaintiffs- 000001883-1884 |
| Q 0021-24 | Produced by Pacific Pictures Corporation.- 00001- 4 |

EXHIBIT 25

1

Declaration Of Marc Toberoff

51

| | |
|---|---|
| Q 0025 | Internet listing for Pacific Pictures Corp. from California Business Portal; not in Plaintiffs' files. |
| Q 0026 | Internet listing for Pacific Pictures Corp. from New York Department of State; not in Plaintiffs' files. |
| Q 0027-33 | Plaintiffs' supplemental privilege log # 82 |
| Q 0034-35 | Produced by Jean Peavy and Warren Peary ("Shusters")-142-43 |
| Q 0036-39 | Produced by Shusters- 125-28 |
| Q 0040 | Attorney Don Bulson ("Bulson") privilege log #319 |
| Q 0041 | Produced by Shusters- 119 |
| Q 0042-50 | Produced by Shusters-113- 118 |
| Q 0051 | Wall Street Journal article by John Lippman; not in Plaintiffs' file. |
| Q 0052 | Variety.com article by Claude Brodesser; not in Plaintiffs' file. |
| Q 0053-54 | Produced by Shusters-140-141 |
| Q 0055-56 | Produced by Shusters- 138-139 |
| Q 0057-58 | Bulson privilege log # 327 |
| Q 0059-74 | Produced by Shusters- 63-78 |
| Q 0075-76 | Bulson privilege log # 327 |
| Q 0077-81 | Produced  by Shusters- 79- 83 |
| Q 0082-85 | Produced by Shusters- 105- 108 |
| Q 0083-85 | Produced by Shusters- 106 |
| Q 0086 | Produced by Plaintiffs- 000002050 |

EXHIBIT 25          2

| | |
|---|---|
| Q 0087-0089 | Plaintiffs' supplemental privilege log # 69 |
| Q 0090-95 | Plaintiffs' supplemental privilege log # 76 |
| Q 0096-104 | Plaintiffs' supplemental privilege log # 77, 78 |
| Q 0105-127 | Plaintiffs' supplemental privilege log # 77, 78 |
| Q 0128-31 | Plaintiffs' supplemental privilege log # 98 |
| Q 0132-37 | Plaintiffs' supplemental privilege log # 82, 83 |
| Q 0138-45 | Plaintiffs' supplemental privilege log # 79 |
| Q 0146-51 | Plaintiffs' supplemental privilege log #80, 81 |
| Q 0152-57 | Plaintiffs' supplemental privilege log #80, 81 |
| Q 0158-63 | Plaintiffs' supplemental privilege log #82, 83 |
| Q 0164- 171 | Plaintiffs' supplemental privilege log # 182 |
| Q 0172-175 | Plaintiffs' supplemental privilege log # 181 |
| Q 0176-94 | Shusters' supplemental privilege log # 2 |
| Q 0195-199 | Shusters' supplemental privilege log # 3 |
| Q 0200 | Shusters' supplemental privilege log # 5 |
| Q 0201-222 | Shusters' supplemental privilege log # 4 |
| Q 0223 | Produced by Shusters- 103 |
| Q 0224-42 | Shusters' supplemental privilege log # 4 |
| Q 0243-44 | Shusters' supplemental privilege log # 9 |
| Q 0245-49 | Produced by Shusters- 79-83 |

EXHIBIT 25

3

Declaration of Marc Toberoff

53

| | | |
|---|---|---|
| 1 | Q 0250-254 | Plaintiffs' supplemental privilege log # 98 |
| 2 | Q 0255-273 | Shusters' supplemental privilege log # 2 |
| 3 | Q 0274-5 | Shusters' supplemental privilege log # 8 |
| 4 | | |
| 5 | Q 0276 | Shusters' supplemental privilege log # 6 |
| 6 | Q 0277 | Shusters' supplemental privilege log # 7 |
| 7 | Q 0278 | Privileged communication between Law Offices of Marc Toberoff and Plaintiff Laura Siegel Larson dated August 13, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | Q 0279-80 | 8/11/05 litigation letter from David Burg to M. Toberoff |
| 12 | | |
| 13 | Q 0281-82 | 8/11/05 litigation letter from David Burg to M. Toberoff |
| 14 | Q 0283 | 8/12/05 litigation letter from M. Toberoff to David Burg |
| 15 | Q 0284 | 8/12/05 litigation letter from M. Toberoff to David Burg |
| 16 | | |
| 17 | Q 0285-289 | Privileged communication between Law Offices of Marc Toberoff and Plaintiffs Laura Siegel Larson and Joanne Siegel dated August 12, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | Q 0290-0296 | Un-dated defamatory cover letter (duplicate) |
| 22 | Q 0297-299 | Produced by Plaintiffs- 000001888-90 |
| 23 | | |
| 24 | Q 0300 | Wall Street Journal article by John Lippman; not in Plaintiffs' file. |
| 25 | | |
| 26 | Q 0301-303 | Produced by Pacific Pictures Corp- 1-4 |
| 27 | Q 0304-305 | Produced by Shusters- 142-143 |
| 28 | | |

EXHIBIT 25    4

Declaration of Marc Toberoff

Page 65

54

| | | |
|---|---|---|
| 1 | Q 0306-309 | Produced by Shusters- 125- 128 |
| 2 | Q 0310-13 | Plaintiffs' supplemental privilege log #175 |
| 3 4 | Q 0314 | Internet listing for Pacific Pictures Corp. from California Business Portal; not in Plaintiffs' files. |
| 5 6 | Q 0315 | Internet listing for Pacific Pictures Corp. from New York Department of State; not in Plaintiffs' files. |
| 7 8 | Q 0316-23 | Plaintiffs' supplemental privilege log # 79 |
| 9 | Q 0324-32 | Plaintiffs' supplemental privilege log # 77, 78 |
| 10 | Q 0333-35 | Plaintiffs' supplemental privilege log # 69 |
| 11 12 | Q 0336-340 | Produced by IPW, LLC 17- 20, Plaintiffs- 000001882 |
| 13 | Q 0341-42 | Produced by Plaintiffs- 000001883-84 |
| 14 | Q 0343-44 | Produced by Plaintiffs- 000002048-49 |
| 15 16 | Q 0343-44 | Produced by Plaintiffs- 000002048-9 |
| 17 | Q 0345-50 | Plaintiffs' supplemental privilege log # 76 |
| 18 19 | Q 0351 | Variety.com article by Claude Brodesser; not in Plaintiffs' file. |
| 20 | Q 0352 | Bulson privilege log # 319 |
| 21 22 | Q 0353-360 | Plaintiffs' supplemental privilege log # 182 |
| 23 24 25 26 | Q 0361 | Privileged communication between Law Offices of Marc Toberoff and Plaintiff Laura Siegel Larson dated October 10, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. |
| 27 | Q 0362-63 | Produced by Shusters- 140-41 |
| 28 | | |

EXHIBIT 25    5

Declaration of Marc Toberoff

55

| | | |
|---|---|---|
| 1 | Q 0364-382 | Shusters' supplemental privilege log #2 |
| 2 | Q 0383-87 | Shusters' supplemental privilege log #3 |
| 3 | Q 0388-93 | Plaintiffs' supplemental privilege log #80, 81 |
| 4 | | |
| 5 | Q 0394-399 | Plaintiffs' supplemental privilege log #82, 83 |
| 6 | Q 0400-01 | Bulson privilege log # 327 |
| 7 | Q 0402-408 | Shusters' privilege log # 9 |
| 8 | | |
| 9 | Q 0409-424 | Produced by Shusters- 63-78 |
| 10 | Q 0425-29 | Plaintiffs' supplemental privilege log # 98 |
| 11 | Q 0430-52 | Plaintiffs' supplemental privilege log # 77, 78 |
| 12 | | |
| 13 | Q 0453-71 | Shusters' supplemental privilege log # 2 |
| 14 | Q 0472-76 | Shusters' supplemental privilege log # 3 |
| 15 | Q 0477-82 | Plaintiffs' supplemental privilege log # 80 |
| 16 | | |
| 17 | Q 0483-88 | Plaintiffs' supplemental privilege log # 82, 83 |
| 18 | Q 0489-90 | Bulson privilege log # 327, 328 |
| 19 | Q 0491-95 | Produced by Shusters- 79-83 |
| 20 | | |
| 21 | Q 0496-99 | Plaintiffs' supplemental privilege log # 98 |
| 22 | Q 0500-1 | Shusters' supplemental privilege log # 8 |
| 23 | Q 0502-05 | Produced by Shusters- 105-08 |
| 24 | | |
| 25 | Q 0506-30 | Shusters' supplemental privilege log # 5 |
| 26 | Q 0531-32 | Produced by Shusters- 138-139 |
| 27 | Q 0533-46 | Shusters' supplemental privilege log # 4 |
| 28 | | |

EXHIBIT 25

6

| | |
|---|---|
| Q 0547 | Produced by Plaintiffs- 000002050 |
| Q 0548 | Shusters' supplemental privilege log # 6 |
| Q 0549 | Shusters' supplemental privilege log # 7 |
| Q 0550 | Privileged communication between Law Offices of Marc Toberoff and Plaintiff Laura Siegel Larson dated August 13, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. (Duplicate of Q 0278). |
| Q 0551-52 | 8/11/05 litigation letter from David Burg to M. Toberoff |
| Q 0553-4 | 8/11/05 litigation letter from David Burg to M. Toberoff |
| Q 0555 | 8/12/05 litigation letter from M. Toberoff to David Burg |
| Q 0556 | 8/12/05 litigation letter from M. Toberoff to David Burg |
| Q 0557-61 | Privileged communication between Law Offices of Marc Toberoff and Plaintiff Laura Siegel Larson and Joanne Siegel dated August 12, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. (Duplicate of Q 0285-289) |
| Q 0562-569 | Un-dated defamatory cover letter (duplicate) |
| Q 0570-72 | Produced by Plaintiffs- 000001888-90 |
| Q 0573-74 | Produced by Plaintiffs- 000001883-84 |
| Q 0575-76 | Produced by Plaintiffs- 000002048-49 |
| Q 0577-80 | Produced by Shusters- 125-128 |
| Q 0581-582 | Produced by Shusters- 142-143 |
| Q 0583-586 | Produced by Shusters- 125-128 |

EXHIBIT 25

7

Declaration Of Marc Toberoff

57

| | | |
|---|---|---|
| 1 | Q 0587 | Internet listing for Pacific Pictures Corp. from California |
| 2 | | Business Portal; not in Plaintiffs' files. |
| 3 | Q 0588 | Internet listing for Pacific Pictures Corp. from New York |
| 4 | | Department of State; not in Plaintiffs' files. |
| 5 | Q 0589- 596 | Plaintiffs' supplemental privilege log # 79 |
| 6 | | |
| 7 | Q 0597- 0605 | Plaintiffs' supplemental privilege log # 77, 78 |
| 8 | Q 0606- 0609 | Plaintiffs' supplemental privilege log # 175 |
| 9 | Q 0610-0617 | Plaintiffs' supplemental privilege log # 182 |
| 10 | | |
| 11 | Q 0618 | Privileged communication between Law Offices of Marc |
| 12 | | Toberoff and Plaintiff Laura Siegel Larson dated October 10, 2005, after the start of this litigation. This document is *not* |
| 13 | | required to be listed in a privilege log pursuant to the parties' standing agreement. (Duplicate of Q 0361). |
| 14 | | |
| 15 | Q 0619-20 | Produced by Shusters- 140-141 |
| 16 | Q 0621-23 | Plaintiffs' supplemental privilege log # 69 |
| 17 | Q 0624-28 | Produced by IPW, LLC- 17- 20; Produced by Plaintiffs- |
| 18 | | 000001882 |
| 19 | Q 0629-0634 | Plaintiffs' supplemental privilege log # 76 |
| 20 | | |
| 21 | Q 0635 | Bulson privilege log # 318 |
| 22 | Q 0636- 654 | Shusters' supplemental privilege log # 2 |
| 23 | Q 0655-659 | Shusters' supplemental privilege log # 3 |
| 24 | | |
| 25 | Q 0660-65 | Plaintiffs' supplemental privilege log # 80, 81 |
| 26 | Q 0666-71 | Plaintiffs' supplemental privilege log # 82, 83 |
| 27 | Q 0672-73 | Bulson's privilege log # 327, 328 |
| 28 | | |

EXHIBIT 25

Declaration of Marc Toberoff

| | | |
|---|---|---|
| 1 | Q 0674-680 | Shusters' supplemental privilege log # 9 |
| 2 | | |
| 3 | Q 0681-696 | Produced by Shusters- 63- 78 |
| 4 | Q 0697-701 | Plaintiffs' supplemental privilege log # 98 |
| 5 | | |
| | Q 0702-724 | Plaintiffs' supplemental privilege log # 77, 78 |
| 6 | | |
| 7 | Q 0725-743 | Shusters' supplemental privilege log # 2 |
| 8 | Q 0744-748 | Shusters' supplemental privilege log # 3 |
| 9 | Q 0749- 754 | Plaintiffs' supplemental privilege log # 80, 81 |
| 10 | | |
| 11 | Q 0755-760 | Plaintiffs' supplemental privilege log # 82, 83 |
| 12 | Q 0761-762 | Bulson privilege log # 327, 328 |
| 13 | Q 0763-767 | Produced by Shusters- 79-83 |
| 14 | | |
| 15 | Q 0768-771 | Plaintiffs' supplemental privilege log # 98 |
| 16 | Q 0772-773 | Shusters' supplemental privilege log # 8 |
| 17 | Q 0774-777 | Produced by Shusters- 105- 108 |
| 18 | | |
| 19 | Q 0778-802 | Shusters' supplemental privilege log # 5 |
| 20 | Q 0803-804 | Produced by Shusters 138-39 |
| 21 | Q 0805-823 | Shusters' supplemental privilege log # 4 |
| 22 | | |
| 23 | Q 0824 | Produced by Plaintiffs- 000002050 |
| 24 | Q 0825 | Shusters' supplemental privilege log #6 |
| 25 | Q 0826 | Shusters' supplemental privilege log #7 |
| 26 | | |
| 27 | Q 0827 | Privileged communication between Law Offices of Marc Toberoff and Plaintiff Laura Siegel Larson dated August |
| 28 | | |

9

EXHIBIT 25
Declaration of Marc Toberoff
Page 692
59

13, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. (Duplicate of Q 0278).

Q 0828-29    8/11/05 litigation letter from David Burg to M. Toberoff

Q 0830-31    8/11/05 litigation letter from David Burg to M. Toberoff

Q 0832    8/12/05 litigation letter from M. Toberoff to David Burg

Q 0833    8/12/05 litigation letter from M. Toberoff to David Burg

Q 0836-38    Privileged communication between Law Offices of Marc Toberoff and Plaintiffs Laura Siegel Larson and Joanne Siegel dated August 12, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. (Duplicate of Q 0285-289)

Q 0839    Wall Street Journal article by John Lippman; not in Plaintiffs' file.

    I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

    Executed on May 21, 2007 in Los Angeles, California.

                                    _____
                                            Marc Toberoff

EXHIBIT 25    10
Page 693
Declaration Of Marc Toberoff              60

EXHIBIT 26

1

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                          EASTERN DIVISION

4                              - - -

5          HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                              - - -

7    JOANNE SIEGEL, ET AL.,              )
                                         )
8                       PLAINTIFFS,      )
                                         )
9              VS.                       )   NO. CV 04-08776-SGL
                                         )
10   TIME WARNER, INC., ET AL.,          )
                                         )   CROSS MOTIONS FOR
11                      DEFENDANTS.      )   PARTIAL SUMMARY JUDGEMENT
     _____)
                                         )
12                                       )
     AND RELATED CASES,                  )
13   _____)

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                     RIVERSIDE, CALIFORNIA

17                 MONDAY, SEPTEMBER 17, 2007

18                          1:38 P.M.

19

20

21

22

23                 THERESA A. LANZA, RPR, CSR
                 FEDERAL OFFICIAL COURT REPORTER
24                  3470 12TH STREET, RM. 134
                  RIVERSIDE, CALIFORNIA  92501
25                       (951) 274-0844
                     CSR11457@SBCGLOBAL.NET
     EXHIBIT 26

**CERTIFIED COPY**

2

1   APPEARANCES:

2   ON BEHALF OF THE PLAINTIFFS:

3
                    LAW OFFICES OF MARC TOBEROFF
4                   BY:  MARC TOBEROFF
                    BY:  NICHOLAS WILLIAMSON
5                   2049 CENTURY PARK EAST,
                    SUITE 2720
6                   LOS ANGELES, CALIFORNIA  90067
                    310-246-3333
7

8
    ON BEHALF OF DEFENDANTS:
9
                    WEISSMANN WOLFF BERGMAN COLEMAN
10                   GRODIN & EVALL LLP
                    BY:  MICHAEL BERGMAN
11                  9665 WILSHIRE BOULEVARD,
                    NINTH FLOOR
12                  BEVERLY HILLS, CALIFORNIA  90212
                    310-858-7888
13

14

15  ON BEHALF OF DEFENDANTS:

16                  FROSS ZELNICK LEHRMAN & ZISSU, P.C.
                    BY:  ROGER L. ZISSU
17                  866 UNITED NATIONS PLAZA
                    AT FIRST AVENUE & 48TH STREET
18                  NEW YORK, NEW YORK  10017
                    212-813-5900
19

20
    ON BEHALF OF DEFENDANTS:
21
                    PERKINS LAW OFFICE, P.C.
22                  BY:  PATRICK T. PERKINS
                    1711 ROUTE 9D
23                  COLD SPRINGS, NEW YORK  10516
                    845-265-2820
24

25                          EXHIBIT 26

1   WILL DO THE BEST I CAN TO COMPLETE IT SOONER, BUT I THINK

2   CUTTING IT LESS THAN THREE HOURS IS JUST -- WE JUST CAN'T DO

3   IT.

4           HE CAME BACK AT THE ELEVENTH HOUR AND OFFERED TWO

5   HOURS FOR MRS. LARSON.  WE JUST FELT LIKE WE COULDN'T AGREE TO        04:40

6   THAT, PARTICULARLY SINCE --

7           THE COURT:  YOU MEAN MRS. SIEGEL.

8           MR. PERKINS:  IT'S LAURA SIEGEL LARSON; SHE'S THE

9   DAUGHTER, YOUR HONOR.

10          THE COURT:  YES.                                             04:4

11          MR. PERKINS:  WE HAVE A LITTLE BIT OF A HISTORY, AT

12  LEAST WITH THE LAST DEPOSITION, OF MRS. LARSON WHICH HAS BEEN

13  THE SUBJECT OF A COUPLE OF MOTIONS WHICH INCLUDED A FINDING BY

14  MAGISTRATE JUDGE ZAREFSKY THAT SOME OF THE OBJECTIONS BY

15  MR. TOBEROFF WERE DEVIATING FROM WHAT THE RULES REQUIRE; THERE        04:4

16  WERE OVER 285 OF THEM DURING THE DEPOSITION.  IT WAS, WE

17  CONSIDERED, TO BE EXCESSIVE.  THAT'S ONE OF THE THINGS,

18  FRANKLY, THAT WE'RE CONCERNED ABOUT IN ENSURING THAT WE HAVE

19  SUFFICIENT TIME, THAT WE DON'T GET STALLED, IF YOU WILL, BY

20  VIRTUE OF LENGTHY SPEAKING OBJECTIONS.                               04:

21          TO BE FAIR, MR. TOBEROFF AND I HAVE HAD NUMEROUS

22  DEPOSITIONS TOGETHER AND WE HAVE DONE OUR BEST TO AVOID THAT,

23  BUT IT IS A CONCERN SINCE THIS IS ONE OF THE PLAINTIFFS.

24          THE COURT:  VERY GOOD.

25          MR. TOBEROFF, WHAT ABOUT THESE ESCROW DOCUMENTS?            04:

EXHIBIT 26

SIEGEL V. WARNER, ET AL.

1    JUDGE ZAREFSKY IS NOT IN A POSITION TO WHERE HE NEEDS TO BE

2    HEARING MOTIONS FOR SANCTIONS RIGHT NOW; HE'S GOT OTHER THINGS

3    ON HIS MIND, AND --

4            MR. TOBEROFF:  I DIDN'T MAKE THE MOTION TO BE --

5            THE COURT:  COUNSEL, WE CAN'T BOTH SPEAK AT THE SAME        04:41

6    TIME.

7            I KNOW YOU DIDN'T MAKE THE MOTION.  I UNDERSTAND

8    THAT, ACCORDING TO THE ALLEGATIONS, YOU DID NOT PRODUCE THE

9    DOCUMENTS.  WHAT'S GOING ON HERE?

10           MR. TOBEROFF:  THE ALLEGATIONS ARE COMPLETELY FALSE.        04:41

11           THE COURT:  YOU'VE PRODUCED THE ESCROW DOCUMENTS?

12           MR. TOBEROFF:  NO.

13           THE ESCROW DOCUMENTS, WHAT THEY STYLE AS THE ESCROW

14   DOCUMENTS, ARE DOCUMENTS THAT WERE STOLEN FROM MY LEGAL LAW

15   OFFICE'S FILES BY A FORMER EMPLOYEE WHO IS ALSO AN ATTORNEY WHO    04:41

16   RANSACKED THE FILES -- A DISGRUNTLED ATTORNEY -- TOOK ALL SORTS

17   OF OBVIOUSLY PRIVILEGED INFORMATION; PUT IT IN THREE DUPLICATE

18   PACKAGES; SENT IT OVER TO THE DEFENDANTS.

19           THIS IS MUCH MORE COMPLEX AND DISTURBING THAN THEY

20   ARE LETTING YOU KNOW.                                             04:4

21           IN THE PROCESS, MAGISTRATE ZAREFSKY SAID 'WELL, HAVE

22   YOU PRODUCED THESE DOCUMENTS?'  AND WE SAID WE PRODUCED THEM

23   AND LISTED THOSE ON THE PRIVILEGED LOG, THOSE THAT ARE INVOLVED

24   IN THE CASE.  AND HE SAID THEN WHAT ARE WE ARGUING OVER?

25           AND EVEN THOUGH THIS IS SHOCKING, AND AS A MATTER OF        04:4

**EXHIBIT 26**

SEPTEMBER 17, 2007                        STEGEL V. WARNER, ET AL.

1    PRINCIPLE, IT SHOULD NOT BE USED BY THE DEFENDANTS AS A

2    WINDFALL TO GAIN SOME ADVANTAGE IN LITIGATION, WHICH IS WHAT

3    THEY ARE OBVIOUSLY DOING BY PRESSING WITH THESE DOCUMENTS -- HE

4    SAID, WHAT ARE YOU FIGHTING OVER, AND HE ISSUED AN ORDER WHICH

5    SAID 'SIMPLY PUT IN A DECLARATION BATES NUMBERS -- THESE          04:42

6    DOCUMENTS THAT WERE STOLEN WERE THEN BATES STAMPED BY THE

7    DEFENDANTS AND PUT WITH ANOTHER LAWYER WHO THEY SAID WAS A

8    NEUTRAL, BUT, IN FACT, WAS A LAWYER HIRED BY THEM AND PAID BY

9    THEM, AND THEY BATES STAMPED THESE DOCUMENTS.  AND HE SAID JUST

10   CORRESPOND THE DOCUMENTS THAT YOU HAVE PRODUCED AND THE          04:4

11   DOCUMENTS LISTED IN THE PRIVILEGED LOGS TO THOSE THAT ARE

12   BATES STAMPED.  WHICH I DID, COMPLYING WITH THE ORDER IN THE

13   DECLARATION; SO I'VE COMPLIED WITH THE ORDER.

14            THE PROBLEM IS, AFTER GETTING MAGISTRATE ZAREFSKY TO

15   ISSUE THE ORDER, THEN THEY STARTED TO ABUSE THE SITUATION;       04:4

16   CONTACTING THE PURPORTED ESCROW AGENT, ASKING HIM NOT SIMPLY TO

17   DISPERSE THE DOCUMENTS PURSUANT TO MAGISTRATE JUDGE ZAREFSKY'S

18   ORDER, BUT TO EXAMINE THE DOCUMENTS LISTED IN THE PRIVILEGED

19   LOGS, DETERMINE WHETHER OR NOT THEY ARE PRIVILEGED; ALL SORTS

20   OF THINGS WHICH BOTH ABUSE THE ORDER AND ABUSE THE SUPPOSED      04:4

21   NEUTRAL PROVISION OF THE PERSON HOLDING THESE ESCROW DOCUMENTS.

22            WE OBJECTED TO THAT.

23            THE MOTION IS ABOUT THREE DOCUMENTS OR SO THAT FELL

24   THROUGH THE CRACKS OF THE ORDER AND WHILE ADDRESSED IN MY

25   PAPERS IN FRONT OF MAGISTRATE ZAREFSKY, WERE NEVER ADDRESSED IN  04:0

EXHIBIT 26

SEPTEMBER 17, 2007                    SIEGEL V. WARNER, ET AL.

115

1    ORAL ARGUMENTS OR BY THE RULING.

2           AND EVEN THOUGH IT MADE NO SENSE TO RELEASE THOSE

3    DOCUMENTS UNDER THE RATIONALE OF MAGISTRATE ZAREFSKY'S ORDERS,

4    THEY PRESSED THE ESCROW AGENT TO RELEASE THE DOCUMENTS; AND

5    EVEN THOUGH HE'S HIRED BY THEM AND ON RETAINER FOR THEM, HE          04:44

6    FELT UNCOMFORTABLE IN THE SITUATION BECAUSE, PRESUMABLY, HE

7    FELT THAT PLAINTIFFS HAD A POINT AND HE SAID THAT MAGISTRATE

8    ZAREFSKY NEEDS TO DECIDE THIS.

9           **THE COURT:**  SO THESE ARE THE THREE DOCUMENTS THAT

10   WERE --                                                             04:4

11          **MR. TOBEROFF:**  THERE'S A COVER LETTER WHICH WAS IN

12   THE SUBJECT OF THE MOTION, OF THIS DISGRUNTLED EMPLOYEE WHO IS

13   MAKING ALL THESE DEFAMATORY STATEMENTS.  THERE ARE DOCUMENTS

14   WHICH WEREN'T LISTED IN A PRIVILEGE LOG BECAUSE WE HAVE AN

15   AGREEMENT WITH DEFENDANTS THAT POST-LITIGATION DOCUMENTS           04:4

16   BETWEEN COUNSEL AND THEIR CLIENTS NEED NOT BE LISTED; SO THEY

17   ARE SAYING, WELL, THE ORDER SAYS YOU RELEASED --

18          **THE COURT:**  YOU HAVE TO SLOW DOWN, COUNSEL.

19          **MR. TOBEROFF:**  THERE WERE A COUPLE OF DOCUMENTS WHERE

20   COMMUNICATIONS FROM MY AND MY CLIENT, AFTER LITIGATION HAD          04:4

21   COMMENCED AND PURSUANT TO AN ADMITTED AGREEMENT, THAT THEY

22   ADMIT THEY WERE NOT ON A PRIVILEGE LOG.  THEY SAID, WELL, THE

23   BRIGHT LINE ORDER WOULD REQUIRE THE ESCROW AGENT TO RELEASE

24   THOSE ANYWAY; THAT'S THE SECOND CATEGORY THAT'S JUST A COUPLE

25   OF LETTERS.                                                         04:4

**EXHIBIT 26**

116

1      AND THE THIRD FALLS SQUARELY WITHIN THE ORDER,

2  BECAUSE IT'S LISTED ON A THIRD-PARTY PRIVILEGE LOG, AND THEY

3  ARE SAYING 'BECAUSE YOU DIDN'T ALSO LIST IT, THE JOINT

4  PRIVILEGE IS WAIVED'; SOMETHING THAT THEY NEVER BROUGHT IN

5  THEIR ORIGINAL MOTION TO COMPEL.

6      THE COURT:  SO IN ALL THREE CASES, YOU'RE ASSERTING

7  PRIVILEGE AT THIS POINT.

8      MR. TOBEROFF:  YES.

9      THE COURT:  LET ME HEAR A RESPONSE.

10      MR. PERKINS:  YOUR HONOR, THIS STORY IS A VERY LONG

11  AND COMPLICATED STORY, AND JUDGE ZAREFSKY ACTUALLY HELD ORAL

12  ARGUMENT ON THIS, AND TO SORT OF ENCAPSULATE IT, JUDGE ZAREFSKY

13  SAID --

14      THE COURT:  WHEN DID HE HOLD ORAL ARGUMENT ON THIS?

15      MR. PERKINS:  THAT'S A GOOD QUESTION.

16      MR. BERGMAN:  WHEN?

17      MR. PERKINS:  YES.

18      MR. BERGMAN:  SEVERAL MONTHS AGO.

19      THE COURT:  SO NOT RECENTLY.

20      MR. PERKINS:  NOT RECENTLY, YOUR HONOR.

21      AT THE ORAL ARGUMENT, HE BASICALLY SAID TO

22  MR. TOBEROFF, 'I'M GOING TO HOLD YOU TO YOUR REPRESENTATION.  I

23  WANT YOU TO GO THROUGH, AND YOU HAVE TO IDENTIFY BY BATES

24  NUMBER ALL OF THESE ESCROW DOCUMENTS AND IDENTIFY WHETHER THEY

25  HAVE BEEN PRODUCED OR WHETHER THEY HAVE BEEN IDENTIFIED ON YOUR

EXHIBIT 26

SEPTEMBER 17, 2007          SIEGEL V. WARNER, ET AL.

1    CLIENT'S PRIVILEGE LOG.  AND IF THEY HAVEN'T BEEN IDENTIFIED ON

2    THE CLIENT'S PRIVILEGE LOG, THE PRIVILEGE IS WAIVED.  HE SAID

3    THAT.  HE DID NOT ISSUE A WRITTEN ORDER; IT'S JUST IN THE

4    TRANSCRIPT.

5           MR. TOBEROFF THEN DID AS HE WAS ASKED; HE CREATED A      04:47

6    DECLARATION IDENTIFYING BY BATES NUMBER WHAT JUDGE ZAREFSKY HAD

7    MADE CLEAR.

8           ONE OF THE THINGS THAT WAS NOT INCLUDED ON ANY

9    PRIVILEGE LOG WAS THE LETTER, THE COVER LETTER.  THAT COVER

10   LETTER WAS THE SUBJECT OF A SUBPOENA ON MR. TOBEROFF'S OFFICE.   04:4

11   IT WAS THE SUBJECT OF A DOCUMENT REQUEST TO THE PLAINTIFFS.

12   THEY NEVER PRODUCED IT AND THEY NEVER LISTED IT ON ANY

13   PRIVILEGE LOG.

14          THE COURT:  IF THAT REALLY IS A LETTER FROM HIS

15   FORMER LAW ASSOCIATE TO HIM, WHY WOULD THAT BE RELEVANT TO THIS  04:4

16   LAWSUIT?

17          MR. PERKINS:  WELL, THAT'S A GOOD QUESTION.  I DON'T

18   KNOW.

19          FIRST OF ALL, IT'S NOT A LETTER TO MR. TOBEROFF.

20          IT'S A LETTER FROM THE DISGRUNTLED EMPLOYEE TO THE        04:4

21   PEOPLE AT WARNER BROTHERS TO WHOM THE DOCUMENTS ARE DELIVERED.

22          AS I UNDERSTAND IT, IT OUTLINES WHY HE'S DOING WHAT

23   HE'S DOING.  I DON'T KNOW, BECAUSE I HAVEN'T SEEN THE

24   DOCUMENTS.  WHAT WARNER BROTHERS DID AND WHAT JUDGE ZAREFSKY

25   FOUND TO BE ENTIRELY APPROPRIATE WAS THEY DID AN INITIAL REVIEW  04:4

EXHIBIT 26

118

1    PURSUANT TO CALIFORNIA LAW TO DETERMINE WHETHER OR NOT THE

2    DOCUMENTS WERE PRIVILEGED OR NOT.  THEY PUT THEM INTO

3    CATEGORIES, INTO PILES:  NON PRIVILEGED; MAY BE PRIVILEGED; ARE

4    PRIVILEGED.  THOSE DOCUMENTS WERE THEN BUNDLED UP AND SENT OVER

5    TO THIS THIRD-PARTY LAWYER WHERE THEY HAVE BEEN EVER SINCE, AND          04:48

6    THEY WERE NUMBERED AT THAT POINT; SO NO OUTSIDE COUNSEL HAS

7    SEEN THOSE DOCUMENTS.

8          THE COURT:  DO YOU HAVE ANY REASON TO DOUBT THE

9    REPRESENTATIONS THAT COUNSEL IS MAKING NOW ABOUT THE NATURE OF

10   THE PRIVILEGE ATTACHED TO THESE THREE CATEGORIES OF DOCUMENTS?          04:48

11         MR. PERKINS:  I DON'T KNOW, BECAUSE I HAVEN'T SEEN

12   THEM.  I DON'T KNOW OF ANY PRIVILEGE THAT WOULD ATTACH TO THE

13   LETTER.  THE LETTER WAS WRITTEN BY A LAWYER TO WARNER BROTHERS.

14   THERE'S NO ATTORNEY-CLIENT PRIVILEGE.

15         THE COURT:  IT'S UNCLEAR WHAT RELEVANCE THAT HAS TO           04:4

16   THIS LAWSUIT.

17         MR. PERKINS:  WELL, PRESUMABLY IT HAS SOME RELEVANCE,

18   BECAUSE IT HAS SOMETHING TO DO WITH THE DOCUMENTS THAT HAD BEEN

19   DELIVERED THAT ARE, ACCORDING TO THE LETTER, AT LEAST, AS I

20   UNDERSTAND IT, ARE RELEVANT TO THE CASE.                          04:4

21         SO, I MEAN, YOU KNOW, AGAIN, THAT DOCUMENT WAS NOT

22   LISTED ON ANY PRIVILEGE LOG.  THIS LETTER WAS PART OF THE

23   MOTION.  IT WAS IDENTIFIED IN THE MOTION.  JUDGE ZAREFSKY RULED

24   THE WAY THAT HE RULED, AND WE JUST WANTED THE ESCROW AGENT TO

25   BE ABLE TO PRODUCE THE DOCUMENTS THAT HAD BEEN PROVIDED.          04:4

EXHIBIT 26

Page 702

SEPTEMBER 17, 2007                    SIEGEL V. WARNER, ET AL.

1    THE COURT:  HOW MANY DOCUMENTS ARE WE TALKING ABOUT?

2    MR. PERKINS:  THE TOTAL NUMBER OF DOCUMENTS?

3    THE COURT:  YES.  APPROXIMATELY, COUNSEL.

4    MR. PERKINS:  DO YOU REMEMBER?

5    MR. WILLIAMSON:  APPROXIMATELY 839 PAGES.

6    THE COURT:  THE ONES NOT PRODUCED; THE THREE

7    CATEGORIES.

8    MR. PERKINS:  THEY SAY THE THREE DOCUMENTS THAT ARE,

9    WHAT, 20, 30 PAGES?

10    MR. TOBEROFF:  IT'S A TOTAL OF NINE DOCUMENTS OUT OF

11    839 PAGES.

12    THE COURT:  NINE DOCUMENTS TOTALING 39 PAGES?

13    MR. TOBEROFF:  NINE DOCUMENTS OUT OF A TOTAL OF 839

14    PAGES.  OUT OF 839 PAGES THAT WERE ACCOUNTED FOR, THESE NINE

15    DOCUMENTS THAT FELL THROUGH THE CRACKS.  AND OF THOSE, FOUR OF

16    THEM ARE FAX COVER SHEETS.  THE LETTER FROM A FORMER EMPLOYEE,

17    SINCE HE WAS A LAWYER IN MY OFFICE, WHICH DESCRIBES THE

18    CONTENTS OF THE DOCUMENTS THAT ARE BEING ILLEGALLY DISCLOSED,

19    DESCRIBES PRIVILEGED INFORMATION WORK-PRODUCT WITHIN THE

20    LETTER; THAT'S WHY IT'S PROTECTED.  AND WE WOULD NEVER HAVE

21    LISTED THAT ON A PRIVILEGE LOG BECAUSE THE LETTER ITSELF WAS

22    NOT WRITTEN DIRECTLY FROM A LAWYER TO THE CLIENT.

23    THE COURT:  WHO HAS THE DOCUMENTS?  THIS ESCROW

24    AGENT?

25    MR. PERKINS:  YES, YOUR HONOR.

EXHIBIT 26

SEPTEMBER 17, 2007              SIEGEL V. WARNER, ET AL.

120

1      **THE COURT:**  BUT YOU KNOW WHAT THESE DOCUMENTS ARE.

2      **MR. TOBEROFF:**  YES, I DO, YOUR HONOR.

3      **THE COURT:**  OKAY.

4      **MR. PERKINS:**  SO ONE OF THE THINGS THAT WE WANTED THE

5   ESCROW AGENT TO DO WAS TO SIMPLY MATCH UP THE DOCUMENTS WITH

6   MR. TOBEROFF'S DECLARATION, ESSENTIALLY TO ENSURE THAT THE

7   DOCUMENTS AS HE IDENTIFIED THEM WERE ACCURATELY IDENTIFIED.

8      **THE COURT:**  BUT HE'S SAYING THAT THEY FELL THROUGH

9   THE CRACKS AND THAT --

10     **MR. PERKINS:**  THAT'S A SEPARATE ISSUE, YOUR HONOR.

11     ONE OF THE THINGS WE HAD ASKED THE ESCROW AGENT TO DO

12  WAS TO TAKE MR. TOBEROFF'S DECLARATION AND TO GO DOCUMENT

13  NUMBER BY DOCUMENT NUMBER AND ENSURE THAT THE DOCUMENTS THAT HE

14  IDENTIFIED ON HIS DECLARATION REALLY WERE WHAT HE SAID THEY

15  WERE.  IN OTHER WORDS, HE IDENTIFIES CERTAIN ONES THAT HAD

16  ALREADY BEEN PRODUCED.

17     **THE COURT:**  LET'S NOT TALK ABOUT THE ONES THAT HAVE

18  BEEN DONE.  LET'S TALK ABOUT THE NINE THAT WE HAVE LEFT.  I

19  WANT TO RESOLVE THIS.  WE'RE GOING TO MOVE ON HERE, COUNSEL.

20     WHAT ARE WE GOING TO DO ABOUT THESE NINE DOCUMENTS?

21     HE SAYS THESE NINE DOCUMENTS FELL THROUGH THE CRACKS;

22  THAT HE DIDN'T INCLUDE THEM ON THE LOG; BUT YET, HE WANTS TO

23  ASSERT A PRIVILEGE.

24     HOW ARE WE GOING TO RESOLVE THIS?

25     **MR. PERKINS:**  AT THIS POINT, WE HAVE A RULING THAT

04:5...

**EXHIBIT 26**

121

1   SAYS THAT ANYTHING THAT'S NOT ON A PRIVILEGE LOG, THE PRIVILEGE

2   IS WAIVED.

3          **THE COURT:**  PEOPLE MAKE MISTAKES, COUNSEL.  YOU'VE

4   MADE MISTAKES IN YOUR CAREER; YOU'VE PRODUCED DOCUMENTS OR NOT

5   PRODUCED DOCUMENTS THAT YOU SHOULD HAVE; YOU'VE INCLUDED THINGS    04:5

6   ON LOGS THAT YOU SHOULDN'T HAVE.  WE ALL MAKE MISTAKES.

7          **MR. PERKINS:**  IN THIS INSTANCE, THERE WAS A

8   CALCULATED DECISION MADE ON MR. TOBEROFF'S PART.  THERE WAS A

9   SUBPOENA SERVED ON HIS LAW OFFICE FOR THESE DOCUMENTS.

10  MR. TOBEROFF CHOSE, INSTEAD OF PRODUCING A PRIVILEGE LOG, TO       04:52

11  ASSERT OSTENSIBLY A BLANKET OBJECTION.  SIMILARLY, A DOCUMENT

12  REQUEST WAS SERVED ON HIS CLIENTS.  HE AGAIN SERVED THE SIMILAR

13  BLANKET REQUEST; DID NOT INCLUDE THESE DOCUMENTS ON THE

14  PRIVILEGE LOG.

15         I MEAN, IF THE RULE IS GOING TO BE THAT HE MADE A          04:52

16  MISTAKE, THEY HAVEN'T BEEN WAIVED, THERE'S NOTHING THAT I CAN

17  SAY TO THAT IN RESPONSE, YOUR HONOR.

18         **THE COURT:**  ALL RIGHT.  VERY WELL.

19         **MR. BERGMAN:**  COULD I SPEAK NOW?

20         DURING A HEARING IN FRONT OF JUDGE ZAREFSKY WHERE WE       04:53

21  MOVED TO COMPEL THE PRODUCTION OF THESE DOCUMENTS THAT HAD BEEN

22  SUBPOENAED, MR. TOBEROFF MADE THE UNEQUIVOCAL REPRESENTATION TO

23  MAGISTRATE JUDGE ZAREFSKY THAT HE HAD EITHER PRODUCED EVERY ONE

24  OF THESE DOCUMENTS OR HAD LISTED EVERY ONE OF THESE DOCUMENTS

25  ON A PRIVILEGE LOG.                                               04:53

EXHIBIT 26

122

**THE COURT:** NOW HE'S SAYING HE MADE A MISTAKE AND HE DIDN'T INCLUDE THESE NINE.

**MR. BERGMAN:** NOW HE'S SAYING THAT THERE WERE DOCUMENTS WHICH WERE NEITHER PRODUCED NOR ON A PRIVILEGE LOG.

IT'S BEEN QUITE A TEMPEST BETWEEN US. IT'S SOMETHING THAT IS DISTASTEFUL. BUT WE BELIEVE THAT JUDGE ZAREFSKY'S ORDER WAS MADE VERY PURPOSEFULLY, BECAUSE HE BELIEVED THAT THERE WAS SOME QUESTION ABOUT WHETHER MR. TOBEROFF WAS BEING TRUTHFUL IN MAKING THE REPRESENTATIONS.

WE RELIED ON THE REPRESENTATIONS.

THE ESCROW AGENT WHO'S AN EMINENT MEMBER OF THE BAR, WHEN WE TURNED THE DOCUMENTS OVER TO HIM, WE TOLD HIM TO BATES STAMP EVERY PAGE. MR. TOBEROFF TOOK THE POSITION THAT HE HAD PRODUCED OR LISTED EVERYTHING, SO WE MERELY SAID, AFTER JUDGE ZAREFSKY ISSUED HIS ORDER, TO THE ESCROW AGENT, 'PLEASE CHECK EACH BATES STAMPED DOCUMENT AGAINST EACH DOCUMENT THAT HAS BEEN PRODUCED OR EACH DOCUMENT LISTED ON THE PRIVILEGE LOG, TO MAKE SURE THAT REPRESENTATION IS TRUE.'

MR. TOBEROFF OBJECTED TO THE ESCROW AGENT; PREVENTED HIM FROM DOING THAT, THE ESCROW AGENT THREW UP HIS HANDS AND SAID 'I'M NOT GOING TO DO ANYTHING; I'LL WAIT FOR A COURT ORDER.' SO WE HAVE NOW MOVED IN FRONT OF JUDGE ZAREFSKY; THE PAPERS SHOULD BE AVAILABLE TO YOUR HONOR SOON, AND ALL I CAN ASK IS THAT YOUR HONOR LOOK AT THE PAPERS, PERHAPS EVEN VIEW THE DOCUMENTS IN CAMERA, AND MAKE YOUR OWN DECISION AS TO

**EXHIBIT 26**

123

| | |
|---|---|
| 1 | WHETHER THEY SHOULD BE PRODUCED OR NOT; THAT WOULD BE |
| 2 | SATISFACTORY TO US. |
| 3 | **THE COURT:**  THANK YOU, COUNSEL. |
| 4 | **MR. TOBEROFF:**  I'M SORRY, YOUR HONOR.  COUNSEL IS |
| 5 | MISSTATING OR MISREPRESENTING THE SITUATION.  THIS IS NOT HOW |
| 6 | THIS WENT DOWN. |
| 7 | OUT OF 839 DOCUMENTS -- LET ME BACKTRACK. |
| 8 | THERE'S A LOGIC TO MAGISTRATE JUDGE ZAREFSKY'S ORDER, |
| 9 | AND THAT IS IF IT'S PRIVILEGED, YOU LIST IT ON A PRIVILEGE LOG. |
| 10 | IF IT'S NOT, YOU WOULD PRODUCE IT AND JUST SORT IT OUT BY THESE |
| 11 | BATES NUMBERS SINCE YOU'RE SAYING YOU'VE PRODUCED IT ANYWAY. |
| 12 | HE'S ASKED ME, HAVE YOU PRODUCED THESE DOCUMENTS OR |
| 13 | LISTED THEM ON A PRIVILEGE LOG, AND I OUT OF 839 PAGES OF |
| 14 | DOCUMENTS, AT THE TIME, I NEGLECTED, WHEN I SAID 'YES,' TO |
| 15 | THINK ABOUT THE DOCUMENTS WHICH FELL THROUGH THE CRACKS; FOUR |
| 16 | OF THEM WHICH ARE FAX COVER SHEETS; SO ESSENTIALLY, FIVE |
| 17 | DOCUMENTS OUT OF 839 PAGES OF DOCUMENTS, I DIDN'T THINK OF WHEN |
| 18 | I ANSWERED. |
| 19 | FIVE OF THE NINE DOCUMENTS ARE DOCUMENTS THAT WERE |
| 20 | NOT LISTED ON A PRIVILEGE LOG BECAUSE WE HAVE A STANDING |
| 21 | AGREEMENT WITH DEFENDANTS THAT YOU NEED NOT LIST DOCUMENTS ON A |
| 22 | PRIVILEGE LOG AFTER LITIGATION HAS COMMENCED. |
| 23 | **THE COURT:**  YOU STILL SHOULD HAVE LISTED THOSE ON THE |
| 24 | PRIVILEGE LOG, COUNSEL, REGARDLESS OF THAT AGREEMENT; BUT |
| 25 | THAT'S JUST A PRACTICE POINT. |

04:55

04:55

04:56

04:56

04:56

EXHIBIT 26

SEPTEMBER 17, 2007     Page 707     SIEGEL V. WARNER, ET AL.

124

1      **MR. TOBEROFF:**  OKAY.

2      NEITHER SIDE IN THIS LITIGATION HAVE LISTED ANY --

3      **THE COURT:**  GIVEN JUDGE ZAREFSKY'S ORDER IN THIS

4  CASE, AND GIVEN THE SPECIFIC SENSITIVITY OF THESE DOCUMENTS, I

5  THINK YOU MAY HAVE AVOIDED SOME OF THIS PROBLEM IF YOU WOULD          04:5

6  HAVE LISTED THOSE DOCUMENTS.

7      **MR. TOBEROFF:**  NO.  BY THAT TIME THERE WASN'T THE

8  OPPORTUNITY TO LIST DOCUMENTS ON THE LOG.

9      I ASSERTED THAT THEY MAINTAIN THEIR PRIVILEGE, GIVEN

10  JUDGE ZAREFSKY'S ORDERS, BECAUSE OF THE RATIONALE OF THE ORDER.     04:5

11  FOR THEM TO SAY THEY HAVE AN AGREEMENT THAT WE NEED NOT LIST

12  DOCUMENTS ON A PRIVILEGE LOG BUT WE'VE WAIVED THE PRIVILEGES BY

13  THE STANDING ORDER MAKES NO SENSE.

14      **THE COURT:**  I UNDERSTAND YOUR ARGUMENT.

15      **MR. TOBEROFF:**  THAT ACCOUNTS FOR FIVE OF THE NINE           04:5

16  DOCUMENTS OUT OF 830 PAGES OF DOCUMENTS.

17      **THE COURT:**  AND THE OTHER FOUR?

18      **MR. TOBEROFF:**  THE OTHER FOUR CONSIST OF A COVER

19  LETTER WHICH, BECAUSE IT'S A COVER LETTER, IT DESCRIBES THE

20  DOCUMENTS THAT THE PERSON WHO STOLE THESE FILES FROM MY OFFICE     04:5

21  WERE SENDING OVER TO WARNER BROTHERS AND THEREBY, BY DESCRIBING

22  DOCUMENTS WHICH ARE LISTED ON A PRIVILEGE LOG, IT'S DISCLOSING

23  PRIVILEGE INFORMATION AND WORK PRODUCT.  AND THAT FALLS, AGAIN,

24  WITHIN THE RATIONALE OF THE ORDER, BECAUSE HE'S SAYING 'IF IT'S

25  LISTED ON THE PRIVILEGE LOG, YOU NEED NOT PRODUCE IT; SO WHY       04:57

EXHIBIT 26

1   WOULD YOU PRODUCE A COVER LETTER THAT'S DISCLOSING INFORMATION

2   THAT'S LISTED ON A PRIVILEGE LOG SIMPLY BECAUSE IT DIDN'T FALL

3   SQUARELY WITHIN SOMETHING YOU WOULD LIST ON A PRIVILEGE LOG

4   SINCE IT WASN'T A LETTER FROM AN ATTORNEY TO A CLIENT.

5           **THE COURT:**  ALL RIGHT, COUNSEL.                        04:58

6           **MR. TOBEROFF:**  AND THEN THE OTHER DOCUMENT COMPLIES

7   WITH THE OTHER TWO DOCUMENTS, ARE LETTERS WHICH COMPLY WITH

8   JUDGE ZAREFSKY'S ORDER, BECAUSE THEY ARE LISTED ON A

9   THIRD-PARTY PRIVILEGE LOG.  HIS ORDER WASN'T LIMITED TO

10  PLAINTIFF'S PRIVILEGE LOG.  IT WENT TO ANY PRIVILEGE LOG.     04:58

11          IN FACT, IN COMPLYING WITH THE ORDER, THERE ARE MANY

12  DOCUMENTS WHICH ARE LISTED ON THIRD-PARTY PRIVILEGE LOGS, AND

13  BASED ON THAT ASSERTION OF PRIVILEGE, THE ESCROW AGENT WAS NOT

14  GOING TO RELEASE THOSE DOCUMENTS.

15          THESE PARTICULAR TWO DOCUMENTS THEY ARE INTERESTED     04:58

16  IN, SO THEY ARE MAKING NEW ARGUMENTS ABOUT JOINT INTEREST

17  PRIVILEGE THAT THEY NEVER MADE IN THEIR MOTION; THAT'S THE

18  REALITY OF IT.

19          **THE COURT:**  THANK YOU, COUNSEL.

20          **MR. TOBEROFF:**  I JUST WANT TO MAKE ONE POINT ABOUT   04:58

21  LAURA SIEGEL.

22          THE LAURA SIEGEL SITUATION, AGAIN, IS SOMETHING THAT

23  CAN BE DEALT WITH IN VERIFIED INTERROGATORIES.  WHEN I ASKED

24  DEFENDANTS 'WHY DON'T YOU SERVE US WITH VERIFIED

25  INTERROGATORIES; ASK ANY QUESTION YOU WANT; WE'D BE MORE THAN  04:59

                        **EXHIBIT 26**

126

1   HAPPY TO ANSWER THEM,' THEY DIDN'T GIVE ME THE REASON.

2           TO PUT THIS IN CONTEXT, THEY HAVE TRIED, NOW -- I

3   GUESS THEY ARE NOT HAPPY WITH THEIR DEPOSITION OF

4   LAURA SIEGEL -- THEY HAVE TRIED -- THIS IS NOW THE THIRD

5   OCCASION WHERE THEY HAVE TRIED TO REOPEN HER DEPOSITION.  THE        04:5:

6   FIRST OCCASION, THEY SAID MY OBJECTIONS STOPPED THEM FROM BEING

7   ABLE TO CONDUCT THE DEPOSITION.  THAT MOTION WAS DENIED BY

8   MAGISTRATE ZAREFSKY; SO IN WHAT THEY ARE QUOTING OF MAGISTRATE

9   ZAREFSKY, SAYING MY OBJECTIONS WEREN'T PROPER, OUT OF THE

10  COURSE OF THE SEVEN-HOUR DEPOSITION, HE SAID 'ALTHOUGH SOME OF        04:5:

11  THE OBJECTIONS I MIGHT QUARREL WITH, THOUGH MAY NOT BE

12  IMPROPER, ON THE WHOLE, I DON'T BELIEVE IT IMPEDED YOUR

13  DEPOSITION.'

14          THE COURT:  THANK YOU, COUNSEL.

15          I THINK I HAVE BEFORE ME ALL OF THE DISCOVERY              05:00

16  DISPUTES.

17          MR. PERKINS:  I NEED TO MAKE ONE CORRECTION OF

18  SOMETHING THAT I SAID.

19          THE LAST PIECE OF WHAT I OFFERED TO MR. TOBEROFF WAS

20  THAT I, IN FACT, OFFERED TO TAKE MRS. LARSON'S DEPOSITION IN        05:00

21  TWO AND A HALF HOURS, EXCLUSIVE OF ANY COLLOQUY ON THE RECORD.

22  SORT OF LIKE, AS I EXPLAINED TO MR. TOBEROFF, LIKE A SOCCER

23  STOPPAGE TIME.

24          THE COURT:  I UNDERSTAND.

25          MR. PERKINS:  THANK YOU, YOUR HONOR.                      05:00

EXHIBIT 26

SEPTEMBER 17, 2007        Page 710   SIEGEL V. WARNER, ET AL.

127

1    **THE COURT:**  ALL RIGHT.

2        I'VE ALREADY INDICATED THAT I HAVE TAKEN THE

3    CROSS-MOTIONS IN BOTH THE SUPERMAN AND THE SUPERBOY CASE UNDER

4    SUBMISSION.

5        WITH RESPECT TO DISCOVERY DISPUTES, DISCOVERY IS    05:0(

6    COMPLETELY CLOSED EXCEPT FOR THE FOLLOWING:

7        NUMBER ONE:  WE HAVE THE BRIAN SINGER DEPOSITION

8    WHICH HAS BEEN SCHEDULED.

9        AND COUNSEL, SOMEONE REFRESH MY RECOLLECTION, WHEN IS

10   THAT SCHEDULED FOR, TO TAKE PLACE ON OR BEFORE WHAT DATE?    05:0(

11   **MR. TOBEROFF:**  END OF NOVEMBER.

12   **THE COURT:**  VERY WELL.

13       SECOND, THE RESERVE ACCOUNT DOCUMENTS WILL BE

14   PRODUCED THIS WEEK;

15       THIRD:  THE LAURA SIEGEL LARSON DEPOSITION WILL TAKE    05:01

16   PLACE ON OR BEFORE OCTOBER 9, 2007; TWO HOURS MAXIMUM.

17       FOURTH:  THE ULTIMATES WILL BE PRODUCED.

18       FIFTH.  I'LL GIVE YOU AN EXTENSION UNTIL OCTOBER 9,

19   2007, TO CONTINUE WITH THIS AUDIT.  YOU'RE GOING TO HAVE TO

20   WORK IT OUT WITH MR. SILLS;    05:01

21       NUMBER SIX:  THE ESCROW DOCUMENTS WILL BE PROVIDED IN

22   CAMERA TO THE COURT SO THE ESCROW ATTORNEY CAN BE RELIEVED OF

23   THIS; ALONG WITH THE DECLARATION OF COUNSEL SITTING FORTH YOUR

24   PRIVILEGES AND A SINGULAR RESPONSE DOCUMENT TO THOSE PRIVILEGES

25   FILED BY THE DEFENSE.    05:01

EXHIBIT 26

SEPTEMBER 17, 2007        Page 711 SIEGEL V. WARNER, ET AL.

128

1        AND THEN I WILL ISSUE AN ORDER ON THAT AND THEN WE'RE

2   DONE.

3        ANY QUESTIONS?  NOW IS THE TIME.

4        MR. TOBEROFF:  WHAT IS THE DEADLINE FOR THE ESCROW

5   DOCUMENTS?                                                    05:0

6        THE COURT:  THE ESCROW DOCUMENTS SHOULD BE PRODUCED

7   THIS WEEK.  I PRESUME IT'S JUST A MATTER OF THE ATTORNEY

8   TURNING THEM OVER TO THE COURT.  HE SHOULD DO THAT FORTHWITH;

9   AND I'LL GET A DECLARATION FROM YOU BY FRIDAY, AND FAX IT OVER

10  TO THE DEFENSE AND GET A RESPONSE FROM YOU BY TUESDAY.         05:0

11       MR. BERGMAN:  THANK YOU, YOUR HONOR.

12       MR. PERKINS:  THE ONLY OTHER ISSUE, YOUR HONOR,

13  RELATES TO AFTER THE AUDIT IS COMPLETED, A SCHEDULE FOR

14  MR. SILLS TO PROVIDE US WITH HIS REPORT AND FOR US TO BE ABLE

15  TO RESPOND WITH OUR EXPERT REPORT AND THE DEPOSITIONS OF THOSE  05:02

16  FOLKS.

17       THE COURT:  YOU SHOULD SCHEDULE THOSE EXPEDITIOUSLY.

18       ANY FURTHER QUESTIONS?

19       MR. BERGMAN:  NO, SIR.

20       THE COURT:  GOOD AFTERNOON.                               05:02

21       MR. TOBEROFF:  THANK YOU, YOUR HONOR.

22       MR. BERGMAN:  THANK YOU, YOUR HONOR.

23       MR. PERKINS:  THANK YOU, YOUR HONOR.

24  / / /

25  / / /

EXHIBIT 26

SEPTEMBER 17, 2007      Page 712      SIEGEL V. WARNER, ET AL.

129

1                              CERTIFICATE

2

3    I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
4    THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
     ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
5    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

6

7    _____                    9-21-07
                                                 _____
8    THERESA A. LANZA, CSR, RPR                       DATE
     FEDERAL OFFICIAL COURT REPORTER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 26
SEPTEMBER 17, 2007           SIEGEL V. WARNER, ET AL

EXHIBIT 27

**SEND**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
CIVIL MINUTES -- GENERAL

Case No.   CV 04-08400-SGL (RZx); CV 04-8776-SGL (RZx)      Date:  September 17, 2007

Title:   JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON; an individual -v-
WARNER BROS. ENTERTAINMENT INC., a corporation; TIME WARNER INC., a
corporation; DC COMICS INC., a corporation; and DOES 1-10

=================================================================

PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

Jim Holmes
Courtroom Deputy Clerk

Theresa Lanza
Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:      ATTORNEYS PRESENT FOR DEFENDANTS:

Marc Toberoff

Michael Bergman
Roper L. Zissu
Patrick T. Perkins

PROCEEDINGS:   ORDER RE OUTSTANDING DISCOVERY MATTERS

At the conclusion of the September 17, 2007, hearing on the parties' cross-motions for
partial summary judgment in the Superman, CV-04-8400-SGL, and the Superboy,
CV-04-8776-SGL, matters, which motions the Court then concurrently took under submission, the
Court heard argument from counsel regarding outstanding discovery issues.  Except as set forth
below, discovery in these matters is **ORDERED** closed:

(1)   Consistent with the September 11, 2007, Joint Stipulation of the parties, Bryan Singer is
**ORDERED** to sit for a deposition by no later than November 30, 2007;

(2)   Plaintiff Laura Siegel Larson is **ORDERED** to sit for a deposition by no later than October 9,
2007, said deposition not to exceed two hours in length;

(3)   Defendant DC Comics is **ORDERED** to produce the "reserve account documents" to
plaintiffs on or before Friday, September 21, 2007;

DOCKETED ON CM

SEP 1 9 2007

MINUTES FORM 90      EXHIBIT 27      Page 1      Initials of Deputy Clerk __jh___
CIVIL -- GEN                                    Time:  3/50

(4)    Defendants are **ORDERED** to produce to plaintiffs all requested "ultimates" as referenced in the September 14, 2007, Declaration of Steven Sills at ¶¶ 10-11 by Friday, September 21, 2007;

(5)    Plaintiffs ex parte application for an order modifying the Court's August 13, 2007, discovery order is **GRANTED** in part in that plaintiffs are afforded until October 9, 2007, to complete their damages-related audit of defendants Time Warner, Inc., Warner Bros Entertainment, Inc., Warner Bros Television Production, Inc., and DC Comics.

(6)    The "escrow attorney" referenced at the hearing is directed to submit by Friday, September 21, 2007, to the Court for in camera review the nine documents which plaintiffs had either not previously produced to defendants or were not listed on a privilege log in connection with this litigation.  Counsel for plaintiffs is **ORDERED** to submit a declaration on or before Friday, September 21, 2007, setting forth the grounds for any claims of privilege relating to said documents; defendants may file a response to the declaration on or before Tuesday, September 29, 2007.  The motion to compel which defense counsel informed the Court has been or was being filed with the magistrate judge is hereby rendered **MOOT**.

Finally, the trial date in the Superman matter remains January 22, 2008.  The trial date in the Superboy matter will be set thereafter by the Court.

**IT IS SO ORDERED.**

MINUTES FORM 90
CIVIL -- GEN

EXHIBIT 27
Page 715
2

Initials of Deputy Clerk __jh_____
Time:  3/50

EXHIBIT 28

1  WEISSMANN WOLFF BERGMAN
     COLEMAN GRODIN & EVALL LLP
2  Michael Bergman (SBN 37797)
   Anjani Mandavia (SBN 94092)
3  9665 Wilshire Boulevard, Ninth Floor
   Beverly Hills, California 90212
4  Telephone:  310-858-7888
   Fax:         310-550-7191
5  Email:       mbergman@wwllp.com

6  FROSS ZELNICK LEHRMAN & ZISSU, P.C.
   Roger L. Zissu (Admitted *pro hac vice*)
7  James Weinberger (Admitted *pro hac vice*)
   866 United Nations Plaza
8  New York, New York 10017
   Telephone:  212-813-5900
9  Fax:         212-813-5901

10 PERKINS LAW OFFICE, P.C.
   Patrick T. Perkins (Admitted *pro hac vice*)
11 1711 Route 9D
   Cold Spring, NY 10516
12 Telephone:  845-265-2820
   Fax:         845-265-2819

13
   Attorneys for Defendants and Counterclaimant
14
                 UNITED STATES DISTRICT COURT
15
      CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION
16

17 JOANNE SIEGEL and LAURA          )  Case No. SA CV 04-8400 SGL (RZx)
   SIEGEL LARSON,                   )  Case No. SA CV 04-8776 SGL (RZx)
18                                  )
                                    )  Hon. Stephen G. Larson, U.S.D.J.
19         Plaintiffs,              )  Hon. Ralph Zarefsky, U.S.M.J.
                                    )
20      vs.                         )  **DECLARATION OF MICHAEL
                                    )  BERGMAN IN RESPONSE TO
21 TIME WARNER INC., WARNER         )  THE DECLARATION OF MARC
   COMMUNICATIONS INC. WARNER       )  TOBEROFF FILED PURSUANT
22 BROS. ENTERTAINMENT INC.,        )  TO THE COURT'S SEPTEMBER
   WARNER BROS. TELEVISION          )  17, 2007 ORDER**
23 PRODUCTION INC., DC COMICS,      )
   and DOES 1-10,                   )  **DISCOVERY MATTER
24                                  )  LOCAL RULE 37**
           Defendants.             )
25                                  )
                                    )
26                                  )
                                    )
27                                  )
                                    )
28 AND RELATED COUNTERCLAIMS.       )
                                    )
                                       EXHIBIT 28
                                       Page 716

1    I, Michael Bergman, declare under penalty of perjury:

2       1.      I am a member of Weissmann Wolff Bergman Coleman Grodin &

3    Evall LLP, counsel for Defendants.  This declaration, based upon my own personal

4    knowledge and our office's records, is submitted in response to the Declaration of

5    Marc Toberoff Filed Pursuant To The Court's September 17, 2007 Order.

6       2.      This declaration addresses two issues.  The first issue is whether the

7    nine Escrow Documents that "slipped through the cracks" should be withheld from

8    production based upon Plaintiffs' and Mr. Toberoff's current assertions of the

9    attorney-client privilege.  As explained below, each of the three categories of

10   documents addressed in Mr. Toberoff's declaration -- the "defamatory cover letter"

11   to the Escrow Documents, the post-litigation attorney-client communications, and

12   Mr. Toberoff's correspondence with third party Michael Siegel's attorney Don

13   Bulson -- should be produced to Defendants.

14      3.      The second issue is how the escrow holder should handle the

15   remaining Escrow Documents, which was not addressed in the Court's September

16   17, 2007 Minute Order.  To fully comply with Magistrate Judge Zarefsky's April

17   30, 2007 Order, the escrow holder, as the only neutral party with access to the

18   Escrow Documents, should use Mr. Toberoff's May 21, 2007 declaration to match

19   up the Escrow Documents with the privilege log entries and production documents

20   listed in that declaration to ensure that he is releasing the proper documents and

21   confirm that no additional documents have "fallen through the cracks."

22                                **Background**

23      4.      Some background is necessary to place Plaintiffs' and Mr. Toberoff's

24   current privilege claims in context.  This dispute dates back to June of 2006.  On

25   July 5, 2006, I received a call from Wayne Smith, Vice President, Senior Litigation

26   and Chief Patent Counsel of Warner Bros. Entertainment Inc., informing me that

27   three Warner Bros. employees, including General Counsel John Schulman, had

28   received packages on June 28, 2006 containing documents relating to the present

EXHIBIT 28
Page 717   1

1 litigation that had been sent by an anonymous source. (The parties now refer to

2 these documents as the "Escrow Documents," the designation used by Magistrate

3 Judge Zarefsky during the April 30, 2007 Hearing). Mr. Smith told me that the

4 packages, apparently identical, each contained an unsigned cover letter alleging,

5 among other things, various types of ethical misconduct on the part of Plaintiffs'

6 counsel in connection with the present litigation and another previously litigated

7 case. The cover letter also explained how the enclosed documents related to the

8 misconduct allegations. Mr. Smith advised me that he had discussed the situation

9 with Mr. Schulman, and that they had determined -- after Mr. Smith read an article

10 from Los Angeles Lawyer addressing the obligations of lawyers who unwittingly

11 receive privileged documents from opposing counsel's files, along with the main

12 California cases identified therein -- that Mr. Smith would follow the procedure

13 outlined in the case *State Compensation Insurance Fund v. WPS, Inc.*, 70 Cal. App.

14 4th 644 (1999). That procedure required the document recipient: (i) to review each

15 document but to cease the review once it became apparent that the document was

16 privileged; (ii) to contact opposing counsel and advise that the documents have

17 been received; and (iii) to refrain from using any information in the documents

18 until there was either an agreement with opposing counsel, or the court had

19 determined the documents' disposition.

20      5.     Mr. Smith advised me that during the evening of June 28, 2006, he

21 had undertaken the procedure described in *State Compensation*. He told me that

22 the Escrow Documents included a number of apparently privileged documents, but

23 that they also included non-privileged documents that he believed had not been

24 produced in the litigation. Mr. Smith also advised that he had discussed the results

25 of his *State Compensation* review of the Escrow Documents with Mr. Schulman

26 and that they had decided to turn the documents over to a neutral third party,

27 pending resolution of the disposition of the Escrow Documents, either pursuant to

28 the agreement of the parties or order of the Court.

EXHIBIT 28
Page 718    2

1    6.    Mr. Smith further advised that on June 30, 2006 the Escrow

2    Documents had been turned over to John Quinn, then an attorney at Arnold &

3    Porter LLP and the former president of the Los Angeles County Bar Association.

4    Mr. Quinn sent a letter to counsel dated July 5, 2006. Attached hereto as Exhibit <u>A</u>

5    is a true and correct copy of that letter.

6    7.    Mr. Quinn subsequently Bates labeled a set of the Escrow Documents

7    and sent them to Mr. Toberoff, retaining a set for himself to hold in escrow.

8    Although the parties spoke on the phone and exchanged correspondence regarding

9    the Escrow Documents, they were unable to agree upon the proper disposition of

10    those documents. Defendants subsequently served a request for production on

11    Plaintiffs on August 7, 2007 and a personal subpoena on Mr. Toberoff on August

12    10, 2007, asking for the production of the Escrow Documents. Attached hereto as

13    Exhibit <u>B</u> is a true and correct copy of Defendants'/Counterclaimant's Third Set Of

14    Requests For The Production Of Documents And Things, and attached hereto as

15    Exhibit <u>C</u> is a true and correct copy of the Subpoena in a Civil Case directed to Mr.

16    Toberoff.

17    8.    Attached hereto as Exhibit <u>D</u> is a true and correct copy of Plaintiffs'

18    Response to Defendants'/Counterclaimant's Third Set Of Requests For The

19    Production Of Documents And Things, served on September 6, 2006.

20    9.    Attached hereto as Exhibit <u>E</u> is a true and correct copy of Toberoff's

21    Objections to Defendants' Subpoena, served on August 23, 2006.

22    10.    Pursuant to an August 14, 2006 Order by Magistrate Judge Zarefsky

23    on another discovery motion requiring Plaintiffs to "produce all privilege logs,

24    including any revisions, by September 29, 2006," Plaintiffs served their privilege

25    log on September 29, 2006. However, Mr. Toberoff never served a privilege log

26    supporting his privilege objections to Defendants' Subpoena. Attached hereto as

27    Exhibit <u>F</u> is a true and correct copy of a letter from my associate Adam Hagen to

28    Mr. Toberoff dated September 28, 2006 requesting that Mr. Toberoff serve a

EXHIBIT 28
Page 719    3

1   privilege log in support of his privilege objections.  Mr. Toberoff never responded

2   to that letter and never served a privilege log on Defendants.

3   **Defendants' Motion To Compel**

4      11.    Defendants subsequently initiated the joint stipulation process to

5   compel Plaintiffs and Mr. Toberoff to produce all non-privileged Escrow

6   Documents and/or all Escrow Documents not identified on any privilege log.

7   Defendants filed their joint stipulation on March 26, 2007, and their supplemental

8   memorandum on April 2, 2007.

9      12.    Magistrate Judge Zarefsky heard Defendants' motion on April 30,

10  2007.  Attached hereto as Exhibit G is a true and correct copy of the transcript

11  from that hearing.  In pertinent part, Mr. Toberoff unequivocally represented to

12  Magistrate Judge Zarefsky not once, but several times, that -- save for two

13  documents that Plaintiffs produced to Defendants after Defendants filed the Joint

14  Stipulation -- all of the Escrow Documents had been either previously produced to

15  Defendants or listed on a privilege log:

16        The Court:  The question is: Have you otherwise produced [the

17        documents]?  That's all that's at issue, isn't it?

18        Mr. Toberoff:  I have, your Honor.  I have put in a declaration

19        unequivocally that even though I'm not obligated to do so, and jump

20        through hoops of having to respond and own up to documents stolen

21        from my legal files, an obligation that does not apply to the

22        defendants in this case and does not apply to parties under Rule 34, I

23        nonetheless went through every single one of those documents, which

24        they, instead of returning the originals, returned to me with Bate

25        stamps, checked it against our production, and found two documents

26        that were non-privileged that hadn't been produced that consisted of

27        letters from plaintiffs to DC Comics, which I produced.

28

EXHIBIT 28

Page 720    4

1    The Court:  See, your declaration doesn't quite say that, Mr.
2    Toberoff.  I read your declaration.
3        Mr. Toberoff:  The intention of the declaration is to say exactly
4    what I'm saying now; that I went through my files, not just the
5    plaintiffs' files, which is all the motion pertains to, but all my files, all
6    the third-party witness files --
7        The Court:  Forgive me for interrupting.  Your declaration does
8    say that.  What your declaration doesn't say is that you went through
9    these, let's call them 'whistleblower' documents, even though that
10   may not be an accurate statement, you went through these
11   whistleblower documents, and that you verified that each of the
12   whistleblower documents either had been produced or had been listed
13   on the privilege log.  It doesn't say that.
14       Mr. Toberoff:  That is the case, your Honor, and that was
15   certainly my intention to say that, and I'm saying that now.
16       The Court:  All right, then we can get that cleared up
17   immediately.
18       Mr. Toberoff:  I'd be happy to take an oath and say that,
19   because that is precisely what I did.
20   (Tr. at 10:17 - 12:2).
21       The Court:  But Mr. Toberoff, you tell me that everything that's
22   not privileged has been produced except for two small items, and
23   everything that is -
24       Mr. Toberoff: We produced those items, your Honor.
25   (Tr. at 15:12 - 15:14).
26       The Court:  Well, now, Mr. Toberoff, didn't you tell me there
27   were only two documents that hadn't been produced that were
28   unprivileged?          EXHIBIT 28

1         Mr. Toberoff:  That's correct, but the ones that have been

2   produced, we still need to match up, and the ones that were listed on

3   the privilege log we would still need to match up.  And we've

4   produced the two documents that haven't been produced.

5   (Tr. at 32:9 - 32:16).

6         The Court:  And you are saying that in the escrow documents

7   there are some documents that came from third parties?

8         Mr. Toberoff:  Absolutely.  Well, they're actually -

9         The Court:  Excuse me.  But documents that nevertheless had

10   already been produced?

11         Mr. Toberoff:  Yes.

12   (Tr. at 33:4 - 33:10).

13   Magistrate Judge Zarefsky, noting that there was some "wiggle room" in Mr.

14   Toberoff's declaration, issued the following Order:

15         The Court:  Now, I told you, Mr. Toberoff, that I saw a little

16   wiggle room in your declaration.  You tell me you didn't mean for

17   there to be any.  So, here's what I'm going to do.  Not later than May

18   7th, that's a week from today, I want you to submit a declaration that

19   does identify by the Bates numbers of the escrow documents and the

20   corresponding Bates numbers of documents already produced, those

21   among the escrow documents which are unprivileged and have

22   already been produced.

23         So, you take the Bates numbers of the escrow documents and

24   say, 'Here are the corresponding Bates numbers of the documents that

25   have already been produced.'  Take the Bates numbers of the escrow

26   documents and correspond to the listings on the privilege log of the

27   documents which have not have been produced because they were

28   privileged.  All right?  So, put that in your declaration.

EXHIBIT 28

1    Then the escrow holder, Mr. Bergman, [sic] is to return to the

2    plaintiffs any documents which are identified in the declaration as

3    being privileged and having been identified on the privilege logs.

4    The others can be delivered to trial counsel for defendants

5    because they're either unprivileged, or, if they were privileged,

6    privilege has been waived because they weren't listed on the privilege

7    log.

8                                    * * *

9    The Court:  Do you understand what I've ordered you to put in

10    the declaration?

11    Mr. Toberoff:  I do, your Honor.

12    Towards the end of the hearing, in the context of Mr. Toberoff's request for

13    additional time to complete the declaration ordered by Magistrate Judge Zarefsky,

14    he repeated his Order:

15    Mr. Toberoff:  Okay.  Could you please repeat it for me,

16    because I want to make sure I'm clear.

17    The Court:  For example, Bates number, . . . Escrow document

18    00004 corresponds to previously produced document 00006.  Escrow

19    document 00007 corresponds to previously produced document

20    00009, and so on.

21    Mr. Toberoff:  Okay.

22    The Court:  Privilege escrow document 00015 is a privilege

23    document which was listed on the privilege log as document such and

24    such.

25    Mr. Toberoff:  Okay.

26    The Court:  Privileged documents get returned.  The privilege

27    documents that were listed on the privilege log get returned.  The

28    others get sent to defense counsel.

EXHIBIT 28
Page 723    7

1      Mr. Toberoff:  The others get sent to defense counsel?

2      The Court:  From the escrow.

3      Mr. Toberoff:  Right.  Even though we've produced them, but

4  because we're saying they're not privileged, they will get sent to

5  defense counsel.  Okay.

6  (Tr. at 30:5 - 31:5).

7  **Actions Taken Subsequent To Magistrate Judge Zarefsky's Order**

8      13.    After Magistrate Judge Zarefsky issued his Order, I followed up with

9  Mr. Quinn, who had since left Arnold & Porter to take a position as a neutral at

10  JAMS/Endispute, and I proposed that Mr. Quinn continue to oversee the escrow

11  process to carry out the Court's Order.  Attached hereto as Exhibit H is a true and

12  correct copy of my letter to Mr. Quinn dated May 16, 2007.

13      14.    On May 18, 2007, David Eisen, Mr. Quinn's former partner at Arnold

14  & Porter, responded to my letter, informing Mr. Toberoff and I that he had

15  assumed custody of the Escrow Documents after Mr. Quinn's departure from the

16  firm, and that he was "prepared to fulfill the terms of Magistrate Judge Zarefsky's

17  order."  He also requested that one of the parties send him "the briefs on the

18  relevant motion and the transcript of the hearing" in order to assist him in the

19  process.  Attached hereto as Exhibit I is Mr. Eisen's letter to Mr. Toberoff and I

20  dated May 18, 2007.

21      15.    Mr. Toberoff served the declaration ordered by Magistrate Judge

22  Zarefsky on May 21, 2007.  Attached hereto as Exhibit J is a true and correct copy

23  of the Declaration of Marc Toberoff Pursuant to Magistrate Judge Zarefsky's April

24  30, 2007 Order.  That declaration listed a number of documents that had neither

25  been listed on a privilege log nor previously produced.

26      16.    Mr. Toberoff attached a cover letter to the May 21, 2007 declaration,

27  with the instruction that "[a]ny Documents not identified in my Declaration as

28  listed in a privilege log or as previously produced to Defendants are to be produced

EXHIBIT 28
Page 724

8

to Defendants, <u>with the exception of the clearly Privileged Litigation Communications</u> identified in my declaration." (emphasis in original).  Attached hereto as Exhibit <u>K</u> is a true and correct copy of that cover letter.

17.    I responded to Mr. Toberoff's letter on May 22, 2007 and attached the following documents to assist Mr. Eisen in his review of Mr. Toberoff's declaration: the April 30, 2007 hearing transcript; the documents Mr. Toberoff had identified in his declaration as having previously been produced, so that Mr. Eisen could compare them to the Escrow Documents Mr. Toberoff claimed were corresponding; the privilege logs Mr. Toberoff cited in his declaration so that Mr. Eisen could compare the pertinent entries to the Escrow Documents Mr. Toberoff claimed he had listed on those privilege logs; and the briefing on Defendants' motion to compel that Mr. Eisen requested in his May 18, 2007 letter.  Attached hereto as Exhibit <u>L</u> is a true and correct copy of my May 22, 2007 letter, with the attachments omitted.

18.    Mr. Toberoff then responded to my letter, instructing Mr. Eisen, among other things, that he was not to use Mr. Toberoff's declaration to confirm that the Escrow Documents he would be releasing actually corresponded to the production documents and privilege log entries listed in Mr. Toberoff's declaration.  Attached hereto as Exhibit <u>M</u> is a true and correct copy of Mr. Toberoff's letter to Mr. Eisen dated May 23, 2007.

19.    Because Defendants believed that Mr. Toberoff was preventing Mr. Eisen from complying with Magistrate Judge Zarefsky's April 30, 2007 Order, we initiated the meet-and-confer process, and on September 17, 2007 Defendants filed their Joint Stipulation Re: Defendants' Motion to Compel Compliance With The Court's 4/30/07 Order And Motion For Sanctions.

### This Court's September 17, 2007 Order

20.    During the Hearing in front of this Court on September 17, 2007, the Court held an impromptu argument regarding the Escrow Documents.  It issued a

EXHIBIT 28
Page 725
9

1   ruling from the bench and then subsequently issued an Order that the escrow

2   attorney submit to the Court for *in camera* review the nine documents Mr.

3   Toberoff had identified as being under dispute because they had not previously

4   been produced to Defendants or identified on a privilege log.  The Court also

5   ordered Mr. Toberoff to submit a declaration "setting forth the ground for any

6   claim of privilege relating to said documents."  Defendants have submitted this

7   declaration in response to Mr. Toberoff's declaration.

8        21.   Mr. Toberoff's declaration, at paragraph 6, represents that the

9   "handful of documents [that had neither been listed on a privilege log nor

10  previously produced to Defendants] fall[s] into three categories that slipped

11  between the 'cracks' of [Magistrate Judge Zarefsky's] Order but are clearly

12  privileged: (i) 6 *post-litigation attorney-client communications*, which, pursuant to

13  the parties' standing agreement . . . need not have been listed in a privilege log to

14  preserve the privilege . . . ; (ii) the "defamatory cover letter" enclosing and

15  describing the contents of the stolen Escrow Documents, including many of the

16  attorney-client communications that are identified on the privilege logs of

17  Plaintiffs and non-party witnesses . . .; and (iii) 2 letters between [Mr. Toberoff]

18  and Don Bulson, Esq., the attorney for Plaintiff Laura Siegel Larson's half-brother,

19  Michael Siegel, who is a statutory beneficiary of the 'Superman' termination

20  notices, which were listed in Mr. Bulson's privilege log and properly identified as

21  such in [Mr. Toberoff's] May 21, 2007 declaration."  Below, I explain why

22  Plaintiffs and Mr. Toberoff should be required to produce the Escrow Documents

23  falling into each of these three categories (hereinafter the "Disputed Documents").

24       22.   Before delving into each individual category, it is important to point

25  out that "fell through the cracks" is a misnomer.  Plaintiffs and Mr. Toberoff have

26  been in possession of the Escrow Documents since Mr. Quinn Bates labeled and

27  sent the documents to Mr. Toberoff on July 18, 2006, and they have had several

28

EXHIBIT 28
Page 726   10

1  opportunities to state their privilege contentions with respect to the Disputed

2  Documents.

3      23.    Plaintiffs' and Mr. Toberoff's first opportunity to assert that the

4  Disputed Documents are protected by the attorney-client privilege came after

5  Defendants served separate discovery requests to Plaintiffs and Mr. Toberoff, each

6  of which specifically called for the production of the Escrow Documents.

7  Plaintiffs served a privilege log on the September 29, 2006 deadline but did not

8  identify the Disputed Documents in that privilege log.  Mr. Toberoff himself made

9  the choice entirely to forgo serving a privilege log supporting the privilege

10 assertions he made in response to Defendants subpoena duces tecum to him

11 personally.

12     24.    Mr. Toberoff had a second opportunity to raise his and Plaintiffs'

13 contentions with respect to the privileged nature of the Disputed Documents during

14 the April 30, 2007 hearing in front of Magistrate Judge Zarefsky.  As described in

15 Paragraph 12 above, however, Mr. Toberoff expressly avowed several times that

16 all of the Escrow Documents had been either produced or listed on a privilege log.

17     25.    Mr. Toberoff and Plaintiffs had a third opportunity to raise their

18 contentions regarding the Disputed Documents by filing objections to Magistrate

19 Judge Zarefsky's April 30, 2007 ruling within 10 days, as provided by Local Rule

20 72-2.1.  They did not file any objections, however.

21     Given these facts, Defendants dispute Mr. Toberoff's characterization of the

22 Disputed Documents as having "fallen through the cracks."

23 **The "Defamatory" Cover Letter To The Escrow Documents**

24     26.    The first reason the "defamatory cover letter" should be released to

25 Defendants is that it falls directly within the purview of Magistrate Judge

26 Zarefsky's Order requiring the escrow holder to turn over any documents not

27 previously produced or listed on any of Plaintiffs' or Mr. Toberoff's privilege logs.

28

EXHIBIT 28

Page 727 11

27.    Mr. Toberoff's assertion at Paragraph 15 that the cover letter was not the subject of Defendants' Joint Stipulation regarding the Escrow Documents is incorrect. Defendants' Motion was based on Plaintiffs' and Mr. Toberoff's failure to produce documents or provide a privilege log in response to their request for production to Plaintiffs and their subpoena to Mr. Toberoff, both of which asked for "*All Writings* referenced in the July 5, 2006 letter from John J. Quinn, Esq. to, among others, Marc Toberoff, Esq. . . ., and which were attached to or enclosed with the July 18, 2006 letter from John J. Quinn, Esq. to Marc Toberoff, Esq." (emphasis added). Because the "defamatory cover letter" was among the documents referenced in Mr. Quinn's letter and enclosed with Mr. Quinn's July 18, 2006 letter, it was the subject of Defendants' discovery requests and properly put at issue in Defendants' Motion.

28.    Second, in light of Mr. Toberoff's prior statements about the privileged nature of the "defamatory cover letter," Mr. Toberoff's current declaration does not establish that the document should be protected by the attorney-client privilege. In conjunction with the briefing on Defendants' original motion to compel, Mr. Toberoff submitted a March 23, 2007 declaration specifically addressing the privilege issue and stating, at paragraph 27, that the letter "is defamatory and in other respects *potentially violates* the attorney-client privilege," (emphasis added) even though it had never been listed on Plaintiffs' or any other privilege log. . Attached as Exhibit N̲ hereto is a true and correct copy of the March 23, 2007 Declaration of Marc Toberoff in Opposition to Defendants' Motion to Compel Production of Whistle Blower Documents. This "potential" objection was neither raised at the April 30, 2007 hearing nor in the May 21, 2007 declaration following the hearing. Indeed, the first time the "potential" privilege was ever asserted to the Court was in the declaration just submitted on September 20, 2007.

**Post-Litigation Attorney-Client Communications**

EXHIBIT 28
Page 728

29.    The Disputed Documents containing post-litigation communications between Mr. Toberoff and his clients should be produced because they fall directly within the purview of Magistrate Judge Zarefsky's Order requiring the escrow holder to turn over any documents not previously produced or listed on any of Plaintiffs' or Mr. Toberoff's privilege logs.

30.    That Mr. Toberoff referenced these documents at Paragraph 22 to his March 23, 2007 declaration in Opposition to Defendants Motion to Compel Production of Whistle Blower Documents only further supports Defendants' position that the documents did not just "fall through the cracks." During the hearing before Magistrate Judge Zarefsky on April 30, 2007, Mr. Toberoff unequivocally stated that all of the Escrow Documents had been either produced or listed on a privilege log. His several unequivocal affirmations during the Hearing effectively prevented Magistrate Judge Zarefsky from considering whether Mr. Toberoff's failure to serve a privilege log in response to the subpoena issued to him personally (as opposed to the requests for production served on Plaintiffs) waived any assertion that the post-litigation communications could be protected by the attorney-client privilege. After all, although Defendants do not deny that they entered into an agreement with Plaintiffs regarding post-litigation attorney-client communications, that agreement was only with respect to documents on both Plaintiffs' and Defendants' privilege logs which post-dated the litigation and the disclosure of which would invade work product. Moreover, no arrangement was **ever** made with Mr. Toberoff regarding the contents of his privilege log.

**Mr. Toberoff's Correspondence With Michael Siegel's Attorney Don Bulson**

31.    The first reason the Disputed Documents concerning correspondence with third party Don Bulson should be produced to Defendants is that they fall directly within the purview of Magistrate Judge Zarefsky's Order requiring the escrow holder to turn over any documents not previously produced or listed on any of Plaintiffs' or Mr. Toberoff's privilege logs. Mr. Bulson has acted as attorney at

EXHIBIT 28

Page 729

13

1 relevant times for plaintiff Laura Siegel Larson's half-brother Michael Siegel, who

2 though now deceased has a 25% share of the termination interests being litigated in

3 this case.

4     32.    The following timeline explains why these particular Disputed

5 Documents could not have been listed on Mr. Bulson's privilege log, as Mr.

6 Toberoff contends they were:

7     33.    Warner Bros. received the Escrow Documents from an unidentified

8 sender on <u>June 28, 2006</u>.

9     34.    Mr. Quinn sent Mr. Toberoff Bates labeled copies of the Escrow

10 Documents on <u>July 18, 2006</u>.

11     35.    Defendants served Plaintiffs with their request for production of the

12 Escrow Documents on <u>August 7, 2006</u>, and Defendants served Mr. Toberoff with a

13 personal subpoena on <u>August 10, 2006</u>.

14     36.    On <u>August 11, 2006</u>, Defendants served an unrelated subpoena duces

15 tecum, issued out of the United States District Court for the District of Ohio, on

16 Don Bulson, the attorney of Michael Siegel, Jerry Siegel's deceased son.  At that

17 time, Mr. Bulson was not represented by Mr. Toberoff.

18     37.    It was only sometime after Defendants served the subpoena on Mr.

19 Bulson that Mr. Toberoff's associate Nicholas Williamson contacted Mr. Bulson.

20 Attached hereto as Exhibit <u>O</u> is a true and correct copy of the Declaration of

21 Nicholas C. Williamson, Esq. In Opposition to Defendants' Motion To Compel

22 Documents Pursuant To Subpoena Duces Tecum.  At paragraph 3 of Exhibit <u>O</u>,

23 Mr. Williamson states that "[u]pon receipt of Defendants' August 11, 2006

24 Subpoena Duces Tecum ("Subpoena"), I immediately contacted Bulson regarding

25 documents he had relevant to the subpoena."

26     38.    During his conversation with Mr. Bulson, Mr. Williamson learned that

27 the relevant files had been forwarded to attorney Melvin Bancheck. (Exhibit <u>O</u> at

28 ¶ 3.)

EXHIBIT 28
Page 730
14

1      39.    Mr. Williamson subsequently contacted Mr. Bancheck, who provided

2    him with the relevant documents some time after September 7, 2006.  (Exhibit O at

3    ¶¶ 4-5).

4      40.    Because Mr. Toberoff refused to produce any documents or privilege

5    log on Mr. Bulson's behalf, Defendants filed a motion to compel before the

6    District Court of Ohio on October 20, 2006.  Waiting until after Defendants had

7    filed their motion, on October 23, 2006, Mr. Toberoff's office provided Defendants

8    with Mr. Bulson's privilege log, which purported to list all of the documents from

9    Mr. Bulson's files.  Defendants' motion to compel in Ohio, which among other

10    things challenges Mr. Bulson's assertion of the common-interest privilege, remains

11    pending, and has been since November 2006.

12      41.    Mr. Toberoff is now asserting that the Disputed Documents

13    concerning correspondence between Mr. Toberoff and Mr. Bulson should not be

14    produced because they were listed on *Mr. Bulson's* October 23, 2006 privilege log.

15    Given the facts as described above, that is a physical impossibility, since the

16    Escrow Documents were taken from Mr. Toberoff's files and sent to Warner Bros.

17    in June 2006, whereas Mr. Bulson's documents were not in Mr. Toberoff's files

18    until, at the earliest, September 7, 2006.

19      42.    In addition, the privilege log entries referenced by Mr. Toberoff

20    indicate that the letters were correspondence between Mr. Toberoff and Mr.

21    Bulson.  It is reasonable to conclude that the documents taken from Mr. Toberoff's

22    files and included among the Escrow Documents were Mr. Toberoff's copies of

23    that correspondence, which were never listed on a privilege log or produced.  It is

24    not accurate for Mr. Toberoff to cite to the entries on Mr. Bulson's privilege log

25    because those entries relate to Mr. Bulson's copies of those documents, which

26    could not have been included among the Escrow Documents.

27      43.    Even indulging the unwarranted assumption that these Bulson

28    documents "fell through the cracks," Plaintiffs' and Mr. Toberoff's privilege

EXHIBIT 28

15

1  assertion does not meet the test required to establish the common-interest

2  exception to the attorney-client privilege.  Plaintiffs and Mr. Toberoff are asserting

3  that they did not waive their attorney-client privilege when they initiated

4  communications with third party Mr. Bulson.  Given their relationship between

5  Plaintiffs and Mr. Bulson's client Michael Siegel, however, they cannot meet their

6  burden.

7      44.    Michael Siegel (now deceased), owned a vested 25% share of the

8  copyright termination interest that is the subject of the current litigation.  His

9  position vis-à-vis Plaintiffs' ownership shares is certainly adversarial, as it has

10  been at least since Plaintiffs' September 21, 2002 letter to Defendants purported to

11  repudiate Plaintiffs' October 2001 settlement with Defendants (prior to the

12  purported repudiation, Michael Siegel stood to benefit from the Settlement

13  Agreement and his interests were arguably aligned with Plaintiffs' interests with

14  respect to the settlement.)  Attached hereto as Exhibit P is a true and correct copy

15  of that letter.    45.    After Plaintiffs repudiated that settlement agreement,

16  Plaintiffs retained a California company, IP Worldwide, LLC ("IPW"), in which

17  Mr. Toberoff was a principal, to represent them in connection with efforts to

18  exploit their termination interest.  Attached hereto as Exhibit Q is a true and correct

19  copy of an agreement between IP Worldwide, LLC and Joanne Siegel and Laura

20  Siegel Larson, dated as of October 3, 2002.

21      46.    Then, in January 2003, Plaintiffs and IPW entered into a second

22  agreement in which they acknowledged certain "risks and potential problems

23  regarding Michael Siegel" and agreed that IPW partner Ariel Emanuel "will

24  attempt to purchase all of Michael Siegel's rights, title and interest" in his

25  termination rights in connection with IPW's representation of Plaintiffs.  Attached

26  hereto as Exhibit R is a true and correct copy of an agreement between IP

27  Worldwide, LLC and Joanne Siegel and Laura Siegel Larson, dated January 21,

28  2003.

EXHIBIT 28

16

Page 732

47.     These agreements suggest that Mr. Toberoff's communications with Mr. Bulson on Plaintiffs' behalf were not made in the pursuit of a common legal interest.  Rather, Mr. Toberoff, as Plaintiffs' representative and on behalf of IPW, was attempting to negotiate a purchase of Michael Siegel's rights in the copyright termination interest.  This type of relationship does not fall within the common interest exception to the attorney-client privilege, which requires that the parties pursue a common legal interest, not a common business interest.

**The Remaining Escrow Documents**

48.     Finally, although the Court's September 17, 2007 Minute Order instructs the escrow holder to turn over the nine Disputed Documents to the Court, it does not address how he should handle the remaining Escrow Documents.

49.     Defendants request that, pursuant to Magistrate Zarefksy's April 30, 2007 Order, the escrow holder be required to use Mr. Toberoff's declaration to match up the Escrow Documents with the privilege log entries and production documents listed in that declaration to ensure that he is releasing the proper documents.  If the Court is concerned about the burden on the escrow agent, it could conduct the review *in camera*.

50.     By undertaking this review, Mr. Eisen or the Court can ensure that he complies with Magistrate Judge Zarefsky's Order that the Escrow Documents be returned to Mr. Toberoff *only* if they have been listed on Plaintiffs' privilege logs.  If any of the Escrow Documents do not correspond to the privilege log entries Mr. Toberoff has provided, those documents should be turned over to Defendants.

51.     Given the facts described above, that Magistrate Judge Zarefsky's Order was founded on the representation Mr. Toberoff solemnly made during the hearing that each Escrow Document had either been produced or listed on a privilege log, there is even more of a reason for Mr. Eisen to undertake this analysis.  Mr. Toberoff has taken the position that only nine documents "slipped through the cracks."  However, it is impossible for Defendants, who do not have

EXHIBIT 28
17
Page 733

1   access to the Escrow Documents, to determine if any additional documents "fell

2   through the cracks," or if Mr. Toberoff's has accurately represented that the

3   remaining documents all correspond to privilege log entries.  Mr. Eisen, as a

4   neutral party with access to the Escrow Documents, is in a unique position to

5   undertake this analysis.  Moreover, Defendants have reason to believe that

6   additional documents have indeed "slipped through the cracks."  Indeed,

7   Defendants' original concern regarding the Escrow Documents was that they

8   included *nonprivileged*, responsive documents that had not been produced by

9   Defendants.  As mentioned above, Mr. Smith undertook an initial review of the

10  Escrow Documents pursuant to the *State Compensation* case.  During that review,

11  he segregated the Escrow Documents into three categories: "non-privileged,"

12  "privileged," and "?"  Among the "non-privileged" category of Escrow Documents

13  was correspondence between plaintiff Laura Siegel Larson and her estranged (now

14  deceased) step-brother, Michael Siegel, relating to Mr. Siegel's share of the

15  termination interest at stake in the litigation.  Plaintiffs have not produced any such

16  correspondence in this litigation, and it has not been identified on any of the

17  privilege logs.  Thus, these documents would also appear to have "fallen through

18  the cracks," yet are not among the nine documents provided by Mr. Toberoff to the

19  Court.  An actual comparison of the Escrow Documents to the allegedly

20  corresponding privilege log entries is the only way to confirm that all non-

21  privileged documents contained within the Escrow Documents have been

22  produced, and we respectfully request that it be ordered to occur.

23      I declare under penalty of perjury of the laws of the United States of

24  America that the foregoing is true and correct.

25      Dated this 25th day of September, 2007 at Beverly Hills, California.

26

27                                                      Michael Bergman

28

EXHIBIT 28
Page 734  18

EXHIBIT 29

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No.    CV 04-08400-SGL (RZx)                    Date:  September 26, 2008

Title:    JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON; an individual -v-
WARNER BROS. ENTERTAINMENT INC., a corporation; TIME WARNER INC., a
corporation; DC COMICS INC., a corporation; and DOES 1-10
==================================================================================

PRESENT:    HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

    Jim Holmes                                    None Present
    Courtroom Deputy Clerk                        Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:        ATTORNEYS PRESENT FOR DEFENDANTS:

None present                                None present

PROCEEDINGS:    ORDER REGARDING ESCROW DOCUMENTS

        The Court has been called upon to resolve a dispute over the disposition of certain
documents (hereinafter "escrow documents") in the possession of attorney Mr. David Eisen at the
law firm Arnold & Porter.  Given the passage of time, some background is in order.

        In June, 2006, three employees at Warner Bros. Entertainment, Inc. (including the
company's then general counsel, Mr. John Schulman) received packages containing documents
relating to the present litigation (the aforementioned escrow documents) from an anonymous
source.  The documents in question contained embarrassing and potentially questionable conduct
by plaintiffs counsel in this case.  The Vice President for Warner Bros., Mr. Wayne Smith,
thereafter undertook the following steps: (1) He reviewed each document but ceased such review
when it became apparent that the document was privileged, (2) contacted plaintiffs' counsel and
advised him that the documents had been received, and (3) refrained from using any information in
the documents unless and until there was either an agreement with opposing counsel or the court
had determined how to proceed with the document's disposition.  Moreover, Mr. Smith and Mr.
Schulman further decided to turn the documents over to a neutral third party pending resolution of
the disposition of the escrow documents, either pursuant to the agreement of the parties or order
of the Court.

MINUTES FORM 90
CIVIL -- GEN                            1                    Initials of Deputy Clerk: jh

EXHIBIT 29
Page 735

Magistrate Judge Zarefsky was the discovery judge in this matter at the time the escrow documents in question were received by company employees at Warner Bros.  On June 30, 2006, the escrow documents were turned over to the escrow agent. The escrow agent thereafter Bates-stamped a set of the escrow documents and then sent a copy of the same to plaintiffs' counsel, Mr. Toberoff.  The originals remained in the agent's possession in escrow.

On August 7, 2006, defendants served a request on plaintiffs for the production of the escrow documents, requesting, in particular, "[a]ll Writings referenced in the July 5, 2006 letter from [the escrow agent] to, among others, Marc Toberoff, Esq. and which were attached to or enclosed with the July 18, 2006, letter from [the escrow agent] to Marc Toberoff, Esq."  Plaintiffs' thereafter filed a response on September 6, 2006.  Subsequently, in connection with another discovery matter, Magistrate Judge Zarefsky ordered that plaintiffs "produce all privilege logs, including any revisions, by September 29, 2006."  In the subsequently-produced privilege log, plaintiffs' counsel allegedly did not assert privilege in the escrow documents.  At this point, defendants filed a motion to compel plaintiffs and their counsel to produce all non-privileged escrow documents not identified on any privilege log.

Defendants' motion to compel was heard by Magistrate Judge Zarefsky on April 30, 2007. During the hearing, plaintiffs' counsel asserted that, except for two documents, all of the escrow documents had been either previously produced to defendants or had been listed on a privilege log:

> COURT: The question is: Have you otherwise produced [the documents]?  That's all that's all at issue, isn't it?

> MR. TOBEROFF: I have, your Honor.  I have put in a declaration unequivocally that even though I'm not obliged to do so, and jump through hoops of having to respond and own up to documents stolen from my legal files, an obligation that does not apply to the defendants in this case and does not apply to parties under Rule 34, I nonetheless went through every single one of those documents, which they, instead of returning the originals, returned to me with Bate stamps, checked it against our production, and found two documents that were non-privileged that hadn't been produced that consisted of letters from plaintiffs to DC Comics, which I produced.

> COURT: See, your declaration doesn't quite say that, Mr. Toberoff.  I read your declaration.

> MR. TOBEROFF: The intention of the declaration is to say exactly what I'm saying now; that I went through my files, not just the plaintiffs' files, which is all the motion pertains to, but all my files, all the third-party witness files —

EXHIBIT 29
Page 736

COURT: Forgive me for interrupting. Your declaration does say that. What your declaration doesn't say is that you went through these, let's call them [escrow] documents, even though that may not be an accurate statement, you went through these [escrow] documents, and that you verified that each of the [escrow] documents either had been produced or had been listed on the privilege log. It doesn't say that.

MR. TOBEROFF: That is the case, your Honor, and that was certainly my intention to say that, and I'm saying that now.

COURT: All right, then we can get that cleared up immediately.

MR. TOBEROFF: I'd be happy to take an oath and say that, because that is precisely what I did.

That during the hearing, Magistrate Judge Zarefsky, noting that the previously provided declaration was unclear, issued the following Order:

COURT: Now I told you, Mr. Toberoff, that I saw a little wiggle room in your declaration. You tell me you didn't mean for there to be any. So, here's what I'm going to do. Not later than May 7th, that's a week from today, I want you to submit a declaration that does identify by the Bates numbers of the escrow documents and the corresponding Bates numbers of documents already produced, those among the escrow documents which are unprivileged and have already been produced.

So, you take the Bates numbers of the escrow documents and say, "Here are the corresponding Bates numbers of the documents that have already been pro and correspond to the listings on the privilege log of the documents which have not been produced because they were privileged. All right? So, put that in your declaration.

Then the escrow holder . . . is to return to the plaintiffs any documents which are identified in the declaration as being privileged and having been identified on the privilege logs.

The others can be delivered to trial counsel for defendants because they're either unprivileged, or, if they were privileged, privilege has been waived because they weren't listed on the privilege log

. . . .

Do you understand what I've ordered you to put in the

EXHIBIT 29
Page 737

declaration?

         MR. TOBEROFF: I do, your Honor.

(emphasis added).  Magistrate Judge Zarefsky then repeated the outline of his Order to plaintiffs' counsel towards the end of the hearing: "Privileged documents get returned.  <u>The privilege documents that were listed on the privilege log get returned</u>.  The others get sent to defense counsel." (emphasis added).

      On May 21, 2007, plaintiffs' counsel produced the declaration required by Magistrate Judge Zarefsky.  The declaration asserted privilege for the first time for a number of documents in escrow that had neither  been listed previously on a privilege log nor had been previously produced.  That plaintiffs' counsel's declaration went beyond the bounds of Magistrate Judge Zarefsky's order was made plain by a cover letter attached to his May 21, 2007, declaration: "Any documents not identified in my declaration as listed in a privilege log or as previously produced to defendants are to be produced to defendants, <u>with the exception of the clearly privileged litigation communications identified in my declaration</u>."  (emphasis added).

      Not surprisingly a dispute quickly ensued between the parties over whether plaintiffs' counsel's declaration sought to exclude from production to defendants categories of escrow documents ordered to be produced by Magistrate Judge Zarefsky's Order.  The matter was presented to this Court when Magistrate Judge Zarefsky had to step aside from serving as the discovery judge in this matter due to attend to personal matters.

      The Court ordered the escrow agent to submit the particular escrow documents in question (the ones plaintiffs' counsel was asserting privilege for the first time) for an <u>in camera</u> review and ordered plaintiffs' counsel to submit a declaration "setting forth the grounds for any claim of privilege relating to said documents."  Both steps were eventually done and the Court is now in the possession of both.

      Upon reflection the Court finds that plaintiffs' counsel's newly asserted claims for privilege are not well-taken. Pursuant to Magistrate Judge Zarefsky's order, any claim of privilege not previously asserted before that Order was deemed "waived."  Although plaintiffs suggest that such a reading of Magistrate Judge's order as not a fair one and lacks common sense, the language of his order is clear and unambiguous: Any escrow document not matching up to the privilege log or the declaration's list of previously-produced documents was to be produced to defendants; any assertion of privilege to such documents to be produced was deemed "waived."  That plaintiffs' counsel may have a basis to assert such privilege or otherwise challenge the propriety of producing such material on relevance grounds, etc., is inapposite.  If plaintiffs wished to press such new claims of privilege or any other basis for challenging production of the same, Magistrate Judge Zarefsky's Order deemed them waived.  What plaintiffs' counsel should have done at that point to preserve such assertions was to appeal Magistrate Judge Zarefsky's Order to this Court, in particular that section of his Order deeming any previously un-asserted grounds of privilege to be "waived."  Plaintiffs did not do so, and the time to appeal Magistrate Judge Zarefsky's Order to this

MINUTES FORM 90                                           Initials of Deputy Clerk: jh
CIVIL -- GEN                                4

EXHIBIT 29
Page 738

CV 04-08400-SGL (RZx)
JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON; an individual v WARNER BROS.
ENTERTAINMENT INC., a corporation; TIME WARNER INC., a corporation; DC COMICS INC., a
corporation; and DOES 1-10
MINUTE ORDER of September 26, 2008

Court has long since expired.  See Local Rule 72-2.1.

Magistrate Judge Zarefsky's Order is now the law of the case in this matter.  Plaintiffs'
argument that the parties had reached an agreement beforehand that any post-litigation attorney-
client communications did not have to be listed in a privilege log to preserve its privilege status is,
as explained in defendants' supplemental declaration to the Court's Order, simply mistaken.

Accordingly, pursuant to the terms of Magistrate Judge Zarefsky's Order, the escrow agent
is **ORDERED** to produce to defendants' counsel forthwith any escrow document not previously
listed in a privilege log or as having been previously been produced.  That is to say, the escrow
agent is to match up the escrow documents with the privilege log entries and production
documents listed in Mr. Toberoff's May 21, 2007, declaration.  Thus, the nine documents produced
by the escrow agent to the Court for in camera review are to be produced to defendants' counsel
as those documents were not previously identified in a privilege log provided by plaintiffs.

**IT IS SO ORDERED.**

EXHIBIT 29
Page 739

EXHIBIT 30

1   WEISSMANN WOLFF BERGMAN
      COLEMAN GRODIN & EVALL LLP
2   Michael Bergman (SBN 37797)
    Anjani Mandavia (SBN 94092)
3   9665 Wilshire Boulevard, Ninth Floor
    Beverly Hills, California 90212
4   Telephone: (310) 858-7888
    Fax: (310) 550-7191
5
    FROSS ZELNICK LEHRMAN & ZISSU, P.C.
6   Roger L. Zissu (Admitted *pro hac vice*)
    James D. Weinberger (Admitted *pro hac vice*)
7   866 United Nations Plaza
    New York, New York 10017
8   Telephone: (212) 813-5900
    Fax: (212) 813-5901
9
    PERKINS LAW OFFICE, P.C.
10  Patrick T. Perkins (Admitted *pro hac vice*)
    1711 Route 9D
11  Cold Spring, New York 10516
    Telephone: (845) 265-2820
12  Fax: (845) 265-2819

13  Attorneys for Defendants and Counterclaimant

14              UNITED STATES DISTRICT COURT
15              CENTRAL DISTRICT OF CALIFORNIA

16  | JOANNE SIEGEL and LAURA | Case No. CV 04-8400 SGL (RZx) |
17  | SIEGEL LARSON, | |
    |            Plaintiffs, | Hon. Stephen G. Larson, U.S.D.J. |
18  |              vs. | Hon. Ralph Zarefsky, U.S.M.J. |
19  | TIME WARNER INC., WARNER | |
20  | COMMUNICATIONS INC. WARNER | **DEFENDANTS' RESPONSE TO** |
    | BROS. ENTERTAINMENT INC., | **PLAINTIFFS' OBJECTION** |
21  | WARNER BROS. TELEVISION | **CONCERNING THE ESCROW** |
    | PRODUCTION INC., DC COMICS, and | **DOCUMENTS** |
22  | DOES 1-10, | |
23  | | |
24  |            Defendants. | |
25  | | |
26  | AND RELATED COUNTERCLAIMS | |

27

28

1        Defendants will not attempt to address the many inaccuracies and

2    unwarranted inferences contained in the "Objection" papers filed by Plaintiffs'

3    counsel.  Defendants, however, believe that the record before the Court should be

4    supplemented to include the threats made by Plaintiffs' counsel against Mr. Eisen

5    and his firm that have prevented compliance with this Court's September 26

6    Order.  Accordingly, attached as Exhibit 1 hereto is a *complete* set of the

7    correspondence and emails between the parties and Mr. Eisen regarding the

8    Court's September 26 Order.

9        These threats against Mr. Eisen and his firm should be seen for what they

10   are:  an "end run" around Plaintiffs' counsel's repeatedly threatened, but never

11   filed, motion to reconsider the Court's September 26th Order.  Without bothering

12   to seek reconsideration, Plaintiffs' counsel brazenly challenges that portion of the

13   Court's September 26 Order requiring Mr. Eisen to "match up the escrow

14   documents with the privilege log entries and production documents listed in Mr.

15   Toberoff's May 21, 2007 declaration."  Counsel does so under the guise that

16   comparing a document to a log entry to confirm that they are one and the same is

17   somehow passing upon the propriety of the asserted privilege.  It is, of course, no

18   such thing; rather it is precisely what the Court ordered Mr. Eisen to do – and for

19   sound reasons.

20   Dated: October 17, 2008           Respectfully submitted,

21                        WEISSMANN WOLFF BERGMAN
                          COLEMAN GRODIN & EVALL, LLP

22                              -and-
                          FROSS ZELNICK LEHRMAN ZISSU, LLP

23                              -and-
                          PERKINS LAW FIRM, PLC

24

25                        By _____
                                Michael Bergman

26

27                        Attorneys for Defendants and Counterclaimant

28

10/09/2008 13:51 FAX 213 243 4199 ARNOLD & PORTER, LLP ☑ 002/004

ARNOLD & PORTER LLP

David S. Eisen
David.Eisen@aporter.com

213.243.4182
213.243.4199 Fax

44th Floor
777 South Figueroa Street
Los Angeles, CA 90017-5844

October 9, 2008

_Via Facsimile_

Michael Bergman, Esq.
Weissmann Wolff Bergman Coleman
 Grodin & Evall, LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills. CA 90212

Marc Toberoff, Esq.
Law Offices of Marc Toberoff
2049 Century Park East, Suite 2720
Los Angeles, CA 90067

    Re:   Siegel & Larson v. Time Warner, Inc.

Gentlemen:

    I spoke last evening with Mr. Toberoff, and this letter is intended to supplement that discussion and respond to some issues raised in Mr. Toberoff's letter of today.

    First, neither Jack Quinn, this firm, nor I has suggested that we are formal escrow agents, in the legal sense of that term. We are holding the documents pending orders of the Court; we do not, in my view, owe either side to this litigation any legal duty. We expect to be paid for our time by defendants, but have not been engaged by them to perform legal services, and we have not been engaged by plaintiffs in any respect. If the parties are dissatisfied with what we are doing, I would be happy to deposit the documents with the Court under seal, but Mr. Toberoff has rejected that proposal. Hence, in my view, we are answerable only to the Court, and I am attempting to carry out the orders of the Court as best as I can. Mr. Toberoff's threats to me and my firm last night (and more vaguely in today's letter) are offensive, but they will not affect the manner in which I deal with the document situation.

EXHIBIT 30
Page 742

69

Case 2:10-cv-03633-ODW-RZ    Document 42-9    Filed 08/30/10    Page 165 of 171    Page
Case 2:04-cv-08400-ODW-RZ    Document 383-26    Filed 10/17/08    Page 70 of 89    Page ID
#:3257

10/09/2008 13:52 FAX  213 243 4199        ARNOLD & PORTER,LLP                           ☑ 003/004

## ARNOLD & PORTER LLP

Michael Bergman, Esq.
Marc Toberoff, Esq.
October 9, 2008
Page 2

In the course of my discussions with Mr. Toberoff, it became clear that
there are two ways in which he differs with my reading of the Court's September
26, 2008 order:

(1) Because the Court ordered me to produce to Mr. Bergman the "nine
documents," and because those documents include two, I believe, that appear
on the privilege logs of third parties, I assumed the Court intended that the
"match-up" of escrow documents to privilege logs **not** include those on third
party privilege logs, and that documents on the privilege logs of third parties
should be produced to Mr. Bergman. Mr. Toberoff says that my assumption is
incorrect, and that with the exception of those among the "nine documents,"
documents on third party privilege logs are protected. Mr. Toberoff also points
out that Mr. Bergman has never claimed that third party-privilege documents
should be produced. I could very well have made an incorrect assumption
about the Court's order, and solicit Mr. Bergman's thoughts.

(2) I stated in my letter of yesterday that I thought the match-up involved
my ascertaining whether the privilege log citation contained in Mr. Toberoff's
declaration accurately describes the corresponding document. I obviously did
not mean that literally; what I meant was that I would see whether the document
is fairly characterized in the privilege log, which essentially means that the
description of date, sender, recipient and type of document is roughly what the
document actually is. Mr. Toberoff disagrees that this is what I am supposed to
do. Mr. Toberoff also asked what would happen, assuming I engage in the
process described, in the event a cover letter is accurately described in the
privilege log, but an attached legal memo, for example, is not mentioned at all.
I said that while common sense should be part of the process (a legal memo
attached to a transmittal to the client is obviously privileged), an attached
document not referred to at all in the privilege log would not seem to pass the
"match up" test.

Mr. Toberoff's position is that what I am to do is much more ministerial
than this, but I am unsure of what he has in mind. Mr. Toberoff's declaration
already lists escrow documents and a corresponding privilege log entry. If I am
not supposed to see whether the privilege log entry is actually for the escrow
document to which Mr. Toberoff's declaration refers, then what match-up could

EXHIBIT 30

Page 743

70

Case 2:10-cv-03633-ODW-RZ    Document 42-9    Filed 08/30/10    Page 166 of 171    Page
ID #:3217
Case 2:04-cv-08400-ODW-RZ    Document 363-2    Filed 10/17/08    Page 71 of 89    Page ID
#:3258

10/09/2008 13:52 FAX  213 243 4199          ARNOLD & PORTER,LLP                    ☑ 004/004

## ARNOLD & PORTER LLP

Michael Bergman, Esq.
Marc Toberoff, Esq.
October 9, 2008
Page 3

Judge Larson be referring to?  Without looking to see whether the escrow document is the one listed on the privilege log, then it seems that Mr. Toberoff's declaration completes the match-up process, and there is nothing at all for me to do.

Given the awkward position I am in, it appears that I must hold on to the documents pending further clarification from Judge Larson on these two issues (or agreement by the two sides), except with respect to the nine documents which the Court clearly has asked me to produce and which Mr. Toberoff does not appear to dispute.  I will produce the nine documents to Mr. Bergman next week, upon my return from out of town depositions.

I request that Mr. Bergman get back to me on the issues raised above.  If the parties are not in agreement as to these issues, and if neither side intends to file a motion with the Court for clarification, I will write to the Court myself.

Sincerely,

DAVID S. EISEN

EXHIBIT 30

Page 744

71

EXHIBIT 31

**SEND**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No.    CV 04-08400-SGL (RZx)                    Date:  December 4, 2008

Title:    JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON; an individual -v-
WARNER BROS. ENTERTAINMENT INC., a corporation; TIME WARNER INC., a
corporation; DC COMICS INC., a corporation; and DOES 1-10

====================================================================================

PRESENT:    HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

Jim Holmes                                    None Present
Courtroom Deputy Clerk                        Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:            ATTORNEYS PRESENT FOR DEFENDANTS:

None present                                 None present

PROCEEDINGS:    **ORDER REGARDING ESCROW HOLDER'S OCTOBER 16, 2008, LETTER
SEEKING CLARIFICATION OF COURT'S SEPTEMBER 26, 2008, ORDER**

The Court has received and reviewed the escrow holder's October 16, 2008, letter (revised)
requesting clarification of the Court's September 26, 2008, Order, as well as the parties' respective
briefs filed in response to the escrow holder's letter.  In the letter, the escrow holder asks the Court
to answer the following questions:

> In addition to the 'nine documents,' you [also] ordered me to produce to
> defendants 'any escrow document not previously listed in a privilege log
> or as having previously been produced.'  You further said that I am to
> 'match up the escrow documents with the privilege log entries and
> production documents listed on Mr. Toberoff's May 21, 2007,
> declaration.' This leads to the following issues, as to which I would
> appreciate the Court's guidance: (1) Defendants' counsel has informed
> me his position is that escrow documents listed on the privilege log of
> [third party] Mr. Bulson must be produced.  Plaintiffs' counsel has
> informed me his position is that documents listed on Mr. Bulson's

MINUTES FORM 90
CIVIL -- GEN                                1            Initials of Deputy Clerk __jh_____

EXHIBIT 31
Page 745

privilege log must not be produced.  I would request the Court's advice as to which position is correct. (2) With respect to the 'match up' of the relevant privilege logs and Mr. Toberoff's declaration, the parties disagree with one another as to whether I am to compare the description of each document in the privilege log to the corresponding escrow document.

The Court's September 26, 2008, Order was meant to dispose of the <u>one</u> remaining dispute between the parties concerning the escrow documents — the plaintiffs' assertion of privilege over nine of the documents held in escrow that were listed on Mr. Toberoff's May 21, 2007, declaration as ones to which privilege had not previously been asserted during this litigation.  This declaration was created at the direction of an order Magistrate Judge Zarefsky entered on April 30, 2007, which additionally spelled out the ramifications flowing from the information disclosed in said declaration.  Specifically, Magistrate Judge Zarefsky stated:

> I want you to submit a declaration that does identify by the Bates numbers of the escrow documents and the corresponding Bates numbers of documents already produced, those among the escrow documents which are unprivileged and have already been produced. So, you take the Bates numbers of the escrow documents and say, "Here are the corresponding Bates numbers of the documents that have already been produced and correspond to the listings on the privilege log of the documents which have not been produced because they were privileged. All right?  So, put that in your declaration.  Then the escrow holder . . . is to return to the plaintiffs any documents which are identified in the declaration as being privileged and having been identified on the privilege logs.  The others can be delivered to trial counsel for defendants because they're either unprivileged, or, if they were privileged, <u>privilege has been waived because they weren't listed on the privilege log</u>. . . .  <u>Privileged documents get returned.  The privilege documents that were listed on the privilege log get returned.  The others get sent to defense counsel.</u>

(emphasis added).

As the escrow holder noted in his correspondence to the parties shortly after Magistrate Judge Zarefsky's April 30, 2007, Order, was issued: "In the transcript, Magistrate Judge Zarefsky does seem to announce a simple protocol for the so-called Escrow Documents: documents which appear on [prior] privilege logs are protected and should not be turned over to defendants, and documents not on [previous] privilege logs are not protected and should be produced to defendants." (Decl. Marc Toberoff, Ex. F).  What was a simple process, however, became complicated by "additional issues/arguments" submitted by Mr. Toberoff after the hearing concerning the scope of Magistrate Judge Zarefsky's April 30, 2007, Order.  Specifically, plaintiffs contended that certain escrow documents were privileged pursuant to a "gentleman's agreement"

MINUTES FORM 90
CIVIL -- GEN

2

Initials of Deputy Clerk __jh_____

EXHIBIT 31

Page 746

the parties had reached at the onset of the litigation concerning post-litigation communications, and that another escrow document (the cover letter attached when the escrow documents were delivered to defendants) was not previously in plaintiffs possession and contained privileged material therein. Defendants for their part sought to litigate the propriety of the invocation of privilege contained in prior privilege logs themselves (particularly, the invocation of the common interest privilege on a log submitted by third party Don Bulson) and also sought for the escrow holder to examine the descriptions in Mr. Toberoff's declaration to see if they accurately described those escrow documents. (Decl. Marc Toberoff, Ex. G (defense counsel at September 17, 2007, hearing, informing Court that one of the things defendants sought was for the escrow holder "to take Mr. Toberoff's declaration and to go document number by document number and ensure that the documents that he identified on his declaration really were what he said they were")).

This Court ordered the escrow holder to produce for in camera inspection the nine documents referenced by plaintiffs' newly-asserted contention of being privileged. This was done and the parties submitted further pleadings with respect to the assertion of privilege concerning those documents. At the same time, defendants sought to raise the additional considerations with the Court, arguments which the Court informed defense counsel it was not inclined to entertain. (Decl. Marc Toberoff, Ex. G ("The Court: Let's not talk about the ones that have been done. Let's talk about the nine that we have left. I want to resolve this. We're going to move on here, counsel. What are we going to do about these nine documents")).

On September 26, 2008, the Court issued an Order resolving what had initially been brought to the Court's attention back in September, 2007, that is, whether the escrow holder was required to turnover to defense counsel the nine documents. The Court held that plaintiffs' new assertions of privilege were trumped by the fact that Magistrate Judge Zarefsky's Order provided that "any claim of privilege not previously asserted before that Order was deemed 'waived'"; that plaintiffs never appealed that order; and that, as a consequence, "Magistrate Judge Zarefsky's Order is now the law of the case in this matter." Essentially, the Court's September 26, 2008, Order sought to restore the status quo ante by simply enforcing Magistrate Judge Zarefsky's April, 2007, Order. Similarly, the Court's Order did not address, nor did it seek to address, the extraneous issues being pressed by defendants, issues going beyond those addressed by Magistrate Judge Zarefsky's Order.

The Court thereupon ordered the escrow holder to perform the limited task set forth in Magistrate Judge Zarefsky's April, 2007, Order: Compare the Toberoff declaration to the escrow documents in his possession, and turnover to defendants those for which privilege had not previously been asserted.

To answer the escrow holder's two-part question, the Court's response is as follows:

(1) No. The escrow documents listed on the privilege log of Mr. Bulson are not to be produced, as such production exceeds the scope of Magistrate Judge Zarefsky's April 30, 2007, Order, which was predicated on the turnover of those escrow documents to which no prior

MINUTES FORM 90
CIVIL -- GEN

3

Initials of Deputy Clerk __jh_____

EXHIBIT 31

CV 04-08400-SGL (RZx)
JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON; an individual v WARNER BROS.
ENTERTAINMENT INC., a corporation; TIME WARNER INC., a corporation; DC COMICS INC., a
corporation; and DOES 1-10
MINUTE ORDER of December 4, 2008

privilege log had listed them as privileged; Mr. Bulson listed the escrow
documents in question in his privilege log well before Magistrate Judge
Zarefsky's April 30, 2007, Order.

(2)   No.  The escrow holder is not to compare the description of each
document in Toberoff's declaration to the corresponding escrow
document to ensure the description's accuracy.  Rather, the task of
matching up or review is done only insofar as the escrow holder is
charged with carrying out the task, as set forth in Magistrate Judge
Zarefsky's April 30, 2007, Order, of locating (using the Bates stamp
legend) those documents which appear on Toberoff's May, 2007,
declaration as having previously been listed on a privilege log and
turning them over to plaintiffs, and turning over the remainder (the
aforementioned "nine escrow documents") to defendants.

**IT IS SO ORDERED.**

MINUTES FORM 90
CIVIL -- GEN

4

Initials of Deputy Clerk __jh_____

EXHIBIT 31

Page 748