EXHIBIT 32

1  WEISSMANN WOLFF BERGMAN
      COLEMAN GRODIN & EVALL LLP
2  Michael Bergman (SBN 37797)
   Anjani Mandavia (SBN 94092)
3  Adam Hagen (SBN 218021)
   9665 Wilshire Boulevard, Ninth Floor
4  Beverly Hills, California 90212
   Telephone: (310) 858-7888
5  Fax: (310) 550-7191

6  FROSS ZELNICK LEHRMAN & ZISSU, P.C.
   Roger L. Zissu (Admitted *pro hac vice*)
7  James D. Weinberger (Admitted *pro hac vice*)
   866 United Nations Plaza
8  New York, New York 10017
   Telephone: (212) 813-5900
9  Fax: (212) 813-5901

10 PERKINS LAW OFFICE, P.C.
   Patrick T. Perkins (Admitted *pro hac vice*)
11 1711 Route 9D
   Cold Spring, New York 10516
12 Telephone: (845) 265-2820
   Fax: (845) 265-2819

13

14 Attorneys for Defendants and Counterclaimant

15                 UNITED STATES DISTRICT COURT
                   CENTRAL DISTRICT OF CALIFORNIA
16

| 17 | JOANNE SIEGEL and LAURA SIEGEL LARSON, | Case Nos. [Consolidated for Discovery]: |
|---|---|---|
| 18 | Plaintiffs, | CV 04-8400 SGL (RZx) |
| 19 | vs. | CV 04-8776 SGL (RZx) |
| | WARNER BROS. ENTERTAINMENT | Hon. Steven G. Larson, U.S.D.J. |
| 20 | INC.; TIME WARNER INC.; DC COMICS; and DOES 1-10, | Hon. Ralph Zarefsky, U.S.M.J. |
| 21 | Defendants. | **NOTICE OF MOTION AND JOINT STIPULATION RE: DEFENDANTS'** |
| 22 | JOANNE SIEGEL and LAURA SIEGEL LARSON, | **MOTION TO REOPEN DISCOVERY, TO COMPEL** |
| 23 | Plaintiffs, | **PRODUCTION OF DOCUMENTS, AND TO COMPEL THE FURTHER** |
| | vs. | **DEPOSITION OF KEVIN MARKS** |
| 24 | TIME WARNER INC.; WARNER COMMUNICATIONS INC.; WARNER | **DISCOVERY MATTER** |
| 25 | BROS. ENTERTAINMENT INC.; WARNER BROS. TELEVISION | **LOCAL RULE 37** |
| 26 | PRODUCTION INC.; DC COMICS; and DOES 1-10, | Time: 10:00 a.m. |
| 27 | Defendants. | Date: April 20, 2009 |
| | AND RELATED COUNTERCLAIMS | Courtroom: 1 |
| 28 | | Hon. Stephen G. Larson |
| | | Discovery Cutoff: Nov. 17, 2006 |

EXHIBIT 32

Page 749

1   TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

2        PLEASE TAKE NOTICE THAT on April 20, 2009 or as soon thereafter as

3   the matter may be heard in the above-entitled action before the Honorable Stephen

4   G. Larson, United States District Judge, United States District Court for the Central

5   District of California, Eastern Division, 3470 Twelfth Street, Riverside, California,

6   Courtroom 1, defendants Warner Bros. Entertainment Inc., Time Warner Inc.,

7   Warner Communications Inc., Warner Bros. Television Production Inc. and

8   defendant and counterclaimant DC Comics ("Defendants"), will and hereby do

9   move the Court to rule on this jointly filed stipulation pursuant to Local Rule 37-3

10  of the Local Rules of the United States District Court for the Central District of

11  California ("L.R."). Defendants invited counsel for Plaintiffs Joanne Siegel and

12  Laura Siegel Larson ("Plaintiffs" or the "Siegels") to meet and confer in writing on

13  January 14, 2009, in accordance with L.R. 37-1. By letter dated January 22, 2009,

14  Plaintiffs' counsel rebutted Defendants' stated bases for their motion but did not

15  provide a date to meet and confer. By e-mail dated January 23, 2009, Defendants'

16  counsel asked whether Plaintiffs' counsel wished to meet and confer further on the

17  topic by the deadline set by L.R. 37-1 – January 26, 2009 – but Plaintiffs' counsel

18  did not respond.

19       After the close of discovery and after the Court's ruling on Plaintiffs' motion

20  for summary judgment on Defendants' settlement defense, Plaintiffs produced a

21  document indicating that Plaintiffs' former counsel Kevin Marks wrote to Plaintiffs

22  and others on August 9, 2002 to indicate "that he would testify in court against the

23  Siegels" "because he believes there has already been agreement reached." The

24  recently-produced document is titled "Marc Toberoff Timeline," and the quoted

25  language captures the substance of Mr. Marks' August 9, 2002 communication. By

26  this motion, Defendants seek the actual August 9, 2002 communication as well as

27  the further deposition of Mr. Marks.

28

1

EXHIBIT 32
Page 750

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 4 of 201   Page
ID #:2146
Case 2:04-cv-08400-ODW -RZ   Document 476   Filed 03/02/09   Page 3 of 80

1       The document is relevant to Defendants' settlement defense and likely

2 supports further discovery and a motion for reconsideration. It shows that, long

3 after Plaintiffs attempted to create a dispute about settlement, the person who had

4 negotiated the settlement for Plaintiffs, Mr. Marks, still believed that a settlement

5 existed. No matter how the Court evaluates the impact of evidence concerning

6 conduct and state of mind, the state of mind of the key negotiator on Plaintiffs' side

7 is relevant. Nor is the newly-revealed evidence just about state of mind; it is about

8 conduct, as Mr. Marks acted on his understanding and made it clear that he would

9 testify adversely to his former clients if they were to join with new counsel to upset

10 the settlement. Moreover, in the end the question is not just about the exact impact

11 of the August 9, 2002 communication by Mr. Marks. The record on the settlement

12 issues should be full and complete and should include such a direct statement by a

13 key settlement negotiator, not least because he testified in his deposition that, as of

14 February 6, 2002, he believed there was not a settlement.

15       The August 9, 2002 communication was from Mr. Marks to his former

16 clients, but the attorney-client privilege does not justify keeping it out of the record.

17 First, the "Marc Toberoff Timeline" repeats the substance of the August 9, 2002

18 communication, and its production waives any privilege as to the underlying

19 document. Second, Plaintiffs determined to let Mr. Marks testify at his deposition

20 concerning his understanding about whether there was a settlement as of February 6,

21 2002 – after controversy about whether there was a settlement had arisen – so

22 privilege has been waived as to other evidence concerning Mr. Marks'

23 understanding or state of mind regarding settlement, certainly as to a document in

24 which he so directly contradicts his deposition testimony.

25       Put simply there is now an incomplete record regarding key settlement

26 evidence – deposition testimony says one thing, and the "Marc Toberoff Timeline"

27 says another. There is no good reason for Defendants and the Court not to have, and

28 for the record not to be completed by, Mr. Marks' August 9, 2002 communication.

EXHIBIT 32      2
Page 751

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 5 of 201   Page
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 03/02/09   Page 4 of 80
ID #:2147

1  Defendants also seek leave to further depose Mr. Marks concerning the

2  communication.

3        This motion is made pursuant to Rules 26 and 37 of the Federal Rules

4  of Civil Procedure and L.R. 37.  Defendants contend that good cause therefore exists

5  for the discovery sought.

6

7  DATED:  March 2, 2009            FROSS ZELNICK LEHRMAN & ZISSU, P.C.

8                                   PERKINS LAW OFFICE, P.C.

9                                        -and-

10                                 WEISSMANN WOLFF BERGMAN
                                      COLEMAN GRODIN & EVALL LLP

11

12                                 By: _____

13                                     Michael Bergman

14                                 Attorneys for Defendants and Counterclaimant

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 32  3
Page 752

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 6 of 201    Page
ID #:2146
Case 2:04-cv-08400-ODW -RZ    Document 476    Filed 03/02/09    Page 5 of 80

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................v

I.     DEFENDANTS' AUTHORITIES ...............................................v

II.    PLAINTIFFS' AUTHORITIES ................................................v

JOINT STIPULATION..........................................................1

I.     DEFENDANTS' INTRODUCTORY STATEMENT ...................................1

II.    PLAINTIFFS' INTRODUCTORY STATEMENT ..................................2

III.   DEFENDANTS' CONTENTIONS ..........................................6

    A.    FACTUAL AND PROCEDURAL BACKGROUND.........................6

        1.    DC Comics' Settlement Defense In The Actions ...................6

        2.    Warner Bros.' Receipt Of The Escrow Documents.................7

        3.    Defendants' Attempts To Obtain The Escrow
            Documents..........................................................8

        4.    The Toberoff Timeline ...........................................10

        5.    The Parties' Meet And Confer Efforts...........................14

    B.    LEGAL ARGUMENT .....................................14

        1.    The Newly Discovered Evidence In The "Toberoff Time
            Line" And The Not-Yet-Discovered Evidence In The August
            9, 2002 Communication Contain Discoverable Information
            Which May Ultimately Support Reconsideration By The
            Court Of Defendants' Settlement Defense. ......................14

        2.    The Evidence That Defendants Now Seek Is Impeachment
            Evidence That Goes Directly to the Heart of Marks'
            Credibility on the Settlement Issue. ...........................15

        3.    Plaintiffs Have Improperly Obscured The Truth Through
            Selective Use And Waiver Of The Privilege. ....................16

        4.    It Is The "Law Of The Case" That Any Attorney-Client
            Privilege Applicable To The Toberoff Timeline Has Been
            Waived, Which In Turn Serves To Waive Any Privilege In
            Kevin Marks' August 2002 Communication With Plaintiffs
            Concerning Marks' Opinion That The Parties Had Reached
            A Settlement.....................................................20

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 7 of 201    Page
Case 2:04-cv-08400-ODW -RZ   Document 476    Filed 03/02/09   Page 6 of 80
ID #:1419

5.  Defendants Have Been Diligent In Seeking Discovery Of The Escrow Documents And Thus Have "Good Cause" To Reopen Discovery. ......................................................... 22

6.  The Evidence Sought By Defendants In This Motion Is Discoverable Notwithstanding The Court's Ruling On Summary Judgment ................................................................. 23

7.  The Interests Of Justice And The Integrity Of The Judicial Process Strongly Favor The Relief Sought By Defendants ..... 24

IV.  PLAINTIFFS' CONTENTIONS ................................................... 25

A.  FACTUAL AND PROCEDURAL BACKGROUND ........................ 25

1.  The Court Properly Held on Summary Judgment That No Settlement Agreement Was Consummated By the Parties ..... 25

2.  Defendants Improperly Seek to Exploit and Leverage the Theft of Documents from Plaintiffs' Counsel's Office ........... 29

a.  Documents Stolen From Plaintiffs' Legal Files ............ 29

b.  The Court's April 30, 2007 Order ................................. 31

c.  Defendants' Second Motion to Compel ........................ 32

B.  LEGAL ARGUMENT ................................................................. 35

1.  Defendants Improperly Seek Reconsideration of the April 30, 2007 Order ................................................................. 35

2.  Defendants' Veiled Motion for Reconsideration Ignores Black-Letter Contract Law Upheld By The Court's Summary Judgment Order ........................................................... 37

a.  The Defamatory Letter Distorts Marks' Beliefs and Does Not Even Mention Marks' August 9 Letter to Plaintiffs ................................................................. 37

b.  Defendants' Motion Even Mischaracterizes the Defamatory Letter and Kevin Marks' Testimony ......... 38

c.  Marks' Subjective Opinion Is, In Any Event, Extraneous  Because the Existence of a Contract Is Based Upon the Objective Manifestation of the Parties' Intent ................................................................ 41

d.  Defendants' Arguments Based on the Parties' Subjective Understanding Have Already Been Rejected by the Court ................................................ 44

3.  The Defamatory Letter Does Not Waive Attorney-Client Privilege ............................................................................. 45

EXHIBIT 32 ii

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 8 of 201    Page
ID #:2190
Case 2:04-cv-08400-ODW -RZ    Document 476    Filed 03/02/09    Page 7 of 80

a.   There Was No Voluntary Waiver of Attorney-Client
     Privilege as to the August 9 Letter ................................. 45

b.   There Was No Basis to List the Defamatory Letter on
     a Privilege Log............................................................... 47

c.   Any Failure to List the Defamatory Letter on a
     Privilege Log Was Excusable Inadvertence ................... 48

d.   The Cases Cited by Defendants for Waiving Privilege
     Are Inapplicable.............................................................. 49

4.   Defendants' "Work Product" Arguments Are Both Irrelevant
     to the Protection of the August 9 Letter and Unavailing ........ 50

a.   As Work-Product Protection Was Not Asserted for
     the August 9 Letter, Waiver of Work-Product is
     Irrelevant......................................................................... 50

b.   Marks' Testimony Does Not Constitute Work-Product
     and Would Not Waive Work Product Protection .......... 51

c.   There Is No Connection Between Marks' Testimony
     and the August 9 Letter.................................................... 52

5.   The Court Should Reconsider Its Conclusion that the Letter
     "Contains" Conduct By Plaintiffs' Counsel as the Letter is
     Unethical, Anonymous, Inadmissible and Unsupported ......... 53

6.   The September 26, 2008 Order Should Be Reconsidered
     Because the April 30 Order Did Not Encompass the
     Defamatory Letter and In Any Event Plaintiffs Had No
     Opportunity to "Appeal" the April 30 Order as to this Issue... 55

a.   The April 30 Order Did Not Encompass the
     Defamatory Letter Because Defendants Had Not
     Moved to Compel Production of the Letter..................... 55

b.   The Issue of Whether the Defamatory Letter Should
     Be Released to Defendants Was Not Ripe for Appeal
     Under Local Rule 72-2.1 ............................................... 56

7.   The September 26, 2008 Order for the Production of the
     Defamatory Letter Should Be Reconsidered In Light of the
     Record and Defendants' Misuse of the Stolen Documents ..... 57

a.   Magistrate Zarefsky's April 30 Order Was Based
     on Defendants' Misrepresentation of a Sanitized
     Protocol .......................................................................... 57

     i.   Warner Bros. Engaged in a Substantive Review
          of the Privileged Stolen Documents ................... 57

EXHIBIT 32  iii
Page 755

ii.      Defendants Misrepresented that They Turned
the Stolen Documents Over to a "Neutral" and
Perpetuated the Fiction that the Documents
Were Held by an "Escrow Agent" ....................... 62

V.      DEFENDANTS' CONCLUSION ................................................................ 66

VI.      PLAINTIFFS' CONCLUSION ................................................................ 66

EXHIBIT 32      iv

Page 756

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 10 of 201    Page
Case 2:04-cv-08400-ODW -RZ    Document 476    Filed 03/02/09   Page 9 of 80
ID #:2152

1

## TABLE OF AUTHORITIES

2  **I.    Defendants' Authorities**

3  **Cases**

4  *Atari Corp. v. Sega of Am.*,
   161 F.R.D. 417 (N.D. Cal. 1994)............................................................ 16

5
   *Columbia Pictures Television, Inc. v. Krypton Broadcasting of Birmingham, Inc.*,
6  259 F.3d 1186 (9th Cir. 2001)............................................................ 16

7  *In re Kidder Peabody Sec. Litig.*,
   168 F.R.D. 459 (S.D.N.Y. 1996)............................................................ 21

8
   *In re McKesson HBOC, Inc. Secs. Litig.*,
9  2005 U.S. Dist. LEXIS 7098 (N.D. Cal. Mar. 31, 2005)........................... 16

10 *Johnson v. Mammoth Recreations, Inc.*,
   975 F.2d 604 (9th Cir. 1992)............................................................ 22

11
   *Kintera, Inc. v. Convio, Inc.*,
12 219 F.R.D. 503 (S.D. Cal. 2003)............................................................ 17

13 *Nidec Corp. v. Victor Co.*,
   249 F.R.D. 575 (N.D. Cal. 2007)........................................................20-21

14
   *Noyes v. Kelly Servs.*,
15 488 F.3d 1163 (9th Cir. 2007)............................................................ 22

16 *N.Y. Life Ins. Co. v. Morales*,
   2008 U.S. Dist. LEXIS 51304 (S.D. Cal. July 1, 2008) ........................... 22

17
   *U.S. v. Jacobs*,
18 117 F.3d 82 (2d Cir. 1991)............................................................ 21

19 *Weil v. Investment/Indicators, Research & Mgmt., Inc.*,
   647 F.2d 18 (9th Cir. 1981)............................................................ 21

20
   **Other Authorities**

21 Fed. R. Civ. P. 16(b) ............................................................ 16

22 Fed. R. Civ. P. 26(b)(1)............................................................ 16

23
   1 Paul R. Rice,
24 Attorney-Client Privilege in the United States § 4:35 (1999 ed.)........................... 20

25 **II.    Plaintiff's Authorities**

26 **Federal Cases**

27 *Atari Corp. v. Sega of Am.*,
   161 F.R.D. 417 (N.D. Cal. 1994)............................................................ 51

28

EXHIBIT 32    v
Page 757

*Chevron Corp. v. Pennzoil Co.,*
974 F.2d 1156 (9th Cir.1992) .................................................................. 48

*City of L.A. v. Santa Monica BayKeeper,*
254 F.3d 882 (9th Cir. 2001) .................................................................. 57

*Columbia Pictures Television, Inc. v. Krypton Broadcasting of Birmingham, Inc.,*
259 F.3d 1186 (9th Cir. 2001) .................................................................. 51

*Cox v. Administrator U.S. Steel & Carnegie,*
17 F.3d 1386 (11th Cir.) .................................................................. 52-53

*Cunningham v. Connecticut Mut. Life Ins.,*
845 F. Supp. 1403 (S.D. Cal. 1994) .................................................................. 48

*First Savings Bank, F.S.B. v. First Bank System, Inc.,*
902 F. Supp. 1356 (D. Kan. 1995) .................................................................. 48

*Gomez v. Vernon,*
255 F.3d 1118 (9th Cir. 2001) .................................................................. 58

*Government Guarantee Fund of Republic of Finland v. Hyatt Corp.,*
182 F.R.D. 182 (D.V.I. 1998) .................................................................. 47

*Hickman v. Taylor,*
329 U.S. 495 (1947) .................................................................. 51

*In re Dayco Corp. Derivative Sec. Litig.,*
102 F.R.D. 468 (S.D. Ohio 1984) .................................................................. 46

*In re Echostar Comms. Corp.,*
448 F.3d 1294 (Fed. Cir. 2006) .................................................................. 50-51

*In re Grand Jury Proceedings Involving Berkley and Co., Inc.,*
466 F. Supp. 863 (D. Minn. 1979) .................................................................. 46

*In re Grand Jury Subpoena,*
350 F.3d 1010 (9th Cir. 2003) .................................................................. 51

*In re Kidder Peabody Sec. Litig.,*
168 F.R.D. 459 (S.D.N.Y. 1996) .................................................................. 49

*In re Martin Marietta Corp.,*
856 F.2d 619 (4th Cir. 1988) .................................................................. 52

*In re McKesson HBOC, Inc. Secs. Litig.,*
2005 U.S. Dist. LEXIS 7098 (N.D. Cal. Mar. 31, 2005) .................................................................. 51

*In re Michigan Boiler & Eng'g Co.,*
87 B.R. 465 (Bankr. E.D. Mich. 1988) .................................................................. 50

*Kenyatta v. Kelly,*
375 F. Supp. 1175 (E.D. Pa. 1974) .................................................................. 46

EXHIBIT 32
vi

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 12 of 201   Page
ID #:2154
Case 2:04-cv-08400-ODW -RZ   Document 476   Filed 03/02/09   Page 11 of 80

*Kintera, Inc. v. Convio, Inc.,*
219 F.R.D. 503 (S.D. Cal. 2003) ...................................................... 48, 51

*Laxalt v. McClatchy,*
116 F.R.D. 438 (D. Nev. 1987) ............................................................ 47

*Mendenhall v. Barber-Greene Co.,*
531 F. Supp. 948 (N.D. Ill. 1981) ........................................................ 48

*Nidec Corp. v. Victor Co.,*
249 F.R.D. 575 (N.D. Cal. 2007) ......................................................... 49

*Picard Chemical Inc. Profit Sharing v. Perrigo Co.,*
951 F. Supp. 679 (W.D. Mich. 1996) .................................................... 50

*Resolution Trust Corp. v. Dean,*
813 F. Supp 1426 (D. Ariz. 1993) ........................................................ 46

*Rhone-Poulenc Rorer Inc. v. Home Indem. Co.,*
32 F.3d 851 (3rd Cir. 1994) ................................................................ 50

*Robinson v. Tex. Auto. Dealers Ass'n,*
214 F.R.D. 432 (E.D. Tex. 2003) ......................................................... 48

*Sackman v. Ligget Group, Inc.,*
173 F.R.D. 358 (E.D.N.Y. 1997) ......................................................... 46

*Shell Oil Refinery v. Shell Oil Co.,*
143 F.R.D. 105 (E.D. La. 1992) ........................................................... 62

*Siegel v. Warner Bros. Entertainment Inc.* ("*Siegel II*"),
542 F. Supp. 2d 1098 (C.D. Cal. 2008) ........................................... *passim*

*Smith v. Armour Pharmaceutical Co.,*
838 F. Supp. 1573 (S.D. Fla. 1993) ...................................................... 46

*Spacone v. Burke (In re Truck-A-Way),*
300 B.R. 31 (E.D. Cal. 2003) .............................................................. 62

*Tennenbaum v. Deloitte & Touche,*
77 F.3d 337 (9th Cir. 1996) ................................................................ 46

*Transamerica Computer Co., Inc. v. International Business Machines Corp.,*
573 F.2d 646 (9th Cir. 1978) ............................................................... 45

*United States v. Chen,*
99 F.3d 1495 (9th Cir. 1996) ............................................................... 46

*United States v. Doe,*
219 F.3d 175 (2d Cir. 1999) ................................................................ 51

*United States v. Jacobs,*
117 F.3d 82 (2d Cir. 1997) ............................................................ 49, 51

EXHIBIT 32   vii
Page 759

*United States v. Nobles,*
422 U.S. 225 (1975) ............................................................................ 51

*United States ex rel. Mayman v. Martin Marietta Corp.,*
886 F. Supp. 1243 (D. Md. 1995) ....................................................... 46

*Weil v. Investment/Indicators, Research and Management, Inc.,*
647 F.2d 18 (9th Cir. 1981) ......................................................... 45, 49

**State Cases**

*Apablasa v. Merritt & Co.,*
176 Cal.App.2d 719 (1959) ................................................................. 42

*Cooke v. Superior Court,*
147 Cal. Rptr. 915 (Cal. Ct. App. 1978) ............................................. 46

*Grove v. Grove Valve & Reg. Co.,*
4 Cal.App.3d 299 (1970) ..................................................................... 42

*Louis Lesser Enterprises, Ltd. v. Roeder,*
209 Cal.App.2d 401 (1962) ................................................................. 43

*Meyer v. Benko,*
55 Cal.App.3d 937 (1976) ............................................................ 39, 43

*Rico v. Mitsubishi Motors Corp.,*
116 Cal. App. 4th 51 (2004) ............................................................... 62

*Rico v. Mitsubishi Motors Corp.,*
171 P.3d 1092 (2007) .......................................................................... 58

*State Compensation Insurance Fund v. WPS, Inc. (State Fund),*
70 Cal.App.4th 644 (1999) .............................................................. 58-59

*Stewart v. Preston Pipeline Inc.,*
134 Cal.App.4th 1565 (2005) ............................................................. 43

*Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co.,*
27 Cal. 4th 705 (2003) ........................................................................ 63

**Other Authorities**

F.R.C.P. 26 ........................................................................................... 51

California Civil Code § 1585 ............................................................... 42

Local Rule 7 ................................................................................... 57, 63

Local Rule 72 ....................................................................................... 56

159 *American Law Reports Federal* 153 ........................................... 46

*Matthew Bender Practice Guide:*
*Federal Pretrial Civil Procedure in California* § 24.40 ...................... 58

EXHIBIT 32    viii

Page 760

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 14 of 201   Page
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 03/02/09   Page 13 of 80
ID #:2156

1  Jones, Rosen, Wegner & Jones,
Federal Civil Trials and Evidence ¶ 8:3700.......................................................... 51

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 32   ix

Page 761

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 15 of 201    Page
ID #:2157
Case 2:04-cv-08400-ODW -RZ    Document 476    Filed 03/02/09    Page 14 of 80

## JOINT STIPULATION

### I.   DEFENDANTS' INTRODUCTORY STATEMENT

As the Court is aware, in late June 2006, three separate packages of documents (the "Escrow Documents") were anonymously mailed to executives of Defendant Warner Bros. As this Court observed in its Order of September 26, 2008 (the "September 26 Order"), the Escrow Documents "contain embarrassing and potentially questionable conduct by plaintiffs' counsel in this case." (September 26 Order at 1.)  Since their delivery in June 2006, Defendants have played strictly by the rules in an attempt to obtain the Escrow Documents.  All the while, Plaintiffs did everything in their power to block production of the embarrassing Escrow Documents.  Finally, after more than a year and a half of motion practice, the Court confirmed as "law of the case," the Magistrate Judge's ruling that, due to Plaintiffs' counsel's failure to list certain of the Escrow Documents on a privilege log, any privilege in certain of the Escrow Documents had been waived.

Unfortunately, Plaintiffs' obstructionist tactics were temporarily successful as Defendants were prevented from seeing any of the Escrow Documents until December 12, 2008 – well after the close of discovery and well after the Court had ruled on motions for summary judgment.

When Defendants finally received the Escrow Documents, they saw that one such document, the so-called "Marc Toberoff Timeline" (the "Toberoff Timeline"), contained the revelation that in August 2002 Plaintiffs' former counsel, Kevin Marks, had advised his clients that he believed that an enforceable settlement agreement with DC Comics had been reached.  Even more significant was Kevin Marks' statement that if Plaintiffs did not abide by the settlement agreement, he would testify against them at a trial to enforce the agreement.  This revelation of evidence came too late – *after* the October 7, 2006 deposition of Kevin Marks during which Mr. Marks testified in a manner inconsistent with his prior written

1

EXHIBIT 32
Page 762

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 16 of 201   Page
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 03/02/09   Page 15 of 80
ID #:2158

1   statement, and *after* this Court's dismissal of Defendants' settlement defense on

2   March 26, 2008, to allow Defendants to develop a full and fair record on the

3   settlement issue.  Because the Escrow Documents were not produced until after the

4   Court had ruled, Defendants were deprived of the ability to develop the facts and to

5   put them before the Court on summary judgment.  The Court ruled without the

6   benefit of such developed evidence.

7        By this motion, Defendants seek:  (i) production of correspondence dated

8   August 9, 2002, the substance of which was revealed in the Toberoff Timeline,

9   containing the now disclosed statement of Kevin Marks that an enforceable

10  settlement had been reached; and (ii) the right to further depose Plaintiffs' former

11  counsel, Kevin Marks in view of the new evidence that has come to light and its

12  inconsistency with his deposition testimony.

13  **II.    PLAINTIFFS' INTRODUCTORY STATEMENT**

14       Defendants' baseless motion is but their latest frivolous attempt to leverage

15  the theft of privileged documents from the offices of Plaintiffs' counsel, and to bias

16  the trier of fact against Plaintiffs and their counsel through a flurry of false,

17  unsupported accusations.  Defendants erroneously claim that an unproven statement

18  in a privileged communication by Plaintiffs' former counsel to his clients is enough

19  to overturn the Court's March 26, 2008 summary judgment order, holding that no

20  enforceable agreement was reached between the parties regarding Plaintiffs'

21  recaptured Superman copyrights.  *See Siegel v. Warner Bros. Entertainment Inc.*

22  ("*Siegel II*"), 542 F. Supp. 2d 1098, 1136-1138 (C.D. Cal. 2008).

23       The facts underlying this seemingly endless matter are simple:  Plaintiffs'

24  legal files were *stolen* from the offices of Plaintiffs' counsel (the "Stolen

25  Documents") and delivered to Defendant Warner Bros. Entertainment Inc. ("Warner

26  Bros.") A majority of the documents were clearly privileged attorney-client

27  communications. Enclosed with the Stolen Documents was an anonymous,

28  unsupported, defamatory cover letter (the "Defamatory Letter").  This conspiratorial

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 17 of 201    Page
ID #:2159
Case 2:04-cv-08400-ODW-RZ    Document 476    Filed 03/02/09    Page 16 of 80

1   rant was written by a disgruntled attorney, employed briefly at the firm of Plaintiffs'

2   counsel, who deliberately ignored his legal and ethical duties to Plaintiffs by

3   stealing their privileged legal files and handing them over to Warner Bros. in the

4   midst of this litigation.

5        We know now that Defendants misrepresented their handling of the Stolen

6   Documents to Magistrate Zarefsky and this Court to obtain approval of their

7   purported procedures and to sanitize their unseemly use of the stolen legal files.

8   Warner Bros.' in-house counsel Wayne Smith claimed to have only briefly

9   "thumbed through" the Stolen Documents to see if they were privileged. Instead of

10  notifying Plaintiffs' counsel immediately and returning clearly privileged

11  documents, Warner Bros. purportedly arranged for a law firm to act as a "neutral"

12  "escrow holder." It was later revealed, however, that the firm, retained and paid by

13  Defendants, was neither "neutral" nor an "escrow holder." Moreover, it is clear

14  from Smith's repeated ability to pinpoint and describe specific documents and to

15  correlate them to specific entries on Plaintiffs' privilege logs (received long after

16  Defendants purportedly turned over all Stolen Documents to a so-called "neutral")

17  that Warner Bros. stepped way over the line in leveraging this theft and exploiting

18  clearly privileged information in this litigation.

19       On April 30, 2007, Magistrate Zarefsky ordered a simple ministerial

20  procedure to deal with the documents: the stolen documents which were listed on

21  privilege logs should be returned to Plaintiffs, while documents not listed on

22  privilege logs should be produced to Defendants. This led to two disputes. The first

23  dispute concerned 9 documents (4 of which are merely fax cover or confirmation

24  sheets) of the 839 pages of the Stolen Documents that fell between the "cracks" of

25  the April 30, 2007 order, but were clearly privileged. These documents included the

26  Defamatory Letter and post-litigation attorney-client communications. The second

27  dispute concerned Defendants' transparent manipulation of their "escrow" protocol.

28  Instead of letting their "escrow" execute the simple disbursal ordered by Magistrate

EXHIBIT 323
Page 764

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 18 of 201   Page
Case 2:04-cv-08400-ODW -RZ   Document 476   Filed 03/02/09   Page 17 of 80
ID #:2160

1   Zarefsky on April 30, 2007 and again by this Court on September 26, 2008, with

2   respect to the 130 documents that remained undisputed, Defendants instructed their

3   "escrow" to retain all the documents and repeatedly attempted to have him "peek"

4   behind the logs to challenge Plaintiffs' assertion of privilege.

5       This Court again resolved the matter in its December 4, 2008 Order.  The 9

6   documents remaining in question, including the Defamatory Letter, were ordered

7   produced, and all other documents – those listed on privilege logs or already

8   produced – were finally returned to Plaintiffs.

9       Now, on the groundless basis of the Defamatory Letter, Defendants once

10   again attempt to re-open this matter and rip away the already upheld attorney-client

11   privilege protecting an August 9, 2002 letter from attorney Kevin Marks ("Marks")

12   to his clients, Laura and Joanne Siegel (the "August 9 Letter") that was among the

13   Stolen Documents.

14       The privileged August 9 Letter *was* properly listed and claimed on a privilege

15   log.  Based on no less than four Court orders, the inquiry should end there.  Ignoring

16   these fatal facts, Defendants attempt to violate the attorney-client privilege on the

17   sole basis that the anonymous, inadmissible Defamatory Letter purportedly

18   describes the privileged August 9 Letter, and that this description allegedly

19   contradicts Marks' sworn deposition testimony regarding the negotiation of a

20   settlement agreement.

21       As an initial matter, the Defamatory Letter neither mentions the August 9

22   Letter, nor any writing, in describing what Marks purportedly believed.  Defendants'

23   entire motion is falsely premised on the unproven contents of the privileged August

24   9 Letter.  Moreover, *even if* Marks subjectively believed (he did not) that a binding

25   agreement had been reached, such a belief would be extraneous because the

26   formation of a contract requires an "objective manifestation" of a "meeting of the

27   minds" on all material terms of agreement.  The Court correctly held this was

28   clearly absent in the well-documented exchange between Plaintiffs and DC of offers

EXHIBIT 32     4
Page 765

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 19 of 201   Page
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 03/02/09   Page 18 of 86   Page
ID #:2161

1    and counter-offers containing materially different terms. *See Siegel II*, 542 F. Supp.

2    2d at 1136-1139.

3       Secondly, Defendants mischaracterize both Marks' deposition testimony and

4    the Defamatory Letter to fabricate an inconsistency that, in reality, does not exist.

5    Even if the ranting Defamatory Letter were taken at face value, it simply states:

6    "Marks also tells the Siegels that he would testify in court against the Siegels if they

7    accepted this offer because he believes there has already been an agreement

8    reached." *See* Declaration of Patrick Perkins in Support of Defendants' Motion to

9    Compel ("Perkins Decl."), Ex. 1 at 1. Defendants repeatedly mischaracterize the

10   Defamatory Letter as stating an "*enforceable* agreement" had been reached, when it

11   plainly does not say this. This critical distinction is amply illustrated by Marks'

12   testimony, cited by Defendants (hence Defendants' deceptive insertion of

13   "enforceable"):

14      "A: Well, if the question is did I think at this point there was a final, binding,
       enforceable agreement, the answer would be no, ***but I did believe that we had***

15      ***come to an agreement back on October 19th, 2001....*** So while I thought we
       had an agreement on these terms, John evidently didn't, and where you don't

16      have a meeting of the minds, you don't have an agreement."

17   *See* Perkins Decl., Ex. 6 at 154:12-155:2 (emphasis added). Marks' testimony is

18   perfectly consistent with the Defamatory Letter's statement that Marks "believes

19   there has already been an agreement reached."

20       Defendants' motion is nothing more than a veiled motion for reconsideration

21   of the Court's summary judgment ruling and is built on a false pretext. Defendants'

22   continuing efforts to exploit Stolen Documents to access Plaintiffs' privileged

23   attorney-client communications taints this case. Moreover, the baseless nature of

24   Defendants' motion suggests that Defendants' real objective is to once again place

25   the Defamatory Letter before the Court to prejudice the trier of fact shortly before

26   trial. Plaintiffs respectfully request that this Court reconsider its prior September 26,

27   2008 ruling that the anonymous, inadmissible and wholly unsupported Defamatory

28   Letter "contained embarrassing and potentially questionable conduct by plaintiffs[']

EXHIBIT 32[5]
Page 766

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 20 of 201   Page
Case 2:04-cv-08400-ODW-RZ   Document 476    Filed 03/02/09   Page 19 of 80
ID #:2162

1 | counsel in this case." Plaintiffs further request that Defendants be precluded from
2 | using the Defamatory Letter in this litigation or elsewhere. This Court should close
3 | this disgraceful chapter of this litigation once and for all.

**III.  DEFENDANTS' CONTENTIONS**

    **A.  FACTUAL AND PROCEDURAL BACKGROUND**

        **1.  DC Comics' Settlement Defense In The Actions**

In response to Plaintiffs' complaints in the two related cases (the "Actions"), Defendant DC Comics ("DC") filed counterclaims seeking enforcement of a prior settlement agreement between the parties. DC's settlement claim was based on a letter sent by Plaintiffs' prior counsel, Kevin Marks ("Marks"), on October 19, 2001, which unequivocally states that the Siegel Family has "accepted D.C. Comics' offer of October 16, 2001" and which outlines all of the material terms of the parties' agreement. (*See, e.g.*, Exhibit 2 to the Declaration of Patrick T. Perkins submitted herewith ("Perkins Decl."), ¶¶ 47-56.)

In reply to DC's counterclaims, Plaintiffs denied that the parties reached any valid settlement agreement. In response to Defendants' settlement defense, Plaintiffs initially asserted as an affirmative defense that Marks did not have authority, or exceeded the scope of his authority. (Perkins Decl. ¶ 5; Perkins Ex. 3 at ¶ 183.)[1] Additionally, Plaintiffs argued that the subsequent conduct of Defendants after October 19, 2001, including but not limited to (i) an October 26, 2001 letter to Marks containing a "more fulsome" outline of the parties' agreement; and (ii) a long-form agreement drafted by Defendants and submitted to Plaintiffs on February 1, 2002, added to and materially changed the terms of the settlement that

---

[1] Defendants moved to compel production of documents and testimony regarding Plaintiffs' counsel's lack of authority to send the October 19, 2001 letter on the basis that the authority defense served as a waiver of privilege. On May 2, 2007, Magistrate Judge Zarefsky granted Defendants' motion but allowed Plaintiffs to withdraw the defense and, in effect, retract their waiver of privilege by striking the affirmative defense in lieu of compelling Plaintiffs to produce the documents and provide further testimony. (Perkins Decl. ¶ 7.)

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 21 of 201    Page
ID #:2165
Case 2:04-cv-08400-ODW-RZ    Document 476    Filed 03/02/09    Page 20 of 80

1  they had accepted and thus justified their decision not to consummate their

2  agreement with Defendants.  (Perkins Decl. ¶ 5; Perkins Ex. 3 at ¶ 53.)

3        **2.    Warner Bros.' Receipt Of The Escrow Documents**

4        On or around June 28, 2006, three sets of the Escrow Documents arrived at

5  the offices of Warner Bros. from an anonymous source, addressed to separate

6  Warner Bros. executives.  The executives to whom the Escrow Documents were

7  sent were instructed by Warner Bros.' then General Counsel to deliver them to his

8  office without reviewing the Documents.  (Declaration of Wayne M. Smith

9  submitted March 26, 2007 (the "March 2007 Smith Decl. ¶ __") ¶ 2 (attached for the

10 Court's convenience as Perkins Exhibit 4).)

11       The Escrow Documents were provided to in-house litigation counsel Wayne

12 Smith ("Smith") who, after reviewing the unsigned cover letter that accompanied

13 them and after thumbing through the Documents, determined that some of them may

14 have been privileged.  (March 2007 Smith Decl. ¶ 4.)

15       Smith researched the issue of what obligations, if any, governed Defendants'

16 handling of the Escrow Documents that Warner Bros. had received.  Based on his

17 review of the relevant California authorities, Defendants:  (i) reviewed each

18 document but ceased the review once it became apparent that the document was

19 privileged or may have been privileged; (ii) contacted opposing counsel and advised

20 him that the documents have been received; and (iii) refrained from using any

21 information in the documents until there was either an agreement with opposing

22 counsel, or the Court had determined each document's disposition.  (March 2007

23 Smith Decl. ¶ 6.)  Magistrate Judge Zarefsky found the procedure exercised by Mr.

24 Smith to be appropriate and "professional."  (Perkins Ex. 5 at 19:3-7.)

25       During his review, Defendants' in-house counsel identified an August 9, 2002

26 written communication from Marks to his clients (the "August 9, 2002

27 Communication"), as one that related to plaintiffs' contention that Marks lacked

28 authority to bind plaintiffs to any settlement, and he concluded that the privilege

EXHIBIT 32    7

Page 768

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 22 of 201   Page
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 03/02/09   Page 21 of 80
ID #:2164

1  attaching to the document had likely been waived.  (February 19, 2009 Declaration

2  of Wayne M. Smith ("February 2009 Smith Decl. ¶__") ¶ 5.

3       On June 30, 2006, Defendants provided *all* of the Escrow Documents to an

4  escrow agent, not just those that were clearly or potentially privileged, and retained

5  no copies.  (March 2007 Smith Decl. ¶ 13.) On July 18, 2006, the escrow agent

6  supplied a full copy set of the Escrow Documents to Plaintiffs' counsel.  (Perkins

7  Decl. ¶ 10.)  Meanwhile, neither copies nor the contents of the Escrow Documents

8  were provided to or shared with any of the outside counsel representing the

9  Defendants in this action, nor were any such documents used in the litigations unless

10  they were separately produced by Plaintiffs or by recipients of third-party

11  subpoenas. (March 2007 Smith Decl. ¶ 13.)

12       **3.    Defendants' Attempts To Obtain The Escrow**

13                **Documents.**

14       In July 2006, Defendants made multiple attempts to work out with Plaintiffs

15  voluntary production of the non-privileged Escrow Documents.  When those efforts

16  failed, on August 7, 2006, Defendants served a document request on Plaintiffs, as

17  well as a subpoena *duces tecum* on Plaintiffs' counsel, Marc Toberoff, seeking a

18  copy of the Escrow Documents.  (Perkins Decl. ¶ 11; September 26 Order at 2.)  In

19  response, on August 23, 2006, Plaintiffs and Mr. Toberoff served a general

20  objection and refused to produce the Escrow Documents.  (Perkins Decl. ¶ 12;

21  September 26 Order at 2.)

22       The objections served by Plaintiffs and Mr. Toberoff relied principally on

23  privilege objections and stated that a log identifying any item withheld on the basis

24  of privilege would be provided.  However, Plaintiffs and their counsel ultimately

25  made the tactical decision not to provide the promised privilege logs in response to

26  Defendants' request and subpoena.  (Perkins Decl. ¶ 12.)

27       Plaintiffs' failure to serve privilege logs addressing the Escrow Documents

28  was significant because Magistrate Judge Zarefsky had previously ordered Plaintiffs

EXHIBIT 32 8
Page 769

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 23 of 201   Page
ID #:2165
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 03/02/09   Page 22 of 88

1  to "produce all privilege logs, including any revisions, by September 29, 2006," well

2  over a month *after* Plaintiffs and Mr. Toberoff responded to the subpoenas. As a

3  consequence, some of the Escrow Documents, which Mr. Toberoff later claimed

4  were privileged, were not identified in any privilege log. (*See* September 26 Order

5  at 2; Smith March 2007 Decl. ¶ 12.)

6      As a result of Plaintiffs' refusal to produce the Escrow Documents, and their

7  failure to list at least some of them on their privilege log, Defendants made a motion

8  to compel. On April 30, 2007, Magistrate Judge Zarefsky conducted a hearing on

9  the motion. (Perkins Decl. ¶ 13.) At the conclusion of the hearing, Magistrate

10  Judge Zarefsky summarized his order, stating, "[p]rivileged documents get returned.

11  The privileged documents that were listed on the privilege log get returned. The

12  others get sent to defense counsel." (Perkins Ex. 5 at 30:22-24.)

13      Notwithstanding Plaintiffs' counsel's representations at the April 2007

14  hearing that all Escrow Documents that had not been produced were listed on a

15  privilege log, Plaintiffs had not in fact listed all allegedly privileged documents on

16  their privilege log. The declaration subsequently served by Plaintiffs' counsel in

17  response to Magistrate Judge Zarefsky's order conceded this, but Plaintiffs did not

18  produce the unlisted documents as the Magistrate Judge had ordered. Instead,

19  Plaintiffs asserted that the unlisted documents were privileged and refused to

20  produce them. (September 26 Order at 4.) As a result, Defendants were required to

21  go back to Court, moving on September 17, 2007 to compel compliance with

22  Magistrate Judge Zarefsky's order. (Perkins Decl. ¶ 14.)

23      Because Defendants' September 17, 2007, motion to compel compliance was

24  not ruled upon, Defendants filed a renewed motion on April 9, 2008, this time with

25  the District Court. Plaintiffs' principal focus in opposing the renewed motion

26  centered on withholding the Toberoff Timeline. Neither Plaintiffs nor Mr. Toberoff

27  had ever listed the Toberoff Timeline on any privilege logs. (*Id.*)

28

EXHIBIT 32   9

Page 770

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 24 of 201   Page
Case 2:04-cv-08400-ODW -RZ   Document 476   Filed 03/02/09   Page 23 of 80
ID #:2166

1    On September 26, 2008, the District Court ruled on Defendants' motion to

2    enforce Plaintiffs' compliance with Magistrate Judge Zarefsky's order, a motion that

3    Defendants had filed more than a year before, on September 17, 2007.  In the

4    September 26 Order, the District Court confirmed that the Magistrate Judge's prior

5    ruling that for any potentially privileged documents not listed on Plaintiffs' privilege

6    logs, privilege as to those documents was deemed waived and was now the "law of

7    the case" due, in part, to Plaintiffs' failure to timely appeal the Magistrate Judge's

8    ruling.  (September 26 Order at 4-5.)  The District Court reiterated the Magistrate

9    Judge's finding that the waiver of privilege occurred <u>not</u> by the anonymous delivery

10   of the Escrow Documents to Warner Bros., but instead by virtue of Plaintiffs' failure

11   to include certain of the Escrow Documents, including the Toberoff Timeline, on a

12   privilege log.  (*Id.*)

13           **4.      The Toberoff Timeline**

14           On December 12, 2008, more than a year and a half after first moving to

15   compel production, Defendants finally received the subset of the Escrow Documents

16   that had not been produced previously and that were not listed on a privilege log.

17   Of the Escrow Documents finally produced to Defendants, the most explosive is the

18   Toberoff Timeline.

19           The Toberoff Timeline, which was written by a former lawyer in Plaintiffs'

20   counsel's firm (Perkins Ex. 5 at 9:25-10:8), chronicles the history of Plaintiffs'

21   counsel's involvement in asserting control over the termination rights in Superman.

22   (Perkins Ex. 1.)  According to the Toberoff Timeline, which purports to draw its

23   information from other documents included among the Escrow Documents

24   delivered to Warner Bros. in 2006, Plaintiffs' counsel set in motion a plan to gain

25   control over certain copyrights related to Superman, such that the result is that

26   **"Marc Toberoff *personally* [owns] 47.5% of the entire Superman interest."**

27   (Perkins Ex. 1 at 6; bold and italics in original.)  The Toberoff Timeline further

28   states that, in August 2002, Mr. Toberoff "approaches the Siegels [through their

EXHIBIT 32    10

Page 771

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 25 of 201   Page
ID #:2167
Case 2:04-cv-08400-ODW -RZ   Document 476   Filed 03/02/09   Page 24 of 80

1    then counsel Kevin Mark ("Marks")], *not as an attorney but as a film producer*,

2    stating that he is 'allied' with [agent Ari] Emanuel…" and that Toberoff and

3    Emanuel "have a billionaire ready to offer $15 million dollars up front, plus what

4    they promise to be meaningful participation from proceeds for exploitation of the

5    Siegels' rights to SUPERMAN and some continued royalties on an ongoing basis in

6    all media." [2] (*Id*. at 2; emphasis in original.)

7           The Toberoff Timeline further states that, in response to Mr. Toberoff's offer,

8    Plaintiffs' then-counsel Marks contemporaneously communicated such offer to

9    Plaintiffs but advised against accepting it, warning them that "he would testify in

10   court against the Siegels if they accepted the offer because he believes there has

11   already been an agreement reached." (*Id*.)  Defendants have concluded, based upon

12   the Toberoff Timeline, the recollection of Warner Bros. counsel Wayne Smith who

13   saw the underlying documents, and Plaintiffs' privilege logs, that this statement was

14   communicated by Marks to Plaintiffs in the August 9, 2002 Communication, which

15   Defendants still have not obtained in discovery. [3]  (February 2009 Smith Decl. ¶ 5.)

16          Although Magistrate Judge Zarefsky's order of April 30, 2007 required that

17   the Toberoff Timeline be produced in May 2007, Plaintiffs kept Defendants from

18   obtaining access to it until discovery was over and, significantly, until after the

19   motions for summary judgment had been briefed and ruled upon.  Defendants

20   respectfully but firmly believe that the statements attributed to Marks, which appear

21   in the August 9, 2002 Communication from Marks to the Siegels, is information that

22   Defendants were entitled to probe and develop during discovery.  Defendants submit

23   that such discovery and its resulting evidence would have had a material impact on

24   the Court's view of Defendants' settlement defense.

---

25   [2] The Toberoff Timeline further alleges that Toberoff later admitted "to Laura Siegel that
26   there never was a billionaire willing to invest $15 million when he first approached them."
     (Perkins Ex. 1 at 6.)
27   [3] Significantly, in their response to Defendants' invitation to meet and confer on this
     motion, Plaintiffs do not deny that the August 9, 2002 writing from Marks contains, in
28   substance, the statement set forth in the Toberoff Timeline.  (Perkins Ex. 8.)

EXHIBIT 32   11
Page 772

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 26 of 201    Page
ID #:2168
Case 2:04-cv-08400-ODW -RZ    Document 476    Filed 03/02/09    Page 25 of 80

1    Plaintiffs' failure to produce the August 9, 2002 Communication during the

2  discovery period allowed the Court to rely on Marks' uncontroverted testimony at

3  his deposition:

4           Q. [BERGMAN] Did you as of February 6, 2002
           believe that you had closed a deal with DC for the
5           Superman interest?

6                              * * * *

7                       [Objections Deleted]

8           A. [MARKS] Well, *if the question is did I think at
           this point there was a final, binding, enforceable
9           agreement, the answer would be no*, but I did believe that
           we had come to an agreement back on October 19th, 2001,
10          that was reflected exactly in the terms that I have set out.
           At the end of that letter I wrote to John in substance and
11          effect, "John, if I've gotten anything wrong, if I've
           misstated any of these terms, please let me know." When
12          John writes back on October 26, which I see later, in effect
           his letter is yeah, you've got terms wrong. My outline of
13          the deal terms is different than your outline of the deal
           terms. So while I have thought we had an agreement on
14          these terms, John evidently didn't, and where you don't
           have a meeting of the minds, you don't have an
15          agreement.

16

17

18  (Perkins Ex. 6 at 153:21-155:2; emphasis added.)  The foregoing answer laid the

19  foundation and was the jumping off point for Marks' immediately following

20  testimony regarding the supposed many "differences" between Marks' October 19,

21  2001 acceptance letter, and Schulman's October 26, 2001 response.  (*Id.* at 155:4-

22  164:11.)  This follow-on testimony consumed eight pages of deposition transcript

23  and was extensively relied on by Plaintiffs as allegedly objective evidence of the

24  absence of a settlement agreement in seeking summary judgment.  (Pltfs' Motion for

25  Summary Judgment (Dkt # 161), at 48-57.)  Indeed, in moving for summary

26  judgment, Mr. Toberoff characterized Marks' recitation of differences as "material"

27  and claimed that these differences were evidence that "there never was a 'meeting of

28  the minds'" – precisely the words that Marks invoked in answering the question

EXHIBIT 32   12
Page 773

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 27 of 201    Page
Case 2:04-cv-08400-ODW -RZ    Document 476    Filed 03/02/09    Page 26 of 88
ID #:2169

1   above. (*Id.* at 48, 58.) Defendants submit that had they been able to confront Mr.

2   Marks at deposition with his statement in the August 9, 2002 Communication, they

3   would have impeached Mr. Marks, and he might have changed his testimony.

4   Moreover, the difference between Marks' testimony at deposition and his statement

5   in the August 9, 2002 Communication would have created a fact issue on Summary

6   Judgment.

7       The Court ultimately accepted Plaintiffs' "material differences"

8   characterization – underpinned by Marks' unrebutted testimony – and found that

9   there were "numerous material differences between the terms relayed in the October

10  19 and 26, 2001, letters." (March 26, 2008 Order at p. 61:6-7.) Adopting the

11  formulations of both Marks and Plaintiff's counsel, the Court also found that "the

12  documents [including the October 19 and 26, 2001 letters] referenced above . . .

13  aptly demonstrate that there was no 'meeting of the minds' on all material terms."

14  (*Id.* at 60:23-25.) But the Court's conclusion that these differences were on

15  "material terms" was made without the benefit of Marks' subsequent advice to his

16  clients in August 2002 that he believed there was an enforceable agreement and that

17  he was prepared to testify to that fact under oath if they tried to breach that

18  agreement.

19       Thus, without the benefit of Plaintiffs' former counsel's statement that he

20  believed that an agreement was in place that was sufficiently enforceable for him to

21  testify against his own clients, the Court on summary judgment dismissed Defendant

22  DC Comics' settlement defense. (March 26, 2008 Order at 57-62.) Not only did the

23  Court rely upon the supposed "material" differences in the parties' correspondence –

24  which are completely undermined by Marks' August 2002 communication – but

25  also on the parties' "*conduct in reaction thereto.*" (*Id.* at 61, emphasis added.) This

26  "conduct in reaction thereto" necessarily included Marks' now-disclosed

27  communications to his clients that an enforceable agreement had in fact been

28  reached, something that the Court never had the opportunity to consider.

EXHIBIT 32    13
Page 774

## 5. The Parties' Meet And Confer Efforts

Pursuant to L.R. 37-1, on January 14, 2009, Defendants' counsel sent Plaintiffs' counsel a letter setting forth Defendants' position on the issues presented in this motion, outlining the relief sought in an attempt to avoid the need for Court intervention, and inviting Plaintiffs' counsel to confer on the issue. (Perkins Decl. ¶ 16; Ex. 7.)  By letter dated January 22, 2009, Plaintiffs' counsel rejected Defendants' position on the issues raised in this motion, but did not provide any dates on which to confer with Defendants' counsel.  (*Id.* ¶ 17; Ex. 8.).  By e-mail dated January 23, 2009, Defendants' counsel confirmed receipt of Plaintiffs' counsel's letter of January 22, 2009, and confirmed that Plaintiffs considered the "meet and confer" obligation to have been satisfied.  (*Id.* ¶ 18; Ex. 9.)  Plaintiffs' counsel did not respond.  Thus, the parties have not been able to resolve the dispute.

## B. LEGAL ARGUMENT

### 1. The Newly Discovered Evidence In The "Toberoff Time Line" And The Not-Yet-Discovered Evidence In The August 9, 2002 Communication Contain Discoverable Information Which May Ultimately Support Reconsideration By The Court Of Defendants' Settlement Defense.

Because of the conduct of Plaintiffs and their counsel in this matter, the Court has dismissed on summary judgment a key defense – that the parties had previously reached a settlement of this dispute – on the basis of an incomplete and misleading record.  The Court in its ruling relied in part on certain evidence – Marks' deposition testimony – that we now know to be a distorted fragment of the truth because Plaintiffs and their counsel tried, and almost succeeded, in hiding contrary evidence.  The full picture in fact shows that Plaintiffs' counsel, when all was said and done, months after the exchange of letters and the long form agreement that Plaintiffs contended on summary judgment demonstrated that there was no meeting of the

EXHIBIT 32   14

Page 775

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 29 of 201    Page
ID #:2171
Case 2:04-cv-08400-ODW-RZ    Document 476    Filed 03/02/09    Page 28 of 80

1    minds, wrote a letter to his client saying that a settlement had in fact been reached

2    and that he would so testify in court if necessary.

3        Because of the tactics of Plaintiffs and their counsel, the Court at the time of

4    its ruling had before it an incomplete record that still is not complete.  Fundamental

5    fairness dictates that Defendants be allowed to discover all of the relevant non-

6    privileged evidence on this issue and to consider whether to ask the Court to revise

7    its ruling on the settlement issue.  The decision on whether to move to reconsider,

8    on any motion to reconsider, or on appeal if any, ought to be made on the basis of a

9    complete record and not on the basis of potentially misleading fragments.

10   Disclosure of the contents of the August 9, 2002 Communication and further

11   discovery on this issue ought to be had.

12        **2.**     <u>**The Evidence That Defendants Now Seek Is Impeachment**</u>

13               <u>**Evidence That Goes Directly to the Heart of Marks'**</u>

14               <u>**Credibility on the Settlement Issue.**</u>

15        Marks testified in 2006 that no settlement had occurred in 2001, in part due to

16   certain actions by Defendants in late 2001 and early 2002.  It would have been

17   critical for Defendants' counsel to have confronted Marks at his deposition with a

18   letter written by Marks to his clients in *August 2002* and providing his then-

19   contemporaneous views and conclusions concerning the events in question, namely,

20   that there had been a settlement and that were he sworn to tell the truth, he would be

21   forced to say so.  Marks was not confronted by that letter – and indeed the Court and

22   counsel do not even today know for sure exactly what that letter contains – because

23   of Plaintiffs' multi-year effort to hide the ball.

24        The question on the settlement defense is whether the parties had a meeting of

25   the minds on the material terms of a settlement back in 2001.  No piece of evidence

26   on this question is more critical than what Marks believed back in 2001 at the time

27   that these events occurred – a subject that Plaintiffs' counsel allowed Marks to

28   testify on at his deposition, in the absence of the August 9, 2002 Communication

EXHIBIT 32 15

Page 776

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 30 of 201    Page
Case 2:04-cv-08400-ODW -RZ    Document 476    Filed 03/02/09    Page 29 of 80
ID #:2172

1  that provides the *best* evidence on this key issue. To allow the Defendants and the

2  Court to litigate these issues on the basis of Marks' characterization of the events in

3  2006, years after they occurred, when there is written evidence of what Marks

4  contemporaneously believed back in 2002 in the form of a presumably candid

5  assessment by a lawyer to his client, is to risk a substantial miscarriage of justice. In

6  Defendants' view, the Court ought to avoid that risk and allow a complete and

7  searching investigation of the facts.

8       Defendants are entitled to a full account before they are forced to decide

9  whether to ask the Court to reconsider. The Court is entitled to a full account if it is

10  asked to reconsider. And, no matter what, the parties are entitled to a complete

11  record in this case in the event that further proceedings ensue. Discovery of the

12  August 9, 2002 Communication and a resumed deposition of Marks depending on

13  what the August 9, 2002 Communication reveals are the first steps in the process of

14  undoing the damage to this case that Plaintiffs' conduct has caused.

15       3.    **Plaintiffs Have Improperly Obscured The Truth Through**

16            **Selective Use And Waiver Of The Privilege.**

17       Any voluntary disclosure inconsistent with the confidential nature of the work

18  product privilege waives the privilege. *Atari Corp. v. Sega of Am.*, 161 F.R.D. 417,

19  420 (N.D. Cal. 1994). "Disclosure to an actual or potential adversary waives work

20  product protection as to the material disclosed." *In re McKesson HBOC, Inc. Secs.*

21  *Litig.*, 2005 U.S. Dist. LEXIS 7098, 32-33 (N.D. Cal. Mar. 31, 2005). Moreover, a

22  waiver of the privilege may occur even if there is an agreement among parties that

23  disclosure does not constitute waiver. *Id.* Equally important in the rules governing

24  the waiver of privileges is the prevention of "prejudice to a party and distortion of

25  the judicial process by a privilege holder's selective disclosure of privileged

26  information . . . ." *Jacobs*, 117 F.3d at 89. *See also Columbia Pictures Television,*

27  *Inc. v. Krypton Broadcasting of Birmingham, Inc.*, 259 F.3d 1186, 1196 (9th Cir.

28  2001) (the attorney-client privilege and work product immunity may not be used

EXHIBIT 32  16
Page 777

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 31 of 201   Page
ID #:2173
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 03/02/09   Page 30 of 80

1   both as a sword and a shield); *Kintera, Inc. v. Convio, Inc.*, 219 F.R.D. 503, 512

2   (S.D. Cal. 2003).

3        At the deposition of Kevin Marks, Plaintiffs sought to selectively waive the

4   work-product doctrine.  Specifically, Defendants' counsel asked Mr. Marks the

5   following question:

6         Q. [BERGMAN] Did you as of February 6, 2002
believe that you had closed a deal with DC for the

7         Superman interest?

8   (Perkins Ex. 6 at 153:21-22.)

9        At this point in the deposition, Mr. Marks' counsel and Mr. Toberoff

10   interposed the following objections:

11         [MR. MARMARO] The question is vague and

12         ambiguous, calls for a legal conclusion, and again, I am
going to defer to Mr. Toberoff whether he has any

13         objection to – subject to those objections, having Mr.
Marks answer the question.

14

15         [MR. TOBEROFF] I object on *work product*

16         *privilege*, but I think I am not asserting that on behalf of
the clients.  I am not asserting that on behalf of the Siegels

17

18         [MR MARMARO] Mr. Marks would be prepared to

19         answer the question if the Siegels have no objection to it.

20         [MR TOBEROFF] As to your personal belief, no

21         objection.

22   (*Id.* at 153:23-154:11; emphasis added.)  With the express permission of Plaintiffs'

23   counsel to testify as to his state of mind as to whether he believed there was an

24   agreement, Mr. Marks went on to testify as follows:

25         A. [MARKS] Well, if the question is did I think at

26         this point there was a final, binding, enforceable
agreement, the answer would be no, but I did believe that

27         we had come to an agreement back on October 19th, 2001,
that was reflected exactly in the terms that I have set out.

28         At the end of that letter I wrote to John in substance and

EXHIBIT 32
Page 778

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 32 of 201   Page
ID #:2174
Case 2:04-cv-08400-ODW -RZ   Document 476   Filed 03/02/09   Page 31 of 80

1    effect, "John, if I've gotten anything wrong, if I've
     misstated any of these terms, please let me know." When
2    John writes back on October 26, which I see later, in effect
3    his letter is yeah, you've got terms wrong. My outline of
     the deal terms is different than your outline of the deal
4    terms. So while I have thought we had an agreement on
     these terms, John evidently didn't, and where you don't
5    have a meeting of the minds, you don't have an
     agreement.
6

7    (*Id.* at 154:12-155:2)  Of course, what Defendants did not know at the time of Mr.

8    Marks' deposition was that, in a letter in August 2002, Mr. Marks had actually

9    reached a different conclusion than that expressed at deposition.  According to the

10   Toberoff Timeline, Mr. Marks had told his clients that he believed that Plaintiffs had

11   entered into a binding agreement and that if they took Mr. Toberoff's offer, Mr.

12   Marks would testify against the Plaintiffs. (Perkins Ex. 1 at 2.)  Ironically, Mr.

13   Marks ended up testifying exactly the opposite.

14        Plaintiffs' tactic at the Marks deposition is the very kind of "sword and

15   shield" behavior that the law governing waiver of privilege was designed to

16   prevent.[4]  Mr. Marks was asked for his legal judgments formed as of February 6,

17   2002, shortly after he received Defendants' draft long form agreement.  (Perkins Ex.

18   6 at 153:21-22.)  In other words, Mr. Marks was asked to disclose his mental

19   impressions formed in February 2002.  Such impressions were unquestionably

20   formed in anticipation of litigation because as Mr. Marks testified at deposition

21   "litigation was always looming" when it came to the negotiations regarding the

22   Superman termination interest. (Perkins Ex. 6 at 45:21-22.)  Plaintiffs' counsel

23   acknowledged that this question called for testimony concerning the attorney work

24   product, but then stated that he was not asserting that objection on behalf of the

25

26

27   [4] Plaintiffs' counsel and/or Mr. Marks' counsel objected on privilege grounds and
     instructed Mr. Marks not to answer on more than 15 separate occasions during the course
28   of the deposition. (Perkins Decl. ¶ 15.)

EXHIBIT 32    18
Page 779

Case 2:10-cv-03633-ODW-RZ  Document 42-10  Filed 08/30/10  Page 33 of 201  Page
ID #:2175
Case 2:04-cv-08400-ODW-RZ  Document 476  Filed 03/02/09  Page 32 of 80

1    Siegels. (Perkins Ex. 6 at 154:3-6.)[5] Plaintiffs' counsel knew what Mr. Marks'

2    answer would be and therefore was anxious to have him answer the question.

3       Plaintiffs' counsel's selective waiver of the work-product privilege, and Mr.

4    Marks' ensuing favorable testimony for Plaintiffs, is troubling in light of the

5    apparent inconsistency between Mr. Marks' deposition testimony and the August 9,

6    2002 Communication in which Mr. Marks apparently told his clients – in writing –

7    that he believed an agreement *had* been reached, and felt sufficiently strongly about

8    this to threaten to testify under oath against Plaintiffs should they renege on the

9    agreement and instead accept Mr. Toberoff's offer. (Perkins Ex. 1 at 2.)

10   Meanwhile, when Defendants heard Mr. Marks' work product testimony, they were

11   unaware of the contents of the Toberoff Timeline or the contents of the August 9,

12   2002 Communication. As a result, they were not able to inquire as to the

13   inconsistency in Mr. Marks' view, nor could they even move to compel production

14   of the August 9, 2002 Communication on the basis of Mr. Marks' waiver.

15       In light of what was an obvious waiver of Mr. Marks' work product – his

16   voluntary disclosure of his mental impressions as to whether he believed there was

17   an agreement between the parties in 2002 – as well as the inconsistency between

18   Mr. Marks' deposition testimony on the one hand, and content of the August 9, 2002

19   Communication on the other, the law that governs waiver and that is designed to

20   protect against prejudice to parties and to prevent the distortion of justice requires

21   that Defendants' motion be granted, that the August 9, 2002 Communication be

22   produced, and that Mr. Marks be deposed on the subject matter thereof.

23   ///

24   ///

25   ///

26

27   [5] Of course, this begs the question, on whose behalf *other than the Siegels* he could have
been asserting a work product privilege? Of course, the answer is that it could only be the

28   Plaintiffs' privilege.

EXHIBIT 32    19

Page 780

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 34 of 201   Page
Case 2:04-cv-08400-ODW -RZ   Document 476   Filed 03/02/09   Page 33 of 80
ID #:2176

4. **It Is The "Law Of The Case" That Any Attorney-Client Privilege Applicable To The Toberoff Timeline Has Been Waived, Which In Turn Serves To Waive Any Privilege In Kevin Marks' August 2002 Communication With Plaintiffs Concerning Marks' Opinion That The Parties Had Reached A Settlement.**

In its September 26 Order, the District Court held:

> Pursuant to Magistrate Judge Zarefsky's order, any claim of privilege not previously asserted before that Order was deemed "waived." Although plaintiffs suggest that such a reading of Magistrate Judge's order as not a fair one and lacks common sense, the language of his order is clear and unambiguous: Any escrow document not matching up to the privilege log or the declaration's list of previously-produced documents was to be produced to defendants; any assertion of privilege to such documents to be produced was deemed "waived." That plaintiffs' counsel may have a basis to assert such privilege or otherwise challenge the propriety of producing such material on relevance grounds, etc., is inapposite. If plaintiffs wished to press such new claims of privilege or any other basis for challenging production of the same, Magistrate Zarefsky's Order deemed them waived. What plaintiffs' counsel should have done at that point to preserve such assertions was to appeal Magistrate Judge Zarefsky's Order to this Court, in particular that section of his Order deeming any previously un-asserted grounds of privilege to be "waived." Plaintiffs did not do so, and the time to appeal Magistrate Judge Zarefsky's Order to this Court has long since expired. See Local Rule 72-2.1.

Magistrate Judge Zarefsky's Order is now the law of the case in this matter.

(September 26 Order at 4-5.)

"[A]ttorney-client communications made 'in the presence of, or shared with, third-parties destroys the confidentiality of the communications and the privilege protection that is dependent upon that confidentiality.' 1 Paul R. Rice, Attorney-Client Privilege in the United States § 4:35, at 195 (1999 ed.)." *Nidec Corp. v.*

EXHIBIT 32  20

Page 781

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 35 of 201    Page
ID #:2177
Case 2:04-cv-08400-ODW-RZ    Document 476    Filed 03/02/09    Page 34 of 80

1  *Victor Co.*, 249 F.R.D. 575, 578 (N.D. Cal. 2007). Once disclosure of previously

2  privileged information occurs "it extinguishes the element of confidentiality that one

3  must show in order to claim the privilege." *Weil v. Investment/Indicators, Research*

4  *& Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981). Similarly, "'disclosure of the

5  substance of a privileged communication is as effective a waiver as a direct

6  quotation since it reveals the "substance" of the statement.'" *U.S. v. Jacobs*, 117

7  F.3d 82, 91 (2d Cir. 1991) *quoting In re Kidder Peabody Sec. Litig.*, 168 F.R.D.

8  459, 470 (S.D.N.Y. 1996).

9        According to the Toberoff Timeline, in response to an offer from Mr.

10  Toberoff to Plaintiffs for their Superman rights, Plaintiffs' then-counsel, Kevin

11  Marks, "tells the [Plaintiffs] that he would testify in court against the [Plaintiffs] if

12  they accepted [Toberoff's] offer *because he believes there has already been an*

13  *agreement reached.*" (Perkins Ex. 1, at 2, emphasis added.) Defendants have

14  concluded, based upon the Toberoff Timeline, the recollection of Warner Bros.

15  counsel Wayne Smith who saw the underlying documents, and Plaintiffs' privilege

16  logs, that this statement was communicated by Marks to Plaintiffs and others in the

17  August 9, 2002 Communication. (February 2009 Smith Decl. ¶ 5.)[6] Effectively, the

18  "gist" of the August 9, 2002 Communication has already been disclosed and the

19  production of that document will "add literal meaning to that disclosure." *Jacobs*,

20  117 F.3d at 90. Namely, the August 9, 2002 Communication will provide the full

21  context of Mr. Marks' contemporaneous view of a binding agreement and will allow

22  Defendants – and the Court – to view Mr. Marks' position in his own words.

23        As a result of the disclosure of the contents of the August 9, 2002

24  Communication through the production of the Toberoff Timeline pursuant to a

25  finding of privilege waiver which is the law of this case, the privilege in the August

26

27  [6] Significantly, in their response to Defendants' invitation to meet and confer on this
    motion, Plaintiffs do not deny that the August 9, 2002 writing from Marks contains, in

28  substance, the statement set forth in the Toberoff Timeline. (Perkins Ex. 8.)

EXHIBIT 32          21
Page 782

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 36 of 201   Page
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 03/02/09   Page 35 of 80
ID #:2178

1   9, 2002 Communication has been waived.  Thus, Defendants are entitled to the

2   August 9, 2002 Communication (which was called for under Defendants' Document

3   Requests (Perkins Decl. ¶ 11), as well as to depose Mr. Marks further concerning

4   the Document's contents.

5       **5.**   **Defendants Have Been Diligent In Seeking Discovery Of The**

6               **Escrow Documents And Thus Have "Good Cause" To**

7               **Reopen Discovery.**

8         "Rule 16(b) provides that a district court's scheduling order may be modified

9   upon a showing of 'good cause,' an inquiry which focuses on the reasonable

10   diligence of the moving party." *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1174 (9th Cir.

11   2007) *citing Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir.

12   1992). *See also N.Y. Life Ins. Co. v. Morales*, 2008 U.S. Dist. LEXIS 51304 (S.D.

13   Cal. July 1, 2008) (whether defendant has demonstrated good cause for reopening

14   discovery turns on when defendant learned of new deponents whether he pursued

15   discovery in a reasonably diligent manner).

16         Here, Defendants have been diligent in attempting to obtain first, the Escrow

17   Documents, and now the August 9, 2002 Communication.  Defendants began their

18   effort to receive at least some of the Escrow Documents by voluntary exchange in

19   July 2006.  When those efforts failed, Defendants served formal document requests

20   on Plaintiffs as well as a subpoena *duces tecum* on Plaintiffs' counsel on August 7,

21   2006.  (Perkins Decl. ¶ 11.)

22         After Plaintiffs refused to produce any of the Escrow Documents, and well

23   before the close of discovery, on March 26, 2007, Defendants moved to compel

24   production of some of the Escrow Documents.  On April 30, 2007, Magistrate Judge

25   Zarefsky issued an order on the record that should have resulted in Defendants

26   receiving in May 2007 the documents that were finally produced on December 12,

27   2008.  (Perkins Ex. 5 at 30:22-24.)  Instead, Plaintiffs simply refused to comply with

28   Magistrate Zarefsky's order, requiring Defendants to again move before the

EXHIBIT 32    22

Page 783

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 37 of 201   Page
ID #:2179
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 03/02/09   Page 36 of 80

1   Magistrate Judge on September 12, 2007 prior to the close of discovery.  (Perkins

2   Decl. ¶ 14.)  Through no fault of Defendants, this motion was not ruled upon until

3   more than a year later, on September 26, 2008 and, because of an outstanding issue,

4   the Escrow Documents were not produced to Defendants until December 12, 2008.

5   (*Id.*)

6        Approximately one month after having received the Escrow Documents

7   (which month included the Christmas and New Year's holidays), Defendants

8   commenced the process of filing the instant motion.  (*Id.* ¶ 16.)

9        In light of the foregoing, Defendants have demonstrated diligence in timely

10  seeking the evidence they seek by this Motion, thus demonstrating the "good cause"

11  necessary under Fed. R. Civ. P. 16(b).

12       **6.**     **The Evidence Sought By Defendants In This Motion Is**

13              **Discoverable Notwithstanding The Court's Ruling On**

14              **Summary Judgment.**

15       The standard for what is discoverable is very broad under Rule 26 of the

16  Federal Rules of Civil Procedure:

17              Parties may obtain discovery regarding any matter, not
                privileged, that is relevant to the claim or defense of any
18              party, including the existence, description, nature, custody,
                condition, and location of any books, documents, or other
19              tangible things and the identity and location of persons
                having knowledge of any discoverable matter. For good
20              cause, the court may order discovery of any matter
                relevant to the subject matter involved in the action.
21              Relevant information need not be admissible at the trial if
                the discovery appears reasonably calculated to lead to the
22              discovery of admissible evidence.
23

24  Fed. R. Civ. P. 26(b)(1).[7]  There can be no dispute that documents and testimony

25  concerning Plaintiffs' main negotiator and attorney's contemporaneous view as to

26  ─────────────────────────────
    [7] The Court reiterated this point at a recent hearing in ordering Defendants to supplement
27  their document production, stating "I'm sure that all counsel in this room understand the
    distinction between the standard of relevancy in the discovery phase versus the standard of
28  relevancy at the trial itself. (Jan. 14, 2009 Trans. at 21:6-9.)

EXHIBIT 32    23

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 38 of 201   Page
ID #:2180
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 03/02/09   Page 37 of 80

1   whether the parties had an enforceable agreement is probative evidence itself and

2   would lead to the discovery of admissible evidence regarding Defendants'

3   settlement defense.

4        Indeed, in ruling on the settlement defense without the benefit of a letter from

5   Plaintiffs' counsel expressing his contemporaneous opinion that the parties <u>had</u>

6   reached an agreement as of August 9, 2002, the Court found that no such agreement

7   existed.  In so ruling, the Court relied on differences in the parties' correspondence

8   and on "conduct in reaction thereto." (March 16, 2008 Order at 61.)  The impact of

9   the differences in correspondence, if there were differences, is undermined by the

10  direct evidence now available concerning the state of mind of the negotiator on the

11  Siegels' side.  It demonstrates that he believed he had a settlement notwithstanding

12  any differences in the correspondence, something the Court did not know before.

13  Moreover, Mr. Marks' decision to confront his clients and to insist that he would

14  testify to the existence of a settlement is "conduct in reaction thereto," conduct

15  about which the Court was unaware when it ruled on Summary Judgment.

16       Defendants respectfully argue that a contemporaneous letter from Plaintiffs'

17  then counsel expressing a belief that the parties had an agreement is powerful

18  evidence of the very sort of "conduct in reaction" upon which the Court indicated it

19  relied in dismissing Defendants' settlement defense, or at the very least places that

20  "conduct in reaction" under a significantly different light.  Such evidence, if

21  developed and presented on summary judgment, should have created a fact issue for

22  trial.

23       7.    <u>The Interests Of Justice And The Integrity Of The Judicial</u>

24             <u>Process Strongly Favor The Relief Sought By Defendants.</u>

25       Defendants do not, at this time or by this motion, seek reconsideration of the

26  District Court's dismissal of the settlement defense.  Rather, Defendants seek only

27  narrow relief – production of the August 9, 2002 Communication and the

28  opportunity to depose Marks thereon.  Whether Defendants decide to move for

EXHIBIT 32   24

Page 785

1   reconsideration will depend, in part, upon the development of the evidence.

2   However, regardless of whether Defendants seek reconsideration, fundamental

3   fairness requires that they must be permitted to develop this newly discovered

4   evidence so that they may have the option to seek reconsideration or simply to have

5   the evidence in the record on appeal at the conclusion of the case.

6          The Toberoff Timeline describes a pattern of deception by Plaintiffs' counsel

7   that has seriously tainted the process to Defendants' detriment.  Most germane to

8   this motion, Plaintiffs' improper delay in complying with Magistrate Judge

9   Zarefsky's Order of April 30, 2007, combined with delay in final decisions being

10  rendered on Defendants' motion to compel, conspired to keep powerful evidence of

11  a settlement between the parties from Defendants until after the close of discovery

12  and after the Court ruled on summary judgment.  In addition, by selectively waiving

13  the work product privilege and allowing Marks to testify in a way that appears to be

14  directly contradicted by a letter he wrote to his clients in 2002, Plaintiffs' conduct

15  has unfairly affected the merits of the case and has undermined the fundamental

16  fairness of the judicial process.  As a result, Defendants respectfully submit that the

17  Court's duty to maintain the integrity of the judicial process and fundamental

18  fairness further favor the granting of the narrow relief sought by Defendants herein.

19  **IV.  PLAINTIFFS' CONTENTIONS**

20      **A.  FACTUAL AND PROCEDURAL BACKGROUND**

21          **1.  The Court Properly Held on Summary Judgment That No
22              Settlement Agreement Was Consummated By the Parties**

23          On April 30, 2007, Plaintiffs moved for partial summary judgment that no

24  settlement agreement was reached between Plaintiffs and Defendants regarding

25  Plaintiffs' Superman termination, as Defendants had alleged.  *See* Defs. First

26  Amended Answer, dated November 1, 2005, at ¶¶ 112-113; Defs. First Amended

27  Counterclaims, dated October 17, 2005, ¶¶ 47-56, 97-105.  Plaintiffs demonstrated

28  that the parties' objective manifestations of intent *clearly* indicated no "meeting of

EXHIBIT 32    25

Page 786

1 the minds" on all of the material terms of a settlement agreement, as is required

2 under California law.[8]

3      Three key documents amply showed that, as a matter of law, no settlement

4 agreement was ever consummated due to their differing material terms: (1) a letter

5 dated October 19, 2001 (the "October 19, 2001 Letter"), from Plaintiffs' then

6 counsel, Kevin Marks ("Marks"), to Warner's general counsel, John Schulman

7 ("Schulman"); (2) a reply letter dated October 26, 2001, from Schulman to Marks,

8 with an outline of purported deal terms (collectively, the "October 26, 2001 Letter");

9 and (3) a proposed first draft of an agreement sent by Defendants' outside counsel to

10 Marks on February 1, 2002 (the "February 1, 2002 Draft"). *See Siegel II*, 542 F.

11 Supp. 2d at 1137.

12      In 2000 and 2001 the parties had communicated sporadically concerning the

13 potential settlement of this matter through the purchase by Defendants of Plaintiffs'

14 recaptured Superman copyrights. Plaintiffs' Motion for Partial Summary Judgment

15 (filed April 30, 2007) (Pls. MSJ) at 46:10-13. These negotiations became

16 increasingly complex and led to an October 16, 2001 conference between Schulman

17 and Marks in which many different terms, including complicated contingent

18 compensation formulas, were discussed. *Id.* Thereafter, Marks sent Schulman the

19 October 19, 2001 Letter, which stated as follows:

20      "The Siegel Family (through Joanne Siegel and Laura Siegel Larson, the
         majority owners of the terminated copyright interests) has accepted D.C.
21      Comics' offer of October 16, 2001 in respect of the 'Superman' and 'Spectre'
         properties. The terms are as follows: ...."
22

23 Declaration of Marc Toberoff in Support of Plaintiffs' Motion for Partial Summary

24 Judgment ("Toberoff MSJ Decl."), Ex. BB at 1. The October 19, 2001 Letter set

25 forth financial and other terms and concluded by stating:

26

27 [8] *See* Declaration of Marc Toberoff in Opposition to Defendants' Motion to Reopen
     Discovery ("Toberoff Decl."), Ex. A; Plaintiffs' Reply in Support of Motion for Partial
28 Summary Judgment (filed June 25, 2007) ("Pls. Reply MSJ") at 55:1- 62:8.

EXHIBIT 32  26
Page 787

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 41 of 201    Page
ID #:2185
Case 2:04-cv-08400-ODW -RZ    Document 476    Filed 03/02/09    Page 40 of 80

1    *"John [Schulman], if there is any aspect of the above that is somehow
2    misstated, please let me know*... I will be out of the office... for the
following four weeks."

3    *Id.*, at 1-6 (emphasis added).

4    Schulman responded to Marks' October 19, 2001 Letter by his October 26,

5    2001 Letter, stating:

6    "I have received, and have finally had a chance to review, your outline
fax of October 19... *I enclose herewith* for you and Bruce *a more*
7    *fulsome outline of what we believe the deal we've agreed to is.* We're
working on the *draft* agreement so that by the time you [return]... we
8    will have this super-matter transaction in document form."

9    *Id.*, Ex. CC (emphasis added). Schulman's "more fulsome outline," entitled

10    "October 2001 Outline," contained new or different material terms than those

11    contained in Marks' October 19, 2001 Letter, and was therefore never accepted by

12    Marks or Plaintiffs. *Id.*

13    Defendants' outside counsel thereafter furnished to Marks the February 1,

14    2002 Draft – a first draft of a proposed agreement – along with a cover letter dated

15    February 1, 2002, which stated:

16    "I am pleased to enclose a *draft* agreement between your clients and
DC Comics concerning the Superman property. *As our clients have*
17    *not seen this latest version of the agreement, I must reserve their*
*right to comment.* In addition, you will note that the draft agreement
18    makes reference to certain 'Stand Alone Assignments.' We are
finalizing those and, as soon as they are ready we will forward them to
19    you."

20    *Id.*, Ex. DD (emphasis added).

21    Defendants' February 1, 2002 Draft contained even more new or changed

22    material terms than those contained in Schulman's October 26, 2001 Letter, and

23    added "trap doors" that effectively minimized key financial terms set forth in

24    Marks' October 19, 2001 Letter. *See* Toberoff Decl., Ex. A.[9]

25    Joanne Siegel, by a letter dated May 9, 2002 to Warner Bros. CEO Richard

26

27    [9] One such "trap door" in the February 1, 2002 Draft was that Plaintiffs royalty was tied to
DC licensing revenues from *Siegel's* works, and not revenues from all derivative
28    Superman properties. *See also* Toberoff Decl., Ex. A at 48:7-19.

EXHIBIT 32  27
Page 788

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 42 of 201   Page
ID #:2164
Case 2:04-cv-08400-ODW -RZ   Document 476   Filed 03/02/09   Page 41 of 80

1   Parsons, expressed great dissatisfaction with Defendants' aggressive negotiating

2   tactics and their February 1, 2002 Draft, in the strongest of terms:

3
        "Your company's unconscionable contract dated February 4, 2002 [*sic*]
4       contained new, outrageous demands that were not in the proposal.  The
        document is a heartless attempt to rewrite the history of Superman's
5       creation and to strip Laura and me of the dignity and respect that we
        deserve…. After four years we have no deal and this contract makes an
6       agreement impossible."

7   *See* Declaration of Michael Bergman in Opposition to Plaintiffs' Motion for

8   Summary Judgment ("Bergman MSJ Opp. Decl."), Ex. Z (May 9, 2002 letter).

9        Parson's response, dated May 21, 2002, *admitted* that as of that late date an

10  agreement had *not* been consummated: "John [Schulman] and Paul [Levitz] look

11  forward to meeting with your representatives, and *we continue to hope that this*

12  *agreement can be closed* based upon the earlier discussions with your lawyers."

13  Bergman MSJ. Opp. Decl., Ex. AA (emphasis added).

14       Plaintiffs formally terminated settlement discussions by letter dated

15  September 21, 2002:

16
        "We regret to inform you that after many years of difficult negotiations
17      with your representatives culminating in an offer sent to us on February
        4, 2002 [February 1, 2002 Draft], irreconcilable differences that cannot
18      be overcome…. Putting outrageous, never discussed, unacceptable
        demands into DC's February document made it clear that no agreement
19      could ever be reached."

20  Bergman MSJ Opp. Decl., Ex. DD.

21       In opposition to Plaintiffs' motion, Defendants insisted that a full and final

22  agreement was reached in the October 19, 2001 Letter, and that the remaining letters

23  and drafts were mere "documentation."  The Court rejected Defendants' premise:

24      "Defendants argument to the contrary is premised on the notion that they can
        limit the scope of the legal analysis to the October 19, 2001, letter and call it a
25      contract, regardless of their materially different October 26, 2001, letter in
        reply ("I enclose…a more fulsome outline of what we believe the deal…is")
26      and their vastly different February 1, 2002 draft which were part and parcel of
        the same settlement negotiation."

27  *Siegel II*, 542 F. Supp. 2d at 1138 (emphasis original).  Instead, the Court analyzed

28

EXHIBIT 32   28

Page 789

1    the objective manifestation of the parties' intent and granted Plaintiffs' motion:

> "Defendants further seek to create issues of fact through post hoc testimony and rationalizations. *None of this subjective belief is sufficient to defeat the objective manifestation of the parties' intent relayed in the documents referenced above that aptly demonstrate that there was no "meeting of the minds" on all material terms*... One need only review the language of the parties' correspondence, their conduct in reaction thereto, and the numerous material differences between the terms relayed in the October 19 and 26, 2001 letters and the February 1, 2002, draft to reach the conclusion that the parties failed to come to an agreement on all material terms... Far from signifying that the parties' "negotiations... result[ed] in a binding contract" leaving nothing more than the drafting of more formal documentation memorializing that agreement, these submissions between the parties went far beyond that by adding in or further refining areas from what was contained in the October 19 letter... *From all of this there is no document or set of documents reflecting agreement by the parties to singular agreed terms*."

10    *Id.* at 1138-1139 (internal citations omitted) (emphasis added).

> ### 2.    Defendants Improperly Seek to Exploit and Leverage the Theft of Documents from Plaintiffs' Counsel's Office

> #### a.    Documents Stolen From Plaintiffs' Legal Files

14    On July 5, 2006, Plaintiffs' counsel Marc Toberoff ("Toberoff") received a

15 letter from the law firm Arnold & Porter LLP ("Arnold & Porter"), notifying

16 Toberoff on behalf of Defendants, and in the vaguest of terms, that Defendants had

17 received three sets of documents from an unidentified source (the "Stolen

18 Documents"). *See* Toberoff Decl., Ex. B. The letter stated that Arnold & Porter

19 was in possession of the documents and suggested a "protocol" for dealing with

20 them. *Id.* Curiously, the letter did not identify the documents and omitted that the

21 documents, including *numerous privileged attorney-client communications*, had

22 obviously been *stolen* from the files of Toberoff's law firm. Nor did the letter offer

23 to return the Stolen Documents or to permit Toberoff to review them. *Id.*

24    Pursuant to a July 11, 2006 telephone inquiry by Toberoff, he was informed

25 by Arnold & Porter *for the first time* that the documents were from the legal files of

26 his own firm. Toberoff Decl., Ex. M at ¶ 8. Toberoff thereupon demanded that the

27 documents be returned immediately and rejected the "protocol" outlined in the July

28

EXHIBIT 32   29
Page 790

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 44 of 201   Page
Case 2:04-cv-08400-ODW -RZ   Document 476   Filed 03/02/09   Page 43 of 80
ID #:9476

1  5 letter as geared to exploiting the documents in this litigation. *Id.*[10]

2       By letter dated July 19, 2006 to Arnold & Porter, Toberoff reiterated his

3  demand for the return of the Stolen Documents, and requested specific information

4  as to the circumstances under which Warner had received hundreds of Stolen

5  Documents.[11] *Id.,* Ex. D.  By letter dated July 20, 2006, Defendants' counsel

6  Michael Bergman ("Bergman") insisted that Arnold & Porter retain possession of

7  the Stolen Documents (as it had already done on Defendants' behalf), but

8  conspicuously ignored Plaintiffs' inquiry regarding Warner's curious receipt of the

9  Stolen Documents.  *Id.*, Ex. E.  By letter dated July 26, 2006, Toberoff reiterated

10  his July 19 request for information regarding Warner's mysterious receipt of the

11  bulk of Plaintiffs' legal files.  *Id.*, Ex. F.

12       On July 27, 2006, Bergman finally came up with a response.  *Id.*, Exs. G, T at

13  ¶¶ 11-12.  He claimed that three apparently identical sets of documents addressed to

14  three highly-placed Warner executives had mysteriously arrived in envelopes on

15  June 28, 2006, that Warner purportedly did not retain any of the three envelopes (or

16  a copy of any envelopes), and that Warner purportedly had no mailroom, security or

17  executive office records, notes or logs of the three heavy packages ever being signed

18  in or received.  *Id.*, Exs. G, T at ¶¶ 11-12.  In short, Bergman claimed to have no

19  information whatsoever concerning the purportedly anonymous receipt by three

20  high-ranking Warner executives of substantial packages containing numerous

21  privileged documents relating to this lawsuit.

22  [10] By letter dated July 13, 2006 Arnold & Porter announced that it would Bates stamp the
23  documents, send a Bates stamped copy to Plaintiffs' counsel, but, contrary to Plaintiffs'
    wishes, retain the originals with a Bates stamped set.  Toberoff Decl., Ex. C .  On July 18,
24  2006, Arnold & Porter delivered three Bates stamped sets of the Stolen Documents,
    keeping the originals.  *Id.*, Ex. M, ¶ 10.

25  [11] The July 19, 2006 letter requested that Warner furnish: "(1) the date(s) each set of
26  documents was received; (2) copies of all envelopes or packages enclosing the documents;
    (3) the method by which the documents were sent, and in the unlikely event the documents
27  were delivered by hand, the name of the messenger (and messenger service) logged at
    Warner Bros.' security gate; and (4) any other pertinent information regarding Warner
28  Bros.' receipt of these documents."  Toberoff Decl., Ex. D.

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 45 of 201   Page
Case 2:04-cv-08400-ODW -RZ   Document 476   Filed 03/02/09   Page 44 of 80
ID #:2187

1    On August 7, 2006, Defendants served a Third Set of Requests for Production

2  seeking the Stolen Documents, to which Plaintiffs objected on September 6, 2006.

3  Toberoff Decl., ¶ 30.

4              b.    The Court's April 30, 2007 Order

5    On March 23, 2007, Defendants filed a motion to compel the Stolen

6  Documents in the form of a joint stipulation, which was heard by Magistrate

7  Zarefsky on April 30, 2007. *See* Notice of Motion and Joint Stipulation re:

8  Defendants' Motion to Compel Production of Whistle-Blower Documents (filed

9  March 26, 2007) ("Defts. March 2007 Motion to Compel"). At the hearing,

10  Magistrate Zarefsky instructed Plaintiffs' counsel to submit a simple declaration that

11  would identify, by their Bates numbers, those of the Stolen Documents that had

12  been produced and those that had been listed on privilege logs. *See* Perkins Decl.,

13  Ex. 5 at 19:11-15. The Court further clarified:

14      "Then the escrow holder... is to return to plaintiffs any documents which are
        identified in the declaration as being privileged and having been identified on

15      the privilege logs. The others can be delivered to trial counsel for
        defendants...."

16      "Privilege documents get returned. The privilege documents that were listed

17      on the privilege log get returned. The others get sent to defense counsel."

18  *Id.* at 19:16- 20:3; 30:7-24.

19    On May 18, 2007, David Eisen, Esq., ("Eisen") of Arnold & Porter sent a

20  letter to the parties' counsel stating he would be serving as the custodian of the

21  "Escrow Documents." Toberoff Decl., Ex. L. On May 21, 2007, Toberoff served

22  Eisen and Defendants' counsel with his declaration ("May 21 Declaration")

23  pursuant to, and in full compliance with Magistrate Zarefsky's April 30, 2007 order

24  ("April 30 Order"). *Id.*, Ex. N. Nearly all of the Stolen Documents were either

25  privileged or had already been produced, and were designated as such in Toberoff's

26  declaration. However, nine documents (one of which is the Defamatory Letter and

27  four of which are merely fax cover or fax confirmation sheets) of the 839 pages of

28  Stolen Documents did not fit the Order and had fallen between the "cracks" of the

EXHIBIT 32    31
Page 792

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 46 of 201    Page
ID #:2188
Case 2:04-cv-08400-ODW -RZ    Document 476    Filed 03/02/09    Page 45 of 80

1  parties' joint stipulation and the hearing.[12]

2       By letter dated May 21, 2007, Plaintiffs asked Eisen *to disburse the Stolen*

3  *Documents pursuant to the April 30 Order*, but to retain the Nine Documents as they

4  were privileged and had not been addressed. *Id.*, Ex. N. However, on May 22, 2007,

5  Defendants sent Eisen a letter improperly disputing Toberoff's declaration and

6  instructing Eisen not to disburse *any* of the Stolen Documents, even those clearly

7  listed on Plaintiffs' privilege logs. *Id.*, Ex. O. Defendants also sent Eisen the

8  produced documents and privilege logs identified in Toberoff's declaration, but did

9  not furnish Plaintiffs with copies of the documents provided to Eisen, despite

10  Plaintiffs' written request for same. *See id.*, Ex. P.

11       Defendants then tried to get Eisen to "peek behind" the privilege logs, review

12  the stolen privileged documents, and search for particular documents to assist

13  Defendants with circumventing or challenging Plaintiffs' privilege logs:

> "To assist you in your review we have compiled the documents Mr. Toberoff
> has identified in his declaration as having previously been produced, which
> we have enclosed so that you can compare them to the Escrow Documents in
> you file. We have also enclosed the privilege logs he cites to so that you can
> compare the privilege entries to the Escrow Documents in your file. It is
> Defendants' position that any document that does not match up exactly to an
> identified entry on the privilege logs should not be returned to Mr. Toberoff,
> but instead should be produced to Defendants."

19  *See id.*, Ex. O at 2. No part of Magistrate Zarefsky's order permitted Defendants to

20  contact Eisen in this fashion – a blatant attempt to influence what Defendants had

21  previously misrepresented as a passive, neutral function. Perkins Decl., Ex. 5 at

22  19:8- 20:5.

23            c.   Defendants' Second Motion to Compel

24       After instructing Eisen not to disburse *any* of the Stolen Documents pursuant

---

[12] These consisted of: (i) two post-litigation attorney-client communications, which,
pursuant to the parties' standing agreement need not have been listed in a privilege log; (ii)
the Defamatory Letter; (iii) two letters between Toberoff and Don Bulson, the attorney for
Michael Siegel, a statutory beneficiary of the Superman termination notices, which had
been listed on Bulson's privilege log, and (iv) four fax cover or confirmation sheets
(collectively, the "Nine Documents"). Toberoff Decl., Exs. N, T at ¶ 6.

EXHIBIT 32    32

Page 793

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 47 of 201    Page
ID #:2189
Case 2:04-cv-08400-ODW -RZ    Document 476    Filed 03/02/09    Page 46 of 80

1  to the April 30 Order, Defendants brought a motion to compel on September 17,

2  2007, seeking to have the "escrow agent" or the Court undertake a review of the

3  Stolen Documents so as to challenge Plaintiffs' assertion of privilege on their logs.[13]

4       The Court addressed this motion at the September 17, 2007 hearing on the

5  parties' cross-motions for summary judgment.  The Court made it abundantly clear

6  that it was not interested in re-hashing this matter with respect to all the Escrow

7  Documents, and would focus instead on the Nine Documents *remaining* at issue:

8       Mr. Perkins:  "One of the things we had asked the escrow agent to do was to
        take Mr. Toberoff's declaration and to go document number by document
9       number and ensure that the documents that he identified on his declaration
        really were what he said they were. In other words, he identifies certain ones
10      that had already been produced."

11      The Court:  ***"Let's not talk about the ones that have been done. Let's talk
        about the nine that we have left. I want to resolve this. We're going to move
12      on here, counsel."***

13  *See* Toberoff Decl., Ex. R at 120:11-19.  The Court's September 17, 2007 minute

14  order described Defendants' motion to compel as "moot," and ordered Plaintiffs to

15  submit the Nine Documents for an *in camera* review, accompanied by a declaration

16  regarding "any claim of privilege relating to said documents." *Id.*, Ex. S at 2.

17      Plaintiffs submitted their declaration on September 20, 2007, arguing, *inter*

18  *alia*, that the Defamatory Letter discusses and purports to disclose privileged

19  attorney-client communications and work product contained within Plaintiffs'

20  confidential legal files, listed on Plaintiffs' and third party privilege logs, and upheld

21  by the April 30 Order.  *Id.*, Ex. T.  Neither Plaintiffs nor their counsel consented, at

22  any time, to the illicit Defamatory Letter, and, as it was sent anonymously, there

23  would have been no opportunity to list it on a privilege log.

24      On September 26, 2008, the Court ordered Eisen to produce forthwith "any

25  escrow document not previously listed in a privilege log or as having been

26

27  [13] *See* Joint Stipulation Re: Defendants' Motion to Compel Compliance with the Court's
     4/30/07 Order and Motion for Sanctions (filed September 17, 2007), at 20:15-22:26;
28  Toberoff Decl., Exs. O, Q.

EXHIBIT 32      33

Page 794

Case 2:10-cv-03633-ODW-RZ Document 42-10 Filed 08/30/10 Page 48 of 201 Page
Case 2:04-cv-08400-ODW -RZ Document 476 Filed 03/02/09 Page 47 of 80 Page
ID #:2190

1  previously produced… [and that] the nine documents… are to be produced to

2  defendants' counsel as those documents were not previously identified in a privilege

3  log provided by plaintiffs." *Id.*, Ex. U at 5.

4      In response to the Court's September 26, 2008 order, Eisen wrote to counsel

5  on October 8, 2008, erroneously stating that he would produce to Defendants'

6  counsel: "(1) post litigation communications, (2) the undated cover letter, and (3)

7  documents identified in the privilege log of a third party." *Id.*, Ex. V. He also

8  stated he would "compare the privilege logs to the documents, and to produce to Mr.

9  Bergman all escrow documents except those accurately described on the privilege

10 logs." *Id.* By letter dated October 9, 2008, Plaintiffs reminded Eisen that the

11 Court's September 26, 2008 Order did not call for the release of *all* Stolen

12 Documents listed on third party privilege logs as set forth in Eisen's letter, and that

13 Eisen should not adjudicate whether the Stolen Documents were accurately

14 described in the privilege logs. *Id.*, Ex. W. Plaintiffs reminded Eisen that as an

15 alleged "escrow agent" he owed a fiduciary duty to both parties. *Id.*

16     In response, Eisen stated:

17     "[N]either… this firm, nor I has suggested that we are formal escrow agents,
    in the legal sense of that term…we do not in my view, owe either party to this

18     litigation any legal duty. We expect to be paid for our time by defendants…."

19 Toberoff Decl., Ex. X. By letter dated October 10, 2008, Bergman, in sync with

20 Eisen, stated: "[We] agree with your interpretation of the Court's Order regarding

21 your obligations to match-up the Escrow Documents to the pertinent privilege logs

22 entries to determine whether the description of date, sender, recipient and type of

23 document corresponds with what the document actually is." *Id.*, Ex. Y. Moreover,

24 Bergman encouraged Eisen, over Plaintiffs' objections, to communicate *ex parte*

25 with the Court as to this matter. *Id.*

26     By letter dated October 13, 2008, Plaintiffs objected to Defendants' latest

27 attempt to have Eisen look beneath Plaintiffs' privilege logs to adjudicate their

28 sufficiency, and reminded Eisen that the Stolen Documents, with the exception of

EXHIBIT 32    34
Page 795

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 49 of 201   Page
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 03/02/09   Page 48 of 80
ID #:2191

1  the Nine Documents remaining in dispute, should have been released immediately

2  pursuant to the April 30 Order.  *Id., Ex. Z.*  Plaintiffs pointed out that Eisen's sole

3  reason for not disbursing the documents, as ordered, was *Defendants'* insistence that

4  he engage in an improper substantive review of the Stolen Documents on their

5  behalf.  *Id.*

6        Nonetheless, Eisen sent a letter to the Court on October 16, 2008 advocating

7  Defendants' desired "matching up" process.  *Id.*, Ex. AA.  Plaintiffs objected on

8  October 17, 2008.  *See* Plaintiffs' Objection and Response to Attorney David S.

9  Eisen's *Ex Parte* Communication with the Court, filed October 17, 2008.  On

10  December 4, 2008, the Court issued an order denying Defendants' and Eisen's

11  request for a substantive review of the asserted privileges:

> "The escrow holder is not to compare the description of each document to Toberoff's declaration to the corresponding escrow document to ensure the description's accuracy.  Rather the task of matching up or review is done only insofar as the escrow holder is charged with carrying out the task, as set forth in Magistrate Judge Zarefsky's April 30, 2007, Order, of locating (using the Bates stamp legend) those documents which appear on Toberoff's May 2007, declaration as having previously been listed on a privilege log and turning them over to plaintiffs ..."

Toberoff Decl., Ex. BB.  Eisen finally released the Stolen Documents on December

12, 2008, having retained Plaintiffs' privileged documents ***at Defendant's direction***

for over twenty months after Magistrate Zarefsky had ordered their prompt

disbursal.  *Id.* at ¶ 31.  Over a month later, on January 14, 2009, Defendants wrote to

Plaintiffs and demanded to reopen discovery on the basis of the Defamatory Letter.

*See* Perkins Decl., Ex. 7.  By letter dated January 22, 2009, Plaintiffs pointed out

that Defendants' motion was baseless and moot.  *Id.*, Ex. 8.  Defendants served their

portion of this Joint Stipulation on February 19, 2009.

**B.**    **LEGAL ARGUMENT**

    **1.**    **Defendants Improperly Seek Reconsideration of the April 30, 2007 Order**

      Magistrate Zarefsky's Order of August 18, 2006 upheld Plaintiffs' privilege

logs.  *See* Toberoff Decl., Ex. H.  The Court's Orders of April 30, 2007, September

1  26, 2008, and December 4, 2008 upheld privilege as to *all* Stolen Documents listed

2  on Plaintiffs' privilege logs. Defendants now seek to circumvent those orders and to

3  improperly challenge the privileged status of such documents, an issue the Court

4  clearly considers "closed."

5      The August 9 Letter was clearly an attorney-client communication listed on

6  Plaintiffs' privilege log, as Defendants admit, and thus falls within the scope of

7  Magistrate Zarefsky's original April 30 Order that such documents retained their

8  privileged status and should be returned to Plaintiffs. *See* Perkins Decl., Ex. 5 at

9  19:16-20:3 ("The escrow holder... is to return to the plaintiffs any documents which

10  are identified in the declaration as being privileged and having been identified on

11  the privilege log.").

12      The Court has already stated that the April 30 Order is "the law of the case in

13  this matter," and that the time to appeal it "has long since expired" under Local Rule

14  72-2.1. *See* Toberoff Decl., Ex. U at 5; L.R. 72-2.1 (allowing ten days to appeal a

15  magistrate judge's order). The Court has further stated that its orders were "meant

16  to dispose of the <u>one</u> remaining dispute [resolution of the privileged status of the

17  nine documents] between the parties concerning the escrow documents."

18  Defendants had already "sought to litigate the propriety of the invocation of

19  privilege contained in prior privilege logs," and the Court "was not inclined to

20  entertain" further arguments on this subject. *Id.* at 2-3. *See also id.*, Exs. R at

21  120:19 ("We're going to move on here, counsel"), BB.

22      The Court's September 26 and December 4, 2008 Orders also ended

23  Defendants' repeated attempts to have their purported "escrow agent" adjudicate

24  Plaintiffs' assertions of privilege on its logs under the guise of a "matching-up"

25  process. Once Defendants had obtained Magistrate Zarefsky's blessing of their

26  handling of the Stolen Documents by misrepresentations of a neutral "escrow"

27  protocol, they began to abuse it. After Toberoff submitted the May 2007

28  Declaration, per Magistrate Zarefsky's April 30 Order, Bergman instructed

EXHIBIT 32     36
Page 797

Case 2:10-cv-03633-ODW-RZ Document 42-10 Filed 08/30/10 Page 51 of 201 Page
ID #:3053
Case 2:04-cv-08400-ODW -RZ Document 476 Filed 03/02/09 Page 50 of 80

1   Defendants' "escrow" agent (an attorney retained and paid by them) to "compare the

2   privilege entries to the Escrow Documents in your file" and to produce to

3   Defendants "any document that does not match up exactly." *See* Toberoff Decl.,

4   Ex. O. Defendants then on *three* separate occasions prior to the Court's September

5   26, 2008 Order, submitted filings to the Court advocating a review of Plaintiffs'

6   privilege assertions.[14]  When the Court's September 26, 2008 order clearly did not

7   envisage the re-testing of Plaintiffs' logs, Bergman, over Plaintiffs' objections, then

8   had their "escrow" attorney write to the Court *ex parte* on October 16, 2008 to

9   advocate such a process. *See* Toberoff Decl., Ex. AA. The Court finally ended the

10  matter on December 4, 2008, when it ordered the escrow agent to disburse the

11  documents, and not to adjudicate Plaintiffs' already-upheld assertions of privilege.

12  *Id.*, Ex. BB.

13       While Defendants purport to limit their claim to the August 9 Letter, the

14  implication of Defendants' position is that the unauthorized and anonymous

15  Defamatory Letter operates as a waiver of privilege as to *each and every privileged*

16  *document* referenced therein – documents already upheld as privileged and duly

17  listed on privilege logs.   This position is logically and legally incorrect.

18  Defendants' overreaching motion would have the Court override *four* prior orders

19  on this subject, and must be rejected.  Toberoff Decl., Exs. H, U, BB; Perkins Decl.,

20  Ex. 5. Accordingly, Defendants' motion should be denied on this ground alone.

21           **2.    Defendants' Veiled Motion for Reconsideration Ignores**
             **Black-Letter Contract Law Upheld by the Court's Summary**
22           **Judgment Order**

23           a.    <u>The Defamatory Letter Distorts Marks' Beliefs and Does</u>
                   <u>Not Even Mention Marks' August 9 Letter to Plaintiffs</u>

24

25  _____

26  [14] *See* Notice of Motion and Joint Stipulation re: Defendants' Motion to Compel
     Compliance with the Court's 4/30/07 Order and Motion for Sanctions (dated September
     17, 2007), at 20:15-22:26; Declaration of Michael Bergman in Response to the Declaration
27  of Marc Toberoff Filed Pursuant to the Court's September 17, 2007 Order (filed
     September 25, 2007) at ¶¶ 48-51; Notice of New Evidence re: Defendants Declaration
28  Filed Pursuant to the Court's September 17, 2007 Order (filed April 9, 2008), at 5:11-19.

EXHIBIT 32 37

Page 798

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 52 of 201   Page
ID #:2194
Case 2:04-cv-08400-ODW -RZ   Document 476   Filed 03/02/09   Page 51 of 80

1      As an initial matter, Defendants' argument falsely presupposes that the

2  Defamatory Letter accurately discloses the August 9 Letter, when it never even

3  mentions the August 9 Letter nor refers to a writing when describing what Marks

4  purportedly told his clients. *See* Perkins Decl., Ex. 1 at 2 ("Marks also tells the

5  Siegels that … he believes there has already been an agreement reached.").

6  Defendants oddly assume that anonymous, inadmissible third party statements in a

7  ranting Defamatory Letter are trustworthy, accurate evidence of the privileged

8  attorney-client communications discussed therein. As one might imagine, the

9  Defamatory Letter inaccurately describes both the content and meaning of the

10  August 9 Letter. The August 9 Letter reveals no inconsistency with Marks'

11  testimony regarding the settlement agreement. Toberoff Decl., ¶ 32. Yet

12  Defendants misleadingly refer to statements in the Defamatory Letter, as if such

13  were statements in the August 9 Letter itself.[15] Defendants also repeatedly refer to

14  the Defamatory Letter, as if its distorted hearsay is somehow, irrefutably, "true."

15                        **b.**    <u>Defendants' Motion Even Mischaracterizes the</u>

16                           <u>Defamatory Letter and Kevin Marks' Testimony</u>

17      Defendants' motion is based on their calculated mischaracterization of the

18  contents of the Defamatory Letter. Defendants misleadingly and repeatedly portray

19  the Defamatory Letter as stating that Marks' August 9 Letter says that "an

20  *enforceable* settlement agreement" had been reached.[16] However, the Defamatory

---

[15] For example, Defendants proclaim "this 'conduct in relation thereto' necessarily included Marks' now-disclosed communications to his clients that an enforceable agreement had in fact been reached"; "[the August 9 Letter] demonstrates that he believed he had a settlement notwithstanding any differences in the correspondence, something the Court did not know before," and the August 9 Letter shows "if Plaintiffs did not abide by the settlement agreement, he would testify against them at trial to enforce an agreement." *Supra* at 13:25-28, 24:11-12, 1:24-25. *See also id.* at 18:8-9 ("in a letter in August 2002, Mr. Marks had actually reached a different conclusion than that expressed in the deposition"); *Id.* at 19:17-19 ("the inconsistency between Mr. Marks' deposition testimony on the one hand, and the content of the August 9, 2002 Communication on the other").

[16] *See, e.g., supra* at 13:15-17 ("Marks' subsequent advice to his clients in August 2002 that he believed there was an *enforceable* agreement and that he was prepared to testify to that fact"); 13:19-21 ("[H]e believed that an agreement was in place that was sufficiently

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 53 of 201    Page
ID #:2195
Case 2:04-cv-08400-ODW -RZ   Document 476    Filed 03/02/09   Page 52 of 80

1   Letter says no such thing:  it merely states that "[Marks] believes there has already

2   been an agreement reached" and would testify as such.  Perkins Decl., Ex. 1 at 2.[17]

3        Defendants also pretend that an inconsistency exists between the Defamatory

4   Letter and Marks' testimony regarding the settlement agreement.  This, too, is false.

5   Marks clearly testified at his deposition that "*I did believe that we had come to an*

6   *agreement back on October 19th, 2001*," while testifying in the same paragraph that

7   ultimately, "a final, binding, *enforceable* agreement" was not reached as there had

8   been no "meeting of the minds" on all terms.  *See* Perkins Decl., Ex. 6 at 154:13-14,

9   155:1-2 (emphasis added).[18]  Despite Defendants' claims to the contrary, there is

10  simply no inconsistency between the Defamatory Letter's unsupported statement

11  that Marks would testify that an "agreement" had been reached, and Marks' actual

12  deposition testimony that an "an agreement" or deal had been reached, but that "a

13  final, binding *enforceable* agreement" had *not* been reached.  This is also consistent

14  with the objective manifestation of the parties' intent set forth in the October 19 and

15  26, 2001, and February 1, 2002 letters, which controls.  *See Siegel II*, 542 F. Supp.

16  2d at 1138, *citing Meyer v. Benko*, 55 Cal.App.3d 937, 942-43 (1976).

17       Marks, like the Court, understands the distinction between a deal or

18  "agreement," and a "final, binding, enforceable agreement," with the "meeting of

19  ─────────────────────────────────────────
    enforceable for him to testify against his own clients.").

20
    [17] Nor are these the only intentional distortions of the record found in Defendants'
21  misguided motion.  For example, Defendants falsely claim that "Plaintiffs' principal focus
    in opposing the[ir prior] renewed motion centered on withholding the Toberoff Timeline."
22  *Supra* at 9:25-26. This statement is false:  (1) there was no "renewed motion," merely a
    "Notice of New Evidence" filed by Defendants on April 9, 2008, relating to a ruling from
23  the Northern District of Ohio; and (2) Plaintiffs' opposition filed on April 16, 2007,
    centered on:  (a) the preclusive effect of the Ohio ruling; (b) the common interest privilege;
24  and (c) Defendants' repeated attempts to re-argue the privilege of documents listed on
    third party privilege logs. *It barely mentioned the Defamatory Letter*.
25
    [18]  Defendants outrageously imply that use by both Plaintiffs' counsel and Marks of the
26  common contract-law concept of "meeting of the minds" is indicative of some sort of
    conspiracy among Plaintiffs and their current and former attorneys.  *See supra* at 12:28
27  (quoting "meeting of the minds" from Plaintiffs' Motion for Summary Judgment and
    claiming they were "precisely the words that Marks invoked in answering the question");
28  19:1-2 ("Plaintiffs' counsel knew what Mr. Marks' answer would be...").

EXHIBIT 32          39
Page 800

1  the minds" on all material terms required to form a contract.  *Compare* Perkins
2  Decl., Ex. 6 at 154:12-155:2 ("Well, if the question is did I think at this point there
3  was a final, binding, enforceable agreement, the answer would be no, but I did
4  believe that we had come to an agreement back on October 19th, 2001.... So while I
5  thought we had an agreement on these terms, John evidently didn't, and where you
6  don't have a meeting of the minds, you don't have an agreement.") *with Siegel II,*
7  542 F. Supp. 2d at 1137 (The parties "found themselves in the all-too-familiar
8  situation in which verbal settlement negotiations result in *what the parties believe to*
9  *be an agreement* on all the major points of dispute but which, upon further
10  discussion, falls short of the agreement needed to resolved the dispute.") (emphasis
11  added).

12      Thus, Defendants' motion should additionally be denied, as the purported
13  evidentiary inconsistencies underpinning the motion do not exist.

14      Moreover, Defendants outrageously claim *without a shred of evidence* and
15  contrary to the record, that Kevin Marks, "Plaintiffs and their counsel tried, and
16  almost succeeded, in hiding contrary evidence."  *Supra* at 14:24.[19]  This purported
17  conspiracy would have required the active cooperation of Marks, a respected lawyer
18  in the firm Gang, Tyre, Ramer & Brown, who was terminated by Plaintiffs on
19  September 21, 2002, and who retained his own counsel to defend his deposition.
20  *See* Toberoff MSJ Decl., Ex. AA.  When Defendants claim that they could have
21  "impeached" Marks, they are essentially accusing him, an officer of the court, of
22  perjury, solely on the basis of *their* mischaracterization of the Defamatory Letter, a
23  document that Marks did not write and which has *none* of the characteristics that
24  indicate reliability in a legal proceeding.  It is not made under oath, it is anonymous,

25

26  [19] *See, e.g., supra* at 15:23 ("multi-year effort to hide the ball"), ("risk a substantial
   miscarriage of justice"); 25:6-7 ("a pattern of deception by Plaintiffs' counsel that has
27  seriously tainted the process"); 25:10-11 (Plaintiffs "conspired to keep powerful evidence
   of a settlement between the parties from Defendants"); 25:15-16 (Plaintiffs have
28  "undermined the fundamental fairness of the judicial process").

EXHIBIT 32  40
Page 801

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 55 of 201   Page
ID #:2197
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 03/02/09   Page 54 of 80

1    it is hearsay, and it was written by a disgruntled lawyer, acting against his own

2    clients, in breach of his most fundamental ethical duties.

3         Defendants' unsupported accusation that Plaintiffs and their counsel

4    conspired to secret evidence and "hide the ball" from Defendants and the Court is

5    disgraceful. The Court should not lose sight of the fact that *Plaintiffs* were the

6    victim of a *theft*. Instead of having their documents, many of which are privileged,

7    returned immediately, they have been subjected to a sham "neutral" "escrow"

8    protocol for over two years of this litigation, with no end in sight. In response to

9    such an unspeakable violation of trust, Plaintiffs and their counsel have been

10   nothing but forthcoming. Upon finally receiving copies of the Stolen Documents,

11   they promptly compared these 839 pages to their legal files, finding that *all but two*

12   of the non-privileged documents had long ago been produced.[20] Moreover, every

13   privileged Stolen Document was accounted for on a privilege log, except the two

14   post-litigation attorney-client communications *that need not be listed on a privilege*

15   *log* per the parties' standing agreement (admitted by Defendants), and the

16   Defamatory Letter. Toberoff Decl., Ex. T at ¶¶ 19-22. It is clear that the real

17   objective of Defendants' frivolous motion is to prejudice the trier of fact prior to

18   trial by engaging in a smear campaign against Plaintiffs and their counsel.

19             c.    Marks' Subjective Opinion Is, In Any Event, Extraneous
                     Because the Existence of a Contract Is Based Upon the
20                   Objective Manifestation of the Parties' Intent

21        Even if Marks had made the allegedly inconsistent statements (he did not),

22   Defendants' argument still fails, as Marks' subjective state of mind regarding the

23   settlement negotiations (to the extent revealed in the August 9 Letter) is superfluous

24   to the objective record of such negotiations, which demonstrates that a binding

25   agreement was not consummated. *See Siegel II*, 542 F. Supp. 2d at 1136-1139. The

26

---

27   [20]  These documents, consisting of two letters from Plaintiff Joanne Siegel to DC's
     President, Paul Levitz, were immediately produced, although already in Defendants'
28   possession. *See* Toberoff Decl., Ex. M at ¶ 22.

EXHIBIT 32    41

Page 802

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 56 of 201    Page
ID #:2158
Case 2:04-cv-08400-ODW-RZ    Document 476    Filed 03/02/09    Page 55 of 80

1   Court's order was based on an objective reading of the relevant documents – the

2   October 19, 2001 letter from Kevin Marks to John Schulman, purporting to "accept"

3   Schulman's offer, Schulman's October 26, 2001 *counteroffer* in response, and a

4   Defendants' further "long-form" counteroffer dated February 1, 2002.  *Id.*[21]

5       The Court, after analyzing the documents comprising the negotiation, found

6   that such "did not result in an enforceable agreement."  *Id.*  The Court relied on

7   applicable California law that "[t]he failure to reach a meeting of the minds on all

8   material points prevents the formation of a contract even if the parties have orally

9   agreed upon some of the terms."  *Id.* at 1137.

10      Notably, Schulman's "more fulsome outline" dated October 26, 2001,

11  responding to Marks' October 19, 2001 Letter, contained "numerous material

12  differences," constituting a counter-offer.  *Id.* at 1115, 1138.  As confirmed by the

13  Court, it is black-letter law that for "mutual [contractual] consent" to exist, there

14  must be an "unequivocal acceptance," and that a qualified acceptance is a counter-

15  offer ending the original offer.  *Id* at 1138.[22]

16      Moreover, ***even if*** the parties "believe… an agreement" has been reached,

17  "[n]one of this subjective belief is sufficient to defeat the objective manifestation of

18  the parties' intent relayed in the documents referenced above that aptly demonstrate

19  that there was no "meeting of the minds" on all material terms."  *Id.*[23]  The Court

20  _____

[21] *See also id.* at 1138 (additionally noting that Defendants reserved the right to revise their

21  February 1, 2002 Draft, the anticipated submission of related "stand alone agreements"
    that had yet to be finalized, and the acknowledgement by Time-Warner's CEO that

22  "comments and questions" from Plaintiffs "would need to be resolved.").

23  [22] *See also* California Civil Code § 1585 ("An acceptance must be absolute and
    unqualified, or must include in itself an acceptance of that character which the proposer

24  can separate from the rest, and which will conclude the person accepting.  A qualified
    acceptance is a new proposal."); *Apablasa v. Merritt & Co.*, 176 Cal.App.2d 719, 726

25  (1959) ("Terms proposed in an offer must be met exactly, precisely and unequivocally for
    its acceptance to result in the formation of a binding contract; and a qualified acceptance

26  amounts to a new proposal or counter-offer putting an end to the original offer.") (citations
    omitted).

27
    [23] *See also Grove v. Grove Valve & Reg. Co.*, 4 Cal.App.3d 299, 312 (1970) ("The

28  California law is clear that there is no contract until there has been a meeting of the minds

EXHIBIT 32   42

Page 803

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 57 of 201    Page
ID #:2199
Case 2:04-cv-08400-ODW-RZ    Document 476    Filed 03/02/09    Page 56 of 80

1   properly based its conclusion "that the parties' settlement negotiations did not result

2   in an enforceable agreement" on the parties' objective manifestations of their intent:

3   "Far from signifying that the parties' 'negotiations...result[ed] in a binding

4   contract'... these submissions between the parties went far beyond that by adding in

5   or further refining areas from what was contained in the October 19 letter... From

6   all of this there is no document or set of documents reflecting agreement by the

7   parties to singular agreed terms." *Id.* at 1139.[24] *See also* Toberoff Decl., Ex. A.

8          Under California law and the sound logic of the Court's analysis, *even if*

9   Marks had offered testimony that he "believed" the parties had reached an

10  enforceable agreement (he did not), such subjective belief or legal conclusion would

11  be superfluous in light of the parties' "objective manifestations" of their actual

12  negotiations.[25] As Marks' "beliefs" are not decisive or even germane to the issue

13  under California law, there are no grounds to reopen discovery or to invade the

14  attorney-client privilege, especially not on the basis of the anonymous hearsay

15  statement in the Defamatory Letter.

16

17

---

18  on all material points, despite the fact some terms have been agreed orally, or some action
    has been taken."); *Louis Lesser Enterprises, Ltd. v. Roeder*, 209 Cal.App.2d 401, 405
19  (1962) ("[T]here is no meeting of the minds of the parties while they are still negotiating
    terms.").

20
    [24] *See also Meyer*, 55 Cal.App.3d at 942-43 (Contracts require "mutual consent...
21  determined by objective rather than subjective criteria," and finding such consent based
    upon the parties agreeing upon and signing a contract.); *Stewart v. Preston Pipeline Inc.*,
22  134 Cal.App.4th 1565, 1587 (2005) (Consent "is based upon objective and outward
    manifestations of the parties," and finding such consent based upon the parties agreeing
23  upon and signing a contract.).

24  [25] Defendants, without citing any authority, repeatedly contend that Marks' subjective
    beliefs somehow constitute "conduct in relation thereto" with respect to the non-existent
25  settlement agreement, and that the Court relied on such belief in its decision. The Court
    clearly did not. Plaintiffs' motion for summary judgment and the Order relied on the
26  objective differences between the parties various proposals. *See* Toberoff Decl., Ex. A;
    *Siegel II*, 542 F. Supp. 2d at 1138 ("numerous material differences between the terms
27  relayed in the... letters"). The testimony of Marks, a seasoned entertainment transactional
    attorney, was submitted by Plaintiffs to explain and illustrate such contractual differences.
28  *Id.*

EXHIBIT 32    43

Page 804

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 58 of 201   Page
Case 2:04-cv-08400-ODW -RZ   Document 476   Filed 03/02/09   Page 57 of 80
ID #:2206

1
2
          d.     <u>Defendants' Arguments Based on the Parties' Subjective
               Understanding Have Already Been Rejected by the Court</u>

3       Defendants have had every opportunity – through the depositions of Marks,

4 the Plaintiffs, and even Plaintiffs' current attorney, and through written discovery –

5 to develop their theory that a binding settlement agreement had supposedly been

6 reached.

7       Defendants relied heavily on Marks' letter of October 19, 2001 at summary

8 judgment.  For instance, Defendants emphasized in their opposition that Plaintiffs

9 "conceded in open court, without qualification, that the [October 19] Marks Letter

10 represented the statements of Plaintiffs themselves."  Defendants' Opposition to

11 Plaintiffs' Motion for Partial Summary Judgment (filed May 29, 2007) (Defts. MSJ

12 Opp.) at 70:11-13.  The October 19 Letter expressly stated that "the Siegel Family…

13 has accepted D.C. Comics' offer of October 16, 2001 in respect of the 'Superman'

14 and 'Specter' properties."  *Id.* at 72 n.52.  *See also id.* at 75:8-9 ("Mr. Marks, an

15 experienced transactional lawyer, carefully worded his letter to use the powerful

16 legal language of acceptance.").

17       Defendants argued that Marks' actions were "'outward manifestations' of

18 intent" that supported the purportedly "reasonable inference" that an enforceable

19 settlement agreement had been reached.  *Id.* at 79:14.  The Court therefore had

20 before it on summary judgment precisely the argument Defendants are making

21 presently:  that Plaintiffs' attorney believed that the parties had reached a binding

22 agreement.[26]

23       The Court found such subjective impressions insufficient as a matter of law.

24

25 [26] *See, e.g.,* Defts. MSJ Opp. at 78:22-24 (Marks "at no time expressed any concern,
disagreement, or dissatisfaction" with Defendants' counteroffer.), 79:4-6 (Marks "did not
26 challenge the [counteroffer] or seek to correct it, and did not disavow any of its terms or
dispute that an agreement had been reached."); 79:7-8 (Marks "did not protest any of its
27 provisions."); 79:11-13 (Marks even "acknowledged… that the February Draft was *not*
contrary to the parties' agreement, and undertook a rewrite.").

28

EXHIBIT 32 44

Page 805

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 59 of 201    Page
Case 2:04-cv-08400-ODW-RZ    Document 476    Filed 03/02/09    Page 58 of 80
ID #:2201

1  Whatever Marks allegedly said in the privileged August 9 Letter to his clients as to

2  his *beliefs*, it will *not* materially change the "enforceable agreement" argument

3  Defendants already put before the Court, and the Court rejected.[27] *See Siegel II*, 542

4  F. Supp. 2d at 1138 ("None of this subjective *belief* is sufficient to defeat the

5  objective manifestation of the parties' intent relayed in the *documents* referenced

6  above that aptly demonstrate that there was no 'meeting of the minds' on all

7  material terms.") (emphasis added).

> ### 3.    The Defamatory Letter Does Not Waive Attorney-Client Privilege
>
> #### a.    There Was No Voluntary Waiver of Attorney-Client Privilege as to the August 9 Letter

11      Defendants' motion completely ignores the fact that the August 9 Letter was a

12 privileged communication between an attorney and his clients, and was duly listed

13 as such on privilege log.  Toberoff Decl., Ex. N at 1:17.  Plaintiffs have taken no

14 action that would waive the privilege of the August 9 Letter.  Waiver of the

15 attorney-client privilege arises *only* when the holder of the privilege takes voluntary

16 action to waive the privilege – such as by *voluntarily* disclosing the information or

17 by putting attorney-client communications at issue.  *See Transamerica Computer*

18 *Co., Inc. v. International Business Machines Corp.*, 573 F.2d 646 (9th Cir. 1978)

19 (The "general principle" is that "disclosure of confidential material constitutes a

20 waiver of the attorney-client privilege only if it is voluntary and not compelled.").[28]

---

[27] Defendants claim that "[i]t would have been critical for Defendants' counsel to have confronted Marks at his deposition with a letter written by Marks to his clients in *August 2002* and providing his then-contemporaneous views and conclusions regarding the events in question." *Supra* at 15:16-19.  Defendants' fantasy of "confronting" Marks is based on their misguided perception that they are *entitled* to privileged attorney-client communications.  Defendants imagine impeaching Marks with a privileged communication that was listed on a privilege log when the deposition occurred.  The Gang, Tyre privilege log was served on September 29, 2006, prior to Marks' deposition on October 7, 2006.  *See* Toberoff Decl., Ex. I; Perkins Decl., Ex. 6.  Defendants would have no access whatsoever to such a document in the ordinary course of litigation.

[28] *See also Weil v. Investment/Indicators, Research and Management, Inc.*, 647 F.2d 18, 24 (9th Cir. 1981) ("[V]oluntary disclosure of the content of a privileged attorney communication constitutes waiver of the privilege").

EXHIBIT 32   45

Page 806

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 60 of 201   Page
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 03/02/09   Page 59 of 60
ID #:2202

1    Moreover, **unauthorized** disclosure of protected attorney-client information

2    or documents does not waive attorney-client privilege. *See Tennenbaum v. Deloitte*

3    *& Touche*, 77 F.3d 337, 341 (9th Cir. 1996) ("[T]he focal point of privilege waiver

4    analysis should be the *holder's* disclosure of privileged communications to someone

5    outside the attorney-client relationship."); *Resolution Trust Corp. v. Dean*, 813 F.

6    Supp. 1426, 1430 (D. Ariz. 1993) (finding that, as the disclosure was unauthorized

7    and possibly criminal, the party "did not voluntarily waive any attorney-client

8    privilege it would have possessed."). Courts have consistently held that only those

9    authorized to do so may waive attorney-client privilege, and that unauthorized

10   disclosures or leaks do not waive the privilege, even when the party seeking to use

11   such evidence was "innocent" of any wrongdoing. *See, e.g., United States v. Chen*,

12   99 F.3d 1495, 1502 (9th Cir. 1996) (an ex-employee "cannot waive the

13   corporation's privilege"); *United States ex rel. Mayman v. Martin Marietta Corp.*,

14   886 F. Supp. 1243, 1246 (D. Md. 1995) (privilege not waived as to document stolen

15   by fired employee); *Sackman v. Ligget Group, Inc.*, 173 F.R.D. 358, 365 (E.D.N.Y.

16   1997) (prohibiting the deposition testimony of an expert who would base his opinion

17   on a privileged document that was stolen and disseminated to the public).[29]

18

19   ───────────────

[29] *See also In re Grand Jury Proceedings Involving Berkley and Co., Inc.*, 466 F. Supp

20   863, 870 (D. Minn. 1979) ("To the extent the documents can be viewed as stolen,
following the modern trend mentioned above, they should not lose the protection of the

21   privilege."); *Smith v. Armour Pharmaceutical Co.*, 838 F. Supp. 1573, 1576 (S.D. Fla.
1993) (denying use of memorandum widely distributed after its *unauthorized* release);

22   *Kenyatta v. Kelly*, 375 F. Supp. 1175 (E.D. Pa. 1974) (precluding use of documents stolen
by a third party from defendants, even though the documents had already been produced

23   by defendants to the plaintiffs); *In re Dayco Corp. Derivative Sec. Litig.*, 102 F.R.D. 468,
469-70 (S.D. Ohio 1984) (where no indication that party voluntarily gave privileged diary

24   to reporter, publication of excerpts of diary should not be considered waiver of attorney-
client privilege.); *Cooke v. Superior Court*, 147 Cal. Rptr. 915 (Cal. Ct. App. 1978)

25   (evidence excluded in divorce action when receipt of confidential information about
husband, including confidential communications between husband and his lawyer, was

26   purloined and passed to lawyer by husband's unfaithful agent without complicity of
receiving lawyer); 159 *American Law Reports Federal* 153 (Courts "will not condone

27   conduct which is condemned for public policy reasons, even if the result of judicial action
is to harm the innocent recipient of the unlawfully disclosed information. This is

28   especially so when the information is released as a result of a crime.").

EXHIBIT 32          46

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 61 of 201   Page
ID #:2203
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 03/02/09   Page 60 of 80

1      The August 9 Letter was duly listed on a privilege log furnished to

2 Defendants on September 29, 2006. Toberoff Decl., Ex. N at 1:17. There was no

3 voluntary waiver of privilege as to the August 9 Letter.[30] Lacking a valid legal

4 argument, Defendants argue that the production of the Defamatory Letter pursuant

5 to Court order somehow operates as a waiver of privilege as to the August 9 Letter.

6 However, it is well accepted and logical that disclosure of information pursuant to a

7 Court order does ***not*** operate as a *voluntary* waiver of privilege.[31]

8
          b.   <u>There Was No Basis to List the Defamatory Letter on a</u>

9                 <u>Privilege Log</u>

10     Defendants erroneously argue that, because the Defamatory Letter was not

11 listed on a privilege log, not only is privilege purportedly waived as to the

12 Defamatory Letter, but also as to any attorney-client communications referenced

13 therein, including the August 9 Letter.

14     Even to the extent the Defamatory Letter purports to discuss and disclose

15 privileged attorney-client communications and attorney work product, *every one of*

16 *such documents was appropriately listed in privilege logs and remains protected*

17 *pursuant thereto and the April 30, 2007 Order*: "The privilege documents that were

18 listed on the privilege log get returned [to Plaintiffs]." Perkins Decl., Ex. 5 at 30:23-

19 24; Toberoff Decl., Ex. N. Furthermore, there was little or no basis for Plaintiffs to

20 have listed the Defamatory Letter, itself, on a privilege log. The Defamatory Letter

21 does not fit within the parameters of a privilege log: it was not created by Plaintiffs

22 ───────────

[30] Defendants previously brought a motion to compel challenging Plaintiffs' privilege log.
23 Magistrate Zarefsky denied Defendants' challenge and sustained the validity of Plaintiffs'
privilege log. See Toberoff Decl., Ex. H at 5:16-27. Magistrate Zarefsky held that the
24 "descriptions in the log were sufficient" to assert privilege. *Id.* This order was never
appealed to the Court by Defendants under L.R. 72-2.1 and thus is also the "law of the
25 case." *See id.*, Ex. U at 5.

26 [31] *See, e.g., Government Guarantee Fund of Republic of Finland v. Hyatt Corp.*, 182
F.R.D. 182 (D.V.I. 1998) ("The attorney-client privilege is not destroyed by disclosure of
27 protected information... which is done only under the compulsion of a court order.");
*Laxalt v. McClatchy*, 116 F.R.D. 438, 455 (D. Nev. 1987) (Compliance with a court order
28 "will not waive the work product or attorney-client privileges.").

EXHIBIT 32   47
Page 808

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 62 of 201    Page
ID #:2204
Case 2:04-cv-08400-ODW-RZ    Document 476    Filed 03/02/09    Page 61 of 80

1  or their counsel; it is not an attorney-client communication; and is not Plaintiffs'

2  attorneys' work-product. The unauthorized letter is written anonymously, and the

3  recipients were Warner Bros. executives. As such, it is entirely proper that Plaintiffs

4  did not list such a peculiar document on a privilege log, especially since the

5  privileged documents referenced therein *were* all duly listed on privilege logs.

6       The "failure" to list the Defamatory Letter on a privilege log was no failure at

7  all. There is no voluntary act Defendants can point to by which Plaintiffs waived

8  privilege as to the Defamatory Letter and to any privileged documents or

9  information illicitly referenced therein. Even if Plaintiffs not listing the Defamatory

10 Letter on a privilege log was deemed to be the requisite voluntary act, there would

11 still be no basis to expand the scope of the waiver beyond the Defamatory Letter

12 itself to the August 9 Letter. *See Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156,

13 1162 (9th Cir. 1992) (refusing to extend the scope of a waiver beyond the privileged

14 document actually disclosed).[32]

15
16          c.    Any Failure to List the Defamatory Letter on a Privilege
           Log Was Excusable Inadvertence

17      Even if one argues that Plaintiffs could have listed the Defamatory Letter on a

18 privilege log, despite the peculiar nature of this rogue document, Plaintiffs failure to

19 do so was "excusable inadvertence" preventing any waiver of privilege. *See*

20 *Cunningham v. Connecticut Mut. Life Ins.*, 845 F. Supp. 1403, 1409 (S.D. Cal.

21 1994) (emphasizing "overriding issues of fairness").[33]

22  _____
23  [32] *See also Kintera, Inc. v. Convio, Inc.*, 219 F.R.D. 503, 511 (S.D. Cal. 2003) ("Mere
    disclosure of the underlying fact would not waive the privilege or protection as to a
    communication containing that fact."), *citing Robinson v. Tex. Auto. Dealers Ass'n*, 214
24  F.R.D. 432, 448 (E.D. Tex. 2003); *Mendenhall v. Barber-Greene Co.*, 531 F. Supp 948
    (N.D. Ill. 1981) ("The fact that some of the information is thus publicly disclosed does not
25  waive the privilege.").

26  [33] "The following factors... are applied to determine whether the failure to specifically
    identify a document or a claim of privilege was excusable inadvertence: (1) the precautions
27  taken to properly assert the privilege, (2) the time taken to rectify the error, (3) the scope of
    discovery, (4) the extent of the objection or claim of privilege, and (5) overriding issues of
28  fairness." *Id. See also First Savings Bank, F.S.B. v. First Bank System, Inc.*, 902 F. Supp.

EXHIBIT 32   48
Page 809

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 63 of 201    Page
Case 2:04-cv-08400-ODW-RZ    Document 476    Filed 03/02/09    Page 62 of 80
ID #:2205

1    In this case, the "excusable inadvertence" factors weigh heavily in favor of

2    retaining the privilege as to the August 9 Letter.  Plaintiffs clearly took proper

3    precautions as to privileged documents.  The August 9 Letter and all other attorney-

4    client communications were properly listed in privilege logs.  In light of the April

5    30, 2007 Order, limiting the waiver of privilege to those documents not listed

6    privilege logs, it would be grossly unfair to find a waiver of privilege as to the

7    August 9 Letter that *was* listed on a privilege log – on the basis of an illicit

8    anonymous Defamatory Letter *that does not even reference the August 9 Letter.*

9    Toberoff Decl., Ex. M ¶¶ 17-20.

10                       d.    The Cases Cited by Defendants for Waiving Privilege Are
11                             Inapplicable

12    The cases cited by Defendants for the proposition that Plaintiffs have waived

13    privilege as to the August 9 Letter are inapplicable, as they are all based on

14    *affirmative acts* taken by a party or its counsel that waived the privilege.  In *Weil*, an

15    appellee deliberately disclosed the content of its own privileged attorney-client

16    communication to bolster its arguments on the issue of scienter.  *Weil*, 647 F.2d at

17    23.  The Ninth Circuit ruled that the appellee could not invoke the privilege for other

18    communications on the same issue. *Id.* at 24–25.  In *United States v. Jacobs*, 117

19    F.3d 82, 90-91 (2d Cir. 1997), the defendant knowingly made representations to

20    third parties of his communications with his attorney to further his own business

21    enterprises, and thereby voluntarily waived the privileged status of those

22    communications.  In *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 469-470

23    (S.D.N.Y. 1996), Kidder Peabody voluntarily released a report to the general public

24    and thereby waived any privilege.[34]

25    _____

26    1356 (D. Kan. 1995) (ruling that a party's failure to assert a privilege claim was excusable
      inadvertence because of the party's heavy workload, because the party took steps to rectify
27    its error once the opposing party filed a motion to compel, and because the opposing party
      failed to meaningfully confer and could not show it suffered prejudice from its alleged
28    inability use the documents during deposition).
      [34] *See also Nidec Corp. v. Victor Co.*, 249 F.R.D. 575, 578 (N.D. Cal. 2007) (cited by

EXHIBIT 32    49

Page 810

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 64 of 201   Page
ID #:2206
Case 2:04-cv-08400-ODW-RZ    Document 476    Filed 03/02/09   Page 63 of 80

4.    **Defendants' "Work Product" Arguments Are Both
Irrelevant to the Protection of the August 9 Letter and
Unavailing**

a.    As Work-Product Protection Was Not Asserted for the
August 9 Letter, Waiver of Work-Product is Irrelevant

Defendants' extended discussion of the waiver of work-product protection for
the August 9 Letter is no more than a "red herring," used to provide a platform for
their baseless motion. Plaintiffs and Marks asserted attorney-client privilege as to
the August 9 Letter, not work-product protection, and, as discussed *supra*, the
attorney-client privilege plainly remains intact as to the August 9 Letter.

Defendants' lead argument is that Plaintiffs and Marks purportedly waived
work product protection of Marks' August 9 Letter based on Marks' answer to a
single deposition question. This issue is ***moot***, as the August 9 Letter is protected by
the attorney-client privilege asserted in Gang, Tyre, Ramer & Brown's privilege log.
*See* Toberoff Decl., Exs. I, N. The attorney-client privilege and the attorney work-
product doctrine are separate and distinct, and a purported waiver of work-product
protection does not waive the attorney-client privilege. *See In re Echostar Comms.
Corp.*, 448 F.3d 1294 (Fed. Cir. 2006) ("The attorney-client privilege and the work-
product doctrine, though related, are two distinct concepts and waiver of one does
not necessarily waive the other.").[35]

Even if work-product protection is waived, it "remains necessary to consider
what [is] protected by the attorney-client privilege." *In re Michigan Boiler & Eng'g
Co.*, 87 B.R. 465, 469 (Bankr. E.D. Mich. 1988). The August 9 Letter is protected
by the attorney-client privilege; whether unclaimed work product protection was

---

Defendants for the "general rule that… attorney-client communications made 'in the
presence of, or shared with, third parties'" are not privileged).

[35] *See also Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 866 (3rd Cir.
1994) (With respect to the attorney-client privilege and work-product protection, the
waiver of "one does not lead to the [waiver of the] other."); *Picard Chemical Inc. Profit
Sharing v. Perrigo Co.*, 951 F. Supp. 679, 688 (W.D. Mich. 1996) ("Separate standards
dictate the waiver of the attorney-client privilege and work product immunity.").

EXHIBIT 32    50

Page 811

Case 2:10-cv-03633-ODW-RZ  Document 42-10  Filed 08/30/10  Page 65 of 201  Page
Case 2:04-cv-08400-ODW-RZ  Document 476  Filed 03/02/09  Page 64 of 80
ID #:2207

1    somehow "waived" is irrelevant.

2            b.    <u>Marks' Testimony Does Not Constitute Work-Product and
            Would Not Waive Work Product Protection</u>

3        The definition of work-product is codified in the Federal Rules of Civil

4    Procedure as "*documents and tangible things* that are prepared in anticipation of

5    litigation or for trial by or for another party or its representative." F.R.C.P.

6    26(b)(3)(A) (emphasis added). *See In re Grand Jury Subpoena*, 350 F.3d 1010,

7    1015 (9th Cir. 2003) ("The work product doctrine… protects from discovery

8    *documents and tangible things* prepared… in anticipation of litigation.") (internal

9    quotation omitted) (emphasis added).[36] The work product doctrine is critical to the

10   functioning of the legal system, because it provides lawyers with an essential zone

11   of privacy to work. *Hickman v. Taylor*, 329 U.S. 495, 511 (1947).

12       An attorney or party waives work-product protection only through "a

13   deliberate decision to disclose privileged *materials* in a forum where disclosure was

14   voluntary and calculated to benefit the disclosing party." *United States v. Doe*, 219

15   F.3d 175, 184 (2d Cir. 1999) (emphasis added). This is illustrated by the cases cited

16   by Defendants regarding the waiver of work-product protection, which all involve

17   the voluntary disclosure of tangible materials or writings, not testimony.[37]

18

19   [36] *See also In re Echostar Communications Corp.*, 448 F.3d at 1301 ("Unlike the attorney-
client privilege, which protects all communication whether written or oral, ***work-product***

20   ***immunity protects documents and tangible things***, such as memorandums, letters, and e-
mails.") (emphasis added); Jones, Rosen, Wegner & Jones, Federal Civil Trials and

21   Evidence ¶ 8:3700 (Rutter 2008) (work product "protects ***trial preparation materials*** that
reveal an attorney's strategy, intended lines of proof, evaluation of strengths and

22   weaknesses, and inferences drawn from interviews.") (emphasis added).

23   [37] *See Atari Corp. v. Sega of Am.*, 161 F.R.D. 417, 418-19 (N.D. Cal. 1994) (voluntary
production of a copy of videotape with non-testifying expert consultant during discovery

24   waived work-product protection for the tape); *In re McKesson HBOC, Inc. Secs. Litig.*,
2005 U.S. Dist. LEXIS 7098 at *32-33 (N.D. Cal. Mar. 31, 2005) (voluntary disclosure of

25   attorney work-product to the SEC and the United States Attorney's Office waived
protection); *Kintera*, 219 F.R.D. at 510-11 (voluntary disclosure of the substance of

26   witness affidavits to the general public on writings on parties' own Web site waived
protection); *Columbia Pictures Television, Inc. v. Krypton Broadcasting of Birmingham,*

27   *Inc.*, 259 F.3d 1186, 1196 (9th Cir. 2001) (holding that a party could not introduce
attorney-client communications as evidence after asserting a privilege for the

28   communications during discovery); *Jacobs*, 117 F.3d at 90-91 (voluntary description in

1    Marks' testimony that, when he sent his October 19, 2001 "acceptance" letter,

2    he believed there was an agreement, but that "a final, binding, enforceable

3    agreement" was never reached due to DC's counter-offers, did not disclose

4    information subject to work-product protection. While summarizing the parties'

5    negotiations, it did not disclose work product materials or other tangible things

6    prepared in anticipation of litigation. *See id.* at 191 (Testimony by an attorney as to

7    the substance of a meeting did not waive work product protection of notes regarding

8    the meeting.).

9              c.    There Is No Connection Between Marks' Testimony and

10                   the August 9 Letter

11    Even if Marks' answer to one of Defendants' deposition questions were

12    somehow held to be work product, and even if work product were relevant, the

13    August 9 Letter would remain protected as work product for two reasons.

14    Firstly, Defendants have not proved the contents of the August 9 Letter by an

15    anonymous, untrustworthy and inadmissible Defamatory Letter that does not even

16    mention the August 9 Letter. Marks' testimony also did not discuss or disclose in

17    *any* sense the August 9 Letter. Simply put, Defendants' waiver theory rests on the

18    contents of the August 9 Letter, which Defendants have not established.

19    Secondly, Marks' testimony constituted, at most, "opinion" work product.

20    "Opinion" work product is "materials involving pure legal theory or opinion ... pure

21    mental impressions." *In re Martin Marietta Corp.*, 856 F.2d 619, 625 (4th Cir.

22    1988). While disclosing "fact" work product can give rise to "subject matter

23    waiver" as to documents touching on the same subject matter, the disclosure of

24    "opinion" work product does not. *Id.* at 626 (the doctrine of subject matter waiver

25

26    writing of the content of attorney-client communications to attract investors waived
      privilege). *See also United States v. Nobles*, 422 U.S. 225, 227-228, 239-40 (1975)

27    (voluntary use of written work-product report in conducting cross-examination waived
      privilege).

28

EXHIBIT 32    52

Page 813

Case 2:10-cv-93633-ODW-RZ  Document 42-10  476  Filed 08/30/12  Page 66 of 201  Page
Case 2:04-cv-08400-ODW-RZ  Document 476  Filed 03/02/09  Page 66 of 201  Page
ID #:2209

1  "does not apply" to opinion work product).[38] As such, Marks' opinion would not

2  provide a basis for waiving work protect protection of the August 9 Letter to the

3  extent it discussed the settlement negotiations.

5.  **The Court Should Reconsider Its Conclusion that the Letter "Contains" Conduct By Plaintiffs' Counsel as the Letter is Unethical, Anonymous, Inadmissible and Unsupported**

6  Notwithstanding Defendants' insidious smear campaign and hyping of the

7  Defamatory Letter as "explosive" new evidence, a "revelation," and a

8  "whistleblower" document, it is clearly none of these things.  The rant in the

9  anonymous Defamatory Letter lacks any indicia of trustworthiness.  It was written

10 by an attorney who, after hours, surreptitiously photocopied Plaintiffs' entire

11 privileged legal files and privileged documents of related clients, and blithely turned

12 them all over to Defendants in the midst of this litigation.  In so doing, the attorney

13 potentially harmed his clients, in violation of the attorney's most fundamental

14 ethical duties.  It is hard to imagine a more despicable act by a lawyer.  Moreover, to

15 anyone thoroughly familiar with the parties and the facts of this case, the

16 Defamatory Letter reads like an incoherent conspiratorial rant against Plaintiffs'

17 counsel.

18 There was nothing "whistleblower"[39] about this conduct, despite Defendants'

19 constant efforts to elevate it so as to malign Plaintiffs' counsel.  If the attorney truly

20 had a shred of evidence or knowledge of *any* unethical conduct by Plaintiffs'

21 counsel, he could and would have informed the California Bar.  Instead, he

22 unethically disclosed reams of his clients' privileged documents to Warner Bros.

23

24 [38] *See also Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1422 (11th Cir.

25 1994) ("[T]he subject-matter waiver doctrine does not extend to materials protected by the opinion work product privilege."), *mod. on other grounds*, 30 F.3d 1347 (11th Cir.1994).

26 [39] In their original motion to compel before Magistrate Zarefsky, Defendants

27 disingenuously promoted the Stolen Documents as "Whistleblower Documents." This characterization was flatly rejected by Magistrate Zarefsky: "And I will say that I don't

28 agree with the designation of these as 'whistleblower' documents either...." Perkins Decl., Ex. 5 at 18:16-18.

EXHIBIT 32   53

Page 814

1    Contrary to Defendants' ridiculous allegations of a conspiratorial "cover-up"

2   by Plaintiffs, Plaintiffs' present counsel and prior counsel, Gang, Tyre, Ramer &

3   Brown, it turns out that of the 839 pages of Stolen Documents, all but two non-

4   privileged documents already in Defendants' possession had been produced and all

5   but two privileged post-litigation documents had been listed on privilege logs.[40]

6        The attorney who stole Plaintiffs' privileged files and delivered them to

7   Warner Bros. had worked at Toberoff's law firm for less than three months, without

8   any apparent problem or incident, and then one day disappeared on his lunch break

9   in November 2005 without notice. Toberoff Decl. at ¶¶ 33-34. The attorney did not

10  return the firm's calls. *Id.* He thereafter brazenly contacted Plaintiffs and other

11  clients of the firm in December 2005, and tried to convince them to terminate

12  Toberoff's firm by falsely disparaging Toberoff and offering a "better deal." *Id.*

13  By all accounts, his motives were financial. He was rejected by Plaintiffs and the

14  firm's other clients in December, 2005. *Id.* It is believed that soon thereafter he

15  communicated with Defendants and provided the privileged documents he had

16  stolen from Plaintiffs' legal files – hence, his statement in the Defamatory Letter

17  "consider it an early Holiday present."

18       In light of this unseemly and unethical behavior, and the anonymous,

19  unsupported and inadmissible nature of the letter, itself, *no credence should be given*

20  *to its statements.*

21       Therefore, Plaintiffs respectfully request that the Court reconsider the

22  conclusion in its September 26, 2008 Order that "[t]he documents in question

23  *contained* embarrassing and potentially questionable conduct by plaintiffs[']

24  counsel in this case." *Id.,* Ex. U at 1 (emphasis added). This statement appears to

25  accept as fact the anonymous Defamatory Letter's unsupported rant against

26  Toberoff and random characterization of documents, *not before the Court.*

27

28  [40] *See* Toberoff Decl., Exs. M at ¶ 22, T at ¶ 19.

EXHIBIT 32    54

Page 815

Case 2:10-cv-03623-ODW-RZ    Document 42-10    Filed 08/30/10    Page 69 of 201    Page
ID #:2211
Case 2:04-cv-08400-ODW-RZ    Document 476    Filed 03/02/09    Page 68 of 80

1    Defendants, not surprisingly, have seized upon the Court's statement, quoting

2   it in the second line of their motion. Encouraged, Defendants argue that the

3   Defamatory Letter is presumptively "true," and without a shred of evidence or

4   support embark on a further smear campaign in their efforts to prejudice the trier of

5   fact. Accordingly, Plaintiffs respectfully request that the condemnatory statement in

6   the Court's September 26, 2008 Order be eliminated or, in the alternative, modified

7   to reflect that the Defamatory Letter "alleges" conduct, without support.

8

9       **6.    The September 26, 2008 Order Should Be Reconsidered
               Because the April 30 Order Did Not Encompass the
10              Defamatory Letter and In Any Event Plaintiffs Had No
                Opportunity to "Appeal" the April 30 Order as to this Issue**

11          a.    <u>The April 30 Order Did Not Encompass the Defamatory
                    Letter Because Defendants Had Not Moved to Compel</u>
12                 <u>Production of the Letter</u>

13    Magistrate Zarefsky's April 30, 2007 Order encompassed only those

14  documents that Defendants had moved to compel. Defendants clearly did not move

15  to compel the Defamatory Letter; they moved to compel the so-called "Whistle-

16  blower documents." *See generally* Defts. March 2007 Motion to Compel. At no

17  point did Defendants provide *any* indication that the "Whistle-blower documents"

18  included the Defamatory Letter, and expressly distinguished the Defamatory Letter

19  from the "Whistle-blower documents."[41] Because Defendants had not moved to

20  compel the Defamatory Letter, it was not discussed by *either* party at the April 30,

21  2007 hearing before Magistrate Zarefsky, nor encompassed by the April 30 Order.

22  *See* Perkins Decl., Ex. 5.

23    Production of the Defamatory Letter was not before Magistrate Zarefsky, and

24

25  [41] *See, e.g.,* Defts. March 2007 Motion to Compel at 2:6-14 (requesting production of the
     "Whistle-blower documents"), 6:13-14 (referring to "the cover letter contained with the
26  documents"), 6:26-27 (characterizing "the 'cover letter' that *came with* the Whistle-blower
     documents") (emphasis added); 7:9-10 (referring to "Whistle-blower Documents contained
27  with the letter"), 7:17-19 (referring to attorneys' perusal of "the contents of the cover letter
     and my brief thumbing through the documents"); and 16:17-21:28 (referring repeatedly to
28  the "Whistle-blower Documents" and never mentioning the cover letter).

EXHIBIT 32    55

Page 816

Case 2:10-cv-93633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 70 of 201   Page
ID #:2212
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 03/02/09   Page 69 of 80

1   his April 30 Order should not be misconstrued to include it.

2   ///

3   ///

                    b.      <u>The Issue of Whether the Defamatory Letter Should Be</u>
4                          <u>Released to Defendants Was Not Ripe for Appeal Under</u>
                          <u>Local Rule 72-2.1</u>

5

6        The Court held in the September 26, 2008 Order that Plaintiffs had "waived"

7   any opportunity to preserve privilege in the Nine Documents, because they did not

8   appeal the April 30 Order within ten days pursuant to Local Rule 72-2.1.  *Id.* at 4-5.

    However, such an appeal would not have made sense at the time the April 30 Order
9
    was issued.   The April 30 Order, by its own terms, required Plaintiffs' counsel to
10
    submit a declaration *twenty-one* days later on May 21, 2007.  In the process of
11
    reviewing the Stolen Documents, it became apparent to Plaintiffs that the Nine
12
    Documents had not been addressed by Defendants' motion, at the hearing or by the
13
    Order.  Plaintiffs' counsel therefore asserted that the Nine Documents remained
14
    privileged in his May 2007 Declaration.  *See* Toberoff Decl., Ex. N.
15
        Plaintiffs did not disagree with the straightforward April 30 Order.  Plaintiffs
16
    believed that the Nine Documents had "fallen through the cracks," and that,
17
    considering the transcript of the April 30, 2007 hearing and the Order, Magistrate
18
    Zarefsky had not intended that privilege be waived for the Nine Documents.  In such
19
    circumstances, where the issue was not ripe for appeal, an immediate appeal to this
20
    Court pursuant to Local Rule 72-2.1 would have been premature.
21
        By the time this issue came to a head, after meet and confer letters between
22
    the parties and a round of communications with Arnold & Porter, Magistrate
23
    Zarefsky suffered the tragic loss of his wife and was indisposed.  Thereafter,
24
    Defendants moved to compel and challenged the privilege claims to the Nine
25
    Documents asserted in the May 21 2007 declaration, resulting in the Court's
26
    September 26 Order.  Ordinarily, Defendants would have brought this motion to
27
    Magistrate Zarefsky.  In the unlikely event Magistrate Zarefsky had granted
28

EXHIBIT 32  56

Page 817

Case 2:10-cv-93633-ODW-RZ Document 42-10 476 Filed 08/30/10 09 Page 71 of 201 Page
Case 2:04-cv-08400-ODW-RZ Document 476 Filed 03/02/09 Page 70 of 80
ID #:2213

1   Defendants' motion, such would have been the order to have been appealed

2   pursuant to Local Rule 72-2.1.

3       Given the above circumstances, Plaintiffs did not waive their opportunity to

4   have Magistrate Zarefsky's Order clarified.

5        **7.**    **The September 26, 2008 Order for the Production of the**
**Defamatory Letter Should Be Reconsidered In Light of the**
6             **Record and Defendants' Misuse of the Stolen Documents**

7       Defendants secured the Defamatory Letter based on their misrepresentations

8   to the Court that they followed a proper protocol in handling the Stolen Documents

9   and *immediately* turned them over to a supposed "neutral." As neither is true, the

10   April 30, 2007 and September 26, 2008 Orders should be reconsidered, at least with

11   respect to the Defamatory Letter. For the reasons set forth below, the Defamatory

12   Letter should be returned to Plaintiffs, and Defendants should be barred from further

13   attempting to use it in this litigation or otherwise. *See City of L.A. v. Santa Monica*

14   *BayKeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (Courts have the "plenary power" "to

15   correct mistakes" in prior orders.); Local Rule 7-18(b).

16        a.    Magistrate Zarefsky's April 30 Order Was Based on
             Defendants' Misrepresentation of a Sanitized Protocol
17

18       Throughout this process, Defendants have used terms like "protocol,"

19   "neutral" and "escrow," all in an effort to mask the uneasy appearance of their

20   overzealous conduct. Defendants went to great lengths to create the appearance of a

21   sanitized protocol to deal with the Stolen Documents. However, the record of

22   evidence, which surfaced after Defendants had convinced Magistrate Zarefsky to

23   bless their supposedly "neutral" procedures, reveals their misrepresentations and

24   Defendants' objective to ride roughshod over the attorney-client privilege.

25        i.    Warner Bros. Engaged in a Substantive Review of
             the Privileged Stolen Documents

26       Defendants' misconduct began when their attorney Wayne Smith ("Smith"),

27   Warner's Senior VP, Litigation, who oversees this litigation on Defendants' behalf,

28   undertook a detailed review of Plaintiffs' privileged documents, instead of

1  immediately notifying and returning them to Plaintiffs' counsel. A lawyer who

2  receives materials of opposing counsel that are facially privileged or otherwise

3  confidential, when the materials were not intended for the recipient, should refrain

4  from examining them, notify opposing counsel immediately, and abide by his

5  instructions. *See Gomez v. Vernon*, 255 F.3d 1118, 1131–32 (9th Cir. 2001); 3

6  *Matthew Bender Practice Guide: Federal Pretrial Civil Procedure in California* §

7  24.40. Defendants did none of these things – they reviewed the documents in detail,

8  failed to promptly notify Plaintiffs' counsel, and, obviously, did not comply with

9  Plaintiffs' instructions to return the Stolen Documents immediately.

10      Smith claims he relied on *State Compensation Insurance Fund v. WPS, Inc.*

11  (*State Fund*), 70 Cal.App.4th 644 (1999) in deciding how to handle the Stolen

12  Documents. However, the protocol set forth in *State Fund* is more stringent than as

13  depicted by Smith[42]:

14
15      "[T]he lawyer receiving such materials should refrain from examining the
        materials any more than is essential to ascertain if the materials are privileged,
        and shall immediately notify the sender that he or she possesses material that
16      appears to be privileged."

17  70 Cal.App.4th at 656.[43] As demonstrated below, Smith failed to comply with the

18  *State Fund* procedures touted by Defendants to Magistrate Zarefsky and this Court.

19      It is believed from the conduct of the attorney who stole the documents

20  (sudden disappearance in early November, 2005, failed attempt to poach Plaintiffs

21  in late November, 2005) and his statements to Warner Bros. in the Defamatory

22

---

23  [42] Smith shades the *State Fund* procedures: "(i) to review each document but to cease the
    review once it became apparent that the document was privileged; (ii) to contact opposing
24  counsel and advise that the documents have been received; and (iii) to refrain from using
    any information in the documents until there was either an agreement with opposing
25  counsel, or the court had determined the documents' disposition." Perkins Decl., Ex. 4 at ¶
    6.
26
    [43] This decision was upheld by the Supreme Court of California, which noted that it
27  comports with an attorney's "obligation not only to protect his client's interests but also to
    respect the legitimate interests of fellow members of the bar, the judiciary, and the
28  administration of justice." *Rico v. Mitsubishi Motors Corp.*, 171 P.3d 1092, 1099 (2007).

EXHIBIT 32    58

Letter ("consider it an early Holiday gift") that Warner received their early Christmas present in late November or early December, 2005, and waited *seven months* before deciding whether or when to disclose this matter to Plaintiffs.[44]

Moreover, even if Defendants received the stolen documents in June, 2006, as they say, they did not bring this to Plaintiffs' *immediate* attention as required by *State Fund.* They belatedly mention the "anonymous" receipt of documents in a letter dated July 5, 2006 and then in only the vaguest of terms as "certain documents." Toberoff Decl., Ex. B. Plaintiffs did not learn that the documents were *their* privileged documents, until July 11, 2006, and only after Plaintiffs' counsel pressed Defendants. Toberoff Decl., Ex. M at ¶ 8. Plaintiffs did not receive a copy of the documents until *July 18, 2006.* *Id.*, ¶ 10.

The second fiction Defendants have maintained is that Smith, pursuant to *State Fund*, merely "thumbed through" or just "brief[ly]" glanced at the Stolen Documents to determine their privilege status. *See* Defs. March 2007 Motion to Compel at 7:9-10; Perkins Decl., Ex. 4 at ¶ 3. Smith states in his March 27, 2007 declaration that he placed the Stolen Documents in three piles marked "non-privileged," "privileged" and "?" (when he believed privilege had been waived). Perkins Decl., Ex. 4 at ¶¶ 8-12. Smith claimed "where it first appeared to me it was entirely privileged, I ceased reading it, placed the document in the "privileged" pile and did not look at it further." *Id.* Smith professed to have briefly skimmed the documents, upon receipt, on June 28, 2006 and to have turned *all* of them over to

---

[44] These inferences are further supported by Defendants' evasion of Plaintiffs' requests for information and evidence regarding their receipt of the Stolen Documents. Warner claimed that three identical sets of documents addressed to three high placed Warner executives mysteriously arrived in envelopes on June 28, 2006, that Warner purportedly did not retain any of the three envelopes (or a copy of any) despite the unusual, sensitive and legal nature of the contents, and that Warner purportedly had no mailroom, security gate, or executive office records, notes or logs of the three heavy packages ever being signed in or received by three top executives, including Warner's General Counsel, John Schulman. Toberoff Decl., Exs. D, F, T at ¶¶ 11-12. All such information commonly kept by Studio security, mailrooms, executive offices and attorneys had purportedly vanished.

EXHIBIT 32

59

Page 820

Case 2:10-cv-03633-ODW-RZ Document 42-10 475 Filed 08/30/10 Page 74 of 201 Page
Case 2:04-cv-08400-ODW-RZ Document 14 Filed 09/02/09 Page 73 of 30
ID #:2216

1   Arnold & Porter on June 30, 2006. *Id.*, ¶¶ 8, 13. Smith further stated "[b]ecause I

2   did not conduct a detailed review of the Superman Documents, and because of the

3   passage of time, I do not recall their specific contents." *Id.*

4       Despite this purported very limited review of Stolen Documents (numbering

5   839 pages), stated lack of recollection, and purported turning over of all documents

6   in two days to a "neutral" "escrow agent," Smith has repeatedly in this litigation

7   been able to selectively recall the contents of specific documents, whether they were

8   produced and whether they were listed on privilege logs.[45]

9       In support of Defendants' first motion to compel regarding the Stolen

10   Documents, Smith *falsely* stated in his March 27, 2007 declaration: that none "of the

11   'non-privileged' documents had been produced in the litigation" and that "at least

12   some (and perhaps virtually all) of the privileged documents, as well as those in the

13   "?" pile, were, to the best of my knowledge, never identified in any privilege log

14   served by Plaintiffs." Smith Decl., ¶ 12. This statement is odd as Smith claimed to

15   have received the Stolen Documents on June 28, 2006 and to have turned them *all*

16   over to Arnold & Porter two days later. *Id.*, ¶¶ 8, 13. Plaintiffs did not serve their

17   first privilege log until July 20, 2006 and served their supplemental privilege log on

18   September 29, 2006.[46] Toberoff Decl., Ex. M at ¶¶ 17-18. The privilege logs list

19   the simple information (date, sender, recipient, etc.) in the form approved by the

20   Court's August 18, 2006 order. *Id.* Ex. H.

21

22   [45]  Plaintiffs had produced nearly 2000 pages of documents at the time the Stolen
    Documents were allegedly reviewed by Smith.

23

24   [46] Plaintiffs produced documents responsive to Defendants' requests for production on
    September 29, 2005 and supplemented their production on October 6, 2006, November 6,
    2006 and November 17, 2006. Toberoff Decl., Ex. M at ¶ 16. The privilege log for

25   Plaintiffs' former counsel, Gang Tyre Ramer & Brown, was served on September 29,
    2006. *Id.*, Ex. I. Documents were further produced by third parties as follows: Jean

26   Peavy and Warren Peary (the "Shusters") on July 18, August 11 and August 14, with
    privilege logs on August 11, 2006 and October 16, 2006; IPW, LLC on November 15,

27   2006; Pacific Pictures Corporation on November 15, 2006; and Don Bulson, attorney for
    Michael Siegel, Plaintiff Laura Siegel Larson's half-brother, produced a privilege log on

28   October 23, 2006 in response to Defendants' subpoena. *Id.*, Exs. J, M at ¶¶ 19-21.

EXHIBIT 32    60

Page 821

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 75 of 201   Page
ID #:2217
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 03/02/09   Page 74 of 80

1   It is not credible that after a mere cursory review in June, 2006, Smith could

2   recall in March 2007 (or even in late July or September 2006), the dates, sender and

3   recipients of documents supposedly missing from Plaintiffs' subsequently produced

4   privilege logs (containing hundreds of entries), especially since Smith admitted

5   "because of the passage of time, I do not recall the specific documents" and declared

6   that when it first appeared that a document was privileged, "I ceased reading it,

7   placed the document in the 'privileged' pile and did not look at it further."  Smith

8   Decl., ¶ 8.

9   If Smith is taken at his word, he could not possibly have concluded from such

10   a cursory review that the Stolen Documents were not included among the nearly

11   2000 documents produced by Plaintiffs or by subpoenaed third parties, nor could he

12   have reasonably compared them to the hundreds of entries on the *subsequent*

13   privilege logs of Plaintiffs and third parties.[47]

14   In Defendants' May 22, 2007 letter regarding Toberoff's May 21, 2007

15   declaration (per the April 30 Order), Smith is cited as remembering *one* piece of

16   "correspondence concerning the interest in Superman that might be owned by…

17   Michael Siegel [that] has never been produced in this litigation, and does not appear

18   to have been listed in any privilege log."  Toberoff Decl., Ex. O.

19   For Defendants' latest motion, Smith's powers of recall are being utilized yet

20   again.  Based upon his brief "thumbing through" 839 pages of Stolen Documents in

21   June, 2006, Smith now declares under oath:  "I believe the language quoted from the

22   [Defamatory Letter] refers to and is substantially similar to statements made by Mr.

23   Marks to his clients in [the August 9 Letter]."  *See* February 19, 2009 Declaration of

24   Wayne Smith, ¶ 5.  Incredibly, Smith is able to take a single, unsupported statement

25   ("Marks tells the Siegels…") in the Defamatory Letter and line it up with a specific

26   document, the August 9 Letter, among the 839 pages of Stolen Documents.  This is

---

[47]   For instance, the privilege log of Don Bulson, Esq., the attorney of Michael Siegel,
28   Laura Siegels' now deceased step-brother, contains 422 entries.  Toberoff Decl., Ex. J.

EXHIBIT 32   61

Page 822

Case 2:10-cv-93633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 76 of 201    Page
Case 2:04-cv-08400-ODW-RZ    Document 476    Filed 03/02/09    Page 75 of 80
ID #:2218

1   all the more revealing as the Defamatory Letter does not refer to the August 9 Letter

2   or even to a writing as the basis for its statement regarding Marks. *See* Perkins

3   Decl., Ex. 1.

4        It is obvious from Smith's incredulous statements that Warner went *far*

5   beyond the mere "sorting" of documents, as represented to Magistrate Zarefsky, and

6   engaged in a substantive analysis of documents to see how they could be exploited

7   by Defendants in this litigation, including documents that were *facially* privileged

8   attorney-client communications.[48]  This is immediately apparent even from Smith's

9   testimony that he had sorted the August 9 Letter, clearly an attorney-client

10  communication, into the "?" pile on the basis that he "believed privilege likely had

11  been waived." *Id.*

12       Defendants have cultivated the appearance of acting judiciously with regards

13  to the Stolen Documents.  However, it now appears that their calculated

14  representations to Magistrate Zarefsky and this Court were false and misleading.

15  Whenever it is expedient, Smith is able to pinpoint specific Stolen Documents and

16  not only purports to "recall" their contents, but their relation as well to the thousands

17  of documents produced by Plaintiffs or multiple third parties, or subsequently listed

18  on their respective privilege logs.

19

20             ii.    Defendants Misrepresented that They Turned the
                      Stolen Documents Over to a "Neutral" and
21                    Perpetuated the Fiction that the Documents Were
                      Held by an "Escrow Agent"

22       Defendants also misrepresented to Magistrate Zarefsky that they had turned

23  the documents over to a purported "neutral" who was acting as an "escrow agent"

24  ─────────────
[48] *See generally, Rico v. Mitsubishi Motors Corp.*, 116 Cal. App. 4th 51, 71 (2004)
25  (disqualification proper where counsel "studied the [privileged] document carefully, made
    his own notes on it...and based his litigation strategy" on it.); *Spacone v. Burke (In re*
26  *Truck-A-Way)*, 300 B.R. 31, 39 (Bankr. E.D. Cal. 2003) (lawyer disqualified because,
    upon discovery of an opponent's privileged documents, he conditioned the documents'
27  release upon his opponent providing a privilege log); *Shell Oil Refinery v. Shell Oil Co.*,
    143 F.R.D. 105, 108 (E.D. La. 1992) (plaintiff subject to sanctions for improperly
28  obtaining proprietary documents from one of defendant corporation's employees).

EXHIBIT 32    62

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 77 of 201   Page
ID #:2219
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 05/02/09   Page 76 of 80

1   (the law firm Arnold & Porter) in furtherance of their purported "protocol." *See*

2   Defts. March 2007 Motion to Compel at 1:16-17 ("all copies of the documents were

3   turned over to a neutral third party for preservation and identification"); 10:14-18

4   (Defendants "discussed having a neutral third party hold the documents.").[49]

5   However, as Arnold & Porter was retained and compensated by Defendants, it is not

6   a "neutral," by definition.  Moreover, Eisen has expressly *admitted* that neither his

7   law firm, nor he were acting as either a "neutral" or an escrow holder:

8

9         "[N]either...this firm, nor I has suggested that we are formal escrow agents,
        in the legal sense of that term... we do not in my view, owe either party to
        this litigation any legal duty.  We expect to be paid for our time by

10        defendants..."

11   Toberoff Decl., Ex. X.  *See Summit Financial Holdings, Ltd. v. Continental Lawyers*

12   *Title Co.*, 27 Cal. 4th 705, 711 (2003) ("An escrow holder is an agent and fiduciary

13   of the parties to an escrow.").   It was not until October, 2008, well *after* the April

14   30, 2007 and September 26, 2008 Orders had been issued that this fact was finally

15   admitted.  This alone justifies reconsideration. *See* Local Rule 7-18 (b) ("emergence

16   of new material facts ... after the time of such decision").

17       After obtaining Magistrate Zarefsky's blessing of their "neutral" procedures

18   on false pretenses, Defendants set about mining for as much privileged information

19   as they could pry loose.  Defendants repeatedly attempted to get Mr. Eisen to "peek

20   behind" Plaintiffs' privilege logs, to review the stolen privileged documents, test the

21   sufficiency of the log descriptions, and search for particular documents "recalled"

22

23   [49] Defendants also repeatedly attempted to leverage Eisen as a purported "neutral" in later filings. *See* Notice of Motion and Joint Stipulation re: Defendants' Motion to Compel

24   Compliance with the Court's 4/30/07 Order and Motion for Sanctions at 1:11 ("Defendants turned them over to a neutral third party"); 6:10-11 (Defendants "ultimately concluded that

25   he should turn them over to a neutral third party"); 8:6 (the "original caretaker" of the documents); 8:10 ("escrow services"); 22:10-12 ("[I]t is necessary for Mr. Eisen, in his

26   capacity as a neutral third party, to compare the Escrow Documents with the listed documents and privilege log entries"); and at 1:22, 2:12, 2:16, 10:16, 13:19, 13:22, 20:15

27   ("escrow holder"); Declaration of Michael Bergman in Response to the Declaration of Marc Toberoff Filed Pursuant to the Court's September 17, 2007 Order at 1:17-18 ("the only neutral party with access to the Escrow Documents").

28

EXHIBIT 32    63

Page 824

Case 2:10-cv-03633-ODW-RZ Document 42-10476 Filed 08/30/10 Page 78 of 201 Page
Case 2:04-cv-08400-ODW-RZ Document 476 Filed 08/02/09 Page 78 of 80 Page
ID #:2220

1   by Smith.  It soon became clear from Eisen's written statements to Plaintiffs and the

2   Court that Defendants had enlisted his assistance to circumvent and challenge

3   Plaintiffs' privilege logs.

4        After Plaintiffs' counsel provided his declaration on May 21, 2007 per the

5   April 30 Order, Defendants unilaterally provided Eisen with the produced

6   documents identified therein as well as copies of the referenced privilege logs.

7   Defendants instructed Eisen to "compare the privilege entries to the Escrow

8   Documents in your file… any document that does not match up exactly to an

9   identified entry on the privilege logs should not be returned to Mr. Toberoff, but

10  instead should be produced to Defendants."  *See* Toberoff Decl., Ex. O.

11       Despite the clarity of the April 30 Order ("the privilege documents that were

12  listed on the privilege log get returned. The others get sent to defense counsel"),

13  Defendants instructed Eisen not to disburse any documents.  Instead they brought

14  another motion to compel insisting that Eisen be allowed to test each claim of

15  privilege for the Stolen Documents.  The Court denied Defendants' motion to

16  compel as "moot."[50]  With the September 26, 2008 Order,  the Court ordered Eisen,

17  pursuant to the April 30, 2007 Order,  to "produce forthwith any escrow document

18  not previously listed in a privilege log or has having been previously produced… the

19  nine documents… are to be produced to defendants' counsel as those documents

20  were not previously identified in a privilege log provided by plaintiffs."  Toberoff

21  Decl., Ex. U at 5.

22       Despite the clarity of the Court's ruling and the "mootness" of Defendants'

23  "match-up" request, Eisen, at Defendants' behest, *again* did not disburse the Stolen

24  Documents.  Instead, he wrote to Plaintiffs that he would "compare the privilege

25  logs to the documents, and to produce to Mr. Bergman all escrow documents except

26

27  [50] "Let's not talk about the ones that have been done. Let's talk about the nine that we
    have left. I want to resolve this. We're going to move on here, counsel."  Toberoff Decl.,

28  Ex. R at 120:18-19.

EXHIBIT 32   64

Page 825

Case 2:10-cv-03633-ODW-RZ Document 42-10 Filed 08/30/10 Page 79 of 201 Page
ID #:2221
Case 2:04-cv-08400-ODW-RZ Document 476 Filed 03/02/09 Page 78 of 80

1  those accurately described on the privilege logs." *Id.*, Ex. V. Not surprisingly,

2  Bergman readily approved of Eisen's plan: "Defendants agree with your

3  interpretation of the Court's Order regarding your obligations to match-up the

4  Escrow Documents to the pertinent privilege log entries to determine whether "the

5  description of date, sender, recipient and type of document" corresponds to what the

6  document actually is." *Id.*, Ex. Y.

7         Bergman further encouraged Eisen (an attorney retained by them), to contact

8  the Court *ex parte.* *Id.* ("we request that you seek guidance directly from the

9  Court"). Over Plaintiffs' objections, Eisen sent a letter to the Court on October 16,

10  2008, advocating Defendants' objectives in the form of questions:

11

12       "With respect to the "match up" of the relevant privilege logs and Mr.
         Toberoff's declaration, ...am I to ascertain whether the escrow document and
         privilege log entry actually match and produce the document to defendants if

13       it does not?...Suppose a series of pages among the escrow documents consists
         of more than one document (e.g. a cover letter and an enclosed document) but

14       the privilege log entry only references one of the documents. Under those
         circumstances, is the document not referenced in the privilege log deemed to

15       be included within the confines of the privilege log protection, or not?"

16  *Id.*, Ex. AA. From these facts, it is more than apparent that Eisen was not "neutral"

17  in any sense, but did as his client requested: retain the Stolen Documents, keep the

18  hopes of a full blown privilege review alive and advance Defendants' position. In

19  the face of two successive orders clearly outlining the simple process by which he

20  was to immediately disburse the Stolen Documents, Eisen refused, instead lobbying

21  to get Defendants' "match-up" process approved, until it was specifically rejected

22  by the Court on December 4, 2008.

23         As evidenced by Defendants' latest motion, they remain committed to

24  chipping away at Plaintiffs' privileged stolen documents, this time under the

25  ridiculous pretext of the anonymous Defamatory Letter. We now know that

26  Defendants' original motion to compel the Stolen Documents was based on

27  fundamental misrepresentations to Magistrate Zarefsky: (i) that Defendants merely

28  "thumbed through" the privileged Stolen Documents and (ii) that they set up a

EXHIBIT 32

65

1 "neutral" "escrow" procedure to handle the documents.  It is obvious from the

2 record facts that this is not true.  Defendants have crossed the line by reviewing and

3 leveraging Plaintiffs' privileged information.  Accordingly, sufficient grounds exist

4 for this Court to reconsider its ruling and release of the Defamatory Letter to

5 Defendants.

6 V.     **DEFENDANTS' CONCLUSION**

7        For the reasons set forth herein, Defendants respectfully request that their

8 motion be granted.

9 VI.    **PLAINTIFFS' CONCLUSION**

10        For the reasons stated above, (i) Defendants' motion should be denied in its

11 entirety, (ii) the Court is respectfully requested to reconsider its September 26, 2008

12 order insofar as it states that the anonymous, inadmissible and wholly unsupported

13 Defamatory Letter "***contained*** embarrassing and potentially questionable conduct by

14 plaintiffs['] counsel in this case," instead of "alleged" such conduct, and (iii) to

15 reconsider the release of the Defamatory Letter in light of new evidence regarding

16 Defendants' misrepresentations to Magistrate Judge Zarefsky and improper

17 exploitation of the Stolen Documents, and/or (iv) preclude the further use of the

18 Defamatory Letter by Defendants in this litigation or otherwise.

19 DATED:  March 2, 2009            FROSS ZELNICK LEHRMAN & ZISSU, P.C.

20                                 PERKINS LAW OFFICE, P.C.

21                                        -and-

22                                 WEISSMANN WOLFF BERGMAN
                                   COLEMAN GRODIN & EVALL LLP
23

24                                 By: _____
                                       Michael Bergman
25

26                                 Attorneys for Defendants and Counterclaimant

27

28

66

EXHIBIT 32
Page 827

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 81 of 201   Page
Case 2:04-cv-08400-ODW -RZ   Document 476   Filed 03/02/09   Page 80 of 80
ID #:2223

1   DATED:  March 2, 2009                TOBEROFF & ASSOCIATES, P.C.

2

3                                         By_____

4                                              Marc Toberoff

5                                         Attorneys for Plaintiffs/Counterclaim-
                                          Defendants

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

67

EXHIBIT 32

EXHIBIT 33

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 83 of 201    Page
ID #:2225
Case 2:04-cv-08400-SGL-RZ    Document 478    Filed 03/13/2009    Page 1 of 19

1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA-EASTERN DIVISION**

9

| | |
|---|---|
| JOANNE SIEGEL and LAURA SIEGEL LARSON,<br><br>           Plaintiffs,<br><br>vs.<br><br>WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; DC COMICS; and DOES 1-10,<br><br>           Defendants. | Case No. CV 04-8400 SGL (RZx)<br><br>Hon. Stephen G. Larson, U.S.D.J.<br><br>**FINAL PRE-TRIAL CONFERENCE ORDER**<br><br>**Final Pre-Trial Conference**<br>Date:   January 26, 2009<br>Time:   11:00 a.m.<br>Place:  Courtroom 1<br><br>**Trial**<br>Date:   April 21, 2009<br>Time:   9:30 a.m.<br>Place:  Courtroom 1<br><br>[Complaint filed: October 8, 2004] |
| AND RELATED COUNTERCLAIMS | |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 33

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 84 of 201    Page
Case 2:04-cv-08400-SGL-RZ    Document 478    Filed 03/13/2009    Page 2 of 19
ID #:2226

# **TABLE OF CONTENTS**

1.    Parties ...................................................................................................1

2.    Jurisdiction and Venue .......................................................................1

3.    Estimated Time of Trial .....................................................................2

4.    Non-Jury Trial ....................................................................................2

5.    Admitted Facts ...................................................................................2

6.    Facts Stipulated Without Prejudice to Evidentiary Objections............4

7.    Claims and Defenses ..........................................................................7

    A. Claims To Be Tried .......................................................................7

    B.   Defenses .......................................................................................8

8.    Discovery............................................................................................8

9.    F.R.C.P. 26(a)(3) Disclosures ...........................................................8

10.   Witness Lists ......................................................................................8

11.   Pending Motions.................................................................................9

12.   Bifurcation .......................................................................................16

13.   Conclusion .......................................................................................17

EXHIBIT 33

i

TABLE OF CONTENTS

Following pretrial proceedings and pursuant to Rule 16, F.R.Civ.P. and L.R. 16,

**IT IS ORDERED:**

**1.    THE PARTIES ARE:**

Plaintiff and counterclaim defendant Joanne Siegel, an individual and plaintiff and counterclaim defendant Laura Siegel Larson, an individual (collectively, "Plaintiffs").

Defendant Warner Bros. Entertainment Inc. ("Warner Bros. Entertainment"), a corporation, defendant Time Warner Inc. ("TWI"), a corporation and defendant and counterclaimant DC Comics, a general partnership (collectively, "Defendants").

Each of these parties has been served and has appeared. All other parties named in the pleadings and not identified in the preceding paragraph are now dismissed.

The pleadings which raise the issues are:

        A.    Plaintiffs' Second Amended Complaint;

        B.    Defendants' Answer and Affirmative Defenses to Plaintiffs' Second Amended Complaint; and Defendants' Counterclaims against Plaintiffs.

**2.    FEDERAL JURISDICTION AND VENUE ARE INVOKED UPON THE FOLLOWING GROUNDS:**

This is a civil action seeking declaratory relief, accounting for profits and related claims arising out of Plaintiffs' termination notices of prior grants of copyright pursuant to the United States Copyright Act of 1976, 17 U.S.C. § 304(c). The Court has subject matter jurisdiction over the claims set forth in Plaintiffs' Second Amended Complaint pursuant to the United States Copyright Act (hereinafter, the "Copyright Act"), 17 U.S.C. § 101 et al. and 28 U.S.C. §§ 1331, 1332, 1338(a) and (b). This Court has supplemental jurisdiction over the related state claims herein under 18 U.S.C. § 1367 in that these claims form part of the same case and controversy as the federal claims herein. This Court has personal jurisdiction

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 86 of 201    Page
Case 2:04-cv-08400-SGL-RZ    Document 478    Filed 03/13/2009    Page 4 of 19    Page
ID #:2228

over the Defendants in that Defendants are regularly doing business in the State of
California and in this District, and because a substantial part of the relevant acts
complained of herein occurred in the State of California and this District.  Venue is
proper in the United States District Court for the Central District of California
pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a) because a substantial part of the
relevant acts that give rise to the claims herein below occurred in this district and
because Warner Bros. Entertainment Inc. has its principal place of business in this
district.  The facts requisite to federal jurisdiction are admitted.

### 3.   ESTIMATED TIME OF TRIAL

Plaintiffs estimate seven (7) trial days.

Defendants estimate four (4) trial days, if their motions in limine are granted.

After further consideration of the amended witness lists, and notwithstanding
the Court's earlier direction, the Court has determined that each side will be allotted
no more than 18 hours for their respective cases-in-chief.

### 4.   THE TRIAL IS TO BE A NON-JURY TRIAL

At least fourteen (14) days prior to the trial date each party shall lodge and
serve by e-mail, fax, or personal delivery the findings of fact and conclusions of law
the party expects the Court to make upon proof at the time of trial as required by L.R.
52-1 and this Court.   Notwithstanding the Court's earlier directions, no responses to
the findings of fact and conclusions of law lodged by the other side are required at
this time.

### 5.   THE FOLLOWING FACTS ARE ADMITTED AND REQUIRE NO PROOF:

1.     DC Comics is in the business of creating, publishing, and licensing
comic book stories and characters.

2.     The November 6, 1999, Superman Film Option/Purchase agreement
(Bates numbered WB004199-4231) between DC Comics and Time Warner

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 87 of 201   Page
Case 2:04-cv-08400-SGL-RZ   Document 478   Filed 03/13/2009   Page 5 of 19
ID #:2229

Entertainment Company, L.P. ("TWEC") was fully executed on May 9, 2002.

3.     The December 5, 2000, Smallville Television Agreement (Bates numbered WB0135031-135051) between DC Comics and TWEC was fully executed on February 12, 2001.

4.     The December 5, 2000, Smallville Television Agreement between DC Comics and TWEC was amended by a written instrument dated September 5, 2002.

5.     The Batman Option Purchase Agreement dated as of May 31, 2002, (Bates numbered WB004083-4120) between DC Comics and TWEC was fully executed on February 3, 2004.

6.     Paul Levitz is the President and Publisher of DC Comics.

7.     Paul Levitz negotiated on behalf of DC Comics certain financial terms of the Superman Option/Purchase agreement between DC Comics and TWEC dated as of November 6, 1999, regarding Superman motion picture and other audiovisual rights (the "Superman Film Agreement").

8.     Paul Levitz negotiated, on behalf of DC Comics, certain financial terms of the Smallville Television Agreement between DC Comics and TWEC dated as of December 5, 2000, regarding Superman television rights (the "Superman Television Agreement.")

9.     Paul Levitz negotiated on behalf of DC Comics certain financial terms of the September 5, 2002, Amendment to the Superman Television Agreement.

10.     The Superman Film Agreement applies to the 2006 feature motion picture entitled *Superman Returns*.

11.     On or about May 22, 2002, Warner Bros. paid DC Comics the $1,500,000 option fee pursuant to Paragraph 1(a) of the Superman Film Agreement.

12.     The Superman Television Agreement, as amended September 5, 2002, applies to the *Smallville* television series.

13.     The agreement dated June 15, 1987, between DC Comics Inc. and Cantharus Productions N.V. (Bates numbered WB016531-16549), applies to the

3
FINAL PRE-TRIAL CONFERENCE ORDER

EXHIBIT 33
Page 833

Case 2:10-cv-03633-ODW-RZ Document 42-10 Filed 08/30/10 Page 88 of 201 Page
Case 2:04-cv-08400-SGL-RZ Document 478 Filed 03/13/2009 Page 6 of 19 Page
ID #:2230

1   television series entitled *Superboy* (a.k.a *The Adventures of Superboy*) (1988-1992).

2        14.    The agreement dated September 21, 1995, between DC Comics Inc. and

3   Warner Bros. Animation (Bates numbered WB019605-19618) applies to the

4   animated television series entitled *Superman* (also known as *Superman: The*

5   *Animated Series*) (1996-2000).

6        15.    The agreement dated January 1, 2000, between DC Comics Inc. and

7   Warner Bros. Television Animation (Bates numbered WB019503-19526) applies to

8   the animated television series entitled *Justice League* (2001-2004).

9        16.    The agreement dated January 1, 2004, between DC Comics and Warner

10   Bros. Animation Inc. (Bates numbered WB019544-19566) applies to the animated

11   television series entitled *Krypto* (2005-2006).

12        17.    The unexecuted draft agreement dated June 1, 2004, between DC

13   Comics and Warner Bros. Animation Inc. (Bates numbered WB019575-19601)

14   applies to the animated television series entitled *Legion of Super Heroes* (2006-2008).

15

16       **6.**     **THE FOLLOWING FACTS, THOUGH STIPULATED, SHALL BE WITHOUT PREJUDICE TO ANY EVIDENTIARY OBJECTION:**

17

18        18.    National Periodical Publications, Inc. ("National") is the successor in

19   interest to Detective Comics, Inc.

20        19.    In 1976, National's name was changed to DC Comics, Inc.

21        20.    In 1993, DC Comics, Inc. was dissolved and converted to a New York

22   general partnership.

23        21.    DC Comics has remained a New York general partnership from 1993

24   until the present.

25        22.    From 1993 until March 2003, the partners in DC Comics were WCI and

26   Time Warner Entertainment Company, L.P. ("TWEC").

27        23.    In 1992 Historic Time Warner Inc. formed TWEC with certain of its

28   affiliates, and third party investors. The affiliated entities contributed various cable,

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 89 of 201    Page
Case 2:04-cv-08400-SGL-RZ    Document 478    Filed 03/13/2009    Page 7 of 19
ID #:2231

filmed entertainment and network programming assets to the TWEC partnership,
while the non-affiliated parties made substantial capital contributions in exchange for
limited partnership interests.

24.     Between 1993 and 2003 Historic Time Warner Inc. and its affiliated
partners owned between approximately 70% and 75% of TWEC.  During this time
TWEC held various cable, entertainment and network programming assets, including
Warner Bros., Warner Bros. Television Production, HBO and Time Warner Cable, all
of which were separate divisions of TWEC.

25.     In March 2003, Time Warner Inc. ("TWI") completed a restructuring of
TWEC.  As a result of this restructuring, TWI acquired complete indirect ownership
of TWEC's filmed entertainment and network programming assets, including Warner
Bros., Warner Bros. Television Production, and certain other former divisions of
TWEC.

26.     EC is a direct wholly owned subsidiary of WCI.

27.     WCI is an indirect subsidiary of TWI.

28.     Warner Bros. Entertainment is a direct wholly owned subsidiary of WCI.

29.     In connection with the restructuring of TWEC, WCI contributed its 50%
interest in DC Comics to EC and TWEC distributed the assets of its content
businesses (i.e. the filmed entertainment and network programming assets), including
its partnership interest in DC Comics, to WCI.

30.     The partners in DC Comics are EC and WCI, each holding a one-half
interest in the partnership.

31.     The 2003 TWEC restructuring resulted in the formation of a number of
new corporations to hold and operate the content businesses formerly owned by
TWEC. These newly formed corporations included Warner Bros. Entertainment,
which succeeded to TWEC's filmed entertainment businesses.

32.     Warner Bros. Entertainment is wholly owned by WCI, which is
indirectly owned by TWI.

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 90 of 201    Page
Case 2:04-cv-08400-SGL-RZ    Document 478    Filed 03/13/2009    Page 8 of 19
ID #:2232

33. Both DC Comics and Warner Bros. Entertainment are affiliates of TWI.

34. For financial reporting purposes, DC Comics and WBEI fall within the "filmed entertainment" group of TWI companies - which also includes New Line Cinema Corporation and Castle Rock Entertainment - and for operating management purposes DC Comics reports to its ultimate corporate parent through Warner Bros. Entertainment.

35. Because of that financial reporting structure, DC Comic's President and Publisher reports to and obtains approvals from Warner Bros. Entertainment's President and Chief Operating Officer before making significant acquisitions or certain financial decisions or investments that are outside the scope of DC Comic's customary acquisitions and investments; before implementing meaningful strategic changes; and before embarking on something substantially outside DC Comic's normal course of business.

36. Warner Bros. began developing a Superman theatrical motion picture entitled "Superman Reborn" in 1994.

37. The feature film "Batman" was theatrically released in the United States on June 23, 1989.

38. The feature film "Batman Returns" was theatrically released in the United States on June 19, 1992.

39. The feature film "Batman Forever" was theatrically released in the United States on June 16, 1995.

40. The feature film "Batman & Robin" was theatrically released in the United States on June 20, 1997.

41. The feature film "The Matrix" was theatrically released in the United States on March 31, 1999.

42. The feature film "Harry Potter and The Sorcerer's Stone" was theatrically released on November 16, 2001.

43. The feature film "Lord of the Rings: Fellowship of the Ring" was

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 91 of 201   Page
ID #:2233
Case 2:04-cv-08400-SGL-RZ   Document 478   Filed 03/13/2009   Page 9 of 19

1   theatrically released on December 19, 2001.

2       44.    The feature film "Harry Potter and the Chamber of Secrets" was

3   theatrically released on November 15, 2002.

4       45.    The feature film "Lord of The Rings: The Two Towers" was theatrically

5   released on December 18, 2002.

6       46.    The feature film "The Matrix Reloaded" was theatrically released in the

7   United States on May 15, 2003.

8       47.    The feature film "The Matrix Revolutions" was theatrically released in

9   the United States on November 5, 2003.

10      48.    The feature film "Lord of the Rings: The Return of the King" was

11  theatrically released on December 17, 2003.

12      49.    The feature film "Harry Potter and the Prisoner of Azkaban" was

13  theatrically released on June 4, 2004.

14      50.    The feature film "Batman Begins" was theatrically released on June 15,

15  2005.

16      51.    The feature film "Harry Potter and the Goblet of Fire" was theatrically

17  released on November 18, 2005.

18      52.    The feature film "The Dark Knight" was theatrically released in the

19  United States on July 18, 2008.

20

21      **7.    CLAIMS AND DEFENSES TO BE PRESENTED AT TRIAL:**

22

23      **A.    <u>Claims To Be Tried</u>**

24

25      Given the nature and the characterization of the property in question, the trial

26  shall determine whether the value of the various Superman option and assignment

27  agreements between DC Comics and TWEC, Warner Bros. Entertainment's

28  predecessor in interest, and the amounts paid to DC Comics by TWEC (and its

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 92 of 201    Page
ID #:2234
Case 2:04-cv-08400-SGL-RZ    Document 428    Filed 03/13/2009    Page 10 of 19

1    successor Warner Bros. Entertainment) thereunder, reflect the fair market value of the

2    nonexclusive rights that the Court has determined were transferred from DC Comics

3    to TWEC (and its successor Warner Bros. Entertainment), and, if not, what

4    accounting shall be required of Warner Bros. Entertainment to ensure an equitable

5    result.

6        The Court's reference to "nonexclusive rights" reflects the Court's finding that,

7    notwithstanding DC Comics' attempt to confer what DC Comics characterized as all

8    of the exclusive rights to Superman, the Court has found, for the reasons set forth in

9    detail in its Order dated March 26, 2008, that those rights were, in fact, nonexclusive

10    rights, as further explained below in the Court's ruling on Plaintiffs' Motion in

11    Limine No. 1.

12        In light of the above, Plaintiffs' motion for clarification and their ex parte

13    application for clarification are **DENIED**.

14

---

15      [1]      Even if the factual premise were correct (and it is not), plaintiffs' legal

16 argument that a co-owner can exclusively assign away all or part of its interest in the

17 copyright in question (the co-owner's share, not the entirety of the copyright itself

owned by both co-owners) without the consent of the other co-owner is a matter of

18 much debate, compare Gardner v. Nike, 279 F.3d 774 (9th Cir. 2002) and Sybersound

19 Records, Inc. v. UAV Corp., 517 F.3d 1137 (9th Cir. 2008)  with 2 PATRY ON

COPYRIGHT § 5:103 (2008) (criticizing Ninth Circuit's decisions as leading to the

20 creation of "a copyright Minotaur: part 1909 Act and part 1976 Act" and under the

21 1976 Act Congress "intended that co-owners be able to . . . transfer their proportional

share in the whole without the other's permission, in which case the transferee would

22 indeed stand in the shoes of the transferor").  The Court need not wade into that legal

23 morass as the facts here establish that, unlike the circumstances in the decisions and

treatise cited, in the option and assignment agreements defendant DC Comics held

24 itself out as the sole owner to the entirety of the Superman copyright, and then

25 attempted to exclusively assign all, not just its one-half co-owner proportional share,

of that right to Warner Bros. Entertainment.  Given that there was no intent to simply

26 assign its proportional co-ownership interest (rather than the entirety of the

27 copyright's audiovisual rights itself), the options and assignments are judged based

on that reality, that is, what DC Comics was seeking to transfer, and not on what it

28 could have (if it wished) transferred.

EXHIBIT 33
Page 838

Case 2:10-cv-03633-ODW-RZ Document 42-178 Filed 08/30/2009 Page 22 of 120 Page
ID #:2235
Case 2:04-cv-08400-SGL-RZ Document 478 Filed 03/13/2009 Page 9 of 119 Page

**B.** **Defenses**

Defendants will not be asserting any affirmative defenses or counterclaims in this phase of the trial.

## 8.   DISCOVERY

Discovery is complete.

Defendants' motion to reopen discovery filed March 2, 2009 is **DENIED**.

## 9.   ALL DISCLOSURES UNDER FED.R.CIV.P. 26(A)(3) HAVE BEEN MADE

The joint exhibit list of the parties has been filed under separate cover as required by L.R. 16-6-1.  Unless all parties agree that an exhibit shall be withdrawn, all exhibits will be admitted without objection at trial, except those exhibits objected to in the parties' Joint Exhibit Stipulation filed concurrently herewith.

## 10.   WITNESS LISTS OF THE PARTIES HAVE BEEN FILED WITH THE COURT

Only the witnesses identified in the parties' joint witness list (as amended) will be permitted to testify (other than solely for impeachment).

Neither party is intending to present evidence by way of deposition testimony (other than for cross-examination or impeachment).

## 11.   THE FOLLOWING LAW AND MOTION MATTERS AND MOTIONS *IN LIMINE*, AND NO OTHERS, HAVE BEEN SUBMITTED, HEARD, AND DECIDED BY THE COURT, AS FOLLOWS:

**Plaintiffs' Motions in Limine**

A.   Motion in Limine No. 1

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 94 of 201   Page
Case 2:04-cv-08400-SGL-RZ   Document 478   Filed 03/13/2009   Page 12 of 19
ID #:2238

Plaintiffs have moved in their first motion in limine to preclude Defendants from introducing evidence that Warner Bros. Entertainment purportedly paid DC Comics "fair market value" for Warner Bros. Entertainment's purchase of DC Comics's Superman "audiovisual," motion picture, and television rights, on the basis that such evidence is moot and irrelevant with respect to such Superman copyright interests that are now *co-owned* by Warner Bros. Entertainment and Plaintiffs, not DC Comics and Plaintiffs.

Plaintiffs' Motion in Limine No. 1 is **DENIED**.  The factual basis underlying the motion is the contention that, in licensing the Superman copyright's audiovisual rights to defendant Warner Bros. Entertainment, defendant DC Comics purported to convey "DC's entire proportional copyright interest in the Superman audiovisual rights . . . and the fact that such transfer was exclusive as to DC."  (Pls' Mot. Limine # 1 at 2 (emphasis in original)).   Plaintiffs then argue that, in such a situation, certain authorities have held that the consent of the co-owner to the copyright is not needed to render the transfer effective, which would thereby lead to the transferee effectively stepping into the shoes of the transferor.[1]  The factual premise for this argument, however, is mistaken, a result which creates a legally material difference in whether DC Comics remained (or whether Warner Bros Entertainment possibly stepped into the shoes) as a co-owner with plaintiffs to the Superman audiovisual rights at stake in this case.

Case 2:10-cv-03633-ODW-RZ    Document 42-19    Filed 08/30/10    Page 95 of 201   Page
ID #:2237
Case 2:04-cv-08400-SGL-RZ    Document 478    Filed 03/13/2009    Page 13 of 19

As the Court noted in its March 26, 2008, Order, in the option and assignment agreements, DC Comics held itself out as being the only owner to the entirety of the Superman copyright (not as a co-owner to a jointly owned work), and then sought to exclusively transfer all of a portion of that entire copyright (the audiovisual rights) to Warner Bros. Entertainment.  See Siegel v. Warner Bros. Entertainment Inc., 542 F.Supp.2d 1098, 1143 (C.D. Cal. 2008) ("DC Comics unilaterally sought to give an exclusive license to the entirety in the Superman property's movie and television rights to WBEI post-termination"); see also Decl. Marc Toberoff in Opp. to Defs' Mot. Partial Summ. J., Ex. E at 65 ("DC hereby represents and warrants that (a) DC is the sole proprietor of all rights in the Property" (emphasis added)) & Ex. F at 94 ("Assignor represents and warrants that Assignor is the sole author and owner of the work, and of all rights herein granted and assigned" (emphasis added)).

In such a situation, the authorities provide that, should it be determined that the transferor was in fact a co-owner of the copyright so-conveyed, then the attempt to exclusively convey the entirety of the copyright (or one or more of its divisible parts) to a third party would be ineffective absent the consent of the co-owner of that copyright; instead, what would have been conveyed was, at best, a non-exclusive license leaving the transferor (here DC Comics) as a co-owner of the copyright (or portion thereof) in place.  See id. at 1143-44 (quoting 2 PATRY ON COPYRIGHT § 5:7 ("A joint author (or co-owner) may not, however, transfer all interest in the work without the other co-owner's express (and written) authorization, since that would

Case 2:10-cv-03633-ODW-RZ   Document 42-19   Filed 08/30/10   Page 96 of 201   Page
Case 2:04-cv-08400-SGL-RZ   Document 428   Filed 03/13/2009   Page 14 of 19   Page
ID #:2238

1   result in an involuntary transfer of the other joint owner's undivided interest in the

2   whole") and citing 3 NIMMER ON COPYRIGHT § 10.03[A][7] at 10-51).

3          The Court itself recognized in the March 26, 2008, Order that the

4

5   circumstances could be different if DC Comics had attempted simply to convey only

6   its one-half co-ownership interest in the copyright to Warner Bros.. Id. at 1143 ("The

7
    same requirement for prior consent holds true even with respect to the wholesale
8

9   transfer of exclusive licenses in subparts to a copyright, such as a license transferring

10  all the stage rights (not just the joint owner's rights) to a novel but not the movie or

11
    literary rights" (emphasis added)).  However, that is not what occurred; therefore,
12

13  plaintiffs' argument regarding that possibility is factually inapposite.  (See also Defs'

14  Opp. to Pls' Mot Limine No. 1 at 5 ("this authority [cited to by plaintiffs] addresses

15
    the situation where a joint owner transfers just his own . . . interest in a copyright, not
16

17  where he purports to transfer the entirety of exclusive rights [owned and shared by

18  the copyright's co-owners] under that copyright")).

19

20

21          B.      Motion in Limine No. 2

22          Plaintiffs have moved in their second motion in limine to preclude Defendants'

23  experts, William Immerman and Richard Marks, from testifying on the grounds that,

24  with regard to the issues to be tried on April 21, 2009, the mere conclusory opinions

25  expressed in their expert reports and deposition testimony are not supported by

26  sufficient facts or data and/or by any reliable or even discernable methodology.

27          For the reasons set forth on the record, plaintiffs' Motion in Limine No. 2 is

28  **DENIED** without prejudice to plaintiffs' being able to voire dire defendants' experts

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 97 of 201    Page
ID #:2239
Case 2:04-cv-08400-SGL-RZ    Document 478    Filed 03/13/2009    Page 15 of 19

1   Willim Immerman and Richard Marks at trial.  Defendants should remain mindful

2   that the expert opinions of Mr. Immerman and Mr. Marks, and the basis for said

3   opinions, are limited to what is contained in their expert reports.

4              C.     Motion in Limine No. 3

5

6        Plaintiffs have moved in their third motion in limine to preclude Defendants

7   from introducing into evidence documents and agreements produced for the first time

8   at the parties' L.R. 16-2 Meeting of Counsel because Defendants failed to comply

9   with their discovery obligations pursuant to Fed. R. Civ. P. 26.  Defendants were

10  required to supplement their Rule 26(a) disclosures as well as their document

11  production by November 21, 2008 pursuant to written agreement of the parties, but

12  willfully failed to do so.  Plaintiffs have also moved (a) to preclude Defendants'

13  percipient witnesses from testifying regarding agreements they did not negotiate,

14  draft and/or directly participate in and which were not produced prior to the agreed

15  November 21, 2008 deadline; and (b) to preclude Defendants' non-expert witnesses

16  from offering lay opinions about the purported "fairness" of the Superman

17  agreements between DC Comics and Warner Bros. Entertainment.

18

19       For the reasons set forth on the record and subject to the conditions set forth in

20  the Court's ruling on Defendants' Motion in Limine No. 4, plaintiffs' Motion in

21  Limine No. 3 is **DENIED** as it relates to the 23 agreements described in the papers

22

23  and discussed at the hearing.  Insofar as the other evidentiary objections raised in

24  plaintiffs' Motion in Limine No. 3 are concerned, it is **DENIED** without prejudice to

25  plaintiffs' being able to raise said objections  to the evidence as it is sought to be

26  introduced during trial (the propriety of said objection dependent upon the same

27

28  having been vocalized during the trial itself or the objection is deemed waived).  The

1  party seeking admission of the evidence shall bear the initial burden of production

2  demonstrating that said evidence satisfies the particular objection being raised (be it

3  improper disclosure, untimely production, etc.,) upon which the burden then shifts to

4

5  the objecting party to demonstrate that is not the case.

6

    D.    Motion in Limine No. 4

7

8    Plaintiffs have moved in their fourth motion in limine to preclude Defendants

9  from introducing irrelevant, prejudicial and/or inadmissible documents at trial,

10 including evidence of agreements regarding intellectual properties that were not of

11

12 Superman's stature as a longstanding "franchise" property at the time the agreements

13 were entered into.

14

    For the reasons set forth on the record, plaintiffs' Motion in Limine No. 4 is

15

16 **DENIED**.

17 **Defendants' Motions in Limine**

18
    A.    Motion in Limine No. 1
19

20   Defendants' first motion in limine is to limit the scope of the trial, and the

21 evidence introduced, to the issue of whether and to what extent any relevant

22
    agreement between DC Comics and Warner Bros. Entertainment constitutes a
23

24 "sweetheart deal" such that DC Comics received less than fair market value for the

25 license, and to exclude any evidence related to the traditional alter ego elements or

26
    any other matters
27

28

Case 2:10-cv-03633-ODW-RZ   Document 42-10   Filed 08/30/10   Page 99 of 201   Page
Case 2:04-cv-08400-SGL-RZ   Document 478   Filed 03/13/2009   Page 17 of 19   Page
ID #:2241

In light of the Court's articulation both on the record and of this Order setting forth the issue to be tried during this phase of the case, and the discussion during the hearing on the permissible scope of what is relevant evidence related thereto, defendants' Motion in Limine No. 1 is **GRANTED**.

    B.    Motion in Limine No. 2

Defendants' second motion in limine is to exclude the testimony of certain witnesses, including senior corporate officers of Defendants (*i.e.* "apex" witnesses), none of whom were identified in Plaintiffs' Rule 26 disclosures or were deposed; and certain of Plaintiffs' "expert" witnesses who have no expertise on the issues to be tried in this phase of the trial.

After considering the arguments of counsel as well as the parties' amended witness lists submitted pursuant to the Court's January 26, 2009, minute order, the Court **DENIES** the motion with respect to Alan Horn.  The motion is **GRANTED** with respect to any apex witness not listed on plaintiffs' amended witness list.

    C.    Motion in Limine No. 3

Defendants' third motion in limine is to exclude a number of Plaintiffs' proposed exhibits as being irrelevant to the issues to be tried in this phase of the trial.

In light of the Court's articulation both on the record and in section 7 of this Order setting forth the issue to be tried during this phase of the case, and the discussion during the hearing on the permissible scope of what is relevant evidence related thereto, defendants' Motion in Limine No. 3 is **DENIED**.  Again such denial is without prejudice to defendants' being able to raise said objections to the evidence during the course of trial.

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 100 of 201
Case 2:04-cv-08400-SGL-RZ    Document 478    Filed 03/13/2009    Page 18 of 19
Page ID #:2242

D.    Motion in Limine No. 4

Defendants' fourth motion in limine is to exclude any of Plaintiffs' exhibits first identified and produced after the exchange of the parties' Rule 16 exhibit lists on December 3, 2008, and any documents obtained by Plaintiffs through improper document subpoenas served on third parties on December 22 and 23, 2008, in violation of the discovery cut off, and over two years after discovery closed.

For the reasons set forth on the record, defendants' Motion in Limine No. 4 is **DENIED** subject to this proviso: Plaintiffs are permitted to introduce the trial testimony and documents sought in the listed sixteen third-party subpoenas, but only during their rebuttal case and only if defendants introduce in their case in chief the 23 licensing agreements referenced in Plaintiffs' Motion in Limine No. 4.

## 12.    BIFURCATION OF THE FOLLOWING ISSUES FOR TRIAL IS ORDERED:

Pursuant to the Court's March 26, 2008, order granting in part and denying in part the parties' respective motions for partial summary judgment, the Court reserved for trial Plaintiffs' "accounting" claims arising out of their termination of certain rights under copyright in literary work(s) including Superman pursuant to 17 U.S.C. 304(c), including Plaintiffs' claim that Warner Bros. Entertainment's profits from the exploitation of certain Superman copyright interests should be included in this calculation. On October 6, 2008, the Court bifurcated these claims, with the determination of whether Plaintiffs are entitled to share in Warner Bros. Entertainment's profits to be tried first on January 20, 2009. The remaining accounting issues are set to be tried on March 24, 2009. On December 18, 2008, the Court continued the first trial until February 3, 2009 and kept the second trial on its originally scheduled date of March 24, 2009. Thereafter, the Court on January 26, 2009, continued the first trial to April 21, 2009, and continued the second trial to June 9, 2009.

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 101 of 301
Case 2:04-cv-08400-SGL-RZ    Document 478    Filed 03/13/2009    Page 19 of 19
Page ID #:2243

## 13.  CONCLUSION

The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues remaining to be litigated, this Final Pretrial Conference Order shall supersede the relevant pleadings relevant to the first phase of trial on April 21, 2009 and govern the course of such trial, unless modified to prevent manifest injustice.

Dated: March 13, 2009

UNITED STATES DISTRICT COURT JUDGE

EXHIBIT 34

Print Post - Deadline.com



# Warner Bros/DC Comics Sues 'Superman' Copyright Lawyer; Marc Toberoff Response

By Nikki Finke Friday May 14, 2010 @ 12:45pm PST

**BREAKING NEWS! 2ND UPDATE 12:40 PM:** The subject of today's Warner Bros/DC Comics lawsuit, Los Angeles copyright attorney Marc Toberoff, just gave me his response. (*See below*)

Original Post Filed 10:26 AM. Updated Writethru 11:30 AM:



Today there's been a shocking development in the *Superman* copyright litigation. Warner Bros has gone up against and in some situations lost too many such rights cases against its arch-nemesis, lawyer Marc Toberoff. So recently the studio hired Daniel Petrocelli to come up with a new strategy to prevent the studio from possibly losing a portion of the copyright to *Superman* in 2013 as a court has previously ruled, and Petrocelli has obliged. His newest tactic? To get rid of Toberoff entirely. This morning, Warner Bros' new outside counsel is filing has filed a lawsuit in federal court in Los Angeles against Toberoff raising questions about his alleged role as a financial participant in the *Superman* copyright and not as the attorney for the Shuster and Siegel families litigating their *Superman* cases. But the purpose of the lawsuit is obviously to put Toberoff in a position where he might have to resign as the Siegel and Shuster attorney.

It's a hardball and some might say also despicable tactic by Petrocelli and the studio's new general counsel John Rogovin (hiding behind DC Comics), especially because it hinges on documents stolen from Toberoff's office by a Toberoff employee. (I've learned that Warner Bros claims the documents mysteriously "arrived" on its doorstep and that the employee was a lawyer in Toberoff's firm and a "whistleblower". Toberoff has indicated that something much more nefarious may have happened. (*See his response below*.) What's also ironic about Petrocelli's tactic is that, when he defended Disney against the Slesinger family's Winnie The Pooh underpaid royalty claims, he was able to get the entire case thrown out of court by alleging that the Slesinger's were basing some of their documentation on paperwork "stolen" from a dumpster on the Disney lot. Oh, how the worm has tuned. (*Full Disclosure: Petrocelli, on behalf of Disney in the Pooh case, once gave a media interview that defamed me.*)

Here is what Marc Toberoff just told me after he was sued:

"Having substantially lost the *Superman* copyright, Warner Bros and DC Comics and their new counsel Daniel Petrocelli now resort to gutter tactics and personally libel me rather than just litigate the remainder of the case on the merits. Even before filing this lawsuit, Warner Bros launched a well cordinated media campaign to defame me. Warner Brothers and Mr. Petrocelli are well aware that their frivolous allegations in the complaint will never prevail. However, that's not the purpose of the lawsuit against me. The purpose is to defame me or potentially conflict me out of the case and thereby pressure my clients to sell back the *Superman* and *Superboy* copyrights they've recaptured at a distress sales price.

Warner Bros, DC Comics, and Mr. Pertocelli disingenously claim that I have a financial interest in the lawsuits when they know full well that the only interest I have is a contingent legal fee. And the last time I checked, a lawyer working on a contigent fee basis is legal in the State of California. The goal here is to muddy the waters and avoid litigating on the merits. As further proof of that, Warner Brothers, DC Comics, and Mr. Petrocelli attach to their complaint an anonymous letter spewing unsubstantiated and unattributed accusations -- and time will tell whether Warner Bros itself had a hand in that letter. Such unethical thug tactics are nothing short of deplorable. Warner Bros and Mr. Petrocelli should be ashamed of themselves.

In recognition of the inferior bargaining power of authors who seek to have their works published, the termination provisions of the Copyright Act specifically allow authors and their heirs the right to recover their copyrights by terminating, with an emphasis on terminating, prior grants of copyrights. Ridiculously, Warner Brothers/DC Comics is alleging that the exercise of this termination right is the basis for their frivolous claim of tortious interference with an existing contract. The Siegels, Shusters, and I will vigorously defend against these

EXHIBIT 34

Page 848

baseless accusations, and my clients remain undeterred in their efforts to protect their *Superman* and *Superboy* copyrights.

Warner Bros has to be careful, very careful, not to piss off the Superman fans who are steadfastly in the Shuster and Siegal corners. The studio recently put Warner Bros veteran executive Diane Nelson as the head of DC Entertainment Inc, that new company founded to fully realize and integrate the power and value of the DC Comics brand and characters across all media and platforms into Warner Bros Entertainment's content and distribution businesses. Nelson especially was charged with suping up *Superman* again in a way fans like because it's way too valuable a property to leave dormant like this.

Besides, the clock is ticking. Toberoff, who keeps suing Warner Bros on behalf of creative rightsholders, has warned the studio that, in 2013, the Jerome Siegel heirs along with the estate of co-creator Joe Shuster will own a portion of the original copyright to Superman -- "and neither DC Comics nor Warner Bros will be able to exploit any new Superman works without a license from the Siegels and Shusters". He's also pointed out that, if Warner Bros does not start production on a new *Superman* sequel or reboot by 2011, the Siegels could sue to recover their damages on the grounds that the deal should have contained a clause in which the rights returned to the owners after a given time if no film was in development. The heirs of Siegel have already been awarded half the copyright for Superman. And in 2013 the heirs of co-creator Joe Shuster get the remaining half. After that, neither DC Comics nor Warner Bros will be able to use Superman without a financial agreement with the heirs. There are also stipulations on what parts of the origins story can be used in future Superman movies and which require re-negotiations with the creators' heirs or estates.

Today's lawsuit alleges these talking points:

-- DC Comics filed suit today in the federal court in Los Angeles to protect its longstanding rights in the Superman franchise. During the past 70 years, DC and Warner Bros. have brought together many of the finest writers, artists, television producers and filmmakers to continue to popularize Superman, chronicle his new adventures in all media, and maintain him as one of the world's best-loved characters. The untold millions invested in the property by DC has resulted in an unbroken 70-year history of consistent success with Superman, equaled by no other fictional hero.

-- During their lifetimes, Superman co-creators Jerome Siegel and Joe Shuster never tried to exercise any right to terminate and recapture DC's copyrights to Superman. They worked constructively with DC to arrive at mutually beneficial agreements, and after their deaths, so did their families. These agreements provided both co-creators and their families lifetime compensation and assured DC's ability to continue developing and exploiting the Superman property in movies, television, and other media.

-- The lawsuit alleges that changed when Los Angeles-based Marc Toberoff and companies under his control learned of WB's agreements with the families and sought to gain control of DC's Superman rights. As alleged in the lawsuit, Toberoff caused the Shuster and Siegel families to repudiate their agreements and relations with DC, enter into a web of new agreements with his companies, and terminate and seek to recapture DC's Superman copyright interests. The complaint alleges this was done to position Toberoff and his companies to secure a controlling financial interest in the families' collective claims — leaving him as the largest financial stakeholder (47.5%), while relegating the Siegel heirs (27.5%) and Shuster heirs (25%) to minority status.

-- At issue is the future generation of Superman movies, television programs, and comics would be placed at risk. The lawsuit asks the Court to confirm DC's ownership of Superman rights, put an end to Toberoff's activity allegedly interfering with the rights, and clear the way for all new Superman productions in the future. DC claims it filed this lawsuit only after exhaustive attempts to resolve these matters failed.

This article was printed from http://www.deadline.com/2010/05/shocker-warner-bros-now-suing-superman-rights-lawyer/

EXHIBIT 34

Page 849

EXHIBIT 35

**K** Kendall Brill Klieger

writer's direct:
310.272.7900 telephone
310.272.7936 facsimile
rkendall@kbkfirm.com

July 16, 2010

**VIA EMAIL**

Daniel Petrocelli
O'Melveny & Myers  LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
*dpetrocelli@omm.com*

Re:    DC Comics v. Pacific Pictures Corp., et al., Central District of California, Case No. 10-
CV-03633 ODW

Dear Dan:

Pursuant to Local Rule 37-1, I am writing to request that we meet and confer regarding an issue
that we discussed during our meeting on July 13, 2010 regarding the permissible scope of
discovery in this matter.

In that meeting, you informed us that Plaintiff DC Comics ("DC") intends to notice the
depositions of Joanne Siegel, Jean Peavy, and Mark Warren Peary, and that during the
depositions of those individuals, DC intends to ask questions related to the so-called "Toberoff
Timeline," which is attached as Exhibit A to DC's Complaint in this action.  As we explained in
the meeting, the disclosure of that document to DC is a matter of ongoing dispute in the *Siegel*
litigation, which your firm is also handling, and orders relating to such disclosure will be the
subject of appeal in that case.  It is appropriate for a protective order to enter in this case in order
for such appellate review to be effective, and to prevent irreversible prejudice in the meantime.

The protective order defendants will seek will bar any use of the Toberoff Timeline in this
litigation or at a minimum bar such use until after the Ninth Circuit has ruled on these issues.

Defendants' position is founded on the substantial possibility that the disclosure orders will be
reversed.  For example, Magistrate Judge Zarefsky did not address the Toberoff Timeline in his
ruling, and therefore the law of the case doctrine could not require its disclosure.  *See, e.g.,*
*Hegler v. Borg*, 50 F.3d 1472, 1475 (9th Cir. 1995). *See also United States v. Smith*, 389 F.3d
944, 948-950 (9th Cir. 2004).

In light of the very serious ethical breaches surrounding the original unauthorized creation and
disclosure of the Toberoff Timeline, we expect the Ninth Circuit to take these issues seriously.
*See,* e.g., *Resolution Trust Corp. v. Dean*, 813 F. Supp. 1426, 1430 (D. Ariz. 1993) (protecting
stolen documents from disclosure)); *In re Grand Jury Proceedings Involving Berkley & Co.,*
*Inc.*, 466 F. Supp. 863, 869 (D. Minn. 1979) (same).

EXHIBIT 35

July 16, 2010
Page 2

Accordingly, a protective order is appropriate in this case to ensure that the right of appellate review is not rendered meaningless. *See Mohawk Industries, Inc. v. Carpenter*, 130 S.Ct. 599, 608 (2009) (holding that there is no immediate right of appeal under the collateral order doctrine for disclosure orders adverse to the attorney-client privilege, since "[p]ostjudgment appeals, together with other review mechanisms, suffice to protect the rights of litigants," noting that "protective orders are available to limit the spillover effects of disclosing sensitive information").

We are available to meet and confer any afternoon the week of July 19 to address these issues and to determine whether DC is willing to agree to limit the scope of discovery so that a motion for a protective order can be avoided.

Very truly yours,

Laura W. Brill

54811.2

EXHIBIT 35

EXHIBIT 36



# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

July 28, 2010

OUR FILE NUMBER
905,900-321

**VIA E-MAIL AND U.S. MAIL**

WRITER'S DIRECT DIAL
(310) 246-6850

Richard Kendall
Kendall Brill & Klieger LLP
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 2720
Los Angeles, California 90067

Re:    *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Dick and Marc:

I write to follow up on our telephone conversation yesterday with Dick in which Marc did not participate.

As I explained, we do not believe it is appropriate for defendants to file a discovery-related motion in advance of the initial discovery conference required by Federal Rule of Civil Procedure 26(f). Your threatened motion for a protective order regarding use of the Toberoff Timeline is plainly a discovery motion that defendants do not have the right to file without complying with Rule 26(f), which requires the parties to confer on all discovery matters prior to the commencement of discovery proceedings. Rule 26(f) provides that "the parties must confer *as soon as practicable*" on all discovery matters. FED. R. CIV. P. 26(f)(1) (emphasis added). Judge Wright's standard Scheduling Conference Order expressly refers to Rule 26(f) and instructs the parties to "begin to conduct discovery actively before the Scheduling Conference." Standard Scheduling Conference Order at 2 n.1.[1] We first requested a Rule 26(f) conference in my initial telephone conversation with Marc on June 2. Marc said he wanted more time to consider retention of counsel. I obliged. Since then, I have persistently repeated that request,

---

[1] As I noted in my June 7 letter, Judge Wright's standard Scheduling Conference Order is available on the Court's website: http://www.cacd.uscourts.gov/CACD/JudgeReq.nsf/ 2fb080863c88ab47882567c9007fa070/caed4425584c8428882572bf0062cd93?OpenDocument.

EXHIBIT 36

Page 852

O'MELVENY & MYERS LLP
July 28, 2010 - Page 2

including in my two e-mails to Marc on June 2; in my June 7, June 9, and June 29 letters; during our July 13 meet and confer; and in yesterday's call.

To date, you have refused to schedule the Rule 26(f) conference. As I reiterated in our telephone conversation yesterday, your insistence on filing a motion for a protective order separate from and without conducting the Rule 26(f) conference is an inappropriate preemptive tactic. Any such motion should be filed—if at all—as part of and in coordination with the discovery plan and other case management issues to be addressed in the Rule 26(f) conference that we have been requesting for well over a month. As I have advised you in our prior communications, we wish to commence discovery by promptly obtaining certain documents and taking the depositions of Ms. Siegel and Ms. Peavy in light of their advanced age. As you know, Ms. Siegel is 92 and Ms. Peavy is 89. You have asserted various arguments why you might oppose this discovery, including your view that we should be precluded from using the Toberoff Timeline in discovery. The rules require our joint cooperation and efforts in framing and presenting these discovery disputes, and no good reason exists to separate these issues in the manner you have suggested. This letter represents our final request for a Rule 26(f) conference, which we are prepared to conduct immediately. Assuming disputes still remain after our conference, we are likewise prepared to promptly file our motion, together with any you wish to file. This is plainly the correct and efficient way to proceed. If you do not agree to promptly participate in such a Rule 26(f) conference or to otherwise coordinate with us in filing joint motions, then we will seek appropriate relief from the Court, including an order deferring consideration of your threatened motion pending your participation in the Rule 26(f) conference and authorizing the commencement of our discovery notwithstanding your participation in the Rule 26(f) conference.

In our discussion yesterday, you insisted that we confirm in writing the discovery we wish to commence so that you can formulate a final position. Though unnecessary in light of our prior discussions, as promised yesterday and in the interest of moving things forward, we have enclosed the Notices of Deposition and Requests for Production of Documents we intend to serve on Ms. Siegel and Ms. Peavy. We can discuss your final position in our Rule 26 conference, which as I've said, we're prepared to do right away.

Many thanks.

Very truly yours,

Daniel M. Petrocelli
of O'MELVENY & MYERS LLP

Enclosures

EXHIBIT 36

Page 853

1  DANIEL M. PETROCELLI (S.B. #97802)
     dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
     mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
     cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA 90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:  (310) 246-6779

7  (continued on next page)

8  Attorneys for Plaintiff DC Comics

9

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12  DC COMICS,                          Case No. CV-10-3633 ODW (RZx)

13              Plaintiff,              **PLAINTIFF DC COMICS'
                                        NOTICE OF DEPOSITION OF
14       v.                             DEFENDANT JOANNE SIEGEL
                                        AND REQUEST FOR
15  PACIFIC PICTURES                    PRODUCTION OF DOCUMENTS**
    CORPORATION, IP WORLDWIDE,
16  LLC, IPW, LLC, MARC TOBEROFF,       The Hon. Otis D. Wright II
    an individual, MARK WARREN
17  PEARY, as personal representative of Deposition Date:   September 2, 2010
    the ESTATE OF JOSEPH SHUSTER,       Deposition Time:   9:00 a.m.
18  JOANNE SIEGEL, an individual,
    LAURA SIEGEL LARSON, an
19  individual, and DOES 1-10, inclusive,

20              Defendants.

21

22

23

24

25

26

27

28

EXHIBIT 36
Page 854

NOTICE OF DEPOSITION OF DEFENDANT
JOANNE SIEGEL AND REQUEST FOR
PRODUCTION OF DOCUMENTS

1    (continued from previous page)

2    PATRICK T. PERKINS (admitted *pro hac vice*)
       pperkins@ptplaw.com
3    PERKINS LAW OFFICE, P.C.
     1711 Route 9D
4    Cold Spring, NY 10516
     Telephone:  (845) 265-2820
5    Facsimile:   (845) 265-2819

6    Attorneys for Plaintiff DC Comics

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 36

Page 855

NOTICE OF DEPOSITION OF DEFENDANT
JOANNE SIEGEL AND REQUEST FOR
PRODUCTION OF DOCUMENTS

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure 30, the deposition upon oral examination of defendant Joanne Siegel (the "Deponent") will be taken in the above-entitled action on September 2, 2010 starting at 9:00 a.m. and continuing over the course of one day until completed or otherwise adjourned.  The deposition will be held at the offices of O'Melveny & Myers LLP, 1999 Avenue of the Stars, Suite 700, Los Angeles, California 90067. The deposition will be taken before a notary public or other officer authorized to administer oaths and will be recorded by stenographic, sound, and visual means.

PLEASE TAKE FURTHER NOTICE that, pursuant to Federal Rule of Civil Procedure 34, Deponent is requested to produce for inspection and copying all documents described in Attachment A to this Notice of Deposition, in accordance with the definitions contained therein, by no later than August 27, 2010.

This Notice of Deposition is being served on Deponent's counsel at the address shown on the accompanying Proof of Service.

Dated:  July 28, 2010

Respectfully submitted,

O'MELVENY & MYERS LLP

By:_____
Daniel M. Petrocelli

Attorneys for Plaintiff DC Comics

NOTICE OF DEPOSITION OF DEFENDANT
JOANNE SIEGEL AND REQUEST FOR
PRODUCTION OF DOCUMENTS

EXHIBIT 36

## ATTACHMENT A
## DEFINITIONS AND INSTRUCTIONS

1.     "DOCUMENT" shall be interpreted in its broadest sense to include any and all "documents" and "other tangible things" as those terms are understood in Federal Rule of Civil Procedure 34, including, without limitation, any "writing," "recording," or "photograph" as those terms are defined in Federal Rule of Evidence 1001.  This shall include, but is not limited to:  e-mail, audio or video recordings, correspondence, letters, phone messages, notes, memoranda, facsimiles, publications, contracts, agreements, calendars, drafts of proposed contracts or agreements, papers, and photographs.

2.     "COMMUNICATION" means all written, electronic, oral, telephonic, gesture, or other transmission or exchange of information, including without limitation any inquiry, request, dialogue, discussion, conversation, interview, correspondence, letter, note, consultation, negotiation, agreement, understanding, meeting, e-mail, and all DOCUMENTS evidencing any verbal or nonverbal interaction between any individuals or entities.

3.     "REFER" or "RELATE" means, without limitation, evidence, reflect, summarize, constitute, contain, study, analyze, explain, mention, show, discuss, describe, or comment upon.

4.     "PERSON" means any natural person, firm, association, corporation, partnership, or other legal entity or organization separately identifiable, and any department(s) or division(s) therein.

5.     "YOU" or "YOUR" means Joanne Siegel and, as applicable, any PERSON acting on her behalf, including but not limited to her agents, employees, attorneys, and representatives.

6.     "DEFENDANT" or "DEFENDANTS" means, collectively and severally, any defendant in the above-entitled action, including YOU; Pacific Pictures Corporation; IP Worldwide, LLC; IPW, LLC; Marc Toberoff; Mark

1    Warren Peary, on behalf of the Estate of Joseph Shuster; and Laura Siegel Larson

2    and, as applicable, any PERSON acting on their behalf, including but not limited

3    to their agents, employees, attorneys, and representatives.

4        7.    "SIEGEL HEIRS" means, collectively and severally, YOU, Laura

5    Siegel Larson, Dennis Larson, Michael Siegel, or any other executor,

6    administrator, heir, relative, or representative of Jerome Siegel and, as applicable,

7    any PERSON acting on their behalf, including but not limited to their agents,

8    employees, attorneys, and representatives.

9        8.    "SHUSTER HEIRS" means, collectively and severally, the Estate of

10   Joseph Shuster, Jean Peavy, Mark Peary, Dawn Peavy, Frank Shuster, or any

11   other executor, administrator, heir, relative, or representative of Joseph Shuster

12   and, as applicable, any PERSON acting on their behalf, including but not limited

13   to their agents, employees, attorneys, and representatives.

14       9.    "SIEGEL" means Jerome Siegel and, as applicable, any PERSON

15   acting on his behalf, including but not limited to his agents, employees, attorneys,

16   heirs, and representatives.

17       10.    "SHUSTER" means Joseph Shuster and, as applicable, any PERSON

18   acting on his behalf, including but not limited to his agents, employees, attorneys,

19   heirs, and representatives.

20       11.    "SUPERMAN" means the Superman character as delineated in

21   literary works such as comic books, newspapers, novels, radio programs,

22   television programs, and motion pictures, and any of the works in which he

23   appears, including but not limited to *Action Comics. No. 1.*

24       12.    "SUPERBOY" means the Superboy character as delineated in

25   literary works such as comic books, newspapers, novels, radio programs,

26   television programs, and motion pictures, and any of the works in which he

27   appears, including but not limited to *More Fun Comics #101.*

28       13.    "INCLUDING" means "including, but not limited to."

NOTICE OF DEPOSITION OF DEFENDANT
JOANNE SIEGEL AND REQUEST FOR
PRODUCTION OF DOCUMENTS

EXHIBIT 36[3]
Page 858

1    14.    "Any" and "All" are interchangeable.

2    15.    The singular form includes the plural form, and vice versa.

3    16.    YOU are instructed to produce all DOCUMENTS that are responsive

4    to these Requests and that are in YOUR possession, custody, or control.  A

5    DOCUMENT is in YOUR "possession, custody, or control" if it is in YOUR

6    physical possession, or if, as a practical matter, YOU have the ability, upon

7    request, to obtain possession of the DOCUMENT or a copy thereof from another

8    person or entity that has physical possession of the DOCUMENT.

9    17.    If any DOCUMENT or category of DOCUMENTS is not produced

10   in full, please state with particularity the reason or reasons it is not being

11   produced in full, and describe, to the best of YOUR knowledge, information and

12   belief, and with as much particularity as possible, the DOCUMENT or portions of

13   the DOCUMENT that are not being produced.

14   18.    Each DOCUMENT is to be produced as it is kept in the usual course

15   of business, including all file folders, binders, notebooks, and other devices by

16   which such DOCUMENTS may be organized or separated.

17   19.    If YOU withhold any DOCUMENT, or portion of a DOCUMENT,

18   on grounds that it is protected from discovery by the attorney-client privilege,

19   work-product doctrine, or other privilege or immunity from discovery, please set

20   forth, for each DOCUMENT or portion of a DOCUMENT withheld:

21        (a)    The place, approximate date, and manner of recording, creating

22               or otherwise preparing the DOCUMENT;

23        (b)    The names and organization position, if any, of each author,

24               sender, and recipient of the DOCUMENT;

25        (c)    A general description of the subject matter of the DOCUMENT;

26        (d)    The basis of any claim of privilege; and

27        (e)    If work-product is asserted, the proceeding for which the

28               DOCUMENT was created.

NOTICE OF DEPOSITION OF DEFENDANT
JOANNE SIEGEL AND REQUEST FOR
PRODUCTION OF DOCUMENTS

EXHIBIT 36    4
Page 859

20.    For any DOCUMENT or category of DOCUMENTS that was, but no longer is, in YOUR possession, custody or control, please describe each such DOCUMENT as completely as possible and provide the following information:

    (a)    The reason the DOCUMENT is no longer in YOUR possession, custody or control;

    (b)    The person or entity, if any, who has possession, custody or control or, if unknown, so state; and

    (c)    If the DOCUMENT was destroyed or otherwise disposed of, state (i) the manner of disposal (*i.e.*, destruction, loss, discarding or other means of disposal); (ii) the date of disposal; (iii) the reason for disposal; (iv) the person authorizing disposal; (v) the person disposing of the DOCUMENT; and (vi) the name and address of the most recent custodian of the DOCUMENT.

21.    Each Request shall be construed independently and no Request shall be viewed as limiting the scope of any other Request.

22.    All responsive DOCUMENTS maintained or stored in electronic format shall be produced in native file format with all associated metadata preserved.  All responsive DOCUMENTS maintained in hard copy shall be produced in TIFF.

23.    The collection and production of DOCUMENTS shall be performed in a manner that ensures that the source of each DOCUMENTS may be determined, if necessary.

24.    DOCUMENTS attached to each other shall not be separated.

25.    These Requests impose a continuing obligation subsequent to YOUR initial production within thirty days of the service date of these Requests, or other date mutually agreed upon by the parties, to timely supplement YOUR response or production if YOU determine that YOUR response or production is incomplete or incorrect.

NOTICE OF DEPOSITION OF DEFENDANT
JOANNE SIEGEL AND REQUEST FOR
PRODUCTION OF DOCUMENTS

EXHIBIT 36  5
Page 860

**DOCUMENTS REQUESTED**

1. All agreements between or among YOU and any DEFENDANT regarding the SIEGEL HEIRS' purported rights in SUPERMAN and SUPERBOY.

2. All agreements between or among YOU and the SHUSTER HEIRS regarding the SIEGEL HEIRS' purported rights in SUPERMAN and SUPERBOY.

3. All agreements between or among YOU and any DEFENDANT regarding the SHUSTER HEIRS' purported rights in SUPERMAN and SUPERBOY.

4. All agreements between or among SIEGEL and SHUSTER regarding any purported rights in SUPERMAN and SUPERBOY.

5. All agreements between or among YOU and the SHUSTER HEIRS regarding the SHUSTER HEIRS' purported rights in SUPERMAN and SUPERBOY.

6. All DOCUMENTS relating to or affecting the ability of YOU or the SIEGEL HEIRS to negotiate or enter into agreements regarding SUPERMAN or SUPERBOY.

7. All DOCUMENTS relating to or affecting the ability of the SHUSTER HEIRS to negotiate or enter into agreements regarding SUPERMAN or SUPERBOY.

8. All DOCUMENTS relating to or affecting the disposition, division, or ownership of any rights in SUPERMAN or SUPERBOY.

9. All DOCUMENTS relating to or affecting the division of revenue, proceeds, or other profits regarding SUPERMAN or SUPERBOY.

10. All DOCUMENTS relating to or affecting the division of any settlement proceeds regarding SUPERMAN or SUPERBOY.

11. All DOCUMENTS relating to the potential sale, assignment, license, or other disposition of any rights relating to SUPERMAN or SUPERBOY, including but not limited to any solicitation, offer, option, or proposed agreement.

NOTICE OF DEPOSITION OF DEFENDANT
JOANNE SIEGEL AND REQUEST FOR
PRODUCTION OF DOCUMENTS

EXHIBIT 36     6
Page 861

1    12.    All DOCUMENTS relating to the valuation of any past, current, or

2    potential ownership interest in SUPERMAN or SUPERBOY.

3    13.    All DOCUMENTS relating to the introduction of YOU or the SIEGEL

4    HEIRS to any DEFENDANT.

5    14.    All DOCUMENTS relating to the October 16, 2001

6    COMMUNICATION between Kevin Marks and John Schulman.

7    15.    All DOCUMENTS relating to the October 19, 2002 letter from Kevin

8    Marks to John Schulman confirming that the SIEGEL HEIRS "accepted D.C.

9    Comics' offer of October 16, 2001."

10    16.    All DOCUMENTS relating to the October 26, 2001 letter from DC

11    Comics to the SIEGEL HEIRS.

12    17.    All DOCUMENTS relating to the November 29, 2001

13    COMMUNICATION between DEFENDANT Marc Toberoff and Kevin Marks

14    regarding the SIEGEL HEIRS' purported rights in SUPERMAN and SUPERBOY.

15    18.    All DOCUMENTS relating to the February 1, 2002 letter from Patrick

16    Perkins to the SIEGEL HEIRS.

17    19.    All DOCUMENTS relating to the February 6, 2002

18    COMMUNICATION between DEFENDANT Marc Toberoff and Kevin Marks

19    regarding the SIEGEL HEIRS' purported rights in SUPERMAN and SUPERBOY.

20    20.    All DOCUMENTS relating to the February 2002 COMMUNICATION

21    between DEFENDANT Marc Toberoff and Warner Bros. executive Steven Spira

22    regarding the rights in SUPERMAN and SUPERBOY.

23    21.    All DOCUMENTS relating to the May 9, 2002 letter from YOU to

24    Time Warner Inc.

25    22.    All DOCUMENTS relating to the May 21, 2002 letter from Richard

26    Parsons of Time Warner Inc. to YOU.

27

28

EXHIBIT 36
Page 862

NOTICE OF DEPOSITION OF DEFENDANT
JOANNE SIEGEL AND REQUEST FOR
PRODUCTION OF DOCUMENTS

23. All DOCUMENTS relating to any solicitation, offer, or option from any DEFENDANT regarding the purported rights of YOU or the SIEGEL HEIRS in SUPERMAN or SUPERBOY.

24. All DOCUMENTS relating to the September 21, 2002 letter from YOU to Kevin Marks.

25. All DOCUMENTS relating to the September 21, 2002 letter from YOU to DC Comics.

26. All DOCUMENTS relating to the letter agreement dated October 3, 2002 that YOU signed with DEFENDANT IP Worldwide, LLC, and any revisions, modifications, or adjustments thereto.

27. All DOCUMENTS relating to the October 28, 2002 letter from YOU to Lillian Laserson of DC Comics.

28. All DOCUMENTS relating to the Notice of Termination of Transfer Covering Extended Renewal Term: Superboy served on behalf of the SIEGEL HEIRS on or around November 8, 2002.

Dated: July 28, 2010                    Respectfully submitted,

O'MELVENY & MYERS LLP

By:_____
              Daniel M. Petrocelli

Attorneys for Plaintiff DC Comics

EXHIBIT 36     8

Page 863

NOTICE OF DEPOSITION OF DEFENDANT
JOANNE SIEGEL AND REQUEST FOR
PRODUCTION OF DOCUMENTS

1   DANIEL M. PETROCELLI (S.B. #97802)
      dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA 90067-6035
    Telephone:  (310) 553-6700
6   Facsimile:   (310) 246-6779

7   (continued on next page)

8   Attorneys for Plaintiff DC Comics

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11

12   DC COMICS,                        Case No. CV-10-3633 ODW (RZx)

13              Plaintiff,             **PLAINTIFF DC COMICS'**
                                       **NOTICE OF DEPOSITION OF**
                 v.                    **JEAN PEAVY AND REQUEST**
14                                     **FOR PRODUCTION OF**
     PACIFIC PICTURES                  **DOCUMENTS**
15   CORPORATION, IP WORLDWIDE,
     LLC, IPW, LLC, MARC TOBEROFF,     The Hon. Otis D. Wright II
16   an individual, MARK WARREN
     PEARY, as personal representative of   Deposition Date:   September 7, 2010
17   the ESTATE OF JOSEPH SHUSTER,     Deposition Time:   9:00 a.m.
     JOANNE SIEGEL, an individual,
18   LAURA SIEGEL LARSON, an
     individual, and DOES 1-10, inclusive,
19
                 Defendants.
20

21

22

23

24

25

26

27

28

EXHIBIT 36

Page 864

NOTICE OF DEPOSITION OF
JEAN PEAVY AND REQUEST FOR
PRODUCTION OF DOCUMENTS

1   (continued from previous page)

2   PATRICK T. PERKINS (admitted *pro hac vice*)
     pperkins@ptplaw.com
3   PERKINS LAW OFFICE, P.C.
     1711 Route 9D
4   Cold Spring, NY 10516
     Telephone:  (845) 265-2820
5   Facsimile:    (845) 265-2819

6   Attorneys for Plaintiff DC Comics

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF DEPOSITION OF<br>JEAN PEAVY AND REQUEST FOR<br>PRODUCTION OF DOCUMENTS

EXHIBIT 36
Page 865

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure 30 and the concurrently-served Subpoena to Testify at a Deposition in a Civil Action (the "Subpoena"), the deposition upon oral examination of third party Jean Adele Peavy (the "Deponent") will be taken in the above-entitled action on September 7, 2010 starting at 9:00 a.m. and continuing over the course of one day until completed or otherwise adjourned.  The deposition will be held at the Hilton Hotel, 100 Sandoval Street, Santa Fe, New Mexico 87501-2131.  The deposition will be taken before a notary public or other officer authorized to administer oaths and will be recorded by stenographic, sound, and visual means.

PLEASE TAKE FURTHER NOTICE that, in connection with such deposition and in accordance with the concurrently-served Subpoena, the Deponent is required to provide the documents, records, papers and information described in Attachment A to this Notice of Deposition, in accordance with the definitions contained therein, by no later than August 27, 2010.

This Notice of Deposition is being served on Deponent's counsel at the address shown on the accompanying Proof of Service.


Dated:  July 28, 2010                    Respectfully submitted,

                                         O'MELVENY & MYERS LLP


                                         By:_____
                                               Daniel M. Petrocelli

                                         Attorneys for Plaintiff DC Comics


EXHIBIT 36     1

Page 866

NOTICE OF DEPOSITION OF
JEAN PEAVY AND REQUEST FOR
PRODUCTION OF DOCUMENTS

## ATTACHMENT A
## <u>DEFINITIONS AND INSTRUCTIONS</u>

1. "DOCUMENT" shall be interpreted in its broadest sense to include any and all "documents" and "other tangible things" as those terms are understood in Federal Rule of Civil Procedure 34, including, without limitation, any "writing," "recording," or "photograph" as those terms are defined in Federal Rule of Evidence 1001. This shall include, but is not limited to: e-mail, audio or video recordings, correspondence, letters, phone messages, notes, memoranda, facsimiles, publications, contracts, agreements, calendars, drafts of proposed contracts or agreements, papers, and photographs.

2. "COMMUNICATION" means all written, electronic, oral, telephonic, gesture, or other transmission or exchange of information, including without limitation any inquiry, request, dialogue, discussion, conversation, interview, correspondence, letter, note, consultation, negotiation, agreement, understanding, meeting, e-mail, and all DOCUMENTS evidencing any verbal or nonverbal interaction between any individuals or entities.

3. "REFER" or "RELATE" means, without limitation, evidence, reflect, summarize, constitute, contain, study, analyze, explain, mention, show, discuss, describe, or comment upon.

4. "PERSON" means any natural person, firm, association, corporation, partnership, or other legal entity or organization separately identifiable, and any department(s) or division(s) therein.

5. "YOU" or "YOUR" means Jean Adele Peavy and, as applicable, any PERSON acting on her behalf, including but not limited to her agents, employees, attorneys, and representatives.

6. "DEFENDANT" or "DEFENDANTS" means, collectively and severally, any defendant in the above-entitled action, including Pacific Pictures Corporation; IP Worldwide, LLC; IPW, LLC; Marc Toberoff; Mark Warren

EXHIBIT 36  2

Page 867

NOTICE OF DEPOSITION OF
JEAN PEAVY AND REQUEST FOR
PRODUCTION OF DOCUMENTS

1  Peary, on behalf of the Estate of Joseph Shuster; Joanne Siegel; and Laura Siegel

2  Larson and, as applicable, any PERSON acting on their behalf, including but not

3  limited to their agents, employees, attorneys, and representatives.

4       7.    "SHUSTER HEIRS" means, collectively and severally, YOU, the

5  Estate of Joseph Shuster, Mark Peary, Dawn Peavy, Frank Shuster, or any other

6  executor, administrator, heir, relative, or representative of Joseph Shuster and, as

7  applicable, any PERSON acting on their behalf, including but not limited to their

8  agents, employees, attorneys, and representatives.

9       8.    "SIEGEL HEIRS" means, collectively and severally, Joanne Siegel,

10  Laura Siegel Larson, Dennis Larson, Michael Siegel, or any other executor,

11  administrator, heir, relative, or representative of Jerome Siegel and, as applicable,

12  any PERSON acting on their behalf, including but not limited to their agents,

13  employees, attorneys, and representatives.

14       9.    "SHUSTER" means Joseph Shuster and, as applicable, any PERSON

15  acting on his behalf, including but not limited to his agents, employees, attorneys,

16  heirs, and representatives.

17       10.    "SIEGEL" means Jerome Siegel and, as applicable, any PERSON

18  acting on his behalf, including but not limited to his agents, employees, attorneys,

19  heirs, and representatives.

20       11.    "SUPERMAN" means the Superman character as delineated in

21  literary works such as comic books, newspapers, novels, radio programs,

22  television programs, and motion pictures, and any of the works in which he

23  appears, including but not limited to *Action Comics. No. 1.*

24       12.    "SUPERBOY" means the Superboy character as delineated in

25  literary works such as comic books, newspapers, novels, radio programs,

26  television programs, and motion pictures, and any of the works in which he

27  appears, including but not limited to *More Fun Comics #101.*

28       13.    "INCLUDING" means "including, but not limited to."

14.    "Any" and "All" are interchangeable.

15.    The singular form includes the plural form, and vice versa.

16.    YOU are instructed to produce all DOCUMENTS that are responsive to these Requests and that are in YOUR possession, custody, or control.  A DOCUMENT is in YOUR "possession, custody, or control" if it is in YOUR physical possession, or if, as a practical matter, YOU have the ability, upon request, to obtain possession of the DOCUMENT or a copy thereof from another person or entity that has physical possession of the DOCUMENT.

17.    If any DOCUMENT or category of DOCUMENTS is not produced in full, please state with particularity the reason or reasons it is not being produced in full, and describe, to the best of YOUR knowledge, information and belief, and with as much particularity as possible, the DOCUMENT or portions of the DOCUMENT that are not being produced.

18.    Each DOCUMENT is to be produced as it is kept in the usual course of business, including all file folders, binders, notebooks, and other devices by which such DOCUMENTS may be organized or separated.

19.    If YOU withhold any DOCUMENT, or portion of a DOCUMENT, on grounds that it is protected from discovery by the attorney-client privilege, work-product doctrine, or other privilege or immunity from discovery, please set forth, for each DOCUMENT or portion of a DOCUMENT withheld:

    (a)    The place, approximate date, and manner of recording, creating or otherwise preparing the DOCUMENT;

    (b)    The names and organization position, if any, of each author, sender, and recipient of the DOCUMENT;

    (c)    A general description of the subject matter of the DOCUMENT;

    (d)    The basis of any claim of privilege; and

    (e)    If work-product is asserted, the proceeding for which the DOCUMENT was created.

EXHIBIT 36        4

NOTICE OF DEPOSITION OF
JEAN PEAVY AND REQUEST FOR
PRODUCTION OF DOCUMENTS

1    20.    For any DOCUMENT or category of DOCUMENTS that was, but

2    no longer is, in YOUR possession, custody or control, please describe each such

3    DOCUMENT as completely as possible and provide the following information:

4              (a)    The reason the DOCUMENT is no longer in YOUR possession,

5                      custody or control;

6              (b)    The person or entity, if any, who has possession, custody or

7                      control or, if unknown, so state; and

8              (c)    If the DOCUMENT was destroyed or otherwise disposed of,

9                      state (i) the manner of disposal (*i.e.*, destruction, loss, discarding

10                     or other means of disposal); (ii) the date of disposal; (iii) the

11                     reason for disposal; (iv) the person authorizing disposal; (v) the

12                     person disposing of the DOCUMENT; and (vi) the name and

13                     address of the most recent custodian of the DOCUMENT.

14    21.    Each Request shall be construed independently and no Request shall

15    be viewed as limiting the scope of any other Request.

16    22.    All responsive DOCUMENTS maintained or stored in electronic

17    format shall be produced in native file format with all associated metadata

18    preserved.  All responsive DOCUMENTS maintained in hard copy shall be

19    produced in TIFF.

20    23.    The collection and production of DOCUMENTS shall be performed

21    in a manner that ensures that the source of each DOCUMENTS may be

22    determined, if necessary.

23    24.    DOCUMENTS attached to each other shall not be separated.

24    25.    These Requests impose a continuing obligation subsequent to YOUR

25    initial production within thirty days of the service date of these Requests, or other

26    date mutually agreed upon by the parties, to timely supplement YOUR response

27    or production if YOU determine that YOUR response or production is incomplete

28    or incorrect.

EXHIBIT 36    5
Page 870

NOTICE OF DEPOSITION OF
JEAN PEAVY AND REQUEST FOR
PRODUCTION OF DOCUMENTS

## DOCUMENT REQUESTS

1.    All agreements between or among YOU and any DEFENDANT regarding the SHUSTER HEIRS' purported rights in SUPERMAN and SUPERBOY.

2.    All agreements between or among YOU and any DEFENDANT regarding the SIEGEL HEIRS' purported rights in SUPERMAN and SUPERBOY.

3.    All agreements between or among SHUSTER and SIEGEL regarding any purported rights in SUPERMAN and SUPERBOY.

4.    All DOCUMENTS relating to or affecting the ability of YOU or the SHUSTER HEIRS to negotiate or enter into agreements regarding SUPERMAN or SUPERBOY.

5.    All DOCUMENTS relating to or affecting the ability of the SIEGEL HEIRS to negotiate or enter into agreements regarding SUPERMAN or SUPERBOY.

6.    All DOCUMENTS relating to or affecting the disposition, division, or ownership of any rights in SUPERMAN or SUPERBOY.

7.    All DOCUMENTS relating to or affecting the division of revenue, proceeds, or other profits regarding SUPERMAN or SUPERBOY.

8.    All DOCUMENTS relating to or affecting the division of any settlement proceeds regarding SUPERMAN or SUPERBOY.

9.    All DOCUMENTS relating to the potential sale, assignment, license, or other disposition of any rights relating to SUPERMAN or SUPERBOY, including but not limited to any solicitation, offer, option, or proposed agreement.

10.    All DOCUMENTS relating to the valuation of any past, current, or potential ownership interest in SUPERMAN or SUPERBOY.

11.    All DOCUMENTS relating to the introduction of YOU or the SHUSTER HEIRS to any DEFENDANT.

1    12.    All DOCUMENTS relating to the introduction of the SIEGEL HEIRS

2    to any DEFENDANT.

3    13.    All DOCUMENTS relating to the letter dated August 21, 1992 that

4    YOU sent to Time Warner Inc.

5    14.    All DOCUMENTS relating to the letter dated September 10, 1992 that

6    Frank Shuster sent on YOUR behalf to Paul Levitz of DC Comics.

7    15.    All DOCUMENTS relating to the agreement dated August 1, 1992 that

8    YOU entered into with DC Comics.

9    16.    All DOCUMENTS relating to the letter dated July 10, 1993 that YOU

10    sent to Paul Levitz of DC Comics.

11    17.    All DOCUMENTS relating to the letter dated September 14, 1993 that

12    YOU sent to Paul Levitz of DC Comics.

13    18.    All DOCUMENTS relating to the letter dated April 27, 1995 that YOU

14    sent to Paul Levitz of DC Comics.

15    19.    All DOCUMENTS relating to the letter agreement dated November 23,

16    2001 that YOU entered into with DEFENDANT Pacific Pictures Corporation.

17    20.    All DOCUMENTS relating to the letter agreement dated October 27,

18    2003 that YOU entered into with DEFENDANT Pacific Pictures Corporation.

19    21.    All DOCUMENTS relating to the letter dated September 10, 2004 that

20    YOU signed with DEFENDANT Pacific Pictures Corporation.

21    //

22    //

23    //

24    //

25    //

26    //

27    //

28    //

EXHIBIT 36    7
Page 872

NOTICE OF DEPOSITION OF
JEAN PEAVY AND REQUEST FOR
PRODUCTION OF DOCUMENTS

1    22.    All DOCUMENTS relating to the Notice of Termination of Transfer

2  Covering Extended Copyright Renewal Term of "Superman" served on behalf of

3  the Estate of Joseph Shuster on or around November 10, 2003.

4

5       Dated:  July 28, 2010                    Respectfully submitted,

6                                               O'MELVENY & MYERS LLP

7

8                                               By:_____
                                                   Daniel M. Petrocelli
9
                                               Attorneys for Plaintiff DC Comics
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 37

Read the Warner Bros. lawsuit against Superman lawyer    http://thresq.hollywoodreporter.com/2010/05/warner-bros-.html

« Hollywood Docket: Studios disconnect Pirate Bay; FCC strategizes; 'Transformers 3' vs. YouTube | Main | Weinstein Co. loses key ruling in battle with soul singer »

# READ THE WARNER BROS. LAWSUIT AGAINST SUPERMAN LAWYER

Fri May 14, 2010 @ 10:43AM PST

**By Matthew Belloni**

Warner Bros. has pulled the trigger on a lawsuit we've heard rumblings about for months.

The studio today is suing Marc Toberoff, the arch nemesis attorney who represents the Shuster and Siegel families in copyright termination cases that put the studio's Superman franchise at risk. Warners claims Toberoff has a conflict of interest because he stands to gain financially from the "Superman" property.

Here's the full complaint, read for yourself.

**You might also like:**

- Superman lawyer now targeting Fox's 'Percy Jackson'
- Superman attorney lawsuit: smear campaign or savvy strategy?
- Warner Bros. loses Alan Ladd, Jr. appeal
- Staffing: Superman lawyer gets a lawyer; music program in Georgia; EFF-er to Google
- Warner Bros. wins jury verdict in trial over Eastwood film

LinkWithin

Filed Under Litigation | Comments (View) | ☼ SHARE ◼ ⚙ ⚞

## Add New Comment

Optional: Login below.

**Warning:** A browser setting is preventing you from logging in. **Fix this setting to log in**

Type your comment here.

Post as ...

Showing 0 comments

Sort by  Best rating ▾   ✉ Subscribe by email   🔲 Subscribe by RSS

## Top Posts

- **10.0** Clas deploy 'z
- **9.3** Secon over hara
- **7.5** Why lawyers t
- **7.4** Jimm discrimin
- **6.9** Vide traveler a
- **6.8** Jailbr antipiracy
- **6.4** Holly 'Twilight'
- **6.3** Holly harassme RIAA leg
- **6.2** Why



THResq    THR, £    Like

446 people like THR

 

 

Eric    Harold



EXHIBIT 37        Page 874

2 of 3

Case 2:10-cv-03633-ODW-RZ    Document 42-10    Filed 08/30/10    Page 133 of 201
Page ID #:2275
Read the Warner Bros. lawsuit against Superman lawyer

http://thresq.hollywoodreporter.com/2010/05/warner-bros-.html

**The Hollywood Reporter is Your Complete Film Resource**

The columnists and bloggers who write for The Hollywood Reporter have their collective finger on the pulse of the boxoffice.
Martin Grove and the other THR columnists deliver their thoughts on the film industry in an uncompromised style. Subscribe
to THR today and get the latest views from these film experts and get the latest movie reviews as well.

**Writer Jobs at Disney ABC**
Apply your creative thinking at Disney ABC
Television. Apply now!
disney.go.com/careers

**Paralysis Attorney**
No Fee Unless We Succeed. We Advance All Costs
of the Lawsuit.
www.la-personalinjuryattorneys.com

Ads by Google





Hollywood Reporter Home | Film News and Reviews | Entertainment and Technology News | Digital Media and Widgets | Box Office Finance | Music and Entertainment
News | World Film News | Subscriptions | Editions | Newsletter | Movie and Entertainment Video | Celebrity and Movie News | About Us | Advertising Opportunities | FAQ |
Subscriber FAQs | Sitemap | Entertainment News RSS

© 2010 The Hollywood Reporter. All rights reserved. Terms of Use | Privacy Policy



EXHIBIT 37          Page 875

EXHIBIT 38

1  DANIEL M. PETROCELLI (S.B. #97802)
    dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
    mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
    cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA 90067-6035
   Telephone: (310) 553-6700
6  Facsimile: (310) 246-6779

7  Attorneys for Plaintiff DC COMICS

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10
    DC COMICS,                          Case No.
11
                  Plaintiff,            **COMPLAINT FOR**:
12
         v.                             (1)  Declaratory Relief re: Invalidity of
13                                            Copyright Termination Notice;
    PACIFIC PICTURES
14  CORPORATION, IP                     (2)  Declaratory Relief re: Scope of
    WORLDWIDE, LLC, IPW, LLC,                 Copyright Termination Notice;
15  MARC TOBEROFF, an individual,
    MARK WARREN PEARY, as              (3)  Declaratory Relief re: DC Comics
16  personal representative of the           Period of Exclusivity re: Shuster;
    ESTATE OF JOSEPH SHUSTER,
17  JOANNE SIEGEL, an individual,      (4)  Interference with 1992 Shuster
    LAURA SIEGEL LARSON, an                 Agreement;
18  individual, and DOES 1-10,
    inclusive,                          (5)  Interference with Prospective
19                                            Economic Advantage re: Siegel-
                  Defendants.                 DC Comics Agreement; and
20
                                        (6)  Declaratory Relief re: Invalidity of
21                                            Copyright Assignment and
                                              Consent Agreements
22
                                        **DEMAND FOR JURY TRIAL**
23

24

25

26

27

28
                                                              COMPLAINT

EXHIBIT 38
Page 876

# I.  STATEMENT OF THE CASE

1.    This lawsuit challenges a scheme by Marc Toberoff and companies under his control to violate the U.S. Copyright Act and other laws by trafficking in federal copyright interests and interfering with contractual rights and other interests of plaintiff DC Comics related to the iconic property "Superman."[1]  By this scheme, Toberoff has sought to enrich himself by wrongfully laying claim to purported rights to control the exploitation of Superman to the substantial detriment of DC Comics and in violation of rights it has held, significantly invested in, and expanded upon for over 70 years.  DC Comics brings this suit to confirm its rights to the Superman property and seek redress for the wrongful conduct of Toberoff and entities he controls.  This Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. §§ 1331, 1338, and 1367, under the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, and under the Court's supplemental jurisdiction.

2.    Under certain narrowly defined circumstances, the Copyright Act permits authors and specified heirs to terminate copyright grants and recapture those interests from the original grantees.  These provisions of the Copyright Act also protect original grantees—such as DC Comics—by confining termination rights to certain classes of individuals in a specified time frame and manner, limiting the types of works that may be terminated, and creating an exclusive statutory period during which only the original grantee may enter into new agreements with the author or heirs to continue creating new works under the recaptured copyrights.

3.    In derogation of these provisions of the Copyright Act and the rights of DC Comics, Toberoff and entities he controls orchestrated a web of collusive agreements concerning the Superman copyrights with the heirs to the co-creators of

---

[1] Throughout this introductory statement and in other parts of the Complaint, the term "DC Comics" is used as shorthand for both DC Comics and its predecessors in interest.  The specific identities of relevant corporate entities are identified *infra.*

COMPLAINT

EXHIBIT 38
Page 877

Superman, Jerome Siegel and Joseph Shuster.  By these agreements, Toberoff

purported to secure a majority and controlling financial stake in copyright interests

in Superman assertedly held by the Siegel and Shuster heirs and preclude the heirs

from freely entering into new agreements with DC Comics for the continued

exploitation of Superman.  As detailed below, these agreements are unlawful under

the copyright laws, are void as against public policy, and both violate DC Comics'

rights and threaten the ongoing viability of the Superman property.

4.    During their lifetimes, Jerry Siegel and Joe Shuster—both well aware

of the termination provisions in amendments to the Copyright Act—never once

sought to terminate any of DC Comics' copyright interests.  Instead, Siegel and

Shuster rightly honored their agreements with DC Comics, under which they and

their families enjoyed lifetime compensation and other benefits.  After their deaths,

Siegel and Shuster's heirs reached similar agreements with DC Comics—the

Shuster heirs in 1992, and the Siegel heirs in 2001.  These agreements provided the

heirs substantial compensation and fully and finally resolved any claims of

termination to any rights in Superman and confirmed that DC Comics owned all

right, title, and interest in and to Superman.

5.    In or about 2001, Toberoff learned of these agreements between DC

Comics and the Siegel and Shuster heirs and engineered a course of conduct to

induce the heirs to repudiate those agreements, file invalid and erroneous copyright

termination notices, and enter into new agreements with Toberoff and his

companies netting him the controlling stake in the heirs' asserted interests in

Superman.

6.    Toberoff induced the Shuster heirs to repudiate their 1992 agreement

with DC Comics and enter into a 50/50 joint venture with defendant Pacific

Pictures Corporation, a company wholly owned and controlled by Toberoff,

pursuant to which the heirs conveyed the entirety of their purported Superman

copyright termination rights to the venture.  The stated purpose of the venture was

- 2 -

COMPLAINT

EXHIBIT 38
Page 878

1    to secure and exploit DC Comics' copyright interest in Superman.  Toberoff

2    procured this joint-venture agreement even though he knew that the Shusters' 1992

3    agreement with DC Comics operated to grant any and all of the heirs' interest in

4    Superman to DC Comics and extinguish any termination rights the heirs might have

5    held.  Toberoff also induced the Shuster heirs to serve a notice of termination

6    purporting to terminate and recapture alleged interests they had granted to DC

7    Comics under the parties' 1992 agreement.  This termination notice was invalid:

8    among other defects, it was filed by a party lacking the necessary majority interest

9    to terminate.  Furthermore, any putative right to terminate held by Joe Shuster

10   ceased to exist when he died having elected not to exercise it during his lifetime and

11   having died without leaving a surviving spouse, child, or grandchild to inherit and

12   exercise it.

13       7.    Toberoff similarly induced the Siegel heirs to repudiate their 2001

14   agreement with DC Comics.  After years of negotiations following a termination

15   notice sent by the Siegel heirs in 1997, DC Comics and the Siegel heirs reached an

16   agreement providing that DC Comics would retain all rights to Superman and

17   entitling the Siegels to receive a significant portion of the Superman profits.

18       8.    Toberoff became aware of the existence of the 2001 agreement

19   between the Siegels and DC Comics and understood it diminished his stake in the

20   putative Superman rights held by his joint venture with the Shusters.  In pursuit of

21   his plan to corner and control all potential Superman termination rights and thereby

22   block further exploitation of the property by DC Comics, Toberoff set out to derail

23   the 2001 Siegel agreement.  Among other things, Toberoff falsely represented to

24   the Siegels that if they repudiated their agreement with DC Comics and entered into

25   an agreement with him instead, a "billionaire investor" was prepared immediately

26   to pay the Siegels $15 million for their Superman rights, plus a generous back-end

27   profit participation in any future exploitations of the Superman property.  Toberoff

28   also falsely represented that he would help the Siegels produce their own Superman

- 3 -                                    COMPLAINT

EXHIBIT 38
Page 879

1  motion picture that would compete successfully with a Superman motion picture

2  that Warner Bros.—DC Comics' licensee—was then developing. Based on

3  Toberoff's inducements, the Siegels repudiated their 2001 agreement with DC

4  Comics, terminated the employment of their then-law firm Gang, Tyre, Ramer &

5  Brown, and entered into agreements with Toberoff and defendant IP Worldwide

6  LLC, an entity controlled by Toberoff. Under these agreements, Toberoff and his

7  company received a 45% interest in any recovery by the Siegels—an 800% increase

8  over the 5% fee in the Siegels' agreement with the Gang Tyre firm.

9      9.    As a result of his arrangements with both the Shuster and Siegel heirs,

10  Toberoff secured control of the largest financial stake in the collective, putative

11  Superman termination rights (*i.e.*, Toberoff—47.5%; Siegel heirs—27.5%; Shuster

12  heirs—25%). Toberoff sought further control, however. In order to assert that DC

13  Comics had *no* further rights to exploit the derivative Superman character

14  "Superboy"—including in the highly popular *Smallville* network television series—

15  Toberoff manufactured the position that Jerry Siegel *alone*—to the exclusion of

16  Shuster—was the sole creator of Superboy. Toberoff did so with full knowledge

17  that his 2001 agreement with the Shusters explicitly confirmed the *Shusters'*

18  asserted joint rights in Superboy, consistent with the long-held view of Shuster,

19  Siegel, and their heirs that Superboy was jointly created by Shuster and Siegel.[2]

20      10.    Despite these incontestable facts concerning Superboy's creation—

21  facts which Joe Shuster, Jerry Siegel, their heirs, and even Toberoff and his

22  companies ratified and affirmed over time—Toberoff caused to be filed in 2002, on

23  behalf of the Siegels, a copyright termination notice falsely stating that Siegel was

24  the *sole* creator of Superboy. He then induced the Shusters in 2003 to amend their

25  joint venture agreement with Pacific Pictures to *delete* all references to Superboy.

26  ―――――――――

27  [2] As explained below, DC Comics fully agrees that Shuster and Siegel jointly
   contributed to Superboy. It is DC Comics' position, however, that Superboy is a
   work entirely derivative of Superman and that Superboy is not subject to

28  termination under the Copyright Act's termination regime.

- 4 -

COMPLAINT

EXHIBIT 38
Page 880

1    The deletion of Superboy was directly contrary to the Shusters' interests and

2    occurred solely to park *all* of the alleged Superboy rights with the Siegels.  Having

3    manipulated the Superboy rights in favor of the Siegels, and directly contrary to

4    copyright filings that the Siegels and Shusters had previously made, Toberoff then

5    filed a termination notice on behalf of the Shusters that purported to terminate only

6    Superman rights, leaving out all mention of Superboy.  These artifices positioned

7    the Siegels to claim 100% ownership of Superboy in order to bring a copyright

8    infringement claim against DC Comics, Warner Bros., and the *Smallville* series,

9    which they filed in 2004—and which remains pending today.

10        11.    Yet another component of Toberoff's scheme to gain complete control

11    over the heirs to the putative Superman termination rights was preventing the Siegel

12    and Shuster heirs from freely entering into agreements with DC Comics—even if it

13    was in their respective economic interest to do so.  In violation of DC Comics'

14    statutory period of exclusivity under the copyright laws, Toberoff induced the

15    Siegels and Shusters to enter into agreements transferring their respective interests

16    to his companies and preventing them from conveying any rights to DC Comics

17    without each other's—and Toberoff's—consent.  As a result of these illicit

18    agreements, DC Comics has been deprived of its ability to enter into agreements

19    with the heirs to secure their purported termination rights, in violation of the

20    Copyright Act, other laws, and public policy promoting the free and fair settlement

21    of legal claims.

22        12.    To protect its rights under the copyright laws, agreements, and

23    interests with the Siegels and Shusters and remove the cloud that Toberoff's actions

24    have unlawfully placed over the Superman property and its future, DC Comics

25    brings this action to seek declaratory judgments and other relief as set forth below.

26                    **II.  PARTIES**

27        13.    Plaintiff DC COMICS ("DC Comics") is a general partnership

28    organized and existing under the laws of the State of New York and has its

- 5 -

COMPLAINT

EXHIBIT 38
Page 881

1  principal place of business in the State of New York.  DC Comics is the successor-

2  in-interest to all rights, including rights under copyright, relating to the Superman

3  works and character.

4       14.    Defendant PACIFIC PICTURES CORPORATION ("Pacific

5  Pictures") is a New York corporation organized under the laws of the State of New

6  York, and was registered as a foreign corporation doing business in the State of

7  California, with its principal place of business in the State of California and the

8  County of Los Angeles.  Upon information and belief, Toberoff is the sole

9  shareholder and registered agent for service of process of Pacific Pictures.  Upon

10  information and belief, Pacific Pictures forfeited its active status as a New York

11  corporation and as a registered foreign corporation in California as of early 2009.

12       15.    Defendant IP WORLDWIDE, LLC ("IP Worldwide") is a Delaware

13  limited liability company organized and existing under the laws of the State of

14  Delaware, and registered as a foreign entity doing business in the State of

15  California, which has its principal place of business in the State of California and

16  the County of Los Angeles.  Upon information and belief, Toberoff is the managing

17  and controlling member of IP Worldwide and owns the controlling interest therein.

18       16.    Defendant IPW, LLC ("IPW") is a California limited liability

19  company organized and existing under the laws of the State of California, which

20  has its principal place of business in the State of California and the County of Los

21  Angeles.  Upon information and belief, Toberoff is the managing and controlling

22  member of IPW, is its registered agent for service of process, and owns the

23  controlling interest in IPW.  Upon information and belief, IPW is a successor-in-

24  interest to all or part of IP Worldwide's interests.

25       17.    Defendant MARC TOBEROFF ("Toberoff") is an individual who

26  resides in the County of Los Angeles in the State of California, and upon

27  information and belief, is and at all times has been a citizen of the United States.

28

COMPLAINT

EXHIBIT 38

Page 882

1    Upon information and belief, Toberoff is a shareholder and member of defendants

2    PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; and IPW, LLC.

3        18.    Defendant MARK WARREN PEARY ("Mark Peary" or "Peary") is

4    an individual who resides in the State of New Mexico and is, and at all times has

5    been, a citizen of the United States.  Peary is the nephew of Joseph Shuster, and a

6    California court appointed him as the personal representative of the Shuster Estate.

7        19.    Defendant ESTATE OF JOSEPH SHUSTER ("Shuster Estate") is a

8    probate estate established by the Los Angeles Superior Court on August 25, 2003

9    (Case No. BP-080635).

10       20.    Defendant JOANNE SIEGEL ("Joanne Siegel") is an individual who

11   resides in the County of Los Angeles in the State of California and is, and at all

12   times has been, a citizen of the United States.  Joanne Siegel is the widow of

13   Jerome Siegel.

14       21.    Defendant LAURA SIEGEL LARSON ("Laura Siegel Larson") is an

15   individual who resides in the County of Los Angeles in the State of California and

16   is, and at all times has been, a citizen of the United States.  Laura Siegel Larson is

17   the daughter of Jerome Siegel and Joanne Siegel.

18       22.    Upon information and belief, Toberoff is, and at all relevant times has

19   been, the sole shareholder and principal of Pacific Pictures and a member and

20   principal of IP Worldwide and IPW.  Upon information and belief, Toberoff is the

21   alter ego of Pacific Pictures, IP Worldwide, and IPW, in that there is, and at all

22   relevant times has been, such unity of interest between Toberoff, Pacific Pictures,

23   IP Worldwide, and IPW that any individuality and separateness between them did

24   not and does not exist, and adherence to the fiction of the independent and separate

25   existence of Pacific Pictures, IP Worldwide, and IPW distinct from each other and

26   Toberoff would promote injustice and inequity.

27       23.    Upon information and belief, the fictitiously-named DOES 1-10 are in

28   some manner responsible for the events giving rise to the claims set forth herein.

- 7 -                                        COMPLAINT

EXHIBIT 38
Page 883

1   The true names and capacities of such fictitiously-named defendants, whether

2   individual, corporate, or otherwise, are presently unknown to DC Comics.  DC

3   Comics will amend this Complaint to assert the true names and capacities of such

4   fictitiously-named defendants when this information has been ascertained.  Each

5   reference herein to a named defendant shall also refer to DOES 1-10.

6   ### III.  JURISDICTION AND VENUE

7       24.    As noted, the Court has subject matter jurisdiction over the claims set

8   forth herein pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.  The Court has original

9   jurisdiction over DC Comics' claims arising under the Copyright Act and

10  supplemental jurisdiction over its related state-law claims.

11      25.    The Court has personal jurisdiction over defendants, *inter alia*,

12  because a substantial part of the events giving rise to the claims set forth herein

13  occurred in the State of California and the defendants have extensive contacts with

14  the State, including the following:

15          a.      Defendants Marc Toberoff, the Shuster Estate, and Peary

16          established a joint venture in California under California law for the

17          purpose of terminating and recapturing prior grants of the copyrights at

18          issue in this action.

19          b.      On behalf of the Shuster Estate, Peary filed a probate action in

20          Los Angeles Superior Court—which, upon information and belief,

21          remains pending—in order to effectuate the purpose of the California

22          joint venture.  A California court appointed Peary as executor of the

23          Shuster Estate, and Peary serves in that capacity as a matter of

24          California law.  In that capacity, Peary served one of the copyright

25          termination notices at issue in this action.

26          c.      Upon information and belief, defendants Pacific Pictures and IP

27          Worldwide are foreign entities registered as doing business in the State

28          of California, and they have their principal places of business and are

- 8 -                                    COMPLAINT

EXHIBIT 38
Page 884

1    headquartered in the State of California and the County of Los

2    Angeles.

3        d.    Upon information and belief, defendant IPW is a California

4    limited liability company organized and existing under the laws of the

5    State of California and has its principal place of business and

6    headquarters in the State of California and the County of Los Angeles.

7        e.    Defendants Toberoff, Joanne Siegel, and Laura Siegel Larson

8    reside and conduct business in the State of California and the County

9    of Los Angeles.

10       f.    Defendants Joanne Siegel and Laura Siegel Larson filed two

11   related actions against DC Comics in this District and Court to resolve

12   ownership of the rights in Superman and Superboy.  (Case Nos. CV-

13   04-8400 ODW, CV-04-8776 ODW).

14       26.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

15   Defendants are subject to personal jurisdiction in this District, and a substantial part

16   of the events giving rise to the claims set forth herein occurred in this District.

17   **IV.  FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

18   **A.    DC Comics' Development of Superman**

19       27.    In the 1930s, Jerome Siegel (a story writer in Cleveland) and Joseph

20   Shuster (an illustrator, and Siegel's peer) conceived of a fictional character named

21   "Superman," whom they originally envisioned as a criminal mastermind, and then

22   reconceived as a hero fighting for social justice.  Aside from the name, the

23   character shared little similarity with the figure that would later become known

24   throughout the world as Superman.  Between 1933 and 1937, Siegel and Shuster

25   submitted the Superman comic strips to a number of prospective publishers and

26   newspaper syndicates, all of which rejected them.

27       28.    A company that would come to be known as DC Comics—and for

28   whom Siegel and Shuster worked for hire developing fictional characters—would

- 9 -                                            COMPLAINT

EXHIBIT 38
Page 885

1   eventually decide to publish a 13-page comic story featuring "Superman" in the

2   first issue of a 64-page comic book entitled "Action Comics." This original version

3   of Superman had few, limited powers, and his fictional world and back-story were

4   not well developed.

5       29.    Months before this "Action Comics" book ("Action Comics No. 1")

6   was published, Siegel and Shuster entered into, on December 4, 1937, an

7   "Agreement of Employment" with Detective Comics, Inc. ("DCI"), a predecessor-

8   in-interest to DC Comics (the "December 4, 1937 Agreement"). Siegel and Shuster

9   renewed their employment arrangement with DCI in agreements on September 22,

10  1938 (the "DCI September 22, 1938 Agreement" and "McClure September 22,

11  1938 Agreement") and December 19, 1939 (the "December 19, 1939 Agreement").

12      30.    In 1938, at the instance and expense of DCI and subject to its right of

13  control, Siegel and Shuster adapted the preexisting Superman comic strips they had

14  created and added new material to create the 13-page comic book story entitled

15  "Superman." This story—like all the Superman works that Siegel and Shuster

16  thereafter created—was created for DC Comics as a work made for hire. Moreover,

17  Siegel and Shuster only contributed to a part of this work. Upon information and

18  belief, Shuster submitted black-and-white illustrations to DCI that were later

19  colorized by printers or engravers working at DCI's direction. DCI also prepared

20  one or more cover illustrations for Action Comics No. 1, which depicted Superman

21  and was published in other comic books prior to the publication of Action Comics

22  No. 1. Action Comics No. 1 itself was published in April 1938.

23      31.    To the extent Siegel and Shuster created any copyrightable Superman-

24  related works outside their work-for-hire relationship with DC Comics, those works

25  consisted solely of certain panels and portions of the Action Comics No. 1 comic

26  book and other minor creations in the 1930s, which Siegel and Shuster conveyed to

27  DC Comics in 1937 and 1938. In an agreement dated March 1, 1938 (the "March

28  1, 1938 Agreement"), and as required by the December 4, 1937 Agreement, Siegel

- 10 -                                                           COMPLAINT

EXHIBIT 38
Page 886

1    and Shuster again assigned to DCI all of their rights in Superman, including "all

2    good will attached thereto and exclusive right to the use of the characters and story,

3    continuity and title of strip." Siegel and Shuster confirmed DCI's sole and

4    exclusive ownership of all Superman rights in the DCI September 22, 1938

5    Agreement and December 19, 1939 Agreement.

6    　　　　32.　　The initial appearance of Superman in Action Comics No. 1 presented

7    a limited view of the character. The readers learn only that Superman was sent to

8    Earth as an infant aboard a space ship from an unnamed planet that was destroyed

9    by old age. He secretly possessed five super-human powers: the abilities to leap

10   1/8 of a mile; hurdle a twenty-story building; raise tremendous weights; run faster

11   than an express train; and repel bullets and knives by virtue of his "tough skin." In

12   his alter-ego life, Superman was depicted as Clark Kent, a mild-mannered

13   newspaper reporter for "The Daily Star," with a female co-worker named "Lois,"

14   whose last name is not mentioned. In his life as Superman, he was depicted as a

15   costumed figure who uses his super-human abilities to fight crime. In Action

16   Comics No. 1, Superman is said to have grown up in an orphanage and is depicted

17   (both in words and images) as a child with super-human strength.

18   　　　　33.　　Since the publication of Action Comics No. 1 in 1938, DC Comics—

19   with its teams of work-for-hire writers and artists (including Siegel and Shuster)—

20   has added more than 70 years of material defining, updating, expanding, and

21   improving upon the Superman myth and creating a continuous flow of new exploits

22   and characters, resulting in a vast Superman "universe." DC Comics has authored,

23   published, and distributed hundreds of millions of copies of thousands of comic

24   book issues throughout the United States and abroad depicting the adventures of

25   Superman. These comic books have been authored and illustrated by dozens of DC

26   Comics' talented staff writers and artists. DC Comics has also created, developed,

27   distributed, and licensed numerous feature-length motion pictures, motion-picture

28   serials, radio serials, television shows, novels, and live theatrical presentations

- 11 -                                                            COMPLAINT

EXHIBIT 38

Page 887

1  based on Superman. Indeed, the radio, television, and motion-picture projects in

2  particular—with which Siegel and Shuster had nothing or little to do—were largely

3  responsible for spreading the Superman myth and popularity and expanding the

4  Superman storyline.

5      34.    As a result of DC Comics' significant and sustained investment in and

6  stewardship of Superman—and 70-plus years of character and story development

7  by some of the most creative and talented minds in the comic-book, radio,

8  television, and motion-picture industries—Superman has remained constantly in the

9  public's eye and has become one of the most famous and beloved fictional

10  characters in the world. Over these 70 years, Superman has evolved from the few

11  black-and-white illustrations originally drawn by Shuster into a full-blown, color

12  character inhabiting a multi-dimensional universe.

13      35.    DC Comics' development of Superman over many decades has

14  represented a continuous and ever-evolving portrayal of the character, featuring

15  new elements in the Superman back-story, new super-powers, new characters, and

16  changes in Superman's appearance. Many of the most famous story elements and

17  characters associated with Superman were developed long after 1938 and by

18  illustrators and story writers other than Shuster and Siegel working for hire for DC

19  Comics. These include stories about and depictions of: (a) "Smallville," the town

20  where Superman grew up; (b) "Kryptonite," or surviving fragments of the

21  destroyed planet Krypton, which have the power to harm or affect Superman;

22  (c) the "Fortress of Solitude," Superman's secret headquarters outside Metropolis

23  (traditionally located in the Arctic, but also placed in the Andes and Amazon

24  rainforest); (d) the "Daily Planet" newspaper, where Clark Kent would go to work;

25  (e) Jimmy Olsen and Perry White, Kent's co-workers at the Daily Planet; (f) love

26  interests, such as Lana Lang; (g) villains, such as Lex Luthor and Brainiac;

27  (h) Superman's adoptive parents, the Kents; and (i) other allies, such as "Krypto"

28  the Superdog as well as Supergirl. Other aspects of Superman's evolution included

- 12 -                                      COMPLAINT

EXHIBIT 38
Page 888

1   the development of new super-powers, including: (a) the ability to fly (a key

2   component, especially of the Superman motion pictures); (b) super-vision, which

3   enables him to see through walls ("X-ray" vision); (c) telescopic vision, which

4   allows him to see across great distances; (d) "heat vision," which empowers him to

5   aim rays of extreme heat with his eyes; (e) super-hearing, which enables him to

6   hear conversations at great distances; (f) invulnerability to injury; and (g) the ability

7   to survive in outer space without protective gear. It is this constant and

8   uninterrupted evolution of the Superman mythology that allows Superman to

9   remain a force in popular consciousness decades after so many contemporary

10  characters have been forgotten or deemed old-fashioned.

11  **B.    Early Disputes Regarding the Superman Rights**

12       36.    Siegel and Shuster served in a work-for-hire capacity for DCI from the

13  early 1930s through the late 1940s, helping draw and write Superman comic strips

14  and comic books. Though paid substantial sums for their work—several million

15  dollars in today's economic terms—the relationship eventually became contentious.

16       37.    In 1947, Siegel and Shuster filed an action against DCI's successor,

17  National Comics Publications, Inc. ("National"), in the New York Supreme Court

18  in Westchester County (the "Westchester Action"). In the Westchester Action,

19  Siegel and Shuster sought to invalidate the March 1, 1938 Agreement. They also

20  sought to recapture all rights in Superman, arguing that the DCI September 22,

21  1938 Agreement was obtained by duress. Siegel and Shuster further challenged as

22  unauthorized DCI's publication in November 1944 of a series of comic-book

23  stories entitled "Superboy," which featured the adventures of Superman as a youth.

24       38.    On November 21, 1947, a referee in the Westchester Action issued an

25  opinion after trial (the "Westchester Opinion") holding that the March 1, 1938

26  Agreement assigned "all" of the Superman rights to DCI, and that the DCI

27  September 22, 1938 Agreement was valid and not obtained under duress. The

28  referee found that DCI had acted improperly in publishing Superboy.

- 13 -

COMPLAINT

EXHIBIT 38
Page 889

39.    At the referee's request, the parties to the Westchester Action submitted proposed findings of fact and conclusions of law.  On April 12, 1948, the referee adopted findings of fact and conclusions of law and issued an interlocutory judgment (collectively, the "Westchester Action Interlocutory Judgment"), in which he made statements based on a script that Siegel had submitted that Siegel originated and owned the comic strip Superboy to the exclusion of DC Comics. National filed a notice of appeal, and the Westchester Action Interlocutory Judgment was stayed pending appeal.

40.    Shortly thereafter, the parties to the Westchester Action entered into two separate agreements:  (a) a stipulation dated May 19, 1948 (the "May 19, 1948 Stipulation"); and (b) a consent judgment dated May 21, 1948 (the "May 21, 1948 Consent Agreement").  Under both documents, *inter alia*, Siegel and Shuster: (a) agreed to vacate the Westchester Action Interlocutory Judgment; (b) acknowledged that, pursuant to the March 1, 1938 Agreement, they transferred to DCI all rights in and to Superman, including "the title, names, characters, concept and formula" as set forth in Action Comics No. 1; and (c) agreed that National was the sole and exclusive owner of all rights in Superman and Superboy. In exchange, Siegel and Shuster were paid nearly $900,000 in today's dollars.

41.    Following the commencement of the Westchester Action, Siegel attempted to launch a new comic book and syndicated strip feature entitled "Funnyman."  The *Funnyman* comic book, however, was cancelled after only six issues, and the syndicated *Funnyman* strip was only picked up by a few newspapers and dropped prior to the end of 1949.  By the late 1950s, Siegel was unable to find employment in the comic book field and needing to support his family, he approached DC Comics asking for work.  Despite Siegel's prior lawsuit and challenge to DC's rights in Superman, DC Comics agreed to hire Siegel and thereafter employed him continuously as a work-for-hire writer until the mid-1960s, when Siegel once again challenged DC Comics' rights to Superman.

- 14 -                                COMPLAINT

EXHIBIT 38
Page 890

42.     In April 1965, Siegel (while still working for DC Comics) and Shuster (who was being paid a monthly stipend by DC Comics) filed copyright renewal notices in their own names, claiming to own the renewal copyrights in the Superman character and in Action Comics No. 1.  This was followed by a lawsuit filed by Siegel and Shuster against National in 1969 in the District Court for the Southern District of New York, seeking a declaration that they owned the "renewal" copyright terms for Superman and Action Comics No. 1.  (Under the then-applicable 1909 Copyright Act, the period of copyright protection for a work included an initial term of 28 years and an optional renewal term of 28 years.) Again, Siegel and Shuster's arguments were rejected, and the federal district court held, *inter alia*, that the agreements between Siegel and Shuster, on the one hand, and DCI (later National), on the other, had assigned "all" rights in Superman to DCI and National, including all renewal copyrights.  *See Siegel v. Nat'l Periodical Publ'ns, Inc.*, 364 F. Supp. 1032 (S.D.N.Y. 1973).  The Court of Appeals for the Second Circuit affirmed the district court's ruling that National owned all rights in Superman.  *See Siegel v. Nat'l Periodical Publ'ns, Inc.*, 508 F.2d 909 (2d Cir. 1974).  Siegel and Shuster did not further appeal that ruling.

43.     Following the failure of their second lawsuit to recapture copyrights in Superman, Siegel and Shuster ran into financial difficulties.  Siegel publicized their financial plight, and there were calls for companies like National (and even for Congress) to help such artists.  On December 23, 1975, and despite Siegel and Shuster's two prior lawsuits against National, Warner Communications, Inc. ("WCI"), National's then-parent company, agreed to provide them financial assistance.  Under an agreement entered into in 1975 (the "1975 Agreement"), Siegel and Shuster again acknowledged that DC Comics was the sole and exclusive owner of "all right, title and interest in and to the 'Superman' concept, idea, continuity, pictorial representation, formula, characters, cartoons and comic strips, title, logo, copyrights and trademarks, including any and all renewals and

- 15 -

COMPLAINT

EXHIBIT 38
Page 891

1  extensions of such rights, in the United States and throughout the world, in any and

2  all forms of publication, reproduction and presentation, whether now in existence or

3  hereafter devised."  In exchange, WCI agreed to provide Siegel and Shuster with,

4  *inter alia*, annual payments of $20,000 each (around $80,000 in current dollars),

5  annual payments to their heirs after their death, medical insurance coverage, and a

6  lump sum of $17,500 each.  With respect to Shuster's heirs, WCI agreed that after

7  Shuster's death, it would make annual payments to his brother, Frank Shuster, of

8  $10,000 until December 31, 1985, and then $5,000 a year for the rest of his life.

9        44.    In the years following the 1975 Agreement, DC Comics increased the

10  annual payments to Siegel and Shuster, made periodic cost-of-living increases,

11  provided insurance, and paid special bonuses.  During the last several years,

12  Siegel's widow, for example, has received $135,000 per year plus reimbursement

13  for all medical expenses.  In all, DC Comics has paid Siegel, Shuster, and their

14  heirs nearly $4 million pursuant to the 1975 Agreement and other arrangements—

15  benefits that DC Comics continues to pay, and the Siegel and Shuster heirs continue

16  to accept.

17        45.    In 1976, Congress amended the Copyright Act to give authors and

18  certain of their heirs certain limited rights to terminate prior grants of copyright.

19  *See* 17 U.S.C. § 304(c) (1976).  This amendment did not apply to works-made-for-

20  hire (the company paying for the production of those works would always own

21  them), and entitled authors and certain heirs to recapture copyrighted interest only

22  in works that the *author* actually created (*e.g.*, it did not entitle authors to recapture

23  derivative works the grantee may have developed pursuant to the original grant,

24  such as the original Superman radio and television shows, or Superman-related

25  characters, such as "Superboy" or "Lex Luthor").  Despite their previous legal

26  battles with National and the widespread publicity surrounding this legislation,

27  neither Jerry Siegel nor Joe Shuster ever endeavored to exercise any termination

28  rights under the statute.  Instead, for the rest of their lives, Siegel and Shuster

- 16 -

COMPLAINT

EXHIBIT 38
Page 892

1    accepted and enjoyed the benefits under the 1975 Agreement. This decision made

2    sense, given Siegel and Shuster's work-for-hire relationship with DC Comics, the

3    narrow sliver of rights (if any) to which they might claim an interest, and the

4    significant contributions made to Superman in the past 70 years to which they could

5    claim no interest. Moreover, the 1975 Agreement paid Shuster and Siegel an

6    annual pension and medical insurance for the rest of their lives and, upon their

7    death, paid annual pensions to their heirs. Although Shuster's and Siegel's

8    "window of time" in which to attempt to terminate prior grants of copyright

9    interests in Superman theoretically opened in 1984, at no time during their lives did

10   they attempt to exercise any such right.

11   **C.    Joe Shuster's Death and the Shuster Heirs' 1992 Agreement**

12          46.    Joe Shuster passed away on July 30, 1992. He was survived only by

13   his brother Frank Shuster, sister Jean Peavy, and Jean's two children, Mark Peary

14   and Dawn Peavy (the "Shuster Heirs"). (Mark Peary changed his last name from

15   "Peavy" to "Peary.") Shuster did not leave a widow and never had children or

16   grandchildren. Shuster's purported will names Jean Peavy the sole beneficiary of

17   his estate. (An alleged copy of this will surfaced and was probated in 2001, only

18   after Toberoff intervened. In addition to certain irregularities in the will, probate

19   papers filed by the Shuster Heirs falsely represented that Joe Shuster was never

20   married and omitted that Joe had a sibling, Frank, who had also survived him.)

21          47.    On August 21, 1992, Jean Peavy sent a letter to Time Warner and DC

22   Comics explaining that Shuster had "left his family with a crushing burden of

23   unpaid debts and bills and only a tiny estate." Jean stated: "It's unbelievable to me

24   that Joe could have so little considering the generosity shown by Time Warner in

25   raising the pension income of Siegel and Shuster." She also disclosed that 20% of

26   Shuster's income had been taken by Joanne Siegel, Jerome Siegel's widow, "as an

27   agent's commission for getting pay raises for Siegel and Shuster" following the

28   December 23, 1975 Agreement. Much of the remainder of Shuster's income was

- 17 -                                    COMPLAINT

EXHIBIT 38
Page 893

spent by him during "compulsive buy[ing]" and "shopping sprees" and on
expensive stereo equipment and other personal items. As a result, Shuster had
accumulated "almost $20,000 in credit card debts and unpaid bills." Jean asked that
Time Warner and DC Comics "pay his final debts and expenses."

48.    In September 1992, Time Warner and DC Comics offered to pay off
Shuster's debts and expenses, totaling approximately $20,000, plus increase Frank
Shuster's annual survivor payments under the 1975 Agreement from $5,000 to
$25,000 per year.

49.    In a September 10, 1992 letter sent to DC Comics (the "September 10,
1992 Letter"), Frank Shuster, on behalf of himself and Jean, requested that the
annual payments due and owing Frank be made to Jean Peavy in order to take
advantage of certain tax benefits. Frank and Jean further promised that, if an
agreement could be reached, Jean "would not pursue the termination of the
Superman copyright as provided for to creators' heirs in the 1976 U.S. Copyright
Act."

50.    Based on Jean and Frank's letter and the parties' further discussions,
DC Comics, Jean, and Frank entered into a written agreement on October 2, 1992
(the "1992 Agreement"). The 1992 Agreement confirmed that it "fully settles all
claims to any payments or other rights or remedies which you may have under any
other agreement or otherwise, whether now or hereafter existing regarding the
copyrights, trademarks, or other property right in any and all work created in whole
or in part by your brother, Joseph Shuster, or any works based thereon," and that
the Shuster Heirs "covenant not to assert any claim of right, by suit or otherwise,
with respect to the above, now and forever." The 1992 Agreement operated to
revoke, rescind, and replace Shuster's prior copyright grants and agreements.

51.    After the 1992 Agreement, DC Comics and the Shuster Heirs enjoyed
an amicable relationship with the Shuster Heirs. To date, DC Comics and its
affiliates have paid the Shuster Heirs close to $500,000 under the 1992 Agreement.

- 18 -

COMPLAINT

EXHIBIT 38
Page 894

On April 27, 1995, Jean Peavy sent a letter to DC Comics expressing gratitude for their generosity and concluding: "You know we appreciate your thoughtfulness." Even after Frank Shuster's death in 1996, DC Comics has continued to this day to pay $25,000 per year to Jean Peavy.

**D.**     **Toberoff Induces the Shusters to Repudiate the 1992 Agreement with**
           **DC Comics and Acquires a 50% Interest in the Shusters' Putative Rights**

52.     This state of affairs remained undisturbed for almost a decade.  In 2001, Toberoff and his production company, Pacific Pictures, induced the Shuster Heirs to violate their 1992 Agreement and wrongfully attempt to acquire and exploit future copyright interests in Superman.

53.     Toberoff is a self-described "intellectual property entrepreneur."  His business—conducted through a variety of corporate entities like Pacific Pictures—is to locate the authors of valuable copyrighted works or their heirs and acquire, or prevent them from conveying to others asserted rights to present or future copyright interests.  To convince these authors and heirs to go into business with him, Toberoff holds himself out as a producer with the financial resources and connections to exploit recaptured rights in all media in the entertainment industry.

54.     In or around 2001, Toberoff made contact with the Shuster Heirs and embarked on a course of conduct with them to disrupt their relationship with DC Comics, including DC Comics' rights under the 1992 Agreement.  On November 28, 2001, the Shuster Heirs formed a joint venture with Toberoff's company Pacific Pictures ("2001 Pacific Pictures Agreement") for the stated "purpose of retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations."  The 2001 Pacific Pictures Agreement provided that this purpose would be realized "via the establishment of Joe Shuster's estate" in a California probate court "and the estate's termination pursuant to [17 U.S.C. § 304] of any and all grant or transfers by Joe Shuster of any copyright interest in his creations."

- 19 -

COMPLAINT

EXHIBIT 38
Page 895

55.     The 2001 Pacific Pictures Agreement defined the Shuster Heirs' rights being assigned as including all "rights, claims, title, copyrights and interests in and to each character, story element, and indicia associated with ... 'SUPERMAN' [and] *Superboy*." (Italics added.)

56.     Pursuant to the 2001 Pacific Pictures Agreement, Jean and her son Mark Peary "transfer[red] and assign[ed] to the Venture their rights, title, and interest" in Shuster's Superman and Superboy rights.  The Agreement provided that "[a]ny and all moneys and proceeds [of the Venture] will be shared, divided and payable:  fifty percent (50%) to [the Shuster Heirs] and fifty percent (50%) to PPC [Pacific Pictures]," and that upon "winding-up of the Venture or in the event of termination of the Venture *for any reason*, all Rights, property or assets of the Venture will be held fifty percent (50%) by the [Shuster Heirs] and fifty percent (50%) by PPC." (Emphasis added.)

57.     The 2001 Pacific Pictures Agreement also provided that the Shuster Heirs could not enter into any agreement with respect to the Superman and Superboy rights "without the express written consent" of Pacific Pictures, an entity controlled solely by Toberoff.  The 2001 Pacific Pictures Agreement further provided that the joint venture would "retain Marc Toberoff, Esq. to render legal services in connection with the Rights and the Venture."

58.     Pursuant to the 2001 Pacific Pictures Agreement, the Shuster Heirs filed a probate action in Los Angeles Superior Court to establish the Shuster Estate. That action remains open.  (*See* LASC Case No. BP-080635.)

**E.     Toberoff Induces the Siegels to Repudiate the Siegel-DC Comics**
**Agreement and Acquires a 45% Interest in the Siegels' Putative Rights**

59.     Having orchestrated this joint venture, Toberoff used the Shuster Heirs to gain access to the heirs of Jerry Siegel, Joanne Siegel and Laura Siegel Larson (collectively, the "Siegel Heirs").  Toberoff sought to corner the other putative "half" of putative Superman termination rights.  Toberoff knew, however, that the

- 20 -

COMPLAINT

EXHIBIT 38
Page 896

1    Siegels had reached an agreement with DC Comics in 2001 resolving their putative

2    termination claims.  Nevertheless, Toberoff and his companies set out to interfere

3    with this agreement in order to acquire a stake in the Siegel Heirs' putative

4    copyright interests in Superman.

5        60.    In 1997—and after Jerry Siegel's death in 1996—the Siegel Heirs had

6    employed counsel and served notices to terminate grants of Superman rights that

7    Siegel had conveyed to DC Comics (the "Siegel Superman Termination Notice").

8    The Siegel Superman Termination Notice, which was prepared by prior counsel,

9    listed Superboy works and elements as among the "character[s], story element[s], or

10   indicia reasonably associated with SUPERMAN," in recognition of the fact that

11   Superboy was a complete derivative of Superman rather than a stand-alone, non-

12   derivative work based upon Superman.

13       61.    The Siegel Heirs and DC Comics began negotiations, and in these

14   talks the Siegel Heirs were represented by Kevin Marks of the Gang Tyre

15   entertainment law firm.  As the parties' negotiations progressed, and as

16   expectations grew that an agreement would soon be reached, DC Comics paid the

17   Siegels a non-refundable advance of $250,000.

18       62.    On October 16, 2001, DC Comics made a proposal to the Siegel Heirs.

19   On October 19, 2001, Kevin Marks sent a letter to DC Comics confirming that the

20   Siegel Heirs "accepted D.C. Comics' offer of October 16, 2001."  On October 26,

21   2001, DC Comics sent a return letter confirming the parties' agreed-upon terms.

22   DC Comics then began drafting a long-form agreement.  DC Comics sent the Siegel

23   Heirs a copy of the long-form document on February 1, 2002.  As a result of the

24   parties' agreement (the "Siegel-DC Comics Agreement"), the Siegels were now on

25   the brink of receiving significant portions of the Superman profits—sums that

26   would immediately and dramatically change their lives.  Moreover, virtually all of

27   the money would be theirs alone to keep, as the Gang Tyre firm had agreed to

28   represent the Siegels for the standard 5% fee.

                                    - 21 -                          COMPLAINT

EXHIBIT 38
Page 897

63.     Toberoff has admitted that he closely tracked the progress of the Siegel Heirs' termination attempt.  On learning of the Siegel-DC Comics Agreement, he knew his company's joint-venture interest in the Shuster rights was limited and that he could assert greater leverage only if he could disrupt the Siegel-DC Comics Agreement and corner both "halves" of the putative Superman termination rights. Given that Joe Shuster and his heirs held whatever Superman copyright interests they owned (*if any*) jointly with Jerome Siegel, Toberoff understood that if DC Comics obtained the rights from the Siegels to exploit new Superman properties, it could do so freely without any ability on the part of the Shusters to claim their interests were being infringed.

64.     With knowledge that his actions would interfere with DC Comics' actual and prospective economic advantages under the Siegel-DC Comics Agreement, beginning in or around late 2001, Toberoff—identifying himself as a film producer—approached the Siegel Heirs, including and/or through their representative Kevin Marks, for the purpose of acquiring their rights.

65.     Marks informed Toberoff that the Siegel Heirs had already reached a binding agreement with DC Comics, which was in the process of being further documented in a long-form agreement.  Undeterred, Toberoff continued to contact the Siegel Heirs and their representatives in an effort to induce them to repudiate the Siegel-DC Comics Agreement and enter into a production agreement with Toberoff or one of his companies.

66.     On May 9, 2002, as a result of Toberoff's improper interference and inducements, Joanne Siegel sent a letter to DC Comics' affiliate acknowledging the Siegel Heirs had accepted DC Comics' October 16, 2001 offer, but purporting to object to certain unspecified portions of the long-form document.  DC Comics objected to the Siegel Heirs' sudden and unfounded objections, but continued working with their counsel to finalize the long-form agreement.

- 22 -

COMPLAINT

EXHIBIT 38
Page 898

67.    In or around August 2002, as Marks was finalizing the Siegels'
revisions to the long-form document, Toberoff contacted Marks again regarding the
Siegel-DC Comics Agreement.  Upon information and belief, Marks informed
Toberoff he could not discuss the matter, including the terms of the agreement,
because of a confidentiality agreement between DC Comics and the Siegel Heirs.
Toberoff reiterated interest in purchasing the Siegel Heirs' Superman rights.  On
August 8, 2002, Toberoff conveyed an offer to Marks for presentation to the
Siegels, which Marks said he would convey.

68.    Upon information and belief, Toberoff's offer stated that he had found
a billionaire investor willing to purchase the Siegel Heirs' Superman rights.
Toberoff claimed the investor would give the Siegel Heirs $15 million cash up
front, plus generous royalty and "back-end" rights on any properties developed,
including a new Superman motion picture.  Upon information and belief, Toberoff
also falsely offered to help the Siegel Heirs produce a movie that would compete
directly with the Superman movie in development at the time at Warner Bros., DC
Comics' licensee, even though he knew that the Siegels' limited rights in the
recaptured copyright, if any, would make such a competing motion picture all but
impossible to produce and distribute.

69.    Upon information and belief, although Marks conveyed Toberoff's
offer to the Siegels, he advised them that they had already reached a binding
agreement with DC Comics.  Nonetheless, as a result of Toberoff's inducements,
the Siegel Heirs stated that they would repudiate their agreement with DC Comics
and accept Toberoff's offer.

70.    On or around September 21, 2002, the Siegel Heirs sent a letter to
Marks terminating him as their attorney.  On or around September 21, 2002, based
on Toberoff's inducements, the Siegel Heirs sent a letter to DC Comics repudiating
the Siegel-DC Comics Agreement.  On October 23, 2002, the Siegel Heirs
formalized an agreement with defendant IP Worldwide for the purpose of

- 23 -

COMPLAINT

EXHIBIT 38
Page 899

1   "arrang[ing] and negotiat[ing] the sale, lease, license and all other dispositions or

2   exploitations" of the Siegel Heirs' Superman rights (the "IP Worldwide

3   Agreement"). The Siegel Heirs agreed to pay IP Worldwide a fee of 10% of the

4   gross proceeds generated by those rights. Upon information and belief, the fee was

5   subsequently reduced to 5%.

6        71.    Upon information and belief, in or around September 2004, the Siegel

7   Heirs entered into an agreement with Toberoff granting him 40% of their Superman

8   rights and retaining him as their attorney (the "Siegel-Toberoff Agreement").

9        72.    Upon information and belief, as a result of the Siegel-Toberoff

10   Agreement and IP Worldwide Agreement, Toberoff now owns a 45% financial

11   interest in the Siegel Heirs' purported Superman rights.

12   **F.**   **Toberoff Manipulates the Siegel Heirs and Shuster Heirs into Falsely**

13       **Claiming that Superboy Was the Sole Creation of Jerry Siegel**

14        73.    After inducing the Siegel Heirs to repudiate the Siegel-DC Comics

15   Agreement, on November 8, 2002, Toberoff caused the Siegel Heirs to serve a

16   second copyright termination notice on DC Comics directed at the character

17   Superboy (the "Siegel Superboy Termination Notice"). The notice not only

18   erroneously stated that Superboy was a copyrightable work not derivative of

19   Superman, but falsely recited that Superboy was created *solely* by Siegel (without

20   contribution from Shuster), thereby entitling the Siegel Heirs to terminate and

21   recapture 100% of the putative Superboy rights.

22        74.    Defendants knew these claims were false. To begin, in the Siegel

23   Superman Termination Notice served by the Siegel Heirs in 1997—the one served

24   prior to Toberoff's intervention—the Siegel Heirs expressly identified the Superboy

25   works and elements as among the "character[s], story element[s], or indicia

26   reasonably associated with SUPERMAN." This earlier notice acknowledged—as is

27   in fact the case—that Superboy was a derivative work of Superman, rather than a

28   separately copyrightable work.

- 24 -

COMPLAINT

EXHIBIT 38
Page 900

75.    As to the representation that Superboy was created solely by Jerry Siegel, defendants knew that claim was untrue as well.  Among other reasons:

- One year earlier, through defendant Pacific Pictures, Toberoff had entered into the 2001 joint venture agreement with the Shuster Heirs, specifying that the *Shuster Heirs* owned an interest in "Superboy."

- The original Superboy "script" on which the Siegel Heirs' ownership claims rely openly contains the byline:  "By Jerry Siegel *and Joe Shuster*"—not just Jerry Siegel alone.  (Emphasis added.)

- In 1972 and 1973, Siegel and Shuster together filed their own copyright renewal notices with the copyright office for Superboy, in which they identified Superboy as a work that they had *jointly* created.

- And long before the alleged first publication of "Superboy" in November 1944, Shuster illustrated works for DC Comics that included various depictions of Superman as a boy, exhibiting super-human strength.  Several examples are reproduced below.  In "Action Comics No. 1," for example, Shuster drew Superman as a very young boy displaying an "astonish[ing] feat[]" of super-human strength, holding a chair above his head:



Action Comics No. 1 (1930)

- 25 -

COMPLAINT

EXHIBIT 38
Page 901

Shuster also depicted Superman as a youth with super-powers in "Superman No. 1," a work allegedly terminated by Shuster in the notice filed by Toberoff on behalf of the Shuster heirs,



Superman No. 1 (May 1939)

as well as in a 1942 Sunday comic strip, in which Superman as a "youth" discovers that his "amazing powers" are "multiplied with the years" and that, as a boy, he could "outrace the fastest streamline train":



Superman Sunday Strip (May 31, 1942)

76.     Through Pacific Pictures, Toberoff manipulated the Siegel and Shuster Heirs into falsely positioning Siegel as the sole creator of any putative

- 26 -

COMPLAINT

EXHIBIT 38
Page 902

1 | copyrightable elements in Superboy. They did so to enable the Siegels to claim a
2 | sole ownership interest in Superboy elements allegedly subject to recapture and
3 | thereby prevent DC Comics from exploiting Superboy without the Siegels'
4 | authorization and without being subject to claims of copyright infringement.
5 | (Again, to be clear, DC Comics disputes that Superboy is not a derivative work of
6 | Superman and disputes that it is a work that Shuster and Siegel owned.)

7 |     77.   To manufacture this claim of sole ownership by the Siegels, Toberoff
8 | (acting through Pacific Pictures) caused the *Shuster Heirs* to remove from the 2001
9 | joint venture between Pacific Pictures and the Shuster Heirs all claims by the
10 | Shusters to alleged rights in any and all Superboy elements. Toberoff
11 | accomplished this by creating a new joint venture agreement—signed October 30,
12 | 2003—that *deleted* any reference to Superboy. Defendant Mark Peary signed this
13 | agreement (the "2003 Pacific Pictures Agreement"), which omitted all references to
14 | Superboy in its description of the Shuster Heirs' rights. Toberoff induced the
15 | Shuster Heirs to disclaim any interest in Superboy so that Toberoff could position
16 | the Siegel Heirs to recapture 100% of these rights and assert a copyright
17 | infringement action against DC Comics—and seek an injunction against the
18 | television program *Smallville* on that basis.

19 |     78.   In October 2004, the Siegels filed two actions in this Court seeking
20 | declaratory relief as to the validity of the Superman and Superboy termination
21 | notices, and in April 2005, the Siegels supplemented their pleadings in the
22 | Superboy action to assert copyright infringement. (Case Nos. CV-04-8400 ODW;
23 | CV-04-8776 ODW.) Both actions remain pending before this Court.

24 | **G.   The Shusters' Flawed Termination Notice**

25 |     79.   On November 10, 2003, one week after the 2003 Pacific Pictures
26 | Agreement was signed, defendant Mark Peary served on DC Comics a "Notice of
27 | Termination of Transfer Covering Extended Copyright Renewal Term of
28 | 'Superman'" (the "Shuster Termination Notice").

- 27 -

COMPLAINT

EXHIBIT 38
Page 903

80.    The form submitting the Shuster Termination Notice for recordation in the U.S. Copyright Office was certified under penalty of perjury by Toberoff on behalf of "IP Worldwide/Estate of Joseph Shuster."  IP Worldwide is the Toberoff entity which, upon information and belief, holds a portion of the Siegel Heirs' Superman and Superboy rights pursuant to the IP Worldwide Agreement.

81.    The Shuster Termination Notice purports to terminate, under 17 U.S.C. § 304(d), effective October 26, 2013, the following Shuster copyright grants: (a) the December 4, 1937 Agreement; (b) the March 1, 1938 Agreement; (c) the DCI September 22, 1938 Agreement; (d) the McClure September 22, 1938 Agreement; (e) the December 19, 1939 Agreement; (f) the May 19, 1948 Stipulation; and (g) the December 23, 1975 Agreement.

82.    The Shuster Termination Notice does *not* purport to terminate the copyright grants in the May 21, 1948 Consent Agreement or, even more importantly, the 1992 Agreement between the Shuster Heirs and DC Comics.

83.    The Shuster Termination Notice purports to apply to the following works:  (a) certain unpublished material created before Action Comics No. 1; (b) Action Comics No. 1; (c) Action Comics No. 2; (d) Action Comics No. 3; (e) Action Comics No. 4; (f) Action Comics No. 5; (g) Action Comics No. 6; (h) Action Comics No. 7; (i) Superman No. 1; and (j) Superman No. 3.

84.    The Shuster Termination Notice does not purport to terminate any copyright grant in pre-Action Comics No. 1 promotional materials or any materials relating to Superboy.

85.    The Shuster Termination Notice states that defendant Mark Peary "is the person entitled to exercise Joseph Shuster's termination interest" and that the Notice was "signed by all persons whose signature is necessary to terminate."  The Notice makes no mention of the joint venture that the Shuster Heirs and Pacific Pictures formed or its putative ownership stake in the to-be terminated Superman rights.  Nor does the Notice mention Pacific Pictures or its putative ownership stake

- 28 -

COMPLAINT

EXHIBIT 38
Page 904

1  in the joint venture, despite the grant of 50/50 rights in the joint venture to Pacific

2  Pictures pursuant to Pacific Pictures' 2001 and 2003 agreements with the Shusters.

3      86.    On September 10, 2004, Pacific Pictures and the Shuster Heirs signed

4  a one-page letter (the "September 10, 2004 Letter") purporting to cancel their joint

5  venture and providing that the 2001 Pacific Pictures Agreement and 2003 Pacific

6  Pictures Agreement "have been cancelled." However, because the Shuster Heirs

7  and Pacific Pictures had agreed that all rights held by their joint venture would be

8  divided 50/50 upon termination of the joint venture "for any reason," the apparent

9  effect of the September 10, 2004 Letter was to transfer 50% of the Shuster Heirs'

10  purported share of Shuster's rights to Toberoff or his companies.

11      87.    DC Comics is informed and believes that Toberoff (or his companies)

12  now own 50% of the Shuster Heirs' putative rights as well as the 45% share of the

13  Siegel Heirs' putative rights. This gives Toberoff the largest financial stake among

14  defendants' collective asserted rights in Superman and in the pending legal disputes

15  concerning those rights (*i.e.*, Toberoff—47.5%; Siegel Heirs—27.5%; Shuster

16  Heirs—25%).

17      88.    DC Comics is also informed and believes that Toberoff, Pacific

18  Pictures, IP Worldwide, the Siegels, and the Shusters have entered into one or more

19  agreements preventing the Siegels or Shusters from conveying rights to DC Comics

20  or entering into other agreements with DC Comics, including for the settlement of

21  their putative termination claims or litigation, without the consent of other parties.

22  For example, in the 2003 Pacific Pictures Agreement, the Shuster Heirs agreed not

23  to settle any claims with respect to the Superman rights without Pacific Pictures' or

24  Toberoff's consent. Such consent agreements are void as against public policy,

25  violate DC Comics' rights, and impede the administration of justice.

26

27

28

- 29 -                                COMPLAINT

EXHIBIT 38
Page 905

**H.    Toberoff's Wrongful Conduct Is Revealed to DC Comics in the Toberoff Timeline**

89.    Pursuant to federal court orders dated September 26, 2008 and December 4, 2008, Toberoff was compelled to produce to DC Comics a document titled "Superman – Marc Toberoff Timeline" ("Toberoff Timeline," attached hereto as Exhibit A), which Toberoff has acknowledged was written by an attorney he previously employed.  To prevent DC Comics from obtaining and using the document, Toberoff asserted to the federal court that it was privileged, but his position was rejected.  Toberoff produced the Toberoff Timeline to DC Comics on December 10, 2008.

90.    The Toberoff Timeline describes and discloses Toberoff's wrongful activities in pursuing the Siegel and Shuster Heirs' putative interests in the Superman rights.  It lays out Toberoff's scheme to induce the Siegel Heirs to repudiate the Siegel-DC Comics Agreement with DC Comics (*e.g.*, "It [is] clear at this juncture that [Toberoff] thwarted the earlier deal with Time Warner and DC Comics in 2002 for his own personal gain"); his efforts to acquire as "much ownership of the Superman copyright <u>personally</u> as he can"; and his attempt to conceal certain of his illicit activities from the Siegel and Shuster Heirs.  (Emphasis in original.)  As a result, "*the single person who would stand to gain the MOST in a settlement with Time Warner [and DC Comics] regarding the ongoing SUPERMAN legal dispute would not be the heirs themselves, but Marc Toberoff.*"  (Emphasis in original.)

91.    The Toberoff Timeline discloses many of the facts alleged herein, and concludes: "[Toberoff] is solely motivated *at all times* not by his clients' interests, but manipulating pieces of the puzzle so that he may receive the greatest percentage from a very possible large Time Warner settlement, through part ownership and unconscionable fees."  (Emphasis in original.)  The Toberoff Timeline explains that "[a]t least 7 attorneys have come and gone at the Law Offices of Marc Toberoff,

- 30 -

COMPLAINT

EXHIBIT 38
Page 906

and many have left due to ethical issues."  Many of these and other disturbing,

salient facts detailed herein have only recently come to light in the past 18 months.

## V.   CLAIMS FOR RELIEF

**A.    First Claim for Relief:  Declaratory Relief re: Invalidity of Copyright**

**Termination Notice (Against Defendants Shuster Estate and Peary)**

92.    DC Comics re-alleges and incorporates by reference each and every

allegation contained in the paragraphs above.

93.    The Shuster Termination Notice is invalid, and thus ineffective, for at

least five separate, independent, and alternative reasons:

### (1) There Is No Statutory Basis for the Shusters to Terminate

94.    The Copyright Act does not provide any basis for the Shuster Estate to

terminate.  Shuster's termination right was lost when he died in 1992 without

having exercised it and without leaving a statutory heir to inherit it under the then-

applicable provisions of the Copyright Act.

95.    The 1976 Copyright Act gave authors the ability to terminate certain

pre-1978 copyright grants.  According to the original termination provisions:

"Where an author is dead, his or her termination interest is owned, and may be

exercised, by his widow or her widower and his or her children or grandchildren."

17 U.S.C. § 304(c)(2) (1976).  In other words, the right of termination could only

be exercised by an author during his or her lifetime, or by a widow, child, or

grandchild after the author's death.  As the language of the statute establishes, and

its legislative history confirms, the right of termination was lost if an author died

without exercising it and without leaving a widow, child, or grandchild to inherit it.

96.    Shuster could have exercised his putative termination right beginning

in April 1984.  The 1976 Copyright Act provided that a copyright grant could be

terminated 56 years after the date copyright was first secured (*i.e.*, April 1994, or 56

years after the April 1938 publication of Action Comics No. 1), and that notice of

- 31 -

COMPLAINT

EXHIBIT 38
Page 907

1   termination could be served 10 years before the termination date (*i.e.*, April 1984,

2   or 10 years before April 1994).  17 U.S.C. § 304(c)(3)-(4).

3       97.    During his lifetime, Shuster chose not to exercise his termination right.

4   Shuster died in 1992, and did not leave a widow, child, or grandchild to succeed to

5   his termination right under section 304(c) of the 1976 Copyright Act.  As a result,

6   Shuster's termination right ceased to exist on his death.

7       98.    The 1999 Copyright Term Extension Act ("CTEA") extended the term

8   of copyright by 20 years and also provided an opportunity to authors and selected

9   heirs to terminate for this new extended time period in circumstances where the

10  "[t]ermination rights provided for in subsection (c) have expired on or before the

11  effective date of the [CTEA]," or October 27, 1998, and the "author or owner of the

12  termination right has not previously exercised such termination right."  17 U.S.C.

13  § 304(d).  Where section 304(d) applies, section 304(c)(2) provides that if an author

14  is dead, the termination right can be exercised by his widow, children, or

15  grandchildren or, "[i]n the event that the author's widow or widower, children or

16  grandchildren *are not living*, the author's executor, administrator, personal

17  representative, or trustee...."  (Emphasis added).  These are the provisions that

18  defendant Mark Peary, the executor of the Shuster Estate, purports to rely on in the

19  Shuster Termination Notice, but they have no application here.  By its own terms,

20  section 304(d) only applies where an author's window for exercising the

21  termination right opened and closed or "expired" (*not* when an author died while

22  the window was open without exercising the right or leaving any heirs to do so),

23  and where a deceased author's widow, child, or grandchild is "not living," but who

24  did at some time live.  Shuster never had a widow, child, or grandchild, and Peary,

25  acting on behalf of the Shuster Estate, has no right to file the invalid notice of

26  termination that he did.

27

28

- 32 -                                            COMPLAINT

EXHIBIT 38

Page 908

**(2) <u>The 1992 Agreement Bars the Shusters from Pursuing Termination</u>**

99.    The 1992 Agreement that Frank Shuster and Jean Peavy entered into with DC Comics bars the Shuster Estate from pursuing termination because, *inter alia*, in exchange for valuable consideration, the 1992 Agreement effected a rescission, revocation, and re-grant of all prior copyright grants, which eliminated any pre-1978 grant that could be subject to termination under section 304 of the Copyright Act.

100.    The 1992 Agreement, which was executed on October 2, 1992, provides that Shusters' heirs "fully settle[]" and forfeit any and all of rights under Joseph Shuster's prior "agreements or otherwise," thereby revoking and rescinding those prior, pre-1992 instruments.  It also *"grant[s] to us* [DC Comics] any ... copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon." (Emphasis added.)

101.    Section 304(d) of the Copyright Act only allows for termination of copyright grants "executed before January 1, 1978."  Because the 1992 Agreement left intact no pre-1978 copyright grant to terminate, section 304(d) does not apply, and the Shuster Estate has no copyright grant that it may terminate.

102.    Shuster's heirs approached DC Comics in 1992 seeking increased annual payments, certain tax benefits, and payment of Shuster's debts and expenses.  At the time, Shuster's heirs recognized the value of Superman as a property.  As the result of DC Comics' development, promotion, and exploitation of Superman from 1938 to 1992, Superman had evolved from the black-and-white figure drawn by Shuster for Action Comics No. 1 to a global, multi-media industry.  Moreover, in correspondence with DC Comics, the Shusters adverted to the termination rights provided for under the Copyright Act.  As Shuster's heirs requested, the 1992 Agreement provided that DC Comics would:  (a) increase its annual payments to the Shuster Heirs to $25,000 per year—five times higher than

- 33 -

COMPLAINT

EXHIBIT 38
Page 909

the amount it was obligated to pay under the December 23, 1975 Agreement;

(b) make these annual payments to Jean Peavy for purposes of a tax benefit; and

(c) pay the approximately $20,000 representing Shuster's final debts and expenses.

DC Comics continues to make annual payments under the 1992 Agreement, and

has paid Shuster's heirs close to $500,000 to date.  The 1992 Agreement confirms

that it "fully settles *all claims to any payments or other rights or remedies* which

you may have under any other agreement or otherwise, *whether now or hereafter*

*existing* regarding the copyrights, trademarks, or other property right in any and all

work created in whole or in part by your brother, Joseph Shuster, or any works

based thereon." (Emphasis added.)  Shuster's heirs agreed "not to assert any claim

of right, by suit or otherwise, with respect to the above, now and forever."

103.    By effectively rescinding, revoking, and re-granting any and all prior

grants of Joe Shuster's rights, the Shuster Heirs have no right to terminate any of

the Superman copyrights.

104.    At the very least, because of DC Comics' continued performance

under the 1992 Agreement, and the Shusters' continued acceptance of benefits

under the Agreement—even after filing the Shuster Termination Notice—the

Shusters are estopped from disputing that the 1992 Agreement remains in full force

and effect, which operates to preclude the assertion of any termination right.

### (3) The Shusters Lack the Majority Interest Necessary to Terminate

105.    The Shuster Termination Notice is also invalid because the party that

filed it—if defendants' own contractual documents are to be believed—lacked

authority to do so.  Section 304(c)(1) of the Copyright Act provides that termination

of a grant executed by an author who is not living may be exercised only "by the

person or persons who … own and are entitled to exercise a total of *more than one-*

*half of that author's termination interest*."  17 U.S.C. § 304(c)(1) (emphasis added).

Copyright Office regulations require that a termination notice include "specific

indication of the person or persons executing the notice who constitute more than

- 34 -

COMPLAINT

EXHIBIT 38
Page 910

one-half of that author's termination interest" and "shall be signed by the number and proportion of the owners of that author's termination interest required under section 304(c)." 37 C.F.R. § 201.10(b)(1)(vii), (c)(2).

106.   According to the Pacific Pictures agreements (to the extent they are valid and enforceable), the Shuster Estate does not own—and did not own at the time the Shuster Termination Notice was executed—the "more than one-half" majority interest necessary to terminate under section 304(c)(1) of the Copyright Act.

107.   Pursuant to the 2001 Pacific Pictures Agreement, defendant Mark Peary and Jean Peavy "transfer[red] and assign[ed] … their rights, title, and interest" in all of Shuster's copyrights and creations to their joint venture with Pacific Pictures.  In the 2003 Pacific Pictures Agreement, Peary confirmed the terms of the 2001 Pacific Pictures Agreement on behalf of the Shuster Estate.

108.   One week later, on November 10, 2003, Peary served the Shuster Termination Notice on behalf of the Shuster Estate.  At the time, the Shuster Estate did not own *any* of the purported termination right, as this and all other rights had been transferred to the joint venture with Pacific Pictures.[3]  The Shuster Termination Notice is therefore invalid under section 304(c)(1) of the Copyright Act.

109.   The Shuster Termination Notice represents that Peary "is the person entitled to exercise Joseph Shuster's termination interest" and that the Notice had been "signed by all persons whose signature is necessary to terminate."  Peary's

---

[3] At most, the Shuster Estate owned only a 50% interest in that joint venture. This is still the case.  As a result of the September 10, 2004 Letter purporting to cancel the 2001 and 2003 Pacific Pictures Agreements and by the terms of the 2001 and 2003 agreements themselves, any putative rights held by the joint venture were split 50/50 between the Shuster Heirs and Pacific Pictures on cancellation of the joint venture agreement:  "[Upon] winding-up of the Venture or in the event of termination of the Venture *for any reason, all Rights, property or assets of the Venture will be held* fifty percent (50%) by the [Shuster Heirs] *and fifty percent (50%) by PPC*."  (Emphasis added.)

- 35 -                                                          COMPLAINT

EXHIBIT 38
Page 911

1    failure to disclose that he had purported to transfer this putative termination right to

2    the joint venture with Pacific Pictures, or include a signature on behalf of the joint

3    venture or Pacific Pictures, violated 37 C.F.R. § 201.10(b)(1)(vii) and 37 C.F.R. §

4    201.10(c)(2).

5       110.   Peary's failure to disclose the requisite information in the Shuster

6    Termination Notice was not harmless.  Upon information and belief, these

7    omissions were not inadvertent, but were intended to conceal material information

8    from DC Comics, including:  (a) the various conflicts of interest arising from

9    Toberoff's and his companies' significant ownership interest in the Shuster Estate's

10   and the Siegel Heirs' purported rights; and (b) consent agreements that Toberoff

11   procured limiting the Shuster and Siegel Heirs' freedom to enter into agreements

12   with DC Comics regarding those rights.

13      111.   The Copyright Act's termination provisions were crafted to avoid the

14   trafficking in future interests by third parties like Toberoff and his companies, yet

15   that is exactly what his agreements with the Shuster and Siegel Heirs accomplish,

16   and what Toberoff and Shusters failed to disclose to DC Comics and the Copyright

17   Office by serving and filing the Shuster Termination Notice.

18              **(4) The Shusters Do Not Attempt to Terminate Certain**

19                  **All-Encompassing Copyright Grants**

20      112.   The 1992 Agreement includes a "grant" by Shuster's heirs to DC

21   Comics of, *inter alia*, all "copyrights, trademarks, or other property right in any and

22   all work created in whole or in part by … Joseph Shuster, or any works based

23   thereon."  In the Shuster Termination Notice, defendants did not terminate (or even

24   mention) the 1992 Agreement.

25      113.   The May 21, 1948 Consent Agreement also includes a grant by Siegel

26   and Shuster to National, DC Comics' predecessor-in-interest, of all of Siegel and

27   Shuster's rights in Superman and Superboy.  (If the 1992 Agreement is not read as

28   a rescission, revocation, and re-grant of all prior agreements between Shuster and

                                        - 36 -                    COMPLAINT

EXHIBIT 38

Page 912

1   DC Comics (and it should be), then the May 21, 1948 Consent Agreement remains

2   in effect.)

3        114.   Defendants do not attempt to terminate the May 21, 1948 Consent

4   Agreement, and do not identify the May 21, 1948 Consent Agreement in the

5   Shuster Termination Notice.

6        115.   As the result of defendants' failure to terminate the 1992 Agreement

7   and May 21, 1948 Consent Agreement, the grants contained therein remain in full

8   force and effect.  Thus, DC Comics is and continues to be the sole owner of all

9   rights, including rights under copyright, in Superman pursuant to the 1992

10  Agreement and May 21, 1948 Consent Agreement.

11       **(5) <u>The Doctrine of Unclean Hands Bars the Shusters from Terminating</u>**

12       116.   The doctrine of unclean hands requires that the Shuster Termination

13  Notice be deemed invalid because it contains material misrepresentations intended

14  to mislead the courts, Copyright Office, and DC Comics—all to the detriment of

15  DC Comics.

16       117.   The Shuster Heirs did not disclose Pacific Pictures' purported

17  ownership interest in the rights sought to be terminated.  Just one week before filing

18  the Shuster Termination Notice, the Shuster Estate signed the 2003 Pacific Pictures

19  Agreement, reaffirming its transfer of 100% of its rights in any Superman-related

20  copyrights to the joint venture with Pacific Pictures.  Copyright Office regulations

21  require that a termination notice include "specific indication of the person or

22  persons executing the notice who constitute more than one-half of that author's

23  termination interest" and "shall be signed by the number and proportion of the

24  owners of that author's termination interest required under section 304(c)."  37

25  C.F.R. § 201.10(b)(1)(vii), (c)(2).  Yet Pacific Pictures is conspicuously absent

26  from the Shuster Termination Notice.  This omission was not inadvertent, as

27  explained above.

28

- 37 -                                                              COMPLAINT

EXHIBIT 38
Page 913

118.    Induced by Toberoff, the Shuster Heirs also falsely disclaimed any interest in the Superboy rights in the Shuster Termination Notice. This permitted Toberoff to assert on behalf of the Siegel heirs a baseless Superboy-related copyright infringement claim against DC Comics. Prior to these manipulations by Toberoff, Shuster and the Shuster heirs had truthfully maintained for over 50 years that Shuster had co-created Superboy. For example, the findings submitted by Siegel and Shuster's counsel in the 1940s Westchester Action, specified that Shuster had drawn the first "Superboy" denominated story in More Fun Comics No. 101. Similarly, in 1972 and 1973, during the Superman renewal litigation, Siegel and Shuster jointly filed copyright renewal notices asserting joint authorship both in the Superboy character, and in More Fun Comics No. 101, which contained the first comic book story denominated "Superboy."

119.    Additionally, in the 2001 Pacific Pictures Agreement, entered into before Toberoff had secured an agreement with the Siegel Heirs, Toberoff and the Shuster Heirs expressly identified "Superboy" as among the universe of rights that Shuster had jointly created with Siegel. Yet just two years later in 2003, and only *after* Toberoff had entered into an agreement with the Siegel Heirs securing control over their rights, did the Shuster Heirs suddenly reverse course. The 2003 Pacific Pictures Agreement omitted all reference to Superboy, and the Shuster Termination Notice filed one week later avoided any overt mention of Superboy elements or works.[4] But even the termination notice served by the Shuster Heirs, while carefully drafted to avoid any mention of Superboy, could not completely rewrite history. The Shuster Termination Notice expressly identifies Action Comics No. 1 and Superman No. 1 as terminated works. Both of these works, however, clearly depict Superman as a boy with super-powers: *i.e.*, a "Superboy." For example,

---

[4] As noted, DC Comics maintains that Superboy is a derivative work based upon the preexisting Superman, and in any event, is owned solely and exclusively by DC Comics, *inter alia*, because it is a work-for-hire or because the script submitted by Siegel and Shuster is unpublished and, thus, is not terminable.

- 38 -

COMPLAINT

EXHIBIT 38

Page 914

1    Action Comics No. 1 features Superman as a very young boy exhibiting super

2    strength, and Superman No. 1 depicts Superman as a youth leaping over a building.

3        120.    After the Shuster Termination Notice was filed, the Siegel Heirs

4    brought a copyright infringement claim against DC Comics on the frivolous ground

5    that Superboy was the sole creation of Siegel, entitling the Siegel Heirs to terminate

6    and recapture 100% of the Superboy rights (as opposed to the 50% share they

7    would be entitled to recapture if Superboy was a joint work).  The Siegel Heirs

8    threatened to enjoin the popular *Smallville* television series, which they wrongly

9    claimed infringed their exclusive rights in Superboy.  As a result, DC Comics has

10   incurred substantial expenses defending against the claim Toberoff manufactured

11   and the Shusters facilitated.  Defendants compromised the integrity of the

12   Copyright Office and judicial system by crafting the Shuster Termination Notice in

13   this way, and the Shuster Termination Notice should be held invalid on this and the

14   other related grounds set forth herein.

15                        *        *        *

16       121.    Each of the foregoing reasons is a separate, independent, and

17   alternative basis for declaring the Shuster Termination Notice to be invalid and thus

18   ineffective.  A declaration by this Court regarding the validity of the Shuster

19   Termination Notice is warranted under the Declaratory Judgment Act, 28 U.S.C.

20   §§ 2201 *et seq.*, to establish the parties' respective rights and obligations with

21   respect to the copyright interest in the Superman material.

22   **B.    Second Claim for Relief:  Declaratory Relief re: Limited Scope of**

23         **Copyright Termination Notice (Against Defendants Shuster Estate and**

24         **Peary)**

25       122.    DC Comics re-alleges and incorporates by reference each and every

26   allegation contained in the paragraphs above.

27

28

123.   This Second Claim for Relief is advanced in the alternative—*i.e.*, if the Court does not grant DC Comics' First Claim for Relief set forth above and hold that the Shuster Termination Notice is invalid.

### (1) Additional Factual Background

124.   Upon information and belief, in or around 1933, Siegel and Shuster began co-creating comic strips, some of which included stories featuring a character named Superman.  The materials created by Siegel and Shuster during this time are believed to include: (a) 24 days of Superman comic strips intended for newspapers; (b) a seven-page synopsis of the last 18 days (weeks two through four) of such comic strips; (c) a paragraph previewing future Superman exploits; (d) a nine-page synopsis of an additional two months of daily comic strips; and (e) 15 daily comic strips (collectively, the "Unpublished Superman Works").  None of these materials was published in its original form, most were never published at all, and some are apparently lost.

125.   Upon information and belief, between 1933 and 1937, Siegel and Shuster submitted the Unpublished Superman Works to a number of prospective publishers and newspaper syndicates, all of which rejected them.

126.   On December 4, 1937, Siegel and Shuster entered into the December 4, 1937 Agreement with DCI.  Siegel and Shuster agreed to "give their exclusive services" in producing certain comic features for a period of two years.  Siegel and Shuster were required to submit any new continuity to DCI, which reserved the right to accept or reject them for a period of sixty days.

127.   In early 1938, DCI was seeking material for use in a new comic book it was developing entitled "Action Comics."  Pursuant to the December 4, 1937 Agreement, the 24 days of Superman comic strips from the Unpublished Superman Works were provided to DCI for review.  DCI decided to publish a Superman story in Action Comics No. 1, but the materials submitted by Siegel and Shuster to DCI were neither in a form that was acceptable for publication in a comic book, nor

- 40 -

COMPLAINT

EXHIBIT 38
Page 916

were they complete.  Therefore, at the instance and expense of DCI and subject to its right of control, Siegel and Shuster adapted the 24 days of comic strips, and added certain new material, to create a 13-page uncolored comic book story entitled "Superman."  Cover art featuring Superman that was used for Action Comics No. 1 was thereafter created by DCI.  DCI's printers or engravers, working at the direction of DCI, chose colors for the Superman character and colored the 13-page story and cover.

128.   Siegel and Shuster assigned to DCI all of their rights in Superman in the March 1, 1938 Agreement.  This included "all good will attached thereto and exclusive right to the use of the characters and story, continuity and title of strip." Siegel and Shuster agreed not to use Superman or any other character featured in the strip "by their names contained therein."

129.   Before the April 1938 publication of Action Comics No. 1, which was cover-dated June 1938, DCI promoted the upcoming Superman story in some of its other publications, including "More Fun Comics No. 31" and "Detective Comics No. 15." These publications were cover-dated May 1938 and were published prior to Action Comics No. 1.  The promotions (the "Promotions") depict Superman in his costume—including a cape, boots, leotard, and inverted triangular "S" crest on his chest—exhibiting his super-strength by holding a car over his head as bystanders watch in awe.  The Promotions show almost the entirety of what would become the cover of Action Comics No. 1 in clarity and detail.

130.   Action Comics No. 1 was comprised not only of the 24 days of Superman comic strips from the pre-existing Unpublished Superman Works (as modified and edited by Siegel and Shuster), but of additional new material created by Siegel and Shuster at DCI's instance and expense and subject to its right of control.

131.   Upon information and belief, after the publication of Action Comics No. 1, Siegel and Shuster supplied further original Superman stories to DCI, at

- 41 -                                                          COMPLAINT

EXHIBIT 38

Page 917

1   DCI's instance and expense and subject to its right of control.  On September 22,

2   1938, Siegel and Shuster entered into another employment agreement with DCI

3   confirming that Siegel and Shuster had "been doing the art work and continuity for

4   said comics [including Superman comics] for us.  We wish you to continue to do

5   said work and hereby employ and retain you for said purposes."  The DCI

6   September 22, 1938 Agreement also contained an acknowledgement that DCI was

7   the "exclusive" owner of Superman.

8       132.   Also on September 22, 1938, Siegel and Shuster entered into the

9   McClure September 22, 1938 Agreement with DCI and the McClure Newspaper

10  Syndicate concerning the use of Superman in newspaper strips.

11      133.   All of Siegel and Shuster's contributions to Superman comic books

12  and comic strips were made pursuant to the March 1, 1938 Agreement, the DCI

13  September 22, 1938 Agreement, the McClure September 22, 1938 Agreement,

14  contemporaneous oral agreements confirmed by one or more of those agreements,

15  or certain subsequent agreements affirming those agreements, as employees of DCI

16  (or its successors) and at DCI's instance and expense and subject to its right of

17  control.  As a result, all of these materials constitute works for hire under the 1909

18  Copyright Act, and the copyrights therein are owned exclusively by DC Comics

19  and are not subject to termination under later amendments to the Copyright Act.

20      134.   On November 30, 1938, Siegel wrote a letter to DCI (the "November

21  1938 Letter") suggesting that it publish a comic book entitled "Superboy," "which

22  would relate to the adventures of Superman as a youth."  The November 30, 1938

23  Letter does not contain any discussion of plot, dialogue, appearance, or any other

24  copyrightable material relating to Superboy.  DCI decided not to publish a

25  Superboy comic book at that time, and had already published comic books,

26  discussed *supra*, that showed Superman as a young boy and exhibiting super-

27  human strength.  For example, in 1939, among the Superman material prepared by

28  Siegel and Shuster at the instance and expense of DCI and subject to its right of

- 42 -                                    COMPLAINT

EXHIBIT 38

Page 918

1    control was Superman No. 1. In Superman No. 1, Clark Kent is depicted as a boy

2    with super-powers.

3        135.  On December 19, 1939, Siegel and Shuster entered into the December

4    19, 1939 Agreement with DCI, which modified the DCI September 22, 1938

5    Agreement by, *inter alia*, doubling Siegel and Shuster's compensation for

6    Superman comic books and newspaper strips and providing for payment to Siegel

7    and Shuster for uses of Superman in media such as radio, motion pictures, and toys.

8    Under the December 19, 1939 Agreement, Siegel and Shuster again acknowledged

9    DCI's sole ownership of Superman.

10       136.  Upon information and belief, in December 1940, Siegel, on behalf of

11   himself and Shuster, submitted to DCI a 13-page script of continuity for Superboy

12   (the "Unpublished 1940 Superboy Script") and renewed his suggestion that DCI

13   publish a comic book depicting Superman as a youth. The Unpublished 1940

14   Superboy Script, which includes the credit line "By Jerry Siegel and Joe Shuster,"

15   states: "So many faithful followers of today's leading adventure comic strip,

16   SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth ... And

17   so here he is at last ... the answer to your requests ... America's outstanding boy

18   hero: SUPERBOY!" The Unpublished 1940 Superboy Script explains that "[i]n

19   later years [Superboy] was to become the might[y] figure known as SUPERMAN!"

20   The Unpublished 1940 Superboy Script was derived entirely from pre-existing

21   Superman elements and ideas that had been published by DCI as part of works for

22   hire, and contained no original copyrightable element. Again, DCI decided not to

23   publish a Superboy comic book at that time.

24       137.  Upon information and belief, sometime prior to November 18, 1944,

25   DCI published a comic book depicting the adventures of Superman as a youth,

26   called Superboy, in "More Fun Comics No. 101," which had a cover date of

27   January-February 1945 and was illustrated at least in part by Shuster. Upon

28   information and belief, Siegel did not participate in the creation of this comic book

- 43 -

COMPLAINT

EXHIBIT 38
Page 919

1    or the Superboy story it contained.  Other than retelling the Superman origin story

2    from Action Comics No. 1 and Superman No. 1, this Superboy story bore no

3    resemblance to the Unpublished 1940 Superboy Script.

4        138.    In the more than 70 years since the publication of Action Comics No.

5    1 in 1938, DC Comics has created a vast universe of Superman material spanning

6    virtually all media, including comic books, graphic novels, live action pictures,

7    feature-length motion pictures, motion picture serials, radio and television serials,

8    and live theatrical presentations.  DC Comics' extensive development and

9    exploitation of Superman has generated new characters, new super-powers, new

10   components to the Superman universe, new elements in the Superman back story,

11   and new changes in Superman's appearance.

12            **(2) Claim for Declaratory Relief re: Limited Scope of**

13                    **Copyright Termination Notice**

14       139.    In the event that the Shuster Termination Notice challenged in the First

15   Claim for Relief above is deemed to be effective, the scope and reach of the Notice

16   must be declared limited in the following ways:

17                    **a.  Unpublished Superman Works**

18       140.    The Shuster Termination Notice purports to terminate certain portions

19   of the Unpublished Superman Works, including:  (a) "twenty-four days ... of

20   previously unpublished SUPERMAN newspaper comic strips, created c. 1934,"

21   (b) "SUPERMAN story in comic book form ... created c. 1933," and (c) "15

22   SUPERMAN daily comic strips ... created c. 1934."

23       141.    To the extent that any portion of the Unpublished Superman Works

24   may be considered published for purposes of the Copyright Act (and this is

25   disputed), those portions were published only as a result of their adaptation for

26   inclusion in Action Comics No. 1, which was a work made for hire.  The Copyright

27   Act expressly provides that "a work made for hire" cannot be subject to

28

- 44 -

COMPLAINT

EXHIBIT 38
Page 920

1  termination.  17 U.S.C. § 304(c)-(d).  As a result, the Shuster Termination Notice is

2  ineffective as to the Unpublished Superman Works.

3  **b. Pre-Action Comics No. 1 Promotions**

4  142.  The Shuster Termination Notice does not attempt to terminate DC

5  Comics' rights in the Promotions published before Action Comics No. 1.

6  143.  Moreover, upon information and belief, the Promotions, depicting in

7  sum and substance what was subsequently published as the cover of Action Comics

8  No. 1, were not prepared by Siegel or Shuster, but rather by others either employed

9  by DCI or at the instance and expense of DCI and subject to its right of control.  As

10  a result, the Promotions were works made for hire and any copyright therein was

11  owned by DCI *ab initio* and cannot be subject to termination.  17 U.S.C. § 304(c)-

12  (d).

13  144.  DC Comics remains the sole owner of the Promotions, all copyrights

14  therein, and the various copyrightable elements contained therein.  The Shusters

15  may not seek to terminate copyright interests comprised in the Promotions.

16  **c. Works for Hire**

17  145.  The Shuster Termination Notice purports to recapture the rights in

18  Action Comics Nos. 1-7, Superman No. 1, and Superman No. 3 ("Superman

19  Works").  Each of the Superman Works was prepared at the instance and expense

20  of DCI and subject to its right of control.  As a result, the Superman Works were

21  works made for hire and any copyright therein was owned by DCI *ab initio* and

22  cannot be subject to termination.  17 U.S.C. § 304(c)-(d).

23  146.  DC Comics remains the sole owner of the Superman Works, all

24  copyrights therein, and the various copyrightable elements contained therein.[5]

25  ─────────────

26  [5] In the related action filed by the Siegel Heirs against DC Comics, the federal
court agreed with this position almost entirely, ruling that other than a handful of
pre-1938 materials authored by Siegel, all of Siegel's Superman works were created

27  as "works for hire" on behalf of DC Comics.  The court ruled that all material
created by Siegel after his 1938 employment agreement with DCI, including Action

28  Comics Nos. 2, 3, 5-61, Superman Nos. 1-23 (other than pages 3-6 of Superman

- 45 -                                                    COMPLAINT

EXHIBIT 38
Page 921

### d. Derivative Works

147.    All Superman-related works prepared after the publication of Action Comics No. 1 were derivative works based on pre-existing copyrightable material and created under the authority of valid copyright grants (the "Derivative Works").

148.    The Derivative Works include new characters, new super-powers, new components to the Superman universe, new elements in the Superman back-story, and changes in the appearance of Superman.

149.    Regardless of whether the Shuster Termination Notice is deemed valid, DC Comics remains the sole owner of the Derivative Works and retains the continuing right to exploit the Derivative Works under section 304 of the Copyright Act, 17 U.S.C. § 304(c)(6)(A).

### e. Scope of Shuster Notice

150.    The Shuster Termination Notice, in addition to specifying works to be terminated, also describes certain elements purportedly encompassed by the works sought to be recaptured.  Many of these elements do not appear in the specified works.  In addition to identifying elements that are not present, the Shuster Termination Notice is also notable for its failure to specify elements that are present.  For example, although both the purportedly terminated works Action Comics No. 1 and Superman No. 1 depict Superman as a boy with super-powers, the Shuster Termination Notice is silent on this element.  Accordingly, a dispute has arisen between the parties regarding the scope of the Shuster Termination Notice with respect to the elements that appear, or which do not appear, in the allegedly terminated identified in the Shuster Termination Notice, including, but not limited to, the following:

No. 1), and post-1938 newspaper strips, were works-for-hire and thus could not be terminated.  DC Comics reserves all rights with respect to these interim rulings in the Siegel case.

- 46 -

COMPLAINT

EXHIBIT 38
Page 922

1         a.    Superman's "telescopic vision"

2         b.    Superman's "super hearing"

3         c.    Superman's "super … sense of smell"

4         d.    Superman as a boy with super-powers (*i.e.*, "Superboy")

5         e.    "[D]iamond-shaped "S" insignia on [Superman's] chest"

6         f.    "[L]ove triangle between Superman, Lois Lane and Clark Kent"

7         g.    "Perry White"

8         h.    "Daily Planet newspaper"

9         i.    "Metropolis"

10         j.    "Jor L"

11         k.    "Krypton"

12     151.   A declaration by this Court regarding the scope of the Shuster

13 Termination Notice is warranted under the Declaratory Judgment Act, 28 U.S.C.

14 § 2201 *et seq.*, to establish the parties' respective rights and obligations with respect

15 to the copyright interest in the Superman material.  The Shusters may not seek to

16 terminate copyright interests owned by DC Comics, including those materials listed

17 above.

18 **C.**    <u>**Third Claim for Relief**</u>:  **Declaratory Relief re: Shuster Period of**

19         **Exclusivity (Against All Defendants)**

20     152.   DC Comics re-alleges and incorporates by reference each and every

21 allegation contained in the paragraphs above.

22     153.   This Third Claim for Relief is advanced in the alternative—*i.e.*, if the

23 Court does not grant DC Comics' First Claim for Relief set forth above and hold

24 that the Shuster Termination Notice is invalid.

25     154.   The Copyright Act establishes an exclusive period between the time a

26 copyright termination notice is served and the effective termination date in which

27 the original copyright grantee may enter into an agreement with the original

28 copyright author or their heirs regarding the rights sought to be recaptured.  Section

1    304(c)(6)(D) provides: "A further grant, or agreement to make a further grant, of

2    any right covered by a terminated grant is valid only if it is made after the effective

3    date of the termination." 17 U.S.C. § 304(c)(6)(D). While the statute bars third

4    parties (like Toberoff and his companies) from trafficking in such future copyright

5    interests during this exclusive time period, it protects the rights and interests of

6    original grantees like DC Comics, providing that "an agreement for such a further

7    grant may be made between the author or [his heirs] and the original grantee or [its

8    successor (e.g., DC Comics)], after the notice of termination has been served." *Id.*

9        155.    Section 304(c)(6)(D) of the Copyright Act establishes a right of DC

10   Comics from November 10, 2003 (when the Shuster Heirs served the Termination

11   Notice) until October 26, 2013 (the effective date of the Notice), during which DC

12   Comics is the sole party that can enter into an agreement with the Shuster Heirs for

13   the rights sought to be terminated. This right has been described by Congress, in its

14   legislative history, and the United States Court of Appeals as a "right of first

15   refusal." Any restriction or limitation on this period of exclusivity must be deemed

16   unenforceable under section 304(c)(6)(D).

17       156.    Upon information and belief, the Shuster Heirs have entered into

18   agreements that frustrate and impede DC Comics' period of exclusivity. For

19   example, the 2003 Pacific Pictures Agreement grants and assigns the Shuster Heirs'

20   putative present and future copyright interests and provides that "any and all

21   agreements regarding any of the Rights [in Shuster's creations, including copyright]

22   shall be subject to the express written approval" of Pacific Pictures. This

23   improperly allowed Pacific Pictures (and Toberoff) to prevent the Shuster Heirs

24   from entering into an agreement with DC Comics concerning their purported

25   rights—in clear violation of section 304(c)(6)(D). Although Pacific Pictures and

26   the Shuster Heirs purported to cancel the 2001 and 2003 Pacific Pictures

27   Agreements in their September 10, 2004 Letter, this improper agreement was in

28   effect at least from the time it was executed on October 30, 2003 through

- 48 -                                              COMPLAINT

EXHIBIT 38
Page 924

1   September 10, 2004, which means that it improperly eliminated most of the first

2   year of DC Comics' period of exclusivity.  Moreover, the original 2001 Pacific

3   Pictures Agreement provides that if the Shusters' joint venture with Pacific Pictures

4   is terminated "for any reason," then Pacific Pictures will hold 50% of "the property

5   or assets of the Venture," including all the alleged Shuster Superman copyright

6   interests, as a "tenant[] in common," meaning that Pacific Pictures and Toberoff

7   still have improperly encumbered, to this day, DC Comics' period of exclusivity.

8         157.   Upon information and belief, Toberoff has induced the Siegel and

9   Shuster Heirs to enter into additional agreements, which prohibit either family from

10  entering into agreements conveying rights to DC Comics without the express

11  approval of all stakeholders in the heirs' rights—*i.e.*, the Siegel Heirs, Shuster

12  Heirs, and Toberoff and his companies.  These agreements and others like it that

13  may exist—which upon information and belief remain in effect to this day—violate

14  section 304(c)(6)(D) and impede DC Comics' ability to settle any and all disputes

15  with the Shusters and Siegels and lawfully pursue its business.

16        158.   The Shuster Heirs' agreements with Toberoff, his companies, and the

17  Siegels improperly interfere with DC Comics' period of exclusivity with the

18  Shuster Heirs regarding their purported Superman rights.

19        159.   A declaration by this Court is warranted under the Declaratory

20  Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, to establish the parties' respective rights

21  and obligations with respect to the copyright interest in the Superman material.

22  This declaration should establish that:  (a) DC Comics is the sole party with whom

23  the Shuster Heirs can enter into an agreement to convey their putative Superman

24  rights during the exclusivity period, through and including October 26, 2013;

25  (b) any agreement with any third party regarding those putative rights during the

26  exclusivity period is invalid and unenforceable; and (c) any agreements requiring

27  consent of other parties to settle termination claims violate the exclusivity period

28  and, therefore, are invalid and unenforceable.

                                  - 49 -

                                                              COMPLAINT

EXHIBIT 38
Page 925

160.   DC Comics seeks an injunction (a) barring the Shuster Heirs from entering into any agreement with any third party regarding the rights sought to be recaptured in the Shuster Termination Notice until October 26, 2013; and (b) restoring to DC Comics its 10-year period of exclusivity.

**D.    Fourth Claim for Relief:**  **Intentional Interference with 1992 Shuster Agreement (Against Defendants Toberoff and Pacific Pictures)**

161.   DC Comics re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

162.   In October 1992, the Shuster Heirs and DC Comics executed a final written agreement "fully settl[ing] all claims" as to "right[s] in any and all work[s] created in whole or in part by … Joseph Shuster" (the "1992 Agreement"). Since 1992, DC Comics has paid the Shuster Heirs nearly half a million dollars under the 1992 Agreement. To DC Comics' knowledge, the Shuster Heirs have never disputed the validity or existence of the 1992 Agreement, which operated to rescind, revoke, and re-grant all of the Shusters' prior grants of rights in the Superman properties to DC Comics. In that 1992 Agreement, the Shuster Heirs further agreed that they would not—either then or in the future—make any claim of right to any work created in whole or part by Joe Shuster.

163.   DC Comics' 1992 Agreement with the Shuster Heirs was both a valid contract and had the probability of future economic benefit to DC Comics. The Shuster Heirs fully relinquished their rights under any prior agreement and re-granted to DC Comics all of their Superman-related rights. This confirmation allowed DC Comics to continue freely developing and exploiting those rights without the risk of termination of the alleged Shuster rights or expensive and protracted legal disputes regarding the ownership of those rights.[6]

---

[6] DC Comics maintains that the 1992 Agreement is a binding, enforceable agreement with the Shuster Heirs. Even assuming this agreement was deemed invalid, DC Comics also has a long-established economic relationship with the Shusters giving rise to an interference with prospective economic advantage claim.

COMPLAINT

EXHIBIT 38
Page 926

164.    Toberoff and Pacific Pictures were aware of the 1992 Agreement and DC Comics' ongoing business relationship with the Shusters.  Toberoff knew that his actions in having his company enter into a joint venture with the Shusters for the purpose of terminating DC Comics' rights were substantially certain to interfere with DC Comics' 1992 Agreement with the Shusters.  Toberoff's ultimate purpose in approaching the Shuster Heirs was to induce them to repudiate the 1992 Agreement and attempt to terminate prior grants of Shuster's rights.  For this reason, Toberoff and the Shusters formed a joint venture with Pacific Pictures for the express purpose of "retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations" through "termination pursuant to [17 U.S.C. § 304] of any and all grant or transfers by Joe Shuster of any copyright interest in his creations."

165.    Toberoff and Pacific Pictures engaged in independently wrongful conduct to achieve this goal.  They induced the Shuster Heirs to breach the 1992 Agreement and enter into the illegal copyright-assignment and settlement-consent agreements described above.  Toberoff also induced the Shusters to manipulate claims of ownership in Superboy.

166.    As the direct result of Toberoff's and Pacific Pictures' actions, the Shuster Heirs have breached the 1992 Agreement, causing DC Comics to lose the value of the Agreement and forcing DC Comics to incur substantial attorneys' fees and costs in an amount to be proven at trial.

---

This relationship dates back to 1935, when DC Comics' predecessor hired the unknown artist Joseph Shuster to illustrate comic strips for its publications.  Even after their employment arrangement ended, Shuster continued to benefit from his early work on Superman under the 1975 Agreement, which provided him with an annual pension, medical insurance, and a lump-sum payment in exchange for acknowledgment of DC Comics' sole and exclusive ownership of the Superman rights.  At the time Toberoff approached the Shuster Heirs in 2001, DC Comics and the Shuster Heirs had an agreement in place for almost 10 years, which resolved all claims concerning Shuster's putative share of the Superman rights.  DC Comics' agreement with the Shusters and the economic relationship they contemplated had the probability of future economic benefit to DC Comics.

- 51 -

COMPLAINT

EXHIBIT 38
Page 927

**E.**  **Fifth Claim for Relief**: **Intentional Interference with Prospective Economic Advantage re: Siegel-DC Comics Agreement (Against Defendant Toberoff)**

167.  DC Comics re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

168.  DC Comics reached a binding, enforceable agreement with the Siegel Heirs. After the Siegel Heirs served the Superman Termination Notice in 1997, they engaged in negotiations with DC Comics for four years. On October 16, 2001, DC Comics made a settlement offer to the Siegel Heirs. On October 19, 2001, the Siegel Heirs' attorney at the time, Marks, sent a letter to DC Comics outlining the material terms and confirming that the Siegel Heirs "accepted D.C. Comics' offer of October 16, 2001." On October 26, 2001, DC Comics sent a return letter confirming the parties' agreed-upon terms. DC Comics then drafted a long-form contract memorializing the agreement, which it sent to the Siegel Heirs on February 1, 2002. Marks has confirmed that all parties understood that they had a binding agreement.[7]

169.  Even in the event that this agreement is finally adjudicated and deemed to be invalid, DC Comics had a long-established economic relationship with the Siegel Heirs giving rise to an interference with prospective economic advantage claim. This relationship dates back as far as 1935, when DC Comics' predecessor

---

[7] The district court in the Siegel Actions determined that this agreement was not binding because there was no "meeting of the minds" between the parties. Of course, this was before the Toberoff Timeline had been produced, which confirmed, *inter alia*, that Marks—who negotiated the agreement on behalf of the Siegel Heirs—understood that the 2001 agreement was final and binding. Indeed, Marks communicated his position to the Siegel Heirs in August 2002, in an attempt to convince them to reject Toberoff's attempts at interference. DC Comics reserves all rights to challenge the district court's ruling in the Siegel Actions based on this newly discovered evidence and otherwise, and DC Comics respectfully submits that the district court's interim ruling on this issue is contrary to fact and law. If DC Comics' claims are accepted, it will amend this Complaint to include a claim for interference with contract arising out of Toberoff's tortious interference with this binding agreement.

- 52 -                                                                                  COMPLAINT

EXHIBIT 38

Page 928

hired an unknown writer named Jerome Siegel to write comic strips for its publications. Over the years, Siegel worked on-and-off as an employee of DC Comics and its predecessors. Even after the employment arrangement ended, Siegel continued to benefit from his early work on Superman under the 1975 Agreement, which provided him and his family with an annual pension, medical insurance, and lump payment in exchange for acknowledgement of DC Comics' sole and exclusive ownership of the Superman rights. When a dispute arose in 1997 over the Siegel Heirs' attempt to terminate prior grants of Siegel's share of Superman rights, DC Comics and Siegel commenced negotiations, which lasted over four years. At the time Toberoff approached the Siegel Heirs in 2001, DC Comics and the Siegel Heirs had finally reached an agreement resolving their claims to the Superman and Superboy rights.

170.  The economic relationship that the Siegel Heirs and DC Comics had contemplated and agreed to had the probability of future economic benefit to DC Comics. The Siegel Heirs recognized DC Comics' sole and exclusive ownership of all rights in Superman and Superboy, allowing it to continue freely developing and exploiting those rights, and avoid the possibility of an expensive and protracted lawsuit regarding ownership of those rights.

171.  Toberoff was well aware of the agreement between DC Comics and the Siegel Heirs. Toberoff has admitted that he tracked the Siegel Heirs' termination efforts through Internet reports. Moreover, upon information and belief, when Toberoff approached the Siegel Heirs and their representatives in late 2001 and 2002 to express interest in purchasing their Superman rights, he was informed that the Siegel Heirs had already reached an agreement with DC Comics.

172.  Toberoff knew his actions were substantially certain to interfere with the Siegel Heirs' agreement and ongoing business dealings with DC Comics. Toberoff intentionally engaged in independently wrongful conduct to carry out his interference by, among other things:  falsely misrepresenting to the Siegel Heirs

- 53 -

COMPLAINT

EXHIBIT 38

Page 929

1   that he had a billionaire investor ready to purchase their Superman rights if they

2   repudiated their settlement agreement with DC Comics; falsely representing to the

3   Siegels that he would help them produce a competing Superman motion picture;

4   and wrongly inducing the Siegels to repudiate their agreement and business

5   relationship with DC Comics.

6       173.   As a direct result of Toberoff's misdeeds, the Siegel Heirs repudiated

7   the Siegel-DC Comics Agreement with DC Comics and ended all further

8   discussions, causing DC Comics to lose the value of the agreement, to lose their

9   ongoing business relationship with the Siegels, and to incur millions of dollars in

10  subsequent legal fees in disputes with the Siegel Heirs.  DC Comics has suffered

11  actual damages in an amount to be proven at trial.

12  **G.    Sixth Claim for Relief:  Declaratory Relief re: Invalidity of Copyright**

13  **Assignment and Consent Agreements (Against All Defendants)**

14      174.   DC Comics re-alleges and incorporates by reference each and every

15  allegation contained in the paragraphs above.

16      175.   The various copyright assignment and consent agreements between

17  Toberoff and/or his companies, the Siegel Heirs, and the Shuster Heirs are void and

18  unenforceable, including under California's unfair competition laws, *e.g.*, CAL.

19  BUS. & PROF. CODE §§ 17200 *et seq.*  The copyright assignments secured by

20  Toberoff and/or his companies are unlawful and violate DC Comics' rights and

21  interests for the reasons set forth above.  The consent agreements Toberoff has

22  procured are void as a matter of law and public policy because they strip the Siegels

23  and Shusters of their right freely to settle their claims and violate DC Comics'

24  concomitant right freely to negotiate settlement of such claims.

25      176.   A declaration by this Court is warranted under the Declaratory

26  Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, to establish the parties' respective rights

27  and obligations with respect to the copyright interest in the Superman material.

28

- 54 -

COMPLAINT

EXHIBIT 38

Page 930

## VI.  **PRAYER FOR RELIEF**

WHEREFORE, DC Comics prays for judgment against defendants as follows:

177.  A declaration that the Shuster Termination Notice is invalid, and thus ineffective, for one or more of the reasons set forth in DC Comics' First Claim for Relief;

178.  In the event that the Shuster Termination Notice is deemed valid and effective, a declaration that the scope and effect of the Notice is limited as set forth in DC Comics' Second Claim for Relief;

179.  A declaration that:  (a) DC Comics was entitled to a period of exclusivity regarding the Shuster Heirs' purported Superman rights from November 10, 2003 through October 26, 2013; (b) any agreement interfering with that period of exclusivity is invalid and unenforceable; and (c) the consent agreements impermissibly interfere with DC Comics' period of exclusivity and require restoration of the 10-year period free of interference;

180.  A declaration that the various consent agreements between Toberoff and/or his companies, the Siegel Heirs, and the Shuster Heirs are void and unenforceable as a matter of public policy;

181.  An injunction that:  (a) bars the Shuster Heirs from entering into any agreement with any third party regarding the rights sought to be recaptured in the Shuster Termination Notice until October 26, 2013; and (b) restores DC Comics' 10-year period of exclusivity with respect to the Shuster Termination Notice;

182.  As to the tort claims against Toberoff and his entities as sued herein, damages in amounts to be determined at trial;

183.  An award of reasonable attorneys' fees and costs; and

184.  Such other and further relief as this Court deems just and proper.

COMPLAINT

EXHIBIT 38
Page 931

1

## VII.  DEMAND FOR JURY TRIAL

2       185.   Plaintiff DC Comics hereby demands a trial by jury on all issues

3   triable by a jury.

4

5       Dated:  May 14, 2010                    Respectfully submitted,

6                                               O'MELVENY & MYERS LLP

7

8                                               By: _____
                                                     Daniel M. Petrocelli
9                                               Attorneys for Plaintiff DC Comics

10

11

12   Of counsel:

13       PATRICK T. PERKINS (*pro hac vice*
         application pending)
14         pperkins@ptplaw.com
         PERKINS LAW OFFICE, P.C.
15       1711 Route 9D
         Cold Spring, New York 10516
16       Telephone: (845) 265-2820
         Facsimile:  (845) 265-2819

17   CC1:829569.6

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 38

- 56 -                                    COMPLAINT

# EXHIBIT A

EXHIBIT 38
Page 933

# SUPERMAN – MARC TOBEROFF TIMELINE

*Please read closely. We have enclosed several supporting documents in our package to you, and very much hope you will spend some time reviewing them before you come to any potential settlement with Marc Toberoff, who represents the Siegels and the Schuster heirs in the ongoing Superman legal dispute with Time Warner and DC Comics.*

*The below information should save Time Warner potentially millions and millions of dollars, and, if you so choose, - have Marc Toberoff suspended, disgraced, --- if not ultimately disbarred --- from practicing law.*

*Toberoff being labeled as the "relentless crusader for artists' rights" is hardly that: he has devised a strategy whereas he has ultimately claimed much ownership of the Superman copyright personally as he can. And of course, he has done so without the knowledge and full disclosure to the Siegels and Schuster heirs, creators of Superman.*

*As it stands right now, the single person who would stand to gain the MOST in a settlement with Time Warner regarding the ongoing SUPERMAN legal dispute would not be the heirs themselves, but Marc Toberoff.*

*What you do with the below information is up to you. You should most certainly conduct your own investigation. We believe there are details within this timeline that will be of strong interest to you.*

*Consider it an early holiday gift.*

*(Also, please be aware that this timeline is written with the assumptions that the reader(s) are aware of the characters involved within the ongoing Superman legal dispute between Time Warner/DC Comics. The heirs to the SUPERMAN copyright are: the Siegels (Joanne, Laura & Michael), Jerry Siegel's heirs, who collectively have claims to 50% of the copyright to Superman, while the Schuster estate has claims on the other 50%.) Marc Toberoff currently represents both parties in ongoing litigation.*

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

In 2000 MT established a separate corporation entitled "Pacific Pictures Corporation" (PPC), with an address of 23852 Pacific Coast Hwy, Suite 555, Malibu, CA 90265. Tel: (310)-589-5151. You will see below that he established this business to solicit his services as an attorney.

In 2001, Marc Toberoff (MT) began researching Superman, who had rights, etc.

MT initially contacts Kevin Marks at Gang, Tyre, who represented Joanne and Laura Siegel with an offer for the Siegel rights. Marks discourages Toberoff from any advances, and does not tell Siegels initially of the interaction because he believes it is not in their best interest.

1

Q 0001

On Nov. 23, 2001, MT entered into a joint venture agreement between his own outside corporation Pacific Pictures Corp. (NOT a law firm), and Mark Warren Peavy, and his mother Jean Peavy, heirs to the Joe Schuster estate. For the purposes of this document, we do not know the content of that agreement.

MT and Ari Emanuel, partner and agent at Endeavor, contacts Kevin Marks at Gang, Tyrer, Ramer, & Brown again, (who represented Joanne and Laura Siegel), on August 8, 2002. MT approaches the Siegels, *not as an attorney but as a film producer*, stating that he is "allied" with Emanuel, hoping such a claim will legitimize him.

On August 8th 2002, MT tells Marks that he and Emanuel have a billionaire ready to offer $15 million dollars up-front, plus what they promise to be meaningful participation from proceeds for exploitation of the Siegels' rights to SUPERMAN and some continued royalties on an ongoing basis in all media. Kevin Marks says to the Siegels, "Don't do it." Gang, Tyrer tells the Siegels that they believe MT has brokered a confidential agreement with the Joe Schuster estate. Marks also tells the Siegels that the Schuster estate will have termination rights in approximately 2013. Schuster missed termination notices.

Within their offer, MT appeals to the Siegels' sense of ownership and encourages them to take this deal. MT says he can help them make a movie in direct competition to the one being made at Warner Brothers (MT makes this argument to Joanne and Laura, all the while knowing full well that no one would ever go near making such an attempt; no other studio would go for it because of the division of rights, and no one outside of the studio system would attempt such an endeavor for all the enormous costs attributable to the making, marketing and distribution of such a film.) In other words, MT displays "predatory intent" in his initial approach to the Siegels from the very beginning.

In their very first conversation, Kevin Marks tells MT "no go" --- that the Siegels have already reached an agreement with Time Warner and DC Comics.

Marks conveys MT's offer to the Siegels, and Marks does say to the Siegels, it is a better offer than the one you have. However, Marks also tells the Siegels that he would testify in court against the Siegels if they accepted this offer because he believes there has already been an agreement reached.

The Siegels are angry at Kevin Marks that he said he would testify against them if they took MT's offer, and relations break down between the Siegels and Gang, Tyrer. They fire Gang, Tyrer. And, because the Siegels believed that MT was sympathetic to their plight, and because MT appealed to their sense of ownership of SUPERMAN, they decide to enter into an agreement with Intellectual Properties Worldwide, otherwise known as "IPW", Marc Toberoff's film production company, for 10% for any kind of deal he got to make a movie or exploit the rights. (as you know, the Siegels submitted termination notices on the Superman copyright in 1997).

2

The Siegels' agreement with IPW is an agreement that mirrors the earlier Pacific Pictures agreement that MT makes with the heirs to Joe Schuster (*see more information on this below*). In other words, Marc Toberoff is named as their attorney within the agreement (which is masked as a retainer agreement) in the event that they go to litigation over anything (*please see enclosed document*). Upon the Siegels signing the agreement, MT then tells Joanne and Laura that his mysterious billionaire has decided to invest elsewhere. In other words, MT makes himself the Siegels' attorney of record while he solicited them as a film producer, violating the rule that no lawyer may directly solicit business, with the double violation of doing it under the auspices of doing separate business dealings. MT's sole intent was to become the Siegels' attorney, not to help the Siegels (as he had alleged) to make a movie in competition to *Superman Returns*, which was then in development at Warner Brothers. MT also never divulges his previous direct dealings with the Schuster heirs, and his Nov.23, 2001 joint agreement with the Peavys (the Schuster heirs) in which he is named their attorney of record.

In 2002, MT set his sights on acquiring the passive interest to Michael Siegel's rights, who, as you know, is Jerry Siegel's son from his first marriage, and is Laura's half-brother. Michael Siegel has an interest of 12.5% in SUPERMAN and SUPERBOY. The Siegels total have 50% interest (Joanne holds 50%, Laura 25%, Michael 25%). So, in essence, Joanne has 25%, Laura 12.5, Michael 12.5. MT used to his advantage the strained relationship between Joanne and Laura, and Michael; as well as strained communication with the Schusters.

Here comes Ari Emanuel, and he is going to finance the purchase of Michael Siegel's interest. But Michael Siegel turns him down flat. MT discloses the intent to purchase to Joanne and Laura, admitting it is a possible conflict of interest. MT is fully aware of what he is doing is wrong.

On December 16, 2002, there is another letter from MT and Ari Emanuel to Joanne and Laura Siegel, saying they are re-approaching Michael again about purchasing his interest. MT tells Michael Siegel that they have an investor ready to buy out his interest, though the amount is significantly less than what DC showed as his share.

March 3, 2003 – letter from Paul Levitz/DC Comics to the Siegels, and MT is messing up relationships for his own personal benefit. DC is trying to understand why they backed out of the deal. The reason is MT who is interfering in all the relationships up to this point.

May 2003 – MT is continuing to make business arrangements with the Schuster heirs, unbeknownst to Joanne and Laura Siegel.

May 13, 2003: Michael Siegel sends a very concerned letter to Laura Siegel about Marc Toberoff's actions. (*please see enclosed letter; this letter lays out well MT's scheme*). Among other things, Michael Siegel tells her of how Toberoff is now controlling the whole of the SUPERMAN copyright, how he may have bought a substantial portion of the Schuster interest for himself, and he brings to light MT's utter lack of opening a

3

dialogue with anyone regarding making another SUPERMAN movie, in partnership with Ari Emanuel. Also that MT has not even made contact with Time Warner. Lastly, Michael conveys that MT seems to have an agenda of "someone" buying him out, and that MT is pressing for an answer.

In May-June 2003. **STATUE OF LIMITATIONS is coming close on for filing of the SUPERMAN complaint. Both Joanne and Laura Siegel are now very ill.** MT starts saying to the Siegels that the statue of limitations is coming up, and they would have waived their right to sue based on the termination notices. *This is the very seed MT meant to mine all along.* He sends them the research on the statue of limitations, and concerned, the Siegels contact Art Levine in Washington, D.C. to have independent research done on the matter. The research confirms that they should file by September.

In June, Ari Emanuel through IPW is still trying to buy Michael Siegel's interest but can't come to terms on price.

End of June 2003, MT gets a law firm to represent the Schusters to assist with the SUPERMAN copyrights. They determine the value of the estate is $0, and California Probate Code will not be applicable, such that the estate attorney will not be entitled to any future settlement regarding the Superman interest. Estate attorney is only receiving an hourly rate. MT "graciously" pays all legal fees.

In other words, MT helped probate the estate, but hired an attorney to do the dirty work. Fittingly, the Joe Schuster will was "lost", so the will had no value. So, the court writes the will for him, and includes the rights to proceed with the termination. And since the firm receives an hourly rate, and the estate is valued at $0, it does not effect any future settlement. The estate attorney will thereby not be entitled to statutory compensation. Another example of showing that MT is solely motivated *at all times* not by his clients' interests, but manipulating pieces of the puzzle so that he may receive the greatest percentage from a very possible large Time Warner settlement, through part ownership and unconscionable fees (*see below*).

**Absolutely nothing is moving ahead with Siegel/Schuster rights and agreements because MT was never intending to do anything with rights other than litigate.**

July 5, 2003. Laura Siegel reveals her ignorance of Toberoff's dubious actions in her return letter back to Michael --- MT has NOT told them he is about to enter into the PPC agreement, whereby MT *personally* will have a 50% of the Schuster interest in Superman. He will shortly own equal to what Joanne owns (25% of entire copyright), and double what Laura owns, *but MT has failed to disclose this.* The Schusters – through the Pacific Pictures Corp agreement – gave MT half of what they had. MT never had the intention to make a movie in competition to the one at Warners – it is tantamount to throwing $$$ away, but it does appeal to the heirs' sense of lost ownership. MT never did want to make a movie, and exploit the rights. MT knows no one is going to invest in an outside movie project outside of Warner Brothers, though he uses Ari Emanuel, the agent, to legitimize his claims. (*please see enclosed letter*)

4

Q 0004

EXHIBIT A
60

EXHIBIT 38     Page 937

Also, in the letter back to Michael Siegel, that MT helped Laura Siegel draft --- in response to Michael's accusations of Toberoff, Laura clearly states that MT does *not* have a production company. (This is false – Marc Toberoff's IPW has been in existence, partly funded by Ari Emanuel, since at least 2002). In the draft of the letter, MT crossed out the statement that he does not have a production company, and writes " MT has not plans to produce a SUPERMAN movie, nor is this feasible given the division of ownership of the rights." (please see enclosed letter). **This clearly delineates that Toberoff never had the intention of making a movie, and approached the Siegels and Schusters separately ---- not for the exploitation of rights as he initially asserted,** but to gain an unconscionable fee from a very large possible settlement with Time Warner.

August 7, 2003 --- Letter from Rodi-Pollock, who is the attorney in the Schuster estate – who says the Schuster Will would be written by the court August 25, 2003, since the Schuster Will had been "lost".

Sept-Oct 2003 ---- Letter with Ari Emanuel in which he would receive $2.5 million flat fee for "negotiating services"

On October 27, 2003, MT uses PPC to enter into another agreement with the Joe Schuster's heirs: Mark Warren Peavy and Jean Peavy, in which PPC is "engaged as the Executor of the recently probated estate of Joeseph Schuster." The agreement purports that PPC is the Peavys exclusive advisor "for the purpose of retrieving, enforcing, and exploiting all of Joe Schuster's rights ....in all of his creations...". In this agreement, MT also names himself their attorney for any and all litigation or questions that should arise in regards to these Rights. MT also clearly delineates that PPC is NOT a law firm. And, lastly but most significantly, MT defines that any and all moneys and proceeds, in cash or in kind, received from the enforcement, settlement, or exploitation of any of the Rights, ...any monies would be split 50/50. **IN ESSENCE, MARC TOBEROFF NOW HAS A 25% STAKE IN SUPERMAN PERSONALLY BECAUSE OF HIS DEAL WITH THE SCHUSTERS THAT WAS MADE IN 2003. He gets – under the guise of Pacific Pictures Corp – the rights to retrieve and enforce and exploit Joe Schuster's interest in SUPERMAN.** MT's alleged "firewall" between film producing and soliciting business as an attorney comes tumbling down. (*please see enclosed signed agreement, dated October 27, 2003*).

In 2013 MT will own Schuster's side of it; but it does not matter, they will settle before.

MT inquires into the legality of entering into the Pacific Pictures Corporation agreement with the Peavys, heirs to Schuster estate, using law firm Armstrong, Hirsch, Jackoway, Tyerman, & Wertheimer. The inquiry raises strong eyebrows, and questions of legality as to MT's actions in regards to the Schusters, and strongly discourages further involvement with MT and this matter.

5

August 2003 – Michael Siegel wants an annuity of $200,000, which equaled $3.5 million.
MT tells him that "no investor is going to go for that." MT says Warners' estimation was
$2 million less; such a bad risk for an investor, MT says. MT is tenaciously going after
the 12.5%, and of course, the investor MT "has" is himself.  He is trying to get Michael
to lower the price.

**MT is also trying to convince Michael Siegel not to sell his interest to another
outside party.  MT is lying to Michael Siegel to make sure he can still draw a fee
from Michael's 12.5% interest. If Michael went away, he would only draw from
remaining 37.5%, instead of 50%.   In the final letter, MT tells Michael Siegel that
he cannot sell without our approval because Michael did not take part in the
termination, but "we will give you (Michael Siegel) approval, if you sell it to a third
party, *monitored by Marc Toberoff*."  MT is lying to Michael Siegel about Siegel's
ability to sell his interest in the SUPERMAN copyright.**

**Significantly, MT admits to Laura Siegel that there never was a billionaire willing to
invest $15 million when he first approached them. But by then the Siegels were
concerned about appearing flaky for changing lawyers a few times.  They decide to
stick it out.**

October 2, 2004 --- MT files the complaint with the court against Time-Warner. There is
disgruntlement in the Siegel camp, regarding the contingency fee.  MT pushes hard for
33.3% contingency fee to go up to 40% if it falls within 60 days of trial (which, of
course, he would make sure that it would…).  In the contingency agreement they signed
for SUPERMAN, IPW (Marc Toberoff's *film production company*) would have received
a 10% negotiating fee (thus most likely bolstering Ari Emanuel's take in the settlement
from Time Warner as well). Thus, Toberoff used the "film production arm" of his
company to use as a shell to elicit larger contingency fees from his clients despite the fact
that Toberoff maintains that there is a "firewall" between his law firm and his production
company. (see John Lippman, *Wall Street Journal* article enclosed.)

MT "graciously" agrees to decrease IPW's take by 5%, which will be deducted from the
firm's % fee, applicable to the gross proceeds of any settlement or outcome of the
litigations.

****In other words, MT decreases his contingency fee by 5% -- instead of getting
50%, he will get 45%. Combined with the Schuster interest, the aggregate of any
outcome in SUPERMAN litigation for Marc Toberoff *personally* becomes 47.5% of
the entire Superman interest.***** It becomes clear at this juncture that MT thwarted
the earlier deal with Time Warner and DC Comics in 2002 for his own personal gain.**

And lastly, on the DUKES OF HAZZARD case, MT pocketed $8.5 million personally,
more than any single plaintiff involved in the case (each plaintiff pocketed around $1.7
million).   According to the settlement amount, he received an unconscionable 50%
contingency fee.

6

Q 0006

Very strong likelihood that Marc created an entity for the purposes of the lawsuit (Moonrunners Limited, or Moonrunners LLP), which allegedly held the rights at issue and ultimately led to the injunction. Christensen-Miller, Kevin Leichter, or the like need explore in greater detail the existence of the entity in which the rights were allegedly held. It is strongly believed this entity was created only to bolster the lawsuit – that the rights were never conveyed at all.

MT had his President of Production of IPW, J. Todd Harris, leak the confidential settlement on the DUKES OF HAZZARD case to Variety ($17.5 million). He then called Larry Greenfield, another attorney in his office at the time who has since left, to cover his tracks, "demanding" to know who leaked the amount, and to act as if he was portraying shock and dismay at the leak. MT did it himself to attract more business in town. At least 7 attorneys have come and gone at the Law Offices of Marc Toberoff, and many have left due to ethical issues.

And lastly, MT is charging 50% in another Allison Giannini case involving real estate. The reason this fact is included is to show a history of charging unconscionable fees.

It should be noted for those at Time Warner that Marc Toberoff has still managed to set up SKYPORT as a producer at Warners, and he has a tangential hold on GILLIGAN'S ISLAND. Fyi.

*****************

cc:    Alan F. Horn
       Jeff Robinov
       John Schulman
       Patti Connolly

7

Q 0007

EXHIBIT A
63

EXHIBIT 38    Page 940

EXHIBIT 39

1  DANIEL M. PETROCELLI (S.B. #97802)
   dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
   mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
   cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA 90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:  (310) 246-6779

7  Attorneys for Plaintiff DC COMICS

8

FILED
CLERK, U.S. DISTRICT COURT

MAY 1 4 2010
10:23 am

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

9            UNITED STATES DISTRICT COURT

10          CENTRAL DISTRICT OF CALIFORNIA

JHN SSx

11  DC COMICS,                      Case No.   CV10 3633

12                  Plaintiff,      COMPLAINT FOR:

13        v.                        (1)  Declaratory Relief re: Invalidity of
                                         Copyright Termination Notice;
14  PACIFIC PICTURES
    CORPORATION, IP              (2)  Declaratory Relief re: Scope of
15  WORLDWIDE, LLC, IPW, LLC,          Copyright Termination Notice;
    MARC TOBEROFF, an individual,
16  MARK WARREN PEARY, as         (3)  Declaratory Relief re: DC Comics
    personal representative of the       Period of Exclusivity re: Shuster;
17  ESTATE OF JOSEPH SHUSTER,
    JOANNE SIEGEL, an individual,  (4)  Interference with 1992 Shuster
18  LAURA SIEGEL LARSON, an           Agreement;
    individual, and DOES 1-10,
19  inclusive,                     (5)  Interference with Prospective
                                         Economic Advantage re: Siegel-
20                  Defendants.         DC Comics Agreement; and

21                                 (6)  Declaratory Relief re: Invalidity of
                                         Copyright Assignment and
22                                       Consent Agreements

23                                 **DEMAND FOR JURY TRIAL**

24

25

26

27

28

COMPLAINT

EXHIBIT 39
Page 941