# EXHIBIT Z

1  WEISSMANN WOLFF BERGMAN
      COLEMAN GRODIN & EVALL LLP
2  Michael Bergman (SBN 37797)
   Anjani Mandavia (SBN 94092)
3  Adam Hagen (SBN 218021)
   9665 Wilshire Boulevard, Ninth Floor
4  Beverly Hills, California 90212
   Telephone: (310) 858-7888
5  Fax: (310) 550-7191

6  FROSS ZELNICK LEHRMAN & ZISSU, P.C.
   Roger L. Zissu (Admitted *pro hac vice*)
7  James D. Weinberger (Admitted *pro hac vice*)
   866 United Nations Plaza
8  New York, New York 10017
   Telephone: (212) 813-5900
9  Fax: (212) 813-5901

10  PERKINS LAW OFFICE, P.C.
   Patrick T. Perkins (Admitted *pro hac vice*)
11  1711 Route 9D
   Cold Spring, New York 10516
12  Telephone: (845) 265-2820
   Fax: (845) 265-2819

13

14  Attorneys for Defendants and Counterclaimant

15          UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
16

| 17 | JOANNE SIEGEL and LAURA SIEGEL LARSON, | Case Nos. [Consolidated for Discovery]: |
|---|---|---|
| 18 | Plaintiffs, | CV 04-8400 SGL (RZx) |
| 19 | vs. | CV 04-8776 SGL (RZx) |
| 20 | WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; DC COMICS; and DOES 1-10, | Hon. Steven G. Larson, U.S.D.J. Hon. Ralph Zarefsky, U.S.M.J. |
| 21 | Defendants. | **DECLARATION OF PATRICK T. PERKINS IN SUPPORT OF DEFENDANTS' MOTION TO REOPEN DISCOVERY, TO COMPEL PRODUCTION OF DOCUMENTS, AND TO COMPEL THE FURTHER DEPOSITION TO KEVIN MARKS** |
| 22 | JOANNE SIEGEL and LAURA SIEGEL LARSON, | |
| 23 | Plaintiffs, | |
| 24 | vs. | |
| 25 | TIME WARNER INC.; WARNER COMMUNICATIONS INC.; WARNER BROS. ENTERTAINMENT INC.; WARNER BROS. TELEVISION PRODUCTION INC.; DC COMICS; and DOES 1-10, | |
| 26 | Defendants. | Time: 10:00 a.m. Date: April 20, 2009 Courtroom: 1 Hon. Stephen G. Larson Discovery Cutoff: Nov. 17, 2006 |
| 27 | AND RELATED COUNTERCLAIMS | |
| 28 | | |

DECLARATION OF PATRICK T. PERKINS

1      I, Patrick T. Perkins, declare under penalty of perjury:

2          1.    I am a member of Perkins Law Office PC, counsel for Defendants. I

3 am admitted *pro hac vice* to appear in these consolidated actions. This declaration,

4 based upon my own personal knowledge and on my office's records, is submitted in

5 support of Defendants' motion to reopen discovery, to compel production of

6 documents, and to compel the further deposition of Kevin Marks.

7          2.    Attached as Exhibit 1 hereto is a true and exact copy of the document

8 entitled "Superman-Marc Toberoff Timeline," produced to Defendants on

9 December 12, 2008 pursuant to the Court's Order of September 26, 2008.

10         3.    Attached as Exhibit 2 hereto is a true and exact copy of Defendant DC

11 Comics' First Amended Counterclaims.

12         4.    Attached as Exhibit 3 hereto is a true and exact copy of Plaintiffs'

13 Reply to Defendant DC Comics' First Amended Counterclaims.

14         5.    In reply to DC's Counterclaims, Plaintiffs denied that the parties

15 reached any valid settlement agreement. Plaintiffs initially asserted as an

16 affirmative defense that Marks did not have authority, or exceeded the scope of his

17 authority, with respect to the settlement being asserted by Defendants. In particular,

18 Plaintiffs took the position that their counsel did not have prior authority to send the

19 October 19, 2001 letter as it was written.

20         6.    Additionally, Plaintiffs asserted that the subsequent conduct of

21 Defendants after October 19, 2001, including but not limited to (i) a October 26,

22 2001 letter to Marks containing a "more fulsome" outline of the parties' agreement;

23 and (ii) a long-form agreement drafted by Defendants and submitted to Plaintiffs on

24 February 1, 2002, added to and materially changed the terms of the settlement that

25 they had accepted and thus justified their decision not to consummate their

26 agreement with Defendants.

27

28

7.    Defendants moved to compel production of documents and testimony regarding Plaintiffs' counsel's lack of authority to send the October 19, 2001 letter on the basis that the authority defense served as a waiver of privilege.  On May 2, 2007, Magistrate Judge Zarefsky granted Defendants' motion but allowed Plaintiffs to withdraw the defense and, in effect, retract their waiver of privilege by striking the affirmative defense in lieu of compelling Plaintiffs to produce the documents and provide further testimony.

8.    Attached as Exhibit 4 hereto is a true and exact copy of the Declaration of Wayne M. Smith submitted March 26, 2007 in connection with Defendants' first motion to compel production of the Escrow Documents.

9.    Attached as Exhibit 5 hereto is a true and exact copy of the Transcript of proceedings before Magistrate Judge Zarefsky on April 30, 2007.

10.    On July 18, 2006, an escrow agent engaged by the Warner Bros. defendants supplied a full copy set of the Escrow Documents to Plaintiffs' counsel.

11.    In July 2006, Defendants made multiple attempts to work out with Plaintiffs voluntary production of the non-privileged Escrow Documents.  When those efforts failed, on August 7, 2006, Defendants served a document request on Plaintiffs, as well as a subpoena *duces tecum* on Plaintiffs' counsel, Marc Toberoff, seeking a copy of the Escrow Documents.

12.    In response, on August 23, 2006, Plaintiffs and Mr. Toberoff served a general objection and refused to produce the Escrow Documents.  The objections served by Plaintiffs and Mr. Toberoff relied principally on privilege objections, and stated that a log identifying any item withheld on the basis of privilege would be provided.  However, Plaintiffs and their counsel ultimately made the tactical decision not to provide the promised privilege logs in response to Defendants' request and subpoena.

13.    As a result of Plaintiffs' refusal to produce the Escrow Documents, and their failure to list at least some of them on their privilege log, Defendants made a

2

Ex Z - 334

1 | motion to compel. On April 30, 2007 Magistrate Judge Zarefsky conducted a
2 | hearing on the motion.

3 |      14.   Defendants were required to go back to Court, moving on September
4 | 17, 2007 to compel compliance with Magistrate Judge Zarefsky's order issued on
5 | the record on April 30, 2007. Because Defendants' September 17, 2007, motion to
6 | compel compliance was not ruled upon, Defendants filed a renewed motion on April
7 | 9, 2008, this time with the District Court. Plaintiffs' principal focus in opposing the
8 | renewed motion centered on withholding the Toberoff Timeline. Neither Plaintiffs
9 | nor Mr. Toberoff had ever listed the Toberoff Timeline on any privilege logs.
10 | Through no fault of Defendants, this motion was not ruled upon until more than a
11 | year later, on September 26, 2008, and, because of an outstanding issue, the Escrow
12 | Documents were not produced to Defendants until December 12, 2008.

13 |      15.   Attached as Exhibit 6 hereto is a true and exact copy of pages 45, 153-
14 | 164 from the transcript of the Deposition of Kevin Marks taken October 7, 2006.
15 | During Mr. Marks' deposition, Plaintiffs' counsel and/or Mr. Marks' counsel
16 | objected on privilege grounds and instructed Mr. Marks not to answer on more than
17 | 15 separate occasions.

18 |      16.   On January 14, 2009, I sent Plaintiffs' counsel a letter setting forth
19 | Defendants' position on the issues presented in this motion, outlining the relief
20 | sought in an attempt to avoid the need for Court intervention, and inviting Plaintiffs'
21 | counsel to confer on the issue. Attached as Exhibit 7 hereto is a true and exact copy
22 | my letter of January 14, 2009 to Plaintiffs' counsel.

23 |      17.   By letter dated January 22, 2009, Plaintiffs' counsel rejected our
24 | position on the issues raised in this motion, but did not provide any dates on which
25 | to confer with me. Attached as Exhibit 8 hereto is a true and exact copy of
26 | Plaintiffs' counsel's letter to me dated January 22, 2009.

27 |      18.   By e-mail dated January 23, 2009, I confirmed receipt of Plaintiffs'
28 | counsel's letter of January 22, 2009, and confirmed that Plaintiffs considered the

3

1  "meet and confer" obligation to have been satisfied. Plaintiffs' counsel did not

2  respond. Attached as Exhibit 9 hereto is a true and exact copy of my e-mail to

3  Plaintiffs' counsel dated January 23, 2009.

4

5       I declare under penalty of perjury of the laws of the United States of America

6  that the foregoing is true and correct.

7  February 19, 2009 at Cold Spring, New York.

8

9                                                      Patrick T. Perkins

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                4

Case 2:10-cv-03633-ODW-RZ   Document 42-17   Filed 08/30/10   Page 7 of 45   Page
ID #:2708
Case 2:04-cv-08400-ODW-RZ   Document 476-4   Filed 03/02/2009   Page 1 of 147

# EXHIBIT 1

Case 2:10-cv-03633-ODW-RZ    Document 42-17    Filed 08/30/10    Page 8 of 45    Page
ID #:2709
Case 2:04-cv-08400-ODW-RZ    Document 476-4    Filed 03/02/2009    Page 2 of 147

## SUPERMAN – MARC TOBEROFF TIMELINE

*\*Please read closely. We have enclosed several supporting documents in our package to you, and very much hope you will spend some time reviewing them before you come to any potential settlement with Marc Toberoff, who represents the Siegels and the Schuster heirs in the ongoing Superman legal dispute with Time Warner and DC Comics.*

*The below information should save Time Warner potentially millions and millions of dollars, and, if you so choose, - have Marc Toberoff suspended, disgraced, --- if not ultimately disbarred --- from practicing law.*

*Toberoff being labeled as the "relentless crusader for artists' rights" is hardly that: he has devised a strategy whereas he has ultimately claimed much ownership of the Superman copyright personally as he can. And of course, he has done so without the knowledge and full disclosure to the Siegels and Schuster heirs, creators of Superman.*

*As it stands right now, the single person who would stand to gain the MOST in a settlement with Time Warner regarding the ongoing SUPERMAN legal dispute would not be the heirs themselves, but Marc Toberoff.*

*What you do with the below information is up to you. You should most certainly conduct your own investigation. We believe there are details within this timeline that will be of strong interest to you.*

*Consider it an early holiday gift.*

*(Also, please be aware that this timeline is written with the assumptions that the reader(s) are aware of the characters involved within the ongoing Superman legal dispute between Time Warner/DC Comics. The heirs to the SUPERMAN copyright are: the Siegels (Joanne, Laura & Michael), Jerry Siegel's heirs, who collectively have claims to 50% of the copyright to Superman, while the Schuster estate has claims on the other 50%.) Marc Toberoff currently represents both parties in ongoing litigation.*

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

In 2000 MT established a separate corporation entitled "Pacific Pictures Corporation" (PPC), with an address of 23852 Pacific Coast Hwy, Suite 555, Malibu, CA 90265. Tel: (310)-589-5151. You will see below that he established this business to solicit his services as an attorney.

In 2001, Marc Toberoff (MT) began researching Superman, who had rights, etc.

MT initially contacts Kevin Marks at Gang, Tyre, who represented Joanne and Laura Siegel with an offer for the Siegel rights. Marks discourages Toberoff from any advances, and does not tell Siegels initially of the interaction because he believes it is not in their best interest.

1

Q 0001

Exhibit 1  Page 5

Ex Z - 338

On Nov. 23, 2001, MT entered into a joint venture agreement between his own outside corporation Pacific Pictures Corp. (NOT a law firm), and Mark Warren Peavy, and his mother Jean Peavy, heirs to the Joe Schuster estate. For the purposes of this document, we do not know the content of that agreement.

MT and Ari Emanuel, partner and agent at Endeavor, contacts Kevin Marks at Gang, Tyrer, Ramer, & Brown again, (who represented Joanne and Laura Siegel), on August 8, 2002. MT approaches the Siegels, *not as an attorney but as a film producer*, stating that he is "allied" with Emanuel, hoping such a claim will legitimize him.

On August 8th 2002, MT tells Marks that he and Emanuel have a billionaire ready to offer $15 million dollars up-front, plus what they promise to be meaningful participation from proceeds for exploitation of the Siegels' rights to SUPERMAN and some continued royalties on an ongoing basis in all media. Kevin Marks says to the Siegels, "Don't do it." Gang, Tyrer tells the Siegels that they believe MT has brokered a confidential agreement with the Joe Schuster estate. Marks also tells the Siegels that the Schuster estate will have termination rights in approximately 2013. Schuster missed termination notices.

Within their offer, MT appeals to the Siegels' sense of ownership and encourages them to take this deal. MT says he can help them make a movie in direct competition to the one being made at Warner Brothers (MT makes this argument to Joanne and Laura, all the while knowing full well that no one would ever go near making such an attempt; no other studio would go for it because of the division of rights, and no one outside of the studio system would attempt such an endeavor for all the enormous costs attributable to the making, marketing and distribution of such a film.) In other words, MT displays "predatory intent" in his initial approach to the Siegels from the very beginning.

In their very first conversation, Kevin Marks tells MT "no go" --- that the Siegels have already reached an agreement with Time Warner and DC Comics.

Marks conveys MT's offer to the Siegels, and Marks does say to the Siegels, it is a better offer than the one you have. However, Marks also tells the Siegels that he would *testify* in court against the Siegels if they accepted this offer because he believes there has already been an agreement reached.

The Siegels are angry at Kevin Marks that he said he would testify against them if they took MT's offer, and relations break down between the Siegels and Gang, Tyrer. They fire Gang, Tyrer. And, because the Siegels believed that MT was sympathetic to their plight, and because MT appealed to their sense of ownership of SUPERMAN, they decide to enter into an agreement with Intellectual Properties Worldwide, otherwise known as "IPW", Marc Toberoff's film production company, for 10% for any kind of deal he got to make a movie or exploit the rights. (as you know, the Siegels submitted termination notices on the Superman copyright in 1997).

2

Exhibit 1   Page 6

Ex Z – 339

Case 2:10-cv-03633-ODW-RZ    Document 42-17    Filed 08/30/10    Page 10 of 45    Page
ID #:2711
Case 2:04-cv-08400-ODW-RZ    Document 476-4    Filed 03/02/2009    Page 4 of 147

The Siegels' agreement with IPW is an agreement that mirrors the earlier Pacific Pictures agreement that MT makes with the heirs to Joe Schuster (*see more information on this below*). In other words, Marc Toberoff is named as their attorney within the agreement (which is masked as a retainer agreement) in the event that they go to litigation over anything (*please see enclosed document*). Upon the Siegels signing the agreement, MT then tells Joanne and Laura that his mysterious billionaire has decided to invest elsewhere. In other words, MT makes himself the Siegels' attorney of record while he solicited them as a film producer, violating the rule that no lawyer may directly solicit business, with the double violation of doing it under the auspices of doing separate business dealings. MT's sole intent was to become the Siegels' attorney, not to help the Siegels (as he had alleged) to make a movie in competition to *Superman Returns*, which was then in development at Warner Brothers. MT also never divulges his previous direct dealings with the Schuster heirs, and his Nov.23, 2001 joint agreement with the Peavys (the Schuster heirs) in which he is named their attorney of record.

In 2002, MT set his sights on acquiring the passive interest to Michael Siegel's rights, who, as you know, is Jerry Siegel's son from his first marriage, and is Laura's half-brother. Michael Siegel has an interest of 12.5% in SUPERMAN and SUPERBOY. The Siegels total have 50% interest (Joanne holds 50%, Laura 25%. Michael 25%). So, in essence, Joanne has 25%, Laura 12.5, Michael 12.5. MT used to his advantage the strained relationship between Joanne and Laura, and Michael; as well as strained communication with the Schusters.

Here comes Ari Emanuel, and he is going to finance the purchase of Michael Siegel's interest. But Michael Siegel turns him down flat. MT discloses the intent to purchase to Joanne and Laura, admitting it is a possible conflict of interest. MT is fully aware of what he is doing is wrong.

On December 16, 2002, there is another letter from MT and Ari Emanuel to Joanne and Laura Siegel, saying they are re-approaching Michael again about purchasing his interest. MT tells Michael Siegel that they have an investor ready to buy out his interest, though the amount is significantly less than what DC showed as his share.

March 3, 2003 – letter from Paul Levitz/DC Comics to the Siegels, and MT is messing up relationships for his own personal benefit.  DC is trying to understand why they backed out of the deal. The reason is MT who is interfering in all the relationships up to this point.

May 2003 -- MT is continuing to make business arrangements with the Schuster heirs, unbeknownst to Joanne and Laura Siegel.

May 13, 2003: Michael Siegel sends a very concerned letter to Laura Siegel about Marc Toberoff's actions. (*please see enclosed letter; this letter lays out well MT's scheme*). Among other things, Michael Siegel tells her of how Toberoff is now controlling the whole of the SUPERMAN copyright, how he may have bought a substantial portion of the Schuster interest for himself, and he brings to light MT's utter lack of opening a

3

Case 2:10-cv-03633-ODW-RZ    Document 42-17    Filed 08/30/10    Page 11 of 45    Page
ID #:2712
Case 2:04-cv-08400-ODW-RZ    Document 476-4    Filed 03/02/2009    Page 5 of 147

dialogue with anyone regarding making another SUPERMAN movie, in partnership with Ari Emanuel.  Also that MT has not even made contact with Time Warner. Lastly, Michael conveys that MT seems to have an agenda of "someone" buying him out, and that MT is pressing for an answer.

In May-June 2003. **STATUE OF LIMITATIONS is coming close on for filing of the SUPERMAN complaint. Both Joanne and Laura Siegel are now very ill.** MT starts saying to the Siegels that the statue of limitations is coming up, and they would have waived their right to sue based on the termination notices. *This is the very seed MT meant to mine all along.* He sends them the research on the statue of limitations, and concerned, the Siegels contact Art Levine in Washington, D.C. to have independent research done on the matter. The research confirms that they should file by September.

In June, Ari Emanuel through IPW is still trying to buy Michael Siegel's interest but can't come to terms on price.

End of June 2003, MT gets a law firm to represent the Schusters to assist with the SUPERMAN copyrights. They determine the value of the estate is $0, and California Probate Code will not be applicable, such that the estate attorney will not be entitled to any future settlement regarding the Superman interest. Estate attorney is only receiving an hourly rate. MT "graciously" pays all legal fees.

In other words, MT helped probate the estate, but hired an attorney to do the dirty work. Fittingly, the Joe Schuster will was "lost", so the will had no value.  So, the court writes the will for him, and includes the rights to proceed with the termination.  And since the firm receives an hourly rate, and the estate is valued at $0, it does not effect any future settlement.  The estate attorney will thereby not be entitled to statutory compensation.
Another example of showing that MT is solely motivated *at all times* not by his clients' interests, but manipulating pieces of the puzzle so that he may receive the greatest percentage from a very possible large Time Warner settlement, through part ownership and unconscionable fees *(see below).*

**Absolutely nothing is moving ahead with Siegel/Schuster rights and agreements because MT was never intending to do anything with rights other than litigate.**

July 5, 2003. Laura Siegel reveals her ignorance of Toberoff's dubious actions in her return letter back to Michael --- MT has NOT told them he is about to enter into the PPC agreement, whereby MT *personally* will have a 50% of the Schuster interest in Superman. He will shortly own equal to what Joanne owns (25% of entire copyright), and double what Laura owns, *but MT has failed to disclose this.* The Schusters – through the Pacific Pictures Corp agreement – gave MT half of what they had.  MT never had the intention to make a movie in competition to the one at Warners – it is tantamount to throwing $$$ away, but it does appeal to the heirs' sense of lost ownership.  MT never did want to make a movie, and exploit the rights.  MT knows no one is going to invest in an outside movie project outside of Warner Brothers, though he uses Ari Emanuel, the agent, to legitimize his claims. *(please see enclosed letter)*

4

Q 0004

Exhibit  1   Page 8

Ex Z – 341

Case 2:10-cv-03633-ODW-RZ    Document 42-17    Filed 08/30/10    Page 12 of 45    Page
ID #:2713
Case 2:04-cv-08400-ODW-RZ    Document 476-4    Filed 03/02/2009    Page 6 of 147

Also, in the letter back to Michael Siegel, that MT helped Laura Siegel draft --- in response to Michael's accusations of Toberoff, Laura clearly states that MT does *not* have a production company. (This is false – Marc Toberoff's IPW has been in existence, partly funded by Ari Emanuel, since at least 2002). In the draft of the letter, MT crossed out the statement that he does not have a production company, and writes " MT has not plans to produce a SUPERMAN movie, nor is this feasible given the division of ownership of the rights." (please see enclosed letter). **This clearly delineates that Toberoff never had the intention of making a movie, and approached the Siegels and Schusters separately –-- not for the exploitation of rights as he initially asserted,** but to gain an unconscionable fee from a very large possible settlement with Time Warner.

August 7, 2003 --- Letter from Rodi-Pollock, who is the attorney in the Schuster estate – who says the Schuster Will would be written by the court August 25, 2003, since the Schuster Will had been "lost".

Sept-Oct 2003 ---- Letter with Ari Emanuel in which he would receive $2.5 million flat fee for "negotiating services"

On October 27, 2003, MT uses PPC to enter into another agreement with the Joe Schuster's heirs: Mark Warren Peavy and Jean Peavy, in which PPC is "engaged as the Executor of the recently probated estate of Joeseph Schuster." The agreement purports that PPC is the Peavys exclusive advisor "for the purpose of retrieving, enforcing, and exploiting all of Joe Schuster's rights ....in all of his creations...". In this agreement, MT also names himself their attorney for any and all litigation or questions that should arise in regards to these Rights. MT also clearly delineates that PPC is NOT a law firm. And, lastly but most significantly, MT defines that any and all moneys and proceeds, in cash or in kind, received from the enforcement, settlement, or exploitation of any of the Rights, ....any monies would be split 50/50. **IN ESSENCE, MARC TOBEROFF NOW HAS A 25% STAKE IN SUPERMAN <u>PERSONALLY</u> BECAUSE OF HIS DEAL WITH THE SCHUSTERS THAT WAS MADE IN 2003. He gets – under the guise of Pacific Pictures Corp – the rights to retrieve and enforce and exploit Joe Schuster's interest in SUPERMAN.** MT's alleged "firewall" between film producing and soliciting business as an attorney comes tumbling down. *(please see enclosed signed agreement, dated October 27, 2003).*

In 2013 MT will own Schuster's side of it; but it does not matter, they will settle before.

MT inquires into the legality of entering into the Pacific Pictures Corporation agreement with the Peavys, heirs to Schuster estate, using law firm Armstrong, Hirsch, Jackoway, Tyerman, & Wertheimer. The inquiry raises strong eyebrows, and questions of legality as to MT's actions in regards to the Schusters, and strongly discourages further involvement with MT and this matter.

5

Exhibit 1   Page 9

Ex Z - 342

Case 2:10-cv-03633-ODW-RZ     Document 42-17     Filed 08/30/10     Page 13 of 45     Page
ID #:2714
Case 2:04-cv-08400-ODW-RZ     Document 476-4     Filed 03/02/2009     Page 7 of 147

August 2003 – Michael Siegel wants an annuity of $200,000, which equaled $3.5 million. MT tells him that "no investor is going to go for that." MT says Warners' estimation was $2 million less; such a bad risk for an investor, MT says. MT is tenaciously going after the 12.5%, and of course, the investor MT "has" is himself.   He is trying to get Michael to lower the price.

**MT is also trying to convince Michael Siegel not to sell his interest to another outside party.  MT is lying to Michael Siegel to make sure he can still draw a fee from Michael's 12.5% interest. If Michael went away, he would only draw from remaining 37.5%, instead of 50%.   In the final letter, MT tells Michael Siegel that he cannot sell without our approval because Michael did not take part in the termination, but "we will give you (Michael Siegel) approval, if you sell it to a third party, *monitored by Marc Toberoff*."  MT is lying to Michael Siegel about Siegel's ability to sell his interest in the SUPERMAN copyright.**

**Significantly, MT admits to Laura Siegel that there never was a billionaire willing to invest $15 million when he first approached them. But by then the Siegels were concerned about appearing flaky for changing lawyers a few times. They decide to stick it out.**

October 2, 2004 --- MT files the complaint with the court against Time-Warner. There is disgruntlement in the Siegel camp, regarding the contingency fee.   MT pushes hard for 33.3% contingency fee to go up to 40% if it falls within 60 days of trial (which, of course, he would make sure that it would...).  In the contingency agreement they signed for SUPERMAN, IPW (Marc Toberoff's *film production company*) would have received a 10% negotiating fee (thus most likely bolstering Ari Emanuel's take in the settlement from Time Warner as well). Thus, Toberoff used the "film production arm" of his company to use as a shell to elicit larger contingency fees from his clients despite the fact that Toberoff maintains that there is a "firewall" between his law firm and his production company. (see John Lippman, *Wall Street Journal* article enclosed.)

MT "graciously" agrees to decrease IPW's take by 5%, which will be deducted from the firm's % fee, applicable to the gross proceeds of any settlement or outcome of the litigations.

****In other words, MT decreases his contingency fee by 5% -- instead of getting 50%, he will get 45%. Combined with the Schuster interest, the aggregate of any outcome in SUPERMAN litigation for Marc Toberoff *personally* becomes 47.5% of the entire Superman interest.***** It becomes clear at this juncture that MT thwarted the earlier deal with Time Warner and DC Comics in 2002 for his own personal gain.

And lastly, on the DUKES OF HAZZARD case, MT pocketed $8.5 million personally, more than any single plaintiff involved in the case (each plaintiff pocketed around $1.7 million).   According to the settlement amount, he received an unconscionable 50% contingency fee.

6

Very strong likelihood that Marc created an entity for the purposes of the lawsuit (Moonrunners Limited, or Moonrunners LLP), which allegedly held the rights at issue and ultimately led to the injunction. Christensen-Miller, Kevin Leichter, or the like need explore in greater detail the existence of the entity in which the rights were allegedly held. It is strongly believed this entity was created only to bolster the lawsuit – that the rights were never conveyed at all.

**MT had his President of Production of IPW, J. Todd Harris, leak the confidential settlement on the DUKES OF HAZZARD case to Variety ($17.5 million). He then called Larry Greenfield, another attorney in his office at the time who has since left, to cover his tracks, "demanding" to know who leaked the amount, and to act as if he was portraying shock and dismay at the leak. MT did it himself to attract more business in town. At least 7 attorneys have come and gone at the Law Offices of Marc Toberoff, and many have left due to ethical issues.**

And lastly, MT is charging 50% in another Allison Giannini case involving real estate. The reason this fact is included is to show a history of charging unconscionable fees.

It should be noted for those at Time Warner that Marc Toberoff has still managed to set up SKYPORT as a producer at Warners, and he has a tangential hold on GILLIGAN'S ISLAND. Fyi.

*****************

cc:    Alan F. Horn
       Jeff Robinov
       John Schulman
       Patti Connolly

7

Q 0007

**Exhibit 1    Page 11**

Ex Z - 344

# EXHIBIT AA

Case 2:10-cv-03633-ODW-RZ    Document 42-17    Filed 08/30/10    Page 16 of 45    Page
ID #:2717
Case 2:04-cv-08400-ODW-RZ    Document 478    Filed 03/13/2009    Page 1 of 19

1

2

3

4

5

6

7

8

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA-EASTERN DIVISION

| | |
|---|---|
| JOANNE SIEGEL and LAURA SIEGEL LARSON,<br><br>Plaintiffs,<br><br>vs.<br><br>WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; DC COMICS; and DOES 1-10,<br><br>Defendants. | Case No. CV 04-8400 SGL (RZx)<br><br>Hon. Stephen G. Larson, U.S.D.J.<br><br>**FINAL PRE-TRIAL CONFERENCE ORDER**<br><br>**Final Pre-Trial Conference**<br>Date:  January 26, 2009<br>Time:  11:00 a.m.<br>Place: Courtroom 1<br><br>**Trial**<br>Date:  April 21, 2009<br>Time:  9:30 a.m.<br>Place: Courtroom 1<br><br>[Complaint filed: October 8, 2004] |
| AND RELATED COUNTERCLAIMS | |

FINAL PRE-TRIAL CONFERENCE ORDER

## TABLE OF CONTENTS

1.   Parties ................................................................................................1

2.   Jurisdiction and Venue .......................................................................1

3.   Estimated Time of Trial ....................................................................2

4.   Non-Jury Trial ..................................................................................2

5.   Admitted Facts .................................................................................2

6.   Facts Stipulated Without Prejudice to Evidentiary Objections.............4

7.   Claims and Defenses .........................................................................7

     A. Claims To Be Tried  ....................................................................7

     B.  Defenses .................................................................................8

8.   Discovery..........................................................................................8

9.   F.R.C.P. 26(a)(3) Disclosures .............................................................8

10.  Witness Lists ...................................................................................8

11.  Pending Motions...............................................................................9

12.  Bifurcation .....................................................................................16

13.  Conclusion .....................................................................................17

Ex AA - 346

Case 2:10-cv-03633-ODW-RZ    Document 42-17    Filed 08/30/10    Page 18 of 45    Page
ID #:2719
Case 2:04-cv-08400-ODW-RZ    Document 478    Filed 03/13/2009    Page 3 of 19

1        Following pretrial proceedings and pursuant to Rule 16, F.R.Civ.P. and L.R.

2  16,

3    **IT IS ORDERED:**

4      **1.    THE PARTIES ARE:**

5        Plaintiff and counterclaim defendant Joanne Siegel, an individual and plaintiff

6  and counterclaim defendant Laura Siegel Larson, an individual (collectively,

7  "Plaintiffs").

8        Defendant Warner Bros. Entertainment Inc. ("Warner Bros. Entertainment"), a

9  corporation, defendant Time Warner Inc. ("TWI"), a corporation and defendant and

10  counterclaimant DC Comics, a general partnership (collectively, "Defendants").

11        Each of these parties has been served and has appeared.  All other parties

12  named in the pleadings and not identified in the preceding paragraph are now

13  dismissed.

14        The pleadings which raise the issues are:

15          A.    Plaintiffs' Second Amended Complaint;

16          B.    Defendants' Answer and Affirmative Defenses to Plaintiffs'

17  Second Amended Complaint; and Defendants' Counterclaims against Plaintiffs.

18

19      **2.    FEDERAL JURISDICTION AND VENUE ARE INVOKED UPON THE FOLLOWING GROUNDS:**

20        This is a civil action seeking declaratory relief, accounting for profits and

21  related claims arising out of Plaintiffs' termination notices of prior grants of

22  copyright pursuant to the United States Copyright Act of 1976, 17 U.S.C. § 304(c).

23  The Court has subject matter jurisdiction over the claims set forth in Plaintiffs'

24  Second Amended Complaint pursuant to the United States Copyright Act

25  (hereinafter, the "Copyright Act"), 17 U.S.C. § 101 et al. and 28 U.S.C. §§ 1331,

26  1332, 1338(a) and (b).  This Court has supplemental jurisdiction over the related state

27  claims herein under 18 U.S.C. § 1367 in that these claims form part of the same case

28  and controversy as the federal claims herein.  This Court has personal jurisdiction

Case 2:10-cv-03633-ODW-RZ    Document 42-17    Filed 08/30/10    Page 19 of 45    Page
ID #:2720
Case 2:04-cv-08400-ODW-RZ    Document 478    Filed 03/13/2009    Page 4 of 19

1    over the Defendants in that Defendants are regularly doing business in the State of

2    California and in this District, and because a substantial part of the relevant acts

3    complained of herein occurred in the State of California and this District.  Venue is

4    proper in the United States District Court for the Central District of California

5    pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a) because a substantial part of the

6    relevant acts that give rise to the claims herein below occurred in this district and

7    because Warner Bros. Entertainment Inc. has its principal place of business in this

8    district.  The facts requisite to federal jurisdiction are admitted.

9           **3.    ESTIMATED TIME OF TRIAL**

10          Plaintiffs estimate seven (7) trial days.

11          Defendants estimate four (4) trial days, if their motions in limine are granted.

12          After further consideration of the amended witness lists, and notwithstanding

13    the Court's earlier direction, the Court has determined that each side will be allotted

14    no more than 18 hours for their respective cases-in-chief.

15          **4.    THE TRIAL IS TO BE A NON-JURY TRIAL**

16

17          At least fourteen (14) days prior to the trial date each party shall lodge and

18    serve by e-mail, fax, or personal delivery the findings of fact and conclusions of law

19    the party expects the Court to make upon proof at the time of trial as required by L.R.

20    52-1 and this Court.   Notwithstanding the Court's earlier directions, no responses to

21    the findings of fact and conclusions of law lodged by the other side are required at

22    this time.

23          **5.    THE FOLLOWING FACTS ARE ADMITTED AND REQUIRE**
             **      NO PROOF:**
24

25          1.      DC Comics is in the business of creating, publishing, and licensing

26    comic book stories and characters.

27          2.      The November 6, 1999, Superman Film Option/Purchase agreement

28    (Bates numbered WB004199-4231) between DC Comics and Time Warner

2
FINAL PRE-TRIAL CONFERENCE ORDER

Case 2:10-cv-03633-ODW-RZ    Document 42-17    Filed 08/30/10    Page 20 of 45    Page
ID #:2721
Case 2:04-cv-08400-ODW-RZ    Document 478    Filed 03/13/2009    Page 5 of 19

1    Entertainment Company, L.P. ("TWEC") was fully executed on May 9, 2002.

2        3.    The December 5, 2000, Smallville Television Agreement (Bates

3    numbered WB0135031-135051) between DC Comics and TWEC was fully executed

4    on February 12, 2001.

5        4.    The December 5, 2000, Smallville Television Agreement between DC

6    Comics and TWEC was amended by a written instrument dated September 5, 2002.

7        5.    The Batman Option Purchase Agreement dated as of May 31, 2002,

8    (Bates numbered WB004083-4120) between DC Comics and TWEC was fully

9    executed on February 3, 2004.

10        6.    Paul Levitz is the President and Publisher of DC Comics.

11        7.    Paul Levitz negotiated on behalf of DC Comics certain financial terms of

12    the Superman Option/Purchase agreement between DC Comics and TWEC dated as

13    of November 6, 1999, regarding Superman motion picture and other audiovisual

14    rights (the "Superman Film Agreement").

15        8.    Paul Levitz negotiated, on behalf of DC Comics, certain financial terms

16    of the Smallville Television Agreement between DC Comics and TWEC dated as of

17    December 5, 2000, regarding Superman television rights (the "Superman Television

18    Agreement.")

19        9.    Paul Levitz negotiated on behalf of DC Comics certain financial terms of

20    the September 5, 2002, Amendment to the Superman Television Agreement.

21        10.    The Superman Film Agreement applies to the 2006 feature motion

22    picture entitled *Superman Returns*.

23        11.    On or about May 22, 2002, Warner Bros. paid DC Comics the

24    $1,500,000 option fee pursuant to Paragraph 1(a) of the Superman Film Agreement.

25        12.    The Superman Television Agreement, as amended September 5, 2002,

26    applies to the *Smallville* television series.

27        13.    The agreement dated June 15, 1987, between DC Comics Inc. and

28    Cantharus Productions N.V. (Bates numbered WB016531-16549), applies to the

3
FINAL PRE-TRIAL CONFERENCE ORDER

Case 2:10-cv-03633-ODW-RZ   Document 42-17   Filed 08/30/10   Page 21 of 45   Page
ID #:2722
Case 2:04-cv-08400-ODW-RZ   Document 478   Filed 03/13/2009   Page 6 of 19

1  television series entitled *Superboy* (a.k.a *The Adventures of Superboy*) (1988-1992).

2      14.    The agreement dated September 21, 1995, between DC Comics Inc. and

3  Warner Bros. Animation (Bates numbered WB019605-19618) applies to the

4  animated television series entitled *Superman* (also known as *Superman: The*

5  *Animated Series*) (1996-2000).

6      15.    The agreement dated January 1, 2000, between DC Comics Inc. and

7  Warner Bros. Television Animation (Bates numbered WB019503-19526) applies to

8  the animated television series entitled *Justice League* (2001-2004).

9      16.    The agreement dated January 1, 2004, between DC Comics and Warner

10  Bros. Animation Inc. (Bates numbered WB019544-19566) applies to the animated

11  television series entitled *Krypto* (2005-2006).

12      17.    The unexecuted draft agreement dated June 1, 2004, between DC

13  Comics and Warner Bros. Animation Inc. (Bates numbered WB019575-19601)

14  applies to the animated television series entitled *Legion of Super Heroes* (2006-2008).

15

16      **6.    THE FOLLOWING FACTS, THOUGH STIPULATED, SHALL
        BE WITHOUT PREJUDICE TO ANY EVIDENTIARY
        OBJECTION:**

17

18      18.    National Periodical Publications, Inc. ("National") is the successor in

19  interest to Detective Comics, Inc.

20      19.    In 1976, National's name was changed to DC Comics, Inc.

21      20.    In 1993, DC Comics, Inc. was dissolved and converted to a New York

22  general partnership.

23      21.    DC Comics has remained a New York general partnership from 1993

24  until the present.

25      22.    From 1993 until March 2003, the partners in DC Comics were WCI and

26  Time Warner Entertainment Company, L.P. ("TWEC").

27      23.    In 1992 Historic Time Warner Inc. formed TWEC with certain of its

28  affiliates, and third party investors.  The affiliated entities contributed various cable,

Ex AA - 350

Case 2:10-cv-03633-ODW-RZ    Document 42-17    Filed 08/30/10    Page 22 of 45    Page
ID #:2723
Case 2:04-cv-08400-ODW-RZ    Document 478    Filed 03/13/2009    Page 7 of 19

1 | filmed entertainment and network programming assets to the TWEC partnership,

2 | while the non-affiliated parties made substantial capital contributions in exchange for

3 | limited partnership interests.

4 |     24.    Between 1993 and 2003 Historic Time Warner Inc. and its affiliated

5 | partners owned between approximately 70% and 75% of TWEC.  During this time

6 | TWEC held various cable, entertainment and network programming assets, including

7 | Warner Bros., Warner Bros. Television Production, HBO and Time Warner Cable, all

8 | of which were separate divisions of TWEC.

9 |     25.    In March 2003, Time Warner Inc. ("TWI") completed a restructuring of

10 | TWEC.  As a result of this restructuring, TWI acquired complete indirect ownership

11 | of TWEC's filmed entertainment and network programming assets, including Warner

12 | Bros., Warner Bros. Television Production, and certain other former divisions of

13 | TWEC.

14 |     26.    EC is a direct wholly owned subsidiary of WCI.

15 |     27.    WCI is an indirect subsidiary of TWI.

16 |     28.    Warner Bros. Entertainment is a direct wholly owned subsidiary of WCI.

17 |     29.    In connection with the restructuring of TWEC, WCI contributed its 50%

18 | interest in DC Comics to EC and TWEC distributed the assets of its content

19 | businesses (i.e. the filmed entertainment and network programming assets), including

20 | its partnership interest in DC Comics, to WCI.

21 |     30.    The partners in DC Comics are EC and WCI, each holding a one-half

22 | interest in the partnership.

23 |     31.    The 2003 TWEC restructuring resulted in the formation of a number of

24 | new corporations to hold and operate the content businesses formerly owned by

25 | TWEC. These newly formed corporations included Warner Bros. Entertainment,

26 | which succeeded to TWEC's filmed entertainment businesses.

27 |     32.    Warner Bros. Entertainment is wholly owned by WCI, which is

28 | indirectly owned by TWI.

Case 2:10-cv-03633-ODW-RZ    Document 42-17    Filed 08/30/10    Page 23 of 45    Page.
ID #:2724
Case 2:04-cv-08400-ODW-RZ    Document 478    Filed 03/13/2009    Page 8 of 19

33.    Both DC Comics and Warner Bros. Entertainment are affiliates of TWI.

34.    For financial reporting purposes, DC Comics and WBEI fall within the "filmed entertainment" group of TWI companies - which also includes New Line Cinema Corporation and Castle Rock Entertainment - and for operating management purposes DC Comics reports to its ultimate corporate parent through Warner Bros. Entertainment.

35.    Because of that financial reporting structure, DC Comic's President and Publisher reports to and obtains approvals from Warner Bros. Entertainment's President and Chief Operating Officer before making significant acquisitions or certain financial decisions or investments that are outside the scope of DC Comic's customary acquisitions and investments; before implementing meaningful strategic changes; and before embarking on something substantially outside DC Comic's normal course of business.

36.    Warner Bros. began developing a Superman theatrical motion picture entitled "Superman Reborn" in 1994.

37.    The feature film "Batman" was theatrically released in the United States on June 23, 1989.

38.    The feature film "Batman Returns" was theatrically released in the United States on June 19, 1992.

39.    The feature film "Batman Forever" was theatrically released in the United States on June 16, 1995.

40.    The feature film "Batman & Robin" was theatrically released in the United States on June 20, 1997.

41.    The feature film "The Matrix" was theatrically released in the United States on March 31, 1999.

42.    The feature film "Harry Potter and The Sorcerer's Stone" was theatrically released on November 16, 2001.

43.    The feature film "Lord of the Rings: Fellowship of the Ring" was

6
FINAL PRE-TRIAL CONFERENCE ORDER

1  theatrically released on December 19, 2001.

2      44.    The feature film "Harry Potter and the Chamber of Secrets" was

3  theatrically released on November 15, 2002.

4      45.    The feature film "Lord of The Rings: The Two Towers" was theatrically

5  released on December 18, 2002.

6      46.    The feature film "The Matrix Reloaded" was theatrically released in the

7  United States on May 15, 2003.

8      47.    The feature film "The Matrix Revolutions" was theatrically released in

9  the United States on November 5, 2003.

10      48.    The feature film "Lord of the Rings: The Return of the King" was

11  theatrically released on December 17, 2003.

12      49.    The feature film "Harry Potter and the Prisoner of Azkaban" was

13  theatrically released on June 4, 2004.

14      50.    The feature film "Batman Begins" was theatrically released on June 15,

15  2005.

16      51.    The feature film "Harry Potter and the Goblet of Fire" was theatrically

17  released on November 18, 2005.

18      52.    The feature film "The Dark Knight" was theatrically released in the

19  United States on July 18, 2008.

20

21      **7.**    **CLAIMS AND DEFENSES TO BE PRESENTED AT TRIAL:**

22

23      **A.**    **<u>Claims To Be Tried</u>**

24

25      Given the nature and the characterization of the property in question, the trial

26  shall determine whether the value of the various Superman option and assignment

27  agreements between DC Comics and TWEC, Warner Bros. Entertainment's

28  predecessor in interest, and the amounts paid to DC Comics by TWEC (and its

Case 2:10-cv-03633-ODW-RZ    Document 42-17    Filed 08/30/10    Page 25 of 45    Page
ID #:2726
Case 2:04-cv-08400-ODW-RZ    Document 478    Filed 03/13/2009    Page 10 of 19

1  successor Warner Bros. Entertainment) thereunder, reflect the fair market value of the

2  nonexclusive rights that the Court has determined were transferred from DC Comics

3  to TWEC (and its successor Warner Bros. Entertainment), and, if not, what

4  accounting shall be required of Warner Bros. Entertainment to ensure an equitable

5  result.

6      The Court's reference to "nonexclusive rights" reflects the Court's finding that,

7  notwithstanding DC Comics' attempt to confer what DC Comics characterized as all

8  of the exclusive rights to Superman, the Court has found, for the reasons set forth in

9  detail in its Order dated March 26, 2008, that those rights were, in fact, nonexclusive

10  rights, as further explained below in the Court's ruling on Plaintiffs' Motion in

11  Limine No. 1.

12      In light of the above, Plaintiffs' motion for clarification and their ex parte

13  application for clarification are **DENIED**.

14

15  _____

[1]    Even if the factual premise were correct (and it is not), plaintiffs' legal

16  argument that a co-owner can exclusively assign away all or part of its interest in the

17  copyright in question (the co-owner's share, not the entirety of the copyright itself
owned by both co-owners) without the consent of the other co-owner is a matter of

18  much debate, compare Gardner v. Nike, 279 F.3d 774 (9th Cir. 2002) and Sybersound

19  Records, Inc. v. UAV Corp., 517 F.3d 1137 (9th Cir. 2008) with 2 PATRY ON
COPYRIGHT § 5:103 (2008) (criticizing Ninth Circuit's decisions as leading to the

20  creation of "a copyright Minotaur: part 1909 Act and part 1976 Act" and under the

21  1976 Act Congress "intended that co-owners be able to . . . transfer their proportional
share in the whole without the other's permission, in which case the transferee would

22  indeed stand in the shoes of the transferor"). The Court need not wade into that legal

23  morass as the facts here establish that, unlike the circumstances in the decisions and
treatise cited, in the option and assignment agreements defendant DC Comics held

24  itself out as the sole owner to the entirety of the Superman copyright, and then

25  attempted to exclusively assign all, not just its one-half co-owner proportional share,
of that right to Warner Bros. Entertainment. Given that there was no intent to simply

26  assign its proportional co-ownership interest (rather than the entirety of the

27  copyright's audiovisual rights itself), the options and assignments are judged based
on that reality, that is, what DC Comics was seeking to transfer, and not on what it

28  could have (if it wished) transferred.

Case 2:10-cv-03633-ODW-RZ    Document 42-17    Filed 08/30/10    Page 26 of 45    Page
ID #:2727
Case 2:04-cv-08400-ODW-RZ    Document 478    Filed 03/13/2009    Page 11 of 19

**B.    Defenses**

Defendants will not be asserting any affirmative defenses or counterclaims in this phase of the trial.

**8.    DISCOVERY**

Discovery is complete.

Defendants' motion to reopen discovery filed March 2, 2009 is **DENIED.**

**9.    ALL DISCLOSURES UNDER FED.R.CIV.P. 26(A)(3) HAVE
BEEN MADE**

The joint exhibit list of the parties has been filed under separate cover as required by L.R. 16-6-1.  Unless all parties agree that an exhibit shall be withdrawn, all exhibits will be admitted without objection at trial, except those exhibits objected to in the parties' Joint Exhibit Stipulation filed concurrently herewith.

**10.    WITNESS LISTS OF THE PARTIES HAVE BEEN FILED WITH
THE COURT**

Only the witnesses identified in the parties' joint witness list (as amended) will be permitted to testify (other than solely for impeachment).

Neither party is intending to present evidence by way of deposition testimony (other than for cross-examination or impeachment).

**11.    THE FOLLOWING LAW AND MOTION MATTERS AND
MOTIONS *IN LIMINE*, AND NO OTHERS, HAVE BEEN
SUBMITTED, HEARD, AND DECIDED BY THE COURT, AS
FOLLOWS:**

**Plaintiffs' Motions in Limine**

A.    Motion in Limine No. 1

9
FINAL PRE-TRIAL CONFERENCE ORDER

Case 2:10-cv-03633-ODW-RZ    Document 42-17    Filed 08/30/10    Page 27 of 45    Page
ID #:2728
Case 2:04-cv-08400-ODW-RZ    Document 478    Filed 03/13/2009    Page 12 of 19

1    Plaintiffs have moved in their first motion in limine to preclude Defendants

2    from introducing evidence that Warner Bros. Entertainment purportedly paid DC

3    Comics "fair market value" for Warner Bros. Entertainment's purchase of DC

4

5    Comics's Superman "audiovisual," motion picture, and television rights, on the basis

6    that such evidence is moot and irrelevant with respect to such Superman copyright

7    interests that are now *co-owned* by Warner Bros. Entertainment and Plaintiffs, not

8

9    DC Comics and Plaintiffs.

10    Plaintiffs' Motion in Limine No. 1 is **DENIED**.  The factual basis underlying

11    the motion is the contention that, in licensing the Superman copyright's audiovisual

12

13    rights to defendant Warner Bros. Entertainment, defendant DC Comics purported to

14    convey "<u>DC's entire proportional copyright interest</u> in the Superman audiovisual

15    rights . . . and the fact that such transfer was <u>exclusive as to DC</u>." (Pls' Mot. Limine

16

17    # 1 at 2 (emphasis in original)).    Plaintiffs then argue that, in such a situation, certain

18    authorities have held that the consent of the co-owner to the copyright is not needed

19

20    to render the transfer effective, which would thereby lead to the transferee effectively

21    stepping into the shoes of the transferor.[1]  The factual premise for this argument,

22    however, is mistaken, a result which creates a legally material difference in whether

23

24    DC Comics remained (or whether Warner Bros Entertainment possibly stepped into

25    the shoes) as a co-owner with plaintiffs to the Superman audiovisual rights at stake in

26    this case.

27

28

Ex AA - 356

Case 2:10-cv-03633-ODW-RZ    Document 42-17    Filed 08/30/10    Page 28 of 45    Page
ID #:2729
Case 2:04-cv-08400-ODW-RZ    Document 478    Filed 03/13/2009    Page 13 of 19

1    As the Court noted in its March 26, 2008, Order, in the option and assignment

2    agreements, DC Comics held itself out as being the only owner to the entirety of the

3    Superman copyright (not as a co-owner to a jointly owned work), and then sought to

4

5    exclusively transfer all of a portion of that entire copyright (the audiovisual rights) to

6    Warner Bros. Entertainment.  See Siegel v. Warner Bros. Entertainment Inc., 542

7    F.Supp.2d 1098, 1143 (C.D. Cal. 2008) ("DC Comics unilaterally sought to give an

8

9    exclusive license to the entirety in the Superman property's movie and television

10    rights to WBEI post-termination"); see also Decl. Marc Toberoff in Opp. to Defs'

11    Mot. Partial Summ. J., Ex. E at 65 ("DC hereby represents and warrants that (a) DC

12

13    is the sole proprietor of all rights in the Property" (emphasis added)) & Ex. F at 94

14    ("Assignor represents and warrants that Assignor is the sole author and owner of the

15    work, and of all rights herein granted and assigned" (emphasis added)).

16

17    In such a situation, the authorities provide that, should it be determined that the

18    transferor was in fact a co-owner of the copyright so-conveyed, then the attempt to

19

20    exclusively convey the entirety of the copyright (or one or more of its divisible parts)

21    to a third party would be ineffective absent the consent of the co-owner of that

22    copyright; instead, what would have been conveyed was, at best, a non-exclusive

23

24    license leaving the transferor (here DC Comics) as a co-owner of the copyright (or

25    portion thereof) in place.  See id. at 1143-44 (quoting 2 PATRY ON COPYRIGHT § 5:7

26    ("A joint author (or co-owner) may not, however, transfer all interest in the work

27    without the other co-owner's express (and written) authorization, since that would

28

11
FINAL PRE-TRIAL CONFERENCE ORDER

Case 2:10-cv-03633-ODW-RZ    Document 42-17    Filed 08/30/10    Page 29 of 45    Page
ID #:2730
Case 2:04-cv-08400-ODW-RZ    Document 478    Filed 03/13/2009    Page 14 of 19

1    result in an involuntary transfer of the other joint owner's undivided interest in the

2    whole") and citing 3 NIMMER ON COPYRIGHT § 10.03[A][7] at 10-51).

3        The Court itself recognized in the March 26, 2008, Order that the

4
5    circumstances could be different if DC Comics had attempted simply to convey only

6    its one-half co-ownership interest in the copyright to Warner Bros.. Id. at 1143 ("The

7
8    same requirement for prior consent holds true even with respect to the wholesale

9    transfer of exclusive licenses in subparts to a copyright, such as a license transferring

10   all the stage rights (not just the joint owner's rights) to a novel but not the movie or

11
12   literary rights" (emphasis added)).  However, that is not what occurred; therefore,

13   plaintiffs' argument regarding that possibility is factually inapposite. (See also Defs'

14   Opp. to Pls' Mot Limine No. 1 at 5 ("this authority [cited to by plaintiffs] addresses

15
16   the situation where a joint owner transfers just his own . . . interest in a copyright, not

17   where he purports to transfer the entirety of exclusive rights [owned and shared by

18   the copyright's co-owners] under that copyright")).

19

20
21            B.    Motion in Limine No. 2

22        Plaintiffs have moved in their second motion in limine to preclude Defendants'

23   experts, William Immerman and Richard Marks, from testifying on the grounds that,

24   with regard to the issues to be tried on April 21, 2009, the mere conclusory opinions

25   expressed in their expert reports and deposition testimony are not supported by

26   sufficient facts or data and/or by any reliable or even discernable methodology.

27        For the reasons set forth on the record, plaintiffs' Motion in Limine No. 2 is

28   DENIED without prejudice to plaintiffs' being able to voire dire defendants' experts

Ex AA - 358

Case 2:10-cv-03633-ODW-RZ    Document 42-17    Filed 08/30/10    Page 30 of 45    Page
ID #:2731
Case 2:04-cv-08400-ODW-RZ    Document 478    Filed 03/13/2009    Page 15 of 19

1  Willim Immerman and Richard Marks at trial.  Defendants should remain mindful

2  that the expert opinions of Mr. Immerman and Mr. Marks, and the basis for said

3  opinions, are limited to what is contained in their expert reports.

4              C.     Motion in Limine No. 3

5

6      Plaintiffs have moved in their third motion in limine to preclude Defendants

7  from introducing into evidence documents and agreements produced for the first time

8  at the parties' L.R. 16-2 Meeting of Counsel because Defendants failed to comply

9  with their discovery obligations pursuant to Fed. R. Civ. P. 26.  Defendants were

10  required to supplement their Rule 26(a) disclosures as well as their document

11  production by November 21, 2008 pursuant to written agreement of the parties, but

12  willfully failed to do so.  Plaintiffs have also moved (a) to preclude Defendants'

13  percipient witnesses from testifying regarding agreements they did not negotiate,

14  draft and/or directly participate in and which were not produced prior to the agreed

15  November 21, 2008 deadline; and (b) to preclude Defendants' non-expert witnesses

16  from offering lay opinions about the purported "fairness" of the Superman

17  agreements between DC Comics and Warner Bros. Entertainment.

18

19      For the reasons set forth on the record and subject to the conditions set forth in

20  the Court's ruling on Defendants' Motion in Limine No. 4, plaintiffs' Motion in

21  Limine No. 3 is **DENIED** as it relates to the 23 agreements described in the papers

22

23  and discussed at the hearing.  Insofar as the other evidentiary objections raised in

24  plaintiffs' Motion in Limine No. 3 are concerned, it is **DENIED** without prejudice to

25  plaintiffs' being able to raise said objections  to the evidence as it is sought to be

26

27  introduced during trial (the propriety of said objection dependent upon the same

28  having been vocalized during the trial itself or the objection is deemed waived).  The

Ex AA - 359

Case 2:10-cv-03633-ODW-RZ    Document 42-17    Filed 08/30/10    Page 31 of 45    Page
ID #:2733
Case 2:04-cv-08400-ODW-RZ    Document 478    Filed 03/13/2009    Page 16 of 19

party seeking admission of the evidence shall bear the initial burden of production

demonstrating that said evidence satisfies the particular objection being raised (be it

improper disclosure, untimely production, etc.,) upon which the burden then shifts to

the objecting party to demonstrate that is not the case.

### D. Motion in Limine No. 4

Plaintiffs have moved in their fourth motion in limine to preclude Defendants

from introducing irrelevant, prejudicial and/or inadmissible documents at trial,

including evidence of agreements regarding intellectual properties that were not of

Superman's stature as a longstanding "franchise" property at the time the agreements

were entered into.

For the reasons set forth on the record, plaintiffs' Motion in Limine No. 4 is

**DENIED**.

**Defendants' Motions in Limine**

### A. Motion in Limine No. 1

Defendants' first motion in limine is to limit the scope of the trial, and the

evidence introduced, to the issue of whether and to what extent any relevant

agreement between DC Comics and Warner Bros. Entertainment constitutes a

"sweetheart deal" such that DC Comics received less than fair market value for the

license, and to exclude any evidence related to the traditional alter ego elements or

any other matters

14
FINAL PRE-TRIAL CONFERENCE ORDER

Case 2:10-cv-03633-ODW-RZ    Document 42-17    Filed 08/30/10    Page 32 of 45    Page
ID #:2733
Case 2:04-cv-08400-ODW-RZ    Document 478    Filed 03/13/2009    Page 17 of 19

1    In light of the Court's articulation both on the record and of this Order setting

2    forth the issue to be tried during this phase of the case, and the discussion during the

3    hearing on the permissible scope of what is relevant evidence related thereto,

4
5    defendants' Motion in Limine No. 1 is **GRANTED**.

6        B.    Motion in Limine No. 2

7
8        Defendants' second motion in limine is to exclude the testimony of certain

9    witnesses, including senior corporate officers of Defendants (*i.e.* "apex" witnesses),

10    none of whom were identified in Plaintiffs' Rule 26 disclosures or were deposed; and

11    certain of Plaintiffs' "expert" witnesses who have no expertise on the issues to be

12    tried in this phase of the trial.

13        After considering the arguments of counsel as well as the parties' amended

14    witness lists submitted pursuant to the Court's January 26, 2009, minute order, the

15    Court **DENIES** the motion with respect to Alan Horn.  The motion is **GRANTED**

16    with respect to any apex witness not listed on plaintiffs' amended witness list.

17
18        C.    Motion in Limine No. 3

19        Defendants' third motion in limine is to exclude a number of Plaintiffs'

20    proposed exhibits as being irrelevant to the issues to be tried in this phase of the trial.

21
22        In light of the Court's articulation both on the record and in section 7 of this

23    Order setting forth the issue to be tried during this phase of the case, and the

24
25    discussion during the hearing on the permissible scope of what is relevant evidence

26    related thereto, defendants' Motion in Limine No. 3 is **DENIED**.  Again such denial

27    is without prejudice to defendants' being able to raise said objections to the evidence

28    during the course of trial.

Ex AA - 361

Case 2:10-cv-03633-ODW-RZ    Document 42-17    Filed 08/30/10    Page 33 of 45    Page
ID #:2734
Case 2:04-cv-08400-ODW-RZ    Document 478    Filed 03/13/2009    Page 18 of 19

D.    Motion in Limine No. 4

Defendants' fourth motion in limine is to exclude any of Plaintiffs' exhibits first identified and produced after the exchange of the parties' Rule 16 exhibit lists on December 3, 2008, and any documents obtained by Plaintiffs through improper document subpoenas served on third parties on December 22 and 23, 2008, in violation of the discovery cut off, and over two years after discovery closed.

For the reasons set forth on the record, defendants' Motion in Limine No. 4 is **DENIED** subject to this proviso: Plaintiffs are permitted to introduce the trial testimony and documents sought in the listed sixteen third-party subpoenas, but only during their rebuttal case and only if defendants introduce in their case in chief the 23 licensing agreements referenced in Plaintiffs' Motion in Limine No. 4.

**12.    BIFURCATION OF THE FOLLOWING ISSUES FOR TRIAL IS ORDERED:**

Pursuant to the Court's March 26, 2008, order granting in part and denying in part the parties' respective motions for partial summary judgment, the Court reserved for trial Plaintiffs' "accounting" claims arising out of their termination of certain rights under copyright in literary work(s) including Superman pursuant to 17 U.S.C. 304(c), including Plaintiffs' claim that Warner Bros. Entertainment's profits from the exploitation of certain Superman copyright interests should be included in this calculation. On October 6, 2008, the Court bifurcated these claims, with the determination of whether Plaintiffs are entitled to share in Warner Bros. Entertainment's profits to be tried first on January 20, 2009. The remaining accounting issues are set to be tried on March 24, 2009. On December 18, 2008, the Court continued the first trial until February 3, 2009 and kept the second trial on its originally scheduled date of March 24, 2009. Thereafter, the Court on January 26, 2009, continued the first trial to April 21, 2009, and continued the second trial to June 9, 2009.

Case 2:10-cv-03633-ODW-RZ    Document 42-17    Filed 08/30/10    Page 34 of 45    Page
ID #:2735
Case 2:04-cv-08400-ODW-RZ    Document 478    Filed 03/13/2009    Page 19 of 19

1

### 13.  CONCLUSION

2           The foregoing admissions having been made by the parties, and the

3    parties having specified the foregoing issues remaining to be litigated, this Final

4    Pretrial Conference Order shall supersede the relevant pleadings relevant to the first

5    phase of trial on April 21, 2009 and govern the course of such trial, unless modified

6    to prevent manifest injustice.

7

8    Dated: March 13, 2009

9

10                                      UNITED STATES DISTRICT COURT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT BB

# AMERICAN LAWYER.COM

Select '**Print**' in your browser menu to print this document.

**Copyright 2010. ALM Media Properties, LLC. All rights reserved. The American Lawyer**
Page printed from: http://www.americanlawyer.com

Back to Article

# At Heart of Superman Suit, a Disappearing Lawyer with a Grudge

The Am Law Daily
The American Lawyer
05-20-2010

**By Drew Combs**

Given that the storylines played out in Superman comic books are full of shadowy figures with dark motivations, it seems fitting that the real world legal fight over who owns the rights to the Man of Steel would feature such a character in a pivotal role. Call him The Vanisher.

On May 14, in what The New York Times labeled "an aggressive move to defend its 'Superman' franchise," Warner Bros. sued Marc Toberoff, the lawyer for the comic icon's co-creators, in federal court in Los Angeles, accusing him of engaging in a "scheme" to "enrich himself" by trying to wrongfully seize control of a substantial chunk of the Superman property.

In its 56-page complaint, Warner Bros., represented by O'Melveny & Myers partner Daniel Petrocelli, alleges that Toberoff (pictured here) "entered into a 'web of collusive' deals with the heirs of Superman co-creators Jerome Siegel and Joseph Shuster, that caused the families to repudiate their agreements with DC Comics in a bid to recapture the copyright to the character," according to the Los Angeles Times. (Download Superman Complaint.)

Toberoff's reaction? "This frivolous complaint severely underestimates the intelligence of the federal judiciary," he says. At the same time, Toberoff suggests, his formal response to the suit could have serious consequences for The Vanisher, whose identity he has until now been content to keep secret.

The suit is based, in part, on a seven-page letter--laid out in timeline form and attached to the complaint as an exhibit--that Warner's characterizes as a detailed accounting of Toberoff's efforts to attach himself to the Superman franchise.

The source of the anonymous letter, which the court granted the studio access to in December 2008, is a lawyer who used to work for Toberoff. (Petrocelli would not comment on the case, but a source close to the matter says that no one at Warner's or O'Melveny's knows the lawyer's identity.)

While Toberoff wouldn't identify the attorney in question when contacted by The Am Law Daily, in a court filing last year he described the lawyer as someone who worked at the Toberoff firm for less than three months, "disappeared on his lunch break in November 2005 without notice," and didn't respond to e-mails or phone calls after disappearing. (Download Toberoff Declaration)

Ex BB - 364

Case 2:10-cv-03633-ODW-RZ    Document 42-17    Filed 08/30/10    Page 37 of 45    Page ID #:2738

"My law firm's investigation has revealed that the stolen documents were secretly copied and stolen from my law firm's files by a disgruntled attorney employed by the firm who thereafter furnished documents to Warner Bros," Toberoff states in the declaration, adding that the former attorney also contacted Toberoff clients soon after leaving the firm and offered to take on their matters at a reduced fee.

That the letter to Warner's included a note saying the timeline information could lead to Toberoff being "suspended" and "disgraced" isn't something Toberoff takes lightly. He says he expects to reveal the mysterious lawyer's identity as part of his broader response to the Warner's suit.

Even more ominously, Toberoff says he is considering reporting the associate's actions to the California bar. In other words, The Vanisher may face a day of reckoning. Stay tuned for the next installment.

*Contact Drew Combs at* <u>dcombs@alm.com</u>.

Ex BB - 365

# EXHIBIT CC

EDITIONS:  US | Int'l | Asia | Print          SEARCH                    GO          Subscribe | Advertise | Newslette

# THR
**The Hollywood Reporter**

## The Hollywood Reporter.
# POWER 100 LAWYERS
## IN ENTERTAINMENT

Sp

**CITY NATI**

---

Power Lawyers 2010          Previous     Next

Search the list

See the 201

See the 200



### LITIGATION

## Marc Toberoff
*Toberoff & Associates*

The thorn in Hollywood's side dug in even deeper this year. In addition to representing heirs of the two creators of Superman in thus-far successful attempts to wrestle back key rights, Toberoff took aim at Marvel Entertainment on behalf of the estate of comics icon Jack Kirby, trying to terminate copyrights and gain control to such creations as "Spider-Man" and "X-Men." Toberoff estimates that the Kirby characters represent 80% of Disney-owned Marvel's revenues. In May, Warner Bros. lobbed a bombshell complaint against Toberoff personally for pursuing a "scheme" that interfered with its contracts over "Superman." Toberoff promises revenge. "After we get rid of the frivolous tortious interference claims, I am going to go personally after Warner Bros. and the individuals involved, including (litigator and fellow Power Lawyer) Dan Petrocelli, and file a malicious prosecution lawsuit," he says. "I'll knock this out even if it takes me 10 years."

Previous     Next

See the complete list of Power Lawyers 2010

---

Follow us on **twitter**      Find us on **facebook**      Watch us on **You Tube**          HOLLYWOOD★

Hollywood Reporter Home | Film News and Reviews | Entertainment and Technology News | Digital Media and Widgets | Box Office Finance | Music and Entertainment News |
World Film News | Subscriptions | Editions | Newsletter | Movie and Entertainment Video | Celebrity and Movie News | About Us | Advertising Opportunities | FAQ | Sitemap |
Entertainment News RSS

© 2010 The Hollywood Reporter. All rights reserved. Terms of Use | Privacy Policy

Share Page      Twitter      Like                    |          Chat with your friends

Ex CC - 366

# EXHIBIT DD



# O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
HONG KONG
LONDON
LOS ANGELES
NEWPORT BEACH
NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO
SHANGHAI
SILICON VALLEY
SINGAPORE
TOKYO
WASHINGTON, D.C.

August 16, 2010

OUR FILE NUMBER
905,900-321

**VIA E-MAIL AND U.S. MAIL**

WRITER'S DIRECT DIAL
(310) 246-6750

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 2720
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Richard Kendall
Kendall Brill & Klieger LLP
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California 90067

Re:    *DC Comics v. Pacific Pictures Corp. et al.*, **CV-10-3633 (ODW) (RZx)**

Dear Counsel:

I write to follow up on an issue raised during the parties' Rule 26(f) conference today. As you know, I asked you to identify the anonymous author of the Toberoff Timeline document during our initial meet and confer on July 13. You refused. We reiterated that request today; again you refused, responding only that you "noted" our request.

As we have indicated to you, it is part of the parties' overall discovery obligations to ensure that all relevant evidence is preserved. Please confirm immediately that you have so notified the anonymous author, or alternatively, identify that person so that we may notify them. If you decline both of these alternatives, we will have no option but to seek appropriate relief.

We reserve all rights.

Very truly yours,

Daniel M. Petrocelli
of O'MELVENY & MYERS LLP

Ex DD - 367

# EXHIBIT EE

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 2720

LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
- ALSO ADMITTED IN NEW YORK

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

May 23, 2007

Via Facsimile (213) 243-4182 and US Mail

David S. Eisen, Esq.
Arnold & Porter LLP
777 South Figueroa Street- 44th Floor
Los Angeles, CA 90017

Re:  Superman/Superboy Litigations, Case Nos. 04-CV-8400, 04-CV-8776 SGL (RZx)

Dear David:

We write in response to Michael Bergman's May 22, 2007 letter to you regarding my
May 21, 2007 declaration. Plaintiffs disagree with defendants' inaccurate and self serving
interpretation and application of Magistrate Zarefsky's April 30, 2007 ruling ("Order").
In their motion regarding the stolen documents ("Motion"), which I understand has been
provided to you, defendants referred to your predecessor, John Quinn as a "neutral" to
buttress the propriety of their handling of the documents.  As such, Magistrate Zarefsky
referred to the documents as "escrow documents."

We therefore respectfully request that you not release to defendants any escrow
documents which remain the subject of disagreement between the parties. Mr. Bergman
states in his letter that he is prepared to bring a motion regarding same before Magistrate
Zarefsky.  Defendants must not receive through this "escrow" procedure what they could
not otherwise obtain.

Defendants insist on clinging to the absurd position that there has been a waiver of the
two plainly privileged communications between me and Plaintiffs that occurred after the
commencement of this litigation because such were not listed on a privilege log even
though defendants do not (and cannot) deny that the parties have a standing agreement
that neither side must list such communications on a privilege log.  Defendants
erroneously state that this was never brought to the Court's attention. However, in
paragraph 22 of my March 23, 2007 declaration in opposition to defendants' motion to
compel, which has been provided to you, I specifically mentioned the two e-mails and
explained to the court that these post-litigation communications were not listed on a
privilege log because "the parties to this action have agree not to list post-complaint
attorney-client communications on their respective privilege logs."

## LAW OFFICES OF MARC TOBEROFF

David S. Eisen, Esq.
May 23, 2007
Page 2

No fair reading of the Order, as well as common sense, could give defendants access to privileged communications they would not otherwise be entitled to, simply because such documents were stolen from my legal files, and, as Mr. Bergman well knows, this was not Magistrate Zarefsky's intention.

While admitting that "'escrow documents' that were originally listed on the privilege logs of non-party witnesses should not be released," Mr. Bergman, one paragraph later, claims that two documents listed on non-party attorney Don Bulson's privilege log must be turned over. Mr. Bergman makes a specific legal argument to you regarding the joint interest privilege (as if you were the Court) that he could have made months ago in the form of a properly noticed motion, but never did. The claim was neither made in the subject motion (nor ruled on), nor in their pending motion in Ohio regarding Mr. Bulson's privilege log. This is a perfect example of Mr. Bergman's overreaching and abuse of Magistrate Zaresky's ruling and, in fact, your role as holder of the escrow documents.

Mr. Bergman also cites no authority for his dubious position that the joint interest privilege asserted by Mr. Bulson is waived because plaintiffs did not have a corresponding listing on their privilege logs. There was certainly no requirement in the Order that privileged documents be cross-referenced on multiple privilege logs in order to sustain the privilege. Accordingly, as these documents are plainly listed on a privilege log, they are not to be turned over to defendants.

Defendants also claim that the "undated defamatory letter" must be released because it has not been listed on a privilege log. This letter was not the subject of defendants' motion to compel and neither party attached it. The letter was not discussed during the April 30, 2007 hearing nor is it discussed in the Order. However, in paragraph 27 of my declaration, I state that the letter contains information protected by the attorney-client privilege and the work product doctrine. The letter discloses the substance of documents listed on the privilege logs of plaintiffs and third parties which remain protected under Magistrate Zarefsky's Order.

As this letter was not authorized by plaintiffs or their counsel, they can hardly be held to have consented to the release of this privileged information or to have waived the privilege. Nor would they have listed this illicit third party communication on their privilege log. Magistrate Zarefsky's ruling obviously did not consider this letter. As it was not a focus of defendants' motion, nor discussed at the hearing, it fell through the cracks. However, one would be hard pressed to conclude that Magistrate Zarefsky found that the privileged information contained in the letter has been waived when the privilege is maintained for the documents and information to which it refers.

**LAW OFFICES OF MARC TOBEROFF**

David S. Eisen, Esq.
May 23, 2007
Page 3


Mr. Bergman also improperly asked that you read through the privileged documents
which plaintiffs have keyed by bates numbers to their privilege log, pursuant to the
Order, to hunt for particular documents on defendants' behalf to assess their privileged
status and the sufficiency of plaintiffs' privilege logs. The Order does not provide for
this, nor is it appropriate to your function, as represented by defendants and stated by the
Court, as the holder in escrow. The Order directed plaintiffs to account for all the escrow
documents by bates numbers and to key privileged documents to the numbered entries on
the privilege logs which plaintiffs have done. By prior motion to compel, defendants
challenged the sufficiency of plaintiffs' privilege logs, and Magistrate Zarefsky held that
plaintiffs' privilege logs are entirely proper and contain sufficient information.

Lastly, although Mr. Bergman copied us on his last two letters, we respectfully request
that plaintiffs be sent all communications by defendants regarding the "escrow
documents."

Please do not hesitate to contact me with any questions or comments concerning the
above.

Very truly yours,

Marc Toberoff

cc: Micheal Bergman (via facsimile)
    Patrick Perkins, Esq. (via facsimile)
    James Weinberger, Esq. (via facsimile)