# EXHIBIT X

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA



JOANNE SIEGEL, )
LAURA SIEGEL LARSON )
          )
     Plaintiffs, )
          )
v.       ) CASE NO. CV 04-8400
          )     CV 04-8776
WARNER BROS, et al.    )
          )
     Defendants. )


DEPOSITION OF JEAN ADELE PEAVY
November 11, 2006
1:26 p.m.
317 Paseo de Peralta
Santa Fe, New Mexico


PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:
TAKEN BY: MR. PATRICK PERKINS
   Attorney for the Defendants



REPORTED BY: MABEL JIN CHIN, NM CCR #81
     Bean & Associates, Inc.
     Professional Court Reporting Service
     500 Marquette, Northwest, Suite 280
     Albuquerque, New Mexico 87102
(3520B) MC

Page 2

```
 1         APPEARANCES
 2
 3  For the Plaintiffs:
 4     MR. MARC TOBEROFF
        2049 Century Park East, #2720
 5      Los Angeles, California 90067
 6  For the Defendants:
 7     PERKINS LAW OFFICE, P.C.
        1711 Route 9D
 8      Cold Spring, New York 10516
        BY: MR. PATRICK PERKINS
 9
10  ALSO PRESENT: MS. MARGO MOIR, Videographer
11
12            I N D E X
13  EXAMINATION OF JEAN ADELE PEAVY
14  By Mr. Perkins                      3
15  CERTIFICATE OF COMPLETION OF DEPOSITION    38
16  WITNESS SIGNATURE/CORRECTION PAGE          40
17
18      EXHIBITS MARKED OR FORMALLY IDENTIFIED
19  12. Subpoena in a Civil Case              5
20  13. April 27, 1999 letter, Peavy to Levitz  12
21  14. August 21, 1992 note, Peavy to Paul    18
22  15. September 10, 1992 letter, Frank to Paul  24
23  16. August 1, 1992 letter, Levitz to Frank   25
24  17. March 31, 2001 letter, Jean to Joanne    28
25
```

Page 3

```
 1          JEAN ADELE PEAVY,
 2     after having been first duly sworn under
 3     oath, was questioned and testified as follows:
 4              EXAMINATION
 5  BY MR. PERKINS:
 6     Q.  Good afternoon, Mrs. Peavy.  My name is
 7  Patrick Perkins.  I am a lawyer for DC Comics and
 8  other Warner Brothers entities.  I represent DC Comics
 9  in a lawsuit that was filed in the United States
10  District Court in California by Joanne Siegel and
11  Laura Siegel Larson.  The lawsuit involves copyright
12  rights relating to the Superman character, and you
13  have been subpoenaed in this case to give testimony
14  because we believe you have information that might be
15  relevant to the case.
16     Mrs. Peavy, have you ever had your
17  deposition taken before?
18     A.  No.
19     MR. TOBEROFF:  Before we go further, I just
20  wanted to add, in the other one, Warren, the
21  deposition, you had mentioned that there were two
22  lawsuits and that one concerned Superman, the other
23  concerned Superboy, and correctly that they have been
24  consolidated for purposes of discovery.
25     Q.  I may be asking you certain questions, and
```

Page 4

```
 1  obviously wanting you to give answers.  It's important
 2  that you understand the question that I am asking.
 3  And if you don't understand it, then you please ask
 4  for clarification.  Do you understand that?
 5     A.  Uh-huh.
 6     Q.  And you are going to have to give a verbal
 7  "yes" or "no" even though --
 8     A.  Okay.
 9     Q.  -- we're being videotaped, for Ms. Chin, to
10  make it easier to take down people's answers.
11     A.  Okay.
12     MR. TOBEROFF:  It's hard for them to take
13  down "uh-huh" and "huh-uh."
14     A.  Oh.
15     Q.  Is there -- are you taking any medication or
16  anything that would impair your ability to testify
17  truthfully today?
18     A.  No.
19     Q.  Is there anything that would impede you from
20  testifying completely and truthfully today?
21     A.  No.
22     Q.  When I ask you questions -- I am sure your
23  lawyer has instructed you on this -- but you need to
24  leave sometime to allow him to object to the question
25  if there is an objection.  And I can't imagine there
```

Page 5

```
 1  would be any objection to my questions, but sometimes
 2  it happens.
 3     MR. TOBEROFF:  Because the court reporter
 4  can't take people talking over each other.  She can
 5  only take one person at a time.
 6     (Exhibit 12 marked.)
 7     Q.  (By Mr. Perkins) I have asked the court
 8  reporter to mark as Exhibit 12 a document that's
 9  entitled "Subpoena in a Civil Case."  Have you seen
10  this document before today, Ms. Peavy?
11     A.  I know we were subpoenaed, yes.
12     Q.  Do you -- do you recall searching for any
13  documents to produce to give to us in response to the
14  subpoena?
15     A.  Oh, my son would have done that.
16     Q.  Did you independently do anything?
17     A.  No.  No.
18     Q.  Are there documents relating to Superman or
19  to Superboy that you have that your son would not know
20  about?
21     A.  No.
22     Q.  So you are comfortable that he searched
23  everywhere where documents do exist?
24     A.  Oh, yes.  Yes.
25     Q.  Ms. Peavy, you are the sister of Joseph
```

Page 6

1  Shuster; isn't that right?
2  A. Yes.
3  Q. Were you and your brother close?
4  A. Very close.
5  Q. If you don't mind my asking, what is the age
6  difference between you and --
7  A. Six years.
8  Q. And were you close to Mr. Shuster during the
9  years when he was beginning to do Superman?
10  A. Yes.
11  Q. And do you -- did he talk to you about the
12  process of creating the first Superman comic book?
13       MR. TOBEROFF: Vague and ambiguous. You can
14  answer.
15  A. Yes. I watched it being drawn.
16  Q. You were there when he was drawing it?
17  A. I am the only one in the world that watched
18  it being drawn.
19  Q. How wonderful. Do you remember when that
20  was?
21  A. Well, let's see. I was -- first they did
22  the evil character, and then they made it the good
23  character. I think the good character was 1934.
24  21 -- 31 -- 33 -- 34.
25  Q. Okay. And do you recall when Mr. Shuster

Page 7

1  first met Jerry Siegel?
2  A. Oh, yes. In high school. Uh-huh.
3  Q. And when did you first meet Jerry Siegel?
4  A. The first day they met.
5  Q. Where was that?
6  A. They met in high school. They were
7  introduced by a cousin, by Jerry's cousin, and they
8  immediately came over to our -- to our house. And
9  they got around -- we had a big dining room table
10  about, you know, a little bit bigger than this, and
11  they immediately started talking about science fiction
12  and very, very excited about HG Wells and all the --
13  all the great science fiction things that were going
14  on. And they were both great fans, and so they -- the
15  first day they thought, we ought to do something
16  together. So, immediate.
17  Q. And do you recall how the first Superman
18  comic strip came to be? Was there a script written
19  first or was there a drawing done first? Do you
20  recall what the process was?
21  A. They worked together. Jerry got the idea
22  and they came over and around the dining table, and he
23  would talk about his idea for a story and, then Joe
24  would say, well, then -- well, how about this? And he
25  would draw it out real, real fast and say, how does

Page 8

1  this look to you? And Jerry would say, yes, great.
2  Great. Great. And they were both excited and
3  enthusiastic and very, very excited.
4  Q. Now, do you recall when -- in which comic
5  book the first Superman story was published? Do you
6  remember that?
7  A. Oh, June 1938.
8  Q. Right. And do you remember the title of the
9  comic?
10  A. Oh, well, was it --
11  Q. It's okay if you don't.
12  A. No. No. No, I don't think I would remember
13  the title.
14  Q. Do you remember the title Action Comics?
15  A. Oh, of course.
16  Q. Okay. So the June 1938 Action Comics Number
17  1, was that your recollection of the first story that
18  was published?
19  A. Yes.
20  Q. Now, after they -- strike that. Let me go
21  back.
22       Were you -- did your brother keep you
23  apprised as to their efforts to sell the Superman
24  comic?
25  A. Oh, yes, definitely.

Page 9

1  Q. And did he -- at some point did Joe Shuster
2  tell you that they had, in fact, found someone who
3  would publish Superman?
4  A. Eventually, yes.
5  Q. Eventually. And did he tell you about --
6  about this before Action Comics Number 1 was
7  published?
8  A. Oh, yes. They were submitting it. Uh-huh.
9  Q. But did they tell you -- in other words, did
10  your brother tell you that Superman was going to be
11  published in Action Comics Number 1 before the comic
12  book actually came out?
13  A. Oh, yes.
14  Q. He did?
15  A. Uh-huh.
16  Q. After Action Comics Number 1 was
17  published -- or strike that. Let me go back.
18       The comic that was in Action Comics Number
19  1, was that a comic that Joe and Jerry had come up
20  with together on their own without anybody else being
21  involved?
22  A. Oh, that was a newspaper -- that was the
23  dailies from the newspaper.
24  Q. And the dailies then became Action Comics
25  Number 1?

Page 10

1   A. Yes. Yes.
2   Q. So at the time that they found someone to
3   publish the dailies into a comic book, were there any
4   other Superman comics that were done, ready to be
5   published?
6   A. Yes. Yes.
7   Q. Do you recall which ones they were?
8   A. Many of them. I know that they were --
9   there were many.
10  Q. There were many that were completed?
11  A. Yes. Uh-huh.
12  Q. How many? Do you know?
13  A. Oh, I wouldn't know how many, but there were
14  quite a few. Quite a few.
15  Q. And do you know if those were ultimately
16  published?
17  A. Well, I guess they were. A lot of Action
18  Comics came out, and it sold so well that they finally
19  made a Superman magazine out of it.
20  Q. And when -- after the first Action Comics
21  Number -- after Action Comics Number 1 came out, did
22  Joe ever tell you about the way that he and Jerry
23  worked with the publisher? Their working process.
24      MR. TOBEROFF: The way they worked after
25  Action Comics Number 1 came out?

Page 11

1   Q. Yes.
2   A. Hum -- what do you mean by "the way"?
3   Q. Well, did he ever tell you whether they were
4   given assignments or what they were asked to do, how
5   it was supposed to work?
6   A. Oh, they -- they paid them by the page. I
7   know that.
8   Q. Okay.
9       MR. TOBEROFF: I think he is asking you --
10      MR. PERKINS: You know what? That's okay.
11  I appreciate that. It's all right.
12      THE WITNESS: I know they paid $10 a page.
13  Q. (By Mr. Perkins) Do you recall at any time
14  a novel that was published called The Adventures of
15  Superman that had illustrations by your brother?
16  A. Uh-huh.
17  Q. Do you recall that?
18  A. Uh-huh.
19  Q. Do you recall when that was published?
20  A. Back in the '40s.
21  Q. Back in the '40s. And how did you come to
22  know about this -- about the novel?
23      MR. TOBEROFF: Assumes facts not in
24  evidence. You can answer.
25  A. I just saw it.

Page 12

1   Q. When did you see it?
2   A. Oh, I don't remember.
3   Q. Did Joe give it to you or did you see it in
4   the store?
5   A. No. No. I really wouldn't remember too
6   much about a novel -- the novel. I just know it was
7   done and he was very, very proud of it. So -- I know
8   that.
9       MR. PERKINS: Why don't you mark that for
10  me?
11      (Exhibit 13 marked.)
12  Q. (By Mr. Perkins) And Ms. Peavy, I have
13  asked the court reporter to mark a document as Exhibit
14  13, which is a letter dated April 27, 1995, under your
15  signature, directed to Paul Levitz.
16  A. Uh-huh.
17  Q. Is this your signature at the bottom of the
18  page?
19  A. Yes.
20  Q. Did you write the letter?
21  A. Me? Um -- I -- I don't know if I did or my
22  son did. Probably my son, and I signed it.
23  Q. Okay. The first sentence refers to, says,
24  quote, "It was a delightful surprise to receive a copy
25  of the book, The Adventures of Superman, by Lowther."

Page 13

1   Do you see that?
2   A. Oh, yes.
3   Q. Did you, in fact, receive a copy of that
4   from Paul Levitz?
5   A. Oh, yes. Yes.
6   Q. And the next sentence says, "I had such a
7   feeling of nostalgia looking at the drawings"?
8   A. Oh, yes. Yes. I wrote that. I wrote
9   that. I remember that.
10  Q. Okay.
11  A. Okay. I remember that.
12  Q. All right. And have you read this book, by
13  any chance? Have you read the novel or did you just
14  look at it?
15  A. No, I didn't. I just looked at the
16  pictures.
17  Q. Okay. Now, at some point in the 1940s
18  Mr. Shuster joined Jerry Siegel and filed a lawsuit
19  against -- against National Periodicals or some other
20  entities that they were working with. Do you recall
21  that?
22  A. Uh-huh.
23  Q. Were you close to --
24      MR. TOBEROFF: Excuse me. Did you mean to
25  say -- did you say 1960s or '70s?

Page 14

1  MR. PERKINS: I said 1940s.
2  MR. TOBEROFF: Oh, 1940s.
3  THE WITNESS: '47, I believe or '48.
4  MR. PERKINS: 1947.
5  MR. TOBEROFF: Sorry. Sorry.
6  MR. PERKINS: That's all right. Wrong
7  lawsuit.
8  Q. (By Mr. Perkins) Were you close to Joe at
9  the time that that happened?
10  A. Yes. In the '40s I was.
11  Q. Do you recall --
12  A. Yes.
13  Q. Did Joe tell you anything about that
14  lawsuit?
15  A. I think that he -- that they felt that they
16  were weren't being compensated for their contribution
17  to a character that was making hundreds of millions of
18  people happy, and they weren't getting their due
19  compensation. That's what I -- I'm aware of.
20  Q. Did he ever talk to you about any of the
21  details of the lawsuit?
22  A. No.
23  Q. Did he ever talk to you about --
24  A. Oh, well, I know that it kept going on and
25  on and on and on, I know that. And we thought when is

Page 15

1  this ever going to be settled. I remember that.
2  Q. Okay.
3  A. And very unhappy. My poor brother, he was
4  -- he was poor. And -- you know, and here is a
5  character that's making other people rich and he is
6  not -- doesn't have enough money.
7  Q. Now --
8  A. The same with Jerry, too.
9  Q. Now, the case that took place in the
10  1940s --
11  A. Uh-huh.
12  Q. -- did he ever talk to you about what the
13  case -- what kind of claims there were in the case?
14  Did he ever talk to you about anything like that?
15  A. I don't think I know the claim itself.
16  Q. Okay. Did your brother ever talk to you
17  about the character Superboy?
18  A. Um -- no, not Joe. Not Joe, no.
19  Q. He never did?
20  A. No.
21  Q. Okay. Now, your brother had another lawsuit
22  in the late 1960s that he had.
23  A. Uh-huh.
24  Q. Do you recall -- do you recall that?
25  A. Yes.

Page 16

1  Q. And do you recall what that lawsuit was
2  about?
3  A. Oh, here they were a couple of the creators
4  of Superman living in poverty. They were destitute.
5  They were really desperate.
6  Q. Did Mr. Shuster talk to you about why they
7  brought the lawsuit?
8  A. I think they wanted some compensation.
9  Q. Now, did they end up ever getting any
10  compensation?
11  A. Not then.
12  Q. When -- when did they end up getting
13  compensation?
14  MR. TOBEROFF: Vague and ambiguous, calls
15  for a narrative.
16  A. Much later. I was married by then, and
17  raising kids, and I didn't keep as much -- track of
18  anything legal at all.
19  Q. When you were -- are you aware that in the
20  1970s Mr. Shuster entered into an agreement with
21  Warner Communications for some compensation to him?
22  A. Yes. I think there was something going on I
23  read. Yes.
24  Q. Were you close to him at that time?
25  A. No. I was married and raising two kids, and

Page 17

1  he -- yes. I was living in Texas then, so --
2  Q. In El Paso?
3  A. Yes.
4  Q. And were you estranged at all?
5  A. Oh, no.
6  Q. Okay.
7  A. No. No. He -- he called me on the phone,
8  he is interested in the kids, you know, about Warren
9  and Dawn and my husband and me and how we were getting
10  along and, you know, not too well and, you know -- I
11  mean -- no, we had a happy family life, but I mean,
12  financially we weren't doing as good as we would have
13  liked.
14  Q. Do you -- did you at any time have an
15  understanding as to how much money Mr. Shuster was
16  receiving in this deal that he entered into with
17  Warner Communications?
18  A. No.
19  Q. Were you aware that the deal also provided
20  for certain monies to be paid to your other brother,
21  Frank --
22  A. Uh-huh.
23  Q. -- under that agreement?
24  A. Uh-huh.
25  Q. And do you recall how much he was to

Page 18

1  receive?
2     A. I don't remember.
3     Q. You don't remember.
4     A. Originally 5,000 -- I don't even remember.
5     Q. At some point did you become aware that
6  Joanne Siegel -- well, strike that. Who was Joanne
7  Siegel?
8     A. Jerry's wife.
9     Q. Okay. And at some point did you become
10 aware that Joanne Siegel was acting as an agent for
11 your brother?
12    A. Yes. I think -- -- you know, Joe would --
13 when I talked to him on the phone he would always say
14 Joanne was handling it. That's all I know. Joanne
15 was handling it.
16    Q. Did you ever come to learn whether Joanne
17 was charging Joe anything for that?
18    A. I don't know.
19       (Exhibit 14 marked.)
20    Q. I have asked the court reporter to mark a
21 document, multipage document as Exhibit 14.
22    MR. TOBEROFF: Am I correct that this
23 basically has no Bates stamps, that prior to this
24 deposition this has never been produced?
25    MR. PERKINS: No.

Page 19

1     MR. TOBEROFF: It has been produced?
2     MR. PERKINS: Yes.
3     MR. TOBEROFF: Okay.
4     THE WITNESS: Okay.
5     Q. (By Mr. Perkins) Do you recall writing this
6  note?
7     A. Yes.
8     Q. And who is the Paul that's referenced in
9  this note?
10    A. Well, I am writing to Paul Levitz.
11    Q. And this is your handwriting; correct?
12    A. Yes.
13    Q. Okay. The next page there is a typed letter
14 that begins -- to a Mr. Marty Payson?
15    A. Uh-huh.
16    Q. Who was Marty Payson?
17    A. Oh, if I recall he was the -- was the
18 treasurer then or something? He was some executive
19 there.
20    Q. Did you have direct contact with him at all?
21    A. Never.
22    Q. If I could ask you to look at the second to
23 last page of this letter, is that your signature?
24    A. Yes.
25    Q. Okay. Now, this was written or is dated

Page 20

1  August 21, 1992?
2     A. Uh-huh.
3     Q. Which is less than a month after your
4  brother Joe died; correct?
5     A. Yes. Uh-huh.
6     Q. And do you recall why this letter was sent?
7     A. Um -- well, wait a minute. I --
8     MR. TOBEROFF: Why don't you take your time
9  and read it?
10    MR. PERKINS: Take a minute and read the
11 letter.
12    MR. TOBEROFF: I would read the whole
13 letter.
14    THE WITNESS: We --
15    MR. TOBEROFF: Wait. I would read the whole
16 letter before you answer about the document.
17    THE WITNESS: Oh.
18    MR. TOBEROFF: Just take your time.
19    THE WITNESS: Yes, Joe -- estate almost
20 nothing -- that's right.
21    Okay. Yes. I remember that now, yes.
22    Q. (By Mr. Perkins) What was the purpose of
23 writing this letter to Marty Payson?
24    A. I had to appeal for help, financial help.
25    Q. Did you receive any help as a result?

Page 21

1     A. Yes. They took care of everything.
2     Q. Did -- and when you say they took care of
3  everything, what do you mean?
4     A. Well, I mean, I think they -- whatever had
5  to be paid they paid.
6     Q. Now, at page 2 of the letter -- so it's the
7  third page of that document, in the second paragraph?
8     A. Second page, yes.
9     Q. I will read to you in the second paragraph
10 beginning the third sentence, "We also found out" --
11 I'm sorry, "We also found that over $1,200 a month was
12 being paid to Joanne Siegel for some kind of
13 commission for including him in the pay raise. It
14 appears that for quite a few years she has been taking
15 20 percent of his income as an agent's commission for
16 getting pay raises for Siegel and Shuster." Do you
17 see that?
18    A. Yes. Yes.
19    Q. Had you known this --
20    A. I didn't.
21    Q. -- before you wrote the letter?
22    A. No, I didn't know it before.
23    Q. And what was your reaction to this when you
24 found out?
25    MR. TOBEROFF: Vague and ambiguous. You can

Page 22

1  answer. Calls for a narrative.
2   A. She was always handling the business.
3  That's all I know. She was putting herself out
4  handling the business.
5   Q. And did you ever ask her about this 20
6  percent that she was receiving from Joe?
7   A. When they -- when I was in Joe's apartment
8  and Jerry and Joanne came over, yes, and we talked
9  about it.
10   Q. And do you --
11   A. Sorry. Now I do recall about it, yes.
12   Q. Do you recall what was said during that
13  conversation?
14   A. Well, no. I thought it was okay then
15  because, you know, understanding how Joanne had worked
16  for -- you know, to help Joe along with Jerry, then --
17  before that -- I wrote this letter before and I didn't
18  realize until I talked to Joe, Joanne and Jerry, as to
19  why it was okay.
20   Q. And what was your understanding as to what
21  was being done to earn that money?
22   A. She -- she had worked to get a higher pay
23  raise, I guess.
24   Q. And do you remember how much Joe was
25  receiving by the time he died?

Page 23

1   A. No, I have no idea.
2   Q. You don't remember?
3   At some point -- strike that.
4   Was -- was -- after Joe died was your
5  brother Frank still receiving money from Warner
6  Communications?
7   A. Yes.
8   Q. Do you remember how much?
9   A. Huh-uh. No, I don't think I remember how
10  much.
11   Q. Do you recall having any discussions with
12  either Paul Levitz or anyone else about an amount of
13  money that would continue to be paid to Frank?
14   A. To Frank, yes. Yes.
15   Q. Do you recall how much that was?
16   A. Yes. I think it was 25,000.
17   Q. Per year?
18   A. Yes.
19   Q. And who was to receive that money?
20   A. My brother, Frank.
21   Q. And was the money paid to Frank or to you?
22   A. Oh, no. No. To Frank.
23   Q. And when he died, who then began -- did you
24  begin receiving that money?
25   A. Yes. yes.

Page 24

1   Q. Okay.
2   A. Well, yes. Yes.
3   (Exhibit 15 marked.)
4   Q. I am going to hand you what's been marked as
5  Exhibit 15.
6   MR. TOBEROFF: Before you ask the question,
7  I would also like to note that this letter, which I
8  also don't recall seeing, is also not Bates stamped.
9  Has this been produced before today?
10   MR. PERKINS: To my knowledge, yes.
11   MR. TOBEROFF: I have never seen Exhibit 14
12  and I have never seen this letter. I could have
13  missed it in the document, but I'm curious as to why
14  all the documents are Bates stamped except these
15  letters, which I don't recall seeing.
16   THE WITNESS: Uh-huh.
17   MR. TOBEROFF: I have never seen this
18  letter. I don't believe it was produced.
19   And it couldn't be -- no comment.
20   THE WITNESS: My brother -- I have never
21  seen it, either.
22   Q. (By Mr. Perkins) You have never seen it
23  before?
24   A. No.
25   Q. Do you recall whether the payments --

Page 25

1  payments were made to you instead of to your brother?
2   A. Yes.
3   Q. Were they, in fact, made to you?
4   A. Uh-huh.
5   MR. TOBEROFF: Wait a moment for me to
6  object.
7   THE WITNESS: Okay.
8   MR. TOBEROFF: Also, let him finish the
9  question before you answer --
10   THE WITNESS: Okay.
11   MR. TOBEROFF: -- even though you think you
12  know what he is asking --
13   THE WITNESS: Okay.
14   MR. TOBEROFF: -- let him finish the
15  question.
16   THE WITNESS: Uh-huh.
17   MR. TOBEROFF: You are doing fine.
18   THE WITNESS: Uh-huh.
19   (Exhibit 16 marked.)
20   THE WITNESS: Okay.
21   Q. (By Mr. Perkins) All right. I have had the
22  court reporter mark as Exhibit 16 a two-page
23  document. I have -- I have copied them together.
24  They really don't go together, I'm sorry about that.
25  Actually, you may even take off the back page.

### Page 26

1  MR. TOBEROFF: Just the page 1 we should
2  keep?
3  MR. PERKINS: Yes.
4  MR. TOBEROFF: I'll do it for you.
5  THE WITNESS: All right.
6  MR. PERKINS: The other one doesn't -- it's
7  not very --
8  Q. (By Mr. Perkins) Did you -- is this your
9  signature at the bottom of the page?
10  A. Yes. Uh-huh.
11  Q. Did you review this document before you
12  signed it?
13  A. I probably glanced at it, yes.
14  Q. Now, in the agreement, the second full
15  paragraph, the last sentence says, quote, "In any
16  event, you now grant to us any such rights and release
17  us" -- let me try that again.
18      "In any event, you now grant to us any such
19  rights and release us, our licensees and all others
20  acting with our permission, and covenant not to assert
21  any claim of right, by suit or otherwise, with respect
22  to the above, now and forever."
23      In the following paragraph it states, and I
24  quote, "If, despite the terms of this agreement,
25  either of you assert any such claim of right, for any

### Page 27

1  reason, you agree to refund to us, upon the making of
2  any such assertion, all amounts previously paid to you
3  hereunder, and we will have no obligation to make any
4  further payments under this agreement," period, closed
5  quote. Do you see that?
6  A. Yes.
7  Q. Do you remember reading that when you signed
8  this document?
9  A. I probably read it but I -- you know, I was
10  -- I was listening to my brother Frank at the time, so
11  I wasn't paying much attention. I was depending upon
12  him to, you know, tell me if I should sign it. So --
13  Q. Do you have an understanding as to what this
14  second to last paragraph means?
15  MR. TOBEROFF: Calls for a legal conclusion.
16  You can answer.
17  A. Yes. I -- I don't -- I don't have any claim
18  if that's what -- yes.
19  Q. Well, the first sentence of the second to
20  the last paragraph says that if either of you assert
21  any such claim of right for any reason, you agree to
22  refund to us, upon the making of any such assertion,
23  all amounts previously paid to you hereunder. Do you
24  see that?
25  A. Yes.

### Page 28

1  Q. Now, to your knowledge, had you made any
2  claim to --
3  A. Huh-uh.
4  Q. -- own or to be able to recapture the
5  copyrights of your brother, Joseph Shuster?
6  MR. TOBEROFF: Objection, calls for a legal
7  conclusion, vague and ambiguous. You can answer the
8  question if you understand it.
9  A. Yes. No, I haven't made any claim.
10  Q. Are you aware as to whether or not the
11  estate of your brother has made any claim?
12  A. My son handles everything legal, so I
13  don't -- I don't know what's going on there.
14  Q. Okay.
15      (Exhibit 17 marked.)
16  Q. I have asked the court reporter to mark as
17  Exhibit 17 the document, one-page document appears to
18  be a letter that bears Bates number 53 on it.
19  A. Uh-huh. Um. Okay. I remember that.
20  Q. Did you -- is this -- did you write this
21  letter?
22  A. Uh-huh.
23  Q. And this is your signature at the bottom?
24  A. Yes. Yes.
25  Q. Do you have regular contact with Joanne

### Page 29

1  Siegel.
2  A. Uh-huh.
3  Q. How often do you communicate with her?
4  A. Oh, we call each other on the phone.
5  Q. When is the last time you spoke with
6  Mrs. Siegel?
7  A. A few weeks ago, I think.
8  Q. And do you recall what you discussed?
9  A. Family stuff. We never talk business.
10  Q. Have you ever had any conversations with her
11  about her lawsuit?
12  A. Never.
13  Q. I would like to invite your attention to the
14  second paragraph, first sentence, says, quote, "There
15  was so much injustice done that I am hoping the wrongs
16  will be righted and that your attorney will get a fair
17  deal for you," period, closed quote. Do you remember
18  reading that -- writing that?
19  A. Yes. Yes.
20  Q. And did you -- was that referring to
21  something that you had discussed with Joanne?
22  A. Yes. I knew she had an attorney.
23  Q. Do you recall who that was?
24  A. No.
25  Q. At some point did you recommend to Joanne

Page 30

1  Siegel that she -- strike that.
2      Do you have any kind of agreement with
3  Joanne Siegel about money relating to Superman?
4      A. No.
5      Q. Do you know, for example, how much money she
6  receives from Warner Brothers?
7      A. I have no idea.
8      Q. Do you know whether she knows how much money
9  you receive?
10     A. I think she is the one that -- is the one
11 that got it for Frank, and then I inherited it, so I
12 think she knows about -- yes, what I get, yes.
13     Q. And do you -- other than -- are you still
14 receiving the $25,000 per year?
15     A. Uh-huh.
16     Q. And do you -- do you also receive other
17 money from DC Comics?
18     A. No.
19     Q. Do you ever receive bonus payments from
20 them?
21     A. No -- no. No. I don't remember. No, we
22 didn't get anything for -- this latest one, no.
23     Q. Have you ever gotten a bonus payment?
24     A. No, I don't -- no, I don't think I ever
25 did. No.

Page 31

1      Q. Okay. When you referred to injustice being
2  done, what were you referring to?
3      A. Well, over the years they were not
4  compensated for -- for their creation, so that's the
5  injustice.
6      Q. That's what you're referring to?
7      A. Yes.
8      Q. Was there any other injustice that you are
9  referring to?
10     A. No.
11     Q. And you mentioned that you never talk
12 business with Joanne Siegel?
13     A. Huh-uh.
14     Q. Have there been ever any instances --
15     MR. TOBEROFF: I think that
16 mischaracterizes -- I believe it mischaracterizes the
17 testimony, but that's okay.
18     A. Well, I mean, I knew she had had a lawyer.
19     Q. Okay.
20     A. But I mean, I didn't know any of her
21 dealings with -- with whatever was going on with her
22 personal -- her personal case. We never talked about
23 her personal case, that's what I mean.
24     Q. Do you recall when -- when you first met
25 Mr. Toberoff?

Page 32

1      A. Uh-huh.
2      Q. When was that?
3      A. Um -- 2001, about the middle of 2001
4  sometime.
5      Q. And earlier today your son indicated that
6  Mr. Toberoff's name was given to Joanne Siegel?
7      A. Uh-huh.
8      Q. And he thought that you had been the one to
9  communicate that?
10     A. I told her about him.
11     Q. Do you recall when you did that?
12     A. Maybe about a year later, after -- after we
13 had, I don't know, Marc Toberoff as our counsel, and
14 she was unhappy with or she was -- she was unhappy
15 with her lawyer.
16     Q. What did she tell you about being unhappy
17 with her lawyer? What did she tell you?
18     A. Well, he -- the case -- her case wasn't
19 moving.
20     Q. And was that the only thing that she
21 expressed to you was making her unhappy?
22     A. Yes, I think so. Nothing was happening, as
23 far as I know. So I told her -- I thought that Marc
24 Toberoff would -- we liked him very much, and we -- we
25 felt he was very ethical, very knowledgeable, very

Page 33

1  intelligent. And so we -- I -- I on the telephone, I
2  suggested that she get in touch with him.
3      Q. Okay. Do you recall whether she -- did she
4  ever tell you that she did that?
5      A. Oh, yes, she did.
6      Q. What did she tell you?
7      A. Oh, she told me that she called him and that
8  they -- they had a luncheon. I guess they met for
9  lunch or something. She and Laura and Mr. Toberoff
10 met for lunch in LA.
11     Q. And what did she tell you about that
12 meeting?
13     A. I -- she asked him a lot of questions and
14 she liked him a lot.
15     Q. Did she tell you what questions she asked
16 him?
17     A. No. No.
18     Q. Did she tell you why she liked him?
19     A. She thought he was smart, ethical. She got
20 good vibrations about him and so did I. So --
21     MR. TOBEROFF: Thank you.
22     Q. I was going to say, what's not to like?
23     MR. TOBEROFF: I'm not -- I'm not allowed
24 to --
25     If you wake up every morning after talking

Page 34

1 to the defendants to see if there are horns growing
2 out of my head.
3    Q. (By Mr. Perkins) Mrs. Peavy, do you recall
4 signing any agreements with any of Mr. Toberoff's
5 companies?
6    A. Yes, I guess we did. Companies or with
7 Mr. Toberoff?
8    Q. Did you get legal counsel with respect to
9 whether or not to sign those agreements?
10    A. We couldn't afford any legal counsel so,
11 no. I just had a good feeling -- we just had a good
12 feeling about him.
13    Q. Okay. Do you recall in any of those
14 agreements that you signed how much Mr. Toberoff would
15 receive in connection with whatever income you
16 received from Superman?
17    A. No. We went in as partners, as far as I
18 know.
19    Q. And when you say partners, what do you --
20    A. Well, I mean, we couldn't afford anything,
21 so --
22    Q. So by that you mean a 50-50 partnership? Is
23 that what you were saying?
24    A. Yes.
25    Q. In 2005, were you -- did you receive a

Page 35

1 letter from Paul Levitz making an offer to license
2 certain Superman rights?
3    A. I think Warren might have. I am not sure
4 about that.
5    Q. That's okay.
6       MR. PERKINS: Can you show her what was
7 previously marked as Exhibit 10?
8    Q. Before I have you read the whole thing,
9 Ms. Peavy, and I don't think we're going to do that --
10    A. No.
11    Q. Because I want to --
12    A. Anyway, you know, I don't think I read it.
13    Q. You don't think you read this?
14    A. No, because that's legal stuff and I just --
15 I let it --
16    Q. Were you aware that this -- among other
17 things, there was an offer to pay a -- to pay two
18 million dollars to you and Warren if you would sign an
19 agreement?
20    A. You know, my son didn't take it seriously
21 because we didn't talk about it. He just said he got
22 a letter and he wasn't -- forget it.
23    Q. Did he say anything else to you about it?
24    A. Huh-uh. I don't think we -- I don't think
25 he took it seriously.

Page 36

1    Q. Are you aware that DC Comics had offered to
2 pay you two million dollars?
3    A. Yes. I think he might have mentioned that,
4 yes.
5       MR. PERKINS: I just want to take a quick
6 break.
7       (A recess was taken.)
8    Q. (By Mr. Perkins) I wanted to go back to
9 something that counsel said regarding Exhibit 14.
10 Exhibit 14 was produced. The Bates numbers are DCC
11 6476 through 6479. That I have with me. I don't
12 have --
13       MR. TOBEROFF: I'm sorry, 6476 through 6479?
14       MR. PERKINS: That's right. It's actually a
15 more complete document that's produced that has the
16 actual receipts and bills that go with it.
17       MR. TOBEROFF: Oh, okay.
18       MR. PERKINS: So it goes all the way through
19 6494. As for the handwritten letter, I don't have it
20 with me but, you know, my recollection is that was
21 also produced.
22       MR. TOBEROFF: Okay. If I am wrong I take
23 back what I said.
24       MR. PERKINS: Mrs. Peavy, I have no further
25 questions for you. Thank you so much for coming

Page 37

1 today. It was a pleasure meeting you.
2       THE WITNESS: Oh, thank you very much.
3 Okay. So that's all?
4       MR. PERKINS: That's it.
5       (The deposition concluded at 2:33 p.m.)

## Page 38

```
 1      UNITED STATES DISTRICT COURT
 2   FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JOANNE SIEGEL,          )
     LAURA SIEGEL LARSON     )
 5                           )
         Plaintiffs, )
 6                  )
     v.             ) CASE NO. CV 04-8400
 7                  )        CV 04-8776
     WARNER BROS, et al.    )
 8                  )
         Defendants. )
 9
10      CERTIFICATE OF COMPLETION OF DEPOSITION
11      I, MABEL JIN CHIN, New Mexico CCR #81, DO HEREBY
     CERTIFY that on November 11, 2006, the deposition of
12   JEAN ADELE PEAVY was taken before me at the request
     of, and sealed original thereof retained by:
13
         Attorney for the Defendants
14       PERKINS LAW OFFICE, P.C.
         1711 Route 9D
15       Cold Spring, New York 10516
         BY: MR. PATRICK PERKINS
16
        I FURTHER CERTIFY that copies of this certificate
17   have been mailed or delivered on _____, with
     changes, if any, by the witness appended, to the
18   following counsel of record and parties not
     represented by counsel:
19
         Attorney for the Plaintiffs
20       MR. MARC TOBEROFF
         2049 Century Park East, #2720
21       Los Angeles, California 90067
22      I FURTHER CERTIFY that examination of this
     transcript and signature of the witness were requested
23   by the witness and all parties present.
24      On _____, a letter was mailed or
     delivered to Mr. Toberoff regarding obtaining
25   signature of the witness.
```

## Page 39

```
 1      I FURTHER CERTIFY that the recoverable cost of the
     original and one copy of the deposition, including
 2   exhibits to Mr. Perkins is $_____.
 3      I FURTHER CERTIFY that I did administer the oath
     to the witness herein prior to the taking of this
 4   deposition; that I did thereafter report in
     stenographic shorthand the questions and answers set
 5   forth herein, and the foregoing is a true and correct
     transcript of the proceeding had upon the taking of
 6   this deposition to the best of my ability.
 7      I FURTHER CERTIFY that I am neither employed by
     nor related to nor contracted with (unless excepted by
 8   the rules) any of the parties or attorneys in this
     case, and that I have no interest whatsoever in the
 9   final disposition of this case in any court.
10
11      _____
            MABEL JIN CHIN
12          Certified Court Reporter #81
            License expires: 12/31/2006
13
14
15
16
17
18
19
20   (3520B) MC
     Date taken: November 11, 2006
21   Proofread by: LR
22
23
24
25
```

## Page 40

```
 1   SIEGEL vs. WARNER BROS
 2      WITNESS SIGNATURE/CORRECTION PAGE
 3   If there are any typographical errors to your
     deposition, indicate them below.
 4
     PAGE   LINE
 5
     _____ Change to _____
 6
     _____ Change to _____
 7
     _____ Change to _____
 8
     _____ Change to _____
 9
10   Any other changes to your deposition are to be listed
     below with a statement as to the reason for such
11   change.
12   PAGE   LINE      CORRECTION       REASON
13
14
15
16
17
18
19     I, JEAN ADELE PEAVY, do hereby certify that I have
     read the foregoing pages of my testimony as
20   transcribed, and that the same is a true and correct
     transcript of the testimony given by me in this
21   deposition on November 11, 2006, except for the
     changes made.
22
23      _____
             JEAN ADELE PEAVY
24           DATE SIGNED: _____
25   (3520B) MC Proofread by: LR
```

## Page 41

```
 1      UNITED STATES DISTRICT COURT
 2   FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JOANNE SIEGEL,          )
     LAURA SIEGEL LARSON     )
 5                           )
         Plaintiffs, )
 6                  )
     v.             ) CASE NO. CV 04-8400
 7                  )        CV 04-8776
     WARNER BROS, et al.    )
 8                  )
         Defendants. )
 9
10          AFFIDAVIT
11
     Deposition of: JEAN ADELE PEAVY
12
     Date taken: November 11, 2006
13
14
        The witness in this case was notified of the need
15
     for signature on _____.
16
        Failure of the witness to timely sign this
17
     deposition has resulted in the filing of this
18
     deposition on _____.
19
20
21   _____ BEAN & ASSOCIATES
22
23
24   (3520B) MC
25
```

Page 42

1  DATE DELIVERED:_____
2
3  MR. MARC TOBEROFF
   2049 Century Park East, #2720
   Los Angeles, California 90067
4
5  RE: SIEGEL vs. WARNER BROS
   DEPOSITION OF: JEAN ADELE PEAVY
6  DATE TAKEN: November 11, 2006
7  Dear Mr. Toberoff:
8  At the time of the above deposition/sworn statement
   was taken, it was requested that the witness read and
9  sign his/her transcript.
10
    ____Enclosed is your copy of the transcript with the
11  original signature page. Please ask the witness
    to read the transcript, make any corrections on
12  the signature page, and return the original
    signature page to our Albuquerque office.
13
    ____Enclosed is your copy of the transcript. Please
14  read it, note any corrections on the signature
    page, and return the original signature page to
15  our Albuquerque office. You may keep the
    transcript for your files.
16
    ____The transcript is now ready to review. Please
17  contact our Albuquerque office, 505-843-9494, to
    make arrangements to have the transcript read and
18  signed. If you are outside the Albuquerque area,
    please call 800-669-9492.
19
    ____The transcript is now ready for review. Please
20  remit payment in the amount of $_____ to our
    Albuquerque office. As soon as payment is
21  received, your transcript will be delivered. If
    you choose not to pay, please contact our
22  Albuquerque office, 505-843-9494, to make
    arrangements for signature.
23
    ____Trial in this matter is set for_____. If
24  the transcript has not been read and signed
    before that date, the original will be filed
25  without a signature.

Page 43

1  ____Other:_____
2  _____
3  The Federal Rules of Civil Procedure provide the
   witness 30 days in most instances from the receipt of
4  this letter to read and sign his/her transcript. If
   he/she has not read and signed the transcript in that
5  time, we will file the original transcript without the
   signature page.
6
   Sincerely,
7
8  BEAN & ASSOCIATES, INC.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  (3520B) MC

Page 44

1         RECEIPT
2  JOB NUMBER: (3520B) MC November 11, 2006
3  WITNESS NAME: JEAN ADELE PEAVY
4  CASE CAPTION: SIEGEL vs. WARNER BROS
5           * * *
6  ATTORNEY: MR. PATRICK PERKINS
7  DOCUMENT: TRANSCRIPT / EXHIBITS / DISK / OTHER
8  DATE DELIVERED: _____ DELIVERED BY: _____
9  RECEIVED BY: _____ TIME: _____
10          * * *
11 ATTORNEY:
12 DOCUMENT: TRANSCRIPT / EXHIBITS / DISK / OTHER
13 DATE DELIVERED: _____ DELIVERED BY: _____
14 RECEIVED BY: _____ TIME: _____
15          * * *

38

```
             UNITED STATES DISTRICT COURT

          FOR THE CENTRAL DISTRICT OF CALIFORNIA


JOANNE SIEGEL,                    )
LAURA SIEGEL LARSON               )
                                  )
              Plaintiffs,         )
                                  )
     v.                           )  CASE NO.  CV 04-8400
                                  )            CV 04-8776
WARNER BROS, et al.               )
                                  )
              Defendants.         )
```

CERTIFICATE OF COMPLETION OF DEPOSITION

I, MABEL JIN CHIN, New Mexico CCR #81, DO HEREBY CERTIFY that on November 11, 2006, the deposition of JEAN ADELE PEAVY was taken before me at the request of, and sealed original thereof retained by:

> Attorney for the Defendants
> PERKINS LAW OFFICE, P.C.
> 1711 Route 9D
> Cold Spring, New York 10516
> BY:  MR. PATRICK PERKINS

I FURTHER CERTIFY that copies of this certificate have been mailed or delivered on _____, with changes, if any, by the witness appended, to the following counsel of record and parties not represented by counsel:

> Attorney for the Plaintiffs
> MR. MARC TOBEROFF
> 2049 Century Park East, #2720
> Los Angeles, California 90067

I FURTHER CERTIFY that examination of this transcript and signature of the witness were requested by the witness and all parties present.

On _November 20, 2006_, a letter was mailed or delivered to Mr. Toberoff regarding obtaining signature of the witness.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Ex X - 218

39

1    I FURTHER CERTIFY that the recoverable cost of the original and one copy of the deposition, including
2    exhibits to Mr. Perkins is $_____.

3    I FURTHER CERTIFY that I did administer the oath to the witness herein prior to the taking of this
4    deposition; that I did thereafter report in stenographic shorthand the questions and answers set
5    forth herein, and the foregoing is a true and correct transcript of the proceeding had upon the taking of
6    this deposition to the best of my ability.

7    I FURTHER CERTIFY that I am neither employed by nor related to nor contracted with (unless excepted by
8    the rules) any of the parties or attorneys in this case, and that I have no interest whatsoever in the
9    final disposition of this case in any court.

10

11   _____
     MABEL JIN CHIN
12   Certified Court Reporter #81
     License expires:  12/31/2006
13

14

15

16

17

18

19

20   (3520B) MC
     Date taken:  November 11, 2006
21   Proofread by: LR

22

23

24

25



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

Dean & Associates, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com