# EXHIBIT A

DANIEL M. PETROCELLI (S.B. #97802)
  dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
  mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
  cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067-6035
Telephone:  (310) 553-6700
Facsimile:   (310) 246-6779

Attorneys for Plaintiff DC COMICS

FILED
CLERK, U.S. DISTRICT COURT

MAY I 4 2010
/0:23 am

CENTRAL DISTRICT OF CALIFORNIA
BY                         DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

JHN SSx

CV10 3633

| | |
|---|---|
| DC COMICS,<br><br>                    Plaintiff,<br><br>        v.<br><br>PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JOANNE SIEGEL, an individual, LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive,<br><br>                    Defendants. | Case No.<br><br>**COMPLAINT FOR**:<br><br>(1)  Declaratory Relief re: Invalidity of Copyright Termination Notice;<br><br>(2)  Declaratory Relief re: Scope of Copyright Termination Notice;<br><br>(3)  Declaratory Relief re: DC Comics Period of Exclusivity re: Shuster;<br><br>(4)  Interference with 1992 Shuster Agreement;<br><br>(5)  Interference with Prospective Economic Advantage re: Siegel-DC Comics Agreement; and<br><br>(6)  Declaratory Relief re: Invalidity of Copyright Assignment and Consent Agreements<br><br>**DEMAND FOR JURY TRIAL** |

# I.  STATEMENT OF THE CASE

1.    This lawsuit challenges a scheme by Marc Toberoff and companies under his control to violate the U.S. Copyright Act and other laws by trafficking in federal copyright interests and interfering with contractual rights and other interests of plaintiff DC Comics related to the iconic property "Superman."[1]  By this scheme, Toberoff has sought to enrich himself by wrongfully laying claim to purported rights to control the exploitation of Superman to the substantial detriment of DC Comics and in violation of rights it has held, significantly invested in, and expanded upon for over 70 years.  DC Comics brings this suit to confirm its rights to the Superman property and seek redress for the wrongful conduct of Toberoff and entities he controls.  This Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. §§ 1331, 1338, and 1367, under the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, and under the Court's supplemental jurisdiction.

2.    Under certain narrowly defined circumstances, the Copyright Act permits authors and specified heirs to terminate copyright grants and recapture those interests from the original grantees.  These provisions of the Copyright Act also protect original grantees—such as DC Comics—by confining termination rights to certain classes of individuals in a specified time frame and manner, limiting the types of works that may be terminated, and creating an exclusive statutory period during which only the original grantee may enter into new agreements with the author or heirs to continue creating new works under the recaptured copyrights.

3.    In derogation of these provisions of the Copyright Act and the rights of DC Comics, Toberoff and entities he controls orchestrated a web of collusive agreements concerning the Superman copyrights with the heirs to the co-creators of

---

[1] Throughout this introductory statement and in other parts of the Complaint, the term "DC Comics" is used as shorthand for both DC Comics and its predecessors in interest.  The specific identities of relevant corporate entities are identified *infra*.

COMPLAINT

**008**

1  Superman, Jerome Siegel and Joseph Shuster.  By these agreements, Toberoff

2  purported to secure a majority and controlling financial stake in copyright interests

3  in Superman assertedly held by the Siegel and Shuster heirs and preclude the heirs

4  from freely entering into new agreements with DC Comics for the continued

5  exploitation of Superman.  As detailed below, these agreements are unlawful under

6  the copyright laws, are void as against public policy, and both violate DC Comics'

7  rights and threaten the ongoing viability of the Superman property.

8         4.      During their lifetimes, Jerry Siegel and Joe Shuster—both well aware

9  of the termination provisions in amendments to the Copyright Act—never once

10  sought to terminate any of DC Comics' copyright interests.  Instead, Siegel and

11  Shuster rightly honored their agreements with DC Comics, under which they and

12  their families enjoyed lifetime compensation and other benefits.  After their deaths,

13  Siegel and Shuster's heirs reached similar agreements with DC Comics—the

14  Shuster heirs in 1992, and the Siegel heirs in 2001.  These agreements provided the

15  heirs substantial compensation and fully and finally resolved any claims of

16  termination to any rights in Superman and confirmed that DC Comics owned all

17  right, title, and interest in and to Superman.

18         5.      In or about 2001, Toberoff learned of these agreements between DC

19  Comics and the Siegel and Shuster heirs and engineered a course of conduct to

20  induce the heirs to repudiate those agreements, file invalid and erroneous copyright

21  termination notices, and enter into new agreements with Toberoff and his

22  companies netting him the controlling stake in the heirs' asserted interests in

23  Superman.

24         6.      Toberoff induced the Shuster heirs to repudiate their 1992 agreement

25  with DC Comics and enter into a 50/50 joint venture with defendant Pacific

26  Pictures Corporation, a company wholly owned and controlled by Toberoff,

27  pursuant to which the heirs conveyed the entirety of their purported Superman

28  copyright termination rights to the venture.  The stated purpose of the venture was

COMPLAINT

**009**

1   to secure and exploit DC Comics' copyright interest in Superman.  Toberoff

2   procured this joint-venture agreement even though he knew that the Shusters' 1992

3   agreement with DC Comics operated to grant any and all of the heirs' interest in

4   Superman to DC Comics and extinguish any termination rights the heirs might have

5   held.  Toberoff also induced the Shuster heirs to serve a notice of termination

6   purporting to terminate and recapture alleged interests they had granted to DC

7   Comics under the parties' 1992 agreement.  This termination notice was invalid:

8   among other defects, it was filed by a party lacking the necessary majority interest

9   to terminate.  Furthermore, any putative right to terminate held by Joe Shuster

10  ceased to exist when he died having elected not to exercise it during his lifetime and

11  having died without leaving a surviving spouse, child, or grandchild to inherit and

12  exercise it.

13          7.      Toberoff similarly induced the Siegel heirs to repudiate their 2001

14  agreement with DC Comics.  After years of negotiations following a termination

15  notice sent by the Siegel heirs in 1997, DC Comics and the Siegel heirs reached an

16  agreement providing that DC Comics would retain all rights to Superman and

17  entitling the Siegels to receive a significant portion of the Superman profits.

18          8.      Toberoff became aware of the existence of the 2001 agreement

19  between the Siegels and DC Comics and understood it diminished his stake in the

20  putative Superman rights held by his joint venture with the Shusters.  In pursuit of

21  his plan to corner and control all potential Superman termination rights and thereby

22  block further exploitation of the property by DC Comics, Toberoff set out to derail

23  the 2001 Siegel agreement.  Among other things, Toberoff falsely represented to

24  the Siegels that if they repudiated their agreement with DC Comics and entered into

25  an agreement with him instead, a "billionaire investor" was prepared immediately

26  to pay the Siegels $15 million for their Superman rights, plus a generous back-end

27  profit participation in any future exploitations of the Superman property.  Toberoff

28  also falsely represented that he would help the Siegels produce their own Superman

1   motion picture that would compete successfully with a Superman motion picture

2   that Warner Bros.—DC Comics' licensee—was then developing.  Based on

3   Toberoff's inducements, the Siegels repudiated their 2001 agreement with DC

4   Comics, terminated the employment of their then-law firm Gang, Tyre, Ramer &

5   Brown, and entered into agreements with Toberoff and defendant IP Worldwide

6   LLC, an entity controlled by Toberoff.  Under these agreements, Toberoff and his

7   company received a 45% interest in any recovery by the Siegels—an 800% increase

8   over the 5% fee in the Siegels' agreement with the Gang Tyre firm.

9       9.      As a result of his arrangements with both the Shuster and Siegel heirs,

10  Toberoff secured control of the largest financial stake in the collective, putative

11  Superman termination rights (*i.e.*, Toberoff—47.5%; Siegel heirs—27.5%; Shuster

12  heirs—25%).  Toberoff sought further control, however.  In order to assert that DC

13  Comics had *no* further rights to exploit the derivative Superman character

14  "Superboy"—including in the highly popular *Smallville* network television series—

15  Toberoff manufactured the position that Jerry Siegel *alone*—to the exclusion of

16  Shuster—was the sole creator of Superboy.  Toberoff did so with full knowledge

17  that his 2001 agreement with the Shusters explicitly confirmed the *Shusters'*

18  asserted joint rights in Superboy, consistent with the long-held view of Shuster,

19  Siegel, and their heirs that Superboy was jointly created by Shuster and Siegel.[2]

20      10.     Despite these incontestable facts concerning Superboy's creation—

21  facts which Joe Shuster, Jerry Siegel, their heirs, and even Toberoff and his

22  companies ratified and affirmed over time—Toberoff caused to be filed in 2002, on

23  behalf of the Siegels, a copyright termination notice falsely stating that Siegel was

24  the *sole* creator of Superboy.  He then induced the Shusters in 2003 to amend their

25  joint venture agreement with Pacific Pictures to *delete* all references to Superboy.

26  _____

27      [2] As explained below, DC Comics fully agrees that Shuster and Siegel jointly
    contributed to Superboy.  It is DC Comics' position, however, that Superboy is a
28  work entirely derivative of Superman and that Superboy is not subject to
    termination under the Copyright Act's termination regime.

- 4 -

The deletion of Superboy was directly contrary to the Shusters' interests and occurred solely to park *all* of the alleged Superboy rights with the Siegels. Having manipulated the Superboy rights in favor of the Siegels, and directly contrary to copyright filings that the Siegels and Shusters had previously made, Toberoff then filed a termination notice on behalf of the Shusters that purported to terminate only Superman rights, leaving out all mention of Superboy. These artifices positioned the Siegels to claim 100% ownership of Superboy in order to bring a copyright infringement claim against DC Comics, Warner Bros., and the *Smallville* series, which they filed in 2004—and which remains pending today.

11.    Yet another component of Toberoff's scheme to gain complete control over the heirs to the putative Superman termination rights was preventing the Siegel and Shuster heirs from freely entering into agreements with DC Comics—even if it was in their respective economic interest to do so. In violation of DC Comics' statutory period of exclusivity under the copyright laws, Toberoff induced the Siegels and Shusters to enter into agreements transferring their respective interests to his companies and preventing them from conveying any rights to DC Comics without each other's—and Toberoff's—consent. As a result of these illicit agreements, DC Comics has been deprived of its ability to enter into agreements with the heirs to secure their purported termination rights, in violation of the Copyright Act, other laws, and public policy promoting the free and fair settlement of legal claims.

12.    To protect its rights under the copyright laws, agreements, and interests with the Siegels and Shusters and remove the cloud that Toberoff's actions have unlawfully placed over the Superman property and its future, DC Comics brings this action to seek declaratory judgments and other relief as set forth below.

## II. PARTIES

13.    Plaintiff DC COMICS ("DC Comics") is a general partnership organized and existing under the laws of the State of New York and has its

- 5 -

1  principal place of business in the State of New York.  DC Comics is the successor-

2  in-interest to all rights, including rights under copyright, relating to the Superman

3  works and character.

4      14.    Defendant PACIFIC PICTURES CORPORATION ("Pacific

5  Pictures") is a New York corporation organized under the laws of the State of New

6  York, and was registered as a foreign corporation doing business in the State of

7  California, with its principal place of business in the State of California and the

8  County of Los Angeles.  Upon information and belief, Toberoff is the sole

9  shareholder and registered agent for service of process of Pacific Pictures.  Upon

10  information and belief, Pacific Pictures forfeited its active status as a New York

11  corporation and as a registered foreign corporation in California as of early 2009.

12      15.    Defendant IP WORLDWIDE, LLC ("IP Worldwide") is a Delaware

13  limited liability company organized and existing under the laws of the State of

14  Delaware, and registered as a foreign entity doing business in the State of

15  California, which has its principal place of business in the State of California and

16  the County of Los Angeles.  Upon information and belief, Toberoff is the managing

17  and controlling member of IP Worldwide and owns the controlling interest therein.

18      16.    Defendant IPW, LLC ("IPW") is a California limited liability

19  company organized and existing under the laws of the State of California, which

20  has its principal place of business in the State of California and the County of Los

21  Angeles.  Upon information and belief, Toberoff is the managing and controlling

22  member of IPW, is its registered agent for service of process, and owns the

23  controlling interest in IPW.  Upon information and belief, IPW is a successor-in-

24  interest to all or part of IP Worldwide's interests.

25      17.    Defendant MARC TOBEROFF ("Toberoff") is an individual who

26  resides in the County of Los Angeles in the State of California, and upon

27  information and belief, is and at all times has been a citizen of the United States.

28

COMPLAINT

**013**

1    Upon information and belief, Toberoff is a shareholder and member of defendants

2    PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; and IPW, LLC.

3         18.    Defendant MARK WARREN PEARY ("Mark Peary" or "Peary") is

4    an individual who resides in the State of New Mexico and is, and at all times has

5    been, a citizen of the United States.  Peary is the nephew of Joseph Shuster, and a

6    California court appointed him as the personal representative of the Shuster Estate.

7         19.    Defendant ESTATE OF JOSEPH SHUSTER ("Shuster Estate") is a

8    probate estate established by the Los Angeles Superior Court on August 25, 2003

9    (Case No. BP-080635).

10        20.    Defendant JOANNE SIEGEL ("Joanne Siegel") is an individual who

11   resides in the County of Los Angeles in the State of California and is, and at all

12   times has been, a citizen of the United States.  Joanne Siegel is the widow of

13   Jerome Siegel.

14        21.    Defendant LAURA SIEGEL LARSON ("Laura Siegel Larson") is an

15   individual who resides in the County of Los Angeles in the State of California and

16   is, and at all times has been, a citizen of the United States.  Laura Siegel Larson is

17   the daughter of Jerome Siegel and Joanne Siegel.

18        22.    Upon information and belief, Toberoff is, and at all relevant times has

19   been, the sole shareholder and principal of Pacific Pictures and a member and

20   principal of IP Worldwide and IPW.  Upon information and belief, Toberoff is the

21   alter ego of Pacific Pictures, IP Worldwide, and IPW, in that there is, and at all

22   relevant times has been, such unity of interest between Toberoff, Pacific Pictures,

23   IP Worldwide, and IPW that any individuality and separateness between them did

24   not and does not exist, and adherence to the fiction of the independent and separate

25   existence of Pacific Pictures, IP Worldwide, and IPW distinct from each other and

26   Toberoff would promote injustice and inequity.

27        23.    Upon information and belief, the fictitiously-named DOES 1-10 are in

28   some manner responsible for the events giving rise to the claims set forth herein.

The true names and capacities of such fictitiously-named defendants, whether individual, corporate, or otherwise, are presently unknown to DC Comics. DC Comics will amend this Complaint to assert the true names and capacities of such fictitiously-named defendants when this information has been ascertained. Each reference herein to a named defendant shall also refer to DOES 1-10.

### III. JURISDICTION AND VENUE

24.    As noted, the Court has subject matter jurisdiction over the claims set forth herein pursuant to 28 U.S.C. §§ 1331, 1338, and 1367. The Court has original jurisdiction over DC Comics' claims arising under the Copyright Act and supplemental jurisdiction over its related state-law claims.

25.    The Court has personal jurisdiction over defendants, *inter alia*, because a substantial part of the events giving rise to the claims set forth herein occurred in the State of California and the defendants have extensive contacts with the State, including the following:

a.    Defendants Marc Toberoff, the Shuster Estate, and Peary established a joint venture in California under California law for the purpose of terminating and recapturing prior grants of the copyrights at issue in this action.

b.    On behalf of the Shuster Estate, Peary filed a probate action in Los Angeles Superior Court—which, upon information and belief, remains pending—in order to effectuate the purpose of the California joint venture. A California court appointed Peary as executor of the Shuster Estate, and Peary serves in that capacity as a matter of California law. In that capacity, Peary served one of the copyright termination notices at issue in this action.

c.    Upon information and belief, defendants Pacific Pictures and IP Worldwide are foreign entities registered as doing business in the State of California, and they have their principal places of business and are

COMPLAINT

**015**

1    headquartered in the State of California and the County of Los

2    Angeles.

3        d.     Upon information and belief, defendant IPW is a California

4    limited liability company organized and existing under the laws of the

5    State of California and has its principal place of business and

6    headquarters in the State of California and the County of Los Angeles.

7        e.     Defendants Toberoff, Joanne Siegel, and Laura Siegel Larson

8    reside and conduct business in the State of California and the County

9    of Los Angeles.

10        f.     Defendants Joanne Siegel and Laura Siegel Larson filed two

11    related actions against DC Comics in this District and Court to resolve

12    ownership of the rights in Superman and Superboy.  (Case Nos. CV-

13    04-8400 ODW, CV-04-8776 ODW).

14        26.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

15    Defendants are subject to personal jurisdiction in this District, and a substantial part

16    of the events giving rise to the claims set forth herein occurred in this District.

17        **IV.  FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

18    **A.    DC Comics' Development of Superman**

19        27.    In the 1930s, Jerome Siegel (a story writer in Cleveland) and Joseph

20    Shuster (an illustrator, and Siegel's peer) conceived of a fictional character named

21    "Superman," whom they originally envisioned as a criminal mastermind, and then

22    reconceived as a hero fighting for social justice.  Aside from the name, the

23    character shared little similarity with the figure that would later become known

24    throughout the world as Superman.  Between 1933 and 1937, Siegel and Shuster

25    submitted the Superman comic strips to a number of prospective publishers and

26    newspaper syndicates, all of which rejected them.

27        28.    A company that would come to be known as DC Comics—and for

28    whom Siegel and Shuster worked for hire developing fictional characters—would

1    eventually decide to publish a 13-page comic story featuring "Superman" in the

2    first issue of a 64-page comic book entitled "Action Comics." This original version

3    of Superman had few, limited powers, and his fictional world and back-story were

4    not well developed.

5        29.    Months before this "Action Comics" book ("Action Comics No. 1")

6    was published, Siegel and Shuster entered into, on December 4, 1937, an

7    "Agreement of Employment" with Detective Comics, Inc. ("DCI"), a predecessor-

8    in-interest to DC Comics (the "December 4, 1937 Agreement"). Siegel and Shuster

9    renewed their employment arrangement with DCI in agreements on September 22,

10   1938 (the "DCI September 22, 1938 Agreement" and "McClure September 22,

11   1938 Agreement") and December 19, 1939 (the "December 19, 1939 Agreement").

12       30.    In 1938, at the instance and expense of DCI and subject to its right of

13   control, Siegel and Shuster adapted the preexisting Superman comic strips they had

14   created and added new material to create the 13-page comic book story entitled

15   "Superman." This story—like all the Superman works that Siegel and Shuster

16   thereafter created—was created for DC Comics as a work made for hire. Moreover,

17   Siegel and Shuster only contributed to a part of this work. Upon information and

18   belief, Shuster submitted black-and-white illustrations to DCI that were later

19   colorized by printers or engravers working at DCI's direction. DCI also prepared

20   one or more cover illustrations for Action Comics No. 1, which depicted Superman

21   and was published in other comic books prior to the publication of Action Comics

22   No. 1. Action Comics No. 1 itself was published in April 1938.

23       31.    To the extent Siegel and Shuster created any copyrightable Superman-

24   related works outside their work-for-hire relationship with DC Comics, those works

25   consisted solely of certain panels and portions of the Action Comics No. 1 comic

26   book and other minor creations in the 1930s, which Siegel and Shuster conveyed to

27   DC Comics in 1937 and 1938. In an agreement dated March 1, 1938 (the "March

28   1, 1938 Agreement"), and as required by the December 4, 1937 Agreement, Siegel

- 10 -

COMPLAINT

and Shuster again assigned to DCI all of their rights in Superman, including "all good will attached thereto and exclusive right to the use of the characters and story, continuity and title of strip." Siegel and Shuster confirmed DCI's sole and exclusive ownership of all Superman rights in the DCI September 22, 1938 Agreement and December 19, 1939 Agreement.

32.     The initial appearance of Superman in Action Comics No. 1 presented a limited view of the character. The readers learn only that Superman was sent to Earth as an infant aboard a space ship from an unnamed planet that was destroyed by old age. He secretly possessed five super-human powers: the abilities to leap 1/8 of a mile; hurdle a twenty-story building; raise tremendous weights; run faster than an express train; and repel bullets and knives by virtue of his "tough skin." In his alter-ego life, Superman was depicted as Clark Kent, a mild-mannered newspaper reporter for "The Daily Star," with a female co-worker named "Lois," whose last name is not mentioned. In his life as Superman, he was depicted as a costumed figure who uses his super-human abilities to fight crime. In Action Comics No. 1, Superman is said to have grown up in an orphanage and is depicted (both in words and images) as a child with super-human strength.

33.     Since the publication of Action Comics No. 1 in 1938, DC Comics— with its teams of work-for-hire writers and artists (including Siegel and Shuster)— has added more than 70 years of material defining, updating, expanding, and improving upon the Superman myth and creating a continuous flow of new exploits and characters, resulting in a vast Superman "universe." DC Comics has authored, published, and distributed hundreds of millions of copies of thousands of comic book issues throughout the United States and abroad depicting the adventures of Superman. These comic books have been authored and illustrated by dozens of DC Comics' talented staff writers and artists. DC Comics has also created, developed, distributed, and licensed numerous feature-length motion pictures, motion-picture serials, radio serials, television shows, novels, and live theatrical presentations

COMPLAINT

based on Superman. Indeed, the radio, television, and motion-picture projects in particular—with which Siegel and Shuster had nothing or little to do—were largely responsible for spreading the Superman myth and popularity and expanding the Superman storyline.

34. As a result of DC Comics' significant and sustained investment in and stewardship of Superman—and 70-plus years of character and story development by some of the most creative and talented minds in the comic-book, radio, television, and motion-picture industries—Superman has remained constantly in the public's eye and has become one of the most famous and beloved fictional characters in the world. Over these 70 years, Superman has evolved from the few black-and-white illustrations originally drawn by Shuster into a full-blown, color character inhabiting a multi-dimensional universe.

35. DC Comics' development of Superman over many decades has represented a continuous and ever-evolving portrayal of the character, featuring new elements in the Superman back-story, new super-powers, new characters, and changes in Superman's appearance. Many of the most famous story elements and characters associated with Superman were developed long after 1938 and by illustrators and story writers other than Shuster and Siegel working for hire for DC Comics. These include stories about and depictions of: (a) "Smallville," the town where Superman grew up; (b) "Kryptonite," or surviving fragments of the destroyed planet Krypton, which have the power to harm or affect Superman; (c) the "Fortress of Solitude," Superman's secret headquarters outside Metropolis (traditionally located in the Arctic, but also placed in the Andes and Amazon rainforest); (d) the "Daily Planet" newspaper, where Clark Kent would go to work; (e) Jimmy Olsen and Perry White, Kent's co-workers at the Daily Planet; (f) love interests, such as Lana Lang; (g) villains, such as Lex Luthor and Brainiac; (h) Superman's adoptive parents, the Kents; and (i) other allies, such as "Krypto" the Superdog as well as Supergirl. Other aspects of Superman's evolution included

COMPLAINT

**019**

the development of new super-powers, including: (a) the ability to fly (a key component, especially of the Superman motion pictures); (b) super-vision, which enables him to see through walls ("X-ray" vision); (c) telescopic vision, which allows him to see across great distances; (d) "heat vision," which empowers him to aim rays of extreme heat with his eyes; (e) super-hearing, which enables him to hear conversations at great distances; (f) invulnerability to injury; and (g) the ability to survive in outer space without protective gear.  It is this constant and uninterrupted evolution of the Superman mythology that allows Superman to remain a force in popular consciousness decades after so many contemporary characters have been forgotten or deemed old-fashioned.

**B.**    **Early Disputes Regarding the Superman Rights**

36.    Siegel and Shuster served in a work-for-hire capacity for DCI from the early 1930s through the late 1940s, helping draw and write Superman comic strips and comic books.  Though paid substantial sums for their work—several million dollars in today's economic terms—the relationship eventually became contentious.

37.    In 1947, Siegel and Shuster filed an action against DCI's successor, National Comics Publications, Inc. ("National"), in the New York Supreme Court in Westchester County (the "Westchester Action").  In the Westchester Action, Siegel and Shuster sought to invalidate the March 1, 1938 Agreement.  They also sought to recapture all rights in Superman, arguing that the DCI September 22, 1938 Agreement was obtained by duress.  Siegel and Shuster further challenged as unauthorized DCI's publication in November 1944 of a series of comic-book stories entitled "Superboy," which featured the adventures of Superman as a youth.

38.    On November 21, 1947, a referee in the Westchester Action issued an opinion after trial (the "Westchester Opinion") holding that the March 1, 1938 Agreement assigned "all" of the Superman rights to DCI, and that the DCI September 22, 1938 Agreement was valid and not obtained under duress.  The referee found that DCI had acted improperly in publishing Superboy.

- 13 -

COMPLAINT

**020**

39.     At the referee's request, the parties to the Westchester Action submitted proposed findings of fact and conclusions of law.  On April 12, 1948, the referee adopted findings of fact and conclusions of law and issued an interlocutory judgment (collectively, the "Westchester Action Interlocutory Judgment"), in which he made statements based on a script that Siegel had submitted that Siegel originated and owned the comic strip Superboy to the exclusion of DC Comics. National filed a notice of appeal, and the Westchester Action Interlocutory Judgment was stayed pending appeal.

40.     Shortly thereafter, the parties to the Westchester Action entered into two separate agreements:  (a) a stipulation dated May 19, 1948 (the "May 19, 1948 Stipulation"); and (b) a consent judgment dated May 21, 1948 (the "May 21, 1948 Consent Agreement").  Under both documents, *inter alia*, Siegel and Shuster: (a) agreed to vacate the Westchester Action Interlocutory Judgment; (b) acknowledged that, pursuant to the March 1, 1938 Agreement, they transferred to DCI all rights in and to Superman, including "the title, names, characters, concept and formula" as set forth in Action Comics No. 1; and (c) agreed that National was the sole and exclusive owner of all rights in Superman and Superboy. In exchange, Siegel and Shuster were paid nearly $900,000 in today's dollars.

41.     Following the commencement of the Westchester Action, Siegel attempted to launch a new comic book and syndicated strip feature entitled "Funnyman."  The *Funnyman* comic book, however, was cancelled after only six issues, and the syndicated *Funnyman* strip was only picked up by a few newspapers and dropped prior to the end of 1949.  By the late 1950s, Siegel was unable to find employment in the comic book field and needing to support his family, he approached DC Comics asking for work.  Despite Siegel's prior lawsuit and challenge to DC's rights in Superman, DC Comics agreed to hire Siegel and thereafter employed him continuously as a work-for-hire writer until the mid-1960s, when Siegel once again challenged DC Comics' rights to Superman.

COMPLAINT

42.    In April 1965, Siegel (while still working for DC Comics) and Shuster (who was being paid a monthly stipend by DC Comics) filed copyright renewal notices in their own names, claiming to own the renewal copyrights in the Superman character and in Action Comics No. 1.  This was followed by a lawsuit filed by Siegel and Shuster against National in 1969 in the District Court for the Southern District of New York, seeking a declaration that they owned the "renewal" copyright terms for Superman and Action Comics No. 1.  (Under the then-applicable 1909 Copyright Act, the period of copyright protection for a work included an initial term of 28 years and an optional renewal term of 28 years.)  Again, Siegel and Shuster's arguments were rejected, and the federal district court held, *inter alia*, that the agreements between Siegel and Shuster, on the one hand, and DCI (later National), on the other, had assigned "all" rights in Superman to DCI and National, including all renewal copyrights.  *See Siegel v. Nat'l Periodical Publ'ns, Inc.*, 364 F. Supp. 1032 (S.D.N.Y. 1973).  The Court of Appeals for the Second Circuit affirmed the district court's ruling that National owned all rights in Superman.  *See Siegel v. Nat'l Periodical Publ'ns, Inc.*, 508 F.2d 909 (2d Cir. 1974).  Siegel and Shuster did not further appeal that ruling.

43.    Following the failure of their second lawsuit to recapture copyrights in Superman, Siegel and Shuster ran into financial difficulties.  Siegel publicized their financial plight, and there were calls for companies like National (and even for Congress) to help such artists.  On December 23, 1975, and despite Siegel and Shuster's two prior lawsuits against National, Warner Communications, Inc. ("WCI"), National's then-parent company, agreed to provide them financial assistance.  Under an agreement entered into in 1975 (the "1975 Agreement"), Siegel and Shuster again acknowledged that DC Comics was the sole and exclusive owner of "all right, title and interest in and to the 'Superman' concept, idea, continuity, pictorial representation, formula, characters, cartoons and comic strips, title, logo, copyrights and trademarks, including any and all renewals and

- 15 -

extensions of such rights, in the United States and throughout the world, in any and all forms of publication, reproduction and presentation, whether now in existence or hereafter devised." In exchange, WCI agreed to provide Siegel and Shuster with, *inter alia*, annual payments of $20,000 each (around $80,000 in current dollars), annual payments to their heirs after their death, medical insurance coverage, and a lump sum of $17,500 each. With respect to Shuster's heirs, WCI agreed that after Shuster's death, it would make annual payments to his brother, Frank Shuster, of $10,000 until December 31, 1985, and then $5,000 a year for the rest of his life.

44. In the years following the 1975 Agreement, DC Comics increased the annual payments to Siegel and Shuster, made periodic cost-of-living increases, provided insurance, and paid special bonuses. During the last several years, Siegel's widow, for example, has received $135,000 per year plus reimbursement for all medical expenses. In all, DC Comics has paid Siegel, Shuster, and their heirs nearly $4 million pursuant to the 1975 Agreement and other arrangements— benefits that DC Comics continues to pay, and the Siegel and Shuster heirs continue to accept.

45. In 1976, Congress amended the Copyright Act to give authors and certain of their heirs certain limited rights to terminate prior grants of copyright. *See* 17 U.S.C. § 304(c) (1976). This amendment did not apply to works-made-for hire (the company paying for the production of those works would always own them), and entitled authors and certain heirs to recapture copyrighted interest only in works that the *author* actually created (*e.g.*, it did not entitle authors to recapture derivative works the grantee may have developed pursuant to the original grant, such as the original Superman radio and television shows, or Superman-related characters, such as "Superboy" or "Lex Luthor"). Despite their previous legal battles with National and the widespread publicity surrounding this legislation, neither Jerry Siegel nor Joe Shuster ever endeavored to exercise any termination rights under the statute. Instead, for the rest of their lives, Siegel and Shuster

- 16 -

1  accepted and enjoyed the benefits under the 1975 Agreement.  This decision made

2  sense, given Siegel and Shuster's work-for-hire relationship with DC Comics, the

3  narrow sliver of rights (if any) to which they might claim an interest, and the

4  significant contributions made to Superman in the past 70 years to which they could

5  claim no interest.  Moreover, the 1975 Agreement paid Shuster and Siegel an

6  annual pension and medical insurance for the rest of their lives and, upon their

7  death, paid annual pensions to their heirs.  Although Shuster's and Siegel's

8  "window of time" in which to attempt to terminate prior grants of copyright

9  interests in Superman theoretically opened in 1984, at no time during their lives did

10 they attempt to exercise any such right.

11  **C.    Joe Shuster's Death and the Shuster Heirs' 1992 Agreement**

12        46.    Joe Shuster passed away on July 30, 1992.  He was survived only by

13 his brother Frank Shuster, sister Jean Peavy, and Jean's two children, Mark Peary

14 and Dawn Peavy (the "Shuster Heirs").  (Mark Peary changed his last name from

15 "Peavy" to "Peary.")  Shuster did not leave a widow and never had children or

16 grandchildren.  Shuster's purported will names Jean Peavy the sole beneficiary of

17 his estate.  (An alleged copy of this will surfaced and was probated in 2001, only

18 after Toberoff intervened.  In addition to certain irregularities in the will, probate

19 papers filed by the Shuster Heirs falsely represented that Joe Shuster was never

20 married and omitted that Joe had a sibling, Frank, who had also survived him.)

21        47.    On August 21, 1992, Jean Peavy sent a letter to Time Warner and DC

22 Comics explaining that Shuster had "left his family with a crushing burden of

23 unpaid debts and bills and only a tiny estate."  Jean stated:  "It's unbelievable to me

24 that Joe could have so little considering the generosity shown by Time Warner in

25 raising the pension income of Siegel and Shuster."  She also disclosed that 20% of

26 Shuster's income had been taken by Joanne Siegel, Jerome Siegel's widow, "as an

27 agent's commission for getting pay raises for Siegel and Shuster" following the

28 December 23, 1975 Agreement.  Much of the remainder of Shuster's income was

COMPLAINT

1  spent by him during "compulsive buy[ing]" and "shopping sprees" and on

2  expensive stereo equipment and other personal items.  As a result, Shuster had

3  accumulated "almost $20,000 in credit card debts and unpaid bills."  Jean asked that

4  Time Warner and DC Comics "pay his final debts and expenses."

5        48.    In September 1992, Time Warner and DC Comics offered to pay off

6  Shuster's debts and expenses, totaling approximately $20,000, plus increase Frank

7  Shuster's annual survivor payments under the 1975 Agreement from $5,000 to

8  $25,000 per year.

9        49.    In a September 10, 1992 letter sent to DC Comics (the "September 10,

10  1992 Letter"), Frank Shuster, on behalf of himself and Jean, requested that the

11  annual payments due and owing Frank be made to Jean Peavy in order to take

12  advantage of certain tax benefits.  Frank and Jean further promised that, if an

13  agreement could be reached, Jean "would not pursue the termination of the

14  Superman copyright as provided for to creators' heirs in the 1976 U.S. Copyright

15  Act."

16        50.    Based on Jean and Frank's letter and the parties' further discussions,

17  DC Comics, Jean, and Frank entered into a written agreement on October 2, 1992

18  (the "1992 Agreement").  The 1992 Agreement confirmed that it "fully settles all

19  claims to any payments or other rights or remedies which you may have under any

20  other agreement or otherwise, whether now or hereafter existing regarding the

21  copyrights, trademarks, or other property right in any and all work created in whole

22  or in part by your brother, Joseph Shuster, or any works based thereon," and that

23  the Shuster Heirs "covenant not to assert any claim of right, by suit or otherwise,

24  with respect to the above, now and forever."  The 1992 Agreement operated to

25  revoke, rescind, and replace Shuster's prior copyright grants and agreements.

26        51.    After the 1992 Agreement, DC Comics and the Shuster Heirs enjoyed

27  an amicable relationship with the Shuster Heirs.  To date, DC Comics and its

28  affiliates have paid the Shuster Heirs close to $500,000 under the 1992 Agreement.

COMPLAINT

1  On April 27, 1995, Jean Peavy sent a letter to DC Comics expressing gratitude for

2  their generosity and concluding: "You know we appreciate your thoughtfulness."

3  Even after Frank Shuster's death in 1996, DC Comics has continued to this day to

4  pay $25,000 per year to Jean Peavy.

5  **D.    Toberoff Induces the Shusters to Repudiate the 1992 Agreement with**

6  **DC Comics and Acquires a 50% Interest in the Shusters' Putative Rights**

7  52.    This state of affairs remained undisturbed for almost a decade.  In

8  2001, Toberoff and his production company, Pacific Pictures, induced the Shuster

9  Heirs to violate their 1992 Agreement and wrongfully attempt to acquire and

10 exploit future copyright interests in Superman.

11 53.    Toberoff is a self-described "intellectual property entrepreneur."  His

12 business—conducted through a variety of corporate entities like Pacific Pictures—

13 is to locate the authors of valuable copyrighted works or their heirs and acquire, or

14 prevent them from conveying to others asserted rights to present or future copyright

15 interests.  To convince these authors and heirs to go into business with him,

16 Toberoff holds himself out as a producer with the financial resources and

17 connections to exploit recaptured rights in all media in the entertainment industry.

18 54.    In or around 2001, Toberoff made contact with the Shuster Heirs and

19 embarked on a course of conduct with them to disrupt their relationship with DC

20 Comics, including DC Comics' rights under the 1992 Agreement.  On November

21 28, 2001, the Shuster Heirs formed a joint venture with Toberoff's company Pacific

22 Pictures ("2001 Pacific Pictures Agreement") for the stated "purpose of retrieving,

23 enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims,

24 copyrights, property, title and interests in and to Joe Shuster's creations."  The 2001

25 Pacific Pictures Agreement provided that this purpose would be realized "via the

26 establishment of Joe Shuster's estate" in a California probate court "and the estate's

27 termination pursuant to [17 U.S.C. § 304] of any and all grant or transfers by Joe

28 Shuster of any copyright interest in his creations."

COMPLAINT

55.     The 2001 Pacific Pictures Agreement defined the Shuster Heirs' rights being assigned as including all "rights, claims, title, copyrights and interests in and to each character, story element, and indicia associated with … 'SUPERMAN' [and] *Superboy*."  (Italics added.)

56.     Pursuant to the 2001 Pacific Pictures Agreement, Jean and her son Mark Peary "transfer[red] and assign[ed] to the Venture their rights, title, and interest" in Shuster's Superman and Superboy rights.  The Agreement provided that "[a]ny and all moneys and proceeds [of the Venture] will be shared, divided and payable:  fifty percent (50%) to [the Shuster Heirs] and fifty percent (50%) to PPC [Pacific Pictures]," and that upon "winding-up of the Venture or in the event of termination of the Venture *for any reason*, all Rights, property or assets of the Venture will be held fifty percent (50%) by the [Shuster Heirs] and fifty percent (50%) by PPC."  (Emphasis added.)

57.     The 2001 Pacific Pictures Agreement also provided that the Shuster Heirs could not enter into any agreement with respect to the Superman and Superboy rights "without the express written consent" of Pacific Pictures, an entity controlled solely by Toberoff.  The 2001 Pacific Pictures Agreement further provided that the joint venture would "retain Marc Toberoff, Esq. to render legal services in connection with the Rights and the Venture."

58.     Pursuant to the 2001 Pacific Pictures Agreement, the Shuster Heirs filed a probate action in Los Angeles Superior Court to establish the Shuster Estate.  That action remains open.  (*See* LASC Case No. BP-080635.)

E.     **Toberoff Induces the Siegels to Repudiate the Siegel-DC Comics Agreement and Acquires a 45% Interest in the Siegels' Putative Rights**

59.     Having orchestrated this joint venture, Toberoff used the Shuster Heirs to gain access to the heirs of Jerry Siegel, Joanne Siegel and Laura Siegel Larson (collectively, the "Siegel Heirs").  Toberoff sought to corner the other putative "half" of putative Superman termination rights.  Toberoff knew, however, that the

COMPLAINT

1   Siegels had reached an agreement with DC Comics in 2001 resolving their putative

2   termination claims.  Nevertheless, Toberoff and his companies set out to interfere

3   with this agreement in order to acquire a stake in the Siegel Heirs' putative

4   copyright interests in Superman.

5          60.    In 1997—and after Jerry Siegel's death in 1996—the Siegel Heirs had

6   employed counsel and served notices to terminate grants of Superman rights that

7   Siegel had conveyed to DC Comics (the "Siegel Superman Termination Notice").

8   The Siegel Superman Termination Notice, which was prepared by prior counsel,

9   listed Superboy works and elements as among the "character[s], story element[s], or

10  indicia reasonably associated with SUPERMAN," in recognition of the fact that

11  Superboy was a complete derivative of Superman rather than a stand-alone, non-

12  derivative work based upon Superman.

13         61.    The Siegel Heirs and DC Comics began negotiations, and in these

14  talks the Siegel Heirs were represented by Kevin Marks of the Gang Tyre

15  entertainment law firm.  As the parties' negotiations progressed, and as

16  expectations grew that an agreement would soon be reached, DC Comics paid the

17  Siegels a non-refundable advance of $250,000.

18         62.    On October 16, 2001, DC Comics made a proposal to the Siegel Heirs.

19  On October 19, 2001, Kevin Marks sent a letter to DC Comics confirming that the

20  Siegel Heirs "accepted D.C. Comics' offer of October 16, 2001."  On October 26,

21  2001, DC Comics sent a return letter confirming the parties' agreed-upon terms.

22  DC Comics then began drafting a long-form agreement.  DC Comics sent the Siegel

23  Heirs a copy of the long-form document on February 1, 2002.  As a result of the

24  parties' agreement (the "Siegel-DC Comics Agreement"), the Siegels were now on

25  the brink of receiving significant portions of the Superman profits—sums that

26  would immediately and dramatically change their lives.  Moreover, virtually all of

27  the money would be theirs alone to keep, as the Gang Tyre firm had agreed to

28  represent the Siegels for the standard 5% fee.

COMPLAINT

63.    Toberoff has admitted that he closely tracked the progress of the Siegel Heirs' termination attempt.  On learning of the Siegel-DC Comics Agreement, he knew his company's joint-venture interest in the Shuster rights was limited and that he could assert greater leverage only if he could disrupt the Siegel-DC Comics Agreement and corner both "halves" of the putative Superman termination rights. Given that Joe Shuster and his heirs held whatever Superman copyright interests they owned (*if any*) jointly with Jerome Siegel, Toberoff understood that if DC Comics obtained the rights from the Siegels to exploit new Superman properties, it could do so freely without any ability on the part of the Shusters to claim their interests were being infringed.

64.    With knowledge that his actions would interfere with DC Comics' actual and prospective economic advantages under the Siegel-DC Comics Agreement, beginning in or around late 2001, Toberoff—identifying himself as a film producer—approached the Siegel Heirs, including and/or through their representative Kevin Marks, for the purpose of acquiring their rights.

65.    Marks informed Toberoff that the Siegel Heirs had already reached a binding agreement with DC Comics, which was in the process of being further documented in a long-form agreement.  Undeterred, Toberoff continued to contact the Siegel Heirs and their representatives in an effort to induce them to repudiate the Siegel-DC Comics Agreement and enter into a production agreement with Toberoff or one of his companies.

66.    On May 9, 2002, as a result of Toberoff's improper interference and inducements, Joanne Siegel sent a letter to DC Comics' affiliate acknowledging the Siegel Heirs had accepted DC Comics' October 16, 2001 offer, but purporting to object to certain unspecified portions of the long-form document.  DC Comics objected to the Siegel Heirs' sudden and unfounded objections, but continued working with their counsel to finalize the long-form agreement.

- 22 -

67.    In or around August 2002, as Marks was finalizing the Siegels' revisions to the long-form document, Toberoff contacted Marks again regarding the Siegel-DC Comics Agreement.  Upon information and belief, Marks informed Toberoff he could not discuss the matter, including the terms of the agreement, because of a confidentiality agreement between DC Comics and the Siegel Heirs. Toberoff reiterated interest in purchasing the Siegel Heirs' Superman rights.  On August 8, 2002, Toberoff conveyed an offer to Marks for presentation to the Siegels, which Marks said he would convey.

68.    Upon information and belief, Toberoff's offer stated that he had found a billionaire investor willing to purchase the Siegel Heirs' Superman rights. Toberoff claimed the investor would give the Siegel Heirs $15 million cash up front, plus generous royalty and "back-end" rights on any properties developed, including a new Superman motion picture.  Upon information and belief, Toberoff also falsely offered to help the Siegel Heirs produce a movie that would compete directly with the Superman movie in development at the time at Warner Bros., DC Comics' licensee, even though he knew that the Siegels' limited rights in the recaptured copyright, if any, would make such a competing motion picture all but impossible to produce and distribute.

69.    Upon information and belief, although Marks conveyed Toberoff's offer to the Siegels, he advised them that they had already reached a binding agreement with DC Comics.  Nonetheless, as a result of Toberoff's inducements, the Siegel Heirs stated that they would repudiate their agreement with DC Comics and accept Toberoff's offer.

70.    On or around September 21, 2002, the Siegel Heirs sent a letter to Marks terminating him as their attorney.  On or around September 21, 2002, based on Toberoff's inducements, the Siegel Heirs sent a letter to DC Comics repudiating the Siegel-DC Comics Agreement.  On October 23, 2002, the Siegel Heirs formalized an agreement with defendant IP Worldwide for the purpose of

- 23 -

"arrang[ing] and negotiat[ing] the sale, lease, license and all other dispositions or exploitations" of the Siegel Heirs' Superman rights (the "IP Worldwide Agreement"). The Siegel Heirs agreed to pay IP Worldwide a fee of 10% of the gross proceeds generated by those rights. Upon information and belief, the fee was subsequently reduced to 5%.

71.    Upon information and belief, in or around September 2004, the Siegel Heirs entered into an agreement with Toberoff granting him 40% of their Superman rights and retaining him as their attorney (the "Siegel-Toberoff Agreement").

72.    Upon information and belief, as a result of the Siegel-Toberoff Agreement and IP Worldwide Agreement, Toberoff now owns a 45% financial interest in the Siegel Heirs' purported Superman rights.

**F.    Toberoff Manipulates the Siegel Heirs and Shuster Heirs into Falsely Claiming that Superboy Was the Sole Creation of Jerry Siegel**

73.    After inducing the Siegel Heirs to repudiate the Siegel-DC Comics Agreement, on November 8, 2002, Toberoff caused the Siegel Heirs to serve a second copyright termination notice on DC Comics directed at the character Superboy (the "Siegel Superboy Termination Notice"). The notice not only erroneously stated that Superboy was a copyrightable work not derivative of Superman, but falsely recited that Superboy was created *solely* by Siegel (without contribution from Shuster), thereby entitling the Siegel Heirs to terminate and recapture 100% of the putative Superboy rights.

74.    Defendants knew these claims were false. To begin, in the Siegel Superman Termination Notice served by the Siegel Heirs in 1997—the one served prior to Toberoff's intervention—the Siegel Heirs expressly identified the Superboy works and elements as among the "character[s], story element[s], or indicia reasonably associated with SUPERMAN." This earlier notice acknowledged—as is in fact the case—that Superboy was a derivative work of Superman, rather than a separately copyrightable work.

- 24 -

75.     As to the representation that Superboy was created solely by Jerry Siegel, defendants knew that claim was untrue as well.  Among other reasons:

- One year earlier, through defendant Pacific Pictures, Toberoff had entered into the 2001 joint venture agreement with the Shuster Heirs, specifying that the *Shuster Heirs* owned an interest in "Superboy."

- The original Superboy "script" on which the Siegel Heirs' ownership claims rely openly contains the byline:  "By Jerry Siegel *and Joe Shuster*"—not just Jerry Siegel alone.  (Emphasis added.)

- In 1972 and 1973, Siegel and Shuster together filed their own copyright renewal notices with the copyright office for Superboy, in which they identified Superboy as a work that they had *jointly* created.

- And long before the alleged first publication of "Superboy" in November 1944, Shuster illustrated works for DC Comics that included various depictions of Superman as a boy, exhibiting super-human strength.  Several examples are reproduced below.  In "Action Comics No. 1," for example, Shuster drew Superman as a very young boy displaying an "astonish[ing] feat[]" of super-human strength, holding a chair above his head:



Action Comics No. 1 (1930)

- 25 -

Shuster also depicted Superman as a youth with super-powers in "Superman No. 1," a work allegedly terminated by Shuster in the notice filed by Toberoff on behalf of the Shuster heirs,



Superman No. 1 (May 1939)

as well as in a 1942 Sunday comic strip, in which Superman as a "youth" discovers that his "amazing powers" are "multiplied with the years" and that, as a boy, he could "outrace the fastest streamline train":



Superman Sunday Strip (May 31, 1942)

76.    Through Pacific Pictures, Toberoff manipulated the Siegel and Shuster Heirs into falsely positioning Siegel as the sole creator of any putative

- 26 -

copyrightable elements in Superboy.  They did so to enable the Siegels to claim a
sole ownership interest in Superboy elements allegedly subject to recapture and
thereby prevent DC Comics from exploiting Superboy without the Siegels'
authorization and without being subject to claims of copyright infringement.
(Again, to be clear, DC Comics disputes that Superboy is not a derivative work of
Superman and disputes that it is a work that Shuster and Siegel owned.)

77.    To manufacture this claim of sole ownership by the Siegels, Toberoff
(acting through Pacific Pictures) caused the *Shuster Heirs* to remove from the 2001
joint venture between Pacific Pictures and the Shuster Heirs all claims by the
Shusters to alleged rights in any and all Superboy elements.  Toberoff
accomplished this by creating a new joint venture agreement—signed October 30,
2003—that *deleted* any reference to Superboy.  Defendant Mark Peary signed this
agreement (the "2003 Pacific Pictures Agreement"), which omitted all references to
Superboy in its description of the Shuster Heirs' rights.  Toberoff induced the
Shuster Heirs to disclaim any interest in Superboy so that Toberoff could position
the Siegel Heirs to recapture 100% of these rights and assert a copyright
infringement action against DC Comics—and seek an injunction against the
television program *Smallville* on that basis.

78.    In October 2004, the Siegels filed two actions in this Court seeking
declaratory relief as to the validity of the Superman and Superboy termination
notices, and in April 2005, the Siegels supplemented their pleadings in the
Superboy action to assert copyright infringement.  (Case Nos. CV-04-8400 ODW;
CV-04-8776 ODW.)  Both actions remain pending before this Court.

G.     **The Shusters' Flawed Termination Notice**

79.    On November 10, 2003, one week after the 2003 Pacific Pictures
Agreement was signed, defendant Mark Peary served on DC Comics a "Notice of
Termination of Transfer Covering Extended Copyright Renewal Term of
'Superman'" (the "Shuster Termination Notice").

- 27 -

80.    The form submitting the Shuster Termination Notice for recordation in the U.S. Copyright Office was certified under penalty of perjury by Toberoff on behalf of "IP Worldwide/Estate of Joseph Shuster." IP Worldwide is the Toberoff entity which, upon information and belief, holds a portion of the Siegel Heirs' Superman and Superboy rights pursuant to the IP Worldwide Agreement.

81.    The Shuster Termination Notice purports to terminate, under 17 U.S.C. § 304(d), effective October 26, 2013, the following Shuster copyright grants: (a) the December 4, 1937 Agreement; (b) the March 1, 1938 Agreement; (c) the DCI September 22, 1938 Agreement; (d) the McClure September 22, 1938 Agreement; (e) the December 19, 1939 Agreement; (f) the May 19, 1948 Stipulation; and (g) the December 23, 1975 Agreement.

82.    The Shuster Termination Notice does *not* purport to terminate the copyright grants in the May 21, 1948 Consent Agreement or, even more importantly, the 1992 Agreement between the Shuster Heirs and DC Comics.

83.    The Shuster Termination Notice purports to apply to the following works: (a) certain unpublished material created before Action Comics No. 1; (b) Action Comics No. 1; (c) Action Comics No. 2; (d) Action Comics No. 3; (e) Action Comics No. 4; (f) Action Comics No. 5; (g) Action Comics No. 6; (h) Action Comics No. 7; (i) Superman No. 1; and (j) Superman No. 3.

84.    The Shuster Termination Notice does not purport to terminate any copyright grant in pre-Action Comics No. 1 promotional materials or any materials relating to Superboy.

85.    The Shuster Termination Notice states that defendant Mark Peary "is the person entitled to exercise Joseph Shuster's termination interest" and that the Notice was "signed by all persons whose signature is necessary to terminate." The Notice makes no mention of the joint venture that the Shuster Heirs and Pacific Pictures formed or its putative ownership stake in the to-be terminated Superman rights. Nor does the Notice mention Pacific Pictures or its putative ownership stake

COMPLAINT

1     in the joint venture, despite the grant of 50/50 rights in the joint venture to Pacific

2     Pictures pursuant to Pacific Pictures' 2001 and 2003 agreements with the Shusters.

3          86.     On September 10, 2004, Pacific Pictures and the Shuster Heirs signed

4     a one-page letter (the "September 10, 2004 Letter") purporting to cancel their joint

5     venture and providing that the 2001 Pacific Pictures Agreement and 2003 Pacific

6     Pictures Agreement "have been cancelled." However, because the Shuster Heirs

7     and Pacific Pictures had agreed that all rights held by their joint venture would be

8     divided 50/50 upon termination of the joint venture "for any reason," the apparent

9     effect of the September 10, 2004 Letter was to transfer 50% of the Shuster Heirs'

10     purported share of Shuster's rights to Toberoff or his companies.

11          87.     DC Comics is informed and believes that Toberoff (or his companies)

12     now own 50% of the Shuster Heirs' putative rights as well as the 45% share of the

13     Siegel Heirs' putative rights. This gives Toberoff the largest financial stake among

14     defendants' collective asserted rights in Superman and in the pending legal disputes

15     concerning those rights (*i.e.*, Toberoff—47.5%; Siegel Heirs—27.5%; Shuster

16     Heirs—25%).

17          88.     DC Comics is also informed and believes that Toberoff, Pacific

18     Pictures, IP Worldwide, the Siegels, and the Shusters have entered into one or more

19     agreements preventing the Siegels or Shusters from conveying rights to DC Comics

20     or entering into other agreements with DC Comics, including for the settlement of

21     their putative termination claims or litigation, without the consent of other parties.

22     For example, in the 2003 Pacific Pictures Agreement, the Shuster Heirs agreed not

23     to settle any claims with respect to the Superman rights without Pacific Pictures' or

24     Toberoff's consent. Such consent agreements are void as against public policy,

25     violate DC Comics' rights, and impede the administration of justice.

26

27

28

COMPLAINT

**H.**    **Toberoff's Wrongful Conduct Is Revealed to DC Comics in the Toberoff**
**Timeline**

89.    Pursuant to federal court orders dated September 26, 2008 and
December 4, 2008, Toberoff was compelled to produce to DC Comics a document
titled "Superman – Marc Toberoff Timeline" ("Toberoff Timeline," attached hereto
as Exhibit A), which Toberoff has acknowledged was written by an attorney he
previously employed.  To prevent DC Comics from obtaining and using the
document, Toberoff asserted to the federal court that it was privileged, but his
position was rejected.  Toberoff produced the Toberoff Timeline to DC Comics on
December 10, 2008.

90.    The Toberoff Timeline describes and discloses Toberoff's wrongful
activities in pursuing the Siegel and Shuster Heirs' putative interests in the
Superman rights.  It lays out Toberoff's scheme to induce the Siegel Heirs to
repudiate the Siegel-DC Comics Agreement with DC Comics (*e.g.*, "It [is] clear at
this juncture that [Toberoff] thwarted the earlier deal with Time Warner and DC
Comics in 2002 for his own personal gain"); his efforts to acquire as "much
ownership of the Superman copyright personally as he can"; and his attempt to
conceal certain of his illicit activities from the Siegel and Shuster Heirs.  (Emphasis
in original.)  As a result, "***the single person who would stand to gain the MOST in***
***a settlement with Time Warner [and DC Comics] regarding the ongoing***
***SUPERMAN legal dispute would not be the heirs themselves, but Marc***
***Toberoff.***"  (Emphasis in original.)

91.    The Toberoff Timeline discloses many of the facts alleged herein, and
concludes:  "[Toberoff] is solely motivated *at all times* not by his clients' interests,
but manipulating pieces of the puzzle so that he may receive the greatest percentage
from a very possible large Time Warner settlement, through part ownership and
unconscionable fees."  (Emphasis in original.)  The Toberoff Timeline explains that
"[a]t least 7 attorneys have come and gone at the Law Offices of Marc Toberoff,

- 30 -

COMPLAINT

1    and many have left due to ethical issues." Many of these and other disturbing,

2    salient facts detailed herein have only recently come to light in the past 18 months.

3    ## V.  CLAIMS FOR RELIEF

4    **A.      First Claim for Relief: Declaratory Relief re: Invalidity of Copyright**

5    **Termination Notice (Against Defendants Shuster Estate and Peary)**

6         92.    DC Comics re-alleges and incorporates by reference each and every

7    allegation contained in the paragraphs above.

8         93.    The Shuster Termination Notice is invalid, and thus ineffective, for at

9    least five separate, independent, and alternative reasons:

10        **(1) There Is No Statutory Basis for the Shusters to Terminate**

11        94.    The Copyright Act does not provide any basis for the Shuster Estate to

12   terminate. Shuster's termination right was lost when he died in 1992 without

13   having exercised it and without leaving a statutory heir to inherit it under the then-

14   applicable provisions of the Copyright Act.

15        95.    The 1976 Copyright Act gave authors the ability to terminate certain

16   pre-1978 copyright grants. According to the original termination provisions:

17   "Where an author is dead, his or her termination interest is owned, and may be

18   exercised, by his widow or her widower and his or her children or grandchildren."

19   17 U.S.C. § 304(c)(2) (1976). In other words, the right of termination could only

20   be exercised by an author during his or her lifetime, or by a widow, child, or

21   grandchild after the author's death. As the language of the statute establishes, and

22   its legislative history confirms, the right of termination was lost if an author died

23   without exercising it and without leaving a widow, child, or grandchild to inherit it.

24        96.    Shuster could have exercised his putative termination right beginning

25   in April 1984. The 1976 Copyright Act provided that a copyright grant could be

26   terminated 56 years after the date copyright was first secured (*i.e.*, April 1994, or 56

27   years after the April 1938 publication of Action Comics No. 1), and that notice of

28

COMPLAINT

**038**

1  termination could be served 10 years before the termination date (*i.e.*, April 1984,

2  or 10 years before April 1994).  17 U.S.C. § 304(c)(3)-(4).

3       97.    During his lifetime, Shuster chose not to exercise his termination right.

4  Shuster died in 1992, and did not leave a widow, child, or grandchild to succeed to

5  his termination right under section 304(c) of the 1976 Copyright Act.  As a result,

6  Shuster's termination right ceased to exist on his death.

7       98.    The 1999 Copyright Term Extension Act ("CTEA") extended the term

8  of copyright by 20 years and also provided an opportunity to authors and selected

9  heirs to terminate for this new extended time period in circumstances where the

10  "[t]ermination rights provided for in subsection (c) have expired on or before the

11  effective date of the [CTEA]," or October 27, 1998, and the "author or owner of the

12  termination right has not previously exercised such termination right."  17 U.S.C.

13  § 304(d).  Where section 304(d) applies, section 304(c)(2) provides that if an author

14  is dead, the termination right can be exercised by his widow, children, or

15  grandchildren or, "[i]n the event that the author's widow or widower, children or

16  grandchildren *are not living*, the author's executor, administrator, personal

17  representative, or trustee…."  (Emphasis added).  These are the provisions that

18  defendant Mark Peary, the executor of the Shuster Estate, purports to rely on in the

19  Shuster Termination Notice, but they have no application here.  By its own terms,

20  section 304(d) only applies where an author's window for exercising the

21  termination right opened and closed or "expired" (*not* when an author died while

22  the window was open without exercising the right or leaving any heirs to do so),

23  and where a deceased author's widow, child, or grandchild is "not living," but who

24  did at some time live.  Shuster never had a widow, child, or grandchild, and Peary,

25  acting on behalf of the Shuster Estate, has no right to file the invalid notice of

26  termination that he did.

27

28

COMPLAINT

### (2) <u>The 1992 Agreement Bars the Shusters from Pursuing Termination</u>

99.   The 1992 Agreement that Frank Shuster and Jean Peavy entered into with DC Comics bars the Shuster Estate from pursuing termination because, *inter alia*, in exchange for valuable consideration, the 1992 Agreement effected a rescission, revocation, and re-grant of all prior copyright grants, which eliminated any pre-1978 grant that could be subject to termination under section 304 of the Copyright Act.

100.   The 1992 Agreement, which was executed on October 2, 1992, provides that Shusters' heirs "fully settle[]" and forfeit any and all of rights under Joseph Shuster's prior "agreements or otherwise," thereby revoking and rescinding those prior, pre-1992 instruments.  It also "*grant[s] to us* [DC Comics] any ... copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon." (Emphasis added.)

101.   Section 304(d) of the Copyright Act only allows for termination of copyright grants "executed before January 1, 1978."  Because the 1992 Agreement left intact no pre-1978 copyright grant to terminate, section 304(d) does not apply, and the Shuster Estate has no copyright grant that it may terminate.

102.   Shuster's heirs approached DC Comics in 1992 seeking increased annual payments, certain tax benefits, and payment of Shuster's debts and expenses.  At the time, Shuster's heirs recognized the value of Superman as a property.  As the result of DC Comics' development, promotion, and exploitation of Superman from 1938 to 1992, Superman had evolved from the black-and-white figure drawn by Shuster for Action Comics No. 1 to a global, multi-media industry.  Moreover, in correspondence with DC Comics, the Shusters adverted to the termination rights provided for under the Copyright Act.  As Shuster's heirs requested, the 1992 Agreement provided that DC Comics would:  (a) increase its annual payments to the Shuster Heirs to $25,000 per year—five times higher than

- 33 -

040

1   the amount it was obligated to pay under the December 23, 1975 Agreement;

2   (b) make these annual payments to Jean Peavy for purposes of a tax benefit; and

3   (c) pay the approximately $20,000 representing Shuster's final debts and expenses.

4   DC Comics continues to make annual payments under the 1992 Agreement, and

5   has paid Shuster's heirs close to $500,000 to date.  The 1992 Agreement confirms

6   that it "fully settles *all claims to any payments or other rights or remedies* which

7   you may have under any other agreement or otherwise, *whether now or hereafter*

8   *existing* regarding the copyrights, trademarks, or other property right in any and all

9   work created in whole or in part by your brother, Joseph Shuster, or any works

10  based thereon." (Emphasis added.)  Shuster's heirs agreed "not to assert any claim

11  of right, by suit or otherwise, with respect to the above, now and forever."

12      103.   By effectively rescinding, revoking, and re-granting any and all prior

13  grants of Joe Shuster's rights, the Shuster Heirs have no right to terminate any of

14  the Superman copyrights.

15      104.   At the very least, because of DC Comics' continued performance

16  under the 1992 Agreement, and the Shusters' continued acceptance of benefits

17  under the Agreement—even after filing the Shuster Termination Notice—the

18  Shusters are estopped from disputing that the 1992 Agreement remains in full force

19  and effect, which operates to preclude the assertion of any termination right.

20      **(3) The Shusters Lack the Majority Interest Necessary to Terminate**

21      105.   The Shuster Termination Notice is also invalid because the party that

22  filed it—if defendants' own contractual documents are to be believed—lacked

23  authority to do so.  Section 304(c)(1) of the Copyright Act provides that termination

24  of a grant executed by an author who is not living may be exercised only "by the

25  person or persons who … own and are entitled to exercise a total of *more than one-*

26  *half of that author's termination interest.*" 17 U.S.C. § 304(c)(1) (emphasis added).

27  Copyright Office regulations require that a termination notice include "specific

28  indication of the person or persons executing the notice who constitute more than

- 34 -

COMPLAINT

041

1  one-half of that author's termination interest" and "shall be signed by the number

2  and proportion of the owners of that author's termination interest required under

3  section 304(c)."  37 C.F.R. § 201.10(b)(1)(vii), (c)(2).

4      106.  According to the Pacific Pictures agreements (to the extent they are

5  valid and enforceable), the Shuster Estate does not own—and did not own at the

6  time the Shuster Termination Notice was executed—the "more than one-half"

7  majority interest necessary to terminate under section 304(c)(1) of the Copyright

8  Act.

9      107.  Pursuant to the 2001 Pacific Pictures Agreement, defendant Mark

10 Peary and Jean Peavy "transfer[red] and assign[ed] … their rights, title, and

11 interest" in all of Shuster's copyrights and creations to their joint venture with

12 Pacific Pictures.  In the 2003 Pacific Pictures Agreement, Peary confirmed the

13 terms of the 2001 Pacific Pictures Agreement on behalf of the Shuster Estate.

14     108.  One week later, on November 10, 2003, Peary served the Shuster

15 Termination Notice on behalf of the Shuster Estate.  At the time, the Shuster Estate

16 did not own *any* of the purported termination right, as this and all other rights had

17 been transferred to the joint venture with Pacific Pictures.[3]  The Shuster

18 Termination Notice is therefore invalid under section 304(c)(1) of the Copyright

19 Act.

20     109.  The Shuster Termination Notice represents that Peary "is the person

21 entitled to exercise Joseph Shuster's termination interest" and that the Notice had

22 been "signed by all persons whose signature is necessary to terminate."  Peary's

23 ───────────────

24     [3] At most, the Shuster Estate owned only a 50% interest in that joint venture.
This is still the case.  As a result of the September 10, 2004 Letter purporting to

25 cancel the 2001 and 2003 Pacific Pictures Agreements and by the terms of the 2001
and 2003 agreements themselves, any putative rights held by the joint venture were

26 split 50/50 between the Shuster Heirs and Pacific Pictures on cancellation of the
joint venture agreement:  "[Upon] winding-up of the Venture or in the event of

27 termination of the Venture *for any reason, all Rights, property or assets of the
Venture will be held* fifty percent (50%) by the [Shuster Heirs] *and fifty percent*

28 *(50%) by PPC*."  (Emphasis added.)

failure to disclose that he had purported to transfer this putative termination right to the joint venture with Pacific Pictures, or include a signature on behalf of the joint venture or Pacific Pictures, violated 37 C.F.R. § 201.10(b)(1)(vii) and 37 C.F.R. § 201.10(c)(2).

110.    Peary's failure to disclose the requisite information in the Shuster Termination Notice was not harmless.  Upon information and belief, these omissions were not inadvertent, but were intended to conceal material information from DC Comics, including:  (a) the various conflicts of interest arising from Toberoff's and his companies' significant ownership interest in the Shuster Estate's and the Siegel Heirs' purported rights; and (b) consent agreements that Toberoff procured limiting the Shuster and Siegel Heirs' freedom to enter into agreements with DC Comics regarding those rights.

111.    The Copyright Act's termination provisions were crafted to avoid the trafficking in future interests by third parties like Toberoff and his companies, yet that is exactly what his agreements with the Shuster and Siegel Heirs accomplish, and what Toberoff and Shusters failed to disclose to DC Comics and the Copyright Office by serving and filing the Shuster Termination Notice.

## (4) The Shusters Do Not Attempt to Terminate Certain All-Encompassing Copyright Grants

112.    The 1992 Agreement includes a "grant" by Shuster's heirs to DC Comics of, *inter alia*, all "copyrights, trademarks, or other property right in any and all work created in whole or in part by … Joseph Shuster, or any works based thereon."  In the Shuster Termination Notice, defendants did not terminate (or even mention) the 1992 Agreement.

113.    The May 21, 1948 Consent Agreement also includes a grant by Siegel and Shuster to National, DC Comics' predecessor-in-interest, of all of Siegel and Shuster's rights in Superman and Superboy.  (If the 1992 Agreement is not read as a rescission, revocation, and re-grant of all prior agreements between Shuster and

- 36 -

COMPLAINT

043

1  DC Comics (and it should be), then the May 21, 1948 Consent Agreement remains

2  in effect.)

3       114.   Defendants do not attempt to terminate the May 21, 1948 Consent

4  Agreement, and do not identify the May 21, 1948 Consent Agreement in the

5  Shuster Termination Notice.

6       115.   As the result of defendants' failure to terminate the 1992 Agreement

7  and May 21, 1948 Consent Agreement, the grants contained therein remain in full

8  force and effect.  Thus, DC Comics is and continues to be the sole owner of all

9  rights, including rights under copyright, in Superman pursuant to the 1992

10  Agreement and May 21, 1948 Consent Agreement.

11       **(5) The Doctrine of Unclean Hands Bars the Shusters from Terminating**

12       116.   The doctrine of unclean hands requires that the Shuster Termination

13  Notice be deemed invalid because it contains material misrepresentations intended

14  to mislead the courts, Copyright Office, and DC Comics—all to the detriment of

15  DC Comics.

16       117.   The Shuster Heirs did not disclose Pacific Pictures' purported

17  ownership interest in the rights sought to be terminated.  Just one week before filing

18  the Shuster Termination Notice, the Shuster Estate signed the 2003 Pacific Pictures

19  Agreement, reaffirming its transfer of 100% of its rights in any Superman-related

20  copyrights to the joint venture with Pacific Pictures.  Copyright Office regulations

21  require that a termination notice include "specific indication of the person or

22  persons executing the notice who constitute more than one-half of that author's

23  termination interest" and "shall be signed by the number and proportion of the

24  owners of that author's termination interest required under section 304(c)."  37

25  C.F.R. § 201.10(b)(1)(vii), (c)(2).  Yet Pacific Pictures is conspicuously absent

26  from the Shuster Termination Notice.  This omission was not inadvertent, as

27  explained above.

28

118.    Induced by Toberoff, the Shuster Heirs also falsely disclaimed any interest in the Superboy rights in the Shuster Termination Notice.  This permitted Toberoff to assert on behalf of the Siegel heirs a baseless Superboy-related copyright infringement claim against DC Comics.  Prior to these manipulations by Toberoff, Shuster and the Shuster heirs had truthfully maintained for over 50 years that Shuster had co-created Superboy.  For example, the findings submitted by Siegel and Shuster's counsel in the 1940s Westchester Action, specified that Shuster had drawn the first "Superboy" denominated story in More Fun Comics No. 101.  Similarly, in 1972 and 1973, during the Superman renewal litigation, Siegel and Shuster jointly filed copyright renewal notices asserting joint authorship both in the Superboy character, and in More Fun Comics No. 101, which contained the first comic book story denominated "Superboy."

119.    Additionally, in the 2001 Pacific Pictures Agreement, entered into before Toberoff had secured an agreement with the Siegel Heirs, Toberoff and the Shuster Heirs expressly identified "Superboy" as among the universe of rights that Shuster had jointly created with Siegel.  Yet just two years later in 2003, and only *after* Toberoff had entered into an agreement with the Siegel Heirs securing control over their rights, did the Shuster Heirs suddenly reverse course.  The 2003 Pacific Pictures Agreement omitted all reference to Superboy, and the Shuster Termination Notice filed one week later avoided any overt mention of Superboy elements or works.[4]  But even the termination notice served by the Shuster Heirs, while carefully drafted to avoid any mention of Superboy, could not completely rewrite history.  The Shuster Termination Notice expressly identifies Action Comics No. 1 and Superman No. 1 as terminated works.  Both of these works, however, clearly depict Superman as a boy with super-powers:  *i.e.*, a "Superboy."  For example,

---

[4] As noted, DC Comics maintains that Superboy is a derivative work based upon the preexisting Superman, and in any event, is owned solely and exclusively by DC Comics, *inter alia*, because it is a work-for-hire or because the script submitted by Siegel and Shuster is unpublished and, thus, is not terminable.

COMPLAINT

1 Action Comics No. 1 features Superman as a very young boy exhibiting super

2 strength, and Superman No. 1 depicts Superman as a youth leaping over a building.

3  120. After the Shuster Termination Notice was filed, the Siegel Heirs

4 brought a copyright infringement claim against DC Comics on the frivolous ground

5 that Superboy was the sole creation of Siegel, entitling the Siegel Heirs to terminate

6 and recapture 100% of the Superboy rights (as opposed to the 50% share they

7 would be entitled to recapture if Superboy was a joint work).  The Siegel Heirs

8 threatened to enjoin the popular *Smallville* television series, which they wrongly

9 claimed infringed their exclusive rights in Superboy.  As a result, DC Comics has

10 incurred substantial expenses defending against the claim Toberoff manufactured

11 and the Shusters facilitated.  Defendants compromised the integrity of the

12 Copyright Office and judicial system by crafting the Shuster Termination Notice in

13 this way, and the Shuster Termination Notice should be held invalid on this and the

14 other related grounds set forth herein.

15     *  *  *

16  121. Each of the foregoing reasons is a separate, independent, and

17 alternative basis for declaring the Shuster Termination Notice to be invalid and thus

18 ineffective.  A declaration by this Court regarding the validity of the Shuster

19 Termination Notice is warranted under the Declaratory Judgment Act, 28 U.S.C.

20 §§ 2201 *et seq.*, to establish the parties' respective rights and obligations with

21 respect to the copyright interest in the Superman material.

22 **B.** **<u>Second Claim for Relief</u>:  Declaratory Relief re: Limited Scope of**

23   **Copyright Termination Notice (Against Defendants Shuster Estate and**

24   **Peary)**

25  122. DC Comics re-alleges and incorporates by reference each and every

26 allegation contained in the paragraphs above.

27

28

COMPLAINT

123.   This Second Claim for Relief is advanced in the alternative—*i.e.*, if the Court does not grant DC Comics' First Claim for Relief set forth above and hold that the Shuster Termination Notice is invalid.

### (1) Additional Factual Background

124.   Upon information and belief, in or around 1933, Siegel and Shuster began co-creating comic strips, some of which included stories featuring a character named Superman.  The materials created by Siegel and Shuster during this time are believed to include: (a) 24 days of Superman comic strips intended for newspapers; (b) a seven-page synopsis of the last 18 days (weeks two through four) of such comic strips; (c) a paragraph previewing future Superman exploits; (d) a nine-page synopsis of an additional two months of daily comic strips; and (e) 15 daily comic strips (collectively, the "Unpublished Superman Works").  None of these materials was published in its original form, most were never published at all, and some are apparently lost.

125.   Upon information and belief, between 1933 and 1937, Siegel and Shuster submitted the Unpublished Superman Works to a number of prospective publishers and newspaper syndicates, all of which rejected them.

126.   On December 4, 1937, Siegel and Shuster entered into the December 4, 1937 Agreement with DCI.  Siegel and Shuster agreed to "give their exclusive services" in producing certain comic features for a period of two years.  Siegel and Shuster were required to submit any new continuity to DCI, which reserved the right to accept or reject them for a period of sixty days.

127.   In early 1938, DCI was seeking material for use in a new comic book it was developing entitled "Action Comics."  Pursuant to the December 4, 1937 Agreement, the 24 days of Superman comic strips from the Unpublished Superman Works were provided to DCI for review.  DCI decided to publish a Superman story in Action Comics No. 1, but the materials submitted by Siegel and Shuster to DCI were neither in a form that was acceptable for publication in a comic book, nor

COMPLAINT

047

1    were they complete.  Therefore, at the instance and expense of DCI and subject to

2    its right of control, Siegel and Shuster adapted the 24 days of comic strips, and

3    added certain new material, to create a 13-page uncolored comic book story entitled

4    "Superman."  Cover art featuring Superman that was used for Action Comics No. 1

5    was thereafter created by DCI.  DCI's printers or engravers, working at the

6    direction of DCI, chose colors for the Superman character and colored the 13-page

7    story and cover.

8         128.   Siegel and Shuster assigned to DCI all of their rights in Superman in

9    the March 1, 1938 Agreement.  This included "all good will attached thereto and

10   exclusive right to the use of the characters and story, continuity and title of strip."

11   Siegel and Shuster agreed not to use Superman or any other character featured in

12   the strip "by their names contained therein."

13        129.   Before the April 1938 publication of Action Comics No. 1, which was

14   cover-dated June 1938, DCI promoted the upcoming Superman story in some of its

15   other publications, including "More Fun Comics No. 31" and "Detective Comics

16   No. 15."  These publications were cover-dated May 1938 and were published prior

17   to Action Comics No. 1.  The promotions (the "Promotions") depict Superman in

18   his costume—including a cape, boots, leotard, and inverted triangular "S" crest on

19   his chest—exhibiting his super-strength by holding a car over his head as

20   bystanders watch in awe.  The Promotions show almost the entirety of what would

21   become the cover of Action Comics No. 1 in clarity and detail.

22        130.   Action Comics No. 1 was comprised not only of the 24 days of

23   Superman comic strips from the pre-existing Unpublished Superman Works (as

24   modified and edited by Siegel and Shuster), but of additional new material created

25   by Siegel and Shuster at DCI's instance and expense and subject to its right of

26   control.

27        131.   Upon information and belief, after the publication of Action Comics

28   No. 1, Siegel and Shuster supplied further original Superman stories to DCI, at

- 41 -

COMPLAINT

048

1  DCI's instance and expense and subject to its right of control.  On September 22,

2  1938, Siegel and Shuster entered into another employment agreement with DCI

3  confirming that Siegel and Shuster had "been doing the art work and continuity for

4  said comics [including Superman comics] for us.  We wish you to continue to do

5  said work and hereby employ and retain you for said purposes."  The DCI

6  September 22, 1938 Agreement also contained an acknowledgement that DCI was

7  the "exclusive" owner of Superman.

8        132.   Also on September 22, 1938, Siegel and Shuster entered into the

9  McClure September 22, 1938 Agreement with DCI and the McClure Newspaper

10  Syndicate concerning the use of Superman in newspaper strips.

11        133.   All of Siegel and Shuster's contributions to Superman comic books

12  and comic strips were made pursuant to the March 1, 1938 Agreement, the DCI

13  September 22, 1938 Agreement, the McClure September 22, 1938 Agreement,

14  contemporaneous oral agreements confirmed by one or more of those agreements,

15  or certain subsequent agreements affirming those agreements, as employees of DCI

16  (or its successors) and at DCI's instance and expense and subject to its right of

17  control.  As a result, all of these materials constitute works for hire under the 1909

18  Copyright Act, and the copyrights therein are owned exclusively by DC Comics

19  and are not subject to termination under later amendments to the Copyright Act.

20        134.   On November 30, 1938, Siegel wrote a letter to DCI (the "November

21  1938 Letter") suggesting that it publish a comic book entitled "Superboy," "which

22  would relate to the adventures of Superman as a youth."  The November 30, 1938

23  Letter does not contain any discussion of plot, dialogue, appearance, or any other

24  copyrightable material relating to Superboy.  DCI decided not to publish a

25  Superboy comic book at that time, and had already published comic books,

26  discussed *supra*, that showed Superman as a young boy and exhibiting super-

27  human strength.  For example, in 1939, among the Superman material prepared by

28  Siegel and Shuster at the instance and expense of DCI and subject to its right of

1   control was Superman No. 1.  In Superman No. 1, Clark Kent is depicted as a boy

2   with super-powers.

3       135.   On December 19, 1939, Siegel and Shuster entered into the December

4   19, 1939 Agreement with DCI, which modified the DCI September 22, 1938

5   Agreement by, *inter alia*, doubling Siegel and Shuster's compensation for

6   Superman comic books and newspaper strips and providing for payment to Siegel

7   and Shuster for uses of Superman in media such as radio, motion pictures, and toys.

8   Under the December 19, 1939 Agreement, Siegel and Shuster again acknowledged

9   DCI's sole ownership of Superman.

10       136.   Upon information and belief, in December 1940, Siegel, on behalf of

11   himself and Shuster, submitted to DCI a 13-page script of continuity for Superboy

12   (the "Unpublished 1940 Superboy Script") and renewed his suggestion that DCI

13   publish a comic book depicting Superman as a youth.  The Unpublished 1940

14   Superboy Script, which includes the credit line "By Jerry Siegel and Joe Shuster,"

15   states:  "So many faithful followers of today's leading adventure comic strip,

16   SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth … And

17   so here he is at last … the answer to your requests … America's outstanding boy

18   hero: SUPERBOY!"  The Unpublished 1940 Superboy Script explains that "[i]n

19   later years [Superboy] was to become the might[y] figure known as SUPERMAN!"

20   The Unpublished 1940 Superboy Script was derived entirely from pre-existing

21   Superman elements and ideas that had been published by DCI as part of works for

22   hire, and contained no original copyrightable element.  Again, DCI decided not to

23   publish a Superboy comic book at that time.

24       137.   Upon information and belief, sometime prior to November 18, 1944,

25   DCI published a comic book depicting the adventures of Superman as a youth,

26   called Superboy, in "More Fun Comics No. 101," which had a cover date of

27   January-February 1945 and was illustrated at least in part by Shuster.  Upon

28   information and belief, Siegel did not participate in the creation of this comic book

- 43 -

COMPLAINT

1  or the Superboy story it contained.  Other than retelling the Superman origin story

2  from Action Comics No. 1 and Superman No. 1, this Superboy story bore no

3  resemblance to the Unpublished 1940 Superboy Script.

4      138.  In the more than 70 years since the publication of Action Comics No.

5  1 in 1938, DC Comics has created a vast universe of Superman material spanning

6  virtually all media, including comic books, graphic novels, live action pictures,

7  feature-length motion pictures, motion picture serials, radio and television serials,

8  and live theatrical presentations.  DC Comics' extensive development and

9  exploitation of Superman has generated new characters, new super-powers, new

10  components to the Superman universe, new elements in the Superman back story,

11  and new changes in Superman's appearance.

## (2) Claim for Declaratory Relief re: Limited Scope of
## Copyright Termination Notice

14      139.  In the event that the Shuster Termination Notice challenged in the First

15  Claim for Relief above is deemed to be effective, the scope and reach of the Notice

16  must be declared limited in the following ways:

### a.  Unpublished Superman Works

18      140.  The Shuster Termination Notice purports to terminate certain portions

19  of the Unpublished Superman Works, including:  (a) "twenty-four days … of

20  previously unpublished SUPERMAN newspaper comic strips, created c. 1934,"

21  (b) "SUPERMAN story in comic book form … created c. 1933," and (c) "15

22  SUPERMAN daily comic strips … created c. 1934."

23      141.  To the extent that any portion of the Unpublished Superman Works

24  may be considered published for purposes of the Copyright Act (and this is

25  disputed), those portions were published only as a result of their adaptation for

26  inclusion in Action Comics No. 1, which was a work made for hire.  The Copyright

27  Act expressly provides that "a work made for hire" cannot be subject to

28

1     termination.  17 U.S.C. § 304(c)-(d).  As a result, the Shuster Termination Notice is

2     ineffective as to the Unpublished Superman Works.

3     **b.  Pre-Action Comics No. 1 Promotions**

4        142.    The Shuster Termination Notice does not attempt to terminate DC

5     Comics' rights in the Promotions published before Action Comics No. 1.

6        143.    Moreover, upon information and belief, the Promotions, depicting in

7     sum and substance what was subsequently published as the cover of Action Comics

8     No. 1, were not prepared by Siegel or Shuster, but rather by others either employed

9     by DCI or at the instance and expense of DCI and subject to its right of control.  As

10    a result, the Promotions were works made for hire and any copyright therein was

11    owned by DCI *ab initio* and cannot be subject to termination.  17 U.S.C. § 304(c)-

12    (d).

13        144.    DC Comics remains the sole owner of the Promotions, all copyrights

14    therein, and the various copyrightable elements contained therein.  The Shusters

15    may not seek to terminate copyright interests comprised in the Promotions.

16     **c.  Works for Hire**

17        145.    The Shuster Termination Notice purports to recapture the rights in

18    Action Comics Nos. 1-7, Superman No. 1, and Superman No. 3 ("Superman

19    Works").  Each of the Superman Works was prepared at the instance and expense

20    of DCI and subject to its right of control.  As a result, the Superman Works were

21    works made for hire and any copyright therein was owned by DCI *ab initio* and

22    cannot be subject to termination.  17 U.S.C. § 304(c)-(d).

23        146.    DC Comics remains the sole owner of the Superman Works, all

24    copyrights therein, and the various copyrightable elements contained therein.[5]

25        [5] In the related action filed by the Siegel Heirs against DC Comics, the federal

26    court agreed with this position almost entirely, ruling that other than a handful of

     pre-1938 materials authored by Siegel, all of Siegel's Superman works were created

27    as "works for hire" on behalf of DC Comics.  The court ruled that all material

     created by Siegel after his 1938 employment agreement with DCI, including Action

28    Comics Nos. 2, 3, 5-61, Superman Nos. 1-23 (other than pages 3-6 of Superman

#### d. Derivative Works

147.    All Superman-related works prepared after the publication of Action Comics No. 1 were derivative works based on pre-existing copyrightable material and created under the authority of valid copyright grants (the "Derivative Works").

148.    The Derivative Works include new characters, new super-powers, new components to the Superman universe, new elements in the Superman back-story, and changes in the appearance of Superman.

149.    Regardless of whether the Shuster Termination Notice is deemed valid, DC Comics remains the sole owner of the Derivative Works and retains the continuing right to exploit the Derivative Works under section 304 of the Copyright Act, 17 U.S.C. § 304(c)(6)(A).

#### e. Scope of Shuster Notice

150.    The Shuster Termination Notice, in addition to specifying works to be terminated, also describes certain elements purportedly encompassed by the works sought to be recaptured.  Many of these elements do not appear in the specified works.  In addition to identifying elements that are not present, the Shuster Termination Notice is also notable for its failure to specify elements that are present.  For example, although both the purportedly terminated works Action Comics No. 1 and Superman No. 1 depict Superman as a boy with super-powers, the Shuster Termination Notice is silent on this element.  Accordingly, a dispute has arisen between the parties regarding the scope of the Shuster Termination Notice with respect to the elements that appear, or which do not appear, in the allegedly terminated identified in the Shuster Termination Notice, including, but not limited to, the following:

---

No. 1), and post-1938 newspaper strips, were works-for-hire and thus could not be terminated.  DC Comics reserves all rights with respect to these interim rulings in the Siegel case.

COMPLAINT

053

a.   Superman's "telescopic vision"

b.   Superman's "super hearing"

c.   Superman's "super … sense of smell"

d.   Superman as a boy with super-powers (*i.e.*, "Superboy")

e.   "[D]iamond-shaped "S" insignia on [Superman's] chest"

f.   "[L]ove triangle between Superman, Lois Lane and Clark Kent"

g.   "Perry White"

h.    "Daily Planet newspaper"

i.   "Metropolis"

j.   "Jor L"

k.   "Krypton"

151.   A declaration by this Court regarding the scope of the Shuster Termination Notice is warranted under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, to establish the parties' respective rights and obligations with respect to the copyright interest in the Superman material. The Shusters may not seek to terminate copyright interests owned by DC Comics, including those materials listed above.

C.   **Third Claim for Relief**: **Declaratory Relief re: Shuster Period of Exclusivity (Against All Defendants)**

152.   DC Comics re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

153.   This Third Claim for Relief is advanced in the alternative—*i.e.*, if the Court does not grant DC Comics' First Claim for Relief set forth above and hold that the Shuster Termination Notice is invalid.

154.   The Copyright Act establishes an exclusive period between the time a copyright termination notice is served and the effective termination date in which the original copyright grantee may enter into an agreement with the original copyright author or their heirs regarding the rights sought to be recaptured. Section

- 47 -

1   304(c)(6)(D) provides: "A further grant, or agreement to make a further grant, of

2   any right covered by a terminated grant is valid only if it is made after the effective

3   date of the termination." 17 U.S.C. § 304(c)(6)(D). While the statute bars third

4   parties (like Toberoff and his companies) from trafficking in such future copyright

5   interests during this exclusive time period, it protects the rights and interests of

6   original grantees like DC Comics, providing that "an agreement for such a further

7   grant may be made between the author or [his heirs] and the original grantee or [its

8   successor (*e.g.*, DC Comics)], after the notice of termination has been served." *Id.*

9       155.   Section 304(c)(6)(D) of the Copyright Act establishes a right of DC

10  Comics from November 10, 2003 (when the Shuster Heirs served the Termination

11  Notice) until October 26, 2013 (the effective date of the Notice), during which DC

12  Comics is the sole party that can enter into an agreement with the Shuster Heirs for

13  the rights sought to be terminated. This right has been described by Congress, in its

14  legislative history, and the United States Court of Appeals as a "right of first

15  refusal." Any restriction or limitation on this period of exclusivity must be deemed

16  unenforceable under section 304(c)(6)(D).

17      156.   Upon information and belief, the Shuster Heirs have entered into

18  agreements that frustrate and impede DC Comics' period of exclusivity. For

19  example, the 2003 Pacific Pictures Agreement grants and assigns the Shuster Heirs'

20  putative present and future copyright interests and provides that "any and all

21  agreements regarding any of the Rights [in Shuster's creations, including copyright]

22  shall be subject to the express written approval" of Pacific Pictures. This

23  improperly allowed Pacific Pictures (and Toberoff) to prevent the Shuster Heirs

24  from entering into an agreement with DC Comics concerning their purported

25  rights—in clear violation of section 304(c)(6)(D). Although Pacific Pictures and

26  the Shuster Heirs purported to cancel the 2001 and 2003 Pacific Pictures

27  Agreements in their September 10, 2004 Letter, this improper agreement was in

28  effect at least from the time it was executed on October 30, 2003 through

- 48 -

COMPLAINT

September 10, 2004, which means that it improperly eliminated most of the first year of DC Comics' period of exclusivity. Moreover, the original 2001 Pacific Pictures Agreement provides that if the Shusters' joint venture with Pacific Pictures is terminated "for any reason," then Pacific Pictures will hold 50% of "the property or assets of the Venture," including all the alleged Shuster Superman copyright interests, as a "tenant[] in common," meaning that Pacific Pictures and Toberoff still have improperly encumbered, to this day, DC Comics' period of exclusivity.

157. Upon information and belief, Toberoff has induced the Siegel and Shuster Heirs to enter into additional agreements, which prohibit either family from entering into agreements conveying rights to DC Comics without the express approval of all stakeholders in the heirs' rights—*i.e.*, the Siegel Heirs, Shuster Heirs, and Toberoff and his companies. These agreements and others like it that may exist—which upon information and belief remain in effect to this day—violate section 304(c)(6)(D) and impede DC Comics' ability to settle any and all disputes with the Shusters and Siegels and lawfully pursue its business.

158. The Shuster Heirs' agreements with Toberoff, his companies, and the Siegels improperly interfere with DC Comics' period of exclusivity with the Shuster Heirs regarding their purported Superman rights.

159. A declaration by this Court is warranted under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, to establish the parties' respective rights and obligations with respect to the copyright interest in the Superman material. This declaration should establish that: (a) DC Comics is the sole party with whom the Shuster Heirs can enter into an agreement to convey their putative Superman rights during the exclusivity period, through and including October 26, 2013; (b) any agreement with any third party regarding those putative rights during the exclusivity period is invalid and unenforceable; and (c) any agreements requiring consent of other parties to settle termination claims violate the exclusivity period and, therefore, are invalid and unenforceable.

COMPLAINT

160.   DC Comics seeks an injunction (a) barring the Shuster Heirs from entering into any agreement with any third party regarding the rights sought to be recaptured in the Shuster Termination Notice until October 26, 2013; and (b) restoring to DC Comics its 10-year period of exclusivity.

**D.**    **Fourth Claim for Relief:** **Intentional Interference with 1992 Shuster Agreement (Against Defendants Toberoff and Pacific Pictures)**

161.   DC Comics re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

162.   In October 1992, the Shuster Heirs and DC Comics executed a final written agreement "fully settl[ing] all claims" as to "right[s] in any and all work[s] created in whole or in part by ... Joseph Shuster" (the "1992 Agreement").  Since 1992, DC Comics has paid the Shuster Heirs nearly half a million dollars under the 1992 Agreement.  To DC Comics' knowledge, the Shuster Heirs have never disputed the validity or existence of the 1992 Agreement, which operated to rescind, revoke, and re-grant all of the Shusters' prior grants of rights in the Superman properties to DC Comics.  In that 1992 Agreement, the Shuster Heirs further agreed that they would not—either then or in the future—make any claim of right to any work created in whole or part by Joe Shuster.

163.   DC Comics' 1992 Agreement with the Shuster Heirs was both a valid contract and had the probability of future economic benefit to DC Comics.  The Shuster Heirs fully relinquished their rights under any prior agreement and re-granted to DC Comics all of their Superman-related rights.  This confirmation allowed DC Comics to continue freely developing and exploiting those rights without the risk of termination of the alleged Shuster rights or expensive and protracted legal disputes regarding the ownership of those rights.[6]

_____

[6] DC Comics maintains that the 1992 Agreement is a binding, enforceable agreement with the Shuster Heirs.  Even assuming this agreement was deemed invalid, DC Comics also has a long-established economic relationship with the Shusters giving rise to an interference with prospective economic advantage claim.

COMPLAINT

164.    Toberoff and Pacific Pictures were aware of the 1992 Agreement and DC Comics' ongoing business relationship with the Shusters. Toberoff knew that his actions in having his company enter into a joint venture with the Shusters for the purpose of terminating DC Comics' rights were substantially certain to interfere with DC Comics' 1992 Agreement with the Shusters. Toberoff's ultimate purpose in approaching the Shuster Heirs was to induce them to repudiate the 1992 Agreement and attempt to terminate prior grants of Shuster's rights. For this reason, Toberoff and the Shusters formed a joint venture with Pacific Pictures for the express purpose of "retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations" through "termination pursuant to [17 U.S.C. § 304] of any and all grant or transfers by Joe Shuster of any copyright interest in his creations."

165.    Toberoff and Pacific Pictures engaged in independently wrongful conduct to achieve this goal. They induced the Shuster Heirs to breach the 1992 Agreement and enter into the illegal copyright-assignment and settlement-consent agreements described above. Toberoff also induced the Shusters to manipulate claims of ownership in Superboy.

166.    As the direct result of Toberoff's and Pacific Pictures' actions, the Shuster Heirs have breached the 1992 Agreement, causing DC Comics to lose the value of the Agreement and forcing DC Comics to incur substantial attorneys' fees and costs in an amount to be proven at trial.

---

This relationship dates back to 1935, when DC Comics' predecessor hired the unknown artist Joseph Shuster to illustrate comic strips for its publications. Even after their employment arrangement ended, Shuster continued to benefit from his early work on Superman under the 1975 Agreement, which provided him with an annual pension, medical insurance, and a lump-sum payment in exchange for acknowledgement of DC Comics' sole and exclusive ownership of the Superman rights. At the time Toberoff approached the Shuster Heirs in 2001, DC Comics and the Shuster Heirs had an agreement in place for almost 10 years, which resolved all claims concerning Shuster's putative share of the Superman rights. DC Comics' agreement with the Shusters and the economic relationship they contemplated had the probability of future economic benefit to DC Comics.

COMPLAINT

**E.    Fifth Claim for Relief:  Intentional Interference with Prospective Economic Advantage re: Siegel-DC Comics Agreement (Against Defendant Toberoff)**

167.    DC Comics re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

168.    DC Comics reached a binding, enforceable agreement with the Siegel Heirs.  After the Siegel Heirs served the Superman Termination Notice in 1997, they engaged in negotiations with DC Comics for four years.  On October 16, 2001, DC Comics made a settlement offer to the Siegel Heirs.  On October 19, 2001, the Siegel Heirs' attorney at the time, Marks, sent a letter to DC Comics outlining the material terms and confirming that the Siegel Heirs "accepted D.C. Comics' offer of October 16, 2001."  On October 26, 2001, DC Comics sent a return letter confirming the parties' agreed-upon terms.  DC Comics then drafted a long-form contract memorializing the agreement, which it sent to the Siegel Heirs on February 1, 2002.  Marks has confirmed that all parties understood that they had a binding agreement.[7]

169.    Even in the event that this agreement is finally adjudicated and deemed to be invalid, DC Comics had a long-established economic relationship with the Siegel Heirs giving rise to an interference with prospective economic advantage claim.  This relationship dates back as far as 1935, when DC Comics' predecessor

_____

[7] The district court in the Siegel Actions determined that this agreement was not binding because there was no "meeting of the minds" between the parties.  Of course, this was before the Toberoff Timeline had been produced, which confirmed, *inter alia*, that Marks—who negotiated the agreement on behalf of the Siegel Heirs—understood that the 2001 agreement was final and binding.  Indeed, Marks communicated his position to the Siegel Heirs in August 2002, in an attempt to convince them to reject Toberoff's attempts at interference.  DC Comics reserves all rights to challenge the district court's ruling in the Siegel Actions based on this newly discovered evidence and otherwise, and DC Comics respectfully submits that the district court's interim ruling on this issue is contrary to fact and law.  If DC Comics' claims are accepted, it will amend this Complaint to include a claim for interference with contract arising out of Toberoff's tortious interference with this binding agreement.

COMPLAINT

**059**

1   hired an unknown writer named Jerome Siegel to write comic strips for its

2   publications. Over the years, Siegel worked on-and-off as an employee of DC

3   Comics and its predecessors. Even after the employment arrangement ended,

4   Siegel continued to benefit from his early work on Superman under the 1975

5   Agreement, which provided him and his family with an annual pension, medical

6   insurance, and lump payment in exchange for acknowledgement of DC Comics'

7   sole and exclusive ownership of the Superman rights. When a dispute arose in

8   1997 over the Siegel Heirs' attempt to terminate prior grants of Siegel's share of

9   Superman rights, DC Comics and Siegel commenced negotiations, which lasted

10  over four years. At the time Toberoff approached the Siegel Heirs in 2001, DC

11  Comics and the Siegel Heirs had finally reached an agreement resolving their

12  claims to the Superman and Superboy rights.

13      170.    The economic relationship that the Siegel Heirs and DC Comics had

14  contemplated and agreed to had the probability of future economic benefit to DC

15  Comics. The Siegel Heirs recognized DC Comics' sole and exclusive ownership of

16  all rights in Superman and Superboy, allowing it to continue freely developing and

17  exploiting those rights, and avoid the possibility of an expensive and protracted

18  lawsuit regarding ownership of those rights.

19      171.    Toberoff was well aware of the agreement between DC Comics and

20  the Siegel Heirs. Toberoff has admitted that he tracked the Siegel Heirs'

21  termination efforts through Internet reports. Moreover, upon information and

22  belief, when Toberoff approached the Siegel Heirs and their representatives in late

23  2001 and 2002 to express interest in purchasing their Superman rights, he was

24  informed that the Siegel Heirs had already reached an agreement with DC Comics.

25      172.    Toberoff knew his actions were substantially certain to interfere with

26  the Siegel Heirs' agreement and ongoing business dealings with DC Comics.

27  Toberoff intentionally engaged in independently wrongful conduct to carry out his

28  interference by, among other things:  falsely misrepresenting to the Siegel Heirs

COMPLAINT

1    that he had a billionaire investor ready to purchase their Superman rights if they

2    repudiated their settlement agreement with DC Comics; falsely representing to the

3    Siegels that he would help them produce a competing Superman motion picture;

4    and wrongly inducing the Siegels to repudiate their agreement and business

5    relationship with DC Comics.

6        173.   As a direct result of Toberoff's misdeeds, the Siegel Heirs repudiated

7    the Siegel-DC Comics Agreement with DC Comics and ended all further

8    discussions, causing DC Comics to lose the value of the agreement, to lose their

9    ongoing business relationship with the Siegels, and to incur millions of dollars in

10   subsequent legal fees in disputes with the Siegel Heirs.  DC Comics has suffered

11   actual damages in an amount to be proven at trial.

12   **G.**    **<u>Sixth Claim for Relief</u>: Declaratory Relief re: Invalidity of Copyright**

13       **Assignment and Consent Agreements (Against All Defendants)**

14       174.   DC Comics re-alleges and incorporates by reference each and every

15   allegation contained in the paragraphs above.

16       175.   The various copyright assignment and consent agreements between

17   Toberoff and/or his companies, the Siegel Heirs, and the Shuster Heirs are void and

18   unenforceable, including under California's unfair competition laws, *e.g.*, CAL.

19   BUS. & PROF. CODE §§ 17200 *et seq.*  The copyright assignments secured by

20   Toberoff and/or his companies are unlawful and violate DC Comics' rights and

21   interests for the reasons set forth above.  The consent agreements Toberoff has

22   procured are void as a matter of law and public policy because they strip the Siegels

23   and Shusters of their right freely to settle their claims and violate DC Comics'

24   concomitant right freely to negotiate settlement of such claims.

25       176.   A declaration by this Court is warranted under the Declaratory

26   Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, to establish the parties' respective rights

27   and obligations with respect to the copyright interest in the Superman material.

28

COMPLAINT

# VI.  PRAYER FOR RELIEF

WHEREFORE, DC Comics prays for judgment against defendants as follows:

177.  A declaration that the Shuster Termination Notice is invalid, and thus ineffective, for one or more of the reasons set forth in DC Comics' First Claim for Relief;

178.  In the event that the Shuster Termination Notice is deemed valid and effective, a declaration that the scope and effect of the Notice is limited as set forth in DC Comics' Second Claim for Relief;

179.  A declaration that:  (a) DC Comics was entitled to a period of exclusivity regarding the Shuster Heirs' purported Superman rights from November 10, 2003 through October 26, 2013; (b) any agreement interfering with that period of exclusivity is invalid and unenforceable; and (c) the consent agreements impermissibly interfere with DC Comics' period of exclusivity and require restoration of the 10-year period free of interference;

180.  A declaration that the various consent agreements between Toberoff and/or his companies, the Siegel Heirs, and the Shuster Heirs are void and unenforceable as a matter of public policy;

181.  An injunction that:  (a) bars the Shuster Heirs from entering into any agreement with any third party regarding the rights sought to be recaptured in the Shuster Termination Notice until October 26, 2013; and (b) restores DC Comics' 10-year period of exclusivity with respect to the Shuster Termination Notice;

182.  As to the tort claims against Toberoff and his entities as sued herein, damages in amounts to be determined at trial;

183.  An award of reasonable attorneys' fees and costs; and

184.  Such other and further relief as this Court deems just and proper.

COMPLAINT

## VII.   **DEMAND FOR JURY TRIAL**

185.   Plaintiff DC Comics hereby demands a trial by jury on all issues triable by a jury.


Dated:  May 14, 2010                           Respectfully submitted,

                                               O'MELVENY & MYERS LLP


                                               By:_____
                                                     Daniel M. Petrocelli
                                               Attorneys for Plaintiff DC Comics


Of counsel:

    PATRICK T. PERKINS (*pro hac vice*
    application pending)
        pperkins@ptplaw.com
    PERKINS LAW OFFICE, P.C.
    1711 Route 9D
    Cold Spring, New York 10516
    Telephone: (845) 265-2820
    Facsimile:  (845) 265-2819

CC1:829569.6

COMPLAINT

**063**