# EXHIBIT E

Marc Toberoff (State Bar No. 188547)
Nicholas C. Williamson (State Bar No. 231124)
Keith G. Adams (State Bar No. 240497)
TOBEROFF & ASSOCIATES, P.C.
2049 Century Park East, Suite 2720
Los Angeles, California, 90067
Telephone: (310) 246-3333
Fax: (310) 246-3101
MToberoff@ipwla.com

Attorneys for Defendants Mark Warren
Peary, as personal representative of the
Estate of Joseph Shuster, Joanne Siegel and
Laura Siegel Larson

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| DC COMICS,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>PACIFIC PICTURES CORPORATION;<br>IP WORLDWIDE, LLC; IPW, LLC;<br>MARC TOBEROFF, an individual;<br>MARK WARREN PEARY, as personal<br>representative of the ESTATE OF<br>JOSEPH SHUSTER; JOANNE SIEGEL,<br>an individual; LAURA SIEGEL<br>LARSON, an individual,<br>and DOES 1-10, inclusive,<br><br>　　　　　Defendants. | Case No: CV 10-03633 ODW (RZx)<br><br>Hon. Otis D. Wright II, U.S.D.J.<br><br>**DEFENDANT MARK WARREN PEARY'S, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JOSEPH SHUSTER, NOTICE OF MOTION AND MOTION TO DISMISS AND/OR STAY PLAINTIFF'S COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6); MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Complaint filed: May 14, 2010<br>Trial Date: None Set<br><br>Date:　October 18, 2010<br>Time:　1:30 p.m.<br>Place:　Courtroom 11 |

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on October 18, 2010 at 1:30 p.m., or as soon thereafter as counsel may be heard, in Courtroom 11 of the above-captioned Court, located at 312 N. Spring Street, Los Angeles, California, 90012, defendant Mark Warren Peary, as personal representative of the Estate of Joseph Shuster (the "Shuster Executor"), will and hereby does move to dismiss the first and second claims for relief in the plaintiff DC Comics' ("DC") complaint pursuant to Fed. R. Civ. P. 12(b)(6).

Plaintiff DC's First Claim for Relief seeks to invalidate the Shuster Executor's notice of termination under 17 U.S.C. § 304(d) on impermissible and spurious grounds. DC advances an interpretation of § 304(d) that contradicts both the plain language of the statute and the accepted interpretation of "not living" under the Copyright Act. DC also argues that a 1992 agreement between DC and Shuster's siblings bars the Shuster Termination, when such an agreement could not do so under the termination statute. DC makes a frivolous argument, contradicted by its own complaint, that the Shuster Executor did not own the "majority interest necessary to terminate," when the Shuster Executor clearly held the entirety of the termination interest. DC also advances a claim that the Shuster Executor failed to terminate a May 21, 1948 consent judgment, when this Court already correctly decided that this consent judgment had no effect on the validity of Superman termination notices. Lastly, DC argues that the Shuster Executor has "unclean hands," when the alleged "wrongful" acts have already been determined by a court to be proper.

DC's Second Claim for Relief, which seeks to invalidate or limit the Superman notices of termination served by the Shuster Executor pursuant to 17 U.S.C. § 304, improperly attempts to re-litigate the issues previously litigated on the merits and decided against DC in the related Superman case – *Siegel v. Warner Bros. Ent. Inc. et al.*, C.D. Cal. Case No. 04-CV-08400 ODW (RZx). The *Siegel* litigation to which DC is a party concerned the statutory termination under 17 U.S.C. § 304 of the same

pre-1978 grants of the same Superman works, co-authored by Jerome Siegel and Joseph Shuster, as DC's newly filed action.  DC is barred by the "law of the case" doctrine from re-litigating the same issues decided against DC in the related *Siegel* action that involved mirror-image Superman notices of termination.  To the extent any issues remain, such issues are pending in the more advanced *Siegel* litigation, and should be stayed here, pending their resolution in that closely related action.

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on July 13, 2010.

Defendant seeks dismissal of these claims based on this Notice of Motion and Motion, the attached memorandum of points and authorities, the pleadings and records on file in this action, such additional authority and argument as may be presented in any reply and at the hearing on this motion, and such other matters of which this Court may take judicial notice.

DATED:  August 13, 2010        TOBEROFF & ASSOCIATES, P.C.

By _____
        Marc Toberoff

Attorneys for Defendants Mark Warren Peary, as personal representative of the Estate of Joseph Shuster, Joanne Siegel and Laura Siegel Larson

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

ARGUMENT ......................................................................................................2

I.    LEGAL STANDARD ...............................................................................2

II.    DC'S FIRST CAUSE OF ACTION FAILS TO STATE A
CLAIM ....................................................................................................2

    A.    Shuster's Executor Holds Termination Rights Pursuant to
§ 304(d) ........................................................................................2

        1.    An Executor Holds Termination Rights in the
Absence of a Spouse, Child or Grandchild ................3

        2.    The U.S. Supreme Court's Interpretation of
Parallel Sections of the Copyright Act Contradicts
DC's Allegations ........................................................4

        3.    DC's Interpretation Would Lead to Absurd
Results ........................................................................5

        4.    DC's Argument Contradicts the Statute's Clear
Intent ..........................................................................6

        5.    Shuster's Termination Rights Expired Under the
Plain Meaning of § 304(d) ..........................................7

    B.    The 1992 Agreement Was Not a Revocation and/or
Regrant of Superman Copyrights and Does Not Affect
Termination Rights ........................................................................7

        1.    The Shuster Executor Was Not a Party to the 1992
Agreement ..................................................................9

        2.    The 1992 Agreement Could Not Transfer
Termination Rights ....................................................10

        3.    The 1992 Agreement Did Not Grant Superman
Copyrights ................................................................11

    C.    The Shuster Executor Was Properly the Sole Signatory
to the Shuster Termination Notices .....................................13

    D.    The 1948 Consent Agreement Is Irrelevant to the
Termination ..................................................................................14

        1.    This Court Already Held That the Consent
Judgment Was Not a Copyright Grant and Need
Not Be Listed ............................................................14

2.    The Shuster Executor Was Not Required to List the May 21, 1948 Consent Agreement As It Was Not a Copyright Grant ................................................. 15

E.    DC's Unclean Hands Claim Fails as a Matter of Law ........ 16

1.    Unclean Hands Is Not a Basis for a Cause of Action ........................................................................ 16

2.    The Failure to List PPC or Superboy in the Shuster Termination Does Not Show "Unclean Hands" ................................................................... 17

a.    PPC Owned No Termination Interest ............. 17

b.    The Shuster Executor Was Bound by a Court Order That Jerry Siegel Was the Sole Author and Owner of Superboy ..................... 17

c.    The Superboy Works Could Not Have Been Included in the Shuster Termination In Any Event ........................................................... 18

III.   DC's SECOND CAUSE OF ACTION MUST BE DISMISSED AS IT SEEKS TO RE-LITIGATE MATTERS ALREADY DECIDED ........................................................................ 19

A.    DC Ignores the Past Six Years of Litigation in the *Siegel* Action ..................................................................... 19

B.    The "Law of the Case" Doctrine Bars DC's Attempt to Re-Litigate ............................................................... 20

1.    Work For Hire .................................................... 22

2.    Promotions ........................................................ 23

C.    This Action Should Be Stayed Pending the Outcome in *Siegel* ................................................................. 24

CONCLUSION ...................................................................... 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF AUTHORITIES</u>

<u>**Federal Cases**</u>                                                      **Pages**

*Adler v. Fed. Republic of Nigeria*,
219 F.3d 869 (9th Cir. 2000) ...............................................................16

*Artichoke Joe's Cal. Grand Casino v. Norton*,
353 F.3d 712 (9th Cir. 2003) .................................................................3

*Ashcroft v. Iqbal*,
129 S.Ct. 1937 (2009) ............................................................................2

*Association of American Medical Colleges v. Princeton Review, Inc.*,
332 F. Supp. 2d 11 (D.D.C. 2004) .......................................................16

*Carson Harbor Vill., Ltd. v. Unocal Corp.*,
270 F.3d 863 (9th Cir. 2001) .................................................................5

*Classic Media, Inc. v. Mewborn* ("*Mewborn*"),
532 F.3d 978, 984 (9th Cir. 2008) ............................................ *passim*

*Clinton v. Jones*,
520 U.S. 681, 707 (1997)......................................................................25

*Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.*,
819 F.2d 1519 (9th Cir. 1987) .............................................................24

*Disimone v. Browner*,
121 F.3d 1262 (9th Cir. 1997) ........................................................20, 23

*Dunn Computer Corp. v. Loudcloud, Inc.*,
133 F. Supp. 2d 823 (E.D. Va. 2001) ...................................................17

*Fred Fisher Music Co. v. M. Witmark & Sons*,
318 U.S. 643 (1943)..............................................................................10

*Green v. Bock Laundry Machine Co.*,
490 U.S. 504 (1989)................................................................................6

*In re McKesson HBOC, Inc. ERISA Litig.*,
391 F. Supp. 2d 812 (N.D. Cal. 2005)..................................................16

*Marvel Characters v. Simon*,
310 F.3d 280 (2d Cir. 2002) ........................................................... 9-11

*Mason v. Texaco, Inc.*,
741 F. Supp. 1472 (D. Kan. 1990)........................................................20

*Mills Music, Inc. v. Snyder*,
469 U.S. 153 (1985)..............................................................................10

*Miller Music Corp. v. Charles N. Daniels, Inc.*,
362 U.S. 373 (1960)........................................................................ 4-6

*Moss v. Crawford & Co.*,
201 F.R.D. 398 (W.D. Pa. 2000) ........................................................................20

*Music Sales Corp. v. Morris*,
73 F. Supp. 2d 364 (S.D.N.Y. 1999) ..............................................................5, 16

*Ovadia v. Top Ten Jewelry Corp.*,
2005 U.S. Dist. LEXIS 16784 (S.D.N.Y. Aug. 12, 2005)..................................20

*Parrino v. FHP, Inc.*,
146 F.3d 699 (9th Cir. 1997) ...............................................................................8

*Pelich v. INS*,
329 F.3d 1057 (9th Cir. 2003) ...........................................................................16

*Ridgeway v. Mont. High School Ass'n*,
858 F.2d 579 (9th Cir. 1988) .............................................................................20

*Rivers v. Walt Disney Co.*,
980 F. Supp. 1358 (C.D. Cal. 1997) ..................................................................25

*Robi v. Five Platters, Inc.*,
838 F.2d 318 (9th Cir. 1988) .............................................................................24

*Siegel v. Nat'l Periodical Publ'ns, Inc.* ("*National*"),
508 F.2d 909 (2d Cir. 1974) ..................................................................... *passim*

*Siegel v. Nat'l Periodical Publications, Inc.*,
364 F. Supp. 1032 (S.D.N.Y. 1973) ........................................................... 15-16

*Siegel v. Warner Bros. Ent. Inc.* ("*Siegel*"),
C.D. Cal. Case No. 04-CV-08400 ODW (RZx)..........................................2, 24

*Siegel v. Warner Bros. Ent. Inc.*,
542 F. Supp. 2d 1098 (C.D. Cal. 2008) ...................................................... *passim*

*Siegel v. Warner Bros. Ent. Inc.*,
658 F. Supp. 2d 1036 (C.D. Cal. 2009) ...................................................... *passim*

*Siegel v. Warner Bros. Ent. Inc.*,
690 F. Supp. 2d 1048 (C.D. Cal. 2009) ......................................................19, 23

*Silvers v. Sony Pictures Entertainment, Inc.*,
402 F.3d 881 (9th Cir. 2005) ........................................................................ 5-6

*Stewart v. Abend*,
495 U.S. 207 (1990).............................................................................................4

*Thomas v. Bible*,
983 F.2d 152 (9th Cir. 2003) ............................................................. 20-21, 24

*Venegas-Hernandez v. Asociacion de Compositores y Editores de Musica Latinoamericana*,
424 F.3d 50 (1st Cir. 2005)..................................................................................5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Federal Statutes and Rules**

37 C.F.R. § 201.10 ........................................................................ 14-16

67 Fed. Reg. 69134 ...........................................................................7, 19

F.R.C.P. 8 .............................................................................................2

F.R.C.P. 12 ...........................................................................................2

Pub. L. 94-553.....................................................................................9

Pub. L. 105-298....................................................................................9

17 U.S.C. § 304 ........................................................................ *passim*

H.R. Rep No. 105-452, 105th Congress, 2d Sess. (1998) ...................6

**State Cases**

*Estate of Simoncini*,
229 Cal. App. 3d 881 (1991) ...............................................................6

**Other Authorities**

M. Nimmer & D. Nimmer,
3 *Nimmer on Copyright* ("*Nimmer*") § 11.03 ............................... 4, 6-7

3 *Nimmer* § 11.05...............................................................................7

3 *Nimmer* § 11.08...............................................................................13

18 Wright, Miller & Cooper,
*Federal Practice and Procedure* § 4478 (1981).................................20

# **INTRODUCTION**

Plaintiff DC Comics' ("DC") First Claim for Relief against defendant Mark Warren Peary, the personal representative ("Shuster Executor") of the Estate of Joseph Shuster ("Shuster" and the "Shuster Estate"), seeks to invalidate the Shuster Executor's proper termination under 17 U.S.C. § 304(d) of Shuster's prior grants of copyright to DC in the world-famous comic book hero Superman, co-created by Jerry Siegel ("Siegel") and Joseph Shuster in the 1930's (the "Shuster Termination").

*Section (1) of DC's First Claim* (Complaint, ¶¶ 94-98) erroneously alleges that Shuster's termination rights do not vest in the executor or representative of his estate unless he had a widow, children and grandchildren who were "not living, but who did at some time live." This argument contradicts the plain language of the statute and the accepted interpretation of "not living" under the Copyright Act, as well as the legislative intent of § 304, and would lead to absurd results. *Section (2)* (Complaint, ¶¶ 99-104) argues that a 1992 agreement between DC and Shuster's siblings bars the Shuster Termination. This argument fails because the 1992 agreement did not, and could not, lawfully grant any Superman copyrights. None of the parties to that agreement possessed any termination rights to grant; the Shuster Executor, the sole holder of the termination right, was not a party to the 1992 agreement; and, in any event, the agreement could not have conveyed or released the inalienable termination right as a matter of law under § 304(c)(5). *Section (3)* (Complaint, ¶¶ 105-11) alleges that the Shuster Executor did not own the "majority interest necessary to terminate," but the Shuster Executor clearly held the entirety of the termination interest, because, as asserted elsewhere in the Complaint, termination rights cannot be transferred prior to the effective date of termination per § 304(c)(6)(D). *Section (4)* (Complaint, ¶¶ 112-15) claims that the Shuster Termination failed to terminate a May 21, 1948 consent judgment; however, this Court has already correctly decided that this consent judgment was not a copyright grant, and had no effect on the validity of Superman termination notices. *Section (5)*'s "unclean hands" claim (*id.*, ¶¶ 116-20) fails

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

because unclean hands is a *defense* that is available only against a plaintiff that seeks affirmative relief, and is not a basis for a cause of action.  Moreover, the acts alleged to be "wrongful" acts have already been determined by a court to be proper.

DC's Second Claim transparently attempts to re-litigate issues already decided against DC in the related Superman case, *Siegel v. Warner Bros. Ent. Inc.*, C.D. Cal. Case No. 04-08400 ODW (RZx), and is barred by the doctrine of "law of the case." To the extent any issues remain, such issues are pending in the more advanced *Siegel* litigation, and should be stayed until resolved in *Siegel*.

## ARGUMENT

## I.   LEGAL STANDARD

Pursuant to F.R.C.P. 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  To survive a motion to dismiss under F.R.C.P. 12(b)(6), "a complaint must contain sufficient factual matter … to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).  Mere legal conclusions "are not entitled to an assumption of truth."  *Id.* at 1950.

## II.   DC'S FIRST CAUSE OF ACTION FAILS TO STATE A CLAIM

### A.   Shuster's Executor Holds Termination Rights Pursuant to § 304(d)

DC alleges in section (1) of its First Claim (Complaint, ¶¶ 94-98) that Joseph Shuster's termination rights do not vest in the executor of his estate, and argues that § 304(c)(2)(D) provides such rights to an executor only if an author's widow, children and grandchildren are "'not living,' but [] did at some time live."  *Id.*, ¶ 98.  Contrary to this unsupported, counter-intuitive interpretation of the Copyright Act, the Shuster termination rights properly vested in the Shuster Executor, as Joseph Shuster had neither a widow nor children.  *Id.*, ¶ 46.  DC's argument must be rejected because it: (i) contradicts the plain language of the statute; (ii) ignores binding interpretations of the phrase "not living"; (iii) conflicts with the clear congressional intent of § 304(c)(2)(D); and (iv) leads to absurd results.

## 1.    An Executor Holds Termination Rights in the Absence of a Spouse, Child or Grandchild

The plain language of the statute bars DC's interpretation.  Section 304(c)(2) provides that if an author dies and there is no widow, child or grandchild to exercise the author's termination rights, such rights vest in the author's executor:

> "Where an author is dead, his or her termination interest is owned, and may be exercised, as follows: ….
> (D)    In the event that the author's widow or widower, children and grandchildren are not living, the author's executor, administrator, personal representative, or trustee shall own the author's entire termination interest."

17 U.S.C. § 304(c)(2).  Courts interpret a federal statute by looking at the "the language of the statute," and "[w]hen the words of a statute are unambiguous, judicial inquiry is complete."  *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 720 (9th Cir. 2003).  Read as a whole, § 304(c)(2) establishes four classes of statutory heirs who may exercise termination rights:  (1) widow or widower, (2) children, (3) grandchildren, and (4) if there is no widow or widower, children, or grandchildren, the executor, personal representative, or another administrator of the author's estate.  17 U.S.C. § 304(c)(2).  Accordingly, this Court has already acknowledged that the Shuster Executor has termination rights under § 304(c)(2):

> "As executor of the Shuster estate, [Mark Warren Peary] is entitled, under changes made to the 1976 termination provisions by the 1998 … Copyright Term Extension Act, to make the same termination claims for the Superman copyright that Shuster or his heirs would have been entitled to bring beforehand.  *See* 17 U.S.C. § 304(c)(2) …."

*Siegel v. Warner Bros. Ent. Inc.* ("*Siegel I*"), 542 F. Supp. 2d 1098, 1114 n.3 (C.D. Cal. 2008); Request for Judicial Notice ("RJN"), Ex. H.  As explained in *Nimmer on Copyright*, the leading copyright treatise:

> "What … if, upon the death of an author … there is no surviving spouse, and no surviving children or grandchildren?  Under the 1976 Act at its passage, the result was that no one could exercise the right of termination.  That harsh result persisted for the current Act's first two decades.  Then in the [1998] Copyright Term Extension Act, Congress ameliorated that result.  Effective from October 27, 1998 onward, *the termination right, instead of lapsing in these circumstances, belongs to 'the author's executor, administrator, personal representative, or trustee*.'"

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

M. Nimmer & D. Nimmer, 3 *Nimmer on Copyright* ("*Nimmer*") § 11.03[A][2][a] at
11-40.1-11.40.2 (emphasis added).  DC admits that Mark Warren Peary is the Court-
appointed personal representative of Joseph Shuster's estate.  Complaint, ¶¶ 18-19.
As such, he properly holds termination rights under § 304(c)(2)(D).

### 2. The U.S. Supreme Court's Interpretation of Parallel Sections of the Copyright Act Contradicts DC's Allegations

DC's argument that "not living" under § 304(c)(2)(D) means 'once living, now
deceased' contradicts the accepted interpretation of "not living" under the Copyright
Act.  The termination provisions of §§ 304(c) and (d) provide an author or his estate
with the right to recapture a copyright for its extended *renewal* term.  17 U.S.C. §
304(c) (termination "of a transfer or license of the renewal copyright"). The related
sub-section dealing with those persons entitled to the *renewal* copyright, § 304(a),
uses "not living" language identical to that found in § 304(c)(2)(D):

> "(a)  Copyrights in Their First Term on January 1, 1978.....
>  (C)  In the case of any other copyrighted work....
>          (i)   the author of such work....
>          (ii)  the widow, widower, or children of the author....
>          (iii) the author's executors, if such author, widow, widower, or children
>          *are not living*....
>      shall be entitled to a renewal and extension of the copyright...."

17 U.S.C. § 304(a) (emphasis added).  Under DC's twisted interpretation of "not
living," a renewal copyright would not vest in the executor of an estate under §
304(a)(1)(C)(iii) unless the author was first survived by a spouse or child, and both
thereafter died.  Yet the courts have *consistently* held that copyrights are owned by an
author's estate under § 304(a)(1)(C)(iii) (formerly §24 of 1909 Copyright Act), even
if the author had *no spouse or children*.

In the landmark U.S. Supreme Court case *Stewart v. Abend*, 495 U.S. 207, 212
(1990), the renewal copyright for Cornell Woolrich's story "It Had to Be Murder"
was held to have vested in the executor of the Woolrich estate, as Woolrich had no
widow or children.  *Id.*  But under DC's statutory interpretation of "not living," the
renewal copyright in the story would not have vested in anyone.  *See also Miller*

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Case 2:10-cv-03633-ODW-RZ Document 47-5 Filed 08/31/10 Page 14 of 34 Page
ID #:3255
Case 2:10-cv-03633-ODW-RZ Document 35 Filed 08/13/10 Page 15 of 33 Page ID #:864

*Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373, 374–75 (1960) (construing the phrase "if such author, widow, widower, or children be not living" to mean "leaving no widow, widower, or children," and granting rights to the author's estate where he had no wife or children).[1] DC's argument must be rejected, as the identical phrase "not living" in the related renewal (§ 304(a)(1)(C)(iii)) and termination (§ 304(c)(2)(D)) provisions must be interpreted consistently with one another. *See Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 880 (9th Cir. 2001) (a statute is be read as a whole, as "[n]o statutory provision is written in a vacuum").

### 3.  DC's Interpretation Would Lead to Absurd Results

DC's self-serving interpretation would lead to patently absurd results.  Section 304(c)(2)(D) plainly states that the termination right is owned by the executor "[i]n the event that the author's widow or widower, children ***and*** grandchildren are not living" (emphasis added).[2]  DC's theory that "not living" means 'once alive but now dead' would result in the termination right vesting in an executor only if the author had a widow/widower, children ***and*** grandchildren, ***and*** all those people had died. Thus, in DC's view, the termination right would not vest in the author's executor if: (a) the author had a spouse and children who were deceased, but the author did not have grandchildren; (b) the author had a deceased spouse, children and grandchildren, but the author's spouse died before the author, as there would be no "widow/widower"; (c) if the author had deceased children and grandchildren, but had never married; or (d) if the author had married but was subsequently divorced, as, again, there would be no "widow/widower."  As "courts will not interpret a statute in a way that results in an absurd or unreasonable result," DC's nonsensical interpretation must be rejected.  *Silvers v. Sony Pictures Entertainment, Inc.*, 402

---

[1] *See also Venegas-Hernandez v. Asociacion de Compositores y Editores de Musica Latinoamericana*, 424 F.3d 50, 54 (1st Cir. 2005) (renewal copyrights pass to the executor under § 304(a)(1)(C)(iii) "for disposition in accordance with [the author's] will"); *Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364, 373-75 (S.D.N.Y. 1999) (rejecting argument that "not living" means "deceased," and holding that "if such author, widow, widower or children are not living" includes situations where the author never had a spouse or child).

[2] DC misquotes § 304(c)(2)(D) as saying that the executor owns the termination right if "the author's widow or widower, children **or** grandchildren are not living."  *Id.*, ¶ 98 (em. add.).

Case 2:10-cv-03633-ODW-RZ Document 47-5 Filed 08/31/10 Page 15 of 34 Page
ID #:3256
Case 2:10-cv-03633-ODW-RZ Document 25 Filed 08/13/10 Page 14 of 33 Page ID #:865

F.3d 881, 900 (9th Cir. 2005).  *See Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 509 (1989) (an interpretation of a statute is disregarded when it "compels an odd or absurd result").

### 4.    DC's Argument Contradicts the Statute's Clear Intent

DC's interpretation violates the clear legislative intent of the 1998 Copyright Term Extension Act, and leads to precisely the sort of "harsh result" that § 304(c)(2) (D) was meant to avoid.  3 *Nimmer* § 11.03 at 11-40.1.  The 1998 amendments to § 304 were intended to allow "the original authors of works and their beneficiaries to benefit from the extended [renewal] copyright protection."  H.R. Rep No. 105-452, 105th Congress, 2d Sess. ("H.R. Rep. 105-452"), at 8 (1998).  The reasonable interpretation of § 304(c)(2) as amended in 1998 is that Congress intended to give termination rights to widows and children and grandchildren if they existed, and to otherwise allow the author to bequeath termination rights by will or testament, just as Congress had done in § 304(a) with respect to renewal copyrights.  This result accords with Congress' stated intent that an author's executor would own his termination interest.  *See* H.R. Rep No. 105-452 at 8 (the amendments "allow[] an author's executor to receive his entire termination interest in the event that the author's widow, widower, children or grandchildren are not living").

If the executor holds the termination interest, then the author can instruct the executor to dispose of the proceeds from such interest pursuant to his estate plan.  *See Miller Music Corp.,* 362 U.S. at 376 ("[A]n executor usually takes [possession] in a representative capacity" and "represents the person of his testator."); *Estate of Simoncini*, 229 Cal. App. 3d 881, 888–89 (1991) ("The basic rule in the interpretation … of any will is that the intention of the testator must be carried out….").  DC's incorrect construction would mean that heirs of an author who happened to have no spouse or children (*e.g.,* a former spouse, a long-term but unmarried partner, a child raised but not adopted) could not benefit from the termination interest, even if the author had provided for such benefit in his will.  This must be rejected, as it

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

contradicts the clear Congressional intent that the termination rights "were designed to assure that its new benefits would be for the authors and their heirs." *Classic Media, Inc. v. Mewborn* ("*Mewborn*"), 532 F.3d 978, 984 (9th Cir. 2008).

### 5. Shuster's Termination Rights Expired Under the Plain Meaning of § 304(d)

To further circumvent the Shuster Executor's termination right under § 304(d), DC engages in a similar linguistic sleight of hand by alleging that "Shuster's termination right ceased to exist on his death," and was "extinguished," as opposed to having "expired" – the word used in § 304(d).  DC argues that to have "expired," the termination window must have "opened and closed" while the author or his widow/children/grandchildren were alive.  Complaint, ¶ 97-98.  That is nonsense.  Shuster's termination window opened in October 1984, while he was alive, and "expired" with his death in 1992.  *Id.*, ¶¶ 96-97.  *Nimmer* agrees, stating that § 304(d) was designed to "correct the imbalance arising from the fact that the author (or his heirs) failed to terminate previously, whether through neglect *or inability*."  3 *Nimmer* § 11.05[B][2] at 11-40.12 (emphasis added).  *Nimmer* points out that such "inability" could arise "because no one was alive to effectuate termination" and that the 1998 Act "solves that latter situation, as well," through the addition of § 304(c)(2)(D).  *Id.* at n.25.[3]  *See also* 67 Fed. Reg. 69134, 69135 (the Copyright Office states, without conditions, that "the termination right will have 'expired,' see 17 U.S.C. § 304(d), 59 years after copyright was secured").

### B. The 1992 Agreement Was Not a Revocation and/or Regrant of Superman Copyrights and Does Not Affect Termination Rights

Section (2) of DC's First Claim (Complaint, ¶¶ 99-104) argues that the 1992

---

[3] Furthermore, § 304(c)(2)(D), which allows an executor to exercise termination rights, and § 304(d), which permits termination of grants to works copyrighted before October 1939, were both added by the 1998 Copyright Term Extension Act, and § 304(d)(1) expressly incorporates § 304(c)(2).  DC's interpretation would make this incorporation nearly meaningless, as:  (1) an author of a pre-1939 work would likely have died prior to 1998; (2) an author who died without a widow/children/grandchildren would have his termination rights "extinguished"; and (3) his executor could not exercise rights under § 304(c)(2)(D), as the rights would have been "extinguished."  Such a harsh result contravenes the remedial intent of the 1998 amendments.  *See* 3 *Nimmer* § 11.03 at 11-40.1; Section II.B.1, *infra*.

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

1  Agreement between DC, Frank Shuster and Jean Peavy bars termination.  However,

2  the 1992 Agreement had no effect on the Shuster Executor's termination of Joseph

3  Shuster's operative pre-1978 copyright grants to DC's predecessor.  DC's argument

4  fails for many reasons.  The one-page 1992 Agreement did not affect termination

5  rights, but instead merely purported to quitclaim to DC any rights of, and to release

6  DC from any claim by, Frank Shuster or Jean Peavy as to Joseph Shuster's works:

7

8  "[T]his agreement fully settles all claims to any payments or other rights or remedies which *you* [Jean Peavy/Frank Shuster] may have under any other agreement or otherwise, whether now or hereafter existing regarding any

9  copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon.

10  In any event, ***you*** now grant to us any such rights and release us, our licensees and all others acting with our permission, and convenant not to assert any claim

11  of right, by suit or otherwise, with respect to the above, now and forever...."

12  RJN, Ex. A (emphasis added).[4]

13  Shuster's siblings, who signed the 1992 Agreement, have never held any

14  termination rights.  Complaint, ¶ 97-98.  The 1992 Agreement cannot bar the Shuster

15  Executor from exercising the termination rights that only he holds, because he was

16  not a party to the agreement, and would not even be appointed by the probate court

17  for another 11 years.  Even if the Shuster Executor had been a party to the 1992

18  Agreement, it still could not bar termination because:  (i) the agreement did not

19  mention or purport to affect termination rights; (ii) in 1992 no one held a termination

20  right regarding Shuster's copyright grants, and the executor of an estate, such as the

21  Shuster Executor, was not given termination rights until the 1998 amendment to the

22  Copyright Act; (iii) even if the 1992 Agreement had purported to waive (non-

23  existent) termination rights, it would be unenforceable under § 304(c)(5)  as an

24  "agreement to the contrary"; (iv) even if the agreement had purported to convey

25

26  [4] On a Rule 12(b)(6) motion, it is proper for a court to take judicial notice of documents referenced in, but not attached to, the complaint.  *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-06 (9th Cir. 1997) (holding that "documents critical to plaintiff's claims, but not explicitly incorporated in his complaint" may be judicially noticed and considered by a district court

27  on a motion to dismiss).  As both the 1992 Agreement (Complaint, ¶¶ 161-166) and the

28  Shuster Termination notice (*id.*, ¶¶ 79-88, 92-151) are heavily referenced and described in the Complaint, this Court may properly take judicial notice of such documents.  RJN, Exs. A, C.

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

(non-existent) termination interests, it would be void under § 304(c)(6)(B), which forbids any such conveyance before the termination interest vests through service of a notice of termination (in this case, in 2003); and (v) the limited exception to the statutory bar on "agreements to the contrary" (which applies only if the copyright owner and grantee expressly revoke prior grants, and then expressly regrant the copyrights) is inapplicable, as (a) the agreement contains no language of revocation or regrant, and (b) the revocation/regrant procedure is permitted only after the 5-year termination 'window' has opened, whereas here, no termination right existed in 1992.

### 1. The Shuster Executor Was Not a Party to the 1992 Agreement

The parties to the 1992 Agreement are Joseph Shuster's siblings, Jean Peavy and Frank Shuster, who have never had termination rights under the Copyright Act. Under § 304(c)(2) of the 1976 Copyright Act, Pub. L. 94-553, only an author's widow or widower, children or grandchildren held termination rights. At the time of the 1992 Agreement, Shuster was deceased, and he had no widow or children. Complaint, ¶ 46. Thus, at the time of the 1992 Agreement, ***no one*** had termination rights with respect to Joseph Shuster's works, as conceded by DC. *Id.*, ¶¶ 97-98. The parties to the 1992 Agreement could not release a termination right or convey a termination interest that they never possessed, and that did not even exist. *See Marvel Characters v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002) (holding that a 1969 settlement agreement did not bar defendant's termination right as "neither the extended copyright term nor the termination right existed at the time"). After Frank Shuster's death in 1996, the Copyright Term Extension Act of 1998, Pub. L. 105-298, expanded the categories of those who possess termination rights by adding "the author's executor, administrator, personal representative, or trustee." 17 U.S.C. § 304(c)(2)(D). After Mark Warren Peary was appointed as the Shuster Executor in 2003, he became the sole holder of termination rights. The 1992 Agreement cannot bar the Shuster Executor's exercise of termination rights because, as DC acknowledged, Mr. Peary was not a party to the 1992 Agreement and he did not even

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

become the Shuster Executor for another 11 years.  Complaint, ¶¶ 18-19, 50.

### 2. The 1992 Agreement Could Not Transfer Termination Rights

The 1992 Agreement does not purport to waive, transfer or release the Shuster termination rights, but even if it had, such would be null and void as an "agreement to the contrary" under § 304(c)(5).  The Copyright Act's termination provisions lie in stark contrast to basic contract principles as they were designed to provide authors/ heirs with relief from one-sided, unremunerative copyright grants, in recognition of the imbalance of power between authors and publishers.  *See* 3 *Nimmer* § 11.01.  In enacting this fundamental termination right, Congress expressly sought to prevent its contractual erosion.  Thus, in further abrogation of "freedom of contract" principles, Congress ensured that the termination right could not be waived, cancelled or contracted around, and that "[t]ermination of the grant may be effected *notwithstanding any agreement to the contrary*, including an agreement to make a will or to make any future grant."  17 U.S.C. § 304(c)(5) (emphasis added). Therefore, to the extent that DC alleges that the 1992 Agreement bars the exercise of the Shuster termination rights, it is an unenforceable "agreement to the contrary." *See Simon,* 310 F.3d at 290 (settlement agreement that characterized a work as a non-terminable "work for hire" was an unenforceable "agreement to the contrary").

Secondly, the 1992 Agreement would be ineffective for purporting to transfer termination rights that do not vest under § 304(c)(6)(B) until exercised.  To further protect authors/heirs, Congress specified that the termination interest is inalienable and may not be transferred to the original grantee or its successor until exercised by service of a notice of termination.[5]  17 U.S.C. § 304(c)(6)(B); Section I.C, *infra*. Thus, even if the Shuster Executor had been a party to the 1992 Agreement, he could not have transferred or released the termination interest, as such did not vest until his service of the Shuster Termination in 2003.  Complaint, ¶ 79.

---

[5] Congress made the termination right inalienable to prevent a repeat of *Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643 (1943), which had frustrated the pro-author objectives of the renewal copyright by allowing publishers to prematurely acquire a renewal copyright before it vested.  *See Mills Music, Inc. v. Snyder*, 469 U.S. 153, 185–86 (1985).

10

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Case 2:10-cv-03633-ODW-RZ Document 47-5 Filed 08/31/10 Page 20 of 34 Page
ID #:3261
Case 2:10-cv-03638-ODW-RZ Document 25 Filed 08/13/10 Page 15 of 33 Page ID #:970

### 3. The 1992 Agreement Did Not Grant Superman Copyrights

DC will likely argue that it can avoid the Copyright Act's clear prohibition of "agreements to the contrary" in § 304(c)(5) under the very narrow exception established in *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005). *Milne* held that where a copyright grantor expressly revoked a pre-1978 copyright assignment and regranted all of the rights that had been previously assigned, and further expressly agreed not to exercise his termination rights, such an agreement could bar termination. *Id.* at 1040-41. However, the 1992 Agreement does not fall within the limited exception established by *Milne*.

The 1992 Agreement was not an operative grant of Shuster's Superman copyrights, which in 1992 were already in DC's sole possession. Complaint, ¶¶ 42, 100-101. As DC acknowledges, long before the 1992 Agreement, the "agreements between Siegel and Shuster, on the one hand, and [DC's predecessors], on the other, had assigned 'all' rights in Superman," and DC already "owned all rights in Superman" in 1992, as expressly held in *Siegel v. Nat'l Periodical Publ'ns, Inc.* ("*National*"), 508 F.2d 909 (2d Cir. 1974). Complaint, ¶ 42. The Shuster Executor properly terminated these operative grants under the Copyright Act. Aware of this problem, DC makes the misleading, unsupported, conclusory allegation that "[t]he 1992 Agreement operated to revoke, rescind, and replace Shuster's prior copyright grants," in an attempt to bring it within the *Milne* exception. *Id.*, ¶ 50.

However, there is absolutely no language of revocation in the 1992 Agreement as would be required. RJN, Ex. A. Any revocation of Joseph Shuster's operative copyright grants, particularly if DC attempts to use the 1992 Agreement to argue a forfeiture of statutory termination rights, would have to be clear and unmistakable. *See Mewborn*, 542 F.3d at 983; *see also Simon*, 310 F.3d at 290 ("[T]he clear Congressional purpose behind § 304(c) was to prevent authors from waiving their termination right by contract."). In both this action (*id.*, ¶¶ 29-31, 39-44, 140-41, 145-46), and the related *Siegel* action (First Amended Counterclaims

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

("Counterclaims"), *Siegel* Docket No. 42, (RJN, Ex. B) ¶¶ 10-12, 15-17, 20, 26, 29-30), DC asserts and relies heavily on the effectiveness of the original Superman grants, contrary to its frivolous and contradictory allegation elsewhere in the Complaint that the 1992 Agreement somehow revoked them.  Complaint, ¶ 50.

Nor does the 1992 Agreement contain any regrant of any copyright interest in Superman.  RJN, Ex. A.  The 1992 Agreement merely "settles all claims to any payments or other rights or remedies which [Frank Shuster and Jean Peavy] may have under any other agreement or otherwise … in any and all work created in whole or in part by your brother [Joseph Shuster]" and provides "[Frank Shuster and Jean Peavy] now grant to [DC] any such rights" that they may have had at the time.  *Id.* This is a quitclaim of any rights, not a regrant of the Superman copyrights already in DC's possession by virtue of Siegel and Shuster's operative grants.

Even if the 1992 Agreement had purported to regrant Joseph Shuster's previously assigned copyright interests, this would have no force or effect.  The leading Ninth Circuit decision on this issue, *Mewborn*, 532 F.3d at 986, held that a post-1978 grant by an author's daughter that purported to "assign" to a company *Lassie* copyrights, already assigned to the company in a pre-1978 grant, was "a nullity," with no effect on the daughter's right to terminate the operative pre-1978 grant under § 304.  The company in *Mewborn* made the same "revocation and regrant" claim as DC makes here, and the Ninth Circuit firmly rejected it.  *Id.* at 989.

This situation is nearly identical.  Frank Shuster and Jean Peavy had no Superman copyrights to grant to DC, as such copyrights had already been assigned by Jerome Siegel and Joseph Shuster in their operative pre-1978 grants.  Complaint, ¶¶ 29-31, 39-44.  Shuster's unrevoked pre-1978 grants remained subject to termination by the Shuster Executor.  DC's bald, conclusory allegations of a "revocation and regrant" are unsupported by the 1992 Agreement, and contradicts the record, DC's other allegations, and *Mewborn*.[6]

---

[6] The Court should not accept as true DC's conclusory allegations that contradict both the 1992 Agreement and DC's assertion in this and the *Siegel* action that it owns all rights in

**C.** **The Shuster Executor Was Properly the Sole Signatory to the Shuster Termination Notices**

The Shuster Termination was served on November 10, 2003, with an effective termination date of October 26, 2013.  Complaint, ¶¶ 79-81.  Section (3) of DC's first claim alleges that the Shuster Executor did not own the "more than one-half majority [of the termination] interest necessary to terminate," erroneously arguing that 50% of such termination interest was purportedly owned by Pacific Pictures Corporation ("PPC"), pursuant to PPC's 2001 and 2003 agreements with Jean Peavy and Mark Warren Peary.  *Id.*, ¶¶ 107-08.  However, the Shuster Executor clearly held the entirety of Shuster's termination interest when the Shuster Termination was executed and served in 2003, and still holds 100% of such interest.  Termination rights are held only by certain classes of people defined by statute, and PPC has never been a member of any such class.  17 U.S.C. § 304(c)(2)(A)–(D).  Moreover, the termination rights ***cannot*** be transferred prior to the effective termination date (here, 10/26/13):

> "***A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination***. …."

17 U.S.C. § 304(c)(6)(D) (emphasis added).[7]  *See* 3 *Nimmer* § 11.08[A] at 11-49 ("Neither a further grant nor an agreement to make a further grant … will be valid unless such grant or agreement is executed after the date of termination….").

DC's erroneous allegations that the "Pacific Pictures Agreements," executed in 2001 and 2003, and cancelled nearly six years ago in 2004, transferred the Shuster Executor's termination rights (Complaint, ¶¶ 86, 105-11) are disingenuous and misleading.  DC itself acknowledges elsewhere in its Complaint that "[§]

---

Superman under operative pre-1978 grants.  *See Barnett v. Evans*, 2009 U.S. Dist. LEXIS 30388, at *13 (N.D. Cal. 2009) ("A court … is not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint."); *Young v. Mandeville*, 2006 U.S. Dist. LEXIS 63959, at *7 (E.D. Cal. 2006) ("[A] court is not required to accept … allegations that contradict facts which may be judicially noticed.").

[7] Pursuant to 17 U.S.C. § 304(c)(6)(D), the sole exception to this rule is that *after the service of a termination notice* but before the effective date of the termination, "an agreement for such a further grant may be made … with the original grantee [or its successor-in-interest – *i.e.,* DC]."  Complaint, ¶ 154.  PPC is not the original grantee or its successor, DC.

13

Case 2:10-cv-03633-ODW-RZ Document 47-5 Filed 08/31/10 Page 23 of 34 Page
ID #:3264
Case 2:10-cv-03633-ODW-RZ Document 25 Filed 06/09/10 Page 22 of 33 Page ID #:173

304(c)(6)(D) provides: 'A further grant … of any right covered by a terminated grant is valid if it is made after the effective date of termination,'" and that "until October 26, 2013 … DC is the sole party that can enter into an agreement with the Shuster Heirs for the rights sought to be terminated." *Id.*, ¶¶ 154-55. Thus, as a matter of law neither the PPC agreements nor the Shuster Executor could transfer his termination interest prior to the October 26, 2013 termination date. Accordingly, the Shuster Executor, the sole party entitled to exercise termination rights, retained the entire termination right, and correctly served the Shuster Termination bearing his signature. RJN, Ex. C at 13.

## D. The 1948 Consent Agreement Is Irrelevant to the Termination

### 1. This Court Already Held That the Consent Judgment Was Not a Copyright Grant and Need Not Be Listed

Contrary to DC's assertions in section (4) of its First Claim (Complaint, ¶¶ 112-115), the May 21, 1948 consent judgment in the Westchester Action ("May 21 Consent Judgment") has no bearing on the Shuster Termination.[8] Judge Larson has already decided that the May 21 Consent Judgment was not a copyright grant and did not affect the validity of notices terminating Siegel and Shuster's Superman copyright grants. In *Siegel*, DC made the exact same argument regarding the May 21 Consent Judgment as to the Siegel Termination, which this Court roundly rejected:

> "The consent judgment at issue did not effectuate any transfer of rights from Siegel and Shuster to Detective Comics. If any rights were transferred as a result of the Westchester action, such a transfer was effectuated by the execution of the earlier stipulated agreement of the parties, not a document created two days later which simply memorialized the transfer that the stipulation itself had accomplished. The binding nature of the transfer contained in the stipulation was completed the moment that agreement was executed. The consent judgment, was a mere formality whose execution (or lack thereof) did not detract from the otherwise binding nature of the parties' earlier agreement. It merely parroted what was already agreed to by the parties in the stipulation itself."

542 F. Supp. 2d at 1131; RJN, Ex. H. This Court also ruled that, even if the May 21

---

[8] The 1992 Agreement was also excluded from the termination notices because it is ineffective as a matter of law to transfer Joseph Shuster's copyright interests already in DC's possession. *See* Complaint, ¶¶ 112, 115; 37 C.F.R. § 201.10(b)(iv) (requiring termination notices to identify the grants to be terminated).

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Consent Agreement could be considered a grant, its absence was harmless error:

> "Here, viewing the issue in the light most favorable to [DC Comics and Warner], the 1948 consent judgment simply served to culminate or otherwise finalize the transfer of the Superman copyright achieved through the stipulation the parties reached two days earlier. That [the Siegels] only identified the latter rather than the former does not materially affect [DC's] understanding of the 'grant' sought to be affected…."

*Id.* at 1132.  As discussed more fully below regarding DC's Second Claim, this ruling is binding on DC under the "law of the case" doctrine.

## 2. The Shuster Executor Was Not Required to List the May 21, 1948 Consent Agreement As It Was Not a Copyright Grant

As Judge Larson already held, the May 21 Consent Judgment was not an operative copyright grant.  A notice of termination should include "a brief statement reasonably identifying the grant to which the notice of termination applies."  37 C.F.R. § 201.10(b)(1)(iv).  The Shuster Termination listed seven agreements that might be construed as grants, including a May 19, 1948 stipulation from the Westchester Action (the "May 19 Stipulation").  RJN, Ex. D.  The May 19 Stipulation settled the Westchester Action, and re-acknowledged DC's predecessor's ownership of Superman.  *See id.*; Complaint, ¶¶ 40, 81.  The May 19 Stipulation also provided for the May 21 Consent Judgment, which was entered two days later, incorporating the stipulation's terms.  *Id.*, ¶ 40.  Thus, to the questionable extent that a Superman copyright grant even occurred, it occurred in the May 19 Stipulation, listed in the Shuster Termination.  RJN, Ex. C at 8.  The May 21 Consent Judgment did not operate as a grant, transfer or conveyance of copyrights; it merely confirmed the May 19 Stipulation already entered into.  *Siegel I*, 542 F. Supp. 2d at 1131.

Nor were either the May 19 Stipulation or the May 21 Consent Judgment the operative grant of Superman copyrights to DC's predecessors.  A March 1, 1938 grant by Siegel and Shuster was held in the Westchester Action and the subsequent 1974 action to have conveyed all rights in Superman to DC's predecessors.  *See* Complaint, ¶¶ 31, 37-40; RJN, Ex. E, Conclusion of Law No. 1; *Siegel v. Nat'l Periodical Publications, Inc.*, 364 F. Supp. 1032, 1035, 1037–38 (S.D.N.Y. 1973),

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Case 2:10-cv-03633-ODW-RZ   Document 47-5   Filed 08/31/10   Page 25 of 34   Page
ID #:3266
Case 2:10-cv-03633-ODW-RZ   Document 33   Filed 08/13/10   Page 24 of 33   Page ID #:2875

1   *aff'd* 508 F.2d 909, 911–12.  As such, neither the subsequent May 19 Stipulation nor

2   the May 21 Consent Agreement conveyed Superman copyrights already assigned by

3   Siegel and Shuster.  *See Mewborn,* 532 F.3d at 986 (holding "language in the 1978

4   Assignment purporting to assign the … rights is a nullity," as such rights had already

5   been assigned).  Lastly, even if the May 21 Consent Agreement somehow granted

6   already-granted rights, the underlying May 19 Stipulation listed in the termination

7   notice "reasonably identifies" the parallel May 21 Consent Agreement.  37 C.F.R. §

8   201.10(b)(1)(iv); *Siegel*, 542 F. Supp. 2d at 1131.[9]

9           **E.      DC's Unclean Hands Claim Fails as a Matter of Law**

10                  **1.      Unclean Hands Is Not a Basis for a Cause of Action**

11           DC's free-standing "unclean hands" claim (Complaint, ¶¶ 116-20) is

12   inappropriate because "unclean hands is an equitable defense, not a cause of action."

13   *In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 812, 842 (N.D. Cal. 2005)

14   (dismissing cause of action for "unclean hands").  The "unclean hands" doctrine acts

15   as a defense against "plaintiffs seeking equitable relief" on an affirmative claim.

16    *Adler v. Fed. Republic of Nigeria*, 219 F.3d 869, 877 (9th Cir. 2000).  "The doctrine

17   of unclean hands does not obviously apply where it is [the plaintiff], not the

18   [defendant], who seeks relief" based on this "'defensive doctrine.'"  *Pelich v. INS*,

19   329 F.3d 1057, 1062 (9th Cir. 2003) (citations omitted).  DC's attempt to turn this

20   equitable defense into an aggressive cause of action against the Shuster Executor is

21   manifestly improper as a matter of law.[10]  Moreover, even if the "unclean hands"

22   _____

23   [9] Furthermore, as held by the Court in *Siegel*, the absence of the May 21 Consent Judgment
     is harmless error.  "Harmless errors in a notice that do not materially affect the adequacy of

24   the information required to serve the purposes of … section 304(c) … shall not render the
     notice invalid."  37 C.F.R. § 201.10(e)(1).  DC had ample notice of the Shuster Executor's

25   intention to terminate all of Shuster's prior grants, and were not prejudiced by the Shuster
     Executor not listing the May 21 Consent Judgment in addition to the parallel May 19

26   Stipulation, the operative March 1, 1938 grant and other prior agreements.  *See Music Sales
     Corp.,* 73 F. Supp. 2d at 378 (holding that a description of a grant as simply "Grant or

27   transfer of copyright and the rights of copyright proprietor, including publication and
     recording right," was insufficient to identify the grant, but was "harmless error").

28   [10] Courts have also clearly held that, like "unclean hands," the closely related defense of
     copyright and trademark "misuse" is only available as a defense, not as a cause of action.
     *See Ass'n of American Medical Colleges v. Princeton Review, Inc.*, 332 F. Supp. 2d 11, 19

                                               16
     DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

defense was a proper basis for a claim, DC's claim would still fail.

### 2. The Failure to List PPC or Superboy in the Shuster Termination Does Not Show "Unclean Hands"

#### a. PPC Owned No Termination Interest

The first part of DC's "unclean hands" argument is based on a failure to list "[PPC's] purported ownership interest in the rights ... to be terminated." Complaint, ¶ 117. As acknowledged by DC elsewhere (*id.*, ¶¶ 154-155), PPC had no such ownership interest. *See* Section II.D, *supra*. Therefore, the failure to list PPC in the Shuster Termination could not constitute "unclean hands."

#### b. The Shuster Executor Was Bound by a Court Order That Jerry Siegel Was the Sole Author and Owner of Superboy

The second part of DC's "unclean hands" claim is based on the Shuster Executor's decision not to include the separate Superboy character in his termination. DC cannot plausibly maintain its allegation that the Shuster Executor "compromised the integrity of the Copyright Office and judicial system by crafting the Shuster Termination Notice" to exclude Superboy (Complaint, ¶ 120), because the Shuster Executor was bound by prior judicial determinations that Siegel was the sole author and owner of Superboy. *Compare id.*, ¶¶ 118-20 *with National*, 508 F.2d at 913-14.

In the 1930s, Siegel and Shuster created Superman, which they ultimately sold to DC's predecessor, Detective Comics ("Detective"). *See* Complaint, ¶¶ 27-31; RJN, Ex. E, Findings of Fact ("FF") and Conclusions of Law ("COL")), FF ¶¶ 9–10, 24–29, 44–45. In 1938, Siegel, acting alone, developed the idea, conception and plan for Superboy, and submitted it to Detective, which rejected the proposed comic. *Id.*, FF ¶¶ 156–59. In December 1940, Siegel submitted another Superboy proposal, with a complete script containing the continuity, plan and dialogue for a Superboy comic,

---

(D.D.C. 2004) ("Because the policy reasons underlying the development of the equitable doctrine of copyright misuse are grounded in the unclean hands doctrine, permitting copyright misuse as an independent, affirmative claim would be contrary to the ... doctrine."); *Dunn Comp. Corp. v. Loudcloud, Inc.*, 133 F. Supp. 2d 823, 830 (E.D. Va. 2001) ("Trademark misuse is not an independent cause of action, but is, instead, only an affirmative defense to a trademark infringement claim. Because no trademark infringement claim has yet been asserted against plaintiff, there is no occasion here for ... [the] defense.").

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

which Detective again rejected.  *Id.*, FF ¶¶ 160-62.  Four years later, while Siegel was off fighting for his country, Detective published Superboy in *More Fun Comics*, No. 101, and in subsequent comics, based on Siegel's material, but without his consent. *Id.*, FF ¶¶ 162, 164-65.  In 1947, Siegel and Shuster brought the Westchester Action jointly asserting rights to Superman.  However, Siegel individually claimed that Detective had no right to publish Superboy, and that Superboy belonged to Siegel. *Id.*, COL ¶¶ 25–26.  The presiding referee found that Siegel was the sole creator of Superboy, and that Siegel had the exclusive right to create, sell and distribute Superboy, and enjoined Detective from publishing Superboy.  *Id*.  In the 1970s, when Siegel and Shuster brought suit against DC's predecessor, the Second Circuit treated the findings and conclusions in this Westchester Action as binding and preclusive. *National,* 508 F.2d at 913-14.

The Siegel Termination therefore credits Superboy as the sole creation of Jerry Siegel because, as held in the Westchester Action, Siegel **was** the sole author of the script that established Superboy, a script never illustrated by Shuster.  Thus, the Shuster Executor did not seek to terminate Superboy works.  As the Siegel and Shuster terminations accurately reflect the Westchester Action, found in *National*, 508 F.2d at 914, to have preclusive effect, there is no plausible legal or factual basis for DC to assert "unclean hands" for not listing Superboy in the Shuster Termination.

### c.   The Superboy Works Could Not Have Been Included in the Shuster Termination In Any Event

DC's "unclean hands" claim is based on the omission of Superboy from "the Shuster Termination Notice."  Complaint, ¶¶ 118-120.  However, the Shuster Termination was served pursuant to 17 U.S.C. § 304(d) (Complaint, ¶ 81) and Superboy could not have been terminated under § 304(d) as a matter of law.  As DC acknowledges, the first Superboy story was published in *More Fun Comics, No. 101* in November 1944 (RJN, Ex. E, FF ¶ 163; Complaint, ¶¶ 37-38, 118).  Superboy therefore first secured a statutory copyright by publication in 1944.  *Id.*, ¶ 75.

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Case 2:10-cv-03633-ODW-RZ Document 47-5 Filed 08/31/10 Page 28 of 34 Page
ID #:3269
Case 2:10-cv-03633-ODW-RZ Document 35 Filed 08/13/10 Page 27 of 33 Page ID #:2678

However, only a copyrighted work "subsisting in its renewal term on the effective

date of the … Copyright Term Extension Act [*i.e.*, October 27, 1998] for which the

termination right provided in subsection (c) has expired by such date" can be

terminated under 17 U.S.C. § 304(d).  The Copyright Office has clarified that §

304(d) applies only to "works for which copyright was secured between January 1,

1923, and October 26, 1939."  67 Fed. Reg. 69134, 69135 (Nov. 15, 2002).  The

Shuster Termination properly covered only those works that had secured copyright

within this § 304(d) termination window.  *See* Complaint, ¶ 83 (listing works covered

by the Shuster Termination); RJN, Ex. C at 6-7 (listing only works that secured

copyright between 1933 and October 25, 1938).  Superboy, which first appeared in

November **1944,** after this October 26, **1939** cut-off**,** clearly fell outside the scope of

works that could be terminated by the Shuster Termination. Accordingly, its omission

cannot constitute "unclean hands."[11]

## III.  DC's SECOND CAUSE OF ACTION MUST BE DISMISSED AS IT SEEKS TO RE-LITIGATE MATTERS ALREADY DECIDED

### A.  DC Ignores the Past Six Years of Litigation in the *Siegel* Action

DC's Second Claim is nothing more than an attempt to re-litigate the serious

setbacks DC has suffered in the *Siegel* case:  the Siegel Termination has been held

valid as to the comic books *Action Comics, Nos. 1, 4* and portions of *Superman, No.

1*, as well as the first two weeks of the *Superman* newspaper strips.  *See Siegel v.

Warner Bros. Ent. Inc.*, 542 F. Supp. 2d 1098, 658 F. Supp. 2d 1036 (C.D. Cal. 2009)

("*Siegel II*") (RJN, Ex. I), 690 F. Supp. 2d 1048 (C.D. Cal. 2009) ("*Siegel III*") (RJN,

Ex. J).  These works comprise the essential core of the Superman mythos, and

include Superman's origin on Krypton, his iconic costume and super-powers, his

"alter ego," Clark Kent, and his relationship with feisty reporter Lois Lane.  *Siegel I,*

---

[11] Furthermore, the Siegels had an independent right to claim sole ownership of Superboy
based on the preclusive findings in the Westchester Action cited above.  The Siegels served
their Superboy notice of termination on November 8, 2002 before service of the Shuster
Termination on November 10, 2003.  Complaint, ¶¶ 73, 79.  Even if the subsequent Shuster
Termination had included Superboy (it could not have), DC would still have had to defend
against the Siegels' claim based squarely on the Westchester Action.

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

1   542 F. Supp. 2d at 1126; *Siegel II*, 658 F. Supp. at 1063-83; RJN, Exs. H-I.

2         Unhappy with having to account to the Siegels for the use of these valuable

3   Superman elements, DC ignores this Court's three published opinions in *Siegel*, and

4   attacks the "mirror image" Shuster Termination on many of the same grounds as it

5   unsuccessfully attacked the Siegel Termination, in a transparent effort to re-litigate

6   issues thoroughly litigated in *Siegel*.  However, DC is barred by the "law of the case"

7   doctrine.  As Siegel and Shuster co-authored the works in question, any decisions

8   about the validity and effect of the Siegel Termination with respect to such works

9   apply to the twin Shuster Termination.  With *Siegel* largely decided, DC's Complaint

10  cannot be used to brush aside the past six years of hard-fought litigation at the

11  expense of considerable judicial resources, or as an "appeal" at the trial court level.

12        **B.**   **The "Law of the Case" Doctrine Bars DC's Attempt to Re-Litigate**

13        DC's Second Claim is barred by the "law of the case" doctrine, which stands

14  for the common-sense principle that the same *issue* presented a second time in the

15  same court should lead to the same result, as to do otherwise "would create

16  intolerable instability for the parties."  *Ridgeway v. Mont. High School Ass'n*, 858

17  F.2d 579, 587-88 (9th Cir. 1988).  Thus, "a court is generally precluded from

18  reconsidering an issue that has already been decided by the same court, or a higher

19  court."  *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993).  "Where litigants have

20  once battled for the court's decision, they should neither be required, nor without

21  good reason permitted, to battle for it again."  *Disimone v. Browner*, 121 F.3d 1262,

22  1266-67 (9th Cir. 1997) (applying "law of the case" doctrine to related cases).  The

23  "law of the case" doctrine reflects "the respect that one judge or court owes the

24  rulings of another judge or court in the same or closely related cases."  18 Wright,

25  Miller & Cooper, *Federal Practice and Procedure* § 4478 at 788 (1981).[12]  A court

26  may depart from this doctrine only if "(1) the first decision was clearly erroneous; (2)

---

27  [12] *See Moss v. Crawford & Co.*, 201 F.R.D. 398, 401 n. 1 (W.D. Pa. 2000) (law of the case

28  doctrine applies to issues determined in "closely related" cases); *Mason v. Texaco, Inc.*, 741
    F. Supp. 1472, 1492 (D. Kan. 1990) (the "law of the case doctrine 'encompasses … the
    rulings of another judge or court in … a closely related case'"); *Ovadia v. Top Ten Jewelry
    Corp.*, 2005 U.S. Dist. LEXIS 16784 at *3 (S.D.N.Y. Aug. 12, 2005) (same).

20

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Case 2:10-cv-03638-ODW-RZ Document 25 Filed 08/13/10 Page 29 of 30 Page ID #:980

an intervening change in the law has occurred; (3) the evidence on remand is substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would otherwise result." *Thomas*, 983 F.2d at 155. Absent such conditions, failure to adhere to the "law of the case" doctrine is an abuse of discretion. *Id.*

This related action is plainly subject to the rulings in *Siegel* under the "law of the case" doctrine. DC conceded that these actions are very closely related, and filed on May 14, 2010 a Notice of Related Cases certifying that this case is related to *Siegel* because it "(1) arise[s] in part from the same or closely related events; (2) call[s] for the determination of similar issues of law and fact; (3) would entail substantial duplication of labor if heard by different judges; and (4) involve[s] many of the same copyrights." *See* Docket No. 4, at 1:14-17. DC similarly admitted that "the scope and ownership of a variety of Superman-related copyrights is at issue in all three actions, as are historical facts concerning the creation of Superman and its exploitation in a variety of media," and that "at issue in all three actions are common legal theories and defenses, and overlapping issues of material fact." *Id*. at 2:3-7.

Moreover, the Complaint's Second Claim as to the alleged "limited scope" of the Shuster Termination is nearly identical to DC's Fifth Counterclaim, for a "declaration of limitations on the scope" of the Siegel Termination, in *Siegel*. *Compare* Complaint, ¶¶ 140-49 *with* Counterclaims (RJN, Ex. B), ¶¶ 106-20, 132-35. DC's Second Claim herein tackles the same subjects regarding the scope of the terminations addressed in DC's Fifth Counterclaim in *Siegel*, including the effect of so-called "Promotional Announcements" ("Ads") and whether the terminations recapture derivative works. *Compare* Complaint, ¶¶ 142-43, 147-49 *with* Counterclaims (RJN, Ex. B), ¶¶ 109-13, 118-20, respectively. The Court's prior binding rulings in *Siegel* already analyzed in great detail and decided the issues in the Second Claim.[13]

---

[13] The Complaint contains nearly identical factual allegations as DC's October 14, 2005 First Amended Counterclaims regarding the creation of *Superman* and *Action Comics, No. 1*. *Compare* Complaint, ¶¶ 124-37 *with* Counterclaims (RJN, Ex. B), ¶¶ 7-8, 10-18, 20-22.

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

## 1.    Work For Hire

DC's Second Claim repeats DC's losing argument that the first Superman story published in *Action Comics, No. 1* and other Superman works were "works made for hire," exempt from termination (Complaint, ¶¶ 140-41, 145-46), when this was heavily litigated, thoroughly considered and rejected by this Court.  *See Siegel I*, 542 F. Supp. 2d at 1126-30; *Siegel II*, 658 F. Supp. 2d at 1063-68, 1083.[14]

DC's claim, as before, is foreclosed by the Second Circuit's decision in *National*, 508 F.2d at 914, that *none* of *Action Comics, No. 1* was "work for hire":

> "In the case before us, Superman and his miraculous powers were completely developed long before the employment relationship was instituted. The record indicates that the revisions directed by the defendants were simply to accommodate Superman to a magazine format. We do not consider this sufficient to create the presumption that the [comic book] was a work for hire."

Moreover, this Court properly held that DC is collaterally estopped by this decision:

> "Defendants argue that portions of the copyrightable material contained in *Action Comics*, Vol. 1, are unaffected by the termination notice because those portions belong exclusively to them as "works for hire," arguing that certain material … was created by Detective Comics' in-house employees, or … was added to the underlying Superman material by Siegel and Shuster at the publisher's direction….  The thrust of defendants' argument was made and rejected by the Second Circuit in the 1970s … and is thus precluded as a matter of collateral estoppel here."

*Siegel I*, 542 F. Supp. 2d at 1127.  This Court also ruled on the remaining Superman works created by Siegel and Shuster, holding that portions of *Action Comics, No. 4* and *Superman, No. 1*, and the first two weeks of the *Superman* newspaper strips, were *not* "works for hire," but that "the remainder of the Superman material at issue … published from 1938 to 1943" were "works for hire."  *Siegel II,* 658 F. Supp. 2d at 1095.[15]  Both sides filed motions for reconsideration of this ruling, which were

---

[14] DC's tactic is laid bare by its claim that *all* of *Action Comics, No. 1* was a "work for hire," whereas in *Siegel* DC claimed only minimal "Additional Action Comics No. 1 Materials" were "work for hire."  *Compare* Complaint, ¶ 133 *with* First Amended Counterclaims, ¶ 132. *See also* RJN, Ex. F at 37:13-15 ("DC is the copyright proprietor of *a portion* of *Action Comics* No. 1 which was created after Siegel and Shuster's preexisting material and as a work made for hire….") (emphasis added).

[15] DC also advances a convoluted argument that "Unpublished Superman Works," created c. 1934-35 were published as part of, and are therefore somehow themselves, "works for hire."  Complaint, ¶¶ 140-41.  But this Court has already indisputably held that Superman

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

denied.  *Siegel III,* 690 F. Supp. 2d 1048.  These rulings are the "law of the case" as
to whether the works were "made for hire," and are binding on the parties here.

## 2.        Promotions

DC similarly tries to re-litigate the issue of the "Promotions" ("Ads") in its
Complaint (¶¶ 142-44), completely ignoring that this Court has already ruled that
although the Ads were not terminated by the Siegels (*Id.* at 1118-26), the scope of
DC's resulting copyright interest is extremely limited, as the Ads depicted only "the
image of a person with extraordinary strength who wears a black and white leotard
and cape" and contained "[o]bviously nothing concerning the Superman storyline
(that is, the literary elements contained in *Action Comics,* Vol. 1)… thus, Superman's
name, his alter ego, his compatriots, his origins, his mission to serve as a champion of
the oppressed, or his heroic abilities in general, do not remain within defendants sole
possession to exploit."  *Id.* at 1126.  Judge Larson further limited the Ads's scope:

> "What remains of the Siegel and Shuster's Superman copyright that is still
> subject to termination (and, of course, what defendants truly seek) is the
> entire storyline from *Action Comics,* Vol. 1, Superman's  distinctive blue
> leotard (complete with its inverted triangular crest across the chest with a red
> 'S' on a yellow background), a red cape and boots, and his superhuman
> ability to leap tall buildings, repel bullets, and run faster than a locomotive,
> none of which is apparent from the announcement."

*Id.*  Unhappy with this ruling, DC moved for reconsideration, which was denied on
July 3, 2008.  RJN, Ex. K.  The "Court affirm[ed] its conclusion on the scope of the
copyrightable material contained in [the Ads]."  *Id.* at 3-4.  DC now tries for the ***third***
time to litigate the limited scope of the Ads.  Complaint, ¶¶ 142-44.[16]

However, these rulings are the "law of the case," which applies with equal
force to a *related* case such as this, and must not be revisited.  *See Disimone*, 121
F.3d at 1266-67.  The underlying facts here are identical to those in *Siegel*, and
concern the statutory termination of the same copyright grants to the same Superman
works by Siegel and Shuster.  DC has not alleged any new facts or evidence that it

---

material created before March 1938 was <u>not</u> work for hire.  658 F. Supp. 2d at 1061.

[16] Judge Larson also ruled that DC is entitled to continue to exploit pre-existing "unaltered
derivative works" created before the effective date of termination, resolving DC's complaint
as to that issue as well.  *Compare* Complaint, ¶¶ 147-49 *with* 542 F. Supp. 2d at 1142.

1  did not offer or could not have offered previously, as the pertinent events occurred in

2  the 1930s.  There has been no "change in circumstances" or of the governing law that

3  overrides the "law of the case" of this Court's prior orders.  *Thomas*, 983 F.2d at 155.

4  Nor has DC alleged that the extensive prior published opinions are "clearly

5  erroneous," or result in a "manifest injustice."  *Id*.  Indeed, DC freely cites such

6  rulings to the extent that they are in its favor.  *See* Complaint, ¶ 146, n.5.

7  Accordingly, the following sub-parts of the Second Claim – sections a. "Unpublished

8  Superman Works" (*id.*, ¶¶ 140-41); b. "Promotions" (*id.*, ¶¶ 142-44); c. "Works for

9  Hire" (*id.*, ¶¶ 145-46); and d. "Derivative Works" (*id.*, ¶¶ 147-49) – must be

10  dismissed pursuant to the "law of the case" doctrine.[17]

11  ### C.    This Action Should Be Stayed Pending the Outcome in *Siegel*

12  The *Siegel* action (C.D. Cal., Case No. 04-CV-08400) commenced on October

13  8, 2004, and is in a far more advanced stage than this recently filed related action.  In

14  *Siegel*, DC's liability to the Siegels (as co-owners of the recaptured Superman

15  copyrights) has been established, and an "accounting trial" to determine the Siegels'

16  Superman profits is pending.  To the extent that any issues remain in DC's Second

17  Claim, such shared issues should first be decided in *Siegel*, and the duplicative

18  Second Claim should be stayed until *Siegel* is completed.

19  The sole remaining issue in the Second Claim that has not already been fully

20  adjudicated in *Siegel* is in sub-part "e" (Complaint, ¶¶ 150-151).  This issue will

21  necessarily be decided first in *Siegel*, as it concerns which Superman elements are

22  contained in *Action Comics, No. 1*, and in the other recaptured Superman works for

23  which DC must account in *Siegel*.  Such issue should be stayed here, pending its

24  decision by the trier of fact in the more advanced *Siegel* case.  DC will not be

25

26  ---

[17] Furthermore, if the Court grants the pending Rule 54(b) motion by plaintiffs in the *Siegel*
litigation, DC's Second Claim would also be barred by issue preclusion.  *See Continental*
27  *Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1525 (9th Cir. 1987) ("[A]
54(b) ruling in fact has res judicata ramifications.").  Such rulings have preclusive effect
28  while an appeal is pending.  *See Robi v. Five Platters, Inc.*, 838 F.2d 318, 327 (9th Cir.
1988) (pending appeals "in no way affect the 'firmness' of the [district court] decisions …
for purposes of issue preclusion").

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

prejudiced if this remaining portion of its Second Claim is stayed, as DC will have the full and fair opportunity to litigate the identical issue in *Siegel*.

A court "has broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 707 (1997). "When considering a motion to stay, the district court should consider three factors: (1) potential prejudice to the non-moving party, (2) hardship and inequity to the moving party if the action is not stayed; and (3) the judicial resources that would be saved by avoiding duplicative litigation…." *Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1360 (C.D. Cal. 1997) (staying action pending related litigation to "serve the interests of judicial economy").

After six long years of hard-fought litigation in *Siegel*, it would be highly inequitable, inefficient and wasteful to permit DC's redundant Complaint to interfere with and re-start from scratch this lengthy judicial process. In 2008, this Court held that the Siegels were entitled to a co-ownership share of Superman profits since April 16, 1999, yet DC has still not paid them one penny of these substantial profits. The Siegels will clearly be prejudiced if this action is used to delay the prosecution of their claims. DC must not be permitted to use this case as a tactic to delay, encumber or "swallow" the long pending accounting trial in *Siegel*. What remains of DC's new lawsuit should properly be stayed until *Siegel* is completed.

## CONCLUSION

For the foregoing reasons, Plaintiff's First and Second Claims for Relief should be dismissed with prejudice.

DATED: August 13, 2010        TOBEROFF & ASSOCIATES, P.C.


By _____
          Marc Toberoff

Attorneys for Defendants Mark Warren Peary,
as personal representative of the Estate of
Joseph Shuster, Joanne Siegel and Laura Siegel
Larson

25