# EXHIBIT I

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA
SIEGEL LARSON,

      Plaintiffs,

vs.

WARNER BROS. ENTERTAINMENT
INC., et al.,

      Defendants.

No. 04-8400 (RSWL)(RZx)
      -and-
No. 04-8776 (RSWL)(RZx)

AND RELATED COUNTERCLAIMS.

# ORIGINAL

DEPOSITION OF JOANNE SIEGEL

Beverly Hills, California

Wednesday, August 2, 2006

Reported by:
DAVID S. COLEMAN
CSR No. 4613

Job No. 1-50935

www.sarnoffcourtreporters.com

Irvine • Los Angeles • San Francisco

phone 877.955.3855 • fax 949.955.3854



SARNOFF
Court Reporters and
Legal Technologies

226

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4    JOANNE SIEGEL and LAURA
     SIEGEL LARSON,
5
             Plaintiffs,
6
        vs.                        No. 04-8400 (RSWL) (RZx)
7
     WARNER BROS. ENTERTAINMENT
8    INC., et al.,

9            Defendants.                        -and-
     _____
10   JOANNE SIEGEL and LAURA
     SIEGEL LARSON,
11
             Plaintiffs,
12
                                   No. 04-8776 (RSWL)(RZx)
        vs.
13
     TIME WARNER INC., WARNER
14   COMMUNICATIONS INC., WARNER
     BROS. ENTERTAINMENT INC., WARNER
15   BROS. TELEVISION PRODUCTION INC.,
     DC COMICS, and DOES 1-10,
16
             Defendants.
17   _____
     AND RELATED COUNTERCLAIMS.
18

     _____
19

20           Deposition of JOANNE SIEGEL, taken on behalf of

21   Defendants and Counterclaimants, at 9665 Wilshire

22   Boulevard, 9th Floor, Beverly Hills, California,

23   beginning at 10:04 AM and ending at 4:52 PM on Wednesday,

24   August 2, 2006, before DAVID S. COLEMAN, Certified

25   Shorthand Reporter No. 4613.

2

```
 1    APPEARANCES:

 2

 3    For Plaintiffs:

 4         LAW OFFICES OF MARC TOBEROFF
           BY:  MARC TOBEROFF
 5         Attorney at Law
           2049 Century Park East, Suite 2720
 6         Los Angeles, California 90067
           310-246-3333
 7

 8

      For Defendants and Counterclaimant:
 9

           WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
10         BY:  MICHAEL BERGMAN
           Attorney at Law
11         9665 Wilshire Boulevard, 9th Floor
           Beverly Hills, California 90212
12         310-858-7888
           mbergman@wwllp.com
13
               -and-
14
           FROSS ZELNICK LEHRMAN & ZISSU
15         BY:  ROGER L. ZISSU
           Attorney at Law
16         866 United Nations Plaza
           New York, New York 10017
17         212-813-5900
           rzissu@frosszelnick.com
18

19

      Also Present:
20
           LILLIAN LASERSON
21

22

23

24

25
```

3

1                          INDEX

2   WITNESS                          EXAMINATION

3   JOANNE SIEGEL

4

5          BY MR. ZISSU                    7, 137

6          BY MR. TOBEROFF                 137

7

8                          EXHIBITS

9   DEFENDANT                              PAGE

10  43   Letter from Joanne Siegel and Laura    43
         Siegel Larson to Paul Levitz dated
11       September 21, 2002

12  44   Letter from Martin Payson to Mrs.      62
         Jerry Siegel dated March 15, 1982
13

     45   Letter from Joanne Siegel to Joseph    67
14       Shuster dated May 27, 1986

15  46   Letter from Joanne Siegel to John      70
         Schulman dated September 14, 1995
16

     47   Letter from Paul Levitz to Joanne      72
17       Siegel dated April 15, 1999

18  48   Letter from Bruce Ramer to Carol       74
         Simkin and John Schulman dated
19       April 30, 1999

20  49   Letter from Carol Simkin to Kevin      77
         Marks dated January 6, 2000
21

     50   Letter from Carol Simkin to Kevin      78
22       Marks dated March 29, 2000

23  51   Letter from Kevin Marks to John        83
         Schulman dated July 18, 2000
24

     52   Letter from John Schulman to Kevin     85
25       Marks dated July 18, 2000

4

```
 1   INDEX (Continued:

 2                   EXHIBITS (Continued)

 3   DEFENDANT                                      PAGE

 4   53   Reply to First Amended Counterclaims     86
          in USDC Case No. 04-8400 RSWL (RZx)
 5        dated November 1, 2005

 6   54   Letter from Joanne Siegel to Paul        95
          Levitz dated November 6, 2000
 7
     55   Letter from Joanne Siegel to Paul        97
 8        Levitz dated May 14, 2001

 9   56   Letter from John Schulman to Bruce       101
          Ramer and Kevin Marks dated January
10        22, 2002

11   57   Notice of Termination of Transfer        102
          Covering Extended Copy Renewal Term
12        of 'Superman'

13   58   Letter from Jerome Siegel to J.S.        105
          Liebowitz dated November 30, 1938
14
     59   Document from Jerry Siegel entitled      109
15        "SUPERBOY" Bates Nos. 000000589 - 601

16   60   Document entitled "The ADVENTURES of     123
          SUPERMAN" by George Lowther
17
     61   Plaintiffs Joanne Siegel and Laura       125
18        Siegel Larson's Supplemental Responses
          to Defendant DC Comics' First Set of
19        Interrogatories dated July 14, 2006

20

21                 INSTRUCTION NOT TO ANSWER

22
                      Page    Line
23
                      20      20
24                    31       3
                      32       8
25                    126     23
```

5

1    INDEX (Continued):

2              INSTRUCTION NOT TO ANSWER (Continued)

3                         Page     Line

4                         128      24
                          130       1
5                         131       1
                          131       9
6                         131      21

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1          Beverly Hills, California, Wednesday, August 2, 2006

2                          10:04 AM - 4:52 PM

3

4                              JOANNE SIEGEL,

5      having been first administered an oath, was examined and

6      testified as follows:

7

8              MR. ZISSU:  Can we have the same stipulations we

9      used yesterday?

10             MR. TOBEROFF:  Which?

11             MR. ZISSU:  Objections except as to form are

12     reserved, the witness can sign -- can make a declaration

13     instead of signing before a notary or filing the

14     deposition with the court or before the notary, and

15     that's it.

16             MR. TOBEROFF:  Yes, except I am going to state

17     the objections.  Objections except as to form are always

18     reserved.  We don't have to stipulate to that.  That's

19     fine.

20

21                             EXAMINATION

22     BY MR. ZISSU:

23         Q   Miss Siegel, where do you do live?

24         A   In Marina Del Rey.

25         Q   And what's the address?

7

1          THE WITNESS:  I really don't know what you want.

2    BY MR. ZISSU:

3          Q    Well, you knew him from 1935 to 1948, before you

4    married him.

5          MR. TOBEROFF:  Objection.  Misstates testimony.

6    BY MR. ZISSU:

7          Q    Correct?

8          A    Yes.

9          Q    And in that time frame between the time you

10   first met him and the time you married him, did you

11   become familiar with what he did for a living?

12         A    Only vaguely, through Joe Shuster.

13         Q    Did you know anything of Mr. Siegel's

14   relationship with DC Comics in that time frame?

15         A    No.

16         Q    When you got married to Mr. Siegel in 1948, was

17   he doing work on the Superman comic books?

18         A    When we were married?

19         Q    Yes.

20         A    No.

21         Q    Did -- after 1948 did there come a time when he

22   did work on Superman comic books or comic strips?

23         A    Many years later.

24         Q    And when was that?

25         A    I believe it was in 1958.

1        Q    Did he seek out that employment?

2        A    Actually, I did.

3        Q    What -- how did that come about?

4        A    I was in touch with Mr. Liebowitz, who was I

5   guess president, and I asked him if he would give Jerry

6   work.

7        Q    And what did he say?

8        A    He refused at first.

9        Q    And then what happened?

10       A    I kept asking him.

11       Q    And --

12       A    And he said yes.

13       Q    And what was the work he gave him?

14       A    He did what they call the newspaper dailies.

15   He -- all I know is that he did write some stories,

16   probably the comic books.

17       Q    Do you know what characters were involved?

18       A    Superman.

19       Q    And how long did he continue to do that?

20       A    I believe the -- until 1966.

21       Q    Did he do any work on Superman comic books or

22   scripts after 1966?

23       A    I don't believe so.  I don't recall.

24       Q    I am going to show you -- or ask you to look at

25   from the exhibits we marked yesterday Exhibits --

15

1    Defendants' Exhibits 16 and 17.

2            MR. TOBEROFF:  Do you want me to try and find --

3            MR. ZISSU:  Yes.

4            MR. TOBEROFF:  -- these?

5            MR. ZISSU:  They should be in order, I hope.

6            MR. TOBEROFF:  Okay.

7            MR. ZISSU:  So 16 and 17.

8            MR. TOBEROFF:  Which one first?

9            MR. ZISSU:  Well, 16 first.

10       Q    This exhibit includes text from seven notices of

11   termination -- of copyright termination, and my question

12   is have you ever seen this exhibit?

13            For example, the first page, have you ever seen

14   that before?

15       A    Just the first page?

16       Q    Yes.  Does that look familiar to you?

17       A    Yes.

18       Q    All right.  And did you authorize the service of

19   notices of termination on DC Comics and other Time Warner

20   entities?

21       A    Yes.

22       Q    And did this occur before or after Mr. Siegel

23   died?

24       A    After.

25       Q    And why did -- did you ever discuss with

16

1    Mr. Siegel taking action to terminate these copyright

2    grants before he died?

3         A    Yes.   Yes.

4         Q    And why didn't he serve these notices of

5    termination before he died?

6         A    He was very ill.

7         Q    How long was he ill before he passed away?

8         A    A long time.

9         Q    Was it so long as 10 years?

10        A    Oh, yes.

11        Q    It was?

12        A    On and off.

13        Q    What was he suffering from?

14        A    A heart condition.

15        Q    In the period before he died, did Mr. Siegel or

16   you ever make any attempt to assess the value of the

17   termination rights?

18             MR. TOBEROFF:  Objection.  Vague.

19             You can answer.

20             THE WITNESS:  No.

21   BY MR. ZISSU:

22        Q    When he died, did you -- you were -- strike

23   that.

24             Were you his executrix under his estate, under

25   his will?

17

1    you spoken to a consultant about what the Siegel

2    copyright rights are worth?

3        A    I don't recall.

4            MR. TOBEROFF:  Wait.  Excluding lawyers?

5            MR. ZISSU:  Excluding lawyers.

6            THE WITNESS:  I don't recall.

7    BY MR. ZISSU:

8        Q    When did you arrange for Arthur Levine to

9    represent you?

10       A    It was in early fall, I believe, in 1996.

11       Q    And how did you communicate with him?

12       A    We went to Washington, D.C., to meet with him.

13       Q    And did you meet with anybody else while you

14   were there?

15       A    Yes.

16       Q    Who?

17       A    Another attorney.

18       Q    Do you remember his name or her name?

19       A    George Zadorozny.

20       Q    And where was he -- did he have an office in

21   Washington?

22       A    No.

23       Q    And how did you first get in touch with

24   Mr. Zadorogny?

25           MR. TOBEROFF:  Zadorozny.

22

1          MR. ZISSU:  Zadorozny.

2          THE WITNESS:  He got in touch with us.

3    BY MR. ZISSU:

4      Q   When did that happen?

5      A   While my husband was still alive.

6      Q   Was he -- at the point when you met with him in

7    Washington, was he already your lawyer in some respect?

8          MR. TOBEROFF:  I don't think she met with -- I'm

9    not sure if she met with Zadorozny in Washington.

10         MR. ZISSU:  The witness is supposed to answer

11   the questions.

12         MR. TOBEROFF:  Okay.  I'm trying to give --

13         MR. ZISSU:  Please --

14         MR. TOBEROFF:  I am trying to give you a clear

15   record.

16         MR. ZISSU:  I don't need the record.  You have

17   cross-examination, and you can correct things.  That's

18   why we have cross-examination.

19         MR. TOBEROFF:  You're misunderstanding my

20   comments.

21   BY MR. ZISSU:

22     Q   Was Mr. Zadorozny your lawyer at the time you

23   met with him in Washington in the fall, I think you said,

24   1996?

25     A   I had asked him some questions.

23

1       Q    Before the meeting?

2       A    Yes.

3       Q    Did you also engage him to assist you, along

4   with Mr. Levine, with respect to the copyright

5   termination?

6       A    Yes.

7       Q    After October 19, 2001, when Mr. Marks wrote the

8   letter that you referred to, and before February of 2002,

9   did you communicate with any third persons other than

10  lawyers concerning the sufficiency of the deal points

11  that are mentioned in Mr. Marks' letter?

12      A    I don't understand the question.

13      Q    After Mr. Marks' letter of October 19, 2001 and

14  before February of 2002, did you consult with anybody

15  about the sufficiency of the value that was set forth in

16  his letter of the payments that would be made to you?

17          MR. TOBEROFF:  Lacks foundation.  Compound.

18  Vague and ambiguous.

19          MR. ZISSU:  Take a break for a second.

20          (Recess.)

21          MR. ZISSU:  Back on the record.

22          Could we read the question back?

23          (Record read as follows:

24              "Q    After Mr. Marks' letter of

25          October 19, 2001 and before February

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

```
1              of 2002, did you consult with anybody
2              about the sufficiency of the value
3              that was set forth in his letter of
4              the payments that would be made to
5              you?")
6              MR. TOBEROFF:  Same objection.
7              THE WITNESS:  Can you --
8   BY MR. ZISSU:
9         Q    Yes.  There was a provision in the October 19,
10  2001 letter for money to be paid to you.
11             Correct?
12        A    Would you clarify that further?
13        Q    The October 19, 2001 letter --
14        A    What letter is that?
15        Q    From Kevin Marks to John Schulman --
16        A    Oh.
17        Q    -- mentioned amounts that --
18        A    Did you say --
19             MR. TOBEROFF:  Ask the question.
20  BY MR. ZISSU:
21        Q    It mentioned amounts that would be paid to you.
22             Correct?
23             MR. TOBEROFF:  Objection.  Lacks foundation.
24             You can answer.
25             THE WITNESS:  Repeat that again.  I'm having
```

25

1   trouble with this.

2   BY MR. ZISSU:

3       Q   Let me show you this letter, which is

4   Defendants' Exhibit 22.

5           If you can show that to the witness.

6           MR. TOBEROFF:  Can I put this exhibit back,

7   because it's going to get disorganized?

8           MR. ZISSU:  Yeah, you can put it back, sure.

9       Q   Do you see that there are different moneys that

10   are to be paid?

11      A   Oh, yes.

12      Q   Some moneys.  Whatever the amounts --

13      A   Yes.

14      Q   -- there are moneys.

15      A   Yes, I see.

16      Q   After this letter was sent, did you speak to

17   anybody about whether the amounts were enough?

18          MR. TOBEROFF:  Other than an attorney.

19   BY MR. ZISSU:

20      Q   Other than an attorney.

21      A   I don't recall.

22      Q   Now, I asked you that question between October

23   19, 2001 and February of 2002.

24          Did you speak to anybody about whether these

25   amounts were enough --

26

1      A    I would like to see what you're talking about.

2   You're talking about still another letter right now?

3      Q    Well, yeah.  Why don't we look at the --

4      A    I'm having -- you know, I must remind you I do

5   have trouble concentrating, and dates are very difficult

6   for me.

7      Q    I appreciate that.  I'm trying to make this as

8   easy as possible.

9         Defendants' Exhibit 25, which is a cover letter

10  with the February 1, 2002 draft, might be helpful to put

11  before the witness.

12        MR. TOBEROFF:  I am sorry.  What is the exhibit

13  number?

14        MR. ZISSU:  25.

15     Q    If you could look at that exhibit, and after the

16  first page there is a draft of a contract.  If you could

17  please look at that.

18     A    Yes.  Page 1, yes.

19     Q    Do you recall receiving and seeing a copy of

20  that document on or shortly after the date of it, which

21  is February 1, 2002?

22     A    I recall that -- shortly after?

23     Q    On or about that time.

24     A    Shortly after the 1st?

25     Q    Yeah.  In the beginning of February did you see

27

```
 1    that document?

 2         A    Not at the beginning of February.

 3         Q    When did you see it?

 4         A    I'm trying to reconstruct.

 5         Q    Well, approximately.

 6         A    Maybe in or around the mid -- middle of

 7    February, my guess.

 8         Q    And wholly independent of any discussions you've

 9    had with any lawyers, when you saw it, did you have a

10    reaction to it?

11         A    Yes.

12         Q    And what was your reaction?

13         A    I was very upset.

14              MR. TOBEROFF:  Okay.  I just want to instruct

15    the witness to -- I'll kind of keep this brief -- when he

16    says "wholly independent," I want to make sure --

17              MR. ZISSU:  This is inappropriate.  You are not

18    supposed to be doing this.

19              MR. TOBEROFF:  Excuse me --

20              MR. ZISSU:  The witness answered the question,

21    understood the question --

22              MR. TOBEROFF:  You can do the deposition your

23    way.  I am going to defend it my way.  Please stop

24    interrupting.

25              MR. ZISSU:  I object.
```

28

1        Q    When you first --

2        A    It's gotten -- this has gotten too confusing.

3        Q    Well, when you first saw this document in mid

4   February, had you already discussed it with your lawyer?

5             MR. TOBEROFF:  Objection.  You are not to

6   testify -- I instruct you not to answer that question, as

7   to what you discussed with your lawyer.

8             (Instruction not to answer.)

9   BY MR. ZISSU:

10       Q    Did you have any reaction before you had any

11  communication with your lawyer about this document?

12       A    I don't recall.

13       Q    So is it fair to say that independently of any

14  conversations you had with a lawyer, you can't recall

15  having had any reaction to this document?

16       A    I don't know all -- I'm confused right now, so I

17  can't answer that.

18       Q    Now let's look at Defendants' Exhibit 23.

19            MR. TOBEROFF:  I think it's better that you

20  handle these exhibits.  I think it's more appropriate.

21            MR. ZISSU:  Oh, okay.  That's fine.

22       Q    Did you write this letter?

23       A    I believe so.

24       Q    Did any lawyer help you write this letter?

25       A    No.

32

1          Q   Did you discuss with any lawyer --

2              MR. TOBEROFF:  Just a second.  Before we get to

3     the next question, I did not -- I do not have -- I didn't

4     realize we were going to work off the same exhibits, so I

5     don't have a set to look at.

6              MR. ZISSU:  Why don't you borrow these.  Oh, no.

7     Why don't you borrow those.  Sorry.

8              MR. TOBEROFF:  That would be great.  If I

9     could...  Sorry.

10             MR. ZISSU:  That's all right.

11             MR. TOBEROFF:  Let me just organize these for a

12    second.

13             MR. ZISSU:  They're in order.

14             MR. ZISSU:  Could you read back the last

15    question and answer?

16             (Record read as follows:

17                 "Q   Did any lawyer help you write

18             this letter?

19                 "A   No.

20                 "Q   Did you discuss with any

21             lawyer -- ")

22             THE WITNESS:  Was it about this letter?

23    BY MR. ZISSU:

24        Q   Did you discuss with any lawyer the content of

25    this letter before you sent it?

33

1        A    No.

2        Q    Now, if you look at the next -- the second page,

3    in the fourth paragraph down --

4        A    Yes.

5        Q    -- there is -- the second sentence reads as

6    follows:  "The beast hungers for more," and then the next

7    sentence reads, "Just like the Gestapo, your company

8    wants to strip us naked of our legal rights," close

9    quote.

10            In what way did you believe that the defendants

11    were stripping you of your legal rights?

12        A    You mean in connection with what?

13        Q    In connection with the letter you wrote.  What

14    did you mean in your letter?

15        A    Well, the February contract was so shocking that

16    we felt -- that's the way I felt.

17        Q    And in what way did you feel it was shocking?

18            MR. TOBEROFF:  Now you're getting back into the

19    same interpretation of a 56-page document.  It involves

20    the attorneys, and that contract was obviously

21    interpreted for her by her attorneys, and she can't --

22    first of all, you're not asking her to articulate that,

23    but I'm instructing her not to answer information she got

24    through discussions with her attorneys.

25            MR. ZISSU:  Well, I just want to point out two

34

1    objectionable, but she can't go into the details of why

2    because that discloses her conversation and advice from

3    her attorneys regarding interpreting a 56-page contract.

4         MR. ZISSU:  I disagree with you, but I didn't

5    ask her to interpret a 56-page contract or the details.

6    I asked her in broad terms to identify to me in what ways

7    she considered that AOL Time Warner, Inc. and the other

8    defendants were stripping her of her legal rights, in

9    broad terms.  That's the question.

10        MR. TOBEROFF:  You can answer very broadly

11   without going into details.

12        THE WITNESS:  You would have to repeat that.  I

13   heard part of it, of what you said, but not the other

14   part.

15   BY MR. ZISSU:

16        Q    Well, in what way or ways did you consider that

17   Time Warner and the other defendants were stripping you

18   of your legal rights by virtue of the February 1, 2002

19   draft contract?

20        A    I don't recall.

21        Q    Are you familiar with this letter?

22        A    Well, it's written a long time ago.

23        Q    Can you read it again now for a minute?

24        A    The entire letter?

25        Q    Yes.

36

1            MR. TOBEROFF:  Take your time.

2    BY MR. ZISSU:

3        Q    Are you finished?

4        A    Yes.

5        Q    What were you trying to achieve in writing this

6    letter?

7        A    I wanted to make him aware of what his attorneys

8    or representatives had done.

9        Q    Was it your intention to tell him that there

10   would be no deal?

11           MR. TOBEROFF:  Vague and ambiguous.

12           You can answer.

13           THE WITNESS:  That -- what is your question?

14   BY MR. ZISSU:

15       Q    Was it your intention to tell him at this point

16   that there would be no deal?

17       A    I guess so.

18       Q    And if you look at paragraph 3, there is a --

19           MR. TOBEROFF:  Which page?

20           MR. ZISSU:  On the first page.

21       Q    There is a sentence -- the last sentence of that

22   paragraph reads as follows --

23       A    The last sentence?

24       Q    The last sentence of paragraph 3.

25       A    Okay.

37

1      Q    "When we made those difficult concessions and

2   reluctantly accepted John Schulman's last proposal six

3   months ago, we were stabbed in the back with a shocking

4   contract."

5           Was the presentation of this contract the reason

6   for your considering that there would be no deal?

7      A    Is the presentation of the contract?

8      Q    Was offering -- sending you this draft contract

9   the reason that you considered there would be -- there

10  was no deal?

11          MR. TOBEROFF:   Objection.   Vague and ambiguous.

12          You can answer.

13          THE WITNESS:   Probably.

14  BY MR. ZISSU:

15     Q    Was there anything else that Time Warner or DC

16  comics did that led you to this view?

17     A    Well, they made changes, unapproved changes in

18  what they sent us.

19     Q    Anything else?

20     A    Things that had never been discussed, never

21  approved, just put in there, and the -- everything was

22  subject to approval, and obviously we couldn't approve of

23  something, first of all, we hadn't seen before, and then

24  be shocked what changes and additions that we didn't

25  approve of.

38

1      Q   Was there anything else that they did that

2   was -- that you considered to be the basis for concluding

3   there could be no deal?

4      A    Well, yes.  It's difficult to express and

5   explain it, but as I recall, there was an October 19th

6   letter written by Kevin Marks, and then -- in which he

7   says he is going to be unavailable for four weeks.  That

8   was when he went to China.  And 10 days later -- he sent

9   that letter to John Schulman.  10 days later, on the

10  26th, while he was away, John Schulman sends him a

11  letter, knowing he's not there, and in it he says that he

12  thinks he has a -- more fulsome ideas about that contract

13  or proposal and that he believed that it wasn't -- that

14  there was no meeting of minds.  So it sounded more like a

15  counterproposal.  I mean, there was -- you know, he's

16  saying this afterward.  And we didn't even learn of that

17  until more recently, that that letter of the 26th

18  existed.

19     Q   When did you learn of that letter?

20     A   The --

21     Q   October 26.

22     A   Just more recently.

23     Q   Not in November of 2001?

24     A   No.

25     Q   Did you learn it --

39

1      A    More recently.  This is 2006.

2      Q    Oh, you only learned of that in 2006?

3      A    Yes.

4      Q    Kevin Marks had never sent -- strike that.

5           Kevin Marks' office did not send you a copy in

6      October of 2001?

7      A    No, we didn't get that copy.

8           He wasn't -- what probably happened is this:  He

9      was out of the country for four weeks, and that letter

10     was sent to his office while he was out of the country

11     and probably got filed, and maybe he didn't know about it

12     until we asked for our papers be returned, and it turned

13     up some -- I don't know if we got all the papers all at

14     one time, or maybe we had to ask for additional papers

15     that were missing, and when those papers came, these

16     papers obvious -- the 26th letter was obviously found and

17     was among the papers that were sent.  That's my guess.

18     Q    When were the papers returned to your lawyer, I

19     think?

20     A    My lawyer would know.

21     Q    Did -- when you say you didn't know of this

22     October 26, 2001 letter, do you mean neither you nor your

23     daughter Laura knew?

24     A    That is correct.  And neither did anyone else,

25     apparently.

40

1      Q   Isn't it a fact that Mr. Toberoff began

2  representing you in late 2002 or early 2003?

3      A   It was late 2002.

4      Q   And didn't he get the files, which included this

5  document, at about that time?

6      A   I don't know when he got it.

7      Q   I'm looking --

8          MR. TOBEROFF:  I can represent to you this

9  October 26 letter was not in the files that I received

10 from Kevin Marks.

11         MR. ZISSU:  I'm looking for the copy of it, the

12 October 26 letter, which was marked yesterday, I believe.

13 It's in a separate pile here somewhere.

14     Q   Were you also dealing with Bruce Ramer at the

15 Gang Tyre firm?

16     A   When?

17     Q   In the period when Kevin Marks was representing

18 you.

19     A   Oh, that's the firm.

20     Q   Yes.

21         And Bruce Ramer was also working for you then.

22         Correct?

23     A   I -- yes, I guess.

24         MR. ZISSU:  Marc, it would be really helpful if

25 you would help me so I can reduce my time looking for

41

1    these exhibits.

2          MR. TOBEROFF:  I have these exhibits here.

3          MR. ZISSU:  I am joking.

4          MR. TOBEROFF:  Were you joking?

5          MR. ZISSU:  Yes.  I always like help.  See,

6    you're making my life more complicated.

7      Q    Let me show you Defendants' Exhibit 24, which is

8    a copy of the October 26, 2001 letter.

9      A    Yes.  I see the top page.

10     Q    And you see that that letter from Mr. Siegel was

11   also copied to Mr. Ramer.

12          Correct?

13     A    Correct.

14     Q    And you never received from Mr. Ramer a copy of

15   this letter?

16     A    No.

17     Q    If you look at Defendants' Exhibit 23, which is

18   your May 9, 2002 letter --

19     A    Yes.

20     Q    -- is it your testimony that when you wrote that

21   letter, you had never seen Mr. Schulman's October 26,

22   2001 letter?

23     A    That is correct.

24     Q    And so that the comments in your May 9, 2002

25   letter have nothing to do with Mr. Schulman's letter of

42

1    October 26, 2001.

2            Is that correct?

3        A    What do you mean, "had nothing to do"?

4        Q    Well, on May 9, 2002, you had never seen

5    Mr. Schulman's October 26, 2001 letter, so the comments

6    that you made to Mr. Parsons are not about Mr. Schulman's

7    letter.

8            Correct?

9        A    That is correct.

10            MR. ZISSU:  Now I want to mark as Defendants'

11    Exhibit 43 a letter dated September 21, 2002 from Joanne

12    Siegel and Laura Siegel Larson to Paul Levitz.  I'm

13    having trouble finding the copy I want.

14            Let's go back -- we will look instead at a

15    September 21, 2002 letter from you and Laura to Kevin

16    Marks, which I will find in the exhibits.

17            Can we take a break for five minutes.  Okay?

18            MR. TOBEROFF:  Sure.

19            (Recess.)

20            MR. ZISSU:  Let's mark as Defendants' Exhibit

21    43 -- I think I stated this before -- a September 21,

22    2002 letter from Joanne Siegel and Laura Siegel Larson to

23    Paul Levitz.

24            (Defendants' Exhibit 43 marked.)

25            MR. TOBEROFF:  I think we had this last time.

43

1            MR. ZISSU:  No.  What you had --

2            MR. TOBEROFF:  Just to be clear, on the new

3    exhibits, I'll add one copy to this pile and keep another

4    copy separate?

5            MR. ZISSU:  Right.

6            MR. TOBEROFF:  Okay.

7            MR. ZISSU:  And so you need another.  Right?

8            MR. TOBEROFF:  Yeah.

9            MR. ZISSU:  The letter to which you're

10   referring, Marc, is Defendants' Exhibit 41, which is a

11   letter of the same day to Kevin Marks and Bruce Ramer.

12           MR. TOBEROFF:  Okay.

13   BY MR. ZISSU:

14       Q   Miss Siegel, you have before you Defendants'

15   Exhibit 43.  Did you write that letter?

16       A   Would you repeat the date?

17       Q   Yes.  September 21, 2002.  Did you with your

18   daughter write that letter to Paul Levitz?

19       A   Yes.

20       Q   Yes?

21       A   Yes.

22       Q   And at that date is it your testimony that you

23   still did not have a copy of John Schulman's October 26,

24   2001 letter?

25       A   Yes.

44

1      Q   Now, if you will look again at Defendants'

2   Exhibit 23, which is your letter to Mr. Parsons -- do you

3   have that in front of you somewhere?

4          Does the witness have it?

5      A   Yes.

6      Q   23?

7      A   Yes.

8          MR. TOBEROFF:  Yes.

9          MR. ZISSU:  Okay.

10     Q   On the first page in the bottom paragraph, you

11  state, quote, "Your company's unconscionable contract

12  dated February 4, 2002 contained new, outrageous demands

13  that were not in the proposal," close quote.

14          Now, without the necessity for me or for

15  Mr. Toberoff to repeat our objections to similar

16  questions, my question is this:  Can you in a broad,

17  general sense tell me what you considered to be the

18  outrageous demands?

19     A   Well, when we got the contract, we spoke with

20  our attorney because it's a legal contract with legalese

21  stuff, and after he looked it over and talked with us, he

22  made us realize, you know, that there were -- of the

23  changes and the additions which were outrageous.

24     Q   But can you tell me in a broad sense what struck

25  you as outrageous at the time?

45

```
 1        A    Well, it was --

 2             MR. TOBEROFF:  Excuse me.  The witness just

 3   testified she received a contract, she spoke to her

 4   attorney, and after he explained it to us, we concluded

 5   that they were outrageous.  She can't go into the

 6   substance of that.  I don't know if -- that would be

 7   protected.  Wouldn't you agree with that?

 8             MR. ZISSU:  I don't agree with that.  But let me

 9   ask the question and you give her an instruction.

10        Q    First of all, after speaking with your attorney,

11   what was your understanding of what was outrageous?

12             I have to make a record on this, so you can

13   instruct the witness whatever you want, and we will move

14   on, you know.  So that's the question.

15        A    What my attorney pointed out.

16        Q    After you spoke to your attorney.

17             MR. TOBEROFF:  You can speak just, you know, I

18   guess, as to your conclusions but not to your -- not your

19   specific mental impressions based on your conversations

20   with your attorney.  You can speak very broadly as to

21   your conclusion.  I'll allow you to testify to that.

22             THE WITNESS:  Well, some of the changes were

23   just unacceptable, un- -- I just -- well, I can't

24   verbalize it word for word.

25   BY MR. ZISSU:
```

46

```
 1  of October 19, 2001?
 2       A   Do I -- did I see it at that time?
 3       Q   Yes.
 4       A   Whenever it arrived.
 5       Q   Do you remember --
 6       A   I wouldn't -- I couldn't tell you what day it
 7  came.
 8       Q   Not the exact day, but was it in October of
 9  2001, you think?
10       A   Well, whenever it was mailed to me.  I can't
11  recall.
12       Q   I am going to show you Defendants' Exhibit 13,
13  which is a 19 -- December 23, 1975 agreement.
14           MR. TOBEROFF:  You don't have it yet.
15  BY MR. ZISSU:
16       Q   I will show it to you.
17           THE WITNESS:  Didn't he say 23?
18           MR. TOBEROFF:  No.
19           THE WITNESS:  Oh.
20           MR. TOBEROFF:  Should I put these off to the
21  side?
22           MR. ZISSU:  Yes.
23           MR. TOBEROFF:  Let me just put these...
24  BY MR. ZISSU:
25       Q   Do you recognize this agreement?
```

56

1          A    Well, it looks familiar.

2          Q    It looks familiar.

3               If you look at the third page, which has a

4     number at the bottom 835, and the "3" is obscured in the

5     photocopy, there is a reference to your being paid -- to

6     Jerome Siegel being paid and your being paid certain

7     amounts -- I'm sorry.  Strike that.  There is a reference

8     to your being paid certain amounts if Jerry Siegel dies.

9     Sometimes people have called them in some of the

10    correspondence widow's benefits.

11              Does that ring a bell?

12              MR. TOBEROFF:  Excuse me.  Objection.  It

13    misstates the evidence.  You're only giving her part of

14    the document.  Therefore, it's misleading.  It says, "if

15    Jerry Siegel dies," and I'd like you to finish what it

16    says.

17    BY MR. ZISSU:

18         Q    On that page it says, "In addition, if Jerry

19    Siegel dies, on or before December 31, 1985, Warner will

20    pay his wife, Joanne Siegel, if she survives him, monthly

21    payments at the rate of $20,000 a year, commencing on the

22    date of Jerry's death, and ending December 31, 1985..."

23              Do you see that?  And so forth.

24         A    Yes.

25         Q    Does this jog your recollection as to what this

57

1    was about?

2         A    This was Jerry and Joe's agreement.

3         Q    Yes.  Are you familiar --

4         A    Not my agreement.

5         Q    Are you familiar with it, though?

6         A    I see it.

7         Q    And did you become familiar with it in the

8    1970s?

9         A    No.

10        Q    Did at some point you become familiar with it?

11             Did you learn about this agreement at some

12   point?

13        A    Yes.

14        Q    When?

15        A    I don't remember.

16        Q    Do you know that this copy of the agreement was

17   produced by you in this case --

18        A    This?

19        Q    -- to the defendants?

20             Yes.

21        A    This agreement was produced by --

22        Q    No.  A copy -- sorry.  Go ahead.

23             MR. TOBEROFF:  She doesn't understand what

24   "produced" means.

25   BY MR. ZISSU:

1        Q    Do you understand that a copy of this agreement
2   in this case was given by your lawyer to the defendants'
3   lawyers?
4            MR. TOBEROFF:   In the litigation, we had in our
5   files a copy of this agreement.  We gave it over to them.
6            Do you understand that?
7            THE WITNESS:   This had nothing to do with the
8   litigation.
9            MR. TOBEROFF:   That's not his question.
10           THE WITNESS:   I'm afraid I'm...
11           MR. TOBEROFF:   Should I -- do you want to just
12  ask it again?
13           MR. ZISSU:   Yeah.
14       Q    Do you know where this copy of the agreement
15  comes from?
16       A    What --
17       Q    It comes from somebody's files.
18           Right?
19       A    Well, I still don't see what you're trying to
20  get at.
21       Q    I'm trying to get you to tell me what you know
22  about this agreement, and the first step is I want to see
23  that you can identify it.
24       A    It was Jerry and Joe's agreement in 1975 --
25       Q    And --

59

1          A    -- after they publicized to the whole world that

2     they were 61 years old and completely broke and the DC

3     Comics had just made a $30 million TV deal to star George

4     Reeves and -- no, I think I have that wrong.    That TV

5     deal I think was when he -- my husband went on a hunger

6     strike.    I'm sorry, I'm very bad with dates.    I must

7     apologize.

8          Q    Well, I am not going to hold you to the dates.

9     I am just trying to get you to see what you know about

10    these benefits that were paid each year to your husband.

11             Were you aware of that?

12         A    Yes.

13         Q    And after he died have you been receiving --

14    since 1996 have you, as his widow, been receiving

15    payments of such benefits?

16         A    Yes.

17         Q    Under this agreement?

18         A    Not under this agreement.

19         Q    What -- after he died in 1996, there were no

20    benefits paid under this agreement to you?

21         A    Not under this agreement.

22         Q    But you receive moneys each year?

23         A    I had my own agreement.

24         Q    You had your own agreement?

25         A    Yes, with Steve Ross.

60

1      Q    And was that in writing or just an understanding

2    with him?

3      A    There was a letter --

4      Q    And --

5      A    -- from -- from Steve Ross' attorney.

6      Q    Was that --

7      A    I had written to Steve Ross because I was

8    worried if my husband dropped dead, you know, I'd be in a

9    bad situation.

10     Q    And you wrote to Steve Ross before your husband

11   died?

12     A    Correct.

13     Q    Was it many years --

14     A    I didn't want to wait until he died and then

15   find myself without any money.

16     Q    Was that many years before he died?

17     A    Well, it was some years.

18     Q    And did you negotiate with somebody for that

19   agreement?

20     A    Which agreement?

21     Q    The agreement you made with the lawyer for Steve

22   Ross.  Your agreement.

23          MR. TOBEROFF:  Misstates her testimony.

24          THE WITNESS:  I wrote him a letter.

25   BY MR. ZISSU:

61

1    Q    You wrote him a letter, but you said you had

2    your own agreement.

3    A    That's right.

4    Q    And you had that agreement with --

5    A    Steve Ross.

6    Q    With Steve Ross.

7         Was there a letter or a writing?

8    A    His attorney sent a letter agreeing to my

9    getting money that I would need if my husband dropped

10   dead.

11   Q    I am going to show you a letter, and maybe

12   that's the letter, if you could tell me that.

13        Let's mark as Defendants' Exhibit 44, I think...

14        (Defendants' Exhibit 44 marked.)

15   BY MR. ZISSU:

16   Q    Is that the letter?

17   A    Yes.  This is from the attorney.

18   Q    Is it fair to say that you negotiated this

19   arrangement with Warner?

20   A    I wrote the letter.  I wrote the letter --

21   Q    Yes, but --

22   A    -- asking --

23   Q    But is it fair for me to said that you

24   negotiated this arrangement?

25   A    You mean that Martin Payson is replying to?

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

```
1        Q    Yes.    That you achieved an arrangement that you

2    negotiated with Warner.

3        A    I suppose so.

4        Q    And is it fair to say that that was a kind of

5    arrangement for payments under the 1975 agreement?

6             MR. TOBEROFF:    Objection.    Asked and answered.

7             THE WITNESS:    It's not.

8    BY MR. ZISSU:

9        Q    It's not.

10            Did this -- this agreement provides -- I'm

11   referring to Defendants' Exhibit 44.    What were the

12   amounts that you were being -- that you were to be paid

13   originally under this?

14       A    Under this?

15       Q    Yes.

16       A    Somewhat less than what I am receiving now.

17       Q    And do you remember the range of it?

18       A    I don't remember.

19       Q    Does this letter tell you how much you were to

20   be paid?

21       A    No.

22       Q    And what are you receiving now?

23       A    $126,148 and change.

24       Q    Doesn't this Defendants' Exhibit 44 say you were

25   going to be paid $60,000 per year as the widow?
```

63

1      A    That's what it says there.

2      Q    And so it's doubled since --

3      A    It has nothing to do with that.

4      Q    What does it have to do with?

5      A    My deal had nothing to do with that, what was in

6    that.  I was not -- that was Jerry and Joe's 1975 deal as

7    a result of the bad publicity they gave the company.

8      Q    No.  I'm referring to the numbers I referred to

9    that are in the letter, Defendants' Exhibit 44, which is

10   in front of you.

11     A    You're talking about page 3?

12     Q    No.  I'm talking about the letter.

13     A    Yes.

14          MR. TOBEROFF:  Exhibit 44.

15   BY MR. ZISSU:

16     Q    Exhibit 44.

17     A    What about -- oh, yes, I see the "44" down

18   there.  I didn't understand.

19     Q    So the amount was to be 60,000 under this

20   Defendants' Exhibit 44.

21          Correct?

22          MR. TOBEROFF:  Objection.  The document speaks

23   for itself.

24          THE WITNESS:  Where does it say sixty?

25   BY MR. ZISSU:

64

1       Q    Well, it's --

2       A    Oh, probably.

3       Q    And the number is now 120,000.

4            Correct?

5       A    Yes, but those are years -- my husband didn't

6  die until 1996.

7       Q    I understand that.  I understand that.  But the

8  amount was changed as the years went by.

9       A    There -- while my husband was still alive --

10      Q    Yes.

11      A    -- there were cost-of-living increases, plus

12  Steve Ross gave still another increase from 60- to

13  80,000, somewhere in the eighties.  I don't know the

14  exact figure.  I don't remember.

15      Q    And did you negotiate those amounts, or they

16  were just given to you?

17           MR. TOBEROFF:  Vague and ambiguous.

18           You can answer.

19           THE WITNESS:  Well, I had -- I helped get that.

20  BY MR. ZISSU:

21      Q    So you were part of the force there?

22      A    Yeah, I guess I was the one who negotiated with

23  my letters.

24      Q    Let me ask you to look at Defendants' Exhibit

25  14, which is a series of letters dated April 9, 1987.

65

1          Do you recognize those letters, if you look

2   through it?

3      A    They look familiar.

4      Q    They appear to have been written by you.

5      A    Yes.

6      Q    If you look at the bottom of the first page of

7   the first letter in Defendants' Exhibit 14, the first

8   sentence states, "It has only been since 1981, after I

9   negotiated several income and cost of living increases in

10  the December, 1975 $20,000 a year income arrangement,

11  that Jerry and I received a larger income."

12         Do you see that?

13     A    Yes.

14     Q    And that's correct, isn't it?

15     A    Yes, but it's misleading.

16     Q    It's?

17     A    It's misleading.

18     Q    Why?

19     A    Because the income kept getting higher.  I don't

20  know what you want from --

21     Q    Is this sentence I read to you misleading --

22     A    I am --

23     Q    -- or incorrect?

24     A    The way you put it, I don't know what you want.

25     Q    I am asking you if you made this statement in

66

1   this letter, first.

2        A    Well, it's there.

3        Q    And is the statement correct?

4            MR. TOBEROFF:   Read the statement.

5            THE WITNESS:   You're -- the interpretation --

6   let me read this so I can --

7   BY MR. ZISSU:

8        Q    Yes.  I am not interpreting --

9        A    -- refresh my memory.

10           That bears out what's in that attorney's letter,

11  Martin Payson.

12       Q    So it's correct.

13       A    Yes.  Yes.

14       Q    And it's your statement, the statement I read to

15  you.

16       A    Appears to be.

17           MR. ZISSU:   Let's mark as Defendants' Exhibit 45

18  a letter from Joanne Siegel dated May 27, 1986 to Joseph

19  Shuster.

20           (Defendants' Exhibit 45 marked.)

21  BY MR. ZISSU:

22       Q    Please let me know when you're finished reading

23  it.

24           Have you read it?

25       A    Yes.

67

1      Q    Were you acting for Joseph Shuster in

2   negotiating increases in the payments that would be made

3   to him under the 1975 agreement?

4      A    He requested that.

5      Q    What?

6      A    He requested.

7      Q    No.  But were you acting for him at his request?

8         MR. TOBEROFF:  Objection.  Vague, ambiguous.

9         You can answer it.

10        THE WITNESS:  Was I -- would you -- I'm sorry.

11   BY MR. ZISSU:

12        Q    Did you act as his agent in negotiating

13   increases in the amounts that were to be paid under the

14   1975 agreement?

15        MR. TOBEROFF:  Objection.  Calls for a legal

16   conclusion.

17        You can answer it.

18        THE WITNESS:  Was I acting as his agent?

19   BY MR. ZISSU:

20        Q    Yes.

21        A    I guess so.

22        Q    And that -- if you look at the last sentence of

23   the letter before it says "Warmest regards," it says,

24   quote, "This will accurately state that I only negotiate

25   bonuses and income increases for you on your lifetime

```
 1    income, and do not seek employment from you -- [sic] for

 2    you."

 3              Correct?

 4         A    Yes, I see it.

 5         Q    And how many years did you act in this capacity

 6    for Shuster?

 7         A    I don't recall.

 8         Q    Did you also act in negotiating increases in the

 9    amount -- the annual payments paid to your husband in

10    this period?

11         A    Yes.

12         Q    And when did that begin?

13         A    Same time.

14         Q    Is there a reason your husband couldn't act for

15    himself?

16         A    Yes.

17         Q    What was that?

18         A    He was too emotionally involved, upset, and he

19    just -- he was suffering too much over everything.

20         Q    Is it fair to say that you at some point became

21    his manager, in effect?

22              MR. TOBEROFF:  Objection.  Calls for -- it's

23    vague and ambiguous as to "manager."

24              THE WITNESS:  I don't know.

25    BY MR. ZISSU:
```

69

1        Q    Did there come a time when you took over

2   handling all of his business matters?

3        A    No.

4        Q    That never happened?

5        A    You're saying "all."  I don't know what you're

6   referring to, "all."

7             MR. ZISSU:  Let's mark as Defendants' Exhibit 46

8   a letter from Joanne Siegel to John Schulman dated

9   September 14, 1995.

10            MR. TOBEROFF:  Just wait for his questions.

11   Just wait for his questions.

12            (Defendants' Exhibit 46 marked.)

13   BY MR. ZISSU:

14        Q    And if you would read that letter, please, I'll

15   have a question.

16        A    Okay.

17        Q    Did there come a time when you started handling

18   all business matters for your husband?

19        A    Well, that's misleading because he didn't have a

20   business as people consider it.  He didn't have a

21   business.  But I -- he was sick.  As you can see, pointed

22   out in this letter, he couldn't handle the business of

23   going after the cost-of-living increases, which had to be

24   mentioned constantly every year or we didn't get it, and

25   when I had to write to anybody about anything that had to

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

```
 1   do with Jerry, I would try to do it for him.  So if you

 2   want to call that handling his business...

 3        Q   Didn't you -- didn't you yourself call it

 4   handling all the business matters for him?

 5        A   Yes, I did, but I'm trying to explain to you

 6   that -- you seem to have a much broader idea of what that

 7   meant.

 8        Q   Well, it would have included by 1995 dealing

 9   with his copyright issues.

10            Correct?

11            MR. TOBEROFF:  Objection.  Strike that.

12   BY MR. ZISSU:

13        Q   Yes or no?

14        A   Well --

15            MR. TOBEROFF:  Objection.  Assumes facts not in

16   evidence.

17            THE WITNESS:  Pardon?

18            MR. TOBEROFF:  You can answer.

19            THE WITNESS:  Would you -- handling his

20   copyright issues?

21   BY MR. ZISSU:

22        Q   Well, whatever issues that came up relating to

23   copyright ownership and termination rights and things

24   like that by 1995 --

25        A   In 19- --
```

71

```
 1          Q   -- you were the person handling that for him.
 2          Correct?
 3          MR. TOBEROFF:  Objection.  Assumes facts not in
 4     evidence.  Lacks foundation.
 5          THE WITNESS:  We talked about it.  He wasn't
 6     able to handle anything.  As you can see, he was very
 7     ill, and he put it into my hands to get information about
 8     what we could do and how we would handle the situation.
 9     He was aware of the termination law granted by the U.S.
10     Congress before he died, and he had told me about it, and
11     we were just trying to get information at that stage,
12     and, yes, he put me in charge of that.
13          MR. ZISSU:  Let's mark as Defendants' Exhibit 47
14     a letter from Paul Levitz to you dated April 15, 1999.
15          (Defendants' Exhibit 47 marked.)
16          THE WITNESS:  Okay.
17          MR. TOBEROFF:  I would just like to just object
18     that this is an incomplete document.  It's marked on the
19     bottom "Total Page 002."  We don't have page 1.
20          That's okay.  Go ahead.  I mean, you can answer
21     questions.
22     BY MR. ZISSU:
23          Q   Do you recognize this letter from Mr. Levitz?
24          A   Yes.
25          Q   And did you receive it around April 15, 1999?
```

72

1        Q    Now, if you turn to page 14 and paragraph 53 --

2   do you see that?

3        A    (Nods head.)

4        Q    Could you read to yourself paragraph 53?  I have

5   a question about it.

6        A    All right.

7        Q    In paragraph 53 it says, among other things,

8   that plaintiffs admit only that the terms in the February

9   1, 2000 draft, quote, "differed from and/or substantially

10  diluted the terms negotiated."

11       My question is, how did the February 1, 2002

12  draft dilute the terms negotiated?

13       A    That was something that we discussed with our

14  attorney, and so it was -- you know, it was -- I really

15  don't know how to put it into words, but we -- I'm not a

16  lawyer.  The -- this was a legal document, and we

17  discussed it, and there were -- I think I mentioned

18  before it -- in one part it diluted our interests in that

19  things would be more favorable to DC than to us.

20       Q    Did you mean -- by "diluted" you mean

21  financially, in money diluted, or something else?

22       A    Well, it would have --

23       MR. TOBEROFF:  I'm going to object.  I couldn't

24  get my objection in before, but I'm objecting.  This

25  calls for a legal conclusion.  You're asking her to

87

1   interpret documents in a reply written by her attorneys

2   in her behalf.

3           You can answer generally.

4           THE WITNESS:  Well, I think I just did answer

5   generally.

6           MR. TOBEROFF:  That's okay then.

7   BY MR. ZISSU:

8       Q   My question was, did you mean diluted the

9   terms -- did you mean by "diluted" the terms, are you

10  speaking about money, or are you speaking about something

11  else?

12      A   It would have interpreted in one part to money,

13  yes.

14      Q   And can you tell me how, in broad terms, the

15  money was diluted?

16          MR. TOBEROFF:  If you can't discuss it without

17  revealing things that you learned from your attorney

18  interpreting the documents, then I instruct you not to

19  answer.  You can answer only very broadly.  If you

20  understand -- really understand, you could answer in

21  broad terms.

22          THE WITNESS:  I think I just did in broad terms.

23          MR. TOBEROFF:  Well, I think you did also.

24  BY MR. ZISSU:

25      Q   I am asking now in more detailed terms.  Were

1    said, and that's what she said.

2    BY MR. ZISSU:

3        Q    Let me answer -- let me ask the question:  Is

4    there -- was there something in the February 1, 2002

5    draft that you felt changed the amount of payments that

6    would be made to you under the October 19, 2001

7    agreement -- letter?

8            MR. TOBEROFF:  Vague and ambiguous.

9            THE WITNESS:  Yeah.

10   BY MR. ZISSU:

11       Q    Can you answer?

12       A    It's too difficult to answer because I can't --

13       Q    I'm trying to make it simple.

14       A    I appreciate that.

15       Q    Did -- when you looked at the February 1, 2002

16   draft, did you think that it reduced the amount of money

17   that you would be paid for selling the terminated rights?

18           MR. TOBEROFF:  Asked and answered.

19           You can answer simply.

20           THE WITNESS:  Would you repeat it?

21   BY MR. ZISSU:

22       Q    Did you think the February 1, 2002 draft reduced

23   the amount of money that you would have been paid under

24   the October 19, 2001 letter?

25       A    Eventually that would happen.

94

1          Q    How, as best you can understand?

2          A    I get back to --

3          Q    You can't answer?

4          A    I can't answer that.

5          Q    Correct?

6          A    Correct.

7               MR. ZISSU:  Let's mark as Defendants' Exhibit 54

8     a letter from Joanne Siegel to Paul Levitz dated November

9     6, 2000.

10              (Defendants' Exhibit 54 marked.)

11              THE WITNESS:  Do you want to talk just about the

12    top letter or all three?

13    BY MR. ZISSU:

14         Q    Just the top letter.  I have a question or two.

15         A    Okay.

16              MR. TOBEROFF:  I just want to make sure everyone

17    knows that there are three letters here:  One from Joanne

18    Siegel to Paul Levitz Bates stamped 1185, one from Napa

19    County to Joanne Siegel, Health & Human Services Agency,

20    but then there is a third one here, Joanne Siegel to

21    Gerald Levin, 1187.

22    BY MR. ZISSU:

23         Q    My question about the first page is can you

24    identify this as a letter you sent?

25         A    Yes.

95

1    Mr. Schulman was communicating with Mr. Ramer and

2    Mr. Marks?

3        A   Well, this letter made me aware.

4        Q   Were you aware of any other communications

5    between them in this time frame?

6        A   I don't -- I can't think of anything at the

7    moment.

8            MR. ZISSU:  All right.  Defendants' Exhibit 57

9    will be a Notice of Termination of Transfer Covering

10   Extended Copyright Renewal Term of "Superman," is the

11   name of the document, and it's signed on page 9 by a Mark

12   Warren Peary.

13           (Defendants' Exhibit 57 marked.)

14   BY MR. ZISSU:

15       Q   And my first question is, have you ever seen

16   this before?

17       A   I believe this is the same one --

18           MR. TOBEROFF:  Read through it.

19           Can you tell her what it is?

20           MR. ZISSU:  Yeah.

21       Q   This is a notice of termination that was served

22   on behalf of the Shuster estate.  This is from the

23   Shuster estate --

24       A   Oh, I see.

25       Q   -- that Mr. Toberoff served, and my question is,

102

1    have you ever seen it before?

2        A    Have I seen something that belonged to the

3    Shusters?

4        Q    It was served on behalf of the Shusters, and the

5    question is whether you've ever seen that before.   Yes,

6    that's the question.

7        A    Why would we --

8        MR. TOBEROFF:   Just answer his question.   It's a

9    yes or no question.

10   BY MR. ZISSU:

11       Q    Have you ever seen it before?

12       A    Have I ever seen this before?

13       Q    Yes.

14       A    I saw this in reference with our termination.

15       Q    But have you seen this before?

16       MR. TOBEROFF:   The Shusters' termination.

17       THE WITNESS:   Since the termination?

18       MR. TOBEROFF:   No.   He is asking you if you saw

19   this document that was served for the Shusters regarding

20   Superman.

21       THE WITNESS:   I don't know anything about what

22   went on with the Shusters.

23   BY MR. ZISSU:

24       Q    Do you know that they served a termination

25   notice?

103

1      A    I believe she did mention it, yes.

2      Q    Who is she?

3      A    Jean Peavy.

4      Q    And when did you -- did she mention this to you?

5      A    I don't recall exactly.

6      Q    A year ago?  Two years ago?

7      A    I'm not good with dates.  We were having a

8  conversation on the phone.

9      Q    Is that a recent conversation or --

10     A    No, it wasn't recent.

11     Q    When did you last speak with her?

12     A    At the premiere, I think.  Or I may have called

13  her since then.  But I've had -- I'm just -- I had just

14  got over a very bad case of bronchitis, and, as a matter

15  of fact, I wasn't feeling well during the premiere

16  either, so what I was doing while I was on that extra

17  medication, talking of this one or that one, I can't

18  recall.

19     Q    Do you keep in touch pretty regularly with --

20     A    Not regularly.

21     Q    -- Jean Peavy?

22     A    Not regularly.

23     Q    How frequently?

24     A    I don't have a -- I don't do it by the calendar.

25  I don't know.  Occasionally.

104

1        Q    Do you know that Mr. Toberoff represents

2   Mrs. Peary?

3        A    Yes.

4             MR. TOBEROFF:   Peavy.

5             MR. ZISSU:   Sorry.   Peavy.

6             Let's mark as Defendants' Exhibit 58 a letter

7   dated November 30, 1938 from Jerome Siegel or Jerry

8   Siegel to Mr. J.S. Liebowitz of Detective Comics.

9             (Defendants' Exhibit 58 marked.)

10            THE WITNESS:   I didn't finish reading, but if

11  it's not necessary for me to read the whole thing, maybe

12  I should --

13  BY MR. ZISSU:

14       Q    Why don't you read it, unless you're familiar

15  with it.

16       A    Okay.

17       Q    Are you familiar with this?

18       A    No.   It's the first time I've seen this.

19       Q    First time you've ever seen it?

20       A    Yes.   I wasn't married to Jerry at this time.

21       Q    And in all the years you were married to him, he

22  never showed this to you?

23       A    Pardon?

24       Q    In the years that you were married to him, he

25  never showed you this letter?

105

1        A    No.

2        Q    And you haven't read it before since --

3        A    This is the first time I'm seeing this.

4        Q    Is it fair to say that this letter is proposing

5   an idea?

6        A    I don't want to comment on something that I

7   never saw before.

8        Q    Well, you're a plaintiff in the case, and there

9   are certain claims and assertions being made by you in

10  the case, and they include allegations with respect to

11  this document and some others that may have been signed

12  by your husband years ago.

13            Do you understand that?

14       A    Yes.  But I do want to make it clear that when

15  we were having -- going through the termination, a sister

16  of mine passed away, and I was out of town.  I gave my

17  daughter access to anything that my husband had, and so a

18  lot of stuff became hers, and she turned it over to our

19  attorney, so...

20       Q    Well, you just read it.

21            Correct?

22       A    I just read it.

23       Q    Do you think it's fair to characterize this as a

24  letter proposing an idea --

25            MR. TOBEROFF:  Objection --

106

1          MR. ZISSU:  Let me finish the question.

2      Q    -- that does not flesh out the Superboy

3  character or the continuity?

4          MR. TOBEROFF:  Objection.  Calls for a legal

5  conclusion as to the way -- calls for a legal conclusion.

6  Also vague and ambiguous.

7          THE WITNESS:  I don't know how to answer that.

8  I would have to study and see what you're actually

9  referring to.

10  BY MR. ZISSU:

11     Q    Well, I'm referring to on the second page in the

12  paragraph that begins on that page, it says --

13     A    Second paragraph?

14     Q    Well, it's the second block of text --

15     A    Okay.

16     Q    -- on the second page.  It starts with the

17  words, "Another suggestion."  You see that?

18     A    Yes.

19     Q    It says, "While talking to Mr. Nimis the subject

20  came up of what 'top' strip to use on the Sunday page of

21  SUPERMAN.  I suggested to him that we use a strip named

22  SUPERBOY, which would relate the adventures of Superman

23  as a youth.  The appearance of SUPERMAN in ACTION COMICS

24  has developed the character very much so that we now know

25  how to handle him for syndication.  Now don't you think

107

```
 1    that it might be a good idea for me to do a strip

 2    entitled SUPERBOY for one of our other magazines,

 3    possibly NEW ADVENTURE COMICS, or perhaps MORE FUN

 4    COMICS."

 5            Is it fair to characterize that as proposing an

 6    idea for a new character?

 7            MR. TOBEROFF:  Same objection.

 8            THE WITNESS:  Well, yeah.

 9    BY MR. ZISSU:

10       Q   And if you read the rest of the letter, is it

11    fair to say that beyond the idea, the letter does not

12    flesh out the character or provide any details of stories

13    or continuities?

14       A   Well, it does -- it does describe it as a

15    12-year-old.

16       Q   Anything beyond that?

17       A   I'd have to reread this.

18            MR. TOBEROFF:  Objection.  The document speaks

19    for itself.

20            THE WITNESS:  I guess --

21    BY MR. ZISSU:

22       Q   I am asking you whether you agree with my

23    characterization that this document does not flesh out

24    the character beyond the age you mentioned and does not

25    provide --
```

108

```
 1        A    Well, I can't say that --

 2        Q    Let me finish the question.

 3             -- and does not provide any continuities?

 4             MR. TOBEROFF:  Same objection.  You're asking

 5   her to -- same objection.  You're asking her to make a

 6   legal interpretation.  This document speaks for itself.

 7             THE WITNESS:  Well, I have to rely on legal

 8   opinion because I'm not qualified to give a legal opinion

 9   on anything like this.

10   BY MR. ZISSU:

11        Q    You don't feel you can answer my question.

12             Correct?

13        A    That's right.

14             MR. ZISSU:  Let's mark as Defendants' Exhibit

15   59 -- I think this has been referred to as the Superboy

16   synopsis, Superboy script.

17             (Defendants' Exhibit 59 marked.)

18   BY MR. ZISSU:

19        Q    And to begin with, my question is, have you seen

20   this before, and are you familiar with it?

21        A    It doesn't look familiar to me.

22             This is when?  Do you have a date on this

23   anywhere?

24        Q    No, but I think I can represent that the parties

25   agree this dates to 1940.
```

109

```
 1        A    Well, I wasn't married to him till 1948.

 2        Q    Are you familiar with Action Comics No. 1?

 3        A    Well, it depends on what you mean by "familiar."

 4        Q    Well, I have it somewhere.  Let me show it to

 5   you.

 6        A    Do you mean the cover?  Of course.  It's been

 7   printed many times.

 8        Q    The continuity and the artwork.

 9             I thought we marked it yesterday.

10             MS. LASERSON:  We did.

11             MR. ZISSU:  We did, so it should be there.

12             I've got it.  I have it.  Thank you.

13        Q    I am handing you Defendants' Exhibit 21, I think

14   it is?  Is that correct?

15             Does it say "21" on there, Marc?

16             MR. TOBEROFF:  Yes.

17             MR. ZISSU:  It does.

18             MR. TOBEROFF:  Are you going to ask her

19   questions about this?

20             MR. ZISSU:  I am going to try to.

21             MR. TOBEROFF:  Okay.  So she is going to have to

22   go through it.

23             MR. ZISSU:  Well, I'll let her go through it in

24   a minute, but do you think if I asked you questions --

25   strike that.
```

110

1          Q    Have you read that before at one time or

2     another?

3          A    Yes.

4          Q    Have you read it in the last couple of years?

5          A    Maybe.

6          Q    Will you be able to answer questions for me

7     about -- strike that.

8               If you look at Defendants' Exhibit 59, which is

9     a script that your late husband submitted to Detective

10    Comics in 1940 --

11         A    Pardon?

12         Q    In 1940.

13         A    Yes.

14         Q    Would you be able to look and see what aspects

15    of the Superman character in Action Comics No. 1 are

16    repeated in the script?

17         A    Well, I'd have to read it.  It's too difficult

18    because this is all in art, and this is all in script.

19    I'd have to read it.

20              You want me to tell you what's different in all

21    of this compared to all of this?

22         Q    No, not all of it.  Let me try a couple

23    questions and see how we do.

24              Is the fact that Superman's -- one of his

25    identities is Clark Kent, was that in Action Comics

111

1    No. 1?

2         MR. TOBEROFF:  I'm going to object to the line

3    of questioning so I don't have to interrupt.  I am going

4    to object to this line of questioning that the documents

5    speak for themselves and that it's calling for expert

6    testimony.  Anything above the document speaking for

7    themselves is calling for expert testimony from a lay

8    witness.  It's also, I think, extremely burdensome to

9    give her a 10-page -- a 13-page script and ask her to

10   compare it to a -- I don't know how many pages, -- 10-

11   page comic book with pictures and be able to get a

12   meaningful answer.

13        MR. ZISSU:  Why don't I try something a little

14   different.

15    Q    Why don't you just -- you look at Action Comics

16   No. 1, and I'll ask you a couple questions about that,

17   and my first question is --

18    A    It's upside down.

19    Q    Put the script aside.

20        MR. TOBEROFF:  Did I get a copy of 59?  I am

21   looking for it.

22        MR. ZISSU:  It should be in here.

23        MR. TOBEROFF:  Did we do --

24        MR. ZISSU:  I gave you 59, I think.

25        MR. TOBEROFF:  I just have one copy.

112

1          MR. ZISSU:  Well, you should have a second one.

2          MR. TOBEROFF:  I just got one.

3          MR. TOBEROFF:  Do you want me to use the one

4    from this set?

5          MR. ZISSU:  Yeah, go ahead, until we straighten

6    it out.

7      Q    Here is the question:  Does Action Comics No. 1

8    identify the hero by the name Clark Kent?

9      A    I believe this panel right here does.  Let's

10   see.  I believe this editor's speaking to him, and he

11   says, "Think you can handle that, Kent?"

12     Q    Okay.  Feel comfortable to give me as much

13   detail as you want --

14     A    You don't want me to describe the illustration?

15     Q    No.  My question is only, does this Action

16   Comics No. 1 identify the hero by the name Clark Kent?

17     A    It does, yes.

18     Q    Does Action Comics No. 1 show some kind of a

19   spacecraft in the first panel going into space launched

20   from a distant planet?

21     A    Are you talking about page 1?

22     Q    Yes, the upper left-hand panel.

23     A    I'm sorry.  What is your question?

24     Q    Does this show a spacecraft being launched from

25   a distant planet?

113

1        A    Well, the --

2             MR. TOBEROFF:   Objection.   Compound.   Multiple

3    questions.

4             THE WITNESS:   It looks like the planet is

5    exploding.

6    BY MR. ZISSU:

7        Q    All right.   And you see that green looks like a

8    bullet?   Is that some kind of a spacecraft?

9        A    I don't know what it is.   More like a cucumber.

10       Q    Well, is there reference to a spaceship in the

11   words with that panel being launched toward Earth?

12       A    In that first panel?

13       Q    Yes.

14       A    Is there a reference to a spaceship?

15       Q    Yeah.   Does the first panel in the text --

16       A    No, not in the text.

17       Q    Is there text with the first panel?

18       A    Oh, I'm sorry.   I'm looking at the comic book.

19       Q    At the upper left.   I'm not asking you anything

20   about the script, just Action Comics, and if you look at

21   the top left panel --

22       A    Yes, the first panel.

23       Q    Yes.

24       A    Yes.

25       Q    And does it say, "As a distant planet was

114

1    destroyed by old age, a scientist placed his infant son

2    within a hastily devised space-ship, launching it toward

3    Earth"?

4        A    Yes.

5        Q    And is there reference in the next panel to a

6    passing motorist who discovered a babe?

7        A    Yes.

8        Q    And is there a panel -- a picture of a babe or a

9    baby holding up an armchair?

10       A    Yes.

11           MR. ZISSU:  Let me take a break to consider how

12   to move this along.  If we can go off the record.

13           (Recess.)

14           MR. ZISSU:  On the record.

15           Based upon our recent questions and answers, I

16   believe that the witness cannot go through the process

17   doing comparisons of the kind I was going to do.  I

18   was -- I'll tell you what I was going to do.  I was going

19   to have her compare Action Comics No. 1 with Defendants'

20   Exhibit 59, the synopsis of the script, and then I was

21   going to have a comparison by the witness between the

22   synopsis of the script with More Fun Comics No. 1, and

23   then I was going to ask her some similar questions about

24   the contents of Smallville, of which there are many

25   episodes.

115

1    before closing off the questions about works and

2    similarities, I have one question, and then I hope to

3    wind up with some short questions remaining.

4        Q    First, if you would turn and look at Defendants'

5    Exhibit 23, which is the letter you wrote to Mr. Parsons,

6    Defendants' Exhibit 23, I am going to ask you a question

7    about a paragraph on the second page.  It's the fifth

8    paragraph on the second page.

9        A    Yes.

10       Q    It says, "It is to the everlasting shame of

11   everyone in leadership roles at the company that they

12   allowed that disgraceful contract to be sent to us.

13   There was no concern for the suffering it would cause

14   Jerry Siegel's widow and his ailing, impoverished

15   daughter," close quote.

16            Yesterday I asked your daughter what the

17   suffering was referring to, and I believe she answered

18   that this would be the deprivation of the money that

19   would have come to you at this time in your lives.

20       A    For both of us.

21       Q    For both of you.

22            So my question to you now is --

23            MR. TOBEROFF:  Let him finish his question

24   before you answer.

25            MR. ZISSU:  Yeah, wait.

119

1      Q    The question to you now is, have you made any

2    attempt to calculate how much by now you would have been

3    paid under the October 19, 2001 letter if the February 1

4    draft contract had not been occurred?

5      A    You mean based on that contract that we didn't

6    like but approved?

7      Q    Yes.

8      A    No.

9           You asked if we calculated the amount?

10     Q    Yeah.  Have you considered --

11     A    No, we didn't, but perhaps our representatives

12   did.

13     Q    Did an accountant --

14     A    I don't recall actually.

15     Q    Did any accountant or auditor take a look at

16   what you would have been paid by now?

17     A    Let's see.  This is at the end of the

18   representation of Kevin Marks and Bruce Ramer.

19     Q    Yes, but I'm asking --

20     A    They may have.

21     Q    But have you --

22     A    But personally I didn't.

23     Q    Have you considered --

24     A    I figured that I wasn't qualified to make

25   that -- try to figure that out.

120

1      Q     In a rough sense, did you consider that there

2   would be several millions of dollars --

3      A     Many millions.

4      Q     Many millions.

5            MR. TOBEROFF:  What are we...

6            MR. ZISSU:  That's the question, and that's the

7   answer.  That's the end.

8            MR. TOBEROFF:  Okay.

9            MR. ZISSU:  Whatever.  Okay.

10           Let's mark now as Defendants' Exhibit 60 --

11           MR. TOBEROFF:  I am going to object to that last

12   question.  I know I'm a little late on the draw.  She

13   answered before I could object, but the question was

14   vague and confusing, and I think the witness was -- did

15   not -- was confused in what she was answering when she

16   said "many millions."

17           MR. ZISSU:  I don't think so, but we'll leave it

18   to her testimony.

19           Defendants' Exhibit 60 is...  Defendants'

20   Exhibit 60 is excerpts from a book "The Adventures of

21   SUPERMAN" by George Lowther.

22           THE WITNESS:  I don't think I answered your -- I

23   mean I didn't understand your last question, and I --

24   BY MR. ZISSU:

25      Q     You answered the question.

121

1    original book in 1942, and in the reference to the

2    Library of Congress catalogue information it states,

3    "Superman / by George Lowther; based upon the cartoon

4    character created by Jerry Siegel and Joe Shuster;

5    illustrations by Joe Shuster; forward by Josette Frank;

6    introduction by Roger Stern."

7         Do you know whether your husband was aware of

8    this book in 19- --

9    A    No.

10   Q    -- -47?

11   A    '47?  We weren't married until late 1948.

12   Q    But you knew him in 1947.  You knew him in 1947.

13   A    Yes, but he was in Cleveland.  I wasn't.

14   Q    Where were you?

15   A    I was in Florida.  I was in Miami.

16   Q    And after you married him in 1948, do you know

17   whether he knew of the existence of this book --

18   A    No.

19   Q    -- at that time?

20        Do you know anything about the lawsuit that your

21   husband and Joseph Shuster filed against the predecessor

22   of DC Comics in the New York state courts in 1947?

23   A    That would be the Westchester case?

24   Q    Yes, the Westchester case.

25   A    I think very little about it.  He never wanted

124

1    to talk about it.

2        Q    Do you know whether any of the claims that your

3    husband and Shuster brought in that case covered or

4    related to this book, the Lowther book?

5        A    That is all blank to me.

6            MR. ZISSU:  Let's mark as Defendants' Exhibit 61

7    Plaintiffs Joanne Siegel and Laura Siegel Larson's

8    Supplemental Responses to Defendant DC Comics' First Set

9    of Interrogatories.

10           (Defendants' Exhibit 61 marked.)

11   BY MR. ZISSU:

12       Q    Do you recognize this?

13       A    The cover, yes.

14       Q    Yes.

15           MR. TOBEROFF:  Give her a chance to read through

16   it.

17           MR. TOBEROFF:  Okay.

18   BY MR. ZISSU:

19       Q    Are you familiar with this?

20       A    Yes.

21       Q    And did you recently -- if you turn to page 12,

22   did you recently sign the statement made at page 12?

23           MR. TOBEROFF:  I am just going to find the page

24   for her.

25           THE WITNESS:  Yes.

125

1    the last comment I made?

2    BY MR. ZISSU:

3        Q    The question is, isn't it true that Superman led

4    to the Superboy synopsis written by your late husband?

5            MR. TOBEROFF:  What's the question?

6    BY MR. ZISSU:

7        Q    Isn't it true that Action Comics No. 1 led to

8    the Superboy synopsis, which is that script that we

9    looked at which was submitted by your late husband to

10   Detective Comics, Inc.?

11           MR. TOBEROFF:  Objection.  Calls for a legal

12   conclusion.

13           You can answer if you know.

14           THE WITNESS:  I can't hear.

15           MR. TOBEROFF:  Objection.  Calls for a legal

16   conclusion.

17           You can answer if you know the answer.

18           THE WITNESS:  Will you repeat that question

19   again?

20   BY MR. ZISSU:

21       Q    Isn't it true that Action Comics No. 1, which is

22   Exhibit -- Defendants' Exhibit 21, led to the idea and

23   text in the script that Mr. Siegel wrote about Superboy

24   in 1940?

25           MR. TOBEROFF:  Objection.  Vague and ambiguous.

135

1    Calls for a legal conclusion.

2            THE WITNESS:  I don't know.  I can't answer that

3    because I'm very tired, and I'm --

4            MR. TOBEROFF:  It's okay.

5            THE WITNESS:  -- having trouble with this whole

6    thing.

7    BY MR. ZISSU:

8        Q    We are almost at the end of the deposition.

9            Isn't it true if there had never been any

10   Superman, there wouldn't have been any Superboy?

11       A    I don't know.

12       Q    Well, isn't Superboy a character that is

13   Superman as a youth?

14       A    I don't think so, no.

15       Q    You don't think so?

16       A    No.

17       Q    What is Superboy as you understand it?

18       A    Superboy is a teenage character with teenage

19   problems, very close to his parents.  He lives in a farm-

20   like atmosphere.  And Superman is in the city.  He does

21   his exploits mainly in the cities.  And Superboy is young

22   and -- you know, and that's the difference.  They're two

23   different characters.

24       Q    Didn't your husband say that Superboy was

25   Superman as a youth?

136

1          A    I don't think so.

2          Q    You don't think so.

3          A    I have no knowledge of anything like that.

4               MR. ZISSU:  I have no further questions.

5               MR. TOBEROFF:  I just have one question.

6

7                          EXAMINATION

8    BY MR. TOBEROFF:

9          Q    You stated earlier in response to a certain line

10   of questioning that you would have made many millions,

11   and my question is, did you -- were you saying that had

12   you entered into the February 1st draft that was sent by

13   John Schulman, you would have made many millions?

14         A    No.

15         Q    Did you mean that if you had entered into the

16   April proposal that was sent by your -- excuse me --

17   October 19th proposal that was sent by your attorney,

18   Kevin Marks, that you would have made many millions?

19         A    No.

20              MR. TOBEROFF:  I have no further questions,

21   unless you do.

22              MR. ZISSU:  Yeah.

23

24                          EXAMINATION

25   BY MR. ZISSU:

137

```
 1        Q    What were you saying about many millions?

 2        A    If we had a better deal.  I thought you meant if

 3   we got a better deal, what did I expect.  That's what I

 4   thought you meant.

 5             MR. ZISSU:  I don't have any further questions.

 6             MR. TOBEROFF:  Want to do the same stipulation

 7   as yesterday?

 8             MR. ZISSU:  Yes.

 9             (The following stipulation is incorporated

10             by reference:

11                "MR. ZISSU:  The stipulation is you

12             can waive filing and have it signed

13             before a notary public, if that's

14             acceptable.  That's another stipulation

15             that's normal, I believe.

16                "MR. TOBEROFF:  Any stipulations you

17             want to make regarding the transcript?

18                "MR. BERGMAN:  Well, we could waive

19             the notary and just have it signed under

20             penalty of perjury, which is --

21                "MR. ZISSU:  That's okay.

22                "MR. BERGMAN:  -- pretty customary.

23                "MR. TOBEROFF:  I think so.

24                "MR. ZISSU:  That's okay.

25                "MR. BERGMAN:  And the reporter would
```

138

1              be relieved of his responsibilities and

2              will deliver the original directly to

3         Mr. Marks --

4              "MR. TOBEROFF:  Toberoff.

5              "MR. BERGMAN:  Toberoff.

6              "MR. TOBEROFF:  My first name is Marc.

7              "MR. ZISSU:  All the other rules as to

8              "timing and signing apply.

9              "MR. BERGMAN:  Yes.

10             "MR. TOBEROFF:  So stipulated.")

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

139

1

2

3

4

5

6

7

8        I, JOANNE SIEGEL, do hereby declare under

9  penalty of perjury that I have read the foregoing

10  transcript; that I have made any corrections as appear

11  noted, in ink, initialed by me, or attached hereto; that

12  my testimony as contained herein, as corrected, is true

13  and correct.

14        EXECUTED this _17th_ day of _September_,

15  20_06_, at _MARINA DEL Rey_, _CA_.
                        (City)                (State)

16

17

18

19        _____
           JOANNE SIEGEL

20

21

22

23

24

25

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1

2

3

4          I, the undersigned, a Certified Shorthand

5   Reporter of the State of California, do hereby certify:

6          That the foregoing proceedings were taken

7   before me at the time and place herein set forth; that

8   any witnesses in the foregoing proceedings, prior to

9   testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under by

12  direction; further, that the foregoing is an accurate

13  transcription thereof.

14          I further certify that I am neither

15  financially interested in the action nor a relative or

16  employee of any attorney of any of the parties.

17          IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19

20  Dated: _____AUG 1 8 2006_____

21

22

                    DAVID S. COLEMAN, CSR NO. 4613

23

24

25

# Errata Sheet

**Pg/Ln**                                                    **Correction**

11 / 10 _js_  Change from: "... and a October 1926 letter."
              Change to: "... and an October 26th letter."

39 / 8-10 _js_  Change from: "And 10 days later he sent that letter to John Schulman. 10 days later,
                Change to: "And 7 days later he sent that letter to Kevin Marks. 7 days later..."

49 / 4 _js_  Change from: "demands that were your unapprovable."
             Change to: "demands that were unapprovable."

87 / 8-9 _js_  Change from: "February 1, 2000 draft"
               Change to: "February 1, 2002 draft"

120 / 5-6 _js_  Change from: "you mean based on that contract that we didn't like..."
                Change to: "you mean based on that letter that we didn't like..."

___ / ___  Change from:_____
           Change to:_____

___ / ___  Change from:_____
           Change to:_____

___ / ___  Change from:_____
           Change to:_____

___ / ___  Change from:_____
           Change to:_____

___ / ___  Change from:_____
           Change to:_____

___ / ___  Change from:_____
           Change to:_____

___ / ___  Change from:_____
           Change to:_____

___ / ___  Change from:_____
           Change to:_____

Signature:_____Jeanne Siegel_____    Date:_September 17th 2006_

305