# EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA
SIEGEL LARSON,

      Plaintiffs,

    vs.               No. 04-8400 (RSWL)(RZx)
                             -and-
WARNER BROS. ENTERTAINMENT  No. 04-8776 (RSWL)(RZx)
INC., et al.,

      Defendants.

AND RELATED COUNTERCLAIMS.

# ORIGINAL

DEPOSITION OF JOANNE SIEGEL

Beverly Hills, California

Wednesday, August 2, 2006

Reported by:
DAVID S. COLEMAN
CSR No. 4613

Job No. 1-50935



www.sarnoffcourtreporters.com

Irvine • Los Angeles • San Francisco

phone 877.955.3855 • fax 949.955.3854

SARNOFF
Court Reporters and
Legal Technologies

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4    JOANNE SIEGEL and LAURA
     SIEGEL LARSON,
5
              Plaintiffs,
6
         vs.                           No. 04-8400 (RSWL) (RZx)
7

     WARNER BROS. ENTERTAINMENT
8    INC., et al.,

9             Defendants.                        -and-
     _____
10   JOANNE SIEGEL and LAURA
     SIEGEL LARSON,
11
              Plaintiffs,
12                                     No. 04-8776 (RSWL)(RZx)
         vs.
13
     TIME WARNER INC., WARNER
14   COMMUNICATIONS INC., WARNER
     BROS. ENTERTAINMENT INC., WARNER
15   BROS. TELEVISION PRODUCTION INC.,
     DC COMICS, and DOES 1-10,
16
              Defendants.
17   _____
     AND RELATED COUNTERCLAIMS.
18

     _____
19

20            Deposition of JOANNE SIEGEL, taken on behalf of

21   Defendants and Counterclaimants, at 9665 Wilshire

22   Boulevard, 9th Floor, Beverly Hills, California,

23   beginning at 10:04 AM and ending at 4:52 PM on Wednesday,

24   August 2, 2006, before DAVID S. COLEMAN, Certified

25   Shorthand Reporter No. 4613.

2

```
 1    APPEARANCES:

 2

 3    For Plaintiffs:

 4         LAW OFFICES OF MARC TOBEROFF
           BY:  MARC TOBEROFF
 5         Attorney at Law
           2049 Century Park East, Suite 2720
 6         Los Angeles, California 90067
           310-246-3333

 7

 8

      For Defendants and Counterclaimant:
 9
           WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
10         BY:  MICHAEL BERGMAN
           Attorney at Law
11         9665 Wilshire Boulevard, 9th Floor
           Beverly Hills, California 90212
12         310-858-7888
           mbergman@wwllp.com
13
               -and-
14
           FROSS ZELNICK LEHRMAN & ZISSU
15         BY:  ROGER L. ZISSU
           Attorney at Law
16         866 United Nations Plaza
           New York, New York 10017
17         212-813-5900
           rzissu@frosszelnick.com
18

19

      Also Present:
20
           LILLIAN LASERSON
21

22

23

24

25
```

3

1                          INDEX

2    WITNESS                          EXAMINATION

3    JOANNE SIEGEL

4

5           BY MR. ZISSU                    7, 137

6           BY MR. TOBEROFF               137

7

8                         EXHIBITS

9    DEFENDANT                              PAGE

10   43    Letter from Joanne Siegel and Laura    43
           Siegel Larson to Paul Levitz dated
11         September 21, 2002

12   44    Letter from Martin Payson to Mrs.      62
           Jerry Siegel dated March 15, 1982
13

14   45    Letter from Joanne Siegel to Joseph    67
           Shuster dated May 27, 1986

15   46    Letter from Joanne Siegel to John      70
           Schulman dated September 14, 1995
16

17   47    Letter from Paul Levitz to Joanne      72
           Siegel dated April 15, 1999

18   48    Letter from Bruce Ramer to Carol       74
           Simkin and John Schulman dated
19         April 30, 1999

20   49    Letter from Carol Simkin to Kevin      77
           Marks dated January 6, 2000
21

22   50    Letter from Carol Simkin to Kevin      78
           Marks dated March 29, 2000

23   51    Letter from Kevin Marks to John        83
           Schulman dated July 18, 2000
24

25   52    Letter from John Schulman to Kevin     85
           Marks dated July 18, 2000

4

```
 1    INDEX (Continued:

 2                      EXHIBITS (Continued)

 3    DEFENDANT                                           PAGE

 4    53   Reply to First Amended Counterclaims    86
           in USDC Case No. 04-8400 RSWL (RZx)
 5         dated November 1, 2005

 6    54   Letter from Joanne Siegel to Paul        95
           Levitz dated November 6, 2000
 7
      55   Letter from Joanne Siegel to Paul        97
 8         Levitz dated May 14, 2001

 9    56   Letter from John Schulman to Bruce      101
           Ramer and Kevin Marks dated January
10         22, 2002

11    57   Notice of Termination of Transfer      102
           Covering Extended Copy Renewal Term
12         of 'Superman'

13    58   Letter from Jerome Siegel to J.S.      105
           Liebowitz dated November 30, 1938
14
      59   Document from Jerry Siegel entitled    109
15         "SUPERBOY" Bates Nos. 000000589 - 601

16    60   Document entitled "The ADVENTURES of   123
           SUPERMAN" by George Lowther
17
      61   Plaintiffs Joanne Siegel and Laura     125
18         Siegel Larson's Supplemental Responses
           to Defendant DC Comics' First Set of
19         Interrogatories dated July 14, 2006

20

21
                    INSTRUCTION NOT TO ANSWER
22
                         Page    Line
23
                         20      20
24                       31       3
                         32       8
25                      126      23
```

5

1    INDEX (Continued):

2              INSTRUCTION NOT TO ANSWER (Continued)

3                        Page    Line

4                        128     24
                         130      1
5                        131      1
                         131      9
6                        131     21

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1          Beverly Hills, California, Wednesday, August 2, 2006

2                        10:04 AM - 4:52 PM

3

4                          JOANNE SIEGEL,

5     having been first administered an oath, was examined and

6     testified as follows:

7

8              MR. ZISSU:  Can we have the same stipulations we

9     used yesterday?

10             MR. TOBEROFF:  Which?

11             MR. ZISSU:  Objections except as to form are

12    reserved, the witness can sign -- can make a declaration

13    instead of signing before a notary or filing the

14    deposition with the court or before the notary, and

15    that's it.

16             MR. TOBEROFF:  Yes, except I am going to state

17    the objections.  Objections except as to form are always

18    reserved.  We don't have to stipulate to that.  That's

19    fine.

20

21                          EXAMINATION

22    BY MR. ZISSU:

23        Q    Miss Siegel, where do you do live?

24        A    In Marina Del Rey.

25        Q    And what's the address?

7

1              THE WITNESS:  I really don't know what you want.

2    BY MR. ZISSU:

3         Q    Well, you knew him from 1935 to 1948, before you

4    married him.

5              MR. TOBEROFF:  Objection.  Misstates testimony.

6    BY MR. ZISSU:

7         Q    Correct?

8         A    Yes.

9         Q    And in that time frame between the time you

10   first met him and the time you married him, did you

11   become familiar with what he did for a living?

12        A    Only vaguely, through Joe Shuster.

13        Q    Did you know anything of Mr. Siegel's

14   relationship with DC Comics in that time frame?

15        A    No.

16        Q    When you got married to Mr. Siegel in 1948, was

17   he doing work on the Superman comic books?

18        A    When we were married?

19        Q    Yes.

20        A    No.

21        Q    Did -- after 1948 did there come a time when he

22   did work on Superman comic books or comic strips?

23        A    Many years later.

24        Q    And when was that?

25        A    I believe it was in 1958.

14

1          Q     Did he seek out that employment?

2          A     Actually, I did.

3          Q     What -- how did that come about?

4          A     I was in touch with Mr. Liebowitz, who was I

5     guess president, and I asked him if he would give Jerry

6     work.

7          Q     And what did he say?

8          A     He refused at first.

9          Q     And then what happened?

10          A     I kept asking him.

11          Q     And --

12          A     And he said yes.

13          Q     And what was the work he gave him?

14          A     He did what they call the newspaper dailies.

15     He -- all I know is that he did write some stories,

16     probably the comic books.

17          Q     Do you know what characters were involved?

18          A     Superman.

19          Q     And how long did he continue to do that?

20          A     I believe the -- until 1966.

21          Q     Did he do any work on Superman comic books or

22     scripts after 1966?

23          A     I don't believe so.  I don't recall.

24          Q     I am going to show you -- or ask you to look at

25     from the exhibits we marked yesterday Exhibits --

15

1    Defendants' Exhibits 16 and 17.

2            MR. TOBEROFF:  Do you want me to try and find --

3            MR. ZISSU:  Yes.

4            MR. TOBEROFF:  -- these?

5            MR. ZISSU:  They should be in order, I hope.

6            MR. TOBEROFF:  Okay.

7            MR. ZISSU:  So 16 and 17.

8            MR. TOBEROFF:  Which one first?

9            MR. ZISSU:  Well, 16 first.

10       Q    This exhibit includes text from seven notices of

11   termination -- of copyright termination, and my question

12   is have you ever seen this exhibit?

13            For example, the first page, have you ever seen

14   that before?

15       A    Just the first page?

16       Q    Yes.  Does that look familiar to you?

17       A    Yes.

18       Q    All right.  And did you authorize the service of

19   notices of termination on DC Comics and other Time Warner

20   entities?

21       A    Yes.

22       Q    And did this occur before or after Mr. Siegel

23   died?

24       A    After.

25       Q    And why did -- did you ever discuss with

16

```
 1    Mr. Siegel taking action to terminate these copyright

 2    grants before he died?

 3        A    Yes.  Yes.

 4        Q    And why didn't he serve these notices of

 5    termination before he died?

 6        A    He was very ill.

 7        Q    How long was he ill before he passed away?

 8        A    A long time.

 9        Q    Was it so long as 10 years?

10        A    Oh, yes.

11        Q    It was?

12        A    On and off.

13        Q    What was he suffering from?

14        A    A heart condition.

15        Q    In the period before he died, did Mr. Siegel or

16    you ever make any attempt to assess the value of the

17    termination rights?

18            MR. TOBEROFF:  Objection.  Vague.

19            You can answer.

20            THE WITNESS:  No.

21    BY MR. ZISSU:

22        Q    When he died, did you -- you were -- strike

23    that.

24            Were you his executrix under his estate, under

25    his will?
```

17

1    you spoken to a consultant about what the Siegel

2    copyright rights are worth?

3          A    I don't recall.

4                MR. TOBEROFF:  Wait.  Excluding lawyers?

5                MR. ZISSU:  Excluding lawyers.

6                THE WITNESS:  I don't recall.

7    BY MR. ZISSU:

8          Q    When did you arrange for Arthur Levine to

9    represent you?

10          A    It was in early fall, I believe, in 1996.

11          Q    And how did you communicate with him?

12          A    We went to Washington, D.C., to meet with him.

13          Q    And did you meet with anybody else while you

14    were there?

15          A    Yes.

16          Q    Who?

17          A    Another attorney.

18          Q    Do you remember his name or her name?

19          A    George Zadorozny.

20          Q    And where was he -- did he have an office in

21    Washington?

22          A    No.

23          Q    And how did you first get in touch with

24    Mr. Zadorogny?

25                MR. TOBEROFF:  Zadorozny.

22

1          MR. ZISSU:  Zadorozny.

2          THE WITNESS:  He got in touch with us.

3   BY MR. ZISSU:

4      Q    When did that happen?

5      A    While my husband was still alive.

6      Q    Was he -- at the point when you met with him in

7   Washington, was he already your lawyer in some respect?

8          MR. TOBEROFF:  I don't think she met with -- I'm

9   not sure if she met with Zadorozny in Washington.

10         MR ZISSU:  The witness is supposed to answer

11  the questions.

12         MR. TOBEROFF:  Okay.  I'm trying to give --

13         MR. ZISSU:  Please --

14         MR. TOBEROFF:  I am trying to give you a clear

15  record.

16         MR. ZISSU:  I don't need the record.  You have

17  cross-examination, and you can correct things.  That's

18  why we have cross-examination.

19         MR. TOBEROFF:  You're misunderstanding my

20  comments.

21  BY MR. ZISSU:

22     Q    Was Mr. Zadorozny your lawyer at the time you

23  met with him in Washington in the fall, I think you said,

24  1996?

25     A    I had asked him some questions.

23

1        Q    Before the meeting?

2        A    Yes.

3        Q    Did you also engage him to assist you, along

4    with Mr. Levine, with respect to the copyright

5    termination?

6        A    Yes.

7        Q    After October 19, 2001, when Mr. Marks wrote the

8    letter that you referred to, and before February of 2002,

9    did you communicate with any third persons other than

10   lawyers concerning the sufficiency of the deal points

11   that are mentioned in Mr. Marks' letter?

12       A    I don't understand the question.

13       Q    After Mr. Marks' letter of October 19, 2001 and

14   before February of 2002, did you consult with anybody

15   about the sufficiency of the value that was set forth in

16   his letter of the payments that would be made to you?

17            MR. TOBEROFF:  Lacks foundation.  Compound.

18   Vague and ambiguous.

19            MR. ZISSU:  Take a break for a second.

20            (Recess.)

21            MR. ZISSU:  Back on the record.

22            Could we read the question back?

23            (Record read as follows:

24            "Q    After Mr. Marks' letter of

25            October 19, 2001 and before February

1          of 2002, did you consult with anybody

2          about the sufficiency of the value

3          that was set forth in his letter of

4          the payments that would be made to

5          you?")

6          MR. TOBEROFF:  Same objection.

7          THE WITNESS:  Can you --

8     BY MR. ZISSU:

9          Q   Yes.  There was a provision in the October 19,

10    2001 letter for money to be paid to you.

11         Correct?

12         A   Would you clarify that further?

13         Q   The October 19, 2001 letter --

14         A   What letter is that?

15         Q   From Kevin Marks to John Schulman --

16         A   Oh.

17         Q   -- mentioned amounts that --

18         A   Did you say --

19         MR. TOBEROFF:  Ask the question.

20    BY MR. ZISSU:

21         Q   It mentioned amounts that would be paid to you.

22         Correct?

23         MR. TOBEROFF:  Objection.  Lacks foundation.

24         You can answer.

25         THE WITNESS:  Repeat that again.  I'm having

25

1    trouble with this.

2    BY MR. ZISSU:

3        Q    Let me show you this letter, which is

4    Defendants' Exhibit 22.

5             If you can show that to the witness.

6             MR. TOBEROFF:  Can I put this exhibit back,

7    because it's going to get disorganized?

8             MR. ZISSU:  Yeah, you can put it back, sure.

9        Q    Do you see that there are different moneys that

10   are to be paid?

11       A    Oh, yes.

12       Q    Some moneys.  Whatever the amounts --

13       A    Yes.

14       Q    -- there are moneys.

15       A    Yes, I see.

16       Q    After this letter was sent, did you speak to

17   anybody about whether the amounts were enough?

18            MR. TOBEROFF:  Other than an attorney.

19   BY MR. ZISSU:

20       Q    Other than an attorney.

21       A    I don't recall.

22       Q    Now, I asked you that question between October

23   19, 2001 and February of 2002.

24            Did you speak to anybody about whether these

25   amounts were enough --

26

1      A    I would like to see what you're talking about.

2  You're talking about still another letter right now?

3      Q    Well, yeah.  Why don't we look at the --

4      A    I'm having -- you know, I must remind you I do

5  have trouble concentrating, and dates are very difficult

6  for me.

7      Q    I appreciate that.  I'm trying to make this as

8  easy as possible.

9           Defendants' Exhibit 25, which is a cover letter

10  with the February 1, 2002 draft, might be helpful to put

11  before the witness.

12           MR. TOBEROFF:  I am sorry.  What is the exhibit

13  number?

14           MR. ZISSU:  25.

15      Q    If you could look at that exhibit, and after the

16  first page there is a draft of a contract.  If you could

17  please look at that.

18      A    Yes.  Page 1, yes.

19      Q    Do you recall receiving and seeing a copy of

20  that document on or shortly after the date of it, which

21  is February 1, 2002?

22      A    I recall that -- shortly after?

23      Q    On or about that time.

24      A    Shortly after the 1st?

25      Q    Yeah.  In the beginning of February did you see

27

1    that document?

2        A    Not at the beginning of February.

3        Q    When did you see it?

4        A    I'm trying to reconstruct.

5        Q    Well, approximately.

6        A    Maybe in or around the mid -- middle of

7    February, my guess.

8        Q    And wholly independent of any discussions you've

9    had with any lawyers, when you saw it, did you have a

10   reaction to it?

11       A    Yes.

12       Q    And what was your reaction?

13       A    I was very upset.

14           MR. TOBEROFF:  Okay.  I just want to instruct

15   the witness to -- I'll kind of keep this brief -- when he

16   says "wholly independent," I want to make sure --

17           MR. ZISSU:  This is inappropriate.  You are not

18   supposed to be doing this.

19           MR. TOBEROFF:  Excuse me --

20           MR. ZISSU:  The witness answered the question,

21   understood the question --

22           MR. TOBEROFF:  You can do the deposition your

23   way.  I am going to defend it my way.  Please stop

24   interrupting.

25           MR. ZISSU:  I object.

28

1          Q    When you first --

2          A    It's gotten -- this has gotten too confusing.

3          Q    Well, when you first saw this document in mid

4    February, had you already discussed it with your lawyer?

5               MR. TOBEROFF:  Objection.  You are not to

6    testify -- I instruct you not to answer that question, as

7    to what you discussed with your lawyer.

8               (Instruction not to answer.)

9    BY MR. ZISSU:

10         Q    Did you have any reaction before you had any

11   communication with your lawyer about this document?

12         A    I don't recall.

13         Q    So is it fair to say that independently of any

14   conversations you had with a lawyer, you can't recall

15   having had any reaction to this document?

16         A    I don't know all -- I'm confused right now, so I

17   can't answer that.

18         Q    Now let's look at Defendants' Exhibit 23.

19              MR. TOBEROFF:  I think it's better that you

20   handle these exhibits.  I think it's more appropriate.

21              MR. ZISSU:  Oh, okay.  That's fine.

22         Q    Did you write this letter?

23         A    I believe so.

24         Q    Did any lawyer help you write this letter?

25         A    No.

32

1       Q   Did you discuss with any lawyer --

2           MR. TOBEROFF:  Just a second.  Before we get to

3   the next question, I did not -- I do not have -- I didn't

4   realize we were going to work off the same exhibits, so I

5   don't have a set to look at.

6           MR. ZISSU:  Why don't you borrow these.  Oh, no.

7   Why don't you borrow those.  Sorry.

8           MR. TOBEROFF:  That would be great.  If I

9   could...  Sorry.

10          MR. ZISSU:  That's all right.

11          MR. TOBEROFF:  Let me just organize these for a

12  second.

13          MR. ZISSU:  They're in order.

14          MR. ZISSU:  Could you read back the last

15  question and answer?

16          (Record read as follows:

17              "Q   Did any lawyer help you write

18          this letter?

19              "A   No.

20              "Q   Did you discuss with any

21          lawyer -- ")

22          THE WITNESS:  Was it about this letter?

23  BY MR. ZISSU:

24      Q   Did you discuss with any lawyer the content of

25  this letter before you sent it?

33

```
1          A    No.

2          Q    Now, if you look at the next -- the second page,

3    in the fourth paragraph down --

4          A    Yes.

5          Q    -- there is -- the second sentence reads as

6    follows:  "The beast hungers for more," and then the next

7    sentence reads, "Just like the Gestapo, your company

8    wants to strip us naked of our legal rights," close

9    quote.

10              In what way did you believe that the defendants

11   were stripping you of your legal rights?

12         A    You mean in connection with what?

13         Q    In connection with the letter you wrote.  What

14   did you mean in your letter?

15         A    Well, the February contract was so shocking that

16   we felt -- that's the way I felt.

17         Q    And in what way did you feel it was shocking?

18              MR. TOBEROFF:  Now you're getting back into the

19   same interpretation of a 56-page document.  It involves

20   the attorneys, and that contract was obviously

21   interpreted for her by her attorneys, and she can't --

22   first of all, you're not asking her to articulate that,

23   but I'm instructing her not to answer information she got

24   through discussions with her attorneys.

25              MR. ZISSU:  Well, I just want to point out two
```

34

1    objectionable, but she can't go into the details of why

2    because that discloses her conversation and advice from

3    her attorneys regarding interpreting a 56-page contract.

4          MR. ZISSU:  I disagree with you, but I didn't

5    ask her to interpret a 56-page contract or the details.

6    I asked her in broad terms to identify to me in what ways

7    she considered that AOL Time Warner, Inc. and the other

8    defendants were stripping her of her legal rights, in

9    broad terms.  That's the question.

10         MR. TOBEROFF:  You can answer very broadly

11   without going into details.

12         THE WITNESS:  You would have to repeat that.  I

13   heard part of it, of what you said, but not the other

14   part.

15   BY MR. ZISSU:

16       Q   Well, in what way or ways did you consider that

17   Time Warner and the other defendants were stripping you

18   of your legal rights by virtue of the February 1, 2002

19   draft contract?

20       A   I don't recall.

21       Q   Are you familiar with this letter?

22       A   Well, it's written a long time ago.

23       Q   Can you read it again now for a minute?

24       A   The entire letter?

25       Q   Yes.

36

1            MR. TOBEROFF:  Take your time.

2    BY MR. ZISSU:

3        Q    Are you finished?

4        A    Yes.

5        Q    What were you trying to achieve in writing this

6    letter?

7        A    I wanted to make him aware of what his attorneys

8    or representatives had done.

9        Q    Was it your intention to tell him that there

10    would be no deal?

11            MR. TOBEROFF:  Vague and ambiguous.

12            You can answer.

13            THE WITNESS:  That -- what is your question?

14    BY MR. ZISSU:

15        Q    Was it your intention to tell him at this point

16    that there would be no deal?

17        A    I guess so.

18        Q    And if you look at paragraph 3, there is a --

19            MR. TOBEROFF:  Which page?

20            MR. ZISSU:  On the first page.

21        Q    There is a sentence -- the last sentence of that

22    paragraph reads as follows --

23        A    The last sentence?

24        Q    The last sentence of paragraph 3.

25        A    Okay.

37

1     Q    "When we made those difficult concessions and

2     reluctantly accepted John Schulman's last proposal six

3     months ago, we were stabbed in the back with a shocking

4     contract."

5           Was the presentation of this contract the reason

6     for your considering that there would be no deal?

7     A    Is the presentation of the contract?

8     Q    Was offering -- sending you this draft contract

9     the reason that you considered there would be -- there

10    was no deal?

11          MR. TOBEROFF:  Objection.  Vague and ambiguous.

12          You can answer.

13          THE WITNESS:  Probably.

14    BY MR. ZISSU:

15    Q    Was there anything else that Time Warner or DC

16    comics did that led you to this view?

17    A    Well, they made changes, unapproved changes in

18    what they sent us.

19    Q    Anything else?

20    A    Things that had never been discussed, never

21    approved, just put in there, and the -- everything was

22    subject to approval, and obviously we couldn't approve of

23    something, first of all, we hadn't seen before, and then

24    be shocked what changes and additions that we didn't

25    approve of.

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1     Q   Was there anything else that they did that

2  was -- that you considered to be the basis for concluding

3  there could be no deal?

4     A   Well, yes.  It's difficult to express and

5  explain it, but as I recall, there was an October 19th

6  letter written by Kevin Marks, and then -- in which he

7  says he is going to be unavailable for four weeks.  That

8  was when he went to China.  And 10 days later -- he sent

9  that letter to John Schulman.  10 days later, on the

10 26th, while he was away, John Schulman sends him a

11 letter, knowing he's not there, and in it he says that he

12 thinks he has a -- more fulsome ideas about that contract

13 or proposal and that he believed that it wasn't -- that

14 there was no meeting of minds.  So it sounded more like a

15 counterproposal.  I mean, there was -- you know, he's

16 saying this afterward.  And we didn't even learn of that

17 until more recently, that that letter of the 26th

18 existed.

19    Q   When did you learn of that letter?

20    A   The --

21    Q   October 26.

22    A   Just more recently.

23    Q   Not in November of 2001?

24    A   No.

25    Q   Did you learn it --

39

1       A    More recently.  This is 2006.

2       Q    Oh, you only learned of that in 2006?

3       A    Yes.

4       Q    Kevin Marks had never sent -- strike that.

5            Kevin Marks' office did not send you a copy in

6  October of 2001?

7       A    No, we didn't get that copy.

8            He wasn't -- what probably happened is this:  He

9  was out of the country for four weeks, and that letter

10 was sent to his office while he was out of the country

11 and probably got filed, and maybe he didn't know about it

12 until we asked for our papers be returned, and it turned

13 up some -- I don't know if we got all the papers all at

14 one time, or maybe we had to ask for additional papers

15 that were missing, and when those papers came, these

16 papers obvious -- the 26th letter was obviously found and

17 was among the papers that were sent.  That's my guess.

18      Q    When were the papers returned to your lawyer, I

19 think?

20      A    My lawyer would know.

21      Q    Did -- when you say you didn't know of this

22 October 26, 2001 letter, do you mean neither you nor your

23 daughter Laura knew?

24      A    That is correct.  And neither did anyone else,

25 apparently.

40

```
 1          Q    Isn't it a fact that Mr. Toberoff began

 2   representing you in late 2002 or early 2003?

 3          A    It was late 2002.

 4          Q    And didn't he get the files, which included this

 5   document, at about that time?

 6          A    I don't know when he got it.

 7          Q    I'm looking --

 8          MR. TOBEROFF:  I can represent to you this

 9   October 26 letter was not in the files that I received

10   from Kevin Marks.

11          MR. ZISSU:  I'm looking for the copy of it, the

12   October 26 letter, which was marked yesterday, I believe.

13   It's in a separate pile here somewhere.

14          Q    Were you also dealing with Bruce Ramer at the

15   Gang Tyre firm?

16          A    When?

17          Q    In the period when Kevin Marks was representing

18   you.

19          A    Oh, that's the firm.

20          Q    Yes.

21               And Bruce Ramer was also working for you then.

22               Correct?

23          A    I -- yes, I guess.

24          MR. ZISSU:  Marc, it would be really helpful if

25   you would help me so I can reduce my time looking for
```

41

```
 1    these exhibits.

 2            MR. TOBEROFF:  I have these exhibits here.

 3            MR. ZISSU:  I am joking.

 4            MR. TOBEROFF:  Were you joking?

 5            MR. ZISSU:  Yes.  I always like help.  See,

 6    you're making my life more complicated.

 7       Q    Let me show you Defendants' Exhibit 24, which is

 8    a copy of the October 26, 2001 letter.

 9       A    Yes.  I see the top page.

10       Q    And you see that that letter from Mr. Siegel was

11    also copied to Mr. Ramer.

12            Correct?

13       A    Correct.

14       Q    And you never received from Mr. Ramer a copy of

15    this letter?

16       A    No.

17       Q    If you look at Defendants' Exhibit 23, which is

18    your May 9, 2002 letter --

19       A    Yes.

20       Q    -- is it your testimony that when you wrote that

21    letter, you had never seen Mr. Schulman's October 26,

22    2001 letter?

23       A    That is correct.

24       Q    And so that the comments in your May 9, 2002

25    letter have nothing to do with Mr. Schulman's letter of
```

42

1    October 26, 2001.

2         Is that correct?

3         A    What do you mean, "had nothing to do"?

4         Q    Well, on May 9, 2002, you had never seen

5    Mr. Schulman's October 26, 2001 letter, so the comments

6    that you made to Mr. Parsons are not about Mr. Schulman's

7    letter.

8         Correct?

9         A    That is correct.

10        MR. ZISSU:  Now I want to mark as Defendants'

11    Exhibit 43 a letter dated September 21, 2002 from Joanne

12    Siegel and Laura Siegel Larson to Paul Levitz.  I'm

13    having trouble finding the copy I want.

14        Let's go back -- we will look instead at a

15    September 21, 2002 letter from you and Laura to Kevin

16    Marks, which I will find in the exhibits.

17        Can we take a break for five minutes.  Okay?

18        MR. TOBEROFF:  Sure.

19        (Recess.)

20        MR. ZISSU:  Let's mark as Defendants' Exhibit

21    43 -- I think I stated this before -- a September 21,

22    2002 letter from Joanne Siegel and Laura Siegel Larson to

23    Paul Levitz.

24        (Defendants' Exhibit 43 marked.)

25        MR. TOBEROFF:  I think we had this last time.

43

1          MR. ZISSU:  No.  What you had --

2          MR. TOBEROFF:  Just to be clear, on the new

3   exhibits, I'll add one copy to this pile and keep another

4   copy separate?

5          MR. ZISSU:  Right.

6          MR. TOBEROFF:  Okay.

7          MR. ZISSU:  And so you need another.  Right?

8          MR. TOBEROFF:  Yeah.

9          MR. ZISSU:  The letter to which you're

10  referring, Marc, is Defendants' Exhibit 41, which is a

11  letter of the same day to Kevin Marks and Bruce Ramer.

12          MR. TOBEROFF:  Okay.

13  BY MR. ZISSU:

14      Q   Miss Siegel, you have before you Defendants'

15  Exhibit 43.  Did you write that letter?

16      A   Would you repeat the date?

17      Q   Yes.  September 21, 2002.  Did you with your

18  daughter write that letter to Paul Levitz?

19      A   Yes.

20      Q   Yes?

21      A   Yes.

22      Q   And at that date is it your testimony that you

23  still did not have a copy of John Schulman's October 26,

24  2001 letter?

25      A   Yes.

44

1          Q    Now, if you will look again at Defendants'
2     Exhibit 23, which is your letter to Mr. Parsons -- do you
3     have that in front of you somewhere?
4          Does the witness have it?
5          A    Yes.
6          Q    23?
7          A    Yes.
8          MR. TOBEROFF:  Yes.
9          MR. ZISSU:  Okay.
10         Q    On the first page in the bottom paragraph, you
11    state, quote, "Your company's unconscionable contract
12    dated February 4, 2002 contained new, outrageous demands
13    that were not in the proposal," close quote.
14         Now, without the necessity for me or for
15    Mr. Toberoff to repeat our objections to similar
16    questions, my question is this:  Can you in a broad,
17    general sense tell me what you considered to be the
18    outrageous demands?
19         A    Well, when we got the contract, we spoke with
20    our attorney because it's a legal contract with legalese
21    stuff, and after he looked it over and talked with us, he
22    made us realize, you know, that there were -- of the
23    changes and the additions which were outrageous.
24         Q    But can you tell me in a broad sense what struck
25    you as outrageous at the time?

45

```
 1        A    Well, it was --

 2             MR. TOBEROFF:  Excuse me.  The witness just

 3    testified she received a contract, she spoke to her

 4    attorney, and after he explained it to us, we concluded

 5    that they were outrageous.  She can't go into the

 6    substance of that.  I don't know if -- that would be

 7    protected.  Wouldn't you agree with that?

 8             MR. ZISSU:  I don't agree with that.  But let me

 9    ask the question and you give her an instruction.

10        Q    First of all, after speaking with your attorney,

11    what was your understanding of what was outrageous?

12             I have to make a record on this, so you can

13    instruct the witness whatever you want, and we will move

14    on, you know.  So that's the question.

15        A    What my attorney pointed out.

16        Q    After you spoke to your attorney.

17             MR. TOBEROFF:  You can speak just, you know, I

18    guess, as to your conclusions but not to your -- not your

19    specific mental impressions based on your conversations

20    with your attorney.  You can speak very broadly as to

21    your conclusion.  I'll allow you to testify to that.

22             THE WITNESS:  Well, some of the changes were

23    just unacceptable, un- -- I just -- well, I can't

24    verbalize it word for word.

25    BY MR. ZISSU:
```

46

1    of October 19, 2001?

2         A    Do I -- did I see it at that time?

3         Q    Yes.

4         A    Whenever it arrived.

5         Q    Do you remember --

6         A    I wouldn't -- I couldn't tell you what day it

7    came.

8         Q    Not the exact day, but was it in October of

9    2001, you think?

10        A    Well, whenever it was mailed to me.  I can't

11   recall.

12        Q    I am going to show you Defendants' Exhibit 13,

13   which is a 19 -- December 23, 1975 agreement.

14             MR. TOBEROFF:  You don't have it yet.

15   BY MR. ZISSU:

16        Q    I will show it to you.

17             THE WITNESS:  Didn't he say 23?

18             MR. TOBEROFF:  No.

19             THE WITNESS:  Oh.

20             MR. TOBEROFF:  Should I put these off to the

21   side?

22             MR. ZISSU:  Yes.

23             MR. TOBEROFF:  Let me just put these...

24   BY MR. ZISSU:

25        Q    Do you recognize this agreement?

56

1        A    Well, it looks familiar.

2        Q    It looks familiar.

3            If you look at the third page, which has a

4    number at the bottom 835, and the "3" is obscured in the

5    photocopy, there is a reference to your being paid -- to

6    Jerome Siegel being paid and your being paid certain

7    amounts -- I'm sorry.  Strike that.  There is a reference

8    to your being paid certain amounts if Jerry Siegel dies.

9    Sometimes people have called them in some of the

10   correspondence widow's benefits.

11           Does that ring a bell?

12           MR. TOBEROFF:  Excuse me.  Objection.  It

13   misstates the evidence.  You're only giving her part of

14   the document.  Therefore, it's misleading.  It says, "if

15   Jerry Siegel dies," and I'd like you to finish what it

16   says.

17   BY MR. ZISSU:

18       Q    On that page it says, "In addition, if Jerry

19   Siegel dies, on or before December 31, 1985, Warner will

20   pay his wife, Joanne Siegel, if she survives him, monthly

21   payments at the rate of $20,000 a year, commencing on the

22   date of Jerry's death, and ending December 31, 1985..."

23           Do you see that?  And so forth.

24       A    Yes.

25       Q    Does this jog your recollection as to what this

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

```
 1   was about?

 2        A    This was Jerry and Joe's agreement.

 3        Q    Yes.  Are you familiar --

 4        A    Not my agreement.

 5        Q    Are you familiar with it, though?

 6        A    I see it.

 7        Q    And did you become familiar with it in the

 8   1970s?

 9        A    No.

10        Q    Did at some point you become familiar with it?

11             Did you learn about this agreement at some

12   point?

13        A    Yes.

14        Q    When?

15        A    I don't remember.

16        Q    Do you know that this copy of the agreement was

17   produced by you in this case --

18        A    This?

19        Q    -- to the defendants?

20             Yes.

21        A    This agreement was produced by --

22        Q    No.  A copy -- sorry.  Go ahead.

23             MR. TOBEROFF:  She doesn't understand what

24   "produced" means.

25   BY MR. ZISSU:
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1       Q    Do you understand that a copy of this agreement

2   in this case was given by your lawyer to the defendants'

3   lawyers?

4           MR. TOBEROFF:   In the litigation, we had in our

5   files a copy of this agreement.   We gave it over to them.

6           Do you understand that?

7           THE WITNESS:   This had nothing to do with the

8   litigation.

9           MR. TOBEROFF:   That's not his question.

10          THE WITNESS:   I'm afraid I'm...

11          MR. TOBEROFF:   Should I -- do you want to just

12  ask it again?

13          MR. ZISSU:   Yeah.

14      Q    Do you know where this copy of the agreement

15  comes from?

16      A    What --

17      Q    It comes from somebody's files.

18          Right?

19      A    Well, I still don't see what you're trying to

20  get at.

21      Q    I'm trying to get you to tell me what you know

22  about this agreement, and the first step is I want to see

23  that you can identify it.

24      A    It was Jerry and Joe's agreement in 1975 --

25      Q    And --

59

1        A    -- after they publicized to the whole world that

2    they were 61 years old and completely broke and the DC

3    Comics had just made a $30 million TV deal to star George

4    Reeves and -- no, I think I have that wrong.   That TV

5    deal I think was when he -- my husband went on a hunger

6    strike.   I'm sorry, I'm very bad with dates.   I must

7    apologize.

8        Q    Well, I am not going to hold you to the dates.

9    I am just trying to get you to see what you know about

10   these benefits that were paid each year to your husband.

11            Were you aware of that?

12       A    Yes.

13       Q    And after he died have you been receiving --

14   since 1996 have you, as his widow, been receiving

15   payments of such benefits?

16       A    Yes.

17       Q    Under this agreement?

18       A    Not under this agreement.

19       Q    What -- after he died in 1996, there were no

20   benefits paid under this agreement to you?

21       A    Not under this agreement.

22       Q    But you receive moneys each year?

23       A    I had my own agreement.

24       Q    You had your own agreement?

25       A    Yes, with Steve Ross.

60

1          Q     And was that in writing or just an understanding

2     with him?

3          A     There was a letter --

4          Q     And --

5          A     -- from -- from Steve Ross' attorney.

6          Q     Was that --

7          A     I had written to Steve Ross because I was

8     worried if my husband dropped dead, you know, I'd be in a

9     bad situation.

10         Q     And you wrote to Steve Ross before your husband

11    died?

12         A     Correct.

13         Q     Was it many years --

14         A     I didn't want to wait until he died and then

15    find myself without any money.

16         Q     Was that many years before he died?

17         A     Well, it was some years.

18         Q     And did you negotiate with somebody for that

19    agreement?

20         A     Which agreement?

21         Q     The agreement you made with the lawyer for Steve

22    Ross.  Your agreement.

23              MR. TOBEROFF:  Misstates her testimony.

24              THE WITNESS:  I wrote him a letter.

25    BY MR. ZISSU:

61

1       Q    You wrote him a letter, but you said you had

2  your own agreement.

3       A    That's right.

4       Q    And you had that agreement with --

5       A    Steve Ross.

6       Q    With Steve Ross.

7            Was there a letter or a writing?

8       A    His attorney sent a letter agreeing to my

9  getting money that I would need if my husband dropped

10 dead.

11      Q    I am going to show you a letter, and maybe

12 that's the letter, if you could tell me that.

13           Let's mark as Defendants' Exhibit 44, I think...

14           (Defendants' Exhibit 44 marked.)

15 BY MR. ZISSU:

16      Q    Is that the letter?

17      A    Yes.  This is from the attorney.

18      Q    Is it fair to say that you negotiated this

19 arrangement with Warner?

20      A    I wrote the letter.  I wrote the letter --

21      Q    Yes, but --

22      A    -- asking --

23      Q    But is it fair for me to said that you

24 negotiated this arrangement?

25      A    You mean that Martin Payson is replying to?

62

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

```
1          Q    Yes.    That you achieved an arrangement that you

2    negotiated with Warner.

3          A    I suppose so.

4          Q    And is it fair to say that that was a kind of

5    arrangement for payments under the 1975 agreement?

6               MR. TOBEROFF:   Objection.   Asked and answered.

7               THE WITNESS:   It's not.

8    BY MR. ZISSU:

9          Q    It's not.

10              Did this -- this agreement provides -- I'm

11   referring to Defendants' Exhibit 44.  What were the

12   amounts that you were being -- that you were to be paid

13   originally under this?

14         A    Under this?

15         Q    Yes.

16         A    Somewhat less than what I am receiving now.

17         Q    And do you remember the range of it?

18         A    I don't remember.

19         Q    Does this letter tell you how much you were to

20   be paid?

21         A    No.

22         Q    And what are you receiving now?

23         A    $126,148 and change.

24         Q    Doesn't this Defendants' Exhibit 44 say you were

25   going to be paid $60,000 per year as the widow?
```

63

1        A    That's what it says there.

2        Q    And so it's doubled since --

3        A    It has nothing to do with that.

4        Q    What does it have to do with?

5        A    My deal had nothing to do with that, what was in

6    that.  I was not -- that was Jerry and Joe's 1975 deal as

7    a result of the bad publicity they gave the company.

8        Q    No.  I'm referring to the numbers I referred to

9    that are in the letter, Defendants' Exhibit 44, which is

10   in front of you.

11       A    You're talking about page 3?

12       Q    No.  I'm talking about the letter.

13       A    Yes.

14            MR. TOBEROFF:  Exhibit 44.

15   BY MR. ZISSU:

16       Q    Exhibit 44.

17       A    What about -- oh, yes, I see the "44" down

18   there.  I didn't understand.

19       Q    So the amount was to be 60,000 under this

20   Defendants' Exhibit 44.

21            Correct?

22            MR. TOBEROFF:  Objection.  The document speaks

23   for itself.

24            THE WITNESS:  Where does it say sixty?

25   BY MR. ZISSU:

1      Q    Well, it's --

2      A    Oh, probably.

3      Q    And the number is now 120,000.

4           Correct?

5      A    Yes, but those are years -- my husband didn't

6  die until 1996.

7      Q    I understand that.  I understand that.  But the

8  amount was changed as the years went by.

9      A    There -- while my husband was still alive --

10     Q    Yes.

11     A    -- there were cost-of-living increases, plus

12  Steve Ross gave still another increase from 60- to

13  80,000, somewhere in the eighties.  I don't know the

14  exact figure.  I don't remember.

15     Q    And did you negotiate those amounts, or they

16  were just given to you?

17          MR. TOBEROFF:  Vague and ambiguous.

18          You can answer.

19          THE WITNESS:  Well, I had -- I helped get that.

20  BY MR. ZISSU:

21     Q    So you were part of the force there?

22     A    Yeah, I guess I was the one who negotiated with

23  my letters.

24     Q    Let me ask you to look at Defendants' Exhibit

25  14, which is a series of letters dated April 9, 1987.

65

1          Do you recognize those letters, if you look

2    through it?

3         A    They look familiar.

4         Q    They appear to have been written by you.

5         A    Yes.

6         Q    If you look at the bottom of the first page of

7    the first letter in Defendants' Exhibit 14, the first

8    sentence states, "It has only been since 1981, after I

9    negotiated several income and cost of living increases in

10   the December, 1975 $20,000 a year income arrangement,

11   that Jerry and I received a larger income."

12             Do you see that?

13        A    Yes.

14        Q    And that's correct, isn't it?

15        A    Yes, but it's misleading.

16        Q    It's?

17        A    It's misleading.

18        Q    Why?

19        A    Because the income kept getting higher.  I don't

20   know what you want from --

21        Q    Is this sentence I read to you misleading --

22        A    I am --

23        Q    -- or incorrect?

24        A    The way you put it, I don't know what you want.

25        Q    I am asking you if you made this statement in

66

1   this letter, first.

2        A    Well, it's there.

3        Q    And is the statement correct?

4             MR. TOBEROFF:  Read the statement.

5             THE WITNESS:  You're -- the interpretation --

6   let me read this so I can --

7   BY MR. ZISSU:

8        Q    Yes.  I am not interpreting --

9        A    -- refresh my memory.

10            That bears out what's in that attorney's letter,

11  Martin Payson.

12       Q    So it's correct.

13       A    Yes.  Yes.

14       Q    And it's your statement, the statement I read to

15  you.

16       A    Appears to be.

17            MR. ZISSU:  Let's mark as Defendants' Exhibit 45

18  a letter from Joanne Siegel dated May 27, 1986 to Joseph

19  Shuster.

20            (Defendants' Exhibit 45 marked.)

21  BY MR. ZISSU:

22       Q    Please let me know when you're finished reading

23  it.

24            Have you read it?

25       A    Yes.

67

1        Q    Were you acting for Joseph Shuster in

2   negotiating increases in the payments that would be made

3   to him under the 1975 agreement?

4        A    He requested that.

5        Q    What?

6        A    He requested.

7        Q    No.   But were you acting for him at his request?

8             MR. TOBEROFF:   Objection.   Vague, ambiguous.

9             You can answer it.

10             THE WITNESS:   Was I -- would you -- I'm sorry.

11   BY MR. ZISSU:

12        Q    Did you act as his agent in negotiating

13   increases in the amounts that were to be paid under the

14   1975 agreement?

15             MR. TOBEROFF:   Objection.   Calls for a legal

16   conclusion.

17             You can answer it.

18             THE WITNESS:   Was I acting as his agent?

19   BY MR. ZISSU:

20        Q    Yes.

21        A    I guess so.

22        Q    And that -- if you look at the last sentence of

23   the letter before it says "Warmest regards," it says,

24   quote, "This will accurately state that I only negotiate

25   bonuses and income increases for you on your lifetime

68

1    income, and do not seek employment from you -- [sic] for

2    you."

3           Correct?

4       A    Yes, I see it.

5       Q    And how many years did you act in this capacity

6    for Shuster?

7       A    I don't recall.

8       Q    Did you also act in negotiating increases in the

9    amount -- the annual payments paid to your husband in

10   this period?

11      A    Yes.

12      Q    And when did that begin?

13      A    Same time.

14      Q    Is there a reason your husband couldn't act for

15   himself?

16      A    Yes.

17      Q    What was that?

18      A    He was too emotionally involved, upset, and he

19   just -- he was suffering too much over everything.

20      Q    Is it fair to say that you at some point became

21   his manager, in effect?

22          MR. TOBEROFF:  Objection.  Calls for -- it's

23   vague and ambiguous as to "manager."

24          THE WITNESS:  I don't know.

25   BY MR. ZISSU:

69

```
 1        Q    Did there come a time when you took over
 2   handling all of his business matters?
 3        A    No.
 4        Q    That never happened?
 5        A    You're saying "all."  I don't know what you're
 6   referring to, "all."
 7             MR. ZISSU:  Let's mark as Defendants' Exhibit 46
 8   a letter from Joanne Siegel to John Schulman dated
 9   September 14, 1995.
10             MR. TOBEROFF:  Just wait for his questions.
11   Just wait for his questions.
12             (Defendants' Exhibit 46 marked.)
13   BY MR. ZISSU:
14        Q    And if you would read that letter, please, I'll
15   have a question.
16        A    Okay.
17        Q    Did there come a time when you started handling
18   all business matters for your husband?
19        A    Well, that's misleading because he didn't have a
20   business as people consider it.  He didn't have a
21   business.  But I -- he was sick.  As you can see, pointed
22   out in this letter, he couldn't handle the business of
23   going after the cost-of-living increases, which had to be
24   mentioned constantly every year or we didn't get it, and
25   when I had to write to anybody about anything that had to
```

70

053

1    do with Jerry, I would try to do it for him.  So if you

2    want to call that handling his business...

3        Q    Didn't you -- didn't you yourself call it

4    handling all the business matters for him?

5        A    Yes, I did, but I'm trying to explain to you

6    that -- you seem to have a much broader idea of what that

7    meant.

8        Q    Well, it would have included by 1995 dealing

9    with his copyright issues.

10           Correct?

11           MR. TOBEROFF:  Objection.  Strike that.

12   BY MR. ZISSU:

13       Q    Yes or no?

14       A    Well --

15           MR. TOBEROFF:  Objection.  Assumes facts not in

16   evidence.

17           THE WITNESS:  Pardon?

18           MR. TOBEROFF:  You can answer.

19           THE WITNESS:  Would you -- handling his

20   copyright issues?

21   BY MR. ZISSU:

22       Q    Well, whatever issues that came up relating to

23   copyright ownership and termination rights and things

24   like that by 1995 --

25       A    In 19- --

71

1          Q    -- you were the person handling that for him.

2          Correct?

3          MR. TOBEROFF:  Objection.  Assumes facts not in

4     evidence.  Lacks foundation.

5          THE WITNESS:  We talked about it.  He wasn't

6     able to handle anything.  As you can see, he was very

7     ill, and he put it into my hands to get information about

8     what we could do and how we would handle the situation.

9     He was aware of the termination law granted by the U.S.

10    Congress before he died, and he had told me about it, and

11    we were just trying to get information at that stage,

12    and, yes, he put me in charge of that.

13         MR. ZISSU:  Let's mark as Defendants' Exhibit 47

14    a letter from Paul Levitz to you dated April 15, 1999.

15         (Defendants' Exhibit 47 marked.)

16         THE WITNESS:  Okay.

17         MR. TOBEROFF:  I would just like to just object

18    that this is an incomplete document.  It's marked on the

19    bottom "Total Page 002."  We don't have page 1.

20         That's okay.  Go ahead.  I mean, you can answer

21    questions.

22    BY MR. ZISSU:

23         Q    Do you recognize this letter from Mr. Levitz?

24         A    Yes.

25         Q    And did you receive it around April 15, 1999?

72

1      Q   Now, if you turn to page 14 and paragraph 53 --

2   do you see that?

3      A   (Nods head.)

4      Q   Could you read to yourself paragraph 53?  I have

5   a question about it.

6      A   All right.

7      Q   In paragraph 53 it says, among other things,

8   that plaintiffs admit only that the terms in the February

9   1, 2000 draft, quote, "differed from and/or substantially

10  diluted the terms negotiated."

11      My question is, how did the February 1, 2002

12  draft dilute the terms negotiated?

13      A   That was something that we discussed with our

14  attorney, and so it was -- you know, it was -- I really

15  don't know how to put it into words, but we -- I'm not a

16  lawyer.  The -- this was a legal document, and we

17  discussed it, and there were -- I think I mentioned

18  before it -- in one part it diluted our interests in that

19  things would be more favorable to DC than to us.

20      Q   Did you mean -- by "diluted" you mean

21  financially, in money diluted, or something else?

22      A   Well, it would have --

23      MR. TOBEROFF:  I'm going to object.  I couldn't

24  get my objection in before, but I'm objecting.  This

25  calls for a legal conclusion.  You're asking her to

87

```
 1   interpret documents in a reply written by her attorneys
 2   in her behalf.
 3            You can answer generally.
 4            THE WITNESS:  Well, I think I just did answer
 5   generally.
 6            MR. TOBEROFF:  That's okay then.
 7   BY MR. ZISSU:
 8       Q    My question was, did you mean diluted the
 9   terms -- did you mean by "diluted" the terms, are you
10   speaking about money, or are you speaking about something
11   else?
12       A    It would have interpreted in one part to money,
13   yes.
14       Q    And can you tell me how, in broad terms, the
15   money was diluted?
16            MR. TOBEROFF:  If you can't discuss it without
17   revealing things that you learned from your attorney
18   interpreting the documents, then I instruct you not to
19   answer.  You can answer only very broadly.  If you
20   understand -- really understand, you could answer in
21   broad terms.
22            THE WITNESS:  I think I just did in broad terms.
23            MR. TOBEROFF:  Well, I think you did also.
24   BY MR. ZISSU:
25       Q    I am asking now in more detailed terms.  Were
```

88

1    said, and that's what she said.

2    BY MR. ZISSU:

3        Q    Let me answer -- let me ask the question:  Is

4    there -- was there something in the February 1, 2002

5    draft that you felt changed the amount of payments that

6    would be made to you under the October 19, 2001

7    agreement -- letter?

8            MR. TOBEROFF:  Vague and ambiguous.

9            THE WITNESS:  Yeah.

10   BY MR. ZISSU:

11       Q    Can you answer?

12       A    It's too difficult to answer because I can't --

13       Q    I'm trying to make it simple.

14       A    I appreciate that.

15       Q    Did -- when you looked at the February 1, 2002

16   draft, did you think that it reduced the amount of money

17   that you would be paid for selling the terminated rights?

18           MR. TOBEROFF:  Asked and answered.

19           You can answer simply.

20           THE WITNESS:  Would you repeat it?

21   BY MR. ZISSU:

22       Q    Did you think the February 1, 2002 draft reduced

23   the amount of money that you would have been paid under

24   the October 19, 2001 letter?

25       A    Eventually that would happen.

94

1      Q    How, as best you can understand?

2      A    I get back to --

3      Q    You can't answer?

4      A    I can't answer that.

5      Q    Correct?

6      A    Correct.

7           MR. ZISSU:  Let's mark as Defendants' Exhibit 54

8   a letter from Joanne Siegel to Paul Levitz dated November

9   6, 2000.

10          (Defendants' Exhibit 54 marked.)

11          THE WITNESS:  Do you want to talk just about the

12  top letter or all three?

13  BY MR. ZISSU:

14     Q    Just the top letter.  I have a question or two.

15     A    Okay.

16          MR. TOBEROFF:  I just want to make sure everyone

17  knows that there are three letters here:  One from Joanne

18  Siegel to Paul Levitz Bates stamped 1185, one from Napa

19  County to Joanne Siegel, Health & Human Services Agency,

20  but then there is a third one here, Joanne Siegel to

21  Gerald Levin, 1187.

22  BY MR. ZISSU:

23     Q    My question about the first page is can you

24  identify this as a letter you sent?

25     A    Yes.

95

1    Mr. Schulman was communicating with Mr. Ramer and

2    Mr. Marks?

3        A    Well, this letter made me aware.

4        Q    Were you aware of any other communications

5    between them in this time frame?

6        A    I don't -- I can't think of anything at the

7    moment.

8            MR. ZISSU:   All right.  Defendants' Exhibit 57

9    will be a Notice of Termination of Transfer Covering

10   Extended Copyright Renewal Term of "Superman," is the

11   name of the document, and it's signed on page 9 by a Mark

12   Warren Peary.

13           (Defendants' Exhibit 57 marked.)

14   BY MR. ZISSU:

15       Q    And my first question is, have you ever seen

16   this before?

17       A    I believe this is the same one --

18           MR. TOBEROFF:   Read through it.

19           Can you tell her what it is?

20           MR. ZISSU:   Yeah.

21       Q    This is a notice of termination that was served

22   on behalf of the Shuster estate.  This is from the

23   Shuster estate --

24       A    Oh, I see.

25       Q    -- that Mr. Toberoff served, and my question is,

102

1    have you ever seen it before?

2        A    Have I seen something that belonged to the

3    Shusters?

4        Q    It was served on behalf of the Shusters, and the

5    question is whether you've ever seen that before.  Yes,

6    that's the question.

7        A    Why would we --

8        MR. TOBEROFF:  Just answer his question.  It's a

9    yes or no question.

10   BY MR. ZISSU:

11       Q    Have you ever seen it before?

12       A    Have I ever seen this before?

13       Q    Yes.

14       A    I saw this in reference with our termination.

15       Q    But have you seen this before?

16       MR. TOBEROFF:  The Shusters' termination.

17       THE WITNESS:  Since the termination?

18       MR. TOBEROFF:  No.  He is asking you if you saw

19   this document that was served for the Shusters regarding

20   Superman.

21       THE WITNESS:  I don't know anything about what

22   went on with the Shusters.

23   BY MR. ZISSU:

24       Q    Do you know that they served a termination

25   notice?

103

1      A    I believe she did mention it, yes.

2      Q    Who is she?

3      A    Jean Peavy.

4      Q    And when did you -- did she mention this to you?

5      A    I don't recall exactly.

6      Q    A year ago?  Two years ago?

7      A    I'm not good with dates.  We were having a

8  conversation on the phone.

9      Q    Is that a recent conversation or --

10     A    No, it wasn't recent.

11     Q    When did you last speak with her?

12     A    At the premiere, I think.  Or I may have called

13 her since then.  But I've had -- I'm just -- I had just

14 got over a very bad case of bronchitis, and, as a matter

15 of fact, I wasn't feeling well during the premiere

16 either, so what I was doing while I was on that extra

17 medication, talking of this one or that one, I can't

18 recall.

19     Q    Do you keep in touch pretty regularly with --

20     A    Not regularly.

21     Q    -- Jean Peavy?

22     A    Not regularly.

23     Q    How frequently?

24     A    I don't have a -- I don't do it by the calendar.

25 I don't know.  Occasionally.

104

1        Q    Do you know that Mr. Toberoff represents

2   Mrs. Peary?

3        A    Yes.

4             MR. TOBEROFF:   Peavy.

5             MR. ZISSU:   Sorry.   Peavy.

6             Let's mark as Defendants' Exhibit 58 a letter

7   dated November 30, 1938 from Jerome Siegel or Jerry

8   Siegel to Mr. J.S. Liebowitz of Detective Comics.

9             (Defendants' Exhibit 58 marked.)

10            THE WITNESS:   I didn't finish reading, but if

11  it's not necessary for me to read the whole thing, maybe

12  I should --

13  BY MR. ZISSU:

14       Q    Why don't you read it, unless you're familiar

15  with it.

16       A    Okay.

17       Q    Are you familiar with this?

18       A    No.   It's the first time I've seen this.

19       Q    First time you've ever seen it?

20       A    Yes.   I wasn't married to Jerry at this time.

21       Q    And in all the years you were married to him, he

22  never showed this to you?

23       A    Pardon?

24       Q    In the years that you were married to him, he

25  never showed you this letter?

1      A    No.

2      Q    And you haven't read it before since --

3      A    This is the first time I'm seeing this.

4      Q    Is it fair to say that this letter is proposing

5  an idea?

6      A    I don't want to comment on something that I

7  never saw before.

8      Q    Well, you're a plaintiff in the case, and there

9  are certain claims and assertions being made by you in

10  the case, and they include allegations with respect to

11  this document and some others that may have been signed

12  by your husband years ago.

13          Do you understand that?

14      A    Yes.  But I do want to make it clear that when

15  we were having -- going through the termination, a sister

16  of mine passed away, and I was out of town.  I gave my

17  daughter access to anything that my husband had, and so a

18  lot of stuff became hers, and she turned it over to our

19  attorney, so...

20      Q    Well, you just read it.

21          Correct?

22      A    I just read it.

23      Q    Do you think it's fair to characterize this as a

24  letter proposing an idea --

25          MR. TOBEROFF:  Objection --

106

1          MR. ZISSU:  Let me finish the question.

2      Q    -- that does not flesh out the Superboy

3  character or the continuity?

4          MR. TOBEROFF:  Objection.  Calls for a legal

5  conclusion as to the way -- calls for a legal conclusion.

6  Also vague and ambiguous.

7          THE WITNESS:  I don't know how to answer that.

8  I would have to study and see what you're actually

9  referring to.

10  BY MR. ZISSU:

11     Q    Well, I'm referring to on the second page in the

12  paragraph that begins on that page, it says --

13     A    Second paragraph?

14     Q    Well, it's the second block of text --

15     A    Okay.

16     Q    -- on the second page.  It starts with the

17  words, "Another suggestion."  You see that?

18     A    Yes.

19     Q    It says, "While talking to Mr. Nimis the subject

20  came up of what 'top' strip to use on the Sunday page of

21  SUPERMAN.  I suggested to him that we use a strip named

22  SUPERBOY, which would relate the adventures of Superman

23  as a youth.  The appearance of SUPERMAN in ACTION COMICS

24  has developed the character very much so that we now know

25  how to handle him for syndication.  Now don't you think

107

1    that it might be a good idea for me to do a strip

2    entitled SUPERBOY for one of our other magazines,

3    possibly NEW ADVENTURE COMICS, or perhaps MORE FUN

4    COMICS."

5            Is it fair to characterize that as proposing an

6    idea for a new character?

7            MR. TOBEROFF:  Same objection.

8            THE WITNESS:  Well, yeah.

9    BY MR. ZISSU:

10       Q    And if you read the rest of the letter, is it

11   fair to say that beyond the idea, the letter does not

12   flesh out the character or provide any details of stories

13   or continuities?

14       A    Well, it does -- it does describe it as a

15   12-year-old.

16       Q    Anything beyond that?

17       A    I'd have to reread this.

18            MR. TOBEROFF:  Objection.  The document speaks

19   for itself.

20            THE WITNESS:  I guess --

21   BY MR. ZISSU:

22       Q    I am asking you whether you agree with my

23   characterization that this document does not flesh out

24   the character beyond the age you mentioned and does not

25   provide --

108

1      A    Well, I can't say that --

2      Q    Let me finish the question.

3           -- and does not provide any continuities?

4           MR. TOBEROFF:  Same objection.  You're asking

5      her to -- same objection.  You're asking her to make a

6      legal interpretation.  This document speaks for itself.

7           THE WITNESS:  Well, I have to rely on legal

8      opinion because I'm not qualified to give a legal opinion

9      on anything like this.

10     BY MR. ZISSU:

11     Q    You don't feel you can answer my question.

12          Correct?

13     A    That's right.

14          MR. ZISSU:  Let's mark as Defendants' Exhibit

15     59 -- I think this has been referred to as the Superboy

16     synopsis, Superboy script.

17          (Defendants' Exhibit 59 marked.)

18     BY MR. ZISSU:

19     Q    And to begin with, my question is, have you seen

20     this before, and are you familiar with it?

21     A    It doesn't look familiar to me.

22          This is when?  Do you have a date on this

23     anywhere?

24     Q    No, but I think I can represent that the parties

25     agree this dates to 1940.

109

```
 1         A    Well, I wasn't married to him till 1948.

 2         Q    Are you familiar with Action Comics No. 1?

 3         A    Well, it depends on what you mean by "familiar."

 4         Q    Well, I have it somewhere.  Let me show it to

 5    you.

 6         A    Do you mean the cover?  Of course.  It's been

 7    printed many times.

 8         Q    The continuity and the artwork.

 9              I thought we marked it yesterday.

10              MS. LASERSON:  We did.

11              MR. ZISSU:  We did, so it should be there.

12              I've got it.  I have it.  Thank you.

13         Q    I am handing you Defendants' Exhibit 21, I think

14    it is?  Is that correct?

15              Does it say "21" on there, Marc?

16              MR. TOBEROFF:  Yes.

17              MR. ZISSU:  It does.

18              MR. TOBEROFF:  Are you going to ask her

19    questions about this?

20              MR. ZISSU:  I am going to try to.

21              MR. TOBEROFF:  Okay.  So she is going to have to

22    go through it.

23              MR. ZISSU:  Well, I'll let her go through it in

24    a minute, but do you think if I asked you questions --

25    strike that.
```

110

1    Q    Have you read that before at one time or

2    another?

3    A    Yes.

4    Q    Have you read it in the last couple of years?

5    A    Maybe.

6    Q    Will you be able to answer questions for me

7    about -- strike that.

8         If you look at Defendants' Exhibit 59, which is

9    a script that your late husband submitted to Detective

10   Comics in 1940 --

11   A    Pardon?

12   Q    In 1940.

13   A    Yes.

14   Q    Would you be able to look and see what aspects

15   of the Superman character in Action Comics No. 1 are

16   repeated in the script?

17   A    Well, I'd have to read it.  It's too difficult

18   because this is all in art, and this is all in script.

19   I'd have to read it.

20        You want me to tell you what's different in all

21   of this compared to all of this?

22   Q    No, not all of it.  Let me try a couple

23   questions and see how we do.

24        Is the fact that Superman's -- one of his

25   identities is Clark Kent, was that in Action Comics

111

1   No. 1?

2        MR. TOBEROFF:  I'm going to object to the line

3   of questioning so I don't have to interrupt.  I am going

4   to object to this line of questioning that the documents

5   speak for themselves and that it's calling for expert

6   testimony.  Anything above the document speaking for

7   themselves is calling for expert testimony from a lay

8   witness.  It's also, I think, extremely burdensome to

9   give her a 10-page -- a 13-page script and ask her to

10  compare it to a -- I don't know how many pages, -- 10-

11  page comic book with pictures and be able to get a

12  meaningful answer.

13        MR. ZISSU:  Why don't I try something a little

14  different.

15     Q   Why don't you just -- you look at Action Comics

16  No. 1, and I'll ask you a couple questions about that,

17  and my first question is --

18     A   It's upside down.

19     Q   Put the script aside.

20        MR. TOBEROFF:  Did I get a copy of 59?  I am

21  looking for it.

22        MR. ZISSU:  It should be in here.

23        MR. TOBEROFF:  Did we do --

24        MR. ZISSU:  I gave you 59, I think.

25        MR. TOBEROFF:  I just have one copy.

112

1          MR. ZISSU:  Well, you should have a second one.

2          MR. TOBEROFF:  I just got one.

3          MR. TOBEROFF:  Do you want me to use the one

4    from this set?

5          MR. ZISSU:  Yeah, go ahead, until we straighten

6    it out.

7      Q    Here is the question:  Does Action Comics No. 1

8    identify the hero by the name Clark Kent?

9      A    I believe this panel right here does.  Let's

10   see.  I believe this editor's speaking to him, and he

11   says, "Think you can handle that, Kent?"

12     Q    Okay.  Feel comfortable to give me as much

13   detail as you want --

14     A    You don't want me to describe the illustration?

15     Q    No.  My question is only, does this Action

16   Comics No. 1 identify the hero by the name Clark Kent?

17     A    It does, yes.

18     Q    Does Action Comics No. 1 show some kind of a

19   spacecraft in the first panel going into space launched

20   from a distant planet?

21     A    Are you talking about page 1?

22     Q    Yes, the upper left-hand panel.

23     A    I'm sorry.  What is your question?

24     Q    Does this show a spacecraft being launched from

25   a distant planet?

```
1         A    Well, the --

2              MR. TOBEROFF:  Objection.  Compound.  Multiple

3    questions.

4              THE WITNESS:  It looks like the planet is

5    exploding.

6    BY MR. ZISSU:

7         Q    All right.  And you see that green looks like a

8    bullet?  Is that some kind of a spacecraft?

9         A    I don't know what it is.  More like a cucumber.

10        Q    Well, is there reference to a spaceship in the

11   words with that panel being launched toward Earth?

12        A    In that first panel?

13        Q    Yes.

14        A    Is there a reference to a spaceship?

15        Q    Yeah.  Does the first panel in the text --

16        A    No, not in the text.

17        Q    Is there text with the first panel?

18        A    Oh, I'm sorry.  I'm looking at the comic book.

19        Q    At the upper left.  I'm not asking you anything

20   about the script, just Action Comics, and if you look at

21   the top left panel --

22        A    Yes, the first panel.

23        Q    Yes.

24        A    Yes.

25        Q    And does it say, "As a distant planet was
```

114

```
 1    destroyed by old age, a scientist placed his infant son

 2    within a hastily devised space-ship, launching it toward

 3    Earth"?

 4         A    Yes.

 5         Q    And is there reference in the next panel to a

 6    passing motorist who discovered a babe?

 7         A    Yes.

 8         Q    And is there a panel -- a picture of a babe or a

 9    baby holding up an armchair?

10         A    Yes.

11              MR. ZISSU:  Let me take a break to consider how

12    to move this along.  If we can go off the record.

13              (Recess.)

14              MR. ZISSU:  On the record.

15              Based upon our recent questions and answers, I

16    believe that the witness cannot go through the process

17    doing comparisons of the kind I was going to do.  I

18    was -- I'll tell you what I was going to do.  I was going

19    to have her compare Action Comics No. 1 with Defendants'

20    Exhibit 59, the synopsis of the script, and then I was

21    going to have a comparison by the witness between the

22    synopsis of the script with More Fun Comics No. 1, and

23    then I was going to ask her some similar questions about

24    the contents of Smallville, of which there are many

25    episodes.
```

115

1    before closing off the questions about works and

2    similarities, I have one question, and then I hope to

3    wind up with some short questions remaining.

4        Q    First, if you would turn and look at Defendants'

5    Exhibit 23, which is the letter you wrote to Mr. Parsons,

6    Defendants' Exhibit 23, I am going to ask you a question

7    about a paragraph on the second page.  It's the fifth

8    paragraph on the second page.

9        A    Yes.

10       Q    It says, "It is to the everlasting shame of

11   everyone in leadership roles at the company that they

12   allowed that disgraceful contract to be sent to us.

13   There was no concern for the suffering it would cause

14   Jerry Siegel's widow and his ailing, impoverished

15   daughter," close quote.

16            Yesterday I asked your daughter what the

17   suffering was referring to, and I believe she answered

18   that this would be the deprivation of the money that

19   would have come to you at this time in your lives.

20       A    For both of us.

21       Q    For both of you.

22            So my question to you now is --

23            MR. TOBEROFF:  Let him finish his question

24   before you answer.

25            MR. ZISSU:  Yeah, wait.

119

1      Q    The question to you now is, have you made any

2  attempt to calculate how much by now you would have been

3  paid under the October 19, 2001 letter if the February 1

4  draft contract had not been occurred?

5      A    You mean based on that contract that we didn't

6  like but approved?

7      Q    Yes.

8      A    No.

9           You asked if we calculated the amount?

10     Q    Yeah.  Have you considered --

11     A    No, we didn't, but perhaps our representatives

12  did.

13     Q    Did an accountant --

14     A    I don't recall actually.

15     Q    Did any accountant or auditor take a look at

16  what you would have been paid by now?

17     A    Let's see.  This is at the end of the

18  representation of Kevin Marks and Bruce Ramer.

19     Q    Yes, but I'm asking --

20     A    They may have.

21     Q    But have you --

22     A    But personally I didn't.

23     Q    Have you considered --

24     A    I figured that I wasn't qualified to make

25  that -- try to figure that out.

120

```
 1        Q    In a rough sense, did you consider that there
 2   would be several millions of dollars --
 3        A    Many millions.
 4        Q    Many millions.
 5             MR. TOBEROFF:  What are we...
 6             MR. ZISSU:  That's the question, and that's the
 7   answer.  That's the end.
 8             MR. TOBEROFF:  Okay.
 9             MR. ZISSU:  Whatever.  Okay.
10             Let's mark now as Defendants' Exhibit 60 --
11             MR. TOBEROFF:  I am going to object to that last
12   question.  I know I'm a little late on the draw.  She
13   answered before I could object, but the question was
14   vague and confusing, and I think the witness was -- did
15   not -- was confused in what she was answering when she
16   said "many millions."
17             MR. ZISSU:  I don't think so, but we'll leave it
18   to her testimony.
19             Defendants' Exhibit 60 is...  Defendants'
20   Exhibit 60 is excerpts from a book "The Adventures of
21   SUPERMAN" by George Lowther.
22             THE WITNESS:  I don't think I answered your -- I
23   mean I didn't understand your last question, and I --
24   BY MR. ZISSU:
25        Q    You answered the question.
```

121

```
 1    original book in 1942, and in the reference to the

 2    Library of Congress catalogue information it states,

 3    "Superman / by George Lowther; based upon the cartoon

 4    character created by Jerry Siegel and Joe Shuster;

 5    illustrations by Joe Shuster; forward by Josette Frank;

 6    introduction by Roger Stern."

 7            Do you know whether your husband was aware of

 8    this book in 19- --

 9        A    No.

10        Q    -- -47?

11        A    '47?  We weren't married until late 1948.

12        Q    But you knew him in 1947.  You knew him in 1947.

13        A    Yes, but he was in Cleveland.  I wasn't.

14        Q    Where were you?

15        A    I was in Florida.  I was in Miami.

16        Q    And after you married him in 1948, do you know

17    whether he knew of the existence of this book --

18        A    No.

19        Q    -- at that time?

20            Do you know anything about the lawsuit that your

21    husband and Joseph Shuster filed against the predecessor

22    of DC Comics in the New York state courts in 1947?

23        A    That would be the Westchester case?

24        Q    Yes, the Westchester case.

25        A    I think very little about it.  He never wanted
```

124

1    to talk about it.

2        Q   Do you know whether any of the claims that your

3    husband and Shuster brought in that case covered or

4    related to this book, the Lowther book?

5        A   That is all blank to me.

6            MR. ZISSU:  Let's mark as Defendants' Exhibit 61

7    Plaintiffs Joanne Siegel and Laura Siegel Larson's

8    Supplemental Responses to Defendant DC Comics' First Set

9    of Interrogatories.

10           (Defendants' Exhibit 61 marked.)

11   BY MR. ZISSU:

12       Q   Do you recognize this?

13       A   The cover, yes.

14       Q   Yes.

15           MR. TOBEROFF:  Give her a chance to read through

16   it.

17           MR. TOBEROFF:  Okay.

18   BY MR. ZISSU:

19       Q   Are you familiar with this?

20       A   Yes.

21       Q   And did you recently -- if you turn to page 12,

22   did you recently sign the statement made at page 12?

23           MR. TOBEROFF:  I am just going to find the page

24   for her.

25           THE WITNESS:  Yes.

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1    the last comment I made?

2    BY MR. ZISSU:

3        Q    The question is, isn't it true that Superman led

4    to the Superboy synopsis written by your late husband?

5            MR. TOBEROFF:  What's the question?

6    BY MR. ZISSU:

7        Q    Isn't it true that Action Comics No. 1 led to

8    the Superboy synopsis, which is that script that we

9    looked at which was submitted by your late husband to

10   Detective Comics, Inc.?

11           MR. TOBEROFF:  Objection.  Calls for a legal

12   conclusion.

13           You can answer if you know.

14           THE WITNESS:  I can't hear.

15           MR. TOBEROFF:  Objection.  Calls for a legal

16   conclusion.

17           You can answer if you know the answer.

18           THE WITNESS:  Will you repeat that question

19   again?

20   BY MR. ZISSU:

21       Q    Isn't it true that Action Comics No. 1, which is

22   Exhibit -- Defendants' Exhibit 21, led to the idea and

23   text in the script that Mr. Siegel wrote about Superboy

24   in 1940?

25           MR. TOBEROFF:  Objection.  Vague and ambiguous.

135

 1    Calls for a legal conclusion.

 2            THE WITNESS:  I don't know.  I can't answer that

 3    because I'm very tired, and I'm --

 4            MR. TOBEROFF:  It's okay.

 5            THE WITNESS:  -- having trouble with this whole

 6    thing.

 7    BY MR. ZISSU:

 8        Q    We are almost at the end of the deposition.

 9            Isn't it true if there had never been any

10    Superman, there wouldn't have been any Superboy?

11        A    I don't know.

12        Q    Well, isn't Superboy a character that is

13    Superman as a youth?

14        A    I don't think so, no.

15        Q    You don't think so?

16        A    No.

17        Q    What is Superboy as you understand it?

18        A    Superboy is a teenage character with teenage

19    problems, very close to his parents.  He lives in a farm-

20    like atmosphere.  And Superman is in the city.  He does

21    his exploits mainly in the cities.  And Superboy is young

22    and -- you know, and that's the difference.  They're two

23    different characters.

24        Q    Didn't your husband say that Superboy was

25    Superman as a youth?

136

1          A    I don't think so.

2          Q    You don't think so.

3          A    I have no knowledge of anything like that.

4               MR. ZISSU:  I have no further questions.

5               MR. TOBEROFF:  I just have one question.

6

7                        EXAMINATION

8    BY MR. TOBEROFF:

9          Q    You stated earlier in response to a certain line

10   of questioning that you would have made many millions,

11   and my question is, did you -- were you saying that had

12   you entered into the February 1st draft that was sent by

13   John Schulman, you would have made many millions?

14         A    No.

15         Q    Did you mean that if you had entered into the

16   April proposal that was sent by your -- excuse me --

17   October 19th proposal that was sent by your attorney,

18   Kevin Marks, that you would have made many millions?

19         A    No.

20              MR. TOBEROFF:  I have no further questions,

21   unless you do.

22              MR. ZISSU:  Yeah.

23

24                        EXAMINATION

25   BY MR. ZISSU:

137

1        Q    What were you saying about many millions?

2        A    If we had a better deal.  I thought you meant if

3    we got a better deal, what did I expect.  That's what I

4    thought you meant.

5              MR. ZISSU:  I don't have any further questions.

6              MR. TOBEROFF:  Want to do the same stipulation

7    as yesterday?

8              MR. ZISSU:  Yes.

9              (The following stipulation is incorporated

10             by reference:

11                 "MR. ZISSU:  The stipulation is you

12             can waive filing and have it signed

13             before a notary public, if that's

14             acceptable.  That's another stipulation

15             that's normal, I believe.

16                 "MR. TOBEROFF:  Any stipulations you

17             want to make regarding the transcript?

18                 "MR. BERGMAN:  Well, we could waive

19             the notary and just have it signed under

20             penalty of perjury, which is --

21                 "MR. ZISSU:  That's okay.

22                 "MR. BERGMAN:  -- pretty customary.

23                 "MR. TOBEROFF:  I think so.

24                 "MR. ZISSU:  That's okay.

25                 "MR. BERGMAN:  And the reporter would

138

1          be relieved of his responsibilities and

2          will deliver the original directly to

3          Mr. Marks --

4               "MR. TOBEROFF:   Toberoff.

5               "MR. BERGMAN:   Toberoff.

6               "MR. TOBEROFF:   My first name is Marc.

7               "MR. ZISSU:  All the other rules as to

8               "timing and signing apply.

9               "MR. BERGMAN:   Yes.

10              "MR. TOBEROFF:   So stipulated.")

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

139

1

2

3

4

5

6

7

8           I, JOANNE SIEGEL, do hereby declare under

9    penalty of perjury that I have read the foregoing

10   transcript; that I have made any corrections as appear

11   noted, in ink, initialed by me, or attached hereto; that

12   my testimony as contained herein, as corrected, is true

13   and correct.

14           EXECUTED this _17th_ day of _September_,

15   20_06_, at _MARINA DEL Rey_, _CA_.
                        (City)                    (State)

16

17

18

19           _____
                    _Joanne Siegel_
20           JOANNE SIEGEL

21

22

23

24

25

140

1

2

3

4          I, the undersigned, a Certified Shorthand

5   Reporter of the State of California, do hereby certify:

6              That the foregoing proceedings were taken

7   before me at the time and place herein set forth; that

8   any witnesses in the foregoing proceedings, prior to

9   testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under by

12  direction; further, that the foregoing is an accurate

13  transcription thereof.

14             I further certify that I am neither

15  financially interested in the action nor a relative or

16  employee of any attorney of any of the parties.

17             IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19

20  Dated:        AUG 1 8 2006

21

22

        DAVID S. COLEMAN, CSR NO. 4613

23

24

25

# Errata Sheet

**Pg/Ln**                                                    **Correction**

11 / 10   Change from: "... and a October 1926 letter."
          Change to: "... and an October 26th letter."

39 / 8-10   Change from: "And 10 days later he sent that letter to John Schulman. 10 days later.
            Change to: "And 7 days later he sent that letter to Kevin Marks. 7 days later..."

49 / 4   Change from: "demands that were your unapprovable."
         Change to: "demands that were unapprovable."

87 / 8-9   Change from: "February 1, 2000 draft"
           Change to: "February 1, 2002 draft"

120 / 5-6   Change from: "you mean based on that contract that we didn't like..."
            Change to: "you mean based on that letter that we didn't like..."

___/___   Change from:_____
          Change to:_____

___/___   Change from:_____
          Change to:_____

___/___   Change from:_____
          Change to:_____

___/___   Change from:_____
          Change to:_____

___/___   Change from:_____
          Change to:_____

___/___   Change from:_____
          Change to:_____

___/___   Change from:_____
          Change to:_____

___/___   Change from:_____
          Change to:_____

Signature:_____ _Joanne Siegel_____    Date: _September 17th 2006_

# EXHIBIT B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA
SIEGEL LARSON,

     Plaintiffs,

    vs.                   No. 04-8400 (RSWL)(RZx)
                             -and-
WARNER BROS. ENTERTAINMENT   No. 04-8776 (RSWL)(RZx)
INC., et al.,

     Defendants.
_____

AND RELATED COUNTERCLAIMS.

# ORIGINAL

DEPOSITION OF LAURA SIEGEL LARSON

Beverly Hills, California

Tuesday, August 1, 2006

Reported by:
DAVID S. COLEMAN
CSR No. 4613

Job No. 1-50934



www.sarnoffcourtreporters.com

Irvine • Los Angeles • San Francisco

phone 877.955.3855 • fax 949.955.3854

SARNOFF
Court Reporters and
Legal Technologies

```
 1              UNITED STATES DISTRICT COURT
 2             CENTRAL DISTRICT OF CALIFORNIA
 3
 4  JOANNE SIEGEL and LAURA
    SIEGEL LARSON,
 5
           Plaintiffs,
 6
       vs.                    No. 04-8400 (RSWL) (RZx)
 7
    WARNER BROS. ENTERTAINMENT
 8  INC., et al.,
 9         Defendants.
                                        -and-
10  JOANNE SIEGEL and LAURA
    SIEGEL LARSON,
11
           Plaintiffs,
12                            No. 04-8776 (RSWL)(RZx)
       vs.
13
    TIME WARNER INC., WARNER
14  COMMUNICATIONS INC., WARNER
    BROS. ENTERTAINMENT INC., WARNER
15  BROS. TELEVISION PRODUCTION INC.,
    DC COMICS, and DOES 1-10,
16
           Defendants.
17
    AND RELATED COUNTERCLAIMS.
18

19
20         Deposition of LAURA SIEGEL LARSON, taken on
21  behalf of Defendants and Counterclaimants, at 9665
22  Wilshire Boulevard, 9th Floor, Beverly Hills, California,
23  beginning at 10:05 AM and ending at 8:50 PM on Tuesday,
24  August 1, 2006, before DAVID S. COLEMAN, Certified
25  Shorthand Reporter No. 4613.
```

2

```
1    APPEARANCES:

2

3    For Plaintiffs:

4         LAW OFFICES OF MARC TOBEROFF
          BY:  MARC TOBEROFF
5         Attorney at Law
          2049 Century Park East, Suite 2720
6         Los Angeles, California 90067
          310-246-3333
7

8

9    For Defendants and Counterclaimant:

          WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
10        BY:  MICHAEL BERGMAN
          Attorney at Law
11        9665 Wilshire Boulevard, 9th Floor
          Beverly Hills, California 90212
12        310-858-7888
          mbergman@wwllp.com
13
              -and-
14
          FROSS ZELNICK LEHRMAN & ZISSU
15        BY:  ROGER L. ZISSU
          Attorney at Law
16        866 United Nations Plaza
          New York, New York 10017
17        212-813-5900
          rzissu@frosszelnick.com
18

19

20   Also Present:

          LILLIAN LASERSON
21

22

23

24

25
```

3

1                          INDEX

2    WITNESS                          EXAMINATION

3    LAURA SIEGEL LARSON

4

5         BY MR. ZISSU                        9

6

7                         EXHIBITS

8

DEFENDANT                              PAGE
9

1    Complaint in USDC 04-8400 (RSWL)    10
10        (RZx)

11   2    Complaint in USDC 04-08776 (RSWL)   11
          (RZx)
12

3    Defendants'/Counterclaimant's First   17
13        Set of Requests for the Production
          of Documents and Things
14

4    E-mail from Mark Toberoff to James   24
15        Weinberger dated June 19, 2006

16   5    Web page for Intellectual Properties   26
          Worldwide, LLC
17

6    Letter from Ariel Emanuel to Bruce   58
18        Rosenblum

19   7    Letter from Paul Levitz to Jean   62
          Adele Peavy dated April 28, 2005
20

8    Letter from Joanne Siegel to John   64
21        Schulman dated April 9, 1997

22   9    Findings and Order After Hearing   68
          in LASC Case No. BD321289
23

10   Income and Expense Declaration in   71
24        LASC Case No. BD321289

25

4

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

INDEX (Continued):

EXHIBITS (Continued)

| DEFENDANT | | PAGE |
|---|---|---|
| 11 | Complaint for Declaratory Judgment; Demand for Trial by Jury in Probate Court, Case No. 2006 ADV 0112506 | 73 |
| 12 | Letter from Michael Bergman to Magistrate Judge Ralph Zarefsky dated July 6, 2006 | 74 |
| 13 | Letter from Jay Emmett to Jerome Siegel and Joseph Shuster dated December 23, 1975 | 76 |
| 14 | Letter from Joanne Siegel to Gerald Levin dated April 9, 1997 | 83 |
| 15 | Letter from Paul Levitz to Joanne Siegel dated April 15, 1999 | 85 |
| 16 | Notice of Termination of Transfer Covering Extended Renewal Term | 88 |
| 17 | Notice of Termination of Transfer Covering Extended Renewal Term Superboy | 105 |
| 18 | Notice of Termination of Transfer Covering Extended Renewal Term | 107 |
| 19 | Cover and one page from Issue No. 51 of More Fun Comics dated January, 1940 | 108 |
| 20 | Issue No. 31 of More Fun Comics dated May, 1938 | 110 |
| 21 | Issue No. 1 of Action Comics dated June, 1938 | 114 |
| 22 | Letter from Kevin Marks to John Schulman dated October 19, 2001 | 131 |
| 23 | Letter from Joanne Siegel to Richard Parsons dated May 9, 2002 | 134 |

5

INDEX (Continued):

EXHIBITS (Continued)

DEFENDANT                                                          PAGE

24   Letter from John Schulman to Kevin          139
     Marks dated October 26, 2001

25   Letter from Patrick Perkins to Kevin        151
     Marks dated February 1, 2002

26   Letter from Carol Simkin to Arthur          221
     Levine dated April 17, 1997

27   Letter from Arthur Levine to Carol          223
     Simkin dated April 22, 1997

28   Letter from Arthur Levine to Carol          223
     Simkin dated May 15, 1997

29   Letter from Arthur Levine to Carol          224
     Simkin dated June 19, 1997

30   Letter from Arthur Levine to Carol          225
     Simkin dated October 3, 1997

31   Letter from Arthur Levine to Carol          226
     Simkin dated December 17, 1997

32   Letter from Paul Levitz to Joanne           227
     Siegel and Laura Siegel Larson
     dated October 10, 1997

33   Letter from Carol Simkin to Arthur          234
     Levine dated December 18, 1997

34   Letter from Arthur Levine to                244
     Register of Copyrights, Library of
     Congress, dated February 2, 1998

35   Letter from Carol Simkin to Arthur          245
     Levine dated May 29, 1998

36   Letter from Arthur Levine to Carol          247
     Simkin dated June 19, 1998

37   Letter from Carol Simkin to Arthur          248
     Levine dated July 23, 1998

6

INDEX (Continued):

### EXHIBITS (Continued)

| DEFENDANT | | PAGE |
|---|---|---|
| 38 | Letter from Carol Simkin to Arthur Levine dated March 3, 1999 | 249 |
| 39 | Letter from Bruce Ramer to John Schulman dated September 28, 1999 | 252 |
| 40 | Letter from Kevin Marks to Carol Simkin dated March 7, 2000 | 259 |
| 41 | Letter from Joanne Siegel and Laura Siegel Larson to Kevin Marks and Bruce Ramer dated September 21, 2002 | 261 |
| 42 | 1 page of handwritten notes, Bates stamped WB005972 | 273 |

### INSTRUCTION NOT TO ANSWER

| Page | Line |
|---|---|
| 50 | 19 |
| 50 | 25 |
| 51 | 23 |
| 54 | 7 |
| 55 | 11 |
| 56 | 6 |
| 56 | 15 |
| 66 | 12 |
| 76 | 14 |
| 123 | 3 |
| 129 | 22 |
| 195 | 8 |
| 203 | 13 |
| 203 | 21 |
| 209 | 16 |
| 228 | 17 |
| 251 | 3 |
| 269 | 7 |
| 271 | 21 |
| 272 | 22 |

7

1    (Continued):

2            INSTRUCTION NOT TO ANSWER (Continued)

3                        Page   Line

4                        273    10
                         275    21

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

8

```
 1            Beverly Hills, California, Tuesday, August 1, 2006

 2                      10:05 AM - 8:50 PM

 3

 4                   LAURA SIEGEL LARSON,

 5   having been administered an oath, was examined and

 6   testified as follows:

 7

 8                        EXAMINATION

 9   BY MR. ZISSU:

10       Q    Could you tell us your name?

11       A    Laura Siegel Larson.

12       Q    And where do you live?

13       A    6400 Pacific Avenue, No. 106, in Playa Del Rey,

14   California 90293.

15            MR. ZISSU:  Now, we will have certain

16   stipulations, which I think are normal.  Objections

17   except as to form are reserved.

18            Okay?

19            MR. TOBEROFF:  That's fine.

20   BY MR. ZISSU:

21       Q    Should I call you Miss Larson or Miss Siegel

22   or...

23       A    Miss Siegel.

24       Q    What do you prefer?

25       A    Miss Siegel would be fine, thank you.
```

9

1    regarding the objection.

2              MR. ZISSU:  All right.

3              You want to repeat the question?

4              (Record read as follows:

5                   "Q   Yeah.  What's the nature --

6              let's take Defendants' Exhibit 1.

7              What's the nature of that action as

8              you understand it?")

9              THE WITNESS:  I believe this is the -- this is

10   the action regarding the Superman terminations.

11   BY MR. ZISSU:

12       Q   But what's your understanding of its goal?

13              MR. TOBEROFF:  Same objection.

14              THE WITNESS:  It relates to our termination that

15   became effective on April 16, 1999, and the fact that we

16   have not been -- no accounting of profits has been paid

17   to us.

18   BY MR. ZISSU:

19       Q   And, now, what's your understanding of the

20   nature of the Defendants' Exhibit 2?

21       A   Exhibit 2 relates to Superboy and the

22   termination that has been filed regarding Superboy.

23       Q   Did you see both of these complaints before they

24   were filed?

25       A   Yes.

14

1        Q    You read them personally?

2        A    Yes.

3        Q    What have been your addresses since 1997 --

4    since January 1, 1997?

5        A    The same as they are now.

6        Q    And could you receive faxes at that address, at

7    your home?

8        A    Yes.

9        Q    And what's your fax number?

10       A    Area code 310-827-7227.

11       Q    And that's been the same throughout the

12   period --

13       A    Yes.

14       Q    -- from --

15       A    Yes.

16       Q    -- January 1, '97 to date?

17       A    Yes.

18       Q    And what did you do to prepare for this

19   examination?

20       A    I looked over these complaints and just thought

21   about it.

22       Q    Did you look over any other documents besides

23   the pleadings in the case?

24       A    No, not really.

25       Q    Are you married?

15

1    KCAL in Los Angeles, which was owned by the Disney

2    company at that time.

3        Q    And since you have been disabled, you have not

4    been employed?

5        A    Correct.

6        Q    When was the first time you had any

7    communication with Marc Toberoff?

8        A    I believe it was in late 2002.

9        Q    Okay.  And do you remember the occasion of

10    meeting him?

11        A    My mother had spoken to him on the phone.  She

12    had had a conversation with Jean Peavy, and Jean Peavy

13    recommended him, and subsequent to that we met.

14        Q    And who is Jean Peavy?

15        A    Jean Peavy is an old family friend, and she is

16    the sister of Joe Shuster.

17        Q    Do you know whether that telephone conversation

18    was initiated by Ms. Peavy or by your mother?

19        A    I don't know.

20        MR. ZISSU:  Let's mark as Defendants' Exhibit 3

21    a document entitled "Defendants'/Counterclaimant's First

22    Set of Requests for the Production of Documents and

23    Things."

24            (Defendants' Exhibit 3 marked.)

25    BY MR. ZISSU:

17

```
 1    your possession.  No.

 2            Correct?

 3        A   I don't recall.  I believe the answer is no.

 4        Q   And anything else you're aware of, you said

 5    maybe a press article?

 6        A   Yes.

 7        Q   Do you know whether your mother has copies of

 8    any such documents?

 9        A   I wouldn't know.

10        Q   When did Mr. Toberoff become your lawyer?

11        A   In late 2002.

12        Q   Did you ever speak with him about anything else

13    before he became your lawyer?

14        A   No.

15        Q   Do you know who the lawyer is representing the

16    estate of Joseph Shuster?

17        A   I believe it's Mr. Toberoff.

18            MR. ZISSU:  Let's mark as Defendants' 4 an

19    e-mail dated June 19, 2006 from Marc Toberoff.

20            (Defendants' Exhibit 4 marked.)

21    BY MR. ZISSU:

22        Q   First, have you ever seen this before or a copy

23    of it?

24        A   I don't remember it, no.

25        Q   Directing your attention to the e-mail address
```

24

1    of Mr. Toberoff, do you know this website?

2        A    Well, it's an e-mail address.  I don't believe

3    it's a website.

4        Q    Yes.  Do you know what will happen if you click

5    on it and you go to that address, if you're surfing?

6            MR. TOBEROFF:  Ambiguous.

7            THE WITNESS:  I don't surf for any e-mail

8    address.

9    BY MR. ZISSU:

10        Q    Do you know whether Mr. Toberoff has a website?

11        A    No, I don't know if he has a website.

12        Q    Do you know anything about his business other

13    than his practice of law?

14        A    He's my attorney.  That's the way I function

15    with him.

16        Q    You don't know any other businesses that he's

17    in?

18        A    I believe he has produced films.

19        Q    Did he ever discuss with you acquiring rights

20    from the Siegels?

21        A    Could you explain that?

22        Q    Did Mr. Toberoff ever have a discussion with you

23    about acquiring any interest in the Superman rights from

24    you or your mother?

25        A    No.

25

1        Q    Do you know whether he had any such discussion

2   with Kevin Marks or Bruce Ramer?

3        A    I don't know.

4        Q    Or anyone else at the Gang Tyre law firm?

5        A    I don't know.

6             MR. ZISSU:  Let's mark as Defendants' 5 a

7   document that says "Home," and it has a heading

8   "Intellectual Properties Worldwide, LLC."

9             (Defendants' Exhibit 5 marked.)

10  BY MR. ZISSU:

11       Q    I think I can represent to you on the basis

12  of -- if you look down in the lower left-hand corner, you

13  will see the e-mail address, which I believe is the same

14  as that on Defendants' Exhibit 4, for Marc Toberoff.

15            Have you ever seen this before?

16            MR. TOBEROFF:  Objection.  That's incorrect.

17            You can answer.

18            THE WITNESS:  I haven't seen this website.  I'm

19  aware of Mr. Toberoff's e-mail address.

20  BY MR. ZISSU:

21       Q    Are you aware of a company called Intellectual

22  Properties Worldwide, LLC?

23       A    Yes.

24       Q    And what's your understanding of who that

25  company is?

26

```
 1              MR. TOBEROFF:  Objection.  Ambiguous.  Calls for
 2    a narrative.
 3              THE WITNESS:  My understanding is that at one
 4    time Ari Emanuel, who is a well-known Hollywood agent,
 5    was a part of this company with Mr. Toberoff,
 6    Mr. Toberoff providing legal services.
 7    BY MR. ZISSU:
 8        Q   Do you know -- who is Mr. Ari Emanuel?
 9        A   He is an agent, a Hollywood agent.
10        Q   And you said "at one time."  Do you know when
11    that ended, if it ended?
12        A   I don't know.
13        Q   At what time did you become aware of it?
14        A   In late 2002.
15        Q   Did you have any discussions with Ari Emanuel?
16        A   Yes.
17        Q   And what was the subject of those discussions?
18        A   He was interested in representing the Siegel
19    rights in negotiations.
20        Q   And did you speak with him?
21        A   Yes.
22        Q   Did he call you, or did you call him?
23        A   I believe Mr. Toberoff set up the meeting.
24        Q   And where did the meeting take place?
25        A   At Mr. Emanuel's office.
```

27

1    later?

2        A    No.

3        Q    Was it after the holidays or before?

4        A    I believe so.

5        Q    And who was at that meeting?

6        A    My mother, myself, Mr. Toberoff and Mr. Emanuel.

7        Q    And you came to some kind of an agreement?

8        A    Yes.

9        Q    And what was that agreement?

10       A    We decided that Mr. Emanuel would be a

11   negotiator for us, and Mr. Toberoff would serve as our

12   attorney.

13       Q    And when you say you decided that Mr. Emanuel

14   would serve you, did you agree that Intellectual

15   Properties Worldwide, LLC would be the entity through

16   which you would work?

17       A    Yes.

18       Q    And do you know who owns Intellectual Properties

19   Worldwide, LLC?  Today do you know?

20       A    Today I don't know.

21       Q    Did you know at the time in early 2003 or late

22   2002?

23       A    My understanding was that it was a partnership

24   between Mr. Emanuel and Mr. Toberoff.

25       Q    And do you know who J. Todd Harris is?

34

1       A    No.

2       Q    If you look at Defendants' Exhibit 5, you will

3  see reference to him in the second paragraph.  It states,

4  "Marc Toberoff IPW's, Chairman & CEO, is an experienced

5  entertainment attorney and producer with expertise in

6  identifying and obtaining intellectual property.  J. Todd

7  Harris, the head of production [sic] -- of the production

8  division, is a seasoned Hollywood producer with over

9  twenty three...films to his credit."

10          But you didn't hear his name at the time, did

11 you?

12      A    No.

13      Q    And do you know whether Mr. Toberoff was the

14 chairman and CEO of Intellectual Properties Worldwide,

15 LLC at the time of your meeting?

16      A    He could have been.  I don't know what his title

17 was.

18      Q    And was the agreement you reached with

19 Mr. Emanuel and/or Intellectual Properties Worldwide,

20 LLC, was that ever written up in a piece of paper?

21      A    Yes.

22      Q    And have you produced that in this case?

23      A    I'm not sure.

24      Q    Do you have a copy of it?

25      A    Yes, I have a copy of it.

35

1          Q    At home, or where do you keep it?

2          A    It would be at home.

3          Q    Well, we would -- if it hasn't been produced, we

4     are going to ask you -- we call for the production of it.

5               How lengthy --

6               MR. TOBEROFF:  Excuse me.  I can simplify this

7     for you --

8               MR. ZISSU:  Yeah.

9               MR. TOBEROFF:  -- and represent to you that the

10    company that Siegel is talking about is not Intellectual

11    Properties Worldwide, LLC.

12              MR. ZISSU:  If you want to fill out some more

13    blanks --

14              MR. TOBEROFF:  Yes.

15              MR. ZISSU:  -- and tell us what the name of it

16    is --

17              MR. TOBEROFF:  It's IP Worldwide, which is not

18    the same company even though they have similar names.  So

19    I'm telling you that for your benefit.

20              MR. ZISSU:  Right.  Well, I don't want to make

21    this an examination of counsel, so we can talk about that

22    separately.

23              MR. TOBEROFF:  I understand.  Just to make it

24    easier, your questioning that a fact, and I can

25    understand how...

36

BY MR. ZISSU:

     Q    Okay.  Without regard to that, you understood that there was a company or entity of some kind in which Mr. Toberoff was a partner with Mr. Emanuel, and you agreed with them in the manner you've described to proceed.

          Correct?

          MR. TOBEROFF:  Objection.  Misstates her testimony.

BY MR. ZISSU:

     Q    Is that correct?

     A    Could you rephrase that?

     Q    You had a meeting, and you agreed that there was a company that Mr. Emanuel was involved with and of which you understood Mr. Toberoff was a partner that would proceed to represent you in connection with dealing with your rights at that point?

          MR. TOBEROFF:  Objection.  Misstates her testimony.

          You can answer.

          THE WITNESS:  Mr. Emanuel was a negotiator, and Mr. Toberoff was our attorney, and that's the way we understood the situation.

BY MR. ZISSU:

     Q    And you understood that they were partners

37

```
 1   together --
 2           MR. TOBEROFF:  Misstates the testimony.
 3   BY MR. ZISSU:
 4       Q   -- in some kind of company that you have
 5   described.
 6           Correct?
 7       A   That didn't enter into our relationship with
 8   them.
 9       Q   I didn't ask you whether it entered into your
10   relationship.
11           Have you testified today that you understood
12   that there was some company, the name of which you may
13   have gotten correctly or incorrectly, and Mr. Toberoff
14   was involved as a partner with Mr. Emanuel?
15           Did you so testify?
16       A   I believe they had a company.
17           MR. ZISSU:  Let's mark as Defendants' Exhibit
18   6 -- no.
19       Q   Before we go to that, and what happened after
20   this agreement was entered into with Mr. Emanuel or
21   Mr. Toberoff or both of them, whatever, what happened
22   after that meeting --
23           MR. TOBEROFF:  Objection.  Calls --
24   BY MR. ZISSU:
25       Q   -- and the agreement?
```

38

1    game and that he was going to aggressively pursue the

2    true value of our rights.

3        Q   Is it fair to say that the problem with the --

4    what you've called the offer from the defendants was

5    insufficient in terms of its valuation?

6            MR. TOBEROFF:  Objection.  Vague and ambiguous.

7            You can answer.

8            THE WITNESS:  There were different stages of

9    what you refer to as "the offer," so if you could be more

10   specific, I could answer you better.

11   BY MR. ZISSU:

12       Q   Well, I believe, subject to your agreeing with

13   me, that in October of 2001 there was a letter from Kevin

14   Marks, which listed a summary of terms and conditions,

15   and it had a financial component.

16           And so my question is -- that's the offer to

17   which I was referring.

18           Is that what the problem was, that you

19   eventually concluded that that amount or the amounts

20   being offered were not enough?

21           MR. TOBEROFF:  Objection.  Vague and ambiguous.

22   Assumes facts not in evidence.  Lacks foundation.

23           THE WITNESS:  I can't make the connection that

24   you're asking about.  What I can say is that --

25           MR. TOBEROFF:  Answer his question.

45

1              THE WITNESS:   Okay.   Then could you restate the

2    question?

3    BY MR. ZISSU:

4         Q    Well, you were about to answer.   You -- Mr. -- I

5    think you've described Mr. Emanuel as saying that he was

6    going to pursue getting the maximum value, and I'm asking

7    you whether the problem with the offer to which you

8    referred was that it didn't pay you enough?

9              MR. TOBEROFF:   Assumes facts not in evidence --

10   BY MR. ZISSU:

11        Q    It's that simple.

12             MR. TOBEROFF:   Objection.   Assumes facts not in

13   evidence.   Lacks foundation.   Vague and ambiguous.

14   BY MR. ZISSU:

15        Q    Will you answer the question?

16        A    No.   The problem with -- we had agreed to the

17   terms that were represented in the October 19 letter from

18   Kevin Marks.   Subsequently, those are not the terms that

19   ended up being presented to us later.

20        Q    So my question is, was it the financial aspect

21   of those terms or some other aspect that was the problem?

22        A    There were many things.

23             MR. TOBEROFF:   Objection.   You're getting into

24   an area here where the answer divulges attorney work

25   product and attorney-client privileged communications

46

1        A    My mother.

2        Q    Okay.  Is there somebody other than your mother

3    that you trusted to represent you?

4        A    Once we got to know Mr. Toberoff and

5    Mr. Emanuel, we trusted them.

6        Q    And I am asking you, why didn't you trust your

7    prior representatives?

8             MR. TOBEROFF:  Same objection.  Asked and

9    answered.  Instruct you not to answer.  Please stop

10   asking the same question.  We are going to waste time.  I

11   will instruct her the same way.

12            (Instruction not to answer.)

13            MR. ZISSU:  We will obviously reserve our rights

14   to pursue this.

15            Let's move to Defendants' -- strike that.

16       Q    Were there any other documents besides this

17   agreement relating to the representation of you and your

18   mother and your interests by Ari Emanuel?

19            MR. TOBEROFF:  Vague and ambiguous.

20            You can answer.

21            THE WITNESS:  I can't recall any.

22   BY MR. ZISSU:

23       Q    So your best recollection is there was one piece

24   of paper which was an agreement, and there was nothing

25   else in writing.

52

1        Q     Did you ask any attorneys?

2              MR. TOBEROFF:   Objection.   Same objection.

3              MR. ZISSU:   Are you directing her not to answer?

4              MR. TOBEROFF:   Yes, I am, as to what she asked

5    attorneys.

6              (Instruction not to answer.)

7    BY MR. ZISSU:

8        Q     Not asked.   Requested.   Directed.

9              Did you direct them to provide you with

10   documents, the attorneys?

11             MR. TOBEROFF:   Same objection.   Asked and

12   answered.

13             Please don't answer questions about your

14   communications with attorneys.

15             (Instruction not to answer.)

16   BY MR. ZISSU:

17       Q     When you -- did you ever -- after you -- there

18   came a time when you told Gang Tyre that they would no

19   longer represent you.

20             Correct?

21       A     Correct.

22       Q     Did you obtain back your documents from your

23   attorneys, from Gang Tyre, your files?

24       A     They went to my new attorney.

25       Q     Who is Mr. Toberoff?

1        Q    Just to follow up, your relationship with

2   Mr. Emanuel is no longer in effect?

3            MR. TOBEROFF:  Vague and ambiguous.

4            THE WITNESS:  It's no longer needed.

5   BY MR. ZISSU:

6        Q    But you still have an arrangement with him or

7   not?

8        A    It expired.

9        Q    Going back to that first meeting with him, you

10  thought, I think you testified, it was before the

11  holidays?

12       A    I don't believe I said that.  I said I didn't --

13  I wasn't sure when it was.

14       Q    You weren't sure.  You thought it might be

15  before the holidays because you --

16       A    I don't recall.

17       Q    You don't recall.

18            I think you testified that Mr. Emanuel told you

19  the offer you'd received was ridiculously low?  Do you

20  recall that?

21       A    He thought that our rights were worth more.

22       Q    Did he ever -- what -- to your best

23  recollection, what did he actually say at the time, if we

24  can focus on that?

25       A    Well, he's a big Hollywood agent, and we

60

1   believed that he would be a good person to represent our

2   rights.

3       Q    What did he say about the value that you'd been

4   offered?

5       A    That it was very, very low.

6       Q    Did he say anything about what he thought it

7   should be or what range it should be in, the offer?

8           MR. TOBEROFF:  Objection.  Asked and answered.

9           You can answer it.

10          THE WITNESS:  He didn't have anything specific.

11  BY MR. ZISSU:

12      Q    And was it at that meeting that you made the

13  arrangement to have Mr. Toberoff represent you?

14      A    Mr. Toberoff was already representing us before

15  that.

16      Q    When did he first begin to represent you?

17          MR. TOBEROFF:  Objection.  Asked and answered.

18          THE WITNESS:  In late 2002.

19  BY MR. ZISSU:

20      Q    Sometime before the meeting, though?

21      A    Yes.

22          MR. ZISSU:  Let's mark as 7, I guess,

23  Defendants' 7, a letter dated April 28, 2005 from DC

24  Comics.  I think it's from Mr. Levitz to Jean Adele Peavy

25  and Mark Warren Peavy [sic].

61

```
 1                (Defendants' Exhibit 7 marked.)
 2   BY MR. ZISSU:
 3        Q   My first question is have you seen a copy of
 4   that letter before?
 5        A   No.
 6        Q   Have you seen it, ever?
 7        A   No.
 8        Q   Did you ever hear from either of the Peavys that
 9   they received an offer --
10        A   No.
11        Q   -- from DC Comics?
12        A   No.
13           MR. TOBEROFF:  While the next question is
14   pending, before you answer, please give me time.  Count
15   to 5.
16   BY MR. ZISSU:
17        Q   When did your own involvement with the copyright
18   termination rights pertaining to your father's works
19   begin?
20           MR. TOBEROFF:  Objection.  Vague and ambiguous.
21   Lacks foundation.  Calls for a narrative.
22           THE WITNESS:  When my father died.
23   BY MR. ZISSU:
24        Q   Had you any involvement with these kinds of
25   rights before he died?
```

62

1        A    He talked to me about what he was doing.

2        Q    And what's your recollection of what he told

3   you?

4        A    He was going to pursue his termination rights

5   that were given to him under the copyright law.

6        Q    Did he ever say why he had not already pursued

7   them?

8        A    No.

9        Q    Did you ever discuss with him why he didn't

10  serve a termination notice while he was alive?

11       A    No.

12       Q    Do you know whether your mother discussed that

13  with him?

14       A    I don't know.

15       Q    Did he ever discuss with you what he thought his

16  termination rights were worth?

17       A    No.

18       Q    Did you ever hear that he had ever done any

19  evaluation or assessment of the value of those rights?

20       A    No.

21       Q    To your knowledge is there any evaluation that

22  was done for him of those rights?

23       A    No.

24       Q    Have you ever had a deposition taken of you

25  before?

63

1          A     Yes.

2          Q     And in what cases?

3          A     My divorce.

4          Q     And did that happen on more than one on occasion

5    in your divorce?

6          A     No.

7          Q     What was it, a one-day or half-a-day thing, or

8    what was it?

9          A     A few hours.

10         Q     Did you testify at any hearings in the divorce

11   in court or before a court officer?

12         A     Yes.

13         Q     And how long were you on the stand for those

14   examinations?

15         A     Maybe 10 or 15 minutes.

16         MR. ZISSU:  Let's mark as Defendants' 8 a letter

17   dated April 9, 1997 to John Schulman from Joanne Siegel.

18         (Defendants' Exhibit 8 marked.)

19   BY MR. ZISSU:

20         Q     You've seen that letter before?

21         A     Why isn't it signed?

22         Q     This -- there is a reason.  This comes from your

23   document production, so the recipient may have a signed

24   copy, but your own may have been just a file copy.

25         A     Okay.

64

1        Q    If you look down at the bottom of these

2   documents, when it just has a number with no, I guess,

3   "DC" or "WB," it means it came from your files.

4        A    Okay.

5        Q    But you've seen this letter before?

6        A    Yes.

7        Q    And between the time that your father died and

8   the sending of this letter, did you and your mother ever

9   have any evaluation or assessment of value done of the --

10  what the termination rights were worth?

11       A    No.

12       Q    Did you consult anybody on that subject other

13  than lawyers?

14       A    No.

15       Q    Is there a reason you waited a couple of years

16  before serving the termination notices?

17       MR. TOBEROFF:  Objection.  Attorney work

18  product.

19  BY MR. ZISSU:

20       Q    I am asking you why you waited between the time

21  your father died and the time you served him.  It has

22  nothing to do with a communication from you to an

23  attorney.

24       MR. TOBEROFF:  You --

25       MR. ZISSU:  Let me finish the question.

65

1       A    Yes.

2       Q    Are there any agreements you made to share any

3  of the proceeds of the termination rights case with

4  anyone else, such as accountants or lawyers?

5            MR. TOBEROFF:  Objection.  Vague and ambiguous.

6            THE WITNESS:  I don't understand the question.

7  BY MR. ZISSU:

8       Q    In the cases we're here for, the termination

9  cases, you're seeking an accounting.  My question is, are

10  you going to share whatever you obtain under the

11  accounting, the current cases, with any lawyers from the

12  divorce case or any other lawyers?

13      A    Not from the divorce case.

14      Q    With Mr. Toberoff?

15           MR. TOBEROFF:  You can answer whether or not we

16  have a contingency arrangement.

17           THE WITNESS:  We have a contingency agreement.

18  BY MR. ZISSU:

19      Q    Is it a lengthy document?

20      A    Could you speak up?

21      Q    Is it a lengthy document?

22      A    The --

23      Q    Contingency fee agreement.

24      A    The fee agreement?

25      Q    Yes.

72

1          A    I don't know what you would consider lengthy.

2          Q    Well, is it more than 10 pages?

3          A    I don't believe so.

4          Q    Were you represented by a lawyer other than

5    Mr. Toberoff when you signed it?

6          A    Yes.

7          Q    And who was that lawyer?

8          A    Mr. Levine.

9               MR. ZISSU:  Defendants' 11 is a complaint in the

10   probate court of Cuyahoga County, Ohio -- a copy of a

11   complaint.

12               (Defendants' Exhibit 11 marked.)

13   BY MR. ZISSU:

14         Q    Have you seen a copy of this document before?

15         A    Yes.

16         Q    And do you have knowledge of this proceeding in

17   Ohio?

18         A    Yes.

19         Q    And what do you know about it?

20               MR. TOBEROFF:  Objection.  Calls for a

21   narrative.

22               THE WITNESS:  My half-brother Michael's cousins

23   are trying to get themselves declared his heir.

24               My half-brother Michael's --

25               MR. ZISSU:  Declared --

73

1              THE WITNESS:  -- cousins declared his heir.

2    BY MR. ZISSU:

3        Q    And do you know what the status is, as best you

4    understand it, currently?

5        A    An attorney representing Mr. Banchek has filed a

6    motion to dismiss.

7        Q    And has that been granted, or is it pending?

8        A    It's pending.

9        Q    Are you a party to that case?

10       A    No.

11       Q    Have you submitted any papers --

12       A    No.

13       Q    -- to the case?

14            Nothing you signed has been submitted in that

15   case?

16       A    Not to my knowledge.

17            MR. ZISSU:  Defendants' Exhibit 12 is a copy of

18   a letter from Michael Bergman in this case to the United

19   States Magistrate in the case dated July 6, 2006.

20            (Defendants' Exhibit 12 marked.)

21   BY MR. ZISSU:

22       Q    My first question will be have you seen this

23   before?

24       A    There are two documents here.

25       Q    Two?  Let me see.  Oh, you mean two in the

74

1  the subject of these documents?

2      MR. TOBEROFF:  Objection.  Instruct you not to

3  divulge the substance of any communications from me

4  regarding this letter or regarding this subject.  If you

5  independently know something, you can testify to it.

6      THE WITNESS:  I don't know anything other than

7  communications I've had with my attorney.

8  BY MR. ZISSU:

9      Q    Now I will ask you, and what do you know from

10  your attorney?

11      MR. TOBEROFF:  Objection.  Attorney-client

12  privilege.  Instruct you not to answer the substance of

13  your communications with your attorney.

14      (Instruction not to answer.)

15      MR. ZISSU:  I am going to mark as Defendants' 13

16  a letter dated December 23, 1975 to Mr. Jerome Siegel and

17  Mr. Joseph Shuster on the letterhead of Warner

18  Communications.

19      (Defendants' Exhibit 13 marked.)

20  BY MR. ZISSU:

21      Q    And my question is first, have you seen a copy

22  of that letter before?

23      A    Yes.

24      Q    And have you yourself had any involvement before

25  your father died in the rights and obligations of the

76

1    parties to that letter over the years?

2            MR. TOBEROFF:  Objection.  Vague and ambiguous.

3            THE WITNESS:  I don't really understand your

4    question.

5    BY MR. ZISSU:

6        Q    Do you understand what this letter is about?

7        A    Yes.

8        Q    Okay.  And it has to do, among other things,

9    with annual payments --

10       A    Yes.

11       Q    -- that were made to your mother, among other

12   people?

13       A    No.

14       Q    Or to your father and then to your mother?

15           MR. TOBEROFF:  Just one second.  Because the

16   court reporter can't take people talking together --

17           MR. ZISSU:  Yes.

18           MR. TOBEROFF:  -- let him finish his question

19   before responding, and please give me the opportunity to

20   object without answering right away.

21           THE WITNESS:  Okay.

22   BY MR. ZISSU:

23       Q    Okay.  Do you understand it had to do with

24   annual payments that were made to your father and then

25   your mother by Warner Communications?

77

1          MR. TOBEROFF:  Objection.  Lacks foundation.

2     Assumes facts not in evidence.

3     BY MR. ZISSU:

4          Q    Do you understand the nature of the letter and

5     the subject of the letter in that respect?

6          MR. TOBEROFF:  Same objection.

7     BY MR. ZISSU:

8          Q    You can answer.

9          A    I disagree with the compound that you put into

10    that question.

11         Q    Well, tell me what you understand about the

12    letter.

13         A    It has to do with payments to my father.

14         Q    Okay.  And were you involved in any of the

15    discussions or negotiations relating to the payments that

16    were made, before your father died, under this letter?

17         A    No.

18         Q    And have you been involved since your father

19    died with respect to any payments made under this letter?

20         MR. TOBEROFF:  Objection.  Vague and ambiguous.

21         THE WITNESS:  Since my father died --

22    BY MR. ZISSU:

23         Q    Since your father died, yeah.

24         A    This related to payments to him during his

25    lifetime.

78

1      Q    Right.

2      A    So there -- the answer is no.

3      Q    And have there been payments to your knowledge

4  made since his death, under this letter, to your mother?

5      A    No.  This letter has nothing to do with my

6  mother.

7      Q    It has nothing to do with your mother.

8           Have there ever -- to your knowledge have any

9  payments ever been made relating to this letter to your

10  mother since your father died?

11      A    My mother is not a party to this document.

12      Q    I know that, but what do you know about this

13  document in relation to your mother?

14           MR. TOBEROFF:  I object to that question.  Also

15  vague and ambiguous.

16           And, Laura, if I can ask you to just focus on

17  the specific question and answer the specific question if

18  you understand it.

19           THE WITNESS:  Could you repeat it?

20  BY MR. ZISSU:

21      Q    What knowledge do you have as to payments made

22  to your mother -- forget the document -- since your

23  father died on an annual basis from Warner Communications

24  or DC Comics or any of the defendants?

25           MR. TOBEROFF:  Objection.  Calls for a

79

1    narrative.

2            You can answer.

3            THE WITNESS:  My mother needed money, and she

4    asked for money after my father died.

5    BY MR. ZISSU:

6        Q    And was she paid money after your father died by

7    one or more of the defendants?

8        A    Yes.

9        Q    And how much to your knowledge was she paid

10   since 1996?

11       A    I don't know.

12       Q    Were you involved in any of the discussions

13   relating to what your mother was paid?

14       A    No.

15       Q    Were you ever involved in any discussions about

16   how this letter might apply to your mother between --

17   with any representative of the defendants?

18            Were you involved is the question?

19       A    No.

20       Q    Who would have been involved, if you know?

21       A    Who would have been involved in --

22       Q    Involved in any discussions relating to these

23   payments or requests for payment by your mother.  Who

24   would have been involved in those discussions?

25       A    My mother.

80

1           MR. TOBEROFF:  Objection -- excuse me.

2           THE WITNESS:  Sorry.

3           MR. TOBEROFF:  Objection.  Calls for

4    speculation.

5    BY MR. ZISSU:

6       Q   And your answer is your mother?

7       A   I -- yes.

8       Q   Would you have discussed with your mother these

9    payments made or requested after your father died?

10          MR. TOBEROFF:  Objection.  Vague and ambiguous.

11          THE WITNESS:  Could you ask a more specific

12   question?

13   BY MR. ZISSU:

14      Q   Did you ever discuss with your mother her

15   requests to any of the defendants for payments after she

16   died?  After she died?

17      Q   I am sorry.  After your father died.

18      A   Yes.

19      Q   And what was the substance of those discussions?

20      A   She was concerned about her ability to survive

21   without any kind of annual income.

22      Q   And what's your best understanding of what

23   happened to her requests?

24      A   She made an appeal and was granted an annual

25   income.

81

1        Q    And has that continued to date?

2        A    Yes.

3        Q    Do you know what time of the year it's paid?

4        A    I believe she gets biweekly checks.

5        Q    And has she also requested money for medical

6    expenses?

7              MR. TOBEROFF:  Objection.  Are you asking her

8    what --

9    BY MR. ZISSU:

10        Q    Since your father died.

11             MR. TOBEROFF:  Objection.  Are you asking her

12    what her mother told her?

13             MR. ZISSU:  Yes.  It's based on -- unless she

14    was involved in them, yes.

15             MR. TOBEROFF:  Okay.

16             THE WITNESS:  Yes, my mother told me that she

17    was receiving medical benefits.

18    BY MR. ZISSU:

19        Q    And is that done on a biweekly -- or what --

20    strike that.

21             On what basis is that done so far as you

22    understand?

23             MR. TOBEROFF:  Objection.  Vague and ambiguous.

24             THE WITNESS:  She has medical coverage.

25    BY MR. ZISSU:

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1        Q    It's in the form of insurance coverage?

2        A    Correct.

3        Q    Which is paid for by one of the defendants?

4        A    Yes.

5             MR. ZISSU:  Now, I have a series of letters.  We

6    will make it into one exhibit.  There are five letters.

7    They are -- the first is to Gerald M. Levin; the second

8    is to Jenette, J E N E T T E, Kahn, K A H N; the third is

9    to Robert Daly, D A L Y; the fourth is to Terry,

10   T E R R Y, Semel, S E M E L.  It's only four letters.

11   I'd like to make it five letters.  And the fifth one is

12   to Paul Levitz.  They're the same date.

13            MR. TOBEROFF:  Do you have a paper clip or

14   something?

15            MR. BERGMAN:  I'll get some.

16            MR. TOBEROFF:  We are off the record?

17   MR. ZISSU:  Yeah.

18            (Recess.)

19            MR. ZISSU:  So this series of letters are

20   Defendants' 14.  There are five of them.

21            (Defendants' Exhibit 14 marked.)

22            MR. TOBEROFF:  Are these in the order that are

23   going to be --

24            MR. ZISSU:  Yes.

25            MR. TOBEROFF:  What's the first one, 1069?

83

1        You can answer.

2        THE WITNESS:  I don't approve what my mother

3   does.  That's not my role.

4   BY MR. ZISSU:

5        Q   Did you consent to them?  Since they are, I

6   think, in part written with regard to actions taken by

7   you and your mother.

8        A   She didn't ask for my consent.

9        Q   But did you consent to them or approve them

10  afterwards?

11       MR. TOBEROFF:  Vague and ambiguous.

12  BY MR. ZISSU:

13       Q   Did you ever tell your mother that you objected

14  to any of the content of these letters after she sent

15  them?

16       A   No.

17       MR. ZISSU:  Let's mark as I think it's 15 two

18  letters, the top one of which is from Paul Levitz to

19  Joanne Siegel, and the second of which is from Joanne

20  Siegel to Paul Levitz.

21       (Defendants' Exhibit 15 marked.)

22  BY MR. ZISSU:

23       Q   I will give you a chance to read them both.  I

24  am going to ask you if you've seen them both before.

25       A   Okay.  And your question is?

85

1        Q    Yeah.   Let's look at the first letter, which is

2  the second in the exhibit.   It's dated April -- I'm

3  sorry.

4            Look at the top one, April 15, 1999.   Have you

5  seen that letter before?

6        A    Yes.

7        Q    And did you see it on or about that time, April

8  15, 1999?

9        A    I saw it shortly after my mother received it.

10       Q    And did your mother discuss that with you?

11       A    Yes.

12       Q    And what did she say?

13       A    She told me she got a letter from Paul.

14       Q    Did she say that she was going to respond to it?

15       A    Yes.

16       Q    And did you discuss the response with her?

17       A    I believe so.

18       Q    Which is the second letter, April 19, 1999?

19       A    Uh-huh.

20            THE REPORTER:   That's "yes"?

21            THE WITNESS:   Yes.   Sorry.

22            MR. TOBEROFF:   He can't take down "uh-huh."

23            THE WITNESS:   I know, I know.   I'm getting

24  tired.

25  BY MR. ZISSU:

86

1      Q     There is a handwritten word that looks like the

2   word "negotiators" that is crossed out in the sentence

3   that reads, "Please know that Laura and I have been

4   assured and we believe that our" -- the typed text says

5   "negotiators will indeed contact you shortly," and it

6   looks like that was crossed out, and there is a word

7   written below which I think says "representatives."

8          Is that --

9      A     Uh-huh, looks like that.

10     Q     Is that your handwriting?

11     A     It's a bad xerox.  It could be.

12     Q     And do you recall making that change in this

13  text?

14     A     Probably.

15     Q     And why was it changed?

16     A     I don't know.  Just sounded better.

17     Q     Was it your mother's practice to show you her

18  drafts of letters, and then you would review them and

19  edit them?

20     A     Sometimes.

21     Q     And did you help write this letter, which is

22  April 19, 1999?

23     A     I believe she wrote it, and, you know, I may

24  have made that, you know, suggestion.

25     Q     You didn't make any other suggestions to change?

87

1          A    I don't recall any.

2              MR. ZISSU:  The next exhibit, Defendants' 16, is

3    a thick document.  It says, "Notice of Termination of

4    Transfer Covering Extended Renewal Term."  It's Bates

5    numbers 848 through 910.

6              (Defendants' Exhibit 16 marked.)

7    BY MR. ZISSU:

8          Q    And have you seen that document before, or a

9    copy of it?

10         A    This is a collection of several documents.

11         Q    Yes.  These are the -- I think they're the

12   termination notices that were served in the Superman case

13   or are the basis for the Superman case and --

14             MR. TOBEROFF:  Just to clarify the record --

15             MR. ZISSU:  Yeah.

16             MR. TOBEROFF:  -- there were several termination

17   notices that were sent, but each of them had a --

18             MR. ZISSU:  A list.

19             MR. TOBEROFF:  -- a very lengthy list, and for

20   both parties' convenience what was produced was the list,

21   but then each of the other notices included everything

22   but the list, so we wouldn't have to keep --

23             MR. ZISSU:  Right.  And I am doing likewise.

24   This is just the notices without the list.

25             MR. TOBEROFF:  Well, it's the notices excluding

88

1    her and her attorneys.

2    BY MR. ZISSU:

3        Q    Are you familiar with your father's Superman

4    works?

5        A    Yes --

6        Q    You've seen --

7        A    -- to a certain extent.  I'm not a comic book

8    historian.

9        Q    But you've read or seen works?

10       A    Some of them.

11       Q    Some of them.

12            You've seen Action Comics No. 1?

13       A    Yes.

14       Q    You've read it?

15       A    Yes.

16       Q    Have you read your father's -- in 1938 he wrote

17   a letter to Detective Comics proposing a Superboy comic

18   book.  You've read that letter.

19            Correct?

20            MR. TOBEROFF:  Objection.  Lacks foundation.

21   Assumes facts not in evidence.

22   BY MR. ZISSU:

23       Q    Did you read that letter?

24       A    A long time ago.

25       Q    And did you ever read a script or continuation

92

1    from 1940 which proposed a form of Superboy comic book?

2         MR. TOBEROFF:  Same objection.

3         THE WITNESS:  I read that some time ago as well.

4    BY MR. ZISSU:

5         Q    And have you ever read More Fun Comics -- any of

6    the More Fun Comics which featured Superboy?

7         A    A long time ago.

8         Q    How long --

9         MR. TOBEROFF:  Just a second.  Assumes facts not

10   in evidence.

11   BY MR. ZISSU:

12        Q    How long ago?

13        A    I don't recall.

14        Q    Did you read them in connection with any aspect

15   of these cases in which you're a plaintiff?

16        MR. TOBEROFF:  Vague and ambiguous.

17        THE WITNESS:  I probably read it a couple of

18   years ago.

19   BY MR. ZISSU:

20        Q    Do you understand that there is any relationship

21   between the Superman character and Superboy?

22        A    That's --

23        MR. TOBEROFF:  Vague and ambiguous.

24        THE WITNESS:  Could you be more specific,

25   because that's such a broad question?

93

BY MR. ZISSU:

Q    Well, I'm asking you if you understand there is any relationship between the character Superman and the character Superboy?

MR. TOBEROFF:  Objection.  Vague and ambiguous.

THE WITNESS:  They were both created by my father.

BY MR. ZISSU:

Q    And are the characters as created related in any way?

MR. TOBEROFF:  Objection.  Vague and ambiguous.  Calls for a legal conclusion.

BY MR. ZISSU:

Q    In your understanding as a reader.

A    They have completely different story lines.

Q    Isn't it a fact that Superboy is portrayed as Superman as a youth?

MR. TOBEROFF:  Objection.  Assumes facts not in evidence.  Lacks foundation.

THE WITNESS:  Could you ask the question again, please?

BY MR. ZISSU:

Q    Isn't it a fact that as portrayed in the comic books, Superboy is Superman as a youth?

MR. TOBEROFF:  You can answer.

94

1              THE WITNESS:  Yes.

2    BY MR. ZISSU:

3        Q   And isn't that a relationship between the two

4    characters, as portrayed?

5              MR. TOBEROFF:  Vague and ambiguous.

6              THE WITNESS:  It's -- there are a lot of legal

7    aspects to this that I'm not qualified to answer.

8    BY MR. ZISSU:

9        Q   I am not asking you anything legal.  You look at

10   the two.  One is a version of the other as a youth;

11   you've just admitted that, and I asked you if that makes

12   them related, and you say you can't answer.

13             MR. TOBEROFF:  Object --

14   BY MR. ZISSU:

15       Q   Correct?  That's your answer?

16             MR. TOBEROFF:  Excuse me.  Let me object.

17   Objection.  Misstates her prior testimony.  That was not

18   her answer.

19             Do you know what the pending question is?

20             THE WITNESS:  I did not say that he was a

21   version of him.

22   BY MR. ZISSU:

23       Q   What aspects of the character Superman can be

24   found in the character Superboy?

25             MR. TOBEROFF:  Objection.  Calls for a legal

95

```
 1   conclusion.
 2   BY MR. ZISSU:
 3       Q    You understand you are the plaintiff in this
 4   action?
 5       A    Yes.
 6       Q    And you understand you're making claims,
 7   apparently, that Superboy is not related to Superman as
 8   the characters have been portrayed in publications?  Do
 9   you understand that that's what you're saying?
10           MR. TOBEROFF:  Objection.  Lacks foundation.
11   Misstates the evidence.
12           THE WITNESS:  That's not what the case says.
13   BY MR. ZISSU:
14       Q    I didn't -- there are aspects of the case in
15   which -- including your deposition today in which you're
16   unwilling to concede that Superboy is related to
17   Superman.
18           Do you understand that?
19           MR. TOBEROFF:  Objection.  Vague and ambiguous.
20   Misstates her testimony.
21   BY MR. ZISSU:
22       Q    Do you understand that?
23       A    I don't know how to answer your question.
24           MR. TOBEROFF:  What is the pending question?
25   BY MR. ZISSU:
```

96

1        Q    The question now is -- we will go on to another

2    question -- is it your testimony that the character

3    Superboy as he's appeared in publications is not related

4    to the character Superman as Superman has been portrayed

5    in publications?

6            MR. TOBEROFF:  Objection.  Vague and

7    ambiguous --

8    BY MR. ZISSU:

9        Q    Is that --

10           MR. TOBEROFF:  -- but you can answer.

11   BY MR. ZISSU:

12       Q    -- your testimony?

13       A    No, that's not my testimony.

14       Q    Well, what, if any, relationship do those two

15   characters have?

16           MR. TOBEROFF:  Asked and answered.

17           You can answer again.

18           THE WITNESS:  As I said before, they -- you

19   know, they're -- they were both created by my father, but

20   they're separately created characters.

21   BY MR. ZISSU:

22       Q    I didn't ask you whether they were separately

23   created.

24           As you see them on a page when you read them, is

25   it your testimony that they are not related?

97

1          Q    Now, you don't deny that these notices, all

2    seven of them, repeat throughout in the footnote 1 to

3    each notice the statements that Superboy and a bunch of

4    other characters listed here are, quote, a "SUPERMAN-

5    related work"?

6          A    Yes, that's what it says.

7          Q    Okay.  And each of them say this.

8          Correct?

9          A    Yes.

10         Q    Now, if you go to page 897 in this Exhibit 16,

11   on that page -- and I will let you read it, but there is

12   a description of various documents, among others, related

13   to a 1947 or 1948 case that I can represent took place in

14   the State of New York, and in the third and fourth lines

15   there is -- among the documents referenced there is,

16   quote, ":  A stipulation executed on or about May 19,

17   1948, providing in part that by virtue of a March 1, 1930

18   [sic] agreement, the co-authors" --

19         MR. TOBEROFF:  1938.

20         MR. ZISSU:  Sorry.

21         Q    -- "1938 agreement, the co-authors transferred

22   to Detective Comics...," et cetera, and do you see that?

23         A    Yes, I do.

24         Q    Okay.  Now, the question I am asking you is

25   not -- again, I am not asking you for a legal conclusion.

100

1    I'm asking you -- the question is, there was also -- and

2    I will represent to you, and I think your counsel will

3    agree, that there was another document in that case

4    called -- that was a consent judgment that was from 1948

5    as well, and this consent judgment is not mentioned in

6    any of these notices of termination, and my question to

7    you is, do you know anything about why, either yes or no?

8    I am not asking you for what your counsel told you.  I am

9    only asking you if you have knowledge on the subject.

10           MR. TOBEROFF:  Objection.  Compound.  Vague and

11   ambiguous.

12           And you can only answer to the extent your

13   answer does not entail any -- the substance of any

14   attorney-client communications.

15           THE WITNESS:  And the question again is?

16   BY MR. ZISSU:

17      Q   The question is --

18           MR. TOBEROFF:  Does she know why?

19           MR. ZISSU:  Right.

20      Q   In these notices, the consent judgment from that

21   case is not listed as among the documents -- among the

22   transfers or grants being terminated.

23           My question is, do you know why it was omitted?

24      A   Yes.

25      Q   And why was it omitted?

101

1    documents.

2          MR. TOBEROFF:  Give me five seconds to object

3    before your answer.  Okay, Laura?

4          THE WITNESS:  I'm very tired.

5          MR. ZISSU:  We are going to break soon, so...

6    Sorry for that.

7          Okay.  Defendants' 17, which is a Notice of

8    Termination of Transfer Covering Extended Renewal Term

9    Superboy.  And I think this is the whole one, if I'm not

10   wrong.  We were able to put the whole thing together.

11         (Defendants' Exhibit 17 marked.)

12   BY MR. ZISSU:

13      Q    My questions are pretty focused.

14         If you go to page 616, and there is a paragraph

15   2, and there is a reference in the fourth line to "More

16   Fun Comics, No. 101," and my question is, do you think

17   you may have looked at More Fun Comics on or shortly --

18   on or about or shortly before this termination notice was

19   signed by you?

20      A    I believe so.

21      Q    And your signature appears on page 669, just for

22   your own information.

23         And then on the next page there is -- there are

24   references to -- in small Roman numbers -- they follow

25   small Roman numbers.  (I) is a synopsis of a 1938 letter,

105

1    and then after little Roman (ii) there is a reference to

2    a 13-page script, and my question is, did you shortly

3    before signing this document review or look through those

4    two documents, namely, the summary or synopsis and the

5    13-page script?

6            MR. TOBEROFF:  Objection.  Misstates what this

7    exhibit says and misstates the evidence and lacks

8    foundation.

9            You can answer.

10            THE WITNESS:  Yeah, I'm trying to read it.  My

11    vision is not so good at this moment, so I'm sorry it's

12    taking so long.

13    BY MR. ZISSU:

14        Q    Well, let me read it into the record.  After the

15    little (i) it says, "a three-page summary or synopsis of

16    the concept and plan for a new comic strip to be known as

17    SUPERBOY solely originated, created, conceived and

18    written by Jerome Siegel (c. 1938) and submitted by

19    Jerome Siegel to Detective Comics, Inc. on or about

20    November 30, 1938; and (ii) a complete thirteen page

21    script containing the continuity, plan and dialogue for

22    the first 'release' or 'releases' of the proposed new

23    comic strip, SUPERBOY, the concept and character of

24    SUPERBOY and the entire plan for the future publication

25    of SUPERBOY...," et cetera.

106

1          So my question is, did you read those two

2    referenced documents shortly before or in connection with

3    signing this document?

4          A    Yes.

5          MR. ZISSU:   And then this is the last one before

6    lunch, if I can find it.   This is a Notice of Termination

7    of Transfer Covering Extended Renewal Term.   Let me find

8    it.

9          (Defendants' Exhibit 18 marked.)

10   BY MR. ZISSU:

11         Q    It doesn't have all the pages.   It has pages 1,

12   2, 3, 24, 25 and 26 of the document.   On page 25 it has

13   the signatures of Joanne Siegel and Laura Siegel Larson,

14   and it has to do, I think, with a character called

15   Spectre or The Spectre, spelled T H E S P E C T R E.

16         And do you recognize this?

17         A    Yes.

18         Q    And if you go to page 2 in paragraph 2 following

19   the Arabic number (1) in parentheses, there is reference

20   to the "Spectre character appearing in costume in an ad

21   in issue No. 51 of More Fun Comics, copyrighted November

22   28, 1939...," and then it goes on, and my question is, do

23   you remember reviewing or seeing a copy of the ad that's

24   referenced?

25         A    No.

107

```
 1        Q    Now, you have seen Action Comics No. 1 before.

 2        Correct?

 3     A   Yes.

 4        Q    And I am going to come back to that.  I first

 5   have some other questions.

 6        MR. TOBEROFF:  Give me time if I want to

 7   interpose an objection.

 8   BY MR. ZISSU:

 9        Q    When did you first have any communications with

10   Arthur Levine?

11     A   During the summer of 1996.

12        Q    Ninety?

13     A   '96.

14        Q    And did you ever meet him in person?

15     A   Yes.

16        Q    And where was that?

17     A   In his office in Washington.

18        Q    And was your mother there as well?

19     A   Yes.

20        Q    And in working with him, was it your practice --

21   or his practice to send you copies of written

22   communications to the representatives of DC Comics on a

23   consistent basis?

24     A   Yes.

25        Q    And how soon -- how did he send you copies of
```

115

1    those communications?

2        A    Sometimes they were by mail.  Sometimes they

3    were by fax.

4        Q    And with regard to his letters, did you see the

5    letters that he was sending before he would send them

6    out?

7        A    I believe so.  I can't say whether I saw all of

8    them, but I believe so.

9        Q    And the ones that you would not have seen

10   beforehand, would you have seen them soon thereafter?

11       A    I don't remember.

12       Q    How frequently did you speak with Mr. Levine

13   after you engaged him as your lawyer?

14       A    It varied.  Sometimes quite frequently.

15   Sometimes there would be periods of time when there was

16   nothing to talk about.

17       Q    And when you spoke with him, was your mother on

18   the call as well as yourself?

19       A    Not always.

20       Q    And were you the primary person that dealt with

21   Mr. Levine?

22       A    I'd say, you know, different people would do it

23   at different times.

24       Q    Would you say you did -- you had more of the

25   contact with him directly than your mother?

116

1           What about the October 19, 2001 letter from

2  Kevin Marks to John Schulman?

3      A    I did not see that letter before he sent it to

4  John Schulman, but he sent it to us immediately after

5  having sent it to John Schulman.

6      Q    How did he send it to you?

7      A    By fax.

8      Q    And did you know that the contents of that

9  letter would be before it was sent even though you didn't

10  see the actual letter beforehand?

11      A    My mom and I had conditionally --

12           MR. TOBEROFF:  Don't talk about communications

13  with Kevin Marks.

14  BY MR. ZISSU:

15      Q    I am just asking you if you knew -- the question

16  is first if you knew.

17      A    If I knew the contents?

18      Q    Yes.  Before the letter was sent out.

19      A    I knew deal points.  I did not know wording.

20      Q    And did you approve those deal points before

21  this letter was sent out?

22      A    We conditionally approved deal points on the --

23  provided that they would not be changed in any way, that

24  no new material would be added, that there would be no

25  changes that we objected to, and that they were written

125

1    up in a manner that we could be comfortable with and that

2    we felt was consistent with our understanding of what had

3    been discussed.

4        Q   And you discussed each of those deal points with

5    your lawyer beforehand.

6            True?

7            MR. TOBEROFF:  Objection.  You're asking her --

8    you should phrase it a different way.  And you already

9    phrased it as asked and answered.  Don't ask her what she

10   discussed with her attorneys.

11           MR. ZISSU:  I will ask her, because you have

12   waived the privilege.

13           MR. TOBEROFF:  Now you're claiming we've waived

14   the privilege?

15           MR. ZISSU:  Well, we are claiming you waived the

16   privilege, so I am going to make you, you know,

17   distinguish between what's waived and not.  Your

18   responses to interrogatories as supplemented have still

19   put into question the authority of Kevin Marks to have

20   written that letter as he wrote it.

21           MR. TOBEROFF:  And we have disagreed with your

22   contention.  There is a motion pending on it, and that

23   motion has yet to be decided.

24   BY MR. ZISSU:

25       Q   So did you -- let me strike that.

126

1          You saw the letter immediately afterwards.

2          True?

3          MR. TOBEROFF:  Misstates her testimony.

4    BY MR. ZISSU:

5          Q    Did you?

6          A    I saw the letter after it had been sent to John

7    Schulman.

8          Q    And you received it by fax?

9          A    Correct.

10         Q    And you received it that day?

11         A    I believe so.

12         Q    And you approved of its contents when you saw

13   it.

14         True?

15         A    Not necessarily the wording, but the deal

16   points.

17         Q    Even after you saw the wording, you didn't

18   approve of the way it was worded?

19         A    I would --

20         MR. TOBEROFF:  Excuse me.  Objection.  Vague and

21   ambiguous.

22         THE WITNESS:  I would have worded some of it

23   differently.

24   BY MR. ZISSU:

25         Q    But you saw it as written.

127

1          Correct?

2      A   Yes.

3      Q   Did you ever object to the -- to Kevin Marks or

4  tell DC Comics that you didn't approve the language in

5  the letter?

6      A   I -- that actually --

7          MR. TOBEROFF:  You can't say whether you

8  objected to Kevin Marks or not.

9          THE WITNESS:  No.  I was just going to say

10 that's calling for me to discuss a private conversation

11 that I had with my attorney.

12 BY MR. ZISSU:

13     Q   You saw the letter and the way it was written.

14 Did you find a problem with the language in the way it

15 was phrased?

16         I am not asking you about talking to Kevin

17 Marks.  You saw it.  Did you have that reaction?  That's

18 what I'm asking.

19     A   Well, if you're asking me the first part of your

20 question, did I see it and did I object to some of the

21 wording, the answer is yes.

22     Q   To whom?

23         MR. TOBEROFF:  That's --

24 BY MR. ZISSU:

25     Q   Did you ever object to DC Comics?  Did you ever

128

1   tell DC Comics or their lawyers that you objected to the

2   language in the letter?

3        A    I wasn't communicating with DC Comics.  That was

4   my lawyer's job.

5        Q    I just asked you whether you communicated with

6   DC.  The answer is no.

7             Is that correct?  You didn't tell DC Comics?

8        A    The answer is no.

9        Q    Do you know whether Kevin Marks ever told DC

10   Comics that any of the phrasing in the letter was not

11   authorized or agreed to by you?

12        A    I don't know.

13             MR. TOBEROFF:  Misstates her testimony.

14             Give me time to object, please.  You have to

15   give me time to object.

16   BY MR. ZISSU:

17        Q    Did you ever instruct Mr. Marks to communicate

18   to the lawyers for DC Comics that there should be a

19   correction made in his letter?

20             MR. TOBEROFF:  Objection.  Attorney-client

21   privilege.  Instruct you not to answer.

22             (Instruction not to answer.)

23   BY MR. ZISSU:

24        Q    Are you going to answer it?

25             MR. TOBEROFF:  She is going to follow my

1    instruction.  Please don't --

2         MR. ZISSU:  No, she'll --

3         MR. TOBEROFF:  Excuse me.  I am not finished.

4    Don't ask her whether she is going to answer a question

5    after she's been instructed by me not to answer.  That's

6    totally inappropriate.

7         MR. ZISSU:  It's not appropriate to point your

8    finger at me that way, Marc.  Get control of yourself.

9         I will assume that she will follow your

10   instructions, and I want the record to be clear that the

11   matter has been exhausted once you give the instruction.

12        Okay?

13        MR. TOBEROFF:  I don't know what that means.

14   You can say anything you want on the record.

15        MR. ZISSU:  If there is any uncertainty as to

16   whether she is following your instructions, I am going to

17   ask her.  Otherwise, I want the fact that you give an

18   instruction to be deemed to mean that she would follow

19   it.  Now, if you are not willing to agree to that --

20        MR. TOBEROFF:  I am willing to agree to that --

21        MR. ZISSU:  Thank you.

22        MR. TOBEROFF:  -- but you added a lot of unclear

23   verbiage to it.

24        MR. ZISSU:  You're just always afraid of things,

25   so you can't get a straight answer out of you.

130

1                Let's mark as Defendants' Exhibit 22 a letter

2     dated October 19, 2001, which we have been referring to,

3     from Kevin Marks to John Schulman.

4                (Defendants' Exhibit 22 marked.)

5     BY MR. ZISSU:

6         Q    Can you go look at this letter and go through it

7     and tell me which language you didn't agree to?

8                MR. TOBEROFF:  Misstates her testimony.

9                THE WITNESS:  The first paragraph.

10    BY MR. ZISSU:

11        Q    The first paragraph reads, "This is to confirm

12    our telephone conversation of October 19, 2001.  The

13    Siegel family (through Joanne Siegel and Laura Siegel

14    Larson, the majority owners of the terminated copyright

15    interests) has accepted DC Comics' offer of October 16,

16    2001 in respect of the 'Superman' and 'Spectre'

17    properties.  The terms are as follows:"

18                What -- is there some portion of that paragraph

19    that you found -- use your own terms -- either not

20    approved or not acceptable or objectionable?

21                MR. TOBEROFF:  What she said was, since she

22    didn't necessarily approve all the wording of the

23    letter --

24                MR. ZISSU:  Right.

25                MR. TOBEROFF:  -- but she approved the deal

131

1    points.

2            MR. ZISSU:  I heard that.

3        Q   What --

4            MR. TOBEROFF:  That's all she said.

5    BY MR. ZISSU:

6        Q   What language in that paragraph, what wording,

7    did you not agree with?

8        A   "The Siegel family (through Joanne Siegel and

9    Laura Siegel Larson, the majority owners of the

10   terminated copyright interests) has accepted DC Comics'

11   offer..."

12       Q   And what was your point on that?

13       A   We conditionally accepted the offer provided

14   that there were no changes to it, there were no additions

15   to it, and that it was written up in a manner that was

16   going to be acceptable to us and true to our

17   understanding.

18       Q   You don't disagree that Joanne Siegel and Laura

19   Siegel Larson -- that's yourself -- were the majority

20   owners of the terminated copyright interests, do you?

21       A   I don't disagree with that.

22       Q   And you don't disagree that the deal points had

23   been accepted.

24           Correct?

25       A   They were conditionally accepted.

1        Q    And he should have told DC Comics, according to

2    what you're testifying, that these deal points were

3    accepted on the conditions you've just testified to?

4        A    Yes.

5        Q    And did -- and was that information ever

6    conveyed either by you or by Mr. Marks to DC Comics, the

7    conditions you've just mentioned?

8        A    I don't recall.

9        Q    To this day has that ever been explained or

10   communicated to DC Comics?

11       A    I believe it was.

12       Q    When?

13       A    I believe that my mother made it perfectly

14   clear.

15       Q    To whom?

16       A    In a letter that she wrote.

17       Q    To?  To whom?

18       A    To Dick Parsons.

19       Q    These conditions were mentioned in a letter that

20   your mother wrote in May of the next year -- is that what

21   you're referring to? -- to Dick -- to Mr. Parsons?

22       A    Yes, I believe that was the letter.

23            MR. ZISSU:  Let's mark as Defendants' Exhibit 23

24   a letter dated May 9, 2002 from Joanne Siegel to Richard

25   D. Parsons.

133

1           (Defendants' Exhibit 23 marked.)

2    BY MR. ZISSU:

3        Q    Do you want to look through that for a second,

4    please?

5             Have you finished?

6        A    Yes.

7        Q    Where are those conditions mentioned in this

8    letter, which is Defendants' Exhibit 23?

9        A    In the first line of the fourth paragraph on

10   page 1 is one place.

11       Q    And you want to read that?

12       A    "Your company's unconscionable contract dated

13   February 4, 2002 contained new, outrageous demands that

14   were not in the proposal."

15       Q    Maybe I'm missing something.  I don't see that

16   that sentence refers to the conditions you mentioned, and

17   I don't think it says that the October 19, 2001 letter

18   included -- was to have included such conditions.

19            Could you explain that to me?

20            MR. TOBEROFF:  Objection.  Argumentative.

21   BY MR. ZISSU:

22       Q    Well, I'm asking you, how does this sentence

23   include a statement to Mr. Parsons that the October 19,

24   2001 letter was conditional?

25       A    Because our conditions were that no new demands

134

1   would appear in a proposal -- I mean that were not in the

2   proposal would appear in a final write-up.

3       Q   I think you gave me an explanation of what the

4   conditions were in your prior testimony, and I don't

5   think you mentioned in those conditions that there

6   wouldn't be new demands made.

7       A   I believe I did say that.

8       Q   You did?

9           Could we find that portion of the testimony?

10          THE WITNESS:  If I didn't, I certainly would say

11  that right now.

12          MR. ZISSU:  Can we find the -- that question and

13  answer where the conditions were outlined?

14          (Record read as follows:

15              "A   We conditionally accepted the

16              offer provided that there were no

17              changes to it, there were no additions

18              to it, and that it was written up in a

19              manner that was going to be acceptable

20              to us and true to our understanding.")

21  BY MR. ZISSU:

22      Q   My question is, did you tell -- in Defendants'

23  Exhibit 23 did you tell Mr. Parsons that the acceptance

24  of the October 19, 2001 letter was conditioned on there

25  being no new demands made?  Did you tell him that was a

135

1    condition of the October 19, 2001 letter?

2         MR. TOBEROFF:  Objection.  This is a letter from

3    Joanne Siegel.  You mean through her mom?

4    BY MR. ZISSU:

5         Q   Yes, through your mom, your mother, this letter.

6         A   I don't believe that the October 19th letter is

7    specifically referenced in this letter.  Nevertheless,

8    our condition was no changes, no new demands.

9         Q   My point is directed, did you ever tell anyone

10   at DC Comics before today that that was a condition of

11   your acceptance of the deal points in the October 19,

12   2001 letter?

13        A   I personally have never spoken to anyone at DC

14   Comics about it.

15        Q   And your mother's letter doesn't say that

16   either.

17            Correct?

18            MR. TOBEROFF:  Objection --

19   BY MR. ZISSU:

20        Q   It says --

21            MR. TOBEROFF:  Strike that.

22   BY MR. ZISSU:

23        Q   It says you objected to the demands, but it

24   didn't say the making of new demands was a condition of

25   acceptance of the October 19, 2001 letter.

136

1      A    I would need more time to read this entire

2  letter very carefully.

3      Q    Well, I will let you take some time to read it.

4      A    I'm sorry.  What -- now would you like to phrase

5  your question?

6      Q    Yeah.

7           Did you find any other portion of this letter

8  which refers to the acceptance of the deal points in the

9  October 19, 2001 letter as being conditional?

10     A    I would actually like to say it was more we

11  approved the deal points.  We did not accept the deal

12  points.

13     Q    Approved being a condition.

14     A    Well, my mother does say here, "For your

15  representatives to condition our receiving financial

16  compensation for our rights on demands which were not in

17  the proposal we accepted, is deceitful."

18     Q    Where --

19     A    That's in paragraph 3, page 2.

20     Q    But that doesn't say that this was a condition

21  communicated -- strike that.

22          I don't read this -- and I am asking you whether

23  you agree with me or not the way you do read this.  I

24  don't see this as saying to Mr. Parsons when we accepted

25  or approved, whatever the word you want to use, on

137

1    October 19, 2001, it was conditional.

2            MR. TOBEROFF:  Objection.  That's not a

3    question.  It's a comment on the evidence.

4            MR. ZISSU:  I'm not finished with the question.

5        Q    Do you agree with me?

6        A    You'd have to say it again.

7        Q    Do you agree with me that this language you have

8    cited on page 2 does not inform Mr. Parsons that the

9    approval on October 19, 2001 was conditional?

10       A    No, I disagree with your statement.

11       Q    You disagree.  You think that this makes it

12   clear that whatever happened on October 19, 2001 from

13   your part was conditional?

14       A    Yes.

15       Q    Let me direct your attention on the prior page

16   of Defendants' Exhibit 23 to the following paragraph:

17           "Every step" -- third paragraph.  "Every step in

18   the termination process, the filing, the timing, were

19   carefully researched, checked and rechecked with

20   knowledgeable attorneys on both coasts before going

21   ahead.  We then hired two additional Beverly Hills

22   entertainment attorneys as our negotiators.  Negotiations

23   dragged on for four difficult years.  We made painful

24   concessions assured if we did we would arrive at an

25   agreement.  When we made those difficult concessions and

138

1    reluctantly accepted John Schulman's last proposal six

2    months ago, we were stabbed in the back with a shotgun

3    contract," close quote.

4            Now, first, it's true that your mother uses the

5    word "accepted" here, not "approved," which you say you

6    prefer.

7            Isn't that true?

8        A   I prefer the word "approved."

9        Q   But she said "accepted."

10       A   She said that in this letter.

11       Q   Right.

12           And, by the way, what was John Schulman's last

13   proposal six months ago?

14       A   It was the -- our understanding of the

15   discussion that he had had with Kevin Marks --

16       Q   What was --

17       A   -- on October 16th.

18       Q   Was -- okay.  Is that a reference to a letter

19   that Mr. Schulman wrote?

20       A   No, there was no letter.  It was a verbal

21   discussion.

22           MR. ZISSU:  Let's have marked as Defendants'

23   Exhibit 24 a letter dated October 26 from John Schulman

24   to Kevin Marks.

25           (Defendants' Exhibit 24 marked.)

139

BY MR. ZISSU:

1

2      Q    Have you seen that before?

3      A    The first time I saw this was when Warner Bros.

4  produced this during this litigation.

5      Q    You never saw that before?

6      A    No.

7      Q    Did your mother see it before?

8      A    No.

9      Q    So her -- your mother's reference wasn't to that

10  letter --

11     A    No.

12     Q    -- in the --

13     A    She never saw --

14     Q    In this Defendants' Exhibit 23, your mother was

15  not referring to Defendants' Exhibit 24.

16          Correct?

17     A    Correct.

18     Q    Now going back to Defendants' Exhibit 23, and I

19  will read again the last sentence of the portion I read

20  before:  "When we made those difficult concessions and

21  reluctantly accepted John Schulman's last proposal six

22  months ago, we were stabbed in the back with a shocking

23  contract."

24          Now, your mother didn't say that the acceptance

25  was conditional, did she, in this letter?

140

1       A   She didn't --

2       MR. TOBEROFF:  Excuse me.  Asked and answered.

3  BY MR. ZISSU:

4       Q   Will you answer it again?

5       A   She did not use those words, but it was a

6  condition all the same.

7       Q   It was a condition, but it's not a condition

8  that your lawyer ever mentioned to DC Comics' lawyers or

9  that you or your mother ever mentioned to DC Comics'

10  lawyers between October 19, 2001 and today.

11       Isn't that correct?

12       A   I can't --

13       MR. TOBEROFF:  Objection.  Are you representing

14  to her what her lawyers told DC or Warner Bros.?

15       MR. ZISSU:  I am.

16       MR. TOBEROFF:  Because she doesn't know what her

17  lawyer actually --

18  BY MR. ZISSU:

19       Q   I am asking so far as you know.

20       A   I can't testify as to anything other than what I

21  said or what my knowledge is.

22       Q   And so you don't know that that condition -- the

23  acceptance -- the fact that it was conditional was ever

24  communicated to anybody at DC Comics or to any DC Comics

25  representative.

141

1          that condition -- the acceptance --

2          the fact that it was conditional was

3          ever communicated to anybody at DC

4          Comics or to any DC Comics

5          representative.

6                  Correct?")

7          MR. TOBEROFF:  Object --

8          THE WITNESS:  Could you rephrase that?  That's

9    too confusing to me.

10          MR. TOBEROFF:  Compound.

11    BY MR. ZISSU:

12      Q    You are not able to say that the fact that the

13    October 19, 2001 acceptance or approval was conditional

14    was ever communicated to any representative of DC Comics.

15          Correct, question mark?

16          MR. TOBEROFF:  Objection.  Vague and ambiguous.

17    Compound.  Indefinite as to time and place.

18          THE WITNESS:  I'm still kind of confused by your

19    wording, but I think I know what you're getting at, but

20    could you just say it one more time, please?

21          MR. ZISSU:  Well, I'll have him read the

22    question back.

23          THE WITNESS:  Well, maybe you could rephrase it.

24    Maybe that that would help.

25    BY MR. ZISSU:

143

1      Q    I don't have to rephrase it, okay.  You have to

2   answer it, and do the best you can.

3      A    I'm trying.

4           MR. TOBEROFF:  If you don't understand the

5   question, you don't have to answer it.

6           MR. ZISSU:  I'll try it again.

7      Q    You've testified that the approval or acceptance

8   of the deal points in the October 19, 2001 letter from

9   your lawyer was conditional, and you've also testified

10  that you didn't tell or communicate to any representative

11  of DC Comics that it was conditional, and you, I think,

12  would agree that your mother did not tell any

13  representative of DC Comics that this approval or

14  acceptance was conditional.

15          So my question is, is it correct to say that

16  you're not able to say that the fact that the approval

17  was conditional was ever communicated to anybody

18  representing DC Comics?

19          MR. TOBEROFF:  Objection.  Vague and ambiguous.

20  Compound.  Indefinite as to time and place.

21          THE WITNESS:  Well, I disagree with the

22  statement that you said that my mother did not

23  communicate it because I believe that my mother did

24  communicate it.  Aside from that, if you're asking if

25  anyone -- do I have knowledge of whether anyone else

144

1    communicated it --

2    BY MR. ZISSU:

3        Q   Yes, I am asking you that.

4        A   -- I have no knowledge as to whether anyone else

5    did.

6        Q   And therefore you cannot say as we sit here

7    today that it was communicated.

8            Correct?

9        A   I do not know.

10           MR. TOBEROFF:  Objection.  Misstates prior

11   testimony.

12           MR. ZISSU:  I am not trying to state her

13   testimony.  I am asking whether she can cite me any

14   example or tell me that it was communicated, and your

15   answer is you can't --

16           MR. TOBEROFF:  Objection --

17           MR. ZISSU:  -- other than your mentioning the

18   May 9, 2002 letter.

19           THE WITNESS:  At this point -- at this point I

20   can't.

21   BY MR. ZISSU:

22       Q   Thank you.

23           Now going back to Defendants' Exhibit 22, is

24   there any other text or wording in this letter that you

25   disapproved of?

145

1          A    No.

2          Q    And going back to Defendants' Exhibit 23, in the

3    last sentence of the third paragraph it reads, "When we

4    made those difficult concessions and reluctantly accepted

5    John Schulman's last proposal six months ago...," et

6    cetera, am I correct that you understand that the sense

7    of that is to read as follows:  When we made those

8    difficult concessions and reluctantly agreed --

9    accepted -- I'm sorry -- accepted conditionally John

10   Schulman's last proposal six months ago?

11              Is that the way you read that language?

12         A    I would say conditionally accepted John

13   Schulman's proposal, and I would clarify as discussed on

14   October 16th.

15         Q    That's how you -- that's your sense of it --

16         A    Yes.

17         Q    -- as you read it today?

18         A    Yes.

19         Q    But it doesn't say "conditionally," does it?

20         A    I believe that that's what it conveys.

21         Q    But does it say "conditionally"?

22              MR. TOBEROFF:  The document speaks for itself.

23   BY MR. ZISSU:

24         Q    Will you concede that it doesn't use the word

25   "conditionally"?

146

1      A    I do not see the word "conditional" here.

2      Q    Thank you.

3      A    I know what the situation was.

4      Q    Now going back to Defendants' Exhibit 22, which

5   is the October 19, 2001 letter, except for the language

6   you described which you would have wanted in the first

7   paragraph about a conditional acceptance, did you

8   otherwise agree to me -- I'm sorry.  Strike that -- did

9   you otherwise intend to be bound by these financial and

10  deal points?

11          MR. TOBEROFF:  Objection.  Vague and ambiguous.

12          THE WITNESS:  I don't know what you mean by the

13  word "bound."

14  BY MR. ZISSU:

15      Q    Well, you have a whole letter that you said you

16  wouldn't have worded any differently, and you have the

17  first paragraph that you said you didn't approve of the

18  way it was worded.  I'm talking about the rest of the

19  points.

20          Except for that qualification, did you intend to

21  agree to and accept and be bound by the rest of these

22  terms, subject to your -- what you've testified to about

23  the first paragraph?

24          MR. TOBEROFF:  Objection.  Misleading.  Vague

25  and ambiguous.

147

1          THE WITNESS:  We approved these deal points

2    provided that there were no changes to them, so I can't

3    say that we were saying that we were bound to these.

4    BY MR. ZISSU:

5          Q    If there had never been any changes in these

6    deal points, would you have accepted them and proceeded

7    with the agreement?

8          A    At that time.

9          Q    And what about a month later?  You wouldn't

10   have?  You mean only that day you would have?

11              I'm not sure I understand your answer.  What do

12   you mean --

13         A    At the time this letter was written, there was

14   one offer.  Later on something -- another document came

15   in that was completely different, very aggressively in

16   Warner Bros.', Time Warner's and DC Comics' favor and to

17   our detriment in a number of areas.

18         Q    What was to your detriment?

19         A    Well, it would take a lawyer to go through and

20   compare the documents, but I will say --

21         Q    Yes.

22         A    -- there are three points that jump out at me in

23   my memory.  One of them was that the original -- our

24   original understanding was that the rights being

25   discussed only had to do with Superman, Superboy and The

148

1    Spectre.  When the written-up version arrived in February

2    of 2002, all of a sudden DC Comics, Warner Bros. and Time

3    Warner wanted rights to everything that my father had

4    ever written in his entire career, things that had

5    absolutely nothing to do with these properties.  That was

6    completely objectionable to us.  That was one point.

7            Another point had to do with warranties and

8    liabilities.  The proposal that had been made to us was

9    very simple, and it afforded us some protection in the

10   area of warranty and liability.  Suddenly, when the

11   February 2002 document showed up, there were all kinds of

12   new provisions and things that had been inserted in there

13   that would have exposed us to millions of dollars in

14   liability -- in potential liability, and they were all in

15   Warner Bros.' favor.  That was completely out of line.

16   We couldn't do that.

17       Q   What was the third?

18       A   And the third point was we had, as reflected in

19   here, talked about a royalty of 6 percent.  When the

20   document showed up, that 6 percent was eroded in a number

21   of ways.  There were all kinds of new conditions that

22   were inserted that would reduce the overall financial --

23   what's the word I'm searching for --

24       Q   Do you remember --

25       A   -- that would reduce the money that we would

149

1    get.

2        Q    Do you remember what you were -- what the

3    liabilities were?  What kinds of liabilities are you

4    talking about, as best you can recall?

5        A    It was very simple.  It was -- all we had to do

6    was warrant that we had not sold any of our termination

7    rights to anyone else.

8            MR. TOBEROFF:  I think he's asking --

9            MR. ZISSU:  Yeah.

10       Q    And what was added?  In what respect was that

11   enlarged?

12           MR. TOBEROFF:  I am not objecting, but just to

13   make this record clear --

14           MR. ZISSU:  Yeah.

15           MR. TOBEROFF:  -- are you asking about the

16   original proposal in October, or are you asking about the

17   February 2002 --

18           MR. ZISSU:  I am asking about the February 2002

19   proposal.

20       Q    In what way were your liabilities enlarged, so

21   far as you understand it?

22       A    There was a whole list of different things, and

23   all of them exposed my mom and me and my half-brother

24   Michael to a dangerous situation.

25           MR. ZISSU:  We will mark the February 1, 2002

150

```
 1              MR. TOBEROFF:  Please don't ask her to interpret

 2    this agreement.

 3              MR. ZISSU:  I am not asking her to interpret it.

 4    I am asking for her reaction as to why she didn't find it

 5    acceptable, which she's basically testified to, but I

 6    want to probe her on that, and I have a right to.

 7        Q    Let's look at representation (i):  "They have

 8    the right and power to enter into this Agreement and to

 9    grant all rights which are granted by them herein and

10    covered by this Agreement."

11              Did that representation present a problem for

12    you?

13        A    No.

14        Q    And (ii):  That "neither they nor Jerome Siegel

15    have granted any right, license, or permission, or

16    entered into any transaction or agreement in relation to

17    or with respect to, the subject matter hereof, to any

18    other party or encumbered any of The SIEGELS' (or Jerome

19    Siegel's) rights or interests in The WORKS or the MARKS

20    in any way."

21              Did that present a problem to you?

22        A    We're beginning to get into language that I'm

23    not qualified to really comment on.

24        Q    Is it that you don't --

25        A    It's getting more complex.
```

153

1      Q    I am asking you if you can -- do you understand

2    this language or not?

3      A    Not at this moment.

4      Q    Don't you -- do you -- don't you understand that

5    to mean that it's a representation that as grantors in

6    this agreement, you haven't already transferred away the

7    rights that you would be granting?

8      A    I don't know.  It could read something else to a

9    lawyer.

10      Q    What about as you understand it in English?

11           MR. TOBEROFF:  She just answered the question.

12    BY MR. ZISSU:

13      Q    So your testimony is you can't understand this

14    language.

15           Correct?

16      A    Not at this moment.

17      Q    And, (iii):  That "they," meaning you, "know of

18    no other party with any rights of any kind to or that

19    claim to have any rights of any kind to The WORKS or The

20    MARKS."

21           Do you understand that?

22      A    May I --

23      Q    Yes.

24      A    -- make a comment here?

25      Q    Sure.

154

1    agreement?

2        A    I can't say that there wouldn't be something

3    that I would understand, but I think that after that

4    first statement that you asked me, it's too complex

5    legally for me to be able to give you an answer without

6    input from an attorney.

7        Q    Well, what if I -- I will ask you by surmising

8    and translating it, and if you can't understand it,

9    you'll tell me you can't, and if you can't understand it

10   without an attorney.

11           And so with respect to subdivision (ii) here, if

12   DC asks you to represent that you hadn't already sold the

13   rights that you were granting to them to a third person,

14   would that be something that you found as adding new

15   conditions or going beyond what you had agreed -- had

16   accepted or approved in October of 2001?

17       A    Well, I can't be sure that that's what this

18   says, but if that's your question, I would suppose that I

19   wouldn't object to that.

20       Q    All right.  And what if -- and with regard to

21   number (iii), if they asked you to represent that you

22   didn't know of any other party who was claiming to own

23   the same rights that you were selling to DC Comics, would

24   that be a problem?  And if I'm misstating by the

25   question, you can note that, but if that's what's being

159

1        A    I don't think I answered number (iii).

2            MR. TOBEROFF:  She didn't answer number (iii).

3    BY MR. ZISSU:

4        Q    Okay, number (iii), I would like an answer to

5    it.

6            MR. TOBEROFF:  What's the question?

7    BY MR. ZISSU:

8        Q    The question is basically, was this request,

9    which I read as saying that you would represent that you

10   didn't know of any other party claiming to own the same

11   rights that you would be selling, if that presented a

12   problem for you?

13       A    I didn't read this separately from what it could

14   mean to us.  You know, I mean --

15       Q    Well --

16       A    -- are you asking did I know of any other party

17   with any rights?  I didn't know of any party with any

18   rights --

19       Q    Right.

20       A    -- but I was concerned that if some bizarre

21   claim would come up, what that could mean.  So I wasn't

22   entirely comfortable with that being in there.

23       Q    We will talk about the consequences and why that

24   may -- but I'm asking you, does the fact that you would

25   represent it alone, would that have made you

162

1    uncomfortable and present a problem, and I think you've

2    testified no, but it might have had consequences

3    somewhere else in the agreement that you want -- I'll ask

4    you about that, but I can't do it all at once.  I've got

5    to go one by one, and then we will get to what else

6    might -- I am going to ask you what made you

7    uncomfortable, and you can tell the whole story.

8         If I leave it out, that's what cross-

9    examination -- counsel is supposed to then fill in if

10   I've done something that's incomplete.  He is not

11   supposed to sit in the middle of my examination, which he

12   has done all day, and interrupt it and prevent it from

13   taking place.  And we have a limited amount of time with

14   you.  I don't want to spend any more time than we have

15   to, but I have to get through these questions.

16        Your position is there were deal points you

17   accepted, but they changed in a way that were very

18   detrimental, is what you said, and I'm trying to ask you

19   in what respect detrimental, and I will demonstrate to

20   you, we will in this case, that they weren't detrimental.

21   And I don't fully understand your reasons.  Maybe it's a

22   misunderstanding, but I've got to look into that, so

23   that's what we have to do.

24        So in number (iv) --

25        A    Number (iii), I'm really not comfortable with.

163

1       Q    So in other words, you were not comfortable

2    making a representation that nobody else owned the rights

3    that you would be selling to DC Comics.

4       A    No, I'm not comfortable with that.

5       Q    Okay.  That's all you have to say.

6            (iv) --

7       A    Now I understand the question.

8       Q    Okay.  I'm trying to make you understand the

9    questions, because I want to get through this.

10           And (iv), it says, "they," meaning you, "shall

11   not" at any other time sell the rights again to anybody

12   else or interfere with them by --

13      A    Who is "they"?

14      Q    "They" is you and your mother will not, after

15   entering into this agreement, try to enter into other

16   deals to sell the same rights or to encumber them.  That

17   means to tie them up or burden them.

18           Is that something that made you uncomfortable or

19   would make you uncomfortable?

20           MR. TOBEROFF:  Objection.  Calls for a legal

21   conclusion.

22   BY MR. ZISSU:

23      Q    Whether it made you uncomfortable is not a legal

24   conclusion.  You could be irrationally uncomfortable

25   without regard to any legal conclusions or because you're

164

```
 1    not feeling well today or at the time.

 2              I am asking you, is that something that would

 3    have been something that was a problem?

 4              MR. TOBEROFF:  Objection.  Calls for a legal

 5    conclusion.  Calls for speculation.

 6    BY MR. ZISSU:

 7         Q    So can you try to answer it, please?

 8              MR. TOBEROFF:  Vague and ambiguous.

 9              THE WITNESS:  I'm having trouble with the last

10    part of that.  I'm having trouble with the words, "any

11    copyright termination interest or any Reversionary Rights

12    in any rights related to The WORKS."

13    BY MR. ZISSU:

14         Q    Yeah.  That's saying the kind of thing you might

15    try to offer and sell to somebody else whatever your

16    rights that were to be recaptured.

17         A    I guess what I'm saying is I'm confused by this

18    section.

19         Q    You had legal counsel, though, at the time.

20              Correct?

21         A    Yes.

22         Q    So you could have -- if you had some confusion,

23    they could have explained it to you, either in a

24    satisfactory manner or otherwise.

25              Correct?
```

165

1      A    Yes.

2      Q    Let's go to number (v) --

3           MR. TOBEROFF:  Also --

4           THE WITNESS:  I don't know that we did -- wait a

5   minute.

6           MR. TOBEROFF:  Also, don't accept his statement

7   of what this says for what it says, because he is not

8   your lawyer.

9           MR. ZISSU:  I'll accept that she doesn't accept

10   it.  I want to ask the questions and get her answers.  If

11   you want to argue about it later, that's fine.

12           THE WITNESS:  I see two different (iv)s here.

13   There are two different (iv)s on page 41.

14           MR. TOBEROFF:  That's true.  There are.

15           MS. LASERSON:  There are.

16           MR. ZISSU:  Two different (iv)s?

17           Which is the good (iv)?

18      Q    Okay.  The second (iv) --

19           MR. TOBEROFF:  Did you object to that?

20   BY MR. ZISSU:

21      Q    If the rights fall into the public domain, in

22   other words, at the time the copyright rights expire,

23   this asks you to agree that you are not going to go use

24   your father's works, that you would agree to that.  You

25   would in effect get out of the business of owning and

166

1    dealing in his rights.

2              Is that a problem for you?

3              MR. TOBEROFF:  Excuse me.  Are you asking what's

4    a problem for her now as she sits here today or what's a

5    problem when this was rejected?  What are you asking?

6              MR. ZISSU:  Well, I think they coincide, but she

7    said that this draft included warranties that created

8    liabilities that she was not willing to risk, and so I am

9    asking really when she decided that this draft was a stab

10   in the back and didn't comply with the conditions that

11   she would have wanted.  I am asking her to go through

12   that at that time.  That's the time frame.

13      Q    So at the time that you considered that DC

14   Comics had gone beyond the conditions that you wanted

15   Mr. Marks to have included, my question is, would this

16   representation that you wouldn't in the future, when The

17   WORKS went into the public domain, use them or exploit

18   them, was that a problem?

19      A    As heartbreaking as that aspect of this

20   negotiation was to us, we had conditionally approved that

21   being a part of this, provided there weren't any other

22   changes.  That was a very difficult one for us.

23      Q    Why was that difficult?

24      A    Because it's my family's legacy, and everyone in

25   the world would be able to do something with my father's

167

1    creation except for me and my children.

2         Q    Okay.  (v) is...  (v) I think provides in

3    effect -- you need a moment?

4         A    Yes, I do.

5         Q    You want to take a short break?

6              MR. TOBEROFF:  Yeah, let's take a short break.

7              (Recess.)

8    BY MR. ZISSU:

9         Q    I am now directing your attention again to

10   Defendants' Exhibit 25, to little Roman (v) at the bottom

11   of page 41 in Defendants' Exhibit 25.

12              Would the representation that you would not

13   exploit The WORKS or The MARKS that were being sold or

14   license others to do so after you signed the agreement be

15   a problem?

16              MR. TOBEROFF:  Objection.  Ambiguous.  Calls for

17   speculation, the way you phrased it.

18              THE WITNESS:  And I don't know whether it is.

19   BY MR. ZISSU:

20        Q    Well, if you read number (v) at the bottom of

21   page 41 going over to the top of page 42, you're

22   representing and warranting there, quote, "any and all

23   rights that they own, owned, claim or claimed in The

24   WORKS or The MARKS, including but not limited to all

25   trademark rights (if any) and copyright rights, and all

168

1          MR. ZISSU:  That standing objection is

2    preserved.  I agree it's preserved so that you don't have

3    to repeat it each time.  We each have different views as

4    to whether the objection is valid, but it will be deemed

5    to be a standing objection to this line of questioning.

6          MR. TOBEROFF:  Fine.  I may have other

7    objections in addition to that, but I will not repeat

8    that one.

9          MR. ZISSU:  Fine.

10    Q    So now go back to the representation number --

11    which is listed here as number (v).  Was the

12    representation that any rights that you would be selling

13    and claim to own flowed only from Jerry Siegel, was that

14    a representation that you considered would be detrimental

15    and inconsistent with the deal points in the October 19,

16    2001 letter?

17          MR. TOBEROFF:  Ambiguous.  Indefinite as to

18    time.

19          MR. ZISSU:  I'll stipulate that that's a

20    continuing objection as well that you can preserve.

21          MR. TOBEROFF:  That doesn't apply to all your --

22    hopefully to all your questions.

23          THE WITNESS:  But I'm confused by your question.

24    Are you asking me at the time that I read it then?  Are

25    you asking me how I feel about it now?

174

```
 1   BY MR. ZISSU:

 2        Q    I am not asking you how do you feel about it

 3   now.  In terms of your feelings and what governed your

 4   actions in not accepting the February 1, 2002 draft or

 5   making any counterproposal, was this a representation

 6   that presented the kind of problem you previously

 7   described as creating, potentially, liabilities that were

 8   unacceptable?

 9        A    So you're asking me to recall --

10        Q    Yes.

11        A    -- my impression --

12        Q    Yes.

13        A    -- two and a half years ago?

14        Q    Just the way you recalled your impression, as

15   you testified, that the warranties and liabilities that

16   could be created by these warranties were something you

17   couldn't accept.  So I am going through each of them and

18   saying, well, is this one a problem or is that one a

19   problem, at the time.

20        A    I'll do my best to remember.

21        Q    Okay.

22             So was it a problem for you to represent that

23   all the rights that were involved that you'd be selling

24   flowed only from Jerry Siegel?

25        A    I don't believe there was a problem.
```

175

1      Q    And the next one is under Roman (vi) here,

2    little (vi) here, in effect that no one other than DC

3    Comics or the Siegels owned any of the rights in the

4    Works created by Jerome Siegel.

5           Is that a problem?  The rights that were being

6    sold.

7      A    I'm not comfortable with that statement, so if

8    you're asking me is that a problem, yes, that's a

9    problem.

10     Q    In this little Roman (vi), for you to make a

11   statement nobody else beyond the Siegels and DC Comics

12   owned any of these rights, that was a problem?

13     A    Yes.

14     Q    Now, as you sit here today, do you know of

15   anybody else who may have owned the rights that were

16   involved in this proposed transaction?

17     A    I have no way of knowing what sort of

18   arrangements DC Comics has entered into.

19     Q    It says other than somebody through DC.

20          Other than DC or anybody they have licensed, do

21   you know anybody else claiming that they owned these

22   rights?

23     A    It doesn't say who they licensed.

24     Q    I'm sorry.  "No person or entity other than The

25   SIEGELS and/or DC COMICS own any rights or could possibly

176

1    claim any rights of any nature in, or arising out of, any

2    of The works -- [sic] any Works created by Jerome

3    Siegel."

4          Today do you know anybody else who could own or

5    claim rights in these Works?

6      A    It's something that I don't have enough

7    information to form an opinion on.

8      Q    Is that a representation -- was it -- I'm asking

9    you today is that a representation, if you were selling

10   the rights, that you thought was a stab in the back or

11   unreasonable for somebody buying the rights to make?

12         MR. TOBEROFF:  Vague and ambiguous.  Confusing

13   and indefinite as to time and place.

14         THE WITNESS:  I believe you were asking me if it

15   was something I objected to.

16   BY MR. ZISSU:

17     Q    At the time.

18     A    Yes.

19     Q    Right.

20         And the answer is yes?

21     A    The answer is yes.

22     Q    And my question is why, that representation?

23     A    As I said, I have no knowledge of whether there

24   could be someone else who would assert that they owned

25   the rights.

177

1        Q    Have you ever heard of anybody else other than
2    DC Comics or the Siegels claiming they owned these
3    rights?
4        A    What I've heard and what could end up happening
5    are two different things.
6        Q    No, but I'm asking you about what you'd ever
7    heard.
8        A    I know they license things all the time.  I have
9    no idea whether there's ownership involved.
10        Q    That would be somebody claiming through DC
11    Comics.  But other than the Siegels or DC Comics or DC
12    Comics licensees, have you ever heard about a third
13    person coming along, not licensed by DC Comics and not
14    licensed by the Siegels, claiming they own any of the
15    rights involved in the Superman or Superboy properties?
16        A    That's why I would need an expert to advise me
17    on that.
18        Q    I asked you what you heard with your ears.  Have
19    you ever heard that from anywhere?  Have you ever heard
20    it?  Did anybody ever tell you that there's a third
21    person out there claiming to own some part of Superman?
22    Have you ever heard that?
23        A    I have not heard that.
24        Q    Thank you.
25             The next one is (vii).  That representation says

178

1      you didn't know of any Works other than the Superman and

2      The Spectre Works created by Jerome Siegel in which you

3      claimed rights.

4          A    I don't understand the way this is written, and

5      I don't understand your explanation of it.

6          Q    So this one, you couldn't understand?

7          A    I don't understand it, because it's relating to

8      other Siegel Works, et cetera.  It relates to a

9      completely different portion of this document.

10         Q    Were there ever any efforts to seek

11     clarification as to what it meant by your lawyer?

12         A    My lawyer and my mother and I discussed things.

13              MR. TOBEROFF:  Don't say anything that reveals

14     the substance of your conversations with your lawyer.

15              THE WITNESS:  I'm not planning to.

16     BY MR. ZISSU:

17         Q    But apart from any discussions, did you take any

18     action, like trying to clarify or change that, so far as

19     you know, this provision?

20         A    What do you mean by "action"?

21         Q    Did your lawyer to your knowledge ever go back

22     to DC Comics' lawyer and say, "What is this?  It's not

23     understandable.  What do you mean by it?"

24              Did anybody seek clarification on your behalf?

25         A    I don't know.

179

1      Q    Now, the next one is (viii).  It says you would

2  represent that you know of no Works included among the

3  Superman Works that were not listed in the Superman

4  notices of termination.

5          Was that kind of a representation one that would

6  be -- would have been a problem?

7      A    Well, I believe there's several ways of

8  interpreting that.

9      Q    Well --

10     A    When you say, "no Works included among the

11  Superman Works," are you referring -- is this contract

12  referring to the list of Works that was part of the

13  notices of termination?

14     Q    Right.  No.  It's referring to the notices of

15  termination and -- so it's incorporating by reference

16  whatever you have listed on that big -- I think this

17  representation means -- I wanted to know to the best of

18  your knowledge was this a complete list of the Superman

19  Works?

20         MR. TOBEROFF:  Misstates the documents.

21         THE WITNESS:  Yeah, this document really doesn't

22  say that, and also it says no Works included were not

23  listed.  You know, by its very nature, if something was

24  included, how could it not be listed?  I think it's --

25  BY MR. ZISSU:

180

1    Q    It sounds to me like you had a grammatical

2    problem, but I -- the way I read this thing is DC Comics

3    wanted to be assured that among the Works they were

4    purchasing were all the Superman Works and that there

5    were no Works -- Superman Works out there except the ones

6    that you have listed, so that that's what the transaction

7    was about.

8            MR. TOBEROFF:  Objection --

9    BY MR. ZISSU:

10   Q    Can you read it that way?  If I explain that,

11   can you understand that?

12   A    But I think your explanation is different from

13   the document that I was considering at the time.

14   Q    So just so I understand it, how did you read

15   this provision at the time?  What was your understanding?

16           MR. TOBEROFF:  Don't -- when he says how did you

17   read it, if your understanding in reading it is only

18   through the advice of counsel, don't disclose that.  If

19   you made an independent assessment not with advice of

20   counsel, you can disclose it.

21           THE WITNESS:  It was unclear and contradictory,

22   so I couldn't form an opinion on it.

23   BY MR. ZISSU:

24   Q    But even though you couldn't form an opinion,

25   you decided it was detrimental and would expose you to

181

1    liabilities.

2            Correct?

3        A    I didn't make an opinion on that particular

4    provision of many provisions that are in here.

5        Q    Well, this was one of them.

6        A    It was one of them, but I didn't --

7        Q    Maybe this was not one of them.  Was it one of

8    them or not?

9        A    This particular one was not one I formed an

10    opinion on because -- outside of consultation with my

11    attorney.

12        Q    And, finally, the last one, and I think it's

13    (x), it is a representation that "Joanne [sic] Siegel is

14    the sole executor, trustee, administrator and personal

15    representative of Mr. Siegel and his estate."

16            That was not a problem?

17        A    No, that's not a problem.

18        Q    Now, you have also -- I think you mentioned that

19    the Defendants' Exhibit 25 involved --

20        A    Excuse me.

21        Q    Yes.

22        A    Excuse me.  I do have a problem with the words,

23    "personal representative of Mr. Siegel and his estate."

24        Q    What was the problem?

25        A    She was the sole executor, trustee and

182

1    administrator of his estate, but she was not the only

2    representative of Mr. Siegel and his estate.

3         Q    And who was the -- who were the other

4    representatives, if any?

5         A    Legal counsel.

6         Q    Okay.  Other than that?

7         A    At that time, legal counsel.

8         Q    Was legal counsel named in the will of your

9    father as an executor?

10        A    No.  But executor is a separate question here.

11        Q    Was legal counsel named as a personal

12   representative or other kind of agent in the will of your

13   father?

14        A    Well, this doesn't read to me as if it's only

15   asking about his will.

16        Q    But I'm asking you.

17        A    No.

18        Q    And was legal counsel ever appointed under any

19   court order or --

20        A    Ever -- what was the word?

21        Q    Appointed by any court --

22        A    No.

23        Q    -- as -- let me finish the question.

24        A    Sorry.

25        Q    -- as legal representative, and the answer is

183

1    no.  All right.

2          Now, I think you also said earlier that the

3    Defendants' Exhibit 25 would require you to sell and

4    transfer to DC Comics all rights in any Works that your

5    father ever created.

6          Do I have that right?

7    A   Excuse me for just a moment.

8    Q   Yes.

9    A   May I consult with my attorney for a question?

10    Q   Sure.

11    MR. TOBEROFF:  We can go outside.

12    THE WITNESS:  Okay.

13    (Recess.)

14    (Record read as follows:

15        "Now, I think you also said

16        earlier that the Defendants' Exhibit

17        25 would require you to sell and

18        transfer to DC Comics all rights in

19        any Works that your father ever

20        created.

21        "Do I have that right?")

22    THE WITNESS:  Yes.

23    BY MR. ZISSU:

24    Q   Okay.  And do you have -- are you able to recall

25    now any specific language of the draft that was that

184

1    broad?

2         A    I can't remember.

3         Q    Would it refresh your recollection if I directed

4    you to page 20 of Defendants' Exhibit 25 where there is a

5    subparagraph small g), and the caption or the heading of

6    that subparagraph reads, "grant Of All Rights In the

7    OTHER SIEGEL Works" -- does that stir your recollection

8    as to the basis for your feeling that you were being

9    asked to grant rights in all Siegel Works?

10        A    I don't recall this particular paragraph.   I

11   haven't read this document in a really long time.

12        Q    I will represent to you that when I read -- have

13   read this agreement, I see that there are grants of

14   rights in SUPERMAN Works, which is a defined term, and

15   then there are grants of rights in SPECTRE Works, and

16   there is a grant of rights in OTHER SIEGEL Works, but

17   that's also a defined term, and I read a limitation in

18   the definition of OTHER SIEGEL Works so that it would

19   only include works that were -- for which Jerome Siegel

20   was paid and compensated by DC Comics or its predecessor,

21   Detective.

22        Does that make any sense to you, or is that

23   something you disagree with?

24        MR. TOBEROFF:   Objection.   Compounding

25   confusing, vague and ambiguous.

185

```
1    BY MR. ZISSU:

2        Q   Can you answer it as best you can?

3        A   I -- could you just read it back to me, please?

4        Q   The way I read the grant provision, there are

5    grants of rights in SUPERMAN Works and SPECTRE Works and

6    other works, but other works is defined to only include

7    works that Jerome Siegel did for DC Comics or its

8    predecessor, and I am asking you if you understood that.

9            MR. TOBEROFF:  Objection.  Most of that question

10   is not a question.  He's commenting on the evidence.  And

11   also you're asking her to interpret this contract to see

12   if your legal definition of what that says is correct?

13           MR. ZISSU:  Yes.  I'm asking whether she agrees

14   with the way I read the contract and the way DC Comics

15   reads the contract.

16   BY MR. ZISSU:

17       Q   Where can you -- strike that.

18           On what basis can you say that it required the

19   transfer of all rights to any works ever created by

20   Jerome Siegel that were not published or submitted to DC

21   Comics?

22       A   To --

23           MR. TOBEROFF:  If you are not sure, don't

24   answer.  Only if you know the answer, answer it.

25           THE WITNESS:  I was going to say to answer that
```

186

1    question, I -- you know, I feel completely unqualified.

2    This is a matter that I had to -- excuse me.  This is a

3    matter that I had to fully discuss with my attorney, and

4    I can't -- it's not a simple yes or no answer.

5    BY MR. ZISSU:

6        Q    When you read the agreement -- you did read it

7    at some point, this draft --

8        A    Yes.

9        Q    -- Defendants' Exhibit 25?

10           Apart from any discussions with your attorney,

11   did you read it and say to yourself or -- did you read it

12   and understand that it was a grant as broad as you have

13   indicated?

14       A    Yes.

15       Q    That's the way you read it?

16       A    Correct.

17       Q    Is there any way you can -- if I take you

18   through the grant provisions, you could explain to me how

19   you read it that way?

20       A    No.

21       Q    Well, let me direct your attention to some of

22   these provisions, and if you turn to page 13, you will

23   see a paragraph 1, "GRANT OF RIGHTS."  I am going to ask

24   you about page 13, the grant of rights in paragraph 1 of

25   Defendants' Exhibit 25.

187

```
 1              You see 1 a), it says, "Grant Of All Rights In
 2    The SUPERMAN Works."
 3              Correct?
 4        A    I see that it says that.
 5        Q    All right.  And then if you turn to the next
 6    page, on page 14 -- no.  If you continue and go to
 7    subdivision b) -- that's 1 a).  If you go to 1 b) there
 8    is reference to a grant on the second page, 15 --
 9        A    Yeah.
10        Q    -- of all rights in the SUPERMAN Derivative
11    Works.
12        A    I see it says that.
13        Q    Do you recall whether that was a problem?
14        A    I don't recall.
15        Q    But this was a very important point to you, was
16    it not?
17        A    Well --
18             MR. TOBEROFF:  Vague and ambiguous.
19             THE WITNESS:  Everything's important to me.
20    BY MR. ZISSU:
21        Q    Well, you identified three points as being the
22    key or the crucial points.
23             MR. TOBEROFF:  Misstates her testimony
24    completely.
25    BY MR. ZISSU:
```

188

1       Q    In effect I've gotten it right.

2            What was the term you used in describing these

3   three areas?

4       A    I said to the best of my recollection, there

5   were three areas that really jumped out at me.

6       Q    Okay, the three areas that jumped out at you.

7            And is it fair to say that these struck you as

8   very important at the time?

9       A    The issues?

10      Q    Yes, the three that jumped out at you.

11      A    Sure.

12      Q    They were crucial to you.

13           Correct?

14      A    Yes.

15      Q    So do you consider that I have misstated your

16  testimony in saying that they were key for you?

17      A    I --

18           MR. TOBEROFF:  She didn't say they were key.

19           THE WITNESS:  I don't remember what the context

20  was that you asked me.

21  BY MR. ZISSU:

22      Q    You said they jumped out to you and were

23  important, and I referred to them as key or crucial to

24  you.  Do you think that was unfair?

25      A    No.  They were important to me.

189

1      Q    They -- do you recall --

2      A    That's not to say that there weren't other

3   things that were important too.

4      Q    I know.  This is your characterization, and I am

5   asking you -- I am following that up.  I can't follow up

6   the ones you didn't tell me about.  Not yet.

7           So you can't recall that the grant of rights in

8   the SUPERMAN Derivative Works was among those you were --

9   that jumped out to you as a problem.

10     A    I can't recall.

11     Q    If you turn to the next page, paragraph

12  subdivision c), 1 c), that there is a grant of all rights

13  in the SUPERMAN Marks.  Is that one of the ones that

14  jumped out to you as going too broadly?

15     A    It may have been.  I don't remember.

16     Q    But you don't have any recollection of it today?

17     A    No.

18     Q    And in the next paragraph, paragraph d), there

19  is a grant of -- reference to a "Grant Of All Rights In

20  The SPECTRE WORKS."  Do you recall that granting rights

21  in The SPECTRE Works was something that went too broadly

22  in relation to the deal points?

23     A    I don't remember whether the way it's written up

24  here was what our understanding of it was going to be.

25     Q    But apart from the definition, the idea that The

190

1    SPECTRE Works were going to be the subject of the grant,

2    that wasn't among the ones that you considered as being

3    too broad, was it?

4        A    No.

5        Q    And going to page 19, subdivision e), there is

6    reference to a "...Grant Of All Rights In The SPECTRE

7    Derivative Works."  Do you have any recollection that

8    that grant provision was among the ones that jumped out

9    to you as being too broad?

10       A    I don't remember.

11       Q    And in subdivision 1 f) on the same page, do you

12   have any recollection that the grant of all rights in The

13   SPECTRE Marks was going beyond what the deal points

14   called for?

15       A    I don't remember.

16       Q    And in g) on the next page, 20, I've asked you

17   about the grant of all rights in The OTHER SIEGEL Works.

18   Do you recall that that was -- had gone too broadly in

19   relation to what the deal points called for?

20       A    I don't remember the specifics of this

21   paragraph.

22       Q    But it doesn't strike you today as being --

23   having been a problem at the time?

24       A    It may have been a problem at the time.  I don't

25   remember.

191

```
 1        Q    I am not able to stimulate your recollection so

 2   that you can remember.

 3             Correct?

 4        A    Correct.

 5        Q    And in h), "Acknowledgment/Grant Of All Rights

 6   In the OTHER Marks," was -- is that something that jumps

 7   out at you today as having been a problem in having gone

 8   too broadly?

 9        A    I can't remember.

10        Q    Now, you also mentioned the royalty of 6

11   percent --

12        A    Excuse me.

13        Q    I'm sorry?

14        A    You know, it occurs to me that when we were

15   talking about the warranties before --

16        Q    Yes.

17        A    -- you said that you were going to discuss the

18   indemnification aspects of this, and since those were

19   completely a part of my impression, I feel it's important

20   to point out we have to discuss that.

21        Q    You don't mind if I don't ask you all the

22   questions at once, do you?

23        A    No.  I just --

24        Q    So I ask one question, and then I get to

25   another, and that's okay with you.  You understand that's
```

192

1    part of the process?  Otherwise, your lawyer would say

2    it's a compound question.

3             Correct?

4        A    No, I can't speak for him.

5             MR. TOBEROFF:  Objection.  Argumentative.

6    BY MR. ZISSU:

7        Q    But you can't answer more than one question at a

8    time.

9             Isn't that correct?

10            MR. TOBEROFF:  Objection.  Argumentative.

11            THE WITNESS:  My understanding was that you were

12   going to follow questions of warranties with questions

13   about indemnification --

14   BY MR. ZISSU:

15       Q    I am.

16       A    -- because --

17       Q    I am about to turn to that --

18            MR. TOBEROFF:  Let her finish.  Please don't

19   interrupt the witness when she's speaking.

20            MR. ZISSU:  Well, it's not an answer to a

21   question, so I will interrupt her.  Just tell her to

22   answer the questions asked, and then if you have a

23   problem with the question, you can tell me about it,

24   instead of telling me what questions to ask and when.

25            Okay?

193

```
 1              MR. TOBEROFF:  Laura, finish what you were

 2    saying.

 3              THE WITNESS:  I was saying that it was my

 4    impression we were going to get to this.  I'm glad we're

 5    going to get to it.

 6    BY MR. ZISSU:

 7        Q    Well, fine.

 8              Do you have anything else you have the

 9    impression I'm going to get to?

10        A    You haven't stated anything else.

11        Q    You know, let me know if you do.

12              MR. TOBEROFF:  Objection.  Harassing the

13    witness.  Argumentative.

14    BY MR. ZISSU:

15        Q    Do you have anything you want to tell me about

16    the indemnification provisions?

17        A    You had questions for me about the others --

18        Q    I will.

19        A    -- do you have questions about these?

20        Q    You seemed to have something to say about it.

21    If you do, say it.  Otherwise, we can proceed to my

22    questions.

23        A    No.

24        Q    Okay.  In 12 -- I think it's in paragraph 12 b),

25    did you have a discussion with your counsel when you went
```

194

```
 1    didn't like.

 2              Correct?

 3              MR. TOBEROFF:  Objection.  Misstates her

 4    testimony.  Are you testifying?

 5              MR. ZISSU:  I am asking her the answer to that

 6    question.

 7              THE WITNESS:  I don't know anymore what your

 8    question is.

 9    BY MR. ZISSU:

10        Q    Is it your testimony that everything you know

11    about Defendants' Exhibit 22 and the contents thereof

12    including the deal points came solely through

13    communications from your lawyer?

14        A    It came --

15              MR. TOBEROFF:  You can answer that question.

16              THE WITNESS:  It came mostly from my discussions

17    with my lawyer.

18    BY MR. ZISSU:

19        Q    When you first read it, had you spoken with your

20    lawyer?

21              MR. TOBEROFF:  Vague and ambiguous as to time

22    and place.

23              THE WITNESS:  Yeah, I don't understand what you

24    mean.

25    BY MR. ZISSU:
```

204

1        Q    You got a copy of it.

2             Right?

3        A    Yes.

4        Q    Did you read it?

5        A    Yes.

6        Q    Did you call your lawyer before you read it?

7        A    I couldn't call him before I read it.  I didn't

8   know it was coming.

9        Q    Okay.  And when you read it, you had certain

10  reactions and understanding from reading it.

11            Correct?

12       A    Yes.

13       Q    And that was before you spoke with your lawyer.

14       A    I had questions for him about it.

15       Q    Based on your understanding of what you were

16  reading.

17            Correct?

18            MR. TOBEROFF:  Or lack of understanding.

19  BY MR. ZISSU:

20       Q    Or lack of understanding.

21       A    Right.

22       Q    And I am asking you about your understanding.  I

23  am not asking you about what any lawyer told you.

24            MR. TOBEROFF:  Objection.  It's impossible for

25  her to be --

205

```
 1   deal --

 2          MR. TOBEROFF:  I am sorry --

 3   BY MR. ZISSU:

 4      Q    -- with DC Comics?

 5          MR. TOBEROFF:  I am sorry.  Could I just ask you

 6   to repeat that?  I apologize.

 7          MR. ZISSU:  If you got it, you can read it back.

 8          (Question read.)

 9          THE WITNESS:  No.

10   BY MR. ZISSU:

11      Q    With respect to Defendants' Exhibit 22, which is

12   the October 19, 2001 letter, did you ever see any prior

13   drafts of this letter before it was sent?

14      A    No.

15      Q    Did you make any notes about this when you read

16   a copy?

17      A    I don't believe so.

18      Q    Turning to the Defendants' Exhibit 23, the

19   letter from your mother to Mr. Parsons, and with respect

20   to the third paragraph, there is reference to hiring --

21   or to having various lawyers at various points.  You say

22   you checked and rechecked with knowledgeable attorneys.

23          Were the knowledgeable attorneys you checked

24   with -- please just tell me who -- the identification of

25   the lawyers was.
```

210

1        A    Arthur J. Levine, George Zadorozny --

2        Q    George?

3        A    Zadorozny.

4        Q    Spell it.

5        A    Z A D O R O Z N Y.

6        Q    Where does he practice?

7        A    In Florida.

8             And Dennis Larson.

9        Q    And Dennis Larson is also your husband?

10       A    Is my ex-husband.

11       Q    Okay.  Is he still a lawyer for you?

12       A    No.

13       Q    Is Mr. Zadorozny still a lawyer for you?

14       A    He's on a consulting basis.

15       Q    And then it says you hired two additional

16  attorneys, and does that mean Kevin Marks and Bruce

17  Ramer?

18       A    Yes.

19       Q    Other than in the ways you've been -- strike

20  that.

21            Your counsel has given you an instruction not to

22  answer certain questions.  Is there any way for you to

23  tell me anything further about what the new, outrageous

24  demands were that were not in the October 1 -- actually,

25  I'm sorry, October 19, 2001 proposal?

211

1        MR. TOBEROFF:  That was asked and answered.

2        THE WITNESS:  Well --

3        MR. TOBEROFF:  You can tell him you told him

4    before.

5        THE WITNESS:  I was gonna say that, you know,

6    everything was really discussed with the attorneys.

7    BY MR. ZISSU:

8        Q    So you can't answer anything on that subject?

9        A    No.

10        Q    Your mother also states in the fourth paragraph

11    with regard to the February -- I think it's the February

12    1, 2002 draft, quote, "The document is a heartless

13    attempt to rewrite the history of the Superman [sic]

14    creation..."

15        Can you tell me what you understood her to mean

16    by rewriting the history?  Your mother refers to

17    rewriting the history of the Superman creation.  Do you

18    know what she meant by that?

19        A    I don't recall what she was referring to.

20        Q    Did you help write this letter?

21        A    Not really.  She wrote a draft, and, you know,

22    she sent it.  I think I looked at it.  I might have made

23    a suggestion, you know, for a word or two here or there,

24    but she pretty much just did it herself.

25        Q    But you saw a draft beforehand?

212

1      A    You know, I don't remember, actually.  I don't

2  know if I saw this one or not.  I don't remember whether

3  I saw this one or not.

4      Q    Did you or your mother consult with a lawyer

5  about the content of this letter?

6      A    No.

7      Q    Your mother also states that this attempts to,

8  quote, "discredit my late husband, Jerry Siegel," close

9  quote.

10         Do you know what she meant by discredit him?

11      A    I don't remember what she was referring to.

12      Q    On the next page it says, "This contract" -- at

13  the top -- "was sent to us three months ago."

14         Do you know why it took three months or whatever

15  the time was to write this letter to Mr. Parsons?

16      A    Well, it was an agonizing time trying to figure

17  out what to do.

18      Q    And I guess my question is why didn't you write

19  this letter right away?

20      A    We were agonizing over the situation.  It was

21  very painful.

22      Q    In the entire period from October 19, 2001 to

23  May 9, 2002?

24      A    No.  She -- my understanding is that you are

25  asking about the period between February and May.

213

1        Q    Oh, I'm sorry.  You're right.

2             Yes, in that period, the entire time you were

3    agonizing.

4             Correct?

5        A    Yes.

6        Q    In the next paragraph it says in the last

7    sentence, "In addition, my disabled daughter" --

8        A    I'm sorry.  Where is this?

9        Q    In the next page --

10       A    Page 2?

11       Q    -- second paragraph on that page?

12            MR. TOBEROFF:  Page 2?

13            MR. ZISSU:  Page 2.

14       Q    "In addition, my disabled daughter still has not

15   received the medical coverage she and her children were

16   promised several years ago."

17            Is that true?

18       A    Yes.

19       Q    Wasn't there some problem with getting you

20   coverage under the company insurance policy?

21       A    That wasn't at this point, from my

22   understanding.

23       Q    There is a reference to DC's lawyers having --

24   representatives having asked you to do unethical things.

25            Do you know what she meant by "the unethical

214

1   things demanded"?

2       A   I don't recall.

3       Q   In the next paragraph there is a statement,

4   quote, "Just like the Gestapo, your company wants to

5   strip us naked of our legal rights."

6           Do you know what your mother meant by the term

7   "Gestapo"?

8       A   She was angry.

9       Q   But was she referring to the Nazi police?

10      A   Yes.

11      Q   And do you agree that considering a proposal --

12  strike that.

13          Do you agree that requesting you to consider the

14  proposal made on February 1, 2002 to your lawyers is the

15  equivalent of stripping you naked of your legal rights

16  the way the Gestapo did in Germany?

17      A   I can't speak for my mother, but your question

18  is what is my opinion?

19      Q   Yeah.  Did you have that reaction?

20          MR. TOBEROFF:  He is asking about the Gestapo.

21          THE WITNESS:  I think that it is -- how can I

22  put this --

23  BY MR. ZISSU:

24      Q   Hyperbole?

25      A   Yeah, I think she was making a comparison to

215

1    make a point.  I don't think she meant it literally.  In

2    fact, I can tell you for a fact she didn't mean it

3    literally.

4        Q    Did you and your mother ever consider counter-

5    proposing with regard to the February 1, 2002 draft?

6        A    That was up to our lawyers.

7        Q    Did you ever think about it?

8        A    Yes, we thought about it.

9        Q    And you decided not to?

10       A    I can't answer that.

11           MR. TOBEROFF:  Objection.  You're getting into

12    the --

13           MR. ZISSU:  Well, you made a --

14       Q    Was there any counterproposal made to your

15    knowledge?

16       A    I believe that in the talks with Ari Emanuel,

17    John Schulman asked for Ari to make a proposal.

18       Q    And what happened?

19       A    I believe that he did.

20       Q    Ari made a proposal?

21       A    I believe so.

22       Q    Did he write it up, or was this just orally?

23       A    I don't know.

24       Q    Did you ever see a copy of --

25       A    I don't remember.

216

1        Q    -- a proposal?

2             Who was at that meeting with John Schulman?    It

3     was Ari Emanuel, John Schulman?

4        A    Ari Emanuel, John Schulman and Marc Toberoff.

5        Q    Was Paul Levitz there?

6        A    I don't know.

7        Q    Do you know anything else about what was said at

8     that meeting?

9        A    I was told that Mr. Schulman was very negative

10    about what Mr. Emanuel was proposing.

11       Q    Do you recall hearing how the meeting ended?

12       A    It ended with Schulman saying, "Make a

13    proposal."

14       Q    And to your knowledge there never was such a

15    proposal?

16       A    No, I believe -- I don't know what it was, but I

17    believe that there was a proposal, and I believe that it

18    was rejected.

19       Q    A proposal at the meeting or subsequently?

20       A    No.  Subsequently.

21       Q    Oh, subsequently.

22            Do you know how it was made, whether by phone or

23    by meeting or --

24       A    I don't know.

25       Q    In the next paragraph, I think the fifth

217

1    paragraph, your mother refers to "suffering."

2          Do you understand that she suffered as a result

3    of this proposal?

4          A    Yes.

5          Q    And --

6          MR. TOBEROFF:    That's the fifth paragraph on

7    page 2?

8          MR. ZISSU:    Page 2.

9          Q    Is the suffering you refer to her being upset

10   about it or something beyond that?

11         A    Extremely upset.

12         Q    Anything beyond that?

13         A    No.  Well, let me -- I mean, she was upset with

14   the document, but I think she was also talking about

15   long-term -- the long-term effect that such a document

16   would have on her and on me.

17         Q    Meaning what?

18         A    Meaning that it would not bring us what we had

19   hoped for and what we expected.

20         Q    Meaning financially?

21         A    Meaning in every way.

22         Q    In what ways beyond financial?

23         A    Well, we felt that we had been betrayed.  We

24   made every effort, every good-faith effort over a long

25   period of time to reach an agreement.  We wanted an

1    agreement, and then when we were presented with what

2    ended up being apparently the other side's understanding

3    or the changes that they wanted to put into the

4    agreement, it was not something that we could go forward

5    with, and we lost all trust in the company.  They...

6        Q    Did the proposal that all of your ownership

7    rights would end up with DC Comics -- was that something

8    that was upsetting?

9            MR. TOBEROFF:  Asked and answered.

10           You can answer again.

11           THE WITNESS:  Well, yes, it was upsetting.

12    BY MR. ZISSU:

13        Q    Had you wanted to retain certain ownership

14    rights notwithstanding the -- whatever would be paid to

15    you to acquire them?

16        A    That was the subject of long-term negotiations.

17        Q    And that's one of the concessions that you made,

18    isn't it?

19        A    That was a concession that we made conditioned

20    on other things not being changed.

21        Q    Turning your attention to the last paragraph of

22    that page, there is a reference to -- it says, quote, "I

23    had hoped that Laura and my good relationships with Jerry

24    Levin and D C Comics would continue after we reached...

25    agreement," close quote.

219

1          The "after we reached...agreement," is that

2     referring to the period following Kevin Marks' October

3     19, 2001 letter?

4      A    No.  She was talking about if we reached a final

5     agreement.  We never reached a final agreement.

6          MR. TOBEROFF:  I guess I can't say it.  I think

7     I know what it means, but I'm not going to say it.

8     BY MR. ZISSU:

9      Q    At the top of the next page it says, "But this

10    contract seeks to discredit Jerry...and to undermine our

11    rights, a direct contradiction to what was said."

12         Did you consider this contract to be a

13    contradiction because all of the rights would end up with

14    DC?

15     A    No.  I think she's talking about a contradiction

16    to the -- to terms that we had approved.  She's not

17    talking about anything that we --

18     Q    And what --

19     A    -- didn't approve.

20         THE REPORTER:  "Didn't approve"?  Is that what

21    you said?

22         THE WITNESS:  I don't know what I said.

23         (Answer read.)

24         THE WITNESS:  I guess I said "didn't approve."

25    BY MR. ZISSU:

220

1          Q    The sentence also says it was "a direct

2    contradiction to what was said," and to what are you

3    referring when you say "what was said"?

4          A    I didn't say.

5          Q    Are you and your mother referring.

6          A    I'm not sure.  You'd have to find out from her.

7          Q    And I think I've asked you earlier about what

8    your mother meant by discrediting Jerry Siegel, but what

9    would discrediting Jerry Siegel have to do with the basic

10   deal points?

11         A    I think it's something that wasn't in the deal

12   points.  It obviously was something that we did not

13   approve.

14         Q    And is it correct that the same text was sent to

15   Mr. Case at AOL Time Warner?  Is that your recollection?

16         A    I don't remember, and there is no cc on the

17   letter, so I don't know.

18         Q    Do you know whether your mother wrote to

19   Mr. Case at this time?

20         A    I don't know.

21              MR. ZISSU:  Let's mark as Defendants' Exhibit 26

22   a letter dated April 17, 1997 to Arthur Levine from Carol

23   Simkin.

24              (Defendants' Exhibit 26 marked.)

25   BY MR. ZISSU:

221

1    Q    The question is, do you recall seeing this
2    letter at about the time it was dated -- it's dated?
3    A    I -- as of today, I don't remember exactly, but
4    I believe I did.
5    Q    And do you recall what authority you gave to
6    Mr. Levine in relation to dealing -- strike that.
7         Let me direct your attention to the third
8    paragraph, the language which reads, quote, "Our client
9    would like very much to engage in a dialogue with your
10   clients in order to find a mutually agreeable resolution
11   of this matter," close quote.
12        Do you -- did you give Mr. Levine authority to
13   enter into such a dialogue?
14   A    He had many discussions with --
15        MR. TOBEROFF:  Answer the question.
16        THE WITNESS:  Yes.
17   BY MR. ZISSU:
18   Q    And what authority did you give him in that
19   regard?
20   A    To conduct dialogues.
21   Q    To negotiate?
22   A    I don't know if I'd use the word "negotiate."
23   Q    What would you use?
24   A    To talk to --
25   Q    About a deal or settlement?

222

1        A    -- the other side, to see what the other side

2   had in mind when they said "to engage in a dialogue."

3            MR. ZISSU:  Let's mark as Defendants' Exhibit 27

4   a letter dated April 22, 1997 from Arthur Levine to Carol

5   Simkin.

6            (Defendants' Exhibit 27 marked.)

7            MR. TOBEROFF:  I'm sorry.  I just want to get

8   these --

9            MR. ZISSU:  27 is the April 22 --

10           MR. TOBEROFF:  April 17 is 26?

11           MR. ZISSU:  26.

12           MR. TOBEROFF:  I am missing --

13           THE WITNESS:  This was 25.

14           MR. ZISSU:  25 was the February --

15           MR. TOBEROFF:  Excuse me.  They're sitting here.

16  BY MR. ZISSU:

17      Q    Did you see Defendants' Exhibit 27 at or about

18  the time it was sent?

19      A    Yes.

20           MR. ZISSU:  Defendants' Exhibit 27 is a letter

21  from Arthur Levine to Carol Simkin dated May 15, 1997.

22  This is 27.  This is 28.

23           (Defendants' Exhibit 28 marked.)

24  BY MR. ZISSU:

25      Q    Did you see this letter at or about the time it

223

1     was sent?

2         A    Yes.

3         Q    And is it fair to say that Mr. Levine was

4     authorized to invite a proposal, as he states in this

5     letter?

6         A    Yes.

7             MR. ZISSU:  Defendants' Exhibit 29 is a letter

8     from Mr. Levine to Carol Simkin dated June 19, 1997.

9             (Defendants' Exhibit 29 marked.)

10    BY MR. ZISSU:

11        Q    Did you see this Defendants' Exhibit 29 at or

12    about the time it was sent?

13        A    Yes.

14        Q    Did you -- is there anything in this letter that

15    you disapprove of?

16            MR. TOBEROFF:  Sitting here today?

17    BY MR. ZISSU:

18        Q    That you disapproved of at the time you saw it.

19        A    I don't remember any disapproval.

20        Q    Is it fair to say that -- as Mr. Levine does,

21    that the primary and most significant consideration to

22    the Siegels -- strike that.

23            Is it fair to say, as Mr. Levine says, that the

24    primary and most significant matter is the consideration

25    to the Siegels representing the future value of the

224

1    Superman characters?

2        A    I don't know.

3        Q    I'm sorry.  I didn't hear you.

4        A    I don't know.

5        Q    At the time was the primary and most significant

6    of the matters to be discussed between the counsel for

7    both sides the consideration that you would receive for

8    the future value of the Superman characters?

9        A    I don't recall.

10       Q    Would you say that this is incorrect?

11       A    But I don't remember, so I can't really tell

12   you.

13       Q    Did you ever tell Mr. Levine that you disagreed

14   with him about that?

15       A    I don't remember a conversation like that.

16           MR. ZISSU:  Defendants' Exhibit 30 is an October

17   3, 1997 letter from Arthur Levine to Carol Simkin.

18           (Defendants' Exhibit 30 marked.)

19   BY MR. ZISSU:

20       Q    Did you see that letter at or about the time it

21   was sent?

22       A    Yes.

23       Q    And do you recall your mother's apartment

24   building undergoing renovations?

25       A    Yes.

225

1      Q    Is this reflective of the way you worked with

2  your mother; namely, that both of you had to be involved

3  and available to consider the matters being discussed

4  between Mr. Levine and Miss Simkin?

5      A    Yes.

6           MR. ZISSU:  Defendants' Exhibit 31 is a letter

7  from Mr. Levine dated December 17th, 1997 to Carol

8  Simkin.

9           (Defendants' Exhibit 31 marked.)

10  BY MR. ZISSU:

11      Q    Did you receive that letter -- I'm sorry.

12           Did you see that letter at or about the time it

13  was sent?

14      A    I remember this issue, but I don't remember, you

15  know, whether this is the only letter that may have

16  discussed it, but I'm sure I saw it.

17      Q    And I think Mr. Levine refers to the discussions

18  between him and Miss Simkin as "our clients'

19  negotiations."  Do you see that in the first paragraph?

20      A    No.  Where is that?

21           Oh, I see.

22      Q    Is it fair to characterize the discussions that

23  were going on as negotiations on each side through their

24  counsel?

25      A    I guess, if that's what he called it.

226

1        Q    I mean, do you disagree with that?

2        A    No.  I don't know.

3             MR. ZISSU:  Exhibit 32 is a letter from Paul

4   Levitz to Joanne Siegel dated October 10, 1997.

5             (Defendants' Exhibit 32 marked.)

6   BY MR. ZISSU:

7        Q    It's also to yourself, Laura Siegel Larson.

8        A    Yes.

9        Q    Did you receive that letter on or shortly after

10  it was sent?

11       A    Yes.

12       Q    And --

13            MR. TOBEROFF:  Wait.  It's a six-page letter,

14  so, Laura, I would like you to read it over before you

15  answer questions.

16  BY MR. ZISSU:

17       Q    Directing your attention to the second page,

18  there is an indented text from Mr. Levitz in which he

19  tries to state various things about a proposal that DC

20  Comics was making.  In particular, I'm directing your

21  attention to the text that reads, quote, "The Siegel

22  interest is a set of rights which gives Jerry's heirs the

23  ability to benefit from the copyrights in the early

24  Superman stories that were not created as 'works for

25  hire' in copyright terms," and then at the beginning of

227

1   the next paragraph, he says, "The Siegel interest does

2   not include any right to use the almost 60 years of

3   stories, artwork, characters, and other elements created

4   after the relatively small (but obviously vital) original

5   copyrights."

6          Did you consider Mr. Levitz's reference to what

7   the Siegel interest did not include as a -- as

8   discrediting Jerome Siegel?

9       A    No.

10      Q    Did you consider this an insult?

11      A    No.

12      Q    Did you agree with his statement?

13          MR. TOBEROFF:  Objection.  I don't believe she

14   can answer that without divulging both attorney work

15   product and attorney-client communications, and to that

16   extent I instruct you not to answer.

17          (Instruction not to answer.)

18   BY MR. ZISSU:

19      Q    When you read it, did you -- when you first read

20   it, did you have a reaction as to whether Mr. Levitz was

21   correct in making the statement that "The Siegel interest

22   does not include any right to use the almost 60 years of

23   stories...and other elements created after the relatively

24   small (but obviously vital) original copyrights"?

25      A    I didn't --

228

1          MR. TOBEROFF:  Objection.  Objection.  You've

2    got to give me time to object, particularly when we get

3    into these legal matters.

4          The objection is that as a layman, she can't

5    possibly form an opinion as to work for hire without

6    counsel because it's a legal concept with different

7    definitions under different copyright acts, and there is

8    no way she can answer that without divulging attorney-

9    client communications.

10   BY MR. ZISSU:

11       Q    When you read it, did you have a reaction to

12   this statement I've just quoted?

13       A    No.  I had to discuss it with my attorney.

14       Q    I didn't ask you about whether you had to

15   discuss it.

16          You read it.  Did you sit down and say, "What

17   the hell is this" or "This is wonderful"?  Did you have a

18   reaction --

19          MR. TOBEROFF:  She --

20   BY MR. ZISSU:

21       Q    -- and the answer is you had no reaction?

22       A    No.

23       Q    You just read it with no reaction.

24          Correct?

25       A    Yes.

229

1       Q    And you decided to do what after you read this?

2  To consult a lawyer about it.

3            Correct?

4       A    Discuss it with my attorney.

5       Q    But you knew that this was DC Comics' view.

6            Correct?

7       A    Well, it was written by --

8       Q    Paul Levitz.

9       A    -- Paul Levitz.

10      Q    Now, on the next page the beginning of the

11 second paragraph states, quote, "In return, then, for a

12 re-grant of the Siegel interest in the Superman rights,

13 we propose...," and he goes on to make a proposal.

14           You understood from that that DC Comics was

15 going to seek a re-grant of the Siegel interest in all

16 the Superman rights.

17           Correct?

18      A    That's --

19           MR. TOBEROFF:  Wait a minute.  Where are we

20 here?

21           MR. ZISSU:  I am asking her on page 3, the

22 beginning of the second paragraph, I quoted her a

23 statement made by Paul Levitz.  It says, "In return,

24 then, for a re-grant of the Siegel interest in all the

25 Superman rights," we make such-and-such proposal.

230

1          Q    And my question is, you understood that DC

2     Comics was seeking a re-grant of the Siegel interest in

3     all the Superman copyrights.

4          Correct?

5          MR. TOBEROFF:  You can answer that narrowly.

6          MR. ZISSU:  That's not appropriate, for you to

7     give instructions like that.

8          Q    Answer the question.

9          MR. TOBEROFF:  Excuse me.  When I say

10    "narrowly," I mean without -- it was implied that I meant

11    without disclosing attorney-client communications.

12          MR. ZISSU:  I didn't ask her anything about an

13    attorney.  I asked her whether she understood what the DC

14    Comics was seeking from the letter.

15          MR. TOBEROFF:  And I said she could answer that,

16    and by "narrowly" I meant without disclosing attorney-

17    client privileged communications.

18          THE WITNESS:  I understood that's what Paul

19    Levitz was asking for.

20    BY MR. ZISSU:

21          Q    On the next page, which is 4, in the second two

22    paragraphs there is reference to percentages, percentage

23    payments, and in the first paragraph there is a reference

24    to paying the Siegels "5% of DC's income from such

25    licenses."

231

1        Did you understand that that meant that you

2   would be paid on gross revenues?

3        A    No.

4        Q    What did you understand?

5        A    I didn't understand it.

6        Q    You didn't understand it.

7        A    No.

8        Q    You didn't understand it at all?

9        A    Not on my own.

10       Q    Going towards the bottom of the page,

11  "Insurance," it says in the first bullet point at the

12  bottom of the page, "DC will extend medical insurance in

13  substantially the same comprehensive form that now covers

14  Joanne to both Joanne and Laura for their respective

15  lifetimes."

16       Did -- was DC extending medical insurance to

17  Joanne for her lifetime?

18       A    Yes.

19       Q    And that was under this 1975 agreement?

20       A    No.

21       Q    It was a gift?

22       A    Yes.

23       Q    On the next page in the first paragraph, the

24  third sentence, quote, "As you know, without a re-grant

25  to DC, you would find yourselves possessed of a narrow

232

1    set of rights."

2          My question is, did you have any understanding

3    at this time of what rights you would possess if there

4    were no re-grant to DC of the terminated rights?  The

5    question is whether, yes or no, you had any

6    understanding.

7          MR. TOBEROFF:  Including an understanding from

8    her attorneys?

9          MR. ZISSU:  Including any understanding.

10          MR. TOBEROFF:  You can answer yes or no, but you

11    can't disclose or -- that part of your understanding

12    which came through speaking with your counsel.

13          THE WITNESS:  I had no independent understanding

14    of it.

15    BY MR. ZISSU:

16    Q    And did you have any understanding -- I am not

17    asking you what the understanding was -- based on advice

18    of counsel?

19    A    Uh-huh.

20    Q    Yes?

21    A    No.  I understand what you're saying, but what

22    are you asking me?

23    Q    Did you have an understanding based on advice

24    from counsel, yes or no?

25    A    Yes.

233

1      Q    In the bottom paragraph...

2           Defendants' Exhibit 33 is a letter from Carol

3      Simkin, I believe, to Arthur Levine dated December 18,

4      1977 -- 97.

5           (Defendants' Exhibit 33 marked.)

6      BY MR. ZISSU:

7      Q    Do you recall seeing this at or shortly after

8      the time it was received by Mr. Levine's office?

9      A    Yes.

10     Q    Directing your attention to the first page, the

11     bottom paragraph, quote, "In other words, the intention

12     of our offer is for DC to receive, in exchange, for [sic]

13     the perpetual enjoyment of all rights relating to work

14     created by or contributed to by Mr. Siegel which was done

15     for or furnished to DC Comics."

16          MR. TOBEROFF:  Minor point.  You inserted a

17     "for" before "DC."

18          MR. ZISSU:  Yeah, I'll read it again.

19     Q    "In other words, the intention of our offer is

20     for DC to receive, in exchange, the perpetual enjoyment

21     of all rights relating to the [sic] work created by or

22     contributed to by Mr. Siegel which was done for or

23     furnished to DC Comics."

24          Did you understand that to be DC's goal in the

25     transaction or the proposed transaction?

234

1        A    At what time?

2        Q    At this time.

3        A    Are you saying without benefit of counsel's

4    input?

5        Q    Yeah.  When you read it, did you understand that

6    that's what they were asking for?

7        A    I had to discuss it with my attorney first.

8        Q    So when you read it, you didn't know what DC

9    Comics was asking for?

10            When you read it, you did not know what they

11   were asking for?

12       A    I did not form an independent opinion.

13       Q    You read it, and you didn't understand what it

14   said.

15            Correct?

16       A    Correct.

17       Q    On the next page under the heading "DC's Proven

18   Excellence," there is a sentence in there that says, and

19   I will read it to you, "DC has done a superb job with

20   Superman."

21            Did you agree with that?

22       A    I don't see it.

23       Q    In that paragraph seven lines down.  You see,

24   "DC has done a superb job with Superman"?

25       A    I see it.

235

1       Q    Did you agree with that statement?

2       A    No.

3       Q    Why not?

4       A    I think that they did a good job with some

5  aspects of the character and missed the boat with other

6  aspects.

7       Q    What aspects did they miss the boat on?

8       A    They didn't market it sufficiently during

9  certain periods of time.  They let the character sort of

10 dwindle while other minor characters were being licensed

11 and marketed and sold to movies, and there was very

12 little activity during certain periods of time with the

13 character.

14      Q    Did you -- do you have any -- do you recall any

15 of the minor characters you had in mind?

16      A    Well, I'm talking about things like Spiderman,

17 made into movies and things of that sort.

18      Q    When Superman was not made into a movie?

19      A    Yes.

20      Q    On the next page at the bottom of the page,

21 about seven lines up from the bottom there is a sentence

22 which begins -- it's the last two sentences in the

23 paragraph -- quote, "In addition, the appearance of the

24 Superman character has evolved" --

25      A    I am sorry.  I don't see it.  Seven lines up

236

1    from the bottom?

2         Q    This is on page 3, starting in --

3         A    Oh, I'm sorry.  I was on page 2.

4         Q    "In addition, the appearance of the Superman

5    character has evolved significantly since 1938, and new

6    characters and story elements have been created during

7    the grant period."

8              Did you understand that to be the case?

9         A    I had to consult with my attorney to figure out

10   what they were really saying here.

11        Q    Well, did you at the time understand that there

12   were new story elements added to the Superman exploits

13   after Action Comics No. 1?

14        A    I suppose.

15        Q    Were you familiar with any of them over the

16   years?

17        A    I couldn't tell you what they are.  I'm not a

18   comics historian.

19        Q    Did you feel you needed to ask your attorney if

20   that was a fact?

21        A    I asked him for his opinion.

22        Q    What?

23        A    I asked him for his opinion.

24        Q    Who -- was Mr. -- your attorney was Mr. Levine.

25   Was he an expert on the comic book history of Superman?

237

1          MR. TOBEROFF:  I think you're crossing wires in

2   terms of what you're asking and what she's answering.

3   What are you asking?

4          MR. ZISSU:  I am asking was she aware that the

5   Superman character had evolved significantly since 1938.

6          MR. TOBEROFF:  And she's answering that she

7   couldn't form an opinion on that --

8          MR. ZISSU:  Without speaking to her attorney.

9          MR. TOBEROFF:  Right.  Exactly.

10  BY MR. ZISSU:

11      Q    And I am asking, was your attorney knowledgeable

12  with respect to the evolution of the Superman character

13  from 1938?

14      A    He was able to do research.

15      Q    And had you not seen examples of your father's

16  creations in these comic books over the years?

17      A    I've seen some.

18      Q    And did you know that there were new characters

19  added after Action Comics No. 1?

20      A    Well, Superman is Superman.

21      Q    No.  There are -- comics books have stories in

22  them.

23      A    Are you talking about minor characters?

24      Q    No.  New characters in the plot, in the

25  exploits.  Like Lex Luthor.  He wasn't in Action Comics

238

1    No. 1.

2         A    Oh, yes.

3         Q    Characters like that.

4         A    Yes.

5         Q    So there were.

6              And there were new plot lines added over the

7    years.

8         A    Yes.

9         Q    In the next sentence it says, "DC will continue

10   to own these, and the Siegels' termination gives them no

11   rights to use or license these, or to participate in the

12   income that flows from these uses, whenever received."

13             My question is, is that something you could not

14   understand without consulting your lawyer?

15        A    I could not understand it without consulting my

16   lawyer.

17        Q    Were you insulted when you read it?

18        A    No.  I wanted to know what it meant.

19        Q    On the next page there is a statement under the

20   heading little Roman (iv).  It says, "DC's Proposal" --

21   there is a heading, and it says, "DC's Proposal Provides

22   For Sharing In Revenues From Worldwide Use," and the next

23   sentence reads, "Your clients' termination of the grant

24   in the Superman Comic has no effect on DC's rights

25   outside of the United States," and when you read that,

239

1    did you have any understanding of it?

2         A    No.

3         Q    Apart from whether this is correct or not, are

4    you saying you couldn't understand the meaning of the

5    sentence, or you couldn't understand whether it was

6    correct?

7         A    I couldn't understand if it was correct.

8         Q    But you did understand what it said?

9         A    I knew what the words meant.

10        Q    Yes.

11        A    I didn't, you know, form an opinion.

12        Q    And then at the bottom of the page there are

13   some statements about trademarks, and it says in the last

14   sentence, "They," meaning the Siegels, "would not be

15   entitled to income attributable to other factors,

16   including the Superman trademark, and the associated

17   goodwill built up by DC over the years," close quote.

18            Is that another statement that you understood

19   what was being said, but you didn't understand whether it

20   was correct?

21            MR. TOBEROFF:  I am sorry.  Before you answer

22   that, could you just point out which -- I lost you.

23            MR. ZISSU:  The last sentence on the page.

24   "They" --

25            THE WITNESS:  I think you're on the wrong page.

240

1          MR. ZISSU:  Page 4.

2          THE WITNESS:  Could you ask the question again,

3    please?

4    BY MR. ZISSU:

5        Q   The question is whether you understood what was

6    being said but didn't understand whether it was correct

7    without speaking to your lawyer.

8        A   I had to speak to my attorney about it.  The

9    whole wording of this was confusing.

10       Q   Did you ever gain any familiarity with the

11   decision of the federal court in the case your father

12   brought against I think it was National Periodical

13   Publications about ownership of the Superman character?

14       A   What do you mean by "familiarity"?

15       Q   Did you ever read the decision?

16       A   Yes.

17       Q   And did you understand that the court said that

18   Action Comics No. 1 was not a work made for hire, that

19   that's what the court said in the opinion?

20          MR. TOBEROFF:  Which opinion again are you

21   talking about?

22          MR. ZISSU:  This is in the Second Circuit

23   opinion.

24          MR. TOBEROFF:  Lower court?

25          MR. ZISSU:  Second Circuit Court of Appeals.

241

1       A    You'd have to ask my mother.  She wrote the

2   check.

3       Q    Okay.

4            Defendants' Exhibit 35.

5            (Defendants' Exhibit 35 marked.)

6   BY MR. ZISSU:

7       Q    Did you see this letter at or shortly after it

8   was sent to Mr. Levine?  It's from Carol Simkin to Arthur

9   Levine dated May 29, 1998.

10      A    This is a bad xerox.  It's hard for me to read

11  it.

12      Q    Well --

13      A    I'm trying.

14      Q    Yeah.  Let me try to save some time, subject to

15  your counsel's comment.

16           The letter is basically saying on May 29, 1998,

17  that in a year and a half the Siegels, you and your

18  mother, had not responded to the proposal of DC Comics

19  made in earlier letters, and so my question is --

20      A    Could you tell me where it says that?

21      Q    Yeah.  It's in the beginning of the second

22  paragraph.

23      A    My --

24      Q    I don't have a question.

25           My question is, is there a reason it took

245

1    time -- this amount of time to respond to the proposal?

2        MR. TOBEROFF:  I just want to -- are you

3    referring to this letter?  Because it's a little bit hard

4    to read, so I want to make sure my client is able to read

5    it.  I think I can --

6        MR. ZISSU:  That's my only question.

7        MR. TOBEROFF:  Right, but are you referring to

8    this letter when you ask the question?

9        MR. ZISSU:  I am referring to the statement --

10       MR. TOBEROFF:  Why don't we just read that

11   statement.

12       MR. ZISSU:  "Art, as you know, it took nearly

13   half a year and the exchange of considerable

14   correspondence for our clients to finally agree" -- wait

15   a minute.  Yeah, okay.  I know...

16   Q    This is to -- okay.  Let me read it again.

17   "Art, as you know, it took nearly a half a year and the

18   exchange of considerable correspondence for our clients

19   to finally agree on the terms of the December 17, 1997

20   Agreement," and that agreement, I think I can represent

21   to you, had to do with the confidentiality of

22   negotiations.

23       So my first question is, is there a reason that

24   you recall that it took so long to respond?

25   A    I don't remember.

246

1      Q    And then it continues on in that paragraph to

2  read, "On the basis of that agreement, our client

3  delivered to you an extensive proposal, for your clients'

4  consideration.  The proposal was prepared after a great

5  deal of work, at your clients' specific request.  You

6  have now had [sic] it almost" --

7           MR. TOBEROFF:  It says, "you have had it now."

8           MR. ZISSU:  "You have had it now" --

9           MR. TOBEROFF:  "For almost" --

10          MR. ZISSU:  -- "for almost 6 months."

11          MR. TOBEROFF:  I can't read that as "6."  I

12  don't know what it is.  Could be "8" --

13          MR. ZISSU:  It's "almost 6 months" because it

14  was made in December of the prior year.

15     Q    My question is, do you recall why it took the

16  length of time it did to respond to that proposal?

17     A    No.

18          MR. ZISSU:  This is Defendants' Exhibit 36, a

19  letter from Arthur Levine to Carol Simkin dated June 19,

20  1998.

21          (Defendants' Exhibit 36 marked.)

22  BY MR. ZISSU:

23     Q    Do you recall seeing this letter at or shortly

24  after the time it was sent?

25     A    Yes.

247

```
 1        Q    Do you recall any of this discussion -- strike
 2   that.
 3             Do you recall having any reaction to this
 4   discussion today?  Do you have any recollection of having
 5   a reaction, regardless of the basis, relating to the
 6   content of this letter?
 7        A    I wanted to know what the answers would be to
 8   the questions that were asked.
 9        Q    So is it fair to say that you were interested in
10   getting this financial information before you would react
11   to DC Comics' proposal?
12        A    We wanted all of the information that we asked
13   for.
14             MR. ZISSU:  Next is Defendants' Exhibit 37.
15             (Defendants' Exhibit 37 marked.)
16             (Discussion held off the record.)
17   BY MR. ZISSU:
18        Q    Did you or your mother ever try to obtain any
19   trademark registrations for Superman or any image of
20   Superman?
21        A    No.
22        Q    Did you or your mother ever try to market or
23   license the Superman property --
24        A    No.
25        Q    -- to anyone?
```

248

1    understanding of what was stated in this opinion than you

2    have previously testified today?

3         A    No.

4         Q    Did --

5              MR. TOBEROFF:  How we doing on time?

6              MR. ZISSU:  How much do we have left on the

7    clock?

8              (Discussion held off the record.)

9              MR. ZISSU:  Defendants' Exhibit 41.

10             (Defendants' Exhibit 41 marked.)

11   BY MR. ZISSU:

12        Q    This is a letter dated from Laura Siegel Larson

13   and Joanne Siegel to Kevin Marks dated September 21,

14   2002.

15             Are you familiar with this letter?

16        A    Yes.

17        Q    In the -- I think it's the third sentence, it

18   says, "Therefore due to irreconcilable differences, after

19   four years of painful and unsatisfying negotiations, this

20   letter serves as formal notification that we are totally

21   stopping and ending all negotiations with DC Comics,

22   Inc., it's parent company AOL Time Warner and all of its

23   representatives and associates, effective immediately,"

24   and my question is, was there some prior informal

25   notification given to anyone to the same effect?

261

1          A    I don't believe so.

2          Q    Did anyone help you write this letter?

3          A    My mom and I wrote it together.

4          Q    Had you met Mr. Toberoff at this point?

5          A    No.

6          Q    And you hadn't consulted him about this letter?

7          A    No.

8          Q    So what was the answer about -- there was no

9    prior informal notification?  Was that your testimony?

10         A    I don't believe so.

11         Q    Were you repudiating the October 19, 2001

12   letter?

13              MR. TOBEROFF:  Objection.  Calls for a legal

14   conclusion.

15              THE WITNESS:  I don't know what you mean by

16   that.

17   BY MR. ZISSU:

18         Q    Well, how would you terminate what you were

19   doing in relation to the October 19, 2001 letter?

20         A    Well, the --

21              MR. TOBEROFF:  Objection.  Vague and ambiguous.

22              THE WITNESS:  The October 19th letter was no

23   longer at issue.  What was at issue was this February

24   2002 document.

25   BY MR. ZISSU:

262

1          Q   Well, the October 19, 2001 letter at this point

2     was still out there, and nobody had ever told on your

3     behalf DC Comics that it was not.

4              MR. TOBEROFF:  Objection.  Misstates the

5     evidence.  Comment on the evidence.

6     BY MR. ZISSU:

7          Q   Is that correct?

8          A   No, that's not correct.

9          Q   What communication had there been to any

10    representative of DC Comics that the October 19, 2001

11    letter was dead?

12         A   Well, it was our understanding that it was being

13    ignored and that a February 2002 document was a

14    counteroffer in essence to the October 19th letter.

15         Q   It was being ignored by DC Comics?

16         A   Yes.

17         Q   In what respect was it being ignored?

18         A   Well, the two documents speak for themselves.

19    They're so different.

20         Q   Was there some respect in which DC Comics was

21    not honoring the October 19, 2001 letter?

22         A   I --

23             MR. TOBEROFF:  Objection.  Asked and answered.

24    We went over that in great detail.

25             MR. ZISSU:  I haven't asked this question.

263

1          THE WITNESS:  By the drafting of the February

2    2002 document, it became clear that DC Comics was not

3    paying attention to the October 19th letter that

4    contained our understanding of what the deal was, you

5    know, supposed to be.

6    BY MR. ZISSU:

7        Q   Was there anything else besides the sending of

8    the draft on February 1, 2002 --

9        A   I'm sorry, I can't hear you.

10       Q   Was there anything else besides the sending of

11   the draft on February 1, 2002 that you considered to be

12   ignoring the October 19, 2001 letter from Mr. Marks?

13          MR. TOBEROFF:  Objection.  Vague and ambiguous,

14   calls for a narrative, and indefinite as to time.

15          THE WITNESS:  I don't believe so.  I'm not sure

16   I understand your question.

17   BY MR. ZISSU:

18       Q   Well, you cited the sending of that draft as in

19   effect an action by DC Comics ignoring the October 19,

20   2001 letter, and I am asking you, was there any other

21   action that you're aware of that DC Comics took that you

22   considered ignoring the October 19, 2001 letter?

23          MR. TOBEROFF:  Aware of at the time this letter

24   was sent or aware of today?

25   BY MR. ZISSU:

264

1        Q    Aware of on September 21, 2002, when you wrote

2    this letter which is Defendants' Exhibit 41.

3        A    No.

4        Q    Did you ever have any further discussions with

5    Mr. Marks about the February 1, 2002 draft after

6    September 21, 2002?

7            MR. TOBEROFF:  Attorney-client privileged, what

8    she discussed with her clients after -- what she

9    discussed with her attorney after September 21, 2002.

10           THE WITNESS:  No.

11   BY MR. ZISSU:

12       Q    Did Mr. Marks return to you all your files?

13       A    He did not return them to me.  He sent them to

14   my attorney -- my new attorney.

15       Q    To your satisfaction?

16           You're going -- you're giving -- you're going,

17   well...  Yes or no?  I mean, what's your answer?

18       A    I'm waiting --

19       Q    You're waiting for your counsel to tell you --

20       A    No, no, no, not at all.

21           MR. TOBEROFF:  No.  She is waiting to give me

22   time to object.  Excuse me.

23           MR. ZISSU:  Okay, so you have objected.

24           Please read the question.

25           (Record read as follows:

265

1              MR. TOBEROFF:  Any stipulations you want to make

2    regarding the transcript?

3              MR. BERGMAN:  Well, we could waive the notary

4    and just have it signed under penalty of perjury, which

5    is --

6              MR. ZISSU:  That's okay.

7              MR. BERGMAN:  -- pretty customary.

8              MR. TOBEROFF:  I think so.

9              MR. ZISSU:  That's okay.

10             MR. BERGMAN:  And the reporter would be relieved

11    of his responsibilities and will deliver the original

12    directly to Mr. Marks --

13             MR. TOBEROFF:  Toberoff.

14             MR. BERGMAN:  Toberoff.

15             MR. TOBEROFF:  My first name is Marc.

16             MR. ZISSU:  All the other rules as to timing and

17    signing apply.

18             MR. BERGMAN:  Yes.

19             MR. TOBEROFF:  So stipulated.

20

21

22

23

24

25

277

1

2

3

4

5

6

7

8          I, LAURA SIEGEL LARSON, do hereby declare under

9     penalty of perjury that I have read the foregoing

10    transcript; that I have made any corrections as appear

11    noted, in ink, initialed by me, or attached hereto; that

12    my testimony as contained herein, as corrected, is true

13    and correct.

14          EXECUTED this *17th* day of *September*,

15    20 *06*, at *Playa Del Rey,*              , *California* .
                        (City)                        (State)

16

17

18

19          *Laura Siegel Larson*
            LAURA SIEGEL LARSON

20

21

22

23

24

25

278

1

2

3

4        I, the undersigned, a Certified Shorthand

5    Reporter of the State of California, do hereby certify:

6          That the foregoing proceedings were taken

7    before me at the time and place herein set forth; that

8    any witnesses in the foregoing proceedings, prior to

9    testifying, were placed under oath; that a verbatim

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under by

12   direction; further, that the foregoing is an accurate

13   transcription thereof.

14          I further certify that I am neither

15   financially interested in the action nor a relative or

16   employee of any attorney of any of the parties.

17          IN WITNESS WHEREOF, I have this date

18   subscribed my name.

19              AUG 1 8 2006

20   Dated: _____

21

22

23         DAVID S. COLEMAN, CSR NO. 4613

24

25

# Errata Sheet

**Pg/Ln**                                           **Correction**

5 | 20 *SLL* Change from: *Issue No. 31 of More Fun Comics dated May, 1938*
Change to: *Cover and one page from Issue No. 31 of More Fun Comics dated May, 1938, cover and one page from Issue No. 26 of Adventure Comics dated May, 1938, and cover and one page from Issue No. 15 of Detective Comics*

16 | 7 *SLL* Change from: *" 1972 "*
Change to: *" 1973 "*

20 | 2 *SLL* Change from: *"I don't remember like that."*
Change to: *"I don't remember anything like that."*

25 | 7 *SLL* Change from: *"I don't surf for any email address,"*
Change to: *"I don't surf for an email address,"*

30 | 24-25 *SLL* Change from: *"He was very energetic and passionate about the Siegel and the*
Change to: *"He was very energetic and passionate about the Siegel — the Siegels*   Siegels

71 | 7-8 *SLL* Change from: *"It has nothing to do with copyright issue,"*
Change to: *"It has nothing to do with the copyright issue."*

135 | 1-2 *SLL* Change from: *"I mean that were not in the proposal would appear in a final m*   write-up,
Change to: *"I mean that no conditions, that were not in the original proposal would appear in a final write-up."*

180 | 11-12 *SLL* Change from: *"... is this contract referring to the list of Works,..."*
Change to: *"... is this referring to the list of Works,..."*

25 | 24 *SLL* Change from: *"1991"*
Change to: *"1999"*

___ | ___     Change from:
Change to:

___ | ___     Change from:
Change to:

___ | ___     Change from:
Change to:

___ | ___     Change from:
Change to:

Signature: *Laura Siegel Larson*     Date: *September 17, 2006*

# EXHIBIT C

ORIGINAL SHIPPED OCT 1 9 2007

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA    )
SIEGEL LARSON,             )
                           )
                           )
              Plaintiffs,  )
                           )    CASE NO.
                           )    04-8400 (RSWL)(RZx)
         VS.               )        -and-
                           )    04-8776 (RSWL)(RZx)
                           )
WARNER BROS. ENTERTAINMENT )
INC., et al.,              )
                           )
                           )
              Defendants.  )
_____)
AND RELATED COUNTERCLAIMS.

**CERTIFIED ORIGINAL**

VOLUME II

VIDEOTAPED DEPOSITION OF LAURA SIEGEL LARSON

BEVERLY HILLS, CALIFORNIA

FRIDAY, OCTOBER 5, 2007

REPORTED BY:

     JEAN F. HOLLIDAY

     CSR No. 4535, RPR, CRR



US LEGAL SUPPORT

Certified Shorthand Reporters

15250 Ventura Boulevard
Suite 410
Sherman Oaks, CA 91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

251

Los Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento • and across the nation

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4      JOANNE SIEGEL and LAURA          )
       SIEGEL LARSON,                    )
5                                        )
                                         )
6                    Plaintiffs,        )
                                         )  CASE NO.
7                                        )  04-8400 (RSWL)(RZx)
            VS.                          )         -and-
8                                        )  04-8776 (RSWL)(RZx)
                                         )
9      WARNER BROS. ENTERTAINMENT        )
       INC., et al.,                     )
10                                       )
                                         )
11                   Defendants. )
       _____)
12     AND RELATED COUNTERCLAIMS.

13

14

15            Videotaped deposition of LAURA SIEGEL

16            LARSON, VOLUME II, taken on behalf of

17            Defendants and Counterclaimants, at

18            9665 Wilshire Boulevard, Ninth Floor,

19            Beverly Hills, California, beginning

20            at 10:27 a.m., and ending at 12:12

21            p.m., on Friday, October 5, 2007,

22            before JEAN F. HOLLIDAY, Certified

23            Shorthand Reporter No. 4535.

24

25

                                                    281

```
 1    APPEARANCES:

 2        FOR THE PLAINTIFFS:

 3            LAW OFFICES OF MARC TOBEROFF
              BY:  MARC TOBEROFF, ESQ.
 4            2049 Century Park East
              Suite 2720
 5            Los Angeles, California  90067
              (310)246-3333
 6

 7        FOR THE DEFENDANTS AND COUNTERCLAIMANTS:

 8            PERKINS LAW OFFICE, PC
              BY:  PATRICK T. PERKINS, ESQ.
 9            1711 Route 9D
              Cold Spring, New York  10516
10            (845)265-2820
              pperkins@ptplaw.com
11
              AND
12
              WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
13            BY:  MICHAEL BERGMAN, ESQ.
              9665 Wilshire Boulevard
14            Ninth Floor
              Beverly Hills, California  90212
15            (310)858-7888
              mbergman@wwllp.com
16

17        ALSO PRESENT:

18            David Chorley, Videographer

19

20

21

22

23

24

25
                                                          282
```

```
 1   STATE OF CALIFORNIA    )
                            ) SS
 2   COUNTY OF LOS ANGELES  )

 3

 4       I, Jean F. Holliday, a Certified Shorthand

 5   Reporter, do hereby certify:

 6       That prior to being examined, the witness in the

 7   foregoing proceedings was by me duly sworn to testify to

 8   the truth, the whole truth, and nothing but the truth;

 9       That said proceedings were taken before me at the

10   time and place therein set forth, and were taken down by

11   me in shorthand and thereafter transcribed into

12   typewriting under my direction and supervision;

13       I further certify that I am neither counsel for,

14   nor related to, any party to said proceedings, nor in

15   anywise interested in the outcome thereof.

16       In witness whereof, I have hereunto subscribed my

17   name.

18

19   Dated:_____JCT 1 9 200/_____

20

21

22   _____
     Jean F. Holliday
23   CSR No. 4535, RPR, CRR

24

25
```

**Word Index**

254