# EXHIBIT D

1

1   UNITED STATES DISTRICT COURT

2   FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

ORIGINAL

4   JOANNE SIEGEL,                  )
    LAURA SIEGEL LARSON            )
5                                   )
                  Plaintiffs,       )
6                                   )
       v.                           )   CASE NO.  CV 04-8400
7                                   )             CV 04-8776
    WARNER BROS, et al.             )
8                                   )
                  Defendants.       )
9

10

11

12

13          DEPOSITION OF MARK WARREN PEARY
                  November 11, 2006
                     8:30 a.m.
14            317 Paseo de Peralta
               Santa Fe, New Mexico
15

16

17       PURSUANT TO THE FEDERAL RULES OF CIVIL
    PROCEDURE, this deposition was:

18  TAKEN BY:  MR. PATRICK PERKINS
                Attorney for the Defendants
19

20

21

22  REPORTED BY:  MABEL JIN CHIN, NM CCR #81
                   Bean & Associates, Inc.
23                 Professional Court Reporting Service
                   500 Marquette, Northwest, Suite 280
24                 Albuquerque, New Mexico 87102

25  (3519B) MC

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2

1                    A P P E A R A N C E S

2

3    For the Plaintiffs:

4            MR. MARC TOBEROFF
             2049 Century Park East, #2720
5            Los Angeles, California 90067

6    For the Defendants:

7            PERKINS LAW OFFICE, P.C.
             1711 Route 9D
8            Cold Spring, New York 10516
             BY:  MR. PATRICK PERKINS

9

10   ALSO PRESENT:   MS. MARGO MOIR, Videographer

11

12                    I N D E X

13   EXAMINATION OF MARK WARREN PEARY

14   By Mr. Perkins                                    3

15   CERTIFICATE OF COMPLETION OF DEPOSITION          86

16   WITNESS SIGNATURE/CORRECTION PAGE                88

17

18        EXHIBITS MARKED OR FORMALLY IDENTIFIED

19   1.   Subpoena in a Civil Case                     6

20   2.   Subpoena in a Civil Case                    13

21   3.   Joint Venture Agreement                     24

22   4.   Privilege Log                               37

23   5.   October 27, 2003 agreement                  40

24   6.   Order Admitting Will to Probate             48

25   7.   Notice of Termination of Transfer ...       50

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9   257
e-mail: info@litsupport.com

3

1    8.   March 12, 2004 Register of Copyrights documents  57

2    9.   September 10, 2004 cancellation letter          59

3    10.  April 26, 2005 letter, Levitz to Peavy, Peary   64

4    11.  May 12, 2005 letter, Toberoff to Perkins        71

5                    *     *     *

6                MARK WARREN PEARY,

7      after having been first duly sworn under

8      oath, was questioned and testified as follows:

9          MR. TOBEROFF:   Before we start, I would just

10   like to note at the outset of the deposition that we

11   have discussed timing, and that we have to leave at

12   4 o'clock sharp so that I can make a flight.

13         I would also just like to object that

14   plaintiffs were not -- I was not given notice as

15   attorney for Warren Peavy, the witness, that this

16   deposition was going to be videotaped as I believe is

17   required by the rules.

18         Oh, excuse me.   The Notice.   I'm seeing it's

19   not in the subpoena.   It may be required in the

20   subpoena, it's not in the subpoena but it is in the

21   Notice to me.

22                    EXAMINATION

23   BY MR. PERKINS:

24      Q.   Good morning, Mr. Peary.   My name is Patrick

25   Perkins.   I represent the defendants, DC Comics, and



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-2668
e-mail: info@litsupport.com

18

1  defer to her.

2      Q.   So you don't have any personal knowledge

3  from speaking to your uncle as to how the first

4  Superman story was created, for example?

5      A.   No.

6      Q.   And do you have any personal knowledge from

7  having spoken to your uncle about any lawsuits that

8  were brought with respect to Superman?

9      A.   No.  He didn't discuss anything like that.

10     Q.   Mr. Peary, at any time did you become aware

11 that in or around 1975 Mr. Shuster entered into an

12 agreement with Warner Communications?

13         MR. TOBEROFF:  Lacks foundation, vague.

14     A.   I think I did.

15     Q.   And do you have an understanding as to what

16 that agreement provided.

17         MR. TOBEROFF:  Calls for a legal

18 conclusion.  Document speaks for itself.

19     A.   No.  All I knew was he had arranged some

20 pension agreement.  That's all I knew.

21     Q.   And when you say "pension agreement," do you

22 mean pension agreement for himself?

23     A.   Yes.

24     Q.   And were you aware of how much money he was

25 receiving?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    A.    No.

2    Q.    Did Mr. Shuster, while he was alive, ever

3    talk to you about a will?

4    A.    Yes.

5    Q.    When did he talk to you about that?

6    A.    Let's say a few years before he died.

7    Q.    How many years before he died?

8    A.    I don't know exactly.  It was -- that's all

9    I can recall, just it was before he died.

10    Q.    And what did he tell you about the will?

11    A.    Well, let me see.  We -- we had a copy of it

12    after he signed it because he wanted us to have it.

13    That's -- that's what I saw.

14    Q.    When did you see that?

15    A.    It's the same answer as before, sometime

16    before he died, a few years, or something like a

17    couple of years.  I don't know exactly.

18    Q.    And he gave you a copy?

19    A.    Our family.  Our family had a copy, yes.

20    Q.    When you say "our family," who are you

21    referring to?

22    A.    That would be my mother, which is his

23    sister.

24    Q.    Anyone else?

25    A.    No.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

200

20

1    Q.    Mr. Peary, what is Pacific Pictures
2  Corporation?
3    A.    It's -- it's one of Marc Toberoff's
4  businesses.
5    Q.    When did you first make the acquaintance of
6  Marc Toberoff?
7    A.    It would have been 2001, I believe.
8    Q.    Do you remember when in 2001?
9    A.    Not exactly.  I was doing research on
10  copyrights and I contacted him as a result.  So exact
11  month, I don't remember.
12    Q.    What exactly were you researching with
13  respect to copyright?
14    A.    Copyright law and rights.
15    Q.    And why did you contact Mr. Toberoff?
16    A.    I thought we might have some rights.
17    Q.    What was the basis for your belief that you
18  thought you might have some rights?
19    A.    What I read about copyright law.
20    Q.    And where did you -- where did you read
21  about copyright law?
22    A.    Various places -- the Internet, articles in
23  magazines.
24    Q.    And what rights did you believe that you
25  had?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

21

1    A.    Rights connected to Superman.

2    Q.    What rights connected to Superman did you

3 believe you had?

4    A.    That's my understanding of it, that the law

5 grants certain rights, ownership rights.  That's my

6 understanding.

7    Q.    And that's why you contacted Mr. Toberoff?

8    A.    Yes.

9    Q.    Did you contact anyone else concerning those

10 rights?

11   A.    Yes, I have.  I have had done so in the

12 past, earlier.  I -- I talked to other people.

13   Q.    Whom did you speak to?

14   A.    I talked to an attorney in Albuquerque once.

15   Q.    Do you recall when that was?

16   A.    1990s sometime.  I don't know the exact

17 year.

18   Q.    Was your uncle still alive at the time?

19   A.    I don't think so.

20   Q.    Did you ever discuss the issue of copyright

21 rights in Superman with your uncle?

22   A.    No.  No.

23   Q.    Did he ever talk to you about any

24 unhappiness with respect to the arrangements that had

25 been made with respect to Superman, speak to you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

262

22

1    personally?

2            MR. TOBEROFF:   Vague and ambiguous.

3        A.   He didn't say much.  I don't think he wanted

4    to talk too much about it.  He really didn't say that

5    much.

6        Q.   So, going back to your testimony, you

7    contacted Mr. Toberoff sometime in 2001; correct?

8        A.   Yes.

9        Q.   And as you sit here today, you can't

10   remember when in 2001?

11       A.   Not the exact month, no.

12       Q.   Do you remember the season?

13       A.   It seems like it was mid year sometime.

14       Q.   Now, when you contacted Mr. Toberoff, had

15   you made any attempt to evaluate what, if anything,

16   the copyright rights in Superman were worth that you

17   were contacting Mr. Toberoff about?

18           MR. TOBEROFF:   Objection, vague and

19   ambiguous.

20       A.   I don't think I -- no, I don't think I went

21   that far.  I didn't.

22       Q.   Since then have you done anything to try to

23   evaluate the value of copyright rights in Superman?

24           MR. TOBEROFF:   Him personally?

25       Q.   (By Mr. Perkins)   You personally?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

283

23

1      A.    Me personally?  Not really on my own, just
2  whatever has been discussed with my attorney.
3      Q.    Were there discussions with your attorney
4  concerning the value of Superman?  That's a yes or no
5  question.
6          MR. TOBEROFF:  Objection, calls for
7  attorney-client privileged information.  The substance
8  of his conversations are privileged, and you just
9  outlined the substance.  Instruct him not to answer.
10      Q.    Are you going to follow Mr. Toberoff's
11  instruction not to answer the question?
12          MR. TOBEROFF:  Of course he is going to
13  follow my instruction.
14      A.    Yes.  That's a privileged question.
15      Q.    So you are going to follow his instruction
16  not to answer?
17      A.    Yes.
18      Q.    Thank you.  At what point did Mr. Toberoff
19  become your attorney?
20      A.    It was fairly soon after I contacted him.
21      Q.    Well, you have another relationship with
22  Mr. Toberoff also, or did, other than as an attorney,
23  didn't you?
24          MR. TOBEROFF:  Vague and ambiguous.
25      A.    Well, the -- the first relationship was as



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

24

1    counsel, and then we had discussed possible uses of

2    rights, but we really -- I employed him as counsel

3    very soon after I contacted him.

4        MR. PERKINS:  Would you mark that, please?

5        (Exhibit 3 marked.)

6    Q.    (By Mr. Perkins)  I have asked the court

7    reporter to mark as Exhibit 3 a document that's

8    entitled Joint Venture Agreement.  Could you turn to

9    the last page of this document, please?

10       MR. TOBEROFF:  Before you ask him questions

11   about an isolated portion of the document, I think you

12   should look it over because the rest of the agreement

13   may provide context for whatever question Mr. Perkins

14   is asking.

15       MR. PERKINS:  Well, I didn't ask any

16   questions yet, but I was just --

17       MR. TOBEROFF:  I presume you were about to?

18       MR. PERKINS:  I was just going to ask him if

19   it was his signature on the last page, because if it's

20   not, then it's going to be a very different

21   examination.

22   Q.    (By Mr. Perkins)  Is this your signature on

23   the last page?

24   A.    Yes.

25   Q.    Okay.  Have you seen this agreement before



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

285

25

1    today?

2        A.    Yes.

3        Q.    Did you read it before you signed it?

4        A.    Yes.

5        Q.    Okay.  Why don't you go ahead and go through

6    the agreement, because I am going to ask you some

7    questions about it now.

8            Have you had occasion to read through the

9    document?

10       A.    Yes.

11       Q.    Now, this agreement is a Joint Venture

12   Agreement; correct?

13           MR. TOBEROFF:  Objection, calls for a legal

14   conclusion.  You can answer.

15       A.    Well, that's what it says here.

16       Q.    What did you understand you were doing when

17   you signed this agreement?

18       A.    We were employing Marc Toberoff, Esquire, as

19   our attorney to exploit any rights we may have in

20   connection with Superman.

21       Q.    And so what was Pacific Pictures

22   Corporation's role in this whole agreement, then, your

23   understanding?

24           MR. TOBEROFF:  Calls for speculation.

25       A.    Um -- I don't know how to characterize

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9063

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

206

26

1   exactly what Pacific Pictures' role is my.

2   Understanding is that this is when we employed Marc

3   Toberoff as our attorney, and this was a business name

4   he was using.  That's my understanding.

5       Q.   Did you -- did you get legal counsel to

6   advise you on this agreement before entering into it?

7       A.   No.

8       Q.   Now, in the first paragraph -- in the

9   paragraph that's named -- that listed number 1, do you

10  see that?

11      A.   Yes.

12      Q.   It lists a number of characters.  Do you see

13  that?

14      A.   Yes.

15      Q.   Now, I promised the court reporter that I

16  wouldn't reference one particular character because of

17  the difficulty in spelling it, so we won't go through

18  all of them.  But I want to draw your attention to two

19  specific characters.  Before I do, who decided which

20  names and characters would be included in paragraph

21  1?

22          MR. TOBEROFF:  Objection, attorney-client

23  privileged information.  Instruct you not to answer.

24          Also attorney work-product.

25      Q.   Are you going to follow your counsel's

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-2867

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

287

27

1    instructions not to answer.

2              THE WITNESS:  Yes.

3              MR. TOBEROFF:  Mr. Perkins, for the

4    remainder of this deposition please assume that he is

5    going to follow his counsel and do not ask him after

6    each question whether he is going to follow the

7    instruction.  I find that improper.

8              MR. PERKINS:  It's actually not,

9    Mr. Toberoff.  I have to ask the question because if I

10   just leave it with your instruction and don't ask, I

11   open myself up to the possibility that at trial he

12   could answer the question saying I was never asked

13   whether I would follow the instruction.

14             MR. TOBEROFF:  Okay.  So let's say for the

15   remainder of the deposition when I instruct you not to

16   answer are you going to follow my instructions?

17             THE WITNESS:  Yes.

18             MR. PERKINS:  That's fine.  Thank you.

19             MR. TOBEROFF:  Okay.  Then you don't need to

20   keep asking him.

21             MR. PERKINS:  Thank you.

22        Q.   (By Mr. Perkins)  Do you have any

23   understanding as to why the character Superboy is

24   listed in paragraph one of this agreement?

25        A.   No.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

266

28

1    Q.    In the research that you did concerning
2  copyright law relating to Superman, was it your belief
3  that some of the rights that you may have held were
4  rights relating to Superboy?
5    A.    No.
6    Q.    And I also note that paragraph one mentions
7  Smallville.  Do you see that?
8    A.    Yes.
9    Q.    Do you have any understanding as to why that
10  was included in this paragraph?
11    A.    No, I don't.
12    Q.    Do you know what Smallville is?  What that's
13  referring to there?
14    A.    Yes.
15    Q.    What is it?
16    A.    It's -- it was a name that was created by --
17  in connection with the story in connection with
18  Superboy.
19    Q.    And based on the --
20    A.    Or actually, let me finish, because --
21        MR. TOBEROFF:  Wait.
22    A.    It was actually -- I'm recalling, it was
23  part of the whole story from the very beginning, if
24  I'm recalling the whole story, the whole Superman
25  story.  From the very beginning it was used in there,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

29

1   so that's all I know about it.

2       Q.    And based on the research that you did, was

3   it your belief that the copyright rights that you may

4   have had rights to would include rights in Smallville?

5       A.    When you say Smallville, are you talking

6   about, like, the TV show that's on or --

7       Q.    That -- I'm sorry -- yes.

8       A.    Oh.

9           MR. TOBEROFF:  Calls for a legal conclusion

10  as to rights he would have.

11      A.    That's -- that's not really my understanding

12  that that's part of our rights.

13      Q.    You testified earlier, if I'm not mistaken

14  and if I get it wrong please tell me, and I'm sure

15  Mr. Toberoff will jump in and say that I

16  mischaracterized it.  The joint -- the purpose of this

17  document was to hire Mr. Toberoff as your attorney.

18  Is that an accurate characterization of your belief.

19          MR. TOBEROFF:  Asked and answered.  Oh,

20  mischarac- -- okay.  Strike that.

21      A.    Yes.  My understanding was that, that this

22  is the document that we used to hire Mr. Toberoff as

23  our attorney.

24      Q.    If you could turn to the second page in

25  paragraph 5, do you see that?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

30

1    A.    Yes.

2    Q.    That paragraph provides for a division of

3  proceeds of 50 percent to you and your mother and 50

4  percent to Pacific Pictures, do you see that?

5    A.    Let's see.   Who are the claimants again?

6  Let's see.   Let's see.

7    Q.    In the top paragraph of the first page, it

8  identifies Jean A. Peavy and her son Mark Warren

9  Peary --

10    A.    Oh.

11    Q.    -- individually and collectively as

12  claimants.   Do you see that?

13    A.    Yes.

14    Q.    So, turning back to paragraph 5?

15    A.    Uh-huh.

16    Q.    There is a division of 50 percent to you and

17  your mother and 50 percent to Pacific Pictures.   Do

18  you see that?

19    A.    Yes.

20    Q.    And, do you recall how the parties to this

21  agreement came up with that division?

22        MR. TOBEROFF:   Vague and ambiguous.

23    A.    It's discussions, just discussions between

24  us and Mr. Toberoff.

25    Q.    And what was the basis for choosing that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

31

1   particular division of proceeds?

2        MR. TOBEROFF:  Vague and ambiguous, asked

3   and answered.

4        A.   Yes, it was pretty much what I said before,

5   it was just based on just discussions over time.

6        Q.   Well, were there certain considerations that

7   went into determining this percentage?

8        A.   Perhaps the amount of work involved, the

9   amount of time, the commitment, like, it was the idea

10  it was not an immediate thing, it might take many

11  years.

12        Level of -- just, you know, that's it.

13        Q.   In entering into this Joint Venture

14  Agreement, what there any discussion as to how much

15  revenue was anticipated would come in, in exploiting

16  the rights here?

17        A.   Oh, I -- I don't recall discussing exact

18  figures, no.

19        Q.   Discuss -- do you recall general amounts?

20        A.   You know, that's -- that's not something we

21  really talked too much about.  It was more having to

22  do with what the exact copyright law states what our

23  rights might be.  We really didn't discuss figures

24  much.

25        Q.   Did you enter into a separate written



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

272

32

1  agreement with Mr. Toberoff concerning his

2  representation of you as a lawyer?

3      A.    This is all I recall, right here.

4          MR. TOBEROFF:  I want to interject.  The

5  question was vague and ambiguous at the time.

6      Q.    If I could ask you to turn to page 3 of the

7  document and take a look at paragraph 8, which is the

8  first paragraph on the page?  Could you please read

9  that paragraph to yourself, and then I'm going to ask

10  you some questions about it.

11      A.    Oh, okay.

12          Okay.

13      Q.    The second sentence of this agreement

14  states, and I quote, "Upon the expiration of the term

15  and the winding up of the venture, or in the event of

16  termination of the venture for any reason, all rights,

17  property or assets of the venture will be held 50

18  percent by the claimants and 50 percent by PPC as

19  tenants in common, and claimants and PPC will each be

20  entitled to receive and continue to receive 50 percent

21  of all proceeds derived from the rights after

22  termination of the venture."

23          My question is, Mr. Peary, what was your

24  understanding as to what, if any relationship, would

25  continue to exist between you and Pacific Pictures in

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE
1-800-669-2433

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

33

1   the event that this agreement was terminated?

2        MR. TOBEROFF:  Calls for a legal conclusion,

3   the document speaks for itself.

4        A.    My understanding of what that meant?

5   Probably death, if he died.

6        Q.    What -- what was your understanding of what

7   would happen to the rights that are at issue in this

8   agreement in the event that this agreement was

9   terminated?

10        MR. TOBEROFF:  Same objections, calls for a

11   legal conclusion.  The document speaks for itself.

12        A.    What would happen to the rights?

13        Q.    Well, who would own them?

14        MR. TOBEROFF:  Are you asking him to read

15   the document and tell you what it means?

16        Q.    I'm asking you, Mr. Peary, what your

17   understanding was of what would happen to the rights

18   if the agreement was terminated at the time that you

19   signed the agreement?

20        A.    Well, it was terminated at some later date.

21        Q.    Yes.

22        A.    The rights would be split 50 percent.

23        Q.    If I could have you go back to page -- to

24   the first page of Exhibit 3, in paragraph 3 there is

25   reference to PPC paying costs and expenses of the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


Bean
& Associates, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

274

34

1    venture.  Do you see that?

2        A.    Yes.

3        Q.    And it refers to -- it lists a number of

4    costs and fees.  My question, Mr. Peary, is, were you

5    ever made aware as to whether any costs or fees were

6    incurred by the venture?

7            MR. TOBEROFF:  Vague and ambiguous.

8        A.    There were -- there was some fees associated

9    with the establishment of the Joe Shuster estate.

10   That's pretty much all I know.

11       Q.    Were you aware of any other attorneys' fees

12   that were incurred in connection with this venture?

13           MR. TOBEROFF:  Objection, vague and

14   ambiguous.

15       A.    The only fees I am aware of is fees

16   associated with the establishment of the Shuster

17   estate.

18       Q.    Now, you mentioned that under this agreement

19   you believe that you were hiring Mr. Toberoff as your

20   attorney.  What is your understanding of the fee

21   arrangement with Mr. Toberoff for his legal services?

22           MR. TOBEROFF:  Asked and answered.

23       A.    Yes.  My understanding is what it says in

24   paragraph 5 that we discussed.

25       Q.    All right.  Hold on to that document, and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

275

35

```
1   I'm going to mark something else and we're going to go
2   back to it.
3           MR. TOBEROFF:  I'm getting a glass of
4   water.
5           THE VIDEOGRAPHER:  Your mike.
6           MR. TOBEROFF:  Oh, sorry.
7           (A discussion was held off the record.)
8   Q.    (By Mr. Perkins)  Before you look at Exhibit
9   4, I would like you to go back to Exhibit 3 for a
10  moment, Mr. Peary.  Is this document, this agreement
11  the first agreement between you and Mr. Toberoff that
12  you believe established him as your attorney?
13  A.    Yes.
14  Q.    And the date on the back page of this, it's
15  signed November 28, 2001; correct?
16  A.    Yes.
17  Q.    Did you have any discussions with
18  Mr. Toberoff prior to November 28, 2001?
19          MR. TOBEROFF:  Just a second.  I need to put
20  on my mike.
21          Objection, asked and answered.
22  A.    Yes.  I would refer you back to the prior
23  answer about when I first talked to him.
24  Q.    He wasn't your lawyer when you first talked
25  to him; correct?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE



MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    A.    Not at first.

2    Q.    Do you remember what you said during your

3    first conversation with Mr. Toberoff?

4          MR. TOBEROFF:    Objection.    I would like to

5    counsel -- instruct you not to answer questions about

6    your conversation because they are privileged, even

7    though I had not yet been retained.    Your

8    conversations and our interviews are still privileged.

9    So I instruct you not to answer any questions as to

10   the substance of our conversations when you first

11   contacted me.

12   Q.    Did you ever have any conversations with

13   Mr. Toberoff as the President of Pacific Pictures, as

14   opposed to as your lawyer?

15         MR. TOBEROFF:    Vague and ambiguous, calls

16   for a legal conclusion.

17   A.    Um -- you know, I would say I contacted him

18   seeking legal advice.

19   Q.    But in November you entered into this

20   agreement which is a joint venture with the company

21   called Pacific Pictures; correct?

22   A.    Yes.

23   Q.    And Mr. Toberoff is the president of Pacific

24   Pictures Corporation; correct?

25         MR. TOBEROFF:    Assumes facts not in

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

37

1    evidence.

2        A.    Well, that's what it says here.

3        Q.    That's what the document says.  So my

4    question, sir, is, did you ever have discussions

5    with Mr. Toberoff in his capacity as the President of

6    Pacific Pictures Corporation?

7            MR. TOBEROFF:  Objection, calls for a legal

8    conclusion, calls for speculation.

9        A.    Yes.  I wasn't really aware of the Pacific

10   Pictures -- as having any dealings with Pacific

11   Pictures, because I have always talked with Marc

12   Toberoff, the man, as seeking legal advice.

13       Q.    So it's your testimony, as you sit here

14   today, that all of the discussions that you had with

15   Mr. Toberoff were in the context of his role as your

16   lawyer?

17           MR. TOBEROFF:  Asked and answered.

18       A.    Yes.

19           (Exhibit 4 marked.)

20       Q.    Okay.  If you could take a look at Exhibit

21   4, this is a document that's -- it's one of these

22   lawyer things that people who don't litigate will

23   scratch their heads about, and I'm going to try to

24   explain to you what it is, and Mr. Toberoff will chime

25   in if I have got it wrong.  It's identified a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

228

38

1  privilege log, and it is a list of documents that was

2  provided to us by your lawyer among the documents that

3  were responsive to the subpoena that your lawyer has

4  taken the position are protected by the

5  attorney-client privilege, and therefore we cannot see

6  them.  Do you understand that?

7      A.   Yes.

8      Q.   And so this log goes through and gives the

9  date of the document, and it gives who the author is

10 and it gives what kind of document it is and what the

11 privilege claim is.  Do you see that?

12     A.   Yes.

13     Q.   Okay.  The second document on here

14 identifies an attorney named John Pettker,

15 P-E-T-T-K-E-R.  Do you see that?

16     A.   Yes.

17     Q.   Who is John Pettker?

18     A.   He is an attorney involved in establishing

19 the Joe Shuster estate.

20     Q.   And who -- who hired him?

21     A.   Our attorney, Marc Toberoff.

22     Q.   Did you have any direct dealings with

23 Mr. Pettker?

24     A.   No, I don't believe so.

25     Q.   Going back to Exhibit 3 for a moment, if we

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

279

39

1    could, if you could turn to the third page of the

2    document?  You have testified on a couple of occasions

3    that one of the things that was going to happen as a

4    result of this joint venture was to establish the Joe

5    Shuster estate; is that correct?

6            MR. TOBEROFF:  Misstates his testimony as to

7    on behalf of the venture.

8        Q.    Well, then -- that's a good point.  At some

9    point you undertook to establish the Joe Shuster

10   estate; is that accurate?

11       A.    Well, I -- it was -- it was between me and

12   Marc Toberoff.  As far as my understanding of it, that

13   that was legally necessary to establish the estate.

14       Q.    Okay.  And if you look at paragraph 10, the

15   last sentence reads, and I quote, "The parties hereby

16   approve Michael Catron," C-A-T-R-O-N, "for appointment

17   as the administrator of Joe Shuster's estate, once it

18   is established."  Who is Michael Catron?

19       A.    He is -- he is a friend.

20       Q.    And is he, in fact, the administrator of Joe

21   Shuster's estate?

22       A.    No.

23       Q.    And why not?

24       A.    We changed, decided to change that,

25   discussion with Marc Toberoff.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-2889

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

40

```
 1      Q.    Who initially came up with the name Michael
 2  Catron as the administrator?
 3          MR. TOBEROFF:  Came up with it?  Vague and
 4  ambiguous.
 5      A.    I'm not sure who first came up with it.  He
 6  is a long-time friend.  That's all I can say.
 7          MR. PERKINS:  Would you mark this for me?
 8          (Exhibit 5 marked.)
 9      Q.    (By Mr. Perkins)  I have asked the court
10  reporter to mark as Exhibit 5 a document that is dated
11  October 27, 2003.  It is addressed to Mark Warren
12  Peary, and it is from Pacific Pictures Corporation.
13  If I could invite your attention to the last page,
14  please?
15          Is that your signature?
16      A.    Yes.
17      Q.    And did you read this document before you
18  signed it?
19      A.    Yes.
20      Q.    Mr. Peary, what was the purpose of entering
21  into this agreement?
22      A.    As far as I understand, the purpose of this
23  was after I was appointed executor of the Shuster
24  estate.
25      Q.    And why did you need to enter this
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

41

```
1   agreement, having been appointed executor of the
2   Shuster estate?
3       A.   I assume since my legal role changed that
4   this needed to be another agreement.
5       Q.   Did you receive legal counsel from anyone
6   prior to entering into this agreement with respect to
7   this agreement?
8            MR. TOBEROFF:  Are you asking whether he
9   sought an outside attorney?
10      A.   An outside attorney?
11      Q.   Yes.
12      A.   Other than Marc Toberoff?
13      Q.   Yes, other than Marc Toberoff.
14      A.   No, I don't believe so.
15      Q.   And as of October 27, 2003, when you signed
16  this agreement, had there been any -- strike that.
17           As of October 27, 2003, when you signed this
18  agreement, did you have any idea as to the value of
19  the rights that are at issue in this document?
20           MR. TOBEROFF:  Vague and ambiguous.
21      A.   Do I have any I -- did I have any idea as to
22  the value?  It wasn't really discussed between me --
23           MR. TOBEROFF:  Don't talk about discussions
24  with me.
25      A.   Okay.  So, no, I guess -- I guess not.  I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

43

1    representative, to either purchase or license any of

2    the rights that are at issue in Exhibit 5?

3        A.    Yes, I recall something.

4        Q.    Tell me what you recall.

5        A.    Let's see.  We received a letter from DC

6    Comics with -- it was addressed to me and my mother,

7    and it was some kind of an offer made -- I don't

8    recall the exact details.

9        Q.    Other than the offer from DC Comics, have

10   any other offers been made?

11       A.    No.

12       Q.    To your knowledge, have any offers been

13   solicited on your behalf to any third party?

14       A.    No.

15       Q.    Mr. Peary, who is Joanne Siegel?

16       A.    She is Jerry Siegel's wife.

17       Q.    Do you know her personally?

18       A.    I have met her a few times.

19       Q.    When is the last time that you spoke with

20   her?

21       A.    It would have been in July of this year.

22       Q.    And what was the context of that

23   conversation?  Was it in person?

24       A.    Yes.

25       Q.    Where did you speak with her?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

44

1      A.    In Los Angeles.

2      Q.    Where in Los Angeles?

3      A.    At the -- at a hotel we were staying.

4      Q.    And who was present at the conversation?

5      A.    Besides myself and Joanne, and my mother and

6   her two sons and -- I mean, her two grandsons and her

7   daughter and Marc Toberoff.  And my sister, yes.

8      Q.    And what was discussed at this meeting?

9            MR. TOBEROFF:  Mischaracterizes his

10  testimony.

11     Q.    Well, what did you talk about?

12     A.    Mainly family things, what her grandsons

13  were doing, what we were doing.  And -- and we talked

14  about the new Superman movie.  And that's pretty much

15  it.

16     Q.    What did you talk about with respect to the

17  new Superman movie?

18     A.    The -- we liked it, the story, the actors.

19  That's pretty much it.

20     Q.    Was Laura Siegel Larson there also?

21     A.    Yes.

22     Q.    And have you had any direct discussions with

23  Laura Siegel Larson?

24     A.    Discussions about --

25     Q.    About anything?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsuppo...

284

45

```
 1        A.    Well, just -- I think the first time I met
 2   her was then, that July of this year.
 3        Q.    Had you spoken with her before that?
 4        A.    I don't recall actually speaking with her,
 5   no.
 6        Q.    Prior to the July 2006 conversation with
 7   Joanne Siegel did you have any other conversations
 8   with her?
 9        A.    Yes.  Yes, I have.
10        Q.    What is the -- what other conversations do
11   you recall having?
12        A.    I spoke with her at a Comic-Con convention
13   in San Diego.
14        Q.    When?
15        A.    In 1998 or '99.
16        Q.    So between your discussion at Comic-Con in
17   1998 or 1999, and your discussion in July of 2006,
18   have you had any other discussions with Joanne Siegel?
19        A.    I talked with her on the phone a few times.
20        Q.    Okay.  When is the last time you spoke with
21   her on the phone?
22        A.    It would have been -- it would have been
23   after we saw her in Los Angeles this year.
24        Q.    Okay.  Do you remember when?
25        A.    Um -- the exact month, yes -- around
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

46

1    September, I think.  Probably a couple of months.

2        Q.    And do you recall what she said to you?

3        A.    Well, she had asked to speak to Jean and --

4    just mostly pleasantries.  Just it was nice to get a

5    chance to talk and meet -- everyone meet the family

6    and talk about what we were doing, mainly.  That's all

7    it was that I recall.

8        Q.    Was there any discussion of Superman in your

9    conversation?

10       A.    No.

11       Q.    Any discussion of the litigation?

12       A.    No.

13       Q.    Did she end up speaking with your mother?

14       A.    I believe so.

15       Q.    Other than the July 2006 conversation and

16   the September of 2006 telephone conversations, do you

17   recall any other conversations that you had with

18   Joanne Siegel?

19       A.    Yes.  There's been a few times that she has

20   called over the years that I have spoken with her

21   briefly.  We haven't discussed any business, though.

22   It's pleasantries, family issues, that Laura is

23   dealing with multiple sclerosis, so there's some kind

24   of a sad story there, but that's pretty much it.

25       Q.    Have you ever had any telephone

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

47

```
1    conversations with Laura Siegel Larson?

2        A.   No, I don't think so.

3        Q.   Mr. Peary, do you have any agreement of any

4    kind with Joanne Siegel or Laura Siegel Larson?

5        A.   No.

6        Q.   Is there any arrangement whereby you would

7    have the authority to approve any kind of settlement

8    that Joanne Siegel might enter into with DC Comics?

9        A.   No.

10       Q.   So it's possible for Joanne Siegel and Laura

11   Siegel Larson to settle their case with DC Comics and

12   you would have no say-so in that; is that accurate?

13       A.   That's my understanding.

14       Q.   And if they were to settle and receive money

15   from DC Comics, is there any arrangement by which you

16   would receive any of that money?

17       A.   No.

18       Q.   Do you -- are you aware that Joanne Siegel

19   and Laura Siegel Larson are also represented by Marc

20   Toberoff?

21       A.   Yes.

22       Q.   Are you aware of the arrangement that is in

23   place between the Siegels and Mr. Toberoff?

24       A.   Yes, I'm aware that they have retained him

25   as their attorney.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

48

1    Q.    Are you -- do you know whether the business

2    terms are in any way similar to the business terms

3    that you have entered into and arrangement with

4    Pacific Pictures?

5    A.    I don't know the details, no.

6          (Exhibit 6 marked.)

7    Q.    I have asked the court reporter to mark as

8    Exhibit 6 a multipage document that bears Bates

9    numbers -- and when I say Bates numbers, Mr. Peary, I

10   mean the numbers in the lower right-hand corner.

11   Those are numbers that I will represent to you are

12   placed thereon by your attorneys in order to identify

13   these documents that are coming from your production

14   and to keep some kind of order.

15   A.    Okay.

16   Q.    The Bates numbers run from 79 through 108.

17   A.    Okay.

18   Q.    Have you seen this document before today?

19   A.    Yes.

20   Q.    And what is it?

21   A.    Order Admitting Will to Probate, appointing

22   me as executor, and authorizing independent

23   administration of the estate.

24   Q.    Now, this document, if you will turn to page

25   90, if you look at the bottom right-hand corner?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

49

1          Pages 90 through 92, can you take a look at

2    those, please?

3          A.    Uh-huh.

4          Q.    Okay.  Is this the will that you testified

5    about previously in your deposition?

6          A.    Yes, this is the will I'm aware of.

7          Q.    And do you know where this will was located?

8          A.    Joseph Shuster retained an original and

9    my -- my mother also retained an original.

10         Q.    Does your mother still have the original?

11         A.    Yes.

12         Q.    So, was this will ever lost?

13         A.    Well, we always had a copy, and my mother

14   had misplaced the original at the time the -- the

15   estate was being established.  But she has since found

16   the original.  We always had the copy.

17         Q.    And when was the -- when was the copy --

18   strike that.

19               When was the original found?

20         A.    Yes.  She found it -- she found it after we

21   had already filed the documents to establish the

22   estate.  So, it was -- it was a year or so ago when

23   she found it.  I know it was after we had found it.

24               MR. PERKINS:  Okay.  We're going to take a

25   break.  There's five minutes left of tape so they need

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

50

1    to switch over.  So, why don't we take five or ten

2    minutes?

3            (A recess was taken.)

4        Q.   (By Mr. Perkins)  Looking at Exhibit 6,

5    again, Mr. Peary.

6        A.   Is this it?

7        Q.   Yes, that's it.  Are you aware as to whether

8    or not the Court actually granted the petition to

9    authorize you to administer the estate?

10       A.   Yes, I'm aware.

11       Q.   And did it, in fact, grant your petition?

12       A.   Yes.

13            (Exhibit 7 marked.)

14       Q.   Okay.  I have asked the court reporter to

15   mark as Exhibit 7 a multipage document bearing the

16   Bates numbers 9 through 21.  Have you seen this

17   document before?

18       A.   Yes.

19       Q.   And if you would turn to page 17, please?

20            That's Bates number 17.  That's confusing,

21   but -- is that your signature?

22       A.   Yes.

23       Q.   Did you review this document before you

24   signed it?

25       A.   Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

51

1    Q.    And what is this document?

2    MR. TOBEROFF:    Vague and ambiguous.

3    A.    I have to review it a minute.

4    Q.    Sure.    Take your time.

5    A.    My understanding of this is, this is in my

6    capacity for the Shuster estate to some kind of a

7    notice, terminates the grant of the transfer of

8    renewal copyrights to the extent of Joe Shuster

9    ownership share of the renewal copyright in the

10    copyrighted works entitled Superman.

11    Q.    Do you have any knowledge as to if this were

12    -- if this were a valid document, when it would take

13    effect?

14    A.    I am aware of -- of some statutes, copyright

15    statutes on this.

16    Q.    Do you know what -- what year, if this were

17    a valid document, what the effective date would be,

18    what year?

19    A.    Yes.

20    Q.    What year?

21    A.    The -- the copyright law would have to take

22    effect in 2013.

23    Q.    Now, if you would turn to page 13, which is

24    the paragraph 2, back one page -- I'm sorry, it's

25    confusing because there are two sets of page numbers.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

52

1    Bates number 13.

2        A.    Okay.

3        Q.    I apologize.    Paragraph 2 begins to identify

4    works.    Do you see that?

5        A.    Yes.

6        Q.    And it identifies some on page 13 and then

7    over to page 14 and then over to page 15.    Do you see

8    that?

9        A.    Yes.

10       Q.    Do you know how many works are identified in

11   this notice?

12            MR. TOBEROFF:    Objection, the document

13   speaks for itself.    Are you asking to look at the

14   document?

15            MR. PERKINS:    Sure.

16            THE WITNESS:    Not off the top of my head.    I

17   would have to review it in detail.

18       Q.    (By Mr. Perkins)    Well, let's review it in

19   detail, then.    Paragraph 2, it refers to Action Comics

20   Number 1.    Do you see that?

21       A.    Yes.    Yes.

22       Q.    Okay.    And then we go to the next page.    It

23   refers to on the next page, it reads, and I quote,

24   "This Work was based upon, incorporated, and

25   constituted a slightly revised version of the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

53

1 following Works to which the Notice of Termination

2 also applies."  Do you see that?

3    A.    Yes.

4    Q.    And then identifies "24 days of previously

5 unpublished Superman newspaper comic strips."  Do you

6 see that?

7    A.    Yes.

8         MR. TOBEROFF:  Okay.  Objection, your

9 questions are pointing him in the right direction,

10 omits a -- in paragraph 2 a footnote which is on Bates

11 stamp 13.  Thereafter it talks about the Works to

12 which this notice applies, there's a footnote 1, and

13 that footnote 1 also has bearing on the Works to which

14 this termination applies.

15         MR. PERKINS:  Okay.  Well, we can go back to

16 that.  I recognize that it still -- and I don't want

17 to debate the meaning of the document with you, but it

18 talks about each and every element of the Work, and

19 the Work is defined in paragraph 2.  So it's a subset

20 of what's in paragraph 2.

21         MR. TOBEROFF:  Right, but it's part of

22 paragraph 2.

23         MR. PERKINS:  Sure.

24         MR. TOBEROFF:  To the extent he is reading

25 it --



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

DEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

54

```
 1              MR. PERKINS:  I agree with you.

 2              MR. TOBEROFF:  Okay.  Fine.

 3              MR. PERKINS:  I agree with you.

 4              MR. TOBEROFF:  Okay.

 5        Q.   (By Mr. Perkins)  So, then, if you go to

 6   page 15, it lists 15 daily comic strips.  Do you see

 7   that?

 8        A.   Yes.

 9        Q.   And then Action Comics numbers 2 through 7.

10   Do you see that?

11        A.   Yes.

12        Q.   So, rough count is that this is a dozen

13   works that are listed?  More than that, if we take

14   each of the strips separately?

15        A.   Well, some of this is legal in that there's

16   specific Works listed, but then there's also the

17   entire, like it says in footnote 1 and 2, there's the

18   entire character and, so, as far as I understand,

19   there a very broad range of things here.

20        Q.   What's the basis for your understanding that

21   it's a broad range?

22        A.   What it says here, and my discussions with

23   Marc Toberoff.

24              MR. TOBEROFF:  No.

25        Q.   Yes.  Don't tell me what you talked about
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

55

```
 1    with Mr. Toberoff.
 2            Have you seen the document that's similar to
 3    this that was served by the Siegels?
 4        A.    No.
 5        Q.    Are you aware that their document contains
 6    more than 15,000 titles?
 7        A.    No.
 8        Q.    Do you have any idea as to why your document
 9    does not contain 15,000 titles?
10            MR. TOBEROFF:  It assumes facts not in
11    evidence, misstates the document.
12        A.    No, I don't.
13        Q.    Are you aware of any works that are Superman
14    works that Jerry Siegel is the author of but Joe
15    Shuster is not the author of?
16            MR. TOBEROFF:  Objection, vague as to
17    "Superman works."
18        A.    I mean, the only thing that I have an idea
19    of is Superboy.
20        Q.    Anything else?
21        A.    No.
22        Q.    Do you know which comic book Superboy
23    appears in for the first time?
24        A.    Not offhand.
25        Q.    Do you know who did the illustrations for
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

56

```
1    the first Superboy comic book?

2        A.    I am not -- I'm not exactly sure.  I assume

3    that Joe Shuster did illustrations, but I don't know

4    if he was sole.  I don't know.

5        Q.    Going back, I'm sorry, to Exhibit 7 -- I'm

6    sorry, I got you in mid --

7              Going back to Exhibit 7, this document was

8    signed by you on November 10, 2003; correct?

9        A.    What page again?  Oh, 17?

10       Q.    I'm sorry.  Strike that.  Let's do this

11   again.  Page 17, this document was signed by you on

12   November 7, 2003; correct?

13       A.    Yes.

14       Q.    And that was after the probate court in

15   California established you as the administrator of the

16   Shuster estate; correct?

17       A.    Yes.

18       Q.    Okay.

19             MR. TOBEROFF:  You had said administrator.

20   It may be, but I'm not sure that's the legal title in

21   the probate document.

22             MR. PERKINS:  Okay.

23             MR. TOBEROFF:  I'm not positive.  It may

24   have been executor or personal representative.

25             THE WITNESS:  Yes, it is executor.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

57

```
 1            MR. PERKINS:  Okay.
 2            MR. TOBEROFF:  I'm not sure exactly.
 3            MR. PERKINS:  That's fine.
 4      Q.    (By Mr. Perkins)  I have asked the court
 5 reporter to mark as Exhibit 8 the document that bears
 6 Bates numbers 63 through 78.
 7            (Exhibit 8 marked.)
 8      Q.    Have you seen this document before?
 9      A.    Let's see.  I don't recall this.
10      Q.    Well, let me invite your attention to the
11 second page of the document.  And it says "Certificate
12 of Recordation."  Do you see that?  The second --
13 you're -- back one more.  Yes.
14            I'm going to represent to you that this is a
15 recordation of the document that we looked at before,
16 Exhibit 7, that this is the official recordation of
17 that document with the United States Copyright
18 Office.
19      A.    Okay.
20      Q.    Okay?  And I would like you to look at the
21 third page of the document.  And you will notice that
22 in box 10 there's a signature there that appears to be
23 Mr. Toberoff's signature, and underneath it says "duly
24 authorized agent of IP Worldwide/Estate of Joe
25 Shuster" -- "Joseph Shuster."  Do you see that?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

58

```
 1      A.   Yes.

 2      Q.   Who is IP Worldwide?

 3      A.   As I understand it, that's a professional

 4 name used for his law practice, Marc Toberoff's law

 5 practice.

 6      Q.   And do you have any kind of agreement with

 7 IP Worldwide relating to the rights, the copyright

 8 rights of Joe Shuster?

 9      A.   I don't know if it says IP Worldwide.  Our

10 agreements are with Marc Toberoff as our attorney.  I

11 don't recall if it says IP Worldwide.

12      Q.   Are there agreements, written agreements

13 other than the two you have seen during this

14 deposition?

15           MR. TOBEROFF:  Referring to?

16      Q.   Between you and Mr. Toberoff's entities?

17      A.   I believe there was another agreement

18 between us and Marc Toberoff.  The -- the estate?  I

19 don't know.

20      Q.   Okay.  We'll come back to that.

21           Did you see this recordation before it was

22 filed with the United States Copyright Office?

23           MR. TOBEROFF:  You mean this document?

24      Q.   Yes.

25      A.   Before -- no, not before.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

59

```
1        Q.    Have you seen it before today?

2              MR. TOBEROFF:  Asked and answered.

3        A.    Yes, I did answer that before.

4              MR. TOBEROFF:  Well, you can answer.

5        Q.    Indulge me.  I don't remember.

6        A.    Oh, okay.  I don't recall seeing this, this

7    one sheet here.  But every other page following I

8    have.

9              MR. TOBEROFF:  I mean, if it helps I can

10   represent to you that this --

11             MR. PERKINS:  You know, I would rather

12   not --

13             MR. TOBEROFF:  Okay.

14             MR. PERKINS:  -- have you testify to that.

15             MR. TOBEROFF:  All right.

16             MR. PERKINS:  Here you go.

17             (Exhibit 9 marked.)

18       Q.    (By Mr. Perkins)  I have asked the court

19   reporter to mark as Exhibit 9 a one-page document that

20   bears Bates number 133, and it's dated September 10,

21   2004.  Have you seen this document before today?

22       A.    Yes.

23       Q.    And is that your signature, twice?

24       A.    Yes.

25       Q.    This document states that, quote, "1, The
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport

296

60

1    Joint Venture Agreement dated as of November 23, 2001

2    between you and Pacific Pictures Corp; and 2, the

3    Engagement Agreement dated October 27, 2003 between

4    the Estate of Joseph Shuster and Pacific Pictures Corp

5    have been cancelled," closed quote.  Do you see that?

6        A.   Yes.

7        Q.   Why is it that the two agreements referenced

8    are -- were canceled by this document?

9        A.   It was replaced by a retainer directly with

10   Marc Toberoff as our attorney.

11       Q.   If I could have you take a look at Exhibit

12   4, which is the privilege log?

13       A.   Uh-huh.

14       Q.   Can you identify from any of these documents

15   which of the documents listed in the log are this

16   other retainer agreement directly with Marc Toberoff?

17       A.   It doesn't say it here.  It just says

18   "letters."  I can't really identify just from this.

19       Q.   Yes, neither can I.  Do you have -- do you

20   know whether the document is an agreement or a letter?

21       A.   We have a legal retainer with Marc Toberoff

22   as our attorney.  The estate has a legal retainer.

23       Q.   And do you know what the date of that is?

24       A.   Um -- it's around the time of this -- this

25   letter here from Exhibit 9.  It's --

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

61

1    Q.   When you entered into this agreement or when

2  you signed this document and entered into the retainer

3  agreement, did the nature of your business

4  relationship with Mr. Toberoff change?

5        MR. TOBEROFF:  Mis -- mischaracterizes the

6  testimony, vague and ambiguous.  You can answer.

7    A.   No, the nature did not change.

8    Q.   And are the business terms of the new

9  agreement the same or similar to the business terms in

10 the two agreements that are canceled by Exhibit 9?

11       MR. TOBEROFF:  Attorney-client privilege and

12 instruct you not to answer as to the terms of our

13 retainer agreement.

14   Q.   Mr. Peary, under the terms of the retainer

15 agreement are you or the estate required to pay

16 Mr. Toberoff a percentage of revenues from Superboy?

17       Excuse me.  Just a minute.

18       I'm going to withdraw the question because I

19 didn't mean to say Superboy.  Let's go back and do

20 that again.

21       MR. TOBEROFF:  I was wondering what I was

22 going to say.

23   Q.   Under the retainer agreement with

24 Mr. Toberoff, is the estate and/or you or your mother

25 required to pay Mr. Toberoff a percentage of revenues



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

1  derived from exploitation of copyrights of Joseph

2  Shuster?

3          MR. TOBEROFF:  Vague and ambiguous, calls

4  for a legal conclusion.  Are you asking -- he can

5  answer solely as to whether it's a contingent fee, the

6  retainer agreement provides for contingent fees or

7  hourly fees.  As I understand, you are entitled to

8  know that.  He can answer that question.  But I don't

9  -- other questions as to terms of the agreement, I am

10  instructing him not to answer.

11     Q.    Let me ask you, then, that question.  Is it

12  a contingent fee agreement?

13     A.    Yes.

14     Q.    And what is the percentage that you are to

15  pay?

16          MR. TOBEROFF:  Instruct you not to answer,

17  attorney-client privilege.

18     Q.    Now, going back to -- if I could ask you to

19  pull out Exhibit 3 and Exhibit 9?

20     A.    Okay.

21     Q.    All right.  If you would look at Exhibit 3,

22  and I would ask you to go to page -- to the third page

23  of the document, paragraph 8?  I asked you questions

24  about this paragraph, and in particular, what your

25  understanding was of what would happen to the rights



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

63

1   at issue in this agreement if for any reason the

2   agreement was terminated.  Do you remember those

3   questions that I asked you?

4        A.   Yes.

5        Q.   And you testified that you believed that if

6   the agreement were terminated for any reason, that the

7   ownership would remain 50-50.  Do you recall that

8   testimony?

9        A.   Yes.

10       Q.   Okay.  So my question is, is it the

11  intention under Exhibit 9 that the terms of paragraph

12  8 that we have talked about would remain in play,

13  namely, that having canceled the agreement, the

14  ownership split remains 50-50 between you and Pacific

15  Pictures?

16            MR. TOBEROFF:  That calls for a legal

17  conclusion.

18       A.   What my understanding is, it's -- applies to

19  Marc --

20            MR. TOBEROFF:  Don't testify to the terms of

21  our legal retainer agreement.

22            If you could answer without doing that you

23  could answer.

24       A.   Yes, I -- I guess it would -- it involves

25  the legal retainer agreement, the terms of that, so I



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

64

1    guess I can't say anything.

2        Q.    Did you receive any counsel, legal counsel

3    from any lawyer, other than Mr. Toberoff, with respect

4    to entering into Exhibit 9?

5        A.    No.

6        Q.    Is there any relationship at this point

7    between the estate and Pacific Pictures Corporation?

8            MR. TOBEROFF:  Objection, vague and

9    ambiguous, calls for a legal conclusion, you could

10   answer.

11       A.    My understanding is that the agreement with

12   Pacific Pictures has been supplanted with a new legal

13   retainer.

14           (Exhibit 10 marked.)

15       Q.    I have asked the court reporter to mark as

16   Exhibit 10 a document dated April 28, 2005.  It's

17   bearing Bates numbers 1 through 7, and it's a letter

18   addressed to Jean Adele Peavy and Mark Warren Peary

19   from Paul Levitz at DC Comics.  Have you seen this

20   letter before today?

21       A.    Yes.

22       Q.    Did you review this letter carefully when

23   you received it?

24       A.    Yes, I read it.

25       Q.    And did you form any impressions as to the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


DEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492
e-mail: info@litsupport.com

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492

73

1    "the offer is extremely low and bears no relation to

2    the net present value of the estate's 50 percent

3    interest in Superman profits for the duration of

4    copyright commencing 2013"?

5           MR. TOBEROFF:  Objection, attorney-client

6    privilege, and particularly attorney-client

7    work-product, and instruct you not to answer.

8       Q.    The next sentence reads, "nor does DC's

9    offer reflect the considerable strategic value of the

10   estate's 50 percent copyright interest in tandem with

11   the Siegels' 50 percent copyright interest in

12   Superman."  Do you see that?

13      A.    Yes.

14      Q.    What do you understand the considerable

15   strategic value of the estate's 50 percent copyright

16   interest to be?

17          MR. TOBEROFF:  Objection, attorney

18   work-product.  I instruct you not to answer.

19          MR. PERKINS:  I'm asking him his

20   understanding of the words on the page as he sits here

21   today.

22          MR. TOBEROFF:  No.  You asked him what it is

23   in fact -- what the strategic value of the -- what is

24   your understanding of what that strategic value is,

25   not what the words strategic value means.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

74

1    MR. PERKINS:  No.  I am asking what he
2  understands the sentence to mean.
3    Q.    (By Mr. Perkins)  What do you understand
4  that is being referred to when it refers to the
5  strategic value in that sentence?
6    MR. TOBEROFF:  Attorney work-product,
7  strategies and -- the sentence evokes attorney
8  work-product?
9    Q.    Well, Mr. Peary, you testified that you
10  wanted communicated to DC Comics what is in this
11  letter; isn't that correct?
12    A.    I'm in agreement with what the letter says.
13    Q.    But you testified that you wanted that
14  communicated to DC Comics; isn't that right?
15    A.    Well, I don't know about the word
16  communicated.  I am in agreement with everything this
17  letter states.  So, I mean, it's -- that's all I can
18  say.  I'm in agreement with it.
19    Q.    And you agree, therefore, that there is a
20  strategic value in the estate's 50 percent copyright
21  interest?
22    MR. TOBEROFF:  You can answer "yes" or "no."
23    A.    Yes.
24    Q.    And do you have an understanding as to what
25  happens to that strategic value to the extent it

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

83

```
1   tied in with my advice from counsel.

2       Q.   (By Mr. Perkins)  Thank you.  I would like

3   to go back, if I could, to the privilege log.  I know

4   that I asked this question before but don't believe I

5   got the answer.  The Exhibit 9 agreement, September

6   10, 2004, you indicated that at or around that time

7   you entered into a separate agreement with

8   Mr. Toberoff for his legal representation.  Do you

9   recall that testimony?

10      A.   Yes.

11      Q.   And are you able to make out from this log

12  any document that would be the agreement that you are

13  talking about?

14          MR. TOBEROFF:  Asked and answered.

15      A.   I looked before and I couldn't state exactly

16  just from the description of the letter.  I couldn't

17  tell.

18          MR. PERKINS:  Mr. Toberoff, I would ask that

19  the privilege log be updated to include that document

20  to the extent it's not on here.  I can't tell from the

21  descriptions, but based on the testimony I don't think

22  it's here, so I request that that be updated.

23      Q.   Mr. Peary, do you know who introduced

24  Mr. Toberoff to Joanne Siegel?

25      A.   Yes.  We recommended him.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

84

1    Q.    And why did you do that?

2    A.    As we have extremely high confidence in him,

3    his track record, his ability as a lawyer and as a

4    person of high ethics.

5    Q.    And who made the call to Joanne to do that?

6          MR. TOBEROFF:  Assumes facts not in

7    evidence, lacks foundation.

8    A.    I don't remember.

9    Q.    Do you recall how Joanne was told about

10   Mr. Toberoff?

11         MR. TOBEROFF:  Vague and ambiguous.

12   A.    It could have been my mother talking with

13   her.  I'm not sure.

14   Q.    Did you tell Joanne Siegel about

15   Mr. Toberoff directly?

16   A.    No.

17   Q.    Do you recall when Joanne Siegel was told

18   about Mr. Toberoff?

19   A.    It's been -- it's been at least a couple of

20   years.  I don't -- I don't know.  I don't recall the

21   exact date.

22   Q.    It's -- that's all I wanted to know.  Give

23   me just two minutes off the record, Marc, to see

24   whether I'm done.

25         MR. TOBEROFF:  Okay.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

85

1            (A recess was taken.)

2            MR. PERKINS:  Mr. Peary, I have nothing

3    further for you.  Thank you very much.

4            THE WITNESS:  Okay.  Thank you.

5            (The deposition concluded at 11:18 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

86

```
1                    UNITED STATES DISTRICT COURT

2              FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4   JOANNE SIEGEL,                )
    LAURA SIEGEL LARSON          )
5                                 )
                   Plaintiffs,   )
6                                 )
         v.                       ) CASE NO. CV 04-8400
7                                 )          CV 04-8776
    WARNER BROS, et al.           )
8                                 )
                   Defendants.   )
9

10        CERTIFICATE OF COMPLETION OF DEPOSITION

11     I, MABEL JIN CHIN, New Mexico CCR #81, DO HEREBY
    CERTIFY that on November 11, 2006, the deposition of
12  MARK WARREN PEARY was taken before me at the request
    of, and sealed original thereof retained by:
13

14          Attorney for the Defendants
            PERKINS LAW OFFICE, P.C.
15          1711 Route 9D
            Cold Spring, New York 10516
16          BY:  MR. PATRICK PERKINS

17     I FURTHER CERTIFY that copies of this certificate
    have been mailed or delivered on _____, with
18  changes, if any, by the witness appended, to the
    following counsel of record and parties not
19  represented by counsel:

20          Attorney for the Plaintiffs
            MR. MARC TOBEROFF
21          2049 Century Park East, #2720
            Los Angeles, California 90067

22     I FURTHER CERTIFY that examination of this
    transcript and signature of the witness were requested
23  by the witness and all parties present.

24     On November 21, 2006 , a letter was mailed or
    delivered to Mr. Toberoff regarding obtaining
25  signature of the witness.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

87

1     I FURTHER CERTIFY that the recoverable cost of the
original and one copy of the deposition, including
2 exhibits to Mr. Perkins is $_____508.68_____.

3     I FURTHER CERTIFY that I did administer the oath
to the witness herein prior to the taking of this
4 deposition; that I did thereafter report in
stenographic shorthand the questions and answers set
5 forth herein, and the foregoing is a true and correct
transcript of the proceeding had upon the taking of
6 this deposition to the best of my ability.

7     I FURTHER CERTIFY that I am neither employed by
nor related to nor contracted with (unless excepted by
8 the rules) any of the parties to or attorneys in this
case, and that I have no interest whatsoever in the
9 final disposition of this case in any court.

10

11     _____
MABEL JIN CHIN
12     Certified Court Reporter #81
License expires:  12/31/2006
13

14

15

16

17

18

19

20     (3519B) MC
Date taken:  November 11, 2006
21     Proofread by: LR

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

# EXHIBIT E

Marc Toberoff (State Bar No. 188547)
Nicholas C. Williamson (State Bar No. 231124)
Keith G. Adams (State Bar No. 240497)
TOBEROFF & ASSOCIATES, P.C.
2049 Century Park East, Suite 2720
Los Angeles, California, 90067
Telephone:  (310) 246-3333
Fax:         (310) 246-3101
MToberoff@ipwla.com

Attorneys for Plaintiffs Joanne Siegel and
Laura Siegel Larson

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual,<br><br>         Plaintiffs,<br><br>  vs.<br><br>WARNER BROS. ENTERTAINMENT INC., a corporation; TIME WARNER INC., a corporation; DC COMICS, a general partnership; and DOES 1-10,<br><br>        Defendants. | Case No: CV 04-8400 ODW (RZx)<br><br>Hon. Otis D. Wright II, U.S.D.J.<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ENTRY OF A PARTIAL JUDGMENT UNDER FED. R. CIV. P. 54(B) AND FOR STAY OF REMAINING CLAIMS PENDING APPEAL; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Complaint filed:  October 8, 2004<br>Trial Date:  None Set<br><br>Date:    September 27, 2010<br>Time:    1:30 p.m.<br>Place:   Courtroom 11 |
| DC COMICS,<br><br>         Counterclaimant,<br><br>  vs.<br><br>JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual,<br><br>        Counterclaim Defendants. | |

Case 2:10-cv-03633-ODW-RZ  Document 61-3  Filed 09/13/10  Page 60 of 243  Page
ID #:4092
Case 2:04-cv-08400-ODW-RZ  Document 61-3  Filed 08/13/10  Page 2 of 29  Page ID
#:3402

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on September 27, 2010 at 1:30 p.m., or as soon thereafter as counsel may be heard, in Courtroom 11 of the above-captioned Court, located at 312 N. Spring Street, Los Angeles, California, 90012, plaintiffs Joanne Siegel and Laura Siegel Larson will and hereby do respectfully move the Court for certification pursuant to Fed. R. Civ. P. 54(b) of the Court's March 26, 2008 and August 12, 2009 orders, which granted partial summary judgment upholding the validity and scope of plaintiffs Joanne Siegel and Laura Siegel Larson's ("Plaintiffs") notices of copyright termination filed pursuant to 17 U.S.C. § 304(c) regarding the world famous character Superman.  These orders also determined which Superman works (i.e., certain Superman comic books and newspaper strips) have been recaptured pursuant to the Plaintiffs' notices of termination.  The Court's orders constitute a "final" disposition of Plaintiffs' claim that the notices of termination are valid, and there is no just reason to delay entering the orders as an immediately appealable judgment with respect to such claim.  Indeed, due to the distinct nature of the claims that are the subjects of the Court's orders, the ability to immediately appeal such orders will increase judicial efficiency and decrease prejudice and hardship for the parties, as these issues have a direct bearing on the remaining accounting claims in this case.  Any errors in these decisions, particularly with respect to those Superman works recaptured by Plaintiffs' terminations, will mean the accounting action will have been substantively incomplete, and thus need to be substantially re-tried.  Accordingly, the interests of efficiency and fairness support a stay of the remaining claims in this matter pending disposition of Plaintiffs' appeal.

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place in person on July 13, 2010.  The parties further met and conferred telephonically on August 5, 2010.  Defendants informed Plaintiffs that they would oppose this motion.

Plaintiffs' motion is based on this Notice of Motion and Motion, the attached

PLAINTIFFS' NOTICE OF MOTION & MOTION FOR PARTIAL FINAL JUDGMENT

Case 2:10-cv-03633-ODW-RZ   Document 61-3   Filed 09/13/10   Page 61 of 243   Page
ID #:4084
Case 2:04-cv-08400-ODW-RZ   Document 61-8   Filed 08/12/10   Page 2 of 29   Page ID #:3448

Memorandum of Points and Authorities, the pleadings and records on file in this action, such additional authority and argument as may be presented in any reply and at the hearing on this motion, and such other matters of which this Court may take judicial notice.

DATED:  August 12, 2010          TOBEROFF & ASSOCIATES, P.C.


By_____
            Marc Toberoff

Attorneys for Plaintiffs Joanne Siegel and
Laura Siegel Larson

Case 2:10-cv-03636-ODW-RZ Document 61-3 Filed 09/13/10 Page 62 of 243 Page
ID #:4095
Case 2:04-cv-08400-ODW-RZ Document 613 Filed 08/13/10 Page 4 of 29 Page ID
#:34115

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................1

FACTUAL BACKGROUND .................................................................2

ARGUMENT .......................................................................................11

I.      F.R.C.P. 54(b) PERMITS A TRIAL COURT TO ENTER A FINAL JUDGMENT AS TO ORDERS THAT DECIDE A CLAIM IF THERE IS NO JUST REASON FOR DELAY .........11

II.     THE COURT HAS DISPOSED OF THE FIRST CLAIM BY FINDING THE SIEGELS' SUPERMAN TERMINATION VALID................................................................................13

     A.    Entry of Judgment as to the First Claim Is Appropriate and Would Streamline the Ensuing Litigation ...................13

          1.    The First Claim Is Severable from the Other, Complicated Accounting Claims.............................13

          2.    The Interests of Judicial Economy and Streamlining This Litigation Weigh Heavily in Favor of Finalizing the First Claim Before Proceeding With the Accounting Trial.....................14

     B.    The Court's "Work for Hire" Determinations Are Integral to the First Claim and Have a Direct Effect on the Remaining Claims...........................................16

          1.    The Court's Contested Work for Hire Determinations..........................................16

          2.    The Ninth Circuit's Resolution of the Validity and Scope of the Superman Terminations Will Promote Settlement .................................19

     C.    Defendants' Transparent Attempt to Re-Litigate These Issues in the New Action Further Justifies an Immediate Appeal ...................................................................19

III.    IN LIGHT OF THESE ISSUES, THIS ACTION SHOULD BE STAYED UNTIL RESOLUTION OF AN APPEAL....................21

CONCLUSION....................................................................................22

# <u>TABLE OF AUTHORITIES</u>

<u>Federal Cases</u>                                                                **Pages**

*Adams v. United States*,
2010 U.S. Dist. LEXIS 47509 (D. Idaho May 12, 2010) ............................15, 18

*Adidas Am., Inc. v. Payless Shoesource, Inc.*,
166 Fed. Appx. 268 (9th Cir. 2006)......................................................................15

*Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*,
106 F.3d 11 (2d Cir. 1997) .................................................................................12

*Angoss II Pshp. v. Trifox, Inc.*,
2000 U.S. Dist. LEXIS 3165 (N.D. Cal. Mar. 10, 2000) ..................................13

*City of St. Paul v. Evans*,
344 F.3d 1029, 1033, 1033 (9th Cir. 2003) ........................................................14

*Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.*,
819 F.2d 1519 (9th Cir. 1987) .................................................................. *passim*

*Curtiss-Wright Corp. v. General Electric Co.*,
446 U.S. 1 (1980)..................................................................................... *passim*

*DC Comics v. Pacific Pictures Corp.*,
C.D. Cal. Case No. 10-CV-03633 ODW (RZx) ...............................................2, 4

*De Aguilar v. AMTRAK*,
2006 U.S. Dist. LEXIS 11187 (E.D. Cal. March 2, 2006) .................................21

*Dependable Highway Exp., Inc. v. Navigators Ins. Co.*,
498 F.3d 1059 (9th Cir. 2007) ............................................................................21

*Doe v. Univ. of California*,
1993 U.S. Dist. LEXIS 12876 (N.D. Cal. Sept. 2, 1993) ............................13, 21

*Erwin v. U.S.*,
2008 U.S. Dist. LEXIS 21366 (M.D.N.C. 2008)................................................12

*Flores v. Emerich & Fike*,
2008 U.S. Dist. LEXIS 49385 (E.D. Cal. June 17, 2008) ..................................20

*James v. Price Stern Sloan*,
283 F.3d 1064 (9th Cir. 2002) ............................................................................13

*Janos v. Wells Fargo Bank*,
2006 U.S. Dist. LEXIS 6758 (D. Ariz. Feb. 14, 2006) ......................................12

*Landis v. North American Co.*,
299 U.S. 248 (1936)............................................................................................21

*Leyva v. Certified Grocers of California, Ltd.*,
593 F.2d 857 (9th Cir. 1979) .............................................................................21

*Loral Fairchild Corp. v. Victor Co. of Japan,*
931 F. Supp. 1044 (E.D.N.Y. 1996) ...................................................................19

*Matek v. Murat,*
862 F.2d 720 (9th Cir. 1988) ............................................................................21

*Mattel, Inc. v. MGA Entertainment, Inc.,*
__ F.3d __, 2009 U.S. App. LEXIS 29187 (9th Cir. 2010)...............................17

*Noel v. Hall,*
568 F.3d 743 (9th Cir. 2009) .....................................................................12, 15

*Roe v. City of Spokane,*
2008 U.S. Dist. LEXIS 82528 (E.D. Wash. Oct. 16, 2008) ..............................21

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization,*
206 F.3d 1322 (9th Cir. 2000) ..........................................................................17

*Siegel v. Warner Bros. Ent. Inc.,*
C.D. Cal. Case No. 04-08400 ODW (RZx) ............................................... *passim*

*Siegel v. Time Warner Inc.,*
C.D. Cal. Case No. 04-08776 ODW (RZx) ..........................................................4

*Siegel v. Warner Bros. Ent. Inc.* ("*Siegel I*"),
542 F. Supp. 2d 1098 (C.D. Cal. 2008) .................................................... *passim*

*Siegel v. Warner Bros. Ent. Inc.* ("*Siegel II*"),
658 F. Supp. 2d 1036 (C.D. Cal. 2009) .................................................... *passim*

*Siegel v. Warner Bros. Ent. Inc.* ("*Siegel III*"),
690 F. Supp. 2d 1048 (C.D. Cal. 2009) ................................................. 11, 16-18

*Texaco, Inc. v. Ponsoldt,*
939 F.2d 794 (9th Cir. 1991) ................................................................. 12-13, 15

*Torres v. City of Madera,*
655 F. Supp. 2d 1109 (E.D. Cal. 2009) .................................................12, 15, 18

*Twentieth Century Fox Film Corp. v. Entertainment Distrib.,*
429 F.3d 869 (9th Cir. 2005) ............................................................................17

*Whitney v. Wurtz,*
2007 U.S. Dist. LEXIS 60077 (N.D. Cal. Aug. 16, 2007) ........................12, 19

*Wood v. GCC Bend, LLC,*
422 F.3d 873 (9th Cir. 2005) ............................................................................19

*Zuill v. Shanahan,*
80 F.3d 1366 (9th Cir. 1996) ............................................................................14

**Federal Statutes and Rules**

Federal Rule of Civil Procedure 54(b)....................................................... *passim*

17 U.S.C. § 304 ................................................................................ *passim*

Pub. L. 94-553 ............................................................................................3

Pub. L. 105-298 ..........................................................................................3

**<u>Other Authorities</u>**

3 M. Nimmer & D. Nimmer,
*Nimmer on Copyright* § 12.10[A] .........................................................17

## **INTRODUCTION**

A final judgment has been reached and should be recognized in this action as to the validity and scope of the copyright termination notices under 17 U.S.C. § 304(c) (the "Siegel Terminations") served by Plaintiffs Joanne Siegel and Laura Siegel Larson (the "Siegels") regarding the iconic character Superman. In a series of lengthy published decisions, this Court completely resolved all of the issues in Plaintiffs' First Claim for Relief, and most of the related issues in Defendant/Counterclaim-Plaintiff DC Comics' First, Second, Third, Fourth and Fifth Counterclaims, which relate to the validity and scope of the Siegel Terminations. *See Siegel v. Warner Bros. Ent. Inc.*, 542 F. Supp. 2d 1098 (C.D. Cal. 2008) ("*Siegel I*"), 658 F. Supp. 2d 1036 (C.D. Cal. 2009) ("*Siegel II*").

Specifically, this Court has found that the Siegel Terminations are valid and that, as of April 16, 1999, the Plaintiffs are co-owners with Defendants of the original Superman copyright. *Siegel I*, 542 F. Supp. 2d at 1130, 1145. The Court has also delineated the Superman works subject to the Siegel Terminations: the first Superman story as published in *Action Comics, No. 1*, and the Superman stories published in *Action Comics, No. 4*, *Superman, No. 1* (pages 3-6), and the first two weeks of the Superman newspaper strips. *Siegel II*, 658 F. Supp. 2d at 1063-83.

The trier of fact must now decide Plaintiffs' remaining accounting claims as to the profits owed Plaintiffs since April 16, 1999 (the effective date of the Siegel Terminations) from Defendants' exploitation of the core Superman copyrights co-owned with Plaintiffs. *See* Docket No. 602 ("Joint Status Report"), at 16:8-23. The accounting claims and pending accounting trial are directly premised on the correctness of this Court's prior rulings as to the Superman works recaptured by Plaintiffs. If any recaptured Superman works are improperly excluded or included in the trier of fact's analysis, then the entire accounting trial will have to be re-tried. Therefore, in the interests of judicial economy, and to avoid duplicative and pointless re-litigation of the accounting phase of this case, this Court should enter a final

judgment as to Plaintiffs' severable First Claim for Relief, enabling the parties to immediately appeal such judgment to the Ninth Circuit. The certainty and guidance provided by Ninth Circuit review at this juncture will also promote long-awaited settlement of the Superman matter.

DC attempts in its recently filed complaint, *DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx), to re-litigate the Court's rulings against it on the First Claim in *Siegel* after six years of hard-fought litigation. DC's new action challenges the validity and scope of the Superman termination notice filed by the executor ("Shuster Executor") of the estate of Joseph Shuster, the co-author with Jerome Siegel of the exact same Superman works litigated in the *Siegel* action. The Shuster termination is the mirror-image of the Siegels' notices of termination, upheld in *Siegel*. In fact, in its new action, DC raises "work for hire" and other defenses identical to those raised in *Siegel*. DC even argues that its purported settlement agreement defense, fully adjudicated and rejected by the Court in *Siegel*, should be re-litigated even though the Shusters had no involvement in the Siegels' settlement negotiations. *See DC Comics*, Docket No. 1, ¶¶ 112-15, 140-41, 145-46, 168 n.6. DC is effectively "appealing" *Siegel* in the same district court under the thinly veiled guise of a "new" action. However, the proper and most efficient forum for the appeal DC craves is the Ninth Circuit. Final resolution of the issues in *this* case by the Ninth Circuit will avoid unnecessary, duplicative and wasteful litigation of identical issues in the *DC Comics* action.

Lastly, because the Ninth Circuit's decision regarding Plaintiffs' First Claim will control the outcome in the pending "accounting" trial, this Court should exercise its discretion to stay this action until such appeal is complete.

## FACTUAL BACKGROUND

Plaintiffs Joanne Siegel and Laura Siegel Larson are the widow and daughter, respectively, of Jerome Siegel ("Siegel") who, with Joseph Shuster ("Shuster"), co-created Superman. Siegel and Shuster co-authored the first Superman comic book

1  story which was later published in 1938 in *Action Comics, No. 1*, by Detective
2  Comics, Inc. ("Detective"), the predecessor of Defendant DC Comics ("DC").  *Siegel*
3  *I*, 542 F. Supp. 2d at 1105-07, 1126-30.  By agreement dated March 1, 1938, Siegel
4  and Shuster granted to Detective all worldwide rights in their Superman story and
5  character, and Detective exploited those rights in various media over the next seventy
6  years.  *Id*. at 1107, 1110.  From 1938 to 1943, Siegel and Shuster wrote hundreds of
7  additional Superman comic book stories published by Detective, and hundreds of
8  Superman newspaper strips syndicated by the McClure Newspaper Syndicate. *Siegel*
9  *II*, 658 F. Supp. 2d at 1047-56.

10      The 1976 Copyright Act, which became effective on January 1, 1978, provided
11  authors and their families with valuable new rights to recapture the author's original
12  copyright(s), for the extended renewal term, by noticing the termination of previous
13  grants of copyright.  *See* 17 U.S.C. §§ 304(c), 304(d).  Pursuant to § 304(c) of the
14  1976 Act, the Siegels served notices of termination on DC with respect to Siegel's
15  original copyright interests in Superman and Superboy on April 3, 1997, and
16  November 8, 2002, respectively, with effective termination dates of April 16, 1999,
17  and November 17, 2004, respectively. *Siegel I*, 542 F. Supp. 2d at 1114.

18      Superman is considered a joint work under the Copyright Act because it was
19  co-authored by Siegel and Shuster.  As such, each co-author originally owned an
20  undivided 50% interest in the copyright therein.  Joint owners of a copyright each
21  have the non-exclusive right to exploit such copyright, subject to a duty to account to
22  one another.  The Siegel Terminations related to Siegel's (not Shuster's) 50% interest
23  in the original Superman copyrights.  Shuster was not married at the time of his death
24  and had no children, and accordingly his estate lacked termination rights until 1998.[1]

25
26  [1] At the time of Joseph Shuster's death, under the Copyright Act of 1976, Pub. L. 94-553, 17 U.S.C. § 304(c)(2), only an author's widow or widower, children or grandchildren held termination rights,  and as Shuster had none, no one held termination rights as to Shuster's 50% copyright interest in Superman. *Siegel I*, 542 F. Supp. 2d at 1114 n.3. The Copyright
27  Term Extension Act of 1998, Pub. L. 105-298, expanded the category of potential holders of the termination right by adding "the author's executor, personal representative, or trustee" to the list of potential holders of termination rights.  17 U.S.C. §
28  304(c)(2)(D); *Siegel I*, 542 F. Supp. 2d at 1114 n.3.  The estate of Joseph Shuster was

Warner Bros. Entertainment, Inc. ("Warner") and its subsidiary, DC,
challenged the validity and scope of the Siegel Terminations.  In response, the
Siegels in October 2004 filed the Superman and Superboy actions, which included a
claim for declaratory relief that the Siegel Terminations were valid, and additional
claims.  *See Siegel v. Warner Bros. Ent. Inc.*, C.D. Cal. Case No. 04-08400 ODW
(RZx) ("*Siegel*" or the "Superman Action"), Docket Nos. 1, 378, Second Amended
Complaint ("SAC"), ¶¶ 52-55, 83 ("First Claim"); *Siegel v. Time Warner Inc.*, C.D.
Cal. Case No. 04-08776 ODW (RZx) (the "Superboy Action").  DC counterclaimed
that the Siegel Terminations were invalid or tried to limit their scope.  *See Siegel*,
Docket No. 42, First Amended Counterclaim ("Counterclaims"), ¶¶ 68-69, 70-76, 90-
96, 97-101, 102-113, 118-20, 132-35.

The SAC in the Superman action contained the following causes of action:

• Plaintiffs' First Claim for Relief sought declaratory relief to affirm the validity
of Plaintiffs' Superman Termination Notices pursuant to 17 U.S.C. § 304(c);

• Plaintiffs' Second Claim for Relief sought declaratory relief as to the scope of
Defendants' duty to account to Plaintiffs for post-April 16, 1999 profits from
exploitation of Plaintiffs' recaptured Superman copyrights;

• Plaintiffs' Third Claim for Relief sought a declaration that Defendants have a
duty to account for exploitation of the Superman "crest" and/or Superman
"shield" on the ground that they are derivative of the copyrighted Superman
crest in *Action Comics, No. 1*;

• Plaintiffs' Fourth Claim for Relief sought an accounting from all Defendants

---

probated to avail itself of the termination right provided by the Copyright Term Extension
Act of 1998.  17 U.S.C. § 304(d).  On November 10, 2003, Warren Peary, the duly
appointed personal representative of the estate (the "Shuster Executor") served a notice of
termination under § 304(d) with respect to Shuster's 50% share of the Superman copyright,
with an effective termination date of October 26, 2013, and thereafter filed the notice with
the U.S. Copyright Office. *Siegel I*, 542 F. Supp. 2d at 1114 n.3.  *See DC Comics,*
Complaint, ¶¶ 79-80.  On May 14, 2010, DC filed the related case of *DC Comics v. Pacific
Pictures Corp., et al.*, Case No. 10-CV-03633 ODW, which seeks, *inter alia,* declaratory
relief that the Shuster Termination is somehow invalid.  In the *DC Comics* action, DC also
seeks to re-litigate many issues already decided in the *Siegel* action.  *See DC Comics*,
Complaint filed May 14, 2010, at ¶¶ 94-98, 113-15, 122-49, 168, and 168 n.7.

1  for their respective exploitation of recaptured Superman copyrights after the
2  effective Termination date;

3  • Plaintiffs' Fifth Claim for Relief alleged that Defendants violated California
4  Business and Professions Code §§ 17200 *et seq.* by omitting the Terminations
5  from Time Warner's public financial disclosures.

6  The following counterclaims were asserted by DC:

7  • DC's First Counterclaim requested declaratory relief that the Siegel
8  Terminations Notices were ineffective;

9  • DC's Second Counterclaim requested a declaration that the Siegels' claims
10  were barred by the statute of limitations;

11  • DC's Third and Fourth Counterclaims alleged that the parties had entered into
12  a settlement agreement that the Siegels had repudiated;

13  • DC's Fifth Counterclaim requested declaratory relief on the basis of various
14  limitations provided in section 304(c) that the Court limit the scope and reach
15  of the Superman and Superboy notices;

16  • DC's Sixth Counterclaim sought a determination regarding the application of a
17  number of accounting principles in the event that the Siegel Terminations were
18  deemed valid and effective.

19  Plaintiffs' First Claim, and Defendants' Second, Third and Fourth
20  Counterclaims, as well as certain portions of DC's First and Fifth Counterclaims, all
21  concerned the validity of the Siegel Terminations with respect to numerous
22  Superman works co-authored by Siegel and Shuster.  *See* Counterclaims, ¶¶ 68-76,
23  90-113, 118-20, 132-35.

24  The parties conducted substantial discovery over the next two and half years,
25  with fact discovery closing on November 16, 2006.  On April 30, 2007, the parties
26  filed cross-motions for partial summary judgment in the Superman Action.  Plaintiffs
27  sought partial summary judgment in full as to Plaintiffs' First Claim and as to
28  relevant portions of DC's Counterclaims, as follows:

1    •     That the Siegel Terminations are valid as a matter of law with respect to at

2          least the original Superman story published in *Action Comics, No. 1*, and that

3          Plaintiffs have thereby recaptured Siegel's co-authorship share of the

4          copyrights therein (*see* SAC, ¶¶ 52-55);

5    •     That the defenses to the Siegel Terminations alleged in Defendants' First and

6          Second Counterclaims and parts of their Fifth Counterclaim lack merit

7          because:  (a) Siegel and Shuster's Superman story published in *Action Comics,*

8          *No. 1,* is not a "work made for hire" as it was independently created by them

9          long before their relationship with Detective (Counterclaim, ¶¶ 132-33); (b)

10         that a May 21, 1948 consent judgment need not have been listed in the Siegel

11         Terminations because it was not a copyright grant and, in any event, is

12         duplicative of a May 19, 1948 stipulation listed in the Siegel Terminations (*id.*,

13         ¶¶ 68-69); (c) that a December 23, 1975 agreement was not a copyright grant

14         and, in any event, Plaintiff Joanne Siegel's acceptance of certain pension

15         benefits thereunder from Defendants did not reinstate any copyright grants (*id.*,

16         ¶¶ 70-76); (d) that the Siegel Terminations were timely served (*id.*, ¶¶ 86-87);

17         and (e) that the Siegel Terminations are not barred by the statute of limitations

18         (*id.*, ¶¶ 90-96);

19   •     That Defendants' Third and Fourth Counterclaims should be dismissed

20         because the parties failed to consummate a binding settlement agreement

21         regarding Plaintiffs' recaptured copyrights (*id.*, ¶¶ 97-105); and

22   •     That Plaintiffs are entitled to an accounting of all profits earned from

23         Plaintiffs' recaptured Superman copyrights in the United States and in foreign

24         territories (to the extent such foreign profits are based on Defendants' predicate

25         acts in the United States) (SAC, ¶¶ 58(a), 84(b)).

26   Defendants sought partial summary judgment as follows:

27   •     That Plaintiffs have no right under the Copyright Act to share in Defendants'

28         profits derived from the foreign exploitation of any Superman work

1      (Counterclaims, ¶ 137(a));

2   •   That as a result of Plaintiffs' alleged failure to terminate certain copyrighted

3       works as prescribed by the Copyright Act, Defendants remain free to use such

4       unterminated works and the elements contained therein without accounting to

5       Plaintiffs and without liability for copyright infringement (*id.*, ¶ 137(c)); and

6   •   That neither Warner Bros. nor Time Warner is the "alter ego" of DC, and

7       Plaintiffs therefore are not entitled to reach any Superman-related profits of

8       either of these two Defendants (*id.*, ¶ 137(e); SAC, ¶ 84(g)-(h)).

9       The Court issued its ruling on the parties' partial summary judgment motions

10  on March 26, 2008, disposing of the issues listed above.  The Court granted

11  Plaintiffs' motion with respect to Defendants' work for hire defense, concluding that

12  "all the Superman material contained in *Action Comics*, Vol. 1, is not a work made

13  for hire and therefore is subject to termination." *Siegel I*, 542 F. Supp. 2d at 1130.

14  The court also granted Plaintiffs' motion in holding that Plaintiffs' omission of the

15  1948 consent judgment in the Siegel termination notices did not diminish or

16  invalidate the terminations.  *Id.* at 1132.  The Court likewise granted Plaintiffs'

17  motion that Joanne Siegel's continued acceptance of benefits under the parties' 1975

18  agreement did not constitute a "grant" of copyrights under section 304(c)(6)(D) and

19  had no effect on the Siegel Terminations.  *Id.* at 1134.  The Court also granted

20  Plaintiffs' motion in denying Defendants' statute of limitations defense, holding that

21  Plaintiffs' action was timely filed.  *Id.* at 1136.  The Court likewise granted Plaintiffs'

22  motion in denying Defendants' purported defense that the parties had allegedly

23  entered into a binding settlement agreement in 2001, ruling that "the parties'

24  settlement negotiations did not result in an enforceable agreement."  *Id.* at 1139.

25      The Court granted Defendants' motion in ruling that certain "promotional

26  announcements" ("Ads") due to their earlier publication, fell outside the statutory

27  time "window" of the Siegel Terminations.  *Id.* at 1126.  The Court also severely

28  limited the scope of the Ads holding that they only depict "the image of a person with

extraordinary strength who wears a black and white leotard and cape" and contained
"[o]bviously nothing concerning the Superman storyline (that is, the literary elements
contained in Action Comics, Vol. 1)… thus, Superman's name, his alter ego, his
compatriots, his origins, his mission to serve as a champion of the oppressed, or his
heroic abilities in general, do not remain within defendants sole possession to
exploit." *Id.*

In addition, the Court granted Defendants' motion on the foreign profits issue
and denied Plaintiffs' motion, ruling that "the termination notice is *not* effective as to
… defendants' exploitation of the work abroad," and that therefore Defendants "must
account to plaintiffs only for the profits from such domestic exploitation of the
Superman copyright." *Id.* at 1142.[2]

Both sides moved for clarification and/or reconsideration of certain portions of
the Court's March 26, 2008 Partial Summary Judgment Order. Defendants' motion
(Docket No. 307) requested that the Court reconsider its statement regarding the
scope of copyrightable material contained in the "promotional announcements."
Plaintiffs' motion (Docket Nos. 300, 312) requested that the Court "(a) clarify that
Defendants did not secure any copyrightable *Superman* elements via the
'promotional announcements'"; and (b) clarify that the promotional announcements
did not detract from Plaintiffs' recaptured Superman copyrights. Docket No. 312 at
1:13-16. Plaintiffs also sought clarification that the Court's statements in the
background section of its order regarding the Superman elements it did not see in
*Action Comics, No. 1* were *dicta*, on the ground that this literary issue had not been
joined.

On July 3, 2008, the Court issued an order denying Defendants' motion with
prejudice, and "affirm[ed] its conclusion on the scope of the copyrightable material
contained in those [promotional] announcements." Docket No. 327 at 3-4. The

---

[2] The Court denied Defendants' motion to dismiss Plaintiffs' "alter ego" claims, holding
that "whether the license fees paid [to DC for Superman] represents the fair market value
therefor, or whether the license for the works between the entities was a 'sweetheart deal,'
are questions of fact that are not answered on summary judgment…." *Id.* at 1145.

1    Court denied Plaintiffs' motion, but without prejudice, stating that "[s]hould

2    plaintiffs wish for the Court to deal with the questions identified in their motion, they

3    may append them to those issues identified in the March 31, 2008 Order requiring

4    further briefing." *Id.* at 4.

5          On February 21, 2008, a month before the Court issued its March 26, 2008

6    Partial Summary Judgment Order, the parties filed a stipulation with the Court,

7    requesting that it accept briefing on certain "Additional Issues" that would

8    substantially impact the nature, conduct and length of the trial, as well as the parties'

9    pre-trial preparations.  Among these, Defendants sought additional partial summary

10   judgment that Jerome Siegel's contribution to all Superman works published after

11   *Action Comics, No*. 1 and within the five-year Termination "window" (1938-1943)

12   were "works made for hire," not subject to termination; Plaintiffs asserted that such

13   fact-intensive "work for hire" issues were for the trier of fact.[3]

14          **The August 12, 2009 Decision on "Work For Hire" Issues**

15          On August 12, 2009, the Court issued an "Order Resolving Additional Issues."

16   In its Order, the Court ruled on the work for hire arguments presented in the parties'

17   Additional Issues briefing, denying Plaintiffs' request for a trial as to such issues.

18   *See Siegel II*, 658 F. Supp. 2d 1036.  At issue was whether the following works

19   within the Termination window were "works made for hire":  (i) a description of

20   "future Superman exploits" written by Siegel; (ii) Superman comic strips created by

21   Siegel and artist Russell Keaton (the "Keaton Material"); (iii) *Action Comics, Nos. 2-

22   61*; (iv) *Superman, Nos. 1-6*; and (v) Superman newspaper strips syndicated by the

23   McClure Newspaper Syndicate.  In pertinent part, the Court ruled as follows:

24   •     The "future Superman exploits" paragraph written before the publication of

25         *Action Comics, No. 1* could not be terminated because it was too generalized to

26         secure copyright protection.  *Id.* at 1061-1062;

27   _____

28   [3] Pursuant to the Court's July 3, 2008 Order regarding Plaintiffs' motion for clarification,
     Plaintiffs re-briefed the issues of (a) the scope of Defendants' rights based on the
     "promotional announcements," and (b) whether the Court's background statements
     concerning the absence of certain Superman elements in *Action Comics No. 1* were *dicta*.

Case 2:04-cv-08400-ODW-RZ   Document 618   Filed 09/13/10   Page 75 of 243   Page
ID #:3468
Case 2:04-cv-08400-ODW-RZ   Document 613   Filed 09/13/10   Page 97 of 24   Page
ID #:3468

- The "Keaton Material" was unpublished and therefore could not be terminated, because it did not "acquire[] statutory copyright protection under the 1909 Act, as it was either never published with the requisite notice or registered as an unpublished work." *Id.* at 1062;

- The Superman material "appearing in *Action Comics* No. 4 is based almost verbatim on Siegel's pre-1938 script, . . . the Superman material appearing therein was not a work for hire and is subject to termination" and therefore was recaptured by Plaintiffs. *Id.* at 1063;

- *Superman* No. 1, pages three through six, was not a "work made for hire" and was thus subject to termination and recaptured by Plaintiffs. *Id.* at 1064-65;

- "[T]he Superman material in *Action Comics* Nos. 2-3 and 5-6 . . . were works made for hire." *Id.* at 1067-68;

- "[T]he Superman materials created by Siegel and Shuster during the term of their employment agreement (namely, *Action Comics* Nos. 7-61, and to *Superman* Nos. 1-23) were works made for hire." *Id.* at 1070;

- "[T]he two weeks' worth of newspaper comic strip material created by Siegel and Shuster during the spring of 1938, *before* the execution of the syndication agreement were *not* works made for hire" and therefore were subject to termination and recaptured by Plaintiffs. *Id.* at 1083 (emphasis in original);

- The failure to list the two weeks of newspaper strips in the Siegel Terminations "was 'harmless error' that does not affect the validity of termination notice" regarding these newspaper strips. *Id.* at 1095; and

- "[T]he newspaper strips created by Siegel and Shuster after September 22, 1938, were works made for hire, [and] the right to terminate does not reach the grant to those works." *Id.* at 1080.

As a result of these various rulings, Plaintiffs have recaptured Jerome Siegel's co-authorship interests in, and co-own with Defendant DC, the copyrights to the following works:  the first Superman story as published in *Action Comics, No. 1*,

*Action Comics, No. 4*, *Superman, No. 1* (pages three through six), and the first two weeks of the Superman newspaper strips.[4]

Defendants filed a motion on October 2, 2009, seeking reconsideration of the Court's ruling that the omission of the first two weeks of the Superman newspaper strips from the Siegel Terminations was "harmless error."  Plaintiffs filed a motion on October 3, 2009, requesting reconsideration of the Court's ruling that the McClure Superman newspaper strips created by Siegel and Shuster after September 22, 1938 were "works made for hire."  In an opinion dated October 30, 2009, the Court denied both sides' motions.  *Siegel v. Warner Bros. Ent. Inc.*, 690 F. Supp. 2d 1048 (C.D. Cal. 2009) ("*Siegel III*").

## **ARGUMENT**

## I.    **F.R.C.P. 54(b) PERMITS A TRIAL COURT TO ENTER A FINAL JUDGMENT AS TO ORDERS THAT DECIDE A CLAIM IF THERE IS NO JUST REASON FOR DELAY**

Federal Rule of Civil Procedure 54(b) allows a district court to certify as final and immediately appealable interlocutory orders that, like Judge Larson's Orders, completely resolve certain outstanding claims in a case:

> "When more than one claim for relief is presented in an action … or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment."

Fed. R. Civ. P. 54(b).  To be eligible for entry of judgment under Rule 54(b), the order must constitute "an ultimate disposition of an individual claim entered in the course of a multiple claims action," and there must be no just reason to delay appellate review of the order until the conclusion of the entire case.  *Curtiss-Wright Corp. v. General Electric Co.*, 446 U.S. 1, 7-8 (1980).

---

[4] The Court declined to address the remaining Additional Issues that have been pending before the Court since the parties briefed them in July of 2008, reserving decision on those issues to a later date in advance of the accounting trial.  *Siegel II*, 658 F. Supp. 2d at 1095, n. 27.  However, such Additional Issues relate to the procedural parameters of the "accounting" phase of trial and not Plaintiffs' First Claim for relief.

In looking to see if appellate review should be delayed, courts "must take into account judicial administrative interests as well as the equities involved." *Curtiss-Wright*, 446 U.S. at 9. Courts must weigh "such factors as whether the claims under review were separable from the others remaining to be adjudicated and whether the nature of the claims already determined was such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals." *Id.* at 8. The Ninth Circuit embraces a "pragmatic approach focusing on severability [of claims] and efficient judicial administration." *Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1525 (9th Cir. 1987).[5]

"[C]laims certified for appeal do not need to be separate and independent from the remaining claims, so long as resolving the claims would 'streamline the ensuing litigation.'" *Noel v. Hall*, 568 F.3d 743, 747 (9th Cir. 2009) (citations omitted). Courts have found no just reason for delay where a 54(b) judgment would avoid an unnecessary and duplicative trial. *Continental Airlines, Inc.*, 819 F.2d at 1525 ("[G]iven the size and complexity of this case, we cannot condemn the district court's effort to carve out threshold claims and thus streamline further litigation."); *Torres v. City of Madera*, 655 F. Supp. 2d 1109, 1135 (E.D. Cal. 2009) (granting 54(b) judgment where "if [the parties] were to wait until after trial to appeal the court's ruling, it would result in a second, duplicative and costly trial"); *Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 797 (9th Cir. 1991) ("Rule 54(b) certification is proper if it will aid 'expeditious decision' of the case.").[6]

---

[5] Although the Ninth Circuit has not established a precise test to determine whether there is just reason for delay, the factors to be considered include "whether the nature of the claims already determined is such that no appellate court would have to decide the same issues more than once, even if subsequent appeals are heard" and "whether immediate appellate resolution will foster settlement of the remaining claims." *Whitney v. Wurtz*, 2007 U.S. Dist. LEXIS 60077, at *5 (N.D. Cal. Aug. 16, 2007).

[6] *See also Janos v. Wells Fargo Bank*, 2006 U.S. Dist. LEXIS 6758, at *22 (D. Ariz. Feb. 14, 2006) (granting 54(b) judgment where "an immediate appeal of this order would not threaten duplication of judicial work through repetitive appeals on related issues or transactions"); *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 16 (2d Cir. 1997) (holding that a 54(b) judgment is appropriate "where an expensive and duplicative trial could be avoided"); *Erwin v. U.S.*, 2008 U.S. Dist. LEXIS 21366 at *4, n.2 (M.D.N.C. 2008) (granting 54(b) judgment "in the interest of conserving judicial resources

Case 2:04-cv-08400-ODW-RZ   Document 613   Filed 09/13/10   Page 78 of 243   Page
ID #:4400
Case 2:04-cv-08400-ODW-RZ   Document 618-3   Filed 09/29/10   Page 20 of 29   Page ID
#:3460

1    The Ninth Circuit "reviews the certification of an appeal under Rule 54(b) for

2    abuse of discretion." *Texaco, Inc.*, 939 F.2d at 797. As such, "issuance of a Rule

3    54(b) order is a fairly routine act that is reversed only in the rarest instances." *James*

4    *v. Price Stern Sloan*, 283 F.3d 1064, 1068 n.11 (9th Cir. 2002).[7]

## II.    THE COURT HAS DISPOSED OF THE FIRST CLAIM BY FINDING THE SIEGELS' SUPERMAN TERMINATION VALID

7    The Court's March 26, 2008 order unambiguously upheld the validity of the

8    Siegel Terminations as to *Action Comics, No. 1*, the first appearance of Superman,

9    thus disposing of Plaintiffs' First Claim for Relief. In so doing, Judge Larson

10   carefully considered, addressed and dismissed each of Defendants' alleged defenses

11   and counterclaims as to the validity of the Siegel Terminations. *Siegel* at 1131-40.

12   The Court's order clearly amounts to an "ultimate disposition" of the Siegels' First

13   Claim for Relief, and there exists no just reason to delay its appellate review. *Curtiss-*

14   *Wright*, 446 U.S. at 7-8.

### A.    <u>Entry of Judgment as to the First Claim Is Appropriate and Would Streamline the Ensuing Litigation</u>

#### 1.    **The First Claim Is Severable from the Other, Complicated Accounting Claims**

18   Plaintiffs' First Claim is clearly "severable" from the remaining accounting

19   claims because it establishes the threshold issues of the validity and scope of the

20   Siegel Terminations.[8] This claim is separate from Plaintiffs' remaining Second,

21   Third, and Fourth claims, which seek an accounting of profits from the Superman

22   copyrights recaptured by the Siegel Terminations. The issues of the validity and

---

23   and preventing duplicative trials"). *See also Cadillac Fairview/California, Inc. v. United*
24   *States*, 41 F.3d 562, 564 (9th Cir. 1994) (entry of final judgment under Rule 54(b) is
     appropriate, "even if subsequent trial proceedings might obviate the need for an appeal").

25   [7] Courts routinely grant Rule 54(b) motions over the objections of an opposing party. *See,*
26   *e.g., Doe v. Univ. of California*, 1993 U.S. Dist. LEXIS 12876, at *5 (N.D. Cal. Sept. 2, 1993) (granting 54(b) judgment despite defendants' opposition); *Angoss II Pshp. v. Trifox,*
27   *Inc.*, 2000 U.S. Dist. LEXIS 3165 (N.D. Cal. Mar. 10, 2000) (same).

28   [8] Similarly, the relevant portions of DC's First, Second, Third, Fourth and Fifth
     Counterclaims seek as a threshold matter to invalidate the terminations. *See* Counterclaims,
     ¶¶ 68-76, 90-113, 118-20, 132-35. The adjudication through appeal of Plaintiffs' First
     Claim would naturally implicate and resolve all such claims.

scope of the Siegel Terminations under the Copyright Act are distinct and severable

from the issue of how Defendants must account to Plaintiffs for profits from the

Superman copyrights recaptured and co-owned as of 1999 pursuant to the Siegel

Terminations.  Whereas the former is governed by the Copyright Act, the latter is

governed by state-law accounting principles applicable to co-owners of property.  *See*

*Zuill v. Shanahan*, 80 F.3d 1366, 1371 (9th Cir. 1996).  The trier of fact will have to

determine the amount of post-termination Superman profits at issue; however, this

"accounting" analysis does not affect the validity and scope of the Siegel

Terminations.  The Siegels could have well brought the First Claim alone, and sued

later if Defendants failed to properly account to them as co-owners of the recaptured

Superman copyrights.  For this reason, *the Ninth Circuit would never have to decide*

*the validity and scope of the Siegel Terminations "more than once" if such issues*

*are now appealed.*  Even if this Court's determination of the "accounting" issues

were appealed, the validity and scope of the Siegel Terminations would already have

been finally resolved.  *See City of St. Paul v. Evans*, 344 F.3d 1029, 1033, 1033 n.6

(9th Cir. 2003) (entering Rule 54(b) judgment on declaratory relief claim as to breach

of a valid agreement, while "not dispos[ing] of the remaining counterclaims").

> **2.     The Interests of Judicial Economy and Streamlining This
> Litigation Weigh Heavily in Favor of Finalizing the First
> Claim Before Proceeding With the Accounting Trial**

Defendants can hardly claim that certification and appeal of the Court's ruling

as to the validity and scope of the Siegel Terminations is unfair or prejudicial, as

Defendants will appeal this core ruling in any event as it is unfavorable to them.  The

Siegel Terminations, as well as the mirror-image termination notice filed by the

Shuster Executor, have considerable impact on Defendants' interests in Superman.

In fact, as of October 26, 2013, the effective date of the Shuster termination notice,

Defendants will be unable to produce new Superman derivative works without a new

license from the Siegels and the Shuster Executor of the recaptured Superman

copyrights.  Accordingly, the core determination of the basic validity and scope of

Case 2:04-cv-08400-ODW-RZ   Document 618   Filed 09/13/10   Page 80 of 243   Page
ID #:3463
Case 2:04-cv-08400-ODW-RZ   Document 613   Filed 09/13/10   Page 22 of 24   Page ID
#:3461

the Siegel Terminations is a much more central economic concern to Defendants than the particular outcome of the *Siegel* accounting trial.  Defendants should therefore welcome a final determination of such issues by the Ninth Circuit as soon as possible.

In both sides' estimation, substantial resources of both the Courts and the parties will be required for the accounting trial.  *See* Joint Status Report at 2.  Entry of judgment and an immediate appeal of the Court's rulings on the First Claim would finally determine the scope of the Siegel Terminations, and the specific Superman works for which an accounting is owed, resolve DC's related counterclaims and defenses, and promote the speedy and efficient resolution of the accounting litigation that depends on such threshold decisions.  *See Noel v. Hall*, 568 F.3d at 747; *Continental Airlines, Inc.*, 819 F.2d at 1525.

Courts routinely grant Rule 54(b) motions where it would streamline the issues, conserve judicial resources and promote settlement.  *See Texaco,* 939 F.2d at 798 (approving entry of judgment where "the legal issues now appealed will streamline the ensuing litigation").  Entry of judgment on adjudicated claims under Rule 54(b) is especially appropriate where, as set forth in Section II.B. below, the claims determine the scope and contours of trial as to the remaining issues, that trial is likely to be protracted, and the Court will avoid wasting precious resources in a re-trial.  *See Continental Airlines*, 819 F.2d at 1525 (approving Rule 54(b) entry of judgment where "the district court effectively narrowed the issues, shortened any subsequent trial by months, and efficiently separated the legal from the factual questions"); *Adidas Am., Inc. v. Payless Shoesource, Inc.*, 166 Fed. Appx. 268, 270–71 (9th Cir. 2006) (approving Rule 54(b) judgment where appellate reversal of partial summary judgment after final resolution of the lawsuit would require a second trial).[9]

---

[9] *See also Torres*, 655 F. Supp. 2d at 1135 (E.D. Cal. 2009) (entering judgment under Rule 54(b) because "[a]llowing an appeal now would avoid the need for possibly two duplicative trials" and "[t]his would conserve judicial resources and avoid the parties' expenditure of vast resources on trying a case twice"); *Adams v. United States*, 2010 U.S. Dist. LEXIS 47509, at *12–13 (D. Idaho May 12, 2010) (entering judgment under Rule 54(b), as an immediate appeal would "provide important appellate direction" for an upcoming trial, and because "if an appeal must await the end of that trial, the immense efforts of Court and counsel could be wasted if the appeal results in re-trial.").

Case 2:04-cv-08400-ODW-RZ   Document 613   Filed 08/13/10   Page 23 of 24   Page ID #:3484

## B.   The Court's "Work for Hire" Determinations Are Integral to the First Claim and Have a Direct Effect on the Remaining Claims

A "work made for hire" is not subject to the Copyright Act's termination provisions.  17 U.S.C. § 304(c).  Judge Larson's determinations as to which Superman works were not "works for hire" is integral to Plaintiffs' First Claim for Relief and determined the copyrighted works successfully recaptured by the Siegel Terminations (the "Recaptured Copyrights").  SAC, ¶¶ 39, 54, 83.  Any errors in such "work for hire" rulings and consequent determination of the Recaptured Copyrights for which Defendants must account would directly impact and necessarily reverse the second phase "accounting" trial, wasting this Court's precious resources.

### 1.   The Court's Contested Work for Hire Determinations

In a series of exhaustively-analyzed published decisions, this Court decided the fact-intensive question of which works listed in the Siegel Terminations, and within the statutory termination "window" (1938-1943), were subject to successful recapture by Plaintiffs, and which works were exempted from the Siegel Terminations as "works made for hire."  *See Siegel I,* 542 F. Supp. 2d at 1126-30, *Siegel II,* 658 F. Supp. 2d 1036, *Siegel III,* 690 F. Supp. 2d 1048.

In its initial summary judgment ruling, this Court held that the Siegels successfully recaptured Jerome Siegel's copyright interest in *Action Comics, No. 1*, as it was not a "work for hire."  *Siegel I,* 542 F. Supp. 2d at 1126-30.  Thereafter, the Court, in its August 12, 2009 order, ruled which subsequent Superman works published between 1938-1943 were recaptured by the Siegel Terminations, or were exempt as "works made for hire."  *Siegel II*, 658 F. Supp. 2d 1036.  The Court ruled that the Siegels additionally recaptured *Action Comics, No. 4* (*id*. at 1062-63), pages three through six of Superman No. 1 (*id*. at 1063-64), and the first two weeks of the Superman newspaper strips (*id*. at 1080-84), but held that all the remaining works, namely *Action Comics, Nos. 2, 3, 5, 6-61*; *Superman, Nos. 1-23* (*id*. at 1064-70); and all the Superman newspaper strips created by Siegel and Shuster after September 22,

PLAINTIFFS' MOTION FOR PARTIAL FINAL JUDGMENT

Case 2:04-cv-08400-ODW-RZ   Document 618   Filed 09/13/10   Page 82 of 243   Page
ID #:3465
Case 2:04-cv-08400-ODW-RZ   Document 613   Filed 09/13/10   Page 24 of 24   Page ID
#:3465

1  1938 were "works-made-for-hire," and thus exempt from the Siegel Terminations.

2      As the Court has thoroughly analyzed and determined all of the Recaptured

3  Copyrights for which an accounting is owed, its rulings are sufficiently "final" to be

4  suitable for Rule 54(b) certification.  *Curtiss-Wright*, 446 U.S. at 7-8.

5      Judge Larson's "work for hire" rulings are contested by both sides, which each

6  filed motions for reconsideration that were denied.  *See Siegel III,* 690 F. Supp. 2d

7  1048 (C.D. Cal. 2009).  Plaintiffs contend that other than with respect to *Action*

8  *Comics, No. 1* and the first two weeks of the Superman newspaper strips, which were

9  clearly created "on spec," the question of which subsequent Superman works were

10  "made for hire" presents multiple issues of material fact for the trier of fact, and

11  should not have been decided on summary judgment.  *See Twentieth Century Fox*

12  *Film Corp. v. Entertainment Distrib.*, 429 F.3d 869, 874 (9th Cir. 2005) (reversing

13  grant of summary judgment as to work for hire under the 1909 Copyright Act as

14  inappropriate because "work for hire" disputes present genuine issues of material

15  fact); *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 206

16  F.3d 1322, 1330 (9th Cir. 2000) (holding summary judgment inappropriate for a

17  "work for hire" determination); 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* §

18  12.10[A] (the "questions of historical intent" and "as to the parties' intent" inherent

19  in a "work for hire" determination are questions for the finder of fact).  *See also*

20  *Mattel, Inc. v. MGA Entertainment, Inc.*, __ F.3d __, 2009 U.S. App. LEXIS 29187,

21  at *18, *33 (9th Cir. 2010) (reversing grant of summary judgment as "issue should

22  have been submitted to the jury" and noting that "the entire case will probably need

23  to be retried").

24      Plaintiffs further contend that the Court erred in its application of the "work for

25  hire" doctrine to the post-September 22, 1938 Superman newspaper strips published

26  by the McClure Syndicate (the "Strips").  *See* Docket Nos. 569, 583.  In fact, the

27  Court itself acknowledged in its order that such Strips were "on the outer boundaries

28  of what would constitute a work made for hire."  *Siegel II*, 658 F. Supp. at 1080.

This ruling alone affects approximately 1,100 daily Strips, and the first publication of many valuable Superman elements. *Siegel III,* 690 F. Supp. 2d at 1069 n.11.  Error found in the Court's exclusion of the Strips from the Recaptured Copyrights will materially affect the accounting trial and require re-trial of the accounting claims.

Defendants, for their part, argued strenuously that the *first two weeks* of the Superman Strips, which included Superman's famous origin story on Krypton, should have been *excluded* from the Recaptured Copyrights because such works were not specifically listed in the Siegel Terminations, and Defendants argued that, contrary to the Court's opinion, this was not excusable "harmless error."  *See* Docket Nos. 567, 585; *Siegel III,* 690 F. Supp. 2d at 1050-73.

Both sides filed extensive motions for reconsideration of the above "work for hire" decisions, and it is clear from such motions that both sides intend to appeal such decisions.  *See* Docket Nos. 567, 569, 576-79, 583, 585-86, 588-89.

There is no good reason to delay this inevitable appeal. If the threshold determination of the Recaptured Copyrights is incorrect, it follows that the subsidiary determination of owed profits in the accounting trial will be erroneous, and the entire time-consuming "accounting" trial would have to be re-tried. As set forth above, this very real potential for duplicative trials weighs heavily in favor of certification.  *See Torres*, 655 F. Supp. 2d at 1135; *Adams,* 2010 U.S. Dist. LEXIS 47509, at *12–13.

Defendants can hardly claim that an appeal now of the Court's threshold "work for hire" decisions will prejudice them, as it is much more efficient to have such appellate review *before* the parties expend significant resources mounting an accounting trial, concerning thousands of derivative Superman products, that may well be fatally flawed from the outset.  Accordingly, the sooner the parties receive guidance from the Ninth Circuit the better, as it would enable the accounting trial to proceed on a much firmer footing.

///

///

Case 2:10-cv-03633-ODW-RZ   Document 61-3   Filed 09/13/10   Page 84 of 243   Page
ID #:3466
Case 2:04-cv-08400-ODW-RZ   Document 618   Filed 09/14/10   Page 26 of 29   Page ID
#:3466

### 2. The Ninth Circuit's Resolution of the Validity and Scope of the Superman Terminations Will Promote Settlement

Finally, a decision by the Ninth Circuit upholding the validity and scope of the Siegel Terminations will provide certainty and thereby promote timely settlement of this action *and* the closely related *DC Comics* action. *Curtiss-Wright Corp.*, 446 U.S. at 8 n.2 (noting that a court, in deciding a 54(b) motion, should assess whether "appellate resolution of the certified claims would facilitate a settlement of the remainder of the claims.").[10]  If the Ninth Circuit upholds the validity of the Siegel Terminations, as expected, and determines the Superman copyrights recaptured, this should also resolve the *DC Comics* action, as such deals with the Shuster Executor's twin notice of termination regarding the same Superman works by Siegel and Shuster.  Given the considerable value of the Superman copyrights in question, it is far less likely that these cases will be settled at the trial court level. The Superman case has dragged on for six long years. The Ninth Circuit's input at this important juncture will promote long-awaited settlement of the *entire* Superman dispute.

### C. Defendants' Transparent Attempt to Re-Litigate These Issues in the New Action Further Justifies an Immediate Appeal

As noted above, the Siegel Terminations have been held valid as to the comic books *Action Comics, Nos. 1, 4*, and portions of *Superman, No. 1*, as well as the first two weeks of the *Superman* newspaper strips.  These works comprise the essential core of the Superman mythos, and include Superman's origin on Krypton, his iconic costume and super-powers, his "alter ego," Clark Kent, and "their" relationship with feisty reporter, Lois Lane.  *Siegel I*, 542 F. Supp. 2d at 1126.  Unhappy with having to account to the Siegels for the use of these valuable Superman elements after April

---

[10] *Whitney*, 2007 U.S. Dist. LEXIS 60077 at *5 ("A settlement before trial would obviate the need for either trial on the merits or a subsequent appeal. Accordingly, this factor weighs heavily in favor of certification."); *Wood v. GCC Bend, LLC*, 422 F.3d 873, 882 n.6 (9th Cir. 2005) ("[A]s the Supreme Court suggested in *Curtiss-Wright*, in a proper case settlement prospects might outweigh piecemeal appeal concerns."); *Loral Fairchild Corp. v. Victor Co. of Japan*, 931 F. Supp. 1044, 1047 (E.D.N.Y. 1996) (granting 54(b) motion in part because "resolution of the decided [patent infringement] issues on appeal may facilitate settlement with the remaining defendants").

Case 2:04-cv-08400-ODW-RZ   Document 618   Filed 09/13/10   Page 85 of 243   Page
ID #:4468
Case 2:04-cv-08400-ODW-RZ   Document 613   Filed 08/27/10   Page 27 of 29   Page ID
#:34063

16, 1999 (the effective date of the *Siegel* Terminations), DC attempts to have this
Court ignore the previous six years of litigation in *Siegel*, by attacking the twin
Shuster Termination in the *DC Comics* case, on many of the same grounds on which
DC unsuccessfully attacked the Siegel Terminations in this case.

      Aside from the point that DC is precluded from re-litigating these issues in the
new *DC Comics* action under the "law of the case" doctrine, it would in any event be
wholly inefficient for the parties and this Court to allow this litigation to "start over."
*See* Defendant Marc Warren Peary, as Personal Representative of the Estate of
Joseph Shuster's Motion to Dismiss and/or Stay Plaintiff's Complaint Pursuant to
F.R.C.P. 12(b)(6), to be filed by August 13, 2010, at 19-25.  As Siegel and Shuster
co-authored the Superman works in question, any decisions as to the validity and
scope of the Siegel Terminations (which, in turn, implicate decisions as to which
works are terminable because they are not "works for hire") logically apply with
equal force to the Shuster Termination.  *Id.*

      Therefore, the entry of judgment pursuant to Rule 54(b) will also greatly
streamline the *DC Comics* action, as this Court's prior rulings will thereby have
collateral estoppel effect in that closely related action.  *See Brown v. Dunbar*, 2010
U.S. App. LEXIS 8160 (9th Cir. Apr. 20, 2010) (approving district "court's orders
[that] found preclusive the partial final judgment under Federal Rule of Civil
Procedure 54(b)").[11]

      With the *Siegel* case largely decided, DC's *DC Comics* action cannot be used
as a vehicle to brush aside the past six years of hard-fought litigation at the expense
of considerable judicial resources, or as a de facto "appeal" at the *trial court* level.
The proper and most efficient forum for the immediate appeal DC seeks is not its
belated new complaint, but clearly the Ninth Circuit.

///

---

[11] *See also Continental Airlines, Inc.*, 819 F.2d at 1525 ("[A] 54(b) ruling in fact has res judicata ramifications."); *Flores v. Emerich & Fike*, 2008 U.S. Dist. LEXIS 49385, at *28-29 (E.D. Cal. June 17, 2008) (where a court has "entered final judgment pursuant to Rule 54(b) … there has been a final judgment" for preclusion purposes).

Case 2:04-cv-08400-ODW-RZ   Document 618   Filed 09/13/10   Page 86 of 243   Page
ID #:3469
Case 2:04-cv-08400-ODW-RZ   Document 618   Filed 09/13/10   Page 28 of 29   Page ID
#:3469

### III.   IN LIGHT OF THESE ISSUES, THIS ACTION SHOULD BE STAYED UNTIL RESOLUTION OF AN APPEAL

As a general principle, a district court possesses the inherent power to control its docket and promote efficient use of judicial resources. *See Dependable Highway Exp., Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.") (citing *Landis v. North American Co.*, 299 U.S. 248, 254-55 (1936)); *Leyva v. Certified Grocers of California, Ltd.*, 593 F.2d 857, 863-64 (9th Cir. 1979) ("A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case.").

"If a district court certifies claims for appeal pursuant to Rule 54(b), it should stay all proceedings on the remaining claims if the interests of efficiency and fairness are served by doing so." *Doe*, 1993 U.S. Dist. LEXIS 12876, at *5 (citation omitted). *See also Matek v. Murat*, 862 F.2d 720, 732 n.18 (9th Cir. 1988) (affirming stay of proceedings after entry of judgment under Rule 54(b) pending the appeal); *Roe v. City of Spokane*, 2008 U.S. Dist. LEXIS 82528, at *17-18 (E.D. Wash. Oct. 16, 2008) (granting entry of judgment under Rule 54(b) and a stay, where holding a trial could "waste judicial resources as well as the resources of the parties and their counsel"); *De Aguilar v. AMTRAK*, 2006 U.S. Dist. LEXIS 11187, at *9–11 (E.D. Cal. March 2, 2006) (staying proceedings after entry of judgment under Rule 54(b) pending the appeal).

As both the validity and scope of the Siegel Terminations, and the specific copyrights thereby recaptured, control the results in the pending "accounting" trial, this Court should exercise its discretion to stay this action until the appeal of such underlying issues is complete.

///

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for entry of a partial final judgment under F.R.C.P. 54(b) should be granted in its entirety.

DATED:  August 12, 2010          TOBEROFF & ASSOCIATES, P.C.


By_____
                    Marc Toberoff

Attorneys for Plaintiffs Joanne Siegel and
Laura Siegel Larson

# EXHIBIT F

1  Marc Toberoff (CA State Bar No. 188547)
   Nicholas C. Williamson (CA State Bar No. 231124)
2  LAW OFFICES OF MARC TOBEROFF, PLC
   2049 Century Park East, Suite 2720
3  Los Angeles, CA 90067
   Telephone: (310) 246-3333
4  Facsimile: (310) 246-3101

5  Attorneys for Plaintiffs and Counterclaim Defendants
   JOANNE SIEGEL and LAURA SIEGEL LARSON
6
                   **UNITED STATES DISTRICT COURT**
7
                   **CENTRAL DISTRICT OF CALIFORNIA**
8

9   JOANNE SIEGEL, an individual; and       Case Nos.:
10  LAURA SIEGEL LARSON, an                  CV 04-08400 SGL (RZx)
    individual,                              CV 04-08776 SGL (RZx)
11           Plaintiffs,
                                             [Hon. Stephen G. Larson, U.S.D.J.]
12      vs.                                  [Hon. Ralph Zaresky, U.S.M.J.]

13  TIME WARNER INC., a corporation;
14  WARNER COMMUNICATIONS            **DECLARATION OF MARC**
    INC., a corporation; WARNER      **TOBEROFF IN OPPOSITION TO**
15  BROS. ENTERTAINMENT INC., a      **DEFENDANTS' MOTION TO**
                                     **COMPEL PRODUCTION OF**
    corporation; WARNER BROS.        **WHISTLE BLOWER**
16  TELEVISION PRODUCTION INC.,      **DOCUMENTS**
17  a corporation; DC COMICS, a general
    partnership; and DOES 1-10,      **DISCOVERY MATTER**
18                                   **LOCAL RULE 37**

19           Defendants.            Date:  April 16, 2007
                                    Time:  10:00 a.m.
20  ─────────────────────────       Place: Courtroom 540
    DC COMICS,                      Mag. Judge Ralph Zarefsky
21                                  Discovery Cutoff: Nov. 17, 2006
            Counterclaimant,
22
        vs.
23
24  JOANNE SIEGEL, an individual; and
    LAURA SIEGEL LARSON, an
25  individual,
26
            Counterclaim Defendants.
27
28

I, Marc Toberoff, declare as follows:

1.    I am an attorney at the Law Offices of Marc Toberoff, PLC, counsel of record for plaintiffs Joanne Siegel and Laura Siegel Larson ("Plaintiffs"). I am a member in good standing of the State Bar of California and submit this declaration in opposition to defendants' ("Defendants") motion to compel production of purported "whistle-blower" documents. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.    On February 15, 2006, Plaintiffs moved for partial summary adjudication that their statutory "Superboy" termination is valid and that Plaintiffs thereby recaptured Siegel's "Superboy" copyright. Defendants cross-moved for summary judgment claiming the "Superboy" termination was invalid based in large part on the same purported claims and defenses asserted with respect to "Superman." On March 23, 2006, the Court granted Plaintiffs' motion in its entirety and denied Defendants' motion in its entirety. On March 24, 2006, Plaintiffs moved to have their order certified for appeal, which motion was denied by the Court.

3.    Attached hereto as Exhibit "A" is a true and correct copy of this Court's order dated August 18, 2006 denying Defendants' motion to compel which alleged that Plaintiffs purportedly had waived the attorney-client privilege.

4.    Attached hereto as Exhibit "B" is a true and correct copy of this Court's order dated September 25, 2006 denying Defendants' motion for reconsideration of the aforesaid August 18, 2006 order.

5.    Attached hereto as Exhibit "C" is a true and correct copy of this Court's order dated November 7, 2006 denying Defendants' motion for compel the re-deposition of each of the Plaintiffs.

6.    Attached hereto as Exhibit "D" is a true and correct copy of Michael Bergman's July 6, 2006 letter to the Court.

1

Declaration Of Marc Toberoff In Opposition To Defendants' Motion To Compel

7.      Attached hereto as Exhibit "E" is a true and correct copy of this Court's July 6, 2006 minute order.

8.      On July 11, 2006 I spoke telephonically with John J. Quinn ("Quinn") of the law firm Arnold & Porter, LLP regarding his July 5, 2006 letter to me (*see* Declaration of Michael Bergman ("Bergman Decl."), Ex. D.). At no time did Quinn present himself as a "neutral" and at all times he appeared to me to be acting on behalf of Warner Bros. I inquired as to the nature of the documents vaguely referred to in Quinn's July 5, 2006 letter and was informed for the first time that the documents apparently came from my own legal files. I demanded that the documents be returned immediately. I further rejected the "protocol" outlined in Quinn's July 5 letter. I suggested instead that an independent print shop copy and bate stamp all the documents; that Arnold and Porter be provided with this bates stamp number range, but not retain the stolen documents and that *all* of the documents, including defendant Warner Bros' "originals,' be returned to me immediately.

9.      By letter dated July 13, 2006 (see Bergman Decl., Ex. E) Quinn announced, that he would have the documents bates stamped by his office, send a copy of the bates stamped documents to me, and retain a bates stamped set and the originals, contrary to my wishes.

10.     On July 18, 2006, Quinn delivered three sets of copies of the stolen documents to my offices. These sets had been bates stamped. The "originals" have never been returned to my offices or to Plaintiffs.

11.     Attached hereto as Exhibit "F" is a true and correct copy of my July 19, 2006 letter to Quinn.

12.     Attached hereto as Exhibit "G" is a true and correct copy of a letter dated July 20, 2006 from Defendants' other counsel, Michael Bergman ("Bergman"), to Quinn.

13.     Attached hereto as Exhibit "H" is a true and correct copy of a letter dated July 24, 2006 from Quinn to me.

2

Declaration Of Marc Toberoff In Opposition To Defendants' Motion To Compel

14.     Attached hereto as Exhibit "I" is a true and correct copy of a letter dated July 26, 2007 from me to Quinn.

15.     Attached hereto as Exhibit "J" is a true and correct copy of a letter dated July 27, 2006 from Bergman to me.

16.     Plaintiffs produced documents in this case on September 29, 2005 and supplemented this production on October 6, 2006, November 6, 2006 and November 17, 2006.  Attached hereto as composite Exhibit "K" are true and correct copies of the September 29, October 6, November 6 and November 17, 2006 cover letters accompanying Plaintiffs' document production.

17.     Attached hereto as Exhibit "L" is a true and correct copy of Plaintiffs' July 20, 2006 privilege log.

18.     Attached hereto as composite Exhibit "M" are true and correct copies of Plaintiffs' supplemental privilege logs served on September 29, 2006.

19.     Documents were produced by third parties Jean Peavy and Warren Peary (the "Shusters") on July 18, August 11 and August 14, 2006 in response to Defendants' subpoena.  The Shusters served a privilege log on August 11, 2006.  Shusters served a supplemented privilege log on October 16, 2006.  Attached hereto as Exhibit "N" is a true and correct copy of the Shuster's October 16, 2006 privilege log.

20.     On behalf of Don Bulson, the former attorney of Laura Siegel Larson's stepbrother, Michael Siegel, I served a privilege log on October 23, 2006 in response to Defendants' subpoena.  Attached hereto as Exhibit "O" is a true and correct copy of October 23, 2006 privilege log.

21.     Third party IPW, LLC produced documents on November 15, 2006 in response to Defendants' subpoena.  Third party Pacific Pictures Corporation produced documents on November 15, 2006 in response to Defendants' subpoena.  Attached hereto as Exhibit "P" is a November 15, 2006 letter from my office to Defendants' counsel concerning their respective document production.

3

Declaration Of Marc Toberoff In Opposition To Defendants' Motion To Compel

22.    I have reviewed the stolen documents and compared them to my firm's legal files.  I found that all but two non-privileged documents in Plaintiffs' legal files had long ago been produced or listed by Plaintiffs in a privilege log.  The documents, consisting of two letters from Plaintiff Joanne Siegel to DC Comics' executive Paul Levitz although already in Defendants' possession, have recently been produced.  I also cross-referenced two privileged e-mail communications between Plaintiffs and me dated after the commencement of this action which were not listed in Plaintiffs' privilege logs because the parties to this action have agreed not to list post-complaint attorney-client communications on their respective privilege logs.

23.    Additionally, I searched the files of other persons or entities which my firm represents that have been subpoenaed in this case, in search of any stolen documents that had not either been produced or listed in a privilege log, even though this motion to compel is only directed at Plaintiffs.  As a result of this search I found in the files of IPW, LLC, one IP Worldwide fax cover sheet having little relevance to this action, which I nonetheless also recently produced to Defendants.

24.    I also re-searched the files of Jean Peavy, Warren Peary, and the Estate of Joe Schuster (the "Shusters"), cross-referencing the stolen documents, and found three irrelevant, but non-privileged documents, regarding the probating of Joe Shuster's Estate, that I believe had not been previously produced.  I therefore also recently produced these documents.  In this search I also found one privileged document from the Shuster files, again concerning probate, and on the Shusters' behalf I listed this document on a supplemental privilege log which I recently provided to Defendants.

25.    As a result of my law firm's ongoing investigation, I believe that the documents to which this motion applies were stolen from my law firm's files by a disgruntled former *attorney* employed by the firm who thereafter furnished the documents to Warner Bros. under circumstances of which I am not yet aware.  The

4

attorney is not named by me herein so as not to jeopardize my firm's ongoing
investigation or that of the authorities.

26.    This attorney/employee was terminated by my firm in November, 2005.
Our investigation has revealed that in late November and early December, 2005, after
the attorney was terminated, he contacted Plaintiffs and another client of my firm and
tried to convince them to terminate the firm, and to retain him instead, by falsely
disparaging me and by offering to work for a reduced fee. I am advised by Plaintiffs
and my other client that they both rejected this attorney's overtures in early
December, 2005.

27.    On July 18, 2006, when Arnold & Porter furnished me with bates
stamped copies of the stolen documents they also furnished me with a copy of an
allegedly undated and anonymous cover letter to Warner Bros. purporting to enclose
the stolen documents ("Cover Letter"). The Cover Letter was not attached by
Defendants and is not attached by Plaintiffs because it is defamatory, in other respects
potentially violates the attorney-client privilege and work product doctrine, and
should not be further published through the public record of this action. The Cover
Letter ends by stating to Warner Bros.: "consider this an early Christmas present."

I declare under penalty of perjury of the laws of the United States of America
that the foregoing is true and correct.

Executed on March 23, 2007 in Los Angeles, California.


_____
                    Marc Toberoff

Declaration Of Marc Toberoff In Opposition To Defendants' Motion To Compel

# EXHIBIT P

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 2720

LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
ALEXANDER M. MERINO

* ALSO ADMITTED IN NEW YORK

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

November 15, 2006

<u>Via Facsimile</u>

Adam Hagen, Esq.
Weissman Wolff Bergman Coleman Grodin & Evall LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, CA 90212

Re:    *Joanne Siegel & Laura Siegel Larson v. Time Warner, Inc. et al.*
       USDC Central District of CA, Case No. 04-08400 SGL (RZx)
       *Joanne Siegel & Laura Siegel Larson v. Time Warner, Inc. et al.*
       USDC Central District of CA, Case No. 04-08776 SGL (RZx)

Dear Adam:

Enclosed please find IPW, LLC's production of documents, numbered IPW 00001-00016.  In addition, enclosed please find Pacific Pictures Corporation's production of documents, numbered PPC 00001-00009.

Very truly yours,

Alexander M. Merino

cc:    Patrick T. Perkins, Esq.
       James D. Weinberger, Esq.

350

ember    : 045          *** SEND SUCCESSFUL ***

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

MARC TOBEROFF·
NICHOLAS C. WILLIAMSON
ALEXANDER M. MERINO
· ALSO ADMITTED IN NEW YORK

## FACSIMILE COVER PAGE

| TO: Adam Hagen, Esq., James D. Weinberger, Esq., Patrick T. Perkins, Esq. | FAX: 310-550-7191, 212-813-5901, 845-265-2819 |
|---|---|
| FROM: Marc Toberoff | PAGES ( including cover ): 27 |
| DATE : 11/15/06 | RE: Superman (Case Nos. 04-CV-8400 SGL (RZx) and 04-CV-8776 SGL (RZx)) |

COMMENTS:

THIS INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

# Group Send Report

Page         : 001
Date & Time: Nov-15-06  10:47pm
Line 1      :
Machine ID :

Job number              :   045

Date                    :   Nov-15 10:32pm

Number of pages         :   027

Start time              :   Nov-15 10:32pm

End time                :   Nov-15 10:47pm

Successful nbrs.

    Fax numbers

        ☎13105507191
        ☎12128135901
        ☎18452652819

Unsuccessful nbrs.                                                      Pages sent

# EXHIBIT G

1  Marc Toberoff (CA State Bar No. 188547)
   Nicholas C. Williamson (CA State Bar No. 231124)
2  LAW OFFICES OF MARC TOBEROFF, PLC
   2049 Century Park East, Suite 2720
3  Los Angeles, CA 90067
   Telephone: (310) 246-3333
4  Facsimile: (310) 246-3101
   Email: MToberoff@ipwla.com
5
   Attorneys for Plaintiffs and Counterclaim Defendants
6  JOANNE SIEGEL and LAURA SIEGEL LARSON

7              UNITED STATES DISTRICT COURT

8      CENTRAL DISTRICT OF CALIFORNIA-EASTERN DIVISION

9

10 JOANNE SIEGEL, an individual; and     Case Nos.:  CV 04-08400 SGL (RZx)
   LAURA SIEGEL LARSON, an                           CV 04-08776 SGL (RZx)
11 individual,
                                         [Hon. Stephen G. Larson, U.S.D.J.]
12            Plaintiffs,                 [Hon. Ralph Zaresky, U.S.M.J.]
      vs.
13
14 TIME WARNER INC., a corporation;      DECLARATION OF MARC
   WARNER COMMUNICATIONS            TOBEROFF FILED PURSUANT
15 INC., a corporation; WARNER           TO THE COURT'S SEPTEMBER
                                         17, 2007 ORDER
   BROS. ENTERTAINMENT INC., a
16 corporation; WARNER BROS.             DISCOVERY MATTER
17 TELEVISION PRODUCTION INC.,           LOCAL RULE 37
   a corporation; DC COMICS, a general
18 partnership; and DOES 1-10,
19
20            Defendants.
   ──────────────────────────────
21 DC COMICS,
22
              Counterclaimant,
23    vs.
24
   JOANNE SIEGEL, an individual; and
25 LAURA SIEGEL LARSON, an
   individual,
26
27            Counterclaim Defendants.
28 ──────────────────────────────

1    I, Marc Toberoff, declare as follows:

2    1.    I am an attorney at the Law Offices of Marc Toberoff, PLC, counsel of

3    record for plaintiffs Joanne Siegel and Laura Siegel Larson ("Plaintiffs"). I am a

4    member in good standing of the State Bar of California and submit this declaration

5    pursuant to the Court's September 17, 2007 order. I have personal knowledge of the

6    facts set forth in this declaration and, if called as a witness, could and would testify

7    competently to such facts under oath.

8    2.    On April 30, 2007 I participated in a hearing before Magistrate Zarefsky

9    concerning Defendants' motion to compel the production of a large number of

10    documents, many clearly confidential attorney-client communications, stolen from

11    my law offices and delivered to Defendants, which Defendants then placed with

12    Arnold & Porter, as "escrow holder" (the "Escrow Holder") of the stolen documents

13    (the "Escrow Documents").

14    3.    At the April 30 hearing, Magistrate Zarefsky ordered me to furnish the

15    Escrow Holder with a declaration specifically referencing, by the bates numbers,

16    which "Escrow Documents" had already been produced and which had not been

17    produced and listed on a privilege log, so that the Escrow Holder could appropriately

18    disburse the Escrow Documents by the bates numbers referenced in my declaration –

19    returning the privileged documents to my offices and releasing the non-privileged

20    documents to Defendants' counsel. ("April 30, 2007 Order"). A true and correct

21    copy of the transcript of the April 30, 2007 hearing is attached hereto as Exhibit "1".

22    4.    I drafted and furnished to Mr. Eisen a declaration which fully complied

23    with the April 30, 2007 Order, as admitted by Defendants. Attached hereto as

24    Exhibit "2" is a true and correct copy of my May 21, 2007 declaration. *See* the

25    parties' September 17, 2007 Joint Stipulation at 13, a true and correct copy of which

26    is attached hereto as Exhibit "3." ("September 17, 2007 Joint Stipulation").

27    5.    The vast majority of the "Escrow Documents" are privileged or have

28    already been produced, and were designated as such in my declaration. However, 9

1

1  documents (4 of which are merely fax cover or confirmation sheets) of the 839 pages

2  of "Escrow Documents" (many duplicates) did not fit squarely within the Order in the

3  context of the April 30 hearing, and, pursuant to this Court's order of September 17,

4  2007, are to be reviewed by the Court *in camera*.

5      6.    This handful of documents fall into three categories that slipped between

6  the "cracks" of the Order but are clearly privileged: (i) 6 *post-litigation attorney-*

7  *client communications*, which, pursuant to the parties' standing agreement (admitted

8  by Defendants herein) need not have been listed in a privilege log to preserve the

9  privilege (*see* Exhibit 3 (September 17, 2007 Joint Stipulation) at 32- 34); (ii) the

10  "defamatory cover letter" enclosing and describing the contents of the stolen Escrow

11  Documents, including many of the attorney-client communications that are identified

12  on the privilege logs of Plaintiffs and non-party witnesses (*see* Exhibit 3 at 34-37);

13  and (iii) 2 letters between me and Don Bulson, Esq., the attorney for Plaintiff Laura

14  Siegel Larson's half-brother, Michael Siegel, who is a statutory beneficiary of the

15  "Superman" termination notices, which were listed in Mr. Bulson's privilege log and

16  properly identified as such in my May 21, 2007 declaration (*see* Exhibit 3 at 37-42).

17      7.    To put the anonymous "defamatory cover letter" in context, my

18  investigation has revealed that in late 2005 the Escrow Documents were stolen from

19  my law firm's files by a disgruntled *attorney* formerly employed by my firm, who

20  thereafter furnished the documents to Defendant Warner Bros. Entertainment, Inc.

21  ("Warner") under circumstances that Warner has not disclosed.

22      8.    This attorney, after working at my firm for just three months,

23  disappeared without notice in November, 2005.  My investigation has revealed that in

24  late November and early December, 2005, he then contacted Plaintiffs and tried to

25  convince them to terminate my firm, and to retain him instead, by disparaging me

26  with false, and often nutty, statements, and by offering to work for a reduced fee,

27  suggesting that his actions were financially motivated.  I am informed that he did the

28  same with another female client of mine (and that he additionally harassed her by

2

1 | repeated phone calls and messages asking her out). I am advised by these clients that

2 | that they rejected this attorney's overtures in early *December, 2005*.

3 |     9.    The "defamatory cover letter" is rife with highly prejudicial ranting and

4 | conspiratorial speculation. More troubling, this attorney, without regard for his oath

5 | as an officer of the court, disclosed without authorization confidential attorney-client

6 | communications and work product (pre-meditatively assembled after hours) to the

7 | opposing party in the midst of a lawsuit.

8 |     10.    The "defamatory cover letter," which Warner alleges enclosed the stolen

9 | documents, states: "consider it an early holiday gift." Notwithstanding this, I was

10 | not contacted by Warner (via Arnold & Porter) about these stolen documents until

11 | July 5, 2006. Warner claimed that on June 28, 2006, three very high level executives

12 | – Alan Horn, Warner President and COO; Jeff Rabinov, President of Production, and

13 | John Schulman, Warner's General Counsel – each anonymously received packages

14 | consisting of the of the documents.

15 |     11.    I requested by letter dated July 19, 2006 to Arnold & Porter and copied

16 | to Defendants' counsel, Michael Bergman ("Bergman"), that Warner furnish the

17 | following:

18 |         "(1) the date(s) each set of documents was received; (2) copies of all

19 |         envelopes or packages enclosing the documents; (3) the method by

20 |         which the documents were sent and, in the unlikely event the

        documents were delivered by hand, the name of the messenger (and

21 |         messenger service) logged at Warner Bros. security gate and (4) any

22 |         other pertinent information regarding Warner Bros.' receipt of these

        documents. We would also like to inspect the "original" documents

23 |         and enclosing envelopes or packages as received by Warner Bros."

24 | *See* Exhibit F of my Declaration in Opposition to Defendants' Motion to Compel

25 | Production of Whistleblower Documents, dated March 23, 2007, a true and correct

26 | copy of which is attached hereto as Exhibit "4."

27 |     12.    I thereafter received letters dated July 20, 2006 and July 24, 2006 from

28 | Mr. Bergman, and on July 24, 2006 from Arnold & Porter, but neither provided the

3

Declaration Of Marc Toberoff Filed Pursuant to the Court's September 17, 2007 Order

1    requested information.  *See* Exhibit 4; Exs. G, H.   By letter dated July 26, 2007 to

2    Mr. Bergman, I reiterated Plaintiffs' demand for information regarding Warner's

3    receipt of the stolen documents.  *See* Exhibit 4, Ex. I.   Mr. Bergman finally

4    responded by letter dated July 27, 2006, repeating that the packages mysteriously

5    arrived in envelopes at the desks of three high placed Warner executives on June 28,

6    2006; but claiming that Warner did not retain any of the three envelopes (or a copy of

7    any envelopes) and stating that Warner had no mailroom, security or executive office

8    records, notes or logs of the three substantial packages ever being signed in or

9    received, despite the extraordinary nature of their contents.  *See* Exhibit 4, Ex. J.  All

10   such information, commonly kept by Studio security, mailrooms and executive

11   offices, had vanished.

12       13.    The undated, anonymous cover letter discusses and discloses the

13   substance and contents of many, if not most, of the privileged documents enclosed by

14   the cover letter and listed in the privilege logs of Plaintiffs and alleged non-party

15   witnesses.  Specifically, the letter contains, directly and indirectly, the substance of

16   privileged attorney-client communications and attorney work product that were

17   contained within the confidential files at my law firm.

18       14.    The "defamatory cover letter" is irrelevant to the subject matter of this

19   action, and is obviously highly prejudicial; nor is it likely to lead to the discovery of

20   admissible evidence, particularly as discovery in this action is closed.  It is not subject

21   to authentication by the author, as it was anonymous.  It is also riddled with

22   inadmissible hearsay statements.  Finally, the letter refers to documents and

23   information protected by, *inter alia*, the attorney-client privilege and work product

24   doctrine, and would therefore be inadmissible in any event.

25       15.    The cover letter was clearly not the subject of Defendants' March 26,

26   2007 Joint Stipulation regarding the escrow documents, as throughout their initial

27   motion Defendants drew a clear line between the "Whistle-blower documents" that

28   were the subject of its motion and the "cover letter" contained with the documents,

1  which was not. *Compare Defendants' March 26, 2007 Joint Stipulation* at 2:6-14

2  (requesting production of the "Whistle-blower documents") with 6:13-14 (referring to

3  "the cover letter contained with the documents"); 6:26-27 (characterizing "the 'cover

4  letter' that *came with* the Whistle-blower documents") (emphasis added); 7:9-10

5  (referring to "Whistle-blower Documents contained with the letter"); 7:17-19

6  (referring to attorneys perusal of "the contents of the cover letter and my brief

7  thumbing through the documents"); and 16:17-21:28 (referring repeatedly to the

8  "Whistle-blower Documents" and never mentioning the cover letter.)   Attached

9  hereto as Exhibit "5" is a true and correct copy of the parties' March 26, 2007 Joint

10  Stipulation Re: Defendants' Motion to Compel Production of Whistleblower

11  Documents.

12      16.    Plaintiffs' opposition to Defendants' original motion to compel

13  specifically states at page 37, footnote 10, that the cover letter, in discussing the

14  stolen attorney-client communications accompanying it, discloses information

15  protected by the attorney-client privilege and the work product doctrine. *See* Exhibit

16  5 at 37.  However, the cover letter was not discussed by either party at the April 30,

17  2007 hearing before Magistrate Zarefsky, as it did not appear to be a part of

18  Defendants' motion to compel. *See* Exhibit 1 at 7:25- 20:5.

19      17.    Plaintiffs and I did not authorize this illicit letter.  Plaintiffs cannot be

20  held to have consented to the release of the privileged information and work product

21  contained therein, or to have waived the privilege, as the unauthorized disclosure of

22  protected attorney-client information or documents does not waive attorney-client

23  privilege. *See* Exhibit 3 at 35-37.

24      18.    The cover letter, in disclosing privileged information contained in the

25  attorney-client communications *listed in Plaintiffs' and third party privilege logs*,

26  falls within the rationale and spirit of Magistrate Zarefsky's April 30, 2007 order as a

27  document that should not be released to Defendants.

28

Declaration Of Marc Toberoff Filed Pursuant to the Court's September 17, 2007 Order

19.    Defendants have also demanded that the Escrow Holder, David Eisen,
Esq., turn over two obviously privileged communications between Plaintiffs and me
from *after the commencement of litigation.* Defendants cling to the absurd and
inequitable position that there has been a waiver of these plainly privileged
communications because such were not listed on a privilege log, even though
Defendants admit, as they must, that *the parties have a longstanding agreement
pursuant to which neither side was supposed to list post-litigation attorney-client
communications on a privilege log. See* Exhibit 3 at 13. Per this agreement,
Defendants and Plaintiffs have not listed hundreds of post-litigation communications
on any privilege log. These two communications are clearly subject to this standing
agreement, and the fact they were stolen from my law offices in no way changes this.

20.    These privileged e-mails were specifically discussed on page 30 of
Plaintiffs' portion of the parties' March 26, 2007 Joint Stipulation regarding the
escrow documents as follows: "There are also 2 privileged e-mail communications
between Plaintiffs and their present counsel dated after commencement of this action
which were not listed in Plaintiffs' privilege logs because the parties have agreed not
to list post-complaint attorney-client communications on their respective privilege
logs." *See* Exhibit 5 at 30.

21.    Additionally, in paragraph 22 of my March 23, 2007 declaration in
opposition to defendants' motion to compel, I specifically mentioned the two
privileged e-mails, and explained to the Court that these post-litigation
communications were not listed on a privilege log because "the parties to this action
have agreed not to list post-complaint attorney-client communications on their
respective privilege logs." *See* Exhibit 4.

22.    It is my belief that Magistrate Zarefsky did not intend by his April 30,
2007 Order that such clearly privileged communications be produced. No fair
reading of the Order's rationale, as well as common sense, could give Defendants

6

Declaration Of Marc Toberoff Filed Pursuant to the Court's September 17, 2007 Order

1  access to privileged communications, to which they would not otherwise be entitled,

2  because such documents were pilfered from my legal files.

3      23.    On behalf of Don Bulson ("Bulson"), the former attorney of Laura

4  Siegel Larson's stepbrother, Michael Siegel, I served a privilege log on October 23,

5  2006 in response to Defendants' subpoena.  The items listed on this privilege log

6  included two letters we wrote to each other.  *See* Exhibit 4, Ex. O.

7      24.    Magistrate Zarefsky's April 30, 2007 Order encompassed and protects

8  documents such as these two communications listed on third party privilege logs and

9  referenced in my March 23, 2007 declaration.  *See* Exhibit 1, at 19:16- 20:6.  In fact,

10  my declaration referenced several Escrow Documents by bates numbers on third

11  party privilege logs that Defendants acknowledge are covered by the Order and have

12  not challenged.  *See* Exhibit 2 at 6:13-14, 22; *see also* Declaration of Michael

13  Bergman in Support of Defendants' Motion to [sic] Compliance With the Court's

14  4/30/07 Order and Motion For Sanctions ("Bergman Decl."), Ex. E, a true and correct

15  copy of which is attached hereto as Exhibit 6.  Defendants, nonetheless, belatedly

16  chose to impermissibly challenge the assertion of the joint interest privilege with

17  respect to these two communications.

18      25.    Mr. Bulson's privilege log was served on Defendants long ago on

19  October 23, 2006, and listed the two documents as communications between Mr.

20  Bulson and myself.  Exhibit 4, Ex. O.  Plaintiffs' privilege logs were also served long

21  ago on July 20 and September 29, 2006.  Exhibit 4, Exs. L, M.  Defendants could

22  easily have moved in this Court to compel Plaintiffs' production of these two

23  documents within the discovery and motion deadlines.  They did not do so, and

24  instead attempted to "bootstrap" this new motion to compel after the cut-off into their

25  September 17, 2007 Joint Stipulation regarding the April 30, 2007 Order *after the*

26  *deadline for discovery motions has long passed.*  *See* Stipulation Regarding

27  Scheduling Order entered March 19, 2007.  For the Court's information, Defendants

28

7

Declaration Of Marc Toberoff Filed Pursuant to the Court's September 17, 2007 Order

1  did file a motion to compel against Mr. Bulson in the United States District Court for

2  the Northern District of Ohio, which motion is pending.

3      26.    The two letters exchanged between me and Mr. Bulson were designed to

4  further a joint legal strategy between my clients, Joanne Siegel and Laura Siegel

5  Larson, and Mr. Bulson's then-client, Michael Siegel, with respect to the "Superman"

6  termination notices ("Terminations"), of which both Mr. Bulson's and my clients

7  were beneficiaries under 17 U.S.C. § 304(c). These communications necessarily

8  concerned prior settlement discussions with Defendants and anticipated litigation

9  regarding the Termination. Considering the financial value of the "Superman"

10  property, such litigation was a virtual inevitability in the absence of settlement.

11      27.    Such communications amongst the attorneys of Jerome Siegel's

12  statutory heirs under 17 U.S.C. § 304(c) (*i.e.*, Plaintiffs and Michael Siegel) in

13  anticipation of litigation regarding the Termination, of which they are the

14  beneficiaries, is precisely the sort of communications the joint interest privilege is

15  designed to protect. *See* Exhibit 3 at 38-42. Therefore, the Bulson documents are

16  protected by the applicable joint interest privilege and work product doctrine, which

17  are not waived by disclosure to Mr. Bulson.

18      28.    In compliance with Magistrate Zarefsky's April 30, 2007 Order, my

19  declaration matched the escrow bates numbers of the two Bulson letters to the

20  corresponding entries on Mr. Bulson's *privilege log*. *See* Exhibit 2; Exhibit 4, Ex. O.

21  There was certainly no requirement in the Order that privileged documents/privilege

22  log listings be cross-referenced on multiple privilege logs to sustain the privilege.

23  *See* Exhibit 1 at 19:8- 20:5. As such, the Bulson documents were to be returned and

24  not released to Defendants by the Escrow Holder, per the April 30, 2007 Order.

25      29.    In response, Defendants' counsel, Michael Bergman, wrote to the

26  Escrow Holder on May 22, 2007, improperly challenging the assertion of the joint

27  interest privilege in Bulson's log, as if the Escrow Holder were the Court, and

28

Declaration Of Marc Toberoff Filed Pursuant to the Court's September 17, 2007 Order

1  demanding the release of the documents on this alleged newfound basis.  *See* Exhibit

2  6, Ex. E.

3       30.  In his May 22, 2007 letter, Mr. Bergman *admits* that "'escrow

4  documents' originally listed on the privilege logs of non-party witnesses should not

5  be released."  *Id.*  However, one paragraph later, he claims that the two documents

6  listed on the privilege log of Mr. Bulson, a non-party attorney, must be turned over,

7  while citing no rationale or authority for this exception to the April 30, 2007 Order.

8  *Id. See* Exhibit 3 at 39-42.

9       31.  On July 24, 2006, Defendants filed a motion to compel challenging the

10  sufficiency and format of Plaintiffs' privilege logs.  By order dated August 18, 2006,

11  Magistrate Zarefsky denied Defendants' motion, ruling that "the Court notes that the

12  log appears to follow the form suggested in a commonly used treatise, W. Schwarzer,

13  W. Tashima and J. Wagstaffe, Federal Civil Procedure Before Trial, Form 11:A

14  (Rutter 2006). Moreover, the log appears to have the same information which the

15  Court found sufficient in *Dole v. Milonas*, 889 F.2d 885 (9th Cir. 1989). Accordingly,

16  this Court finds that by providing this log, the Plaintiffs have sufficiently asserted the

17  attorney-client privilege and the work product doctrine." *See* Exhibit 4, Ex. A.  Mr.

18  Bulson's privilege log followed the same standard format approved by Magistrate

19  Zarefsky.  *See* Exhibit 4, Ex. O.

20       32.  Thus, the Bulson documents are protected by the applicable joint interest

21  privilege and work product doctrine, as properly noted on his privilege log.

22       I declare under penalty of perjury of the laws of the United States of America

23  that the foregoing is true and correct.

24       Executed on September 20, 2007 in Los Angeles, California.

25

26                                     Marc Toberoff

27

28

9

# EXHIBIT H

1 | KENDALL BRILL & KLIEGER LLP
Richard B. Kendall (90072)
2 |   *rkendall@kbkfirm.com*
Laura W. Brill (195889)
3 |   *lbrill@kbkfirm.com*
Nicholas F Daum (236155)
4 |   *ndaum@kbkfirm.com*
Nathalie E. Cohen (258222)
5 |   *ncohen@kbkfirm.com*
10100 Santa Monica Blvd., Suite 1725
6 | Los Angeles, California  90067
Telephone:  310.556.2700
7 | Facsimile:   310.556.2705

8 | Attorneys for Defendants Marc Toberoff,
Pacific Pictures Corporation, IP
9 | Worldwide, LLC, and IPW, LLC

10

11 | UNITED STATES DISTRICT COURT

12 | CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

13

14 | DC Comics, | Case No. CV 10-3633 ODW(RZx)

15 |      Plaintiff, | **NOTICE OF MOTION AND**
**MOTION TO STRIKE**
16 |     v. | **PLAINTIFF'S STATE LAW**
**CAUSES OF ACTION PURSUANT**
17 | PACIFIC PICTURES CORPORATION, | **TO CALIFORNIA'S ANTI-SLAPP**
IP WORLDWIDE, LLC, IPW, LLC, | **LAW (CAL. CODE CIV. PROC.**
18 | MARC TOBEROFF, an individual, | **§ 425,16); MEMORANDUM OF**
MARK WARREN PEARY, as personal | **POINTS AND AUTHORITIES**
19 | representative of the ESTATE OF
JOSEPH SHUSTER, JOANNE SIEGEL, | *Filed concurrently with*
20 | an individual, LAURA SIEGEL | *DECLARATION OF NICHOLAS F.*
LARSON, an individual, and DOES 1- | *DAUM, MOTION TO DISMISS,*
21 | 10, inclusive, | *REQUEST FOR JUDICIAL NOTICE,*
*and NOTICE OF JOINDER*
22 |     Defendants. |
Hon. Otis D Wright, II
23 |

24 | | Date:   October 18, 2010
Time:   1:30 p.m.
25 | | Complaint Filed:     May 14, 2010

26

27

28

**Kendall Brill**
**& Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

---

1   TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:

2   **PLEASE TAKE NOTICE THAT** on October 2, 2010, at 1:30 p.m., or as

3   soon thereafter as counsel may be heard, in the courtroom of the Honorable Otis D

4   Wright, II, located in the United States Courthouse, 312 N. Spring Street, Los

5   Angeles, California, 90012, Defendants Marc Toberoff, Pacific Pictures

6   Corporation, IP Worldwide, LLC, IPW, LLC ("Toberoff Defendants") will and

7   hereby do move this Court to strike Plaintiff's Fourth, Fifth, and Sixth Causes of

8   Action pursuant to California's Anti-SLAPP statute, Code of Civil Procedure

9   § 425.16.

10   This Motion is made upon the following grounds: the Fourth, Fifth and Sixth

11   Causes of Action are protected by California Code of Civil Procedure § 425.16

12   because they concern (i) statements or writings made before a legislative, executive,

13   or judicial or other official proceeding (Cal. Code Civ. Proc. § 425.16(e)(1),

14   (ii) written or oral statements and writings made in connection with an issue under

15   consideration or review by a legislative, executive, or judicial body (Cal. Code Civ.

16   Proc. § 425.15(e)(2), and (iii) an exercise of free speech rights in connection with a

17   public issue (Cal. Code Civ. Proc. § 425.16(e)(4).

18   The Plaintiff cannot show a reasonable likelihood of success on the merits for

19   its Fourth Claim for Relief, for tortious interference with contract, because (i) no

20   interference has been alleged and no valid contract has been alleged; (ii) the Claim

21   for Relief is barred by a two-year statute of limitations, and (iii) the Claim for Relief

22   is barred by California's litigation privilege.

23   Plaintiff cannot show a reasonable likelihood of success for its Fifth Claim for

24   Relief, for tortious interference with prospective economic advantage, because

25   (i) there is no evidence or credible allegation that the purported prospective

26   economic advantage was interfered with by any defendant; (ii) the Claim for Relief

27   is barred by a two-year statute of limitations, and (iii) the Claim for Relief is barred

28   by California's litigation privilege (Cal. Civil Code § 47(b)).

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1    Plaintiff cannot show a reasonable likelihood of success for its Sixth Claim

2  for Relief, for declaratory relief, because that Claim for Relief is moot, and, to the

3  extent that it is not moot, it fails to provide any basis upon which declaratory relief

4  may be granted.

5    Pursuant to Cal. Code Civ. Proc. § 425.16(c)(1), and *United States ex rel.*

6  *Newsham v. Lockheed Missile & Space Co.*, 190 F.3d 963, 973 (9th Cir. 1999), an

7  order awarding to the Toberoff Defendants their attorneys fees incurred in

8  preparation of this special motion to strike, subject to proof of such fees to be

9  submitted after the proceedings on such motion are concluded.

10    This motion is made following the conference of counsel pursuant to L.R. 7-

11  3, which took place on July 13, 2010.

12    This Motion is based on this Notice of Motion, the attached Memorandum of

13  Points and Authorities, the concurrently filed Declaration of Nicholas F. Daum, all

14  of the pleadings, files, and records in this proceeding, all other matters of which the

15  Court may take judicial notice, and any argument or evidence that may be presented

16  to or considered by the Court prior to its ruling.

17  Dated:  August 13, 2010          KENDALL BRILL & KLIEGER LLP

18

19

20                         By:  /s/ Richard B. Kendall

21                              Richard B. Kendall
                                Attorneys for Defendants Marc Toberoff,

22                              Pacific Pictures Corporation, IP
                                Worldwide, LLC, and IPW, LLC

23

24

25

26

27

28

2
**NOTICE OF MOTION TO STRIKE PLAINTIFF'S STATE LAW CAUSES OF ACTION
PURSUANT TO CALIFORNIA'S ANTI-SLAPP LAW**

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..................................................................................... 1

II. FACTUAL BACKGROUND ................................................................... 4

    A.    General Background .......................................................................... 4

    B.    The Siegels, Independently of Toberoff, Serve Termination
          Notices and Commence Settlement Discussions ............................. 5

    C.    Marc Toberoff Begins Representing the Shuster Family .................. 6

    D.    The Siegels Break Off Settlement Negotiations With DC ............... 7

          1.    Toberoff Does Not Contact the Siegel Family ..................... 7

          2.    Joanne Siegel Informs DC That There Will Be No Deal ........... 8

    E.    The Siegels Fire Gang Tyre and Then Hire Toberoff ....................... 8

    F.    The Commencement of the *Siegel* Litigation ....................... 10

    G.    The Shuster Termination and Cancellation of the PPC
          Agreements .................................................................................... 10

    I.    DC Exploits A Theft Of Privileged And Confidential
          Information From Toberoff's Law Firm In Filing the Instant
          Complaint .................................................................................... 12

III. ARGUMENT ....................................................................................... 12

    A.    The Anti-SLAPP Law .................................................................. 12

    B.    The Fourth, Fifth and Sixth Claims Concern Conduct Protected
          By the Anti-SLAPP Law Because They Concern Statements
          Made In Connection With Litigation and Filings In the U.S.
          Copyright Office ........................................................................... 13

          1.    The Fourth and Fifth Claims Fall Within § 425.16(e) .............. 14

                   (a)    The Fourth Claim Arises From the Encouragement ........ 14

                   of the Shuster Executor to Exercise His Constitutional
                   Right ...................................................................... 14

                   to Petition through Filing With a Government Agency ............. 14

                   (b)    The Fourth and Fifth Claims Arise From the
                   Encouragement .............................................................. 15

**MEMO OF Ps & As IN SUPPORT OF MOTION TO STRIKE PURSUANT TO ANTI-SLAPP LAW** 368

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

of the Shuster Executor to Exercise His Constitutional
Right ...................................................................................... 15

to Petition through Taking Legal Action .................................... 15

(c)   The Fourth and Fifth Claims Arise from Protected
Communications in the Context of Anticipated
Litigation and Settlement Discussions ........................... 16

(d)   The Fourth and Fifth Claims Arise From Protected
Solicitation of Attorney-Client Relationships ................. 18

2.   The Sixth Claim Falls Within § 425.16(e) ................................. 19

C.   The Fourth, Fifth and Sixth Claims for Relief Concern Conduct
Protected By the Anti-SLAPP Law Because They Concern
Statements Made In Connection With A Public Issue ......................... 21

D.   The Fourth, Fifth and Sixth Claims for Relief Have No
Likelihood of Success on the Merits .................................................... 21

1.   The Motion to Dismiss Arguments Are Incorporated By
Reference ................................................................................... 21

2.   The Fifth Claim Fails Because There Is No Evidence That
Toberoff Interfered With the Purported Economic
Relationship ................................................................................ 22

3.   The Fifth Claim for Relief Is Barred by the Statute of
Limitations ................................................................................. 23

4.   The Sixth Claim Against the Toberoff Entities Will Fail ........... 24

IV.   CONCLUSION AND REQUEST FOR FEES ............................................... 25

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

MEMO OF Ps & As IN SUPPORT OF MOTION TO STRIKE PURSUANT TO ANTI-SLAPP LAW

369

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Batzel v. Smith*,
    333 F.3d 1018 (9th Cir. 2003).................................................................13, 21

*Briggs v. Eden Council for Hope and Opportunity*,
    19 Cal. 4th 1106 (1999)...........................................................14, 15, 16

*Campbell v. PMI Food Equipment Group, Inc.*,
    509 F.3d 776 (6th Cir. 2007)....................................................................25

*Classic Media, Inc. v. Mewborn*,
    532 F.3d 978 (9th Circuit 2008)................................................................4

*Dixon v. Superior Court*,
    30 Cal. App. 4th 733 (1994)....................................................................13

*Dove Audio v. Rosenfeld, Meyer & Susma,n*
    47 Cal. App. 4th 777 (1996)....................................................................15

*GeneThera, Inc. v. Troy & Gould Prof. Corp.*,
    171 Cal. App. 4th 901 (2009)...................................................................17

*Hilton v. Hallmark Cards*,
    580 F.3d 874 (9th Cir. 2009)................................................................13, 21

*Jolly v. Eli Lilly & Co.*,
    44 Cal. 3d 1103 (1988)............................................................................24

*Kashian v. Harriman*,
    98 Cal. App. 4th 892 (2002)....................................................................14

*Ketchum v. Moses*,
    24 Cal. 4th 1122 (2001)............................................................................4

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003)...........................................................................23

*Ludwig v. Superior Court*,
    37 Cal. App. 4th 8 (1995)...........................................................12, 15, 16

*Mindys Cosmetics, Inc. v. Dakar*,
    --- F.3d ---, 2010 WL 2652480 (9th Cir. July 6, 2010).....................12, 13, 14

*Neville v. Chudacoff*,
    160 Cal. App. 4th 1255 (2008).......................................................13, 14, 17, 20

*Rohde v. Wolf*,
    154 Cal. App. 4th 28 (2007)....................................................................14

Kendall Brill
& Klieger LLP

10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

*Rubin v. Green*,
 4 Cal. 4th 1187 (1993)...................................................................................19

*Seltzer v. Barnes*,
 182 Cal. App. 4th 953 (2010)..........................................................13, 17, 21

*Siegel v. Warner Bros. Ent. Inc.*,
 690 F. Supp. 2d 1048 (C.D. Cal. 2009).........................................................2, 12

*Siegel v. Warner Bros. Ent. Inc.*,
 658 F. Supp. 2d 1036 (C.D. Cal. 2009).........................................................2, 12

*Siegel v. Warner Bros. Ent. Inc.*,
 542 F. Supp. 2d 1098 (C.D. Cal. 2008)........................................................passim

*Super Tire Eng'g Co. v. McCorkle*,
 416 U.S. 115 (1974).......................................................................................25

*Taheri Law Group v. Evans*,
 160 Cal. App. 4th 482 (2008)........................................................................19

*United States ex rel. Newsham v. Lockheed Missile & Space Co.*,
 190 F.3d 963 (9th Cir. 1999)..................................................................2, 4, 13

*Youst v. Longo*,
 43 Cal.3d 64 (1987)......................................................................................22


**STATUTES**

17 U.S.C. § 304...............................................................................................5, 6, 15

17 U.S.C. 203.......................................................................................................15

73 Fed. Reg. 3899 37............................................................................................15

Cal. Civil Code § 47.........................................................................................1, 19

Cal. Code Civ. Proc. § 425..............................................................................passim

Cal. Code Civ. Proc. § 426....................................................................................14

Cal. Evid. Code § 1152.........................................................................................18

L.R. 7-3...................................................................................................................2

Public Law 105-298 (1998)....................................................................................6

Public Law. 94-553 1976 S22.................................................................................6

U.S.C. § 304............................................................................................................4

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

iv

**1**   **<u>OTHER AUTHORITIES</u>**

**2**   3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 11.01[A] (2010) ...................5

**3**   H.R. Rep. No. 94-1476 at 140 (1976) ...........................................................5

**4**

**5**

**6**

**7**

**8**

**9**

**10**

**11**

**12**

**13**

**14**

**15**

**16**

**17**

**18**

**19**

**20**

**21**

**22**

**23**

**24**

**25**

**26**

**27**

**28**

**Kendall Brill
& Klieger LLP**

10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

*"If you have the facts on your side you try the facts.  If you don't have the facts you try the law.  And if you don't have the facts and don't have the law, you try the prosecutor."* – Defense Lawyer's Adage

This Court has determined in three published opinions and countless orders that the plaintiff in this action, DC Comics ("DC") has neither the facts nor the law on its side in the long-running dispute between DC and the heirs of *Superman's* creators, Jerome Siegel ("Siegel") and Joseph Shuster ("Shuster") over the exercise of their termination rights under the Copyright Act.  After this Court ruled that the embattled Siegel heirs had, at long last, recaptured the copyright in their iconic creation, DC responded with a vituperative countersuit against their lawyer, Marc Toberoff, who had successfully prosecuted the action for the Siegels and who also represents the Shuster heirs.  The transparent purpose of DC's lawsuit against Mr. Toberoff is to re-litigate the issues that DC has already lost, disrupt the relationship between Mr. Toberoff and his clients, and delay the final reckoning between DC and Mr. Toberoff's clients.  As demonstrated below, DC's desperate and cynical strategy must fail.  DC's allegations of interference arising from Toberoff's communications and understandings with his clients, and DC's claims of damage resulting from the clients' statutory terminations, rejection of DC's settlement overtures, and commencement of litigation, challenge activity that is protected under California's Anti-SLAPP law, California Code of Civil Procedure § 425.16.   DC's retaliatory claims strike at the heart of the S*uperman* heirs' right to zealous representation by an attorney to pursue their statutory rights in filings with the U.S. Copyright Office, in settlement negotiations and in the courts.  DC's countersuit is therefore a paradigmatic strategic lawsuit against public participation, and the Anti-SLAPP law commands that its Fourth, Fifth, and Six Claims for Relief be stricken.

In the mid-1930s, Siegel and Shuster, two Depression-era high school students, co-created *Superman* and with it, the superhero genre.  In 1938, for a

**Kendall Brill & Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1 pittance, they signed a publisher's release and were later held to have granted their

2 entire copyright in *Superman* to DC. Despite the riches their creations earned for

3 DC, Siegel and Shuster died in penury. However, in 1976 and again, in 1998,

4 Congress amended the Copyright Act to provide authors and designated heirs the

5 right to recapture their copyrights by terminating such one-sided unremunerative

6 grants. The Siegel heirs and the executor of Shuster's estate availed themselves of

7 this statutory termination right and, ever since, DC has fought tooth and nail to

8 prevent them from receiving its intended benefits.

9     The attorney for the Siegel heirs in the two actions that have been pending in

10 this District since 2004, and also for the Shuster heirs in the probating of the Shuster

11 Estate and the drafting, filing and enforcement of the executor's notices of

12 termination, is Marc Toberoff ("Toberoff") and his law firm, Toberoff & Associates.

13 Toberoff began representing the Shuster heirs in 2001, and the Siegels in late 2002.

14     In 2008 and 2009, Toberoff won key victories for his clients. This Court first

15 ruled, in an extraordinarily detailed 72-page published opinion, that the Siegels'

16 *Superman* termination was valid with respect to the first *Superman* story, as

17 published in "Action Comics No. 1," which contained the core *Superman* elements.

18 Next, in August 2009, this Court, in a second exhaustive published opinion, held

19 that the Siegels' termination was valid with respect to the first two weeks of the

20 *Superman* newspaper strips, containing *Superman's* key origin story on the planet

21 Krypton. *See Siegel v. Warner Bros. Ent. Inc.*, 542 F. Supp. 2d 1098, 1117-39 (C.D.

22 Cal. 2008) ("*Siegel I*") (validity of termination), 658 F. Supp. 2d 1036, 1080-84

23 (C.D. Cal. 2009) ("*Siegel II*") (scope includes newspaper strips). In October 2009,

24 this Court denied DC's motion for reconsideration in a third published opinion. *See*

25 690 F. Supp. 2d 1048 (C.D. Cal. 2009) ("*Siegel III*").

26     After losing on summary judgment, DC brought this countersuit against Mr.

27 Toberoff. As demonstrated below, however, the Anti-SLAPP law requires prompt

28 dismissal of this lawsuit, because all of DC's claims involve communicative

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

55730.2

2

1  activities that arise from Toberoff's clients' efforts to vindicate their legal rights:  in

2  copyright termination notices filed in the U.S. Copyright Office; in years of grinding

3  settlement negotiations accompanied by DC's threats of litigation; and finally in

4  years of litigation that led to Toberoff's victories on behalf of his clients.

5       DC's Fourth, Fifth, and Six Claims boil down to two contentions – that

6  Toberoff interfered by (i) wrongfully soliciting the Siegel and Shuster heirs as

7  clients and (ii) encouraging and enforcing the exercise of their termination rights

8  under the Copyright Act – both of which are plainly protected under the Anti-

9  SLAPP law.  Every alleged injury of which DC complains resulted from the Siegels'

10  and Shusters' struggle "against all odds" to enforce their statutory termination

11  rights, both in the Copyright Office and in the courts, instead of settling on DC's

12  one-sided terms. *Siegel I,* 542 F. Supp. 2d at 1102 (quotation marks omitted).  Their

13  pre-litigation communications and agreements with an attorney, Toberoff, as they

14  and he marshaled their resources and prepared to enforce rights under the Copyright

15  Act, lie at the core of the Anti-SLAPP statute's promise that strategic lawsuits will

16  not be allowed to deter or delay citizens from enforcing their legal rights.

17       Because the Fourth through Sixth Claims for Relief fall within the Anti-

18  SLAPP law, the burden is on DC to establish a "reasonable probability" that it will

19  prevail on the merits of these claims – a burden it cannot meet.  DC has no

20  reasonable probability of demonstrating a likelihood of success on the merits on any

21  of its three state-law claims against Toberoff and affiliated entities:  tortious

22  interference with contract; tortious interference with prospective economic

23  advantage; and declaratory relief under California's unfair competition laws.  The

24  claims fail as a matter of law for the reasons extensively detailed in the Motions to

25  Dismiss filed concurrently herewith, and for the additional reasons set forth in

26  Section III, below.  DC's claims are time-barred and moot, the heirs breached no

27  agreements, and Toberoff's alleged "interference" consisted of litigation-related

28  communications immunized by the litigation privilege.  Accordingly, the Court

Kendall Brill
& Klieger LLP

10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

55730.2                                            3

**MEMO OF Ps & As IN SUPPORT OF MOTION TO STRIKE PURSUANT TO ANTI-SLAPP LAW** 375

1   should strike all three claims, and award the Toberoff defendants their attorney's

2   fees as mandated by the statute.[1]

3   **II.  FACTUAL BACKGROUND**

4   **A.       General Background**

5          Author Jerome Siegel and illustrator Joseph Shuster co-created *Superman*.

6   *Siegel I*, 542 F. Supp. 2d at 1126-30.  They conceived of *Superman* in the mid-

7   1930s, while in high school, and co-authored *Superman* comic strips.  *Id*. at 1102-

8   05.  In 1938, Siegel and Shuster adapted their preexisting *Superman* strips to a

9   comic-book format and their original *Superman* story was published in "Action

10  Comics No. 1" by Detective Comics. Inc., DC's predecessor-in-interest.  *Id.* at

11  1105-07.  "Action Comics No. 1" contained the essential format for *Superman*

12  stories to come.  *Id*. at 1108-1110.  By agreement dated March 1, 1938, Siegel and

13  Shuster granted Detective worldwide rights in their *Superman* story and character,

14  and DC freely exploited those rights in multiple media for over 70 years.  *Id*. at

15  1107, 1110.  From 1938 to 1943, Siegel and Shuster wrote hundreds of additional

16  *Superman* stories, and hundreds of *Superman* syndicated newspaper strips.  *Siegel*

17  *II*, 658 F. Supp. 2d at 1047-56.

18         In 1976, Congress amended the Copyright Act to extend the copyright term,

19  and in response to the plight of authors who lacked bargaining power and, like

20  Siegel and Shuster, had sold their copyrights for a pittance, never realizing fair

21  value for their contributions, Congress, gave authors, their surviving spouses,

22  children, and grandchildren the right to recapture their copyrights, for the extended

23  term, by terminating prior grants of copyright.  Complaint ¶ 45; 17 U.S.C. § 304.[2]

24  _____

25         [1] *See* Cal. Code Civ. Proc. § 425.16(c)(1), *United States ex rel. Newsham v. Lockheed Missile & Space Co., Inc*., 190 F.3d 963, 973 (9th Cir. 1999); *Ketchum v. Moses*, 24 Cal. 4th 1122, 1131 (2001).

26         [2] *See Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 983 (9th Circuit 2008)

27  (noting that Congress, in recognition of the "unequal bargaining position of authors," engrafted the termination right into the 1976 Act to provide the benefits of

28  the extended copyright renewal term to authors, rather than to their assignees, along with "the monetary rewards of a work that may have been initially undervalued, but

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

55730.2

4

**MEMO OF Ps & As IN SUPPORT OF MOTION TO STRIKE PURSUANT TO ANTI-SLAPP LAW** 376

Case 2:10-cv-03633-ODW-RZ   Document 61-3   Filed 09/13/10   Page 123 of 243   Page
Case 2:10-cv-03633-ODW-RZ   Document 301-1   Filed 08/19/10   Page 13 of 33   Page ID #:149
ID #:4156

1    Congress intended to give the benefit of the extended copyright term to authors and

2    their families rather than to grantees, such as DC, for whom the automatic grant of

3    the extended term would have been an unjustified windfall.  *See* H.R. Rep. No. 94-

4    1476 at 140 (1976).  The termination right lies in stark contrast to ordinary contract

5    principles, as it empowers authors and designated heirs to terminate grants of

6    copyright *without cause*, regardless of the contracting parties' promises, intent or

7    expectations at the time of the grant.  17 U.S.C. § 304(c)(5).

8    **B.**    **The Siegels, Independently of Toberoff, Serve Termination Notices and**

9          **Commence Settlement Discussions**

10         In 1996, Jerome Siegel died.  *Siegel I*, 542 F. Supp. 2d at 1113; Complaint

11   ¶ 60.  He was survived by his widow, defendant Joanne Siegel, and their daughter,

12   defendant Laura Siegel Larson (the "Siegels").  *Siegel I*, 542 F. Supp. 2d at 1114.  In

13   1997, the Siegels began the process of terminating Jerome Siegel's 1938 *Superman*

14   copyright grant to DC.  *Id.*  On April 3, 1997, represented by counsel, the Siegels

15   served seven separate notices of termination under 17 U.S.C. § 304(c), terminating

16   Jerome Siegel's grants or potential grant(s) of copyright, each covering a multitude

17   of works embodying *Superman*.  *Id.*  The parties thereafter engaged in what the

18   Court has termed "settlement" discussions to resolve their legal dispute.  *Id.* at 1115.

19         The day before the termination was to take effect, DC sent a letter to Arthur

20   Levine, then-counsel for Joanne Siegel and Laura Siegel Larson, contesting the

21   "validity and scope" of their termination notices.  *Id.*; Declaration of Nicholas F.

22   Daum ("Daum Decl.)[3] Ex. A (Toberoff Decl. Ex. Q at 171).  Thereafter, the Siegels

23   retained new counsel, the firm of Gang, Tyre, Ramer and Brown, for further

24   _____

25   which later becomes a commercial success.");  *see also* 3 M. Nimmer & D. Nimmer,
     *Nimmer on Copyright* § 11.01[A] (2010).

26         [3] All documents and deposition excerpts referenced in the text of this motion
     have been attached as exhibits to the Declaration of Nicholas F. Daum.  References

27   herein to "Ex. ___" are references to exhibits attached to the Daum Declaration.
     References to "MT Depo," "LSL Depo," "JS Depo," "MWP," "JP," and "KM

28   Depo" are, respectively, references to the Deposition of Marc Toberoff, Laura
     Siegel Larson, Joanne Siegel, Mark Warren Peary, Jean Peavy and Kevin Marks.

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1  settlement negotiations, conducted primarily by Kevin Marks ("Marks") of Gang,

2  Tyre for the Siegels, throughout 2001. *Siegel I*, 542 F. Supp. 2d at 1115; Complaint

3  ¶ 61.

4  **C.    Marc Toberoff Begins Representing the Shuster Family**

5        Joseph Shuster died in 1992. Complaint ¶ 46. At his death, he had no

6  surviving widow, children or grandchildren. *Id.* Although he was survived by his

7  siblings, Frank Shuster (who died in 1996) and Jean Peavy ("Peavy"), and by

8  Peavy's two children, *id.*, these heirs held no termination rights under the 1976

9  Copyright Act, as such rights had been provided solely to an author, his/her widow

10 or widower, children, or grandchildren. *See* Public Law. 94-553 1976 S22, at

11 § 304(c)(2). In 1998, however, Congress amended the 1976 Act to provide, for the

12 first time, the termination right to an "author's executor, administrator, personal

13 representative, or trustee." 17 U.S.C. § 304; Pub. Law 105-298 (1998).

14       In mid-2001, Joseph Shuster's nephew, Mark Warren Peary ("Peary"), after

15 researching copyright issues on the internet, sought out attorney Marc Toberoff in

16 connection with the potential termination of Joseph Shuster's copyright grants. Exs.

17 B, G (MT Depo at 52:9-25; MWP Depo at 20:5-20:22). Peary's telephone call was

18 Toberoff's first contact with any member or representative of the Siegel or Shuster

19 families. *Id.* Soon thereafter, Toberoff began providing legal advice to Peavy and

20 Peary (hereinafter, the "Shusters"). Ex. G (MWP Depo at 23:18-20; 23:25-24:3). In

21 November 2001, Peavy and Peary entered into a joint venture agreement with

22 Pacific Pictures Corp. ("PPC"), Toberoff's "loan-out" company, "for the purpose of

23 retrieving, enforcing and exploiting all of Joe Shuster and his estate's rights, claims,

24 copyrights, property, title and interests in and to Joe Shuster's creations." Ex. C

25 (MT Depo Ex. 13, at p. 1) (the "2001 PPC Agreement"); Complaint ¶ 54. The 2001

26 PPC Agreement provided for the establishment of the Estate of Joseph Shuster

27 through probate proceedings, and that the venture would "retain Marc Toberoff,

28 Esq. to render legal services." Ex. C (MT Depo Ex. 13, at ¶ 7); Complaint ¶ 57.

Kendall Brill
& Klieger LLP

10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

55730.2

6

1 | Toberoff has provided legal advice to Peavy and Peary continuously since
2 | November 2001. Ex. B (MT Depo at 65:1-66:22).

3 | **D.**    **The Siegels Break Off Settlement Negotiations With DC**

4 |      Meanwhile, the Siegels (still represented by Gang, Tyre) and DC continued
5 | settlement negotiations. On October 19, 2001, Gang Tyre sent to DC a "six page
6 | letter outlining the substance of a settlement offer from defendants." *Siegel I*, 542 F.
7 | Supp. 2d at 1136. On October 26, 2001, DC responded with its own outline and
8 | counter-offer. *Id.* DC's outline was materially different than the Siegels' letter
9 | summary of the proposed settlement, including differences with regards to the scope
10 | of the rights granted, the relevant indemnities and other warranties, and additional
11 | issues. *See id.* Months later, on February 1, 2002, DC's outside counsel provided
12 | the Siegels with a 56-page draft long-form settlement agreement. *Id.* at 1115; Ex. P
13 | (LSL Depo Ex. 25). The draft agreement also contained numerous differences from
14 | Marks' October 19 letter and even DC's October 26 letters. *Id.* at 1137-40.

15 |      **1.**    **Toberoff Does Not Contact the Siegel Family**

16 |      As Toberoff began to advise the Shuster family in November 2001, he
17 | attempted to learn the status of the Siegels' parallel negotiations with DC. Ex. B
18 | (MT Depo 86:1-87:4). The Siegels' prior counsel, Arthur Levine, informed
19 | Toberoff that Marks represented the Siegels in negotiations with DC. Ex. B (MT
20 | Depo 86:22-87:1). Accordingly, Toberoff left a phone message for Marks on
21 | November 29, 2001. Marks did not return the call. Ex. R (KM Depo 151:4-11);
22 | Ex. B (MT Depo 86:20-21). On February 6, 2002, Toberoff tried to call Marks
23 | again. Exs. R, S (KM Depo 151:18-152:2 & Ex. 3 at GTBR 604). A few days
24 | later, Marks called Toberoff back, and the two had a brief conversation, in which
25 | Marks informed Toberoff that the Siegels were in negotiations with DC, and
26 | declined to speak with Toberoff about the Siegels' *Superman* interests. Exs. B, R
27 | (MT Depo 90:16-92:9; KM Depo 151:18-153:20). The conversation did not
28 | proceed further. Ex. B (MT Depo 90:21-91:1). Apart from the unanswered

Kendall Brill
& Klieger LLP

10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

55730.2

7

**MEMO OF Ps & As IN SUPPORT OF MOTION TO STRIKE PURSUANT TO ANTI-SLAPP LAW** 379

November 29, 2001 message and the brief February 6, 2002 call with Marks, Toberoff had no contact with any member or representative of the Siegel family until late-July or early August 2002.  Exs. B, K, M (MT Depo 94:10-97:24; JS Depo 33:24-34:1, 41:1-3; LSL Depo 17:6-8).

### 2. Joanne Siegel Informs DC That There Will Be No Deal

On May 9, 2002, Joanne Siegel ("Joanne"), with no involvement by counsel, sent a letter to Richard Parsons, the COO of DC's parent company, AOL Time Warner, Inc.  In that letter, she expressed her anger at the draft contract provided by DC, and declared unequivocally that an agreement was "impossible."  Ex. O (LSL Depo Ex. 23) ("After four years we have no deal and this contract makes an agreement impossible.")  No lawyer helped her write the letter, and she did not discuss the letter with any lawyer before sending it.  Ex. K (JS Depo 33:17-34:1). [4] In fact, at the time Joanne sent this letter, neither of the Siegels had ever had any contact with Toberoff.  Exs. K, M (JS Depo 33:17-34:1, 41:1-3; LSL Depo 17:6-8).

### E. The Siegels Fire Gang Tyre and Then Hire Toberoff

In late July 2002, Toberoff called Marks to inquire as to the status of the Siegels' termination.  Ex. B (MT Depo 94:10-97:19).  Earlier in 2002, Toberoff and Ari Emanuel ("Emanuel") of the Endeavor Talent Agency, now William Morris Endeavor, had formed a joint venture, IP Worldwide, LLC ("IP Worldwide"), for the purpose of acquiring and talent packaging intellectual property rights.  Exs. B, R (MT Depo 32:12-14, 116:6-23; KM Depo 168:13-20).  Toberoff asked Marks if the Siegels would be interested in licensing their *Superman* rights.  *Id.* (MT Depo 97:14-19; KM Depo 166:23-167:3).  Marks was receptive and told Toberoff that he should present any offers.  *Id.* (MT Depo 94:17-95:2, 97:14-19; KM Depo 166:23-167:3).

---

[4] DC has conceded that Joanne acted without counsel's assistance or participation. Ex. Z (Joint Stip. re: Motion to Compel Whistle Blower Documents at 5) (DC: "Indeed, on May 9, 2002, plaintiff Joanne Siegel – *without the assistance or participation of counsel* – wrote letters to Time Warner's chief executives…") (emphasis added).

Kendall Brill & Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

55730.2

8

MEMO OF Ps & As IN SUPPORT OF MOTION TO STRIKE PURSUANT TO ANTI-SLAPP LAW   380

1    Several days later, in early August 2002, Marks held a conference call with

2    Toberoff and Emanuel, during which Emanuel made a proposal to purchase the

3    Siegels' rights for $15 million plus a portion of the "back end."  Exs. B, R. (MT

4    Depo 99:5-100:1, 103:1-9; KM Depo 168:2-169:5).  Marks conveyed this August

5    2002 offer to the Siegels, but they did not respond to Toberoff or Emanuel.

6    Toberoff had no further contact with the Siegels or their counsel until early October

7    2002.  Exs. B, R (MT Depo 105:24-106:23; KM Depo 169:23-170:12, 171:14-21,

8    172:14-17, 174:17-21).

9    On September 21, 2002, the Siegels sent a letter to their counsel at Gang

10   Tyre, with a copy to Time Warner (DC's parent), that terminated Gang Tyre and

11   provided "formal notification that we are totally stopping and ending all

12   negotiations with DC Comics, Inc., its parent company AOL Time Warner and all of

13   its representatives and associates."  Ex. Q (LSL Depo Ex. 41) (Sept. 21, 2002 letter

14   to Marks and Ramer).  The same day, the Siegels sent a letter to DC's President,

15   stating that "after many years of difficult negotiations with your representatives

16   culminating in an offer sent to us on February 4, 2002, irreconcilable differences

17   exist that cannot be overcome."  Ex. L (JS Depo Ex. 43) (Sept. 21, 2002 letter to

18   Levitz); *Siegel I*, 542 F. Supp. 2d at 1136.

19   The September 21 letters were sent before either of the Siegels had ever met

20   Toberoff, and Toberoff had not consulted with them in any way concerning these

21   letters.  Ex. M (LSL Depo 261:17-262:7).  In early October 2002, Joanne Siegel

22   contacted Toberoff.  Exs. B, M (MT Depo 106:1-107:7, 135:1-6; LSL Depo 17:6-

23   13).  Joanne informed Toberoff that she had gotten his name from Jean Peavy, and

24   that she was looking for a lawyer to represent her in connection with the Siegels'

25   termination rights.  Ex. B (MT Depo 107:8-24).   The Siegels thereafter formed an

26   attorney-client relationship with Toberoff.  Exs. B, K, M (MT Depo 109:14-110:9;

27

28

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

55730.2

9

MEMO OF Ps & As IN SUPPORT OF MOTION TO STRIKE PURSUANT TO ANTI-SLAPP LAW   381

1    JS Depo 41:1-3; LSL Depo 17:6-13).[5]

2    **F.**      **The Commencement of the *Siegel* Litigation**

3        In November 2002, the Siegel family, now represented by Toberoff, filed an

4 additional notice of termination regarding *Superboy*. Ex. N (LSL Depo Ex. 17).

5 Thereafter, Toberoff met with Warner Bros.' General Counsel, who acted on behalf

6 of DC, to engage in negotiations regarding *Superman* and *Superboy*, but to no avail.

7 Ex. V (John Schulman Depo 94:23-95:19). In October 2004, the Siegels,

8 represented by Toberoff, filed two actions in this Court, No. 04-CV-08400 ODW

9 (RZx) (*Superman*) & 04-CV-08776 ODW (RZx) (*Superboy*), seeking, among other

10 remedies, declaratory relief that the *Superman* and *Superboy* terminations were valid

11 and enforceable. Prior to filing these actions, Toberoff entered into a legal retainer

12 agreement with the Siegels and has litigated these two cases for nearly six years

13 pursuant to such retainer agreements. Ex. B (MT Depo. 114:15-18).

14    **G.**      **The Shuster Termination and Cancellation of the PPC Agreements**

15        Meanwhile, as contemplated in the 2001 PPC Agreement, the estate of Joseph

16 Shuster (the "Shuster Estate") was probated. Mark Warren Peary was appointed as

17 the Shuster Estate's personal representative ("Shuster Executor"). Ex. G (MWP

18 Depo 56:14-25). In October 2003, the 2001 PPC Agreement was modified, creating

19 a new agreement (the "2003 PPC Agreement") to add as a party Mark Warren Peary

20 in his capacity as personal representative of the Shuster Estate. Exs. B, D (MT

21 Depo 70:13-17 & Ex. 14). Like the 2001 PPC Agreement, the 2003 PPC

22

23        [5] After this relationship formed, in October 2002, Joanne Siegel, and Laura
24 Siegel Larson entered into an agreement with IP Worldwide (the "IP Worldwide Agreement"), dated as of October 3, 2002. Ex. F (MT Depo Ex. 18). Under this
25 agreement, which had an 18-month term, the Siegels agreed to "grant[] [IP Worldwide] the exclusive right to represent [the Siegels' rights] throughout the
26 world in negotiating and assisting [the Siegels] to arrange and negotiate the sale, lease, license, and all other dispositions or exploitations of the Rights." *Id.*¶ 1. IP
27 Worldwide would "provide Marc Toberoff's legal services with respect to all legal contracts in connection with all of the above." *Id.* ¶ 2. The IP Worldwide
28 Agreement was briefly extended, and then expired of its own force as of on April 23, 2005, and has had no effect for more than five years. *Id.*¶ 5.

**Kendall Brill & Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

55730.2

10

**MEMO OF Ps & As IN SUPPORT OF MOTION TO STRIKE PURSUANT TO ANTI-SLAPP LAW** 382

1    Agreement provided that Toberoff would be retained as counsel. *Id.* at ¶ 2.

2        In November 2003, the Shuster Executor filed in the U.S. Copyright Office

3    and served on DC a formal notice of termination under 17 U.S.C. § 304(d) (the

4    "Shuster Termination"), terminating Joseph Shuster's *Superman* copyright grants.

5    *Siegel I*, 542 F. Supp. 2d at 1114, n.3; Complaint ¶ 79-81. Toberoff prepared the

6    termination notice and proof of service. Ex. H (MWP Depo Ex. 7) (Notice of

7    Termination at 10, 13); Complaint ¶ 80. DC contests the validity of the termination.

8    Complaint ¶¶ 92-151. On April 28, 2005, DC sent a letter to Peavy and Peary that

9    repeated DC's arguments against the terminations in the *Siegel* litigation, and

10   offered to settle with the Shusters. Ex. J (MWP Depo Ex. 10). The Shuster

11   Executor declined this offer. Ex. G (MWP Depo 68:18-20).

12       In September 2004, Toberoff, Jean Peavy, and Mark Warren Peary cancelled

13   the 2001 and 2003 PPC Agreements. Ex. E (MT Depo Ex. 15). For nearly six

14   years, Toberoff has had only a legal retainer agreement with Peavy and the Shuster

15   Executor. Ex B (MT Depo, 62:9-14; 78:19-23). Thus, neither of the PPC

16   Agreements has had any force or effect for nearly six years. The Shuster family is

17   still represented by Toberoff. PPC was dissolved in 2009. RJN in support of

18   Motion to Dismiss Fourth and Fifth Causes of Action ("MTD RJN") ¶ 7.

19   **H.     The Siegels Win Summary Judgment in the *Siegel* Litigation**

20       Discovery in the *Siegel* Litigation lasted over two years. The parties

21   produced voluminous documents and DC took depositions of all of the witnesses to

22   the Siegel and Shuster dealings with Toberoff. On April 30, 2007, the parties filed

23   cross-motions for partial summary judgment. On March 26, 2008, the Court issued

24   its ruling on the parties' summary judgment motions. *See Siegel I*, 542 F. Supp. 2d

25   1098. The Court granted the Siegels' motion in dominant part. Notably, the Court

26   held that "all the Superman material contained in <u>Action Comics</u>, Vol. 1 [the first

27   published *Superman* comic-book] is not a work-made-for-hire and is therefore

28   subject to termination." *Id.* at 1130. The Court rejected many of DC's affirmative

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

55730.2
                                    11
MEMO OF Ps & As IN SUPPORT OF MOTION TO STRIKE PURSUANT TO ANTI-SLAPP LAW    383

defenses, including DC's argument that the parties had a binding settlement agreement as a result of the 2001-2002 negotiations. *Id.* at 1139. In 2009, the Court further ordered that a number of additional *Superman* works had been successfully "terminated," *Siegel II*, 658 F. Supp. 2d at 1063-83, and thereafter denied DC's motion to reconsider that ruling. *Siegel III*, 690 F. Supp. 2d at 1073-74.

## I. DC Exploits A Theft Of Privileged And Confidential Information From Toberoff's Law Firm In Filing the Instant Complaint

On May 14, 2010, DC filed the instant action against Toberoff, the Siegels and Shusters, and attached to its Complaint an anonymous cover letter (the "Cover Letter"), calling it the "Toberoff Timeline." DC acknowledges in its Complaint that the Cover Letter was written by an attorney and former Toberoff & Associates employee (Complaint ¶ 89), yet DC fails to mention in its Complaint that the Cover Letter, which the attorney sent to Warner Bros.' General Counsel prior to June 28, 2006, in the midst of the *Siegel* litigation, enclosed reams of ***privileged*** attorney-client documents ***stolen*** by the attorney from Toberoff's law firm. Ex. BB (Toberoff Sept. 20, 2007 Decl. ¶¶ 7-14). The Cover Letter on which DC relies is set up as an obvious "hit piece" against Toberoff, and purports to discuss the stolen privileged documents the attorney handed over to Warner Bros. in blatant violation of his duties of loyalty and confidentiality to the Siegels and Shusters. Ex. AA, BB (Toberoff Mar. 23, 2007 Decl. ¶¶ 25-26; Toberoff Sept. 20, 2007 Decl. ¶¶ 7-8).

## III. ARGUMENT

## A. The Anti-SLAPP Law

California's Anti-SLAPP law, Code of Civil Procedure ("CCP") § 425.16, provides substantive immunity from suit for claims that interfere with the exercise of speech rights, including the right to communicate with government offices, or with private parties in contemplation or furtherance of litigation. *See Mindys Cosmetics, Inc. v. Dakar*, --- F.3d. ---, 2010 WL 2652480 at *1 (9th Cir. July 6, 2010); *Ludwig v. Superior Court*, 37 Cal. App. 4th 8, 14 (1995); *Neville v.*

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

55730.2

12

MEMO OF Ps & As IN SUPPORT OF MOTION TO STRIKE PURSUANT TO ANTI-SLAPP LAW   384

1  *Chudacoff*, 160 Cal. App. 4th 1255, 1268-69 (2008).  The Anti-SLAPP law applies

2  to California state-law claims brought in federal court.  *Batzel v. Smith*, 333 F.3d

3  1018, 1025 (9th Cir. 2003) .  "The hallmark of a SLAPP suit is that it lacks merit

4  and is brought with the goals of obtaining an economic advantage over a citizen

5  party by increasing the cost of litigation to the point that the citizen party's case will

6  be weakened or abandoned, and of deterring future litigation."  *United States v.*

7  *Lockheed Missiles & Space Co.*, 190 F.3d 963, 971 (9th Cir. 1999).  It is a remedy

8  designed to quickly dispose of "lawsuits brought primarily to chill the valid exercise

9  of constitutional rights of freedom of speech and petition for redress of grievances."

10  Cal. Code Civ. Proc. § 425.16(a); *Dixon v. Superior Court*, 30 Cal. App. 4th 733,

11  741 (1994).

12  Anti-SLAPP motions to strike involve a two-step process.  First, a defendant

13  is required to make a prima facie showing that the plaintiff's suit arises from activity

14  that is protected under the Anti-SLAPP law.  *See Neville*, 160 Cal. App. 4th at 1261-

15  62.  Second, "[t]he burden then shifts to the plaintiff to establish a reasonable

16  probability that the plaintiff will prevail on his or her [] claim."  *Batzel*, 333 F.3d at

17  1024.  In applying § 425.16, courts must heed the Legislature's admonition that it be

18  "construed broadly."  *Hilton v. Hallmark Cards*, 580 F.3d 874, 882-83 (9th Cir.

19  2009).  Even if a cause of action concerns *some* activity that is not protected under

20  § 425.16 in addition to protected activity, the cause of action will be subject to the

21  Anti-SLAPP law provided that the protected activity is not "merely incidental" to

22  the unprotected conduct.  *Seltzer v. Barnes*, 182 Cal. App. 4th 953, 962-963 (2010).

23  **B.**  **The Fourth, Fifth and Sixth Claims Concern Conduct Protected By the**

24  **Anti-SLAPP Law Because They Concern Statements Made In Connection**

25  **With Litigation and Filings In the U.S. Copyright Office**

26  California enacted the anti-SLAPP statute "in response to the legislature's

27  concern about civil actions aimed at private citizens to deter or punish them for

28  exercising their political or *legal* rights.'"  *Mindys Cosmetics*, 2010 WL 2652480 at

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

55730.2

13

MEMO OF Ps & As IN SUPPORT OF MOTION TO STRIKE PURSUANT TO ANTI-SLAPP LAW   385

1   *1 (quoting *Newsham*, 190 F.3d at 970) (emphasis added).  The Anti-SLAPP statute

2   applies to claims based upon "written or oral statement[s] or writing[s] made in

3   connection with an issue under consideration or review by a legislative, executive,

4   or judicial body, or any other official proceeding authorized by law."  Cal. Code

5   Civ. Proc. § 425.16(e)(2).  Courts have routinely applied this provision to

6   "litigation-related" activities, and have adopted an "expansive view of what

7   constitutes litigation-related activities within the scope of section 425.16."  *Kashian*

8   *v. Harriman*, 98 Cal. App. 4th 892, 908 (2002).  If a statement "concern[s] the

9   subject of the dispute" and is made "in anticipation of litigation 'contemplated in

10  good faith and under serious consideration'" it falls within § 426.16(e).  *Neville*, 160

11  Cal. App. 4th at 1268 (quoting *Rohde v. Wolf*, 154 Cal. App. 4th 28, 36-37 (2007)).

12  The Ninth Circuit recently clarified that "an attempt to establish a property right

13  under a comprehensive federal statutory scheme"(in that case, a trademark

14  application) is litigation-related activity that is protected by the Anti-SLAPP law.

15  *Mindys Cosmetics*, 2010 WL 2652480 at *3.

16          1.      **The Fourth and Fifth Claims Fall Within § 425.16(e)**

17                  (a)      **The Fourth Claim Arises From the Encouragement**

18                           **of the Shuster Executor to Exercise His Constitutional Right**

19                           **to Petition through Filing With a Government Agency**

20          The right to petition protected by the Anti-SLAPP law is clearly implicated

21  where, as here, an individual acts under a comprehensive federal statutory scheme to

22  establish a property right.  *See* CCP § 425.16(e)(1) (right to petition under Anti-

23  SLAPP law includes "any written or oral statement or writing made before … any

24  other official proceeding authorized by law"); *Briggs v. Eden Council for Hope and*

25  *Opportunity,* 19 Cal. 4th 1106, 1109-10 (1999) (granting anti-SLAPP motion where

26  lawsuit based on filing with government agency and assisting in litigation); *Mindys*

27  *Cosmetics*, 2010 WL 2652480 at *3.

28          Toberoff prepared the Shuster Termination so the Shuster Executor could

**Kendall Brill
& Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

55730.2

14

1   exercise his statutory right of termination.  *See* 73 Fed. Reg. 3899 37 (Copyright

2   Office notice, Jan. 23, 2008) ("The termination provisions are not self-executing.").

3   The formal "Notices of Termination" were legally operative documents, complete

4   with citations to caselaw, proofs of service and other indicia of the careful

5   draftsmanship of a lawyer.  Exs. H, I (MWP Depo. Exs. 7, 8).  As required by

6   statute, the Shuster Termination was filed and recorded with the U.S. Copyright

7   Office.  37 *See* 17 U.S.C. 304(c)(4); 304(d)(1); 203(a)(4).  The notice of termination

8   was required to contain specific information, without which the Copyright Office

9   will refuse to record such termination.  *See* 37 C.F.R. 201.10(f).

10          Because DC's Fourth Claim is clearly based upon filing with the U.S.

11   Copyright Office and service on DC of statutory termination notices, under clear

12   Ninth Circuit precedent it is subject to the protections of the Anti-SLAPP law.  *See*

13   *Mindys Cosmetics*, 2010 WL 2652480 at *4 (filing with trademark office is an

14   exercise of the right to petition under § 425.16(e)).

15          **(b)      The Fourth and Fifth Claims Arise From the Encouragement**

16                  **of the Shuster Executor to Exercise His Constitutional Right**

17                  **to Petition through Taking Legal Action**

18          Courts have consistently applied the litigation-related protections of the Anti-

19   SLAPP law to strike claims for tortious interference with contract and/or economic

20   relations.  For example, in *Ludwig*, 37 Cal. App. 4th at 12-13, the Court used the

21   Anti-SLAPP law to dismiss claims for interference with contract and economic

22   advantage based on the defendant's providing resources to support litigation as to

23   development rights, holding that the anti-SLAPP law applies to those who "formally

24   fil[e] a lawsuit" as well as those "who support[] and encourage[] the filing of a

25   lawsuit."  *See also Briggs,* 19 Cal. 4th at 1110, 1115 (assistance "in prosecuting

26   a…court action" falls under §425.16(e)).  In *Dove Audio v. Rosenfeld, Meyer &*

27   *Susman,* 47 Cal. App. 4th 777, 784-85 (1996), the Court applied the Anti-SLAPP

28   law to strike a claim for tortious interference with economic relations based on a

**Kendall Brill & Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

55730.2

15

**MEMO OF Ps & As IN SUPPORT OF MOTION TO STRIKE PURSUANT TO ANTI-SLAPP LAW** 387

1   defendant sending a letter to private parties regarding a planned complaint

2   concerning royalty payments.  That a "communication was made to other private

3   citizens rather than to [an] official agency does not exclude it from the shelter of the

4   Anti-SLAPP suit statute."  *Id.* at 784; *See also Briggs,* 19 Cal. 4th at 1117.

5           In its Fourth Claim, DC alleges that Toberoff and PPC tortiously interfered

6   with DC's 1992 Agreement with Frank Shuster and Jean Peavy, by inducing Mark

7   Warren Peary "to file a probate action in Los Angeles Superior Court to establish

8   the Shuster Estate" and to take legal action to terminate Joseph Shuster's copyright

9   grants, which, as is apparent from this suit, was a prelude to litigation.  Complaint

10  ¶¶ 58, 164.  The Fourth Claim further alleges that Toberoff thereby manipulated the

11  Shuster Executor's claims regarding *Superboy* so as to benefit the Siegels in their

12  litigation.  Complaint ¶ 165.  These allegations – that Toberoff induced the filing of

13  probate proceedings and a statutory notice of termination, fall clearly within

14  § 425.16(e)'s protection for such activities.

15          Similarly, the Fifth Claim is directly based on alleged inducements to litigate.

16  The gravamen of the claim is that Toberoff allegedly made improper offers to the

17  Siegels, causing them to reject a settlement proposal by DC, and to initiate litigation

18  to vindicate their recaptured *Superman* copyrights.  Complaint ¶ 173.  This

19  allegation – the center-piece of DC's Fifth Claim – is unquestionably based on

20  support and encouragement of litigation.  As such, the Fifth Claim unambiguously

21  falls within Section 425.16(e).  *See e.g., Ludwig*, 37 Cal. App. 4th at 17.

22          **(c)**     **The Fourth and Fifth Claims Arise from Protected**

23                  **Communications in the Context of Anticipated Litigation**

24                  **and Settlement Discussions**

25          The Fourth and Fifth Claims are also subject to the Anti-SLAPP law because

26  the purportedly tortious communications occurred in the context of settlement

27  negotiations and anticipated litigation over statutory termination rights.  The Anti-

28  SLAPP law, like the litigation privilege, applies to statements that are reasonably

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

55730.2

16

MEMO OF Ps & As IN SUPPORT OF MOTION TO STRIKE PURSUANT TO ANTI-SLAPP LAW

388

1   relevant to pending or *contemplated* litigation.  *See Neville*, 160 Cal. App. 4th at

2   1266.  Communications related to the *settlement* of anticipated litigation are also

3   clearly protected by the Anti-SLAPP law.  *See Seltzer v. Barnes*, 182 Cal. App. 4th

4   953, 963 (2010) ("settlement negotiations are an exercise of the right to petition and

5   statements made as part of such negotiations are in connection with the underlying

6   lawsuit for purposes of section 425.16, subdivision (e)(2)").[6]

7           With respect to the Fourth Claim, the Shusters' actions related to the Shuster

8   Termination were plainly related to contemplated litigation and settlement.  The

9   Shusters were informed, before they reached out to Toberoff, that the Siegels were

10  in the midst of settlement negotiations and threatened litigation with DC.  *See*

11  Section II.B., *supra*.  In March 2001, well before meeting Toberoff, Jean Peavy sent

12  Joanne Siegel a letter, noting that "[t]here was so much injustice done that I am

13  hoping that the wrongs will be righted and that *your attorney* will get a fair deal for

14  you."  Ex. Y (JP Depo Ex. 17) (emphasis added).  The 2001 and 2003 PPC

15  Agreements between Toberoff and the Shusters clearly contemplate litigation

16  related to the termination of Joseph Shuster's copyright grants.  Both agreements

17  state that the venture would pay "any and all attorneys' fees, costs and

18  disbursements in connection with any legal actions or disputes concerning the

19  enforcement and/or defense of the Rights" and would retain Toberoff's services "to

20  render legal services . . . including in connection with all legal disputes, litigation,

21  arbitration and/or mediation regarding the Rights."   Exs. C, D (MT Depo Exs. 13 &

22  14) (2001 & 2003 PPC Agreements).

23          In 2005, DC sent a letter to Peavy and Peary, referencing its lengthy litigation

24  with the Siegels, asserting defenses to the Shuster Termination and making an initial

25  settlement offer.  Ex. J (MWP Depo Ex. 10).  The entire process of the Shuster

---

26          [6] *See also GeneThera, Inc. v. Troy & Gould Prof. Corp.,* 171 Cal. App. 4th

27  901, 907-908 (2009) (claim for tortious interference based on a settlement offer in
    another action barred by Anti-SLAPP law).

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

55730.2                              17
MEMO OF Ps & As IN SUPPORT OF MOTION TO STRIKE PURSUANT TO ANTI-SLAPP LAW   389

1  Termination was conducted in the arena of threatened litigation and settlement,

2  which brings the Fourth Claim squarely within the Anti-SLAPP law.

3       As for the Fifth Claim, it equally clear that Toberoff's communications with

4  the Siegels occurred in connection with settlement negotiations and anticipated

5  litigation.  Litigation between DC and the Siegels was contemplated as early as

6  1997, when the Siegels served their initial notices of termination.  By April 15,

7  1999, DC had sent the Siegels a letter stating that it intended to engage in litigation

8  over the terminations if the parties failed to settle.  Ex. A (Toberoff Decl. Ex. Q).[7]

9  The Siegels entered into a tolling agreement with DC, in which both parties agreed

10 that neither would "assert any statute of limitations . . . defense" for the period in

11 which they were engaged in negotiations.  *Id.* (Toberoff Decl. Ex. Z).  The parties

12 also agreed to treat their communications as confidential settlement communications

13 under Cal. Evid. Code § 1152.  Ex. T, U (KM Depo Exs. 5 & 6).  The parties

14 consistently referred to their "settlement" negotiations, and the attorneys involved

15 have referred to the litigation "looming over" over such negotiations.  Ex. R (KM

16 Depo. 45:17-46:6).  The Court has already specifically characterized DC's

17 discussions with the Siegels as "settlement negotiations."  *Siegel I*, 548 F. Supp. 2d

18 at 1136.

19       **(d)    The Fourth and Fifth Claims Arise From Protected**

20              **Solicitation of Attorney-Client Relationships**

21       The Fourth and Fifth Claims also fall within the Anti-SLAPP law because

22 they relate directly to the establishment of an attorney-client relationship.  The Anti-

23 SLAPP law applies to actions based upon the allegedly improper solicitations of

24 clients by attorneys.  *See Taheri Law Group v. Evans*, 160 Cal. App. 4th 482, 489

---

25       [7] The 4/15/99 letter stated: "[O]ur client has no alternative but to move to the
26 stage of putting your clients on clear notice … of DC Comics' rights and of its
   determination … to take all appropriate and necessary steps to protect [its] rights.
27 First, your clients are hereby put on notice that <u>DC Comics rejects both the validity
   and scope of the Notices and will vigorously oppose any attempt by your clients to
   exploit or authorize the exploitation of any copyrights, or indeed any rights at all,</u> in
28 Superman."  Ex. A (Toberoff Decl. Ex. Q at 1).(emphasis added).

**Kendall Brill
& Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

55730.2

18

**MEMO OF Ps & As IN SUPPORT OF MOTION TO STRIKE PURSUANT TO ANTI-SLAPP LAW** 390

1   (2008) (in action involving "improper solicitation of another attorney's client,"

2   finding that "it is difficult to conjure a clearer scenario than the case before us of a

3   lawsuit arising from [Anti-SLAPP] protected activity."). Indeed, California Civil

4   Code § 47(b) has long provided immunity against lawsuits based on the solicitation

5   of opposing parties in ongoing litigation. As the California Supreme Court has held,

6   a claim based upon "alleged misrepresentations" of a lawyer "in the course of

7   discussions [over] the possibility of being retained to prosecute [an] action" cannot

8   serve as the basis for a lawsuit brought by anyone other than the client to whom the

9   statements were addressed. *Rubin v. Green*, 4 Cal. 4th 1187, 1196-98 (1993).

10      The Fourth Claim is based upon the formation of an attorney-client

11  relationship between Toberoff and the Shuster family. Immediately after he was

12  contacted by Peary in mid-2001, Toberoff entered into an attorney-client

13  relationship with, and began providing legal advice to, Peavy and Peary. Ex. G

14  (MWP Depo. 23:18-20, 23:25-24:3). That relationship – including the advice given

15  by Toberoff to Peavy and Peary as to the exercise of termination rights – is clearly

16  the basis of DC's Fourth Claim. *See* Complaint, ¶¶ 164-166. Accordingly, the

17  Fourth Claim is subject to the Anti-SLAPP law.

18      The Fifth Claim is likewise premised on purportedly tortious actions taken by

19  Toberoff to induce the Siegels to become his clients and is thus, equally subject to

20  the Anti-SLAPP law. Toberoff formed an attorney-client relationship with the

21  Siegels in October 2002, immediately after Joanne Siegel contacted him, and he has

22  represented the Siegels ever since. Exs. B, K, M (MT Depo 106:1-107:7, 109:14-

23  110:9, 135:1-6; JS Depo 41:1-3; LSL Depo 17:6-13).

24      **2.    The Sixth Claim Falls Within § 425.16(e)**

25      DC's Sixth Claim alleges that "[t]he various copyright assignment and

26  consent agreements between Toberoff and/or his companies, the Siegel Heirs, and

27  the Shusters Heirs, are void and unenforceable, including under California's unfair

28  competition laws," and incorporates by reference the preceding allegations,

Kendall Brill
& Klieger LLP

10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1  including those related to the 2001 and 2003 PPC Agreements and the IP

2  Worldwide Agreement.  *See* Complaint, ¶¶ 174-175.

3      The California Supreme Court has specifically held that California's unfair

4  competition law may not be used as an end-run around the protections afforded by

5  the laws barring suits related to the solicitation of litigation.  *See Rubin*, 4 Cal. 4th at

6  1203 ("[P]lacing in the hands of a litigation adversary a weapon with the tactical

7  potential of a statutory unfair competition claim [] would promote all of the evils we

8  have described above as accompanying retaliatory suits based on litigation-related

9  communications."); *see also Thornton v. Rhoden*, 245 Cal. App. 2d. 80, 99 (1966)

10  ("The salutary purpose of the [litigation] privilege should not be frustrated by

11  putting a new label on the complaint.").[8]

12      DC's challenge to these alleged agreements under the unfair competition laws

13  invokes the litigation-protection provisions of the Anti-SLAPP law for the reasons

14  discussed above. Each of the agreements at issue was expressly entered into with

15  respect to Toberoff's legal services regarding the Siegel Termination and Shuster

16  Termination, respectively.  For instance, as noted above, both the 2001 and 2003

17  PPC Agreements specifically refer to employing Toberoff's legal services (Ex. C ¶

18  7, Ex.  D ¶ 2), and this was clearly understood by Toberoff's clients.  Ex. G (MWP

19  Depo 25:16-26:4).  DC's effort to attack contracts for the provision of legal services

20  in connection with the termination notices, settlement discussions, and anticipated

21  litigation strikes at the heart of protected activity under the Anti-SLAPP statute.

22      DC has also alleged that a consent agreement exists between the Siegels and

23  Shusters regarding settlement.  Complaint ¶ 157, 175.  As any such agreement

---

[8] The protections of § 425.16(e)(2) are similar to California's "litigation privilege," contained within California Civil Code § 47(b). "[T]he two statutes serve similar policy interests, and courts look to the litigation privilege [section 47] in construing the scope of [section 425.16,] subdivision [(e)(2)] with respect to the first step of the two-step anti-SLAPP inquiry."  *See Neville*, 160 Cal. App. 4th at 1262-63.  Accordingly, the arguments and facts set forth above that demonstrate why the Fourth, Fifth and Sixth Claims fall within 425.16(e)(2) also mean that such claims are barred by the litigation privilege. *See Neville,* 160 Cal. App. 4th at 1262.

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1  would be directly related to the settlement of ongoing litigation, DC's claim is

2  clearly subject to the Anti-SLAPP law.  *See Seltzer*, 182 Cal. App. 4th at 962.

3  **C.**  **The Fourth, Fifth and Sixth Claims for Relief Concern Conduct**

4  **Protected By the Anti-SLAPP Law Because They Concern Statements**

5  **Made In Connection With A Public Issue**

6  DC's Fourth, Fifth and Sixth claims also fall within the Anti-SLAPP statute

7  under a separate prong, CCP § 425.16(e)(4), which protects actions that "concern[]

8  an exercise of free speech rights in connection with a public issue."  *Id.*  The instant

9  litigation, which concerns control of the rights to the iconic character *Superman*, is

10  indisputably a public issue:  *Superman* is clearly "in the public eye," and the

11  litigation concerns "conduct that could directly affect a large number of people

12  beyond the direct participants," and is "a topic of widespread, public interest."

13  *Hilton v. Hallmark Cards*, 580 F.3d 874, 886 (9th Cir. 2009).[9]  It is beyond dispute

14  that *Superman* and *Superboy* are matters of public interest, as are the circumstances

15  of their creation, the ownership of rights therein, and litigation relating thereto.

16  Complaint ¶¶ 33, 34 ("Superman has remained constantly in the public's eye").[10]

17  **D.**  **The Fourth, Fifth and Sixth Claims for Relief Have No Likelihood of**

18  **Success on the Merits**

19  **1.**  **The Motion to Dismiss Arguments Are Incorporated By Reference**

20  Because the Fourth, Fifth, and Sixth Claims all fall within the Anti-SLAPP

21  statute, DC has the burden of establishing through admissible evidence a

22  "reasonable probability" it will prevail on each claim.  *Batzel*, 333 F.3d at 1024.  DC

23  _____

24  [9] *Hilton* articulated the three-factor test, quoted above, to determine if an issue
is "public."  In *Hilton*, the Ninth Circuit applied this test to find that a suit brought by
the celebrity Paris Hilton in connection with an alleged misuse of her image on

25  greeting cards fell within the Anti-SLAPP law.  *Id.* at 887.

26  [10] There can also be no reasonable dispute that this action concerns an
exercise of free speech rights.  California law requires merely that a defendant's
action be "communicative" to be an exercise of free speech rights.  *See Hilton*, 580

27  F.3d at 884.  ("The California Supreme Court has not drawn the outer limits of
activity that furthers the exercise of free speech rights. It seems to suffice, however,

28  that the defendant's activity is communicative.").

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

55730.2

21

MEMO OF Ps & As IN SUPPORT OF MOTION TO STRIKE PURSUANT TO ANTI-SLAPP LAW    393

1   cannot meet its burden.  Simultaneously with this motion, the Toberoff defendants

2   have moved to dismiss the Fourth and Fifth Claims pursuant to F.R.C.P. 12(b)(6),

3   and the Siegel and Shuster defendants have moved to dismiss the Sixth Claim.  To

4   avoid repetition, the arguments from those motions and supporting papers, which

5   explain why the Fourth, Fifth and Sixth Claims have no merit whatsoever, are

6   incorporated by reference here.[11]  There are several additional reasons, arising from

7   matters not pleaded in DC's complaint, why DC's claims are meritless, which, while

8   inappropriate for a Rule 12(b)(6) motion, may be considered in connection with this

9   Anti-SLAPP motion and are set forth below.

10              **2.    The Fifth Claim Fails Because There Is No Evidence That Toberoff**

11                      **Interfered With the Purported Economic Relationship**

12          The Fifth Claim has no likelihood of success on the merits because the record

13   establishes that Toberoff did not cause the Siegels to end negotiations with DC.  To

14   prevail on a claim for tortious interference with economic advantage, the plaintiff

15   must show that it is "reasonably probable that [its] prospective economic advantage

16   would have been realized but for the defendant's interference."  *Youst v. Longo*, 43

17   Cal.3d 64, 71 (1987).  Here, there is no basis for asserting that Toberoff's actions

18   proximately caused a disruption to a prospective economic relationship of DC.

19          The Complaint itself specifies that Toberoff's allegedly "wrongful acts"

20   occurred "[i]n or around August, 2002," and the above record evidence makes clear

21   that the first substantive contact between Toberoff and the Siegel's attorney, Marks,

22   occurred in late July or early August 2002.  Complaint ¶ 67.[12]  However, August

---

23

24          [11] In short, those motions explain that the Fourth Claim for tortious
     interference with contract is barred:  (1) because DC has failed to allege any actual
25   interference or a valid contract, (2) by the statute of limitations, and (3) by
     California's litigation privilege.  The Fifth Claim for tortious interference with
26   prospective economic advantage, is barred: (1) by California's litigation privilege
     and (2) by the statute of limitations.  The Sixth Claim, for unfair competition, is
27   barred because: (1) DC has none of the claimed rights as a matter of law and
     therefore lacks standing, (2) it is preempted by the Copyright Act, (3) it pleads no
     unfair conduct, and by (4) California's litigation privilege.
28          [12] Plaintiff must show that the interference was "independently wrongful."

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**MEMO OF Ps & As IN SUPPORT OF MOTION TO STRIKE PURSUANT TO ANTI-SLAPP LAW**  394

1   2002 was approximately three months <u>after</u> Joanne Siegel had sent a letter to DC's

2   parent company, stating that "[a]fter four years we have no deal and this contract

3   makes **<u>an agreement impossible</u>**." Ex. O (LSL Depo Ex. 23) (emphasis added).

4       The Court in *Siegel* held that the May 9, 2002, letter confirmed that the

5   Siegels had "clearly and unequivocally" rejected DC's proposals. *Siegel I*, 542

6   F. Supp. 2d at 1139. Joanne Siegel had no contact with Toberoff whatsoever at or

7   before the time she sent the May letter, no lawyer (including Toberoff) helped her

8   write the May letter, and she did not discuss the May letter with any lawyer before

9   sending it. *See* Section II.D., above. Indeed, in the *Siegel* cases, DC has <u>admitted</u>

10  that Joanne Siegel wrote the May 9 letter without the assistance or participation of

11  counsel.[13] DC cannot meet its evidentiary burden on this point when every witness

12  with any knowledge has testified that Toberoff had nothing to do with the May 9

13  letter that effectively ended DC's purported "prospective economic advantage."

14      Nor is there evidence that Toberoff had anything to do with the September 21,

15  2002, letters sent by the Siegels terminating their counsel and informing DC that

16  negotiations had completely concluded. The September letters were sent before

17  either of the Siegels had met Toberoff, and all relevant parties have testified that

18  Toberoff had not consulted with them at all as to these letters, and that the first time

19  Toberoff had *any* contact with a member of the Siegel family was in early October

20  2002. Ex. M (LSL Depo 261:17-262:7). Accordingly, there is simply no evidence

21  that Toberoff interfered with DC's "prospective economic advantage" in settlement

22  negotiations with the Siegels that had expired.

23          **3.    <u>The Fifth Claim for Relief Is Barred by the Statute of Limitations</u>**

24      As explained in the concurrently filed motion to dismiss, the Fifth Claim is

25

26  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1154 (2003).

27  [13] Ex. Z (Joint Stip. re: Motion to Compel Whistleblower Documents at 5)
    (DC: "Indeed, on May 9, 2002, plaintiff Joanne Siegel – **<u>without the assistance or
    participation of counsel</u>** – wrote letters to Time Warner's chief executives…")

28  (emphasis added).

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

55730.2

23

1    barred by a two-year statute of limitations.  The Complaint omitted certain critical

2    facts, which therefore were not included in the concurrent motion to dismiss, but

3    which further support that the Fifth Claim is barred by the statute of limitations.

4         The "independently wrongful" conduct alleged by DC that constituted the

5    purported interference in the Fifth Claim is that Toberoff purportedly "falsely

6    misrepresent[ed] to the Siegel Heirs" that he had a "billionaire investor" who

7    "would give the Siegel Heirs $15 million cash up front, plus generous royalty and

8    'back-end' rights on any properties developed, including a new Superman motion

9    picture," and that Toberoff offered to assist the Siegels in producing a motion

10   picture.  Complaint ¶¶ 68, 172.  By at least 2006, however, through deposition

11   testimony, DC knew that Toberoff and Emanuel had offered the Siegels, in early

12   August 2002, $15 million plus a back-end in a rights deal, and that Toberoff was

13   actively involved in marketing the Siegels' intellectual property rights.  Kevin

14   Marks, the Siegels' counsel, testified to exactly that in a deposition conducted by

15   DC's counsel on October 7, 2006.[14]  DC was thus plainly on inquiry notice of the

16   Fifth Claim by 2006, more than two years before it filed this action.  *See Jolly v. Eli*

17   *Lilly & Co.*, 44 Cal. 3d 1103, 1110-11 (1988).

18        **4.    The Sixth Claim Against the Toberoff Entities Will Fail**

19        The Sixth Claim also seeks declaratory relief against the Toberoff-affiliated

20   companies:  PPC, IP Worldwide and IPW.  However, these entities either no longer

21   have, or never had, any interest in *Superman*, and accordingly, a claim for

22   declaratory relief against these entities is moot.  The only interest that IP Worldwide

23   and PPC ever had in any *Superman* rights derived from agreements that have

24   expired or have been cancelled.  The 2001 and 2003 PPC Agreements between the

---

[14] Marks testified in 2006 that his call with Mr. Toberoff and Mr. Emanuel
included a "proposal of  $15 million and what was described as a meaningful back
end," which Mr. Marks understood to be "a contingent compensation position or a
royalty position in the exploitation of the property."  Ex. R (KM Depo 169:1-5).
Marks also understood that they intended to "take [the *Superman* property] to
studios to exploit the package."  *Id.*

**Kendall Brill
& Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

55730.2

24

**MEMO OF Ps & As IN SUPPORT OF MOTION TO STRIKE PURSUANT TO ANTI-SLAPP LAW**    396

1   Estate of Joseph Shuster and PPC were wholly cancelled by an agreement dated

2   September 10, 2004. Ex. E (MT Depo Ex. 15). PPC itself is dissolved, and has no

3   conceivable interest in *Superman* that could be the subject of declaratory relief.

4   MTD RJN ¶ 7. As for IP Worldwide, the IP Worldwide Agreement provided that

5   the term of the agreement was "eighteen (18) months from the date this Agreement

6   is executed by all parties," and was extended for twelve (12) months, meaning that

7   the agreement expired on April 23, 2005. Ex. F at ¶ 5, Ex. CC at 6. IPW's only

8   relation to the action is that the expired IP Worldwide Agreement was transferred to

9   it, and IPW has no claim whatsoever to the rights to *Superman*. Ex. B (MT Depo

10  45:6-15), Ex. CC at 6.

11          Accordingly, Plaintiff has no claim against IPW, and any conceivable claim

12  against IP Worldwide and PPC is moot. *Super Tire Eng'g Co. v. McCorkle*, 416

13  U.S. 115, 122, (1974) (mootness turns on "whether the facts alleged, under all the

14  circumstances, show that there is a substantial controversy . . . of sufficient

15  immediacy and reality to warrant the issuance of a declaratory judgment").[15]

16  **IV.    CONCLUSION AND REQUEST FOR FEES**

17          For the foregoing reasons, the Court should strike DC's Fourth, Fifth, and

18  Sixth Claims for relief pursuant to California Code of Civil Procedure § 425.16, and,

19  award to the Toberoff Defendants their attorneys' fees as provided by law.

20  Dated:  August 13, 2010              KENDALL BRILL & KLIEGER LLP

21
                                        By: /s/ Richard B. Kendall
22                                          Attorneys for Defendants Marc Toberoff,
23                                          Pacific Pictures Corporation, IP
                                            Worldwide, LLC, and IPW, LLC
24

25          [15] Moreover, since the agreements entered into by PPC and IP Worldwide are
    no longer in effect and there is no attempt to enforce those agreements, there is no
26  "live" controversy and a declaration as to their validity is needless. *See Campbell v.
    PMI Food Equipment Group, Inc.*, 509 F.3d 776, 781-782 (6th Cir. 2007) (claim
27  that tax-abatement agreement is unconstitutional was moot where the agreement had
    expired, such that the constitutionality of the agreement is "no longer a 'live'
28  controversy").

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

55730.2
                                        25
MEMO OF Ps & As IN SUPPORT OF MOTION TO STRIKE PURSUANT TO ANTI-SLAPP LAW   397

# EXHIBIT I

KENDALL BRILL & KLIEGER LLP
Richard B. Kendall (90072)
  *rkendall@kbkfirm.com*
Laura W. Brill (195889)
  *lbrill@kbkfirm.com*
Nicholas F Daum (236155)
  *ndaum@kbkfirm.com*
Nathalie E. Cohen (258222)
  *ncohen@kbkfirm.com*
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067
Telephone: 310.556.2700
Facsimile: 310.556.2705

Attorneys for Defendants Marc Toberoff,
Pacific Pictures Corporation, IP
Worldwide, LLC, and IPW, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DC Comics, | Case No. CV 10-3633 ODW(RZx) |
| Plaintiff, | **NOTICE OF MOTION AND MOTION OF MARC TOBEROFF, PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FED.R.CIV.P. 12(B)(6); MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JOANNE SIEGEL, an individual, LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive, | |
| Defendants. | *Filed concurrently with REQUEST FOR JUDICIAL NOTICE, DECLARATION OF DAUM, MOTION TO STRIKE PURSUANT TO CALIFORNIA'S ANTI-SLAPP LAW, and NOTICE OF JOINDER* |
| | Hon. Otis D Wright, II |
| | Date: October 18, 2010<br>Time: 1:30 p.m. |
| | Complaint Filed: May 14. 2010 |

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**NOTICE OF MOTION AND MOTION OF DEFENDANTS MARC TOBEROFF, ET AL.
TO DISMISS PLAINTIFF'S COMPLAINT**                                      399

**TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on October 18, 2010, at 1:30 p.m., or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Otis D Wright, II, located in the United States Courthouse, 312 N. Spring Street, Los Angeles, California, 90012, Defendants Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC, IPW, LLC ("Moving Parties") will and hereby do move this Court to dismiss plaintiff's Fourth and Fifth Causes of Action pursuant to Fed. R. Civ. P. 12(b)(6).

This Motion is made upon the following grounds: the Fourth Claim for Relief for tortious interference with contract fails to state a claim because no interference has been alleged, no valid contract has been alleged, and the cause of action is barred by a two-year statute of limitations and by California's litigation privilege. The Fifth Claim for Relief for tortious interference with prospective economic advantage fails to state a claim because it is barred by a two-year statute of limitations and by California's litigation privilege.

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on July 13, 2010.

This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, all of the pleadings, files, and records in this proceeding, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

Dated:  August 13, 2010          KENDALL BRILL & KLIEGER LLP

By:  /s/ Richard B. Kendall
       Richard B. Kendall
       Attorneys for Defendants Marc Toberoff,
       Pacific Pictures Corporation, IP
       Worldwide, LLC, and IPW, LLC

**Kendall Brill & Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1

NOTICE OF MOTION AND MOTION OF DEFENDANTS MARC TOBEROFF, ET AL. TO DISMISS
PLAINTIFF'S COMPLAINT

400

Case 2:10-cv-03633-ODW-RZ   Document 61-3   Filed 09/13/10   Page 147 of 248   Page
ID #:4180

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION .................................................................................. 1

II.   STATUTORY BACKGROUND ........................................................... 4

III.  DC'S COMPLAINT AND JUDICIALLY-NOTICEABLE
DOCUMENTS .................................................................................... 5

    A.   The 1992 Agreement Between DC, Frank Shuster, and Jean
Peavy ....................................................................................... 5

    B.   The Siegel Heirs Terminate Jerome Siegel's Copyright Grants........... 6

    C.   The PPC Agreements ............................................................... 6

    D.   The Siegels Contact Toberoff, Enter Into the IP Worldwide
Agreement, and Thereafter File Suit ....................................... 7

    E.   The *Siegel* Litigation and the So-Called "Toberoff Timeline"............... 8

IV.  ARGUMENT ....................................................................................... 8

    A.   Legal Standard ........................................................................ 8

    B.   The Fourth Claim For Interference With the 1992 Shuster
Agreement Fails to State a Claim .......................................... 9

        1.   Elements of a Claim for Tortious Interference With
Contract ....................................................................... 9

        2.   There Has Been No Interference with the 1992 Agreement ....... 9

        3.   If the 1992 Agreement *Did* Somehow Affect the
Termination Interest of the Shuster Executor, It Would Be
Void .......................................................................... 13

        4.   A Claim of Interference with the 1992 Agreement Is
Barred by the Statute Of Limitations, Which Began to Run
No Later Than 2006 .................................................... 18

        5.   The Litigation Privilege Bars DC's Interference Claim........... 20

    C.   The Fifth Claim For Interference With Prospective Economic
Advantage Fails to State a Claim .......................................... 21

        1.   The Litigation Privilege Bars DC's Interference Claim........... 21

        2.   DC's Fifth Claim is Barred by the Two-Year Statute Of
Limitations That Accrued No Later Than 2006 .................. 23

V.   CONCLUSION .................................................................................. 25

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1

# TABLE OF AUTHORITIES

2
**Page**

3
## CASES

4  *Aronson v. Kinsella*,
   58 Cal. App. 4th 254 (1997) ........................................................ 23
5
6  *Ashcroft v. Iqbal*,
   129 S.Ct. 1937 (2009) ................................................................ 8

7  *Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture
   Partners*,
8     52 Cal. App. 4th 867(1997) .................................................. 13, 18

9  *Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................... 8
10
   *Branch v. Tunnell*,
11    14 F.3d 449 (9th Cir. 1994) ....................................................... 5

12 *Classic Media, Inc. v. Mewborn*,
   532 F.3d 978 (2008) ........................................................... passim
13
   *Crowley v. Katleman*,
14    8 Cal. 4th 666 (1994) ............................................................... 22

15 *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman*,
   47 Cal. App. 4th 777 (2008) ....................................................... 22
16
17 *E.E.O.C. v. Waffle House, Inc.*,
   534 U.S. 279 (2002) ................................................................. 12

18 *Fox v. Ethicon Endo-Surgery, Inc.*,
   35 Cal. 4th 797 (2005) ....................................................... 19, 24
19
20 *Galbraith v. County of Santa Clara*,
   307 F.3d 1119 (9th Cir. 2002) ...................................................... 5

21 *Jolly v. Eli Lilly & Co.*,
   44 Cal. 3d 1103 (1988) .................................................. 19, 20, 24
22
23 *Kashian v. Harriman*,
   98 Cal. App. 4th 892 (2002) ....................................................... 23

24 *Larry Spier, Inc. v. Bourne Co.*,
   953 F.2d 774 (2d Cir. 1992) ....................................................... 14
25
26 *Marvel Characters, Inc. v. Simon*,
   310 F.3d 280 (2d Cir. 2002) ....................................................... 14

27 *Milne v. Stephen Slesinger, Inc.*,
   430 F.3d 1036 (9th Cir. 2005) ........................................... 15, 16, 17
28

**Kendall Brill
& Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

ii

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S COMPLAINT

**402**

*Moss v. U.S. Secret Service*,
    572 F.3d 962 (9th Cir. 2009) ................................................................ 8

*Music Sales Corp. v. Morris*,
    73 F. Supp. 2d 364 (S.D.N.Y. 1999) .................................................... 15

*Pacific Gas & Electric Co. v. Bear Stearns & Co.* ("*PG&E*"),
    50 Cal.3d 1118 (1990) ............................................................... 9, 21, 23

*Parrino v. FHP, Inc.*,
    146 F.3d 699 (9th Cir. 1997) .............................................................. 10

*Rosenthal v. Irell & Manella*,
    135 Cal. App. 3d 121 (1982) ......................................................... 20, 22

*Rubin v. Green*,
    4 Cal. 4th 1187 (1993) ................................................................... 20, 21

*Samuels v. Forest*,
    2007 WL 3149285 (Cal. App. Oct. 30, 2007) .................................... 20

*Seltzer v. Barnes*,
    182 Cal. App. 4th 953 (2010) ............................................................. 23

*Siegel v. Warner Bros. Ent. Inc.*,
    542 F. Supp. 2d 1098 (C.D. Cal. 2008) ................................................. 8

*Siegel v. Warner Bros. Ent. Inc.*,
    658 F. Supp. 2d 1036 (C.D. Cal. 2009) ................................................. 8

*Silberg v. Anderson*,
    50 Cal.3d 205 (1990) ......................................................................... 21

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998) ............................................................ 18

*Streamcast Networks, Inc. v. Skype Techs., S.A.*,
    2006 WL 5441237 (C.D. Cal. Sept. 14, 2006) ................................... 19

*Taheri Law Group v. Evans*,
    160 Cal. App. 4th 482 (2008) ............................................................. 22

*Trembath v. Digardi*,
    43 Cal. App. 3d 834 (1974) ................................................................ 19


**STATUTES & RULES**

112 Stat. 2827 (1998) .............................................................................. 5

17 U.S.C. § 101 ..................................................................................... 15

Cal. Civ. Code § 47 ............................................................................... 23

Kendall Brill
& Klieger LLP

10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

iii

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S COMPLAINT

403

1 | Cal. Code Civ. Proc. § 339(1) ................................................................ 19, 23

2 | Cal. Code Civ. Proc. § 425 ............................................................................ 3

3 | Cal. Civil Code § 47(b)............................................................................ 4, 15

4 | Copyright Act, 17 U.S.C. § 304 ..........................................................passim

5 | Fed. R. Civ. P. 12..........................................................................................1, 9

6 | Fed. R. Civ. P. 8 .............................................................................................9

7 | Public Law 94-553.................................................................4, 5, 11, 20

8 | Public Law No. 105-298.........................................................................20

9

10 **OTHER AUTHORITIES**

11 | 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 11.01....................................14

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Kendall Brill & Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

iv

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S COMPLAINT**

404

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

This action represents an absolutely meritless attack by plaintiff DC Comics ("DC") against an opposing attorney in the midst of ongoing litigation.  DC, after losing on summary judgment to the heirs of Jerome Siegel ("Siegel") in the long-running *Superman* litigation, has opted to sue its opposing counsel in a transparent attempt to reopen the record, re-litigate the case, and delay final judgment.  This outlandish strategy fails as a matter of law, as we demonstrate below.

DC's latest tactic arises in the 11th hour of a long-running battle over the copyright to *Superman* between DC Comics (inclusive of its predecessors, "DC") and the heirs of *Superman*'s original co-authors, Siegel and Joseph Shuster ("Shuster").  In the 1930s, Siegel and Shuster, two high school students, co-created *Superman* and with it, the superhero genre.  In 1938, for a pittance, they signed a publisher's release which was later held to have granted their entire copyright in *Superman* to DC.  *Superman*, of course, became one of the most famous and lucrative superhero franchises in the world, but its co-authors, Siegel and Shuster, did not share in the substantial profits from their creation.

In 1976, Congress changed the law in recognition of the fact that authors, like Siegel and Shuster, faced a tragic problem:  publishers routinely demanded that authors sign contracts granting the entirety of their copyrights for small sums if they wished to see their works published, denying them the fruits of their labor, even if their works proved wildly successful.  To help level the field Congress engrafted a termination right into the Copyright Act, 17 U.S.C. § 304, which empowers authors and certain of their heirs to recapture their copyrights, after lengthy waiting periods, by terminating old copyright grants without cause, 17 U.S.C. § 304(c)(5).

Although both Siegel and Shuster are deceased, Siegel's heirs and the personal representative of Shuster's Estate (the "Shuster Executor") properly availed themselves of their termination rights.  The Siegels served notices of termination in

1997.  The Shuster Executor served a notice of termination in 2003, shortly after he
was appointed by the probate court.  Ever since, DC has fought desperately to
prevent them from receiving the intended benefits of their statutory termination
rights.  DC has spent nearly six years in litigation with the Siegels, so far.  The
Siegel cases, Nos. 04-CV-08400 ODW (RZx) ("*Superman*") & 04-CV-08776 ODW
(RZx) ("*Superboy*") (the "*Siegel* litigation") have been pending before this Court
since October 2004.  Therein, the Siegels sought declaratory relief that their
terminations are valid and an accounting of profits.  Defendant Marc Toberoff
("Toberoff") and his law firm, Toberoff & Associates, represents the Siegels in the
*Siegel* litigation.  Mr. Toberoff also represents the Shuster Executor with respect to
his mirror-image termination regarding the same *Superman* works and grants by
Siegel and Shuster.

In March 2008, DC suffered an enormous setback in the *Siegel* litigation.  The
Hon. Stephen G. Larson of this District granted partial summary judgment largely in
favor of the Siegels, threatening DC's exclusive control over *Superman*, and setting
a trial as to an accounting and related issues.  Judge Larson held in his
extraordinarily detailed, 72-page partial summary judgment opinion that the Siegel
heirs had properly invoked Section 304 to recapture Jerome Siegel's original
*Superman* copyrights.  The same logic will compel a similar conclusion with respect
to the Estate of Joseph Shuster.

After losing on summary judgment, DC replaced its counsel and concocted its
current strategy, reflected in DC's Complaint:  to re-litigate the copyright issues
thoroughly litigated on the merits in the *Siegel* litigation, while seeking to
undermine the relationship between the Siegels, the Shusters, and their attorneys by
attacking Mr. Toberoff personally.[1]  However, as shown below, there is no basis in

---

[1] Notably, the Siegel and Shuster families continue to employ Mr. Toberoff and
adamantly oppose DC's attempt to interfere with their attorney's representation of them.

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

2
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S COMPLAINT

406

1   law or reason for DC's attempt to drag Mr. Toberoff and several affiliated entities

2   into this copyright litigation.[2]

3        This motion[3] concerns DC's Fourth and Fifth Claims for Relief, the two

4   claims that directly implicate Toberoff.  DC's Fourth Claim for tortious interference

5   with contract alleges that by inducing the Shuster Estate to file a statutory notice of

6   termination concerning *Superman*, Toberoff and an entity controlled by Toberoff,

7   Pacific Pictures Corporation ("PPC"), interfered with a 1992 agreement (the "1992

8   Agreement") between DC and the siblings of Joseph Shuster.  This claim fails for at

9   least four independent reasons.  *First*, the termination of the *Superman* copyright

10  interests by the personal representative of the Shuster Estate (the "Shuster

11  Executor") could not have interfered with the 1992 Agreement.  That agreement was

12  between DC and Joseph Shuster's brother and sister.  Shuster's brother and sister

13  have never had any rights under the Copyright Act to terminate Shuster's copyright

14  grants.  Under the Copyright Act, the Shuster Executor is the only party with a right

15  to terminate Shuster's copyright grants to DC, and he was <u>not</u> a party to the 1992

16  Agreement.  Because the 1992 Agreement concerns only the rights of Shuster's

17  siblings, it has no bearing whatsoever on the independent termination right held

18  solely by the Shuster Executor.  *Second*, even if the 1992 Agreement could

19  somehow be construed to prevent the Shuster Executor from exercising his

20  termination rights, such a contract would be void under the Copyright Act, 17

21  U.S.C. § 304(c)(5), and clear Ninth Circuit precedent.  *Third*, the claim is squarely

22  barred by the two-year statute of limitations for tortious interference claims.  It is a

23  matter of public record that by 2006 DC was aware of the facts that allegedly gave

---

[2] Defendants have concurrently filed a motion ("Anti-SLAPP Motion") to strike
these three claims pursuant to Cal. Code of Civ. Proc. § 425.16 (the "Anti-SLAPP law").

[3] Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC and IPW, LLC
join in the motion to dismiss concurrently filed by defendants Joanne Siegel and Laura
Siegel Larson with respect to the Third and Sixth Claims for Relief.

Kendall Brill
& Klieger LLP

10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

3

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S COMPLAINT

407

1  rise to this claim.  *Fourth*, the claim is clearly barred by California's litigation

2  privilege, Civil Code § 47(b).

3      DC's Fifth Claim is equally meritless as a matter of law.  This claim alleges

4  interference by Toberoff with DC's purported "prospective economic advantage" –

5  namely, a proposed settlement agreement between DC and the Siegel heirs over

6  their *Superman* terminations.  This claim, like the Fourth Claim, is squarely barred

7  by California's litigation privilege, as the sole basis of the cause of action is

8  Toberoff's alleged solicitation of his clients in the *Siegel* litigation.  Moreover, this

9  claim is also barred by the two-year statute of limitations applicable to tortious

10  interference claims.

11  **II.    STATUTORY BACKGROUND**

12      This motion involves the termination provisions of the Copyright Act, 17

13  U.S.C. §§ 304(c) & (d).  With the enactment of the 1976 Copyright Act (effective

14  January 1, 1978), Congress provided a new right to authors, their surviving spouses,

15  children, and grandchildren, to recapture their copyrights by terminating prior grants

16  of copyright grants, under specified procedures.  Complaint ¶ 45; 17 U.S.C. § 304;

17  *see also Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 984 (9th Cir. 2008).

18      Significantly for this motion, the termination right belongs exclusively to the

19  author and certain statutorily-designated parties, but not to an author's siblings.  17

20  U.S.C. § 304(c)(2).  Moreover, when Congress first enacted the termination right in

21  1976, it did not provide an author's estate with the right to terminate prior copyright

22  grants.  Pub. L. 94-553, 90 Stat. 2768 (1976), at § 304(c)(2).  However, in 1998,

23  Congress amended the 1976 Act to also provide the termination right to the

24  executor, administrator or personal representative of an author's estate.  17 U.S.C.

25  § 304(c)(2)(D); Pub. L. 105-298, 112 Stat. 2827 (1998) ("In the event that the

26  author's widow or widower, children, and grandchildren are not living, the author's

27  executor, administrator, personal representative, or trustee shall own the author's

28  entire termination interest.").  Siblings still have no termination right.  *Id.*

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

4
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S COMPLAINT

408

## III.   DC'S COMPLAINT AND JUDICIALLY-NOTICEABLE DOCUMENTS[4]

In the mid-1930s, Jerome Siegel, a writer, and Joseph Shuster, an illustrator, created the *Superman* character in comic strips which they submitted to publishers. Complaint ¶ 27.  In 1938, Siegel and Shuster adapted their preexisting *Superman* strips and story to a comic book format, published in "Action Comics No. 1" by a predecessor-in-interest of DC Comics.  *Id. ¶* 30.  In agreements from 1938 and 1939, Siegel and Shuster assigned their copyrights in *Superman* to DC.  *Id.* ¶ 29. For more than 70 years, Siegel and Shuster's *Superman* character has endured as "one of the most famous and beloved fictional characters in the world" and the subject of numerous comic books, films, and television series.  *Id.* ¶¶ 33, 34.

### A.   The 1992 Agreement Between DC, Frank Shuster, and Jean Peavy

In 1992, Joseph Shuster died.  Complaint ¶ 46.  He had no surviving widow at the time of his death, nor did he have any children or grandchildren.  *Id.*  He was survived by his brother and sister, Frank Shuster and Jean Peavy, and Jean Peavy's two children.  On September 10, 1992, DC, Frank Shuster, and Jean Peavy entered into a one-page written agreement (the "1992 Agreement") regarding *Superman*. Complaint ¶¶ 46-48; Defendant's Request for Judicial Notice ("RJN") at ¶ 1, Ex. A.

In exchange for annual payments to Jean Peavy of $25,000 per year, Frank Shuster and Jean Peavy agreed to settle all claims that they personally held against DC in connection with Joseph Shuster's copyright interests.  RJN ¶ 1, Ex. A.  Frank Shuster and Jean Peavy further agreed that if "either of [them] assert any such claim of right," they would refund the annual payments to DC, and DC would have no

---

[4] In a motion to dismiss under Rule 12(b)(6), the Court considers only the allegations of the Complaint, documents whose contents have been alleged in the Complaint, and matters subject to judicial notice.  *See Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994) (overruled on other grounds in *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1127 (9th Cir. 2002)).  For purposes of this motion, defendants assume the truth of the allegations of the Complaint, in light of the documents that the Court may consider, without prejudice to defendants' right to contest those allegations.

Kendall Brill
& Klieger LLP

10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

5

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S COMPLAINT

409

1    ongoing obligation.  *Id.*  Neither Joseph Shuster, nor the Shuster Estate, nor the

2    executor, administrator, or personal representative of the Shuster Estate was a party

3    to the 1992 Agreement.  *Id.*; Complaint ¶ 50.  Frank Shuster died in 1996.

4    Complaint ¶ 51.

5            **B.        The Siegel Heirs Terminate Jerome Siegel's Copyright Grants**

6            In 1996, Jerome Siegel died.  Complaint ¶ 60.  He was survived by his

7    widow, Joanne Siegel, and their daughter, Laura Siegel Larson (the "Siegels").  *Id.*

8    ¶¶ 20-21.  In 1997, the Siegels served statutory notices under 17 U.S.C. § 304(c) to

9    terminate Jerome Siegel's prior grants of his *Superman* copyright interests to DC

10   (the "Siegel Termination").  *Id.* ¶ 60.  In April 1999, DC sent a letter to the Siegels'

11   counsel rejecting the "validity and scope" of the Siegel Termination.  RJN ¶ 2, Ex.

12   B at 20.  Thereafter, DC and the Siegels held settlement negotiations.  Complaint

13   ¶ 61.

14           **C.        The PPC Agreements**

15           In 2001, Marc Toberoff, an attorney who, among other things, advised clients

16   on business issues related to the recapture and marketing of rights under the

17   Copyright Act, came into contact with Joseph Shuster's sister, Jean Peavy, and

18   nephew, Mark Warren Peary.  Complaint ¶ 54.  Later in 2001, Pacific Pictures

19   Corporation ("PPC"), an entity controlled by Toberoff, entered into a joint venture

20   agreement with Jean Peavy and Mark Warren Peary (the "2001 PPC Agreement")

21   for the express "purpose of retrieving, enforcing and exploiting all of Joe Shuster

22   and his estate's rights, claims, copyrights … in and to Joe Shuster's creations"

23   through "termination pursuant to [17 U.S.C. § 304] of any and all grant or transfers

24   by Joe Shuster of any copyright interest in his creations."  *Id.*; RJN ¶ 4, Ex. D at ¶ 2.

25   The parties agreed in the 2001 PPC agreement to establish the estate of Joseph

26   Shuster, and that the venture would "retain Marc Toberoff, Esq. to render legal

27   services."  RJN ¶ 4, Ex. D at ¶ 7.

28

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

6

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S COMPLAINT**                              410

In 2003, after the Shuster Estate was established, the 2001 PPC Agreement was modified in a new agreement (the "2003 PPC Agreement") to add Mark Warren Peary to the venture in his capacity as personal representative of the Shuster Estate. RJN ¶ 5, Ex. E. The 2003 PPC Agreement also specifically included a provision that Toberoff would be retained as counsel to the venture. RJN ¶ 5, Ex. E at ¶ 2.

Both the 2001 and 2003 PPC Agreements were cancelled in 2004, with the consent of all parties to those Agreements, and no longer have any force or effect. Complaint ¶ 86; RJN ¶ 6, Ex. F. PPC itself was dissolved in 2009. RJN ¶ 7. Toberoff continues to represent Mark Warren Peary (in his capacity as personal representative of the Shuster Estate) and Jean Peavy as their attorney.

In November, 2003, Mark Warren Peary, as personal representative of the Shuster Estate, served on DC a notice of termination under the Copyright Act (the "Shuster Termination"), terminating Joseph Shuster's copyright grants to DC relating to *Superman*. Complaint ¶ 81.

**D.     The Siegels Contact Toberoff, Enter Into the IP Worldwide Agreement, and Thereafter File Suit**

Through 2001, settlement negotiations between DC and the Siegels continued. In May 2002, Joanne Siegel sent a letter to DC's affiliate, objecting to the long-form Agreement offered by DC. Complaint ¶ 66.

In September 2002, the Siegels let go of their prior attorney. Thereafter, in October 2002, the Siegels entered into a joint venture agreement with IP Worldwide, LLC, a company affiliated with Toberoff (the "IP Worldwide Agreement"), that would "furnish and provide the legal services of Marc Toberoff, Esq., and the business services of Ariel Emanuel" to the venture. Complaint ¶ 70; RJN ¶ 8, Ex. H at ¶ 2.

In November 2002, the Siegel heirs, represented by Toberoff, served a new notice of termination under the Copyright Act, related to the character *Superboy*. Complaint ¶ 73. In October 2004, the Siegels filed the *Superman* and *Superboy*

Kendall Brill & Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

7

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S COMPLAINT

411

1  actions in this Court, seeking declarations that their statutory terminations regarding

2  *Superman* and *Superboy*, respectively, were valid and enforceable.  *Id.* ¶ 78.

3       **E.    The *Siegel* Litigation and the So-Called "Toberoff Timeline"**

4       Litigation in both *Siegel* actions is ongoing, and, as this Court is aware, has

5  produced a voluminous record.  *See* RJN ¶ 9, Ex. I (Joint Status Report).  On March

6  26, 2008, the Hon. Stephen G. Larson issued a detailed 72 page summary judgment

7  ruling in the *Superman* action largely in favor of the Siegels, and reserved certain

8  accounting and other issues for trial.  *See Siegel v. Warner Bros. Ent. Inc.*, 542 F.

9  Supp. 2d 1098, 1117-39 (C.D. Cal. 2008).  In 2009, the Court further ordered that a

10 number of additional *Superman* works had been successfully "terminated," and

11 declined to reconsider the 2008 summary judgment ruling.  *See Siegel v. Warner*

12 *Bros. Ent. Inc.*, 658 F. Supp. 2d 1036, 1080-84 (C.D. Cal. 2009).  In the midst of the

13 *Siegel* litigation, a former attorney at Toberoff & Associates sent to John Schulman,

14 the General Counsel of DC's close affiliate Warner Bros. Entertainment, numerous

15 privileged and confidential documents concerning the case.  Complaint ¶ 89, Ex. A.

16 Included was an anonymous "cover letter" that is a defamatory hit piece against

17 Toberoff and which purports to discuss the privileged documents.  *Id.*  DC relies on

18 and attached this untrustworthy inadmissible document to its Complaint, and refers

19 to it as the "Toberoff Timeline."  *Id*.

20 **IV.    ARGUMENT**

21      **A.    Legal Standard**

22      To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint

23 must contain sufficient factual matter … to 'state a claim to relief that is plausible

24 on its face.'"  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic*

25 *Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[F]or a complaint to survive a

26 motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences

27 from that content, must be plausibly suggestive of a claim entitling the plaintiff to

28 relief."  *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009).  "Factual

**Kendall Brill
& Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

8

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S COMPLAINT**

**412**

allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Iqbal,* 129 S.Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

**B.      The Fourth Claim For Interference With the 1992 Shuster Agreement Fails to State a Claim**

**1.      Elements of a Claim for Tortious Interference With Contract**

DC's Fourth Claim for Relief is based on an allegation that Toberoff and PPC interfered with the 1992 Agreement by causing the Shuster Estate to serve the Shuster Termination. A cause of action for tortious interference with a contract requires that a plaintiff allege "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pacific Gas & Electric Co. v. Bear Stearns & Co.* ("*PG&E*"), 50 Cal.3d 1118, 1126 (1990). Tortious interference with contract thus requires, at a minimum, that the underlying contract has been breached (or otherwise "disrupted") and that the underlying contract is valid. As a matter of law, neither element is present here.

**2.      There Has Been No Interference with the 1992 Agreement**

First, there is no cognizable allegation of an interference with the 1992 Agreement, because there is no allegation of a breach of any term of the Agreement, or of any interference with any right held by any party to the Agreement.

The only parties to the 1992 Agreement are DC, Frank Shuster and Jean Peavy, the brother and sister of Joseph Shuster. Complaint ¶ 50. The one page Agreement contains three, and only three, obligations for Frank Shuster and Jean Peavy. Frank Shuster and Jean Peavy settled any claim to payment that they held relating to any work by Joseph Shuster, granted to DC any rights that they held in

9

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S COMPLAINT

413

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Shuster's copyrights to DC, and covenanted not to assert any rights that <u>they</u> held

against DC.  RJN ¶ 1, Ex. A.  The 1992 Agreement with Frank Shuster and Jean

Peavy ("you") provides:

> [T]his agreement fully settles all claims to any payments or other rights
> or remedies which ***you*** may have under any other agreement or
> otherwise, whether now or hereafter existing regarding any copyrights,
> trademarks, or other property right in any and all work created in whole
> or in part by your brother, Joseph Shuster, or any works based thereon.
> In any event, ***you*** now grant to us any such rights and release us, our
> licensees and all others acting with our permission, and covenant not to
> assert any claim of right, by suit or otherwise, with respect to the
> above, now and forever . . . .

*Id.* (emphasis added).[5]  Frank Shuster and Jean Peavy further agreed that if "either

of [***them***] assert any such claim of right," they would refund the annual payments to

DC and DC would have no ongoing obligation to them.  *Id.*

These are the **<u>only</u>** relevant obligations in the 1992 Agreement.  The

Agreement concerns only "claims to any payments or other rights or remedies" that

<u>Frank Shuster or Jean Peavy</u> "have under any other agreement or otherwise."  RJN

¶ 1, Ex. A.  It does not discuss any right, remedy, or claim of any party <u>other</u> than

Frank Shuster or Jean Peavy.  *Id.* It does not discuss termination.  It makes no

mention of the Estate of Joseph Shuster (which did not then exist).  *Id.*  Nor does it

purport to revoke, replace or supplant Joseph Shuster's prior copyright grants to DC.

*Id.*

It is also critical to understand that Jean Peavy and Frank Shuster have never

had any right or power to terminate their brother's copyright grants – they did not

have that right in 1992, and do not have that right today.  The Copyright Act of

1976, Pub. L. 94-553, 17 U.S.C. § 304(c)(2), provided that only an author's widow

or widower, children or grandchildren held termination rights.  Joseph Shuster had

---

[5] It is proper to take judicial notice of the 1992 Agreement, which is referenced
throughout the Complaint and thereby incorporated by reference. *See, e.g.,* Complaint, ¶¶
161-166; *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-706 (9th Cir. 1997) (holding that such
documents may be judicially noticed by a district court on a motion to dismiss).

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S COMPLAINT

414

1   neither a widow nor any children.  Complaint ¶ 46.  Thus, at the time of the 1992
2   Agreement, <u>no one</u> had termination rights with respect to Joseph Shuster's works.
3   *Id.* ¶ 98.  Six years later, in 1998, the Copyright Term Extension Act, Pub. L. 105-
4   298, expanded the category of potential holders of the termination right by adding
5   "the author's executor, administrator, personal representative, or trustee."  17 U.S.C.
6   § 304(c)(2)(D).  Accordingly, since 1998, the executor or personal representative of
7   an author's <u>estate</u> also holds a termination right.  However, an author's siblings have
8   <u>never</u> been granted termination rights by the Copyright Act.

9       DC alleges that the 1992 Agreement was interfered with by the Shuster
10  Estate's "'termination pursuant to [17 U.S.C. § 304] of any and all grant or transfer
11  *by Joe Shuster* of any copyright interest in his creations.'"  Complaint ¶ 164
12  (emphasis added).  However, as shown above, it is impossible as a legal and factual
13  matter for the alleged interference to have occurred, because the 1992 Agreement
14  was irrelevant to the termination pursuant to § 304 of any grants or transfers of
15  copyright by Joseph Shuster.

16      In its Complaint, DC obscures the critical distinction between Mark Warren
17  Peary, the personal representative of the Shuster Estate (the "Shuster Executor"), the
18  party with the power to exercise the termination right, and Jean Peavy, the surviving
19  party to the 1992 Agreement.  DC defines the term "Shuster Heirs" to include Mark
20  Warren Peary (the Shuster Executor), Frank Shuster and Jean Peavy (Complaint
21  ¶ 46), and then, throughout its Complaint, misleadingly refers to the 1992
22  Agreement as a contract with the "Shuster Heirs."  *See id.* ¶¶ 50-51, 82, 162-165.
23  However, DC's misleading definition cannot obscure the core fact that the parties to
24  the 1992 Agreement – Jean Peavy and Frank Shuster – never had any termination
25  rights under the Copyright Act, and that the 1992 Agreement could therefore not
26  have granted, resolved, or affected the Shuster Executor's right to terminate Joseph
27  Shuster's operative copyright grants.  17 U.S.C. §§ 304(c)(2)(D) & (d)(1).

28

11

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S COMPLAINT**

1   There is thus no cognizable allegation in the Complaint of a breach or

2   disruption of the 1992 Agreement.  Frank Shuster died well before the Shuster

3   Executor exercised his termination right.  Jean Peavy's obligations under the 1992

4   Agreement were to release DC from claims by her and to quitclaim to DC rights that

5   she may have had.  Jean Peavy has met those obligations.  She did not have, and has

6   never had any termination right regarding Joseph Shuster's *Superman* copyright

7   interests.  Jean Peavy did not file (and could not have filed) the Shuster Termination

8   underlying DC's Fourth Claim.  The sole party with the power to exercise the

9   termination right – and the sole party that *has* exercised a termination right – is the

10  Shuster Executor.  But the Shuster Executor and the Shuster Estate were not parties

11  to the 1992 Agreement, and cannot conceivably be bound by its language.  *See*

12  *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("[A] contract cannot bind

13  a nonparty.").  The 1992 Agreement remains undisturbed, and DC's Fourth Claim

14  fails as a matter of law.

15  Faced with this decisive bar to its tortious interference claim, DC may try to

16  argue, although it does not allege in its Complaint, that there was a disruption of the

17  1992 Agreement if Jean Peavy encouraged or will participate in any benefits from

18  the Shuster Executor's termination of Joseph Shuster's copyright grants.  However,

19  there is nothing in the 1992 Agreement that would bar Jean Peavy from doing so,

20  because the 1992 Agreement simply settles and release rights held by Peavy and

21  Frank Shuster – not rights held by other parties.

22  The 1992 Agreement does not mention termination rights, nor does it even

23  arguably address any other party's right to terminate Joseph Shuster's original

24  grants of copyright (a right which only came into existence by an act of Congress

25  six years after execution of the 1992 Agreement).  There is simply no basis in the

26  language of the 1992 Agreement for any suggestion that subsequent knowledge or

27  actions, if any, by Peavy regarding the service of the Shuster Termination by the

28  Shuster Executor constitute a "claim[] to any payments or other rights or remedies

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067
12
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S COMPLAINT          416

1  which *you* [i.e., Jean Peavy] may have under any other agreement" or an "assert[ion

2  of] any claim of right" by "*you*" [i.e., Jean Peavy].  RJN at ¶ 1, Ex. A.  Thus, there

3  is no basis at all for DC's allegation that the 1992 Agreement has been interfered

4  with.[6]

5          **3.      If the 1992 Agreement *Did* Somehow Affect the Termination**

6                    **Interest of the Shuster Executor, It Would Be Void**

7          DC's Fourth Claim for Relief also fails because, even if the 1992 Agreement

8  *did* prohibit or encumber the Shuster Termination in any way – and it did not – it

9  would be void under the Copyright Act as a matter of law.

10         In order for a claim for intentional interference with a contract to stand, the

11  underlying contract must be enforceable.  *See Bed, Bath & Beyond of La Jolla, Inc.*

12  *v. La Jolla Vill. Square Venture Partners*, 52 Cal. App. 4th 867, 877-80 (1997) (a

13  plaintiff could not maintain a claim against a third party for intentional interference

14  with a contractual relationship when the underlying contract was unenforceable).

15  DC fails to establish this element of its tortious interference claim.

16         The 1976 Copyright Act established as a matter of law that an author or his or

17  her specified heirs may terminate a copyright grant "notwithstanding any agreement

18  to the contrary, including an agreement to make a will or to make any future grant."

19  *See* 17 U.S.C. §§ 304(c)(5), 203(a)(5).  Under 17 U.S.C. § 101, the term "including"

20  is "illustrative" not "limitative" and thus [a Court] must interpret the term

21  "agreement[s] to the contrary" under § 304(c)(5) as inclusive of agreements "other

22  than the two examples Congress explicitly mentioned."  *Mewborn*, 532 F.3d at 983

23  (9th Cir. 2008).  To further protect authors and their statutory heirs, Congress

24  specified that the termination right or interest is inalienable and may not be assigned

25  ────────────────

26         [6] Nor is there any allegation that an interference with the 1992 Agreement was the
    proximate cause of any damage to DC. The sole possible damage to DC alleged in the

27  Complaint is the exercise of the Shuster Executor's termination rights, which, as explained
    above, has no connection with the 1992 Agreement.

28

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S COMPLAINT**

1  before it is exercised by the service of a notice of termination.  *See* 17 U.S.C.

2  § 304(c)(6)(D).  Thus, any agreement that purports to bar the statutory termination

3  right or to transfer the termination interest prior to proper service of a termination

4  notice is unenforceable.

5        The Copyright Act's deviation from the ordinary rule of freedom of contract,

6  and Congress' mandate that the termination right is inalienable, was recently

7  explained in detail by the Ninth Circuit in *Mewborn*:

> Congress enacted the inalienability of termination rights provision in §
> 304(c)(5) to resurrect the fundamental purpose underlying the two-
> tiered structure of the duration of copyrights it originally adopted: to
> award to the author, and not to the assignee of the right to exploit the
> copyright during its initial term, the monetary rewards of a work that
> may have been initially undervalued, but which later becomes a
> commercial success.  As reported in the House Report for the 1909 Act:
>
>> It not infrequently happens that the author sells his
>> copyright outright to a publisher for a comparatively small
>> sum. If the work proves to be a great success and lives
>> beyond the term of twenty-eight years, your committee felt
>> that it should be the exclusive right of the author to take
>> the renewal term, and the law should be framed as is the
>> existing law, so that he could not be deprived of that right.
>
> H.R. Rep. No. 2222, 60th Cong., 2d Sess., at 14 (1909).  It is plain that
> the renewal process was intended to give an author and his heirs a
> second chance to benefit from the fruits of his labors.

18  *Mewborn*, 532 F.3d at 983.  *See also Stewart v. Abend*, 495 U.S. 207, 230 (1990)

19  (the 1976 Act "provides an inalienable termination right"); 3 M. Nimmer & D.

20  Nimmer, *Nimmer on Copyright* § 11.01 (congressional intent of termination is to

21  provide authors and their families with relief from one-sided, unremunerative

22  copyright grants).  The Second Circuit has likewise consistently recognized the

23  inalienability of the Copyright Act's termination right.  *See Marvel Characters, Inc.*

24  *v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002) ("the clear Congressional purpose

25  behind § 304(c) was to prevent authors from waiving their termination right by

26  contract.").[7]  Thus, even if the 1992 Agreement could somehow be construed as

27

28        [7] *See also Larry Spier, Inc. v. Bourne Co.*, 953 F.2d 774, 779-80 (2d Cir. 1992)

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

14
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S COMPLAINT          418

1  transferring, granting, alienating or encumbering the Shuster Executor's right of

2  termination, it would plainly be an unenforceable under the plain language of 17

3  U.S.C. § 304(c) as an "agreement to the contrary."

4      Faced with this fatal flaw in its tortious interference with contract claim, DC

5  will likely argue that it can avoid the clear rule of inalienability under a very narrow

6  exception established in *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir.

7  2005).  But the *Milne* case offers DC no support.

8      In *Milne*, Christopher Milne, the son of A.A. Milne, the author of the *Winnie

9  the Pooh* books, negotiated a new agreement with the Walt Disney Corporation

10 ("Disney"), a prior grantee of *Pooh* rights.  430 F.3d at 1040-41.  Therein,

11 Christopher Milne *expressly revoked* a pre-1978 copyright assignment and expressly

12 *re-granted* all of the Milne rights that had been previously assigned, and further

13 *expressly agreed not to exercise his termination rights*.  *Id.* at 1040-41.

14     Furthermore, when the Milne/Disney negotiations began, Milne's statutory

15 termination "window" had already opened, meaning that he then possessed a *present*

16 right of termination,[8] but had not yet served a formal notice of termination.  *Id.* at

17 _____

18 (footnote continued)
   ("Section 304(c) was drafted so as to leave no doubt about the family's power to recapture
19 the copyright.  Indeed, Section 304(c)(5) expressly provides that the termination 'may be
   affected notwithstanding any agreement to the contrary.'"); *Music Sales Corp. v. Morris,*
20 73 F. Supp. 2d 364, 372 (S.D.N.Y. 1999) ("[U]nlike the renewal rights, the termination
   right is inalienable.  Neither the author nor the statutory heirs may contract away their
21 termination right, and any contract provision that purports to assign that right is void.").

22     [8] Pursuant to 17 U.S.C. §§ 304(c)(1)-(2), any grant of copyright by an author
   "executed before January 1, 1978" is subject to termination by authors or their statutorily-
23 designated heirs.  Under 17 U.S.C. § 304(c)(3), the provision invoked in the *Milne* case,
   the termination of the grant may be effected in a five-year window beginning at the end of
24 56 years from the date copyright was originally secured, with notice of termination to be
   sent between two and ten years prior to that effective date.  *See* 17 U.S.C. §§ 304(c)(3)-(4).
25 That statutory window had opened at the time of the Milne/Disney negotiations.  However,
   the Shuster Executor terminated Shuster's copyright grants under 17 U.S.C. § 304(d),
26 which permits a termination to be exercised within a five-year period beginning 75 years
   from the original grant of copyright, with notice of termination to be sent between two and
27 ten years prior to that effective date. 17 U.S.C. § 304(d)(2).  Thus, here, unlike in *Milne,*
   the Shuster Termination could not even have been served by the Shuster Executor until
28 2003 (1938 plus 75 years) at the earliest – eleven years after the negotiation of the 1992

Kendall Brill
& Klieger LLP

10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S COMPLAINT**

1039-40.  Milne expressly used the leverage of the pending termination window to

negotiate a new agreement, in which he received compensation resulting in a net

gain of hundreds of millions of dollars.  *Id.* at 1040-41.  Despite Christopher Milne

having achieved the Congressional purpose in enacting section 304, Milne's heir

argued that she should be able to terminate the ***revoked*** pre-1978 agreement with

Disney.  *Id.*

Given these unique facts, the Ninth Circuit found that "there was no pre-1978

grant of rights . . . in existence" to terminate as the prior grant had already been

expressly revoked by Milne in 1983, and that his operative 1983 grant was not

subject to termination under the Copyright Act.  *Id.* at 1042-43.[9]  The *Milne* Court

further reasoned that Milne's 1983 grant was not an "agreement to the contrary"

under the Act because Milne had a present right of termination, and thus it was an

agreement consistent with, and that fully honored, Milne's right of termination,

which could vest immediately if he served notice.  *Id.* at 1045; *see Mewborn*, 532

F.3d at 988.  In *Mewborn*, the Ninth Circuit distinguished and limited *Milne* in ways

that leave no doubt that *Milne* has no relevance here.  In that case, a publisher

claimed that Winifred Mewborn, the daughter of Eric Knight, the author of the

beloved children's novel *Lassie Come Home*, had transferred or released her

termination rights to it.  532 F.3d at 986.  Mewborn had made two duplicative

assignments of the *Lassie* copyright, one in 1976 and the other in 1978.  *Id.* at 980.

The Ninth Circuit explained why the language of the agreements in *Mewborn*

radically distinguished it from *Milne*.  First, the agreement in *Milne* specifically and

explicitly revoked the author's pre-1978 grant of rights, and re-granted the same

_____

(footnote continued)
Agreement, to which he was not even a party.

[9] Under the Copyright Act, 17 U.S.C. §§ 304(c)-(d), a pre-1978 copyright grant may
be terminated by an author's statutory heir , but there is no provision to terminate a post-
January 1, 1978 grant by anyone other than the author.  *See Milne*, 430 F.3d at 1042-43.

1  rights, meaning that as of the date of that agreement there was no longer a pre-1978

2  grant left to be terminated under the Copyright Act.  In *Mewborn*, by contrast, there

3  was no revocation of the original 1976 grant, and thus the plaintiff *still possessed* a

4  valid termination right that she could enforce.  Unlike in *Milne*, "[t]he 1976

5  Assignment . . . was not substituted or revoked by the 1978 Assignment but

6  remained intact," and was subject to statutory termination.  *Id.* at 986.  Second, the

7  agreement in *Milne* expressly dealt with termination rights.  *Id.* at 989.  The

8  agreement in *Mewborn*, by contrast, did not discuss termination rights.  *Id.*

9        The *Mewborn* Court further emphasized that at the time the author's daughter

10  executed the purported 1978 assignment, she did not yet have an existing right to

11  serve a notice of termination under the Copyright Act, whereas in *Milne*, the

12  author's son "had – and knew that he had – the right to vest copyright in himself at

13  the very time he revoked the prior grants and leveraged his termination rights to

14  secure the benefits of the copyrighted works."  *Id.* at 989.

15        This case is not merely similar to *Mewborn*, which is controlling Ninth

16  Circuit precedent.  It presents an even clearer instance for squarely applying the

17  non-alienability provisions of Section 304(c).  First, the 1992 Agreement, by its

18  plain language, does not reflect *any* intention – let alone a clear intention – of the

19  parties to revoke and re-grant any copyright interest.  The 1992 Agreement nowhere

20  even purports to "revoke" Joseph Shuster's prior copyright grants to DC.  The words

21  "termination" or "termination right" are also nowhere to be found in the 1992

22  Agreement.  Thus, the language in the Milne agreement that the Ninth Circuit in

23  both *Mewborn* and *Milne* found essential to the outcome in *Milne* is wholly absent

24  here.[10]  Moreover,  as in *Mewborn*, but unlike in *Milne*, no party to the 1992

25

26        [10] Although DC baldly asserts that the 1992 Agreement "revoked and regranted" the
     Shuster copyright interests, the Court should not accept as true DC's mere conclusory
27     allegations that contradict the 1992 Agreement, itself, and DC's repeated assertions in this
     and the related *Siegel* action that it owns all rights in *Superman* pursuant to the operative
28     pre-1978 grants from Siegel and Shuster.  *See Steckman v. Hart Brewing, Inc.*, 143 F.3d

Kendall Brill
& Klieger LLP

10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

17

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S COMPLAINT

421

Case 2:10-cv-03633-ODW-RZ    Document 61-3    Filed 09/13/10    Page 168 of 243   Page
Case 2:10-cv-03633-ODW-RZ    Document 61-3    Filed 08/10/10    Page 24 of 36   Page ID #:368
ID #:4201

1  Agreement – and no one else, for that matter – had *any* termination right concerning

2  Shuster's copyright interests at the time the 1992 Agreement was signed.  *See*

3  *Mewborn*, 532 F.3d at 989; *Milne*, 430 F.3d at 1040-41.  As explained above, in

4  1992, only an author's widow or widower, children or grandchildren held

5  termination rights, and Shuster had left no widow, children or grandchildren.  *See*

6  Pub. L. 94-553, 17 U.S.C. § 304(c)(2).  The Shuster Executor, who was not a party

7  to the 1992 Agreement, was not able to assert any termination right until after the

8  law was changed in 1998.  *See* Pub. L. No. 105-298.[11]  *See Simon*, 310 F.3d at 287

9  (holding that a 1969 settlement agreement did not bar defendant's termination right

10  as "neither the extended copyright term nor the termination right existed at the

11  time").

12      In short, therefore, to the extent DC alleges that the 1992 Agreement bars the

13  exercise of the Shuster termination right, it would be an unenforceable "agreement

14  to the contrary" under 17 U.S.C. § 304(c)(5), rendering DC's claim for interference

15  with contract baseless as a matter of law.  *See Bed Bath & Beyond,* 52 Cal. App. 4th

16  at 877-80 (affirming that a claim for interference with contract cannot lie where

17  predicated on an unenforceable contract provision).

18          **4.      A Claim of Interference with the 1992 Agreement Is Barred**

19                  **by the Statute Of Limitations, Which Began to Run No Later**

20                  **Than 2006**

21      DC's Fourth Claim for Relief also fails because it is barred by the two-year

22  statute of limitations for tortious interference with contract.  *See* Cal. Code Civ.

23  _____

24  (footnote continued)
    1293, 1295-96 (9th Cir. 1998) ("A court . . . is not required to accept as true conclusory
25  allegations which are contradicted by documents referred to in the complaint.");
    Complaint, ¶¶ 29-31, 39-40, 42-44, 140-41, 145-46 (asserting pre-1978 grants).

26      [11] Moreover, until 2003, the Shuster Estate had not even been probated yet, and an
27  executor or personal representative had not been appointed. Thus, until 2003, no one was
    statutorily empowered to issue a notice of termination.

28

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS**
**MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S COMPLAINT**          **422**

1  Proc. § 339(1); *Trembath v. Digardi*, 43 Cal. App. 3d 834, 836 (1974). DC alleges

2  that the purported interference took place, at the latest, in November, 2003 when the

3  Shuster Termination was served.[12] The Complaint was filed over six years later, in

4  May 2010. On its face, DC's claim for tortious interference with contract is plainly

5  time-barred. *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 806 (2005)

6  ("Generally speaking, a cause of action accrues at "the time when the cause of

7  action is complete with all of its elements."). *See, e.g.*, *Streamcast Networks, Inc. v.*

8  *Skype Techs., S.A.*, 2006 WL 5441237, at *10 (C.D. Cal. Sept. 14, 2006)

9  (interference claim accrued once plaintiff was aware that their counterparty sought

10  to "terminate the [agreement]").

11      DC may argue that California's "discovery rule" delayed the accrual of the

12  cause of action. In order to take advantage of the discovery rule, however, DC must

13  plead facts entitling it to invoke the rule. *Ethicon*, 35 Cal. 4th at 808 (placing

14  burden on plaintiff to "specifically plead facts to show (1) the time and manner of

15  discovery and (2) the inability to have made earlier discovery despite reasonable

16  diligence."). The California Supreme Court has held that the "discovery rule"

17  means that a limitations period will begin once a reasonable person has been put on

18  inquiry notice of the basic nature of the alleged wrongdoing:

19      [T]he limitations period begins once the plaintiff has notice or
        information of circumstances to put a reasonable person on inquiry . . . .
20      A plaintiff need not be aware of the specific 'facts' necessary to
        establish the claim . . . . Once the plaintiff has a suspicion of
21      wrongdoing . . . she must decide whether to file suit or sit on her rights.

22  *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1110-11 (1988).

23      Here, DC's claim for tortious interference is based upon an allegation that

24  Toberoff, Pacific Pictures, and the Shuster family formed a joint venture in the 2001

25  _____
    [12] DC expressly alleges that "terminating DC Comics rights w[as] substantially
26  certain to interfere with DC Comics' 1992 Agreement" and "DC Comics' ongoing
    business relationship with the Shusters" – that is, that the termination itself constituted
27  interference. Complaint ¶ 164. DC admits that it was served with the Shuster Termination
    on November 10, 2003, well over six years ago. *Id*. ¶ 79. DC further asserts that Toberoff
28  signed the Shuster Termination and the forms filed with the Copyright Office. *Id*. ¶ 80.

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1   and 2003 Pacific Pictures Agreements for the purpose of serving the Shuster

2   Termination, thus purportedly interfering with the 1992 Agreement. *See, e.g.*,

3   Complaint ¶¶ 54-58, 77, 86, 164-65. DC's core allegation is that "Toberoff's

4   ultimate purpose in approaching the Shuster Heirs was to induce them to . . . attempt

5   to terminate prior grants of Shuster's rights" under 17 U.S.C. § 304 and "Toberoff

6   and the Shusters formed a joint venture with Pacific Pictures for [that] express

7   purpose." *Id.* ¶ 164.

8          It is, however, a matter of public record that DC knew about the joint venture

9   between Toberoff, the Shusters, and Pacific Pictures by no later than November 15,

10  2006. *See, e.g.*, *Samuels v. Forest*, 2007 WL 3149285, at *8 (Cal. App. Oct. 30,

11  2007) (plaintiff was on notice of interference claim once he saw the agreement that

12  allegedly interfered with his contract). Unredacted versions of both the 2001 and

13  2003 Pacific Pictures Agreements were produced to DC in the *Siegel* action on that

14  date, and DC introduced the agreements as exhibits in its deposition of Mr. Toberoff

15  two days later. RJN ¶ 4-5, 10, Exs. D-E, J. Therefore, DC was on "notice" of the

16  entirety of the purported "interference" – the Shuster Termination and the related

17  agreements showing Pacific Pictures and Toberoff's involvement – by, at the very

18  latest, November 2006, over three years before it filed its Complaint. Such was

19  more than sufficient to have put DC "on inquiry" notice. *Jolly*, 44 Cal. 3d at 111-

20  11.

21         From every perspective, DC's Fourth Claim is clearly time-barred.

22              **5.    The Litigation Privilege Bars DC's Interference Claim**

23         DC's Fourth Claim also fails because it deals entirely with activities protected

24  by California's litigation privilege, for reasons discussed in more detail in Section C.

25  1 below. The cause of action is entirely based upon Toberoff's solicitation of his

26  clients (*see Rubin v. Green*, 4 Cal. 4th 1187 (1993)), and communications given in a

27  context in which there was reasonably anticipated litigation (*see Rosenthal v. Irell &*

28  *Manella*, 135 Cal. App. 3d 121, 126 (1982)), and are thus completely protected by

20

**Kendall Brill
& Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S COMPLAINT**          **424**

1 the privilege. Moreover, California imposes an absolute bar on tortious interference

2 claims premised upon inducements to litigation, which bars the Fourth Claim in its

3 entirety. *PG&E*, 50 Cal. 3d at 1126.

4      **C.**     **The Fifth Claim For Interference With Prospective Economic**

5            **Advantage Fails to State a Claim**

6         **1.**     **The Litigation Privilege Bars DC's Interference Claim**

7       DC's Fifth Claim for Relief fails to state a claim because, on its face, it is

8 barred by California's litigation privilege, codified in California Civil Code § 47(b).

9 The Fifth Claim alleges that Toberoff, by communicating with the Siegels.

10 "interfered" with DC's purported "prospective economic advantage," consisting of a

11 settlement "offer" and negotiations with the Siegels regarding the Siegel

12 Termination. Complaint ¶¶ 168-72.

13       The litigation privilege bars this claim for at least three separate and

14 independent reasons.[13] First, the communications that form the basis of this claim

15 all stem from alleged actions by Toberoff to induce the Siegels to become his

16 clients. *Id*. ¶¶ 63-72, 78. In *Rubin v. Green*, 4 Cal. 4th 1187 (1993), the California

17 Supreme Court ruled that a third party action against an attorney, on the grounds of

18 wrongful solicitation of a client was squarely barred by § 47(b):

19        ***Plaintiff's claims, however styled, are founded essentially upon alleged***

20        ***misrepresentations*** made by the law firm . . . in the course of discussions
       over park conditions and the possibility of being retained to prosecute the

21        failure-to-maintain action, and the subsequent filing of pleadings in the
       lawsuit itself. ***Whether these acts amounted to wrongful attorney***

22        ***solicitation or not, they were communicative in their essential nature***
       ***and therefore within the privilege of section 47(b)***. . . .

23 *Id.* at 1196 (emphasis added). The *Rubin* Court reasoned that "a rule permitting the

24 defendant in a civil action to institute parallel litigation seeking to impose liability

25            [13] California Civil Code § 47(b) provides immunity from suit for "any

26 communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other
participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have

27 some connection or logical relation to the action." *Silberg v. Anderson,* 50 Cal. 3d 205,
211-12 (1990).

28

Kendall Brill
& Klieger LLP

10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S COMPLAINT**

1  on the attorney for the adverse party based on the circumstances surrounding the

2  formation of the attorney-client relationship" would result in dire consequences:

> The impairment of colorable claims by disrupting access to counsel, ***the
> intimidating effect on attorneys of facing an almost certain
> retaliatory proceeding,*** the *distractions inherent in requiring counsel
> to deal with defending a personal countersuit as well as the predicate
> action* and, in general, the dampening effect on the unobstructed
> presentation of claims which we have identified as the central value
> supporting limitations on other derivative tort actions, apply [to parallel
> suits against opposing counsel].

*Id.* at 1198 (emphasis added).  Here, DC's "retaliatory" lawsuit, as alleged, is

unquestionably a "personal countersuit," filed during ongoing litigation, based upon

Toberoff's alleged solicitation of his current clients.[14]  The gravamen of DC's claim

is that Toberoff purportedly took inappropriate steps to gain the Siegels as clients,

causing them to reject a purported settlement offer or agreement.  Complaint ¶ 172.

Second, the Fifth Claim rests entirely upon DC's allegations that Toberoff

interfered with ongoing settlement negotiations designed to resolve anticipated

litigation.  DC's core allegation is that Toberoff caused the Siegels to reject a

"settlement offer."  Complaint ¶ 168.  Communications related to the rejection of a

settlement offer are clearly contained within the litigation privilege.  The litigation

privilege bars any action based on communications made to achieve the objects of

any "reasonably anticipated" litigation, including communications made in the

context of settlement negotiations, even if such preliminary communications

allegedly constitute tortious interference.  *See Rosenthal*, 135 Cal. App. 3d at 126

(applying privilege to bar alleged tortious interference with settlement negotiations

---

[14] The litigation privilege is particularly forceful in barring such secondary attacks on attorneys in ongoing litigation. *See Crowley v. Katleman*, 8 Cal. 4th 666, 681 n.9 (1994) (applying *Rubin's* holding "that one who is the target of a threatened lawsuit cannot maintain a retaliatory action charging the attorneys for the opposing party with 'soliciting' the suit"); *Taheri Law Group v. Evans*, 160 Cal. App. 4th 482, 490 (2008) (barring claim for intentional interference where the "causes of action arise directly from communications between [the client] and [defendant attorney] about the pending lawsuits against [the client]"); *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman*, 47 Cal. App. 4th 777, 781-82 (2008) (suits based on communications "between a law firm and persons with potential claims" are barred by litigation privilege).

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

22

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S COMPLAINT

426

1   by an attorney); *Kashian v. Harriman*, 98 Cal. App. 4th 892, 920 (2002) (holding

2   that communications before a lawsuit are privileged, even if "they are, or are alleged

3   to be, fraudulent, perjurious, unethical, or even illegal," so long as they are

4   "'logically related'" to the action); *Seltzer v. Barnes*, 182 Cal. App. 4th 953, 972

5   (2010) (where "[interference] was the negotiation of the settlement . . . [the]

6   litigation privilege applies as a matter of law"). If the statement is made "in serious

7   contemplation of litigation, then the statement is sufficiently connected to litigation

8   and will be protected by the litigation privilege. The privilege then applied is

9   absolute."); *Aronson v. Kinsella*, 58 Cal. App. 4th 254, 266 (1997).

10       Third, the California Supreme Court has clearly held that there can be <u>no</u>

11  liability <u>whatsoever</u> for tortious interference with contract based on a third-party's

12  inducement of any party to file suit:

13       This conclusion will bring us face to face with the question, not squarely
         framed by the parties, whether it is proper to impose liability for inducing
14       a potentially meritorious lawsuit. We will conclude that it is not.

15  *PG&E*, 50 Cal. 3d at 1127. In *PG&E,* the alleged contract was with a municipal

16  agency. The defendant contacted the agency, convinced them to seek declaratory

17  relief in order to terminate the contract, paid "for legal, engineering and marketing

18  studies," and retained and paid for outside counsel, in exchange for a percentage of

19  any increased revenues. *Id.* at 1123-24. *PG&E* held that such actions could not, as

20  a matter of law, give rise to a claim for tortious interference. *Id.* at 1136. Here, the

21  Fifth Claim is based upon an alleged inducement of the Siegels to reject a settlement

22  offer, and to thereafter file a declaratory judgment action concerning their

23  termination rights. As such, it is plainly barred as a matter of law.

24       **2.**     **DC's Fifth Claim is Barred by the Two-Year Statute Of**

25                  **Limitations That Accrued No Later Than 2006**

26       DC's Fifth Claim for Relief is also time-barred. As with tortious interference

27  with contract, the statute of limitations for interference with prospective economic

28  advantage is two years. *See* Cal. Code Civ. Proc. § 339(1). Here, the alleged

Kendall Brill
& Klieger LLP

10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

23

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S COMPLAINT

427

1  interference by Toberoff occurred in 2002, when the Siegels renounced any

2  purported settlement agreement with DC.  Complaint, ¶¶ 66, 168-72.  The claim is

3  thus time-barred, unless DC can meet its burden of showing facts sufficient to

4  invoke the delayed discovery rule.  *Ethicon*, 35 Cal. 4th at 808.

5  DC has not and cannot possibly allege facts to support such delayed

6  discovery, as the Complaint and the judicially-noticeable record make clear that DC

7  had more than enough facts to have put it on inquiry notice by, at the latest, 2006.

8  The statute of limitations begins to run "once the plaintiff has notice or information

9  of circumstances to put a reasonable person on inquiry."  *Jolly*, 44 Cal. 3d at 1110-

10  11.  "So long as a suspicion exists, it is clear that the plaintiff must go find the facts;

11  she cannot wait for the facts to find her." *Id.*  "Suspicion of one or more of the

12  elements of a cause of action, coupled with knowledge of any remaining elements,

13  will generally trigger the statute of limitations period."  *Ethicon*, 35 Cal. 4th at 807.

14  DC has pleaded that it received a letter on September 21, 2002, stating that

15  the Siegels had repudiated the settlement agreement with DC, which alerted it to the

16  disruption of its prospective economic relationship with the Siegels.  Complaint ¶

17  70.  By November 2006, DC received in discovery a copy of the IP Worldwide

18  Agreement, documenting as of October 3, 2002 a joint venture between Toberoff,

19  the Siegels, and the talent agent Ari Emanuel to "arrange and negotiate the sale,

20  lease, license, and all other dispositions or exploitations" of the Siegels' *Superman*

21  rights.  *See id.*; RJN ¶ 10.  Thus, by 2006, DC indisputably knew:  (a) that their

22  alleged economic relationship had been disrupted, (b) that Toberoff had represented

23  the Siegels close in time to such alleged disruption, and (c) that Toberoff and a well-

24  known agent had, during this period, contracted with the Siegels for the purpose of

25  the marketing and exploitation of their *Superman* rights.  That information was

26  clearly more than sufficient, as a matter of law, to have raised a reasonable suspicion

27  as to DC's allegation that Toberoff had induced the Siegels through a promised

28  business relationship to terminate the proposed settlement agreement – the entire

Kendall Brill & Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Case 2:10-cv-03633-ODW-RZ Document 61-3 Filed 09/13/10 Page 175 of 243 Page
Case 2:10-cv-03633-ODW-RZ Document 31 Filed 08/13/10 Page 5 of 375 Page ID #:495
ID #:4208

1    basis for DC's Fifth Claim.[15]  Thus, the two-year limitations period for the Fifth

2    Claim was indisputably triggered almost four years before DC filed its Complaint.

3    **V.    <u>CONCLUSION</u>**

4          For the foregoing reasons, Plaintiff's Fourth and Fifth Claims for Relief

5    should be dismissed with prejudice.

6    Dated:  August 13, 2010              KENDALL BRILL & KLIEGER LLP

7

8

9                                  By: /s/ Richard B. Kendall

10                                      Richard B. Kendall
                                        Attorneys for Defendants Marc Toberoff,
11                                      Pacific Pictures Corporation, IP
                                        Worldwide, LLC, and IPW, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25          [15] *See* Complaint ¶¶ 171-72 (describing the alleged interference by Toberoff as:
     "approach[ing]the Siegel Heirs and their representatives in late 2001 and 2002 to express
26   interest in purchasing their Superman rights"; "misrepresenting . . . that he had a billionaire
     investor ready to purchase their Superman rights"; "representing . . . that he would help
27   them produce a competing Superman motion picture" and "inducing the Siegels to
     repudiate their agreement and business relationship with DC Comics.").

28

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

25
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S COMPLAINT                    429

# EXHIBIT J

1   Marc Toberoff (State Bar No. 188547)
   Nicholas C. Williamson (State Bar No. 231124)
2   Keith G. Adams (State Bar No. 240497)
   TOBEROFF & ASSOCIATES, P.C.
3   2049 Century Park East, Suite 2720
   Los Angeles, California, 90067
4   Telephone: (310) 246-3333
   Fax:       (310) 246-3101
5   MToberoff@ipwla.com

6   Attorneys for Defendants Mark Warren
   Peary, as personal representative of the
7   Estate of Joseph Shuster, Joanne Siegel and
   Laura Siegel Larson

8

## UNITED STATES DISTRICT COURT

9

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| 10   DC COMICS, | Case No: CV 10-03633 ODW (RZx) |
| 11         Plaintiff, | Hon. Otis D. Wright II, U.S.D.J. |
| 12    vs. | **DEFENDANT MARK WARREN PEARY'S, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JOSEPH SHUSTER, NOTICE OF MOTION AND MOTION TO DISMISS AND/OR STAY PLAINTIFF'S COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6); MEMORANDUM OF POINTS AND AUTHORITIES** |
| 13   PACIFIC PICTURES CORPORATION; | |
| 14   IP WORLDWIDE, LLC; IPW, LLC; | |
| 15   MARC TOBEROFF, an individual; | |
|    MARK WARREN PEARY, as personal | |
| 16   representative of the ESTATE OF | |
|    JOSEPH SHUSTER; JOANNE SIEGEL, | |
| 17   an individual; LAURA SIEGEL | |
|    LARSON, an individual, | |
| 18   and DOES 1-10, inclusive, | |
| 19 | Complaint filed: May 14, 2010 |
|         Defendants. | Trial Date: None Set |
| 20 | Date:     October 18, 2010 |
| | Time:     1:30 p.m. |
| 21 | Place:    Courtroom 11 |

22

23

24

25

26

27

28

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on October 18, 2010 at 1:30 p.m., or as soon thereafter as counsel may be heard, in Courtroom 11 of the above-captioned Court, located at 312 N. Spring Street, Los Angeles, California, 90012, defendant Mark Warren Peary, as personal representative of the Estate of Joseph Shuster (the "Shuster Executor"), will and hereby does move to dismiss the first and second claims for relief in the plaintiff DC Comics' ("DC") complaint pursuant to Fed. R. Civ. P. 12(b)(6).

Plaintiff DC's First Claim for Relief seeks to invalidate the Shuster Executor's notice of termination under 17 U.S.C. § 304(d) on impermissible and spurious grounds. DC advances an interpretation of § 304(d) that contradicts both the plain language of the statute and the accepted interpretation of "not living" under the Copyright Act. DC also argues that a 1992 agreement between DC and Shuster's siblings bars the Shuster Termination, when such an agreement could not do so under the termination statute. DC makes a frivolous argument, contradicted by its own complaint, that the Shuster Executor did not own the "majority interest necessary to terminate," when the Shuster Executor clearly held the entirety of the termination interest. DC also advances a claim that the Shuster Executor failed to terminate a May 21, 1948 consent judgment, when this Court already correctly decided that this consent judgment had no effect on the validity of Superman termination notices. Lastly, DC argues that the Shuster Executor has "unclean hands," when the alleged "wrongful" acts have already been determined by a court to be proper.

DC's Second Claim for Relief, which seeks to invalidate or limit the Superman notices of termination served by the Shuster Executor pursuant to 17 U.S.C. § 304, improperly attempts to re-litigate the issues previously litigated on the merits and decided against DC in the related Superman case – *Siegel v. Warner Bros. Ent. Inc. et al.*, C.D. Cal. Case No. 04-CV-08400 ODW (RZx). The *Siegel* litigation to which DC is a party concerned the statutory termination under 17 U.S.C. § 304 of the same

DEFENDANT PEARY'S NOTICE OF MOTION & MOTION TO DISMISS

pre-1978 grants of the same Superman works, co-authored by Jerome Siegel and Joseph Shuster, as DC's newly filed action. DC is barred by the "law of the case" doctrine from re-litigating the same issues decided against DC in the related *Siegel* action that involved mirror-image Superman notices of termination. To the extent any issues remain, such issues are pending in the more advanced *Siegel* litigation, and should be stayed here, pending their resolution in that closely related action.

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on July 13, 2010.

Defendant seeks dismissal of these claims based on this Notice of Motion and Motion, the attached memorandum of points and authorities, the pleadings and records on file in this action, such additional authority and argument as may be presented in any reply and at the hearing on this motion, and such other matters of which this Court may take judicial notice.

DATED: August 13, 2010          TOBEROFF & ASSOCIATES, P.C.

By _____
                    Marc Toberoff

Attorneys for Defendants Mark Warren Peary, as personal representative of the Estate of Joseph Shuster, Joanne Siegel and Laura Siegel Larson

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

ARGUMENT ......................................................................................................2

I.    LEGAL STANDARD .........................................................................2

II.    DC'S FIRST CAUSE OF ACTION FAILS TO STATE A CLAIM ........................................................................................2

    A.    Shuster's Executor Holds Termination Rights Pursuant to § 304(d) ..................................................................2

        1.    An Executor Holds Termination Rights in the Absence of a Spouse, Child or Grandchild ................3

        2.    The U.S. Supreme Court's Interpretation of Parallel Sections of the Copyright Act Contradicts DC's Allegations ........................................................4

        3.    DC's Interpretation Would Lead to Absurd Results ..................................................................5

        4.    DC's Argument Contradicts the Statute's Clear Intent ....................................................................6

        5.    Shuster's Termination Rights Expired Under the Plain Meaning of § 304(d) ........................................7

    B.    The 1992 Agreement Was Not a Revocation and/or Regrant of Superman Copyrights and Does Not Affect Termination Rights ..................................................7

        1.    The Shuster Executor Was Not a Party to the 1992 Agreement ......................................................9

        2.    The 1992 Agreement Could Not Transfer Termination Rights ............................................................10

        3.    The 1992 Agreement Did Not Grant Superman Copyrights ................................................................11

    C.    The Shuster Executor Was Properly the Sole Signatory to the Shuster Termination Notices ......................13

    D.    The 1948 Consent Agreement Is Irrelevant to the Termination ..................................................14

        1.    This Court Already Held That the Consent Judgment Was Not a Copyright Grant and Need Not Be Listed ..................................................14

2.  The Shuster Executor Was Not Required to List the May 21, 1948 Consent Agreement As It Was Not a Copyright Grant .................................................15

E.  DC's Unclean Hands Claim Fails as a Matter of Law ........16

1.  Unclean Hands Is Not a Basis for a Cause of Action .........................................................................16

2.  The Failure to List PPC or Superboy in the Shuster Termination Does Not Show "Unclean Hands" ......................................................................17

a.  PPC Owned No Termination Interest .............17

b.  The Shuster Executor Was Bound by a Court Order That Jerry Siegel Was the Sole Author and Owner of Superboy .....................17

c.  The Superboy Works Could Not Have Been Included in the Shuster Termination In Any Event.................................................................18

III.  DC's SECOND CAUSE OF ACTION MUST BE DISMISSED AS IT SEEKS TO RE-LITIGATE MATTERS ALREADY DECIDED ......................................................................................19

A.  DC Ignores the Past Six Years of Litigation in the *Siegel* Action............................................................................19

B.  The "Law of the Case" Doctrine Bars DC's Attempt to Re-Litigate .............................................................................20

1.  Work For Hire ...............................................................22

2.  Promotions.....................................................................23

C.  This Action Should Be Stayed Pending the Outcome in *Siegel* .......................................................................................24

CONCLUSION.......................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**<u>Federal Cases</u>**                                                                **Pages**

*Adler v. Fed. Republic of Nigeria*,
219 F.3d 869 (9th Cir. 2000) ........................................................................16

*Artichoke Joe's Cal. Grand Casino v. Norton*,
353 F.3d 712 (9th Cir. 2003) ..........................................................................3

*Ashcroft v. Iqbal*,
129 S.Ct. 1937 (2009)......................................................................................2

*Association of American Medical Colleges v. Princeton Review, Inc.*,
332 F. Supp. 2d 11 (D.D.C. 2004)................................................................16

*Carson Harbor Vill., Ltd. v. Unocal Corp.*,
270 F.3d 863 (9th Cir. 2001) ..........................................................................5

*Classic Media, Inc. v. Mewborn* ("*Mewborn*"),
532 F.3d 978, 984 (9th Cir. 2008) ........................................................ *passim*

*Clinton v. Jones*,
520 U.S. 681, 707 (1997)...............................................................................25

*Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.*,
819 F.2d 1519 (9th Cir. 1987) ......................................................................24

*Disimone v. Browner*,
121 F.3d 1262 (9th Cir. 1997) ................................................................20, 23

*Dunn Computer Corp. v. Loudcloud, Inc.*,
133 F. Supp. 2d 823 (E.D. Va. 2001) ...........................................................17

*Fred Fisher Music Co. v. M. Witmark & Sons*,
318 U.S. 643 (1943).......................................................................................10

*Green v. Bock Laundry Machine Co.*,
490 U.S. 504 (1989).........................................................................................6

*In re McKesson HBOC, Inc. ERISA Litig.*,
391 F. Supp. 2d 812 (N.D. Cal. 2005)..........................................................16

*Marvel Characters v. Simon*,
310 F.3d 280 (2d Cir. 2002) .................................................................... 9-11

*Mason v. Texaco, Inc.*,
741 F. Supp. 1472 (D. Kan. 1990).................................................................20

*Mills Music, Inc. v. Snyder*,
469 U.S. 153 (1985).......................................................................................10

*Miller Music Corp. v. Charles N. Daniels, Inc.*,
362 U.S. 373 (1960).................................................................................... 4-6

*Moss v. Crawford & Co.*,
201 F.R.D. 398 (W.D. Pa. 2000) ........................................................................20

*Music Sales Corp. v. Morris*,
73 F. Supp. 2d 364 (S.D.N.Y. 1999) ............................................................5, 16

*Ovadia v. Top Ten Jewelry Corp.*,
2005 U.S. Dist. LEXIS 16784 (S.D.N.Y. Aug. 12, 2005)................................20

*Parrino v. FHP, Inc.*,
146 F.3d 699 (9th Cir. 1997) ..............................................................................8

*Pelich v. INS*,
329 F.3d 1057 (9th Cir. 2003) ..........................................................................16

*Ridgeway v. Mont. High School Ass'n*,
858 F.2d 579 (9th Cir. 1988) ............................................................................20

*Rivers v. Walt Disney Co.*,
980 F. Supp. 1358 (C.D. Cal. 1997) .................................................................25

*Robi v. Five Platters, Inc.*,
838 F.2d 318 (9th Cir. 1988) ............................................................................24

*Siegel v. Nat'l  Periodical Publ'ns, Inc.* ("*National*"),
508 F.2d 909 (2d Cir. 1974) ...................................................................... *passim*

*Siegel v. Nat'l Periodical Publications, Inc.*,
364 F. Supp. 1032 (S.D.N.Y. 1973) ........................................................... 15-16

*Siegel v. Warner Bros. Ent. Inc.* ("*Siegel*"),
C.D. Cal. Case No. 04-CV-08400 ODW (RZx)........................................2, 24

*Siegel v. Warner Bros. Ent. Inc.*,
542 F. Supp. 2d 1098 (C.D. Cal. 2008) ...................................................... *passim*

*Siegel v. Warner Bros. Ent. Inc.*,
658 F. Supp. 2d 1036 (C.D. Cal. 2009) ...................................................... *passim*

*Siegel v. Warner Bros. Ent. Inc.*,
690 F. Supp. 2d 1048 (C.D. Cal. 2009) .....................................................19, 23

*Silvers v. Sony Pictures Entertainment, Inc.*,
402 F.3d 881 (9th Cir. 2005) ......................................................................... 5-6

*Stewart v. Abend*,
495 U.S. 207 (1990)............................................................................................4

*Thomas v. Bible*,
983 F.2d 152 (9th Cir. 2003) .............................................................. 20-21, 24

*Venegas-Hernandez v. Asociacion de Compositores y Editores de Musica Latinoamericana*,
424 F.3d 50 (1st Cir. 2005)..................................................................................5

iv
TABLES OF CONTENTS AND AUTHORITIES

**Federal Statutes and Rules**

37 C.F.R. § 201.10 ........................................................................ 14-16

67 Fed. Reg. 69134 ...........................................................................7, 19

F.R.C.P. 8 ...............................................................................................2

F.R.C.P. 12 ..........................................................................................2

Pub. L. 94-553 ......................................................................................9

Pub. L. 105-298 ....................................................................................9

17 U.S.C. § 304 ........................................................................ *passim*

H.R. Rep No. 105-452, 105th Congress, 2d Sess. (1998) ..................................6

**State Cases**

*Estate of Simoncini*,
229 Cal. App. 3d 881 (1991) ...................................................................6

**Other Authorities**

M. Nimmer & D. Nimmer,
3 *Nimmer on Copyright* ("*Nimmer*") § 11.03 ................................. 4, 6-7

3 *Nimmer* § 11.05 ...............................................................................7

3 *Nimmer* § 11.08 ..............................................................................13

18 Wright, Miller & Cooper,
*Federal Practice and Procedure* § 4478 (1981)................................20

## **INTRODUCTION**

Plaintiff DC Comics' ("DC") First Claim for Relief against defendant Mark Warren Peary, the personal representative ("Shuster Executor") of the Estate of Joseph Shuster ("Shuster" and the "Shuster Estate"), seeks to invalidate the Shuster Executor's proper termination under 17 U.S.C. § 304(d) of Shuster's prior grants of copyright to DC in the world-famous comic book hero Superman, co-created by Jerry Siegel ("Siegel") and Joseph Shuster in the 1930's (the "Shuster Termination").

*Section (1) of DC's First Claim* (Complaint, ¶¶ 94-98) erroneously alleges that Shuster's termination rights do not vest in the executor or representative of his estate unless he had a widow, children and grandchildren who were "not living, but who did at some time live." This argument contradicts the plain language of the statute and the accepted interpretation of "not living" under the Copyright Act, as well as the legislative intent of § 304, and would lead to absurd results. *Section (2)* (Complaint, ¶¶ 99-104) argues that a 1992 agreement between DC and Shuster's siblings bars the Shuster Termination. This argument fails because the 1992 agreement did not, and could not, lawfully grant any Superman copyrights. None of the parties to that agreement possessed any termination rights to grant; the Shuster Executor, the sole holder of the termination right, was not a party to the 1992 agreement; and, in any event, the agreement could not have conveyed or released the inalienable termination right as a matter of law under § 304(c)(5). *Section (3)* (Complaint, ¶¶ 105-11) alleges that the Shuster Executor did not own the "majority interest necessary to terminate," but the Shuster Executor clearly held the entirety of the termination interest, because, as asserted elsewhere in the Complaint, termination rights cannot be transferred prior to the effective date of termination per § 304(c)(6)(D). *Section (4)* (Complaint, ¶¶ 112-15) claims that the Shuster Termination failed to terminate a May 21, 1948 consent judgment; however, this Court has already correctly decided that this consent judgment was not a copyright grant, and had no effect on the validity of Superman termination notices. *Section (5)*'s "unclean hands" claim (*id.*, ¶¶ 116-20) fails

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Case 2:10-cv-03633-ODW-RZ   Document 61-3   Filed 09/13/10   Page 186 of 243   Page
ID #:4219
Case 2:10-cv-03633-ODW-RZ   Document 33-1   Filed 08/13/10   Page 10 of 36   Page ID #:861

because unclean hands is a *defense* that is available only against a plaintiff that seeks affirmative relief, and is not a basis for a cause of action.  Moreover, the acts alleged to be "wrongful" acts have already been determined by a court to be proper.

DC's Second Claim transparently attempts to re-litigate issues already decided against DC in the related Superman case, *Siegel v. Warner Bros. Ent. Inc.*, C.D. Cal. Case No. 04-08400 ODW (RZx), and is barred by the doctrine of "law of the case." To the extent any issues remain, such issues are pending in the more advanced *Siegel* litigation, and should be stayed until resolved in *Siegel*.

## ARGUMENT

## I.   LEGAL STANDARD

Pursuant to F.R.C.P. 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  To survive a motion to dismiss under F.R.C.P. 12(b)(6), "a complaint must contain sufficient factual matter … to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).  Mere legal conclusions "are not entitled to an assumption of truth."  *Id.* at 1950.

## II.   DC'S FIRST CAUSE OF ACTION FAILS TO STATE A CLAIM

### A.   Shuster's Executor Holds Termination Rights Pursuant to § 304(d)

DC alleges in section (1) of its First Claim (Complaint, ¶¶ 94-98) that Joseph Shuster's termination rights do not vest in the executor of his estate, and argues that § 304(c)(2)(D) provides such rights to an executor only if an author's widow, children and grandchildren are "'not living,' but [] did at some time live." *Id.*, ¶ 98.  Contrary to this unsupported, counter-intuitive interpretation of the Copyright Act, the Shuster termination rights properly vested in the Shuster Executor, as Joseph Shuster had neither a widow nor children. *Id.*, ¶ 46.  DC's argument must be rejected because it: (i) contradicts the plain language of the statute; (ii) ignores binding interpretations of the phrase "not living"; (iii) conflicts with the clear congressional intent of § 304(c)(2)(D); and (iv) leads to absurd results.

Case 2:10-cv-03633-ODW-RZ   Document 161-3   Filed 09/13/10   Page 187 of 243   Page
ID #:4220
Case 2:10-cv-03633-ODW-RZ   Document 131   Filed 08/13/10   Page 1 of 33   Page ID #:862

## 1.     An Executor Holds Termination Rights in the Absence of a Spouse, Child or Grandchild

The plain language of the statute bars DC's interpretation.  Section 304(c)(2) provides that if an author dies and there is no widow, child or grandchild to exercise the author's termination rights, such rights vest in the author's executor:

> "Where an author is dead, his or her termination interest is owned, and may be exercised, as follows: ….
> (D)     In the event that the author's widow or widower, children and grandchildren are not living, the author's executor, administrator, personal representative, or trustee shall own the author's entire termination interest."

17 U.S.C. § 304(c)(2).  Courts interpret a federal statute by looking at the "the language of the statute," and "[w]hen the words of a statute are unambiguous, judicial inquiry is complete."  *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 720 (9th Cir. 2003).  Read as a whole, § 304(c)(2) establishes four classes of statutory heirs who may exercise termination rights:  (1) widow or widower, (2) children, (3) grandchildren, and (4) if there is no widow or widower, children, or grandchildren, the executor, personal representative, or another administrator of the author's estate.  17 U.S.C. § 304(c)(2).  Accordingly, this Court has already acknowledged that the Shuster Executor has termination rights under § 304(c)(2):

> "As executor of the Shuster estate, [Mark Warren Peary] is entitled, under changes made to the 1976 termination provisions by the 1998 … Copyright Term Extension Act, to make the same termination claims for the Superman copyright that Shuster or his heirs would have been entitled to bring beforehand.  *See* 17 U.S.C. § 304(c)(2) …."

*Siegel v. Warner Bros. Ent. Inc.* ("*Siegel I*"), 542 F. Supp. 2d 1098, 1114 n.3 (C.D. Cal. 2008); Request for Judicial Notice ("RJN"), Ex. H.  As explained in *Nimmer on Copyright*, the leading copyright treatise:

> "What … if, upon the death of an author … there is no surviving spouse, and no surviving children or grandchildren?  Under the 1976 Act at its passage, the result was that no one could exercise the right of termination.  That harsh result persisted for the current Act's first two decades.  Then in the [1998] Copyright Term Extension Act, Congress ameliorated that result.  Effective from October 27, 1998 onward, *the termination right, instead of lapsing in these circumstances, belongs to 'the author's executor, administrator, personal representative, or trustee*.'"

3

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Case 2:10-cv-03633-ODW-RZ    Document 61-3    Filed 09/13/10    Page 188 of 243   Page
Case 2:10-cv-03633-ODW-RZ    Document 31    Filed 08/19/10    Page 2 of 33   Page ID #:4221
ID #:4221

1   M. Nimmer & D. Nimmer, 3 *Nimmer on Copyright* ("*Nimmer*") § 11.03[A][2][a] at

2   11-40.1-11.40.2 (emphasis added).  DC admits that Mark Warren Peary is the Court-

3   appointed personal representative of Joseph Shuster's estate.  Complaint, ¶¶ 18-19.

4   As such, he properly holds termination rights under § 304(c)(2)(D).

5
6   **2.      The U.S. Supreme Court's Interpretation of Parallel Sections
            of the Copyright Act Contradicts DC's Allegations**

7       DC's argument that "not living" under § 304(c)(2)(D) means 'once living, now

8   deceased' contradicts the accepted interpretation of "not living" under the Copyright

9   Act.  The termination provisions of §§ 304(c) and (d) provide an author or his estate

10  with the right to recapture a copyright for its extended ***renewal*** term.  17 U.S.C. §

11  304(c) (termination "of a transfer or license of the renewal copyright"). The related

12  sub-section dealing with those persons entitled to the ***renewal*** copyright, § 304(a),

13  uses "not living" language identical to that found in § 304(c)(2)(D):

14          "(a)  Copyrights in Their First Term on January 1, 1978…..
             (C)  In the case of any other copyrighted work….
15                     (i)   the author of such work….
                        (ii)  the widow, widower, or children of the author….
16                     (iii) the author's executors, if such author, widow, widower, or children
                        ***are not living***….
17          shall be entitled to a renewal and extension of the copyright…."

18  17 U.S.C. § 304(a) (emphasis added).  Under DC's twisted interpretation of "not

19  living," a renewal copyright would not vest in the executor of an estate under §

20  304(a)(1)(C)(iii) unless the author was first survived by a spouse or child, and both

21  thereafter died.  Yet the courts have *consistently* held that copyrights are owned by an

22  author's estate under § 304(a)(1)(C)(iii) (formerly §24 of 1909 Copyright Act), even

23  if the author had *no spouse or children*.

24      In the landmark U.S. Supreme Court case *Stewart v. Abend*, 495 U.S. 207, 212

25  (1990), the renewal copyright for Cornell Woolrich's story "It Had to Be Murder"

26  was held to have vested in the executor of the Woolrich estate, as Woolrich had no

27  widow or children.  *Id.*  But under DC's statutory interpretation of "not living," the

28  renewal copyright in the story would not have vested in anyone.  *See also Miller*

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

**442**

*Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373, 374–75 (1960) (construing the phrase "if such author, widow, widower, or children be not living" to mean "leaving no widow, widower, or children," and granting rights to the author's estate where he had no wife or children).[1]  DC's argument must be rejected, as the identical phrase "not living" in the related renewal (§ 304(a)(1)(C)(iii)) and termination (§ 304(c)(2)(D)) provisions must be interpreted consistently with one another.  *See Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 880 (9th Cir. 2001) (a statute is be read as a whole, as "[n]o statutory provision is written in a vacuum").

### 3.    DC's Interpretation Would Lead to Absurd Results

DC's self-serving interpretation would lead to patently absurd results.  Section 304(c)(2)(D) plainly states that the termination right is owned by the executor "[i]n the event that the author's widow or widower, children ***and*** grandchildren are not living" (emphasis added).[2]  DC's theory that "not living" means 'once alive but now dead' would result in the termination right vesting in an executor only if the author had a widow/widower, children ***and*** grandchildren, ***and*** all those people had died.  Thus, in DC's view, the termination right would not vest in the author's executor if: (a) the author had a spouse and children who were deceased, but the author did not have grandchildren; (b) the author had a deceased spouse, children and grandchildren, but the author's spouse died before the author, as there would be no "widow/widower"; (c) if the author had deceased children and grandchildren, but had never married; or (d) if the author had married but was subsequently divorced, as, again, there would be no "widow/widower."  As "courts will not interpret a statute in a way that results in an absurd or unreasonable result," DC's nonsensical interpretation must be rejected.  *Silvers v. Sony Pictures Entertainment, Inc.*, 402

---

[1] *See also Venegas-Hernandez v. Asociacion de Compositores y Editores de Musica Latinoamericana*, 424 F.3d 50, 54 (1st Cir. 2005) (renewal copyrights pass to the executor under § 304(a)(1)(C)(iii) "for disposition in accordance with [the author's] will"); *Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364, 373-75 (S.D.N.Y. 1999) (rejecting argument that "not living" means "deceased," and holding that "if such author, widow, widower or children are not living" includes situations where the author never had a spouse or child).

[2] DC misquotes § 304(c)(2)(D) as saying that the executor owns the termination right if "the author's widow or widower, children **or** grandchildren are not living."  *Id.*, ¶ 98 (em. add.).

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Case 2:10-cv-03633-ODW-RZ  Document 61-3  Filed 09/03/10  Page 190 of 243  Page
ID #:4223
Case 2:10-cv-03633-ODW-RZ  Document 331-3  Filed 08/19/13  Page 4 of 33  Page ID #:865

1  F.3d 881, 900 (9th Cir. 2005).  *See Green v. Bock Laundry Machine Co.*, 490 U.S.

2  504, 509 (1989) (an interpretation of a statute is disregarded when it "compels an odd

3  or absurd result").

4      **4.**    **DC's Argument Contradicts the Statute's Clear Intent**

5         DC's interpretation violates the clear legislative intent of the 1998 Copyright

6  Term Extension Act, and leads to precisely the sort of "harsh result" that § 304(c)(2)

7  (D) was meant to avoid.  3 *Nimmer* § 11.03 at 11-40.1.  The 1998 amendments to §

8  304 were intended to allow "the original authors of works and their beneficiaries to

9  benefit from the extended [renewal] copyright protection."  H.R. Rep No. 105-452,

10  105th Congress, 2d Sess. ("H.R. Rep. 105-452"), at 8 (1998).  The reasonable

11  interpretation of § 304(c)(2) as amended in 1998 is that Congress intended to give

12  termination rights to widows and children and grandchildren if they existed, and to

13  otherwise allow the author to bequeath termination rights by will or testament, just as

14  Congress had done in § 304(a) with respect to renewal copyrights.  This result

15  accords with Congress' stated intent that an author's executor would own his

16  termination interest.  *See* H.R. Rep No. 105-452 at 8 (the amendments "allow[] an

17  author's executor to receive his entire termination interest in the event that the

18  author's widow, widower, children or grandchildren are not living").

19         If the executor holds the termination interest, then the author can instruct the

20  executor to dispose of the proceeds from such interest pursuant to his estate plan.  *See*

21  *Miller Music Corp.,* 362 U.S. at 376 ("[A]n executor usually takes [possession] in a

22  representative capacity" and "represents the person of his testator."); *Estate of*

23  *Simoncini*, 229 Cal. App. 3d 881, 888–89 (1991) ("The basic rule in the interpretation

24  … of any will is that the intention of the testator must be carried out….").  DC's

25  incorrect construction would mean that heirs of an author who happened to have no

26  spouse or children (*e.g.,* a former spouse, a long-term but unmarried partner, a child

27  raised but not adopted) could not benefit from the termination interest, even if the

28  author had provided for such benefit in his will.  This must be rejected, as it

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Case 2:10-cv-03633-ODW-RZ    Document 33-1   Filed 09/10   Page 7 of 33   Page ID #:866

1   contradicts the clear Congressional intent that the termination rights "were designed

2   to assure that its new benefits would be for the authors and their heirs."  *Classic*

3   *Media, Inc. v. Mewborn* ("*Mewborn*"), 532 F.3d 978, 984 (9th Cir. 2008).

4

5   **5.  Shuster's Termination Rights Expired Under the Plain
        Meaning of § 304(d)**

6           To further circumvent the Shuster Executor's termination right under § 304(d),

7   DC engages in a similar linguistic sleight of hand by alleging that "Shuster's

8   termination right ceased to exist on his death," and was "extinguished," as opposed to

9   having "expired" – the word used in § 304(d).  DC argues that to have "expired," the

10  termination window must have "opened and closed" while the author or his widow/

11  children/grandchildren were alive.  Complaint, ¶ 97-98.  That is nonsense.  Shuster's

12  termination window opened in October 1984, while he was alive, and "expired" with

13  his death in 1992.  *Id.*, ¶¶ 96-97.  *Nimmer* agrees, stating that § 304(d) was designed

14  to "correct the imbalance arising from the fact that the author (or his heirs) failed to

15  terminate previously, whether through neglect *or inability*."  3 *Nimmer* § 11.05[B][2]

16  at 11-40.12 (emphasis added).  *Nimmer* points out that such "inability" could arise

17  "because no one was alive to effectuate termination" and that the 1998 Act "solves

18  that latter situation, as well," through the addition of § 304(c)(2)(D).  *Id.* at n.25.[3]  *See*

19  *also* 67 Fed. Reg. 69134, 69135 (the Copyright Office states, without conditions, that

20  "the termination right will have 'expired,' see 17 U.S.C. § 304(d), 59 years after

21  copyright was secured").

22  **B.      The 1992 Agreement Was Not a Revocation and/or Regrant of
             Superman Copyrights and Does Not Affect Termination Rights**

23

24          Section (2) of DC's First Claim (Complaint, ¶¶ 99-104) argues that the 1992

25  ---
    [3] Furthermore, § 304(c)(2)(D), which allows an executor to exercise termination rights, and
    § 304(d), which permits termination of grants to works copyrighted before October 1939,

26  were both added by the 1998 Copyright Term Extension Act, and § 304(d)(1) expressly
    incorporates § 304(c)(2).  DC's interpretation would make this incorporation nearly

27  meaningless, as:  (1) an author of a pre-1939 work would likely have died prior to 1998; (2)
    an author who died without a widow/children/grandchildren would have his termination

28  rights "extinguished"; and (3) his executor could not exercise rights under § 304(c)(2)(D),
    as the rights would have been "extinguished."  Such a harsh result contravenes the remedial
    intent of the 1998 amendments.  *See* 3 *Nimmer* § 11.03 at 11-40.1; Section II.B.1, *infra*.

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Agreement between DC, Frank Shuster and Jean Peavy bars termination.  However, the 1992 Agreement had no effect on the Shuster Executor's termination of Joseph Shuster's operative pre-1978 copyright grants to DC's predecessor.  DC's argument fails for many reasons.  The one-page 1992 Agreement did not affect termination rights, but instead merely purported to quitclaim to DC any rights of, and to release DC from any claim by, Frank Shuster or Jean Peavy as to Joseph Shuster's works:

> "[T]his agreement fully settles all claims to any payments or other rights or remedies which *you* [Jean Peavy/Frank Shuster] may have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon. In any event, *you* now grant to us any such rights and release us, our licensees and all others acting with our permission, and convenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever…."

RJN, Ex. A (emphasis added).[4]

Shuster's siblings, who signed the 1992 Agreement, have never held any termination rights.  Complaint, ¶ 97-98.  The 1992 Agreement cannot bar the Shuster Executor from exercising the termination rights that only he holds, because he was not a party to the agreement, and would not even be appointed by the probate court for another 11 years.  Even if the Shuster Executor had been a party to the 1992 Agreement, it still could not bar termination because:  (i) the agreement did not mention or purport to affect termination rights; (ii) in 1992 no one held a termination right regarding Shuster's copyright grants, and the executor of an estate, such as the Shuster Executor, was not given termination rights until the 1998 amendment to the Copyright Act; (iii) even if the 1992 Agreement had purported to waive (non-existent) termination rights, it would be unenforceable under § 304(c)(5)  as an "agreement to the contrary"; (iv) even if the agreement had purported to convey

---

[4] On a Rule 12(b)(6) motion, it is proper for a court to take judicial notice of documents referenced in, but not attached to, the complaint.  *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-06 (9th Cir. 1997) (holding that "documents critical to plaintiff's claims, but not explicitly incorporated in his complaint" may be judicially noticed and considered by a district court on a motion to dismiss).  As both the 1992 Agreement (Complaint, ¶¶ 161-166) and the Shuster Termination notice (*id.*, ¶¶ 79-88, 92-151) are heavily referenced and described in the Complaint, this Court may properly take judicial notice of such documents.  RJN, Exs. A, C.

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Case 2:10-cv-03633-ODW-RZ   Document 61-3   Filed 09/03/10   Page 193 of 243   Page
Case 2:10-cv-03633-ODW-RZ   Document 151-3   Filed 08/14/13   Page 7 of 33   Page ID
ID #:4226

(non-existent) termination interests, it would be void under § 304(c)(6)(B), which forbids any such conveyance before the termination interest vests through service of a notice of termination (in this case, in 2003); and (v) the limited exception to the statutory bar on "agreements to the contrary" (which applies only if the copyright owner and grantee expressly revoke prior grants, and then expressly regrant the copyrights)  is inapplicable, as (a) the agreement contains no language of revocation or regrant, and (b) the revocation/regrant procedure is permitted only after the 5-year termination 'window' has opened, whereas here, no termination right existed in 1992.

### 1.    The Shuster Executor Was Not a Party to the 1992 Agreement

The parties to the 1992 Agreement are Joseph Shuster's siblings, Jean Peavy and Frank Shuster, who have never had termination rights under the Copyright Act. Under § 304(c)(2) of the 1976 Copyright Act, Pub. L. 94-553, only an author's widow or widower, children or grandchildren held termination rights.  At the time of the 1992 Agreement, Shuster was deceased, and he had no widow or children. Complaint, ¶ 46.  Thus, at the time of the 1992 Agreement, **_no one_** had termination rights with respect to Joseph Shuster's works, as conceded by DC.  *Id.*, ¶¶ 97-98. The parties to the 1992 Agreement could not release a termination right or convey a termination interest that they never possessed, and that did not even exist.  *See Marvel Characters v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002) (holding that a 1969 settlement agreement did not bar defendant's termination right as "neither the extended copyright term nor the termination right existed at the time").  After Frank Shuster's death in 1996, the Copyright Term Extension Act of 1998, Pub. L. 105-298, expanded the categories of those who possess termination rights by adding "the author's executor, administrator, personal representative, or trustee."  17 U.S.C. § 304(c)(2)(D).  After Mark Warren Peary was appointed as the Shuster Executor in 2003, he became the sole holder of termination rights. The 1992 Agreement cannot bar the Shuster Executor's exercise of termination rights because, as DC acknowledged, Mr. Peary was not a party to the 1992 Agreement and he did not even

9

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

1    become the Shuster Executor for another 11 years.  Complaint, ¶¶ 18-19, 50.

2            **2.      The 1992 Agreement Could Not Transfer Termination Rights**

3            The 1992 Agreement does not purport to waive, transfer or release the Shuster

4    termination rights, but even if it had, such would be null and void as an "agreement

5    to the contrary" under § 304(c)(5).  The Copyright Act's termination provisions lie in

6    stark contrast to basic contract principles as they were designed to provide authors/

7    heirs with relief from one-sided, unremunerative copyright grants, in recognition of

8    the imbalance of power between authors and publishers.  *See 3 Nimmer* § 11.01.  In

9    enacting this fundamental termination right, Congress expressly sought to prevent its

10   contractual erosion.  Thus, in further abrogation of "freedom of contract" principles,

11   Congress ensured that the termination right could not be waived, cancelled or

12   contracted around, and that "[t]ermination of the grant may be effected

13   ***notwithstanding any agreement to the contrary***, including an agreement to make a

14   will or to make any future grant."  17 U.S.C. § 304(c)(5) (emphasis added).

15   Therefore, to the extent that DC alleges that the 1992 Agreement bars the exercise of

16   the Shuster termination rights, it is an unenforceable "agreement to the contrary."

17   *See Simon,* 310 F.3d at 290 (settlement agreement that characterized a work as a non-

18   terminable "work for hire" was an unenforceable "agreement to the contrary").

19           Secondly, the 1992 Agreement would be ineffective for purporting to transfer

20   termination rights that do not vest under § 304(c)(6)(B) until exercised.  To further

21   protect authors/heirs, Congress specified that the termination interest is inalienable

22   and may not be transferred to the original grantee or its successor until exercised by

23   service of a notice of termination.[5]  17 U.S.C. § 304(c)(6)(B); Section I.C, *infra*.

24   Thus, even if the Shuster Executor had been a party to the 1992 Agreement, he could

25   not have transferred or released the termination interest, as such did not vest until his

26   service of the Shuster Termination in 2003.  Complaint, ¶ 79.

27   _____

28   [5] Congress made the termination right inalienable to prevent a repeat of *Fred Fisher Music
     Co. v. M. Witmark & Sons*, 318 U.S. 643 (1943), which had frustrated the pro-author
     objectives of the renewal copyright by allowing publishers to prematurely acquire a renewal
     copyright before it vested.  *See Mills Music, Inc. v. Snyder*, 469 U.S. 153, 185–86 (1985).

10

Case 2:10-cv-03633-ODW-RZ   Document 331   Filed 08/19/10   Page 9 of 335   Page ID #:870

### 3.    The 1992 Agreement Did Not Grant Superman Copyrights

DC will likely argue that it can avoid the Copyright Act's clear prohibition of "agreements to the contrary" in § 304(c)(5) under the very narrow exception established in *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005). *Milne* held that where a copyright grantor expressly revoked a pre-1978 copyright assignment and regranted all of the rights that had been previously assigned, and further expressly agreed not to exercise his termination rights, such an agreement could bar termination. *Id.* at 1040-41. However, the 1992 Agreement does not fall within the limited exception established by *Milne*.

The 1992 Agreement was not an operative grant of Shuster's Superman copyrights, which in 1992 were already in DC's sole possession. Complaint, ¶¶ 42, 100-101. As DC acknowledges, long before the 1992 Agreement, the "agreements between Siegel and Shuster, on the one hand, and [DC's predecessors], on the other, had assigned 'all' rights in Superman," and DC already "owned all rights in Superman" in 1992, as expressly held in *Siegel v. Nat'l Periodical Publ'ns, Inc.* ("*National*"), 508 F.2d 909 (2d Cir. 1974). Complaint, ¶ 42. The Shuster Executor properly terminated these operative grants under the Copyright Act. Aware of this problem, DC makes the misleading, unsupported, conclusory allegation that "[t]he 1992 Agreement operated to revoke, rescind, and replace Shuster's prior copyright grants," in an attempt to bring it within the *Milne* exception. *Id.*, ¶ 50.

However, there is absolutely no language of revocation in the 1992 Agreement as would be required. RJN, Ex. A. Any revocation of Joseph Shuster's operative copyright grants, particularly if DC attempts to use the 1992 Agreement to argue a forfeiture of statutory termination rights, would have to be clear and unmistakable. *See Mewborn*, 542 F.3d at 983; *see also Simon*, 310 F.3d at 290 ("[T]he clear Congressional purpose behind § 304(c) was to prevent authors from waiving their termination right by contract."). In both this action (*id.*, ¶¶ 29-31, 39-44, 140-41, 145-46), and the related *Siegel* action (First Amended Counterclaims

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

("Counterclaims"), *Siegel* Docket No. 42, (RJN, Ex. B) ¶¶ 10-12, 15-17, 20, 26, 29-30), DC asserts and relies heavily on the effectiveness of the original Superman grants, contrary to its frivolous and contradictory allegation elsewhere in the Complaint that the 1992 Agreement somehow revoked them.  Complaint, ¶ 50.

Nor does the 1992 Agreement contain any regrant of any copyright interest in Superman.  RJN, Ex. A.  The 1992 Agreement merely "settles all claims to any payments or other rights or remedies which [Frank Shuster and Jean Peavy] may have under any other agreement or otherwise … in any and all work created in whole or in part by your brother [Joseph Shuster]" and provides "[Frank Shuster and Jean Peavy] now grant to [DC] any such rights" that they may have had at the time.  *Id.* This is a quitclaim of any rights, not a regrant of the Superman copyrights already in DC's possession by virtue of Siegel and Shuster's operative grants.

Even if the 1992 Agreement had purported to regrant Joseph Shuster's previously assigned copyright interests, this would have no force or effect.  The leading Ninth Circuit decision on this issue, *Mewborn*, 532 F.3d at 986, held that a post-1978 grant by an author's daughter that purported to "assign" to a company *Lassie* copyrights, already assigned to the company in a pre-1978 grant, was "a nullity," with no effect on the daughter's right to terminate the operative pre-1978 grant under § 304.  The company in *Mewborn* made the same "revocation and regrant" claim as DC makes here, and the Ninth Circuit firmly rejected it.  *Id.* at 989.

This situation is nearly identical.  Frank Shuster and Jean Peavy had no Superman copyrights to grant to DC, as such copyrights had already been assigned by Jerome Siegel and Joseph Shuster in their operative pre-1978 grants.  Complaint, ¶¶ 29-31, 39-44.  Shuster's unrevoked pre-1978 grants remained subject to termination by the Shuster Executor.  DC's bald, conclusory allegations of a "revocation and regrant" are unsupported by the 1992 Agreement, and contradicts the record, DC's other allegations, and *Mewborn*.[6]

---

[6] The Court should not accept as true DC's conclusory allegations that contradict both the 1992 Agreement and DC's assertion in this and the *Siegel* action that it owns all rights in

12

Case 2:10-cv-03633-ODW-RZ    Document 161-3    Filed 09/13/10    Page 197 of 243   Page
Case 2:10-cv-03633-ODW-RZ    Document 135-1    Filed 08/13/10    Page 27 of 33   Page ID #:8/2
ID #:4230

### C. The Shuster Executor Was Properly the Sole Signatory to the Shuster Termination Notices

The Shuster Termination was served on November 10, 2003, with an effective termination date of October 26, 2013. Complaint, ¶¶ 79-81. Section (3) of DC's first claim alleges that the Shuster Executor did not own the "more than one-half majority [of the termination] interest necessary to terminate," erroneously arguing that 50% of such termination interest was purportedly owned by Pacific Pictures Corporation ("PPC"), pursuant to PPC's 2001 and 2003 agreements with Jean Peavy and Mark Warren Peary. *Id.*, ¶¶ 107-08. However, the Shuster Executor clearly held the entirety of Shuster's termination interest when the Shuster Termination was executed and served in 2003, and still holds 100% of such interest. Termination rights are held only by certain classes of people defined by statute, and PPC has never been a member of any such class. 17 U.S.C. § 304(c)(2)(A)–(D). Moreover, the termination rights ***cannot*** be transferred prior to the effective termination date (here, 10/26/13):

> "***A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination***. ...."

17 U.S.C. § 304(c)(6)(D) (emphasis added).[7] *See* 3 *Nimmer* § 11.08[A] at 11-49 ("Neither a further grant nor an agreement to make a further grant … will be valid unless such grant or agreement is executed after the date of termination….").

DC's erroneous allegations that the "Pacific Pictures Agreements," executed in 2001 and 2003, and cancelled nearly six years ago in 2004, transferred the Shuster Executor's termination rights (Complaint, ¶¶ 86, 105-11) are disingenuous and misleading. DC itself acknowledges elsewhere in its Complaint that "[§]

---

Superman under operative pre-1978 grants. *See Barnett v. Evans*, 2009 U.S. Dist. LEXIS 30388, at *13 (N.D. Cal. 2009) ("A court … is not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint."); *Young v. Mandeville*, 2006 U.S. Dist. LEXIS 63959, at *7 (E.D. Cal. 2006) ("[A] court is not required to accept … allegations that contradict facts which may be judicially noticed.").

[7] Pursuant to 17 U.S.C. § 304(c)(6)(D), the sole exception to this rule is that *after the service of a termination notice* but before the effective date of the termination, "an agreement for such a further grant may be made … with the original grantee [or its successor-in-interest – *i.e.,* DC]." Complaint, ¶ 154. PPC is not the original grantee or its successor, DC.

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

304(c)(6)(D) provides: 'A further grant … of any right covered by a terminated grant is valid if it is made after the effective date of termination,'" and that "until October 26, 2013 … DC is the sole party that can enter into an agreement with the Shuster Heirs for the rights sought to be terminated." *Id*., ¶¶ 154-55.  Thus, as a matter of law neither the PPC agreements nor the Shuster Executor could transfer his termination interest prior to the October 26, 2013 termination date.  Accordingly, the Shuster Executor, the sole party entitled to exercise termination rights, retained the entire termination right, and correctly served the Shuster Termination bearing his signature. RJN, Ex. C at 13.

## D.    The 1948 Consent Agreement Is Irrelevant to the Termination

### 1.    This Court Already Held That the Consent Judgment Was Not a Copyright Grant and Need Not Be Listed

Contrary to DC's assertions in section (4) of its First Claim (Complaint, ¶¶ 112-115), the May 21, 1948 consent judgment in the Westchester Action ("May 21 Consent Judgment") has no bearing on the Shuster Termination.[8]  Judge Larson has already decided that the May 21 Consent Judgment was not a copyright grant and did not affect the validity of notices terminating Siegel and Shuster's Superman copyright grants.  In *Siegel*, DC made the exact same argument regarding the May 21 Consent Judgment as to the Siegel Termination, which this Court roundly rejected:

> "The consent judgment at issue did not effectuate any transfer of rights from Siegel and Shuster to Detective Comics.  If any rights were transferred as a result of the Westchester action, such a transfer was effectuated by the execution of the earlier stipulated agreement of the parties, not a document created two days later which simply memorialized the transfer that the stipulation itself had accomplished.  The binding nature of the transfer contained in the stipulation was completed the moment that agreement was executed.  The consent judgment, was a mere formality whose execution (or lack thereof) did not detract from the otherwise binding nature of the parties' earlier agreement. It merely parroted what was already agreed to by the parties in the stipulation itself."

542 F. Supp. 2d at 1131; RJN, Ex. H.  This Court also ruled that, even if the May 21

---

[8] The 1992 Agreement was also excluded from the termination notices because it is ineffective as a matter of law to transfer Joseph Shuster's copyright interests already in DC's possession. *See* Complaint, ¶¶ 112, 115; 37 C.F.R. § 201.10(b)(iv) (requiring termination notices to identify the grants to be terminated).

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Consent Agreement could be considered a grant, its absence was harmless error:

> "Here, viewing the issue in the light most favorable to [DC Comics and Warner], the 1948 consent judgment simply served to culminate or otherwise finalize the transfer of the Superman copyright achieved through the stipulation the parties reached two days earlier. That [the Siegels] only identified the latter rather than the former does not materially affect [DC's] understanding of the 'grant' sought to be affected...."

*Id.* at 1132.  As discussed more fully below regarding DC's Second Claim, this ruling is binding on DC under the "law of the case" doctrine.

### 2.  The Shuster Executor Was Not Required to List the May 21, 1948 Consent Agreement As It Was Not a Copyright Grant

As Judge Larson already held, the May 21 Consent Judgment was not an operative copyright grant.  A notice of termination should include "a brief statement reasonably identifying the grant to which the notice of termination applies."  37 C.F.R. § 201.10(b)(1)(iv).  The Shuster Termination listed seven agreements that might be construed as grants, including a May 19, 1948 stipulation from the Westchester Action (the "May 19 Stipulation").  RJN, Ex. D.  The May 19 Stipulation settled the Westchester Action, and re-acknowledged DC's predecessor's ownership of Superman.  *See id.*; Complaint, ¶¶ 40, 81.  The May 19 Stipulation also provided for the May 21 Consent Judgment, which was entered two days later, incorporating the stipulation's terms.  *Id.*, ¶ 40.  Thus, to the questionable extent that a Superman copyright grant even occurred, it occurred in the May 19 Stipulation, listed in the Shuster Termination.  RJN, Ex. C at 8.  The May 21 Consent Judgment did not operate as a grant, transfer or conveyance of copyrights; it merely confirmed the May 19 Stipulation already entered into.  *Siegel I*, 542 F. Supp. 2d at 1131.

Nor were either the May 19 Stipulation or the May 21 Consent Judgment the operative grant of Superman copyrights to DC's predecessors.  A March 1, 1938 grant by Siegel and Shuster was held in the Westchester Action and the subsequent 1974 action to have conveyed all rights in Superman to DC's predecessors.  *See* Complaint, ¶¶ 31, 37-40; RJN, Ex. E, Conclusion of Law No. 1; *Siegel v. Nat'l Periodical Publications, Inc.*, 364 F. Supp. 1032, 1035, 1037–38 (S.D.N.Y. 1973),

Case 2:10-cv-03633-ODW-RZ   Document 61-3   Filed 09/13/10   Page 200 of 243   Page
Case 2:10-cv-03633-ODW-RZ   Document 33-1   Filed 08/13/10   Page 24 of 39   Page ID #:875
ID #:4233

*aff'd* 508 F.2d 909, 911–12.  As such, neither the subsequent May 19 Stipulation nor the May 21 Consent Agreement conveyed Superman copyrights already assigned by Siegel and Shuster.  *See Mewborn,* 532 F.3d at 986 (holding "language in the 1978 Assignment purporting to assign the … rights is a nullity," as such rights had already been assigned).  Lastly, even if the May 21 Consent Agreement somehow granted already-granted rights, the underlying May 19 Stipulation listed in the termination notice "reasonably identifies" the parallel May 21 Consent Agreement.  37 C.F.R. § 201.10(b)(1)(iv); *Siegel*, 542 F. Supp. 2d at 1131.[9]

### E.   DC's Unclean Hands Claim Fails as a Matter of Law

#### 1.   Unclean Hands Is Not a Basis for a Cause of Action

DC's free-standing "unclean hands" claim (Complaint, ¶¶ 116-20) is inappropriate because "unclean hands is an equitable defense, not a cause of action." *In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 812, 842 (N.D. Cal. 2005) (dismissing cause of action for "unclean hands").  The "unclean hands" doctrine acts as a defense against "plaintiffs seeking equitable relief" on an affirmative claim. *Adler v. Fed. Republic of Nigeria*, 219 F.3d 869, 877 (9th Cir. 2000).  "The doctrine of unclean hands does not obviously apply where it is [the plaintiff], not the [defendant], who seeks relief" based on this "'defensive doctrine.'"  *Pelich v. INS*, 329 F.3d 1057, 1062 (9th Cir. 2003) (citations omitted).  DC's attempt to turn this equitable defense into an aggressive cause of action against the Shuster Executor is manifestly improper as a matter of law.[10]  Moreover, even if the "unclean hands"

---

[9] Furthermore, as held by the Court in *Siegel*, the absence of the May 21 Consent Judgment is harmless error.  "Harmless errors in a notice that do not materially affect the adequacy of the information required to serve the purposes of … section 304(c) … shall not render the notice invalid."  37 C.F.R. § 201.10(e)(1).  DC had ample notice of the Shuster Executor's intention to terminate all of Shuster's prior grants, and were not prejudiced by the Shuster Executor not listing the May 21 Consent Judgment in addition to the parallel May 19 Stipulation, the operative March 1, 1938 grant and other prior agreements.  *See Music Sales Corp.,* 73 F. Supp. 2d at 378 (holding that a description of a grant as simply "Grant or transfer of copyright and the rights of copyright proprietor, including publication and recording right," was insufficient to identify the grant, but was "harmless error").

[10] Courts have also clearly held that, like "unclean hands," the closely related defense of copyright and trademark "misuse" is only available as a defense, not as a cause of action. *See Ass'n of American Medical Colleges v. Princeton Review, Inc.*, 332 F. Supp. 2d 11, 19

16

Case 2:10-cv-03633-ODW-RZ   Document 61-3   Filed 09/13/10   Page 201 of 243   Page
Case 2:10-cv-03633-ODW-RZ   Document 33   Filed 08/13/10   Page 29 of 39   Page ID #:876
ID #:4234

1    defense was a proper basis for a claim, DC's claim would still fail.

**2.    The Failure to List PPC or Superboy in the Shuster Termination Does Not Show "Unclean Hands"**

a.    <u>PPC Owned No Termination Interest</u>

The first part of DC's "unclean hands" argument is based on a failure to list "[PPC's] purported ownership interest in the rights … to be terminated." Complaint, ¶ 117. As acknowledged by DC elsewhere (*id.*, ¶¶ 154-155), PPC had no such ownership interest. *See* Section II.D, *supra*. Therefore, the failure to list PPC in the Shuster Termination could not constitute "unclean hands."

b.    <u>The Shuster Executor Was Bound by a Court Order That Jerry Siegel Was the Sole Author and Owner of Superboy</u>

The second part of DC's "unclean hands" claim is based on the Shuster Executor's decision not to include the separate Superboy character in his termination. DC cannot plausibly maintain its allegation that the Shuster Executor "compromised the integrity of the Copyright Office and judicial system by crafting the Shuster Termination Notice" to exclude Superboy (Complaint, ¶ 120), because the Shuster Executor was bound by prior judicial determinations that Siegel was the sole author and owner of Superboy. *Compare id.*, ¶¶ 118-20 *with National*, 508 F.2d at 913-14.

In the 1930s, Siegel and Shuster created Superman, which they ultimately sold to DC's predecessor, Detective Comics ("Detective"). *See* Complaint, ¶¶ 27-31; RJN, Ex. E, Findings of Fact ("FF") and Conclusions of Law ("COL")), FF ¶¶ 9–10, 24–29, 44–45. In 1938, Siegel, acting alone, developed the idea, conception and plan for Superboy, and submitted it to Detective, which rejected the proposed comic. *Id.*, FF ¶¶ 156–59. In December 1940, Siegel submitted another Superboy proposal, with a complete script containing the continuity, plan and dialogue for a Superboy comic,

(D.D.C. 2004) ("Because the policy reasons underlying the development of the equitable doctrine of copyright misuse are grounded in the unclean hands doctrine, permitting copyright misuse as an independent, affirmative claim would be contrary to the ... doctrine."); *Dunn Comp. Corp. v. Loudcloud, Inc.*, 133 F. Supp. 2d 823, 830 (E.D. Va. 2001) ("Trademark misuse is not an independent cause of action, but is, instead, only an affirmative defense to a trademark infringement claim. Because no trademark infringement claim has yet been asserted against plaintiff, there is no occasion here for … [the] defense.").

17

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

which Detective again rejected.  *Id.*, FF ¶¶ 160-62.  Four years later, while Siegel was off fighting for his country, Detective published Superboy in *More Fun Comics*, No. 101, and in subsequent comics, based on Siegel's material, but without his consent. *Id.*, FF ¶¶ 162, 164-65.  In 1947, Siegel and Shuster brought the Westchester Action jointly asserting rights to Superman.  However, Siegel individually claimed that Detective had no right to publish Superboy, and that Superboy belonged to Siegel. *Id.*, COL ¶¶ 25–26.  The presiding referee found that Siegel was the sole creator of Superboy, and that Siegel had the exclusive right to create, sell and distribute Superboy, and enjoined Detective from publishing Superboy.  *Id*.  In the 1970s, when Siegel and Shuster brought suit against DC's predecessor, the Second Circuit treated the findings and conclusions in this Westchester Action as binding and preclusive. *National,* 508 F.2d at 913-14.

The Siegel Termination therefore credits Superboy as the sole creation of Jerry Siegel because, as held in the Westchester Action, Siegel **was** the sole author of the script that established Superboy, a script never illustrated by Shuster.  Thus, the Shuster Executor did not seek to terminate Superboy works.  As the Siegel and Shuster terminations accurately reflect the Westchester Action, found in *National*, 508 F.2d at 914, to have preclusive effect, there is no plausible legal or factual basis for DC to assert "unclean hands" for not listing Superboy in the Shuster Termination.

c.    <u>The Superboy Works Could Not Have Been Included in the Shuster Termination In Any Event</u>

DC's "unclean hands" claim is based on the omission of Superboy from "the Shuster Termination Notice."  Complaint, ¶¶ 118-120.  However, the Shuster Termination was served pursuant to 17 U.S.C. § 304(d) (Complaint, ¶ 81) and Superboy could not have been terminated under § 304(d) as a matter of law.  As DC acknowledges, the first Superboy story was published in *More Fun Comics, No. 101* in November 1944 (RJN, Ex. E, FF ¶ 163; Complaint, ¶¶ 37-38, 118).  Superboy therefore first secured a statutory copyright by publication in 1944.  *Id.*, ¶ 75.

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

However, only a copyrighted work "subsisting in its renewal term on the effective date of the … Copyright Term Extension Act [*i.e.*, October 27, 1998] for which the termination right provided in subsection (c) has expired by such date" can be terminated under 17 U.S.C. § 304(d).  The Copyright Office has clarified that § 304(d) applies only to "works for which copyright was secured between January 1, 1923, and October 26, 1939."  67 Fed. Reg. 69134, 69135 (Nov. 15, 2002).  The Shuster Termination properly covered only those works that had secured copyright within this § 304(d) termination window.  *See* Complaint, ¶ 83 (listing works covered by the Shuster Termination); RJN, Ex. C at 6-7 (listing only works that secured copyright between 1933 and October 25, 1938).  Superboy, which first appeared in November **1944,** after this October 26, **1939** cut-off**,** clearly fell outside the scope of works that could be terminated by the Shuster Termination. Accordingly, its omission cannot constitute "unclean hands."[11]

## III.   DC's SECOND CAUSE OF ACTION MUST BE DISMISSED AS IT SEEKS TO RE-LITIGATE MATTERS ALREADY DECIDED

### A.   DC Ignores the Past Six Years of Litigation in the *Siegel* Action

DC's Second Claim is nothing more than an attempt to re-litigate the serious setbacks DC has suffered in the *Siegel* case:  the Siegel Termination has been held valid as to the comic books *Action Comics, Nos. 1, 4* and portions of *Superman, No. 1*, as well as the first two weeks of the *Superman* newspaper strips.  *See Siegel v. Warner Bros. Ent. Inc.*, 542 F. Supp. 2d 1098, 658 F. Supp. 2d 1036 (C.D. Cal. 2009) ("*Siegel II*") (RJN, Ex. I), 690 F. Supp. 2d 1048 (C.D. Cal. 2009) ("*Siegel III*") (RJN, Ex. J).  These works comprise the essential core of the Superman mythos, and include Superman's origin on Krypton, his iconic costume and super-powers, his "alter ego," Clark Kent, and his relationship with feisty reporter Lois Lane.  *Siegel I*,

---

[11] Furthermore, the Siegels had an independent right to claim sole ownership of Superboy based on the preclusive findings in the Westchester Action cited above.  The Siegels served their Superboy notice of termination on November 8, 2002 before service of the Shuster Termination on November 10, 2003.  Complaint, ¶¶ 73, 79.  Even if the subsequent Shuster Termination had included Superboy (it could not have), DC would still have had to defend against the Siegels' claim based squarely on the Westchester Action.

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Case 2:10-cv-03633-ODW-RZ    Document 131    Filed 08/13/10    Page 28 of 39    Page ID #:879

1    542 F. Supp. 2d at 1126; *Siegel II*, 658 F. Supp. 2d at 1063-83; RJN, Exs. H-I.

2        Unhappy with having to account to the Siegels for the use of these valuable

3    Superman elements, DC ignores this Court's three published opinions in *Siegel*, and

4    attacks the "mirror image" Shuster Termination on many of the same grounds as it

5    unsuccessfully attacked the Siegel Termination, in a transparent effort to re-litigate

6    issues thoroughly litigated in *Siegel*.  However, DC is barred by the "law of the case"

7    doctrine.  As Siegel and Shuster co-authored the works in question, any decisions

8    about the validity and effect of the Siegel Termination with respect to such works

9    apply to the twin Shuster Termination.  With *Siegel* largely decided, DC's Complaint

10   cannot be used to brush aside the past six years of hard-fought litigation at the

11   expense of considerable judicial resources, or as an "appeal" at the trial court level.

12       **B.    The "Law of the Case" Doctrine Bars DC's Attempt to Re-Litigate**

13       DC's Second Claim is barred by the "law of the case" doctrine, which stands

14   for the common-sense principle that the same *issue* presented a second time in the

15   same court should lead to the same result, as to do otherwise "would create

16   intolerable instability for the parties."  *Ridgeway v. Mont. High School Ass'n*, 858

17   F.2d 579, 587-88 (9th Cir. 1988).  Thus, "a court is generally precluded from

18   reconsidering an issue that has already been decided by the same court, or a higher

19   court." *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993).  "Where litigants have

20   once battled for the court's decision, they should neither be required, nor without

21   good reason permitted, to battle for it again."  *Disimone v. Browner*, 121 F.3d 1262,

22   1266-67 (9th Cir. 1997) (applying "law of the case" doctrine to related cases).  The

23   "law of the case" doctrine reflects "the respect that one judge or court owes the

24   rulings of another judge or court in the same or closely related cases."  18 Wright,

25   Miller & Cooper, *Federal Practice and Procedure* § 4478 at 788 (1981).[12]  A court

26   may depart from this doctrine only if "(1) the first decision was clearly erroneous; (2)

_____

27   [12] *See Moss v. Crawford & Co.*, 201 F.R.D. 398, 401 n. 1 (W.D. Pa. 2000) (law of the case
     doctrine applies to issues determined in "closely related" cases); *Mason v. Texaco, Inc.*, 741

28   F. Supp. 1472, 1492 (D. Kan. 1990) (the "law of the case doctrine 'encompasses … the
     rulings of another judge or court in … a closely related case'"); *Ovadia v. Top Ten Jewelry
     Corp.*, 2005 U.S. Dist. LEXIS 16784 at *3 (S.D.N.Y. Aug. 12, 2005) (same).

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

1    an intervening change in the law has occurred; (3) the evidence on remand is

2    substantially different; (4) other changed circumstances exist; or (5) a manifest

3    injustice would otherwise result." *Thomas*, 983 F.2d at 155.  Absent such conditions,

4    failure to adhere to the "law of the case" doctrine is an abuse of discretion.  *Id.*

5         This related action is plainly subject to the rulings in *Siegel* under the "law of

6    the case" doctrine.  DC conceded that these actions are very closely related, and filed

7    on May 14, 2010 a Notice of Related Cases certifying that this case is related to

8    *Siegel* because it "(1) arise[s] in part from the same or closely related events; (2)

9    call[s] for the determination of similar issues of law and fact; (3) would entail

10   substantial duplication of labor if heard by different judges; and (4) involve[s] many

11   of the same copyrights."  *See* Docket No. 4, at 1:14-17.  DC similarly admitted that

12   "the scope and ownership of a variety of Superman-related copyrights is at issue in

13   all three actions, as are historical facts concerning the creation of Superman and its

14   exploitation in a variety of media," and that "at issue in all three actions are common

15   legal theories and defenses, and overlapping issues of material fact."  *Id*. at 2:3-7.

16        Moreover, the Complaint's Second Claim as to the alleged "limited scope" of

17   the Shuster Termination is nearly identical to DC's Fifth Counterclaim, for a

18   "declaration of limitations on the scope" of the Siegel Termination, in *Siegel*.

19   *Compare* Complaint, ¶¶ 140-49 *with* Counterclaims (RJN, Ex. B), ¶¶ 106-20, 132-35.

20   DC's Second Claim herein tackles the same subjects regarding the scope of the

21   terminations addressed in DC's Fifth Counterclaim in *Siegel*, including the effect of

22   so-called "Promotional Announcements" ("Ads") and whether the terminations

23   recapture derivative works.  *Compare* Complaint, ¶¶ 142-43, 147-49 *with*

24   Counterclaims (RJN, Ex. B), ¶¶ 109-13, 118-20, respectively.  The Court's prior

25   binding rulings in *Siegel* already analyzed in great detail and decided the issues in the

26   Second Claim.[13]

27

28   _____

[13] The Complaint contains nearly identical factual allegations as DC's October 14, 2005 First Amended Counterclaims regarding the creation of *Superman* and *Action Comics, No. 1*. *Compare* Complaint, ¶¶ 124-37 *with* Counterclaims (RJN, Ex. B), ¶¶ 7-8, 10-18, 20-22.

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Case 2:10-cv-03633-ODW-RZ    Document 61-3    Filed 09/13/10    Page 206 of 243   Page
Case 2:10-cv-03633-ODW-RZ    Document 33-1    Filed 08/13/10    Page 50 of 396   Page ID #:851
ID #:4239

### 1.    Work For Hire

DC's Second Claim repeats DC's losing argument that the first Superman story published in *Action Comics, No. 1* and other Superman works were "works made for hire," exempt from termination (Complaint, ¶¶ 140-41, 145-46), when this was heavily litigated, thoroughly considered and rejected by this Court. *See Siegel I*, 542 F. Supp. 2d at 1126-30; *Siegel II*, 658 F. Supp. 2d at 1063-68, 1083.[14]

DC's claim, as before, is foreclosed by the Second Circuit's decision in *National*, 508 F.2d at 914, that *none* of *Action Comics, No. 1* was "work for hire":

> "In the case before us, Superman and his miraculous powers were completely developed long before the employment relationship was instituted. The record indicates that the revisions directed by the defendants were simply to accommodate Superman to a magazine format. We do not consider this sufficient to create the presumption that the [comic book] was a work for hire."

Moreover, this Court properly held that DC is collaterally estopped by this decision:

> "Defendants argue that portions of the copyrightable material contained in *Action Comics*, Vol. 1, are unaffected by the termination notice because those portions belong exclusively to them as "works for hire," arguing that certain material … was created by Detective Comics' in-house employees, or … was added to the underlying Superman material by Siegel and Shuster at the publisher's direction…. The thrust of defendants' argument was made and rejected by the Second Circuit in the 1970s … and is thus precluded as a matter of collateral estoppel here."

*Siegel I*, 542 F. Supp. 2d at 1127.  This Court also ruled on the remaining Superman works created by Siegel and Shuster, holding that portions of *Action Comics, No. 4* and *Superman, No. 1*, and the first two weeks of the *Superman* newspaper strips, were *not* "works for hire," but that "the remainder of the Superman material at issue … published from 1938 to 1943" were "works for hire."  *Siegel II,* 658 F. Supp. 2d at 1095.[15]  Both sides filed motions for reconsideration of this ruling, which were

---

[14] DC's tactic is laid bare by its claim that *all* of *Action Comics, No. 1* was a "work for hire," whereas in *Siegel* DC claimed only minimal "Additional Action Comics No. 1 Materials" were "work for hire."  *Compare* Complaint, ¶ 133 *with* First Amended Counterclaims, ¶ 132. *See also* RJN, Ex. F at 37:13-15 ("DC is the copyright proprietor of *a portion* of *Action Comics* No. 1 which was created after Siegel and Shuster's preexisting material and as a work made for hire….") (emphasis added).

[15] DC also advances a convoluted argument that "Unpublished Superman Works," created c. 1934-35 were published as part of, and are therefore somehow themselves, "works for hire."  Complaint, ¶¶ 140-41.  But this Court has already indisputably held that Superman

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Case 2:10-cv-03633-ODW-RZ   Document 61-3   Filed 09/13/10   Page 207 of 243   Page
Case 2:10-cv-03633-ODW-RZ   Document 33-1   Filed 08/19/10   Page 5 of 397   Page ID #:882
ID #:4240

denied.  *Siegel III,* 690 F. Supp. 3d 1048.  These rulings are the "law of the case" as
to whether the works were "made for hire," and are binding on the parties here.

## 2. Promotions

DC similarly tries to re-litigate the issue of the "Promotions" ("Ads") in its
Complaint (¶¶ 142-44), completely ignoring that this Court has already ruled that
although the Ads were not terminated by the Siegels (*Id.* at 1118-26), the scope of
DC's resulting copyright interest is extremely limited, as the Ads depicted only "the
image of a person with extraordinary strength who wears a black and white leotard
and cape" and contained "[o]bviously nothing concerning the Superman storyline
(that is, the literary elements contained in *Action Comics,* Vol. 1)... thus, Superman's
name, his alter ego, his compatriots, his origins, his mission to serve as a champion of
the oppressed, or his heroic abilities in general, do not remain within defendants sole
possession to exploit."  *Id.* at 1126.  Judge Larson further limited the Ads's scope:

> "What remains of the Siegel and Shuster's Superman copyright that is still
> subject to termination (and, of course, what defendants truly seek) is the
> entire storyline from *Action Comics,* Vol. 1, Superman's  distinctive blue
> leotard (complete with its inverted triangular crest across the chest with a red
> 'S' on a yellow background), a red cape and boots, and his superhuman
> ability to leap tall buildings, repel bullets, and run faster than a locomotive,
> none of which is apparent from the announcement."

*Id.*  Unhappy with this ruling, DC moved for reconsideration, which was denied on
July 3, 2008.  RJN, Ex. K.  The "Court affirm[ed] its conclusion on the scope of the
copyrightable material contained in [the Ads]."  *Id.* at 3-4.  DC now tries for the ***third***
time to litigate the limited scope of the Ads.  Complaint, ¶¶ 142-44.[16]

However, these rulings are the "law of the case," which applies with equal
force to a *related* case such as this, and must not be revisited.  *See Disimone*, 121
F.3d at 1266-67.  The underlying facts here are identical to those in *Siegel*, and
concern the statutory termination of the same copyright grants to the same Superman
works by Siegel and Shuster.  DC has not alleged any new facts or evidence that it

---

material created before March 1938 was <u>not</u> work for hire.  658 F. Supp. 2d at 1061.

[16] Judge Larson also ruled that DC is entitled to continue to exploit pre-existing "unaltered
derivative works" created before the effective date of termination, resolving DC's complaint
as to that issue as well.  *Compare* Complaint, ¶¶ 147-49 *with* 542 F. Supp. 2d at 1142.

23

DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Case 2:10-cv-03633-ODW-RZ   Document 61-3   Filed 09/13/10   Page 208 of 243   Page
ID #:4241
Case 2:10-cv-03633-ODW-RZ   Document 33-1   Filed 09/10   Page 52 of 398   Page ID #:883

did not offer or could not have offered previously, as the pertinent events occurred in the 1930s.  There has been no "change in circumstances" or of the governing law that overrides the "law of the case" of this Court's prior orders.  *Thomas*, 983 F.2d at 155.  Nor has DC alleged that the extensive prior published opinions are "clearly erroneous," or result in a "manifest injustice."  *Id.*  Indeed, DC freely cites such rulings to the extent that they are in its favor.  *See* Complaint, ¶ 146, n.5.  Accordingly, the following sub-parts of the Second Claim – sections a. "Unpublished Superman Works" (*id.*, ¶¶ 140-41); b. "Promotions" (*id.*, ¶¶ 142-44); c. "Works for Hire" (*id.*, ¶¶ 145-46); and d. "Derivative Works" (*id.*, ¶¶ 147-49) – must be dismissed pursuant to the "law of the case" doctrine.[17]

## C.  This Action Should Be Stayed Pending the Outcome in *Siegel*

The *Siegel* action (C.D. Cal., Case No. 04-CV-08400) commenced on October 8, 2004, and is in a far more advanced stage than this recently filed related action.  In *Siegel*, DC's liability to the Siegels (as co-owners of the recaptured Superman copyrights) has been established, and an "accounting trial" to determine the Siegels' Superman profits is pending.  To the extent that any issues remain in DC's Second Claim, such shared issues should first be decided in *Siegel*, and the duplicative Second Claim should be stayed until *Siegel* is completed.

The sole remaining issue in the Second Claim that has not already been fully adjudicated in *Siegel* is in sub-part "e" (Complaint, ¶¶ 150-151).  This issue will necessarily be decided first in *Siegel*, as it concerns which Superman elements are contained in *Action Comics, No. 1*, and in the other recaptured Superman works for which DC must account in *Siegel*.  Such issue should be stayed here, pending its decision by the trier of fact in the more advanced *Siegel* case.  DC will not be

---

[17] Furthermore, if the Court grants the pending Rule 54(b) motion by plaintiffs in the *Siegel* litigation, DC's Second Claim would also be barred by issue preclusion.  *See Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1525 (9th Cir. 1987) ("[A] 54(b) ruling in fact has res judicata ramifications.").  Such rulings have preclusive effect while an appeal is pending.  *See Robi v. Five Platters, Inc.*, 838 F.2d 318, 327 (9th Cir. 1988) (pending appeals "in no way affect the 'firmness' of the [district court] decisions … for purposes of issue preclusion").

24
DEFENDANT MARK WARREN PEARY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Case 2:10-cv-03633-ODW-RZ   Document 33-1   Filed 08/13/10   Page 53 of 59   Page ID #:864

prejudiced if this remaining portion of its Second Claim is stayed, as DC will have the full and fair opportunity to litigate the identical issue in *Siegel*.

A court "has broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 707 (1997). "When considering a motion to stay, the district court should consider three factors: (1) potential prejudice to the non-moving party, (2) hardship and inequity to the moving party if the action is not stayed; and (3) the judicial resources that would be saved by avoiding duplicative litigation…." *Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1360 (C.D. Cal. 1997) (staying action pending related litigation to "serve the interests of judicial economy").

After six long years of hard-fought litigation in *Siegel*, it would be highly inequitable, inefficient and wasteful to permit DC's redundant Complaint to interfere with and re-start from scratch this lengthy judicial process. In 2008, this Court held that the Siegels were entitled to a co-ownership share of Superman profits since April 16, 1999, yet DC has still not paid them one penny of these substantial profits. The Siegels will clearly be prejudiced if this action is used to delay the prosecution of their claims. DC must not be permitted to use this case as a tactic to delay, encumber or "swallow" the long pending accounting trial in *Siegel*. What remains of DC's new lawsuit should properly be stayed until *Siegel* is completed.

## CONCLUSION

For the foregoing reasons, Plaintiff's First and Second Claims for Relief should be dismissed with prejudice.

DATED: August 13, 2010          TOBEROFF & ASSOCIATES, P.C.


By _____
              Marc Toberoff

Attorneys for Defendants Mark Warren Peary,
as personal representative of the Estate of
Joseph Shuster, Joanne Siegel and Laura Siegel
Larson

# EXHIBIT K

Case 2:10-cv-03633-ODW-RZ   Document 161-3   Filed 09/13/10   Page 211 of 243   Page
ID #:4244
Case 2:10-cv-03633-ODW-RZ   Document 34-1   Filed 08/13/10   Page 1 of 31   Page ID #:454

1   Marc Toberoff (State Bar No. 188547)
    Nicholas C. Williamson (State Bar No. 231124)
2   Keith G. Adams (State Bar No. 240497)
    TOBEROFF & ASSOCIATES, P.C.
3   2049 Century Park East, Suite 2720
    Los Angeles, California, 90067
4   Telephone:  (310) 246-3333
    Fax:          (310) 246-3101
5   MToberoff@ipwla.com

6   Attorneys for Defendants Mark Warren
    Peary, as personal representative of the
7   Estate of Joseph Shuster, Joanne Siegel and
    Laura Siegel Larson

8
                **UNITED STATES DISTRICT COURT**
9
        **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**
10

11  DC COMICS,                          | Case No: CV 10-03633 ODW (RZx)

                    Plaintiff,          | Hon. Otis D. Wright II, U.S.D.J.
12
        vs.                             | **DEFENDANTS JOANNE
13                                      | SIEGEL AND LAURA SIEGEL
    PACIFIC PICTURES CORPORATION;       | LARSON'S NOTICE OF
14  IP WORLDWIDE, LLC; IPW, LLC;        | MOTION AND MOTION TO
                                        | DISMISS AND/OR STRIKE
15  MARC TOBEROFF, an individual;       | PLAINTIFF'S COMPLAINT
    MARK WARREN PEARY, as personal      | PURSUANT TO FED.R.CIV.P.
16  representative of the ESTATE OF     | 12(b)(6); MEMORANDUM OF
    JOSEPH SHUSTER; JOANNE SIEGEL,      | POINTS AND AUTHORITIES**
17  an individual; LAURA SIEGEL
    LARSON, an individual,              | Complaint filed:  May 14, 2010
18                                      | Trial Date:  None Set
    and DOES 1-10, inclusive,
19                                      | Date:    October 18, 2010
                    Defendants.         | Time:    1:30 p.m.
20                                      | Place:   Courtroom 11

21

22

23

24

25

26

27

28

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on October 18, 2010 at 1:30 p.m., or as soon thereafter as counsel may be heard, in Courtroom 11 of the above-captioned Court, located at 312 N. Spring Street, Los Angeles, California, 90012, defendants Joanne Siegel and Laura Siegel Larson will and hereby do move to dismiss and strike the third and sixth claims for relief in plaintiff DC Comics' complaint pursuant to Fed. R. Civ. P. 12(b)(6) and (f).

Plaintiff bases its Third and Sixth Claims for Relief on the erroneous position that it was entitled under 17 U.S.C. § 304(c)(6)(D) to a so-called "period of exclusivity" to negotiate with the executor of the estate of Joseph Shuster to purchase his Superman copyright termination interest under 17 U.S.C. § 304(d). The statute provides no such "right," and DC's reading of the statute has been specifically rejected by the courts and leading authorities. Moreover, the Third and Sixth Claims are barred by the "litigation privilege," codified in California Civil Code § 47(b).

The Sixth Claim for Relief under California's unfair competition law is also preempted by federal copyright law insofar as plaintiff has not (and could not) allege the requisite "extra" element that would avoid preemption.

Plaintiff's allegations in the Third and Sixth Claims relating to the alleged "consent agreements" (Complaint, ¶ 175), the existence and purpose of which was disclosed to DC during a confidential mediation between DC and the Siegels, must be stricken from the complaint pursuant to Fed. R. Civ. P. 12(f), as plaintiff's use of this information violates (i) the mediation privilege, (ii) the May 1, 2008 JAMS Confidentiality Agreement between the Siegels and DC, and (iii) this Court's January 14, 2009 order in the related Superman action (Case No. 04-CV-8400).

This motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on July 13, 2010. Defendants seek dismissal of the Third and Sixth Claims for Relief based on this Notice of Motion and Motion, the attached

SIEGEL DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS THIRD AND SIXTH CLAIMS FOR RELIEF

1  memorandum of points and authorities, the pleadings and records on file in this

2  action, such additional authority and argument as may be presented in any reply and

3  at the hearing on this motion, and such other matters of which this Court may take

4  judicial notice.

5  DATED:  August 13, 2010          TOBEROFF & ASSOCIATES, P.C.

6
                                        By _____
7                                              Marc Toberoff

8                                       Attorneys for Defendants Mark Warren Peary,
                                        as personal representative of the Estate of
9                                       Joseph Shuster, Joanne Siegel and Laura Siegel
                                        Larson
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SIEGEL DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS THIRD AND SIXTH
CLAIMS FOR RELIEF

# **TABLE OF CONTENTS**

INTRODUCTION .................................................................................1

ARGUMENT .......................................................................................3

I.     LEGAL STANDARD ...............................................................3

II.    PLAINTIFF'S THIRD AND SIXTH CLAIMS FOR RELIEF
       MUST BE DISMISSED ............................................................4

       A.    Plaintiff's Third and Sixth Claims for Relief Regarding
             a Purported "Period of Exclusivity" Are Barred as a
             Matter of Law ................................................................4

             1.   Section 304(c)(6)(D) Does Not Give DC Any
                  "Rights" ................................................................4

             2.   Courts and Commentators Have Rejected DC's
                  Arguments ............................................................5

             3.   As the Statute Gives DC No Rights, DC Lacks
                  Standing ...............................................................7

             4.   The Cancelled 2001 and 2003 Pacific Pictures
                  Agreements Are Moot, and DC Does Not Even
                  Allege That the Purported "Consent Agreements"
                  Violate Section 304(c)(6)(D) ................................8

       B.    The Sixth Claim is Preempted by the Copyright Act ...........9

             1.   DC's Unfair Competition Claim Contains
                  No "Extra Element" .............................................10

       C.    DC's Allegations Do Not Sustain a UCL Claim,
             Because DC Does Not and Cannot Plead Any
             "Unlawful, Unfair or Fraudulent" Conduct ......................12

       D.    The Sixth Claim Is Also Barred by California's
             Litigation Immunity and Mediation Confidentiality
             Statutes .......................................................................15

             1.   Litigation Immunity ..............................................15

             2.   Mediation Confidentiality .......................................17

       E.    DC's Allegations in Paragraphs 157 and 175 of the
             Complaint Must Be Stricken as Violative of Its JAMS
             Confidentiality Agreement ..............................................18

             1.   Procedural Background ..........................................18

             2.   DC's Use of the Settlement Strategy Contravenes
                  the Court's Prior Order and Is Barred By the
                  "Law of the Case" ...............................................21

i

3.  DC's Allegations in the Complaint Once Again Violate the JAMS Confidentiality Agreement and Must Be Struck ........................................................ 21

4.  The Third and Sixth Claims Necessarily Fail, Once Such Privileged Settlement Information Is Struck ........................................................................... 23

CONCLUSION .................................................................................................. 24

TABLES OF CONTENTS AND AUTHORITIES

Case 2:10-cv-03633-ODW-RZ   Document 161-3   Filed 09/03/10   Page 216 of 243   Page ID #:4249
Case 2:10-cv-03633-ODW-RZ   Document 34-1   Filed 08/13/10   Page 6 of 31   Page ID #:4059
ID #:4249

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Federal Cases</u>                                                                    **Pages**

3

*Altera Corp. v. Clear Logic, Inc.*,
424 F.3d 1079 (9th Cir. 2005) ...........................................................10

4

5

*Ashcroft v. Iqbal*,
129 S.Ct. 1937 (2009).........................................................................3

6

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................3

7

8

*Benesch v. Green*,
2009 U.S. Dist. LEXIS 117641 (N.D. Cal. Dec. 17, 2009).................17

9

*Blue Nile, Inc. v. Ice.com, Inc.*,
478 F. Supp. 2d 1240 (W.D. Wash. 2007) .........................................12

10

*Bourne Co., v. MPL Commc'ns, Inc.*,
675 F. Supp. 859 (S.D.N.Y. 1987) ............................................ *passim*

11

12

*Del Madera Properties v. Rhodes & Gardner, Inc.*,
820 F.2d 973 (9th Cir. 1987) ............................................................12

13

*Disimone v. Browner*,
121 F.3d 1262 (9th Cir. 1997) ..........................................................21

14

*Fantasy, Inc. v. Fogerty*,
984 F.2d 1524 (9th Cir. 1993) ..........................................................23

15

16

*Fraker v. Bayer Corp.*,
2009 U.S. Dist. LEXIS 125633 (E.D. Cal. Oct. 2, 2009)..................23

17

18

*Gardner v. Nike, Inc.*,
279 F.3d 774 (9th Cir. 2002) .............................................................7

19

*Idema v. Dreamworks, Inc.*,
162 F. Supp. 2d 1129 (C.D. Cal. 2001) .......................................10, 12

20

21

*In re Connetics Corp. Secs. Litig.*,
542 F. Supp. 2d 996 (N.D. Cal. 2008)...............................................23

22

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) ..........................................................14

23

24

*Kodadek v. MTV Networks*,
152 F.3d 1209 (9th Cir. 1998) ....................................................10-11

25

*Laws v. Sony Music Entm't, Inc.*,
448 F.3d 1134 (9th Cir. 2006) ..........................................................10

26

27

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992).............................................................................7

28

*Mason v. Texaco, Inc.*,
741 F. Supp. 1472 (D. Kan. 1990)..........................................................21

*MEECO Mfg. Co. v. True Value Co.*,
Copy. L. Rep. (CCH) P29,368,
2007 U.S. Dist. LEXIS 25986 (W.D. Wash. Apr. 3, 2007) .............................12

*Mills Music, Inc. v. Snyder*,
469 U.S. 153 (1985)..........................................................................9

*Moss v. Crawford & Co.*,
201 F.R.D. 398 (W.D. Pa. 2000) ........................................................21

*Motown Record Corp. v. George A. Hormel & Co.*,
657 F. Supp. 1236 (C.D. Cal. 1987) ...................................................12

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*,
469 U.S. 189 (1985)..........................................................................5

*Preminger v. Peake*,
536 F.3d 1000 (9th Cir. 2008) ............................................................7

*Ridgeway v. Mont. High School Ass'n*,
858 F.2d 579 (9th Cir. 1988) ............................................................21

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*,
806 F.2d 1393 (9th Cir. 1986) ...........................................................4

*Shroyer v. New Cingular Wireless Servs.*,
606 F.3d 658 (9th Cir. 2010) ...........................................................15

*Sleep Sci. Partners v. Lieberman*,
2010 U.S. Dist. LEXIS 45385 (N.D. Cal. May 10, 2010)...........................15

*Symantec Corp. v. McAfee Assoc., Inc.*,
No. C-97-20367, 1998 WL 740798 (N.D. Cal. June 9, 1998) .....................11

*Thomas v. Bible*,
983 F.2d 152 (9th Cir. 1993) ...........................................................21

*United States v. American Trucking Addn's Inc.*,
310 U.S. 534 (1940)..........................................................................6

*United States v. Granderson*,
511 U.S. 39 (1994)............................................................................6

*United States ex. rel. Burroughs v. DeNardi Corp.*,
167 F.R.D. 680 (S.D. Cal. 1996) .......................................................20

**Federal Statutes and Rules**

F.R.C.P. 8 ......................................................................................3

F.R.C.P. 9 ....................................................................................14

F.R.C.P. 12 .................................................................................. *passim*

17 U.S.C. § 304 .......................................................................... *passim*

H.R. Rep. No. 94-1476 (1976).................................................................9

**State Cases**

*Asia Inv. Co. v. Borowski*,
133 Cal. App. 3d 832 (1982) ...................................................................16

*Bernardo v. Planned Parenthood Federation of America*,
115 Cal. App. 4th 322 (2004) .................................................................13

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Telephone Co.*,
20 Cal. 4th 163 (1999) ....................................................................... 13-14

*Copeland v. Baskin Robbins U.S.A.*,
96 Cal. App. 4th 1251 (2002) .................................................................14

*Durell v. Sharp Healthcare*,
183 Cal. App. 4th 1350 (2010) ...............................................................13

*Foxgate Homeowners' Assn. v. Bramalea California, Inc.*,
26 Cal. 4th 1 (2001) ...........................................................................3, 17

*GeneThera, Inc. v. Troy & Gould Professional Corp.*,
171 Cal. App. 4th 901 (2009) ..............................................................3, 16

*Khoury v. Maly's of Cal., Inc.*,
14 Cal. App. 4th 612 (1993) ...................................................................14

*McClain v. Octagon Plaza, LLC*,
159 Cal. App. 4th 784 (2008) .................................................................14

*Morgan v. AT&T Wireless Services, Inc.*,
177 Cal. App. 4th 1235 (2009) ...............................................................13

*Olszewski v. Scripps Health*,
30 Cal. 4th 798 (2003) ...........................................................................12

*People's Choice Wireless v. Verizon Wireless*,
131 Cal. App. 4th 656 (2005) .................................................................13

*Racine & Laramie, Ltd. v. Department of Parks & Recreation*,
11 Cal. App. 4th 1026 (1992) ...............................................................2, 14

*Rosenthal v. Irell & Manella*,
135 Cal. App. 3d 121 (1982) ...................................................................16

*Rusheen v. Cohen*,
37 Cal. 4th 1048 (2006) ..........................................................................15

*Schnall v. Hertz Corp.*,
78 Cal. App. 4th 1144 (2000) .................................................................13

Case 2:10-cv-03633-ODW-RZ Document 341 Filed 08/19/13 Page 5 of 33 Page ID #:7052

*Seltzer v. Barnes*,
182 Cal. App. 4th 953 (2010) ...................................................................16

*Silberg v. Anderson*,
50 Cal. 3d 2052 (1990) ..................................................................15, 17

*Simmons v. Ghaderi*,
44 Cal. 4th 570 (2008) ...............................................................................17

**State Statutes and Rules**

Cal. Bus. & Prof. Code § 17200 ............................................... *passim*

Cal. Code of Civil Procedure §1775.10..............................................3

Cal. Evid. Code § 1115 ............................................................ 3, 17-18

Cal. Evid. Code § 1119 ...............................................................17

Cal. Evid. Code § 1126 ...............................................................17

**Other Authorities**

61 CAL. JUR. 3d Unfair Competition § 3 (2008)....................................12

3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 11.08.............................7

3 W. Patry, *Patry on Copyright* ("*Patry*") § 7:47 ................................7

3 *Patry* § 21:18 (2010) .................................................................7

18 Wright, Miller & Cooper,
Federal Practice and Procedure § 4478 (1981)....................................21

## **INTRODUCTION**

DC Comics' ("DC") Third and Sixth Claims for Relief distort the Copyright Act and fundamentally misconstrue the obligations of the defendants thereunder. Defendants Joanne Siegel and Laura Siegel Larson (the "Siegels"), the heirs of Jerry Siegel, and defendant Mark Warren Peary, the duly appointed personal representative (the "Shuster Executor") of the Estate of Joseph Shuster (the "Shuster Estate"), have properly exercised their rights under 17 U.S.C. §§ 304(c) and (d), respectively, to terminate prior grants to DC's predecessors by Jerome Siegel ("Siegel") and Joseph Shuster ("Shuster") of the copyright to their famed comic book creation Superman (the "Siegel Termination" and "Shuster Termination," respectively).

DC's Third and Sixth Claims are both premised on the erroneous legal position that DC has a statutory right to a so-called "period of exclusivity" to negotiate the purchase of the Shuster Estate's recaptured *Superman* copyrights under 17 U.S.C. § 304(c)(6)(D). *See* Complaint, ¶¶ 154-55. However, it is clear from the plain language of § 304(c)(6)(D) that it does not provide grantees or their successors (like DC) with any "rights," let alone a right to an exclusive period of negotiation. It simply provides that a "further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination," but that an "agreement for such a further grant may be made between the author or [his heirs] and the original grantee or such grantee's successor in title, after the notice of termination has been served." The statute invalidates any conveyance of terminated rights to a party other than the original grantee before the effective date of the termination, but it does not require the grantor to negotiate with the grantee, contrary to DC's incorrect claims.

> "Nor does the statute provide for an exclusive period of negotiation. The statute neither compels the terminating party to negotiate with the terminated grantee, nor forbids him from negotiating with anyone else."

*Bourne Co., v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 865 (S.D.N.Y. 1987). As DC's Third and Sixth Claims are both falsely premised on a fictitious "right" of

negotiation, both fail as a matter of law, and must be dismissed.

Furthermore, DC's claims to an exclusive period of negotiation are moot. DC argues that two sets of agreements violate its supposed "right": (1) agreements between defendant Pacific Pictures Corporation and the Shuster Executor (Complaint, ¶ 156), which, as DC is aware, were cancelled six years ago (*id.*, ¶ 86) and, in any event, were void *ab initio* under § 304(c)(6)(D) as elsewhere alleged by DC (*id.*, ¶ 154); and (2) alleged "consent agreements" between various defendants. *Id.*, ¶ 157. Such "consent agreements," as alleged, are clearly permitted under § 304(c)(6)(D), which invalidates only "a further grant, or agreement to make a further grant" of copyright but does not limit the rights of terminating parties in any other way. DC has not alleged and cannot allege that the purported "consent agreements" constitute "a grant or an agreement to make a further grant."

DC's vaguely pled Sixth Claim for Relief under California's "Unfair Competition Law" (Cal. Bus. & Prof. Code §§ 17200 *et seq.*) ("UCL") is also clearly preempted by the Copyright Act, because it is premised on DC's allegations that defendants' conduct is "unlawful" under the Copyright Act. Complaint, ¶¶ 174-76. To the extent the Sixth Claim alleges that defendants' conduct is somehow "unfair" because it "impedes" DC's settlement (*i.e.*, purchase) of the Superman termination interests, it also fails: the Siegels' or Shuster Executor's alleged agreements amongst themselves as to how they wish to negotiate with DC cannot constitute an "unfair" practice because they have the right to negotiate with DC as they see fit. *See Racine & Laramie, Ltd. v. Department of Parks & Recreation*, 11 Cal. App. 4th 1026, 1034 (1992).

In addition, any such "consent agreements" constitute understandings between the Siegels and the Shuster Estate regarding settlement strategy, which were disclosed to DC solely in connection with mediation proceedings and pursuant to a JAMS Confidentiality Agreement with DC. DC's references to "consent agreements" in its Complaint must be stricken pursuant to F.R.C.P. 12(f).

SIEGEL DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

1   Communications and statements made in the course of settlement and mediation
2   discussions are absolutely privileged under California CCP § 1775.10, California
3   Evidence Code § 1115 *et seq.* and California Civil Code § 47(b), and cannot form the
4   basis of liability. *See GeneThera, Inc. v. Troy & Gould Professional Corp.*, 171 Cal.
5   App. 4th 901, 909-10 (2009); *Foxgate Homeowners' Assn. v. Bramalea California,*
6   *Inc.*, 26 Cal. 4th 1, 14 (2001). Moreover, DC's references to "consent agreements"
7   constitute a willful breach by DC of the JAMS Confidentiality Agreement it entered
8   into. Once DC's improper allegations are struck, DC's Third and Sixth Claims –
9   based on such allegations – necessarily fail to state a claim and must be dismissed.

## ARGUMENT

### I.   LEGAL STANDARD

12          Pursuant to F.R.C.P. 8(a)(2), a complaint must contain "a short and plain
13  statement of the claim showing that the pleader is entitled to relief." However, to
14  survive a motion to dismiss under F.R.C.P. 12(b)(6), "a complaint must contain
15  sufficient factual matter … to 'state a claim to relief that is plausible on its face.'"
16  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v.*
17  *Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the
18  plaintiff pleads factual content that allows the court to draw the reasonable inference
19  that the defendant is liable for the misconduct alleged." *Ashcroft*, 129 S.Ct. at 1949.
20  In determining whether the complaint states a "plausible" claim, "labels and
21  conclusions" are meaningless and a "formulaic recitation of the elements of a claim
22  will not do." *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to
23  raise a right to relief above the speculative level." *Id.*

24          "Where the well-pleaded facts do not permit the court to infer more than the
25  mere possibility of misconduct, the complaint has alleged – but it has not 'shown' –
26  that the pleader is entitled to relief." *Ashcroft,* 129 S.Ct. at 1950 (quoting F.R.C.P.
27  8(a)(2)). Mere legal conclusions "are not entitled to an assumption of truth."
28  *Ashcroft,* 129 S.Ct. at 1950.

1  Leave to amend a complaint must be denied when the "court determines that

2  the allegations of other facts consistent with the challenged pleading could not

3  possibly cure the deficiency."  *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806

4  F.2d 1393, 1401 (9th Cir. 1986).

5  **II.    PLAINTIFF'S THIRD AND SIXTH CLAIMS FOR RELIEF
       MUST BE DISMISSED**

6

7  **A.    Plaintiff's Third and Sixth Claims for Relief Regarding a Purported
           "Period of Exclusivity" Are Barred as a Matter of Law**

8  **1.    Section 304(c)(6)(D) Does Not Give DC Any "Rights"**

9  DC's Third and Sixth Claims for Relief are both premised on the erroneous

10  legal position that DC has an exclusive "right" under 17 U.S.C. § 304(c)(6)(D) to

11  negotiate the purchase of the Siegels' and Shuster Estate's recaptured Superman

12  copyrights.  DC contends that the Shuster heirs, the Siegels, as well as their attorney

13  Marc Toberoff and entities allegedly controlled by him ("Toberoff") have

14  "violate[d]" DC's purported statutory right by having "agreements, which prohibit

15  either family from entering into agreements [with DC] without the express approval

16  of all stakeholders."  Complaint, ¶ 157; *see id*., ¶ 175 ("The consent agreements

17  Toberoff has procured … violate DC Comics'…right freely to negotiate settlement of

18  such claims.").[1]  According to DC, any alleged agreements with Toberoff's Pacific

19  Pictures Corporation (*id*., ¶ 156) or so-called "consent agreements" between the

20  defendants (*id.*, ¶ 157) "frustrated and impede[d]" DC's purported right of exclusive

21  negotiation, even though such right is neither provided by statute nor recognized by

22  the courts. *Id.*, ¶¶ 155-57, 175.

23  DC argues that its purported "right" somehow arises from 17 U.S.C. §

24  304(c)(6)(D), which merely provides that a "further grant, or agreement to make a

25  further grant, of any right covered by a terminated grant is valid only if it is made

26  after the effective date of the termination," but that an "agreement for such a further

27  grant may be made between the author or [his heirs] and the original grantee or such

28

---

[1] DC references to "settlement," in practice, equate to DC's purchase of the Superman copyrights duly recaptured by the Siegels and Shuster Executor under the Copyright Act.

grantee's successor in title, after the notice of termination has been served." *Id*. *See* Complaint, ¶¶ 154-55.

DC labels its allegations as based on a "period of exclusivity" in an attempt to shoehorn its claims into the statute; however, it is clear that what it actually alleges is that § 304(c)(6)(D) gives DC an exclusive right to negotiate the purchase of the recaptured Superman copyrights, when the statute says no such thing. *See* Complaint, ¶¶ 155-58. Section 304(c)(6)(D) plainly does not provide a terminated grantee with any "right" of negotiation or otherwise. The statute also does not mandate any action by the terminating party; it merely invalidates certain agreements that grant or promise to make a grant, under specified circumstances.

DC's Third and Sixth Claims thereby misapprehend the law and contravene the plain meaning of the statute's unambiguous language, and must be rejected. *See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985) ("Statutory construction must begin with the language … and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.").

### 2.    Courts and Commentators Have Rejected DC's Arguments

DC's claims were expressly addressed and rejected in *Bourne Co. v. MPL Commc'ns, Inc.* ("*Bourne*"), 675 F. Supp. 859, 865 (S.D.N.Y. 1987). *Bourne* involved a termination under the Copyright Act with respect to the musical standard "Cecilia." The widow of one of the song's co-authors was induced by a third party to serve a termination notice on Bourne, the successor to the original grantee. *Id*. Before the effective date of termination, the widow then entered into an agreement granting another third party all rights to the song for the extended renewal period. *Id*. Like DC here, Bourne sued both third parties on the purported ground that such agreement violated Bourne's alleged "exclusive period of negotiation" and "right of first refusal" under § 304(c)(6)(D) with respect to the widow's termination interest, as the successor to the original grantee. *Id*. at 864-867.

The *Bourne* Court expressly rejected the same argument made by DC here, *i.e.*

SIEGEL DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

that § 304(c)(6)(D) creates an "exclusive period of negotiation":

> ***Nor does the statute provide for an exclusive period of negotiation. The statute neither compels the terminating party to negotiate with the terminated grantee, nor forbids him from negotiating with anyone else.*** All it requires is that prior to the effective date of termination, the terminated grantee is the only person with whom the author or his successor can make an enforceable and effective agreement to transfer those rights. The provision does give the terminated grantee a preferred competitive position but '[i]f the author can afford to wait for competitive offers until after the effective date of termination, he can overcome any advantage the grantee or successor may seek to gain from the preferential position.'"

*Id*. at 865 (citations omitted) (emphasis added). The Court further noted that "[i]ndeed, the statute merely provides that a grant to someone other than the original grantee is valid 'only if it is *made* after the effective date of termination,' not that such a grant is valid only if *negotiated* after the termination date." *Id*. at 865, n.11 (emphasis in original).

The *Bourne* Court rejected as unpersuasive Bourne's legislative history argument, parroted here by DC, that § 304(c)(6)(D) is "in the nature of a right of first refusal." Complaint, ¶ 155; *Bourne,* 675 F. Supp. at 866. "If Congress had intended to create a right of first refusal, it would have done so in clear language." *Id*. The Court explained:

> "[Section 304(c)(6)(D)] provides merely that an agreement between the terminating party and the terminated grantee prior to the effective date of termination is the only one that is valid and enforceable against the former. *The statute does not provide that any agreement negotiated by the terminating party must first be offered on the same terms to the terminated grantee*, which is what a right of first refusal, as it is commonly understood, would require."

*Id*. at 865 (emphasis added). Moreover, when the statutory language is clear, as it is in § 304(c)(6)(D), such language governs. *United States v. Granderson*, 511 U.S. 39, 74 n.7 (1994) ("Where the language of a statute is clear, that language, rather than 'isolated excerpts from the legislative history,' should be followed.").[2]

---

[2] *See Bourne,* 675 F. Supp. at 866 ("'It is a well-known canon of construction that the language of the statute is the best indication of legislative intent.'") (citations omitted); *United States v. American Trucking Ass'n, Inc*., 310 U.S. 534, 543 (1940) ("There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes.").

The leading copyright treatise *Nimmer on Copyright* ("*Nimmer*") also states
that the legislative history's "first refusal" characterization is "not entirely accurate,"
and, citing *Bourne*, states that "it is inaccurate to refer to this advantage as 'an
exclusive period of negotiation.'" 3 M. Nimmer & D. Nimmer, *Nimmer* § 11.08[A],
n.6 (2010). *Nimmer* notes that *Bourne* properly "rejected the claim [made here] that a
prior grantee enjoys a private right of action for damages against one who induces the
grantor to make a (necessarily invalid) grant to a third party prior to the termination
date of the original grant." *Id.* The Siegels and the Shuster Executor were not
"compelled" to negotiate with DC, much less "exclusively," either before or after
they served their respective termination notices. *Bourne*, 675 F. Supp. at 865.

### 3.    As the Statute Gives DC No Rights, DC Lacks Standing

Because DC has no "rights" under § 304(c)(6)(D), it has no basis nor standing
to sue for an alleged "violat[ion] of section 304(c)(6)(D)." Complaint, ¶157, 175.
*Patry on Copyright*, the other leading copyright treatise, is in accord:

> "[Section 304(c)(6)(D)], sometimes erroneously described as a 'right of
> first refusal,' does not give the original grantee a right to conclude such
> an agreement; it only means that if such an agreement is made, it will be
> enforceable. Most importantly, if the original grantee is not provided a
> first crack, there is no remedy."

3 W. Patry, *Patry on Copyright* ("*Patry*") § 7:47 (2010). A terminated party receives
"no rights under [§ 304(c)(6)(D)], cannot sue for failure to comply, and the provision
therefore does not provide a basis for standing." 3 *Patry* § 21:18. *See Preminger v.
Peake*, 536 F.3d 1000, 1005 (9th Cir. 2008) (stating that standing requires a
demonstration of "an invasion of a legally protected interest" that is "actual or
imminent," not "conjectural" or "hypothetical") (quoting *Lujan v. Defenders of
Wildlife*, 504 U.S. 555, 560-61 (1992)); *Gardner v. Nike, Inc.*, 279 F.3d 774, 777 (9th
Cir. 2002) (holding that a copyright licensee "lacked standing to bring the action
because they had no legally cognizable interest in the suit").

It is clear that, as § 304(c)(6)(D) grants no "right" and thus no standing to DC,
DC's Third and Sixth Claims therefore fail to state a claim as a matter of law.

### 4. The Cancelled 2001 and 2003 Pacific Pictures Agreements Are Moot, and DC Does Not Even Allege That the Purported "Consent Agreements" Violate Section 304(c)(6)(D)

DC alleges that the 2001 and 2003 Pacific Pictures Agreements violated its alleged right of exclusivity. Complaint, ¶ 156. But to the extent the 2001 and 2003 Pacific Pictures Agreements had granted any Shuster termination interest prior to October 26, 2013 (the effective date of the Shuster Termination), such transfers were void *ab initio* under § 304(c)(6)(D), as alleged by DC, and had no legal force or effect. *Id.*, ¶¶ 154-58. The Pacific Pictures Agreements are further moot, as such were duly and voluntarily cancelled on September 10, 2004. *Id.*, ¶ 86.[3]

The sole remaining agreements complained of by DC with respect to its purported right of exclusivity are the alleged "consent agreements." *Id.,* ¶¶ 157, 175. However, DC has not alleged and cannot allege that such "consent agreements" constitute "a further grant, or agreement to make a further grant" of the recaptured Superman copyrights, barred by § 304(c)(6)(D). DC alleges that the agreements "prohibit either family from entering into agreements conveying rights … without the express approval of all stakeholders in the heirs' rights." *Id.*, ¶ 157. DC's own allegations thus demonstrate that the "consent agreements" are not covered or prohibited by the plain wording of § 304(c)(6)(D) as a matter of law.

In essence, what DC alleges is that the Siegels and Shuster Executor, by such "consent agreements," agreed to enhance their bargaining position by acting together in negotiations with DC, but not that any of them thereby granted any right that was the subject of termination, or promised to convey such rights in the future. *See* 17 U.S.C. § 304(c)(6)(D). There is no statutory basis whatsoever to impede the Siegels and the Shuster Executor, the intended beneficiaries of the termination right, from acting together to better realize market value for their recaptured copyrights. On the contrary, this is consistent with the Congressional purpose of the termination right "to

---

[3] As the Shuster Termination was served on November 10, 2003, DC is, at best, complaining about an alleged loss of 10 months out of 10 years of an alleged, but non-existent, right of exclusive negotiations. *Id.,* ¶¶ 79, 81.

SIEGEL DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

1  provide added benefits to authors…. [and] to relieve authors of the consequences of

2  ill-advised and unrenumerative grants…." *Mills Music, Inc. v. Snyder*, 469 U.S. 153,

3  185 (1985) (*citing* H.R. Rep No. 94-1476 at 124 (1976)).

4        DC's claim that "consent agreements" between the Siegels, the Shuster

5  Executor and their counsel somehow "impede [DC's] ability to settle any and all

6  disputes with the Shusters and Siegels," is equally flawed as a matter of law.

7  Complaint, ¶ 157. While the goal of settlement is shared by the Siegels and the

8  Shuster Executor, DC has no statutory or other "right" to settle (i.e., purchase) the

9  termination interests. *See* 17 U.S.C. § 304(c)(6)(D); *Bourne*, 675 F. Supp. at 865.[4]

10  **B.**    **The Sixth Claim is Preempted by the Copyright Act**

11        In addition to the above, DC's Sixth Claim, brought under California's "Unfair

12  Competition Law" (Cal. Bus. & Prof. Code §§ 17200 *et seq.*) ("UCL") is clearly

13  preempted by the Copyright Act. It asks for declaratory relief that alleged

14  agreements between defendants regarding the Siegels' and the Shuster Estate's

15  termination interests under the Copyright Act are void under "California's unfair

16  competition laws." Complaint ¶ 175, *citing* Cal. Bus. & Prof. Code §§ 17200 *et seq*.

17  However, the Copyright Act specifically preempts "all legal or equitable rights that

18  are equivalent to any of the exclusive rights within the general scope of copyright."

19  17 U.S.C. § 301(a).[5] If a "state law unfair competition claim is based solely on rights

20  equivalent to those protected by the federal copyright laws," then such a claim is

21

22  [4] DC's argument that it is somehow entitled to a "restoration" of a purported "10-year period of exclusivity" (Complaint, ¶¶ 160, 179), is equally absurd. Even if DC had a "right" to exclusive negotiations (it does not), DC would still not be entitled to a "10-year" exclusive negotiating period. Pursuant to 17 U.S.C. § 304(c)(4)(A), a termination notice *may* be served no "less than two or more than ten years before" its effective date. *Id.* The Shuster Termination, with an effective date of October 26, 2013, happens to have been served ten years in advance on November 10, 2003 (Complaint, ¶¶ 79-81), but could just as well have been served two years in advance on October 25, 2011. It would be inequitable to impose a supposed 10-year "period of exclusivity" on the Shuster Executor simply because he happened to have diligently served the termination notice well in advance of § 304(c)(4)(A)'s minimum two-year notice requirement.

27  [5] "[S]ection 301 is intended …. to avoid the development of any vague borderline areas between State and Federal protection." H.R. Rep. No. 94-1476, at 120 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5746.

SIEGEL DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

preempted.  *Kodadek v. MTV Networks*, 152 F.3d 1209, 1213 (9th Cir. 1998).

### 1. DC's Unfair Competition Claim Contains No "Extra Element"

To avoid preemption, the plaintiff must demonstrate that its "state law claim includes an 'extra element' that makes the right asserted qualitatively different from those protected under the Copyright Act."  *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1089-90 (9th Cir. 2005).  *See also Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1143 (9th Cir. 2006) (same).

DC's Sixth Claim is preempted because it concerns the Siegels' and the Shuster Executor's special termination interests under § 304(c) and (d) of the Copyright Act and DC's purported "exclusive" right to negotiate the purchase of those interests under § 304(c)(6)(D) of the Act, and DC has not alleged and cannot allege the requisite "extra element" to avoid preemption.  In analyzing whether a state claim contains such "extra element," courts look to "whether the gravamen of the state law claim is the same as the rights protected by the Copyright Act."  *Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1190 (C.D. Cal. 2001).  In so doing the Court looks to "the state law claims *as they are asserted*."  *Id*.  (emphasis in original).

Here, DC's "state-law" unfair competition claim is a mere regurgitation of DC's Third Claim for declaratory relief under the Copyright Act, which asserts that the same alleged "consent agreements" are void because they purportedly "frustrate and impede DC Comics' period of exclusivity" under 17 U.S.C. § 304(c)(6)(D) to negotiate with the Siegels and the Shuster Executor and "violate section 304(c)(6)(D)."  Complaint, ¶¶ 156-157.  *Compare* Complaint, Sixth Claim, ¶ 175 ("The consent agreements Toberoff has procured are void as a matter of law and public policy because they strip the Siegels and Shusters of their right to freely settle their claims and violate DC Comics' concomitant right to freely negotiate settlement of such claims.") *with* Complaint, Third Claim, ¶ 158 ("The Shuster Heirs' agreements with Toberoff, his companies, and the Siegels improperly interfere with

SIEGEL DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

1    DC Comics' period of exclusivity [to negotiate under § 304(c)(6)(D) of the

2    Copyright Act] with the Shuster Heirs regarding their purported Superman rights.").

3    DC's anticipated argument that California's unfair competition laws are purportedly

4    broader than the Copyright Act will not salvage its Sixth Claim.  *See Symantec Corp.*

5    *v. McAfee Assoc., Inc*., No. C-97-20367, 1998 WL 740798, at *4-5 (N.D. Cal. June 9,

6    1998) ("The fact that the state-created right is either broader or narrower than its

7    federal counterpart will not save it from preemption.").

8          DC even admits that it seeks by its Sixth Claim to "establish the parties'

9    respective rights and obligations *with respect to the copyright interest in the*

10   *Superman material*."  *Id.*, ¶ 176 (emphasis added).  The Sixth Claim for declaratory

11   relief is facially equivalent to DC's Third Claim for declaratory relief under the

12   Copyright Act: "A declaration by this Court is warranted … to establish the parties'

13   respective rights and obligations with respect to the copyright interest in the

14   Superman material."  *Id.*, ¶ 159.  However, the determination of a party's respective

15   rights and obligations regarding the special "termination" interest provided by the

16   Copyright Act is plainly the province of copyright law, not state unfair competition

17   law.  *Id.*, ¶¶ 92-120.  *See Kodadek,* 152 F.3d at 1212-13 (dismissing California unfair

18   competition claim where allegations were "within the 'subject matter' of the

19   Copyright Act").

20          In fact, DC in its short Sixth Claim incorporates by reference "each and every

21   allegation contained in the paragraphs above" under the Copyright Act, and asserts

22   that "[t]he copyright assignments procured by Toberoff and/or his companies are

23   unlawful and violate DC Comics' rights and interests *for the reasons set forth above*"

24   – that is, DC bases its Sixth Claim on purported violations of the Copyright Act set

25   forth above in its Complaint.  Complaint ¶¶ 174-75 (emphasis added); *see id.*, ¶¶ 155-

26   59 ("the reasons").  By *incorporating by reference* such alleged violation of the

27   Copyright Act's termination provisions previously raised in its Complaint, but

28   alleging no other facts in support of its short claim under state unfair competition

SIEGEL DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

law, DC has conceded that the "gravamen of the state law claim is the same as the rights protected by the Copyright Act." *Idema,* 162 F. Supp. 2d at 1190. *See Motown Record Corp. v. George A. Hormel & Co.*, 657 F. Supp. 1236, 1239 (C.D. Cal. 1987) (dismissing California unfair competition claim that incorporated by reference plaintiff's copyright claim).[6] Accordingly, DC's Sixth Claim is preempted by the Copyright Act. *See Del Madera Properties v. Rhodes & Gardner, Inc.*, 820 F.2d 973, 977 (9th Cir. 1987) (finding preemption of unfair competition claim where "[t]he argument is constructed upon the premise" of a Copyright Act violation, and "does not add any 'extra element' which changes the nature of the action").

### C. DC's Allegations Do Not Sustain a UCL Claim, Because DC Does Not and Cannot Plead Any "Unlawful, Unfair or Fraudulent" Conduct

"'The UCL defines unfair competition as any unlawful, unfair or fraudulent business practice….' A business practice is unlawful 'if it is forbidden by any law….'" *Olszewski v. Scripps Health*, 30 Cal. 4th 798, 827 (2003). As set forth above, the only purportedly "unlawful" conduct is alleged under the Copyright Act and is thereby ***preempted*** – specifically, that alleged assignments to Pacific Pictures Corporation violate 17 U.S.C. § 304(c)(6)(D) (Complaint, ¶¶ 156, 158-59, 174-76) and that alleged "consent agreements" between the Defendants also violate DC's purported "period of exclusivity" under § 304(c)(6)(D). *Id.*, ¶¶ 157-59, 174-76.

Furthermore, conduct that is "neither required nor proscribed by law does not constitute an 'unlawful' business activity under the [UCL]." 61 CAL. JUR. 3d Unfair Competition § 3 (2008). The statute in question does not "require" or "proscribe" any conduct, but instead simply states the conditions under which a transfer of the termination interest will be valid. 17 U.S.C. § 304(c)(6)(D) ("[A] further grant, or

---

[6] *See also Blue Nile, Inc. v. Ice.com, Inc.*, 478 F. Supp. 2d 1240, 1249 (W.D. Wash. 2007) ("Plaintiff's unfair competition claim is dismissed as preempted because by incorporating the copyright claims by reference, the unfair competition claim is based on rights equivalent to those protected by copyright."); *MEECO Mfg. Co. v. True Value Co.*, Copy. L. Rep. (CCH) P29,368, 2007 U.S. Dist. LEXIS 25986 at *14 (W.D. Wash. Apr. 3, 2007) ("[The unfair competition] claim is preempted because it incorporates the copyright claim by reference and is therefore based on rights equivalent to those protected by copyright.").

SIEGEL DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after effective date of the termination.").  As section 304(c)(6)(D) concerns the enforceability of a contract, it cannot form the basis for a claim of "unlawful" business activity under the UCL.

If a "practice" is not "unlawful," it is only considered to be "unfair" in violation of the UCL if it significantly threatens or harms competition:

> "When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means **conduct that threatens an incipient violation of an antitrust law**, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, **or otherwise significantly threatens or harms competition**."

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 187 (1999) (emphasis added).[7]  *See People's Choice Wireless v. Verizon Wireless*, 131 Cal. App. 4th 656, 662–63 (2005) ("Injury to a competitor is not equivalent to injury to competition; only the latter is the proper focus of antitrust laws.").[8]

Here, aside from DC's claims regarding purportedly unlawful conduct under the Copyright Act,  DC's complaint merely asserts that purported "consent agreements" are somehow "void and unenforceable … under California's unfair competition laws," because "they strip the Siegels and Shusters of their right freely to settle their claims and violate [DC's] concomitant right freely to negotiate settlement of such claims."  Complaint, ¶ 175.  *First*, as set forth above, this too is preempted for it refers to settlement of the Siegels and the Shuster Executor's termination interests under the Copyright Act. *Id.*, ¶¶ 155-59, 174-75.  *Second*, as shown in section II.A, *supra*, DC simply has no exclusive "right" under the Copyright Act to

---

[7] *See also Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1364 (2010) ("[A]ny finding of unfairness to competitors under section 17200 [must] be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition."); *Bernardo v. Planned Parenthood Federation of America*, 115 Cal. App. 4th 322, 353 (2004) (same); *Schnall v. Hertz Corp.*, 78 Cal. App. 4th 1144, 1166 (2000) (same).

[8] A somewhat broader standard applies to UCL claims filed by a consumer.  *See Morgan v. AT&T Wireless Services, Inc.*, 177 Cal. App. 4th 1235, 1255 (2009).  However, DC has not pled its UCL claim as a consumer because DC is obviously a "competitor" of the defendants with respect to the copyrights at issue.

SIEGEL DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

negotiate for the purchase of the Siegels and the Shuster Executor's termination interest. *Third*, and notwithstanding the preemption of DC's UCL claim, the Siegels and the Shuster Executor are not otherwise prohibited from making agreements amongst themselves as to the manner and terms under which they will negotiate with DC regarding their termination interests under the Copyright Act. *See Bourne*, 675 F. Supp. at 865 ("The statute neither compels the terminating party to negotiate with the terminated grantee, nor forbids him from negotiating with anyone else.").[9]

Moreover, DC's allegations certainly do not amount to "conduct that threatens an incipient violation of an antitrust law…or otherwise significantly threatens or harms competition" so as to sustain an unfair competition claim. *Cel-Tech Communications, Inc.*, 20 Cal. 4th at 187. In fact, DC's concocted claims as to an exclusive "right" of negotiation, or "right of first refusal" attempt to *squelch* competition. Thus, the Siegels' or the Shuster Executor's negotiation on certain terms, or alleged "consent agreements" as to how they will negotiate with DC, cannot constitute an unfair "practice" that can sustain an unfair competition claim.

Finally, any claim of fraudulent practices under the UCL, like fraud in general, is subject to a heightened pleading standard and must be pled with specificity. *See* F.R.C.P. 9(b) ("[A] party must state with particularity the circumstances constituting fraud or mistake."); *Khoury v. Maly's of Cal., Inc.*, 14 Cal. App. 4th 612, 619 (1993) ("A plaintiff alleging unfair business practices under these statutes must state with reasonable particularity the facts supporting the statutory elements of the violation.").[10] DC's extremely general allegations as to "various copyright

---

[9] *See Racine & Laramie, Ltd.*, 11 Cal. App. 4th at 1034 ("The fact that parties commence negotiations looking to a contract … does not by itself impose any duty on either party" as to such negotiations); *Copeland v. Baskin Robbins U.S.A.*, 96 Cal. App. 4th 1251, 1260 (2002) ("When two parties, under no compulsion to do so, engage in negotiations to form or modify a contract neither party has any obligation [to the other]."); *McClain v. Octagon Plaza, LLC*, 159 Cal. App. 4th 784, 799 (2008) (same).

[10] *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) ("Rule 9(b) demands that the circumstances constituting the alleged fraud [under the UCL] 'be 'specific enough to give defendants notice of the particular misconduct … so that they can defend against the charge and not just deny that they have done anything wrong.' 'Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged.' A

assignment and consent agreements" fail to plead "fraudulent" conduct with the requisite specificity.  Complaint, ¶ 175.  *See Sleep Sci. Partners v. Lieberman*, 2010 U.S. Dist. LEXIS 45385, at *26-27 (N.D. Cal. May 10, 2010) ("Plaintiff must identify the conduct … that is actionable under a theory of liability that applies the UCL in a manner that avoids preemption…. If fraud is alleged, it must be ple[d] with particularity under Federal Rule of Civil Procedure 9(b).")

## D.   The Sixth Claim Is Also Barred by California's Litigation Immunity and Mediation Confidentiality Statutes

### 1.   Litigation Immunity

DC's UCL allegations based on alleged "consent agreements" between the Siegels and Shusters are also barred as a matter of law by the litigation immunity set forth in California Civil Code § 47(b).  Complaint, ¶¶ 88, 157, 175.  Section 47(b) provides ***absolute immunity*** against all torts for "any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Silberg v. Anderson*, 50 Cal. 3d 205, 211-12 (1990). In addition, "where the claim is based on a communicative act, the litigation privilege extends to those noncommunicative actions which are necessarily related to that communicative act." *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1052 (2006).

DC alleges that the Siegels and Shusters have entered into "consent agreements" that "prohibit either family from entering into agreements conveying rights to DC Comics without the express approval of all stakeholders in the heirs' rights."  Complaint, ¶¶ 157, 175.  However, DC fails to mention that the alleged understandings between the Siegels and Shusters regarding their settlement strategies were solely disclosed in connection with Court-ordered settlement mediation in the

---

party alleging fraud must 'set forth more than the neutral facts necessary to identify the transaction.'")(citations omitted); *Shroyer v. New Cingular Wireless Servs.*, 606 F.3d 658, 665-67 (9th Cir. 2010) (applying Rule 9(b) to dismiss UCL "fraud" claim as "[i]n order to plead fraud with particularity, the complaint must allege the time, place, and content of the fraudulent representation; conclusory allegations do not suffice").

related *Siegel* case (C.D. Cal. Case No. 04-08400). DC previously admitted that an

alleged "consent agreement" was disclosed on May 2, 2008 by the Siegels' counsel

*during settlement "mediation*." *See* Request for Judicial Notice ("RJN"), Ex. A.[11]

 Such communications and statements made in the course of settlement

negotiations cannot support a claim, because they are communications to "achieve

the objects of the litigation" and, as such, are absolutely privileged under California

Civil Code § 47(b). *See GeneThera, Inc. v. Troy & Gould Professional Corp.*, 171

Cal. App. 4th 901, 909-10 (2009) ("A settlement letter directed to counsel falls

within the category of communications to which the [§ 47(b)] privilege attaches

regardless of appellants' perception [that] it is divisive and purportedly precipitates a

conflict of interest. Our conclusion does not change even if the communications in

question were, as appellants claim, substantively at variance with the Rules of

Professional Conduct."); *Seltzer v. Barnes*, 182 Cal. App. 4th 953, 972 (2010) (where

the "alleged conduct was the negotiation of the settlement …. [the] Civil Code

section 47 litigation privilege applies as a matter of law"); *Rosenthal v. Irell &

Manella*, 135 Cal. App. 3d 121, 128 (1982) (letter sent by an attorney to induce

plaintiff's professional liability insurers to settle a malpractice action against him was

absolutely privileged under § 47(b)); *Asia Inv. Co. v. Borowski*, 133 Cal. App. 3d

832, 842 (1982) (settlement proposal that was an alleged "threat to coerce" through

legal action was absolutely privileged under § 47(b)).

 DC's claim is therefore barred by the litigation immunity as both the alleged

"consent agreements" and discussions regarding the Siegels' and Shusters' settlement

objectives and strategies were clearly communications made in the course of "judicial

or quasi-judicial proceedings"; "by litigants or other participants authorized by law";

"to achieve the objects of the litigation"; and "have some … logical relation to the

---

[11] As discussed more fully in Section II.E below, DC's declaration was submitted in
connection with Defendants' December 30, 2008 motion to compel the production of the
alleged "consent agreement." That motion was denied by Judge Larson, in part because it
involved information exchanged during settlement mediation and subject to the parties'
May 1, 2008 JAMS Confidentiality Agreement. RJN, Ex. B at 12:15-19.

1   action." *Silberg,* 50 Cal. 3d at 211-12.  As DC's Sixth Claim alleges liability based

2   on communications in the course of litigation the claim is barred by § 47(b).

3                    **2.      Mediation Confidentiality**

4           DC's use of the alleged "consent agreement" in this, or any other matter, is

5   also expressly barred by the mediation confidentiality privilege promulgated in

6   California Evidence Code § 1115 *et seq.*:

7           "[The] Legislature designed the mediation confidentiality statutes [§ 1115 *et
            seq.*] to promote 'a candid and informal exchange regarding events in the past
8           …. This frank exchange is achieved only if the participants know that what is
            said in the mediation will not be used to their detriment through later court
9           proceedings and other adjudicatory processes.'"

10  *Simmons v. Ghaderi*, 44 Cal. 4th 570, 578 (2008) (quoting *Foxgate Homeowners'*

11  *Assn. v. Bramalea California, Inc.*, 26 Cal. 4th 1, 14 (2001)).  Section 1119

12  "prohibits any person, mediator and participants alike, from revealing any written or

13  oral communication made during mediation."  *Foxgate Homeowners' Assn.*, 26 Cal.

14  4th at 14 (2001).  Sub-section 1119(a) states, in pertinent part, that "[n]o evidence of

15  anything said or any admission made for the purpose of, in the course of, or pursuant

16  to, a mediation … is admissible or subject to discovery."  Sub-section 1119(b) states,

17  in pertinent part, that "[n]o writing … that is prepared for the purpose of, in the

18  course of, or pursuant to, a mediation or a mediation consultation, is admissible or

19  subject to discovery."  Accordingly, "statements made during mediation and

20  mediation materials are confidential not only during the mediation, but also after the

21  mediation ends." *Simmons*, 44 Cal. 4th at 580.  *See also Benesch v. Green*, 2009

22  U.S. Dist. LEXIS 117641, at *11 (N.D. Cal. Dec. 17, 2009) ("Courts strictly apply

23  [California's] mediation confidentiality statutes….").

24          The disclosure of the "consent agreement" was solely "for the purpose of, in

25  the course of, or pursuant to" the JAMS mediation sessions in *Siegel*, as admitted by

26  DC.  RJN, Ex. A.  Therefore, no evidence regarding this disclosure "is admissible or

27  subject to discovery," nor may it used "after the mediation ends." *Simmons*, 44 Cal.

28  4th at 580; § 1119(a); § 1126.  As DC's Sixth Claim rests on a confidential

disclosure, plainly shielded by § 1115 *et seq.*, and which cannot be used as evidence, the Sixth Claim must fail as a matter of law.

### E. DC's Allegations in Paragraphs 157 and 175 of the Complaint Must Be Stricken as Violative of Its JAMS Confidentiality Agreement

DC's reference in its Complaint to the Siegels' and the Shuster Executor's alleged settlement strategy and objectives in the form of alleged "consent agreements" constitutes a deliberate breach of not only the mediation privilege of California Evidence Code § 1115 *et seq.*, but also of the parties' JAMS Confidentiality Agreement dated May 1, 2008 between DC and the Siegels and the Shuster Executor ("Confidentiality Agreement") regarding the parties' settlement negotiations. RJN, Ex. C.

### 1. Procedural Background

After Judge Larson issued the March 26, 2008 order upholding the validity of the Siegel Terminations as to *Action Comics, No. 1*, he ordered on March 31, 2008 that the parties participate in settlement discussions with a JAMS mediator. RJN, Ex. E. The parties thereafter retained the services of the Honorable Daniel Weinstein (Ret.). In anticipation of the parties' court-ordered mediation, the parties negotiated and entered into a JAMS Confidentiality Agreement on or about May 1, 2008. RJN, Ex. C. This agreement substantially strengthened the provisions of the standard "JAMS Confidentiality Agreement," and was specifically negotiated by the parties' counsel to ensure that the parties could speak freely during settlement discussions, and that such discussions would not be used by either side in litigation "in any way, shape or form." The Confidentiality Agreement provides, in relevant part:

> "The provisions of the Central District of California Local Rule 16-15…also apply to this mediation. Pursuant to Local Rule 16-5.8, the mediation and any settlement conference or discussion ("Settlement Conference") shall be confidential, and no part of any Settlement Conference shall be reported, or otherwise recorded, without the consent of the parties. With respect to California Evidence Code § 1122, any agreement to disclose under subsections (a)(1) or (a)(2) of that section must expressly be made in writing. THIS CONFIDENTIALITY AGREEMENT… EXTENDS TO ALL PRESENT AND FUTURE

CIVIL, JUDICIAL, QUASI-JUDICIAL, ARBITAL, ADMINISTRATIVE OR OTHER PROCEEDINGS."

RJN, Ex. C at 1 (emphasis in original).  Paragraph 4 provides that "[t]he privileged character of any information or documents is not altered by the disclosure to the mediator or the disclosure in any Settlement Conference."  *Id.*  Paragraph 5 provides:

> "All parties, counsel and any other persons attending any Settlement Conference shall treat all such discussions as strictly confidential in every respect, including without limitation, the contents or substance of any oral or written statements made at the Settlement Conference, and all other substantive aspects of such Settlement Conference ('Confidential Settlement Information').  ***Without limitation, any document that is marked 'Confidential – For Settlement Purposes Only' and is disclosed or produced at or in connection with a Settlement Conference shall be treated as Confidential Settlement Information.  Confidential Settlement Information shall not be*** disclosed to anyone other than the parties, their counsel or the mediator or ***used in any way, shape or form for any purpose, including impeachment, in any pending or future proceeding in any court, in whole or in part, directly or indirectly***, orally or in writing, except as set forth in paragraph 6 below."

*Id.* at 2 (emphasis added).  Paragraph 6 provides that information will not be considered Confidential Settlement Information *only* if it is:

> "(a) publicly available, (b) already in possession of the adverse party or their counsel prior to its disclosure by a party or their counsel at a Settlement Conference, or (c) is developed independently of any Settlement Conference and without reference thereto."

*Id.*  Paragraph 7 expressly limits disclosures to the Court regarding the parties' settlement communications, demonstrating the parties' sensitivity to the abuse of any aspect of their settlement discussions in Court, and it even specifies the limited language to be used in the "joint report" to the Court outlining the parties' settlement efforts if the parties did not succeed in settling this case.  *Id.*

On May 2, 2008, the Siegels' counsel disclosed a settlement strategy of the Siegels and Shusters and briefly described its general nature ("Settlement Strategy") in a letter to Defendants' counsel marked "CONFIDENTIAL – FOR SETTLEMENT PURPOSES ONLY," thus qualifying it as "Confidential Settlement Information" under the parties' Confidentiality Agreement.  RJN, Ex. A.  The first sentence of the letter expressly states:  "This letter is sent pursuant to the 'JAMS Confidentiality

Agreement' and solely in connection with the upcoming settlement mediation sessions." *Id.*  The Settlement Strategy – contained in a communication between the Siegels, the Shuster Executor and their mutual counsel, Mr. Toberoff, concerning settlement – is also clearly protected by the attorney-client privilege, the joint interest privilege and the attorney work-product doctrine.  RJN, Ex. F at 9-13.  The Settlement Strategy was made shortly before and solely for purposes of the parties' settlement mediation, which commenced on May 8, 2008.  *Id.* at 13-15.  Pursuant to the parties' longstanding discovery agreement, acknowledged by DC, the Siegels had no obligation to disclose this post-litigation communication on a privilege log, or otherwise, as it was created after the commencement of this litigation and for purposes of a settlement mediation.  RJN, Ex. D at 13:16-18.

Nonetheless, on December 30, 2008, DC moved to compel the production of the Settlement Strategy in flagrant breach of the parties' JAMS Confidentiality Agreement.  The Siegels asserted that their Settlement Strategy was protected by the Confidentiality Agreement, as well as the attorney-client privilege, joint-interest privilege[12] and the work product doctrine.  RJN, Ex. F at 9-15.

At the January 14, 2009 hearing on DC's motion, its counsel went so far as to try to describe the Settlement Strategy to the Court but was stopped in his tracks:

> MR. BERGMAN: Would your Honor permit me to use the one-word adjective with which Mr. Toberoff described the letter?
> ***
> THE COURT: No.

RJN, Ex. B at 11:7-16.  The Court thereafter denied DC's motion:

> THE COURT:  Part of this is motivated simply by the Court's commitment to maintaining the settlement privilege. It was the Court that encouraged you to engage in that settlement effort, and I want to maintain the confidences that were agreed to during that period. So that motion is denied.

---

[12] *See United States ex. rel. Burroughs v. DeNardi Corp.*, 167 F.R.D. 680, 685 (S.D. Cal. 1996) ("[W]hether the jointly interested persons are defendants or plaintiffs, and whether the litigation or potential litigation is civil or criminal, the rationale for the privilege is clear: Persons who share a common interest in litigation should be able to communicate confidentially with their respective attorneys, and with each other, to more effectively prosecute or defend their claims."); RJN, Ex. F at 9-13.

SIEGEL DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

*Id.* at 12:15-19.  *See also* RJN, Ex. G.

### 2. DC's Use of the Settlement Strategy Contravenes the Court's Prior Order and Is Barred By the "Law of the Case"

DC is also precluded from re-litigating the issue of the Settlement Strategy by the "law of the case" doctrine, as such was already litigated and held to be privileged by Judge Larson as described above.  *See Siegel,* Docket Nos. 395, 442.  The "law of the case" doctrine stands for the common-sense principle that the same *issue* presented a second time in the same court should lead to the same result, as to do otherwise "would create intolerable instability for the parties."  *Ridgeway v. Mont. High School Ass'n*, 858 F.2d 579, 587-88 (9th Cir. 1988).  Thus, "a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court."  *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993).  The law of the case doctrine applies with equal force to related cases.  *See also Disimone v. Browner*, 121 F.3d 1262, 1266-67 (9th Cir. 1997).[13]

### 3. DC's Allegations in the Complaint Once Again Violate the JAMS Confidentiality Agreement and Must Be Struck

Eighteen months after DC's motion to compel was denied, DC and its attorneys have once again willfully breached the JAMS Confidentiality Agreement, violated the mediation privilege as described in Section II.D.2 above, *and* defied this Court's January 14, 2009 order by purporting to disclose the Settlement Strategy in paragraph 157 of the Complaint.  The Settlement Strategy was indisputably Confidential Settlement Information under the parties' agreement and was disclosed "at or in connection with a Settlement Conference" after the Confidentiality Agreement was signed.  RJN, Ex. C at 2.  As noted above, the first sentence of the May 2, 2008 letter disclosing the Settlement Strategy expressly states:  "This letter is sent pursuant to the 'JAMS Confidentiality Agreement' and 'solely in connection

---

[13] *See also* 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4478 at 788 (1981) (the "law of the case" doctrine reflects "the respect that one judge or court owes the rulings of another judge or court in the same or closely related cases"); *Moss v. Crawford & Co.*, 201 F.R.D. 398, 401 n.1 (W.D. Pa. 2000) ("law of the case" doctrine applies to issues determined in "closely related" cases); *Mason v. Texaco, Inc.*, 741 F. Supp. 1472, 1492 (D. Kan. 1990) ("law of the case doctrine 'encompasses … the rulings of another judge or court in … a closely related case.'").

with the upcoming settlement mediation sessions.'"  RJN, Ex. A.  Pursuant to

paragraph 7 of the Confidentiality Agreement, the letter was clearly marked

"CONFIDENTIAL – FOR SETTLEMENT PURPOSES ONLY."  *Id*.  The

Settlement Strategy does not qualify for any of the exceptions in paragraph 6 of the

Confidentiality Agreement as it has never been publicly available, was not already in

DC's possession, nor "developed independently" of the Settlement Conference.

By express agreement of the parties, the Settlement Strategy, and even its

existence and subject matter, therefore constitutes Confidential Settlement

Information, which is confidential to all except the parties and the mediator.  RJN,

Ex. C at 2.  Accordingly, per the parties' Confidentiality Agreement, the Settlement

Strategy cannot be "used in any, way shape or form for any purpose, including

impeachment, in any pending or future proceeding in any court, in whole or in part,

directly or indirectly, orally or in writing." *Id*.

The Siegels and their counsel obviously relied on the Confidentiality

Agreement and the sanctity of the settlement and mediation privileges when they

made their disclosure.  Indeed, the whole purpose of the Confidentiality Agreement

was to enable the parties to comfortably make disclosures in the course of a

settlement mediation that they would not otherwise make, including privileged or

confidential information that, when disclosed, might further settlement.

DC and its counsel have shamelessly chosen with their Complaint to breach

the Confidentiality Agreement, and the mediation privilege, and have defied this

Court's January 14, 2009 Order.  RJN, Ex. B at 11:7-16, 12:15-19.  They have done

so willfully even though the parties' Confidentiality Agreement expressly applies to

"ALL PRESENT AND FUTURE CIVIL, JUDICIAL … PROCEEDINGS."  RJN,

Ex. C at 1 (emphasis in original).  This Court, as before, should not countenance

DC's brazen gamesmanship.  Defendants hereby move that such allegations be

stricken from the Complaint (Complaint, ¶¶ 88, 157-160, 175-176, 179-80) pursuant

to F.R.C.P. 12(f), and that DC be enjoined from any further use of such settlement

SIEGEL DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

discussions in this litigation or otherwise, pursuant to the mediation privilege and the express terms of the Confidentiality Agreement. *See Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993) (*rev'd on other grounds*, 510 U.S. 517 (1994)) (F.R.C.P. 12(f)'s essential function is to "avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial.").[14]

### 4. The Third and Sixth Claims Necessarily Fail, Once Such Privileged Settlement Information Is Struck

DC's Third and Sixth Claims are inexorably based on allegations purporting to disclose privileged Confidential Settlement Information in willful violation of the mediation privilege, the parties' JAMS Confidentiality Agreement, and this Court's January 14, 2009 Order. *See* Complaint, ¶¶ 88, 157-60, 175-76, 179-80. Once such allegations are properly struck by the Court pursuant to F.R.C.P. 12(f), the Third and Sixth Claims necessarily fail to state a claim. *See In re Connetics Corp. Secs. Litig.*, 542 F. Supp. 2d 996, 1006 (N.D. Cal. 2008) (granting motion to dismiss where "the complaint cannot possibly make sufficient allegations against these defendants in the absence of the stricken paragraph"); *Fraker v. Bayer*, 2009 U.S. Dist. LEXIS 125633, at *25 (E.D. Cal. Oct. 2, 2009) (where "portion of the [complaint] that alleges a factual basis for Plaintiff's claim … has been order[ed] stricken from the [complaint] … [the] claim must fail for failure to state a claim").

///
///
///

---

[14] Moreover, DC's willful breach entitles Defendants to an injunction against DC's disclosure of Confidential Settlement Information pursuant to the Confidentiality Agreement. RJN, Ex. C at 3 (stating that "any breach of this Agreement would cause irreparable injury" and that "any [party] to this Agreement may obtain an injunction to prevent disclosure of any such confidential information"). Defendants therefore will respectfully request that DC as well as the closely affiliated defendants in the related *Superman* and *Superboy* cases be enjoined from any further use of such privileged "Confidential Settlement Information."

## **CONCLUSION**

For the foregoing reasons, Plaintiff's Third and Sixth Claims for Relief should be dismissed with prejudice.

DATED:  August 13, 2010

TOBEROFF & ASSOCIATES, P.C.

By _____

Marc Toberoff

Attorneys for Defendants Mark Warren Peary, as personal representative of the Estate of Joseph Shuster, Joanne Siegel and Laura Siegel Larson

SIEGEL DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS