# EXHIBIT L

1  DANIEL M. PETROCELLI (S.B. #97802)
   dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
   mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
   cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA 90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:   (310) 246-6779

7  (continued on next page)

8  Attorneys for Plaintiff DC Comics

9

10

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

11

12  DC COMICS,                           Case No. CV-10-3633 ODW (RZx)

13              Plaintiff,               **DISCOVERY MATTER**

14      v.                              **PLAINTIFF DC COMICS'**
                                        **NOTICE OF DEPOSITION OF**
15  PACIFIC PICTURES                    **DEFENDANT JOANNE SIEGEL**
    CORPORATION, IP WORLDWIDE,          **AND REQUEST FOR**
16  LLC, IPW, LLC, MARC TOBEROFF,       **PRODUCTION OF DOCUMENTS**
    an individual, MARK WARREN
17  PEARY, as personal representative of **Judge**:  Hon. Otis D. Wright II
    the ESTATE OF JOSEPH SHUSTER,       **Magistrate**:  Hon. Ralph Zarefsky
18  JOANNE SIEGEL, an individual,
    LAURA SIEGEL LARSON, an             Deposition Date:  October 5, 2010
19  individual, and DOES 1-10, inclusive, Deposition Time:  9:00 a.m.

20              Defendants.

21

22

23

24

25

26

27

28

1    (continued from previous page)

2    PATRICK T. PERKINS (admitted *pro hac vice*)
         pperkins@ptplaw.com
3    PERKINS LAW OFFICE, P.C.
     1711 Route 9D
4    Cold Spring, NY 10516
     Telephone:  (845) 265-2820
5    Facsimile:   (845) 265-2819

6    Attorneys for Plaintiff DC Comics

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF DEPOSITION OF DEFENDANT
JOANNE SIEGEL AND REQUEST FOR
PRODUCTION OF DOCUMENTS

**500**

1    **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

2         PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure

3    30, the deposition upon oral examination of defendant Joanne Siegel (the

4    "Deponent") will be taken in the above-entitled action on October 5, 2010 starting

5    at 9:00 a.m. and continuing over the course of one day until completed or otherwise

6    adjourned.  The deposition will be held at the offices of O'Melveny & Myers LLP,

7    1999 Avenue of the Stars, Suite 700, Los Angeles, California 90067.  The

8    deposition will be taken before a notary public or other officer authorized to

9    administer oaths and will be recorded by stenographic, sound, and visual means.

10        PLEASE TAKE FURTHER NOTICE that, pursuant to Federal Rule of Civil

11   Procedure 34, Deponent is requested to produce for inspection and copying all

12   documents described in Attachment A to this Notice of Deposition, in accordance

13   with the definitions contained therein, by no later than September 17, 2010.

14        This Notice of Deposition is being served on Deponent's counsel at the

15   address shown on the accompanying Proof of Service.

16

17        Dated:  August 17, 2010              Respectfully submitted,

18                                             O'MELVENY & MYERS LLP

19

20                                             By:_____

21                                                  Daniel M. Petrocelli

22                                             Attorneys for Plaintiff DC Comics

23

24

25

26

27

28

NOTICE OF DEPOSITION OF DEFENDANT
JOANNE SIEGEL AND REQUEST FOR
PRODUCTION OF DOCUMENTS

**501**

# ATTACHMENT A

## DEFINITIONS AND INSTRUCTIONS

1.    "DOCUMENT" shall be interpreted in its broadest sense to include any and all "documents" and "other tangible things" as those terms are understood in Federal Rule of Civil Procedure 34, including, without limitation, any "writing," "recording," or "photograph" as those terms are defined in Federal Rule of Evidence 1001.  This shall include, but is not limited to:  e-mail, audio or video recordings, correspondence, letters, phone messages, notes, memoranda, facsimiles, publications, contracts, agreements, calendars, drafts of proposed contracts or agreements, papers, and photographs.

2.    "COMMUNICATION" means all written, electronic, oral, telephonic, gesture, or other transmission or exchange of information, including without limitation any inquiry, request, dialogue, discussion, conversation, interview, correspondence, letter, note, consultation, negotiation, agreement, understanding, meeting, e-mail, and all DOCUMENTS evidencing any verbal or nonverbal interaction between any individuals or entities.

3.    "REFER" or "RELATE" means, without limitation, evidence, reflect, summarize, constitute, contain, study, analyze, explain, mention, show, discuss, describe, or comment upon.

4.    "PERSON" means any natural person, firm, association, corporation, partnership, or other legal entity or organization separately identifiable, and any department(s) or division(s) therein.

5.    "YOU" or "YOUR" means Joanne Siegel and, as applicable, any PERSON acting on her behalf, including but not limited to her agents, employees, attorneys, and representatives.

6.    "DEFENDANT" or "DEFENDANTS" means, collectively and severally, any defendant in the above-entitled action, including YOU; Pacific Pictures Corporation; IP Worldwide, LLC; IPW, LLC; Marc Toberoff; Mark

1   Warren Peary, on behalf of the Estate of Joseph Shuster; and Laura Siegel Larson

2   and, as applicable, any PERSON acting on their behalf, including but not limited

3   to their agents, employees, attorneys, and representatives.

4        7.     "SIEGEL HEIRS" means, collectively and severally, YOU, Laura

5   Siegel Larson, Dennis Larson, Michael Siegel, or any other executor,

6   administrator, heir, relative, or representative of Jerome Siegel and, as applicable,

7   any PERSON acting on their behalf, including but not limited to their agents,

8   employees, attorneys, and representatives.

9        8.     "SHUSTER HEIRS" means, collectively and severally, the Estate of

10   Joseph Shuster, Jean Peavy, Mark Peary, Dawn Peavy, Frank Shuster, or any

11   other executor, administrator, heir, relative, or representative of Joseph Shuster

12   and, as applicable, any PERSON acting on their behalf, including but not limited

13   to their agents, employees, attorneys, and representatives.

14        9.     "SIEGEL" means Jerome Siegel and, as applicable, any PERSON

15   acting on his behalf, including but not limited to his agents, employees, attorneys,

16   heirs, and representatives.

17        10.     "SHUSTER" means Joseph Shuster and, as applicable, any PERSON

18   acting on his behalf, including but not limited to his agents, employees, attorneys,

19   heirs, and representatives.

20        11.     "SUPERMAN" means the Superman character as delineated in

21   literary works such as comic books, newspapers, novels, radio programs,

22   television programs, and motion pictures, and any of the works in which he

23   appears, including but not limited to *Action Comics. No. 1.*

24        12.     "SUPERBOY" means the Superboy character as delineated in

25   literary works such as comic books, newspapers, novels, radio programs,

26   television programs, and motion pictures, and any of the works in which he

27   appears, including but not limited to *More Fun Comics #101.*

28        13.     "INCLUDING" means "including, but not limited to."

14.    "Any" and "All" are interchangeable.

15.    The singular form includes the plural form, and vice versa.

16.    YOU are instructed to produce all DOCUMENTS that are responsive to these Requests and that are in YOUR possession, custody, or control.  A DOCUMENT is in YOUR "possession, custody, or control" if it is in YOUR physical possession, or if, as a practical matter, YOU have the ability, upon request, to obtain possession of the DOCUMENT or a copy thereof from another person or entity that has physical possession of the DOCUMENT.

17.    If any DOCUMENT or category of DOCUMENTS is not produced in full, please state with particularity the reason or reasons it is not being produced in full, and describe, to the best of YOUR knowledge, information and belief, and with as much particularity as possible, the DOCUMENT or portions of the DOCUMENT that are not being produced.

18.    Each DOCUMENT is to be produced as it is kept in the usual course of business, including all file folders, binders, notebooks, and other devices by which such DOCUMENTS may be organized or separated.

19.    If YOU withhold any DOCUMENT, or portion of a DOCUMENT, on grounds that it is protected from discovery by the attorney-client privilege, work-product doctrine, or other privilege or immunity from discovery, please set forth, for each DOCUMENT or portion of a DOCUMENT withheld:

    (a)    The place, approximate date, and manner of recording, creating or otherwise preparing the DOCUMENT;

    (b)    The names and organization position, if any, of each author, sender, and recipient of the DOCUMENT;

    (c)    A general description of the subject matter of the DOCUMENT;

    (d)    The basis of any claim of privilege; and

    (e)    If work-product is asserted, the proceeding for which the DOCUMENT was created.

NOTICE OF DEPOSITION OF DEFENDANT
JOANNE SIEGEL AND REQUEST FOR
PRODUCTION OF DOCUMENTS

20.    For any DOCUMENT or category of DOCUMENTS that was, but no longer is, in YOUR possession, custody or control, please describe each such DOCUMENT as completely as possible and provide the following information:

(a)    The reason the DOCUMENT is no longer in YOUR possession, custody or control;

(b)    The person or entity, if any, who has possession, custody or control or, if unknown, so state; and

(c)    If the DOCUMENT was destroyed or otherwise disposed of, state (i) the manner of disposal (*i.e.*, destruction, loss, discarding or other means of disposal); (ii) the date of disposal; (iii) the reason for disposal; (iv) the person authorizing disposal; (v) the person disposing of the DOCUMENT; and (vi) the name and address of the most recent custodian of the DOCUMENT.

21.    Each Request shall be construed independently and no Request shall be viewed as limiting the scope of any other Request.

22.    All responsive DOCUMENTS maintained or stored in electronic format shall be produced in native file format with all associated metadata preserved.  All responsive DOCUMENTS maintained in hard copy shall be produced in TIFF.

23.    The collection and production of DOCUMENTS shall be performed in a manner that ensures that the source of each DOCUMENTS may be determined, if necessary.

24.    DOCUMENTS attached to each other shall not be separated.

25.    These Requests impose a continuing obligation subsequent to YOUR initial production within thirty days of the service date of these Requests, or other date mutually agreed upon by the parties, to timely supplement YOUR response or production if YOU determine that YOUR response or production is incomplete or incorrect.

NOTICE OF DEPOSITION OF DEFENDANT
JOANNE SIEGEL AND REQUEST FOR
PRODUCTION OF DOCUMENTS

## **DOCUMENTS REQUESTED**

1.    All agreements between or among YOU and any DEFENDANT regarding the SIEGEL HEIRS' purported rights in SUPERMAN and/or SUPERBOY.

2.    All agreements between or among YOU and the SHUSTER HEIRS regarding the SIEGEL HEIRS' purported rights in SUPERMAN and/or SUPERBOY.

3.    All agreements between or among YOU and any DEFENDANT regarding the SHUSTER HEIRS' purported rights in SUPERMAN and/or SUPERBOY.

4.    All agreements between or among SIEGEL and SHUSTER regarding any purported rights in SUPERMAN and/or SUPERBOY.

5.    All agreements between or among YOU and the SHUSTER HEIRS regarding the SHUSTER HEIRS' purported rights in SUPERMAN and/or SUPERBOY.

6.    All DOCUMENTS relating to or affecting the ability of YOU or the SIEGEL HEIRS to negotiate or enter into agreements regarding SUPERMAN and/or SUPERBOY.

7.    All DOCUMENTS relating to or affecting the ability of the SHUSTER HEIRS to negotiate or enter into agreements regarding SUPERMAN and/or SUPERBOY.

8.    All DOCUMENTS relating to or affecting the disposition, division, or ownership of any rights in SUPERMAN and/or SUPERBOY.

9.    All DOCUMENTS relating to or affecting the division of revenue, proceeds, or other profits regarding SUPERMAN and/or SUPERBOY.

10.    All DOCUMENTS relating to or affecting the division of any settlement proceeds regarding SUPERMAN and/or SUPERBOY.

11.    All DOCUMENTS relating to the potential sale, assignment, license, or other disposition of any rights relating to SUPERMAN and/or SUPERBOY, including but not limited to any solicitation, offer, option, or proposed agreement.

12.    All DOCUMENTS relating to the valuation of any past, current, or potential ownership interest in SUPERMAN and/or SUPERBOY.

13.    All DOCUMENTS relating to the introduction of YOU or the SIEGEL HEIRS to any DEFENDANT.

14.    All DOCUMENTS relating to the October 16, 2001 COMMUNICATION between Kevin Marks and John Schulman.

15.    All DOCUMENTS relating to the October 19, 2002 letter from Kevin Marks to John Schulman confirming that the SIEGEL HEIRS "accepted D.C. Comics' offer of October 16, 2001."

16.    All DOCUMENTS relating to the October 26, 2001 letter from DC Comics to the SIEGEL HEIRS.

17.    All DOCUMENTS relating to the November 29, 2001 COMMUNICATION between DEFENDANT Marc Toberoff and Kevin Marks regarding the SIEGEL HEIRS' purported rights in SUPERMAN and/or SUPERBOY.

18.    All DOCUMENTS relating to the February 1, 2002 letter from Patrick Perkins to the SIEGEL HEIRS.

19.    All DOCUMENTS relating to the February 6, 2002 COMMUNICATION between DEFENDANT Marc Toberoff and Kevin Marks regarding the SIEGEL HEIRS' purported rights in SUPERMAN and/or SUPERBOY.

20.    All DOCUMENTS relating to the February 2002 COMMUNICATION between DEFENDANT Marc Toberoff and Warner Bros. executive Steven Spira regarding the rights in SUPERMAN and/or SUPERBOY.

1       21.    All DOCUMENTS relating to the May 9, 2002 letter from YOU to

2  Time Warner Inc.

3       22.    All DOCUMENTS relating to the May 21, 2002 letter from Richard

4  Parsons of Time Warner Inc. to YOU.

5       23.    All DOCUMENTS relating to any solicitation, offer, or option from

6  any DEFENDANT regarding the purported rights of YOU or the SIEGEL HEIRS

7  in SUPERMAN and/or SUPERBOY.

8       24.    All DOCUMENTS relating to the September 21, 2002 letter from

9  YOU to Kevin Marks.

10       25.    All DOCUMENTS relating to the September 21, 2002 letter from

11  YOU to DC Comics.

12       26.    All DOCUMENTS relating to the letter agreement dated October 3,

13  2002 that YOU signed with DEFENDANT IP Worldwide, LLC, and any revisions,

14  modifications, or adjustments thereto.

15       27.    All DOCUMENTS relating to the October 28, 2002 letter from YOU

16  to Lillian Laserson of DC Comics.

17       28.    All DOCUMENTS relating to the Notice of Termination of Transfer

18  Covering Extended Renewal Term:  Superboy served on behalf of the SIEGEL

19  HEIRS on or around November 8, 2002.

20

21      Dated:  August 17, 2010        Respectfully submitted,

22                                 O'MELVENY & MYERS LLP

23

24                               By: _____

                                        Daniel M. Petrocelli

25                                Attorneys for Plaintiff DC Comics

26

27

28

NOTICE OF DEPOSITION OF DEFENDANT
JOANNE SIEGEL AND REQUEST FOR
PRODUCTION OF DOCUMENTS

508

# EXHIBIT M

1  DANIEL M. PETROCELLI (S.B. #97802)
     dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
     mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
     cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA 90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:   (310) 246-6779

7  (continued on next page)

8  Attorneys for Plaintiff DC Comics

9                    UNITED STATES DISTRICT COURT

10                   CENTRAL DISTRICT OF CALIFORNIA

11  DC COMICS,                          Case No. CV-10-3633 ODW (RZx)

12                  Plaintiff,          **DISCOVERY MATTER**

13       v.                             **PLAINTIFF DC COMICS'
                                         NOTICE OF DEPOSITION OF
14                                       DEFENDANT LAURA SIEGEL
    PACIFIC PICTURES                     LARSON AND REQUEST FOR
15  CORPORATION, IP WORLDWIDE,           PRODUCTION OF DOCUMENTS**
    LLC, IPW, LLC, MARC TOBEROFF,
16  an individual, MARK WARREN           **Judge**:  Hon. Otis D. Wright II
    PEARY, as personal representative of **Magistrate**:  Hon. Ralph Zarefsky
17  the ESTATE OF JOSEPH SHUSTER,
    JOANNE SIEGEL, an individual,        Deposition Date:  October 6, 2010
18  LAURA SIEGEL LARSON, an              Deposition Time:  9:00 a.m.
    individual, and DOES 1-10, inclusive,
19
20                  Defendants.
21
22
23
24
25
26
27
28

1    (continued from previous page)

2    PATRICK T. PERKINS (admitted *pro hac vice*)
       pperkins@ptplaw.com
3    PERKINS LAW OFFICE, P.C.
      1711 Route 9D
4    Cold Spring, NY 10516
      Telephone:  (845) 265-2820
5    Facsimile:   (845) 265-2819

6    Attorneys for Plaintiff DC Comics

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

2    PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure

3    30, the deposition upon oral examination of defendant Laura Siegel Larson (the

4    "Deponent") will be taken in the above-entitled action on October 6, 2010 starting

5    at 9:00 a.m. and continuing over the course of one day until completed or otherwise

6    adjourned.  The deposition will be held at the offices of O'Melveny & Myers LLP,

7    1999 Avenue of the Stars, Suite 700, Los Angeles, California 90067.  The

8    deposition will be taken before a notary public or other officer authorized to

9    administer oaths and will be recorded by stenographic, sound, and visual means.

10    PLEASE TAKE FURTHER NOTICE that, pursuant to Federal Rule of Civil

11    Procedure 34, Deponent is requested to produce for inspection and copying all

12    documents described in Attachment A to this Notice of Deposition, in accordance

13    with the definitions contained therein, by no later than September 17, 2010.

14    This Notice of Deposition is being served on Deponent's counsel at the

15    address shown on the accompanying Proof of Service.

16

17    Dated:  August 17, 2010                    Respectfully submitted,

18                                                              O'MELVENY & MYERS LLP

19

20                                               By: _____

21                                                              Daniel M. Petrocelli

22                                               Attorneys for Plaintiff DC Comics

23

24

25

26

27

28

NOTICE OF DEPOSITION OF DEFENDANT
LAURA SIEGEL LARSON AND REQUEST
FOR PRODUCTION OF DOCUMENTS

## ATTACHMENT A

## DEFINITIONS AND INSTRUCTIONS

1. "DOCUMENT" shall be interpreted in its broadest sense to include any and all "documents" and "other tangible things" as those terms are understood in Federal Rule of Civil Procedure 34, including, without limitation, any "writing," "recording," or "photograph" as those terms are defined in Federal Rule of Evidence 1001. This shall include, but is not limited to: e-mail, audio or video recordings, correspondence, letters, phone messages, notes, memoranda, facsimiles, publications, contracts, agreements, calendars, drafts of proposed contracts or agreements, papers, and photographs.

2. "COMMUNICATION" means all written, electronic, oral, telephonic, gesture, or other transmission or exchange of information, including without limitation any inquiry, request, dialogue, discussion, conversation, interview, correspondence, letter, note, consultation, negotiation, agreement, understanding, meeting, e-mail, and all DOCUMENTS evidencing any verbal or nonverbal interaction between any individuals or entities.

3. "REFER" or "RELATE" means, without limitation, evidence, reflect, summarize, constitute, contain, study, analyze, explain, mention, show, discuss, describe, or comment upon.

4. "PERSON" means any natural person, firm, association, corporation, partnership, or other legal entity or organization separately identifiable, and any department(s) or division(s) therein.

5. "YOU" or "YOUR" means Laura Siegel Larson and, as applicable, any PERSON acting on her behalf, including but not limited to her agents, employees, attorneys, and representatives.

6. "DEFENDANT" or "DEFENDANTS" means, collectively and severally, any defendant in the above-entitled action, including YOU; Pacific Pictures Corporation; IP Worldwide, LLC; IPW, LLC; Marc Toberoff; Mark

1    Warren Peary, on behalf of the Estate of Joseph Shuster; and Joanne Siegel and,

2    as applicable, any PERSON acting on their behalf, including but not limited to

3    their agents, employees, attorneys, and representatives.

4        7.    "SIEGEL HEIRS" means, collectively and severally, YOU, Joanne

5    Siegel, Dennis Larson, Michael Siegel, or any other executor, administrator, heir,

6    relative, or representative of Jerome Siegel and, as applicable, any PERSON

7    acting on their behalf, including but not limited to their agents, employees,

8    attorneys, and representatives.

9        8.    "SHUSTER HEIRS" means, collectively and severally, the Estate of

10   Joseph Shuster, Jean Peavy, Mark Peary, Dawn Peavy, Frank Shuster, or any

11   other executor, administrator, heir, relative, or representative of Joseph Shuster

12   and, as applicable, any PERSON acting on their behalf, including but not limited

13   to their agents, employees, attorneys, and representatives.

14       9.    "SIEGEL" means Jerome Siegel and, as applicable, any PERSON

15   acting on his behalf, including but not limited to his agents, employees, attorneys,

16   heirs, and representatives.

17       10.   "SHUSTER" means Joseph Shuster and, as applicable, any PERSON

18   acting on his behalf, including but not limited to his agents, employees, attorneys,

19   heirs, and representatives.

20       11.   "SUPERMAN" means the Superman character as delineated in

21   literary works such as comic books, newspapers, novels, radio programs,

22   television programs, and motion pictures, and any of the works in which he

23   appears, including but not limited to *Action Comics. No. 1.*

24       12.   "SUPERBOY" means the Superboy character as delineated in

25   literary works such as comic books, newspapers, novels, radio programs,

26   television programs, and motion pictures, and any of the works in which he

27   appears, including but not limited to *More Fun Comics #101.*

28       13.   "INCLUDING" means "including, but not limited to."

NOTICE OF DEPOSITION OF DEFENDANT
LAURA SIEGEL LARSON AND REQUEST
FOR PRODUCTION OF DOCUMENTS

3

14. "Any" and "All" are interchangeable.

15. The singular form includes the plural form, and vice versa.

16. YOU are instructed to produce all DOCUMENTS that are responsive to these Requests and that are in YOUR possession, custody, or control. A DOCUMENT is in YOUR "possession, custody, or control" if it is in YOUR physical possession, or if, as a practical matter, YOU have the ability, upon request, to obtain possession of the DOCUMENT or a copy thereof from another person or entity that has physical possession of the DOCUMENT.

17. If any DOCUMENT or category of DOCUMENTS is not produced in full, please state with particularity the reason or reasons it is not being produced in full, and describe, to the best of YOUR knowledge, information and belief, and with as much particularity as possible, the DOCUMENT or portions of the DOCUMENT that are not being produced.

18. Each DOCUMENT is to be produced as it is kept in the usual course of business, including all file folders, binders, notebooks, and other devices by which such DOCUMENTS may be organized or separated.

19. If YOU withhold any DOCUMENT, or portion of a DOCUMENT, on grounds that it is protected from discovery by the attorney-client privilege, work-product doctrine, or other privilege or immunity from discovery, please set forth, for each DOCUMENT or portion of a DOCUMENT withheld:

(a)   The place, approximate date, and manner of recording, creating or otherwise preparing the DOCUMENT;

(b)   The names and organization position, if any, of each author, sender, and recipient of the DOCUMENT;

(c)   A general description of the subject matter of the DOCUMENT;

(d)   The basis of any claim of privilege; and

(e)   If work-product is asserted, the proceeding for which the DOCUMENT was created.

20.    For any DOCUMENT or category of DOCUMENTS that was, but no longer is, in YOUR possession, custody or control, please describe each such DOCUMENT as completely as possible and provide the following information:

    (a)    The reason the DOCUMENT is no longer in YOUR possession, custody or control;

    (b)    The person or entity, if any, who has possession, custody or control or, if unknown, so state; and

    (c)    If the DOCUMENT was destroyed or otherwise disposed of, state (i) the manner of disposal (*i.e.*, destruction, loss, discarding or other means of disposal); (ii) the date of disposal; (iii) the reason for disposal; (iv) the person authorizing disposal; (v) the person disposing of the DOCUMENT; and (vi) the name and address of the most recent custodian of the DOCUMENT.

21.    Each Request shall be construed independently and no Request shall be viewed as limiting the scope of any other Request.

22.    All responsive DOCUMENTS maintained or stored in electronic format shall be produced in native file format with all associated metadata preserved. All responsive DOCUMENTS maintained in hard copy shall be produced in TIFF.

23.    The collection and production of DOCUMENTS shall be performed in a manner that ensures that the source of each DOCUMENTS may be determined, if necessary.

24.    DOCUMENTS attached to each other shall not be separated.

25.    These Requests impose a continuing obligation subsequent to YOUR initial production within thirty days of the service date of these Requests, or other date mutually agreed upon by the parties, to timely supplement YOUR response or production if YOU determine that YOUR response or production is incomplete or incorrect.

NOTICE OF DEPOSITION OF DEFENDANT
LAURA SIEGEL LARSON AND REQUEST
FOR PRODUCTION OF DOCUMENTS

## **DOCUMENTS REQUESTED**

1.    All agreements between or among YOU and any DEFENDANT regarding the SIEGEL HEIRS' purported rights in SUPERMAN and/or SUPERBOY.

2.    All agreements between or among YOU and the SHUSTER HEIRS regarding the SIEGEL HEIRS' purported rights in SUPERMAN and/or SUPERBOY.

3.    All agreements between or among YOU and any DEFENDANT regarding the SHUSTER HEIRS' purported rights in SUPERMAN and/or SUPERBOY.

4.    All agreements between or among SIEGEL and SHUSTER regarding any purported rights in SUPERMAN and/or SUPERBOY.

5.    All agreements between or among YOU and the SHUSTER HEIRS regarding the SHUSTER HEIRS' purported rights in SUPERMAN and/or SUPERBOY.

6.    All DOCUMENTS relating to or affecting the ability of YOU or the SIEGEL HEIRS to negotiate or enter into agreements regarding SUPERMAN and/or SUPERBOY.

7.    All DOCUMENTS relating to or affecting the ability of the SHUSTER HEIRS to negotiate or enter into agreements regarding SUPERMAN and/or SUPERBOY.

8.    All DOCUMENTS relating to or affecting the disposition, division, or ownership of any rights in SUPERMAN and/or SUPERBOY.

9.    All DOCUMENTS relating to or affecting the division of revenue, proceeds, or other profits regarding SUPERMAN and/or SUPERBOY.

10.    All DOCUMENTS relating to or affecting the division of any settlement proceeds regarding SUPERMAN and/or SUPERBOY.

1   11. All DOCUMENTS relating to the potential sale, assignment, license,

2 or other disposition of any rights relating to SUPERMAN and/or SUPERBOY,

3 including but not limited to any solicitation, offer, option, or proposed agreement.

4   12. All DOCUMENTS relating to the valuation of any past, current, or

5 potential ownership interest in SUPERMAN and/or SUPERBOY.

6   13. All DOCUMENTS relating to the introduction of YOU or the SIEGEL

7 HEIRS to any DEFENDANT.

8   14. All DOCUMENTS relating to the October 16, 2001

9 COMMUNICATION between Kevin Marks and John Schulman.

10   15. All DOCUMENTS relating to the October 19, 2002 letter from Kevin

11 Marks to John Schulman confirming that the SIEGEL HEIRS "accepted D.C.

12 Comics' offer of October 16, 2001."

13   16. All DOCUMENTS relating to the October 26, 2001 letter from DC

14 Comics to the SIEGEL HEIRS.

15   17. All DOCUMENTS relating to the November 29, 2001

16 COMMUNICATION between DEFENDANT Marc Toberoff and Kevin Marks

17 regarding the SIEGEL HEIRS' purported rights in SUPERMAN and/or

18 SUPERBOY.

19   18. All DOCUMENTS relating to the February 1, 2002 letter from Patrick

20 Perkins to the SIEGEL HEIRS.

21   19. All DOCUMENTS relating to the February 6, 2002

22 COMMUNICATION between DEFENDANT Marc Toberoff and Kevin Marks

23 regarding the SIEGEL HEIRS' purported rights in SUPERMAN and/or

24 SUPERBOY.

25   20. All DOCUMENTS relating to the February 2002 COMMUNICATION

26 between DEFENDANT Marc Toberoff and Warner Bros. executive Steven Spira

27 regarding the rights in SUPERMAN and/or SUPERBOY.

28

1       21.    All DOCUMENTS relating to the May 9, 2002 letter from

2   DEFENDANT Joanne Siegel to Time Warner Inc.

3       22.    All DOCUMENTS relating to the May 21, 2002 letter from Richard

4   Parsons of Time Warner Inc. to DEFENDANT Joanne Siegel.

5       23.    All DOCUMENTS relating to any solicitation, offer, or option from

6   any DEFENDANT regarding the purported rights of YOU or the SIEGEL HEIRS

7   in SUPERMAN and/or SUPERBOY.

8       24.    All DOCUMENTS relating to the September 21, 2002 letter from

9   YOU to Kevin Marks.

10      25.    All DOCUMENTS relating to the September 21, 2002 letter from

11  YOU to DC Comics.

12      26.    All DOCUMENTS relating to the letter agreement dated October 3,

13  2002 that YOU signed with DEFENDANT IP Worldwide, LLC, and any revisions,

14  modifications, or adjustments thereto.

15      27.    All DOCUMENTS relating to the October 28, 2002 letter from YOU

16  to Lillian Laserson of DC Comics.

17      28.    All DOCUMENTS relating to the Notice of Termination of Transfer

18  Covering Extended Renewal Term:  Superboy served on behalf of the SIEGEL

19  HEIRS on or around November 8, 2002.

20

21      Dated:  August 17, 2010              Respectfully submitted,

22                                           O'MELVENY & MYERS LLP

23

24      By: _____

                                             Daniel M. Petrocelli

25                                           Attorneys for Plaintiff DC Comics

26

27

28

# EXHIBIT N

1  DANIEL M. PETROCELLI (S.B. #97802)
     dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
     mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
     cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA 90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:   (310) 246-6779

7  (continued on next page)

8  Attorneys for Plaintiff DC Comics

9
                 UNITED STATES DISTRICT COURT
10
                 CENTRAL DISTRICT OF CALIFORNIA
11

12  DC COMICS,                          Case No. CV-10-3633 ODW (RZx)

13              Plaintiff,              **DISCOVERY MATTER**

14       v.                             **PLAINTIFF DC COMICS'
                                        NOTICE OF DEPOSITION OF
15  PACIFIC PICTURES                    MARK WARREN PEARY AND
    CORPORATION, IP WORLDWIDE,          REQUEST FOR PRODUCTION
16  LLC, IPW, LLC, MARC TOBEROFF,       OF DOCUMENTS**
    an individual, MARK WARREN
17  PEARY, as personal representative of  **Judge**:  Hon. Otis D. Wright II
    the ESTATE OF JOSEPH SHUSTER,       **Magistrate**:  Hon. Ralph Zarefsky
18  JOANNE SIEGEL, an individual,
    LAURA SIEGEL LARSON, an            Deposition Date:    October 13, 2010
19  individual, and DOES 1-10, inclusive,  Deposition Time:   9:00 a.m.

20              Defendants.

21

22

23

24

25

26

27

28
                                        NOTICE OF DEPOSITION OF DEFENDANT
                                        MARK WARREN PEARY AND REQUEST
                                        FOR PRODUCTION OF DOCUMENTS

                                        **521**

1    (continued from previous page)

2    PATRICK T. PERKINS (admitted *pro hac vice*)
         pperkins@ptplaw.com
3    PERKINS LAW OFFICE, P.C.
     1711 Route 9D
4    Cold Spring, NY 10516
     Telephone:  (845) 265-2820
5    Facsimile:   (845) 265-2819

6    Attorneys for Plaintiff DC Comics

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF DEPOSITION OF DEFENDANT
MARK WARREN PEARY AND REQUEST
FOR PRODUCTION OF DOCUMENTS

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure 30, the deposition upon oral examination of defendant Mark Warren Peary (the "Deponent") will be taken in the above-entitled action on October 13, 2010 starting at 9:00 a.m. and continuing over the course of one day until completed or otherwise adjourned. The deposition will be held at the Hilton Hotel, 100 Sandoval Street, Santa Fe, New Mexico 87501-2131. The deposition will be taken before a notary public or other officer authorized to administer oaths and will be recorded by stenographic, sound, and visual means.

PLEASE TAKE FURTHER NOTICE that, pursuant to Federal Rule of Civil Procedure 34, Deponent is requested to produce for inspection and copying all documents described in Attachment A to this Notice of Deposition, in accordance with the definitions contained therein, by no later than September 17, 2010.

This Notice of Deposition is being served on Deponent's counsel at the address shown on the accompanying Proof of Service.

Dated: August 17, 2010

Respectfully submitted,

O'MELVENY & MYERS LLP

By:_____

Daniel M. Petrocelli

Attorneys for Plaintiff DC Comics

NOTICE OF DEPOSITION OF DEFENDANT
MARK WARREN PEARY AND REQUEST
FOR PRODUCTION OF DOCUMENTS

1

# ATTACHMENT A

## DEFINITIONS AND INSTRUCTIONS

1.    "DOCUMENT" shall be interpreted in its broadest sense to include any and all "documents" and "other tangible things" as those terms are understood in Federal Rule of Civil Procedure 34, including, without limitation, any "writing," "recording," or "photograph" as those terms are defined in Federal Rule of Evidence 1001.  This shall include, but is not limited to:  e-mail, audio or video recordings, correspondence, letters, phone messages, notes, memoranda, facsimiles, publications, contracts, agreements, calendars, drafts of proposed contracts or agreements, papers, and photographs.

2.    "COMMUNICATION" means all written, electronic, oral, telephonic, gesture, or other transmission or exchange of information, including without limitation any inquiry, request, dialogue, discussion, conversation, interview, correspondence, letter, note, consultation, negotiation, agreement, understanding, meeting, e-mail, and all DOCUMENTS evidencing any verbal or nonverbal interaction between any individuals or entities.

3.    "REFER" or "RELATE" means, without limitation, evidence, reflect, summarize, constitute, contain, study, analyze, explain, mention, show, discuss, describe, or comment upon.

4.    "PERSON" means any natural person, firm, association, corporation, partnership, or other legal entity or organization separately identifiable, and any department(s) or division(s) therein.

5.    "YOU" or "YOUR" means Mark Warren Peary and the Estate of Joseph Shuster, and, as applicable, any PERSON acting on their behalf, including but not limited to their agents, employees, attorneys, and representatives.

6.    "DEFENDANT" or "DEFENDANTS" means, collectively and severally, any defendant in the above-entitled action, including YOU; Pacific Pictures Corporation; IP Worldwide, LLC; IPW, LLC; Marc Toberoff; Joanne

1    Siegel; and Laura Siegel Larson and, as applicable, any PERSON acting on their

2    behalf, including but not limited to their agents, employees, attorneys, and

3    representatives.

4        7.    "SHUSTER HEIRS" means, collectively and severally, YOU, Jean

5    Peavy, Dawn Peavy, Frank Shuster, or any other executor, administrator, heir,

6    relative, or representative of Joseph Shuster and, as applicable, any PERSON

7    acting on their behalf, including but not limited to their agents, employees,

8    attorneys, and representatives.

9        8.    "SIEGEL HEIRS" means, collectively and severally, Joanne Siegel,

10   Laura Siegel Larson, Dennis Larson, Michael Siegel, or any other executor,

11   administrator, heir, relative, or representative of Jerome Siegel and, as applicable,

12   any PERSON acting on their behalf, including but not limited to their agents,

13   employees, attorneys, and representatives.

14       9.    "SHUSTER" means Joseph Shuster and, as applicable, any PERSON

15   acting on his behalf, including but not limited to his agents, employees, attorneys,

16   heirs, and representatives.

17       10.   "SIEGEL" means Jerome Siegel and, as applicable, any PERSON

18   acting on his behalf, including but not limited to his agents, employees, attorneys,

19   heirs, and representatives.

20       11.   "SUPERMAN" means the Superman character as delineated in

21   literary works such as comic books, newspapers, novels, radio programs,

22   television programs, and motion pictures, and any of the works in which he

23   appears, including but not limited to *Action Comics. No. 1.*

24       12.   "SUPERBOY" means the Superboy character as delineated in

25   literary works such as comic books, newspapers, novels, radio programs,

26   television programs, and motion pictures, and any of the works in which he

27   appears, including but not limited to *More Fun Comics #101.*

28       13.   "INCLUDING" means "including, but not limited to."

NOTICE OF DEPOSITION OF DEFENDANT
MARK WARREN PEARY AND REQUEST
FOR PRODUCTION OF DOCUMENTS

14.    "Any" and "All" are interchangeable.

15.    The singular form includes the plural form, and vice versa.

16.    YOU are instructed to produce all DOCUMENTS that are responsive to these Requests and that are in YOUR possession, custody, or control.  A DOCUMENT is in YOUR "possession, custody, or control" if it is in YOUR physical possession, or if, as a practical matter, YOU have the ability, upon request, to obtain possession of the DOCUMENT or a copy thereof from another person or entity that has physical possession of the DOCUMENT.

17.    If any DOCUMENT or category of DOCUMENTS is not produced in full, please state with particularity the reason or reasons it is not being produced in full, and describe, to the best of YOUR knowledge, information and belief, and with as much particularity as possible, the DOCUMENT or portions of the DOCUMENT that are not being produced.

18.    Each DOCUMENT is to be produced as it is kept in the usual course of business, including all file folders, binders, notebooks, and other devices by which such DOCUMENTS may be organized or separated.

19.    If YOU withhold any DOCUMENT, or portion of a DOCUMENT, on grounds that it is protected from discovery by the attorney-client privilege, work-product doctrine, or other privilege or immunity from discovery, please set forth, for each DOCUMENT or portion of a DOCUMENT withheld:

    (a)    The place, approximate date, and manner of recording, creating or otherwise preparing the DOCUMENT;

    (b)    The names and organization position, if any, of each author, sender, and recipient of the DOCUMENT;

    (c)    A general description of the subject matter of the DOCUMENT;

    (d)    The basis of any claim of privilege; and

    (e)    If work-product is asserted, the proceeding for which the DOCUMENT was created.

NOTICE OF DEPOSITION OF DEFENDANT
MARK WARREN PEARY AND REQUEST
FOR PRODUCTION OF DOCUMENTS

20.    For any DOCUMENT or category of DOCUMENTS that was, but no longer is, in YOUR possession, custody or control, please describe each such DOCUMENT as completely as possible and provide the following information:

(a)    The reason the DOCUMENT is no longer in YOUR possession, custody or control;

(b)    The person or entity, if any, who has possession, custody or control or, if unknown, so state; and

(c)    If the DOCUMENT was destroyed or otherwise disposed of, state (i) the manner of disposal (*i.e.*, destruction, loss, discarding or other means of disposal); (ii) the date of disposal; (iii) the reason for disposal; (iv) the person authorizing disposal; (v) the person disposing of the DOCUMENT; and (vi) the name and address of the most recent custodian of the DOCUMENT.

21.    Each Request shall be construed independently and no Request shall be viewed as limiting the scope of any other Request.

22.    All responsive DOCUMENTS maintained or stored in electronic format shall be produced in native file format with all associated metadata preserved.  All responsive DOCUMENTS maintained in hard copy shall be produced in TIFF.

23.    The collection and production of DOCUMENTS shall be performed in a manner that ensures that the source of each DOCUMENTS may be determined, if necessary.

24.    DOCUMENTS attached to each other shall not be separated.

25.    These Requests impose a continuing obligation subsequent to YOUR initial production within thirty days of the service date of these Requests, or other date mutually agreed upon by the parties, to timely supplement YOUR response or production if YOU determine that YOUR response or production is incomplete or incorrect.

NOTICE OF DEPOSITION OF DEFENDANT
MARK WARREN PEARY AND REQUEST
FOR PRODUCTION OF DOCUMENTS

1          **DOCUMENT REQUESTS**

2          1.     All agreements between or among YOU and any DEFENDANT

3     regarding the SHUSTER HEIRS' purported rights in SUPERMAN and/or

4     SUPERBOY.

5          2.     All agreements between or among YOU and any DEFENDANT

6     regarding the SIEGEL HEIRS' purported rights in SUPERMAN and/or

7     SUPERBOY.

8          3.     All agreements between or among SHUSTER and SIEGEL regarding

9     any purported rights in SUPERMAN and/or SUPERBOY.

10          4.     All DOCUMENTS relating to or affecting the ability of YOU or the

11     SHUSTER HEIRS to negotiate or enter into agreements regarding SUPERMAN

12     and/or SUPERBOY.

13          5.     All DOCUMENTS relating to or affecting the ability of the SIEGEL

14     HEIRS to negotiate or enter into agreements regarding SUPERMAN and/or

15     SUPERBOY.

16          6.     All DOCUMENTS relating to or affecting the disposition, division, or

17     ownership of any rights in SUPERMAN and/or SUPERBOY.

18          7.     All DOCUMENTS relating to or affecting the division of revenue,

19     proceeds, or other profits regarding SUPERMAN and/or SUPERBOY.

20          8.     All DOCUMENTS relating to or affecting the division of any

21     settlement proceeds regarding SUPERMAN and/or SUPERBOY.

22          9.     All DOCUMENTS relating to the potential sale, assignment, license,

23     or other disposition of any rights relating to SUPERMAN and/or SUPERBOY,

24     including but not limited to any solicitation, offer, option, or proposed agreement.

25          10.     All DOCUMENTS relating to the valuation of any past, current, or

26     potential ownership interest in SUPERMAN and/or SUPERBOY.

27          11.     All DOCUMENTS relating to the introduction of YOU or the

28     SHUSTER HEIRS to any DEFENDANT.

12.    All DOCUMENTS relating to the introduction of the SIEGEL HEIRS to any DEFENDANT.

13.    All DOCUMENTS relating to the letter dated August 21, 1992 that Jean Peavy sent to Time Warner Inc.

14.    All DOCUMENTS relating to the letter dated September 10, 1992 that Frank Shuster sent to Paul Levitz of DC Comics.

15.    All DOCUMENTS relating to the agreement dated August 1, 1992 that Jean Peavy and Frank Shuster entered into with DC Comics.

16.    All DOCUMENTS relating to the letter dated July 10, 1993 that Jean Peavy sent to Paul Levitz of DC Comics.

17.    All DOCUMENTS relating to the letter dated September 14, 1993 that Jean Peavy sent to Paul Levitz of DC Comics.

18.    All DOCUMENTS relating to the letter dated April 27, 1995 that Jean Peavy sent to Paul Levitz of DC Comics.

19.    All DOCUMENTS relating to the letter agreement dated November 23, 2001 that YOU entered into with DEFENDANT Pacific Pictures Corporation.

20.    All DOCUMENTS relating to the letter agreement dated October 27, 2003 that YOU entered into with DEFENDANT Pacific Pictures Corporation.

21.    All DOCUMENTS relating to the letter dated September 10, 2004 that YOU signed with DEFENDANT Pacific Pictures Corporation.

//

//

//

//

//

//

//

//

NOTICE OF DEPOSITION OF DEFENDANT
MARK WARREN PEARY AND REQUEST
FOR PRODUCTION OF DOCUMENTS

1      22.    All DOCUMENTS relating to the Notice of Termination of Transfer

2    Covering Extended Copyright Renewal Term of "Superman" served on behalf of

3    the Estate of Joseph Shuster on or around November 10, 2003.

4

5         Dated:  August 17, 2010          Respectfully submitted,

6                                     O'MELVENY & MYERS LLP

7

8                                   By:_____

9                                       Daniel M. Petrocelli

10                               Attorneys for Plaintiff DC Comics

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF DEPOSITION OF DEFENDANT
MARK WARREN PEARY AND REQUEST
FOR PRODUCTION OF DOCUMENTS

# EXHIBIT O

AO 88A  (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the
District of New Mexico

| | | |
|---|---|---|
| DC COMICS, | ) | |
| *Plaintiff* | ) | Civil Action No. CV-10-3633 ODW (RZx) |
| v. | ) | |
| | ) | |
| PACIFIC PICTURES CORPORATION, et al., | ) | (If the action is pending in another district, state where:  Central |
| *Defendants* | ) | District of California) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:
   Jean Adele Peavy

   ☒ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization that is *not* a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: | Date and Time: |
|---|---|
| Hilton Hotel, 100 Sandoval Street, Santa Fe, New Mexico 87501-2131 | October 12, 2010 at 9:00 a.m. |

   The deposition will be recorded by this method:  Stenographic, sound, and visual means

   ☒ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:
   See attachment

   The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  August 17, 2010

|  | | |
|---|---|---|
| *CLERK OF COURT* | | |
| _____ | OR | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |
| | | Daniel M. Petrocelli |

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*  Plaintiff DC Comics
_____ , who issues or requests this subpoena, are:
DANIEL M. PETROCELLI, MATTHEW T. KLINE, and CASSANDRA L. SETO, O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor, Los Angeles, CA 90067-6035
Telephone:  (310) 553-6700; E-Mail:  dpetrocelli@omm.com; mkline@omm.com; cseto@omm.com

American LegalNet, Inc.
www.FormsWorkFlow.com

AO 88A  (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. CV-10-3633 ODW (RZx)

# PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 _____

I declare under penalty of perjury that this information is true.

Date: _____        _____

                                                                    *Server's signature*

                                            _____

                                                                    *Printed name and title*

                                            _____

                                                                    *Server's address*

Additional information regarding attempted service, etc:


American LegalNet, Inc.
www.FormsWorkFlow.com

AO 88A  (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

 **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

 **(2)** *Command to Produce Materials or Permit Inspection.*

 **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

 **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

 **(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

 **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3)** *Quashing or Modifying a Subpoena.*

 **(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

 **(i)** fails to allow a reasonable time to comply;

 **(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

 **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

 **(iv)** subjects a person to undue burden.

 **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

 **(i)** disclosing a trade secret or other confidential research, development, or commercial information;

 **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

 **(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

 **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

 **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

 **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

 **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

 **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

 **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

 **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

 **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2)** *Claiming Privilege or Protection.*

 **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

 **(i)** expressly make the claim; and

 **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

 **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).



# ATTACHMENT TO SUBPOENA
## DEFINITIONS AND INSTRUCTIONS

1.    "DOCUMENT" shall be interpreted in its broadest sense to include any and all "documents" and "other tangible things" as those terms are understood in Federal Rule of Civil Procedure 34, including, without limitation, any "writing," "recording," or "photograph" as those terms are defined in Federal Rule of Evidence 1001.  This shall include, but is not limited to:  e-mail, audio or video recordings, correspondence, letters, phone messages, notes, memoranda, facsimiles, publications, contracts, agreements, calendars, drafts of proposed contracts or agreements, papers, and photographs.

2.    "COMMUNICATION" means all written, electronic, oral, telephonic, gesture, or other transmission or exchange of information, including without limitation any inquiry, request, dialogue, discussion, conversation, interview, correspondence, letter, note, consultation, negotiation, agreement, understanding, meeting, e-mail, and all DOCUMENTS evidencing any verbal or nonverbal interaction between any individuals or entities.

3.    "REFER" or "RELATE" means, without limitation, evidence, reflect, summarize, constitute, contain, study, analyze, explain, mention, show, discuss, describe, or comment upon.

4.    "PERSON" means any natural person, firm, association, corporation, partnership, or other legal entity or organization separately identifiable, and any department(s) or division(s) therein.

5.    "YOU" or "YOUR" means Jean Adele Peavy and, as applicable, any PERSON acting on her behalf, including but not limited to her agents, employees, attorneys, and representatives.

535

6.    "DEFENDANT" or "DEFENDANTS" means, collectively and severally, any defendant in the above-entitled action, including Pacific Pictures Corporation; IP Worldwide, LLC; IPW, LLC; Marc Toberoff; Mark Warren Peary, on behalf of the Estate of Joseph Shuster; Joanne Siegel; and Laura Siegel Larson and, as applicable, any PERSON acting on their behalf, including but not limited to their agents, employees, attorneys, and representatives.

7.    "SHUSTER HEIRS" means, collectively and severally, YOU, the Estate of Joseph Shuster, Mark Peary, Dawn Peavy, Frank Shuster, or any other executor, administrator, heir, relative, or representative of Joseph Shuster and, as applicable, any PERSON acting on their behalf, including but not limited to their agents, employees, attorneys, and representatives.

8.    "SIEGEL HEIRS" means, collectively and severally, Joanne Siegel, Laura Siegel Larson, Dennis Larson, Michael Siegel, or any other executor, administrator, heir, relative, or representative of Jerome Siegel and, as applicable, any PERSON acting on their behalf, including but not limited to their agents, employees, attorneys, and representatives.

9.    "SHUSTER" means Joseph Shuster and, as applicable, any PERSON acting on his behalf, including but not limited to his agents, employees, attorneys, heirs, and representatives.

10.    "SIEGEL" means Jerome Siegel and, as applicable, any PERSON acting on his behalf, including but not limited to his agents, employees, attorneys, heirs, and representatives.

11.    "SUPERMAN" means the Superman character as delineated in literary works such as comic books, newspapers, novels, radio programs, television programs, and motion pictures, and any of the works in which he appears, including but not limited to *Action Comics. No. 1.*

12.    "SUPERBOY" means the Superboy character as delineated in literary works such as comic books, newspapers, novels, radio programs, television programs, and motion pictures, and any of the works in which he appears, including but not limited to *More Fun Comics #101*.

13.    "INCLUDING" means "including, but not limited to."

14.    "Any" and "All" are interchangeable.

15.    The singular form includes the plural form, and vice versa.

16.    YOU are instructed to produce all DOCUMENTS that are responsive to these Requests and that are in YOUR possession, custody, or control. A DOCUMENT is in YOUR "possession, custody, or control" if it is in YOUR physical possession, or if, as a practical matter, YOU have the ability, upon request, to obtain possession of the DOCUMENT or a copy thereof from another person or entity that has physical possession of the DOCUMENT.

17.    If any DOCUMENT or category of DOCUMENTS is not produced in full, please state with particularity the reason or reasons it is not being produced in full, and describe, to the best of YOUR knowledge, information and belief, and with as much particularity as possible, the DOCUMENT or portions of the DOCUMENT that are not being produced.

18.    Each DOCUMENT is to be produced as it is kept in the usual course of business, including all file folders, binders, notebooks, and other devices by which such DOCUMENTS may be organized or separated.

19.    If YOU withhold any DOCUMENT, or portion of a DOCUMENT, on grounds that it is protected from discovery by the attorney-client privilege, work-product doctrine, or other privilege or

immunity from discovery, please set forth, for each DOCUMENT or portion of a DOCUMENT withheld:

(a)    The place, approximate date, and manner of recording, creating or otherwise preparing the DOCUMENT;

(b)    The names and organization position, if any, of each author, sender, and recipient of the DOCUMENT;

(c)    A general description of the subject matter of the DOCUMENT;

(d)    The basis of any claim of privilege; and

(e)    If work-product is asserted, the proceeding for which the DOCUMENT was created.

20.    For any DOCUMENT or category of DOCUMENTS that was, but no longer is, in YOUR possession, custody or control, please describe each such DOCUMENT as completely as possible and provide the following information:

(a)    The reason the DOCUMENT is no longer in YOUR possession, custody or control;

(b)    The person or entity, if any, who has possession, custody or control or, if unknown, so state; and

(c)    If the DOCUMENT was destroyed or otherwise disposed of, state (i) the manner of disposal (*i.e.*, destruction, loss, discarding or other means of disposal); (ii) the date of disposal; (iii) the reason for disposal; (iv) the person authorizing disposal; (v) the person disposing of the DOCUMENT; and (vi) the name and address of the most recent custodian of the DOCUMENT.

21.    Each Request shall be construed independently and no Request shall be viewed as limiting the scope of any other Request.

22.    All responsive DOCUMENTS maintained or stored in electronic format shall be produced in native file format with all associated

metadata preserved. All responsive DOCUMENTS maintained in hard copy shall be produced in TIFF.

23.    The collection and production of DOCUMENTS shall be performed in a manner that ensures that the source of each DOCUMENTS may be determined, if necessary.

24.    DOCUMENTS attached to each other shall not be separated.

25.    These Requests impose a continuing obligation subsequent to YOUR initial production within thirty days of the service date of these Requests, or other date mutually agreed upon by the parties, to timely supplement YOUR response or production if YOU determine that YOUR response or production is incomplete or incorrect.

## DOCUMENT REQUESTS

1.    All agreements between or among YOU and any DEFENDANT regarding the SHUSTER HEIRS' purported rights in SUPERMAN and/or SUPERBOY.

2.    All agreements between or among YOU and any DEFENDANT regarding the SIEGEL HEIRS' purported rights in SUPERMAN and/or SUPERBOY.

3.    All agreements between or among SHUSTER and SIEGEL regarding any purported rights in SUPERMAN and/or SUPERBOY.

4.    All DOCUMENTS relating to or affecting the ability of YOU or the SHUSTER HEIRS to negotiate or enter into agreements regarding SUPERMAN and/or SUPERBOY.

5.    All DOCUMENTS relating to or affecting the ability of the SIEGEL HEIRS to negotiate or enter into agreements regarding SUPERMAN and/or SUPERBOY.

6.    All DOCUMENTS relating to or affecting the disposition, division, or ownership of any rights in SUPERMAN and/or SUPERBOY.

7.    All DOCUMENTS relating to or affecting the division of revenue, proceeds, or other profits regarding SUPERMAN and/or SUPERBOY.

8.    All DOCUMENTS relating to or affecting the division of any settlement proceeds regarding SUPERMAN and/or SUPERBOY.

9.    All DOCUMENTS relating to the potential sale, assignment, license, or other disposition of any rights relating to SUPERMAN and/or SUPERBOY, including but not limited to any solicitation, offer, option, or proposed agreement.

10.    All DOCUMENTS relating to the valuation of any past, current, or potential ownership interest in SUPERMAN and/or SUPERBOY.

11.    All DOCUMENTS relating to the introduction of YOU or the SHUSTER HEIRS to any DEFENDANT.

12.    All DOCUMENTS relating to the introduction of the SIEGEL HEIRS to any DEFENDANT.

13.    All DOCUMENTS relating to the letter dated August 21, 1992 that YOU sent to Time Warner Inc.

14.    All DOCUMENTS relating to the letter dated September 10, 1992 that Frank Shuster sent on YOUR behalf to Paul Levitz of DC Comics.

15.    All DOCUMENTS relating to the agreement dated August 1, 1992 that YOU entered into with DC Comics.

16.    All DOCUMENTS relating to the letter dated July 10, 1993 that YOU sent to Paul Levitz of DC Comics.

17.    All DOCUMENTS relating to the letter dated September 14, 1993 that YOU sent to Paul Levitz of DC Comics.

**540**

18.    All DOCUMENTS relating to the letter dated April 27, 1995 that YOU sent to Paul Levitz of DC Comics.

19.    All DOCUMENTS relating to the letter agreement dated November 23, 2001 that YOU entered into with DEFENDANT Pacific Pictures Corporation.

20.    All DOCUMENTS relating to the letter agreement dated October 27, 2003 that YOU entered into with DEFENDANT Pacific Pictures Corporation.

21.    All DOCUMENTS relating to the letter dated September 10, 2004 that YOU signed with DEFENDANT Pacific Pictures Corporation.

22.    All DOCUMENTS relating to the Notice of Termination of Transfer Covering Extended Copyright Renewal Term of "Superman" served on behalf of the Estate of Joseph Shuster on or around November 10, 2003.

# EXHIBIT P

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

September 2, 2010

OUR FILE NUMBER
905,900-321

## VIA E-MAIL AND U.S. MAIL

WRITER'S DIRECT DIAL
(310) 246-6850

Laura Brill
Kendall Brill & Klieger LLP
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 2720
Los Angeles, California 90067

Re:    _DC Comics v. Pacific Pictures Corp. et al._, CV-10-3633 (ODW) (RZx)

Dear Counsel:

Following up on our telephone conference earlier today and having reviewed Laura's letter, below is our proposal for addressing the pending issues:

1.    We will agree to reschedule the depositions noticed to date for late October/early November.

2.    We will file our amended complaint tomorrow.  Assuming you intend to go forward with your dispositive motions, you will file them to be heard on October 18, leaving us sufficient time to respond within the time established by the Rules.

3.    You will serve your responses to the document requests appended to the deposition notices on September 17.  We will meet and confer on the disputed issues in the ensuing week, and any motions, such as a motion by us to initiate/compel discovery and a motion by you for a protective order, will be briefed and set to be heard by Magistrate Zarefsky on October 25.

4.    Magistrate Zarefsky will proceed to hear your motion regarding the Toberoff Timeline on September 20, as scheduled.

543

O'MELVENY & MYERS LLP
September 2, 2010 - Page 2


I tried calling to discuss this with you, but could not reach either of you.  Please let us hear back from you right away.


Very truly yours,


Daniel M. Petrocelli
of O'MELVENY & MYERS LLP

# EXHIBIT Q



writer's direct:
310.272.7922
lbrill@kbkfirm.com

September 2, 2010

**<u>VIA ELECTRONIC MAIL</u>**

Daniel Petrocelli
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067
dpetrocelli@omm.com

Re:     DC Comics v. PPC

Dear Dan:

Thank you for your letter of this afternoon.  I was on another call when you tried me earlier.

We appreciate your proposal, but we think it still does not resolve the problem of burdening the parties and Judge Zarefsky with motions on largely hypothetical issues that may be immediately mooted by Judge Wright's decisions on the dispositive motions.

Specifically, by requiring that motions for a protective order concerning the document production and depositions be heard on October 25, your proposal would require the parties to file discovery motions on October 4, 2010, or before the October 18, 2010 hearing on the dispositive motions that could resolve many of the issues.  Accordingly, the parties would have no opportunity to meet and confer following the hearing on these issues, and may be forced into filing motions that are entirely unnecessary.  Moreover, since we do not yet know what the disputed issues will be concerning the document production, your proposed schedule may not allow sufficient time to meet and confer and get necessary motions on file concerning those issues.

We would propose, as an alternative, that DC take off calendar the currently scheduled depositions, that the parties meet and confer regarding discovery during the week of October 18, after the hearing before Judge Wright, and, if the parties are unable to resolve any disputes, that they thereafter promptly move either to compel discovery or for a protective order, as they deem necessary.  We would also discuss a schedule for briefing and hearing of the discovery motions, including the possibility of expediting the schedule.  DC would schedule any depositions for dates following the hearing on these motions.

As to your currently pending motion to initiate discovery, if you would like to take that discovery motion off calendar, as implied in your letter, that is your choice, but we wish to be clear that we are not asking you to do so as part of any agreement.  We believe that the motion was frivolous, that it should never have been filed, and that we should not have been put to the substantial burden and expense of opposing.  Defendants reserve all rights with respect to

**Kendall Brill & Klieger LLP**
10100 Santa Monica Blvd.   Suite 1725  Los Angeles, CA 90067   telephone 310.556.2700   facsimile 310.556.2705   www.kbkfirm.com

**546**

Kendall Brill & Klieger LLP

September 2, 2010
Page 2

recovering the attorneys' fees that this firm and Mr. Toberoff's firm expended in connection with opposing that motion.

Sincerely,

*[signature]*

Laura W. Brill

cc:     Richard Kendall
        Marc Toberoff

# EXHIBIT R

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

September 2, 2010

**VIA E-MAIL AND U.S. MAIL**

Laura Brill
Kendall Brill & Klieger LLP
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California 90067

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 2720
Los Angeles, California 90067

OUR FILE NUMBER
905,900-321

WRITER'S DIRECT DIAL
(310) 246-6850

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Re:    *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Counsel:

    We believe our proposal fairly satisfied the issues you identified. Your proposal would require further substantial delay in commencing discovery. Therefore, we decline it.

Very truly yours,

Daniel M. Petrocelli
of O'MELVENY & MYERS LLP

**549**

# EXHIBIT S

**From:** "Kline, Matthew" <MKline@OMM.com>
**Date:** August 28, 2010 2:45:36 PM MDT
**To:** Richard Kendall <rkendall@kbkfirm.com>
**Cc:** "Petrocelli, Daniel" <DPetrocelli@OMM.com>
**Subject: PPC Case**

Dick,

This is to follow up on some pending items, including your voicemail of Friday.  I've been out of the office and will be travelling for business on Monday, but we will aim to speak to you early next week about the "consent agreements" issue.


As for Laura's latest emails, we disagree and see no need to respond further.

As for our complaint, we intend to amend.  As we said in our August 16 call, we will not drop or add any claims for relief, but will augment the pleading to address issues raised in your motions.  We'd like 5 extra days (3 over the holiday weekend) until September 8 to do so to accommodate Dan's vacation, plus the fact that we'll also be responding to Marc's Rule 54 motion on Friday.  Please let us know right away if this is acceptable so that we do not have to trouble the Court.  As Marc and you know, we have accommodated requests for extensions, and the Court strongly admonished counsel to cooperate on extending reasonable courtesies:

"This kind of thing, you know, little tit for tat, this arguing about a day here, a day there and cooperate with me in granting me, you know, one more day to provide an opposition, all the rest of that which I really think falls under the category of extending professional courtesies to one another -- the case, certainly a case of this magnitude, does not turn on that foolishness, nor will I permit it to turn on that foolishness."

Thanks,

Matt

**551**

# EXHIBIT T

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON

* ALSO ADMITTED IN NEW YORK

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

July 14, 2006

Via U.S. Mail & Facsimile (845) 265-2819

Patrick Perkins, Esq.
Perkins Law Office, PC
1711 Route 9D
Cold Spring, New York 10516

Re: Jean Shuster Peavy and Mark Peary

Dear Patrick:

Enclosed please find the following documents from Jean Shuster Peavy and Mark Peary numbered 1-8 responsive to Defendants' April 10, 2006 deposition subpoenas. We expressly reserve the right to supplement this production.

Very truly yours,

Marc Toberoff

cc:   Michael Bergman, Esq.
      James D. Weinberger, Esq.

553

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON

* ALSO ADMITTED IN NEW YORK

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

August 14, 2006

<u>Via Facsimile (845) 265-2819</u>

Patrick Perkins, Esq.
Perkins Law Office, P.C.
1711 Route 9D
Cold Spring, New York 10516

<u>Re: Warren Peary and Jean Peavy Document Production</u>

Dear Patrick:

Enclosed please find an additional document produced by Warren Peary and Jean Peavy
bates numbered 134- 137.

Very truly yours,

Nicholas C. Williamson

# EXHIBIT U

1   DANIEL M. PETROCELLI (S.B. #97802)
      dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA 90067-6035
    Telephone: (310) 553-6700
6   Facsimile: (310) 246-6779

FILED
CLERK, U.S. DISTRICT COURT

MAY 1 4 2010
10:23 am

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

7   Attorneys for Plaintiff DC COMICS

8
9                   UNITED STATES DISTRICT COURT

10                 CENTRAL DISTRICT OF CALIFORNIA

JHN SSx
CV 10 3633

10

11  DC COMICS,                          Case No.

12              Plaintiff,              **COMPLAINT FOR**:

13      v.                              (1)  Declaratory Relief re: Invalidity of
                                             Copyright Termination Notice;
14  PACIFIC PICTURES
    CORPORATION, IP                     (2)  Declaratory Relief re: Scope of
15  WORLDWIDE, LLC, IPW, LLC,                Copyright Termination Notice;
    MARC TOBEROFF, an individual,
16  MARK WARREN PEARY, as               (3)  Declaratory Relief re: DC Comics
    personal representative of the           Period of Exclusivity re: Shuster;
17  ESTATE OF JOSEPH SHUSTER,
    JOANNE SIEGEL, an individual,       (4)  Interference with 1992 Shuster
18  LAURA SIEGEL LARSON, an                  Agreement;
    individual, and DOES 1-10,
19  inclusive,                          (5)  Interference with Prospective
                                             Economic Advantage re: Siegel-
20              Defendants.                 DC Comics Agreement; and

21                                      (6)  Declaratory Relief re: Invalidity of
                                             Copyright Assignment and
22                                           Consent Agreements

23                                      **DEMAND FOR JURY TRIAL**

24

25

26

27

28

# I.  STATEMENT OF THE CASE

1.      This lawsuit challenges a scheme by Marc Toberoff and companies under his control to violate the U.S. Copyright Act and other laws by trafficking in federal copyright interests and interfering with contractual rights and other interests of plaintiff DC Comics related to the iconic property "Superman."[1]  By this scheme, Toberoff has sought to enrich himself by wrongfully laying claim to purported rights to control the exploitation of Superman to the substantial detriment of DC Comics and in violation of rights it has held, significantly invested in, and expanded upon for over 70 years.  DC Comics brings this suit to confirm its rights to the Superman property and seek redress for the wrongful conduct of Toberoff and entities he controls.  This Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. §§ 1331, 1338, and 1367, under the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, and under the Court's supplemental jurisdiction.

2.      Under certain narrowly defined circumstances, the Copyright Act permits authors and specified heirs to terminate copyright grants and recapture those interests from the original grantees.  These provisions of the Copyright Act also protect original grantees—such as DC Comics—by confining termination rights to certain classes of individuals in a specified time frame and manner, limiting the types of works that may be terminated, and creating an exclusive statutory period during which only the original grantee may enter into new agreements with the author or heirs to continue creating new works under the recaptured copyrights.

3.      In derogation of these provisions of the Copyright Act and the rights of DC Comics, Toberoff and entities he controls orchestrated a web of collusive agreements concerning the Superman copyrights with the heirs to the co-creators of

---

[1] Throughout this introductory statement and in other parts of the Complaint, the term "DC Comics" is used as shorthand for both DC Comics and its predecessors in interest.  The specific identities of relevant corporate entities are identified *infra*.

COMPLAINT

Superman, Jerome Siegel and Joseph Shuster.  By these agreements, Toberoff purported to secure a majority and controlling financial stake in copyright interests in Superman assertedly held by the Siegel and Shuster heirs and preclude the heirs from freely entering into new agreements with DC Comics for the continued exploitation of Superman.  As detailed below, these agreements are unlawful under the copyright laws, are void as against public policy, and both violate DC Comics' rights and threaten the ongoing viability of the Superman property.

4.      During their lifetimes, Jerry Siegel and Joe Shuster—both well aware of the termination provisions in amendments to the Copyright Act—never once sought to terminate any of DC Comics' copyright interests.  Instead, Siegel and Shuster rightly honored their agreements with DC Comics, under which they and their families enjoyed lifetime compensation and other benefits.  After their deaths, Siegel and Shuster's heirs reached similar agreements with DC Comics—the Shuster heirs in 1992, and the Siegel heirs in 2001.  These agreements provided the heirs substantial compensation and fully and finally resolved any claims of termination to any rights in Superman and confirmed that DC Comics owned all right, title, and interest in and to Superman.

5.      In or about 2001, Toberoff learned of these agreements between DC Comics and the Siegel and Shuster heirs and engineered a course of conduct to induce the heirs to repudiate those agreements, file invalid and erroneous copyright termination notices, and enter into new agreements with Toberoff and his companies netting him the controlling stake in the heirs' asserted interests in Superman.

6.      Toberoff induced the Shuster heirs to repudiate their 1992 agreement with DC Comics and enter into a 50/50 joint venture with defendant Pacific Pictures Corporation, a company wholly owned and controlled by Toberoff, pursuant to which the heirs conveyed the entirety of their purported Superman copyright termination rights to the venture.  The stated purpose of the venture was

- 2 -

COMPLAINT

1   to secure and exploit DC Comics' copyright interest in Superman.  Toberoff

2   procured this joint-venture agreement even though he knew that the Shusters' 1992

3   agreement with DC Comics operated to grant any and all of the heirs' interest in

4   Superman to DC Comics and extinguish any termination rights the heirs might have

5   held.  Toberoff also induced the Shuster heirs to serve a notice of termination

6   purporting to terminate and recapture alleged interests they had granted to DC

7   Comics under the parties' 1992 agreement.  This termination notice was invalid:

8   among other defects, it was filed by a party lacking the necessary majority interest

9   to terminate.  Furthermore, any putative right to terminate held by Joe Shuster

10  ceased to exist when he died having elected not to exercise it during his lifetime and

11  having died without leaving a surviving spouse, child, or grandchild to inherit and

12  exercise it.

13      7.     Toberoff similarly induced the Siegel heirs to repudiate their 2001

14  agreement with DC Comics.  After years of negotiations following a termination

15  notice sent by the Siegel heirs in 1997, DC Comics and the Siegel heirs reached an

16  agreement providing that DC Comics would retain all rights to Superman and

17  entitling the Siegels to receive a significant portion of the Superman profits.

18      8.     Toberoff became aware of the existence of the 2001 agreement

19  between the Siegels and DC Comics and understood it diminished his stake in the

20  putative Superman rights held by his joint venture with the Shusters.  In pursuit of

21  his plan to corner and control all potential Superman termination rights and thereby

22  block further exploitation of the property by DC Comics, Toberoff set out to derail

23  the 2001 Siegel agreement.  Among other things, Toberoff falsely represented to

24  the Siegels that if they repudiated their agreement with DC Comics and entered into

25  an agreement with him instead, a "billionaire investor" was prepared immediately

26  to pay the Siegels $15 million for their Superman rights, plus a generous back-end

27  profit participation in any future exploitations of the Superman property.  Toberoff

28  also falsely represented that he would help the Siegels produce their own Superman

COMPLAINT

559

1   motion picture that would compete successfully with a Superman motion picture

2   that Warner Bros.—DC Comics' licensee—was then developing.  Based on

3   Toberoff's inducements, the Siegels repudiated their 2001 agreement with DC

4   Comics, terminated the employment of their then-law firm Gang, Tyre, Ramer &

5   Brown, and entered into agreements with Toberoff and defendant IP Worldwide

6   LLC, an entity controlled by Toberoff.  Under these agreements, Toberoff and his

7   company received a 45% interest in any recovery by the Siegels—an 800% increase

8   over the 5% fee in the Siegels' agreement with the Gang Tyre firm.

9        9.    As a result of his arrangements with both the Shuster and Siegel heirs,

10  Toberoff secured control of the largest financial stake in the collective, putative

11  Superman termination rights (*i.e.*, Toberoff—47.5%; Siegel heirs—27.5%; Shuster

12  heirs—25%).  Toberoff sought further control, however.  In order to assert that DC

13  Comics had *no* further rights to exploit the derivative Superman character

14  "Superboy"—including in the highly popular *Smallville* network television series—

15  Toberoff manufactured the position that Jerry Siegel *alone*—to the exclusion of

16  Shuster—was the sole creator of Superboy.  Toberoff did so with full knowledge

17  that his 2001 agreement with the Shusters explicitly confirmed the *Shusters'*

18  asserted joint rights in Superboy, consistent with the long-held view of Shuster,

19  Siegel, and their heirs that Superboy was jointly created by Shuster and Siegel.[2]

20       10.   Despite these incontestable facts concerning Superboy's creation—

21  facts which Joe Shuster, Jerry Siegel, their heirs, and even Toberoff and his

22  companies ratified and affirmed over time—Toberoff caused to be filed in 2002, on

23  behalf of the Siegels, a copyright termination notice falsely stating that Siegel was

24  the *sole* creator of Superboy.  He then induced the Shusters in 2003 to amend their

25  joint venture agreement with Pacific Pictures to *delete* all references to Superboy.

26

27
      [2] As explained below, DC Comics fully agrees that Shuster and Siegel jointly contributed to Superboy.  It is DC Comics' position, however, that Superboy is a work entirely derivative of Superman and that Superboy is not subject to

28  termination under the Copyright Act's termination regime.

COMPLAINT

The deletion of Superboy was directly contrary to the Shusters' interests and occurred solely to park *all* of the alleged Superboy rights with the Siegels. Having manipulated the Superboy rights in favor of the Siegels, and directly contrary to copyright filings that the Siegels and Shusters had previously made, Toberoff then filed a termination notice on behalf of the Shusters that purported to terminate only Superman rights, leaving out all mention of Superboy. These artifices positioned the Siegels to claim 100% ownership of Superboy in order to bring a copyright infringement claim against DC Comics, Warner Bros., and the *Smallville* series, which they filed in 2004—and which remains pending today.

11.    Yet another component of Toberoff's scheme to gain complete control over the heirs to the putative Superman termination rights was preventing the Siegel and Shuster heirs from freely entering into agreements with DC Comics—even if it was in their respective economic interest to do so. In violation of DC Comics' statutory period of exclusivity under the copyright laws, Toberoff induced the Siegels and Shusters to enter into agreements transferring their respective interests to his companies and preventing them from conveying any rights to DC Comics without each other's—and Toberoff's—consent. As a result of these illicit agreements, DC Comics has been deprived of its ability to enter into agreements with the heirs to secure their purported termination rights, in violation of the Copyright Act, other laws, and public policy promoting the free and fair settlement of legal claims.

12.    To protect its rights under the copyright laws, agreements, and interests with the Siegels and Shusters and remove the cloud that Toberoff's actions have unlawfully placed over the Superman property and its future, DC Comics brings this action to seek declaratory judgments and other relief as set forth below.

## II. PARTIES

13.    Plaintiff DC COMICS ("DC Comics") is a general partnership organized and existing under the laws of the State of New York and has its

COMPLAINT

561

1   principal place of business in the State of New York.  DC Comics is the successor-

2   in-interest to all rights, including rights under copyright, relating to the Superman

3   works and character.

4       14.    Defendant PACIFIC PICTURES CORPORATION ("Pacific

5   Pictures") is a New York corporation organized under the laws of the State of New

6   York, and was registered as a foreign corporation doing business in the State of

7   California, with its principal place of business in the State of California and the

8   County of Los Angeles.  Upon information and belief, Toberoff is the sole

9   shareholder and registered agent for service of process of Pacific Pictures.  Upon

10  information and belief, Pacific Pictures forfeited its active status as a New York

11  corporation and as a registered foreign corporation in California as of early 2009.

12      15.    Defendant IP WORLDWIDE, LLC ("IP Worldwide") is a Delaware

13  limited liability company organized and existing under the laws of the State of

14  Delaware, and registered as a foreign entity doing business in the State of

15  California, which has its principal place of business in the State of California and

16  the County of Los Angeles.  Upon information and belief, Toberoff is the managing

17  and controlling member of IP Worldwide and owns the controlling interest therein.

18      16.    Defendant IPW, LLC ("IPW") is a California limited liability

19  company organized and existing under the laws of the State of California, which

20  has its principal place of business in the State of California and the County of Los

21  Angeles.  Upon information and belief, Toberoff is the managing and controlling

22  member of IPW, is its registered agent for service of process, and owns the

23  controlling interest in IPW.  Upon information and belief, IPW is a successor-in-

24  interest to all or part of IP Worldwide's interests.

25      17.    Defendant MARC TOBEROFF ("Toberoff") is an individual who

26  resides in the County of Los Angeles in the State of California, and upon

27  information and belief, is and at all times has been a citizen of the United States.

28

COMPLAINT

**562**

Upon information and belief, Toberoff is a shareholder and member of defendants PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; and IPW, LLC.

18.    Defendant MARK WARREN PEARY ("Mark Peary" or "Peary") is an individual who resides in the State of New Mexico and is, and at all times has been, a citizen of the United States.  Peary is the nephew of Joseph Shuster, and a California court appointed him as the personal representative of the Shuster Estate.

19.    Defendant ESTATE OF JOSEPH SHUSTER ("Shuster Estate") is a probate estate established by the Los Angeles Superior Court on August 25, 2003 (Case No. BP-080635).

20.    Defendant JOANNE SIEGEL ("Joanne Siegel") is an individual who resides in the County of Los Angeles in the State of California and is, and at all times has been, a citizen of the United States.  Joanne Siegel is the widow of Jerome Siegel.

21.    Defendant LAURA SIEGEL LARSON ("Laura Siegel Larson") is an individual who resides in the County of Los Angeles in the State of California and is, and at all times has been, a citizen of the United States.  Laura Siegel Larson is the daughter of Jerome Siegel and Joanne Siegel.

22.    Upon information and belief, Toberoff is, and at all relevant times has been, the sole shareholder and principal of Pacific Pictures and a member and principal of IP Worldwide and IPW.  Upon information and belief, Toberoff is the alter ego of Pacific Pictures, IP Worldwide, and IPW, in that there is, and at all relevant times has been, such unity of interest between Toberoff, Pacific Pictures, IP Worldwide, and IPW that any individuality and separateness between them did not and does not exist, and adherence to the fiction of the independent and separate existence of Pacific Pictures, IP Worldwide, and IPW distinct from each other and Toberoff would promote injustice and inequity.

23.    Upon information and belief, the fictitiously-named DOES 1-10 are in some manner responsible for the events giving rise to the claims set forth herein.

- 7 -

1  The true names and capacities of such fictitiously-named defendants, whether

2  individual, corporate, or otherwise, are presently unknown to DC Comics.  DC

3  Comics will amend this Complaint to assert the true names and capacities of such

4  fictitiously-named defendants when this information has been ascertained.  Each

5  reference herein to a named defendant shall also refer to DOES 1-10.

6  ### III.  JURISDICTION AND VENUE

7  24.    As noted, the Court has subject matter jurisdiction over the claims set

8  forth herein pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.  The Court has original

9  jurisdiction over DC Comics' claims arising under the Copyright Act and

10  supplemental jurisdiction over its related state-law claims.

11  25.    The Court has personal jurisdiction over defendants, *inter alia*,

12  because a substantial part of the events giving rise to the claims set forth herein

13  occurred in the State of California and the defendants have extensive contacts with

14  the State, including the following:

15  a.    Defendants Marc Toberoff, the Shuster Estate, and Peary

16  established a joint venture in California under California law for the

17  purpose of terminating and recapturing prior grants of the copyrights at

18  issue in this action.

19  b.    On behalf of the Shuster Estate, Peary filed a probate action in

20  Los Angeles Superior Court—which, upon information and belief,

21  remains pending—in order to effectuate the purpose of the California

22  joint venture.  A California court appointed Peary as executor of the

23  Shuster Estate, and Peary serves in that capacity as a matter of

24  California law.  In that capacity, Peary served one of the copyright

25  termination notices at issue in this action.

26  c.    Upon information and belief, defendants Pacific Pictures and IP

27  Worldwide are foreign entities registered as doing business in the State

28  of California, and they have their principal places of business and are

COMPLAINT

**564**

headquartered in the State of California and the County of Los Angeles.

d.      Upon information and belief, defendant IPW is a California limited liability company organized and existing under the laws of the State of California and has its principal place of business and headquarters in the State of California and the County of Los Angeles.

e.      Defendants Toberoff, Joanne Siegel, and Laura Siegel Larson reside and conduct business in the State of California and the County of Los Angeles.

f.      Defendants Joanne Siegel and Laura Siegel Larson filed two related actions against DC Comics in this District and Court to resolve ownership of the rights in Superman and Superboy.  (Case Nos. CV-04-8400 ODW, CV-04-8776 ODW).

26.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Defendants are subject to personal jurisdiction in this District, and a substantial part of the events giving rise to the claims set forth herein occurred in this District.

## IV.  FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.  DC Comics' Development of Superman

27.      In the 1930s, Jerome Siegel (a story writer in Cleveland) and Joseph Shuster (an illustrator, and Siegel's peer) conceived of a fictional character named "Superman," whom they originally envisioned as a criminal mastermind, and then reconceived as a hero fighting for social justice.  Aside from the name, the character shared little similarity with the figure that would later become known throughout the world as Superman.  Between 1933 and 1937, Siegel and Shuster submitted the Superman comic strips to a number of prospective publishers and newspaper syndicates, all of which rejected them.

28.      A company that would come to be known as DC Comics—and for whom Siegel and Shuster worked for hire developing fictional characters—would

- 9 -

COMPLAINT

1    eventually decide to publish a 13-page comic story featuring "Superman" in the

2    first issue of a 64-page comic book entitled "Action Comics." This original version

3    of Superman had few, limited powers, and his fictional world and back-story were

4    not well developed.

5       29.    Months before this "Action Comics" book ("Action Comics No. 1")

6    was published, Siegel and Shuster entered into, on December 4, 1937, an

7    "Agreement of Employment" with Detective Comics, Inc. ("DCI"), a predecessor-

8    in-interest to DC Comics (the "December 4, 1937 Agreement"). Siegel and Shuster

9    renewed their employment arrangement with DCI in agreements on September 22,

10   1938 (the "DCI September 22, 1938 Agreement" and "McClure September 22,

11   1938 Agreement") and December 19, 1939 (the "December 19, 1939 Agreement").

12      30.    In 1938, at the instance and expense of DCI and subject to its right of

13   control, Siegel and Shuster adapted the preexisting Superman comic strips they had

14   created and added new material to create the 13-page comic book story entitled

15   "Superman." This story—like all the Superman works that Siegel and Shuster

16   thereafter created—was created for DC Comics as a work made for hire. Moreover,

17   Siegel and Shuster only contributed to a part of this work. Upon information and

18   belief, Shuster submitted black-and-white illustrations to DCI that were later

19   colorized by printers or engravers working at DCI's direction. DCI also prepared

20   one or more cover illustrations for Action Comics No. 1, which depicted Superman

21   and was published in other comic books prior to the publication of Action Comics

22   No. 1. Action Comics No. 1 itself was published in April 1938.

23      31.    To the extent Siegel and Shuster created any copyrightable Superman-

24   related works outside their work-for-hire relationship with DC Comics, those works

25   consisted solely of certain panels and portions of the Action Comics No. 1 comic

26   book and other minor creations in the 1930s, which Siegel and Shuster conveyed to

27   DC Comics in 1937 and 1938. In an agreement dated March 1, 1938 (the "March

28   1, 1938 Agreement"), and as required by the December 4, 1937 Agreement, Siegel

- 10 -

COMPLAINT

1  and Shuster again assigned to DCI all of their rights in Superman, including "all

2  good will attached thereto and exclusive right to the use of the characters and story,

3  continuity and title of strip."  Siegel and Shuster confirmed DCI's sole and

4  exclusive ownership of all Superman rights in the DCI September 22, 1938

5  Agreement and December 19, 1939 Agreement.

6        32.    The initial appearance of Superman in Action Comics No. 1 presented

7  a limited view of the character.  The readers learn only that Superman was sent to

8  Earth as an infant aboard a space ship from an unnamed planet that was destroyed

9  by old age.  He secretly possessed five super-human powers:  the abilities to leap

10  1/8 of a mile; hurdle a twenty-story building; raise tremendous weights; run faster

11  than an express train; and repel bullets and knives by virtue of his "tough skin."  In

12  his alter-ego life, Superman was depicted as Clark Kent, a mild-mannered

13  newspaper reporter for "The Daily Star," with a female co-worker named "Lois,"

14  whose last name is not mentioned.  In his life as Superman, he was depicted as a

15  costumed figure who uses his super-human abilities to fight crime.  In Action

16  Comics No. 1, Superman is said to have grown up in an orphanage and is depicted

17  (both in words and images) as a child with super-human strength.

18        33.    Since the publication of Action Comics No. 1 in 1938, DC Comics—

19  with its teams of work-for-hire writers and artists (including Siegel and Shuster)—

20  has added more than 70 years of material defining, updating, expanding, and

21  improving upon the Superman myth and creating a continuous flow of new exploits

22  and characters, resulting in a vast Superman "universe."  DC Comics has authored,

23  published, and distributed hundreds of millions of copies of thousands of comic

24  book issues throughout the United States and abroad depicting the adventures of

25  Superman.  These comic books have been authored and illustrated by dozens of DC

26  Comics' talented staff writers and artists.  DC Comics has also created, developed,

27  distributed, and licensed numerous feature-length motion pictures, motion-picture

28  serials, radio serials, television shows, novels, and live theatrical presentations

COMPLAINT

1  based on Superman. Indeed, the radio, television, and motion-picture projects in
2  particular—with which Siegel and Shuster had nothing or little to do—were largely
3  responsible for spreading the Superman myth and popularity and expanding the
4  Superman storyline.

5       34.    As a result of DC Comics' significant and sustained investment in and
6  stewardship of Superman—and 70-plus years of character and story development
7  by some of the most creative and talented minds in the comic-book, radio,
8  television, and motion-picture industries—Superman has remained constantly in the
9  public's eye and has become one of the most famous and beloved fictional
10  characters in the world. Over these 70 years, Superman has evolved from the few
11  black-and-white illustrations originally drawn by Shuster into a full-blown, color
12  character inhabiting a multi-dimensional universe.

13       35.    DC Comics' development of Superman over many decades has
14  represented a continuous and ever-evolving portrayal of the character, featuring
15  new elements in the Superman back-story, new super-powers, new characters, and
16  changes in Superman's appearance. Many of the most famous story elements and
17  characters associated with Superman were developed long after 1938 and by
18  illustrators and story writers other than Shuster and Siegel working for hire for DC
19  Comics. These include stories about and depictions of: (a) "Smallville," the town
20  where Superman grew up; (b) "Kryptonite," or surviving fragments of the
21  destroyed planet Krypton, which have the power to harm or affect Superman;
22  (c) the "Fortress of Solitude," Superman's secret headquarters outside Metropolis
23  (traditionally located in the Arctic, but also placed in the Andes and Amazon
24  rainforest); (d) the "Daily Planet" newspaper, where Clark Kent would go to work;
25  (e) Jimmy Olsen and Perry White, Kent's co-workers at the Daily Planet; (f) love
26  interests, such as Lana Lang; (g) villains, such as Lex Luthor and Braniac;
27  (h) Superman's adoptive parents, the Kents; and (i) other allies, such as "Krypto"
28  the Superdog as well as Supergirl. Other aspects of Superman's evolution included

COMPLAINT

568

1   the development of new super-powers, including:  (a) the ability to fly (a key

2   component, especially of the Superman motion pictures); (b) super-vision, which

3   enables him to see through walls ("X-ray" vision); (c) telescopic vision, which

4   allows him to see across great distances; (d) "heat vision," which empowers him to

5   aim rays of extreme heat with his eyes; (e) super-hearing, which enables him to

6   hear conversations at great distances; (f) invulnerability to injury; and (g) the ability

7   to survive in outer space without protective gear.  It is this constant and

8   uninterrupted evolution of the Superman mythology that allows Superman to

9   remain a force in popular consciousness decades after so many contemporary

10  characters have been forgotten or deemed old-fashioned.

11  **B.**      **Early Disputes Regarding the Superman Rights**

12      36.    Siegel and Shuster served in a work-for-hire capacity for DCI from the

13  early 1930s through the late 1940s, helping draw and write Superman comic strips

14  and comic books.  Though paid substantial sums for their work—several million

15  dollars in today's economic terms—the relationship eventually became contentious.

16      37.    In 1947, Siegel and Shuster filed an action against DCI's successor,

17  National Comics Publications, Inc. ("National"), in the New York Supreme Court

18  in Westchester County (the "Westchester Action").  In the Westchester Action,

19  Siegel and Shuster sought to invalidate the March 1, 1938 Agreement.  They also

20  sought to recapture all rights in Superman, arguing that the DCI September 22,

21  1938 Agreement was obtained by duress.  Siegel and Shuster further challenged as

22  unauthorized DCI's publication in November 1944 of a series of comic-book

23  stories entitled "Superboy," which featured the adventures of Superman as a youth.

24      38.    On November 21, 1947, a referee in the Westchester Action issued an

25  opinion after trial (the "Westchester Opinion") holding that the March 1, 1938

26  Agreement assigned "all" of the Superman rights to DCI, and that the DCI

27  September 22, 1938 Agreement was valid and not obtained under duress.  The

28  referee found that DCI had acted improperly in publishing Superboy.

- 13 -

COMPLAINT

39.     At the referee's request, the parties to the Westchester Action submitted proposed findings of fact and conclusions of law.  On April 12, 1948, the referee adopted findings of fact and conclusions of law and issued an interlocutory judgment (collectively, the "Westchester Action Interlocutory Judgment"), in which he made statements based on a script that Siegel had submitted that Siegel originated and owned the comic strip Superboy to the exclusion of DC Comics. National filed a notice of appeal, and the Westchester Action Interlocutory Judgment was stayed pending appeal.

40.     Shortly thereafter, the parties to the Westchester Action entered into two separate agreements:  (a) a stipulation dated May 19, 1948 (the "May 19, 1948 Stipulation"); and (b) a consent judgment dated May 21, 1948 (the "May 21, 1948 Consent Agreement").  Under both documents, *inter alia*, Siegel and Shuster: (a) agreed to vacate the Westchester Action Interlocutory Judgment; (b) acknowledged that, pursuant to the March 1, 1938 Agreement, they transferred to DCI all rights in and to Superman, including "the title, names, characters, concept and formula" as set forth in Action Comics No. 1; and (c) agreed that National was the sole and exclusive owner of all rights in Superman and Superboy. In exchange, Siegel and Shuster were paid nearly $900,000 in today's dollars.

41.     Following the commencement of the Westchester Action, Siegel attempted to launch a new comic book and syndicated strip feature entitled "Funnyman."  The *Funnyman* comic book, however, was cancelled after only six issues, and the syndicated *Funnyman* strip was only picked up by a few newspapers and dropped prior to the end of 1949.  By the late 1950s, Siegel was unable to find employment in the comic book field and needing to support his family, he approached DC Comics asking for work.  Despite Siegel's prior lawsuit and challenge to DC's rights in Superman, DC Comics agreed to hire Siegel and thereafter employed him continuously as a work-for-hire writer until the mid-1960s, when Siegel once again challenged DC Comics' rights to Superman.

- 14 -

42.    In April 1965, Siegel (while still working for DC Comics) and Shuster
(who was being paid a monthly stipend by DC Comics) filed copyright renewal
notices in their own names, claiming to own the renewal copyrights in the
Superman character and in Action Comics No. 1.  This was followed by a lawsuit
filed by Siegel and Shuster against National in 1969 in the District Court for the
Southern District of New York, seeking a declaration that they owned the
"renewal" copyright terms for Superman and Action Comics No. 1.  (Under the
then-applicable 1909 Copyright Act, the period of copyright protection for a work
included an initial term of 28 years and an optional renewal term of 28 years.)
Again, Siegel and Shuster's arguments were rejected, and the federal district court
held, *inter alia*, that the agreements between Siegel and Shuster, on the one hand,
and DCI (later National), on the other, had assigned "all" rights in Superman to
DCI and National, including all renewal copyrights.  *See Siegel v. Nat'l Periodical
Publ'ns, Inc.*, 364 F. Supp. 1032 (S.D.N.Y. 1973).  The Court of Appeals for the
Second Circuit affirmed the district court's ruling that National owned all rights in
Superman.  *See Siegel v. Nat'l Periodical Publ'ns, Inc.*, 508 F.2d 909 (2d Cir.
1974).  Siegel and Shuster did not further appeal that ruling.

43.    Following the failure of their second lawsuit to recapture copyrights in
Superman, Siegel and Shuster ran into financial difficulties.  Siegel publicized their
financial plight, and there were calls for companies like National (and even for
Congress) to help such artists.  On December 23, 1975, and despite Siegel and
Shuster's two prior lawsuits against National, Warner Communications, Inc.
("WCI"), National's then-parent company, agreed to provide them financial
assistance.  Under an agreement entered into in 1975 (the "1975 Agreement"),
Siegel and Shuster again acknowledged that DC Comics was the sole and exclusive
owner of "all right, title and interest in and to the 'Superman' concept, idea,
continuity, pictorial representation, formula, characters, cartoons and comic strips,
title, logo, copyrights and trademarks, including any and all renewals and

COMPLAINT

1    extensions of such rights, in the United States and throughout the world, in any and
2    all forms of publication, reproduction and presentation, whether now in existence or
3    hereafter devised." In exchange, WCI agreed to provide Siegel and Shuster with,
4    *inter alia*, annual payments of $20,000 each (around $80,000 in current dollars),
5    annual payments to their heirs after their death, medical insurance coverage, and a
6    lump sum of $17,500 each. With respect to Shuster's heirs, WCI agreed that after
7    Shuster's death, it would make annual payments to his brother, Frank Shuster, of
8    $10,000 until December 31, 1985, and then $5,000 a year for the rest of his life.

9         44.    In the years following the 1975 Agreement, DC Comics increased the
10   annual payments to Siegel and Shuster, made periodic cost-of-living increases,
11   provided insurance, and paid special bonuses. During the last several years,
12   Siegel's widow, for example, has received $135,000 per year plus reimbursement
13   for all medical expenses. In all, DC Comics has paid Siegel, Shuster, and their
14   heirs nearly $4 million pursuant to the 1975 Agreement and other arrangements—
15   benefits that DC Comics continues to pay, and the Siegel and Shuster heirs continue
16   to accept.

17        45.    In 1976, Congress amended the Copyright Act to give authors and
18   certain of their heirs certain limited rights to terminate prior grants of copyright.
19   *See* 17 U.S.C. § 304(c) (1976). This amendment did not apply to works-made-for
20   hire (the company paying for the production of those works would always own
21   them), and entitled authors and certain heirs to recapture copyrighted interest only
22   in works that the *author* actually created (*e.g.*, it did not entitle authors to recapture
23   derivative works the grantee may have developed pursuant to the original grant,
24   such as the original Superman radio and television shows, or Superman-related
25   characters, such as "Superboy" or "Lex Luthor"). Despite their previous legal
26   battles with National and the widespread publicity surrounding this legislation,
27   neither Jerry Siegel nor Joe Shuster ever endeavored to exercise any termination
28   rights under the statute. Instead, for the rest of their lives, Siegel and Shuster

- 16 -

COMPLAINT

1    accepted and enjoyed the benefits under the 1975 Agreement.  This decision made

2    sense, given Siegel and Shuster's work-for-hire relationship with DC Comics, the

3    narrow sliver of rights (if any) to which they might claim an interest, and the

4    significant contributions made to Superman in the past 70 years to which they could

5    claim no interest.  Moreover, the 1975 Agreement paid Shuster and Siegel an

6    annual pension and medical insurance for the rest of their lives and, upon their

7    death, paid annual pensions to their heirs.  Although Shuster's and Siegel's

8    "window of time" in which to attempt to terminate prior grants of copyright

9    interests in Superman theoretically opened in 1984, at no time during their lives did

10   they attempt to exercise any such right.

11   **C.    Joe Shuster's Death and the Shuster Heirs' 1992 Agreement**

12        46.    Joe Shuster passed away on July 30, 1992.  He was survived only by

13   his brother Frank Shuster, sister Jean Peavy, and Jean's two children, Mark Peary

14   and Dawn Peavy (the "Shuster Heirs").  (Mark Peary changed his last name from

15   "Peavy" to "Peary.")  Shuster did not leave a widow and never had children or

16   grandchildren.  Shuster's purported will names Jean Peavy the sole beneficiary of

17   his estate.  (An alleged copy of this will surfaced and was probated in 2001, only

18   after Toberoff intervened.  In addition to certain irregularities in the will, probate

19   papers filed by the Shuster Heirs falsely represented that Joe Shuster was never

20   married and omitted that Joe had a sibling, Frank, who had also survived him.)

21        47.    On August 21, 1992, Jean Peavy sent a letter to Time Warner and DC

22   Comics explaining that Shuster had "left his family with a crushing burden of

23   unpaid debts and bills and only a tiny estate."  Jean stated:  "It's unbelievable to me

24   that Joe could have so little considering the generosity shown by Time Warner in

25   raising the pension income of Siegel and Shuster."  She also disclosed that 20% of

26   Shuster's income had been taken by Joanne Siegel, Jerome Siegel's widow, "as an

27   agent's commission for getting pay raises for Siegel and Shuster" following the

28   December 23, 1975 Agreement.  Much of the remainder of Shuster's income was

- 17 -

COMPLAINT

1    spent by him during "compulsive buy[ing]" and "shopping sprees" and on

2    expensive stereo equipment and other personal items.  As a result, Shuster had

3    accumulated "almost $20,000 in credit card debts and unpaid bills."  Jean asked that

4    Time Warner and DC Comics "pay his final debts and expenses."

5        48.    In September 1992, Time Warner and DC Comics offered to pay off

6    Shuster's debts and expenses, totaling approximately $20,000, plus increase Frank

7    Shuster's annual survivor payments under the 1975 Agreement from $5,000 to

8    $25,000 per year.

9        49.    In a September 10, 1992 letter sent to DC Comics (the "September 10,

10   1992 Letter"), Frank Shuster, on behalf of himself and Jean, requested that the

11   annual payments due and owing Frank be made to Jean Peavy in order to take

12   advantage of certain tax benefits.  Frank and Jean further promised that, if an

13   agreement could be reached, Jean "would not pursue the termination of the

14   Superman copyright as provided for to creators' heirs in the 1976 U.S. Copyright

15   Act."

16       50.    Based on Jean and Frank's letter and the parties' further discussions,

17   DC Comics, Jean, and Frank entered into a written agreement on October 2, 1992

18   (the "1992 Agreement").  The 1992 Agreement confirmed that it "fully settles all

19   claims to any payments or other rights or remedies which you may have under any

20   other agreement or otherwise, whether now or hereafter existing regarding the

21   copyrights, trademarks, or other property right in any and all work created in whole

22   or in part by your brother, Joseph Shuster, or any works based thereon," and that

23   the Shuster Heirs "covenant not to assert any claim of right, by suit or otherwise,

24   with respect to the above, now and forever."  The 1992 Agreement operated to

25   revoke, rescind, and replace Shuster's prior copyright grants and agreements.

26       51.    After the 1992 Agreement, DC Comics and the Shuster Heirs enjoyed

27   an amicable relationship with the Shuster Heirs.  To date, DC Comics and its

28   affiliates have paid the Shuster Heirs close to $500,000 under the 1992 Agreement.

- 18 -

COMPLAINT

574

1  On April 27, 1995, Jean Peavy sent a letter to DC Comics expressing gratitude for

2  their generosity and concluding: "You know we appreciate your thoughtfulness."

3  Even after Frank Shuster's death in 1996, DC Comics has continued to this day to

4  pay $25,000 per year to Jean Peavy.

5  **D.    Toberoff Induces the Shusters to Repudiate the 1992 Agreement with**

6      **DC Comics and Acquires a 50% Interest in the Shusters' Putative Rights**

7       52.    This state of affairs remained undisturbed for almost a decade.  In

8  2001, Toberoff and his production company, Pacific Pictures, induced the Shuster

9  Heirs to violate their 1992 Agreement and wrongfully attempt to acquire and

10  exploit future copyright interests in Superman.

11       53.    Toberoff is a self-described "intellectual property entrepreneur."  His

12  business—conducted through a variety of corporate entities like Pacific Pictures—

13  is to locate the authors of valuable copyrighted works or their heirs and acquire, or

14  prevent them from conveying to others asserted rights to present or future copyright

15  interests.  To convince these authors and heirs to go into business with him,

16  Toberoff holds himself out as a producer with the financial resources and

17  connections to exploit recaptured rights in all media in the entertainment industry.

18       54.    In or around 2001, Toberoff made contact with the Shuster Heirs and

19  embarked on a course of conduct with them to disrupt their relationship with DC

20  Comics, including DC Comics' rights under the 1992 Agreement.  On November

21  28, 2001, the Shuster Heirs formed a joint venture with Toberoff's company Pacific

22  Pictures ("2001 Pacific Pictures Agreement") for the stated "purpose of retrieving,

23  enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims,

24  copyrights, property, title and interests in and to Joe Shuster's creations."  The 2001

25  Pacific Pictures Agreement provided that this purpose would be realized "via the

26  establishment of Joe Shuster's estate" in a California probate court "and the estate's

27  termination pursuant to [17 U.S.C. § 304] of any and all grant or transfers by Joe

28  Shuster of any copyright interest in his creations."

- 19 -

COMPLAINT

55.    The 2001 Pacific Pictures Agreement defined the Shuster Heirs' rights being assigned as including all "rights, claims, title, copyrights and interests in and to each character, story element, and indicia associated with … 'SUPERMAN' [and] *Superboy*." (Italics added.)

56.    Pursuant to the 2001 Pacific Pictures Agreement, Jean and her son Mark Peary "transfer[red] and assign[ed] to the Venture their rights, title, and interest" in Shuster's Superman and Superboy rights. The Agreement provided that "[a]ny and all moneys and proceeds [of the Venture] will be shared, divided and payable: fifty percent (50%) to [the Shuster Heirs] and fifty percent (50%) to PPC [Pacific Pictures]," and that upon "winding-up of the Venture or in the event of termination of the Venture *for any reason*, all Rights, property or assets of the Venture will be held fifty percent (50%) by the [Shuster Heirs] and fifty percent (50%) by PPC." (Emphasis added.)

57.    The 2001 Pacific Pictures Agreement also provided that the Shuster Heirs could not enter into any agreement with respect to the Superman and Superboy rights "without the express written consent" of Pacific Pictures, an entity controlled solely by Toberoff. The 2001 Pacific Pictures Agreement further provided that the joint venture would "retain Marc Toberoff, Esq. to render legal services in connection with the Rights and the Venture."

58.    Pursuant to the 2001 Pacific Pictures Agreement, the Shuster Heirs filed a probate action in Los Angeles Superior Court to establish the Shuster Estate. That action remains open. (*See* LASC Case No. BP-080635.)

E.    **Toberoff Induces the Siegels to Repudiate the Siegel-DC Comics Agreement and Acquires a 45% Interest in the Siegels' Putative Rights**

59.    Having orchestrated this joint venture, Toberoff used the Shuster Heirs to gain access to the heirs of Jerry Siegel, Joanne Siegel and Laura Siegel Larson (collectively, the "Siegel Heirs"). Toberoff sought to corner the other putative "half" of putative Superman termination rights. Toberoff knew, however, that the

COMPLAINT

1    Siegels had reached an agreement with DC Comics in 2001 resolving their putative

2    termination claims.  Nevertheless, Toberoff and his companies set out to interfere

3    with this agreement in order to acquire a stake in the Siegel Heirs' putative

4    copyright interests in Superman.

5         60.    In 1997—and after Jerry Siegel's death in 1996—the Siegel Heirs had

6    employed counsel and served notices to terminate grants of Superman rights that

7    Siegel had conveyed to DC Comics (the "Siegel Superman Termination Notice").

8    The Siegel Superman Termination Notice, which was prepared by prior counsel,

9    listed Superboy works and elements as among the "character[s], story element[s], or

10   indicia reasonably associated with SUPERMAN," in recognition of the fact that

11   Superboy was a complete derivative of Superman rather than a stand-alone, non-

12   derivative work based upon Superman.

13        61.    The Siegel Heirs and DC Comics began negotiations, and in these

14   talks the Siegel Heirs were represented by Kevin Marks of the Gang Tyre

15   entertainment law firm.  As the parties' negotiations progressed, and as

16   expectations grew that an agreement would soon be reached, DC Comics paid the

17   Siegels a non-refundable advance of $250,000.

18        62.    On October 16, 2001, DC Comics made a proposal to the Siegel Heirs.

19   On October 19, 2001, Kevin Marks sent a letter to DC Comics confirming that the

20   Siegel Heirs "accepted D.C. Comics' offer of October 16, 2001."  On October 26,

21   2001, DC Comics sent a return letter confirming the parties' agreed-upon terms.

22   DC Comics then began drafting a long-form agreement.  DC Comics sent the Siegel

23   Heirs a copy of the long-form document on February 1, 2002.  As a result of the

24   parties' agreement (the "Siegel-DC Comics Agreement"), the Siegels were now on

25   the brink of receiving significant portions of the Superman profits—sums that

26   would immediately and dramatically change their lives.  Moreover, virtually all of

27   the money would be theirs alone to keep, as the Gang Tyre firm had agreed to

28   represent the Siegels for the standard 5% fee.

COMPLAINT

577

63.    Toberoff has admitted that he closely tracked the progress of the Siegel Heirs' termination attempt.  On learning of the Siegel-DC Comics Agreement, he knew his company's joint-venture interest in the Shuster rights was limited and that he could assert greater leverage only if he could disrupt the Siegel-DC Comics Agreement and corner both "halves" of the putative Superman termination rights. Given that Joe Shuster and his heirs held whatever Superman copyright interests they owned (*if any*) jointly with Jerome Siegel, Toberoff understood that if DC Comics obtained the rights from the Siegels to exploit new Superman properties, it could do so freely without any ability on the part of the Shusters to claim their interests were being infringed.

64.    With knowledge that his actions would interfere with DC Comics' actual and prospective economic advantages under the Siegel-DC Comics Agreement, beginning in or around late 2001, Toberoff—identifying himself as a film producer—approached the Siegel Heirs, including and/or through their representative Kevin Marks, for the purpose of acquiring their rights.

65.    Marks informed Toberoff that the Siegel Heirs had already reached a binding agreement with DC Comics, which was in the process of being further documented in a long-form agreement.  Undeterred, Toberoff continued to contact the Siegel Heirs and their representatives in an effort to induce them to repudiate the Siegel-DC Comics Agreement and enter into a production agreement with Toberoff or one of his companies.

66.    On May 9, 2002, as a result of Toberoff's improper interference and inducements, Joanne Siegel sent a letter to DC Comics' affiliate acknowledging the Siegel Heirs had accepted DC Comics' October 16, 2001 offer, but purporting to object to certain unspecified portions of the long-form document.  DC Comics objected to the Siegel Heirs' sudden and unfounded objections, but continued working with their counsel to finalize the long-form agreement.

- 22 -

67.    In or around August 2002, as Marks was finalizing the Siegels' revisions to the long-form document, Toberoff contacted Marks again regarding the Siegel-DC Comics Agreement.  Upon information and belief, Marks informed Toberoff he could not discuss the matter, including the terms of the agreement, because of a confidentiality agreement between DC Comics and the Siegel Heirs. Toberoff reiterated interest in purchasing the Siegel Heirs' Superman rights.  On August 8, 2002, Toberoff conveyed an offer to Marks for presentation to the Siegels, which Marks said he would convey.

68.    Upon information and belief, Toberoff's offer stated that he had found a billionaire investor willing to purchase the Siegel Heirs' Superman rights. Toberoff claimed the investor would give the Siegel Heirs $15 million cash up front, plus generous royalty and "back-end" rights on any properties developed, including a new Superman motion picture.  Upon information and belief, Toberoff also falsely offered to help the Siegel Heirs produce a movie that would compete directly with the Superman movie in development at the time at Warner Bros., DC Comics' licensee, even though he knew that the Siegels' limited rights in the recaptured copyright, if any, would make such a competing motion picture all but impossible to produce and distribute.

69.    Upon information and belief, although Marks conveyed Toberoff's offer to the Siegels, he advised them that they had already reached a binding agreement with DC Comics.  Nonetheless, as a result of Toberoff's inducements, the Siegel Heirs stated that they would repudiate their agreement with DC Comics and accept Toberoff's offer.

70.    On or around September 21, 2002, the Siegel Heirs sent a letter to Marks terminating him as their attorney.  On or around September 21, 2002, based on Toberoff's inducements, the Siegel Heirs sent a letter to DC Comics repudiating the Siegel-DC Comics Agreement.  On October 23, 2002, the Siegel Heirs formalized an agreement with defendant IP Worldwide for the purpose of

- 23 -

1    "arrang[ing] and negotiat[ing] the sale, lease, license and all other dispositions or

2    exploitations" of the Siegel Heirs' Superman rights (the "IP Worldwide

3    Agreement").  The Siegel Heirs agreed to pay IP Worldwide a fee of 10% of the

4    gross proceeds generated by those rights.  Upon information and belief, the fee was

5    subsequently reduced to 5%.

6        71.    Upon information and belief, in or around September 2004, the Siegel

7    Heirs entered into an agreement with Toberoff granting him 40% of their Superman

8    rights and retaining him as their attorney (the "Siegel-Toberoff Agreement").

9        72.    Upon information and belief, as a result of the Siegel-Toberoff

10   Agreement and IP Worldwide Agreement, Toberoff now owns a 45% financial

11   interest in the Siegel Heirs' purported Superman rights.

12   **F.    Toberoff Manipulates the Siegel Heirs and Shuster Heirs into Falsely**

13        **Claiming that Superboy Was the Sole Creation of Jerry Siegel**

14       73.    After inducing the Siegel Heirs to repudiate the Siegel-DC Comics

15   Agreement, on November 8, 2002, Toberoff caused the Siegel Heirs to serve a

16   second copyright termination notice on DC Comics directed at the character

17   Superboy (the "Siegel Superboy Termination Notice").  The notice not only

18   erroneously stated that Superboy was a copyrightable work not derivative of

19   Superman, but falsely recited that Superboy was created *solely* by Siegel (without

20   contribution from Shuster), thereby entitling the Siegel Heirs to terminate and

21   recapture 100% of the putative Superboy rights.

22       74.    Defendants knew these claims were false.  To begin, in the Siegel

23   Superman Termination Notice served by the Siegel Heirs in 1997—the one served

24   prior to Toberoff's intervention—the Siegel Heirs expressly identified the Superboy

25   works and elements as among the "character[s], story element[s], or indicia

26   reasonably associated with SUPERMAN."  This earlier notice acknowledged—as is

27   in fact the case—that Superboy was a derivative work of Superman, rather than a

28   separately copyrightable work.

- 24 -

75.    As to the representation that Superboy was created solely by Jerry Siegel, defendants knew that claim was untrue as well.  Among other reasons:

- One year earlier, through defendant Pacific Pictures, Toberoff had entered into the 2001 joint venture agreement with the Shuster Heirs, specifying that the *Shuster Heirs* owned an interest in "Superboy."

- The original Superboy "script" on which the Siegel Heirs' ownership claims rely openly contains the byline:  "By Jerry Siegel *and Joe Shuster*"—not just Jerry Siegel alone.  (Emphasis added.)

- In 1972 and 1973, Siegel and Shuster together filed their own copyright renewal notices with the copyright office for Superboy, in which they identified Superboy as a work that they had *jointly* created.

- And long before the alleged first publication of "Superboy" in November 1944, Shuster illustrated works for DC Comics that included various depictions of Superman as a boy, exhibiting super-human strength.  Several examples are reproduced below.  In "Action Comics No. 1," for example, Shuster drew Superman as a very young boy displaying an "astonish[ing] feat[]" of super-human strength, holding a chair above his head:



Action Comics No. 1 (1930)

COMPLAINT

581

1    Shuster also depicted Superman as a youth with super-powers in "Superman

2    No. 1," a work allegedly terminated by Shuster in the notice filed by

3    Toberoff on behalf of the Shuster heirs,



Superman No. 1 (May 1939)

14    as well as in a 1942 Sunday comic strip, in which Superman as a "youth"

15    discovers that his "amazing powers" are "multiplied with the years" and

16    that, as a boy, he could "outrace the fastest streamline train":



Superman Sunday Strip (May 31, 1942)

27        76.    Through Pacific Pictures, Toberoff manipulated the Siegel and Shuster

28    Heirs into falsely positioning Siegel as the sole creator of any putative

- 26 -

1  copyrightable elements in Superboy.  They did so to enable the Siegels to claim a

2  sole ownership interest in Superboy elements allegedly subject to recapture and

3  thereby prevent DC Comics from exploiting Superboy without the Siegels'

4  authorization and without being subject to claims of copyright infringement.

5  (Again, to be clear, DC Comics disputes that Superboy is not a derivative work of

6  Superman and disputes that it is a work that Shuster and Siegel owned.)

7        77.    To manufacture this claim of sole ownership by the Siegels, Toberoff

8  (acting through Pacific Pictures) caused the *Shuster Heirs* to remove from the 2001

9  joint venture between Pacific Pictures and the Shuster Heirs all claims by the

10  Shusters to alleged rights in any and all Superboy elements.  Toberoff

11  accomplished this by creating a new joint venture agreement—signed October 30,

12  2003—that *deleted* any reference to Superboy.  Defendant Mark Peary signed this

13  agreement (the "2003 Pacific Pictures Agreement"), which omitted all references to

14  Superboy in its description of the Shuster Heirs' rights.  Toberoff induced the

15  Shuster Heirs to disclaim any interest in Superboy so that Toberoff could position

16  the Siegel Heirs to recapture 100% of these rights and assert a copyright

17  infringement action against DC Comics—and seek an injunction against the

18  television program *Smallville* on that basis.

19        78.    In October 2004, the Siegels filed two actions in this Court seeking

20  declaratory relief as to the validity of the Superman and Superboy termination

21  notices, and in April 2005, the Siegels supplemented their pleadings in the

22  Superboy action to assert copyright infringement.  (Case Nos. CV-04-8400 ODW;

23  CV-04-8776 ODW.)  Both actions remain pending before this Court.

24  **G.    The Shusters' Flawed Termination Notice**

25        79.    On November 10, 2003, one week after the 2003 Pacific Pictures

26  Agreement was signed, defendant Mark Peary served on DC Comics a "Notice of

27  Termination of Transfer Covering Extended Copyright Renewal Term of

28  'Superman'" (the "Shuster Termination Notice").

- 27 -

COMPLAINT

80.    The form submitting the Shuster Termination Notice for recordation in the U.S. Copyright Office was certified under penalty of perjury by Toberoff on behalf of "IP Worldwide/Estate of Joseph Shuster."  IP Worldwide is the Toberoff entity which, upon information and belief, holds a portion of the Siegel Heirs' Superman and Superboy rights pursuant to the IP Worldwide Agreement.

81.    The Shuster Termination Notice purports to terminate, under 17 U.S.C. § 304(d), effective October 26, 2013, the following Shuster copyright grants: (a) the December 4, 1937 Agreement; (b) the March 1, 1938 Agreement; (c) the DCI September 22, 1938 Agreement; (d) the McClure September 22, 1938 Agreement; (e) the December 19, 1939 Agreement; (f) the May 19, 1948 Stipulation; and (g) the December 23, 1975 Agreement.

82.    The Shuster Termination Notice does *not* purport to terminate the copyright grants in the May 21, 1948 Consent Agreement or, even more importantly, the 1992 Agreement between the Shuster Heirs and DC Comics.

83.    The Shuster Termination Notice purports to apply to the following works:  (a) certain unpublished material created before Action Comics No. 1; (b) Action Comics No. 1; (c) Action Comics No. 2; (d) Action Comics No. 3; (e) Action Comics No. 4; (f) Action Comics No. 5; (g) Action Comics No. 6; (h) Action Comics No. 7; (i) Superman No. 1; and (j) Superman No. 3.

84.    The Shuster Termination Notice does not purport to terminate any copyright grant in pre-Action Comics No. 1 promotional materials or any materials relating to Superboy.

85.    The Shuster Termination Notice states that defendant Mark Peary "is the person entitled to exercise Joseph Shuster's termination interest" and that the Notice was "signed by all persons whose signature is necessary to terminate."  The Notice makes no mention of the joint venture that the Shuster Heirs and Pacific Pictures formed or its putative ownership stake in the to-be terminated Superman rights.  Nor does the Notice mention Pacific Pictures or its putative ownership stake

- 28 -

in the joint venture, despite the grant of 50/50 rights in the joint venture to Pacific Pictures pursuant to Pacific Pictures' 2001 and 2003 agreements with the Shusters.

86.    On September 10, 2004, Pacific Pictures and the Shuster Heirs signed a one-page letter (the "September 10, 2004 Letter") purporting to cancel their joint venture and providing that the 2001 Pacific Pictures Agreement and 2003 Pacific Pictures Agreement "have been cancelled." However, because the Shuster Heirs and Pacific Pictures had agreed that all rights held by their joint venture would be divided 50/50 upon termination of the joint venture "for any reason," the apparent effect of the September 10, 2004 Letter was to transfer 50% of the Shuster Heirs' purported share of Shuster's rights to Toberoff or his companies.

87.    DC Comics is informed and believes that Toberoff (or his companies) now own 50% of the Shuster Heirs' putative rights as well as the 45% share of the Siegel Heirs' putative rights. This gives Toberoff the largest financial stake among defendants' collective asserted rights in Superman and in the pending legal disputes concerning those rights (*i.e.*, Toberoff—47.5%; Siegel Heirs—27.5%; Shuster Heirs—25%).

88.    DC Comics is also informed and believes that Toberoff, Pacific Pictures, IP Worldwide, the Siegels, and the Shusters have entered into one or more agreements preventing the Siegels or Shusters from conveying rights to DC Comics or entering into other agreements with DC Comics, including for the settlement of their putative termination claims or litigation, without the consent of other parties. For example, in the 2003 Pacific Pictures Agreement, the Shuster Heirs agreed not to settle any claims with respect to the Superman rights without Pacific Pictures' or Toberoff's consent. Such consent agreements are void as against public policy, violate DC Comics' rights, and impede the administration of justice.

COMPLAINT

585

**H.    Toberoff's Wrongful Conduct Is Revealed to DC Comics in the Toberoff Timeline**

89.    Pursuant to federal court orders dated September 26, 2008 and December 4, 2008, Toberoff was compelled to produce to DC Comics a document titled "Superman – Marc Toberoff Timeline" ("Toberoff Timeline," attached hereto as Exhibit A), which Toberoff has acknowledged was written by an attorney he previously employed.  To prevent DC Comics from obtaining and using the document, Toberoff asserted to the federal court that it was privileged, but his position was rejected.  Toberoff produced the Toberoff Timeline to DC Comics on December 10, 2008.

90.    The Toberoff Timeline describes and discloses Toberoff's wrongful activities in pursuing the Siegel and Shuster Heirs' putative interests in the Superman rights.  It lays out Toberoff's scheme to induce the Siegel Heirs to repudiate the Siegel-DC Comics Agreement with DC Comics (*e.g.*, "It [is] clear at this juncture that [Toberoff] thwarted the earlier deal with Time Warner and DC Comics in 2002 for his own personal gain"); his efforts to acquire as "much ownership of the Superman copyright personally as he can"; and his attempt to conceal certain of his illicit activities from the Siegel and Shuster Heirs.  (Emphasis in original.)  As a result, "***the single person who would stand to gain the MOST in a settlement with Time Warner [and DC Comics] regarding the ongoing SUPERMAN legal dispute would not be the heirs themselves, but Marc Toberoff.***"  (Emphasis in original.)

91.    The Toberoff Timeline discloses many of the facts alleged herein, and concludes:  "[Toberoff] is solely motivated *at all times* not by his clients' interests, but manipulating pieces of the puzzle so that he may receive the greatest percentage from a very possible large Time Warner settlement, through part ownership and unconscionable fees."  (Emphasis in original.)  The Toberoff Timeline explains that "[a]t least 7 attorneys have come and gone at the Law Offices of Marc Toberoff,

- 30 -

1   and many have left due to ethical issues." Many of these and other disturbing,

2   salient facts detailed herein have only recently come to light in the past 18 months.

3   ## V.  CLAIMS FOR RELIEF

4   **A.      First Claim for Relief: Declaratory Relief re: Invalidity of Copyright**

5   **Termination Notice (Against Defendants Shuster Estate and Peary)**

6   92.     DC Comics re-alleges and incorporates by reference each and every

7   allegation contained in the paragraphs above.

8   93.     The Shuster Termination Notice is invalid, and thus ineffective, for at

9   least five separate, independent, and alternative reasons:

10   **(1) There Is No Statutory Basis for the Shusters to Terminate**

11   94.     The Copyright Act does not provide any basis for the Shuster Estate to

12   terminate. Shuster's termination right was lost when he died in 1992 without

13   having exercised it and without leaving a statutory heir to inherit it under the then-

14   applicable provisions of the Copyright Act.

15   95.     The 1976 Copyright Act gave authors the ability to terminate certain

16   pre-1978 copyright grants. According to the original termination provisions:

17   "Where an author is dead, his or her termination interest is owned, and may be

18   exercised, by his widow or her widower and his or her children or grandchildren."

19   17 U.S.C. § 304(c)(2) (1976). In other words, the right of termination could only

20   be exercised by an author during his or her lifetime, or by a widow, child, or

21   grandchild after the author's death. As the language of the statute establishes, and

22   its legislative history confirms, the right of termination was lost if an author died

23   without exercising it and without leaving a widow, child, or grandchild to inherit it.

24   96.     Shuster could have exercised his putative termination right beginning

25   in April 1984. The 1976 Copyright Act provided that a copyright grant could be

26   terminated 56 years after the date copyright was first secured (*i.e.*, April 1994, or 56

27   years after the April 1938 publication of Action Comics No. 1), and that notice of

28

COMPLAINT

1   termination could be served 10 years before the termination date (*i.e.*, April 1984,

2   or 10 years before April 1994).  17 U.S.C. § 304(c)(3)-(4).

3        97.    During his lifetime, Shuster chose not to exercise his termination right.

4   Shuster died in 1992, and did not leave a widow, child, or grandchild to succeed to

5   his termination right under section 304(c) of the 1976 Copyright Act.  As a result,

6   Shuster's termination right ceased to exist on his death.

7        98.    The 1999 Copyright Term Extension Act ("CTEA") extended the term

8   of copyright by 20 years and also provided an opportunity to authors and selected

9   heirs to terminate for this new extended time period in circumstances where the

10  "[t]ermination rights provided for in subsection (c) have expired on or before the

11  effective date of the [CTEA]," or October 27, 1998, and the "author or owner of the

12  termination right has not previously exercised such termination right."  17 U.S.C.

13  § 304(d).  Where section 304(d) applies, section 304(c)(2) provides that if an author

14  is dead, the termination right can be exercised by his widow, children, or

15  grandchildren or, "[i]n the event that the author's widow or widower, children or

16  grandchildren *are not living*, the author's executor, administrator, personal

17  representative, or trustee...."  (Emphasis added).  These are the provisions that

18  defendant Mark Peary, the executor of the Shuster Estate, purports to rely on in the

19  Shuster Termination Notice, but they have no application here.  By its own terms,

20  section 304(d) only applies where an author's window for exercising the

21  termination right opened and closed or "expired" (*not* when an author died while

22  the window was open without exercising the right or leaving any heirs to do so),

23  and where a deceased author's widow, child, or grandchild is "not living," but who

24  did at some time live.  Shuster never had a widow, child, or grandchild, and Peary,

25  acting on behalf of the Shuster Estate, has no right to file the invalid notice of

26  termination that he did.

27

28

COMPLAINT

**588**

### (2) **The 1992 Agreement Bars the Shusters from Pursuing Termination**

99.    The 1992 Agreement that Frank Shuster and Jean Peavy entered into with DC Comics bars the Shuster Estate from pursuing termination because, *inter alia*, in exchange for valuable consideration, the 1992 Agreement effected a rescission, revocation, and re-grant of all prior copyright grants, which eliminated any pre-1978 grant that could be subject to termination under section 304 of the Copyright Act.

100.    The 1992 Agreement, which was executed on October 2, 1992, provides that Shusters' heirs "fully settle[]" and forfeit any and all of rights under Joseph Shuster's prior "agreements or otherwise," thereby revoking and rescinding those prior, pre-1992 instruments.  It also "*grant[s] to us* [DC Comics] any ... copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon."  (Emphasis added.)

101.    Section 304(d) of the Copyright Act only allows for termination of copyright grants "executed before January 1, 1978."  Because the 1992 Agreement left intact no pre-1978 copyright grant to terminate, section 304(d) does not apply, and the Shuster Estate has no copyright grant that it may terminate.

102.    Shuster's heirs approached DC Comics in 1992 seeking increased annual payments, certain tax benefits, and payment of Shuster's debts and expenses.  At the time, Shuster's heirs recognized the value of Superman as a property.  As the result of DC Comics' development, promotion, and exploitation of Superman from 1938 to 1992, Superman had evolved from the black-and-white figure drawn by Shuster for Action Comics No. 1 to a global, multi-media industry.  Moreover, in correspondence with DC Comics, the Shusters adverted to the termination rights provided for under the Copyright Act.  As Shuster's heirs requested, the 1992 Agreement provided that DC Comics would:  (a) increase its annual payments to the Shuster Heirs to $25,000 per year—five times higher than

- 33 -

COMPLAINT

589

the amount it was obligated to pay under the December 23, 1975 Agreement;

(b) make these annual payments to Jean Peavy for purposes of a tax benefit; and

(c) pay the approximately $20,000 representing Shuster's final debts and expenses. DC Comics continues to make annual payments under the 1992 Agreement, and has paid Shuster's heirs close to $500,000 to date.  The 1992 Agreement confirms that it "fully settles *all claims to any payments or other rights or remedies* which you may have under any other agreement or otherwise, *whether now or hereafter existing* regarding the copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon."  (Emphasis added.)  Shuster's heirs agreed "not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever."

103.   By effectively rescinding, revoking, and re-granting any and all prior grants of Joe Shuster's rights, the Shuster Heirs have no right to terminate any of the Superman copyrights.

104.   At the very least, because of DC Comics' continued performance under the 1992 Agreement, and the Shusters' continued acceptance of benefits under the Agreement—even after filing the Shuster Termination Notice—the Shusters are estopped from disputing that the 1992 Agreement remains in full force and effect, which operates to preclude the assertion of any termination right.

### (3) The Shusters Lack the Majority Interest Necessary to Terminate

105.   The Shuster Termination Notice is also invalid because the party that filed it—if defendants' own contractual documents are to be believed—lacked authority to do so.  Section 304(c)(1) of the Copyright Act provides that termination of a grant executed by an author who is not living may be exercised only "by the person or persons who ... own and are entitled to exercise a total of *more than one-half of that author's termination interest.*"  17 U.S.C. § 304(c)(1) (emphasis added). Copyright Office regulations require that a termination notice include "specific indication of the person or persons executing the notice who constitute more than

- 34 -

1   one-half of that author's termination interest" and "shall be signed by the number

2   and proportion of the owners of that author's termination interest required under

3   section 304(c)."  37 C.F.R. § 201.10(b)(1)(vii), (c)(2).

4        106.   According to the Pacific Pictures agreements (to the extent they are

5   valid and enforceable), the Shuster Estate does not own—and did not own at the

6   time the Shuster Termination Notice was executed—the "more than one-half"

7   majority interest necessary to terminate under section 304(c)(1) of the Copyright

8   Act.

9        107.   Pursuant to the 2001 Pacific Pictures Agreement, defendant Mark

10  Peary and Jean Peavy "transfer[red] and assign[ed] … their rights, title, and

11  interest" in all of Shuster's copyrights and creations to their joint venture with

12  Pacific Pictures.  In the 2003 Pacific Pictures Agreement, Peary confirmed the

13  terms of the 2001 Pacific Pictures Agreement on behalf of the Shuster Estate.

14       108.   One week later, on November 10, 2003, Peary served the Shuster

15  Termination Notice on behalf of the Shuster Estate.  At the time, the Shuster Estate

16  did not own *any* of the purported termination right, as this and all other rights had

17  been transferred to the joint venture with Pacific Pictures.[3]  The Shuster

18  Termination Notice is therefore invalid under section 304(c)(1) of the Copyright

19  Act.

20       109.   The Shuster Termination Notice represents that Peary "is the person

21  entitled to exercise Joseph Shuster's termination interest" and that the Notice had

22  been "signed by all persons whose signature is necessary to terminate."  Peary's

23  _____

24  [3] At most, the Shuster Estate owned only a 50% interest in that joint venture.
    This is still the case.  As a result of the September 10, 2004 Letter purporting to

25  cancel the 2001 and 2003 Pacific Pictures Agreements and by the terms of the 2001
    and 2003 agreements themselves, any putative rights held by the joint venture were

26  split 50/50 between the Shuster Heirs and Pacific Pictures on cancellation of the
    joint venture agreement:  "[Upon] winding-up of the Venture or in the event of

27  termination of the Venture *for any reason*, *all Rights, property or assets of the*
    *Venture will be held* fifty percent (50%) by the [Shuster Heirs] *and fifty percent*

28  *(50%) by PPC*."  (Emphasis added.)

                                    - 35 -                              COMPLAINT

1  failure to disclose that he had purported to transfer this putative termination right to

2  the joint venture with Pacific Pictures, or include a signature on behalf of the joint

3  venture or Pacific Pictures, violated 37 C.F.R. § 201.10(b)(1)(vii) and 37 C.F.R. §

4  201.10(c)(2).

5       110.  Peary's failure to disclose the requisite information in the Shuster

6  Termination Notice was not harmless.  Upon information and belief, these

7  omissions were not inadvertent, but were intended to conceal material information

8  from DC Comics, including:  (a) the various conflicts of interest arising from

9  Toberoff's and his companies' significant ownership interest in the Shuster Estate's

10  and the Siegel Heirs' purported rights; and (b) consent agreements that Toberoff

11  procured limiting the Shuster and Siegel Heirs' freedom to enter into agreements

12  with DC Comics regarding those rights.

13       111.  The Copyright Act's termination provisions were crafted to avoid the

14  trafficking in future interests by third parties like Toberoff and his companies, yet

15  that is exactly what his agreements with the Shuster and Siegel Heirs accomplish,

16  and what Toberoff and Shusters failed to disclose to DC Comics and the Copyright

17  Office by serving and filing the Shuster Termination Notice.

18      **(4) The Shusters Do Not Attempt to Terminate Certain**

19      **All-Encompassing Copyright Grants**

20       112.  The 1992 Agreement includes a "grant" by Shuster's heirs to DC

21  Comics of, *inter alia*, all "copyrights, trademarks, or other property right in any and

22  all work created in whole or in part by … Joseph Shuster, or any works based

23  thereon."  In the Shuster Termination Notice, defendants did not terminate (or even

24  mention) the 1992 Agreement.

25       113.  The May 21, 1948 Consent Agreement also includes a grant by Siegel

26  and Shuster to National, DC Comics' predecessor-in-interest, of all of Siegel and

27  Shuster's rights in Superman and Superboy.  (If the 1992 Agreement is not read as

28  a rescission, revocation, and re-grant of all prior agreements between Shuster and

COMPLAINT

DC Comics (and it should be), then the May 21, 1948 Consent Agreement remains in effect.)

114. Defendants do not attempt to terminate the May 21, 1948 Consent Agreement, and do not identify the May 21, 1948 Consent Agreement in the Shuster Termination Notice.

115. As the result of defendants' failure to terminate the 1992 Agreement and May 21, 1948 Consent Agreement, the grants contained therein remain in full force and effect. Thus, DC Comics is and continues to be the sole owner of all rights, including rights under copyright, in Superman pursuant to the 1992 Agreement and May 21, 1948 Consent Agreement.

**(5) <u>The Doctrine of Unclean Hands Bars the Shusters from Terminating</u>**

116. The doctrine of unclean hands requires that the Shuster Termination Notice be deemed invalid because it contains material misrepresentations intended to mislead the courts, Copyright Office, and DC Comics—all to the detriment of DC Comics.

117. The Shuster Heirs did not disclose Pacific Pictures' purported ownership interest in the rights sought to be terminated. Just one week before filing the Shuster Termination Notice, the Shuster Estate signed the 2003 Pacific Pictures Agreement, reaffirming its transfer of 100% of its rights in any Superman-related copyrights to the joint venture with Pacific Pictures. Copyright Office regulations require that a termination notice include "specific indication of the person or persons executing the notice who constitute more than one-half of that author's termination interest" and "shall be signed by the number and proportion of the owners of that author's termination interest required under section 304(c)." 37 C.F.R. § 201.10(b)(1)(vii), (c)(2). Yet Pacific Pictures is conspicuously absent from the Shuster Termination Notice. This omission was not inadvertent, as explained above.

- 37 -

118.   Induced by Toberoff, the Shuster Heirs also falsely disclaimed any interest in the Superboy rights in the Shuster Termination Notice. This permitted Toberoff to assert on behalf of the Siegel heirs a baseless Superboy-related copyright infringement claim against DC Comics. Prior to these manipulations by Toberoff, Shuster and the Shuster heirs had truthfully maintained for over 50 years that Shuster had co-created Superboy. For example, the findings submitted by Siegel and Shuster's counsel in the 1940s Westchester Action, specified that Shuster had drawn the first "Superboy" denominated story in More Fun Comics No. 101. Similarly, in 1972 and 1973, during the Superman renewal litigation, Siegel and Shuster jointly filed copyright renewal notices asserting joint authorship both in the Superboy character, and in More Fun Comics No. 101, which contained the first comic book story denominated "Superboy."

119.   Additionally, in the 2001 Pacific Pictures Agreement, entered into before Toberoff had secured an agreement with the Siegel Heirs, Toberoff and the Shuster Heirs expressly identified "Superboy" as among the universe of rights that Shuster had jointly created with Siegel. Yet just two years later in 2003, and only *after* Toberoff had entered into an agreement with the Siegel Heirs securing control over their rights, did the Shuster Heirs suddenly reverse course. The 2003 Pacific Pictures Agreement omitted all reference to Superboy, and the Shuster Termination Notice filed one week later avoided any overt mention of Superboy elements or works.[4] But even the termination notice served by the Shuster Heirs, while carefully drafted to avoid any mention of Superboy, could not completely rewrite history. The Shuster Termination Notice expressly identifies Action Comics No. 1 and Superman No. 1 as terminated works. Both of these works, however, clearly depict Superman as a boy with super-powers: *i.e.*, a "Superboy." For example,

---

[4] As noted, DC Comics maintains that Superboy is a derivative work based upon the preexisting Superman, and in any event, is owned solely and exclusively by DC Comics, *inter alia*, because it is a work-for-hire or because the script submitted by Siegel and Shuster is unpublished and, thus, is not terminable.

COMPLAINT

594

1    Action Comics No. 1 features Superman as a very young boy exhibiting super
2    strength, and Superman No. 1 depicts Superman as a youth leaping over a building.
3        120.    After the Shuster Termination Notice was filed, the Siegel Heirs
4    brought a copyright infringement claim against DC Comics on the frivolous ground
5    that Superboy was the sole creation of Siegel, entitling the Siegel Heirs to terminate
6    and recapture 100% of the Superboy rights (as opposed to the 50% share they
7    would be entitled to recapture if Superboy was a joint work).  The Siegel Heirs
8    threatened to enjoin the popular *Smallville* television series, which they wrongly
9    claimed infringed their exclusive rights in Superboy.  As a result, DC Comics has
10    incurred substantial expenses defending against the claim Toberoff manufactured
11    and the Shusters facilitated.  Defendants compromised the integrity of the
12    Copyright Office and judicial system by crafting the Shuster Termination Notice in
13    this way, and the Shuster Termination Notice should be held invalid on this and the
14    other related grounds set forth herein.
15                              *      *      *
16        121.    Each of the foregoing reasons is a separate, independent, and
17    alternative basis for declaring the Shuster Termination Notice to be invalid and thus
18    ineffective.  A declaration by this Court regarding the validity of the Shuster
19    Termination Notice is warranted under the Declaratory Judgment Act, 28 U.S.C.
20    §§ 2201 *et seq.*, to establish the parties' respective rights and obligations with
21    respect to the copyright interest in the Superman material.
22    **B.**    **Second Claim for Relief:  Declaratory Relief re: Limited Scope of**
23          **Copyright Termination Notice (Against Defendants Shuster Estate and**
24          **Peary)**
25        122.    DC Comics re-alleges and incorporates by reference each and every
26    allegation contained in the paragraphs above.
27
28

- 39 -                                    COMPLAINT

595

123.    This Second Claim for Relief is advanced in the alternative—*i.e.*, if the Court does not grant DC Comics' First Claim for Relief set forth above and hold that the Shuster Termination Notice is invalid.

### (1) Additional Factual Background

124.    Upon information and belief, in or around 1933, Siegel and Shuster began co-creating comic strips, some of which included stories featuring a character named Superman.  The materials created by Siegel and Shuster during this time are believed to include: (a) 24 days of Superman comic strips intended for newspapers; (b) a seven-page synopsis of the last 18 days (weeks two through four) of such comic strips; (c) a paragraph previewing future Superman exploits; (d) a nine-page synopsis of an additional two months of daily comic strips; and (e) 15 daily comic strips (collectively, the "Unpublished Superman Works").  None of these materials was published in its original form, most were never published at all, and some are apparently lost.

125.    Upon information and belief, between 1933 and 1937, Siegel and Shuster submitted the Unpublished Superman Works to a number of prospective publishers and newspaper syndicates, all of which rejected them.

126.    On December 4, 1937, Siegel and Shuster entered into the December 4, 1937 Agreement with DCI.  Siegel and Shuster agreed to "give their exclusive services" in producing certain comic features for a period of two years.  Siegel and Shuster were required to submit any new continuity to DCI, which reserved the right to accept or reject them for a period of sixty days.

127.    In early 1938, DCI was seeking material for use in a new comic book it was developing entitled "Action Comics."  Pursuant to the December 4, 1937 Agreement, the 24 days of Superman comic strips from the Unpublished Superman Works were provided to DCI for review.  DCI decided to publish a Superman story in Action Comics No. 1, but the materials submitted by Siegel and Shuster to DCI were neither in a form that was acceptable for publication in a comic book, nor

COMPLAINT

1    were they complete.  Therefore, at the instance and expense of DCI and subject to

2    its right of control, Siegel and Shuster adapted the 24 days of comic strips, and

3    added certain new material, to create a 13-page uncolored comic book story entitled

4    "Superman."  Cover art featuring Superman that was used for Action Comics No. 1

5    was thereafter created by DCI.  DCI's printers or engravers, working at the

6    direction of DCI, chose colors for the Superman character and colored the 13-page

7    story and cover.

8         128.   Siegel and Shuster assigned to DCI all of their rights in Superman in

9    the March 1, 1938 Agreement.  This included "all good will attached thereto and

10   exclusive right to the use of the characters and story, continuity and title of strip."

11   Siegel and Shuster agreed not to use Superman or any other character featured in

12   the strip "by their names contained therein."

13        129.   Before the April 1938 publication of Action Comics No. 1, which was

14   cover-dated June 1938, DCI promoted the upcoming Superman story in some of its

15   other publications, including "More Fun Comics No. 31" and "Detective Comics

16   No. 15."  These publications were cover-dated May 1938 and were published prior

17   to Action Comics No. 1.  The promotions (the "Promotions") depict Superman in

18   his costume—including a cape, boots, leotard, and inverted triangular "S" crest on

19   his chest—exhibiting his super-strength by holding a car over his head as

20   bystanders watch in awe.  The Promotions show almost the entirety of what would

21   become the cover of Action Comics No. 1 in clarity and detail.

22        130.   Action Comics No. 1 was comprised not only of the 24 days of

23   Superman comic strips from the pre-existing Unpublished Superman Works (as

24   modified and edited by Siegel and Shuster), but of additional new material created

25   by Siegel and Shuster at DCI's instance and expense and subject to its right of

26   control.

27        131.   Upon information and belief, after the publication of Action Comics

28   No. 1, Siegel and Shuster supplied further original Superman stories to DCI, at

- 41 -

COMPLAINT

597

1  DCI's instance and expense and subject to its right of control.  On September 22,

2  1938, Siegel and Shuster entered into another employment agreement with DCI

3  confirming that Siegel and Shuster had "been doing the art work and continuity for

4  said comics [including Superman comics] for us.  We wish you to continue to do

5  said work and hereby employ and retain you for said purposes."  The DCI

6  September 22, 1938 Agreement also contained an acknowledgement that DCI was

7  the "exclusive" owner of Superman.

8      132.   Also on September 22, 1938, Siegel and Shuster entered into the

9  McClure September 22, 1938 Agreement with DCI and the McClure Newspaper

10  Syndicate concerning the use of Superman in newspaper strips.

11     133.   All of Siegel and Shuster's contributions to Superman comic books

12  and comic strips were made pursuant to the March 1, 1938 Agreement, the DCI

13  September 22, 1938 Agreement, the McClure September 22, 1938 Agreement,

14  contemporaneous oral agreements confirmed by one or more of those agreements,

15  or certain subsequent agreements affirming those agreements, as employees of DCI

16  (or its successors) and at DCI's instance and expense and subject to its right of

17  control.  As a result, all of these materials constitute works for hire under the 1909

18  Copyright Act, and the copyrights therein are owned exclusively by DC Comics

19  and are not subject to termination under later amendments to the Copyright Act.

20     134.   On November 30, 1938, Siegel wrote a letter to DCI (the "November

21  1938 Letter") suggesting that it publish a comic book entitled "Superboy," "which

22  would relate to the adventures of Superman as a youth."  The November 30, 1938

23  Letter does not contain any discussion of plot, dialogue, appearance, or any other

24  copyrightable material relating to Superboy.  DCI decided not to publish a

25  Superboy comic book at that time, and had already published comic books,

26  discussed *supra*, that showed Superman as a young boy and exhibiting super-

27  human strength.  For example, in 1939, among the Superman material prepared by

28  Siegel and Shuster at the instance and expense of DCI and subject to its right of

COMPLAINT

598

1    control was Superman No. 1.  In Superman No. 1, Clark Kent is depicted as a boy

2    with super-powers.

3        135.   On December 19, 1939, Siegel and Shuster entered into the December

4    19, 1939 Agreement with DCI, which modified the DCI September 22, 1938

5    Agreement by, *inter alia*, doubling Siegel and Shuster's compensation for

6    Superman comic books and newspaper strips and providing for payment to Siegel

7    and Shuster for uses of Superman in media such as radio, motion pictures, and toys.

8    Under the December 19, 1939 Agreement, Siegel and Shuster again acknowledged

9    DCI's sole ownership of Superman.

10       136.   Upon information and belief, in December 1940, Siegel, on behalf of

11   himself and Shuster, submitted to DCI a 13-page script of continuity for Superboy

12   (the "Unpublished 1940 Superboy Script") and renewed his suggestion that DCI

13   publish a comic book depicting Superman as a youth.  The Unpublished 1940

14   Superboy Script, which includes the credit line "By Jerry Siegel and Joe Shuster,"

15   states:  "So many faithful followers of today's leading adventure comic strip,

16   SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth … And

17   so here he is at last … the answer to your requests … America's outstanding boy

18   hero:  SUPERBOY!"  The Unpublished 1940 Superboy Script explains that "[i]n

19   later years [Superboy] was to become the might[y] figure known as SUPERMAN!"

20   The Unpublished 1940 Superboy Script was derived entirely from pre-existing

21   Superman elements and ideas that had been published by DCI as part of works for

22   hire, and contained no original copyrightable element.  Again, DCI decided not to

23   publish a Superboy comic book at that time.

24       137.   Upon information and belief, sometime prior to November 18, 1944,

25   DCI published a comic book depicting the adventures of Superman as a youth,

26   called Superboy, in "More Fun Comics No. 101," which had a cover date of

27   January-February 1945 and was illustrated at least in part by Shuster.  Upon

28   information and belief, Siegel did not participate in the creation of this comic book

COMPLAINT

1  or the Superboy story it contained.  Other than retelling the Superman origin story

2  from Action Comics No. 1 and Superman No. 1, this Superboy story bore no

3  resemblance to the Unpublished 1940 Superboy Script.

4      138.   In the more than 70 years since the publication of Action Comics No.

5  1 in 1938, DC Comics has created a vast universe of Superman material spanning

6  virtually all media, including comic books, graphic novels, live action pictures,

7  feature-length motion pictures, motion picture serials, radio and television serials,

8  and live theatrical presentations.  DC Comics' extensive development and

9  exploitation of Superman has generated new characters, new super-powers, new

10  components to the Superman universe, new elements in the Superman back story,

11  and new changes in Superman's appearance.

12  **(2) Claim for Declaratory Relief re: Limited Scope of**

13  **Copyright Termination Notice**

14      139.   In the event that the Shuster Termination Notice challenged in the First

15  Claim for Relief above is deemed to be effective, the scope and reach of the Notice

16  must be declared limited in the following ways:

17  **a.  Unpublished Superman Works**

18      140.   The Shuster Termination Notice purports to terminate certain portions

19  of the Unpublished Superman Works, including: (a) "twenty-four days ... of

20  previously unpublished SUPERMAN newspaper comic strips, created c. 1934,"

21  (b) "SUPERMAN story in comic book form ... created c. 1933," and (c) "15

22  SUPERMAN daily comic strips ... created c. 1934."

23      141.   To the extent that any portion of the Unpublished Superman Works

24  may be considered published for purposes of the Copyright Act (and this is

25  disputed), those portions were published only as a result of their adaptation for

26  inclusion in Action Comics No. 1, which was a work made for hire.  The Copyright

27  Act expressly provides that "a work made for hire" cannot be subject to

28

- 44 -

1   termination.  17 U.S.C. § 304(c)-(d).  As a result, the Shuster Termination Notice is

2   ineffective as to the Unpublished Superman Works.

3                    **b.  Pre-Action Comics No. 1 Promotions**

4        142.   The Shuster Termination Notice does not attempt to terminate DC

5   Comics' rights in the Promotions published before Action Comics No. 1.

6        143.   Moreover, upon information and belief, the Promotions, depicting in

7   sum and substance what was subsequently published as the cover of Action Comics

8   No. 1, were not prepared by Siegel or Shuster, but rather by others either employed

9   by DCI or at the instance and expense of DCI and subject to its right of control.  As

10  a result, the Promotions were works made for hire and any copyright therein was

11  owned by DCI *ab initio* and cannot be subject to termination.  17 U.S.C. § 304(c)-

12  (d).

13       144.   DC Comics remains the sole owner of the Promotions, all copyrights

14  therein, and the various copyrightable elements contained therein.  The Shusters

15  may not seek to terminate copyright interests comprised in the Promotions.

16                         **c.  Works for Hire**

17       145.   The Shuster Termination Notice purports to recapture the rights in

18  Action Comics Nos. 1-7, Superman No. 1, and Superman No. 3 ("Superman

19  Works").  Each of the Superman Works was prepared at the instance and expense

20  of DCI and subject to its right of control.  As a result, the Superman Works were

21  works made for hire and any copyright therein was owned by DCI *ab initio* and

22  cannot be subject to termination.  17 U.S.C. § 304(c)-(d).

23       146.   DC Comics remains the sole owner of the Superman Works, all

24  copyrights therein, and the various copyrightable elements contained therein.[5]

25       [5] In the related action filed by the Siegel Heirs against DC Comics, the federal
26  court agreed with this position almost entirely, ruling that other than a handful of
    pre-1938 materials authored by Siegel, all of Siegel's Superman works were created
27  as "works for hire" on behalf of DC Comics.  The court ruled that all material
    created by Siegel after his 1938 employment agreement with DCI, including Action
28  Comics Nos. 2, 3, 5-61, Superman Nos. 1-23 (other than pages 3-6 of Superman

- 45 -

COMPLAINT

#### d. Derivative Works

147.    All Superman-related works prepared after the publication of Action Comics No. 1 were derivative works based on pre-existing copyrightable material and created under the authority of valid copyright grants (the "Derivative Works").

148.    The Derivative Works include new characters, new super-powers, new components to the Superman universe, new elements in the Superman back-story, and changes in the appearance of Superman.

149.    Regardless of whether the Shuster Termination Notice is deemed valid, DC Comics remains the sole owner of the Derivative Works and retains the continuing right to exploit the Derivative Works under section 304 of the Copyright Act, 17 U.S.C. § 304(c)(6)(A).

#### e. Scope of Shuster Notice

150.    The Shuster Termination Notice, in addition to specifying works to be terminated, also describes certain elements purportedly encompassed by the works sought to be recaptured.  Many of these elements do not appear in the specified works.  In addition to identifying elements that are not present, the Shuster Termination Notice is also notable for its failure to specify elements that are present.  For example, although both the purportedly terminated works Action Comics No. 1 and Superman No. 1 depict Superman as a boy with super-powers, the Shuster Termination Notice is silent on this element.  Accordingly, a dispute has arisen between the parties regarding the scope of the Shuster Termination Notice with respect to the elements that appear, or which do not appear, in the allegedly terminated identified in the Shuster Termination Notice, including, but not limited to, the following:

No. 1), and post-1938 newspaper strips, were works-for-hire and thus could not be terminated.  DC Comics reserves all rights with respect to these interim rulings in the Siegel case.

COMPLAINT

1      a.    Superman's "telescopic vision"

2      b.    Superman's "super hearing"

3      c.    Superman's "super … sense of smell"

4      d.    Superman as a boy with super-powers (*i.e.*, "Superboy")

5      e.    "[D]iamond-shaped "S" insignia on [Superman's] chest"

6      f.    "[L]ove triangle between Superman, Lois Lane and Clark Kent"

7      g.    "Perry White"

8      h.    "Daily Planet newspaper"

9      i.    "Metropolis"

10      j.    "Jor L"

11      k.    "Krypton"

12    151.   A declaration by this Court regarding the scope of the Shuster

13 Termination Notice is warranted under the Declaratory Judgment Act, 28 U.S.C.

14 § 2201 *et seq.*, to establish the parties' respective rights and obligations with respect

15 to the copyright interest in the Superman material.  The Shusters may not seek to

16 terminate copyright interests owned by DC Comics, including those materials listed

17 above.

18 **C.**    **<u>Third Claim for Relief</u>:  Declaratory Relief re: Shuster Period of**

19       **Exclusivity (Against All Defendants)**

20    152.   DC Comics re-alleges and incorporates by reference each and every

21 allegation contained in the paragraphs above.

22    153.   This Third Claim for Relief is advanced in the alternative—*i.e.*, if the

23 Court does not grant DC Comics' First Claim for Relief set forth above and hold

24 that the Shuster Termination Notice is invalid.

25    154.   The Copyright Act establishes an exclusive period between the time a

26 copyright termination notice is served and the effective termination date in which

27 the original copyright grantee may enter into an agreement with the original

28 copyright author or their heirs regarding the rights sought to be recaptured.  Section

COMPLAINT

**603**

1    304(c)(6)(D) provides: "A further grant, or agreement to make a further grant, of

2    any right covered by a terminated grant is valid only if it is made after the effective

3    date of the termination." 17 U.S.C. § 304(c)(6)(D). While the statute bars third

4    parties (like Toberoff and his companies) from trafficking in such future copyright

5    interests during this exclusive time period, it protects the rights and interests of

6    original grantees like DC Comics, providing that "an agreement for such a further

7    grant may be made between the author or [his heirs] and the original grantee or [its

8    successor (*e.g.*, DC Comics)], after the notice of termination has been served." *Id.*

9         155.   Section 304(c)(6)(D) of the Copyright Act establishes a right of DC

10   Comics from November 10, 2003 (when the Shuster Heirs served the Termination

11   Notice) until October 26, 2013 (the effective date of the Notice), during which DC

12   Comics is the sole party that can enter into an agreement with the Shuster Heirs for

13   the rights sought to be terminated. This right has been described by Congress, in its

14   legislative history, and the United States Court of Appeals as a "right of first

15   refusal." Any restriction or limitation on this period of exclusivity must be deemed

16   unenforceable under section 304(c)(6)(D).

17        156.   Upon information and belief, the Shuster Heirs have entered into

18   agreements that frustrate and impede DC Comics' period of exclusivity. For

19   example, the 2003 Pacific Pictures Agreement grants and assigns the Shuster Heirs'

20   putative present and future copyright interests and provides that "any and all

21   agreements regarding any of the Rights [in Shuster's creations, including copyright]

22   shall be subject to the express written approval" of Pacific Pictures. This

23   improperly allowed Pacific Pictures (and Toberoff) to prevent the Shuster Heirs

24   from entering into an agreement with DC Comics concerning their purported

25   rights—in clear violation of section 304(c)(6)(D). Although Pacific Pictures and

26   the Shuster Heirs purported to cancel the 2001 and 2003 Pacific Pictures

27   Agreements in their September 10, 2004 Letter, this improper agreement was in

28   effect at least from the time it was executed on October 30, 2003 through

COMPLAINT

September 10, 2004, which means that it improperly eliminated most of the first year of DC Comics' period of exclusivity. Moreover, the original 2001 Pacific Pictures Agreement provides that if the Shusters' joint venture with Pacific Pictures is terminated "for any reason," then Pacific Pictures will hold 50% of "the property or assets of the Venture," including all the alleged Shuster Superman copyright interests, as a "tenant[] in common," meaning that Pacific Pictures and Toberoff still have improperly encumbered, to this day, DC Comics' period of exclusivity.

157. Upon information and belief, Toberoff has induced the Siegel and Shuster Heirs to enter into additional agreements, which prohibit either family from entering into agreements conveying rights to DC Comics without the express approval of all stakeholders in the heirs' rights—*i.e.*, the Siegel Heirs, Shuster Heirs, and Toberoff and his companies. These agreements and others like it that may exist—which upon information and belief remain in effect to this day—violate section 304(c)(6)(D) and impede DC Comics' ability to settle any and all disputes with the Shusters and Siegels and lawfully pursue its business.

158. The Shuster Heirs' agreements with Toberoff, his companies, and the Siegels improperly interfere with DC Comics' period of exclusivity with the Shuster Heirs regarding their purported Superman rights.

159. A declaration by this Court is warranted under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, to establish the parties' respective rights and obligations with respect to the copyright interest in the Superman material. This declaration should establish that: (a) DC Comics is the sole party with whom the Shuster Heirs can enter into an agreement to convey their putative Superman rights during the exclusivity period, through and including October 26, 2013; (b) any agreement with any third party regarding those putative rights during the exclusivity period is invalid and unenforceable; and (c) any agreements requiring consent of other parties to settle termination claims violate the exclusivity period and, therefore, are invalid and unenforceable.

COMPLAINT

**605**

160.    DC Comics seeks an injunction (a) barring the Shuster Heirs from entering into any agreement with any third party regarding the rights sought to be recaptured in the Shuster Termination Notice until October 26, 2013; and (b) restoring to DC Comics its 10-year period of exclusivity.

**D.    Fourth Claim for Relief:  Intentional Interference with 1992 Shuster Agreement (Against Defendants Toberoff and Pacific Pictures)**

161.    DC Comics re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

162.    In October 1992, the Shuster Heirs and DC Comics executed a final written agreement "fully settl[ing] all claims" as to "right[s] in any and all work[s] created in whole or in part by … Joseph Shuster" (the "1992 Agreement").  Since 1992, DC Comics has paid the Shuster Heirs nearly half a million dollars under the 1992 Agreement.  To DC Comics' knowledge, the Shuster Heirs have never disputed the validity or existence of the 1992 Agreement, which operated to rescind, revoke, and re-grant all of the Shusters' prior grants of rights in the Superman properties to DC Comics.  In that 1992 Agreement, the Shuster Heirs further agreed that they would not—either then or in the future—make any claim of right to any work created in whole or part by Joe Shuster.

163.    DC Comics' 1992 Agreement with the Shuster Heirs was both a valid contract and had the probability of future economic benefit to DC Comics.  The Shuster Heirs fully relinquished their rights under any prior agreement and re-granted to DC Comics all of their Superman-related rights.  This confirmation allowed DC Comics to continue freely developing and exploiting those rights without the risk of termination of the alleged Shuster rights or expensive and protracted legal disputes regarding the ownership of those rights.[6]

---

[6] DC Comics maintains that the 1992 Agreement is a binding, enforceable agreement with the Shuster Heirs.  Even assuming this agreement was deemed invalid, DC Comics also has a long-established economic relationship with the Shusters giving rise to an interference with prospective economic advantage claim.

COMPLAINT

164.    Toberoff and Pacific Pictures were aware of the 1992 Agreement and DC Comics' ongoing business relationship with the Shusters.  Toberoff knew that his actions in having his company enter into a joint venture with the Shusters for the purpose of terminating DC Comics' rights were substantially certain to interfere with DC Comics' 1992 Agreement with the Shusters.  Toberoff's ultimate purpose in approaching the Shuster Heirs was to induce them to repudiate the 1992 Agreement and attempt to terminate prior grants of Shuster's rights.  For this reason, Toberoff and the Shusters formed a joint venture with Pacific Pictures for the express purpose of "retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations" through "termination pursuant to [17 U.S.C. § 304] of any and all grant or transfers by Joe Shuster of any copyright interest in his creations."

165.    Toberoff and Pacific Pictures engaged in independently wrongful conduct to achieve this goal.  They induced the Shuster Heirs to breach the 1992 Agreement and enter into the illegal copyright-assignment and settlement-consent agreements described above.  Toberoff also induced the Shusters to manipulate claims of ownership in Superboy.

166.    As the direct result of Toberoff's and Pacific Pictures' actions, the Shuster Heirs have breached the 1992 Agreement, causing DC Comics to lose the value of the Agreement and forcing DC Comics to incur substantial attorneys' fees and costs in an amount to be proven at trial.

---

This relationship dates back to 1935, when DC Comics' predecessor hired the unknown artist Joseph Shuster to illustrate comic strips for its publications.  Even after their employment arrangement ended, Shuster continued to benefit from his early work on Superman under the 1975 Agreement, which provided him with an annual pension, medical insurance, and a lump-sum payment in exchange for acknowledgement of DC Comics' sole and exclusive ownership of the Superman rights.  At the time Toberoff approached the Shuster Heirs in 2001, DC Comics and the Shuster Heirs had an agreement in place for almost 10 years, which resolved all claims concerning Shuster's putative share of the Superman rights.  DC Comics' agreement with the Shusters and the economic relationship they contemplated had the probability of future economic benefit to DC Comics.

- 51 -

COMPLAINT

**E.**   **Fifth Claim for Relief**: **Intentional Interference with Prospective Economic Advantage re: Siegel-DC Comics Agreement (Against Defendant Toberoff)**

167.   DC Comics re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

168.   DC Comics reached a binding, enforceable agreement with the Siegel Heirs.  After the Siegel Heirs served the Superman Termination Notice in 1997, they engaged in negotiations with DC Comics for four years.  On October 16, 2001, DC Comics made a settlement offer to the Siegel Heirs.  On October 19, 2001, the Siegel Heirs' attorney at the time, Marks, sent a letter to DC Comics outlining the material terms and confirming that the Siegel Heirs "accepted D.C. Comics' offer of October 16, 2001."  On October 26, 2001, DC Comics sent a return letter confirming the parties' agreed-upon terms.  DC Comics then drafted a long-form contract memorializing the agreement, which it sent to the Siegel Heirs on February 1, 2002.  Marks has confirmed that all parties understood that they had a binding agreement.[7]

169.   Even in the event that this agreement is finally adjudicated and deemed to be invalid, DC Comics had a long-established economic relationship with the Siegel Heirs giving rise to an interference with prospective economic advantage claim.  This relationship dates back as far as 1935, when DC Comics' predecessor

---

[7] The district court in the Siegel Actions determined that this agreement was not binding because there was no "meeting of the minds" between the parties.  Of course, this was before the Toberoff Timeline had been produced, which confirmed, *inter alia*, that Marks—who negotiated the agreement on behalf of the Siegel Heirs—understood that the 2001 agreement was final and binding.  Indeed, Marks communicated his position to the Siegel Heirs in August 2002, in an attempt to convince them to reject Toberoff's attempts at interference.  DC Comics reserves all rights to challenge the district court's ruling in the Siegel Actions based on this newly discovered evidence and otherwise, and DC Comics respectfully submits that the district court's interim ruling on this issue is contrary to fact and law.  If DC Comics' claims are accepted, it will amend this Complaint to include a claim for interference with contract arising out of Toberoff's tortious interference with this binding agreement.

COMPLAINT

hired an unknown writer named Jerome Siegel to write comic strips for its publications.  Over the years, Siegel worked on-and-off as an employee of DC Comics and its predecessors.  Even after the employment arrangement ended, Siegel continued to benefit from his early work on Superman under the 1975 Agreement, which provided him and his family with an annual pension, medical insurance, and lump payment in exchange for acknowledgement of DC Comics' sole and exclusive ownership of the Superman rights.  When a dispute arose in 1997 over the Siegel Heirs' attempt to terminate prior grants of Siegel's share of Superman rights, DC Comics and Siegel commenced negotiations, which lasted over four years.  At the time Toberoff approached the Siegel Heirs in 2001, DC Comics and the Siegel Heirs had finally reached an agreement resolving their claims to the Superman and Superboy rights.

170.  The economic relationship that the Siegel Heirs and DC Comics had contemplated and agreed to had the probability of future economic benefit to DC Comics.  The Siegel Heirs recognized DC Comics' sole and exclusive ownership of all rights in Superman and Superboy, allowing it to continue freely developing and exploiting those rights, and avoid the possibility of an expensive and protracted lawsuit regarding ownership of those rights.

171.  Toberoff was well aware of the agreement between DC Comics and the Siegel Heirs.  Toberoff has admitted that he tracked the Siegel Heirs' termination efforts through Internet reports.  Moreover, upon information and belief, when Toberoff approached the Siegel Heirs and their representatives in late 2001 and 2002 to express interest in purchasing their Superman rights, he was informed that the Siegel Heirs had already reached an agreement with DC Comics.

172.  Toberoff knew his actions were substantially certain to interfere with the Siegel Heirs' agreement and ongoing business dealings with DC Comics.  Toberoff intentionally engaged in independently wrongful conduct to carry out his interference by, among other things:  falsely misrepresenting to the Siegel Heirs

COMPLAINT

**609**

1  that he had a billionaire investor ready to purchase their Superman rights if they

2  repudiated their settlement agreement with DC Comics; falsely representing to the

3  Siegels that he would help them produce a competing Superman motion picture;

4  and wrongly inducing the Siegels to repudiate their agreement and business

5  relationship with DC Comics.

6      173.   As a direct result of Toberoff's misdeeds, the Siegel Heirs repudiated

7  the Siegel-DC Comics Agreement with DC Comics and ended all further

8  discussions, causing DC Comics to lose the value of the agreement, to lose their

9  ongoing business relationship with the Siegels, and to incur millions of dollars in

10  subsequent legal fees in disputes with the Siegel Heirs.  DC Comics has suffered

11  actual damages in an amount to be proven at trial.

12  **G.**   **Sixth Claim for Relief**: **Declaratory Relief re: Invalidity of Copyright**

13      **Assignment and Consent Agreements (Against All Defendants)**

14      174.   DC Comics re-alleges and incorporates by reference each and every

15  allegation contained in the paragraphs above.

16      175.   The various copyright assignment and consent agreements between

17  Toberoff and/or his companies, the Siegel Heirs, and the Shuster Heirs are void and

18  unenforceable, including under California's unfair competition laws, *e.g.*, CAL.

19  BUS. & PROF. CODE §§ 17200 *et seq*.  The copyright assignments secured by

20  Toberoff and/or his companies are unlawful and violate DC Comics' rights and

21  interests for the reasons set forth above.  The consent agreements Toberoff has

22  procured are void as a matter of law and public policy because they strip the Siegels

23  and Shusters of their right freely to settle their claims and violate DC Comics'

24  concomitant right freely to negotiate settlement of such claims.

25      176.   A declaration by this Court is warranted under the Declaratory

26  Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, to establish the parties' respective rights

27  and obligations with respect to the copyright interest in the Superman material.

28

COMPLAINT

# VI.  **PRAYER FOR RELIEF**

WHEREFORE, DC Comics prays for judgment against defendants as follows:

177.   A declaration that the Shuster Termination Notice is invalid, and thus ineffective, for one or more of the reasons set forth in DC Comics' First Claim for Relief;

178.   In the event that the Shuster Termination Notice is deemed valid and effective, a declaration that the scope and effect of the Notice is limited as set forth in DC Comics' Second Claim for Relief;

179.   A declaration that:  (a) DC Comics was entitled to a period of exclusivity regarding the Shuster Heirs' purported Superman rights from November 10, 2003 through October 26, 2013; (b) any agreement interfering with that period of exclusivity is invalid and unenforceable; and (c) the consent agreements impermissibly interfere with DC Comics' period of exclusivity and require restoration of the 10-year period free of interference;

180.   A declaration that the various consent agreements between Toberoff and/or his companies, the Siegel Heirs, and the Shuster Heirs are void and unenforceable as a matter of public policy;

181.   An injunction that:  (a) bars the Shuster Heirs from entering into any agreement with any third party regarding the rights sought to be recaptured in the Shuster Termination Notice until October 26, 2013; and (b) restores DC Comics' 10-year period of exclusivity with respect to the Shuster Termination Notice;

182.   As to the tort claims against Toberoff and his entities as sued herein, damages in amounts to be determined at trial;

183.   An award of reasonable attorneys' fees and costs; and

184.   Such other and further relief as this Court deems just and proper.

COMPLAINT

**611**

1

## VII.  DEMAND FOR JURY TRIAL

2      185.   Plaintiff DC Comics hereby demands a trial by jury on all issues

3  triable by a jury.

4

5      Dated:  May 14, 2010                Respectfully submitted,

6                                          O'MELVENY & MYERS LLP

7

8      By:_____

                                          Daniel M. Petrocelli
9                                         Attorneys for Plaintiff DC Comics

10

11

12  Of counsel:

13      PATRICK T. PERKINS (*pro hac vice*
        application pending)
14      pperkins@ptplaw.com
        PERKINS LAW OFFICE, P.C.
15      1711 Route 9D
        Cold Spring, New York 10516
16      Telephone: (845) 265-2820
        Facsimile:  (845) 265-2819
17
    CC1:829569.6
18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

**612**

# EXHIBIT V

DANIEL M. PETROCELLI (S.B. # 097802)
  dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. # 211640)
  mkline@omm.com
CASSANDRA L. SETO (S.B. # 246608)
  cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067-6035
Telephone:  (310) 553-6700
Facsimile:   (310) 246-6779
  *Attorneys for Plaintiff DC Comics*

(Additional counsel listed on the next page)

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DC COMICS,<br><br>        Plaintiff,<br><br>    v.<br><br>PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JOANNE SIEGEL, an individual, LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive,<br><br>        Defendants. | Case No. CV 10-3633 ODW (RZx)<br><br>**DISCOVERY MATTER**<br><br>**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO INITIATE DISCOVERY AND TAKE IMMEDIATE, LIMITED DISCOVERY OF TWO ELDERLY WITNESSES**<br><br>FILED SEPARATELY:  [PROPOSED] ORDER; DECLARATION OF DANIEL M. PETROCELLI IN SUPPORT OF PLAINTIFF'S MOTION; DECLARATIONS OF MARC TOBEROFF AND JOANNE SIEGEL IN OPPOSITION TO PLAINTIFF'S MOTION<br><br>**Judge**:      Hon. Otis D. Wright II<br>**Magistrate**:  Hon. Ralph Zarefsky<br><br>**Hearing Date**:  September 20, 2010<br>**Time**:        10:00 a.m.<br>**Complaint Filed**: May 14, 2010 |

1 (List of counsel continued)

2 PATRICK T. PERKINS (admitted *pro hac vice*)

3   pperkins@ptplaw.com
PERKINS LAW OFFICE, P.C.

4 1711 Route 9D
Cold Spring, NY 10516

5 Telephone:  (845) 265-2820

6 Facsimile:  (845) 265-2819
  *Attorney for Plaintiff DC Comics*

7

8 MARC TOBEROFF (S.B. # 188547)
NICHOLAS C. WILLIAMSON (S.B. # 231124)

9 KEITH G. ADAMS (S.B. # 240497)
TOBEROFF & ASSOCIATES, P.C.

10 2049 Century Park East, Suite 2720
Los Angeles, California 90067

11 Telephone: (310) 246-3333

12 Facsimile: (310) 246-3101
  *Attorneys for Defendants Mark Warren Peary*

13   *as personal representative of the Estate of Joseph*
  *Shuster, Joanne Siegel, and Laura Siegel Larson*

14

15 RICHARD B. KENDALL (S.B. # 90072)
  rkendall@kbkfirm.com

16 LAURA W. BRILL (S.B. # 195889)
  lbrill@kbkfirm.com

17 NICHOLAS F. DAUM (S.B. # 236155)
  ndaum@kbkfirm.com

18 NATHALIE E. COHEN (S.B. # 258222)
  ncohen@kbkfirm.com

19 KENDALL BRILL & KLIEGER LLP

20 10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067

21 Telephone: (310) 556-2700

22 Facsimile: (310) 556-2705
  *Attorneys for Defendants Marc Toberoff,*

23   *Pacific Pictures Corporation, IP*
  *Worldwide, LLC, and IPW, LLC*

24

25

26

27

28

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY  OF TWO WITNESSES

**615**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTORY STATEMENTS ................................................ 2

    A.   DC Comics' Introductory Statement ...................................... 2

    B.   Defendants' Introductory Statement ....................................... 4

II.   DC COMICS' STATEMENT OF THE ISSUES IN DISPUTE ..................... 7

III.   DEFENDANTS' STATEMENT OF THE ISSUES IN DISPUTE ................ 7

IV.   DC COMICS' POSITION ......................................................... 8

    A.   Factual Background ............................................................. 8

        1.   DC Comics' Complaint ................................................. 8

        2.   Ms. Peavy and Ms. Siegel ............................................ 9

        3.   DC Comics' Efforts to Commence Discovery ........................ 10

    B.   Discovery Must Commence in this Case, and Ms. Peavy and
        Ms. Siegel Should Be Deposed No Later than September 30,
        2010. ................................................................................ 11

        1.   Defendants' Contemplated Motion to Dismiss Is Not a
            Bar to Discovery and Its "SLAPP" Motion, in Fact,
            Necessitates Expedited Discovery ................................... 11

        2.   Discovery in this Case Is Not Precluded by Discovery in
            the Siegel Cases ....................................................... 13

        3.   The Toberoff Timeline Is a Proper Subject of Discovery ........ 16

    C.   Conclusion ....................................................................... 17

V.   DEFENDANTS' POSITION ...................................................... 17

    A.   Factual Background ........................................................... 17

        1.   The Siegel Litigation (Case No. CV 04-8400) ..................... 17

        2.   DC Files This Retaliatory Action ................................... 21

            a.   DC's Lawsuit Prompts Dispositive Motions by
                Defendants ...................................................... 21

            b.   DC Exploits the Theft of Privileged and
                Confidential Information from Toberoff's Law
                Firm ............................................................... 21

    B.   The Relief Sought by DC in Its Motion Is No Longer At Issue ......... 23

    C.   This Court Lacks Jurisdiction Over Jean Peavy ........................... 23

    D.   Depositions Should Not Be Compelled on the Dates Noticed by
        DC, Because Dispositive Motions Will Be Heard Less Than
        Two Weeks Later ............................................................... 24

    E.   Depositions Should Await Imminent Resolution of the Pending
        Rule 54(b) Motion in Siegel Which, If Granted, Will
        Substantially Narrow Discovery in this Case ............................. 29

JOINT STIPULATION RE: PLAINTIFF'S MOTION
TO INITIATE DISCOVERY AND TAKE
DISCOVERY OF TWO WITNESSES

1

2

## TABLE OF CONTENTS
(continued)

Page

F.    The Pending Anti-SLAPP Motion Should Stay and/or Limit
      Depositions..................................................................................30

G.    The Depositions Should Be Stayed Because the Witnesses Have
      Already Been Exhaustively Deposed in the Siegel Actions...............35

H.    Conclusion .........................................................................39

APPENDIX A ...........................................................................40

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STIPULATION RE: PLAINTIFF'S MOTION
TO INITIATE DISCOVERY AND TAKE
DISCOVERY OF TWO WITNESSES

617

1    Pursuant to Rules 26, 34, and 37 of the Federal Rules of Civil Procedure and

2    Rule 37-2 of the Local Rules of this Court, the parties respectfully submit the

3    following Joint Stipulation Regarding Plaintiff's Motion to Initiate Discovery and

4    Take Immediate, Limited Discovery of Two Elderly Witnesses.  Pursuant to Local

5    Rule 37-1, the parties have attempted unsuccessfully to resolve their disputes and

6    therefore respectfully seek the assistance of the Court.

7

8    Dated:        August 30, 2010              Respectfully Submitted,

9                                              O'MELVENY & MYERS LLP

10

11   By:  /s/ Daniel M. Petrocelli
          Daniel M. Petrocelli
12        Attorneys for Plaintiff DC Comics

13   Dated:        August 30, 2010              Respectfully Submitted,

14                                              TOBEROFF & ASSOCIATES, P.C.

15

16   By:  /s/ Marc Toberoff
          Marc Toberoff
17        Attorneys for Defendants Mark
          Warren Peary as personal
18        representative of the Estate of Joseph
          Shuster, Joanne Siegel, and Laura
19        Siegel Larson
20

21   Dated:        August 30, 2010              Respectfully Submitted,

22                                              KENDALL BRILL & KLIEGER LLP

23

24   By:  /s/ Richard B. Kendall
          Richard B. Kendall
25        Attorneys for Defendants Marc
          Toberoff, Pacific Pictures
26        Corporation, IP Worldwide, LLC,
          and IPW, LLC
27

28

# I.   INTRODUCTORY STATEMENTS

## A.   DC Comics' Introductory Statement

Plaintiff DC Comics filed this case in May 2010—some three months ago—and since making this filing has sought to promptly commence discovery, especially the depositions of two crucial witnesses of advanced age:  Jean Peavy, age 89, and Joanne Siegel, age 92.  At every turn, defendants have offered one unfounded reason after another to prevent discovery altogether or delay it indefinitely.  To date, DC Comics has been unable to obtain any discovery, secure a discovery plan, or conduct the Rule 26(f) conference.  Therefore, DC Comics seeks an order compelling the commencement of discovery proceedings in this case, specifically the depositions of Ms. Peavy and Ms. Siegel and their discoverable documents.

As detailed in the complaint, this lawsuit was commenced to address various issues concerning the comic-book character Superman, including ownership and control of certain rights to the property; improper efforts by the heirs of Joseph Shuster, the original illustrator of Superman, to recapture purported copyright interests in the character; and unlawful acts of interference by self-styled movie producer and entrepreneur Marc Toberoff.  Jean Peavy is the sister and alleged sole beneficiary of Shuster's estate; and Joanne Siegel is the widow of Jerome Siegel, Shuster's co-creator in Superman.  Both witnesses are parties to several contracts central to this dispute, including contracts granting DC Comics rights that Ms. Peavy and Ms. Siegel now impermissibly seek for themselves, and agreements among the defendants that interfere with DC Comics' rights under federal and state law.  They also are percipient witnesses to the back-room misconduct that interfered with DC Comics' rights, including the manipulation of alleged rights in the character Superboy.

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY  OF TWO WITNESSES

**619**

There is no good reason to further delay the commencement of discovery, especially the depositions of these important witnesses.  Defendants various objections have no merit:

- Defendants contend discovery may not commence until after a Rule 26(f) conference is held, yet they have tactically delayed the Rule 26(f) conference for over two months to forestall DC Comics' right to commence discovery.  Although it has already caused DC Comics unwarranted delay, this objection is now moot, since the Rule 26(f) conference is, finally, scheduled for August 16—the earliest date defendants would accept.

- Defendants contend discovery must await the Court's resolution of their motions to dismiss and motion to strike under the California "SLAPP" statute, scheduled to be filed on August 13.  However, the Federal Rules authorize discovery to proceed during the pendency of Rule 12 motions; and the discovery-stay provisions in California's SLAPP statute have *no* application to DC Comics' federal claims and, in fact, *entitle* DC Comics to expedited discovery regarding its state claims since the defendants' SLAPP motion challenges their *factual* sufficiency.

- Defendants claim the depositions of Ms. Peavy and Ms. Siegel will be duplicative of testimony they gave in lawsuits filed by Ms. Siegel (Case Nos. CV-04-8400 ODW, CV-04-8776 ODW) ("the Siegel Cases")).  This is no bar to their depositions in this case, which involves different parties, different legal claims, and different legal and factual theories.  If defendants have objections to specific questions asked at these or other depositions, they can make those objections in the course of the examinations, DC Comics can respond, and the Court will have a record on which to rule.  No basis exists for an advisory opinion foreclosing lines of inquiry in advance of these depositions.

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

**620**

- Finally, while deliberately delaying the Rule 26(f) conference, defendants filed a preemptive protective-order motion that seeks to prevent DC Comics from conducting discovery about the "Toberoff Timeline" document attached as Exhibit A to DC Comics' complaint.  They contend no discovery can proceed until their motion is decided.  Defendants' position is indefensible.  As will be explained in DC Comics' opposition to defendants' motion, the District Court in the Siegel Cases *ordered* this document produced *nearly two years ago*, finding that any privilege regarding the document was waived.  The Toberoff Timeline has been a matter of public record since March 2009—*for almost 18 months*.  *See Siegel v. Warner Bros. Ent't Inc.*, Case No. CV 04-8400 ODW (RZx) (Docket No. 476-4).  Defendants' motion is without merit and provides no basis to preclude DC Comics' discovery.

## B.    Defendants' Introductory Statement

Plaintiff DC Comics' ("DC") motion to take expedited and unlimited depositions of two elderly witnesses, Joanne Siegel and Jean Peavy, both of whom have already been deposed in closely related litigation, is moot, lacks merit as a matter of law and equity, and is procedurally and jurisdictionally improper.  This motion is part of a larger effort by DC to create a burdensome and chaotic discovery process, to re-litigate matters already decided against it in related litigation, and to obtain strategic leverage by re-deposing elderly witnesses as to the recapture under 17 U.S.C. § 304(c) of the original copyrights to Superman.  As opposed to proceeding on a rational schedule and waiting until recently filed dispositive motions have been resolved, DC insists on immediately deposing these two elderly witnesses.  DC's demands are wholly inappropriate under the unique circumstances of this case, including the following:

- The order sought by DC – to initiate discovery, and to produce Joanne Siegel and Jean Peavy for deposition by September 30, 2010 – is entirely moot,

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY  OF TWO WITNESSES

1  |  since DC initiated discovery following the parties' F.R.C.P. 26(f) conference,

2  |  and has itself noticed depositions of Joanne Siegel on October 5, 2010, and

3  |  Jean Peavy on October 12, 2010, dates which fall after September 30, 2010.

4  | •  Even construing DC's motion as a request for an order to compel depositions

5  |  of Jean Peavy and Joanne Siegel on October 5 and October 12, 2010 (relief

6  |  DC has not requested), DC's motion must be denied. Defendants' well-

7  |  founded dispositive motions pursuant to F.R.C.P. 12(b)(6) are pending as to

8  |  every claim in DC's complaint. These motions are set for hearing shortly

9  |  thereafter on October 18, 2010. There is no need for discovery to resolve

10 |  these motions, as they raise pure issues of law. If any of the motions is

11 |  granted, the scope of appropriate discovery will be dramatically narrowed.

12 | •  DC has stated that it will amend its Complaint, meaning that the pleadings

13 |  are as yet unsettled. This renders depositions in early October unnecessarily

14 |  burdensome, as the parties will be engaged in extensive motion practice

15 |  concerning the amended Complaint in advance of the October 18 hearing.

16 | •  Defendants have informed DC that if its Complaint survives such dispositive

17 |  motions, they will likely assert counterclaims. Such counterclaims will also

18 |  likely affect the appropriate scope of discovery.

19 | •  An Anti-SLAPP motion by defendants is pending as to DC's state law

20 |  claims, as such are intended to chill public copyright filings and participation

21 |  in litigation, and to interfere with the relationship between the attorney Marc

22 |  Toberoff and his clients. With such a motion pending, a discovery stay is

23 |  automatic in state court, and, under a recent United States Supreme Court

24 |  decision that DC fails to mention, such an automatic stay should be applied

25 |  in federal court as a substantive provision of state law. DC makes no effort

26 |  whatsoever to show good cause for lifting such a stay. Even if F.R.C.P.

27 |  56(f)'s analogous standard for postponing a summary judgment motion is

28 |  applied, DC has no "right" to discovery while the Anti-SLAPP motion is

5

**622**

pending, as it has made no showing whatsoever of the facts it needs to
contest such motions.

- DC has already obtained extensive discovery in the closely related Superman
  action, *Joanne Siegel, et al. v. Warner Bros. Entertainment Inc. et al.*, 04-
  CV-8400 ODW (RZx) ("*Siegel*"), from these same witnesses, on the same
  topics on which it now seeks to re-depose them.
- A motion for entry of final judgment pursuant to F.R.C.P. 54(b) is also
  pending before Judge Wright in *Siegel*, regarding three lengthy published
  orders by the Court that upheld the Siegels' recaptured Superman copyright
  interest and defined its scope. That motion is set for hearing on September
  27, 2010. If it is granted, the findings in *Siegel* will have collateral estoppel
  effect as to DC in this case, thereby also substantially narrowing the scope of
  discovery.
- 92-year-old Joanne Siegel experienced pronounced stress and discomfort
  during her last seven-hour deposition in *Siegel*. *See* Declaration of Joanne
  Siegel, ¶¶ 2-9. At a minimum, if she is forced to sit through a repetitive
  second deposition, the above motions should first be decided and the scope
  of the pleadings set.
- DC has been on notice of the claims in its new Complaint for at least four
  years, and has been in receipt of the documents that it alleges give rise to its
  claims since November 2006 and December 2008, at the latest. Yet DC
  waited a year and a half (until May 2010) to bring this lawsuit, knowing that
  the witnesses it seeks to depose were elderly. Having waited so long, DC's
  claim of urgency due to advanced age lacks credibility.
- There is no urgent reason why DC must take these depositions immediately,
  rather than waiting just a few weeks for the Court to rule on the dispositive
  motions to dismiss, the Anti-SLAPP motion and the Rule 54(b) motion, and
  for DC to amend its Complaint. A needless rush to discovery would raise a

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

host of unnecessary problems and confusion over the appropriate scope of examination that could be entirely avoided.

• 89-year-old Jean Peavy is not a party to this action, she resides in New Mexico, and DC failed to serve a proper subpoena to depose her in that State. DC's motion as to her is frivolous, as this Court lacks jurisdiction to compel her deposition.

Given that this Court lacks jurisdiction over Ms. Peavy, and that the request to "initiate" discovery is moot, the only live question here is whether this Court should order the expedited deposition of the 92-year-old Joanne Siegel (who was already deposed for seven hours on the same topics) before the Court rules on the dispositive motions that could end or greatly narrow this case. No good reason exists to grant such an order, and all the factors outlined above support an opposite approach.

## II.  DC COMICS' STATEMENT OF THE ISSUES IN DISPUTE

(1) Whether defendants may continue to delay the initiation of discovery in this case?

(2) Whether defendants must be compelled to produce Joanne Siegel and Jean Peavy for their noticed depositions, along with their documents, no later than September 30, 2010?

## III.  DEFENDANTS' STATEMENT OF THE ISSUES IN DISPUTE

(1) Is this "Motion to Initiate Discovery" entirely moot, because DC has already initiated discovery and has noticed depositions of the two witnesses at issue for dates after the September 30 deadline it requests?

(2) Should the 92-year-old widow and 89-year-old sister of Superman's two co-creators be forced to sit for depositions while dispositive motions under F.R.C.P. 12(b)(6), and 54(b), and California's Anti-SLAPP law are pending and will be heard in a matter of weeks, and the pleadings are not yet final?

(3) Does this Court have jurisdiction to compel the deposition of Jean Peavy,

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

a non-party to this action and a resident of New Mexico?

(4) Can DC compel discovery during the pendency of an Anti-SLAPP motion, where DC has failed to identify any facts it seeks to obtain through such discovery or how they are relevant to the motion?

(5) Is the automatic discovery stay provided under California's Anti-SLAPP law, to protect free speech and public participation against abusive lawsuits designed to chill such conduct, so intertwined with a state right or remedy that it functions to define the scope of the state-created right, and therefore must be applied in federal court under the controlling opinion of the United States Supreme Court in *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431 (2010)?

## IV.   DC COMICS' POSITION

### A.   Factual Background

#### 1.   DC Comics' Complaint

DC Comics filed the complaint in this case on May 14, 2010 to protect rights in the Superman property it has nurtured, developed, and promoted for over 70 years and to seek redress for violations of its rights by defendants. DC Comics' complaint includes six claims for relief: the first three arise under federal copyright law; the remainder arise under state law. The first and second claims challenge purported copyright termination notices filed on behalf of the putative heirs of Joseph Shuster, the first illustrator of Superman. *See* Compl. ¶¶ 92-151. These termination notices are invalid because, among other reasons, Shuster's heirs—including his sister, Jean Peavy—entered into a contract in 1992 that has the legal effect of preventing Ms. Peavy or Shuster's heirs from asserting the termination rights they now invoke. *See id.* ¶¶ 46-51, 99-104. DC Comics' third claim similarly arises under federal copyright law and, like the first claim, asserts that defendants, Ms. Peavy, and others engaged in forbidden trafficking of rights that violate DC Comics' rights under the Copyright Act. *See id.* ¶¶ 151-60. This

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

1   includes transferring the Shusters' putative rights in Superman to Toberoff, his

2   alter-ego companies, and the Siegels, *see id.* ¶¶ 52-58, 156-58—all in violation of

3   DC Comics' rights. *See Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1047 (9th

4   Cir. 2005). These illicit dealings also include misconduct connected to the parking

5   of alleged Superboy rights with the Siegels—rights that Shuster had long claimed

6   were his own. *See id.* ¶¶ 73-78.

7          DC Comics' fourth, fifth, and sixth claims arise under state law and are

8   aimed at unlawful schemes orchestrated by Marc Toberoff and his alter-ego

9   companies in interfering with DC Comics' rights, contracts, and economic

10  relationships. *See* Compl. ¶¶ 161-76. Toberoff's rights-manipulation scheme is a

11  complicated one. Although some of his activities have recently come to light as

12  summarized in DC Comics' complaint, much more remains to be exposed. *See id.*

13  ¶¶ 1-11, 52-91.

14                    2.   **Ms. Peavy and Ms. Siegel**

15         Both Jean Peavy and Joanne Siegel are material witnesses in this case and

16  have direct financial stakes in its outcome. Their advanced age makes it essential to

17  preserve their testimony. They are parties to multiple contracts with DC Comics, as

18  well as with each other and various defendants, that are at the heart of this dispute.

19  *See* Compl. ¶¶ 5-11, 46-57, 61-71, 76-77, 86-88. DC Comics is entitled to examine

20  both witnesses concerning the origin, negotiation, formation, and performance of

21  these agreements, among other key issues.

22         The depositions of Ms. Peavy and Ms. Siegel in the Siegel Cases do not

23  remotely suffice to substitute for proper depositions in this case. They contain

24  limited examination on some issues relevant to this case, but only in the context of

25  the separate claims and issues being litigated in the Siegel Cases. *See infra* Section

26  IV.B.3. There is no meaningful examination, for instance, about the conduct of

27  Toberoff and his companies in trafficking and interference with copyright and

28  contractual interests; the circumstances of the heirs' initial and ensuing interactions

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

with Toberoff; and the illicit agreements by which the Shusters were precluded

from freely entering into an agreement with DC Comics—all conduct that underlies

DC Comics' claims in this case.

### 3.  DC Comics' Efforts to Commence Discovery

Promptly after filing its complaint, DC Comics requested that defendants

engage in the initial discovery conference required by Rule 26(f).  *See* Petrocelli

Decl. ¶¶ 10-11, Ex. H.  Over the course of the next two months, defendants

persistently refused to timely hold the conference or agree to commence discovery,

including the depositions of Ms. Peavy and Ms. Siegel, as detailed in Daniel

Petrocelli's accompanying declaration.  Initially, defendants said the parties could

not commence discovery or discuss a discovery plan until the Court issued an order

setting a scheduling conference.  Next, Mr. Toberoff, after stating he was

representing himself "for now," said he needed time to retain counsel for the

Toberoff parties.  After counsel was obtained, defendants said discovery should not

proceed because they intended to file dispositive motions to dismiss the complaint.

Defendants also claimed any depositions of Ms. Peavy and Ms. Siegel were

unnecessary in whole or in part because they already testified in the Siegel Cases.

Then, after weeks of unsuccessful efforts by DC Comics to secure a Rule 26(f)

conference or otherwise engage defendants in discovery, defendants asserted that

discovery could not proceed because they intended to seek a protective order

related to the Toberoff Timeline.  Defendants also said they needed to see the

specific discovery DC Comics sought from Ms. Siegel and Ms. Peavy—which DC

Comics immediately provided.  *See id.* ¶¶ 11-28; Exs. H-U.

DC Comics protested these tactical delays, particularly defendants' refusal to

participate in a Rule 26(f) conference to forestall commencement of DC Comics'

discovery and enable defendants to file a preemptive motion for a protective order

that they insisted be litigated and heard first.  *See* Petrocelli Decl. ¶¶ 11-28; Exs. H,

I, K, O, Q, S, T, V.  DC Comics advocated a joint motion after the parties' Rule

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY  OF TWO WITNESSES

26(f) conference.  *See id.* ¶¶ 27-29, Exs. T, V.  Defendants refused, and even now contend that DC Comics has no right to bring this discovery motion because it did not adequately meet and confer.

The record is clear, and so is defendants' objective:  to block all discovery indefinitely in the hope of obtaining a complete dismissal.  DC Comics submits there is no just reason for further obstruction of its discovery rights.

**B.      Discovery Must Commence in this Case, and Ms. Peavy and Ms. Siegel Should Be Deposed No Later than September 30, 2010.**

While the ordinary procedure is to conduct an early meeting of counsel before commencing discovery, Rule 26(d) provides that discovery may be taken at any time when authorized by court order and on good cause being shown.  *See* FED. R. CIV. PROC. 26(d); *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002).  This Court instructs parties to "begin to conduct discovery actively before the Schedule Conference required by Fed. R. Civ. P. 16(b)," because "at the Scheduling Conference the Court will impose tight deadlines to complete discovery."  Petrocelli Decl. Ex. at 2 n.1.

DC Comics has provided defendants with specific notice of two depositions it seeks to take, together with the documents.  *See* Petrocelli Decl. ¶¶ 27, Ex. T.  On August 16, the parties are scheduled to have the Rule 26(f) conference.  Ms. Peavy and Ms. Siegel are elderly, and good cause exists to order that their depositions take place no later than September 30, 2010, and that discovery commence and proceed apace in this case.

**1.      Defendants' Contemplated Motion to Dismiss Is Not a Bar to Discovery and Its "SLAPP" Motion, in Fact, Necessitates Expedited Discovery.**

The mere filing of a dispositive motion under Rule 12 does not relieve defendants of their discovery obligations.  *See Skellerup Indus. v. City of Los Angeles*, 163 F.R.D. 598, 600-601 (C.D. Cal. 1995).  "Had the Federal Rules

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

1   contemplated a motion to dismiss under [Rule] 12(b)(6) would stay discovery, the

2   Rules would contain a provision for that effect.  In fact, such a notion is directly at

3   odds with the need for expeditious resolution of litigation."  *Id.*

4           Although California's anti-SLAPP statute, *see* CALIF. CODE CIV. P. § 425.16,

5   provides for staying discovery related to California *state-law claims* being

6   adjudicated in California *state court*, the U.S. Constitution's Supremacy Clause

7   dictates that the anti-SLAPP statute has no bearing on DC Comics' federal claims

8   for relief.  *See Hilton v. Hallmark Cards*, 580 F.3d 874, 881 (9th Cir. 2009) ("[T]he

9   anti-SLAPP statute does not apply to federal law causes of action."); *Sonoma*

10  *Foods, Inc. v. Sonoma Cheese Factory, LLC*, 634 F. Supp. 2d 1009, 1016 (N.D.

11  Cal. 2007) ("Although Section 425.16 applies to state law claims brought in federal

12  court, it does not apply to federal question claims in federal court because such

13  application would frustrate substantive federal rights.").

14          *All of the discovery* DC Comics seeks of Ms. Peavy and Ms. Siegel is

15  relevant to DC Comics' three federal claims and, thus, defendants have no reason

16  based on the SLAPP statute to object to any of the discovery.  *In re Bah*, 321 B.R.

17  41, 45 (9th Cir. BAP 2005) (SLAPP statute does not apply to federal question

18  claims); *see also Globetrotter Software, Inc. v. Elan Computer Group. Inc.*, 63 F.

19  Supp. 2d 1127, 1130 (N.D. Cal. 1999) ("the anti-SLAPP statute is not applicable to

20  the federal claims").  Moreover, in light of the defendants' SLAPP motion, DC

21  Comics is entitled to discovery necessary to respond to the motion.  The Ninth

22  Circuit has made clear that when a defendant files a SLAPP motion in federal court,

23  the motion cannot be granted unless the non-moving party is given a full and fair

24  opportunity to "discover information that is essential to its opposition."  *Metabolife*

25  *Intern., Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) ("Because the discovery-

26  limiting aspects of § 425.16(f) and (g) collide with the discovery-allowing aspects

27  of Rule 56, these aspects of subsections (f) and (g) cannot apply in federal court.").

28

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY  OF TWO WITNESSES

**629**

Furthermore, defendants' SLAPP motion, as described in meet-and-confer discussions, seeks to challenge the factual underpinnings of DC Comics' state-law claims. DC Comics is entitled to take discovery to oppose such challenges and must be provided the opportunity to do so before summary judgment. *See, e.g.*, *id.*; *Moser v. Triarc Cos.*, 2007 WL 3026425, at *3 (S.D. Cal. Oct. 16, 2007) ("[I]f a party brings an anti-SLAPP motion challenging the sufficiency of the nonmoving party's evidence, *the court must allow the nonmoving party to conduct discovery* sufficiently to permit summary judgment under Rule 56.") (emphasis added); *cf. Four Navy Seals v. Associated Press*, 413 F. Supp. 2d 1136, 1149 (S.D. Cal. 2005) (where SLAPP motion only challenges *legal sufficiency* of complaint, discovery may not be necessary).

## 2. Discovery in this Case Is Not Precluded by Discovery in the Siegel Cases.

By rule, DC Comics is entitled to initiate discovery in this case, *see* FED. R. CIV. P. 26-37, and to the extent defendants seek to prevent discovery generally or to prevent the depositions of Ms. Peavy and Ms. Siegel, they must "carry a heavy burden of showing why discovery should be denied." *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975); *see also DR Sys., Inc. v. Eastman Kodak Co.*, 2009 WL 2973008, at *2 (S.D. Cal. Sept. 14, 2009) (right to deposition should not be barred absent "extraordinary circumstances").

Defendants have not identified specific objections to the depositions of Ms. Peavy or Ms. Siegel. Nor could they reasonably do so: these depositions have yet to occur, and a record has to yet to develop as to what questions DC Comics will ask, what answers the witnesses will give, and what objections defendants will interpose. Instead, defendants have made the blanket objection that Ms. Peavy and Ms. Siegel may not be examined on subjects previously touched on in the Siegel Cases or even at all. *See* Petrocelli Decl. ¶ 30, Ex. V. Defendants' position is unfounded and requires the Court to issue an advisory opinion precluding entire

1   lines of inquiry without an appropriate record of the scope, content, and conduct of

2   these examinations.

3       Courts refuse to grant such broad in-limine rulings in the trial context, and

4   such orders are even more inappropriate where, as here, the objection is that

5   discovery may be cumulative or burdensome.  "A court generally will not limit

6   discovery simply because it may be somewhat cumulative and duplicative.  Rather,

7   the discovery must be unreasonably so in light of the nature of the inquiry before

8   the court will limit the discovery sought."  6 DANIEL R. COQUILLETTE ET AL.,

9   MOORE'S FED. PRAC. § 26.60[2], at 26-431 (3d ed. 2007).  "Broad allegations of

10  harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy

11  the Rule 26(c) test."  *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th

12  Cir. 1992).  Indeed, the Federal Rules, by their own terms, acknowledge that

13  discovery will oftentimes be cumulative or duplicative, but only when discovery is

14  "*unreasonably* cumulative or duplicative" may it be precluded.  FED. R. CIV. P.

15  26(b)(2)(C)(1) (emphasis added).

16      Parties are routinely allowed to depose the same witnesses on similar topics

17  in different cases, and are even permitted to do so within the same case, especially

18  where, as here, a long time has passed since the first deposition, new evidence has

19  come to light, and new case theories have developed.  *See, e.g.*, *Graebner v. James*

20  *River Corp.*, 130 F.R.D. 440, 441 (N.D. Cal. 1989); *Blackwell v. City & County of*

21  *San Francisco*, 2010 WL 2608330, at *1 (N.D. Cal. June 25, 2010).  As defendants

22  well know, this is a new case, and the parties and claims for relief at issue are

23  distinct from the Siegel Cases, as a comparison of the claims in the two cases bears

24  out.  *Compare id.* Ex. C, *with id.* Exs. A & B.  In the limited instances where there

25  is overlap in the issues, courts have long permitted second depositions on such

26  topics, *see, e.g.*, *Batelli v. Kagan & Gaines Co.*, 236 F.2d 167, 169-70 (9th Cir.

27  1956), especially where, as here, the witnesses were asked only a few questions on

28  overlapping areas of fact—or were asked no questions at all on important issues,

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

1   *see, e.g.*, *Cunningham v. Gates*, 2006 WL 2294877, at *3 (C.D. Cal. Aug. 2, 2006);

2   *see also Baldwin-Montrose Chem. Co. v. Rothberg*, 37 F.R.D. 354, 356 (S.D.N.Y.

3   1964). In no event is DC Comics bound by limited examinations conducted years

4   before this case on issues that were not fully explored and on which the Court in the

5   Siegel Cases made no findings and rendered no final judgment. *Cf. Levi Strauss &*

6   *Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1356-57 (9th Cir. 1985) (issue preclusion

7   only applicable where issues and facts are identical—not merely similar—and—

8   unlike here—the court rendered final judgment in prior case); *Hydranautics v.*

9   *FilmTec Corp.*, 204 F.3d 880, 887-88 (9th Cir. 2000) (claim preclusion; same).

10  Ms. Peavy was deposed in the Siegel Cases for a total of 67 minutes,

11  generating 37 pages of transcript. *See* Petrocelli Decl. Ex. X. In the Siegel Cases,

12  she was a third-party witness. Here, she is the self-described sole beneficiary of the

13  Shuster Estate; it is the Shuster copyright termination notice that is centrally at

14  issue in the dispute; Ms. Peavy signed key contracts at issue; and she bore witness

15  to Toberoff's conduct that interfered with DC Comics' rights under federal and

16  state law. *See* Compl. ¶¶ 5-6, 9-11, 46-58, 73-88, 92-160, 174-76. Even where

17  extensive discovery has occurred in a prior case, further depositions and discovery

18  are warranted where the specific issues in the subsequent case were not previously

19  "fully developed factually." *Waltz v. U.S. Dep't of Agric.*, 251 F.R.D. 491, 500

20  (E.D. Cal. 2008).

21  Moreover, Ms. Peavy must be deposed because she was never examined in

22  the Siegel Cases on important contracts, documents, and other issues that have

23  come to light since her deposition. *Cf. Graebner*, 130 F.R.D. at 441; *Blackwell*,

24  2010 WL 2608330, at *1. This includes the existence and terms of agreements

25  between the Shusters and the Siegels (and others) concerning the Shusters' ability

26  to reach agreements with DC Comics during the pendency of the Shusters'

27  copyright termination notices. Any such agreements would violate DC Comics'

28  rights under the Copyright Act. *See Milne*, 430 F.3d at 1047. DC Comics has

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

1  every right to explore these contentions with Ms. Peavy, as well as question her on

2  other offending agreements in which she participated.  DC Comics also needs to

3  examine the illicit parking of Superboy rights, *see* Compl. ¶¶ 9-10, 73-78, in

4  addition to the events described in the Toberoff Timeline, which was ordered

5  produced well after Ms. Peavy was deposed, *see id.* ¶¶ 89-91, Ex. A.

6  Similarly, Ms. Siegel's deposition in the Siegel Cases did not fully explore

7  key issues being litigated here or address certain issues at all.  For example, she was

8  only briefly examined, over a few pages, concerning Superboy; whether and how

9  the Siegels and Shusters share in rights related to Superboy are directly relevant to

10  DC Comics' second, third, and sixth claims for relief.  Like Ms. Peavy, Ms. Siegel

11  also was not examined concerning events described in the Toberoff Timeline.  *See*

12  *Kraemer v. Unocal Termination Allowance Plan*, 2009 WL 936611, at *2 (C.D.

13  Cal. Apr. 6, 2009) (further deposition of witnesses deposed in prior cases not

14  duplicative where facts related to potential conflict of interest were not at issue in

15  prior cases).

16  Among other issues to address with the witnesses is whether and to what

17  extent they were misled by Toberoff about his being in business with a "billionaire

18  willing to invest $15 million"—an illicit inducement Toberoff used to interfere with

19  DC Comics' business relations with the Siegels.  *See* Compl. ¶¶ 68-69, Ex. A at 6;

20  *Zamora v. D'Arrigo Brother Co.*, 2006 WL 3227870, at *2 (N.D. Cal. Nov. 7,

21  2006) (second Rule 30(b)(6) deposition not duplicative where important evidence

22  was produced after first deposition); *UniRAM Tech., Inc. v. Monolithic Sys. Tech.,*

23  *Inc.*, 2007 WL 915225, at *2 (N.D. Cal. Mar. 23, 2007) (second 30(b)(6) deposition

24  would not be unreasonably duplicative, even where "significant overlap" may

25  occur).

26  3.  **The Toberoff Timeline Is a Proper Subject of Discovery.**

27  Completely without merit are defendants' efforts—years after the fact—to

28  now cloak the Toberoff Timeline in privilege, remove it from the public record,

16

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY  OF TWO WITNESSES

suppress its use in this case, and use the document itself as a basis to delay the taking of Ms. Peavy's and Ms. Siegel's depositions. The District Court in the Siegel Cases ordered production of the Timeline in December 2008. Immediately thereafter, the Toberoff and Siegel defendants were advised that the document would be filed publicly, and though specifically invited to move for a protective order if they objected, they filed no such motion. They similarly took no action when, in May 2010, DC Comics filed this complaint, which attached the Timeline as Exhibit A. Far from objecting, Toberoff spoke openly to the press about the document. Only on July 13—and well after DC Comics had pressed for commencement of discovery—did defendants assert for the first time that they would file a motion to preclude any use of the Timeline in this case and insisted that *their motion* be resolved before discovery proceeds. *See* Petrocelli Decl. ¶ 23. DC Comics will respond to defendants' motion for a protective order in its opposition papers.

### C. Conclusion

The Court should issue an order: (1) requiring that discovery commence in this case without any further delay; and (2) requiring that Ms. Siegel and Ms. Peavy sit for their depositions and produce their documents no later than September 30, 2010.

## V. DEFENDANTS' POSITION

### A. Factual Background

#### 1. The *Siegel* Litigation (Case No. CV 04-8400)

This discovery dispute involves two closely related actions, both of which deal with the statutory termination by the heirs of Superman's co-creators of prior Superman grants to DC, pursuant to the Copyright Act. Jerome Siegel ("Siegel") and Joseph Shuster ("Shuster") co-authored the first Superman story, later published in 1938 in *Action Comics, No. 1* by DC's predecessor, and hundreds of subsequent Superman works. Joanne Siegel, Siegel's widow, and Laura Siegel

17

Larson, their daughter, served notices of termination pursuant to 17 U.S.C. § 304(c)

(the "Siegel Terminations") on DC, and its effective parent, Warner Bros.

Entertainment Inc. ("Warner"), on April 3, 1997 and November 8, 2002, that

terminated Siegel's old copyright grants regarding Superman and Superboy, on

April 16, 1999 and November 17, 2004, respectively.

Warner disputed the Siegel Terminations, forcing the Siegels in October

2004 to file for declaratory relief as to their validity in two separate actions, Nos.

04-CV-8400 (Superman) and 04-CV-8776 (Superboy).  DC counterclaimed that the

Siegel Terminations were invalid.  These cases have been litigated fiercely ever

since, generating four published opinions that total more than two hundred pages,

as well as extensive discovery.  Multiple depositions were taken, including those of

the two witnesses at issue in the instant motion, Joanne Siegel and Jean Peavy.

Jean Peavy ("Peavy") is the 89-year-old sister of Joseph Shuster.  DC also took the

depositions of Jerome Siegel's daughter, Laura Siegel Larson, and Joseph Shuster's

nephew (and the executor of his estate), Mark Warren Peary ("Peary" or "Shuster

Executor").  The Siegels' counsel, Marc Toberoff ("Toberoff"), also represents the

Shuster Executor, who served a notice of termination regarding Superman ("Shuster

Termination") on November 10, 2003 pursuant to 17 U.S.C. § 304(d), which will

become effective on October 26, 2013.[1]  The above-named persons, including

Joanne Siegel and Jean Peavy, produced thousands of pages of documents in

response to DC's subpoenas and deposition notices.  *See* Declaration of Marc

---

[1] At the time of Joseph Shuster's death in 1992, under the Copyright Act of 1976,
Pub. L. 94-553, 17 U.S.C. § 304(c)(2), only an author's widow or widower,
children or grandchildren held termination rights.  Joseph Shuster died unmarried
and childless.  Toberoff Decl., Ex. A, ¶ 46.  As such, no one in Shuster's family
held termination rights.  The Copyright Term Extension Act of 1998, Pub. L. No.
105-298, expanded the category of those holding the termination right by adding
"the author's executor, administrator, personal representative, or trustee." 17 U.S.C.
§ 304(c)(2)(D).  The Shuster Estate was then probated to avail itself of the
termination right provided by the 1998 Act.  17 U.S.C. § 304(d).

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

1  Toberoff ("Toberoff Decl."), ¶ 14.

2  As part of this discovery, DC asked for and received extensive information

3  concerning the formation of the attorney-client relationship between the Siegel and

4  Shuster families and their attorney, Toberoff. For example, in 2006 copies of 2001

5  and 2003 agreements between Peavy, Peary and Toberoff's loan-out company,

6  Pacific Pictures Corporation ("Pacific Pictures Agreements") were produced to DC

7  in *Siegel*. Toberoff Decl., ¶ 16, Ex. J. These agreements were cancelled in 2004

8  and have had no effect for nearly six years. Toberoff Decl., Ex. A ("Complaint"), ¶

9  86. A 2002 agreement between Toberoff, Joanne Siegel, Laura Siegel Larson, and

10  IP Worldwide (the "IP Worldwide Agreement") was also produced in 2006 to DC

11  in *Siegel*. Toberoff Decl., Ex. L. This agreement expired and has had no effect for

12  more than five years. Toberoff Decl., Ex. C at 10, n.5.

13  DC repeatedly questioned both Joanne Siegel and Jean Peavy about their

14  retention of Mr. Toberoff. Joanne Siegel was deposed for a full day, during which

15  DC asked her about many of the topics at issue in DC's new lawsuit, including:

16  when Toberoff's representation of her began (Toberoff Decl., Ex. I ("Siegel Depo.

17  Tr.") at 41:1-3; Ex. A (Complaint), ¶¶ 64, 70-72); whether Toberoff was involved

18  in the Siegels' negotiations with DC and Warner in 2001 and 2002 (Siegel Depo.

19  Tr. at 24:13-28:13, 39:1-40:25; Complaint, ¶¶ 62, 168-69); whether Joanne received

20  any assistance from Toberoff in writing her May 9, 2002 or September 21, 2002

21  letters breaking off settlement talks with DC regarding the Siegel Terminations

22  (Siegel Depo. Tr. at 32:18-34:17, 36:16-40:17, 42:17-43:9, 43:10-44:25, 45:1-

23  46:24, 119:4-121:9; Complaint, ¶¶ 65-67, 70, 168-69); and the Shuster Termination

24  and Toberoff's representation of Jean Peavy (Siegel Depo. Tr. at 102:8-104:25,

25  105:1-5; Complaint, ¶¶ 64, 70-72, 79-88). *See* Toberoff Decl., Exs. A, I.

26  Jean Peavy was also asked about many topics at issue in this lawsuit

27  including: Peavy's first meeting with Toberoff and her introduction of the Siegels

28  to Toberoff (Toberoff Decl., Ex. K ("Peavy Depo. Tr.") at 31:24-32:4; Ex. A

19

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

**636**

1    (Complaint), ¶¶ 54, 164-66); the formation of the Shuster Estate and the Shuster

2    Termination (Peavy Depo. Tr. at 28:10-14; Complaint, ¶ 58); the Pacific Pictures

3    Agreements (Peavy Depo. Tr. 34:3-34:24; Complaint, ¶¶ 54-57, 105-11); and a

4    1992 agreement Peavy entered into with DC (Peavy Depo. Tr. 18:20-23:25, 34:3-

5    34:24; Complaint, ¶¶ 47-51, 99-104, 162-63). *See* Toberoff Decl., Exs. A, K.

6         Fact discovery in the *Siegel* litigation closed on November 16, 2006.

7    Toberoff Decl., ¶ 21. DC unsuccessfully sought to reopen discovery based on the

8    so-called "Toberoff Timeline" (discussed below, and which is attached to and

9    forms the basis of DC's new Complaint), but the Court denied this request. *Id.*,

10   Exs. N-O.

11        The parties filed substantial cross-motions for partial summary judgment in

12   the Superman action. The Siegels sought, *inter alia*, to have their terminations

13   declared valid as a matter of law. On March 26, 2008, Judge Larson upheld the

14   Siegels' Superman Termination, and ruled that, as of April 16, 1999, the Siegels

15   own 50% of the copyright to the first Superman story published in *Action Comics,*

16   *No. 1*. *See Siegel v. Warner Bros. Ent. Inc.*, 542 F. Supp. 2d 1098, 1117-39 (C.D.

17   Cal. 2008) ("*Siegel* I"). Subsequently, on August 12, 2009, Judge Larson held that

18   the Siegels had also recaptured Siegel's copyright interest in *Action Comics, No. 4*,

19   parts of *Superman, No. 1* (pages 3-6) and Superman's origin story on the planet

20   Krypton contained in the first two weeks of the *Superman* newspaper strips. *See*

21   *Siegel v. Warner Bros. Ent. Inc.*, 658 F. Supp. 2d 1036 (C.D. Cal 2009) ("*Siegel*

22   II"). Recently, on August 12, 2010, the Siegels moved under F.R.C.P. 54(b) to

23   have judgment entered as to these detailed orders as to the validity and scope of the

24   Siegel Terminations, to permit immediate appeal. Toberoff Decl., Ex. P. The

25   motion is set to be heard on September 27, 2010. *Id*.

26

27

28

20                          JOINT STIPULATION RE: PLAINTIFF'S
                            MOTION TO INITIATE DISCOVERY AND
                            TAKE DISCOVERY OF TWO WITNESSES

2.  **DC Files This Retaliatory Action**

a.  DC's Lawsuit Prompts Dispositive Motions by
    Defendants

Judge Larson retired from the bench in October 2009, and the *Siegel* cases were transferred to Judge Otis D. Wright.  Thereafter, Warner and DC fired their counsel and retained Daniel Petrocelli, of O'Melveny and Myers, LLP.  Unhappy with the results of the *Siegel* litigation, DC filed this new lawsuit on May 14, 2010.  The new complaint contains three state-law claims for relief, wherein DC personally sued the Siegels and Shuster Estate's attorney, Toberoff, for purportedly "tortiously interfering" with DC's "relationship" with the Siegels, and contested the validity of the Shuster Termination on many of the same failed grounds that DC had contested the Siegel Termination.  DC also sued the Siegels, the Shuster Executor, and Toberoff for allegedly entering into so-called "consent agreements" with the Shuster Executor that supposedly violated DC's purported rights under the Copyright Act.

On August 13, 2010, Toberoff filed a substantial motion to dismiss DC's Fourth, Fifth and Sixth claims against him and his entities pursuant to F.R.C.P. 12(b)(6), and filed a motion to strike under California's Anti-SLAPP statute, Code of Civil Procedure § 425.16.  Toberoff Decl., Exs. C-D.  DC's Complaint also contains three claims, purportedly under the Copyright Act, that challenge the Shuster Termination and accused the Siegels, the Shuster Executor, and Toberoff of conspiratorial "schemes" regarding their rightfully filed Superman termination notices.  On August 13, 2010, the Siegels and the Shuster Executor filed substantial motions to dismiss DC's First, Second, Third and Sixth Claims pursuant to F.R.C.P. 12(b)(6).  Toberoff Decl., Exs. E-F.  All of these dispositive motions are scheduled to be heard shortly by Judge Wright, on October 18, 2010.  *Id.*, Exs. C-F.

During the parties' Rule 26(f) conference, held on August 16, 2010, DC indicated that, in light of the pending motions, it was very likely to amend its

21

Complaint. *Id.*, ¶ 4. On Saturday, August 28, DC confirmed by email that it will file an amended Complaint. *Id.*, Ex. Q. DC also indicated that it would not add any additional causes of action to the amended Complaint, but merely "augment" the current complaint in response to the various dispositive motions. Defendants intend to file similar motions to dismiss the amended Complaint, and to file another motion pursuant to California's Anti-SLAPP laws, and plan on having these motions heard on October 18, 2010. To the extent any portion of DC's amended Complaint survives the dispositive motions, defendants also intend to file counterclaims against DC. Toberoff Decl., ¶ 4.

> b. DC Exploits the Theft of Privileged and Confidential Information From Toberoff's Law Firm

In 2006, an attorney, formerly employed by Toberoff, mailed packages of documents stolen from Toberoff's office to executives at DC's effective parent, Warner, including its General Counsel, in an apparent attempt to attack Toberoff and to assist Warner and DC in the *Siegel* litigation. *See* Toberoff Decl., Ex. L, ¶¶ 25-26; Ex. M, ¶¶ 7-14. The attorney/thief included with this package of documents a rambling, defamatory cover letter which discusses privileged documents and information, while straining to discredit Toberoff. DC attached this patently inadmissible and unreliable document, created and disseminated in clear violation of the attorney's duties of loyalty and confidentiality, as "Exhibit A" and the centerpiece of DC's new Complaint, referring to it as the "Toberoff Timeline." Defendants have filed a motion for a protective order, pending before this Court and also scheduled to be heard on September 20, 2010, that seeks to bar the use of the Toberoff Timeline in discovery until the Ninth Circuit has had the opportunity to rule on the propriety of DC's exploitation of this theft and patently improper disclosure.

## B. The Relief Sought by DC in Its Motion Is No Longer At Issue

In this "Motion to Initiate Discovery," DC raises two issues that are purportedly in dispute. The first issue is whether the Court should issue an order "initiating discovery." However, this issue is entirely moot. Discovery has been initiated.[2] On August 5, 2010, the parties scheduled a Rule 26(f) conference for Monday, August 16, 2010. On the eve of that scheduled conference, at 6:53 p.m. on Friday August 13, 2010, DC served the instant motion. The next business day, August 16, 2010, the parties conducted the Rule 26(f) conference. Toberoff Decl., ¶ 4; Ex. B. The very next day, August 17, 2010, DC initiated discovery by serving discovery requests and notices of deposition. Toberoff Decl., Exs. G-H.

The second issue raised by DC's motion is a request that Joanne Siegel and Jean Peavy's depositions take place by September 30, 2010. That controversy is also moot. On August 17, DC served a notice of deposition on Joanne Siegel, which set a deposition date of October 5, 2010, and subpoena of Jean Peavy, which set a deposition date of October 12, 2010. Toberoff Decl., Exs. G-H. Those dates fall after September 30, 2010. Thus, DC currently has no procedural basis to seek the relief demanded in this motion, and the entirety of DC's motion is moot.

## C. This Court Lacks Jurisdiction Over Jean Peavy

DC's motion is further flawed because this Court lacks jurisdiction to compel the deposition of Jean Peavy. Peavy is not a party to this action and is a resident of New Mexico. Accordingly, any motion to compel her deposition must be *preceded* by service of a subpoena issued from the United States District Court for the

---

[2] DC's repeated accusations that defendants are engaging in improper delay are baseless. It is entirely proper for defendants to have postponed the Rule 26(f) conference until after the Toberoff defendants had retained their own counsel, and such counsel had an opportunity to familiarize themselves with the voluminous record in this complex case. The other postponements were the result of routine minor scheduling issues, including vacations and prior commitments, which defendants' counsel worked reasonably to resolve.

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

**640**

District of New Mexico, and that court has sole jurisdiction to decide any motion to compel arising from such a subpoena. *See* F.R.C.P. 45(a)(2)(B) ("A subpoena must issue as follows: … for attendance at a deposition, from the court for the district where the deposition is to be taken."); *Visx, Inc. v. Nidek Co.*, 208 F.R.D. 615, 616 (N.D. Cal. 2002) ("Under Rule 45, the only procedure for enforcing a subpoena *duces tecum* is to institute contempt proceedings before the district court that issued the subpoena."); *Platypus Wear, Inc. v. K.D. Co., Inc.*, 905 F. Supp. 808, 810 (S.D. Cal. 1995) ("[F.R.C.P.] 37(a)(1) provides that a motion to compel discovery should be brought before the court in the district where the discovery is being, or is to be, taken.").

No subpoena was served on Jean Peavy before DC served this premature motion, and no subpoena is attached to the motion. Four days ***after*** DC served this motion, DC served a subpoena on Peavy from the New Mexico District Court. Toberoff Decl., Ex. H. That subpoena is ineffective because it failed to include witness fees. *See Tourgeman v. Collins Fin. Servs.*, 2009 U.S. Dist. LEXIS 92230, at *3–4 (N.D. Cal. May 4, 2009) ("A failure to tender fees at the time of service invalidates the subpoena and the deposition testimony will not be compelled."); 9-45 *Moore's Federal Practice – Civil* § 45.21 ("The service of a subpoena that requires attendance but is not accompanied by the required fee is invalid, and the witness may refuse to appear solely on that ground."); Toberoff Decl., ¶ 13. Any motion to compel based on that inadequate subpoena must be heard by the issuing court. There is simply no issue for this Court to decide concerning Jean Peavy, and DC's motion as to her must be denied.

### D. Depositions Should Not Be Compelled on the Dates Noticed by DC, Because Dispositive Motions Will Be Heard Less Than Two Weeks Later

Even if this motion is construed as a request for an order permitting depositions of Ms. Siegel and Ms. Peavy on October 5 and October 12, 2010, the

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

1    motion should be denied.  On August 13, 2010, the same day that DC served the

2    instant motion, defendants filed three Rule 12(b)(6) motions to dismiss and an Anti-

3    SLAPP motion to strike.  Toberoff Decl., Exs. C-F.  Faced with these motions, DC

4    announced on August 28, 2010, that it will file an amended Complaint in order to

5    "augment the pleading to address issues raised in [the dispositive] motions."

6    Toberoff Decl., Ex. Q.  DC, however, does not plan to add additional causes of

7    action, and, as all of DC's claims are fatally defective as a matter of law, defendants

8    intend to file renewed motions to dismiss all of DC's claims.  These motions can

9    and should dispose of all of DC's claims as a matter of law, and will, at a minimum,

10   clarify the scope of the pleadings and associated discovery.  Accordingly, DC's

11   request to expedite the depositions of Jean Peavy and Joanne Siegel, both of whom

12   were already deposed in the closely-related *Siegel* cases, should be denied, and

13   other depositions should be stayed pending the outcome of these dispositive

14   motions.

15          DC repeats the straw man generalization that the "mere filing of a dispositive

16   motion under F.R.C.P. 12 does not relieve defendants of their discovery

17   obligations."  Joint Stipulation, Section IV.B.1.  Defendants have never asserted

18   that they are relieved of all discovery obligations as a result of their F.R.C.P.

19   12(b)(6) motions.  The question is whether, given the pendency of substantial

20   motions to dismiss and an Anti-SLAPP motion that will all be heard shortly, it

21   makes sense to rush to depose elderly witnesses before the scope of the pleadings

22   and associated discovery is known.

23          DC ignores the well-established case law that holds that, while a motion to

24   dismiss does not automatically stay discovery, the courts have broad discretion to

25   stay discovery pending the resolution of dispositive motions to dismiss.  *See Jarvis*

26   *v. Regan*, 833 F.2d 149, 155 (9th Cir. 1987).[3]  The Ninth Circuit has approved

27   _____

28   [3] *Skellerup Indus. v. City of Los Angeles*, 163 F.R.D. 598 (C.D. Cal. 1995), relied

discovery stays pending a motion to dismiss where discovery was "not required to address the issues raised" by the motion, as "[d]iscovery is only appropriate where there are factual issues raised by a Rule 12(b) motion." *Id.* at 155 (quotations omitted). *See Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir. 1984) (approving discovery stay because "there were no factual issues" raised by motions to dismiss); *Wood v. McEwen*, 644 F.2d 797, 802 (9th Cir. 1981) (a district court "may … stay discovery when it is convinced that the plaintiff will be unable to state a claim for relief"); *Sasselli v. Pena*, 2008 U.S. Dist. LEXIS 44458, at *2 (E.D. Cal. June 3, 2008) (a magistrate judge "has broad discretion to stay discovery pending decision on a dispositive motion"). District Courts in the Ninth Circuit have adopted a simple test to determine whether it is appropriate for discovery to be postponed while a dispositive motion is pending:

> "First, a pending motion must be potentially dispositive of the entire case, or at least dispositive on the issue at which discovery is directed …. Second, the court must determine whether the pending dispositive motion can be decided absent additional discovery."

*Lowery v. F.A.A.*, CIV. S-93-1352, 1994 WL 912632, at *3 (E.D. Cal. Apr. 11, 1994) (citations omitted).[4] As part of this analysis, "the Court should '… take a preliminary peek at the merits of the allegedly dispositive motion to see if on its face there appears to be an immediate and clear possibility that it will be granted.'" *GTE Wireless, Inc. v. Qualcomm, Inc.*, 192 F.R.D. 284, 286 (S.D. Cal. 2000).

---

on heavily by DC for the proposition that a Rule 12(b) motion does not stay discovery, recognizes that a court will often stay discovery on a "case-by-case" basis pending the resolution of a dispositive motion, based on factors including "whether it is a challenge as a 'matter of law,'" and "whether some or all of the defendants join in the request for a stay," both of which are present here. *Id.* at 601.

[4] The cases applying this test and concluding that it is appropriate for discovery to wait until dispositive motions have been adjudicated are legion. *Hall v. Tilton*, 2010 U.S. Dist. LEXIS 11162, at *2-*3 (N.D. Cal. Feb. 8, 2010) (adopting test and granting stay); *Curtis v. Benda*, 2009 U.S. Dist. LEXIS 86504, at *3-*6 (W.D. Wash. Sept. 4, 2009) (same); *Hanni v. American Airlines, Inc.*, 2009 U.S. Dist. LEXIS 49338 (N.D. Cal. May 27, 2009) (same).

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

1    Defendants' motions meet these criteria.  *First*, the motions that have already

2    been filed, and will be re-filed in response to DC's amended Complaint, target each

3    of DC's claims and, if successful, would dispose of the entire case.  *See*

4    Defendants' Summary of Dispositive Motions, attached as Appendix A to

5    Defendants' Portion of this Joint Stipulation; Toberoff Decl. at Exs. C-F.  *Second*,

6    the motions are and will be to dismiss as a matter of law, based on clear statutory

7    and case authority.  *See id.*  DC has not identified in its motion any discovery that

8    could contradict the clear and well-established law on which defendants rely.

9    While defendants do not intend to re-argue the motions in this brief, they

10   respectfully refer this Court to the motions (*see* Toberoff Decl. at Exs. C-F) and

11   have included an appendix that describes the bases for such motions to dismiss in

12   detail, and demonstrates how the motions will resolve all of DC's claims as a

13   matter of law.  *See* Appendix A.  In any event, there can be no reasonable dispute

14   that each and every one of these motions can clearly be "decided absent additional

15   discovery" as a matter of law.  *Lowery*, 1994 WL 912632, at *3.  Thus, there is no

16   basis for an order compelling that depositions occur before these dispositive

17   motions are decided shortly.  *Wood*, 644 F.2d at 802.

18   Moreover, even considering DC's decision to delay resolution of these

19   motions by filing an amended complaint, defendants intend to maintain a hearing

20   date of October 18, 2010, or a date shortly thereafter, for the dispositive motions.

21   Accordingly, the period of the stay should not be lengthy.  There is no reason

22   whatsoever why DC needs to take depositions now, instead of after the resolution

23   of these motions, which along with DC's pending amendment of its Complaint and

24   defendants' counterclaims, will undoubtedly clarify and narrow the matters at issue

25   in this action.

26   DC's primary argument as to why these depositions are urgent is that the

27   witnesses are of "advanced age."  Joint Stipulation, Section I.A.  DC's sense of

28   urgency, however, is belied by its own conduct.

27

*First*, DC waited years to initiate its claims, and cannot now assert that it will be substantially prejudiced by waiting a couple more weeks for defendants' dispositive motions to be resolved. The Pacific Pictures Agreements and IP Worldwide Agreement on which DC bases its claims were produced to DC in 2006. Toberoff Decl., ¶¶ 16-17, 19, Ex. J, Ex. L. Moreover, even if the so-called "Toberoff Timeline" was DC's sole source of knowledge as to the allegations in its Complaint (it is not), by DC's own account it received the letter on December 10, 2008 (Complaint, ¶88), but waited a year and a half, until May 14, 2010, to file suit.

*Second*, had these witnesses' age been DC's true concern, DC could have filed, but did not file, a petition under F.R.C.P. 27(a) to take their depositions to "preserve testimony" at any time from 2008-2010, prior to the filing of this action.

*Third*, DC has offered no reason, even given the advanced age of the witnesses, why waiting for a matter of weeks to depose them presents a material problem. *See, e.g., United States v. Int'l Longshoremen's Ass'n*, 2007 U.S. Dist. LEXIS 70686 at *7 (E.D.N.Y. Sept. 24, 2007) (rejecting the expedited deposition of an elderly witness, because the deponent's age alone was an insufficient basis to expedite).

*Fourth*, DC has offered no case law to support the expedited depositions of elderly witnesses where, as discussed in more detail below, their testimony has already been preserved by their depositions in a closely related action. Accordingly, the witnesses' ages alone provide no basis for seeking unnecessarily expedited depositions. Indeed, the advanced age of the deponents favors a reasonable stay of depositions, to avoid the possibility that these elderly persons will be seriously burdened with successive and entirely unnecessary questioning by DC. *See* Declaration of Joanne Siegel, ¶¶ 2-9.

*Fifth*, DC has waited months to amend its Complaint, despite being advised as early as July 13, 2010 of the fatal problems with its pleading.

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

**645**

1    Nor is there any other reason why DC would be materially prejudiced from a

2    temporary stay of depositions pending resolution of the dispositive motions. DC

3    fails to articulate any facts that it needs in order to address the pending motions, and

4    therefore DC cannot show that it will suffer prejudice by briefly waiting to

5    commence depositions until these motions are decided.  The discovery period in

6    this action will clearly be sufficient to permit DC to take any appropriate deposition

7    following the resolution of the motions.  Toberoff Decl., ¶ 5.  On the other hand, if

8    the depositions are taken before the dispositive motions and related discovery

9    motions are decided, it will force defendants' counsel to instruct these witnesses not

10   to answer questions at deposition on the grounds stated in the pending motions.

11   This will undoubtedly lead to further motion practice, and potentially result in Ms.

12   Siegel and Ms. Peavy having their depositions taken three times.  DC's discovery

13   "plan" is thus inefficient, duplicative and burdensome, all of which justifies

14   postponing the depositions, not expediting them.  F.R.C.P. 26(c).  Common sense

15   demands that the dispositive motions be resolved first, and then, with the scope of

16   the case properly narrowed, the depositions can proceed if and as necessary.

17   **E.**    **Depositions Should Await Imminent Resolution of the Pending**

18          **Rule 54(b) Motion in *Siegel* Which, If Granted, Will Substantially**

19          **Narrow Discovery in this Case**

20          The Siegels' pending F.R.C.P. 54(b) motion in the *Siegel* Superman action,

21   to be heard by Judge Wright on September 27, 2010, also has a direct and

22   substantial bearing on discovery in this case.  Toberoff Decl., Ex. P.  If the Court

23   enters judgment based on its three lengthy published opinions concerning the scope

24   and validity of the Siegels' Superman Terminations,[5] that will have preclusive

25   _____

26   [5] *Siegel I,* 542 F. Supp. 2d 1098, 1117-39 (termination upheld as to first Superman
     story in *Action Comics* No. 1); *Siegel II,* 658 F. Supp. 2d 1036, 1080-84 (defining

27   additional recaptured Superman works); *Siegel v. Warner Bros. Ent. Inc.*, 690 F.
     Supp. 2d 1048 (C.D. Cal. 2009) ("*Siegel* III") (denying motions for

28   reconsideration).

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY  OF TWO WITNESSES

1  effect as to the same issues in this action regarding the mirror-image Shuster

2  Termination, preventing DC from re-litigating such issues, and significantly

3  narrowing the scope of discovery in this case.  At a status conference on August 13,

4  2010, Judge Wright indicated that entry of such a judgment pursuant to Rule 54(b)

5  may be appropriate.  Toberoff Decl., Ex. R at 3:19-4:13.  Common sense demands

6  that the Rule 54(b) motion, along with the dispositive motions be resolved first, and

7  then, with the scope of the case properly narrowed, that depositions proceed if and

8  as necessary.

9  **F.**    **The Pending Anti-SLAPP Motion Should Stay and/or Limit**

10 **Depositions**

11 DC argues that defendants' Anti-SLAPP motion "necessitates" expedited

12 discovery.  However, DC has failed to identify good cause or any particularized

13 need for such discovery.  Accordingly, applying either the substantive principles of

14 the Anti-SLAPP law or the Federal Rules of Civil Procedure, DC has not made the

15 necessary showing to support expedited discovery before the hearing on the Anti-

16 SLAPP motion.

17 Under California law, the filing of an Anti-SLAPP motion stays discovery

18 unless the plaintiff can show "good cause" for obtaining discovery.  Under

19 California Code of Civil Procedure Section 425.16(g), "[a]ll discovery proceedings

20 in the action shall be stayed upon the filing of a notice of motion made pursuant to

21 this section. The stay of discovery shall remain in effect until notice of entry of the

22 order ruling on the motion. The court, on noticed motion and for good cause shown,

23 may order that specified discovery be conducted notwithstanding this subdivision."

24 *Id.*  A showing of good cause requires the plaintiff to identify particular facts that it

25 seeks in discovery.  *See 1-800 Contacts, Inc. v. Steinberg*, 107 Cal.App.4th 568,

26 593 (2003) (plaintiff seeking to lift anti-SLAPP discovery stay must explain what

27 additional facts the plaintiff expects to uncover).  Similarly, under F.R.C.P. 56(f), a

28 plaintiff may be entitled to conduct discovery before a hearing on a motion for

30

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

**647**

1    summary judgment if it shows a "particularized need" for the discovery.[6]

2           DC has made no effort whatsoever to meet either the showing of good cause

3    required by § 426.16(g) or the showing of particularized need required by F.R.C.P.

4    56(f).  DC fails to make such a showing despite its admission that F.R.C.P. 56(f)

5    provides only for discovery that is "essential" to opposing summary judgment.

6    Joint Stipulation, Section IV.B.2.  Because DC has failed to identify any discovery

7    that is "essential" to oppose the Anti-SLAPP motion, it cannot rely on federal rules

8    regarding summary judgment motions as a basis to demand expedited discovery.

9    As Judge Feess explained in *New.Net, Inc. v. Lavasoft*:

10           "Even if the Court concluded that Section 425.16(g) and Rule 56 were
             potentially in conflict, the potential for a direct collision has not
11           materialized because Plaintiff has not demonstrated that discovery is
             essential to its opposition nor has Plaintiff shown good cause as to why
12           discovery should be permitted.
             "Although Plaintiff has sought to defer this motion pending discovery,
13           it has not stated with any degree of specificity what discovery it needs
             or how that discovery would bear on this motion….  To the extent that
14           the proposed discovery would contain any relevant information, most
             of it is already known to Plaintiff…. In short, Plaintiff has failed to
15           persuade the Court that discovery is essential to its opposition to
             Defendant's motion."
16

17    356 F. Supp. 2d at 1102 (internal citations omitted).  *See also Moser v. Triarc Cos.*,

18    2007 WL 3026425, at *2-*4 (S.D. Cal. Oct. 16, 2007) (court denied plaintiff's

19    motion for leave to conduct discovery because such discovery was not "essential in

20    _____

21    [6] Judge Feess held in *New.Net, Inc. v. Lavasoft*, 356 F.Supp.2d 1090 (C.D. Cal.
     2004) that the standards under Rule 56(f) and the Anti-SLAPP statute are similar.
22    Cal. Civ. Proc. Code § 425.16(g) provides that "on a noticed motion and for good
     cause shown, [a court] may order that specified discovery be conducted
23    notwithstanding [the automatic stay]."  *Id.* at 1101.  This protection is analogous to
     Rule 56's requirement that a party opposing a motion "must explain with
24    particularity why it is unable to oppose the motion, state with specificity what facts
     it intends to seek through discovery, and show how its discovery efforts are
25    reasonably expected to create a triable issue."  *Id.* at 1101-1102 (finding no
     "collision" between Rule 56 and the Anti-SLAPP law and noting that "to find such
26    collision would undermine the holding in [*United States v. Lockheed Missiles &
     Space Co., Inc.*, 190 F.3d 963, (9th Cir. 1999)] permitting the use of the Anti-
27    SLAPP procedure in federal court.").

28

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY  OF TWO WITNESSES

opposing" anti-SLAPP motion); *compare Metabolife Intern., Inc. v. Wornick*, 264 F.3d 832, 838 (9th Cir. 2001) ("The district court … asked Metabolife to itemize the discovery needed to respond to the anti-SLAPP motion, which Metabolife did."). Here, DC articulates no specific need for discovery tied to the Anti-SLAPP motion, and under either the Federal Rules of Civil Procedure or California law, DC has not met its burden.

DC ignores its own failure to make the necessary showing to obtain discovery under either California Code of Civil Procedure 425.16(g) *or* F.R.C.P. 56(f), and instead simply recites (incorrectly) that no limitations on discovery whatsoever are imposed when an Anti-SLAPP motion is pending in federal court.

Recent Supreme Court precedent, which DC wholly ignores, shows why DC's position is incorrect. In *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431 (2010), decided this year, the United States Supreme Court set forth principles reinforcing the conclusion that the discovery stay of California's Anti-SLAPP law, as a matter of substantive law governing state-created rights, must apply in federal court. In *Shady Grove*, the Supreme Court addressed the interplay between a New York law relating to class action lawsuits and F.R.C.P. 23. In a controlling concurrence, Justice Stevens made clear that, under the Rules Enabling Act, a federal rule cannot govern when it "would displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right." 130 S. Ct. at 1452 (Stevens, J., concurring).[7]

Here, the discovery stay and good cause requirements of the Anti-SLAPP

---

[7] When "a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices," the "narrowest ground" on which the judgment rests then represents the controlling rule. *Marks v. United States*, 430 U.S. 188, 193 (1977). Justice Stevens' opinion therefore provides the controlling rule in *Shady Grove*.

law are substantive protections that California adopted to suppress "non-meritorious cases aimed at chilling [free speech] through costly, time-consuming litigation." *New.net,* 365 F.Supp.2d at 1098 (citing Cal. Code of Civ. Proc. § 425.16(a)). By definition, the SLAPP plaintiff "does not hope to win the lawsuit and instead 'tries to wear down the other side by forcing it to spend time, money, and resources battling the SLAPP instead of the protected activity.'" *Schering Corp. v. First Databank Inc.*, 2007 WL 1176627, at *6 (N.D. Cal. April 20, 2007) (*quoting Visher v. City of Malibu*, 126 Cal.App.4th 364 (2005)). The automatic discovery stay prevents a plaintiff from coercing the defendant to respond to costly and time-consuming discovery before the court has had an opportunity to determine the merits of a defendant's Anti-SLAPP motion. To allow wide-ranging discovery before an Anti-SLAPP motion has been decided would controvert the purposes of the Anti-SLAPP statute. *New.net, Inc.*, 365 F.Supp.2d at 1098. In light of *Shady Grove*'s mandate that "[w]hen a federal rule appears to abridge, enlarge, or modify a substantive right, federal courts must consider whether the rule can reasonably be interpreted to avoid that impermissible result," 130 S.Ct. at 1452 (Stevens, J., concurring), it is clear that California's Anti-SLAPP discovery stay should apply here absent a showing of "good cause" for discovery, a showing that DC has not even attempted to provide.[8]

_____

[8] Moreover, two years after its decision in *Metabolife*, the Ninth Circuit noted without disapproval that "[i]f the defendant files a [anti-SLAPP] motion to strike, all discovery proceedings are stayed. See § 425.16(g). A court may, however permit specified discovery 'on noticed motion and for good cause shown.'" *Batzel v. Smith*, 333 F.3d 1018, 1024 (9th Cir. 2003). DC ignores *Batzel*, which specifically stated that "[b]ecause California law recognizes the protection of the Anti-SLAPP statute as a substantive immunity from suit, this Court, sitting in diversity, will do so as well." *Id.* at 1025-26 (*citing Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)) (emphasis added). As with other types of immunities from suit, the substantive policies of the Anti-SLAPP law to protect public participation would be seriously impaired if a plaintiff could bring a SLAPP suit and wear the opposing party down in discovery while the anti-SLAPP motion is pending. *Cf. Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ("The entitlement is an immunity from suit

33

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

Finally, DC's attempt to distinguish its federal and state law claims does not resolve the issue of whether the depositions should take place before the hearing on the Anti-SLAPP motion.  DC claims that "[a]ll of the discovery [DC] seeks … is relevant to [DC's] federal claims" and thus is not subject to a stay under the Anti-SLAPP laws.  Joint Stipulation, Section IV.B.2.  However, because DC has failed to identify the subject matter of the depositions, and has sought documents clearly related to its state-law claims alone, it is impossible to know how the depositions could be limited to the federal claims.  Toberoff Decl., Exs. G-H.  DC's state law claims raise additional issues not covered in the federal claims for which DC actively seeks discovery.  For example, DC's counsel insists on questioning Joanne Siegel and Ms. Peavy based on the "Toberoff Timeline" (giving rise to defendants' motion for a protective order pending before this Court), an issue <u>directly</u> related to DC's state law claims for tortious interference.  Complaint, ¶¶ 89-90, 171-72.  Even if the depositions could somehow be limited solely to its federal claims (which is highly unlikely, and impossible to achieve in practice), DC would eventually want to take discovery as to its state law claims, subjecting these elderly witnesses to two depositions in addition to the depositions already taken of these witnesses in the closely related *Siegel* cases.  *See Baxter Healthcare Corp. v. Fresenius Medical Care Holding, Inc.*, 2007 WL 3342573, at *2 (N.D. Cal. 2007) (motion to compel second deposition of elderly witness denied because of "potential inconvenience of a repeat deposition to an elderly witness").

---

rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("Until this threshold immunity question is resolved, discovery should not be allowed.").

JOINT STIPULATION RE: PLAINTIFF'S MOTION TO INITIATE DISCOVERY AND TAKE DISCOVERY  OF TWO WITNESSES

## G.   The Depositions Should Be Stayed Because the Witnesses Have Already Been Exhaustively Deposed in the *Siegel* Actions

A further reason to stay these depositions pending resolution of the dispositive motions is that the witnesses have already been deposed on essentially identical topics in the closely-related *Siegel* actions.  This suggests that, at a minimum, depositions should be delayed until the issues in this case have been clarified, and that the scope of these depositions should be limited to prevent duplicative and harassing discovery.  The Ninth Circuit has held that "eliminating duplicative discovery" is an important consideration in discovery practice. *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 475 (9th Cir. 1992).  There is no plausible reason to subject anyone to multiple, redundant depositions on the same topics, especially with pending dispositive motions, as "repeat depositions are disfavored."  *Graebner v. James River Corp.*, 130 F.R.D. 440, 441 (N.D. Cal. 1989).[9]  This concern is only heightened where, as here, the deponents are elderly. *Baxter Healthcare Corp.*, 2007 WL 3342573, at *2.

Moreover, the cases cited by DC do not support its contention that it is free to re-depose witnesses as to subjects already covered at length.  If anything, the cases strongly support the proposition that, if DC is allowed to re-depose witnesses, DC should be limited to *new* topics not covered in the original depositions.  DC claims that Courts "routinely" allow repeat depositions when "a long time has passed since the first deposition, new evidence has come to light, and new case theories have developed," citing *Graebner*, 130 F.R.D. 440, and *Blackwell v. City & County of San Francisco*, 2010 U.S. Dist. LEXIS 75453 (N.D. Cal. June 25, 2010).  However,

---

[9] *See also Melhorn v. New Jersey Transit Rail Operations, Inc.*, 203 F.R.D. 176, 180 (E.D. Pa. 2001) ("Absent some showing of need or good reason for doing so, a deponent should not be required to appear for a second deposition."); *Sentry Ins. v. Shivers*, 164 F.R.D. 255, 256 (D. Kan. 1996) (citations omitted) ("Scheduling a second deposition of the same person without a showing of good reason will generally support a finding of annoyance and undue burden or expense.").

1    in both cases, the courts **refused** to permit a second deposition.  *Graebner*, 130

2    F.R.D. at 441-42, refused to allow a second deposition where the deponent already

3    had been deposed at length, despite claims that "new information" had surfaced and

4    "new issues in the case [were] raised by her amended complaint."  Similarly, the

5    court in *Blackwell*, 2010 U.S. Dist. LEXIS 75453 at *4-*6, refused to allow a

6    second deposition where the attorney "had an opportunity to obtain the information

7    now sought through the first deposition," and when the reason offered for the

8    second deposition was the development of a new legal theory.[10]

9        DC also claims that "where there is overlap in the issues, courts have long

10   permitted second depositions … especially where … the witnesses were asked only

11   a few questions" as to the overlapping areas, citing *Batelli v. Kagan & Gaines Co.*,

12   236 F.2d 167 (9th Cir. 1956), *Cunningham v. Gates*, 2006 U.S. Dist. LEXIS 58368

13   (C.D. Cal. Aug. 2, 2006), and *Baldwin-Montrose Chem. Co. v. Rothberg*, 37 F.R.D.

14   354 (S.D.N.Y. 1964).  None help DC's argument.  *Batelli*, 236 F.2d at 169-70,

15   merely noted that a person had been deposed in two different cases, and did not

16   address the propriety of a second deposition.  *Cunningham*, 2006 U.S. Dist. LEXIS

17   58368 at *11-*12, did not concern repeat depositions, but merely whether witnesses

18   should be required to testify *at trial* when they had testified on similar issues at a

19   previous trial.  *Baldwin-Montrose Chem. Co*, 37 F.R.D. at 356-57, actually

20   **supports** defendants' position:  *Baldwin* provided that the parties would utilize

21   depositions and discovery from a companion lawsuit, rather than conduct new

22   discovery on the same issues, and limited further discovery to "matters not covered

23   in the [companion lawsuit's] depositions and interrogatories."  *Id.* at 356–57.  The

---

25   [10] DC also cites *Waltz v. U.S. Dep't of Agric.*, 251 F.R.D. 491 (E.D. Cal. 2008), for
26   the proposition that "[e]ven where extensive discovery has occurred in a prior case,
     further depositions and discovery are warranted where the specific issues … were
27   not previously 'fully developed factually.'"  *Waltz* is inapplicable, as the witnesses
     therein had not been deposed or even disclosed in the prior action, and thus there
28   was no "second deposition."  *Id.* at 496.

36

1   *Baldwin* Court did so "to avoid a needless waste of time, money and effort and to

2   expedite the litigation." *Id.*[11]

3        DC has given no indication that it is willing to limit the repeated deposition

4   of either Ms. Siegel or Ms. Peavy to *new* topics not covered in their initial

5   depositions. On the contrary, it is evident from DC's Complaint, which seeks to re-

6   litigate the issues decided against DC in *Siegel*, and DC's voluminous document

7   requests that the depositions at issue herein will be largely duplicative.

8        Joanne Siegel was already deposed for a full day, covering numerous topics

9   directly at issue in this litigation, including Superboy,[12] and her 1999-2002

10  "settlement" negotiations with DC. Declaration of Joanne Siegel, ¶¶ 2-9. Such

11  topics include, but are not limited to, the following:

| Topic | Depo Pages | Complaint |
|---|---|---|
| Joanne Siegel's relationship with Jerome Siegel from 1935-1948 | 14:3-14:9 | ¶¶ 27-30, 36 |
| Jerry Siegel being re-hired by DC's predecessors in the late 1960s | 14:21-15:23 | ¶ 41 |

---

[11] DC does manage to cite a handful of readily distinguishable cases where a second deposition was allowed. In *Kraemer v. Unocal Termination Allowance Plan*, 2009 U.S. Dist. LEXIS 33695, at *7 (C.D. Cal. Apr. 6, 2009), the court allowed second depositions of two witnesses, only "on issues related to conflict of interest," an issue that arose *after* the initial depositions. Moreover, *Kramer* specifically ordered the parties "to use the [] discovery" from the prior action in formulating a discovery plan. *Id.* Similarly, in *Zamora v. D'Arrigo Brother Co. of Cal.*, 2006 U.S. Dist. LEXIS 83106, at *4–5 (N.D. Cal. Nov. 7, 2006), a second deposition was allowed, but was strictly limited to questions arising from data that arose years after the first deposition. In *UniRAM Tech., Inc. v. Monolithic Sys. Tech.*, Inc., 2007 U.S. Dist. LEXIS 24869, at *5-8 (N.D. Cal. March 23, 2007), the court allowed a second Rule 30(b)(6) *corporate* deposition where new topics were designated for the deposition, there was no indication that the same individual would be deposed twice on the same topics, and "there was some understanding … [that] the [prior] deposition could be reconvened in light of the shortened [] deposition." *Id.*

[12] As the Court may recall, discovery in the "Superman" action (Case No. 04-CV-08400 ODW (RZx) and the "Superboy" action (Case No. 04-CV-08776 ODW (RZx) was consolidated. The issue of Superboy was obviously at hand in Joanne Siegel's deposition, as she was one of the two plaintiffs in the "Superboy" case.

JOINT STIPULATION RE: PLAINTIFF'S MOTION TO INITIATE DISCOVERY AND TAKE DISCOVERY OF TWO WITNESSES

| Topic | Depo Pages | Complaint |
|---|---|---|
| Joanne Siegel's discussions of termination with Jerry Siegel | 16:18-17:14; 71:8-72:12 | ¶ 45 |
| Joanne Siegel's retention of counsel to exercise her termination rights | 22:8-24:6 | ¶¶ 60-61 |
| Joanne Siegel and Laura Siegel Larson's "settlement" discussions with DC between October 2001 and February 2002 | 24:13-28:13; 39:1-40:25 | ¶¶ 62, 168-69 |
| DC's February 2002 long-form draft settlement agreement | 27:9-28:13; 87:4-88:13; 94:3-95:6 | ¶¶ 62, 168-69 |
| The drafting and meaning of the May 9, 2002 letter sent by Joanne Siegel | 32:18-34:17; 36:16-40:17; 42:17-43:9; 45:1-46:24; 119:4-121:9 | ¶¶ 65-67, 168-69 |
| Joanne Siegel's first contact with Marc Toberoff | 41:1-3 | ¶¶ 64, 70-72 |
| Joanne Siegel's September 21, 2002 Letter to DC's Publisher | 43:10-44:25 | ¶¶ 70, 168-69 |
| The 1974 Agreement between Jerry Siegel and Warner Bros., and further amendments to that agreement | 56:12-71:7 | ¶¶ 43-45 |
| The Shuster Termination | 102:8-104:25 | ¶¶ 79-88 |
| Marc Toberoff's representation of Jean Peavy | 105:1-5 | ¶¶ 64, 70-72 |
| The Superboy "pitch" letter by Jerry Siegel | 105:6-109:13 | ¶¶ 74, 134, 137 |
| The Superboy script by Jerry Siegel | 109:14-115:10; 135:3-137:3 | ¶¶ 74, 136-37 |
| The 1947 Action between Jerry Siegel, Joseph Shuster, and DC's predecessors | 124:20-125:5 | ¶¶ 37-40 |

As discussed above, the District of New Mexico is the proper forum to address any discovery that DC seeks from Jean Peavy, who resides there. In addition, Ms. Peavy was already deposed in the Siegel cases on many topics that are at issue here. That DC is now unsatisfied with its questioning on these topics and wants a "do-over" of discovery already taken is no reason to subject 89- and

92-year-old witnesses to multiple depositions on the same topics.

## H. Conclusion

For the foregoing reasons, DC's "Motion to Initiate Discovery" should be denied in its entirety. Depositions should not be compelled while a number of dispositive motions will shortly be heard and the pleadings will soon be amended. Instead, the parties should meet and confer promptly after the rulings on the pending dispositive motions and after the pleadings are amended to discuss an appropriate deposition plan.

Dated: August 30, 2010  Respectfully Submitted,

O'MELVENY & MYERS LLP

By: /s/ Daniel M. Petrocelli
  Daniel M. Petrocelli
  Attorneys for Plaintiff DC Comics

Dated: August 30, 2010  Respectfully Submitted,

TOBEROFF & ASSOCIATES, P.C.

By: /s/ Marc Toberoff
  Marc Toberoff
  Attorneys for Defendants Mark
  Warren Peary as personal
  representative of the Estate of Joseph
  Shuster, Joanne Siegel, and Laura
  Siegel Larson

Dated: August 30, 2010  Respectfully Submitted,

KENDALL BRILL & KLIEGER LLP

By: /s/ Richard B. Kendall
  Richard B. Kendall
  Attorneys for Defendants Marc
  Toberoff, Pacific Pictures
  Corporation, IP Worldwide, LLC,
  and IPW, LLC

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

## APPENDIX A

### DEFENDANTS' SUMMARY OF DISPOSITIVE MOTIONS

For the Court's convenience, the Arguments made in the separate motions to dismiss are summarized as follows.

- DC's First Claim seeks to invalidate the Shuster Terminations, and will fail as a matter of law:

  - *Section (1)* of DC's First Claim (Toberoff Decl., Ex. A ("Complaint"), ¶¶ 94-98) erroneously alleges that Shuster's termination rights do not vest in the executor or representative of his estate unless he had a widow, children and grandchildren who were "not living, but who did at some time live." This argument contradicts the plain language of the statute and the accepted interpretation of "not living" under the Copyright Act, as well as the legislative intent of § 304, and would lead to absurd results. *See Siegel v. Warner Bros. Ent. Inc.* ("*Siegel I*"), 542 F. Supp. 2d 1098, 1114 n.3 (C.D. Cal. 2008); 3 M. Nimmer & D. Nimmer, 3 *Nimmer on Copyright* ("*Nimmer*") § 11.03[A][2][a] at 11-40.1-11.40.2 (emphasis added); *Stewart v. Abend*, 495 U.S. 207, 212 (1990); 67 Fed. Reg. 69134; Toberoff Decl., Ex. E at 2-7.

  - *Section (2)* (Complaint, ¶¶ 99-104) argues that a 1992 agreement ("1992 Agreement") between DC and Shuster's siblings bars the Shuster Termination. This argument fails because the 1992 agreement could not lawfully grant any Superman copyrights. None of the parties to that agreement possessed any termination rights or Superman copyrights to grant; the Shuster Executor, the sole holder of the termination right, was not a party to the 1992 Agreement, as pled in the complaint; and, in any event, the agreement could not have conveyed or released the inalienable termination right as a matter of law under § 304(c)(5). *See* 17 U.S.C. §§ 304 (c)(5), (c)(6)(B); *Classic*

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

*Media, Inc. v. Mewborn* ("*Mewborn*"), 532 F.3d 978 (9th Cir. 2008); Toberoff Decl., Ex. E at 7-12

o **Section (3)** (Complaint, ¶¶ 105-11) alleges that the Shuster Executor did not own the "majority interest necessary to terminate" purportedly because it had granted half such rights in the Pacific Pictures Agreements, but the Shuster Executor clearly held the entirety of the termination interest because, as asserted elsewhere in DC's Complaint, termination rights cannot be transferred to a third party prior to the effective date of termination per 17 U.S.C. § 304(c)(6)(D), and the effective termination date is October 26, 2013. *See id.*; Complaint, ¶¶ 81, 154-55; Toberoff Decl., Ex. E at 13-14.

o **Section (4)** (Complaint, ¶¶ 112-15) claims that the Shuster Termination failed to terminate a May 21, 1948 consent judgment; however, Judge Larson in *Siegel* has already correctly decided that such consent judgment was not a copyright grant, and has no effect on the validity of Superman termination notices. The same reasoning and holding applies to the "mirror image" Shuster Termination and, as this is a closely related action, is binding on DC under the "law of the case" doctrine. *See Siegel I,* 542 F. Supp. 2d at 1131; Toberoff Decl., Ex. E at 14-16; *See Disimone v. Browner*, 121 F.3d 1262, 1266-67 (9th Cir. 1997) (applying "law of the case" doctrine to related cases).

o **Section (5)'s** "unclean hands" claim regarding Superboy (Complaint, ¶¶ 116-20) fails because unclean hands is a defense that is available only against a plaintiff that seeks affirmative relief, and is not a basis for a cause of action. *See Pelich v. INS*, 329 F.3d 1057, 1062 (9th Cir. 2003); Toberoff Decl., Ex. E at 16-17. Defendants also cannot be charged with "unclean hands" regarding Superboy as their actions comport with the specific findings of fact and conclusions of law in a

1947 action between DC's predecessors, and Siegel and Shuster. *See id.* at 17-19; *Siegel v. Nat'l Periodical Publ'ns, Inc.*, 508 F.2d 909 (2d Cir. 1974); *Siegel v. National Comics Publications, Inc.*, Case No. 1099-1947 (N.Y. Sup. Ct. April 12, 1948).

- DC's Second Claim transparently attempts to re-litigate issues already decided against DC in the related Superman case, *Siegel v. Warner Bros. Ent. Inc.*, C.D. Cal. Case No. 04-08400 ODW (RZx), and is barred by the doctrine of "law of the case" in this closely related action. *Disimone*, 121 F.3d at 1266-67; Toberoff Decl., Ex. E at 19-25.

- DC's Third Claim (as well as its Sixth Claim) is premised on the erroneous legal position that DC has a statutory right to a so-called "period of exclusivity" to negotiate the purchase of the Shuster Estate's recaptured *Superman* copyrights under 17 U.S.C. § 304(c)(6)(D). *See* Complaint, ¶¶ 154-55. However, it is clear from the plain language of § 304(c)(6)(D) that it does not provide DC with any "rights," let alone a right to an exclusive period of negotiation. *See* 17 U.S.C. § 304(c)(6)(D); *Bourne Co., v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 865 (S.D.N.Y. 1987) ("Nor does the statute provide for an exclusive period of negotiation. The statute neither compels the terminating party to negotiate with the terminated grantee, nor forbids him from negotiating with anyone else."); 3 *Nimmer* § 11.08[A], n.6 (2010) (*Bourne* properly "rejected the claim [made here] that a prior grantee enjoys a private right of action for damages against one who induces the grantor to make a (necessarily invalid) grant to a third party prior to the termination date of the original grant."); Toberoff Decl., Ex. F at 4-7. As such, DC lacks standing to prosecute this claim. *See* 3 W. Patry, *Patry on Copyright* ("*Patry*") § 7:47 (2010); Toberoff Decl., Ex. F at 7.

- DC's Fourth Claim for tortious interference with contract alleges that by inducing the Shuster Estate to file a statutory notice of termination

42

concerning *Superman*, Toberoff, and an entity controlled by Toberoff, Pacific Pictures Corporation ("PPC"), interfered with the 1992 Agreement between DC and the siblings of Joseph Shuster. This claim fails as a matter of law for at least four independent reasons.

  o *First*, the termination of the *Superman* copyright interests by the Shuster Executor could not have interfered with the 1992 Agreement, which has no bearing whatsoever on the independent termination right held solely by the Shuster Executor. Toberoff Decl., Ex. D at 9-13.

  o *Second*, even if the 1992 Agreement could somehow be construed as intending to prevent the Shuster Executor from exercising his termination rights, such a contract would be void under the Copyright Act, 17 U.S.C. § 304(c)(5), and clear Ninth Circuit precedent. Toberoff Decl., Ex. D at 13-18.

  o *Third*, the claim is squarely barred by the two-year statute of limitations for tortious interference claims, as it is a matter of public record that by 2006 DC was fully aware of the Shuster Termination and the Pacific Pictures Agreements, the facts that allegedly gave rise to this claim. *Id.* at 18-20.

  o *Fourth*, the claim is barred on its face by California's litigation privilege, Civil Code § 47(b). Toberoff Decl., Ex. D at 20-21.

- DC's Fifth Claim is equally meritless as a matter of law. This claim alleges interference by Toberoff with DC's purported "prospective economic advantage" – namely, a proposed settlement agreement between DC and the Siegels over the Siegel Terminations. This claim, like the Fourth Claim, is squarely barred by California's litigation privilege, as the sole basis of the cause of action is Toberoff's alleged solicitation of his clients in the *Siegel* cases. Moreover, this claim is also barred by the two-year statute of limitations applicable to tortious interference claims, based on matters of

1    public record, subject to judicial notice. *Id.* at 21-25.

2    •    DC's Sixth Claim under California unfair competition laws is preempted by

3         the Copyright Act, as it is expressly based on and incorporates DC's

4         allegations of purported violations of the Copyright Act, and does not contain

5         an "extra element" that "makes the right asserted qualitatively different from

6         those protected under the Copyright Act." *Altera Corp. v. Clear Logic, Inc.*,

7         424 F.3d 1079, 1089-90 (9th Cir. 2005).  *See* Toberoff Decl., Ex. F at 9-12.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES