# EXHIBIT 8

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


JOANNE SIEGEL and LAURA
SIEGEL LARSON,

      Plaintiffs,

    vs.              No. 04-8400 (RSWL)(RZx)
                        -and-
WARNER BROS. ENTERTAINMENT    No. 04-8776 (RSWL)(RZx)
INC., et al.,

      Defendants.

AND RELATED COUNTERCLAIMS.

**CERTIFIED COPY**


DEPOSITION OF LAURA SIEGEL LARSON

Beverly Hills, California

Tuesday, August 1, 2006


Reported by:
DAVID S. COLEMAN
CSR No. 4613

Job No. 1-50934



www.sarnoffcourtreporters.com
Irvine • Los Angeles • San Francisco
phone 877.955.3855 • fax 949.955.3854

SARNOFF
Court Reporters and
Legal Technologies

EXHIBIT 8
22

1     Q    It was oral?

2     A    Yes.

3     Q    And did he tell you what the value of the rights

4    were?

5     A    He didn't have a dollar figure, but he had a

6    general figure of what things go for in the entertainment

7    industry.

8     Q    And what did he tell you your rights would go

9    for in the entertainment industry?

10    A    He said he would need to do more research.

11    Q    But he didn't give you any specifics as to the

12    percentage by which the defendants' offer was too low or

13    anything else?

14    A    I don't believe so.

15    Q    And was anything agreed to at that meeting with

16    Mr. Emanuel?

17    A    Not at that meeting.

18    Q    Was there a subsequent communication --

19    A    Yes.

20    Q    -- with Mr. Emanuel?

21          And when did that take place?

22    A    I don't remember the exact date, but we did have

23    subsequent meetings and communications with him.

24    Q    Why don't you tell me the best you can, just

25    outline each of those communications.

32

1          MR. TOBEROFF:  Calls for a narrative.

2          You can answer.

3          THE WITNESS:  We decided to enter into an

4     agreement with IP Worldwide for Mr. Emanuel to represent

5     us in negotiations for our rights.

6     BY MR. ZISSU:

7          Q    And was that agreed to in a telephone

8     conversation or another face-to-face meeting?

9          A    We discussed it, and it was probably both in a

10    face-to-face meeting and by telephone, but I don't really

11    recall.

12         Q    Did you go to his office, Mr. Emanuel's

13    office --

14         A    Yes.

15         Q    -- again?

16         A    Yes.

17         Q    And how many -- in terms of time frame, how much

18    after the first meeting did that take place?

19         MR. TOBEROFF:  Ambiguous.

20         THE WITNESS:  I believe the next meeting lasted

21    about 45 minutes.

22    BY MR. ZISSU:

23         Q    And how -- and it was -- you're not sure --

24         A    Not sure.

25         Q    -- whether it was two weeks later or a week

33

1    later?

2        A   No.

3        Q   Was it after the holidays or before?

4        A   I believe so.

5        Q   And who was at that meeting?

6        A   My mother, myself, Mr. Toberoff and Mr. Emanuel.

7        Q   And you came to some kind of an agreement?

8        A   Yes.

9        Q   And what was that agreement?

10       A   We decided that Mr. Emanuel would be a

11  negotiator for us, and Mr. Toberoff would serve as our

12  attorney.

13       Q   And when you say you decided that Mr. Emanuel

14  would serve you, did you agree that Intellectual

15  Properties Worldwide, LLC would be the entity through

16  which you would work?

17       A   Yes.

18       Q   And do you know who owns Intellectual Properties

19  Worldwide, LLC?  Today do you know?

20       A   Today I don't know.

21       Q   Did you know at the time in early 2003 or late

22  2002?

23       A   My understanding was that it was a partnership

24  between Mr. Emanuel and Mr. Toberoff.

25       Q   And do you know who J. Todd Harris is?

34

1     A   No.

2     Q   If you look at Defendants' Exhibit 5, you will

3 see reference to him in the second paragraph.  It states,

4 "Marc Toberoff IPW's, Chairman & CEO, is an experienced

5 entertainment attorney and producer with expertise in

6 identifying and obtaining intellectual property.  J. Todd

7 Harris, the head of production [sic] -- of the production

8 division, is a seasoned Hollywood producer with over

9 twenty three...films to his credit."

10       But you didn't hear his name at the time, did

11 you?

12     A   No.

13     Q   And do you know whether Mr. Toberoff was the

14 chairman and CEO of Intellectual Properties Worldwide,

15 LLC at the time of your meeting?

16     A   He could have been.  I don't know what his title

17 was.

18     Q   And was the agreement you reached with

19 Mr. Emanuel and/or Intellectual Properties Worldwide,

20 LLC, was that ever written up in a piece of paper?

21     A   Yes.

22     Q   And have you produced that in this case?

23     A   I'm not sure.

24     Q   Do you have a copy of it?

25     A   Yes, I have a copy of it.

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

EXHIBIT 8
26

1      Q    At home, or where do you keep it?

2      A    It would be at home.

3      Q    Well, we would -- if it hasn't been produced, we

4   are going to ask you -- we call for the production of it.

5         How lengthy --

6         MR. TOBEROFF:  Excuse me.  I can simplify this

7   for you --

8         MR. ZISSU:  Yeah.

9         MR. TOBEROFF:  -- and represent to you that the

10  company that Siegel is talking about is not Intellectual

11  Properties Worldwide, LLC.

12        MR. ZISSU:  If you want to fill out some more

13  blanks --

14        MR. TOBEROFF:  Yes.

15        MR. ZISSU:  -- and tell us what the name of it

16  is --

17        MR. TOBEROFF:  It's IP Worldwide, which is not

18  the same company even though they have similar names.  So

19  I'm telling you that for your benefit.

20        MR. ZISSU:  Right.  Well, I don't want to make

21  this an examination of counsel, so we can talk about that

22  separately.

23        MR. TOBEROFF:  I understand.  Just to make it

24  easier, your questioning that a fact, and I can

25  understand how...

36

1    BY MR. ZISSU:

2        Q    Okay.  Without regard to that, you understood

3    that there was a company or entity of some kind in which

4    Mr. Toberoff was a partner with Mr. Emanuel, and you

5    agreed with them in the manner you've described to

6    proceed.

7            Correct?

8            MR. TOBEROFF:  Objection.  Misstates her

9    testimony.

10   BY MR. ZISSU:

11       Q    Is that correct?

12       A    Could you rephrase that?

13       Q    You had a meeting, and you agreed that there was

14   a company that Mr. Emanuel was involved with and of which

15   you understood Mr. Toberoff was a partner that would

16   proceed to represent you in connection with dealing with

17   your rights at that point?

18           MR. TOBEROFF:  Objection.  Misstates her

19   testimony.

20           You can answer.

21           THE WITNESS:  Mr. Emanuel was a negotiator, and

22   Mr. Toberoff was our attorney, and that's the way we

23   understood the situation.

24   BY MR. ZISSU:

25       Q    And you understood that they were partners

37

1    together --

2         MR. TOBEROFF:  Misstates the testimony.

3    BY MR. ZISSU:

4         Q    -- in some kind of company that you have

5    described.

6         Correct?

7         A    That didn't enter into our relationship with

8    them.

9         Q    I didn't ask you whether it entered into your

10   relationship.

11        Have you testified today that you understood

12   that there was some company, the name of which you may

13   have gotten correctly or incorrectly, and Mr. Toberoff

14   was involved as a partner with Mr. Emanuel?

15        Did you so testify?

16        A    I believe they had a company.

17        MR. ZISSU:  Let's mark as Defendants' Exhibit

18   6 -- no.

19        Q    Before we go to that, and what happened after

20   this agreement was entered into with Mr. Emanuel or

21   Mr. Toberoff or both of them, whatever, what happened

22   after that meeting --

23        MR. TOBEROFF:  Objection.  Calls --

24   BY MR. ZISSU:

25        Q    -- and the agreement?

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

EXHIBIT 8

1            MR. TOBEROFF:  Objection.  Calls for a

2   narrative.

3         You can answer.

4         THE WITNESS:  Mr. Emanuel met with John Schulman

5   of Warner Bros.

6   BY MR. ZISSU:

7      Q   Were you there?

8      A   No.

9      Q   Did you have further conversations with

10  Mr. Emanuel or Mr. Toberoff with respect to this

11  representation?

12      A   Yes.

13         MR. TOBEROFF:  Objection.  Don't testify as to

14  your conversations with me --

15         MR. ZISSU:  She can --

16         MR. TOBEROFF:  -- it's attorney-client

17  privileged.

18         MR. ZISSU:  She can testify as to the -- whether

19  there was a conversation, but you should avoid telling me

20  the contents --

21         THE WITNESS:  Right.

22         MR. ZISSU:  -- of any discussions with counsel.

23         MR. TOBEROFF:  Correct.

24         MR. ZISSU:  So if you want to go back to the

25  last question.

39

1          (Record read as follows:

2          "Q   Did you have further

3      conversations with Mr. Emanuel or

4      Mr. Toberoff with respect to this

5      representation?

6          "A   Yes.")

7  BY MR. ZISSU:

8      Q   All right.  With whom did you have conversations

9  and when?

10     A   Mr. Emanuel and Mr. Toberoff.

11     Q   In another meeting or by telephone?

12     A   Another meeting.

13     Q   And where was that and when?

14     A   Mr. Emanuel's office, but I don't recall when.

15     Q   And were there -- and thereafter were there any

16 further meetings?

17         MR. TOBEROFF:  Vague and ambiguous.

18         THE WITNESS:  We had many conversations with

19 Mr. Toberoff but not as many conversations with

20 Mr. Emanuel.

21 BY MR. ZISSU:

22     Q   And how long -- did there come a time when that

23 relationship ended with Mr. Emanuel?

24         MR. TOBEROFF:  Vague and ambiguous.

25         THE WITNESS:  Well, there came a time when we

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT 8

1    had to enter into litigation.  At that point

2    Mr. Emanuel's services were no longer needed.

3    BY MR. ZISSU:

4        Q    So Mr. Emanuel's efforts and services in your

5    behalf continued until the litigation began?

6        A    Yes.

7        Q    And what were the terms of your agreement with

8    Mr. Emanuel, if you can summarize them?

9        A    I haven't read that agreement for a long time.

10    I really don't recall.

11        Q    Was he to get a percentage of any compensation

12    that you would derive from marketing or selling or

13    licensing your rights?

14        A    I believe so.

15        Q    Do you remember what that percentage was?

16        A    No, I don't.

17        Q    Do you know whether he had -- Mr. Emanuel had

18    any conversations with Gang Tyre about the deal you made

19    with Mr. Emanuel?

20        A    Could you speak up a little, please?  I'm having

21    trouble hearing you.

22        Q    I'm sorry.

23        Do you know whether Mr. Emanuel had any

24    conversations with the Gang Tyre law firm about the deal

25    he made, he, Mr. Emanuel, made with you?

41

EXHIBIT 8
32

1     A   No.

2     Q   And in this time period that Mr. Emanuel

3  provided services, what did he do for you?

4     A   He researched the property.  He, as I said, met

5  with John Schulman.

6     Q   Did he ever provide any report or memorandum or

7  writing concerning his research?

8     A   No.

9     Q   Did he ever provide any written communications

10  concerning his discussions with John Schulman or anyone

11  else?

12     A   I don't recall.

13     Q   In working with your mother in relation to the

14  rights in the Superman and Superboy properties, how do

15  you work together?

16     MR. TOBEROFF:  Objection.  Vague and ambiguous.

17  BY MR. ZISSU:

18     Q   In general, how do you work together?

19     MR. TOBEROFF:  Objection.  Vague, ambiguous.

20  Calls for a narrative.

21     THE WITNESS:  Could you ask me like in a

22  specific situation?

23  BY MR. ZISSU:

24     Q   Yes.

25     Well, if there is a decision to be made, such as

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT 8
33

1    whether to engage Mr. Emanuel, do you meet with each

2    other?  Do you speak with each other on the phone?  Do

3    you have counsel involved?  How does it work?

4            MR. TOBEROFF:  Objection.  Compound.

5            THE WITNESS:  We talk.  We talk a lot about any

6    decision that we reach.

7    BY MR. ZISSU:

8        Q    And is there one of you that predominates or

9    makes the decisions, or are these jointly made?

10           MR. TOBEROFF:  Objection.  Compound.  Vague and

11   ambiguous.

12           THE WITNESS:  It's always a joint decision, but

13   when it comes to the actual work of a lot of phone calls,

14   things of that sort, oftentimes I will do more of that.

15   BY MR. ZISSU:

16       Q    And will you do more of that when it relates to

17   reading through communications you receive pertaining to

18   your efforts?

19       A    Yes.  My mother, you know, is very interested in

20   everything that goes on.

21       Q    But she relies on you to do some of the more

22   labor-intensive aspects of things?

23       A    Yes.

24       Q    With respect to the meeting with John Schulman,

25   what is your remembrance or recollection of what happened

43

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT 8
34

1       the list which goes in the center of each notice.

2              MR. ZISSU:  Yes, correct.  But this is

3       reproduced in the way it was from the notices as you

4       produced them, following your Bates numbers, and --

5              MR. TOBEROFF:  But I believe we clarified in

6       making the production --

7              MR. ZISSU:  Yeah.

8              MR. TOBEROFF:  -- why we didn't produce the list

9       over and over again.

10             MR. ZISSU:  And I think there are seven notices

11      of termination, if I'm correct.

12             MR. TOBEROFF:  I believe that's correct.

13             MR. ZISSU:  And each of them is signed -- by way

14      of example, if you look on page 907, they're signed by

15      Joanne Siegel and Laura Siegel Larson.

16         Q   The question is do you recognize these notices

17      of termination without the list?

18         A   Yes.

19         Q   And you signed them in each case with your

20      mother?

21         A   Yes.

22         Q   And did you read through them and review them

23      before you signed them?

24         A   Yes.

25         Q   And I think in each one -- let's take the first

89

1    one, and go to page 3 of it.  There is a footnote number

2    1, which I think is repeated in each of the notices, and

3    this footnote refers to the list that was -- the full

4    list that was attached to each of the notices.

5         Do you see that?

6    A    Yes.

7    Q    Okay.  And each of the footnotes refers to --

8    well, I will read this footnote on page -- it's on 850 of

9    the Bates numbers.  It's page 3 of the first notice.

10         Quote, "This Notice of Termination applies to

11   each and every work (in any medium whatsoever, whenever

12   created) that includes or embodies any character, story

13   element, or indicia reasonably associated with SUPERMAN

14   or the SUPERMAN stories, such as, without limitation,

15   Superman, Clark Kent, Lois Lane, Perry White, Jimmy

16   Olsen, Superboy, Supergirl, Lana Lang, Lex Luthor,

17   Mr." -- and this is in all caps -- MXYZTPLK (also known

18   as Mr. MXYZTPLK) -- in caps again -- "Ma and Pa Kent,

19   Steel," S T E E L, "the planet Krypton," K R Y P T O N,

20   "Kryptonite, Metropolis" -- these are initial cap --

21   "Smallville or the Daily Planet.  Every reasonable effort

22   has been made to find and list herein each such SUPERMAN-

23   related work ever created.  Nevertheless, if any such

24   work has been omitted, such omission is unintentional and

25   involuntary, and this Notice," with a capital N, "also

90

1    applies to each and every such omitted work."

2         Did you understand that in signing this notice,

3    that Superboy is a related work to Superman?

4         MR. TOBEROFF:  Objection.  Calls for a legal

5    conclusion.

6         If you can answer the question without revealing

7    information obtained from your attorney, you can answer,

8    but only to that extent.

9         THE WITNESS:  That was left to the attorneys.

10   BY MR. ZISSU:

11   Q    But do you -- you signed this, and you filed

12   this in the copyright office.

13        Correct?

14   A    Uh-huh.

15   Q    Do you understand that Superboy is related to

16   Superman?

17        MR. TOBEROFF:  Objection.  Calls for a legal

18   conclusion.

19        Only answer to the extent you are not revealing

20   any attorney-client communications or attorney work

21   product.

22        MR. ZISSU:  Did you instruct her not to answer?

23        MR. TOBEROFF:  She can answer but only to the

24   extent the answer does not reveal communications between

25   her attorneys or legal strategies communicated between

91

1    her and her attorneys.

2    BY MR. ZISSU:

3        Q    Are you familiar with your father's Superman

4    works?

5        A    Yes --

6        Q    You've seen --

7        A    -- to a certain extent.  I'm not a comic book

8    historian.

9        Q    But you've read or seen works?

10       A    Some of them.

11       Q    Some of them.

12            You've seen Action Comics No. 1?

13       A    Yes.

14       Q    You've read it?

15       A    Yes.

16       Q    Have you read your father's -- in 1938 he wrote

17   a letter to Detective Comics proposing a Superboy comic

18   book.  You've read that letter.

19            Correct?

20            MR. TOBEROFF:  Objection.  Lacks foundation.

21   Assumes facts not in evidence.

22   BY MR. ZISSU:

23       Q    Did you read that letter?

24       A    A long time ago.

25       Q    And did you ever read a script or continuation

92

1    from 1940 which proposed a form of Superboy comic book?

2            MR. TOBEROFF:  Same objection.

3            THE WITNESS:  I read that some time ago as well.

4    BY MR. ZISSU:

5        Q    And have you ever read More Fun Comics -- any of

6    the More Fun Comics which featured Superboy?

7        A    A long time ago.

8        Q    How long --

9            MR. TOBEROFF:  Just a second.  Assumes facts not

10    in evidence.

11    BY MR. ZISSU:

12        Q    How long ago?

13        A    I don't recall.

14        Q    Did you read them in connection with any aspect

15    of these cases in which you're a plaintiff?

16            MR. TOBEROFF:  Vague and ambiguous.

17            THE WITNESS:  I probably read it a couple of

18    years ago.

19    BY MR. ZISSU:

20        Q    Do you understand that there is any relationship

21    between the Superman character and Superboy?

22        A    That's --

23            MR. TOBEROFF:  Vague and ambiguous.

24            THE WITNESS:  Could you be more specific,

25    because that's such a broad question?

93

1   BY MR. ZISSU:

2       Q   Well, I'm asking you if you understand there is

3   any relationship between the character Superman and the

4   character Superboy?

5           MR. TOBEROFF:  Objection.  Vague and ambiguous.

6           THE WITNESS:  They were both created by my

7   father.

8   BY MR. ZISSU:

9       Q   And are the characters as created related in any

10  way?

11          MR. TOBEROFF:  Objection.  Vague and ambiguous.

12  Calls for a legal conclusion.

13  BY MR. ZISSU:

14      Q   In your understanding as a reader.

15      A   They have completely different story lines.

16      Q   Isn't it a fact that Superboy is portrayed as

17  Superman as a youth?

18          MR. TOBEROFF:  Objection.  Assumes facts not in

19  evidence.  Lacks foundation.

20          THE WITNESS:  Could you ask the question again,

21  please?

22  BY MR. ZISSU:

23      Q   Isn't it a fact that as portrayed in the comic

24  books, Superboy is Superman as a youth?

25          MR. TOBEROFF:  You can answer.

94

1          THE WITNESS:  Yes.

2    BY MR. ZISSU:

3          Q    And isn't that a relationship between the two

4    characters, as portrayed?

5          MR. TOBEROFF:  Vague and ambiguous.

6          THE WITNESS:  It's -- there are a lot of legal

7    aspects to this that I'm not qualified to answer.

8    BY MR. ZISSU:

9          Q    I am not asking you anything legal.  You look at

10   the two.  One is a version of the other as a youth;

11   you've just admitted that, and I asked you if that makes

12   them related, and you say you can't answer.

13         MR. TOBEROFF:  Object --

14   BY MR. ZISSU:

15         Q    Correct?  That's your answer?

16         MR. TOBEROFF:  Excuse me.  Let me object.

17   Objection.  Misstates her prior testimony.  That was not

18   her answer.

19         Do you know what the pending question is?

20         THE WITNESS:  I did not say that he was a

21   version of him.

22   BY MR. ZISSU:

23         Q    What aspects of the character Superman can be

24   found in the character Superboy?

25         MR. TOBEROFF:  Objection.  Calls for a legal

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT 8
41

1    conclusion.

2    BY MR. ZISSU:

3         Q    You understand you are the plaintiff in this

4    action?

5         A    Yes.

6         Q    And you understand you're making claims,

7    apparently, that Superboy is not related to Superman as

8    the characters have been portrayed in publications?  Do

9    you understand that that's what you're saying?

10             MR. TOBEROFF:  Objection.  Lacks foundation.

11   Misstates the evidence.

12             THE WITNESS:  That's not what the case says.

13   BY MR. ZISSU:

14        Q    I didn't -- there are aspects of the case in

15   which -- including your deposition today in which you're

16   unwilling to concede that Superboy is related to

17   Superman.

18             Do you understand that?

19             MR. TOBEROFF:  Objection.  Vague and ambiguous.

20   Misstates her testimony.

21   BY MR. ZISSU:

22        Q    Do you understand that?

23        A    I don't know how to answer your question.

24             MR. TOBEROFF:  What is the pending question?

25   BY MR. ZISSU:

96

1        Q    The question now is -- we will go on to another

2   question -- is it your testimony that the character

3   Superboy as he's appeared in publications is not related

4   to the character Superman as Superman has been portrayed

5   in publications?

6            MR. TOBEROFF:  Objection.  Vague and

7   ambiguous --

8   BY MR. ZISSU:

9        Q    Is that --

10           MR. TOBEROFF:  -- but you can answer.

11  BY MR. ZISSU:

12       Q    -- your testimony?

13       A    No, that's not my testimony.

14       Q    Well, what, if any, relationship do those two

15  characters have?

16           MR. TOBEROFF:  Asked and answered.

17           You can answer again.

18           THE WITNESS:  As I said before, they -- you

19  know, they're -- they were both created by my father, but

20  they're separately created characters.

21  BY MR. ZISSU:

22       Q    I didn't ask you whether they were separately

23  created.

24           As you see them on a page when you read them, is

25  it your testimony that they are not related?

97

1          MR. TOBEROFF:  Objection --

2    BY MR. ZISSU:

3        Q    Yes or no?

4          MR. TOBEROFF:  Objection.  Asked and answered.

5          You can answer, Laura.

6          MR. ZISSU:  You've obstructed the examination --

7          MR. TOBEROFF:  No, I haven't.  I'm telling

8    her --

9          MR. ZISSU:  -- by suggesting repeatedly that she

10    not answer the question, and then you have the nerve to

11    say "asked and answered."  I just want an answer to the

12    question.

13          MR. TOBEROFF:  Okay.  I have to address you

14    since you've addressed me now with colloquy.  I try to

15    keep it simple and just voice my objections.  That's not

16    the nature of the objections.  Most of the questions,

17    I've said "You can answer" after stating my objection,

18    but certain questions, because it's phrased in the

19    context of this lawsuit, ask for a legal conclusion.  You

20    know it, I know it, that's why you're asking, and because

21    of that they're unfair.

22          MR. ZISSU:  Let me just --

23          MR. TOBEROFF:  The last question that's pending,

24    about whether or not they're related, you can answer

25    that, Laura.  I don't think it's a trick question.  You

98

1    can answer that simple question.  He is just asking you

2    whether or not they are.

3         THE WITNESS:  I understand.  It's the word

4    "related" that I have a little difficulty with.

5    BY MR. ZISSU:

6         Q    Let me just say something to you, and I will say

7    it to your counsel.  I'm asking you facts in terms of

8    what you see and what you perceive.  They do definitely

9    have legal consequences in the case, but that does not

10   enable you to avoid discussing the facts.

11        The consequences can be argued about later by

12   lawyers, but if this character was based in part upon

13   Superman, and then -- even if separately created but

14   based in part on Superman, and that is apparent by

15   viewing them, that's what I'm asking about.

16        Does it have a legal consequence?  It might, but

17   that's not what -- you're not a lawyer, and I am not

18   asking you for a legal consequence, but I am entitled to

19   ask you a fact, from which I will argue legal

20   consequences, and your counsel will argue the other way.

21        And I am asking you, if you read the stories,

22   you read your father's submissions to Detective Comics,

23   which you acknowledged reading, is Superboy based in part

24   on Superman?  That's the question.  How do you see it?

25        A    Yes.

99

1          Q    Now, you don't deny that these notices, all

2     seven of them, repeat throughout in the footnote 1 to

3     each notice the statements that Superboy and a bunch of

4     other characters listed here are, quote, a "SUPERMAN-

5     related work"?

6          A    Yes, that's what it says.

7          Q    Okay.  And each of them say this.

8               Correct?

9          A    Yes.

10         Q    Now, if you go to page 897 in this Exhibit 16,

11    on that page -- and I will let you read it, but there is

12    a description of various documents, among others, related

13    to a 1947 or 1948 case that I can represent took place in

14    the State of New York, and in the third and fourth lines

15    there is -- among the documents referenced there is,

16    quote, ":  A stipulation executed on or about May 19,

17    1948, providing in part that by virtue of a March 1, 1930

18    [sic] agreement, the co-authors" --

19              MR. TOBEROFF:  1938.

20              MR. ZISSU:  Sorry.

21         Q    -- "1938 agreement, the co-authors transferred

22    to Detective Comics...," et cetera, and do you see that?

23         A    Yes, I do.

24         Q    Okay.  Now, the question I am asking you is

25    not -- again, I am not asking you for a legal conclusion.

100

1    I'm asking you -- the question is, there was also -- and

2    I will represent to you, and I think your counsel will

3    agree, that there was another document in that case

4    called -- that was a consent judgment that was from 1948

5    as well, and this consent judgment is not mentioned in

6    any of these notices of termination, and my question to

7    you is, do you know anything about why, either yes or no?

8    I am not asking you for what your counsel told you.  I am

9    only asking you if you have knowledge on the subject.

10          MR. TOBEROFF:  Objection.  Compound.  Vague and

11   ambiguous.

12          And you can only answer to the extent your

13   answer does not entail any -- the substance of any

14   attorney-client communications.

15          THE WITNESS:  And the question again is?

16   BY MR. ZISSU:

17      Q    The question is --

18          MR. TOBEROFF:  Does she know why?

19          MR. ZISSU:  Right.

20      Q    In these notices, the consent judgment from that

21   case is not listed as among the documents -- among the

22   transfers or grants being terminated.

23          My question is, do you know why it was omitted?

24      A    Yes.

25      Q    And why was it omitted?

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT 8
47

Sep-18-06   02:31pm   From-                                      T-998   P.003/006   F-698

```
 1
 2
 3
 4
 5
 6
 7
 8          I, LAURA SIEGEL LARSON, do hereby declare under
 9   penalty of perjury that I have read the foregoing
10   transcript; that I have made any corrections as appear
11   noted, in ink, initialed by me, or attached hereto; that
12   my testimony as contained herein, as corrected, is true
13   and correct.
14          EXECUTED this 17th day of September,
15   20 06 , at Playa Del Rey,          , California .
                        (City)                 (State)
16
17
18
19        Laura Siegel Larson
          LAURA SIEGEL LARSON
20
21
22
23
24
25
```

                                                              278

EXHIBIT 8
48

1

2

3

4      I, the undersigned, a Certified Shorthand

5  Reporter of the State of California, do hereby certify:

6      That the foregoing proceedings were taken

7  before me at the time and place herein set forth; that

8  any witnesses in the foregoing proceedings, prior to

9  testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under by

12  direction; further, that the foregoing is an accurate

13  transcription thereof.

14      I further certify that I am neither

15  financially interested in the action nor a relative or

16  employee of any attorney of any of the parties.

17      IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19

20  Dated:   AUG 1 8 2006

21

22

    DAVID S. COLEMAN, CSR NO. 4613

23

24

25

EXHIBIT 8
49