# EXHIBIT 9

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA
SIEGEL LARSON,

       Plaintiffs,

    vs.             No. 04-8400 (RSWL)(RZx)
                       -and-
WARNER BROS. ENTERTAINMENT  No. 04-8776 (RSWL)(RZx)
INC., et al.,

       Defendants.

AND RELATED COUNTERCLAIMS.

**CERTIFIED**

**COPY**

DEPOSITION OF JOANNE SIEGEL

Beverly Hills, California

Wednesday, August 2, 2006

Reported by:
DAVID S. COLEMAN
CSR No. 4613

Job No. 1-50935



www.sarnoffcourtreporters.com

Irvine • Los Angeles • San Francisco

phone 877.955.3855 • fax 949.955.3854

SARNOFF
Court Reporters and
Legal Technologies

EXHIBIT 9
50

1      A    More recently.  This is 2006.

2      Q    Oh, you only learned of that in 2006?

3      A    Yes.

4      Q    Kevin Marks had never sent -- strike that.

5           Kevin Marks' office did not send you a copy in

6    October of 2001?

7      A    No, we didn't get that copy.

8           He wasn't -- what probably happened is this:  He

9    was out of the country for four weeks, and that letter

10   was sent to his office while he was out of the country

11   and probably got filed, and maybe he didn't know about it

12   until we asked for our papers be returned, and it turned

13   up some -- I don't know if we got all the papers all at

14   one time, or maybe we had to ask for additional papers

15   that were missing, and when those papers came, these

16   papers obvious -- the 26th letter was obviously found and

17   was among the papers that were sent.  That's my guess.

18     Q    When were the papers returned to your lawyer, I

19   think?

20     A    My lawyer would know.

21     Q    Did -- when you say you didn't know of this

22   October 26, 2001 letter, do you mean neither you nor your

23   daughter Laura knew?

24     A    That is correct.  And neither did anyone else,

25   apparently.

40

1    Q    Isn't it a fact that Mr. Toberoff began

2    representing you in late 2002 or early 2003?

3    A    It was late 2002.

4    Q    And didn't he get the files, which included this

5    document, at about that time?

6    A    I don't know when he got it.

7    Q    I'm looking --

8        MR. TOBEROFF:    I can represent to you this

9    October 26 letter was not in the files that I received

10   from Kevin Marks.

11       MR. ZISSU:    I'm looking for the copy of it, the

12   October 26 letter, which was marked yesterday, I believe.

13   It's in a separate pile here somewhere.

14   Q    Were you also dealing with Bruce Ramer at the

15   Gang Tyre firm?

16   A    When?

17   Q    In the period when Kevin Marks was representing

18   you.

19   A    Oh, that's the firm.

20   Q    Yes.

21       And Bruce Ramer was also working for you then.

22       Correct?

23   A    I -- yes, I guess.

24       MR. ZISSU:    Marc, it would be really helpful if

25   you would help me so I can reduce my time looking for

41

1   these exhibits.

2          MR. TOBEROFF:  I have these exhibits here.

3          MR. ZISSU:  I am joking.

4          MR. TOBEROFF:  Were you joking?

5          MR. ZISSU:  Yes.  I always like help.  See,

6   you're making my life more complicated.

7      Q    Let me show you Defendants' Exhibit 24, which is

8   a copy of the October 26, 2001 letter.

9      A    Yes.  I see the top page.

10     Q    And you see that that letter from Mr. Siegel was

11  also copied to Mr. Ramer.

12          Correct?

13     A    Correct.

14     Q    And you never received from Mr. Ramer a copy of

15  this letter?

16     A    No.

17     Q    If you look at Defendants' Exhibit 23, which is

18  your May 9, 2002 letter --

19     A    Yes.

20     Q    -- is it your testimony that when you wrote that

21  letter, you had never seen Mr. Schulman's October 26,

22  2001 letter?

23     A    That is correct.

24     Q    And so that the comments in your May 9, 2002

25  letter have nothing to do with Mr. Schulman's letter of

42

1      Q    Do you know that Mr. Toberoff represents

2   Mrs. Peary?

3      A    Yes.

4           MR. TOBEROFF:   Peavy.

5           MR. ZISSU:   Sorry.   Peavy.

6           Let's mark as Defendants' Exhibit 58 a letter

7   dated November 30, 1938 from Jerome Siegel or Jerry

8   Siegel to Mr. J.S. Liebowitz of Detective Comics.

9           (Defendants' Exhibit 58 marked.)

10          THE WITNESS:   I didn't finish reading, but if

11  it's not necessary for me to read the whole thing, maybe

12  I should --

13  BY MR. ZISSU:

14     Q    Why don't you read it, unless you're familiar

15  with it.

16     A    Okay.

17     Q    Are you familiar with this?

18     A    No.   It's the first time I've seen this.

19     Q    First time you've ever seen it?

20     A    Yes.   I wasn't married to Jerry at this time.

21     Q    And in all the years you were married to him, he

22  never showed this to you?

23     A    Pardon?

24     Q    In the years that you were married to him, he

25  never showed you this letter?

105

```
 1        A    No.

 2        Q    And you haven't read it before since --

 3        A    This is the first time I'm seeing this.

 4        Q    Is it fair to say that this letter is proposing

 5   an idea?

 6        A    I don't want to comment on something that I

 7   never saw before.

 8        Q    Well, you're a plaintiff in the case, and there

 9   are certain claims and assertions being made by you in

10   the case, and they include allegations with respect to

11   this document and some others that may have been signed

12   by your husband years ago.

13             Do you understand that?

14        A    Yes.  But I do want to make it clear that when

15   we were having -- going through the termination, a sister

16   of mine passed away, and I was out of town.  I gave my

17   daughter access to anything that my husband had, and so a

18   lot of stuff became hers, and she turned it over to our

19   attorney, so...

20        Q    Well, you just read it.

21             Correct?

22        A    I just read it.

23        Q    Do you think it's fair to characterize this as a

24   letter proposing an idea --

25             MR. TOBEROFF:  Objection --
```

106

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

EXHIBIT 9
55

1      MR. ZISSU:  Let me finish the question.

2      Q    -- that does not flesh out the Superboy

3   character or the continuity?

4      MR. TOBEROFF:  Objection.  Calls for a legal

5   conclusion as to the way -- calls for a legal conclusion.

6   Also vague and ambiguous.

7      THE WITNESS:  I don't know how to answer that.

8   I would have to study and see what you're actually

9   referring to.

10  BY MR. ZISSU:

11     Q    Well, I'm referring to on the second page in the

12  paragraph that begins on that page, it says --

13     A    Second paragraph?

14     Q    Well, it's the second block of text --

15     A    Okay.

16     Q    -- on the second page.  It starts with the

17  words, "Another suggestion."  You see that?

18     A    Yes.

19     Q    It says, "While talking to Mr. Nimis the subject

20  came up of what 'top' strip to use on the Sunday page of

21  SUPERMAN.  I suggested to him that we use a strip named

22  SUPERBOY, which would relate the adventures of Superman

23  as a youth.  The appearance of SUPERMAN in ACTION COMICS

24  has developed the character very much so that we now know

25  how to handle him for syndication.  Now don't you think

107

1    that it might be a good idea for me to do a strip

2    entitled SUPERBOY for one of our other magazines,

3    possibly NEW ADVENTURE COMICS, or perhaps MORE FUN

4    COMICS."

5            Is it fair to characterize that as proposing an

6    idea for a new character?

7            MR. TOBEROFF:  Same objection.

8            THE WITNESS:  Well, yeah.

9    BY MR. ZISSU:

10       Q   And if you read the rest of the letter, is it

11    fair to say that beyond the idea, the letter does not

12    flesh out the character or provide any details of stories

13    or continuities?

14       A   Well, it does -- it does describe it as a

15    12-year-old.

16       Q   Anything beyond that?

17       A   I'd have to reread this.

18           MR. TOBEROFF:  Objection.  The document speaks

19    for itself.

20           THE WITNESS:  I guess --

21    BY MR. ZISSU:

22       Q   I am asking you whether you agree with my

23    characterization that this document does not flesh out

24    the character beyond the age you mentioned and does not

25    provide --

108

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

EXHIBIT 9
57

1    A    Well, I can't say that --

2    Q    Let me finish the question.

3         -- and does not provide any continuities?

4         MR. TOBEROFF:  Same objection.  You're asking

5    her to -- same objection.  You're asking her to make a

6    legal interpretation.  This document speaks for itself.

7         THE WITNESS:  Well, I have to rely on legal

8    opinion because I'm not qualified to give a legal opinion

9    on anything like this.

10   BY MR. ZISSU:

11   Q    You don't feel you can answer my question.

12        Correct?

13   A    That's right.

14        MR. ZISSU:  Let's mark as Defendants' Exhibit

15   59 -- I think this has been referred to as the Superboy

16   synopsis, Superboy script.

17        (Defendants' Exhibit 59 marked.)

18   BY MR. ZISSU:

19   Q    And to begin with, my question is, have you seen

20   this before, and are you familiar with it?

21   A    It doesn't look familiar to me.

22        This is when?  Do you have a date on this

23   anywhere?

24   Q    No, but I think I can represent that the parties

25   agree this dates to 1940.

109

1       A    Well, I wasn't married to him till 1948.

2       Q    Are you familiar with Action Comics No. 1?

3       A    Well, it depends on what you mean by "familiar."

4       Q    Well, I have it somewhere.  Let me show it to

5    you.

6       A    Do you mean the cover?  Of course.  It's been

7    printed many times.

8       Q    The continuity and the artwork.

9            I thought we marked it yesterday.

10           MS. LASERSON:  We did.

11           MR. ZISSU:  We did, so it should be there.

12           I've got it.  I have it.  Thank you.

13      Q    I am handing you Defendants' Exhibit 21, I think

14   it is?  Is that correct?

15           Does it say "21" on there, Marc?

16           MR. TOBEROFF:  Yes.

17           MR. ZISSU:  It does.

18           MR. TOBEROFF:  Are you going to ask her

19   questions about this?

20           MR. ZISSU:  I am going to try to.

21           MR. TOBEROFF:  Okay.  So she is going to have to

22   go through it.

23           MR. ZISSU:  Well, I'll let her go through it in

24   a minute, but do you think if I asked you questions --

25   strike that.

110

1      Q    Have you read that before at one time or

2  another?

3      A    Yes.

4      Q    Have you read it in the last couple of years?

5      A    Maybe.

6      Q    Will you be able to answer questions for me

7  about -- strike that.

8           If you look at Defendants' Exhibit 59, which is

9  a script that your late husband submitted to Detective

10  Comics in 1940 --

11      A    Pardon?

12      Q    In 1940.

13      A    Yes.

14      Q    Would you be able to look and see what aspects

15  of the Superman character in Action Comics No. 1 are

16  repeated in the script?

17      A    Well, I'd have to read it.  It's too difficult

18  because this is all in art, and this is all in script.

19  I'd have to read it.

20           You want me to tell you what's different in all

21  of this compared to all of this?

22      Q    No, not all of it.  Let me try a couple

23  questions and see how we do.

24           Is the fact that Superman's -- one of his

25  identities is Clark Kent, was that in Action Comics

111

1    No. 1?

2            MR. TOBEROFF:  I'm going to object to the line

3    of questioning so I don't have to interrupt.  I am going

4    to object to this line of questioning that the documents

5    speak for themselves and that it's calling for expert

6    testimony.  Anything above the document speaking for

7    themselves is calling for expert testimony from a lay

8    witness.  It's also, I think, extremely burdensome to

9    give her a 10-page -- a 13-page script and ask her to

10   compare it to a -- I don't know how many pages, -- 10-

11   page comic book with pictures and be able to get a

12   meaningful answer.

13           MR. ZISSU:  Why don't I try something a little

14   different.

15       Q   Why don't you just -- you look at Action Comics

16   No. 1, and I'll ask you a couple questions about that,

17   and my first question is --

18       A   It's upside down.

19       Q   Put the script aside.

20           MR. TOBEROFF:  Did I get a copy of 59?  I am

21   looking for it.

22           MR. ZISSU:  It should be in here.

23           MR. TOBEROFF:  Did we do --

24           MR. ZISSU:  I gave you 59, I think.

25           MR. TOBEROFF:  I just have one copy.

112

1          MR. ZISSU:  Well, you should have a second one.

2          MR. TOBEROFF:  I just got one.

3          MR. TOBEROFF:  Do you want me to use the one

4   from this set?

5          MR. ZISSU:  Yeah, go ahead, until we straighten

6   it out.

7      Q    Here is the question:  Does Action Comics No. 1

8   identify the hero by the name Clark Kent?

9      A    I believe this panel right here does.  Let's

10  see.  I believe this editor's speaking to him, and he

11  says, "Think you can handle that, Kent?"

12     Q    Okay.  Feel comfortable to give me as much

13  detail as you want --

14     A    You don't want me to describe the illustration?

15     Q    No.  My question is only, does this Action

16  Comics No. 1 identify the hero by the name Clark Kent?

17     A    It does, yes.

18     Q    Does Action Comics No. 1 show some kind of a

19  spacecraft in the first panel going into space launched

20  from a distant planet?

21     A    Are you talking about page 1?

22     Q    Yes, the upper left-hand panel.

23     A    I'm sorry.  What is your question?

24     Q    Does this show a spacecraft being launched from

25  a distant planet?

113

1          A    Well, the --

2               MR. TOBEROFF:  Objection.  Compound.  Multiple

3     questions.

4               THE WITNESS:   It looks like the planet is

5     exploding.

6     BY MR. ZISSU:

7          Q    All right.  And you see that green looks like a

8     bullet?  Is that some kind of a spacecraft?

9          A    I don't know what it is.  More like a cucumber.

10         Q    Well, is there reference to a spaceship in the

11    words with that panel being launched toward Earth?

12         A    In that first panel?

13         Q    Yes.

14         A    Is there a reference to a spaceship?

15         Q    Yeah.  Does the first panel in the text --

16         A    No, not in the text.

17         Q    Is there text with the first panel?

18         A    Oh, I'm sorry.  I'm looking at the comic book.

19         Q    At the upper left.  I'm not asking you anything

20    about the script, just Action Comics, and if you look at

21    the top left panel --

22         A    Yes, the first panel.

23         Q    Yes.

24         A    Yes.

25         Q    And does it say, "As a distant planet was

114

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

EXHIBIT 9

1   destroyed by old age, a scientist placed his infant son

2   within a hastily devised space-ship, launching it toward

3   Earth"?

4       A   Yes.

5       Q   And is there reference in the next panel to a

6   passing motorist who discovered a babe?

7       A   Yes.

8       Q   And is there a panel -- a picture of a babe or a

9   baby holding up an armchair?

10      A   Yes.

11          MR. ZISSU:  Let me take a break to consider how

12  to move this along.  If we can go off the record.

13          (Recess.)

14          MR. ZISSU:  On the record.

15          Based upon our recent questions and answers, I

16  believe that the witness cannot go through the process

17  doing comparisons of the kind I was going to do.  I

18  was -- I'll tell you what I was going to do.  I was going

19  to have her compare Action Comics No. 1 with Defendants'

20  Exhibit 59, the synopsis of the script, and then I was

21  going to have a comparison by the witness between the

22  synopsis of the script with More Fun Comics No. 1, and

23  then I was going to ask her some similar questions about

24  the contents of Smallville, of which there are many

25  episodes.

115

1          So I'm assuming that if I made that attempt, do

2     that exercise, I would get the same kinds of answers that

3     I've gotten in asking her the questions about Action

4     Comics No. 1 and the script.  So on that basis, if you

5     agree that those would be the answers or the kind of

6     answers given, I think we can move on and drop those --

7     and not go through that exercise.

8          MR. TOBEROFF:  I don't know what -- I sort of

9     agree with the tenor of what you're saying, but I

10    don't -- in other words, when you say that those would be

11    the kind of answers, I don't know what the answers are,

12    but I just -- it just seems to me that these documents,

13    you know, speak for themselves, and these comparisons

14    should be made by either experts or lawyers, and that --

15    but to the extent there could be something gotten out of

16    a comparison by a layman or by Miss Siegel, I just think

17    it's -- it would be a very -- it just seems to me from

18    the questions you've asked, I come to the same conclusion

19    that you do, that it would be a difficult -- it would be

20    difficult for you to get a meaningful responses.

21         MR. ZISSU:  Yeah.  Would you agree with me that

22    the witness is not able to do that, that kind of an

23    exercise?

24         MR. TOBEROFF:  Not -- not -- I don't know.  I

25    just think that -- in other words, I think it's

116

1   difficult -- I think that's difficult for any layman to

2   do, but I suppose it would be particularly difficult for

3   somebody who's nearly 89 years old.

4         MR. ZISSU:  The reason I'm asking that is I'm

5   saying if the witness is going to take the stand at

6   trial --

7         THE WITNESS:  You know, I would appreciate if

8   you both talked a little louder.

9         MR. ZISSU:  I'm sorry.  If the witness is going

10  to take the stand at a trial and go through a comparison

11  of the kind that I've been -- I would ask her to go

12  through now, I would have to go through that now and see

13  what the answers would be, but if she is not going to do

14  that for one reason or another or can't do that, then I

15  don't see the need to go through those questions with her

16  now.  This means that if you're going to go through any

17  comparisons at trial, you would have to do it through a

18  different witness, such as an expert.

19        MR. TOBEROFF:  I don't have any -- I don't have

20  plans to have Miss Siegel make that -- if you are asking

21  me whether I would put Miss Siegel on the stand to make

22  those kinds of comparison where I thought that would be

23  fruitful at trial, I would say no, I would think it would

24  not be fruitful at trial.

25        MR. ZISSU:  Okay.  And would you also agree --

117

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT 9
66

```
 1              THE WITNESS:  Are you talking about me?
 2              MR. TOBEROFF:  Yes.
 3              MR. ZISSU:  Yes.
 4              MR. TOBEROFF:  Her testimony at some point
 5   could -- I don't want, you know -- her testimony at some
 6   point could bear on some issue which is related to some
 7   issue that could come forth in some kind of comparison,
 8   but, no, I would not use her to establish what the
 9   elements are and what the similarities are and what the
10   dissimilarities are.  I would not use her for that
11   purpose.
12              MR. ZISSU:  And would you agree that she would
13   not be able to do that at a trial, subject to the
14   exception you noted?
15              MR. TOBEROFF:  I can't say she would not be
16   able.  I think it would be -- I can't say she would not
17   be able.  I think in this -- I can't say she wouldn't be
18   able.  I couldn't say that, but I could say I think there
19   are better ways of making those comparisons.
20              MR. ZISSU:  Okay.  All right.  I think on that
21   basis we can forego those -- that line of questioning.
22              MR. TOBEROFF:  Okay.
23              MR. ZISSU:  And I might have a particular
24   question now but not in that form and on that line, and I
25   think it will shorten the deposition considerably.  So
```

118

1    before closing off the questions about works and

2    similarities, I have one question, and then I hope to

3    wind up with some short questions remaining.

4        Q    First, if you would turn and look at Defendants'

5    Exhibit 23, which is the letter you wrote to Mr. Parsons,

6    Defendants' Exhibit 23, I am going to ask you a question

7    about a paragraph on the second page.  It's the fifth

8    paragraph on the second page.

9        A    Yes.

10        Q    It says, "It is to the everlasting shame of

11    everyone in leadership roles at the company that they

12    allowed that disgraceful contract to be sent to us.

13    There was no concern for the suffering it would cause

14    Jerry Siegel's widow and his ailing, impoverished

15    daughter," close quote.

16        Yesterday I asked your daughter what the

17    suffering was referring to, and I believe she answered

18    that this would be the deprivation of the money that

19    would have come to you at this time in your lives.

20        A    For both of us.

21        Q    For both of you.

22        So my question to you now is --

23        MR. TOBEROFF:  Let him finish his question

24    before you answer.

25        MR. ZISSU:  Yeah, wait.

119

1      Q    The question to you now is, have you made any

2  attempt to calculate how much by now you would have been

3  paid under the October 19, 2001 letter if the February 1

4  draft contract had not been occurred?

5      A    You mean based on that ~~contract~~ *letter* that we didn't

6  like but approved?

7      Q    Yes.

8      A    No.

9           You asked if we calculated the amount?

10     Q    Yeah.  Have you considered --

11     A    No, we didn't, but perhaps our representatives

12  did.

13     Q    Did an accountant --

14     A    I don't recall actually.

15     Q    Did any accountant or auditor take a look at

16  what you would have been paid by now?

17     A    Let's see.  This is at the end of the

18  representation of Kevin Marks and Bruce Ramer.

19     Q    Yes, but I'm asking --

20     A    They may have.

21     Q    But have you --

22     A    But personally I didn't.

23     Q    Have you considered --

24     A    I figured that I wasn't qualified to make

25  that -- try to figure that out.

120

1

2

3

4

5

6

7

8      I, JOANNE SIEGEL, do hereby declare under

9   penalty of perjury that I have read the foregoing

10   transcript; that I have made any corrections as appear

11   noted, in ink, initialed by me, or attached hereto; that

12   my testimony as contained herein, as corrected, is true

13   and correct.

14      EXECUTED this _15th_ day of _September_,

15   20_06_, at _MARINA DEL Rey_, _CA_.
                    (City)                    (State)

16

17

18

19      _____
            JOANNE SIEGEL
20

21

22

23

24

25

                                                    140

EXHIBIT 9
70

1

2

3

4      I, the undersigned, a Certified Shorthand

5  Reporter of the State of California, do hereby certify:

6           That the foregoing proceedings were taken

7  before me at the time and place herein set forth; that

8  any witnesses in the foregoing proceedings, prior to

9  testifying, were placed under oath; that a verbatim

10 record of the proceedings was made by me using machine

11 shorthand which was thereafter transcribed under by

12 direction; further, that the foregoing is an accurate

13 transcription thereof.

14           I further certify that I am neither

15 financially interested in the action nor a relative or

16 employee of any attorney of any of the parties.

17           IN WITNESS WHEREOF, I have this date

18 subscribed my name.

19

20 Dated: _____AUG 1 8 2006_____

21

22                          _____
                            DAVID S. COLEMAN, CSR NO. 4613

23

24

25

EXHIBIT 9
71