# EXHIBIT 11

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA



JOANNE SIEGEL,            )
LAURA SIEGEL LARSON       )
                          )
     Plaintiffs,          )
                          )
v.                        ) CASE NO. CV 04-8400
                          )           CV 04-8776
WARNER BROS, et al.       )
                          )
     Defendants.          )

DEPOSITION OF MARK WARREN PEARY
November 11, 2006
8:30 a.m.
317 Paseo de Peralta
Santa Fe, New Mexico

PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:
TAKEN BY: MR. PATRICK PERKINS
    Attorney for the Defendants

REPORTED BY: MABEL JIN CHIN, NM CCR #81
    Bean & Associates, Inc.
    Professional Court Reporting Service
    500 Marquette, Northwest, Suite 280
    Albuquerque, New Mexico 87102
(3519B) MC

BEAN & ASSOCIATES, INC.
info@litsupport.com     500 Marquette Ave. NW, Suite 280, Albuquerque NM 87102     505-843-9494

EXHIBIT 11
96

Page 22

1 personally?
2      MR. TOBEROFF: Vague and ambiguous.
3      A. He didn't say much. I don't think he wanted
4 to talk too much about it. He really didn't say that
5 much.
6      Q. So, going back to your testimony, you
7 contacted Mr. Toberoff sometime in 2001; correct?
8      A. Yes.
9      Q. And as you sit here today, you can't
10 remember when in 2001?
11     A. Not the exact month, no.
12     Q. Do you remember the season?
13     A. It seems like it was mid year sometime.
14     Q. Now, when you contacted Mr. Toberoff, had
15 you made any attempt to evaluate what, if anything,
16 the copyright rights in Superman were worth that you
17 were contacting Mr. Toberoff about?
18          MR. TOBEROFF: Objection, vague and
19 ambiguous.
20     A. I don't think I -- no, I don't think I went
21 that far. I didn't.
22     Q. Since then have you done anything to try to
23 evaluate the value of copyright rights in Superman?
24          MR. TOBEROFF: Him personally?
25     Q. (By Mr. Perkins) You personally?

Page 23

1      A. Me personally? Not really on my own, just
2 whatever has been discussed with my attorney.
3      Q. Were there discussions with your attorney
4 concerning the value of Superman? That's a yes or no
5 question.
6          MR. TOBEROFF: Objection, calls for
7 attorney-client privileged information. The substance
8 of his conversations are privileged, and you just
9 outlined the substance. Instruct him not to answer.
10     Q. Are you going to follow Mr. Toberoff's
11 instruction not to answer the question?
12          MR. TOBEROFF: Of course he is going to
13 follow my instruction.
14     A. Yes. That's a privileged question.
15     Q. So you are going to follow his instruction
16 not to answer?
17     A. Yes.
18     Q. Thank you. At what point did Mr. Toberoff
19 become your attorney?
20     A. It was fairly soon after I contacted him.
21     Q. Well, you have another relationship with
22 Mr. Toberoff also, or did, other than as an attorney,
23 didn't you?
24          MR. TOBEROFF: Vague and ambiguous.
25     A. Well, the -- the first relationship was as

Page 24

1 counsel, and then we had discussed possible uses of
2 rights, but we really -- I employed him as counsel
3 very soon after I contacted him.
4          MR. PERKINS: Would you mark that, please?
5          (Exhibit 3 marked.)
6      Q. (By Mr. Perkins) I have asked the court
7 reporter to mark as Exhibit 3 a document that's
8 entitled Joint Venture Agreement. Could you turn to
9 the last page of this document, please?
10          MR. TOBEROFF: Before you ask him questions
11 about an isolated portion of the document, I think you
12 should look it over because the rest of the agreement
13 may provide context for whatever question Mr. Perkins
14 is asking.
15          MR. PERKINS: Well, I didn't ask any
16 questions yet, but I was just --
17          MR. TOBEROFF: I presume you were about to?
18          MR. PERKINS: I was just going to ask him if
19 it was his signature on the last page, because if it's
20 not, then it's going to be a very different
21 examination.
22     Q. (By Mr. Perkins) Is this your signature on
23 the last page?
24     A. Yes.
25     Q. Okay. Have you seen this agreement before

Page 25

1 today?
2      A. Yes.
3      Q. Did you read it before you signed it?
4      A. Yes.
5      Q. Okay. Why don't you go ahead and go through
6 the agreement, because I am going to ask you some
7 questions about it now.
8          Have you had occasion to read through the
9 document?
10     A. Yes.
11     Q. Now, this agreement is a Joint Venture
12 Agreement; correct?
13          MR. TOBEROFF: Objection, calls for a legal
14 conclusion. You can answer.
15     A. Well, that's what it says here.
16     Q. What did you understand you were doing when
17 you signed this agreement?
18     A. We were employing Marc Toberoff, Esquire, as
19 our attorney to exploit any rights we may have in
20 connection with Superman.
21     Q. And so what was Pacific Pictures
22 Corporation's role in this whole agreement, then, your
23 understanding?
24          MR. TOBEROFF: Calls for speculation.
25     A. Um -- I don't know how to characterize

Page 26

1  exactly what Pacific Pictures' role is my.
2  Understanding is that this is when we employed Marc
3  Toberoff as our attorney, and this was a business name
4  he was using. That's my understanding.
5      Q. Did you -- did you get legal counsel to
6  advise you on this agreement before entering into it?
7      A. No.
8      Q. Now, in the first paragraph -- in the
9  paragraph that's named -- that listed number 1, do you
10 see that?
11     A. Yes.
12     Q. It lists a number of characters. Do you see
13 that?
14     A. Yes.
15     Q. Now, I promised the court reporter that I
16 wouldn't reference one particular character because of
17 the difficulty in spelling it, so we won't go through
18 all of them. But I want to draw your attention to two
19 specific characters. Before I do, who decided which
20 names and characters would be included in paragraph
21 1?
22         MR. TOBEROFF: Objection, attorney-client
23 privileged information. Instruct you not to answer.
24         Also attorney work-product.
25     Q. Are you going to follow your counsel's

Page 27

1  instructions not to answer.
2         THE WITNESS: Yes.
3         MR. TOBEROFF: Mr. Perkins, for the
4  remainder of this deposition please assume that he is
5  going to follow his counsel and do not ask him after
6  each question whether he is going to follow the
7  instruction. I find that improper.
8         MR. PERKINS: It's actually not,
9  Mr. Toberoff. I have to ask the question because if I
10 just leave it with your instruction and don't ask, I
11 open myself up to the possibility that at trial he
12 could answer the question saying I was never asked
13 whether I would follow the instruction.
14        MR. TOBEROFF: Okay. So let's say for the
15 remainder of the deposition when I instruct you not to
16 answer are you going to follow my instructions?
17        THE WITNESS: Yes.
18        MR. PERKINS: That's fine. Thank you.
19        MR. TOBEROFF: Okay. Then you don't need to
20 keep asking him.
21        MR. PERKINS: Thank you.
22    Q. (By Mr. Perkins) Do you have any
23 understanding as to why the character Superboy is
24 listed in paragraph one of this agreement?
25    A. No.

Page 28

1      Q. In the research that you did concerning
2  copyright law relating to Superman, was it your belief
3  that some of the rights that you may have held were
4  rights relating to Superboy?
5      A. No.
6      Q. And I also note that paragraph one mentions
7  Smallville. Do you see that?
8      A. Yes.
9      Q. Do you have any understanding as to why that
10 was included in this paragraph?
11     A. No, I don't.
12     Q. Do you know what Smallville is? What that's
13 referring to there?
14     A. Yes.
15     Q. What is it?
16     A. It's -- it was a name that was created by --
17 in connection with the story in connection with
18 Superboy.
19     Q. And based on the --
20     A. Or actually, let me finish, because --
21         MR. TOBEROFF: Wait.
22     A. It was actually -- I'm recalling, it was
23 part of the whole story from the very beginning, if
24 I'm recalling the whole story, the whole Superman
25 story. From the very beginning it was used in there,

Page 29

1  so that's all I know about it.
2      Q. And based on the research that you did, was
3  it your belief that the copyright rights that you may
4  have had rights to would include rights in Smallville?
5      A. When you say Smallville, are you talking
6  about, like, the TV show that's on or --
7      Q. That -- I'm sorry -- yes.
8      A. Oh.
9          MR. TOBEROFF: Calls for a legal conclusion
10 as to rights he would have.
11     A. That's -- that's not really my understanding
12 that that's part of our rights.
13     Q. You testified earlier, if I'm not mistaken
14 and if I get it wrong please tell me, and I'm sure
15 Mr. Toberoff will jump in and say that I
16 mischaracterized it. The joint -- the purpose of this
17 document was to hire Mr. Toberoff as your attorney.
18 Is that an accurate characterization of your belief.
19         MR. TOBEROFF: Asked and answered. Oh,
20 mischarac- -- okay. Strike that.
21     A. Yes. My understanding was that, that this
22 is the document that we used to hire Mr. Toberoff as
23 our attorney.
24     Q. If you could turn to the second page in
25 paragraph 5, do you see that?

Page 30

1  A. Yes.
2  Q. That paragraph provides for a division of
3  proceeds of 50 percent to you and your mother and 50
4  percent to Pacific Pictures, do you see that?
5  A. Let's see. Who are the claimants again?
6  Let's see. Let's see.
7  Q. In the top paragraph of the first page, it
8  identifies Jean A. Peavy and her son Mark Warren
9  Peary --
10 A. Oh.
11 Q. -- individually and collectively as
12 claimants. Do you see that?
13 A. Yes.
14 Q. So, turning back to paragraph 5?
15 A. Uh-huh.
16 Q. There is a division of 50 percent to you and
17 your mother and 50 percent to Pacific Pictures. Do
18 you see that?
19 A. Yes.
20 Q. And, do you recall how the parties to this
21 agreement came up with that division?
22    MR. TOBEROFF: Vague and ambiguous.
23 A. It's discussions, just discussions between
24 us and Mr. Toberoff.
25 Q. And what was the basis for choosing that

Page 31

1  particular division of proceeds?
2     MR. TOBEROFF: Vague and ambiguous, asked
3  and answered.
4  A. Yes, it was pretty much what I said before,
5  it was just based on just discussions over time.
6  Q. Well, were there certain considerations that
7  went into determining this percentage?
8  A. Perhaps the amount of work involved, the
9  amount of time, the commitment, like, it was the idea
10 it was not an immediate thing, it might take many
11 years.
12    Level of -- just, you know, that's it.
13 Q. In entering into this Joint Venture
14 Agreement, what there any discussion as to how much
15 revenue was anticipated would come in, in exploiting
16 the rights here?
17 A. Oh, I -- I don't recall discussing exact
18 figures, no.
19 Q. Discuss -- do you recall general amounts?
20 A. You know, that's -- that's not something we
21 really talked too much about. It was more having to
22 do with what the exact copyright law states what our
23 rights might be. We really didn't discuss figures
24 much.
25 Q. Did you enter into a separate written

Page 32

1  agreement with Mr. Toberoff concerning his
2  representation of you as a lawyer?
3  A. This is all I recall, right here.
4     MR. TOBEROFF: I want to interject. The
5  question was vague and ambiguous at the time.
6  Q. If I could ask you to turn to page 3 of the
7  document and take a look at paragraph 8, which is the
8  first paragraph on the page? Could you please read
9  that paragraph to yourself, and then I'm going to ask
10 you some questions about it.
11 A. Oh, okay.
12    Okay.
13 Q. The second sentence of this agreement
14 states, and I quote, "Upon the expiration of the term
15 and the winding up of the venture, or in the event of
16 termination of the venture for any reason, all rights,
17 property or assets of the venture will be held 50
18 percent by the claimants and 50 percent by PPC as
19 tenants in common, and claimants and PPC will each be
20 entitled to receive and continue to receive 50 percent
21 of all proceeds derived from the rights after
22 termination of the venture."
23    My question is, Mr. Peary, what was your
24 understanding as to what, if any relationship, would
25 continue to exist between you and Pacific Pictures in

Page 33

1  the event that this agreement was terminated?
2     MR. TOBEROFF: Calls for a legal conclusion,
3  the document speaks for itself.
4  A. My understanding of what that meant?
5  Probably death, if he died.
6  Q. What -- what was your understanding of what
7  would happen to the rights that are at issue in this
8  agreement in the event that this agreement was
9  terminated?
10    MR. TOBEROFF: Same objections, calls for a
11 legal conclusion. The document speaks for itself.
12 A. What would happen to the rights?
13 Q. Well, who would own them?
14    MR. TOBEROFF: Are you asking him to read
15 the document and tell you what it means?
16 Q. I'm asking you, Mr. Peary, what your
17 understanding was of what would happen to the rights
18 if the agreement was terminated at the time that you
19 signed the agreement?
20 A. Well, it was terminated at some later date.
21 Q. Yes.
22 A. The rights would be split 50 percent.
23 Q. If I could have you go back to page -- to
24 the first page of Exhibit 3, in paragraph 3 there is
25 reference to PPC paying costs and expenses of the

Page 34

1   venture. Do you see that?
2       A. Yes.
3       Q. And it refers to -- it lists a number of
4   costs and fees. My question, Mr. Peary, is, were you
5   ever made aware as to whether any costs or fees were
6   incurred by the venture?
7       MR. TOBEROFF: Vague and ambiguous.
8       A. There were -- there was some fees associated
9   with the establishment of the Joe Shuster estate.
10  That's pretty much all I know.
11      Q. Were you aware of any other attorneys' fees
12  that were incurred in connection with this venture?
13      MR. TOBEROFF: Objection, vague and
14  ambiguous.
15      A. The only fees I am aware of is fees
16  associated with the establishment of the Shuster
17  estate.
18      Q. Now, you mentioned that under this agreement
19  you believe that you were hiring Mr. Toberoff as your
20  attorney. What is your understanding of the fee
21  arrangement with Mr. Toberoff for his legal services?
22      MR. TOBEROFF: Asked and answered.
23      A. Yes. My understanding is what it says in
24  paragraph 5 that we discussed.
25      Q. All right. Hold on to that document, and

Page 35

1   I'm going to mark something else and we're going to go
2   back to it.
3       MR. TOBEROFF: I'm getting a glass of
4   water.
5       THE VIDEOGRAPHER: Your mike.
6       MR. TOBEROFF: Oh, sorry.
7       (A discussion was held off the record.)
8       Q. (By Mr. Perkins) Before you look at Exhibit
9   4, I would like you to go back to Exhibit 3 for a
10  moment, Mr. Peary. Is this document, this agreement
11  the first agreement between you and Mr. Toberoff that
12  you believe established him as your attorney?
13      A. Yes.
14      Q. And the date on the back page of this, it's
15  signed November 28, 2001; correct?
16      A. Yes.
17      Q. Did you have any discussions with
18  Mr. Toberoff prior to November 28, 2001?
19      MR. TOBEROFF: Just a second. I need to put
20  on my mike.
21      Objection, asked and answered.
22      A. Yes. I would refer you back to the prior
23  answer about when I first talked to him.
24      Q. He wasn't your lawyer when you first talked
25  to him; correct?

Page 36

1       A. Not at first.
2       Q. Do you remember what you said during your
3   first conversation with Mr. Toberoff?
4       MR. TOBEROFF: Objection. I would like to
5   counsel -- instruct you not to answer questions about
6   your conversation because they are privileged, even
7   though I had not yet been retained. Your
8   conversations and our interviews are still privileged.
9   So I instruct you not to answer any questions as to
10  the substance of our conversations when you first
11  contacted me.
12      Q. Did you ever have any conversations with
13  Mr. Toberoff as the President of Pacific Pictures, as
14  opposed to as your lawyer?
15      MR. TOBEROFF: Vague and ambiguous, calls
16  for a legal conclusion.
17      A. Um -- you know, I would say I contacted him
18  seeking legal advice.
19      Q. But in November you entered into this
20  agreement which is a joint venture with the company
21  called Pacific Pictures; correct?
22      A. Yes.
23      Q. And Mr. Toberoff is the president of Pacific
24  Pictures Corporation; correct?
25      MR. TOBEROFF: Assumes facts not in

Page 37

1   evidence.
2       A. Well, that's what it says here.
3       Q. That's what the document says. So my
4   question, sir, is, did you ever have discussions
5   with Mr. Toberoff in his capacity as the President of
6   Pacific Pictures Corporation?
7       MR. TOBEROFF: Objection, calls for a legal
8   conclusion, calls for speculation.
9       A. Yes. I wasn't really aware of the Pacific
10  Pictures -- as having any dealings with Pacific
11  Pictures, because I have always talked with Marc
12  Toberoff, the man, as seeking legal advice.
13      Q. So it's your testimony, as you sit here
14  today, that all of the discussions that you had with
15  Mr. Toberoff were in the context of his role as your
16  lawyer?
17      MR. TOBEROFF: Asked and answered.
18      A. Yes.
19      (Exhibit 4 marked.)
20      Q. Okay. If you could take a look at Exhibit
21  4, this is a document that's -- it's one of these
22  lawyer things that people who don't litigate will
23  scratch their heads about, and I'm going to try to
24  explain to you what it is, and Mr. Toberoff will chime
25  in if I have got it wrong. It's identified a

Page 38

1  privilege log, and it is a list of documents that was
2  provided to us by your lawyer among the documents that
3  were responsive to the subpoena that your lawyer has
4  taken the position are protected by the
5  attorney-client privilege, and therefore we cannot see
6  them. Do you understand that?
7     A. Yes.
8     Q. And so this log goes through and gives the
9  date of the document, and it gives who the author is
10 and it gives what kind of document it is and what the
11 privilege claim is. Do you see that?
12    A. Yes.
13    Q. Okay. The second document on here
14 identifies an attorney named John Pettker,
15 P-E-T-T-K-E-R. Do you see that?
16    A. Yes.
17    Q. Who is John Pettker?
18    A. He is an attorney involved in establishing
19 the Joe Shuster estate.
20    Q. And who -- who hired him?
21    A. Our attorney, Marc Toberoff.
22    Q. Did you have any direct dealings with
23 Mr. Pettker?
24    A. No, I don't believe so.
25    Q. Going back to Exhibit 3 for a moment, if we

Page 39

1  could, if you could turn to the third page of the
2  document? You have testified on a couple of occasions
3  that one of the things that was going to happen as a
4  result of this joint venture was to establish the Joe
5  Shuster estate; is that correct?
6     MR. TOBEROFF: Misstates his testimony as to
7  on behalf of the venture.
8     Q. Well, then -- that's a good point. At some
9  point you undertook to establish the Joe Shuster
10 estate; is that accurate?
11    A. Well, I -- it was -- it was between me and
12 Marc Toberoff. As far as my understanding of it, that
13 that was legally necessary to establish the estate.
14    Q. Okay. And if you look at paragraph 10, the
15 last sentence reads, and I quote, "The parties hereby
16 approve Michael Catron," C-A-T-R-O-N, "for appointment
17 as the administrator of Joe Shuster's estate, once it
18 is established." Who is Michael Catron?
19    A. He is -- he is a friend.
20    Q. And is he, in fact, the administrator of Joe
21 Shuster's estate?
22    A. No.
23    Q. And why not?
24    A. We changed, decided to change that,
25 discussion with Marc Toberoff.

Page 40

1     Q. Who initially came up with the name Michael
2  Catron as the administrator?
3     MR. TOBEROFF: Came up with it? Vague and
4  ambiguous.
5     A. I'm not sure who first came up with it. He
6  is a long-time friend. That's all I can say.
7     MR. PERKINS: Would you mark this for me?
8     (Exhibit 5 marked.)
9     Q. (By Mr. Perkins) I have asked the court
10 reporter to mark as Exhibit 5 a document that is dated
11 October 27, 2003. It is addressed to Mark Warren
12 Peary, and it is from Pacific Pictures Corporation.
13 If I could invite your attention to the last page,
14 please?
15    Is that your signature?
16    A. Yes.
17    Q. And did you read this document before you
18 signed it?
19    A. Yes.
20    Q. Mr. Peary, what was the purpose of entering
21 into this agreement?
22    A. As far as I understand, the purpose of this
23 was after I was appointed executor of the Shuster
24 estate.
25    Q. And why did you need to enter this

Page 41

1  agreement, having been appointed executor of the
2  Shuster estate?
3     A. I assume since my legal role changed that
4  this needed to be another agreement.
5     Q. Did you receive legal counsel from anyone
6  prior to entering into this agreement with respect to
7  this agreement?
8     MR. TOBEROFF: Are you asking whether he
9  sought an outside attorney?
10    A. An outside attorney?
11    Q. Yes.
12    A. Other than Marc Toberoff?
13    Q. Yes, other than Marc Toberoff.
14    A. No, I don't believe so.
15    Q. And as of October 27, 2003, when you signed
16 this agreement, had there been any -- strike that.
17    As of October 27, 2003, when you signed this
18 agreement, did you have any idea as to the value of
19 the rights that are at issue in this document?
20    MR. TOBEROFF: Vague and ambiguous.
21    A. Do I have any I -- did I have any idea as to
22 the value? It wasn't really discussed between me --
23    MR. TOBEROFF: Don't talk about discussions
24 with me.
25    A. Okay. So, no, I guess -- I guess not. I

Page 42

1  don't really have -- did not really have any idea of
2  the value, no.
3     Q. As of October 27, 2003, to your knowledge,
4  had any effort been made to place a value on these
5  rights, either by you or by anyone connected to you?
6     MR. TOBEROFF: Objection, vague and
7  ambiguous. And by value, do you mean a specific
8  dollar figure? In other words, you have asked this
9  question several times as to value. What do you mean?
10    Q. Well, what -- Mr. Peary, when I use the term
11 value in connection with rights, what do you
12 understand me to mean?
13    A. I understand you to mean a dollar figure.
14    Q. Okay. So, using that as the definition, as
15 of October 27, 2003, to your knowledge, had anyone
16 placed a value on the rights that are at issue in this
17 agreement?
18    MR. TOBEROFF: Anyone in the world?
19    Q. Anyone, to your knowledge?
20    A. No, not to my knowledge. Not any specific
21 amount, no.
22    Q. Was there a general amount?
23    A. No.
24    Q. Mr. Peary, are you aware of any offers that
25 have been made to you, either directly or through a

Page 43

1  representative, to either purchase or license any of
2  the rights that are at issue in Exhibit 5?
3     A. Yes, I recall something.
4     Q. Tell me what you recall.
5     A. Let's see. We received a letter from DC
6  Comics with -- it was addressed to me and my mother,
7  and it was some kind of an offer made -- I don't
8  recall the exact details.
9     Q. Other than the offer from DC Comics, have
10 any other offers been made?
11    A. No.
12    Q. To your knowledge, have any offers been
13 solicited on your behalf to any third party?
14    A. No.
15    Q. Mr. Peary, who is Joanne Siegel?
16    A. She is Jerry Siegel's wife.
17    Q. Do you know her personally?
18    A. I have met her a few times.
19    Q. When is the last time that you spoke with
20 her?
21    A. It would have been in July of this year.
22    Q. And what was the context of that
23 conversation? Was it in person?
24    A. Yes.
25    Q. Where did you speak with her?

Page 44

1     A. In Los Angeles.
2     Q. Where in Los Angeles?
3     A. At the -- at a hotel we were staying.
4     Q. And who was present at the conversation?
5     A. Besides myself and Joanne, and my mother and
6  her two sons and -- I mean, her two grandsons and her
7  daughter and Marc Toberoff. And my sister, yes.
8     Q. And what was discussed at this meeting?
9     MR. TOBEROFF: Mischaracterizes his
10 testimony.
11    Q. Well, what did you talk about?
12    A. Mainly family things, what her grandsons
13 were doing, what we were doing. And -- and we talked
14 about the new Superman movie. And that's pretty much
15 it.
16    Q. What did you talk about with respect to the
17 new Superman movie?
18    A. The -- we liked it, the story, the actors.
19 That's pretty much it.
20    Q. Was Laura Siegel Larson there also?
21    A. Yes.
22    Q. And have you had any direct discussions with
23 Laura Siegel Larson?
24    A. Discussions about --
25    Q. About anything?

Page 45

1     A. Well, just -- I think the first time I met
2  her was then, that July of this year.
3     Q. Had you spoken with her before that?
4     A. I don't recall actually speaking with her,
5  no.
6     Q. Prior to the July 2006 conversation with
7  Joanne Siegel did you have any other conversations
8  with her?
9     A. Yes. Yes, I have.
10    Q. What is the -- what other conversations do
11 you recall having?
12    A. I spoke with her at a Comic-Con convention
13 in San Diego.
14    Q. When?
15    A. In 1998 or '99.
16    Q. So between your discussion at Comic-Con in
17 1998 or 1999, and your discussion in July of 2006,
18 have you had any other discussions with Joanne Siegel?
19    A. I talked with her on the phone a few times.
20    Q. Okay. When is the last time you spoke with
21 her on the phone?
22    A. It would have been -- it would have been
23 after we saw her in Los Angeles this year.
24    Q. Okay. Do you remember when?
25    A. Um -- the exact month, yes -- around

Page 58

1   A. Yes.
2   Q. Who is IP Worldwide?
3   A. As I understand it, that's a professional
4   name used for his law practice, Marc Toberoff's law
5   practice.
6   Q. And do you have any kind of agreement with
7   IP Worldwide relating to the rights, the copyright
8   rights of Joe Shuster?
9   A. I don't know if it says IP Worldwide. Our
10  agreements are with Marc Toberoff as our attorney. I
11  don't recall if it says IP Worldwide.
12  Q. Are there agreements, written agreements
13  other than the two you have seen during this
14  deposition?
15      MR. TOBEROFF: Referring to?
16  Q. Between you and Mr. Toberoff's entities?
17  A. I believe there was another agreement
18  between us and Marc Toberoff. The -- the estate? I
19  don't know.
20  Q. Okay. We'll come back to that.
21      Did you see this recordation before it was
22  filed with the United States Copyright Office?
23      MR. TOBEROFF: You mean this document?
24  Q. Yes.
25  A. Before -- no, not before.

Page 59

1   Q. Have you seen it before today?
2       MR. TOBEROFF: Asked and answered.
3   A. Yes, I did answer that before.
4       MR. TOBEROFF: Well, you can answer.
5   Q. Indulge me. I don't remember.
6   A. Oh, okay. I don't recall seeing this, this
7   one sheet here. But every other page following I
8   have.
9       MR. TOBEROFF: I mean, if it helps I can
10  represent to you that this --
11      MR. PERKINS: You know, I would rather
12  not --
13      MR. TOBEROFF: Okay.
14      MR. PERKINS: -- have you testify to that.
15      MR. TOBEROFF: All right.
16      MR. PERKINS: Here you go.
17      (Exhibit 9 marked.)
18  Q. (By Mr. Perkins) I have asked the court
19  reporter to mark as Exhibit 9 a one-page document that
20  bears Bates number 133, and it's dated September 10,
21  2004. Have you seen this document before today?
22  A. Yes.
23  Q. And is that your signature, twice?
24  A. Yes.
25  Q. This document states that, quote, "1, The

Page 60

1   Joint Venture Agreement dated as of November 23, 2001
2   between you and Pacific Pictures Corp; and 2, the
3   Engagement Agreement dated October 27, 2003 between
4   the Estate of Joseph Shuster and Pacific Pictures Corp
5   have been cancelled," closed quote. Do you see that?
6   A. Yes.
7   Q. Why is it that the two agreements referenced
8   are -- were canceled by this document?
9   A. It was replaced by a retainer directly with
10  Marc Toberoff as our attorney.
11  Q. If I could have you take a look at Exhibit
12  4, which is the privilege log?
13  A. Uh-huh.
14  Q. Can you identify from any of these documents
15  which of the documents listed in the log are this
16  other retainer agreement directly with Marc Toberoff?
17  A. It doesn't say it here. It just says
18  "letters." I can't really identify just from this.
19  Q. Yes, neither can I. Do you have -- do you
20  know whether the document is an agreement or a letter?
21  A. We have a legal retainer with Marc Toberoff
22  as our attorney. The estate has a legal retainer.
23  Q. And do you know what the date of that is?
24  A. Um -- it's around the time of this -- this
25  letter here from Exhibit 9. It's --

Page 61

1   Q. When you entered into this agreement or when
2   you signed this document and entered into the retainer
3   agreement, did the nature of your business
4   relationship with Mr. Toberoff change?
5       MR. TOBEROFF: Mis -- mischaracterizes the
6   testimony, vague and ambiguous. You can answer.
7   A. No, the nature did not change.
8   Q. And are the business terms of the new
9   agreement the same or similar to the business terms in
10  the two agreements that are canceled by Exhibit 9?
11      MR. TOBEROFF: Attorney-client privilege and
12  instruct you not to answer as to the terms of our
13  retainer agreement.
14  Q. Mr. Peary, under the terms of the retainer
15  agreement are you or the estate required to pay
16  Mr. Toberoff a percentage of revenues from Superboy?
17      Excuse me. Just a minute.
18      I'm going to withdraw the question because I
19  didn't mean to say Superboy. Let's go back and do
20  that again.
21      MR. TOBEROFF: I was wondering what I was
22  going to say.
23  Q. Under the retainer agreement with
24  Mr. Toberoff, is the estate and/or you or your mother
25  required to pay Mr. Toberoff a percentage of revenues

86

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JOANNE SIEGEL,                )
     LAURA SIEGEL LARSON           )
 5                                 )
                  Plaintiffs,      )
 6                                 )
          v.                       )  CASE NO. CV 04-8400
 7                                 )           CV 04-8776
     WARNER BROS, et al.           )
 8                                 )
                  Defendants.      )
 9

10         CERTIFICATE OF COMPLETION OF DEPOSITION

11      I, MABEL JIN CHIN, New Mexico CCR #81, DO HEREBY
     CERTIFY that on November 11, 2006, the deposition of
12   MARK WARREN PEARY was taken before me at the request
     of, and sealed original thereof retained by:
13
             Attorney for the Defendants
14           PERKINS LAW OFFICE, P.C.
             1711 Route 9D
15           Cold Spring, New York 10516
             BY:  MR. PATRICK PERKINS
16
        I FURTHER CERTIFY that copies of this certificate
17   have been mailed or delivered on _____, with
     changes, if any, by the witness appended, to the
18   following counsel of record and parties not
     represented by counsel:
19
             Attorney for the Plaintiffs
20           MR. MARC TOBEROFF
             2049 Century Park East, #2720
21           Los Angeles, California 90067

22      I FURTHER CERTIFY that examination of this
     transcript and signature of the witness were requested
23   by the witness and all parties present.

24      On November 21, 2006, a letter was mailed or
     delivered to Mr. Toberoff regarding obtaining
25   signature of the witness.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT 11
104

87

1   I FURTHER CERTIFY that the recoverable cost of the original and one copy of the deposition, including
2   exhibits to Mr. Perkins is $_____.

3   I FURTHER CERTIFY that I did administer the oath to the witness herein prior to the taking of this
4   deposition; that I did thereafter report in stenographic shorthand the questions and answers set
5   forth herein, and the foregoing is a true and correct transcript of the proceeding had upon the taking of
6   this deposition to the best of my ability.

7   I FURTHER CERTIFY that I am neither employed by nor related to nor contracted with (unless excepted by
8   the rules) any of the parties or attorneys in this case, and that I have no interest whatsoever in the
9   final disposition of this case in any court.

10
11   _____
       MABEL JIN CHIN
12     Certified Court Reporter #81
       License expires:   12/31/2006
13
14
15
16
17
18
19
20  (3519B) MC
    Date taken: November 11, 2006
21  Proofread by: LR
22
23
24
25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


Bean & Associates, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT 11
105