# EXHIBIT 12

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA



JOANNE SIEGEL,              )
LAURA SIEGEL LARSON    )
                                       )
         Plaintiffs, )
                                       )
    v.              ) CASE NO. CV 04-8400
                      )         CV 04-8776
WARNER BROS, et al.   )
                                       )
         Defendants. )


DEPOSITION OF JEAN ADELE PEAVY
November 11, 2006
1:26 p.m.
317 Paseo de Peralta
Santa Fe, New Mexico


PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:
TAKEN BY:  MR. PATRICK PERKINS
    Attorney for the Defendants


REPORTED BY:  MABEL JIN CHIN, NM CCR #81
        Bean & Associates, Inc.
        Professional Court Reporting Service
        500 Marquette, Northwest, Suite 280
        Albuquerque, New Mexico 87102
(3520B) MC

Page 14

1    MR. PERKINS: I said 1940s.
2    MR. TOBEROFF: Oh, 1940s.
3    THE WITNESS: '47, I believe or '48.
4    MR. PERKINS: 1947.
5    MR. TOBEROFF: Sorry. Sorry.
6    MR. PERKINS: That's all right. Wrong
7 lawsuit.
8    Q. (By Mr. Perkins) Were you close to Joe at
9 the time that that happened?
10    A. Yes. In the '40s I was.
11    Q. Do you recall --
12    A. Yes.
13    Q. Did Joe tell you anything about that
14 lawsuit?
15    A. I think that he -- that they felt that they
16 were weren't being compensated for their contribution
17 to a character that was making hundreds of millions of
18 people happy, and they weren't getting their due
19 compensation. That's what I -- I'm aware of.
20    Q. Did he ever talk to you about any of the
21 details of the lawsuit?
22    A. No.
23    Q. Did he ever talk to you about --
24    A. Oh, well, I know that it kept going on and
25 on and on and on, I know that. And we thought when is

Page 15

1 this ever going to be settled. I remember that.
2    Q. Okay.
3    A. And very unhappy. My poor brother, he was
4 -- he was poor. And -- you know, and here is a
5 character that's making other people rich and he is
6 not -- doesn't have enough money.
7    Q. Now --
8    A. The same with Jerry, too.
9    Q. Now, the case that took place in the
10 1940s --
11    A. Uh-huh.
12    Q. -- did he ever talk to you about what the
13 case -- what kind of claims there were in the case?
14 Did he ever talk to you about anything like that?
15    A. I don't think I know the claim itself.
16    Q. Okay. Did your brother ever talk to you
17 about the character Superboy?
18    A. Um -- no, not Joe. Not Joe, no.
19    Q. He never did?
20    A. No.
21    Q. Okay. Now, your brother had another lawsuit
22 in the late 1960s that he had.
23    A. Uh-huh.
24    Q. Do you recall -- do you recall that?
25    A. Yes.

Page 16

1    Q. And do you recall what that lawsuit was
2 about?
3    A. Oh, here they were a couple of the creators
4 of Superman living in poverty. They were destitute.
5 They were really desperate.
6    Q. Did Mr. Shuster talk to you about why they
7 brought the lawsuit?
8    A. I think they wanted some compensation.
9    Q. Now, did they end up ever getting any
10 compensation?
11    A. Not then.
12    Q. When -- when did they end up getting
13 compensation?
14    MR. TOBEROFF: Vague and ambiguous, calls
15 for a narrative.
16    A. Much later. I was married by then, and
17 raising kids, and I didn't keep as much -- track of
18 anything legal at all.
19    Q. When you were -- are you aware that in the
20 1970s Mr. Shuster entered into an agreement with
21 Warner Communications for some compensation to him?
22    A. Yes. I think there was something going on I
23 read. Yes.
24    Q. Were you close to him at that time?
25    A. No. I was married and raising two kids, and

Page 17

1 he -- yes. I was living in Texas then, so --
2    Q. In El Paso?
3    A. Yes.
4    Q. And were you estranged at all?
5    A. Oh, no.
6    Q. Okay.
7    A. No. No. He -- he called me on the phone,
8 he is interested in the kids, you know, about Warren
9 and Dawn and my husband and me and how we were getting
10 along and, you know, not too well and, you know -- I
11 mean -- no, we had a happy family life, but I mean,
12 financially we weren't doing as good as we would have
13 liked.
14    Q. Do you -- did you at any time have an
15 understanding as to how much money Mr. Shuster was
16 receiving in this deal that he entered into with
17 Warner Communications?
18    A. No.
19    Q. Were you aware that the deal also provided
20 for certain monies to be paid to your other brother,
21 Frank --
22    A. Uh-huh.
23    Q. -- under that agreement?
24    A. Uh-huh.
25    Q. And do you recall how much he was to

Page 22

1  answer. Calls for a narrative.
2  A. She was always handling the business.
3  That's all I know. She was putting herself out
4  handling the business.
5  Q. And did you ever ask her about this 20
6  percent that she was receiving from Joe?
7  A. When they -- when I was in Joe's apartment
8  and Jerry and Joanne came over, yes, and we talked
9  about it.
10 Q. And do you --
11 A. Sorry. Now I do recall about it, yes.
12 Q. Do you recall what was said during that
13 conversation?
14 A. Well, no. I thought it was okay then
15 because, you know, understanding how Joanne had worked
16 for -- you know, to help Joe along with Jerry, then --
17 before that -- I wrote this letter before and I didn't
18 realize until I talked to Joe, Joanne and Jerry, as to
19 why it was okay.
20 Q. And what was your understanding as to what
21 was being done to earn that money?
22 A. She -- she had worked to get a higher pay
23 raise, I guess.
24 Q. And do you remember how much Joe was
25 receiving by the time he died?

Page 23

1  A. No, I have no idea.
2  Q. You don't remember?
3     At some point -- strike that.
4     Was -- was -- after Joe died was your
5  brother Frank still receiving money from Warner
6  Communications?
7  A. Yes.
8  Q. Do you remember how much?
9  A. Huh-uh. No, I don't think I remember how
10 much.
11 Q. Do you recall having any discussions with
12 either Paul Levitz or anyone else about an amount of
13 money that would continue to be paid to Frank?
14 A. To Frank, yes. Yes.
15 Q. Do you recall how much that was?
16 A. Yes. I think it was 25,000.
17 Q. Per year?
18 A. Yes.
19 Q. And who was to receive that money?
20 A. My brother, Frank.
21 Q. And was the money paid to Frank or to you?
22 A. Oh, no. No. To Frank.
23 Q. And when he died, who then began -- did you
24 begin receiving that money?
25 A. Yes, yes.

Page 24

1  Q. Okay.
2  A. Well, yes. Yes.
3     (Exhibit 15 marked.)
4  Q. I am going to hand you what's been marked as
5  Exhibit 15.
6     MR. TOBEROFF: Before you ask the question,
7  I would also like to note that this letter, which I
8  also don't recall seeing, is also not Bates stamped.
9  Has this been produced before today?
10    MR. PERKINS: To my knowledge, yes.
11    MR. TOBEROFF: I have never seen Exhibit 14
12 and I have never seen this letter. I could have
13 missed it in the document, but I'm curious as to why
14 all the documents are Bates stamped except these
15 letters, which I don't recall seeing.
16    THE WITNESS: Uh-huh.
17    MR. TOBEROFF: I have never seen this
18 letter. I don't believe it was produced.
19    And it couldn't be -- no comment.
20    THE WITNESS: My brother -- I have never
21 seen it, either.
22 Q. (By Mr. Perkins) You have never seen it
23 before?
24 A. No.
25 Q. Do you recall whether the payments --

Page 25

1  payments were made to you instead of to your brother?
2  A. Yes.
3  Q. Were they, in fact, made to you?
4  A. Uh-huh.
5     MR. TOBEROFF: Wait a moment for me to
6  object.
7     THE WITNESS: Okay.
8     MR. TOBEROFF: Also, let him finish the
9  question before you answer --
10    THE WITNESS: Okay.
11    MR. TOBEROFF: -- even though you think you
12 know what he is asking --
13    THE WITNESS: Okay.
14    MR. TOBEROFF: -- let him finish the
15 question.
16    THE WITNESS: Uh-huh.
17    MR. TOBEROFF: You are doing fine.
18    THE WITNESS: Uh-huh.
19    (Exhibit 16 marked.)
20    THE WITNESS: Okay.
21 Q. (By Mr. Perkins) All right. I have had the
22 court reporter mark as Exhibit 16 a two-page
23 document. I have -- I have copied them together.
24 They really don't go together, I'm sorry about that.
25 Actually, you may even take off the back page.

**Page 26**

1  MR. TOBEROFF: Just the page 1 we should
2  keep?
3  MR. PERKINS: Yes.
4  MR. TOBEROFF: I'll do it for you.
5  THE WITNESS: All right.
6  MR. PERKINS: The other one doesn't -- it's
7  not very --
8  Q. (By Mr. Perkins) Did you -- is this your
9  signature at the bottom of the page?
10  A. Yes. Uh-huh.
11  Q. Did you review this document before you
12  signed it?
13  A. I probably glanced at it, yes.
14  Q. Now, in the agreement, the second full
15  paragraph, the last sentence says, quote, "In any
16  event, you now grant to us any such rights and release
17  us" -- let me try that again.
18  "In any event, you now grant to us any such
19  rights and release us, our licensees and all others
20  acting with our permission, and covenant not to assert
21  any claim of right, by suit or otherwise, with respect
22  to the above, now and forever."
23  In the following paragraph it states, and I
24  quote, "If, despite the terms of this agreement,
25  either of you assert any such claim of right, for any

**Page 27**

1  reason, you agree to refund to us, upon the making of
2  any such assertion, all amounts previously paid to you
3  hereunder, and we will have no obligation to make any
4  further payments under this agreement," period, closed
5  quote. Do you see that?
6  A. Yes.
7  Q. Do you remember reading that when you signed
8  this document?
9  A. I probably read it but I -- you know, I was
10  -- I was listening to my brother Frank at the time, so
11  I wasn't paying much attention. I was depending upon
12  him to, you know, tell me if I should sign it. So --
13  Q. Do you have an understanding as to what this
14  second to last paragraph means?
15  MR. TOBEROFF: Calls for a legal conclusion.
16  You can answer.
17  A. Yes. I -- I don't -- I don't have any claim
18  if that's what -- yes.
19  Q. Well, the first sentence of the second to
20  the last paragraph says that if either of you assert
21  any such claim of right for any reason, you agree to
22  refund to us, upon the making of any such assertion,
23  all amounts previously paid to you hereunder. Do you
24  see that?
25  A. Yes.

**Page 28**

1  Q. Now, to your knowledge, had you made any
2  claim to --
3  A. Huh-uh.
4  Q. -- own or to be able to recapture the
5  copyrights of your brother, Joseph Shuster?
6  MR. TOBEROFF: Objection, calls for a legal
7  conclusion, vague and ambiguous. You can answer the
8  question if you understand it.
9  A. Yes. No, I haven't made any claim.
10  Q. Are you aware as to whether or not the
11  estate of your brother has made any claim?
12  A. My son handles everything legal, so I
13  don't -- I don't know what's going on there.
14  Q. Okay.
15  (Exhibit 17 marked.)
16  Q. I have asked the court reporter to mark as
17  Exhibit 17 the document, one-page document appears to
18  be a letter that bears Bates number 53 on it.
19  A. Uh-huh. Um. Okay. I remember that.
20  Q. Did you -- is this -- did you write this
21  letter?
22  A. Uh-huh.
23  Q. And this is your signature at the bottom?
24  A. Yes. Yes.
25  Q. Do you have regular contact with Joanne

**Page 29**

1  Siegel.
2  A. Uh-huh.
3  Q. How often do you communicate with her?
4  A. Oh, we call each other on the phone.
5  Q. When is the last time you spoke with
6  Mrs. Siegel?
7  A. A few weeks ago, I think.
8  Q. And do you recall what you discussed?
9  A. Family stuff. We never talk business.
10  Q. Have you ever had any conversations with her
11  about her lawsuit?
12  A. Never.
13  Q. I would like to invite your attention to the
14  second paragraph, first sentence, says, quote, "There
15  was so much injustice done that I am hoping the wrongs
16  will be righted and that your attorney will get a fair
17  deal for you," period, closed quote. Do you remember
18  reading that -- writing that?
19  A. Yes. Yes.
20  Q. And did you -- was that referring to
21  something that you had discussed with Joanne?
22  A. Yes. I knew she had an attorney.
23  Q. Do you recall who that was?
24  A. No.
25  Q. At some point did you recommend to Joanne

Page 30

1  Siegel that she -- strike that.
2     Do you have any kind of agreement with
3  Joanne Siegel about money relating to Superman?
4     A. No.
5     Q. Do you know, for example, how much money she
6  receives from Warner Brothers?
7     A. I have no idea.
8     Q. Do you know whether she knows how much money
9  you receive?
10    A. I think she is the one that -- is the one
11 that got it for Frank, and then I inherited it, so I
12 think she knows about -- yes, what I get, yes.
13    Q. And do you -- other than -- are you still
14 receiving the $25,000 per year?
15    A. Uh-huh.
16    Q. And do you -- do you also receive other
17 money from DC Comics?
18    A. No.
19    Q. Do you ever receive bonus payments from
20 them?
21    A. No -- no. No. I don't remember. No, we
22 didn't get anything for -- this latest one, no.
23    Q. Have you ever gotten a bonus payment?
24    A. No, I don't -- no, I don't think I ever
25 did. No.

Page 31

1     Q. Okay. When you referred to injustice being
2  done, what were you referring to?
3     A. Well, over the years they were not
4  compensated for -- for their creation, so that's the
5  injustice.
6     Q. That's what you're referring to?
7     A. Yes.
8     Q. Was there any other injustice that you are
9  referring to?
10    A. No.
11    Q. And you mentioned that you never talk
12 business with Joanne Siegel?
13    A. Huh-uh.
14    Q. Have there been ever any instances --
15    MR. TOBEROFF: I think that
16 mischaracterizes -- I believe it mischaracterizes the
17 testimony, but that's okay.
18    A. Well, I mean, I knew she had had a lawyer.
19    Q. Okay.
20    A. But I mean, I didn't know any of her
21 dealings with -- with whatever was going on with her
22 personal -- her personal case. We never talked about
23 her personal case, that's what I mean.
24    Q. Do you recall when -- when you first met
25 Mr. Toberoff?

Page 32

1     A. Uh-huh.
2     Q. When was that?
3     A. Um -- 2001, about the middle of 2001
4  sometime.
5     Q. And earlier today your son indicated that
6  Mr. Toberoff's name was given to Joanne Siegel?
7     A. Uh-huh.
8     Q. And he thought that you had been the one to
9  communicate that?
10    A. I told her about him.
11    Q. Do you recall when you did that?
12    A. Maybe about a year later, after -- after we
13 had, I don't know, Marc Toberoff as our counsel, and
14 she was unhappy with or she was -- she was unhappy
15 with her lawyer.
16    Q. What did she tell you about being unhappy
17 with her lawyer? What did she tell you?
18    A. Well, he -- the case -- her case wasn't
19 moving.
20    Q. And was that the only thing that she
21 expressed to you was making her unhappy?
22    A. Yes, I think so. Nothing was happening, as
23 far as I know. So I told her -- I thought that Marc
24 Toberoff would -- we liked him very much, and we -- we
25 felt he was very ethical, very knowledgeable, very

Page 33

1  intelligent. And so we -- I -- I on the telephone, I
2  suggested that she get in touch with him.
3     Q. Okay. Do you recall whether she -- did she
4  ever tell you that she did that?
5     A. Oh, yes, she did.
6     Q. What did she tell you?
7     A. Oh, she told me that she called him and that
8  they -- they had a luncheon. I guess they met for
9  lunch or something. She and Laura and Mr. Toberoff
10 met for lunch in LA.
11    Q. And what did she tell you about that
12 meeting?
13    A. I -- she asked him a lot of questions and
14 she liked him a lot.
15    Q. Did she tell you what questions she asked
16 him?
17    A. No. No.
18    Q. Did she tell you why she liked him?
19    A. She thought he was smart, ethical. She got
20 good vibrations about him and so did I. So --
21    MR. TOBEROFF: Thank you.
22    Q. I was going to say, what's not to like?
23    MR. TOBEROFF: I'm not -- I'm not allowed
24 to --
25    If you wake up every morning after talking

Page 34

1  to the defendants to see if there are horns growing
2  out of my head.
3     Q. (By Mr. Perkins) Mrs. Peavy, do you recall
4  signing any agreements with any of Mr. Toberoff's
5  companies?
6     A. Yes, I guess we did. Companies or with
7  Mr. Toberoff?
8     Q. Did you get legal counsel with respect to
9  whether or not to sign those agreements?
10    A. We couldn't afford any legal counsel so,
11 no. I just had a good feeling -- we just had a good
12 feeling about him.
13    Q. Okay. Do you recall in any of those
14 agreements that you signed how much Mr. Toberoff would
15 receive in connection with whatever income you
16 received from Superman?
17    A. No. We went in as partners, as far as I
18 know.
19    Q. And when you say partners, what do you --
20    A. Well, I mean, we couldn't afford anything,
21 so --
22    Q. So by that you mean a 50-50 partnership? Is
23 that what you were saying?
24    A. Yes.
25    Q. In 2005, were you -- did you receive a

Page 35

1  letter from Paul Levitz making an offer to license
2  certain Superman rights?
3     A. I think Warren might have. I am not sure
4  about that.
5     Q. That's okay.
6        MR. PERKINS: Can you show her what was
7  previously marked as Exhibit 10?
8     Q. Before I have you read the whole thing,
9  Ms. Peavy, and I don't think we're going to do that --
10    A. No.
11    Q. Because I want to --
12    A. Anyway, you know, I don't think I read it.
13    Q. You don't think you read this?
14    A. No, because that's legal stuff and I just --
15 I let it --
16    Q. Were you aware that this -- among other
17 things, there was an offer to pay a -- to pay two
18 million dollars to you and Warren if you would sign an
19 agreement?
20    A. You know, my son didn't take it seriously
21 because we didn't talk about it. He just said he got
22 a letter and he wasn't -- forget it.
23    Q. Did he say anything else to you about it?
24    A. Huh-uh. I don't think we -- I don't think
25 he took it seriously.

Page 36

1     Q. Are you aware that DC Comics had offered to
2  pay you two million dollars?
3     A. Yes. I think he might have mentioned that,
4  yes.
5        MR. PERKINS: I just want to take a quick
6  break.
7        (A recess was taken.)
8     Q. (By Mr. Perkins) I wanted to go back to
9  something that counsel said regarding Exhibit 14.
10 Exhibit 14 was produced. The Bates numbers are DCC
11 6476 through 6479. That I have with me. I don't
12 have --
13       MR. TOBEROFF: I'm sorry, 6476 through 6479?
14       MR. PERKINS: That's right. It's actually a
15 more complete document that's produced that has the
16 actual receipts and bills that go with it.
17       MR. TOBEROFF: Oh, okay.
18       MR. PERKINS: So it goes all the way through
19 6494. As for the handwritten letter, I don't have it
20 with me but, you know, my recollection is that was
21 also produced.
22       MR. TOBEROFF: Okay. If I am wrong I take
23 back what I said.
24       MR. PERKINS: Mrs. Peavy, I have no further
25 questions for you. Thank you so much for coming

Page 37

1  today. It was a pleasure meeting you.
2        THE WITNESS: Oh, thank you very much.
3  Okay. So that's all?
4        MR. PERKINS: That's it.
5        (The deposition concluded at 2:33 p.m.)

38

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4   JOANNE SIEGEL,                 )
     LAURA SIEGEL LARSON            )
 5                                  )
              Plaintiffs,           )
 6                                  )
         v.                         )   CASE NO. CV 04-8400
 7                                  )             CV 04-8776
     WARNER BROS, et al.            )
 8                                  )
              Defendants.           )
 9
10        CERTIFICATE OF COMPLETION OF DEPOSITION
11      I, MABEL JIN CHIN, New Mexico CCR #81, DO HEREBY
     CERTIFY that on November 11, 2006, the deposition of
12   JEAN ADELE PEAVY was taken before me at the request
     of, and sealed original thereof retained by:
13
              Attorney for the Defendants
14            PERKINS LAW OFFICE, P.C.
              1711 Route 9D
15            Cold Spring, New York 10516
              BY:  MR. PATRICK PERKINS
16
        I FURTHER CERTIFY that copies of this certificate
17   have been mailed or delivered on _____, with
     changes, if any, by the witness appended, to the
18   following counsel of record and parties not
     represented by counsel:
19
              Attorney for the Plaintiffs
20            MR. MARC TOBEROFF
              2049 Century Park East, #2720
21            Los Angeles, California 90067

22      I FURTHER CERTIFY that examination of this
     transcript and signature of the witness were requested
23   by the witness and all parties present.

24      On November 20, 2006, a letter was mailed or
     delivered to Mr. Toberoff regarding obtaining
25   signature of the witness.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

Bean & Associates, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT 12
112

39

1   I FURTHER CERTIFY that the recoverable cost of the original and one copy of the deposition, including
2   exhibits to Mr. Perkins is $_____.

3   I FURTHER CERTIFY that I did administer the oath to the witness herein prior to the taking of this
4   deposition; that I did thereafter report in stenographic shorthand the questions and answers set
5   forth herein, and the foregoing is a true and correct transcript of the proceeding had upon the taking of
6   this deposition to the best of my ability.

7   I FURTHER CERTIFY that I am neither employed by nor related to nor contracted with (unless excepted by
8   the rules) any of the parties or attorneys in this case, and that I have no interest whatsoever in the
9   final disposition of this case in any court.

10

11

   MABEL JIN CHIN
12   Certified Court Reporter #81
   License expires:   12/31/2006

13

...

20   (3520B) MC
   Date taken:   November 11, 2006
21   Proofread by: LR

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


Bean & Associates, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT 12