# EXHIBIT E

1  Marc Toberoff (State Bar No. 188547)
   Nicholas C. Williamson (State Bar No. 231124)
2  Keith G. Adams (State Bar No. 240497)
   TOBEROFF & ASSOCIATES, P.C.
3  2049 Century Park East, Suite 2720
   Los Angeles, California, 90067
4  Telephone:  (310) 246-3333
   Fax:          (310) 246-3101
5  MToberoff@ipwla.com

6  Attorneys for Defendants Mark Warren
   Peary, as personal representative of the
7  Estate of Joseph Shuster, Jean Adele
   Peavy, Joanne Siegel and Laura Siegel
8  Larson

9
                    UNITED STATES DISTRICT COURT
10
          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
11

12
   DC COMICS,                          Case No. CV 10-3633 ODW(RZx)
13
              Plaintiff,               **DISCOVERY MATTER**
14
         v.                            **JOINT STIPULATION RE:**
15                                     **MOTION FOR A PROTECTIVE**
   PACIFIC PICTURES CORPORATION,       **ORDER STAYING DEPOSITIONS,**
16 IP WORLDWIDE, LLC, IPW, LLC,        **PENDING RULINGS ON**
   MARC TOBEROFF, an individual,       **DISPOSITIVE MOTIONS AND**
17 MARK WARREN PEARY, as personal      **LIMITING SCOPE AND TIME OF**
   representative of the ESTATE OF     **DEPOSITIONS**
18 JOSEPH SHUSTER, JEAN ADELE
   PEAVY, an individual, JOANNE        Hon. Otis D. Wright II, U.S.D.J.
19 SIEGEL, an individual, LAURA        Hon. Ralph Zarefsky, U.S.M.J.
   SIEGEL LARSON, an individual, and
20 DOES 1-10, inclusive,               Complaint filed:  May 14, 2010
                                       Trial Date:        None Set
21            Defendants.
                                       Date:   October 4, 2010
22                                     Time:   10:00 a.m.
                                       Place:  Courtroom 540
23

24

25

26

27

28

EXHIBIT E
64

1   KENDALL BRILL & KLIEGER LLP
    Richard B. Kendall (90072)
2     *rkendall@kbkfirm.com*
    Laura W. Brill (195889)
3     *lbrill@kbkfirm.com*
    Nicholas F Daum (236155)
4     *ndaum@kbkfirm.com*
    Nathalie E. Cohen (258222)
5     *ncohen@kbkfirm.com*
    10100 Santa Monica Blvd., Suite 1725
6   Los Angeles, California  90067
    Telephone:   310.556.2700
7   Facsimile:   310.556.2705

8   Attorneys for Defendants Marc Toberoff,
    Pacific Pictures Corporation, IP
9   Worldwide, LLC, and IPW, LLC

10  DANIEL M. PETROCELLI (S.B. #97802)
      dpetrocelli@omm.com
11  MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
12  CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
13  O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
14  Los Angeles, CA 90067-6035
    Telephone:   (310) 553-6700
15  Facsimile:   (310) 246-6779

16  PATRICK T. PERKINS (admitted *pro hac vice*)
      pperkins@ptplaw.com
17  PERKINS LAW OFFICE, P.C.
    1711 Route 9D
18  Cold Spring, NY 10516
    Telephone:   (845) 265-2820
19  Facsimile:   (845) 265-2819

20  Attorneys for Plaintiff DC Comics

21

22

23

24

25

26

27

28

---

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS AND
DOCUMENT DISCOVERY PENDING RULINGS ON DISPOSITIVE MOTIONS

EXHIBIT E
65

# TABLE OF CONTENTS

I.      DEFENDANTS' INTRODUCTORY STATEMENT .................................2

II.     DC COMICS' INTRODUCTORY STATEMENT ....................................5

III.    DEFENDANTS' STATEMENT OF THE ISSUES IN DISPUTE ...........7

IV.     DC COMICS' STATEMENT OF THE ISSUES IN DISPUTE...............8

V.      DEFENDANTS' POSITION ......................................................................8

        A.   Factual Background ........................................................................9

             1.   Overview..............................................................................9

             2.   DC Insists on a Chaotic Discovery Process ........................11

        B.   The Depositions Should Be Briefly Postponed Until the Dispositive Motions to Dismiss as a Matter of Law Have Been Decided ........................................................................................14

        C.   The Depositions Should Be Postponed Until the Anti-SLAPP Motion Has Been Decided ............................................................18

        D.   There Is No Prejudice to DC From a Brief Stay of Discovery Until Dispositive Motions Are Decided ........................................23

        E.   The Scope and Time of These Depositions Should Be Limited for Two of the Witnesses Who Suffer From Severe Medical Conditions .....................................................................................24

        F.   Depositions Should Be Strictly Limited in Scope Because the Witnesses Have Already Been Exhaustively Deposed in the Siegel Litigation.............................................................................25

        G.   Any Depositions That Are Permitted to Go Forward Should Be Limited In Scope, Time and Format .............................................31

        H.   Defendants' Conclusion ...............................................................32

VI.     DC COMICS' POSITION.......................................................................32

        A.   Factual Background ......................................................................32

        B.   Defendants' SLAPP And Rule 12 Motions Are Irrelevant To DC Comics' Requested Discovery, Which Is Directed To Its Federal Claims And The Resolution Of Disputed Factual Issues. ............................................................................................34

             1.   DC Comics' First Claim for Relief: Challenging the Shusters' Notices of Termination .......................................36

             2.   DC Comics' Third Claim for Relief: Challenging the Shusters' Notices of Termination .......................................42

EXHIBIT E
66

C.    Defendants' Remaining Arguments for Barring Discovery Are Equally Baseless and Misguided. ...................................................46

        1.    DC Comics Proposed Reasonable Ways To Account For The Advanced Age and Medical Condition of Witnesses. ...........................................................................46

        2.    There Is Nothing "Short" or "Non-Prejudicial" About The Indefinite Discovery Delay Defendants Seek. .............47

        3.    The Rule 54(b) Motion Filed In The *Siegel* Case Has No Bearing On Discovery Here...........................................48

        4.    Defendants' Arguments About Their Contemplated Anti-SLAPP Motion Are Both Irrelevant And Misstate The Law. ........................................................................49

D.    Conclusion........................................................................55

APPENDIX A...................................................................................57

TABLE OF CONTENTS

1        Pursuant to Rules 26, 34, and 37 of the Federal Rules of Civil Procedure and

2    Rule 37-2 of the Local Rules of this Court, the parties respectfully submit the

3    following Joint Stipulation Regarding Defendants' Motion For a Protective Order

4    Staying Depositions, Pending Rulings on Dispositive Motions and Limiting Scope

5    and Time Of Depositions.  Pursuant to Local Rule 37-1, the parties have attempted

6    unsuccessfully to resolve their disputes and therefore respectfully seek the assistance

7    of the Court.

8    Dated:  September ___, 2009          TOBEROFF & ASSOCIATES, P.C.

9

10                                        By_____
                                              Marc Toberoff
11
                                          Attorneys for Defendants Mark Warren Peary, as
12                                        personal representative of the Estate of Joseph
                                          Shuster, Jean Adele Peavy, Joanne Siegel and
13                                        Laura Siegel Larson

14

15   Dated:  September ___, 2010          KENDALL BRILL & KLIEGER LLP

16

17

18                                        By: _____
                                              Richard B. Kendall
19                                            Attorneys for Defendants Marc Toberoff,
                                              Pacific Pictures Corporation, IP
20                                            Worldwide, LLC, and IPW, LLC

21

22   Dated:  September 10, 2010           O'MELVENY & MYERS LLP

23

24

25                                        By: _____
                                              Daniel Petrocelli
26                                            Attorneys for Plaintiff DC Comics

27

28

                                          1
                          JOINT STIPULATION RE: DEPOSITIONS

EXHIBIT E
68

1   I.      **DEFENDANTS' INTRODUCTORY STATEMENT**

2          Defendants seek a protective order to postpone three[1] depositions for a matter

3   of weeks until dispositive motions – which address all of plaintiff DC Comics'

4   ("DC") claims as a matter of law and include a motion under California's Anti-

5   SLAPP law – have been decided.  Each of the witnesses that DC now seeks to

6   depose in this action on an accelerated schedule was <u>already</u> exhaustively deposed

7   by DC in closely related, pending actions, *Siegel v. Warner Bros. Ent. Inc., et al.*,

8   Case Nos. 04-CV-08400 ODW (RZx) and *Siegel v. Time Warner Inc.*, 04-CV-08776

9   ODW (RZx), concerning the <u>same</u> subject matter on which DC now plans to re-

10  interrogate them.  Discovery in the related actions was closed years ago. Two of the

11  three witnesses at issue have very serious health problems that make the stress of a

12  deposition a significant health risk, and these same witnesses were already deposed

13  for a full seven hours in the related actions.  However, after largely losing on

14  summary judgment in the related action, DC retained new counsel and brought the

15  instant action, asserting very dubious claims.  Despite a years-long delay in bringing

16  this action, DC is now rushing to re-open discovery that it would otherwise be

17  barred from taking, in order to collaterally attack the adverse decisions in the related

18  cases.  DC's strategy – to file a defective complaint, and then make a rush for

19  discovery in the hopes of obtaining some morsel of ambiguity that might permit the

20  filing of a new pleading – is not a proper basis for seeking early depositions, and

21  should not be condoned.  Accordingly, the Court should issue an order staying these

22  depositions for a matter of weeks until the dispositive motions have been resolved,

23  _____

24         [1] As described below, DC also noticed a fourth deposition through a subpoena
    issued to Jean Peavy, a non-party resident of the District of New Mexico.  Ms. Peavy is
25  outside of the jurisdiction of this Court.  Accordingly, defendants do not seek a protective
    order concerning that deposition here, but have served timely objections to the subpoena.
26  However, if DC seeks a court ruling on these objections, it is likely that the District Court
    in New Mexico will look to this Court for guidance on the matters addressed in this
27  motion.  Like the other witnesses from whom DC seeks discovery, Ms. Peavy has already
    been deposed and will be subject to undue burdens in a new deposition.

28

EXHIBIT E
69

1    and the pleadings have been settled, and limiting the time and manner in which the

2    witnesses with health issues may be deposed.

3       There is no legitimate reason why these witnesses need to be deposed before

4    the dispositive motions are heard, instead of waiting to see what, if anything,

5    remains of the case.  No trial date has been set and the Court has not held an initial

6    status conference nor issued a scheduling order under F.R.C.P. 16.

7       There are multiple additional reasons why such a stay, and moderate

8    limitations on the scope and time of depositions, is appropriate:

9    •    DC has noticed depositions for October 5, 6, and 13, 2010.  A hearing on the

10       dispositive motions is currently set for October 18, 2010.  DC has recently

11       announced that it will amend its Complaint in early September, but that the

12       amendments will add no new claims and should not materially affect the

13       dispositive motions or the October 18 hearing date.  An Anti-SLAPP motion

14       is pending as to the state law claims in this case, and will likely be augmented

15       and re-filed when DC amends its Complaint.  A discovery stay is automatic in

16       such cases in state court, and DC cannot show good cause for avoiding such a

17       stay.  Nor can it meet the standard for obtaining discovery under F.R.C.P.

18       56(f).

19    •    A motion for entry of judgment pursuant to F.R.C.P. 54(b) is also pending

20       before Judge Wright in *Siegel v. Warner Bros. Ent. Inc.*  That motion is set for

21       hearing on September 27, 2010.  If it is granted, the rulings in *Siegel* will have

22       preclusive effect as to DC, thereby substantially narrowing the issues and

23       discovery in this case.

24    •    Two of the witnesses at issue suffered extreme stress in the prior deposition

25       process:  defendants Joanne Siegel, who will be 93 this December, and Laura

26       Siegel Larson, who suffers from multiple sclerosis.  These two witnesses were

27       both deposed at length on the same topics, and should not be forced to sit

28       through new depositions due to serious medical conditions which, as their

EXHIBIT E
70

1   doctors have testified, will be exacerbated by the deposition process.

2   • DC also served extensive, overbroad document requests with its deposition

3   notices. Defendants will object to these requests, and anticipate that the

4   parties will need a reasonable amount of time to resolve those objections. DC

5   has, at a minimum, been on inquiry notice of its claims for at least four years,

6   and it admits that it has been on actual notice of documents giving rise to its

7   claims since December 2008. Yet it waited a year and a half – until May

8   2010 – before bringing this lawsuit. Having waited so long, DC cannot

9   justify their demands that these depositions be held now, instead of in a

10  matter of weeks, when the pleadings have been settled and the Anti-SLAPP

11  issues have been resolved.

12      On September 2, 2010, the date this motion was due to be served under

13  Local Rule 37, DC offered to postpone these depositions until after October 18,

14  2010, the presumptive date of the hearing on the dispositive motions. It is clear

15  from this offer that DC itself agrees that it has no pressing need to take these

16  depositions in advance of the hearing on the dispositive motions. However, DC's

17  offer was conditioned on defendants filing a motion on the scope of discovery

18  before the October 18 hearing on dispositive motions before Judge Wright. This

19  arrangement would have imposed unnecessary burdens on the parties and the Court,

20  by requiring briefing on issues likely to be mooted or altered as a result of the

21  dispositive motions. Defendants instead offered to meet and confer promptly after

22  the October 18 hearing on such motions to work out a reasonable schedule for any

23  remaining discovery motions, with the benefit of the Court's guidance as to the

24  remaining claims and issues in the case and, thus, the proper scope of discovery.

25  DC did not accept that proposal and would not agree to take the noticed depositions

26  off calendar. Defendants therefore request a protective order staying and limiting

27  these depositions.

28

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING RULINGS ON DISPOSITIVE MOTIONS

EXHIBIT E
71

## II.    DC COMICS' INTRODUCTORY STATEMENT

There are many reasons why defendants' motion lacks merit, all of which are discussed below.  But there is one overarching reason that obviates the need to consider all their arguments:  *all* of the discovery that DC Comics seeks is directly relevant to its first and third claims for relief.  Neither of these *federal* claims is subject to a SLAPP motion; neither is properly subject to a motion to dismiss under Rule 12; and neither is duplicative of the claims or issues litigated in the *Siegel* cases.  In seeking to prevent discovery, defendants bear a "heavy burden of making a 'strong showing' why discovery should be denied."  *Skellerup Indus. v. City of Los Angeles*, 163 F.R.D. 598, 600 (C.D. Cal. 1995).  Defendants come nowhere close to meeting this burden, and their suggestion that it is *DC Comics*' burden to show why discovery should commence is wrong.

1.  DC Comics' first claim challenges the validity of copyright termination notices the Shuster heirs served in 2004 based, in part, on an agreement the Shuster heirs reached with DC Comics in 1992.  Am. Compl. ¶¶ 112-17.  While defendants assert this new lawsuit is the "same" as the *Siegel* cases or "closely related," *infra* at 2-3, 7-8, 25-26, 30-31, 58, defendants argued just the opposite before.  As Toberoff and the Shusters represented in court in 2006, but do not disclose here:  "the *Siegel Litigations* do <u>not</u> concern Shuster's copyright interests in *Superman*," and the 1992 agreement "has absolutely nothing to do with the Siegel Litigations."  Decl. of D. Petrocelli ("Petrocelli Decl.") Ex. 10 at 84, 91 (emphasis in original).  DC Comics has every right to full discovery in support of its claims in this case, including in connection with the Shuster heirs' termination notice and the 1992 agreement.  Although defendants' initial Rule 12 motions sought to challenge the meaning and legal effect of the 1992 agreement, such arguments—as shown by the very cases defendants cite—turn on fact-bound questions of contractual intent that cannot be resolved before discovery is taken.  *Infra* Section VI.B.  Moreover, as Judge Larson made clear in the *Siegel* cases, and as defendants again fail to apprise the Court:  "It

5

EXHIBIT E
72

1   is by no means a foregone conclusion that the Shuster estate will be successful in

2   terminating the grant to the Superman material" that the Siegels obtained.  Case No.

3   CV 04-8400 ODW (RZx), Docket No. 554 at 23.  This new case—and DC Comics'

4   first and second claims for relief—are aimed at these open questions, among others,

5   and defendants have no legitimate basis to prevent discovery related to them.

6         2.  DC Comics' third claim for relief challenges illicit agreements between

7   defendants and Toberoff—acting in his capacity as a film producer and

8   businessman—that violate DC Comics' rights under the Copyright Act.  These

9   agreements, which impermissibly impede the Shuster heirs' ability to enter into

10  agreements with DC Comics, are part of a pattern of misconduct by Toberoff and

11  his companies.  Many of the documents and most of the issues underlying this claim

12  have either never been discovered or explored or, if such issues arose in the *Siegel*

13  cases, they were addressed only tangentially.  DC Comics has every right to take full

14  discovery in support of its third claim for relief, and defendants' assertion that DC

15  Comics' third claim will be dismissed based on their Rule 12 motion does not come

16  close to meeting their "heavy burden" to avoid discovery.  Furthermore, the 1987

17  *Bourne* case cited by defendants supports DC Comics' third claim as pleaded.

18  Moreover, defendants fail to mention the Ninth Circuit opinion in *Milne v. Stephen*

19  *Slesinger, Inc.*, 430 F.3d 1036, 1047 (9th Cir. 2005), which directly recognized the

20  statutory "right" that DC Comics seeks to vindicate.

21        3.  Defendants' other arguments against discovery are equally unfounded:

22        a.  Defendants cite to the age and health of three material witnesses DC

23  Comics seeks to depose—Ms. Siegel, Ms. Larson, and Ms. Peavy—to justify

24  delaying discovery.  To accommodate these witnesses, DC Comics offered to defer

25  their depositions and schedule a single hearing before the Magistrate in late October

26  to address at one time all arguments regarding these depositions, including

27  production of documents.  Defendants rejected this proposal because, from the

28  outset, they are determined to delay all discovery indefinitely.  That is why, for

6

EXHIBIT E
73

1   example, they have insisted on addressing their litany of discovery objections

2   sequentially, rather than at one time.  That is improper and should not be allowed.

3   Likewise without merit is defendants' claim that Ms. Peavy is not subject to

4   discovery because she is not a party to this action or subject to the Court's

5   jurisdiction.  That claim is also moot, because Ms. Peavy is now a named defendant.

6   In any event, the age and health of the witnesses only underscore DC Comics' right

7   and need to preserve their testimony without further delay.

8        b.   Defendants concede they seek delay, but say it will be "short" and will not

9   "prejudice" DC Comics.  *Infra* at 14, 16.  There is nothing short or non-prejudicial

10  about the delay they have engineered.  DC Comics has been seeking this discovery

11  since *early June*—in part, because of the advanced age and poor health of

12  defendants' key witnesses.  There is no assurance that the Court will be able to hear

13  and rule upon defendants' dispositive motions anytime soon.  Indeed, because DC

14  Comics recently amended its complaint, defendants' initial motions were mooted

15  and taken off calendar and have yet to be refiled, let alone set for hearing.

16  Defendants' initial SLAPP motion was also mooted by DC Comics' amended

17  complaint.  Assuming defendants refile their SLAPP motion, DC Comics not only

18  will oppose it on the merits, but will seek discovery relevant to its opposition.  It is

19  standard course in federal court to allow discovery to oppose a SLAPP motion.

20  Defendants' arguments to the contrary misstate the law, inventing alleged conflicts

21  in the law where *none* exists.

22  **III.   DEFENDANTS' STATEMENT OF THE ISSUES IN DISPUTE**

23       (1)  Should the depositions of witnesses noticed by DC, set for October 5, 6,

24  and 13, 2010, be delayed until the resolution of pending motions to dismiss pursuant

25  to F.R.C.P. 12(b)(6) that are currently set for hearing on October 18?

26       (2)  Can DC compel discovery during the pendency of an Anti-SLAPP

27  motion, where the motions are based on issues of law, and DC thus cannot show that

28  it needs such discovery to oppose the motion, and where the automatic discovery

7

EXHIBIT E
74

1   stay provided under the Anti-SLAPP law is so intertwined with this state right or

2   remedy that it functions to define thereof, and therefore must be applied in federal

3   court under the controlling opinions of the United States Supreme Court in *Shady*

4   *Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431 (2010)?

5       (3)  Should the 92-year-old widow and chronically ill daughter of one of

6   Superman's co-creators be forced to sit for depositions, when their doctors have

7   testified that depositions pose significant health risks for them?

8       (4)  Regardless of whether depositions are permitted now or later in the case,

9   should their scope be limited to prevent needless re-questioning on topics on which

10  the witnesses were already deposed?

11  **IV.    DC COMICS' STATEMENT OF THE ISSUES IN DISPUTE**

12      (1)  Have defendants met the "heavy burden of making a 'strong showing'"

13  that the depositions of Jean Peavy, Joanne Siegel, Laura Siegel Larson, and Mark

14  Warren Peary should be indefinitely postponed pending the resolution of the

15  motions they intend to file challenging DC Comics' amended complaint?

16  **V.      DEFENDANTS' POSITION**

17      There is no need for burdensome and unnecessary depositions to go forward

18  before dispositive motions are heard and decided, when DC has already had the

19  opportunity to depose these same witnesses on the same and closely related issues,

20  and where two of the witnesses are chronically ill and would suffer serious health

21  consequences from this repeated deposition process.

22      F.R.C.P. 26(c)(1)(B) expressly authorizes courts to issue protective orders

23  upon a movant's showing of good cause.  Courts in this circuit and elsewhere have

24  long found "good cause" for a protective order in situations where well-grounded

25  motions to dismiss are pending and the protective order would not prejudice the

26  non-moving party.  *See Lowery v. F.A.A.*, CIV. S-93-1352, 1994 WL 912632 (E.D.

27  Cal. Apr. 11, 1994); *Johnson v. New York Univ. School of Educ.*, 205 F.R.D. 433,

28  434 (S.D.N.Y. 2002) ("[A] stay of discovery is appropriate pending resolution of a

8

EXHIBIT E
75

1    potentially dispositive motion where the motion appear[s] to have substantial

2    grounds or, stated another way, do[es] not appear to be without foundation in law.")

3    (quotation marks omitted).

4        Here, not only are dispositive motions pending that address exclusively legal

5    issues, but there are numerous additional factors that urge the issuance of a

6    protective order.

7        A.    **Factual Background**

8            1.    **Overview**

9        The general factual background of this action is set forth in the defendants'

10    portion of the Joint Stipulation Regarding Plaintiff's Motion to Initiate Discovery

11    and Take Immediate, Limited Discovery of Two Elderly Witnesses (Docket No. 45),

12    to be heard by the Court on September 20, 2010, and the Court is respectfully

13    referred to those papers for such factual background.  Declaration of Marc Toberoff

14    ("Toberoff Decl."), Ex. V.  In broad terms, this discovery dispute involves two

15    closely related actions, both of which deal with the statutory termination by the heirs

16    of Superman's co-creators of the same Superman copyright grants to DC regarding

17    the same Superman works.  Jerome Siegel ("Siegel") and Joseph Shuster ("Shuster")

18    co-authored the first Superman story, later published in 1938 in *Action Comics*, No.

19    1 by DC's predecessor, and hundreds of subsequent Superman works.

20        Siegel's widow, Joanne Siegel, and their daughter, Laura Siegel Larson,

21    served notices of termination pursuant to 17 U.S.C. § 304(c) (the "Siegel

22    Terminations") that terminated Siegel's old copyright grants regarding Superman

23    and Superboy, on April 16, 1999 and November 17, 2004, respectively.  DC and its

24    effective parent company, Warner Bros. Entertainment, Inc. ("Warner") disputed the

25    Siegel Terminations, forcing the Siegels in October 2004 to file for declaratory

26    relief as to their validity in two separate actions, No. 04-CV-08400 (Superman) and

27    No. 04-CV-08776 (Superboy) (collectively, the "*Siegel* litigation").  DC

28    counterclaimed that the Siegel Terminations were invalid.

9

EXHIBIT E
76

1    During the *Siegel* litigation, DC deposed Joanne Siegel, Laura Siegel Larson
2  (twice), and Mark Warren Peary.  Toberoff Decl., Exs. A-D.  Joanne Siegel and
3  Laura Siegel Larson each were deposed for the full seven hours allowable under
4  F.R.C.P. 30(d)(1).  *Id.*, Exs. A-C.

5    Fact discovery in the *Siegel* litigation closed on November 16, 2006.  On
6  March 26, 2008, Judge Larson upheld the Siegels' Superman Termination, and ruled
7  that, as of April 16, 1999, the Siegels own 50% of the copyright to the first
8  Superman story published in *Action Comics*, No. 1.  *See Siegel v. Warner Bros. Ent.*
9  *Inc.*, 542 F. Supp. 2d 1098, 1117-39 (C.D. Cal. 2008) ("*Siegel* I").  Subsequently, on
10  August 12, 2009, Judge Larson held that the Siegels had also recaptured Siegel's
11  copyright interest in *Action Comics,* No. 4, parts of *Superman,* No. 1 (pages 3-6) and
12  Superman's origin story on the planet Krypton contained in the first two weeks of
13  the Superman newspaper strips.  *See Siegel v. Warner Bros. Ent. Inc.*, 658 F. Supp.
14  2d 1036 (C.D. Cal. 2009) ("*Siegel* II").  Recently, on August 12, 2010, the Siegels
15  moved under F.R.C.P. 54(b) to have judgment entered as to these detailed orders as
16  to the validity and scope of the Siegel Terminations, to permit immediate appeal.
17  Toberoff Decl., Ex. E.  The motion is set to be heard on September 27, 2010.  *Id.*

18    Marc Toberoff, the attorney for Joanne Siegel and Laura Siegel Larson in the
19  *Siegel* litigation, also represents Jean Peavy, the sister of Joseph Shuster, and Mark
20  Warren Peary, the nephew of Joseph Shuster and personal representative of the
21  Joseph Shuster Estate (the "Shuster Executor"), in connection with the termination
22  of Shuster's copyright grants to DC concerning *Superman*.  In November 2003, the
23  Shuster Executor served on DC and filed in the U.S. Copyright Office a formal
24  notice of termination under 17 U.S.C. § 304(d) (the "Shuster Termination"),
25  terminating Joseph Shuster's Superman copyright grants.  *Siegel* I, 542 F. Supp. 2d
26  at 1114, n.3; Toberoff Decl., Ex. U ("Complaint"), ¶ 79-81.

27    Unhappy with the results of the *Siegel* litigation, DC filed this new lawsuit on
28  May 14, 2010.  DC's Complaint in the instant action contains three state-law claims,

10

EXHIBIT E
77

1  wherein DC frivolously sued the Siegels and Shuster Estate's attorney, Toberoff, for

2  "tortiously interfering" with DC's "relationship" with the Siegel and Shuster heirs,

3  based on their exercise of their statutory termination rights, and contested the

4  validity of the Shuster Termination on many of the same failed grounds that DC had

5  contested the Siegel Terminations.  DC also sued the Siegels, the Shuster Executor,

6  and Toberoff for allegedly entering into so-called "consent agreements" with the

7  Shuster Executor that supposedly violated DC's purported rights under the

8  Copyright Act.

9       DC attached as Exhibit A to its Complaint an anonymous, rambling,

10  defamatory cover letter it describes as the "Toberoff Timeline," which strains to

11  discredit Toberoff while discussing and enclosing privileged material stolen from

12  his law office.  In 2006, an attorney, formerly employed by Toberoff, mailed large

13  packages of documents stolen from his law firm's legal files to executives at DC's

14  effective parent, Warner, including its General Counsel, in an apparent attempt to

15  smear Toberoff and assist Warner and DC in the *Siegel* litigation.  *See* Toberoff

16  Decl., Ex. F, ¶¶ 25-26; Ex. G, ¶¶ 7-14.  DC attached this patently inadmissible and

17  unreliable cover letter, created and disseminated in clear violation of the attorney's

18  duties of loyalty and confidentiality, as "Exhibit A" and the centerpiece of DC's

19  new Complaint.

20            **2.    DC Insists on a Chaotic Discovery Process**

21       On July 13, 2010, once Toberoff had retained independent counsel, the parties

22  met and conferred over the filing of dispositive motions.  Toberoff Decl., ¶¶ 2-3.  At

23  that meeting defendants indicated that they intended to file motions to dismiss each

24  of DC's claims for relief, together with a motion to strike under California's Anti-

25  SLAPP law, and provided a detailed substantive overview of the basis for these

26  motions.  *Id.*  During that meeting, the parties discussed the use of the Toberoff

27  Timeline in discovery; DC stated that it intended to fully exploit the Timeline in

28  discovery, and defendants indicated that they would oppose DC's use of that

11

EXHIBIT E
78

1  document. *Id.*, ¶ 3.  The parties met and conferred further on that issue, and

2  defendants filed a motion for a protective order regarding the Timeline on August

3  30, 2010.  Docket Nos. 41-42.

4       On August 13, 2010, consistent with the parties' discussion on July 13, 2010,

5  Toberoff filed a substantial motion to dismiss DC's Fourth, Fifth and Sixth claims

6  against him and his entities pursuant to F.R.C.P. 12(b)(6), and filed a motion to

7  strike under California's Anti-SLAPP statute, Code of Civil Procedure § 425.16.

8  Toberoff Decl., Exs. H-I.  Simultaneously, the Siegels and the Shuster Executor

9  filed substantial motions to dismiss DC's First, Second, Third and Sixth Claims

10 pursuant to F.R.C.P. 12(b)(6).  *Id.*, Exs. J-K.  All defendants joined in these

11 dispositive motions, which are currently scheduled to be heard by Judge Wright on

12 October 18, 2010.  *Id.*, Exs. H-K.

13      On August 13, 2010, DC served its portion of a joint stipulation on a motion

14 to take immediate depositions of Joanne Siegel and third-party Jean Peavy in

15 advance of the parties' meeting pursuant to F.R.C.P. 26(f), which was scheduled for

16 the very next business day, August 16, 2010.  Despite the fact that this meeting

17 clearly mooted DC's motion to open discovery, DC pressed forward with its motion,

18 which will be heard by this Court on September 20, 2010.  Toberoff Decl., Ex. V.

19      On August 17, 2010, the day after the Rule 26(f) conference, DC served the

20 deposition notices at issue in the instant motion.[2]  These notices set depositions for

21 Joanne Siegel, Laura Siegel Larson, and Mark Warren Peary in Los Angeles on

22 October 5, 6, and 13, 2010, respectively.  Toberoff Decl., Exs. L-N.  DC also

23 noticed a deposition in New Mexico for Jean Peavy for October 12, 2010.  *Id.* Ex.

24 O.  Each deposition notice and subpoena was accompanied by a broad document

25

26      [2] Before serving these notices, DC had previously – before the Rule 26(f)
   conference held on August 16 – provided defendants with copies of a proposed deposition
27 notice for Joanne Siegel and a deposition subpoena for Jean Peavy.  Toberoff Decl., Ex. U
   at 23:19-24:23.

28

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS

EXHIBIT E
79

1    request, seeking "all documents related to" the Shuster and Siegel terminations.  *Id.*,

2    Ex. L at 8 (Joanne Siegel); Ex. M at 8 (Laura Siegel Larson); Ex. N at 8 (Mark

3    Warren Peary); Ex. O at 7 (Jean Peavy).

4          During a follow-up meet and confer session held on September 2, 2010, the

5    day this motion was due to be served, DC offered to take the depositions off-

6    calendar and expressly agreed that "two weeks" of delay in taking these depositions

7    would not unduly affect the case.  Toberoff Decl., ¶ 20, Ex. P.  However, DC

8    conditioned its offer on a requirement that the defendants file on October 4, 2010,

9    for hearing on October 25, 2010, any discovery motions, including a motion for a

10   protective order as to the depositions.  Toberoff Decl., Ex. P.  In other words, DC

11   conditioned the common-sense adjournment of the depositions for a matter of weeks

12   on defendants serving discovery motions before Judge Wright has had the

13   opportunity to rule on defendants' dispositive motions or even to provide guidance

14   at the October 18 hearing on the dispositive motions.  Such would have amounted to

15   a premature motion for a series of advisory opinions which may (and likely will) be

16   mooted by Judge Wright's rulings on the dispositive motions, as well as by this

17   Court's rulings on the discovery motions set for hearing on September 20, 2010.  To

18   avoid burdening both the Court and the parties with potentially unnecessary motions

19   on hypothetical topics, defendants offered instead to meet and confer shortly after

20   the October 18 hearing on dispositive motions, and to thereafter expeditiously seek

21   resolution of any remaining discovery disputes.  *Id.*, Ex. Q.  DC did not agree, and

22   refused to take off calendar the depositions it had noticed for October 5, 6, and 13,

23   2010.  *Id.*, Ex. R.

24         During the parties' Rule 26(f) conference, held on August 16, 2010, DC

25   indicated that, in light of the pending motions, it was likely to amend its Complaint.

26   Toberoff Decl., ¶ 4.  On Saturday, August 28, DC confirmed by email that it will

27   file an amended Complaint.  *Id.*, Ex. S.  DC also indicated that it will not add any

28   additional causes of action to the amended Complaint, but merely "augment" the

13

EXHIBIT E
80

1    current Complaint in response to defendants' dispositive motions. *Id.* On

2    September 2, 2010, DC confirmed that it did not expect the additional amendments

3    to the Complaint to substantially affect the pending motions to dismiss and Anti-

4    SLAPP motion. *Id.*, ¶ 21, Ex. P. Defendants therefore contemplate filing very

5    similar motions with respect to the amended Complaint, and plan on having these

6    motions heard on October 18, 2010. To the extent any portion of DC's amended

7    Complaint survives these dispositive motions, defendants also intend to file

8    counterclaims against DC. *Id.*, ¶ 4.

9        **B.**    **The Depositions Should Be Briefly Postponed Until the Dispositive**

10           **Motions to Dismiss as a Matter of Law Have Been Decided**

11         The upcoming dispositive motions, which will shortly be heard, can and

12   should dispose of all of DC's claims as a matter of law, and will at a minimum

13   clarify and narrow the scope of the pleadings and associated discovery. *Id.*, Exs. H-

14   K. Accordingly, it makes no sense to rush to depose witnesses, each of whom has

15   already been deposed, before the scope of the pleadings and thus related discovery is

16   known. *Id.*, Exs. A-D.

17         Courts in this Circuit can, and routinely do, stay discovery pending the

18   resolution of dispositive motions to dismiss. *See Jarvis v. Regan*, 833 F.2d 149, 155

19   (9th Cir. 1987). The Ninth Circuit has approved discovery stays pending a motion

20   to dismiss where discovery was "'not required to address the issues raised'" by the

21   motion, as "[d]iscovery is only appropriate where there are factual issues raised by a

22   Rule 12(b) motion." *Id.* at 155. *See also Rae v. Union Bank*, 725 F.2d 478, 481 (9th

23   Cir. 1984) (approving discovery stay because "there were no factual issues" raised

24   by motions to dismiss); *Wood v. McEwen*, 644 F.2d 797, 802 (9th Cir. 1981) (a

25   district court "may … stay discovery when it is convinced that the plaintiff will be

26   unable to state a claim for relief"); *Sasselli v. Pena*, 2008 U.S. Dist. LEXIS 44458,

27   at *2 (E.D. Cal. June 3, 2008) (a magistrate judge "has broad discretion to stay

28   discovery pending decision on a dispositive motion").

EXHIBIT E
81

1  District Courts in the Ninth Circuit have adopted a simple test for determining

2  whether it is appropriate for discovery to be postponed while a dispositive motion is

3  pending:

> This court applies a two pronged analysis in deciding whether to grant a protective order staying discovery before other pending motions can be heard. First, a pending motion must be potentially dispositive of the entire case, or at least dispositive on the issue at which discovery is directed …. Second, the court must determine whether the pending dispositive motion can be decided absent additional discovery.

8  *Lowery v. F.A.A.*, 1994 WL 912632 (E.D. Cal. Apr. 11, 1994) (citations omitted).[3]

9  As part of this analysis, "the Court should '… take a preliminary peek at the merits

10  of the allegedly dispositive motion to see if on its face there appears to be an

11  immediate and clear possibility that it will be granted.'"  *GTE Wireless, Inc. v.*

12  *Qualcomm, Inc.*, 192 F.R.D. 284, 286 (S.D. Cal. 2000) (quoting *Feldman v. Flood*,

13  176 F.R.D. 651, 652 (M.D. Fla. 1997).

14  Defendants' pending motions meet these criteria.  *First*, as discussed below,

15  the motions that have already been filed, and will shortly be re-filed in response to

16  DC's amended Complaint, target each of DC's claims and, if successful, will

17  dispose of the entire case.  *See* Toberoff Decl., Exs. H-K.  Second, the motions are

18  to dismiss as a matter of law, based on clear statutory and case authority.  *See id.*

19  DC has not identified any discovery in its motion that could contradict the clear and

20  well-established law on which defendants rely.  While defendants do not intend to

21  re-argue the motions in this brief, they have included an Appendix that describes the

22  bases for the motions to dismiss in detail, demonstrating how the motions will

23  resolve all of DC's claims as a matter of law.  *See* Appendix A.

---

25  [3] The cases applying this test and concluding that it is appropriate for discovery to wait
until dispositive motions have been adjudicated are legion.  *Hall v. Tilton*, 2010 U.S. Dist.

26  LEXIS 11162, at *2-*3 (N.D. Cal. Feb. 8, 2010) (adopting test and granting stay); *Curtis v.
Benda*, 2009 U.S. Dist. LEXIS 86504, at *3-*6 (W.D. Wash. Sept. 4, 2009) (same); *Hanni*

27  *v. American Airlines, Inc.*, 2009 U.S. Dist. LEXIS 49338 (N.D. Cal. May 27, 2009)
(same).

28

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS

EXHIBIT E
82

1    In any event, there can be no reasonable dispute that each and every one of

2    these claims can clearly be "decided absent additional discovery" as a matter of law,

3    and nothing in DC's proposed amendments to the Complaint could alter that

4    analysis. *Lowery*, 1994 WL 912632, at *3.

5    Moreover, the parties intend to maintain the October 18, 2010 hearing date, or

6    a date shortly thereafter, for the dispositive motions. Accordingly, the period of the

7    stay should not be lengthy. There is no reason why DC needs to take depositions in

8    early October, instead of shortly thereafter, following the resolution of the motions,

9    and the filing of DC's amended Complaint and defendants' counterclaims. Good

10   cause exists for an order staying depositions so that they will occur, if at all, after the

11   dispositive motions are decided and such pleadings are filed, as this will

12   undoubtedly clarify and narrow the matters at issue and the scope of permissible

13   discovery. *Wood*, 644 F.2d at 802.

14   DC has argued that these depositions are urgent because one of the three

15   witnesses, Joanne Siegel, is of "advanced age." Toberoff Decl., Ex. V at 1.

16   However, DC's purported urgency is belied by its own conduct. *First*, DC waited

17   years to initiate its claims, and cannot now claim that it will be substantially

18   prejudiced by waiting a few more weeks. Even if the so-called "Toberoff Timeline"

19   was DC's sole source of knowledge as to the allegations in its Complaint (and it is

20   not), by DC's own account it received the letter on December 10, 2008 (Complaint,

21   ¶88), and waited a year and a half, until May 14, 2010, to file suit. *Second*, DC has

22   waited months to amend its Complaint, despite being advised in mid-July of the

23   fatal problems with its pleading. *Third*, had Joanne Siegel's age been DC's true

24   concern, DC could have filed, but did not file, a petition under F.R.C.P. 27(a) to take

25   their depositions to purportedly "preserve testimony" at any time from 2008-2010,

26   prior to the filing of this action. *Fourth*, DC has offered no reason why, even given

27   Joanne's advanced age, waiting for a matter of weeks to depose her presents a

28   material problem. *See, e.g., United States v. Int'l Longshoremen's Ass'n*, 2007 U.S.

16

EXHIBIT E
83

1    Dist. LEXIS 70686 at *7 (E.D.N.Y. Sept. 24, 2007) (rejecting the expedited

2    deposition of an elderly witness, because the deponent's age alone was an

3    insufficient basis to expedite).  *Fifth*, DC has offered no case law to support the

4    expedited depositions of an elderly witness where, as discussed in more detail

5    below, her testimony has already been preserved by her deposition in a closely

6    related action.

7         Accordingly, Joanne Siegel's age provides no basis for expediting her

8    duplicative deposition.  Indeed, as discussed below, her advanced age favors a

9    reasonable stay and limitation of her deposition.

10        Nor is there any other reason why DC would be materially prejudiced from a

11   temporary stay of depositions pending resolution of the dispositive motions.  Indeed,

12   by offering to move the depositions (albeit for an unacceptable *quid pro quo*), DC

13   has essentially admitted as much.  Therefore DC has not shown and cannot show

14   that it will suffer any prejudice by waiting until these motions are shortly decided

15   before launching deposition discovery.  The discovery period in this action is clearly

16   sufficient to permit DC to take appropriate depositions following the resolution of

17   the pending motions.

18        On the other hand, if the depositions are taken prematurely before the pending

19   dispositive issues are decided, it may force further discovery motion practice, and

20   potentially result in the witnesses having their depositions taken three times (and, in

21   the case of Laura Siegel Larson, *four* times).  DC's discovery "plan" is thus

22   inefficient, duplicative and burdensome, all of which justifies postponing the

23   depositions, not expediting them. Fed. R. Civ. P. 26(c).

24        The Siegels' pending F.R.C.P. 54(b) motion in the *Siegel* Superman action, to

25   be heard by Judge Wright on September 27, 2010, also has a direct and substantial

26   bearing on discovery in this case.  Toberoff Decl., Ex. E.  If the Court enters

27   judgment based on its three lengthy published opinions concerning the validity and

28

---

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS

EXHIBIT E
84

scope of the Siegels' Superman Terminations,[4] that will have preclusive effect as to the same issues in this action regarding the mirror-image Shuster Termination, preventing DC from re-litigating such issues, and significantly narrowing the scope of discovery in this case. Common sense therefore demands that this Rule 54(b) motion, along with the dispositive motions, be resolved first, and then, with the scope of this case properly narrowed, that depositions proceed if and as necessary.

### C.    The Depositions Should Be Postponed Until the Anti-SLAPP Motion Has Been Decided

An additional reason to stay these depositions temporarily is that a motion under California Code of Civil Procedure § 425.16 *et seq.* (the "Anti-SLAPP" law) is currently pending, and will be re-filed in response to the amended Complaint. *Id.*, Ex. H. Under California law, the filing of an Anti-SLAPP motion stays discovery unless the plaintiff can show "good cause" for obtaining discovery. Under California Code of Civil Procedure Section 425.16(g), "[a]ll discovery proceedings in the action shall be stayed upon the filing of a notice of motion made pursuant to this section. The stay of discovery shall remain in effect until notice of entry of the order ruling on the motion. The court, on noticed motion and for good cause shown, may order that specified discovery be conducted notwithstanding this subdivision." *Id.* A showing of good cause requires the plaintiff to identify particular facts that it seeks in discovery. *See 1-800 Contacts, Inc. v. Steinberg*, 107 Cal. App. 4th 568, 593 (2003) (plaintiff seeking to lift anti-SLAPP discovery stay must explain what additional facts the plaintiff expects to uncover). Similarly, under Federal Rule of Civil Procedure 56(f), a plaintiff may be entitled to conduct discovery before a hearing on a motion for summary judgment if it shows a "particularized need" for

---

[4] *Siegel I,* 542 F. Supp. 2d at 1117-39 (termination upheld as to first Superman story in *Action Comics* No. 1); *Siegel II,* 658 F. Supp. 2d at 1080-84 (defining additional recaptured Superman works); *Siegel v. Warner Bros. Ent. Inc.*, 690 F. Supp. 2d 1048 (C.D. Cal. 2009) ("*Siegel* III") (denying motions for reconsideration).

18

EXHIBIT E
85

1   the discovery.[5]

2       DC has admitted, in a prior pleading, that FRCP 56(f) provides only for

3   discovery that is "essential" to opposing summary judgment.  Toberoff Decl., Ex. V

4   at 8.  Here, however, the overwhelming bulk of defendants' motion under the Anti-

5   SLAPP law has no factual component, and incorporates legal arguments from the

6   simultaneously pending motions to dismiss.  *See* Toberoff Decl., Ex. H at 24 ("To

7   avoid repetition, the arguments from [the motions to dismiss] and supporting papers,

8   which explain why the Fourth, Fifth and Sixth Claims have no merit whatsoever, are

9   incorporated by reference here.").  No discovery at all could be relevant to the vast

10  majority of the Anti-SLAPP motion.  The only factual issues raised in the motion

11  are discussed in slightly more than three pages of the motion therein, and relate

12  exclusively to:  (a) Mr. Toberoff's non-involvement in Joanne Siegel's decision to

13  send letters in May and October 2002 rejecting DC's settlement proposal; (b) a

14  reference to deposition testimony in the prior litigation, which demonstrates that DC

15  was on inquiry notice of its current claims outside of the limitations period; and (c)

16  the fact that certain of the agreements alleged by DC in its Complaint have expired

17  on their own terms, rendering DC's claims with respect thereto moot.  *Id.*  As

18  discussed below, the witnesses were already examined on all of these topics

19  previously.  Moreover, any limited discovery DC might seek to obtain on these

20  narrow subjects could just as easily be obtained via interrogatories, a deposition on

21  _____

22      [5] Judge Feess held in *New.Net, Inc. v. Lavasoft*, 356 F.Supp.2d 1090 (C.D. Cal.
    2004), that the standards under Rule 56(f) and the Anti-SLAPP statute are similar.  Cal.

23  Civ. Proc. Code § 425.16(g) provides that "on a noticed motion and for good cause shown,
    [a court] may order that specified discovery be conducted notwithstanding [the automatic

24  stay]."  *Id.* at 1101.  This protection is analogous to Rule 56's requirement that a party
    opposing a summary judgment motion "must explain with particularity why it is unable to

25  oppose the motion, state with specificity what facts it intends to seek through discovery,
    and show how its discovery efforts are reasonably expected to create a triable issue."  *Id.* at

26  1101-02 (finding no "collision" between Rule 56 and the Anti-SLAPP law and noting that
    "to find such collision would undermine the holding in [*United States v. Lockheed Missiles

27  & Space Co., Inc.*, 190 F.3d 963, (9th Cir. 1999)] permitting the use of the Anti-SLAPP
    procedure in federal court.").

28

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS

EXHIBIT E
86

1    written questions, or some other, less burdensome method.

2            DC simply cannot meet its burden – which it must meet in order to obtain

3    discovery before the resolution of the Anti-SLAPP motion – that the discovery it

4    seeks is essential to opposing the motion.  As Judge Feess explained in *New.Net,*

5    *Inc. v. Lavasoft*:

6            Even if the Court concluded that Section 425.16(g) and Rule 56 were
         potentially in conflict, the potential for a direct collision has not
7            materialized because Plaintiff has not demonstrated that discovery is
         essential to its opposition nor has Plaintiff shown good cause as to why
8            discovery should be permitted.

9            Although Plaintiff has sought to defer this motion pending discovery, it
         has not stated with any degree of specificity what discovery it needs or
10           how that discovery would bear on this motion.  Plaintiff's opposition
         generally refers to matters such as learning about Lavasoft's business
11           plan, its sales and revenue, its motives and reasons for 'targeting'
         New.net and other entities, [the function of Lavasoft's software] and
12           Lavasoft's customer base.  To the extent that the proposed discovery
         would contain any relevant information, most of it is already known to
13           Plaintiff … In short, Plaintiff has failed to persuade the Court that
         discovery is essential to its opposition to Defendant's motion.

14
15   356 F. Supp. 2d at 1102 (internal citations to the record omitted); *see also Moser v.*

16   *Triarc Cos.*, 2007 WL 3026425, at *2-*4 (S.D. Cal. Oct. 16, 2007) (court denied

17   plaintiff's motion for leave to conduct discovery because such discovery was not

18   "essential in opposing" anti-SLAPP motion); *compare Metabolife Intern., Inc. v.*

19   *Wornick*, 264 F.3d 832, 838 (9th Cir. 2001) ("The district court … asked Metabolife

20   to itemize the discovery needed to respond to the anti-SLAPP motion, which

21   Metabolife did.").

22           Recent Supreme Court precedent also demonstrates why the Anti-SLAPP

23   discovery stay should apply.  In *Shady Grove Orthopedic Associates, P.A. v. Allstate*

24   *Ins. Co.*, 130 S. Ct. 1431 (2010), decided this year, the United States Supreme Court

25   set forth principles reinforcing the conclusion that the discovery stay of California's

26   Anti-SLAPP law, as a matter of substantive law governing state-created rights, must

27   apply in federal court.  In *Shady Grove*, the Supreme Court addressed the interplay

28   between a New York law relating to class action lawsuits and Rule 23 of the Federal

20

EXHIBIT E
87

1   Rules of Civil Procedure.  In a controlling concurrence, Justice Stevens made clear

2   that, under the Rules Enabling Act, a federal rule cannot govern when it "would

3   displace a state law that is procedural in the ordinary use of the term but is so

4   intertwined with a state right or remedy that it functions to define the scope of the

5   state-created right."  130 S. Ct. at 1452 (Stevens, J., concurring).[6]

6        Here, the discovery stay and good cause requirements of the Anti-SLAPP law

7   are substantive protections that California adopted to suppress "non-meritorious

8   cases aimed at chilling [free speech] through costly, time-consuming litigation."

9   *New.net, Inc.*, 365 F.Supp.2d at 1098 (citing Cal. Civ. Proc. Code § 425.16(a)).  By

10  definition, the SLAPP plaintiff "does not hope to win the lawsuit and instead 'tries

11  to wear down the other side by forcing it to spend time, money, and resources

12  battling the SLAPP instead of the protected activity.'"  *Schering Corp. v. First*

13  *Databank Inc.*, 2007 WL 1176627, at *6 (N.D. Cal. April 20, 2007) (*quoting Visher*

14  *v. City of Malibu*, 126 Cal.App.4th 364 (2005)).  The automatic discovery stay

15  provision prevents a plaintiff from coercing the defendant to respond to costly and

16  time-consuming discovery before the court has even had an opportunity to

17  determine the merits of a defendant's Anti-SLAPP motion.  To allow wide-ranging

18  discovery before Defendants' anti-SLAPP motion has been decided would

19  controvert the purposes of the anti-SLAPP statute.  *New.net, Inc.,* 365 F.Supp.2d at

20  1098.

21        In light of *Shady Grove*'s mandate that "[w]hen a federal rule appears to

22  abridge, enlarge, or modify a substantive right, federal courts must consider whether

23  the rule can reasonably be interpreted to avoid that impermissible result," 130 S. Ct.

24  at 1452 (Stevens, J., concurring), it is clear that California's Anti-SLAPP discovery

25  

26        [6] When "a fragmented Court decides a case and no single rationale explaining the
    result enjoys the assent of five Justices," the "narrowest ground" on which the judgment

27  rests then represents the controlling rule.  *Marks v. United States*, 430 U.S. 188, 193
    (1977).  Justice Stevens' opinion therefore provides the controlling rule in *Shady Grove*.

28  

21

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS

EXHIBIT E
88

1  stay should apply here absent a showing of "good cause" for discovery, a showing

2  DC has not even attempted to provide.[7]

3      Finally, DC's attempt to distinguish its federal and state law claims does not

4  resolve the issue of whether the depositions should take place before the hearing on

5  the Anti-SLAPP motion.  DC has claimed, in a prior pleading, that "[a]ll of the

6  discovery [DC] seeks … is relevant to [DC's] federal claims," and thus is not

7  subject to a stay under the Anti-SLAPP laws.  Toberoff Decl., Ex. V at 12.  DC will

8  likely argue that, since the Anti-SLAPP motion is potentially dispositive only as to

9  the state claims, discovery as to the federal claims can proceed.  However, as DC

10 has not limited the depositions so as to exclude issues relating to the state-law

11 claims, and has sought documents clearly related to its state-law claims alone, it is

12 both impossible to determine how the depositions will be limited to the federal

13 claims, and improbable that the depositions will be so limited.  DC's state-law

14 claims raise issues not covered in the federal claims for which DC actively seeks

15 discovery.  For example, DC's counsel has indicated that he intends to extensively

16 question witnesses based on the anonymous "Toberoff Timeline" (giving rise to

17 defendants' motion for a protective order pending before this Court), on which DC

18 based its state-law claims for purported tortious interference.  Toberoff Decl., ¶ 3.

19 ───────────────

20     [7]  Moreover, two years after its decision in *Metabolife*, the Ninth Circuit noted without disapproval that "[i]f the defendant files a[n anti-SLAPP] motion to strike, all discovery proceedings are stayed.  A court may, however permit specified discovery 'on

21 noticed motion and for good cause shown.'"  *Batzel v. Smith*, 333 F.3d 1018, 1024 (9th Cir. 2003) (quoting Cal. Code Civ. Proc. § 425.16(g)).  DC ignores *Batzel*, which

22 specifically stated that "[b]ecause California law recognizes the protection of the Anti-SLAPP statute as a substantive immunity from suit, this Court, sitting in diversity, will do

23 so as well."  *Id.* at 1025-26 (*citing Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)) (emphasis added).  As with other types of immunities from suit, the substantive policies of

24 the Anti-SLAPP law to protect public participation would be seriously impeded if a plaintiff could bring a SLAPP suit and wear the opposing party down in discovery while

25 the anti-SLAPP motion is pending.  *Cf. Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)

26 ("The entitlement is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to

27 trial."); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("Until this threshold immunity question is resolved, discovery should not be allowed.").

28

1   Even if the depositions could somehow be limited solely to DC's federal
2   claims (which is highly unlikely, and impossible to achieve in practice), DC would
3   eventually want to take discovery as to its state law claims, subjecting these elderly
4   and chronically ill witnesses to two depositions in this case in addition to the
5   depositions already taken of these witnesses in the closely related *Siegel* litigation.
6   *See Baxter Healthcare Corp. v. Fresenius Medical Care Holding, Inc.*, 2007 WL
7   3342573, at *2 (N.D. Cal. 2007) (motion to compel second deposition of elderly
8   witness denied because of "potential inconvenience of a repeat deposition to an
9   elderly witness").  It would therefore be far more reasonable and efficient for these
10  depositions to await the resolution of plaintiffs' dispositive motions.

11      **D.      There Is No Prejudice to DC From a Brief Stay of Discovery Until**
12              **Dispositive Motions Are Decided**

13      Other than its desire to try to salvage its defective Complaint or to further its
14  improper attempt to reopen issues already litigated in *Siegel*, DC can point to no
15  conceivable reason to begin depositions immediately instead of waiting a few
16  weeks.  No scheduling order exists in this litigation, and no trial date has been set.
17  Once the issues in this case have been narrowed by the pending motions and the
18  pleadings have been settled, it is indisputable that DC will have more than ample
19  time to depose these witnesses.  It makes no difference to DC's ability to put on its
20  case if the depositions are delayed a few weeks.

21      On the other hand, it would substantially burden these elderly and ill
22  witnesses to be deposed now, and possibly a third time, based solely on DC's tactic
23  to prop up its defective Complaint and gain advantages in the related litigation in
24  which discovery has long been closed.  The Court should reject DC's approach, and
25  allow discovery in this matter to proceed on an orderly and rational basis after the
26  pleading motions have been decided.

27
28

EXHIBIT E
90

E.    **The Scope and Time of These Depositions Should Be Limited for Two of the Witnesses Who Suffer From Severe Medical Conditions**

Two of the witnesses at issue – Joanne Siegel and Laura Siegel Larson – suffer from serious medical conditions which make the deposition process unduly difficult and debilitating, and, in the case of Joanne Siegel, poses the threat of heart failure, according to her physician.

Joanne Siegel is 92 (and soon to be 93), and while her condition is stable, she suffers from a heart condition, a hearing disability and high blood pressure. *See* Declaration of Joanne Siegel ("Joanne Decl."), ¶¶ 3-9; Declaration of Richard Taw, MD ("Taw Decl."), ¶¶ 5-9. Mrs. Siegel suffered extreme stress and physical trauma during and after her full-day deposition in 2006 in the *Siegel* litigation. Joanne Decl., ¶¶ 3-9. Her treating physician has testified as follows: "It is my professional medical opinion that Ms. Siegel should not be subjected to a deposition of any duration and that a deposition would subject Ms. Siegel to an unacceptably high risk of serious adverse health consequences, including the threat of a debilitating or life-threatening heart attack or stroke." Taw Decl., ¶ 9.

Laura Siegel Larson has Multiple Sclerosis (a debilitating autoimmune disease that affects the central nervous system), Fibromyalgia (a musculoskeletal pain and fatigue disorder), Spondylosis (a degenerative joint disease), Scoliosis (congenital curvature of the spine), Temporomandibular joint disorder (affecting the joints on either side of her jaw), Arthritis, and Glaucoma. *See* Declaration of Laura Siegel Larson ("Laura Decl."), ¶¶ 4-12, 15; Declaration of Barbara Giesser, MD ("Giesser Decl."), ¶¶ 7-8; Declaration of Eric Hsu, MD ("Hsu Decl."), ¶¶ 7-8. During her deposition in the *Siegel* litigation, Laura suffered considerable pain and discomfort due to these medical conditions, including severe back and neck pain, cramping and muscle spasms, a severe headache, blurry and double vision, shortness of breath, exhaustion and numbness in her hands, feet and face, most of which lasted into the following day. Laura Decl., ¶ 3, 8. The neurologist who treats Laura for

24

EXHIBIT E
91

1    MS has advised as follows:  "It is my professional medical opinion that the

2    significant stress of a deposition could precipitate a MS exacerbation.  Due to

3    Laura's severe medical condition, she should not be subjected to a deposition of any

4    duration, unless and to the limited extent it is absolutely necessary."  Giesser Decl.,

5    ¶ 9.  The physician who treats Laura for Fibromyalgia and chronic pain concurs.

6    *See* Hsu Decl., ¶ 9.

7         At a minimum, the age and/or severe medical condition of these deponents

8    urges that their depositions be postponed until such are clearly necessary, the issues

9    are narrowed and the pleadings are set in this case, and that reasonable efforts be

10   made to avoid subjecting these witnesses to duplicative questioning.  Indeed, DC

11   should not be able to depose these two witnesses at all without showing that they

12   have unique information unavailable from any other source on matters not covered

13   in the prior depositions.  Even then, their depositions should be limited to written

14   questions.

15        **F.**    **Depositions Should Be Strictly Limited in Scope Because the**

16              **Witnesses Have Already Been Exhaustively Deposed in the *Siegel***

17              **Litigation**

18        If and when the depositions of witnesses already deposed in the closely

19   related *Siegel* litigation go forward, they should be strictly limited, to avoid

20   subjecting these witnesses to duplicative questioning on the same subject matter and

21   to avoid their sitting for *three* depositions – or *four*, in the case of Laura Siegel

22   Larson.  Toberoff Decl., Exs. B-C.  The Ninth Circuit has held that "eliminating

23   duplicative discovery" is an important consideration in discovery practice.  *Beckman*

24   *Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470 (9th Cir. 1992).  There is no plausible

25   reason to subject anyone to multiple, redundant depositions on the same topics,

26   especially with pending dispositive motions, as "repeat depositions are disfavored."

27

28

EXHIBIT E
92

1  *Graebner v. James River Corp.*, 130 F.R.D. 440 (N.D. Cal. 1989).[8]  This concern is

2  only heightened where, as here, most of the deponents are elderly and/or infirm.

3  *Baxter Healthcare Corp.*, 2007 WL 3342573, at *2.

4      DC has already examined Joanne Siegel, Laura Siegel Larson, and Mark

5  Warren Peary on identical or closely related topics in the *Siegel* litigation, and

6  accordingly, DC should not be allowed to re-examine these witnesses on topics

7  already covered during their prior depositions, or to use testimony it obtains in this

8  action for the purposes of the *Siegel* litigation.  Toberoff Decl., Exs. A-D.

9      There can be no reasonable dispute that DC has already had a full and fair

10  opportunity to depose these same witnesses on the topics of the Complaint in this

11  action, and has obtained extensive discovery relevant to the issues in its Complaint.

12  As noted above, Joanne Siegel and Laura Siegel Larson were deposed for a full day,

13  and Mark Warren Peary was deposed for a half-day on such topics.  *Id.*, Exs. A-D.

14  Without a protective order, and as set forth below, each of these individuals will be

15  deposed twice on <u>identical</u> topics.  *Id.*, Exs. L-O, U ("Complaint").

16                    <u>**Joanne Siegel**</u>

| <u>**Topic**</u> | <u>**Depo Pages (Ex. A)**</u> | <u>**Complaint**</u> |
|---|---|---|
| Joanne Siegel's relationship with Jerome Siegel from 1935-1948 | 14:3-14:9 | ¶¶ 27-30, 36 |
| Jerry Siegel being re-hired by DC's predecessors in the late 1960s | 14:21-15:23 | ¶ 41 |

---

[8] *See also* F.R.C.P. 30(d)(2) ("Unless otherwise authorized by the court or stipulated by the parties, a deposition is limited to one day of seven hours." ); *Independence Park Apartments v. U.S.*, 59 Fed.Cl. 765, 769 (Fed. Cl. 2004) (The approach taken by the courts has been "to limit a deposition to seven hours absent a showing of good cause for additional time."); *Melhorn v. New Jersey Transit Rail Operations, Inc.*, 203 F.R.D. 176, 180 (E.D. Pa. 2001) ("Absent some showing of need or good reason for doing so, a deponent should not be required to appear for a second deposition."); *Sentry Ins. v. Shivers*, 164 F.R.D. 255, 256 (D. Kan. 1996) (citations omitted) ("Scheduling a second deposition of the same person without a showing of good reason will generally support a finding of annoyance and undue burden or expense.").

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS

EXHIBIT E
93

| Topic | Depo Pages (Ex. A) | Complaint |
|---|---|---|
| Joanne Siegel's discussions of termination with Jerry Siegel | 16:18-17:14; 71:8-72:12 | ¶ 45 |
| Joanne Siegel's retention of counsel to exercise her termination rights | 22:8-24:6 | ¶¶ 60-61 |
| Joanne Siegel and Laura Siegel Larson's "settlement" discussions with DC between October 2001 and February 2002 | 24:13-28:13; 39:1-40:25 | ¶¶ 62, 168-69 |
| DC's February 2002 long-form draft settlement agreement | 27:9-28:13; 87:4-88:13; 94:3-95:6 | ¶¶ 62, 168-69 |
| The drafting and meaning of the May 9, 2002 letter sent by Joanne Siegel | 32:18-34:17; 36:16-40:17; 42:17-43:9; 45:1-46:24; 119:4-121:9 | ¶¶ 65-67, 168-69 |
| Joanne Siegel's first contact with Marc Toberoff | 41:1-3 | ¶¶ 64, 70-72 |
| Joanne Siegel's September 21, 2002 letter to DC's Publisher | 43:10-44:25 | ¶¶ 70, 168-69 |
| The 1974 Agreement between Jerry Siegel and Warner Bros., and further amendments to that agreement | 56:12-71:7 | ¶¶ 43-45 |
| The Shuster Termination | 102:8-104:25 | ¶¶ 79-88 |
| Marc Toberoff's representation of Jean Peavy | 105:1-5 | ¶¶ 64, 70-72 |
| The Superboy "pitch" letter by Jerry Siegel | 105:6-109:13 | ¶¶ 74, 134, 137 |
| The Superboy script by Jerry Siegel | 109:14-115:10; 135:3-137:3 | ¶¶ 74, 136-37 |
| The 1947 Action between Jerry Siegel, Joseph Shuster, and DC's predecessors | 124:20-125:5 | ¶¶ 37-40 |

### Laura Siegel Larson

| Topic | Depo Pages (Ex. B) | Complaint |
|---|---|---|
| The separate "Superboy" action | 14:19-15:2 | ¶¶ 78, 118-20 |

27

| Topic | Depo Pages (Ex. B) | Complaint |
|-------|--------------------|-----------|
| First contact with Marc Toberoff | 17:6-17:19; 24:10-17 | ¶¶ 59, 64, 70-72, 169 |
| Marc Toberoff's representation of Joanne and Laura Siegel Larson | 24:10-17; 61:12-21 | ¶ 71 |
| Marc Toberoff's representation of Jean Peavy and Mark Warren Peary | 24:15-17; 25:12-25 | ¶ 54 |
| Discussions between Joanne and Laura Siegel Larson, and/or Kevin Marks, and Marc Toberoff about the acquisition of Superman rights | 25:22-26:5 | ¶ 68 |
| Knowledge of Intellectual Properties Worldwide, LLC | 26:21-27:14 | ¶ 70 |
| The IP Worldwide Agreement | 34:5-38:16; 52:16-21 | ¶ 70 |
| Joanne Siegel and Laura Siegel Larson's "settlement" discussions with DC between October 2001 and February 2002 | 45:3-46:22; 125:1-133:22; 139:12-140:17; 143:12-145:9; 147:4-150:24; 153:7-154:16; 159:7-159:19; 162:8-168:18; 174:10-194:11; 204:10-205:21; 216:4-10; 261:12-265:10 | ¶¶ 62, 168-69 |
| Joanne Siegel and Laura Siegel Larson's termination of Gang Tyre | 56:17-24 | ¶ 70 |
| Expiration of the IP Worldwide Agreement | 60:1-60:8 | ¶¶ 70, 72 |
| Laura Siegel Larson's discussions of termination with Jerry Siegel | 62:17-63:23 | ¶ 45 |
| Marc Toberoff's contingency agreement with Joanne Siegel and Laura Siegel Larson | 72:8-73:8 | ¶¶ 71-72 |
| The 1974 Agreement between Jerry Siegel and Warner Bros., and further amendments to that agreement | 76:15-83:4 | ¶¶ 43-45 |
| Joanne Siegel and Laura Siegel Larson's "settlement" discussions with DC between 1997 and October 2001 | 64:16-65:6; 85:17-88:1; 221:21-241:9; 245:3-248:13 | ¶¶ 60-61 |

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING RULINGS ON DISPOSITIVE MOTIONS

EXHIBIT E
95

| Topic | Depo Pages (Ex. B) | Complaint |
|---|---|---|
| The Superboy "pitch" letter by Jerry Siegel | 92:16-24 | ¶¶ 74, 134, 137 |
| The Superboy script by Jerry Siegel | 92:25-93:3 | ¶¶ 74, 136-37 |
| The Superboy materials created by Jerry Siegel | 93:20-97:20 | ¶ 75 |
| The exclusion of the 1948 consent judgment from the Siegel Termination | 100:10-101:24 | ¶ 113 |
| The separate "Superboy" notice of termination | 105:7-107:4 | ¶¶ 73-75, 118-20 |
| Joanne Siegel's and Laura Siegel Larson's retention of counsel to exercise their termination rights | 115:9-116:25 | ¶¶ 60-61 |
| The drafting and meaning of the May 9, 2002 letter sent by Joanne Siegel | 133:19-139:10; 140:14-141:6; 146:2-147:3; 210:18-216:3; 217:25-221:13 | ¶¶ 65-67, 168-69 |
| Joanne Siegel's September 21, 2002 letter to DC's Publisher | 261:15-262:7 | ¶¶ 70, 168-69 |

**Mark Warren Peary**

| Topic | Depo Pages (Ex. D) | Complaint |
|---|---|---|
| The 1974 Agreement between Jerry Siegel and Warner Bros., and further amendments to that agreement | 18:10-19:1 | ¶¶ 43-45 |
| Mark Warren Peary's discussions with Joseph Shuster about Shuster's will | 19:2-19:25 | ¶¶ 46 |
| Mark Warren Peary's first contact with Marc Toberoff | 20:1-21:17; 22:6-22:21; 35:17-37:18 | ¶¶ 52-54 |
| Mark Warren Peary's retention of Marc Toberoff as counsel | 23:18-24:3; 29:13-29:23; 57:20-58:11; 60:7-61:7; 61:14-62:13 | ¶¶ 64, 70-72 |

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING RULINGS ON DISPOSITIVE MOTIONS

EXHIBIT E
96

| **Topic** | **Depo Pages (Ex. D)** | **Complaint** |
|---|---|---|
| The 2001 Pacific Pictures Agreement | 24:6-35:16 | ¶¶ 54-57, 105-110, 117, 156, 158, 164 |
| The inclusion of "Superboy" in the 2001 Pacific Pictures Agreement | 27:22-29:12 | ¶¶ 73-77 |
| The 50/50 split in revenues under the Pacific Pictures Agreement | 29:24-31:12 | ¶¶ 56, 87 |
| The "Expiration" clause of the 2001 Pacific Pictures Agreement | 32:6-33:22; 62:21-64:13 | ¶¶ 56, 156, 158 |
| The establishment of the Estate of Joseph Shuster | 38:13-40:24; 48:7-49:23; 50:4-12; 56:5-17 | ¶¶ 54, 58 |
| The 2003 Pacific Pictures Agreement | 40:7-41:14 | ¶¶ 77, 156, 158, 164 |
| Relationship with Joanne and Laura Siegel | 43:15-47:2 | ¶¶ 59 |
| Marc Toberoff's representation of Joanne and Laura Siegel Larson | 47:18-48:5 | ¶¶ 59 |
| The original copy of Joseph Shuster's will | 48:24-49:23 | ¶¶ 46 |
| The Shuster Notice of Termination | 50:14-56:25 | ¶¶ 79-88 |
| The works listed in the Shuster Notice of Termination | 51:23-54:19 | ¶¶ 73-77, 84 |
| Works not listed in the Shuster Notice of Termination, including "Superboy," which was solely authored by Jerome Siegel | 55:13-56:4 | ¶¶ 73-77, 118-120 |
| Signature of the Shuster Notice of Termination | 50:14-22 | ¶¶ 105-110, 117 |
| The 2004 cancellation of the Pacific Pictures Agreements | 59:18-60:10 | ¶¶ 56, 86, 156, 158 |
| Joanne Siegel's first contact with Marc Toberoff | 83:23-84:21 | ¶¶ 59, 64, 70-72, 169 |

In short, DC has obtained information from these very same witnesses on essentially all topics relevant to its Complaint in this action. Moreover, DC has already obtained substantial information and documents concerning the relationship

30

EXHIBIT E
97

1   between the Siegel and Shuster families and Toberoff.  For example, in 2006, copies

2   of the 2001 and 2003 agreements between Jean Peavy, Mark Warren Peary and

3   Toberoff's loan-out company, Pacific Pictures Corporation, were produced to DC in

4   Siegel.  Toberoff Decl., ¶ 25, Ex. T.  These agreements were cancelled in 2004, and

5   have had no effect for nearly six years.  *Id.*, Ex. U, ¶ 86.  A 2002 agreement between

6   Toberoff, Joanne Siegel, Laura Siegel Larson, and IP Worldwide was also produced

7   in 2006 to DC in the *Siegel* litigation.  Toberoff Decl., ¶ 10, Ex. F.  This agreement

8   expired and has had no effect for more than five years.  Toberoff Decl., Ex. H at 10,

9   n.5.

10          Accordingly, DC has no urgent need to take these depositions.  If DC is

11   allowed to re-depose witnesses previously deposed in the related *Siegel* litigation,

12   DC should be limited to **new** topics not covered in the prior depositions.

13          **G.      Any Depositions That Are Permitted to Go Forward Should Be**

14          **Limited In Scope, Time and Format**

15          For the reasons stated above, any depositions that do go forward of these

16   three witnesses should be limited in scope and as to time and manner given the

17   witnesses' prior testimony and the health concerns relevant to certain of the

18   witnesses.  Defendants submit that the best way to handle these limitations would be

19   for the parties to confer – after the pending dispositive motions and the motion for a

20   protective order on the Toberoff Timeline have been decided – on the appropriate

21   time, scope, and manner of these depositions, including those matters that might be

22   more appropriately addressed through interrogatories or depositions on written

23   questions.

24          If, however, the Court is inclined to order that the depositions proceed

25   immediately on the dates noticed by DC, it should limit the scope of the

26   examinations.  Given the serious health concerns raised by Joanne Siegel and Laura

27   Siegel Larson's treating physicians, if the Court nonetheless permits their

28   depositions, such depositions should only be on a limited number of written

31

EXHIBIT E
98

1  questions. This is particularly appropriate as DC has already had the opportunity to

2  obtain live testimony from each witness for a full day in the closely related *Siegel*

3  litigation, and cannot, therefore, complain that it has had no opportunity to observe

4  these witnesses' demeanor or to ask follow-up questions on relevant topics.

5  Moreover, given that all three witnesses have already been deposed, if DC is

6  allowed to re-depose witnesses, it should be limited to ***new*** topics not covered in

7  their original depositions.

8  ### H.   Defendants' Conclusion

9  For the foregoing reasons, a protective order should issue, staying depositions

10 in this matter until the resolution of the motions to dismiss under F.R.C.P. 12(b)(6)

11 and the motion to strike under California's Anti-SLAPP law.  Defendants also

12 respectfully request that the Court order the parties to confer as to the time, scope,

13 and manner for these depositions, if any, immediately following the resolution of

14 these dispositive motions.  Any depositions that do go forward of witnesses already

15 deposed in the closely related *Siegel* litigation should be duly limited as to scope,

16 time, and format.

17 ## VI.   DC COMICS' POSITION

18 ### A.   Factual Background

19 DC Comics filed this action on May 14, 2010, to protect its rights in the

20 iconic character Superman.  DC Comics' first claim challenges the validity of the

21 copyright termination notice served by the heirs of original Superman illustrator,

22 Joseph Shuster.  Am. Compl. ¶¶ 105-34.  The second claim seeks a declaration that,

23 even if this termination notice is valid, Shuster's limited contributions to Superman

24 entitle his heirs to recapture only a correspondingly limited sliver of rights.  *Id.*

25 ¶¶ 135-64.  DC Comics' third claim challenges an illicit web of agreements

26 orchestrated by Marc Toberoff in his capacity as a businessman and movie producer

27 that violate DC Comics' rights under the Copyright Act.  *Id.* ¶¶ 165-73.  DC

28 Comics' fourth through sixth claims, which arise under state law, challenge

32

EXHIBIT E
99

Toberoff's scheme improperly to secure for himself a controlling financial stake in the putative Superman rights held by the Siegel and Shuster heirs by interfering with DC Comics' contractual relationships and other rights. *Id.* ¶¶ 174-89. DC Comics filed an amended complaint on September 3, which named Shuster heir Jean Peavy as a defendant and augmented several of its claims for relief.

As set forth in DC Comics' pending motion to initiate discovery and take the depositions of Joanne Siegel and Jean Peavy, DC Comics has been trying for months to commence discovery in this case. *See* Case No. 10-3633 ODW (RZx), Docket No. 44-1 at 2-4, 8-17. Defendants have resisted every step of the way. *Id.*

Defendants stalled repeatedly before finally agreeing to participate in the required Rule 26(f) conference. *See id.* They insisted that DC Comics send defendants drafts of its discovery of Ms. Peavy and Ms. Siegel, which DC Comics did on July 28. Petrocelli Decl. Ex. 14. On August 17, after DC Comics was finally able to convene the Rule 26 conference, DC Comics served notices of deposition and requests for production on four defendants (Joanne Siegel, Laura Siegel Larson, Jean Peavy, and Mark Warren Peary), *id.* Exs. 15-19, and while there are dozens of other witnesses from whom DC Comics will seek discovery, DC Comics has focused its initial discovery on these four material witnesses—three of whom are elderly and/or are in poor health.

Defendants refused to participate in even this limited discovery. When defendants' initial motions to dismiss were set to be heard on October 18, DC Comics offered to defer the court depositions until after the hearing date, to give defendants an opportunity to have their motions considered. Defendants rejected this proposal, just as they resisted DC Comics' attempt to schedule a single hearing before the Magistrate to hear and resolve all objections related to these depositions. Petrocelli Decl. Ex. 20. Defendants have been adamant in rejecting these proposals, making clear they will not engage in any discovery at this juncture unless ordered by the Court. *Id.* Ex. 21.

33

EXHIBIT E
100

**B.      Defendants' SLAPP And Rule 12 Motions Are Irrelevant To DC Comics' Requested Discovery, Which Is Directed To Its Federal Claims And The Resolution Of Disputed Factual Issues.**

All of the discovery that DC Comics seeks and to which defendants object is directly relevant to its federal claims—in particular, its first and third claims for relief.  Defendants' initial and anticipated motion to strike under California's SLAPP statute has no impact on DC Comics' right to pursue this discovery, since as the Ninth Circuit has established, "the anti-SLAPP statute does not apply to federal law causes of action."  *Hilton v. Hallmark Cards*, 580 F.3d 874, 881 (9th Cir. 2009).

While defendants contend that "the depositions [to which they object] should be postponed until the anti-SLAPP motion has been decided," *supra* at 18, they fail to cite a single case suggesting—much less holding—that a pending SLAPP motion can justify staying discovery related to a federal claim.  Defendants do not cite such a case, and no such case exists.  Staying discovery related to a *federal claim* on the basis of a state statute "would frustrate substantive federal rights," violating the Supremacy Clause.  *Sonoma Foods, Inc. v. Sonoma Cheese Factory, LLC*, 634 F. Supp. 2d 1009, 1016 (N.D. Cal. 2007); U.S. CONST. art. § VI, cl. 2.

Nor can defendants' Rule 12 motions be used to impede DC Comics' right to discovery on its federal claims.  While defendants assert that discovery should be postponed because its motions to dismiss "can and should dispose of all of DC's claims as a matter of law," *supra* at 14, it is well established that a discovery stay is not warranted simply because defendants believe they are "likely to prevail on motions to dismiss," *Gray v. First Winthrop Corp.*, 133 F.R.D. 39, 39-40 (N.D. Cal. 1990); *Skellerup Indus. Ltd. v. City of L.A.*, 163 F.R.D. 598, 600 (C.D. Cal. 1995).  If the rule were otherwise, "it would undercut the Federal Rules' liberal discovery provisions" and stand "directly at odds with the need for expeditious resolution of litigation."  *Gray*, 133 F.R.D. at 39-40.

To avoid this rule, defendants ask the Court to "take a preliminary peek at the

34

EXHIBIT E
101

1  merits of the allegedly dispositive motion to see if on its face there appears to be an

2  immediate and clear possibility that it will be granted." *Supra* at 15.  As an initial

3  matter, asking the Court "to make a preliminary finding of the likelihood of success

4  on the motion[s] to dismiss" is inappropriate and "would circumvent the procedures

5  for resolution of such a motion." *Gray*, 133 F.R.D. at 40; *Turner Broad. Sys. v.*

6  *Tracinda Corp.*, 175 F.R.D. 554, 556 (D. Nev. 1997); *Long v. Hewlett-Packard,*

7  *Co.*, 2006 WL 3751447, at *2 (N.D. Cal. 2006) ("it is not for [the magistrate] to rule

8  upon or predict the success of HP's motion to dismiss").  Moreover, as shown

9  below, even were the Court to consider defendants' motions, it is clear they are

10  without merit—among other defects, they misstate the law and impermissibly seek

11  resolution of factual questions.  In no event do these motions bar discovery.[9]

12

13

14  ――――――――――――

15      [9] The decision in *GTE Wireless, Inc. v. Qualcomm, Inc.*, 192 F.R.D. 284 (S.D. Cal. 2000), on which defendants centrally rely, *see supra* at 15, does not authorize the Court to stay discovery on the basis of defendants' motions.  *GTE* involved a

16  request for *partial stay of discovery* on the *limited issue of damages* pending resolution of defendant's motion for *summary judgment*.  *See id.* at 285.  By the time

17  defendant's motion to stay had been filed, the parties had engaged in extensive fact discovery, and the Court reasoned there were "more than enough issues outside of

18  damages such as liability and claim construction that [could] be pursued during a [partial] stay." *Id.* at 289.  Here, of course, defendants seek to put the entire case on

19  hold from the outset, and indefinitely.
      Defendants' assertion that "cases … concluding that it is appropriate for

20  discovery to wait until dispositive motions have been adjudicated are legion," *supra* at 15 n.3, is equally of no help to them; nor are the three cases they cite on this

21  point.  *Cf. Hall v. Tilton*, 2010 U.S. Dist. LEXIS 11162, at *4 (N.D. Cal. Feb. 8, 2010) (discovery stay issued where "none of plaintiff's discovery requests [were]

22  relevant to the issue raised in the pending motion to dismiss"); *Curtis v. Benda*, 2009 U.S. Dist. LEXIS 86504, at *4-5 (W.D. Wash. Sept. 4, 2009) (discovery stay

23  issued where defendants asserted qualified immunity, which "is meant to protect public officials from the broad-ranging discovery that can be peculiarly disruptive of

24  effective government"); *Hanni v. Am. Airlines, Inc.*, 2009 U.S. Dist. LEXIS 49338 (N.D. Cal. May 27, 2009) (stay of discovery pending resolution of summary

25  judgment and class certification where discovery regarding class certification had closed and plaintiffs had access for "some time" to the discovery they sought).

26

27

28

EXHIBIT E
102

1    **1.    DC Comics' First Claim for Relief:  Challenging the Shusters'**
2    ***Notices of Termination***

3    DC Comics' first claim challenges the validity of the Shusters' copyright
4    termination notices on at least five grounds.  Many of these grounds are fact-bound
5    and turn on the interpretation, intent, and extrinsic evidence related to agreements to
6    which the Shusters are parties.  These claims may not be decided at the pleading
7    stage, they require discovery to commence immediately, and defendants' Rule 12
8    motions are no justification for an order precluding discovery.

9    a. <u>The 1992 Shuster Agreement.</u>  A central component of DC Comics' first
10   claim is a 1992 agreement between DC Comics, Jean Peavy, and Frank Shuster, in
11   which Peavy and Shuster revoked and re-granted to DC Comics all of Joseph
12   Shuster's purported Superman rights.  This 1992 agreement, which does not contain
13   an integration clause—but was confirmed by Frank Shuster and Jean Peavy in
14   contemporaneous and subsequent writings—had the legal effect of vitiating any and
15   all termination rights the Shusters now seek to pursue.  *See* Am. Compl. ¶¶ 51-57.
16   The dispositive legal effect of these writings is discussed in *Penguin Group (USA)*
17   *Inc. v. Steinbeck*, 537 F.3d 193, 200-02 (2d Cir. 2008), and *Milne v. Stephen*
18   *Slesinger, Inc.*, 430 F.3d 1036, 1042-45 (9th Cir. 2005), in which the Ninth Circuit
19   and Second Circuit, respectively, held that an heir of the author of Winnie the Pooh,
20   and heirs of John Steinbeck, relinquished such rights.

21   As noted at the outset, Toberoff and the Shusters conceded in the *Siegel* cases
22   that this 1992 "letter agreement has *absolutely nothing to do with the Siegel*
23   *Litigations*" and that "*Shuster's joint copyright interest in Superman [wa]s not at*
24   *issue in the Siegel Litigations*."  Petrocelli Decl. Ex. 10 at 84, 91 (emphasis added).
25   Despite these clear admissions about the limited scope of the *Siegel* cases,
26   defendants now take the opposite position in contending that this new action is a
27   collateral attack on the *Siegel* cases as to which no discovery should be allowed until
28   defendants' pleading motions are resolved.  *Supra* at 2, 14-18.

36

EXHIBIT E
103

1    Such a stay of discovery is wholly unwarranted.  Of the Shuster witnesses DC

2    Comics seeks immediately to depose, Mark Peary was asked *nothing* about the 1992

3    agreement at his abbreviated (2 hour, 48 minute) third-party deposition in the *Siegel*

4    cases.  And during her 67-minute deposition—which focused mainly on the origins

5    of Superman—Ms. Peavy was asked only a few minutes of questions about the 1992

6    agreement, Petrocelli Decl. Ex. 12 at 108 (23:11-24:2), 108-109 (25:21-28:14), and

7    only *one* question about its impact on the Shusters' putative termination rights, *id.* at

8    109 (28:1-9).

9    Neither of these depositions delved into such issues as the contemporaneous

10   letters written by the family or their negotiations with DC Comics.  For good

11   reason—the *Siegel* cases included *no* Shuster-related claims for relief.  These

12   limited third-party depositions in the *Siegel* cases do not remotely suffice to provide

13   the discovery relevant to this case.  If the Shuster heirs intend to pursue claims to

14   own "half" the Superman franchise, they must be compelled to participate in the

15   discovery process like any other litigant.

16   By delaying discovery indefinitely, defendants also hope to avoid

17   impeachment of their key witnesses.  Ms. Peavy, for example, wrote letters that

18   plainly refute positions defendants are now taking, including a 1999 letter in which

19   she confirmed the 1992 agreement vitiated the termination claim she now pursues:

20   "I have learned from the Internet that Joanne Siegel has filed a copyright claim for

21   SUPERMAN [*i.e.*, the Siegel Termination Notice].  I want you to know that I intend

22   to honor our [1992] pension agreement."  Petrocelli Decl. Ex. 5.  Her letters also

23   refute defendants' false, sensationalized claims that DC Comics somehow

24   mistreated Jerry Siegel, Joe Shuster, and their heirs—*e.g.*, "It's unbelievable to me

25   that Joe could have so little considering the generosity shown"; "we appreciate your

26   thoughtfulness."  *Id*. Exs. 2 at 8, 4 at 12.  It comes as no surprise, therefore, that

27   defendants make the wholly unsupportable argument that depositions are

28   unnecessary because interrogatories will suffice.  *Supra* at 19-20.  DC Comics is

EXHIBIT E
104

1  entitled to live answers to live questions at a live deposition, in addition to answers

2  to interrogatories it may propound.

3      And while one of defendants' Rule 12 motions challenged the legal effect of

4  the 1992 agreement, defendants' arguments largely rested on heavily disputed issues

5  of fact.  For example, defendants asserted that the 1992 agreement was not intended

6  to rescind and re-grant Joseph Shuster's copyright interests to DC Comics.  Case

7  No. 10-3633, Docket No. 31 at 17:15-18:11.  Not only is this contention contrary to

8  the evidence, Am. Compl. ¶¶ 52-57; Petrocelli Decl. Exs. 2-5, it disregards the rule

9  that *all* of the factual claims pleaded in DC Comics' complaint must be accepted as

10  true in resolving a motion to dismiss.  *See Wyler-Summit P'ship v. Turner Broad.*

11  *Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998).

12      When Rule 12 motions implicate such factual questions, staying discovery

13  pending resolution of such motions is particularly unwarranted.  *See Mattel, Inc. v.*

14  *MGA Entm't, Inc.*, 2010 WL 2853761, at *6 (9th Cir. July 22, 2010) (disputed issues

15  of contractual intent should be "submitted to the jury"); *HRPT Props. Trust v.*

16  *Lingle*, 676 F. Supp. 2d 1036, 1044 (D. Haw. 2009) (where "there is some doubt as

17  to the intent of the parties [to a contract], that intent is a question of fact" and

18  precludes dismissal); *Cook v. Ensign Yachts, Inc. v. Arrigoni*, 2010 WL 918107, at

19  *10 (D. Conn. Mar. 11, 2010) (dismissal "premature" because "the question of

20  contractual intent presents a question of fact for the ultimate fact finder").  For this

21  reason alone, defendants cannot carry their "heavy burden of making a 'strong

22  showing' why discovery should be denied," or why this is the extraordinary case in

23  which all of the Federal Rules governing discovery should be suspended while

24  defendants litigate their Rule 12 motions.  *Skellerup*, 163 F.R.D. at 600.

25      Indeed, the very cases on which defendants relied in their Rule 12 motions

26  show that their arguments about the 1992 agreement cannot be resolved at the

27  pleading stage.  The courts in the cases addressing such contracts *waited until*

28  *discovery was completed and summary judgment briefing occurred* to resolve

1   whether the agreements at issue had the legal effect of relinquishing the party's

2   copyright termination rights.  *See Steinbeck v. McIntosh & Otis, Inc.*, 433 F. Supp.

3   2d 395, 404 (S.D.N.Y. 2006); *Classic Media, Inc. v. Mewborn*, 2006 WL 3333715,

4   at *3-4 (C.D. Cal. Feb. 9, 2006); *Marvel Characters, Inc. v. Simon*, 2002 U.S. Dist.

5   LEXIS 3260, at *2 (S.D.N.Y. Feb. 27, 2002); *see also Milne v. Stephen Slesinger,*

6   *Inc.*, 2003 WL 21076983, at *6 (C.D. Cal. May 8, 2003) (over 12 years of discovery

7   in related cases).  Defendants have no explanation why this case—which similarly

8   turns on contested questions of contractual intent—should be the lone exception to

9   the rule.

10          b.  <u>The Pacific Pictures Joint Venture Agreements.</u>  DC Comics also

11  challenges the Shusters' termination notice on the ground that the heirs lacked the

12  statutory majority to serve it and violated the Copyright Office's rules in doing so.

13  *See* Am. Compl. ¶¶ 6, 118-24.  At the time the Shusters served the notice, one of

14  Toberoff's alter-ego companies, Pacific Pictures, owned 50% of the Shusters'

15  putative copyright interests.  Since Pacific Pictures did not join in the termination

16  notice, the notice was invalid.  *See id.*

17          Pacific Pictures' 50% interest was received as part of joint-venture

18  agreements that Toberoff and the Shusters signed in 2001 and 2003.  Although

19  defendants now assert these rights transfers were rescinded by a later agreement

20  cancelling the joint venture, *cf. supra* at 31, their argument yet again turns on

21  heavily disputed fact-bound questions they do not address or disclose.  The joint-

22  venture agreement between Pacific Pictures and the Shusters specifically provide

23  that if the joint venture is *terminated*—as defendants now say is the case—the 50%

24  putative copyright interest the Shusters granted to the joint venture is distributed *not*

25  to them, but to Toberoff's alter ego company, Pacific Pictures (or PPC):

26          *[I]n the event of termination of the Venture for any reason*, all Rights,
            property or assets of the Venture will be held fifty percent (50%) by the
27          [Shusters] and fifty percent (50%) by PPC as tenants in common, and
            [Shusters] and PPC will each be entitled to receive and continue to

28

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS

EXHIBIT E
106

1    receive fifty percent (50%) of all Proceeds derived from the Rights
2    after termination of the Venture.

Petrocelli Decl. Ex. 6 at 16; Ex. 7 at 19.

These issues are raised directly by DC Comics' complaint, *see* Am. Compl. ¶¶ 118-24, and will be the subject of probing discovery—which did not occur on these issues in the *Siegel* cases. Jean Peavy was never examined about these issues, including the Pacific Pictures agreements, which she signed herself. Her son, Mark Peary, was asked some tangentially related questions at his deposition, but the issue was not the focus of the case and not explored in any detail. Petrocelli Decl. Ex. 11 at 97-100 (24:6-37:18), 101-102 (40:9-42:23). DC Comics has every right to examine these and other witnesses on these agreements and issues that underlie DC Comics' first and third claims as well as other claims in its amended complaint.

c. The Manipulation of the Superboy Rights. Another pivotal element of DC Comics' first claim is Toberoff's scheme to induce the Siegel and Shuster heirs to fraudulently assert that Jerry Siegel, to the exclusion of Joe Shuster, was the sole creator of the character Superboy in order to park all the rights in the hands of the Siegels. *See* Am. Compl. ¶¶ 129-33. DC Comics seeks discovery from Ms. Siegel, Ms. Larson, Ms. Peavy, and Mr. Peary, among others, regarding key factual issues underpinning this claim, including:

- Why the 2001 agreement between the Shuster heirs and defendant Pacific Pictures Corporation identifies "Superboy" as among the Shusters' purported rights, but the 2003 agreement between the same parties— entered into after Toberoff induced the Siegel heirs to serve a termination notice purporting to recapture all rights in Superboy—deleted all references to Superboy, *see id.* ¶¶ 9-10, 61, 86-91, 131-33, 147-50;
- Why, after 50 years of taking the position that Superboy was jointly created by Siegel and Shuster, the Shuster heirs suddenly disclaimed any interest in Superboy in their copyright termination notice, *see id.*;

40

EXHIBIT E
107

- Why a termination notice served by the Siegel heirs in 1997 expressly identified Superboy works and elements as among the "character[s], story element[s], or indicia reasonably associated with SUPERMAN," but a second notice served in 2002—after Toberoff's intervention—asserted that Superboy was a separate work, *see id.* ¶¶ 9-10, 67, 86-91; and

- Whether there are any oral or written agreements between and among the defendants regarding the division of proceeds from the purported Superboy rights and the Superboy lawsuit the Siegels filed.

These subjects were either not addressed or were covered only superficially in the *Siegel* cases, and relevant evidence has surfaced since discovery closed in that case, including the Toberoff Timeline, which describes Toberoff's wrongful conduct in pursuing the Siegel and Shuster heirs' putative rights.  For example:

- Joanne Siegel's examination focused solely on whether Superboy was a separately copyrightable character than Superman.  *See* Petrocelli Decl. Ex. 9 at 54:6-68:3.  It did not address defendants' back-room dealings to park the Superboy rights with the Siegels.

- Laura Siegel Larson's examination was similarly limited to the copyrightability of Superboy, independent of Superman.  *See* Petrocelli Decl. Ex. 8 at 36:7-46:9.  During this limited, 10-page exchange, Mr. Toberoff, acting as her counsel, raised 17 objections and impeded the examination, and at no point was there examination about the dealings between the Siegels and Shusters with respect to Superboy.  *Id.*

- Jean Peavy was asked a single question regarding Superboy, *see* Petrocelli Decl. Ex. 12 at 107 (15:16-20), and there was no discussion why Superboy was referenced as part of the Shusters' bundle of rights in the 2001 PPC Agreement, but omitted in the 2003 PPC Agreement.

- While Mark Peary commented that his own research indicated the Shuster heirs may not have any interest in Superboy, *see* Petrocelli Decl. Ex. 11 at

41

EXHIBIT E
108

1    98 (27:22-28:5), since such matters were not at issue, there was no

2    examination on why Superboy was listed in the 2001 PPC Agreement or

3    why Joe Shuster claimed an interest to Superboy in copyright filings,

4    among many other issues relevant to this action.

5    Defendants seek to avoid these Superboy issues, raising *factual* arguments in

6    their Rule 12 motions why, under their view, the claims have no merit.  Defendants

7    assert that a state-court referee in the 1940s definitively concluded that Siegel

8    created and owned Superboy to the exclusion of DC Comics.  *See* Case No. DC 10-

9    3633, Docket No. 33 at 18:4-19.  Judge Larson *rejected* that legal argument,

10   however, in the *Siegel* cases, *see* Case No. CV 04-8776 ODW (RZx), Docket No.

11   151, and Joe Shuster's and Jerry Siegel's conduct in the decades subsequent to this

12   ruling exposes the factual fallacy (and disputed issues) underlying defendants' Rule

13   12 motion.  To take just two examples:

14   •   In 1972 and 1973, Siegel *and Shuster together* filed copyright notices with

15       the copyright office for Superboy, in which they identified Superboy as a

16       work that they had *jointly* created.  Petrocelli Decl. Ex. 1 at 5-6.

17   •   And in 2001, Toberoff, Pacific Pictures, and the Shuster heirs entered into

18       a joint-venture agreement specifying that the *Shuster heirs* owned an

19       interest in "Superboy."  Petrocelli Decl. Ex. 6 at 14.

20       2.    *DC Comics' Third Claim for Relief:  Challenging the Shusters'*

21            *Notices of Termination*

22   DC Comics' third claim for relief challenges an illicit web of agreements

23   orchestrated by Toberoff and his alter-ego entities to frustrate and impede DC

24   Comics' rights under the Copyright Act.  *See* Am. Compl. ¶¶ 165-73.  Section

25   304(c)(6)(D) of the Act and Ninth Circuit law establish that during the 10-year

26   notice period of the Shusters' copyright termination notices—which runs from 2003

27   to 2013—the Shuster heirs were forbidden from entering into agreements regarding

28   their putative copyright interests with any party other than DC Comics.  *See Milne*,

42

EXHIBIT E
109

430 F.3d at 1047.  This statutory prohibition against the "trafficking in future [copyright] interests" by parties like Toberoff was meant to protect original grantees to such copyright interests—such as DC Comics, which spent 70 years and millions of dollars nurturing, developing, and promoting Superman.  *Id.*  The statutory right was described in the legislative history of the statute, and by the Ninth Circuit in *Milne*, as creating a substantive "right" running in DC Comics' favor, which protected the "original grantee['s] opportunity to negotiate a further transfer" from the terminating party during this period of exclusive negotiations.  *Id.*  In connection with this third claim, DC Comics seeks discovery from Ms. Siegel, Ms. Larson, Ms. Peavy, and Mr. Peary, who were all parties to agreements that violate DC Comics' statutory right.

Defendants moved to dismiss this claim citing a 1987 decision from the Southern District of New York, which is neither binding on this Court (unlike *Milne*), nor does it bar DC Comics' claim.  *Supra* at 59.  While *Bourne Co. v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 865 (S.D.N.Y. 1987), did not hold that section 304(c)(6)(D) creates a "statutory right of refusal" in grantees like DC Comics, the case recognized this provision "does give the terminated grantee a preferred competitive position," and left open that parties like DC Comics could bring declaratory relief claims seeking to enforce that right.  To the extent *Bourne* can be read as inconsistent with *Milne*, which it should not be, *Milne* controls.  Defendants' citation to the Nimmer treatise, *supra* at 59, fails for the same reason.  *Milne*, not Nimmer, is the law in the Ninth Circuit.  Also, Nimmer served as counsel for the unsuccessful party in *Milne*, and the court rejected his arguments (made in his treatise and brief) about the scope of the statute.  430 F.3d at 1047-48.

In any event, resolution of DC Comics' third claim for relief will require factual development and consideration of fact-bound issues, including:

- The purpose and effect of joint-venture agreements between the Shuster heirs and Pacific Pictures preventing the Shuster heirs from entering into

43

EXHIBIT E
110

1         any agreement regarding their purported rights "without the express

2         written consent" of Pacific Pictures, an entity controlled by Toberoff;

3    &bull;  The effect of provisions in these contracts providing "in the event of

4         termination of the Venture for any reason, all Rights, property or assets of

5         the Venture will be held fifty percent (50%) … by PPC"; and

6    &bull;  The existence of other agreements between and among the defendants that

7         impede the Shuster heirs' ability to settle their claims against DC Comics.

8 In connection with each of these claims, there are numerous areas of discovery,

9 including Toberoff's misconduct recounted in the Toberoff Timeline. No prior

10 deposition addressed the Timeline, nor could it have: the Siegels were deposed in

11 August 2006 and the Shusters were deposed in November 2006—over two years

12 before the Timeline was ordered produced. Petrocelli Decl. Exs. 8-9, 11-13. Also

13 necessary to explore are the illicit agreements Toberoff engineered with the

14 Siegels—many of which have still yet to be disclosed and that were not the subject

15 of discovery in the *Siegel* cases.

16    &bull;  Joanne Siegel, for example, was not questioned concerning the October

17         2002 IP Worldwide agreement she signed with Toberoff's alter-ego

18         company. Her entire testimony concerning the beginning of her

19         relationship with Toberoff—which is a central issue in this case—

20         consisted of three lines. Petrocelli Decl. Ex. 9 at 52:1-3.

21    &bull;  Laura Siegel Larson testified she "enter[ed] into an agreement with IP

22         Worldwide for [talent agent Ari] Emanuel to represent [the Siegels] in

23         negotiations for our rights," Petrocelli Decl. Ex. 8 at 24:3-5, but she was

24         not questioned about how that agreement affected her ability to enter into

25         agreements with DC Comics absent the improper approvals required by

26         Toberoff and IP Worldwide, *see id.* at 24:3-33:12.

27    &bull;  Jean Peavy's questioning about her 2001 and 2003 agreements with PPC

28         encompassed one page of testimony, and she did not discuss her inability

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS

EXHIBIT E
111

1       to reach agreement with DC Comics without the consent of Toberoff or

2       other defendants. Petrocelli Decl. Ex. 12 at 111 (34:3-24).

3   •   Mark Peary similarly was not examined about the specific clauses in the

4       PPC Agreements that required Toberoff's consent to any settlement

5       agreement—in direct violation of the statutory right recognized by the

6       Ninth Circuit in *Milne*. Petrocelli Decl. Ex. 11 at 97-100 (24:6-37:18).

7   •   Nor have defendants produced the retainer agreements between Toberoff

8       and the Siegels and Shusters. *Id.* at 103 (60:7-10). DC Comics is entitled

9       to these agreements in discovery, *e.g.*, *In re Grand Jury Proceedings*, 33

10      F.3d 1060, 1063-64 (9th Cir. 1994) ("Information regarding the fee

11      arrangement is ordinarily not part of the subject matter of the professional

12      consulting and therefore is not privileged communication."); *Montgomery*

13      *County v. MicroVote Corp.*, 175 F.3d 296, 304 (3d Cir. 1999) ("The

14      attorney-client privilege does not shield fee arrangements."), and has

15      sought them in its document requests, *e.g.*, Petrocelli Decl. Ex. 16 at 145.

16     These are just examples of key areas of discovery in this case—and there are

17 many more. But again, it is not DC Comics' burden to show an entitlement to

18 discovery. That burden is defendants', and it is a "heavy one." Defendants must

19 make a "strong showing" that their Rule 12 motions present no factual issues. *See*

20 *Skellerup*, 163 F.R.D. at 600; *see also Blankenship v. Hearst Corp.*, 519 F.2d 418,

21 429 (9th Cir. 1975); *In re Valence Tech. Sec. Litig.*, 1994 WL 758688, at *2-3 (N.D.

22 Cal. Nov. 18, 1994). They do not and cannot make any such showing.

23     In wrongly contending that DC Comics must demonstrate "good cause"

24 before it can take its noticed depositions, *supra* at 26 n.8, defendants cite to a

25 standard that applies to multiple depositions *within the same case*—not to

26 depositions in a new case. *Cf. Graebner v. James River Corp.*, 130 F.R.D. 440, 441

27 (N.D. Cal. 1989) (second deposition allowed in same case where "long passage of

28 time" between depositions, "new evidence" emerged, and "new theories added to

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS

EXHIBIT E
112

1   the complaint"); *Blackwell v. City & County of San Francisco*, 2010 WL 2608330,

2   at *1 (N.D. Cal. June 25, 2010) (same); *Harris v. New Jersey*, 259 F.R.D. 89, 94-95

3   (D.N.J. 2007) (same).

4           Even assuming this inapposite standard applied—and it does not—DC

5   Comics is fully entitled to the discovery it seeks.  Numerous issues in this case were

6   neither present in the *Siegel* cases or the subject of discovery, including the validity

7   of Shusters' purported termination and the contracts that render it void, the illegal

8   parking of Superboy rights with the Siegels, and Toberoff's schemes to interfere

9   with DC Comics' relationships as evidenced including by the Toberoff Timeline.

10  *Cf. Kraemer v. Unocal Termination Allowance Plan*, 2009 WL 936611, at *2 (C.D.

11  Cal. Apr. 6, 2009) (ordering depositions in subsequent case when new issues arose

12  after the prior depositions).  Despite their efforts to distinguish cases like *Kraemer*

13  and to dispute DC Comics' other cases, *cf. supra* at 25-26; Docket No. 45 at 35-37

14  & n.11, defendants cite no authority—none—where depositions in a second case

15  were barred after the deponents themselves admitted the issues in the two cases

16  were different, *as the Shusters and Toberoff did here in 2006*.  Petrocelli Decl. Ex.

17  10 at 84, 91.  It is defendants' burden to show the discovery DC Comics seeks is

18  duplicative of that taken in the *Siegel* cases—and they must show this discovery is

19  "unreasonably" "cumulative and duplicative."  6 DANIEL R. COQUILLETTE ET AL.,

20  MOORE'S FED. PRAC. § 26.60[2], at 26-431 (3d ed. 2007).  Defendants' "[b]road

21  allegations of harm" and "unsubstantiated," non-"specific" lists of areas of supposed

22  overlap, *cf. supra* at 26-30, "do not satisfy the Rule 26(c) test."  *Beckman Indus.,*

23  *Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992).

       **C.    Defendants' Remaining Arguments for Barring Discovery Are**

       **Equally Baseless and Misguided.**

               *1.    DC Comics Proposed Reasonable Ways To Account For The*

                     *Advanced Age and Medical Condition of Witnesses.*

28      DC Comics does not dispute that Ms. Siegel, Ms. Larson, and Ms. Peavy are

46

EXHIBIT E
113

1    of advanced age and/or suffer from physical infirmities; indeed, that is why their

2    testimony must be taken and preserved now.  Aged and infirm witnesses are

3    frequently required to give depositions early in a case for precisely this reason, as

4    DC Comics has endeavored to do since early June.  *E.g.*, *Marvel Worldwide, Inc. v.*

5    *Kirby*, 10 Civ. 141 (CM) (KNF), Docket No. 28 (S.D.N.Y. Apr. 19, 2010) (ordering

6    immediate deposition of material witness in case involving termination of copyright

7    grants in comic-book characters); *Alaska Pulp Corp. v. U.S.*, 41 Fed. Cl. 611, 613

8    (1998) (court ordered deposition to preserve testimony of deponent with health

9    concerns).  In addition to being material witnesses, the Shusters and Siegels are

10   laying claim to millions and millions of dollars.  They have an obligation to submit

11   to full discovery.

12        Defendants' contention that the Court cannot compel the deposition of

13   Ms. Peavy because she is a "non-party resident of the District of New Mexico,"

14   *supra* at 2 n.1—an argument they never raised in the meet-and-confer process—is

15   wrong and now moot.  DC Comics' amended complaint names her as a defendant.

16        Defendants assert that even if the Court grants DC Comics' pending

17   discovery motion, they will object to DC Comics' document requests and lines of

18   examination.  Because defendants wish to address these objections in seriatim and in

19   advance of any questions, they seek to put off the depositions indefinitely.  *See*

20   Petrocelli Decl. ¶¶ 21-23.  Defendants' strategy is no grounds to further delay

21   discovery.  DC Comics has proposed briefly deferring the depositions until a single

22   hearing on all objections and issues, including defendants' refusal to produce

23   documents, can occur on October 25.  *Id.* ¶ 22; Exs. 20, 23.  That way, the Court

24   will have before it all at once all issues related to the depositions.  Even though this

25   proposal fully addresses their professed concerns, defendants refused it.  *Id.* Ex. 21.

26            2.    *There Is Nothing "Short" or "Non-Prejudicial" About The*

27                  *Indefinite Discovery Delay Defendants Seek.*

28        Defendants claim their motion only requires postponing the scheduled

47

EXHIBIT E
114

1  depositions by "a few weeks" and would "not prejudice" DC Comics. *Supra* at 23.

2  Defendants are wrong—their position would require an indefinite moratorium on

3  discovery to DC Comics' severe prejudice. Under defendants' view, no discovery

4  may commence until Judge Wright rules on the four-plus motions they plan to file

5  challenging DC Comics' complaint. Defendants' initial motions spanned some 100

6  pages, included over 1,000 pages of exhibits, and presented not only complicated

7  (and tortured) legal arguments, but repeated challenges to the "evidence" supporting

8  DC Comics' claims. Case No. CV 10-3633, Docket No. 30 at 22:10, 23:11 ("The

9  Fifth Claim Fails Because There Is No Evidence"; "DC cannot meet its evidentiary

10 burden").

11     In response to DC Comics' amended complaint, defendants say they

12 "contemplate filing very similar motions with respect to the amended Complaint."

13 *Supra* at 14. Like any federal judge, Judge Wright has an extremely busy calendar

14 and this is only one of hundreds of cases on his docket. There is no assurance that

15 Judge Wright will be able to hear—much less resolve—four oversized motions in

16 the next month, or even before the end of the calendar year.[10]

17         3.    *The Rule 54(b) Motion Filed In The* Siegel *Case Has No Bearing*

18               *On Discovery Here.*

19     Defendants' Rule 54(b) motion in the *Siegel* case is another red herring. The

20 motion lacks merit, *see* Case No. CV-04-8400, Docket No. 624, and the issues the

21 Siegels hope to appeal there have no "preclusive effect" on the claims or discovery

_____

23     [10] *Cf.* Thomas E. Willging, et al., *An Empirical Analysis of Rule 23 To Address*
24 *the Rulemaking Challenges*, 71 N.Y.U. L. REV. 74, 111 (1996) ("Looking at the time
   from the filing of the first motion to dismiss to the first ruling on dismissal, the
   median time for rulings on motions to dismiss ranged from 2.6 months to 7.4
25 months"); Rebecca L. Kourlis, et al., INST. FOR THE ADVANCEMENT OF THE AM.
26 LEGAL SYS., UNIV. OF DENVER, CIVIL CASE PROCESSING IN THE FED. DIST. COURT:
   A 21ST CENTURY ANALYSIS at 48 (2009), http://www.du.edu/legalinstitute/
27 publications2009.html (average time from filing to ruling on Rule 12 motions,
   among courts in study, was 129.78 days).

28

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS

EXHIBIT E
115

in this case, *cf. supra* at 3, 18.  Defendants' "preclusion" and related efficiency arguments hinge on the erroneous assertion that the copyright-termination issues in the *Siegel* case are the "mirror image" of the issues here.  *Supra* at 18, 58.  To have any preclusive effect, the *Siegel* adjudications would need to be final judgments and the issues in the two cases would need to be "identical."  *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 885 (9th Cir. 2000).  There is no final judgment in the *Siegel* cases.  And as Toberoff and the Shusters openly admitted:  "The Shuster Termination … is wholly separate and apart from the Siegel Terminations at issue in the Siegel Litigations," and that "the Siegel Litigations do <u>not</u> concern Shuster's copyright interests in *Superman* and/or *Superboy* (if any); the litigations concern *only* Jerry Siegel's copyright interests in *Superman* and/or *Superboy*."  Petrocelli Decl. Ex. 10 at 75, 84 (emphasis in original).  Judge Larson confirmed the Siegels and Shusters were asserting different claims, when he noted:  "It is by no means a foregone conclusion that the Shuster estate will be successful in terminating the grant to the Superman material published in *Action Comics No. 1*."  Case No. CV 04-8400, Docket No. 554 at 23.

> #### 4.    *Defendants' Arguments About Their Contemplated Anti-SLAPP Motion Are Both Irrelevant And Misstate The Law.*

Not only is defendants' anticipated SLAPP motion irrelevant to DC Comics' requested discovery—which relates equally to DC Comics' federal claims, *supra* Section VI.B—the Ninth Circuit has established that a SLAPP motion may not be decided in a federal case before the opposing party has had an "opportunity to discover information that is essential to its opposition."  *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001).  DC Comics intends to oppose any new SLAPP motion filed by defendants, including moving to stay any resolution of it until DC Comics has had adequate time to take discovery in support of its state-law claims.  Defendants' initial SLAPP motion challenged the factual sufficiency of DC Comics' claims.  *E.g.*, CV 10-3633, Docket No. 30 at 22:10-23:13.  "[I]f a party

49

EXHIBIT E
116

1  brings an anti-SLAPP motion challenging the sufficiency of the nonmoving party's

2  evidence, *the court must allow the nonmoving party to conduct discovery*

3  sufficiently to permit summary judgment under Rule 56."  *Moser v. Triarc Cos.*,

4  2007 WL 3026425, at *3 (S.D. Cal. Oct. 16, 2007) (emphasis added).[11]

5      As fall-back arguments, defendants assert a litany of other objections to avoid

6  this clear rule entitling DC Comics to discovery.  None has merit:

7      a.  Defendants complain that DC Comics has not shown why it is entitled to

8  discovery on its state-law claims.  *Cf. supra* at 19-23.  DC Comics has no obligation

9  to make this showing now, and it is defendants' clear and "heavy burden" to justify

10  why no discovery can be allowed in this case.  *Supra* Section VI.B.1.

11  As for defendants' SLAPP motion, Judge Wright rightly held it was mooted by DC

12

_____

13  [11] Defendants baldly assert that the "overwhelming bulk" of their SLAPP motion
had "no factual component," *supra* at 19, but all the Court need do is look at the

14  motion to see this is incorrect.  The motion relied extensively on factual arguments
and some 30 evidentiary exhibits—all of which raise the factual questions presented

15  below, *all which are disputed*, and all of which are also directly relevant, to DC

16  Comics' non-SLAPPable federal claims.  These issues include:

17  • The nature of Toberoff's initial involvement with the Shuster heirs;
   • When Toberoff began providing legal services to the Shuster heirs;

18  • When and how Toberoff first contacted the Siegel heirs;
   • How and who presented Toberoff's business proposal to the Siegel heirs and

19    when it was revealed to be fraudulent; and
   • When the Siegels first formed an attorney-client relationship with Toberoff.

20    *Compare* SLAPP Mot. at 6-10, *with* Am. Compl. ¶¶ 58-91.

21  Defendants claim DC Comics' fourth claim implicates SLAPP because it relates
"to the establishment of an attorney-client relationship."  SLAPP Mot. at 18.  But

22  the existence of this relationship, when it began, and Toberoff's separate business
dealings with the heirs are all disputed issues about which DC Comics is entitled to

23  discovery.  *See* Am. Compl. ¶¶ 58-91, 174-79.  Similarly, in arguing DC Comics'
fifth claim is protected, defendants say it is "clear that Toberoff's communications

24  with the Siegels occurred in connection with settlement negotiations and anticipated
litigation."  SLAPP Mot. at 18.  Again, this is only "clear" if one accepts the

25  repeated false factual assertions made in defendants' motion.  *See* Am. Compl.

26  ¶¶ 66-85, 180-86.  Challenging DC's sixth claim, defendants assert SLAPP shields
the improper "consent agreements" that Toberoff engineered, because each "was

27  expressly entered into with respect to Toberoff's legal services."  SLAPP Mot. at 20.
Again, this factual claim is disputed.  *See* Am. Compl. ¶¶ 58-91, 101, 187-89.

28

EXHIBIT E
117

1   Comics' amended complaint, *see* Case No. CV 10-3663, Docket No. 52, and if and

2   only when defendants re-file their SLAPP motion will DC Comics have any

3   obligation to identify what discovery it needs.  To erase any question about whether

4   and what discovery will be sought to oppose defendants' motion, here is just one

5   example.  In support of its fifth claim for relief, DC Comics alleges it:

6

7           had a long-established economic relationship with the Siegel Heirs….
            At the time Toberoff approached the Siegel Heirs in 2001, DC Comics
            and the Siegel Heirs had finally reached an agreement resolving their

8           claims to the Superman and Superboy rights.

9                   The economic relationship that the Siegel Heirs and DC Comics
            had contemplated and agreed to had the probability of future economic

10          benefit to DC Comics.  The Siegel Heirs recognized DC Comics' sole
            and exclusive ownership of all rights in Superman and Superboy,

11          allowing it to continue freely developing and exploiting those rights,
            and avoid the possibility of an expensive and protracted lawsuit

12          regarding ownership of those rights.

13                  Toberoff was well aware of the agreement between DC Comics
            and the Siegel Heirs.  Toberoff has admitted that he tracked the Siegel

14          Heirs' termination efforts through Internet reports….

15                  Toberoff knew his actions were substantially certain to interfere
            with the Siegel Heirs' agreement and ongoing business dealings with

16          DC Comics.  *Toberoff intentionally engaged in independently wrongful
            conduct to carry out his interference by, among other things:  falsely*

17          *misrepresenting to the Siegel Heirs that he had a billionaire investor
            ready to purchase their Superman rights if they repudiated their*

18          *settlement agreement with DC Comics; falsely representing to the
            Siegels that he would help them produce a competing Superman motion*

19          *picture; and wrongly inducing the Siegels to repudiate their agreement
            and business relationship with DC Comics.*  Toberoff engaged in this

20          misconduct in his role as businessman and shareholder of IP

21          Worldwide.

22                  As a direct result of Toberoff's misdeeds, the Siegel Heirs
            repudiated the Siegel-DC Comics Agreement with DC Comics and

23          ended all further discussions, causing DC Comics to lose the value of
            the agreement, to lose their ongoing business relationship with the

24          Siegels, and to incur millions of dollars in subsequent legal fees in
            disputes with the Siegel Heirs.

25

26  Am. Compl. ¶¶ 182-86 (emphasis added).  All of these factual issues are in dispute,

27  and no discovery has been taken with respect to the Toberoff Timeline revealing

28  how Toberoff misled the Siegels in forming his business relationship with them and

51

EXHIBIT E
118

1  interfering with DC Comics' rights. *See id.* ¶¶ 102-04.

2      b.  Defendants next assert that Justice Stevens' concurrence in *Shady Grove*

3  *Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431 (2010), upsets the

4  well-settled rule that DC Comics must be given the opportunity to take discovery in

5  aid of its SLAPP opposition, *see Metabolife*, 264 F.3d at 846.  Indeed, defendants go

6  so far as to suggest DC Comics misled the Court by not citing this concurring

7  opinion. *See* Case No. CV 10-3633, Docket No. 44-1 at 5:22-25, 32:11-22.

8      Defendants are badly mistaken, and the only lack of candor is defendants', for

9  failing to cite *no fewer than five* district court cases handed down since *Shady Grove*

10  that continue to recognize a plaintiff's right to take discovery in opposing a SLAPP

11  motion. *See, e.g.*, *Nguyen v. County of Clark*, 2010 WL 3211873, at * 3 (W.D.

12  Wash. Aug, 12, 2010) (applying *Metabolife* and granting discovery prior to

13  adjudication of SLAPP motion); *Rebel Commc'ns, LLC v. Virgin Valley Water*

14  *Dist.*, 2010 WL 2773530, *2 (D. Nev. July 12, 2010) (recognizing *Metabolife* and

15  plaintiff's entitlement to discovery necessary to respond to SLAPP motion);

16  *Thornbrough v. Western Placer Unified Sch. Dist.*, 2010 WL 2179917, at *4 (E.D.

17  Cal. May 27, 2010) ("requiring Plaintiff to present evidence to support his claims

18  without the opportunity for discovery would directly conflict with Federal Rule of

19  Civil Procedure 56"); *Chevron Corp. v. Bonifaz*, 2010 WL 1948681, at *3 (N.D.

20  Cal. May 12, 2010) (recognizing and applying *Metabolife*'s refusal to apply the

21  automatic discovery stay in federal court); *Pacquiao v. Mayweather*, 2010 WL

22  1439100, at *1 (D. Nev. April 09, 2010) (same).

23      The reason none of these cases endorses defendants' reading of *Shady Grove*

24  is that defendants' view is erroneous.  At issue in *Shady Grove* was whether a New

25  York statute governing class action certification conflicted with Federal Rule of

26  Civil Procedure 23 and should supplant Rule 23 in the instant case. *See* 130 S. Ct. at

27  1442, 1444.  The Court, in separate opinions, rejected this argument, concluding the

28  New York statute conflicted with Rule 23, and Rule 23 must apply. *See id.*

1    In a concurrence joined by no other Justice, Justice Stevens agreed the state-law

2    provision could not apply. *See id.* at 1448-49. In reaching this conclusion, Justice

3    Stevens suggested applying a new version of the *Erie* test, which as Justice Scalia

4    and two other concurring Justices correctly pointed out, conflicted with the Supreme

5    Court's ruling in *Sibbach v. Wilson & Co.*, 312 U.S. 1 (1941), and created an

6    unworkable web in which the Federal Rules would apply differently from state to

7    state. *See* 130 S. Ct. at 1444 (rejecting "impracticability of a test that turns on the

8    idiosyncrasies of state law") (citing *Sibbach*, 312 U.S. at 14).

9       Defendants' characterization of Justice Stevens' opinion as the "controlling

10   concurrence," *supra* at 21, is wrong. Since Justice Stevens' concurrence *upheld*

11   application of a federal rule, his opinion would only ever "control" in determining

12   whether a rule *satisfies* the Rules Enabling Act—the narrowest possible holding in

13   the case. *Marks v. U.S.*, 430 U.S. 188, 193 (1977); *U.S. v. Williams*, 435 F.3d 1148,

14   1157, n.7 (9th Cir. 2006) ("Applying *Marks*' rule, we have often construed one

15   Justice's concurring opinion as representing *a logical subset of the plurality's* and as

16   adopting a holding that would *affect a narrower range of cases*.") (emphasis

17   added). Under *Marks*, Justice Stevens' test does not control when arguing, as

18   defendants do here, that Rule 56's discovery procedures *do not apply* in this case or

19   that cases like *Metabolife* are now bad law. The other concurring Justices expressly

20   rejected Justice Stevens' test for determining when a federal rule *fails* the test, and

21   his lone discussion in dicta is not a "logical subset of the plurality's position" or a

22   holding that affects a "narrow range of cases." *Williams*, 435 F.3d at 1157, n.7.

23      This esoteric debate of defendants' invention is of no moment here, because

24   cases like *Metabolife* would survive even under Justice Stevens' test. Justice

25   Stevens asked whether the federal procedural rule at issue—here, allowing Rule 56-

26   based discovery to oppose a potentially dispositive SLAPP motion—"so displace[s]

27   a state law that is procedural in the ordinary use of the term but is so intertwined

28   with a state right or remedy that it functions to define the scope of the state-created

53

EXHIBIT E
120

1    right?"  130 S. Ct. at 1452.  Defendants do not attempt to answer this nuanced

2    question, instead making the sweeping claim that "wide-ranging" discovery is

3    prohibited by the SLAPP statute.  *Supra* at 21.  This misses the mark.  Rather, the

4    question is whether discovery of the sort permitted by Rule 56(f), *see* Case No. CV

5    10-3633, Docket No. 44-1 at 11-13, may apply here.  The "Justice Stevens" test

6    would permit Rule 56(f) to apply, because the SLAPP statute itself *allows for*

7    *discovery* if there is "good cause," and the statute contains no general prohibition

8    barring discovery in all cases.  *Cf.* CAL. CIV. PROC. CODE § 425.16(g).  And while

9    the SLAPP standard for "good cause" may be different than the standard for seeking

10   discovery under Rule 56, *cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5

11   (1986), this slight divergence falls well short of violating Justice Stevens' view,

12   which would require that the federal rule "*displace … a state law right or*

13   *remedy.*"  130 S. Ct. at 1452 (emphasis added).  Indeed, as Justice Stevens

14   explained in rejecting defendant's claim in *Shady Grove*, "classically procedural

15   calibration[s]"—such as who gets discovery on an issue and when in opposing a

16   motion—do not trammel on substantive state rights.  *Id*. at 1459.

17         c.  Finally, defendants assert that DC Comics "ignores" relevant, post-

18   *Metabolife* Ninth Circuit jurisprudence—*Batzel v. Smith*, 333 F.3d 1018 (9th Cir.

19   2003)—which they suggest calls *Metabolife* into doubt.  *Supra* at 22 n.7.  This

20   argument is indefensible.  Courts in this circuit have cited *Metabolife* approvingly

21   over 50 times since *Batzel*, including 23 times by the Ninth Circuit alone, and as

22   recently as June 29, 2010, *see Flores v. Emerich & Fike*, 2010 WL 2640625, at *2

23   (9th Cir. 2010) (unpublished).  Moreover, the court in *Batzel* was describing the

24   general mechanisms of the SLAPP statute in an introductory section of an opinion,

25   which had *nothing* to do with taking discovery, but whether SLAPP orders were

26   appealable.  *See* 333 F.3d at 1024.  *Batzel* cited *Metabolife* positively, *see id*., and

27   never questioned or criticized its rule requiring discovery.  For defendants to suggest

28   *Batzel* overruled *Metabolife sub silentio* on this important point of law only exposes

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS

EXHIBIT E
121

1  the extreme lengths they will go to advance frivolous positions to block discovery in

2  this case.[12]

3      **D.    Conclusion**

4          For the foregoing reasons, defendants' motion for a protective order should be

5  denied, and DC Comics' discovery motion should be granted.  Case No. 10-3633,

6  Docket No. 44-1.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26          [12] To the extent *Batzel* differs from *Metabolife*—and it does not—Ninth Circuit
    law is clear on how to resolve such disputes:  the earlier decision, *i.e.*, *Metabolife*,
27  controls.  *See U.S. v. Hardesty*, 977 F.2d 1347, 1347 (9th Cir. 1992) (en banc)
    ("when two panels reach different conclusions the earlier decision controls").

28

EXHIBIT E
122

1

2   Dated:  September __, 2009          TOBEROFF & ASSOCIATES, P.C.

3

4                                       By_____
                                              Marc Toberoff
5
                                        Attorneys for Defendants Mark Warren Peary, as
6                                       personal representative of the Estate of Joseph
                                        Shuster, Jean Adele Peavy, Joanne Siegel and
7                                       Laura Siegel Larson

8

9   Dated:  September __, 2010          KENDALL BRILL & KLIEGER LLP

10

11

12                                      By: _____
                                               Richard B. Kendall
13                                             Attorneys for Defendants Marc Toberoff,
                                               Pacific Pictures Corporation, IP
14                                             Worldwide, LLC, and IPW, LLC

15

16  Dated:  September 10, 2010          O'MELVENY & MYERS LLP

17

18

19                                      By: _____
                                               Daniel Petrocelli
20                                             Attorneys for Plaintiff DC Comics

21

22

23

24

25

26

27

28

                                         56
_____
JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
                    RULINGS ON DISPOSITIVE MOTIONS

EXHIBIT E
123

<u>APPENDIX A</u>

DEFENDANTS' SUMMARY OF DISPOSITIVE MOTIONS

For the Court's convenience, the Arguments made in the separate motions to dismiss are summarized as follows.

- DC's First Claim seeks to invalidate the Shuster Terminations, and will fail as a matter of law:

  o ***Section (1)*** of DC's First Claim (Toberoff Decl., Ex. U ("Complaint"), ¶¶ 94-98) erroneously alleges that Shuster's termination rights do not vest in the executor or representative of his estate unless he had a widow, children and grandchildren who were "not living, but who did at some time live."  This argument contradicts the plain language of the statute and the accepted interpretation of "not living" under the Copyright Act, as well as the legislative intent of § 304, and would lead to absurd results.  *See Siegel v. Warner Bros. Ent. Inc.* ("*Siegel I*"), 542 F. Supp. 2d 1098, 1114 n.3 (C.D. Cal. 2008); 3 M. Nimmer & D. Nimmer, 3 *Nimmer on Copyright* ("*Nimmer*") § 11.03[A][2][a] at 11-40.1-11.40.2 (emphasis added); *Stewart v. Abend*, 495 U.S. 207, 212 (1990); 67 Fed. Reg. 69134; Toberoff Decl., Ex. J at 2-7.

  o ***Section (2)*** (Complaint, ¶¶ 99-104) argues that a 1992 agreement ("1992 Agreement") between DC and Shuster's siblings bars the Shuster Termination.  This argument fails because the 1992 agreement could not lawfully grant any Superman copyrights.  None of the parties to that agreement possessed any termination rights or Superman copyrights to grant; the Shuster Executor, the sole holder of the termination right, was not a party to the 1992 Agreement, as pled in the complaint; and, in any event, the agreement could not have conveyed or released the inalienable termination right as a matter of law under § 304(c)(5).  *See* 17 U.S.C. §§ 304 (c)(5), (c)(6)(B); *Classic Media, Inc.*

57

EXHIBIT E
124

1      *v. Mewborn* ("*Mewborn*"), 532 F.3d 978 (9th Cir. 2008); Toberoff

2      Decl., Ex. J at 7-12

3      o **Section (3)** (Complaint, ¶¶ 105-11) alleges that the Shuster Executor

4      did not own the "majority interest necessary to terminate" purportedly

5      because it had granted half such rights in the Pacific Pictures

6      Agreements, but the Shuster Executor clearly held the entirety of the

7      termination interest because, as asserted elsewhere in DC's Complaint,

8      termination rights cannot be transferred to a third party prior to the

9      effective date of termination per 17 U.S.C. § 304(c)(6)(D), and the

10     effective termination date is October 26, 2013.  *See id.*; Complaint, ¶¶

11     81, 154-55; Toberoff Decl., Ex. J at 13-14.

12     o **Section (4)** (Complaint, ¶¶ 112-15) claims that the Shuster

13     Termination failed to terminate a May 21, 1948 consent judgment;

14     however, Judge Larson in *Siegel* has already correctly decided that such

15     consent judgment was not a copyright grant, and has no effect on the

16     validity of Superman termination notices.  The same reasoning and

17     holding applies to the "mirror image" Shuster Termination and, as this

18     is a closely related action, is binding on DC under the "law of the case"

19     doctrine.  *See Siegel I,* 542 F. Supp. 2d at 1131; Toberoff Decl., Ex. J at

20     14-16; *See Disimone v. Browner*, 121 F.3d 1262, 1266-67 (9th Cir.

21     1997) (applying "law of the case" doctrine to related cases).

22     o **Section (5)'s** "unclean hands" claim regarding Superboy (Complaint,

23     ¶¶ 116-20) fails because unclean hands is a defense that is available

24     only against a plaintiff that seeks affirmative relief, and is not a basis

25     for a cause of action.  *See Pelich v. INS*, 329 F.3d 1057, 1062 (9th Cir.

26     2003); Toberoff Decl., Ex. J at 16-17.  Defendants also cannot be

27     charged with "unclean hands" regarding Superboy as their actions

28     comport with the specific findings of fact and conclusions of law in a

58

EXHIBIT E
125

1   1947 action between DC's predecessors, and Siegel and Shuster.  *See*

2   *id.* at 17-19; *Siegel v. Nat'l  Periodical Publ'ns, Inc.*, 508 F.2d 909 (2d

3   Cir. 1974); *Siegel v. National Comics Publications, Inc.*, Case No.

4   1099-1947 (N.Y. Sup. Ct. April 12, 1948).

5   • DC's Second Claim transparently attempts to re-litigate issues already

6   decided against DC in the related Superman case, *Siegel v. Warner Bros. Ent.*

7   *Inc.*, C.D. Cal. Case No. 04-08400 ODW (RZx), and is barred by the doctrine

8   of "law of the case" in this closely related action.  *Disimone*, 121 F.3d at

9   1266-67; Toberoff Decl., Ex. J at 19-25.

10   • DC's Third Claim (as well as its Sixth Claim) is premised on the erroneous

11   legal position that DC has a statutory right to a so-called "period of

12   exclusivity" to negotiate the purchase of the Shuster Estate's recaptured

13   *Superman* copyrights under 17 U.S.C. § 304(c)(6)(D).  *See* Complaint, ¶¶

14   154-55.  However, it is clear from the plain language of § 304(c)(6)(D) that it

15   does not provide DC with any "rights," let alone a right to an exclusive period

16   of negotiation.  *See* 17 U.S.C. § 304(c)(6)(D); *Bourne Co., v. MPL*

17   *Commc'ns, Inc.*, 675 F. Supp. 859, 865 (S.D.N.Y. 1987) ("Nor does the

18   statute provide for an exclusive period of negotiation. The statute neither

19   compels the terminating party to negotiate with the terminated grantee, nor

20   forbids him from negotiating with anyone else."); 3 *Nimmer* § 11.08[A], n.6

21   (2010) (*Bourne* properly "rejected the claim [made here] that a prior grantee

22   enjoys a private right of action for damages against one who induces the

23   grantor to make a (necessarily invalid) grant to a third party prior to the

24   termination date of the original grant."); Toberoff Decl., Ex. K at 4-7.  As

25   such, DC lacks standing to prosecute this claim.  *See* 3 W. Patry, *Patry on*

26   *Copyright* ("*Patry*") § 7:47 (2010); Toberoff Decl., Ex. K at 7.

27   • DC's Fourth Claim for tortious interference with contract alleges that by

28   inducing the Shuster Estate to file a statutory notice of termination concerning

59

EXHIBIT E
126

*Superman*, Toberoff, and an entity controlled by Toberoff, Pacific Pictures Corporation ("PPC"), interfered with the 1992 Agreement between DC and the siblings of Joseph Shuster. This claim fails as a matter of law for at least four independent reasons.

- o *First*, the termination of the *Superman* copyright interests by the Shuster Executor could not have interfered with the 1992 Agreement, which has no bearing whatsoever on the independent termination right held solely by the Shuster Executor. Toberoff Decl., Ex. I at 9-13.

- o *Second*, even if the 1992 Agreement could somehow be construed as intending to prevent the Shuster Executor from exercising his termination rights, such a contract would be void under the Copyright Act, 17 U.S.C. § 304(c)(5), and clear Ninth Circuit precedent. Toberoff Decl., Ex. I at 13-18.

- o *Third*, the claim is squarely barred by the two-year statute of limitations for tortious interference claims, as it is a matter of public record that by 2006 DC was fully aware of the Shuster Termination and the Pacific Pictures Agreements, the facts that allegedly gave rise to this claim. *Id.* at 18-20.

- o *Fourth*, the claim is barred on its face by California's litigation privilege, Civil Code § 47(b). Toberoff Decl., Ex. I at 20-21.

- DC's Fifth Claim is equally meritless as a matter of law. This claim alleges interference by Toberoff with DC's purported "prospective economic advantage" – namely, a proposed settlement agreement between DC and the Siegels over the Siegel Terminations. This claim, like the Fourth Claim, is squarely barred by California's litigation privilege, as the sole basis of the cause of action is Toberoff's alleged solicitation of his clients in the *Siegel* cases. Moreover, this claim is also barred by the two-year statute of limitations applicable to tortious interference claims, based on matters of

60

EXHIBIT E
127

1    public record, subject to judicial notice.  Toberoff Decl., Ex. I at 21-25.

2  •    DC's Sixth Claim under California unfair competition laws is preempted by

3    the Copyright Act, as it is expressly based on and incorporates DC's

4    allegations of purported violations of the Copyright Act, and does not contain

5    an "extra element" that "makes the right asserted qualitatively different from

6    those protected under the Copyright Act."  *Altera Corp. v. Clear Logic, Inc.*,

7    424 F.3d 1079, 1089-90 (9th Cir. 2005).  *See* Toberoff Decl., Ex. K at 9-12.

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS

EXHIBIT E
128