# EXHIBIT A

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

September 8, 2010

OUR FILE NUMBER
905,900-321

WRITER'S DIRECT DIAL
(310) 246-6850

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

**<u>VIA E-MAIL AND U.S. MAIL</u>**

Richard Kendall
Kendall Brill & Klieger LLP
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California 90067

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 2720
Los Angeles, California 90067

Re:    <u>*DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)</u>

Dear Counsel:

As we discussed during our September 2 conference call, your recently served motion for a protective order staying depositions substantially overlaps the issues raised in our earlier motion to initiate discovery and, therefore, we believe it makes sense for these two motions to be heard together.

Based on our prior communications, it appears defendants will not be producing documents as part of their repsonses to our outstanding document demands, due September 17. This will necessitate a motion to compel, which we intend to file promptly after receipt of your repsonses.

As we previously proposed, in the interest of decreasing the burden on the Court and the parties, we intend to ask Magistrate Zarefsky to hear these three interrelated discovery motions on October 25. In the interim, we will postpone the depositions noticed to a date in late October or early November. This will not affect the current briefing schedule, according to which we will serve you with our opposition to your motion for a protective order staying depositions tomorrow and file a supplemental memorandum in support of our motion to initiate discovery on September 13. Nor will this affect the schedule on your first protective order motion, which can be heard as scheduled.

O'MELVENY & MYERS LLP
September 8, 2010 - Page 2


   Please let us know by the end of the day Friday whether you agree to continuing both our motion to initiate discovery and your motion for a protective order to stay depositions to October 25 (currently an open date).  If not, we will file an *ex parte* application with Magistrate Zarefsky next week.



        Very truly yours,


        Daniel M. Petrocelli
        of O'MELVENY & MYERS LLP

# EXHIBIT B

**K** Kendall Brill Klieger

writer's direct:
310.272.7922
lbrill@kbkfirm.com

September 10, 2010

<u>**VIA ELECTRONIC MAIL**</u>

Daniel Petrocelli
O'Melveny and Myers, LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
*dpetrocelli@omm.com*

Re:    DC Comics v. Pacific Pictures Corp.

Dear Dan:

Now that DC has filed a First Amended Complaint, there are a variety of scheduling issues to be addressed.  We would like to set up a time to meet and confer with you regarding the schedule in general.  We propose Tuesday, September 14 at 3:00 p.m.

In the meantime, we do have some concerns about your proposal.  First, at the time you filed your motion to initiate discovery, your position was that it was urgent to have depositions begin the first week in October.  You refused to change these dates in the meet and confer process, despite the fact that we told you repeatedly that the motion was premature.  You then served the motion and forced us to respond, at substantial expense to our client.  One of the primary bases for our opposition was that the depositions should not go forward, if at all, until after the hearing on dispositive motions.  Your new proposal, under which the depositions would not move forward until shortly after the date originally scheduled for dispositive motions, in essence acknowledges that our timing objection was appropriate, that you never needed depositions during the first week of October and therefore that your motion to initiate discovery need never have been filed.  In addition to your own motion, your refusal to push back the deposition dates forced us to file a motion for a protective order for a hearing on October 4, imposing additional significant expense.  While we are pleased that you now see that we were right that there was no need for you to have these depositions prior to the hearing on dispositive motions, your intransigence as to deposition dates imposed significant costs that were entirely unnecessary.

Now that you did force us to respond, however, there is substantial benefit in having these motions heard as planned, because having Judge Zarefsky's views on whether discovery should go forward while dispositive motions are pending will help to avoid the need for yet additional briefing on similar issues in connection with the motion to compel that you say you are planning.  The matter is set for hearing on September 20 because you said it was critical to you to have it heard at the same time as our motion for a protective order regarding the Toberoff Timeline, and we do not think it is appropriate to put off a decision on the issues of the effect of the Anti-SLAPP motion or the pendency of the 12(b)(6) motions so that there can be three motions on these issues instead of two.

**Kendall Brill & Klieger LLP**
10100 Santa Monica Blvd.  Suite 1725  Los Angeles, CA 90067  telephone 310.556.2700  facsimile 310.556.2705  www.kbkfirm.com

**007**

Kendall Brill & Klieger LLP

September 10, 2010
Page 2

Another problem with your proposal is that it does not address the fact that you have now made Jean Peavy a party to the suit. Defendants have not filed a motion for a protective order as to her deposition because there was never a proper subpoena served. Defendants should not have to file yet another discovery motion to address Ms. Peavy when the principles we expect the Court to establish on September 20 in response to your motion to initiate discovery will likely be applicable to her as well, and it would be incredibly wasteful for the parties and the Court to have to hear four overlapping motions instead of the single motion that is set for hearing at your insistence on September 20.

A further difficulty with your proposal is that it would require us to prepare and file a completely new motion for protective order, even setting aside the issue of Jean Peavy. One of the main issues addressed in our currently pending motion for a protective order is that the depositions should not go forward until after the resolution of dispositive motions. Since you are now agreeing that, at the very least, there is no need for depositions prior to the hearing on these motions, we would not wish to present briefing to the Court that focuses on this issue. We would therefore have to prepare and refile a completely different motion. This will impose additional burden and expense on us, and likely cannot be done on the timetable you propose.

In addition, your proposal would create a large and unnecessary burden on Magistrate Judge Zarefsky, who would be forced to prepare for and hear motions on issues that may be entirely mooted or narrowed by the resolution of the dispositive motions. Since you do not need the depositions before those motions are heard, there is no good reason not to wait until after that hearing and then meet and confer on the appropriate scope of discovery. Once we know which, if any, aspects of the complaint survive, both sides will be in a far better position to assess these issues.

As we have made clear, we are willing to work with you on an overall schedule, including the potential for expedited discovery after dispositive motions are resolved. Your current proposal to postpone the depositions until late November or early October, however, shows that you never needed the early October depositions in the first place, and it makes little sense to preemptively schedule  depositions at the end of October or early November, either, or to require ongoing motion practice concerning discovery until the dispositive legal issues in the case have been resolved. As we have consistently made clear, we would be willing to discuss an arrangement under which the depositions you have proposed are taken off calendar, with the parties promptly meeting and conferring after the hearing on the dispositive 12(b)(6) motions and the Anti-

Kendall Brill & Klieger LLP

September 10, 2010
Page 3


SLAPP motion, in an effort to resolve any disputes concerning the depositions.  Please let us know if you are amenable to such an arrangement.

Sincerely,

Laura W. Brill

cc:    Richard Kendall
       Marc Toberoff

# EXHIBIT C

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

September 13, 2010

OUR FILE NUMBER
905,900-321

**VIA E-MAIL AND U.S. MAIL**

WRITER'S DIRECT DIAL
(310) 246-6850

Laura Brill
Kendall Brill & Klieger LLP
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 2720
Los Angeles, California 90067

Re:    *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Counsel:

We disagree with the positions in your September 10 letter and, as previously advised, will not engage in the wasteful exercise of responding to self serving, inaccurate communications.  As for the request to meet and confer about your proposal, we already apprised you the proposal was not reasonable.  We will proceed with the *ex parte* application.

Very truly yours,

Daniel M. Petrocelli
of O'MELVENY & MYERS LLP

**011**

# EXHIBIT D

Kendall Brill Klieger

writer's direct:
310.272.7922
lbrill@kbkfirm.com

September 13, 2010

**<u>VIA EMAIL</u>**

Daniel Petrocelli
O'Melveny and Myers, LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
*dpetrocelli@omm.com*

Re:    <u>DC Comics v. PPC</u>

Dear Dan:

I write to follow up on your letter to Mr. Toberoff and me of earlier today.

The meet and confer that I proposed in my letter to you of September 10 is for the purpose of discussing adjustments to each side's proposals that would permit the parties, in a spirit of compromise, to achieve an agreement that satisfies most, if not all, of their concerns.  It is not appropriate for DC Comics to burden the Court with an *ex parte* application while declining our invitation to meet and confer.

If you do move forward with your *ex parte* application, please inform the Court that Defendants object to the schedule proposed in your September 8, 2010 letter and intend to file an opposition. Please also include this letter and my September 10 letter as part of your *ex parte* application so that the Court will be able to appreciate the nature of our objections.

Thank you in advance for your cooperation.

Sincerely,

Laura W. Brill

cc:    Richard Kendall
       Marc Toberoff

**Kendall Brill & Klieger LLP**
10100 Santa Monica Blvd.  Suite 1725  Los Angeles, CA 90067  telephone 310.556.2700  facsimile 310.556.2705  www.kbkfirm.com

013

# EXHIBIT E

1

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JOANNE SIEGEL,            )
     LAURA SIEGEL LARSON       )      ORIGINAL
 5                             )
                  Plaintiffs,  )
 6                             )
          v.                   )   CASE NO. CV 04-8400
 7                             )           CV 04-8776
     WARNER BROS, et al.       )
 8                             )
                  Defendants.  )
 9

10

11

12

13          DEPOSITION OF JEAN ADELE PEAVY
               November 11, 2006
14                 1:26 p.m.
              317 Paseo de Peralta
15             Santa Fe, New Mexico

16

17       PURSUANT TO THE FEDERAL RULES OF CIVIL
     PROCEDURE, this deposition was:

18   TAKEN BY:  MR. PATRICK PERKINS
                Attorney for the Defendants
19

20

21

22   REPORTED BY:  MABEL JIN CHIN, NM CCR #81
                   Bean & Associates, Inc.
23                 Professional Court Reporting Service
                   500 Marquette, Northwest, Suite 280
24                 Albuquerque, New Mexico 87102

25   (3520B) MC
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2

1                    A P P E A R A N C E S

2

3    For the Plaintiffs:

4          MR. MARC TOBEROFF
           2049 Century Park East, #2720
5          Los Angeles, California 90067

6    For the Defendants:

7          PERKINS LAW OFFICE, P.C.
           1711 Route 9D
8          Cold Spring, New York 10516
           BY:  MR. PATRICK PERKINS
9

10   ALSO PRESENT:   MS. MARGO MOIR, Videographer

11

12                      I N D E X

13   EXAMINATION OF JEAN ADELE PEAVY

14   By Mr. Perkins                                3

15   CERTIFICATE OF COMPLETION OF DEPOSITION      38

16   WITNESS SIGNATURE/CORRECTION PAGE            40

17

18        EXHIBITS MARKED OR FORMALLY IDENTIFIED

19   12.  Subpoena in a Civil Case                5

20   13.  April 27, 1999 letter, Peavy to Levitz  12

21   14.  August 21, 1992 note, Peavy to Paul     18

22   15. September 10, 1992 letter, Frank to Paul  24

23   16.  August 1, 1992 letter, Levitz to Frank  25

24   17.  March 31, 2001 letter, Jean to Joanne   28

25



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

046

3

```
 1                    JEAN ADELE PEAVY,
 2       after having been first duly sworn under
 3       oath, was questioned and testified as follows:
 4                       EXAMINATION
 5   BY MR. PERKINS:
 6       Q.    Good afternoon, Mrs. Peavy.  My name is
 7   Patrick Perkins.  I am a lawyer for DC Comics and
 8   other Warner Brothers entities.  I represent DC Comics
 9   in a lawsuit that was filed in the United States
10   District Court in California by Joanne Siegel and
11   Laura Siegel Larson.  The lawsuit involves copyright
12   rights relating to the Superman character, and you
13   have been subpoenaed in this case to give testimony
14   because we believe you have information that might be
15   relevant to the case.
16            Mrs. Peavy, have you ever had your
17   deposition taken before?
18       A.    No.
19            MR. TOBEROFF:  Before we go further, I just
20   wanted to add, in the other one, Warren, the
21   deposition, you had mentioned that there were two
22   lawsuits and that one concerned Superman, the other
23   concerned Superboy, and correctly that they have been
24   consolidated for purposes of discovery.
25       Q.    I may be asking you certain questions, and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492
e-mail: info@litsupport.com

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492

13

1  Do you see that?

2      A.    Oh, yes.

3      Q.    Did you, in fact, receive a copy of that

4  from Paul Levitz?

5      A.    Oh, yes.  Yes.

6      Q.    And the next sentence says, "I had such a

7  feeling of nostalgia looking at the drawings"?

8      A.    Oh, yes.  Yes.  I wrote that.  I wrote

9  that.  I remember that.

10      Q.    Okay.

11      A.    Okay.  I remember that.

12      Q.    All right.  And have you read this book, by

13  any chance?  Have you read the novel or did you just

14  look at it?

15      A.    No, I didn't.  I just looked at the

16  pictures.

17      Q.    Okay.  Now, at some point in the 1940s

18  Mr. Shuster joined Jerry Siegel and filed a lawsuit

19  against -- against National Periodicals or some other

20  entities that they were working with.  Do you recall

21  that?

22      A.    Uh-huh.

23      Q.    Were you close to --

24            MR. TOBEROFF:  Excuse me.  Did you mean to

25  say -- did you say 1960s or '70s?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport048

14

1    MR. PERKINS:  I said 1940s.

2    MR. TOBEROFF:  Oh, 1940s.

3    THE WITNESS:  '47, I believe or '48.

4    MR. PERKINS:  1947.

5    MR. TOBEROFF:  Sorry.  Sorry.

6    MR. PERKINS:  That's all right.  Wrong

7    lawsuit.

8    Q.   (By Mr. Perkins)  Were you close to Joe at

9    the time that that happened?

10    A.   Yes.  In the '40s I was.

11    Q.   Do you recall --

12    A.   Yes.

13    Q.   Did Joe tell you anything about that

14    lawsuit?

15    A.   I think that he -- that they felt that they

16    were weren't being compensated for their contribution

17    to a character that was making hundreds of millions of

18    people happy, and they weren't getting their due

19    compensation.  That's what I -- I'm aware of.

20    Q.   Did he ever talk to you about any of the

21    details of the lawsuit?

22    A.   No.

23    Q.   Did he ever talk to you about --

24    A.   Oh, well, I know that it kept going on and

25    on and on and on, I know that.  And we thought when is

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    this ever going to be settled.  I remember that.

2        Q.    Okay.

3        A.    And very unhappy.  My poor brother, he was

4    -- he was poor.  And -- you know, and here is a

5    character that's making other people rich and he is

6    not -- doesn't have enough money.

7        Q.    Now --

8        A.    The same with Jerry, too.

9        Q.    Now, the case that took place in the

10   1940s --

11       A.    Uh-huh.

12       Q.    -- did he ever talk to you about what the

13   case -- what kind of claims there were in the case?

14   Did he ever talk to you about anything like that?

15       A.    I don't think I know the claim itself.

16       Q.    Okay.  Did your brother ever talk to you

17   about the character Superboy?

18       A.    Um -- no, not Joe.  Not Joe, no.

19       Q.    He never did?

20       A.    No.

21       Q.    Okay.  Now, your brother had another lawsuit

22   in the late 1960s that he had.

23       A.    Uh-huh.

24       Q.    Do you recall -- do you recall that?

25       A.    Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

16

1    Q.    And do you recall what that lawsuit was

2    about?

3    A.    Oh, here they were a couple of the creators

4    of Superman living in poverty.  They were destitute.

5    They were really desperate.

6    Q.    Did Mr. Shuster talk to you about why they

7    brought the lawsuit?

8    A.    I think they wanted some compensation.

9    Q.    Now, did they end up ever getting any

10   compensation?

11   A.    Not then.

12   Q.    When -- when did they end up getting

13   compensation?

14        MR. TOBEROFF:  Vague and ambiguous, calls

15   for a narrative.

16   A.    Much later.  I was married by then, and

17   raising kids, and I didn't keep as much -- track of

18   anything legal at all.

19   Q.    When you were -- are you aware that in the

20   1970s Mr. Shuster entered into an agreement with

21   Warner Communications for some compensation to him?

22   A.    Yes.  I think there was something going on I

23   read.  Yes.

24   Q.    Were you close to him at that time?

25   A.    No.  I was married and raising two kids, and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

17

```
 1  he -- yes.  I was living in Texas then, so --

 2       Q.    In El Paso?

 3       A.    Yes.

 4       Q.    And were you estranged at all?

 5       A.    Oh, no.

 6       Q.    Okay.

 7       A.    No.  No.  He -- he called me on the phone,

 8  he is interested in the kids, you know, about Warren

 9  and Dawn and my husband and me and how we were getting

10  along and, you know, not too well and, you know -- I

11  mean -- no, we had a happy family life, but I mean,

12  financially we weren't doing as good as we would have

13  liked.

14       Q.    Do you -- did you at any time have an

15  understanding as to how much money Mr. Shuster was

16  receiving in this deal that he entered into with

17  Warner Communications?

18       A.    No.

19       Q.    Were you aware that the deal also provided

20  for certain monies to be paid to your other brother,

21  Frank --

22       A.    Uh-huh.

23       Q.    -- under that agreement?

24       A.    Uh-huh.

25       Q.    And do you recall how much he was to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

1   receive?

2       A.   I don't remember.

3       Q.   You don't remember.

4       A.   Originally 5,000 -- I don't even remember.

5       Q.   At some point did you become aware that

6   Joanne Siegel -- well, strike that.  Who was Joanne

7   Siegel?

8       A.   Jerry's wife.

9       Q.   Okay.  And at some point did you become

10  aware that Joanne Siegel was acting as an agent for

11  your brother?

12      A.   Yes.  I think -- -- you know, Joe would --

13  when I talked to him on the phone he would always say

14  Joanne was handling it.  That's all I know.  Joanne

15  was handling it.

16      Q.   Did you ever come to learn whether Joanne

17  was charging Joe anything for that?

18      A.   I don't know.

19           (Exhibit 14 marked.)

20      Q.   I have asked the court reporter to mark a

21  document, multipage document as Exhibit 14.

22           MR. TOBEROFF:  Am I correct that this

23  basically has no Bates stamps, that prior to this

24  deposition this has never been produced?

25           MR. PERKINS:  No.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          MR. TOBEROFF:  It has been produced?

2          MR. PERKINS:  Yes.

3          MR. TOBEROFF:  Okay.

4          THE WITNESS:  Okay.

5      Q.   (By Mr. Perkins)  Do you recall writing this

6  note?

7      A.   Yes.

8      Q.   And who is the Paul that's referenced in

9  this note?

10     A.   Well, I am writing to Paul Levitz.

11     Q.   And this is your handwriting; correct?

12     A.   Yes.

13     Q.   Okay.  The next page there is a typed letter

14  that begins -- to a Mr. Marty Payson?

15     A.   Uh-huh.

16     Q.   Who was Marty Payson?

17     A.   Oh, if I recall he was the -- was the

18  treasurer then or something?  He was some executive

19  there.

20     Q.   Did you have direct contact with him at all?

21     A.   Never.

22     Q.   If I could ask you to look at the second to

23  last page of this letter, is that your signature?

24     A.   Yes.

25     Q.   Okay.  Now, this was written or is dated

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

20

```
 1   August 21, 1992?
 2        A.    Uh-huh.
 3        Q.    Which is less than a month after your
 4   brother Joe died; correct?
 5        A.    Yes.   Uh-huh.
 6        Q.    And do you recall why this letter was sent?
 7        A.    Um -- well, wait a minute.   I --
 8             MR. TOBEROFF:   Why don't you take your time
 9   and read it?
10             MR. PERKINS:   Take a minute and read the
11   letter.
12             MR. TOBEROFF:   I would read the whole
13   letter.
14             THE WITNESS:   We --
15             MR. TOBEROFF:   Wait.   I would read the whole
16   letter before you answer about the document.
17             THE WITNESS:   Oh.
18             MR. TOBEROFF:   Just take your time.
19             THE WITNESS:   Yes, Joe -- estate almost
20   nothing -- that's right.
21             Okay.   Yes.   I remember that now, yes.
22        Q.    (By Mr. Perkins)  What was the purpose of
23   writing this letter to Marty Payson?
24        A.    I had to appeal for help, financial help.
25        Q.    Did you receive any help as a result?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

21

1    A.    Yes.  They took care of everything.

2    Q.    Did -- and when you say they took care of

3  everything, what do you mean?

4    A.    Well, I mean, I think they -- whatever had

5  to be paid they paid.

6    Q.    Now, at page 2 of the letter -- so it's the

7  third page of that document, in the second paragraph?

8    A.    Second page, yes.

9    Q.    I will read to you in the second paragraph

10  beginning the third sentence, "We also found out" --

11  I'm sorry, "We also found that over $1,200 a month was

12  being paid to Joanne Siegel for some kind of

13  commission for including him in the pay raise.  It

14  appears that for quite a few years she has been taking

15  20 percent of his income as an agent's commission for

16  getting pay raises for Siegel and Shuster."  Do you

17  see that?

18    A.    Yes.  Yes.

19    Q.    Had you known this --

20    A.    I didn't.

21    Q.    -- before you wrote the letter?

22    A.    No, I didn't know it before.

23    Q.    And what was your reaction to this when you

24  found out?

25        MR. TOBEROFF:  Vague and ambiguous.  You can



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

22

1   answer.  Calls for a narrative.

2       A.    She was always handling the business.

3   That's all I know.  She was putting herself out

4   handling the business.

5       Q.    And did you ever ask her about this 20

6   percent that she was receiving from Joe?

7       A.    When they -- when I was in Joe's apartment

8   and Jerry and Joanne came over, yes, and we talked

9   about it.

10      Q.    And do you --

11      A.    Sorry.  Now I do recall about it, yes.

12      Q.    Do you recall what was said during that

13  conversation?

14      A.    Well, no.  I thought it was okay then

15  because, you know, understanding how Joanne had worked

16  for -- you know, to help Joe along with Jerry, then --

17  before that -- I wrote this letter before and I didn't

18  realize until I talked to Joe, Joanne and Jerry, as to

19  why it was okay.

20      Q.    And what was your understanding as to what

21  was being done to earn that money?

22      A.    She -- she had worked to get a higher pay

23  raise, I guess.

24      Q.    And do you remember how much Joe was

25  receiving by the time he died?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

23

```
 1        A.   No, I have no idea.

 2        Q.   You don't remember?

 3             At some point -- strike that.

 4             Was -- was -- after Joe died was your

 5   brother Frank still receiving money from Warner

 6   Communications?

 7        A.   Yes.

 8        Q.   Do you remember how much?

 9        A.   Huh-uh.  No, I don't think I remember how

10   much.

11        Q.   Do you recall having any discussions with

12   either Paul Levitz or anyone else about an amount of

13   money that would continue to be paid to Frank?

14        A.   To Frank, yes.  Yes.

15        Q.   Do you recall how much that was?

16        A.   Yes.  I think it was 25,000.

17        Q.   Per year?

18        A.   Yes.

19        Q.   And who was to receive that money?

20        A.   My brother, Frank.

21        Q.   And was the money paid to Frank or to you?

22        A.   Oh, no.  No.  To Frank.

23        Q.   And when he died, who then began -- did you

24   begin receiving that money?

25        A.   Yes.  yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

25

```
 1   payments were made to you instead of to your brother?
 2       A.   Yes.
 3       Q.   Were they, in fact, made to you?
 4       A.   Uh-huh.
 5            MR. TOBEROFF:  Wait a moment for me to
 6   object.
 7            THE WITNESS:  Okay.
 8            MR. TOBEROFF:  Also, let him finish the
 9   question before you answer --
10            THE WITNESS:  Okay.
11            MR. TOBEROFF:  -- even though you think you
12   know what he is asking --
13            THE WITNESS:  Okay.
14            MR. TOBEROFF:  -- let him finish the
15   question.
16            THE WITNESS:  Uh-huh.
17            MR. TOBEROFF:  You are doing fine.
18            THE WITNESS:  Uh-huh.
19            (Exhibit 16 marked.)
20            THE WITNESS:  Okay.
21       Q.   (By Mr. Perkins)  All right.  I have had the
22   court reporter mark as Exhibit 16 a two-page
23   document.  I have -- I have copied them together.
24   They really don't go together, I'm sorry about that.
25   Actually, you may even take off the back page.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

26

1      MR. TOBEROFF:  Just the page 1 we should

2   keep?

3      MR. PERKINS:  Yes.

4      MR. TOBEROFF:  I'll do it for you.

5      THE WITNESS:  All right.

6      MR. PERKINS:  The other one doesn't -- it's

7   not very --

8      Q.  (By Mr. Perkins)  Did you -- is this your

9   signature at the bottom of the page?

10      A.  Yes.  Uh-huh.

11      Q.  Did you review this document before you

12   signed it?

13      A.  I probably glanced at it, yes.

14      Q.  Now, in the agreement, the second full

15   paragraph, the last sentence says, quote, "In any

16   event, you now grant to us any such rights and release

17   us" -- let me try that again.

18       "In any event, you now grant to us any such

19   rights and release us, our licensees and all others

20   acting with our permission, and covenant not to assert

21   any claim of right, by suit or otherwise, with respect

22   to the above, now and forever."

23       In the following paragraph it states, and I

24   quote, "If, despite the terms of this agreement,

25   either of you assert any such claim of right, for any

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

27

1    reason, you agree to refund to us, upon the making of

2    any such assertion, all amounts previously paid to you

3    hereunder, and we will have no obligation to make any

4    further payments under this agreement," period, closed

5    quote.  Do you see that?

6        A.    Yes.

7        Q.    Do you remember reading that when you signed

8    this document?

9        A.    I probably read it but I -- you know, I was

10    -- I was listening to my brother Frank at the time, so

11    I wasn't paying much attention.  I was depending upon

12    him to, you know, tell me if I should sign it.  So --

13        Q.    Do you have an understanding as to what this

14    second to last paragraph means?

15            MR. TOBEROFF:  Calls for a legal conclusion.

16    You can answer.

17        A.    Yes.  I -- I don't -- I don't have any claim

18    if that's what -- yes.

19        Q.    Well, the first sentence of the second to

20    the last paragraph says that if either of you assert

21    any such claim of right for any reason, you agree to

22    refund to us, upon the making of any such assertion,

23    all amounts previously paid to you hereunder.  Do you

24    see that?

25        A.    Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

28

1    Q.    Now, to your knowledge, had you made any

2  claim to --

3    A.    Huh-uh.

4    Q.    -- own or to be able to recapture the

5  copyrights of your brother, Joseph Shuster?

6        MR. TOBEROFF:    Objection, calls for a legal

7  conclusion, vague and ambiguous.    You can answer the

8  question if you understand it.

9    A.    Yes.   No, I haven't made any claim.

10    Q.    Are you aware as to whether or not the

11  estate of your brother has made any claim?

12    A.    My son handles everything legal, so I

13  don't -- I don't know what's going on there.

14    Q.    Okay.

15        (Exhibit 17 marked.)

16    Q.    I have asked the court reporter to mark as

17  Exhibit 17 the document, one-page document appears to

18  be a letter that bears Bates number 53 on it.

19    A.    Uh-huh.   Um.   Okay.   I remember that.

20    Q.    Did you -- is this -- did you write this

21  letter?

22    A.    Uh-huh.

23    Q.    And this is your signature at the bottom?

24    A.    Yes.   Yes.

25    Q.    Do you have regular contact with Joanne

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

31

1      Q.    Okay.  When you referred to injustice being

2   done, what were you referring to?

3      A.    Well, over the years they were not

4   compensated for -- for their creation, so that's the

5   injustice.

6      Q.    That's what you're referring to?

7      A.    Yes.

8      Q.    Was there any other injustice that you are

9   referring to?

10      A.    No.

11      Q.    And you mentioned that you never talk

12   business with Joanne Siegel?

13      A.    Huh-uh.

14      Q.    Have there been ever any instances --

15           MR. TOBEROFF:  I think that

16   mischaracterizes -- I believe it mischaracterizes the

17   testimony, but that's okay.

18      A.    Well, I mean, I knew she had had a lawyer.

19      Q.    Okay.

20      A.    But I mean, I didn't know any of her

21   dealings with -- with whatever was going on with her

22   personal -- her personal case.  We never talked about

23   her personal case, that's what I mean.

24      Q.    Do you recall when -- when you first met

25   Mr. Toberoff?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport

033

32

1    A.    Uh-huh.

2    Q.    When was that?

3    A.    Um -- 2001, about the middle of 2001

4 sometime.

5    Q.    And earlier today your son indicated that

6 Mr. Toberoff's name was given to Joanne Siegel?

7    A.    Uh-huh.

8    Q.    And he thought that you had been the one to

9 communicate that?

10    A.    I told her about him.

11    Q.    Do you recall when you did that?

12    A.    Maybe about a year later, after -- after we

13 had, I don't know, Marc Toberoff as our counsel, and

14 she was unhappy with or she was -- she was unhappy

15 with her lawyer.

16    Q.    What did she tell you about being unhappy

17 with her lawyer?  What did she tell you?

18    A.    Well, he -- the case -- her case wasn't

19 moving.

20    Q.    And was that the only thing that she

21 expressed to you was making her unhappy?

22    A.    Yes, I think so.  Nothing was happening, as

23 far as I know.  So I told her -- I thought that Marc

24 Toberoff would -- we liked him very much, and we -- we

25 felt he was very ethical, very knowledgeable, very

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

33

1    intelligent.   And so we -- I -- I on the telephone, I

2    suggested that she get in touch with him.

3        Q.    Okay.  Do you recall whether she -- did she

4    ever tell you that she did that?

5        A.    Oh, yes, she did.

6        Q.    What did she tell you?

7        A.    Oh, she told me that she called him and that

8    they -- they had a luncheon.  I guess they met for

9    lunch or something.  She and Laura and Mr. Toberoff

10   met for lunch in LA.

11       Q.    And what did she tell you about that

12   meeting?

13       A.    I -- she asked him a lot of questions and

14   she liked him a lot.

15       Q.    Did she tell you what questions she asked

16   him?

17       A.    No.  No.

18       Q.    Did she tell you why she liked him?

19       A.    She thought he was smart, ethical.  She got

20   good vibrations about him and so did I.  So --

21           MR. TOBEROFF:  Thank you.

22       Q.    I was going to say, what's not to like?

23           MR. TOBEROFF:  I'm not -- I'm not allowed

24   to --

25           If you wake up every morning after talking

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

34

```
 1    to the defendants to see if there are horns growing
 2    out of my head.
 3        Q.    (By Mr. Perkins)  Mrs. Peavy, do you recall
 4    signing any agreements with any of Mr. Toberoff's
 5    companies?
 6        A.    Yes, I guess we did.  Companies or with
 7    Mr. Toberoff?
 8        Q.    Did you get legal counsel with respect to
 9    whether or not to sign those agreements?
10        A.    We couldn't afford any legal counsel so,
11    no.  I just had a good feeling -- we just had a good
12    feeling about him.
13        Q.    Okay.  Do you recall in any of those
14    agreements that you signed how much Mr. Toberoff would
15    receive in connection with whatever income you
16    received from Superman?
17        A.    No.  We went in as partners, as far as I
18    know.
19        Q.    And when you say partners, what do you --
20        A.    Well, I mean, we couldn't afford anything,
21    so --
22        Q.    So by that you mean a 50-50 partnership?  Is
23    that what you were saying?
24        A.    Yes.
25        Q.    In 2005, were you -- did you receive a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

36

1    Q.    Are you aware that DC Comics had offered to
2    pay you two million dollars?
3    A.    Yes.    I think he might have mentioned that,
4    yes.
5         MR. PERKINS:    I just want to take a quick
6    break.
7         (A recess was taken.)
8    Q.    (By Mr. Perkins)    I wanted to go back to
9    something that counsel said regarding Exhibit 14.
10   Exhibit 14 was produced.    The Bates numbers are DCC
11   6476 through 6479.    That I have with me.    I don't
12   have --
13        MR. TOBEROFF:    I'm sorry, 6476 through 6479?
14        MR. PERKINS:    That's right.    It's actually a
15   more complete document that's produced that has the
16   actual receipts and bills that go with it.
17        MR. TOBEROFF:    Oh, okay.
18        MR. PERKINS:    So it goes all the way through
19   6494.    As for the handwritten letter, I don't have it
20   with me but, you know, my recollection is that was
21   also produced.
22        MR. TOBEROFF:    Okay.    If I am wrong I take
23   back what I said.
24        MR. PERKINS:    Mrs. Peavy, I have no further
25   questions for you.    Thank you so much for coming

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

37

1    today.   It was a pleasure meeting you.

2            THE WITNESS:   Oh, thank you very much.

3    Okay.   So that's all?

4            MR. PERKINS:   That's it.

5            (The deposition concluded at 2:33 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL,                    )
LAURA SIEGEL LARSON              )
                                 )
            Plaintiffs,          )
                                 )
      v.                         )  CASE NO. CV 04-8400
                                 )           CV 04-8776
WARNER BROS, et al.              )
                                 )
            Defendants.          )

CERTIFICATE OF COMPLETION OF DEPOSITION

    I, MABEL JIN CHIN, New Mexico CCR #81, DO HEREBY
CERTIFY that on November 11, 2006, the deposition of
JEAN ADELE PEAVY was taken before me at the request
of, and sealed original thereof retained by:

        Attorney for the Defendants
        PERKINS LAW OFFICE, P.C.
        1711 Route 9D
        Cold Spring, New York 10516
        BY:  MR. PATRICK PERKINS

    I FURTHER CERTIFY that copies of this certificate
have been mailed or delivered on _____, with
changes, if any, by the witness appended, to the
following counsel of record and parties not
represented by counsel:

        Attorney for the Plaintiffs
        MR. MARC TOBEROFF
        2049 Century Park East, #2720
        Los Angeles, California 90067

    I FURTHER CERTIFY that examination of this
transcript and signature of the witness were requested
by the witness and all parties present.

    On _November 20, 2006_, a letter was mailed or
delivered to Mr. Toberoff regarding obtaining
signature of the witness.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


DEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

39

1    I FURTHER CERTIFY that the recoverable cost of the
original and one copy of the deposition, including
2    exhibits to Mr. Perkins is $___268.49___.

3    I FURTHER CERTIFY that I did administer the oath
to the witness herein prior to the taking of this
4    deposition; that I did thereafter report in
stenographic shorthand the questions and answers set
5    forth herein, and the foregoing is a true and correct
transcript of the proceeding had upon the taking of
6    this deposition to the best of my ability.

7    I FURTHER CERTIFY that I am neither employed by
nor related to nor contracted with (unless excepted by
8    the rules) any of the parties or attorneys in this
case, and that I have no interest whatsoever in the
9    final disposition of this case in any court.

10

11    _____
MABEL JIN CHIN
12    Certified Court Reporter #81
License expires:  12/31/2006
13

14

15

16

17

18

19

20    (3520B) MC
Date taken:  November 11, 2006
21    Proofread by: LR

22

23

24

25



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

# EXHIBIT F

COPY

1  DANIEL M. PETROCELLI (S.B. #97802)
     dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
     mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
     cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA 90067-6035
   Telephone: (310) 553-6700
6  Facsimile: (310) 246-6779

7  Attorneys for Plaintiff DC COMICS

8  (continued on next page)

FILED
CLERK, U.S. DISTRICT COURT

SEP - 3 2010

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

9
10                  **UNITED STATES DISTRICT COURT**

11                  **CENTRAL DISTRICT OF CALIFORNIA**

12  DC COMICS,                          | Case No. CV 10-3633 ODW (RZx)

13              Plaintiff,              | **FIRST AMENDED COMPLAINT FOR**:

14       v.                            | (1)  Declaratory Relief re: Invalidity of
                                       |      Copyright Termination Notice;
15  PACIFIC PICTURES
    CORPORATION, IP                    | (2)  Declaratory Relief re: Scope of
16  WORLDWIDE, LLC, IPW, LLC,          |      Copyright Termination Notice;
    MARC TOBEROFF, an individual,
17  MARK WARREN PEARY, as              | (3)  Declaratory Relief re: DC Comics
    personal representative of the     |      Period of Exclusivity re: Shuster;
18  ESTATE OF JOSEPH SHUSTER,
    JEAN ADELE PEAVY, an               | (4)  Interference with 1992 Shuster
19  individual, JOANNE SIEGEL, an      |      Agreement;
    individual, LAURA SIEGEL
20  LARSON, an individual, and DOES    | (5)  Interference with Prospective
    1-10, inclusive,                   |      Economic Advantage re: Siegel-
21                                     |      DC Comics Agreement; and
              Defendants.
22                                     | (6)  Declaratory Relief re: Invalidity of
                                       |      Copyright Assignment and
23                                     |      Consent Agreements

24                                     | **DEMAND FOR JURY TRIAL**

25                                     | **Hon. Otis D. Wright II**

26

27

28

FIRST AMENDED COMPLAINT

1  (continued from previous page)

2  PATRICK T. PERKINS (admitted *pro hac vice*)
3     pperkins@ptplaw.com
   PERKINS LAW OFFICE, P.C.
4  1711 Route 9D
   Cold Spring, NY 10516
5  Telephone:  (845) 265-2820
   Facsimile:   (845) 265-2819
6

7  Attorneys for Plaintiff DC COMICS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT

1  (continued from previous page)

2  PATRICK T. PERKINS (admitted *pro hac vice*)
3     pperkins@ptplaw.com
   PERKINS LAW OFFICE, P.C.
4  1711 Route 9D
   Cold Spring, NY 10516
5  Telephone:  (845) 265-2820
   Facsimile:   (845) 265-2819
6

7  Attorneys for Plaintiff DC COMICS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT

# I.  <u>STATEMENT OF THE CASE</u>

1.      This lawsuit challenges a scheme by Marc Toberoff and companies under his control to violate the U.S. Copyright Act and other laws by trafficking in federal copyright interests and interfering with contractual rights and other interests of plaintiff DC Comics related to the iconic property "Superman."[1]  By this scheme, Toberoff has sought to enrich himself by wrongfully laying claim to purported rights to control the exploitation of Superman to the substantial detriment of DC Comics and in violation of rights it has held, significantly invested in, and expanded upon for over 70 years.  DC Comics brings this suit to confirm its rights to the Superman property and seek redress for the wrongful conduct of Toberoff and entities he controls.  This Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. §§ 1331, 1338, and 1367, under the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, and under the Court's supplemental jurisdiction.

2.      Under certain narrowly defined circumstances, the Copyright Act permits authors and specified heirs to terminate copyright grants and recapture those interests from the original grantees.  These provisions of the Copyright Act also protect original grantees—such as DC Comics—by confining termination rights to certain classes of individuals in a specified time frame and manner, limiting the types of works that may be terminated, and creating an exclusive statutory period during which only the original grantee may enter into new agreements with the author or heirs to continue creating new works under the recaptured copyrights.

3.      In derogation of these provisions of the Copyright Act and the rights of DC Comics, Toberoff and entities he controls orchestrated a web of collusive agreements concerning the Superman copyrights with the heirs to the co-creators of

---

[1] Throughout this introductory statement and in other parts of the Complaint, the term "DC Comics" is used as shorthand for both DC Comics and its predecessors in interest.  The specific identities of relevant corporate entities are identified *infra*.

FIRST AMENDED COMPLAINT

Superman, Jerome Siegel and Joseph Shuster. By these agreements, Toberoff purported to secure a majority and controlling financial stake in copyright interests in Superman assertedly held by the Siegel and Shuster heirs and to preclude the heirs from freely entering into new agreements with DC Comics for the continued exploitation of Superman. As detailed below, these agreements are unlawful under the copyright laws, are void as against public policy, and both violate DC Comics' rights and threaten the ongoing viability of the Superman property.

4.     During their lifetimes, Jerry Siegel and Joe Shuster—both well aware of the termination provisions in amendments to the Copyright Act—never once sought to terminate any of DC Comics' copyright interests, even though they could have attempted to do so as early as 1984. Instead, Siegel and Shuster rightly honored their agreements with DC Comics, under which they and their families enjoyed significant compensation, lifetime pensions, and other important benefits. After their deaths, Siegel and Shuster's heirs reached separate agreements with DC Comics—the Shuster heirs in 1992, and the Siegel heirs in 2001. These agreements provided the heirs substantial compensation and fully and finally resolved any claims of termination to any rights in Superman and confirmed that DC Comics owned all right, title, and interest in and to Superman.

5.     In or around 2001, Toberoff learned of these agreements between DC Comics and the Siegel and Shuster heirs and engineered a course of conduct to induce the heirs to repudiate those agreements and enter into new agreements with Toberoff and his companies netting him the controlling stake in the heirs' asserted interests in Superman.

6.     Toberoff induced the Shuster heirs to repudiate their 1992 agreement with DC Comics and enter into a 50/50 joint venture with defendant Pacific Pictures Corporation, a film-production company wholly owned and controlled by Toberoff, pursuant to which the heirs conveyed the entirety of their purported Superman copyright termination rights to the venture. The stated purpose of the

FIRST AMENDED COMPLAINT

1   venture was to secure and exploit DC Comics' copyright interest in Superman.

2   Toberoff procured this joint-venture agreement even though he knew that the

3   Shusters' 1992 agreement with DC Comics operated to grant any and all of the

4   heirs' interest in Superman to DC Comics and extinguish any termination rights the

5   heirs might have held. Toberoff also induced the Shuster heirs to serve a notice of

6   termination purporting to terminate and recapture the same alleged interests they

7   had granted to DC Comics under the parties' 1992 agreement. This termination

8   notice was invalid: among other defects, it was filed by a party lacking the

9   necessary majority interest to terminate. Furthermore, any putative right to

10  terminate held by Joe Shuster ceased to exist when he died having elected not to

11  exercise it during his lifetime and having died without leaving a surviving spouse,

12  child, or grandchild to inherit and exercise it.

13          7.      Toberoff similarly induced the Siegel heirs to repudiate their 2001

14  agreement with DC Comics. After years of negotiations following a copyright

15  termination notice sent by the Siegel heirs in 1997, DC Comics and the Siegel heirs

16  reached an agreement providing that DC Comics would retain all rights to

17  Superman and entitling the Siegels to receive a significant portion of the Superman

18  profits.

19          8.      Toberoff became aware of the existence of the 2001 agreement

20  between the Siegels and DC Comics and understood it diminished his stake in the

21  putative Superman rights held by his joint venture with the Shusters. In pursuit of

22  his plan to corner and control all potential Superman termination rights and thereby

23  block further exploitation of the property by DC Comics, Toberoff set out to derail

24  the 2001 Siegel agreement. Toberoff presented himself as a film producer and

25  falsely represented to the Siegels that if they repudiated their agreement with DC

26  Comics and entered into an agreement with him instead, a "billionaire investor"

27  was prepared immediately to pay the Siegels $15 million for their Superman rights,

28  plus a generous back-end profit participation in any future exploitations of the

FIRST AMENDED COMPLAINT

1    Superman property.  Toberoff also falsely represented that they would help the

2    Siegels produce their own Superman motion picture that would compete

3    successfully with a Superman motion picture that Warner Bros.—DC Comics'

4    licensee—was then developing.  Based on Toberoff's inducements, the Siegels

5    repudiated their 2001 agreement with DC Comics, terminated the employment of

6    their then-law firm Gang, Tyre, Ramer & Brown, and ultimately entered into

7    agreements with Toberoff and defendant IP Worldwide LLC, an entity controlled

8    by Toberoff.  Under these agreements, Toberoff and his company received a 45%

9    interest in any recovery by the Siegels—an 800% increase over the 5% fee in the

10    Siegels' agreement with the Gang Tyre firm.

11        9.    As a result of his arrangements with both the Shuster and Siegel heirs,

12    Toberoff secured control of the largest financial stake in the collective, putative

13    Superman termination rights (*i.e.*, Toberoff—47.5%; Siegel heirs—27.5%; Shuster

14    heirs—25%).  Toberoff sought further control, however.  In order to assert that DC

15    Comics had *no* further rights to exploit the derivative Superman character

16    "Superboy"—including in the highly popular *Smallville* network television series—

17    Toberoff manufactured the position that Jerry Siegel *alone*—to the exclusion of

18    Shuster—was the sole creator of Superboy.  Toberoff did so with full knowledge

19    that his 2001 agreement with the Shusters explicitly confirmed the *Shusters'*

20    asserted joint rights in Superboy, consistent with the long-held view of Shuster,

21    Siegel, and their heirs that Superboy was jointly created by Shuster and Siegel.[2]

22        10.    Despite these incontestable facts concerning Superboy's creation—

23    facts which Joe Shuster, Jerry Siegel, their heirs, and even Toberoff and his

24    companies ratified and affirmed over time—Toberoff induced the Siegels and

25    Shusters to falsely position Siegel as the *sole* creator of Superboy.  In 2002, the

26    _____

27    [2] As explained *infra*, DC Comics fully agrees that Shuster and Siegel jointly
contributed to Superboy.  It is DC Comics' position, however, that Superboy is a
work entirely derivative of Superman and thus Superboy is not subject to

28    termination under the Copyright Act's termination regime.

FIRST AMENDED COMPLAINT

Siegels then filed a copyright termination notice asserting sole ownership of Superboy. Toberoff then induced the Shusters in 2003 to amend their joint-venture agreement with Pacific Pictures to *delete* all references to Superboy. The deletion of Superboy was directly contrary to the Shusters' interests and occurred solely to park *all* of the alleged Superboy rights with the Siegels. Having manipulated the Superboy rights in favor of the Siegels, and directly contrary to copyright filings that the Siegels and Shusters had previously made, Toberoff then filed a termination notice on behalf of the Shusters that purported to terminate only Superman rights, leaving out all mention of Superboy. These artifices positioned the Siegels to claim 100% ownership of Superboy in order to later bring a copyright infringement claim against DC Comics, Warner Bros., and the *Smallville* series. That case—which was filed in 2004—remains pending today.

11.    Yet another component of Toberoff's scheme to gain complete control over the heirs to the putative Superman termination rights was preventing the Siegel and Shuster heirs from freely entering into agreements with DC Comics—even if it was in their respective economic interest to do so. In violation of DC Comics' statutory period of exclusivity under the copyright laws, Toberoff induced the Siegels and Shusters to enter into agreements transferring their respective interests to his companies and preventing them from conveying any rights to DC Comics without each other's—and Toberoff's—consent. As a result of these illicit agreements, DC Comics has been deprived of its ability to enter into agreements with the heirs to secure their purported termination rights, in violation of the Copyright Act, other laws, and public policy promoting the free and fair settlement of legal claims.

12.    To protect its rights under the copyright laws, agreements, and interests with the Shusters and Siegels and remove the cloud that Toberoff's actions have unlawfully placed over the Superman property and its future, DC Comics brings this action to seek declaratory judgments and other relief as set forth below.

- 5 -

FIRST AMENDED COMPLAINT

## II. **PARTIES**

13.    Plaintiff DC COMICS ("DC Comics") is a general partnership organized and existing under the laws of the State of New York and has its principal place of business in the State of New York.  DC Comics is the successor-in-interest to all rights, including rights under copyright, relating to the Superman works and character.

14.    Defendant PACIFIC PICTURES CORPORATION ("Pacific Pictures") is a New York corporation organized under the laws of the State of New York, and was registered as a foreign corporation doing business in the State of California, with its principal place of business in the State of California and the County of Los Angeles.  Upon information and belief, Toberoff is the sole shareholder and registered agent for service of process of Pacific Pictures.  Upon information and belief, Pacific Pictures forfeited its active status as a New York corporation and as a registered foreign corporation in California as of early 2009.

15.    Defendant IP WORLDWIDE, LLC ("IP Worldwide") is a Delaware limited liability company organized and existing under the laws of the State of Delaware, and registered as a foreign entity doing business in the State of California, which has its principal place of business in the State of California and the County of Los Angeles.  Upon information and belief, Toberoff is the managing and controlling member of IP Worldwide and owns the controlling interest therein.

16.    Defendant IPW, LLC ("IPW") is a California limited liability company organized and existing under the laws of the State of California, which has its principal place of business in the State of California and the County of Los Angeles.  Upon information and belief, Toberoff is the managing and controlling member of IPW, is its registered agent for service of process, and owns the controlling interest in IPW.  Upon information and belief, IPW is a successor-in-interest to all or part of IP Worldwide's interests.

- 6 -

FIRST AMENDED COMPLAINT

17.     Defendant MARC TOBEROFF ("Toberoff") is an individual who resides in the County of Los Angeles in the State of California, and upon information and belief, is and at all times has been a citizen of the United States. Upon information and belief, Toberoff is a shareholder and member of defendants PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; and IPW, LLC.

18.     Defendant MARK WARREN PEARY ("Mark Peary" or "Peary") is an individual who resides in the State of New Mexico and is, and at all times has been, a citizen of the United States. Peary is the nephew of Joseph Shuster, and a California court appointed him as the personal representative of the Shuster Estate.

19.     Defendant ESTATE OF JOSEPH SHUSTER ("Shuster Estate") is a probate estate established by the Los Angeles Superior Court in 2003 (LASC Case No. BP-080635).

20.     Defendant JEAN ADELE PEAVY ("Jean Peavy" or "Peavy") is an individual who resides in the State of New Mexico and, upon information and belief, is, and at all relevant times has been, a citizen of the United States. Peavy was the sister of Joseph Shuster, and under the terms of Shuster's purported will, the sole beneficiary of the Shuster Estate. Peavy has actively participated in the Shuster probate proceedings pending in Los Angeles, California, personally disposed of property of the Shuster Estate in California pursuant to the provisions of the California Probate Code, and is a party to certain agreements formed in California at issue in this action.

21.     Defendant JOANNE SIEGEL ("Joanne Siegel") is an individual who resides in the County of Los Angeles in the State of California and is, and at all times has been, a citizen of the United States. Joanne Siegel is the widow of Jerome Siegel.

22.     Defendant LAURA SIEGEL LARSON ("Laura Siegel Larson") is an individual who resides in the County of Los Angeles in the State of California and

- 7 -

FIRST AMENDED COMPLAINT

1   is, and at all times has been, a citizen of the United States.  Laura Siegel Larson is

2   the daughter of Jerome Siegel and Joanne Siegel.

3       23.    Upon information and belief, Toberoff is, and at all relevant times has

4   been, the sole shareholder and principal of Pacific Pictures and a member and

5   principal of IP Worldwide and IPW.  Upon information and belief, Toberoff is the

6   alter ego of Pacific Pictures, IP Worldwide, and IPW, in that there is, and at all

7   relevant times has been, such unity of interest between Toberoff, Pacific Pictures,

8   IP Worldwide, and IPW that any individuality and separateness between them did

9   not and does not exist, and adherence to the fiction of the independent and separate

10  existence of Pacific Pictures, IP Worldwide, and IPW distinct from each other and

11  Toberoff would promote injustice and inequity.

12      24.    Upon information and belief, the fictitiously-named DOES 1-10 are in

13  some manner responsible for the events giving rise to the claims set forth herein.

14  The true names and capacities of such fictitiously-named defendants, whether

15  individual, corporate, or otherwise, are presently unknown to DC Comics.  DC

16  Comics will amend this Complaint to assert the true names and capacities of such

17  fictitiously-named defendants when this information has been ascertained.  Each

18  reference herein to a named defendant shall also refer to DOES 1-10.

19          **III.  JURISDICTION AND VENUE**

20      25.    As noted, the Court has subject matter jurisdiction over the claims set

21  forth herein pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.  The Court has original

22  jurisdiction over DC Comics' claims arising under the Copyright Act and

23  supplemental jurisdiction over its related state-law claims.

24      26.    The Court has personal jurisdiction over defendants, *inter alia*,

25  because a substantial part of the events giving rise to the claims set forth herein

26  occurred in the State of California and the defendants have extensive contacts with

27  the State, including the following:

28

- 8 -                              FIRST AMENDED COMPLAINT

a.      Defendants Marc Toberoff, the Shuster Estate, Peary, and Peavy established a joint venture in California under California law for the purpose of terminating and recapturing prior grants of the copyrights at issue in this action.

b.      On behalf of the joint venture, Peary and Peavy initiated a probate action in Los Angeles Superior Court—which, upon information and belief, remains pending—in order to effectuate the purpose of the California joint venture.  A California court appointed Peary executor of the Shuster Estate, and Peary serves in that capacity as a matter of California law.  In that capacity, Peary served one of the copyright termination notices at issue in this action.

c.      Upon information and belief, defendants Pacific Pictures and IP Worldwide are foreign entities registered as doing business in the State of California, and they have their principal places of business and are headquartered in the State of California and the County of Los Angeles.

d.      Upon information and belief, defendant IPW is a California limited liability company organized and existing under the laws of the State of California and has its principal place of business and headquarters in the State of California and the County of Los Angeles.

e.      Defendants Toberoff, Joanne Siegel, and Laura Siegel Larson reside and conduct business in the State of California and the County of Los Angeles.

f.      Defendants Joanne Siegel and Laura Siegel Larson filed two related actions against DC Comics in this District and Court to resolve ownership of the rights in Superman and Superboy.  (Case Nos. CV-04-8400 ODW (RZx), CV-04-8776 ODW (RZx)).

- 9 -

FIRST AMENDED COMPLAINT

053

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Defendants are subject to personal jurisdiction in this District, and a substantial part of the events giving rise to the claims set forth herein occurred in this District.

## IV.   FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.   DC Comics' Development of Superman

28.     In the 1930s, Jerome Siegel (a story writer in Cleveland) and Joseph Shuster (an illustrator, and Siegel's peer) conceived of a fictional character named "Superman," whom they originally envisioned as a criminal mastermind, and then reconceived as a hero fighting for social justice.  Aside from the name, the character shared little similarity with the figure that would later become known throughout the world as Superman.  Between 1933 and 1937, Siegel and Shuster submitted the Superman comic strips to a number of prospective publishers and newspaper syndicates, all of which rejected them.  According to a 1941 *Saturday Evening Post* profile of the pair, "by this time [Siegel and Shuster] had abandoned hope that Superman would ever amount to much."

29.     A company that would come to be known as DC Comics—and for whom Siegel and Shuster worked for hire developing fictional characters—would eventually decide to publish a 13-page comic story featuring "Superman" in the first issue of a 64-page comic book entitled "Action Comics."  As explained below, this original version of Superman had few, limited powers, and his fictional world and back-story were not well developed.

30.     Months before this "Action Comics" book ("Action Comics No. 1") was published, Siegel and Shuster entered into, on December 4, 1937, an "Agreement of Employment" with Detective Comics, Inc. ("DCI"), a predecessor-in-interest to DC Comics (the "December 4, 1937 Agreement").  Siegel and Shuster renewed their employment arrangement with DCI in agreements on September 22, 1938 (the "DCI September 22, 1938 Agreement" and "McClure September 22, 1938 Agreement") and December 19, 1939 (the "December 19, 1939 Agreement").

- 10 -

FIRST AMENDED COMPLAINT

31.    In 1938, at the instance and expense of DCI and subject to its right of control, Siegel and Shuster adapted the preexisting Superman comic strips they had created and added new material to create the 13-page comic book story entitled "Superman." This story—like all the Superman works that Siegel and Shuster thereafter created—was created for DC Comics as a work made for hire. Moreover, Siegel and Shuster only contributed to a part of this work. Upon information and belief, Shuster submitted black-and-white illustrations to DCI that were later colorized by printers or engravers working at DCI's direction. DCI also prepared one or more cover illustrations for Action Comics No. 1, which depicted Superman and was published in other comic books prior to the publication of Action Comics No. 1. Action Comics No. 1 itself was published in April 1938.

32.    To the extent Siegel and Shuster created any copyrightable Superman-related works outside their work-for-hire relationship with DC Comics (and DC Comics has disputed that they did), those works consisted solely of certain panels and portions of the Action Comics No. 1 comic book and other minor creations in the 1930s, which Siegel and Shuster conveyed to DC Comics in 1937 and 1938. In an agreement dated March 1, 1938 (the "March 1, 1938 Agreement"), and as required by the December 4, 1937 Agreement, Siegel and Shuster again assigned to DCI all of their rights in Superman, including "all good will attached thereto and exclusive right to the use of the characters and story, continuity and title of strip." Siegel and Shuster confirmed DCI's sole and exclusive ownership of all Superman rights in the DCI September 22, 1938 Agreement and December 19, 1939 Agreement.

33.    The initial appearance of Superman in Action Comics No. 1 presented a limited view of the character. The readers learn only that Superman was sent to Earth as an infant aboard a space ship from an unnamed planet that was destroyed by old age. He secretly possessed five super-human powers: the abilities to leap 1/8 of a mile; hurdle a twenty-story building; raise tremendous weights; run faster

FIRST AMENDED COMPLAINT

than an express train; and repel bullets and knives by virtue of his "tough skin."  In his alter-ego life, Superman was depicted as Clark Kent, a "coward" and a "weakling" who worked as a reporter for "The Daily Star," with a female co-worker named "Lois," whose last name is not mentioned.  In his life as Superman, he was depicted as a costumed vigilante who uses his super-human abilities to fight criminals and mete out his own brand of justice.  In Action Comics No. 1, Superman is said to have grown up in an orphanage and is depicted (both in words and images) as a child with super-human strength.

34.     Since the publication of Action Comics No. 1 in 1938, DC Comics—with its teams of work-for-hire writers and artists (including Siegel and Shuster)—has added more than 70 years of material defining, updating, expanding, and improving upon the Superman myth and creating a continuous flow of new exploits and characters, resulting in a vast Superman "universe."

35.     DC Comics has authored, published, and distributed hundreds of millions of copies of thousands of comic book issues throughout the United States and abroad depicting the adventures of Superman.  These comic books have been authored and illustrated by dozens of DC Comics' talented staff writers and artists, and many of most iconic images and stories of Superman were created by these work-for-hire artists who reshaped his image over time.

36.     DC Comics has also created, developed, distributed, and licensed numerous feature-length motion pictures, motion-picture serials, radio serials, television shows, novels, and live theatrical presentations based on Superman.  Indeed, the radio, television, and motion-picture projects in particular—with which Siegel and Shuster had nothing or little to do—were largely responsible for spreading the Superman myth and popularity and expanding the Superman storyline.

37.     As a result of DC Comics' significant and sustained investment in and stewardship of Superman—and 70-plus years of character and story development

- 12 -

FIRST AMENDED COMPLAINT

by some of the most creative and talented minds in the comic-book, radio, television, and motion-picture industries—Superman has remained constantly in the public's eye and has become one of the most famous and beloved fictional characters in the world.  Over these 70 years, Superman has evolved from the few black-and-white illustrations originally drawn by Shuster into a full-blown, color character inhabiting a multi-dimensional universe.

38.    DC Comics' development of Superman over many decades has represented a continuous and ever-evolving portrayal of the character, featuring new elements in the Superman back-story, new super-powers, new characters, and changes in Superman's appearance.  Many of the most famous story elements and characters associated with Superman were developed long after 1938, and by illustrators and story writers other than Shuster and Siegel working for hire for DC Comics.  These include stories about and depictions of:  (a) "Smallville," the town where Superman grew up; (b) "Kryptonite," or surviving fragments of the destroyed planet Krypton, which have the power to harm or affect Superman; (c) the "Fortress of Solitude," Superman's secret headquarters outside Metropolis (traditionally located in the Arctic, but also placed in the Andes and Amazon rainforest); (d) the "Daily Planet" newspaper, where Clark Kent would go to work; (e) Jimmy Olsen and Perry White, Kent's co-workers at the Daily Planet; (f) love interests, such as Lana Lang; (g) villains, such as Lex Luthor and Brainiac; (h) Superman's adoptive parents, the Kents; and (i) other allies, such as "Krypto" the Superdog as well as Supergirl.  Other aspects of Superman's evolution included the development of new super-powers, including:  (a) the ability to fly (a key component, especially of the Superman motion pictures); (b) super-vision, which enables him to see through walls ("X-ray" vision); (c) telescopic vision, which allows him to see across great distances; (d) "heat vision," which empowers him to aim rays of extreme heat with his eyes; (e) super-hearing, which enables him to hear conversations at great distances; (f) invulnerability to injury; and (g) the ability

FIRST AMENDED COMPLAINT

1    to survive in outer space without protective gear.  It is this constant and

2    uninterrupted evolution of the Superman mythology that allows Superman to

3    remain a force in popular consciousness decades after so many contemporary

4    characters have been forgotten or deemed old-fashioned.

5         39.    In *Superman: The Action Comics Archives, Vol. 1* (1997), renowned

6    comic-book historian Mark Waid explained the dramatic transformation Superman

7    underwent over the past 70 years and stark contrast between the Superman that

8    Siegel and Shuster conceived in the 1930s and the one the world now knows:

> The whole world knows Superman.  He is kind, he is wise, he is
> gentle, he upholds the law and the mores of a decent society.  He is
> half boy scout, half policeman.  In fact, here is what the citizens of
> 1939 Metropolis have to say about him:
>
>     "It is the devil himself!"
>     "You're breaking the law, sir!"
>     "Don't hit me again!  I'll give ya anything ya want!"
>     "Hundreds of officers—all incapable of stopping the mad course
>     of one hoodlum!"
>
> I thought I knew everything about Superman.  Then I read the [early
> Superman stories].  Within these pages, I met a head-bashing
> Superman who took no prisoners, who made his own law and enforced
> it with his fists, who gleefully intimidated his foes with a wicked grin
> and a baleful glare.  A Superman who reveled in his strength, who
> clearly enjoyed raising a little hell and who didn't care who got in his
> way as he bounded through Metropolis meting out his own brand of
> justice ….  How could he have started out so different?

**B.    Early Disputes Regarding the Superman Rights**

20        40.    Siegel and Shuster served in a work-for-hire capacity for DCI from the

21   early 1930s through the late 1940s, helping draw and write Superman comic strips

22   and comic books.  They were paid substantial sums for their work, and DC Comics

23   renegotiated the pair's contract numerous times to give them greater and greater

24   stakes in the success of Superman.  By 1940 (at the end of the Great Depression),

25   Siegel and Shuster were paid the equivalent of well over a million dollars in today's

26   dollars.  The pair's earnings were even greater in 1941, exceeding $1.5 million in

27   today's terms, and in the years that followed, Siegel and Shuster would earn the

28

- 14 -

FIRST AMENDED COMPLAINT

1    equivalent of millions more.  Yet despite the financial success shared by DC

2    Comics and Siegel and Shuster, the relationship eventually became contentious.

3        41.    In 1947, Siegel and Shuster filed an action against DCI's successor,

4    National Comics Publications, Inc. ("National"), in the New York Supreme Court

5    in Westchester County (the "Westchester Action").  In the Westchester Action,

6    Siegel and Shuster sought to invalidate the March 1, 1938 Agreement.  They also

7    sought to recapture all rights in Superman, arguing that the DCI September 22,

8    1938 Agreement was obtained by duress.  Siegel and Shuster further challenged as

9    unauthorized DCI's publication in November 1944 of a series of comic-book

10    stories entitled "Superboy," which featured the adventures of Superman as a youth.

11        42.    On November 21, 1947, a referee in the Westchester Action issued an

12    opinion after trial (the "Westchester Opinion") holding that the March 1, 1938

13    Agreement assigned "all" of the Superman rights to DCI, and that the DCI

14    September 22, 1938 Agreement was valid and not obtained under duress.  The

15    referee found that DCI had acted improperly in publishing Superboy.

16        43.    At the referee's request, the parties to the Westchester Action

17    submitted proposed findings of fact and conclusions of law.  On April 12, 1948, the

18    referee adopted findings of fact and conclusions of law and issued an interlocutory

19    judgment (collectively, the "Westchester Action Interlocutory Judgment"), in which

20    he made statements based on a script that Siegel had submitted that Siegel

21    originated and owned the comic strip Superboy to the exclusion of DC Comics.

22    National filed a notice of appeal, and the Westchester Action Interlocutory

23    Judgment was stayed pending appeal.

24        44.    Shortly thereafter, the parties to the Westchester Action entered into

25    two separate agreements:  (a) a stipulation dated May 19, 1948 (the "May 19, 1948

26    Stipulation"); and (b) a consent judgment dated May 21, 1948 (the "May 21, 1948

27    Consent Agreement").  Under both documents, *inter alia*, Siegel and Shuster:

28    (a) agreed to vacate the Westchester Action Interlocutory Judgment;

- 15 -                    FIRST AMENDED COMPLAINT

1   (b) acknowledged that, pursuant to the March 1, 1938 Agreement, they transferred

2   to DCI all rights in and to Superman, including "the title, names, characters,

3   concept and formula" as set forth in Action Comics No. 1; and (c) agreed that

4   National was the sole and exclusive owner of all rights in Superman and Superboy.

5   In exchange, Siegel and Shuster were paid nearly $900,000 in today's dollars.

6       45.    Following the commencement of the Westchester Action, Siegel

7   attempted to launch a new comic book and syndicated strip feature entitled

8   "Funnyman." The *Funnyman* comic book, however, was cancelled after only six

9   issues, and the syndicated *Funnyman* strip was only picked up by a few newspapers

10  and dropped prior to the end of 1949. By the late 1950s, Siegel was unable to find

11  employment in the comic book field. Having exhausted his savings and needing to

12  support his family, he approached DC Comics asking for work. Despite Siegel's

13  prior lawsuit and challenge to DC's rights in Superman, DC Comics agreed to hire

14  him and thereafter employed Siegel continuously as a work-for-hire writer until the

15  mid-1960s, when he once again challenged DC Comics' rights to Superman.

16      46.    In April 1965, Siegel (while still working for DC Comics) and Shuster

17  (who was being paid a monthly stipend by DC Comics) filed copyright renewal

18  notices in their own names, claiming to own the renewal copyrights in the

19  Superman character and in Action Comics No. 1. This was followed by a lawsuit

20  filed by Siegel and Shuster against National in 1969 in the District Court for the

21  Southern District of New York, seeking a declaration that they owned the

22  "renewal" copyright terms for Superman and Action Comics No. 1. (Under the

23  then-applicable 1909 Copyright Act, the period of copyright protection for a work

24  included an initial term of 28 years and an optional renewal term of 28 years.)

25  Again, Siegel and Shuster's arguments were rejected, and the federal district court

26  held, *inter alia*, that the agreements between Siegel and Shuster, on the one hand,

27  and DCI (later National), on the other, had assigned "all" rights in Superman to

28  DCI and National, including all renewal copyrights. *See Siegel v. Nat'l Periodical*

- 16 -

FIRST AMENDED COMPLAINT

1   *Publ'ns, Inc.*, 364 F. Supp. 1032 (S.D.N.Y. 1973). The Court of Appeals for the

2   Second Circuit affirmed the district court's ruling that National owned all rights in

3   Superman. *See Siegel v. Nat'l Periodical Publ'ns, Inc.*, 508 F.2d 909 (2d Cir.

4   1974). Siegel and Shuster did not further appeal that ruling.

5       47.   Following the failure of their second lawsuit to recapture copyrights in

6   Superman, Siegel and Shuster ran into financial difficulties of their own making.

7   Siegel publicized their financial plight, and there were calls for companies like

8   National (and even for Congress) to help such artists. On December 23, 1975, and

9   despite Siegel and Shuster's two prior lawsuits against National, Warner

10   Communications, Inc. ("WCI"), National's then-parent company, agreed to provide

11   them financial assistance. Under an agreement entered into in 1975 (the "1975

12   Agreement"), Siegel and Shuster again acknowledged that DC Comics was the sole

13   and exclusive owner of "all right, title and interest in and to the 'Superman'

14   concept, idea, continuity, pictorial representation, formula, characters, cartoons and

15   comic strips, title, logo, copyrights and trademarks, including any and all renewals

16   and extensions of such rights, in the United States and throughout the world, in any

17   and all forms of publication, reproduction and presentation, whether now in

18   existence or hereafter devised." In exchange, WCI agreed to provide Siegel and

19   Shuster with, *inter alia*, annual payments of $20,000 each (around $80,000 in

20   current dollars), annual payments to their heirs after their death, medical insurance

21   coverage, and a lump sum of $17,500 each. With respect to Shuster's heirs, WCI

22   agreed that after Shuster's death, it would make annual payments to his brother,

23   Frank Shuster, of $10,000 until December 31, 1985, and then $5,000 a year for the

24   rest of his life.

25       48.   In the years following the 1975 Agreement, DC Comics increased the

26   annual payments to Siegel and Shuster, made periodic cost-of-living increases,

27   provided insurance, and paid special bonuses. During the last several years,

28   Siegel's widow, for example, has received $135,000 per year plus reimbursement

FIRST AMENDED COMPLAINT

for all medical expenses.  In all, DC Comics has paid Siegel, Shuster, and their heirs nearly $4 million pursuant to the 1975 Agreement and other arrangements—benefits that DC Comics continues to pay, and the Siegel and Shuster heirs continue to accept.

49.    In 1976, Congress amended the Copyright Act to give authors and certain of their heirs certain limited rights to terminate prior grants of copyright. *See* 17 U.S.C. § 304(c) (1976).  This amendment did not apply to works-made-for hire (the company paying for the production of those works would always own them), and entitled authors and certain heirs to recapture copyrighted interest only in works that the *author* actually created (*e.g.*, it did not entitle authors to recapture derivative works the grantee may have developed pursuant to the original grant, such as the original Superman radio and television shows, or Superman-related characters, such as "Superboy" or "Lex Luthor").

50.    Despite their previous legal battles with National and the widespread publicity surrounding this legislation, neither Jerry Siegel nor Joe Shuster ever endeavored to exercise any termination rights under the statute.  Instead, for the rest of their lives, Siegel and Shuster accepted and enjoyed the benefits under the 1975 Agreement.  This decision made sense, given Siegel and Shuster's work-for-hire relationship with DC Comics, the narrow sliver of rights (if any) to which they might claim an interest, and the significant contributions made to Superman in the past 70 years to which they could claim no interest.  Moreover, the 1975 Agreement paid Shuster and Siegel an annual pension and medical insurance for the rest of their lives and, upon their death, paid annual pensions to their heirs.  Although Shuster's and Siegel's "window of time" in which to attempt to terminate prior grants of copyright interests in Superman theoretically opened in 1984, at no time during their lives did they attempt to exercise any such right.

- 18 -

FIRST AMENDED COMPLAINT

C.    **Joe Shuster's Death and the Shuster Heirs' 1992 Agreement**

51.    Joe Shuster passed away on July 30, 1992. He was survived only by his brother Frank Shuster, sister Jean Peavy, and Ms. Peavy's two children, Mark Peary and Dawn Peavy (the "Shuster Heirs"). (Mark Peary changed his last name from "Peavy" to "Peary.") Shuster did not leave a widow and never had children or grandchildren. Shuster's purported will appoints Jean Peavy the sole beneficiary and executrix of his estate. (An alleged copy of this will surfaced and was probated in 2003, after Toberoff intervened. In addition to certain irregularities in the will, probate papers filed by the Shuster Heirs falsely represented that Joe Shuster was never married and omitted that Joe Shuster had a sibling, Frank Shuster, who also survived him.)

52.    On August 21, 1992, Jean Peavy sent a letter to Time Warner and DC Comics explaining that she was the sole heir to Shuster's estate and that Shuster had left "a crushing burden of unpaid debts and bills and only a tiny estate." Ms. Peavy stated: "It's unbelievable to me that Joe could have so little considering the generosity shown by Time Warner in raising the pension income of Siegel and Shuster." She also disclosed that 20% of Shuster's income had been taken by Joanne Siegel, Jerome Siegel's widow, "as an agent's commission for getting pay raises for Siegel and Shuster" following the December 23, 1975 Agreement. Much of the remainder of Shuster's income was spent by him during "compulsive buy[ing]" and "shopping sprees" and on expensive stereo equipment and other personal items. As a result, Shuster had accumulated "almost $20,000 in credit card debts and unpaid bills" that, "[a]s heir to his Will, [Ms. Peavy was] responsible for paying." Ms. Peavy asked that Time Warner and DC Comics "pay his final debts and expenses."

53.    In September 1992, Time Warner and DC Comics offered to pay off Shuster's debts and expenses, totaling approximately $20,000, plus increase Frank

- 19 -

FIRST AMENDED COMPLAINT

1    Shuster's annual survivor payments under the 1975 Agreement from $5,000 to

2    $25,000 per year.

3         54.    In a September 10, 1992 letter sent to DC Comics (the "September 10,

4    1992 Letter"), Frank Shuster, on behalf of himself and Jean Peavy, requested that

5    the annual payments due and owing Frank Shuster be made to Jean Peavy in order

6    to take advantage of certain tax benefits.  Frank Shuster and Jean Peavy further

7    promised that, if an agreement could be reached, Jean Peavy "would not pursue the

8    termination of the Superman copyright as provided for to creators' heirs in the 1976

9    U.S. Copyright Act."

10        55.    Based on Jean Peavy and Frank Shuster's letter and the parties' further

11   discussions, DC Comics, Jean Peavy, and Frank Shuster entered into a written

12   agreement on October 2, 1992 (the "1992 Agreement").  The 1992 Agreement,

13   which did not have an integration clause, confirmed that it "fully settles all claims

14   to any payments or other rights or remedies which you may have under any other

15   agreement or otherwise, whether now or hereafter existing regarding the copyrights,

16   trademarks, or other property right in any and all work created in whole or in part

17   by your brother, Joseph Shuster, or any works based thereon," and that the Shuster

18   Heirs "covenant not to assert any claim of right, by suit or otherwise, with respect

19   to the above, now and forever."  The 1992 Agreement provided that the Shuster

20   Heirs "now grant to us [DC Comics] any … copyrights, trademarks, or other

21   property right in any and all work created in whole or in part by your brother,

22   Joseph Shuster, or any works based thereon."  The 1992 Agreement thus operated

23   to revoke, rescind, and replace Shuster's prior copyright grants and agreements.

24   After the 1992 Agreement, DC Comics enjoyed an amicable relationship with the

25   Shuster Heirs.

26        56.    On September 7, 1999, Jean Peavy sent a letter to DC Comics

27   confirming that the clear effect of the 1992 Agreement was to revoke and regrant

28   any prior copyright grants that could otherwise have been subject to termination:  "I

- 20 -

FIRST AMENDED COMPLAINT

1  have learned from the Internet that Joanne Siegel has filed a copyright claim for

2  SUPERMAN [*i.e.*, the Siegel Superman Termination Notice]. I want you to know

3  that I intend to honor our pension agreement."

4      57.    To date, DC Comics and its affiliates have paid the Shuster Heirs close

5  to $500,000 under the 1992 Agreement. On April 27, 1995, Jean Peavy sent a letter

6  to DC Comics expressing gratitude for their generosity and concluding: "You know

7  we appreciate your thoughtfulness." Even after Frank Shuster's death in 1996, DC

8  Comics has continued to this day to pay $25,000 per year to Jean Peavy.

9  **D.    Toberoff Induces the Shusters to Repudiate the 1992 Agreement with**

10     **DC Comics and Acquires a 50% Interest in the Shusters' Putative Rights**

11     58.    This state of affairs remained undisturbed for almost a decade. In

12  2001, Toberoff and his motion-picture production company, Pacific Pictures,

13  induced the Shuster Heirs to violate their 1992 Agreement and wrongfully attempt

14  to acquire and exploit future copyright interests in Superman.

15     59.    Toberoff is a self-described "intellectual property entrepreneur." His

16  business—conducted through a variety of corporate entities like Pacific Pictures—

17  is to locate the authors of valuable copyrighted works or their heirs and acquire, or

18  prevent them from conveying to others, asserted rights to present or future

19  copyright interests. To convince these authors and heirs to go into business with

20  him, Toberoff holds himself out as a producer with the financial resources and

21  connections to exploit recaptured rights in all media in the entertainment industry.

22     60.    In or around 2001, Toberoff made contact with the Shuster Heirs and

23  embarked on a course of conduct with them to disrupt their relationship with DC

24  Comics, including DC Comics' rights under the 1992 Agreement. On November

25  28, 2001, the Shuster Heirs formed a joint venture with Toberoff's company Pacific

26  Pictures (the "2001 Pacific Pictures Agreement") for the stated purpose of

27  "exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property,

28  title and interests in and to Joe Shuster's creations"—despite the fact that these

- 21 -

FIRST AMENDED COMPLAINT

rights had been granted to DC Comics in the 1992 Agreement. The 2001 Pacific Pictures Agreement provided that this purpose would be realized in part "via the establishment of Joe Shuster's estate … and the estate's termination pursuant to [17 U.S.C. § 304] of any and all grant or transfers by Joe Shuster of any copyright interest in his creations."

61.    The 2001 Pacific Pictures Agreement defined the Shuster Heirs' rights being assigned as including all "rights, claims, title, copyrights and interests in and to each character, story element, and indicia associated with … 'SUPERMAN' [and] *Superboy*." (Italics added.)

62.    Pursuant to the 2001 Pacific Pictures Agreement, Jean Peavy and her son Mark Peary "transfer[red] and assign[ed] to the Venture their rights, title, and interest" in Shuster's purported Superman and Superboy rights. The Agreement provided that "[a]ny and all moneys and proceeds [of the Venture] will be shared, divided and payable:  fifty percent (50%) to [the Shuster Heirs] and fifty percent (50%) to PPC [Pacific Pictures]," and that upon "winding-up of the Venture or in the event of termination of the Venture *for any reason*, all Rights, property or assets of the Venture will be held fifty percent (50%) by the [Shuster Heirs] and fifty percent (50%) by PPC." (Emphasis added.)

63.    The 2001 Pacific Pictures Agreement also provided that the Shuster Heirs could not enter into any agreement with respect to the Superman and Superboy rights "without the express written consent" of Pacific Pictures, an entity controlled solely by Toberoff.

64.    The 2001 Pacific Pictures Agreement did not represent a legal retainer agreement. Rather, the Agreement provided that the joint venture would separately "retain Marc Toberoff, Esq. to render legal services in connection with the Rights and the Venture." In a subsequent agreement in 2003, the parties confirmed that "PPC … is not a law firm." Toberoff signed the 2001 Pacific Pictures Agreement on behalf of "Pacific Pictures Corporation" as "Marc Toberoff, President"—as

- 22 -

FIRST AMENDED COMPLAINT

1    opposed to "Marc Toberoff, Esq."  Upon information and belief, Toberoff and the

2    Shuster Heirs did not enter into a legal retainer agreement until 2004—*three years*

3    after entering into the 2001 Pacific Pictures Agreement.

4        65.     After entering into the 2001 Pacific Pictures Agreement, the Shuster

5    Heirs filed a probate action in Los Angeles Superior Court to establish the Shuster

6    Estate (the "Probate Action").  (*See* LASC Case No. BP-080635.)  Under the terms

7    of Shuster's purported will, Jean Peavy was appointed the sole beneficiary and

8    executrix of his estate.  In the Probate Action, however, the Shuster Heirs asked the

9    Superior Court to authorize Mark Peary to serve as executor in Jean Peavy's place.

10   The Superior Court appointed Peary executor on October 7, 2003; one month later,

11   Peary served a copyright termination notice on DC Comics on behalf of the newly-

12   formed Shuster Estate.

13   **E.**     **Toberoff Induces the Siegels to Repudiate the Siegel-DC Comics**

14         **Agreement and Acquires a 45% Interest in the Siegels' Putative Rights**

15        66.     Having orchestrated this joint venture with the Shuster Heirs, Toberoff

16   used the Shuster Heirs to gain access to the heirs of Jerry Siegel, Joanne Siegel and

17   Laura Siegel Larson (collectively, the "Siegel Heirs").  Toberoff sought to corner

18   the other putative "half" of putative Superman termination rights.  Toberoff knew,

19   however, that the Siegels had reached an agreement with DC Comics in 2001

20   resolving their putative termination claims.  Nevertheless, Toberoff and his

21   companies set out to interfere with this agreement in order to acquire a stake in the

22   Siegel Heirs' putative copyright interests in Superman.

23        67.     In 1997—and after Jerry Siegel's death in 1996—the Siegel Heirs had

24   employed counsel and served notices to terminate grants of Superman rights that

25   Siegel had conveyed to DC Comics (the "Siegel Superman Termination Notice").

26   The Siegel Superman Termination Notice, which was prepared by prior counsel,

27   listed Superboy works and elements as among the "character[s], story element[s], or

28   indicia reasonably associated with SUPERMAN," in recognition of the fact that

- 23 -

FIRST AMENDED COMPLAINT

Superboy was a complete derivative of Superman rather than a stand-alone, non-derivative work based upon Superman.

68.    The Siegel Heirs and DC Comics began negotiations, and in these talks the Siegel Heirs were represented by Kevin Marks of the Gang Tyre entertainment law firm.  As the parties' negotiations progressed, and as expectations grew that an agreement would soon be reached, DC Comics paid the Siegels a non-refundable advance of $250,000.

69.    On October 16, 2001, DC Comics made a proposal to the Siegel Heirs. On October 19, 2001, Kevin Marks sent a letter to DC Comics confirming that the Siegel Heirs "accepted D.C. Comics' offer of October 16, 2001."  On October 26, 2001, DC Comics sent a return letter confirming the parties' agreed-upon terms. DC Comics then began drafting a long-form agreement.  DC Comics sent the Siegel Heirs a copy of the long-form document on February 1, 2002.  As a result of the parties' agreement (the "Siegel-DC Comics Agreement"), the Siegels were now on the brink of receiving significant portions of the Superman profits—sums that would immediately and dramatically change their lives.  Moreover, virtually all of the money would be theirs alone to keep, as the Gang Tyre firm had agreed to represent the Siegels for the standard 5% fee.

70.    Toberoff has admitted that he closely tracked the progress of the Siegel Heirs' termination attempt.  On learning of the Siegel-DC Comics Agreement, he knew his company's joint-venture interest in the Shuster rights was limited and that he could assert greater leverage only if he could disrupt the Siegel-DC Comics Agreement and corner both "halves" of the putative Superman termination rights. Given that Joe Shuster and his heirs held whatever Superman copyright interests they owned (*if any*) jointly with Jerome Siegel, Toberoff understood that if DC Comics obtained the rights from the Siegels to exploit new Superman properties, it could do so freely without any ability on the part of the Shusters to claim their interests were being infringed.

- 24 -

FIRST AMENDED COMPLAINT

71.    With knowledge that his actions would interfere with DC Comics' actual and prospective economic advantages under the Siegel-DC Comics Agreement, on or around November 29, 2001— six days after signing the 2001 Pacific Pictures Agreement with the Shuster Heirs—Toberoff, identifying himself as a film producer, approached the Siegel Heirs, including and/or through their representative Kevin Marks, for the purpose of acquiring their rights.

72.    Toberoff contacted Marks again on or around February 6, 2002 regarding a "potential buyout" of the Siegel Heirs' rights.  Marks informed Toberoff that the Siegel Heirs had already reached a binding agreement with DC Comics, which was in the process of being further documented in a long-form agreement.  Undeterred, Toberoff continued his efforts to interfere with the Siegel-DC Comics Agreement.

73.    On or around February 9, 2002, Toberoff approached Steven Spira, a Warner Bros. Pictures executive, at a social function and told him: "You have a Superman rights problem."

74.    On February 12, 2002, Toberoff formed IP Worldwide as a joint venture between Pacific Pictures and a well-known Hollywood talent agent.

75.    While Toberoff was undertaking these activities to disrupt DC Comics' relationship and agreements with the Siegels, on May 9, 2002, Joanne Siegel sent a letter to DC Comics' affiliate acknowledging the Siegel Heirs had accepted DC Comics' October 16, 2001 offer, but purporting to object to certain unspecified portions of the long-form document.

76.    DC Comics objected to the Siegel Heirs' sudden and unfounded objections expressed in their May 9 letter, but continued working with the Siegels' counsel (Kevin Marks) to finalize the long-form agreement.  On May 16, 2002, Marks, who had discussed the long-form agreement with the Siegel Heirs, told Warner Bros. general counsel John Schulman that his long-form agreement was "aggressive," but that the Siegels could "deal with it" and that it was "not contrary

- 25 -

FIRST AMENDED COMPLAINT

069

1    to what had been agreed to." Throughout the summer of 2002, Marks worked on a

2    re-draft of the February 1, 2002 long-form agreement, which he submitted to the

3    Siegels for their approval on July 15, 2002.

4         77.     In or around August 2002, as Marks was finalizing the Siegels'

5    revisions to the long-form document, Toberoff contacted Marks again regarding the

6    Siegel-DC Comics Agreement.  Upon information and belief, Marks informed

7    Toberoff he could not discuss the matter, including the terms of the agreement,

8    because of a confidentiality agreement between DC Comics and the Siegel Heirs.

9    Toberoff reiterated interest in purchasing the Siegel Heirs' Superman rights.  On

10   August 8, 2002, Toberoff conveyed an offer to Marks for presentation to the

11   Siegels, which Marks said he would convey.

12        78.     Upon information and belief, Toberoff's offer stated that he had found

13   a billionaire investor willing to purchase the Siegel Heirs' Superman rights.

14   Toberoff claimed the investor would give the Siegel Heirs $15 million cash up

15   front, plus generous royalty and "back-end" rights on any properties developed,

16   including a new Superman motion picture.  Marks asked whether the offer was

17   contingent on a due diligence investigation, and Toberoff stated that he had already

18   conducted due diligence.  Upon information and belief, Toberoff also falsely

19   offered to help the Siegel Heirs produce a movie that would compete directly with

20   the Superman movie in development at the time at Warner Bros., DC Comics'

21   licensee, even though he knew that the Siegels' limited rights in the recaptured

22   copyright, if any, would make such a competing motion picture all but impossible

23   to produce and distribute.

24        79.     Upon information and belief, although Marks conveyed Toberoff's

25   offer to the Siegels, he advised them that they had already reached a binding

26   agreement with DC Comics.  Nonetheless, as a result of Toberoff's fraudulent

27   inducements, the Siegel Heirs stated that they would repudiate their agreement with

28

- 26 -

FIRST AMENDED COMPLAINT

1    DC Comics and accept Toberoff's offer.  On or around September 21, 2002, the

2    Siegel Heirs sent a letter to Marks terminating him as their attorney.

3         80.    On or around September 21, 2002, based on Toberoff's inducements

4    and other acts of interference described above, the Siegel Heirs sent a letter to DC

5    Comics repudiating the Siegel-DC Comics Agreement.  On October 28, 2002, the

6    Siegel Heirs sent a letter to DC Comics confirming that the September 21, 2002

7    letter "totally stopped and ended negotiations with DC Comics, Inc."  And in a

8    2006 discovery response in the Siegel Actions, the Siegel Heirs denied that "[b]y

9    the May 9 Letter, [the Siegel Heirs] terminated negotiations with Defendants

10   concerning the Superman Notices."

11        81.    On October 23, 2002, the Siegel Heirs formalized an agreement with

12   defendant IP Worldwide for the purpose of "arrang[ing] and negotiat[ing] the sale,

13   lease, license and all other dispositions or exploitations" of the Siegel Heirs'

14   Superman rights (the "IP Worldwide Agreement").  The Siegel Heirs agreed to pay

15   IP Worldwide a fee of 10% of the gross proceeds generated by those rights.  Upon

16   information and belief, the fee was subsequently reduced to 5%.

17        82.    The IP Worldwide Agreement provided that the Siegel Heirs could

18   "not transfer, assign, license or in any manner encumber the Rights … other than

19   through or as a result of IPW's exclusive representation thereunder."

20        83.    The IP Worldwide Agreement was not a legal retainer agreement.  It

21   confirmed that "the scope of this Agreement does not include legal services and/or

22   expenses in connection with litigation," and provided that "[t]he provision of such

23   services and advancing of such expenses … will be rendered by Marc Toberoff,

24   Esq., subject to good faith negotiation of a mutually acceptable agreement executed

25   by Mr. Toberoff" and the Siegel Heirs.  Upon information and belief, it was not

26   until 2004—two years after entering into the IP Worldwide Agreement—that the

27   Siegel Heirs entered into an agreement with Toberoff granting him 40% of their

28

- 27 -

FIRST AMENDED COMPLAINT

071

Superman rights and retaining him as their attorney (the "Siegel-Toberoff Agreement").

84.    Upon information and belief, as a result of the Siegel-Toberoff Agreement and IP Worldwide Agreement, Toberoff now owns a 45% financial interest in the Siegel Heirs' purported Superman rights.

85.    Upon information and belief, Toberoff admitted to the Siegel Heirs that he misled them about the existence of the billionaire investor he used as an inducement to obtain their putative rights.  He also acknowledged that even if the Siegel Heirs succeeded in recapturing any Superman rights, he could not follow through on his false promise to make a competing Superman movie for them.  His reasons: "1. the clout of WB Consumer Products in the licensing industry; 2, perception that WB owns S[uperman] and that to understand what you own requires an understanding of the nuances of copyright law; 3. fear of being sued or embroiled in litigation."

**F.    Toberoff Manipulates the Siegel Heirs and Shuster Heirs into Falsely Claiming that Superboy Was the Sole Creation of Jerry Siegel**

86.    After Toberoff induced the Siegel Heirs to repudiate the Siegel-DC Comics Agreement, on November 8, 2002, the Siegel Heirs served a second copyright termination notice on DC Comics directed at the character Superboy (the "Siegel Superboy Termination Notice").  The notice not only erroneously stated that Superboy was a copyrightable work not derivative of Superman, but falsely recited that Superboy was created *solely* by Siegel (without contribution from Shuster), thereby entitling the Siegel Heirs to terminate and recapture 100% of the putative Superboy rights.

87.    Defendants knew these claims were false.  To begin, in the Siegel Superman Termination Notice served by the Siegel Heirs in 1997—the one served prior to Toberoff's intervention—the Siegel Heirs expressly identified the Superboy works and elements as among the "character[s], story element[s], or indicia

- 28 -

reasonably associated with SUPERMAN." This earlier notice acknowledged—as is in fact the case—that Superboy was a derivative work of Superman, rather than a separately copyrightable work.

88.    As to the representation that Superboy was created solely by Jerry Siegel, defendants knew that claim was untrue as well. Among other reasons:

- One year earlier, through defendant Pacific Pictures, Toberoff had entered into the 2001 joint-venture agreement with the Shuster Heirs, specifying that the *Shuster Heirs* owned an interest in "Superboy."

- The original Superboy "script" on which the Siegel Heirs' ownership claims rely openly contains the byline: "By Jerry Siegel *and Joe Shuster*"—not just Jerry Siegel alone. (Emphasis added.)

- In 1948, a Court in Westchester, New York found that Joe Shuster provided the artwork for the Superboy story in More Fun Comics No. 101, the comic book which the Siegel Superboy Termination Notice claims is the first published Superboy work.

- In 1972 and 1973, Siegel and Shuster together filed their own copyright renewal notices with the copyright office for Superboy, in which they identified Superboy as a work that they had *jointly* created.

- And long before the alleged first publication of "Superboy" in November 1944, Shuster illustrated works for DC Comics that included various depictions of Superman as a boy, exhibiting super-human strength. Several examples are reproduced below. In "Action Comics No. 1," for example, Shuster drew Superman as a very young boy displaying an "astonish[ing] feat[]" of super-human strength, holding a chair above his head:

FIRST AMENDED COMPLAINT

073



Action Comics No. 1 (1930)

Shuster also depicted Superman as a youth with super-powers in "Superman No. 1," a work allegedly terminated by Shuster in the notice filed by Toberoff on behalf of the Shuster heirs,



Superman No. 1 (May 1939)

as well as in a 1942 Sunday comic strip, in which Superman as a "youth" discovers that his "amazing powers" are "multiplied with the years" and that, as a boy, he could "outrace the fastest streamline train":

- 30 -



Superman Sunday Strip (May 31, 1942)

89.     Through Pacific Pictures, Toberoff manipulated the Siegel and Shuster Heirs into falsely positioning Siegel as the sole creator of any putative copyrightable elements in Superboy.  They did so to enable the Siegels to claim a sole ownership interest in Superboy elements allegedly subject to recapture and thereby prevent DC Comics from exploiting Superboy without the Siegels' authorization and without being subject to claims of copyright infringement. (Again, to be clear, DC Comics disputes that Superboy is not a derivative work of Superman and disputes that it is a work that Shuster and Siegel owned.)

90.     To manufacture this claim of sole ownership by the Siegels, Toberoff (acting through Pacific Pictures) caused the *Shuster Heirs* to remove from the 2001 joint venture between Pacific Pictures and the Shuster Heirs all claims by the Shusters to alleged rights in any and all Superboy elements.  Toberoff accomplished this by creating a new joint-venture agreement—signed October 30, 2003—that *deleted* any reference to Superboy.  Defendants Mark Peary and Jean Peavy signed this agreement (the "2003 Pacific Pictures Agreement"), which omitted all references to Superboy in its description of the Shuster Heirs' rights. Toberoff induced the Shuster Heirs to disclaim any interest in Superboy so that Toberoff could position the Siegel Heirs to recapture 100% of these rights and

- 31 -

1    assert a copyright infringement action against DC Comics—and seek an injunction

2    against the television program *Smallville* on that basis.

3        91.    In October 2004, the Siegels filed two actions in this Court seeking

4    declaratory relief as to the validity of the Superman and Superboy termination

5    notices, and in April 2005, the Siegels supplemented their pleadings in the

6    Superboy action to assert copyright infringement (the "Siegel Actions"). (Case

7    Nos. CV-04-8400 ODW; CV-04-8776 ODW.) Both actions remain pending before

8    this Court.

9    **G.    The Shusters' Flawed Termination Notice**

10       92.    On November 10, 2003, one week after the 2003 Pacific Pictures

11   Agreement was signed, defendant Mark Peary served on DC Comics a "Notice of

12   Termination of Transfer Covering Extended Copyright Renewal Term of

13   'Superman'" (the "Shuster Termination Notice").

14       93.    The form submitting the Shuster Termination Notice for recordation in

15   the U.S. Copyright Office was certified under penalty of perjury by Toberoff on

16   behalf of "IP Worldwide/Estate of Joseph Shuster." IP Worldwide is the Toberoff

17   entity which, upon information and belief, holds a portion of the Siegel Heirs'

18   Superman and Superboy rights pursuant to the IP Worldwide Agreement.

19       94.    The Shuster Termination Notice purports to terminate, under 17 U.S.C.

20   § 304(d), effective October 26, 2013, the following Shuster copyright grants:

21   (a) the December 4, 1937 Agreement; (b) the March 1, 1938 Agreement; (c) the

22   DCI September 22, 1938 Agreement; (d) the McClure September 22, 1938

23   Agreement; (e) the December 19, 1939 Agreement; (f) the May 19, 1948

24   Stipulation; and (g) the December 23, 1975 Agreement.

25       95.    The Shuster Termination Notice does *not* purport to terminate the

26   copyright grants in the May 21, 1948 Consent Agreement or, even more

27   importantly, the 1992 Agreement between the Shuster Heirs and DC Comics.

28

FIRST AMENDED COMPLAINT

1    96.    The Shuster Termination Notice purports to apply to the following

2    works:  (a) certain unpublished material created before Action Comics No. 1;

3    (b) Action Comics No. 1; (c) Action Comics No. 2; (d) Action Comics No. 3;

4    (e) Action Comics No. 4; (f) Action Comics No. 5; (g) Action Comics No. 6;

5    (h) Action Comics No. 7; (i) Superman No. 1; and (j) Superman No. 3.

6    97.    The Shuster Termination Notice does not purport to terminate any

7    copyright grant in pre-Action Comics No. 1 promotional materials or any materials

8    relating to Superboy.

9    98.    The Shuster Termination Notice states that defendant Mark Peary "is

10    the person entitled to exercise Joseph Shuster's termination interest" and that the

11    Notice was "signed by all persons whose signature is necessary to terminate."  The

12    Notice makes no mention of the joint venture that the Shuster Heirs and Pacific

13    Pictures formed or its putative ownership stake in the to-be terminated Superman

14    rights.  Nor does the Notice mention Pacific Pictures or its putative ownership stake

15    in the joint venture, despite the grant of 50/50 rights in the joint venture to Pacific

16    Pictures pursuant to Pacific Pictures' 2001 and 2003 agreements with the Shusters.

17    99.    On September 10, 2004, Pacific Pictures and the Shuster Heirs signed

18    a one-page letter (the "September 10, 2004 Letter") purporting to cancel their joint

19    venture and providing that the 2001 Pacific Pictures Agreement and 2003 Pacific

20    Pictures Agreement "have been cancelled."  However, because the Shuster Heirs

21    and Pacific Pictures had agreed that all rights held by their joint venture would be

22    divided 50/50 upon termination of the joint venture "for any reason," the apparent

23    effect of the September 10, 2004 Letter was to transfer 50% of the Shuster Heirs'

24    purported share of Shuster's rights to Toberoff or his companies.

25    100.    DC Comics is informed and believes that Toberoff (or his companies)

26    now own 50% of the Shuster Heirs' putative rights as well as the 45% share of the

27    Siegel Heirs' putative rights.  This gives Toberoff the largest financial stake among

28    defendants' collective asserted rights in Superman and in the pending legal disputes

- 33 -

FIRST AMENDED COMPLAINT

1  concerning those rights (*i.e.*, Toberoff—47.5%; Siegel Heirs—27.5%; Shuster

2  Heirs—25%).

3      101.   DC Comics is also informed and believes that Toberoff, Pacific

4  Pictures, IP Worldwide, the Siegels, and the Shusters have entered into one or more

5  agreements preventing the Siegels or Shusters from conveying rights to DC Comics

6  or entering into other agreements with DC Comics, including for the settlement of

7  their putative termination claims or litigation, without the consent of other parties.

8  For example, in the 2001 and 2003 Pacific Pictures Agreements, the Shuster Heirs

9  agreed not to settle any claims with respect to the Superman rights without Pacific

10  Pictures' or Toberoff's consent.  Such consent agreements are void as against

11  public policy, violate DC Comics' rights, and impede the administration of justice.

12  **H.**    **Toberoff's Wrongful Conduct Is Revealed to DC Comics in the Toberoff**

13          **Timeline**

14      102.   Pursuant to federal court orders dated September 26, 2008 and

15  December 4, 2008, Toberoff was compelled to produce to DC Comics a document

16  titled "Superman – Marc Toberoff Timeline" (the "Toberoff Timeline," attached

17  hereto as Exhibit A), which Toberoff has acknowledged was written by an attorney

18  he previously employed.  To prevent DC Comics from obtaining and using the

19  document, Toberoff asserted that it was privileged, but his position was repeatedly

20  rejected by this Court.  The Toberoff Timeline was produced to DC Comics on

21  December 10, 2008.

22      103.   The Toberoff Timeline describes and discloses Toberoff's wrongful

23  activities in pursuing the Siegel and Shuster Heirs' putative interests in the

24  Superman rights.  It lays out Toberoff's scheme to induce the Siegel Heirs to

25  repudiate the Siegel-DC Comics Agreement with DC Comics (*e.g.*, "It [is] clear at

26  this juncture that [Toberoff] thwarted the earlier deal with Time Warner and DC

27  Comics in 2002 for his own personal gain"); his efforts to acquire as "much

28  ownership of the Superman copyright <u>personally</u> as he can"; and his attempt to

- 34 -

FIRST AMENDED COMPLAINT

conceal certain of his illicit activities from the Siegel and Shuster Heirs.  (Emphasis in original.)  As a result, "***the single person who would stand to gain the MOST in a settlement with Time Warner [and DC Comics] regarding the ongoing SUPERMAN legal dispute would not be the heirs themselves, but Marc Toberoff.***"  (Emphasis in original.)

104.    The Toberoff Timeline discloses many of the facts alleged herein, and concludes:  "[Toberoff] is solely motivated *at all times* not by his clients' interests, but manipulating pieces of the puzzle so that he may receive the greatest percentage from a very possible large Time Warner settlement, through part ownership and unconscionable fees."  (Emphasis in original.)  The Toberoff Timeline explains that "[a]t least 7 attorneys have come and gone at the Law Offices of Marc Toberoff, and many have left due to ethical issues."  Many of these and other disturbing, salient facts detailed herein have only recently come to light in the past 20 months.

# V.  CLAIMS FOR RELIEF

**A.    First Claim for Relief:  Declaratory Relief re: Invalidity of Copyright Termination Notice (Against Defendants Shuster Estate, Peary, and Peavy)**

105.    DC Comics re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

106.    The Shuster Termination Notice is invalid, and thus ineffective, for at least five separate, independent, and alternative reasons:

**(1) There Is No Statutory Basis for the Shusters to Terminate**

107.    The Copyright Act does not provide any basis for the Shuster Estate to terminate.  Shuster's termination right was lost when he died in 1992 without having exercised it and without leaving a statutory heir to inherit it under the then-applicable provisions of the Copyright Act.

108.    The 1976 Copyright Act gave authors the ability to terminate certain pre-1978 copyright grants.  According to the original termination provisions:

FIRST AMENDED COMPLAINT

1  "Where an author is dead, his or her termination interest is owned, and may be

2  exercised, by his widow or her widower and his or her children or grandchildren."

3  17 U.S.C. § 304(c)(2) (1976).  In other words, the right of termination could only

4  be exercised by an author during his or her lifetime, or by a widow, child, or

5  grandchild after the author's death.  As the language of the statute establishes, and

6  its legislative history confirms, the right of termination was lost if an author died

7  without exercising it and without leaving a widow, child, or grandchild to inherit it.

8      109.    Shuster could have exercised his putative termination right beginning

9  in April 1984.  The 1976 Copyright Act provided that a copyright grant could be

10  terminated 56 years after the date copyright was first secured (*i.e.*, April 1994, or 56

11  years after the April 1938 publication of Action Comics No. 1), and that notice of

12  termination could be served 10 years before the termination date (*i.e.*, April 1984,

13  or 10 years before April 1994).  17 U.S.C. § 304(c)(3)-(4).

14      110.    During his lifetime, Shuster chose not to exercise his termination right.

15  Shuster died in 1992, and did not leave a widow, child, or grandchild to succeed to

16  his termination right under section 304(c) of the 1976 Copyright Act.  As a result,

17  Shuster's termination right ceased to exist on his death.

18      111.    The 1999 Copyright Term Extension Act ("CTEA") extended the term

19  of copyright by 20 years and also provided an opportunity to authors and selected

20  heirs to terminate for this new extended time period in circumstances where the

21  "[t]ermination rights provided for in subsection (c) have expired on or before the

22  effective date of the [CTEA]," or October 27, 1998, and the "author or owner of the

23  termination right has not previously exercised such termination right."  17 U.S.C.

24  § 304(d).  Where section 304(d) applies, section 304(c)(2) provides that if an author

25  is dead, the termination right can be exercised by his widow, children, or

26  grandchildren or, "[i]n the event that the author's widow or widower, children and

27  grandchildren *are not living*, the author's executor, administrator, personal

28  representative, or trustee…."  (Emphasis added).  These are the provisions that

- 36 -

FIRST AMENDED COMPLAINT

1    defendant Mark Peary, the executor of the Shuster Estate, purports to rely on in the

2    Shuster Termination Notice, but they have no application here.  By its own terms,

3    section 304(d) only applies where an author's window for exercising the

4    termination right opened and closed or "expired" (*not* when an author died while

5    the window was open without exercising the right or leaving any heirs to do so),

6    and where a deceased author's widow, child, or grandchild is "not living," but who

7    did at some time live.  Shuster never had a widow, child, or grandchild, and Peary,

8    acting on behalf of the Shuster Estate, has no right to file the invalid notice of

9    termination that he did.

10       **(2) The 1992 Agreement Bars the Shusters from Pursuing Termination**

11       112.    The 1992 Agreement that Frank Shuster and Jean Peavy entered into

12   with DC Comics bars the Shuster Estate from pursuing termination because, *inter*

13   *alia*, in exchange for valuable consideration, the 1992 Agreement effected a

14   rescission, revocation, and re-grant of all prior copyright grants, which eliminated

15   any pre-1978 grant that could be subject to termination under section 304 of the

16   Copyright Act.

17       113.    The 1992 Agreement, which was executed on October 2, 1992,

18   provides that Shusters' heirs "fully settle[]" and forfeit any and all rights under

19   Joseph Shuster's prior "agreements or otherwise," thereby revoking and rescinding

20   those prior, pre-1992 instruments.  It also "*grant[s] to us* [DC Comics] any …

21   copyrights, trademarks, or other property right in any and all work created in whole

22   or in part by your brother, Joseph Shuster, or any works based thereon." (Emphasis

23   added.)

24       114.    Section 304(d) of the Copyright Act only allows for termination of

25   copyright grants "executed before January 1, 1978."  Because the 1992 Agreement

26   left intact no pre-1978 copyright grant to terminate, section 304(d) does not apply,

27   and the Shuster Estate has no copyright grant that it may terminate.

28

- 37 -

FIRST AMENDED COMPLAINT

115.    Shuster's heirs approached DC Comics in 1992 seeking increased annual payments, certain tax benefits, and payment of Shuster's debts and expenses.  At the time, Shuster's heirs recognized the value of Superman as a property.  As the result of DC Comics' development, promotion, and exploitation of Superman from 1938 to 1992, Superman had evolved from the black-and-white figure drawn by Shuster for Action Comics No. 1 to a global, multi-media industry. Moreover, in correspondence with DC Comics, the Shusters adverted to the termination rights provided for under the Copyright Act.  As Shuster's heirs requested, the 1992 Agreement provided that DC Comics would:  (a) increase its annual payments to the Shuster Heirs to $25,000 per year—five times higher than the amount it was obligated to pay under the December 23, 1975 Agreement; (b) make these annual payments to Jean Peavy for purposes of a tax benefit; and (c) pay the approximately $20,000 representing Shuster's final debts and expenses. DC Comics continues to make annual payments under the 1992 Agreement, and has paid Shuster's heirs close to $500,000 to date.  The 1992 Agreement confirms that it "fully settles *all claims to any payments or other rights or remedies* which you may have under any other agreement or otherwise, *whether now or hereafter existing* regarding the copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon."  (Emphasis added.)  Shuster's heirs agreed "not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever."

116.    By effectively rescinding, revoking, and re-granting any and all prior grants of Joe Shuster's rights, the Shuster Heirs have no right to terminate any of the Superman copyrights.  Defendant Peavy has recognized that this was the clear effect of the 1992 Agreement; in a September 7, 1999 letter to DC Comics, she confirmed:  "I have learned from the Internet that Joanne Siegel has filed a copyright claim for SUPERMAN [*i.e.*, the Siegel Superman Termination Notice].  I want you to know that I intend to honor our pension agreement."

- 38 -

FIRST AMENDED COMPLAINT

117.    At the very least, because of DC Comics' continued performance under the 1992 Agreement, and the Shusters' continued acceptance of benefits under the Agreement—even after filing the Shuster Termination Notice—the Shusters are estopped from disputing that the 1992 Agreement remains in full force and effect, which operates to preclude the assertion of any termination right.

### (3) **The Shusters Lack the Majority Interest Necessary to Terminate**

118.    The Shuster Termination Notice is also invalid because the party that filed it—if defendants' own contractual documents are to be believed—lacked authority to do so.  Section 304(c)(1) of the Copyright Act provides that termination of a grant executed by an author who is not living may be exercised only "by the person or persons who … own and are entitled to exercise a total of *more than one-half of that author's termination interest*."  17 U.S.C. § 304(c)(1) (emphasis added).  Copyright Office regulations require that a termination notice include "specific indication of the person or persons executing the notice who constitute more than one-half of that author's termination interest" and "shall be signed by the number and proportion of the owners of that author's termination interest required under section 304(c)."  37 C.F.R. § 201.10(b)(1)(vii), (c)(2).

119.    According to the Pacific Pictures agreements (to the extent they are valid and enforceable), the Shuster Estate does not own—and did not own at the time the Shuster Termination Notice was executed—the "more than one-half" majority interest necessary to terminate under section 304(c)(1) of the Copyright Act.

120.    Pursuant to the 2001 Pacific Pictures Agreement, defendants Mark Peary and Jean Peavy "transfer[red] and assign[ed] … their rights, title, and interest" in all of Shuster's copyrights and creations to their joint venture with Pacific Pictures.  In the 2003 Pacific Pictures Agreement, Peary confirmed the terms of the 2001 Pacific Pictures Agreement on behalf of the Shuster Estate.

- 39 -

FIRST AMENDED COMPLAINT

1   121.   One week later, on November 10, 2003, Peary served the Shuster

2   Termination Notice on behalf of the Shuster Estate.  At the time, the Shuster Estate

3   did not own *any* of the purported termination right, as this and all other rights had

4   been transferred to the joint venture with Pacific Pictures.  At most, the Shuster

5   Estate owned only a 50% interest in that joint venture.  As a result of the September

6   10, 2004 Letter purporting to cancel the 2001 and 2003 Pacific Pictures Agreements

7   and by the terms of the 2001 and 2003 agreements themselves, any putative rights

8   held by the joint venture were split 50/50 between the Shuster Heirs and Pacific

9   Pictures on cancellation of the joint venture agreement:  "[Upon] winding-up of the

10  Venture or in the event of termination of the Venture *for any reason*, *all Rights,*

11  *property or assets of the Venture will be held* fifty percent (50%) by the [Shuster

12  Heirs] *and fifty percent (50%) by PPC*."  (Emphasis added.)  The Shuster

13  Termination Notice is therefore invalid under section 304(c)(1) of the Copyright

14  Act.

15  122.   The Shuster Termination Notice represents that Peary "is the person

16  entitled to exercise Joseph Shuster's termination interest" and that the Notice had

17  been "signed by all persons whose signature is necessary to terminate."  Peary's

18  failure to disclose that he had purported to transfer this putative termination right to

19  the joint venture with Pacific Pictures, or include a signature on behalf of the joint

20  venture or Pacific Pictures, violated 37 C.F.R. § 201.10(b)(1)(vii) and 37 C.F.R.

21  § 201.10(c)(2).

22  123.   Peary's failure to disclose the requisite information in the Shuster

23  Termination Notice was not harmless.  Upon information and belief, these

24  omissions were not inadvertent, but were intended to conceal material information

25  from DC Comics, including:  (a) the various conflicts of interest arising from

26  Toberoff's and his companies' significant ownership interest in the Shuster Estate's

27  and the Siegel Heirs' purported rights; and (b) consent agreements that Toberoff

28

- 40 -                          FIRST AMENDED COMPLAINT

1  procured limiting the Shuster and Siegel Heirs' freedom to enter into agreements

2  with DC Comics regarding those rights.

3      124.   The Copyright Act's termination provisions were crafted to avoid the

4  trafficking in future interests by third parties like Toberoff and his companies, yet

5  that is exactly what his agreements with the Shuster and Siegel Heirs accomplish,

6  and what Toberoff and Shusters failed to disclose to DC Comics and the Copyright

7  Office by serving and filing the Shuster Termination Notice.

8          **(4) The Shusters Do Not Attempt to Terminate Certain**

9              **All-Encompassing Copyright Grants**

10     125.   The 1992 Agreement includes a "grant" by Shuster's heirs to DC

11  Comics of, *inter alia*, all "copyrights, trademarks, or other property right in any and

12  all work created in whole or in part by … Joseph Shuster, or any works based

13  thereon."  In the Shuster Termination Notice, defendants did not terminate (or even

14  mention) the 1992 Agreement.

15     126.   The May 21, 1948 Consent Agreement also includes a grant by Siegel

16  and Shuster to National, DC Comics' predecessor-in-interest, of all of Siegel and

17  Shuster's rights in Superman and Superboy.  (If the 1992 Agreement is not read as

18  a rescission, revocation, and re-grant of all prior agreements between Shuster and

19  DC Comics (and it should be), then the May 21, 1948 Consent Agreement remains

20  in effect.)

21     127.   Defendants do not attempt to terminate the May 21, 1948 Consent

22  Agreement, and do not identify the May 21, 1948 Consent Agreement in the

23  Shuster Termination Notice.

24     128.   As the result of defendants' failure to terminate the 1992 Agreement

25  and May 21, 1948 Consent Agreement, the grants contained therein remain in full

26  force and effect.  Thus, DC Comics is and continues to be the sole owner of all

27  rights, including rights under copyright, in Superman pursuant to the 1992

28  Agreement and May 21, 1948 Consent Agreement.

- 41 -

**(5) <u>The Doctrine of Unclean Hands Bars the Shusters from Terminating</u>**

129.    The doctrine of unclean hands requires that the Shuster Termination Notice be deemed invalid because it contains material misrepresentations intended to mislead the courts, Copyright Office, and DC Comics—all to the detriment of DC Comics.

130.    The Shuster Heirs did not disclose Pacific Pictures' purported ownership interest in the rights sought to be terminated.  Just one week before filing the Shuster Termination Notice, the Shuster Estate signed the 2003 Pacific Pictures Agreement, reaffirming its transfer of 100% of its rights in any Superman-related copyrights to the joint venture with Pacific Pictures.  Copyright Office regulations require that a termination notice include "specific indication of the person or persons executing the notice who constitute more than one-half of that author's termination interest" and "shall be signed by the number and proportion of the owners of that author's termination interest required under section 304(c)."  37 C.F.R. § 201.10(b)(1)(vii), (c)(2).  Yet Pacific Pictures is conspicuously absent from the Shuster Termination Notice.  This omission was not inadvertent, as explained above.

131.    Induced by Toberoff, the Shuster Heirs also falsely disclaimed any interest in the Superboy rights in the Shuster Termination Notice.  This permitted Toberoff to assert on behalf of the Siegel heirs a baseless Superboy-related copyright infringement claim against DC Comics.  Prior to these manipulations by Toberoff, Shuster and the Shuster heirs had truthfully maintained for over 50 years that Shuster had co-created Superboy.  For example, the findings submitted by Siegel and Shuster's counsel in the 1940s Westchester Action, specified that Shuster had drawn the first "Superboy" denominated story in More Fun Comics No. 101.  Similarly, in 1972 and 1973, during the Superman renewal litigation, Siegel and Shuster jointly filed copyright renewal notices asserting joint authorship

- 42 -

FIRST AMENDED COMPLAINT

1   both in the Superboy character, and in More Fun Comics No. 101, which contained

2   the first comic book story denominated "Superboy."

3        132.    Additionally, in the 2001 Pacific Pictures Agreement, entered into

4   before Toberoff had secured an agreement with the Siegel Heirs, Toberoff and the

5   Shuster Heirs expressly identified "Superboy" as among the universe of rights that

6   Shuster had jointly created with Siegel. Yet just two years later in 2003, and only

7   *after* Toberoff had entered into an agreement with the Siegel Heirs securing control

8   over their rights, did the Shuster Heirs suddenly reverse course. The 2003 Pacific

9   Pictures Agreement omitted all reference to Superboy, and the Shuster Termination

10  Notice filed one week later avoided any overt mention of Superboy elements or

11  works.[3] But even the termination notice served by the Shuster Heirs, while

12  carefully drafted to avoid any mention of Superboy, could not completely rewrite

13  history. The Shuster Termination Notice expressly identifies Action Comics No. 1

14  and Superman No. 1 as terminated works. Both of these works, however, clearly

15  depict Superman as a boy with super-powers: *i.e.*, a "Superboy." For example,

16  Action Comics No. 1 features Superman as a very young boy exhibiting super

17  strength, and Superman No. 1 depicts Superman as a youth leaping over a building.

18       133.    After the Shuster Termination Notice was filed, the Siegel Heirs

19  brought a copyright infringement claim against DC Comics on the frivolous ground

20  that Superboy was the sole creation of Siegel, entitling the Siegel Heirs to terminate

21  and recapture 100% of the Superboy rights (as opposed to the 50% share they

22  would be entitled to recapture if Superboy was a joint work). The Siegel Heirs

23  threatened to enjoin the popular *Smallville* television series, which they wrongly

24  claimed infringed their exclusive rights in Superboy. As a result, DC Comics has

25  incurred substantial expenses defending against the claim Toberoff manufactured

26  _____

27  [3] As noted, DC Comics maintains that Superboy is a derivative work based upon the preexisting Superman, and in any event, is owned solely and exclusively by DC Comics, *inter alia*, because it is a work-for-hire and the script submitted by Siegel

28  and Shuster is unpublished and, thus, is not terminable.

- 43 -

FIRST AMENDED COMPLAINT

1   and the Shusters facilitated.  Defendants compromised the integrity of the

2   Copyright Office and judicial system by crafting the Shuster Termination Notice in

3   this way, and the Shuster Termination Notice should be held invalid on this and the

4   other related grounds set forth herein.

5                                *     *     *

6        134.   Each of the foregoing reasons is a separate, independent, and

7   alternative basis for declaring the Shuster Termination Notice to be invalid and thus

8   ineffective.  A declaration by this Court regarding the validity of the Shuster

9   Termination Notice is warranted under the Declaratory Judgment Act, 28 U.S.C.

10  §§ 2201 *et seq.*, to establish the parties' respective rights and obligations with

11  respect to the copyright interest in the Superman material.

12  **B.    Second Claim for Relief:  Declaratory Relief re: Limited Scope of**

13  **Copyright Termination Notice (Against Defendants Shuster Estate,**

14  **Peary, and Peavy)**

15       135.   DC Comics re-alleges and incorporates by reference each and every

16  allegation contained in the paragraphs above.

17       136.   This Second Claim for Relief is advanced in the alternative—*i.e.*, if the

18  Court does not grant DC Comics' First Claim for Relief set forth above and hold

19  that the Shuster Termination Notice is invalid.

20                **(1) Additional Factual Background**

21       137.   Upon information and belief, in or around 1933, Siegel and Shuster

22  began co-creating comic strips, some of which included stories featuring a character

23  named Superman.  The materials created by Siegel and Shuster during this time are

24  believed to include: (a) 24 days of Superman comic strips intended for newspapers;

25  (b) a seven-page synopsis of the last 18 days (weeks two through four) of such

26  comic strips; (c) a paragraph previewing future Superman exploits; (d) a nine-page

27  synopsis of an additional two months of daily comic strips; and (e) 15 daily comic

28  strips (collectively, the "Unpublished Superman Works").  None of these materials

                                - 44 -                FIRST AMENDED COMPLAINT

1    was published in its original form, most were never published at all, and some are

2    apparently lost.

3         138.   Upon information and belief, between 1933 and 1937, Siegel and

4    Shuster submitted the Unpublished Superman Works to a number of prospective

5    publishers and newspaper syndicates, all of which rejected them.

6         139.   On December 4, 1937, Siegel and Shuster entered into the December

7    4, 1937 Agreement with DCI.  Siegel and Shuster agreed to "give their exclusive

8    services" in producing certain comic features for a period of two years.  Siegel and

9    Shuster were required to submit any new continuity to DCI, which reserved the

10   right to accept or reject them for a period of sixty days.

11        140.   In early 1938, DCI was seeking material for use in a new comic book

12   it was developing entitled "Action Comics."  Pursuant to the December 4, 1937

13   Agreement, the 24 days of Superman comic strips from the Unpublished Superman

14   Works were provided to DCI for review.  DCI decided to publish a Superman story

15   in Action Comics No. 1, but the materials submitted by Siegel and Shuster to DCI

16   were neither in a form that was acceptable for publication in a comic book, nor

17   were they complete.  Therefore, at the instance and expense of DCI and subject to

18   its right of control, Siegel and Shuster adapted the 24 days of comic strips, and

19   added certain new material, to create a 13-page uncolored comic book story entitled

20   "Superman."  Cover art featuring Superman that was used for Action Comics No. 1

21   was thereafter created by DCI.  DCI's printers or engravers, working at the

22   direction of DCI, chose colors for the Superman character and colored the 13-page

23   story and cover.

24        141.   Siegel and Shuster assigned to DCI all of their rights in Superman in

25   the March 1, 1938 Agreement.  This included "all good will attached thereto and

26   exclusive right to the use of the characters and story, continuity and title of strip."

27   Siegel and Shuster agreed not to use Superman or any other character featured in

28   the strip "by their names contained therein."

- 45 -

FIRST AMENDED COMPLAINT

142.   Before the April 1938 publication of Action Comics No. 1, which was cover-dated June 1938, DCI promoted the upcoming Superman story in some of its other publications, including "More Fun Comics No. 31" and "Detective Comics No. 15." These publications were cover-dated May 1938 and were published prior to Action Comics No. 1.  The promotions (the "Promotions") depict Superman in his costume—including a cape, boots, leotard, and inverted triangular "S" crest on his chest—exhibiting his super-strength by holding a car over his head as bystanders watch in awe.  The Promotions show almost the entirety of what would become the cover of Action Comics No. 1 in clarity and detail.

143.   Action Comics No. 1 was comprised not only of the 24 days of Superman comic strips from the pre-existing Unpublished Superman Works (as modified and edited by Siegel and Shuster), but of additional new material created by Siegel and Shuster at DCI's instance and expense and subject to its right of control.

144.   Upon information and belief, after the publication of Action Comics No. 1, Siegel and Shuster supplied further original Superman stories to DCI, at DCI's instance and expense and subject to its right of control.  On September 22, 1938, Siegel and Shuster entered into another employment agreement with DCI confirming that Siegel and Shuster had "been doing the art work and continuity for said comics [including Superman comics] for us.  We wish you to continue to do said work and hereby employ and retain you for said purposes."  The DCI September 22, 1938 Agreement also contained an acknowledgement that DCI was the "exclusive" owner of Superman.

145.   Also on September 22, 1938, Siegel and Shuster entered into the McClure September 22, 1938 Agreement with DCI and the McClure Newspaper Syndicate concerning the use of Superman in newspaper strips.

146.   All of Siegel and Shuster's contributions to Superman comic books and comic strips were made pursuant to the December 4, 1937 Agreement, March

- 46 -

FIRST AMENDED COMPLAINT

1, 1938 Agreement, the DCI September 22, 1938 Agreement, the McClure September 22, 1938 Agreement, contemporaneous oral agreements confirmed by one or more of those agreements, or certain subsequent agreements affirming those agreements, as employees of DCI (or its successors) and at DCI's instance and expense and subject to its right of control. In particular, upon information and belief, Shuster continued to work for DCI and/or its successors as a staff artist even when Siegel did not, and therefore may have had oral or written employment agreements independently of Siegel. As a result, all of these materials constitute works for hire under the 1909 Copyright Act, and the copyrights therein are owned exclusively by DC Comics and are not subject to termination under later amendments to the Copyright Act.

147. On November 30, 1938, Siegel wrote a letter to DCI (the "November 1938 Letter") suggesting that it publish a comic book entitled "Superboy," "which would relate to the adventures of Superman as a youth." The November 30, 1938 Letter does not contain any discussion of plot, dialogue, appearance, or any other copyrightable material relating to Superboy. DCI decided not to publish a Superboy comic book at that time, and had already published comic books, discussed *supra*, that showed Superman as a young boy and exhibiting super-human strength. For example, in 1939, among the Superman material prepared by Siegel and Shuster at the instance and expense of DCI and subject to its right of control was Superman No. 1. In Superman No. 1, Clark Kent is depicted as a boy with super-powers.

148. On December 19, 1939, Siegel and Shuster entered into the December 19, 1939 Agreement with DCI, which modified the DCI September 22, 1938 Agreement by, *inter alia*, doubling Siegel and Shuster's compensation for Superman comic books and newspaper strips and providing for payment to Siegel and Shuster for uses of Superman in media such as radio, motion pictures, and toys.

- 47 -

FIRST AMENDED COMPLAINT

1    Under the December 19, 1939 Agreement, Siegel and Shuster again acknowledged

2    DCI's sole ownership of Superman.

3        149.    Upon information and belief, in December 1940, Siegel, on behalf of

4    himself and Shuster, submitted to DCI a 13-page script of continuity for Superboy

5    (the "Unpublished 1940 Superboy Script") and renewed his suggestion that DCI

6    publish a comic book depicting Superman as a youth.  The Unpublished 1940

7    Superboy Script, which includes the credit line "By Jerry Siegel and Joe Shuster,"

8    states: "So many faithful followers of today's leading adventure comic strip,

9    SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth … And

10   so here he is at last … the answer to your requests … America's outstanding boy

11   hero: SUPERBOY!"  The Unpublished 1940 Superboy Script explains that "[i]n

12   later years [Superboy] was to become the might[y] figure known as SUPERMAN!"

13   The Unpublished 1940 Superboy Script was derived entirely from pre-existing

14   Superman elements and ideas that had been published by DCI as part of works for

15   hire, and contained no original copyrightable element.  Again, DCI decided not to

16   publish a Superboy comic book at that time.

17       150.    Upon information and belief, sometime prior to November 18, 1944,

18   DCI published a comic book depicting the adventures of Superman as a youth,

19   called Superboy, in "More Fun Comics No. 101," which had a cover date of

20   January-February 1945 and was illustrated at least in part by Shuster.  Upon

21   information and belief, Siegel did not participate in the creation of this comic book

22   or the Superboy story it contained.  Other than retelling the Superman origin story

23   from Action Comics No. 1 and Superman No. 1, this Superboy story bore no

24   resemblance to the Unpublished 1940 Superboy Script.

25       151.    In the more than 70 years since the publication of Action Comics No.

26   1 in 1938, DC Comics has created a vast universe of Superman material spanning

27   virtually all media, including comic books, graphic novels, live action pictures,

28   feature-length motion pictures, motion picture serials, radio and television serials,

- 48 -                    FIRST AMENDED COMPLAINT

1    and live theatrical presentations.  DC Comics' extensive development and

2    exploitation of Superman has generated new characters, new super-powers, new

3    components to the Superman universe, new elements in the Superman back story,

4    and new changes in Superman's appearance.

5              **(2) Claim for Declaratory Relief re: Limited Scope of**

6                        **Copyright Termination Notice**

7        152.   In the event that the Shuster Termination Notice challenged in the First

8    Claim for Relief above is deemed to be effective, the scope and reach of the Notice

9    must be declared limited in the following ways:

10                   **a.  Unpublished Superman Works**

11       153.   The Shuster Termination Notice purports to terminate certain portions

12   of the Unpublished Superman Works, including:  (a) "twenty-four days … of

13   previously unpublished SUPERMAN newspaper comic strips, created c. 1934,"

14   (b) "SUPERMAN story in comic book form … created c. 1933," and (c) "15

15   SUPERMAN daily comic strips … created c. 1934."

16       154.   To the extent that any portion of the Unpublished Superman Works

17   may be considered published for purposes of the Copyright Act (and this is

18   disputed), those portions were published only as a result of their adaptation for

19   inclusion in Action Comics No. 1, which was a work made for hire.  The Copyright

20   Act expressly provides that "a work made for hire" cannot be subject to

21   termination.  17 U.S.C. § 304(c)-(d).  As a result, the Shuster Termination Notice is

22   ineffective as to the Unpublished Superman Works.

23                   **b.  Pre-Action Comics No. 1 Promotions**

24       155.   The Shuster Termination Notice does not attempt to terminate DC

25   Comics' rights in the Promotions published before Action Comics No. 1.

26       156.   Moreover, upon information and belief, the Promotions, depicting in

27   sum and substance what was subsequently published as the cover of Action Comics

28   No. 1, were not prepared by Siegel or Shuster, but rather by others either employed

                                    - 49 -                    FIRST AMENDED COMPLAINT

1 by DCI or at the instance and expense of DCI and subject to its right of control. As
2 a result, the Promotions were works made for hire and any copyright therein was
3 owned by DCI *ab initio* and cannot be subject to termination. 17 U.S.C. § 304(c)-
4 (d).

5     157.   DC Comics remains the sole owner of the Promotions, all copyrights
6 therein, and the various copyrightable elements contained therein. The Shusters
7 may not seek to terminate copyright interests comprised in the Promotions.

8                                **c. Works for Hire**

9     158.   The Shuster Termination Notice purports to recapture the rights in
10 Action Comics Nos. 1-7, Superman No. 1, and Superman No. 3 ("Superman
11 Works"). Each of the Superman Works was prepared at the instance and expense
12 of DCI and subject to its right of control. As a result, the Superman Works were
13 works made for hire and any copyright therein was owned by DCI *ab initio* and
14 cannot be subject to termination. 17 U.S.C. § 304(c)-(d).

15     159.   DC Comics remains the sole owner of the Superman Works, all
16 copyrights therein, and the various copyrightable elements contained therein.[4]

17                                **d. Derivative Works**

18     160.   All Superman-related works prepared after the publication of Action
19 Comics No. 1 were derivative works based on pre-existing copyrightable material
20 and created under the authority of valid copyright grants (the "Derivative Works").

21     161.   The Derivative Works include new characters, new super-powers, new
22 components to the Superman universe, new elements in the Superman back-story,
23 and changes in the appearance of Superman.

24

25 _____

26     [4] The court in the Siegel Action agreed with this position almost entirely, ruling
   that other than a handful of pre-1938 materials authored by Siegel, all of Siegel's
27 Superman works were created as "works for hire" on behalf of DC Comics and thus
   could not be terminated. DC Comics reserves all rights with respect to these
28 interim rulings in the Siegel case.

                                - 50 -            FIRST AMENDED COMPLAINT

162.   Regardless of whether the Shuster Termination Notice is deemed valid, DC Comics remains the sole owner of the Derivative Works and retains the continuing right to exploit the Derivative Works under section 304 of the Copyright Act, 17 U.S.C. § 304(c)(6)(A).

### e. Scope of Shuster Notice

163.   The Shuster Termination Notice, in addition to specifying works to be terminated, also describes certain elements purportedly encompassed by the works sought to be recaptured.  Many of these elements do not appear in the specified works.  In addition to identifying elements that are not present, the Shuster Termination Notice is also notable for its failure to specify elements that are present.  For example, although both the purportedly terminated works Action Comics No. 1 and Superman No. 1 depict Superman as a boy with super-powers, the Shuster Termination Notice is silent on this element.  Accordingly, a dispute has arisen between the parties regarding the scope of the Shuster Termination Notice with respect to the elements that appear, or which do not appear, in the allegedly terminated identified in the Shuster Termination Notice, including, but not limited to, the following:

a.      Superman's "telescopic vision"

b.      Superman's "super hearing"

c.      Superman's "super … sense of smell"

d.      Superman as a boy with super-powers (*i.e.*, "Superboy")

e.      "[D]iamond-shaped "S" insignia on [Superman's] chest"

f.      "[L]ove triangle between Superman, Lois Lane and Clark Kent"

g.      "Perry White"

h.       "Daily Planet newspaper"

i.      "Metropolis"

j.      "Jor L"

k.      "Krypton"

- 51 -

FIRST AMENDED COMPLAINT

164.   A declaration by this Court regarding the scope of the Shuster Termination Notice is warranted under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, to establish the parties' respective rights and obligations with respect to the copyright interest in the Superman material.  The Shusters may not seek to terminate copyright interests owned by DC Comics, including those materials listed above.

**C.    Third Claim for Relief:  Declaratory Relief re: Shuster Period of Exclusivity (Against All Defendants)**

165.   DC Comics re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

166.   This Third Claim for Relief is advanced in the alternative—*i.e.*, if the Court does not grant DC Comics' First Claim for Relief set forth above and hold that the Shuster Termination Notice is invalid.

167.   The Copyright Act establishes an exclusive period between the time a copyright termination notice is served and the effective termination date in which the original copyright grantee may enter into an agreement with the original copyright author or their heirs regarding the rights sought to be recaptured.  Section 304(c)(6)(D) provides:  "A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination."  17 U.S.C. § 304(c)(6)(D).  While the statute bars third parties (like Toberoff and his companies) from trafficking in such future copyright interests during this exclusive time period, it protects the rights and interests of original grantees like DC Comics, providing that "an agreement for such a further grant may be made between the author or [his heirs] and the original grantee or [its successor (*e.g.*, DC Comics)], after the notice of termination has been served."  *Id.*

168.   Section 304(c)(6)(D) of the Copyright Act establishes a right of DC Comics from November 10, 2003 (when the Shuster Heirs served the Termination Notice) until October 26, 2013 (the effective date of the Notice), during which DC

1   Comics is the sole party that can enter into an agreement with the Shuster Heirs for

2   the rights sought to be terminated.  This right has been described by Congress, in its

3   legislative history, and the United States Court of Appeals as a "right of first

4   refusal."  Any restriction or limitation on this period of exclusivity must be deemed

5   unenforceable under section 304(c)(6)(D).

6       169.    Upon information and belief, the Shuster Heirs have entered into

7   agreements that frustrate and impede DC Comics' period of exclusivity.  For

8   example, the 2003 Pacific Pictures Agreement grants and assigns the Shuster Heirs'

9   putative present and future copyright interests and provides that "any and all

10  agreements regarding any of the Rights [in Shuster's creations, including copyright]

11  shall be subject to the express written approval" of Pacific Pictures.  This

12  improperly allowed Pacific Pictures (and Toberoff) to prevent the Shuster Heirs

13  from entering into an agreement with DC Comics concerning their purported

14  rights—in clear violation of section 304(c)(6)(D).  Although Pacific Pictures and

15  the Shuster Heirs purported to cancel the 2001 and 2003 Pacific Pictures

16  Agreements in their September 10, 2004 Letter, this improper agreement was in

17  effect at least from the time it was executed on October 30, 2003 through

18  September 10, 2004, which means that it improperly eliminated most of the first

19  year of DC Comics' period of exclusivity.  Moreover, the original 2001 Pacific

20  Pictures Agreement provides that if the Shusters' joint venture with Pacific Pictures

21  is terminated "for any reason," then Pacific Pictures will hold 50% of "the property

22  or assets of the Venture," including all the alleged Shuster Superman copyright

23  interests, as a "tenant[] in common," meaning that Pacific Pictures and Toberoff

24  still have improperly encumbered, to this day, DC Comics' period of exclusivity.

25      170.    Upon information and belief, Toberoff has induced the Siegel and

26  Shuster Heirs to enter into additional agreements, which prohibit either family from

27  entering into agreements conveying rights to DC Comics without the express

28  approval of all stakeholders in the heirs' rights—*i.e.*, the Siegel Heirs, Shuster

- 53 -

FIRST AMENDED COMPLAINT

Heirs, and Toberoff and his companies. These agreements and others like it that may exist—which upon information and belief remain in effect to this day—violate section 304(c)(6)(D) and impede DC Comics' ability to settle any and all disputes with the Shusters and Siegels and lawfully pursue its business.

171. The Shuster Heirs' agreements with Toberoff, his companies, and the Siegels improperly interfere with DC Comics' period of exclusivity with the Shuster Heirs regarding their purported Superman rights.

172. A declaration by this Court is warranted under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, to establish the parties' respective rights and obligations with respect to the copyright interest in the Superman material. This declaration should establish that: (a) DC Comics is the sole party with whom the Shuster Heirs can enter into an agreement to convey their putative Superman rights during the exclusivity period, through and including October 26, 2013; (b) any agreement with any third party regarding those putative rights during the exclusivity period is invalid and unenforceable; and (c) any agreements requiring consent of other parties to settle termination claims violate the exclusivity period and, therefore, are invalid and unenforceable.

173. DC Comics seeks an injunction (a) barring the Shuster Heirs from entering into any agreement with any third party regarding the rights sought to be recaptured in the Shuster Termination Notice until October 26, 2013; and (b) restoring to DC Comics its 10-year period of exclusivity.

**D.    Fourth Claim for Relief: Intentional Interference with 1992 Shuster Agreement (Against Defendants Toberoff and Pacific Pictures)**

174. DC Comics re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

175. In October 1992, the Shuster Heirs and DC Comics executed a final written agreement "fully settl[ing] all claims" as to "right[s] in any and all work[s] created in whole or in part by … Joseph Shuster." Since 1992, DC Comics has paid

FIRST AMENDED COMPLAINT

1    the Shuster Heirs nearly half a million dollars under the 1992 Agreement.  To DC

2    Comics' knowledge, the Shuster Heirs have never disputed the validity or existence

3    of the 1992 Agreement, which operated to rescind, revoke, and re-grant all of the

4    Shusters' prior grants of rights in the Superman properties to DC Comics—to the

5    contrary, the Shuster Heirs have expressly acknowledged that this was the effect of

6    the 1992 Agreement.  In that 1992 Agreement, the Shuster Heirs further agreed that

7    they would not—either then or in the future—make any claim of right to any work

8    created in whole or part by Joe Shuster.

9        176.   DC Comics' 1992 Agreement with the Shuster Heirs was both a valid

10   contract and had the probability of future economic benefit to DC Comics.  The

11   Shuster Heirs fully relinquished their rights under any prior agreement and re-

12   granted to DC Comics all of their Superman-related rights.  This confirmation

13   allowed DC Comics to continue freely developing and exploiting those rights

14   without the risk of termination of the alleged Shuster rights or expensive and

15   protracted legal disputes regarding the ownership of those rights.[5]

16       177.   Toberoff and Pacific Pictures were aware of the 1992 Agreement and

17   DC Comics' ongoing business relationship with the Shusters.  Toberoff knew that

18   his actions in having his company enter into a joint venture with the Shusters for

19

_____

20   [5] DC Comics maintains that the 1992 Agreement is a binding, enforceable

21   agreement with the Shuster Heirs.  Even assuming this agreement was deemed
     invalid, DC Comics also has a long-established economic relationship with the

22   Shusters giving rise to an interference with prospective economic advantage claim.
     This relationship dates back to 1935, when DC Comics' predecessor hired the

23   unknown artist Joseph Shuster to illustrate comic strips for its publications.  Even
     after their employment arrangement ended, Shuster continued to benefit from his

24   early work on Superman under the 1975 Agreement, which provided him with an
     annual pension, medical insurance, and a lump-sum payment in exchange for

25   acknowledgement of DC Comics' sole and exclusive ownership of the Superman
     rights.  At the time Toberoff approached the Shuster Heirs in 2001, DC Comics and

26   the Shuster Heirs had an agreement in place for almost 10 years, which resolved all
     claims concerning Shuster's putative share of the Superman rights.  DC Comics'

27   agreement with the Shusters and the economic relationship they contemplated had
     the probability of future economic benefit to DC Comics.

28

                                        - 55 -            FIRST AMENDED COMPLAINT

the purpose of terminating DC Comics' rights were substantially certain to interfere with DC Comics' 1992 Agreement with the Shusters. Toberoff's ultimate purpose in approaching the Shuster Heirs was to induce them to repudiate the 1992 Agreement and grant him the rights they had already granted to DC Comics. For this reason, Toberoff and the Shusters formed a joint venture with Pacific Pictures for the express purpose of "exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations" through "termination pursuant to [17 U.S.C. § 304] of any and all grant or transfers by Joe Shuster of any copyright interest in his creations."

178. Toberoff and Pacific Pictures engaged in independently wrongful conduct to achieve this goal. They induced the Shuster Heirs to breach the 1992 Agreement and enter into the illegal joint-venture agreements described above. Toberoff also induced the Shusters to manipulate claims of ownership in Superboy. Toberoff engaged in this misconduct in his role as businessman and shareholder of Pacific Pictures.

179. As the direct result of Toberoff's and Pacific Pictures' actions, the Shuster Heirs have breached the 1992 Agreement, causing DC Comics to lose the value of the Agreement and forcing DC Comics to incur substantial attorneys' fees and costs in an amount to be proven at trial.

**E.    Fifth Claim for Relief: Intentional Interference with Prospective Economic Advantage re: Siegel-DC Comics Agreement (Against Defendant Toberoff)**

180. DC Comics re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

181. DC Comics reached a binding, enforceable agreement with the Siegel Heirs. After the Siegel Heirs served the Superman Termination Notice in 1997, they engaged in negotiations with DC Comics for four years. On October 16, 2001, DC Comics made a settlement offer to the Siegel Heirs. On October 19, 2001, the

- 56 -

FIRST AMENDED COMPLAINT

1    Siegel Heirs' attorney at the time, Marks, sent a letter to DC Comics outlining the

2    material terms and confirming that the Siegel Heirs "accepted D.C. Comics' offer

3    of October 16, 2001." On October 26, 2001, DC Comics sent a return letter

4    confirming the parties' agreed-upon terms. DC Comics then drafted a long-form

5    contract memorializing the agreement, which it sent to the Siegel Heirs on February

6    1, 2002. Marks has confirmed that all parties understood that they had a binding

7    agreement.[6]

8         182.    Even in the event that this agreement is finally adjudicated and deemed

9    to be invalid, DC Comics had a long-established economic relationship with the

10   Siegel Heirs giving rise to an interference with prospective economic advantage

11   claim. This relationship dates back as far as 1935, when DC Comics' predecessor

12   hired an unknown writer named Jerome Siegel to write comic strips for its

13   publications. Over the years, Siegel worked on-and-off as an employee of DC

14   Comics and its predecessors. Even after the employment arrangement ended,

15   Siegel continued to benefit from his early work on Superman under the 1975

16   Agreement, which provided him and his family with an annual pension, medical

17   insurance, and lump payment in exchange for acknowledgement of DC Comics'

18   sole and exclusive ownership of the Superman rights. When a dispute arose in

19   1997 over the Siegel Heirs' attempt to terminate prior grants of Siegel's share of

---

20       [6] The district court in the Siegel Actions determined that this agreement was not
21   binding because there was no "meeting of the minds" between the parties. Of
     course, this was before the Toberoff Timeline had been produced, which confirmed,
22   *inter alia*, that Marks—who negotiated the agreement on behalf of the Siegel
     Heirs—understood that the 2001 agreement was final and binding. Indeed, Marks
23   communicated his position to the Siegel Heirs in August 2002, in an attempt to
     convince them to reject Toberoff's attempts at interference. DC Comics reserves
24   all rights to challenge the district court's ruling in the Siegel Actions based on this
     newly discovered evidence and otherwise, and DC Comics respectfully submits that
25   the district court's interim ruling on this issue is contrary to fact and law. If DC
     Comics' claims are accepted, it will amend this Complaint to include a claim for
26   interference with contract arising out of Toberoff's tortious interference with this
     binding agreement. DC Comics contends that the district court's summary
27   judgment ruling on this settlement issue also runs afoul of the Ninth Circuit's recent
     decision in *Mattel, Inc. v. MGA Entm't, Inc.*, 2010 WL 2853761 (9th Cir. July 22,
28   2010).

- 57 -

FIRST AMENDED COMPLAINT

1    Superman rights, DC Comics and Siegel commenced negotiations, which lasted

2    over four years.  At the time Toberoff approached the Siegel Heirs in 2001, DC

3    Comics and the Siegel Heirs had finally reached an agreement resolving their

4    claims to the Superman and Superboy rights.

5    183.    The economic relationship that the Siegel Heirs and DC Comics had

6    contemplated and agreed to had the probability of future economic benefit to DC

7    Comics.  The Siegel Heirs recognized DC Comics' sole and exclusive ownership of

8    all rights in Superman and Superboy, allowing it to continue freely developing and

9    exploiting those rights, and avoid the possibility of an expensive and protracted

10    lawsuit regarding ownership of those rights.

11    184.    Toberoff was well aware of the agreement between DC Comics and

12    the Siegel Heirs.  Toberoff has admitted that he tracked the Siegel Heirs'

13    termination efforts through Internet reports.  Moreover, upon information and

14    belief, when Toberoff approached the Siegel Heirs and their representatives in late

15    2001 and 2002 to express interest in purchasing their Superman rights, he was

16    informed that the Siegel Heirs had already reached an agreement with DC Comics.

17    185.    Toberoff knew his actions were substantially certain to interfere with

18    the Siegel Heirs' agreement and ongoing business dealings with DC Comics.

19    Toberoff intentionally engaged in independently wrongful conduct to carry out his

20    interference by, among other things:  falsely misrepresenting to the Siegel Heirs

21    that he had a billionaire investor ready to purchase their Superman rights if they

22    repudiated their settlement agreement with DC Comics; falsely representing to the

23    Siegels that he would help them produce a competing Superman motion picture;

24    and wrongly inducing the Siegels to repudiate their agreement and business

25    relationship with DC Comics.  Toberoff engaged in this misconduct in his role as

26    businessman and shareholder of IP Worldwide.

27    186.    As a direct result of Toberoff's misdeeds, the Siegel Heirs repudiated

28    the Siegel-DC Comics Agreement with DC Comics and ended all further

- 58 -

FIRST AMENDED COMPLAINT

1    discussions, causing DC Comics to lose the value of the agreement, to lose their

2    ongoing business relationship with the Siegels, and to incur millions of dollars in

3    subsequent legal fees in disputes with the Siegel Heirs.  DC Comics has suffered

4    actual damages in an amount to be proven at trial.

5    **F.    <u>Sixth Claim for Relief</u>:  Declaratory Relief re: Invalidity of Copyright**

6    **Assignment and Consent Agreements (Against All Defendants)**

7    187.    DC Comics re-alleges and incorporates by reference each and every

8    allegation contained in the paragraphs above.

9    188.    The various copyright assignment and consent agreements between

10    Toberoff and/or his companies, the Siegel Heirs, and the Shuster Heirs are void and

11    unenforceable, including under California's unfair competition laws, *e.g.*, CAL.

12    BUS. & PROF. CODE §§ 17200 *et seq*.  The copyright assignments secured by

13    Toberoff and/or his companies are unlawful and violate DC Comics' rights and

14    interests for the reasons set forth above.  The consent agreements Toberoff has

15    procured are void as a matter of law and public policy because they strip the Siegels

16    and Shusters of their right freely to settle their claims and violate DC Comics'

17    concomitant right freely to negotiate settlement of such claims.  The Pacific

18    Pictures and IP Worldwide Agreements secured by Toberoff and/or his companies,

19    for example, are unlawful and unfairly violate DC Comics' rights and interests.

20    189.    A declaration by this Court is warranted under the Declaratory

21    Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, to establish the parties' respective rights

22    and obligations with respect to the copyright interest in the Superman material.

23

24

25

26

27

28

- 59 -

FIRST AMENDED COMPLAINT

# VI.  **PRAYER FOR RELIEF**

WHEREFORE, DC Comics prays for judgment against defendants as follows:

190.   A declaration that the Shuster Termination Notice is invalid, and thus ineffective, for one or more of the reasons set forth in DC Comics' First Claim for Relief;

191.   In the event that the Shuster Termination Notice is deemed valid and effective, a declaration that the scope and effect of the Notice is limited as set forth in DC Comics' Second Claim for Relief;

192.   A declaration that:  (a) DC Comics was entitled to a period of exclusivity regarding the Shuster Heirs' purported Superman rights from November 10, 2003 through October 26, 2013; (b) any agreement interfering with that period of exclusivity is invalid and unenforceable; and (c) the consent agreements impermissibly interfere with DC Comics' period of exclusivity and require restoration of the 10-year period free of interference;

193.   A declaration that the various consent agreements between Toberoff and/or his companies, the Siegel Heirs, and the Shuster Heirs are void and unenforceable as a matter of public policy;

194.   An injunction that:  (a) bars the Shuster Heirs from entering into any agreement with any third party regarding the rights sought to be recaptured in the Shuster Termination Notice until October 26, 2013; and (b) restores DC Comics' 10-year period of exclusivity with respect to the Shuster Termination Notice;

195.   As to the tort claims against Toberoff and his entities as sued herein, damages in amounts to be determined at trial;

196.   An award of reasonable attorneys' fees and costs; and

197.   Such other and further relief as this Court deems just and proper.

FIRST AMENDED COMPLAINT

1

## VII.  **DEMAND FOR JURY TRIAL**

2      198.    Plaintiff DC Comics hereby demands a trial by jury on all issues
3  triable by a jury.

4

5      Dated:  September 3, 2010                  Respectfully submitted,

6                                                 O'MELVENY & MYERS LLP

7
                                                 By:  _____
8                                                      Daniel M. Petrocelli
                                                 Attorneys for Plaintiff DC Comics
9

10

11  CC1.834998

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    - 61 -