1  KENDALL BRILL & KLIEGER LLP
Richard B. Kendall (90072)
2    *rkendall@kbkfirm.com*
Laura W. Brill (195889)
3    *lbrill@kbkfirm.com*
Nicholas F Daum (236155)
4    *ndaum@kbkfirm.com*
Nathalie E. Cohen (258222)
5    *ncohen@kbkfirm.com*
10100 Santa Monica Blvd., Suite 1725
6  Los Angeles, California 90067
Telephone: 310.556.2700
7  Facsimile: 310.556.2705

8  Attorneys for Defendants Marc Toberoff,
Pacific Pictures Corporation, IP
9  Worldwide, LLC, and IPW, LLC

10

11          **UNITED STATES DISTRICT COURT**

12    **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

13

14  DC Comics,               Case No. CV 10-3633 ODW(RZx)

15         Plaintiff,     **DECLARATION OF LAURA W. BRILL IN OPPOSITION TO DC COMICS' EX PARTE**

16        v.            **APPLICATION TO CONSOLIDATE HEARING DATES ON RELATED**

17  PACIFIC PICTURES     **DISCOVERY MOTIONS**
CORPORATION, IP WORLDWIDE,
18  LLC, IPW, LLC, MARC TOBEROFF,
an individual, MARK WARREN   Judge: Hon. Otis D Wright, II
19  PEARY, as personal representative of   Magistrate: Hon. Ralph Zarefsky
the ESTATE OF JOSEPH SHUSTER,
20  JOANNE SIEGEL, an individual,   Date:    September 20, 2010
LAURA SIEGEL LARSON, an   Time:   10:00 a.m.
21  individual, and DOES 1-10, inclusive,
                  Complaint Filed:    May 14, 2010
22         Defendants.

23

24

25

26

27

28

**Kendall Brill & Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

57295.2

## DECLARATION OF LAURA W. BRILL

I, Laura W. Brill, declare as follows:

1.      I am a partner at the law firm of Kendall Brill & Klieger LLP, counsel of record for Defendants Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC, and IPW, LLC in the above-captioned action.  I am a member in good standing of the State Bar of California and am admitted to practice before this Court.  Except where otherwise stated, I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.      Attached hereto as Exhibit A is a true and correct copy of the parties' Stipulation to Extend Time to Respond to Initial Complaint.

3.      Attached hereto as Exhibit B is a true and correct copy of the parties' Joint Stipulation Regarding Plaintiff's Motion to Initiate Discovery and Take Immediate, Limited Discovery of Two Elderly Witnesses.  This motion is referred to in the accompanying opposition as the Motion to Initiate Discovery.

4.      Attached hereto as Exhibit C is a true and correct copy of Defendants' Motion for a Protective Order Staying Depositions, Pending Rulings on Dispositive Motions and Limiting Scope and Time of Depositions.  This motion is referred to in the accompanying opposition as the Motion for a Protective Order.

5.      Attached hereto as Exhibit D is a redline comparison of DC's First Amended Complaint to its initial Complaint.  Counsel for DC refused to provide defendants' counsel with an original redline.  The redline attached as Exhibit D was created by "OCRing" the PDF images of the original complaint and first amended complaint and comparing the text-format documents that resulted from that process, then cleaning up computer errors that resulted from the OCR process.  This process was performed by a paralegal at my firm under my supervision.  I am not aware of any material inaccuracies.  If any exist, they can be eliminated if DC would provide its own redline that does not rely on the OCR conversion process.

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

57295.2

1

6.    Attached hereto as Exhibit E is a true and correct copy of a letter that I sent to counsel for DC Comics ("DC") on September 10, 2010.  In that letter, I proposed setting up a time to meet and confer regarding the scheduling issues. DC's counsel refused to meet and confer in response to this request.

7.    Attached hereto as Exhibit F is a true and correct copy of a letter that I sent to counsel for DC Comics on September 13, 2010.

8.    On July 13, 2010, the parties met and conferred regarding Defendants' motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) and, as to the state law claims, a motion to strike pursuant to California's anti-SLAPP law.  At that meet and confer, DC's counsel, Mr. Petrocelli, stated that the meet and confer discussion was among the most detailed and substantive in which he had ever participated.

9.    Throughout July and August, DC demanded a number of scheduling accommodations due to Mr. Petrocelli's travel schedule and schedule in other matters.  Whenever feasible, Defendants granted such accommodations.  When Defendants have requested reciprocal accommodations, DC lodged baseless, personal attacks against Defendants' counsel.

10.    On August 5, 2010, after Defendant Marc Toberoff had retained his own counsel in this action, the parties scheduled a Rule 26(f) conference for August 16, 2010.

11.    Despite the fact that a Rule 26(f) conference was scheduled for Monday, August 16, 2010, and DC would be able to commence discovery immediately following the conference, DC served on Friday, August 13, its portion of a "Motion to Initiate Discovery," set for hearing in mid-September.  The parties ultimately stipulated, and the Court agreed, that DC's Motion to Initiate Discovery and Defendants' Motion for Protective Order relating to the Toberoff Timeline would both be heard on September 20.

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

57295.2

2

DECLARATION OF LAURA W. BRILL IN OPPOSITION TO DC COMICS' EX PARTE APPLICATION

12. On August 17, 2010, DC served Notices of Depositions of Mark Warren Peary, Jean Peavy, Laura Siegel Larson, and Joanne Siegel. Joanne Siegel's deposition was noticed for October 5, 2010; Laura Siegel Larson's for October 6, 2010; and Mark Warren Peary's for October 13, 2010. A subpoena to Testify at a Deposition was also served on Jean Peavy on August 17, 2010, but the requisite witness fee was not delivered to Ms. Peavy. The Peavy subpoena purported to demand an appearance on October 12, 2010. The Notices of Depositions were accompanied by requests for production of documents. Responses and objections to those requests are due September 17, 2010. Defendants have repeatedly made clear to DC that they intend to timely respond to those three requests. There has been no meet and confer regarding those responses and objections since they are not yet due. Accordingly, is not yet clear what disputes, if any, will arise and whether they can be resolved.

13. In or about early August, DC's counsel repeatedly took the position that DC's Motion to Initiate Discovery had to be postponed and set for hearing on the same date as the Timeline Motion and that the two motions were related.

14. After Defendants served their opposition to DC's Motion to Initiate Discovery, DC aggressively demanded that the motion be postponed and heard with motions that had not yet been briefed. In response, Defendants made clear that DC could voluntarily withdraw the motion if it wished, but that the scheduling proposals DC was making, which are similar to the proposal in DC's *ex parte* application, would require further briefing and motion practice on hypothetical issues, and therefore did not make sense but would merely create unnecessary additional burdens. Attached hereto as Exhibit G is a true and correct copy of a letter I sent to DC's counsel on September 2, 2010, outlining defendants' objections.

15. Although DC's Motion to Initiate Discovery demanded that depositions begin on September 30, DC's Notices of Depositions demanded that

Kendall Brill & Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

57295.2

3

DECLARATION OF LAURA W. BRILL IN OPPOSITION TO DC COMICS' EX PARTE APPLICATION

depositions begin the first week of October.  DC subsequently refused to take the
depositions off calendar to await a ruling from this Court on September 20 as to
Defendants' Motion for Protective Order relating to the Toberoff Timeline and
DC's Motion to Initiate Discovery.  Instead, DC repeatedly demanded that these
depositions move forward, claiming that they were necessary for DC to respond to
Defendants' dispositive motions.  Accordingly, Defendants were forced to file a
motion for protective order to prevent the depositions from going forward.  That
motion was filed on September 13 and is set for hearing on October 4.

16.    DC's counsel never informed counsel for Defendants Marc Toberoff,
Pacific Pictures Corporation, IPW, LLC and IP Worldwide, LLC of the date and
time of their *ex parte* motion or of the substance of the "alternative" relief
requested therein prior to filing the application.  I am informed that DC's counsel
also failed to provide such notice to counsel for Defendants Mark Warren Peary,
Jean Peavy, Joanne Siegel, and Laura Siegel Larson.

I declare under penalty of perjury under the laws of the United States of
America that the foregoing is true and correct.

Executed September 15, 2010, at Los Angeles, California.

Laura W. Brill

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

57295.2

4

DECLARATION OF LAURA W. BRILL IN OPPOSITION TO DC COMICS' EX PARTE APPLICATION

# EXHIBIT A

1  KENDALL BRILL & KLIEGER LLP
   Richard B. Kendall (90072)
2    rkendall@kbkfirm.com
   Laura W. Brill (195889)
3    lbrill@kbkfirm.com
   Nicholas F Daum (236155)
4    ndaum@kbkfirm.com
   Nathalie E. Cohen (258222)
5    ncohen@kbkfirm.com
   10100 Santa Monica Blvd., Suite 1725
6  Los Angeles, California  90067
   Telephone:  310.556.2700
7  Facsimile:  310.556.2705

8  Attorneys for Defendants Marc Toberoff,
   Pacific Pictures Corporation, IP
9  Worldwide, LLC, and IPW, LLC

10              UNITED STATES DISTRICT COURT

11       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

12

13  DC Comics,                          Case No. CV 10-3633 ODW(RZx)

14              Plaintiff,              **STIPULATION TO EXTEND TIME
                                        TO RESPOND TO INITIAL
15       v.                             COMPLAINT**

16  PACIFIC PICTURES                    Hon. Honorable Otis D Wright, II
    CORPORATION, IP WORLDWIDE,
17  LLC, IPW, LLC, MARC TOBEROFF,
    an individual, MARK WARREN          Complaint Filed:     May 14, 2010
18  PEARY, as personal representative of
    the ESTATE OF JOSEPH SHUSTER,
19  JOANNE SIEGEL, an individual,
    LAURA SIEGEL LARSON, an
20  individual, and DOES 1-10, inclusive,

21              Defendants.

22

23

24

25

26

27

28

**Kendall Brill
& Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

54157.1

STIPULATION TO EXTEND TIME TO RESPOND TO INITIAL COMPLAINT

## STIPULATION

WHEREAS, plaintiff DC Comics initiated the above-captioned action by filing a Complaint on May 14, 2010, and by providing all defendants with waivers of service of summons pursuant to Rule of Civil Procedure 4(d);

WHEREAS, all defendants purport to have timely returned waivers of service of summons;

WHEREAS, absent an order of the Court, all defendants would be required to file a responsive pleading to the Complaint by July 13, 2010;

WHEREAS, certain defendants have only recently retained counsel;

WHEREAS defendants will likely file motions in response to the Complaint, including motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a motion to strike material from the Complaint pursuant to Federal Rule of Civil Procedure 12(f) and a motion to strike pursuant to California's "Anti-SLAPP" statute, California Code of Civil Procedure Section 425.16;

WHEREAS, the parties have agreed upon an extension of time to August 13, 2010, for defendants to file responsive pleadings, motions pursuant to Federal Rule of Civil Procedure 12, and a motion to strike under California Code of Civil Procedure Section 425.16; have agreed on a date to meet and confer concerning such motions pursuant to Local Rule 7-3; and have agreed upon a briefing schedule for the oppositions and reply briefs for such motions;

WHEREAS, the parties have not previously requested any extensions of time in this matter;

NOW THEREFORE, the parties stipulate and jointly agree and request that the Court order the following:

1) Defendants' deadline to file and serve their contemplated motions under Federal Rule of Civil Procedure 12(b)(6) and 12(f) and the motion to strike pursuant to California Code of Civil Procedure Section 425.16 (collectively "Defendants' Responsive Motions") shall be continued to August 13, 2010;

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

54157.1

1

STIPULATION TO EXTEND TIME TO RESPOND TO INITIAL COMPLAINT

2) The parties shall, no later than July 13, 2010, have a pre-filing conference pursuant to Local Rule 7-3, to discuss the substance and potential resolution of Defendants' Responsive Motions;

3) Oppositions (if any) to Defendants' Responsive Motions shall be served and filed by September 13, 2010, and reply briefs (if any) shall be served and filed by September 27, 2010.

4) Defendants' Responsive Motions shall be heard on Monday, October 18, 2010, or on a date thereafter convenient for the Court.

5) This stipulation and any order entered hereupon shall not stay discovery in this action, but defendants reserve the right to argue that discovery should be stayed or limited until the resolution of Defendant's Responsive Motions. Plaintiff believes that discovery should proceed notwithstanding any such motions.

6) This stipulation shall not extend any deadlines that have already expired as of the effective date of this stipulation, which is June 29, 2010.

7) By entering into this stipulation, neither party in any way waives any rights except with respect to the deadlines addressed in paragraphs 1 through 3 above, including but not limited to the fact that plaintiff does not concede that defendants' contemplated motions are proper or are well-taken.

IT IS SO STIPULATED

Dated: June 30, 2010                    KENDALL BRILL & KLIEGER LLP


By: _____
      Richard B. Kendall
      Attorneys for Defendants Mark Toberoff,
      Pacific Pictures Corporation, IP
      Worldwide, LLC, and IPW, LLC

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

54157.1                                    2
STIPULATION TO EXTEND TIME TO RESPOND TO INITIAL COMPLAINT
EXHIBIT A
Page 7

1 | Dated:  June 30, 2010                     TOBEROFF & ASSOCIATES, P.C.

2

3

4 |                                           By: _____
                                                  Marc Toberoff
5 |                                               Attorneys for Defendants Mark Warren
                                                  Peary as personal representative of the
6 |                                               Estate of Joseph Shuster, Joanne Siegel,
7 |                                               and Laura Seigel Larson

8

9 | Dated:  June 30, 2010                     O'MELVENY & MYERS L.L.P.

10

11

12 |                                          By: _____
                                                  Daniel M. Petrocelli
13 |                                              Attorneys for Plaintiff
                                                  DC Comics

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Kendall Brill
& Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

54157.1

STIPULATION TO EXTEND TIME TO RESPOND TO INITIAL COMPLAINT; [PROPOSED] ORDER

1    Dated:  June 29, 2010                    TOBEROFF & ASSOCIATES, P.C.

2

3

4                                            By: _____

5                                                Marc Toberoff
                                                 Attorneys for Defendants Mark Warren
6                                                Peary as personal representative of the
                                                 Estate of Joseph Shuster, Joanne Siegel,
7                                                and Laura Seigel Larson

8
     Dated:  June 29, 2010                    O'MELVENY & MYERS L.L.P.
9             30

10

11                                           By: _____

12                                               Daniel M. Petrocelli
                                                 Attorneys for Plaintiff
13                                               DC Comics

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Kendall Brill
& Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

54157.1                                      3
          STIPULATION TO EXTEND TIME TO RESPOND TO INITIAL COMPLAINT

# EXHIBIT B

1   DANIEL M. PETROCELLI (S.B. # 097802)
2        dpetrocelli@omm.com
    MATTHEW T. KLINE (S.B. # 211640)
3        mkline@omm.com
    CASSANDRA L. SETO (S.B. # 246608)
4        cseto@omm.com
    O'MELVENY & MYERS LLP
5   1999 Avenue of the Stars, 7th Floor
    Los Angeles, CA 90067-6035
6   Telephone:   (310) 553-6700
    Facsimile:   (310) 246-6779
7    *Attorneys for Plaintiff DC Comics*
8
    (Additional counsel listed on the next page)
9

10              **UNITED STATES DISTRICT COURT**

11            **CENTRAL DISTRICT OF CALIFORNIA**

12   DC COMICS,
                                     | Case No. CV 10-3633 ODW (RZx)
13                  Plaintiff,
                                     | **DISCOVERY MATTER**
14        v.
                                     | **JOINT STIPULATION REGARDING**
15   PACIFIC PICTURES                 | **PLAINTIFF'S MOTION TO INITIATE**
     CORPORATION, IP                  | **DISCOVERY AND TAKE**
16   WORLDWIDE, LLC, IPW, LLC,        | **IMMEDIATE, LIMITED DISCOVERY**
     MARC TOBEROFF, an individual,    | **OF TWO ELDERLY WITNESSES**
17   MARK WARREN PEARY, as
18   personal representative of the    | FILED SEPARATELY: [PROPOSED]
     ESTATE OF JOSEPH SHUSTER,         | ORDER; DECLARATION OF DANIEL M.
19   JOANNE SIEGEL, an individual,    | PETROCELLI IN SUPPORT OF
     LAURA SIEGEL LARSON, an          | PLAINTIFF'S MOTION;
20   individual, and DOES 1-10,       | DECLARATIONS OF MARC TOBEROFF
     inclusive,                       | AND JOANNE SIEGEL IN OPPOSITION
21                                    | TO PLAINTIFF'S MOTION
22                  Defendants.
23                                    | **Judge:**      Hon. Otis D. Wright II
                                      | **Magistrate:** Hon. Ralph Zarefsky
24
25                                    | **Hearing Date:** September 20, 2010
                                      | **Time:**         10:00 a.m.
26                                    | **Complaint Filed:** May 14, 2010
27
28
                                      JOINT STIPULATION RE: PLAINTIFF'S
                                      MOTION TO INITIATE DISCOVERY AND
                                      TAKE DISCOVERY OF TWO WITNESSES

1    (List of counsel continued)

2    PATRICK T. PERKINS (admitted *pro hac vice*)
         pperkins@ptplaw.com
3    PERKINS LAW OFFICE, P.C.
4    1711 Route 9D
     Cold Spring, NY 10516
5    Telephone:  (845) 265-2820
     Facsimile:   (845) 265-2819
6        *Attorney for Plaintiff DC Comics*

7    MARC TOBEROFF (S.B. # 188547)
8    NICHOLAS C. WILLIAMSON (S.B. # 231124)
     KEITH G. ADAMS (S.B. # 240497)
9    TOBEROFF & ASSOCIATES, P.C.
     2049 Century Park East, Suite 2720
10   Los Angeles, California 90067
11   Telephone: (310) 246-3333
     Facsimile: (310) 246-3101
12       *Attorneys for Defendants Mark Warren Peary*
         *as personal representative of the Estate of Joseph*
13       *Shuster, Joanne Siegel, and Laura Siegel Larson*

14   RICHARD B. KENDALL (S.B. # 90072)
15       rkendall@kbkfirm.com
     LAURA W. BRILL (S.B. # 195889)
16       lbrill@kbkfirm.com
     NICHOLAS F. DAUM (S.B. # 236155)
17       ndaum@kbkfirm.com
     NATHALIE E. COHEN (S.B. # 258222)
18       ncohen@kbkfirm.com
19   KENDALL BRILL & KLIEGER LLP
     10100 Santa Monica Blvd., Suite 1725
20   Los Angeles, California 90067
21   Telephone: (310) 556-2700
     Facsimile: (310) 556-2705
22       *Attorneys for Defendants Marc Toberoff,*
         *Pacific Pictures Corporation, IP*
23       *Worldwide, LLC, and IPW, LLC*

24

25

26

27

28

                                        JOINT STIPULATION RE: PLAINTIFF'S
                                        MOTION TO INITIATE DISCOVERY AND
                                        TAKE DISCOVERY OF TWO WITNESSES

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTORY STATEMENTS ...................................................... 2
     A.   DC Comics' Introductory Statement ...................................... 2
     B.   Defendants' Introductory Statement ...................................... 4
II.  DC COMICS' STATEMENT OF THE ISSUES IN DISPUTE .................. 7
III. DEFENDANTS' STATEMENT OF THE ISSUES IN DISPUTE ................ 7
IV.  DC COMICS' POSITION ............................................................. 8
     A.   Factual Background ........................................................... 8
          1.   DC Comics' Complaint ................................................ 8
          2.   Ms. Peavy and Ms. Siegel ........................................... 9
          3.   DC Comics' Efforts to Commence Discovery ................. 10
     B.   Discovery Must Commence in this Case, and Ms. Peavy and
          Ms. Siegel Should Be Deposed No Later than September 30,
          2010 .............................................................................. 11
          1.   Defendants' Contemplated Motion to Dismiss Is Not a
               Bar to Discovery and Its "SLAPP" Motion, in Fact,
               Necessitates Expedited Discovery ............................... 11
          2.   Discovery in this Case Is Not Precluded by Discovery in
               the Siegel Cases ....................................................... 13
          3.   The Toberoff Timeline Is a Proper Subject of Discovery ....... 16
     C.   Conclusion ...................................................................... 17
V.   DEFENDANTS' POSITION .......................................................... 17
     A.   Factual Background ........................................................... 17
          1.   The Siegel Litigation (Case No. CV 04-8400) ................. 17
          2.   DC Files This Retaliatory Action ................................ 21
               a.   DC's Lawsuit Prompts Dispositive Motions by
                    Defendants ...................................................... 21
               b.   DC Exploits the Theft of Privileged and
                    Confidential Information from Toberoff's Law
                    Firm ............................................................... 21
     B.   The Relief Sought by DC in Its Motion Is No Longer At Issue ........ 23
     C.   This Court Lacks Jurisdiction Over Jean Peavy ..................... 23
     D.   Depositions Should Not Be Compelled on the Dates Noticed by
          DC, Because Dispositive Motions Will Be Heard Less Than
          Two Weeks Later .............................................................. 24
     E.   Depositions Should Await Imminent Resolution of the Pending
          Rule 54(b) Motion in Siegel Which, If Granted, Will
          Substantially Narrow Discovery in this Case ........................ 29

JOINT STIPULATION RE: PLAINTIFF'S MOTION
TO INITIATE DISCOVERY AND TAKE
DISCOVERY OF TWO WITNESSES

# TABLE OF CONTENTS
## (continued)

**Page**

F.    The Pending Anti-SLAPP Motion Should Stay and/or Limit Depositions ........................................................................... 30

G.    The Depositions Should Be Stayed Because the Witnesses Have Already Been Exhaustively Deposed in the Siegel Actions ............... 35

H.    Conclusion ................................................................................ 39

APPENDIX A ......................................................................................... 40

JOINT STIPULATION RE: PLAINTIFF'S MOTION
TO INITIATE DISCOVERY AND TAKE
DISCOVERY OF TWO WITNESSES

-ii-

1    Pursuant to Rules 26, 34, and 37 of the Federal Rules of Civil Procedure and

2    Rule 37-2 of the Local Rules of this Court, the parties respectfully submit the

3    following Joint Stipulation Regarding Plaintiff's Motion to Initiate Discovery and

4    Take Immediate, Limited Discovery of Two Elderly Witnesses.  Pursuant to Local

5    Rule 37-1, the parties have attempted unsuccessfully to resolve their disputes and

6    therefore respectfully seek the assistance of the Court.

7

8    Dated:    August 30, 2010    Respectfully Submitted,

9    O'MELVENY & MYERS LLP

10    By:  /s/ Daniel M. Petrocelli

11    Daniel M. Petrocelli
    Attorneys for Plaintiff DC Comics

12

13    Dated:    August 30, 2010    Respectfully Submitted,

14    TOBEROFF & ASSOCIATES, P.C.

15

16    By:  /s/ Marc Toberoff

17    Marc Toberoff
    Attorneys for Defendants Mark
    Warren Peary as personal

18    representative of the Estate of Joseph

19    Shuster, Joanne Siegel, and Laura
    Siegel Larson

20

21    Dated:    August 30, 2010    Respectfully Submitted,

22

23    KENDALL BRILL & KLIEGER LLP

24    By:  /s/ Richard B. Kendall

25    Richard B. Kendall
    Attorneys for Defendants Marc

26    Toberoff, Pacific Pictures
    Corporation, IP Worldwide, LLC,

27    and IPW, LLC

28

1

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

Case 2:10-cv-03633-ODW-RZ    Document 69-1    Filed 09/15/10    Page 18 of 191    Page
ID #:5095
Case 2:10-cv-03633-ODW-RZ    Document 45    Filed 08/30/10    Page 6 of 48    Page ID #:2809

1    I.    **INTRODUCTORY STATEMENTS**

2         A.    **DC Comics' Introductory Statement**

3              Plaintiff DC Comics filed this case in May 2010—some three months ago—

4    and since making this filing has sought to promptly commence discovery,

5    especially the depositions of two crucial witnesses of advanced age: Jean Peavy,

6    age 89, and Joanne Siegel, age 92.  At every turn, defendants have offered one

7    unfounded reason after another to prevent discovery altogether or delay it

8    indefinitely.  To date, DC Comics has been unable to obtain any discovery, secure a

9    discovery plan, or conduct the Rule 26(f) conference.  Therefore, DC Comics seeks

10   an order compelling the commencement of discovery proceedings in this case,

11   specifically the depositions of Ms. Peavy and Ms. Siegel and their discoverable

12   documents.

13             As detailed in the complaint, this lawsuit was commenced to address various

14   issues concerning the comic-book character Superman, including ownership and

15   control of certain rights to the property; improper efforts by the heirs of Joseph

16   Shuster, the original illustrator of Superman, to recapture purported copyright

17   interests in the character; and unlawful acts of interference by self-styled movie

18   producer and entrepreneur Marc Toberoff.  Jean Peavy is the sister and alleged sole

19   beneficiary of Shuster's estate; and Joanne Siegel is the widow of Jerome Siegel,

20   Shuster's co-creator in Superman.  Both witnesses are parties to several contracts

21   central to this dispute, including contracts granting DC Comics rights that

22   Ms. Peavy and Ms. Siegel now impermissibly seek for themselves, and agreements

23   among the defendants that interfere with DC Comics' rights under federal and state

24   law.  They also are percipient witnesses to the back-room misconduct that

25   interfered with DC Comics' rights, including the manipulation of alleged rights in

26   the character Superboy.

27

28

2

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

1    There is no good reason to further delay the commencement of discovery,

2    especially the depositions of these important witnesses.  Defendants various

3    objections have no merit:

4    • Defendants contend discovery may not commence until after a Rule 26(f)

5       conference is held, yet they have tactically delayed the Rule 26(f)

6       conference for over two months to forestall DC Comics' right to

7       commence discovery.  Although it has already caused DC Comics

8       unwarranted delay, this objection is now moot, since the Rule 26(f)

9       conference is, finally, scheduled for August 16—the earliest date

10      defendants would accept.

11   • Defendants contend discovery must await the Court's resolution of their

12      motions to dismiss and motion to strike under the California "SLAPP"

13      statute, scheduled to be filed on August 13.  However, the Federal Rules

14      authorize discovery to proceed during the pendency of Rule 12 motions;

15      and the discovery-stay provisions in California's SLAPP statute have *no*

16      application to DC Comics' federal claims and, in fact, *entitle* DC Comics

17      to expedited discovery regarding its state claims since the defendants'

18      SLAPP motion challenges their *factual* sufficiency.

19   • Defendants claim the depositions of Ms. Peavy and Ms. Siegel will be

20      duplicative of testimony they gave in lawsuits filed by Ms. Siegel (Case

21      Nos. CV-04-8400 ODW, CV-04-8776 ODW) ("the Siegel Cases")).  This

22      is no bar to their depositions in this case, which involves different parties,

23      different legal claims, and different legal and factual theories.  If

24      defendants have objections to specific questions asked at these or other

25      depositions, they can make those objections in the course of the

26      examinations, DC Comics can respond, and the Court will have a record

27      on which to rule.  No basis exists for an advisory opinion foreclosing lines

28      of inquiry in advance of these depositions.

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

3

1     • Finally, while deliberately delaying the Rule 26(f) conference, defendants
2         filed a preemptive protective-order motion that seeks to prevent DC
3         Comics from conducting discovery about the "Toberoff Timeline"
4         document attached as Exhibit A to DC Comics' complaint. They contend
5         no discovery can proceed until their motion is decided. Defendants'
6         position is indefensible. As will be explained in DC Comics' opposition
7         to defendants' motion, the District Court in the Siegel Cases *ordered* this
8         document produced *nearly two years ago*, finding that any privilege
9         regarding the document was waived. The Toberoff Timeline has been a
10        matter of public record since March 2009—*for almost 18 months*. *See*
11        *Siegel v. Warner Bros. Ent't Inc.*, Case No. CV 04-8400 ODW (RZx)
12        (Docket No. 476-4). Defendants' motion is without merit and provides no
13        basis to preclude DC Comics' discovery.

14    **B.    Defendants' Introductory Statement**

15        Plaintiff DC Comics' ("DC") motion to take expedited and unlimited
16    depositions of two elderly witnesses, Joanne Siegel and Jean Peavy, both of whom
17    have already been deposed in closely related litigation, is moot, lacks merit as a
18    matter of law and equity, and is procedurally and jurisdictionally improper. This
19    motion is part of a larger effort by DC to create a burdensome and chaotic
20    discovery process, to re-litigate matters already decided against it in related
21    litigation, and to obtain strategic leverage by re-deposing elderly witnesses as to the
22    recapture under 17 U.S.C. § 304(c) of the original copyrights to Superman. As
23    opposed to proceeding on a rational schedule and waiting until recently filed
24    dispositive motions have been resolved, DC insists on immediately deposing these
25    two elderly witnesses. DC's demands are wholly inappropriate under the unique
26    circumstances of this case, including the following:

27    •     The order sought by DC – to initiate discovery, and to produce Joanne Siegel
28        and Jean Peavy for deposition by September 30, 2010 – is entirely moot,

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

1    since DC initiated discovery following the parties' F.R.C.P. 26(f) conference,

2    and has itself noticed depositions of Joanne Siegel on October 5, 2010, and

3    Jean Peavy on October 12, 2010, dates which fall after September 30, 2010.

4    •    Even construing DC's motion as a request for an order to compel depositions

5    of Jean Peavy and Joanne Siegel on October 5 and October 12, 2010 (relief

6    DC has not requested), DC's motion must be denied.  Defendants' well-

7    founded dispositive motions pursuant to F.R.C.P. 12(b)(6) are pending as to

8    every claim in DC's complaint.  These motions are set for hearing shortly

9    thereafter on October 18, 2010.  There is no need for discovery to resolve

10   these motions, as they raise pure issues of law.  If any of the motions is

11   granted, the scope of appropriate discovery will be dramatically narrowed.

12   •    DC has stated that it will amend its Complaint, meaning that the pleadings

13   are as yet unsettled.  This renders depositions in early October unnecessarily

14   burdensome, as the parties will be engaged in extensive motion practice

15   concerning the amended Complaint in advance of the October 18 hearing.

16   •    Defendants have informed DC that if its Complaint survives such dispositive

17   motions, they will likely assert counterclaims.  Such counterclaims will also

18   likely affect the appropriate scope of discovery.

19   •    An Anti-SLAPP motion by defendants is pending as to DC's state law

20   claims, as such are intended to chill public copyright filings and participation

21   in litigation, and to interfere with the relationship between the attorney Marc

22   Toberoff and his clients.  With such a motion pending, a discovery stay is

23   automatic in state court, and, under a recent United States Supreme Court

24   decision that DC fails to mention, such an automatic stay should be applied

25   in federal court as a substantive provision of state law.  DC makes no effort

26   whatsoever to show good cause for lifting such a stay.  Even if F.R.C.P.

27   56(f)'s  analogous standard for postponing a summary judgment motion is

28   applied, DC has no "right" to discovery while the Anti-SLAPP  motion is

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY  OF TWO WITNESSES

5

1    pending, as it has made no showing whatsoever of the facts it needs to

2    contest such motions.

3    •    DC has already obtained extensive discovery in the closely related Superman

4    action, *Joanne Siegel, et al. v. Warner Bros. Entertainment Inc. et al.*, 04-

5    CV-8400 ODW (RZx) ("*Siegel*"), from these same witnesses, on the same

6    topics on which it now seeks to re-depose them.

7    •    A motion for entry of final judgment pursuant to F.R.C.P. 54(b) is also

8    pending before Judge Wright in *Siegel*, regarding three lengthy published

9    orders by the Court that upheld the Siegels' recaptured Superman copyright

10    interest and defined its scope.  That motion is set for hearing on September

11    27, 2010.  If it is granted, the findings in *Siegel* will have collateral estoppel

12    effect as to DC in this case, thereby also substantially narrowing the scope of

13    discovery.

14    •    92-year-old Joanne Siegel experienced pronounced stress and discomfort

15    during her last seven-hour deposition in *Siegel*.  *See* Declaration of Joanne

16    Siegel, ¶¶ 2-9.  At a minimum, if she is forced to sit through a repetitive

17    second deposition, the above motions should first be decided and the scope

18    of the pleadings set.

19    •    DC has been on notice of the claims in its new Complaint for at least four

20    years, and has been in receipt of the documents that it alleges give rise to its

21    claims since November 2006 and December 2008, at the latest.  Yet DC

22    waited a year and a half (until May 2010) to bring this lawsuit, knowing that

23    the witnesses it seeks to depose were elderly.  Having waited so long, DC's

24    claim of urgency due to advanced age lacks credibility.

25    •    There is no urgent reason why DC must take these depositions immediately,

26    rather than waiting just a few weeks for the Court to rule on the dispositive

27    motions to dismiss, the Anti-SLAPP motion and the Rule 54(b) motion, and

28    for DC to amend its Complaint.  A needless rush to discovery would raise a

6

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

Case 2:10-cv-03633-ODW-RZ    Document 45    Filed 08/30/10    Page 11 of 48    Page ID #:2814

1    host of unnecessary problems and confusion over the appropriate scope of

2    examination that could be entirely avoided.

3    •   89-year-old Jean Peavy is not a party to this action, she resides in New

4    Mexico, and DC failed to serve a proper subpoena to depose her in that State.

5    DC's motion as to her is frivolous, as this Court lacks jurisdiction to compel

6    her deposition.

7    Given that this Court lacks jurisdiction over Ms. Peavy, and that the request

8    to "initiate" discovery is moot, the only live question here is whether this Court

9    should order the expedited deposition of the 92-year-old Joanne Siegel (who was

10    already deposed for seven hours on the same topics) before the Court rules on the

11    dispositive motions that could end or greatly narrow this case. No good reason

12    exists to grant such an order, and all the factors outlined above support an opposite

13    approach.

14   **II.**    **DC COMICS' STATEMENT OF THE ISSUES IN DISPUTE**

15    (1) Whether defendants may continue to delay the initiation of discovery in

16    this case?

17    (2) Whether defendants must be compelled to produce Joanne Siegel and

18    Jean Peavy for their noticed depositions, along with their documents, no later than

19    September 30, 2010?

20   **III.**    **DEFENDANTS' STATEMENT OF THE ISSUES IN DISPUTE**

21    (1) Is this "Motion to Initiate Discovery" entirely moot, because DC has

22    already initiated discovery and has noticed depositions of the two witnesses at issue

23    for dates after the September 30 deadline it requests?

24    (2) Should the 92-year-old widow and 89-year-old sister of Superman's two

25    co-creators be forced to sit for depositions while dispositive motions under F.R.C.P.

26    12(b)(6), and 54(b), and California's Anti-SLAPP law are pending and will be

27    heard in a matter of weeks, and the pleadings are not yet final?

28    (3) Does this Court have jurisdiction to compel the deposition of Jean Peavy,

JOINT STIPULATION RE: PLAINTIFF'S<br>MOTION TO INITIATE DISCOVERY AND<br>TAKE DISCOVERY OF TWO WITNESSES

7

1  a non-party to this action and a resident of New Mexico?

2      (4) Can DC compel discovery during the pendency of an Anti-SLAPP

3  motion, where DC has failed to identify any facts it seeks to obtain through such

4  discovery or how they are relevant to the motion?

5      (5) Is the automatic discovery stay provided under California's Anti-SLAPP

6  law, to protect free speech and public participation against abusive lawsuits

7  designed to chill such conduct, so intertwined with a state right or remedy that it

8  functions to define the scope of the state-created right, and therefore must be

9  applied in federal court under the controlling opinion of the United States Supreme

10  Court in *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 130 S. Ct.

11  1431 (2010)?

12  **IV.    DC COMICS' POSITION**

13          **A.    Factual Background**

14                  1.    **DC Comics' Complaint**

15      DC Comics filed the complaint in this case on May 14, 2010 to protect rights

16  in the Superman property it has nurtured, developed, and promoted for over 70

17  years and to seek redress for violations of its rights by defendants.  DC Comics'

18  complaint includes six claims for relief:  the first three arise under federal copyright

19  law; the remainder arise under state law.  The first and second claims challenge

20  purported copyright termination notices filed on behalf of the putative heirs of

21  Joseph Shuster, the first illustrator of Superman.  *See* Compl. ¶¶ 92-151.  These

22  termination notices are invalid because, among other reasons, Shuster's heirs—

23  including his sister, Jean Peavy—entered into a contract in 1992 that has the legal

24  effect of preventing Ms. Peavy or Shuster's heirs from asserting the termination

25  rights they now invoke.  *See id.* ¶¶ 46-51, 99-104.  DC Comics' third claim

26  similarly arises under federal copyright law and, like the first claim, asserts that

27  defendants, Ms. Peavy, and others engaged in forbidden trafficking of rights that

28  violate DC Comics' rights under the Copyright Act.  *See id.* ¶¶ 151-60.  This

8

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

1    includes transferring the Shusters' putative rights in Superman to Toberoff, his

2    alter-ego companies, and the Siegels, *see id.* ¶¶ 52-58, 156-58—all in violation of

3    DC Comics' rights.  *See Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1047 (9th

4    Cir. 2005).  These illicit dealings also include misconduct connected to the parking

5    of alleged Superboy rights with the Siegels—rights that Shuster had long claimed

6    were his own.  *See id.* ¶¶ 73-78.

7        DC Comics' fourth, fifth, and sixth claims arise under state law and are

8    aimed at unlawful schemes orchestrated by Marc Toberoff and his alter-ego

9    companies in interfering with DC Comics' rights, contracts, and economic

10   relationships.  *See* Compl. ¶¶ 161-76.  Toberoff's rights-manipulation scheme is a

11   complicated one.  Although some of his activities have recently come to light as

12   summarized in DC Comics' complaint, much more remains to be exposed.  *See id.*

13   ¶¶ 1-11, 52-91.

14        2.    **Ms. Peavy and Ms. Siegel**

15        Both Jean Peavy and Joanne Siegel are material witnesses in this case and

16   have direct financial stakes in its outcome.  Their advanced age makes it essential to

17   preserve their testimony.  They are parties to multiple contracts with DC Comics, as

18   well as with each other and various defendants, that are at the heart of this dispute.

19   *See* Compl. ¶¶ 5-11, 46-57, 61-71, 76-77, 86-88.  DC Comics is entitled to examine

20   both witnesses concerning the origin, negotiation, formation, and performance of

21   these agreements, among other key issues.

22        The depositions of Ms. Peavy and Ms. Siegel in the Siegel Cases do not

23   remotely suffice to substitute for proper depositions in this case.  They contain

24   limited examination on some issues relevant to this case, but only in the context of

25   the separate claims and issues being litigated in the Siegel Cases.  *See infra* Section

26   IV.B.3.  There is no meaningful examination, for instance, about the conduct of

27   Toberoff and his companies in trafficking and interference with copyright and

28   contractual interests; the circumstances of the heirs' initial and ensuing interactions

9

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

1   with Toberoff; and the illicit agreements by which the Shusters were precluded

2   from freely entering into an agreement with DC Comics—all conduct that underlies

3   DC Comics' claims in this case.

### 3.    DC Comics' Efforts to Commence Discovery

5   Promptly after filing its complaint, DC Comics requested that defendants

6   engage in the initial discovery conference required by Rule 26(f). *See* Petrocelli

7   Decl. ¶¶ 10-11, Ex. H.  Over the course of the next two months, defendants

8   persistently refused to timely hold the conference or agree to commence discovery,

9   including the depositions of Ms. Peavy and Ms. Siegel, as detailed in Daniel

10  Petrocelli's accompanying declaration.  Initially, defendants said the parties could

11  not commence discovery or discuss a discovery plan until the Court issued an order

12  setting a scheduling conference.  Next, Mr. Toberoff, after stating he was

13  representing himself "for now," said he needed time to retain counsel for the

14  Toberoff parties.  After counsel was obtained, defendants said discovery should not

15  proceed because they intended to file dispositive motions to dismiss the complaint.

16  Defendants also claimed any depositions of Ms. Peavy and Ms. Siegel were

17  unnecessary in whole or in part because they already testified in the Siegel Cases.

18  Then, after weeks of unsuccessful efforts by DC Comics to secure a Rule 26(f)

19  conference or otherwise engage defendants in discovery, defendants asserted that

20  discovery could not proceed because they intended to seek a protective order

21  related to the Toberoff Timeline.  Defendants also said they needed to see the

22  specific discovery DC Comics sought from Ms. Siegel and Ms. Peavy—which DC

23  Comics immediately provided. *See id.* ¶¶ 11-28; Exs. H-U.

24  DC Comics protested these tactical delays, particularly defendants' refusal to

25  participate in a Rule 26(f) conference to forestall commencement of DC Comics'

26  discovery and enable defendants to file a preemptive motion for a protective order

27  that they insisted be litigated and heard first. *See* Petrocelli Decl. ¶¶ 11-28; Exs. H,

28  I, K, O, Q, S, T, V.  DC Comics advocated a joint motion after the parties' Rule

10

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

1    26(f) conference. *See id.* ¶¶ 27-29, Exs. T, V. Defendants refused, and even now

2    contend that DC Comics has no right to bring this discovery motion because it did

3    not adequately meet and confer.

4        The record is clear, and so is defendants' objective:  to block all discovery

5    indefinitely in the hope of obtaining a complete dismissal.  DC Comics submits

6    there is no just reason for further obstruction of its discovery rights.

7    **B.    Discovery Must Commence in this Case, and Ms. Peavy and**

8            **Ms. Siegel Should Be Deposed No Later than September 30, 2010.**

9        While the ordinary procedure is to conduct an early meeting of counsel

10   before commencing discovery, Rule 26(d) provides that discovery may be taken at

11   any time when authorized by court order and on good cause being shown. *See* FED.

12   R. CIV. PROC. 26(d); *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273,

13   276 (N.D. Cal. 2002).  This Court instructs parties to "begin to conduct discovery

14   actively before the Schedule Conference required by Fed. R. Civ. P. 16(b),"

15   because "at the Scheduling Conference the Court will impose tight deadlines to

16   complete discovery." Petrocelli Decl. Ex. at 2 n.1.

17       DC Comics has provided defendants with specific notice of two depositions

18   it seeks to take, together with the documents. *See* Petrocelli Decl. ¶¶ 27, Ex. T.  On

19   August 16, the parties are scheduled to have the Rule 26(f) conference.  Ms. Peavy

20   and Ms. Siegel are elderly, and good cause exists to order that their depositions take

21   place no later than September 30, 2010, and that discovery commence and proceed

22   apace in this case.

23   1.    **Defendants' Contemplated Motion to Dismiss Is Not a Bar to**

24         **Discovery and Its "SLAPP" Motion, in Fact, Necessitates**

25         **Expedited Discovery.**

26       The mere filing of a dispositive motion under Rule 12 does not relieve

27   defendants of their discovery obligations. *See Skellerup Indus. v. City of Los*

28   *Angeles*, 163 F.R.D. 598, 600-601 (C.D. Cal. 1995).  "Had the Federal Rules

                                                    JOINT STIPULATION RE: PLAINTIFF'S
                                  11                MOTION TO INITIATE DISCOVERY AND
                                                    TAKE DISCOVERY OF TWO WITNESSES

1    contemplated a motion to dismiss under [Rule] 12(b)(6) would stay discovery, the

2    Rules would contain a provision for that effect.  In fact, such a notion is directly at

3    odds with the need for expeditious resolution of litigation." *Id.*

4        Although California's anti-SLAPP statute, *see* CALIF. CODE CIV. P. § 425.16,

5    provides for staying discovery related to California *state-law claims* being

6    adjudicated in California *state court*, the U.S. Constitution's Supremacy Clause

7    dictates that the anti-SLAPP statute has no bearing on DC Comics' federal claims

8    for relief.  *See Hilton v. Hallmark Cards*, 580 F.3d 874, 881 (9th Cir. 2009) ("[T]he

9    anti-SLAPP statute does not apply to federal law causes of action."); *Sonoma*

10   *Foods, Inc. v. Sonoma Cheese Factory, LLC*, 634 F. Supp. 2d 1009, 1016 (N.D.

11   Cal. 2007) ("Although Section 425.16 applies to state law claims brought in federal

12   court, it does not apply to federal question claims in federal court because such

13   application would frustrate substantive federal rights.").

14       *All of the discovery* DC Comics seeks of Ms. Peavy and Ms. Siegel is

15   relevant to DC Comics' three federal claims and, thus, defendants have no reason

16   based on the SLAPP statute to object to any of the discovery.  *In re Bah*, 321 B.R.

17   41, 45 (9th Cir. BAP 2005) (SLAPP statute does not apply to federal question

18   claims); *see also Globetrotter Software, Inc. v. Elan Computer Group. Inc.*, 63 F.

19   Supp. 2d 1127, 1130 (N.D. Cal. 1999) ("the anti-SLAPP statute is not applicable to

20   the federal claims").  Moreover, in light of the defendants' SLAPP motion, DC

21   Comics is entitled to discovery necessary to respond to the motion.  The Ninth

22   Circuit has made clear that when a defendant files a SLAPP motion in federal court,

23   the motion cannot be granted unless the non-moving party is given a full and fair

24   opportunity to "discover information that is essential to its opposition." *Metabolife*

25   *Intern., Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) ("Because the discovery-

26   limiting aspects of § 425.16(f) and (g) collide with the discovery-allowing aspects

27   of Rule 56, these aspects of subsections (f) and (g) cannot apply in federal court.").

28

12

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

1  Furthermore, defendants' SLAPP motion, as described in meet-and-confer

2 discussions, seeks to challenge the factual underpinnings of DC Comics' state-law

3 claims.  DC Comics is entitled to take discovery to oppose such challenges and

4 must be provided the opportunity to do so before summary judgment.  *See, e.g., id.*;

5 *Moser v. Triarc Cos.*, 2007 WL 3026425, at *3 (S.D. Cal. Oct. 16, 2007) ("[I]f a

6 party brings an anti-SLAPP motion challenging the sufficiency of the nonmoving

7 party's evidence, *the court must allow the nonmoving party to conduct discovery*

8 sufficiently to permit summary judgment under Rule 56.") (emphasis added); *cf.*

9 *Four Navy Seals v. Associated Press*, 413 F. Supp. 2d 1136, 1149 (S.D. Cal. 2005)

10 (where SLAPP motion only challenges *legal sufficiency* of complaint, discovery

11 may not be necessary).

12    2.  **Discovery in this Case Is Not Precluded by Discovery in the**

13       **Siegel Cases.**

14  By rule, DC Comics is entitled to initiate discovery in this case, *see* FED. R.

15 CIV. P. 26-37, and to the extent defendants seek to prevent discovery generally or to

16 prevent the depositions of Ms. Peavy and Ms. Siegel, they must "carry a heavy

17 burden of showing why discovery should be denied."  *Blankenship v. Hearst Corp.*,

18 519 F.2d 418, 429 (9th Cir. 1975); *see also DR Sys., Inc. v. Eastman Kodak Co.*,

19 2009 WL 2973008, at *2 (S.D. Cal. Sept. 14, 2009) (right to deposition should not

20 be barred absent "extraordinary circumstances").

21  Defendants have not identified specific objections to the depositions of

22 Ms. Peavy or Ms. Siegel.  Nor could they reasonably do so:  these depositions have

23 yet to occur, and a record has to yet to develop as to what questions DC Comics

24 will ask, what answers the witnesses will give, and what objections defendants will

25 interpose.  Instead, defendants have made the blanket objection that Ms. Peavy and

26 Ms. Siegel may not be examined on subjects previously touched on in the Siegel

27 Cases or even at all.  *See* Petrocelli Decl. ¶ 30, Ex. V.  Defendants' position is

28 unfounded and requires the Court to issue an advisory opinion precluding entire

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY  OF TWO WITNESSES

1   lines of inquiry without an appropriate record of the scope, content, and conduct of

2   these examinations.

3        Courts refuse to grant such broad in-limine rulings in the trial context, and

4   such orders are even more inappropriate where, as here, the objection is that

5   discovery may be cumulative or burdensome. "A court generally will not limit

6   discovery simply because it may be somewhat cumulative and duplicative. Rather,

7   the discovery must be unreasonably so in light of the nature of the inquiry before

8   the court will limit the discovery sought." 6 DANIEL R. COQUILLETTE ET AL.,

9   MOORE'S FED. PRAC. § 26.60[2], at 26-431 (3d ed. 2007). "Broad allegations of

10   harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy

11   the Rule 26(c) test." *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th

12   Cir. 1992). Indeed, the Federal Rules, by their own terms, acknowledge that

13   discovery will oftentimes be cumulative or duplicative, but only when discovery is

14   "*unreasonably* cumulative or duplicative" may it be precluded. FED. R. CIV. P.

15   26(b)(2)(C)(1) (emphasis added).

16        Parties are routinely allowed to depose the same witnesses on similar topics

17   in different cases, and are even permitted to do so within the same case, especially

18   where, as here, a long time has passed since the first deposition, new evidence has

19   come to light, and new case theories have developed. *See, e.g., Graebner v. James

20   River Corp.*, 130 F.R.D. 440, 441 (N.D. Cal. 1989); *Blackwell v. City & County of

21   San Francisco*, 2010 WL 2608330, at *1 (N.D. Cal. June 25, 2010). As defendants

22   well know, this is a new case, and the parties and claims for relief at issue are

23   distinct from the Siegel Cases, as a comparison of the claims in the two cases bears

24   out. *Compare id.* Ex. C, *with id.* Exs. A & B. In the limited instances where there

25   is overlap in the issues, courts have long permitted second depositions on such

26   topics, *see, e.g., Batelli v. Kagan & Gaines Co.*, 236 F.2d 167, 169-70 (9th Cir.

27   1956), especially where, as here, the witnesses were asked only a few questions on

28   overlapping areas of fact—or were asked no questions at all on important issues,

14

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

Case 2:10-cv-03633-ODW-RZ    Document 69-1    Filed 09/15/10    Page 31 of 191    Page
ID #:5108
Case 2:10-cv-03633-ODW-RZ    Document 45    Filed 08/30/10    Page 19 of 48    Page ID #:2822

1   *see, e.g., Cunningham v. Gates*, 2006 WL 2294877, at *3 (C.D. Cal. Aug. 2, 2006);

2   *see also Baldwin-Montrose Chem. Co. v. Rothberg*, 37 F.R.D. 354, 356 (S.D.N.Y.

3   1964).  In no event is DC Comics bound by limited examinations conducted years

4   before this case on issues that were not fully explored and on which the Court in the

5   Siegel Cases made no findings and rendered no final judgment.  *Cf. Levi Strauss &*

6   *Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1356-57 (9th Cir. 1985) (issue preclusion

7   only applicable where issues and facts are identical—not merely similar—and—

8   unlike here—the court rendered final judgment in prior case); *Hydranautics v.*

9   *FilmTec Corp.*, 204 F.3d 880, 887-88 (9th Cir. 2000) (claim preclusion; same).

10      Ms. Peavy was deposed in the Siegel Cases for a total of 67 minutes,

11   generating 37 pages of transcript.  *See* Petrocelli Decl. Ex. X.  In the Siegel Cases,

12   she was a third-party witness.  Here, she is the self-described sole beneficiary of the

13   Shuster Estate; it is the Shuster copyright termination notice that is centrally at

14   issue in the dispute; Ms. Peavy signed key contracts at issue; and she bore witness

15   to Toberoff's conduct that interfered with DC Comics' rights under federal and

16   state law.  *See* Compl. ¶¶ 5-6, 9-11, 46-58, 73-88, 92-160, 174-76.  Even where

17   extensive discovery has occurred in a prior case, further depositions and discovery

18   are warranted where the specific issues in the subsequent case were not previously

19   "fully developed factually."  *Waltz v. U.S. Dep't of Agric.*, 251 F.R.D. 491, 500

20   (E.D. Cal. 2008).

21      Moreover, Ms. Peavy must be deposed because she was never examined in

22   the Siegel Cases on important contracts, documents, and other issues that have

23   come to light since her deposition.  *Cf. Graebner*, 130 F.R.D. at 441; *Blackwell*,

24   2010 WL 2608330, at *1.  This includes the existence and terms of agreements

25   between the Shusters and the Siegels (and others) concerning the Shusters' ability

26   to reach agreements with DC Comics during the pendency of the Shusters'

27   copyright termination notices.  Any such agreements would violate DC Comics'

28   rights under the Copyright Act.  *See Milne*, 430 F.3d at 1047.  DC Comics has

15

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

Case 2:10-cv-03633-ODW-RZ   Document 69-1   Filed 09/15/10   Page 32 of 191   Page
ID #:5109
Case 2:10-cv-03633-ODW-RZ   Document 45   Filed 08/30/10   Page 20 of 48   Page ID #:2823

1   every right to explore these contentions with Ms. Peavy, as well as question her on

2   other offending agreements in which she participated.  DC Comics also needs to

3   examine the illicit parking of Superboy rights, *see* Compl. ¶¶ 9-10, 73-78, in

4   addition to the events described in the Toberoff Timeline, which was ordered

5   produced well after Ms. Peavy was deposed, *see id.* ¶¶ 89-91, Ex. A.

6        Similarly, Ms. Siegel's deposition in the Siegel Cases did not fully explore

7   key issues being litigated here or address certain issues at all.  For example, she was

8   only briefly examined, over a few pages, concerning Superboy; whether and how

9   the Siegels and Shusters share in rights related to Superboy are directly relevant to

10  DC Comics' second, third, and sixth claims for relief.  Like Ms. Peavy, Ms. Siegel

11  also was not examined concerning events described in the Toberoff Timeline. *See*

12  *Kraemer v. Unocal Termination Allowance Plan*, 2009 WL 936611, at *2 (C.D.

13  Cal. Apr. 6, 2009) (further deposition of witnesses deposed in prior cases not

14  duplicative where facts related to potential conflict of interest were not at issue in

15  prior cases).

16       Among other issues to address with the witnesses is whether and to what

17  extent they were misled by Toberoff about his being in business with a "billionaire

18  willing to invest $15 million"—an illicit inducement Toberoff used to interfere with

19  DC Comics' business relations with the Siegels. *See* Compl. ¶¶ 68-69, Ex. A at 6;

20  *Zamora v. D'Arrigo Brother Co.*, 2006 WL 3227870, at *2 (N.D. Cal. Nov. 7,

21  2006) (second Rule 30(b)(6) deposition not duplicative where important evidence

22  was produced after first deposition); *UniRAM Tech., Inc. v. Monolithic Sys. Tech.,*

23  *Inc.*, 2007 WL 915225, at *2 (N.D. Cal. Mar. 23, 2007) (second 30(b)(6) deposition

24  would not be unreasonably duplicative, even where "significant overlap" may

25  occur).

26       3.       **The Toberoff Timeline Is a Proper Subject of Discovery.**

27       Completely without merit are defendants' efforts—years after the fact—to

28  now cloak the Toberoff Timeline in privilege, remove it from the public record,

16

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

1    suppress its use in this case, and use the document itself as a basis to delay the

2    taking of Ms. Peavy's and Ms. Siegel's depositions.  The District Court in the

3    Siegel Cases ordered production of the Timeline in December 2008.  Immediately

4    thereafter, the Toberoff and Siegel defendants were advised that the document

5    would be filed publicly, and though specifically invited to move for a protective

6    order if they objected, they filed no such motion.  They similarly took no action

7    when, in May 2010, DC Comics filed this complaint, which attached the Timeline

8    as Exhibit A.  Far from objecting, Toberoff spoke openly to the press about the

9    document.  Only on July 13—and well after DC Comics had pressed for

10   commencement of discovery—did defendants assert for the first time that they

11   would file a motion to preclude any use of the Timeline in this case and insisted

12   that *their motion* be resolved before discovery proceeds.  *See Petrocelli Decl.* ¶ 23.

13   DC Comics will respond to defendants' motion for a protective order in its

14   opposition papers.

15       **C.    Conclusion**

16       The Court should issue an order: (1) requiring that discovery commence in

17   this case without any further delay; and (2) requiring that Ms. Siegel and Ms. Peavy

18   sit for their depositions and produce their documents no later than September 30,

19   2010.

20   **V.    DEFENDANTS' POSITION**

21       **A.    Factual Background**

22           1.    **The *Siegel* Litigation (Case No. CV 04-8400)**

23       This discovery dispute involves two closely related actions, both of which

24   deal with the statutory termination by the heirs of Superman's co-creators of prior

25   Superman grants to DC, pursuant to the Copyright Act.  Jerome Siegel ("Siegel")

26   and Joseph Shuster ("Shuster") co-authored the first Superman story, later

27   published in 1938 in *Action Comics, No. 1* by DC's predecessor, and hundreds of

28   subsequent Superman works.  Joanne Siegel, Siegel's widow, and Laura Siegel

17

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

1    Larson, their daughter, served notices of termination pursuant to 17 U.S.C. § 304(c)

2    (the "Siegel Terminations") on DC, and its effective parent, Warner Bros.

3    Entertainment Inc. ("Warner"), on April 3, 1997 and November 8, 2002, that

4    terminated Siegel's old copyright grants regarding Superman and Superboy, on

5    April 16, 1999 and November 17, 2004, respectively.

6        Warner disputed the Siegel Terminations, forcing the Siegels in October

7    2004 to file for declaratory relief as to their validity in two separate actions, Nos.

8    04-CV-8400 (Superman) and 04-CV-8776 (Superboy).  DC counterclaimed that the

9    Siegel Terminations were invalid.  These cases have been litigated fiercely ever

10    since, generating four published opinions that total more than two hundred pages,

11    as well as extensive discovery.  Multiple depositions were taken, including those of

12    the two witnesses at issue in the instant motion, Joanne Siegel and Jean Peavy.

13    Jean Peavy ("Peavy") is the 89-year-old sister of Joseph Shuster.  DC also took the

14    depositions of Jerome Siegel's daughter, Laura Siegel Larson, and Joseph Shuster's

15    nephew (and the executor of his estate), Mark Warren Peary ("Peary" or "Shuster

16    Executor").  The Siegels' counsel, Marc Toberoff ("Toberoff"), also represents the

17    Shuster Executor, who served a notice of termination regarding Superman ("Shuster

18    Termination") on November 10, 2003 pursuant to 17 U.S.C. § 304(d), which will

19    become effective on October 26, 2013.[1]  The above-named persons, including

20    Joanne Siegel and Jean Peavy, produced thousands of pages of documents in

21    response to DC's subpoenas and deposition notices.  *See* Declaration of Marc

22    

23    _____

[1] At the time of Joseph Shuster's death in 1992, under the Copyright Act of 1976,
Pub. L. 94-553, 17 U.S.C. § 304(c)(2), only an author's widow or widower,
children or grandchildren held termination rights.  Joseph Shuster died unmarried
and childless.  Toberoff Decl., Ex. A, ¶ 46.  As such, no one in Shuster's family
held termination rights.  The Copyright Term Extension Act of 1998, Pub. L. No.
105-298, expanded the category of those holding the termination right by adding
"the author's executor, administrator, personal representative, or trustee." 17 U.S.C.
§ 304(c)(2)(D).  The Shuster Estate was then probated to avail itself of the
termination right provided by the 1998 Act.  17 U.S.C. § 304(d).

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

1    Toberoff ("Toberoff Decl."), ¶ 14.

2         As part of this discovery, DC asked for and received extensive information

3    concerning the formation of the attorney-client relationship between the Siegel and

4    Shuster families and their attorney, Toberoff.  For example, in 2006 copies of 2001

5    and 2003 agreements between Peavy, Peary and Toberoff's loan-out company,

6    Pacific Pictures Corporation ("Pacific Pictures Agreements") were produced to DC

7    in *Siegel*.  Toberoff Decl., ¶ 16, Ex. J.  These agreements were cancelled in 2004

8    and have had no effect for nearly six years.  Toberoff Decl., Ex. A ("Complaint"), ¶

9    86.  A 2002 agreement between Toberoff, Joanne Siegel, Laura Siegel Larson, and

10   IP Worldwide (the "IP Worldwide Agreement") was also produced in 2006 to DC

11   in *Siegel*.  Toberoff Decl., Ex. L.  This agreement expired and has had no effect for

12   more than five years.  Toberoff Decl., Ex. C at 10, n.5.

13        DC repeatedly questioned both Joanne Siegel and Jean Peavy about their

14   retention of Mr. Toberoff.  Joanne Siegel was deposed for a full day, during which

15   DC asked her about many of the topics at issue in DC's new lawsuit, including:

16   when Toberoff's representation of her began (Toberoff Decl., Ex. I ("Siegel Depo.

17   Tr.") at 41:1-3; Ex. A (Complaint), ¶¶ 64, 70-72); whether Toberoff was involved

18   in the Siegels' negotiations with DC and Warner in 2001 and 2002 (Siegel Depo.

19   Tr. at 24:13-28:13, 39:1-40:25; Complaint, ¶¶ 62, 168-69); whether Joanne received

20   any assistance from Toberoff in writing her May 9, 2002 or September 21, 2002

21   letters breaking off settlement talks with DC regarding the Siegel Terminations

22   (Siegel Depo. Tr. at 32:18-34:17, 36:16-40:17, 42:17-43:9, 43:10-44:25, 45:1-

23   46:24, 119:4-121:9; Complaint, ¶¶ 65-67, 70, 168-69); and the Shuster Termination

24   and Toberoff's representation of Jean Peavy (Siegel Depo. Tr. at 102:8-104:25,

25   105:1-5; Complaint, ¶¶ 64, 70-72, 79-88).  *See* Toberoff Decl., Exs. A, I.

26        Jean Peavy was also asked about many topics at issue in this lawsuit

27   including:  Peavy's first meeting with Toberoff and her introduction of the Siegels

28   to Toberoff (Toberoff Decl., Ex. K ("Peavy Depo. Tr.") at 31:24-32:4; Ex. A

                                         19                 JOINT STIPULATION RE: PLAINTIFF'S
                                                            MOTION TO INITIATE DISCOVERY AND
                                                            TAKE DISCOVERY OF TWO WITNESSES

Case 2:10-cv-03633-ODW-RZ    Document 69-1    Filed 09/15/10    Page 36 of 191    Page
ID #:5113
Case 2:10-cv-03633-ODW-RZ    Document 45    Filed 08/30/10    Page 24 of 48    Page ID #:2827

1    (Complaint), ¶¶ 54, 164-66); the formation of the Shuster Estate and the Shuster

2    Termination (Peavy Depo. Tr. at 28:10-14; Complaint, ¶ 58); the Pacific Pictures

3    Agreements (Peavy Depo. Tr. 34:3-34:24; Complaint, ¶¶ 54-57, 105-11); and a

4    1992 agreement Peavy entered into with DC (Peavy Depo. Tr. 18:20-23:25, 34:3-

5    34:24; Complaint, ¶¶ 47-51, 99-104, 162-63). *See* Toberoff Decl., Exs. A, K.

6         Fact discovery in the *Siegel* litigation closed on November 16, 2006.

7    Toberoff Decl., ¶ 21. DC unsuccessfully sought to reopen discovery based on the

8    so-called "Toberoff Timeline" (discussed below, and which is attached to and

9    forms the basis of DC's new Complaint), but the Court denied this request. *Id.*,

10   Exs. N-O.

11        The parties filed substantial cross-motions for partial summary judgment in

12   the Superman action. The Siegels sought, *inter alia*, to have their terminations

13   declared valid as a matter of law. On March 26, 2008, Judge Larson upheld the

14   Siegels' Superman Termination, and ruled that, as of April 16, 1999, the Siegels

15   own 50% of the copyright to the first Superman story published in *Action Comics,*

16   *No. 1. See Siegel v. Warner Bros. Ent. Inc.*, 542 F. Supp. 2d 1098, 1117-39 (C.D.

17   Cal. 2008) ("*Siegel* I"). Subsequently, on August 12, 2009, Judge Larson held that

18   the Siegels had also recaptured Siegel's copyright interest in *Action Comics, No. 4,*

19   parts of *Superman, No. 1* (pages 3-6) and Superman's origin story on the planet

20   Krypton contained in the first two weeks of the *Superman* newspaper strips. *See*

21   *Siegel v. Warner Bros. Ent. Inc.*, 658 F. Supp. 2d 1036 (C.D. Cal 2009) ("*Siegel*

22   II"). Recently, on August 12, 2010, the Siegels moved under F.R.C.P. 54(b) to

23   have judgment entered as to these detailed orders as to the validity and scope of the

24   Siegel Terminations, to permit immediate appeal. Toberoff Decl., Ex. P. The

25   motion is set to be heard on September 27, 2010. *Id.*

26

27

28

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

Case 2:10-cv-03633-ODW-RZ    Document 69-1    Filed 09/15/10    Page 37 of 191    Page
ID #:5114
Case 2:10-cv-03633-ODW-RZ    Document 45    Filed 08/30/10    Page 25 of 48    Page ID #:2828

2.    **DC Files This Retaliatory Action**

    a.    <u>DC's Lawsuit Prompts Dispositive Motions by</u>
<u>Defendants</u>

Judge Larson retired from the bench in October 2009, and the *Siegel* cases were transferred to Judge Otis D. Wright. Thereafter, Warner and DC fired their counsel and retained Daniel Petrocelli, of O'Melveny and Myers, LLP. Unhappy with the results of the *Siegel* litigation, DC filed this new lawsuit on May 14, 2010. The new complaint contains three state-law claims for relief, wherein DC personally sued the Siegels and Shuster Estate's attorney, Toberoff, for purportedly "tortiously interfering" with DC's "relationship" with the Siegels, and contested the validity of the Shuster Termination on many of the same failed grounds that DC had contested the Siegel Termination. DC also sued the Siegels, the Shuster Executor, and Toberoff for allegedly entering into so-called "consent agreements" with the Shuster Executor that supposedly violated DC's purported rights under the Copyright Act.

On August 13, 2010, Toberoff filed a substantial motion to dismiss DC's Fourth, Fifth and Sixth claims against him and his entities pursuant to F.R.C.P. 12(b)(6), and filed a motion to strike under California's Anti-SLAPP statute, Code of Civil Procedure § 425.16. Toberoff Decl., Exs. C-D. DC's Complaint also contains three claims, purportedly under the Copyright Act, that challenge the Shuster Termination and accused the Siegels, the Shuster Executor, and Toberoff of conspiratorial "schemes" regarding their rightfully filed Superman termination notices. On August 13, 2010, the Siegels and the Shuster Executor filed substantial motions to dismiss DC's First, Second, Third and Sixth Claims pursuant to F.R.C.P. 12(b)(6). Toberoff Decl., Exs. E-F. All of these dispositive motions are scheduled to be heard shortly by Judge Wright, on October 18, 2010. *Id.*, Exs. C-F.

During the parties' Rule 26(f) conference, held on August 16, 2010, DC indicated that, in light of the pending motions, it was very likely to amend its

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

21

1    Complaint. *Id.*, ¶ 4.  On Saturday, August 28, DC confirmed by email that it will

2    file an amended Complaint. *Id.*, Ex. Q.  DC also indicated that it would not add any

3    additional causes of action to the amended Complaint, but merely "augment" the

4    current complaint in response to the various dispositive motions.  Defendants intend

5    to file similar motions to dismiss the amended Complaint, and to file another

6    motion pursuant to California's Anti-SLAPP laws, and plan on having these

7    motions heard on October 18, 2010.  To the extent any portion of DC's amended

8    Complaint survives the dispositive motions, defendants also intend to file

9    counterclaims against DC.  Toberoff Decl., ¶ 4.

10                   b.      DC Exploits the Theft of Privileged and Confidential

11                          Information From Toberoff's Law Firm

12           In 2006, an attorney, formerly employed by Toberoff, mailed packages of

13   documents stolen from Toberoff's office to executives at DC's effective parent,

14   Warner, including its General Counsel, in an apparent attempt to attack Toberoff

15   and to assist Warner and DC in the *Siegel* litigation.  *See* Toberoff Decl., Ex. L, ¶¶

16   25-26; Ex. M, ¶¶ 7-14.  The attorney/thief included with this package of documents

17   a rambling, defamatory cover letter which discusses privileged documents and

18   information, while straining to discredit Toberoff.  DC attached this patently

19   inadmissible and unreliable document, created and disseminated in clear violation

20   of the attorney's duties of loyalty and confidentiality, as "Exhibit A" and the

21   centerpiece of DC's new Complaint, referring to it as the "Toberoff Timeline."

22   Defendants have filed a motion for a protective order, pending before this Court

23   and also scheduled to be heard on September 20, 2010, that seeks to bar the use of

24   the Toberoff Timeline in discovery until the Ninth Circuit has had the opportunity

25   to rule on the propriety of DC's exploitation of this theft and patently improper

26   disclosure.

27

28

22

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

**B.      The Relief Sought by DC in Its Motion Is No Longer At Issue**

In this "Motion to Initiate Discovery," DC raises two issues that are purportedly in dispute. The first issue is whether the Court should issue an order "initiating discovery." However, this issue is entirely moot. Discovery has been initiated.[2] On August 5, 2010, the parties scheduled a Rule 26(f) conference for Monday, August 16, 2010. On the eve of that scheduled conference, at 6:53 p.m. on Friday August 13, 2010, DC served the instant motion. The next business day, August 16, 2010, the parties conducted the Rule 26(f) conference. Toberoff Decl., ¶ 4; Ex. B. The very next day, August 17, 2010, DC initiated discovery by serving discovery requests and notices of deposition. Toberoff Decl., Exs. G-H.

The second issue raised by DC's motion is a request that Joanne Siegel and Jean Peavy's depositions take place by September 30, 2010. That controversy is also moot. On August 17, DC served a notice of deposition on Joanne Siegel, which set a deposition date of October 5, 2010, and subpoena of Jean Peavy, which set a deposition date of October 12, 2010. Toberoff Decl., Exs. G-H. Those dates fall after September 30, 2010. Thus, DC currently has no procedural basis to seek the relief demanded in this motion, and the entirety of DC's motion is moot.

**C.      This Court Lacks Jurisdiction Over Jean Peavy**

DC's motion is further flawed because this Court lacks jurisdiction to compel the deposition of Jean Peavy. Peavy is not a party to this action and is a resident of New Mexico. Accordingly, any motion to compel her deposition must be *preceded* by service of a subpoena issued from the United States District Court for the

---

[2] DC's repeated accusations that defendants are engaging in improper delay are baseless. It is entirely proper for defendants to have postponed the Rule 26(f) conference until after the Toberoff defendants had retained their own counsel, and such counsel had an opportunity to familiarize themselves with the voluminous record in this complex case. The other postponements were the result of routine minor scheduling issues, including vacations and prior commitments, which defendants' counsel worked reasonably to resolve.

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

23

1   District of New Mexico, and that court has sole jurisdiction to decide any motion to

2   compel arising from such a subpoena.  *See* F.R.C.P. 45(a)(2)(B) ("A subpoena must

3   issue as follows: … for attendance at a deposition, from the court for the district

4   where the deposition is to be taken."); *Visx, Inc. v. Nidek Co.*, 208 F.R.D. 615, 616

5   (N.D. Cal. 2002) ("Under Rule 45, the only procedure for enforcing a subpoena

6   *duces tecum* is to institute contempt proceedings before the district court that issued

7   the subpoena."); *Platypus Wear, Inc. v. K.D. Co., Inc.*, 905 F. Supp. 808, 810 (S.D.

8   Cal. 1995) ("[F.R.C.P.] 37(a)(1) provides that a motion to compel discovery should

9   be brought before the court in the district where the discovery is being, or is to be,

10  taken.").

11       No subpoena was served on Jean Peavy before DC served this premature

12  motion, and no subpoena is attached to the motion.  Four days *after* DC served this

13  motion, DC served a subpoena on Peavy from the New Mexico District Court.

14  Toberoff Decl., Ex. H.  That subpoena is ineffective because it failed to include

15  witness fees.  *See Tourgeman v. Collins Fin. Servs.*, 2009 U.S. Dist. LEXIS 92230,

16  at *3–4 (N.D. Cal. May 4, 2009) ("A failure to tender fees at the time of service

17  invalidates the subpoena and the deposition testimony will not be compelled."); 9-

18  45 *Moore's Federal Practice – Civil* § 45.21 ("The service of a subpoena that

19  requires attendance but is not accompanied by the required fee is invalid, and the

20  witness may refuse to appear solely on that ground."); Toberoff Decl., ¶ 13.  Any

21  motion to compel based on that inadequate subpoena must be heard by the issuing

22  court.  There is simply no issue for this Court to decide concerning Jean Peavy, and

23  DC's motion as to her must be denied.

### D.    Depositions Should Not Be Compelled on the Dates Noticed by DC, Because Dispositive Motions Will Be Heard Less Than Two Weeks Later

27       Even if this motion is construed as a request for an order permitting

28  depositions of Ms. Siegel and Ms. Peavy on October 5 and October 12, 2010, the

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

Case 2:10-cv-03633-ODW-RZ    Document 69-1    Filed 09/15/10    Page 41 of 191    Page
ID #:5118
Case 2:10-cv-03633-ODW-RZ    Document 45    Filed 08/30/10    Page 29 of 48    Page ID #:2832

1   motion should be denied. On August 13, 2010, the same day that DC served the

2   instant motion, defendants filed three Rule 12(b)(6) motions to dismiss and an Anti-

3   SLAPP motion to strike. Toberoff Decl., Exs. C-F. Faced with these motions, DC

4   announced on August 28, 2010, that it will file an amended Complaint in order to

5   "augment the pleading to address issues raised in [the dispositive] motions."

6   Toberoff Decl., Ex. Q. DC, however, does not plan to add additional causes of

7   action, and, as all of DC's claims are fatally defective as a matter of law, defendants

8   intend to file renewed motions to dismiss all of DC's claims. These motions can

9   and should dispose of all of DC's claims as a matter of law, and will, at a minimum,

10   clarify the scope of the pleadings and associated discovery. Accordingly, DC's

11   request to expedite the depositions of Jean Peavy and Joanne Siegel, both of whom

12   were already deposed in the closely-related *Siegel* cases, should be denied, and

13   other depositions should be stayed pending the outcome of these dispositive

14   motions.

15        DC repeats the straw man generalization that the "mere filing of a dispositive

16   motion under F.R.C.P. 12 does not relieve defendants of their discovery

17   obligations." Joint Stipulation, Section IV.B.1. Defendants have never asserted

18   that they are relieved of all discovery obligations as a result of their F.R.C.P.

19   12(b)(6) motions. The question is whether, given the pendency of substantial

20   motions to dismiss and an Anti-SLAPP motion that will all be heard shortly, it

21   makes sense to rush to depose elderly witnesses before the scope of the pleadings

22   and associated discovery is known.

23        DC ignores the well-established case law that holds that, while a motion to

24   dismiss does not automatically stay discovery, the courts have broad discretion to

25   stay discovery pending the resolution of dispositive motions to dismiss. *See Jarvis*

26   *v. Regan*, 833 F.2d 149, 155 (9th Cir. 1987).[3] The Ninth Circuit has approved

27

28   [3] *Skellerup Indus. v. City of Los Angeles*, 163 F.R.D. 598 (C.D. Cal. 1995), relied

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

1    discovery stays pending a motion to dismiss where discovery was "not required to

2    address the issues raised" by the motion, as "[d]iscovery is only appropriate where

3    there are factual issues raised by a Rule 12(b) motion." *Id.* at 155 (quotations

4    omitted). *See Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir. 1984) (approving

5    discovery stay because "there were no factual issues" raised by motions to dismiss);

6    *Wood v. McEwen*, 644 F.2d 797, 802 (9th Cir. 1981) (a district court "may … stay

7    discovery when it is convinced that the plaintiff will be unable to state a claim for

8    relief"); *Sasselli v. Pena*, 2008 U.S. Dist. LEXIS 44458, at *2 (E.D. Cal. June 3,

9    2008) (a magistrate judge "has broad discretion to stay discovery pending decision

10   on a dispositive motion"). District Courts in the Ninth Circuit have adopted a

11   simple test to determine whether it is appropriate for discovery to be postponed

12   while a dispositive motion is pending:

13

14          "First, a pending motion must be potentially dispositive of the entire case, or
            at least dispositive on the issue at which discovery is directed …. Second, the
            court must determine whether the pending dispositive motion can be decided

15          absent additional discovery."

16   *Lowery v. F.A.A.*, CIV. S-93-1352, 1994 WL 912632, at *3 (E.D. Cal. Apr. 11,

17   1994) (citations omitted).[4] As part of this analysis, "the Court should '… take a

18   preliminary peek at the merits of the allegedly dispositive motion to see if on its

19   face there appears to be an immediate and clear possibility that it will be granted.'"

20   *GTE Wireless, Inc. v. Qualcomm, Inc.*, 192 F.R.D. 284, 286 (S.D. Cal. 2000).

21

22   on heavily by DC for the proposition that a Rule 12(b) motion does not stay
     discovery, recognizes that a court will often stay discovery on a "case-by-case"

23   basis pending the resolution of a dispositive motion, based on factors including
     "whether it is a challenge as a 'matter of law,'" and "whether some or all of the

24   defendants join in the request for a stay," both of which are present here. *Id.* at 601.

25   [4] The cases applying this test and concluding that it is appropriate for discovery to
     wait until dispositive motions have been adjudicated are legion. *Hall v. Tilton*,

26   2010 U.S. Dist. LEXIS 11162, at *2-*3 (N.D. Cal. Feb. 8, 2010) (adopting test and
     granting stay); *Curtis v. Benda*, 2009 U.S. Dist. LEXIS 86504, at *3-*6 (W.D.

27   Wash. Sept. 4, 2009) (same); *Hanni v. American Airlines, Inc.*, 2009 U.S. Dist.

28   LEXIS 49338 (N.D. Cal. May 27, 2009) (same).

                                                          JOINT STIPULATION RE: PLAINTIFF'S
                                         26               MOTION TO INITIATE DISCOVERY AND
                                                          TAKE DISCOVERY OF TWO WITNESSES

Case 2:10-cv-03633-ODW-RZ     Document 69-1     Filed 09/15/10     Page 43 of 191     Page
ID #:5120
Case 2:10-cv-03633-ODW-RZ     Document 45     Filed 08/30/10     Page 31 of 48     Page ID #:2834

1      Defendants' motions meet these criteria. *First*, the motions that have already

2   been filed, and will be re-filed in response to DC's amended Complaint, target each

3   of DC's claims and, if successful, would dispose of the entire case. *See*

4   Defendants' Summary of Dispositive Motions, attached as Appendix A to

5   Defendants' Portion of this Joint Stipulation; Toberoff Decl. at Exs. C-F. *Second*,

6   the motions are and will be to dismiss as a matter of law, based on clear statutory

7   and case authority. *See id.* DC has not identified in its motion any discovery that

8   could contradict the clear and well-established law on which defendants rely.

9   While defendants do not intend to re-argue the motions in this brief, they

10   respectfully refer this Court to the motions (*see* Toberoff Decl. at Exs. C-F) and

11   have included an appendix that describes the bases for such motions to dismiss in

12   detail, and demonstrates how the motions will resolve all of DC's claims as a

13   matter of law. *See* Appendix A. In any event, there can be no reasonable dispute

14   that each and every one of these motions can clearly be "decided absent additional

15   discovery" as a matter of law. *Lowery*, 1994 WL 912632, at *3. Thus, there is no

16   basis for an order compelling that depositions occur before these dispositive

17   motions are decided shortly. *Wood*, 644 F.2d at 802.

18      Moreover, even considering DC's decision to delay resolution of these

19   motions by filing an amended complaint, defendants intend to maintain a hearing

20   date of October 18, 2010, or a date shortly thereafter, for the dispositive motions.

21   Accordingly, the period of the stay should not be lengthy. There is no reason

22   whatsoever why DC needs to take depositions now, instead of after the resolution

23   of these motions, which along with DC's pending amendment of its Complaint and

24   defendants' counterclaims, will undoubtedly clarify and narrow the matters at issue

25   in this action.

26      DC's primary argument as to why these depositions are urgent is that the

27   witnesses are of "advanced age." Joint Stipulation, Section I.A. DC's sense of

28   urgency, however, is belied by its own conduct.

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

1     *First*, DC waited years to initiate its claims, and cannot now assert that it will

2     be substantially prejudiced by waiting a couple more weeks for defendants'

3     dispositive motions to be resolved.  The Pacific Pictures Agreements and IP

4     Worldwide Agreement on which DC bases its claims were produced to DC in 2006.

5     Toberoff Decl., ¶¶ 16-17, 19, Ex. J, Ex. L.  Moreover, even if the so-called

6     "Toberoff Timeline" was DC's sole source of knowledge as to the allegations in its

7     Complaint (it is not), by DC's own account it received the letter on December 10,

8     2008 (Complaint, ¶88), but waited a year and a half, until May 14, 2010, to file suit.

9     *Second*, had these witnesses' age been DC's true concern, DC could have

10    filed, but did not file, a petition under F.R.C.P. 27(a) to take their depositions to

11    "preserve testimony" at any time from 2008-2010, prior to the filing of this action.

12    *Third*, DC has offered no reason, even given the advanced age of the

13    witnesses, why waiting for a matter of weeks to depose them presents a material

14    problem.  *See, e.g., United States v. Int'l Longshoremen's Ass'n*, 2007 U.S. Dist.

15    LEXIS 70686 at *7 (E.D.N.Y. Sept. 24, 2007) (rejecting the expedited deposition

16    of an elderly witness, because the deponent's age alone was an insufficient basis to

17    expedite).

18    *Fourth*, DC has offered no case law to support the expedited depositions of

19    elderly witnesses where, as discussed in more detail below, their testimony has

20    already been preserved by their depositions in a closely related action.

21    Accordingly, the witnesses' ages alone provide no basis for seeking unnecessarily

22    expedited depositions.  Indeed, the advanced age of the deponents favors a

23    reasonable stay of depositions, to avoid the possibility that these elderly persons

24    will be seriously burdened with successive and entirely unnecessary questioning by

25    DC.  *See* Declaration of Joanne Siegel, ¶¶ 2-9.

26    *Fifth*, DC has waited months to amend its Complaint, despite being advised

27    as early as July 13, 2010 of the fatal problems with its pleading.

28

28

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

1    Nor is there any other reason why DC would be materially prejudiced from a

2    temporary stay of depositions pending resolution of the dispositive motions. DC

3    fails to articulate any facts that it needs in order to address the pending motions, and

4    therefore DC cannot show that it will suffer prejudice by briefly waiting to

5    commence depositions until these motions are decided. The discovery period in

6    this action will clearly be sufficient to permit DC to take any appropriate deposition

7    following the resolution of the motions. Toberoff Decl., ¶ 5. On the other hand, if

8    the depositions are taken before the dispositive motions and related discovery

9    motions are decided, it will force defendants' counsel to instruct these witnesses not

10    to answer questions at deposition on the grounds stated in the pending motions.

11    This will undoubtedly lead to further motion practice, and potentially result in Ms.

12    Siegel and Ms. Peavy having their depositions taken three times. DC's discovery

13    "plan" is thus inefficient, duplicative and burdensome, all of which justifies

14    postponing the depositions, not expediting them. F.R.C.P. 26(c). Common sense

15    demands that the dispositive motions be resolved first, and then, with the scope of

16    the case properly narrowed, the depositions can proceed if and as necessary.

17    **E.    Depositions Should Await Imminent Resolution of the Pending**

18    **Rule 54(b) Motion in *Siegel* Which, If Granted, Will Substantially**

19    **Narrow Discovery in this Case**

20    The Siegels' pending F.R.C.P. 54(b) motion in the *Siegel* Superman action,

21    to be heard by Judge Wright on September 27, 2010, also has a direct and

22    substantial bearing on discovery in this case. Toberoff Decl., Ex. P. If the Court

23    enters judgment based on its three lengthy published opinions concerning the scope

24    and validity of the Siegels' Superman Terminations,[5] that will have preclusive

---

[5] *Siegel I*, 542 F. Supp. 2d 1098, 1117-39 (termination upheld as to first Superman story in *Action Comics* No. 1); *Siegel II*, 658 F. Supp. 2d 1036, 1080-84 (defining additional recaptured Superman works); *Siegel v. Warner Bros. Ent. Inc.*, 690 F. Supp. 2d 1048 (C.D. Cal. 2009) ("*Siegel III*") (denying motions for reconsideration).

JOINT STIPULATION RE: PLAINTIFF'S<br>MOTION TO INITIATE DISCOVERY AND<br>TAKE DISCOVERY OF TWO WITNESSES

1    effect as to the same issues in this action regarding the mirror-image Shuster

2    Termination, preventing DC from re-litigating such issues, and significantly

3    narrowing the scope of discovery in this case.  At a status conference on August 13,

4    2010, Judge Wright indicated that entry of such a judgment pursuant to Rule 54(b)

5    may be appropriate.  Toberoff Decl., Ex. R at 3:19-4:13.  Common sense demands

6    that the Rule 54(b) motion, along with the dispositive motions be resolved first, and

7    then, with the scope of the case properly narrowed, that depositions proceed if and

8    as necessary.

9    **F.    The Pending Anti-SLAPP Motion Should Stay and/or Limit**

10            **Depositions**

11            DC argues that defendants' Anti-SLAPP motion "necessitates" expedited

12   discovery.  However, DC has failed to identify good cause or any particularized

13   need for such discovery.  Accordingly, applying either the substantive principles of

14   the Anti-SLAPP law or the Federal Rules of Civil Procedure, DC has not made the

15   necessary showing to support expedited discovery before the hearing on the Anti-

16   SLAPP motion.

17            Under California law, the filing of an Anti-SLAPP motion stays discovery

18   unless the plaintiff can show "good cause" for obtaining discovery.  Under

19   California Code of Civil Procedure Section 425.16(g), "[a]ll discovery proceedings

20   in the action shall be stayed upon the filing of a notice of motion made pursuant to

21   this section. The stay of discovery shall remain in effect until notice of entry of the

22   order ruling on the motion. The court, on noticed motion and for good cause shown,

23   may order that specified discovery be conducted notwithstanding this subdivision."

24   *Id.*  A showing of good cause requires the plaintiff to identify particular facts that it

25   seeks in discovery.  *See 1-800 Contacts, Inc. v. Steinberg*, 107 Cal.App.4th 568,

26   593 (2003) (plaintiff seeking to lift anti-SLAPP discovery stay must explain what

27   additional facts the plaintiff expects to uncover).  Similarly, under F.R.C.P. 56(f), a

28   plaintiff may be entitled to conduct discovery before a hearing on a motion for

30

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

1    summary judgment if it shows a "particularized need" for the discovery.[6]

2         DC has made no effort whatsoever to meet either the showing of good cause

3    required by § 426.16(g) or the showing of particularized need required by F.R.C.P.

4    56(f). DC fails to make such a showing despite its admission that F.R.C.P. 56(f)

5    provides only for discovery that is "essential" to opposing summary judgment.

6    Joint Stipulation, Section IV.B.2. Because DC has failed to identify any discovery

7    that is "essential" to oppose the Anti-SLAPP motion, it cannot rely on federal rules

8    regarding summary judgment motions as a basis to demand expedited discovery.

9    As Judge Feess explained in *New.Net, Inc. v. Lavasoft*:

10         "Even if the Court concluded that Section 425.16(g) and Rule 56 were
potentially in conflict, the potential for a direct collision has not

11    materialized because Plaintiff has not demonstrated that discovery is
essential to its opposition nor has Plaintiff shown good cause as to why

12    discovery should be permitted.
     "Although Plaintiff has sought to defer this motion pending discovery,

13    it has not stated with any degree of specificity what discovery it needs
or how that discovery would bear on this motion.... To the extent that

14    the proposed discovery would contain any relevant information, most
of it is already known to Plaintiff.... In short, Plaintiff has failed to

15    persuade the Court that discovery is essential to its opposition to
Defendant's motion."

16

17    356 F. Supp. 2d at 1102 (internal citations omitted). *See also Moser v. Triarc Cos.*,

18    2007 WL 3026425, at *2-*4 (S.D. Cal. Oct. 16, 2007) (court denied plaintiff's

19    motion for leave to conduct discovery because such discovery was not "essential in

20    _____

21    [6] Judge Feess held in *New.Net, Inc. v. Lavasoft*, 356 F.Supp.2d 1090 (C.D. Cal.
2004) that the standards under Rule 56(f) and the Anti-SLAPP statute are similar.

22    Cal. Civ. Proc. Code § 425.16(g) provides that "on a noticed motion and for good
cause shown, [a court] may order that specified discovery be conducted

23    notwithstanding [the automatic stay]." *Id.* at 1101. This protection is analogous to
Rule 56's requirement that a party opposing a motion "must explain with

24    particularity why it is unable to oppose the motion, state with specificity what facts
it intends to seek through discovery, and show how its discovery efforts are

25    reasonably expected to create a triable issue." *Id.* at 1101-1102 (finding no
"collision" between Rule 56 and the Anti-SLAPP law and noting that "to find such

26    collision would undermine the holding in [*United States v. Lockheed Missiles &
Space Co., Inc.*, 190 F.3d 963, (9th Cir. 1999)] permitting the use of the Anti-

27    SLAPP procedure in federal court.").

28     

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

1   opposing" anti-SLAPP motion); *compare Metabolife Intern., Inc. v. Wornick*, 264

2   F.3d 832, 838 (9th Cir. 2001) ("The district court … asked Metabolife to itemize

3   the discovery needed to respond to the anti-SLAPP motion, which Metabolife

4   did."). Here, DC articulates no specific need for discovery tied to the Anti-SLAPP

5   motion, and under either the Federal Rules of Civil Procedure or California law,

6   DC has not met its burden.

7        DC ignores its own failure to make the necessary showing to obtain

8   discovery under either California Code of Civil Procedure 425.16(g) *or* F.R.C.P.

9   56(f), and instead simply recites (incorrectly) that no limitations on discovery

10  whatsoever are imposed when an Anti-SLAPP motion is pending in federal court.

11       Recent Supreme Court precedent, which DC wholly ignores, shows why

12  DC's position is incorrect. In *Shady Grove Orthopedic Associates, P.A. v. Allstate*

13  *Ins. Co.*, 130 S. Ct. 1431 (2010), decided this year, the United States Supreme

14  Court set forth principles reinforcing the conclusion that the discovery stay of

15  California's Anti-SLAPP law, as a matter of substantive law governing state-

16  created rights, must apply in federal court. In *Shady Grove*, the Supreme Court

17  addressed the interplay between a New York law relating to class action lawsuits

18  and F.R.C.P. 23. In a controlling concurrence, Justice Stevens made clear that,

19  under the Rules Enabling Act, a federal rule cannot govern when it "would displace

20  a state law that is procedural in the ordinary use of the term but is so intertwined

21  with a state right or remedy that it functions to define the scope of the state-created

22  right." 130 S. Ct. at 1452 (Stevens, J., concurring).[7]

23       Here, the discovery stay and good cause requirements of the Anti-SLAPP

24

25

26  [7] When "a fragmented Court decides a case and no single rationale explaining the
    result enjoys the assent of five Justices," the "narrowest ground" on which the

27  judgment rests then represents the controlling rule. *Marks v. United States*, 430
    U.S. 188, 193 (1977). Justice Stevens' opinion therefore provides the controlling

28  rule in *Shady Grove*.

                                                          JOINT STIPULATION RE: PLAINTIFF'S
                                        32                MOTION TO INITIATE DISCOVERY AND
                                                          TAKE DISCOVERY OF TWO WITNESSES

1   law are substantive protections that California adopted to suppress "non-

2   meritorious cases aimed at chilling [free speech] through costly, time-consuming

3   litigation." *New.net*, 365 F.Supp.2d at 1098 (citing Cal. Code of Civ. Proc. §

4   425.16(a)). By definition, the SLAPP plaintiff "does not hope to win the lawsuit

5   and instead 'tries to wear down the other side by forcing it to spend time, money,

6   and resources battling the SLAPP instead of the protected activity.'" *Schering*

7   *Corp. v. First Databank Inc.*, 2007 WL 1176627, at *6 (N.D. Cal. April 20, 2007)

8   (quoting *Visher v. City of Malibu*, 126 Cal.App.4th 364 (2005)). The automatic

9   discovery stay prevents a plaintiff from coercing the defendant to respond to costly

10  and time-consuming discovery before the court has had an opportunity to determine

11  the merits of a defendant's Anti-SLAPP motion. To allow wide-ranging discovery

12  before an Anti-SLAPP motion has been decided would controvert the purposes of

13  the Anti-SLAPP statute. *New.net, Inc.*, 365 F.Supp.2d at 1098. In light of *Shady*

14  *Grove*'s mandate that "[w]hen a federal rule appears to abridge, enlarge, or modify

15  a substantive right, federal courts must consider whether the rule can reasonably be

16  interpreted to avoid that impermissible result," 130 S.Ct. at 1452 (Stevens, J.,

17  concurring), it is clear that California's Anti-SLAPP discovery stay should apply

18  here absent a showing of "good cause" for discovery, a showing that DC has not

19  even attempted to provide.[8]

20  _____

21  [8]  Moreover, two years after its decision in *Metabolife*, the Ninth Circuit noted
    without disapproval that "[i]f the defendant files a [anti-SLAPP] motion to strike,
22  all discovery proceedings are stayed. See § 425.16(g). A court may, however
    permit specified discovery 'on noticed motion and for good cause shown.'" *Batzel*
23  *v. Smith*, 333 F.3d 1018, 1024 (9th Cir. 2003). DC ignores *Batzel*, which
    specifically stated that "[b]ecause California law recognizes the protection of the
24  Anti-SLAPP statute as a substantive immunity from suit, this Court, sitting in
    diversity, will do so as well." *Id.* at 1025-26 (citing *Erie R.R. Co. v. Tompkins*, 304
25  U.S. 64 (1938)) (emphasis added). As with other types of immunities from suit, the
    substantive policies of the Anti-SLAPP law to protect public participation would be
26  seriously impaired if a plaintiff could bring a SLAPP suit and wear the opposing
    party down in discovery while the anti-SLAPP motion is pending. *Cf. Mitchell v.*
27  *Forsyth*, 472 U.S. 511, 526 (1985) ("The entitlement is an immunity from suit

28

33                              JOINT STIPULATION RE: PLAINTIFF'S
                                MOTION TO INITIATE DISCOVERY AND
                                TAKE DISCOVERY OF TWO WITNESSES

Case 2:10-cv-03633-ODW-RZ    Document 69-1    Filed 09/15/10    Page 50 of 191    Page
ID #:5127
Case 2:10-cv-03633-ODW-RZ    Document 45    Filed 08/30/10    Page 38 of 48    Page ID #:2841

1    Finally, DC's attempt to distinguish its federal and state law claims does not

2    resolve the issue of whether the depositions should take place before the hearing on

3    the Anti-SLAPP motion.  DC claims that "[a]ll of the discovery [DC] seeks ... is

4    relevant to [DC's] federal claims" and thus is not subject to a stay under the Anti-

5    SLAPP laws.  Joint Stipulation, Section IV.B.2.  However, because DC has failed

6    to identify the subject matter of the depositions, and has sought documents clearly

7    related to its state-law claims alone, it is impossible to know how the depositions

8    could be limited to the federal claims.  Toberoff Decl., Exs. G-H.  DC's state law

9    claims raise additional issues not covered in the federal claims for which DC

10    actively seeks discovery.  For example, DC's counsel insists on questioning Joanne

11    Siegel and Ms. Peavy based on the "Toberoff Timeline" (giving rise to defendants'

12    motion for a protective order pending before this Court), an issue directly related to

13    DC's state law claims for tortious interference.  Complaint, ¶¶ 89-90, 171-72.  Even

14    if the depositions could somehow be limited solely to its federal claims (which is

15    highly unlikely, and impossible to achieve in practice), DC would eventually want

16    to take discovery as to its state law claims, subjecting these elderly witnesses to two

17    depositions in addition to the depositions already taken of these witnesses in the

18    closely related *Siegel* cases.  *See Baxter Healthcare Corp. v. Fresenius Medical*

19    *Care Holding, Inc.*, 2007 WL 3342573, at *2 (N.D. Cal. 2007) (motion to compel

20    second deposition of elderly witness denied because of "potential inconvenience of

21    a repeat deposition to an elderly witness").

22

23

24

25

26    rather than a mere defense to liability; and like an absolute immunity, it is
effectively lost if a case is erroneously permitted to go to trial."); *Harlow v.*
27    *Fitzgerald*, 457 U.S. 800, 818 (1982) ("Until this threshold immunity question is
resolved, discovery should not be allowed.").
28

34                JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

**G.**     **The Depositions Should Be Stayed Because the Witnesses Have Already Been Exhaustively Deposed in the *Siegel* Actions**

A further reason to stay these depositions pending resolution of the dispositive motions is that the witnesses have already been deposed on essentially identical topics in the closely-related *Siegel* actions. This suggests that, at a minimum, depositions should be delayed until the issues in this case have been clarified, and that the scope of these depositions should be limited to prevent duplicative and harassing discovery. The Ninth Circuit has held that "eliminating duplicative discovery" is an important consideration in discovery practice. *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 475 (9th Cir. 1992). There is no plausible reason to subject anyone to multiple, redundant depositions on the same topics, especially with pending dispositive motions, as "repeat depositions are disfavored." *Graebner v. James River Corp.*, 130 F.R.D. 440, 441 (N.D. Cal. 1989).[9] This concern is only heightened where, as here, the deponents are elderly. *Baxter Healthcare Corp.*, 2007 WL 3342573, at *2.

Moreover, the cases cited by DC do not support its contention that it is free to re-depose witnesses as to subjects already covered at length. If anything, the cases strongly support the proposition that, if DC is allowed to re-depose witnesses, DC should be limited to *new* topics not covered in the original depositions. DC claims that Courts "routinely" allow repeat depositions when "a long time has passed since the first deposition, new evidence has come to light, and new case theories have developed," citing *Graebner*, 130 F.R.D. 440, and *Blackwell v. City & County of San Francisco*, 2010 U.S. Dist. LEXIS 75453 (N.D. Cal. June 25, 2010). However,

---

[9] *See also Melhorn v. New Jersey Transit Rail Operations, Inc.*, 203 F.R.D. 176, 180 (E.D. Pa. 2001) ("Absent some showing of need or good reason for doing so, a deponent should not be required to appear for a second deposition."); *Sentry Ins. v. Shivers*, 164 F.R.D. 255, 256 (D. Kan. 1996) (citations omitted) ("Scheduling a second deposition of the same person without a showing of good reason will generally support a finding of annoyance and undue burden or expense.").

JOINT STIPULATION RE: PLAINTIFF'S MOTION TO INITIATE DISCOVERY AND TAKE DISCOVERY OF TWO WITNESSES

1    in both cases, the courts **refused** to permit a second deposition. *Graebner,* 130

2    F.R.D. at 441-42, refused to allow a second deposition where the deponent already

3    had been deposed at length, despite claims that "new information" had surfaced and

4    "new issues in the case [were] raised by her amended complaint."  Similarly, the

5    court in *Blackwell,* 2010 U.S. Dist. LEXIS 75453 at *4-*6, refused to allow a

6    second deposition where the attorney "had an opportunity to obtain the information

7    now sought through the first deposition," and when the reason offered for the

8    second deposition was the development of a new legal theory.[10]

9         DC also claims that "where there is overlap in the issues, courts have long

10   permitted second depositions … especially where … the witnesses were asked only

11   a few questions" as to the overlapping areas, citing *Batelli v. Kagan & Gaines Co.,*

12   236 F.2d 167 (9th Cir. 1956), *Cunningham v. Gates,* 2006 U.S. Dist. LEXIS 58368

13   (C.D. Cal. Aug. 2, 2006), and *Baldwin-Montrose Chem. Co. v. Rothberg,* 37 F.R.D.

14   354 (S.D.N.Y. 1964).  None help DC's argument.  *Batelli,* 236 F.2d at 169-70,

15   merely noted that a person had been deposed in two different cases, and did not

16   address the propriety of a second deposition.  *Cunningham,* 2006 U.S. Dist. LEXIS

17   58368 at *11-*12, did not concern repeat depositions, but merely whether witnesses

18   should be required to testify *at trial* when they had testified on similar issues at a

19   previous trial.  *Baldwin-Montrose Chem. Co,* 37 F.R.D. at 356-57, actually

20   *supports* defendants' position:  *Baldwin* provided that the parties would utilize

21   depositions and discovery from a companion lawsuit, rather than conduct new

22   discovery on the same issues, and limited further discovery to "matters not covered

23   in the [companion lawsuit's] depositions and interrogatories."  *Id.* at 356–57.  The

24   _____

25   [10] DC also cites *Waltz v. U.S. Dep't of Agric.,* 251 F.R.D. 491 (E.D. Cal. 2008), for
     the proposition that "[e]ven where extensive discovery has occurred in a prior case,
26   further depositions and discovery are warranted where the specific issues … were
     not previously 'fully developed factually.'"  *Waltz* is inapplicable, as the witnesses
27   therein had not been deposed or even disclosed in the prior action, and thus there
28   was no "second deposition."  *Id.* at 496.

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

1    *Baldwin* Court did so "to avoid a needless waste of time, money and effort and to

2    expedite the litigation." *Id.*[11]

3       DC has given no indication that it is willing to limit the repeated deposition

4    of either Ms. Siegel or Ms. Peavy to *new* topics not covered in their initial

5    depositions. On the contrary, it is evident from DC's Complaint, which seeks to re-

6    litigate the issues decided against DC in *Siegel*, and DC's voluminous document

7    requests that the depositions at issue herein will be largely duplicative.

8       Joanne Siegel was already deposed for a full day, covering numerous topics

9    directly at issue in this litigation, including Superboy,[12] and her 1999-2002

10    "settlement" negotiations with DC. Declaration of Joanne Siegel, ¶¶ 2-9. Such

11    topics include, but are not limited to, the following:

| **Topic** | **Depo Pages** | **Complaint** |
|---|---|---|
| Joanne Siegel's relationship with Jerome Siegel from 1935-1948 | 14:3-14:9 | ¶¶ 27-30, 36 |
| Jerry Siegel being re-hired by DC's predecessors in the late 1960s | 14:21-15:23 | ¶ 41 |

---

[11] DC does manage to cite a handful of readily distinguishable cases where a second deposition was allowed. In *Kraemer v. Unocal Termination Allowance Plan*, 2009 U.S. Dist. LEXIS 33695, at *7 (C.D. Cal. Apr. 6, 2009), the court allowed second depositions of two witnesses, only "on issues related to conflict of interest," an issue that arose *after* the initial depositions. Moreover, *Kramer* specifically ordered the parties "to use the [] discovery" from the prior action in formulating a discovery plan. *Id.* Similarly, in *Zamora v. D'Arrigo Brother Co. of Cal.*, 2006 U.S. Dist. LEXIS 83106, at *4–5 (N.D. Cal. Nov. 7, 2006), a second deposition was allowed, but was strictly limited to questions arising from data that arose years after the first deposition. In *UniRAM Tech., Inc. v. Monolithic Sys. Tech.*, Inc., 2007 U.S. Dist. LEXIS 24869, at *5-8 (N.D. Cal. March 23, 2007), the court allowed a second Rule 30(b)(6) *corporate* deposition where new topics were designated for the deposition, there was no indication that the same individual would be deposed twice on the same topics, and "there was some understanding ... [that] the [prior] deposition could be reconvened in light of the shortened [] deposition." *Id.*

[12] As the Court may recall, discovery in the "Superman" action (Case No. 04-CV-08400 ODW (RZx) and the "Superboy" action (Case No. 04-CV-08776 ODW (RZx) was consolidated. The issue of Superboy was obviously at hand in Joanne Siegel's deposition, as she was one of the two plaintiffs in the "Superboy" case.

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

| **Topic** | **Depo Pages** | **Complaint** |
|---|---|---|
| Joanne Siegel's discussions of termination with Jerry Siegel | 16:18-17:14; 71:8-72:12 | ¶ 45 |
| Joanne Siegel's retention of counsel to exercise her termination rights | 22:8-24:6 | ¶¶ 60-61 |
| Joanne Siegel and Laura Siegel Larson's "settlement" discussions with DC between October 2001 and February 2002 | 24:13-28:13; 39:1-40:25 | ¶ 62, 168-69 |
| DC's February 2002 long-form draft settlement agreement | 27:9-28:13; 87:4-88:13; 94:3-95:6 | ¶ 62, 168-69 |
| The drafting and meaning of the May 9, 2002 letter sent by Joanne Siegel | 32:18-34:17; 36:16-40:17; 42:17-43:9; 45:1-46:24; 119:4-121:9 | ¶¶ 65-67, 168-69 |
| Joanne Siegel's first contact with Marc Toberoff | 41:1-3 | ¶¶ 64, 70-72 |
| Joanne Siegel's September 21, 2002 Letter to DC's Publisher | 43:10-44:25 | ¶¶ 70, 168-69 |
| The 1974 Agreement between Jerry Siegel and Warner Bros., and further amendments to that agreement | 56:12-71:7 | ¶¶ 43-45 |
| The Shuster Termination | 102:8-104:25 | ¶¶ 79-88 |
| Marc Toberoff's representation of Jean Peavy | 105:1-5 | ¶¶ 64, 70-72 |
| The Superboy "pitch" letter by Jerry Siegel | 105:6-109:13 | ¶¶ 74, 134, 137 |
| The Superboy script by Jerry Siegel | 109:14-115:10; 135:3-137:3 | ¶¶ 74, 136-37 |
| The 1947 Action between Jerry Siegel, Joseph Shuster, and DC's predecessors | 124:20-125:5 | ¶¶ 37-40 |

As discussed above, the District of New Mexico is the proper forum to address any discovery that DC seeks from Jean Peavy, who resides there. In addition, Ms. Peavy was already deposed in the Siegel cases on many topics that are at issue here. That DC is now unsatisfied with its questioning on these topics and wants a "do-over" of discovery already taken is no reason to subject 89- and

JOINT STIPULATION RE: PLAINTIFF'S MOTION TO INITIATE DISCOVERY AND TAKE DISCOVERY OF TWO WITNESSES

1    92-year-old witnesses to multiple depositions on the same topics.

2    **H.    Conclusion**

3        For the foregoing reasons, DC's "Motion to Initiate Discovery" should be

4    denied in its entirety.  Depositions should not be compelled while a number of

5    dispositive motions will shortly be heard and the pleadings will soon be amended.

6    Instead, the parties should meet and confer promptly after the rulings on the

7    pending dispositive motions and after the pleadings are amended to discuss an

8    appropriate deposition plan.

9    Dated:    August 30, 2010    Respectfully Submitted,

10       O'MELVENY & MYERS LLP

11

12       By: /s/ Daniel M. Petrocelli

13           Daniel M. Petrocelli
             Attorneys for Plaintiff DC Comics

14   Dated:    August 30, 2010    Respectfully Submitted,

15       TOBEROFF & ASSOCIATES, P.C.

16

17       By: /s/ Marc Toberoff

18           Marc Toberoff
             Attorneys for Defendants Mark

19           Warren Peary as personal
             representative of the Estate of Joseph

20           Shuster, Joanne Siegel, and Laura
             Siegel Larson

21

22   Dated:    August 30, 2010    Respectfully Submitted,

23       KENDALL BRILL & KLIEGER LLP

24

25       By: /s/ Richard B. Kendall

26           Richard B. Kendall
             Attorneys for Defendants Marc

26           Toberoff, Pacific Pictures

27           Corporation, IP Worldwide, LLC,
             and IPW, LLC

28

                39      JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

## APPENDIX A

### DEFENDANTS' SUMMARY OF DISPOSITIVE MOTIONS

For the Court's convenience, the Arguments made in the separate motions to dismiss are summarized as follows.

- DC's First Claim seeks to invalidate the Shuster Terminations, and will fail as a matter of law:

    o *Section (1)* of DC's First Claim (Toberoff Decl., Ex. A ("Complaint"), ¶¶ 94-98) erroneously alleges that Shuster's termination rights do not vest in the executor or representative of his estate unless he had a widow, children and grandchildren who were "not living, but who did at some time live." This argument contradicts the plain language of the statute and the accepted interpretation of "not living" under the Copyright Act, as well as the legislative intent of § 304, and would lead to absurd results. *See Siegel v. Warner Bros. Ent. Inc.* ("*Siegel I*"), 542 F. Supp. 2d 1098, 1114 n.3 (C.D. Cal. 2008); 3 M. Nimmer & D. Nimmer, 3 *Nimmer on Copyright* ("*Nimmer*") § 11.03[A][2][a] at 11-40.1-11.40.2 (emphasis added); *Stewart v. Abend*, 495 U.S. 207, 212 (1990); 67 Fed. Reg. 69134; Toberoff Decl., Ex. E at 2-7.

    o *Section (2)* (Complaint, ¶¶ 99-104) argues that a 1992 agreement ("1992 Agreement") between DC and Shuster's siblings bars the Shuster Termination. This argument fails because the 1992 agreement could not lawfully grant any Superman copyrights. None of the parties to that agreement possessed any termination rights or Superman copyrights to grant; the Shuster Executor, the sole holder of the termination right, was not a party to the 1992 Agreement, as pled in the complaint; and, in any event, the agreement could not have conveyed or released the inalienable termination right as a matter of law under § 304(c)(5). *See* 17 U.S.C. §§ 304 (c)(5), (c)(6)(B); *Classic*

JOINT STIPULATION RE: PLAINTIFF'S
MOTION TO INITIATE DISCOVERY AND
TAKE DISCOVERY OF TWO WITNESSES

# EXHIBIT C

1   Marc Toberoff (State Bar No. 188547)
    Nicholas C. Williamson (State Bar No. 231124)
2   Keith G. Adams (State Bar No. 240497)
    TOBEROFF & ASSOCIATES, P.C.
3   2049 Century Park East, Suite 2720
    Los Angeles, California, 90067
4   Telephone:  (310) 246-3333
    Fax:          (310) 246-3101
5   MToberoff@ipwla.com

6   Attorneys for Defendants Mark Warren
    Peary, as personal representative of the
7   Estate of Joseph Shuster, Jean Adele
    Peavy, Joanne Siegel and Laura Siegel
8   Larson

9

10                      UNITED STATES DISTRICT COURT

11          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

12

13   DC COMICS,                          Case No. CV 10-3633 ODW(RZx)

                  Plaintiff,             **DISCOVERY MATTER**
14
          v.                             **JOINT STIPULATION RE:**
15                                       **MOTION FOR A PROTECTIVE**
     PACIFIC PICTURES CORPORATION,       **ORDER STAYING DEPOSITIONS,**
16   IP WORLDWIDE, LLC, IPW, LLC,        **PENDING RULINGS ON**
     MARC TOBEROFF, an individual,       **DISPOSITIVE MOTIONS AND**
17   MARK WARREN PEARY, as personal      **LIMITING SCOPE AND TIME OF**
     representative of the ESTATE OF     **DEPOSITIONS**
18   JOSEPH SHUSTER, JEAN ADELE
     PEAVY, an individual, JOANNE        Hon. Otis D. Wright II, U.S.D.J.
19   SIEGEL, an individual, LAURA        Hon. Ralph Zarefsky, U.S.M.J.
     SIEGEL LARSON, an individual, and
20   DOES 1-10, inclusive,               Complaint filed:  May 14, 2010
                                         Trial Date:       None Set
21                Defendants.
                                         Date:    October 4, 2010
22                                       Time:    10:00 a.m.
                                         Place:   Courtroom 540
23

24

25

26

27

28

1  KENDALL BRILL & KLIEGER LLP
   Richard B. Kendall (90072)
2    *rkendall@kbkfirm.com*
   Laura W. Brill (195889)
3    *lbrill@kbkfirm.com*
   Nicholas F Daum (236155)
4    *ndaum@kbkfirm.com*
   Nathalie E. Cohen (258222)
5    *ncohen@kbkfirm.com*
   10100 Santa Monica Blvd., Suite 1725
6  Los Angeles, California  90067
   Telephone:  310.556.2700
7  Facsimile:  310.556.2705

8  Attorneys for Defendants Marc Toberoff,
   Pacific Pictures Corporation, IP
9  Worldwide, LLC, and IPW, LLC

10 DANIEL M. PETROCELLI (S.B. #97802)
     dpetrocelli@omm.com
11 MATTHEW T. KLINE (S.B. #211640)
     mkline@omm.com
12 CASSANDRA L. SETO (S.B. #246608)
     cseto@omm.com
13 O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
14 Los Angeles, CA 90067-6035
   Telephone:  (310) 553-6700
15 Facsimile:  (310) 246-6779

16 PATRICK T. PERKINS (admitted *pro hac vice*)
     pperkins@ptplaw.com
17 PERKINS LAW OFFICE, P.C.
   1711 Route 9D
18 Cold Spring, NY 10516
   Telephone:  (845) 265-2820
19 Facsimile:  (845) 265-2819

20 Attorneys for Plaintiff DC Comics

21

22

23

24

25

26

27

28

---

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS AND
DOCUMENT DISCOVERY PENDING RULINGS ON DISPOSITIVE MOTIONS
EXHIBIT C      Page 54

## **TABLE OF CONTENTS**

I.     DEFENDANTS' INTRODUCTORY STATEMENT .................................2

II.    DC COMICS' INTRODUCTORY STATEMENT ....................................5

III.   DEFENDANTS' STATEMENT OF THE ISSUES IN DISPUTE ...........7

IV.    DC COMICS' STATEMENT OF THE ISSUES IN DISPUTE................8

V.     DEFENDANTS' POSITION ...............................................................8

    A.    Factual Background .........................................................9

           1.    Overview...............................................................9

           2.    DC Insists on a Chaotic Discovery Process .........................11

    B.    The Depositions Should Be Briefly Postponed Until the Dispositive Motions to Dismiss as a Matter of Law Have Been Decided ...............................................................................14

    C.    The Depositions Should Be Postponed Until the Anti-SLAPP Motion Has Been Decided ...................................................18

    D.    There Is No Prejudice to DC From a Brief Stay of Discovery Until Dispositive Motions Are Decided .........................................23

    E.    The Scope and Time of These Depositions Should Be Limited for Two of the Witnesses Who Suffer From Severe Medical Conditions ...............................................................................24

    F.    Depositions Should Be Strictly Limited in Scope Because the Witnesses Have Already Been Exhaustively Deposed in the Siegel Litigation ...................................................................25

    G.    Any Depositions That Are Permitted to Go Forward Should Be Limited In Scope, Time and Format.........................................31

    H.    Defendants' Conclusion .............................................................32

VI.    DC COMICS' POSITION.....................................................................32

    A.    Factual Background .............................................................32

    B.    Defendants' SLAPP And Rule 12 Motions Are Irrelevant To DC Comics' Requested Discovery, Which Is Directed To Its Federal Claims And The Resolution Of Disputed Factual Issues. ...............................................................................34

           1.    DC Comics' First Claim for Relief:  Challenging the Shusters' Notices of Termination ...................................36

           2.    DC Comics' Third Claim for Relief:  Challenging the Shusters' Notices of Termination ...................................42

i

1
2      C.    Defendants' Remaining Arguments for Barring Discovery Are
              Equally Baseless and Misguided. ...................................................46

3          1.    DC Comics Proposed Reasonable Ways To Account
                  For The Advanced Age and Medical Condition of
4                 Witnesses. ........................................................................46

5          2.    There Is Nothing "Short" or "Non-Prejudicial" About
                  The Indefinite Discovery Delay Defendants Seek. ............47
6
           3.    The Rule 54(b) Motion Filed In The *Siegel* Case Has
7                 No Bearing On Discovery Here.........................................48

8          4.    Defendants' Arguments About Their Contemplated
                  Anti-SLAPP Motion Are Both Irrelevant And Misstate
9                 The Law. ...........................................................................49

10     D.    Conclusion.............................................................................55

11   APPENDIX A..............................................................................57
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1        Pursuant to Rules 26, 34, and 37 of the Federal Rules of Civil Procedure and

2    Rule 37-2 of the Local Rules of this Court, the parties respectfully submit the

3    following Joint Stipulation Regarding Defendants' Motion For a Protective Order

4    Staying Depositions, Pending Rulings on Dispositive Motions and Limiting Scope

5    and Time Of Depositions.  Pursuant to Local Rule 37-1, the parties have attempted

6    unsuccessfully to resolve their disputes and therefore respectfully seek the assistance

7    of the Court.

8    Dated:  September 13, 2010              TOBEROFF & ASSOCIATES, P.C.

9

10                                          By_____

11                                                    Marc Toberoff

12                                          Attorneys for Defendants Mark Warren Peary, as
                                            personal representative of the Estate of Joseph
13                                          Shuster, Jean Adele Peavy, Joanne Siegel and
                                            Laura Siegel Larson

14

15   Dated:  September 13, 2010              KENDALL BRILL & KLIEGER LLP

16

17

18                                          By: /s/_____

19                                               Richard B. Kendall
                                                 Attorneys for Defendants Marc Toberoff,
20                                               Pacific Pictures Corporation, IP
                                                 Worldwide, LLC, and IPW, LLC
21

22   Dated:  September ___, 2010             O'MELVENY & MYERS LLP

23

24

25                                          By: _____

26                                               Daniel Petrocelli
                                                 Attorneys for Plaintiff DC Comics
27

28

                                            1

1          Pursuant to Rules 26, 34, and 37 of the Federal Rules of Civil Procedure and

2    Rule 37-2 of the Local Rules of this Court, the parties respectfully submit the

3    following Joint Stipulation Regarding Defendants' Motion For a Protective Order

4    Staying Depositions, Pending Rulings on Dispositive Motions and Limiting Scope

5    and Time Of Depositions.  Pursuant to Local Rule 37-1, the parties have attempted

6    unsuccessfully to resolve their disputes and therefore respectfully seek the assistance

7    of the Court.

8    Dated: September ___, 2009          TOBEROFF & ASSOCIATES, P.C.

9

10                                      By_____
                                            Marc Toberoff
11
                                        Attorneys for Defendants Mark Warren Peary, as
12                                      personal representative of the Estate of Joseph
                                        Shuster, Jean Adele Peavy, Joanne Siegel and
13                                      Laura Siegel Larson

14

15   Dated: September ___, 2010          KENDALL BRILL & KLIEGER LLP

16

17

18                                      By: _____
                                            Richard B. Kendall
19                                          Attorneys for Defendants Marc Toberoff,
                                            Pacific Pictures Corporation, IP
20                                          Worldwide, LLC, and IPW, LLC

21

22   Dated: September **16**, 2010         O'MELVENY & MYERS LLP

23

24

25                                      By: _____

26                                          Daniel Petrocelli
                                            Attorneys for Plaintiff DC Comics
27

28

-------------------------------------------------------------
                                        1
                            JOINT STIPULATION RE: DEPOSITIONS

EXHIBIT C          Page 58

## I.    DEFENDANTS' INTRODUCTORY STATEMENT

Defendants seek a protective order to postpone three[1] depositions for a matter of weeks until dispositive motions – which address all of plaintiff DC Comics' ("DC") claims as a matter of law and include a motion under California's Anti-SLAPP law – have been decided.  Each of the witnesses that DC now seeks to depose in this action on an accelerated schedule was already exhaustively deposed by DC in closely related, pending actions, *Siegel v. Warner Bros. Ent. Inc., et al.*, Case Nos. 04-CV-08400 ODW (RZx) and *Siegel v. Time Warner Inc.*, 04-CV-08776 ODW (RZx), concerning the same subject matter on which DC now plans to re-interrogate them.  Discovery in the related actions was closed years ago. Two of the three witnesses at issue have very serious health problems that make the stress of a deposition a significant health risk, and these same witnesses were already deposed for a full seven hours in the related actions.  However, after largely losing on summary judgment in the related action, DC retained new counsel and brought the instant action, asserting very dubious claims.  Despite a years-long delay in bringing this action, DC is now rushing to re-open discovery that it would otherwise be barred from taking, in order to collaterally attack the adverse decisions in the related cases.  DC's strategy – to file a defective complaint, and then make a rush for discovery in the hopes of obtaining some morsel of ambiguity that might permit the filing of a new pleading – is not a proper basis for seeking early depositions, and should not be condoned.  Accordingly, the Court should issue an order staying these depositions for a matter of weeks until the dispositive motions have been resolved,

---

[1] As described below, DC also noticed a fourth deposition through a subpoena issued to Jean Peavy, a non-party resident of the District of New Mexico. Ms. Peavy is outside of the jurisdiction of this Court.  Accordingly, defendants do not seek a protective order concerning that deposition here, but have served timely objections to the subpoena. However, if DC seeks a court ruling on these objections, it is likely that the District Court in New Mexico will look to this Court for guidance on the matters addressed in this motion. Like the other witnesses from whom DC seeks discovery, Ms. Peavy has already been deposed and will be subject to undue burdens in a new deposition.

Case 2:10-cv-03633-ODW-RZ    Document 69-1    Filed 09/15/10    Page 65 of 191    Page
ID #:5142
Case 2:10-cv-03633-ODW-RZ    Document 61    Filed 09/13/10    Page 8 of 67    Page ID #:3719

1 | and the pleadings have been settled, and limiting the time and manner in which the

2 | witnesses with health issues may be deposed.

3 | There is no legitimate reason why these witnesses need to be deposed before

4 | the dispositive motions are heard, instead of waiting to see what, if anything,

5 | remains of the case. No trial date has been set and the Court has not held an initial

6 | status conference nor issued a scheduling order under F.R.C.P. 16.

7 | There are multiple additional reasons why such a stay, and moderate

8 | limitations on the scope and time of depositions, is appropriate:

9 | •   DC has noticed depositions for October 5, 6, and 13, 2010. A hearing on the

10 | dispositive motions is currently set for October 18, 2010. DC has recently

11 | announced that it will amend its Complaint in early September, but that the

12 | amendments will add no new claims and should not materially affect the

13 | dispositive motions or the October 18 hearing date. An Anti-SLAPP motion

14 | is pending as to the state law claims in this case, and will likely be augmented

15 | and re-filed when DC amends its Complaint. A discovery stay is automatic in

16 | such cases in state court, and DC cannot show good cause for avoiding such a

17 | stay. Nor can it meet the standard for obtaining discovery under F.R.C.P.

18 | 56(f).

19 | •   A motion for entry of judgment pursuant to F.R.C.P. 54(b) is also pending

20 | before Judge Wright in *Siegel v. Warner Bros. Ent. Inc.* That motion is set for

21 | hearing on September 27, 2010. If it is granted, the rulings in *Siegel* will have

22 | preclusive effect as to DC, thereby substantially narrowing the issues and

23 | discovery in this case.

24 | •   Two of the witnesses at issue suffered extreme stress in the prior deposition

25 | process: defendants Joanne Siegel, who will be 93 this December, and Laura

26 | Siegel Larson, who suffers from multiple sclerosis. These two witnesses were

27 | both deposed at length on the same topics, and should not be forced to sit

28 | through new depositions due to serious medical conditions which, as their

Case 2:10-cv-03633-ODW-RZ    Document 69-1    Filed 09/15/10    Page 66 of 191    Page
ID #:5143
Case 2:10-cv-03633-ODW-RZ    Document 61    Filed 09/13/10    Page 9 of 67    Page ID #:3720

1  doctors have testified, will be exacerbated by the deposition process.

2 • DC also served extensive, overbroad document requests with its deposition

3  notices. Defendants will object to these requests, and anticipate that the

4  parties will need a reasonable amount of time to resolve those objections. DC

5  has, at a minimum, been on inquiry notice of its claims for at least four years,

6  and it admits that it has been on actual notice of documents giving rise to its

7  claims since December 2008. Yet it waited a year and a half – until May

8  2010 – before bringing this lawsuit. Having waited so long, DC cannot

9  justify their demands that these depositions be held now, instead of in a

10  matter of weeks, when the pleadings have been settled and the Anti-SLAPP

11  issues have been resolved.

12   On September 2, 2010, the date this motion was due to be served under

13 Local Rule 37, DC offered to postpone these depositions until after October 18,

14 2010, the presumptive date of the hearing on the dispositive motions. It is clear

15 from this offer that DC itself agrees that it has no pressing need to take these

16 depositions in advance of the hearing on the dispositive motions. However, DC's

17 offer was conditioned on defendants filing a motion on the scope of discovery

18 before the October 18 hearing on dispositive motions before Judge Wright. This

19 arrangement would have imposed unnecessary burdens on the parties and the Court,

20 by requiring briefing on issues likely to be mooted or altered as a result of the

21 dispositive motions. Defendants instead offered to meet and confer promptly after

22 the October 18 hearing on such motions to work out a reasonable schedule for any

23 remaining discovery motions, with the benefit of the Court's guidance as to the

24 remaining claims and issues in the case and, thus, the proper scope of discovery.

25 DC did not accept that proposal and would not agree to take the noticed depositions

26 off calendar. Defendants therefore request a protective order staying and limiting

27 these depositions.

28

## II.    DC COMICS' INTRODUCTORY STATEMENT

There are many reasons why defendants' motion lacks merit, all of which are discussed below.  But there is one overarching reason that obviates the need to consider all their arguments:  *all* of the discovery that DC Comics seeks is directly relevant to its first and third claims for relief.  Neither of these *federal* claims is subject to a SLAPP motion; neither is properly subject to a motion to dismiss under Rule 12; and neither is duplicative of the claims or issues litigated in the *Siegel* cases.  In seeking to prevent discovery, defendants bear a "heavy burden of making a 'strong showing' why discovery should be denied."  *Skellerup Indus. v. City of Los Angeles*, 163 F.R.D. 598, 600 (C.D. Cal. 1995).  Defendants come nowhere close to meeting this burden, and their suggestion that it is *DC Comics'* burden to show why discovery should commence is wrong.

1. DC Comics' first claim challenges the validity of copyright termination notices the Shuster heirs served in 2004 based, in part, on an agreement the Shuster heirs reached with DC Comics in 1992.  Am. Compl. ¶¶ 112-17.  While defendants assert this new lawsuit is the "same" as the *Siegel* cases or "closely related," *infra* at 2-3, 7-8, 25-26, 30-31, 58, defendants argued just the opposite before.  As Toberoff and the Shusters represented in court in 2006, but do not disclose here:  "the *Siegel Litigations* do <u>not</u> concern Shuster's copyright interests in *Superman*," and the 1992 agreement "has absolutely nothing to do with the Siegel Litigations."  Decl. of D. Petrocelli ("Petrocelli Decl.") Ex. 10 at 84, 91 (emphasis in original).  DC Comics has every right to full discovery in support of its claims in this case, including in connection with the Shuster heirs' termination notice and the 1992 agreement.  Although defendants' initial Rule 12 motions sought to challenge the meaning and legal effect of the 1992 agreement, such arguments—as shown by the very cases defendants cite—turn on fact-bound questions of contractual intent that cannot be resolved before discovery is taken.  *Infra* Section VI.B.  Moreover, as Judge Larson made clear in the *Siegel* cases, and as defendants again fail to apprise the Court: "It

5

1  is by no means a foregone conclusion that the Shuster estate will be successful in

2  terminating the grant to the Superman material" that the Siegels obtained.  Case No.

3  CV 04-8400 ODW (RZx), Docket No. 554 at 23.  This new case—and DC Comics'

4  first and second claims for relief—are aimed at these open questions, among others,

5  and defendants have no legitimate basis to prevent discovery related to them.

6      2.  DC Comics' third claim for relief challenges illicit agreements between

7  defendants and Toberoff—acting in his capacity as a film producer and

8  businessman—that violate DC Comics' rights under the Copyright Act.  These

9  agreements, which impermissibly impede the Shuster heirs' ability to enter into

10  agreements with DC Comics, are part of a pattern of misconduct by Toberoff and

11  his companies.  Many of the documents and most of the issues underlying this claim

12  have either never been discovered or explored or, if such issues arose in the *Siegel*

13  cases, they were addressed only tangentially.  DC Comics has every right to take full

14  discovery in support of its third claim for relief, and defendants' assertion that DC

15  Comics' third claim will be dismissed based on their Rule 12 motion does not come

16  close to meeting their "heavy burden" to avoid discovery.  Furthermore, the 1987

17  *Bourne* case cited by defendants supports DC Comics' third claim as pleaded.

18  Moreover, defendants fail to mention the Ninth Circuit opinion in *Milne v. Stephen*

19  *Slesinger, Inc.*, 430 F.3d 1036, 1047 (9th Cir. 2005), which directly recognized the

20  statutory "right" that DC Comics seeks to vindicate.

21      3.  Defendants' other arguments against discovery are equally unfounded:

22      a.  Defendants cite to the age and health of three material witnesses DC

23  Comics seeks to depose—Ms. Siegel, Ms. Larson, and Ms. Peavy—to justify

24  delaying discovery.  To accommodate these witnesses, DC Comics offered to defer

25  their depositions and schedule a single hearing before the Magistrate in late October

26  to address at one time all arguments regarding these depositions, including

27  production of documents.  Defendants rejected this proposal because, from the

28  outset, they are determined to delay all discovery indefinitely.  That is why, for

6

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS
EXHIBIT C    Page 63

1   example, they have insisted on addressing their litany of discovery objections

2   sequentially, rather than at one time.  That is improper and should not be allowed.

3   Likewise without merit is defendants' claim that Ms. Peavy is not subject to

4   discovery because she is not a party to this action or subject to the Court's

5   jurisdiction.  That claim is also moot, because Ms. Peavy is now a named defendant.

6   In any event, the age and health of the witnesses only underscore DC Comics' right

7   and need to preserve their testimony without further delay.

8          b.   Defendants concede they seek delay, but say it will be "short" and will not

9   "prejudice" DC Comics.  *Infra* at 14, 16.  There is nothing short or non-prejudicial

10   about the delay they have engineered.  DC Comics has been seeking this discovery

11   since *early June*—in part, because of the advanced age and poor health of

12   defendants' key witnesses.  There is no assurance that the Court will be able to hear

13   and rule upon defendants' dispositive motions anytime soon.  Indeed, because DC

14   Comics recently amended its complaint, defendants' initial motions were mooted

15   and taken off calendar and have yet to be refiled, let alone set for hearing.

16   Defendants' initial SLAPP motion was also mooted by DC Comics' amended

17   complaint.  Assuming defendants refile their SLAPP motion, DC Comics not only

18   will oppose it on the merits, but will seek discovery relevant to its opposition.  It is

19   standard course in federal court to allow discovery to oppose a SLAPP motion.

20   Defendants' arguments to the contrary misstate the law, inventing alleged conflicts

21   in the law where *none* exists.

22   **III.   DEFENDANTS' STATEMENT OF THE ISSUES IN DISPUTE**

23          (1)  Should the depositions of witnesses noticed by DC, set for October 5, 6,

24   and 13, 2010, be delayed until the resolution of pending motions to dismiss pursuant

25   to F.R.C.P. 12(b)(6) that are currently set for hearing on October 18?

26          (2)  Can DC compel discovery during the pendency of an Anti-SLAPP

27   motion, where the motions are based on issues of law, and DC thus cannot show that

28   it needs such discovery to oppose the motion, and where the automatic discovery

Case 2:10-cv-03633-ODW-RZ    Document 69-1    Filed 09/15/10    Page 70 of 191    Page
ID #:5147
Case 2:10-cv-03633-ODW-RZ    Document 61    Filed 09/13/10    Page 13 of 67    Page ID #:3724

1   stay provided under the Anti-SLAPP law is so intertwined with this state right or

2   remedy that it functions to define thereof, and therefore must be applied in federal

3   court under the controlling opinions of the United States Supreme Court in *Shady*

4   *Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431 (2010)?

5        (3)  Should the 92-year-old widow and chronically ill daughter of one of

6   Superman's co-creators be forced to sit for depositions, when their doctors have

7   testified that depositions pose significant health risks for them?

8        (4)  Regardless of whether depositions are permitted now or later in the case,

9   should their scope be limited to prevent needless re-questioning on topics on which

10   the witnesses were already deposed?

11   **IV.**   **DC COMICS' STATEMENT OF THE ISSUES IN DISPUTE**

12        (1)  Have defendants met the "heavy burden of making a 'strong showing'"

13   that the depositions of Jean Peavy, Joanne Siegel, Laura Siegel Larson, and Mark

14   Warren Peary should be indefinitely postponed pending the resolution of the

15   motions they intend to file challenging DC Comics' amended complaint?

16   **V.**   **DEFENDANTS' POSITION**

17        There is no need for burdensome and unnecessary depositions to go forward

18   before dispositive motions are heard and decided, when DC has already had the

19   opportunity to depose these same witnesses on the same and closely related issues,

20   and where two of the witnesses are chronically ill and would suffer serious health

21   consequences from this repeated deposition process.

22        F.R.C.P. 26(c)(1)(B) expressly authorizes courts to issue protective orders

23   upon a movant's showing of good cause.  Courts in this circuit and elsewhere have

24   long found "good cause" for a protective order in situations where well-grounded

25   motions to dismiss are pending and the protective order would not prejudice the

26   non-moving party. *See Lowery v. F.A.A.*, CIV. S-93-1352, 1994 WL 912632 (E.D.

27   Cal. Apr. 11, 1994); *Johnson v. New York Univ. School of Educ.*, 205 F.R.D. 433,

28   434 (S.D.N.Y. 2002) ("[A] stay of discovery is appropriate pending resolution of a

8

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS
EXHIBIT C      Page 65

Case 2:10-cv-03633-ODW-RZ    Document 69-1    Filed 09/15/10    Page 71 of 191    Page
ID #:5148
Case 2:10-cv-03633-ODW-RZ    Document 61    Filed 09/13/10    Page 14 of 67    Page ID #:3725

1  potentially dispositive motion where the motion appear[s] to have substantial

2  grounds or, stated another way, do[es] not appear to be without foundation in law.")

3  (quotation marks omitted).

4      Here, not only are dispositive motions pending that address exclusively legal

5  issues, but there are numerous additional factors that urge the issuance of a

6  protective order.

7      **A.    Factual Background**

8          **1.    Overview**

9      The general factual background of this action is set forth in the defendants'

10  portion of the Joint Stipulation Regarding Plaintiff's Motion to Initiate Discovery

11  and Take Immediate, Limited Discovery of Two Elderly Witnesses (Docket No. 45),

12  to be heard by the Court on September 20, 2010, and the Court is respectfully

13  referred to those papers for such factual background.  Declaration of Marc Toberoff

14  ("Toberoff Decl."), Ex. V.  In broad terms, this discovery dispute involves two

15  closely related actions, both of which deal with the statutory termination by the heirs

16  of Superman's co-creators of the same Superman copyright grants to DC regarding

17  the same Superman works.  Jerome Siegel ("Siegel") and Joseph Shuster ("Shuster")

18  co-authored the first Superman story, later published in 1938 in *Action Comics*, No.

19  1 by DC's predecessor, and hundreds of subsequent Superman works.

20      Siegel's widow, Joanne Siegel, and their daughter, Laura Siegel Larson,

21  served notices of termination pursuant to 17 U.S.C. § 304(c) (the "Siegel

22  Terminations") that terminated Siegel's old copyright grants regarding Superman

23  and Superboy, on April 16, 1999 and November 17, 2004, respectively.  DC and its

24  effective parent company, Warner Bros. Entertainment, Inc. ("Warner") disputed the

25  Siegel Terminations, forcing the Siegels in October 2004 to file for declaratory

26  relief as to their validity in two separate actions, No. 04-CV-08400 (Superman) and

27  No. 04-CV-08776 (Superboy) (collectively, the "*Siegel* litigation").  DC

28  counterclaimed that the Siegel Terminations were invalid.

9

Case 2:10-cv-03633-ODW-RZ    Document 69-1    Filed 09/15/10    Page 72 of 191    Page
ID #:5149
Case 2:10-cv-03633-ODW-RZ    Document 61    Filed 09/13/10    Page 15 of 67    Page ID #:3726

1    During the *Siegel* litigation, DC deposed Joanne Siegel, Laura Siegel Larson

2    (twice), and Mark Warren Peary.  Toberoff Decl., Exs. A-D.  Joanne Siegel and

3    Laura Siegel Larson each were deposed for the full seven hours allowable under

4    F.R.C.P. 30(d)(1).  *Id.*, Exs. A-C.

5    Fact discovery in the *Siegel* litigation closed on November 16, 2006.  On

6    March 26, 2008, Judge Larson upheld the Siegels' Superman Termination, and ruled

7    that, as of April 16, 1999, the Siegels own 50% of the copyright to the first

8    Superman story published in *Action Comics*, No. 1.  *See Siegel v. Warner Bros. Ent.*

9    *Inc.*, 542 F. Supp. 2d 1098, 1117-39 (C.D. Cal. 2008) ("*Siegel* I").  Subsequently, on

10    August 12, 2009, Judge Larson held that the Siegels had also recaptured Siegel's

11    copyright interest in *Action Comics,* No. 4, parts of *Superman,* No. 1 (pages 3-6) and

12    Superman's origin story on the planet Krypton contained in the first two weeks of

13    the Superman newspaper strips.  *See Siegel v. Warner Bros. Ent. Inc.*, 658 F. Supp.

14    2d 1036 (C.D. Cal. 2009) ("*Siegel* II").  Recently, on August 12, 2010, the Siegels

15    moved under F.R.C.P. 54(b) to have judgment entered as to these detailed orders as

16    to the validity and scope of the Siegel Terminations, to permit immediate appeal.

17    Toberoff Decl., Ex. E.  The motion is set to be heard on September 27, 2010.  *Id.*

18    Marc Toberoff, the attorney for Joanne Siegel and Laura Siegel Larson in the

19    *Siegel* litigation, also represents Jean Peavy, the sister of Joseph Shuster, and Mark

20    Warren Peary, the nephew of Joseph Shuster and personal representative of the

21    Joseph Shuster Estate (the "Shuster Executor"), in connection with the termination

22    of Shuster's copyright grants to DC concerning *Superman.*  In November 2003, the

23    Shuster Executor served on DC and filed in the U.S. Copyright Office a formal

24    notice of termination under 17 U.S.C. § 304(d) (the "Shuster Termination"),

25    terminating Joseph Shuster's Superman copyright grants.  *Siegel* I, 542 F. Supp. 2d

26    at 1114, n.3; Toberoff Decl., Ex. U ("Complaint"), ¶ 79-81.

27    Unhappy with the results of the *Siegel* litigation, DC filed this new lawsuit on

28    May 14, 2010.  DC's Complaint in the instant action contains three state-law claims,

10

1   wherein DC frivolously sued the Siegels and Shuster Estate's attorney, Toberoff, for

2   "tortiously interfering" with DC's "relationship" with the Siegel and Shuster heirs,

3   based on their exercise of their statutory termination rights, and contested the

4   validity of the Shuster Termination on many of the same failed grounds that DC had

5   contested the Siegel Terminations.  DC also sued the Siegels, the Shuster Executor,

6   and Toberoff for allegedly entering into so-called "consent agreements" with the

7   Shuster Executor that supposedly violated DC's purported rights under the

8   Copyright Act.

9        DC attached as Exhibit A to its Complaint an anonymous, rambling,

10  defamatory cover letter it describes as the "Toberoff Timeline," which strains to

11  discredit Toberoff while discussing and enclosing privileged material stolen from

12  his law office.  In 2006, an attorney, formerly employed by Toberoff, mailed large

13  packages of documents stolen from his law firm's legal files to executives at DC's

14  effective parent, Warner, including its General Counsel, in an apparent attempt to

15  smear Toberoff and assist Warner and DC in the *Siegel* litigation.  *See* Toberoff

16  Decl., Ex. F, ¶¶ 25-26; Ex. G, ¶¶ 7-14.  DC attached this patently inadmissible and

17  unreliable cover letter, created and disseminated in clear violation of the attorney's

18  duties of loyalty and confidentiality, as "Exhibit A" and the centerpiece of DC's

19  new Complaint.

20            **2.    DC Insists on a Chaotic Discovery Process**

21       On July 13, 2010, once Toberoff had retained independent counsel, the parties

22  met and conferred over the filing of dispositive motions.  Toberoff Decl., ¶¶ 2-3.  At

23  that meeting defendants indicated that they intended to file motions to dismiss each

24  of DC's claims for relief, together with a motion to strike under California's Anti-

25  SLAPP law, and provided a detailed substantive overview of the basis for these

26  motions.  *Id.*  During that meeting, the parties discussed the use of the Toberoff

27  Timeline in discovery; DC stated that it intended to fully exploit the Timeline in

28  discovery, and defendants indicated that they would oppose DC's use of that

1    document. *Id.*, ¶ 3. The parties met and conferred further on that issue, and

2    defendants filed a motion for a protective order regarding the Timeline on August

3    30, 2010. Docket Nos. 41-42.

4        On August 13, 2010, consistent with the parties' discussion on July 13, 2010,

5    Toberoff filed a substantial motion to dismiss DC's Fourth, Fifth and Sixth claims

6    against him and his entities pursuant to F.R.C.P. 12(b)(6), and filed a motion to

7    strike under California's Anti-SLAPP statute, Code of Civil Procedure § 425.16.

8    Toberoff Decl., Exs. H-I. Simultaneously, the Siegels and the Shuster Executor

9    filed substantial motions to dismiss DC's First, Second, Third and Sixth Claims

10   pursuant to F.R.C.P. 12(b)(6). *Id.*, Exs. J-K. All defendants joined in these

11   dispositive motions, which are currently scheduled to be heard by Judge Wright on

12   October 18, 2010. *Id.*, Exs. H-K.

13       On August 13, 2010, DC served its portion of a joint stipulation on a motion

14   to take immediate depositions of Joanne Siegel and third-party Jean Peavy in

15   advance of the parties' meeting pursuant to F.R.C.P. 26(f), which was scheduled for

16   the very next business day, August 16, 2010. Despite the fact that this meeting

17   clearly mooted DC's motion to open discovery, DC pressed forward with its motion,

18   which will be heard by this Court on September 20, 2010. Toberoff Decl., Ex. V.

19       On August 17, 2010, the day after the Rule 26(f) conference, DC served the

20   deposition notices at issue in the instant motion.[2] These notices set depositions for

21   Joanne Siegel, Laura Siegel Larson, and Mark Warren Peary in Los Angeles on

22   October 5, 6, and 13, 2010, respectively. Toberoff Decl., Exs. L-N. DC also

23   noticed a deposition in New Mexico for Jean Peavy for October 12, 2010. *Id.* Ex.

24   O. Each deposition notice and subpoena was accompanied by a broad document

25   
    _____

26       [2] Before serving these notices, DC had previously – before the Rule 26(f)
     conference held on August 16 – provided defendants with copies of a proposed deposition

27   notice for Joanne Siegel and a deposition subpoena for Jean Peavy. Toberoff Decl., Ex. U
     at 23:19-24:23.

28

12

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS
EXHIBIT C    Page 69

1  request, seeking "all documents related to" the Shuster and Siegel terminations. *Id.*,

2  Ex. L at 8 (Joanne Siegel); Ex. M at 8 (Laura Siegel Larson); Ex. N at 8 (Mark

3  Warren Peary); Ex. O at 7 (Jean Peavy).

4        During a follow-up meet and confer session held on September 2, 2010, the

5  day this motion was due to be served, DC offered to take the depositions off-

6  calendar and expressly agreed that "two weeks" of delay in taking these depositions

7  would not unduly affect the case. Toberoff Decl., ¶ 20, Ex. P. However, DC

8  conditioned its offer on a requirement that the defendants file on October 4, 2010,

9  for hearing on October 25, 2010, any discovery motions, including a motion for a

10 protective order as to the depositions. Toberoff Decl., Ex. P. In other words, DC

11 conditioned the common-sense adjournment of the depositions for a matter of weeks

12 on defendants serving discovery motions before Judge Wright has had the

13 opportunity to rule on defendants' dispositive motions or even to provide guidance

14 at the October 18 hearing on the dispositive motions. Such would have amounted to

15 a premature motion for a series of advisory opinions which may (and likely will) be

16 mooted by Judge Wright's rulings on the dispositive motions, as well as by this

17 Court's rulings on the discovery motions set for hearing on September 20, 2010. To

18 avoid burdening both the Court and the parties with potentially unnecessary motions

19 on hypothetical topics, defendants offered instead to meet and confer shortly after

20 the October 18 hearing on dispositive motions, and to thereafter expeditiously seek

21 resolution of any remaining discovery disputes. *Id.*, Ex. Q. DC did not agree, and

22 refused to take off calendar the depositions it had noticed for October 5, 6, and 13,

23 2010. *Id.*, Ex. R.

24       During the parties' Rule 26(f) conference, held on August 16, 2010, DC

25 indicated that, in light of the pending motions, it was likely to amend its Complaint.

26 Toberoff Decl., ¶ 4. On Saturday, August 28, DC confirmed by email that it will

27 file an amended Complaint. *Id.*, Ex. S. DC also indicated that it will not add any

28 additional causes of action to the amended Complaint, but merely "augment" the

13

1   current Complaint in response to defendants' dispositive motions. *Id.* On

2   September 2, 2010, DC confirmed that it did not expect the additional amendments

3   to the Complaint to substantially affect the pending motions to dismiss and Anti-

4   SLAPP motion. *Id.*, ¶ 21, Ex. P. Defendants therefore contemplate filing very

5   similar motions with respect to the amended Complaint, and plan on having these

6   motions heard on October 18, 2010. To the extent any portion of DC's amended

7   Complaint survives these dispositive motions, defendants also intend to file

8   counterclaims against DC. *Id.*, ¶ 4.

9   **B.    <u>The Depositions Should Be Briefly Postponed Until the Dispositive</u>**

10  **<u>Motions to Dismiss as a Matter of Law Have Been Decided</u>**

11        The upcoming dispositive motions, which will shortly be heard, can and

12  should dispose of all of DC's claims as a matter of law, and will at a minimum

13  clarify and narrow the scope of the pleadings and associated discovery. *Id.*, Exs. H-

14  K. Accordingly, it makes no sense to rush to depose witnesses, each of whom has

15  already been deposed, before the scope of the pleadings and thus related discovery is

16  known. *Id.*, Exs. A-D.

17        Courts in this Circuit can, and routinely do, stay discovery pending the

18  resolution of dispositive motions to dismiss. *See Jarvis v. Regan*, 833 F.2d 149, 155

19  (9th Cir. 1987). The Ninth Circuit has approved discovery stays pending a motion

20  to dismiss where discovery was "'not required to address the issues raised'" by the

21  motion, as "[d]iscovery is only appropriate where there are factual issues raised by a

22  Rule 12(b) motion." *Id.* at 155. *See also Rae v. Union Bank*, 725 F.2d 478, 481 (9th

23  Cir. 1984) (approving discovery stay because "there were no factual issues" raised

24  by motions to dismiss); *Wood v. McEwen*, 644 F.2d 797, 802 (9th Cir. 1981) (a

25  district court "may … stay discovery when it is convinced that the plaintiff will be

26  unable to state a claim for relief"); *Sasselli v. Pena*, 2008 U.S. Dist. LEXIS 44458,

27  at *2 (E.D. Cal. June 3, 2008) (a magistrate judge "has broad discretion to stay

28  discovery pending decision on a dispositive motion").

1    District Courts in the Ninth Circuit have adopted a simple test for determining

2    whether it is appropriate for discovery to be postponed while a dispositive motion is

3    pending:

> This court applies a two pronged analysis in deciding whether to grant a
> protective order staying discovery before other pending motions can be heard.
> First, a pending motion must be potentially dispositive of the entire case, or at
> least dispositive on the issue at which discovery is directed …. Second, the
> court must determine whether the pending dispositive motion can be decided
> absent additional discovery.

8    *Lowery v. F.A.A.*, 1994 WL 912632 (E.D. Cal. Apr. 11, 1994) (citations omitted).[3]

9    As part of this analysis, "the Court should '… take a preliminary peek at the merits

10    of the allegedly dispositive motion to see if on its face there appears to be an

11    immediate and clear possibility that it will be granted.'" *GTE Wireless, Inc. v.*

12    *Qualcomm, Inc.*, 192 F.R.D. 284, 286 (S.D. Cal. 2000) (quoting *Feldman v. Flood*,

13    176 F.R.D. 651, 652 (M.D. Fla. 1997).

14    Defendants' pending motions meet these criteria. *First*, as discussed below,

15    the motions that have already been filed, and will shortly be re-filed in response to

16    DC's amended Complaint, target each of DC's claims and, if successful, will

17    dispose of the entire case. *See* Toberoff Decl., Exs. H-K.  Second, the motions are

18    to dismiss as a matter of law, based on clear statutory and case authority. *See id.*

19    DC has not identified any discovery in its motion that could contradict the clear and

20    well-established law on which defendants rely.  While defendants do not intend to

21    re-argue the motions in this brief, they have included an Appendix that describes the

22    bases for the motions to dismiss in detail, demonstrating how the motions will

23    resolve all of DC's claims as a matter of law. *See* Appendix A.

24

---

25    [3] The cases applying this test and concluding that it is appropriate for discovery to wait
until dispositive motions have been adjudicated are legion. *Hall v. Tilton*, 2010 U.S. Dist.

26    LEXIS 11162, at *2-*3 (N.D. Cal. Feb. 8, 2010) (adopting test and granting stay); *Curtis v.*
*Benda*, 2009 U.S. Dist. LEXIS 86504, at *3-*6 (W.D. Wash. Sept. 4, 2009) (same); *Hanni*

27    *v. American Airlines, Inc.*, 2009 U.S. Dist. LEXIS 49338 (N.D. Cal. May 27, 2009)
(same).

28

15

1       In any event, there can be no reasonable dispute that each and every one of

2  these claims can clearly be "decided absent additional discovery" as a matter of law,

3  and nothing in DC's proposed amendments to the Complaint could alter that

4  analysis. *Lowery*, 1994 WL 912632, at *3.

5       Moreover, the parties intend to maintain the October 18, 2010 hearing date, or

6  a date shortly thereafter, for the dispositive motions.  Accordingly, the period of the

7  stay should not be lengthy.  There is no reason why DC needs to take depositions in

8  early October, instead of shortly thereafter, following the resolution of the motions,

9  and the filing of DC's amended Complaint and defendants' counterclaims.  Good

10  cause exists for an order staying depositions so that they will occur, if at all, after the

11  dispositive motions are decided and such pleadings are filed, as this will

12  undoubtedly clarify and narrow the matters at issue and the scope of permissible

13  discovery. *Wood*, 644 F.2d at 802.

14       DC has argued that these depositions are urgent because one of the three

15  witnesses, Joanne Siegel, is of "advanced age."  Toberoff Decl., Ex. V at 1.

16  However, DC's purported urgency is belied by its own conduct. *First*, DC waited

17  years to initiate its claims, and cannot now claim that it will be substantially

18  prejudiced by waiting a few more weeks.  Even if the so-called "Toberoff Timeline"

19  was DC's sole source of knowledge as to the allegations in its Complaint (and it is

20  not), by DC's own account it received the letter on December 10, 2008 (Complaint,

21  ¶88), and waited a year and a half, until May 14, 2010, to file suit. *Second*, DC has

22  waited months to amend its Complaint, despite being advised in mid-July of the

23  fatal problems with its pleading. *Third*, had Joanne Siegel's age been DC's true

24  concern, DC could have filed, but did not file, a petition under F.R.C.P. 27(a) to take

25  their depositions to purportedly "preserve testimony" at any time from 2008-2010,

26  prior to the filing of this action. *Fourth*, DC has offered no reason why, even given

27  Joanne's advanced age, waiting for a matter of weeks to depose her presents a

28  material problem. *See, e.g., United States v. Int'l Longshoremen's Ass'n*, 2007 U.S.

EXHIBIT C   Page 73

1  Dist. LEXIS 70686 at *7 (E.D.N.Y. Sept. 24, 2007) (rejecting the expedited

2  deposition of an elderly witness, because the deponent's age alone was an

3  insufficient basis to expedite). *Fifth*, DC has offered no case law to support the

4  expedited depositions of an elderly witness where, as discussed in more detail

5  below, her testimony has already been preserved by her deposition in a closely

6  related action.

7      Accordingly, Joanne Siegel's age provides no basis for expediting her

8  duplicative deposition. Indeed, as discussed below, her advanced age favors a

9  reasonable stay and limitation of her deposition.

10     Nor is there any other reason why DC would be materially prejudiced from a

11  temporary stay of depositions pending resolution of the dispositive motions. Indeed,

12  by offering to move the depositions (albeit for an unacceptable *quid pro quo*), DC

13  has essentially admitted as much. Therefore DC has not shown and cannot show

14  that it will suffer any prejudice by waiting until these motions are shortly decided

15  before launching deposition discovery. The discovery period in this action is clearly

16  sufficient to permit DC to take appropriate depositions following the resolution of

17  the pending motions.

18     On the other hand, if the depositions are taken prematurely before the pending

19  dispositive issues are decided, it may force further discovery motion practice, and

20  potentially result in the witnesses having their depositions taken three times (and, in

21  the case of Laura Siegel Larson, *four* times). DC's discovery "plan" is thus

22  inefficient, duplicative and burdensome, all of which justifies postponing the

23  depositions, not expediting them. Fed. R. Civ. P. 26(c).

24     The Siegels' pending F.R.C.P. 54(b) motion in the *Siegel* Superman action, to

25  be heard by Judge Wright on September 27, 2010, also has a direct and substantial

26  bearing on discovery in this case. Toberoff Decl., Ex. E. If the Court enters

27  judgment based on its three lengthy published opinions concerning the validity and

28

1  scope of the Siegels' Superman Terminations,[4] that will have preclusive effect as to

2  the same issues in this action regarding the mirror-image Shuster Termination,

3  preventing DC from re-litigating such issues, and significantly narrowing the scope

4  of discovery in this case.  Common sense therefore demands that this Rule 54(b)

5  motion, along with the dispositive motions, be resolved first, and then, with the

6  scope of this case properly narrowed, that depositions proceed if and as necessary.

7  **C.**    **The Depositions Should Be Postponed Until the Anti-SLAPP**

8        **Motion Has Been Decided**

9         An additional reason to stay these depositions temporarily is that a motion

10 under California Code of Civil Procedure § 425.16 *et seq.* (the "Anti-SLAPP" law)

11 is currently pending, and will be re-filed in response to the amended Complaint.  *Id.*,

12 Ex. H.  Under California law, the filing of an Anti-SLAPP motion stays discovery

13 unless the plaintiff can show "good cause" for obtaining discovery.  Under

14 California Code of Civil Procedure Section 425.16(g), "[a]ll discovery proceedings

15 in the action shall be stayed upon the filing of a notice of motion made pursuant to

16 this section. The stay of discovery shall remain in effect until notice of entry of the

17 order ruling on the motion.  The court, on noticed motion and for good cause shown,

18 may order that specified discovery be conducted notwithstanding this subdivision."

19 *Id.*  A showing of good cause requires the plaintiff to identify particular facts that it

20 seeks in discovery.  *See 1-800 Contacts, Inc. v. Steinberg*, 107 Cal. App. 4th 568,

21 593 (2003) (plaintiff seeking to lift anti-SLAPP discovery stay must explain what

22 additional facts the plaintiff expects to uncover).  Similarly, under Federal Rule of

23 Civil Procedure 56(f), a plaintiff may be entitled to conduct discovery before a

24 hearing on a motion for summary judgment if it shows a "particularized need" for

25

26     [4] *Siegel I*, 542 F. Supp. 2d at 1117-39 (termination upheld as to first Superman story
   in *Action Comics* No. 1); *Siegel II*, 658 F. Supp. 2d at 1080-84 (defining additional

27 recaptured Superman works); *Siegel v. Warner Bros. Ent. Inc.*, 690 F. Supp. 2d 1048 (C.D.
   Cal. 2009) ("*Siegel III*") (denying motions for reconsideration).

28

---

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS
EXHIBIT C      Page 75

Case 2:10-cv-03633-ODW-RZ    Document 69-1    Filed 09/15/10    Page 81 of 191    Page
ID #:5158
Case 2:10-cv-03633-ODW-RZ    Document 61    Filed 09/13/10    Page 24 of 67    Page ID #:3735

1  the discovery.[5]

2      DC has admitted, in a prior pleading, that FRCP 56(f) provides only for

3  discovery that is "essential" to opposing summary judgment. Toberoff Decl., Ex. V

4  at 8. Here, however, the overwhelming bulk of defendants' motion under the Anti-

5  SLAPP law has <u>no</u> factual component, and incorporates legal arguments from the

6  simultaneously pending motions to dismiss. *See* Toberoff Decl., Ex. H at 24 ("To

7  avoid repetition, the arguments from [the motions to dismiss] and supporting papers,

8  which explain why the Fourth, Fifth and Sixth Claims have no merit whatsoever, are

9  incorporated by reference here."). No discovery at all could be relevant to the vast

10  majority of the Anti-SLAPP motion. The only factual issues raised in the motion

11  are discussed in slightly more than three pages of the motion therein, and relate

12  exclusively to: (a) Mr. Toberoff's non-involvement in Joanne Siegel's decision to

13  send letters in May and October 2002 rejecting DC's settlement proposal; (b) a

14  reference to deposition testimony in the prior litigation, which demonstrates that DC

15  was on inquiry notice of its current claims outside of the limitations period; and (c)

16  the fact that certain of the agreements alleged by DC in its Complaint have expired

17  on their own terms, rendering DC's claims with respect thereto moot. *Id.* As

18  discussed below, the witnesses were already examined on all of these topics

19  previously. Moreover, any limited discovery DC might seek to obtain on these

20  narrow subjects could just as easily be obtained via interrogatories, a deposition on

---

21      [5] Judge Feess held in *New.Net, Inc. v. Lavasoft*, 356 F.Supp.2d 1090 (C.D. Cal.
22  2004), that the standards under Rule 56(f) and the Anti-SLAPP statute are similar. Cal.
    Civ. Proc. Code § 425.16(g) provides that "on a noticed motion and for good cause shown,
23  [a court] may order that specified discovery be conducted notwithstanding [the automatic
    stay]." *Id.* at 1101. This protection is analogous to Rule 56's requirement that a party
24  opposing a summary judgment motion "must explain with particularity why it is unable to
    oppose the motion, state with specificity what facts it intends to seek through discovery,
25  and show how its discovery efforts are reasonably expected to create a triable issue." *Id.* at
    1101-02 (finding no "collision" between Rule 56 and the Anti-SLAPP law and noting that
26  "to find such collision would undermine the holding in [*United States v. Lockheed Missiles
    & Space Co., Inc.*, 190 F.3d 963, (9th Cir. 1999)] permitting the use of the Anti-SLAPP
27  procedure in federal court.").

28

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS
EXHIBIT C    Page 76

1  written questions, or some other, less burdensome method.

2      DC simply cannot meet its burden – which it must meet in order to obtain

3  discovery before the resolution of the Anti-SLAPP motion – that the discovery it

4  seeks is essential to opposing the motion.  As Judge Feess explained in *New.Net,*

5  *Inc. v. Lavasoft*:

> Even if the Court concluded that Section 425.16(g) and Rule 56 were
> potentially in conflict, the potential for a direct collision has not
> materialized because Plaintiff has not demonstrated that discovery is
> essential to its opposition nor has Plaintiff shown good cause as to why
> discovery should be permitted.
>
> Although Plaintiff has sought to defer this motion pending discovery, it
> has not stated with any degree of specificity what discovery it needs or
> how that discovery would bear on this motion.  Plaintiff's opposition
> generally refers to matters such as learning about Lavasoft's business
> plan, its sales and revenue, its motives and reasons for 'targeting'
> New.net and other entities, [the function of Lavasoft's software] and
> Lavasoft's customer base.  To the extent that the proposed discovery
> would contain any relevant information, most of it is already known to
> Plaintiff … In short, Plaintiff has failed to persuade the Court that
> discovery is essential to its opposition to Defendant's motion.

356 F. Supp. 2d at 1102 (internal citations to the record omitted); *see also Moser v.*

*Triarc Cos.*, 2007 WL 3026425, at *2-*4 (S.D. Cal. Oct. 16, 2007) (court denied

plaintiff's motion for leave to conduct discovery because such discovery was not

"essential in opposing" anti-SLAPP motion); *compare Metabolife Intern., Inc. v.*

*Wornick*, 264 F.3d 832, 838 (9th Cir. 2001) ("The district court … asked Metabolife

to itemize the discovery needed to respond to the anti-SLAPP motion, which

Metabolife did.").

      Recent Supreme Court precedent also demonstrates why the Anti-SLAPP

discovery stay should apply.  In *Shady Grove Orthopedic Associates, P.A. v. Allstate

Ins. Co.*, 130 S. Ct. 1431 (2010), decided this year, the United States Supreme Court

set forth principles reinforcing the conclusion that the discovery stay of California's

Anti-SLAPP law, as a matter of substantive law governing state-created rights, must

apply in federal court.  In *Shady Grove*, the Supreme Court addressed the interplay

between a New York law relating to class action lawsuits and Rule 23 of the Federal

20

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS
EXHIBIT C      Page 77

1  Rules of Civil Procedure.  In a controlling concurrence, Justice Stevens made clear

2  that, under the Rules Enabling Act, a federal rule cannot govern when it "would

3  displace a state law that is procedural in the ordinary use of the term but is so

4  intertwined with a state right or remedy that it functions to define the scope of the

5  state-created right."  130 S. Ct. at 1452 (Stevens, J., concurring).[6]

6        Here, the discovery stay and good cause requirements of the Anti-SLAPP law

7  are substantive protections that California adopted to suppress "non-meritorious

8  cases aimed at chilling [free speech] through costly, time-consuming litigation."

9  *New.net, Inc.*, 365 F.Supp.2d at 1098 (citing Cal. Civ. Proc. Code § 425.16(a)).  By

10  definition, the SLAPP plaintiff "does not hope to win the lawsuit and instead 'tries

11  to wear down the other side by forcing it to spend time, money, and resources

12  battling the SLAPP instead of the protected activity.'"  *Schering Corp. v. First*

13  *Databank Inc.*, 2007 WL 1176627, at *6 (N.D. Cal. April 20, 2007) (*quoting Visher*

14  *v. City of Malibu*, 126 Cal.App.4th 364 (2005)).  The automatic discovery stay

15  provision prevents a plaintiff from coercing the defendant to respond to costly and

16  time-consuming discovery before the court has even had an opportunity to

17  determine the merits of a defendant's Anti-SLAPP motion.  To allow wide-ranging

18  discovery before Defendants' anti-SLAPP motion has been decided would

19  controvert the purposes of the anti-SLAPP statute.  *New.net, Inc.,* 365 F.Supp.2d at

20  1098.

21        In light of *Shady Grove*'s mandate that "[w]hen a federal rule appears to

22  abridge, enlarge, or modify a substantive right, federal courts must consider whether

23  the rule can reasonably be interpreted to avoid that impermissible result," 130 S. Ct.

24  at 1452 (Stevens, J., concurring), it is clear that California's Anti-SLAPP discovery

25

26        [6] When "a fragmented Court decides a case and no single rationale explaining the
result enjoys the assent of five Justices," the "narrowest ground" on which the judgment

27  rests then represents the controlling rule.  *Marks v. United States*, 430 U.S. 188, 193
(1977).  Justice Stevens' opinion therefore provides the controlling rule in *Shady Grove*.

28

21

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS
EXHIBIT C      Page 78

1   stay should apply here absent a showing of "good cause" for discovery, a showing

2   DC has not even attempted to provide.[7]

3          Finally, DC's attempt to distinguish its federal and state law claims does not

4   resolve the issue of whether the depositions should take place before the hearing on

5   the Anti-SLAPP motion.  DC has claimed, in a prior pleading, that "[a]ll of the

6   discovery [DC] seeks … is relevant to [DC's] federal claims," and thus is not

7   subject to a stay under the Anti-SLAPP laws.  Toberoff Decl., Ex. V at 12.  DC will

8   likely argue that, since the Anti-SLAPP motion is potentially dispositive only as to

9   the state claims, discovery as to the federal claims can proceed.  However, as DC

10  has not limited the depositions so as to exclude issues relating to the state-law

11  claims, and has sought documents clearly related to its state-law claims alone, it is

12  both impossible to determine how the depositions will be limited to the federal

13  claims, and improbable that the depositions will be so limited.  DC's state-law

14  claims raise issues not covered in the federal claims for which DC actively seeks

15  discovery.  For example, DC's counsel has indicated that he intends to extensively

16  question witnesses based on the anonymous "Toberoff Timeline" (giving rise to

17  defendants' motion for a protective order pending before this Court), on which DC

18  based its state-law claims for purported tortious interference.  Toberoff Decl., ¶ 3.

19  ───────────────────────────

    [7]  Moreover, two years after its decision in *Metabolife*, the Ninth Circuit noted
20  without disapproval that "[i]f the defendant files a[n anti-SLAPP] motion to strike, all
    discovery proceedings are stayed.  A court may, however permit specified discovery 'on
21  noticed motion and for good cause shown.'"  *Batzel v. Smith*, 333 F.3d 1018, 1024 (9th
    Cir. 2003) (quoting Cal. Code Civ. Proc. § 425.16(g)).  DC ignores *Batzel*, which
22  specifically stated that "[b]ecause California law recognizes the protection of the Anti-
    SLAPP statute as a substantive immunity from suit, this Court, sitting in diversity, will do
23  so as well."  *Id.* at 1025-26 (*citing Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938))
    (emphasis added).  As with other types of immunities from suit, the substantive policies of
24  the Anti-SLAPP law to protect public participation would be seriously impeded if a
    plaintiff could bring a SLAPP suit and wear the opposing party down in discovery while
25  the anti-SLAPP motion is pending.  *Cf. Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)
    ("The entitlement is an immunity from suit rather than a mere defense to liability; and like
26  an absolute immunity, it is effectively lost if a case is erroneously permitted to go to
    trial."); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("Until this threshold immunity
27  question is resolved, discovery should not be allowed.").

28

                                        22

1    Even if the depositions could somehow be limited solely to DC's federal

2    claims (which is highly unlikely, and impossible to achieve in practice), DC would

3    eventually want to take discovery as to its state law claims, subjecting these elderly

4    and chronically ill witnesses to two depositions in this case in addition to the

5    depositions already taken of these witnesses in the closely related *Siegel* litigation.

6    *See Baxter Healthcare Corp. v. Fresenius Medical Care Holding, Inc.*, 2007 WL

7    3342573, at *2 (N.D. Cal. 2007) (motion to compel second deposition of elderly

8    witness denied because of "potential inconvenience of a repeat deposition to an

9    elderly witness").  It would therefore be far more reasonable and efficient for these

10    depositions to await the resolution of plaintiffs' dispositive motions.

11    **D.    There Is No Prejudice to DC From a Brief Stay of Discovery Until**

12    **Dispositive Motions Are Decided**

13    Other than its desire to try to salvage its defective Complaint or to further its

14    improper attempt to reopen issues already litigated in *Siegel*, DC can point to no

15    conceivable reason to begin depositions immediately instead of waiting a few

16    weeks.  No scheduling order exists in this litigation, and no trial date has been set.

17    Once the issues in this case have been narrowed by the pending motions and the

18    pleadings have been settled, it is indisputable that DC will have more than ample

19    time to depose these witnesses.  It makes no difference to DC's ability to put on its

20    case if the depositions are delayed a few weeks.

21    On the other hand, it would substantially burden these elderly and ill

22    witnesses to be deposed now, and possibly a third time, based solely on DC's tactic

23    to prop up its defective Complaint and gain advantages in the related litigation in

24    which discovery has long been closed.  The Court should reject DC's approach, and

25    allow discovery in this matter to proceed on an orderly and rational basis after the

26    pleading motions have been decided.

27

28

23

E.    **The Scope and Time of These Depositions Should Be Limited for Two of the Witnesses Who Suffer From Severe Medical Conditions**

Two of the witnesses at issue – Joanne Siegel and Laura Siegel Larson – suffer from serious medical conditions which make the deposition process unduly difficult and debilitating, and, in the case of Joanne Siegel, poses the threat of heart failure, according to her physician.

Joanne Siegel is 92 (and soon to be 93), and while her condition is stable, she suffers from a heart condition, a hearing disability and high blood pressure. *See* Declaration of Joanne Siegel ("Joanne Decl."), ¶¶ 3-9; Declaration of Richard Taw, MD ("Taw Decl."), ¶¶ 5-9. Mrs. Siegel suffered extreme stress and physical trauma during and after her full-day deposition in 2006 in the *Siegel* litigation. Joanne Decl., ¶¶ 3-9. Her treating physician has testified as follows: "It is my professional medical opinion that Ms. Siegel should not be subjected to a deposition of any duration and that a deposition would subject Ms. Siegel to an unacceptably high risk of serious adverse health consequences, including the threat of a debilitating or life-threatening heart attack or stroke." Taw Decl., ¶ 9.

Laura Siegel Larson has Multiple Sclerosis (a debilitating autoimmune disease that affects the central nervous system), Fibromyalgia (a musculoskeletal pain and fatigue disorder), Spondylosis (a degenerative joint disease), Scoliosis (congenital curvature of the spine), Temporomandibular joint disorder (affecting the joints on either side of her jaw), Arthritis, and Glaucoma. *See* Declaration of Laura Siegel Larson ("Laura Decl."), ¶¶ 4-12, 15; Declaration of Barbara Giesser, MD ("Giesser Decl."), ¶¶ 7-8; Declaration of Eric Hsu, MD ("Hsu Decl."), ¶¶ 7-8. During her deposition in the *Siegel* litigation, Laura suffered considerable pain and discomfort due to these medical conditions, including severe back and neck pain, cramping and muscle spasms, a severe headache, blurry and double vision, shortness of breath, exhaustion and numbness in her hands, feet and face, most of which lasted into the following day. Laura Decl., ¶ 3, 8. The neurologist who treats Laura for

24

1  MS has advised as follows:  "It is my professional medical opinion that the
2  significant stress of a deposition could precipitate a MS exacerbation.  Due to
3  Laura's severe medical condition, she should not be subjected to a deposition of any
4  duration, unless and to the limited extent it is absolutely necessary."  Giesser Decl.,
5  ¶ 9.  The physician who treats Laura for Fibromyalgia and chronic pain concurs.
6  *See* Hsu Decl., ¶ 9.

7          At a minimum, the age and/or severe medical condition of these deponents
8  urges that their depositions be postponed until such are clearly necessary, the issues
9  are narrowed and the pleadings are set in this case, and that reasonable efforts be
10  made to avoid subjecting these witnesses to duplicative questioning.  Indeed, DC
11  should not be able to depose these two witnesses at all without showing that they
12  have unique information unavailable from any other source on matters not covered
13  in the prior depositions.  Even then, their depositions should be limited to written
14  questions.

15  **F.**      **Depositions Should Be Strictly Limited in Scope Because the**
16            **Witnesses Have Already Been Exhaustively Deposed in the *Siegel***
17            **Litigation**

18          If and when the depositions of witnesses already deposed in the closely
19  related *Siegel* litigation go forward, they should be strictly limited, to avoid
20  subjecting these witnesses to duplicative questioning on the same subject matter and
21  to avoid their sitting for *three* depositions – or *four*, in the case of Laura Siegel
22  Larson.  Toberoff Decl., Exs. B-C.  The Ninth Circuit has held that "eliminating
23  duplicative discovery" is an important consideration in discovery practice.  *Beckman*
24  *Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470 (9th Cir. 1992).  There is no plausible
25  reason to subject anyone to multiple, redundant depositions on the same topics,
26  especially with pending dispositive motions, as "repeat depositions are disfavored."

27
28

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS
EXHIBIT C   Page 82

1  *Graebner v. James River Corp.*, 130 F.R.D. 440 (N.D. Cal. 1989).[8]  This concern is

2  only heightened where, as here, most of the deponents are elderly and/or infirm.

3  *Baxter Healthcare Corp.*, 2007 WL 3342573, at *2.

4        DC has already examined Joanne Siegel, Laura Siegel Larson, and Mark

5  Warren Peary on identical or closely related topics in the *Siegel* litigation, and

6  accordingly, DC should not be allowed to re-examine these witnesses on topics

7  already covered during their prior depositions, or to use testimony it obtains in this

8  action for the purposes of the *Siegel* litigation.  Toberoff Decl., Exs. A-D.

9        There can be no reasonable dispute that DC has already had a full and fair

10  opportunity to depose these same witnesses on the topics of the Complaint in this

11  action, and has obtained extensive discovery relevant to the issues in its Complaint.

12  As noted above, Joanne Siegel and Laura Siegel Larson were deposed for a full day,

13  and Mark Warren Peary was deposed for a half-day on such topics.  *Id.*, Exs. A-D.

14  Without a protective order, and as set forth below, each of these individuals will be

15  deposed twice on <u>identical</u> topics.  *Id.*, Exs. L-O, U ("Complaint").

16                    **Joanne Siegel**

| Topic | Depo Pages (Ex. A) | Complaint |
|---|---|---|
| Joanne Siegel's relationship with Jerome Siegel from 1935-1948 | 14:3-14:9 | ¶¶ 27-30, 36 |
| Jerry Siegel being re-hired by DC's predecessors in the late 1960s | 14:21-15:23 | ¶ 41 |

---

[8] *See also* F.R.C.P. 30(d)(2) ("Unless otherwise authorized by the court or stipulated by the parties, a deposition is limited to one day of seven hours." ); *Independence Park Apartments v. U.S.*, 59 Fed.Cl. 765, 769 (Fed. Cl. 2004) (The approach taken by the courts has been "to limit a deposition to seven hours absent a showing of good cause for additional time."); *Melhorn v. New Jersey Transit Rail Operations, Inc.*, 203 F.R.D. 176, 180 (E.D. Pa. 2001) ("Absent some showing of need or good reason for doing so, a deponent should not be required to appear for a second deposition."); *Sentry Ins. v. Shivers*, 164 F.R.D. 255, 256 (D. Kan. 1996) (citations omitted) ("Scheduling a second deposition of the same person without a showing of good reason will generally support a finding of annoyance and undue burden or expense.").

| Topic | Depo Pages (Ex. A) | Complaint |
|---|---|---|
| Joanne Siegel's discussions of termination with Jerry Siegel | 16:18-17:14; 71:8-72:12 | ¶ 45 |
| Joanne Siegel's retention of counsel to exercise her termination rights | 22:8-24:6 | ¶¶ 60-61 |
| Joanne Siegel and Laura Siegel Larson's "settlement" discussions with DC between October 2001 and February 2002 | 24:13-28:13; 39:1-40:25 | ¶¶ 62, 168-69 |
| DC's February 2002 long-form draft settlement agreement | 27:9-28:13; 87:4-88:13; 94:3-95:6 | ¶¶ 62, 168-69 |
| The drafting and meaning of the May 9, 2002 letter sent by Joanne Siegel | 32:18-34:17; 36:16-40:17; 42:17-43:9; 45:1-46:24; 119:4-121:9 | ¶¶ 65-67, 168-69 |
| Joanne Siegel's first contact with Marc Toberoff | 41:1-3 | ¶¶ 64, 70-72 |
| Joanne Siegel's September 21, 2002 letter to DC's Publisher | 43:10-44:25 | ¶¶ 70, 168-69 |
| The 1974 Agreement between Jerry Siegel and Warner Bros., and further amendments to that agreement | 56:12-71:7 | ¶¶ 43-45 |
| The Shuster Termination | 102:8-104:25 | ¶¶ 79-88 |
| Marc Toberoff's representation of Jean Peavy | 105:1-5 | ¶¶ 64, 70-72 |
| The Superboy "pitch" letter by Jerry Siegel | 105:6-109:13 | ¶¶ 74, 134, 137 |
| The Superboy script by Jerry Siegel | 109:14-115:10; 135:3-137:3 | ¶¶ 74, 136-37 |
| The 1947 Action between Jerry Siegel, Joseph Shuster, and DC's predecessors | 124:20-125:5 | ¶¶ 37-40 |

## Laura Siegel Larson

| Topic | Depo Pages (Ex. B) | Complaint |
|---|---|---|
| The separate "Superboy" action | 14:19-15:2 | ¶¶ 78, 118-20 |

27

| Topic | Depo Pages (Ex. B) | Complaint |
|---|---|---|
| First contact with Marc Toberoff | 17:6-17:19; 24:10-17 | ¶¶ 59, 64, 70-72, 169 |
| Marc Toberoff's representation of Joanne and Laura Siegel Larson | 24:10-17; 61:12-21 | ¶ 71 |
| Marc Toberoff's representation of Jean Peavy and Mark Warren Peary | 24:15-17; 25:12-25 | ¶ 54 |
| Discussions between Joanne and Laura Siegel Larson, and/or Kevin Marks, and Marc Toberoff about the acquisition of Superman rights | 25:22-26:5 | ¶ 68 |
| Knowledge of Intellectual Properties Worldwide, LLC | 26:21-27:14 | ¶ 70 |
| The IP Worldwide Agreement | 34:5-38:16; 52:16-21 | ¶ 70 |
| Joanne Siegel and Laura Siegel Larson's "settlement" discussions with DC between October 2001 and February 2002 | 45:3-46:22; 125:1-133:22; 139:12-140:17; 143:12-145:9; 147:4-150:24; 153:7-154:16; 159:7-159:19; 162:8-168:18; 174:10-194:11; 204:10-205:21; 216:4-10; 261:12-265:10 | ¶¶ 62, 168-69 |
| Joanne Siegel and Laura Siegel Larson's termination of Gang Tyre | 56:17-24 | ¶ 70 |
| Expiration of the IP Worldwide Agreement | 60:1-60:8 | ¶¶ 70, 72 |
| Laura Siegel Larson's discussions of termination with Jerry Siegel | 62:17-63:23 | ¶ 45 |
| Marc Toberoff's contingency agreement with Joanne Siegel and Laura Siegel Larson | 72:8-73:8 | ¶¶ 71-72 |
| The 1974 Agreement between Jerry Siegel and Warner Bros., and further amendments to that agreement | 76:15-83:4 | ¶¶ 43-45 |
| Joanne Siegel and Laura Siegel Larson's "settlement" discussions with DC between 1997 and October 2001 | 64:16-65:6; 85:17-88:1; 221:21-241:9; 245:3-248:13 | ¶¶ 60-61 |

28

| Topic | Depo Pages (Ex. B) | Complaint |
|---|---|---|
| The Superboy "pitch" letter by Jerry Siegel | 92:16-24 | ¶¶ 74, 134, 137 |
| The Superboy script by Jerry Siegel | 92:25-93:3 | ¶¶ 74, 136-37 |
| The Superboy materials created by Jerry Siegel | 93:20-97:20 | ¶ 75 |
| The exclusion of the 1948 consent judgment from the Siegel Termination | 100:10-101:24 | ¶ 113 |
| The separate "Superboy" notice of termination | 105:7-107:4 | ¶¶ 73-75, 118-20 |
| Joanne Siegel's and Laura Siegel Larson's retention of counsel to exercise their termination rights | 115:9-116:25 | ¶¶ 60-61 |
| The drafting and meaning of the May 9, 2002 letter sent by Joanne Siegel | 133:19-139:10; 140:14-141:6; 146:2-147:3; 210:18-216:3; 217:25-221:13 | ¶¶ 65-67, 168-69 |
| Joanne Siegel's September 21, 2002 letter to DC's Publisher | 261:15-262:7 | ¶¶ 70, 168-69 |

### Mark Warren Peary

| Topic | Depo Pages (Ex. D) | Complaint |
|---|---|---|
| The 1974 Agreement between Jerry Siegel and Warner Bros., and further amendments to that agreement | 18:10-19:1 | ¶¶ 43-45 |
| Mark Warren Peary's discussions with Joseph Shuster about Shuster's will | 19:2-19:25 | ¶¶ 46 |
| Mark Warren Peary's first contact with Marc Toberoff | 20:1-21:17; 22:6-22:21; 35:17-37:18 | ¶¶ 52-54 |
| Mark Warren Peary's retention of Marc Toberoff as counsel | 23:18-24:3; 29:13-29:23; 57:20-58:11; 60:7-61:7; 61:14-62:13 | ¶¶ 64, 70-72 |

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING RULINGS ON DISPOSITIVE MOTIONS

EXHIBIT C    Page 86

| Topic | Depo Pages (Ex. D) | Complaint |
|---|---|---|
| The 2001 Pacific Pictures Agreement | 24:6-35:16 | ¶¶ 54-57, 105-110, 117, 156, 158, 164 |
| The inclusion of "Superboy" in the 2001 Pacific Pictures Agreement | 27:22-29:12 | ¶¶ 73-77 |
| The 50/50 split in revenues under the Pacific Pictures Agreement | 29:24-31:12 | ¶¶ 56, 87 |
| The "Expiration" clause of the 2001 Pacific Pictures Agreement | 32:6-33:22; 62:21-64:13 | ¶¶ 56, 156, 158 |
| The establishment of the Estate of Joseph Shuster | 38:13-40:24; 48:7-49:23; 50:4-12; 56:5-17 | ¶¶ 54, 58 |
| The 2003 Pacific Pictures Agreement | 40:7-41:14 | ¶¶ 77, 156, 158, 164 |
| Relationship with Joanne and Laura Siegel | 43:15-47:2 | ¶¶ 59 |
| Marc Toberoff's representation of Joanne and Laura Siegel Larson | 47:18-48:5 | ¶¶ 59 |
| The original copy of Joseph Shuster's will | 48:24-49:23 | ¶¶ 46 |
| The Shuster Notice of Termination | 50:14-56:25 | ¶¶ 79-88 |
| The works listed in the Shuster Notice of Termination | 51:23-54:19 | ¶¶ 73-77, 84 |
| Works not listed in the Shuster Notice of Termination, including "Superboy," which was solely authored by Jerome Siegel | 55:13-56:4 | ¶¶ 73-77, 118-120 |
| Signature of the Shuster Notice of Termination | 50:14-22 | ¶¶ 105-110, 117 |
| The 2004 cancellation of the Pacific Pictures Agreements | 59:18-60:10 | ¶¶ 56, 86, 156, 158 |
| Joanne Siegel's first contact with Marc Toberoff | 83:23-84:21 | ¶¶ 59, 64, 70-72, 169 |

In short, DC has obtained information from these very same witnesses on essentially all topics relevant to its Complaint in this action.  Moreover, DC has already obtained substantial information and documents concerning the relationship

30

1   between the Siegel and Shuster families and Toberoff.  For example, in 2006, copies

2   of the 2001 and 2003 agreements between Jean Peavy, Mark Warren Peary and

3   Toberoff's loan-out company, Pacific Pictures Corporation, were produced to DC in

4   *Siegel*.  Toberoff Decl., ¶ 25, Ex. T.  These agreements were cancelled in 2004, and

5   have had no effect for nearly six years.  *Id.*, Ex. U, ¶ 86.  A 2002 agreement between

6   Toberoff, Joanne Siegel, Laura Siegel Larson, and IP Worldwide was also produced

7   in 2006 to DC in the *Siegel* litigation.  Toberoff Decl., ¶ 10, Ex. F.  This agreement

8   expired and has had no effect for more than five years.  Toberoff Decl., Ex. H at 10,

9   n.5.

10       Accordingly, DC has no urgent need to take these depositions.  If DC is

11  allowed to re-depose witnesses previously deposed in the related *Siegel* litigation,

12  DC should be limited to *new* topics not covered in the prior depositions.

13       **G.    Any Depositions That Are Permitted to Go Forward Should Be**

14           **Limited In Scope, Time and Format**

15       For the reasons stated above, any depositions that do go forward of these

16  three witnesses should be limited in scope and as to time and manner given the

17  witnesses' prior testimony and the health concerns relevant to certain of the

18  witnesses.  Defendants submit that the best way to handle these limitations would be

19  for the parties to confer – after the pending dispositive motions and the motion for a

20  protective order on the Toberoff Timeline have been decided – on the appropriate

21  time, scope, and manner of these depositions, including those matters that might be

22  more appropriately addressed through interrogatories or depositions on written

23  questions.

24       If, however, the Court is inclined to order that the depositions proceed

25  immediately on the dates noticed by DC, it should limit the scope of the

26  examinations.  Given the serious health concerns raised by Joanne Siegel and Laura

27  Siegel Larson's treating physicians, if the Court nonetheless permits their

28  depositions, such depositions should only be on a limited number of written

1    questions. This is particularly appropriate as DC has already had the opportunity to

2    obtain live testimony from each witness for a full day in the closely related *Siegel*

3    litigation, and cannot, therefore, complain that it has had no opportunity to observe

4    these witnesses' demeanor or to ask follow-up questions on relevant topics.

5    Moreover, given that all three witnesses have already been deposed, if DC is

6    allowed to re-depose witnesses, it should be limited to ***new*** topics not covered in

7    their original depositions.

8        **H.    Defendants' Conclusion**

9        For the foregoing reasons, a protective order should issue, staying depositions

10    in this matter until the resolution of the motions to dismiss under F.R.C.P. 12(b)(6)

11    and the motion to strike under California's Anti-SLAPP law.  Defendants also

12    respectfully request that the Court order the parties to confer as to the time, scope,

13    and manner for these depositions, if any, immediately following the resolution of

14    these dispositive motions.  Any depositions that do go forward of witnesses already

15    deposed in the closely related *Siegel* litigation should be duly limited as to scope,

16    time, and format.

17    **VI.    DC COMICS' POSITION**

18        **A.    Factual Background**

19        DC Comics filed this action on May 14, 2010, to protect its rights in the

20    iconic character Superman.  DC Comics' first claim challenges the validity of the

21    copyright termination notice served by the heirs of original Superman illustrator,

22    Joseph Shuster.  Am. Compl. ¶¶ 105-34.  The second claim seeks a declaration that,

23    even if this termination notice is valid, Shuster's limited contributions to Superman

24    entitle his heirs to recapture only a correspondingly limited sliver of rights. *Id.*

25    ¶¶ 135-64.  DC Comics' third claim challenges an illicit web of agreements

26    orchestrated by Marc Toberoff in his capacity as a businessman and movie producer

27    that violate DC Comics' rights under the Copyright Act. *Id.* ¶¶ 165-73.  DC

28    Comics' fourth through sixth claims, which arise under state law, challenge

32

1    Toberoff's scheme improperly to secure for himself a controlling financial stake in

2    the putative Superman rights held by the Siegel and Shuster heirs by interfering with

3    DC Comics' contractual relationships and other rights. *Id.* ¶¶ 174-89. DC Comics

4    filed an amended complaint on September 3, which named Shuster heir Jean Peavy

5    as a defendant and augmented several of its claims for relief.

6         As set forth in DC Comics' pending motion to initiate discovery and take the

7    depositions of Joanne Siegel and Jean Peavy, DC Comics has been trying for

8    months to commence discovery in this case. *See* Case No. 10-3633 ODW (RZx),

9    Docket No. 44-1 at 2-4, 8-17. Defendants have resisted every step of the way. *Id.*

10        Defendants stalled repeatedly before finally agreeing to participate in the

11   required Rule 26(f) conference. *See id.* They insisted that DC Comics send

12   defendants drafts of its discovery of Ms. Peavy and Ms. Siegel, which DC Comics

13   did on July 28. Petrocelli Decl. Ex. 14. On August 17, after DC Comics was finally

14   able to convene the Rule 26 conference, DC Comics served notices of deposition

15   and requests for production on four defendants (Joanne Siegel, Laura Siegel Larson,

16   Jean Peavy, and Mark Warren Peary), *id.* Exs. 15-19, and while there are dozens of

17   other witnesses from whom DC Comics will seek discovery, DC Comics has

18   focused its initial discovery on these four material witnesses—three of whom are

19   elderly and/or are in poor health.

20        Defendants refused to participate in even this limited discovery. When

21   defendants' initial motions to dismiss were set to be heard on October 18, DC

22   Comics offered to defer the court depositions until after the hearing date, to give

23   defendants an opportunity to have their motions considered. Defendants rejected

24   this proposal, just as they resisted DC Comics' attempt to schedule a single hearing

25   before the Magistrate to hear and resolve all objections related to these depositions.

26   Petrocelli Decl. Ex. 20. Defendants have been adamant in rejecting these proposals,

27   making clear they will not engage in any discovery at this juncture unless ordered by

28   the Court. *Id.* Ex. 21.

33

**B.    Defendants' SLAPP And Rule 12 Motions Are Irrelevant To DC Comics' Requested Discovery, Which Is Directed To Its Federal Claims And The Resolution Of Disputed Factual Issues.**

All of the discovery that DC Comics seeks and to which defendants object is directly relevant to its federal claims—in particular, its first and third claims for relief. Defendants' initial and anticipated motion to strike under California's SLAPP statute has no impact on DC Comics' right to pursue this discovery, since the Ninth Circuit has established, "the anti-SLAPP statute does not apply to federal law causes of action." *Hilton v. Hallmark Cards*, 580 F.3d 874, 881 (9th Cir. 2009).

While defendants contend that "the depositions [to which they object] should be postponed until the anti-SLAPP motion has been decided," *supra* at 18, they fail to cite a single case suggesting—much less holding—that a pending SLAPP motion can justify staying discovery related to a federal claim. Defendants do not cite such a case, and no such case exists. Staying discovery related to a *federal claim* on the basis of a state statute "would frustrate substantive federal rights," violating the Supremacy Clause. *Sonoma Foods, Inc. v. Sonoma Cheese Factory, LLC*, 634 F. Supp. 2d 1009, 1016 (N.D. Cal. 2007); U.S. CONST. art. § VI, cl. 2.

Nor can defendants' Rule 12 motions be used to impede DC Comics' right to discovery on its federal claims. While defendants assert that discovery should be postponed because its motions to dismiss "can and should dispose of all of DC's claims as a matter of law," *supra* at 14, it is well established that a discovery stay is not warranted simply because defendants believe they are "likely to prevail on motions to dismiss," *Gray v. First Winthrop Corp.*, 133 F.R.D. 39, 39-40 (N.D. Cal. 1990); *Skellerup Indus. Ltd. v. City of L.A.*, 163 F.R.D. 598, 600 (C.D. Cal. 1995). If the rule were otherwise, "it would undercut the Federal Rules' liberal discovery provisions" and stand "directly at odds with the need for expeditious resolution of litigation." *Gray*, 133 F.R.D. at 39-40.

To avoid this rule, defendants ask the Court to "take a preliminary peek at the

1    merits of the allegedly dispositive motion to see if on its face there appears to be an

2    immediate and clear possibility that it will be granted." *Supra* at 15. As an initial

3    matter, asking the Court "to make a preliminary finding of the likelihood of success

4    on the motion[s] to dismiss" is inappropriate and "would circumvent the procedures

5    for resolution of such a motion." *Gray*, 133 F.R.D. at 40; *Turner Broad. Sys. v.*

6    *Tracinda Corp.*, 175 F.R.D. 554, 556 (D. Nev. 1997); *Long v. Hewlett-Packard,*

7    *Co.*, 2006 WL 3751447, at *2 (N.D. Cal. 2006) ("it is not for [the magistrate] to rule

8    upon or predict the success of HP's motion to dismiss"). Moreover, as shown

9    below, even were the Court to consider defendants' motions, it is clear they are

10   without merit—among other defects, they misstate the law and impermissibly seek

11   resolution of factual questions. In no event do these motions bar discovery.[9]

12

13

14   ───────────────

15   [9] The decision in *GTE Wireless, Inc. v. Qualcomm, Inc.*, 192 F.R.D. 284 (S.D. Cal. 2000), on which defendants centrally rely, *see supra* at 15, does not authorize

16   the Court to stay discovery on the basis of defendants' motions. *GTE* involved a request for *partial stay of discovery* on the *limited issue of damages* pending

17   resolution of defendant's motion for *summary judgment. See id.* at 285. By the time defendant's motion to stay had been filed, the parties had engaged in extensive fact

18   discovery, and the Court reasoned there were "more than enough issues outside of damages such as liability and claim construction that [could] be pursued during a

19   [partial] stay." *Id.* at 289. Here, of course, defendants seek to put the entire case on hold from the outset, and indefinitely.

20       Defendants' assertion that "cases … concluding that it is appropriate for

21   discovery to wait until dispositive motions have been adjudicated are legion," *supra* at 15 n.3, is equally of no help to them; nor are the three cases they cite on this

22   point. *Cf. Hall v. Tilton*, 2010 U.S. Dist. LEXIS 11162, at *4 (N.D. Cal. Feb. 8, 2010) (discovery stay issued where "none of plaintiff's discovery requests [were]

23   relevant to the issue raised in the pending motion to dismiss"); *Curtis v. Benda*, 2009 U.S. Dist. LEXIS 86504, at *4-5 (W.D. Wash. Sept. 4, 2009) (discovery stay

24   issued where defendants asserted qualified immunity, which "is meant to protect public officials from the broad-ranging discovery that can be peculiarly disruptive of

25   effective government"); *Hanni v. Am. Airlines, Inc.*, 2009 U.S. Dist. LEXIS 49338

26   (N.D. Cal. May 27, 2009) (stay of discovery pending resolution of summary judgment and class certification where discovery regarding class certification had

27   closed and plaintiffs had access for "some time" to the discovery they sought).

28

35
───────────────

1       *1.     DC Comics' First Claim for Relief:  Challenging the Shusters'*

2                        *Notices of Termination*

3           DC Comics' first claim challenges the validity of the Shusters' copyright

4 termination notices on at least five grounds.  Many of these grounds are fact-bound

5 and turn on the interpretation, intent, and extrinsic evidence related to agreements to

6 which the Shusters are parties.  These claims may not be decided at the pleading

7 stage, they require discovery to commence immediately, and defendants' Rule 12

8 motions are no justification for an order precluding discovery.

9           a. <u>The 1992 Shuster Agreement.</u>  A central component of DC Comics' first

10 claim is a 1992 agreement between DC Comics, Jean Peavy, and Frank Shuster, in

11 which Peavy and Shuster revoked and re-granted to DC Comics all of Joseph

12 Shuster's purported Superman rights.  This 1992 agreement, which does not contain

13 an integration clause—but was confirmed by Frank Shuster and Jean Peavy in

14 contemporaneous and subsequent writings—had the legal effect of vitiating any and

15 all termination rights the Shusters now seek to pursue.  *See* Am. Compl. ¶¶ 51-57.

16 The dispositive legal effect of these writings is discussed in *Penguin Group (USA)*

17 *Inc. v. Steinbeck*, 537 F.3d 193, 200-02 (2d Cir. 2008), and *Milne v. Stephen*

18 *Slesinger, Inc.*, 430 F.3d 1036, 1042-45 (9th Cir. 2005), in which the Ninth Circuit

19 and Second Circuit, respectively, held that an heir of the author of Winnie the Pooh,

20 and heirs of John Steinbeck, relinquished such rights.

21          As noted at the outset, Toberoff and the Shusters conceded in the *Siegel* cases

22 that this 1992 "letter agreement has *absolutely nothing to do with the Siegel*

23 *Litigations*" and that "*Shuster's joint copyright interest in Superman [wa]s not at*

24 *issue in the Siegel Litigations.*"  Petrocelli Decl. Ex. 10 at 84, 91 (emphasis added).

25 Despite these clear admissions about the limited scope of the *Siegel* cases,

26 defendants now take the opposite position in contending that this new action is a

27 collateral attack on the *Siegel* cases as to which no discovery should be allowed until

28 defendants' pleading motions are resolved.  *Supra* at 2, 14-18.

36

1    Such a stay of discovery is wholly unwarranted.  Of the Shuster witnesses DC

2    Comics seeks immediately to depose, Mark Peary was asked *nothing* about the 1992

3    agreement at his abbreviated (2 hour, 48 minute) third-party deposition in the *Siegel*

4    cases.  And during her 67-minute deposition—which focused mainly on the origins

5    of Superman—Ms. Peavy was asked only a few minutes of questions about the 1992

6    agreement, Petrocelli Decl. Ex. 12 at 108 (23:11-24:2), 108-109 (25:21-28:14), and

7    only *one* question about its impact on the Shusters' putative termination rights, *id.* at

8    109 (28:1-9).

9    Neither of these depositions delved into such issues as the contemporaneous

10    letters written by the family or their negotiations with DC Comics.  For good

11    reason—the *Siegel* cases included *no* Shuster-related claims for relief.  These

12    limited third-party depositions in the *Siegel* cases do not remotely suffice to provide

13    the discovery relevant to this case.  If the Shuster heirs intend to pursue claims to

14    own "half" the Superman franchise, they must be compelled to participate in the

15    discovery process like any other litigant.

16    By delaying discovery indefinitely, defendants also hope to avoid

17    impeachment of their key witnesses.  Ms. Peavy, for example, wrote letters that

18    plainly refute positions defendants are now taking, including a 1999 letter in which

19    she confirmed the 1992 agreement vitiated the termination claim she now pursues:

20    "I have learned from the Internet that Joanne Siegel has filed a copyright claim for

21    SUPERMAN [*i.e.*, the Siegel Termination Notice].  I want you to know that I intend

22    to honor our [1992] pension agreement."  Petrocelli Decl. Ex. 5.  Her letters also

23    refute defendants' false, sensationalized claims that DC Comics somehow

24    mistreated Jerry Siegel, Joe Shuster, and their heirs—*e.g.*, "It's unbelievable to me

25    that Joe could have so little considering the generosity shown"; "we appreciate your

26    thoughtfulness."  *Id.* Exs. 2 at 8, 4 at 12.  It comes as no surprise, therefore, that

27    defendants make the wholly unsupportable argument that depositions are

28    unnecessary because interrogatories will suffice.  *Supra* at 19-20.  DC Comics is

1  entitled to live answers to live questions at a live deposition, in addition to answers

2  to interrogatories it may propound.

3      And while one of defendants' Rule 12 motions challenged the legal effect of

4  the 1992 agreement, defendants' arguments largely rested on heavily disputed issues

5  of fact.  For example, defendants asserted that the 1992 agreement was not intended

6  to rescind and re-grant Joseph Shuster's copyright interests to DC Comics.  Case

7  No. 10-3633, Docket No. 31 at 17:15-18:11.  Not only is this contention contrary to

8  the evidence, Am. Compl. ¶¶ 52-57; Petrocelli Decl. Exs. 2-5, it disregards the rule

9  that *all* of the factual claims pleaded in DC Comics' complaint must be accepted as

10  true in resolving a motion to dismiss.  *See Wyler-Summit P'ship v. Turner Broad.*

11  *Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998).

12      When Rule 12 motions implicate such factual questions, staying discovery

13  pending resolution of such motions is particularly unwarranted.  *See Mattel, Inc. v.*

14  *MGA Entm't, Inc.*, 2010 WL 2853761, at *6 (9th Cir. July 22, 2010) (disputed issues

15  of contractual intent should be "submitted to the jury"); *HRPT Props. Trust v.*

16  *Lingle*, 676 F. Supp. 2d 1036, 1044 (D. Haw. 2009) (where "there is some doubt as

17  to the intent of the parties [to a contract], that intent is a question of fact" and

18  precludes dismissal); *Cook v. Ensign Yachts, Inc. v. Arrigoni*, 2010 WL 918107, at

19  *10 (D. Conn. Mar. 11, 2010) (dismissal "premature" because "the question of

20  contractual intent presents a question of fact for the ultimate fact finder").  For this

21  reason alone, defendants cannot carry their "heavy burden of making a 'strong

22  showing' why discovery should be denied," or why this is the extraordinary case in

23  which all of the Federal Rules governing discovery should be suspended while

24  defendants litigate their Rule 12 motions.  *Skellerup*, 163 F.R.D. at 600.

25      Indeed, the very cases on which defendants relied in their Rule 12 motions

26  show that their arguments about the 1992 agreement cannot be resolved at the

27  pleading stage.  The courts in the cases addressing such contracts *waited until*

28  *discovery was completed and summary judgment briefing occurred* to resolve

38

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS

EXHIBIT C    Page 95

Case 2:10-cv-03633-ODW-RZ    Document 69-1    Filed 09/15/10    Page 101 of 191    Page
ID #:5178
Case 2:10-cv-03633-ODW-RZ    Document 61    Filed 09/13/10    Page 44 of 67    Page ID #:3755

1    whether the agreements at issue had the legal effect of relinquishing the party's

2    copyright termination rights. *See Steinbeck v. McIntosh & Otis, Inc.*, 433 F. Supp.

3    2d 395, 404 (S.D.N.Y. 2006); *Classic Media, Inc. v. Mewborn*, 2006 WL 3333715,

4    at *3-4 (C.D. Cal. Feb. 9, 2006); *Marvel Characters, Inc. v. Simon*, 2002 U.S. Dist.

5    LEXIS 3260, at *2 (S.D.N.Y. Feb. 27, 2002); *see also Milne v. Stephen Slesinger,*

6    *Inc.*, 2003 WL 21076983, at *6 (C.D. Cal. May 8, 2003) (over 12 years of discovery

7    in related cases). Defendants have no explanation why this case—which similarly

8    turns on contested questions of contractual intent—should be the lone exception to

9    the rule.

10            b. The Pacific Pictures Joint Venture Agreements. DC Comics also

11    challenges the Shusters' termination notice on the ground that the heirs lacked the

12    statutory majority to serve it and violated the Copyright Office's rules in doing so.

13    *See* Am. Compl. ¶¶ 6, 118-24. At the time the Shusters served the notice, one of

14    Toberoff's alter-ego companies, Pacific Pictures, owned 50% of the Shusters'

15    putative copyright interests. Since Pacific Pictures did not join in the termination

16    notice, the notice was invalid. *See id.*

17            Pacific Pictures' 50% interest was received as part of joint-venture

18    agreements that Toberoff and the Shusters signed in 2001 and 2003. Although

19    defendants now assert these rights transfers were rescinded by a later agreement

20    cancelling the joint venture, *cf. supra* at 31, their argument yet again turns on

21    heavily disputed fact-bound questions they do not address or disclose. The joint-

22    venture agreement between Pacific Pictures and the Shusters specifically provide

23    that if the joint venture is *terminated*—as defendants now say is the case—the 50%

24    putative copyright interest the Shusters granted to the joint venture is distributed *not*

25    to them, but to Toberoff's alter ego company, Pacific Pictures (or PPC):

26            *[I]n the event of termination of the Venture for any reason*, all Rights,
        property or assets of the Venture will be held fifty percent (50%) by the
27        [Shusters] and fifty percent (50%) by PPC as tenants in common, and
        [Shusters] and PPC will each be entitled to receive and continue to
28

39

1    receive fifty percent (50%) of all Proceeds derived from the Rights
2    after termination of the Venture.

Petrocelli Decl. Ex. 6 at 16; Ex. 7 at 19.

3          These issues are raised directly by DC Comics' complaint, *see* Am. Compl.
4  ¶¶ 118-24, and will be the subject of probing discovery—which did not occur on
5  these issues in the *Siegel* cases.  Jean Peavy was never examined about these issues,
6  including the Pacific Pictures agreements, which she signed herself.  Her son, Mark
7  Peary, was asked some tangentially related questions at his deposition, but the issue
8  was not the focus of the case and not explored in any detail.  Petrocelli Decl. Ex. 11
9  at 97-100 (24:6-37:18), 101-102 (40:9-42:23).  DC Comics has every right to
10 examine these and other witnesses on these agreements and issues that underlie DC
11 Comics' first and third claims as well as other claims in its amended complaint.

12         c.  <u>The Manipulation of the Superboy Rights.</u>  Another pivotal element of DC
13 Comics' first claim is Toberoff's scheme to induce the Siegel and Shuster heirs to
14 fraudulently assert that Jerry Siegel, to the exclusion of Joe Shuster, was the sole
15 creator of the character Superboy in order to park all the rights in the hands of the
16 Siegels.  *See* Am. Compl. ¶¶ 129-33.  DC Comics seeks discovery from Ms. Siegel,
17 Ms. Larson, Ms. Peavy, and Mr. Peary, among others, regarding key factual issues
18 underpinning this claim, including:

19    • Why the 2001 agreement between the Shuster heirs and defendant Pacific
20       Pictures Corporation identifies "Superboy" as among the Shusters'
21       purported rights, but the 2003 agreement between the same parties—
22       entered into after Toberoff induced the Siegel heirs to serve a termination
23       notice purporting to recapture all rights in Superboy—deleted all
24       references to Superboy, *see id.* ¶¶ 9-10, 61, 86-91, 131-33, 147-50;
25    • Why, after 50 years of taking the position that Superboy was jointly
26       created by Siegel and Shuster, the Shuster heirs suddenly disclaimed any
27       interest in Superboy in their copyright termination notice, *see id.*;
28

40

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS
EXHIBIT C      Page 97

- Why a termination notice served by the Siegel heirs in 1997 expressly identified Superboy works and elements as among the "character[s], story element[s], or indicia reasonably associated with SUPERMAN," but a second notice served in 2002—after Toberoff's intervention—asserted that Superboy was a separate work, *see id.* ¶¶ 9-10, 67, 86-91; and

- Whether there are any oral or written agreements between and among the defendants regarding the division of proceeds from the purported Superboy rights and the Superboy lawsuit the Siegels filed.

These subjects were either not addressed or were covered only superficially in the *Siegel* cases, and relevant evidence has surfaced since discovery closed in that case, including the Toberoff Timeline, which describes Toberoff's wrongful conduct in pursuing the Siegel and Shuster heirs' putative rights. For example:

- Joanne Siegel's examination focused solely on whether Superboy was a separately copyrightable character than Superman. *See* Petrocelli Decl. Ex. 9 at 54:6-68:3. It did not address defendants' back-room dealings to park the Superboy rights with the Siegels.

- Laura Siegel Larson's examination was similarly limited to the copyrightability of Superboy, independent of Superman. *See* Petrocelli Decl. Ex. 8 at 36:7-46:9. During this limited, 10-page exchange, Mr. Toberoff, acting as her counsel, raised 17 objections and impeded the examination, and at no point was there examination about the dealings between the Siegels and Shusters with respect to Superboy. *Id.*

- Jean Peavy was asked a single question regarding Superboy, *see* Petrocelli Decl. Ex. 12 at 107 (15:16-20), and there was no discussion why Superboy was referenced as part of the Shusters' bundle of rights in the 2001 PPC Agreement, but omitted in the 2003 PPC Agreement.

- While Mark Peary commented that his own research indicated the Shuster heirs may not have any interest in Superboy, *see* Petrocelli Decl. Ex. 11 at

41

1    98 (27:22-28:5), since such matters were not at issue, there was no

2    examination on why Superboy was listed in the 2001 PPC Agreement or

3    why Joe Shuster claimed an interest to Superboy in copyright filings,

4    among many other issues relevant to this action.

5        Defendants seek to avoid these Superboy issues, raising *factual* arguments in

6 their Rule 12 motions why, under their view, the claims have no merit. Defendants

7 assert that a state-court referee in the 1940s definitively concluded that Siegel

8 created and owned Superboy to the exclusion of DC Comics. *See* Case No. DC 10-

9 3633, Docket No. 33 at 18:4-19. Judge Larson *rejected* that legal argument,

10 however, in the *Siegel* cases, *see* Case No. CV 04-8776 ODW (RZx), Docket No.

11 151, and Joe Shuster's and Jerry Siegel's conduct in the decades subsequent to this

12 ruling exposes the factual fallacy (and disputed issues) underlying defendants' Rule

13 12 motion. To take just two examples:

14    ● In 1972 and 1973, Siegel *and Shuster together* filed copyright notices with

15       the copyright office for Superboy, in which they identified Superboy as a

16       work that they had *jointly* created. Petrocelli Decl. Ex. 1 at 5-6.

17    ● And in 2001, Toberoff, Pacific Pictures, and the Shuster heirs entered into

18       a joint-venture agreement specifying that the *Shuster heirs* owned an

19       interest in "Superboy." Petrocelli Decl. Ex. 6 at 14.

20        2.    *DC Comics' Third Claim for Relief:  Challenging the Shusters'*

21              *Notices of Termination*

22        DC Comics' third claim for relief challenges an illicit web of agreements

23 orchestrated by Toberoff and his alter-ego entities to frustrate and impede DC

24 Comics' rights under the Copyright Act. *See* Am. Compl. ¶¶ 165-73. Section

25 304(c)(6)(D) of the Act and Ninth Circuit law establish that during the 10-year

26 notice period of the Shusters' copyright termination notices—which runs from 2003

27 to 2013—the Shuster heirs were forbidden from entering into agreements regarding

28 their putative copyright interests with any party other than DC Comics. *See Milne*,

42

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS
EXHIBIT C      Page 99

1   430 F.3d at 1047.  This statutory prohibition against the "trafficking in future

2   [copyright] interests" by parties like Toberoff was meant to protect original grantees

3   to such copyright interests—such as DC Comics, which spent 70 years and millions

4   of dollars nurturing, developing, and promoting Superman.  *Id.*  The statutory right

5   was described in the legislative history of the statute, and by the Ninth Circuit in

6   *Milne*, as creating a substantive "right" running in DC Comics' favor, which

7   protected the "original grantee['s] opportunity to negotiate a further transfer" from

8   the terminating party during this period of exclusive negotiations.  *Id.*  In connection

9   with this third claim, DC Comics seeks discovery from Ms. Siegel, Ms. Larson, Ms.

10  Peavy, and Mr. Peary, who were all parties to agreements that violate DC Comics'

11  statutory right.

12       Defendants moved to dismiss this claim citing a 1987 decision from the

13  Southern District of New York, which is neither binding on this Court (unlike

14  *Milne*), nor does it bar DC Comics' claim.  *Supra* at 59.  While *Bourne Co. v. MPL*

15  *Commc'ns, Inc.*, 675 F. Supp. 859, 865 (S.D.N.Y. 1987), did not hold that section

16  304(c)(6)(D) creates a "statutory right of refusal" in grantees like DC Comics, the

17  case recognized this provision "does give the terminated grantee a preferred

18  competitive position," and left open that parties like DC Comics could bring

19  declaratory relief claims seeking to enforce that right.  To the extent *Bourne* can be

20  read as inconsistent with *Milne*, which it should not be, *Milne* controls.  Defendants'

21  citation to the Nimmer treatise, *supra* at 59, fails for the same reason.  *Milne*, not

22  Nimmer, is the law in the Ninth Circuit.  Also, Nimmer served as counsel for the

23  unsuccessful party in *Milne*, and the court rejected his arguments (made in his

24  treatise and brief) about the scope of the statute.  430 F.3d at 1047-48.

25       In any event, resolution of DC Comics' third claim for relief will require

26  factual development and consideration of fact-bound issues, including:

27       • The purpose and effect of joint-venture agreements between the Shuster

28         heirs and Pacific Pictures preventing the Shuster heirs from entering into

43

1    any agreement regarding their purported rights "without the express

2    written consent" of Pacific Pictures, an entity controlled by Toberoff;

3    • The effect of provisions in these contracts providing "in the event of

4    termination of the Venture for any reason, all Rights, property or assets of

5    the Venture will be held fifty percent (50%) … by PPC"; and

6    • The existence of other agreements between and among the defendants that

7    impede the Shuster heirs' ability to settle their claims against DC Comics.

8  In connection with each of these claims, there are numerous areas of discovery,

9  including Toberoff's misconduct recounted in the Toberoff Timeline.  No prior

10  deposition addressed the Timeline, nor could it have:  the Siegels were deposed in

11  August 2006 and the Shusters were deposed in November 2006—over two years

12  before the Timeline was ordered produced.  Petrocelli Decl. Exs. 8-9, 11-13.  Also

13  necessary to explore are the illicit agreements Toberoff engineered with the

14  Siegels—many of which have still yet to be disclosed and that were not the subject

15  of discovery in the *Siegel* cases.

16    • Joanne Siegel, for example, was not questioned concerning the October

17    2002 IP Worldwide agreement she signed with Toberoff's alter-ego

18    company.  Her entire testimony concerning the beginning of her

19    relationship with Toberoff—which is a central issue in this case—

20    consisted of three lines.  Petrocelli Decl. Ex. 9 at 52:1-3.

21    • Laura Siegel Larson testified she "enter[ed] into an agreement with IP

22    Worldwide for [talent agent Ari] Emanuel to represent [the Siegels] in

23    negotiations for our rights," Petrocelli Decl. Ex. 8 at 24:3-5, but she was

24    not questioned about how that agreement affected her ability to enter into

25    agreements with DC Comics absent the improper approvals required by

26    Toberoff and IP Worldwide, *see id.* at 24:3-33:12.

27    • Jean Peavy's questioning about her 2001 and 2003 agreements with PPC

28    encompassed one page of testimony, and she did not discuss her inability

44

1  to reach agreement with DC Comics without the consent of Toberoff or

2  other defendants.  Petrocelli Decl. Ex. 12 at 111 (34:3-24).

3  • Mark Peary similarly was not examined about the specific clauses in the

4  PPC Agreements that required Toberoff's consent to any settlement

5  agreement—in direct violation of the statutory right recognized by the

6  Ninth Circuit in *Milne*.  Petrocelli Decl. Ex. 11 at 97-100 (24:6-37:18).

7  • Nor have defendants produced the retainer agreements between Toberoff

8  and the Siegels and Shusters.  *Id.* at 103 (60:7-10).  DC Comics is entitled

9  to these agreements in discovery, *e.g.*, *In re Grand Jury Proceedings*, 33

10  F.3d 1060, 1063-64 (9th Cir. 1994) ("Information regarding the fee

11  arrangement is ordinarily not part of the subject matter of the professional

12  consulting and therefore is not privileged communication."); *Montgomery*

13  *County v. MicroVote Corp.*, 175 F.3d 296, 304 (3d Cir. 1999) ("The

14  attorney-client privilege does not shield fee arrangements."), and has

15  sought them in its document requests, *e.g.*, Petrocelli Decl. Ex. 16 at 145.

16  These are just examples of key areas of discovery in this case—and there are

17  many more.  But again, it is not DC Comics' burden to show an entitlement to

18  discovery.  That burden is defendants', and it is a "heavy one."  Defendants must

19  make a "strong showing" that their Rule 12 motions present no factual issues.  *See*

20  *Skellerup*, 163 F.R.D. at 600; *see also Blankenship v. Hearst Corp.*, 519 F.2d 418,

21  429 (9th Cir. 1975); *In re Valence Tech. Sec. Litig.*, 1994 WL 758688, at *2-3 (N.D.

22  Cal. Nov. 18, 1994).  They do not and cannot make any such showing.

23  In wrongly contending that DC Comics must demonstrate "good cause"

24  before it can take its noticed depositions, *supra* at 26 n.8, defendants cite to a

25  standard that applies to multiple depositions *within the same case*—not to

26  depositions in a new case.  *Cf. Graebner v. James River Corp.*, 130 F.R.D. 440, 441

27  (N.D. Cal. 1989) (second deposition allowed in same case where "long passage of

28  time" between depositions, "new evidence" emerged, and "new theories added to

45

1  the complaint"); *Blackwell v. City & County of San Francisco*, 2010 WL 2608330,

2  at *1 (N.D. Cal. June 25, 2010) (same); *Harris v. New Jersey*, 259 F.R.D. 89, 94-95

3  (D.N.J. 2007) (same).

4       Even assuming this inapposite standard applied—and it does not—DC

5  Comics is fully entitled to the discovery it seeks.  Numerous issues in this case were

6  neither present in the *Siegel* cases or the subject of discovery, including the validity

7  of Shusters' purported termination and the contracts that render it void, the illegal

8  parking of Superboy rights with the Siegels, and Toberoff's schemes to interfere

9  with DC Comics' relationships as evidenced including by the Toberoff Timeline.

10  *Cf. Kraemer v. Unocal Termination Allowance Plan*, 2009 WL 936611, at *2 (C.D.

11  Cal. Apr. 6, 2009) (ordering depositions in subsequent case when new issues arose

12  after the prior depositions).  Despite their efforts to distinguish cases like *Kraemer*

13  and to dispute DC Comics' other cases, *cf. supra* at 25-26; Docket No. 45 at 35-37

14  & n.11, defendants cite no authority—none—where depositions in a second case

15  were barred after the deponents themselves admitted the issues in the two cases

16  were different, *as the Shusters and Toberoff did here in 2006*.  Petrocelli Decl. Ex.

17  10 at 84, 91.  It is defendants' burden to show the discovery DC Comics seeks is

18  duplicative of that taken in the *Siegel* cases—and they must show this discovery is

19  "unreasonably" "cumulative and duplicative."  6 DANIEL R. COQUILLETTE ET AL.,

20  MOORE'S FED. PRAC. § 26.60[2], at 26-431 (3d ed. 2007).  Defendants' "[b]road

21  allegations of harm" and "unsubstantiated," non-"specific" lists of areas of supposed

22  overlap, *cf. supra* at 26-30, "do not satisfy the Rule 26(c) test."  *Beckman Indus.,*

23  *Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992).

24      **C.**    **Defendants' Remaining Arguments for Barring Discovery Are**

25              **Equally Baseless and Misguided.**

26         *1.*   *DC Comics Proposed Reasonable Ways To Account For The*

27             *Advanced Age and Medical Condition of Witnesses.*

28      DC Comics does not dispute that Ms. Siegel, Ms. Larson, and Ms. Peavy are

46

Case 2:10-cv-03633-ODW-RZ    Document 69-1    Filed 09/15/10    Page 109 of 191    Page
ID #:5186
Case 2:10-cv-03633-ODW-RZ    Document 61    Filed 09/13/10    Page 52 of 67    Page ID #:3763

1   of advanced age and/or suffer from physical infirmities; indeed, that is why their

2   testimony must be taken and preserved now.  Aged and infirm witnesses are

3   frequently required to give depositions early in a case for precisely this reason, as

4   DC Comics has endeavored to do since early June.  *E.g.*, *Marvel Worldwide, Inc. v.*

5   *Kirby*, 10 Civ. 141 (CM) (KNF), Docket No. 28 (S.D.N.Y. Apr. 19, 2010) (ordering

6   immediate deposition of material witness in case involving termination of copyright

7   grants in comic-book characters); *Alaska Pulp Corp. v. U.S.*, 41 Fed. Cl. 611, 613

8   (1998) (court ordered deposition to preserve testimony of deponent with health

9   concerns).  In addition to being material witnesses, the Shusters and Siegels are

10   laying claim to millions and millions of dollars.  They have an obligation to submit

11   to full discovery.

12         Defendants' contention that the Court cannot compel the deposition of

13   Ms. Peavy because she is a "non-party resident of the District of New Mexico,"

14   *supra* at 2 n.1—an argument they never raised in the meet-and-confer process—is

15   wrong and now moot.  DC Comics' amended complaint names her as a defendant.

16         Defendants assert that even if the Court grants DC Comics' pending

17   discovery motion, they will object to DC Comics' document requests and lines of

18   examination.  Because defendants wish to address these objections in seriatim and in

19   advance of any questions, they seek to put off the depositions indefinitely.  *See*

20   Petrocelli Decl. ¶¶ 21-23.  Defendants' strategy is no grounds to further delay

21   discovery.  DC Comics has proposed briefly deferring the depositions until a single

22   hearing on all objections and issues, including defendants' refusal to produce

23   documents, can occur on October 25.  *Id.* ¶ 22; Exs. 20, 23.  That way, the Court

24   will have before it all at once all issues related to the depositions.  Even though this

25   proposal fully addresses their professed concerns, defendants refused it.  *Id.* Ex. 21.

26         2.    *There Is Nothing "Short" or "Non-Prejudicial" About The*

27               *Indefinite Discovery Delay Defendants Seek.*

28   Defendants claim their motion only requires postponing the scheduled

1    depositions by "a few weeks" and would "not prejudice" DC Comics. *Supra* at 23.

2    Defendants are wrong—their position would require an indefinite moratorium on

3    discovery to DC Comics' severe prejudice.  Under defendants' view, no discovery

4    may commence until Judge Wright rules on the four-plus motions they plan to file

5    challenging DC Comics' complaint.  Defendants' initial motions spanned some 100

6    pages, included over 1,000 pages of exhibits, and presented not only complicated

7    (and tortured) legal arguments, but repeated challenges to the "evidence" supporting

8    DC Comics' claims.  Case No. CV 10-3633, Docket No. 30 at 22:10, 23:11 ("The

9    Fifth Claim Fails Because There Is No Evidence"; "DC cannot meet its evidentiary

10   burden").

11        In response to DC Comics' amended complaint, defendants say they

12   "contemplate filing very similar motions with respect to the amended Complaint."

13   *Supra* at 14.  Like any federal judge, Judge Wright has an extremely busy calendar

14   and this is only one of hundreds of cases on his docket.  There is no assurance that

15   Judge Wright will be able to hear—much less resolve—four oversized motions in

16   the next month, or even before the end of the calendar year.[10]

17           3.    *The Rule 54(b) Motion Filed In The* Siegel *Case Has No Bearing*

18               *On Discovery Here.*

19        Defendants' Rule 54(b) motion in the *Siegel* case is another red herring.  The

20   motion lacks merit, *see* Case No. CV-04-8400, Docket No. 624, and the issues the

21   Siegels hope to appeal there have no "preclusive effect" on the claims or discovery

22

_____

23      [10] *Cf.* Thomas E. Willging, et al., *An Empirical Analysis of Rule 23 To Address*

24   *the Rulemaking Challenges*, 71 N.Y.U. L. REV. 74, 111 (1996) ("Looking at the time
     from the filing of the first motion to dismiss to the first ruling on dismissal, the

25   median time for rulings on motions to dismiss ranged from 2.6 months to 7.4
     months"); Rebecca L. Kourlis, et al., INST. FOR THE ADVANCEMENT OF THE AM.

26   LEGAL SYS., UNIV. OF DENVER, CIVIL CASE PROCESSING IN THE FED. DIST. COURT:
     A 21ST CENTURY ANALYSIS at 48 (2009), http://www.du.edu/legalinstitute/

27   publications2009.html (average time from filing to ruling on Rule 12 motions,
     among courts in study, was 129.78 days).

28

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS
EXHIBIT C    Page 105

1  in this case, *cf. supra* at 3, 18.  Defendants' "preclusion" and related efficiency

2  arguments hinge on the erroneous assertion that the copyright-termination issues in

3  the *Siegel* case are the "mirror image" of the issues here.  *Supra* at 18, 58.  To have

4  any preclusive effect, the *Siegel* adjudications would need to be final judgments and

5  the issues in the two cases would need to be "identical."  *Hydranautics v. FilmTec*

6  *Corp.*, 204 F.3d 880, 885 (9th Cir. 2000).  There is no final judgment in the *Siegel*

7  cases.  And as Toberoff and the Shusters openly admitted: "The Shuster

8  Termination … is wholly separate and apart from the Siegel Terminations at issue in

9  the Siegel Litigations," and that "the Siegel Litigations do <u>not</u> concern Shuster's

10  copyright interests in *Superman* and/or *Superboy* (if any); the litigations concern

11  *only* Jerry Siegel's copyright interests in *Superman* and/or *Superboy*."  Petrocelli

12  Decl. Ex. 10 at 75, 84 (emphasis in original).  Judge Larson confirmed the Siegels

13  and Shusters were asserting different claims, when he noted: "It is by no means a

14  foregone conclusion that the Shuster estate will be successful in terminating the

15  grant to the Superman material published in *Action Comics No. 1*."  Case No. CV

16  04-8400, Docket No. 554 at 23.

17        *4.     Defendants' Arguments About Their Contemplated Anti-SLAPP*

18              *Motion Are Both Irrelevant And Misstate The Law.*

19        Not only is defendants' anticipated SLAPP motion irrelevant to DC Comics'

20  requested discovery—which relates equally to DC Comics' federal claims, *supra*

21  Section VI.B—the Ninth Circuit has established that a SLAPP motion may not be

22  decided in a federal case before the opposing party has had an "opportunity to

23  discover information that is essential to its opposition."  *Metabolife Int'l, Inc. v.*

24  *Wornick*, 264 F.3d 832, 846 (9th Cir. 2001).  DC Comics intends to oppose any new

25  SLAPP motion filed by defendants, including moving to stay any resolution of it

26  until DC Comics has had adequate time to take discovery in support of its state-law

27  claims.  Defendants' initial SLAPP motion challenged the factual sufficiency of DC

28  Comics' claims.  *E.g.*, CV 10-3633, Docket No. 30 at 22:10-23:13.  "[I]f a party

49

1    brings an anti-SLAPP motion challenging the sufficiency of the nonmoving party's

2    evidence, *the court must allow the nonmoving party to conduct discovery*

3    *sufficiently to permit summary judgment under Rule 56.*" *Moser v. Triarc Cos.*,

4    2007 WL 3026425, at *3 (S.D. Cal. Oct. 16, 2007) (emphasis added).[11]

5        As fall-back arguments, defendants assert a litany of other objections to avoid

6    this clear rule entitling DC Comics to discovery.  None has merit:

7        a.  Defendants complain that DC Comics has not shown why it is entitled to

8    discovery on its state-law claims.  *Cf. supra* at 19-23.  DC Comics has no obligation

9    to make this showing now, and it is defendants' clear and "heavy burden" to justify

10   why no discovery can be allowed in this case.  *Supra* Section VI.B.1.

11   As for defendants' SLAPP motion, Judge Wright rightly held it was mooted by DC

---

[11] Defendants baldly assert that the "overwhelming bulk" of their SLAPP motion had "no factual component," *supra* at 19, but all the Court need do is look at the motion to see this is incorrect.  The motion relied extensively on factual arguments and some 30 evidentiary exhibits—all of which raise the factual questions presented below, *all which are disputed*, and all of which are also directly relevant, to DC Comics' non-SLAPPable federal claims.  These issues include:

- The nature of Toberoff's initial involvement with the Shuster heirs;
- When Toberoff began providing legal services to the Shuster heirs;
- When and how Toberoff first contacted the Siegel heirs;
- How and who presented Toberoff's business proposal to the Siegel heirs and when it was revealed to be fraudulent; and
- When the Siegels first formed an attorney-client relationship with Toberoff. *Compare* SLAPP Mot. at 6-10, *with* Am. Compl. ¶¶ 58-91.

Defendants claim DC Comics' fourth claim implicates SLAPP because it relates "to the establishment of an attorney-client relationship." SLAPP Mot. at 18. But the existence of this relationship, when it began, and Toberoff's separate business dealings with the heirs are all disputed issues about which DC Comics is entitled to discovery. *See* Am. Compl. ¶¶ 58-91, 174-79. Similarly, in arguing DC Comics' fifth claim is protected, defendants say it is "clear that Toberoff's communications with the Siegels occurred in connection with settlement negotiations and anticipated litigation." SLAPP Mot. at 18. Again, this is only "clear" if one accepts the repeated false factual assertions made in defendants' motion. *See* Am. Compl. ¶¶ 66-85, 180-86. Challenging DC's sixth claim, defendants assert SLAPP shields the improper "consent agreements" that Toberoff engineered, because each "was expressly entered into with respect to Toberoff's legal services." SLAPP Mot. at 20. Again, this factual claim is disputed. *See* Am. Compl. ¶¶ 58-91, 101, 187-89.

50

1    Comics' amended complaint, *see* Case No. CV 10-3663, Docket No. 52, and if and

2    only when defendants re-file their SLAPP motion will DC Comics have any

3    obligation to identify what discovery it needs.  To erase any question about whether

4    and what discovery will be sought to oppose defendants' motion, here is just one

5    example.  In support of its fifth claim for relief, DC Comics alleges it:

> had a long-established economic relationship with the Siegel Heirs....
> At the time Toberoff approached the Siegel Heirs in 2001, DC Comics
> and the Siegel Heirs had finally reached an agreement resolving their
> claims to the Superman and Superboy rights.
>
> The economic relationship that the Siegel Heirs and DC Comics
> had contemplated and agreed to had the probability of future economic
> benefit to DC Comics.  The Siegel Heirs recognized DC Comics' sole
> and exclusive ownership of all rights in Superman and Superboy,
> allowing it to continue freely developing and exploiting those rights,
> and avoid the possibility of an expensive and protracted lawsuit
> regarding ownership of those rights.
>
> Toberoff was well aware of the agreement between DC Comics
> and the Siegel Heirs.  Toberoff has admitted that he tracked the Siegel
> Heirs' termination efforts through Internet reports....
>
> Toberoff knew his actions were substantially certain to interfere
> with the Siegel Heirs' agreement and ongoing business dealings with
> DC Comics.  *Toberoff intentionally engaged in independently wrongful
> conduct to carry out his interference by, among other things: falsely
> misrepresenting to the Siegel Heirs that he had a billionaire investor
> ready to purchase their Superman rights if they repudiated their
> settlement agreement with DC Comics; falsely representing to the
> Siegels that he would help them produce a competing Superman motion
> picture; and wrongly inducing the Siegels to repudiate their agreement
> and business relationship with DC Comics.*  Toberoff engaged in this
> misconduct in his role as businessman and shareholder of IP
> Worldwide.
>
> As a direct result of Toberoff's misdeeds, the Siegel Heirs
> repudiated the Siegel-DC Comics Agreement with DC Comics and
> ended all further discussions, causing DC Comics to lose the value of
> the agreement, to lose their ongoing business relationship with the
> Siegels, and to incur millions of dollars in subsequent legal fees in
> disputes with the Siegel Heirs.

26    Am. Compl. ¶¶ 182-86 (emphasis added).  All of these factual issues are in dispute,

27    and no discovery has been taken with respect to the Toberoff Timeline revealing

28    how Toberoff misled the Siegels in forming his business relationship with them and

51

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS
EXHIBIT C      Page 108

1    interfering with DC Comics' rights.  *See id.* ¶¶ 102-04.

2         b.  Defendants next assert that Justice Stevens' concurrence in *Shady Grove*

3    *Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431 (2010), upsets the

4    well-settled rule that DC Comics must be given the opportunity to take discovery in

5    aid of its SLAPP opposition, *see Metabolife*, 264 F.3d at 846.  Indeed, defendants go

6    so far as to suggest DC Comics misled the Court by not citing this concurring

7    opinion.  *See* Case No. CV 10-3633, Docket No. 44-1 at 5:22-25, 32:11-22.

8         Defendants are badly mistaken, and the only lack of candor is defendants', for

9    failing to cite *no fewer than five* district court cases handed down since *Shady Grove*

10   that continue to recognize a plaintiff's right to take discovery in opposing a SLAPP

11   motion.  *See, e.g., Nguyen v. County of Clark*, 2010 WL 3211873, at * 3 (W.D.

12   Wash. Aug, 12, 2010) (applying *Metabolife* and granting discovery prior to

13   adjudication of SLAPP motion); *Rebel Commc'ns, LLC v. Virgin Valley Water*

14   *Dist.*, 2010 WL 2773530, *2 (D. Nev. July 12, 2010) (recognizing *Metabolife* and

15   plaintiff's entitlement to discovery necessary to respond to SLAPP motion);

16   *Thornbrough v. Western Placer Unified Sch. Dist.*, 2010 WL 2179917, at *4 (E.D.

17   Cal. May 27, 2010) ("requiring Plaintiff to present evidence to support his claims

18   without the opportunity for discovery would directly conflict with Federal Rule of

19   Civil Procedure 56"); *Chevron Corp. v. Bonifaz*, 2010 WL 1948681, at *3 (N.D.

20   Cal. May 12, 2010) (recognizing and applying *Metabolife*'s refusal to apply the

21   automatic discovery stay in federal court); *Pacquiao v. Mayweather*, 2010 WL

22   1439100, at *1 (D. Nev. April 09, 2010) (same).

23        The reason none of these cases endorses defendants' reading of *Shady Grove*

24   is that defendants' view is erroneous.  At issue in *Shady Grove* was whether a New

25   York statute governing class action certification conflicted with Federal Rule of

26   Civil Procedure 23 and should supplant Rule 23 in the instant case.  *See* 130 S. Ct. at

27   1442, 1444.  The Court, in separate opinions, rejected this argument, concluding the

28   New York statute conflicted with Rule 23, and Rule 23 must apply.  *See id.*

1   In a concurrence joined by no other Justice, Justice Stevens agreed the state-law

2   provision could not apply. *See id.* at 1448-49. In reaching this conclusion, Justice

3   Stevens suggested applying a new version of the *Erie* test, which as Justice Scalia

4   and two other concurring Justices correctly pointed out, conflicted with the Supreme

5   Court's ruling in *Sibbach v. Wilson & Co.*, 312 U.S. 1 (1941), and created an

6   unworkable web in which the Federal Rules would apply differently from state to

7   state. *See* 130 S. Ct. at 1444 (rejecting "impracticability of a test that turns on the

8   idiosyncrasies of state law") (citing *Sibbach*, 312 U.S. at 14).

9        Defendants' characterization of Justice Stevens' opinion as the "controlling

10  concurrence," *supra* at 21, is wrong. Since Justice Stevens' concurrence *upheld*

11  application of a federal rule, his opinion would only ever "control" in determining

12  whether a rule *satisfies* the Rules Enabling Act—the narrowest possible holding in

13  the case. *Marks v. U.S.*, 430 U.S. 188, 193 (1977); *U.S. v. Williams*, 435 F.3d 1148,

14  1157, n.7 (9th Cir. 2006) ("Applying *Marks*' rule, we have often construed one

15  Justice's concurring opinion as representing *a logical subset of the plurality's* and as

16  adopting a holding that would *affect a narrower range of cases*.") (emphasis

17  added). Under *Marks*, Justice Stevens' test does not control when arguing, as

18  defendants do here, that Rule 56's discovery procedures *do not apply* in this case or

19  that cases like *Metabolife* are now bad law. The other concurring Justices expressly

20  rejected Justice Stevens' test for determining when a federal rule *fails* the test, and

21  his lone discussion in dicta is not a "logical subset of the plurality's position" or a

22  holding that affects a "narrow range of cases." *Williams*, 435 F.3d at 1157, n.7.

23       This esoteric debate of defendants' invention is of no moment here, because

24  cases like *Metabolife* would survive even under Justice Stevens' test. Justice

25  Stevens asked whether the federal procedural rule at issue—here, allowing Rule 56-

26  based discovery to oppose a potentially dispositive SLAPP motion—"so displace[s]

27  a state law that is procedural in the ordinary use of the term but is so intertwined

28  with a state right or remedy that it functions to define the scope of the state-created

1   right?" 130 S. Ct. at 1452. Defendants do not attempt to answer this nuanced

2   question, instead making the sweeping claim that "wide-ranging" discovery is

3   prohibited by the SLAPP statute. *Supra* at 21. This misses the mark. Rather, the

4   question is whether discovery of the sort permitted by Rule 56(f), *see* Case No. CV

5   10-3633, Docket No. 44-1 at 11-13, may apply here. The "Justice Stevens" test

6   would permit Rule 56(f) to apply, because the SLAPP statute itself *allows for*

7   *discovery* if there is "good cause," and the statute contains no general prohibition

8   barring discovery in all cases. *Cf.* CAL. CIV. PROC. CODE § 425.16(g). And while

9   the SLAPP standard for "good cause" may be different than the standard for seeking

10   discovery under Rule 56, *cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5

11   (1986), this slight divergence falls well short of violating Justice Stevens' view,

12   which would require that the federal rule "*displace … a state law right or*

13   *remedy.*" 130 S. Ct. at 1452 (emphasis added). Indeed, as Justice Stevens

14   explained in rejecting defendant's claim in *Shady Grove*, "classically procedural

15   calibration[s]"—such as who gets discovery on an issue and when in opposing a

16   motion—do not trammel on substantive state rights. *Id.* at 1459.

17       c. Finally, defendants assert that DC Comics "ignores" relevant, post-

18   *Metabolife* Ninth Circuit jurisprudence—*Batzel v. Smith*, 333 F.3d 1018 (9th Cir.

19   2003)—which they suggest calls *Metabolife* into doubt. *Supra* at 22 n.7. This

20   argument is indefensible. Courts in this circuit have cited *Metabolife* approvingly

21   over 50 times since *Batzel*, including 23 times by the Ninth Circuit alone, and as

22   recently as June 29, 2010, *see Flores v. Emerich & Fike*, 2010 WL 2640625, at *2

23   (9th Cir. 2010) (unpublished). Moreover, the court in *Batzel* was describing the

24   general mechanisms of the SLAPP statute in an introductory section of an opinion,

25   which had *nothing* to do with taking discovery, but whether SLAPP orders were

26   appealable. *See* 333 F.3d at 1024. *Batzel* cited *Metabolife* positively, *see id.*, and

27   never questioned or criticized its rule requiring discovery. For defendants to suggest

28   *Batzel* overruled *Metabolife sub silentio* on this important point of law only exposes

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS
EXHIBIT C    Page 111

1    the extreme lengths they will go to advance frivolous positions to block discovery in

2    this case.[12]

3    **D.**    **Conclusion**

4         For the foregoing reasons, defendants' motion for a protective order should be

5    denied, and DC Comics' discovery motion should be granted.  Case No. 10-3633,

6    Docket No. 44-1.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26        [12] To the extent *Batzel* differs from *Metabolife*—and it does not—Ninth Circuit

27    law is clear on how to resolve such disputes:  the earlier decision, *i.e.*, *Metabolife*, controls.  *See U.S. v. Hardesty*, 977 F.2d 1347, 1347 (9th Cir. 1992) (en banc)

28    ("when two panels reach different conclusions the earlier decision controls").

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS
EXHIBIT C     Page 112

1

2  Dated:  September 13, 2010          TOBEROFF & ASSOCIATES, P.C.

3

4                                By _____
                                         Marc Toberoff
5
                               Attorneys for Defendants Mark Warren Peary, as
6                               personal representative of the Estate of Joseph
                               Shuster, Jean Adele Peavy, Joanne Siegel and
7                               Laura Siegel Larson

8

9  Dated:  September 13, 2010          KENDALL BRILL & KLIEGER LLP

10

11

12                             By: /s/ _____
                                    Richard B. Kendall
13                                  Attorneys for Defendants Marc Toberoff,
                                    Pacific Pictures Corporation, IP
14                                  Worldwide, LLC, and IPW, LLC

15

16  Dated:  September __, 2010          O'MELVENY & MYERS LLP

17

18

19                             By: _____
                                    Daniel Petrocelli
20                                  Attorneys for Plaintiff DC Comics

21

22

23

24

25

26

27

28

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS
EXHIBIT C      Page 113

1

2    Dated:  September __, 2009          TOBEROFF & ASSOCIATES, P.C.

3

4                                       By_____
                                                  Marc Toberoff
5
                                        Attorneys for Defendants Mark Warren Peary, as
6                                       personal representative of the Estate of Joseph
                                        Shuster, Jean Adele Peavy, Joanne Siegel and
7                                       Laura Siegel Larson

8

9    Dated:  September __, 2010          KENDALL BRILL & KLIEGER LLP

10

11

12                                      By: _____
                                               Richard B. Kendall
13                                             Attorneys for Defendants Marc Toberoff,
                                               Pacific Pictures Corporation, IP
14                                             Worldwide, LLC, and IPW, LLC

15

16   Dated:  September 10, 2010          O'MELVENY & MYERS LLP

17

18

19                                      By: _____
                                               Daniel Petrocelli
20                                             Attorneys for Plaintiff DC Comics

21

22

23

24

25

26

27

28
                                         56
     _____
     JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
                        RULINGS ON DISPOSITIVE MOTIONS

EXHIBIT C      Page 114

# APPENDIX A

## DEFENDANTS' SUMMARY OF DISPOSITIVE MOTIONS

For the Court's convenience, the Arguments made in the separate motions to dismiss are summarized as follows.

- DC's First Claim seeks to invalidate the Shuster Terminations, and will fail as a matter of law:

  - *Section (1)* of DC's First Claim (Toberoff Decl., Ex. U ("Complaint"), ¶¶ 94-98) erroneously alleges that Shuster's termination rights do not vest in the executor or representative of his estate unless he had a widow, children and grandchildren who were "not living, but who did at some time live." This argument contradicts the plain language of the statute and the accepted interpretation of "not living" under the Copyright Act, as well as the legislative intent of § 304, and would lead to absurd results. *See Siegel v. Warner Bros. Ent. Inc.* ("*Siegel I*"), 542 F. Supp. 2d 1098, 1114 n.3 (C.D. Cal. 2008); 3 M. Nimmer & D. Nimmer, 3 *Nimmer on Copyright* ("*Nimmer*") § 11.03[A][2][a] at 11-40.1-11.40.2 (emphasis added); *Stewart v. Abend*, 495 U.S. 207, 212 (1990); 67 Fed. Reg. 69134; Toberoff Decl., Ex. J at 2-7.

  - *Section (2)* (Complaint, ¶¶ 99-104) argues that a 1992 agreement ("1992 Agreement") between DC and Shuster's siblings bars the Shuster Termination. This argument fails because the 1992 agreement could not lawfully grant any Superman copyrights. None of the parties to that agreement possessed any termination rights or Superman copyrights to grant; the Shuster Executor, the sole holder of the termination right, was not a party to the 1992 Agreement, as pled in the complaint; and, in any event, the agreement could not have conveyed or released the inalienable termination right as a matter of law under § 304(c)(5). *See* 17 U.S.C. §§ 304 (c)(5), (c)(6)(B); *Classic Media, Inc.*

57

Case 2:10-cv-03633-ODW-RZ   Document 69-1   Filed 09/15/10   Page 121 of 191   Page
Case 2:10-cv-03633-ODW-RZ   Document 61   Filed 09/13/10   Page 64 of 67   Page ID #:3775
ID #:5198

*v. Mewborn* ("*Mewborn*"), 532 F.3d 978 (9th Cir. 2008); Toberoff
Decl., Ex. J at 7-12

o   *Section (3)* (Complaint, ¶¶ 105-11) alleges that the Shuster Executor
did not own the "majority interest necessary to terminate" purportedly
because it had granted half such rights in the Pacific Pictures
Agreements, but the Shuster Executor clearly held the entirety of the
termination interest because, as asserted elsewhere in DC's Complaint,
termination rights cannot be transferred to a third party prior to the
effective date of termination per 17 U.S.C. § 304(c)(6)(D), and the
effective termination date is October 26, 2013. *See id.*; Complaint, ¶¶
81, 154-55; Toberoff Decl., Ex. J at 13-14.

o   *Section (4)* (Complaint, ¶¶ 112-15) claims that the Shuster
Termination failed to terminate a May 21, 1948 consent judgment;
however, Judge Larson in *Siegel* has already correctly decided that such
consent judgment was not a copyright grant, and has no effect on the
validity of Superman termination notices.  The same reasoning and
holding applies to the "mirror image" Shuster Termination and, as this
is a closely related action, is binding on DC under the "law of the case"
doctrine.  *See Siegel I,* 542 F. Supp. 2d at 1131; Toberoff Decl., Ex. J at
14-16; *See Disimone v. Browner*, 121 F.3d 1262, 1266-67 (9th Cir.
1997) (applying "law of the case" doctrine to related cases).

o   *Section (5)'s* "unclean hands" claim regarding Superboy (Complaint,
¶¶ 116-20) fails because unclean hands is a defense that is available
only against a plaintiff that seeks affirmative relief, and is not a basis
for a cause of action.  *See Pelich v. INS*, 329 F.3d 1057, 1062 (9th Cir.
2003); Toberoff Decl., Ex. J at 16-17.  Defendants also cannot be
charged with "unclean hands" regarding Superboy as their actions
comport with the specific findings of fact and conclusions of law in a

58

Case 2:10-cv-03633-ODW-RZ    Document 69-1    Filed 09/15/10    Page 122 of 191    Page
ID #:5199
Case 2:10-cv-03633-ODW-RZ    Document 61    Filed 09/13/10    Page 65 of 67    Page ID #:3776

1947 action between DC's predecessors, and Siegel and Shuster.  *See
id.* at 17-19; *Siegel v. Nat'l Periodical Publ'ns, Inc.*, 508 F.2d 909 (2d
Cir. 1974); *Siegel v. National Comics Publications, Inc.*, Case No.
1099-1947 (N.Y. Sup. Ct. April 12, 1948).

- DC's Second Claim transparently attempts to re-litigate issues already
  decided against DC in the related Superman case, *Siegel v. Warner Bros. Ent.
  Inc.*, C.D. Cal. Case No. 04-08400 ODW (RZx), and is barred by the doctrine
  of "law of the case" in this closely related action.  *Disimone*, 121 F.3d at
  1266-67; Toberoff Decl., Ex. J at 19-25.

- DC's Third Claim (as well as its Sixth Claim) is premised on the erroneous
  legal position that DC has a statutory right to a so-called "period of
  exclusivity" to negotiate the purchase of the Shuster Estate's recaptured
  *Superman* copyrights under 17 U.S.C. § 304(c)(6)(D).  *See* Complaint, ¶¶
  154-55.  However, it is clear from the plain language of § 304(c)(6)(D) that it
  does not provide DC with any "rights," let alone a right to an exclusive period
  of negotiation.  *See* 17 U.S.C. § 304(c)(6)(D); *Bourne Co., v. MPL
  Commc'ns, Inc.*, 675 F. Supp. 859, 865 (S.D.N.Y. 1987) ("Nor does the
  statute provide for an exclusive period of negotiation. The statute neither
  compels the terminating party to negotiate with the terminated grantee, nor
  forbids him from negotiating with anyone else."); 3 *Nimmer* § 11.08[A], n.6
  (2010) (*Bourne* properly "rejected the claim [made here] that a prior grantee
  enjoys a private right of action for damages against one who induces the
  grantor to make a (necessarily invalid) grant to a third party prior to the
  termination date of the original grant."); Toberoff Decl., Ex. K at 4-7.  As
  such, DC lacks standing to prosecute this claim.  *See* 3 W. Patry, *Patry on
  Copyright* ("*Patry*") § 7:47 (2010); Toberoff Decl., Ex. K at 7.

- DC's Fourth Claim for tortious interference with contract alleges that by
  inducing the Shuster Estate to file a statutory notice of termination concerning

59

Case 2:10-cv-03633-ODW-RZ    Document 69-1    Filed 09/15/10    Page 123 of 191    Page
ID #:5200
Case 2:10-cv-03633-ODW-RZ    Document 61    Filed 09/13/10    Page 66 of 67    Page ID #:3777

1    *Superman*, Toberoff, and an entity controlled by Toberoff, Pacific Pictures

2    Corporation ("PPC"), interfered with the 1992 Agreement between DC and

3    the siblings of Joseph Shuster.  This claim fails as a matter of law for at least

4    four independent reasons.

5        o   *First*, the termination of the *Superman* copyright interests by the

6            Shuster Executor could not have interfered with the 1992 Agreement,

7            which has no bearing whatsoever on the independent termination right

8            held solely by the Shuster Executor.  Toberoff Decl., Ex. I at 9-13.

9        o   *Second*, even if the 1992 Agreement could somehow be construed as

10            intending to prevent the Shuster Executor from exercising his

11            termination rights, such a contract would be void under the Copyright

12            Act, 17 U.S.C. § 304(c)(5), and clear Ninth Circuit precedent.  Toberoff

13            Decl., Ex. I at 13-18.

14        o   *Third*, the claim is squarely barred by the two-year statute of limitations

15            for tortious interference claims, as it is a matter of public record that by

16            2006 DC was fully aware of the Shuster Termination and the Pacific

17            Pictures Agreements, the facts that allegedly gave rise to this claim.  *Id.*

18            at 18-20.

19        o   *Fourth*, the claim is barred on its face by California's litigation

20            privilege, Civil Code § 47(b).  Toberoff Decl., Ex. I at 20-21.

21    •  DC's Fifth Claim is equally meritless as a matter of law.  This claim alleges

22        interference by Toberoff with DC's purported "prospective economic

23        advantage" – namely, a proposed settlement agreement between DC and the

24        Siegels over the Siegel Terminations.  This claim, like the Fourth Claim, is

25        squarely barred by California's litigation privilege, as the sole basis of the

26        cause of action is Toberoff's alleged solicitation of his clients in the *Siegel*

27        cases.  Moreover, this claim is also barred by the two-year statute of

28        limitations applicable to tortious interference claims, based on matters of

60

1      public record, subject to judicial notice.  Toberoff Decl., Ex. I at 21-25.

2      •    DC's Sixth Claim under California unfair competition laws is preempted by

3        the Copyright Act, as it is expressly based on and incorporates DC's

4        allegations of purported violations of the Copyright Act, and does not contain

5        an "extra element" that "makes the right asserted qualitatively different from

6        those protected under the Copyright Act."  *Altera Corp. v. Clear Logic, Inc.*,

7        424 F.3d 1079, 1089-90 (9th Cir. 2005).  *See* Toberoff Decl., Ex. K at 9-12.

JOINT STIPULATION RE: MOTION FOR A PROTECTIVE ORDER STAYING DEPOSITIONS PENDING
RULINGS ON DISPOSITIVE MOTIONS
EXHIBIT C     Page 119

# EXHIBIT D

1   DANIEL M. PETROCELLI (S.B. #97802)
    dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
    mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
    cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA 90067-6035
    Telephone:  (310) 553-6700
6   Facsimile:   (310) 246-6779

7   Attorneys for Plaintiff DC COMICS
    (continued on next page)

8

9                    UNITED STATES DISTRICT COURT

10        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

11

12

13   DC COMICS,                          | Case No. CV 10-3633 ODW(RZx)

                    Plaintiff,           | FIRST AMENDED COMPLAINT
14                                        | FOR:
              v.                          | (1) Declaratory Relief re: Invalidity of
15                                        | Copyright Termination Notice;

16   PACIFIC PICTURES CORPORATION, IP     | (2) Declaratory Relief re: Scope of Copyright
     WORLDWIDE, LLC, IPW, LLC, MARC       | Termination Notice;
     TOBEROFF, an individual, MARK        |
17   WARREN PEARY, as personal representative | (3) Declaratory Relief re: DC Comics Period
     of the ESTATE OF JOSEPH SHUSTER,     | of Exclusivity re: Shuster;
18   JOANNE SIEGEL, an individual, LAURA  |
     SIEGEL LARSON, an individual, and DOES | (4) Interference with 1992 Shuster Agreement;
19   1-10, inclusive,                      |
                                          | (5) Interference with Prospective Economic
20                  Defendants.           | Advantage re: Siegel-DC Comics Agreement;
                                          | and
21
                                          | (6) Declaratory Relief re: Invalidity of
22                                        | Copyright Assignment and Consent
                                          | Agreements
23
                                          | DEMAND FOR JURY TRIAL
24
                                          | Hon. Otis D. Wright II
25

26

27

28

56899.1

FIRST AMENDED COMPLAINT

INTENTIONALLY
LEFT
BLANK

(continued from previous page)

PATRICK T. PERKINS (admitted pro hac vice)
pperkins@ptplaw.com
PERKINS LAW OFFICE, P.C.
1711 Route 90
Cold Spring, NY 10516
Telephone:    (845) 265-2820
Facsimile:     (845) 265-2819

Attorneys for Plaintiff DC COMICS

56899.1

FIRST AMENDED COMPLAINT

# I. <u>STATEMENT OF THE CASE</u>

1.      This lawsuit challenges a scheme by Marc Toberoff and companies  under his control to violate the U.S.  Copyright Act and other laws by trafficking in  federal copyright interests and interfering with contractual rights and other interests  of plaintiff DC Comics related to the iconic property "Superman."[1]  By this scheme, Toberoff has sought to enrich himself by wrongfully laying claim to purported  rights to control the exploitation of Superman to the substantial detriment of DC  Comics and in violation of rights it has held, significantly invested in, and  expanded upon for over 70 years.  DC Comics brings this suit to confirm its rights  to the Superman property and seek redress for the wrongful conduct of Toberoff  and entities he controls. This Court has subject matter jurisdiction in this case  pursuant to 28 U.S.C.  §§ 1331, 1338, and 1367, under the Copyright Act, 17 U.S.C.  §§ 101 *et seq.,* and under the Court's supplemental jurisdiction.

2.      Under certain narrowly defined circumstances, the Copyright Act permits authors and specified heirs to terminate copyright grants and recapture those interests from the original grantees.  These provisions of the Copyright Act also protect original grantees—such as DC Comics—by confining termination rights to certain classes of individuals in a specified time frame and manner, limiting the types of works that may be terminated, and creating an exclusive statutory period during which only the original grantee may enter into new agreements with the author or heirs to continue creating new works under the recaptured copyrights.

3.      In derogation of these provisions of the Copyright Act and the rights of DC Comics, Toberoff and entities he controls orchestrated a web of collusive agreements concerning the Superman copyrights with the heirs to the co-creators of Superman, Jerome Siegel and Joseph Shuster.  By these agreements, Toberoff purported to secure a majority and controlling financial stake in copyright interests in Superman assertedly held by the Siegel and Shuster heirs and to preclude the  heirs from freely entering into new agreements with DC Comics for the continued

---

[1] Throughout this introductory statement and in other parts of the Complaint, the term "DC Comics" is used as shorthand for both DC Comics and its predecessors in interest.  The specific identities of relevant corporate entities are identified *infra.*

1  exploitation of Superman.  As detailed below, these agreements are unlawful under the copyright

2  laws, are void as against public policy, and both violate DC Comics' rights and threaten the

3  ongoing viability of the Superman property.

4         4.       During their lifetimes, Jerry Siegel and Joe Shuster—both well aware of the

5  termination provisions in amendments to the Copyright Act—never once sought to terminate any

6  of DC Comics' copyright interests, even though they could have attempted to do so as early as

7  1984.  Instead, Siegel and Shuster rightly  honored their agreements with DC Comics, under

8  which they and their families  enjoyed ~~lifetime~~significant compensation, lifetime pensions, and

9  other important benefits.  After their deaths, Siegel and Shuster's heirs reached ~~similar~~separate

10  agreements with DC Comics—the Shuster heirs in 1992, and the Siegel heirs in 2001.  These

11  agreements provided the heirs substantial compensation and fully and finally resolved any claims

12  of termination to any rights in Superman and confirmed that DC Comics owned all right, title, and

13  interest in and to Superman.

14         5.       In or ~~about~~around 2001, Toberoff learned of these agreements between DC Comics

15  and the Siegel and Shuster heirs and engineered a course of conduct to induce the heirs to

16  repudiate those agreements, ~~file invalid and erroneous copyright termination notices,~~ and enter

17  into new agreements with Toberoff and his companies netting him the controlling stake in the

18  heirs' asserted interests in Superman.

19         6.       Toberoff induced the Shuster heirs to repudiate their 1992 agreement with DC

20  Comics and enter into a 50/50 joint venture with defendant Pacific Pictures Corporation, a film-

21  production company wholly owned and controlled by Toberoff, pursuant to which the heirs

22  conveyed the entirety of their purported Superman copyright termination rights to the venture.

23  The stated purpose of the venture was to secure and exploit DC Comics' copyright interest in

24  Superman.  Toberoff procured this joint-venture agreement even though he knew that the

25  Shusters' 1992 agreement with DC Comics operated to grant any and all of the heirs' interest in

26  Superman to DC Comics and extinguish any termination rights the heirs might have held.

27  Toberoff also induced the Shuster heirs to serve a notice of termination purporting to terminate

28  and recapture the same alleged interests they had granted to DC Comics under the parties' 1992

1    agreement.  This termination notice was invalid: among other defects, it was filed by a party

2    lacking the necessary majority interest to terminate.  Furthermore, any putative right to terminate

3    held by Joe Shuster ceased to exist when he died having elected not to exercise it during his

4    lifetime and having died without leaving a surviving spouse, child, or grandchild to inherit and

5    exercise it.

6         7.    Toberoff similarly induced the Siegel heirs to repudiate their 2001 agreement with

7    DC Comics.  After years of negotiations following a copyright termination notice sent by the

8    Siegel heirs in 1997, DC Comics and the Siegel heirs reached an agreement providing that DC

9    Comics would retain all rights to Superman and entitling the Siegels to receive a significant

10   portion of the Superman profits.

11        8.    Toberoff became aware of the existence of the 2001 agreement between the Siegels

12   and DC Comics and understood it diminished his stake in the putative Superman rights held by his

13   joint venture with the Shusters.  In pursuit of his plan to corner and control all potential Superman

14   termination rights and thereby block further exploitation of the property by DC Comics, Toberoff

15   set out to derail the 2001 Siegel agreement.  Among other things, Toberoff presented himself as a

16   film producer and falsely represented to the Siegels that if they repudiated their agreement with

17   DC Comics and entered into an agreement with him instead, a "billionaire investor" "was

18   prepared immediately to pay the Siegels $15 million for their Superman rights,   plus a generous

19   back-end profit participation in any future exploitations of the Superman property.  Toberoff also

20   falsely represented that he they would help the Siegels produce their own Superman motion picture

21   that would compete successfully with a Superman motion picture that Warner Bros.—DC Comics'

22   '  licensee—was then developing.  Based on Toberoff's inducements, the Siegels repudiated their

23   2001 agreement with DC Comics, terminated the employment of their then-law firm Gang, Tyre,

24   Ramer & Brown, and ultimately entered into agreements with Toberoff and defendant IP

25   Worldwide LLC, an entity controlled by Toberoff.  Under these agreements, Toberoff and his

26   company received a 45% interest in any recovery by the Siegels—an 800% increase over the 5%

27   fee in the Siegels' agreement with the Gang Tyre firm.

28

56899.1

- 3 -

FIRST AMENDED COMPLAINT

9.     As a result of his arrangements with both the Shuster and Siegel heirs, Toberoff secured control of the largest financial stake in the collective, putative Superman termination rights *(i.e.,* Toberoff—47.5%; Siegel heirs—27.5%; Shuster heirs—25%).  Toberoff sought further control, however.  In order to assert that DC Comics had *no* further rights to exploit the derivative Superman character "Superboy"—including in the highly popular *Smallville* network television series—Toberoff manufactured the position that Jerry Siegel *alone—to* the exclusion of Shuster—was the sole creator of Superboy.  Toberoff did so with full knowledge that his 2001 agreement with the Shusters explicitly confirmed the *Shusters'* asserted joint rights in Superboy, consistent with the long-held view of Shuster, Siegel, and their heirs that Superboy was jointly created by Shuster and Siegel.[2]

10.     Despite these incontestable facts concerning Superboy's creation—facts which Joe Shuster, Jerry Siegel, their heirs, and even Toberoff and his companies ratified and affirmed over time—Toberoff ~~caused to be filed in 2002, onbehalf of~~ induced the Siegels~~, a copyright termination notice~~ and Shusters to falsely ~~stating that~~position Siegel ~~was~~as the *sole* creator of Superboy.  ~~He then induced the Shusters in 2003 to amend their~~In 2002, the ~~joint venture agreement with Pacific Pictures to *delete* all references to Superboy.~~  Siegels then filed a copyright termination notice asserting sole ownership of Superboy.  Toberoff then induced the Shusters in 2003 to amend their joint-venture agreement with Pacific Pictures to *delete* all references to Superboy.  The deletion of Superboy was directly contrary to the Shusters' interests and occurred solely to park *all* of the alleged Superboy rights with the Siegels.  Having manipulated the Superboy rights in favor of the Siegels, and directly contrary to copyright filings that the Siegels and Shusters had previously made, Toberoff then filed a termination notice on behalf of the Shusters that purported to terminate only Superman rights, leaving out all mention of Superboy.  These artifices positioned the Siegels to claim 100% ownership of Superboy in order to later bring

---

[2] As explained ~~below~~*infra,* DC Comics fully agrees that Shuster and Siegel jointly contributed to Superboy.  It is DC Comics' position, however, that Superboy is a work entirely derivative of Superman and ~~that~~thus Superboy is not subject to termination under the Copyright Act's termination regime.

a copyright infringement claim against DC Comics, Warner Bros., and the *Smallville* series~~,~~.  That case—which ~~they~~ was filed in 2004—~~and which~~ remains pending today.

11.    Yet another component of Toberoff's scheme to gain complete control over the heirs to the putative Superman termination rights was preventing the Siegel and Shuster heirs from freely entering into agreements with DC Comics——even if it was in their respective economic interest to do so.  In violation of DC Comics' statutory period of exclusivity under the copyright laws, Toberoff induced the Siegels and Shusters to enter into agreements transferring their respective interests to his companies and preventing them from conveying any rights to DC Comics without each other's—and Toberoff's—consent.  As a result of these illicit agreements, DC Comics has been deprived of its ability to enter into agreements with the heirs to secure their purported termination rights, in violation of the Copyright Act, other laws, and public policy promoting the free and fair settlement of legal claims.

12.    To protect its rights under the copyright laws, agreements, and interests with the ~~Siegels and~~ Shusters and Siegels and remove the cloud that Toberoff's actions have unlawfully placed over the Superman property and its future, DC Comics brings this action to seek declaratory judgments and other relief as set forth below.

## II.    PARTIES

13.    Plaintiff DC COMICS ("DC Comics") is a general partnership organized and existing under the laws of the State of New York and has its principal place of business in the State of New York.  DC Comics is the successor-in-interest to all rights, including rights under copyright, relating to the Superman works and character.

14.    Defendant PACIFIC PICTURES CORPORATION ("Pacific Pictures") is a New York corporation organized under the laws of the State of New York, and was registered as a foreign corporation doing business in the State of California, with its principal place of business in the State of California and the County of Los Angeles.  Upon information and belief, Toberoff is the sole shareholder and registered agent for service of process of Pacific Pictures.  Upon information and belief, Pacific Pictures forfeited its active status as a New York corporation and as a registered foreign corporation in California as of early 2009.

15.    Defendant IP WORLDWIDE, LLC ("IP Worldwide") is a Delaware limited liability company organized and existing under the laws of the State of Delaware, and registered as a foreign entity doing business in the State of California, which has its principal place of business in the State of California and the County of Los Angeles.  Upon information and belief, Toberoff is the managing and controlling member of IP Worldwide and owns the controlling interest therein.

16.    Defendant IPW, LLC ("IPW") is a California limited liability company organized and existing under the laws of the State of California, which has its principal place of business in the State of California and the County of Los Angeles.  Upon information and belief, Toberoff is the managing and controlling member of IPW, is its registered agent for service of process, and owns the controlling interest in IPW.  Upon information and belief, IPW is a successor-in-interest to all or part of IP Worldwide's interests.

17.    Defendant MARC TOBEROFF ("Toberoff") is an individual who resides in the County of Los Angeles in the State of California, and upon information and belief, is and at all times has been a citizen of the United States.  Upon information and belief, Toberoff is a shareholder and member of defendants PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; and IPW, LLC.

18.    Defendant MARK WARREN PEARY ("Mark Peary" or "Peary") is an individual who resides in the State of New Mexico and is, and at all times has been, a citizen of the United States.  Peary is the nephew of Joseph Shuster, and a California court appointed him as the personal representative of the Shuster Estate.

19.    Defendant ESTATE OF JOSEPH SHUSTER ("Shuster Estate") is a probate estate established by the Los Angeles Superior Court on August 25,in 2003 (LASC Case No.  BP-080635).

20.    Defendant JEAN ADELE PEAVY ("Jean Peavy" or "Peavy") is an individual who resides in the State of New Mexico and, upon information and belief, is, and at all relevant times has been, a citizen of the United States.  Peavy was the sister of Joseph Shuster, and under the terms of Shuster's purported will, the sole beneficiary of the Shuster Estate.  Peavy has actively

56899.1

- 6 -

FIRST AMENDED COMPLAINT

1  participated in the Shuster probate proceedings pending in Los Angeles, California, personally

2  disposed of property of the Shuster Estate in California pursuant to the provisions of the California

3  Probate Code, and is a party to certain agreements formed in California at issue in this action.

4  21.  Defendant JOANNE SIEGEL ("Joanne Siegel") is an individual who resides in the

5  County of Los Angeles in the State of California and is, and at all times has been, a citizen of the

6  United States.  Joanne Siegel is the widow of Jerome Siegel.

7  21.22.  Defendant LAURA SIEGEL LARSON ("Laura Siegel Larson") is an

8  individual who resides in the County of Los Angeles in the State of California and is, and at all

9  times has been, a citizen of the United States.  Laura Siegel Larson is the daughter of Jerome

10  Siegel and Joanne Siegel.

11  22.23.  Upon information and belief, Toberoff is, and at all relevant times has been, the

12  sole shareholder and principal of Pacific Pictures and a member and principal of IP Worldwide

13  and IPW.  Upon information and belief, Toberoff is the alter ego of Pacific Pictures, IP

14  Worldwide, and IPW, in that there is, and at all relevant times has been, such unity of interest

15  between Toberoff, Pacific Pictures, IP Worldwide, and IPW that any individuality and

16  separateness between them did not and does not exist, and adherence to the fiction of the

17  independent and separate existence of Pacific Pictures, IP Worldwide, and IPW distinct from each

18  other and Toberoff would promote injustice and inequity.

19  23.24.  Upon information and belief, the fictitiously-named DOES 1-10 are in some

20  manner responsible for the events giving rise to the claims set forth herein.  The true names and

21  capacities of such fictitiously-named defendants, whether individual, corporate, or otherwise, are

22  presently unknown to DC Comics.  DC Comics will amend this Complaint to assert the true names

23  and capacities of such fictitiously-named defendants when this information has been ascertained.

24  Each reference herein to a named defendant shall also refer to DOES 1-10.

25  ### III.  JURISDICTION AND VENUE

26  24.25.  As noted, the Court has subject matter jurisdiction over the claims set forth herein

27  pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.  The Court has original jurisdiction over DC

28

- 7 -

FIRST AMENDED COMPLAINT

1    Comics' claims arising under the Copyright Act and supplemental jurisdiction over its related

2    state-law claims.

3        25.26.        The Court has personal jurisdiction over defendants, *inter alia,* because a

4    substantial part of the events giving rise to the claims set forth herein occurred in the State of

5    California and the defendants have extensive contacts with the State, including the following:

6        a.    Defendants Marc Toberoff, the Shuster Estate, and Peary, and Peavy

7    established a joint venture in California under California law for  the purpose of

8    terminating and recapturing prior grants of the  copyrights at issue in this action.

9        b.    On behalf of the Shuster Estatejoint venture, Peary filed a and Peavy

10   initiated a probate action in Los Angeles Superior Court—which, upon information

11   and belief, remains pending—in order to effectuate the purpose of the California

12   joint venture.  A California court appointed Peary as executor of the Shuster Estate,

13   and Peary serves in that capacity as a matter of California law.  In that capacity,

14   Peary served one of the copyright termination notices at issue in this action.

15       c.    Upon information and belief, defendants Pacific Pictures and IP Worldwide

16   are foreign entities registered as doing business in the State of California, and they

17   have their principal places of business and are headquartered in the State of

18   California and the County of Los Angeles.

19       d.    Upon information and belief, defendant IPW is a California limited liability

20   company organized and existing under the laws of the State of California and has

21   its principal place of business and

22   headquarters in the State of California and the County of Los Angeles.

23       e.    Defendants Toberoff, Joanne Siegel, and Laura Siegel Larson reside and

24   conduct business in the State of California and the County of Los Angeles.

25       f.    Defendants Joanne Siegel and Laura Siegel Larson filed two related actions

26   against DC Comics in this District and Court to resolve ownership of the rights in

27   Superman and Superboy.  (Case Nos.  CV- 04-8400 ODW (RZx), CV-04-8776

28   ODW (RZx)).

- 8 -

FIRST AMENDED COMPLAINT

1    26.27.         Venue is proper in this District pursuant to 28 U.S.C.  § 1391(b).

2    Defendants are subject to personal jurisdiction in this District, and a substantial part of the events

3    giving rise to the claims set forth herein occurred in this District.

4         **IV.  FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

5    **A.       DC Comics' Development of Superman**

6         27.28.  In the 1930s, Jerome Siegel (a story writer in Cleveland) and Joseph Shuster (an

7    illustrator, and Siegel's peer) conceived of a fictional character named "Superman," whom they

8    originally envisioned as a criminal mastermind, and then reconceived as a hero fighting for social

9    justice.  Aside from the name, the character shared little similarity with the figure that would later

10   become known throughout the world as Superman.  Between 1933 and 1937, Siegel and Shuster

11   submitted the Superman comic strips to a number of prospective publishers and newspaper

12   syndicates, all of which rejected them.  According to a 1941 *Saturday Evening Post* profile of the

13   pair, "by this time [Siegel and Shuster] had abandoned hope that Superman would ever amount to

14   much."

15        28.29.  A company that would come to be known as DC Comics—and for whom Siegel

16   and Shuster worked for hire developing fictional characters—would eventually decide to publish a

17   13-page comic story featuring "Superman" in the first issue of a 64-page comic book entitled

18   "Action Comics." ThisAs explained below, this original version of Superman had few, limited

19   powers, and his fictional world  and back-story were not well developed.

20        29.30.  Months before this "Action Comics" book ("Action Comics No.  1") was

21   published, Siegel and Shuster entered into, on December 4, 1937, an "Agreement of Employment"

22   with Detective Comics, Inc.  ("DCI"), a predecessor- in-interest to DC Comics (the "December 4,

23   1937 Agreement").  Siegel and Shuster renewed their employment arrangement with DCI in

24   agreements on September 22, 1938 (the "DCI September 22, 1938 Agreement" and "McClure

25   September 22, 1938 Agreement") and December 19, 1939 (the "December 19, 1939 Agreement").

26        30.31.         In 1938, at the instance and expense of DCI and subject to its right of

27   control, Siegel and Shuster adapted the preexisting Superman comic strips they had created and

28   added new material to create the 13-page comic book story entitled "Superman." This story—like

- 9 -

FIRST AMENDED COMPLAINT

1    all the Superman works that Siegel and Shuster thereafter created—was created for DC Comics as

2    a work made for hire.  Moreover, Siegel and Shuster only contributed to a part of this work.  Upon

3    information and belief, Shuster submitted black-and-white illustrations to DCI that were later

4    colorized by printers or engravers working at DCI's direction.  DCI also prepared one or more

5    cover illustrations for Action Comics No. 1, which depicted Superman and was published in other

6    comic books prior to the publication of Action Comics No. 1.  Action Comics No. 1 itself was

7    published in April 1938.

8          31.32.        To the extent Siegel and Shuster created any copyrightable Superman -

9    related works outside their work-for-hire relationship with DC Comics (and DC Comics has

10   disputed that they did), those works consisted solely of certain panels and portions of the Action

11   Comics No. 1 comic book and other minor creations in the 1930s, which Siegel and Shuster

12   conveyed to DC Comics in 1937 and 1938.  In an agreement dated March 1, 1938 (the "March 1,

13   1938 Agreement"), and as required by the December 4, 1937 Agreement, Siegel and Shuster again

14   assigned to  DCI all of their rights in Superman, including "all good will attached thereto and

15   exclusive right to the use of the characters and story, continuity and title of strip."  Siegel and

16   Shuster confirmed DCI's sole and exclusive ownership of all Superman rights in the DCI

17   September 22, 1938 Agreement and December 19, 1939 Agreement.

18         32.33.        The initial appearance of Superman in Action Comics No. 1 presented a

19   limited view of the character.  The readers learn only that Superman was sent to Earth as an infant

20   aboard a space ship from an unnamed planet that was destroyed by old age.  He secretly possessed

21   five super-human powers: the abilities to leap 1/8 of a mile; hurdle a twenty-story building; raise

22   tremendous weights; run faster than an express train; and repel bullets and knives by virtue of his

23   "tough skin."  In his alter-ego life, Superman was depicted as Clark Kent, a mild-mannered

24   "coward" and a newspaper "weakling" who worked as a reporter for "The Daily Star," with a

25   female co-worker named "Lois," whose last name is not mentioned.  In his life as Superman, he

26   was depicted as a costumed figurevigilante who uses his super-human abilities to fight

27   crimecriminals and mete out his own brand of justice.  In Action Comics No. 1, Superman is said

28

to have grown up in an orphanage and is depicted (both in words and images) as a child with super-human strength.

33.34.  Since the publication of Action Comics No. 1 in 1938, DC Comics—with its teams of work-for-hire writers and artists (including Siegel and Shuster)—has added more than 70 years of material defining, updating, expanding, and improving upon the Superman myth and creating a continuous flow of new exploits and characters, resulting in a vast Superman "universe."

35.  DC Comics has authored, published, and distributed hundreds of millions of copies of thousands of comic book issues throughout the United States and abroad depicting the adventures of Superman.  These comic books have been authored and illustrated by dozens of DC Comics' talented staff writers and artists, and many of most iconic images and stories of Superman were created by these work-for-hire artists who reshaped his image over time.

36.  DC Comics has also created, developed, distributed, and licensed numerous feature-length motion pictures, motion-picture serials, radio serials, television shows, novels, and live theatrical presentations based on Superman.  Indeed, the radio, television, and motion-picture projects in particular—with which Siegel and Shuster had nothing or little to do—were largely responsible for spreading the Superman myth and popularity and expanding the Superman storyline.

34.37.  As a result of DC Comics' significant and sustained investment in and stewardship of Superman—and 70-plus years of character and story development by some of the most creative and talented minds in the comic-book, radio, television, and motion-picture industries—Superman has remained constantly in the public's eye and has become one of the most famous and beloved fictional characters in the world.  Over these 70 years, Superman has evolved from the few black-and-white illustrations originally drawn by Shuster into a full-blown, color character inhabiting a multi-dimensional universe.

35.38.  DC Comics' development of Superman over many decades has represented a continuous and ever-evolving portrayal of the character, featuring new elements in the Superman back-story, new super-powers, new characters, and changes in Superman's appearance.  Many of the most famous story elements and characters associated with Superman were developed long

after 1938, and by illustrators and story writers other than Shuster and Siegel working for hire for DC Comics.  These include stories about and depictions of: (a) "Smallville," the town where Superman grew up; (b) "Kryptonite," or surviving fragments of the destroyed planet Krypton, which have the power to harm or affect Superman; (c) the "Fortress of Solitude," Superman's secret headquarters outside Metropolis (traditionally located in the Arctic, but also placed in the Andes and Amazon rainforest); (d) the "Daily Planet" newspaper, where Clark Kent would go to work; (e) Jimmy Olsen and Perry White, Kent's co-workers at the Daily Planet; (f) love interests, such as Lana Lang; (g) villains, such as Lex Luthor and Brainiac; (h) Superman's adoptive parents, the Kents; and (i) other allies, such as "Krypto" the Superdog as well as Supergirl.  Other aspects of Superman's evolution included the development of new super-powers, including: (a) the ability to fly (a key component, especially of the Superman motion pictures); (b) super-vision, which enables him to see through walls ("X-ray" vision); (c) telescopic vision, which allows him to see across great distances; (d) "heat vision," which empowers him to aim rays of extreme heat with his eyes; (e) super-hearing, which enables him to hear conversations at great distances; (f) invulnerability to injury; and (g) the ability to survive in outer space without protective gear.  It is this constant and uninterrupted evolution of the Superman mythology that allows Superman to remain a force in popular consciousness decades after so many contemporary characters have been forgotten or deemed old-fashioned.

39.     In *Superman: The Action Comics Archives, Vol.  1* (1997), renowned comic-book historian Mark Waid explained the dramatic transformation Superman underwent over the past 70 years and stark contrast between the Superman that Siegel and Shuster conceived in the 1930s and the one the world now knows:

> The whole world knows Superman.  He is kind, he is wise, he is gentle, he upholds the law and the mores of a decent society.  He is half boy scout, half policeman.  In fact, here is what the citizens of 1939 Metropolis have to say about him:
>> "It is the devil himself!"
>> "You' re breaking the law, sir!"
>> "Don't hit me again! I'll give ya anything ya want!"
>> "Hundreds of officers-all incapable of stopping the mad course of one hoodlum!"

I thought I knew everything about Superman.  Then I read the [early Superman stories].  Within these pages, I met a head-bashing Superman who took no prisoners, who made his own law and enforced it with his fists, who gleefully intimidated his foes with a wicked grin and a baleful glare.  A Superman who reveled in his strength, who clearly enjoyed raising a little hell and who didn't care who got in his way as he bounded through Metropolis meting out his own brand of justice ....  How could he have started out so different?

**B.**    **Early Disputes Regarding the Superman Rights**

~~36.~~40.  Siegel and Shuster served in a work-for-hire capacity for DCI from the early 1930s through the late 1940s, helping draw and write Superman comic strips and comic books. ~~Though~~They were paid substantial sums for their work~~— several million~~, and DC Comics renegotiated the pair's contract numerous times to give them greater and greater stakes in the success of Superman.  By 1940 (at the end of the Great Depression),  Siegel and Shuster were paid the equivalent of well over a million dollars in today's dollars.  The pair's earnings were even greater in 1941, exceeding $1.5 million in today's terms, and in the years that followed, Siegel and Shuster would earn the equivalent of millions more.  Yet despite the financial success shared by DC ~~dollars in today's economic terms~~ —Comics and Siegel and Shuster, the relationship eventually became contentious.

~~37.~~41.  In 1947, Siegel and Shuster filed an action against DCI's successor, National Comics Publications, Inc.  ("National"), in the New York Supreme Court in Westchester County (the "Westchester Action").  In the Westchester Action, Siegel and Shuster sought to invalidate the March 1, 1938 Agreement.  They also sought to recapture all rights in Superman, arguing that the DCI September 22, 1938 Agreement was obtained by duress.  Siegel and Shuster further challenged as unauthorized DCI's publication in November 1944 of a series of comic-book stories entitled "Superboy," which featured the adventures of Superman as a youth.

~~38.~~42.  On November 21,1947, a referee in the Westchester Action issued an opinion after trial (the "Westchester Opinion") holding that the March 1, 1938 Agreement assigned "all" of the Superman rights to DCI, and that the DCI September 22, 1938 Agreement was valid and not obtained under duress.  The referee found that DCI had acted improperly in publishing Superboy.

1    39.43.  At the referee's request, the parties to the Westchester Action submitted proposed

2    findings of fact and conclusions of law.  On April 12, 1948, the referee adopted findings of fact

3    and conclusions of law and issued an interlocutory judgment (collectively, the "Westchester

4    Action Interlocutory Judgment"), in which he made statements based on a script that Siegel had

5    submitted that Siegel originated and owned the comic strip Superboy to the exclusion of DC

6    Comics.  National filed a notice of appeal, and the Westchester Action Interlocutory Judgment was

7    stayed pending appeal.

8    40.44.  Shortly thereafter, the parties to the Westchester Action entered into two separate

9    agreements: (a) a stipulation dated May 19, 1948 (the "May 19, 1948 Stipulation"); and (b) a

10    consent judgment dated May 21, 1948 (the "May 21, 1948 Consent Agreement").  Under both

11    documents, *inter alia,* Siegel and Shuster: (a) agreed to vacate the Westchester Action

12    Interlocutory Judgment; (b) acknowledged that, pursuant to the March 1, 1938 Agreement, they

13    transferred to DCI all rights in and to Superman, including "the title, names, characters, concept

14    and formula" as set forth in Action Comics No.  1; and (c) agreed that National was the sole and

15    exclusive owner of all rights in Superman and Superboy.  In exchange, Siegel and Shuster were

16    paid nearly $900,000 in today's dollars.

17    41.45.  Following the commencement of the Westchester Action, Siegel attempted to

18    launch a new comic book and syndicated strip feature entitled "Funnyman." The *Funnyman* comic

19    book, however, was cancelled after only six issues, and the syndicated *Funnyman* strip was only

20    picked up by a few newspapers and dropped prior to the end of 1949.  By the late 1950s, Siegel

21    was unable to find employment in the comic book field.  Having exhausted his savings and

22    needing to support his family, he approached DC Comics asking for work.  Despite Siegel's prior

23    lawsuit and challenge to DC's rights in Superman, DC Comics agreed to hire Siegel him and

24    thereafter employed himSiegel continuously as a work-for-hire writer until the mid-1960s, when

25    Siegelhe once again challenged DC Comics' rights to Superman.

26    42.46.  In April 1965, Siegel (while still working for DC Comics) and Shuster (who was

27    being paid a monthly stipend by DC Comics) filed copyright renewal notices in their own names,

28    claiming to own the renewal copyrights in the Superman character and in Action Comics No.  1.

56899.1

- 14 -

FIRST AMENDED COMPLAINT

1   This was followed by a lawsuit filed by Siegel and Shuster against National in 1969 in the District

2   Court for the Southern District of New York, seeking a declaration that they owned the "renewal"

3   copyright terms for Superman and Action Comics No. 1.  (Under the then-applicable 1909

4   Copyright Act, the period of copyright protection for a work included an initial term of 28 years

5   and an optional renewal term of 28 years.) Again, Siegel and Shuster's arguments were rejected,

6   and the federal district court held, *inter alia,* that the agreements between Siegel and Shuster, on

7   the one hand, and DCI (later National), on the other, had assigned "all" rights in Superman to DCI

8   and National, including all renewal copyrights.  *See Siegel v.  Nat'l Periodical Publ'ns, Inc.,* 364

9   F.  Supp.  1032 (S.D.N.Y.  1973).  The Court of Appeals for the Second Circuit affirmed the

10  district court's ruling that National owned all rights in Superman.  *See Siegel v.  Nat'l Periodical

11  Publ'ns, Inc.,* 508 F.2d 909 (2d Cir.  1974).  Siegel and Shuster did not further appeal that ruling.

12      43.47.  Following the failure of their second lawsuit to recapture copyrights in Superman,

13  Siegel and Shuster ran into financial difficulties of their own making.  Siegel publicized their

14  financial plight, and there were calls for companies like  National (and even for Congress) to help

15  such artists.  On December 23, 1975, and  despite Siegel and Shuster's two prior lawsuits against

16  National, Warner  Communications, Inc.  ("WCI"), National's then-parent company, agreed to

17  provide them financial assistance.  Under an agreement entered into in 1975 (the "1975

18  Agreement"), Siegel and Shuster again acknowledged that DC Comics was the sole and exclusive

19  owner of "all right, title and interest in and to the 'Superman' concept, idea, continuity, pictorial

20  representation, formula, characters, cartoons and comic strips, title, logo, copyrights and

21  trademarks, including any and all renewals and extensions of such rights, in the United States and

22  throughout the world, in any and all forms of publication, reproduction and presentation, whether

23  now in existence or hereafter devised." In exchange, WCI agreed to provide Siegel and Shuster

24  with, *inter alia,* annual payments of $20,000 each (around $80,000 in current dollars), annual

25  payments to their heirs after their death, medical insurance coverage, and a lump sum of $17,500

26  each.  With respect to Shuster's heirs, WCI agreed that after Shuster's death, it would make annual

27  payments to his brother, Frank Shuster, of $10,000 until December 31, 1985, and then $5,000 a

28  year for the rest of his life.

1      44.48.      In the years following the 1975 Agreement, DC Comics increased the

2    annual payments to Siegel and Shuster, made periodic cost-of-living increases, provided

3    insurance, and paid special bonuses.  During the last several years, Siegel's widow, for example,

4    has received $135,000 per year plus reimbursement for all medical expenses.  In all, DC Comics

5    has paid Siegel, Shuster, and their heirs nearly $4 million pursuant to the 1975 Agreement and

6    other arrangements—benefits that DC Comics continues to pay, and the Siegel and Shuster heirs

7    continue to accept.

8      45.49.      In 1976, Congress amended the Copyright Act to give authors and certain of

9    their heirs certain limited rights to terminate prior grants of copyright.  *See* 17 U.S.C. § 304(c)

10   (1976).  This amendment did not apply to works-made-for hire (the company paying for the

11   production of those works would always own them), and entitled authors and certain heirs to

12   recapture copyrighted interest only in works that the *author* actually created *(e.g.,* it did not entitle

13   authors to recapture derivative works the grantee may have developed pursuant to the original

14   grant, such as the original Superman radio and television shows, or Superman-related characters,

15   such as "Superboy" or "Lex Luthor").

16      50.    Despite their previous legal battles with National and the widespread publicity

17   surrounding this legislation, neither Jerry Siegel nor Joe Shuster ever endeavored to exercise any

18   termination rights under the statute.  Instead, for the rest of their lives, Siegel and Shuster accepted

19   and enjoyed the benefits under the 1975  Agreement.  This decision made sense, given Siegel and

20   Shuster's work-for-hire  relationship with DC Comics, the narrow sliver of rights (if any) to which

21   they might claim an interest, and the significant contributions made to Superman in the past 70

22   years to which they could claim no interest.  Moreover, the 1975 Agreement  paid Shuster and

23   Siegel an annual pension and medical insurance for the rest of  their lives and, upon their death,

24   paid annual pensions to their heirs.  Although  Shuster's and Siegel's "window of time" in which

25   to attempt to terminate prior  grants of copyright interests in Superman theoretically opened in

26   1984, at no time during their lives did they attempt to exercise any such right.

27     **C.    Joe Shuster's Death and the Shuster Heirs' 1992 Agreement**

28

1    46.51.  Joe Shuster passed away on July 30, 1992.  He was survived only by his brother

2    Frank Shuster, sister Jean Peavy, and JeanMs. Peavy's two children, Mark Peary and Dawn

3    Peavy (the "Shuster Heirs").  (Mark Peary changed his last name from "Peavy" to "Peary.")

4    Shuster did not leave a widow and never had children or grandchildren.  Shuster's purported will

5    namesappoints Jean Peavy the sole beneficiary and executrix of his estate.  (An alleged copy of

6    this will surfaced and was probated in 2001, only2003, after Toberoff intervened.  In addition to

7    certain irregularities in the will, probate papers filed by the Shuster Heirs falsely represented that

8    Joe Shuster was never married and omitted that Joe Shuster had a sibling, Frank Shuster, who had

9    also survived him.)

10    47.52.  On August 21, 1992, Jean Peavy sent a letter to Time Warner and DC Comics

11    explaining that she was the sole heir to Shuster 's estate and that Shuster had "left his family with

12    "a crushing burden of unpaid debts and bills and only a tiny estate."Jean Ms. Peavy stated: "It's

13    unbelievable to me that Joe could have so little considering the generosity shown by Time Warner

14    in raising the pension income of Siegel and Shuster."  She also disclosed that 20% of Shuster's

15    income had been taken by Joanne Siegel, Jerome Siegel's widow, "as an agent's commission for

16    getting pay raises for Siegel and Shuster" following the December 23, 1975 Agreement.  Much of

17    the remainder of Shuster's income was spent by him during "compulsive buy[ing]" and "shopping

18    sprees" and on expensive stereo equipment and other personal items.  As a result, Shuster had

19    accumulated "almost $20,000 in credit card debts and unpaid bills."Jean that, "[a]s heir to his

20    Will, [Ms. Peavy was] responsible for paying."  Ms. Peavy asked that Time Warner and DC

21    Comics "pay his final debts and expenses."

22    48.53.  In September 1992 Time Warner and DC Comics offered to pay off Shuster's debts

23    and expenses, totaling approximately $20,000, plus increase Frank Shuster's annual survivor

24    payments under the 1975 Agreement from $5,000 to $25,000 per year.

25    49.54.  In a September 10, 1992 letter sent to DC Comics (the "September 10, 1992

26    Letter"), Frank Shuster, on behalf of himself and Jean Peavy, requested that the annual payments

27    due and owing Frank Shuster be made to Jean Peavy in order to take advantage of certain tax

28    benefits.  Frank Shuster and Jean Peavy further promised that, if an agreement could be reached,

56899.1

- 17 -

FIRST AMENDED COMPLAINT

1  Jean Peavy "would not pursue the  termination of the Superman copyright as provided for to

2  creators' heirs in the 1976 U.S. Copyright Act."

3      50.55.        Based on Jean Peavy and Frank' Shuster's letter and the parties' further

4  discussions, DC Comics, Jean Peavy, and Frank Shuster entered into a written agreement on

5  October 2, 1992 (the "1992 Agreement").  The 1992 Agreement, which did not have an integration

6  clause, confirmed that it "fully settles all claims to any payments or other rights or remedies which

7  you may have under any other agreement or otherwise, whether now or hereafter existing

8  regarding the copyrights, trademarks, or other property right in any and all work created in whole

9  or in part by your brother, Joseph Shuster, or any works based thereon," and that the Shuster Heirs

10  "covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and

11  forever." The 1992 Agreement provided that the Shuster Heirs "now grant to us [DC Comics] any

12  ... copyrights, trademarks, or other  property right in any and all work created in whole or in part

13  by your brother, Joseph Shuster, or any works based thereon," and that the Shuster Heirs

14  "covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and

15  forever." The 1992 Agreement thus operated to revoke, rescind, and replace Shuster's prior

16  copyright grants and agreements. 51.  After the 1992 Agreement, DC Comics and the Shuster

17  Heirs enjoyed an amicable relationship with the  Shuster Heirs.

18      56.  On September 7, 1999, Jean Peavy sent a letter to DC Comics confirming that the

19  clear effect of the 1992 Agreement was to revoke and regrant any prior copyright grants that could

20  otherwise have been subject to termination:  "I have learned from the Internet that Joanne Siegel

21  has filed a copyright claim for SUPERMAN [*i.e.,* the Siegel Superman Termination Notice].  I

22  want you to know that I intend to honor our pension agreement."

23      57.  To date, DC Comics and its affiliates have paid the Shuster Heirs close to $500,000

24  under the 1992 Agreement.  On April 27, 1995, Jean Peavy sent a letter to DC Comics expressing

25  gratitude for their generosity and concluding: "You know we appreciate your thoughtfulness."

26  Even after Frank Shuster's death in 1996, DC Comics has continued to this day to pay $25,000 per

27  year to Jean Peavy.

28

56899.1

**C.**      **Toberoff Induces the Shusters to Repudiate the 1992 Agreement with DC Comics and Acquires a 50% Interest in the Shusters' Putative Rights**

~~52.~~58.  This state of affairs remained undisturbed for almost a decade.  In 2001, Toberoff and his motion-picture production company, Pacific Pictures, induced the Shuster Heirs to violate their 1992 Agreement and wrongfully attempt to acquire and exploit future copyright interests in Superman.

~~53.~~59.  Toberoff is a self-described "intellectual property entrepreneur." His business—conducted through a variety of corporate entities like Pacific Pictures—is to locate the authors of valuable copyrighted works or their heirs and acquire, or prevent them from conveying to others, asserted rights to present or future  copyright interests.  To convince these authors and heirs to go into business with him, Toberoff holds himself out as a producer with the financial resources and connections to exploit recaptured rights in all media in the entertainment industry.

~~54.~~60.  In or around 2001, Toberoff made contact with the Shuster Heirs and embarked on a course of conduct with them to disrupt their relationship with DC Comics, including DC Comics' rights under the 1992 Agreement.  On November 28, 2001, the Shuster Heirs formed a joint venture with Toberoff's company Pacific Pictures (the "2001 Pacific Pictures Agreement") for the stated "purpose of ~~retrieving, enforcing and~~ exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations."—despite the fact that these rights had been granted to DC Comics in the 1992 Agreement.  The 2001 Pacific Pictures Agreement provided that this purpose would be realized in part "via the establishment of Joe Shuster's estate" ~~in a California probate court~~ "... and the estate's termination pursuant to [17 U.S.C.  § 304] of any and all grant or transfers by Joe Shuster of any copyright interest in his creations."

~~55.~~61.  The 2001 Pacific Pictures Agreement defined the Shuster Heirs' rights being assigned as including all "rights, claims, title, copyrights and interests in and to each character, story element, and indicia associated with … 'SUPERMAN' [and] *Superboy.*" (Italics added.)

~~56.~~62.  Pursuant to the 2001 Pacific Pictures Agreement, Jean Peavy and her son Mark Peary "transfer[ red] and assign[ed] to the Venture their rights, title, and interest" in Shuster's

- 19 -

FIRST AMENDED COMPLAINT

purported Superman and Superboy rights.  The Agreement provided that "[a ]ny and all moneys and proceeds [of the Venture] will be shared, divided and payable: fifty percent (50%) to [the Shuster Heirs] and fifty percent (50%) to PPC [Pacific Pictures]," and that upon "winding-up of the Venture or in the event of termination of the Venture *for any reason,* all Rights, property or assets of the Venture will be held fifty percent (50%) by the [Shuster Heirs] and fifty  percent (50%) by PPC." (Emphasis added.)

57.63.        The 2001 Pacific Pictures Agreement also provided that the Shuster Heirs could not enter into any agreement with respect to the Superman and Superboy rights "without the express written consent" of Pacific Pictures, an entity controlled solely by Toberoff.

64.        The 2001 Pacific Pictures Agreement furtherdid not represent a legal retainer agreement.  Rather, the Agreement provided that the joint venture would separately "retain Marc Toberoff, Esq.  to render legal services in connection with the Rights and the Venture." In a subsequent agreement in 2003, the parties confirmed that 58.  Pursuant to "PPC ... is not a law firm." Toberoff signed the 2001 Pacific Pictures Agreement, the on behalf of "Pacific Pictures Corporation" as "Marc Toberoff, President"-as opposed to "Marc Toberoff, Esq." Upon information and belief, Toberoff and the Shuster Heirs did not enter into a legal retainer agreement until 2004—*three years* after entering into the 2001 Pacific Pictures Agreement.

65.  After entering into the 2001 Pacific Pictures Agreement, the Shuster Heirs filed a probate action in Los Angeles Superior Court to establish the Shuster Estate.That action remains open (the "Probate Action").  *(See* LASC Case No.  BP-080635.)  Under the terms of Shuster's purported will, Jean Peavy was appointed the sole beneficiary and executrix of his estate.  In the Probate Action, however, the Shuster Heirs asked the Superior Court to authorize Mark Peary to serve as executor in Jean Peavy's place.  The Superior Court appointed Peary executor on October 7,2003; one month later,  Peary served a copyright termination notice on DC Comics on behalf of the newly formed Shuster Estate.

**D.**    **Toberoff Induces the Siegels to Repudiate the Siegel-DC Comics Agreement and Acquires a 45% Interest in the Siegels' Putative Rights**

59.66.  Having orchestrated this joint venture with the Shuster Heirs, Toberoff used the Shuster Heirs to gain access to the heirs of Jerry Siegel, Joanne Siegel and Laura Siegel Larson (collectively, the "Siegel Heirs").  Toberoff sought to corner the other putative "half" of putative Superman termination rights.  Toberoff knew, however, that the Siegels had reached an agreement with DC Comics in 2001 resolving their putative termination claims.  Nevertheless, Toberoff and his companies set out to interfere with this agreement in order to acquire a stake in the Siegel Heirs' putative copyright interests in Superman.

60.67.   In 1997—and after Jerry Siegel's death in 1996—the Siegel Heirs had employed counsel and served notices to terminate grants of Superman rights that Siegel had conveyed to DC Comics (the "Siegel Superman Termination Notice").  The Siegel Superman Termination Notice, which was prepared by prior counsel, listed Superboy works and elements as among the "character[ s], story element[ s], or indicia reasonably associated with SUPERMAN," in recognition of the fact that Superboy was a complete derivative of Superman rather than a stand-alone, non-derivative work based upon Superman.

61.68.    The Siegel Heirs and DC Comics began negotiations, and in these talks the Siegel Heirs were represented by Kevin Marks of the Gang Tyre entertainment law firm.  As the parties' negotiations progressed, and as expectations grew that an agreement would soon be reached, DC Comics paid the Siegels a non-refundable advance of $250,000.

62.69.    On October 16, 2001, DC Comics made a proposal to the Siegel Heirs.  On October 19, 2001, Kevin Marks sent a letter to DC Comics confirming that the Siegel Heirs "accepted D.C.  Comics' offer of October 16, 2001." On October 26, 2001, DC Comics sent a return letter confirming the parties' agreed-upon terms.  DC Comics then began drafting a long-form agreement.  DC Comics sent the Siegel Heirs a copy of the long-form document on February 1, 2002.  As a result of the parties' agreement (the "Siegel-DC Comics Agreement"), the Siegels were now on the brink of receiving significant portions of the Superman profits—sums that would immediately and dramatically change their lives.  Moreover, virtually all of the money would be

1    theirs alone to keep, as the Gang Tyre form had agreed to represent the Siegels for the standard

2    5% fee.

3        63.70.        Toberoff has admitted that he closely tracked the progress of the Siegel

4    Heirs' termination attempt.  On learning of the Siegel-DC Comics Agreement, he knew his

5    company's joint-venture interest in the Shuster rights was limited and that he could assert greater

6    leverage only if he could disrupt the Siegel-DC Comics Agreement and corner both "halves" of

7    the putative Superman termination rights.  Given that Joe Shuster and his heirs held whatever

8    Superman copyright interests they owned *(if any)* jointly with Jerome Siegel, Toberoff understood

9    that if DC Comics obtained the rights from the Siegels to exploit new Superman properties, it

10   could do so freely without any ability on the part of the Shusters to claim their interests were being

11   infringed.

12       64.71.        With knowledge that his actions would interfere with DC Comics' actual

13   and prospective economic advantages under the Siegel-DC Comics Agreement, beginning in or

14   around late 2001,  Toberoff  on or around November 29, 2001—six days after signing the 2001

15   Pacific Pictures Agreement with the Shuster Heirs—Toberoff, identifying himself  as a film

16   producer—, approached the Siegel Heirs, including and/or through their representative Kevin

17   Marks, for the purpose of acquiring their rights.

18       65.72.        Toberoff contacted Marks again on or around February 6, 2002 regarding a

19   "potential buyout" of the Siegel Heirs' rights.  Marks informed Toberoff that the Siegel Heirs had

20   already reached a binding agreement with DC Comics, which was in the process of being further

21   documented in a long-form agreement.  Undeterred, Toberoff continued to contact the Siegel

22   Heirs and their representatives in an effort to induce them to repudiate the Siegel-DC Comics

23   Agreement and enter into a production agreement with Toberoff or one of his companies.  his

24   efforts to interfere with the Siegel-DC Comics Agreement.

25       73.     On or around February 9, 2002, Toberoff approached Steven Spira, a Warner Bros.

26   Pictures executive, at a social function and told him: "You have a Superman rights problem."

27       74.     On February 12, 2002, Toberoff formed IP Worldwide as a joint venture between

28   Pacific Pictures and a well-known Hollywood talent agent.

56899.1

- 22 -

FIRST AMENDED COMPLAINT

66. 75. On May 9, 2002, as a result of Toberoff's improper interference and inducements, While Toberoff was undertaking these activities to disrupt DC Comics' relationship and agreements with the Siegels, on May 9, 2002, Joanne Siegel sent a letter to DC Comics' affiliate acknowledging the Siegel Heirs had accepted DC Comics' October 16, 2001 offer, but purporting to object to certain unspecified portions of the long-form document.

76.     DC Comics objected to the Siegel Heirs' sudden and unfounded objections expressed in their May 9 letter, but continued working with their the Siegels' counsel (Kevin Marks) to finalize the long-form agreement. On May 16, 2002, Marks, who had discussed the long-form agreement with the Siegel Heirs, told Warner Bros. general counsel John Schulman that his long-form agreement was "aggressive," but that the Siegels could "deal with it" and that it was "not contrary 67. to what had been agreed to." Throughout the summer of 2002, Marks worked on a re-draft of the February 1, 2002 long-form agreement, which he submitted to the Siegels for their approval on July 15, 2002.

77.     In or around August 2002, as Marks was finalizing the Siegels' revisions to the long-form document, Toberoff contacted Marks again regarding the Siegel-DC Comics Agreement. Upon information and belief, Marks informed Toberoff he could not discuss the matter, including the terms of the agreement, because of a confidentiality agreement between DC Comics and the Siegel Heirs. Toberoff reiterated interest in purchasing the Siegel Heirs' Superman rights. On August 8, 2002, Toberoff conveyed an offer to Marks for presentation to the Siegels, which Marks said he would convey.

68. 78.     Upon information and belief, Toberoff's offer stated that he had found a billionaire investor willing to purchase the Siegel Heirs' Superman rights. Toberoff claimed the investor would give the Siegel Heirs $15 million cash up front, plus generous royalty and "back-end" rights on any properties developed, including a new Superman motion picture Marks asked whether the offer was contingent on a due diligence investigation, and Toberoff stated that he had already conducted due diligence. Upon information and belief, Toberoff also falsely offered to help the Siegel Heirs produce a movie that would compete directly with the Superman movie in development at the time at Warner Bros., DC Comics' licensee, even though he knew that the

1  Siegels' limited rights in the recaptured copyright, if any, would make such a competing motion

2  picture all but impossible to produce and distribute.

3      69.79.          Upon information and belief, although Marks conveyed Toberoff's offer to

4  the Siegels, he advised them that they had already reached a binding agreement with DC Comics.

5  Nonetheless, as a result of Toberoff's fraudulent inducements, the Siegel Heirs stated that they

6  would repudiate their agreement with DC Comics and accept Toberoff's offer.70. On or around

7  September 21, 2002, the Siegel Heirs sent a letter to Marks terminating him as their attorney.

8      80.  On or around September 21, 2002, based on Toberoff's inducements and other acts of

9  interference described above, the Siegel Heirs sent a letter to DC Comics repudiating the Siegel-

10  DC Comics Agreement.  On October 28,2002, the Siegel Heirs sent a letter to DC Comics

11  confirming that the September 21, 2002 letter "totally stopped and ended negotiations with DC

12  Comics, Inc." And in a 2006 discovery response in the Siegel Actions, the Siegel Heirs denied that

13  "[b]y the May 9 Letter, [the Siegel Heirs] terminated negotiations with Defendants concerning the

14  Superman Notices."

15      81.  On October 23, 2002, the Siegel Heirs formalized an agreement with defendant IP

16  Worldwide for the purpose of "arrang[ing] and negotiat[ing] the sale, lease, license and all other

17  dispositions or exploitations" of the Siegel Heirs' Superman rights (the "IP Worldwide

18  Agreement").  The Siegel Heirs agreed to pay IP Worldwide a fee of 10% of the gross proceeds

19  generated by those rights.  Upon information and belief, the fee was subsequently reduced to 5%.

20      82.  The IP Worldwide Agreement provided that the Siegel Heirs could "not transfer,

21  assign, license or in any manner encumber the Rights ...  other than through or as a result of IPW's

22  exclusive representation thereunder."

23      83.  The IP Worldwide Agreement was not a legal retainer agreement.  It confirmed that

24  "the scope of this Agreement does not include legal services and/or expenses in connection with

25  litigation," and provided that "[t]he provision of such services and advancing of such expenses ...

26  will be rendered by Marc Toberoff, Esq., subject to good faith negotiation of a mutually

27  acceptable agreement executed by Mr. Toberoff and the Siegel Heirs.  71. Upon information and

28  belief, in or around September 2004, the Siegelit was not until 2004-two years after entering into

1    the IP Worldwide Agreement-that the Siegel Heirs entered into an agreement with Toberoff

2    granting him 40% of their Superman rights and retaining him as their attorney (the "Siegel-

3    Toberoff Agreement").

4         72.84.   Upon information and belief, as a result of the Siegel-Toberoff Agreement and IP

5    Worldwide Agreement, Toberoff now owns a 45% financial interest in the Siegel Heirs' purported

6    Superman rights.

7         85.    Upon information and belief, Toberoff admitted to the Siegel Heirs that he misled

8    them about the existence of the billionaire investor he used as an inducement to obtain their

9    putative rights.  He also acknowledged that even if the Siegel Heirs succeeded in recapturing any

10   Superman rights, he could not follow through on his false promise to make a competing Superman

11   movie for them.  His reasons: "1.  the clout of WB Consumer Products in the licensing industry; 2,

12   perception that WB owns S[uperman] and that to understand what you own requires an

13   understanding of the nuances of copyright law; 3.  fear of being sued or embroiled in litigation."

14   **E.      F.  Toberoff Manipulates the Siegel Heirs and Shuster Heirs into Falsely Claiming**

15   **that Superboy Was the Sole Creation of Jerry Siegel**

16        73.86.   After inducingToberoff induced the Siegel Heirs to repudiate the Siegel-DC

17   Comics Agreement, on November 8, 2002, Toberoff caused the Siegel Heirs to serveserved a

18   second copyright termination notice on DC Comics directed at the character Superboy (the "Siegel

19   Superboy Termination Notice").  The notice not only erroneously stated that Superboy was a

20   copyrightable work not derivative of Superman, but falsely recited that Superboy was created

21   *solely* by Siegel (without contribution from Shuster), thereby entitling the Siegel Heirs to

22   terminate and recapture 100% of the putative Superboy rights.

23        74.87.   Defendants knew these claims were false.  To begin, in the Siegel Superman

24   Termination Notice served by the Siegel Heirs in 1997 the one served prior to Toberoff's

25   intervention—the Siegel Heirs expressly identified the Superboy works and elements as among

26   the "character[ s], story element[ s], or indicia reasonably associated with SUPERMAN." This

27   earlier notice acknowledged—as is in fact the case—that Superboy was a derivative work of

28   Superman, rather than a separately copyrightable work.

75.88.  As to the representation that Superboy was created solely by Jerry Siegel, defendants knew that claim was untrue as well.  Among other reasons:

•    One year earlier, through defendant Pacific Pictures, Toberoff had entered into the 2001 joint -venture agreement with the Shuster Heirs, specifying that the *Shuster Heirs* owned an interest in "Superboy."

•    The original Superboy "script" on which the Siegel Heirs' ownership claims rely openly contains the byline: "By Jerry Siegel *and Joe Shuster*"—not just Jerry Siegel alone.  (Emphasis added.)

•    In 1948, a Court in Westchester, New York found that Joe Shuster provided the artwork for the Superboy story in More Fun Comics No.  101, the comic book which the Siegel Superboy Termination Notice claims is the first published Superboy work.

•    In 1972 and 1973, Siegel and Shuster together filed their own copyright renewal notices with the copyright office for Superboy, in which they identified Superboy as a work that they had *jointly* created.

•    And long before the alleged first publication of "Superboy" in November 1944, Shuster illustrated works for DC Comics that included various depictions of Superman as a boy, exhibiting super-human strength.  Several examples are reproduced below.  In "Action Comics No.  1," for example, Shuster drew Superman as a very young boy displaying an "astonish[ing] feat[]" of super-human strength, holding a chair above his head:



Action Comics No. 1 (1930)

Shuster also depicted Superman as a youth with super-powers in "Superman No. 1" a work allegedly terminated by Shuster in the notice filed by Toberoff on behalf of the Shuster heirs,



Superman No. 1 (May 1939)

as well as in a 1942 Sunday comic strip, in which Superman as a "youth" discovers that his "amazing powers" are "multiplied with the years" and that, as a boy, he could "outrace the fastest streamline train":



Superman Sunday Strip (May 31, 1942)

76.89.    Through Pacific Pictures, Toberoff manipulated the Siegel and Shuster Heirs into falsely positioning Siegel as the sole creator of any putative copyrightable elements in Superboy.  They did so to enable the Siegels to claim a sole ownership interest in Superboy elements allegedly subject to recapture and thereby prevent DC Comics from exploiting Superboy without the Siegels' authorization and without being subject to claims of copyright infringement.  (Again, to be clear, DC Comics disputes that Superboy is not a derivative work of Superman and disputes that it is a work that Shuster and Siegel owned.)

77.90.    To manufacture this claim of sole ownership by the Siegels, Toberoff (acting through Pacific Pictures) caused the *Shuster Heirs* to remove from the 2001 joint venture between Pacific Pictures and the Shuster Heirs all claims by the Shusters to alleged rights in any and all Superboy elements.  Toberoff accomplished this by creating a new joint-venture agreement—signed October 30, 2003—that *deleted* any reference to Superboy.  Defendants Mark Peary and Jean Peavy signed this agreement (the "2003 Pacific Pictures Agreement"), which omitted all references to Superboy in its description of the Shuster Heirs' rights.  Toberoff induced the Shuster Heirs to disclaim any interest in Superboy so that Toberoff could position the Siegel Heirs to recapture 100% of these rights and assert a copyright infringement action against DC Comics—and seek an injunction against the television program *Smallville* on that basis.

56899.1

- 28 -

FIRST AMENDED COMPLAINT

1   78.91.   In October 2004, the Siegels filed two actions in this Court seeking declaratory

2   relief as to the validity of the Superman and Superboy termination notices, and in April 2005, the

3   Siegels supplemented their pleadings in the Superboy action to assert copyright infringement (the

4   "Siegel Actions").  (Case Nos.  CV-04-8400 ODW; CV-04-8776 ODW.) Both actions remain

5   pending before  this Court.

6   **F.**        **The Shusters' Flawed Termination Notice**

7   79.92.   On November 10, 2003, one week after the 2003 Pacific Pictures Agreement was

8   signed, defendant Mark Peary served on DC Comics a "Notice of Termination of Transfer

9   Covering Extended Copyright Renewal Term of 'Superman'" (the "Shuster Termination Notice").

10   80.93.        The form submitting the Shuster Termination Notice for recordation in the

11   U.S.  Copyright Office was certified under penalty of perjury by Toberoff on behalf of "IP

12   Worldwide/Estate of Joseph Shuster." IP Worldwide is the Toberoff entity which, upon

13   information and belief, holds a portion of the Siegel Heirs' Superman and Superboy rights

14   pursuant to the IP Worldwide Agreement.

15   81.94.        The Shuster Termination Notice purports to terminate, under 17 U.S.C.  §

16   304(d), effective October 26, 2013, the following Shuster copyright grants: (a) the December 4,

17   1937 Agreement; (b) the March 1, 1938 Agreement; (c) the DCI September 22, 1938 Agreement;

18   (d) the McClure September 22, 1938 Agreement; (e) the December 19, 1939 Agreement; (f) the

19   May 19, 1948 Stipulation; and (g) the December 23, 1975 Agreement.

20   82.95.        The Shuster Termination Notice does *not* purport to terminate the copyright

21   grants in the May 21, 1948 Consent Agreement or, even more importantly, the 1992 Agreement

22   between the Shuster Heirs and DC Comics.

23   83.96.        The Shuster Termination Notice purports to apply to the following works:

24   (a) certain unpublished material created before Action Comics No.  1; (b) Action Comics No.  1;

25   (c) Action Comics No.  2; (d) Action Comics No.  3; (e) Action Comics No.  4; (f) Action Comics

26   No.  5; (g) Action Comics No.  6; (h) Action Comics No.  7; (i) Superman No.  1; and (j)

27   Superman No.  3.

28

56899.1

84.97.    The Shuster Termination Notice does not purport to terminate any copyright grant in pre-Action Comics No. 1 promotional materials or any materials relating to Superboy.

85.98.    The Shuster Termination Notice states that defendant Mark Peary "is the person entitled to exercise Joseph Shuster's termination interest" and that the Notice was "signed by all persons whose signature is necessary to terminate." The Notice makes no mention of the joint venture that the Shuster Heirs and Pacific Pictures formed or its putative ownership stake in the to-be terminated Superman rights. Nor does the Notice mention Pacific Pictures or its putative ownership stake in the joint venture, despite the grant of 50/50 rights in the joint venture to Pacific Pictures pursuant to Pacific Pictures' 2001 and 2003 agreements with the Shusters.

86.99.    On September 10, 2004, Pacific Pictures and the Shuster Heirs signed a one-page letter (the "September 10, 2004 Letter") purporting to cancel their joint venture and providing that the 2001 Pacific Pictures Agreement and 2003 Pacific Pictures Agreement "have been cancelled." However, because the Shuster Heirs and Pacific Pictures had agreed that all rights held by their joint venture would be divided 50/50 upon termination of the joint venture "for any reason," the apparent effect of the September 10, 2004 Letter was to transfer 50% of the Shuster Heirs' purported share of Shuster's rights to Toberoff or his companies.

87.100.    DC Comics is informed and believes that Toberoff (or his companies) now own 50% of the Shuster Heirs' putative rights as well as the 45% share of the Siegel Heirs' putative rights. This gives Toberoff the largest financial stake among defendants' collective asserted rights in Superman and in the pending legal disputes concerning those rights *(i.e.,* Toberoff—47.5%; Siegel Heirs—27.5%; Shuster Heirs—25%).

88.101.    DC Comics is also informed and believes that Toberoff, Pacific Pictures, IP Worldwide, the Siegels, and the Shusters have entered into one or more agreements preventing the Siegels or Shusters from conveying rights to DC Comics or entering into other agreements with DC Comics, including for the settlement of their putative termination claims or litigation, without the consent of other parties. For example, in the 2001 and 2003 Pacific Pictures Agreements, the Shuster Heirs agreed not to settle any claims with respect to the Superman rights without Pacific

1  Pictures' or Toberoff's consent.  Such consent agreements are void as against public policy,

2  violate DC Comics' rights, and impede the administration of justice.

3  **G.    Toberoff's Wrongful Conduct Is Revealed to DC Comics in the Toberoff Timeline**

4      ~~89.~~102.  Pursuant to federal court orders dated September 26, 2008 and December 4, 2008,

5  Toberoff was compelled to produce to DC Comics a document titled "Superman – Marc Toberoff

6  Timeline" (the "Toberoff Timeline," attached  hereto as Exhibit A), which Toberoff has

7  acknowledged was written by an attorney  he previously employed.  To prevent DC Comics from

8  obtaining and using the document, Toberoff asserted ~~to the federal court~~ that it was privileged, but

9  his position was repeatedly rejected by this Court.   The Toberoff ~~produced the Toberoff~~ Timeline

10  was produced to DC Comics on December 10, 2008.

11      ~~90.~~103.  The Toberoff Timeline describes and discloses Toberoff's wrongful activities in

12  pursuing the Siegel and Shuster Heirs' putative interests in the Superman rights.  It lays out

13  Toberoff's scheme to induce the Siegel Heirs to repudiate the Siegel-DC Comics Agreement with

14  DC Comics (*e.g.*, "It [is] clear at this juncture that [Toberoff] thwarted the earlier deal with Time

15  Warner and DC Comics in 2002 for his own personal gain"); his efforts to acquire as "much

16  ownership of the Superman copyright <u>personally</u> as he can"; and his attempt to conceal certain of

17  his illicit activities from the Siegel and Shuster Heirs.  (Emphasis in original.) As a result, "***the

18  single person who would stand to gain the MOST in a settlement with Time Warner [and DC

19  Comics] regarding the ongoing SUPERMAN legal dispute would not be the heirs themselves,

20  but Marc Toberoff.***"  (Emphasis in original.)

21      ~~91.~~104.  The Toberoff Timeline discloses many of the facts alleged herein, and concludes:

22  "[Toberoff] is solely motivated *at all times* not by his clients' interests, but manipulating pieces of

23  the puzzle so that he may receive the greatest percentage from a very possible large Time Warner

24  settlement, through part ownership and  unconscionable fees." (Emphasis in original.) The

25  Toberoff Timeline explains that "[a]t least 7 attorneys have come and gone at the Law Offices of

26  Marc Toberoff, and many have left due to ethical issues." Many of these and other disturbing,

27  salient facts detailed herein have only recently come to light in the past ~~18~~20 months.

28

56899.1

- 31 -

### V.     CLAIMS FOR RELIEF

**A.     First Claim for Relief: Declaratory Relief re: Invalidity of Copyright Termination Notice (Against Defendants Shuster Estate ~~and~~, Peary, and Peavy)**

~~92.~~ 105.  DC Comics re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

~~93.~~ 106.  The Shuster Termination Notice is invalid, and thus ineffective, for at least five separate, independent, and alternative reasons:

**(1)     There Is No Statutory Basis for the Shusters to Terminate**

~~94.~~ 107.  The Copyright Act does not provide any basis for the Shuster Estate to terminate. Shuster's termination right was lost when he died in 1992 without having exercised it and without leaving a statutory heir to inherit it under the then-applicable provisions of the Copyright Act.

~~95.~~ 108.  The 1976 Copyright Act gave authors the ability to terminate certain pre-1978 copyright grants.  According to the original termination provisions: "Where an author is dead, his or her termination interest is owned, and may be exercised, by his widow or her widower and his or her children or grandchildren." 17 U .S.C. § 304( c )(2) (1976).  In other words, the right of termination could only be exercised by an author during his or her lifetime, or by a widow, child, or grandchild after the author's death.  As the language of the statute establishes, and its legislative history confirms, the right of termination was lost if an author died without exercising it and without leaving a widow, child, or grandchild to inherit it.

~~96.~~ 109.  Shuster could have exercised his putative termination right beginning in April 1984.  The 1976 Copyright Act provided that a copyright grant could be terminated 56 years after the date copyright was first secured *(i.e.,* April 1994, or 56  years after the April 1938 publication of Action Comics No.  1), and that notice of termination could be served 10 years before the termination date *(i.e.,* April 1984, or 10 years before April 1994).  17 U.S.C. § 304(c)(3)-(4).

~~97.~~ 110.  During his lifetime, Shuster chose not to exercise his termination right.  Shuster died in 1992, and did not leave a widow, child, or grandchild to succeed to his termination right under section 304( c) of the 1976 Copyright Act.  As a result, Shuster's termination right ceased to exist on his death.

98. 111.  The 1999 Copyright Term Extension Act ("CTEA") extended the term of copyright by 20 years and also provided an opportunity to authors and selected heirs to terminate for this new extended time period in circumstances where the "[t]ermination rights provided for in subsection (c) have expired on or before the effective date of the [CTEA]," or October 27, 1998, and the "author or owner of the termination right has not previously exercised such termination right." 17 U.S.C. § 304( d).  Where section 304( d) applies, section 304( c )(2) provides that if an author is dead, the termination right can be exercised by his widow, children, or grandchildren or, "[i]n the event that the author's widow or widower, children or and grandchildren *are not living,* the author's executor, administrator, personal representative, or trustee... ...." " (Emphasis added). These are the provisions that defendant Mark Peary, the executor of the Shuster Estate, purports to rely on in the Shuster Termination Notice, but they have no application here.  By its own terms, section 304(d) only applies where an author's window for exercising the termination right opened and closed or "expired" *(not* when an author died while the window was open without exercising the right or leaving any heirs to do so), and where a deceased author's widow, child, or grandchild is "not living," but who did at some time live.  Shuster never had a widow, child, or grandchild, and Peary, acting on behalf of the Shuster Estate, has no right to file the invalid notice of termination that he did.

**(2)      The 1992 Agreement Bars the Shusters from Pursuing Termination**

99. 112.  The 1992 Agreement that Frank Shuster and Jean Peavy entered into with DC Comics bars the Shuster Estate from pursuing termination because, *inter alia,* in exchange for valuable consideration, the 1992 Agreement effected a rescission, revocation, and re-grant of all prior copyright grants, which eliminated any pre-1978 grant that could be subject to termination under section 304 of the Copyright Act.

100. 113.  The 1992 Agreement, which was executed on October 2, 1992, provides that Shusters' heirs "fully settle[]" and forfeit any and all of rights under Joseph Shuster's prior "agreements or otherwise," thereby revoking and rescinding those prior, pre-1992 instruments.  It also "*grant[s] to us* [DC Comics] any…copyrights, trademarks, or other property right in any and

1    all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon."

2    (Emphasis added.)

3        101.114.  Section 304(d) of the Copyright Act only allows for termination of copyright

4    grants "executed before January 1, 1978."  Because the 1992 Agreement left intact no pre-1978

5    copyright grant to terminate, section 304( d) does not apply, and the Shuster Estate has no

6    copyright grant that it may terminate.

7        102.115.  Shuster's heirs approached DC Comics in 1992 seeking increased annual

8    payments, certain tax benefits, and payment of Shuster's debts and expenses.  At the time,

9    Shuster's heirs recognized the value of Superman as a property.  As the result of DC Comics'

10   development, promotion, and exploitation of Superman from 1938 to 1992, Superman had evolved

11   from the black-and-white figure drawn by Shuster for Action Comics No.  1 to a global, multi-

12   media industry.  Moreover, in correspondence with DC Comics, the Shusters adverted to the

13   termination rights provided for under the Copyright Act.  As Shuster's heirs requested, the 1992

14   Agreement provided that DC Comics would: (a) increase its annual payments to the Shuster Heirs

15   to $25,000 per year—five times higher than the amount it was obligated to pay under the

16   December 23, 1975 Agreement; (b) make these annual payments to Jean Peavy for purposes of a

17   tax benefit; and (c) pay the approximately $20,000 representing Shuster's final debts and

18   expenses.  DC Comics continues to make annual payments under the 1992 Agreement, and has

19   paid Shuster's heirs close to $500,000 to date.  The 1992 Agreement confirms that it "fully settles

20   *all claims to any payments or other rights or remedies* which you may have under any other

21   agreement or otherwise, *whether now or hereafter existing* regarding the copyrights, trademarks,

22   or other property right in any and all work created in whole or in part by your brother, Joseph

23   Shuster, or any works based thereon." (Emphasis added.) Shuster's heirs agreed "not to assert any

24   claim of right, by suit or otherwise, with respect to the above, now and forever."

25       103.116.  By effectively rescinding, revoking, and re-granting any and all prior grants of

26   Joe Shuster's rights, the Shuster Heirs have no right to terminate any of the Superman copyrights.

27   Defendant Peavy has recognized that this was the clear effect of the 1992 Agreement; in a

28   September 7, 1999 letter to DC Comics, she confirmed: "I have learned from the Internet that

1   Joanne Siegel has filed a copyright claim for SUPERMAN *i.e.,* the Siegel Superman Termination

2   Notice].  I want you to know that I intend to honor our pension agreement."

3   ~~104.~~117.  At the very least, because of DC Comics' continued performance under the 1992

4   Agreement, and the Shusters' continued acceptance of benefits under the Agreement——even

5   after filing the Shuster Termination Notice—the Shusters are estopped from disputing that the

6   1992 Agreement remains in full force and effect, which operates to preclude the assertion of any

7   termination right.

8   **(3)    The Shusters Lack the Majority Interest Necessary to Terminate**

9   ~~105.~~118.  The Shuster Termination Notice is also invalid because the party that filed it—if

10  defendants' own contractual documents are to be believed—lacked authority to do so.  Section

11  304( c)( 1) of the Copyright Act provides that termination of a grant executed by an author who is

12  not living may be exercised only "by the person or persons who…own and are entitled to exercise

13  a total of *more than one-half of that author's termination interest.*" 17 U.S.C.  § 304( c)(1)

14  (emphasis added).  Copyright Office regulations require that a termination notice include "specific

15  indication of the person or persons executing the notice who constitute more than one-half of that

16  author's termination interest" and "shall be signed by the number and proportion of the owners of

17  that author's termination interest required under section 304(c)." 37 C.F.R.  § 201.10(b) (1)(vii),

18  (c)(2).

19  ~~106.~~119.  According to the Pacific Pictures agreements (to the extent they are valid and

20  enforceable), the Shuster Estate does not own—and did not own at the time the Shuster

21  Termination Notice was executed—the "more than one-half" majority interest necessary to

22  terminate under section 304( c)(1) of the Copyright Act.

23  ~~107.~~120.  Pursuant to the 2001 Pacific Pictures Agreement, defendants Mark Peary and

24  Jean Peavy "transfer[ red] and assign[ ed]…their rights, title, and interest" in all of Shuster's

25  copyrights and creations to their joint venture with Pacific Pictures.  In the 2003 Pacific Pictures

26  Agreement, Peary confirmed the terms of the 2001 Pacific Pictures Agreement on behalf of the

27  Shuster Estate.

28

- 35 -

FIRST AMENDED COMPLAINT

108.121.  One week later, on November 10, 2003, Peary served the Shuster Termination Notice on behalf of the Shuster Estate.  At the time, the Shuster Estate did not own *any* of the purported termination right, as this and all other rights had been transferred to the joint venture with Pacific Pictures.[2]  The Shuster Termination Notice is therefore invalid under section 304(c)(1) of the Copyright Act.

109.122.  The Shuster Termination Notice represents that Peary "is the person entitled to exercise Joseph Shuster's termination interest" and that the Notice had been "signed by all persons whose signature is necessary to terminate." Peary's failure to disclose that he had purported to transfer this putative termination right to the joint venture with Pacific Pictures, or include a signature on behalf of the joint venture or Pacific Pictures, violated 37 C.F.R..  § 201.10(b)(1 )(vii) and 37 C.F.R.  § 201.10(c)(2).

110.123.  Peary's failure to disclose the requisite information in the Shuster Termination Notice was not harmless.  Upon information and belief, these omissions were not inadvertent, but were intended to conceal material information from DC Comics, including: (a) the various conflicts of interest arising from Toberoff's and his companies' significant ownership interest in the Shuster Estate's and the Siegel Heirs' purported rights; and (b) consent agreements that Toberoff procured limiting the Shuster and Siegel Heirs' freedom to enter into agreements with DC Comics regarding those rights.

111.124.  The Copyright Act's termination provisions were crafted to avoid the trafficking in future interests by third parties like Toberoff and his companies, yet that is exactly what his agreements with the Shuster and Siegel Heirs accomplish, and what Toberoff and Shusters failed to disclose to DC Comics and the Copyright Office by serving and filing the Shuster Termination Notice.

---

[2] At most, the Shuster Estate owned only a 50% interest in that joint venture.  This is still the case.  As a result of the September 10, 2004 Letter purporting to cancel the 2001 and 2003 Pacific Pictures Agreements and by the terms of the 2001 and 2003 agreements themselves, any putative rights held by the joint venture were split 50/50 between the Shuster Heirs and Pacific Pictures on cancellation of the joint venture agreement: "[Upon] winding-up of the Venture or in the event of termination of the Venture for any reason, all Rights, property or assets of the Venture will be held fifty percent (50%) by the [Shuster Heirs] and fifty percent (50%) by PPC." (Emphasis added.)

**(4)** **The Shusters Do Not Attempt to Terminate Certain All-Encompassing Copyright Grants**

112.125.  The 1992 Agreement includes a "grant" by Shuster's heirs to DC Comics of, *inter alia,* all "copyrights, trademarks, or other property right in any and all work created in whole or in part by…Joseph Shuster, or any works based thereon." In the Shuster Termination Notice, defendants did not terminate (or even mention) the 1992 Agreement.

113.126.  The May 21, 1948 Consent Agreement also includes a grant by Siegel and Shuster to National, DC Comics' predecessor-in-interest, of all of Siegel and Shuster's rights in Superman and Superboy.  (If the 1992 Agreement is not read as a rescission, revocation, and re-grant of all prior agreements between Shuster and DC Comics (and it should be), then the May 21, 1948 Consent Agreement remains in effect.)

114.127.  Defendants do not attempt to terminate the May 21, 1948 Consent Agreement, and do not identify the May 21, 1948 Consent Agreement in the Shuster Termination Notice.

115.128.  As the result of defendants' failure to terminate the 1992 Agreement and May 21, 1948 Consent Agreement, the grants contained therein remain in full force and effect.  Thus, DC Comics is and continues to be the sole owner of all rights, including rights under copyright, in Superman pursuant to the 1992 Agreement and May 21, 1948 Consent Agreement.

**(5)** **The Doctrine of Unclean Hands Bars the Shusters from Terminating**

116.129.  The doctrine of unclean hands requires that the Shuster Termination Notice be deemed invalid because it contains material misrepresentations intended to mislead the courts, Copyright Office, and DC Comics—all to the detriment of DC Comics.

117.130.  The Shuster Heirs did not disclose Pacific Pictures' purported ownership interest in the rights sought to be terminated.  Just one week before filing the Shuster Termination Notice, the Shuster Estate signed the 2003 Pacific Pictures Agreement, reaffirming its transfer of 100% of its rights in any Superman-related copyrights to the joint venture with Pacific Pictures.  Copyright Office regulations require that a termination notice include "specific indication of the person or persons executing the notice who constitute more than one-half of that author's termination interest" and "shall be signed by the number and proportion of the owners of that author's

1    termination interest required under section 304( c)." 37 C.F.R.  § 201.10(b)(1)(vii), (c)(2).  Yet

2    Pacific Pictures is conspicuously absent from the Shuster Termination Notice.  This omission was

3    not inadvertent, as explained above.

4    ~~118.~~131.  Induced by Toberoff, the Shuster Heirs also falsely disclaimed any interest in the

5    Superboy rights in the Shuster Termination Notice.  This permitted Toberoff to assert on behalf of

6    the Siegel heirs a baseless Superboy-related copyright infringement claim against DC Comics.

7    Prior to these manipulations by Toberoff, Shuster and the Shuster heirs had truthfully maintained

8    for over 50 years that Shuster had co-created Superboy.  For example, the findings submitted by

9    Siegel and Shuster's counsel in the 1940s Westchester Action, specified that Shuster had drawn

10   the first "Superboy" denominated story in More Fun Comics No.  101.  Similarly, in 1972 and

11   1973, during the Superman renewal litigation,  Siegel and Shuster jointly filed copyright renewal

12   notices asserting joint authorship both in the Superboy character, and in More Fun Comics No.

13   101, which contained the first comic book story denominated "Superboy."

14   ~~119.~~132.  Additionally, in the 2001 Pacific Pictures Agreement, entered into before

15   Toberoff had secured an agreement with the Siegel Heirs, Toberoff and the Shuster Heirs

16   expressly identified "Superboy" as among the universe of rights that Shuster had jointly created

17   with Siegel.  Yet just two years later in 2003, and only *after* Toberoff had entered into an

18   agreement with the Siegel Heirs securing control over their rights, did the Shuster Heirs suddenly

19   reverse course.  The 2003 Pacific Pictures Agreement omitted all reference to Superboy, and the

20   Shuster Termination Notice filed one week later avoided any overt mention of Superboy elements

21   or works.[34]  But even the termination notice served by the Shuster Heirs, while carefully drafted to

22   avoid any mention of Superboy, could not completely rewrite history.  The Shuster Termination

23   Notice expressly identifies Action Comics No.  1 and Superman No.  1 as terminated works.  Both

24   of these works, however, clearly depict Superman as a boy with super-powers: *i.e.,* a "Superboy."

25

26   [34] As noted, DC Comics maintains that Superboy is a derivative work based upon the
     preexisting Superman, and in any event, is owned solely and exclusively by DC Comics, inter alia,
27   because it is a work-for-hire and the script submitted by Siegel and Shuster is unpublished and,
     thus, is not terminable.

28

1    For example, Action Comics No. 1 features Superman as a very young boy exhibiting super

2    strength, and Superman No. 1 depicts Superman as a youth leaping over a building.

3        ~~120.~~133. After the Shuster Termination Notice was filed, the Siegel Heirs brought a

4    copyright infringement claim against DC Comics on the frivolous ground that Superboy was the

5    sole creation of Siegel, entitling the Siegel Heirs to terminate and recapture 100% of the Superboy

6    rights (as opposed to the 50% share they would be entitled to recapture if Superboy was a joint

7    work). The Siegel Heirs threatened to enjoin the popular *Smallville* television series, which they

8    wrongly claimed infringed their exclusive rights in Superboy. As a result, DC Comics has

9    incurred substantial expenses defending against the claim Toberoff manufactured and the Shusters

10   facilitated. Defendants compromised the integrity of the Copyright Office and judicial system by

11   crafting the Shuster Termination Notice in this way, and the Shuster Termination Notice should be

12   held invalid on this and the other related grounds set forth herein.

13                                *       *       *

14       ~~121.~~134. Each of the foregoing reasons is a separate, independent, and alternative basis for

15   declaring the Shuster Termination Notice to be invalid and thus ineffective. A declaration by this

16   Court regarding the validity of the Shuster Termination Notice is warranted under the Declaratory

17   Judgment Act, 28 U.S.C. §§ 2201 *et seq.,* to establish the parties' respective rights and obligations

18   with respect to the copyright interest in the Superman material.

19   **B.**      **Second Claim for Relief: Declaratory Relief re: Limited Scope of Copyright**

20             **Termination Notice (Against Defendants Shuster Estate ~~and~~, Peary, and Peavy)**

21       ~~122.~~135. DC Comics re-alleges and incorporates by reference each and every allegation

22   contained in the paragraphs above.

23       ~~123.~~136. This Second Claim for Relief is advanced in the alternative—*i.e.*, if the Court

24   does not grant DC Comics' First Claim for Relief set forth above and hold that the Shuster

25   Termination Notice is invalid.

26       **(1)  Additional Factual Background**

27       ~~124.~~137. Upon information and belief, in or around 1933, Siegel and Shuster began co-

28   creating comic strips, some of which included stories featuring a character named Superman. The

materials created by Siegel and Shuster during this time are believed to include: (a) 24 days of Superman comic strips intended for newspapers; (b) a seven-page synopsis of the last 18 days (weeks two through four) of such comic strips; (c) a paragraph previewing future Superman exploits; (d) a nine-page synopsis of an additional two months of daily comic strips; and (e) 15 daily comic strips (collectively, the "Unpublished Superman Works").  None of these materials was published in its original form, most were never published at all, and some are apparently lost.

125.138.  Upon information and belief, between 1933 and 1937, Siegel and Shuster submitted the Unpublished Superman Works to a number of prospective publishers and newspaper syndicates, all of which rejected them.

126.139.  On December 4, 1937, Siegel and Shuster entered into the December 4, 1937 Agreement with DCI.  Siegel and Shuster agreed to "give their exclusive services" in producing certain comic features for a period of two years.  Siegel and Shuster were required to submit any new continuity to DCI, which reserved the right to accept or reject them for a period of sixty days.

127.140.  In early 1938, DCI was seeking material for use in a new comic book it was developing entitled " Action Comics." Pursuant to the December 4, 1937 Agreement, the 24 days of Superman comic strips from the Unpublished Superman Works were provided to DCI for review.  DCI decided to publish a Superman story in Action Comics No.  1, but the materials submitted by Siegel and Shuster to DCI were neither in a form that was acceptable for publication in a comic book, nor were they complete.  Therefore, at the instance and expense of DCI and subject to its right of control, Siegel and Shuster adapted the 24 days of comic strips, and  added certain new material, to create a 13-page uncolored comic book story entitled "Superman." Cover art featuring Superman that was used for Action Comics No.  1 was thereafter created by DCI.  DCI's printers or engravers, working at the direction of DCI, chose colors for the Superman character and colored the 13-page story and cover.

128.141.  Siegel and Shuster assigned to DCI all of their rights in Superman in the March 1, 1938 Agreement.  This included "all good will attached thereto and exclusive right to the use of the characters and story, continuity and title of strip."  Siegel and Shuster agreed not to use Superman or any other character featured in the strip "by their names contained therein."

129.142.  Before the April 1938 publication of Action Comics No. 1, which was cover-dated June 1938, DCI promoted the upcoming Superman story in some of its other publications, including "More Fun Comics No. 31" and "Detective Comics No. 15." These publications were cover-dated May 1938 and were published prior to Action Comics No. 1. The promotions (the "Promotions") depict Superman in his costume—including a cape, boots, leotard, and inverted triangular "S" crest on his chest—exhibiting his super-strength by holding a car over his head as bystanders watch in awe. The Promotions show almost the entirety of what would become the cover of Action Comics No. 1 in clarity and detail.

130.143.  Action Comics No. 1 was comprised not only of the 24 days of Superman comic strips from the pre-existing Unpublished Superman Works (as modified and edited by Siegel and Shuster), but of additional new material created by Siegel and Shuster at DCI's instance and expense and subject to its right of control.

131.144.  Upon information and belief, after the publication of Action Comics No. 1, Siegel and Shuster supplied further original Superman stories to DCI, at DCI's instance and expense and subject to its right of control. On September 22, 1938, Siegel and Shuster entered into another employment agreement with DCI confirming that Siegel and Shuster had "been doing the art work and continuity for said comics [including Superman comics] for us. We wish you to continue to do said work and hereby employ and retain you for said purposes." The DCI September 22, 1938 Agreement also contained an acknowledgement that DCI was the "exclusive" owner of Superman.

132.145.  Also on September 22, 1938, Siegel and Shuster entered into the McClure September 22, 1938 Agreement with DCI and the McClure Newspaper Syndicate concerning the use of Superman in newspaper strips.

133.146.  All of Siegel and Shuster's contributions to Superman comic books and comic strips were made pursuant to the December 4, 1937 Agreement, March 1, 1938 Agreement, the DCI September 22, 1938 Agreement, the McClure September 22, 1938 Agreement, the McClure September 22, 1938 Agreement, contemporaneous oral agreements confirmed by one or more of those agreements, or certain subsequent agreements affirming those agreements, as employees of

DCI (or its successors) and at DCI's instance and expense and subject to its right of control.  In particular, upon information and belief, Shuster continued to work for DCI and/or its successors as a staff artist even when Siegel did not, and therefore may have had oral or written employment agreements independently of Siegel.  As a result, all of these materials constitute works for hire under the 1909 Copyright Act, and the copyrights therein are owned exclusively by DC Comics and are not subject to termination under later amendments to the Copyright Act.

134.147.  On November 30, 1938, Siegel wrote a letter to DCI (the "November 1938 Letter") suggesting that it publish a comic book entitled "Superboy," "which would relate to the adventures of Superman as a youth." The November 30, 1938 Letter does not contain any discussion of plot, dialogue, appearance, or any other copyrightable material relating to Superboy. DCI decided not to publish a Superboy comic book at that time, and had already published comic books, discussed *supra,* that showed Superman as a young boy and exhibiting super-human strength.  For example, in 1939, among the Superman material prepared by Siegel and Shuster at the instance and expense of DCI and subject to its right of control was Superman No.  1.  In Superman No.  1, Clark Kent is depicted as a boy with super-powers.

135.148.  On December 19, 1939, Siegel and Shuster entered into the December 19, 1939 Agreement with DCI, which modified the DCI September 22, 1938 Agreement by, *inter alia,* doubling Siegel and Shuster's compensation for Superman comic books and newspaper strips and providing for payment to Siegel and Shuster for uses of Superman in media such as radio, motion pictures, and toys.  Under the December 19, 1939 Agreement, Siegel and Shuster again acknowledged DCI's sole ownership of Superman.

136.149.  Upon information and belief, in December 1940, Siegel, on behalf of himself and Shuster, submitted to DCI a 13-page script of continuity for Superboy (the "Unpublished 1940 Superboy Script") and renewed his suggestion that DCI publish a comic book depicting Superman as a youth.  The Unpublished 1940 Superboy Script, which includes the credit line "By Jerry Siegel and Joe Shuster," states: "So many faithful followers of today's leading adventure comic strip, SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth…And so here he is at last …the answer to your requests …America's outstanding boy hero: SUPERBOY!" The

Unpublished 1940 Superboy Script explains that "[i]n later years [Superboy] was to become the might[y] figure known as SUPERMAN!" The Unpublished 1940 Superboy Script was derived entirely from pre-existing Superman elements and ideas that had been published by DCI as part of works for hire, and contained no original copyrightable element.  Again, DCI decided not to publish a Superboy comic book at that time.

137.150.  Upon information and belief, sometime prior to November 18, 1944, DCI published a comic book depicting the adventures of Superman as a youth, called Superboy, in "More Fun Comics No. 101," which had a cover date of January-February 1945 and was illustrated at least in part by Shuster.  Upon information and belief, Siegel did not participate in the creation of this comic book or the Superboy story it contained.  Other than retelling the Superman origin story from Action Comics No.  1 and Superman No.  1, this Superboy story bore no resemblance to the Unpublished 1940 Superboy Script.

138.151.  In the more than 70 years since the publication of Action Comics No.  1 in 1938, DC Comics has created a vast universe of Superman material spanning virtually all media, including comic books, graphic novels, live action pictures, feature-length motion pictures, motion picture serials, radio and television serials, and live theatrical presentations.  DC Comics' extensive development and exploitation of Superman has generated new characters, new super-powers, new components to the Superman universe, new elements in the Superman back story, and new changes in Superman's appearance.

**(2)    Claim for Declaratory Relief re: Limited Scope of Copyright Termination Notice**

139.152.  In the event that the Shuster Termination Notice challenged in the First Claim for Relief above is deemed to be effective, the scope and reach of the Notice must be declared limited in the following ways:

**a.    Unpublished Superman Works**

140.153.  The Shuster Termination Notice purports to terminate certain portions of the Unpublished Superman Works, including: (a) "twenty-four days …of previously unpublished

SUPERMAN newspaper comic strips, created c. 1934," (b) "SUPERMAN story in comic book form …created c. 1933," and (c) "15 SUPERMAN daily comic strips …created c. 1934."

141.154. To the extent that any portion of the Unpublished Superman Works may be considered published for purposes of the Copyright Act (and this is disputed), those portions were published only as a result of their adaptation for inclusion in Action Comics No. 1, which was a work made for hire. The Copyright Act expressly provides that "a work made for hire" cannot be subject to termination. 17 U.S.C. § 304(c)-(d). As a result, the Shuster Termination Notice is ineffective as to the Unpublished Superman Works.

**b.     Pre-Action Comics No. 1 Promotions**

142.155. The Shuster Termination Notice does not attempt to terminate DC Comics' rights in the Promotions published before Action Comics No. 1.

143.156. Moreover, upon information and belief, the Promotions, depicting in sum and substance what was subsequently published as the cover of Action Comics No. 1, were not prepared by Siegel or Shuster, but rather by others either employed by DCI or at the instance and expense of DCI and subject to its right of control. As a result, the Promotions were works made for hire and any copyright therein was owned by DCI *ab initio* and cannot be subject to termination. 17 U.S.C. § 304(c)- (d).

144.157. DC Comics remains the sole owner of the Promotions, all copyrights therein, and the various copyrightable elements contained therein. The Shusters may not seek to terminate copyright interests comprised in the Promotions.

**c.     Works for Hire**

145.158. The Shuster Termination Notice purports to recapture the rights in Action Comics Nos. 1-7, Superman No. 1, and Superman No. 3 ("Superman Works"). Each of the Superman Works was prepared at the instance and expense of DCI and subject to its right of control. As a result, the Superman Works were works made for hire and any copyright therein was owned by DCI *ab initio* and cannot be subject to termination. 17 U.S.C. § 304(c)-(d).

146.159.  DC Comics remains the sole owner of the Superman Works, all copyrights therein, and the various copyrightable elements contained therein.[4] [5]

### d.    Derivative Works

147.160.  All Superman-related works prepared after the publication of Action Comics No. 1 were derivative works based on pre-existing copyrightable material and created under the authority of valid copyright grants (the "Derivative Works").

148.161.  The Derivative Works include new characters, new super-powers, new components to the Superman universe, new elements in the Superman back-story, and changes in the appearance of Superman.

149.162.  Regardless of whether the Shuster Termination Notice is deemed valid, DC Comics remains the sole owner of the Derivative Works and retains the continuing right to exploit the Derivative Works under section 304 of the Copyright Act, 17 U.S.C.  § 304(c)(6)(A).

### e.    Scope of Shuster Notice

150.163.  The Shuster Termination Notice, in addition to specifying works to be terminated also describes certain elements purportedly encompassed by the works sought to be recaptured.  Many of these elements do not appear in the specified works.  In addition to identifying elements that are not present, the Shuster Termination Notice is also notable for its failure to specify elements that are present.  For example, although both the purportedly terminated  works Action Comics No. 1 and Superman No. 1 depict Superman as a boy with super-powers, the Shuster Termination Notice is silent on this element.  Accordingly, a dispute has

---

[4] The court in the Siegel Action agreed with this position almost entirely, ruling that other than a handful of pre-1938 materials authored by Siegel, all of Siegel's Superman works were created as "works for hire" on behalf of DC Comics and thus could not be terminated.  DC Comics reserves all rights with respect to these interim rulings in the Siegel case.

[5] In the related action filed by the Siegel Heirs against DC Comics, the federal court agreed with this position almost entirely, ruling that other than a handful of pre-1938 materials authored by Siegel, all of Siegel's Superman works were created as "works for hire" on behalf of DC Comics.  The court ruled that all material created by Siegel after his 1938 employment agreement with DCI, including Action Comics Nos.  2, 3, 5-61, Superman Nos.  1-23 (other than pages 3-6 of Superman  No. 1), and post-1938 newspaper strips, were works-for-hire and thus could not be terminated.  DC Comics reserves all rights with respect to these interim rulings in the Siegel case.

56899.1

- 45 -

FIRST AMENDED COMPLAINT

arisen between the parties regarding the scope of the Shuster Termination  Notice with respect to the elements that appear, or which do not appear, in the allegedly terminated  identified in the Shuster Termination Notice, including, but not limited to, the following:

      a.  Superman's "telescopic vision"

      b.  Superman's "super hearing"

      c.  Superman's "super…sense of smell"

      d.  Superman as a boy with super-powers *(i.e.,* "Superboy")

      e.  "[D]iamond-shaped "S" insignia on [Superman's] chest"

      f.  "[L]ove triangle between Superman, Lois Lane and Clark Kent"

      g.  "Perry White"

      h.  "Daily Planet newspaper"

      i.  "Metropolis"

      j.  "Jor L"

      k.  "Krypton"

~~151.~~164.  A declaration by this Court regarding the scope of the Shuster Termination Notice is warranted under the Declaratory Judgment Act, 28 U.S.C.  § 2201 *et seq.,* to establish the parties' respective rights and obligations with respect to the copyright interest in the Superman material.  The Shusters may not seek to terminate copyright interests owned by DC Comics, including those materials listed above.

**C.**     <u>**Third Claim for Relief**</u>**: Declaratory Relief re: Shuster Period of Exclusivity (Against All Defendants)**

~~152.~~165.  DC Comics re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

~~153.~~166.  This Third Claim for Relief is advanced in the alternative—*i.e.,* if the Court does not grant DC Comics' First Claim for Relief set forth above and hold that the Shuster Termination Notice is invalid.

~~154.~~167.  The Copyright Act establishes an exclusive period between the time a copyright termination notice is served and the effective termination date in which the original copyright

1  grantee may enter into an agreement with the original copyright author or their heirs regarding the

2  rights sought to be recaptured.  Section 304(c)(6)(D) provides: "A further grant, or agreement to

3  make a further grant, of any right covered by a terminated grant is valid only if it is made after the

4  effective date of the termination." 17 U.S.C. § 304(c)(6)(D).  While the statute bars third parties

5  (like Toberoff and his companies) from trafficking in such future copyright interests during this

6  exclusive time period, it protects the rights and interests of original grantees like DC Comics,

7  providing that "an agreement for such a further grant may be made between the author or [his

8  heirs] and the original grantee or [its successor *(e.g.,* DC Comics)], after the notice of termination

9  has been served." *Id.*

10  ~~155.~~168.  Section 304( c)( 6)(D) of the Copyright Act establishes a right of DC  Comics

11  from November 10, 2003 (when the Shuster Heirs served the Termination Notice) until October

12  26, 2013 (the effective date of the Notice), during which DC Comics is the sole party that can

13  enter into an agreement with the Shuster Heirs for the rights sought to be terminated.  This right

14  has been described by Congress, in its legislative history, and the United States Court of Appeals

15  as a "right of first refusal." Any restriction or limitation on this period of exclusivity must be

16  deemed unenforceable under section 304(c)(6)(D).

17  ~~156.~~169.  Upon information and belief, the Shuster Heirs have entered into agreements that

18  frustrate and impede DC Comics' period of exclusivity.  For example, the 2003 Pacific Pictures

19  Agreement grants and assigns the Shuster Heirs' putative present and future copyright interests

20  and provides that "any and all agreements regarding any of the Rights [in Shuster's creations,

21  including copyright] shall be subject to the express written approval" of Pacific Pictures.  This

22  improperly allowed Pacific Pictures (and Toberoff) to prevent the Shuster Heirs from entering into

23  an agreement with DC Comics concerning their purported rights—in clear violation of section

24  304(c)(6)(D).  Although Pacific Pictures and the Shuster Heirs purported to cancel the 2001 and

25  2003 Pacific Pictures Agreements in their September 10, 2004 Letter, this improper agreement

26  was in effect at least from the time it was executed on October 30, 2003 through September 10,

27  2004, which means that it improperly eliminated most of the first  year of DC Comics' period of

28  exclusivity.  Moreover, the original 2001 Pacific Pictures Agreement provides that if the Shusters'

1  joint venture with Pacific Pictures is terminated "for any reason," then Pacific Pictures will hold

2  50% of "the property or assets of the Venture," including all the alleged Shuster Superman

3  copyright interests, as a "tenant[] in common," meaning that Pacific Pictures and Toberoff still

4  have improperly encumbered, to this day, DC Comics' period of exclusivity.

5  157.170.  Upon information and belief, Toberoff has induced the Siegel and Shuster Heirs

6  to enter into additional agreements, which prohibit either family from entering into agreements

7  conveying rights to DC Comics without the express approval of all stakeholders in the heirs'

8  rights—*i.e.*, the Siegel Heirs, Shuster Heirs, and Toberoff and his companies.  These agreements

9  and others like it that may exist—which upon information and belief remain in effect to this day—

10  violate section 304(c)(6)(D) and impede DC Comics' ability to settle any and all disputes with the

11  Shusters and Siegels and lawfully pursue its business.

12  158.171.  The Shuster Heirs' agreements with Toberoff, his companies, and the Siegels

13  improperly interfere with DC Comics' period of exclusivity with the Shuster Heirs regarding their

14  purported Superman rights.

15  159.172.  A declaration by this Court is warranted under the Declaratory Judgment Act, 28

16  U.S.C.  §§ 2201 *et seq.,* to establish the parties' respective rights and obligations with respect to

17  the copyright interest in the Superman material.  This declaration should establish that: (a) DC

18  Comics is the sole party with whom the Shuster Heirs can enter into an agreement to convey their

19  putative Superman rights during the exclusivity period, through and including October 26, 2013;

20  (b) any agreement with any third party regarding those putative rights during the exclusivity

21  period is invalid and unenforceable; and (c) any agreements requiring consent of other parties to

22  settle termination claims violate the exclusivity period and, therefore, are invalid and

23  unenforceable.

24  160.173.  DC Comics seeks an injunction (a) barring the Shuster Heirs from entering into

25  any agreement with any third party regarding the rights sought to be recaptured in the Shuster

26  Termination Notice until October 26, 2013; and (b) restoring to DC Comics its 10-year period of

27  exclusivity.

28

- 48 -

FIRST AMENDED COMPLAINT

**D.**     **Fourth Claim for Relief**: Intentional Interference with 1992 Shuster Agreement

(Against Defendants Toberoff and Pacific Pictures)

161.174  DC Comics re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

162.175.  In October 1992, the Shuster Heirs and DC Comics executed a final written agreement "fully settl[ing] all claims" as to "right[s] in any and all work[s] created in whole or in part by…Joseph Shuster" (the "1992 Agreement").  Since 1992, DC Comics has paid the Shuster Heirs nearly half a million dollars under the 1992 Agreement.  To DC Comics' knowledge, the Shuster Heirs have never disputed the validity or existence of the 1992 Agreement, which operated to rescind, revoke, and re-grant all of the Shusters' prior grants of rights in the Superman properties to DC Comics—to the contrary, the Shuster Heirs have expressly acknowledged that this was the effect of the 1992 Agreement.  In that 1992 Agreement, the Shuster Heirs further agreed that they would not—either then or in the future—make any claim of right to any work created in whole or part by Joe Shuster.

163.176.  DC Comics' 1992 Agreement with the Shuster Heirs was both a valid contract and had the probability of future economic benefit to DC Comics.  The Shuster Heirs fully relinquished their rights under any prior agreement and re-granted to DC Comics all of their Superman-related rights.  This confirmation allowed DC Comics to continue freely developing and exploiting those rights without the risk of termination of the alleged Shuster rights or expensive and protracted legal disputes regarding the ownership of those rights.[5]

_____

[6] [5] DC Comics maintains that the 1992 Agreement is a binding, enforceable agreement with the Shuster Heirs.  Even assuming this agreement was deemed invalid, DC Comics also has a long-established economic relationship with the Shusters giving rise to an interference with prospective economic advantage claim.  This relationship dates back to 1935, when DC Comics' predecessor hired the unknown artist Joseph Shuster to illustrate comic strips for its publications.  Even after their employment arrangement ended, Shuster continued to benefit from his early work on Superman under the 1975 Agreement, which provided him with an annual pension, medical insurance, and a lump-sum payment in exchange for acknowledgement of DC Comics' sole and exclusive ownership of the Superman rights.  At the time Toberoff approached the Shuster Heirs in 2001, DC Comics and the Shuster Heirs had an agreement in place for almost 10 years, which resolved all claims concerning Shuster's putative share of the Superman rights.  DC Comics'

56899.1

FIRST AMENDED COMPLAINT

1

2      164. 177.  Toberoff and Pacific Pictures were aware of the 1992 Agreement and DC

3  Comics' ongoing business relationship with the Shusters.  Toberoff knew that his actions in having

4  his company enter into a joint venture with the Shusters for the purpose of terminating DC

5  Comics' rights were substantially certain to interfere with DC Comics' 1992 Agreement with the

6  Shusters.  Toberoff's ultimate purpose in approaching the Shuster Heirs was to induce them to

7  repudiate the 1992 Agreement and attempt to terminate prior grants of Shuster'sgrant him the

8  rights they had already granted to DC Comics.  For  this reason, Toberoff and the Shusters formed

9  a joint venture with Pacific Pictures for the express purpose of "retrieving, enforcing and

10  exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and

11  interests in and to Joe Shuster's creations" through "termination pursuant to [17 U.S.C. § 304] of

12  any and all grant or transfers  by Joe Shuster of any copyright interest in his creations."

13      165.178.  Toberoff and Pacific Pictures engaged in independently wrongful conduct to

14  achieve this goal.  They induced the Shuster Heirs to breach the 1992 Agreement and enter into

15  the illegal copyright assignment and settlement consentjoint-venture agreements described above.

16  Toberoff also induced the Shusters to manipulate claims of ownership in Superboy.  Toberoff

17  engaged in this misconduct in his role as businessman and shareholder of Pacific Pictures.

18      166.179.  As the direct result of Toberoff's and Pacific Pictures' actions, the Shuster Heirs

19  have breached the 1992 Agreement, causing DC Comics to lose the value of the Agreement and

20  forcing DC Comics to incur substantial attorneys' fees and costs in an amount to be proven at trial.

21  **E.**     **Fifth Claim for Relief: Intentional Interference with Prospective Economic**

22           **Advantage re: Siegel-DC Comics Agreement (Against Defendant Toberoff)**

23      167.180.  DC Comics re-alleges and incorporates by reference each and every allegation

24  contained in the paragraphs above.

25

26  ————————————

(footnote continued)

27  agreement with the Shusters and the economic relationship they contemplated had the probability

of future economic benefit to DC Comics.

28

168.181.  DC Comics reached a binding, enforceable agreement with the Siegel Heirs. After the Siegel Heirs served the Superman Termination Notice in 1997, they engaged in negotiations with DC Comics for four years.  On October 16, 2001,  DC Comics made a settlement offer to the Siegel Heirs.  On October 19, 2001, the Siegel Heirs' attorney at the time, Marks, sent a letter to DC Comics outlining the material terms and confirming that the Siegel Heirs "accepted D.C.  Comics' offer of October 16, 2001." On October 26, 2001, DC Comics sent a return letter confirming the parties' agreed-upon terms.  DC Comics then drafted a long-form contract memorializing the agreement, which it sent to the Siegel Heirs on February 1, 2002. Marks has confirmed that all parties understood that they had a binding agreement.[7][6]

169.182.  Even in the event that this agreement is finally adjudicated and deemed to be invalid, DC Comics had a long-established economic relationship with the Siegel Heirs giving rise to an interference with prospective economic advantage claim.  This relationship dates back as far as 1935, when DC Comics' predecessor hired an unknown writer named Jerome Siegel to write comic strips for its publications.  Over the years, Siegel worked on-and-off as an employee of DC Comics and its predecessors.  Even after the employment arrangement ended,  Siegel continued to benefit from his early work on Superman under the 1975 Agreement, which provided him and his family with an annual pension, medical insurance, and lump payment in exchange for acknowledgement of DC Comics' sole and exclusive ownership of the Superman rights.  When a dispute arose in 1997 over the Siegel Heirs' attempt to terminate prior grants of Siegel's share of

---

[7][6]The district court in the Siegel Actions determined that this agreement was not binding because there was no "meeting of the minds" between the parties.  Of course, this was before the Toberoff Timeline had been produced, which confirmed, *inter alia,* that Marks—who negotiated the agreement on behalf of the Siegel Heirs—understood that the 2001 agreement was final and binding.  Indeed, Marks communicated his position to the Siegel Heirs in August 2002, in an attempt to convince them to reject Toberoff's attempts at interference.  DC Comics reserves all rights to challenge the district court's ruling in the Siegel Actions based on this newly discovered evidence and otherwise, and DC Comics respectfully submits that the district court's interim ruling on this issue is contrary to fact and law.  If DC Comics' claims are accepted, it will amend this Compliant to include a claim for interference with contract arising out of Toberoff's tortious interference with this binding agreement.  DC Comics contends that the district court's summary judgment ruling on this settlement issue also runs afoul of the Ninth Circuit's recent decision in *Mattel.  Inc.  v.  MGA Entm't, Inc.,* 2010 WL 2853761 (9th Cir.  July 22, 2010).

Superman rights, DC Comics and Siegel commenced negotiations, which lasted over four years. At the time Toberoff approached the Siegel Heirs in 2001, DC Comics and the Siegel Heirs had finally reached an agreement resolving their claims to the Superman and Superboy rights.

170.183.  The economic relationship that the Siegel Heirs and DC Comics had contemplated and agreed to had the probability of future economic benefit to DC Comics.  The Siegel Heirs recognized DC Comics' sole and exclusive ownership of all rights in Superman and Superboy, allowing it to continue freely developing and exploiting those rights, and avoid the possibility of an expensive and protracted lawsuit regarding ownership of those rights.

171.184.  Toberoff was well aware of the agreement between DC Comics and the Siegel Heirs.  Toberoff has admitted that he tracked the Siegel Heirs' termination efforts through Internet reports.  Moreover, upon information and belief, when Toberoff approached the Siegel Heirs and their representatives in late 2001 and 2002 to express interest in purchasing their Superman rights, he was informed that the Siegel Heirs had already reached an agreement with DC Comics.

72.185.  Toberoff knew his actions were substantially certain to interfere with the Siegel Heirs' agreement and ongoing business dealings with DC Comics.  Toberoff intentionally engaged in independently wrongful conduct to carry out his interference by, among other things: falsely misrepresenting to the Siegel Heirs that he had a billionaire investor ready to purchase their Superman rights if they repudiated their settlement agreement with DC Comics; falsely representing to the Siegels that he would help them produce a competing Superman motion picture; and wrongly inducing the Siegels to repudiate their agreement and business relationship with DC Comics.  Toberoff engaged in this misconduct in his role as businessman and shareholder of IP Worldwide.

173.186.  As a direct result of Toberoff's misdeeds, the Siegel Heirs repudiated the Siegel-DC Comics Agreement with DC Comics and ended all further discussions, causing DC Comics to lose the value of the agreement, to lose their ongoing business relationship with the Siegels, and to incur millions of dollars in subsequent legal fees in disputes with the Siegel Heirs.  DC Comics has suffered actual damages in an amount to be proven at trial.

**F.**       **Sixth Claim for Relief**: Declaratory Relief re: Invalidity of Copyright Assignment and Consent Agreements (Against All Defendants)

174.187.  DC Comics re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

175.188.  The various copyright assignment and consent agreements between Toberoff and/or his companies, the Siegel Heirs, and the Shuster Heirs are void and unenforceable, including under California's unfair competition laws, *e.g.,* CAL BUS. & PROF. CODE §§ 17200 *et seq.*  The copyright assignments secured by Toberoff and/or his companies are unlawful and violate DC Comics' rights and interests for the reasons set forth above.  The consent agreements Toberoff has procured are void as a matter of law and public policy because they strip the Siegels and Shusters of their right freely to settle their claims and violate DC Comics' concomitant right freely to negotiate settlement of such claims.  The Pacific Pictures and IP Worldwide Agreements secured by Toberoff and/or his companies, for example, are unlawful and unfairly violate DC Comics' rights and interests.

176.189.  A declaration by this Court is warranted under the Declaratory Judgment Act, 28 U.S.C.  §§ 2201 *et seq.,* to establish the parties' respective rights and obligations with respect to the copyright interest in the Superman material.

## VI.       PRAYER FOR RELIEF

WHEREFORE, DC Comics prays for judgment against defendants as follows:

177.190.  A declaration that the Shuster Termination Notice is invalid, and thus ineffective, for one or more of the reasons set forth in DC Comics' First Claim for Relief;

178.191.  In the event that the Shuster Termination Notice is deemed valid and effective, a declaration that the scope and effect of the Notice is limited as set forth in DC Comics' Second Claim for Relief;

179.192.  A declaration that: (a) DC Comics was entitled to a period of exclusivity regarding the Shuster Heirs' purported Superman rights from November 10, 2003 through October 26, 2013, (b) any agreement interfering with that period of exclusivity is invalid and

1  unenforceable; and (c) the consent agreements impermissibly interfere with DC Comics' period of

2  exclusivity and require restoration of the 10-year period free of interference;

3  ~~180.~~193.  A declaration that the various consent agreements between Toberoff and/or his

4  companies, the Siegel Heirs, and the Shuster Heirs are void and unenforceable as a matter of

5  public policy;

6  ~~181.~~194.  An injunction that: (a) bars the Shuster Heirs from entering into any agreement

7  with any third party regarding the rights sought to be recaptured in the Shuster Termination Notice

8  until October 26, 2013; and (b) restores DC Comics' 10-year period of exclusivity with respect to

9  the Shuster Termination Notice;

10  ~~182.~~195.  As to the tort claims against Toberoff and his entities as sued herein, damages in

11  amounts to be determined at trial;

12  ~~183.~~196.  An award of reasonable attorneys' fees and costs; and

13  ~~184.~~197.  Such other and further relief as this Court deems just and proper.

14  **VII.    DEMAND FOR JURY TRIAL**

15  ~~185.~~198.  Plaintiff DC Comics hereby demands a trial by jury on all issues  triable by a

16  jury.

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT

# EXHIBIT E

**K** Kendall Brill Klieger

writer's direct:
310.272.7922
lbrill@kbkfirm.com

September 10, 2010

**VIA ELECTRONIC MAIL**

Daniel Petrocelli
O'Melveny and Myers, LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
*dpetrocelli@omm.com*

Re:    DC Comics v. Pacific Pictures Corp.

Dear Dan:

Now that DC has filed a First Amended Complaint, there are a variety of scheduling issues to be addressed. We would like to set up a time to meet and confer with you regarding the schedule in general. We propose Tuesday, September 14 at 3:00 p.m.

In the meantime, we do have some concerns about your proposal. First, at the time you filed your motion to initiate discovery, your position was that it was urgent to have depositions begin the first week in October. You refused to change these dates in the meet and confer process, despite the fact that we told you repeatedly that the motion was premature. You then served the motion and forced us to respond, at substantial expense to our client. One of the primary bases for our opposition was that the depositions should not go forward, if at all, until after the hearing on dispositive motions. Your new proposal, under which the depositions would not move forward until shortly after the date originally scheduled for dispositive motions, in essence acknowledges that our timing objection was appropriate, that you never needed depositions during the first week of October and therefore that your motion to initiate discovery need never have been filed. In addition to your own motion, your refusal to push back the deposition dates forced us to file a motion for a protective order for a hearing on October 4, imposing additional significant expense. While we are pleased that you now see that we were right that there was no need for you to have these depositions prior to the hearing on dispositive motions, your intransigence as to deposition dates imposed significant costs that were entirely unnecessary.

Now that you did force us to respond, however, there is substantial benefit in having these motions heard as planned, because having Judge Zarefsky's views on whether discovery should go forward while dispositive motions are pending will help to avoid the need for yet additional briefing on similar issues in connection with the motion to compel that you say you are planning. The matter is set for hearing on September 20 because you said it was critical to you to have it heard at the same time as our motion for a protective order regarding the Toberoff Timeline, and we do not think it is appropriate to put off a decision on the issues of the effect of the Anti-SLAPP motion or the pendency of the 12(b)(6) motions so that there can be three motions on these issues instead of two.

Kendall Brill & Klieger LLP

September 10, 2010
Page 2

Another problem with your proposal is that it does not address the fact that you have now made Jean Peavy a party to the suit. Defendants have not filed a motion for a protective order as to her deposition because there was never a proper subpoena served. Defendants should not have to file yet another discovery motion to address Ms. Peavy when the principles we expect the Court to establish on September 20 in response to your motion to initiate discovery will likely be applicable to her as well, and it would be incredibly wasteful for the parties and the Court to have to hear four overlapping motions instead of the single motion that is set for hearing at your insistence on September 20.

A further difficulty with your proposal is that it would require us to prepare and file a completely new motion for protective order, even setting aside the issue of Jean Peavy. One of the main issues addressed in our currently pending motion for a protective order is that the depositions should not go forward until after the resolution of dispositive motions. Since you are now agreeing that, at the very least, there is no need for depositions prior to the hearing on these motions, we would not wish to present briefing to the Court that focuses on this issue. We would therefore have to prepare and refile a completely different motion. This will impose additional burden and expense on us, and likely cannot be done on the timetable you propose.

In addition, your proposal would create a large and unnecessary burden on Magistrate Judge Zarefsky, who would be forced to prepare for and hear motions on issues that may be entirely mooted or narrowed by the resolution of the dispositive motions. Since you do not need the depositions before those motions are heard, there is no good reason not to wait until after that hearing and then meet and confer on the appropriate scope of discovery. Once we know which, if any, aspects of the complaint survive, both sides will be in a far better position to assess these issues.

As we have made clear, we are willing to work with you on an overall schedule, including the potential for expedited discovery after dispositive motions are resolved. Your current proposal to postpone the depositions until late November or early October, however, shows that you never needed the early October depositions in the first place, and it makes little sense to preemptively schedule depositions at the end of October or early November, either, or to require ongoing motion practice concerning discovery until the dispositive legal issues in the case have been resolved. As we have consistently made clear, we would be willing to discuss an arrangement under which the depositions you have proposed are taken off calendar, with the parties promptly meeting and conferring after the hearing on the dispositive 12(b)(6) motions and the Anti-

Kendall Brill & Klieger LLP

September 10, 2010
Page 3

SLAPP motion, in an effort to resolve any disputes concerning the depositions.  Please let us know if you are amenable to such an arrangement.

Sincerely,

Laura W. Brill

cc:    Richard Kendall
       Marc Toberoff

EXHIBIT E
Page 179

# EXHIBIT F

**K** Kendall Brill Klieger

writer's direct:
310.272.7922
lbrill@kbkfirm.com

September 13, 2010

**<u>VIA EMAIL</u>**

Daniel Petrocelli
O'Melveny and Myers, LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
*dpetrocelli@omm.com*

Re:    <u>DC Comics v. PPC</u>

Dear Dan:

I write to follow up on your letter to Mr. Toberoff and me of earlier today.

The meet and confer that I proposed in my letter to you of September 10 is for the purpose of discussing adjustments to each side's proposals that would permit the parties, in a spirit of compromise, to achieve an agreement that satisfies most, if not all, of their concerns. It is not appropriate for DC Comics to burden the Court with an *ex parte* application while declining our invitation to meet and confer.

If you do move forward with your *ex parte* application, please inform the Court that Defendants object to the schedule proposed in your September 8, 2010 letter and intend to file an opposition. Please also include this letter and my September 10 letter as part of your *ex parte* application so that the Court will be able to appreciate the nature of our objections.

Thank you in advance for your cooperation.

Sincerely,

Laura W. Brill

cc:    Richard Kendall
       Marc Toberoff

# EXHIBIT G

**K** Kendall Brill Klieger

writer's direct:
310.272.7922
lbrill@kbkfirm.com

September 2, 2010

**VIA ELECTRONIC MAIL**

Daniel Petrocelli
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067
dpetrocelli@omm.com

Re:    DC Comics v. PPC

Dear Dan:

Thank you for your letter of this afternoon.  I was on another call when you tried me earlier.

We appreciate your proposal, but we think it still does not resolve the problem of burdening the parties and Judge Zarefsky with motions on largely hypothetical issues that may be immediately mooted by Judge Wright's decisions on the dispositive motions.

Specifically, by requiring that motions for a protective order concerning the document production and depositions be heard on October 25, your proposal would require the parties to file discovery motions on October 4, 2010, or before the October 18, 2010 hearing on the dispositive motions that could resolve many of the issues.  Accordingly, the parties would have no opportunity to meet and confer following the hearing on these issues, and may be forced into filing motions that are entirely unnecessary.  Moreover, since we do not yet know what the disputed issues will be concerning the document production, your proposed schedule may not allow sufficient time to meet and confer and get necessary motions on file concerning those issues.

We would propose, as an alternative, that DC take off calendar the currently scheduled depositions, that the parties meet and confer regarding discovery during the week of October 18, after the hearing before Judge Wright, and, if the parties are unable to resolve any disputes, that they thereafter promptly move either to compel discovery or for a protective order, as they deem necessary.  We would also discuss a schedule for briefing and hearing of the discovery motions, including the possibility of expediting the schedule.  DC would schedule any depositions for dates following the hearing on these motions.

As to your currently pending motion to initiate discovery, if you would like to take that discovery motion off calendar, as implied in your letter, that is your choice, but we wish to be clear that we are not asking you to do so as part of any agreement.  We believe that the motion was frivolous, that it should never have been filed, and that we should not have been put to the substantial burden and expense of opposing.  Defendants reserve all rights with respect to

**Kendall Brill & Klieger LLP**

September 2, 2010
Page 2

recovering the attorneys' fees that this firm and Mr. Toberoff's firm expended in connection with opposing that motion.

Sincerely,

Laura W. Brill

cc:    Richard Kendall
       Marc Toberoff

EXHIBIT G
Page 182