1  KENDALL BRILL & KLIEGER LLP
   Richard B. Kendall (90072)
2    rkendall@kbkfirm.com
   Laura W. Brill (195889)
3    lbrill@kbkfirm.com
   Nicholas F Daum (236155)
4    ndaum@kbkfirm.com
   Nathalie E. Cohen (258222)
5    ncohen@kbkfirm.com
   10100 Santa Monica Blvd., Suite 1725
6  Los Angeles, California 90067
   Telephone: 310.556.2700
7  Facsimile: 310.556.2705

8  Attorneys for Defendants Marc Toberoff,
   Pacific Pictures Corporation, IP
9  Worldwide, LLC, and IPW, LLC

10

11              UNITED STATES DISTRICT COURT

12       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

13

14  DC Comics,                          Case No. CV 10-3633 ODW (RZx)

15              Plaintiff,              **NOTICE OF MOTION AND**
                                        **MOTION OF MARC TOBEROFF,**
16         v.                           **PACIFIC PICTURES**
                                        **CORPORATION, IP**
17  PACIFIC PICTURES CORPORATION,       **WORLDWIDE, LLC, IPW, LLC TO**
    IP WORLDWIDE, LLC, IPW, LLC,        **DISMISS PLAINTIFF'S FIRST**
18  MARC TOBEROFF, an individual,       **AMENDED COMPLAINT**
    MARK WARREN PEARY, as personal      **PURSUANT TO FED.R.CIV.P.**
19  representative of the ESTATE OF      **12(B)(6); MEMORANDUM OF**
    JOSEPH SHUSTER, JEAN ADELE          **POINTS AND AUTHORITIES**
20  PEAVY, an individual, JOANNE
    SIEGEL, an individual, LAURA        *Filed concurrently with REQUEST FOR*
21  SIEGEL LARSON, an individual, and   *JUDICIAL NOTICE, DECLARATION*
    DOES 1-10, inclusive,               *OF DAUM, MOTION TO STRIKE*
22                                      *PURSUANT TO CALIFORNIA'S ANTI-*
                Defendants.             *SLAPP LAW, and NOTICE OF*
23                                      *JOINDER*

24                                      Hon. Otis D Wright, II

25                                      Date:   October 18, 2010
                                        Time:   1:30 p.m.
26
                                        Complaint Filed:    May 14. 2010
27

28

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1    **TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:**

2    **PLEASE TAKE NOTICE THAT** on October 18, 2010, at 1:30 p.m., or as

3    soon thereafter as counsel may be heard, in the courtroom of the Honorable Otis D.

4    Wright, II, located in the United States Courthouse, 312 N. Spring Street, Los

5    Angeles, California, 90012, Defendants Marc Toberoff, Pacific Pictures

6    Corporation, IP Worldwide, LLC, and IPW, LLC ("Moving Parties") will and

7    hereby do move this Court to dismiss plaintiff's Fourth and Fifth Causes of Action

8    pursuant to Fed. R. Civ. P. 12(b)(6).

9    This Motion is made upon the following grounds: the Fourth Claim for Relief

10    for tortious interference with contract fails to state a claim because no interference

11    has been alleged, no valid contract has been alleged, and the cause of action is

12    barred by a two-year statute of limitations and by California's litigation privilege.

13    The Fifth Claim for Relief for tortious interference with prospective economic

14    advantage fails to state a claim because it is barred by a two-year statute of

15    limitations and by California's litigation privilege.

16    This Motion is made following the conference of counsel pursuant to L.R. 7-

17    3, which took place on September 15, 2010.

18    This Motion is based on this Notice of Motion, the attached Memorandum of

19    Points and Authorities, all of the pleadings, files, and records in this proceeding, all

20    other matters of which the Court may take judicial notice, and any argument or

21    evidence that may be presented to or considered by the Court prior to its ruling.

22    Dated:  September 20, 2010          KENDALL BRILL & KLIEGER LLP

23

24

25                                         By:  /s/ Richard B. Kendall

26                                              Richard B. Kendall
                                              Attorneys for Defendants Marc Toberoff,
27                                              Pacific Pictures Corporation, IP
                                              Worldwide, LLC, and IPW, LLC
28

**Kendall Brill**
**& Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..................................................................................... 1

II. STATUTORY BACKGROUND ................................................................ 4

III. DC'S FIRST AMENDED COMPLAINT ................................................ 5

    A.    The 1992 Agreement Between DC, Frank Shuster, and Jean Peavy .............................................................................................. 5

    B.    The Siegel Heirs Terminate Jerome Siegel's Copyright Grants ............. 6

    C.    The PPC Agreements ...................................................................... 6

    D.    The Siegels Contact Toberoff, Enter Into the IP Worldwide Agreement, and Thereafter File Suit ........................................... 7

    E.    The *Siegel* Litigation ...................................................................... 7

IV. ARGUMENT ......................................................................................... 8

    A.    Legal Standard .............................................................................. 8

    B.    The Fourth Claim For Interference With the 1992 Shuster Agreement Fails to State a Claim ................................................. 9

        1.    Elements of a Claim for Tortious Interference With Contract ............................................................................. 9

        2.    There Has Been No Interference With the 1992 Agreement ...... 9

        3.    Even If the 1992 Agreement Somehow Affected the Shuster Executor's Termination Interest, It Would Be Void ..................................................................................... 13

        4.    A Claim of Interference with the 1992 Agreement Is Barred by the Statute Of Limitations, Which Began to Run No Later Than 2006 ................................................... 18

        5.    The Litigation Privilege Bars DC's Interference Claim ............. 20

    C.    The Fifth Claim For Interference With Prospective Economic Advantage Fails to State a Claim ................................................ 21

        1.    DC's Fifth Claim is Barred by the Two-Year Statute Of Limitations That Indisputably Accrued No Later Than 2006 ............................................................................ 21

        2.    The Litigation Privilege Bars DC's Interference Claim ............. 22

V. CONCLUSION ..................................................................................... 25

**Kendall Brill & Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

1

<u>**TABLE OF AUTHORITIES**</u>

2

<u>Page</u>

3

4

<u>CASES</u>

5
*Aronson v. Kinsella,*
  58 Cal. App. 4th 254 (1997)..................................................................25

6
*Ashcroft v. Iqbal,*
7   129 S.Ct. 1937 (2009) ...........................................................................8

8
*Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture*
    *Partners,*
9   52 Cal. App. 4th 867(1997)............................................................14, 18

10
*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ...............................................................................8

11
*Branch v. Tunnell,*
12   14 F.3d 449 (9th Cir. 1994)....................................................................5

13
Cal. Code Civ. Proc. § 339(1) .........................................................18, 21

14
*Classic Media, Inc. v. Mewborn,*
    532 F.3d 978 (2008)......................................................................passim

15
*Crowley v. Katleman,*
16   8 Cal. 4th 666 (1994)............................................................................24

17
*Dove Audio, Inc. v. Rosenfeld, Meyer & Susman,*
    47 Cal. App. 4th 777 (2008)..................................................................24

18
*E.E.O.C. v. Waffle House, Inc.,*
19   534 U.S. 279 (2002) .............................................................................12

20
*Fox v. Ethicon Endo-Surgery, Inc.,*
    35 Cal. 4th 797 (2005).....................................................................19, 21

21
*Galbraith v. County of Santa Clara,*
22   307 F.3d 1119 (9th Cir. 2002)................................................................5

23
*Jolly v. Eli Lilly & Co.,*
    44 Cal. 3d 1103 (1988)..............................................................19, 20, 21

24
*Kashian v. Harriman,*
25   98 Cal. App. 4th 892 (2002)..................................................................25

26
*Larry Spier, Inc. v. Bourne Co.,*
    953 F.2d 774 (2d Cir. 1992)..................................................................15

27
*Marvel Characters, Inc. v. Simon,*
28   310 F.3d 280 (2d Cir. 2002)..................................................................15

**Kendall Brill & Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

ii

*Milne v. Stephen Slesinger, Inc.*,
    430 F.3d 1036 (9th Cir. 2005) ...........................................................15, 17, 18

*Moss v. U.S. Secret Service*,
    572 F.3d 962 (9th Cir. 2009) .............................................................................8

*Music Sales Corp. v. Morris*,
    73 F. Supp. 2d 364 (S.D.N.Y. 1999) ...............................................................15

*Pacific Gas & Electric Co. v. Bear Stearns & Co.* ("*PG&E*"),
    50 Cal.3d 1118 (1990) ..........................................................................9, 20, 25

*Parrino v. FHP, Inc.*,
    146 F.3d 699 (9th Cir. 1997) ...........................................................................10

*Rosenthal v. Irell & Manella*,
    135 Cal. App. 3d 121 (1982) ....................................................................20, 24

*Rubin v. Green*,
    4 Cal. 4th 1187 (1993) ..............................................................................20, 23

*Samuels v. Forest*, 2007 WL 3149285 (Cal. App. Oct. 30, 2007) ...........................20

*Seltzer v. Barnes*,
    182 Cal. App. 4th 953 (2010) ..........................................................................25

*Siegel v. Warner Bros. Ent. Inc.*,
    542 F. Supp. 2d 1098 (C.D. Cal. 2008)......................................................8, 13

*Siegel v. Warner Bros. Ent. Inc.*,
    658 F. Supp. 2d 1036 (C.D. Cal. 2009)..............................................................8

*Silberg v. Anderson*,
    50 Cal.3d 205 (1990)........................................................................................23

*Sole Energy Co. v. Petrominerals Corp.*,
    128 Cal. App. 4th 212 (2005) ..........................................................................13

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998) .........................................................................18

*Streamcast Networks, Inc. v. Skype Techs., S.A.*,
    2006 WL 5441237 (C.D. Cal. Sept. 14, 2006).................................................19

*Taheri Law Group v. Evans*,
    160 Cal. App. 4th 482 (2008)...........................................................................24

*Trembath v. Digardi*,
    43 Cal. App. 3d 834 (1974) .............................................................................18

## STATUTES

112 Stat. 2827 (1998) ...............................................................................................4

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

iii

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

17 U.S.C. § 101 ..................................................................................... 14

17 U.S.C. § 304 ..................................................................................... 10

Cal. Civ. Code § 47 ............................................................................... 22

Cal. Code of Civ. Proc. § 425 ................................................................. 2

Civil Code § 47(b) ...................................................................... 3, 6, 15

Copyright Act, 17 U.S.C. § 304 ..................................................... passim

Fed. R. Civ. P. 12 ............................................................................... 1, 8

Fed.R.Civ.P. 8 ....................................................................................... 9

L.R. 7-3 .................................................................................................. 1

Public Law 94-553 ........................................................................... 4, 10

**OTHER AUTHORITIES**

3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 11.01 ..................... 15

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.     INTRODUCTION**

This action represents an absolutely meritless attack by plaintiff DC Comics against an opposing attorney in the midst of ongoing litigation.  DC, after losing on summary judgment to the heirs of Jerome Siegel ("Siegel") in the long-running *Superman* litigation, has opted to sue its opposing counsel in a transparent attempt to reopen the record, re-litigate the case, and delay final judgment.  This outlandish strategy fails as a matter of law, as we demonstrate below.

DC's tactic arises in the 11th hour of a long-running battle over the copyright to *Superman* between DC Comics (inclusive of its predecessors, "DC") and the heirs of *Superman*'s original co-authors, Siegel and Joseph Shuster ("Shuster").  In the 1930s, Siegel and Shuster, two high school students, co-created *Superman* and with it, the superhero genre.  In 1938, they signed a publisher's release for a pittance, and were later held to have signed away their entire *Superman* copyright to DC. *Superman* soon became one of the most lucrative franchises in the world, but Siegel and Shuster did not share in the massive profits from their creation.

In 1976, Congress changed the copyright law in recognition of the fact that authors, like Siegel and Shuster, faced a tragic problem:  publishers routinely demanded that authors sign contracts granting the entirety of their copyrights for small sums if they wished to see their works published, denying them the fruits of their labor, even if their works proved wildly successful.  To help level the field, Congress engrafted a termination right into the Copyright Act, 17 U.S.C. § 304(c), which empowers authors and certain of their heirs to recapture their copyrights, after lengthy waiting periods, by terminating old copyright grants without cause.

Although both Siegel and Shuster are deceased, Siegel's heirs and the personal representative of Shuster's Estate (the "Shuster Executor") properly availed themselves of their termination rights.  The Siegels served notices of termination in 1997.  The Shuster Executor served a notice of termination in 2003, shortly after he

1   was appointed by the probate court.  Ever since, DC has fought desperately to

2   prevent them from receiving the intended benefits of their statutory termination

3   rights.  DC has so far spent nearly six years in litigation with the Siegels.  These

4   cases, Nos. 04-CV-08400 ODW (RZx) ("*Superman*") & 04-CV-08776 ODW (RZx)

5   ("*Superboy*") (the "*Siegel* litigation") have been pending since October 2004.

6   Therein, the Siegels sought declaratory relief that their terminations are valid and an

7   accounting of profits.  Defendant Marc Toberoff ("Toberoff") and his law firm,

8   Toberoff & Associates, represent the Siegels in the *Siegel* litigation.  Mr. Toberoff

9   also represents the Shuster Executor with respect to his mirror-image termination

10  regarding the same *Superman* works and grants by Siegel and Shuster.

11          In March 2008, DC suffered an enormous setback in the *Siegel* litigation.  The

12  Hon. Stephen G. Larson of this District granted partial summary judgment largely in

13  favor of the Siegels.  Judge Larson held in an extraordinarily detailed, 72-page

14  partial summary judgment opinion that the Siegel heirs had properly invoked

15  Section 304 of the Copyright Act to recapture Jerome Siegel's original *Superman*

16  copyrights, thus ending DC's exclusive control over *Superman*.  The same logic will

17  compel a similar conclusion with respect to the Estate of Joseph Shuster.

18          After losing on summary judgment, DC replaced its counsel and concocted its

19  current strategy, reflected in DC's First Amended Complaint ("FAC"):  to re-litigate

20  the copyright issues thoroughly litigated on the merits in the *Siegel* litigation, while

21  seeking to undermine the relationship between the Siegels, the Shusters, and their

22  attorneys by attacking Mr. Toberoff personally.[1]  However, as shown below, there is

23  no basis in law or reason for DC's attempt to drag Mr. Toberoff and several

24  affiliated entities into this litigation.[2]

25  _____

26          [1] Notably, the Siegel and Shuster families continue to employ Mr. Toberoff and adamantly oppose DC's attempt to interfere with their attorney's representation of them.

27          [2] Defendants have concurrently filed a motion ("Anti-SLAPP Motion") to strike these three claims pursuant to Cal. Code of Civ. Proc. § 425.16 (the "Anti-SLAPP law").

28

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

This motion concerns DC's Fourth and Fifth Claims for Relief, the two claims that directly implicate Mr. Toberoff.[3]  DC's Fourth Claim for tortious interference with contract alleges that, by inducing the Shuster Estate to file a statutory notice of termination concerning *Superman*, Toberoff and an entity controlled by Toberoff, Pacific Pictures Corporation ("PPC"), interfered with a 1992 agreement (the "1992 Agreement") between DC and Shuster's siblings.  This claim fails for at least four independent reasons.  *First*, the statutory termination of Joseph Shuster's operative *Superman* copyright grants by the "Shuster Executor could not have interfered with the 1992 Agreement.  That agreement was between DC and Joseph Shuster's brother and sister.  Shuster's brother and sister have never had any rights under the Copyright Act to terminate Shuster's copyright grants.  Under the Copyright Act, the Shuster Executor is the sole party with a right to terminate Shuster's copyright grants to DC, and he was <u>not</u> a party to the 1992 Agreement. As the 1992 Agreement concerns only the rights of Shuster's siblings, it has no bearing whatsoever on the Shuster Executor's termination right.  *Second*, even if the 1992 Agreement could somehow be construed as an attempt to waive termination rights, such a contract would be void under the Copyright Act, 17 U.S.C. § 304(c)(5), and clear Ninth Circuit precedent.  *Third*, the claim is barred by the two-year statute of limitations, as it is a matter of public record that by 2006 DC was aware of the facts that allegedly gave rise to this claim.  *Fourth*, the claim is barred by California's litigation privilege, Civil Code § 47(b).

DC's Fifth Claim is equally meritless as a matter of law.  This claim alleges interference by Toberoff with DC's alleged "prospective economic advantage" from a settlement proposal by which DC would purchase the Siegels' *Superman* copyright interest.  This claim, like the Fourth Claim, is barred by the two-year

---

[3] Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC and IPW, LLC join in the motion to dismiss concurrently filed by defendants Joanne Siegel and Laura Siegel Larson with respect to the Third and Sixth Claims for Relief.

Kendall Brill & Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1  statute of limitations for tortious interference claims.   It is also barred by the

2  litigation privilege, as the basis of the claim is Toberoff's alleged solicitation of his

3  clients, the Siegels, and his alleged encouragement of the Siegels to take positions

4  adverse to DC during settlement negotiations.

5  **II.     STATUTORY BACKGROUND**

6        This motion involves the termination provisions of the Copyright Act, 17

7  U.S.C. §§ 304(c) & (d).  With the enactment of the 1976 Copyright Act (effective

8  January 1, 1978), Congress provided a new right to authors, and their surviving

9  spouses, children, and grandchildren, to recapture their copyrights by terminating

10  prior copyright grants, under specified procedures.  FAC ¶ 49; 17 U.S.C. § 304; *see*

11  *also Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 983-85 (9th Cir. 2008).

12        Significantly for this motion, the termination right belongs exclusively to the

13  author and certain statutorily-designated parties, but not to an author's siblings.  17

14  U.S.C. § 304(c)(2).  Moreover, when Congress first enacted the termination right in

15  1976, it did not provide an author's estate with the right to terminate prior copyright

16  grants.  Pub. L. 94-553, 90 Stat. 2768 (1976), at § 304(c)(2).  It was not until 1998

17  that Congress amended the 1976 Act to also provide the termination right to the

18  executor, administrator or personal representative of an author's estate.  17 U.S.C.

19  § 304(c)(2)(D); Pub. L. 105-298, 112 Stat. 2827 (1998) ("In the event that the

20  author's widow or widower, children, and grandchildren are not living, the author's

21  executor, administrator, personal representative, or trustee shall own the author's

22  entire termination interest.").  Siblings still have no termination right.  *Id.*

23

24

25

26

27

28

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

4

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

## III.    DC'S FIRST AMENDED COMPLAINT[4]

In the mid-1930s, Jerome Siegel, a writer, and Joseph Shuster, an illustrator, created the *Superman* character in comic strips which they submitted to publishers. FAC ¶ 28.  In 1938, Siegel and Shuster adapted their preexisting *Superman* strips and story to a comic book format, published in "Action Comics No. 1" by a predecessor-in-interest of DC Comics.  *Id. ¶* 31.  In agreements from 1938 and 1939, Siegel and Shuster assigned their copyrights in *Superman* to DC.  *Id.* ¶ 30. For more than 70 years, Siegel and Shuster's *Superman* character has endured as "one of the most famous and beloved fictional characters in the world" and the subject of numerous comic books, films, and television series.  *Id.* ¶¶ 34, 37.

### A.    The 1992 Agreement Between DC, Frank Shuster, and Jean Peavy

In 1992, Joseph Shuster died.  FAC ¶ 51.  He had no surviving widow at the time of his death, nor did he have any children or grandchildren.  *Id.*  He was survived by his brother and sister, Frank Shuster and Jean Peavy, and Jean Peavy's two children.  On September 10, 1992, DC, Frank Shuster, and Jean Peavy entered into a one-page written agreement (the "1992 Agreement") regarding *Superman*. FAC ¶¶ 51-54; Defendant's Request for Judicial Notice ("RJN") at ¶ 1, Ex. A.

In exchange for annual payments of $25,000 per year, Frank Shuster and Jean Peavy agreed to settle all claims that they ***personally*** held against DC in connection with Joseph Shuster's copyright interests.  RJN ¶ 1, Ex. A.  Frank Shuster and Jean Peavy further agreed that if "either of [them] assert[s] any such claim of right," they would refund the annual payments to DC, and DC would have no ongoing obligation.  *Id*.  Neither Joseph Shuster, nor the Shuster Estate, nor the executor,

---

[4] In a motion to dismiss under Rule 12(b)(6), the Court considers only the allegations of the Complaint, documents whose contents have been alleged in the Complaint, and matters subject to judicial notice.  *See Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994) (overruled on other grounds in *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1127 (9th Cir. 2002)).  For purposes of this motion, defendants assume the truth of the allegations of the Complaint, in light of the documents that the Court may consider, without prejudice to defendants' right to contest those allegations.

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1    administrator, or personal representative of the Shuster Estate was a party to the

2    1992 Agreement.  *Id.*; FAC ¶ 55.  Frank Shuster died in 1996.  FAC ¶ 57.

3        **B.    The Siegel Heirs Terminate Jerome Siegel's Copyright Grants**

4        In 1996, Jerome Siegel died.  FAC ¶ 67.  He was survived by his widow,

5    Joanne Siegel, and their daughter, Laura Siegel Larson (the "Siegels").  *Id.* ¶¶ 21-22.

6    In 1997, the Siegels served statutory notices under 17 U.S.C. § 304(c) to terminate

7    Jerome Siegel's prior grants of his *Superman* copyright interests to DC (the "Siegel

8    Termination").  *Id.* ¶ 67.  In April 1999, DC sent a letter to the Siegels' counsel

9    rejecting the "validity and scope" of the Siegel Termination.  RJN ¶ 2, Ex. B at 20.

10    Thereafter, DC and the Siegels held settlement negotiations.  FAC ¶ 68.

11        **C.    The PPC Agreements**

12        In 2001, Marc Toberoff, an attorney who, among other things, advised clients

13    on issues related to the recapture and marketing of rights under the Copyright Act,

14    came into contact with Shuster's sister, Jean Peavy, and nephew, Mark Warren

15    Peary.  FAC ¶ 60.  Later in 2001, Pacific Pictures Corporation ("PPC"), an entity

16    then controlled by Toberoff, entered into a joint venture agreement with Peavy and

17    Peary (the "2001 PPC Agreement") for the express "purpose of retrieving, enforcing

18    and exploiting all of Joe Shuster and his estate's rights, claims, copyrights . . . in and

19    to Joe Shuster's creations" through "termination pursuant to [17 U.S.C. § 304] of

20    any and all grant or transfers by Joe Shuster of any copyright interest in his

21    creations."  *Id.*; RJN ¶ 4, Ex. D at ¶ 2.[5]  The parties agreed in the 2001 PPC

22    agreement to establish the estate of Joseph Shuster, and that the venture would

23    "retain Marc Toberoff, Esq. to render legal services."  RJN ¶ 4, Ex. D at ¶ 7.

24

25        [5] Whereas DC's original complaint quoted this language (RJN Ex. O ¶ 54), in
26    response to Defendants' original motion to dismiss, DC's FAC (¶ 60) deleted the words
    "retrieving" and "enforcing" in an effort to conceal the fact that the 2001 PPC Agreement
27    entails legal functions and clearly implicates the litigation immunity of Civil Code §47
    (*see* RJN Ex. P ¶ 60, Section IV.B.5, *infra*).

28

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

6

1    In 2003, after the Shuster Estate was established, the 2001 PPC Agreement

2   was modified in a new agreement (the "2003 PPC Agreement") to add Mark Warren

3   Peary to the venture in his capacity as Shuster Executor.  RJN ¶ 5, Ex. E; FAC ¶ 90.

4   The 2003 PPC Agreement also specifically included a provision that Toberoff

5   would be retained as counsel to the venture.  RJN ¶ 5, Ex. E at ¶ 2.  Both the 2001

6   and 2003 PPC Agreements were cancelled in 2004, with the consent of all parties to

7   those Agreements, and no longer have any force or effect.  FAC ¶ 99; RJN ¶ 6, Ex.

8   F. PPC itself was dissolved in 2009.  RJN ¶ 7.  Toberoff continues to act as counsel

9   for Mark Warren Peary (in his capacity as Shuster Executor) and Jean Peavy.

10   In November 2003, the Shuster Executor, served on DC a notice of

11   termination under the Copyright Act (the "Shuster Termination"), terminating

12   Joseph Shuster's grants of *Superman* copyrights to DC.  FAC ¶ 92.

13   ### D.   <u>The Siegels Contact Toberoff, Enter Into the IP Worldwide</u>

14   <u>Agreement, and Thereafter File Suit</u>

15   Through 2001, settlement negotiations continued between DC and the

16   Siegels.  In May 2002, Joanne Siegel sent a letter to DC's parent company,

17   objecting to the long-form agreement offered by DC.  FAC ¶ 75.   In September

18   2002, the Siegels dismissed their prior attorney.  Thereafter, in October 2002, the

19   Siegels entered into a joint venture agreement with IP Worldwide, LLC, a company

20   affiliated with Toberoff (the "IP Worldwide Agreement"), that would "furnish and

21   provide the legal services of Marc Toberoff, Esq., and the business services of Ariel

22   Emanuel." FAC ¶ 81; RJN ¶ 8, Ex. H at ¶ 2.

23   In November 2002, the Siegels, represented by Toberoff, served a new notice

24   of termination under the Copyright Act, related to the character *Superboy*.  FAC ¶

25   86.  In October 2004, the Siegels filed the *Superman* and *Superboy* actions in this

26   Court, seeking declarations that their statutory terminations regarding *Superman* and

27   *Superboy*, respectively, were valid and enforceable.  *Id. ¶* 91.

28   ### E.   <u>The *Siegel* Litigation</u>

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

7

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

1         Litigation in both *Siegel* actions is ongoing, and, as this Court is aware, has

2    produced a voluminous record.  *See* RJN ¶ 9, Ex. I (Joint Status Report).  On March

3    26, 2008, after four years of hard-fought litigation, the Hon. Stephen G. Larson

4    issued a detailed 72-page summary judgment ruling in the *Superman* action holding

5    that the Siegels' termination was valid and enforceable.  *See Siegel v. Warner Bros.*

6    *Ent. Inc.*, 542 F. Supp. 2d 1098, 1117-39 (C.D. Cal. 2008).  In 2009, the Court

7    further ordered that a number of additional *Superman* works had been successfully

8    "terminated." *See Siegel*, 658 F. Supp. 2d 1036, 1080-84 (C.D. Cal. 2009).

9         In the midst of the *Siegel* litigation, an attorney formerly employed at

10   Toberoff & Associates sent to John Schulman, the General Counsel of DC's close

11   affiliate Warner Bros. Entertainment, numerous privileged and confidential

12   documents concerning the case in violation of his duties of loyalty and

13   confidentiality.  FAC ¶ 102.  Included was his anonymous "cover letter" – a

14   defamatory "hit piece" against Toberoff which purports to discuss the privileged

15   documents.  *Id.*, Ex. A.  DC relies on and attached this untrustworthy inadmissible

16   document to its FAC, and refers to it as the "Toberoff Timeline." *Id*.

17   **IV.    ARGUMENT**

18       **A.    Legal Standard**

19        To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint

20   must contain sufficient factual matter … to 'state a claim to relief that is plausible

21   on its face.'"  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic*

22   *Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Under these cases, "for a complaint

23   to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable

24   inferences from that content, must be plausibly suggestive of a claim entitling the

25   plaintiff to relief."  *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009).

26   "Factual allegations must be enough to raise a right to relief above the speculative

27   level." *Twombly*, 550 U.S. at 555.  "Where the well-pleaded facts do not permit the

28   court to infer more than the mere possibility of misconduct, the complaint has

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

8

1    alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Iqbal,* 129

2    S.Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

3        **B.**    **The Fourth Claim For Interference With the 1992 Shuster**

4            **Agreement Fails to State a Claim**

5            **1.**    **Elements of a Claim for Tortious Interference With Contract**

6        DC's Fourth Claim for Relief is based on an allegation that Toberoff and PPC

7    interfered with the 1992 Agreement by causing the Shuster Estate to serve the

8    Shuster Termination.  A claim for tortious interference with contract requires that a

9    plaintiff allege "(1) a valid contract between plaintiff and a third party; (2)

10   defendant's knowledge of this contract; (3) defendant's intentional acts designed to

11   induce a breach or disruption of the contractual relationship; (4) actual breach or

12   disruption of the contractual relationship; and (5) resulting damage." *Pacific Gas &*

13   *Electric Co. v. Bear Stearns & Co.* ("*PG&E*"), 50 Cal.3d 1118, 1126 (1990).

14   Tortious interference with contract thus requires, at a minimum, that the underlying

15   contract has been breached (or otherwise "disrupted") and that the underlying

16   contract is valid.  As a matter of law, neither element is present here.

17           **2.**    **There Has Been No Interference With the 1992 Agreement**

18       First, there is no cognizable allegation of an interference with the 1992

19   Agreement, because there is no allegation of a breach of any term of the Agreement,

20   or of any interference with any right held by any party to the Agreement.

21       The only parties to the 1992 Agreement are DC, Frank Shuster and Jean

22   Peavy, the brother and sister of Joseph Shuster.  FAC ¶ 55.  The one page

23   Agreement contains three, and only three, obligations for Frank and Jean.  <u>They</u>

24   settled any claim to payment that <u>they</u> held relating to any work by Joseph Shuster,

25   granted to DC any rights that <u>they</u> held in Shuster's copyrights to DC, and

26   covenanted not to assert any rights that <u>they</u> held against DC.  RJN ¶ 1, Ex. A.  The

27   1992 Agreement with Frank Shuster and Jean Peavy ("you") provides:

28       [T]his agreement fully settles all claims to any payments or other rights

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

9

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

> or remedies which **_you_** may have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon. In any event, **_you_** now grant to us any such rights and release us, our licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever.

*Id.* (emphasis added). Frank and Jean further agreed that if "either of [**_them_**] assert any such claim of right," they would refund the annual payments to DC and DC would have no ongoing obligation to them. *Id.*[6]

DC alleges that the 1992 Agreement was interfered with by the Shuster Estate's "'termination pursuant to [17 U.S.C. § 304] of any and all grant or transfers by Joe Shuster of any copyright interest in his creations.'" FAC ¶ 177. However, it is impossible as a legal and factual matter for the alleged interference to have occurred, because the 1992 Agreement was **_irrelevant_** under § 304 to the termination by the Shuster Executor of Joseph Shuster's operative copyright grants.

*First*, there is no allegation, nor could there be, that the Shuster Executor (Mark Warren Peary) or Shuster Estate is a party to the 1992 Agreement. The agreement does not mention either Peary or the Shuster Estate (which did not then exist). RJN Ex. A. Nor does it mention termination, nor discuss any right, remedy, or claim of any party <u>other</u> than Frank Shuster or Jean Peavy. *Id.* Nor does it purport to revoke, replace or supplant Joseph Shuster's prior copyright grants to DC. *Id.*

*Second*, Jean Peavy and Frank Shuster have never had any termination right under the Copyright Act – they did not have that right in 1992, and do not have it today. The Copyright Act of 1976, Pub. L. 94-553, 17 U.S.C. § 304(c)(2), provided that only an author's widow or widower, children or grandchildren held termination rights. Joseph Shuster had neither a widow nor any children. FAC ¶ 51. Thus, at

---

[6] It is proper to take judicial notice of the 1992 Agreement and other documents, which are referenced throughout the FAC and thereby incorporated by reference. *See, e.g.* Complaint, ¶¶ 174-179; *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-706 (9th Cir. 1997) (such documents may be judicially noticed by a district court on a motion to dismiss).

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

1    the time of the 1992 Agreement, <u>no one</u> had termination rights with respect to

2    Joseph Shuster's works.  *Id.* ¶ 111.  Six years later, in 1998, the Copyright Term

3    Extension Act, Pub. L. 105-298, expanded the category of holders of the termination

4    right by adding "the author's executor, administrator, personal representative, or

5    trustee."  17 U.S.C. § 304(c)(2)(D).  Accordingly, since 1998, the executor or

6    personal representative of an author's <u>estate</u> also holds a termination right.

7         In its FAC, DC attempts to obscure the critical distinction between the

8    Shuster Executor, Mark Warren Peary, the party with the power to exercise the

9    termination right, and Jean Peavy, the surviving party to the 1992 Agreement.

10   Cognizant of this fatal flaw in its FAC, DC defines the term "Shuster Heirs" to

11   include Mark Warren Peary, Frank Shuster and Jean Peavy (FAC ¶ 51), and then,

12   throughout its FAC, misleadingly refers to the 1992 Agreement as a contract with

13   the "Shuster Heirs."  *See id.* ¶¶ 51, 55, 95, 175-178.  Even though this manipulation

14   had been specifically pointed out in Defendants' prior motion to dismiss, DC

15   continued this tactic in its FAC.  DC's trickery cannot hide the core fact that the

16   actual parties to the 1992 Agreement – Jean Peavy and Frank Shuster – never had

17   any termination rights under the Copyright Act, and that the 1992 Agreement could

18   not have granted, resolved, or affected the Shuster Executor's right to terminate

19   Joseph Shuster's operative copyright grants.  17 U.S.C. §§ 304(c)(2)(D) & (d)(1).

20        Thus, there is no cognizable allegation in the FAC of a breach or disruption of

21   the 1992 Agreement.  Frank Shuster died well before the Shuster Executor exercised

22   his termination right.  Jean Peavy's obligations under the 1992 Agreement were to

23   release DC from claims by <u>her</u> and to quitclaim to DC rights that <u>she</u> may have had.

24   Jean Peavy has met those obligations.  She did not have, and has never had any

25   termination right regarding Joseph Shuster's *Superman* copyright interests.  She did

26   not file (and could not have filed) the Shuster Termination underlying DC's Fourth

27   Claim.  The sole party with the power to exercise the termination right – and the

28   sole party that *has* exercised a termination right – is the Shuster Executor.  But as

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

1  the Shuster Executor and the Shuster Estate were not parties to the 1992 Agreement,

2  they cannot conceivably be bound by its language.  *See E.E.O.C. v. Waffle House,*

3  *Inc.*, 534 U.S. 279, 294 (2002) ("[A] contract cannot bind a nonparty.").  The 1992

4  Agreement remains undisturbed, and DC's Fourth Claim fails as a matter of law.

5          Faced with this decisive bar to its tortious interference claim, DC may try to

6  argue, although it does not allege in its FAC, that there was a disruption of the 1992

7  Agreement if Jean Peavy "encouraged" or will benefit from the Shuster Executor's

8  termination of Joseph Shuster's copyright grants.  However, there is nothing in the

9  1992 Agreement that would bar Jean Peavy from doing so, because the 1992

10  Agreement simply settles and releases rights held by <u>Jean Peavy and Frank Shuster</u>

11  – not rights held by other parties.

12          DC will likely also argue that a handwritten letter sent by Frank Shuster to

13  DC prior to the 1992 Agreement somehow alters the plain meaning of the 1992

14  Agreement.  The letter requested that pension payments be made directly to his

15  sister for tax reasons, and claimed that Jean Peavy had stated "if payments were

16  made in her name, she would not "pursue termination of the Superman copyright as

17  provided for to [*sic*] creators' heirs."  FAC ¶ 54; RJN Ex. L.  This hearsay letter

18  from Frank Shuster that purports to characterize what Ms. Peavy said is not alleged

19  by DC to have created any contractual obligation.  Moreover, even if the letter from

20  Frank Shuster could be construed as a binding contract between Jean Peavy and DC

21  – and it cannot be – the letter is of no help to DC.  As explained above, Jean Peavy

22  did not have termination rights to pursue in 1992 (nor did anyone else), she has no

23  termination rights today, and she has neither attempted to exercise termination rights

24  nor breached the 1992 Agreement.  Moreover, the Shuster Estate – which did not

25  even exist in 1992 – could not as a matter of law have been bound by the illusory

26  terms of Frank Shuster's letter.  The letter does not even purport to bind the Shuster

27

28

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

1   Estate.[7]

2       DC may also attempt to use a 1999 letter from Jean Peavy, stating she

3   "intends to continue to honor our pension agreement," to argue that the 1992

4   Agreement somehow binds the Shuster Executor.  FAC ¶ 56; RJN Ex. M.  However,

5   this 1999 letter cannot conceivably help DC's case.  The "pension agreement" *was*

6   the 1992 Agreement.  To date, Ms. Peavy has fully "honored" the 1992 Agreement,

7   because, as set forth above, it had nothing to do with future termination rights that

8   did not belong to her, and which, in any event, could not be waived under §

9   304(c)(5). The 1999 letter also does not purport to create any further obligations for

10  Jean Peavy or to interpret the 1992 Agreement.  *See* RJN Ex. M.[8]

11          **3.   Even If the 1992 Agreement Somehow Affected the Shuster**

12               **Executor's Termination Interest, It Would Be Void**

13      DC's Fourth Claim for Relief also fails because, even if the 1992 Agreement

14  *did* prohibit or encumber the Shuster Termination in any way – and it did not – it

15  would be void under the Copyright Act as a matter of law.  *See* 17 U.S.C. §§

16  304(c)(5), 203(a)(5).  In order for a claim for intentional interference with a contract

17  to stand, the underlying contract must be enforceable.  *See Bed, Bath & Beyond of*

18  *La Jolla, Inc. v. La Jolla Vill. Square Venture Partners*, 52 Cal. App. 4th 867, 877-

19  _____

20  [7] The Shuster Estate was not probated until 2003, and no executor or personal
    representative was appointed until that time.  FAC ¶ 65.  Until 2003, no one was statutorily
21  empowered to issue a notice of termination.

    [8] Nor can DC's half-hearted allegation regarding tortious interference with
22  economic advantage – a claim DC has not actually pled – made in a footnote (*see* FAC ¶
    176 fn. 5) save DC's fatally defective Fourth Claim.  The only basis alleged for any
23  purported prospective economic advantage is the so-called "agreement" with the "Shuster
    Heirs," i.e., the 1992 Agreement that cannot serve as the basis for an interference claim.
24  DC tries to mask that fatal flaw by pointing to an irrelevant 1975 Agreement with Joseph
    Shuster, which this Court has already held is not a bar to termination rights.  *Id.* ¶ 176 fn.
25  5; *Siegel* I, 542 F. Supp. 2d at 1132-34.  DC's vague allegations cannot support a claim for
    interference with prospective economic advantage, as aside from the 1992 Agreement that
26  has not been interfered with, no other probability of future economic benefit has been
    alleged.  *See Sole Energy Co. v. Petrominerals Corp.*, 128 Cal. App. 4th 212, 243 (2005)
27  ("Only plaintiffs that can demonstrate an economic relationship with a probable future
    economic benefit will be able to state a cause of action ") (quotations omitted).

28

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

13
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

80 (1997) (a claim for intentional interference with a contractual relationship could not be maintained when the underlying contract was unenforceable).  DC fails to establish this element of its tortious interference claim.

The 1976 Copyright Act established as a matter of law that an author or his or her specified heirs may terminate a copyright grant "notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant."  *See* 17 U.S.C. §§ 304(c)(5), 203(a)(5).[9]  To further protect authors and their statutory heirs, Congress specified that the termination right or interest is inalienable and may <u>not</u> be assigned before it is exercised by the service of a notice of termination. 17 U.S.C. § 304(c)(6) (D).  Thus, any agreement that tries to bar the termination right or to transfer the termination interest prior to service of a termination notice is unenforceable.

The Copyright Act's deviation from the ordinary rule of freedom of contract, and Congress' mandate that the termination right is inalienable, was recently explained in detail by the Ninth Circuit in *Mewborn*:

> Congress enacted the inalienability of termination rights provision in § 304(c)(5) to resurrect the fundamental purpose underlying the two-tiered structure of the duration of copyrights it originally adopted: to award to the author, and not to the assignee of the right to exploit the copyright during its initial term, the monetary rewards of a work that may have been initially undervalued, but which later becomes a commercial success.  As reported in the House Report for the 1909 Act:
>
> > It not infrequently happens that the author sells his copyright outright to a publisher for a comparatively small sum. If the work proves to be a great success and lives beyond the term of twenty-eight years, your committee felt that it should be the exclusive right of the author to take the renewal term, and the law should be framed as is the existing law, so that he could not be deprived of that right.
>
> H.R. Rep. No. 2222, 60th Cong., 2d Sess., at 14 (1909).  It is plain that the renewal process was intended to give an author and his heirs a

---

[9] Under 17 U.S.C. § 101, the term "including" is "illustrative" not "limitative" and thus [a Court] must interpret the term "agreement[s] to the contrary" under § 304(c)(5) as inclusive of agreements "other than the two examples Congress explicitly mentioned." *Mewborn*, 532 F.3d at 983 (9th Cir. 2008).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

Kendall Brill & Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

second chance to benefit from the fruits of his labors.

*Mewborn*, 532 F.3d at 983.  *See also Stewart v. Abend*, 495 U.S. 207, 230 (1990)

(the 1976 Act "provides an inalienable termination right"); 3 M. Nimmer & D.

Nimmer, *Nimmer on Copyright* § 11.01 (congressional intent of termination is to

provide authors and their families with relief from one-sided, unremunerative

copyright grants).  The Second Circuit has also consistently recognized the

inalienability of the Copyright Act's termination right.  *See Marvel Characters, Inc.*

*v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002) ("[T]he clear Congressional purpose

behind § 304(c) was to prevent authors from their termination right by

contract.").[10]  Thus, even if the 1992 Agreement could somehow be construed as

transferring, granting, alienating or encumbering the Shuster Executor's right of

termination, it would plainly be unenforceable under the plain language of 17 U.S.C.

§ 304(c) as an "agreement to the contrary."

Faced with this fatal flaw in its tortious interference with contract claim, DC

will likely argue that it can avoid the clear rule of inalienability under a very narrow

exception established in *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir.

2005).  But the *Milne* case offers DC no support.

In *Milne*, Christopher Milne, the son of A.A. Milne, the author of the *Winnie*

*the Pooh* books, negotiated a new agreement with the Walt Disney Corporation

("Disney"), a prior grantee of *Pooh* rights.  430 F.3d at 1040-41.  Therein,

Christopher Milne *expressly revoked* a pre-1978 copyright assignment and expressly

*re-granted* all of the Milne rights that had been previously assigned, and further

expressly agreed not to exercise his termination rights.  *Id.* at 1040-41. Furthermore,

---

[10] *See also Larry Spier, Inc. v. Bourne Co*., 953 F.2d 774, 779-80 (2d Cir. 1992)
("Section 304(c) was drafted so as to leave no doubt about the family's power to recapture
the copyright.  Indeed, Section 304(c)(5) expressly provides that the termination 'may be
affected notwithstanding any agreement to the contrary.'"); *Music Sales Corp. v. Morris,*
73 F. Supp. 2d 364, 372 (S.D.N.Y. 1999) ("[U]nlike the renewal rights, the termination
right is inalienable.  Neither the author nor the statutory heirs may contract away their
termination right, and any contract provision that purports to assign that right is void.").

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

15

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

1  when the Milne/Disney negotiations began, Milne's statutory termination "window"

2  had already opened, meaning that he then possessed a present right of termination,

3  but had not yet served a formal notice of termination.[11]  *Id.* at 1039-40.  Milne

4  expressly used the leverage of the pending termination window to negotiate a new

5  agreement, in which he received compensation resulting in a net gain of hundreds of

6  millions of dollars.  *Id.* at 1040-41.  Despite Christopher Milne having achieved the

7  legislative objective of Section 304, Milne's heir argued that she should be able to

8  terminate the ***revoked*** pre-1978 agreement with Disney.  *Id.*

9       Given these unique circumstances, the Ninth Circuit found that "there was no

10  pre-1978 grant of rights . . . in existence" to terminate as the prior grant had already

11  been expressly revoked by Milne in 1983, and that his operative 1983 grant was not

12  subject to termination under the Copyright Act.  *Id.* at 1042-43.[12]  The *Milne* Court

13  further reasoned that Milne's 1983 grant was not an "agreement to the contrary"

14  under the Act because Milne had a present right of termination in 1983, and thus it

15  was an agreement consistent with, and that fully honored, Milne's right of

16  termination, which could have vested immediately in 1983 if he had served notice at

17  that time.  *Id.* at 1045; *see Mewborn*, 532 F.3d at 988.

18       In *Mewborn*, the Ninth Circuit distinguished and limited *Milne* in ways that

19       [11] Pursuant to 17 U.S.C. §§ 304(c)(1)-(2), any grant of copyright by an author "executed before January 1, 1978" is subject to termination by authors or their statutorily-designated heirs.  Under § 304(c)(3), the provision invoked in the *Milne* case, the termination of the grant may be effected in a five-year window beginning at the end of 56 years from the date copyright was originally secured, with notice of termination to be sent between two and ten years prior to that effective date.  *See* 17 U.S.C. §§ 304(c)(3)-(4). That statutory window had opened at the time of the Milne/Disney negotiations.  However, the Shuster Executor terminated Shuster's copyright grants under 17 U.S.C. § 304(d), which permits a termination to be exercised within a five-year period beginning 75 years from the original grant of copyright, with notice of termination to be sent between two and ten years prior to that effective date. 17 U.S.C. § 304(d)(2).  Thus, here, unlike in *Milne,* the Shuster Termination could not even have been served by the Shuster Executor until 2003 (1938 plus 75 years) at the earliest – eleven years ***after*** the negotiation of the 1992 Agreement, to which he was not even a party.

       [12] Under 17 U.S.C. §§ 304(c)-(d), a pre-1978 copyright grant may be terminated by an author's statutory heir, but there is no provision to terminate a post-January 1, 1978 grant by anyone other than the author.  *See Milne*, 430 F.3d at 1042-43.

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

16
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

1   leave no doubt that *Milne* has no relevance here.  In that case, a publisher claimed

2   that Winifred Mewborn, the daughter of Eric Knight, the author of the beloved

3   children's novel *Lassie Come Home*, had transferred or released her termination

4   rights to it.  532 F.3d at 986.  Mewborn had made two duplicative assignments of

5   the *Lassie* copyright, one in 1976 and the other in 1978.  *Id.* at 980.

6       The Ninth Circuit explained why the language of the agreements in *Mewborn*

7   radically distinguished it from *Milne*.*Id.* at 987-89.  First, the agreement in *Milne*

8   specifically and explicitly revoked the author's pre-1978 grant of rights, and re-

9   granted the same rights, meaning that as of the date of that agreement there was no

10  longer a pre-1978 grant left to be terminated under the Copyright Act.  In *Mewborn*,

11  by contrast, there was no revocation of the original 1976 grant, and thus the plaintiff

12  *still possessed* a valid termination right that she could enforce.  Unlike in *Milne*,

13  "[t]he 1976 Assignment . . . was not substituted or revoked by the 1978 Assignment

14  but remained intact," and was subject to statutory termination.  *Id.* at 986.  Second,

15  the agreement in *Milne* expressly dealt with termination rights.  *Id.* at 989.  The

16  agreement in *Mewborn*, by contrast, did not discuss termination rights.  *Id.*

17      The *Mewborn* Court further emphasized that at the time the author's daughter

18  executed the purported 1978 assignment, she did not yet have an existing right to

19  serve a notice of termination under the Copyright Act, whereas in *Milne*, the

20  author's son "had – and knew that he had – the right to vest copyright in himself at

21  the very time he revoked the prior grants and leveraged his termination rights to

22  secure the benefits of the copyrighted works."  *Id.* at 989.

23      This case is not merely similar to *Mewborn*, which is controlling Ninth

24  Circuit precedent.  It presents an even clearer instance for squarely applying the

25  non-alienability provisions of Section 304(c).  First, the 1992 Agreement, by its

26  plain language, does not reflect *any* intention – let alone a clear intention – of the

27  parties to revoke and re-grant any copyright interest.  The 1992 Agreement nowhere

28  even purports to "revoke" Joseph Shuster's prior copyright grants to DC.  The words

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

17

1 "termination" or "termination right" are also nowhere to be found in the 1992

2 Agreement.  Thus, the language in the Milne agreement that the Ninth Circuit in

3 both *Mewborn* and *Milne* found essential to the outcome in *Milne* is wholly absent

4 here.[13]  Moreover,  as in *Mewborn*, but unlike in *Milne*, no party to the 1992

5 Agreement – and no one else, for that matter – had *any* termination right concerning

6 Shuster's copyright interests at the time of the 1992 Agreement, as explained above.

7 *See Mewborn*, 532 F.3d at 989; *Milne*, 430 F.3d at 1040-41; *Simon*, 310 F.3d at 287

8 (holding that a 1969 settlement contract did not bar defendant's termination right as

9 "neither the extended copyright term nor the termination right existed at the time").

10    Therefore, to the extent DC alleges that the 1992 Agreement bars the exercise

11 of the Shuster termination right, it would be an unenforceable "agreement to the

12 contrary" under 17 U.S.C. § 304(c)(5), rendering DC's claim for interference with

13 the 1992 Agreement baseless as a matter of law.  *See Bed Bath & Beyond,* 52 Cal.

14 App. 4th at 877-80 (affirming that a claim for interference with contract cannot lie

15 where predicated on an unenforceable contract provision).

16     **4.**     **A Claim of Interference with the 1992 Agreement Is Barred**

17            **by the Statute Of Limitations, Which Began to Run No Later**

18            **Than 2006**

19    DC's Fourth Claim for Relief also fails because it is barred by the two-year

20 statute of limitations for tortious interference with contract.  *See* Cal. Code Civ.

21 Proc. § 339(1); *Trembath v. Digardi*, 43 Cal. App. 3d 834, 836 (1974).  DC alleges

22 that the purported interference took place, at the latest, in November 2003 when the

23

24         [13] Although DC baldly asserts that the 1992 Agreement "revoked and regranted" the
Shuster copyright interests, the Court should not accept as true DC's mere conclusory
25 allegations that contradict the 1992 Agreement, itself, and DC's repeated assertions in this
and the related *Siegel* action that it owns all rights in *Superman* pursuant to the operative
26 pre-1978 grants from Siegel and Shuster.  *See Steckman v. Hart Brewing, Inc.*, 143 F.3d
1293, 1295-96 (9th Cir. 1998) ("A court . . . is not required to accept as true conclusory
27 allegations which are contradicted by documents referred to in the complaint."); FAC ¶¶
30-32, 43-44, 46-48, 153-54, 158-59 (asserting pre-1978 grants).
28

**Kendall Brill & Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

18

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

1  Shuster Termination was served. The FAC was filed over six years later, in May

2  2010. [14]    On its face, DC's claim for tortious interference with contract is time-

3  barred.  *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 806 (2005) ("Generally

4  speaking, a cause of action accrues at "the time when the cause of action is complete

5  with all of its elements.").  *See also Streamcast Networks, Inc. v. Skype Techs., S.A.*,

6  2006 WL 5441237, at *10 (C.D. Cal. Sept. 14, 2006) (interference claim accrued

7  once plaintiff was aware that counterparty sought to "terminate the [agreement]").

8      DC may argue that California's "discovery rule" delayed the accrual of the

9  cause of action.  In order to take advantage of the discovery rule, however, DC must

10  plead facts entitling it to invoke the rule.  *Ethicon*, 35 Cal. 4th at 808 (placing

11  burden on plaintiff to "specifically plead facts to show (1) the time and manner of

12  discovery and (2) the inability to have made earlier discovery despite reasonable

13  diligence.").  The California Supreme Court has held that the "discovery rule"

14  means that a limitations period will begin once a reasonable person has been put on

15  inquiry notice of the basic nature of the alleged wrongdoing:

16      [T]he limitations period begins once the plaintiff has notice or
       information of circumstances to put a reasonable person on inquiry . . . .
17      A plaintiff need not be aware of the specific 'facts' necessary to
       establish the claim . . . .  Once the plaintiff has a suspicion of
18      wrongdoing . . . she must decide whether to file suit or sit on her rights.

19  *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1110-11 (1988).

20      Here, DC's claim for tortious interference is based entirely upon an allegation

21  that Toberoff, Pacific Pictures, and the Shuster family formed a joint venture in the

22  2001 and 2003 Pacific Pictures Agreements for the purpose of serving the Shuster

23  Termination, thus purportedly interfering with the 1992 Agreement.  *See, e.g.*, FAC

24

25      [14] DC expressly alleges that "terminating DC Comics rights w[as] substantially
       certain to interfere with DC Comics' 1992 Agreement" and "DC Comics' ongoing
26      business relationship with the Shusters" – that is, that the termination itself constituted
       interference.  FAC ¶ 177.  DC admits that it was served with the Shuster Termination on
27      November 10, 2003, well over six years ago.  *Id*. ¶ 92.  DC further asserts that Toberoff
       signed the Shuster Termination and the forms filed with the Copyright Office.  *Id*. ¶ 93.

28

19
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

¶¶ 60-65, 90, 99, 177-78.

DC maintains that the allegations in its Fourth Claim "have only recently come to light in the past 20 months." FAC ¶ 104. However, it is beyond dispute that DC knew about the joint venture between Toberoff, the Shusters, and Pacific Pictures by no later than November 15, 2006, and long before it obtained the illicit and unreliable Timeline. Unredacted versions of both the 2001 and 2003 Pacific Pictures Agreements were produced to DC in the *Siegel* action on November 15, 2006, and DC introduced the agreements as exhibits in its deposition of Mr. Toberoff two days later. RJN ¶ 4-5, 10, Exs. D-E, J. DC was therefore on "notice" of the purported "interference" – the Shuster Termination and the related agreements showing Pacific Pictures' and Toberoff's involvement – by, at the very latest, November 2006, over three years before it filed this case. Such was more than sufficient to have put DC "on inquiry" notice. *Jolly*, 44 Cal. 3d at 111-11; *see, e.g.*, *Samuels v. Forest*, 2007 WL 3149285, at *8 (Cal. App. Oct. 30, 2007) (plaintiff was on notice of interference claim once he saw the agreement that allegedly interfered with his contract). Despite amending its Complaint, DC has alleged no facts that invoke the delayed discovery rule. From every perspective, DC's Fourth Claim is clearly time-barred.

### 5.    The Litigation Privilege Bars DC's Interference Claim

DC's Fourth Claim also fails because it deals entirely with activities protected by California's litigation privilege, for reasons discussed in more detail in Section C. 2 below. The cause of action is entirely based upon Toberoff's solicitation of his clients (*see Rubin v. Green*, 4 Cal. 4th 1187 (1993)), and communications given in a context in which there was reasonably anticipated litigation (*see Rosenthal v. Irell & Manella*, 135 Cal. App. 3d 121, 126 (1982)), and are thus completely protected by the privilege. Moreover, California imposes an absolute bar on tortious interference claims premised upon inducements to litigation, which bars the Fourth Claim in its entirety. *PG&E*, 50 Cal. 3d at 1126.

Kendall Brill & Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

C.    **The Fifth Claim For Interference With Prospective Economic Advantage Fails to State a Claim**

1.    **DC's Fifth Claim is Barred by the Two-Year Statute Of Limitations That Indisputably Accrued No Later Than 2006**

DC's Fifth Claim for Relief is plainly time-barred.  As with tortious interference with contract, the statute of limitations for interference with prospective economic advantage is two years.  *See* Cal. Code Civ. Proc. § 339(1).  Here, the alleged interference by Toberoff occurred in 2002, when the Siegels renounced any purported settlement agreement with DC.  FAC, ¶¶ 75, 180-86.  The claim is thus time-barred, unless DC can meet its burden of showing facts sufficient to invoke the delayed discovery rule.  *Ethicon*, 35 Cal. 4th at 808.  DC has not and cannot allege such facts, as the FAC and the judicially-noticeable record make clear that DC had more than enough facts to have put it on inquiry notice by, at the latest, 2006.  The statute of limitations runs "once the plaintiff has notice or information of circumstances to put a reasonable person on inquiry."  *Jolly*, 44 Cal. 3d at 1110-11.  "So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her."  *Id.*  "Suspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period."  *Ethicon*, 35 Cal. 4th at 807.

DC alleges that, in February 2002, Toberoff informed an executive of DC's parent company that DC "ha[d] a Superman rights problem."  FAC ¶ 73.  DC further alleges that it received a letter on September 21, 2002, wherein the Siegels allegedly repudiated a settlement agreement with DC, alerting it to the disruption of its prospective economic relationship from the alleged agreement.  FAC ¶ 70.  By November 2006, DC received in discovery a copy of the IP Worldwide Agreement, documenting, as of October 3, 2002, a joint venture between Toberoff, the Siegels, and the talent agent Ari Emanuel to "arrange and negotiate the sale, lease, license, and all other dispositions or exploitations" of the Siegels' *Superman* rights.  *See id.*;

21

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1  RJN ¶¶ 8, 10, Ex. H.  DC has made the IP Worldwide Agreement a centerpiece of

2  its FAC.  FAC ¶¶ 81-84, 188, 193.

3          Thus, by 2006, based solely on the facts alleged in the FAC and the

4  judicially-noticeable public record, DC indisputably knew that:  (a) its alleged

5  economic relationship had been allegedly disrupted (FAC ¶ 80); (b) Toberoff and

6  Emanuel, a successful talent agent had, two weeks after the alleged disruption,

7  entered into the IP Worldwide Agreement with the Siegels for the purpose of

8  marketing and exploiting their *Superman* rights (FAC ¶¶ 81-84); and (c) Toberoff,

9  Emanuel and the Siegels had entered into this IP Worldwide Agreement as part of

10 the "disruption" of the alleged economic relationship (FAC ¶¶ 182-85).  That

11 information is clearly more than sufficient, as a matter of law, to have raised a

12 reasonable "suspicion" as to DC's allegation that Toberoff had induced the Siegels

13 to repudiate the purported settlement agreement – the entire basis for DC's Fifth

14 Claim.[15]  Therefore, the two-year limitations period applicable to the Fifth Claim

15 was indisputably triggered almost four years before DC filed its FAC.

16              **2.    The Litigation Privilege Bars DC's Interference Claim**

17        DC's Fifth Claim fails to state a claim because, on its face, it is barred by

18 California's litigation privilege, codified in California Civil Code § 47(b).  The Fifth

19 Claim alleges that Toberoff, by communicating with the Siegels, "interfered" with

20 DC's purported "prospective economic advantage," consisting of a settlement

21 "offer" and negotiations regarding the Siegel Termination.  FAC ¶¶ 181-85.

22        The litigation privilege bars this claim for at least three separate and

23

24

25        [15] *See* FAC ¶¶ 184-85 (describing the alleged interference by Toberoff as:
"approach[ing]the Siegel Heirs and their representatives in late 2001 and 2002 to express

26 interest in purchasing their Superman rights"; "misrepresenting . . . that he had a billionaire
investor ready to purchase their Superman rights"; "representing . . . that he would help

27 them produce a competing Superman motion picture" and "inducing the Siegels to
repudiate their agreement and business relationship with DC Comics").

28

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

1    independent reasons.[16]  First, the communications that form the basis of this claim

2    all stem from alleged actions by Toberoff in connection with settlement negotiations

3    with DC, to induce the Siegels to become his clients and conduct further

4    negotiations on their behalf, and, in the event the Siegels' rights were not settled, to

5    initiate legal proceedings against DC in which Toberoff would serve as the Siegels'

6    counsel.  *Id.* ¶¶ 70-84; RJN, Exs. B, C, D, E, ¶¶ 2-5.  In *Rubin v. Green*, 4 Cal. 4th

7    1187 (1993), the California Supreme Court ruled that a third party action against an

8    attorney, on the grounds of wrongful solicitation was squarely barred by § 47(b):

9    >    ***Plaintiff's claims, however styled, are founded essentially upon alleged
>    misrepresentations*** made by the law firm . . . in the course of discussions
10   >    over park conditions and the possibility of being retained to prosecute the
>    failure-to-maintain action, and the subsequent filing of pleadings in the
11   >    lawsuit itself.  ***Whether these acts amounted to wrongful attorney
>    solicitation or not, they were communicative in their essential nature
12   >    and therefore within the privilege of section 47(b).*** . . .

13   *Id.* at 1196 (emphasis added).  The *Rubin* Court reasoned that "a rule permitting the

14   defendant in a civil action to institute parallel litigation seeking to impose liability

15   on the attorney for the adverse party based on the circumstances surrounding the

16   formation of the attorney-client relationship" would result in dire consequences:

17   >    The impairment of colorable claims by disrupting access to counsel, ***the
>    intimidating effect on attorneys of facing an almost certain
18   >    retaliatory proceeding,*** **the** *distractions inherent in requiring counsel
>    to deal with defending a personal countersuit as well as the predicate
19   >    action* and, in general, the dampening effect on the unobstructed
>    presentation of claims which we have identified as the central value
20   >    supporting limitations on other derivative tort actions, apply [to parallel
>    suits against opposing counsel].

21   *Id.* at 1198 (emphasis added).  Here, the gravamen of DC's claim is that Toberoff

22   purportedly took inappropriate steps to gain the Siegels as clients, causing them to

23

24

25

26   _____
        [16] Civil Code § 47(b) provides immunity for "any communication (1) made in
27   judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by
     law; (3) to achieve the objects of the litigation; and (4) that have some connection or
28   logical relation to the action."  *Silberg v. Anderson,* 50 Cal. 3d 205, 211-12 (1990).

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1  reject a purported settlement offer or agreement.  FAC ¶ 184-86.[17]  Thus, DC's

2  "retaliatory" lawsuit is unquestionably a "personal countersuit," filed during

3  ongoing litigation, based upon Toberoff's alleged solicitation of his current clients.[18]

4        Second, the Fifth Claim rests entirely upon DC's allegations that Toberoff

5  interfered with ongoing settlement negotiations designed to resolve anticipated

6  litigation.  DC's core allegation is that Toberoff caused the Siegels to reject a

7  "settlement offer."  FAC ¶ 181.  Communications related to the rejection of a

8  settlement offer are clearly within the litigation privilege.  The litigation privilege

9  bars any action based on communications made to achieve the objects of any

10  "reasonably anticipated" litigation, including communications made in the context

11  of settlement negotiations, even if such preliminary communications allegedly

12  constitute tortious interference.  *See Rosenthal*, 135 Cal. App. 3d at 126 (privilege

13  bars tortious interference claim concerning settlement negotiations by attorney);

---

[17]  DC's conclusory allegation that "Toberoff engaged in this misconduct in his role as businessman and shareholder of IP Worldwide," FAC ¶ 185, is refuted decisively by DC's own allegations. For example, the IP Worldwide Agreement expressly stated that "IPW[orldwide] will furnish the legal services of Marc Toberoff, Esq." and that Toberoff would perform legal services in connection with the "settlement" of the Siegels' rights and foresaw potential litigation. *See* FAC ¶ 83 (noting that the IP Worldwide Agreement provided that "the provision of such [legal] services…will be rendered by Marc Toberoff, Esq."); RJN ¶¶ 2, 10, Ex. H.  Toberoff indisputably acted as an attorney and his services as an attorney were critical to the alleged interference, as DC alleges that the Siegels' "repudiation" of the purported agreement caused DC "to incur millions of dollars in subsequent legal fees in disputes with the Siegel Heirs" – *i.e.,* in a co-ownership/ accounting lawsuit where Toberoff represented the Siegels.  FAC ¶ 186.  That the IP Worldwide Agreement was not itself a "legal retainer agreement" is irrelevant to whether Toberoff was recruiting the Siegels into an attorney-client relationship.  *See Brandlin v. Belcher*, 67 Cal. App. 3d 997, 1001 (1977) ("[N]either a retainer nor formal agreement is required to establish the attorney-client relationship.").

[18]  The litigation privilege is particularly forceful in barring such secondary attacks on attorneys in ongoing litigation.  *See Crowley v. Katleman*, 8 Cal. 4th 666, 681 n.9 (1994) (applying *Rubin's* holding "that one who is the target of a threatened lawsuit cannot maintain a retaliatory action charging the attorneys for the opposing party with 'soliciting' the suit"); *Taheri Law Group v. Evans*, 160 Cal. App. 4th 482, 490 (2008) (barring claim for intentional interference where the "causes of action arise directly from communications between [the client] and [defendant attorney] about the pending lawsuits against [the client]"); *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman*, 47 Cal. App. 4th 777, 781-82 (2008) (suits based on communications "between a law firm and persons with potential claims" are barred by litigation privilege).

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

24

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

1    *Kashian v. Harriman*, 98 Cal. App. 4th 892, 920 (2002) (communications before

2    lawsuit are privileged, even if "they are, or are alleged to be, fraudulent, perjurious,

3    unethical, or even illegal," so long as they are "logically related" to the action).[19]

4          Third, the California Supreme Court has clearly held that there can be <u>no</u>

5    liability <u>whatsoever</u> for tortious interference with contract based on a third-party's

6    inducement of any party to file suit:

7          This conclusion will bring us face to face with the question, not squarely
          framed by the parties, whether it is proper to impose liability for inducing
8          a potentially meritorious lawsuit. We will conclude that it is not.

9    *PG&E*, 50 Cal. 3d at 1127.  In *PG&E,* the alleged contract was with a municipal

10   agency.  The defendant contacted the agency, convinced them to seek declaratory

11   relief in order to terminate the contract, paid "for legal, engineering and marketing

12   studies," and retained and paid for outside counsel, in exchange for a percentage of

13   any increased revenues.  *Id.* at 1123-24.  *PG&E* held that such actions could not, as

14   a matter of law, give rise to a claim for tortious interference.  *Id.* at 1136.  Here, the

15   Fifth Claim is based upon an alleged inducement of the Siegels to reject a settlement

16   offer, and to thereafter file a declaratory judgment action concerning their

17   termination rights.  As such, it is plainly barred as a matter of law.

18   **V.    <u>CONCLUSION</u>**

19         For the foregoing reasons, Plaintiff's Fourth and Fifth Claims for Relief

20   should be dismissed with prejudice.

21   Dated:  September 20, 2010          KENDALL BRILL & KLIEGER LLP
                                         By:  /s/ Richard B. Kendall
22
                                         Attorneys for Defendants Marc Toberoff,
23                                       Pacific Pictures Corporation, IP Worldwide,
                                         LLC, IPW, LLC
24

25

26         [19] *Seltzer v. Barnes*, 182 Cal. App. 4th 953, 972 (2010) (where "[interference] was
     the negotiation of the settlement . . . litigation privilege applies as a matter of law").  If the
27   statement is made "in serious contemplation of litigation, then the statement is sufficiently
     connected to litigation and will be protected by the litigation privilege.  The privilege then
28   applied is absolute."); *Aronson v. Kinsella*, 58 Cal. App. 4th 254, 266 (1997).

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**