1 KENDALL BRILL & KLIEGER LLP
Richard B. Kendall (90072)
2  *rkendall@kbkfirm.com*
Laura W. Brill (195889)
3  *lbrill@kbkfirm.com*
Nicholas F Daum (236155)
4  *ndaum@kbkfirm.com*
Nathalie E. Cohen (258222)
5  *ncohen@kbkfirm.com*
10100 Santa Monica Blvd., Suite 1725
6 Los Angeles, California  90067
Telephone: 310.556.2700
7 Facsimile:  310.556.2705

8 Attorneys for Defendants Marc Toberoff,
Pacific Pictures Corporation, IP
9 Worldwide, LLC, and IPW, LLC

10

11 UNITED STATES DISTRICT COURT

12 CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

13

| | |
|---|---|
| 14 DC Comics, | Case No. CV 10-3633 ODW(RZx) |
| 15          Plaintiff, | **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION OF MARC TOBEROFF, PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT PURSUANT TO FED.R.CIV.P. 12(B)(6)** |
| 16          v. | |
| 17 PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, an individual, JOANNE SIEGEL, an individual, LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive, | |
| 18 | |
| 19 | |
| 20 | |
| 21 | *Filed concurrently with MOTION TO DISMISS, MOTION TO STRIKE PURSUANT TO CALIFORNIA'S ANTI-SLAPP LAW, DECLARATION OF NICHOLAS F. DAUM and NOTICE OF JOINDER* |
| 22 | |
| 23          Defendants. | |
| 24 | Hon. Otis D Wright, II |
| 25 | Date:    October 18, 2010 |
| 26 | Time:    1:30 p.m. |
| 27 | Complaint Filed:    May 14. 2010 |
| 28 | |

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1    Defendants Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC,

2    IPW, LLC (together "Moving Parties"), respectfully submit this Request for Judicial

3    Notice pursuant to Federal Rule of Evidence 201.  Moving Parties request that the

4    Court take judicial notice of the following materials and facts in connection with

5    their Motion to Dismiss Plaintiff's First Amended Complaint Pursuant to Fed. R.

6    Civ. P. 12(b)(6):

7        1.    Moving Parties request that the Court take judicial notice of the

8    agreement between DC Comics, on the one hand, and Frank Shuster and Jean

9    Peavy, on the other hand, dated as of August 1, 1992 (the "1992 Shuster

10   Agreement").  The 1992 Shuster Agreement is attached hereto as Exhibit A.  On a

11   motion to dismiss under Rule 12(b)(6), courts consider documents incorporated by

12   reference in the complaint.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir.

13   2003) ("Even if a document is not attached to a complaint, it may be incorporated by

14   reference into a complaint if the plaintiff refers extensively to the document or the

15   document forms the basis of the plaintiff's claim."); *Von Koenig v. Snapple

16   Beverage Corp.*, 2010 WL 1980208 (E.D. Cal. May 10, 2010) (where parties

17   requested judicial notice of juice and tea bottle labels and labels formed the basis of

18   the relevant causes of action, court considered labels for the purpose of defendant's

19   motion to dismiss).  As the 1992 Shuster Agreement is referred to throughout the

20   complaint in this action (*see*, *e.g.*, First Amended Complaint ("FAC") ¶¶ 3-4, 6, 51-

21   60, 112-117, 125-128, 174-179) and is the basis in part of Plaintiff's Fourth Claim

22   for Relief, it is proper for the Court to consider the 1992 Shuster Agreement on

23   Defendants' motion to dismiss.

24       2.    Moving Parties request that the Court take judicial notice of the Court's

25   Order granting in part and denying in part Plaintiffs' Motion for Partial Summary

26   Judgment; Order granting in part and denying in part Defendants' Motion for Partial

27   Summary Judgment, filed on March 26, 2008, in *Joanne Siegel et al. v. Warner*

28

1

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

1  *Bros. Entertainment Inc., et al.*, USDC Case No. CV-04-8400-SGL (RZx) (the

2  "Superman Litigation") and *Joanne Siegel et al. v. Warner Bros. Entertainment Inc.,*

3  *et al.*, USDC Case No. CV 04-08776-SGL (RZx) (the "Superboy Litigation")

4  (together, the "Siegel Litigation").  The Court's March 26, 2008, Order is attached

5  hereto as Exhibit B.  Pursuant to Rule 201 of the Federal Rules of Evidence, it is

6  proper for the Court to take judicial notice of proceedings and determinations of

7  prior related litigation.  *Stein v. State of Arizona*, 2010 WL 2541136 (D. Ariz. June

8  18, 2010) (on motion to dismiss, taking judicial notice of Plaintiff's sentencing

9  documents and release order in related criminal case against Plaintiff) (citing

10  *Emrich v. Touche Ross & Co.,* 846 F.2d 1190, 1198 (9th Cir. 1988)); *Reyn's Pasta*

11  *Bella, LLC v. Visa USA, Inc.,* 442 F.3d 741, 746 n.6 (9th Cir. 2006) (taking judicial

12  notice, as a matter of public record, of briefs, pleadings, memoranda, expert reports

13  from related litigation); *Kourtis v. Cameron*, 419 F.3d 989, 1001 (9th Cir. 2005)

14  ("court records from related proceedings can be taken into account without

15  converting a motion to dismiss into a summary judgment motion") (*abrogated on*

16  *other grounds by Taylor v. Sturgell*, 553 U.S. 880, 128 S. Ct. 2161, 171 L. Ed. 2d

17  155 (2008)).  "Subsection (d) [of Rule 201]  makes the taking of judicial notice

18  mandatory if the Court is so requested and supplied with the necessary information."

19  *Haye v. United States*, 461 F. Supp. 1168, 1174 (C.D. Cal. 1978).  As the Fourth

20  through Sixth Claims for Relief in this action are based on conduct related to the

21  Siegel Litigation, and that litigation and this action are clearly related, it is proper

22  for this Court to take judicial notice of the proceedings and determinations in the

23  Siegel Litigation.

24      3.  Moving Parties request that the Court take judicial notice of the Court's

25  Order Resolving Additional Issues, filed on August 12, 2009, in the Superman

26  Litigation.  The Court's August 12, 2009, Order is attached hereto as Exhibit C.  It is

27  proper for the Court to take judicial notice of proceedings and determinations of

28

Kendall Brill
& Klieger LLP

10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

1   prior related litigation.  *Stein v. State of Arizona*, 2010 WL 2541136 (D. Ariz. June

2   18, 2010) (citing *Emrich v. Touche Ross & Co.,* 846 F.2d 1190, 1198 (9th Cir.

3   1988)); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.,* 442 F.3d 741, 746 n. 6 (9th Cir.

4   2006); *Kourtis v. Cameron*, 419 F.3d 989, 1001 (9th Cir. 2005) (*abrogated on other*

5   *grounds by Taylor v. Sturgell*, 553 U.S. 880, 128 S. Ct. 2161, 171 L. Ed. 2d 155

6   (2008)).  "Subsection (d) [of Rule 201]  makes the taking of judicial notice

7   mandatory if the Court is so requested and supplied with the necessary information."

8   *Haye v. United States*, 461 F. Supp. 1168, 1174 (C.D. Cal. 1978).  As the Fourth

9   through Sixth Claims for Relief in this action are based on conduct related to the

10   Superman Litigation, and that litigation and this action are clearly related, it is

11   proper for this Court to take judicial notice of the proceedings and determinations in

12   the Superman Litigation.

13   4.   Moving Parties request that the Court take judicial notice of the

14   agreement between Pacific Pictures Corporation ("PPC"), on the one hand, and Jean

15   Peavy and Mark Warren Peary, on the other hand, made as of November 23, 2001

16   (the "2001 PPC Agreement").  The 2001 PPC Agreement is attached hereto as

17   Exhibit D.  On a motion to dismiss under Rule 12(b)(6), courts consider documents

18   incorporated by reference in the complaint.  *United States v. Ritchie*, 342 F.3d 903,

19   908 (9th Cir. 2003); *Von Koenig v. Snapple Beverage Corp.*, 2010 WL 1980208

20   (E.D. Cal. May 10, 2010).  As the 2001 PPC Agreement is referred to throughout

21   the complaint in this action (*see, e.g.*, FAC ¶¶ 3, 6, 11, 60-65, 90, 98-99, 120, 132,

22   169, 177-178, 192-193) and is the basis in part of Plaintiff's Fourth and Sixth

23   Claims for Relief, it is proper for the Court to consider the 2001 PPC Agreement on

24   Defendants' motion to dismiss.

25   5.   Moving Parties request that the Court take judicial notice of the

26   agreement between PPC, on the one hand, and Jean Peavy and Mark Warren Peary,

27   on the other hand, dated October 27, 2003 (the "2003 PPC Agreement").  The 2003

28

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

3

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

1    PPC Agreement is attached hereto as Exhibit E.  On a motion to dismiss under Rule

2    12(b)(6), courts consider documents incorporated by reference in the complaint.

3    *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *Von Koenig v. Snapple*

4    *Beverage Corp.*, 2010 WL 1980208 (E.D. Cal. May 10, 2010).  As the 2003 PPC

5    Agreement is referred to throughout the complaint in this action (*see, e.g.*, FAC ¶¶

6    3, 10-11, 90, 92, 98-99, 101, 120, 130, 132, 169, 177-178, 192-193) and is the basis

7    in part of Plaintiff's Third, Fourth and Sixth Claims for Relief, it is proper for the

8    Court to consider the 2003 PPC Agreement on Defendants' motion to dismiss.

9        6.    Moving Parties request that the Court take judicial notice of the

10   agreement between PPC, on the one hand, and Jean Peavy and Mark Warren Peary,

11   on the other hand, dated September 10, 2004 (the "2004 PPC Agreement").  The

12   2004 PPC Agreement is attached hereto as Exhibit F.  On a motion to dismiss under

13   Rule 12(b)(6), courts consider documents incorporated by reference in the

14   complaint.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *Von Koenig*

15   *v. Snapple Beverage Corp.*, 2010 WL 1980208 (E.D. Cal. May 10, 2010).  As the

16   2004 PPC Agreement is referred to throughout the complaint in this action (*see, e.g.*,

17   FAC ¶¶ 99, 121, 169, 171-172, 177-178) and is the basis in part of Plaintiff's Third,

18   Fourth and Sixth Claims for Relief, it is proper for the Court to consider the 2004

19   PPC Agreement on Defendants' motion to dismiss.

20       7.    Moving Parties request that the Court take judicial notice that PPC was

21   dissolved in the state of New York as of January 28, 2009.  A true and correct copy

22   of Entity Information record for PPC on the New York State Department online

23   database is attached hereto as Exhibit G.  Rule 201 of the Federal Rules of Evidence

24   permits a court to take judicial notice of a fact that is "not subject to reasonable

25   dispute in that it is … capable of accurate and ready determination by resort to

26   sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).

27   Pursuant to Rule 201, a court may take judicial notice of online records maintained

Kendall Brill
& Klieger LLP

10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

28

4

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

1   by government agency websites.  *See, e.g.*, *Paralyzed Veterans of America v.*

2   *McPherson*, 2008 WL 4183981, at *5 (N.D. Cal. Sept. 9, 2008) (information on

3   Secretary of State's website treated as proper subject for judicial notice) (citing

4   multiple cases allowing judicial notice of records of government agency websites);

5   *Pollution Denim & Co. v. Pollution Clothing Co.*, 547 F. Supp. 2d 1132, 1135 n.11

6   (C.D. Cal. 2007); *Peruta v. County of San Diego,* 678 F. Supp. 2d 1046, 1061 n.8

7   (S.D. Cal. 2010).  "Subsection (d) [of Rule 201]  makes the taking of judicial notice

8   mandatory if the Court is so requested and supplied with the necessary information."

9   *Haye v. United States*, 461 F. Supp. 1168, 1174 (C.D. Cal. 1978).

10       8.       Moving Parties request that the Court take judicial notice of the

11   agreement between IP Worldwide, Inc., on the one hand, and Joanne Siegel and

12   Laura Siegel Larson, on the other hand, dated as of October 3, 2002 ("the 2002 IP

13   Worldwide, Inc. Agreement").  The 2003 IP Worldwide, Inc. Agreement is attached

14   hereto as Exhibit H.  On a motion to dismiss under Rule 12(b)(6), courts consider

15   documents incorporated by reference in the complaint.  *United States v. Ritchie*, 342

16   F.3d 903, 908 (9th Cir. 2003); *Von Koenig v. Snapple Beverage Corp.*, 2010 WL

17   1980208 (E.D. Cal. May 10, 2010).  As the 2002 IP Worldwide, Inc. Agreement is

18   referred to throughout the complaint in this action (*see, e.g.*, FAC ¶¶ 3, 8, 81-84,

19   188, 193) and is the basis in part of Plaintiff's Fifth and Sixth Claims for Relief, it is

20   proper for the Court to consider the 2002 IP Worldwide, Inc. Agreement on

21   Defendants' motion to dismiss.

22       9.       Moving Parties request that the Court take judicial notice of the Joint

23   Status Report filed on December 21, 2009, in the Siegel Litigation.  The Joint Status

24   Report is attached hereto as Exhibit I.  Pursuant to Rule 201 of the Federal Rules of

25   Evidence Courts may take judicial notice of proceedings and determinations of prior

26   related litigation.  *Stein v. State of Arizona*, 2010 WL 2541136 (D. Ariz. June 18,

27   2010) (citing *Emrich v. Touche Ross & Co.,* 846 F.2d 1190, 1198 (9th Cir. 1988));

28

Kendall Brill
& Klieger LLP

10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

1   *Reyn's Pasta Bella, LLC v. Visa USA, Inc.,* 442 F.3d 741, 746 n. 6 (9th Cir. 2006);

2   *Kourtis v. Cameron*, 419 F.3d 989, 1001 (9th Cir. 2005) (*abrogated on other*

3   *grounds by Taylor v. Sturgell*, 553 U.S. 880, 128 S. Ct. 2161, 171 L. Ed. 2d 155

4   (2008)).   "Subsection (d) [of Rule 201]  makes the taking of judicial notice

5   mandatory if the Court is so requested and supplied with the necessary information."

6   *Haye v. United States*, 461 F. Supp. 1168, 1174 (C.D. Cal. 1978).  As the Fourth

7   through Sixth Claims for Relief in this action are based on conduct related to the

8   Siegel litigation, and that litigation and this action are clearly related, it is proper for

9   this Court to take judicial notice of the proceedings and determinations in the Siegel

10  litigation.

11          10.    Moving Parties request that the Court take judicial notice that DC

12  Comics was in possession of the 2001 and 2003 PPC Agreements, and the 2002 IP

13  Worldwide, Inc. Agreement on or before November 17, 2006.  Rule 201 of the

14  Federal Rules of Evidence permits a court to take judicial notice of a fact that is "not

15  subject to reasonable dispute in that it is … capable of accurate and ready

16  determination by resort to sources whose accuracy cannot reasonably be

17  questioned."  Fed. R. Evid. 201(b).  Subsection (d) [of Rule 201]  makes the taking

18  of judicial notice mandatory if the Court is so requested and supplied with the

19  necessary information."  *Haye v. United States*, 461 F. Supp. 1168, 1174 (C.D. Cal.

20  1978).

21          That the 2001 and 2003 PPC agreements were produced to DC in the Siegel

22  Litigation is not subject to reasonable dispute.  The 2001 PPC Agreement, 2003

23  PPC Agreement, 2002 IP Worldwide, Inc. Agreement attached hereto as Exhibits D,

24  E, and H, respectively, are Bates stamped as follows:

25          2001 PPC Agreement:          PPC 00005-00008

26          2003 PPC Agreement:          PPC 00001-00004

27

28

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

6

2002 IP Worldwide, Inc.

Agreement:                              IPW 00001-00004

*See also* November 15, 2006, letter from Marc Toberoff to counsel for DC, including facsimile cover sheet, attached hereto as Exhibit K, enclosing productions Bates-stamped IPW 00001-00016 and PPC 00001-00009; *Werner v. Werner*, 267 F.3d 288, 295-296 (3d Cir. 2001) (determination of whether defendants produced corporate meeting minutes during discovery in related state court action "is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned by [defendants]").  Moreover, it cannot be disputed that DC Comics had possession of the Agreements on or before November 17, 2006, as they were both introduced as exhibits by DC Comics in DC Comic's deposition of Marc Toberoff, which took place on November 17, 2006.  *See* cover pages and exhibits list of the transcript of the deposition of Marc Toberoff and documents stamped as Exhibits 13, 14, & 18 thereto, attached hereto as Exhibit J; *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1111 (N.D. Cal. 2009) (court takes judicial notice of conference call transcripts for the fact that statements were made on the dates specified).

11.    Moving Parties request that the Court take judicial notice of a letter from Frank Shuster to Paul Levitz dated September 10, 1992.  The September 10, 1992, letter from Frank Shuster is attached hereto as Exhibit L.  On a motion to dismiss under Rule 12(b)(6), courts consider documents incorporated by reference in the complaint.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1099 (C.D. Cal. 2009) (courts may "consider documents that are incorporated by reference, but not physically attached to, the complaint if they are central to plaintiff's claim and no party questions their authenticity").  As the September 10, 1992, letter from Frank Shuster

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

7

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

1   is described in detail and directly quoted in the complaint in this action (*see*, FAC

2   ¶ 54) and is relied upon by DC for its Fourth Claim for Relief, it is proper for the

3   Court to consider the on Defendants' motion to dismiss.

4         12.    Moving Parties request that the Court take judicial notice of a letter

5   from Jean Peavy to Paul Levitz dated September 7, 1999.  The September 7, 1999,

6   letter from Jean Peavy is attached hereto as Exhibit M.  On a motion to dismiss

7   under Rule 12(b)(6), courts consider documents incorporated by reference in the

8   complaint.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *Solid Host,*

9   *NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1099 (C.D. Cal. 2009).  As the

10  September 7, 1999, letter from Jean Peavy is described in detail and directly quoted

11  in the complaint in this action (*see*, FAC ¶ 56, 116) and is relied upon by DC for its

12  Fourth Claim for Relief, it is proper for the Court to consider the on Defendants'

13  motion to dismiss.

14        13.    Moving Parties request that the Court take judicial notice of the

15  Complaint in this action, filed on May 14, 2010, Docket Number 1.  The Complaint

16  is attached hereto as Exhibit N.  A District Court may always take judicial notice of

17  a related pleading filed earlier in the same litigation.  *Asdar Group v. Pillsbury,*

18  *Madison & Sutro*, 99 F.3d 289, 290, n. 1 (9th Cir. 1996).  "Subsection (d) [of Rule

19  201]  makes the taking of judicial notice mandatory if the Court is so requested and

20  supplied with the necessary information."  *Haye v. United States*, 461 F. Supp.

21  1168, 1174 (C.D. Cal. 1978).

22        14.    Moving Parties request that the Court take judicial notice of a redlined

23  version of the First Amended Complaint in this action, demonstrating changes made

24  from the original Complaint.  This redlined version is attached hereto as Exhibit O.

25  A District Court may always take judicial notice of a related pleading filed earlier in

26  the same litigation.  *Asdar Group v. Pillsbury, Madison & Sutro*, 99 F.3d 289, 290,

27  n. 1 (9th Cir. 1996).  "Subsection (d) [of Rule 201]  makes the taking of judicial

28

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION OF DEFENDANTS
MARC TOBEROFF, ET AL. TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1  notice mandatory if the Court is so requested and supplied with the necessary

2  information." *Haye v. United States*, 461 F. Supp. 1168, 1174 (C.D. Cal. 1978).

3  Dated:  September 20, 2010          KENDALL BRILL & KLIEGER LLP

4

5

6                                           By:  /s/ Richard B. Kendall

7                                                 Richard B. Kendall
                                                  Attorneys for Defendants Marc Toberoff,
8                                                 Pacific Pictures Corporation, IP
                                                  Worldwide, LLC, and IPW, LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

9

# EXHIBIT A



DC COMICS INC.
1325 Avenue of the Americas
New York, New York 10019
(212) 636-5555
FAX (212) 636-5401

Paul Levitz/Executive Vice President & Publisher

Dated as of August 1, 1992

Mr. Frank Shuster                    Ms. Jean Shuster Peavy
98-120 Queens Blvd., Apt. 4K          316 Horton Lane, NW
Rego Park, NY  11374                  Albuquerque, NM  87114

Dear Mr. Shuster and Ms. Peavy:

This is to confirm our agreement to pay you, collectively, a total of $25,000 a year, payable to Jean Shuster Peavy, commencing as of August 1, 1992, for as long as either one of you is alive. Such amounts shall be payable in accordance with Warner Communication Inc.'s customary payroll practices and shall be subject to all applicable withholding taxes. If Jean Shuster Peavy shall predecease Frank Shuster, then the foregoing payments shall be made to Frank Shuster for as long as he shall live.

We ask you to confirm by your signatures below that this agreement fully settles all claims to any payments or other rights or remedies which you may have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon. In any event, you now grant to us any such rights and release us, our licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever.

If, despite the terms of this agreement, either of you assert any such claim of right, for any reason, you agree to refund to us, upon the making of any such assertion, all amounts previously paid to you hereunder, and we will have no obligation to make any further payments under this agreement. We also reserve all of our other rights, remedies and defenses in such an event.

If after full consideration of the foregoing, you accept and agree to all of the above, please so indicate by signing below where indicated.

Very truly yours,

DC Comics

By: _____
        Paul Levitz

ACCEPTED AND AGREED TO:

_Frank Shuster_
Frank Shuster

Dated: 10/2/92

_Jean Shuster Peavy_
Jean Shuster Peavy

Dated: 10/2/92

8

EXHIBIT A  Page 10

# EXHIBIT B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOANNE SIEGEL and LAURA SIEGEL LARSON, | CASE NO. CV-04-8400-SGL (RZx) |
| | [Consolidated for pre-trial and discovery purposes with CV-04-8776-SGL (RZx)] |
| Plaintiffs, | |
| v. | ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT |
| WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; and DC COMICS, | |
| Defendants. | |

The termination provisions contained in the Copyright Act of 1976 have aptly been characterized as formalistic and complex, such that authors, or their heirs, successfully terminating the grant to the copyright in their original work of authorship is a feat accomplished "against all odds." 2 WILLIAM F. PATRY, PATRY ON COPYRIGHT § 7:52 (2007).

In the present case, Joanne Siegel and Laura Siegel Larson, the widow and the daughter of Jerome Siegel, seek a declaration from the Court that they have overcome these odds and have successfully terminated the 1938 grant by Jerome Siegel and his creative partner, Joseph Shuster, of the copyright in their creation of the iconic comic book superhero "Superman," thereby recapturing Jerome Siegel's half of the copyright in the same. No small feat indeed. It requires traversing the

1  many impediments — many requiring a detailed historical understanding both

2  factually and legally of the events that occurred between the parties over the past

3  seventy years — to achieving that goal and, just as importantly, reckoning with the

4  limits of what can be gained through the termination of that grant.

5      Any discussion about the termination of the initial grant to the copyright in a

6  work begins, as the Court does here, with the story of the creation of the work itself.

7      In 1932, Jerome Siegel and Joseph Shuster were teenagers at Glenville High

8  School in Cleveland, Ohio. Siegel was an aspiring writer and Shuster an aspiring

9  artist; what Siegel later did with his typewriter and Shuster with his pen would

10  transform the comic book industry. The two met while working on their high

11  school's newspaper where they discovered their shared passion for science fiction

12  and comics, the beginning of a remarkable and fruitful relationship.

13      One of their first collaborations was publishing a mail-order fanzine titled

14  "Science Fiction: The Advance Guard of Future Civilization."[1]  In the January, 1933,

15  issue, Siegel and Shuster's first superman character appeared in the short story

16  "The Reign of the Superman," but in the form of a villain not a hero. The story told

17  of a "mad scientist's experiment with a deprived man from the breadlines" that

18  transformed "the man into a mental giant who then uses his new powers — the

19  ability to read and control minds — to steal a fortune and attempt to dominate the

20  world." (Decl. Michael Bergman, Ex. HH at 1126). This initial superman character

21  in villain trappings was drawn by Shuster as a bald-headed mad man.

22      A couple of months later it occurred to Siegel that re-writing the character as

23  a hero, bearing little resemblance to his villainous namesake, "might make a great

24  comic strip character." (Decl. Michael Bergman, Ex. HH at 1126). Much of Siegel's

25  desire to shift the role of his protagonist from villain to hero arose from Siegel's

26  exposure to despair and hope: Despair created by the dark days of the Depression

27

28      [1] A fanzine is a publication, usually distributed at no or nominal cost,
produced by fans of a particular topic (such as comic books, opera, murder
mystery stories, etc.) for others who share their interest.

1    and hope through exposure to the "gallant, crusading heros" in popular literature

2    and the movies.  (Decl. Michael Bergman, Ex. HH at 1126).  The theme of hope

3    amidst despair struck the young Siegel as an apt subject for his comic strip:

4    "Superman was the answer — Superman aiding the downtrodden and oppressed."

5    (Decl. Michael Bergman, Ex. HH at 1126).

6          Thereafter, Siegel sat down to create a comic book version of his new

7    character.  While he labored over the script, Shuster began the task of drawing the

8    panels visualizing that script.  Titling it "The Superman," "[t]heir first rendition of the

9    man of steel was a hulking strongman who wore a T-shirt and pants rather than a

10   cape and tights."  (Decl. Michael Bergman, Ex. HH at 1129).  And he was not yet

11   able to hurdle skyscrapers, nor was he from a far away planet; instead, he was

12   simply a strong (but not extraordinarily so) human, in the mold of Flash Gordon or

13   Tarzan, who combated crime.  Siegel and Shuster sent their material to a publisher

14   of comic books — Detective Dan — and were informed that it had been accepted

15   for publication.  Their success, however, was short-lived; the publisher later

16   rescinded its offer to publish their submission.  Crestfallen, Shuster threw into the

17   fireplace all the art for the story except the cover (reproduced below), which Siegel

18   rescued from the flames.

19

20

21

22

23

24

25

26

27

28

3



Undaunted, Siegel continued to tinker with his character, but decided to try a different publication format, a newspaper comic strip. The choice of crafting the material in a newspaper comic strip format was influenced both by the failure to get their earlier incarnation of the Superman character published by Detective Dan in a comic book format, and by the fact that, at the time, black-and-white newspaper comic strips — not comic books — were the most popular medium for comics. As one observer of the period has commented:

> It is worth noting the extent to which early comic books were conjoined with newspaper strips of the day. The earliest comic books consisted of reprints of those newspaper strips, re-pasted into a comic book page format. When original material began appearing in comic book format, it was generally because companies that wished to publish comic books were unable to procure reprint rights to existing newspaper strips. The solution to this . . . was to hire young [comic strip artists] to simulate the same kind of newspaper strip material.

4

1    (Decl. Mark Evanier, Ex. A at 5-6).

2    　　　On a hot summer night in 1934, Siegel, unable to sleep, began brainstorming

3    over plot ideas for this new feature when an idea struck him: "I was up late counting

4    sheep and more and more ideas kept coming to me, and I wrote out several weeks

5    of syndicate script for the proposed newspaper strip.  When morning came, I

6    dashed over to Joe [Shuster]'s place and showed it to him." (Decl. Michael

7    Bergman, Ex. HH at 1129).  Siegel re-envisioned his character in more of the mythic

8    hero tradition of Hercules, righting wrongs in present-day society.  His inspiration

9    was to couple an exaggeration of the daring on-screen acrobatics performed by

10   such actors as Douglas Fairbanks, Sr., with a pseudo-scientific explanation to make

11   such fantastic abilities more plausible in the vein of Edgar Rice Burroughs' John

12   Carter of Mars stories, and placing all of this within a storyline that was the reverse

13   of the formula used in the Flash Gordon serials.  The end product was of a

14   character who is sent as an infant to Earth aboard a space ship from an unnamed

15   distant planet (that had been destroyed by old age) who, upon becoming an adult,

16   uses his superhuman powers (gained from the fact that his alien heritage made him

17   millions of years more evolved than ordinary humans) to perform daring feats for the

18   public good.

19   　　　Siegel named his character "Superman."  Unlike his previous incarnation,

20   Siegel's new Superman character's powers and abilities were much more

21   extraordinary and fantastic:  Superhuman strength; the ability to leap 1/8th of a mile,

22   hurdle a twenty-story building, and run faster than an express train; and nothing less

23   than a bursting shell could penetrate his skin.  Siegel placed his character in a very

24   cosmopolitan environment that had the look and feel of mid-thirties America.  He

25   also humanized his character by giving his superhero an "ordinary person" alter

26   ego:  Mild-mannered, big-city newspaper reporter Clark Kent.  Siegel developed

27   this concept of Superman's secret identity both as a means for his superhero to

28   maintain an inconspicuous position in everyday society and as a literary device to

1    introduce a conflict — and the potential for story lines centered around that conflict

2    — between the character's dual identities, a conflict played out no more

3    dramatically than in the love "triangle" between the character's dual identities and

4    another newspaper reporter, Lois Lane.

5      Shuster immediately turned his attention to giving life and color to Siegel's

6    idea by drawing illustrations for the story. Shuster conceived of the costume for

7    Siegel's Superman superhero — a cape and tight-fitting leotard with briefs, an "S"

8    emblazoned on an inverted triangular crest on his chest, and boots as footwear. In

9    contrast, he costumed Clark Kent in a nondescript suit, wearing black-rimmed

10   glasses, combed black hair, and sporting a fedora. He drew Superman and his

11   alter ego Clark Kent with chiseled features, gave him a hairstyle with a distinctive

12   curl over his forehead, and endowed him with a lean, muscular physique. Clark

13   Kent hid most of these physical attributes behind his wardrobe, which he could

14   quickly doff revealing his Superman costume underneath when he was called to

15   action by someone in need of his superpowers. One of the earliest of Shuster's

16   sketches of Superman and Clark Kent from this 1934 or 1935 period are depicted

17   below:

18

19

20

21

22

23

24

25

26

27

28



CLARK KENT          SUPERMAN
ONE AND SAME!

The two then set about combining Siegel's literary material with Shuster's graphical representations.  Together they crafted a comic strip consisting of several weeks' worth of material suitable for newspaper syndication.  Siegel typed the dialogue and Shuster penciled in artwork, resulting in four weeks of Superman comic strips intended for newspapers.  (Decl. Michael Bergman, Ex. H at 1).  The art work for the first week's worth "of daily [comic] strips was completely inked" and thus ready for publication.  (Decl. Michael Bergman, Ex. H at 1).  The "three additional weeks of 'Superman' newspaper comic strip material" differed from the first week's material "only in that the art work, dialogue and the balloons in which the dialogue appeared had not been inked," instead consisting of no more than black-and-white pencil drawings.  (Decl. Michael Bergman, Exs. G at 2 & H at 1-2).

Siegel also wrote material to which Shuster provided no illustrations:  A paragraph previewing future Superman exploits, and a nine-page synopsis of the storyline appearing in the three weeks of penciled daily Superman newspaper comic strips.  (Decl. James Steranko, Ex. A at 4; Decl. Michael Bergman, Ex. H at

1    2).

2        The two shopped the character for a number of years to numerous

3    publishers but were unsuccessful.  As Siegel later recalled:  One publisher

4    "expressed interest in Superman," but preferred that it be "published in comic book

5    form where it would be seen in color" rather than "a black-and-white daily strip," a

6    suggestion to which he and Shuster balked given their earlier experience with the

7    comic book publisher of <u>Detective Dan</u>.  (Decl. Michael Bergman, Ex. H at 2).

8        In the meantime, Siegel and Shuster penned other comic strips, most notably

9    "Slam Bradley" and "The Spy," that were sold to Nicholson Publishing Company.

10   When Nicholson folded shop in 1937, Detective Comics acquired some of its comic

11   strip properties, including "Slam Bradley" and "The Spy."

12       On December 4, 1937, Siegel and Shuster entered into an agreement with

13   Detective Comics whereby they agreed to furnish some of these existing comic

14   strips for the next two years, and further agreed "that all of these products and work

15   done by [them] for [Detective Comics] during said period of employment shall be

16   and become the sole and exclusive property of [Detective Comics,] and [that

17   Detective Comics] shall be deemed the sole creator thereof . . . ."  (Decl. Michael

18   Bergman, Ex. A).  The agreement further provided that any new or additional

19   features by Siegel and Shuster were to be submitted first to Detective Comics, who

20   was given a sixty-day option to publish the material.

21       Soon thereafter Detective Comics decided to issue a new comic book

22   magazine titled <u>Action Comics</u> and began seeking new material.  Inquiry was made

23   of many newspaper comic strip publishers, including McClure Newspaper

24   Syndicate.  Amongst the material submitted by McClure to Detective Comics was

25   the previously rejected Siegel and Shuster Superman comic strip.  Detective

26   Comics soon became interested in publishing Siegel and Shuster's now well-

27   traveled Superman material, but in an expanded thirteen-page comic book format,

28   for release in its first volume of <u>Action Comics</u>.

1   On February 1, 1938, Detective Comics returned the existing Superman

2   newspaper comic strip material to Siegel and Shuster for revision and expansion

3   into a full-length, thirteen-page comic book production.  Detective Comics' desire to

4   place Superman in a comic book required that Siegel and Shuster reformat their

5   existing Superman newspaper material by re-cutting the strip into separate panels

6   and then re-pasting it into a comic book format.

7   An issue emerged due to Detective Comics' additional requirement that there

8   be eight panels per page in the comic book.  Siegel and Shuster's existing

9   Superman newspaper material did not have enough drawings to meet this format.

10   In response, portions of the thirteen-page comic went forward with fewer than eight

11   panels per page, and in the remaining pages Shuster either trimmed or split existing

12   panels to stay within the page size, or drew additional panels from the existing

13   dialogue to meet the eight-panel requirement.  As Shuster later recounted:

> The only thing I had to do to prepare Superman for
> comic book publication was to ink the last three weeks of
> daily strips which I had previously completely penciled in
> detail.  In addition, I inked the lettering and the dialogue
> and story continuity and inked in the balloons containing
> the dialogue.  Certain panels I trimmed to conform to
> Detective's page size.  I drew several additional pictures
> to illustrate the story continuity and these appear on
> page 1 of the first Superman release.  This was done so
> that we would be certain of having a sufficient number of
> panels to make a thirteen page release.  Finally, I drew
> the last panel appearing on the thirteenth page.
> Detective's only concern was that there would be panels
> sufficient for thirteen complete pages.  Jerry told me that
> Detective preferred having eight panels per page but in
> our judgment this would hurt the property.  I specifically
> refer to the very large panel appearing on what would be
> page 9 of the thirteen page release.  We did not want to
> alter this because of its dramatic effect.  Accordingly, on
> this page but six panels appeared.

(Decl. Michael Bergman, Ex. G at 2).  Siegel similarly recollected:

> Upon receiving word from Detective that we could
> proceed, Joe Shuster, under my supervision, inked the
> illustrations, lettering and dialogue balloons in the three
> weeks of daily strips that had been previously penciled.
> In addition, he trimmed certain pictures to meet
> Detective's panel specifications and extended others.
> To assure ourselves of having the proper number of

9

EXHIBIT B
Page 19

> panels we added several pictures to illustrate the story
> continuity, I had already written. Added as well for this
> reason was the scientific explanation on page 1 of the
> release and the last panel at the foot of page 13.

(Decl. Michael Bergman, Ex. H at 5).

On or around February 16, 1938, the pair resubmitted the re-formatted Superman material to Detective Comics. Soon thereafter Detective Comics informed Siegel that, as he had earlier suggested to them, one of the panels from their Superman comic would be used as the template (albeit slightly altered from the original) for the cover of the inaugural issue of Action Comics. (Decl. Michael Bergman, Ex. I).

On March 1, 1938, prior to the printing of the first issue of Action Comics, Detective Comics wrote to Siegel, enclosing a check in the sum of $130, representing the per-page rate for the thirteen-page Superman comic book release and enclosing with it a written agreement for Siegel and Shuster's signatures. The agreement assigned to Detective Comics "all [the] good will attached . . . and exclusive right[s]" to Superman "to have and hold forever." (Decl. Michael Bergman, Ex. F). Siegel and Shuster executed and returned the written assignment to Detective Comics.

This world-wide grant in ownership rights was later confirmed in a September 22, 1938, employment agreement in which Siegel and Shuster acknowledged that Detective Comics was "the exclusive owner[]" of not only the other comic strips they had penned for Nicholson (and continued to pen for Detective Comics), but Superman as well; that they would continue to supply the artwork and storyline (or in the parlance of the trade, the "continuity") for these comics at varying per-page rates depending upon the comic in question for the next five years; that Detective Comics had the "right to reasonably supervise the editorial matter" of those existing comic strips; that Siegel and Shuster would not furnish "any art copy . . . containing the . . . characters or continuity thereof or in any wise similar" to these comics to a third party; and that Detective Comics would have the right of first refusal (to be

1   exercised within a six-week period after the comic's submission) with respect to any

2   future comic creations by Siegel or Shuster.

3       Detective Comics announced the debut of its Action Comics series with full

4   page announcements in the issues of some of its existing publications. Specifically,

5   in More Fun Comics, Vol. 31, with a cover date of May, 1938, Detective Comics

6   placed the following black-and-white promotional advertisement on the comic's

7   inside cover, which reproduced the cover of the soon-to-be published first issue of

8   Action Comics, albeit in a greatly reduced size:



25      Similarly, Detective Comics, Vol. 15, with a cover date of May, 1938, had a

26   full-page black-and-white promotional advertisement on the comic's inside cover

27   which contained within it a reproduction of the cover (again in a reduced scale) of

28   the soon-to-be published first issue of Action Comics:



To provide some context and contrast, the cover of the first issue of <u>Action Comics</u> is notable for its difference from the promotional advertisements both in its scale and its colorized format.



Superman itself was published by Detective Comics on April 18, 1938, in Action Comics, Vol. 1, which had a cover date of June, 1938. A full reproduction of the original Superman comic contained in Action Comics, Vol. 1, is attached as an addendum to this Order. See Attachment A to this Order. The Superman comic became an instant success, and Superman's popularity continues to endure to this day as his depiction has been transferred to varying media formats.

The Superman character has evolved in subsequent works since his initial depiction in Action Comics, Vol. 1. These additional works have added decades of new material to further define, update, and develop the character (such as his origins, his relationships, and his powers and weaknesses) in an ongoing flow of new exploits and supporting characters, resulting in the creation of an entire fictional Superman "universe." For instance, absent from Action Comics, Vol. 1, was any

1   reference to some of the more famous story elements now associated with

2   Superman, such as the name of Superman's home planet "Krypton."  Many of

3   Superman's powers that are among his most famous today did not appear in Action

4   Comics, Vol. 1, including his ability to fly (even through the vacuum of space); his

5   super-vision, which enables him to see through walls ("x-ray" vision) and across

6   great distances ("telescopic" vision); his super-hearing, which enables him to hear

7   conversations at great distances; and his "heat vision," the ability to aim rays of

8   extreme heat with his eyes.  The "scientific" explanation for these powers was also

9   altered in ensuing comics, initially as owing to differences in gravity between Earth

10  and Superman's home planet (the latter being much larger in size than the former),

11  and later because Krypton orbited a red sun, and his exposure to the yellow rays of

12  Earth's sun somehow made his powers possible.  In a similar Earth-Krypton

13  connection, it was later revealed that Superman's powers could be nullified by his

14  exposure to Kryptonite, radioactive mineral particles of his destroyed home planet.

15       Aside from the further delineation of Superman's powers and weaknesses,

16  many other elements from the Superman story were developed in subsequent

17  publications.  Some of the most famous supporting characters associated with

18  Superman, such as Jimmy Olsen and rival villains Lex Luthor, General Zod, and

19  Brainiac, were created long after Action Comics, Vol. 1, was published.  Moreover,

20  certain elements contained in Action Comics, Vol. 1, were altered, even if slightly, in

21  later publications, most notably Superman's crest.  In Action Comics, Vol. 1, the

22  crest emblem was a small, yellow, inverted triangle bearing the letter "S" in the

23  middle, shown throughout the comic as solid yellow in most instances and as a red

24  "S" in two instances.  Thereafter, the emblem changed, and today is a large yellow

25  five-sided shield, outlined in the color red, and bearing the letter "S" in the middle,

26  also in the color red.

27       The acclaim to which the release of Action Comics, Vo. 1, was greeted by

28  the viewing public quickly made Superman not only the iconic face for the comic

1    book industry but also a powerful super-salesman for his publisher.  Detective
2    Comics oversaw the creation, development, and licensing of the Superman
3    character in a variety of media, including but not limited to radio, novels, live action
4    and animated motion pictures, television, live theatrical productions, merchandise
5    and theme parks.  From such promotional activity, Detective Comics came to "own[]
6    dozens of federal trademark registrations for Superman related indicia, such as
7    certain key symbols across a broad array of goods and services."  (Decl. Paul Levitz
8    ¶ 10).  The most notable of these marks that are placed on various items of
9    merchandise are "Superman's characteristic outfit, comprised of a full length blue
10   leotard with red cape, a yellow belt, the S in Shield Device, as well as certain key
11   identifying phrases[,]" such as "'Look! . . . Up in the sky! . . . It's a bird! . . . It's a
12   plane! . . . It's Superman!"  (Decl. Paul Levitz ¶ 10).

13        Meanwhile, Siegel continued to submit other comic book characters to
14   Detective Comics that were also published.  Sometimes these submissions were
15   without Shuster serving as an illustrator and sometimes, such as in the case of
16   Superman's youthful persona "Superboy," see Siegel v. Time Warner Inc., 496 F.
17   Supp. 2d 1111 (C.D. Cal. 2007), without illustrations accompanying the submission.
18   Among these subsequent creations was "The Spectre," a comic written by Siegel
19   and illustrated by Bernard Baily, which first appeared in 1940 in Detective Comics'
20   More Fun Comics, Vol. 52.  The comic told the story about a superhero with a
21   supernatural bent — the character being the spirit of a police officer killed in the line
22   of duty while investigating a gangland overlord and who, after meeting a higher
23   force in the hereafter, is sent back to Earth with nearly limitless abilities but offered
24   eternal rest only when he has wiped out all crime.

25        With Superman's growing popularity, a growing rift developed between the
26   parties.  Siegel and Shuster believed that Detective Comics' poached the artists
27   apprenticing out of Siegel and Shuster's studio in Cleveland by moving them in-
28   house to its New York offices, and further believed that Detective Comics had not

1   paid them their fair share of profits generated from the exploitation of their

2   Superman creation and from the profits generated from copycat characters that

3   they believed had their roots in the original Superman character. As a result, in

4   1947, Siegel and Shuster brought an action against Detective Comics' successor in

5   interest in New York Supreme Court, Westchester County, seeking, among other

6   things, to annul and rescind their previous agreements with Detective Comics

7   assigning their ownership rights in Superman as void for lack of mutuality and

8   consideration.

9        After a trial, official referee J. Addison Young issued detailed findings of fact

10   and conclusions of law wherein he found that the March 1, 1938, assignment of the

11   Superman copyright to Detective Comics was valid and supported by valuable

12   consideration and that, therefore, Detective Comics was the exclusive owner of "all"

13   the rights to Superman. The parties eventually settled the Westchester action and

14   signed a stipulation on May 19, 1948, whereby in exchange for the payment of over

15   $94,000 to Siegel and Shuster, the parties reiterated the referee's earlier finding

16   that Detective Comics owned all rights to Superman. Two days later, the official

17   referee entered a final consent judgment vacating his earlier findings of fact and

18   conclusions of law, and otherwise reiterating the recitals contained in the stipulation.

19        The feud between the parties did not end after the Westchester action. In

20   the mid-1960s, the simmering dispute boiled anew when the expiration of the initial

21   copyright term for Superman led to another round of litigation over ownership to the

22   copyright's renewal term.[2] In 1969, Siegel and Shuster filed suit in federal district

23   court in New York seeking a declaration that they, not Detective Comics' successor

24

25        [2] Under the Copyright Act of 1909 (the "1909 Act"), which was in effect at
26   the time of Siegel and Shuster's creation of Superman and later assignment of
     rights in the same to Detective Comics, an author was entitled to a copyright in his
27   work for twenty-eight years from the date of its publication. See 17 U.S.C. § 24,
     repealed by Copyright Act of 1976, 17 U.S.C. § 101 et seq. Upon the expiration of
28   this initial twenty-eight year term, the author could renew the copyright for a
     second twenty-eight year period (the "renewal term").

1   (National Periodical Publications, Inc.), were the owners of the renewal rights to the

2   Superman copyright. See Siegel v. National Periodical Publications, Inc., 364

3   F.Supp. 1032 (S.D.N.Y. 1973), aff'd by, 508 F.2d 909 (2nd Cir. 1974). The end

4   result of the litigation was that, in conformity with United States Supreme Court

5   precedent at the time, see Fred Fisher Music Co. v. M. Witmark & Sons, 318 U.S.

6   643, 656-59 (1943), in transferring "all their rights" to Superman in the March 1,

7   1938, grant to Detective Comics (which was reconfirmed in the 1948 stipulation),

8   Siegel and Shuster had assigned not only Superman's initial copyright term but the

9   renewal term as well, even though those renewal rights had yet to vest when the

10  grant (and later the stipulation) was made.

11        After the conclusion of the 1970s Superman litigation, the New York Times

12  "ran a story about how the two creators of Superman were living in near destitute

13  conditions":

14              Two 61-year-old men, nearly destitute and worried about
                how they will support themselves in their old age, are
15              invoking the spirit of Superman for help. Joseph Shuster,
                who sits amidst his threadbare furniture in Queens, and
16              Jerry Siegel, who waits in his cramped apartment in Los
                Angeles, share the hope that they each will get pensions
17              from the Man of Steel.

18  Mary Breasted, Superman's Creators, Nearly Destitute, Invoke His Spirit, N.Y.

19  TIMES, Nov. 22, 1975, at 62.

20        Apparently in response to the bad publicity associated with this and similar

21  articles, the parties thereafter entered into a further agreement, dated December

22  23, 1975. See id. ("'There is no legal obligation,' Mr. Emmett[, executive vice-

23  president of Warner Communications, Inc.,] said, 'but I sure feel that there is a

24  moral obligation on our part'"). In the agreement, Siegel and Shuster re-

25  acknowledged the Second Circuit's decision that "all right, title and interest in"

26  Superman ("including any and all renewals and extensions of . . . such rights")

27  resided exclusively with DC Comics and its corporate affiliates and, in return, DC

28  Comics' now parent company, Warner Communications, Inc. ("WCI"), provided

1   Siegel and Shuster with modest annual payments for the remainder of their lives;

2   provided them medical insurance under the plan for its employees; and credited

3   them as the "creators of Superman."  In tendering this payment, Warner

4   Communications, Inc. specifically stated that it had no legal obligation to do so, but

5   that it did so solely "in consideration" of the pair's "past services . . . and in view of

6   [their] present circumstances," emphasizing that the payments were "voluntary."

7   The 1975 agreement also made certain provisions for Siegel's spouse Joanne,

8   providing her with certain monthly payments "for the balance of her life if Siegel"

9   died before December 31, 1985.  Finally, Warner Communications, Inc. noted that

10  its obligation to make such voluntary payments would cease if either Siegel or

11  Shuster (or their representatives) sued "asserting any right, title or interest in the

12  'Superman' . . . copyright."  As the years went by Warner Communications, Inc.

13  increased the amount of the annual payments, and on at least two occasions paid

14  the pair special bonuses.

15          As the time grew nearer to the December 31, 1985, cutoff date for surviving

16  spouse benefits, Joanne Siegel wrote the CEO for DC Comics expressing her

17  "terrible worry" over the company's refusal to provide Jerome Siegel life insurance

18  in the 1975 agreement.  (Decl. Michael Bergman, Ex. NN).  She voiced her concern

19  that, should anything happen to her husband after the cutoff date, she and their

20  daughter "would be left without any measure of [financial] security."  (Decl. Michael

21  Bergman, Ex. NN).  The parties thereafter agreed by letter dated March 15, 1982,

22  that Warner would pay Joanne Siegel the same benefits it had been paying her

23  husband if he predeceased her, regardless of the time of his death.  (Decl. Michael

24  Bergman, Ex. OO).  Jerome Siegel died on January 28, 1996, and Joanne Siegel

25  has been receiving these voluntary survival spouse benefits since that time.

26          In the meantime, changes in the law resurrected legal questions as to the

27  ownership rights the parties had to the Superman copyright.  With the passage of

28  the Copyright Act of 1976 (the "1976 Act"), Congress changed the legal landscape

18

EXHIBIT B
Page 28

1   concerning artists' transfers of the copyrights in their creations.  First, the 1976 Act

2   expanded by nineteen years the duration of the renewal period for works, like the

3   initial release of Superman in Action Comics, Vol. 1, that were already in their

4   renewal term at the time of the Act's passage.  See 17 U.S.C. § 304(b).

5        Second, and importantly for this case, the 1976 Act gave artists and their

6   heirs the ability to terminate any prior grants of the rights to their creations that were

7   executed before January 1, 1978, regardless of the terms contained in such

8   assignments, e.g., a contractual provision that all the rights (the initial and renewal)

9   belonged exclusively to the publisher.  Specifically, section 304(c) to the 1976 Act

10  provides that, "[i]n the case of any copyright subsisting in either its first or renewal

11  term on January 1, 1978, other than a copyright in a work made for hire, the

12  exclusive or nonexclusive grant of a transfer or license of the renewal copyright or

13  any right under it, executed before January 1, 1978, . . . is subject to termination . . .

14  notwithstanding any agreement to the contrary . . . ."

15       It is this right of termination that Joanne Siegel and Laura Siegel Larson now

16  seek to vindicate in this case.[3]  In pursuing such a claim, the two heirs, initially

17  sought the legal assistance of a highly regarded copyright expert, Mr. Arthur J.

18

19       [3]  Although the present case only concerns the Siegel heirs' efforts to
    terminate the 1938 grant, it has come to the Court's attention that the estate of
20  Superman co-creator Joseph Shuster has recently filed termination notices to
    reclaim the rights to the Superman copyright.  According to documents filed with
21  the United States Copyright Office, Mark Warren Peary, the son of Shuster's sister
    and the court-appointed representative of the Shuster estate, has given notice of
22  the estate's intent to terminate the 1938 grant of the Superman copyright to
    Detective Comics and its successors effective 2013.  As executor of the Shuster
23  estate, Peary is entitled, under changes made to the 1976 termination provisions
    by the 1998 Sonny Bono Copyright Term Extension Act, to make the same
24  termination claims for the Superman copyright that Shuster or his heirs would have
    been entitled to bring beforehand.  See 17 U.S.C. § 304(c)(2); 3 NIMMER ON
25  COPYRIGHT § 11.03[A][2][a] at 11-40.1 (noting that when the 1976 Act was
    originally passed if an author died without leaving heirs before exercising the right
26  to termination "the result was that no one could exercise [that] right," but this
    "harsh result" was "ameliorated" through the passage of the 1998 Act by providing
27  that, "instead of lapsing," the termination right could be exercised by "the author's
    executor, administrator, personal representative, or trustee").
28

1    Levine, in compiling the information necessary to draft the termination notice itself.[4]

2        On April 3, 1997, the two heirs served seven separate notices of termination

3    under section 304(c) of the 1976 Act, purporting to terminate several of Siegel's

4    potential grant(s) in the Superman copyright to defendants, including the March 1,

5    1938, assignment; the May 19, 1948, stipulation; and the December 23, 1975,

6    agreement.  The termination notices also specified that they covered hundreds of

7    works, with the added proviso that the intent was for the termination notice to apply

8    "to each and every work . . . that includes or embodies" Superman, and the failure

9    to list any such work in the notice was "unintentional and involuntary."  Each of the

10   termination notices had an effective date of April 16, 1999.  A flurry of settlement

11   discussions between the parties quickly ensued, but just as quickly fizzled out.

12   Nearly two years then passed without much discussion between the parties.

13       The day before the purported termination was to take effect, defendants sent

14   a letter to Siegel's counsel, Mr. Levine, rejecting "the validity and scope" of the

15   termination notices.  (Decl. Marc Toberoff, Ex. Q at 171).  The same day DC

16   Comics Executive Vice President and Publisher Paul Levitz wrote to Joanne Siegel

17   that his company would "continue to provide the income and insurance benefits you

18   . . . have been receiving under the 1975 agreement, without prejudice to [the

19   company's] rights under that agreement, as long as we all continue to pursue the

20   goal of working together."  (Decl. Michael Bergman, Ex. P).

21       Not long after the termination notices' effective date passed, the Siegel heirs

22   retained new counsel and the parties re-entered into settlement discussions to

23   resolve their respective claims to the Superman copyright.  Towards that end, DC

24   Comics (and its "successors, past and present subsidiaries or affiliates") and the

25   Siegel heirs executed a tolling agreement on April 6, 2000, whereby it was agreed

26   that neither would "assert any statute of limitations . . . defense[] relating to . . . the

27

28       [4]  Before going into private practice, Mr. Levine served as General Counsel
     for the United States Copyright Office and also as Executive Director for the
     National Commission on New Technological Uses of Copyrighted Works.

1   [Termination] Notices" based on "the passage of time during the period from the

2   date hereof until cancellation of this Tolling Agreement pursuant to paragraph 7

3   hereof (the 'Tolling Period')" while the parties attempted "to find an amicable

4   resolution in respect of the [Termination] Notices." (Reply Decl. Marc Toberoff, Ex.

5   A at 1). The agreement further provided that the tolling period would remain in

6   effect "until 10 business days after the earlier of: (a) one of the parties terminating

7   negotiations, in writing, relating to the [Termination] Notices, or (b) the parties

8   reaching an amicable resolution of the disputes between them relating to the

9   Notices." (Reply Decl. Marc Toberoff, Ex. A at 2).

10          At some point the broad outline of a global settlement concerning the

11   copyright to the Superman material, as well as to other works Siegel either authored

12   or contributed material to Detective Comics (notably, Superboy and The Spectre

13   properties), was reached. Specifically, on October 19, 2001, counsel for Joanne

14   Siegel and Laura Siegel Larson sent a six-page letter to Warner Bros.' General

15   Counsel confirming and summarizing the substance of the settlement. The letter

16   concluded that "if there is any aspect of the above that is somehow misstated,

17   please let me know by [October 22, 2001] at 2:00, as I will be out of the office —

18   and likely difficult to reach — for the following four weeks." (Decl. Marc Toberoff,

19   Ex. BB).

20          A week later, on October 26, 2001, Warner Bros' General Counsel John

21   Shulman responded with a letter, stating that he had "reviewed" the summary set

22   forth in the October 19 letter, and then "enclose[d] . . . a more fulsome outline of

23   what we believe the deal we've agreed to is"; the outline was five pages long.

24   (Decl. Marc Toberoff, Ex. CC). The letter concluded that Warner Bros. was

25   "working on the draft agreement" so as to "have this super-matter transaction in

26   document form." (Decl. Marc Toberoff, Ex. CC).

27          A few months later, on February 1, 2002, outside counsel for Warner Bros.

28   provided a copy of the promised draft agreement (spanning fifty-six pages), with the

1  proviso that, "[a]s our clients have not seen this latest version of the agreement, I

2  must reserve their right to comment." (Decl. Marc Toberoff, Ex. DD). Mention was

3  also made in the draft agreement for the need of certain "Stand Alone Assignments"

4  that had as yet not been finalized, something which Warner's outside counsel

5  promised would be forthcoming. (Decl. Marc Toberoff, Ex. DD).

6        Three months later, on May 9, 2002, Joanne Siegel wrote a letter to Time

7  Warner's Chief Operating Officer Richard Parsons, recounting that she and her

8  daughter had "made painful concessions and reluctantly accepted John Shulman's

9  last [settlement] proposal [in October, 2001]," but upon reading the proposed draft

10  agreement learned that they had been "stabbed in the back," as it "contained new,

11  outrageous demands that were not in the [October, 2001] proposal," such as

12  "condition[ing] recei[pt of] financial compensation for our rights on demands which

13  were not in the proposal we accepted." (Decl. Michael Bergman, Ex. Z). The letter

14  concluded that "[a]fter four years we have no deal and this contract makes an

15  agreement impossible." (Decl. Michael Bergman, Ex. Z).

16        Time Warner's CEO quickly responded with a letter of his own on May 21,

17  2002, expressing shock and dismay as "each of the major points covered in the

18  draft agreement . . . accurately represented the agreement previously reached" by

19  the parties. (Decl. Michael Bergman, Ex. AA). The letter continued by

20  acknowledging that, as with all lengthy negotiations, Time Warner "expected" that

21  the submission of the draft agreement would result in further "comments and

22  questions on the draft" by Siegel family's representatives that "would need to [be]

23  resolve[d]." (Decl. Michael Bergman, Ex. AA). The letter concluded by reaffirming

24  Time Warner's continued interest "that this agreement can be closed based upon

25  the earlier discussions with [the Siegel family's] lawyers." (Decl. Michael Bergman,

26  Ex. AA).

27        Not long thereafter, the Siegel heirs' lawyers submitted for the family's review

28  and approval a re-draft of the February 4, 2002, agreement the lawyers had crafted.

1    (Decl. Marc Toberoff, Ex. AA).  The Siegel heirs, on September 21, 2002, rejected

2    the redraft and fired their attorneys.  (Decl. Marc Toberoff, Ex. AA).  That same day

3    Joanne Siegel and Laura Siegel Larson sent a letter to DC Comics' General

4    Counsel Paul Levitz notifying the company that they were "stopp[ing] and end[ing]

5    negotiations with DC Comics, Inc., its parent company AOL Time Warner and all of

6    its representatives and associates concerning" their rights to, among other things,

7    Superman.  (Decl. Michael Bergman, Ex. DD).

8        Joanne Siegel and Laura Siegel Larson thereafter filed the present action,

9    with the assistance of new counsel, Marc Toberoff, on October 8, 2004.  Both sides

10   have since filed cross-motions for partial summary judgment.

11       Reduced to their essentials, the legal questions at stake in the parties' cross-

12   motions are two-fold:

13       (1) The validity and enforceability of the termination notices in light of

14   (a) whether any copyrightable Superman material contained in the promotional

15   advertisements for Action Comics, Vol. 1, lies outside the reach of the termination

16   notice (and hence, the termination notice is not enforceable against it);  (b) whether

17   certain portions of the Superman comic in Action Comics, Vol. 1, are in the nature of

18   a work for hire (and hence, not subject to termination); (c) whether the failure to list

19   the 1948 consent judgment in the notices as one of the grants sought to be

20   terminated materially affects the notices of termination; (d) whether the post-

21   termination receipt of benefits under the 1975 agreement acts as a novation to re-

22   grant the Superman copyright; (e) whether the statute of limitations ran out before

23   the instant action was instituted thereby forestalling this lawsuit; and (f) whether the

24   settlement negotiations that took place between the parties resulted in an

25   enforceable agreement disposing of the claims asserted in the present action; and,

26       (2) The parameters of what was recaptured (and the rights flowing therefrom)

27   through the termination notices, namely, (a) whether plaintiffs have a right to

28   defendants' post-termination foreign profits from the exploitation of the Superman

1   copyright; (b) whether plaintiffs are entitled to profits from any of the various

2   trademarks that defendants have procured since the grant in marketing Superman;

3   (c) whether plaintiffs are entitled to profits from the derivative works of the

4   Superman material published by Detective Comics and its successors in interest

5   prior to the termination notice's effective date; and (d) whether any recovery of

6   profits extends beyond those made through DC Comics' exploitation of the

7   Superman copyright to that of its corporate siblings and parent who are licensees to

8   that copyright's movie and television rights, be it based on an alter-ego theory or

9   other notion of equity.

10          I.      Validity and Enforceability of Termination Notices

11          The 1976 Act created a new right allowing authors and their heirs the ability

12   to terminate a prior grant to the copyright in their creations. See 17 U.S.C.

13   § 304(c). The 1976 Act also set forth specific steps concerning the timing and

14   contents of the notices that had to be served to effectuate the termination of a prior

15   grant. One of the most important steps was placing a limit on the temporal reach

16   such a notice could have on what was subject to being recaptured. Specifically, the

17   "[t]ermination of the grant may be effected at any time during a period of five years

18   beginning at the end of fifty-six years from the date copyright was originally

19   secured." 17 U.S.C. § 304(c)(3) (emphasis added). Moreover, the notice is

20   required to be "served not less than two or more than ten years before" its effective

21   date.

22          Taken together, someone seeking to exercise the termination right must

23   specify the effective date of the termination, and that effective date must fall within a

24   set five-year window which is at least fifty-six years, but no more than sixty-one

25   years, from the date the copyright sought to be recaptured was originally secured,

26   and such termination notice must be served two to ten years before its effective

27   date. The purpose of this time window for terminating pre-1978 grants was so that

28   the only rights to the copyright affected thereby were those to the 19-year extension

1  in the renewal term created by the 1976 Act, leaving undisturbed the grantee's

2  vested interest to the original 28-year renewal term as set forth in the 1909 Act, the

3  governing statute at the time the grant itself was made.

4       Additional procedures required to be followed to make the termination notice

5  effective were specified as well:  The author or his or her heirs had to serve "an

6  advance notice in writing upon the grantee or the grantee's successor in title"; the

7  notice had to be signed by the author or his or her heirs; the notice was required to

8  "state the effective date of the termination"; and the notice must be "recorded in the

9  Copyright Office before the effective date of termination."  17 U.S.C. § 304(c)(4).

10      Beyond these statutory requirements, the notice was also required to

11  "comply, in form, content, and manner of service, with [the] requirements that the

12  Register of Copyrights . . . prescribe[s] by regulation."  17 U.S.C. § 304(c)(4)(B).

13  Toward that end, the Register promulgated regulations implementing this statutory

14  proviso.  See 37 C.F.R. § 201.10.  Among those regulations was one requiring the

15  terminating party to identify in the notice "each work as to which the notice of

16  termination applies."  37 C.F.R. § 201.10(b)(1)(ii).

17      As one noted author has commented, "[i]t is difficult to overstate the

18  intricacies of these [termination] provisions, the result of which is that they are

19  barely used, no doubt the result desired by lobbyists for assignees."  William Patry,

20  Choice of Law and International Copyright, 48 Am. J. Comp. L. 383, 447 (2000);

21  see also Burroughs v. Metro-Goldwyn-Mayer, Inc., 683 F.2d 610, 621 (2nd Cir.

22  1982) (commenting that the steps necessary to make a termination effective

23  oftentimes create "difficult, technical questions").  Those intricate provisions

24  oftentimes create unexpected pitfalls that thwart or blunt the effort of the terminating

25  party to reclaim the full measure of the copyright in a work of authorship.  This case

26  is no different.

27

28

1    1.    Promotional Announcements

2    Plaintiffs gave notice that the effective date of the termination notices was

3    April 16, 1999, meaning that, backdating from that date sixty-one years, the

4    termination notices would leave unaffected (or better said, beyond their reach) any

5    statutory copyright that had been secured in the Superman material before April 16,

6    1938. Defendants contend that the promotional announcements for Action Comics,

7    Vol. 1, featuring a graphical depiction of Superman, fall just a few days outside the

8    five-year effective window of plaintiffs' termination notices; therefore, they argue,

9    any copyright material contained in those promotional announcements, notably the

10    illustration of Superman on the cover of Action Comics, Vol. 1, is unaffected by the

11    termination notices and remains theirs to exploit exclusively. As defendants frame

12    it, section 304(c)(3)'s five-year effective window "is tantamount to a statute of

13    limitations[;] . . . if any work falls outside the five-year window established by the

14    [termination] effective date, it cannot be recaptured, and the original copyright grant

15    remains in force for that work, allowing the grantee to continue exercising the

16    granted rights without liability." (Defs' Mot. Partial Summ. J. at 29). Thus, any work

17    that was published with notice prior to April 16, 1938, i.e., sixty-one years before the

18    stated effective date, remains untouched by the termination notice.[5]

19    Plaintiffs do not dispute the legal consequence section 304(c)'s five-year

20    window has in this case on the effective reach of their termination notices. As

21    drafters of the notice, Siegel's heirs were given carte blanche in identifying the

22    termination notices' effective date. Once they chose a date, certain consequences

23    flowed therefrom, the most important of which is to cabin the five-year window

24    _____

25    [5] Defendants also contend that the promotional advertisements are not

26    effected by the termination notices because plaintiffs failed to list those works in
      their notices. As the Court finds that the promotional advertisements fall outside

27    the five-year window during which those notices could effectively terminate the
      grant in the copyright contained in them, the Court will not pass on the

28    consequences, if any, stemming from plaintiffs' additional failure to list those
      promotional announcements in their notices.

1   within which the notice can recapture any copyright secured in the material to which

2   the grant was directed.  A copyright in a work statutorily secured even just days

3   outside this five year window is beyond the effective reach of the termination notice,

4   in much the same way a tardily-filed renewal registration has been held to be

5   ineffective.  Cf. 3 NIMMER ON COPYRIGHT § 9.05[b][1] at 9-44 ("a variance of even

6   several days is fatal and that the purported renewal is void to rescue the subject

7   work from the public domain, whether filed after expiration of the one year or prior to

8   its initiation").  A leading treatise supports such a calculation and the consequences

9   flowing from it:

10          The appropriate dates for termination notices are
            measured from "the date copyright was originally
11          secured, or beginning on January 1, 1978, whichever is
            later."  In the case of pre-January 1, 1978 works,
12          "secured" means the actual date the work was first
            published with notice (or in the case of unpublished
13          works, the date of registration), e.g., April 15, 1970, not
            December 31, 1970.  Failure to pay attention to the
14          differences between the date the copyright was originally
            secured for purposes of section 304(c) termination of
15          transfer and section 305 expiration of term may lead to
            an untimely notice of termination.

16

17  2 PATRY ON COPYRIGHT § 7:43; see also 3 NIMMER ON COPYRIGHT § 11.05[B][1] at

18  11-40.11 ("Suppose that statutory copyright for a song were first secured on May

19  21, 1925.  Based on the statutory provision that termination may be effected

20  'beginning at the end of fifty-six years from the date copyright was originally

21  secured,' the first effective date for termination should be May 21, 1981"); 3 JAY

22  DRATLER, JR. AND STEPHEN M. MCJOHN, INTELLECTUAL PROPERTY LAW: COMMERCIAL

23  CREATIVE AND INDUSTRIAL PROPERTY § 6.04A[3][a] (2008) ("If the year in which a

24  work was so published predates the current year by more than sixty-one years, then

25  the termination right [to that work] under section 304(c) has expired.  The statute

26  apparently requires calculation of all these termination periods from the exact date

27  of publication, rather than from the end of the publication year, as is appropriate for

28  determining copyright terms under the 1976 Act").

1      It is in this sense that one can say whether a termination notice is timely or

2   not, a question that does not go to the notice's validity (the notice remains valid with

3   respect to a copyright in works that was secured during the five year window) but as

4   to its enforceability against a copyright in a particular work pre- or post-dating that

5   window. Thus, the key in deciding this timeliness question begins with a

6   determination of when the copyright in the work in question was secured, and not

7   when the work itself was created.

8      The determination of when the copyright in a work is secured is when the

9   material was protected by statute, meaning when the copyright in such a work

10  secured protection under this country's copyright laws. Under the 1909 Act, "works

11  could have obtained statutory copyright . . . , without the necessity of registration,

12  simply by the act of publishing copies of the work bearing a proper copyright notice.

13  As to such works, registration did not create the copyright, but merely recorded it."

14  2 NIMMER ON COPYRIGHT § 7.16[A][2][b] at 7-148 (emphasis added); see also 17

15  U.S.C. § 10 (repealed). Thus, the initial question is whether the comic books

16  containing the promotional announcements bore such a copyright notice upon

17  them.

18     Section 19 of the 1909 Act delineated what constituted proper notice: "The

19  notice of copyright required by section 10 of this title shall consist either of the word

20  'Copyright', the abbreviation 'Copr.', or the symbol ©, accompanied by the name of

21  the copyright proprietor, and if the work be a printed literary, musical, or dramatic

22  work, the notice shall include also the year in which the copyright was secured by

23  publication." If the comic books in question contained such a notice, then the date

24  of publication is also the date the copyright in the material contained therein was

25  secured. If not, then any of the copyrightable material in the works (including the

26  promotional announcements) was never secured (absent evidence that the material

27  had been registered beforehand with the Copyright Office when it was in an

28  unpublished state) but instead was injected into the public domain.

1    Here, the material submitted by defendants (the cover page for the magazine

2    and the page on which the promotional announcements is displayed) does contain

3    such a notice.  At the bottom of the promotional announcement itself is the

4    following: "Entire contents copyright 1938 by Detective Comics, Inc."  (Decl.

5    Michael Bergman, Ex. C at 10 & Ex. D at 14).  Thus, the copyright for any of the

6    works contained in the comic books in question was secured on the date they were

7    published.

8        This leads to the next question:  What are the publication dates for the two

9    comic books that contained the promotional announcements for Action Comics,

10   Vol. 1, featuring an illustration of Superman?  Defendants have submitted the initial

11   copyright registrations for these comics, which indicate that More Fun Comics,

12   Vol. 31, was published on April 5, 1938, eleven days before the effectiveness of the

13   plaintiffs' termination notices, and that Detective Comics, Vol. 15, was published on

14   April 10, 1938, six days outside the temporal reach of the termination notices.

15   Under the 1909 Act the initial (as opposed to the renewal) copyright registration

16   constituted prima facie evidence of the publication date for a work.[6]  See 17 U.S.C.

17

18        [6] Defendants' suggestion that the addition of section 304(a)(4)(B) by the
19   Copyright Amendments Act of 1992 somehow altered this rule by extending the
     prima facie imprimatur to renewals like those in this case is simply mistaken.
20   (Defs' Reply at 40 & n.16).  That section provides that, so long as the renewal
     occurred "within 1 year before [the] expiration" of the initial term, then "the
21   certificate of such registration shall constitute prima facie evidence as to the . . .
     the facts stated in the certificate."  However, the 1992 Act's provisions placed one
22   very important proviso on its applicability — its provisions applied only where a
     party was filing a renewal registration to the "extended term of copyright in a work."
23   Thus, the amendments' provisions were limited to renewal claims to works that
     were still in their initial term when the 1976 Act became effective, January 1, 1978,
24   meaning for copyrights whose first term of copyright was secured on or after
     January 1, 1950.  That is to say, section 304(a)(4)(B)'s provisions only applies to
25   works that had yet reached the time for renewal before the 1976 Act extended the
     term of the renewal period (unlike Superman in Action Comics, Vol. 1, or the
26   comics containing the promotional announcements).  For those works, the 1992
     amendments allowed such renewal to be made at anytime, but provided incentives
27   for prompt renewal, the most notable being the extension of the prima facie rule to
     such promptly filed renewal claims.  See 2 PATRY ON COPYRIGHT § 7:50 ("Effective
28

1  § 209 (repealed) (providing that a "certificate of registration" issued by the Register

2  of Copyrights "shall be admitted in any court as prima facie evidence of the facts

3  stated therein"); see also Epoch Productions Corp. v. Killiam Shows, Inc., 522 F.2d

4  737, 745-46 (2nd Cir. 1975); 5 PATRY ON COPYRIGHT § 17:115 (observing that the

5  reason that renewal certificates issued during the 1909 Act were not accorded

6  prima facie status was because of the "minimal attention" the Register of Copyrights

7  paid to the information contained therein; "[a]s long as original registration for a

8  work has been made, the Copyright Office accept[ed] it at face value").

9       Plaintiffs attempt to refute this prima facie evidence through expert testimony

10 and by legal argument.

11      As to the latter, plaintiffs seek to discredit the value of the initial copyright

12 registration for More Fun Comics, Vol. 31, because Detective Comics' successor

13 did not obtain that registration until nearly 28 years after its publication, on the eve

14 of the expiration of the initial copyright term.  The 1909 Act required that, once

15 copyright had been secured by publication with notice, "there shall be promptly

16 deposited" the required copies of the published work and the registration claim

17 itself.  17 U.S.C. § 13 (repealed).  Plaintiffs suggest that such a "late" initial

18 registration raises questions as to the trustworthiness of any of the information

19 contained in that registration.  (Pls' Opp. at 48-49).  Plaintiffs correctly point out that

20 Professor Nimmer in his treatise has commented that, "where there was a failure to

21

22 June 26, 1992, Congress abolished the requirements that works in their first term
   of copyright published or registered between 1964 and 1977 must be timely
23 renewed in order to enjoy the (now) 67-year renewal term.  Instead, these works
   are now automatically renewed for the full term of 75 years.  Copyrights whose
24 first term of copyright was secured between January 1, 1950, and December 31,
   1963, still had to have been renewed according to the requirements of the 1909
25 Act.  Failure to do so resulted in the work falling into the public domain. . . .
   Renewal claims may still be filed at any time during the renewal period, and a
26 number of incentives have been added to encourage filing.  [One such] incentive[]
   for renewing provided in the Copyright Act of 1992 are the prima facie status that
27 is accorded to the validity of the work").  Given that none of the comics in question
   fall within the class affected by section 304(a)(4)(B), that section's expansion of
28 the prima facie status to renewal claims does not apply here.

1    promptly register and deposit, under the 1909 Act, some questions as to the viability

2    of the copyright might be raised." 2 NIMMER ON COPYRIGHT § 7.16[A][2][b] at 7-150.

3    But Professor Nimmer's comments as to the collateral consequences flowing from

4    such a delay were not geared toward the validity of the copyright itself, but to the

5    existence of an impediment to bringing an action for infringement. See id. at 7-149

6    (noting that Supreme Court's Washingtonian decision effectively read the "words

7    'promptly deposited' in Section 13 . . . not . . . as a condition subsequent that, if not

8    satisfied, would result in destruction of the copyright," but rather "[t]he deposit . . .

9    requirement was (as it still is) clearly a condition precedent to the right to bring an

10    infringement action").

11        Although the general line of reasoning plaintiffs seek to draw from such a

12    "late-in-time" registration makes sense from a policy perspective, plaintiffs have

13    cited no authority that such long delays in registration vitiates or otherwise

14    diminishes the statutorily conferred prima facie presumption to which such

15    registration claims (and the information contained therein) are entitled, especially

16    once a registration has (as here) been tendered.  Moreover, even were the Court to

17    entertain plaintiffs' invitation, there remains the initial registration for the other comic

18    book in question — Detective Comics, Vol. 15 — which was obtained shortly after

19    that comic book's publication and, hence, the problem pressed by defendants with

20    the promotional announcement contained therein falling outside the effective reach

21    of the termination notice remains.

22        Plaintiffs next contend that the copies of the registration certificates

23    submitted by defendants have not been authenticated by the declarant to whose

24    declaration they are affixed, and hence, are not admissible as proof of the comic

25    books' publication date.  (Pls' Opp. at 48-49 ("the certificate is not properly

26    authenticated, but is merely attached to the declaration of defendants' attorney, who

27    appears to have no personal knowledge of it").  Such extrinsic evidence of

28    authenticity by the declarant is unnecessary for these copyright registration

1    certificates.  Under Federal Rule of Evidence 902(1), a "document bearing a seal
2    purporting to be that of the United States . . . or of a . . . department, officer, or
3    agency thereof," with "a signature purporting to be an attestation or execution," is
4    considered self-authenticated.  Close inspection of the copyright registration
5    certificates submitted by defendants clearly reveals the seal issued by the United
6    States Copyright Office, signed by the Register of Copyrights, and bearing the
7    following legend: "[A]ttached are additional certificates for the [comics in question]
8    which were registered in accordance with provisions of the United States Copyright
9    Law." (Decl. James Weinberger, Ex. B & C).  The requirements of Rule 902(1)
10   have been met, rendering the copies of the copyright registration certificates as self-
11   authenticated and, thus, admissible.

12          The obscure nature of these promotional announcements does not alter this
13   analysis.  It is undoubtedly true that the existence of these announcements was not
14   widely recognized even by comic book aficionados.  That, however, does not
15   change the effect their existence has vis-à-vis the termination notices' effective
16   reach.  Once a termination effective date is chosen and listed in the notice, the five-
17   year time window is an unbendable rule with an inescapable effect, not subject to
18   harmless error analysis.  See 37 C.F.R. § 201.10(e) (limiting application to
19   "[h]armless errors in a notice" that does not "materially affect the adequacy of the
20   information") (emphasis added).  That good cause may have existed for failing to
21   structure the termination notices so as to sweep the announcements within its reach
22   does not obviate application of the rule itself.

23          The importance such promotional announcements may have on the reach of
24   a termination notice that has been tendered was not lost on plaintiffs' counsel, Mr.
25   Levine, who drafted the termination notices in this case.  He also drafted plaintiffs'
26   termination notice with respect to The Spectre copyright, and structured it in such a
27   way so as to include among the works affected by the notice's five-year window a
28   promotional announcement for The Spectre contained in a comic published a month

1    before the one containing the first comic book story of the character. (Decl. Michael

2    Bergman, Exs. WW-YY (termination notice describing among the works affected by

3    the notice the promotional announcement as "Spectre character appearing in

4    costume in an ad in issue No. 51 of More Fun Comics, copyrighted November 28,

5    1939, as Copyright Registration No. B437786, publication date January 1940") &

6    Decl. Paul Levitz, Ex. A (containing picture of The Spectre ad)).

7        Having provided prima facie evidence of the comic books' publication dates,

8    the burden shifts to the plaintiffs to produce some evidence calling into question

9    those dates. The burden of production is not a heavy one (in large measure owing

10    to the fact that so little is proffered by the applicant or scrutinized by the Copyright

11    Office in the application process to procure the registration in the first instance), but

12    it is one that must be met nonetheless. See 3 PATRY ON COPYRIGHT § 9:14 ("the

13    Copyright Office has no ability to verify facts stated in the certificate, and not

14    surprisingly makes no effort to do so. . . . At the most, the Office can take notice of

15    any inconsistent facts that appear on the deposit copy and request clarification from

16    the claimant . . . . In any event, [the opposing party] should be required to present

17    only a small degree of evidence calling into question the fact at issue in order to

18    rebut the certificate's presumption").

19        On that point all that plaintiffs have submitted is the opinion of a comic book

20    historian, Mark Evanier, who was retained by DC Comics in the 1970s to, among

21    other things, assist it "in attempting to determine approximate dates of past

22    publication" of its comics. (Decl. Mark Evaier ¶ 12). From this particular

23    experience, as well as his long history in the comic book industry, Mr. Evanier seeks

24    to cast doubt on the veracity of the asserted publication dates for the comics

25    containing the promotional announcements. The general thrust of his expert

26    opinion is that, outside the first printing of certain famous comic superheros such as

27    Superman in Action Comics, Vol. 1, a particular "run of the mill" comic book's exact

28    date of publication during the 1930s and 1940s is difficult to determine, rendering

1   the dates listed on the certificates as nothing more than "mere guesstimates" by the

2   publisher. (Decl. Mark Evanier ¶ 10). Furthermore, Mr. Evanier downplays the

3   significance of the fact that the comic books in question contained promotional

4   announcements for Action Comics, Vol. 1, as necessarily meaning that their

5   publication must have preceded Action Comics publication.  As Mr. Evanier

6   explains, the dates provided by publishers were often the dates initially scheduled

7   or intended for publication, but the actual dates often varied with printing, delivery,

8   and other delays. (Decl. Mark Evanier ¶ 11).

9          Mr. Evanier's expert opinion is chalk full of information on the publication of

10  comic books in general during this time period, but is void of any specific evidence

11  or opinion as to the publication of the particular comic books in question in this

12  case. He offers no evidence of any specific printing, delivery, or other problems that

13  may have affected the publication of More Fun Comics, Vol. 31, or Detective

14  Comics, Vol. 15.  His general opinion thus does not sufficiently refute the prima

15  facie evidence set forth in the initial copyright registration certificates for these

16  particular comic books.  At most, his opinion raises some doubts as to the precision

17  of the dates contained in initial copyright registrations for comic books in general

18  from this period.  However, those copyright notices were completed at a time which,

19  by Mr. Evanier's own opinion, the copyright holder was attempting to be as accurate

20  as possible in listing those dates and long before any incentive to provide

21  inaccurate dates by virtue of contemplating this present litigation or the termination

22  provisions of the 1976 Act existed.  Plaintiffs evidence does no more than inform the

23  Court that, despite efforts to be precise about publication dates for comic books

24  during this particular period, mistakes could be made; it is not at all probative on the

25  issue of whether mistakes were in fact made with respect to the information

26  contained in the particular registration certificates at issue in this case.  The Court

27  therefore finds that the promotional announcements containing an illustration of

28  Superman from the cover of Action Comics, Vol. 1, are outside the effective reach

1    of the termination notices.

2         Perhaps anticipating this finding, plaintiffs next seek to downplay the

3    significance of the promotional announcements themselves by arguing that, legally

4    and factually, little, if any, copyrightable Superman material is contained in those

5    announcements.  Specifically, plaintiffs submit that Siegel and Shuster's material

6    was an indivisible joint work, and that the advertisements were a derivative work of

7    the authors' material.  Thus, they claim that none of the Superman material

8    contained in the promotional announcements (namely, the cover artwork from

9    Action Comics, Vol. 1) could be copyrighted, and thus, defendants cannot continue

10   to exploit the same, regardless of the termination notice.  As framed by plaintiffs:

11   "Defendants' entire argument is falsely premised on the erroneous assumption that

12   they can take the cover of Action Comics, No. 1, one of many illustrated panels in

13   Siegel and Shuster's first 'Superman' comic book story, rip it from this copyrighted

14   joint work, and own a separate copyright in the illustration in the form of a mere 'in

15   house announcement' depicting a reduced image of the illustration.  [Moreover,]

16   Detective's 'in-house announcements,' at best, are derivative works based on the

17   pre-existing cover and interior panel of Siegel and Shuster's pre-existing

18   'Superman' story."  (Pls' Opp. at 44, 46).

19        This emphasis on the joint nature of Siegel and Shuster's Superman material

20   is rendered nugatory by the fact that Siegel and Shuster granted the copyright in

21   their material to Detective Comics on March 1, 1938, well before the promotional

22   advertisements were published by Detective Comics in April of that year.  Thus, by

23   the time the promotional announcements were published, Siegel and Shuster's

24   Superman material was owned solely by Detective Comics to do with it as it saw fit,

25   whether it be as a full-length comic or as artwork in its advertising.  That Siegel and

26   Shuster intended their work to be combined together and depicted as a unitary

27   whole is a separate and distinct question from whether, in later using some of

28   Shuster's artwork from that combined material it had acquired, Detective Comics

1    somehow unraveled the copyrightability in that portion of the work.  The manner of a

2    work's authorship is entirely separate from the way in which an assignee may

3    exploit that material once it has acquired exclusive ownership of the same and,

4    correspondingly, whether there were anything copyrightable in the work the

5    assignee subsequently published using only parts of that material.

6         In this respect it is important to remember that a joint work can consist of

7    either inseparable or interdependent parts, the latter example of which include "the

8    collaborative musical works of Gilbert and Sullivan . . . ., [t]hese works are the result

9    of the interdependent contributions of the collaborators, i.e., one person wrote the

10   lyrics and the other the music, either of which could on its own [stand] as an

11   independent work, but which, when combined, form a single[, separate]

12   'interdependent' joint work." 2 PATRY ON COPYRIGHT § 5:6.  The original Superman

13   material was the product of the story and dialogue written by Siegel and the art work

14   drawn by Shuster; each on its own could have been a work in its own right subject

15   to copyright protection, but when merged together they formed a single new and

16   unified interdependent work.  See Siegel v. Time Warner, Inc., 496 F.Supp.2d 1111,

17   1145 (C.D. Cal. 2007) (where this Court held, in regard to Superboy, "the copyright

18   to [the same] (if a joint work) would be considered comprised of interdependent

19   parts — Siegel's dialogue and storyline . . . and Shuster's artwork giving life and

20   color to those words").

21        At most, Detective Comics took a part of Shuster's independently

22   copyrightable art work out of the joint work and utilized it, in conjunction with other

23   material (namely, the advertising slogan), in a promotional announcement.  There is

24   no rule preventing a publisher or others from publishing portions or excerpts of

25   works, joint or otherwise, that it solely owns, and then seeking a separate copyright

26   in the same.  Indeed, the opposite is true — the holder of a copyright is expressly

27   entitled to prepare derivative works based upon a copyrighted work it owns or to

28   utilize portions of that work in other materials.  See 17 U.S.C. § 106(2); see

1    generally 17 U.S.C. § 1 (repealed).  Detective Comics could just as well have

2    decided to split up the Superman material for publication into two or three

3    installments as it could (and did) decide to publish a portion of that material in an

4    advertisement to promote the comic.

5         This leads to plaintiffs' contention that the "derivative nature" of the

6    promotional advertisement itself works to exclude any of the copyright in the pre-

7    existing Superman material (notably, the art work for the Action Comics, Vol. 1

8    cover) contained therein from enuring to the benefit of the defendants to continue to

9    exploit.  Generally, if an author contributes additional original material to a pre-

10    existing work so as to recast, transform, or adapt that work, then the copyright

11    protection afforded to the author of that derivative work extends only to that

12    additional material and in no way extends to the underlying, pre-existing material.

13    See 17 U.S.C. § 103(b) (specifying that a derivative work's copyright does not

14    extend to any part of that work using "preexisting material in which copyright

15    subsists"); 1 NIMMER ON COPYRIGHT § 3.03, at 3-10.  Thus, it is asserted that the

16    author of the pre-existing material work (here Siegel and Shuster) would continue to

17    retain ownership in the same despite its use in the derivative work (the promotional

18    announcement).

19         Even assuming that the changes made to the cover page for Action Comics,

20    Vol. 1, in the promotional announcements is not merely a reproduction, but

21    sufficiently "recast, transform, or adapts" the pre-existing material so as to be

22    considered a derivative work thereof (e.g. the cover is shown in black and white

23    instead of color, the scale of the artwork itself is diminished, and text is placed

24    alongside the artwork), there remains a complicating wrinkle.  At the time the

25    promotional announcements were placed in Detective Comics' existing comic book

26    publications, the underlying pre-existing Superman material from which a portion of

27    the announcements were derived (again the artwork for the cover) had yet to be

28    published, and, hence, copyright in the same was protected at the time under state

1    common law.  See 17 U.S.C. § 2 (repealed).

2        Given that the portion of the pre-existing material at issue had yet to achieve

3    statutory copyright protection when it was first published in More Fun Comics, Vol.

4    31, and Detective Comics, Vol. 15, it was injected into the public domain upon the

5    publication of the promotional announcements themselves, absent investiture of

6    statutory copyright protection through its publication.  See 17 U.S.C. § 10

7    (repealed).  That is to say, the copyright in the cover of Action Comics, Vol. 1, itself

8    first achieved statutory protection, if at all, upon its publication in the

9    announcements, not its later publication in Action Comics, Vol. 1.  See 2 PATRY ON

10   COPYRIGHT § 6:35 ("where an investitive publication occurs, the derivative work

11   copyright covers the unpublished material").

12       This fact has repercussions on plaintiffs' derivative works argument, as it

13   alters the general rule described above.  Once Detective Comics published a

14   portion of the previously unpublished pre-existing material — as was its right as

15   owner of the material at that time — its continued protection resided exclusively

16   under statutory copyright in the derivative work itself lest that portion of the pre-

17   existing material (the art work for the cover) be injected into the public domain.  See

18   Batjac Productions Inc. v. GoodTimes Home Video Corp., 160 F.3d 1223, 1233 (9th

19   Cir. 1998); 2 PATRY ON COPYRIGHT § 6:35 ("to the extent that previously unpublished

20   material is included in an authorized published derivative work, the derivative work

21   publishes the previously unpublished material").  As Professor Nimmer explains:

22           Because a derivative work by definition to some extent
             incorporates a copy of the pre-existing work, publication
23           of the former necessarily constitutes publication of the
             copied portion of the latter.  Of course, an article that
24           merely describes a pre-existing work but does not
             incorporate any substantial portion of it is not a
25           derivative work and hence, does not publish the pre-
             existing work.  Unless the basic work is reproduced in
26           the published work, it is not published.  If only the broad
             outlines or other fragmentary portion of the pre-existing
27           work are copied and published in the derivative work,
             then only to that extent is the pre-existing work
28           published.

1  1 NIMMER ON COPYRIGHT § 4.12[A] at 4-59 to 4-60; see also id. § 4.13[A] at 4-73

2  ("any work published prior to January 1, 1978, was not only thereby divested of

3  common law copyright; it was also injected into the public domain, unless at the

4  moment of publication copies of the work bore a proper copyright notice").

5  Thus, included in defendants' right to continue to exploit the copyright in the

6  derivative work (the promotional announcements) is the right to the copyright in that

7  part of the pre-existing work (the illustration from the cover) that was published for

8  the first time in that derivative work.

9       The cases cited by plaintiffs as standing for the contrary are all

10 distinguishable, as either the act of publication in question fell within the "limited"

11 publication exception because the material was distributed for promotional purposes

12 to members in the trade and not, as here, the general public itself, see Rushton v.

13 Vitale, 218 F.2d 434 (2nd Cir. 1955); Hub Floral Corp. v. Royal Brass Corp., 454

14 F.2d 1226 (2nd Cir. 1972); or because the underlying work reproduced in the

15 derivative work was itself in the public domain (unlike here where the underlying

16 material was in an unpublished state protected by common law copyright), thereby

17 mooting any question about divestiture of the underlying work through publication.

18 See Alfred Bell & Co. v. Catalda Fine Arts, 191 F.2d 99 (2nd Cir. 1951).

19      Here, the promotional announcements represent the first time Superman

20 appeared to the public, and consequently, the first time any of Siegel and Shuster's

21 Superman material was protected by statutory copyright, albeit in conjunction with

22 the other material contained in the advertisement itself.  Thus, all of the material in

23 the promotional announcement (which included the graphic depiction of Superman

24 later portrayed on the cover of Action Comics, Vol. 1) obtained statutory copyright

25 protection before the earliest possible date covered by the plaintiffs' termination

26 notices.  The Court therefore finds that the publication date for at least one of the

27 comics containing the promotional announcements falls outside the reach of the

28 termination notice and, therefore, any copyrightable material contained therein

1   (including that found in the cover to <u>Action Comics</u>, Vol. 1, <u>as</u> <u>depicted</u> in those

2   announcements) remains for defendants to exploit.

3       This leads to the question of the <u>scope</u> of the copyrighted material remaining

4   in defendants' possession by way of the promotional announcements, a question

5   that defendants themselves acknowledge "is most obviously answered by [looking

6   at] the ads which speak for themselves" and that does not require some "special

7   'lens'" to resolve.  (Defs' Reply at 44).

8       The Court begins by observing what is <u>not</u> depicted in the announcements.

9   Obviously, nothing concerning the Superman storyline (that is, the literary elements

10  contained in <u>Action Comics</u>, Vol. 1) is on display in the ads; thus, Superman's

11  name, his alter ego, his compatriots, his origins, his mission to serve as a champion

12  of the oppressed, or his heroic abilities in general, do not remain within defendants

13  sole possession to exploit.  Instead the only copyrightable elements left arise from

14  the pictorial illustration in the announcements, which is fairly limited.

15      The person in question has great strength (he is after all holding aloft a car).

16  The person is wearing some type of costume, but significantly the colors, if any, for

17  the same are not represented, as the advertisement appears only in black and

18  white.  The argument that the "S" crest is recognizable in the promotional

19  advertisement is not persuasive.  What is depicted on  the chest of the costume is

20  so small and blurred as to not be readily recognizable, at best all that can be seen is

21  some vague marking or symbol its precise contours hard to decipher.  The Court

22  thus concludes that defendants may continue to exploit the image of a person with

23  extraordinary strength who wears a black and white leotard and cape.  What

24  remains of the Siegel and Shuster's Superman copyright that is still subject to

25  termination (and, of course, what defendants truly seek) is the entire storyline from

26  <u>Action Comics</u>, Vol. 1, Superman's distinctive blue leotard (complete with its

27  inverted triangular crest across the chest with a red "S" on a yellow background), a

28  red cape and boots, and his superhuman ability to leap tall buildings, repel bullets,

40

1  and run faster than a locomotive, none of which is apparent from the

2  announcement.

3      2.    <u>Work Made for Hire Aspect of Portions of Action Comics, Vol. 1</u>

4      Under the 1976 Act, an author's (or his or her heirs') ability to terminate a

5  prior grant in the copyright to a creation does not apply to a "work made for hire,"

6  because the copyright in such a creation was never the artist's to grant, belonging

7  instead to the one who employed the artist to create the work. <u>See</u> 17 U.S.C.

8  § 304(c); <u>Playboy Enterprises, Inc. v. Dumas</u>, 53 F.3d 549, 554 (2nd Cir. 1995)

9  ("Once it is established that a work is made for hire, the hiring party is presumed to

10  be the author of the work"). The manner in which Siegel and Shuster's Superman

11  material was submitted, then re-submitted in a reformatted version, and finally

12  accepted for publication by Detective Comics raises questions about the work for

13  hire status of the re-formatted material (but not the initial material submitted to the

14  publisher) later published in <u>Action Comics</u>, Vol. 1.

15      Defendants argue that portions of the copyrightable material contained in

16  <u>Action Comics</u>, Vol. 1, are unaffected by the termination notice because those

17  portions belong exclusively to them as "works for hire," arguing that certain material

18  found in the comic book was created by Detective Comics' in-house employees, or

19  that the material was added to the underlying Superman material by Siegel and

20  Shuster at the publisher's direction. (Defs' Opp. at 27). Specifically, the alleged

21  "additional" material provided by Detective Comics' in-house employees is the color

22  choices made throughout the comic, notably, the red color of the letter "S" on

23  Superman's crest and the art work for the cover to the magazine itself (albeit

24  modeled after a interior panel in the Superman comic illustrated by Shuster).

25  Similarly, the additional material supplied in response to the publisher's February 1,

26  1938, letter is Shuster's admitted (and as acknowledged by Siegel) drawing of

27  "several additional pictures to illustrate the story continuity" appearing "on page 1 of

28  the first Superman release" and "the last panel appearing on the thirteenth page."

1  (Decl. Michael Bergman Ex. G at 2 & Ex. H at 5).

2         The thrust of defendants' argument was made and rejected by the Second

3  Circuit in the 1970s Superman copyright renewal litigation, and is thus precluded as

4  a matter of collateral estoppel here.  In that litigation, defendants' predecessors-in-

5  interest presented much of the same evidence now submitted in this case to argue

6  that this additional material transformed the entirety of Siegel and Shuster's

7  pre-existing Superman material published in Action Comics, Vol. 1, into a work

8  made for hire.  The Second Circuit rejected this argument, elaborating: "In the case

9  before us, Superman and his miraculous powers were completely developed long

10  before the employment relationship was instituted.  The record indicates that the

11  revisions directed by the defendants were simply to accommodate Superman to a

12  magazine format.  We do not consider this sufficient to create the presumption that

13  the [comic book] strip was a work for hire."  Siegel, 508 F.2d at 914.  This

14  conclusion forecloses any further litigation on the point of whether Shuster's

15  additional drawings when reformatting the underlying Superman material into a

16  comic book format or other facts related to such a theory such as the colorization

17  process for Action Comics, Vol. 1, or the party responsible for the illustration of the

18  cover to the magazine, rendered all or portions of the resulting comic book a work

19  made for hire.

20         Defendants seek to avoid the collateral estoppel effect of the Second

21  Circuit's decision by arguing that the only issue concerning the work for hire status

22  of Action Comics, Vol. 1, related to Siegel and Shuster's 1934-1935 "contributions,"

23  and not what was "added to the first Superman story by Detective's employees,"

24  amongst whom defendants count Siegel and Shuster after they executed the

25  December, 1937, contract.  (Defs' Opp. at 36).  Such a reading conflicts with the

26  record.  The evidence that was proffered during the 1970s litigation in the trial court

27  on the work for hire question included declarations from Siegel and Shuster

28  discussing what took place during the reformatting process.  This is the same

1   evidence that defendants now seek to use in this case to argue that the reformatted

2   material was a work made for hire.

3        Moreover, the circumstances surrounding the reformatting of the underlying

4   Superman material was not only mentioned by the Second Circuit, but discounted

5   by that court in passing on the work for hire nature of Action Comics, Vol. 1, itself,

6   not just the initial contributions made by Siegel and Shuster back in 1934 and 1935.

7   It would be incongruous for the Court, in respecting as it must the Second Circuit's

8   judgment, to now hold that, while that reformatted material did not transform the

9   entirety of the material in Action Comics, Vol. 1, into a work made for hire, some

10  subpart thereof (and, indeed, a very limited subpart, consisting of but a few panels)

11  was somehow excised out and should be accorded work made for hire status.  The

12  litigation of the larger question sweeps within it defendants' opportunity to litigate a

13  subpart thereof.

14       A contrary holding would transgress certain core principles of collateral

15  estoppel: "A new contention is not necessarily a new issue.  If a new legal theory or

16  factual assertion raised in the second action is relevant to the issues that were

17  litigated and adjudicated previously, the prior determination of the issue is

18  conclusive on the issue despite the fact that new evidence or argument relevant to

19  the issue was not in fact expressly pleaded, introduced into evidence, or otherwise

20  urged." 18 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 132.02[2][c] at 132-25

21  (3rd ed. 2007).  Significantly, much of the evidence underlying defendants'

22  arguments was presented in the Second Circuit litigation (notably Siegel and

23  Shusters' declarations submitted in that litigation) or, if not, was certainly available

24  to be used in that case (the colorization process for the initial printing of

25  Action Comics, Vol. 1, or that in-house employees supposedly drew the cover to the

26  magazine).  "A party may be precluded from re-litigating an issue if evidence

27  supporting the party's position on the issue could have been submitted in previous

28  litigation but, for whatever reason, was not properly raised.  Evidence that is not the

1    result of a different factual situation or changed circumstances, but is instead

2    historical in nature and could have been admitted at the first trial if properly

3    submitted, cannot be introduced in subsequent litigation of the same issue." Id. §

4    132.02[2][d] at 132-25 to 132-26 (citing Yamaha Corp. v. United States, 961 F.2d

5    245, 257 (D.C. Cir. 1992)).

6          Nowhere have defendants explained why they did not bring up the question

7    of the colorization process for Action Comics, Vol. 1, or the cover art work for the

8    magazine, before the courts handling the 1970s Superman litigation.  The question

9    about the legal effect the reformatting of the underlying Superman material had on

10   the work for hire question was litigated by the parties and resolved by the courts

11   during the 1970s Superman matter.  Similarly, the question about the colorization

12   and cover art work (and who was responsible for the same) could have been raised

13   in conjunction with the work for hire question, but defendants failed or decided not

14   to do so.  Having litigated the question and having the opportunity to present all the

15   evidence that pressed on the issue, defendants are now barred from seeking to

16   relitigate it anew even under the purported limited guise that it is now being offered.

17         Some noted treatise writers have commented that the Second Circuit's

18   analysis focusing on the work for hire nature of the additional reformatted material

19   should have been analyzed as a derivative work, that is, that the additional material

20   was derivative of the underlying Superman material.  See 1 NIMMER ON COPYRIGHT

21   § 5.03[B] [1][b][I] at 5-33 n.92.  ("The Siegel decision . . . may be understood as

22   holding that the first expression of the Superman character was the underlying

23   work, and the later development of the character was a derivative work.  Because

24   only the derivative work was produced in a for-hire relationship, the underlying work

25   remains the property of the creators").  However, this analysis does not benefit

26   defendants.

27         First, no additional literary material was supplied in re-formatting the

28   underlying Superman material into a comic book format.   All the dialogue and

1   storyline contained in Action Comics, Vol. 1, was present before Detective Comics

2   requested the pair to provide a reformatted version of the material, and that literary

3   material remained unchanged through the reformatting process. All that is left was

4   supplying some additional illustrations by Shuster, the precise ones specified in his

5   declaration. From the Court's review of these additional illustrations, it appears that

6   the material is completely derivative of other panels in the Action Comics, Vol. 1,

7   comic, with its origins in the underlying Superman material. Thus, for instance,

8   while the final panel on page 13 shows Superman's crest with a red "S" on a yellow

9   background, so, too, does another panel containing the underlying, pre-existing

10  material. Similarly, while the panels on the first page to the comic show Superman

11  leaping skyscapers, running at high rates of speed, and demonstrating feats of

12  great strength, so, too, do other panels containing the pre-existing material. Indeed,

13  the earliest sketches by Shuster from 1934 and 1935 demonstrate that the graphical

14  depiction of Superman was well on its way to being completely developed before

15  the re-formatted material in question was created some three years later. Thus,

16  even if the additional material in question was tendered as a derivative work that

17  was made for hire by Shuster, all the potentially copyrightable material contained

18  therein is completely derivative of the pre-existing material and, hence, is not

19  subject to independent copyright protection in the first instance. This, then, lends

20  strong support to the Second Circuit's observation: "Superman and his miraculous

21  powers were completely developed long before the employment relationship was

22  instituted." Siegel, 508 F.2d at 914.

23      Defendants also argue that the coloring for Action Comics, Vol. 1, was not

24  created or chosen by Siegel or Shuster, but was instead the product of some of

25  Detective Comics' in-house employees working in the printing department. Even if

26  this argument was not otherwise precluded by collateral estoppel, the evidence

27  produced in support is less than persuasive. According to "eye-witness" Jack Adler,

28  the material contained in comic books "at the time" was provided by artists to the

1   Detective Comics' production staff in black and white. (Decl. Jack Adler ¶ 3).

2   "Typically," members of the staff then decided upon the color that would be applied

3   throughout the magazine, something that defendants argue is an additional element

4   added to the underlying Superman material that is itself subject to copyright

5   protection. (Decl. Jack Adler ¶ 3). Defendants' argument depends entirely upon

6   Mr. Adler's declaration, which is not as clear as they suggest.

7          Mr. Adler does not state that he worked on the colorizing of Action Comics,

8   Vol. 1, itself. Instead he states that he "worked for the engraving company that

9   made the metal plates for printing of, among other things, comic books for Detective

10   Comics." (Decl. Jack Adler ¶ 3). He then states that, "[a]t the time, comic book

11   artists . . . submitted drawn and inked comic book work in black and white." (Id.).

12   Mr. Adler further states that the black-and-white pages "were then photographed by

13   the engraver and a photo print was hand[-]colored by staff at Detective and by the

14   engravers." (Id.). Of course, nothing in this statement precludes the possibility that,

15   even if the Superman material was so submitted, Siegel and Shuster may have also

16   placed certain color directions with their material to be utilized in the engraving

17   process. In fact, that the earlier incarnation of Superman as hulking strongman in

18   the tradition of Tarzan was created by the pair as a comic book with color

19   illustrations lends to the possibility that they already had pre-conceived color

20   choices in mind for the later comic if it were later reformatted into a comic book,

21   rather than a newspaper comic strip.

22          Moreover, viewed in context, Mr. Adler's declaration appears to describe

23   procedures generally employed in the printing process, not as evidence of what

24   actually occurred with respect to the printing of Action Comics, Vol. 1, itself. His

25   statement (and, in fact, the entire Adler declaration) is of dubious evidentiary value

26   in light of his candid admission that he has "no knowledge of Siegel and Shuster

27   selecting any of the color in Action Comics, No.1." (Id. ¶ 4). Mr. Adler attempts to

28   temper his admission of lack of knowledge by stating, without any basis, that he is

1    "aware that Detective staff member, Ed Eisenberg, selected the color for

2    Superman's 'S' in Shield on his costume." (Id.)  Of course, Mr. Adler's statement on

3    this point is inadmissible as it is based on hearsay.  Without any direct link between

4    Mr. Adler's work and the printing of Action Comics, Vol. 1, in particular, there exists

5    an insufficient evidentiary foundation for his conclusions concerning the manner in

6    which the Superman material was supplied to the printer and the colorization of the

7    same was handled.

8         Finally, defendants argue that the cover for Action Comics, Vol. 1, was drawn

9    by Detective Comics' in-house artists.  However, the scant evidentiary basis

10   provided in support of this argument is ambiguous.  In a letter sent to Jerome Siegel

11   dated February 22, 1938, Detective Comics' editor, Vin Sullivan, enclosed "a

12   silverprint of the cover of Action Comics," with the observation that Detective

13   Comics "used one of those panel drawings of SUPERMAN, as you suggested in

14   your recent letter." (Decl. Michael Bergman, Ex. I).  The inference sought to be

15   drawn by defendants is that when Mr. Sullivan stated that the publisher "used" an

16   interior illustration from the Superman comic for the cover artwork he was stating

17   that one of the publisher's in-house artists saw the interior panel in question and

18   then drew the cover using the interior panel as inspiration.  Of course, given the

19   limited nature of the information contained in the passage it could also be argued

20   that, in his earlier letter, Siegel enclosed an illustration by Shuster as a suggestion

21   for the comic book's cover and Detective Comics decided to "use" this suggestion.

22   This alternative reading is not implausible.  As demonstrated by the pair's attempt to

23   have their earlier incarnation of Superman published by Detective Dan, Shuster had

24   in the past drawn exemplars for the cover illustration for his comics well before they

25   were ever accepted for publication.

26        In conclusion, the Court finds that the question of the work-for-hire nature of

27   certain portions of the Superman material published in Action Comics, Vol. 1, is

28   precluded from further litigation by operation of the 1974 Second Circuit decision.

1    Accordingly, the binding nature of that court's decision leads to the conclusion that

2    all the Superman material contained in <u>Action Comics</u>, Vol. 1, is not a work-made-

3    for-hire and therefore is subject to termination.

4         3.    Failure to Include 1948 Consent Judgment

5         Among the regulatory requirements promulgated by the Register of

6    Copyrights concerning the termination notice's "form, content, and manner of

7    service," 17 U.S.C. § 304(c)(4)(B), is the requirement that the notice must

8    "reasonably" identify "the grant" to which it applies. 37 C.F.R. § 201.10(b)(1)(iv).

9    Thus, if the author entered into five separate grants of rights for the same work, and

10   a notice of termination identifies only four of those grants, the fifth grant remains

11   "intact," and the grantee's rights thereunder remain unaffected. <u>See</u> 3 NIMMER ON

12   COPYRIGHT § 11.06[B] at 11-40.22(1) n.63 ("if a grant was not effectively terminated,

13   then the rights licensed under such grant remain").

14        Here, defendants argue that plaintiffs' failure to identify the 1948 consent

15   judgment from the Westchester action is fatal to their attempts to terminate their

16   grant to the copyright in Superman, as that consent judgment was among the

17   grants leading to the transfer of ownership from the artists to Detective Comics.

18   Such argumentation is predicated upon the notion that, notwithstanding the

19   plaintiffs' act of identifying the stipulation between the parties from the Westchester

20   litigation that resulted in the consent judgment, identification of the consent

21   judgment from the Westchester action itself as (or part of) a "grant" was necessary

22   because it constituted the final step in "effectuat[ing] the transfer to [Detective

23   Comics] of the sole and exclusive ownership of all rights relating to 'Superman'";

24   "without it the rights identified in the Stipulation would not have been transferred."

25   (Defs' Opp. at 39). The Court disagrees.

26        Although the 1976 Act nowhere defines the term "grant," the central question

27   raised is plainly one of transfer: Did Siegel and Shuster transfer any rights to

28   Superman through or in conjunction with the 1948 consent judgment? If so, then it

1    operated as a grant by the artists in the same.

2        On that point, the 1976 Act is helpful as it defines a "transfer of copyright

3    ownership" as "an assignment, mortgage, exclusive license, or any other

4    conveyance, alienation, or hypothecation of a copyright." 17 U.S.C. § 101; see

5    Melville B. Nimmer, Termination of Transfers under the Copyright Act of 1976, 125

6    U. PA. L. REV. 947, 951-52 (1977) ("In general, the termination provisions apply to

7    any 'transfer' of copyright and to nonexclusive licenses of copyright or of any right

8    comprised in a copyright. [Thus, a] 'transfer' includes not only assignments (as

9    understood under the [1909] Act), but also exclusive licenses and any other

10   conveyance of copyright or of any exclusive right comprised in a copyright").

11       The consent judgment at issue did not effectuate any transfer of rights from

12   Siegel and Shuster to Detective Comics.  If any rights were transferred as a result of

13   the Westchester action, such a transfer was effectuated by the execution of the

14   earlier stipulated agreement of the parties, not a document created two days later

15   which simply memorialized the transfer that the stipulation itself had accomplished.

16   The binding nature of the transfer contained in the stipulation was completed the

17   moment that agreement was executed.  The consent judgment was a mere

18   formality whose execution (or lack thereof) did not detract from the otherwise

19   binding nature of the parties' earlier agreement.  It merely parroted what was

20   already agreed to by the parties in the stipulation itself.

21       Finally, even if the 1948 consent judgment is a "grant" separate and apart

22   from (or part and parcel with) the 1948 stipulation, the regulations recognize that not

23   all errors in compliance with its terms impact the validity of the termination notice:

24   "Harmless errors in a notice that do not materially affect the adequacy of the

25   information required to serve the purposes of . . . section 304(c) . . . shall not render

26   the notice invalid." 37 C.F.R. § 201.10(e)(1). Here, viewing the issue in the light

27   most favorable to the defendants, the 1948 consent judgment simply served to

28   culminate or otherwise finalize the transfer of the Superman copyright achieved

1   through the stipulation the parties reached two days earlier. That plaintiffs only

2   identified the latter rather than the former does not materially affect defendants'

3   understanding of the "grant" sought to be affected by the notice. Indeed, courts

4   have required much less in meeting the regulation's requirement of providing "a

5   brief statement reasonably identifying the grant being terminated." See Music Sales

6   Corp. v. Morris, 73 F.Supp.2d 364, 378 (S.D.N.Y. 1999) (holding that description of

7   the grant in the termination notice as the "grant or transfer of copyright and the

8   rights of the copyright proprietor " was sufficient as "it appears to be boilerplate on

9   termination notices customarily accepted by the Register of Copyrights"); see also 2

10  PATRY ON COPYRIGHT § 7:45 (approving Music Sales). Nowhere do defendants

11  argue why the harmless error rule should not apply in a situation such as this where

12  one document that is a part in the process leading to the "transfer" of rights is

13  identified, but its necessary corollary was not.

14      Accordingly, the Court concludes that, even if the consent judgment is

15  viewed as integral to the transfer of rights, plaintiffs' failure to identify it as a grant

16  subject to the termination notice was a harmless error that did not diminish the

17  notice defendants received regarding the nature of the grant (and resulting transfer

18  of rights) that plaintiffs intended to terminate.

19          4.    Continued Acceptance of Benefits Under 1975 Agreement

20      Defendants argue that Joanne Siegel's continued acceptance of benefits

21  under the parties' 1975 agreement constitutes, "as a matter of equity," a de facto

22  post-termination grant of rights in the Superman copyright to defendants under the

23  terms of that agreement (or as phrased by defendants, plaintiffs have "effectively re-

24  accepted the terms of the grant"). (Defs' Opp. at 41). The legal premise of their

25  argument is that the 1976 Act recognizes that, once a termination notice has been

26  served and thereby vested, see 17 U.S.C. § 304(c)(6)(B), the terminating party is

27  free to make "a further grant . . . of any right covered by a terminated grant" to the

28  original grantee or its successor in title. 17 U.S.C. § 304(c)(6)(D). The Court

1  ultimately rejects this argument as unpersuasive because it mistakenly assumes the

2  1975 agreement was a "grant" to the Superman copyright.

3         A look at the context leading up the execution of the 1975 agreement

4  illuminates in what way the parties believed (and just as importantly did not intend)

5  for that agreement to bind them.  The 1975 agreement appears to have been

6  drafted in response to bad publicity (apparently due to the juxtaposition of the

7  creators' misfortune and the Superman character's commercial success), and not

8  as a means to transfer or convey the party's rights to the Superman copyright.  The

9  agreement observed that nothing therein should be construed as undermining the

10  rights defendants had been conferred by virtue of the March 1, 1938, assignment,

11  rights which were later vindicated in the Westchester action and the 1970s Second

12  Circuit litigation.  Indeed, the agreement reaffirmed defendants' existing rights to

13  Superman and provided plaintiffs with annual payments, medical insurance, and

14  screen credits.  Such conferral of benefits was identified in the agreement as a

15  "voluntary" act by defendants in recognition of Siegel and Shuster's "past services."

16  The 1982 codicil, in turn, removes the condition for the promised benefits to Siegel's

17  widow on the timing of her husband's death.

18         This context and the language in the agreement itself demonstrate that the

19  1975 agreement was not a "grant."  The agreement's execution did not result in the

20  transfer or assignment of the Superman copyright.  Indeed, the agreement itself

21  expressly disavows such an interpretation by including language that the conferring

22  of benefits by defendants to Siegel and Shuster was simply a "voluntary" act in

23  recognition of the pair's "past services," and that nothing therein should be

24  construed as undermining the rights defendants had been conferred in the March 1,

25  1938, assignment as vindicated in the Westchester action and the 1970s Second

26  Circuit litigation.   Thus, by its own terms, no rights were transferred through the

27  execution of that agreement.  A reaffirmation of existing rights without more is no

28  more "an assignment" or "conveyance" of rights to a copyright than it would if

1    Detective Comics had instead issued a press release declaring that previous court

2    rulings had recognized its existing ownership rights to that copyright.

3        Similarly, the 1982 codicil under which Joanne Siegel continued to receive

4    annual payments and benefits did not transfer any rights.  The codicil consists of

5    five paragraphs.  The first merely notes that the letter is in response to a letter

6    written by Joanne Siegel to the company's executive officer regarding her concern

7    over how she would provide for herself after her husband's death.  The second

8    referenced the 1975 agreement, noted the increase in the amount of the annual

9    payments from $20,000 to $50,000 thereunder, and the payment of an additional

10   bonus.  The third clarified a royalty policy that applied to creators other than Siegel

11   and Shuster.  The fourth set forth the agreement to continue to pay benefits to

12   Joanne Siegel for the balance of her life in the event her husband predeceased her

13   before 1985.  The fifth and final paragraph merely wishes Joanne Siegel and her

14   family well.  Nowhere in these five humble paragraphs is a transfer of rights to be

15   inferred, much less explicitly found.

16       Thus, even if Joanne Siegel's continued receipt of the benefits of the bargain

17   contained in the 1975 agreement post-termination somehow operated as a de facto

18   re-acceptance of the agreement itself (and the obligations flowing thereunder),

19   nowhere among those re-accepted "obligations" or "commitments" in that

20   agreement was there a grant to the Superman copyright.  Defendants protest the

21   Court drawing this conclusion, arguing that plaintiffs have admitted in their

22   pleadings (their complaint, and by filing a  termination notice directed at the 1975

23   agreement) that the 1975 agreement contained a grant to the Superman copyright.

24   It certainly is true that "[f]actual assertions in pleadings and pre-trial orders . . . are

25   considered judicial admissions" that bind the party who made them.  American Title

26   Ins. Co. v. Lacelaw Corp., 861 F.2d 224, 226 (9th Cir. 1988).  That being said,

27   "courts still have discretion not to apply the doctrine in particular cases."  18 JAMES

28   WM. MOORE, MOORE'S FEDERAL PRACTICE § 134.33[6] at 134-84 (3rd. ed. 2007)

52

1   (citing New Hampshire v. Maine, 532 U.S. 742, 750 (2001) ("Because the rule is

2   intended to prevent 'improper use of judicial machinery,' judicial estoppel 'is an

3   equitable doctrine invoked by a court at its discretion'")).

4          As noted at the outset, the termination provisions contained in the 1976 Act

5   are among the most complex and technical ones in the statute.  Given this

6   complexity, it is not surprising that a party seeking to harness its machinery may,

7   out of an abundance of caution, be more "over-inclusive" in terms of listing the

8   possible "grants" it seeks to terminate.  To penalize a party for being over-inclusive

9   rather than under-inclusive is all the more inequitable given the high hurdles the

10  termination provisions put in place.  Here, plaintiffs were represented by highly

11  experienced counsel who decided to list the 1975 agreement as a "grant" so as to

12  leave no stone unturned; an approach all the more justified given the extremely

13  technical and arcane arguments that have been advanced in this litigation

14  concerning the efficacy and enforceability of the termination notices themselves.

15  The Court therefore concludes that in these circumstances discretion counsels

16  against applying the judicial estoppel doctrine in the manner advocated by

17  defendants.

18         Accordingly, the Court concludes that Joanne Siegel's continued receipt of

19  payments and benefits under the 1975 agreement and 1982 codicil thereto does not

20  constitute a "further grant" or "an agreement to make a further grant" pursuant to 17

21  U.S.C. § 304(c)(6)(D).

22         5.     Statute of Limitations

23         Defendants contend that the present action was filed untimely.  The statute

24  of limitations itself is clear enough.  The Copyright Act of 1976 provides that "[n]o

25  civil action shall be maintained under the provisions of this title unless it is

26  commenced within three years after the claim accrued."  17 U.S.C. § 507(b).  The

27  issue raised by defendants implicates the latter clause and requires the Court to

28  determine when plaintiffs' claims accrued.

1    At the outset, a clarification of terms is in order.  The instant matter, although

2    couched in terms of terminating the 1938 grant, is in effect one for co-ownership of

3    the copyright in the Superman material contained in Action Comics, Vol. 1,

4    because, if successful, plaintiffs would gain only a joint ownership interest in that

5    material with DC Comics, owing to the fact that Shuster left no heirs who could

6    simultaneously seek to terminate his half of the grant in the material.  Claims of co-

7    ownership accrue when there is a "plain and express repudiation of co-ownership

8    . . . communicated to the claimant."  Zuill v. Shanahan, 80 F.3d 1366, 1369 (9th Cir.

9    1996).

10    Here, defendants assert that such a repudiation was expressed by a letter

11    submitted to plaintiffs' counsel dated December 18, 1997, during the whirlwind of

12    negotiations that took place between the parties shortly after the submission of the

13    termination notices.  The Court finds to the contrary.  As explained more fully below,

14    although the letter stated a position that the termination notices were "defective," the

15    letter addressed only the scope of the rights that could be recaptured by the

16    termination notices and left unchallenged the notices' validity and enforceability,

17    thus falling short of the required repudiation.[7]

18

19    ————————————————

[7] One could quibble with whether any date other than the termination
20    effective date itself can serve as the accrual date in a case involving the right to
termination of a grant.  Much like having to await a judicial determination whether
21    one is an heir (as opposed to instances when an ownership claim is based on
whether or not someone is a creator) has been held to be the earliest instant for
22    an accrual date, see Stone v. Williams, 970 F.2d 1043 (2nd Cir. 1992) (Hank
Williams' putative daughter's claim to be an owner had to await judicial
23    determination that she was in fact his daughter and heir, thus accrual date was not
triggered when Hank Williams' first contested her putative status but instead when
24    state court made determination that she was his heir), so too a claim of ownership
by way of termination of a grant cannot be realized unless and until after the
25    termination's effective date.  Stated another way, a party's status as a creator is a
factual question subject to being challenged by the other putative co-owner at any
26    time, and hence, the accrual date for the same would begin at that instant.  The
same, however, is not true of a putative co-owner by way of termination.  Their
27    status as co-owner is not predicated upon a pre-existing factual scenario, like
whether they were involved in jointly creating the material per se.  Instead, their
28    status as a co-owner is predicated upon a legal mechanism — the exercise of a

1    Specifically, the letter upon which defendants rely notified plaintiffs' counsel,

2    Mr. Levine, that they considered "the Superman Notices to be defective in several

3    respects." (Defs' Opp. at 50).  What is telling is that the areas of defect elaborated

4    upon in the letter did not relate to the validity or enforceability of the termination

5    notices themselves, but pointed to areas curtailing the scope of what could be

6    recaptured even assuming the notice to be properly presented.  These defects thus

7    did not call into question plaintiffs asserted right to termination contained in the

8    notices.  For example, the letter remarks that defendants would still retain its rights

9    in trademarks that it had secured over the years to certain Superman-related

10   material, and that the termination would not give plaintiffs access to an accounting

11   of the foreign profits defendants gained from exploiting the copyright.  Far from

12   repudiating plaintiff's co-ownership to the copyright, the letter acknowledged the

13   validity of that ownership interest.  Thus, the letter remarked that, "if the Siegels do

14   not execute a re-grant to DC, beginning in April of 1999, DC and the Siegels will be

15   joint owners of the United States copyright in the 'Superman' comic published in

16   Action Comics No. 1 in June, 1938." (Decl. Michael Bergman, Ex. U at 2).

17   Even more telling was DC Comics' subsequent conduct.  The parties'

18   negotiations quickly broke down and not much of substance was communicated

19   between the parties thereafter.  Then, the day before the termination effective date,

20   DC Comics sent a letter to plaintiffs' counsel denying the validity of the termination

21

22   ────────────

new statutory right revoking an earlier transfer in the copyright in question, be it
one they solely or jointly created — that takes place at a certain defined point in
time.  Unless and until that legal triggering point is passed, there is nothing for the
other co-owner to reject or challenge.  This is particularly the case given that
termination notices can be served up to ten years before the effective termination
date.  Defendants' position would, as a matter of logic, countenance scenarios
where due to an early "rejection" of the termination notice, the passage of the
limitations period would occur well before the termination effective date even
arrived (and with it the putative co-owner's rights even vested).  Nonetheless, the
Court need not resolve this question as the letter in question does not constitute a
plain and express repudiation of plaintiffs' termination notice (and, hence, its right
to co-ownership to the copyright in the Siegel and Shuster Superman material).

1  notice, proclaiming:

2      The absence of any steps towards negotiation for two
3      years, particularly on the 'eve' of the April 16, 1999
       purported 'effective' date of the termination, leaves us
       concerned.  Thus our client has no alternative but to
4      move to the stage of putting your clients on clear notice,
       as set forth below, of DC Comics' rights and of its
5      determination, if it becomes necessary, to take all
       appropriate and necessary steps to protect those rights.
6      First, your clients are hereby put on notice that DC
       Comics rejects both the validity and scope of the Notices
7      . . . .

8  (Decl. Marc Toberoff, Ex. Q (emphasis added)).

9      If, as defendants contend, such notice of intent had been so clearly and

10 unmistakably communicated over a year and half earlier, it is odd for them to have

11 to repeat it and then state that they were "putting" plaintiffs "on notice" about it.

12 Accordingly, the Court finds that the present action seeking declaratory relief

13 regarding plaintiffs' termination of the 1938 grant accrued on April 16, 1999, the

14 effective date of that termination.  DC Comics' submission of the letter the day

15 before that date denying the validity of the termination notice gave a plain and

16 express indication to plaintiffs that a claim for declaratory relief vis-à-vis the validity

17 of their termination notice was now ripe.  See 28 U.S.C. § 2201 ("In a case of actual

18 controversy within its jurisdiction, . . . any court of the United States, upon the filing

19 of an appropriate pleading, may declare the rights and other legal relations of any

20 interested party seeking such declaration, whether or not further relief is or could be

21 sought.")

22     Applying both the date of the accrual of the claim, the parties' tolling

23 agreement to the three-year statute of limitations, and the filing date of this action,

24 the Court concludes that it is timely.  The effective date of the termination notice,

25 and therefore the date of accrual, is April 16, 1999.  The parties entered into a

26 tolling agreement on April 6, 2000, which amounts to nine days less than one year

27

28

1  that the limitations clock ran before being tolled.[8]  The tolling agreement lasted until

2  ten business days after plaintiffs' September 21, 2002, letter providing written notice

3  that they were ending settlement negotiations, that is, October 4, 2002, at which

4  time the limitations clock started ticking once more.[9]  The present action was filed

5  two years and four days later, on October 8, 2004.  Adding the periods of time the

6  limitations period was running together, it is clear that they add up to a period of

7  time just short of the three-year period set forth in § 507(b).

8         Accordingly, the Court concludes that the present action is timely.

9         6.    The 2001-2002 Settlement Negotiations

10        Defendants contend that plaintiffs' termination notice is no longer effective as

11  the parties' settlement negotiations led to them entering into a binding post-

12  termination agreement that resolved the issues presently before the Court.  A brief

13  review of the time line regarding those negotiations is helpful to the Court's analysis

14  of the present issue:

15        October 19, 2001    Pursuant to the parties' negotiations, plaintiffs' counsel
                              sent to defendants' counsel a six-page letter outlining
16                            the substance of a settlement offer from defendants that

17  _____

18        [8]  Defendants' argument that the tolling agreement does not apply to
    plaintiffs' claims against Time Warner, Inc., and Warner Bros. Entertainment, Inc.,
19  because neither was a "party to" or bound by that agreement is disingenuous.
    (Defs' Opp. at 52).  The tolling agreement expressly provides that its terms bound
20  not only DC Comics but also its "past and present subsidiaries or affiliates."  (Decl.
    Marc Toberoff, Ex. Z).  Being the parent company (Time Warner, Inc.) or corporate
21  sibling (Warner Bros. Entertainment, Inc.,) of another (DC Comics) certainly
    qualifies as a corporate affiliate to the same; a point defendants later admit when
22  speaking to the alter ego question presented in the pleadings.  (Defs' Mot. Summ.
    J. at 79 ("the following is a chart of the current corporate structure and affiliations
23  between DC, WBEI and TWI")).  Moreover, representatives for both companies
    were actively involved in the settlement negotiations themselves, further
24  undermining any suggestion that they were bystanders to the process.

25
26        [9]  Defendants argue that the tolling period concluded much earlier based on
    the parties earlier having reached "an amicable resolution of the dispute."  (Defs'
27  Opp. at 51 (emphasis in original)).  Given that the Court finds that no such
    "resolution," as opposed to a naggingly close potential for the same, occurred
28  through the parties settlement discussion post-termination, see infra A.6, their
    argument is without merit.

1    was "accepted" by the plaintiffs.

2    October 26, 2001    Defendants responded, noting they were working on a
                        draft agreement and enclosing "a more fulsome outline"
3                       of "what" they "believe the deal" they "agreed" to is.

4    February 1, 2002   Defendants' counsel provided a fifty-six page draft
                        agreement that reserved the right to have their clients
5                       comment upon it and noted that certain, related "stand
                        alone" assignments were in the process of being
6                       finalized.

7    May 5, 2002        Plaintiffs responded to defendants' draft by stating that
                        the proposed agreement contained new, unacceptable
8                       terms to which they had not agreed.

9    May 21, 2002       Defendants sent a letter to plaintiffs stating that they
                        believed that each of the major points in the settlement
10                      had already been agreed upon.

11   Sept 21, 2002      Plaintiffs rejected their counsel's proposed draft
                        agreement and advised defendants in writing that they
12                      were ending negotiations.

13       The parties are in agreement that California law should be applied in

14   deciding this question, but disagree as to its application. "California law is clear that

15   there is no contract until there has been a meeting of the minds on all material

16   points." Banner Entertainment v. Superior Court, 62 Cal.App.4th 348, 358 (1998).

17   The failure to reach a meeting of the minds on all material points prevents the

18   formation of a contract even if the parties have orally agreed upon some of the

19   terms, or have taken some action related to the contract. Grove v. Grove Valve &

20   Reg. Co., 4 Cal.App.3d 299, 311-12 (1970). Similarly, the terms proposed in an

21   offer must be met exactly, precisely, and unequivocally for its acceptance to result

22   in the formation of a binding contract. See Panagotacos v. Bank of America, 60

23   Cal.App.4th 851, 855-56 (1998); Apablasa v. Merritt & Co., 176 Cal.App.2d 719,

24   726 (1959). A qualified acceptance constitutes a rejection terminating the original

25   offer and the making of a counteroffer to the original offeror, which must also be

26   unequivocally accepted by the former offeror for a binding contract to form. See

27   Panagotacos, 60 Cal.App.4th at 855-56; Glende Motor Co. v. Superior Court, 159

28   Cal.App.3d 389, 396 (1984) ("California law has generally held that a qualified

1    acceptance . . . affects the viability of the offer itself, so that 'a qualified acceptance

2    amounts to a new proposal or counteroffer putting an end to the original offer'"); In

3    re Pago Pago Air Crash, 637 F.2d 704, 706 (9th Cir. 1981); see also CAL. CIV. CODE

4    § 1585 ("A qualified acceptance is a new proposal.").

5         The parties disagree over whether the terms contained in plaintiffs' October

6    19, 2001, letter differ in substance from those set forth in defendants' later letter of

7    October 26, 2001 (and accompanying outline), such that there was no unequivocal

8    acceptance of an offer and, thus, no agreement.  As with much in both life and law,

9    materiality is in the eye of the beholder.  From the Court's reading of the parties'

10   correspondence, it is clear that the parties went well beyond reaching a settlement

11   in principle regarding their respective positions to the Superman property.  Rather,

12   as suggested by the time line above, the parties' correspondence, and the actions

13   taken in response thereto, illustrates that they found themselves in the all-too-

14   familiar situation in which verbal settlement negotiations result in what the parties

15   believe to be an agreement on all the major points of dispute, but which, upon

16   further discussion, falls short of the agreement needed to resolve their dispute.  The

17   devil, as it often is, was in the details.

18        That material details remained is evidenced by defendants' response to

19   plaintiffs' initial letter, enclosing "a more fulsome outline" of what it "believed the

20   deal" they had "agreed to."  Moreover, defendants' February, 2002, draft

21   agreement was not even considered final by its authors, who reserved the right for

22   their clients to "comment" on it, and would also require the further submission of a

23   number of "stand alone" agreements yet to be finalized.  Indeed, Time Warner's

24   CEO later commented that submission of the draft agreement was "expected" to

25   result in further "comments and questions" from the Siegel heirs that "would need to

26   be resolved."

27        This give and take reveals that the parties, while close to agreeing to a

28   complete and comprehensive settlement of their dispute, had not passed the

1    threshold where they had finalized and assented to all material terms of such a

2    settlement. Rather, as they attempted to sketch in the finer details of a settlement

3    from the broad outlines contained in the October 19 letter, more and more issues

4    arose upon which they could not reach agreement, resulting in the negotiations

5    falling apart. In this respect, the present case is not unlike Callie v. Near, 829 F.2d

6    888 (9th Cir. 1987), and Weddington Prods. v. Flick, 60 Cal.App.4th 793 (1998), in

7    which the courts held that no enforceable agreement was reached when the parties

8    had agreed to a rough outline of an agreement, but were thereafter unable to reach

9    agreement on the finer details and the negotiations fell apart.

10          Defendants' argument to the contrary is premised on the notion that they can

11    limit the scope of the legal analysis to the October 19, 2001, letter and call it a

12    contract, regardless of their materially different October 26, 2001, letter in reply ("I

13    enclose . . . a more fulsome outline of what we believe the deal . . . is") and their

14    vastly different February 1, 2002, draft, which were both part and parcel of the same

15    settlement negotiation. Ignoring these contemporaneous communications is at

16    odds with the requirement in contract formation that courts must consider "all the

17    surrounding circumstances." Donovan v. RRL Corp., 26 Cal.4th 261, 271 (2001).

18    These subsequent efforts to sketch in a more fulsome outline of the parties' alleged

19    agreement provides context and meaning as to the understanding the parties had

20    about the effect of the October 19 letter itself.

21          Defendants further seek to create issues of fact through post hoc testimony

22    and rationalizations. None of this subjective belief is sufficient to defeat the

23    objective manifestation of the parties' intent relayed in the documents referenced

24    above that aptly demonstrate that there was no "meeting of the minds" on all

25    material terms. See Meyer v. Benko, 55 Cal.App.3d 937, 942-43 (1976) ("The

26    existence of mutual consent is determined by objective rather than subjective

27    criteria, the test being what the outward manifestations of consent would lead a

28    reasonable person to believe. Accordingly, the primary focus in determining the

1   existence of mutual consent is upon the acts of the parties involved"); Stewart v.

2   Preston Pipeline Inc., 134 Cal.App.4th 1565, 1587 (2005) ("mutual assent to a

3   contract is based upon objective and outward manifestations of the parties"); CAL.

4   CIV. CODE § 1639.

5          One need only review the language of the parties' correspondence, their

6   conduct in reaction thereto, and the numerous material differences between the

7   terms relayed in the October 19 and 26, 2001, letters and the February 1, 2002,

8   draft to reach the conclusion that the parties failed to come to an agreement on all

9   material terms.  See Grove v. Grove Valve & Reg. Co., 4 Cal.App.3d 299, 311-12

10  (1970) (failure to reach meeting of the minds on all material points prevents contract

11  formation even though parties orally agreed on many terms, or have taken action

12  relating to the contract).  Far from signifying that the parties' "negotiations . . .

13  result[ed] in a binding contract" leaving nothing more than the drafting of more

14  formal documentation memorializing that agreement, see Louis Lesser Enterprises,

15  Ltd. v. Roeder, 209 Cal.App.2d 401, 404 (1962), these submissions between the

16  parties went far beyond that by adding in or further refining areas from what was

17  contained in the October 19 letter.  That after the submission of the October 19

18  letter defendants began the process of creating a settlement trust account and the

19  parties negotiated about providing Siegel and Shuster screen credits in the then

20  upcoming movie Superman Returns could as much be seen as goodwill gestures

21  on defendants' part while the negotiations continued as it could reflect an indication

22  on their part that they thought they were contractually bound to do the same.

23         From all of this there is no document or set of documents reflecting

24  agreement by the parties to singular, agreed terms.  Defendants cannot explain to

25  the Court what from the parties' differing exchange constitutes this purported

26  contract; rather, it appears that defendants wish to take the plaintiffs' "acceptance"

27  reflected in the October 19 letter and either festoon upon it all the terms contained

28  in the February 1, 2002, draft settlement agreement (even though Joanne Siegel

1    clearly and unequivocally rejected that latter draft agreement), or have the Court

2    perform that task. The Court's responsibility is not to create a patch-quilt agreement

3    by stringing together certain expressions of assent made at one point (October 19),

4    and attaching to it material terms spelled out later in time (and to which the

5    supposedly assenting party promptly rejected). See Industrial Indemnity v. Superior

6    Court, 224 Cal.App.3d 828, 832 (1990) ("courts will not write a new contract").

7            Accordingly, the Court concludes that the parties' settlement negotiations did

8    not result in an enforceable agreement resolving the issues presently before the

9    Court.

10   B.      Limitations on Scope of Recaptured Rights

11           The principal purpose behind the creation of the termination right was to give

12   authors (and their heirs) a chance to retain the extended renewal term in their work

13   and then re-bargain for it when its value in the marketplace was known. See H.R.

14   REP. NO. 1476, 94th Cong., 2d Sess. 124 (recognizing as the justification for the

15   termination right "safeguarding authors against unremunerative transfers . . .

16   because of the unequal bargaining position of authors, resulting in part from the

17   impossibility of determining a work's prior value until it has been exploited").

18           The need for such a second bite at the apple flowed from the fact that the

19   1909 Act created a dual term in the copyright to a work, one realized upon the

20   work's publication and the second occurring twenty-eight years later with the

21   copyright's renewal. Justification for this splitting of terms was based, in part, on the

22   understanding that an author's ability to realize the true value of his or her's work

23   was often not apparent at its creation, but required the passage of time (and the

24   marketing efforts by a publisher) to materialize. The renewal term in the copyright

25   to the work thus served as a mid-course re-valuation tool allowing the author, by

26   giving him or her the right of renewal in the work, leverage in re-negotiating a better

27   deal with the original grantee or any other suitor who desired to continue to market

28   the copyright. See Patry, Choice of Law, 48 Am. J. Comp. L. at 446 ("The main

1   theory behind a dual system of term was that it gave the author or the author's heirs

2   a 'second bite at the apple;' when the renewal term came around, the value of the

3   copyright would be better known than at the time of initial publication.  With this

4   information, a new bargain could be struck that would more accurately reflect the

5   market rate").  This re-valuation mechanism provided by the renewal term under the

6   1909 Act was largely frustrated by the Supreme Court's decision in <u>Fred Fisher</u>

7   <u>Music</u>, 318 U.S. at 656-59, allowing authors to assign away at the outset all of their

8   rights to both the initial and the renewal term.

9        Although the termination right contained in the 1976 Act sought to correct the

10  damage done by <u>Fred Fisher</u> to an author's ability to renegotiate through the

11  reversion of rights, it did not revert to the author the full panoply of rights he or she

12  would have enjoyed upon renewal under the 1909 Act.  Owing in large measure to

13  objections by publishers seeking to minimize the disruption to "existing contracts

14  and authorized derivative works already in distribution" that such a recapture right

15  would engender, <u>see</u> 2 PATRY ON COPYRIGHT § 7:43, Congress placed certain

16  limitations on what authors (or their heirs) gained from exercising the termination

17  right.  It is to these limits on the termination right that the Court now turns.

18       1.    <u>Foreign Profits</u>

19       Section 304(c)(6)(E) to the 1976 Act provides that "[t]ermination of a grant

20  under this subsection affects only those rights covered by the grant that arise under

21  this title[, Title 17 of the United States Code, governing copyrights], and in no way

22  affects rights arising under any other Federal, State, or foreign laws."  Defendants

23  read from this a statutory limitation on the scope of any accounting arising from the

24  termination notices in this case to those profits realized by the domestic exploitation

25  of the Superman copyright contained in <u>Action Comics</u>, Vol. 1, excluding those

26  realized from foreign sources.  The Court finds this argument persuasive.

27       Although the Court can locate no case that has specifically addressed the

28  issue of accounting profits from the foreign exploitation of a copyright that is subject

1  to a valid termination notice, the statutory text could not be any clearer on this

2  subject.  Through this section, Congress expressly limited the reach of what was

3  gained by the terminating party through exercise of the termination right;

4  specifically, the terminating party only recaptured the domestic rights (that is, the

5  rights arising under title 17 to the United States Code) of the grant to the copyright

6  in question.  Left expressly intact and undisturbed were any of the rights the original

7  grantee or its successors in interest had gained over the years from the copyright

8  through other sources of law, notably the right to exploit the work abroad that would

9  be governed by the copyright laws of foreign nations.  Thus, the statute explains

10  that termination "in no way affects rights" the grantee or its successors gained

11  "under foreign laws."

12      Such a reading is supported by leading commentators, who are in agreement

13  as to the effect of § 304(c)(6)(E) has in a case such as this.

14      Professor Nimmer states:

15          A grant of copyright "throughout the world" is
        terminable only with respect to uses within the
16      geographic limits of the United States.  Because
        copyright has no extraterritorial operation, arguably
17      American law is precluded from causing the termination
        of rights based upon foreign copyright laws.  A response
18      to this argument is that the nonextraterritoriality of
        copyright is irrelevant because the question here is one
19      of contract law, not copyright law, in that it concerns the
        effect of a contract granting certain rights.  The contract
20      law of one nation may be applicable in another nation
        under the latter's conflict-of-laws rule.  The conclusive
21      answer to this problem lies in the text of the termination
        provisions of the Copyright Act, which expressly provide
22      that statutory termination "in no way affects rights arising
        under . . . foreign laws" — that is, under foreign copyright
23      (not contract) laws.  Thus, even if the conflicts rule of a
        foreign nation were to call for application of the American
24      termination rule as a rule of contract law, that rule by its
        own terms excepts from termination the grant of those
25      rights arising under foreign copyright laws.

26  3 NIMMER ON COPYRIGHT § 11.02[B][2] at 11-19.

27      Professor Patry agrees: "Accordingly, where a U.S. author conveys

28  worldwide rights and terminates under either section, grants in all other countries

1  remain valid according to their terms or provisions in other countries' laws." 7

2  PATRY ON COPYRIGHT § 25:74.

3      Plaintiffs argue, however, that the section also allows for the possibility that

4  the terminating party gains not only the domestic rights to the copyright in question

5  (the "rights covered by the grant that arise under this title"), but also retains

6  whatever other rights it may have under "Federal, State, or foreign laws."  From this

7  premise, plaintiffs argue that, because an accounting between co-owners in a

8  copyright is governed by state law, and California state law allows for the sharing of

9  foreign profits between tenants in common, so, too, should defendants be forced to

10  account for their foreign profits.  This argument misses the fact that all plaintiffs

11  have gained from the termination right is a recapturing of the <u>domestic</u> copyright in

12  the Superman material published in <u>Action Comics</u>, Vol. 1.  Defendants continue to

13  hold, unaffected, separate rights to that copyright arising under <u>foreign</u> copyright

14  laws.  This distinction is important for two reasons.

15      First, such an open effort to extend the reach of U.S. copyright law overseas,

16  as plaintiffs' reading of the statute avows, would be in direct contradiction to not only

17  the plain terms of the statute (stating that termination does <u>not</u> affect another

18  parties' rights arising under the copyright laws of "foreign" nations), but stands in

19  stark juxtaposition to the longstanding rule "that the copyright laws [of this country]

20  have no application beyond the U.S. border." <u>Los Angeles News Serv. v. Reuters</u>

21  <u>TV Intern.</u>, 340 F.3d 926, 931 (9th Cir. 2003).  If Congress contemplated the ability

22  to attach or otherwise force the accounting of foreign profits to which the original

23  grantee or its successors are legally entitled under the copyright laws of other

24  nations through the backdoor of applying state law tenant in common principles,

25  one would have expected such an intention to have been made expressly, and

26  certainly with some explanation given the incongruity that arises from the statutory

27  language's notation that termination did <u>not</u> affect another's rights under "foreign

28  laws."

1    Second, the cases cited by plaintiffs requiring one co-owner to account to the

2    other for both domestic and foreign profits involved parties who were co-owners to

3    the "world-wide" copyright in the work and, not as with the termination right, to only

4    the domestic copyright.  See Goodman v. Lee, 78 F.3d 1007, 1010 (5th Cir. 1996)

5    (noting that declaratory action was filed after other co-owner obtained a "renewal of

6    the copyright" listing himself as the sole author in the song "Let the Good Times

7    Roll").  Plaintiffs have directed the Court to no case wherein a co-owner of the

8    domestic copyright in a work was allowed an accounting of a co-owner's foreign

9    profits.  See 3 NIMMER ON COPYRIGHT § 11.02[B][1] at 11-17 ("Only such rights as

10   were originally the subject of a grant will revert upon the termination of that grant.

11   [T]o the extent that a grant includes rights based upon federal law other than the

12   Copyright Act, state law, or foreign law, such rights are not subject to termination").

13   Accordingly, the Court holds that the termination notice affects only the

14   domestic portion of Siegel's and Shuster's 1938 worldwide grant ("all rights") to

15   Detective Comics of the copyright in the Superman material contained in Action

16   Comics, Vol. 1.  The termination notice is not effective as to the remainder of the

17   grant, that is, defendants exploitation of the work abroad under the aegis of foreign

18   copyright laws.  Thus, although defendants retain the unfettered right to exploit the

19   works (and retain the profits derived therefrom) in foreign nations, they may do so

20   domestically only as a co-owner (through Shuster's share) of the works.  See Oddo

21   v. Ries, 743 F.2d 630, 632-33 (9th Cir. 1984) (""[E]ach co-owner has an

22   independent right to use or license the use of the copyright. . . . . A co-owner of a

23   copyright must account to other co-owners for any profits he earns from licensing or

24   use of the copyright . . . .").  As such, defendants must account to plaintiffs only for

25   the profits from such domestic exploitation of the Superman copyright.

26   2.   Trademark Rights and Ownership of Pre-Termination Derivative

27        Works

28   As noted in the previous section, the right to termination leaves undisturbed

1    the original grantee or its successors in interests rights arising under "federal law."

2    17 U.S.C. § 304(c)(6)(E).  Among the rights based on federal law that defendants

3    secured over the years were several trademarks that utilized or incorporated

4    portions of the copyrighted material found in <u>Action Comics</u>, Vol. 1.  Defendants

5    seek a declaration from the Court that, even if successful in terminating the

6    Superman copyright contained in <u>Action Comics</u>, Vol. 1, plaintiffs cannot share in

7    defendants' profits "purely attributable to [Superman] trademark rights."  (Defs'

8    Reply at 11).  Plaintiffs admirably concede the point in their briefs, but argue that

9    they are "entitled to profits from mixed trademark uses to the extent such exploit

10   recaptured copyright elements (e.g., 'Superman costume')."  (Pls' Reply at 49 n.28).

11        Similarly, defendants seek a declaration that, to the extent plaintiffs are

12   entitled to an accounting as a result of their successfully terminating the 1938 grant,

13   it should not include any profits attributable to the "post-termination exploitation of

14   derivative works [of <u>Action Comics</u>, Vol. 1,] prepared prior to termination."  (Defs'

15   Mot. Summ. J. at 28).  Again, plaintiffs concede, as they should, this point.  (Pls'

16   Reply at 49 n.28).  Section 304(c)(6)(A) provides that derivative works created

17   during the grant (meaning up until the termination effective date) may continue to be

18   exploited after termination.  Again, however, plaintiffs hold out as a separate

19   question the existence of pre-termination derivative works that are "altered so as to

20   become post-termination derivative works."  (Pls' Reply at 49 n.28).

21        Given that these contentions by plaintiffs — the recapture or accounting from

22   the mixed use of trademark and copyright and what to do with any alteration in pre-

23   termination derivative works — are not the subject of the present motion, the Court

24   will not address them in this Order.  Even though it is clear that these issues will

25   impact the accounting of profits in some manner, they cannot be fully adjudicated

26   based on the narrow record currently before the Court and absent a full briefing of

27   the particular mixed uses or altered pre-termination derivative works that are

28   specifically at issue.

1   Accordingly, the Court holds that the profits defendants garner from the use

2   of Superman trademarks that "are purely attributable to [those] trademark rights,"

3   and from its use of unaltered pre-termination derivative works are not subject to

4   accounting.

5       3.    Accounting for Profits of Warner Bros. Entertainment, Inc., and Time

6             Warner, Inc.

7   The parties are in disagreement over whether plaintiffs may directly share in

8   the profits from the exploitation of the works by DC Comics corporate sibling,

9   Warner Brothers Entertainment, Inc. ("WBEI"), and its corporate parent, Time

10  Warner, Inc. ("TWI"). The genesis for this claim stems from certain inter-corporate

11  transactions amongst these actors concerning the Superman copyright. In the

12  same year that plaintiffs' termination notices became effective, DC Comics

13  executed an exclusive license in favor of WBEI (and a year later a separate

14  exclusive license with WBEI's television division) to exploit the Superman copyright

15  for the remainder of its extended renewal term in certain media formats, notably

16  movies, television, and home video. (Decl. Marc Toberoff, Exs. E & F). Defendants

17  contend that, as co-owners of the joint works at issue, plaintiffs are entitled to an

18  accounting of the profits made by DC Comics (in the form of the licensing fees it has

19  collected), but that plaintiffs are not entitled to an accounting of the profits WBEI has

20  made pursuant to the license.[10]

21  Defendants' argument is not without support. The Court starts with the

22  general principle that "each co-owner has an independent right to use or license the

23  use of the copyright[, but that a] co-owner of a copyright must account to other

24  co-owners for any profits he earns from licensing or use of the copyright." Oddo,

25  743 F.2d at 633. Licensees, on the other hand, are accountable only to their

26  _____

27  [10] It appears to the Court that because TWI is not a licensee of the works, it
    may not have any profits to account for; however, absent evidence of this fact from
28  either side (or the representation that such is not the case), the Court cannot rule
    on this issue at this time.

1    licensors, and owe no duty of accounting to the non-licensor co-owner of a

2    copyright the licensee exploits.  See Ashton-Tate Corp. v. Ross, 916 F.2d 516, 523

3    (9th Cir. 1990).

4          Plaintiffs, however, take a different view of the licenses, arguing that "Warner

5    has stepped exclusively into DC's shoes with respect to such motion picture and

6    television copyrights." (Pls' Opp. at 30).  In other words, the exclusive license had

7    the net effect of substituting WBEI for DC Comics as a joint owner with plaintiffs

8    (assuming the successful termination of the 1938 grant) insofar as the exploitation

9    of the copyright in the mediums in which those licenses are concerned.

10         This theory, however, requires large legal leaps that are not countenanced

11   by current law.  To begin, in order for an exclusive license in the entirety of the

12   interest in a joint work itself (such as Superman) to be effective, the consent of both

13   joint owners in the copyrighted work is required.  See 2 PATRY ON COPYRIGHT § 5:7

14   ("A joint author (or co-owner) may not, however, transfer all interest in the work

15   without the other co-owner's express (and written) authorization, since that would

16   result in an involuntary transfer of the other joint owner's undivided interest in the

17   whole"). The same requirement for prior consent holds true even with respect to the

18   wholesale transfer of exclusive licenses in subparts to a copyright, such as a license

19   transferring all the stage rights (not just the joint owner's rights) to a novel but not

20   the movie or literary rights. Cf. 1 NIMMER ON COPYRIGHT § 6.12[C][3] at 6-38.8 to 6-

21   39.

22         Such consent simply did not occur here.  DC Comics unilaterally sought to

23   give an exclusive license to the entirety in the Superman property's movie and

24   television rights to WBEI post-termination.  As a result, the attempt to provide an

25   exclusive license was ineffective.  At best, all that was conveyed was a non-

26   exclusive license, and, at worst, a license agreement whose terms are null and void

27   absent ratification by plaintiffs. See 3 NIMMER ON COPYRIGHT § 10.03[A][7] at 10-51.

28         Applying these principles in a vacuum, the Court would readily reach the

1   conclusion championed by defendants:  WBEI, as a licensee, is answerable only to

2   DC Comics as its licensor; that DC Comics is the only entity that must account for

3   profits to plaintiffs; and, absent exploitation of the works by DC Comics itself, that

4   DC Comics' accounting to plaintiffs is limited to those profits derived from licensing

5   the Superman copyright to WBEI.

6        However, the Court's analysis does not occur in vacuum; rather, it must take

7   into account the relevant facts of this case, particularly given that the accounting

8   sought by plaintiffs in this action is an equitable remedy, and the Court must

9   conduct its inquiry accordingly.  See Oddo, 743 F.2d at 633 ("A co-owner of a

10  copyright must account to other co-owners for any profits he earns from licensing or

11  use of the copyright, . . . but the duty to account does not derive from the copyright

12  law's proscription of infringement.   Rather, it comes from equitable doctrines

13  relating to unjust enrichment and general principles of law governing the rights of

14  co-owners.") (internal quotation marks and citations omitted).

15       Here, the relatedness of the transferor and the transferee entities cannot be

16  ignored.  The evidence before the Court reveals that the relevant entities are all

17  closely related entities — parent corporations, wholly and partially-owned

18  subsidiaries, partners, sibling business entities (owned directly or indirectly by the

19  same parent) — although it is not entirely clear to the Court exactly what those

20  relationships have been at all relevant times.  This fact alone raises a specter of a

21  "sweetheart deal" entered into by related entities in order to pay a less than market

22  value fee for licensing valuable copyrights.  If such were the case, the related entity

23  might be able to exploit the copyrights without the responsibility of answering to the

24  co-owner of a joint work, and the licensor co-owner would thereby be relieved of the

25  responsibility of accounting for any profits (other than a greatly reduced licensing

26  fee) to the non-licensor co-owner.  This result would be inequitable.

27       This concern is bolstered by the declaration of Paul Levitz, President and

28  Publisher for DC Comics, which states that under the post-2003 corporate

1  restructuring of Time Warner's business, "for operating management purposes, DC

2  reports" not to immediate corporate parent WCI, but to its sibling corporation

3  "WBEI," the licensee of the rights at issue in this action.  (Decl. Paul Levitz ¶ 17).

4  As Levitz explains, "I report to and obtain approvals from WBEI's President and

5  Chief Operating Officer before making significant acquisitions or certain financial

6  decisions or investments that are outside the scope of DC's customary acquisitions

7  and investments; before implementing meaningful strategic changes; and before

8  embarking on something substantially outside DC's normal course of business."

9  (Id.).  Although this is not evidence of what occurred at the time of the license, it is

10  still probative evidence of the relatedness of the licensee and licensor that could

11  result in an extremely favorable licensing arrangement that works to the detriment of

12  the non-licensor co-owner.  These open issues also touch upon factors to be

13  considered in analyzing alter ego claims.  See Sonora Diamond Corp. v. Superior

14  Court, 83 Cal.App.4th 523 (2000); Mesler v. Bragg Management Co., 39 Cal.3d 290

15  (Cal.1985) ("The essence of the alter ego doctrine, in which it is claimed that an

16  opposing party is using the corporate form unjustly, is that justice be done. What the

17  formula comes down to, once shorn of verbiage about control, instrumentality,

18  agency and corporate entity, is that liability is imposed to reach an equitable result").

19      Whether the license fees paid represents the fair market value therefor, or

20  whether the license for the works between the related entities was a "sweetheart

21  deal," are questions of fact that are not answered on summary judgment, certainly

22  not without the benefit of expert testimony which has not been presented by either

23  party on this topic.  The Court therefore concludes that summary judgment on this

24  issue is inappropriate at this time.[11]

25

26  _____

27      [11] Because the Court concludes that defendants' motion for summary
   adjudication of this issue must be denied for the reasons stated above, the Court
28  does not at this time resolve other arguments raised by plaintiffs regarding this
   issue.

**CONCLUSION**

After seventy years, Jerome Siegel's heirs regain what he granted so long ago — the copyright in the Superman material that was published in <u>Action Comics</u>, Vol. 1. What remains is an apportionment of profits, guided in some measure by the rulings contained in this Order, and a trial on whether to include the profits generated by DC Comics' corporate sibling's exploitation of the Superman copyright.

DATE:  March 26, 2008

STEPHEN G. LARSON
UNITED STATES DISTRICT JUDGE

# EXHIBIT C



1

2

3

4

5

6

7

8

9

10                 **UNITED STATES DISTRICT COURT**

11       **CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION**

12

13   JOANNE SIEGEL and LAURA    )   Case No. CV-04-8400-SGL (RZx)
      SIEGEL LARSON,               )

14                             )
              Plaintiffs,        )   ORDER RESOLVING ADDITIONAL

15                             )   ISSUES
            v.                 )

16                             )
      WARNER BROS.             )

17   ENTERTAINMENT INC.; TIME    )
      WARNER INC.; and DC COMICS,   )

18                             )
             Defendants.     )

19   ─────────────────────────── )

20         The 1976 Copyright Act contains many intricate formalities that an author

21   (or his or her heirs) must navigate to successfully terminate the grant to the

22   copyright in an original work of authorship, but perhaps none is more fundamental

23   an impediment than the one excluding from the reach of termination the copyright

24   "in a work made for hire." 17 U.S.C. § 304(c); <u>see</u> 1 MELVILLE B. NIMMER, NIMMER

25   ON COPYRIGHT § 5.03[A] at 5-12 (2008) (commenting that the exclusion "relating to

26   termination of transfers is probably the most important feature of the work for hire

27   doctrine with respect to works created at present"); 3 WILLIAM F. PATRY, PATRY ON

28   COPYRIGHT § 7:42 (2008) (labeling as a "significant exclusion" to the right to

EXHIBIT C
Page 83

1    terminate the grant in "work-for-hire creations").  The complexity of the 1976 Act's

2    termination procedures stems as much from the fact that those provisions

3    intersect with and must be construed in light of the body of copyright law that

4    existed at the time the works were created (here, the 1909 Copyright Act) as from

5    the intricacies set forth in the 1976 Act itself.

6        This is particularly true when applying the "work made for hire" bar to works

7    created under the auspices of the 1909 Act, as the law developed by the courts

8    under the Act was oftentimes confused and not well-delineated, with its dimension

9    continuing to evolve long after the effective date of the 1976 Act.  See Easter Seal

10    Society for Crippled Children and Adults of Louisiana, Inc. v. Playboy Enterprises,

11    815 F.2d 323, 325 (5th Cir. 1987) (commenting that the term "work for hire" was

12    undefined in statute, and that a "substantial body of cases developed as courts

13    worked out the definition").

14        Having previously addressed the iconic superhero Superman's first

15    appearance in Action Comics No. 1 in its earlier decision, the Court now considers

16    the myriad relationships and contractual arrangements surrounding the published

17    works of Superman by his creators Jerome Siegel and Joseph Shuster for the

18    years 1938 to 1943.  The task of disentangling these relationships and

19    agreements, and giving legal meaning to them, lies at the heart of this case.

20                    **I. FACTUAL BACKGROUND**

21        When the Court last left Superman, the copyright in the earliest published

22    version of the character, as depicted in the comic book Action Comics No. 1, had

23    been reunited with the heirs of one of his creators, Jerome Siegel.  See Siegel v.

24    Warner Bros. Entertainment Inc., 542 F. Supp. 2d 1098, 1145 (C.D. Cal. 2008).

25    One might have thought that with the extensive discussion of Superman's creation

26    and development therein, little more would be left to be said about Superman's

27    first years in print; as the Court has since learned, there is more to the story.

28

2

EXHIBIT C
Page 84

1      Like the arc of a comic book serial, there has been an unfolding of

2   evidence regarding the creation and subsequent publication of Superman.  The

3   parties have presented to the Court previously undisclosed evidence surrounding

4   the back story to Superman's creation before 1938, the character's publication for

5   the years 1938 to 1943 in comic books published by Detective Comics after <u>Action</u>

6   <u>Comics</u> No. 1, and in the syndication of daily newspaper comic strips through the

7   McClure Newspaper Syndicate.

8   **A.      Pre-1938 Years:  Superman's Initial Creation and Development**

9      As recounted in the Court's earlier Orders, the development of Superman

10  evolved, with the character being re-worked by Siegel and Shuster over a period

11  of years.  However, missing from that account and now disclosed is the existence

12  of another collaborator.

13      The story picks up with Siegel dramatically rescuing from the flames the

14  cover art work from the pair's initial version of the Superman character in heroic

15  form (as a hulking strong man, sans super-human powers or alien origin, in the

16  fashion of Flash Gordon) after Shuster grew despondent when the publisher to the

17  comic book <u>Detective Dan</u> rescinded its offer to publish the material.  <u>See Siegel</u>,

18  542 F. Supp. 2d at 1103.  This led to a split of sorts with Siegel, with Shuster

19  apparently deciding he was no longer interested in continuing to illustrate

20  Superman, and Siegel apparently concerned that the character was going

21  nowhere under Shuster's artistic direction.  As Siegel later recounted, after the

22  debacle with <u>Detective Dan</u>, Shuster became "very discouraged" and decided that

23  he "did not want to work on Superman anymore." (Decl. Marc Toberoff, Ex. F at

24  45).  Undeterred, Siegel sought out other artists to illustrate his scripts as he

25  continued to flesh out the Superman character.  <u>See Siegel</u>, 542 F. Supp. 2d at

26  1103 ("Undaunted, Siegel continued to tinker with his character, but decided to try

27  a different publication format, a newspaper comic strip").

28

3

EXHIBIT C
Page 85

1    Notably, Siegel approached illustrator Russell Keaton, who at that time was

2    providing the art work for the Buck Rogers Sunday newspaper strips.  For a few

3    months spanning the summer and fall of 1934, the pair exchanged

4    correspondence and scripts for Superman.  This activity culminated with Siegel

5    and Keaton producing a week's worth of newspaper comic strips (or nine

6    horizontal strips, each containing four panels, with dialogue and illustrations), and

7    Siegel drafting for Keaton's consideration three scripts (for which no illustrations

8    were ever created) for Superman that, taken together, demonstrated the evolving

9    nature of the character.

10    The story portrayed in the scripts and the week's worth of illustrated

11    material was devoted exclusively to Superman's upbringing as a child by a couple

12    known only as Sam and Molly Kent, and included the first inklings of a science

13    fiction aspect to the character, albeit with a much different take on Superman's

14    now well-familiar origins.

15    In this earlier version, Siegel conceived of Superman as having been sent

16    as an infant back in time, to then-present day America (circa 1935), in a time

17    machine created by "the last man on Earth" before the planet's destruction.  The

18    story is also notable as it contained the first expression of Superman's now

19    familiar super-human powers:  That he had a "physical structure millions of years

20    advanced from" those living in 1935, leading him to possess "colossal strength,"

21    the ability to "leap over a ten story building," "run[] as fast as an express train,"

22    and stated that "nothing less than a bursting shell could penetrate his tough skin."

23    Upon his arrival, Superman spoke a language that his adoptive parents did not

24    understand, and the secret of his origins was tied to a cryptic mystery note

25    accompanying him in the time machine.  When, as an adult, Clark Kent was

26    presented with the mystery note, he could not understand the words written on it.

27    Both the illustrated strips and the scripts contain the by-line crediting its authorship

28    to "Jerome Siegel and Russell Keaton."  (Decl. Marc Toberoff, Exs. C, D & E).

4

EXHIBIT C
Page 86

1    Keaton eventually chose not to take a chance on someone with such little

2    experience writing comics; by sometime in the first half of 1935, Siegel and

3    Shuster resumed their creative partnership and were again working together on

4    Superman, with the pair poised at the tipping point that would lead them to create

5    the version of the character that would transform the comic book industry.  In fact,

6    it was shortly thereafter that Siegel would have his breakthrough moment,

7    conceiving of the now-familiar Superman story on a "hot summer night."  It was

8    then that Siegel combined his now developed Superman character as a mythic

9    superbeing capable of fantastic feats with a new pseudo-scientific explanation for

10   those feats to make them more plausible — the character's extra terrestrial origin.

11   Shuster then went about creating a graphical representation of Siegel's character,

12   replete with costume and distinctive physical features:

> The two then set about combining Siegel's literary
> material with Shuster's graphical representations.
> Together they crafted a comic strip consisting of
> several weeks' worth of material suitable for newspaper
> syndication.  Siegel typed the dialogue and Shuster
> penciled in artwork, resulting in four weeks of
> Superman comic strips intended for newspapers.  The
> art work for the first week's worth of "daily comic strips
> was completely inked" and thus ready for publication.
> The "three additional weeks of 'Superman' newspaper
> comic strip material" differed from the first week's
> material "only in that the art work, dialogue and the
> balloons in which the dialogue appeared had not been
> inked," instead consisting of no more than black-and-
> white pencil drawings.

21   Siegel, 542 F. Supp. 2d at 1105.[1]  Much of this four weeks' worth of material was

22   later re-cut and re-pasted into a comic book format and published in the first

23   installment of Detective Comics' comic book magazine Action Comics.  Not widely

24   known is the amount of material, beyond that published, the pair had created

25   during these formative years, outside the watchful eye of any publisher.

26   _____

27   [1]  In its March 26, 2008, Order, the Court describes this "hot summer night"
moment as occurring in 1934; however, the undisputed evidence now points to an
28   undefined date in the summer of 1935.

5

EXHIBIT C
Page 87

1    To begin, not <u>all</u> of the four weeks of pre-existing Superman material

2    created by Siegel and Shuster found its way into print in <u>Action Comics</u> No. 1.

3    During the editing process, Detective Comics decided to exclude the first weeks'

4    worth of material in order to accommodate space for other features in the comic

5    book.  As later explained by noted comic artist/writer/historian James Steranko in

6    his 1989 forward to DC Comics publication of <u>Superman Archives, Volume 1</u>:

7         McClure Syndicate agent M.C. Gaines, an early comics
          pioneer, just happened to have the Siegel and Shuster
8         submission on his desk when president Harry
          Donenfeld [of Detective Comics] phoned, inquiring
9         about original material to fill a new magazine he was
          assembling. . . .  Donenfeld recognized the material's
10        appeal and ordered the newspaper strip repasted into
          comic-book format, <u>with the first week eliminated to</u>
11        <u>accommodate available space in the magazine</u>, which
          was christened **Action Comics**. . . .  The opening tale
12        was reprinted <u>in its entirety</u> in **Superman** 1 . . . .

13   (emphasis added).

14        Indeed, if one compares the material published in <u>Superman</u> No. 1 with that

15   in <u>Action Comics</u> No. 1, the two mirror one another in every respect except that

16   <u>Superman</u> No. 1 contains an additional six pages (the first six pages in the comic)

17   filling in more details about Superman's formative years as well as providing the

18   prologue to the story told in <u>Action Comics</u> No. 1 (<u>see</u> Addendum A for the first six

19   pages of <u>Superman</u> No. 1).  Included in the famous first edition re-publication of

20   <u>Superman</u> No. 1 is a forward by Siegel himself, which gives the following

21   description of the origins and time of creation for these first six pages of material:

22        M.C. Gaines became involved in this enterprise[, the
          publication of <u>Superman</u> No. 1].  Readers may be
23        especially interested in the letter he wrote to me on
          March 27, 1939 on Detective Comics, Inc. stationary:
24        "With further reference to the SUPERMAN book . . . we
          have decided . . . that for the first six pages of the
25        SUPERMAN book that we would like you to take the
          first page of SUPERMAN, which appeared in ACTION
26        COMICS #1, and by elaborating on this one page,
          using different ideas than those contained on this
27        page, work up <u>two</u> introductory pages, the last panel of
          this second page to consist of the panel marked 'X' on
28        the enclosed sheet.  On these two pages, you will of

6

EXHIBIT C
Page 88

1        course leave out the scientific explanation of Clark
2        Kent's amazing strength, as we want a separate page
          on that item to use further back in the book with the
3        heading as follows:  'Scientific Explanation of
          Superman's Amazing Strength', in which you will
4        incorporate five or six various explanations, which we
          discussed while you were here in New York several
5        days ago.

6    (Decl. Marc Toberoff, Ex. GG).

7        Thus, the first two pages in Superman No. 1 was composed of material

8    created by Siegel and Shuster in 1939 when the comic book was published, but

9    the following four pages in the comic (pages three through six) represent the first

10    week of Superman material the pair had crafted in 1935.

11        Beyond this first four weeks of material (containing Siegel's dialogue and

12    Shuster's illustrations) that was later re-cut and re-pasted in comic book format,

13    Siegel also had written Superman material to which Shuster provided no

14    illustrations.

15        For example, Siegel wrote a paragraph previewing future Superman

16    exploits which was contained at the end of a "nine-page synopsis of the storyline

17    appearing in the three weeks of penciled daily Superman newspaper comic

18    strips."  542 F. Supp. 2d at 1105.  The paragraph Siegel wrote previewing future

19    Superman exploits has now been produced in this case:

20

21          This ends the first month's release and yet the
          potentialities of the character, SUPERMAN, has barely
22    been scratched.  He's headed for the most exciting and
          yet humorous adventures this world has even seen.
23    He will win a war single-handed, battle an airplane with
          his bare hands, swim several hundred miles and think
24    nothing of it, etc.,.  He's different and sure to become
          the idol of young and old.  He'll participate in sports
25    and astound the nation; he'll single-handed rescue a
          town from a flood through his super-strength.  Unlike
26    most adventure strips the scene of the story will not be
          laid in some fantastic, unknown jungle or planet or
27    country, but will be all the more astounding for having
          its locale on familiar streets.  SUPERMAN will operate
28    against a background of America's most well-known
          cities, buildings, and pleasure-spots.

7

EXHIBIT C
Page 89

1   (Decl. Marc Toberoff, Ex. A at 12 (emphasis in original)).

2          These broad outlines later found expression in the plot in Action Comics

3   No. 2, which involved Superman single-handedly averting a war brewing in the

4   fictional country of San Monte that had been instigated by a corporate war

5   profiteer.  In that comic book, there is a series of panels revealing Superman

6   battling a fighter plane in mid-air with his bare hands, and there is also a series of

7   panels depicting Superman swimming a great distance in the ocean.  Action

8   Comics No. 4 similarly gives concrete expression to the idea pitched in Siegel's

9   paragraph, telling the story of Superman interceding in a college football game

10  and using his superpowers on the field to astound the crowd.  Finally, in Action

11  Comics No. 5, Superman is shown saving a town from a flood after a huge dam

12  breaks.

13         Moreover, even with the renewed partnership with Shuster, Siegel still

14  looked to and would lift material he had created while corresponding with Keaton,

15  and use it for publications of his newly conceived Superman character.   Thus, in

16  November, 1934, Siegel sent to Keaton, a nine-page "synopsis of what will occur

17  during the next two months" to convince a potential publisher to bring the extant

18  version of Superman to print.  The synopsis submitted by Siegel is of the college

19  football story alluded to a year later in Siegel's "future exploits" paragraph and

20  tracks almost precisely the storyline, both the dialogue and the action direction,

21  that was later published by Detective Comics in Action Comics No. 4.[2]  The

22  _____

23         [2]  Plaintiffs also assert that there are additional pre-1938 Superman
    material, in the form of scripts, or synopses for daily newspaper strips, that were
24  created.  (Pls.' Opp. at 6 ("scripts (continuity) for 15 Superman daily comic strips
    (created by Siegel c. 1934) and a 9 page synopsis covering 2 months of daily (at 6
25  days per week) comic strips of Superman (created by Siegel c. 1934)")).  This
    reference to additional newspaper comic strip material is misleading.  The material
26  in question is nothing more than a reference to the newspaper strips that were
    later repackaged and published in Action Comics No. 1.  (See Decl. Marc
27  Toberoff, Ex. B ("The drawn daily strips of Superman, herein described, were later
    cut up, pasted onto pages, and reproduced together with the art of daily strip week
28  one and two in ACTION COMICS No. 1, June, 1938 issue"); Ex. X at 176 ("In
                                                              (continued...)

8

EXHIBIT C
Page 90

1   following example, comparing Siegel's 1934 script with a portion of the published

2   material found in <u>Action Comics</u> No. 4, is typical of this near seamless

3   interweaving between these two items.  The narrative from Siegel's script is

4   followed by the embodiment thereof in <u>Action Comics</u> No. 4:

5   Script (page 6)

6         The coach says: "This is going to be good!  The sap is
running for a goal, with everyone on the field trying to
7   stop him.  There goes Martin for him.  Watch Burke
come down faster than a window-shade!"

8

9         Martin is the first to reach SUPERMAN.  As he
dives for a tackle he says: "This is for poking into my
locker!"  SUPERMAN's outhrust arm connects with
10   Martin's face, thrusting off the tackler. "And this," says
SUPERMAN,"is for busting me on the jaw!"

11

12         Three more players close in on SUPERMAN,
from all sides.  The coach says to his assistant: "He'll
have to be a superman to get by them."  SUPERMAN
13   leaps to the shoulder of one of the three oncoming
players, and springs on over the other two.  The
14   coach's assistant replies: "There's your superman!"

15   SUPERMAN is already half-way down the field.  The
coach's assistant says: "I believe he's going to make
16   it!"  To which Coach Oliver replies: "Just fool's luck so
far.  Wait until he meets our 'unbeatables' — Stevens,
17   Burns, and Dennis." The entire remaining team piles
onto SUPERMAN.  The coach yells:  "They've got him!"

18

19   Action Comics No. 4 (page 8):

20

21

22

23

_____

24

    [2](...continued)
25   addition, I prepared a synopsis of the story continuity appearing in the three weeks
of penciled daily strips.  Because we did not want to risk the loss of all the art work
26   we had done, either through the mails or a failure to return it, the synopsis was
sent to prospective out-of-town newspaper syndicates and publishers, in lieu of
the three weeks of penciled strips, together with the first week of inked strips")).
27   Plaintiffs have not come forward with evidence to refute the fair inference of the
evidence that is of record, that the "synopsis" mentioned is nothing more than
28   what was later re-cut and re-pasted in <u>Action Comics</u> No. 1.

9

EXHIBIT C
Page 91



**B.    Superman's Publication in Comic Books and Newspaper Strips**

Siegel and Shuster's well-traveled Superman concept was eventually published by Detective Comics in the premiere issue of its comic book magazine Action Comics in April, 1938, becoming an almost instant success whose popularity endures to this day and whose depiction has been transferred to various media formats.  It is in this transfer to different formats that yet another portion of the untold history of Superman's first years in print takes shape.

Shortly before the publication of Action Comics No. 1, Siegel and Shuster signed a grant of their rights in the copyright to the Superman material contained therein to Detective Comics.  This assignment was executed on March 1, 1938, giving to Detective Comics "such work and strip, all good will attached thereto and

EXHIBIT C
Page 92

1    exclusive right[s] to the use of the characters and story, continuity and title of strip

2    contained therein . . . to have and hold forever," in exchange for $130.  In the

3    grant, Siegel and Shuster further agreed that they would "not employ said

4    characters or said story in any other strips or sell any like strip or story containing

5    the same characters by their names . . . without obtaining [Detective Comics']

6    written consent therefore."

7         Superman's appearance in Action Comics No. 1 was followed by

8    subsequent installments, "published at regular intervals, each succeeding issue

9    having a SUPERMAN comic strip prepared by [Siegel and Shuster], who

10   continue[d] to be paid by DETECTIVE COMICS, INC. at the agreed rate of $10

11   per page." (April 20, 2007, Decl. Bergman, Ex. S at 282 (Westchester referee's

12   Finding of Fact No. 36)).[3]  Thus, Action Comics No. 2 was published on May 25,

13   1938; Action Comics No. 3 was published on June 25, 1938; Action Comics No. 4

14   was published on July 25, 1938; Action Comics No. 5 was published on August

15   25, 1938; and Action Comics No. 6 was published on September 26, 1938.

16        It is apparent from the undisputed evidence that publication of Superman

17   as a continuing feature in Action Comics was part of a pre-arranged, implicit

18   understanding between the artists and Detective Comics.  For instance, before

19   Superman was accepted for publication in the first issue of Action Comics,

20   Detective Comics' editor, in a letter dated January 10, 1938, voiced concerns to

21   Siegel about Shuster's ability to handle such a continuing "feature" given his pre-

22   existing commitments to doing the art work for other regularly appearing comics

23   for the publisher.  (Decl. Michael Bergman, Ex. A ("With all the work Joe is doing

24   now . . . could it be possible for him to still turn out 13 pages of this new feature?

25   . . . if it were humanly possible I'd like to have him turn out this 'Superman' for the

26   new magazine. . . .  It strikes me that adding another 13 pages to his already filled

27   _____

28        [3] The Court previously held that the referee's factual findings are binding in
     this litigation.  Siegel, 496 F. Supp. 2d at 1136.

11

EXHIBIT C
Page 93

1   schedule is loading him up to the neck.  Please let me know immediately whether

2   or not he can do this extra feature" (emphasis in original))).

3        Similarly, correspondence from another Detective Comics' editor to the pair,

4   shortly before Superman's initial appearance in Action Comics No. 1, also

5   suggested that the Superman comic was envisioned by the publisher to be a

6   regular feature in its Action Comics comic book for which the pair would provide

7   continuing material.  On April 8, 1938, Detective Comics sent a check in payment

8   for their "July material," and enclosed was a letter to Siegel remarking that the

9   publisher had "loaded [them] up with 43 pages a month" in material to produce,

10  and expressing concern with the pair's ability to handle such a monumental task,

11  but also reminding the pair that their "chances of . . . making more money is

12  bound up with the success of the magazine."  (Decl. Michael Bergman, Ex. B).

13       Superman's acceptance for publication in comic book format apparently

14  rekindled Siegel's interest in seeing his character syndicated in daily newspaper

15  strips.  As later explained by Shuster during the bench trial in the 1947

16  Westchester litigation, even with Superman's publication in Action Comics No. 1,

17  he and Siegel still "wanted to see Superman in the newspapers, not in the

18  magazines."  (Decl. Marc Toberoff, Ex. N at 118).  Their motive was an economic

19  one:  At this time, "black-and-white newspaper comic strips . . . were" not only "the

20  most popular medium for comics," but were also potentially the most lucrative.

21  Siegel, 542 F. Supp. 2d at 1103.  Toward that end, Siegel, initially without either

22  the approval of or notice to Detective Comics, began shopping around the now

23  accepted, but as yet unpublished, Superman character to various newspaper

24  publishers seeking syndication in or around March or early April, 1938.  That

25  Siegel did not first approach Detective Comics about syndicating Superman in

26  newspapers was understandable given that, in Shuster's words, Detective Comics

27  "wasn't running a newspaper."  (Decl. Marc Toberoff, Ex. N at 118).  As Siegel

28  later explained in an unpublished memoir titled "Creation of a Superhero":

1
2
3
4
5
6
7

I continued attempting to break into newspaper syndication.  On April 8, 1938, an employee in the Business Department of the McClure Newspaper Syndicate wrote to me asking if I would be agreeable to working out two weeks of "Superman" newspaper strips at no obligation to them: "You should get a letter from the publisher of these magazines before we can get down to brass tacks on Superman."  He was referring to "Action Comics."  He added, "The early panels describing the birth of SUPERMAN and how he came to this planet could well be expanded into several weeks releases, we think."

8
9

On April 13, 1938, he suggested that I submit the two-weeks' sample releases of SUPERMAN around July 1st.

10
11
12
13

I wrote a detailed two weeks "Superman" daily strip continuity account of Superman's origin on the planet Krypton; how his father and mother placed their infant child in a rocket ship and sent him to Earth, moments before Krypton exploded.  And how, upon reaching Earth, the infant was rescued from the flaming space craft and grew up to become crusading SUPERMAN.

14

I sent the script to McClure Syndicate.

15    (Decl. Marc Toberoff, Ex. R).

16        Just before he submitted the script to McClure, Siegel wrote the following

17    letter to Detective Comics' president, J.S. Liebowitz, on April 18, 1938:[4]

18
19
20
21
22

Regarding SUPERMAN.  In their latest letter, McClure has instructed us to draw up the two weeks release of SUPERMAN and get them submitted on July 1st.  This, Joe and I will do.  When we submit the drawn up strip to them, I'll inform you at once.  I've no doubt but that if you drop in on the McClure Newspaper Syndicate at that time to discuss matters, that your presence will aid materially in the selling of the strip.

23    (Decl. Marc Toberoff, Ex. S).

24        Siegel's unpublished memoir recounts what transpired thereafter:

25
26
27

On April 21, 1938, McClure responded that they preferred waiting until July 1: "Enclosed we return your continuity for your safe-keeping.  Thank you for your energetic cooperation."

28

_____

[4] Incidentally, the same day that Action Comics No. 1 was first published.

13

EXHIBIT C
Page 95

1     I knew that periodical publishers often returned to
     contributors, upon request, the rights other than first
2     serial rights. Wheeler-Nicholson had written to me that
     this was our arrangement. I wrote to Liebowitz [at
3     Detective Comics] that I had a newspaper syndicate
     interested in syndicating "Superman," and I requested
4     that newspaper syndication rights to "Superman" be
     returned to Joe [Shuster] and me.
5

6     In his letter to me dated June 9, 1938, Liebowitz
     replied, "While it is not our intention to hold you back in
7     any way from a possible newspaper syndication of
     'Superman', we are not in a position to give you what
     you ask for, that is a complete release. If and when a
8     syndicate makes a definite offer for the use of
     'Superman', we can get together so that all of us will
9     benefit."

10    On June 13, 1938, M.C. Gaines of McClure wrote to
     me that since I had already completed the first two
11    weeks of the SUPERMAN strip, I should now send the
     material to him. "I will take this matter up at the first
12    opportunity and let you know what we decide to do."

13    Joe did a terrific art job of illustrating my script for these
     two weeks of the daily "Superman" strip. I mailed the
14    strips to McClure Syndicate.

15 (Decl. Marc Toberoff, Ex. R).

16    While waiting to hear back from McClure, Siegel pursued other newspaper

17 syndicators to see if they might be interested in distributing a Superman

18 newspaper comic strip, submitting with his pitch a copy of the two weeks' worth of

19 material concerning Superman's origins. One other newspaper syndicator that

20 expressed some positive feedback was The Register and Tribune Syndicate.

21 Again, as explained by Siegel in his memoir:

22     Chas. E. Lounsbury of the Register and Tribune
     Syndicate wrote to me on August 10, 1938, in
23    response to my letter of August [sic] 26, "We are
     impressed with your outline and especially your
24    enthusiastic approach. We read with interest the
     optional two weeks' releases. They do strike us as
25    exciting and original." He noted I had a proposal
     elsewhere, and said they could not give me a quick
26    decision. But if I was still in the clear after Labor Day,
     they would be glad to hear from me.
27
     On September 7, 1938, he again wrote that "such
28    matters necessarily move rather slowly here. . . .

14

EXHIBIT C
Page 96

1          Personally I like SUPERMAN very much and believe
           that with a few changes it has very good possibilities."
2          He stated that if McClure Syndicate was in a position to
           take on the strip, he presumed I would go ahead.  I
3          informed Liebowitz [at Detective Comics] of these
           developments.
4

5   (Decl. Marc Toberoff, Ex. R; see also Decl. Marc Toberoff, Ex. T (September 7,

6   1938, letter from Managing Editor Chas Lounsbury to Jerome Siegel)).

7          Shortly thereafter, progress was made on the McClure front.  In early

8   September, 1938, Liebowitz summoned Siegel to New York City to discuss the

9   McClure newspaper syndication proposal.  (Decl. Marc Toberoff, Ex. R ("In early

10  September, Liebowitz asked me to come to New York to discuss the matter of

11  McClure's interest in syndicating 'Superman'")).  What happened during this early

12  September meeting is later related in the June, 1941, Saturday Evening Post

13  story, "Up, Up and Awa-a-y!":

14         From the fall of '38 on, it was all sail and no anchor.
           Amid the piteous sounds of syndicate editors kicking
15         themselves, McClure negotiated with Donenfield [at
           Detective Comics] to handle the newspaper rights,
16         Donenfield to receive 40 per cent.  Superman was
           eventually placed in 230 daily and Sunday newspapers
17         scattered throughout the Western Hemisphere.
           Donenfield's 1940 cut was $100,000.
18
           The McClure negotiations were perceived by
19         considerable unhappiness for the partners.  They
           sensed — correctly — that syndicate editors, who had
20         once turned Superman down, would soon come to
           them, hat in hand.  They begged Donenfield to give
21         back the syndicate rights.

22         "We can't do that," he replied, "but if one of you will
           come to New York, I'm sure we can work something
23         out."

24         Sitting up all night in the coach for lack of sleeper fare,
           Siegel arrived, rumpled and yawning, to receive the
25         proposition: If the partners would confine all their
           services to Donenfield for ten years, he would permit
26         them to do strips for McClure, himself retaining an
           agent's 10 per cent — of McClure's gross, however,
27         not his own 40 per cent.  In the heat of discussion
           Siegel was frequently reminded that Donenfield owned
28         all rights and could freeze the partners out.  The boys

                                    15

EXHIBIT C
Page 97

1               signed a contract, which for the first year brought them
2               an increase of less than $100 a month.

3  (Decl. Marc Toberoff, Ex. M).

4        The transaction was structured into two separate contracts, executed by

5  the parties on approximately September 22, 1938:[5] An employment agreement

6  between Detective Comics, on one hand, and Siegel and Shuster, on the other

7  hand; and a newspaper syndication agreement among all three:  Detective

8  Comics, Siegel and Shuster, and McClure.

9        The newspaper syndication agreement gave McClure an eight-month

10  option for a "six days a week" Superman "daily strip."  If exercised, Detective

11  Comics agreed "to permit [Siegel and Shuster] to supply 'Superman' strip

12  exclusively to [McClure] for syndication in newspapers [throughout the world], for a

13  minimum period of five years from June 1, 1939," with an option for McClure to

14  "renew the agreement for a further period of five years."  "[I]n consideration,"

15  McClure agreed to pay "Detective . . . forty (40%) per cent of the net proceeds

16  from such syndication during the first year, forty-five (45%) per cent during the

17  second year and fifty (50%) per cent thereafter."  (Decl. Marc Toberoff, Ex. Q).

18  Payment to Siegel and Shuster for their "work" created under the contract was to

19  be done "solely" through Detective Comics.

20        The syndication agreement provided that Siegel and Shuster were to

21  supply said material to McClure "on an advanced schedule of at least six weeks"

22  so as to "insure ample time for distribution prior to release dates."  If Siegel and

23  Shuster failed to furnish said material in time, the agreement allowed Detective

24  Comics to substitute "other artists to do the feature and strip."  As to the

25  Superman newspaper strip material supplied to it by Siegel and Shuster, the

26  ————————

27      [5] The agreements are dated September 22, 1938 (before the publication of
Action Comics No. 6); however, correspondence between the parties establishes
28  that Siegel and Shuster did not return the signed agreements to Detective Comics
until September 30, 1938.  (See Decl. Bergman, Ex. C).

16

EXHIBIT C
Page 98

1   syndication agreement provided that McClure, not Detective Comics, would have

2   "reasonable editorial supervision of the feature," which Siegel and Shuster

3   promised to maintain "at the standard shown in the sample submitted." (Decl.

4   Marc Toberoff, Ex. Q).

5          The syndication agreement also provided that monthly statements of

6   McClure's net proceeds would be sent to "Detective and a copy to" Siegel and

7   Shuster.  Furthermore, both Detective Comics and Siegel and Shuster were given

8   the right to inspect McClure's books and records "in reference to the feature, at

9   any reasonable time." (Decl. Marc Toberoff, Ex. Q).

10         As to the copyright in the material published in the newspaper comic strips,

11  the syndication agreement provided that it would be in McClure's name, with a

12  "reversionary" interest in favor of Detective Comics at the conclusion of the

13  contract's term.  (Decl. Marc Toberoff, Ex. Q ("The material contained in the

14  feature which we syndicate will be copyrighted in our name, but copyright reverts

15  to Detective at the termination of this contract")).  Toward that end, the syndication

16  agreement made clear that "the title 'Superman' shall always remain the property

17  of Detective," and that Detective Comics retained the copyright in Superman in all

18  other media "except daily or weekly newspaper publication." (Decl. Marc

19  Toberoff, Ex. Q ("Our agreement covers newspaper rights only.  Radio, motion

20  picture, silent and talkie, book and all other rights are retained and owned by

21  Detective")).  Finally, McClure agreed to provide to Detective Comics free of

22  charge "all the original drawings of the 'Superman' strip, so that said drawings may

23  be used by Detective in the publication" of its comic book magazines, but only "six

24  months after [the] newspaper [strip's] release."

25         The employment agreement notably differentiates provisions relating to

26  newspaper strips and those concerning comic books.  The agreement contained

27  an opening declaration broadly asserting Detective Comics' rights to, among

28  others, the Superman copyright. (Decl. Marc Toberoff, Ex. P ("We, Detective

17

EXHIBIT C
Page 99

1   Comics . . ., are the exclusive owners of comic strips known by the titles

2   'Superman'")).  The employment agreement further noted up front that Siegel and

3   Shuster had, up to that time, been doing the "art work and continuity for [the

4   Superman] comic[] for [Detective, and that Detective] wish[ed] [for them] to

5   continue to do said work and hereby employ and retain you for said purposes for

6   the period of this contract."  The following sentence then recited Siegel and

7   Shuster's agreement to "supply [Detective] each and every month hereafter, in

8   sufficient time for publication in our monthly magazines, sufficient copy and art for

9   each of said features each month hereafter."  The agreement distinguished this

10  duty from Siegel and Shuster's further duty under the syndication agreement: "You

11  shall also furnish in sufficient time to properly perform the terms of an agreement

12  we are executing together with you with the McClure Newspaper Syndicate, all of

13  the art and continuity for the newspaper strip entitled 'Superman' called for by said

14  agreement."  (Decl. Marc Toberoff, Ex. P).

15          The employment agreement then spelled out the per page compensation

16  rate Detective Comics would pay Siegel and Shuster for the respective comic

17  book characters they had been supplying to the publisher at that time (Superman

18  receiving the highest rate of $10 per page).  Again, the agreement then

19  distinguished this payment scheme with that for the artists' creation of the

20  Superman newspaper strips:

21              We further agree to pay you for the McClure
               Newspaper Syndicate strips which you may hereafter
22              furnish pursuant to the above-mentioned contract with
               McClure, on the following basis:
23
               When we receive payment from McClure on the
24              40% basis mentioned in the contract, we shall
               retain 7½% and pay you 32½% of the "net
25              proceeds" as defined in the McClure contract.

26              When we receive payment from McClure on the
               45% basis mentioned in the contract, we shall
27              retain 9% and pay you 36% of the "net proceeds"
               as defined in the McClure contract.

28

EXHIBIT C
Page 100

1
2
3

> When we receive payment from McClure on the
> 50% basis mentioned in the contract, we shall
> retain 10% and pay you 40% of the "net
> proceeds" as defined in the McClure contract.

4  (Decl. Marc Toberoff, Ex. P).

5       As for ownership in the copyright to the newspaper strips, the employment

6  agreement provided that Detective Comics would own "all" such "material" and, at

7  Detective Comics' option, it could be "copyrighted or registered in [Detective's]

8  name or in the names of the parties designated by us."

9       The employment agreement further provided that Detective Comics had the

10  right to "reasonably supervise the editorial matter of all features" and the right to

11  terminate Siegel and Shuster's employment if "the art and continuity of any feature

12  shall not be up to the standard required for the magazines."

13       Moreover, the employment agreement provides that, should Detective

14  Comics decide to re-print some of the Superman newspaper strips in its

15  "magazines," Detective Comics would compensate the pair "at the above-

16  mentioned page rate less the percentage which McClure receives for said

17  syndication."

18       The employment agreement also contained a global (literally and

19  figuratively) prohibition against Siegel and Shuster "hereafter" furnishing to

20  anyone Superman material, whatever its form be it as a "comic" book, a

21  "newspaper" strip, or something else; instead, the artists agreed that they "shall

22  furnish such matter exclusively to [Detective Comics] for the duration of this

23  agreement as such matter may be required by us or as designated by us in

24  writing."

25       Around the time the syndication and employment agreements were signed

26  by all the parties concerned, Liebowitz wrote a letter on September 28, 1938, to

27  Siegel, commenting upon said agreements.  In the course of his lengthy

28  correspondence, Liebowitz reminded Siegel that, "[a]s I have pointed out to you

19

EXHIBIT C
Page 101

1  many times, our company has very little to gain in a monetary sense from the

2  syndication of this material.  Also bear in mind, that we own the feature

3  'Superman' and that we can at any time replace you in the drawing of that feature

4  and that without our consent this feature would not be syndicated and therefore

5  you would be the loser in the entire transaction. . . .  It is entirely up to you and

6  Joe, whether you wish our pleasant relationship to continue and whether you wish

7  the strip 'Superman' to be syndicated." (Decl. Michael Bergman, Ex. B).  Siegel

8  quickly responded that both he and Shuster "are anxious and ready to do our best

9  on SUPERMAN so that all parties concerned will profit."  (Decl. Michael Bergman,

10  Ex. C).

11  　　　With that, Siegel and Shuster produced daily newspaper strips for McClure

12  under the terms of the September 22, 1938, syndication agreement from

13  1939 through 1943; the first daily newspaper strip (depicting the first day's worth

14  of the two weeks of material created by Siege and Shuster in the spring of 1938)

15  appearing in the Milwaukee News Journal on January 16, 1939:

16

17  

26  The applications submitted by McClure (and, when approved, the certificates) for

27  the original copyright term registration for the Superman newspaper strips

28  (identified as a "PERIODICAL CONTRIBUTION") created and published from

EXHIBIT C
Page 102

1  1939 to 1943 listed "McClure Newspaper Syndicate" as the claimant and "Jerry

2  Siegel and Joe Shuster" as the authors of the newspaper strips.  (Decl. Michael

3  Bergman, Ex. C).  No effort was made by any party throughout the initial term of

4  the Superman newspaper strips published through 1943 to file a supplemental

5  registration to make changes to the information contained in the original

6  registrations.

7       Two applications for renewal term registrations were, however, submitted

8  for the Superman newspaper strips in question during the 1960s:  First, National

9  Periodical Publications Inc., as successor in interest to Detective Comics,

10  submitted applications for a renewal registration claiming as proprietors in the

11  copyright of the renewable matter in "a work made for hire," noting that said work

12  was a "contribution to periodical or other composite work," namely, the specific

13  newspaper issue in question.  (Decl. Michael Bergman, Ex. C).  Second,

14  applications for a renewal registration were also made by Siegel and Shuster,

15  listing themselves as authors of the renewable matter.  (Decl. Marc Toberoff, Ex.

16  A (Thomson & Thomson copyright report noting that "the copyrights in the

17  [newspapers strips] originally published through 1943 were renewed . . . in the

18  names of Jerome Siegel and Joe Shuster, claiming as authors")).

19       Not long after Superman entered into newspaper syndication, it became

20  apparent that McClure could not provide the editorial supervision over the material

21  submitted by Siegel and Shuster as called for in the syndication agreement.

22  Correspondence between the artists and their magazine editor at Detective

23  Comics, J.S. Liebowitz, recount this increasingly rocky relationship.  (Decl.

24  Michael Bergman, Ex. D (April 21, 1939, letter from Liebowitz in which he notes

25  "[e]very morning it seems to me I receive copies of criticisms and complaints sent

26  to you by Miss Baker of McClure" and that "Mr. Nimis of McClure was here today

27  and he stated that they definitely do not intend to go on as they are . . . they feel

28

21

EXHIBIT C
Page 103

1 | that the time and effort and aggravation encountered in getting this thing going
2 | properly is not worthwhile because of your lack of cooperation")).
3 |       Eventually, by January, 1940, it was clear that McClure had outsourced its
4 | editorial supervision over the newspaper strips to editors at Detective Comics.
5 | (Decl. Michael Bergman, Ex. I (January 22, 1940 letter commenting that "[w]e've
6 | been having considerable talk about the daily releases on SUPERMAN, and I
7 | believe Jack [Liebowitz] is writing to you to have you send all the material here
8 | before it goes to the syndicate for release"); Ex. E (January 25, 1940 letter from
9 | Liebowitz reminding Siegel that "all copy must clear through our office"); Ex. F
10 | (February 8, 1940 letter remarking on the "present arrangement" of Detective
11 | Comics "editing of the strip")). The substance of the editorial comments contained
12 | in the correspondence from Detective Comics (both as to the Superman comic
13 | book and later also the newspaper strips), pertained for the most part to
14 | complaints about the pair's failure to follow its editorial directions and to submit
15 | material on time, leaving the publisher to have to quickly scramble to get the
16 | material to the printer to meet its deadlines.
17 |       There were, however, more substantive criticisms of both the script and
18 | artwork supplied by the pair, with specific changes either made to yet-to-be
19 | released material or suggested for later releases. (Decl. Michael Bergman, Ex. E
20 | (noting that it was "unwise" to depict Clark Kent flying in the air without wearing
21 | Superman's costume, as had been done with "the last daily release"); Ex. H
22 | (returning 26-page script and suggesting that it be re-written for a 13-page story as
23 | "there is nothing important enough about the story to justify its going to such
24 | length"); Ex. I (cataloging critiques of specific artwork of "sketches" submitted by
25 | Shuster); Ex. M (complaining "that a great deal hasn't been done to make Lois
26 | look better," giving specific examples in which the artwork is deficient, and then
27 | drawing an image of Lois on the correspondence that the editor suggests "Shuster
28 | and his lads" use as an exemplar).

EXHIBIT C
Page 104

1    During the term of the syndication agreement, problems also arose with

2    Siegel and Shuster's ability to supply newspaper strips in a timely fashion to

3    McClure.  As a consequence, McClure turned to Detective Comics for "filler"

4    material for "newspapers which carried the comic strip SUPERMAN in order to

5    prevent said newspapers from terminating their syndication agreements with"

6    McClure.  Notably, Detective Comics did not supply in-house Superman

7    newspaper strips, as was its right under the terms of the syndication agreement.

8    Instead, Detective Comics "supplied" to McClure a Superman spin-off, the "comic

9    strip LOIS LANE, GIRL REPORTER, . . . without charge for use."  In fact,

10    Detective Comics and McClure entered into a side agreement in September,

11    1943, with reference to the Lois Lane newspaper strip's impact on the

12    computation of the net proceeds to be divided among the parties.  In the

13    agreement, the two "agreed that . . . 'net proceeds' for the purposes of computing

14    [Siegel and Shuster's] return from the newspaper publication of Superman should

15    be the entire gross receipts" from the same, "deducting therefrom only the cost of

16    cuts and proofs."  Detective Comics and McClure further agreed that "the

17    compensation of the [in-house] artists engaged by Detective Comics to draw the

18    releases of Lois Lane, Girl Reporter . . . furnished by Detective Comics to McClure

19    for newspaper syndication was to be deducted from the gross receipts of the

20    Superman syndication as 'mechanical costs' in computing 'net proceeds.'"  Siegel

21    and Shuster were not parties to (nor were they apparently aware of) this

22    arrangement between McClure and Detective Comics.

23    Later, McClure notified Detective Comics of its election to extend for five

24    years (beginning from June 1, 1944) the term of the 1938 syndication agreement.

25    Contemporaneously, McClure "assigned to Detective Comics . . . all its rights, title

26    and interest in all copyrights in [the] Superman" newspaper strips created during

27    the preceding five years, "including all renewals and extensions thereof."  (Decl.

28    Toberoff, Ex. A at 5 (Thomson &Thomson copyright report, dated Feb. 29, 1996)).

EXHIBIT C
Page 105

1    During the same time period, the pair produced, under the terms of the

2    employment agreement, Superman material for various comic book magazines

3    published by Detective Comics, first in its serialized magazine Action Comics, then

4    as a stand-alone feature in the self-titled comic book magazine Superman.  The

5    terms contained in the 1938 employment agreement were later altered in a

6    modification agreement entered into between Detective Comics and the artists on

7    December 19, 1939.  In this modification agreement it was noted that, "while both

8    [the artists] have continued to furnish art work and continuity for 'SUPERMAN,' . . .

9    Mr. Shuster no longer furnishes the art work" for the other strips to which the pair

10   were under contract to produce, such as "Slam Bradley" or "Spy."  The parties

11   therefore agreed that, in exchange for Detective Comics being "free to make other

12   arrangements" for "furnishing [the] art work" for these other comics, Siegel and

13   Shuster's compensation for Superman comic book material (which the pair

14   reaffirmed that they would "continue to furnish all [the] art and continuity" thereof)

15   would be increased to $20 per page, and Detective Comics would pay the pair 5%

16   of the net proceeds derived from the commercial exploitation of Superman outside

17   that from comic books and newspaper syndication, and into such other mediums

18   as "radio, motion pictures, [and] the toy and novelty field."  (Decl. Michael

19   Bergman, Ex. A).

20   Detective Comics re-asserted that it had "the unrestricted right to adapt,

21   arrange, change, transpose, add to and otherwise deal with [the Superman] comic

22   strip . . . as [it] in [its] sole discretion . . . deem[ed] necessary."  The agreement

23   further contained Siegel's and Shuster's re-affirmation that Detective Comics was

24   the "sole and exclusive owners of the comic strip entitled 'Superman' . . . and to all

25   rights of reproduction . . . , including but not limited to the fields of magazine or

26   other book publications, newspaper syndication, radio broadcasts, television, [and]

27   motion pictures . . . ."  It was also acknowledged by the pair that Detective Comics

28   held "all right of copyright and all rights to secure copyright registration in respect

EXHIBIT C
Page 106

1   of all such forms of reproduction either in [its] name or others at [its] exclusive

2   option."

3          Not all the Superman comic book material supplied by Siegel and Shuster

4   after the September, 1938, employment agreement was published by Detective

5   Comics, although it remains unclear whether the pair was nonetheless paid for

6   such material.  For instance, plaintiffs have brought to the Court's attention the

7   curious tale of "K-Metal from Krypton."  In August, 1940, Siegel submitted a 26-

8   page script, accompanied by multiple pages of illustrations (mainly pencil

9   drawings, but some that had been inked) created by artists working in Shuster's

10  studio that, in the words of comic writer and historian Mark Waid, "would have . . .

11  radically" altered the then established Superman story line:  Lois Lane learns that

12  Clark Kent is Superman and the two agree to become partners and confidants;

13  the first appearance of the kryptonite concept (referred to in the material as K-

14  Metal derived from meteorite debris from the planet Krypton) and its debilitating

15  effects on Superman's powers; and Superman first learning of his Kryptonian

16  origins.  Although the material was not published when initially submitted by

17  Siegel, upon later being unearthed in DC Comics' library vault in 1988, copies of

18  the material were circulated among the top brass at the company in the hopes of

19  "obtaining Siegel's blessing to have the story re-illustrated and released . . . , but

20  for whatever reason, nothing ever came of it."  (Decl. Marc Toberoff, Ex. BB).

21         Eventually, disputes between Detective Comics and Siegel and Shuster led

22  to the pair leaving the employ of Detective Comics in 1947, ending involvement by

23  this talented pair in the further development of the Superman character.

## II. WORK MADE FOR HIRE UNDER THE 1909 ACT

25         Under the 1976 Act, an author's (or his or her heirs') ability to terminate a

26  prior grant in the copyright to his or her creation does not apply to a "work made

27  for hire" because the copyright in such a creation never belonged to the artist in

28  the first instance to grant; instead, it belonged at the outset to the party that

EXHIBIT C
Page 107

1   commissioned the work. See 17 U.S.C. § 304(c). This absolute bar to

2   termination brings into sharp focus a question that has figured prominently

3   throughout the parties' papers: Whether any of the vast body of Superman

4   material created up to 1943 by Siegel, with either the assistance of Shuster, with

5   the assistance of others, or alone, was a "work made for hire." If so, then plaintiffs

6   (as Siegel's heirs) cannot terminate his grant of the copyright in that material, such

7   a grant being merely a superfluous act that did not alter the pre-existing ownership

8   rights to that copyright. See Playboy Enterprises, Inc. v. Dumas, 53 F.3d 549, 554

9   (2d Cir. 1995) ("Once it is established that a work is made for hire, the hiring party

10   is presumed to be the author of the work").

11        Resolution of the work made for hire nature of this material is controlled by

12   the governing body of law in existence at the time Siegel crafted this Superman

13   material, that is, the 1909 Act and the precedent developed thereunder. See Self-

14   Realization Fellowship v. Ananda Church, 206 F.3d 1322, 1325 (9th Cir. 2000)

15   ("Because all of the copied works were created before 1978, the Copyright Act of

16   1909 governs the validity of the initial copyrights"); Twentieth Century Fox Film

17   Corp. v. Entertainment Distributing, 429 F.3d 869, 876 (9th Cir. 2005) ("We first

18   consider Twentieth Century Fox Parties' infringement claims under the now

19   repealed Copyright Act of 1909 because [the work] was published before the . . .

20   effective date of the 1976 Copyright Act").

21        The 1909 Act provided that, "[i]n the interpretation and construction of this

22   title[,] . . . the word 'author' shall include an employer in the case of works made

23   for hire." 17 U.S.C. § 26 (repealed). "Thus, with respect to works for hire, the

24   employer is legally regarded as the 'author,' as distinguished from the creator of

25   the work, whom Learned Hand referred to as 'the "author" in the colloquial

26   sense.'" Martha Graham Sch. and Dance Foundation, Inc.v Martha Graham

27   Center of Contemporary Dance, Inc., 380 F.3d 624, 634 (2d Cir. 2004). Nowhere,

28   however, did the 1909 Act define what was meant by "work made for hire" or

26

EXHIBIT C
Page 108

1  "employer"; only the consequences flowing from such a designation were spelled

2  out.  The task of giving meaning to these terms was left to the courts.  "Although

3  for most of its life Section 26 was construed to extend work-for-hire status only to

4  traditional employer-employee relationships," by way of demonstration that the

5  work was done within the scope of one's job duties with their employer, "in the late

6  1960s, in limited circumstances, some courts began expanding the definition of

7  'employee' to cover authors outside the traditional employment relationship," to

8  those involving "an independent contractor," but only if it could be shown that "the

9  work was made at the hiring party's 'instance and expense.'"  2 PATRY ON

10  COPYRIGHT § 5:84. [6]

11        However, in 1965, the Ninth Circuit was the first court to utilize the

12  "instance and expense" test to determine whether works created either by

13  independent contractors or employees were ones made for hire. See Lin-Brook

14  Builders Hardware v. Gertler, 352 F.2d 298 (9th Cir. 1965).[7]  Said inclusion was

15  done by the court formulating an across-the-board presumption in favor of finding

16  work-for-hire ownership whenever a work is produced at the "instance and

17  expense" of the hiring party, said presumption only subject to being overcome by

18  evidence that the parties did not intend for such a result:

19                  [W]hen one person engages another, whether as
                    employee or as an independent contractor, to produce
20

21        ───────────────────────
        [6]  Prior to this expansion, invocation of the instance and expense test to
22  independent contractors only resulted in a determination that the commissioned
    party had assigned to the commissioning party the copyright for the initial term,
23  leaving the renewal term in the work with its creator. See Estate of Burne Hogarth
    v. Edgar Rice Burroughs, Inc., 342 F.3d 149, 160 (2d Cir. 2003).
24
          [7]  Plaintiffs object to the across-the-board application of the "instance and
25  expense" test set forth in Lin-Brook for determination of the for-hire status of all
    the works at issue in this case, arguing that at the time the works were created in
26  the late 1930s and early 1940s, the law governing work for hire extended only to
    the traditional employer-employee relationship.  Whatever appeal plaintiffs'
27  argument may otherwise have, it has been rejected by the Ninth Circuit. See
    Twentieth Century, 429 F.3d at 877 (holding that rejection of the retroactive
28  application of Lin-Brook to evaluating works created by independent contractors
    would "overturn forty years of established case law within this circuit").

27

EXHIBIT C
Page 109

1
2
3
4

> a work of an artistic nature, that in the absence of an express contractual reservation of the copyright in the artist, the presumption arises that the mutual intent of the parties is that the title to the copyright shall be in the person at whose instance and expense the work is done.

5   Lin-Brook, 352 F.2d at 300 (noting that the presumption was not overcome

6   because there was no evidence "as to the circumstances or intendment" of the

7   parties); see also Twentieth Century, 429 F.3d at 881 ("[t]he presumption may be

8   rebutted only by evidence that the parties did not intend to create a work-for-hire").

9   The test sought to match the concept of a work made for hire with the purpose of

10  the Copyright Act, that is, to "promote" the creation of "useful Arts." U.S. Const.

11  Art. 1, § 8. As one court explained:  "[T]he law directs its incentives towards the

12  person who initiates, funds and guides the creative activity, namely, the employer,

13  but for whose patronage the creative work would never have been made.

14  Copyright law 'is intended to motivate the creative activity of authors . . . by the

15  provision of a special reward,'" namely, the legal protection afforded to such

16  creative property through copyright. Estate of Hogarth v. Edgar Rice Burroughs,

17  Inc., 62 U.S.P.Q.2d 1301, 1316 (S.D.N.Y. 2002) (quoting Sony Corp v. Universal

18  City Studios, Inc., 464 U.S. 417, 429 (1984)).  Toward that end, the instance and

19  expense test requires the evaluation of three factors: (1) At whose instance the

20  work was prepared; (2) whether the hiring party had the power to accept, reject,

21  modify, or otherwise control the creation of the work; and (3) at whose expense

22  the work was created.  See Twentieth Century, 429 F.3d at 879, 881.

23        The "expense" requirement is met where a "hiring party simply pays an

24  [employee or] independent contractor a sum certain for his or her work." Playboy

25  Enterprises, 53 F.3d at 555.  Such regular, periodic payments of a sum certain

26  bear the hallmark of the wages of an employee required to produce the work in

27  question for his or her employer, and not that of a party who is free to engage with

28  those other than the commissioning party in marketing his or her work.  See

28

EXHIBIT C
Page 110

1    Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc., 375 F.2d 639, 642-43

2    (2d Cir. 1967). "In contrast, where the creator of a work receives royalties as

3    payment, that method of payment generally weighs against finding a work-for-hire

4    relationship." Playboy Enterprises, 53 F.3d at 555; see also Twentieth Century,

5    429 F.3d at 881 (finding that "expense" requirement met when publisher agreed to

6    pay the creator "a lump sum for writing the book, instead of negotiating a royalty

7    deal").

8        Finally, in speaking of the expense in the creation of the work, the focus is

9    not on who bore the costs or expense in physically creating the work itself (the

10   money spent to purchase the paper on which the dialogue and story elements was

11   printed, the typewriter used to put into concrete form the author's concepts of the

12   same, and the pencils and ink needed to draw the illustrations, etc.).  That

13   particular consideration relates to the question of whether "an artist worked as an

14   independent contractor and not as a formal employee," a distinction, as made

15   clear after the Ninth Circuit's decision in Lin-Brook, that has "no bearing on

16   whether the work was made at the hiring party's expense." Playboy Enterprises,

17   53 F.3d at 555.  Instead, the focus is on who bore the risk of the work's

18   profitability.  See Twentieth Century, 429 F.3d at 881 ("there is little doubt that the

19   book was authored at [the publisher's] expense.  [The publisher] took on all the

20   financial risk of the book's success, agreeing to pay [the writer] a lump sum for

21   writing the book, instead of negotiating a royalty deal"); Picture Music, Inc. v.

22   Bourne, Inc., 314 F. Supp. 640, 651 (S.D.N.Y. 1970) (noting that "the fact that the

23   author was obliged to repay advances on royalties which were never accrued is an

24   indication that the relationship was not an employment for hire").

25       The "instance" component of the test inquires into "whether 'the motivating

26   factor in producing the work was the employer who induced the creation.'"

27   Twentieth Century, 429 F.3d at 879; see also Picture Music, Inc. v. Bourne, Inc.,

28   457 F.2d 1213, 1217 (2d Cir. 1972) (concluding that the fact the employer took the

EXHIBIT C
Page 111

1    "initiative in engaging" the author to create the work rendered it as one made for

2    hire). That the commissioning party be the motivating factor is not a "but for" test

3    — that is, but for the artist's employment the work would not have been created —

4    but instead is a more narrow inquiry focused on the nature and scope of the

5    parties' business relationship. As one court explained:

6              No doubt Graham was a self-motivator, and perhaps
                she would have choreographed her dances without the
7              salary of Artistic Director, without the Center's support
                and encouragement, and without the existence of the
8              Center at all, but all that is beside the point. The fact is
                that the Center did employ her to do the work, and she
9              did the work in the course of her regular employment
                with the Center. Where an artist has entered into an
10             explicit employment agreement to create works, works
                that she creates under that agreement cannot be
11             exempted from the work-for-hire doctrine on
                speculation about what she would have accomplished
12             if she had not been so employed.

13                                        . . . .

14             There is no need for the employer to be the
                precipitating force behind each work created by a
15             salaried employee, acting within the scope of her
                regular employment. Many talented people . . . are
16             expected by their employers to produce the sort of
                work for which they were hired, without any need for
17             the employer to suggest any particular project.
                "Instance" is not a term of exclusion as applied to
18             specific works created within the scope of regular
                employment. It may have more significance in
19             determining whether an employee's work somewhat
                beyond such scope has been created at the employer's
20             behest or to serve the employer's interests . . . .

21    Martha Graham Sch., 380 F.3d at 640-41.

22             Thus, "under the 1909 Act[,] a person could be an employee yet create a

23    work 'as a special job assignment, outside the line of the employee's regular

24    duties.' In that event, the work is not a work for hire." Id. at 635 (citing Shapiro

25    Bernstein & Co. v. Jerry Vogel Music Co., 221 F.2d 569, 570 (2d Cir. 1955)). The

26    critical factor is what was the nature of the creator and publisher's business

27    relationship (be it as an employer-employee or an commissioner-independent

28    contractor) at the time of the work's creation, and whether the work in question

30

EXHIBIT C
Page 112

1   falls within the scope of those job duties.  It is for this reason that courts concern

2   themselves with "the degree to which the hiring party had the right to control or

3   supervise the artist's work," as its presence would reflect a circumstance found

4   when the work being created was done so within the confines of the pre-existing

5   employment relationship.  Twentieth Century, 429 F.3d at 879; see also

6   Donaldson, 375 F.2d at 643 (labeling as an "essential element" the "power to

7   direct and supervise the manner in which the writer performs his work"); Picture

8   Music, 314 F. Supp. at 650 ("The existence of an arrangement going beyond an

9   assignor-assignee relationship prior to the undertaking of the particular work.  The

10  antithesis of such an arrangement is a case where an author creates a work of his

11  own volition and then sells it to a proprietor").  Although it is not critical that the

12  commissioning party actually exercise its right of control and supervision in the

13  creation of the work in question, it is necessary that the party have the right to

14  direct, control, or otherwise shape the artist's work.  See Martha Graham Sch.,

15  380 F.3d at 635 ("The right to direct and supervise the manner in which the work

16  is created need never be exercised" (emphasis in original)); Picture Music, 314 F.

17  Supp. at 651 (labeling as "crucial" whether the hiring party had "[t]he right . . . to

18  direct and supervise the manner in which work is performed").

19       Moreover, there are certainly gradations of control a publisher could and

20  may have exerted in the creation of the work, and the greater the extent of such

21  supervision the "more likely it is that the work was created at the commissioning

22  party's instance." Twentieth Century, 429 F.3d at 880.  Thus, a publisher

23  providing suggestions and comments on galleys to a novel, for instance, may

24  move into the realm of that associated with a work made for hire depending on the

25  degree and pervasiveness of said interaction.  Id. (labeling "the degree of in-

26  person supervision was much greater than" what the publisher "usual[ly]" did,

27  including utilizing the services of fact-checker and "regular face-to-face meetings"

28

31

EXHIBIT C
Page 113

1  by the author "with [the publisher's] editorial board" at which the author was

2  "provided . . . with extensive notes and comments").

3  ## III. APPLICATION OF THE WORK FOR HIRE DOCTRINE

4  ## TO THE RELEVANT WORKS

5  There are four major categories of Superman works over which the parties

6  are contesting the work for hire nature:  (A) Superman material created by Siegel

7  before the March 1, 1938, grant (including Action Comics No. 4 and portions of

8  Superman No. 1);[8] (B) Superman comic book material published in the interim

9  period after the March 1, 1938, grant but before the execution of the September

10  22, 1938, employment and syndication agreements (namely, the material

11  appearing in Action Comics Nos. 2-3 and 5-6);[9] (C) the remaining Superman

12  comic book material created by Siegel and Shuster beginning immediately after

13  the execution of the September, 1938, employment and syndication agreements

14  and continuing until the close of the five-year termination window on April 16, 1943

15  (namely, Action Comics Nos. 7-61 and Superman Nos. 1-23); and (D) Superman

16  daily newspaper comic strips published beginning in January, 1939 (under the

17  auspices of the September 22, 1938, syndication agreement) and continuing

18  through April 16, 1943 (the close of the five-year termination window).

19  **A.    Pre-March, 1938, Superman Material (Action Comics No. 4 and**

20  **portions of Superman No. 1)**

21  Beginning with the earliest Superman comic book material, there seems

22  little doubt that any Superman material that Siegel created by himself or with the

23  assistance of others prior to the March 1, 1938, grant, and that was later

24

25  _____

    [8]  The Court previously considered the issue of whether Action Comics No.

26  1 was a work made for hire.  See Siegel, 542 F. Supp. 2d at 1126-28.  Nothing contained in this Order is meant to supersede that Order.

27

    [9]  Although Action Comics No. 4 was published during this period, given

28  that the dialogue thereto was arguably created during the pre-March, 1938, period, the Court will treat its work for hire nature there.

32

EXHIBIT C
Page 114

1   published, is not a work made for hire.  That was a core holding in this Court's

2   March 26, 2008, Order, which itself was built upon the finding the Second Circuit

3   made during the parties 1970s' litigation over the renewal term rights to the

4   Superman copyright.  See Siegel, 542 F. Supp. 2d at 1126-28 ("Accordingly, . . .

5   all the Superman material contained in Action Comics, Vol. 1, is not a work-made-

6   for-hire and therefore is subject to termination."); Siegel, 508 F.2d at 914.

7   Adapting the language from the Second Circuit decision, the Superman material in

8   question had been crafted by the artists years before the relationship between its

9   authors and its ultimate publisher existed.  The creation of this material was not

10   done at the instance and expense of anyone other than the artists themselves.

11        The dispute is thus not with the work for hire nature of this material, but

12   rather over whether any of the following material either contains copyrightable

13   elements or suffers from some other defect preventing termination from occurring:

14   (1) The "future Superman exploits" paragraph written before the publication of

15   Action Comics No. 1; (2) the Superman material found in Action Comics No. 4,

16   which was based on Siegel's 1934 script and the other 1934 material created by

17   Siegel and Keaton; and (3) the first six pages of Superman No. 1.

18        **1.     Paragraph on Superman's Future Exploits**

19        As for the one paragraph concerning future exploits, there is no doubt that

20   the concepts embodied in that paragraph later found concrete expression in some

21   of the earliest Superman material published in Action Comics.  Plaintiffs' counsel,

22   however, would have the Court conclude that, based on this one scant paragraph

23   and its later fuller expression of the concepts contained therein, the Superman

24   materials found in Action Comics Nos. 2, 4, and 5 were created prior to the March

25   1, 1938 grant.  The problem with this argument is that the paragraph itself

26   constitutes mere ideas for future works rather than expressions of those ideas,

27   and thus contains no copyrightable material, which, of course, bars any effort at

28

33

EXHIBIT C
Page 115

1  termination. See 17 U.S.C. § 304(c) (limiting termination to the grant in the

2  "copyright" to a work).

3        "A copyright never extends to the 'idea' of the 'work,' but only to its

4  'expression,' and that no one infringes, unless he descends so far into what is

5  concrete as to invade that 'expression.'" National Comics Publications, Inc. v.

6  Fawcett Publications, Inc., 191 F.2d 594, 600 (2nd Cir. 1951) (L. Hand, J.).  Aside

7  from the addition of a few adjectives, Siegel's one paragraph of future Superman

8  exploits has much more in common with Judge Learned Hand's conception of the

9  general idea of a play about "a riotous knight who kept wassail to the discomfort of

10  the household, or a vain and foppish steward who became amorous of his

11  mistress" than with its concrete expression in the form of Shakespeare's play

12  "Twelfth Night." See Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir.

13  1930).  To turn Judge Hand's phrase, Siegel's one paragraph of future exploits

14  was little more than a generalized description of Superman performing an

15  unelaborated task or heroic feat, the precise details of which were left to be

16  sketched out at a later time, as later occurred, around the time the comic books

17  were published during 1938.[10]  Here, Siegel did little more than sketch the idea of

18  his superhero doing some broad-brushed act, the details being left to be filled in

19  later, as they were when he put the idea into concrete form by writing a script

20  setting down precisely how and why Superman "battles an airplane with his bare

21  hands."  In this sense the one paragraph sets out little more "than the most

22  general statement of what the [comic] is about." Id.  The generalized description

23  Siegel put down to paper concerning Superman's "exploits" did not cross the line

24

25        [10]  For instance, in the story in Action Comics No. 2,  Superman thwarts the

26  efforts of an industrialist war profiteer who is secretly funding both sides in a war in
    a far-off land ("Superman will win a war single-handed"), that leads to Superman

27  battling aircraft ("battle an airplane with his bare hands"), swimming great
    distances in the ocean (he'll swim several hundred miles and think nothing of it"),

28  rescuing Lois Lane from being executed by a firing squad, and ending with the
    industrialist repenting his actions.

EXHIBIT C
Page 116

1   into something to which copyright protection applies and, accordingly, to which no

2   right to termination attaches.

3        **2.    Superman Material Created while Siegel Was Collaborating with**

4        **Keaton**

5        As far as the Superman material created by Siegel during his collaboration

6   with Keaton is concerned, save for one important exception, that material never

7   acquired statutory copyright protection under the 1909 Act, as it was either never

8   published with the requisite notice or registered as an unpublished work.  The

9   termination provisions apply only to a work for which the "copyright [therein was]

10  subsisting in either its first or renewal term on January 1, 1978."  17 U.S.C.

11  § 304(c).  Unless the material had been registered as unpublished works under

12  section 12 to the 1909 Act, copyright protection could be achieved only by

13  publication of the material, before January 1, 1978, bearing the requisite copyright

14  notice.  See Siegel, 496 F. Supp. 2d at 1150; 3 PATRY ON COPYRIGHT § 7:42

15  ("Section 304(c) . . . by its own terms covers only works in either their first or

16  renewal term on January 1, 1978.  The section thus does not cover works that

17  were unpublished" on that date); 3 NIMMER ON COPYRIGHT § 11.02[A][1] at 11-12

18  ("the termination provisions of Section 304(c) apply only if the work in question

19  was the subject of statutory copyright prior to the effective date of the current

20  Act").  There has been no evidence presented that any of the Siegel/Keaton

21  material was registered as an unpublished work under the 1909 Act, nor is there

22  any indication that any portions of the Siegel/Keaton material (other than that

23  appearing in Action Comics No. 4) was ever published with the requisite notice

24  before 1978.  Thus, although not works made for hire, most of the Siegel/Keaton

25  material is not subject to termination.

26       The same, however, cannot be said of the 1934 Superman football story

27  script written by Siegel and sent to Keaton.  Defendants do not dispute that the

28  storyline contained in Action Comics No. 4 published nearly verbatim the entirety

EXHIBIT C
Page 117

1  of the script, as it surely did. See generally Siegel, 496 F.Supp.2d at 1150-51

2  (discussing what was sufficient to demonstrate "publication" of material for

3  purposes of the 1909 Act).

4         Instead, defendants object to the Court's consideration of the script on

5  evidentiary grounds, complaining that the script had never been produced in

6  discovery, that it has not been authenticated, and that plaintiffs have failed to

7  provide the source of the material and how they came into possession of it.

8  (Defs.' Obj. to Pls.' Sept. 22, 2008 ¶ 7).  None of these evidentiary objections are

9  well-taken.  Plaintiffs have submitted declarations evidencing that the script in

10  question was in the possession of Russell Keaton's widow who turned it over,

11  along with other materials, to the family's literary and marketing agent, Denis

12  Kitchen, in 1993.  Mr. Kitchen thereafter on August 21, 2008, posted a comment

13  in response to a blog story titled "Russell Keaton, Superman's Fifth Beatle,"

14  wherein he disclosed that, in addition to the subject of the story (which concerned

15  the illustrated strips, but not the scripts, Siegel and Keaton had created

16  concerning the version of Superman as someone from Earth's future), "there's

17  LOTS more correspondence and scripts."  Plaintiffs' counsel thereafter ran across

18  Kitchen's post while searching the Internet, and after contacting him obtained a

19  copy of the script, which he then promptly produced. (Sept. 23, 2008 Decl.

20  Toberoff; Sept. 23, 2008 Decl. Joanne Siegel; Sept. 29, 2008 Decl. Denis

21  Kitchen).

22         Defendants also apparently argue that plaintiffs should be precluded from

23  acquiring any ownership stake in the artwork found in Action Comics No. 4, as no

24  artwork was contained in Siegel's 1934 script.  As stated in their papers: "Even if

25  accepted in evidence . . . , the allegedly pre-existing continuity pertaining to Action

26  Comics #4 would not signify that the artwork and any new text in this comic book

27  were pre-existing as opposed to being prepared after March 1, 1938 as work for

28  hire." (Defs.' Obj. to Pls.' Sept. 23, 2008, filing ¶ 4).  The record is devoid of any

36

EXHIBIT C
Page 118

1    evidence indicating when the artwork later found in <u>Action Comics</u> No. 4 was

2    created.  However, also missing is what specific legal argument defendants seek

3    raise based on that silence in the record.  For instance, the Court is left to wonder,

4    whether their challenge is based on an assertion that Shuster's artwork appearing

5    in <u>Action Comics</u> No. 4 is a work made for hire on the basis that it was created

6    following the March 1, 1938 grant; or are they asserting that Siegel's script lacks

7    sufficiently originality as to preclude any effort by plaintiffs to recapture the

8    copyright  in the artwork contained in <u>Action Comics</u> No. 4 as part of a joint work;

9    or is it for some other unarticulated reason?  Defendants have had ample time

10   and opportunity to precisely articulate their legal argument flowing from this factual

11   assertion, and they have failed to do so.  The Court has permitted defendants to

12   file four post-hearing briefs related to any of the issues raised at oral argument or

13   in opposing counsel's papers that were filed following the hearing.  Accordingly,

14   being unable to discern the legal basis for defendants' argument, the Court

15   declines to address the significance of defendants' unelaborated observation.

16   <u>See</u> <u>Greenwood v. FAA</u>, 28 F.3d 971, 977 (9th Cir. 1994).

17        This is not to say, however, as plaintiffs would have the Court find, that

18   Siegel writing in 1934 the script ultimately published in <u>Action Comics</u> No. 4 (that

19   was but an expression of one of the ideas found in his "future Superman exploits"

20   paragraph) likewise means that Siegel also wrote the other Superman material

21   that are expressions of these ideas found in that one paragraph (such as that

22   found in <u>Action Comics</u> Nos. 2 and 5) during the same time frame.  There is no

23   evidentiary basis to support such an inference.  The evidence surrounding the

24   1934 football story script gives no indication that, other than the script in question,

25   Siegel had written or planned on writing more Superman scripts.  The one future

26   Superman exploits paragraph itself makes no mention that scripts for the ideas

27   therein had been or were in the process of being crafted by Siegel.  The cover

28   letter Siegel submitted to Keaton with the enclosed football story script likewise

1  contains no indication that Siegel had or was planning on writing more scripts.

2  Rather, the evidence supports the inference that the script was created as a

3  discrete project to woo a prospective publisher.

4    Accordingly, because, as illustrated herein, the material appearing in <u>Action</u>

5  <u>Comics</u> No. 4 is based almost verbatim on Siegel's pre-1938 script, the Court

6  finds that the Superman material appearing therein was not a work made for hire

7  and is subject to termination.

8    **3.**  **<u>Superman No. 1, pages 1-6</u>**

9    This leaves the question of whether the first six pages in <u>Superman</u> No. 1,

10  which in all other respects consist of nothing more than a reprint of the Superman

11  comic from <u>Action Comics</u> Nos. 1-4, contains within it any additional pre-March 1,

12  1938, material.

13    Defendants label as "grossly exaggerated" the notion that the continuity to

14  these first six pages were written by Siegel in 1934. (Defs.' Obj. to Pls.' July 28,

15  2008 Opp. Br. at 13). To this end, defendants point to the fact that Siegel wrote in

16  his memoir, "<u>The Story Behind Superman No. 1</u>," that a Detective Comics' editor,

17  M.C. Gaines, wrote a letter to the pair on March 27, 1939, "specifying in detail

18  [what] the contents of [those] 'first six pages' [should entail], including specific

19  headings and panels." (<u>Id</u>.) It is defendants' factual characterization, not

20  plaintiffs', that exaggerates. The letter referenced by defendants makes clear

21  that it was the first <u>two</u> pages of the six at issue that was created at and the

22  subject of Mr. Gaines editorial direction. Mr. Gaines remarked that insofar as the

23  "first six pages" of <u>Superman</u> No. 1 was concerned, the publisher would like the

24  pair to take the first page from <u>Action Comics</u> No. 1, "and by elaborating on this

25  one page," "work up <u>two</u> introductory pages" for <u>Superman</u> No. 1. (Decl. Marc

26  Toberoff, Ex. GG (emphasis in original)).[11] However, as to pages three through

27  _____

28    [11] Plaintiffs' argument that the first two pages in <u>Superman</u> No. 1 were
                           (continued...)

38

EXHIBIT C
Page 120

1   six in Superman No. 1, there is nothing in Mr. Gaines' letter indicating that the

2   material was created contemporaneously with Superman No. 1's publication in

3   1939. Quite the opposite is true.

4        Specifically, Mr. Steranko's forward to DC Comics' 1989 re-printing of

5   Superman No. 1 recounts the origins of pages three through six as consisting of

6   the first week of material Siegel and Shuster had created in 1935. It had been

7   intended by the artists to be part of Action Comics No. 1, but it was "eliminated" by

8   Detective Comics from inclusion in Action Comics No. 1 in order to make more

9   space available for other comics. Given that no evidence has been submitted to

10  rebut Mr. Steranko's statement (contained in one of defendants' publications, no

11  less), the Court finds that pages three through six of Superman No. 1 is material

12  created by Siegel and Shuster in 1935 and thus was not a work made for hire.[12]

13       Thus, in addition to that set forth in the Court's earlier orders, the

14  uncontroverted evidence establishes that the following works were not works

15  made for hire and are thus subject to termination: Action Comics No. 4 and

16  Superman No. 1, pages three through six.

17

18

19

20  ─────────────────────

21       [11](...continued)
    created before the March 1, 1938, grant is equally unconvincing. Plaintiffs point to
22  various scripts Siegel wrote to Keaton in 1934 to support this claim; however, too
    many discrepancies exist between those scripts and the two published pages in
23  Superman No. 1 to support the conclusion sought by plaintiffs. Moreover, this
    argument is in direct contradiction to Siegel's own account, set forth in his memoir,
24  of the date the first two pages of Superman No. 1 was created, which he places
    squarely in 1939.
25
         [12]  Defendants conclusorily argue that the contents of the story line (but not
26  the illustrations) contained in pages three through six of Superman No. 1 are
    nothing more than "de minimis" elements, to which no copyright would attach.
27  Other than offering this legal conclusion, nowhere have defendant provided any
    specific factual argument directed to what or how this continuity is defective.
28  Defendants have had ample opportunity to elaborate on this argument, but have
    not. Accordingly, the Court declines to consider it.

                                    39

EXHIBIT C
Page 121

1    **B.    Post-March 1, 1938, Superman Comic Book Materials Published Prior**

2    **to September, 1938, Employment Agreement (Material Appearing in**

3    **Action Comics Nos. 2-3 and 5-6)**

4    With respect to the comic books containing Superman material that were

5    published by Detective Comics in the interim period after the March 1, 1938, grant

6    and the September, 30, 1938, employment agreement, namely Action Comics

7    Nos 2-3 and 5-6, defendants' principal argument for why the instance test was met

8    is because Detective Comics was the rights holder in the underlying Superman

9    material contained in Action Comics No. 1 by virtue of the March 1, 1938, grant,

10   and thus its consent was required before any derivative Superman material could

11   be published.  In essence, defendants once again lean heavily on the derivative

12   nature of the work itself to demonstrate they had the right to control its creation.

13   As the Court remarked in resolving the work for hire status of the Superboy script

14   created by Siegel in 1940, the fact that a work is a derivative of another does not

15   automatically translate into it being considered a work for hire or as being

16   produced at the instance of the owner of the pre-existing work; something more is

17   required.  Siegel, 496 F. Supp. 2d at 1142-43.

18   Here, however, there is more than just a naked argument regarding the

19   derivative status of the works in question.  There is correspondence from

20   Detective Comics to Siegel and Shuster noting the publisher's expectation that the

21   pair would continue to generate derivative works of Superman for further

22   publication in its comic book magazines even after the character's initial release in

23   Action Comics No. 1.  In an April 8, 1938, letter, Detective Comics executive J.S.

24   Liebowitz remarked that the company had "loaded [the pair] up with 43 pages a

25   month [said sum including the pair's work on other comic book features for the

26   publisher such as "The Spy" and "Slam Bradley" as well as Superman]," noting

27   that "the success of the magazine is dependent on the type of work done by

28   yourself," and then concluding that he was "looking for your complete cooperation

40

EXHIBIT C
Page 122

1    for our mutual benefit." (Decl. Michael Bergman, Ex. B). Likewise, the January

2    10, 1938, letter from Detective Comics' editor refers to Superman as a "new

3    feature" that could overburden Shuster's time.

4        This correspondence certainly suggests that the Superman material after

5    Action Comics No. 1 was provided pursuant to an implicit agreement between the

6    artists and the publisher to furnish said material on a regular basis for the

7    publisher.  In essence, Detective Comics had already set aside space in its comic

8    book publications to accommodate the artist's Superman material even before the

9    character's first appearance in Action Comics No. 1.  This point is reenforced by

10   the fact that in every succeeding monthly issue of Action Comics for the period in

11   question there appeared a feature of Superman.  Indeed, at trial in the 1947

12   Westchester suit Shuster testified that in accepting Detective Comics' offer, the

13   pair anticipated that they would see Superman's publication in Action Comics.

14   (Decl. Marc Toberoff, Ex. N).  Furthermore, the referee in the 1947 Westchester

15   suit made a factual finding that the artists were regularly paid for the material

16   created during this interim period at the rate of $10 per page.

17       Given this correspondence, the regular appearance of the Superman

18   feature in subsequent publications, and the general understanding of the artists

19   themselves, the evidence leads the Court quite naturally to the conclusion that the

20   creation of the Superman material appearing in Action Comics Nos. 2-3 and 5-6

21   was solicited by and done at the instance of defendants.  See Playboy

22   Enterprises, Inc. v. Dumas,  960 F.Supp. 710, 715 (S.D.N.Y. 1997) (holding that

23   fact that paintings were furnished and published on a regular basis, and that they

24   were described as a "regular feature," "suggest[ed] that the magazine had an

25   implicit agreement with [the painter]" to produce those works, which was, in turn,

26   "persuasive proof of [the publisher's] role" in the works' creation), aff'd without

27   published opinion, 159 F.3d 1347 (2d Cir. 1998).

28

41

EXHIBIT C
Page 123

1    Plaintiffs seek to undermine such an impression by making much of the fact

2    that there was no written agreement between the parties following the March 1,

3    1938, grant wherein Detective Comics specifically commissioned the pair to create

4    subsequent Superman comic book stories.  (Pls.' Opp. at 8 (noting that the March

5    1, 1938 grant "could have but did not provide for the employment of Siegel and

6    Shuster to create subsequent Superman stories")).  In plaintiffs' view, the entire

7    relationship between the parties for this six-month period following the grant is

8    akin to that of a screenwriter submitting a "spec screenplay" to a studio with the

9    hopes that it would be purchased.  (Pls.' Opp. at 5).  Such a characterization of

10    the parties' relationship fails to weave in all aspects of that relationship.

11    Undoubtedly plaintiffs are correct that, in creating this material, there was

12    no guarantee by Detective Comics that it would accept it and thereby pay Siegel

13    and Shuster for their work. The first issue of Superman could have been a

14    commercial flop, leading the publisher to reconsider whether to continue to publish

15    such material or to place the character in the hands of different comic book artists.

16    Because there was no guarantee of success, continuation of the parties' business

17    relationship could have ended abruptly and early, thus placing Siegel and

18    Shuster's role with Detective Comics further afield than under the traditional

19    employee-employer scenario.  That said, the pair's business connection to their

20    "employer" (in the colloquial sense) was much stronger and closer to that of other

21    admitted work for hire scenarios (e.g., an independent contractor) given the nature

22    of the project and the material they were supplying to Detective Comics.  Cf. Self-

23    Realization Fellowship Church, 206 F.3d at 1326-27 (noting that a monk's writings

24    and religious lectures created while the monk was supported by the church was

25    not a work made for hire as the monk had less of a connection to the church than

26    another would have had in a traditional employment setting).

27    To begin, Siegel and Shuster were not simply creating some random work

28    and submitting it to a number of publishers for consideration; the comic book

42

EXHIBIT C
Page 124

1   material was for a character to which the publisher to whom it was submitted

2   owned the pre-existing rights, rendering Siegel and Shuster's material as but a

3   derivative thereof.  Moreover, the material was submitted at the request of

4   Detective Comics.  Again, the letters from Detective Comics' executives in

5   January and April, 1938, indicate that the Superman material first published in

6   Action Comics No. 1 was not intended to be a one-shot deal, but rather was

7   conceived of as an ongoing "new feature" to which sequels would need to be

8   fashioned; hence, the Detective Comics executives' reference in the April 8, 1938,

9   letter to the "43 pages a month" the pair had been "loaded up" with by the

10  publisher, a page computation that included within it the 13-page Superman comic

11  book, and the January, 1938, letter voicing concerns regarding the possibility of

12  placing undesirable constraints on Shuster's time.  Perhaps the best way of

13  envisioning the parties' business relationship at this time was one in which the

14  artists were given a trial period of sorts to see whether their creation would be

15  commercially successful enough to warrant further formal action by the publisher.

16  Thus, the material over this six-month period was not sent on spec to see whether

17  the publisher would like it, but rather was sent as requested for publication in a

18  monthly feature in the hopes that the publisher would eventually decide to formally

19  pick up the feature on a long-term basis.

20          This characterization of the parties' relationship during this period is

21  confirmed by the September, 1938, employment agreement's recital that Siegel

22  and Shuster "have been doing the art work and continuity for us" and that

23  Detective wanted the pair "to continue to do said work and hereby employ and

24  retain you for said purpose."  In essence, the September, 1938 employment

25  agreement formalized what had informally been ongoing beforehand.  That

26  Detective Comics' requests were made on an informal basis before the written

27  agreements were executed does not detract from the fundamental fact that Siegel

28  and Shuster's creation of the derivative Superman material was done at the

43

EXHIBIT C
Page 125

1    request and instance of Detective Comics.  That Detective Comics waited six

2    months before more formally "employing" the pair to "continue" to do just that

3    does not detract from the core point that such production by Siegel and Shuster

4    was again done at the instance of Detective Comics; it simply shows that by that

5    point Superman had so proven itself a commercial success that the publisher

6    desired a more formalized arrangement to be placed down in writing to ensure

7    that the pair would continue to produce such material for it (rather than going on to

8    create other comic book characters for other publishers).

9        When these facts are considered in toto, it is easy to conclude that creation

10   of the works in question lie further along the spectrum from that found in a more

11   traditional employment relationship, as is the case for the comic books created by

12   in-house employees of the publisher.  The lack of any long-term guarantee or

13   commitment by the publisher to the business enterprise itself, however, is not

14   something which is atypical in an independent contractor situation.  That the pair

15   functioned in such a looser employment relationship with the hiring party is not

16   critical.  What is important is the existence of an engagement to create the works,

17   and the level of control and direction the commissioning party thereafter had over

18   creation of the works in question.  And in that regard, the fact that Siegel and

19   Shuster were commissioned by the publisher to create specific material to which

20   the publisher had the statutory right to exert control over its creation, and for which

21   they were paid upon the material's publication, is dispositive as to the instance

22   prong.

23       In short, Detective Comics, as the copyright holder of the pre-existing work,

24   approached the artists and asked that they create works derived from that pre-

25   existing material on a regular basis, and then paid the artists for that derivative

26   work.  As such, the material would fall within the category as a work made for hire.

27   Burroughs, 342 F.3d at 163; Picture Music, 457 F.2d at 1216.  Accordingly, the

28   Court finds that the Superman material in Action Comics Nos. 2-3 and 5-6, which

EXHIBIT C
Page 126

1  were published in the interim period after the March 1, 1938, grant but before the

2  execution of the September 22, 1938, employment agreement were works made

3  for hire.  The Superman material appearing in Action Comics No. 4, although

4  published during this same interim period, was not a work made for hire because it

5  consisted of material created in 1935.  See supra III.A.2.

6  **C.   Post-September, 1938, Superman Comic Book Material (Action**

7  **Comics Nos. 7-61 and Superman Nos. 1-23)**

8       It is clear to the Court that all of the comic book material produced by

9  Siegel and Shuster after they signed the employment agreement with Detective

10  Comics were works made for hire.  The employment agreement makes plain that

11  the pair were specifically "employ[ed] and retain[ed]" by Detective Comics for a

12  period of five years (with an option to extend for an additional five years) to

13  produce, on an ongoing basis, the comic book magazines for certain characters,

14  including Superman, in return for payment of a sum certain upon that materials'

15  publication.  Such an arrangement has all the elements of a relationship leading to

16  the creations of works made for hire.

17       Plaintiffs' argument regarding the "instance" prong of the test centers upon

18  the contention that, although Detective Comics retained a great deal of editorial

19  control over Siegel and Shuster's comic books, it actually exercised very little.

20  That the two were permitted to exercise their creative talents largely, or even

21  exclusively, in the manner they chose is not dispositive of whether the comics

22  were prepared at Detective Comics' instance.  See Martha Graham Sch., 380

23  F.3d at 640-41 ("There is no need for the employer to be the precipitating force

24  behind each work created by a salaried employee, acting within the scope of her

25  regular employment.  Many talented people, whether creative artists or leaders of

26  major corporations, are expected by their employers to produce the sort of work

27  for which they were hired, without any need for the employer to suggest any

28  particular project").  "Complete control over the author's work is not necessary" to

EXHIBIT C
Page 127

Case 2:10-cv-03633-ODW-RZ    Document 77-1    Filed 09/20/10    Page 132 of 185   Page
ID #:5875
Case 2:04-cv-08400-SGL-RZ    Document 560    Filed 08/12/2009    Page 46 of 50

1  meet the instance test,  Twentieth Century, 429 F.3d at 880, all that is required is

2  the right to direct and supervise the manner in which the work is created, and

3  even then, "the right to direct and supervise . . . need never be exercised." Martha

4  Graham Sch., 380 F.3d at 635 (emphasis in original).

5      Here, Detective Comics contractually reserved for itself the right to

6  "reasonably supervise the editorial matter of all features," a right which in some

7  instances it did exercise to provide editorial supervision over that material before it

8  was published, suggesting changes to the art work and the continuity submitted by

9  the pair.  While this supervision perhaps did not rise to the level the publisher in

10  Twentieth Century exercised over the author's manuscript, see 429 F.3d at 880

11  (explaining that "the degree of in-person supervision was much greater than usual,

12  including regular face-to-face meetings between General Eisenhower and

13  Doubleday . . . where the editorial board provided him with extensive notes and

14  comments" as opposed to the normal process of "waiting for the manuscript to be

15  completed, and then discussing possible improvements with the author"), nowhere

16  did the Ninth Circuit suggest that such heightened supervision was necessary to

17  demonstrate that the work was produced at the instance of the publisher.

18      Magnifying the extent of Detective Comics' right to control the Superman

19  comic books' creation is the fact that it was also the holder of the underlying

20  material from which the later Superman comic books were derived.  The fact that

21  Detective Comics approached Siegel and Shuster and, in a written agreement,

22  specifically engaged (and paid) for them to create comic book material derived

23  from the underlying Superman material it already owned, lends strong support to

24  the conclusion that said comic books were made at its instance.  See Burroughs,

25  342 F.3d at 163; Picture Music, 457 F.2d at 1217; Siegel, 496 F. Supp. 2d at 1143

26  ("It was these additional elements of requesting and paying for specific derivative

27  works that served to demonstrate that the creation of the derivative work was at

28  the instance of the commissioning party").

46

EXHIBIT C
Page 128

1       In this respect, the circumstances of this case are not all that different from

2    those in Martha Graham School.  Before being hired by a dance center, the artist

3    had created/choreographed various dances.  Later she was hired as the artistic

4    director (receiving a regular salary) for the dance center and charged with

5    choreographing new dances, which she did to great success.  In her position as

6    director of the dance center, the artist had nearly free reign in the type and

7    manner of the dances she created.  Nonetheless, the Second Circuit held that,

8    because the works in question fell specifically within the class of duties for which

9    the artist was hired to perform (the creation of dances), those works were made

10    for hire.  This case is no different.  Siegel and Shuster were undisputedly charged

11    after September 22, 1938, with supplying Detective Comics "each and every

12    month" the comic book material for Superman.  The works in question fall

13    precisely into the duties the employment contract called on Siegel and Shuster to

14    perform, thus meeting the "instance" prong of the work made for hire test.

15       As for the "expense" prong, the plaintiffs argue that the contingent nature of

16    Detective Comic's obligation to make payment for the material created (upon its

17    acceptance for publication), coupled with the fact that Siegel and Shuster had to

18    bear up-front costs (in more of an independent contractor role than a traditional

19    employee), negates this element.  This method of payment, plaintiffs argue,

20    renders the present case distinguishable from other "sum certain" cases where

21    the artist were paid regardless of whether their work was accepted for publication.

22    However, plaintiffs have failed to present evidence that Siegel and Shuster were

23    not, in any given instance, paid for their work.  Although there is evidence that at

24    least one of the works produced by Siegel and Shuster, "K-Metal from Krypton,"

25    was not accepted for publication by Detective Comics, nowhere have plaintiffs

26    pointed to any direct evidence indicating that the pair were not paid for this

27    rejected submission.  Plaintiffs speculate, rather than substantiate, this point.

28

47

EXHIBIT C
Page 129

1    Plaintiffs attempt to fill this vacuum by pointing to declarations from comic
2    book historians who state that the industry practice at the time was for artists only
3    to be "paid for pages actually delivered by them and eventually published by" the
4    comic book publisher.  (Pls' Opp. at 20).  As the Court noted previously, appeals
5    to expert opinion of industry custom and practice are of "dubious evidentiary
6    value" owing to the fact that the expert in question is not venturing any opinion as
7    to what actually occurred with respect to the specific business relationship
8    between Detective Comics and Siegel and Shuster.  Siegel, 542 F.Supp.2d at
9    1130.
10    Moreover, the language in the parties' December, 1939, modification
11    agreement creates the strong inference that Shuster had been paid by Detective
12    Comics for all or a portion of that prior year's artwork for comic strips (other than
13    Superman) that he did not supply.  Furthermore, as disclosed in the 1947
14    Westchester action, Detective Comics decided near the end of the five-year
15    period in question to pay Siegel and Shuster for Superman material that neither
16    had contributed in creating.  See Siegel, 496 F.Supp.2d at 1138.  These instances
17    of payment for material not created by the artists establishes that the parties'
18    business relationship was anything but that fitting within the industry norm of
19    which the experts opine.  It also demonstrates that, despite plaintiffs' appeal to the
20    "possibilities" of payment given the contractual terms, the parties' actual business
21    relationship belied those terms.  In the end, the parties' actual pattern and practice
22    under the terms of the agreement speaks louder on the expense prong of the
23    work for hire question than such textual contingencies; all the Court has been
24    presented with in this regard are appeals to such possibilities and contingencies
25    that could, but for which there is no evidence ever did, take place.
26    Plaintiffs also emphasize all the costs, expenses, and overhead Siegel and
27    Shuster incurred in running their own artists' studio (payments to assistants,
28    payment of rent, purchasing art tools and supplies, etc.,) in producing the material

EXHIBIT C
Page 130

1  they then supplied to Detective Comics, as demonstrating that the expense prong

2  has not been met.  In the end, this evidence suggests that the artists' relationship

3  with Detective Comics, even when under contract to produce the material in

4  question, was more distant from that of traditional employees and closer to that of

5  independent contractors; however, as noted above, the instance and expense test

6  under the 1909 Act also applied to independent contractors.  See Siegel, 496 F.

7  Supp. 2d at 1138 ("[C]ourts employing the instance and expense test have

8  discounted reliance on the circumstances and the cost borne for the production of

9  the work.  Such consideration relates to the question of whether 'an artist worked

10  as an independent contractor and not as a formal employee,' a distinction that has

11  'no bearing on whether the work was made at the hiring party's expense.'")

12  (quoting Playboy Enterprises, 53 F.3d at 555)).  The "expense" prong of the test is

13  therefore met.

14        Accordingly, applying the "instance and expense test," the undisputed

15  evidence establishes that the Superman materials created by Siegel and Shuster

16  during the term of their employment agreement (namely, Action Comics Nos. 7-

17  61, and to Superman Nos. 1-23) were works made for hire.[13]

18  **D.    Superman Newspaper Strips Published from 1939 to 1943**

19        This leaves the last and most difficult category — the newspaper strips for

20  the period 1939 to 1943 — which the Court further subdivides into two categories:

21  (1) the two weeks' worth of newspaper strip material Siegel and Shuster created

22  before the syndication agreement was executed and (2) the remaining newspaper

23  strips the pair created thereafter under the aegis of that agreement.  Because the

24  Court's ruling regarding the first two weeks' worth of newspaper strips implicates

25  more far-reaching issues, which are discussed in subsequent sections, the two

26

27        [13]  The material appearing on pages three through six of Superman No. 1 is

28  the single exception to this conclusion.  See supra section III.A.3 (holding that these pages were not works for hire).

1   sub-categories are addressed in reverse chronological order.  However, before

2   the Court may address the work for hire aspect of the newspaper strip materials, it

3   is necessary to discuss the significance of McClure's role in the September 22,

4   1938, agreements.

5       The complexity of the work for hire question on this last category of material

6   is due in large measure to the added dimension of McClure's presence in the

7   newspaper syndication endeavor, which altered and rearranged Detective Comics'

8   and the artists' then-existing business relationship.  To be sure, McClure has

9   served as the proverbial elephant in the room in this case, an elephant whose

10  significant impact on the business relationship created through the September 22,

11  1938, employment agreement and newspaper syndication agreement both sides

12  have sought to either ignore or diminish.  Defendants seek to relegate McClure to

13  the role of a mere licensee of the newspaper strips for which it owned nothing, lest

14  the material be injected into the public domain because McClure's listing itself as

15  the proprietor in the copyright notice and registration would arguably violate the

16  prohibition on divisibility of copyright in the 1909 Act.[14]  For their part, plaintiffs

17  _____

18      [14] As noted by Professor Nimmer, under the 1909 Act, "it was inferred" by
    the courts that because the 1909 Act "referred in the singular to the 'copyright

19  proprietor' . . . the bundle of rights which accrued to a copyright owner," such as
    the right to reproduce the material on the stage or in books, "were 'indivisible, 'that

20  is, incapable of assignment in parts." 3 NIMMER ON COPYRIGHTS § 10.01[A] at 10-
    5.  Absent the complete assignment of rights commanded by the copyright, the

21  transfer was considered to be a license, with the transferor maintaining ownership
    in all the rights to the copyright in the material. Id. Given this, any publication of

22  the material by the transferee was required to contain a copyright notice in the
    name of the copyright owner (that is, the transferor); other actions, such as the

23  transferee's publication of the material carrying a notice only in its name, would
    result in publication without proper notice, thereby injecting the material into the

24  public domain. 3 NIMMER ON COPYRIGHTS § 10.01[C][2] at 10-12 to 10-13.  In light
    of the rapid development of different forms of media in which material could be

25  reproduced, pressure began to build against continued adherence to the doctrine
    of indivisibility, resulting in the creation of various judge-made exceptions to its

26  application. Id. at 10-6 to 10-7.  One such exception crafted by some courts was
    conceptualizing "such rights" conveyed as being "held in trust for the benefit of

27  the" transferor but with "legal title" resting in the name of the transferee thereby
    allowing for the publication with notice thereto in the name of the transferee. Id. at

28  10-13 to 10-14; see also Runge v. Lee, 441 F.2d 579 (9th Cir. 1971). As

                                                    (continued...)

                                        50

EXHIBIT C
Page 132

1  contend that, in light of defendants' concession, McClure's role as a prospective

2  hiring party for a work made for hire may be ignored, but thereafter structure their

3  analysis of the relevant agreements to reach their desired conclusion that the

4  creation of the newspaper strips enured solely (and was so intended to enure

5  solely) to McClure's benefit.  Such an analysis is favored by plaintiffs because it

6  seemingly forecloses a conclusion that the newspaper strips were made at

7  Detective Comics' instance and expense.

8       Although each side frames the issue differently, both do so in a manner

9  that limits the analysis of the work for hire issue to the artists and Detective

10  Comics.  (Pls.' Opp. to Defs.' Sur-Reply at 6; Defs.' Reply at 9 n.8).  However

11  tempting it is to follow suit, the Court cannot so easily unburden itself from

12  confronting the relevant evidence in the record and is instead tasked with

13  attempting to give legal meaning to that evidence.

14       In determining the significance of McClure's role, the Court does not write

15  on an empty slate.  The significance from a copyright perspective of the terms in

16  these very agreements was previously litigated and adjudicated by the courts, a

17  fact which neither party brought to the Court's attention in their briefs, at oral

18  argument, or in the numerous unsolicited post-hearing briefs submitted.

19       In 1941, Detective Comics filed suit against Fawcett Publications, alleging

20  that Fawcett's comic book character Captain Marvel, a character who possessed

21  super strength and super speed, who wore a skin-tight costume with a cape, and

22  who hid his superhero identity by way of a radio-reporter alter ego, infringed the

23  copyright to Superman.  Thus began a twelve-year legal battle.  As a defense to

24  the action, Fawcett argued that the copyright to Superman had entered the public

25  domain due to asserted defects in the manner and form in which McClure had

26  _____

27  [14](...continued)
Professor Nimmer observed, such judge-made exceptions effectively

28  "administered a death blow" to the doctrine "even under the 1909 Act." 3 NIMMER ON COPYRIGHT § 10.01[B] at 10-9.

51

EXHIBIT C
Page 133

1  affixed copyright notices on the publications of the Superman newspaper strips.

2  See National Comics Publications, Inc. v. Fawcett Publications, Inc., 93 F. Supp.

3  349, 356 (S.D.N.Y. 1950) (cataloguing the various forms to which McClure affixed,

4  or in some cases did not even attempt to affix, a copyright notice for the

5  newspaper strips).  Detective Comics' response was that it could not be charged

6  with any defects in the copyright notice as those "were errors and omissions of

7  McClure, by which it is not bound, for McClure was merely a licensee, and a

8  licensee cannot relinquish or abandon the rights of his licensor." Id. at 357.  Thus,

9  the relationship of the parties to one another in the 1938 newspaper syndication

10  agreement vis-à-vis ownership of the copyrights to the Superman newspaper

11  strips assumed critical importance in resolving the case. See Detective Comics,

12  Inc. v. Fawcett Publications, Inc., 4 F.R.D. 237, 239 (S.D.N.Y. 1944) (noting that

13  Fawcett's defense would render "the status of McClure, insofar as 'Superman' is

14  concerned, and the validity of its copyrights relating thereto, . . . a material

15  inquiry").[15]

16       At trial, the district court rejected Detective Comics' argument that McClure

17  was merely a licensee.  Instead, the district court determined that the arrangement

18  put in place by the newspaper syndication agreement was in the nature of a joint

19  venture. See Fawcett Publications, 93 F. Supp. at 357 ("I think that this

20  contention is unsound, as the agreement with McClure was not a mere license to

21  use the strips but an agreement of joint adventure").  As explained by the district

22  court:

23              The agreement with McClure contains all the
        elements of a joint adventure.  The subject matter of
24        the joint enterprise was the use of the "Superman"
        strips for the sole purpose of newspaper syndication.
25        The artists agreed to create and draw the strips,
        Detective agreed to pay them for their work and to
26        furnish the strips to McClure, and McClure agreed to

27  _____

28       [15] When Detective Comics later merged into and became National Comics
    Publications, Inc., the latter was substituted as plaintiff.

52

EXHIBIT C
Page 134

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> sell the strips to newspapers. Both the artists and Detective agreed to cooperate with McClure. The proceeds of the sales (there could be no losses) were to be divided between Detective and McClure.

Id. The district court held that McClure took a valid copyright to the newspaper strips, but not because it was an "author, . . . proprietor, . . . [or] an assign"; rather, the district court held that the agreement's provision permitting McClure to copyright the strips in its name (which later reverted to Detective Comics) was a permissible manner by which a valid copyright could be taken. Id. at 358.

In light of this finding, the district court determined that "the errors and omissions of McClure" were indeed "chargeable to Detective," observing that "the rights and obligations of joint adventurers are substantially those of partners, and each participant in a joint adventure is an agent for the other." Id. The district court thereafter found that "with few exceptions," the newspaper strips were published without proper copyright notices and therefore the copyrights in the material for the same were abandoned into the public domain. Id.

On appeal, the Second Circuit, in a decision by none other than Judge Learned Hand, reversed and remanded. At the outset, the court noted that although characterizing the parties' agreement as one of joint venture would have "the same effect upon the copyrights in suit as though McClure were the proprietor," it found it unnecessary to decide whether that characterization was correct (although not without Judge Hand making the astute observation that the entire concept of joint venture is "one of the most obscure and unsatisfactory of legal concepts") as it concluded that "McClure was indeed the 'proprietor' of the copyrights" in the Superman newspaper strips and not a licensee of the same.[16]

---

[16] It was noted, however, that insofar as McClure simply borrowed existing Superman comic book material published previously by Detective Comics and then reprinted it for newspaper syndication then "at best 'McClure' could have become no more than a licensee." Id. at 600. McClure's copyright proprietor position with respect to the newspaper strips was for that material "which were produced and published under the contract of September, 1938." Id. at 601.

(continued...)

53

EXHIBIT C
Page 135

1    National Comics Publications, Inc. v. Fawcett Publications, Inc., 191 F.2d 594, 599

2    (2d Cir. 1951) ("We agree with the result, but because we think that 'McClure' was

3    indeed the 'proprietor' of the copyrights, and for that reason we do not find it

4    necessary to decide whether the contract constituted a 'joint venture'"). Thus, as

5    a matter of copyright law, the acts and omissions of McClure vis-à-vis the

6    copyright notices affixed to the material when it was published were chargeable to

7    Detective Comics.

8         Judge Hand noted that his conclusion was compelled by both the statute

9    and from construing the parties' intent as revealed in the agreements. Only if

10   McClure was determined to be a "proprietor" could its publication of the

11   newspaper strips be done in such a manner that would secure copyright

12   protection under the 1909 Act. Id. ("it is only on the assumption that 'McClure'

13   was the 'proprietor' of the 'work' — i.e., of the 'strips' prepared by the 'Artists'

14   under the contract — that any valid copyrights could be secured by publication in

15   the 'syndicated' newspapers"). Under Section 9, only "author[s] or proprietor[s]"

16   were entitled copyright a work; section 10 provided that an author or proprietor

17   could obtain copyright "by publication" with the "required" notice affixed; and

18   section 19 detailed the required contents of that notice. Thus, unless "McClure

19   was a 'proprietor' of the 'strips' the purpose of the parties to copyright them was

20   defeated," a result to be avoided if it is possible to construe the words of the

21   agreement to effectuate that purpose. Id.

22        Judge Hand found that the text of the syndication agreement compelled

23   such a construction. Id. ("we say that the text [of the agreement] itself comports

24

25        [16](...continued)

26   Nowhere have the parties in the instant case sought to delineate which of the
     strips (outside the first two weeks of strips, which no one suggests was borrowed

27   material) fall into these respective categories. Given the Court's ultimate
     disposition of the work for hire nature of the newspaper material produced after

28   the September, 1938, agreement is concerned, the Court declines to address this
     issue.

54

EXHIBIT C
Page 136

1   only with the conclusion that 'McClure' was to be the 'proprietor'"). Toward that

2   end, the agreement was read as in effect placing ownership of the copyright with

3   McClure to be held in trust for its intended beneficiary — Detective Comics. As

4   Judge Hand ably explained:

5           [T]he "material" — the "strips" — is to be
        copyrighted in 'McClure's' name, but the copyright
6       "reverts to Detective at the termination of this contract."
        That necessarily meant that, until the contract came to
7       an end, "McClure" was to have the "title" to the
        copyrights, for property cannot "revert" from one
8       person to another unless the person from whom it
        "reverts" holds title to it.  Even though he holds it in
9       trust, its fate depends upon his acts, not upon his
        beneficiary's.  The sentence which immediately follows
10      reinforces this conclusion; it reads: "The title
        'Superman' shall always remain the property of
11      Detective."  That disclosed a plainly deliberate
        distinction between the word, "Superman," used as a
12      "title," and the "works" which were to be produced in
        the future and published by "McClure" in the
13      "syndicated newspapers":  the title was to remain
        "Detective's" "property"; the copyrights were only in the
14      future to become its "property."  In final confirmation of
        this interpretation is the clause in which "McClure"
15      assumed "to provide Detective with all the original
        drawings . . . so that said drawings may be used by
16      Detective in the publication 'Action Comics' six months
        after newspaper release."  That is the language of a
17      "proprietor," who assumes power to license another to
        copy the "works."  Since for these reasons "McClure"
18      became the "proprietor" of any copyrights upon "strips"
        published under the contract, in so far as it failed to
19      affix the "required" notices upon the first publication of
        a "strip," and upon each copy published thereafter, the
20      "work" fell into the public domain.

21  Id.

22          As a result of this conclusion, Judge Hand determined that insofar as

23  McClure sent out "mats" to newspapers without any notice at all for the strips, the

24  copyrights in those strips were indeed lost to the public domain.  Id. at 601.  The

25  matter was remanded to the district court to conduct a new trial, in light of the

26  court's narrowing of the class of strips that could be considered abandoned, on

27  whether any newspaper strips placed at issue were validly copyrighted, and, if so,

28  whether Fawcett's Captain Marvel character infringed the copyright contained

55

EXHIBIT C
Page 137

1   therein.  See National Comics Publication, Inc. v. Fawcett Publications, Inc., 198

2   F.2d 927 (2d Cir. 1952).  Thereafter, the parties settled their dispute.

3           Accordingly, defendants' characterization of McClure as nothing more than

4   a mere "licensee" of the newspaper strips with no legal title to the copyright in

5   question was raised and rejected by the Fawcett decision.  Defendants are bound

6   by that judgment.

7           Applying Fawcett to the terms in the syndication agreement, the Court finds

8   that, in essence, McClure and/or Siegel and Shuster (depending on whether the

9   work was made for hire) obtained a grant (the "permission" noted in the

10  agreement) from Detective Comics to the newspaper rights in the underlying, pre-

11  existing Superman material; that permission was provided so that the both could

12  engage in the creation of a separably copyrightable derivative work (the

13  newspaper "strips" referenced by Judge Hand of which McClure was the

14  "proprietor") based on said pre-existing material owned by Detective Comics.

15          In this sense, discussion of divisibility is misplaced.  As Professor Nimmer

16  has noted by way of illustration strikingly similar to the circumstances presented in

17  this case, even under the 1909 Act a party could hold the separate copyright

18  contained in a derivative work, the pre-existing material of which was owned by a

19  third party, without transgressing notions of indivisibility:

20                      [T]he producer of a motion picture . . . is
            undoubtedly the proprietor of the copyright in the
21          resulting film.  The film itself may be a derivative work
            based for example upon a novel.  In order that the
22          [film] not constitute an infringement of the novel the
            producer must obtain a grant of "motion picture rights"
23          in the novel.  However, because he was the proprietor
            of the final film did not under the 1909 Act render him
24          the "proprietor" of the motion picture rights [in the
            novel].  He was the licensee of the motion picture rights
25          in the novel but the proprietor of the derivative work
            motion picture.
26

27  3 NIMMER ON COPYRIGHT § 10.01[B] at 10-9 n.30.  The same holds here.  McClure

28  was the licensee of the "newspaper right" in the underlying Superman copyright

EXHIBIT C
Page 138

1    held by Detective Comics, but was an owner of the copyright in any of the new

2    material found in the derivative newspaper strips.

3        Therefore, McClure's position as a "proprietor" and holder of legal title to

4    the separate copyright in these derivative newspaper "strips" renders it

5    conceivable that the creation of those strips were made at its "instance and

6    expense" (and thus a work for hire).[17] Thus, as alluded to earlier, although

7    plaintiffs would prefer otherwise, the Court cannot escape consideration of the

8    issue of whether the newspaper strips were works made for hire for McClure

9    (rather than Detective Comics).

10        **1.    Post-September,1938, Newspaper Strips**

11        In order to evaluate whether the post-September, 1938, newspaper strips

12    were made for hire, the Court first considers how the terms in the agreements

13    themselves should be construed as a matter of contract law.  Plaintiffs urge the

14    Court to look at the terms in each agreement separate and apart from those

15    contained in the companion agreement, treating the two agreements as standing

16    alone as separate business deals.  Defendants characterize the agreements as

17    but sub-parts in a "total transaction" such that the terms contained therein "run

18    together because this whole thing is one business."  In defendants view, McClure

19    was "just the . . . agent or the syndication arm of [an] arrangement" that "centered

20    around Detective" Comics, and thus the terms in the agreements should be

21    construed in conjunction with and as applying to those in the other agreement.

22        The Court finds both characterizations partly accurate.  The terms in each

23    agreement do overlap with, make reference to, and fill gaps in the other.

24

25        [17]  "[T]he term 'proprietor' [was] used by the 1909 Act and case-law under it

26    to refer" not only to those who are owners by assignment, but also "to employers who induce the creation of a work made for hire and thus own the copyright in it."

27    Burroughs, 62 U.S.P.Q.2d at 1320 (citing Shapiro, Bernstein & Co. v. Bryan, 123 F.2d 697, 700 (2d Cir. 1941) ("[W]hen the employer has become the proprietor of

28    the original copyright because it was made by an employee 'for hire,' the right of renewal goes with it, unlike an assignment")).

EXHIBIT C
Page 139

1   However, there are areas in each agreement which are self-contained and

2   unaffected by terms contained in the other agreement.

3        The employment agreement, for instance, bolsters the provision in the

4   newspaper syndication agreement wherein the artists agreed "to maintain [the

5   newspaper strips they submitted] at the standard shown in the sample submitted"

6   by containing a provision within it that requires the artists to "properly perform the

7   terms" in the newspaper syndication agreement.  Likewise, the employment

8   agreement fills in the blanks from the newspaper syndication agreement as to how

9   and in what manner the artists would be compensated.  The employment

10  agreement also added a further dimension to a term in the syndication agreement

11  by describing how the artists will be paid if, under the syndication agreement,

12  Detective Comics later used the newspaper strips in its comic books (paying the

13  artists at their normal "page rate less the percentage which McClure receives for

14  said syndication").  Similarly, the newspaper syndication agreement expressly

15  notes that payment for the artists' work would be addressed in the employment

16  agreement.

17       In contrast, the self-contained aspects of the agreements are best

18  illustrated by those relating to the hiring parties' contractual right to control and

19  supervise the creation of the material crafted by the artists.  Thus, for instance, the

20  employment agreement provided Detective Comics a contractual right (as

21  opposed to right to control inherent in fact that material was derivative of that to

22  which Detective Comics held the rights to the underlying work) to control or

23  supervise creation of "features."  It is clear in reading the employment agreement

24  that when it used the term "features" it did so solely in reference to the artists'

25  production of a comic book, describing the same as a "monthly feature," "monthly

26  magazine," or "magazine." In contrast, when the employment agreement made

27  reference to the artists' production of newspaper strips it employed terms such as

28  "newspaper strips," "McClure Newspaper Syndication strip," "material furnished for

58

EXHIBIT C
Page 140

1   syndicate purposes," and "syndicate matter."  Just as importantly, in the one

2   paragraph in the employment agreement that prohibited the artists from exploiting

3   Superman with anyone else save Detective Comics and McClure, the agreement

4   separately identifies each class of works rather than through use of defendants'

5   purported global term "feature."  (See Decl. Marc Toberoff, Ex. P ("You agree that

6   you will not hereinafter at any place . . . furnish to any other person, firm,

7   corporation, newspaper or magazine any art or copy for any comics to be used in

8   any strip or comic or newspaper or magazine containing [Superman]")).

9        In applying the "instance and expense" test, the crucial question for the

10  Court is how Siegel and Shuster fit into the scheme devised by the publisher and

11  the newspaper syndicator.[18]

12       The Court begins with evaluating the expense element, which is made

13  more complicated due to the method by which the pair were paid for the strips in

14  question.  Rather than being paid a salary or a sum certain for the newspaper

15  strips, the artists were paid only a percentage of any "net proceeds" that their

16  strips generated, that is, a royalty payment.  Generally, this manner of payment

17  tends to rebut the notion that the newspaper strips were made for hire.  See

18  Martha Graham Sch., 380 F.3d at 641 (noting that "evidence that Graham

19  personally received royalties for her dances . . . may rebut[]" the notion that the

20  dances were made for hire); Playboy Enterprises, 53 F.3d at 555 ("in contrast,

21  where the creator of a work receives royalties as payment, that method of

22  payment generally weighs against finding a work-for-hire relationship"); Twentieth

23  Century, 429 F.3d at 881 (finding that expense requirement met when publisher

24  agreed to pay the author "a lump sum for writing the book, instead of negotiating a

25  _____

26  [18] Fawcett left unanswered the question of how McClure acquired
    ownership of the copyright in these derivative newspaper strips.  Was it acquired
27  by assignment from the artists or by their creation of the material as a work for
    hire?  Or was it acquired through an assignment from Detective Comics, who
28  initially owned the copyright in the works at their inception as works made for hire?
    For the Court's purposes, this distinction is not of particular importance.

EXHIBIT C
Page 141

1  royalty deal"); 2 PATRY ON COPYRIGHT § 5:61 ("Where payment is solely by

2  royalties, this fact weighs against an employment relationship").

3      The fact that payment of a sum certain might be forthcoming to the pair for

4  their work six months later if Detective Comics decided to reprint those newspaper

5  strips in its comic books does not detract from the fundamental nature of the

6  transaction as being geared toward a profit-sharing arrangement as the principal

7  method of compensation for all involved.  Moreover, defendants have not offered

8  any evidence to show whether or to what extent Detective Comics actually

9  exercised this option to reprint the newspaper strips, thus obligating Detective

10  Comics to pay Siegel and Shuster a sum certain for those works.

11      Indeed, the ongoing and extent of the financial risk assumed by Siegel and

12  Shuster with regards to the newspaper strips was significantly higher than they

13  had borne in any of their other business dealings involving Superman.  With

14  respect to the comic book strips, any financial risk assumed by the pair for the

15  expenses incurred in creating the material would be quickly ameliorated by the

16  publisher's decision to publish or not (a process taking only a matter of days or

17  perhaps weeks).  With respect to the newspaper strips, in contrast, such

18  expenses could be borne for months or even longer depending entirely on the

19  material's commercial success.

20      Admittedly, questions concerning the particular method of payment for the

21  work have lessened in importance over the years in determining whether it was

22  one made for hire.  As Patry has written in his treatise, "[b]oth the Second and

23  Ninth Circuits have taken a nuanced look at compensation," allowing courts to turn

24  aside or otherwise diminish the importance that receipt of payment was in

25  royalties has insofar as whether something was a work for hire.  2 PATRY ON

26  COPYRIGHT § 5:61 (citing Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136,

27  1142 (9th Cir. 2003) ("That some royalties were agreed upon in addition to this

28  sum is not sufficient to overcome the great weight of the contractual evidence

60

EXHIBIT C
Page 142

1  indicating a work-for-hire relationship") and <u>Playboy Enterprises</u>, 53 F.3d at 555

2  (wherein the court observed that royalty payments are not conclusive)).

3       Diminishing the importance of this evolution, however, is the fact that, in

4  nearly all of these cases, the authors of the works in question were paid a salary

5  or some other sum certain in addition to the receipt of royalties.  <u>See</u> <u>Estate of</u>

6  <u>Hogarth</u>, 62 U.S.P.Q.2d at 1317 ("Where, as here, the creator receives both a

7  fixed sum <u>and</u> royalties, the fact that the creator received a fixed sum is sufficient

8  to meet the requirement that the works be made at the employer's expense");

9  <u>Warren</u>, 328 F.3d at 1142 (creator received a fixed sum in addition to royalties).

10 Here, Siegel and Shuster were paid only royalties.  Such a financial arrangement,

11 especially when viewed through the realities of the parties' relationship, places this

12 case on the outer edges of the work for hire doctrine.

13      There are, however, other features present related to the works creation

14 (factors centered on the instance prong) that go to the core of what is envisioned

15 by a work made for hire relationship.  Clearly, Siegel and Shuster were engaged

16 (however viewed, by McClure or by Detective Comics, or by both) to create the

17 material.  They were clearly done at the instance of <u>either</u> McClure or Detective

18 Comics.  The syndication agreement (reinforced by the employment agreement)

19 tasked the pair as part of their job duties with the creation of the works in question.

20 Siegel and Shuster could be replaced if they did not submit their work on time.

21 Just as critically, the right to control the process in creating the work was doubly

22 reinforced between the pair's employers:  McClure possessed the contractual right

23 to supervise the artists' work (which it in fact exercised for a period of time) and

24 Detective Comics possessed the additional right to supervise and control the work

25 as the rights holder of the pre-existing Superman material utilized in the creation

26 of the derivative newspaper strips.  This engagement to create and this right of

27

28

61

EXHIBIT C
Page 143

1  control over the artist's creation of the work is not indicative of a joint venture with

2  the artists; rather, it is reflective of a more traditional employment engagement.[19]

3      In essence, read together, the syndication agreement and employment

4  agreement is suggestive of a loaned employee arrangement (although the

5  "employees" were more accurately viewed as independent contractors). See 2

6  PATRY ON COPYRIGHT § 5:79 n.1. Detective Comics retained a measure of control

7  over the artists; McClure retained control over the works those artists created and

8  that it intended to exploit for the benefit of Detective Comics, McClure, and the

9  artists themselves. However those duties were conceived and to whomever they

10  were owed, the fundamental point remains that the instance in creating those

11  newspaper strips rested with someone other than Siegel and Shuster.

12      In this respect, the Second Circuit's decision in Picture Music, which

13  applied the instance and expense test,[20] is eerily similar to the facts presented

14  here.[21] There, the issue presented was whether the adaptation of the musical

15  score, "Who's Afraid of the Big Bad Wolf," from the Walt Disney cartoon, "The

16  Three Little Pigs," into a song was a work made for hire.

17      Walt Disney and Irving Berlin, Inc. (apparently the author of the musical

18  score), believed that the score from the movie could be made into a popular song.

19  ———————————

20      [19] Moreover, the arrangement lacks some of the key elements for a joint
venture to be found under New York law: A sharing of some degree of control

21  over the venture and a sharing of the losses (as well as the profits) from the
venture. See Itel Containers Intern. Corp. v. Atlanttrafik Exp. Service Ltd., 909

22  F.2d 698, 701 (2d Cir. 1990) (setting forth test under New York law for joint
venture); Dinaco Inc., v. Time Warner, Inc., 346 F.3d 64, 68 (2d Cir. 2003)

23  (holding for a joint venture the parties "must submit to the burden of making good
the losses" of others to the venture); In re PCH Associates, 949 F.2d 585, 602 (2d

24  Cir.1991) (right to inspect books and records not sufficient control for purposes of
establishing a joint venture).

25      [20] Although not expressly discussing the two separate prongs of the

26  instance and expense test, Picture Music clearly applied both, as the Court does
here. See Burroughs, 342 F.3d at 160 (2d Cir. 2003).

27      [21] The Ninth Circuit has on more than one occasion cited approvingly to the

28  Second Circuit's decision in Picture Music. See Twentieth Century, 429 F.3d at
880; Warren, 328 F.3d at 1142.

62

EXHIBIT C
Page 144

1    With Disney's approval, Berlin engaged Ann Ronell, an apparent freelancer, to

2    assist in the adaptation; "she did so, rearranging the musical themes in

3    collaboration with an employee of Berlin, and arranging the existing lyrics and

4    adding new ones of her own." 457 F.2d at 1214.

5        Disney thereafter agreed that, "[i]n exchange for an agreement to pay

6    certain royalties[, it would] assign all its rights in the new song to Berlin," and

7    further agreed that "either one-third or one-fourth of its royalties should be paid to

8    Miss Ronell for her services." Id. The copyright in the song was subsequently

9    registered in Berlin's name, with a credit of authorship to Ronell and Frank

10    Churchill, the Disney employee who had composed the original score for the film.

11    Id. at n.1.

12        Thereafter, when the right to seek the renewal term accrued, Ronell

13    claimed that she owned a one-half interest in the song. Berlin's successor in

14    interest defended by asserting that Ronell's contribution to the song was a work

15    made for hire. Notwithstanding that Ronell was paid only royalty payments (and

16    not a "fixed salary"), the Second Circuit agreed.

17        Much like the present case, the Picture Music case involved three parties,

18    not the usual two parties to an employer-employee relationship. In Picture Music,

19    an artist freelanced with another party (Berlin) to adapt a score owned by a third

20    party (Disney) into a song. The Second Circuit was unconcerned with this

21    variation on the more ordinary dyad business relationship and method of payment:

22    "The purpose of the statute is not to be frustrated by conceptualistic formulations

23    of the employment relationship." Id. at 1216.

24        Also much like the present case, the Second Circuit found a right to control

25    the artist's work on the part of both of the other parties, although one party had

26    more direct control than the other: "[T]he trial court found that employees of Berlin

27    did in fact make some revisions in Miss Ronell's work. Moreover, since Disney

28    had control of the original song on which Miss Ronell's work was based, Disney

EXHIBIT C
Page 145

1    (and Berlin, with Disney's permission), at all times had the right to 'direct and

2    supervise' Miss Ronell's work." Id.

3        Although certain initial copyright registrations designated Siegel and

4    Shuster as the "authors" of the newspaper strips, the registration certificates in

5    Picture Music listing the artist as the song's "author" was disregarded in favor of

6    the realities of the parties' relationship; so too, here, the fact that McClure took it

7    upon itself to list Siegel and Shuster as the "author" of the newspaper strips is

8    effectively rebutted when one looks to the realities of the parties' actual business

9    relationship.  See Burroughs, 342 F.3d at 166-67 ("A certificate of registration

10    creates no irrebuttable presumption of copyright validity . . . [w]here other

11    evidence in the record casts doubt on the question, validity will not be assumed").

12        Finally, and for the Court's current purpose, most importantly, the court

13    clearly considered the method of payment for Ronell's work — solely by way of

14    royalties — not dispositive of whether the song was made for hire:  "The absence

15    of a fixed salary, however, is never conclusive, nor is the freedom to do other

16    work, especially in an independent contractor situation." Picture Music, 457 F.2d

17    at 1216.

18        As the Picture Music court summed up its holding:  "In short, the 'motivating

19    factors' in the composition of the new song, 'Who's Afraid of the Big Bad Wolf,'

20    were Disney and Berlin.  They controlled the original song, they took the initiative

21    in engaging Miss Ronell to adapt it, and they had the power to accept, reject, or

22    modify her work.  She in turn accepted payment for it without protest . . . .  That

23    she acted in the capacity of an independent contractor does not preclude a finding

24    that the song was done for hire." Id. at 1217.

25        The Court can here sum up its ruling in an almost identical manner.  After

26    the execution of the syndication and employment agreements, the artists did not

27    independently decide to create the newspaper strips; rather, they did so because

28    they were contractually obligated to do so and because they expected to receive

64

EXHIBIT C
Page 146

Case 2:10-cv-03633-ODW-RZ    Document 77-1    Filed 09/20/10    Page 151 of 185    Page
ID #:5894
Case 2:04-cv-08400-SGL-RZ    Document 560-2    Filed 08/12/2009    Page 15 of 49

1   compensation for their creations.  McClure retained editorial supervision rights

2   over the material; it could "accept, reject, or modify [the pair's] work."  Detective

3   Comics owned the original work from which the derivative newspaper strips were

4   created; it agreed to allow Siegel and Shuster to continue to create derivative

5   works based upon it.  Siegel and Shuster assented to this arrangement.  That they

6   did so in the capacity of independent contractors, like the artist in Picture Music,

7   "does not preclude a finding that [the newspaper strips] were done for hire."

8       Thus, the Court concludes that the expense prong is met, and that the

9   newspaper strips were works made for hire.  However the duties of the artists

10  were conceived, and to whomever they were owed, the fundamental point remains

11  that the instance in creating those newspaper strips Siegel and Shuster rested

12  with someone other than themselves.  Such indicia of a work for hire relationship

13  insofar as the creation of the newspaper strips is concerned is reflected in the

14  facts that the employment agreement obligated them to timely supply — "shall

15  furnish" — the necessary material to McClure; the syndication agreement

16  specified that the copyright in that material belonged to McClure, not Siegel and

17  Shuster; and the syndication agreement noted that, if the pair did not meet their

18  obligation of timely supplying such material to McClure, Detective Comics could

19  appoint someone else to create the Superman newspaper strip.  Far from

20  suggesting that the creation of the material fell outside the scope of the pair's

21  rights and duties under the auspice of their employment with Detective Comics,

22  the agreements demonstrate how deeply enmeshed and integral the creation of

23  such newspaper strips were to Siegel and Shuster's job.

24      Of course, the splitting of the employer role between McClure and

25  Detective Comics makes the characterization of that role (i.e., whether the true

26  employer was McClure or Detective Comics, or both) a much more difficult

27  question, but that difficulty is easily surmounted for purposes of the present

28

65

EXHIBIT C
Page 147

1    inquiry:  Whether the artists' created the newspaper strips within the scope of their

2    job duties.  This they clearly did.

3           Moreover, although in some circumstances the royalty payments could lead

4    to a conclusion (as suggested by plaintiffs) that the parties entered into a joint

5    venture, here, the peculiar structure of the arrangement does not (as it did not in

6    Picture Music) alter the core nature of the relationship.  Specifically, the

7    arrangement "employ[ed]" the artists to provide art work and continuity to

8    Detective Comics and to "furnish," as part of their duties, the newspaper material

9    to McClure.  The arrangement allowed the artists to be replaced by other artists if

10   they failed to do so in a timely manner.  Thus, as in Picture Music, the fact that the

11   pair were paid in royalties rather than a sum certain does not alter the relationship

12   in such a fashion as to lead to the conclusion that the works were not made for

13   hire.  Indeed, the parties' arrangement left no doubt that Siegel and Shuster's role

14   in creating the material could be (and was in fact) substituted by other artists

15   should they fail to timely supply such material.  In this respect, Siegel and

16   Shuster's role was much like that of an employee or independent contractor

17   retained to perform a job, not that of a partner to a joint venture.

18          In sum, this case, much like Picture Music, lies on the outer boundaries of

19   what would constitute a work made for hire, but given that the core elements

20   sought to be captured and addressed by the doctrine are present, the Court finds

21   that the newspaper strips created by Siegel and Shuster after September, 1938,

22   were works made for hire and accordingly the termination notices submitted by

23   plaintiffs do not reach the grant to those works.

24          Thus, because the Court finds that the newspaper strips created by Siegel

25   and Shuster after September 22, 1938, were works made for hire, the right to

26   terminate does not reach the grant to those works.

27

28

EXHIBIT C
Page 148

1          **2.      Pre-Syndication Agreement Newspaper Strips**

2          In stark contrast to the post-syndication agreement newspaper strips, it is

3   clear from the record that the initial two weeks' worth of newspaper strips were not

4   created at the instance of either Detective Comics or McClure; instead, a wholly

5   different "motivating factor" instanced their creation by Siegel and Shuster during

6   the spring of 1938.

7          The sequence of events surrounding these two weeks' worth of newspaper

8   strips is telling:  It began with Siegel soliciting interest in Superman for newspaper

9   syndication in March or early April, 1938.  McClure expressed some interest,

10  telling Siegel to draft two weeks' worth of material for syndication and suggesting

11  that the material fill in the background of Superman's origins and arrival on Earth.

12  Siegel and Shuster created the material, focused on Superman's origin and

13  arrival, and submitted it to McClure.  McClure then <u>returned</u> the material to Siegel

14  pending its decision whether it wished to proceed with syndication efforts.  In the

15  meantime, Siegel submitted the material to <u>other</u> newspaper syndicators for their

16  consideration.  Eventually, McClure, not any other newspaper syndicator, entered

17  into a syndication agreement with Detective Comics and the artists.[22]

18         It is clear to the Court that the initial two weeks' worth of newspaper

19  material Siegel and Shuster created in the spring of 1938, well <u>before</u> the

20  syndication agreement, was not made at the instance or expense of anyone but

21  the artists.  Admittedly, McClure did ask for the material to be created and did

22

23  ─────────────────────

24         [22]  Both sides make attempts at historical revisionism of this record.
    However, viewed in light of this record, plaintiffs' contention that Siegel had written
    the script for the two weeks of material "on his own volition," before soliciting
25  McClure's interest is unsupported.  (Pls.' Obj. Defs.' Reply at 13).  Siegel's own
    recounting of how and when the material was created contradicts this contention.
26  Defendants' characterization of the facts fares no better.  They assert that Siegel's
    solicitations for Superman's appearance in newspaper strips was at Detective
27  Comics' direction or, at least, with Detective Comics' approval.  (Defs.' Obj. to Pls.'
    July 28, 2008 Opp. at 8).  The evidence clearly shows that Siegel first approached
28  McClure, then <u>later</u> sought to bring Detective Comics into the fold <u>after</u> receiving a
    positive response from McClure.

EXHIBIT C
Page 149

1    make suggestions as to its subject matter, but such requests were done outside

2    the confines of any business relationship between the parties and, more

3    importantly, other circumstances rebut the importance of this fact.   Moreover, the

4    work was created without any discussion of, much less any guarantee of,

5    compensation and without any commitment from McClure that it would ever

6    publish the material.

7        Defendants place great weight on the fact that the two weeks' worth of

8    newspaper strips were derivative in nature, arguing that such status forecloses the

9    work's creation from being done in the instance of anyone but the owner of the

10   underlying material — Detective Comics.  However, the cases defendants cite to

11   for this proposition, as noted by the Court in its prior order in the Superboy matter,

12   require that the rights holder to the underlying material actually be the one that

13   sought out and engaged the artists to create the derivative work beforehand.  See

14   Siegel, 496 F. Supp. 2d at 1142-44.  Here, creation of the first two weeks' worth of

15   newspaper strips were not commissioned by Detective Comics, but, at most, were

16   commissioned by McClure, who at the time held no rights to the underlying

17   Superman copyright.

18       Following up on that point, defendants next seek to label Siegel's

19   interaction with McClure as little more than "an inchoate solicitation requesting an

20   opportunity to perform a work," which it is argued is insufficient to rebut a finding

21   that the matter was done at the instance of the artists.   For this proposition,

22   defendants rely on the district court's opinion in Burroughs.  In that case, the noted

23   illustrator Burner Hogarth approached the owner of the copyright in the character

24   Tarzan, Edgar Rice Burroughs, Inc. ("ERB"), suggesting that the company "take

25   up the illustration of the Tarzan Sunday Color Page," which could be reproduced

26   in "hard cover book."  ERB later replied that the company's comic book properties

27   were in flux and that the two would have to "suspend our discussions temporarily."

28   Undeterred, Hogarth wrote back six months later, noting his availability to create

EXHIBIT C
Page 150

1    the Tarzan artwork.  At that point, ERB wrote a series of letters (dated in July,

2    1970) inquiring whether Hogarth could produce "a quality, high priced edition of an

3    adult version Tarzan of the Apes in graphic form," "described in detail" what it

4    envisioned the book to be, and "proposed terms for the project" (including

5    compensation) that ultimately found there way into the parties' written agreement.

6    Id. at 1303-04.  Thereafter, Hogarth set about creating the work requested.

7        With this factual backdrop, the district court concluded that Hogarth's early

8    contacts with ERB were not sufficient to demonstrate the book was made at his

9    instance, commenting "not every solicitation requesting an opportunity to perform

10    work constitutes an instancing."  Id. at 1316.  Instead, the district court found the

11    book project was "first 'instanced' by [ERB] in [its July, 1970] . . . letters, which

12    predicted all of the principal terms for production of the . . . Books."  Id.  The

13    district court further found significant the fact that because Hogarth was dealing

14    directly with the owner of the underlying Tarzan material of which the book

15    solicited would be derivative:  "[I]t would be 'beyond cavil that [he] would  . . . have

16    undertaken production of artwork for the Books [or] brought [it] to publication,

17    without receiving the assignment from ERB to do so."  Id. at 1317.

18        In contrast, here, the uncontroverted evidence shows that Siegel and

19    Shuster did just that:  Siegel created the script and Shuster created the artwork for

20    the first two weeks of newspaper strips without any indication that they received

21    permission to do so beforehand from Detective Comics.  Admittedly, both Siegel

22    and McClure understood such permission from Detective Comics would ultimately

23    have to be forthcoming before the material could be published,[23] but that is a far

24    cry from the notion that Detective Comics engaged Siegel and Shuster to create

25    the material at its instance.  To the contrary, the clearly defined (and expressed)

26

27    _____

28    [23]  This is evidenced by McClure's admonition in its correspondence with Siegel that he "should get a letter from [Detective Comics] before [the parties could] get down to brass tacks on SUPERMAN."

69

EXHIBIT C
Page 151

1    understanding that an artist must <u>eventually</u> obtain from a copyright holder

2    approval of his or her actions in creating a derivative work before that work may

3    be <u>published</u> is fundamentally incompatible with the notion that the copyright

4    holder tasked that artist with <u>creating</u> the derivative work in the first instance.

5    Unlike the artist in <u>Burroughs</u>, Siegel did not solicit from the underlying rights

6    holder an opportunity to create a derivative work; he instead solicited a third party

7    who at the time held no rights.

8        Nor does the fact that Siegel and Shuster were engaged by Detective

9    Comics for creating Superman material necessarily lead to the conclusion that the

10    newspaper strips were done at Detective Comics' instance.  Such material did not

11    fall within the scope of what Detective Comics had (at the time) commissioned

12    them to produce — comic <u>books</u>.  This fact was reinforced by Detective Comics

13    letter <u>after</u> the execution of the syndication agreement that it did not view creation

14    of the newspaper material as giving it "little to gain in a monetary sense" and by

15    Siegel and Shuster's later testimony during the 1947 Westchester litigation that

16    the impetus to seeking such newspaper syndication material after the March 1,

17    1938, grant was precisely because Detective Comics was <u>not</u> in the business of

18    syndicating newspaper comic strips.

19        Nor ultimately does the Court conclude that the material was prepared at

20    McClure's instance.  The fact that the material was created only after Siegel

21    approached McClure and Mcclure suggested a specific subject for the material

22    (Superman's origin and arrival on Earth) would normally lead to the conclusion

23    that the work was done at McClure's instance.  <u>See</u> 2 PATRY ON COPYRIGHT § 5:74

24    ("whether the hiring party is the motivating factor for the creation of the work, a

25    very important, and usually determinative factor is whether the work was

26    substantially completed at the time it was allegedly specially ordered . . . .   If the

27    work has not been begun before the parties meet, this fact weighs in the hiring

28    party's favor").  That McClure did not involve itself in supervising the creation of

70

EXHIBIT C
Page 152

1    the artists' work is likewise unimportant. Id. ("the 'status of a work created by an

2    independent contractor as a specially ordered . . . work made for hire has nothing

3    to do with whether the commissioning party exercise any . . . supervision and

4    control over the independent contractor's work.' Instead, it is sufficient that the

5    hiring party request a specific type of work without having to be involved in the

6    details of its creation").  There is, however, one complicating wrinkle that

7    distinguishes this case from all the other cases where a work is made by request

8    as a condition for obtaining employment — when presented with the works

9    reflecting the suggested storyline, McClure promptly returned it, commenting that

10   it would defer making a decision on the matter.

11         On this point, the Court finds the events that occurred after the materials'

12   return of great significance: Siegel and Shuster attempted to sell this same two

13   weeks' worth of newspaper strips to another syndicator (The Register and Tribune

14   Syndicate), a fact which they publicized to Detective Comics and McClure without

15   objection from either.  If the material was intended by the parties to be a work

16   made for hire owned by McClure, such an act would be completely contrary to

17   such ownership.  That the artists nonetheless openly engaged in such efforts to

18   sell the work to others weighs heavily against creation of that material being

19   treated as a work for hire.  See Martha Graham Sch., 380 F.3d at 638 (finding

20   significant in conclusion that works (choreographed dances) were not made for

21   hire the fact that even after employing the artist to teach she "continued to receive

22   income from other organizations for her dance teaching and choreography").

23         Furthermore, the comment in the correspondence from the other syndicator

24   — that "[a]ny action on our part should not conflict with your progress in dealing

25   with the McClure Syndicate[; i]f they are in a position to take on your strip,

26   naturally I presume you will want to go ahead" — gives the impression that

27   ownership in the material was still, at that time, up for bid, with McClure, at most,

28   operating under the auspices of an informal right of first refusal and not under the

71

EXHIBIT C
Page 153

1   assumption that the rights belonged to any particular syndicator from its inception.

2   Such a "right of first refusal . . . is fundamentally incompatible with a finding that a

3   work . . . is . . . made for hire." Siegel, 496 F. Supp. 2d at 1141. Cf. 1 NIMMER ON

4   COPYRIGHT § 5.03[B] [2][D] at 5-56.8 ("[A] commission relationship may not exist,

5   even if the work is prepared at the request of an other, and even if such other

6   person bears the costs of its creation, where the person requesting the work is

7   expressly granted only a one-time use").

8     This leads to the next significant factor:  That the creation of the material

9   occurred without any mention or provision for compensation (either a fixed sum or

10  a percentage royalty) for the artists.  Even after creating the material, Siegel and

11  Shuster's efforts went unpaid for at least five months.  This distinguishes the

12  present case from Burroughs where the commissioning party's suggestion for the

13  creation of the work contained within it a recital of the basic financial terms of the

14  engagement.  Simply stated, there is no evidence that the material in question

15  was made at the expense of anyone save for the artists that created the material,

16  and who in turn shopped it to multiple syndicators looking for any takers to its

17  publication.

18    Accordingly, the Court finds that the two weeks' worth of newspaper comic

19  strip material created by Siegel and Shuster during the spring of 1938, before the

20  execution of the syndication agreement were not works made for hire.

21     **IV. ASSIGNMENT OF THE FIRST TWO WEEKS' WORTH**

22    **OF NEWSPAPER STRIPS AND TERMINATION NOTICE DEFICIENCIES**

23    As with all the Court's findings regarding work-for-hire status, this

24  conclusion has certain legal ramifications that necessarily flow from it which raise

25  secondary legal arguments concerning the plaintiffs' ability to terminate the grant

26  of these two weeks' worth of newspaper strips.  Thus the Court must address

27  whether all of the rights to the first two weeks' worth of newspapers strips were

28  assigned, the failure to serve McClure with the termination notice, and the failure

EXHIBIT C
Page 154

1  to identify the first two weeks' worth of newspaper strips among the works subject

2  to termination in the notice.

3  **A.      Assignment of the First Two Weeks' Worth of Newspaper Strips**

4  Because the initial two weeks' worth of newspaper strips were not works

5  made for hire, when those strips were created, the copyright in them belonged at

6  its inception to Siegel and Shuster.  That copyright was protected under state

7  common law until the works were published in January, 1939, at which time

8  federal statutory copyright protection may have attached, depending upon

9  compliance with certain statutory formalities.  See Siegel v. Time Warner Inc., 496

10  F. Supp. 2d 1111, 1130 n.7 (C.D. Cal. 2007).  As Professor Nimmer explains in

11  his treatise: "As to a work created and the subject of statutory copyright prior to

12  [the 1976 Act], such copyright did not subsist from the moment of creation.

13  Rather, it became effective either upon publication with notice . . . .  Prior to such

14  publication . . . , a work created before [the 1976 Act] was protected from its

15  creation under the state law of common law copyright.  Common law copyright in

16  a work initially vested in the author or authors thereof."  1 NIMMER ON COPYRIGHT

17  § 5.01[B] at 5-6.  Because the Court has found that the two weeks' worth of

18  newspaper strips are not works made for hire, the "author" of those strips would

19  be Siegel and Shuster, not Detective Comics or McClure.  This designation is

20  important because it impacts who may claim ownership of the works when

21  published, the required contents of the copyright notice affixed to the works when

22  published, and the contents of the registration certificate that was issued.

23  The 1976 termination provisions are limited only to grants in federally

24  copyrighted works, meaning works subsisting in a statutory initial or extended

25  renewal term as of the 1976's effective date.  The right to terminate does not

26  apply to unregistered copyrights protected at common law or copyrights to works

27  that have fallen into the public domain as of the time of the 1976 Act.  See PATRY

28  ON COPYRIGHT § 7:42.  Thus, for termination notice to be effective to reclaim the

73

EXHIBIT C
Page 155

1    rights to the newspaper strips, the newspaper strips must have obtained proper

2    federal statutory copyright protection and maintained that protection up through

3    the time of the 1976 Act.  This then raises the question of whether and how Siegel

4    and Shuster did obtain such statutory copyright protection of the material in their

5    newspaper strips under the 1909 Act; any defect in the process would call into

6    question plaintiffs' ability to terminate the grant to the copyright in those works.

7    Again as Professor Nimmer explains:

> However, the subsequently obtained statutory copyright [upon publication with notice] vested in such author or authors only if prior thereto, there had not been a transfer of the common law copyright . . . .  In the event of such disposition, it was the transferee and not the original author or authors in whom statutory copyright initially vested.  The determination of the proper person initially to claim statutory copyright under the 1909 Act remains of more than antiquarian interest, as an improper claim under the 1909 Act could have injected a published work into the public domain.

14    1 NIMMER ON COPYRIGHT § 5.01[B] at 5-6.

15    The question of assignment is highly significant because, under the 1909

16    Act, agents and licensees could not claim such statutory copyright ownership, but

17    an assignee could.  "The assignee of an author's common law copyright might, by

18    virtue of such assignment, claim statutory copyright."  Id. at 5-7.

19    The pertinent facts are reiterated for purposes of this discussion:  The first

20    two weeks of newspaper strips were first published on January 16, 1939, in the

21    Milwaukee News Journal, which contain the following notice affixed thereto

22    "Copyright, 1939".  The initial copyright registration is treated as having been

23    registered in the name of McClure Newspaper Syndicate, listing as the works

24    authors "Jerry Siegel and Joe Shuster, of United States."[24]  Later on July 3, 1944,

25

---

26    [24] Defendants state that the copyright notice under which the material was first published was "in the name of McClure," (Defs.' Obj to New Arguments at

27    Hearing at 1), but as noted by the Court, the notice affixed thereto actually did not list McClure, or anyone, as the copyright proprietor.  Such a designation in the

28    notice was required by § 19 under the 1909 Act, but this defect is of no

(continued...)

74

EXHIBIT C
Page 156

1   McClure "assigned to Detective Comics, Inc. all its rights, title and interest in all

2   copyrights in SUPERMAN, including the copyrights and all renewals and

3   extensions thereof."[25]

4        As the facts are presented in this case, an assignment by Siegel and

5   Shuster to McClure must have occurred before publication of the initial two weeks'

6   worth of newspaper strips; otherwise, the copyright notice on the works when first

7   published was inadequate to comply with the statutory formalities, and the works

8   have fallen into the public domain.  (Defs.' Obj and Response New Arguments at 2

9   (assuming "Siegel and Shuster owned the copyright of these works from

10  inception, there would need to have been an assignment from them of their entire

11  copyright rights to McClure before the strips appeared, in order to avoid loss of

12  copyright")).

13       Plaintiffs argue that the parties' course of conduct in conjunction with

14  various terms in the syndication agreement itself clearly imply that such an

15  assignment of the artists' rights in the newspaper strips to McClure occurred.  As

16  explained by plaintiffs:

17              While there is no express mention of a sale or
            transfer, under the [syndication] agreement Siegel and
18          Shuster delivered the newspaper strips, protected by

19  ─────────────────────────

20      [24](...continued)
    consequence as the Second Circuit's decision in Fawcett held that such a defect
21  in the notice was saved by virtue of § 21 except in those instances in which
    McClure "sent out 'mats' [of the strips to newspapers] without any notice at all"; in
22  such a situation "the copyrights on those 'strips' were lost, regardless of
    § 21."  191 F.3d at 601.

23
        [25] Two years after this assignment from McClure, Detective Comics was
24  consolidated into other companies into a company called National Comics
    Publications, Inc., which in turn was later consolidated in 1961 into the
25  aforementioned National Periodical Publications, Inc.  In the 1961 consolidation
    agreement it was represented that the new company had become "vested with all
26  the properties of Detective Comics, Inc., and National Comics Publications, Inc.,"
    including that it was "the owner of and is vested with title to all of the copyrights
27  (and renewals and extensions thereof) in the artistic and literary works consisting
    of newspaper cartoon strips or continuities entitled SUPERMAN which the
28  McClure Newspaper Syndicate had from the first day of publication to July 3,
    1944."

                                    75

EXHIBIT C
Page 157

1    common law copyright, to McClure.  McClure then
      copyrighted the material in its own name [(which the
2    syndication agreement clearly provided was
      permissible for them to do)], listing Siegel and Shuster
3    as the 'authors.'  McClure then granted an exclusive
      license to Detective with respect to the non-syndication
4    rights [(namely, allowing Detective Comics to use the
      strips in its comic book magazines free of charge six
5    months after the strips first publication in the
      newspapers)], and later on July 3, 1944 assigned the
6    entire copyright [in the newspaper strips] to Detective
      per the term of the [syndication] agreement.

7

8    (Pls.' Opp and Response to Defs.' Sur-reply at 11)

9        Defendants respond by arguing that an assignment must be supported by a

10   clear, unambiguous, written instrument, and that such instrument is lacking here.

11   (Defs.' Obj. and Response to New Arguments at 2-3 & n.5 ("there is no question

12   that neither of the September 22, 1938 agreements include such an assignment

13   . . . There is no language of copyright assignment" and further commenting that

14   "any assignment of common law copyright would have to have been in writing

15   under the statute of frauds").  This argument does not withstand scrutiny.

16       At the outset, the Court notes that an assignment of a common law

17   copyright was not subject to a requirement of writing.  To the contrary, during the

18   time the 1909 Act was in effect, at common law, a copyright was capable of

19   assignment so as to completely divest the author of his rights, "without the

20   necessity of observing any formalities." Urantia Foundation v. Maaherra, 114 F.3d

21   955, 960 (9th Cir. 1997); accord Epoch Producing Corp. v. Killiam Shows, Inc.,

22   522 F.2d 737, 747 (2d Cir. 1975) (noting that assignment need not be in writing);

23   3 NIMMER ON COPYRIGHT § 10.03[B][2] at 10-56.3 ("it appears that an assignment

24   of common law copyright was not within the Statute of Frauds").  Other case law

25   further demonstrates that such an assignment could be oral or could be implied

26   from the parties' conduct. See Jerry Vogel Music Co. v. Warner Bros., Inc., 535 F.

27   Supp. 172 (S.D.N.Y. 1982); Van Cleef & Arpels, Inc. v. Schechter, 308 F. Supp.

28   674 (S.D.N.Y. 1969).

76

EXHIBIT C
Page 158

1     Having rejected the notion that any writing is required, the Court

2    nevertheless concludes that the parties' syndication and employment agreements,

3    as well as their actions, make clear that the requisite complete assignment of both

4    the initial and the renewal term occurred.

5     Although the words "assign" or "transfer" do not appear in the syndication

6    agreement, such an intent was demonstrated by other language contained in the

7    agreement, as well as by Siegel and Shuster's delivery of newspaper strip material

8    to McClure. The syndication agreement provided that McClure would hold "all the

9    original drawings of the 'Superman' strip," which it would later provide to Detective

10   Comics on license for publication in its comic books.  Such expressed receipt of

11   the "original" material in question and the ability to license that material is not the

12   language used to describe the recipient of a mere license to the material in

13   question, but as one of an assignee.  As Judge Hand remarked, "[t]hat is the

14   language of a 'proprietor,' who assumes power to license another copy the

15   'works.'"  Fawcett, 191 F.2d at 599; see also Urantia, 114 F.3d at 960 (noting that

16   language in trust instrument declaring that transferee "retain[ed] absolute and

17   unconditional control of all plates . . . for the printing and reproduction . . . thereof"

18   was indicative of an "intent to transfer the common law copyright").

19    Defendants also argue that there could have been no assignment to the

20   two weeks' worth of newspaper strips through the syndication agreement because

21   that agreement indicated that at the time of the document's execution Siegel and

22   Shuster "had already created 'the sample submitted' and that the subject 'daily

23   strip . . . entitled 'Superman' . . . was owned by Detective." (Defs.' Obj. and

24   Response to New Arguments at 3).  This argument selectively pieces together

25   different portions of the agreement as if they were written as a single whole, when

26   in fact those sections, read in the context, clearly indicate that the parties were not

27   speaking specifically to the initial two weeks of newspaper strips.  Rather, they

28   were speaking more generally to all newspaper strips published pursuant to the

77

EXHIBIT C
Page 159

1    agreement.  Similarly, the reference defendants make to the agreement noting

2    Detective Comics' ownership to the title "Superman" does not necessarily apply to

3    the strips themselves, a distinction which Judge Hand also drew when construing

4    these same agreements.

5        Moreover, Siegel and Shuster not only allowed McClure to syndicate the

6    Superman newspaper strips, they gave McClure the original manuscript and

7    artwork to the same to McClure to hold in its possession.  "It has been held that

8    delivery of a manuscript suffices" for the purpose of establishing an assignment —

9    "so long as the intent to pass title in the common law copyright is likewise

10    present." NIMMER ON COPYRIGHT § 10.03[B][2] at 10.56.3.  Such an inference is

11    particularly apt when "over a long period of time, the author and other interested

12    parties had acquiesced in the putative assignee's ownership." Urantia, 114 F.3d

13    at 960.  Here, not only did the parties acquiesce in the agreement to McClure

14    receiving the originals to the strips but the parties' agreement stated that the

15    copyright notice in said material was to be made in McClure's name, something

16    which under the 1909 Act could not be undertaken by a mere licensee but only

17    "the author or proprietor" of the work.  Sanctioning such conduct clearly

18    constitutes an acquiescence on Siegel and Shuster's part to McClure's ownership

19    in the copyright to these newspaper strips, and is perhaps the clearest evidence in

20    the syndication agreement itself to an assignment being made in favor of McClure

21    by the artists.

22        Such language in the syndication agreement, and such action by the

23    parties clearly demonstrate at minimum an intent to transfer the initial copyright

24    term in the newspaper strips to McClure, see Urantia, 114 F.3d at 960, but there is

25    other language in the parties' September 1938 agreements that demonstrate an

26    intent by the authors to transfer the renewal term to those strips as well.

27        Not surprisingly, defendants contend that there was no such language of

28    complete assignment from Siegel and Shuster in the newspaper syndication or

78

EXHIBIT C
Page 160

1  employment agreements.  However, when one surveys the agreements as a

2  whole, it becomes readily apparent that there is language of assignment not just

3  of the authors' rights to the initial term, but also (as held by and argued to the

4  Second Circuit's during the litigation surrounding the rights to the Superman

5  renewal term in the 1970s) the renewal term as well.  Notably, the one paragraph

6  in the employment agreement that makes reference to and separately identifies

7  the artists' creation of both newspaper strips and comic books also contained

8  language whereby the artists agreed that they were "furnishing" this global

9  category of material "exclusively" to Detective Comics or to whomever else

10  Detective Comics might designate, an obvious reference to McClure.  (See Decl.

11  Toberoff, Ex. P ("[Y]ou shall furnish such matter exclusively to us . . . as such may

12  be required by us or as designated by us in writing.")).

13       Likewise, the concluding sentence to the paragraph in the employment

14  agreement which spells out the royalty payment terms for the newspaper strip

15  material created by the artists, contains an acknowledgment by the artists that "all

16  [such] material, art and copy shall be owned by" Detective Comics or whomever

17  Detective Comics permits (undoubtedly a reference to the derivative nature of the

18  work) the title in the same to be "copyrighted or registered in our name or in the

19  names of the parties designated by us" (another clear reference to McClure).

20       Despite this language, defendants argue that it is not sufficient, as "there is

21  no question that neither of the September 22, 1938 agreements include such an

22  assignment.  The agreements speak for themselves — they are not assignments

23  from Siegel and Shuster to anyone."  (Defs.' Obj. and Response to New

24  Arguments Made at Hearing at 3).  However, defendants' position is completely

25  contrary to that which its predecessors in interest have taken in the seven

26  decades since those agreements were executed.  It has been the position of

27  defendants and its predecessors in interest (made manifest during the 1970s

28  litigation surrounding the rights to the Superman renewal term) that the March 1,

79

EXHIBIT C
Page 161

1    1938, grant as well as the other agreements the parties entered into (up to and

2    including the 1948 stipulated judgment concluding the Westchester action), that

3    the artists in each instance effectuated a complete assignment of both the initial

4    and renewal terms to the Superman character.

5          Under the 1909 Act, general words of assignment can include renewal

6    rights if the parties had so intended.  See Venus Music Corp. v. Mills Music, Inc.,

7    261 F.2d 577 (2d Cir. 1958); cf. Fred Fisher Music Co. v. M. Witmark & Sons, 318

8    U.S. 643, 653 (1943) (observing that a specific intent to transfer the renewal term

9    must be present).  Following this line of authority, the Second Circuit in the 1970s

10   Superman litigation held that evidence of the parties' conduct and iterations of

11   their various contractual arrangements, which included language acknowledging

12   that the publisher would hold title to the copyright in the character "forever" and

13   prohibiting the artists' from exploiting Superman "at any time hereafter" except

14   with the character's publisher, indicated not simply an assignment of the artists'

15   initial term in the Superman character, but the renewal term as well.  Siegel, 508

16   F.2d at 913-914 (stating that "[t]he ready answer to this argument is that the state

17   court action determined that the agreements conveyed all of the plaintiffs' rights in

18   Superman to the defendants and not just the original copyright term" and noting

19   that the presence of such general terms of conveyance in the parties' agreements

20   such as "hold[ing] forever" a given right and agreeing not to use Superman in any

21   other strip "hereafter" connoted an assignment to the entirety of the copyright in

22   that material (emphasis added)).

23         This is the same language contained in the employment agreement

24   ("owned by us" or McClure, "will not hereafter" exploit Superman character except

25   with either Detective Comics or McClure, and shall provide such material

26   "exclusively to us" or McClure), whose terms apply, in this context at least, to the

27   syndication agreement.  Defendants, having relied on that judgment for over thirty

28   years to exploit Superman to the exclusion of any rights held by the artists, cannot

1  at this late date be heard to complain that a court will likewise rely on that

2  judgment as a basis to permit those artists to reclaim, under the statutorily

3  provided termination scheme, the rights transferred in those much-hailed grants.

4  Defendants are thus precluded both as a matter of judicial estoppel and as a

5  matter of res judicata from contesting whether there was "language of [complete]

6  copyright assignment" to both the initial and renewal term to the Superman

7  material at issue in the employment and newspaper syndication agreements.

8      Thus, the Court rejects the notion that the initial two weeks' worth of

9  newspaper strips is not subject to termination on account of the lack of any

10  assignment by Siegel and Shuster to the entire copyright in that material to

11  McClure prior to the material's publication.

12  **B.    Failure to Serve McClure with Termination Notice**

13      Defendants contend that, if there was such an assignment from Siegel and

14  Shuster to McClure, plaintiffs' failure to serve a copy of the termination notice on

15  McClure's successors renders the termination notice invalid.  (Defs.' Obj and

16  Response to New Arguments at 3 n.6).  Because all of McClure's rights in the

17  material were assigned to Detective Comics in 1944, and Detective Comics'

18  successors were served with the termination notice, the Court rejects this

19  argument.

20      The 1976 Copyright Act provides that the termination notice must be served

21  upon the "grantee or the grantee's successor in title."  17 U.S.C. § 304(c)(4).

22  Moreover, the regulations provide that an investigation will satisfy this notice

23  requirement in the context of termination of rights to works created before the

24  effective date of the 1976 Act.  37 C.F.R. § 201.10(d)(2) states that section

25  304(c)(4)'s service requirement is met if there has been a "reasonable

26  investigation" as to the current ownership of the rights to be terminated and

27  service has occurred on the person or entity "whom there is reason to believe" is

28  the current owner by transfer from the grantee.

EXHIBIT C
Page 163

1     Soon after the 1976 Act became effective, courts were faced with the

2  question of whether this provision, stated in the disjunctive, meant that a notice

3  served upon the immediate grantee would suffice, so that such grantee's current

4  successor in title need not be notified of the termination of its rights; the reverse

5  situation from that found in the present case.

6     In Burroughs v. Metro-Goldwyn-Mayer, Inc., 683 F.2d 610, 633 (2d Cir.

7  1982), the district court held that failure to serve the current successor in title

8  rendered ineffective a purported termination, notwithstanding service on the

9  original grantee.   On appeal, although the Second Circuit found it unnecessary to

10  decide that particular issue, Judge Newman addressed it in a thoughtful

11  concurring opinion.  Acknowledging that it was "not clear from the statute or the

12  regulations who [as between the 'grantee' and 'the grantee's successor in title']

13  must receive notice of termination, and the legislative history offer[ed] no

14  guidance," id., Judge Newman construed the statutory provision as "sensibly read

15  to mean that notice is to be served (a) on the grantee, if the grantee has retained

16  all rights originally conveyed, (b) on the transferee, if the grantee has conveyed all

17  rights to the transferee, or (c) if some rights have been conveyed, on the grantee

18  or the transferee (or both) depending upon which rights are sought to be

19  terminated." Id. at 634 n.5. In Judge Newman's view, the statute was written to

20  require service on only those entities that currently hold a right to be terminated; it

21  was not meant to require a mad dash to serve everyone and anyone who may

22  have been involved in the chain of title to the copyright (but who possess no

23  present right to the same), as suggested here by defendants.  "Whatever the

24  meaning of 'grantee' and 'successor in title' in the notice termination provision, it

25  seems evident that their expression in the disjunctive was intended to cover

26  various contingencies, not to afford those exercising termination rights a choice as

27  to whom to serve." Id.

28

82

EXHIBIT C
Page 164

1    As explained by Professor Nimmer, "It follows that if the grantee has

2    transferred some but not all of the rights that he acquired under the grant, whether

3    the original grantee, his successor with respect to some of the rights, or both,

4    must be served will turn on which rights are purportedly terminated under the

5    termination notice.  If all rights are being terminated, all of the persons who own

6    any portion of such rights must be served in order to effectuate the termination, as

7    the district court concluded." 3 NIMMER ON COPYRIGHT § 11.06[B] at 11-40.20.

8    The Court finds Judge Newman's concurring opinion in Burroughs to be

9    persuasive, and adopts the reasoning contained therein.  As summarized by

10    Professor Nimmer, "[i]t follows, then, that service of the termination notice need

11    only be made upon the last grantee in the chain of title of which those serving the

12    notice are reasonably aware." 3 NIMMER ON COPYRIGHT § 11.06[B] at 11-40.18 -

13    11-40.21.

14    This is exactly what occurred here.  Plaintiffs served the notice on the

15    newspaper strips' most current owner — Detective Comics' successors in interest,

16    DC Comics.  Defendants try to diminish the significance of the 1944 assignment

17    from McClure to Detective Comics of all its (McClure's) rights in the newspaper

18    strips as nothing but a meaningless gesture.[26]  But if Siegel and Shuster had, in

19    _____

20    [26] The argument is built largely on the assumption that Detective Comics
never received the renewal term copyright by way of a "grant of a
21    transfer or license" from McClure.  17 U.S.C. § 304(c).  Such an argument seeks
to make much of the fact that the first proviso to section 24 of the 1909 Act,
22    provided that the right of renewal for a "periodical" work is given to "the proprietor
of such copyright." Barbara A. Ringer, Study No. 31 Renewal of Copyright (1960),
23    reprinted in 1 Studies on Copyright at 524.  As explained by Ringer, "the
'proprietor' in this context means the owner of the copyright at the time renewal
24    registration is made, and not the first or original proprietor.  In other words, a
'proprietor' claim [to the renewal right] follows the ownership of the copyright, and
25    is not a personal right like the claim of an author under the second proviso." Id.
Thus, when McClure secured the original copyright for the newspaper strips, it
26    was the first proprietor and therefore entitled thereto to the renewal copyright in
the same.  Defendants argue that when ownership was transferred in this
27    copyright from McClure to Detective Comics, that the renewal term, rather than
being transferred by agreement, was transferred by way of an automatic function
28    of the statute. (Defs.' Obj. to New Arguments at Hearing at 2 n.4)  This

(continued...)

83

EXHIBIT C
Page 165

1    fact, assigned their copyright in the newspaper strips to McClure, then the transfer

2    would be deeply meaningful as it is a clear and unambiguous grant of both the

3    initial and the not-yet-vested renewal term to the copyright in those strips, thereby

4    rendering Detective Comics (as its immediate successor National Periodical

5    Publications, Inc., would proclaim a few years afterwards) sole owner of the

6    entirety in the copyright to those newspaper strips owing entirely to McClure's later

7    assignment.  Indeed, defense counsel conceded during oral argument that if

8    McClure held the copyright to the newspaper strips in trust for Detective Comics,

9    then it would have required a "reassignment" for the copyright to be transferred to

10   Detective Comics.  Given that Judge Hand held that the right in the material was

11   indeed held "in trust" for Detective Comics, such an assignment was anything but

12   a meaningless gesture.

13          No party disputes that the termination notice was served on DC Comics,

14   the successor to Detective Comics and current holder of all the copyright in the

15   newspaper strips.  Accordingly, the termination notice complied with section

16   304(c)(4), and is not defective based on plaintiffs' failure to serve McClure.

17

18

19   ────────────────────

20   [26](...continued)
     distinction, however, is mistaken.
           The second proviso to section 24 noted that "in the case of any other
21   copyrighted work, including a contribution by an individual author to a periodical or
     to a cyclopedic work or other composite work, the author of such work" was
22   entitled to the renewal term.  Judge Learned Hand later defined the term,
     "composite work," for purposes of the first proviso in section 24, as limited to
23   works "to which a number of authors have contributed distinguishable parts, which
     they have not, however, 'separately registered.'"  Shapiro, 123 F.2d at 699.  Here,
24   however, the newspaper strips were separately registered in the name of their
     individual authors after the publication of the composite work in question, the
25   newspaper.  Indeed, the two weeks' worth of newspaper strips themselves bear a
     separate copyright notice on them.  In such an instance, the author of the work
26   was entitled to the renewal in the separately registered copyright, and hence,
     Detective Comics' receipt by way of assignment from McClure to said renewal
27   term was not effectuated automatically by way of statute.  See Self-Realization
     Fellowship v. Ananda Church, 206 F.3d 1322, 1329 (9th Cir. 2000) (holding that
28   proprietor entitled to renewal term in composite work unless the individual
     contribution was separately registered).

                                          84

EXHIBIT C
Page 166

C.    **Failure to Include Strips in Notice as Works Affected by Termination**

Having found that the initial two weeks' worth of newspaper strips created in the summer of 1938 were not works made for hire, having concluded that Siegel and Shuster assigned all their rights in the copyright to those two weeks' worth of strips to McClure (which later assigned all its corresponding statutorily protected copyright to Detective Comics), and having determined that plaintiffs' failure to serve McClure or its successor does not invalidate the termination notice as to these newspaper strips, the Court is confronted with one final question: Whether the failure to list in the termination notice the initial two weeks' worth of newspaper strips, first published in the Milwaukee News Journal in January, 1939, invalidates the termination notice as to these newspaper strips. (Decl. Michael Bergman Summ. J. Mot., Ex. X at 325 (complete termination notice reprinted)). In the end, the Court determines it does not.

A fact not lost on either party or the Court is that potentially valuable copyright elements subsist in this material, as it is the first material in which Superman's home planet of Krypton is named, Superman's Krypton name is revealed, and the circumstances surrounding Krypton's destruction are revealed. Plaintiffs, to their credit, candidly admit that the first two weeks' worth of newspaper strips are not listed in the termination notice; but they point to the fact that the notice did contain the following catch-all clause:

> This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stories, such as, without limitation, Superman, . . . the planet Krypton . . . . Every reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created. Nevertheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

(Decl. Bergman, Ex. X at 3 n.1).

85

EXHIBIT C
Page 167

1    Defendants, for their part, advocate a harsh rule:  A mistake, even one of

2    omission, is a mistake of consequence; where such a mistake is made, the

3    authors and their heirs must suffer whatever consequences that flow from the

4    resulting invalidity of the copyright notice.  The Court cannot countenance such a

5    harsh, per se rule that is divorced from the underlying facts.

6    Although there is no approved form for termination notices, the Copyright

7    Office has promulgated regulations specifying the required contents of a

8    termination notice:  It must contain a "complete and unambiguous statement of

9    facts . . . without incorporation by reference of information in other documents or

10    records," 37 C.F.R. § 201.10(b)(2), and it must  include the following:

11        1.    the name of each grantee whose rights are
               being terminated or the grantee's successor in
12             title, and each address at which service is made;

13        2.    the title and the name of at least one author of,
               and the date copyright was originally secured in,
14             each work to which the notice applies (including,
               if available, the copyright registration number);

15
          3.    a brief statement reasonably identifying the
16             grant being terminated;

17        4.    the effective date of the termination; and

18        5.    the name, actual signature, and address of the
               person executing the termination.
19

20    37 C.F.R. §§ 201.10(b)(1)-(1), (c)(1), and (c)(4).  The regulations promulgated by

21    the Register of Copyrights also contain a safety valve that "[h]armless errors in a

22    notice that do not materially affect the adequacy of the information required to

23    serve the purposes of [the statute] shall not render the notice invalid." 37 C.F.R.

24    § 201.10(e)(1).

25    In support of their position, defendants rely on Burroughs v. Metro-

26    Goldwyn-Mayer, Inc., 683 F.2d 610 (2d Cir. 1982).  In that case, the author's heirs

27    attempted to terminate the grant to the copyright in all the books written by Edgar

28    Rice Burroughs featuring the character Tarzan.  In the termination notice,

86

EXHIBIT C
Page 168

1    however, the author's heirs mistakenly listed only 30 of the 35 Tarzan books

2    written by Burroughs.  In considering whether the termination notice was effective

3    in recapturing the copyright in those five omitted books, the Second Circuit held

4    that the omission, although inadvertent, rendered the termination notice invalid as

5    to those omitted works.  Id. at 622 (noting that "the omission of the five titles" left

6    the grant "in those five books . . . intact" and unaffected by the termination notice).

7    In reaching this conclusion, the Second Circuit did not discuss section

8    210.10(a)(1)'s harmless error provision; rather, the court simply noted that the

9    regulations required identification of the title and date of original copyright for each

10   work sought to be recaptured, observed the omission in the termination notice,

11   and held that therefore the termination notice was invalid as to the omitted works.

12        Defendants thus vastly overstate the holding of Burroughs as supporting

13   the proposition that plaintiffs' "failure to identify [the newspaper strips] is fatal to

14   their purported termination and their omission cannot be mere 'harmless error.'"

15   (Defs.' Obj. to New Argument at Hearing at 7 (emphasis added)).  Its failure to

16   discuss the harmless error rule makes Burroughs of limited persuasive value to

17   the Court's current analysis.

18        On this point, the Court has discovered only one court decision that

19   considered whether omissions or defects in the termination notice were "harmless

20   errors" such that the termination notice was effective.  See Music Sales Corp. v.

21   Morris, 73 F. Supp. 2d 364 (S.D.N.Y. 1999).  There, the termination notice

22   consisted merely of a bland boilerplate statement:  "Grant or transfer of copyright

23   and the rights of copyright proprietor, including publication and recording right."

24   Although finding that the generic statement would not "reasonably identify[] the

25   grant," the district court nonetheless upheld its adequacy on the basis that "it

26   appears to be boilerplate on termination notices customarily accepted by the

27   Register of Copyrights."  Id. at 378.

28

EXHIBIT C
Page 169

1    Leading commentators have differing views on <u>Music Sales Corp</u>, and by

2    extension, differing views on how stringent courts should be in applying the

3    harmless error safety valve.  Professor Nimmer, on one hand, is much more

4    formalistic on this point, cautious of the proverbial slippery slope.  As Professor

5    Nimmer explained in response to the <u>Music Sales</u> decision:

6    [T]he Register of Copyrights does not pass judgment
     by accepting notices of termination, so that the

7    ministerial act of filing them connotes no approval of
     their verbiage.  On that basis, the court's citation to

8    authority allowing agencies to interpret statutory
     requirements is inapposite.  But the court also cites

9    unspecified custom of the industry as validating the
     boilerplate approach.  It remains to test what that

10   custom might be.

11   3 NIMMER ON COPYRIGHT § 11.06[B] at 11-40.22 - 11.40.22(1).

12    Patry, on the other hand, praised the <u>Music Sales</u> decision as bringing the

13   formalities contained in the regulations into conformity with the realities of how

14   those regulations are actually administered by the agency that was charged with

15   crafting them.  <u>See</u> 3 PATRY ON COPYRIGHT § 7:45 ("In <u>Music Sales Corp. v. Morris</u>,

16   the requirement of a 'brief statement reasonably identifying the grant to which the

17   terminated grant applies' was reviewed, with the court wisely accepting industry

18   custom and Copyright Office practices as indicating compliance").

19    The dearth of case law, along with the divergence of opinion between

20   these two leading commentators, presents the Court with an apparent choice:  On

21   the one hand, the Nimmer approach, <u>i.e.</u>, an insistence on rigid adherence to the

22   formalities specified in the regulations or, on the other hand, the less formalistic

23   (but more practical), lax approach set forth in <u>Music Sales</u> and endorsed by Patry,

24   <u>i.e.</u>, acceptance of industry and agency custom.  The Court declines to choose

25   one extreme or the other, applying instead a middle path that requires a more

26   fact-intensive inquiry in applying the harmless error safety valve.

27    Here, it is clear to the Court that plaintiffs undertook enormous effort to

28   comply with the overly formalist requirements of the termination provisions,

88

EXHIBIT C
Page 170

1  literally providing 546 pages' worth of works subject to the termination notice.  The

2  purpose of the regulations is to give the recipient of the termination notice

3  sufficient information to understand what rights of theirs may or may not be at

4  stake.  Here, any recipient of the termination notice would quickly understand that

5  the plaintiffs have sought to reclaim the copyright in any and all Superman works

6  ever created.  Indeed, any publisher receiving the notice would be foolish to

7  believe otherwise. That the termination notice included a broad and

8  comprehensive catch-all clause only reinforces that which the 546-page listing of

9  titles of works subject to the notice makes painfully obvious.

10      This reasoning is all the more sound because what was sought to be

11  recaptured involved the rights to works involving a particular character that has

12  been continuously exploited for decades.  It is this peculiar nature of the subject

13  matter of the termination notice that makes rigid adherence to the regulatory

14  formalities particularly inapt:

15          In the case of works consisting of a series or
        containing characters requiring the terminating party to
16      list separately each work in the series or all works in
        which the character appears would render the
17      termination right meaningless. Instead, notice that
        reasonably puts the terminated party on notice of the
18      character being terminated is sufficient.

19  3 PATRY ON COPYRIGHT § 7:45. There is little doubt that plaintiffs' termination

20  notice satisfies this concept of reasonable notice that the copyright in the entire

21  body of works to the Superman character was sought to be recaptured.

22      The commentary accompanying adoption of the regulation buttresses this

23  view that such a reasonable notice test is particularly apt with respect to

24  copyrights in characters appearing in thousands of works in countless media over

25  many decades.  In that commentary, the Register of Copyrights (Barbara Ringer),

26  observed that the Copyright Office "remained convinced that the required contents

27  of the notice must not become unduly burdensome to grantors, authors, or their

28  successors, and must recognize that entirely legitimate reasons may exist for

89

EXHIBIT C
Page 171

1  gaps in their knowledge and certainty." <u>Termination of Transfers and Licenses</u>

2  <u>Covering Extended Renewal Term</u>, 42 Fed. Reg. 45916, 45918 (Sept. 13, 1977).

3       Such a conclusion does not necessarily conflict with the Second Circuit's

4  decision in <u>Burroughs</u>.  There was a plausible evidentiary basis upon which the

5  court in <u>Burroughs</u> could have reached the outcome it did, even with consideration

6  of the harmless error safety valve as articulated here.  There were only thirty-five

7  Tarzan books that were possibly subject to termination.  In such a case, with a

8  more finite universe of works possibly at issue, the omission of a few of those

9  works in the termination notice would comprise a significant level of exclusion

10  (roughly 15%).  Thus, the works' exclusion could quite legitimately be viewed as a

11  more meaningful act by the recipient of the notice.  Stated differently, in such a

12  situation, there is simply less of a chance for a mistake or oversight occurring in

13  identifying works in the notice, and thus more probable that the recipient would

14  reasonably believe the omission to be intentional, thereafter acting accordingly

15  when contracting with other parties regarding the copyrights to the omitted works.

16  If the terminating party later declares its intention to recapture the omitted works, it

17  is more likely that the notice's recipient will suffer some prejudice beyond the

18  simple reclamation of the rights to the omitted works.  Such a circumstance is not

19  present in a case where, as here, there is a universe of literally thousands of

20  possible works.

21       In the end, the Court finds that some consideration must be given to the

22  nature of the copyrights sought to be recaptured.  In a case involving thousands of

23  works, to insist on literal compliance with the termination notice regulations sets

24  up a meaningless trap for the unwary without any meaningful vindication of the

25  purpose underlying the regulation at issue, a result that the Register expressly

26  disavowed as the intent of the regulations.  Even the most cautious cataloguer

27  could easily overlook a stray work or two among the many thousands at issue

28  here.  The existence of the catch-all provision, while not always necessarily

EXHIBIT C
Page 172

1   dispositive, clearly and expressly evinces an attempt by the authors to recapture

2   the rights to all the Superman works they authored, and the failure to expressly list

3   the initial two weeks' worth of newspaper strips among those works is harmless

4   error.

5        Having said that, the Court does not hold that all termination notices with

6   similar catch-all provisions will necessarily be sufficient as to inadvertently omitted

7   works.  However, when the notice evidences a demonstrable effort at cataloguing

8   all the relevant and related works, where the universe of those works is large (and

9   certainly larger than the universe of thirty-five works at issue in <u>Burroughs</u>), and

10   where the number of omitted works is minute relative to the included works, the

11   presence of a comprehensive catch-all provision such as that found here leads to

12   the conclusion that the relevant omission was harmless error and the termination

13   notice should be found to be effective even as to the omitted works.

14        Here, the near-Herculean effort and diligence then-plaintiffs' counsel,

15   Arthur J. Levine, placed on cataloging the works and drafting the termination

16   notice, and the inclusion of the express catch-all provision in the termination

17   notice, put to rest any reasonable doubt defendants may have had that plaintiffs

18   sought to recapture all, not just some, of the copyright in the Superman character.

19   In short, if receipt of the nearly six-pound, 546-page termination notice was not

20   enough to convey this message, it was made plain by the explicit statement

21   expressing plaintiffs' intent to terminate the copyrights in <u>all</u> the Superman works.

22        Accordingly, the Court finds that failure to list the two weeks' worth of

23   newspaper strips was harmless error that does not effect the validity of the

24   termination notice to the first two weeks' worth of Superman newspaper strips.

25   ## V. CONCLUSION

26        At the conclusion of this final installment regarding the publication history of

27   and the rights to the iconic comic book superhero Superman, the Court finds that

28   plaintiffs have successfully recaptured (and are co-owners of) the rights to the

91

EXHIBIT C
Page 173

1   following works:  (1) Action Comics No. 1 (subject to the limitations set forth in the

2   Court's previous Order); (2) Action Comics No. 4; (3) Superman No. 1, pages

3   three through six, and (4) the initial two weeks' worth of Superman daily

4   newspaper strips.  Ownership in the remainder of the Superman material at issue

5   that was published from 1938 to 1943 remains solely with defendants.[27]

6

    Dated:  August 12, 2009

7

8

9                                                    STEPHEN G. LARSON

10                                                   UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23   _____

        [27]   Although raised by the parties, the Court declines to address, and
24   preserves for consideration in limine of trial, the remaining issues raised in the
     parties' briefs, including the mechanics of how such an accounting would be
25   performed (should the concept of apportionment used in the infringement context
     be applied and, if so, who bears the burden of proof, and whether such
26   apportionment should be done on a work-by-work or template basis), questions on
     how and to what extent to divide up profits generated from so-called "mixed use"
27   trademark/copyright, and whether and to what extent pre-termination derivative
     works were published after the termination date into post-termination derivative
28   works subject to an accounting of profits.

                                         92

EXHIBIT C
Page 174

**ADDENDUM A**



EXHIBIT C
Page 175



EXHIBIT C
Page 176



EXHIBIT C
Page 177



EXHIBIT C
Page 178



EXHIBIT C
Page 179



EXHIBIT C
Page 180

EXHIBIT C
Page 181