# EXHIBIT D

## JOINT VENTURE AGREEMENT

AGREEMENT made as of November 23, 2001by and between Pacific Pictures
Corporation ("PPC") with offices at 23852 Pacific Coast Highway, Suite 555, Malibu,
CA 90265 ; tel. (310) 589-5151; fax: (310) 589-5152 and Jean A. Peavy and her son
Mark Warren Peary (f/k/a Mark Warren Peavy) (individually and collectively,
"Claimants") located at 51 Camino Cabo, Sante Fe, New Mexico 87508; tel. / fax: (505)
466-4551, regarding the formation of a joint venture for the purpose of retrieving,
enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights,
property, title and interests in and to Joe Shuster's creations (hereinafter, such rights,
property and claims, are individually and collectively referred to as the "Rights").

    1.    The Rights shall include without limitation, all current and future rights,
claims, title, copyrights and interests in and to each character, story element, and indicia
associated with, and all rights to proceeds from "SUPERMAN," or the "SUPERMAN"
stories and comic books, such as, without limitation, "Superman," "Clark Kent," "Lois
Lane," "Jimmy Olsen," "Lex Luther," "Lana Lang," "Mr. Mxyztplk," "Superboy,"
"Supergirl," "The Daily Planet," "Krypton," "Kryptonite," and "Smallville."

    2.    In consideration of the mutual covenants contained herein and other good
and valuable consideration, PPC and Claimants hereby form a joint venture (the
"Venture") to investigate, retrieve, enforce and exploit the Rights, including without
limitation, via the establishment of Joe Shuster's estate and the estate's termination
pursuant to Section 304 (c) of the U.S. Copyright Law (Title 17, U.S.C.) of any and all
grant or transfers by Joe Shuster of any copyright interest in his creations. In
consideration for PPC'S contributions to the Venture and the mutual covenants contained
herein Claimants hereby transfer and assign to the Venture their rights, title and interests
in the Rights. The name of the Venture shall be the "Joe Shuster Venture." The Venture's
office address shall be the California address set forth above.

    3.    PPC will pay any and all costs and expenses of the Venture, including the
legal fees and costs of setting up Joe Shuster's estate, U.S. copyright office costs such as
document retrieval costs and filing fees, research costs, and any and all attorneys' fees,
costs and disbursements in connection with any legal actions or disputes concerning the
enforcement and/or defense of the Rights and the Venture. In addition to attorneys' fees,
PPC will be responsible for the payment of any legal filing fees, expert witness fees,
subpoena and service of process fees, jury fees, deposition transcript costs, photocopying,

Initials: _(signatures)_

PPC 00005

Page 2
Joint Venture Agreement / Joe Shuster
11/23/01

postage, long distance telephone and fax charges, computerized legal research, reporter's fees, costs for preparation of exhibits and demonstrative evidence, travel costs outside of the Los Angeles area if required, and messenger fees. Any and all attorneys' fees payable on a contingency basis will be paid solely out of PPC'S share of Proceeds set forth in paragraph 5 below.

4.    The terms of any and all agreements regarding any of the Rights, in any respect, shall be subject to the express written approval of Claimants and PPC. The parties each warrant and represent that after signing this Agreement they will not without the express written consent of all the parties transfer, limit or encumber the Rights in any respect.

5.    Any and all moneys and proceeds received from the enforcement, settlement or exploitation of any of the Rights, including without limitation, fixed and contingent compensation, settlement or judgment amounts, purchase prices, option or quitclaim fees, and/or royalties (" Proceeds"), will be shared, divided and payable: fifty percent (50%) to Claimants and fifty percent (50%) to PPC. The parties will use all reasonable efforts to have Joe Shuster's estate/administrator and third party payors, if any, directly pay to the Claimants and PPC their respective fifty percent (50%) share of Proceeds. Prior to the above distribution of Proceeds, PPC will be entitled to recoup all of its out-of-pocket expenses under this Agreement subject to the presentation to Claimants of a reasonable accounting and receipts for said expenses.

6.    All notices, correspondence and payments to each party under this Agreement shall be sent to the respective addresses set forth on page 1 of this Agreement unless either party notifies the other of an address change in writing.

7.    The Venture and/or the Estate of Joe Shuster (to be established hereunder) will retain Marc Toberoff, Esq. to render legal services in connection with the Rights and the Venture, including in connection with all legal disputes, litigation, arbitration and/or mediation regarding the Rights; to implement, enforce and prosecute the Rights; and to handle the negotiation of any contracts regarding exploitation of the Rights.

Initials _____

PPC 00006

EXHIBIT D

Page 3
Joint Venture Agreement / Joe Shuster
11/23/01

8.    The term ("Term" ) of the Venture shall extend for the full duration of the Rights and any exploitation of the Rights. Upon the expiration of the Term and the winding-up of the Venture or in the event of termination of the Venture for any reason, all Rights, property or assets of the Venture will be held fifty percent (50%) by the Claimants and fifty percent (50%) by PPC as tenants in common, and Claimants and PPC will each be entitled to receive and continue to receive fifty percent (50%) of all Proceeds derived from the Rights after termination of the Venture.

9.    To cover the unlikely event that Marc Toberoff dies or is disabled; PPC will prior to service of any notice of termination regarding the Rights (pursuant to Section 304 (c) of the U.S. Copyright Law) either (a) arrange for a suitable replacement attorney experienced in copyright litigation and willing to enforce the Rights on solely a contingent fee basis; or (b) if no such replacement attorney is arranged to obtain "key man" insurance for Mr. Toberoff in the amount of $150;000 payable solely to Claimants.

10.    All parties agree to execute such further documents and to perform such further acts as may be reasonably necessary or desirable to carry out the purposes and effect of this Agreement, including without limitation an irrevocable letter of authority instructing the administrator of Joe Shuster's Estate to divide and disburse all Proceeds from the Rights as set forth in paragraph 5 above. When required hereunder, consent shall not be unreasonably withheld by any party regarding the business of the Venture. The parties hereby approve Michael Catron for appointment as the administrator of Joe Shuster's Estate, once it is established.

11.    This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. By countersigning this Agreement the parties each acknowledge that they clearly understand the terms and conditions of this Agreement; and have agreed to these terms and conditions after detailed and mature deliberation. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. The parties have mutually participated in the negotiation and drafting of this Agreement and agree that the terms of this Agreement shall not be construed more favorably to one party than the other. To the extent any provision of this Agreement is found invalid, said provision shall be stricken

EXHIBIT D
Page 184

PPC 00007

Page 4
Joint Venture Agreement / Joe Shuster
11/23/01

and shall not affect the validity of the remaining provisions hereof. This Agreement shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals.

11.    This Agreement shall be governed by the laws of California applicable to agreements made and to be performed therein.

Agreed, understood and accepted:

Pacific Pictures Corporation

_____                    Date: _Nov. 28, 2001_
By: Marc Toberoff, President

_____                    Date: _Nov. 28, 2001_
Jean A. Peavy

_____                    Date: _Nov. 28, 2001_
Mark Warren Peary
(f/k/a Mark Warren Peavy)

PPC 00008

# EXHIBIT E

# PACIFIC PICTURES CORPORATION

23852 Pacific Coast Highway, Suite 555
Malibu, CA 90265
Tel: (310) 589-5151
Fax: (310) 589-5152

October 27, 2003

Mark Warren Peary (f/k/a Mark Warren Peavy)
Executor
Estate of Joseph Shuster
51 Camino Cabo,
Sante Fe, New Mexico 87508

Dear Warren:

We are pleased to welcome you ("Client") as a client of Pacific Pictures Corp. ("PPC"). This letter is intended to supplement the joint venture agreement dated as of November 23, 2001 between PPC and you and your mother, Jean Peavy, and to confirm the agreement regarding your engagement of our company as the Executor of the recently probated Estate of Joseph Shuster.

1.      Client hereby engages PPC as its exclusive advisor for the purpose of retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations (hereinafter, such rights, property and claims, are individually and collectively referred to as the "Rights"). The Rights shall include without limitation, all current and future rights, claims, title, copyrights and interests of Client in and to each character, story element, and indicia associated with, and all rights to proceeds from "SUPERMAN," or the "SUPERMAN" stories and comic books, including, without limitation, Client's copyright termination interest in "SUPERMAN" pursuant to Section 304(d) of the U.S. Copyright Law.

2.      In furtherance of this exclusive agreement, PPC (which is not a law firm) shall engage the services of attorney Marc Toberoff ("Toberoff") to furnish directly to Client all legal services required by Client in connection with the Rights, including in connection with all legal disputes, litigation, arbitration and/or mediation regarding the Rights; to implement, enforce and prosecute the Rights; and to handle the negotiation of any contracts regarding exploitation of the Rights. PPC may engage additional outside counsel to assist Client, but only at PPC's sole expense.

3.      PPC has paid and will continue to pay any and all costs and expenses incurred by it in connection with this agreement, including the legal fees and costs of setting up Joseph Shuster's Estate, U.S. copyright office costs such as document retrieval costs and filing fees, research costs, and any and all attorneys' fees, costs and disbursements in connection with any legal actions or disputes concerning the

Initials: _AT_, _MWP_

PPC 00001

## PACIFIC PICTURES CORPORATION

Page 2
Estate of Joseph Shuster
October 27, 2003

enforcement and/or defense of the Rights and the Estate of Joseph Shuster. In addition to
attorneys' fees, PPC will be responsible for the payment of any legal filing fees, expert
witness fees, subpoena and service of process fees, jury fees, deposition transcript costs,
photocopying, postage, long distance telephone and fax charges, computerized legal
research, reporter's fees, costs for preparation of exhibits and demonstrative evidence,
travel costs outside of the Los Angeles area if required, and messenger fees. Any and all
attorneys' fees payable on a contingency basis will be paid solely out of PPC's share of
Proceeds set forth in paragraph 5 below.

4.    The terms of any and all agreements regarding any of the Rights, in any
respect, shall be subject to the express written approval of Client and PPC. The parties
each warrant and represent that after signing this Agreement they will not without the
express written consent of all the parties transfer, limit or encumber the Rights in any
respect.

5.    Any and all moneys and proceeds, in cash or in kind, received from the
enforcement, settlement or exploitation of any of the Rights, including without limitation,
fixed and contingent compensation, settlement or judgment amounts, purchase prices,
option or quitclaim fees, and/or royalties (" Proceeds"), will be shared, divided and
payable: fifty percent (50%) to Client and fifty percent (50%) to PPC. Prior to the above
distribution of Proceeds, PPC will be entitled to recoup all of its out-of-pocket expenses
under this Agreement subject to the presentation to Client of a reasonable accounting and
receipts for said expenses. The parties hereby acknowledge and agree that the due
payment to and receipt by Client of Proceeds hereunder shall constitute the due receipt of
Proceeds by Jean Peavy and Warren Peavy, respectively, pursuant to paragraph 5 of the
Joint Venture Agreement, in full satisfaction of PPC's obligations under said paragraph.

6.    All notices, correspondence and payments to each party under this
Agreement shall be sent to the respective addresses set forth on page 1 of this Agreement
unless either party notifies the other of an address change in writing.

7.    The term ("Term") of this agreement shall extend for the full duration of
the Rights and any exploitation of the Rights. Upon the expiration of the Term or in the
event of termination by Client of this agreement for any reason, all Rights will be held
fifty percent (50%) by the Client and fifty percent (50%) by PPC as tenants in common,
and Client and PPC will each be entitled to receive and continue to receive fifty percent
(50%) of all Proceeds derived from the Rights after termination, if any.

Initials: _____, _____

PPC 00002

## PACIFIC PICTURES CORPORATION

Page 3
Estate of Joseph Shuster
October 27, 2003

8.    To cover the unlikely event that Marc Toberoff dies or is disabled; PPC will prior to service of any notice of termination regarding the Rights (pursuant to Section 304 (d) of the U.S. Copyright Law) either (a) arrange for a suitable replacement attorney experienced in copyright litigation and willing to enforce the Rights on solely a contingent fee basis; or (b) if no such replacement attorney is arranged to obtain "key man" insurance for Mr. Toberoff in the amount of $150,000 payable solely to Client.

9.    All parties agree to execute such further documents and to perform such further acts as may be reasonably necessary or desirable to carry out the purposes and effect of this Agreement. When required hereunder, consent shall not be unreasonably withheld by any party regarding actions conducted under this agreement.

10.    This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. By countersigning this Agreement the parties each acknowledge that they clearly understand the terms and conditions of this Agreement; and have agreed to these terms and conditions after detailed and mature deliberation. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. The parties have mutually participated in the negotiation and drafting of this Agreement and agree that the terms of this Agreement shall not be construed more favorably to one party than the other. If any provision of this Agreement is found to be unenforceable for any reason, the remainder shall be enforced as fully as possible and the unenforceable provisions shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the parties expressed herein. This Agreement shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals.

11.    This Agreement shall be governed by the laws of California applicable to agreements made and to be performed therein.

If the terms and conditions of this agreement are acceptable to you, please

/ / /
/ / /
/ / /
/ / /

Initials: _MT_ , _____

PPC 00003

## PACIFIC PICTURES CORPORATION

Page 4
Estate of Joseph Shuster
October 27, 2003

acknowledge your acceptance by signing below.

Very truly yours,

Marc Toberoff
President

**Approval of Engagement of Pacific Pictures Corp.**

I have read the foregoing agreement and I agree to its terms.

The Estate of Joseph Shuster

Date: 10-30-03

By: Mark Warren Peary, Executor
(f/k/a Mark Warren Peavy)

I have read the foregoing agreement and agree to its terms to the extent any of my interests are concerned.

Date: 10 - 30 - 03

Jean A. Peavy

PPC 00004

# EXHIBIT F

# PACIFIC PICTURES CORPORATION

23852 Pacific Coast Highway, Suite 555
Malibu, CA 90265
Tel: (310) 589-5151
Fax: (310) 589-5152

September 10, 2004

Mark Warren Peary (f/k/a Mark Warren Peavy)
Executor, Estate of Joseph Shuster
Jean Peavy
51 Camino Cabo,
Sante Fe, New Mexico 87508

Dear Warren and Jean:

This is to confirm that (1) the joint venture agreement dated as of November 23, 2001 between you and Pacific Pictures Corp. and (2) the engagement agreement dated October 27, 2003 between the Estate of Joseph Shuster and Pacific Pictures Corp. have been cancelled.

Sincerely yours,

Marc Toberoff

AGREED:

The Estate of Joseph Shuster

By: Mark Warren Peary, Executor

Mark Warren Peary

Jean A. Peavy

PPC 00009

EXHIBIT F
Page 190

# EXHIBIT G

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through August 12, 2010.

Selected Entity Name: PACIFIC PICTURES CORPORATION
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | PACIFIC PICTURES CORPORATION |
| **Initial DOS Filing Date:** | AUGUST 26, 1988 |
| **County:** | NEW YORK |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC BUSINESS CORPORATION |
| **Current Entity Status:** | INACTIVE - Dissolution by Proclamation / Annulment of Authority (Jan 28, 2009) |

Information to reinstate a corporation that has been dissolved by proclamation or annulment of authority by proclamation is available on the New York State Department of Taxation and Finance website at www.tax.state.ny.us keyword TR-194.1 or by writing to NYS Department of Taxation and Finance, Reinstatement Unit/Bldg-8, Rm #958, W.A. Harriman Campus, Albany, NY 12227 or by telephone at 1-800-972-1233

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**

% MAX TOBEROFF
330 EAST 57TH STREET
APT 34A
NEW YORK, NEW YORK, 10022

**Registered Agent**

NONE

This office does not record information regarding the names and addresses of officers, shareholders or directors of nonprofessional corporations except the chief executive officer, if provided, which would be listed above. Professional corporations must include the name(s) and address(es) of the initial officers, directors, and shareholders in the initial certificate

EXHIBIT G
Page 191

of incorporation, however this information is not recorded and only available by viewing the certificate.

**\*Stock Information**

**# of Shares  Type of Stock  $ Value per Share**

200            No Par Value

\*Stock information is applicable to domestic business corporations.

**Name History**

**Filing Date   Name Type              Entity Name**

AUG 26, 1988  Actual        PACIFIC PICTURES CORPORATION

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results                New Search

Services/Programs   |   Privacy Policy   |   Accessibility Policy   |   Disclaimer   |   Return to DOS Homepage   |   Contact Us   |   Web Feedback

EXHIBIT G
Page 192

# EXHIBIT H

:002 04:55 PM
-07  08:18pm  Prop-

1(   '0 827 7227       P.02
                T-200  P 004/018  F=100

# Ip worldwide

As of October 3, 2002

Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, #106
Playa Del Rey, CA 90293

RECEIVED

OCT 2 4

**Marc Toberoff**

Re: "*Superman*"

Dear Joanne and Laura:

This letter shall confirm the agreement and understanding between you ("Owner") and us ("IPW") regarding Owner's retention of IPW to exclusively represent Owner with respect to any and all of Owner's rights, claims, title and interest in and to the comic book property commonly known as "*Superman*," including, without limitation, all characters and copyright interests therein (jointly and individually, "Rights"):

1.      In consideration for IPW's services set forth below, the mutual covenants contained herein and other good and valuable consideration, Owner hereby grants IPW the exclusive right to represent Owner and the Rights throughout the world in negotiating and assisting Owner to arrange and negotiate the sale, lease, license and all other dispositions or exploitations of the Rights, for the Term set forth below.

2.      IPW will furnish and provide the legal services of Marc Toberoff, Esq., and the business services of Ariel Emanuel and IPW's support staff and employ its network of business relationships and resources to market and negotiate the sale, license, settlement and/or other disposition of the Rights on your behalf, and will advise you and consult with you with respect thereto. IPW will also provide Marc Toberoff's legal services with respect to all legal contracts in connection with all of the above. IPW will be solely responsible for Marc Toberoff's legal fees in connection herewith, if any.

3.      The terms of any and all agreements regarding the Rights will require Owner's express written approval.

4.      IPW will pay its own costs and expenses in connection with this Agreement, including without limitation, office overhead, photocopying, messenger fees, postage and overnight mail, long distance telephone and fax charges, travel and accommodation costs and any legal fees to Marc Toberoff, and such costs will not be recoupable from Proceeds hereunder. Notwithstanding this, in the event IPW advances or loans Owner moneys to pay costs in furtherance of the Rights (e.g., US Copyright Office fees and audit fees, if any) the terms and repayment of any such advances or loans will be set forth in a separate written agreement between the parties.

9701 Wilshire Boulevard, 10th Floor Beverly Hills, CA 90212 Tel: (310) 246-3100; Fax: (310) 246-3335
E-mail: MToberoff@IPWW.biz

IPW 00001

-2002 04:56 PM                                    1 :   1 827 7227        P.03
Oct-21-02   08:18pm   From-                                        T-288   P.005/013   F-788

# **Ip**worldwide

Page 2
Retainer Agreement/ *Superman*
As of October 3, 2002

    5.    The term ("Term") of this Agreement is eighteen (18) months from the date this Agreement is executed by all parties. In the event the parties are actively negotiating an agreement regarding the Rights when the Term is due to expire, the Term will automatically be extended for three (3) additional months. In the event during the Term either Marc Toberoff or Ariel Emanuel are unable to render services in connection with this Agreement for a continuous period greater than three (3) months due to death, incapacity or otherwise, Owner may in its discretion terminate this Agreement prior to the expiration of the Term.

    6.    In consideration of the services to be furnished by IPW hereunder you hereby agree to pay and authorize IPW to retain out of all gross compensation, moneys or other consideration that may be payable or recovered for or by reason of Owner's Rights whether by negotiation, dispute resolution, settlement or otherwise ("Proceeds"): a fee ("Fee") of ten percent (10%) of any and all gross compensation payable including , without limitation, option, quitclaim or licensing fees, purchase price, settlement amounts, advances, fixed and/or contingent compensation. In computing IPW's fee no deduction will be made from gross Proceeds, including, without limitation, no deduction for Owner's taxes, expenses and/or moneys payable to any and all third parties if any. IPW's Fee shall apply to any and all agreements regarding the Rights made during the Term or the material terms of which are substantially negotiated during the Term and/or to any agreements between Owner and an investor or buyer introduced by IPW to Owner during the Term. For the avoidance of doubt, in the event "*Superman*" and the Rights are sold, settled, licensed or otherwise exploited in conjunction with other characters or rights owned or controlled by Owner (e.g., "*Superboy*"); it is understood and agreed that IPW will not "double dip" and the above 10% IPW Fee will apply to gross Proceeds from any said joined transaction(s).

    Notwithstanding the above, for purposes of computing IPW's Fee, Proceeds will not include Joanne Siegel's annual "pension" payments which commenced in 1996 (currently $ 126,148 annually, plus cost of living increases or bonuses, if any) and her full medical and dental coverage provided by AOL Time Warner which consideration and interests pre-date and are wholly separate from her copyright termination interests.

///
///
///
///
///
///

IPW 00002

2002 04:56 PM
Oct-21-02  08:18pm  From-                    1 (   1 827 7227            P.04
                                              T-206  P.008/013  F-786

# Ip worldwide

Page 3
Retainer Agreement/ *Superman*
As of October 3, 2002

7.      Owner hereby authorizes IPW to collect and receive all Proceeds due and payable; to endorse and deposit any checks or moneys payable into a client trust account on Owner's behalf; to deduct IPW's fee as set forth above; whereupon IPW will promptly pay the remainder directly to Owner as directed by Owner in writing. It is understood that the Rights may involve multiple rights and claims against multiple parties and accordingly IPW's above fee shall be applicable to each Rights payment or recovery from any party and same is not contingent on any other Rights payment.

8.      Owner hereby warrants and represents that Owner will not transfer, assign, license or in any manner encumber the Rights during the Term or extended Term other than through or as a result of IPW's exclusive representation hereunder, with the exception of by will, probate or pursuant to other Court order.

9.      All notices and/or payments hereunder shall be made to the parties at the addresses set forth on page 1 hereof unless and until either party gives the other prior written notice of a change of address.

10.     The parties understand and acknowledge that the scope of this Agreement does not include legal services and/or expenses in connection with litigation or formal legal arbitration, if any. The provision of such services and advancing of such expenses, if requested and desired by Owner, will be rendered and provided by Marc Toberoff, Esq., subject to good faith negotiation of a mutually acceptable agreement executed by Mr. Toberoff and Owner.

11.     This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by both parties. The parties acknowledge that they fully understand the terms and conditions of this Agreement and have agreed to such terms and conditions after negotiation, mature thought and deliberation. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. If any provision of this Agreement is found to be unenforceable, the remainder shall be enforced as fully as possible and the unenforceable provisions shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the parties expressed herein. The terms of this Agreement shall be construed pursuant to their fair meaning, not for or against either party. This Agreement shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals. This Agreement shall be governed by the

IPW 00003

EXHIBIT H
Page 195

-2002 04:57 PM
(-18-02   01:13am   From-

1 /  827 7227        P.05
T-281  P.009/013  P-751

# Ip worldwide

Page 4
Retainer Agreement/ *Superman*
As of October 3, 2002

Laws of the State of California applicable to agreements made in and to be performed therein.

We are very pleased and excited to work with you and will do our very best to handle this matter in a dedicated manner and to achieve results satisfactory to you.

Yours sincerely,

Marc Toberoff
Authorized signatory

Ariel Emanuel
Authorized signatory

Agreed, Understood and Accepted:

Joanna Siegel                          Date: October 23rd-2002

Laura Siegel Larson                    Date: October 23, 2002

IPW 00004

# EXHIBIT I

1  Attorneys for Plaintiffs and counterdefendants:
   TOBEROFF & ASSOCIATES, P.C.
   Marc Toberoff (State Bar No. 188547)
2  Nicholas C. Williamson (State Bar No. 231124)
   Keith G. Adams (State Bar No. 240497)
3  2049 Century Park East, Suite 2720
   Los Angeles, California, 90067
4  Telephone:  (310) 246-3333
   Fax:        (310) 246-3101
5
6  Attorneys for Defendants and counterclaimant:
   WEISSMANN WOLFF BERGMAN
7    COLEMAN GRODIN & EVALL LLP
   Michael Bergman (SBN 37797)
8  9665 Wilshire Boulevard, Ninth Floor
   Beverly Hills, California  90212
9  Telephone: (310) 858-7888
   Fax:        (310) 550-7191
10 FROSS ZELNICK LEHRMAN & ZISSU, P.C.
   Roger L. Zissu (Admitted pro hac vice)
11 James D. Weinberger (Admitted pro hac vice)
   866 United Nations Plaza
12 New York, New York 10017
   Telephone:  (212) 813-5900
13 Fax:        (212) 813-5901

14 PERKINS LAW OFFICE, P.C.
   Patrick T. Perkins (Admitted pro hac vice)
15 1711 Route 9D
   Cold Spring, New York  10516
16 Telephone:  (845) 265-2820
   Fax:        (845) 265-2819
17
18              UNITED STATES DISTRICT COURT

19      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

20 JOANNE SIEGEL and LAURA SIEGEL    Case No. CV-04-8700 ODW (RZx)
   LARSON,                          Case No. CV-04-8776 ODW (RZx)
21
           Plaintiffs,             Hon. Otis D. Wright II, U.S.D.J
22
       v.
23                                 **JOINT STATUS REPORT**
   TIME WARNER INC.; WARNER
24 COMMUNICATIONS INC.; WARNER
   ENTERTAINMENT INC.; WARNER BI
25 TELEVISION PRODUCTION INC.; DC
   COMICS; and DOES 1-10,
26
           Defendants.
27
28 AND RELATED COUNTER-CLAIMS

394090v1

JOINT STATUS REPORT

EXHIBIT I
Page 197

1    Plaintiffs Joanne Siegel and Laura Siegel Larson (collectively, "Plaintiffs") and

2 Defendants Time Warner Inc. ("Time-Warner"), Warner Communications Inc., Warner

3 Bros. Entertainment, Inc. ("Warner Bros."), Warner Bros. Television Production Inc., and

4 Defendant and Counterclaimant DC Comics ("DC") (collectively, "Defendants") hereby

5 submit this joint status report in Cases Nos. CV 04-8400 (the "Superman Action") and CV

6 04-8776 (the "Superboy Action"), as directed by the Court.[1]

7    Plaintiffs Joanne Siegel and Laura Siegel Larson are the widow and daughter,

8 respectively, of Jerome Siegel ("Siegel") who, with Joseph Shuster ("Shuster"), co-created

9 Superman.  Siegel and Shuster co-authored the first Superman comic book story which

10 was later published in 1938 by Detective Comics, Inc. ("Detective"), the predecessor of

11 defendant DC Comics, in a new publication entitled *Action Comics No. 1*.  By agreement

12 dated March 1, 1938, Siegel and Shuster granted to Detective all worldwide rights in their

13 Superman story and character, and Detective exploited those rights in various media over

14 the next seventy years.  During the period at issue, from 1938 to 1943, Siegel and Shuster

15 wrote, hundreds of additional Superman comic book stories published by Detective, and

16 hundreds of Superman newspaper strips syndicated by the McClure Newspaper Syndicate.

17    The 1976 Copyright Act, which became effective on January 1, 1978, provided

18 authors and their families with new rights to recapture the author's original copyright(s)

19 for the extended renewal term by noticing the termination of previous grants of copyright.

20 *See* 17 U.S.C. §§ 304(c), 304(d), 203(a).  Pursuant to 304(c) of the 1976 Act, Plaintiffs

21 served notices of termination with respect to  Superman and Superboy ("Termination

22 Notices" or "Terminations") on Defendants on April 3, 1997, and November 8, 2002,

23 respectively, and filed such notices with the U.S. Copyright Office, pertaining to Siegel's

24 alleged copyright interest in Superman and Superboy that had been the subject of certain

25 grants.  Pursuant to section 304(c), the Superman Termination Notices set forth an

26
27 [1] The parties have worked in good faith to prepare a mutually acceptable joint statement and agree that neither party will be prejudiced by the descriptions of the claims, defenses, and arguments presented herein.

28

394090v1

EXHIBIT I
Page 198

1    effective Termination date of April 16, 1999, and the Superboy Termination Notices set

2    forth an effective Termination date of November 17, 2004.

3        Defendants challenged the scope and effectiveness of Plaintiffs' Superman and

4    Superboy Termination Notices.  In response, Plaintiffs initiated, in October 2004, the

5    Superman Action and the Superboy Action for declaratory relief as to the validity of the

6    Superman and Superboy Terminations, respectively, and additional claims.

7        Superman is considered a joint work under the Copyright Act because it was co-

8    authored by Siegel and Shuster.  As such, each co-author originally owned an undivided

9    50% interest in such joint work's copyright.  Joint owners of a copyright each have the

10    non-exclusive right to exploit such copyright subject to a duty to account to one another.

11    The Superman Termination Notices related to Siegel's (but not his co-author Shuster's)

12    50% interest in the Superman copyrights.  Therefore, because DC is currently still the

13    successor of Shuster's joint copyright interest, the Superman Action is principally an

14    action for an accounting of Plaintiffs' allocable share of profits from the exploitation of

15    Plaintiffs' recaptured Siegel Superman copyrights after April 16, 1999, the noticed

16    Superman Termination date.

17        The Superboy Action, in contrast, is based on Siegel's alleged sole authorship of the

18    original Superboy story, and is therefore principally a copyright infringement action, based

19    on Defendants' alleged exploitation of the allegedly recaptured Superboy copyrights after

20    November 17, 2004, the noticed Superboy Termination date.

21        In the more than five years since Plaintiffs filed their actions, the Court has issued a

22    number of wide-ranging opinions that have substantially refined and narrowed the issues

23    presented.  In the sections that follow, we set forth the procedural history of each case,

24    describing the issues that have been determined along with the issues that remain pending.

25    I.    The Superman Action (Case No. CV 04-8400).

26        On April 3, 1997, Plaintiffs served seven notices of termination pursuant to 17

27    U.S.C. § 304(c), all effective as of April 16, 1999, purporting to terminate Siegel's

28    copyright grants to DC's predecessors in the Superman character and comic book series

394090v1

2

JOINT STATUS REPORT

EXHIBIT I
Page 199

1   dating back to 1938.

2        Plaintiffs filed their initial Complaint in the Superman Action on October 4, 2004.

3   The Complaint contained the following causes of action:

4   •    Plaintiffs' First Cause of Action sought declaratory relief to affirm the validity of

5        Plaintiffs' Superman Termination Notices pursuant to 17 U.S.C. § 304(c), and to

6        declare that Plaintiffs, having recaptured Siegel's fifty percent share of the original

7        Superman copyrights, were entitled to an accounting from Defendants for fifty

8        percent of their profits from the continued exploitation of the recaptured Superman

9        copyrights after April 16, 1999;

10  •    Plaintiffs' Second Cause of Action sought declaratory relief as to the scope of

11       Defendants' duty to account to Plaintiffs for post-April 16, 1999 profits from

12       exploitation of Plaintiffs' recaptured Superman copyrights, including declarations:

13       (a) that Defendants' duty to account extends to profits from foreign territories based

14       on "predicate acts" in the United States; (b) that "apportionment" is applicable to

15       copyright *infringement* claims actions and not to an accounting of profits between

16       joint copyright owners; (c) that if apportionment is held to apply, its application

17       should be limited to derivative Superman works created by the accounting

18       Defendant(s), but not to passive Superman licensing by such accounting Defendant;

19       (d) that profits should include profits from any derivative Superman works created,

20       produced or manufactured on or after the effective Termination date; (e) that profits

21       should not be limited to the Superman profits of Warner Bros.' wholly owned

22       subsidiary, DC, but should include Superman profits of Warner Bros. and Time-

23       Warner as well; and (f) that, in determining profits, deductible costs should be

24       limited to those customarily deducted in arm's-length agreements and comply with

25       Generally-Accepted Accounting Principles ("GAAP");

26  •    Plaintiffs' Third Cause of Action sought a declaration that Defendants have a duty

27       to account for post-April 16, 1999 exploitation of the Superman "crest" and/or

28       Superman "shield" on the ground that they are copyrighted works derivative of the

394090v1

**3**

EXHIBIT I
Page 200

1  copyrighted Superman crest in *Action Comics No. 1*;

2  • Plaintiffs' Fourth Cause of Action sought an accounting from all Defendants for

3  their respective exploitation of recaptured Superman copyrights after the effective

4  Termination date;

5  • Plaintiffs' Fifth Cause of Action alleged a claim for waste of the recaptured

6  Superman copyrights after the effective Termination date;

7  • Plaintiffs' Sixth Cause of Action alleged that Defendants violated the Lanham Act

8  by falsely representing exclusive ownership of Superman after the noticed

9  Termination date;[2]

10  • Plaintiffs' Seventh Cause of Action alleged that Defendants violated California

11  Business and Professions Code §§ 17200 *et seq.* by omitting the Terminations from

12  Time-Warner's public financial disclosures.

13

14  Defendants filed their initial Answer and Counterclaims in the Superman Action on

15  November 22, 2004.  Defendant DC Comics asserted the following counterclaims:

16  • DC's First Counterclaim requested declaratory relief that the Termination Notices

17  are ineffective, alleging five independent reasons:  (a) Plaintiffs did not send a

18  notice of termination with respect to a May 21, 1948 Consent Agreement; (b)

19  Plaintiff Joanne Siegel continued to accept benefits under a December 23, 1975

20  agreement, although she served a termination notice listing that agreement; (c)

21  Plaintiffs' Superboy Notice was ineffective because it was based on works that were

22  unpublished and therefore not subject to termination because they were neither in

23  their first nor their second term of copyright as of January 1, 1978, as required by 17

24  U.S.C. § 304(c); (d) Siegel's Superboy proposal and story sent to DC's predecessor-

25  in-interest were either prepared without the authorization of the copyright owner

26

27  [2] Plaintiffs did not include the Fifth and Sixth Causes of Action in their Second Amended Complaint, which was filed on October 8, 2008, with the Court's permission.  Defendants filed their Answer to Plaintiffs' Second Amended Complaint on October 20, 2008.

28

394090v1

4

JOINT STATUS REPORT

EXHIBIT I
Page 201

1   and/or were "works made for hire," and therefore Siegel did not own any copyright

2   interest therein that would be subject to copyright termination; and (e) the Superman

3   Termination Notices were not timely served;

4   • DC's Second Counterclaim requested a declaration that the Siegels' claims are

5   barred by the statute of limitations;

6   • DC's Third and Fourth Counterclaims alleged that the parties had entered into a

7   settlement agreement that the Siegels had repudiated,

8   • DC's Fifth Counterclaim alleged on the basis of various limitations provided in

9   section 304(c) that the Court limit the scope and reach of the Superman and

10   Superboy notices in the following seven ways: (a) Plaintiffs failed to terminate

11   certain Superman Ads published prior to the publication of *Action Comics No. 1*, so

12   that the copyrights therein are still exclusively owned by DC Comics; (b) DC

13   Comics retains the rights to exploit Superman "derivative works" prepared prior to

14   the effective dates of the Superman and Superboy Notices; (c) DC owns all

15   copyrights in post-*Action Comics No. 1* "derivative works," including new super

16   powers, villains, components to the Superman universe, or any other new Superman

17   elements contained therein; (d) Superboy is a "derivative work" based on Superman;

18   (e) Superboy is a joint work of authorship; (f) the television show "Smallville" is not

19   derived from the Siegel Superboy Submissions or any other Superboy work

20   exploited prior to May 21, 1948; and (g) certain "Additional Action Comics No. 1

21   Materials" were works made for hire;

22   • DC's Sixth Counterclaim sought a determination regarding the application of a

23   number of accounting principles in the event that the Superman Termination Notices

24   and/or Superboy Termination Notice were deemed valid and effective.

25

26   The parties subsequently entered into a stipulation permitting Plaintiffs to file their

27   First Amended Complaint and permitting Defendants to file their First Amended

28   Counterclaims, and the Court adopted the stipulation on October 18, 2005.

394090v1

**5**
JOINT STATUS REPORT

EXHIBIT I
Page 202

1      Plaintiffs' First Amended Complaint largely tracked their initial complaint, except

2 for substantive amendments to Plaintiffs' sixth cause of action under the Lanham Act.

3      Defendants' First Amended Counterclaims contained additional allegations

4 concerning Defendants' alleged "settlement" defense. Defendants filed their Answer to

5 Plaintiffs' First Amended Complaint on November 1, 2005. Plaintiffs filed their Reply to

6 Defendants' First Amended Counterclaims on November 4, 2005.

7 **A.**    **The Parties' April 30, 2007 Partial Summary Judgment Motions.**

8      On April 30, 2007, the parties filed cross-motions for partial summary judgment in

9 the Superman Action. Plaintiffs sought partial summary judgment as follows:

10 •    That Defendants' Third and Fourth Alternative Counterclaims should be dismissed

11      because the parties failed to consummate a binding settlement agreement;

12 •    That the Superman Termination is valid as a matter of law with respect to at least

13      the original Superman story published in *Action Comics No. 1*, and that Plaintiffs

14      have thereby recaptured Siegel's co-authorship share of the copyrights therein;

15 •    That the defenses to the Terminations alleged in Defendants' First and Second

16      Alternative Counterclaims and parts of their Fifth Alternative Counterclaim lacked

17      merit because: (a) Siegel and Shuster's Superman story published in *Action Comics*

18      *No. 1* is not a "work made for hire" as it was independently created by them long

19      before their relationship with Detective; (b) that a May 21, 1948 consent judgment

20      need not have been listed in Plaintiffs' Termination Notices because it was not a

21      copyright grant and, in any event, is duplicative of the May 19, 1948 stipulation

22      listed in the Termination Notices; (c) that the December 23, 1975 agreement, was

23      not a copyright grant and, in any event, Plaintiff Joanne Siegel's acceptance of

24      certain pension benefits from Defendants did not reinstate any copyright grants; (d)

25      that the Superman Termination was timely served; and (e) that the Superman

26      Termination is not barred by the statute of limitations; and

27 •    That Plaintiffs are entitled to an accounting of all profits earned from Plaintiffs'

28      recaptured Superman copyrights in the United States and in foreign territories (to the

394090v1

**6**

JOINT STATUS REPORT

EXHIBIT I
Page 203

1    extent such foreign profits are based on Defendants' predicate acts in the United

2    States).

3

4    Defendants sought partial summary judgment as follows:

5  •  That Plaintiffs have no right under the Copyright Act to share in Defendants' profits

6    derived (a) from the foreign exploitation of any Superman work, including

7    "Superboy," or any other juvenile version of Superman, (b) from the exploitation of

8    the Superman family of trademarks, or (c) from the continued exploitation of any

9    Superman "derivative work," including "Superboy," or any other juvenile version of

10    Superman, created prior to the effective dates of Plaintiffs' Terminations;

11  •  That as a result of Plaintiffs' alleged failure to terminate certain copyrighted works

12    as prescribed by the Copyright Act, Defendants remain free to use such

13    unterminated works and the elements contained therein without accounting to

14    Plaintiffs and without liability for copyright infringement; and

15  •  That neither Warner Bros. nor Time-Warner is the "alter ego" of DC, and Plaintiffs

16    therefore are not entitled to reach any Superman-related profits of either of these

17    two Defendants.

18

19    The Court issued its ruling on the parties' partial summary judgment motions on

20    March 26, 2008.

21    The Court granted Plaintiffs' motion with respect to Defendants' work-for-hire

22    defense, concluding that "all the Superman material contained in Action Comics, Vol. 1, is

23    not a work-made-for-hire and therefore is subject to termination." *Siegel v. Warner Bros.*

24    *Ent. Inc.*, 542 F.Supp.2d 1098, 1130 (C.D. Cal. 2008) ("*Siegel II*"). The court also granted

25    Plaintiffs' motion in holding that Plaintiffs' omission of the 1948 consent judgment in the

26    Termination Notices did not diminish or invalidate the Notices. *Id.* at 1132. The Court

27    likewise granted Plaintiffs' motion that Joanne Siegel's continued acceptance of benefits

28    under the parties' 1975 agreement did not constitute a "grant" of copyrights under section

394090v1

**7**

JOINT STATUS REPORT

EXHIBIT I
Page 204

1    304(c)(6)(D) and had no effect on Plaintiffs' Terminations. *Id.* at 1134. The Court also

2    granted Plaintiffs' motion in denying Defendants' statute of limitations defense, holding

3    that Plaintiffs' action was timely filed. *Id.* at 1136. The Court likewise granted Plaintiffs'

4    motion in denying Defendants' defense that the parties had allegedly entered into a

5    binding settlement agreement in 2001, ruling that "the parties' settlement negotiations did

6    not result in an enforceable agreement." *Id.* at 1139.

7         The Court granted Defendants' motion in ruling that certain "promotional

8    announcements," due to their earlier publication, fell outside the statutory time "window"

9    of Plaintiffs' Termination Notices. *Id.* at 1126. The Court defined the scope of the

10   elements in the Promotional Announcements. *Id.*

11        In addition, the Court granted Defendants' motion on the foreign profits issue and

12   denied Plaintiffs' motion, ruling that the "the termination notice is <u>not</u> effective as to …

13   defendants' exploitation of the work abroad," and that therefore Defendants "must account

14   to plaintiffs only for the profits from such domestic exploitation of the Superman

15   copyright." *Id.* at 1142. The Court also granted Defendants' motion that "plaintiffs cannot

16   share in defendants' profits 'purely attributable to [Superman] trademark rights,'" but

17   preserved the issue of Defendants' "accounting [for] the mixed use of trademark and

18   copyright." The Court also granted Defendants' motion that Plaintiffs' accounting "should

19   not include any profits attributable to the 'post-termination exploitation of [Superman]

20   derivative works prepared prior to termination,'" but preserved the issue as to the extent a

21   post-termination "alteration [of] pre-termination derivative works" creates a post-

22   termination derivative work for which Defendants must account. *Id.*

23        The Court denied Defendants' motion to dismiss Plaintiffs' "alter ego" claims,

24   holding that "whether the license fees paid [to DC Comics for the Superman rights]

25   represents the fair market value therefor, or whether the license for the works between the

26   entities was a 'sweetheart deal,' are questions of fact that are not answered on summary

27   judgment…." *Id.* at 1145.

28        Both parties moved for clarification and/or reconsideration of certain portions of the

394090v1

**8**

JOINT STATUS REPORT

EXHIBIT I
Page 205

1 Court's March 26, 2008 Partial Summary Judgment Order. Defendants' motion (Docket

2 Entry #307) requested that the Court reconsider its statement regarding the scope of

3 copyrightable material contained in the "promotional announcements." Plaintiffs' motion

4 (Docket Entry # 300, 312) requested that the Court "(a) clarify that Defendants did not

5 secure any copyrightable <u>Superman</u> elements via the 'promotional announcements;'" and

6 (b) clarify that the promotional announcements did not detract from Plaintiffs' recaptured

7 Superman copyrights. Plaintiffs also sought clarification that the Court's statements in the

8 background section of its order regarding the Superman elements it did not see in *Action*

9 *Comics No. 1* were *dicta*, on the ground that this literary issue had not been joined.

10     On July 3, 2008, the Court issued an order denying Defendants' motion. In denying

11 Defendants' motion, the Court "affirm[ed] its conclusion on the scope of the copyrightable

12 material contained in those [promotional] announcements." Order at 3-4. The Court

13 denied Plaintiffs' motion, but without prejudice, stating that "[s]hould plaintiffs wish for

14 the Court to deal with the questions identified in their motion, they may append them to

15 those issues identified in the March 31, 2008 Order requiring further briefing." Order at 4.

16 *See* Discussion of Additional Issues Briefing in Section I(B), *infra*.

17 **B.    Additional Issues Briefing.**

18     On February 21, 2008, a month before the Court issued its March 26, 2008 Partial

19 Summary Judgment Order, the parties filed a stipulation with the Court, requesting that it

20 accept briefing on and decide certain "Additional Issues" that would substantially impact

21 the nature, conduct and length of the trial, as well as the parties' pre-trial preparations.

22 The Additional Issues were:

23 •     If Plaintiffs are successful in their Superman copyright termination claim, is

24         Plaintiffs' share of post-termination profits as a joint owner of the recaptured

25         Superman copyright(s) subject to reduction via an "apportionment" analysis?

26 •     If Plaintiffs are successful in their Superman copyright termination claim, are the

27         following to be determined by the Court or by the jury: (a) the amount of post-

28         termination Superman profits at issue and (b) the degree, if any, to which Plaintiffs'

394090v1

**9**
JOINT STATUS REPORT

EXHIBIT I
Page 206

1    share of such profits should be reduced by "apportionment"?

2    • If an "apportionment" analysis is held to be appropriate, is the trier of fact (be it the

3    Court or the jury) required to make a separate and independent apportionment

4    determination, if any, for each post-termination Superman work?

5    • Do Plaintiffs or Defendants bear the burden of proof on (a) the issue of Defendants'

6    profits, and (b) the issue of the apportionment, if any, of those profits?

7    • If Plaintiffs are successful in their Superman copyright termination claim, are

8    Plaintiffs only entitled to profits derived from Plaintiffs' recaptured copyright

9    interest in *Action Comics No. 1*; that is, was Jerome Siegel's contribution on all

10   *subsequent* Superman works (within the termination "window") as a "work-made-

11   for-hire" and accordingly not subject to termination?

12

13   In a March 31, 2008 Order, issued several days after the Court's Partial Summary

14   Judgment Order, the Court ordered the parties to engage in settlement mediation, and

15   stated that it would set a briefing schedule for the Additional Issues if the parties were

16   unable to reach a settlement.[3]  The Court also requested that the parties brief (along with

17   the Additional Issues) the following issues that had been left unresolved by the Court's

18   March 26, 2008 Partial Summary Judgment Order:

19   • Whether and to what extent post-termination alterations to pre-termination

20   derivative works fall within the scope of what Plaintiffs regained through their

21   termination notices; and

22   • Whether and to what extent mixed uses of trademarks and copyright fall within the

23   scope of what Plaintiffs regained through their termination notices.

24

25   Pursuant to the Court's July 3, 2008 Order regarding Plaintiffs' motion for

26   clarification, Plaintiffs also re-briefed the issues of (a) the scope of Defendants' rights

27

28   [3] The parties' mediation efforts are described in Section III below.

394090v1

**10**
JOINT STATUS REPORT

EXHIBIT I
Page 207

1   based on the "promotional announcements," and (b) whether the Court's background

2   statements concerning the absence of certain Superman elements in *Action Comics No. 1*

3   were *dicta*.

4   　　　The parties submitted their initial briefs on the Additional Issues on July 21, 2008

5   and their responsive briefs on July 28, 2008.  The Court heard oral argument on September

6   16, 2008, during which the Court bifurcated the trial, with separate trials on (1) the alter

7   ego issues identified in the Court's March 26, 2008 Partial Summary Judgment Order, to

8   determine which Defendants were required to account to Plaintiffs for their Superman

9   profits; and (2) the ultimate accounting claim.

10   　　　On October 6, 2008, the Court issued an Order denying Plaintiffs' request for a jury

11   trial on their "alter ego" and accounting claims.  *Siegel v. Warner Bros. Entm't Inc.*, 581 F.

12   Supp. 2d 1067 (C.D. Cal. 2008).[4]  The Court "reserve[d decision on the other Additional

13   Issues] until shortly before the time of [the accounting] trial." *Id.* at 1076.

14   **C.    Plaintiffs' Lanham (Trademark) Act and Waste Claims**

15   　　　Trial on Plaintiffs' Lanham Act and waste claims was set for November 4, 2008.

16   On September 25, 2008, the parties submitted a stipulation seeking leave for Plaintiffs to

17   file their Second Amended Complaint, removing Plaintiffs' Lanham Act and waste claims.

18   On October 6, 2008, the Court held a status conference to address the parties' stipulation

19   and other trial scheduling issues.  The Court then accepted the parties' stipulation, granting

20   Plaintiffs leave to file the Second Amended Complaint, which they did on October 8,

21   2008.  Defendants filed their Answer to Plaintiffs' Second Amended Complaint on

22   October 20, 2008.

23   　　　In the Court's October 6, 2008 Order on the jury issues, the Court bifurcated the

24   trial, with separate trials on:  (1) the alter ego issues identified in the Court's March 26,

25   _____

26   [4] Plaintiffs had alternatively requested an advisory jury to the extent the Court engaged in an "apportionment" analysis.  Plaintiffs contend that the Court did not decide Plaintiffs' request that it empanel an "advisory jury."  Defendants contend that the Court rejected any claim for a

27   jury in connection with the accounting trial and did not leave the question of an advisory jury for later decision.

28

394090v1

EXHIBIT I
Page 208

1  2008 partial summary judgment Order, which would determine which Defendants'

2  Superman profits would be subject to an accounting, and (2) the ultimate accounting

3  claims.  The Court scheduled the alter ego trial for January 20, 2009 and the accounting

4  trial for March 16, 2009.

5  **D.     The "Alter-Ego Trial"**

6          In its March 26, 2008 Partial Summary Judgment Order, the Court found, with

7  respect to the close relationship between DC and Warner Bros., that "[t]his fact alone

8  raises a specter of a 'sweetheart deal' entered into by related entities in order to pay a less

9  than market value fee for licensing valuable copyrights." *Siegel II,* 542 F.Supp.2d at 1144.

10  Accordingly, the Court conducted the "alter-ego trial" from April 28, 2009 to May 13,

11  2009, and heard closing arguments on May 19, 2009.  In its March 13, 2009 Final Pre-

12  Trial Conference Order, the Court stated:

13          Given the nature and the characterization of the property in question, the trial shall
14          determine whether the value of the various Superman option and assignment
            agreements between DC Comics and TWEC [Time Warner Entertainment
            Company, LP], Warner Bros. Entertainment's predecessor in interest, and the
15          amounts paid to DC Comics by TWEC (and its successor Warner Bros.
            Entertainment) thereunder, reflect the fair market value of the nonexclusive rights
16          that the Court has determined were transferred from DC Comics to TWEC (and its
            successor Warner Bros. Entertainment), and, if not, what accounting shall be
17          required of Warner Bros. Entertainment to ensure an equitable result.

18  Final Pretrial Conference Order at 7-8.

19          After the parties finished their closing arguments on May 19, 2009, the Court

20  dismissed Time-Warner from the case pursuant to Rule 52(c) (Tr. at 1598:2 – 1598:3) and

21  held that there was insufficient evidence to establish that the consumer products agreement

22  or animation agreements at issue were not fair market agreements.  (Tr. at 1598:4 –

23  1598:8).

24          The Court took the other issues under submission.  On July 8, 2009, the Court issued

25  its findings of fact and conclusions of law concerning the "alter-ego trial."  The court

26  found in favor of Defendants as of the time of trial with respect to each of the agreements

27  at issue, concluding that:

28  •       "there is insufficient evidence that the Superman film agreement between DC

394090v1

**12**

1    Comics and Warner Bros., whether judged by its direct economic terms or its
2    indirect ones, was consummated at below its fair market value." Order at 28; and
3    •    "the Court finds that there is no evidence introduced at trial that demonstrates that
4        the Smallville agreement was for less than fair market terms." *Id.*
5
6        However, the Court held that because the Defendants' Superman film agreement did
7    not contain a customary "reversion" clause in DC's favor, Plaintiffs could seek damages if
8    filming on a Superman sequel has not commenced by 2011:
9    •    "If, however, by 2011, no filming has commenced on a Superman sequel, plaintiffs
10        could bring an accounting action at that time to recoup the damages then realized for
11        the Superman film agreement's failure to contain a reversion clause." *Id.* at 29.
12
13    E.    **The August 12, 2009 Decision on "Work-For-Hire" Issues.**
14        On August 12, 2009, the Court issued an "Order Resolving Additional Issues." In
15    its Order, the Court ruled on the work-for-hire arguments presented in the parties'
16    Additional Issues briefing, and denying Plaintiffs' request for a jury trial on the work-for-
17    hire issue. At issue was whether the following works were "works-made-for-hire": (i) a
18    description of "future Superman exploits" written by Siegel; Superman comic strips
19    created by Siegel and artist Russell Keaton (the "Keaton Material"); *Action Comics Nos. 2-*
20    *61*; *Superman Nos. 1-6*; and Superman newspaper strips syndicated by the McClure
21    Newspaper Syndicate. In pertinent part, the Court ruled as follows:
22    •    The "future Superman exploits" paragraph written before the publication of *Action*
23        *Comics No. 1* could not be terminated because it was too generalized to achieve
24        copyright protection. *Siegel v. Warner Bros. Entertainment, Inc.*, 2009 U.S. Dist.
25        LEXIS 78193 at *58-*61 (C.D. Cal. Aug. 9, 2009) ("Siegel III");
26    •    The "Keaton Material" was unpublished and therefore could not be terminated,
27        because it did not "acquire[] statutory copyright protection under the 1909 Act, as it
28        was either never published with the requisite notice or registered as an unpublished

394090v1

**13**
JOINT STATUS REPORT

EXHIBIT I
Page 210

1    work." *Id.* at *61;

2    • The Superman material "appearing in <u>Action Comics</u> No. 4 is based almost

3    verbatim on Siegel's pre-1938 script, . . . the Superman material appearing therein

4    was not a work for hire and is subject to termination" and recaptured by Plaintiffs.

5    *Id.* at *66-*67;

6    • <u>Superman</u> No. 1, pages three through six, was not a work made for hire and was

7    thus subject to termination and recaptured by Plaintiffs. *Id.* at *69-*70;

8    • "[T]he Superman material in <u>Action Comics</u> Nos. 2-3 and 5-6 . . . were works made

9    for hire." *Id.* at *78-*79;

10    • "[T]he Superman materials created by Siegel and Shuster during the term of their

11    employment agreement (namely, <u>Action Comics</u> Nos. 7-61, and to <u>Superman</u> Nos.

12    1-23) were works made for hire." *Id.* at *86-*87;

13    • "[T]he two weeks' worth of newspaper comic strip material created by Siegel and

14    Shuster during the spring of 1938, <u>before</u> the execution of the syndication agreement

15    were <u>not</u> works made for hire" and therefore were subject to termination and

16    recaptured by Plaintiffs. *Id.* at *129;

17    • The failure to list the two weeks of newspaper strips in the termination notices "was

18    'harmless error' that does not affect the validity of termination notice" regarding

19    these newspaper strips; and

20    • "[T]he newspaper strips created by Siegel and Shuster after September 22, 1938,

21    were works made for hire, [and] the right to terminate does not reach the grant to

22    those works." *Id.* at *119.

23        As a result of these various rulings, Plaintiffs have recaptured Jerome Siegel's co-

24    authorship interests in, and co-own with Defendant DC, the copyrights to the following

25    works: the first Superman story as published in *Action Comics No. 1, Action Comics No.*

26    *4, Superman No. 1* (pages three through six), and the first two weeks of the Superman

27    newspaper strips. The Court declined to address the remaining Additional Issues that have

28    been pending before the Court since the parties briefed them in July of 2008, reserving

394090v1

14

**JOINT STATUS REPORT**

EXHIBIT I
Page 211

1  decision on those issues to a later date in advance of the accounting trial. *Id.* at *165, n.

2  27.    Defendants filed a motion on October 2, 2009, seeking reconsideration of the

3  Court's ruling that the omission of the first two weeks of the Superman newspaper strips

4  from the Termination Notices was "harmless error."  Plaintiffs filed a motion on October

5  3, 2009, requesting reconsideration of the Court's ruling that the McClure newspaper strips

6  created by Siegel and Shuster after September 22, 1938 were works made for hire.  In an

7  opinion dated October 30, 2009, the Court denied both parties' motions.

8  **F.    Discovery Matters Impacting the Accounting Trial.**

9      The discovery cut-off in these actions was November 16, 2006.  After that discovery

10 cutoff, the Court decided several discovery motions, and ordered on August 13, 2007 an

11 audit of Defendants.  In addition, the parties entered into a stipulation on June 9, 2008 in

12 which they agreed  to supplement production in advance of trial, and Defendants agreed to

13 supplement their financial production at the end of each financial quarter.  Defendants last

14 supplemented their financial information on June 1, 2009.

15     On October 1, 2009, the Court adopted a stipulation by the parties which granted

16 Plaintiffs leave to replace their former expert Mark Halloran.  The stipulation also granted

17 Defendants leave to appoint a new rebuttal expert and if necessary provide limited

18 supplemental rebuttal reports from previously designated experts.

19     The parties' accounting experts will also need to prepare supplemental reports

20 updating their prior analysis of DC's profits as of June 30, 2007, based on the most recent

21 financial data available.

22 **G.    Current Status of the Superman Action.**

23     The Court will need to schedule the trial and corresponding pretrial deadlines for the

24 accounting action.  As established in the alter-ego trial, the accounting action will concern

25 Defendant DC's profits from the exploitation of those Superman copyrights that the Court

26 has held were recaptured by Plaintiffs' Terminations and are co-owned by DC and

27 Plaintiffs (namely, the first Superman story published in *Action Comics No. 1, Action*

28 *Comics No. 4, Superman No. 1* (pages three through six), and the first two weeks of the

394090v1

EXHIBIT I
Page 212

1    Superman newspaper strips).

2        Both parties respectfully request, however, that the Court determine the remaining
3    undecided Additional Issues which the parties briefed in 2008.  Because such Additional
4    Issues define the contours of the pending accounting trial, the parties cannot properly
5    prepare for trial prior to a determination of the Additional Issues.  The Additional Issues
6    are not *in limine* motions and have far too large an impact on the trial to be decided like *in*
7    *limine* motions, only days before trial.  These remaining Additional Issues include:

8    •    The impact, if any, that Defendants' pre-*Action Comics No. 1* "promotional
9         announcements" have on the scope of Plaintiffs' recaptured copyrights;

10   •    Whether principles of apportionment should be applied to the calculation of
11        Plaintiffs' share of the profits from the recaptured copyrights;

12   •    Whether the apportionment analysis, if applicable, should be on a work-by-work
13        basis or pursuant to a general "template," or whether there should be an alternative
14        method of apportionment;

15   •    Who bears the burden of proof on what issues;

16   •    How broad or narrow is the scope of the mixed use – copyright/trademark –
17        products and merchandise as to which an accounting is required (*e.g.*, t-shirts with
18        both Superman trademarks and copyrightable imagery);

19   •    How much or how little is needed to transform the post-termination sale of a pre-
20        termination "derivative work" into a post-termination "derivative work" so as to
21        require an accounting (*e.g.*, DVD boxed sets of pre-1999 Superman films); and

22   •    Whether the Court's background statements in its March 26, 2008 Partial Summary
23        Judgment Order concerning the literary elements in *Action Comics No. 1* are *dicta*.

24

25       The Court's decision on these remaining Additional Issues will materially impact
26   the parties' pretrial preparations and the accounting trial itself.  Without guidance from the
27   Court on these Additional Issues, well in advance of the deadlines set by the Court for the
28   parties' pretrial submissions, the parties' pretrial submissions will likely be unnecessarily

394090v1

16

JOINT STATUS REPORT

EXHIBIT I
Page 213

1    duplicative and not conform to the standards the Court ultimately adopts to govern the

2    trial.

3    **II.    The Superboy Action (Case No. CV 04-8776).**

4          On November 2, 2002, Plaintiffs served a separate notice of termination under 17

5    U.S.C. § 304(c), as of November 17, 2004, regarding Siegel's copyright grants of the

6    Superboy character to DC's predecessors.

7          Plaintiffs filed their initial Complaint in the Superboy Action on October 22, 2004.

8    The Complaint contained the following causes of action:

9    •     Plaintiffs' First Cause of Action sought declaratory relief confirming the validity of

10         Plaintiffs' Superboy Termination Notice pursuant to 17 U.S.C. § 304(c).  Unlike the

11         Superman Action, where Plaintiffs acknowledged that Siegel co-authored Superman

12         and that Plaintiffs therefore co-own recaptured Superman copyrights, Plaintiffs

13         alleged that Siegel solely authored the first Superboy story and that therefore

14         Plaintiffs solely own recaptured Superboy copyrights.

15   •     Plaintiffs' Second Cause of Action alleged that Defendants violated the Lanham Act

16         by falsely representing that they are the exclusive owners of Superboy.

17   •     Plaintiffs' Third Cause of Action alleged that Defendants violated California

18         Business and Professions Code §§ 17200 *et seq.* by omitting mention of the

19         Superboy Termination from Time-Warner's public financial disclosures.

20   •     Plaintiffs' Fourth Cause of Action sought injunctive relief preventing Defendants

21         from exploiting derivative post-termination Superboy works.

22         Defendants filed their initial Answer and Counterclaims on November 22, 2004.

23   The Counterclaims asserted therein mirrored those included in Defendants' Counterclaims

24   filed in the Superman case.  *See* Section I, *supra.*

25         Plaintiffs filed their First Supplemental Complaint on April 19, 2005.  The principal

26   change from their initial Complaint was the inclusion of a First Cause of Action for

27   Defendants' alleged copyright infringement after November 17, 2004, the effective date of

28   the Superboy Termination.  Plaintiffs alleged that any Superboy works (*e.g.,* the *Smallville*

394090v1

EXHIBIT I
Page 214

1  television series) released by Defendants after the effective Termination date would
2  infringe Plaintiffs' recaptured original Superboy copyright.  Defendants filed their Answer
3  to Plaintiffs' First Supplemental Complaint on September 7, 2005.
4       On October 18, 2005, the Court adopted the parties' stipulation permitting Plaintiffs
5  to file their First Amended Supplemental Complaint, and Defendants to file their First
6  Amended Counterclaims.  Defendants filed their Answer to the First Amended
7  Supplemental Complaint on November 1, 2005, and Plaintiffs filed their Reply to
8  Defendants' First Amended Counterclaims on November 4, 2005.

9  **A.    February 15, 2006 Cross-Motions for Summary Judgment.**

10       On February 15, 2006, the parties filed cross-motions for summary judgment.
11  Plaintiffs moved for partial summary judgment, requesting a ruling that their statutory
12  Termination was valid and effective under 17 U.S.C. §304(c), arguing:

13  •    That Jerry Siegel alone created Superboy as embodied in a November 30, 1938
14       "pitch" letter from Mr. Siegel to DC's predecessor, Detective, and a thirteen-page
15       typed "Superboy" script Mr. Siegel submitted to Detective in December, 1940 (the
16       "Siegel Superboy Materials").

17  •    That the judicial findings in a prior 1947 action between the parties' predecessors in
18       the Supreme Court of the State of New York are binding on Defendants under the
19       doctrines of *res judicata* and collateral estoppel.

20  •    That the 1947 action held that "Siegel is the originator and sole owner of the comic
21       strip feature Superboy."

22  •    That the preclusive effect of the findings and conclusions in the 1947 action was
23       explicitly confirmed by the Second Circuit Court of Appeals in *Jerome Siegel, et al.*
24       *v. National Periodical Publications*, et al., 509 F.2d 909, 912-913 (2nd Cir. 1974).

25  •    That Plaintiffs' Superboy Notices of Termination complied with the requirements
26       set forth in 17 U.S.C. § 304(c).

27  •    That Plaintiffs' Superboy Notices of Termination were not required to list the 1948
28       Consent Judgment from the 1947 action, as the Consent Judgment was not a grant

394090v1

**18**

**JOINT STATUS REPORT**

EXHIBIT I
Page 215

and as Plaintiffs listed the duplicative 1948 Stipulation between the parties; and

- That the Superboy materials created by Siegel were not "works-for-hire."

Defendants cross-moved for summary judgment, arguing:

- That because Superboy is derivative of Superman, Plaintiffs should not be permitted to proceed in a separate Superboy action;

- That because the Siegel Superboy Materials were never published or registered as an unpublished work, there was no "copyright subsisting in either its first or renewal term on January 1, 1978," and the "Superboy works" were therefore not eligible for termination under 17 U.S.C. § 304(c);

- That the Siegel Superboy Materials were not eligible for termination because they were "works for hire;"

- That the Siegel Superboy Materials were joint works of Siegel and Shuster, so that if otherwise terminable, Plaintiffs could only recapture a one-half share to the copyrights in such works;

- That Plaintiffs failed to terminate the grant in the May 21, 1948 Final Consent Agreement; and

- Plaintiffs' claim that the *Smallville* television series infringes the copyright in the Siegel Superboy Materials should be dismissed because Plaintiffs cannot meet the test for establishing infringement.

Judge Lew, who presided over the Superboy Action at that time, issued a decision on the parties' cross-motions on March 24, 2006, granting Plaintiffs' motion for partial summary judgment and denying Defendants' motion for summary judgment.

One of the principal disputes briefed by the parties and addressed in Judge Lew's ruling was whether the 1948 findings of fact and conclusions of law issued in support of an interlocutory ruling in the 1947 state court action had preclusive effect in the Superboy litigation. Judge Lew concluded that the 1948 findings of fact and conclusions of law have

394090v1

1  preclusive effect:

2      "Having relied on [the 1947 action's] findings for previous favorable determinations
       regarding Superman, Defendants now take the inconsistent position that this Court is
3      not bound by the state court findings, as they relate to Superboy…Contrary to
       Defendants' assertions now, both the Southern District of New York and Second
4      Circuit looked directly to, even citing to, Judge Young's findings of fact. This Court
       holds that it is consistent to continue this position and will look to Judge Young's as
5      binding where relevant."

6  *See* March 24, 2006 Order at 7:4-7; 7:14-19.

7      Judge Lew also held that "no genuine issue of material fact exists regarding the

8  effectiveness of [Plaintiffs'] termination of the Superboy copyrights." *Id.* at 12:8-11.

9  Judge Lew also denied Defendants' motion that Defendants' *Smallville* television series

10 does not infringe Plaintiffs' recaptured copyrights in the Siegel Superboy Material,

11 preserving this issue for trial. *Id.* at 15:8-16:26.

12     Defendants filed a certification motion pursuant to 28 U.S.C. § 1292(b) on April 17,

13 2006, requesting that Judge Lew certify the matter for appeal.  Judge Lew denied the

14 certification request in an order dated May 22, 2006.

15     Judge Lew thereafter took senior status and these actions were reassigned to Judge

16 Larson on October 26, 2006.  On January 12, 2007, Defendants filed a motion for

17 reconsideration, requesting that Judge Larson reconsider Judge Lew's holding that "Judge

18 Young's findings of fact [in the 1948 Westchester Action between the parties'

19 predecessors] have preclusive res judicata and collateral estoppel effect on this Court."

20 Defendants requested in the alternative that Judge Larson reconsider Judge Lew's denial of

21 Defendants' April 17, 2006 certification motion.

22     Judge Larson granted Defendants' reconsideration motion in an order dated July 27,

23 2007.  In that ruling, Judge Larson concluded that the referee's findings in the Westchester

24 Action should have preclusive effect, but as a matter of collateral estoppel, not judicial

25 estoppel.  However, Judge Larson ruled that "contrary to the March 24, 2006 Order, those

26 findings are not necessarily determinative of all the issues." *Siegel v. Time Warner Inc.*,

27 496 F. Supp. 2d 1111, 1131 (C.D. Cal. 2007) ("*Siegel I*").  Judge Larson summarized his

28 rulings as follows:

394090v1

EXHIBIT I
Page 217

1
2
3
4

> Based on the referee's findings, the Court has determined that Siegel's Superboy submissions were not a work made for hire, but the Court is unable to conclude whether the requisite 'publication' of the Superboy submissions occurred due to the unresolved matter regarding the submissions' derivative nature. Similarly, the Court was unable to conclude whether the Superboy submissions were part of a joint work, but only because the issue of whether the submissions are a derivative work remains unresolved (and a subject of further court-ordered briefing).

5  *Id.* at 1155.

6      Judge Larson therefore requested supplemental briefing by the parties on the issue

7  of "the derivative nature, if any, of Siegel's Superboy submissions, bearing in mind the

8  legal principles set forth in *Nichols* [*v. Universal Pictures Corp.*, 45 F.2d 119 (2d Cir.

9  1930)] as expounded in [*Detective Comics, Inc. v.*] *Bruns Publications*[*, Inc.*, 111 F.2d 432

10  (2d Cir. 1940)]*, Warner Bros.* [*v. Am. Broad. Cos.*, 720 F.2d 231 (2d Cir. 1983)], and

11  *Sapon* [*v. DC Comics*, 62 U.S.P.Q.2d 1691 (S.D.N.Y. 2002)]." *Id.* The parties submitted

12  their supplemental briefing on September 10, 2007, but Judge Larson did not issue a ruling

13  on the matter.

14  **B.    The Parties' April 30, 2007 Partial Summary Judgment Motions**

15      Between the time Defendants moved for reconsideration of Judge Lew's March 24,

16  2006 Order and the time Judge Larson issued his July 27, 2007 decision granting

17  reconsideration, the parties filed partial summary judgment motions in both cases on April

18  30, 2007.  Defendants sought partial summary judgment in the Superboy Action (some of

19  which overlaps with their motions in the Superman Action) on the follow grounds:

20  •    That Plaintiffs have no right under the Copyright Act to share in Defendants' profits

21       derived (a) from the foreign exploitation of any Superboy work, including

22       "Superboy" or any other juvenile version of Superman, (b) from the exploitation of

23       the Superman family of trademarks, or (c) from the continued exploitation of any

24       Superman "derivative work," including "Superboy," or any other juvenile version of

25       Superman, created prior to the effective dates of Plaintiffs' Terminations;

26  •    That as a result of Plaintiffs' alleged failure to terminate certain copyrighted works

27       as prescribed by the Copyright Act, Defendants remain free to use such

28       unterminated works and the elements contained therein without accounting to

EXHIBIT I
Page 218

1    Plaintiffs and without liability for copyright infringement; and

2  •  That the episodes of the television series *Smallville* prepared on or after November

3    17, 2004 are not "substantially similar" to, and therefore do not infringe upon, any

4    of the Superboy copyrights recaptured by Plaintiffs pursuant to their Termination

5    Notices.

6    Plaintiffs cross-moved for partial summary judgment on the following grounds:

7  •  That Plaintiffs are entitled to an accounting of all profits earned from Plaintiffs'

8    recaptured Superboy copyrights, both in the United States and in foreign territories,

9    to the extent that such foreign profits flow from Defendants' exploitation of such

10    copyrights within the United States.

11

12    As discussed in detail in Section I(A) above, the Court issued its ruling on the

13  parties' Superman partial summary judgment motions on March 26, 2008.  In addition, the

14  Court issued a separate order related to the Superboy Action on March 31, 2008, in which

15  the Court denied the parties' motions for partial summary judgment in the Superboy

16  Action as moot:

17      As the Court stated during the September 17, 2007 hearing on the parties' cross
      motions for partial summary judgment in these cases, the issues raised by the parties
18      in the Superboy action . . ., in light of the Court's earlier ruling on July 27, 2007,
      and with a forthcoming ruling in the companion Superman action . . ., would be
19      rendered moot.

20  Order at 1.

21      The Court further stated:

22      "[T]he Court reserves issuing an order on the remaining issues brought up in the
      Court's July 27, 2007 Order in the Superboy case (and to which the parties have
23      provided both supplemental briefing and oral argument), and setting the pre-trial and
      trial-dates in the Superboy matter, if needed, until after the conclusion of the trial in
24      the Superman case."

25  Order at 2.

26  **C.    Current Status of the Superboy Action.**

27      Plaintiffs' position is that the Court never issued a final ruling that the Siegel

28  Superboy Materials were a "joint work."  Defendants' position is that the Court ruled that

394090v1

EXHIBIT I
Page 219

1   the Siegel Superboy Materials were a "joint work" if and to the extent that they were

2   copyrightable at all.  In addition, given the Court's July 27, 2007 ruling along with its

3   March 31, 2008 ruling, the parties agree that the Court still needs to make determinations

4   on: (1) the extent of the original copyrightable material in Siegel's Superboy Materials, if

5   any; and (2) whether the original material, if any, from the Superboy Materials was

6   published in a work allegedly subject to recapture pursuant to the Superboy Termination

7   Notices.

8          Although Judge Larson suggested in his March 31, 2008 Order that he would wait to

9   resolve these issues until after the conclusion of the accounting trial in the Superman

10  action, the parties submit that they should properly be decided in advance of the Superman

11  accounting trial so that the parties can also account in the Superman Action for Siegel's

12  Superboy Materials, if such is held to be appropriate.

13  **III.    The Parties' Mediation Efforts.**

14         The parties have engaged in two settlement mediations before the Hon. Daniel

15  Weinstein (Ret.), the first in May-June 2008, and the second in September 2009.  On

16  November 11, 2009, the parties each submitted a status report to the mediator pursuant to

17  the mediator's directive.  Despite the parties' mediation efforts, to date they have not

18  settled these cases.

19

20

21

22

23

24

25

26

27

28

394090v1

EXHIBIT I
Page 220

1    Respectfully submitted,

2

3    DATED: December 21, 2009    WEISSMANN WOLFF BERGMAN
                                 COLEMAN GRODIN & EVALL LLP

4                                       -and-

5                                FROSS ZELNICK LEHRMAN & ZISSU, P.C.

6                                       -and-

7                                PERKINS LAW OFFICE, P.C.

8

9

10

11   By: _____

12       Michael Bergman
         Attorneys for Defendants and counterclaimant

13   DATED: December 21, 2009    TOBEROFF & ASSOCIATES, P.C.

14

15

16

17   By: _____

18       Marc Toberoff
         Attorneys for Plaintiffs/Counterclaim-Defendants

19

20

21

22

23

24

25

26

27

28

394090v1
                                        24
                                JOINT STATUS REPORT

EXHIBIT I
Page 221

# EXHIBIT J

ORIGINAL SHIPPED   DEC 0 1 2006

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA          )
SIEGEL LARSON,                   )
                                 )
          Plaintiffs,            )
                                 )
     vs.                         )     No. 04-8400 (RSWL)(RZx)
                                 )
WARNER BROS. ENTERTAINMENT )           -and-
INC., et al.,                    )
                                 )     No. 04-8776 (RSWL)(RZx)
          Defendants.            )
_____)
AND RELATED COUNTERCLAIMS.

**CERTIFIED
ORIGINAL**

DEPOSITION OF MARC TOBEROFF

Beverly Hills, California

Friday, November 17, 2006

Reported by:

DAVID S. COLEMAN

CSR No. 4613

**U.S. LEGAL**

*Support*

*Certified Shorthand Reporters*

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA 91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

EXHIBIT J

*Los Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento . . . and across the nation*

1          Deposition of MARC TOBEROFF, taken on

2      behalf of Defendants and Counterclaimants,

3      at 9665 Wilshire Boulevard, 9th Floor, Beverly

4      Hills, California, beginning at 1:46 PM on

5      Friday, November 17, 2006, before DAVID S.

6      COLEMAN, Certified Shorthand Reporter No. 4613.

7

8

9      APPEARANCES:

10

11      For Plaintiffs and the Witness:

12          LAW OFFICES OF MARC TOBEROFF
           BY:   MARC TOBEROFF
13                NICHOLAS C. WILLIAMSON
           Attorneys at Law
14          2049 Century Park East, Suite 2720
           Los Angeles, California 90067
15          310-246-3333

16

17      For Defendants and Counterclaimant:

18          WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
           BY:   MICHAEL BERGMAN
19                ADAM HAGEN
           Attorneys at Law
20          9665 Wilshire Boulevard, 9th Floor
           Beverly Hills, California 90212
21          310-858-7888
           mbergman@wwllp.com

22

23

24

25

                                                          2

                    U.S. LEGAL SUPPORT

1

2

3

I N D E X

4    WITNESS                    EXAMINATION              PAGE

5    MARC TOBEROFF

6                               BY MR. BERGMAN           6

7

8                               EXHIBITS

9    DEPOSITION                                          PAGE

10   1    Subpoena to Marc Toberoff dated       7
          October 19, 2006, and attachments

11

12   2    Marc Toberoff, Esq's Objections to    7
          Defendants' Subpoena, dated November
          6, 2006

13

14   3    Subpoena to Pacific Pictures Corpor-  10
          ation dated October 19, 2006, and
          attachments

15

16   4    Pacific Pictures Corporation's        10
          Objections to Defendants' Subpoena,
          dated November 6, 2006

17

18   5    Subpoena to IPW, LLC dated October    13
          19, 2006, and attachments

19   6    IPW LLC's Objections to Defendants'   14
          Subpoena, dated November 6, 2006

20

21   7    Subpoena to Marc Toberoff dated       14
          August 10, 2006, and attachments

22   8    Internet printout on Marc Toberoff    16

23   9    Internet printout on Marc Toberoff    21

24   10   Printout from Intellectual Properties 26
          Worldwide, LLC

25

3

**U.S. LEGAL SUPPORT**

INDEX (Continued:

EXHIBITS (Continued)

DEPOSITION                                                    PAGE

11    Internet printout on Intellectual        38
      Properties Worldwide

12    Printout from California Business         41
      Portal on IPW, LLC

13    Joint Venture Agreement made as of        49
      November 23, 2001, by and between
      Pacific Pictures Corporation and
      Jean Peavy and Mark Peary

14    Letter from Marc Toberoff to Mark         68
      Warren Peary dated October 27, 2003

15    Letter from Marc Toberoff to Mark         75
      Warren Peary dated September 10, 2004

16    Fax from Marc Toberoff to Ariel           79
      Emanuel dated 6-3-02

17    Letter from Marc Toberoff to Tom          85
      McGuire dated August 17, 2004, and
      attachments

18    Letter from Marc Toberoff and Ariel       112
      Emanuel to Joanne Siegel and Laura
      Siegel Larson dated October 3, 2002

19    Letter from Marc Toberoff to Joanne       121
      Siegel and Laura Siegel Larson dated
      November 26, 2002, Bates No. 000001882

20    Letter from Marc Toberoff to Joanne       123
      Siegel, Laura Siegel Larson and Ariel
      Emanuel dated December 16, 2002,
      Bates No. 000001883

21    Letter from Marc Toberoff to Joanne       124
      Siegel and Laura Siegel Larson dated
      January 21, 2002, Bates No. 000001888

4

**U.S. LEGAL SUPPORT**

EXHIBIT J

STATE OF CALIFORNIA        )
                           ) ss
COUNTY OF LOS ANGELES      )

      I, DAVID S. COLEMAN, a Certified Shorthand Reporter, do hereby certify:

      That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, nor in anywise interested in the outcome thereof.

      In witness whereof, I have hereunto subscribed my name.

Dated:   **NOV 3 0 2006**

_____

DAVID S. COLEMAN
CSR No. 4613

**U.S. LEGAL SUPPORT**

Copy for reference

310-589-5151

## JOINT VENTURE AGREEMENT

AGREEMENT made as of November 23, 2001 by and between Pacific Pictures Corporation ("PPC") with offices at 23852 Pacific Coast Highway, Suite 555, Malibu, CA 90265 ; tel. (310) 589-5151; fax: (310) 589-5152 and Jean A. Peavy and her son Mark Warren Peary (f/k/a Mark Warren Peavy) (individually and collectively, "Claimants") located at 51 Camino Cabo, Sante Fe, New Mexico 87508; tel. / fax: (505) 466-4551, regarding the formation of a joint venture for the purpose of retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations (hereinafter, such rights, property and claims, are individually and collectively referred to as the "Rights").

1.    The Rights shall include without limitation, all current and future rights, claims, title, copyrights and interests in and to each character, story element, and indicia associated with, and all rights to proceeds from "SUPERMAN," or the "SUPERMAN" stories and comic books, such as, without limitation, "Superman," "Clark Kent," "Lois Lane," "Jimmy Olsen," "Lex Luther," "Lana Lang," "Mr. Mxyztplk," "Superboy," "Supergirl," "The Daily Planet," "Krypton," "Kryptonite," and "Smallville."

2.    In consideration of the mutual covenants contained herein and other good and valuable consideration, PPC and Claimants hereby form a joint venture (the "Venture") to investigate, retrieve, enforce and exploit the Rights, including without limitation, via the establishment of Joe Shuster's estate and the estate's termination pursuant to Section 304 (c) of the U.S. Copyright Law (Title 17, U.S.C ) of any and all grant or transfers by Joe Shuster of any copyright interest in his creations. In consideration for PPC'S contributions to the Venture and the mutual covenants contained herein Claimants hereby transfer and assign to the Venture their rights, title and interests in the Rights. The name of the Venture shall be the "Joe Shuster Venture." The Venture's office address shall be the California address set forth above.

3.    PPC will pay any and all costs and expenses of the Venture, including the legal fees and costs of setting up Joe Shuster's estate, U.S. copyright office costs such as document retrieval costs and filing fees, research costs, and any and all attorneys' fees, costs and disbursements in connection with any legal actions or disputes concerning the enforcement and/or defense of the Rights and the Venture. In addition to attorneys' fees, PPC will be responsible for the payment of any legal filing fees, expert witness fees, subpoena and service of process fees, jury fees, deposition transcript costs, photocopying,

Initials: _JAP_ _MWP_

EXHIBIT 13
FOR IDENTIFICATION
DAVID S. COLEMAN, CSR #4613
DATE 11-17-06
WITNESS Toberoff

Received   Aug-08-06  12:27pm       From-                    To-                    Page 001

129

Page 2
Joint Venture Agreement / Joe Shuster
11/23/01

postage, long distance telephone and fax charges, computerized legal research, reporter's fees, costs for preparation of exhibits and demonstrative evidence, travel costs outside of the Los Angeles area if required, and messenger fees. Any and all attorneys' fees payable on a contingency basis will be paid solely out of PPC'S share of Proceeds set forth in paragraph 5 below.

    4.    The terms of any and all agreements regarding any of the Rights, in any respect, shall be subject to the express written approval of Claimants and PPC. The parties each warrant and represent that after signing this Agreement they will not without the express written consent of all the parties transfer, limit or encumber the Rights in any respect.

    5.    Any and all moneys and proceeds received from the enforcement, settlement or exploitation of any of the Rights, including without limitation, fixed and contingent compensation, settlement or judgment amounts, purchase prices, option or quitclaim fees, and/or royalties (" Proceeds"), will be shared, divided and payable: fifty percent (50%) to Claimants and fifty percent (50%) to PPC. The parties will use all reasonable efforts to have Joe Shuster's estate/administrator and third party payors, if any, directly pay to the Claimants and PPC their respective fifty percent (50%) share of Proceeds. Prior to the above distribution of Proceeds, PPC will be entitled to recoup all of its out-of-pocket expenses under this Agreement subject to the presentation to Claimants of a reasonable accounting and receipts for said expenses.

    6.    All notices, correspondence and payments to each party under this Agreement shall be sent to the respective addresses set forth on page 1 of this Agreement unless either party notifies the other of an address change in writing.

    7.    The Venture and/or the Estate of Joe Shuster (to be established hereunder) will retain Marc Toberoff, Esq. to render legal services in connection with the Rights and the Venture, including in connection with all legal disputes, litigation, arbitration and/or mediation regarding the Rights; to implement, enforce and prosecute the Rights; and to handle the negotiation of any contracts regarding exploitation of the Rights.

Initials: _J. d. I. P. MUP_

EXHIBIT J
Page 228

Page 3
Joint Venture Agreement / Joe Shuster
11/23/01

8.    The term ("Term") of the Venture shall extend for the full duration of the Rights and any exploitation of the Rights. Upon the expiration of the Term and the winding-up of the Venture or in the event of termination of the Venture for any reason, all Rights, property or assets of the Venture will be held fifty percent (50%) by the Claimants and fifty percent (50%) by PPC as tenants in common, and Claimants and PPC will each be entitled to receive and continue to receive fifty percent (50%) of all Proceeds derived from the Rights after termination of the Venture.

9.    To cover the unlikely event that Marc Toberoff dies or is disabled; PPC will prior to service of any notice of termination regarding the Rights (pursuant to Section 304 (c) of the U.S. Copyright Law) either (a) arrange for a suitable replacement attorney experienced in copyright litigation and willing to enforce the Rights on solely a contingent fee basis; or (b) if no such replacement attorney is arranged to obtain "key man" insurance for Mr. Toberoff in the amount of $150,000 payable solely to Claimants.

10.    All parties agree to execute such further documents and to perform such further acts as may be reasonably necessary or desirable to carry out the purposes and effect of this Agreement, including without limitation an irrevocable letter of authority instructing the administrator of Joe Shuster's Estate to divide and disburse all Proceeds from the Rights as set forth in paragraph 5 above. When required hereunder, consent shall not be unreasonably withheld by any party regarding the business of the Venture. The parties hereby approve Michael Catron for appointment as the administrator of Joe Shuster's Estate, once it is established.

11.    This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. By countersigning this Agreement the parties each acknowledge that they clearly understand the terms and conditions of this Agreement; and have agreed to these terms and conditions after detailed and mature deliberation. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. The parties have mutually participated in the negotiation and drafting of this Agreement and agree that the terms of this Agreement shall not be construed more favorably to one party than the other. To the extent any provision of this Agreement is found invalid, said provision shall be stricken

131

11/27/01  20:11 FAX                                                                    ☒ 000/008

Page 4
Joint Venture Agreement / Joe Shuster
11/23/01

and shall not affect the validity of the remaining provisions hereof. This Agreement shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals.

    11.    This Agreement shall be governed by the laws of California applicable to agreements made and to be performed therein.

Agreed, understood and accepted:

Pacific Pictures Corporation


_____                    Date: _____
By: Marc Toberoff, President

_Jean A. Peavy_                                Date: _Nov. 28, 2001_
Jean A. Peavy

_Mark Warren Peavy_                            Date: _Nov. 28, 2001_
Mark Warren Peary
(f/k/a Mark Warren Peavy)

132

# PACIFIC PICTURES CORPORATION

23852 Pacific Coast Highway, Suite 555
Malibu, CA 90265
Tel: (310) 589-5151
Fax: (310) 589-5152

October 27, 2003

Mark Warren Peary (f/k/a Mark Warren Peavy)
Executor
Estate of Joseph Shuster
51 Camino Cabo,
Sante Fe, New Mexico 87508

Dear Warren:

      We are pleased to welcome you ("Client") as a client of Pacific Pictures Corp. ("PPC"). This letter is intended to supplement the joint venture agreement dated as of November 23, 2001 between PPC and you and your mother, Jean Peavy, and to confirm the agreement regarding your engagement of our company as the Executor of the recently probated Estate of Joseph Shuster.

      1.    Client hereby engages PPC as its exclusive advisor for the purpose of retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations (hereinafter, such rights, property and claims, are individually and collectively referred to as the "Rights"). The Rights shall include without limitation, all current and future rights, claims, title, copyrights and interests of Client in and to each character, story element, and indicia associated with, and all rights to proceeds from "SUPERMAN," or the "SUPERMAN" stories and comic books, including, without limitation, Client's copyright termination interest in "SUPERMAN" pursuant to Section 304(d) of the U.S. Copyright Law.

      2.    In furtherance of this exclusive agreement, PPC (which is not a law firm) shall engage the services of attorney Marc Toberoff ("Toberoff") to furnish directly to Client all legal services required by Client in connection with the Rights, including in connection with all legal disputes, litigation, arbitration and/or mediation regarding the Rights; to implement, enforce and prosecute the Rights; and to handle the negotiation of any contracts regarding exploitation of the Rights. PPC may engage additional outside counsel to assist Client, but only at PPC's sole expense.

      3.    PPC has paid and will continue to pay any and all costs and expenses incurred by it in connection with this agreement, including the legal fees and costs of setting up Joseph Shuster's Estate, U.S. copyright office costs such as document retrieval costs and filing fees, research costs, and any and all attorneys' fees, costs and disbursements in connection with any legal actions or disputes concerning the

Initials: _AT_, _MWP_

14

FOR IDENTIFICATION
DAVID S. COLEMAN, CSR #4613
DATE 1-17-06 BY
WITNESS Toberoff

# PACIFIC PICTURES CORPORATION

Page 2
Estate of Joseph Shuster
October 27, 2003

enforcement and/or defense of the Rights and the Estate of Joseph Shuster. In addition to attorneys' fees, PPC will be responsible for the payment of any legal filing fees, expert witness fees, subpoena and service of process fees, jury fees, deposition transcript costs, photocopying, postage, long distance telephone and fax charges, computerized legal research, reporter's fees, costs for preparation of exhibits and demonstrative evidence, travel costs outside of the Los Angeles area if required, and messenger fees. Any and all attorneys' fees payable on a contingency basis will be paid solely out of PPC's share of Proceeds set forth in paragraph 5 below.

4.    The terms of any and all agreements regarding any of the Rights, in any respect, shall be subject to the express written approval of Client and PPC. The parties each warrant and represent that after signing this Agreement they will not without the express written consent of all the parties transfer, limit or encumber the Rights in any respect.

5.    Any and all moneys and proceeds, in cash or in kind, received from the enforcement, settlement or exploitation of any of the Rights, including without limitation, fixed and contingent compensation, settlement or judgment amounts, purchase prices, option or quitclaim fees, and/or royalties (" Proceeds"), will be shared, divided and payable: fifty percent (50%) to Client and fifty percent (50%) to PPC. Prior to the above distribution of Proceeds, PPC will be entitled to recoup all of its out-of-pocket expenses under this Agreement subject to the presentation to Client of a reasonable accounting and receipts for said expenses. The parties hereby acknowledge and agree that the due payment to and receipt by Client of Proceeds hereunder shall constitute the due receipt of Proceeds by Jean Peavy and Warren Peavy, respectively, pursuant to paragraph 5 of the Joint Venture Agreement, in full satisfaction of PPC's obligations under said paragraph.

6.    All notices, correspondence and payments to each party under this Agreement shall be sent to the respective addresses set forth on page 1 of this Agreement unless either party notifies the other of an address change in writing.

7.    The term ("Term") of this agreement shall extend for the full duration of the Rights and any exploitation of the Rights. Upon the expiration of the Term or in the event of termination by Client of this agreement for any reason, all Rights will be held fifty percent (50%) by the Client and fifty percent (50%) by PPC as tenants in common, and Client and PPC will each be entitled to receive and continue to receive fifty percent (50%) of all Proceeds derived from the Rights after termination, if any.

Initials: _____, _____

126

# PACIFIC PICTURES CORPORATION

Page 3
Estate of Joseph Shuster
October 27, 2003

8.    To cover the unlikely event that Marc Toberoff dies or is disabled; PPC will prior to service of any notice of termination regarding the Rights (pursuant to Section 304 (d) of the U.S. Copyright Law) either (a) arrange for a suitable replacement attorney experienced in copyright litigation and willing to enforce the Rights on solely a contingent fee basis; or (b) if no such replacement attorney is arranged to obtain "key man" insurance for Mr. Toberoff in the amount of $150,000 payable solely to Client.

9.    All parties agree to execute such further documents and to perform such further acts as may be reasonably necessary or desirable to carry out the purposes and effect of this Agreement. When required hereunder, consent shall not be unreasonably withheld by any party regarding actions conducted under this agreement.

10.    This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. By countersigning this Agreement the parties each acknowledge that they clearly understand the terms and conditions of this Agreement; and have agreed to these terms and conditions after detailed and mature deliberation. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. The parties have mutually participated in the negotiation and drafting of this Agreement and agree that the terms of this Agreement shall not be construed more favorably to one party than the other. If any provision of this Agreement is found to be unenforceable for any reason, the remainder shall be enforced as fully as possible and the unenforceable provisions shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the parties expressed herein. This Agreement shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals.

11.    This Agreement shall be governed by the laws of California applicable to agreements made and to be performed therein.

If the terms and conditions of this agreement are acceptable to you, please

/ / /
/ / /
/ / /
/ / /

Initials: _____ , _____

127

# PACIFIC PICTURES CORPORATION

Page 4
Estate of Joseph Shuster
October 27, 2003

acknowledge your acceptance by signing below.

Very truly yours,

Marc Toberoff
President

**Approval of Engagement of Pacific Pictures Corp.**

I have read the foregoing agreement and I agree to its terms.

The Estate of Joseph Shuster

By: Mark Warren Peary, Executor    Date: 10-30-03
(f/k/a Mark Warren Peavy)

I have read the foregoing agreement and agree to its terms to the extent any of my interests are concerned.

Jean A. Peavy    Date: 10 - 30 - 03

128

EXHIBIT J
Page 234

Nov-15-06    10:32pm    From-                                                T-128   P.003   F-045
                                                            ʼ(    ʼ8   827   7227
                                                                   T-285   P.004/013   F-139    P. 02

# **Ip** worldwide

As of October 3, 2002

Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Ray, CA 90292

**RECEIVED**

OCT 24

**Marc Toberoff**

Laura Siegel Larson
6400 Pacific Avenue, #106
Playa Del Rey, CA 90293

Re: "*Superman*"

Dear Joanne and Laura:

This letter shall confirm the agreement and understanding between you ("Owner") and us ("IPW") regarding Owner's retention of IPW to exclusively represent Owner with respect to any and all of Owner's rights, claims, title and interest in and to the comic book property commonly known as "*Superman*," including, without limitation, all characters and copyright interests therein (jointly and individually, "Rights"):

    1.    In consideration for IPW's services set forth below, the mutual covenants contained herein and other good and valuable consideration, Owner hereby grants IPW the exclusive right to represent Owner and the Rights throughout the world in negotiating and assisting Owner to arrange and negotiate the sale, lease, license and all other dispositions or exploitations of the Rights, for the Term set forth below.

    2.    IPW will furnish and provide the legal services of Marc Toberoff, Esq., and the business services of Ariel Emanuel and IPW's support staff and employ its network of business relationships and resources to market and negotiate the sale, license, settlement and/or other disposition of the Rights on your behalf, and will advise you and consult with you with respect thereto. IPW will also provide Marc Toberoff's legal services with respect to all legal contracts in connection with all of the above. IPW will be solely responsible for Marc Toberoff's legal fees in connection herewith, if any.

    3.    The terms of any and all agreements regarding the Rights will require Owner's express written approval.

    4.    IPW will pay its own costs and expenses in connection with this Agreement, including without limitation, office overhead, photocopying, messenger fees, postage and overnight mail, long distance telephone and fax charges, travel and accommodation costs and any legal fees to Marc Toberoff, and such costs will not be recoupable from Proceeds hereunder. Notwithstanding this, in the event IPW advances or loans Owner moneys to pay costs in furtherance of the Rights (e.g., US Copyright Office fees and audit fees, if any) the terms and repayment of any such advances or loans will be set forth in a separate written agreement between the parties.

8701 Wilshire Boulevard, 10th Floor Beverly _____ t (310) 246-3100; Fax: (310) 246-3335
E-mail: MToberoff@IPWW.biz

IPW 00001

EXHIBIT J
Page 235

Nov-15-06    10:32pm    From-                                    T-128    P.004    F-045
            -2002 04:56 PM    (                    1 (    1 821 1221              P.05
Oct-21-02    08:15pm    From-                                    T-282    P.095/813    F-756

# **Ip** worldwide

Page 2
Retainer Agreement/ *Superman*
As of October 3, 2002

5.    The term ("Term") of this Agreement is eighteen (18) months from the date this Agreement is executed by all parties. In the event the parties are actively negotiating an agreement regarding the Rights when the Term is due to expire, the Term will automatically be extended for three (3) additional months. In the event during the Term either Marc Toberoff or Ariel Emanuel are unable to render services in connection with this Agreement for a continuous period greater than three (3) months due to death, incapacity or otherwise, Owner may in its discretion terminate this Agreement prior to the expiration of the Term.

6.    In consideration of the services to be furnished by IPW hereunder you hereby agree to pay and authorize IPW to retain out of all gross compensation, moneys or other consideration that may be payable or recovered for or by reason of Owner's Rights whether by negotiation, dispute resolution, settlement or otherwise ("Proceeds"): a fee ("Fee") of ten percent (10%) of any and all gross compensation payable including , without limitation, option, quitclaim or licensing fees, purchase price, settlement amounts, advances, fixed and/or contingent compensation. In computing IPW's fee no deduction will be made from gross Proceeds, including, without limitation, no deduction for Owner's taxes, expenses and/or moneys payable to any and all third parties if any. IPW's Fee shall apply to any and all agreements regarding the Rights made during the Term or the material terms of which are substantially negotiated during the Term and/or to any agreements between Owner and an investor or buyer introduced by IPW to Owner during the Term. For the avoidance of doubt, in the event "*Superman*" and the Rights are sold, settled, licensed or otherwise exploited in conjunction with other characters or rights owned or controlled by Owner (e.g., "*Superboy*"); it is understood and agreed that IPW will not "double dip" and the above 10% IPW Fee will apply to gross Proceeds from any said joined transaction(s).

Notwithstanding the above, for purposes of computing IPW's Fee, Proceeds will not include Joanne Siegel)'s annual "pension" payments which commenced in 1996 (currently $ 126,148 annually, plus cost of living increases or bonuses, if any) and her full medical and dental coverage provided by AOL Time Warner which consideration and interests pre-date and are wholly separate from her copyright termination interests.

///
///
///
///
///
///

IPW 00002

Nov-15-06   10:33pm   From-                                      T-128   P.005   F-045
Oct-21-02   08:18pm   From-                                      Y-160   P.008/012   P-796

# **Ip**worldwide

Page 3
Retainer Agreement/ *Superman*
As of October 3, 2002

7.    Owner hereby authorizes IPW to collect and receive all Proceeds due and payable; to endorse and deposit any checks or moneys payable into a client trust account on Owner's behalf; to deduct IPW's fee as set forth above; whereupon IPW will promptly pay the remainder directly to Owner as directed by Owner in writing. It is understood that the Rights may involve multiple rights and claims against multiple parties and accordingly IPW's above fee shall be applicable to each Rights payment or recovery from any party and same is not contingent on any other Rights payment.

8.    Owner hereby warrants and represents that Owner will not transfer, assign, license or in any manner encumber the Rights during the Term or extended Term other than through or as a result of IPW's exclusive representation hereunder, with the exception of by will, probate or pursuant to other Court order.

9.    All notices and/or payments hereunder shall be made to the parties at the addresses set forth on page 1 hereof unless and until either party gives the other prior written notice of a change of address.

10.    The parties understand and acknowledge that the scope of this Agreement does not include legal services and/or expenses in connection with litigation or formal legal arbitration, if any. The provision of such services and advancing of such expenses, if requested and desired by Owner, will be rendered and provided by Marc Toberoff, Esq., subject to good faith negotiation of a mutually acceptable agreement executed by Mr. Toberoff and Owner.

11.    This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by both parties. The parties acknowledge that they fully understand the terms and conditions of this Agreement and have agreed to such terms and conditions after negotiation, mature thought and deliberation. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. If any provision of this Agreement is found to be unenforceable, the remainder shall be enforced as fully as possible and the unenforceable provisions shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the parties expressed herein. The terms of this Agreement shall be construed pursuant to their fair meaning, not for or against either party. This Agreement shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals. This Agreement shall be governed by the

IPW 00003

Nov-15-06    10:33pm    From-                                                        T-128    P.006    F-045
        -2002  04:57 PM                                                    ...
    ...-18-02   01:18am  From-                                                        T-201    P.008/013    F-760

# Ip worldwide

Page 4
Retainer Agreement/ *Superman*
As of October 3, 2002

Laws of the State of California applicable to agreements made in and to be performed therein.

We are very pleased and excited to work with you and will do our very best to handle this matter in a dedicated manner and to achieve results satisfactory to you.

Yours sincerely,

Marc Toberoff
Authorized signatory

Ariel Emanuel
Authorized signatory

Agreed, Understood and Accepted:

Joanne Siegel

Date: October 23rd 2002

Laura Siegel Larson

Date: October 23, 2002

IPW 00004

# EXHIBIT K

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
ALEXANDER M. MERINO

* ALSO ADMITTED IN NEW YORK

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

November 15, 2006

Via Facsimile

Adam Hagen, Esq.
Weissman Wolff Bergman Coleman Grodin & Evall LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, CA 90212

Re:     *Joanne Siegel & Laura Siegel Larson v. Time Warner, Inc. et al.*
        USDC Central District of CA, Case No. 04-08400 SGL (RZx)
        *Joanne Siegel & Laura Siegel Larson v. Time Warner, Inc. et al.*
        USDC Central District of CA, Case No. 04-08776 SGL (RZx)

Dear Adam:

Enclosed please find IPW, LLC's production of documents, numbered IPW 00001-00016. In addition, enclosed please find Pacific Pictures Corporation's production of documents, numbered PPC 00001-00009.

Very truly yours,

Alexander M. Merino

cc:     Patrick T. Perkins, Esq.
        James D. Weinberger, Esq.




*** SEND SUCCESSFUL ***

## LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

### FACSIMILE COVER PAGE

| TO: Adam Hagen, Esq., James D. Weinberger, Esq., Patrick T. Perkins, Esq. | FAX: 310-550-7191, 212-813-5901, 845-265-2819 |
|---|---|
| FROM: Marc Toberoff | PAGES ( including cover ): 27 |
| DATE : 11/16/06 | RE: Superman (Case Nos. 04-CV-8400 SGL (RZx) and 04-CV-8776 SGL (RZx)) |

COMMENTS:

THIS INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

EXHIBIT K
Page 240




## Group Send Report

Page        : 001
Date & Time: Nov-15-06  10:47pm
Line 1      :
Machine ID  :

Job number          :    045

Date                :    Nov-15 10:32pm

Number of pages     :    027

Start time          :    Nov-15 10:32pm

End time            :    Nov-15 10:47pm

Successful nbrs.

  Fax numbers

            ☎13105507191
            ☎12128135901
            ☎18452652819

Unsuccessful nbrs.                                          Pages sent

EXHIBIT K
Page 241

# EXHIBIT L

Sept. 10, 1992

Dear Paul —

Thank you for your letter of Sept. 8. I was extremely pleased to be informed of Mr. Payson's decision to raise the amount of pension payment, and I am most grateful for the new amount Time Warner will be providing.

I had the opportunity to discuss this good news with my sister Jean and told her I would help her out because of her financial problems.

She pointed out that my income tax as a single individual would be higher than hers as a married person. She made the suggestion that if payments were made in her name, she would not pursue the termination of the Superman copyright as provided for to creators' heirs in the 1976 U.S. Copyright Act, and that she could send me whatever money I wanted as a gift which would not be taxable to me. This arrangement is agreeable with me. Hence, we agreed to suggest that perhaps your accounting department could arrang.



EXHIBIT
Shuster 15
DEAN & ASSOCIATES

EXHIBIT L
Page 242

- 2 -

to have payments signed over to my sister Jean, so that all future payments be sent in her name instead of mine. I know this arrangement is different from the one provided in the Agreement and you may need to discuss this arrangement further with Mr. Payson as well as with Jean herself. She will be arriving in New York on September 20th, and will remain through the week. We plan to call you on Monday Sept. 21st to arrange an appointment.

Another matter I'd like to mention is Joe memorial service which we set for Thursday Sept. 24th. Some of Joe's relatives have said they would like to attend and need to know the exact time, address, and floor at which the service will be held. Also, I wonder if there is a piano in the room, or whether one can be rented.

Thank you for your condolence card and your thoughtfulness to me during my visit at the new DC offices.

Sincerely,
Frank Shuster

EXHIBIT L
Page 243

# EXHIBIT M

505-897-7450

316 Horton Lane, NW
Albuquerque, N.M. 87114-1053

September 7, 1999

Paul Levitz, Exec. V. P. & Publisher
DC COMICS
1700 Broadway
New York, N.Y.

Dear Paul:

Hope you attended the Comic-Con's 30th Anniversary last month.
Sorry I had to miss it. Mike Catron recently sent me a video
he made of the 1998 ACTION NO. 1 COMIC BOOK PANEL which I
had participated in. Did you ever see it?

The second part of the video he had recorded was of the 1996
Memorial Tribute to Jerry Siegel which you M.C.'d. It was fun
watching. I'm glad the public appreciates the fact that Siegel
and Shuster were the pioneers of the comic book industry and
the source of prosperity for so many. I think back of the 30
years in which they suffered in poverty and my brother Frank and
I supporting Joe. We're all glad that a new generation of true
comic book enthusiasts took over DC COMICS.

As Joe's sister I would like to still share in some of the
benefits from the legendary SUPERMAN. You had once told Frank
and I that instead of a yearly raise of the pension, you would
prefer to offer a bonus directly from DC itself. I'm making
that request again for 1999.

I have learned from the Internet that Joanne Siegel has filed
a copyright claim for SUPERMAN. I want you to know that I
intend to continue to honor our pension agreement. I would,
however, appreciate a generous bonus for this year as you
had done many times in the past.

Regards to Janette and any of the staff who know me.

Best wishes,

Jean Shuster Peavy

Jean Shuster Peavy

EXHIBIT M
Page 244

DCC00006198