# EXHIBIT G

1  Attorneys for Plaintiffs and counterdefendants:
   TOBEROFF & ASSOCIATES, P.C.
2  Marc Toberoff (State Bar No. 188547)
   Nicholas C. Williamson (State Bar No. 231124)
3  Keith G. Adams (State Bar No. 240497)
   2049 Century Park East, Suite 2720
4  Los Angeles, California, 90067
   Telephone:  (310) 246-3333
5  Fax:        (310) 246-3101

6  Attorneys for Defendants and counterclaimant:
   WEISSMANN WOLFF BERGMAN
7   COLEMAN GRODIN & EVALL LLP
   Michael Bergman (SBN 37797)
8  9665 Wilshire Boulevard, Ninth Floor
   Beverly Hills, California 90212
9  Telephone: (310) 858-7888
   Fax:       (310) 550-7191

10 FROSS ZELNICK LEHRMAN & ZISSU, P.C.
   Roger L. Zissu (Admitted pro hac vice)
11 James D. Weinberger (Admitted pro hac vice)
   866 United Nations Plaza
12 New York, New York 10017
   Telephone:  (212) 813-5900
13 Fax:        (212) 813-5901

14 PERKINS LAW OFFICE, P.C.
   Patrick T. Perkins (Admitted pro hac vice)
15 1711 Route 9D
   Cold Spring, New York 10516
16 Telephone:  (845) 265-2820
   Fax:        (845) 265-2819

17

18            UNITED STATES DISTRICT COURT

19    CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

20 JOANNE SIEGEL and LAURA SIEGEL      Case No. CV-04-8700 ODW (RZx)
   LARSON,                            Case No. CV-04-8776 ODW (RZx)

21         Plaintiffs,                 Hon. Otis D. Wright II, U.S.D.J

22      v.

23 TIME WARNER INC.; WARNER           **JOINT STATUS REPORT**
   COMMUNICATIONS INC.; WARNER
24 ENTERTAINMENT INC.; WARNER B
   TELEVISION PRODUCTION INC.; DC
25 COMICS; and DOES 1-10,

26         Defendants.

27

28 AND RELATED COUNTER-CLAIMS

1       Plaintiffs Joanne Siegel and Laura Siegel Larson (collectively, "Plaintiffs") and

2 Defendants Time Warner Inc. ("Time-Warner"), Warner Communications Inc., Warner

3 Bros. Entertainment, Inc. ("Warner Bros."), Warner Bros. Television Production Inc., and

4 Defendant and Counterclaimant DC Comics ("DC") (collectively, "Defendants") hereby

5 submit this joint status report in Cases Nos. CV 04-8400 (the "Superman Action") and CV

6 04-8776 (the "Superboy Action"), as directed by the Court.[1]

7       Plaintiffs Joanne Siegel and Laura Siegel Larson are the widow and daughter,

8 respectively, of Jerome Siegel ("Siegel") who, with Joseph Shuster ("Shuster"), co-created

9 Superman. Siegel and Shuster co-authored the first Superman comic book story which

10 was later published in 1938 by Detective Comics, Inc. ("Detective"), the predecessor of

11 defendant DC Comics, in a new publication entitled *Action Comics No. 1*. By agreement

12 dated March 1, 1938, Siegel and Shuster granted to Detective all worldwide rights in their

13 Superman story and character, and Detective exploited those rights in various media over

14 the next seventy years. During the period at issue, from 1938 to 1943, Siegel and Shuster

15 wrote, hundreds of additional Superman comic book stories published by Detective, and

16 hundreds of Superman newspaper strips syndicated by the McClure Newspaper Syndicate.

17       The 1976 Copyright Act, which became effective on January 1, 1978, provided

18 authors and their families with new rights to recapture the author's original copyright(s)

19 for the extended renewal term by noticing the termination of previous grants of copyright.

20 *See* 17 U.S.C. §§ 304(c), 304(d), 203(a). Pursuant to 304(c) of the 1976 Act, Plaintiffs

21 served notices of termination with respect to Superman and Superboy ("Termination

22 Notices" or "Terminations") on Defendants on April 3, 1997, and November 8, 2002,

23 respectively, and filed such notices with the U.S. Copyright Office, pertaining to Siegel's

24 alleged copyright interest in Superman and Superboy that had been the subject of certain

25 grants. Pursuant to section 304(c), the Superman Termination Notices set forth an

---

26 [1] The parties have worked in good faith to prepare a mutually acceptable joint statement and

27 agree that neither party will be prejudiced by the descriptions of the claims, defenses, and arguments presented herein.

28

1  effective Termination date of April 16, 1999, and the Superboy Termination Notices set
2  forth an effective Termination date of November 17, 2004.

3       Defendants challenged the scope and effectiveness of Plaintiffs' Superman and
4  Superboy Termination Notices.  In response, Plaintiffs initiated, in October 2004, the
5  Superman Action and the Superboy Action for declaratory relief as to the validity of the
6  Superman and Superboy Terminations, respectively, and additional claims.

7       Superman is considered a joint work under the Copyright Act because it was co-
8  authored by Siegel and Shuster.  As such, each co-author originally owned an undivided
9  50% interest in such joint work's copyright.  Joint owners of a copyright each have the
10  non-exclusive right to exploit such copyright subject to a duty to account to one another.
11  The Superman Termination Notices related to Siegel's (but not his co-author Shuster's)
12  50% interest in the Superman copyrights.  Therefore, because DC is currently still the
13  successor of Shuster's joint copyright interest, the Superman Action is principally an
14  action for an accounting of Plaintiffs' allocable share of profits from the exploitation of
15  Plaintiffs' recaptured Siegel Superman copyrights after April 16, 1999, the noticed
16  Superman Termination date.

17       The Superboy Action, in contrast, is based on Siegel's alleged sole authorship of the
18  original Superboy story, and is therefore principally a copyright infringement action, based
19  on Defendants' alleged exploitation of the allegedly recaptured Superboy copyrights after
20  November 17, 2004, the noticed Superboy Termination date.

21       In the more than five years since Plaintiffs filed their actions, the Court has issued a
22  number of wide-ranging opinions that have substantially refined and narrowed the issues
23  presented.  In the sections that follow, we set forth the procedural history of each case,
24  describing the issues that have been determined along with the issues that remain pending.

25  **I.  The Superman Action (Case No. CV 04-8400).**

26       On April 3, 1997, Plaintiffs served seven notices of termination pursuant to 17
27  U.S.C. § 304(c), all effective as of April 16, 1999, purporting to terminate Siegel's
28  copyright grants to DC's predecessors in the Superman character and comic book series

394090v1

2

dating back to 1938.

Plaintiffs filed their initial Complaint in the Superman Action on October 4, 2004. The Complaint contained the following causes of action:

- Plaintiffs' First Cause of Action sought declaratory relief to affirm the validity of Plaintiffs' Superman Termination Notices pursuant to 17 U.S.C. § 304(c), and to declare that Plaintiffs, having recaptured Siegel's fifty percent share of the original Superman copyrights, were entitled to an accounting from Defendants for fifty percent of their profits from the continued exploitation of the recaptured Superman copyrights after April 16, 1999;

- Plaintiffs' Second Cause of Action sought declaratory relief as to the scope of Defendants' duty to account to Plaintiffs for post-April 16, 1999 profits from exploitation of Plaintiffs' recaptured Superman copyrights, including declarations: (a) that Defendants' duty to account extends to profits from foreign territories based on "predicate acts" in the United States; (b) that "apportionment" is applicable to copyright *infringement* claims actions and not to an accounting of profits between joint copyright owners; (c) that if apportionment is held to apply, its application should be limited to derivative Superman works created by the accounting Defendant(s), but not to passive Superman licensing by such accounting Defendant; (d) that profits should include profits from any derivative Superman works created, produced or manufactured on or after the effective Termination date; (e) that profits should not be limited to the Superman profits of Warner Bros.' wholly owned subsidiary, DC, but should include Superman profits of Warner Bros. and Time-Warner as well; and (f) that, in determining profits, deductible costs should be limited to those customarily deducted in arm's-length agreements and comply with Generally-Accepted Accounting Principles ("GAAP");

- Plaintiffs' Third Cause of Action sought a declaration that Defendants have a duty to account for post-April 16, 1999 exploitation of the Superman "crest" and/or Superman "shield" on the ground that they are copyrighted works derivative of the

394090v1

141

1      copyrighted Superman crest in *Action Comics No. 1*;

2 •   Plaintiffs' Fourth Cause of Action sought an accounting from all Defendants for

3      their respective exploitation of recaptured Superman copyrights after the effective

4      Termination date;

5 •   Plaintiffs' Fifth Cause of Action alleged a claim for waste of the recaptured

6      Superman copyrights after the effective Termination date;

7 •   Plaintiffs' Sixth Cause of Action alleged that Defendants violated the Lanham Act

8      by falsely representing exclusive ownership of Superman after the noticed

9      Termination date;[2]

10 •   Plaintiffs' Seventh Cause of Action alleged that Defendants violated California

11      Business and Professions Code §§ 17200 *et seq.* by omitting the Terminations from

12      Time-Warner's public financial disclosures.

13

14      Defendants filed their initial Answer and Counterclaims in the Superman Action on

15 November 22, 2004. Defendant DC Comics asserted the following counterclaims:

16 •   DC's First Counterclaim requested declaratory relief that the Termination Notices

17      are ineffective, alleging five independent reasons: (a) Plaintiffs did not send a

18      notice of termination with respect to a May 21, 1948 Consent Agreement; (b)

19      Plaintiff Joanne Siegel continued to accept benefits under a December 23, 1975

20      agreement, although she served a termination notice listing that agreement; (c)

21      Plaintiffs' Superboy Notice was ineffective because it was based on works that were

22      unpublished and therefore not subject to termination because they were neither in

23      their first nor their second term of copyright as of January 1, 1978, as required by 17

24      U.S.C. § 304(c); (d) Siegel's Superboy proposal and story sent to DC's predecessor-

25      in-interest were either prepared without the authorization of the copyright owner

26

---

27 [2] Plaintiffs did not include the Fifth and Sixth Causes of Action in their Second Amended Complaint, which was filed on October 8, 2008, with the Court's permission. Defendants filed their Answer to Plaintiffs' Second Amended Complaint on October 20, 2008.

28

1    and/or were "works made for hire," and therefore Siegel did not own any copyright

2    interest therein that would be subject to copyright termination; and (e) the Superman

3    Termination Notices were not timely served;

4    •   DC's Second Counterclaim requested a declaration that the Siegels' claims are

5        barred by the statute of limitations;

6    •   DC's Third and Fourth Counterclaims alleged that the parties had entered into a

7        settlement agreement that the Siegels had repudiated,

8    •   DC's Fifth Counterclaim alleged on the basis of various limitations provided in

9        section 304(c) that the Court limit the scope and reach of the Superman and

10        Superboy notices in the following seven ways: (a) Plaintiffs failed to terminate

11        certain Superman Ads published prior to the publication of *Action Comics No. 1*, so

12        that the copyrights therein are still exclusively owned by DC Comics; (b) DC

13        Comics retains the rights to exploit Superman "derivative works" prepared prior to

14        the effective dates of the Superman and Superboy Notices; (c) DC owns all

15        copyrights in post-*Action Comics No. 1* "derivative works," including new super

16        powers, villains, components to the Superman universe, or any other new Superman

17        elements contained therein; (d) Superboy is a "derivative work" based on Superman;

18        (e) Superboy is a joint work of authorship; (f) the television show "Smallville" is not

19        derived from the Siegel Superboy Submissions or any other Superboy work

20        exploited prior to May 21, 1948; and (g) certain "Additional Action Comics No. 1

21        Materials" were works made for hire;

22    •   DC's Sixth Counterclaim sought a determination regarding the application of a

23        number of accounting principles in the event that the Superman Termination Notices

24        and/or Superboy Termination Notice were deemed valid and effective.

25

26        The parties subsequently entered into a stipulation permitting Plaintiffs to file their

27    First Amended Complaint and permitting Defendants to file their First Amended

28    Counterclaims, and the Court adopted the stipulation on October 18, 2005.

1       Plaintiffs' First Amended Complaint largely tracked their initial complaint, except
2 for substantive amendments to Plaintiffs' sixth cause of action under the Lanham Act.

3       Defendants' First Amended Counterclaims contained additional allegations
4 concerning Defendants' alleged "settlement" defense. Defendants filed their Answer to
5 Plaintiffs' First Amended Complaint on November 1, 2005. Plaintiffs filed their Reply to
6 Defendants' First Amended Counterclaims on November 4, 2005.

7 **A.**     **The Parties' April 30, 2007 Partial Summary Judgment Motions.**

8       On April 30, 2007, the parties filed cross-motions for partial summary judgment in
9 the Superman Action. Plaintiffs sought partial summary judgment as follows:

10 •     That Defendants' Third and Fourth Alternative Counterclaims should be dismissed
11     because the parties failed to consummate a binding settlement agreement;

12 •     That the Superman Termination is valid as a matter of law with respect to at least
13     the original Superman story published in *Action Comics No. 1*, and that Plaintiffs
14     have thereby recaptured Siegel's co-authorship share of the copyrights therein;

15 •     That the defenses to the Terminations alleged in Defendants' First and Second
16     Alternative Counterclaims and parts of their Fifth Alternative Counterclaim lacked
17     merit because: (a) Siegel and Shuster's Superman story published in *Action Comics*
18     *No. 1* is not a "work made for hire" as it was independently created by them long
19     before their relationship with Detective; (b) that a May 21, 1948 consent judgment
20     need not have been listed in Plaintiffs' Termination Notices because it was not a
21     copyright grant and, in any event, is duplicative of the May 19, 1948 stipulation
22     listed in the Termination Notices; (c) that the December 23, 1975 agreement, was
23     not a copyright grant and, in any event, Plaintiff Joanne Siegel's acceptance of
24     certain pension benefits from Defendants did not reinstate any copyright grants; (d)
25     that the Superman Termination was timely served; and (e) that the Superman
26     Termination is not barred by the statute of limitations; and

27 •     That Plaintiffs are entitled to an accounting of all profits earned from Plaintiffs'
28     recaptured Superman copyrights in the United States and in foreign territories (to the

394090v1

144

extent such foreign profits are based on Defendants' predicate acts in the United States).

Defendants sought partial summary judgment as follows:

- That Plaintiffs have no right under the Copyright Act to share in Defendants' profits derived (a) from the foreign exploitation of any Superman work, including "Superboy," or any other juvenile version of Superman, (b) from the exploitation of the Superman family of trademarks, or (c) from the continued exploitation of any Superman "derivative work," including "Superboy," or any other juvenile version of Superman, created prior to the effective dates of Plaintiffs' Terminations;

- That as a result of Plaintiffs' alleged failure to terminate certain copyrighted works as prescribed by the Copyright Act, Defendants remain free to use such unterminated works and the elements contained therein without accounting to Plaintiffs and without liability for copyright infringement; and

- That neither Warner Bros. nor Time-Warner is the "alter ego" of DC, and Plaintiffs therefore are not entitled to reach any Superman-related profits of either of these two Defendants.

The Court issued its ruling on the parties' partial summary judgment motions on March 26, 2008.

The Court granted Plaintiffs' motion with respect to Defendants' work-for-hire defense, concluding that "all the Superman material contained in <u>Action Comics</u>, Vol. 1, is not a work-made-for-hire and therefore is subject to termination." *Siegel v. Warner Bros. Ent. Inc.*, 542 F.Supp.2d 1098, 1130 (C.D. Cal. 2008) ("*Siegel II*"). The court also granted Plaintiffs' motion in holding that Plaintiffs' omission of the 1948 consent judgment in the Termination Notices did not diminish or invalidate the Notices. *Id.* at 1132. The Court likewise granted Plaintiffs' motion that Joanne Siegel's continued acceptance of benefits under the parties' 1975 agreement did not constitute a "grant" of copyrights under section

394090v1

304(c)(6)(D) and had no effect on Plaintiffs' Terminations. *Id.* at 1134. The Court also granted Plaintiffs' motion in denying Defendants' statute of limitations defense, holding that Plaintiffs' action was timely filed. *Id.* at 1136. The Court likewise granted Plaintiffs' motion in denying Defendants' defense that the parties had allegedly entered into a binding settlement agreement in 2001, ruling that "the parties' settlement negotiations did not result in an enforceable agreement." *Id.* at 1139.

The Court granted Defendants' motion in ruling that certain "promotional announcements," due to their earlier publication, fell outside the statutory time "window" of Plaintiffs' Termination Notices. *Id.* at 1126. The Court defined the scope of the elements in the Promotional Announcements. *Id.*

In addition, the Court granted Defendants' motion on the foreign profits issue and denied Plaintiffs' motion, ruling that the "the termination notice is <u>not</u> effective as to … defendants' exploitation of the work abroad," and that therefore Defendants "must account to plaintiffs only for the profits from such domestic exploitation of the Superman copyright." *Id.* at 1142. The Court also granted Defendants' motion that "plaintiffs cannot share in defendants' profits 'purely attributable to [Superman] trademark rights,'" but preserved the issue of Defendants' "accounting [for] the mixed use of trademark and copyright." The Court also granted Defendants' motion that Plaintiffs' accounting "should not include any profits attributable to the 'post-termination exploitation of [Superman] derivative works prepared prior to termination,'" but preserved the issue as to the extent a post-termination "alteration [of] pre-termination derivative works" creates a post-termination derivative work for which Defendants must account. *Id.*

The Court denied Defendants' motion to dismiss Plaintiffs' "alter ego" claims, holding that "whether the license fees paid [to DC Comics for the Superman rights] represents the fair market value therefor, or whether the license for the works between the entities was a 'sweetheart deal,' are questions of fact that are not answered on summary judgment…." *Id.* at 1145.

Both parties moved for clarification and/or reconsideration of certain portions of the

394090v1

JOINT STATUS REPORT

**146**

1  Court's March 26, 2008 Partial Summary Judgment Order. Defendants' motion (Docket

2  Entry #307) requested that the Court reconsider its statement regarding the scope of

3  copyrightable material contained in the "promotional announcements." Plaintiffs' motion

4  (Docket Entry # 300, 312) requested that the Court "(a) clarify that Defendants did not

5  secure any copyrightable Superman elements via the 'promotional announcements;'" and

6  (b) clarify that the promotional announcements did not detract from Plaintiffs' recaptured

7  Superman copyrights. Plaintiffs also sought clarification that the Court's statements in the

8  background section of its order regarding the Superman elements it did not see in *Action*

9  *Comics No. 1* were *dicta*, on the ground that this literary issue had not been joined.

10       On July 3, 2008, the Court issued an order denying Defendants' motion. In denying

11  Defendants' motion, the Court "affirm[ed] its conclusion on the scope of the copyrightable

12  material contained in those [promotional] announcements." Order at 3-4. The Court

13  denied Plaintiffs' motion, but without prejudice, stating that "[s]hould plaintiffs wish for

14  the Court to deal with the questions identified in their motion, they may append them to

15  those issues identified in the March 31, 2008 Order requiring further briefing." Order at 4.

16  *See* Discussion of Additional Issues Briefing in Section I(B), *infra*.

17  **B.    Additional Issues Briefing.**

18       On February 21, 2008, a month before the Court issued its March 26, 2008 Partial

19  Summary Judgment Order, the parties filed a stipulation with the Court, requesting that it

20  accept briefing on and decide certain "Additional Issues" that would substantially impact

21  the nature, conduct and length of the trial, as well as the parties' pre-trial preparations.

22  The Additional Issues were:

23  •     If Plaintiffs are successful in their Superman copyright termination claim, is

24       Plaintiffs' share of post-termination profits as a joint owner of the recaptured

25       Superman copyright(s) subject to reduction via an "apportionment" analysis?

26  •     If Plaintiffs are successful in their Superman copyright termination claim, are the

27       following to be determined by the Court or by the jury: (a) the amount of post-

28       termination Superman profits at issue and (b) the degree, if any, to which Plaintiffs'

147

1      share of such profits should be reduced by "apportionment"?

2    • If an "apportionment" analysis is held to be appropriate, is the trier of fact (be it the

3      Court or the jury) required to make a separate and independent apportionment

4      determination, if any, for each post-termination Superman work?

5    • Do Plaintiffs or Defendants bear the burden of proof on (a) the issue of Defendants'

6      profits, and (b) the issue of the apportionment, if any, of those profits?

7    • If Plaintiffs are successful in their Superman copyright termination claim, are

8      Plaintiffs only entitled to profits derived from Plaintiffs' recaptured copyright

9      interest in *Action Comics No. 1*; that is, was Jerome Siegel's contribution on all

10     *subsequent* Superman works (within the termination "window") as a "work-made-

11     for-hire" and accordingly not subject to termination?

12

13      In a March 31, 2008 Order, issued several days after the Court's Partial Summary

14 Judgment Order, the Court ordered the parties to engage in settlement mediation, and

15 stated that it would set a briefing schedule for the Additional Issues if the parties were

16 unable to reach a settlement.[3]  The Court also requested that the parties brief (along with

17 the Additional Issues) the following issues that had been left unresolved by the Court's

18 March 26, 2008 Partial Summary Judgment Order:

19    • Whether and to what extent post-termination alterations to pre-termination

20     derivative works fall within the scope of what Plaintiffs regained through their

21     termination notices; and

22    • Whether and to what extent mixed uses of trademarks and copyright fall within the

23     scope of what Plaintiffs regained through their termination notices.

24

25      Pursuant to the Court's July 3, 2008 Order regarding Plaintiffs' motion for

26 clarification, Plaintiffs also re-briefed the issues of (a) the scope of Defendants' rights

27

28 [3] The parties' mediation efforts are described in Section III below.

394090v1

JOINT STATUS REPORT

**148**

based on the "promotional announcements," and (b) whether the Court's background statements concerning the absence of certain Superman elements in *Action Comics No. 1* were *dicta*.

The parties submitted their initial briefs on the Additional Issues on July 21, 2008 and their responsive briefs on July 28, 2008. The Court heard oral argument on September 16, 2008, during which the Court bifurcated the trial, with separate trials on (1) the alter ego issues identified in the Court's March 26, 2008 Partial Summary Judgment Order, to determine which Defendants were required to account to Plaintiffs for their Superman profits; and (2) the ultimate accounting claim.

On October 6, 2008, the Court issued an Order denying Plaintiffs' request for a jury trial on their "alter ego" and accounting claims. *Siegel v. Warner Bros. Entm't Inc.*, 581 F. Supp. 2d 1067 (C.D. Cal. 2008).[4] The Court "reserve[d decision on the other Additional Issues] until shortly before the time of [the accounting] trial." *Id.* at 1076.

**C.    Plaintiffs' Lanham (Trademark) Act and Waste Claims**

Trial on Plaintiffs' Lanham Act and waste claims was set for November 4, 2008. On September 25, 2008, the parties submitted a stipulation seeking leave for Plaintiffs to file their Second Amended Complaint, removing Plaintiffs' Lanham Act and waste claims. On October 6, 2008, the Court held a status conference to address the parties' stipulation and other trial scheduling issues. The Court then accepted the parties' stipulation, granting Plaintiffs leave to file the Second Amended Complaint, which they did on October 8, 2008. Defendants filed their Answer to Plaintiffs' Second Amended Complaint on October 20, 2008.

In the Court's October 6, 2008 Order on the jury issues, the Court bifurcated the trial, with separate trials on: (1) the alter ego issues identified in the Court's March 26,

---

[4] Plaintiffs had alternatively requested an advisory jury to the extent the Court engaged in an "apportionment" analysis. Plaintiffs contend that the Court did not decide Plaintiffs' request that it empanel an "advisory jury." Defendants contend that the Court rejected any claim for a jury in connection with the accounting trial and did not leave the question of an advisory jury for later decision.

1 | 2008 partial summary judgment Order, which would determine which Defendants'

2 | Superman profits would be subject to an accounting, and (2) the ultimate accounting

3 | claims. The Court scheduled the alter ego trial for January 20, 2009 and the accounting

4 | trial for March 16, 2009.

5 | **D.     The "Alter-Ego Trial"**

6 |      In its March 26, 2008 Partial Summary Judgment Order, the Court found, with

7 | respect to the close relationship between DC and Warner Bros., that "[t]his fact alone

8 | raises a specter of a 'sweetheart deal' entered into by related entities in order to pay a less

9 | than market value fee for licensing valuable copyrights." *Siegel II*, 542 F.Supp.2d at 1144.

10 | Accordingly, the Court conducted the "alter-ego trial" from April 28, 2009 to May 13,

11 | 2009, and heard closing arguments on May 19, 2009. In its March 13, 2009 Final Pre-

12 | Trial Conference Order, the Court stated:

13 |      Given the nature and the characterization of the property in question, the trial shall
14 | determine whether the value of the various Superman option and assignment
     agreements between DC Comics and TWEC [Time Warner Entertainment
     Company, LP], Warner Bros. Entertainment's predecessor in interest, and the
15 |      amounts paid to DC Comics by TWEC (and its successor Warner Bros.
     Entertainment) thereunder, reflect the fair market value of the nonexclusive rights
16 |      that the Court has determined were transferred from DC Comics to TWEC (and its
     successor Warner Bros. Entertainment), and, if not, what accounting shall be
17 |      required of Warner Bros. Entertainment to ensure an equitable result.

18 | Final Pretrial Conference Order at 7-8.

19 |      After the parties finished their closing arguments on May 19, 2009, the Court

20 | dismissed Time-Warner from the case pursuant to Rule 52(c) (Tr. at 1598:2 – 1598:3) and

21 | held that there was insufficient evidence to establish that the consumer products agreement

22 | or animation agreements at issue were not fair market agreements. (Tr. at 1598:4 –

23 | 1598:8).

24 |      The Court took the other issues under submission. On July 8, 2009, the Court issued

25 | its findings of fact and conclusions of law concerning the "alter-ego trial." The court

26 | found in favor of Defendants as of the time of trial with respect to each of the agreements

27 | at issue, concluding that:

28 | •     "there is insufficient evidence that the Superman film agreement between DC

394090v1

JOINT STATUS REPORT

Comics and Warner Bros., whether judged by its direct economic terms or its indirect ones, was consummated at below its fair market value." Order at 28; and

- "the Court finds that there is no evidence introduced at trial that demonstrates that the Smallville agreement was for less than fair market terms." *Id.*

However, the Court held that because the Defendants' Superman film agreement did not contain a customary "reversion" clause in DC's favor, Plaintiffs could seek damages if filming on a Superman sequel has not commenced by 2011:

- "If, however, by 2011, no filming has commenced on a Superman sequel, plaintiffs could bring an accounting action at that time to recoup the damages then realized for the Superman film agreement's failure to contain a reversion clause." *Id.* at 29.

**E.    The August 12, 2009 Decision on "Work-For-Hire" Issues.**

On August 12, 2009, the Court issued an "Order Resolving Additional Issues." In its Order, the Court ruled on the work-for-hire arguments presented in the parties' Additional Issues briefing, and denying Plaintiffs' request for a jury trial on the work-for-hire issue. At issue was whether the following works were "works-made-for-hire": (i) a description of "future Superman exploits" written by Siegel; Superman comic strips created by Siegel and artist Russell Keaton (the "Keaton Material"); *Action Comics Nos. 2-61*; *Superman Nos. 1-6*; and Superman newspaper strips syndicated by the McClure Newspaper Syndicate. In pertinent part, the Court ruled as follows:

- The "future Superman exploits" paragraph written before the publication of *Action Comics No. 1* could not be terminated because it was too generalized to achieve copyright protection. *Siegel v. Warner Bros. Entertainment, Inc.*, 2009 U.S. Dist. LEXIS 78193 at *58-*61 (C.D. Cal. Aug. 9, 2009) ("Siegel III");

- The "Keaton Material" was unpublished and therefore could not be terminated, because it did not "acquire[] statutory copyright protection under the 1909 Act, as it was either never published with the requisite notice or registered as an unpublished

1  work." *Id.* at *61;

2  • The Superman material "appearing in <u>Action Comics</u> No. 4 is based almost

3  verbatim on Siegel's pre-1938 script, . . . the Superman material appearing therein

4  was not a work for hire and is subject to termination" and recaptured by Plaintiffs.

5  *Id.* at *66-*67;

6  • <u>Superman</u> No. 1, pages three through six, was not a work made for hire and was

7  thus subject to termination and recaptured by Plaintiffs. *Id.* at *69-*70;

8  • "[T]he Superman material in <u>Action Comics</u> Nos. 2-3 and 5-6 . . . were works made

9  for hire." *Id.* at *78-*79;

10 • "[T]he Superman materials created by Siegel and Shuster during the term of their

11 employment agreement (namely, <u>Action Comics</u> Nos. 7-61, and to <u>Superman</u> Nos.

12 1-23) were works made for hire." *Id.* at *86-*87;

13 • "[T]he two weeks' worth of newspaper comic strip material created by Siegel and

14 Shuster during the spring of 1938, <u>before</u> the execution of the syndication agreement

15 were <u>not</u> works made for hire" and therefore were subject to termination and

16 recaptured by Plaintiffs. *Id.* at *129;

17 • The failure to list the two weeks of newspaper strips in the termination notices "was

18 'harmless error' that does not affect the validity of termination notice" regarding

19 these newspaper strips; and

20 • "[T]he newspaper strips created by Siegel and Shuster after September 22, 1938,

21 were works made for hire, [and] the right to terminate does not reach the grant to

22 those works." *Id.* at *119.

23 As a result of these various rulings, Plaintiffs have recaptured Jerome Siegel's co-

24 authorship interests in, and co-own with Defendant DC, the copyrights to the following

25 works: the first Superman story as published in *Action Comics No. 1*, *Action Comics No.*

26 *4*, *Superman No. 1* (pages three through six), and the first two weeks of the Superman

27 newspaper strips. The Court declined to address the remaining Additional Issues that have

28 been pending before the Court since the parties briefed them in July of 2008, reserving

394090v1

1  decision on those issues to a later date in advance of the accounting trial.  *Id.* at *165, n.

2  27.   Defendants filed a motion on October 2, 2009, seeking reconsideration of the

3  Court's ruling that the omission of the first two weeks of the Superman newspaper strips

4  from the Termination Notices was "harmless error."  Plaintiffs filed a motion on October

5  3, 2009, requesting reconsideration of the Court's ruling that the McClure newspaper strips

6  created by Siegel and Shuster after September 22, 1938 were works made for hire.  In an

7  opinion dated October 30, 2009, the Court denied both parties' motions.

8  **F.      Discovery Matters Impacting the Accounting Trial.**

9         The discovery cut-off in these actions was November 16, 2006.  After that discovery

10  cutoff, the Court decided several discovery motions, and ordered on August 13, 2007 an

11  audit of Defendants.  In addition, the parties entered into a stipulation on June 9, 2008 in

12  which they agreed  to supplement production in advance of trial, and Defendants agreed to

13  supplement their financial production at the end of each financial quarter.  Defendants last

14  supplemented their financial information on June 1, 2009.

15         On October 1, 2009, the Court adopted a stipulation by the parties which granted

16  Plaintiffs leave to replace their former expert Mark Halloran.  The stipulation also granted

17  Defendants leave to appoint a new rebuttal expert and if necessary provide limited

18  supplemental rebuttal reports from previously designated experts.

19         The parties' accounting experts will also need to prepare supplemental reports

20  updating their prior analysis of DC's profits as of June 30, 2007, based on the most recent

21  financial data available.

22  **G.      Current Status of the Superman Action.**

23         The Court will need to schedule the trial and corresponding pretrial deadlines for the

24  accounting action.  As established in the alter-ego trial, the accounting action will concern

25  Defendant DC's profits from the exploitation of those Superman copyrights that the Court

26  has held were recaptured by Plaintiffs' Terminations and are co-owned by DC and

27  Plaintiffs (namely, the first Superman story published in *Action Comics No. 1, Action*

28  *Comics No. 4, Superman No. 1* (pages three through six), and the first two weeks of the

394090v1

JOINT STATUS REPORT

Superman newspaper strips).

Both parties respectfully request, however, that the Court determine the remaining undecided Additional Issues which the parties briefed in 2008. Because such Additional Issues define the contours of the pending accounting trial, the parties cannot properly prepare for trial prior to a determination of the Additional Issues. The Additional Issues are not *in limine* motions and have far too large an impact on the trial to be decided like *in limine* motions, only days before trial. These remaining Additional Issues include:

- The impact, if any, that Defendants' pre-*Action Comics No. 1* "promotional announcements" have on the scope of Plaintiffs' recaptured copyrights;
- Whether principles of apportionment should be applied to the calculation of Plaintiffs' share of the profits from the recaptured copyrights;
- Whether the apportionment analysis, if applicable, should be on a work-by-work basis or pursuant to a general "template," or whether there should be an alternative method of apportionment;
- Who bears the burden of proof on what issues;
- How broad or narrow is the scope of the mixed use – copyright/trademark – products and merchandise as to which an accounting is required (*e.g.*, t-shirts with both Superman trademarks and copyrightable imagery);
- How much or how little is needed to transform the post-termination sale of a pre-termination "derivative work" into a post-termination "derivative work" so as to require an accounting (*e.g.*, DVD boxed sets of pre-1999 Superman films); and
- Whether the Court's background statements in its March 26, 2008 Partial Summary Judgment Order concerning the literary elements in *Action Comics No. 1* are *dicta*.

The Court's decision on these remaining Additional Issues will materially impact the parties' pretrial preparations and the accounting trial itself. Without guidance from the Court on these Additional Issues, well in advance of the deadlines set by the Court for the parties' pretrial submissions, the parties' pretrial submissions will likely be unnecessarily

1   duplicative and not conform to the standards the Court ultimately adopts to govern the

2   trial.

3   **II.      The Superboy Action (Case No. CV 04-8776).**

4          On November 2, 2002, Plaintiffs served a separate notice of termination under 17

5   U.S.C. § 304(c), as of November 17, 2004, regarding Siegel's copyright grants of the

6   Superboy character to DC's predecessors.

7          Plaintiffs filed their initial Complaint in the Superboy Action on October 22, 2004.

8   The Complaint contained the following causes of action:

9   •      Plaintiffs' First Cause of Action sought declaratory relief confirming the validity of

10         Plaintiffs' Superboy Termination Notice pursuant to 17 U.S.C. § 304(c).  Unlike the

11         Superman Action, where Plaintiffs acknowledged that Siegel co-authored Superman

12         and that Plaintiffs therefore co-own recaptured Superman copyrights, Plaintiffs

13         alleged that Siegel solely authored the first Superboy story and that therefore

14         Plaintiffs solely own recaptured Superboy copyrights.

15  •      Plaintiffs' Second Cause of Action alleged that Defendants violated the Lanham Act

16         by falsely representing that they are the exclusive owners of Superboy.

17  •      Plaintiffs' Third Cause of Action alleged that Defendants violated California

18         Business and Professions Code §§ 17200 *et seq.* by omitting mention of the

19         Superboy Termination from Time-Warner's public financial disclosures.

20  •      Plaintiffs' Fourth Cause of Action sought injunctive relief preventing Defendants

21         from exploiting derivative post-termination Superboy works.

22         Defendants filed their initial Answer and Counterclaims on November 22, 2004.

23  The Counterclaims asserted therein mirrored those included in Defendants' Counterclaims

24  filed in the Superman case. *See Section I, supra.*

25         Plaintiffs filed their First Supplemental Complaint on April 19, 2005.  The principal

26  change from their initial Complaint was the inclusion of a First Cause of Action for

27  Defendants' alleged copyright infringement after November 17, 2004, the effective date of

28  the Superboy Termination.  Plaintiffs alleged that any Superboy works (*e.g.*, the *Smallville*

394090v1

1    television series) released by Defendants after the effective Termination date would

2    infringe Plaintiffs' recaptured original Superboy copyright. Defendants filed their Answer

3    to Plaintiffs' First Supplemental Complaint on September 7, 2005.

4         On October 18, 2005, the Court adopted the parties' stipulation permitting Plaintiffs

5    to file their First Amended Supplemental Complaint, and Defendants to file their First

6    Amended Counterclaims. Defendants filed their Answer to the First Amended

7    Supplemental Complaint on November 1, 2005, and Plaintiffs filed their Reply to

8    Defendants' First Amended Counterclaims on November 4, 2005.

9    **A.**    **February 15, 2006 Cross-Motions for Summary Judgment.**

10        On February 15, 2006, the parties filed cross-motions for summary judgment.

11    Plaintiffs moved for partial summary judgment, requesting a ruling that their statutory

12    Termination was valid and effective under 17 U.S.C. §304(c), arguing:

13    •    That Jerry Siegel alone created Superboy as embodied in a November 30, 1938

14         "pitch" letter from Mr. Siegel to DC's predecessor, Detective, and a thirteen-page

15         typed "Superboy" script Mr. Siegel submitted to Detective in December, 1940 (the

16         "Siegel Superboy Materials").

17    •    That the judicial findings in a prior 1947 action between the parties' predecessors in

18         the Supreme Court of the State of New York are binding on Defendants under the

19         doctrines of *res judicata* and collateral estoppel.

20    •    That the 1947 action held that "Siegel is the originator and sole owner of the comic

21         strip feature Superboy."

22    •    That the preclusive effect of the findings and conclusions in the 1947 action was

23         explicitly confirmed by the Second Circuit Court of Appeals in *Jerome Siegel, et al.*

24         *v. National Periodical Publications*, et al., 509 F.2d 909, 912-913 (2nd Cir. 1974).

25    •    That Plaintiffs' Superboy Notices of Termination complied with the requirements

26         set forth in 17 U.S.C. § 304(c).

27    •    That Plaintiffs' Superboy Notices of Termination were not required to list the 1948

28         Consent Judgment from the 1947 action, as the Consent Judgment was not a grant

394090v1

1  and as Plaintiffs listed the duplicative 1948 Stipulation between the parties; and

2  • That the Superboy materials created by Siegel were not "works-for-hire."

3

4  Defendants cross-moved for summary judgment, arguing:

5  • That because Superboy is derivative of Superman, Plaintiffs should not be permitted

6  to proceed in a separate Superboy action;

7  • That because the Siegel Superboy Materials were never published or registered as an

8  unpublished work, there was no "copyright subsisting in either its first or renewal

9  term on January 1, 1978," and the "Superboy works" were therefore not eligible for

10  termination under 17 U.S.C. § 304(c);

11  • That the Siegel Superboy Materials were not eligible for termination because they

12  were  "works for hire;"

13  • That the Siegel Superboy Materials were joint works of Siegel and Shuster, so that if

14  otherwise terminable, Plaintiffs could only recapture a one-half share to the

15  copyrights in such works;

16  • That Plaintiffs failed to terminate the grant in the May 21, 1948 Final Consent

17  Agreement; and

18  • Plaintiffs' claim that the *Smallville* television series infringes the copyright in the

19  Siegel Superboy Materials should be dismissed because Plaintiffs cannot meet the

20  test for establishing infringement.

21

22  Judge Lew, who presided over the Superboy Action at that time, issued a decision

23  on the parties' cross-motions on March 24, 2006, granting Plaintiffs' motion for partial

24  summary judgment and denying Defendants' motion for summary judgment.

25  One of the principal disputes briefed by the parties and addressed in Judge Lew's

26  ruling was whether the 1948 findings of fact and conclusions of law issued in support of an

27  interlocutory ruling in the 1947 state court action had preclusive effect in the Superboy

28  litigation.  Judge Lew concluded that the 1948 findings of fact and conclusions of law have

394090v1

preclusive effect:

> "Having relied on [the 1947 action's] findings for previous favorable determinations regarding Superman, Defendants now take the inconsistent position that this Court is not bound by the state court findings, as they relate to Superboy...Contrary to Defendants' assertions now, both the Southern District of New York and Second Circuit looked directly to, even citing to, Judge Young's findings of fact. This Court holds that it is consistent to continue this position and will look to Judge Young's as binding where relevant."

*See* March 24, 2006 Order at 7:4-7; 7:14-19.

Judge Lew also held that "no genuine issue of material fact exists regarding the effectiveness of [Plaintiffs'] termination of the Superboy copyrights." *Id.* at 12:8-11. Judge Lew also denied Defendants' motion that Defendants' *Smallville* television series does not infringe Plaintiffs' recaptured copyrights in the Siegel Superboy Material, preserving this issue for trial. *Id.* at 15:8-16:26.

Defendants filed a certification motion pursuant to 28 U.S.C. § 1292(b) on April 17, 2006, requesting that Judge Lew certify the matter for appeal. Judge Lew denied the certification request in an order dated May 22, 2006.

Judge Lew thereafter took senior status and these actions were reassigned to Judge Larson on October 26, 2006. On January 12, 2007, Defendants filed a motion for reconsideration, requesting that Judge Larson reconsider Judge Lew's holding that "Judge Young's findings of fact [in the 1948 Westchester Action between the parties' predecessors] have preclusive res judicata and collateral estoppel effect on this Court." Defendants requested in the alternative that Judge Larson reconsider Judge Lew's denial of Defendants' April 17, 2006 certification motion.

Judge Larson granted Defendants' reconsideration motion in an order dated July 27, 2007. In that ruling, Judge Larson concluded that the referee's findings in the Westchester Action should have preclusive effect, but as a matter of collateral estoppel, not judicial estoppel. However, Judge Larson ruled that "contrary to the March 24, 2006 Order, those findings are not necessarily determinative of all the issues." *Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1131 (C.D. Cal. 2007) ("*Siegel I*"). Judge Larson summarized his rulings as follows:

394090v1

**158**

1  Based on the referee's findings, the Court has determined that Siegel's Superboy
   submissions were not a work made for hire, but the Court is unable to conclude
2  whether the requisite 'publication' of the Superboy submissions occurred due to
   the unresolved matter regarding the submissions' derivative nature. Similarly, the
3  Court was unable to conclude whether the Superboy submissions were part of a
   joint work, but only because the issue of whether the submissions are a derivative
4  work remains unresolved (and a subject of further court-ordered briefing).

5  *Id.* at 1155.

6      Judge Larson therefore requested supplemental briefing by the parties on the issue

7  of "the derivative nature, if any, of Siegel's Superboy submissions, bearing in mind the

8  legal principles set forth in *Nichols* [*v. Universal Pictures Corp.*, 45 F.2d 119 (2d Cir.

9  1930)] as expounded in [*Detective Comics, Inc. v.*] *Bruns Publications*[*, Inc.*, 111 F.2d 432

10 (2d Cir. 1940)], *Warner Bros.* [*v. Am. Broad. Cos.*, 720 F.2d 231 (2d Cir. 1983)], and

11 *Sapon* [*v. DC Comics*, 62 U.S.P.Q.2d 1691 (S.D.N.Y. 2002)]." *Id.*  The parties submitted

12 their supplemental briefing on September 10, 2007, but Judge Larson did not issue a ruling

13 on the matter.

14 **B.    The Parties' April 30, 2007 Partial Summary Judgment Motions**

15     Between the time Defendants moved for reconsideration of Judge Lew's March 24,

16 2006 Order and the time Judge Larson issued his July 27, 2007 decision granting

17 reconsideration, the parties filed partial summary judgment motions in both cases on April

18 30, 2007.  Defendants sought partial summary judgment in the Superboy Action (some of

19 which overlaps with their motions in the Superman Action) on the follow grounds:

20 • That Plaintiffs have no right under the Copyright Act to share in Defendants' profits

21   derived (a) from the foreign exploitation of any Superboy work, including

22   "Superboy" or any other juvenile version of Superman, (b) from the exploitation of

23   the Superman family of trademarks, or (c) from the continued exploitation of any

24   Superman "derivative work," including "Superboy," or any other juvenile version of

25   Superman, created prior to the effective dates of Plaintiffs' Terminations;

26 • That as a result of Plaintiffs' alleged failure to terminate certain copyrighted works

27   as prescribed by the Copyright Act, Defendants remain free to use such

28   unterminated works and the elements contained therein without accounting to

394090v1

Plaintiffs and without liability for copyright infringement; and

- That the episodes of the television series *Smallville* prepared on or after November 17, 2004 are not "substantially similar" to, and therefore do not infringe upon, any of the Superboy copyrights recaptured by Plaintiffs pursuant to their Termination Notices.

Plaintiffs cross-moved for partial summary judgment on the following grounds:

- That Plaintiffs are entitled to an accounting of all profits earned from Plaintiffs' recaptured Superboy copyrights, both in the United States and in foreign territories, to the extent that such foreign profits flow from Defendants' exploitation of such copyrights within the United States.

As discussed in detail in Section I(A) above, the Court issued its ruling on the parties' Superman partial summary judgment motions on March 26, 2008. In addition, the Court issued a separate order related to the Superboy Action on March 31, 2008, in which the Court denied the parties' motions for partial summary judgment in the Superboy Action as moot:

> As the Court stated during the September 17, 2007 hearing on the parties' cross motions for partial summary judgment in these cases, the issues raised by the parties in the Superboy action . . ., in light of the Court's earlier ruling on July 27, 2007, and with a forthcoming ruling in the companion Superman action . . ., would be rendered moot.

Order at 1.

The Court further stated:

> "[T]he Court reserves issuing an order on the remaining issues brought up in the Court's July 27, 2007 Order in the Superboy case (and to which the parties have provided both supplemental briefing and oral argument), and setting the pre-trial and trial-dates in the Superboy matter, if needed, until after the conclusion of the trial in the Superman case."

Order at 2.

## C.    Current Status of the Superboy Action.

Plaintiffs' position is that the Court never issued a final ruling that the Siegel Superboy Materials were a "joint work." Defendants' position is that the Court ruled that

394090v1

1  the Siegel Superboy Materials were a "joint work" if and to the extent that they were

2  copyrightable at all.  In addition, given the Court's July 27, 2007 ruling along with its

3  March 31, 2008 ruling, the parties agree that the Court still needs to make determinations

4  on: (1) the extent of the original copyrightable material in Siegel's Superboy Materials, if

5  any; and (2) whether the original material, if any, from the Superboy Materials was

6  published in a work allegedly subject to recapture pursuant to the Superboy Termination

7  Notices.

8        Although Judge Larson suggested in his March 31, 2008 Order that he would wait to

9  resolve these issues until after the conclusion of the accounting trial in the Superman

10  action, the parties submit that they should properly be decided in advance of the Superman

11  accounting trial so that the parties can also account in the Superman Action for Siegel's

12  Superboy Materials, if such is held to be appropriate.

13  **III.   The Parties' Mediation Efforts.**

14        The parties have engaged in two settlement mediations before the Hon. Daniel

15  Weinstein (Ret.), the first in May-June 2008, and the second in September 2009.  On

16  November 11, 2009, the parties each submitted a status report to the mediator pursuant to

17  the mediator's directive.  Despite the parties' mediation efforts, to date they have not

18  settled these cases.

19

20

21

22

23

24

25

26

27

28

394090v1

JOINT STATUS REPORT

Case 2:10-cv-03633-ODW-RZ Document 80-4 Filed 09/29/10 Page 26 of 162 Page
ID #:6490
Case 2:04-cv-08400-ODW-RZ Document 602 Filed 12/21/2009 Page 25 of 25

1   Respectfully submitted,

2

3   DATED: December 21, 2009          WEISSMANN WOLFF BERGMAN
                                        COLEMAN GRODIN & EVALL LLP

4                                              -and-

5                                      FROSS ZELNICK LEHRMAN & ZISSU, P.C.

6                                              -and-

7                                      PERKINS LAW OFFICE, P.C.

8

9

10

11  By: _____

12      Michael Bergman
        Attorneys for Defendants and counterclaimant

13  DATED: December 21, 2009          TOBEROFF & ASSOCIATES, P.C.

14

15

16

17  By: _____

18      Marc Toberoff
        Attorneys for Plaintiffs/Counterclaim-Defendants

19

20

21

22

23

24

25

26

27

28

# EXHIBIT H



LEXSEE 542 F. SUPP. 2D 1098

**JOANNE SIEGEL and LAURA SIEGEL LARSON, Plaintiffs, v. WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; and DC COMICS, Defendants.**

**CASE NO. CV-04-8400-SGL (RZx) [Consolidated for pre-trial and discovery purposes with CV-04-8776-SGL (RZx)]**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

*542 F. Supp. 2d 1098*; *2008 U.S. Dist. LEXIS 27217*; *86 U.S.P.Q.2D (BNA) 1899*

**March 26, 2008, Decided**
**March 26, 2008, Filed**

**SUBSEQUENT HISTORY:** Reconsideration denied by *Siegel v. Warner Bros. Entm't Inc., 2008 U.S. Dist. LEXIS 115678 (C.D. Cal., July 3, 2008)*

**PRIOR HISTORY:** *Siegel v. Time Warner Inc., 496 F. Supp. 2d 1111, 2007 U.S. Dist. LEXIS 56910 (C.D. Cal., 2007)*

**COUNSEL:** [**1] For Joanne Siegel, an individual, Plaintiff: Marc Toberoff, Nicholas Calvin Williamson, LEAD ATTORNEYS, Marc Toberoff Law Offices, Los Angeles, CA.

For Laura Siegel Larson, an individual, Plaintiff: Marc Toberoff, Nicholas Calvin Williamson, LEAD ATTORNEYS, Marc Toberoff Law Offices, Los Angeles, CA.

For Warner Bros Entertainment Inc, a corporation, Time Warner Inc, a corporation, Defendants: Anjani Mandavia, Michael Bergman, LEAD ATTORNEYS, Weissmann Wolff Bergman Coleman, Beverly Hills, CA; James D Weinberger, Roger L Zissu, LEAD ATTORNEYS, Fross Zelnick Lehrman & Zissu, New York, NY; Jonathan Zavin, LEAD ATTORNEY, Loeb & Loeb, New York, NY; Patrick T Perkins, LEAD ATTORNEY, Perkins Law Offices, Cold Spring, NY.

For DC Comics, a New York General Partnership, Defendant: Anjani Mandavia, LEAD ATTORNEY, Michael Bergman, Weissmann Wolff Bergman Coleman, Beverly Hills, CA; David Aaron Grossman, LEAD ATTORNEY, Loeb & Loeb, Los Angeles, CA; James D Weinberger, Roger L Zissu, LEAD ATTORNEYS, Fross Zelnick Lehrman & Zissu, New York, NY; Patrick T Perkins, LEAD ATTORNEY, Perkins Law Offices, Cold Spring, NY.

For Does, 1-10, Defendant: Anjani Mandavia, LEAD ATTORNEY, Weissmann Wolff Bergman Coleman, [**2] Beverly Hills, CA.

For Bad Hat Harry Productions, Inc, Bryan Singer, Intervenors: Christopher G Caldwell, LEAD ATTORNEY, Caldwell Leslie & Proctor, Los Angeles, CA; Michael Dietz Roth, LEAD ATTORNEY, Caldwell Leslie Proctor and Pettit, Los Angeles, CA.

For DC Comics, a New York General Partnership, Counter Claimant: Anjani Mandavia, Michael Bergman, LEAD ATTORNEYS, Weissmann Wolff Bergman Coleman, Beverly Hills, CA; Patrick T Perkins, LEAD ATTORNEY, Perkins Law Offices, Cold Spring, NY; David Aaron Grossman, Loeb & Loeb, Los Angeles, CA; James D Weinberger, Roger L Zissu, Fross Zelnick Lehrman & Zissu, New York, NY; Jonathan Zavin, Loeb

542 F. Supp. 2d 1098, *; 2008 U.S. Dist. LEXIS 27217, **2;
86 U.S.P.Q.2D (BNA) 1899

& Loeb, New York, NY.

For Time Warner Inc, a corporation, Warner Bros Entertainment Inc, a corporation, Counter Claimants: Anjani Mandavia, Michael Bergman, LEAD ATTORNEYS, Weissmann Wolff Bergman Coleman, Beverly Hills, CA; Patrick T Perkins, LEAD ATTORNEY, Perkins Law Offices, Cold Spring, NY; David Aaron Grossman, Loeb & Loeb, Los Angeles, CA; James D Weinberger, Roger L Zissu, Fross Zelnick Lehrman & Zissu, New York, NY.

For Laura Siegel Larson, an individual, Joanne Siegel, an individual, Counter Defendants: Marc Toberoff, Nicholas Calvin Williamson, [**3] LEAD ATTORNEYS, Marc Toberoff Law Offices, Los Angeles, CA.

**JUDGES:** STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** STEPHEN G. LARSON

**OPINION**

   [*1101] ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

   The termination provisions contained in the Copyright Act of 1976 have aptly been characterized as formalistic and complex, [*1102] such that authors, or their heirs, successfully terminating the grant to the copyright in their original work of authorship is a feat accomplished "against all odds." 2 WILLIAM F. PATRY, PATRY ON COPYRIGHT § 7:52 (2007).

   In the present case, Joanne Siegel and Laura Siegel Larson, the widow and the daughter of Jerome Siegel, seek a declaration from the Court that they have overcome these odds and have successfully terminated the 1938 grant by Jerome Siegel and his creative partner, Joseph Shuster, of the copyright in their creation of the iconic comic book superhero "Superman," thereby recapturing Jerome Siegel's half of the copyright in the same. No small feat indeed. It requires traversing the many impediments -- many requiring a detailed historical understanding [**4] both factually and legally of the events that occurred between the parties over the past

seventy years -- to achieving that goal and, just as importantly, reckoning with the limits of what can be gained through the termination of that grant.

   Any discussion about the termination of the initial grant to the copyright in a work begins, as the Court does here, with the story of the creation of the work itself.

   In 1932, Jerome Siegel and Joseph Shuster were teenagers at Glenville High School in Cleveland, Ohio. Siegel was an aspiring writer and Shuster an aspiring artist; what Siegel later did with his typewriter and Shuster with his pen would transform the comic book industry. The two met while working on their high school's newspaper where they discovered their shared passion for science fiction and comics, the beginning of a remarkable and fruitful relationship.

   One of their first collaborations was publishing a mail-order fanzine titled "Science Fiction: The Advance Guard of Future Civilization." [1] In the January, 1933, issue, Siegel and Shuster's first superman character appeared in the short story "The Reign of the Superman," but in the form of a villain not a hero. The story told of [**5] a "mad scientist's experiment with a deprived man from the breadlines" that transformed "the man into a mental giant who then uses his new powers -- the ability to read and control minds -- to steal a fortune and attempt to dominate the world." (Decl. Michael Bergman, Ex. HH at 1126). This initial superman character in villain trappings was drawn by Shuster as a bald-headed mad man.

   [1] A fanzine is a publication, usually distributed at no or nominal cost, produced by fans of a particular topic (such as comic books, opera, murder mystery stories, *etc.*) for others who share their interest.

   A couple of months later it occurred to Siegel that re-writing the character as a hero, bearing little resemblance to his villainous namesake, "might make a great comic strip character." (Decl. Michael Bergman, Ex. HH at 1126). Much of Siegel's desire to shift the role of his protagonist from villain to hero arose from Siegel's exposure to despair and hope: Despair created by the dark days of the Depression and hope through exposure to the "gallant, crusading heros" in popular literature and the movies. (Decl. Michael Bergman, Ex. HH at 1126). The theme of hope amidst despair struck the young Siegel as [**6] an apt subject for his comic strip: "Superman was

542 F. Supp. 2d 1098, *1102; 2008 U.S. Dist. LEXIS 27217, **6;
86 U.S.P.Q.2D (BNA) 1899

the answer -- Superman aiding the downtrodden and oppressed." (Decl. Michael Bergman, Ex. HH at 1126).

Thereafter, Siegel sat down to create a comic book version of his new character. While he labored over the script, Shuster began the task of drawing the panels visualizing that script. Titling it "The Superman," [*1103] "[t]heir first rendition of the man of steel was a hulking strongman who wore a T-shirt and pants rather than a cape and tights." (Decl. Michael Bergman, Ex. HH at 1129). And he was not yet able to hurdle skyscrapers, nor was he from a far away planet; instead, he was simply a strong (but not extraordinarily so) human, in the mold of Flash Gordon or Tarzan, who combated crime. Siegel and Shuster sent their material to a publisher of comic books -- *Detective Dan* -- and were informed that it had been accepted for publication. Their success, however, was short-lived; the publisher later rescinded its offer to publish their submission. Crestfallen, Shuster threw into the fireplace all the art for the story except the cover (reproduced below), which Siegel rescued from the flames.

[SEE EXHIBIT HH IN ORIGINAL]

Undaunted, Siegel continued [**7] to tinker with his character, but decided to try a different publication format, a newspaper comic strip. The choice of crafting the material in a newspaper comic strip format was influenced both by the failure to get their earlier incarnation of the Superman character published by *Detective Dan* in a comic book format, and by the fact that, at the time, black-and-white newspaper comic strips -- not comic books -- were the most popular medium for comics. As one observer of the period has commented:

It is worth noting the extent to which early comic books were conjoined with [*1104] newspaper strips of the day. The earliest comic books consisted of reprints of those newspaper strips, re-pasted into a comic book page format. When original material began appearing in comic book format, it was generally because companies that wished to publish comic books were unable to procure reprint rights to existing newspaper strips. The solution to this . . . was to hire young [comic strip artists] to simulate the same kind of newspaper strip material.

(Decl. Mark Evanier, Ex. A at 5-6).

On a hot summer night in 1934, Siegel, unable to sleep, began brainstorming over plot ideas for this new feature when an idea [**8] struck him: "I was up late counting sheep and more and more ideas kept coming to me, and I wrote out several weeks of syndicate script for the proposed newspaper strip. When morning came, I dashed over to Joe [Shuster]'s place and showed it to him." (Decl. Michael Bergman, Ex. HH at 1129). Siegel re-envisioned his character in more of the mythic hero tradition of Hercules, righting wrongs in present-day society. His inspiration was to couple an exaggeration of the daring on-screen acrobatics performed by such actors as Douglas Fairbanks, Sr., with a pseudo-scientific explanation to make such fantastic abilities more plausible in the vein of Edgar Rice Burroughs' John Carter of Mars stories, and placing all of this within a storyline that was the reverse of the formula used in the Flash Gordon serials. The end product was of a character who is sent as an infant to Earth aboard a space ship from an unnamed distant planet (that had been destroyed by old age) who, upon becoming an adult, uses his superhuman powers (gained from the fact that his alien heritage made him millions of years more evolved than ordinary humans) to perform daring feats for the public good.

Siegel named his character [**9] "Superman." Unlike his previous incarnation, Siegel's new Superman character's powers and abilities were much more extraordinary and fantastic: Superhuman strength; the ability to leap 1/8th of a mile, hurdle a twenty-story building, and run faster than an express train; and nothing less than a bursting shell could penetrate his skin. Siegel placed his character in a very cosmopolitan environment that had the look and feel of mid-thirties America. He also humanized his character by giving his superhero an "ordinary person" alter ego: Mild-mannered, big-city newspaper reporter Clark Kent. Siegel developed this concept of Superman's secret identity both as a means for his superhero to maintain an inconspicuous position in everyday society and as a literary device to introduce a conflict -- and the potential for story lines centered around that conflict -- between the character's dual identities, a conflict played out no more dramatically than in the love "triangle" between the character's dual identities and another newspaper reporter, Lois Lane.

542 F. Supp. 2d 1098, *1104; 2008 U.S. Dist. LEXIS 27217, **9;
86 U.S.P.Q.2D (BNA) 1899

Shuster immediately turned his attention to giving life and color to Siegel's idea by drawing illustrations for the story. Shuster conceived [**10] of the costume for Siegel's Superman superhero -- a cape and tight-fitting leotard with briefs, an "S" emblazoned on an inverted triangular crest on his chest, and boots as footwear. In contrast, he costumed Clark Kent in a nondescript suit, wearing black-rimmed glasses, combed black hair, and sporting a fedora. He drew Superman and his alter ego Clark Kent with chiseled features, gave him a hairstyle with a distinctive curl over his forehead, and endowed him with a lean, muscular physique. Clark Kent hid most of these physical attributes behind his wardrobe, which he could quickly doff revealing his Superman costume underneath when he was called to action by someone [*1105] in need of his superpowers. One of the earliest of Shuster's sketches of Superman and Clark Kent from this 1934 or 1935 period are depicted below:

[SEE ILLUSTRATION IN ORIGINAL]

The two then set about combining Siegel's literary material with Shuster's graphical representations. Together they crafted a comic strip consisting of several weeks' worth of material suitable for newspaper syndication. Siegel typed the dialogue and Shuster penciled in artwork, resulting in four weeks of Superman comic strips intended for newspapers. [**11] (Decl. Michael Bergman, Ex. H at 1). The art work for the first week's worth "of daily [comic] strips was completely inked" and thus ready for publication. (Decl. Michael Bergman, Ex. H at 1). The "three additional weeks of 'Superman' newspaper comic strip material" differed from the first week's material "only in that the art work, dialogue and the balloons in which the dialogue appeared had not been inked," instead consisting of no more than black-and-white pencil drawings. (Decl. Michael Bergman, Exs. G at 2 & H at 1-2).

Siegel also wrote material to which Shuster provided no illustrations: A paragraph previewing future Superman exploits, and a nine-page synopsis of the storyline appearing in the three weeks of penciled daily Superman newspaper comic strips. (Decl. James Steranko, Ex. A at 4; Decl. Michael Bergman, Ex. H at 2).

The two shopped the character for a number of years to numerous publishers but were unsuccessful. As Siegel later recalled: One publisher "expressed interest in Superman," but preferred that it be "published in comic book form where it would be seen in color" rather than "a

black-and-white daily strip," a suggestion to which he and Shuster balked given their [*1106] [**12] earlier experience with the comic book publisher of *Detective Dan*. (Decl. Michael Bergman, Ex. H at 2).

In the meantime, Siegel and Shuster penned other comic strips, most notably "Slam Bradley" and "The Spy," that were sold to Nicholson Publishing Company. When Nicholson folded shop in 1937, Detective Comics acquired some of its comic strip properties, including "Slam Bradley" and "The Spy."

On December 4, 1937, Siegel and Shuster entered into an agreement with Detective Comics whereby they agreed to furnish some of these existing comic strips for the next two years, and further agreed "that all of these products and work done by [them] for [Detective Comics] during said period of employment shall be and become the sole and exclusive property of [Detective Comics,] and [that Detective Comics] shall be deemed the sole creator thereof . . . ." (Decl. Michael Bergman, Ex. A). The agreement further provided that any new or additional features by Siegel and Shuster were to be submitted first to Detective Comics, who was given a sixty-day option to publish the material.

Soon thereafter Detective Comics decided to issue a new comic book magazine titled *Action Comics* and began seeking new material. [**13] Inquiry was made of many newspaper comic strip publishers, including McClure Newspaper Syndicate. Amongst the material submitted by McClure to Detective Comics was the previously rejected Siegel and Shuster Superman comic strip. Detective Comics soon became interested in publishing Siegel and Shuster's now well-traveled Superman material, but in an expanded thirteen-page comic book format, for release in its first volume of *Action Comics*.

On February 1, 1938, Detective Comics returned the existing Superman newspaper comic strip material to Siegel and Shuster for revision and expansion into a full-length, thirteen-page comic book production. Detective Comics' desire to place Superman in a comic book required that Siegel and Shuster reformat their existing Superman newspaper material by re-cutting the strip into separate panels and then re-pasting it into a comic book format.

An issue emerged due to Detective Comics' additional requirement that there be eight panels per page

542 F. Supp. 2d 1098, *1106; 2008 U.S. Dist. LEXIS 27217, **13;
86 U.S.P.Q.2D (BNA) 1899

in the comic book. Siegel and Shuster's existing Superman newspaper material did not have enough drawings to meet this format. In response, portions of the thirteen-page comic went forward with fewer than eight panels [**14] per page, and in the remaining pages Shuster either trimmed or split existing panels to stay within the page size, or drew additional panels from the existing dialogue to meet the eight-panel requirement. As Shuster later recounted:

> The only thing I had to do to prepare Superman for comic book publication was to ink the last three weeks of daily strips which I had previously completely penciled in detail. In addition, I inked the lettering and the dialogue and story continuity and inked in the balloons containing the dialogue. Certain panels I trimmed to conform to Detective's page size. I drew several additional pictures to illustrate the story continuity and these appear on page 1 of the first Superman release. This was done so that we would be certain of having a sufficient number of panels to make a thirteen page release. Finally, I drew the last panel appearing on the thirteenth page. Detective's only concern was that there would be panels sufficient for thirteen complete pages. Jerry told me that Detective preferred having eight panels per page but in our judgment this would hurt the property. I specifically refer to the very large panel appearing on what would be page 9 of the [**15] thirteen page release. We did not want to alter [*1107] this because of its dramatic effect. Accordingly, on this page but six panels appeared.

(Decl. Michael Bergman, Ex. G at 2). Siegel similarly recollected:

> Upon receiving word from Detective that we could proceed, Joe Shuster, under my supervision, inked the illustrations, lettering and dialogue balloons in the three weeks of daily strips that had been previously penciled. In addition, he trimmed certain pictures to meet Detective's panel specifications and extended others. To assure ourselves of

having the proper number of panels we added several pictures to illustrate the story continuity, I had already written. Added as well for this reason was the scientific explanation on page 1 of the release and the last panel at the foot of page 13.

(Decl. Michael Bergman, Ex. H at 5).

On or around February 16, 1938, the pair resubmitted the re-formatted Superman material to Detective Comics. Soon thereafter Detective Comics informed Siegel that, as he had earlier suggested to them, one of the panels from their Superman comic would be used as the template (albeit slightly altered from the original) for the cover of the inaugural issue of *Action Comics*. [**16] (Decl. Michael Bergman, Ex. I).

On March 1, 1938, prior to the printing of the first issue of *Action Comics*, Detective Comics wrote to Siegel, enclosing a check in the sum of $ 130, representing the per-page rate for the thirteen-page Superman comic book release and enclosing with it a written agreement for Siegel and Shuster's signatures. The agreement assigned to Detective Comics "all [the] good will attached . . . and exclusive right[s]" to Superman "to have and hold forever." (Decl. Michael Bergman, Ex. F). Siegel and Shuster executed and returned the written assignment to Detective Comics.

This world-wide grant in ownership rights was later confirmed in a September 22, 1938, employment agreement in which Siegel and Shuster acknowledged that Detective Comics was "the exclusive owner[]" of not only the other comic strips they had penned for Nicholson (and continued to pen for Detective Comics), but Superman as well; that they would continue to supply the artwork and storyline (or in the parlance of the trade, the "continuity") for these comics at varying per-page rates depending upon the comic in question for the next five years; that Detective Comics had the "right to reasonably [**17] supervise the editorial matter" of those existing comic strips; that Siegel and Shuster would not furnish "any art copy . . . containing the . . . characters or continuity thereof or in any wise similar" to these comics to a third party; and that Detective Comics would have the right of first refusal (to be exercised within a six-week period after the comic's submission) with respect to any future comic creations by Siegel or

542 F. Supp. 2d 1098, *1107; 2008 U.S. Dist. LEXIS 27217, **17; 86 U.S.P.Q.2D (BNA) 1899

Shuster.

Detective Comics announced the debut of its *Action Comics* series with full page announcements in the issues of some of its existing publications. Specifically, in *More Fun Comics*, Vol. 31, with a cover date of May, 1938, Detective Comics placed the following black-and-white promotional advertisement on the comic's inside cover, which reproduced the cover of the soon-to-be published first issue of *Action Comics*, albeit in a greatly reduced size:

[SEE ILLUSTRATION IN ORIGINAL]

[*1108] Similarly, *Detective Comics*, Vol. 15, with a cover date of May, 1938, had a full-page black-and-white promotional advertisement on the comic's inside cover which contained within it a reproduction of the cover (again in a reduced scale) of the soon-to-be published first issue of *Action* [**18] *Comics*:

[SEE ILLUSTRATION IN ORIGINAL]

[*1109] To provide some context and contrast, the cover of the first issue of *Action Comics* is notable for its difference from the promotional advertisements both in its scale and its colorized format.

[SEE ILLUSTRATION IN ORIGINAL]

[*1110] Superman itself was published by Detective Comics on April 18, 1938, in *Action Comics*, Vol. 1, which had a cover date of June, 1938. A full reproduction of the original Superman comic contained in *Action Comics*, Vol. 1, is attached as an addendum to this Order. *See* Attachment A to this Order. The Superman comic became an instant success, and Superman's popularity continues to endure to this day as his depiction has been transferred to varying media formats.

The Superman character has evolved in subsequent works since his initial depiction in *Action Comics*, Vol. 1. These additional works have added decades of new material to further define, update, and develop the character (such as his origins, his relationships, and his powers and weaknesses) in an ongoing flow of new exploits and supporting characters, resulting in the creation of an entire fictional Superman "universe." For instance, absent from *Action Comics*, Vol. 1, was any [**19] reference to some of the more famous story elements now associated with Superman, such as the

name of Superman's home planet "Krypton." Many of Superman's powers that are among his most famous today did not appear in *Action Comics*, Vol. 1, including his ability to fly (even through the vacuum of space); his super-vision, which enables him to see through walls ("x-ray" vision) and across great distances ("telescopic" vision); [*1111] his super-hearing, which enables him to hear conversations at great distances; and his "heat vision," the ability to aim rays of extreme heat with his eyes. The "scientific" explanation for these powers was also altered in ensuing comics, initially as owing to differences in gravity between Earth and Superman's home planet (the latter being much larger in size than the former), and later because Krypton orbited a red sun, and his exposure to the yellow rays of Earth's sun somehow made his powers possible. In a similar Earth-Krypton connection, it was later revealed that Superman's powers could be nullified by his exposure to Kryptonite, radioactive mineral particles of his destroyed home planet.

Aside from the further delineation of Superman's powers and weaknesses, [**20] many other elements from the Superman story were developed in subsequent publications. Some of the most famous supporting characters associated with Superman, such as Jimmy Olsen and rival villains Lex Luthor, General Zod, and Brainiac, were created long after *Action Comics*, Vol. 1, was published. Moreover, certain elements contained in *Action Comics*, Vol. 1, were altered, even if slightly, in later publications, most notably Superman's crest. In *Action Comics*, Vol. 1, the crest emblem was a small, yellow, inverted triangle bearing the letter "S" in the middle, shown throughout the comic as solid yellow in most instances and as a red "S" in two instances. Thereafter, the emblem changed, and today is a large yellow five-sided shield, outlined in the color red, and bearing the letter "S" in the middle, also in the color red.

The acclaim to which the release of *Action Comics*, Vo. 1, was greeted by the viewing public quickly made Superman not only the iconic face for the comic book industry but also a powerful super-salesman for his publisher. Detective Comics oversaw the creation, development, and licensing of the Superman character in a variety of media, including but not limited to radio, [**21] novels, live action and animated motion pictures, television, live theatrical productions, merchandise and theme parks. From such promotional activity, Detective Comics came to "own[] dozens of federal trademark

542 F. Supp. 2d 1098, *1111; 2008 U.S. Dist. LEXIS 27217, **21;
86 U.S.P.Q.2D (BNA) 1899

registrations for Superman related indicia, such as certain key symbols across a broad array of goods and services." (Decl. Paul Levitz P 10). The most notable of these marks that are placed on various items of merchandise are "Superman's characteristic outfit, comprised of a full length blue leotard with red cape, a yellow belt, the S in Shield Device, as well as certain key identifying phrases[,]" such as "'Look! . . . Up in the sky! . . . It's a bird! . . . It's a plane! . . . It's Superman!" (Decl. Paul Levitz P 10).

Meanwhile, Siegel continued to submit other comic book characters to Detective Comics that were also published. Sometimes these submissions were without Shuster serving as an illustrator and sometimes, such as in the case of Superman's youthful persona "Superboy," *see Siegel v. Time Warner Inc., 496 F. Supp. 2d 1111 (C.D. Cal. 2007)*, without illustrations accompanying the submission. Among these subsequent creations was "The Spectre," a comic written by Siegel [**22] and illustrated by Bernard Baily, which first appeared in 1940 in Detective Comics' *More Fun Comics*, Vol. 52. The comic told the story about a superhero with a supernatural bent -- the character being the spirit of a police officer killed in the line of duty while investigating a gangland overlord and who, after meeting a higher force in the hereafter, is sent back to Earth with nearly limitless abilities but offered eternal rest only when he has wiped out all crime.

With Superman's growing popularity, a growing rift developed between the parties. Siegel and Shuster believed that Detective [*1112] Comics' poached the artists apprenticing out of Siegel and Shuster's studio in Cleveland by moving them in-house to its New York offices, and further believed that Detective Comics had not paid them their fair share of profits generated from the exploitation of their Superman creation and from the profits generated from copycat characters that they believed had their roots in the original Superman character. As a result, in 1947, Siegel and Shuster brought an action against Detective Comics' successor in interest in New York Supreme Court, Westchester County, seeking, among other things, to annul [**23] and rescind their previous agreements with Detective Comics assigning their ownership rights in Superman as void for lack of mutuality and consideration.

After a trial, official referee J. Addison Young issued detailed findings of fact and conclusions of law wherein

he found that the March 1, 1938, assignment of the Superman copyright to Detective Comics was valid and supported by valuable consideration and that, therefore, Detective Comics was the exclusive owner of "all" the rights to Superman. The parties eventually settled the Westchester action and signed a stipulation on May 19, 1948, whereby in exchange for the payment of over $ 94,000 to Siegel and Shuster, the parties reiterated the referee's earlier finding that Detective Comics owned all rights to Superman. Two days later, the official referee entered a final consent judgment vacating his earlier findings of fact and conclusions of law, and otherwise reiterating the recitals contained in the stipulation.

The feud between the parties did not end after the Westchester action. In the mid-1960s, the simmering dispute boiled anew when the expiration of the initial copyright term for Superman led to another round of litigation over [**24] ownership to the copyright's renewal term. [2] In 1969, Siegel and Shuster filed suit in federal district court in New York seeking a declaration that they, not Detective Comics' successor (National Periodical Publications, Inc.), were the owners of the renewal rights to the Superman copyright. *See Siegel v. National Periodical Publications, Inc., 364 F.Supp. 1032 (S.D.N.Y. 1973), aff'd by, 508 F.2d 909 (2nd Cir. 1974)*. The end result of the litigation was that, in conformity with United States Supreme Court precedent at the time, *see Fred Fisher Music Co. v. M. Witmark & Sons, 318 U.S. 643, 656-59, 63 S. Ct. 773, 87 L. Ed. 1055 (1943)*, in transferring "all their rights" to Superman in the March 1, 1938, grant to Detective Comics (which was reconfirmed in the 1948 stipulation), Siegel and Shuster had assigned not only Superman's initial copyright term but the renewal term as well, even though those renewal rights had yet to vest when the grant (and later the stipulation) was made.

2   Under the Copyright Act of 1909 (the "1909 Act"), which was in effect at the time of Siegel and Shuster's creation of Superman and later assignment of rights in the same to Detective Comics, an author was entitled to a copyright in his work [**25] for twenty-eight years from the date of its publication. *See 17 U.S.C. § 24, repealed by* Copyright Act of 1976, *17 U.S.C. § 101 et seq.* Upon the expiration of this initial twenty-eight year term, the author could renew the copyright for a second twenty-eight year period (the "renewal term").

542 F. Supp. 2d 1098, *1112; 2008 U.S. Dist. LEXIS 27217, **25;
86 U.S.P.Q.2D (BNA) 1899

After the conclusion of the 1970s Superman litigation, the New York Times "ran a story about how the two creators of Superman were living in near destitute conditions":

> Two 61-year-old men, nearly destitute and worried about how they will support themselves in their old age, are invoking the spirit of Superman for help. Joseph Shuster, who sits amidst his threadbare furniture in Queens, and Jerry Siegel, who waits in his cramped apartment in [*1113] Los Angeles, share the hope that they each will get pensions from the Man of Steel.

Mary Breasted, *Superman's Creators, Nearly Destitute, Invoke His Spirit*, N.Y. TIMES, Nov. 22, 1975, at 62.

Apparently in response to the bad publicity associated with this and similar articles, the parties thereafter entered into a further agreement, dated December 23, 1975. *See id.* ("'There is no legal obligation,' Mr. Emmett[, executive vice-president of Warner Communications, [**26] Inc.,] said, 'but I sure feel that there is a moral obligation on our part'"). In the agreement, Siegel and Shuster re- acknowledged the Second Circuit's decision that "all right, title and interest in" Superman ("including any and all renewals and extensions of . . . such rights") resided exclusively with DC Comics and its corporate affiliates and, in return, DC Comics' now parent company, Warner Communications, Inc. ("WCI"), provided Siegel and Shuster with modest annual payments for the remainder of their lives; provided them medical insurance under the plan for its employees; and credited them as the "creators of Superman." In tendering this payment, Warner Communications, Inc. specifically stated that it had no legal obligation to do so, but that it did so solely "in consideration" of the pair's "past services . . . and in view of [their] present circumstances," emphasizing that the payments were "voluntary." The 1975 agreement also made certain provisions for Siegel's spouse Joanne, providing her with certain monthly payments "for the balance of her life if Siegel" died before December 31, 1985. Finally, Warner Communications, Inc. noted that its obligation to make such voluntary [**27] payments would cease if either Siegel or Shuster (or their representatives) sued "asserting any right, title or interest in the 'Superman' . . . copyright." As the years went by, Warner Communications, Inc. increased the amount of

the annual payments, and on at least two occasions paid the pair special bonuses.

As the time grew nearer to the December 31, 1985, cutoff date for surviving spouse benefits, Joanne Siegel wrote the CEO for DC Comics expressing her "terrible worry" over the company's refusal to provide Jerome Siegel life insurance in the 1975 agreement. (Decl. Michael Bergman, Ex. NN). She voiced her concern that, should anything happen to her husband after the cutoff date, she and their daughter "would be left without any measure of [financial] security." (Decl. Michael Bergman, Ex. NN). The parties thereafter agreed by letter dated March 15, 1982, that Warner would pay Joanne Siegel the same benefits it had been paying her husband if he predeceased her, regardless of the time of his death. (Decl. Michael Bergman, Ex. OO). Jerome Siegel died on January 28, 1996, and Joanne Siegel has been receiving these voluntary survival spouse benefits since that time.

In the meantime, changes [**28] in the law resurrected legal questions as to the ownership rights the parties had to the Superman copyright. With the passage of the Copyright Act of 1976 (the "1976 Act"), Congress changed the legal landscape concerning artists' transfers of the copyrights in their creations. First, the 1976 Act expanded by nineteen years the duration of the renewal period for works, like the initial release of Superman in *Action Comics*, Vol. 1, that were already in their renewal term at the time of the Act's passage. *See 17 U.S.C. § 304(b)*.

Second, and importantly for this case, the 1976 Act gave artists and their heirs the ability to *terminate* any prior grants of the rights to their creations that were executed before January 1, 1978, regardless of the terms contained in such assignments, *e.g.*, a contractual provision that all the rights (the initial and renewal) belonged [*1114] exclusively to the publisher. Specifically, *section 304(c)* to the 1976 Act provides that, "[i]n the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any [**29] right under it, executed before January 1, 1978, . . . is subject to termination . . . notwithstanding any agreement to the contrary . . . ."

It is this right of termination that Joanne Siegel and Laura Siegel Larson now seek to vindicate in this case. [3] In pursuing such a claim, the two heirs, initially sought

542 F. Supp. 2d 1098, *1114; 2008 U.S. Dist. LEXIS 27217, **29;
86 U.S.P.Q.2D (BNA) 1899

the legal assistance of a highly regarded copyright expert, Mr. Arthur J. Levine, in compiling the information necessary to draft the termination notice itself. [4]

3    Although the present case only concerns the Siegel heirs' efforts to terminate the 1938 grant, it has come to the Court's attention that the estate of Superman co-creator Joseph Shuster has recently filed termination notices to reclaim the rights to the Superman copyright. According to documents filed with the United States Copyright Office, Mark Warren Peary, the son of Shuster's sister and the court-appointed representative of the Shuster estate, has given notice of the estate's intent to terminate the 1938 grant of the Superman copyright to Detective Comics and its successors effective 2013. As executor of the Shuster estate, Peary is entitled, under changes made to the 1976 termination provisions by the 1998 Sonny [**30] Bono Copyright Term Extension Act, to make the same termination claims for the Superman copyright that Shuster or his heirs would have been entitled to bring beforehand. *See 17 U.S.C. § 304(c)(2)*; 3 *NIMMER ON COPYRIGHT § 11.03[A][2][a]* at 11-40.1 (noting that when the 1976 Act was originally passed if an author died without leaving heirs before exercising the right to termination "the result was that no one could exercise [that] right," but this "harsh result" was "ameliorated" through the passage of the 1998 Act by providing that, "instead of lapsing," the termination right could be exercised by "the author's executor, administrator, personal representative, or trustee").

4    Before going into private practice, Mr. Levine served as General Counsel for the United States Copyright Office and also as Executive Director for the National Commission on New Technological Uses of Copyrighted Works.

On April 3, 1997, the two heirs served seven separate notices of termination under *section 304(c)* of the 1976 Act, purporting to terminate several of Siegel's potential grant(s) in the Superman copyright to defendants, including the March 1, 1938, assignment; the May 19, 1948, stipulation; and the December [**31] 23, 1975, agreement. The termination notices also specified that they covered hundreds of works, with the added proviso that the intent was for the termination notice to apply "to each and every work . . . that includes or embodies"

Superman, and the failure to list any such work in the notice was "unintentional and involuntary." Each of the termination notices had an effective date of April 16, 1999. A flurry of settlement discussions between the parties quickly ensued, but just as quickly fizzled out. Nearly two years then passed without much discussion between the parties.

The day before the purported termination was to take effect, defendants sent a letter to Siegel's counsel, Mr. Levine, rejecting "the validity and scope" of the termination notices. (Decl. Marc Toberoff, Ex. Q at 171). The same day DC Comics Executive Vice President and Publisher Paul Levitz wrote to Joanne Siegel that his company would "continue to provide the income and insurance benefits you . . . have been receiving under the 1975 agreement, without prejudice to [the company's] rights under that agreement, as long as we all continue to pursue the goal of working together." (Decl. Michael Bergman, Ex. P).

[*1115] Not [**32] long after the termination notices' effective date passed, the Siegel heirs retained new counsel and the parties re-entered into settlement discussions to resolve their respective claims to the Superman copyright. Towards that end, DC Comics (and its "successors, past and present subsidiaries or affiliates") and the Siegel heirs executed a tolling agreement on April 6, 2000, whereby it was agreed that neither would "assert any statute of limitations . . . defense[] relating to . . . the [Termination] Notices" based on "the passage of time during the period from the date hereof until cancellation of this Tolling Agreement pursuant to paragraph 7 hereof (the 'Tolling Period')" while the parties attempted "to find an amicable resolution in respect of the [Termination] Notices." (Reply Decl. Marc Toberoff, Ex. A at 1). The agreement further provided that the tolling period would remain in effect "until 10 business days after the earlier of: (a) one of the parties terminating negotiations, in writing, relating to the [Termination] Notices, or (b) the parties reaching an amicable resolution of the disputes between them relating to the Notices." (Reply Decl. Marc Toberoff, Ex. A at 2).

At [**33] some point the broad outline of a global settlement concerning the copyright to the Superman material, as well as to other works Siegel either authored or contributed material to Detective Comics (notably, Superboy and The Spectre properties), was reached.

542 F. Supp. 2d 1098, *1115; 2008 U.S. Dist. LEXIS 27217, **33;
86 U.S.P.Q.2D (BNA) 1899

Specifically, on October 19, 2001, counsel for Joanne Siegel and Laura Siegel Larson sent a six-page letter to Warner Bros.' General Counsel confirming and summarizing the substance of the settlement. The letter concluded that "if there is any aspect of the above that is somehow misstated, please let me know by [October 22, 2001] at 2:00, as I will be out of the office -- and likely difficult to reach -- for the following four weeks." (Decl. Marc Toberoff, Ex. BB).

A week later, on October 26, 2001, Warner Bros.' General Counsel John Shulman responded with a letter, stating that he had "reviewed" the summary set forth in the October 19 letter, and then "enclose[d] . . . a more fulsome outline of what we believe the deal we've agreed to is"; the outline was five pages long. (Decl. Marc Toberoff, Ex. CC). The letter concluded that Warner Bros. was "working on the draft agreement" so as to "have this super-matter transaction in document [**34] form." (Decl. Marc Toberoff, Ex. CC).

A few months later, on February 1, 2002, outside counsel for Warner Bros. provided a copy of the promised draft agreement (spanning fifty-six pages), with the proviso that, "[a]s our clients have not seen this latest version of the agreement, I must reserve their right to comment." (Decl. Marc Toberoff, Ex. DD). Mention was also made in the draft agreement for the need of certain "Stand Alone Assignments" that had as yet not been finalized, something which Warner's outside counsel promised would be forthcoming. (Decl. Marc Toberoff, Ex. DD).

Three months later, on May 9, 2002, Joanne Siegel wrote a letter to Time Warner's Chief Operating Officer Richard Parsons, recounting that she and her daughter had "made painful concessions and reluctantly accepted John Shulman's last [settlement] proposal [in October, 2001]," but upon reading the proposed draft agreement learned that they had been "stabbed in the back," as it "contained new, outrageous demands that were not in the [October, 2001] proposal," such as "condition[ing] recei[pt of] financial compensation for our rights on demands which were not in the proposal we accepted." (Decl. Michael Bergman, [**35] Ex. Z). The letter concluded that "[a]fter four years we have no deal and this contract [*1116] makes an agreement impossible." (Decl. Michael Bergman, Ex. Z).

Time Warner's CEO quickly responded with a letter of his own on May 21, 2002, expressing shock and

dismay as "each of the major points covered in the draft agreement . . . accurately represented the agreement previously reached" by the parties. (Decl. Michael Bergman, Ex. AA). The letter continued by acknowledging that, as with all lengthy negotiations, Time Warner "expected" that the submission of the draft agreement would result in further "comments and questions on the draft" by Siegel family's representatives that "would need to [be] resolve[d]." (Decl. Michael Bergman, Ex. AA). The letter concluded by reaffirming Time Warner's continued interest "that this agreement can be closed based upon the earlier discussions with [the Siegel family's] lawyers." (Decl. Michael Bergman, Ex. AA).

Not long thereafter, the Siegel heirs' lawyers submitted for the family's review and approval a re-draft of the February 4, 2002, agreement the lawyers had crafted. (Decl. Marc Toberoff, Ex. AA). The Siegel heirs, on September 21, 2002, rejected the redraft [**36] and fired their attorneys. (Decl. Marc Toberoff, Ex. AA). That same day Joanne Siegel and Laura Siegel Larson sent a letter to DC Comics' General Counsel Paul Levitz notifying the company that they were "stopp[ing] and end[ing] negotiations with DC Comics, Inc., its parent company AOL Time Warner and all of its representatives and associates concerning" their rights to, among other things, Superman. (Decl. Michael Bergman, Ex. DD).

Joanne Siegel and Laura Siegel Larson thereafter filed the present action, with the assistance of new counsel, Marc Toberoff, on October 8, 2004. Both sides have since filed cross-motions for partial summary judgment.

Reduced to their essentials, the legal questions at stake in the parties' cross-motions are two-fold:

(1) The validity and enforceability of the termination notices in light of (a) whether any copyrightable Superman material contained in the promotional advertisements for *Action Comics*, Vol. 1, lies outside the reach of the termination notice (and hence, the termination notice is not enforceable against it); (b) whether certain portions of the Superman comic in *Action Comics*, Vol. 1, are in the nature of a work for hire (and hence, not subject [**37] to termination); (c) whether the failure to list the 1948 consent judgment in the notices as one of the grants sought to be terminated materially affects the notices of termination; (d) whether the post-termination receipt of benefits under the 1975

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 38 of 132    Page ID #:6502

Page 11

542 F. Supp. 2d 1098, *1116; 2008 U.S. Dist. LEXIS 27217, **37; 86 U.S.P.Q.2D (BNA) 1899

agreement acts as a novation to regrant the Superman copyright; (e) whether the statute of limitations ran out before the instant action was instituted thereby forestalling this lawsuit; and (f) whether the settlement negotiations that took place between the parties resulted in an enforceable agreement disposing of the claims asserted in the present action; and,

(2) The parameters of what was recaptured (and the rights flowing therefrom) through the termination notices, namely, (a) whether plaintiffs have a right to defendants' post-termination foreign profits from the exploitation of the Superman copyright; (b) whether plaintiffs are entitled to profits from any of the various trademarks that defendants have procured since the grant in marketing Superman; (c) whether plaintiffs are entitled to profits from the derivative works of the Superman material published by Detective Comics and its successors in interest prior to the termination [**38] notice's effective date; and (d) whether any recovery of profits extends beyond those made through DC Comics' [*1117] exploitation of the Superman copyright to that of its corporate siblings and parent who are licensees to that copyright's movie and television rights, be it based on an alter-ego theory or other notion of equity.

I. *Validity and Enforceability of Termination Notices*

The 1976 Act created a new right allowing authors and their heirs the ability to terminate a prior grant to the copyright in their creations. *See 17 U.S.C. § 304(c)*. The 1976 Act also set forth specific steps concerning the timing and contents of the notices that had to be served to effectuate the termination of a prior grant. One of the most important steps was placing a limit on the temporal reach such a notice could have on what was subject to being recaptured. Specifically, the "[t]ermination of the grant may be effected at any time during a period of five years beginning at the end of fifty-six years *from the date copyright was originally secured*." *17 U.S.C. § 304(c)(3)* (emphasis added). Moreover, the notice is required to be "served not less than two or more than ten years before" its effective date.

Taken together, [**39] someone seeking to exercise the termination right must specify the effective date of the termination, and that effective date must fall within a set five-year window which is at least fifty-six years, but no more than sixty-one years, from the date the copyright sought to be recaptured was originally secured, and such termination notice must be served two to ten years before

its effective date. The purpose of this time window for terminating pre-1978 grants was so that the only rights to the copyright affected thereby were those to the 19-year extension in the renewal term created by the 1976 Act, leaving undisturbed the grantee's vested interest to the original 28-year renewal term as set forth in the 1909 Act, the governing statute at the time the grant itself was made.

Additional procedures required to be followed to make the termination notice effective were specified as well: The author or his or her heirs had to serve "an advance notice in writing upon the grantee or the grantee's successor in title"; the notice had to be signed by the author or his or her heirs; the notice was required to "state the effective date of the termination"; and the notice must be "recorded in the Copyright [**40] Office before the effective date of termination." *17 U.S.C. § 304(c)(4)*.

Beyond these statutory requirements, the notice was also required to "comply, in form, content, and manner of service, with [the] requirements that the Register of Copyrights . . . prescribe[s] by regulation." *17 U.S.C. § 304(c)(4)(B)*. Toward that end, the Register promulgated regulations implementing this statutory proviso. *See 37 C.F.R. § 201.10*. Among those regulations was one requiring the terminating party to identify in the notice "each work as to which the notice of termination applies." *37 C.F.R. § 201.10(b)(1)(ii)*.

As one noted author has commented, "[i]t is difficult to overstate the intricacies of these [termination] provisions, the result of which is that they are barely used, no doubt the result desired by lobbyists for assignees." William Patry, *Choice of Law and International Copyright*, 48 AM. J. COMP. L. 383, 447 (2000); *see also Burroughs v. Metro-Goldwyn-Mayer, Inc., 683 F.2d 610, 621 (2nd Cir. 1982)* (commenting that the steps necessary to make a termination effective oftentimes create "difficult, technical questions"). Those intricate provisions oftentimes create unexpected pitfalls that thwart [**41] or blunt the effort of the terminating party to reclaim the full measure of the copyright in a work of authorship. This case is no different.

[*1118] 1. *Promotional Announcements*

Plaintiffs gave notice that the effective date of the termination notices was April 16, 1999, meaning that, backdating from that date sixty-one years, the termination

542 F. Supp. 2d 1098, *1118; 2008 U.S. Dist. LEXIS 27217, **41;
86 U.S.P.Q.2D (BNA) 1899

notices would leave unaffected (or better said, beyond their reach) any statutory copyright that had been secured in the Superman material before April 16, 1938. Defendants contend that the promotional announcements for *Action Comics*, Vol. 1, featuring a graphical depiction of Superman, fall just a few days outside the five-year effective window of plaintiffs' termination notices; therefore, they argue, any copyright material contained in those promotional announcements, notably the illustration of Superman on the cover of *Action Comics*, Vol. 1, is unaffected by the termination notices and remains theirs to exploit exclusively. As defendants frame it, *section 304(c)(3)*'s five-year effective window "is tantamount to a statute of limitations[;] . . . if any work falls outside the five-year window established by the [termination] effective date, it *cannot* [**42] be recaptured, and the original copyright grant remains in force for that work, allowing the grantee to continue exercising the granted rights without liability." (Defs' Mot. Partial Summ. J. at 29). Thus, any work that was published with notice prior to April 16, 1938, *i.e.*, sixty-one years before the stated effective date, remains untouched by the termination notice. [5]

> 5  Defendants also contend that the promotional advertisements are not effected by the termination notices because plaintiffs failed to list those works in their notices. As the Court finds that the promotional advertisements fall outside the five-year window during which those notices could effectively terminate the grant in the copyright contained in them, the Court will not pass on the consequences, if any, stemming from plaintiffs' additional failure to list those promotional announcements in their notices.

Plaintiffs do not dispute the legal consequence *section 304(c)*'s five-year window has in this case on the effective reach of their termination notices. As drafters of the notice, Siegel's heirs were given *carte blanche* in identifying the termination notices' effective date. Once they chose a date, certain consequences [**43] flowed therefrom, the most important of which is to cabin the five-year window within which the notice can recapture any copyright secured in the material to which the grant was directed. A copyright in a work statutorily secured even just days outside this five year window is beyond the effective reach of the termination notice, in much the same way a tardily-filed renewal registration has been held to be ineffective. *Cf. 3 NIMMER ON COPYRIGHT §*

*9.05[b][1]* at 9-44 ("a variance of even several days is fatal and that the purported renewal is void to rescue the subject work from the public domain, whether filed after expiration of the one year or prior to its initiation"). A leading treatise supports such a calculation and the consequences flowing from it:

> The appropriate dates for termination notices are measured from "the date copyright was originally secured, or beginning on January 1, 1978, whichever is later." In the case of pre-January 1, 1978 works, "secured" means the actual date the work was first published with notice (or in the case of unpublished works, the date of registration), e.g., April 15, 1970, not December 31, 1970. Failure to pay attention to the differences between [**44] the date the copyright was originally secured for purposes of *section 304(c)* termination of transfer and *section 305* expiration of term may lead to an untimely notice of termination.

2 PATRY ON COPYRIGHT § 7:43; *see also* 3 *NIMMER ON COPYRIGHT § 11.05[B][1]* at 11-40.11 ("Suppose that statutory copyright for a song were first secured on May 21, [*1119] 1925. Based on the statutory provision that termination may be effected 'beginning at the end of fifty-six years from the date copyright was originally secured,' the first effective date for termination should be May 21, 1981 "); 3 JAY DRATLER, JR. AND STEPHEN M. MCJOHN, INTELLECTUAL PROPERTY LAW: COMMERCIAL CREATIVE AND INDUSTRIAL PROPERTY § 6.04A[3][a] (2008) ("If the year in which a work was so published predates the current year by more than sixty-one years, then the termination right [to that work] under *section 304(c)* has expired. The statute apparently requires calculation of all these termination periods from the exact date of publication, rather than from the end of the publication year, as is appropriate for determining copyright terms under the 1976 Act").

It is in this sense that one can say whether a termination notice is timely or [**45] not, a question that does not go to the notice's validity (the notice remains valid with respect to a copyright in works that was secured during the five year window) but as to its enforceability against a copyright in a particular work

542 F. Supp. 2d 1098, *1119; 2008 U.S. Dist. LEXIS 27217, **45;
86 U.S.P.Q.2D (BNA) 1899

pre- or post-dating that window. Thus, the key in deciding this timeliness question begins with a determination of when the copyright in the work in question was secured, and not when the work itself was created.

The determination of when the copyright in a work is secured is when the material was protected by statute, meaning when the copyright in such a work secured protection under this country's copyright laws. Under the 1909 Act, "works could have obtained statutory copyright . . ., without the necessity of registration, simply by the act of publishing copies of the work *bearing a proper copyright notice*. As to such works, registration did not create the copyright, but merely recorded it." 2 *NIMMER ON COPYRIGHT § 7.16[A][2][b]* at 7-148 (emphasis added); *see also 17 U.S.C. § 10* (repealed). Thus, the initial question is whether the comic books containing the promotional announcements bore such a copyright notice upon them.

Section 19 of the 1909 Act [**46] delineated what constituted proper notice: "The notice of copyright required by *section 10* of this title shall consist either of the word 'Copyright', the abbreviation 'Copr.', or the symbol (C), accompanied by the name of the copyright proprietor, and if the work be a printed literary, musical, or dramatic work, the notice shall include also the year in which the copyright was secured by publication." If the comic books in question contained such a notice, then the date of publication is also the date the copyright in the material contained therein was secured. If not, then any of the copyrightable material in the works (including the promotional announcements) was never secured (absent evidence that the material had been registered beforehand with the Copyright Office when it was in an unpublished state) but instead was injected into the public domain.

Here, the material submitted by defendants (the cover page for the magazine and the page on which the promotional announcements is displayed) does contain such a notice. At the bottom of the promotional announcement itself is the following: "Entire contents copyright 1938 by Detective Comics, Inc." (Decl. Michael Bergman, Ex. C at 10 [**47] & Ex. D at 14). Thus, the copyright for any of the works contained in the comic books in question was secured on the date they were published.

This leads to the next question: What are the publication dates for the two comic books that contained

the promotional announcements for *Action Comics*, Vol. 1, featuring an illustration of Superman? Defendants have submitted the initial copyright registrations for these comics, [*1120] which indicate that *More Fun Comics*, Vol. 31, was published on April 5, 1938, eleven days before the effectiveness of the plaintiffs' termination notices, and that *Detective Comics*, Vol. 15, was published on April 10, 1938, six days outside the temporal reach of the termination notices. Under the 1909 Act the initial (as opposed to the renewal) copyright registration constituted *prima facie* evidence of the publication date for a work. [6] *See 17 U.S.C. § 209* (repealed) (providing that a "certificate of registration" issued by the Register of Copyrights "shall be admitted in any court as prima facie evidence of the facts stated therein"); *see also Epoch Productions Corp. v. Killiam Shows, Inc., 522 F.2d 737, 745-46 (2nd Cir. 1975)*; 5 PATRY ON COPYRIGHT § 17:115 (observing [**48] that the reason that renewal certificates issued during the 1909 Act were not accorded *prima facie* status was because of the "minimal attention" the Register of Copyrights paid to the information contained therein; "[a]s long as original registration for a work has been made, the Copyright Office accept[ed] it at face value").

[6]   Defendants' suggestion that the addition of *section 304(a)(4)(B)* by the Copyright Amendments Act of 1992 somehow altered this rule by extending the *prima facie* imprimatur to renewals like those in this case is simply mistaken. (Defs' Reply at 40 & n.16). That section provides that, so long as the renewal occurred "within 1 year before [the] expiration" of the initial term, then "the certificate of such registration shall constitute prima facie evidence as to the . . . the facts stated in the certificate." However, the 1992 Act's provisions placed one very important proviso on its applicability -- its provisions applied only where a party was filing a renewal registration to the "extended term of copyright in a work." Thus, the amendments' provisions were limited to renewal claims to works *that were still in their initial term when the 1976 Act became effective*, [**49] January 1, 1978, meaning for copyrights whose first term of copyright was secured on or after January 1, 1950. That is to say, *section 304(a)(4)(B)*'s provisions only applies to works that had yet reached the time for renewal *before* the 1976 Act extended the term of the renewal period (unlike Superman in

542 F. Supp. 2d 1098, *1120; 2008 U.S. Dist. LEXIS 27217, **49;
86 U.S.P.Q.2D (BNA) 1899

*Action Comics*, Vol. 1, or the comics containing the promotional announcements). For those works, the 1992 amendments allowed such renewal to be made at anytime, but provided incentives for prompt renewal, the most notable being the extension of the *prima facie* rule to such promptly filed renewal claims. *See* 2 PATRY ON COPYRIGHT § 7:50 ("Effective June 26, 1992, Congress abolished the requirements that works in their first term of copyright published or registered between 1964 and 1977 must be timely renewed in order to enjoy the (now) 67-year renewal term. Instead, these works are now automatically renewed for the full term of 75 years. Copyrights whose first term of copyright was secured between January 1, 1950, and December 31, 1963, still had to have been renewed according to the requirements of the 1909 Act. Failure to do so resulted in the work falling into the public domain. . [**50] . . Renewal claims may still be filed at any time during the renewal period, and a number of incentives have been added to encourage filing. [One such] incentive[] for renewing provided in the Copyright Act of 1992 are the prima facie status that is accorded to the validity of the work"). Given that none of the comics in question fall within the class affected by *section 304(a)(4)(B)*, that section's expansion of the *prima facie* status to renewal claims does not apply here.

Plaintiffs attempt to refute this *prima facie* evidence through expert testimony and by legal argument.

As to the latter, plaintiffs seek to discredit the value of the initial copyright registration for *More Fun Comics*, Vol. 31, because Detective Comics' successor did not obtain that registration until nearly 28 years after its publication, on the eve of the expiration of the initial copyright term. The 1909 Act required that, once copyright had been secured by publication with notice, "there shall be promptly deposited" the required copies of the published work and the registration claim itself. *17 U.S.C. § 13* (repealed). Plaintiffs suggest that such a "late" initial registration raises questions as to the trustworthiness [**51] of any [*1121] of the information contained in that registration. (Pls' Opp. at 48-49). Plaintiffs correctly point out that Professor Nimmer in his treatise has commented that, "where there

was a failure to promptly register and deposit, under the 1909 Act, some questions as to the viability of the copyright might be raised." 2 *NIMMER ON COPYRIGHT § 7.16[A][2][b]* at 7-150. But Professor Nimmer's comments as to the collateral consequences flowing from such a delay were not geared toward the validity of the copyright itself, but to the existence of an impediment to bringing an action for infringement. *See id.* at 7-149 (noting that Supreme Court's *Washingtonian* decision effectively read the "words 'promptly deposited' in *Section 13* . . . not . . . as a condition subsequent that, if not satisfied, would result in destruction of the copyright," but rather "[t]he deposit . . . requirement was (as it still is) clearly a condition precedent to the right to bring an infringement action").

Although the general line of reasoning plaintiffs seek to draw from such a "late-in-time" registration makes sense from a policy perspective, plaintiffs have cited no authority that such long delays in registration [**52] vitiates or otherwise diminishes the statutorily conferred *prima facie* presumption to which such registration claims (and the information contained therein) are entitled, especially once a registration has (as here) been tendered. Moreover, even were the Court to entertain plaintiffs' invitation, there remains the initial registration for the other comic book in question -- *Detective Comics*, Vol. 15 -- which was obtained shortly after that comic book's publication and, hence, the problem pressed by defendants with the promotional announcement contained therein falling outside the effective reach of the termination notice remains.

Plaintiffs next contend that the copies of the registration certificates submitted by defendants have not been authenticated by the declarant to whose declaration they are affixed, and hence, are not admissible as proof of the comic books' publication date. (Pls' Opp. at 48-49 ("the certificate is not properly authenticated, but is merely attached to the declaration of defendants' attorney, who appears to have no personal knowledge of it"). Such extrinsic evidence of authenticity by the declarant is unnecessary for these copyright registration certificates. [**53] Under *Federal Rule of Evidence 902(1)*, a "document bearing a seal purporting to be that of the United States . . . or of a . . . department, officer, or agency thereof," with "a signature purporting to be an attestation or execution," is considered self-authenticated. Close inspection of the copyright registration certificates submitted by defendants clearly reveals the seal issued by

542 F. Supp. 2d 1098, *1121; 2008 U.S. Dist. LEXIS 27217, **53;
86 U.S.P.Q.2D (BNA) 1899

the United States Copyright Office, signed by the Register of Copyrights, and bearing the following legend: "[A]ttached are additional certificates for the [comics in question] which were registered in accordance with provisions of the United States Copyright Law." (Decl. James Weinberger, Ex. B & C). The requirements of *Rule 902(1)* have been met, rendering the copies of the copyright registration certificates as self-authenticated and, thus, admissible.

The obscure nature of these promotional announcements does not alter this analysis. It is undoubtedly true that the existence of these announcements was not widely recognized even by comic book aficionados. That, however, does not change the effect their existence has vis-a-vis the termination notices' effective reach. Once a termination effective date [**54] is chosen and listed in the notice, the five-year time window is an unbendable rule with an inescapable effect, not subject to harmless error analysis. *See 37 C.F.R. § 201.10(e)* (limiting application to "[h]armless errors *in* a notice" that does not "materially affect the [*1122] adequacy of the *information*") (emphasis added). That good cause may have existed for failing to structure the termination notices so as to sweep the announcements within its reach does not obviate application of the rule itself.

The importance such promotional announcements may have on the reach of a termination notice that has been tendered was not lost on plaintiffs' counsel, Mr. Levine, who drafted the termination notices in this case. He also drafted plaintiffs' termination notice with respect to The Spectre copyright, and structured it in such a way so as to include among the works affected by the notice's five-year window a promotional announcement for The Spectre contained in a comic published a month before the one containing the first comic book story of the character. (Decl. Michael Bergman, Exs. WW-YY (termination notice describing among the works affected by the notice the promotional announcement as "Spectre [**55] character appearing in costume in an ad in issue No. 51 of *More Fun Comics*, copyrighted November 28, 1939, as Copyright Registration No. B437786, publication date January 1940") & Decl. Paul Levitz, Ex. A (containing picture of The Spectre ad)).

Having provided *prima facie* evidence of the comic books' publication dates, the burden shifts to the plaintiffs to produce some evidence calling into question those

dates. The burden of production is not a heavy one (in large measure owing to the fact that so little is proffered by the applicant or scrutinized by the Copyright Office in the application process to procure the registration in the first instance), but it is one that must be met nonetheless. *See* 3 PATRY ON COPYRIGHT § 9:14 ("the [**56] Copyright Office has no ability to verify facts stated in the certificate, and not surprisingly makes no effort to do so. . . . At the most, the Office can take notice of any inconsistent facts that appear on the deposit copy and request clarification from the claimant . . . . In my event, [the opposing party] should be required to present only a small degree of evidence calling into question the fact at issue in order to rebut the certificate's presumption").

On that point all that plaintiffs have submitted is the opinion of a comic book historian, Mark Evanier, who was retained by DC Comics in the 1970s to, among other things, assist it "in attempting to determine approximate dates of past publication" of its comics. (Decl. Mark Evaier P 12). From this particular experience, as well as his long history in the comic book industry, Mr. Evanier seeks to cast doubt on the veracity of the asserted publication dates for the comics containing the promotional announcements. The general thrust of his expert opinion is that, outside the first printing of certain famous comic superheros such as Superman in *Action Comics*, Vol. 1, a particular "run of the mill" comic book's exact date of publication [**57] during the 1930s and 1940s is difficult to determine, rendering the dates listed on the certificates as nothing more than "mere guesstimates" by the publisher. (Decl. Mark Evanier P 10). Furthermore, Mr. Evanier downplays the significance of the fact that the comic books in question contained promotional announcements for *Action Comics*, Vol. 1, as necessarily meaning that their publication must have preceded *Action Comics* publication. As Mr. Evanier explains, the dates provided by publishers were often the dates initially scheduled or intended for publication, but the actual dates often varied with printing, delivery, and other delays. (Decl. Mark Evanier P 11).

Mr. Evanier's expert opinion is chalk full of information on the publication of comic books in general during this time period, but is void of any specific evidence or opinion as to the publication of the [*1123] *particular* comic books in question in this case. He offers no evidence of any specific printing, delivery, or other problems that may have affected the publication of *More*

542 F. Supp. 2d 1098, *1123; 2008 U.S. Dist. LEXIS 27217, **57;
86 U.S.P.Q.2D (BNA) 1899

*Fun Comics*, Vol. 31, or *Detective Comics*, Vol. 15. His general opinion thus does not sufficiently refute the *prima facie* evidence set forth in the initial [**58] copyright registration certificates for these particular comic books. At most, his opinion raises some doubts as to the precision of the dates contained in initial copyright registrations for comic books in general from this period. However, those copyright notices were completed at a time which, by Mr. Evanier's own opinion, the copyright holder was attempting to be as accurate as possible in listing those dates and long before any incentive to provide inaccurate dates by virtue of contemplating this present litigation or the termination provisions of the 1976 Act existed. Plaintiffs evidence does no more than inform the Court that, despite efforts to be precise about publication dates for comic books during this particular period, mistakes could be made; it is not at all probative on the issue of whether mistakes were in fact made with respect to the information contained in the particular registration certificates at issue in this case. The Court therefore finds that the promotional announcements containing an illustration of Superman from the cover of *Action Comics*, Vol. 1, are outside the effective reach of the termination notices.

Perhaps anticipating this finding, plaintiffs [**59] next seek to downplay the significance of the promotional announcements themselves by arguing that, legally and factually, little, if any, copyrightable Superman material is contained in those announcements. Specifically, plaintiffs submit that Siegel and Shuster's material was an indivisible joint work, and that the advertisements were a derivative work of the authors' material. Thus, they claim that none of the Superman material contained in the promotional announcements (namely, the cover artwork from *Action Comics*, Vol. 1) could be copyrighted, and thus, defendants cannot continue to exploit the same, regardless of the termination notice. As framed by plaintiffs: "Defendants' entire argument is falsely premised on the erroneous assumption that they can take the cover of *Action Comics*, No. 1, one of many illustrated panels in Siegel and Shuster's first 'Superman' comic book story, rip it from this copyrighted joint work, and own a separate copyright in the illustration in the form of a mere 'in house announcement' depicting a reduced image of the illustration. [Moreover,] Detective's 'in-house announcements,' at best, are derivative works based on the pre-existing cover and interior [**60] panel of Siegel and Shuster's pre-existing 'Superman' story." (Pls' Opp. at 44, 46).

This emphasis on the joint nature of Siegel and Shuster's Superman material is rendered nugatory by the fact that Siegel and Shuster granted the copyright in their material to Detective Comics on March 1, 1938, well before the promotional advertisements were published by Detective Comics in April of that year. Thus, by the time the promotional announcements were published, Siegel and Shuster's Superman material was owned solely by Detective Comics to do with it as it saw fit, whether it be as a full-length comic or as artwork in its advertising. That Siegel and Shuster intended their work to be combined together and depicted as a unitary whole is a separate and distinct question from whether, in later using some of Shuster's artwork from that combined material it had acquired, Detective Comics somehow unraveled the copyrightability in that portion of the work. The manner of a work's authorship is entirely separate from the way in which an assignee may exploit that material once it has acquired exclusive ownership of the same and, correspondingly, [*1124] whether there were anything copyrightable in the work [**61] that the assignee subsequently published using only parts of that material.

In this respect it is important to remember that a joint work can consist of either inseparable or interdependent parts, the latter example of which include "the collaborative musical works of Gilbert and Sullivan . . . ., [t]hese works are the result of the interdependent contributions of the collaborators, i.e., one person wrote the lyrics and the other the music, either of which could on its own [stand] as an independent work, but which, when combined, form a single[, separate] 'interdependent' joint work." 2 PATRY ON COPYRIGHT § 5:6. The original Superman material was the product of the story and dialogue written by Siegel and the art work drawn by Shuster; each on its own could have been a work in its own right subject to copyright protection, but when merged together they formed a single new and unified interdependent work. *See Siegel v. Time Warner, Inc., 496 F.Supp.2d 1111, 1145 (C.D. Cal. 2007)* (where this Court held, in regard to Superboy, "the copyright to [the same] (if a joint work) would be considered comprised of interdependent parts -- Siegel's dialogue and storyline . . . and Shuster's artwork giving [**62] life and color to those words").

At most, Detective Comics took a part of Shuster's independently copyrightable art work out of the joint work and utilized it, in conjunction with other material (namely, the advertising slogan), in a promotional

542 F. Supp. 2d 1098, *1124; 2008 U.S. Dist. LEXIS 27217, **62;
86 U.S.P.Q.2D (BNA) 1899

announcement. There is no rule preventing a publisher or others from publishing portions or excerpts of works, joint or otherwise, that it solely owns, and then seeking a separate copyright in the same. Indeed, the opposite is true -- the holder of a copyright is expressly entitled to prepare derivative works based upon a copyrighted work it owns or to utilize portions of that work in other materials. *See 17 U.S.C. § 106(2); see generally 17 U.S.C. § 1* (repealed). Detective Comics could just as well have decided to split up the Superman material for publication into two or three installments as it could (and did) decide to publish a portion of that material in an advertisement to promote the comic.

This leads to plaintiffs' contention that the "derivative nature" of the promotional advertisement itself works to exclude any of the copyright in the pre-existing Superman material (notably, the art work for the *Action Comics*, Vol. 1 cover) contained [**63] therein from enuring to the benefit of the defendants to continue to exploit. Generally, if an author contributes additional original material to a pre-existing work so as to recast, transform, or adapt that work, then the copyright protection afforded to the author of that derivative work extends only to that additional material and in no way extends to the underlying, pre-existing material. *See 17 U.S.C. § 103(b)* (specifying that a derivative work's copyright does not extend to any part of that work using "preexisting material in which copyright subsists"); 1 *NIMMER ON COPYRIGHT § 3.03*, at 3-10. Thus, it is asserted that the author of the pre-existing material work (here Siegel and Shuster) would continue to retain ownership in the same despite its use in the derivative work (the promotional announcement).

Even assuming that the changes made to the cover page for *Action Comics*, Vol. 1, in the promotional announcements is not merely a reproduction, but sufficiently "recast, transform, or adapts" the pre-existing material so as to be considered a derivative work thereof (*e.g*, the cover is shown in black and white instead of color, the scale of the artwork itself is diminished, and text [**64] is placed alongside the artwork), there remains a complicating wrinkle. At the time the promotional announcements [*1125] were placed in Detective Comics' existing comic book publications, the underlying Superman material from which a portion of the announcements were derived (again the artwork for the cover) had yet to be published, and, hence, copyright in the same was protected at the time

under state common law. *See 17 U.S.C. § 2* (repealed).

Given that the portion of the pre-existing material at issue had yet to achieve statutory copyright protection when it was first published in *More Fun Comics*, Vol. 31, and *Detective Comics*, Vol. 15, it was injected into the public domain upon the publication of the promotional announcements themselves, absent investiture of statutory copyright protection through its publication. *See 17 U.S.C. § 10* (repealed). That is to say, the copyright in the cover of *Action Comics*, Vol. 1, itself first achieved statutory protection, if at all, upon its publication in the announcements, not its later publication in *Action Comics*, Vol. 1. *See* 2 PATRY ON COPYRIGHT § 6:35 ("where an investitive publication occurs, the derivative work copyright covers the [**65] unpublished material").

This fact has repercussions on plaintiffs' derivative works argument, as it alters the general rule described above. Once Detective Comics published a portion of the previously unpublished pre-existing material -- as was its right as owner of the material at that time -- its continued protection resided exclusively under statutory copyright in the derivative work itself lest that portion of the pre-existing material (the art work for the cover) be injected into the public domain. *See Batjac Productions Inc. v. GoodTimes Home Video Corp., 160 F.3d 1223, 1233 (9th Cir. 1998)*; 2 PATRY ON COPYRIGHT § 6:35 ("to the extent that previously unpublished material is included in an authorized published derivative work, the derivative work publishes the previously unpublished material"). As Professor Nimmer explains:

Because a derivative work by definition to some extent incorporates a copy of the pre-existing work, publication of the former necessarily constitutes publication of the copied portion of the latter. Of course, an article that merely describes a pre-existing work but does not incorporate any substantial portion of it is not a derivative work and hence, does not [**66] publish the pre-existing work. Unless the basic work is reproduced in the published work, it is not published. If only the broad outlines or other fragmentary portion of the pre-existing work are copied and published in the derivative work, then only to that extent is the pre-existing work

542 F. Supp. 2d 1098, *1125; 2008 U.S. Dist. LEXIS 27217, **66;
86 U.S.P.Q.2D (BNA) 1899

published.

1 *NIMMER ON COPYRIGHT § 4.12[A]* at 4-59 to 4-60; *see also id.* § 4.13[A] at 4-73 ("any work published prior to January 1, 1978, was not only thereby divested of common law copyright; it was also injected into the public domain, unless at the moment of publication copies of the work bore a proper copyright notice"). Thus, included in defendants' right to continue to exploit the copyright in the derivative work (the promotional announcements) is the right to the copyright in that part of the pre-existing work (the illustration from the cover) that was published for the first time in that derivative work.

The cases cited by plaintiffs as standing for the contrary are all distinguishable, as either the act of publication in question fell within the "limited" publication exception because the material was distributed for promotional purposes to members in the trade and not, as here, the general [**67] public itself, *see Rushton v. Vitale, 218 F.2d 434 (2nd Cir. 1955)*; *Hub Floral Corp. v. Royal Brass Corp., 454 F.2d 1226 (2nd Cir. 1972)*; or because the underlying work reproduced in the derivative work was itself in [*1126] the public domain (unlike here where the underlying material was in an unpublished state protected by common law copyright), thereby mooting any question about divestiture of the underlying work through publication. *See Alfred Bell & Co. v. Catalda Fine Arts, 191 F.2d 99 (2nd Cir. 1951)*.

Here, the promotional announcements represent the first time Superman appeared to the public, and consequently, the first time *any* of Siegel and Shuster's Superman material was protected by statutory copyright, albeit in conjunction with the other material contained in the advertisement itself. Thus, all of the material in the promotional announcement (which included the graphic depiction of Superman later portrayed on the cover of *Action Comics*, Vol. 1) obtained statutory copyright protection *before* the earliest possible date covered by the plaintiffs' termination notices. The Court therefore finds that the publication date for at least one of the comics containing the promotional announcements [**68] falls outside the reach of the termination notice and, therefore, any copyrightable material contained therein (including that found in the cover to *Action Comics*, Vol. 1, *as depicted* in those announcements) remains for defendants to exploit.

This leads to the question of the *scope* of the copyrighted material remaining in defendants' possession by way of the promotional announcements, a question that defendants themselves acknowledge "is most obviously answered by [looking at] the ads which speak for themselves" and that does not require some "special 'lens'" to resolve. (Defs' Reply at 44).

The Court begins by observing what is *not* depicted in the announcements. Obviously, nothing concerning the Superman storyline (that is, the literary elements contained in *Action Comics*, Vol. 1) is on display in the ads; thus, Superman's name, his alter ego, his compatriots, his origins, his mission to serve as a champion of the oppressed, or his heroic abilities in general, do not remain within defendants sole possession to exploit. Instead the only copyrightable elements left arise from the pictorial illustration in the announcements, which is fairly limited.

The person in question has great strength [**69] (he is after all holding aloft a car). The person is wearing some type of costume, but significantly the colors, if any, for the same are not represented, as the advertisement appears only in black and white. The argument that the "S" crest is recognizable in the promotional advertisement is not persuasive. What is depicted on the chest of the costume is so small and blurred as to not be readily recognizable, at best all that can be seen is some vague marking or symbol its precise contours hard to decipher. The Court thus concludes that defendants may continue to exploit the image of a person with extraordinary strength who wears a black and white leotard and cape. What remains of the Siegel and Shuster's Superman copyright that is still subject to termination (and, of course, what defendants truly seek) is the entire storyline from *Action Comics*, Vol. 1, Superman's distinctive blue leotard (complete with its inverted triangular crest across the chest with a red "S" on a yellow background), a red cape and boots, and his superhuman ability to leap tall buildings, repel bullets, and run faster than a locomotive, none of which is apparent from the announcement.

2. *Work Made for Hire Aspect* [**70] *of Portions of Action Comics, Vol. 1*

Under the 1976 Act, an author's (or his or her heirs') ability to terminate a prior grant in the copyright to a creation does not apply to a "work made for hire," because the copyright in such a creation was never the

artist's to grant, belonging instead [*1127] to the one who employed the artist to create the work. *See 17 U.S.C. § 304(c)*; *Playboy Enterprises, Inc. v. Dumas, 53 F.3d 549, 554 (2nd Cir. 1995)* ("Once it is established that a work is made for hire, the hiring party is presumed to be the author of the work"). The manner in which Siegel and Shuster's Superman material was submitted, then re-submitted in a reformatted version, and finally accepted for publication by Detective Comics raises questions about the work for hire status of the re-formatted material (but not the initial material submitted to the publisher) later published in *Action Comics*, Vol. 1.

Defendants argue that portions of the copyrightable material contained in *Action Comics*, Vol. 1, are unaffected by the termination notice because those portions belong exclusively to them as "works for hire," arguing that certain material found in the comic book was created by Detective Comics' [**71] in-house employees, or that the material was added to the underlying Superman material by Siegel and Shuster at the publisher's direction. (Defs' Opp. at 27). Specifically, the alleged "additional" material provided by Detective Comics' in-house employees is the color choices made throughout the comic, notably, the red color of the letter "S" on Superman's crest and the art work for the cover to the magazine itself (albeit modeled after a interior panel in the Superman comic illustrated by Shuster). Similarly, the additional material supplied in response to the publisher's February 1, 1938, letter is Shuster's admitted (and as acknowledged by Siegel) drawing of "several additional pictures to illustrate the story continuity" appearing "on page 1 of the first Superman release" and "the last panel appearing on the thirteenth page." (Decl. Michael Bergman Ex. G at 2 & Ex. H at 5).

The thrust of defendants' argument was made and rejected by the Second Circuit in the 1970s Superman copyright renewal litigation, and is thus precluded as a matter of collateral estoppel here. In that litigation, defendants' predecessors-in-interest presented much of the same evidence now submitted in this case [**72] to argue that this additional material transformed the *entirety* of Siegel and Shuster's pre-existing Superman material published in *Action Comics*, Vol. 1, into a work made for hire. The Second Circuit rejected this argument, elaborating: "In the case before us, Superman and his miraculous powers were completely developed long before the employment relationship was instituted. The

record indicates that the revisions directed by the defendants were simply to accommodate Superman to a magazine format. We do not consider this sufficient to create the presumption that the [comic book] strip was a work for hire." *Siegel, 508 F.2d at 914*. This conclusion forecloses any further litigation on the point of whether Shuster's additional drawings when reformatting the underlying Superman material into a comic book format or other facts related to such a theory such as the colorization process for *Action Comics*, Vol. 1, or the party responsible for the illustration of the cover to the magazine, rendered all or portions of the resulting comic book a work made for hire.

Defendants seek to avoid the collateral estoppel effect of the Second Circuit's decision by arguing that the only issue concerning [**73] the work for hire status of *Action Comics*, Vol. 1, related to Siegel and Shuster's 1934-1935 "contributions," and not what was "added to the first Superman story by Detective's employees," amongst whom defendants count Siegel and Shuster after they executed the December, 1937, contract. (Defs' Opp. at 36). Such a reading conflicts with the record. The evidence that was proffered during the 1970s litigation in the trial court on the work for hire question included declarations from [*1128] Siegel and Shuster discussing what took place during the reformatting process. This is the same evidence that defendants now seek to use in this case to argue that the reformatted material was a work made for hire.

Moreover, the circumstances surrounding the reformatting of the underlying Superman material was not only mentioned by the Second Circuit, but discounted by that court in passing on the work for hire nature of *Action Comics*, Vol. 1, itself, not just the initial contributions made by Siegel and Shuster back in 1934 and 1935. It would be incongruous for the Court, in respecting as it must the Second Circuit's judgment, to now hold that, while that reformatted material did not transform the entirety [**74] of the material in *Action Comics*, Vol. 1, into a work made for hire, some subpart thereof (and, indeed, a very limited subpart, consisting of but a few panels) was somehow excised out and should be accorded work made for hire status. The litigation of the larger question sweeps within it defendants' opportunity to litigate a subpart thereof.

A contrary holding would transgress certain core principles of collateral estoppel: "A new contention is not

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 47 of 132    Page ID #:6511

Page 20

542 F. Supp. 2d 1098, *1128; 2008 U.S. Dist. LEXIS 27217, **74;
86 U.S.P.Q.2D (BNA) 1899

necessarily a new issue. If a new legal theory or factual assertion raised in the second action is relevant to the issues that were litigated and adjudicated previously, the prior determination of the issue is conclusive on the issue despite the fact that new evidence or argument relevant to the issue was not in fact expressly pleaded, introduced into evidence, or otherwise urged." 18 JAMES WM. MOORE, *MOORE'S FEDERAL PRACTICE § 132.02[2][c]* at 132-25 (3rd ed. 2007). Significantly, much of the evidence underlying defendants' arguments was presented in the Second Circuit litigation (notably Siegel and Shusters' declarations submitted in that litigation) or, if not, was certainly available to be used in that case (the colorization process for [**75] the initial printing of *Action Comics*, Vol. 1, or that in-house employees supposedly drew the cover to the magazine). "A party may be precluded from re-litigating an issue if evidence supporting the party's position on the issue could have been submitted in previous litigation but, for whatever reason, was not properly raised. Evidence that is not the result of a different factual situation or changed circumstances, but is instead historical in nature and could have been admitted at the first trial if properly submitted, cannot be introduced in subsequent litigation of the same issue." *Id.* § 132.02[2][d] at 132-25 to 132-26 (citing *Yamaha Corp. v. United States, 295 U.S. App. D.C. 158, 961 F.2d 245, 257 (D.C. Cir. 1992)*).

Nowhere have defendants explained why they did not bring up the question of the colorization process for *Action Comics*, Vol. 1, or the cover art work for the magazine, before the courts handling the 1970s Superman litigation. The question about the legal effect the reformatting of the underlying Superman material had on the work for hire question was litigated by the parties and resolved by the courts during the 1970s Superman matter. Similarly, the question about the colorization and cover [**76] art work (and who was responsible for the same) could have been raised in conjunction with the work for hire question, but defendants failed or decided not to do so. Having litigated the question and having the opportunity to present all the evidence that pressed on the issue, defendants are now barred from seeking to relitigate it anew even under the purported limited guise that it is now being offered.

Some noted treatise writers have commented that the Second Circuit's analysis focusing on the work for hire nature of the additional reformatted material should have been analyzed as a derivative work, [*1129] that is, that

the additional material was derivative of the underlying Superman material. *See* 1 *NIMMER ON COPYRIGHT § 5.03[B] [1][b][I]* at 5-33 n.92. ("The *Siegel* decision . . . may be understood as holding that the first expression of the Superman character was the underlying work, and the later development of the character was a derivative work. Because only the derivative work was produced in a for-hire relationship, the underlying work remains the property of the creators"). However, this analysis does not benefit defendants.

First, no additional literary material was supplied in re-formatting [**77] the underlying Superman material into a comic book format. All the dialogue and storyline contained in *Action Comics*, Vol. 1, was present before Detective Comics requested the pair to provide a reformatted version of the material, and that literary material remained unchanged through the reformatting process. All that is left was supplying some additional illustrations by Shuster, the precise ones specified in his declaration. From the Court's review of these additional illustrations, it appears that the material is completely derivative of other panels in the *Action Comics*, Vol. 1, comic, with its origins in the underlying Superman material. Thus, for instance, while the final panel on page 13 shows Superman's crest with a red "S" on a yellow background, so, too, does another panel containing the underlying, pre-existing material. Similarly, while the panels on the first page to the comic show Superman leaping skyscapers, running at high rates of speed, and demonstrating feats of great strength, so, too, do other panels containing the pre-existing material. Indeed, the earliest sketches by Shuster from 1934 and 1935 demonstrate that the graphical depiction of Superman was well on [**78] its way to being completely developed before the re-formatted material in question was created some three years later. Thus, even if the additional material in question was tendered as a derivative work that was made for hire by Shuster, all the potentially copyrightable material contained therein is completely derivative of the pre-existing material and, hence, is not subject to independent copyright protection in the first instance. This, then, lends strong support to the Second Circuit's observation: "Superman and his miraculous powers were completely developed long before the employment relationship was instituted." *Siegel, 508 F.2d at 914.*

Defendants also argue that the coloring for *Action Comics*, Vol. 1, was not created or chosen by Siegel or

542 F. Supp. 2d 1098, *1129; 2008 U.S. Dist. LEXIS 27217, **78;
86 U.S.P.Q.2D (BNA) 1899

Shuster, but was instead the product of some of Detective Comics' in-house employees working in the printing department. Even if this argument was not otherwise precluded by collateral estoppel, the evidence produced in support is less than persuasive. According to "eye-witness" Jack Adler, the material contained in comic books "at the time" was provided by artists to the Detective Comics' production staff in black and white. (Decl. Jack [**79] Adler P 3). "Typically," members of the staff then decided upon the color that would be applied throughout the magazine, something that defendants argue is an additional element added to the underlying Superman material that is itself subject to copyright protection. (Decl. Jack Adler P 3). Defendants' argument depends entirely upon Mr. Adler's declaration, which is not as clear as they suggest.

Mr. Adler does not state that he worked on the colorizing of *Action Comics*, Vol. 1, itself. Instead he states that he "worked for the engraving company that made the metal plates for printing of, among other things, comic books for Detective Comics." (Decl. Jack Adler P 3). He then states that, "[a]t the time, comic book artists . . . submitted drawn and inked comic book [*1130] work in black and white." (*Id.*). Mr. Adler further states that the black-and-white pages "were then photographed by the engraver and a photo print was hand[-]colored by staff at Detective and by the engravers." (*Id.*). Of course, nothing in this statement precludes the possibility that, even if the Superman material was so submitted, Siegel and Shuster may have also placed certain color directions with their material to be utilized [**80] in the engraving process. In fact, that the earlier incarnation of Superman as hulking strongman in the tradition of Tarzan was created by the pair as a comic book with color illustrations lends to the possibility that they already had pre-conceived color choices in mind for the later comic if it were later reformatted into a comic book, rather than a newspaper comic strip.

Moreover, viewed in context, Mr. Adler's declaration appears to describe procedures generally employed in the printing process, not as evidence of what actually occurred with respect to the printing of *Action Comics*, Vol. 1, itself. His statement (and, in fact, the entire Adler declaration) is of dubious evidentiary value in light of his candid admission that he has "no knowledge of Siegel and Shuster selecting any of the color in *Action Comics*, No.1." (*Id.* P 4). Mr. Adler attempts to temper his admission of lack of knowledge by stating, without any

basis, that he is "aware that Detective staff member, Ed Eisenberg, selected the color for Superman's 'S' in Shield on his costume." (*Id.*) Of course, Mr. Adler's statement on this point is inadmissible as it is based on hearsay. Without any direct link between Mr. Adler's [**81] work and the printing of *Action Comics*, Vol. 1, in particular, there exists an insufficient evidentiary foundation for his conclusions concerning the manner in which the Superman material was supplied to the printer and the colorization of the same was handled.

Finally, defendants argue that the cover for *Action Comics*, Vol. 1, was drawn by Detective Comics' in-house artists. However, the scant evidentiary basis provided in support of this argument is ambiguous. In a letter sent to Jerome Siegel dated February 22, 1938, Detective Comics' editor, Vin Sullivan, enclosed "a silverprint of the cover of Action Comics," with the observation that Detective Comics "used one of those panel drawings of SUPERMAN, as you suggested in your recent letter." (Decl. Michael Bergman, Ex. I). The inference sought to be drawn by defendants is that when Mr. Sullivan stated that the publisher "used" an interior illustration from the Superman comic for the cover artwork he was stating that one of the publisher's in-house artists saw the interior panel in question and then drew the cover using the interior panel as inspiration. Of course, given the limited nature of the information contained in the passage [**82] it could also be argued that, in his earlier letter, Siegel enclosed an illustration by Shuster as a suggestion for the comic book's cover and Detective Comics decided to "use" this suggestion. This alternative reading is not implausible. As demonstrated by the pair's attempt to have their earlier incarnation of Superman published by Detective Dan, Shuster had in the past drawn exemplars for the cover illustration for his comics well before they were ever accepted for publication.

In conclusion, the Court finds that the question of the work-for-hire nature of certain portions of the Superman material published in *Action Comics*, Vol. 1, is precluded from further litigation by operation of the 1974 Second Circuit decision. Accordingly, the binding nature of that court's decision leads to the conclusion that all the Superman material contained in *Action Comics*, Vol. 1, is not a work-made-for-hire and therefore is subject to termination.

[*1131]  3. *Failure to Include 1948 Consent Judgment*

542 F. Supp. 2d 1098, *1131; 2008 U.S. Dist. LEXIS 27217, **82;
86 U.S.P.Q.2D (BNA) 1899

Among the regulatory requirements promulgated by the Register of Copyrights concerning the termination notice's "form, content, and manner of service," *17 U.S.C. § 304(c)(4)(B)*, is the requirement that the notice [**83] must "reasonably" identify "the grant" to which it applies. *37 C.F.R. § 201.10(b)(1)(iv)*. Thus, if the author entered into five separate grants of rights for the same work, and a notice of termination identifies only four of those grants, the fifth grant remains "intact," and the grantee's rights thereunder remain unaffected. *See 3 NIMMER ON COPYRIGHT § 11.06[B]* at 11-40.22(1) n.63 ("if a grant was not effectively terminated, then the rights licensed under such grant remain").

Here, defendants argue that plaintiffs' failure to identify the 1948 consent judgment from the Westchester action is fatal to their attempts to terminate their grant to the copyright in Superman, as that consent judgment was among the grants leading to the transfer of ownership from the artists to Detective Comics. Such argumentation is predicated upon the notion that, notwithstanding the plaintiffs' act of identifying the stipulation between the parties from the Westchester litigation that resulted in the consent judgment, identification of the consent judgment from the Westchester action itself as (or part of) a "grant" was necessary because it constituted the final step in "effectuat[ing] the transfer to [Detective [**84] Comics] of the sole and exclusive ownership of all rights relating to 'Superman'"; "without it the rights identified in the Stipulation would not have been transferred." (Defs' Opp. at 39). The Court disagrees.

Although the 1976 Act nowhere defines the term "grant," the central question raised is plainly one of transfer: Did Siegel and Shuster transfer any rights to Superman through or in conjunction with the 1948 consent judgment? If so, then it operated as a grant by the artists in the same.

On that point, the 1976 Act is helpful as it defines a "transfer of copyright ownership" as "an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright." *17 U.S.C. § 101*; *see* Melville B. Nimmer, *Termination of Transfers under the Copyright Act of 1976*, 125 U. PA. L. REV. 947, 951-52 (1977) ("In general, the termination provisions apply to any 'transfer' of copyright and to nonexclusive licenses of copyright or of any right comprised in a copyright. [Thus, a] 'transfer' includes not only assignments (as understood under the [1909] Act),

but also exclusive licenses and any other conveyance of copyright or of any exclusive right comprised in a [**85] copyright").

The consent judgment at issue did not effectuate any transfer of rights from Siegel and Shuster to Detective Comics. If any rights were transferred as a result of the Westchester action, such a transfer was effectuated by the execution of the earlier stipulated agreement of the parties, not a document created two days later which simply memorialized the transfer that the stipulation itself had accomplished. The binding nature of the transfer contained in the stipulation was completed the moment that agreement was executed. The consent judgment was a mere formality whose execution (or lack thereof) did not detract from the otherwise binding nature of the parties' earlier agreement. It merely parroted what was already agreed to by the parties in the stipulation itself.

Finally, even if the 1948 consent judgment is a "grant" separate and apart from (or part and parcel with) the 1948 stipulation, the regulations recognize that not all errors in compliance with its terms impact [*1132] the validity of the termination notice: "Harmless errors in a notice that do not materially affect the adequacy of the information required to serve the purposes of . . . *section 304(c)* . . . shall not [**86] render the notice invalid." *37 C.F.R. § 201.10(e)(1)*. Here, viewing the issue in the light most favorable to the defendants, the 1948 consent judgment simply served to culminate or otherwise finalize the transfer of the Superman copyright achieved through the stipulation the parties reached two days earlier. That plaintiffs only identified the latter rather than the former does not materially affect defendants' understanding of the "grant" sought to be affected by the notice. Indeed, courts have required much less in meeting the regulation's requirement of providing "a brief statement reasonably identifying the grant being terminated." *See Music Sales Corp. v. Morris, 73 F.Supp.2d 364, 378 (S.D.N.Y. 1999)* (holding that description of the grant in the termination notice as the "grant or transfer of copyright and the rights of the copyright proprietor" was sufficient as "it appears to be boilerplate on termination notices customarily accepted by the Register of Copyrights"); *see also* 2 PATRY ON COPYRIGHT § 7:45 (approving *Music Sales*). Nowhere do defendants argue why the harmless error rule should not apply in a situation such as this where one document that is a part in the process [**87] leading to the "transfer" of rights is identified, but its necessary

542 F. Supp. 2d 1098, *1132; 2008 U.S. Dist. LEXIS 27217, **87;
86 U.S.P.Q.2D (BNA) 1899

corollary was not.

Accordingly, the Court concludes that, even if the consent judgment is viewed as integral to the transfer of rights, plaintiffs' failure to identify it as a grant subject to the termination notice was a harmless error that did not diminish the notice defendants received regarding the nature of the grant (and resulting transfer of rights) that plaintiffs intended to terminate.

4. *Continued Acceptance of Benefits Under 1975 Agreement*

Defendants argue that Joanne Siegel's continued acceptance of benefits under the parties' 1975 agreement constitutes, "as a matter of equity," a *de facto* post-termination grant of rights in the Superman copyright to defendants under the terms of that agreement (or as phrased by defendants, plaintiffs have "effectively reaccepted the terms of the grant"). (Defs' Opp. at 41). The legal premise of their argument is that the 1976 Act recognizes that, once a termination notice has been served and thereby vested, *see 17 U.S.C. § 304(c)(6)(B)*, the terminating party is free to make "a further grant . . . of any right covered by a terminated grant" to the original grantee or its [**88] successor in title. *17 U.S.C. § 304(c)(6)(D)*. The Court ultimately rejects this argument as unpersuasive because it mistakenly assumes the 1975 agreement was a "grant" to the Superman copyright.

A look at the context leading up to the execution of the 1975 agreement illuminates in what way the parties believed (and just as importantly did not intend) for that agreement to bind them. The 1975 agreement appears to have been drafted in response to bad publicity (apparently due to the juxtaposition of the creators' misfortune and the Superman character's commercial success), and not as a means to transfer or convey the party's rights to the Superman copyright. The agreement observed that nothing therein should be construed as undermining the rights defendants had been conferred by virtue of the March 1, 1938, assignment, rights which were later vindicated in the Westchester action and the 1970s Second Circuit litigation. Indeed, the agreement reaffirmed defendants' *existing* rights to Superman and provided plaintiffs with annual payments, medical insurance, and screen credits. [*1133] Such conferral of benefits was identified in the agreement as a "voluntary" act by defendants in recognition of Siegel [**89] and Shuster's "past services." The 1982 codicil, in turn, removes the condition for the promised benefits to

Siegel's widow on the timing of her husband's death.

This context and the language in the agreement itself demonstrate that the 1975 agreement was not a "grant." The agreement's execution did not result in the transfer or assignment of the Superman copyright. Indeed, the agreement itself expressly disavows such an interpretation by including language that the conferring of benefits by defendants to Siegel and Shuster was simply a "voluntary" act in recognition of the pair's "past services," and that nothing therein should be construed as undermining the rights defendants had been conferred in the March 1, 1938, assignment as vindicated in the Westchester action and the 1970s Second Circuit litigation. Thus, by its own terms, no rights were transferred through the execution of that agreement. A reaffirmation of existing rights without more is no more "an assignment" or "conveyance" of rights to a copyright than it would if Detective Comics had instead issued a press release declaring that previous court rulings had recognized its existing ownership rights to that copyright.

Similarly, [**90] the 1982 codicil under which Joanne Siegel continued to receive annual payments and benefits did not transfer any rights. The codicil consists of five paragraphs. The first merely notes that the letter is in response to a letter written by Joanne Siegel to the company's executive officer regarding her concern over how she would provide for herself after her husband's death. The second referenced the 1975 agreement, noted the increase in the amount of the annual payments from $ 20,000 to $ 50,000 thereunder, and the payment of an additional bonus. The third clarified a royalty policy that applied to creators *other than* Siegel and Shuster. The fourth set forth the agreement to continue to pay benefits to Joanne Siegel for the balance of her life in the event her husband predeceased her before 1985. The fifth and final paragraph merely wishes Joanne Siegel and her family well. Nowhere in these five humble paragraphs is a transfer of rights to be inferred, much less explicitly found.

Thus, even if Joanne Siegel's continued receipt of the benefits of the bargain contained in the 1975 agreement post-termination somehow operated as a *de facto* re-acceptance of the agreement itself (and the [**91] obligations flowing thereunder), nowhere among those re-accepted "obligations" or "commitments" in that agreement was there a grant to the Superman copyright. Defendants protest the Court drawing this conclusion,

542 F. Supp. 2d 1098, *1133; 2008 U.S. Dist. LEXIS 27217, **91;
86 U.S.P.Q.2D (BNA) 1899

arguing that plaintiffs have admitted in their pleadings (their complaint, and by filing a termination notice directed at the 1975 agreement) that the 1975 agreement contained a grant to the Superman copyright. It certainly is true that "[f]actual assertions in pleadings and pre-trial orders . . . are considered judicial admissions" that bind the party who made them. *American Title Ins. Co. v. Lacelaw Corp., 861 F.2d 224, 226 (9th Cir. 1988)*. That being said, "courts still have discretion not to apply the doctrine in particular cases." 18 JAMES WM. MOORE, *MOORE'S FEDERAL PRACTICE § 134.33[6]* at 134-84 (3rd. ed. 2007) (citing *New Hampshire v. Maine, 532 U.S. 742, 750, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001)* ("Because the rule is intended to prevent 'improper use of judicial machinery,' judicial estoppel 'is an equitable doctrine invoked by a court at its discretion'")).

As noted at the outset, the termination provisions contained in the 1976 Act are among the most complex and technical ones in the statute. Given [**92] this complexity, [*1134] it is not surprising that a party seeking to harness its machinery may, out of an abundance of caution, be more "over-inclusive" in terms of listing the possible "grants" it seeks to terminate. To penalize a party for being over-inclusive rather than under-inclusive is all the more inequitable given the high hurdles the termination provisions put in place. Here, plaintiffs were represented by highly experienced counsel who decided to list the 1975 agreement as a "grant" so as to leave no stone unturned; an approach all the more justified given the extremely technical and arcane arguments that have been advanced in this litigation concerning the efficacy and enforceability of the termination notices themselves. The Court therefore concludes that in these circumstances discretion counsels against applying the judicial estoppel doctrine in the manner advocated by defendants.

Accordingly, the Court concludes that Joanne Siegel's continued receipt of payments and benefits under the 1975 agreement and 1982 codicil thereto does not constitute a "further grant" or "an agreement to make a further grant" pursuant to *17 U.S.C. § 304(c)(6)(D)*.

5. *Statute of Limitations*

Defendants [**93] contend that the present action was filed untimely. The statute of limitations itself is clear enough. The Copyright Act of 1976 provides that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." *17 U.S.C. § 507(b)*. The issue raised by defendants implicates the latter clause and requires the Court to determine when plaintiffs' claims accrued.

At the outset, a clarification of terms is in order. The instant matter, although couched in terms of terminating the 1938 grant, is in effect one for co-ownership of the copyright in the Superman material contained in *Action Comics*, Vol. 1, because, if successful, plaintiffs would gain only a joint ownership interest in that material with DC Comics, owing to the fact that Shuster left no heirs who could simultaneously seek to terminate his half of the grant in the material. Claims of co-ownership accrue when there is a "plain and express repudiation of co-ownership . . . communicated to the claimant." *Zuill v. Shanahan, 80 F.3d 1366, 1369 (9th Cir. 1996)*.

Here, defendants assert that such a repudiation was expressed by a letter submitted to plaintiffs' counsel [**94] dated December 18, 1997, during the whirlwind of negotiations that took place between the parties shortly after the submission of the termination notices. The Court finds to the contrary. As explained more fully below, although the letter stated a position that the termination notices were "defective," the letter addressed only the scope of the rights that could be recaptured by the termination notices and left unchallenged the notices' validity and enforceability, thus falling short of the required repudiation. [7]

> [7] One could quibble with whether any date other than the termination effective date itself can serve as the accrual date in a case involving the right to termination of a grant. Much like having to await a judicial determination whether one is a heir (as opposed to instances when an ownership claim is based on whether or not someone is a creator) has been held to be the earliest instant for an accrual date, see *Stone v. Williams, 970 F.2d 1043 (2nd Cir. 1992)* (Hank Williams' putative daughter's claim to be an owner had to await judicial determination that she was in fact his daughter and heir, thus accrual date was not triggered when Hank Williams' first contested her putative [**95] status but instead when state court made determination that she was his heir), so too a claim of ownership by way of termination of a grant cannot be realized unless and until after the termination's effective date. Stated another way, a

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 52 of 132    Page ID #:6516

Page 25

542 F. Supp. 2d 1098, *1134; 2008 U.S. Dist. LEXIS 27217, **95;
86 U.S.P.Q.2D (BNA) 1899

party's status as a creator is a factual question subject to being challenged by the other putative co-owner at any time, and hence, the accrual date for the same would begin at that instant. The same, however, is not true of a putative co-owner by way of termination. Their status as co-owner is not predicated upon a pre-existing factual scenario, like whether they were involved in jointly creating the material per se. Instead, their status as a co-owner is predicated upon a legal mechanism -- the exercise of a new statutory right revoking an earlier transfer in the copyright in question, be it one they solely or jointly created -- that takes place at a certain defined point in time. Unless and until that legal triggering point is passed, there is nothing for the other co-owner to reject or challenge. This is particularly the case given that termination notices can be served up to ten years before the effective termination date. Defendants' position [**96] would, as a matter of logic, countenance scenarios where due to an early "rejection" of the termination notice, the passage of the limitations period would occur well before the termination effective date even arrived (and with it the putative co-owner's rights even vested). Nonetheless, the Court need not resolve this question as the letter in question does not constitute a plain and express repudiation of plaintiffs' termination notice (and, hence, its right to co-ownership to the copyright in the Siegel and Shuster Superman material).

[*1135] Specifically, the letter upon which defendants rely notified plaintiffs' counsel, Mr. Levine, that they considered "the Superman Notices to be defective in several respects." (Defs' Opp. at 50). What is telling is that the areas of defect elaborated upon in the letter did not relate to the validity or enforceability of the termination notices themselves, but pointed to areas curtailing the scope of what could be recaptured even assuming the notice to be properly presented. These defects thus did not call into question plaintiffs asserted right to termination contained in the notices. For example, the letter remarks that defendants would still retain [**97] its rights in trademarks that it had secured over the years to certain Superman-related material, and that the termination would not give plaintiffs access to an accounting of the foreign profits defendants gained from exploiting the copyright. Far from repudiating plaintiff's co-ownership to the copyright, the letter acknowledged

the validity of that ownership interest. Thus, the letter remarked that, "if the Siegels do not execute a re-grant to DC, beginning in April of 1999, DC and the Siegels will be joint owners of the United States copyright in the 'Superman' comic published in Action Comics No. 1 in June, 1938." (Decl. Michael Bergman, Ex. U at 2).

Even more telling was DC Comics' subsequent conduct. The parties' negotiations quickly broke down and not much of substance was communicated between the parties thereafter. Then, the day before the termination effective date, DC Comics sent a letter to plaintiffs' counsel denying the validity of the termination notice, proclaiming:

> The absence of any steps towards negotiation for two years, particularly on the 'eve' of the April 16, 1999 purported 'effective' date of the termination, leaves us concerned. Thus our client has no alternative [**98] but to move to the stage of *putting your clients on clear notice*, as set forth below, of DC Comics' rights and of its determination, if it becomes necessary, to take all appropriate and necessary steps to protect those rights. First, *your clients are hereby put on notice that DC Comics rejects both the validity and scope of the Notices* . . . .

(Decl. Marc Toberoff, Ex. Q (emphasis added)).

If, as defendants contend, such notice of intent had been so clearly and unmistakably communicated over a year and half earlier, it is odd for them to have to repeat it and then state that they were "putting" plaintiffs "on notice" about it. Accordingly, the Court finds that the present action [*1136] seeking declaratory relief regarding plaintiffs' termination of the 1938 grant accrued on April 16, 1999, the effective date of that termination. DC Comics' submission of the letter the day before that denying the validity of the termination notice gave a plain and express indication to plaintiffs that a claim for declaratory relief vis-vis the validity of their termination notice was now ripe. *See 28 U.S.C. § 2201* ("In a case of actual controversy within its jurisdiction, . . . any court of the United [**99] States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be

542 F. Supp. 2d 1098, *1136; 2008 U.S. Dist. LEXIS 27217, **99;
86 U.S.P.Q.2D (BNA) 1899

sought.")

Applying both the date of the accrual of the claim, the parties' tolling agreement to the three-year statute of limitations, and the filing date of this action, the Court concludes that it is timely. The effective date of the termination notice, and therefore the date of accrual, is April 16, 1999. The parties entered into a tolling agreement on April 6, 2000, which amounts to nine days less than one year that the limitations clock ran before being tolled. [8] The tolling agreement lasted until ten business days after plaintiffs' September 21, 2002, letter providing written notice that they were ending settlement negotiations, that is, October 4, 2002, at which time the limitations clock started ticking once more. [9] The present action was filed two years and four days later, on October 8, 2004. Adding the periods of time the limitations period was running together, it is clear that they add up to a period of time just short of the three-year period set forth in *§ 507(b)*.

[8] Defendants' [**100] argument that the tolling agreement does not apply to plaintiffs' claims against Time Warner, Inc., and Warner Bros. Entertainment, Inc., because neither was a "party to" or bound by that agreement is disingenuous. (Defs' Opp. at 52). The tolling agreement expressly provides that its terms bound not only DC Comics but also its "past and present subsidiaries or affiliates." (Decl. Marc Toberoff, Ex. Z). Being the parent company (Time Warner, Inc.) or corporate sibling (Warner Bros. Entertainment, Inc.,) of another (DC Comics) certainly qualifies as a corporate affiliate to the same; a point defendants later admit when speaking to the alter ego question presented in the pleadings. (Defs' Mot. Summ. J. at 79 ("the following is a chart of the current corporate structure *and affiliations* between DC, WBEI and TWI")). Moreover, representatives for both companies were actively involved in the settlement negotiations themselves, further undermining any suggestion that they were bystanders to the process.

[9] Defendants argue that the tolling period concluded much earlier based on the parties earlier having reached "an amicable *resolution* of the dispute." (Defs' Opp. at 51 (emphasis in original)). [**101] Given that the Court finds that no such "resolution," as opposed to a naggingly

close potential for the same, occurred through the parties settlement discussion post-termination, *see infra* A.6, their argument is without merit.

Accordingly, the Court concludes that the present action is timely.

### 6. *The 2001-2002 Settlement Negotiations*

Defendants contend that plaintiffs' termination notice is no longer effective as the parties' settlement negotiations led to them entering into a binding post-termination agreement that resolved the issues presently before the Court. A brief review of the time line regarding those negotiations is helpful to the Court's analysis of the present issue:

October 19, 2001 Pursuant to the parties' negotiations, plaintiffs' counsel sent to defendants' counsel a six-page letter outlining the substance of a settlement offer from defendants that was "accepted" by the plaintiffs.

October 26, 2001 Defendants responded, noting they were working on a draft agreement and enclosing "a more fulsome outline" of "what" they "believe the deal" they have "agreed" to is.

[*1137] February 1, 2002 Defendants' counsel provided a fifty-six page draft agreement that reserved the right to have [**102] their clients comment upon it and noted that certain, related "stand alone" assignments were in the process of being finalized.

May 5, 2002 Plaintiffs responded to defendants' draft by stating that the proposed agreement contained new, unacceptable terms to which they had not agreed.

May 21, 2002 Defendants sent a letter to plaintiffs stating that they believed that each of the major points in the settlement had already been agreed upon.

Sept 21, 2002 Plaintiffs rejected their counsel's proposed draft agreement and

542 F. Supp. 2d 1098, *1137; 2008 U.S. Dist. LEXIS 27217, **102;
86 U.S.P.Q.2D (BNA) 1899

advised defendants in writing that they were ending negotiations.

The parties are in agreement that California law should be applied in deciding this question, but disagree as to its application. "California law is clear that there is no contract until there has been a meeting of the minds on all material points." *Banner Entertainment v. Superior Court, 62 Cal.App.4th 348, 358, 72 Cal. Rptr. 2d 598 (1998).* The failure to reach a meeting of the minds on all material points prevents the formation of a contract even if the parties have orally agreed upon some of the terms, or have taken some action related to the contract. *Grove v. Grove Valve & Reg. Co., 4 Cal.App.3d 299, 311-12, 84 Cal. Rptr. 300 (1970).* Similarly, [**103] the terms proposed in an offer must be met exactly, precisely, and unequivocally for its acceptance to result in the formation of a binding contract. *See Panagotacos v. Bank of America, 60 Cal.App.4th 851, 855-56, 70 Cal. Rptr. 2d 595 (1998); Apablasa v. Merritt & Co., 176 Cal.App.2d 719, 726, 1 Cal. Rptr. 500 (1959).* A qualified acceptance constitutes a rejection terminating the original offer and the making of a counteroffer to the original offeror, which must also be unequivocally accepted by the former offeror for a binding contract to form. *See Panagotacos, 60 Cal.App.4th at 855-56; Glende Motor Co. v. Superior Court, 159 Cal.App.3d 389, 396, 205 Cal. Rptr. 682 (1984)* ("California law has generally held that a qualified acceptance . . . affects the viability of the offer itself, so that 'a qualified acceptance amounts to a new proposal or counteroffer putting an end to the original offer'"); *In re Pago Pago Air Crash, 637 F.2d 704, 706 (9th Cir. 1981); see also CAL. CIV. CODE § 1585* ("A qualified acceptance is a new proposal.").

The parties disagree over whether the terms contained in plaintiffs' October 19, 2001, letter differ in substance from those set forth in defendants' later letter of October 26, 2001 (and accompanying outline), [**104] such that there was no unequivocal acceptance of an offer and, thus, no agreement. As with much in both life and law, materiality is in the eye of the beholder. From the Court's reading of the parties' correspondence, it is clear that the parties went well beyond reaching a settlement in principle regarding their respective positions to the Superman property. Rather, as suggested by the time line above, the parties' correspondence, and the actions taken in response thereto, illustrates that they found themselves in the all-too-familiar situation in which verbal settlement negotiations result in what the parties believe to be an agreement on all the major points of dispute, but which, upon further discussion, falls short of the agreement needed to resolve their dispute. The devil, as it often is, was in the details.

That material details remained is evidenced by defendants' response to plaintiffs' initial letter, enclosing "a more fulsome *outline*" of what it "believed the deal" they had "agreed to." Moreover, defendants' February, 2002, draft agreement was not even considered final by its authors, who reserved the right for their clients to "comment" on it, and would also require the [**105] further submission of a number of "stand alone" agreements yet to be finalized. Indeed, Time Warner's CEO later [*1138] commented that submission of the draft agreement was "expected" to result in further "comments and questions" from the Siegel heirs that "would need to be resolved."

This give and take reveals that the parties, while close to agreeing to a complete and comprehensive settlement of their dispute, had not passed the threshold where they had finalized and assented to all material terms of such a settlement. Rather, as they attempted to sketch in the finer details of a settlement from the broad outlines contained in the October 19 letter, more and more issues arose upon which they could not reach agreement, resulting in the negotiations falling apart. In this respect, the present case is not unlike *Callie v. Near, 829 F.2d 888 (9th Cir. 1987),* and *Weddington Prods. v. Flick, 60 Cal.App.4th 793, 71 Cal. Rptr. 2d 265 (1998),* in which the courts held that no enforceable agreement was reached when the parties had agreed to a rough outline of an agreement, but were thereafter unable to reach agreement on the finer details and the negotiations fell apart.

Defendants' argument to the contrary is premised on [**106] the notion that they can limit the scope of the legal analysis to the October 19, 2001, letter and call it a contract, regardless of their materially different October 26, 2001, letter in reply ("I enclose . . . a *more fulsome outline of what we believe the deal . . . is*") and their vastly different February 1, 2002, draft, which were both part and parcel of the same settlement negotiation. Ignoring these contemporaneous communications is at odds with the requirement in contract formation that courts must consider "all the surrounding circumstances." *Donovan v. RRL Corp., 26 Cal.4th 261, 271, 109 Cal.*

542 F. Supp. 2d 1098, *1138; 2008 U.S. Dist. LEXIS 27217, **106;
86 U.S.P.Q.2D (BNA) 1899

*Rptr. 2d 807, 27 P.3d 702 (2001).* These subsequent efforts to sketch in a more fulsome outline of the parties' alleged agreement provides context and meaning as to the understanding the parties had about the effect of the October 19 letter itself.

Defendants further seek to create issues of fact through *post hoc* testimony and rationalizations. None of this subjective belief is sufficient to defeat the objective manifestation of the parties' intent relayed in the documents referenced above that aptly demonstrate that there was no "meeting of the minds" on all material terms. *See Meyer v. Benko, 55 Cal.App.3d 937, 942-43, 127 Cal. Rptr. 846 (1976)* [**107] ("The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe. Accordingly, the primary focus in determining the existence of mutual consent is upon the acts of the parties involved"); *Stewart v. Preston Pipeline Inc., 134 Cal.App.4th 1565, 1587, 36 Cal. Rptr. 3d 901 (2005)* ("mutual assent to a contract is based upon objective and outward manifestations of the parties"); *CAL. CIV. CODE § 1639.*

One need only review the language of the parties' correspondence, their conduct in reaction thereto, and the numerous material differences between the terms relayed in the October 19 and 26, 2001, letters and the February 1, 2002, draft to reach the conclusion that the parties failed to come to an agreement on all material terms. *See Grove v. Grove Valve & Reg. Co., 4 Cal.App.3d 299, 311-12, 84 Cal. Rptr. 300 (1970)* (failure to reach meeting of the minds on all material points prevents contract formation even though parties orally agreed on many terms, or have taken action relating to the contract). Far from signifying that the parties' "negotiations . . . result[ed] in a binding contract" leaving nothing [**108] more than the drafting of more formal documentation memorializing that agreement, *see Louis Lesser Enterprises,* [*1139] *Ltd. v. Roeder, 209 Cal.App.2d 401, 404, 25 Cal. Rptr. 917 (1962),* these submissions between the parties went far beyond that by adding in or further refining areas from what was contained in the October 19 letter. That after the submission of the October 19 letter defendants began the process of creating a settlement trust account and the parties negotiated about providing Siegel and Shuster screen credits in the then upcoming movie *Superman Returns* could as much be seen as goodwill gestures on defendants' part while the negotiations continued as it could reflect an indication on their part that they thought they were contractually bound to do the same.

From all of this there is no document or set of documents reflecting agreement by the parties to singular, agreed terms. Defendants cannot explain to the Court what from the parties' differing exchange constitutes this purported contract; rather, it appears that defendants wish to take the plaintiffs' "acceptance" reflected in the October 19 letter and either festoon upon it all the terms contained in the February 1, 2002, draft settlement agreement [**109] (even though Joanne Siegel clearly and unequivocally rejected that latter draft agreement), or have the Court perform that task. The Court's responsibility is not to create a patch-quilt agreement by stringing together certain expressions of assent made at one point (October 19), and attaching to it material terms spelled out later in time (and to which the supposedly assenting party promptly rejected). *See Industrial Indemnity v. Superior Court, 224 Cal.App.3d 828, 832, 275 Cal. Rptr. 218 (1990)* ("courts will not write a new contract").

Accordingly, the Court concludes that the parties' settlement negotiations did not result in an enforceable agreement resolving the issues presently before the Court.

B. *Limitations on Scope of Recaptured Rights*

The principal purpose behind the creation of the termination right was to give authors (and their heirs) a chance to retain the extended renewal term in their work and then re-bargain for it when its value in the marketplace was known. *See* H.R. REP. NO. 1476, 94th Cong., 2d Sess. 124 (recognizing as the justification for the termination right "safeguarding authors against unremunerative transfers . . . because of the unequal bargaining position of authors, resulting [**110] in part from the impossibility of determining a work's prior value until it has been exploited").

The need for such a second bite at the apple flowed from the fact that the 1909 Act created a dual term in the copyright to a work, one realized upon the work's publication and the second occurring twenty-eight years later with the copyright's renewal. Justification for this splitting of terms was based, in part, on the understanding that an author's ability to realize the true value of his or her's work was often not apparent at its creation, but required the passage of time (and the marketing efforts by

542 F. Supp. 2d 1098, *1139; 2008 U.S. Dist. LEXIS 27217, **110;
86 U.S.P.Q.2D (BNA) 1899

a publisher) to materialize. The renewal term in the copyright to the work thus served as a mid-course re-valuation tool allowing the author, by giving him or her the right of renewal in the work, leverage in re-negotiating a better deal with the original grantee or any other suitor who desired to continue to market the copyright. *See* Patry, *Choice of Law*, 48 Am. J. Comp. L. at 446 ("The main theory behind a dual system of term was that it gave the author or the author's heirs a 'second bite at the apple;' when the renewal term came around, the value of the copyright would be better known [**111] than at the time of initial publication. With this information, a new bargain could be struck [*1140] that would more accurately reflect the market rate"). This re-valuation mechanism provided by the renewal term under the 1909 Act was largely frustrated by the Supreme Court's decision in *Fred Fisher Music, 318 U.S. at 656-59*, allowing authors to assign away at the outset all of their rights to both the initial and the renewal term.

Although the termination right contained in the 1976 Act sought to correct the damage done by *Fred Fisher* to an author's ability to renegotiate through the reversion of rights, it did not revert to the author the full panoply of rights he or she would have enjoyed upon renewal under the 1909 Act. Owing in large measure to objections by publishers seeking to minimize the disruption to "existing contracts and authorized derivative works already in distribution" that such a recapture right would engender, *see* 2 PATRY ON COPYRIGHT § 7:43, Congress placed certain limitations on what authors (or their heirs) gained from exercising the termination right. It is to these limits on the termination right that the Court now turns.

### 1. Foreign Profits

*Section 304(c)(6)(E)* to the [**112] 1976 Act provides that "[t]ermination of a grant under this subsection affects only those rights covered by the grant that arise under this title[, Title 17 of the United States Code, governing copyrights], and in no way affects rights arising under any other Federal, State, or foreign laws." Defendants read from this a statutory limitation on the scope of any accounting arising from the termination notices in this case to those profits realized by the domestic exploitation of the Superman copyright contained in *Action Comics*, Vol. 1, excluding those realized from foreign sources. The Court finds this argument persuasive.

Although the Court can locate no case that has specifically addressed the issue of accounting profits from the foreign exploitation of a copyright that is subject to a valid termination notice, the statutory text could not be any clearer on this subject. Through this section, Congress expressly limited the reach of what was *gained* by the terminating party through exercise of the termination right; specifically, the terminating party only recaptured the *domestic* rights (that is, the rights arising under title 17 to the United States Code) of the grant to the copyright [**113] in question. Left expressly intact and undisturbed were any of the rights the original grantee or its successors in interest had gained over the years from the copyright through other sources of law, notably the right to exploit the work abroad that would be governed by the copyright laws of foreign nations. Thus, the statute explains that termination "in no way affects rights" the grantee or its successors gained "under foreign laws."

Such a reading is supported by leading commentators, who are in agreement as to the effect of *§ 304(c)(6)(E)* has in a case such as this.

Professor Nimmer states:

A grant of copyright "throughout the world" is terminable only with respect to uses within the geographic limits of the United States. Because copyright has no extraterritorial operation, arguably American law is precluded from causing the termination of rights based upon foreign copyright laws. A response to this argument is that the nonextraterritoriality of copyright is irrelevant because the question here is one of contract law, not copyright law, in that it concerns the effect of a contract granting certain rights. The contract law of one nation may be applicable in another nation under the [**114] latter's conflict-of-laws rule. The conclusive answer to this problem lies in the text of the termination provisions of the Copyright Act, [*1141] which expressly provide that statutory termination "in no way affects rights arising under . . . foreign laws" -- that is, under foreign copyright (not contract) laws. Thus, even if the conflicts rule of a foreign nation were to call for application

542 F. Supp. 2d 1098, *1141; 2008 U.S. Dist. LEXIS 27217, **114; 86 U.S.P.Q.2D (BNA) 1899

of the American termination rule as a rule of contract law, that rule by its own terms excepts from termination the grant of those rights arising under foreign copyright laws.

3 NIMMER ON COPYRIGHT § 11.02[B][2] at 11-19.

Professor Patry agrees: "Accordingly, where a U.S. author conveys worldwide rights and terminates under either section, grants in all other countries remain valid according to their terms or provisions in other countries' laws." 7 PATRY ON COPYRIGHT § 25:74.

Plaintiffs argue, however, that the section also allows for the possibility that the terminating party gains not only the domestic rights to the copyright in question (the "rights covered by the grant that arise under this title"), but also retains whatever other rights it may have under "Federal, State, or foreign laws." From this [**115] premise, plaintiffs argue that, because an accounting between co-owners in a copyright is governed by state law, and California state law allows for the sharing of foreign profits between tenants in common, so, too, should defendants be forced to account for their foreign profits. This argument misses the fact that all plaintiffs have gained from the termination right is a recapturing of the *domestic* copyright in the Superman material published in *Action Comics*, Vol. 1. Defendants continue to hold, unaffected, separate rights to that copyright arising under *foreign* copyright laws. This distinction is important for two reasons.

First, such an open effort to extend the reach of U.S. copyright law overseas, as plaintiffs' reading of the statute avows, would be in direct contradiction to not only the plain terms of the statute (stating that termination does *not* affect another parties' rights arising under the copyright laws of "foreign" nations), but stands in stark juxtaposition to the longstanding rule "that the copyright laws [of this country] have no application beyond the U.S. border." *Los Angeles News Serv. v. Reuters TV Intern.*, 340 F.3d 926, 931 (9th Cir. 2003). If Congress contemplated [**116] the ability to attach or otherwise force the accounting of foreign profits to which the original grantee or its successors are legally entitled under the copyright laws of other nations through the backdoor of applying state law tenant in common principles, one would have expected such an intention to have been made expressly, and certainly with some

explanation given the incongruity that arises from the statutory language's notation that termination did *not* affect another's rights under "foreign laws."

Second, the cases cited by plaintiffs requiring one co-owner to account to the other for both domestic and foreign profits involved parties who were co-owners to the "world-wide" copyright in the work and, not as with the termination right, to only the domestic copyright. *See Goodman v. Lee*, 78 F.3d 1007, 1010 (5th Cir. 1996) (noting that declaratory action was filed after other co-owner obtained a "renewal of the copyright" listing himself as the sole author in the song "Let the Good Times Roll"). Plaintiffs have directed the Court to no case wherein a co-owner of the *domestic* copyright in a work was allowed an accounting of a co-owner's foreign profits. *See* 3 NIMMER ON COPYRIGHT § 11.02[B][1] [**117] at 11-17 ("Only such rights as were originally the subject of a grant will revert upon the termination of that grant. [T]o the extent that a grant includes rights based upon federal law other than the Copyright Act, state law, or foreign law, [*1142] such rights are not subject to termination").

Accordingly, the Court holds that the termination notice affects only the *domestic* portion of Siegel's and Shuster's 1938 worldwide grant ("all rights") to Detective Comics of the copyright in the Superman material contained in *Action Comics*, Vol. 1. The termination notice is *not* effective as to the remainder of the grant, that is, defendants exploitation of the work abroad under the aegis of foreign copyright laws. Thus, although defendants retain the unfettered right to exploit the works (and retain the profits derived therefrom) in foreign nations, they may do so domestically only as a co-owner (through Shuster's share) of the works. *See Oddo v. Ries*, 743 F.2d 630, 632-33 (9th Cir. 1984) (""[E]ach co-owner has an independent right to use or license the use of the copyright. . . . A co-owner of a copyright must account to other co-owners for any profits he earns from licensing or use of the copyright [**118] . . . ."). As such, defendants must account to plaintiffs only for the profits from such domestic exploitation of the Superman copyright.

2. *Trademark Rights and Ownership of Pre-Termination Derivative Works*

As noted in the previous section, the right to termination leaves undisturbed the original grantee or its successors in interests rights arising under "federal law." *17 U.S.C. § 304(c)(6)(E).* Among the rights based on

542 F. Supp. 2d 1098, *1142; 2008 U.S. Dist. LEXIS 27217, **118;
86 U.S.P.Q.2D (BNA) 1899

federal law that defendants secured over the years were several trademarks that utilized or incorporated portions of the copyrighted material found in *Action Comics*, Vol. 1. Defendants seek a declaration from the Court that, even if successful in terminating the Superman copyright contained in *Action Comics*, Vol. 1, plaintiffs cannot share in defendants' profits "purely attributable to [Superman] trademark rights." (Defs' Reply at 11). Plaintiffs admirably concede the point in their briefs, but argue that they are "entitled to profits from mixed trademark uses to the extent such exploit recaptured copyright elements (e.g., 'Superman costume')." (Pls' Reply at 49 n.28).

Similarly, defendants seek a declaration that, to the extent plaintiffs are entitled to an accounting [**119] as a result of their successfully terminating the 1938 grant, it should not include any profits attributable to the "post-termination exploitation of derivative works [of *Action Comics*, Vol. 1,] prepared prior to termination." (Defs' Mot. Summ. J. at 28). Again, plaintiffs concede, as they should, this point. (Pls' Reply at 49 n.28). *Section 304(c)(6)(A)* provides that derivative works created during the grant (meaning up until the termination effective date) may continue to be exploited after termination. Again, however, plaintiffs hold out as a separate question the existence of pre-termination derivative works that are "altered so as to become post-termination derivative works." (Pls' Reply at 49 n.28).

Given that these contentions by plaintiffs -- the recapture or accounting from the mixed use of trademark and copyright and what to do with any alteration in pre-termination derivative works -- are not the subject of the present motion, the Court will not address them in this Order. Even though it is clear that these issues will impact the accounting of profits in some manner, they cannot be fully adjudicated based on the narrow record currently before the Court and absent a full briefing [**120] of the particular mixed uses or altered pre-termination derivative works that are specifically at issue.

Accordingly, the Court holds that the profits defendants garner from the use of Superman trademarks that "are purely attributable to [those] trademark rights," and from its use of unaltered pre-termination [*1143] derivative works are not subject to accounting.

3. *Accounting for Profits of Warner Bros. Entertainment,*

*Inc., and Time Warner, Inc.*

The parties are in disagreement over whether plaintiffs may directly share in the profits from the exploitation of the works by DC Comics corporate sibling, Warner Brothers Entertainment, Inc. ("WBEI"), and its corporate parent, Time Warner, Inc. ("TWI"). The genesis for this claim stems from certain inter-corporate transactions amongst these actors concerning the Superman copyright. In the same year that plaintiffs' termination notices became effective, DC Comics executed an exclusive license in favor of WBEI (and a year later a separate exclusive license with WBEI's television division) to exploit the Superman copyright for the remainder of its extended renewal term in certain media formats, notably movies, television, and home video. (Decl. Marc [**121] Toberoff, Exs. E & F). Defendants contend that, as co-owners of the joint works at issue, plaintiffs are entitled to an accounting of the profits made by DC Comics (in the form of the licensing fees it has collected), but that plaintiffs are not entitled to an accounting of the profits WBEI has made pursuant to the license. [10]

> 10    It appears to the Court that because TWI is not a licensee of the works, it may not have any profits to account for; however, absent evidence of this fact from either side (or the representation that such is not the case), the Court cannot rule on this issue at this time.

Defendants' argument is not without support. The Court starts with the general principle that "each co-owner has an independent right to use or license the use of the copyright[, but that a] co-owner of a copyright must account to other co-owners for any profits he earns from licensing or use of the copyright." *Oddo, 743 F.2d at 633*. Licensees, on the other hand, are accountable only to their licensors, and owe no duty of accounting to the non-licensor co-owner of a copyright the licensee exploits. *See Ashton-Tate Corp. v. Ross, 916 F.2d 516, 523 (9th Cir. 1990)*.

Plaintiffs, however, take a [**122] different view of the licenses, arguing that "Warner has stepped exclusively into DC's shoes with respect to such motion picture and television copyrights." (Pls' Opp. at 30). In other words, the exclusive license had the net effect of substituting WBEI for DC Comics as a joint owner with plaintiffs (assuming the successful termination of the 1938 grant) insofar as the exploitation of the copyright in

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 59 of 132    Page ID #:6523

Page 32

542 F. Supp. 2d 1098, *1143; 2008 U.S. Dist. LEXIS 27217, **122;
86 U.S.P.Q.2D (BNA) 1899

the mediums in which those licenses are concerned.

This theory, however, requires large legal leaps that are not countenanced by current law. To begin, in order for an exclusive license in the entirety of the interest in a joint work itself (such as Superman) to be effective, the consent of both joint owners in the copyrighted work is required. *See* 2 PATRY ON COPYRIGHT § 5:7 ("A joint author (or co-owner) may not, however, transfer *all* interest in the work without the other co-owner's express (and written) authorization, since that would result in an involuntary transfer of the other joint owner's undivided interest in the whole"). The same requirement for prior consent holds true even with respect to the wholesale transfer of exclusive licenses in subparts to a copyright, such as a license [**123] transferring all the stage rights (not just the joint owner's rights) to a novel but not the movie or literary rights. *Cf.* 1 *NIMMER ON COPYRIGHT § 6.12[C][3]* at 6-38.8 to 6-39.

Such consent simply did not occur here. DC Comics unilaterally sought to give an exclusive license to the entirety in the Superman property's movie and television rights to WBEI post-termination. As a result, the attempt to provide an exclusive [*1144] license was ineffective. At best, all that was conveyed was a non-exclusive license, and, at worst, a license agreement whose terms are null and void absent ratification by plaintiffs. *See* 3 *NIMMER ON COPYRIGHT § 10.03[A][7]* at 10-51.

Applying these principles in a vacuum, the Court would readily reach the conclusion championed by defendants: WBEI, as a licensee, is answerable only to DC Comics as its licensor; that DC Comics is the only entity that must account for profits to plaintiffs; and, absent exploitation of the works by DC Comics itself, that DC Comics' accounting to plaintiffs is limited to those profits derived from licensing the Superman copyright to WBEI.

However, the Court's analysis does not occur in vacuum; rather, it must take into account the relevant facts [**124] of this case, particularly given that the accounting sought by plaintiffs in this action is an equitable remedy, and the Court must conduct its inquiry accordingly. *See Oddo, 743 F.2d at 633* ("A co-owner of a copyright must account to other co-owners for any profits he earns from licensing or use of the copyright, . . . but the duty to account does not derive from the copyright law's proscription of infringement. Rather, it comes from equitable doctrines relating to unjust

enrichment and general principles of law governing the rights of co-owners.") (internal quotation marks and citations omitted).

Here, the relatedness of the transferor and the transferee entities cannot be ignored. The evidence before the Court reveals that the relevant entities are all closely related entities -- parent corporations, wholly and partially-owned subsidiaries, partners, sibling business entities (owned directly or indirectly by the same parent) -- although it is not entirely clear to the Court exactly what those relationships have been at all relevant times. This fact alone raises a specter of a "sweetheart deal" entered into by related entities in order to pay a less than market value fee for licensing [**125] valuable copyrights. If such were the case, the related entity might be able to exploit the copyrights without the responsibility of answering to the co-owner of a joint work, and the licensor co-owner would thereby be relieved of the responsibility of accounting for any profits (other than a greatly reduced licensing fee) to the non-licensor co-owner. This result would be inequitable.

This concern is bolstered by the declaration of Paul Levitz, President and Publisher for DC Comics, which states that under the post-2003 corporate restructuring of Time Warner's business, "for operating management purposes, DC reports" not to immediate corporate parent WCI, but to its sibling corporation "WBEI," the licensee of the rights at issue in this action. (Decl. Paul Levitz P 17). As Levitz explains, "I report to and obtain approvals from WBEI's President and Chief Operating Officer before making significant acquisitions or certain financial decisions or investments that are outside the scope of DC's customary acquisitions and investments; before implementing meaningful strategic changes; and before embarking on something substantially outside DC's normal course of business." (*Id.*). Although [**126] this is not evidence of what occurred at the time of the license, it is still probative evidence of the relatedness of the licensee and licensor that could result in an extremely favorable licensing arrangement that works to the detriment of the non-licensor co-owner. These open issues also touch upon factors to be considered in analyzing alter ego claims. *See Sonora Diamond Corp. v. Superior Court, 83 Cal.App.4th 523, 99 Cal. Rptr. 2d 824 (2000); Mesler v. Bragg Management Co., 39 Cal.3d 290, 216 Cal. Rptr. 443, 702 P.2d 601 (Cal. 1985)* ("The essence of the alter ego doctrine, in which it is claimed that an opposing party is using the corporate form

542 F. Supp. 2d 1098, *1145; 2008 U.S. Dist. LEXIS 27217, **126;
86 U.S.P.Q.2D (BNA) 1899

[*1145] unjustly, is that justice be done. What the formula comes down to, once shorn of verbiage about control, instrumentality, agency and corporate entity, is that liability is imposed to reach an equitable result").

Whether the license fees paid represents the fair market value therefor, or whether the license for the works between the related entities was a "sweetheart deal," are questions of fact that are not answered on summary judgment, certainly not without the benefit of expert testimony which has not been presented by either party on this topic. The Court therefore concludes that summary [**127] judgment on this issue is inappropriate at this time. [11]

> 11 Because the Court concludes that defendants' motion for summary adjudication of this issue must be denied for the reasons stated above, the Court does not at this time resolve other arguments raised by plaintiffs regarding this issue.

**CONCLUSION**

After seventy years, Jerome Siegel's heirs regain what he granted so long ago -- the copyright in the Superman material that was published in *Action Comics*, Vol. 1. What remains is an apportionment of profits, guided in some measure by the rulings contained in this Order, and a trial on whether to include the profits generated by DC Comics' corporate sibling's exploitation of the Superman copyright.

DATE: March 26, 2008

/s/ Stephen G. Larson

STEPHEN G. LARSON

UNITED STATES DISTRICT JUDGE

# EXHIBIT I



LEXSEE 658 F. SUPP. 2D 1036

**JOANNE SIEGEL and LAURA SIEGEL LARSON, Plaintiffs, v. WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; and DC COMICS, Defendants.**

**Case No. CV-04-8400-SGL (RZx)**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION**

*658 F. Supp. 2d 1036*; *2009 U.S. Dist. LEXIS 78193*

**August 12, 2009, Decided**
**August 12, 2009, Filed**

**SUBSEQUENT HISTORY:** Reconsideration denied by, Amended by *Siegel v. Warner Bros. Entm't, 2009 U.S. Dist. LEXIS 104821 (C.D. Cal., Oct. 30, 2009)*

**PRIOR HISTORY:** *Siegel v. Warner Bros. Entm't, Inc., 2009 U.S. Dist. LEXIS 66115 (C.D. Cal., July 8, 2009)*

**COUNSEL:** [**1] For Joanne Siegel, an individual, Laura Siegel Larson, an individual, Plaintiffs: Keith Gregory Adams, Marc Toberoff, Nicholas Calvin Williamson, LEAD ATTORNEYS, Toberoff & Associates P C, Los Angeles, CA.

For Twentieth Century Fox Film Corporation, Movant: Betsy A Zedek, Fox Group Legal, Los Angeles, CA.

For Warner Bros Entertainment Inc, a corporation: Defendant: Anjani Mandavia, Michael Bergman, LEAD ATTORNEYS, Adam Beriah Hagen, Weissmann Wolff Bergman Coleman Grodin & Evall, Beverly Hills, CA; James D Weinberger, Roger L Zissu, LEAD ATTORNEYS, Fross Zelnick Lehrman & Zissu, New York, NY; Jonathan Zavin, LEAD ATTORNEY, PRO HAC VICE, Loeb & Loeb LLP, New York, NY; Patrick T Perkins, LEAD ATTORNEY, Perkins Law Offices, Cold Spring, NY.

For Time Warner Inc, a corporation, Defendant: Anjani Mandavia, Michael Bergman, LEAD ATTORNEYS, Adam Beriah Hagen, Weissmann Wolff Bergman Coleman Grodin & Evall, Beverly Hills, CA; James D Weinberger, Roger L Zissu, LEAD ATTORNEYS, Fross Zelnick Lehrman & Zissu, New York, NY; Patrick T Perkins, LEAD ATTORNEY, Perkins Law Offices, Cold Spring, NY.

For DC Comics, a New York General Partnership, Defendant: Anjani Mandavia, LEAD ATTORNEY, Adam Beriah Hagen, [**2] Michael Bergman, Weissmann Wolff Bergman Coleman Grodin & Evall, Beverly Hills, CA; David Aaron Grossman, LEAD ATTORNEY, Loeb & Loeb LLP, Los Angeles, CA; James D Weinberger, Roger L Zissu, LEAD ATTORNEYS, Fross Zelnick Lehrman & Zissu, New York, NY; Patrick T Perkins, LEAD ATTORNEY, Perkins Law Offices, Cold Spring, NY.

For Does, 1-10, Defendant: Anjani Mandavia, LEAD ATTORNEY, Weissmann Wolff Bergman Coleman Grodin & Evall, Beverly Hills, CA.

For Bad Hat Harry Productions, Inc, Bryan Singer, Intervenors: Christopher G Caldwell, Michael Dietz Roth, LEAD ATTORNEYS, Caldwell Leslie and Proctor, Los Angeles, CA.

For DC Comics, a New York General Partnership,

658 F. Supp. 2d 1036, *; 2009 U.S. Dist. LEXIS 78193, **2

Counter Claimant: Anjani Mandavia, Michael Bergman, LEAD ATTORNEYS, Weissmann Wolff Bergman Coleman Grodin & Evall, Beverly Hills, CA; Patrick T Perkins, LEAD ATTORNEY, Perkins Law Offices, Cold Spring, NY; David Aaron Grossman, Loeb & Loeb LLP, Los Angeles, CA; James D Weinberger, Roger L Zissu, Fross Zelnick Lehrman & Zissu, New York, NY; Jonathan Zavin, LEAD ATTORNEY, PRO HAC VICE, Loeb & Loeb LLP, New York, NY.

For Time Warner Inc, a corporation, Counter Claimant: Anjani Mandavia, Michael Bergman, LEAD ATTORNEYS, Adam Beriah Hagen, [**3] Weissmann Wolff Bergman Coleman Grodin & Evall, Beverly Hills, CA; Patrick T Perkins, LEAD ATTORNEY, Perkins Law Offices, Cold Spring, NY; David Aaron Grossman, Loeb & Loeb LLP, Los Angeles, CA; James D Weinberger, Roger L Zissu, Fross Zelnick Lehrman & Zissu, New York, NY.

For Warner Bros Entertainment Inc, a corporation, Counter Claimant: Michael Bergman, LEAD ATTORNEY, Weissmann Wolff Bergman Coleman Grodin & Evall, Beverly Hills, CA; Patrick T Perkins, LEAD ATTORNEY, Perkins Law Offices, Cold Spring, NY; David Aaron Grossman, Loeb & Loeb LLP, Los Angeles, CA; James D Weinberger, Roger L Zissu, Fross Zelnick Lehrman & Zissu, New York, NY.

For Laura Siegel Larson, an individual, Joanne Siegel, an individual, Counter Defendants: Keith Gregory Adams, Marc Toberoff, Nicholas Calvin Williamson, LEAD ATTORNEYS, Toberoff & Associates P C, Los Angeles, CA.

**JUDGES:** STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** STEPHEN G. LARSON

**OPINION**

[*1041]  ORDER RESOLVING ADDITIONAL ISSUES

The 1976 Copyright Act contains many intricate formalities that an author (or his or her heirs) must navigate to successfully terminate the grant to the copyright in an original work of authorship, but perhaps none is more fundamental an impediment [**4] than the one excluding from the reach of termination the copyright

"in a work made for hire." *17 U.S.C. § 304(c)*; *see* 1 MELVILLE B. NIMMER, *NIMMER ON COPYRIGHT § 5.03[A]* at 5-12 (2008) (commenting that the exclusion "relating to termination of transfers is probably the most important feature of the work for hire doctrine with respect to works created at present"); 3 WILLIAM F. PATRY, PATRY ON COPYRIGHT § 7:42 (2008) (labeling as a "significant exclusion" to the right to terminate the grant in "work-for-hire creations"). The complexity of the 1976 Act's termination procedures stems as much from the fact that those provisions intersect with and must be construed in light of the body of copyright law that existed at the time the works were created (here, the 1909 Copyright Act) as from the intricacies set forth in the 1976 Act itself.

This is particularly true when applying the "work made for hire" bar to works created under the auspices of the 1909 Act, as the law developed by the courts under the Act was oftentimes confused and not well-delineated, with its dimension continuing to evolve long after the effective date [*1042] of the 1976 Act. *See Easter Seal Society for Crippled Children and Adults of Louisiana, Inc. v. Playboy Enterprises, 815 F.2d 323, 325 (5th Cir. 1987)* [**5] (commenting that the term "work for hire" was undefined in statute, and that a "substantial body of cases developed as courts worked out the definition").

Having previously addressed the iconic superhero Superman's first appearance in *Action Comics* No. 1 in its earlier decision, the Court now considers the myriad relationships and contractual arrangements surrounding the published works of Superman by his creators Jerome Siegel and Joseph Shuster for the years 1938 to 1943. The task of disentangling these relationships and agreements, and giving legal meaning to them, lies at the heart of this case.

**I. FACTUAL BACKGROUND**

When the Court last left Superman, the copyright in the earliest published version of the character, as depicted in the comic book *Action Comics* No. 1, had been reunited with the heirs of one of its creators, Jerome Siegel. *See Siegel v. Warner Bros. Entertainment Inc., 542 F. Supp. 2d 1098, 1145 (C.D. Cal. 2008)*. One might have thought that with the extensive discussion of Superman's creation and development therein, little more would be left to be said about Superman's first years in print; as the Court has since learned, there is more to the story.

658 F. Supp. 2d 1036, *1042; 2009 U.S. Dist. LEXIS 78193, **5

Like the arc of a [**6] comic book serial, there has been an unfolding of evidence regarding the creation and subsequent publication of Superman. The parties have presented to the Court previously undisclosed evidence surrounding the back story to Superman's creation before 1938, the character's publication for the years 1938 to 1943 in comic books published by Detective Comics after *Action Comics* No. 1, and in the syndication of daily newspaper comic strips through the McClure Newspaper Syndicate.

### A. *Pre-1938 Years: Superman's Initial Creation and Development*

As recounted in the Court's earlier Orders, the development of Superman evolved, with the character being re-worked by Siegel and Shuster over a period of years. However, missing from that account and now disclosed is the existence of another collaborator.

The story picks up with Siegel dramatically rescuing from the flames the cover art work from the pair's initial version of the Superman character in heroic form (as a hulking strong man, sans super-human powers or alien origin, in the fashion of Flash Gordon) after Shuster grew despondent when the publisher to the comic book *Detective Dan* rescinded its offer to publish the material. *See Siegel, 542 F. Supp. 2d at 1103*. [**7] This led to a split of sorts with Siegel, with Shuster apparently deciding he was no longer interested in continuing to illustrate Superman, and Siegel apparently concerned that the character was going nowhere under Shuster's artistic direction. As Siegel later recounted, after the debacle with *Detective Dan,* Shuster became "very discouraged" and decided that he "did not want to work on Superman anymore." (Decl. Marc Toberoff, Ex. F at 45). Undeterred, Siegel sought out other artists to illustrate his scripts as he continued to flesh out the Superman character. *See Siegel, 542 F. Supp. 2d at 1103* ("Undaunted, Siegel continued to tinker with his character, but decided to try a different publication format, a newspaper comic strip").

Notably, Siegel approached illustrator Russell Keaton, who at that time was providing the art work for the Buck Rogers Sunday newspaper strips. For a few months spanning the summer and fall of [*1043] 1934, the pair exchanged correspondence and scripts for Superman. This activity culminated with Siegel and Keaton producing a week's worth of newspaper comic strips (or nine horizontal strips, each containing four panels, with dialogue and illustrations), and Siegel [**8] drafting for Keaton's consideration three scripts (for which no illustrations were ever created) for Superman that, taken together, demonstrated the evolving nature of the character.

The story portrayed in the scripts and the week's worth of illustrated material was devoted exclusively to Superman's upbringing as a child by a couple known only as Sam and Molly Kent, and included the first inklings of a science fiction aspect to the character, albeit with a much different take on Superman's now well-familiar origins.

In this earlier version, Siegel conceived of Superman as having been sent as an infant back in time, to then-present day America (circa 1935), in a time machine created by "the last man on Earth" before the planet's destruction. The story is also notable as it contained the first expression of Superman's now familiar super-human powers: That he had a "physical structure millions of years advanced from" those living in 1935, leading him to possess "colossal strength," the ability to "leap over a ten story building," "run[] as fast as an express train," and stated that "nothing less than a bursting shell could penetrate his tough skin." Upon his arrival, Superman spoke a language [**9] that his adoptive parents did not understand, and the secret of his origins was tied to a cryptic mystery note accompanying him in the time machine. When, as an adult, Clark Kent was presented with the mystery note, he could not understand the words written on it. Both the illustrated strips and the scripts contain the by-line crediting its authorship to "Jerome Siegel and Russell Keaton." (Decl. Marc Toberoff, Exs. C, D & E).

Keaton eventually chose not to take a chance on someone with such little experience writing comics; by sometime in the first half of 1935, Siegel and Shuster resumed their creative partnership and were again working together on Superman, with the pair poised at the tipping point that would lead them to create the version of the character that would transform the comic book industry. In fact, it was shortly thereafter that Siegel would have his breakthrough moment, conceiving of the now-familiar Superman story on a "hot summer night." It was then that Siegel combined his now developed Superman character as a mythic superbeing capable of fantastic feats with a new pseudo-scientific explanation for those feats to make them more plausible -- the

658 F. Supp. 2d 1036, *1043; 2009 U.S. Dist. LEXIS 78193, **9

character's extra [**10] terrestrial origin. Shuster then went about creating a graphical representation of Siegel's character, replete with costume and distinctive physical features:

> The two then set about combining Siegel's literary material with Shuster's graphical representations. Together they crafted a comic strip consisting of several weeks' worth of material suitable for newspaper syndication. Siegel typed the dialogue and Shuster penciled in artwork, resulting in four weeks of Superman comic strips intended for newspapers. The art work for the first week's worth of "daily comic strips was completely inked" and thus ready for publication. The "three additional weeks of 'Superman' newspaper comic strip material" differed from the first week's material "only in that the art work, dialogue and the balloons in which the dialogue appeared had not been inked," instead [*1044] consisting of no more than black-and-white pencil drawings.

*Siegel, 542 F. Supp. 2d at 1105.* [1] Much of this four weeks' worth of material was later re-cut and re-pasted into a comic book format and published in the first installment of Detective Comics' comic book magazine *Action Comics.* Not widely known is the amount of material, beyond that [**11] published, the pair had created during these formative years, outside the watchful eye of any publisher.

> 1    In its March 26, 2008, Order, the Court describes this "hot summer night" moment as occurring in 1934; however, the undisputed evidence now points to an undefined date in the summer of 1935.

To begin, not *all* of the four weeks of pre-existing Superman material created by Siegel and Shuster found its way into print in *Action Comics* No. 1. During the editing process, Detective Comics decided to exclude the first weeks' worth of material in order to accommodate space for other features in the comic book. As later explained by noted comic artist/writer/historian James Steranko in his 1989 forward to DC Comics publication of *Superman Archives, Volume 1:*

McClure Syndicate agent M.C. Gaines, an early comics pioneer, just happened to have the Siegel and Shuster submission on his desk when president Harry Donenfeld [of Detective Comics] phoned, inquiring about original material to fill a new magazine he was assembling. . . . Donenfeld recognized the material's appeal and ordered the newspaper strip repasted into comic-book format, *with the first week eliminated to accommodate available space* [**12] *in the magazine,* which was christened **Action Comics** . . . . The opening tale was reprinted *in its entirety* in **Superman** 1 . . . .

(emphasis added).

Indeed, if one compares the material published in *Superman* No. 1 with that in *Action Comics* No. 1, the two mirror one another in every respect except that *Superman* No. 1 contains an additional six pages (the first six pages in the comic) filling in more details about Superman's formative years as well as providing the prologue to the story told in *Action Comics* No. 1 *(see* Addendum A for the first six pages of *Superman* No. 1). Included in the famous first edition re-publication of *Superman* No. 1 is a forward by Siegel himself, which gives the following description of the origins and time of creation for these first six pages of material:

> M.C. Gaines became involved in this enterprise[, the publication of *Superman* No. 1]. Readers may be especially interested in the letter he wrote to me on March 27, 1939 on Detective Comics, Inc. stationary: "With further reference to the SUPERMAN book . . . we have decided . . . that for the first six pages of the SUPERMAN book that we would like you to take the first page of SUPERMAN, which appeared in ACTION [**13] COMICS #1, and by elaborating on this one page, using different ideas than those contained on this page, work up *two* introductory pages, the last panel of this second page to consist of the panel marked 'X' on the enclosed sheet. On these two pages, you will of course leave out the

658 F. Supp. 2d 1036, *1044; 2009 U.S. Dist. LEXIS 78193, **13

scientific explanation of Clark Kent's amazing strength, as we want a separate page on that item to use further back in the book with the heading as follows: 'Scientific Explanation of Superman's Amazing Strength', in which you will incorporate five or six various explanations, which we discussed while you were here in New York several days ago.

(Decl. Marc Toberoff, Ex. GG).

Thus, the first two pages in *Superman* No. 1 was composed of material created by Siegel and Shuster in 1939 when the comic book was published, but the following four pages in the comic (pages three through six) represent the first week of Superman material the pair had crafted in 1935.

Beyond this first four weeks of material (containing Siegel's dialogue and Shuster's [*1045] illustrations) that was later re-cut and re-pasted in comic book format, Siegel also had written Superman material to which Shuster provided no illustrations.

For example, [**14] Siegel wrote a paragraph previewing future Superman exploits which was contained at the end of a "nine-page synopsis of the storyline appearing in the three weeks of penciled daily Superman newspaper comic strips." *542 F. Supp. 2d at 1105*. The paragraph Siegel wrote previewing future Superman exploits has now been produced in this case:

This ends the first month's release and yet the potentialities of the character, SUPERMAN, has barely been scratched. He's headed for the most exciting and yet humorous adventures this world has even seen. He will win a war single-handed, battle an airplane with his bare hands, swim several hundred miles and think nothing of it, etc.,. He's *different* and sure to become the idol of young and old. He'll participate in sports and astound the nation; he'll single-handed rescue a town from a flood through his super-strength. Unlike most adventure strips the scene of the story will not be laid in some fantastic, unknown jungle or planet or country, but

will be all the more astounding for having its locale on familiar streets. SUPERMAN will operate against a background of America's most well-known cities, buildings, and pleasure-spots.

(Decl. Marc Toberoff, [**15] Ex. A at 12 (emphasis in original)).

These broad outlines later found expression in the plot in *Action Comics* No. 2, which involved Superman single-handedly averting a war brewing in the fictional country of San Monte that had been instigated by a corporate war profiteer. In that comic book, there is a series of panels revealing Superman battling a fighter plane in mid-air with his bare hands, and there is also a series of panels depicting Superman swimming a great distance in the ocean. *Action Comics* No. 4 similarly gives concrete expression to the idea pitched in Siegel's paragraph, telling the story of Superman interceding in a college football game and using his superpowers on the field to astound the crowd. Finally, in *Action Comics* No. 5, Superman is shown saving a town from a flood after a huge dam breaks.

Moreover, even with the renewed partnership with Shuster, Siegel still looked to and would lift material he had created while corresponding with Keaton, and use it for publications of his newly conceived Superman character. Thus, in November, 1934, Siegel sent to Keaton, a nine-page "synopsis of what will occur during the next two months" to convince a potential publisher to [**16] bring the extant version of Superman to print. The synopsis submitted by Siegel is of the college football story alluded to a year later in Siegel's "future exploits" paragraph and tracks almost precisely the storyline, both the dialogue and the action direction, that was later published by Detective Comics in *Action Comics* No. 4. [2] The following example, comparing [*1046] Siegel's 1934 script with a portion of the published material found in *Action Comics* No. 4, is typical of this near seamless interweaving between these two items. The narrative from Siegel's script is followed by the embodiment thereof in *Action Comics* No. 4:

*Script* (page 6)

The coach says: "This is going to be good! The sap is running for a goal, with everyone on the field trying to stop him.

202

658 F. Supp. 2d 1036, *1046; 2009 U.S. Dist. LEXIS 78193, **16

There goes Martin for him. Watch Burke come down faster than a window-shade!"

Martin is the first to reach SUPERMAN. As he dives for a tackle he says: "This is for poking into my locker!" SUPERMAN's outhrust arm connects with Martin's face, thrusting off the tackler. "And this," says SUPERMAN,"is for busting me on the jaw!"

Three more players close in on SUPERMAN, from all sides. The coach says to his assistant: "He'll have to be a superman [**17] to get by them." SUPERMAN leaps to the shoulder of one of the three oncoming players, and springs on over the other two. The coach's assistant replies: "There's your superman!"

SUPERMAN is already half-way down the field. The coach's assistant says: "I believe he's going to make it!" To which Coach Oliver replies: "Just fool's luck so far. Wait until he meets our 'unbeatables' -- Stevens, Burns, and Dennis." The entire remaining team piles onto SUPERMAN. The coach yells: "They've got him!"

*Action Comics* No. 4 (page 8):

[*1047] [SEE Action Comics No. 4 IN ORIGINAL]

2  Plaintiffs also assert that there are additional pre-1938 Superman material, in the form of scripts, or synopses for daily newspaper strips, that were created. (Pls.' Opp. at 6 ("scripts (continuity) for 15 Superman daily comic strips (created by Siegel c. 1934) and a 9 page synopsis covering 2 months of daily (at 6 days per week) comic strips of Superman (created by Siegel c. 1934)")). This reference to additional newspaper comic strip material is misleading. The material in question is nothing more than a reference to the newspaper strips that were later repackaged and published in *Action Comics* No. 1. *(See* Decl. Marc Toberoff, Ex. [**18] B ("The drawn daily strips of Superman, herein described, were later cut up, pasted onto pages, and reproduced

together with the art of daily strip week one and two in ACTION COMICS No. 1, June, 1938 issue"); Ex. X at 176 ("In addition, I prepared a synopsis of the story continuity appearing in the three weeks of penciled daily strips. Because we did not want to risk the loss of all the art work we had done, either through the mails or a failure to return it, the synopsis was sent to prospective out-of-town newspaper syndicates and publishers, in lieu of the three weeks of penciled strips, together with the first week of inked strips")). Plaintiffs have not come forward with evidence to refute the fair inference of the evidence that is of record, that the "synopsis" mentioned is nothing more than what was later re-cut and re-pasted in *Action Comics* No. 1.

*B. Superman's Publication in Comic Books and Newspaper Strips*

Siegel and Shuster's well-traveled Superman concept was eventually published by Detective Comics in the premiere issue of its comic book magazine *Action Comics* in April, 1938, becoming an almost instant success whose popularity endures to this day and whose depiction has [**19] been transferred to various media formats. It is in this transfer to different formats that yet another portion of the untold history of Superman's first years in print takes shape.

Shortly before the publication of *Action Comics* No. 1, Siegel and Shuster signed a grant of their rights in the copyright to the Superman material contained therein to Detective Comics. This assignment was executed on March 1, 1938, giving to Detective Comics "such work and strip, all good will attached thereto and exclusive right[s] to the use of the characters and story, continuity and title of strip contained therein . . . to have and hold forever," in exchange for $ 130. In the grant, Siegel and Shuster further agreed that they would "not employ said characters or said story in any other strips or sell any like strip or story containing the same characters by their names . . . without obtaining [Detective Comics'] written consent therefore."

Superman's appearance in *Action Comics* No. 1 was followed by subsequent installments, "published at regular intervals, each succeeding issue having a SUPERMAN [*1048] comic strip prepared by [Siegel and Shuster], who continue[d] to be paid by DETECTIVE COMICS, INC. at the [**20] agreed rate

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 68 of 132    Page ID #:6532

Page 7

658 F. Supp. 2d 1036, *1048; 2009 U.S. Dist. LEXIS 78193, **20

of $ 10 per page." (April 20, 2007, Decl. Bergman, Ex. S at 282 (Westchester referee's Finding of Fact No. 36)). [3] Thus, *Action Comics* No. 2 was published on May 25, 1938; *Action Comics* No. 3 was published on June 25, 1938; *Action Comics* No. 4 was published on July 25, 1938; *Action Comics* No. 5 was published on August 25, 1938; and *Action Comics* No. 6 was published on September 26, 1938.

    [3] The Court previously held that the referee's factual findings are binding in this litigation. *Siegel, 496 F. Supp. 2d at 1136.*

    It is apparent from the undisputed evidence that publication of Superman as a continuing feature in *Action Comics* was part of a pre-arranged, implicit understanding between the artists and Detective Comics. For instance, before Superman was accepted for publication in the first issue of *Action Comics,* Detective Comics' editor, in a letter dated January 10, 1938, voiced concerns to Siegel about Shuster's ability to handle such a continuing "feature" given his preexisting commitments to doing the art work for other regularly appearing comics for the publisher. (Decl. Michael Bergman, Ex. A ("With all the work Joe is doing now . . . could it be possible for him to still [**21] turn out 13 pages of this new feature? . . . if it were humanly possible I'd like to have him turn out this 'Superman' for the new magazine. . . . It strikes me that adding another 13 pages to his already filled schedule is loading him up to the neck. Please let me know *immediately* whether or not he can do this extra feature" (emphasis in original))).

    Similarly, correspondence from another Detective Comics' editor to the pair, *shortly before* Superman's initial appearance in *Action Comics* No. 1, also suggested that the Superman comic was envisioned by the publisher to be a regular feature in its *Action Comics* comic book for which the pair would provide continuing material. On April 8, 1938, Detective Comics sent a check in payment for their "July material," and enclosed was a letter to Siegel remarking that the publisher had "loaded [them] up with 43 pages a month" in material to produce, and expressing concern with the pair's ability to handle such a monumental task, but also reminding the pair that their "chances of . . . making more money is bound up with the success of the magazine." (Decl. Michael Bergman, Ex. B).

    Superman's acceptance for publication in comic book format apparently [**22] rekindled Siegel's interest in seeing his character syndicated in daily newspaper strips. As later explained by Shuster during the bench trial in the 1947 Westchester litigation, even with Superman's publication in *Action Comics* No. 1, he and Siegel still "wanted to see Superman in the newspapers, not in the magazines." (Decl. Marc Toberoff, Ex. N at 118). Their motive was an economic one: At this time, "black-and-white newspaper comic strips . . . were" not only "the most popular medium for comics," but were also potentially the most lucrative. *Siegel, 542 F. Supp. 2d at 1103.* Toward that end, Siegel, initially without either the approval of or notice to Detective Comics, began shopping around the now accepted, but as yet unpublished, Superman character to various newspaper publishers seeking syndication in or around March or early April, 1938. That Siegel did not first approach Detective Comics about syndicating Superman in newspapers was understandable given that, in Shuster's words, Detective Comics "wasn't running a newspaper." (Decl. Marc Toberoff, Ex. N at 118). As Siegel [*1049] later explained in an unpublished memoir titled "Creation of a Superhero":

        I continued attempting to break [**23] into newspaper syndication. On April 8, 1938, an employee in the Business Department of the McClure Newspaper Syndicate wrote to me asking if I would be agreeable to working out two weeks of "Superman" newspaper strips at no obligation to them: "You should get a letter from the publisher of these magazines before we can get down to brass tacks on Superman." He was referring to "Action Comics." He added, "The early panels describing the birth of SUPERMAN and how he came to this planet could well be expanded into several weeks releases, we think."

        On April 13, 1938, he suggested that I submit the two-weeks' sample releases of SUPERMAN around July 1st.

        I wrote a detailed two weeks "Superman" daily strip continuity account of Superman's origin on the planet Krypton; how his father and mother placed their infant child in a rocket ship and sent him to Earth, moments before Krypton

204

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 69 of 132    Page ID #:6533

Page 8

658 F. Supp. 2d 1036, *1049; 2009 U.S. Dist. LEXIS 78193, **23

exploded. And how, upon reaching Earth, the infant was rescued from the flaming space craft and grew up to become crusading SUPERMAN.

I sent the script to McClure Syndicate.

(Decl. Marc Toberoff, Ex. R).

Just before he submitted the script to McClure, Siegel wrote the following letter to Detective Comics' president, [**24] J.S. Liebowitz, on April 18, 1938: [4]

Regarding SUPERMAN. In their latest letter, McClure has instructed us to draw up the two weeks release of SUPERMAN and get them submitted on July 1st. This, Joe and I will do. When we submit the drawn up strip to them, I'll inform you at once. I've no doubt but that if you drop in on the McClure Newspaper Syndicate at that time to discuss matters, that your presence will aid materially in the selling of the strip.

(Decl. Marc Toberoff, Ex. S).

[4] Incidentally, the same day that *Action Comics* No. 1 was first published.

Siegel's unpublished memoir recounts what transpired thereafter:

On April 21, 1938, McClure responded that they preferred waiting until July 1: "Enclosed we return your continuity for your safe-keeping. Thank you for your energetic cooperation."

I knew that periodical publishers often returned to contributors, upon request, the rights other than first serial rights. Wheeler-Nicholson had written to me that this was our arrangement. I wrote to Liebowitz [at Detective Comics] that I had a newspaper syndicate interested in syndicating "Superman," and I requested that newspaper syndication rights to "Superman" be returned to Joe [Shuster] and [**25] me.

In his letter to me dated June 9, 1938, Liebowitz replied, "While it is not our intention to hold you back in any way from a possible newspaper syndication of 'Superman', we are not in a position to give you what you ask for, that is a *complete* release. If and when a syndicate makes a definite offer for the use of 'Superman', we can get together so that all of us will benefit."

On June 13, 1938, M.C. Gaines of McClure wrote to me that since I had already completed the first two weeks of the SUPERMAN strip, I should now send the material to him. "I will take this matter up at the first opportunity and let you know what we decide to do."

Joe did a terrific art job of illustrating my script for these two weeks of the daily "Superman" strip. I mailed the strips to McClure Syndicate.

(Decl. Marc Toberoff, Ex. R).

While waiting to hear back from McClure, Siegel pursued other newspaper syndicators to see if they might be interested in distributing a Superman newspaper comic strip, submitting with his pitch a copy of the two weeks' worth of material concerning Superman's origins. One other newspaper syndicator that expressed some positive feedback was The Register and Tribune Syndicate. Again, [**26] as explained by Siegel in his memoir:

Chas. E. Lounsbury of the Register and Tribune Syndicate wrote to me on August 10, 1938, in response to my letter of August [sic] 26, "We are impressed with your outline and especially your enthusiastic approach. We read with interest the optional two weeks' releases. They do strike us as exciting and original." He noted I had a proposal elsewhere, and said they could not give me a quick decision. But if I was still in the clear after Labor Day, they would be glad to hear from me.

On September 7, 1938, he again wrote that "such matters necessarily move rather

658 F. Supp. 2d 1036, *1049; 2009 U.S. Dist. LEXIS 78193, **26

slowly here. . . .

Personally I like SUPERMAN very much and believe that with a few changes it has very good possibilities." He stated that if McClure Syndicate was in a position to take on the strip, he presumed I would go ahead. I informed Liebowitz [at Detective Comics] of these developments.

(Decl. Marc Toberoff, Ex. R; *see also* Decl. Marc Toberoff, Ex. T (September 7, 1938, letter from Managing Editor Chas Lounsbury to Jerome Siegel)).

Shortly thereafter, progress was made on the McClure front. In early September, 1938, Liebowitz summoned Siegel to New York City to discuss the McClure newspaper [**27] syndication proposal. (Decl. Marc Toberoff, Ex. R ("In early September, Liebowitz asked me to come to New York to discuss the matter of McClure's interest in syndicating 'Superman'")). What happened during this early September meeting is later related in the June, 1941, Saturday Evening Post story, "Up, Up and Awa-a-y!":

From the fall of '38 on, it was all sail and no anchor. Amid the piteous sounds of syndicate editors kicking themselves, McClure negotiated with Donenfield [at Detective Comics] to handle the newspaper rights, Donenfield to receive 40 per cent. Superman was eventually placed in 230 daily and Sunday newspapers scattered throughout the Western Hemisphere. Donenfield's 1940 cut was $ 100,000.

The McClure negotiations were perceived by considerable unhappiness for the partners. They sensed -- correctly -- that syndicate editors, who had once turned Superman down, would soon come to them, hat in hand. They begged Donenfield to give back the syndicate rights.

"We can't do that," he replied, "but if one of you will come to New York, I'm sure we can work something out."

Sitting up all night in the coach for

lack of sleeper fare, Siegel arrived, rumpled and yawning, to receive [**28] the proposition: If the partners would confine all their services to Donenfield for ten years, he would permit them to do strips for McClure, himself retaining an agent's 10 per cent -- of McClure's gross, however, not his own 40 per cent. In the heat of discussion Siegel was frequently reminded that Donenfield owned all rights and could freeze the partners out. The boys signed a contract, which for the first year brought them an increase of less than $ 100 a month.

[*1050] (Decl. Marc Toberoff, Ex. M).

The transaction was structured into two separate contracts, executed by the parties [*1051] on approximately September 22, 1938: [5] An employment agreement between Detective Comics, on one hand, and Siegel and Shuster, on the other hand; and a newspaper syndication agreement among all three: Detective Comics, Siegel and Shuster, and McClure.

[5] The agreements are dated September 22, 1938 (before the publication of *Action Comics* No. 6); however, correspondence between the parties establishes that Siegel and Shuster did not return the signed agreements to Detective Comics until September 30, 1938. (See Decl. Bergman, Ex. C).

The newspaper syndication agreement gave McClure an eight-month option for a "six days [**29] a week" Superman "daily strip." If exercised, Detective Comics agreed "to permit [Siegel and Shuster] to supply 'Superman' strip exclusively to [McClure] for syndication in newspapers [throughout the world], for a minimum period of five years from June 1, 1939," with an option for McClure to "renew the agreement for a further period of five years." "[I]n consideration," McClure agreed to pay "Detective . . . forty (40%) per cent of the net proceeds from such syndication during the first year, forty-five (45%) per cent during the second year and fifty (50%) per cent thereafter." (Decl. Marc Toberoff, Ex. Q). Payment to Siegel and Shuster for their "work" created under the contract was to be done "solely" through Detective Comics.

The syndication agreement provided that Siegel and Shuster were to supply said material to McClure "on an

**206**

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 71 of 132    Page ID #:6535

Page 10

658 F. Supp. 2d 1036, *1051; 2009 U.S. Dist. LEXIS 78193, **29

advanced schedule of at least six weeks" so as to "insure ample time for distribution prior to release dates." If Siegel and Shuster failed to furnish said material in time, the agreement allowed Detective Comics to substitute "other artists to do the feature and strip." As to the Superman newspaper strip material supplied to it by Siegel and Shuster, the [**30] syndication agreement provided that McClure, not Detective Comics, would have "reasonable editorial supervision of the feature," which Siegel and Shuster promised to maintain "at the standard shown in the sample submitted." (Decl. Marc Toberoff, Ex. Q).

The syndication agreement also provided that monthly statements of McClure's net proceeds would be sent to "Detective and a copy to" Siegel and Shuster. Furthermore, *both* Detective Comics and Siegel and Shuster were given the right to inspect McClure's books and records "in reference to the feature, at any reasonable time." (Decl. Marc Toberoff, Ex. Q).

As to the copyright in the material published in the newspaper comic strips, the syndication agreement provided that it would be in McClure's name, with a "reversionary" interest in favor of Detective Comics at the conclusion of the contract's term. (Decl. Marc Toberoff, Ex. Q ("The material contained in the feature which we syndicate will be copyrighted in our name, but copyright reverts to Detective at the termination of this contract")). Toward that end, the syndication agreement made clear that "the title 'Superman' shall always remain the property of Detective," and that Detective [**31] Comics retained the copyright in Superman in all other media "except daily or weekly newspaper publication." (Decl. Marc Toberoff, Ex. Q ("Our agreement covers newspaper rights only. Radio, motion picture, silent and talkie, book and all other rights are retained and owned by Detective")). Finally, McClure agreed to provide to Detective Comics free of charge "all the original drawings of the 'Superman' strip, so that said drawings may be used by Detective in the publication" of its comic book magazines, but only "six months after [the] newspaper [strip's] release."

[*1052] The employment agreement notably differentiates provisions relating to newspaper strips and those concerning comic books. The agreement contained an opening declaration broadly asserting Detective Comics' rights to, among others, the Superman copyright. (Decl. Marc Toberoff, Ex. P ("We, Detective Comics . . .,

are the exclusive owners of comic strips known by the titles 'Superman'")). The employment agreement further noted up front that Siegel and Shuster had, up to that time, been doing the "art work and continuity for [the Superman] comic[] for [Detective, and that Detective] wish[ed] [for them] to continue to do said work [**32] and hereby employ and retain you for said purposes for the period of this contract." The following sentence then recited Siegel and Shuster's agreement to "supply [Detective] each and every month hereafter, in sufficient time for publication in our monthly magazines, sufficient copy and art for each of said features each month hereafter." The agreement distinguished this duty from Siegel and Shuster's further duty under the syndication agreement: "You shall also furnish in sufficient time to properly perform the terms of an agreement we are executing together with you with the McClure Newspaper Syndicate, all of the art and continuity for the newspaper strip entitled 'Superman' called for by said agreement." (Decl. Marc Toberoff, Ex. P).

The employment agreement then spelled out the per page compensation rate Detective Comics would pay Siegel and Shuster for the respective comic book characters they had been supplying to the publisher at that time (Superman receiving the highest rate of $ 10 per page). Again, the agreement then distinguished this payment scheme with that for the artists' creation of the Superman newspaper strips:

> We further agree to pay you for the McClure Newspaper [**33] Syndicate strips which you may hereafter furnish pursuant to the above-mentioned contract with McClure, on the following basis:
>
>> When we receive payment from McClure on the 40% basis mentioned in the contract, we shall retain 71/2% and pay you 321/2% of the "net proceeds" as defined in the McClure contract.
>>
>> When we receive payment from McClure on the 45% basis mentioned in the contract, we shall retain 9% and pay you 36% of the

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 72 of 132    Page ID #:6536

Page 11

658 F. Supp. 2d 1036, *1052; 2009 U.S. Dist. LEXIS 78193, **33

"net proceeds" as defined in the McClure contract.

When we receive payment from McClure on the 50% basis mentioned in the contract, we shall retain 10% and pay you 40% of the "net proceeds" as defined in the McClure contract.

(Decl. Marc Toberoff, Ex. P).

As for ownership in the copyright to the newspaper strips, the employment agreement provided that Detective Comics would own "all" such "material" and, at Detective Comics' option, it could be "copyrighted or registered in [Detective's] name or in the names of the parties designated by us."

The employment agreement further provided that Detective Comics had the right to "reasonably supervise the editorial matter of all features" and the right to terminate Siegel and Shuster's employment if "the art and continuity [**34] of any feature shall not be up to the standard required for the magazines."

Moreover, the employment agreement provides that, should Detective Comics decide to re-print some of the Superman newspaper strips in its "magazines," Detective Comics would compensate the pair "at the above-mentioned page rate less the percentage which McClure receives for said syndication."

[*1053] The employment agreement also contained a global (literally and figuratively) prohibition against Siegel and Shuster "hereafter" furnishing to anyone Superman material, whatever its form be it as a "comic" book, a "newspaper" strip, or something else; instead, the artists agreed that they "shall furnish such matter exclusively to [Detective Comics] for the duration of this agreement as such matter may be required by us or as designated by us in writing."

Around the time the syndication and employment agreements were signed by all the parties concerned, Liebowitz wrote a letter on September 28, 1938, to Siegel, commenting upon said agreements. In the course of his lengthy correspondence, Liebowitz reminded Siegel that, "[a]s I have pointed out to you many times, our company has very little to gain in a monetary sense from [**35] the syndication of this material. Also bear in mind, that we own the feature 'Superman' and that we can at any time replace you in the drawing of that feature and that without our consent this feature would not be syndicated and therefore you would be the loser in the entire transaction. . . . It is entirely up to you and Joe, whether you wish our pleasant relationship to continue and whether you wish the strip 'Superman' to be syndicated." (Decl. Michael Bergman, Ex. B). Siegel quickly responded that both he and Shuster "are anxious and ready to do our best on SUPERMAN so that all parties concerned will profit." (Decl. Michael Bergman, Ex. C).

With that, Siegel and Shuster produced daily newspaper strips for McClure under the terms of the September 22, 1938, syndication agreement from 1939 through 1943; the first daily newspaper strip (depicting the first day's worth of the two weeks of material created by Siege and Shuster in the spring of 1938) appearing in the *Milwaukee News Journal* on January 16, 1939:

[SEE IMAGE IN ORIGINAL]

The applications submitted by McClure (and, when approved, the certificates) for the original copyright term registration for the Superman newspaper strips [**36] (identified as a "PERIODICAL CONTRIBUTION") created and published from 1939 to 1943 listed "McClure Newspaper Syndicate" as the claimant and "Jerry Siegel and Joe Shuster" as the authors of the newspaper strips. (Decl. Michael Bergman, Ex. C). No effort was made by any party throughout the initial term of the Superman newspaper strips published through 1943 to file a supplemental registration to make changes to the information contained in the original registrations.

Two applications for renewal term registrations were, however, submitted for the Superman newspaper strips in question [*1054] during the 1960s: First, National Periodical Publications Inc., as successor in interest to Detective Comics, submitted applications for a renewal registration claiming as proprietors in the copyright of the renewable matter in "a work made for hire," noting that said work was a "contribution to periodical or other composite work," namely, the specific newspaper issue in question. (Decl. Michael Bergman, Ex. C). Second, applications for a renewal registration

658 F. Supp. 2d 1036, *1054; 2009 U.S. Dist. LEXIS 78193, **36

were also made by Siegel and Shuster, listing themselves as authors of the renewable matter. (Decl. Marc Toberoff, Ex. A (Thomson & Thomson copyright [**37] report noting that "the copyrights in the [newspapers strips] originally published through 1943 were renewed . . . in the names of Jerome Siegel and Joe Shuster, claiming as authors")).

Not long after Superman entered into newspaper syndication, it became apparent that McClure could not provide the editorial supervision over the material submitted by Siegel and Shuster as called for in the syndication agreement. Correspondence between the artists and their magazine editor at Detective Comics, J.S. Liebowitz, recount this increasingly rocky relationship. (Decl. Michael Bergman, Ex. D (April 21, 1939, letter from Liebowitz in which he notes "[e]very morning it seems to me I receive copies of criticisms and complaints sent to you by Miss Baker of McClure" and that "Mr. Nimis of McClure was here today and he stated that they definitely do not intend to go on as they are . . . they feel that the time and effort and aggravation encountered in getting this thing going properly is not worthwhile because of your lack of cooperation")).

Eventually, by January, 1940, it was clear that McClure had outsourced its editorial supervision over the newspaper strips to editors at Detective Comics. (Decl. [**38] Michael Bergman, Ex. I (January 22, 1940 letter commenting that "[w]e've been having considerable talk about the daily releases on SUPERMAN, and I believe Jack [Liebowitz] is writing to you to have you send all the material here before it goes to the syndicate for release"); Ex. E (January 25, 1940 letter from Liebowitz reminding Siegel that "all copy must clear through our office"); Ex. F (February 8, 1940 letter remarking on the "present arrangement" of Detective Comics "editing of the strip")). The substance of the editorial comments contained in the correspondence from Detective Comics (both as to the Superman comic book and later also the newspaper strips), pertained for the most part to complaints about the pair's failure to follow its editorial directions and to submit material on time, leaving the publisher to have to quickly scramble to get the material to the printer to meet its deadlines.

There were, however, more substantive criticisms of both the script and artwork supplied by the pair, with specific changes either made to yet-to-be released material or suggested for later releases. (Decl. Michael

Bergman, Ex. E (noting that it was "unwise" to depict Clark Kent flying in [**39] the air without wearing Superman's costume, as had been done with "the last daily release"); Ex. H (returning 26-page script and suggesting that it be re-written for a 13-page story as "there is nothing important enough about the story to justify its going to such length"); Ex. I (cataloging critiques of specific artwork of "sketches" submitted by Shuster); Ex. M (complaining "that a great deal hasn't been done to make Lois look better," giving specific examples in which the artwork is deficient, and then drawing an image of Lois on the correspondence that the editor suggests "Shuster and his lads" use as an exemplar).

During the term of the syndication agreement, problems also arose with Siegel [*1055] and Shuster's ability to supply newspaper strips in a timely fashion to McClure. As a consequence, McClure turned to Detective Comics for "filler" material for "newspapers which carried the comic strip SUPERMAN in order to prevent said newspapers from terminating their syndication agreements with" McClure. Notably, Detective Comics did not supply in-house Superman newspaper strips, as was its right under the terms of the syndication agreement. Instead, Detective Comics "supplied" to McClure [**40] a Superman spin-off, the "comic strip LOIS LANE, GIRL REPORTER, . . . without charge for use." In fact, Detective Comics and McClure entered into a side agreement in September, 1943, with reference to the Lois Lane newspaper strip's impact on the computation of the net proceeds to be divided among the parties. In the agreement, the two "agreed that . . . 'net proceeds' for the purposes of computing [Siegel and Shuster's] return from the newspaper publication of Superman should be the entire gross receipts" from the same, "deducting therefrom only the cost of cuts and proofs." Detective Comics and McClure further agreed that "the compensation of the [in-house] artists engaged by Detective Comics to draw the releases of Lois Lane, Girl Reporter . . . furnished by Detective Comics to McClure for newspaper syndication was to be deducted from the gross receipts of the Superman syndication as 'mechanical costs' in computing 'net proceeds.'" Siegel and Shuster were not parties to (nor were they apparently aware of) this arrangement between McClure and Detective Comics.

Later, McClure notified Detective Comics of its election to extend for five years (beginning from June 1,

658 F. Supp. 2d 1036, *1055; 2009 U.S. Dist. LEXIS 78193, **40

1944) the term of [**41] the 1938 syndication agreement. Contemporaneously, McClure "assigned to Detective Comics . . . all its rights, title and interest in all copyrights in [the] Superman" newspaper strips created during the preceding five years, "including all renewals and extensions thereof." (Decl. Toberoff, Ex. A at 5 (Thomson &Thomson copyright report, dated Feb. 29, 1996)).

During the same time period, the pair produced, under the terms of the employment agreement, Superman material for various comic book magazines published by Detective Comics, first in its serialized magazine *Action Comics,* then as a stand-alone feature in the self-titled comic book magazine *Superman.* The terms contained in the 1938 employment agreement were later altered in a modification agreement entered into between Detective Comics and the artists on December 19, 1939. In this modification agreement it was noted that, "while both [the artists] have continued to furnish art work and continuity for 'SUPERMAN,' . . . Mr. Shuster no longer furnishes the art work" for the other strips to which the pair were under contract to produce, such as "Slam Bradley" or "Spy." The parties therefore agreed that, in exchange for Detective Comics [**42] being "free to make other arrangements" for "furnishing [the] art work" for these other comics, Siegel and Shuster's compensation for Superman comic book material (which the pair reaffirmed that they would "continue to furnish all [the] art and continuity" thereof) would be increased to $ 20 per page, and Detective Comics would pay the pair 5% of the net proceeds derived from the commercial exploitation of Superman outside that from comic books and newspaper syndication, and into such other mediums as "radio, [*1056] motion pictures, [and] the toy and novelty field." (Decl. Michael Bergman, Ex. A).

Detective Comics re-asserted that it had "the unrestricted right to adapt, arrange, change, transpose, add to and otherwise deal with [the Superman] comic strip . . . as [it] in [its] sole discretion . . . deem[ed] necessary." The agreement further contained Siegel's and Shuster's re-affirmation that Detective Comics was the "sole and exclusive owners of the comic strip entitled 'Superman' . . . and to all rights of reproduction . . . , including but not limited to the fields of magazine or other book publications, newspaper syndication, radio broadcasts, television, [and] motion pictures . . . ." [**43] It was also acknowledged by the pair that Detective Comics held "all right of copyright and all

rights to secure copyright registration in respect of all such forms of reproduction either in [its] name or others at [its] exclusive option."

Not all the Superman comic book material supplied by Siegel and Shuster after the September, 1938, employment agreement was published by Detective Comics, although it remains unclear whether the pair was nonetheless paid for such material. For instance, plaintiffs have brought to the Court's attention the curious tale of "K-Metal from Krypton." In August, 1940, Siegel submitted a 26-page script, accompanied by multiple pages of illustrations (mainly pencil drawings, but some that had been inked) created by artists working in Shuster's studio that, in the words of comic writer and historian Mark Waid, "would have . . . radically" altered the then established Superman story line: Lois Lane learns that Clark Kent is Superman and the two agree to become partners and confidants; the first appearance of the kryptonite concept (referred to in the material as K-Metal derived from meteorite debris from the planet Krypton) and its debilitating effects on Superman's [**44] powers; and Superman first learning of his Kryptonian origins. Although the material was not published when initially submitted by Siegel, upon later being unearthed in DC Comics' library vault in 1988, copies of the material were circulated among the top brass at the company in the hopes of "obtaining Siegel's blessing to have the story re-illustrated and released . . . , but for whatever reason, nothing ever came of it." (Decl. Marc Toberoff, Ex. BB).

Eventually, disputes between Detective Comics and Siegel and Shuster led to the pair leaving the employ of Detective Comics in 1947, ending involvement by this talented pair in the further development of the Superman character.

## II. WORK MADE FOR HIRE UNDER THE 1909 ACT

Under the 1976 Act, an author's (or his or her heirs') ability to terminate a prior grant in the copyright to his or her creation does not apply to a "work made for hire" because the copyright in such a creation never belonged to the artist in the first instance to grant; instead, it belonged at the outset to the party that commissioned the work. *See 17 U.S.C. § 304(c).* This absolute bar to termination brings into sharp focus a question that has figured prominently throughout [**45] the parties' papers: Whether any of the vast body of Superman

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 75 of 132    Page ID #:6539

Page 14

658 F. Supp. 2d 1036, *1056; 2009 U.S. Dist. LEXIS 78193, **45

material created up to 1943 by Siegel, with either the assistance of Shuster, with the assistance of others, or alone, was a "work made for hire." If so, then plaintiffs (as Siegel's heirs) cannot terminate his grant of the copyright in that material, such a grant being merely a superfluous act that did not alter the pre-existing ownership rights to that copyright. *See Playboy Enterprises, Inc. v. Dumas, 53 F.3d 549, 554 (2d Cir. 1995)* ("Once it is established that a work is made for hire, the hiring party is presumed to be the author of the work").

[*1057] Resolution of the work made for hire nature of this material is controlled by the governing body of law in existence at the time Siegel crafted this Superman material, that is, the 1909 Act and the precedent developed thereunder. *See Self-Realization Fellowship v. Ananda Church, 206 F.3d 1322, 1325 (9th Cir. 2000)* ("Because all of the copied works were created before 1978, the Copyright Act of 1909 governs the validity of the initial copyrights"); *Twentieth Century Fox Film Corp. v. Entertainment Distributing, 429 F.3d 869, 876 (9th Cir. 2005)* ("We first consider Twentieth Century [**46] Fox Parties' infringement claims under the now repealed Copyright Act of 1909 because [the work] was published before the . . . effective date of the 1976 Copyright Act").

The 1909 Act provided that, "[i]n the interpretation and construction of this title[,] . . . the word 'author' shall include an employer in the case of works made for hire." *17 U.S.C. § 26* (repealed). "Thus, with respect to works for hire, the employer is legally regarded as the 'author,' as distinguished from the creator of the work, whom Learned Hand referred to as 'the "author" in the colloquial sense.'" *Martha Graham Sch. and Dance Foundation, Inc.v Martha Graham Center of Contemporary Dance, Inc., 380 F.3d 624, 634 (2d Cir. 2004).* Nowhere, however, did the 1909 Act define what was meant by "work made for hire" or "employer"; only the consequences flowing from such a designation were spelled out. The task of giving meaning to these terms was left to the courts. "Although for most of its life *Section 26* was construed to extend work-for-hire status only to traditional employer-employee relationships," by way of demonstration that the work was done within the scope of one's job duties with their employer, "in the [**47] late 1960s, in limited circumstances, some courts began expanding the definition of 'employee' to cover authors outside the traditional employment relationship,"

to those involving "an independent contractor," but only if it could be shown that "the work was made at the hiring party's 'instance and expense.'" 2 PATRY ON COPYRIGHT § 5:84. [6]

> [6] Prior to this expansion, invocation of the instance and expense test to independent contractors only resulted in a determination that the commissioned party had assigned to the commissioning party the copyright for the initial term, leaving the renewal term in the work with its creator. *See Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc., 342 F.3d 149, 160 (2d Cir. 2003).*

However, in 1965, the Ninth Circuit was the first court to utilize the "instance and expense" test to determine whether works created either by independent contractors or employees were ones made for hire. *See Lin-Brook Builders Hardware v. Gertler, 352 F.2d 298 (9th Cir. 1965).* [7] Said inclusion was done by the court formulating an across-the-board presumption in favor of finding work-for-hire ownership whenever a work is produced at the "instance and expense" of the hiring [**48] party, said presumption only subject to being overcome by evidence that the parties did not intend for such a result:

> [W]hen one person engages another, whether as employee or as an independent contractor, to produce a work of an [*1058] artistic nature, that in the absence of an express contractual reservation of the copyright in the artist, the presumption arises that the mutual intent of the parties is that the title to the copyright shall be in the person at whose instance and expense the work is done.

*Lin-Brook, 352 F.2d at 300* (noting that the presumption was not overcome because there was no evidence "as to the circumstances or intendment" of the parties); *see also Twentieth Century, 429 F.3d at 881* ("[t]he presumption may be rebutted only by evidence that the parties did not intend to create a work-for-hire"). The test sought to match the concept of a work made for hire with the purpose of the Copyright Act, that is, to "promote" the creation of "useful Arts." U.S. Const. Art. 1, § 8. As one court explained: "[T]he law directs its incentives towards the person who initiates, funds and guides the creative

658 F. Supp. 2d 1036, *1058; 2009 U.S. Dist. LEXIS 78193, **48

activity, namely, the employer, but for whose patronage the creative work would [**49] never have been made. Copyright law 'is intended to motivate the creative activity of authors . . . by the provision of a special reward,'" namely, the legal protection afforded to such creative property through copyright. *Estate of Hogarth v. Edgar Rice Burroughs, Inc., 62 U.S.P.Q.2d 1301, 1316 (S.D.N.Y. 2002)* (quoting *Sony Corp v. Universal City Studios, Inc., 464 U.S. 417, 429, 104 S. Ct. 774, 78 L. Ed. 2d 574 (1984)).* Toward that end, the instance and expense test requires the evaluation of three factors: (1) At whose instance the work was prepared; (2) whether the hiring party had the power to accept, reject, modify, or otherwise control the creation of the work; and (3) at whose expense the work was created. *See Twentieth Century, 429 F.3d at 879, 881.*

> 7 Plaintiffs object to the across-the-board application of the "instance and expense" test set forth in *Lin-Brook* for determination of the for-hire status of all the works at issue in this case, arguing that at the time the works were created in the late 1930s and early 1940s, the law governing work for hire extended only to the traditional employer-employee relationship. Whatever appeal plaintiffs' argument may otherwise have, it has been rejected by the Ninth Circuit. [**50] *See Twentieth Century, 429 F.3d at 877* (holding that rejection of the retroactive application of *Lin-Brook* to evaluating works created by independent contractors would "overturn forty years of established case law within this circuit").

The "expense" requirement is met where a "hiring party simply pays an [employee or] independent contractor a sum certain for his or her work." *Playboy Enterprises, 53 F.3d at 555.* Such regular, periodic payments of a sum certain bear the hallmark of the wages of an employee required to produce the work in question for his or her employer, and not that of a party who is free to engage with those other than the commissioning party in marketing his or her work. *See Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc., 375 F.2d 639, 642-43 (2d Cir. 1967).* "In contrast, where the creator of a work receives royalties as payment, that method of payment generally weighs against finding a work-for-hire relationship." *Playboy Enterprises, 53 F.3d at 555; see also Twentieth Century, 429 F.3d at 881* (finding that "expense" requirement met when publisher agreed to pay

the creator "a lump sum for writing the book, instead of negotiating a royalty deal").

Finally, [**51] in speaking of the expense in the creation of the work, the focus is not on who bore the costs or expense in physically creating the work itself (the money spent to purchase the paper on which the dialogue and story elements was printed, the typewriter used to put into concrete form the author's concepts of the same, and the pencils and ink needed to draw the illustrations, etc.). That particular consideration relates to the question of whether "an artist worked as an independent contractor and not as a formal employee," a distinction, as made clear after the Ninth Circuit's decision in *Lin-Brook,* that has "no bearing on whether the work was made at the hiring party's expense." *Playboy Enterprises, 53 F.3d at 555.* Instead, the focus is on who bore the *risk* of the work's profitability. *See Twentieth Century, 429 F.3d at 881* ("there is little doubt that the book was authored at [the publisher's] expense. [The publisher] took on all the financial risk of the book's success, agreeing to pay [the writer] a lump sum for writing the book, instead of negotiating a royalty deal"); *Picture Music,* [*1059] *Inc. v. Bourne, Inc., 314 F. Supp. 640, 651 (S.D.N.Y. 1970)* (noting that "the fact that the author [**52] was obliged to repay advances on royalties which were never accrued is an indication that the relationship was not an employment for hire").

The "instance" component of the test inquires into "whether 'the motivating factor in producing the work was the employer who induced the creation.'" *Twentieth Century, 429 F.3d at 879; see also Picture Music, Inc. v. Bourne, Inc., 457 F.2d 1213, 1217 (2d Cir. 1972)* (concluding that the fact the employer took the "initiative in engaging" the author to create the work rendered it as one made for hire). That the commissioning party be the motivating factor is not a "but for" test -- that is, but for the artist's employment the work would not have been created -- but instead is a more narrow inquiry focused on the nature and scope of the parties' business relationship. As one court explained:

> No doubt Graham was a self-motivator, and perhaps she would have choreographed her dances without the salary of Artistic Director, without the Center's support and encouragement, and without the existence of the Center at all, but all that is beside the point. The fact is

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 77 of 132    Page
ID #:6541

Page 16

658 F. Supp. 2d 1036, *1059; 2009 U.S. Dist. LEXIS 78193, **52

that the Center did employ her to do the work, and she did the work in the course of her [**53] regular employment with the Center. Where an artist has entered into an explicit employment agreement to create works, works that she creates under that agreement cannot be exempted from the work-for-hire doctrine on speculation about what she would have accomplished if she had not been so employed.

. . . .

There is no need for the employer to be the precipitating force behind each work created by a salaried employee, acting within the scope of her regular employment. Many talented people . . . are expected by their employers to produce the sort of work for which they were hired, without any need for the employer to suggest any particular project. "Instance" is not a term of exclusion as applied to specific works created within the scope of regular employment. It may have more significance in determining whether an employee's work somewhat beyond such scope has been created at the employer's behest or to serve the employer's interests . . .

*Martha Graham Sch., 380 F.3d at 640-41.*

Thus, "under the 1909 Act[,] a person could be an employee yet create a work 'as a special job assignment, outside the line of the employee's regular duties.' In that event, the work is not a work for hire." [**54] *Id. at 635* (citing *Shapiro Bernstein & Co. v. Jerry Vogel Music Co., 221 F.2d 569, 570 (2d Cir. 1955)).* The critical factor is what was the nature of the creator and publisher's business relationship (be it as an employer-employee or an commissioner-independent contractor) at the time of the work's creation, and whether the work in question falls within the scope of those job duties. It is for this reason that courts concern themselves with "the degree to which the hiring party had the right to control or supervise the artist's work," as its presence would reflect a circumstance found when the work being created was done so within the confines of the pre-existing employment relationship. *Twentieth Century,*

*429 F.3d at 879*; *see also Donaldson, 375 F.2d at 643* (labeling as an "essential element" the "power to direct and supervise the manner in which the writer performs his work"); *Picture Music, 314 F. Supp. at 650* ("The existence of an arrangement going beyond an assignor-assignee relationship prior to the undertaking of the particular work. The antithesis of such an arrangement is a case where an author creates a work of his own volition [*1060] and then sells it to a proprietor"). Although [**55] it is not critical that the commissioning party actually exercise its right of control and supervision in the creation of the work in question, it is necessary that the party *have* the right to direct, control, or otherwise shape the artist's work. *See Martha Graham Sch., 380 F.3d at 635* ("The *right* to direct and supervise the manner in which the work is created need never be exercised" (emphasis in original)); *Picture Music, 314 F. Supp. at 651* (labeling as "crucial" whether the hiring party had "[t]he right . . . to direct and supervise the manner in which work is performed").

Moreover, there are certainly gradations of control a publisher could and may have exerted in the creation of the work, and the greater the extent of such supervision the "more likely it is that the work was created at the commissioning party's instance." *Twentieth Century, 429 F.3d at 880.* Thus, a publisher providing suggestions and comments on galleys to a novel, for instance, may move into the realm of that associated with a work made for hire depending on the degree and pervasiveness of said interaction. *Id.* (labeling "the degree of in-person supervision was much greater than" what the publisher "usual[ly]" [**56] did, including utilizing the services of fact-checker and "regular face-to-face meetings" by the author "with [the publisher's] editorial board" at which the author was "provided . . . with extensive notes and comments").

## III. APPLICATION OF THE WORK FOR HIRE DOCTRINE TO THE RELEVANT WORKS

There are four major categories of Superman works over which the parties are contesting the work for hire nature: (A) Superman material created by Siegel before the March 1, 1938, grant (including *Action Comics* No. 4 and portions of *Superman* No. 1); [8] (B) Superman *comic book* material published in the interim period after the March 1, 1938, grant but before the execution of the September 22, 1938, employment and syndication agreements (namely, the material appearing in *Action*

Comics Nos. 2-3 and 5-6); [9] (C) the remaining Superman *comic book* material created by Siegel and Shuster beginning immediately after the execution of the September, 1938, employment and syndication agreements and continuing until the close of the five-year termination window on April 16, 1943 (namely, *Action Comics* Nos. 7-61 and *Superman* Nos. 1-23); and (D) Superman *daily newspaper comic strips* published beginning in January, 1939 [**57] (under the auspices of the September 22, 1938, syndication agreement) and continuing through April 16, 1943 (the close of the five-year termination window).

8   The Court previously considered the issue of whether *Action Comics* No. 1 was a work made for hire. *See Siegel, 542 F. Supp. 2d at 1126-28*. Nothing contained in this Order is meant to supersede that Order.

9   Although *Action Comics* No. 4 was *published* during this period, given that the dialogue thereto was arguably *created* during the pre-March, 1938, period, the Court will treat its work for hire nature there.

### A. *Pre-March, 1938, Superman Material (Action Comics No. 4 and portions of Superman No. 1)*

Beginning with the earliest Superman comic book material, there seems little doubt that any Superman material that Siegel created by himself or with the assistance of others prior to the March 1, 1938, grant, and that was later published, is not a work made for hire. That was a core holding in this Court's March 26, 2008, Order, which itself was built upon the finding the Second Circuit made during the parties 1970s' litigation over the renewal term rights to the Superman copyright. [*1061] *See Siegel, 542 F. Supp. 2d at 1126-28* ("Accordingly, . [**58] . . all the Superman material contained in *Action Comics,* Vol. 1, is not a work-made-for-hire and therefore is subject to termination."); *Siegel, 508 F.2d at 914*. Adapting the language from the Second Circuit decision, the Superman material in question had been crafted by the artists years before the relationship between its authors and its ultimate publisher existed. The creation of this material was not done at the instance and expense of anyone other than the artists themselves.

The dispute is thus not with the work for hire nature of this material, but rather over whether any of the following material either contains copyrightable elements or suffers from some other defect preventing termination

from occurring: (1) The "future Superman exploits" paragraph written before the publication of *Action Comics* No. 1; (2) the Superman material found in *Action Comics* No. 4, which was based on Siegel's 1934 script and the other 1934 material created by Siegel and Keaton; and (3) the first six pages of *Superman* No. 1.

### 1. *Paragraph on Superman's Future Exploits*

As for the one paragraph concerning future exploits, there is no doubt that the concepts embodied in that paragraph later found concrete [**59] expression in some of the earliest Superman material published in *Action Comics.* Plaintiffs' counsel, however, would have the Court conclude that, based on this one scant paragraph and its later fuller expression of the concepts contained therein, the Superman materials found in *Action Comics* Nos. 2, 4, and 5 were created prior to the March 1, 1938 grant. The problem with this argument is that the paragraph itself constitutes mere *ideas* for future works rather than *expressions* of those ideas, and thus contains no copyrightable material, which, of course, bars any effort at termination. *See 17 U.S.C. § 304(c)* (limiting termination to the grant in the "copyright" to a work).

"A copyright never extends to the 'idea' of the 'work,' but only to its 'expression,' and that no one infringes, unless he descends so far into what is concrete as to invade that 'expression.'" *National Comics Publications, Inc. v. Fawcett Publications, Inc., 191 F.2d 594, 600 (2nd Cir. 1951)* (L. Hand, J.). Aside from the addition of a few adjectives, Siegel's one paragraph of future Superman exploits has much more in common with Judge Learned Hand's conception of the general idea of a play about "a riotous knight [**60] who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress" than with its concrete expression in the form of Shakespeare's play "Twelfth Night." *See Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir. 1930)*. To turn Judge Hand's phrase, Siegel's one paragraph of future exploits was little more than a generalized description of Superman performing an unelaborated task or heroic feat, the precise details of which were left to be sketched out at a later time, as later occurred, around the time the comic books were published during 1938. [10] Here, Siegel did little more than sketch the idea of his superhero doing some broad-brushed act, the details being left to be filled in later, as they [*1062] were when he put the idea into concrete form by writing a script setting down precisely

658 F. Supp. 2d 1036, *1062; 2009 U.S. Dist. LEXIS 78193, **60

how and why Superman "battles an airplane with his bare hands." In this sense the one paragraph sets out little more "than the most general statement of what the [comic] is about." *Id.* The generalized description Siegel put down to paper concerning Superman's "exploits" did not cross the line into something to which copyright protection applies and, [**61] accordingly, to which no right to termination attaches.

> 10    For instance, in the story in *Action Comics* No. 2, Superman thwarts the efforts of an industrialist war profiteer who is secretly funding both sides in a war in a far-off land ("Superman will win a war single-handed"), that leads to Superman battling aircraft ("battle an airplane with his bare hands"), swimming great distances in the ocean (he'll swim several hundred miles and think nothing of it"), rescuing Lois Lane from being executed by a firing squad, and ending with the industrialist repenting his actions.

**2. Superman Material Created while Siegel Was Collaborating with Keaton**

As far as the Superman material created by Siegel during his collaboration with Keaton is concerned, save for one important exception, that material never acquired statutory copyright protection under the 1909 Act, as it was either never published with the requisite notice or registered as an unpublished work. The termination provisions apply only to a work for which the "copyright [therein was] subsisting in either its first or renewal term on January 1, 1978." *17 U.S.C. § 304(c).* Unless the material had been registered as unpublished works under section 12 [**62] to the 1909 Act, copyright protection could be achieved only by publication of the material, before January 1, 1978, bearing the requisite copyright notice. *See Siegel, 496 F. Supp. 2d at 1150;* 3 PATRY ON COPYRIGHT § 7:42 ("*Section 304(c)* . . . by its own terms covers only works in either their first or renewal term on January 1, 1978. The section thus does not cover works that were unpublished" on that date); 3 *NIMMER ON COPYRIGHT § 11.02[A][1]* at 11-12 ("the termination provisions of *Section 304(c)* apply only if the work in question was the subject of statutory copyright prior to the effective date of the current Act"). There has been no evidence presented that any of the Siegel/Keaton material was registered as an unpublished work under the 1909 Act, nor is there any indication that any portions of the Siegel/Keaton material (other than that appearing in

*Action Comics* No. 4) was ever published with the requisite notice before 1978. Thus, although not works made for hire, most of the Siegel/Keaton material is not subject to termination.

The same, however, cannot be said of the 1934 Superman football story script written by Siegel and sent to Keaton. Defendants do not dispute that [**63] the storyline contained in *Action Comics* No. 4 published nearly verbatim the entirety of the script, as it surely did. *See generally Siegel, 496 F.Supp.2d at 1150-51* (discussing what was sufficient to demonstrate "publication" of material for purposes of the 1909 Act).

Instead, defendants object to the Court's consideration of the script on evidentiary grounds, complaining that the script had never been produced in discovery, that it has not been authenticated, and that plaintiffs have failed to provide the source of the material and how they came into possession of it. (Defs.' Obj. to Pls.' Sept. 22, 2008 P 7). None of these evidentiary objections are well-taken. Plaintiffs have submitted declarations evidencing that the script in question was in the possession of Russell Keaton's widow who turned it over, along with other materials, to the family's literary and marketing agent, Denis Kitchen, in 1993. Mr. Kitchen thereafter on August 21, 2008, posted a comment in response to a blog story titled "Russell Keaton, Superman's Fifth Beatle," wherein he disclosed that, in addition to the subject of the story (which concerned the illustrated strips, but not the scripts, Siegel and Keaton [**64] had created concerning the version of Superman as someone from Earth's future), "there's LOTS more correspondence and scripts." [*1063] Plaintiffs' counsel thereafter ran across Kitchen's post while searching the Internet, and after contacting him obtained a copy of the script, which he then promptly produced. (Sept. 23, 2008 Decl. Toberoff; Sept. 23, 2008 Decl. Joanne Siegel; Sept. 29, 2008 Decl. Denis Kitchen).

Defendants also apparently argue that plaintiffs should be precluded from acquiring any ownership stake in the artwork found in *Action Comics* No. 4, as no artwork was contained in Siegel's 1934 script. As stated in their papers: "Even if accepted in evidence . . . , the allegedly pre-existing continuity pertaining to *Action Comics* #4 would not signify that the artwork and any new text in this comic book were pre-existing as opposed to being prepared after March 1, 1938 as work for hire." (Defs.' Obj. to Pls.' Sept. 23, 2008, filing P 4). The record

658 F. Supp. 2d 1036, *1063; 2009 U.S. Dist. LEXIS 78193, **64

is devoid of any evidence indicating when the artwork later found in *Action Comics* No. 4 was created. However, also missing is what specific legal argument defendants seek raise based on that silence in the record. For instance, the Court [**65] is left to wonder, whether their challenge is based on an assertion that Shuster's artwork appearing in *Action Comics* No. 4 is a work made for hire on the basis that it was created following the March 1, 1938 grant; or are they asserting that Siegel's script lacks sufficiently originality as to preclude any effort by plaintiffs to recapture the copyright in the artwork contained in *Action Comics* No. 4 as part of a joint work; or is it for some other unarticulated reason? Defendants have had ample time and opportunity to precisely articulate their legal argument flowing from this factual assertion, and they have failed to do so. The Court has permitted defendants to file four post-hearing briefs related to any of the issues raised at oral argument or in opposing counsel's papers that were filed following the hearing. Accordingly, being unable to discern the legal basis for defendants' argument, the Court declines to address the significance of defendants' unelaborated observation. *See Greenwood v. FAA, 28 F.3d 971, 977 (9th Cir. 1994).*

This is not to say, however, as plaintiffs would have the Court find, that Siegel writing in 1934 the script ultimately published in *Action Comics* No. [**66] 4 (that was but an expression of one of the ideas found in his "future Superman exploits" paragraph) likewise means that Siegel also wrote the other Superman material that are expressions of these ideas found in that one paragraph (such as that found in *Action Comics* Nos. 2 and 5) during the same time frame. There is no evidentiary basis to support such an inference. The evidence surrounding the 1934 football story script gives no indication that, other than the script in question, Siegel had written or planned on writing more Superman scripts. The one future Superman exploits paragraph itself makes no mention that scripts for the ideas therein had been or were in the process of being crafted by Siegel. The cover letter Siegel submitted to Keaton with the enclosed football story script likewise contains no indication that Siegel had or was planning on writing more scripts. Rather, the evidence supports the inference that the script was created as a discrete project to woo a prospective publisher.

Accordingly, because, as illustrated herein, the material appearing in *Action Comics* No. 4 is based

almost verbatim on Siegel's pre-1938 script, the Court finds that the Superman material appearing [**67] therein was not a work made for hire and is subject to termination.

### 3. *Superman No. 1, pages 1-6*

This leaves the question of whether the first six pages in *Superman* No. 1, which in all other respects consist of nothing more than a reprint of the Superman [*1064] comic from *Action Comics* Nos. 1-4, contains within it any additional pre-March 1, 1938, material.

Defendants label as "grossly exaggerated" the notion that the continuity to these first six pages were written by Siegel in 1934. (Defs.' Obj. to Pls.' July 28, 2008 Opp. Br. at 13). To this end, defendants point to the fact that Siegel wrote in his memoir, *"The Story Behind Superman No. 1,"* that a Detective Comics' editor, M.C. Gaines, wrote a letter to the pair on March 27, 1939, "specifying in detail [what] the contents of [those] 'first six pages' [should entail], including specific headings and panels." *(Id.)* It is defendants' factual characterization, not plaintiffs', that exaggerates. The letter referenced by defendants makes clear that it was the first *two* pages of the six at issue that was created at and the subject of Mr. Gaines editorial direction. Mr. Gaines remarked that insofar as the "first six pages" of *Superman* No. 1 was [**68] concerned, the publisher would like the pair to take the first page from *Action Comics* No. 1, "and by elaborating on this one page," "work up *two* introductory pages" for *Superman* No. 1. (Decl. Marc Toberoff, Ex. GG (emphasis in original)). [11] However, as to pages three through six in *Superman* No. 1, there is nothing in Mr. Gaines' letter indicating that the material was created contemporaneously with *Superman* No. 1's publication in 1939. Quite the opposite is true.

> 11  Plaintiffs' argument that the first two pages in *Superman* No. 1 were created before the March 1, 1938, grant is equally unconvincing. Plaintiffs point to various scripts Siegel wrote to Keaton in 1934 to support this claim; however, too many discrepancies exist between those scripts and the two published pages in *Superman* No. 1 to support the conclusion sought by plaintiffs. Moreover, this argument is in direct contradiction to Siegel's own account, set forth in his memoir, of the date the first two pages of *Superman* No. 1 was created, which he places squarely in 1939.

658 F. Supp. 2d 1036, *1064; 2009 U.S. Dist. LEXIS 78193, **68

Specifically, Mr. Steranko's forward to DC Comics' 1989 re-printing of *Superman* No. 1 recounts the origins of pages three through six as consisting of the [**69] first week of material Siegel and Shuster had created in 1935. It had been intended by the artists to be part of *Action Comics* No. 1, but it was "eliminated" by Detective Comics from inclusion in *Action Comics* No. 1 in order to make more space available for other comics. Given that no evidence has been submitted to rebut Mr. Steranko's statement (contained in one of defendants' publications, no less), the Court finds that pages three through six of *Superman* No. 1 is material created by Siegel and Shuster in 1935 and thus was not a work made for hire. [12]

> 12    Defendants conclusorily argue that the contents of the story line (but not the illustrations) contained in pages three through six of *Superman* No. 1 are nothing more than *"de minimis"* elements, to which no copyright would attach. Other than offering this legal conclusion, nowhere have defendant provided any specific factual argument directed to what or how this continuity is defective. Defendants have had ample opportunity to elaborate on this argument, but have not. Accordingly, the Court declines to consider it.

Thus, in addition to that set forth in the Court's earlier orders, the uncontroverted evidence establishes that the following [**70] works were not works made for hire and are thus subject to termination: *Action Comics* No. 4 and *Superman* No. 1, pages three through six.

**B. Post-March 1, 1938, Superman Comic Book Materials Published Prior to September, 1938, Employment Agreement (Material Appearing in Action Comics Nos. 2-3 and 5-6)**

With respect to the comic books containing Superman material that were published by Detective Comics in the interim [*1065] period after the March 1, 1938, grant and the September, 30, 1938, employment agreement, namely *Action Comics* Nos 2-3 and 5-6, defendants' principal argument for why the instance test was met is because Detective Comics was the rights holder in the underlying Superman material contained in *Action Comics* No. 1 by virtue of the March 1, 1938, grant, and thus its consent was required before any derivative Superman material could be published. In essence, defendants once again lean heavily on the

derivative nature of the work itself to demonstrate they had the right to control its creation. As the Court remarked in resolving the work for hire status of the Superboy script created by Siegel in 1940, the fact that a work is a derivative of another does not automatically translate [**71] into it being considered a work for hire or as being produced at the instance of the owner of the pre-existing work; something more is required. *Siegel, 496 F. Supp. 2d at 1142-43*.

Here, however, there is more than just a naked argument regarding the derivative status of the works in question. There is correspondence from Detective Comics to Siegel and Shuster noting the publisher's expectation that the pair would continue to generate derivative works of Superman for further publication in its comic book magazines even after the character's initial release in *Action Comics* No. 1. In an April 8, 1938, letter, Detective Comics executive J.S. Liebowitz remarked that the company had "loaded [the pair] up with 43 pages a month [said sum including the pair's work on other comic book features for the publisher such as "The Spy" and "Slam Bradley" as well as Superman]," noting that "the success of the magazine is dependent on the type of work done by yourself," and then concluding that he was "looking for your complete cooperation for our mutual benefit." (Decl. Michael Bergman, Ex. B). Likewise, the January 10, 1938, letter from Detective Comics' editor refers to Superman as a "new feature" [**72] that could overburden Shuster's time.

This correspondence certainly suggests that the Superman material after *Action Comics* No. 1 was provided pursuant to an implicit agreement between the artists and the publisher to furnish said material on a regular basis for the publisher. In essence, Detective Comics had already set aside space in its comic book publications to accommodate the artist's Superman material even before the character's first appearance in *Action Comics* No. 1. This point is reenforced by the fact that in *every succeeding* monthly issue of *Action Comics* for the period in question there appeared a feature of Superman. Indeed, at trial in the 1947 Westchester suit Shuster testified that in accepting Detective Comics' offer, the pair anticipated that they would see Superman's publication in *Action Comics*. (Decl. Marc Toberoff, Ex. N). Furthermore, the referee in the 1947 Westchester suit made a factual finding that the artists were regularly paid for the material created during this interim period at the rate of $ 10 per page.

658 F. Supp. 2d 1036, *1065; 2009 U.S. Dist. LEXIS 78193, **72

Given this correspondence, the regular appearance of the Superman feature in subsequent publications, and the general understanding of the artists themselves, [**73] the evidence leads the Court quite naturally to the conclusion that the creation of the Superman material appearing in *Action Comics* Nos. 2-3 and 5-6 was solicited by and done at the instance of defendants. *See Playboy Enterprises, Inc. v. Dumas, 960 F.Supp. 710, 715 (S.D.N.Y. 1997)* (holding that fact that paintings were furnished and published on a regular basis, and that they were described as a "regular feature," "suggest[ed] that the magazine had an implicit agreement with [the painter]" to produce those works, which was, in turn, "persuasive proof of [the publisher's] role" in [*1066] the works' creation), *aff'd without published opinion, 159 F.3d 1347 (2d Cir. 1998)*.

Plaintiffs seek to undermine such an impression by making much of the fact that there was no written agreement between the parties following the March 1, 1938, grant wherein Detective Comics specifically commissioned the pair to create subsequent Superman comic book stories. (Pls.' Opp. at 8 (noting that the March 1, 1938 grant "could have but did not provide for the employment of Siegel and Shuster to create subsequent Superman stories")). In plaintiffs' view, the entire relationship between the parties for this six-month [**74] period following the grant is akin to that of a screenwriter submitting a "spec screenplay" to a studio with the hopes that it would be purchased. (Pls.' Opp. at 5). Such a characterization of the parties' relationship fails to weave in all aspects of that relationship.

Undoubtedly plaintiffs are correct that, in creating this material, there was no guarantee by Detective Comics that it would accept it and thereby pay Siegel and Shuster for their work. The first issue of Superman could have been a commercial flop, leading the publisher to reconsider whether to continue to publish such material or to place the character in the hands of different comic book artists. Because there was no guarantee of success, continuation of the parties' business relationship could have ended abruptly and early, thus placing Siegel and Shuster's role with Detective Comics further afield than under the traditional employee-employer scenario. That said, the pair's business connection to their "employer" (in the colloquial sense) was much stronger and closer to that of other admitted work for hire scenarios *(e.g.,* an independent contractor) given the nature of the project and the material they were supplying [**75] to Detective

Comics. *Cf. Self-Realization Fellowship Church, 206 F.3d at 1326-27* (noting that a monk's writings and religious lectures created while the monk was supported by the church was not a work made for hire as the monk had less of a connection to the church than another would have had in a traditional employment setting).

To begin, Siegel and Shuster were not simply creating some random work and submitting it to a number of publishers for consideration; the comic book material was for a character to which the publisher to whom it was submitted owned the pre-existing rights, rendering Siegel and Shuster's material as but a derivative thereof. Moreover, the material was submitted at the request of Detective Comics. Again, the letters from Detective Comics' executives in January and April, 1938, indicate that the Superman material first published in *Action Comics* No. 1 was not intended to be a one-shot deal, but rather was conceived of as an ongoing "new feature" to which sequels would need to be fashioned; hence, the Detective Comics executives' reference in the April 8, 1938, letter to the "43 pages a month" the pair had been "loaded up" with by the publisher, a page computation [**76] that included within it the 13-page Superman comic book, and the January, 1938, letter voicing concerns regarding the possibility of placing undesirable constraints on Shuster's time. Perhaps the best way of envisioning the parties' business relationship at this time was one in which the artists were given a trial period of sorts to see whether their creation would be commercially successful enough to warrant further formal action by the publisher. Thus, the material over this six-month period was not sent on spec to see whether the publisher would like it, but rather was sent as requested for publication in a monthly feature in the hopes that the publisher would eventually decide to formally pick up the feature on a long-term basis.

[*1067] This characterization of the parties' relationship during this period is confirmed by the September, 1938, employment agreement's recital that Siegel and Shuster "have been doing the art work and continuity for us" and that Detective wanted the pair "to continue to do said work and hereby employ and retain you for said purpose." In essence, the September, 1938 employment agreement formalized what had informally been ongoing beforehand. That Detective Comics' [**77] requests were made on an informal basis before the written agreements were executed does not detract from the fundamental fact that Siegel and Shuster's

658 F. Supp. 2d 1036, *1067; 2009 U.S. Dist. LEXIS 78193, **77

creation of the derivative Superman material was done at the request and instance of Detective Comics. That Detective Comics waited six months before more formally "employing" the pair to "continue" to do just that does not detract from the core point that such production by Siegel and Shuster was again done at the instance of Detective Comics; it simply shows that by that point Superman had so proven itself a commercial success that the publisher desired a more formalized arrangement to be placed down in writing to ensure that the pair would continue to produce such material for it (rather than going on to create other comic book characters for other publishers).

When these facts are considered in toto, it is easy to conclude that creation of the works in question lie further along the spectrum from that found in a more traditional employment relationship, as is the case for the comic books created by in-house employees of the publisher. The lack of any long-term guarantee or commitment by the publisher to the business enterprise itself, [**78] however, is not something which is atypical in an independent contractor situation. That the pair functioned in such a looser employment relationship with the hiring party is not critical. What is important is the existence of an engagement to create the works, and the level of control and direction the commissioning party thereafter had over creation of the works in question. And in that regard, the fact that Siegel and Shuster were commissioned by the publisher to create specific material to which the publisher had the statutory right to exert control over its creation, and for which they were paid upon the material's publication, is dispositive as to the instance prong.

In short, Detective Comics, as the copyright holder of the pre-existing work, approached the artists and asked that they create works derived from that preexisting material on a regular basis, and then paid the artists for that derivative work. As such, the material would fall within the category as a work made for hire. *Burroughs, 342 F.3d at 163*; *Picture Music, 457 F.2d at 1216*. Accordingly, the Court finds that the Superman material in *Action Comics* Nos. 2-3 and 5-6, which were published in the interim period after [**79] the March 1, 1938, grant but before the execution of the September 22, 1938, employment agreement were works made for hire. The Superman material appearing in *Action Comics* No. 4, although *published* during this same interim period, was not a work made for hire because it consisted of material

*created* in 1935. *See supra* III.A.2.

**C. *Post-September, 1938, Superman Comic Book Material (Action Comics Nos. "7-61 and Superman Nos. 1-23)***

It is clear to the Court that all of the *comic book* material produced by Siegel and Shuster *after* they signed the employment agreement with Detective Comics were works made for hire. The employment agreement makes plain that the pair were specifically "employ[ed] and retain[ed]" by Detective Comics for a period of five years (with an option to extend [*1068] for an additional five years) to produce, on an ongoing basis, the comic book magazines for certain characters, including Superman, in return for payment of a sum certain upon that materials' publication. Such an arrangement has all the elements of a relationship leading to the creations of works made for hire.

Plaintiffs' argument regarding the "instance" prong of the test centers upon the contention that, although [**80] Detective Comics *retained* a great deal of editorial control over Siegel and Shuster's comic books, it actually *exercised* very little. That the two were permitted to exercise their creative talents largely, or even exclusively, in the manner they chose is not dispositive of whether the comics were prepared at Detective Comics' instance. *See Martha Graham Sch., 380 F.3d at 640-41* ("There is no need for the employer to be the precipitating force behind each work created by a salaried employee, acting within the scope of her regular employment. Many talented people, whether creative artists or leaders of major corporations, are expected by their employers to produce the sort of work for which they were hired, without any need for the employer to suggest any particular project"). "Complete control over the author's work is not necessary" to meet the instance test, *Twentieth Century, 429 F.3d at 880*, all that is required is the right to direct and supervise the manner in which the work is created, and even then, "the *right* to direct and supervise . . . need never be exercised." *Martha Graham Sch., 380 F.3d at 635* (emphasis in original).

Here, Detective Comics contractually reserved for itself [**81] the right to "reasonably supervise the editorial matter of all features," a right which in some instances it did exercise to provide editorial supervision over that material before it was published, suggesting changes to the art work and the continuity submitted by the pair. While this supervision perhaps did not rise to the

658 F. Supp. 2d 1036, *1068; 2009 U.S. Dist. LEXIS 78193, **81

level the publisher in *Twentieth Century* exercised over the author's manuscript, *see 429 F.3d at 880* (explaining that "the degree of in-person supervision was much greater than usual, including regular face-to-face meetings between General Eisenhower and Doubleday . . . where the editorial board provided him with extensive notes and comments" as opposed to the normal process of "waiting for the manuscript to be completed, and then discussing possible improvements with the author"), nowhere did the Ninth Circuit suggest that such heightened supervision was necessary to demonstrate that the work was produced at the instance of the publisher.

Magnifying the extent of Detective Comics' right to control the Superman comic books' creation is the fact that it was also the holder of the underlying material from which the later Superman comic books were derived. The fact [**82] that Detective Comics approached Siegel and Shuster and, in a written agreement, specifically engaged (and paid) for them to create comic book material derived from the underlying Superman material it already owned, lends strong support to the conclusion that said comic books were made at its instance. *See Burroughs, 342 F.3d at 163*; *Picture Music, 457 F.2d at 1217*; *Siegel, 496 F. Supp. 2d at 1143* ("It was these additional elements of requesting and paying for specific derivative works that served to demonstrate that the creation of the derivative work was at the instance of the commissioning party").

In this respect, the circumstances of this case are not all that different from those in *Martha Graham School*. Before being hired by a dance center, the artist had created/choreographed various dances. Later she was hired as the artistic director (receiving a regular salary) for the dance [*1069] center and charged with choreographing new dances, which she did to great success. In her position as director of the dance center, the artist had nearly free reign in the type and manner of the dances she created. Nonetheless, the Second Circuit held that, because the works in question fell specifically [**83] within the class of duties for which the artist was hired to perform (the creation of dances), those works were made for hire. This case is no different. Siegel and Shuster were undisputedly charged after September 22, 1938, with supplying Detective Comics "each and every month" the comic book material for Superman. The works in question fall precisely into the duties the employment contract called on Siegel and Shuster to perform, thus meeting the "instance" prong of the work made for hire test.

As for the "expense" prong, the plaintiffs argue that the contingent nature of Detective Comic's obligation to make payment for the material created (upon its acceptance for publication), coupled with the fact that Siegel and Shuster had to bear up-front costs (in more of an independent contractor role than a traditional employee), negates this element. This method of payment, plaintiffs argue, renders the present case distinguishable from other "sum certain" cases where the artist were paid regardless of whether their work was accepted for publication. However, plaintiffs have failed to present evidence that Siegel and Shuster were not, in any given instance, paid for their work. Although [**84] there is evidence that at least one of the works produced by Siegel and Shuster, "K-Metal from Krypton," was not accepted for publication by Detective Comics, nowhere have plaintiffs pointed to any direct evidence indicating that the pair were not paid for this rejected submission. Plaintiffs speculate, rather than substantiate, this point.

Plaintiffs attempt to fill this vacuum by pointing to declarations from comic book historians who state that the industry practice at the time was for artists only to be "paid for pages actually delivered by them and eventually published by" the comic book publisher. (Pls' Opp. at 20). As the Court noted previously, appeals to expert opinion of industry custom and practice are of "dubious evidentiary value" owing to the fact that the expert in question is not venturing any opinion as to what actually occurred with respect to the specific business relationship between Detective Comics and Siegel and Shuster. *Siegel, 542 F.Supp.2d at 1130.*

Moreover, the language in the parties' December, 1939, modification agreement creates the strong inference that Shuster had been paid by Detective Comics for all or a portion of that prior year's artwork for comic [**85] strips (other than Superman) that he did not supply. Furthermore, as disclosed in the 1947 Westchester action, Detective Comics decided near the end of the five-year period in question to pay Siegel and Shuster for *Superman* material that neither had contributed in creating. *See Siegel, 496 F.Supp.2d at 1138.* These instances of payment for material not created by the artists establishes that the parties' business relationship was anything but that fitting within the industry norm of which the experts opine. It also demonstrates that, despite plaintiffs' appeal to the "possibilities" of payment given the contractual terms, the parties' actual business relationship belied those terms. In

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 85 of 132    Page ID #:6549

Page 24

658 F. Supp. 2d 1036, *1069; 2009 U.S. Dist. LEXIS 78193, **85

the end, the parties' actual pattern and practice under the terms of the agreement speaks louder on the expense prong of the work for hire question than such textual contingencies; all the Court has been presented with in this regard are appeals to such possibilities and contingencies that could, but for which there is no evidence ever did, take place.

[*1070] Plaintiffs also emphasize all the costs, expenses, and overhead Siegel and Shuster incurred in running their own artists' studio (payments to assistants, [**86] payment of rent, purchasing art tools and supplies, etc.,) in producing the material they then supplied to Detective Comics, as demonstrating that the expense prong has not been met. In the end, this evidence suggests that the artists' relationship with Detective Comics, even when under contract to produce the material in question, was more distant from that of traditional employees and closer to that of independent contractors; however, as noted above, the instance and expense test under the 1909 Act also applied to independent contractors. *See Siegel, 496 F. Supp. 2d at 1138* ("[C]ourts employing the instance and expense test have discounted reliance on the circumstances and the cost borne for the production of the work. Such consideration relates to the question of whether 'an artist worked as an independent contractor and not as a formal employee,' a distinction that has 'no bearing on whether the work was made at the hiring party's expense.'") (quoting *Playboy Enterprises, 53 F.3d at 555*)). The "expense" prong of the test is therefore met.

Accordingly, applying the "instance and expense test," the undisputed evidence establishes that the Superman materials created by Siegel and [**87] Shuster during the term of their employment agreement (namely, *Action Comics* Nos. 7-61, and to *Superman* Nos. 1-23) were works made for hire. [13]

> [13]    The material appearing on pages three through six of *Superman* No. 1 is the single exception to this conclusion. *See supra* section III.A.3 (holding that these pages were not works for hire).

### D. *Superman Newspaper Strips Published from 1939 to 1943*

This leaves the last and most difficult category -- the newspaper strips for the period 1939 to 1943 -- which the Court further subdivides into two categories: (1) the two weeks' worth of newspaper strip material Siegel and

Shuster created *before* the [**88] syndication agreement was executed and (2) the remaining newspaper strips the pair created thereafter under the aegis of that agreement. Because the Court's ruling regarding the first two weeks' worth of newspaper strips implicates more far-reaching issues, which are discussed in subsequent sections, the two sub-categories are addressed in reverse chronological order. However, before the Court may address the work for hire aspect of the newspaper strip materials, it is necessary to discuss the significance of McClure's role in the September 22, 1938, agreements.

The complexity of the work for hire question on this last category of material is due in large measure to the added dimension of McClure's presence in the newspaper syndication endeavor, which altered and rearranged Detective Comics' and the artists' then-existing business relationship. To be sure, McClure has served as the proverbial elephant in the room in this case, an elephant whose significant impact on the business relationship created through the September 22, 1938, employment agreement and newspaper syndication agreement both sides have sought to either ignore or diminish. Defendants seek to relegate McClure to the role [**89] of a mere licensee of the newspaper strips for which it owned nothing, lest the material be injected into the public domain because McClure's listing itself as the proprietor in the copyright notice and registration would arguably violate the prohibition on divisibility of copyright in the 1909 Act. [14] For [*1071] their part, plaintiffs contend that, in light of defendants' concession, McClure's role as a prospective hiring party for a work made for hire may be ignored, but thereafter structure their analysis of the relevant agreements to reach their desired conclusion that the creation of the newspaper strips enured solely (and was so intended to enure solely) to McClure's benefit. Such an analysis is favored by plaintiffs because it seemingly forecloses a conclusion that the newspaper strips were made at Detective Comics' instance and expense.

> [14]    As noted by Professor Nimmer, under the 1909 Act, "it was inferred" by the courts that because the 1909 Act "referred in the singular to the 'copyright proprietor' . . . the bundle of rights which accrued to a copyright owner," such as the right to reproduce the material on the stage or in books, "were 'indivisible, 'that is, incapable of assignment [**90] in parts." 3 *NIMMER ON COPYRIGHTS § 10.01 [A]* at 10-5. Absent the

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 86 of 132    Page ID #:6550

Page 25

658 F. Supp. 2d 1036, *1071; 2009 U.S. Dist. LEXIS 78193, **90

complete assignment of rights commanded by the copyright, the transfer was considered to be a license, with the transferor maintaining ownership in all the rights to the copyright in the material. *Id.* Given this, any publication of the material by the transferee was required to contain a copyright notice in the name of the copyright owner (that is, the transferor); other actions, such as the transferee's publication of the material carrying a notice only in its name, would result in publication without proper notice, thereby injecting the material into the public domain. 3 *NIMMER ON COPYRIGHTS § 10.01[C][2]* at 10-12 to 10-13. In light of the rapid development of different forms of media in which material could be reproduced, pressure began to build against continued adherence to the doctrine of indivisibility, resulting in the creation of various judge-made exceptions to its application. *Id.* at 10-6 to 10-7. One such exception crafted by some courts was conceptualizing "such rights" conveyed as being "held in trust for the benefit of the" transferor but with "legal title" resting in the name of the transferee thereby [**91] allowing for the publication with notice thereto in the name of the transferee. *Id.* at 10-13 to 10-14; *see also Runge v. Lee, 441 F.2d 579 (9th Cir. 1971).* As Professor Nimmer observed, such judge-made exceptions effectively "administered a death blow" to the doctrine "even under the 1909 Act." 3 *NIMMER ON COPYRIGHT § 10.01[B]* at 10-9.

Although each side frames the issue differently, both do so in a manner that limits the analysis of the work for hire issue to the artists and Detective Comics. (Pls.' Opp. to Defs.' Sur-Reply at 6; Defs.' Reply at 9 n.8). However tempting it is to follow suit, the Court cannot so easily unburden itself from confronting the relevant evidence in the record and is instead tasked with attempting to give legal meaning to that evidence.

In determining the significance of McClure's role, the Court does not write on an empty slate. The significance from a copyright perspective of the terms in these very agreements was previously litigated and adjudicated by the courts, a fact which neither party brought to the Court's attention in their briefs, at oral argument, or in the numerous unsolicited post-hearing briefs submitted.

In 1941, Detective Comics filed suit [**92] against Fawcett Publications, alleging that Fawcett's comic book character Captain Marvel, a character who possessed super strength and super speed, who wore a skin-tight costume with a cape, and who hid his superhero identity by way of a radio-reporter alter ego, infringed the copyright to Superman. Thus began a twelve-year legal battle. As a defense to the action, Fawcett argued that the copyright to Superman had entered the public domain due to asserted defects in the manner and form in which McClure had affixed copyright notices on the publications of the Superman newspaper strips. *See National Comics Publications, Inc. v. Fawcett Publications, Inc., 93 F. Supp. 349, 356 (S.D.N.Y. 1950)* (cataloguing the various forms to which McClure affixed, or in some cases did not even attempt to affix, a copyright notice for the newspaper strips). Detective Comics' response was that it could not be charged with any defects in [*1072] the copyright notice as those "were errors and omissions of McClure, by which it is not bound, for McClure was merely a licensee, and a licensee cannot relinquish or abandon the rights of his licensor." *Id. at 357*. Thus, the relationship of the parties to one another in [**93] the 1938 newspaper syndication agreement vis-a-vis ownership of the copyrights to the Superman newspaper strips assumed critical importance in resolving the case. *See Detective Comics, Inc. v. Fawcett Publications, Inc., 4 F.R.D. 237, 239 (S.D.N.Y. 1944)* (noting that Fawcett's defense would render "the status of McClure, insofar as 'Superman' is concerned, and the validity of its copyrights relating thereto, . . . a material inquiry"). [15]

15    When Detective Comics later merged into and became National Comics Publications, Inc., the latter was substituted as plaintiff.

At trial, the district court rejected Detective Comics' argument that McClure was merely a licensee. Instead, the district court determined that the arrangement put in place by the newspaper syndication agreement was in the nature of a joint venture. *See Fawcett Publications, 93 F. Supp. at 357* ("I think that this contention is unsound, as the agreement with McClure was not a mere license to use the strips but an agreement of joint adventure"). As explained by the district court:

The agreement with McClure contains all the elements of a joint adventure. The subject matter of the joint enterprise was

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 87 of 132    Page ID #:6551

Page 26

658 F. Supp. 2d 1036, *1072; 2009 U.S. Dist. LEXIS 78193, **93

the use of the "Superman" [**94] strips for the sole purpose of newspaper syndication. The artists agreed to create and draw the strips, Detective agreed to pay them for their work and to furnish the strips to McClure, and McClure agreed to sell the strips to newspapers. Both the artists and Detective agreed to cooperate with McClure. The proceeds of the sales (there could be no losses) were to be divided between Detective and McClure.

*Id.* The district court held that McClure took a valid copyright to the newspaper strips, but not because it was an "author, . . . proprietor, . . . [or] an assign"; rather, the district court held that the agreement's provision permitting McClure to copyright the strips in its name (which later reverted to Detective Comics) was a permissible manner by which a valid copyright could be taken. *Id. at 358.*

In light of this finding, the district court determined that "the errors and omissions of McClure" were indeed "chargeable to Detective," observing that "the rights and obligations of joint adventurers are substantially those of partners, and each participant in a joint adventure is an agent for the other." *Id.* The district court thereafter found that "with few exceptions," the newspaper [**95] strips were published without proper copyright notices and therefore the copyrights in the material for the same were abandoned into the public domain. *Id.*

On appeal, the Second Circuit, in a decision by none other than Judge Learned Hand, reversed and remanded. At the outset, the court noted that although characterizing the parties' agreement as one of joint venture would have "the same effect upon the copyrights in suit as though McClure were the proprietor," it found it unnecessary to decide whether that characterization was correct (although not without Judge Hand making the astute observation that the entire concept of joint venture is "one of the most obscure and unsatisfactory of legal concepts") as it concluded that "McClure was indeed the 'proprietor' of the copyrights" in the Superman newspaper strips and not a licensee of the same. [16] *National Comics Publications,* [*1073] *Inc. v. Fawcett Publications, Inc., 191 F.2d 594, 599 (2d Cir. 1951)* ("We agree with the result, but because we think that 'McClure' was indeed the 'proprietor' of the copyrights, and for that reason we do not find it necessary to decide whether the contract

constituted a 'joint venture'"). Thus, as a matter of [**96] copyright law, the acts and omissions of McClure vis-a-vis the copyright notices affixed to the material when it was published were chargeable to Detective Comics.

> 16    It was noted, however, that insofar as McClure simply borrowed existing Superman comic book material published previously by Detective Comics and then reprinted it for newspaper syndication then "at best 'McClure' could have become no more than a licensee." *Id. at 600.* McClure's copyright proprietor position with respect to the newspaper strips was for that material "which were produced and published under the contract of September, 1938." *Id. at 601.* Nowhere have the parties in the instant case sought to delineate which of the strips (outside the first two weeks of strips, which no one suggests was borrowed material) fall into these respective categories. Given the Court's ultimate disposition of the work for hire nature of the newspaper material produced after the September, 1938, agreement is concerned, the Court declines to address this issue.

Judge Hand noted that his conclusion was compelled by both the statute and from construing the parties' intent as revealed in the agreements. Only if McClure was determined to [**97] be a "proprietor" could its publication of the newspaper strips be done in such a manner that would secure copyright protection under the 1909 Act. *Id.* ("it is only on the assumption that 'McClure' was the 'proprietor' of the 'work' -- *i.e.,* of the 'strips' prepared by the 'Artists' under the contract -- that any valid copyrights could be secured by publication in the 'syndicated' newspapers"). Under Section 9, only "author[s] or proprietor[s]" were entitled copyright a work; section 10 provided that an author or proprietor could obtain copyright "by publication" with the "required" notice affixed; and section 19 detailed the required contents of that notice. Thus, unless "McClure was a 'proprietor' of the 'strips' the purpose of the parties to copyright them was defeated," a result to be avoided if it is possible to construe the words of the agreement to effectuate that purpose. *Id.*

Judge Hand found that the text of the syndication agreement compelled such a construction. *Id.* ("we say that the text [of the agreement] itself comports only with

Case 2:10-cv-03633-ODW-RZ     Document 80-4     Filed 09/20/10     Page 88 of 132     Page
ID #:6552

Page 27

658 F. Supp. 2d 1036, *1073; 2009 U.S. Dist. LEXIS 78193, **97

the conclusion that 'McClure' was to be the 'proprietor'") . Toward that end, the agreement was read as in effect placing ownership of the copyright [**98] with McClure to be held in trust for its intended beneficiary -- Detective Comics. As Judge Hand ably explained:

> [T]he "material" -- the "strips" -- is to be copyrighted in 'McClure's' name, but the copyright "reverts to Detective at the termination of this contract." That necessarily meant that, until the contract came to an end, "McClure" was to have the "title" to the copyrights, for property cannot "revert" from one person to another unless the person from whom it "reverts" holds title to it. Even though he holds it in trust, its fate depends upon his acts, not upon his beneficiary's. The sentence which immediately follows reinforces this conclusion; it reads: "The title 'Superman' shall always remain the property of Detective." That disclosed a plainly deliberate distinction between the word, "Superman," used as a "title," and the "works" which were to be produced in the future and published by "McClure" in the "syndicated newspapers": the title was to remain "Detective's" "property"; the copyrights were only in the future to become its "property." In final confirmation of this interpretation is the clause in which "McClure" assumed "to provide Detective with all the original [*1074] drawings [**99] . . . so that said drawings may be used by Detective in the publication 'Action Comics' six months after newspaper release." That is the language of a "proprietor," who assumes power to license another to copy the "works." Since for these reasons "McClure" became the "proprietor" of any copyrights upon "strips" published under the contract, in so far as it failed to affix the "required" notices upon the first publication of a "strip," and upon each copy published thereafter, the "work" fell into the public domain.

*Id.*

As a result of this conclusion, Judge Hand determined that insofar as McClure sent out "mats" to newspapers without any notice at all for the strips, the copyrights in those strips were indeed lost to the public domain. *Id. at 601.* The matter was remanded to the district court to conduct a new trial, in light of the court's narrowing of the class of strips that could be considered abandoned, on whether any newspaper strips placed at issue were validly copyrighted, and, if so, whether Fawcett's Captain Marvel character infringed the copyright contained therein. *See National Comics Publications, Inc. v. Fawcett Publications, Inc., 198 F.2d 927 (2d Cir. 1952).* Thereafter, the [**100] parties settled their dispute.

Accordingly, defendants' characterization of McClure as nothing more than a mere "licensee" of the newspaper strips with no legal title to the copyright in question was raised and rejected by the *Fawcett* decision. Defendants are bound by that judgment.

Applying *Fawcett* to the terms in the syndication agreement, the Court finds that, in essence, McClure and/or Siegel and Shuster (depending on whether the work was made for hire) obtained a grant (the "permission" noted in the agreement) from Detective Comics to the newspaper rights in the underlying, preexisting Superman material; that permission was provided so that the both could engage in the creation of a separably copyrightable derivative work (the newspaper "strips" referenced by Judge Hand of which McClure was the "proprietor") based on said pre-existing material owned by Detective Comics.

In this sense, discussion of divisibility is misplaced. As Professor Nimmer has noted by way of illustration strikingly similar to the circumstances presented in this case, even under the 1909 Act a party could hold the separate copyright contained in a derivative work, the pre-existing material of which was owned [**101] by a third party, without transgressing notions of indivisibility:

> [T]he producer of a motion picture . . . is undoubtedly the proprietor of the copyright in the resulting film. The film itself may be a derivative work based for example upon a novel. In order that the [film] not constitute an infringement of the novel the producer must obtain a grant of "motion picture rights" in the novel.

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 89 of 132    Page ID #:6553

Page 28

658 F. Supp. 2d 1036, *1074; 2009 U.S. Dist. LEXIS 78193, **101

However, because he was the proprietor of the final film did not under the 1909 Act render him the "proprietor" of the motion picture rights [in the novel]. He was the licensee of the motion picture rights in the novel but the proprietor of the derivative work motion picture.

3 NIMMER ON COPYRIGHT § 10.01[B] at 10-9 n.30. The same holds here. McClure was the licensee of the "newspaper right" in the underlying Superman copyright held by Detective Comics, but was an owner of the copyright in any of the new material found in the derivative newspaper strips.

Therefore, McClure's position as a "proprietor" and holder of legal title to the separate copyright in these derivative newspaper "strips" renders it conceivable [*1075] that the creation of those strips were made at its "instance and expense" (and thus a [**102] work for hire). [17] Thus, as alluded to earlier, although plaintiffs would prefer otherwise, the Court cannot escape consideration of the issue of whether the newspaper strips were works made for hire for McClure (rather than Detective Comics).

[17] "[T]he term 'proprietor' [was] used by the 1909 Act and case-law under it to refer" not only to those who are owners by assignment, but also "to employers who induce the creation of a work made for hire and thus own the copyright in it." Burroughs, 62 U.S.P.Q.2d at 1320 (citing Shapiro, Bernstein & Co. v. Bryan, 123 F.2d 697, 700 (2d Cir. 1941) ("[W]hen the employer has become the proprietor of the original copyright because it was made by an employee 'for hire,' the right of renewal goes with it, unlike an assignment")).

### 1. Post-September, 1938, Newspaper Strips

In order to evaluate whether the post-September, 1938, newspaper strips were made for hire, the Court first considers how the terms in the agreements themselves should be construed as a matter of contract law. Plaintiffs urge the Court to look at the terms in each agreement separate and apart from those contained in the companion agreement, treating the two agreements as standing alone [**103] as separate business deals. Defendants characterize the agreements as but sub-parts in a "total transaction" such that the terms contained therein "run together because this whole thing is one business." In defendants view, McClure was "just the . . . agent or the syndication arm of [an] arrangement" that "centered around Detective" Comics, and thus the terms in the agreements should be construed in conjunction with and as applying to those in the other agreement.

The Court finds both characterizations partly accurate. The terms in each agreement do overlap with, make reference to, and fill gaps in the other. However, there are areas in each agreement which are self-contained and unaffected by terms contained in the other agreement.

The employment agreement, for instance, bolsters the provision in the newspaper syndication agreement wherein the artists agreed "to maintain [the newspaper strips they submitted] at the standard shown in the sample submitted" by containing a provision within it that requires the artists to "properly perform the terms" in the newspaper syndication agreement. Likewise, the employment agreement fills in the blanks from the newspaper syndication agreement as [**104] to how and in what manner the artists would be compensated. The employment agreement also added a further dimension to a term in the syndication agreement by describing how the artists will be paid if, under the syndication agreement, Detective Comics later used the newspaper strips in its comic books (paying the artists at their normal "page rate less the percentage which McClure receives for said syndication"). Similarly, the newspaper syndication agreement expressly notes that payment for the artists' work would be addressed in the employment agreement.

In contrast, the self-contained aspects of the agreements are best illustrated by those relating to the hiring parties' contractual right to control and supervise the creation of the material crafted by the artists. Thus, for instance, the employment agreement provided Detective Comics a contractual right (as opposed to right to control inherent in fact that material was derivative of that to which Detective Comics held the rights to the underlying work) to control or supervise creation of "features." It is clear in reading the employment agreement that when it used the [*1076] term "features" it did so solely in reference to the artists' [**105] production of a comic book, describing the same as a "monthly feature," "monthly magazine," or "magazine." In contrast, when the employment agreement made

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 90 of 132    Page ID #:6554

Page 29

658 F. Supp. 2d 1036, *1076; 2009 U.S. Dist. LEXIS 78193, **105

reference to the artists' production of newspaper strips it employed terms such as "newspaper strips," "McClure Newspaper Syndication strip," "material furnished for syndicate purposes," and "syndicate matter." Just as importantly, in the one paragraph in the employment agreement that prohibited the artists from exploiting Superman with anyone else save Detective Comics and McClure, the agreement separately identifies each class of works rather than through use of defendants' purported global term "feature." (*See* Decl. Marc Toberoff, Ex. P ("You agree that you will not hereinafter at any place . . . furnish to any other person, firm, corporation, newspaper or magazine any art or copy for any comics to be used in any strip or comic or newspaper or magazine containing [Superman]")).

In applying the "instance and expense" test, the crucial question for the Court is how Siegel and Shuster fit into the scheme devised by the publisher and the newspaper syndicator. [18]

> 18  *Fawcett* left unanswered the question of how McClure acquired ownership [**106] of the copyright in these derivative newspaper strips. Was it acquired by assignment from the artists or by their creation of the material as a work for hire? Or was it acquired through an assignment from Detective Comics, who initially owned the copyright in the works at their inception as works made for hire? For the Court's purposes, this distinction is not of particular importance.

The Court begins with evaluating the expense element, which is made more complicated due to the method by which the pair were paid for the strips in question. Rather than being paid a salary or a sum certain for the newspaper strips, the artists were paid only a percentage of any "net proceeds" that their strips generated, that is, a royalty payment. Generally, this manner of payment tends to rebut the notion that the newspaper strips were made for hire. *See Martha Graham Sch., 380 F.3d at 641* (noting that "evidence that Graham personally received royalties for her dances . . . may rebut[]" the notion that the dances were made for hire); *Playboy Enterprises, 53 F.3d at 555* ("in contrast, where the creator of a work receives royalties as payment, that method of payment generally weighs against finding [**107] a work-for-hire relationship"); *Twentieth Century, 429 F.3d at 881* (finding that expense requirement met when publisher agreed to pay the author

"a lump sum for writing the book, instead of negotiating a royalty deal"); 2 PATRY ON COPYRIGHT § 5:61 ("Where payment is solely by royalties, this fact weighs against an employment relationship").

The fact that payment of a sum certain might be forthcoming to the pair for their work six months later if Detective Comics decided to reprint those newspaper strips in its comic books does not detract from the fundamental nature of the transaction as being geared toward a profit-sharing arrangement as the principal method of compensation for all involved. Moreover, defendants have not offered any evidence to show whether or to what extent Detective Comics actually exercised this option to reprint the newspaper strips, thus obligating Detective Comics to pay Siegel and Shuster a sum certain for those works.

Indeed, the ongoing and extent of the financial risk assumed by Siegel and Shuster with regards to the newspaper strips was significantly higher than they had borne in any of their other business dealings involving Superman. With respect to the [**108] comic book strips, any financial risk assumed by the pair for the expenses incurred [*1077] in creating the material would be quickly ameliorated by the publisher's decision to publish or not (a process taking only a matter of days or perhaps weeks). With respect to the newspaper strips, in contrast, such expenses could be borne for months or even longer depending entirely on the material's commercial success.

Admittedly, questions concerning the particular method of payment for the work have lessened in importance over the years in determining whether it was one made for hire. As Patry has written in his treatise, "[b]oth the Second and Ninth Circuits have taken a nuanced look at compensation," allowing courts to turn aside or otherwise diminish the importance that receipt of payment was in royalties has insofar as whether something was a work for hire. 2 PATRY ON COPYRIGHT § 5:61 (citing *Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1142 (9th Cir. 2003)* ("That some royalties were agreed upon in addition to this sum is not sufficient to overcome the great weight of the contractual evidence indicating a work-for-hire relationship") and *Playboy Enterprises, 53 F.3d at 555* (wherein the [**109] court observed that royalty payments are not conclusive)).

Diminishing the importance of this evolution,

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 91 of 132    Page ID #:6555

Page 30

658 F. Supp. 2d 1036, *1077; 2009 U.S. Dist. LEXIS 78193, **109

however, is the fact that, in nearly all of these cases, the authors of the works in question were paid a salary or some other sum certain in addition to the receipt of royalties. *See Estate of Hogarth, 62 U.S.P.Q.2d at 1317* ("Where, as here, the creator receives both a fixed sum *and* royalties, the fact that the creator received a fixed sum is sufficient to meet the requirement that the works be made at the employer's expense"); *Warren, 328 F.3d at 1142* (creator received a fixed sum in addition to royalties). Here, Siegel and Shuster were paid only royalties. Such a financial arrangement, especially when viewed through the realities of the parties' relationship, places this case on the outer edges of the work for hire doctrine.

There are, however, other features present related to the works creation (factors centered on the instance prong) that go to the core of what is envisioned by a work made for hire relationship. Clearly, Siegel and Shuster were engaged (however viewed, by McClure or by Detective Comics, or by both) to create the material. They were clearly done at the instance [**110] of *either* McClure or Detective Comics. The syndication agreement (reinforced by the employment agreement) tasked the pair as part of their job duties with the creation of the works in question. Siegel and Shuster could be replaced if they did not submit their work on time. Just as critically, the right to control the process in creating the work was doubly reinforced between the pair's employers: McClure possessed the contractual right to supervise the artists' work (which it in fact exercised for a period of time) and Detective Comics possessed the additional right to supervise and control the work as the rights holder of the pre-existing Superman material utilized in the creation of the derivative newspaper strips. This engagement to create and this right of control over the artist's creation of the work is not indicative of a joint venture with the artists; rather, it is reflective of a more traditional employment engagement. [19]

19 Moreover, the arrangement lacks some of the key elements for a joint venture to be found under New York law: A sharing of some degree of control over the venture and a sharing of the *losses* (as well as the profits) from the venture. *See Itel Containers Intern. Corp. v. Atlanttrafik Exp. Service Ltd., 909 F.2d 698, 701 (2d Cir. 1990)* [**111] (setting forth test under New York law for joint venture); *Dinaco Inc., v. Time Warner, Inc., 346 F.3d 64, 68 (2d Cir. 2003)*

(holding for a joint venture the parties "must submit to the burden of making good the losses" of others to the venture); *In re PCH Associates, 949 F.2d 585, 602 (2d Cir.1991)* (right to inspect books and records not sufficient control for purposes of establishing a joint venture).

[*1078] In essence, read together, the syndication agreement and employment agreement is suggestive of a loaned employee arrangement (although the "employees" were more accurately viewed as independent contractors). *See* 2 PATRY ON COPYRIGHT § 5:79 n.1. Detective Comics retained a measure of control over the artists; McClure retained control over the works those artists created and that it intended to exploit for the benefit of Detective Comics, McClure, and the artists themselves. However those duties were conceived and to whomever they were owed, the fundamental point remains that the instance in creating those newspaper strips rested with someone other than Siegel and Shuster.

In this respect, the Second Circuit's decision in *Picture Music,* which applied the instance and expense test, [20] is [**112] eerily similar to the facts presented here. [21] There, the issue presented was whether the adaptation of the musical score, "Who's Afraid of the Big Bad Wolf," from the Walt Disney cartoon, "The Three Little Pigs," into a song was a work made for hire.

20 Although not expressly discussing the two separate prongs of the instance and expense test, *Picture Music* clearly applied both, as the Court does here. *See Burroughs, 342 F.3d at 160 (2d Cir. 2003).*
21 The Ninth Circuit has on more than one occasion cited approvingly to the Second Circuit's decision in *Picture Music.* See *Twentieth Century, 429 F.3d at 880*; *Warren, 328 F.3d at 1142.*

Walt Disney and Irving Berlin, Inc. (apparently the author of the musical score), believed that the score from the movie could be made into a popular song. With Disney's approval, Berlin engaged Ann Ronell, an apparent freelancer, to assist in the adaptation; "she did so, rearranging the musical themes in collaboration with an employee of Berlin, and arranging the existing lyrics and adding new ones of her own." *457 F.2d at 1214.*

Disney thereafter agreed that, "[i]n exchange for an agreement to pay certain royalties[, it would] assign all its rights in the new [**113] song to Berlin," and further

658 F. Supp. 2d 1036, *1078; 2009 U.S. Dist. LEXIS 78193, **113

agreed that "either one-third or one-fourth of its royalties should be paid to Miss Ronell for her services." *Id.* The copyright in the song was subsequently registered in Berlin's name, with a credit of authorship to Ronell and Frank Churchill, the Disney employee who had composed the original score for the film. *Id.* at n.1.

Thereafter, when the right to seek the renewal term accrued, Ronell claimed that she owned a one-half interest in the song. Berlin's successor in interest defended by asserting that Ronell's contribution to the song was a work made for hire. Notwithstanding that Ronell was paid only royalty payments (and not a "fixed salary"), the Second Circuit agreed.

Much like the present case, the *Picture Music* case involved three parties, not the usual two parties to an employer-employee relationship. In *Picture Music,* an artist freelanced with another party (Berlin) to adapt a score owned by a third party (Disney) into a song. The Second Circuit was unconcerned with this variation on the more ordinary dyad business relationship and method of payment: "The purpose of the statute is not to be frustrated by conceptualistic formulations of the employment [**114] relationship." *Id. at 1216.*

Also much like the present case, the Second Circuit found a right to control the artist's work on the part of both of the other parties, although one party had more direct control than the other: "[T]he trial court found that employees of Berlin did in fact make some revisions in Miss Ronell's [*1079] work. Moreover, since Disney had control of the original song on which Miss Ronell's work was based, Disney (and Berlin, with Disney's permission), at all times had the right to 'direct and supervise' Miss Ronell's work." *Id.*

Although certain initial copyright registrations designated Siegel and Shuster as the "authors" of the newspaper strips, the registration certificates in *Picture Music* listing the artist as the song's "author" was disregarded in favor of the realities of the parties' relationship; so too, here, the fact that McClure took it upon itself to list Siegel and Shuster as the "author" of the newspaper strips is effectively rebutted when one looks to the realities of the parties' actual business relationship. *See Burroughs, 342 F.3d at 166-67* ("A certificate of registration creates no irrebuttable presumption of copyright validity . . . [w]here other evidence [**115] in the record casts doubt on the question, validity will not be assumed").

Finally, and for the Court's current purpose, most importantly, the court clearly considered the method of payment for Ronell's work -- solely by way of royalties -- not dispositive of whether the song was made for hire: "The absence of a fixed salary, however, is never conclusive, nor is the freedom to do other work, especially in an independent contractor situation." *Picture Music, 457 F.2d at 1216.*

As the *Picture Music* court summed up its holding: "In short, the 'motivating factors' in the composition of the new song, 'Who's Afraid of the Big Bad Wolf,' were Disney and Berlin. They controlled the original song, they took the initiative in engaging Miss Ronell to adapt it, and they had the power to accept, reject, or modify her work. She in turn accepted payment for it without protest . . . . That she acted in the capacity of an independent contractor does not preclude a finding that the song was done for hire." *Id. at 1217.*

The Court can here sum up its ruling in an almost identical manner. After the execution of the syndication and employment agreements, the artists did not independently decide to create the [**116] newspaper strips; rather, they did so because they were contractually obligated to do so and because they expected to receive compensation for their creations. McClure retained editorial supervision rights over the material; it could "accept, reject, or modify [the pair's] work." Detective Comics owned the original work from which the derivative newspaper strips were created; it agreed to allow Siegel and Shuster to continue to create derivative works based upon it. Siegel and Shuster assented to this arrangement. That they did so in the capacity of independent contractors, like the artist in *Picture Music,* "does not preclude a finding that [the newspaper strips] were done for hire."

Thus, the Court concludes that the expense prong is met, and that the newspaper strips were works made for hire. However the duties of the artists were conceived, and to whomever they were owed, the fundamental point remains that the instance in creating those newspaper strips Siegel and Shuster rested with someone other than themselves. Such indicia of a work for hire relationship insofar as the creation of the newspaper strips is concerned is reflected in the facts that the employment agreement obligated [**117] them to timely supply -- "shall furnish" -- the necessary material to McClure; the syndication agreement specified that the copyright in that

material belonged to McClure, not Siegel and Shuster; and the syndication agreement noted that, if the pair did not meet their obligation of timely supplying such material to McClure, Detective Comics could appoint someone else to create the Superman newspaper strip. Far from suggesting that the creation of the material fell outside the scope of the pair's rights [*1080] and duties under the auspice of their employment with Detective Comics, the agreements demonstrate how deeply enmeshed and integral the creation of such newspaper strips were to Siegel and Shuster's job.

Of course, the splitting of the employer role between McClure and Detective Comics makes the characterization of that role (*i.e.,* whether the true employer was McClure or Detective Comics, or both) a much harder question, but that difficulty is easily surmounted for purposes of the present inquiry: Whether the artists' created the newspaper strips within the scope of their job duties. This they clearly did.

Moreover, although in some circumstances the royalty payments could lead [**118] to a conclusion (as suggested by plaintiffs) that the parties entered into a joint venture, here, the peculiar structure of the arrangement does not (as it did not in *Picture Music*) alter the core nature of the relationship. Specifically, the arrangement "employ[ed]" the artists to provide art work and continuity to Detective Comics and to "furnish," as part of their duties, the newspaper material to McClure. The arrangement allowed the artists to be replaced by other artists if they failed to do so in a timely manner. Thus, as in *Picture Music*, the fact that the pair were paid in royalties rather than a sum certain does not alter the relationship in such a fashion as to lead to the conclusion that the works were not made for hire. Indeed, the parties' arrangement left no doubt that Siegel and Shuster's role in creating the material could be (and was in fact) substituted by other artists should they fail to timely supply such material. In this respect, Siegel and Shuster's role was much like that of an employee or independent contractor retained to perform a job, not that of a partner to a joint venture.

In sum, this case, much like *Picture Music*, lies on the outer boundaries of what [**119] would constitute a work made for hire, but given that the core elements sought to be captured and addressed by the doctrine are present, the Court finds that the newspaper strips created by Siegel and Shuster after September, 1938, were works

made for hire and accordingly the termination notices submitted by plaintiffs do not reach the grant to those works.

Thus, because the Court finds that the newspaper strips created by Siegel and Shuster after September 22, 1938, were works made for hire, the right to terminate does not reach the grant to those works.

### 2. *Pre-Syndication Agreement Newspaper Strips*

In stark contrast to the post-syndication agreement newspaper strips, it is clear from the record that the initial two weeks' worth of newspaper strips were not created at the instance of either Detective Comics or McClure; instead, a wholly different "motivating factor" instanced their creation by Siegel and Shuster during the spring of 1938.

The sequence of events surrounding these two weeks' worth of newspaper strips is telling: It began with Siegel soliciting interest in Superman for newspaper syndication in March or early April, 1938. McClure expressed some interest, telling Siegel to [**120] draft two weeks' worth of material for syndication and suggesting that the material fill in the background of Superman's origins and arrival on Earth. Siegel and Shuster created the material, focused on Superman's origin and arrival, and submitted it to McClure. McClure then *returned* the material to Siegel pending its decision whether it wished to proceed with syndication efforts. In the meantime, Siegel [*1081] submitted the material to *other* newspaper syndicators for their consideration. Eventually, McClure, not any other newspaper syndicator, entered into a syndication agreement with Detective Comics and the artists. [22]

> 22  Both sides make attempts at historical revisionism of this record. However, viewed in light of this record, plaintiffs' contention that Siegel had written the script for the two weeks of material "on his own volition," before soliciting McClure's interest is unsupported. (Pls.' Obj. Defs.' Reply at 13). Siegel's own recounting of how and when the material was created contradicts this contention. Defendants' characterization of the facts fares no better. They assert that Siegel's solicitations for Superman's appearance in newspaper strips was at Detective Comics' direction [**121] or, at least, with Detective Comics' approval. (Defs.' Obj. to Pls.'

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 94 of 132    Page
ID #:6558

Page 33

658 F. Supp. 2d 1036, *1081; 2009 U.S. Dist. LEXIS 78193, **121

July 28, 2008 Opp. at 8). The evidence clearly shows that Siegel first approached McClure, then *later* sought to bring Detective Comics into the fold *after* receiving a positive response from McClure.

It is clear to the Court that the initial two weeks' worth of newspaper material Siegel and Shuster created in the spring of 1938, well *before* the syndication agreement, was not made at the instance or expense of anyone but the artists. Admittedly, McClure did ask for the material to be created and did make suggestions as to its subject matter, but such requests were done outside the confines of any business relationship between the parties and, more importantly, other circumstances rebut the importance of this fact. Moreover, the work was created without any discussion of, much less any guarantee of, compensation and without any commitment from McClure that it would ever publish the material.

Defendants place great weight on the fact that the two weeks' worth of newspaper strips were derivative in nature, arguing that such status forecloses the work's creation from being done in the instance of anyone but the owner of the [**122] underlying material -- Detective Comics. However, the cases defendants cite to for this proposition, as noted by the Court in its prior order in the Superboy matter, require that the rights holder to the underlying material actually be the one that sought out and engaged the artists to create the derivative work beforehand. *See Siegel, 496 F. Supp. 2d at 1142-44.* Here, creation of the first two weeks' worth of newspaper strips were not commissioned by Detective Comics, but, at most, were commissioned by McClure, who *at the time* held no rights to the underlying Superman copyright.

Following up on that point, defendants next seek to label Siegel's interaction with McClure as little more than "an inchoate solicitation requesting an opportunity to perform a work," which it is argued is insufficient to rebut a finding that the matter was done at the instance of the artists. For this proposition, defendants rely on the district court's opinion in *Burroughs.* In that case, the noted illustrator Burner Hogarth approached the owner of the copyright in the character Tarzan, Edgar Rice Burroughs, Inc. ("ERB"), suggesting that the company "take up the illustration of the Tarzan Sunday Color Page," [**123] which could be reproduced in "hard cover book." ERB later replied that the company's comic book properties were in flux and that the two would have

to "suspend our discussions temporarily." Undeterred, Hogarth wrote back six months later, noting his availability to create the Tarzan artwork. At that point, ERB wrote a series of letters (dated in July, 1970) inquiring whether Hogarth could produce "a quality, high priced edition of an adult version Tarzan of the Apes in graphic form," "described in detail" what it envisioned the book to be, and "proposed terms for the project" (including compensation) that ultimately found there way into the parties' written agreement. *Id. at [*1082] 1303-04.* Thereafter, Hogarth set about creating the work requested.

With this factual backdrop, the district court concluded that Hogarth's early contacts with ERB were not sufficient to demonstrate the book was made at his instance, commenting "not every solicitation requesting an opportunity to perform work constitutes an instancing." *Id. at 1316.* Instead, the district court found the book project was "first 'instanced' by [ERB] in [its July, 1970] . . . letters, which predicted all of the principal terms for [**124] production of the . . . Books." *Id.* The district court further found significant the fact that because Hogarth was dealing directly with the owner of the underlying Tarzan material of which the book solicited would be derivative: "[I]t would be 'beyond cavil that [he] would . . . have undertaken production of artwork for the Books [or] brought [it] to publication, without receiving the assignment from ERB to do so." *Id. at 1317.*

In contrast, here, the uncontroverted evidence shows that Siegel and Shuster did just that: Siegel created the script and Shuster created the artwork for the first two weeks of newspaper strips without any indication that they received permission to do so beforehand from Detective Comics. Admittedly, both Siegel and McClure understood such permission from Detective Comics would ultimately have to be forthcoming before the material could be published, [23] but that is a far cry from the notion that Detective Comics engaged Siegel and Shuster to create the material at its instance. To the contrary, the clearly defined (and expressed) understanding that an artist must *eventually* obtain from a copyright holder approval of his or her actions in creating a derivative [**125] work before that work may be *published* is fundamentally incompatible with the notion that the copyright holder tasked that artist with *creating* the derivative work in the first instance. Unlike the artist in *Burroughs,* Siegel did not solicit from the underlying

658 F. Supp. 2d 1036, *1082; 2009 U.S. Dist. LEXIS 78193, **125

rights holder an opportunity to create a derivative work; he instead solicited a third party who at the time held no rights.

23   This is evidenced by McClure's admonition in its correspondence with Siegel that he "should get a letter from [Detective Comics] before [the parties could] get down to brass tacks on SUPERMAN."

Nor does the fact that Siegel and Shuster were engaged by Detective Comics for creating Superman material necessarily lead to the conclusion that the newspaper strips were done at Detective Comics' instance. Such material did not fall within the scope of what Detective Comics had (at the time) commissioned them to produce -- comic *books*. This fact was reinforced by Detective Comics letter *after* the execution of the syndication agreement that it did not view creation of the newspaper material as giving it "little to gain in a monetary sense" and by Siegel and Shuster's later testimony during the 1947 Westchester [**126] litigation that the impetus to seeking such newspaper syndication material after the March 1, 1938, grant was precisely because Detective Comics was *not* in the business of syndicating newspaper comic strips.

Nor ultimately does the Court conclude that the material was prepared at McClure's instance. The fact that the material was created only after Siegel approached McClure and Mcclure suggested a specific subject for the material (Superman's origin and arrival on Earth) would normally lead to the conclusion that the work was done at McClure's instance. *See* 2 PATRY ON COPYRIGHT § 5:74 ("whether the hiring party is the motivating factor for the creation of the work, a very important, and usually determinative factor is whether the work was substantially completed at the time it was allegedly specially ordered . . . . [*1083] If the work has not been begun before the parties meet, this fact weighs in the hiring party's favor"). That McClure did not involve itself in supervising the creation of the artists' work is likewise unimportant. *Id.* ("the 'status of a work created by an independent contractor as a specially ordered . . . work made for hire has nothing to do with whether the commissioning [**127] party exercise any . . . supervision and control over the independent contractor's work.' Instead, it is sufficient that the hiring party request a specific type of work without having to be involved in the details of its creation"). There is, however, one complicating wrinkle that distinguishes this case from all the other cases where a work is made by request as a condition for obtaining employment -- when presented with the works reflecting the suggested storyline, McClure promptly returned it, commenting that it would defer making a decision on the matter.

On this point, the Court finds the events that occurred after the materials' return of great significance: Siegel and Shuster attempted to sell this same two weeks' worth of newspaper strips to another syndicator (The Register and Tribune Syndicate), a fact which they publicized to Detective Comics and McClure without objection from either. If the material was intended by the parties to be a work made for hire owned by McClure, such an act would be completely contrary to such ownership. That the artists nonetheless openly engaged in such efforts to sell the work to others weighs heavily against creation of that material being [**128] treated as a work for hire. *See Martha Graham Sch., 380 F.3d at 638* (finding significant in conclusion that works (choreographed dances) were not made for hire the fact that even after employing the artist to teach she "continued to receive income from other organizations for her dance teaching and choreography").

Furthermore, the comment in the correspondence from the other syndicator -- that "[a]ny action on our part should not conflict with your progress in dealing with the McClure Syndicate[; i]f they are in a position to take on your strip, naturally I presume you will want to go ahead" -- gives the impression that ownership in the material was still, at that time, up for bid, with McClure, at most, operating under the auspices of an informal right of first refusal and not under the assumption that the rights belonged to any particular syndicator from its inception. Such a "right of first refusal . . . is fundamentally incompatible with a finding that a work . . . is . . . made for hire." *Siegel, 496 F. Supp. 2d at 1141. Cf.* 1 NIMMER ON COPYRIGHT § 5.03[B] [2][D] at 5-56.8 ("[A] commission relationship may not exist, even if the work is prepared at the request of an other, and [**129] even if such other person bears the costs of its creation, where the person requesting the work is expressly granted only a one-time use").

This leads to the next significant factor: That the creation of the material occurred without any mention or provision for compensation (either a fixed sum or a percentage royalty) for the artists. Even after creating the

Case 2:10-cv-03633-ODW-RZ Document 80-4 Filed 09/20/10 Page 96 of 132 Page ID #:6560

Page 35

658 F. Supp. 2d 1036, *1083; 2009 U.S. Dist. LEXIS 78193, **129

material, Siegel and Shuster's efforts went unpaid for at least five months. This distinguishes the present case from *Burroughs* where the commissioning party's suggestion for the creation of the work contained within it a recital of the basic financial terms of the engagement. Simply stated, there is no evidence that the material in question was made at the expense of anyone save for the artists that created the material, and who in turn shopped it to multiple syndicators looking for any takers to its publication.

Accordingly, the Court finds that the two weeks' worth of newspaper comic strip material created by Siegel and Shuster [*1084] during the spring of 1938, *before* the execution of the syndication agreement were *not* works made for hire.

## IV. [**130] ASSIGNMENT OF THE FIRST TWO WEEKS' WORTH OF NEWSPAPER STRIPS AND TERMINATION NOTICE DEFICIENCIES

As with all the Court's findings regarding work-for-hire status, this conclusion has certain legal ramifications that necessarily flow from it which raise secondary legal arguments concerning the plaintiffs' ability to terminate the grant of these two weeks' worth of newspaper strips. Thus the Court must address whether all of the rights to the first two weeks' worth of newspapers strips were assigned, the failure to serve McClure with the termination notice, and the failure to identify the first two weeks' worth of newspaper strips among the works subject to termination in the notice.

### A. *Assignment of the First Two Weeks' Worth of Newspaper Strips*

Because the initial two weeks' worth of newspaper strips were not works made for hire, when those strips were created, the copyright in them belonged at its inception to Siegel and Shuster. That copyright was protected under state common law until the works were published in January, 1939, at which time federal statutory copyright protection may have attached, depending upon compliance with certain statutory formalities. *See Siegel v. Time Warner Inc., 496 F. Supp. 2d 1111, 1130 n.7 (C.D. Cal. 2007).* [**131] As Professor Nimmer explains in his treatise: "As to a work created and the subject of statutory copyright prior to [the 1976 Act], such copyright did not subsist from the moment of creation. Rather, it became effective either upon publication with notice . . . . Prior to such

publication . . . , a work created before [the 1976 Act] was protected from its creation under the state law of common law copyright. Common law copyright in a work initially vested in the author or authors thereof." 1 *NIMMER ON COPYRIGHT § 5.01[B]* at 5-6. Because the Court has found that the two weeks' worth of newspaper strips are not works made for hire, the "author" of those strips would be Siegel and Shuster, not Detective Comics or McClure. This designation is important because it impacts who may claim ownership of the works when published, the required contents of the copyright notice affixed to the works when published, and the contents of the registration certificate that was issued.

The 1976 termination provisions are limited only to grants in federally copyrighted works, meaning works subsisting in a statutory initial or extended renewal term as of the 1976's effective date. The right to terminate does [**132] not apply to unregistered copyrights protected at common law or copyrights to works that have fallen into the public domain as of the time of the 1976 Act. *See* PATRY ON COPYRIGHT § 7:42. Thus, for termination notice to be effective to reclaim the rights to the newspaper strips, the newspaper strips must have obtained proper federal statutory copyright protection and maintained that protection up through the time of the 1976 Act. This then raises the question of whether and how Siegel and Shuster did obtain such statutory copyright protection of the material in their newspaper strips under the 1909 Act; any defect in the process would call into question plaintiffs' ability to terminate the grant to the copyright in those works. Again as Professor Nimmer explains:

However, the subsequently obtained statutory copyright [upon publication with notice] vested in such author or authors only if prior thereto, there had not been a transfer of the common law copyright . . . . In the event of such disposition, it was the transferee and not [*1085] the original author or authors in whom statutory copyright initially vested. The determination of the proper person initially to claim statutory copyright under [**133] the 1909 Act remains of more than antiquarian interest, as an improper claim under the 1909 Act could have injected a published work into the public

658 F. Supp. 2d 1036, *1085; 2009 U.S. Dist. LEXIS 78193, **133

domain.

1 *NIMMER ON COPYRIGHT* § 5.01[B] at 5-6.

The question of assignment is highly significant because, under the 1909 Act, agents and licensees could not claim such statutory copyright ownership, but an assignee could. "The assignee of an author's common law copyright might, by virtue of such assignment, claim statutory copyright." *Id.* at 5-7.

The pertinent facts are reiterated for purposes of this discussion: The first two weeks of newspaper strips were first published on January 16, 1939, in the *Milwaukee News Journal,* which contain the following notice affixed thereto "Copyright, 1939". The initial copyright registration is treated as having been registered in the name of McClure Newspaper Syndicate, listing as the works authors "Jerry Siegel and Joe Shuster, of United States." [24] Later on July 3, 1944, McClure "assigned to Detective Comics, Inc. all its rights, title and interest in all copyrights in SUPERMAN, including the copyrights and all renewals and extensions thereof." [25]

24    Defendants state that the copyright notice under which [**134] the material was first published was "in the name of McClure," (Defs.' Obj to New Arguments at Hearing at 1), but as noted by the Court, the notice affixed thereto actually did not list McClure, or anyone, as the copyright proprietor. Such a designation in the notice was required by § 19 under the 1909 Act, but this defect is of no consequence as the Second Circuit's decision in *Fawcett* held that such a defect in the notice was saved by virtue of § 21 except in those instances in which McClure "sent out 'mats' [of the strips to newspapers] without any notice at all"; in such a situation "the copyrights on those 'strips' were lost, regardless of § 21." *191 F.3d at 601.*

25    Two years after this assignment from McClure, Detective Comics was consolidated into other companies into a company called National Comics Publications, Inc., which in turn was later consolidated in 1961 into the aforementioned National Periodical Publications, Inc. In the 1961 consolidation agreement it was represented that the new company had become "vested with all the properties of Detective Comics, Inc., and National Comics Publications, Inc.," including that it was

"the owner of and is vested with title to all [**135] of the copyrights (and renewals and extensions thereof) in the artistic and literary works consisting of newspaper cartoon strips or continuities entitled SUPERMAN which the McClure Newspaper Syndicate had from the first day of publication to July 3, 1944.

As the facts are presented in this case, an assignment by Siegel and Shuster to McClure must have occurred before publication of the initial two weeks' worth of newspaper strips; otherwise, the copyright notice on the works when first published was inadequate to comply with the statutory formalities, and the works have fallen into the public domain. (Defs.' Obj and Response New Arguments at 2 (assuming "Siegel and Shuster owned the copyright of these works from inception, there would need to have been an assignment from them of their entire copyright rights to McClure before the strips appeared, in order to avoid loss of copyright")).

Plaintiffs argue that the parties' course of conduct in conjunction with various terms in the syndication agreement itself clearly imply that such an assignment of the artists' rights in the newspaper strips to McClure occurred. As explained by plaintiffs:

While there is no express mention of a sale or [**136] transfer, under the [syndication] agreement Siegel and Shuster delivered the newspaper strips, protected by common law copyright, to McClure. McClure then copyrighted the material [*1086] in its own name [(which the syndication agreement clearly provided was permissible for them to do)], listing Siegel and Shuster as the 'authors.' McClure then granted an exclusive license to Detective with respect to the non-syndication rights [(namely, allowing Detective Comics to use the strips in its comic book magazines free of charge six months after the strips first publication in the newspapers)], and later on July 3, 1944 assigned the entire copyright [in the newspaper strips] to Detective per the term of the [syndication] agreement.

(Pls.' Opp and Response to Defs.' Sur-reply at 11)

658 F. Supp. 2d 1036, *1086; 2009 U.S. Dist. LEXIS 78193, **136

Defendants respond by arguing that an assignment must be supported by a clear, unambiguous, written instrument, and that such instrument is lacking here. (Defs.' Obj. and Response to New Arguments at 2-3 & n.5 ("there is no question that neither of the September 22, 1938 agreements include such an assignment . . . There is no language of copyright assignment" and further commenting that "any assignment of common law copyright [**137] would have to have been in writing under the statute of frauds"). This argument does not withstand scrutiny.

At the outset, the Court notes that an assignment of a common law copyright was not subject to a requirement of writing. To the contrary, during the time the 1909 Act was in effect, at common law, a copyright was capable of assignment so as to completely divest the author of his rights, "without the necessity of observing any formalities." *Urantia Foundation v. Maaherra, 114 F.3d 955, 960 (9th Cir. 1997); accord Epoch Producing Corp. v. Killiam Shows, Inc., 522 F.2d 737, 747 (2d Cir. 1975)* (noting that assignment need not be in writing); 3 *NIMMER ON COPYRIGHT § 10.03[B][2]* at 10-56.3 ("it appears that an assignment of common law copyright was not within the Statute of Frauds"). Other case law further demonstrates that such an assignment could be oral or could be implied from the parties' conduct. *See Jerry Vogel Music Co. v. Warner Bros., Inc., 535 F. Supp. 172 (S.D.N.Y. 1982); Van Cleef & Arpels, Inc. v. Schechter, 308 F. Supp. 674 (S.D.N.Y. 1969)*.

Having rejected the notion that any writing is required, the Court nevertheless concludes that the parties' syndication and employment [**138] agreements, as well as their actions, make clear that the requisite complete assignment of both the initial and the renewal term occurred.

Although the words "assign" or "transfer" do not appear in the syndication agreement, such an intent was demonstrated by other language contained in the agreement, as well as by Siegel and Shuster's delivery of newspaper strip material to McClure. The syndication agreement provided that McClure would hold "all the original drawings of the 'Superman' strip," which it would later provide to Detective Comics on license for publication in its comic books. Such expressed receipt of the "original" material in question and the ability to license that material is not the language used to describe the recipient of a mere license to the material in question,

but as one of an assignee. As Judge Hand remarked, "[t]hat is the language of a 'proprietor,' who assumes power to license another copy the 'works.'" *Fawcett, 191 F.2d at 599; see also Urantia, 114 F.3d at 960* (noting that language in trust instrument declaring that transferee "retain[ed] absolute and unconditional control of all plates . . . for the printing and reproduction . . . thereof" was indicative [**139] of an "intent to transfer the common law copyright").

Defendants also argue that there could have been no assignment to the two weeks' worth of newspaper strips through the syndication agreement because that agreement [*1087] indicated that at the time of the document's execution Siegel and Shuster "had already created 'the sample submitted' and that the subject 'daily strip . . . entitled 'Superman' . . . was owned by Detective." (Defs.' Obj. and Response to New Arguments at 3). This argument selectively pieces together different portions of the agreement as if they were written as a single whole, when in fact those sections, read in the context, clearly indicate that the parties were not speaking specifically to the initial two weeks of newspaper strips. Rather, they were speaking more generally to all newspaper strips published pursuant to the agreement. Similarly, the reference defendants make to the agreement noting Detective Comics' ownership to the title "Superman" does not necessarily apply to the strips themselves, a distinction which Judge Hand also drew when construing these same agreements.

Moreover, Siegel and Shuster not only allowed McClure to syndicate the Superman newspaper [**140] strips, they gave McClure the original manuscript and artwork to the same to McClure to hold in its possession. "It has been held that delivery of a manuscript suffices" for the purpose of establishing an assignment -- "so long as the intent to pass title in the common law copyright is likewise present." *NIMMER ON COPYRIGHT § 10.03[B][2]* at 10.56.3. Such an inference is particularly apt when "over a long period of time, the author and other interested parties had acquiesced in the putative assignee's ownership." *Urantia, 114 F.3d at 960.* Here, not only did the parties acquiesce in the agreement to McClure receiving the originals to the strips but the parties' agreement stated that the copyright notice in said material was to be made in McClure's name, something which under the 1909 Act could not be undertaken by a mere licensee but only "the author or proprietor" of the work. Sanctioning such conduct clearly constitutes an

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 99 of 132    Page
ID #:6563

Page 38

658 F. Supp. 2d 1036, *1087; 2009 U.S. Dist. LEXIS 78193, **140

acquiescence on Siegel and Shuster's part to McClure's ownership in the copyright to these newspaper strips, and is perhaps the clearest evidence in the syndication agreement itself to an assignment being made in favor of McClure by the artists.

Such language in the [**141] syndication agreement, and such action by the parties clearly demonstrate at minimum an intent to transfer the initial copyright term in the newspaper strips to McClure, *see Urantia, 114 F.3d at 960*, but there is other language in the parties' September 1938 agreements that demonstrate an intent by the authors to transfer the renewal term to those strips as well.

Not surprisingly, defendants contend that there was no such language of complete assignment from Siegel and Shuster in the newspaper syndication or employment agreements. However, when one surveys the agreements as a whole, it becomes readily apparent that there is language of assignment not just of the authors' rights to the initial term, but also (as held by and argued to the Second Circuit's during the litigation surrounding the rights to the Superman renewal term in the 1970s) the renewal term as well. Notably, the one paragraph in the employment agreement that makes reference to and separately identifies the artists' creation of both newspaper strips and comic books also contained language whereby the artists agreed that they were "furnishing" this global category of material "exclusively" to Detective Comics or to whomever [**142] else Detective Comics might designate, an obvious reference to McClure. *(See* Decl. Toberoff, Ex. P ("[Y]ou shall furnish such matter exclusively to us . . . as such may be required by us or as designated by us in writing.")).

Likewise, the concluding sentence to the paragraph in the employment agreement [*1088] which spells out the royalty payment terms for the newspaper strip material created by the artists, contains an acknowledgment by the artists that "all [such] material, art and copy shall be owned by" Detective Comics or whomever Detective Comics permits (undoubtedly a reference to the derivative nature of the work) the title in the same to be "copyrighted or registered in our name or in the names of the parties designated by us" (another clear reference to McClure).

Despite this language, defendants argue that it is not sufficient, as "there is no question that *neither* of the

September 22, 1938 agreements include such an assignment. The agreements speak for themselves -- they are not assignments from Siegel and Shuster to anyone." (Defs.' Obj. and Response to New Arguments Made at Hearing at 3). However, defendants' position is completely contrary to that which its predecessors in interest [**143] have taken in the seven decades since those agreements were executed. It has been the position of defendants and its predecessors in interest (made manifest during the 1970s litigation surrounding the rights to the Superman renewal term) that the March 1, 1938, grant as well as the other agreements the parties entered into (up to and including the 1948 stipulated judgment concluding the Westchester action), that the artists in each instance effectuated a complete assignment of both the initial and renewal terms to the Superman character.

Under the 1909 Act, general words of assignment can include renewal rights if the parties had so intended. *See Venus Music Corp. v. Mills Music, Inc., 261 F.2d 577 (2d Cir. 1958); cf. Fred Fisher Music Co. v. M. Witmark & Sons, 318 U.S. 643, 653, 63 S. Ct. 773, 87 L. Ed. 1055 (1943)* (observing that a specific intent to transfer the renewal term must be present). Following this line of authority, the Second Circuit in the 1970s Superman litigation held that evidence of the parties' conduct and iterations of their various contractual arrangements, which included language acknowledging that the publisher would hold title to the copyright in the character "forever" and prohibiting the [**144] artists' from exploiting Superman "at any time hereafter" except with the character's publisher, indicated not simply an assignment of the artists' initial term in the Superman character, but the renewal term as well. *Siegel, 508 F.2d at 913-914* (stating that "[t]he ready answer to this argument is that the state court action determined that the agreements conveyed all of the plaintiffs' rights in Superman to the defendants and not just the original copyright term" and noting that the presence of such general terms of conveyance in the parties' agreements such as "hold[ing] forever" a given right and agreeing not to use Superman in any other strip "hereafter" connoted an assignment to the entirety of the copyright in that material (emphasis added)).

This is the same language contained in the employment agreement ("owned by us" or McClure, "will not hereafter" exploit Superman character except with either Detective Comics or McClure, and shall

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 100 of 132    Page ID #:6564

Page 39

658 F. Supp. 2d 1036, *1088; 2009 U.S. Dist. LEXIS 78193, **144

provide such material "exclusively to us" or McClure), whose terms apply, in this context at least, to the syndication agreement. Defendants, having relied on that judgment for over thirty years to exploit Superman to the exclusion of any rights [**145] held by the artists, cannot at this late date be heard to complain that a court will likewise rely on that judgment as a basis to permit those artists to reclaim, under the statutorily provided termination scheme, the rights transferred in those much-hailed grants. Defendants are thus precluded both as a matter of judicial estoppel and as a matter of res judicata [*1089] from contesting whether there was "language of [complete] copyright assignment" to both the initial and renewal term to the Superman material at issue in the employment and newspaper syndication agreements.

Thus, the Court rejects the notion that the initial two weeks' worth of newspaper strips is not subject to termination on account of the lack of any assignment by Siegel and Shuster to McClure to the entire copyright in that material to McClure prior to the material's publication.

**B.** *Failure to Serve McClure with Termination Notice*

Defendants contend that, if there was such an assignment from Siegel and Shuster to McClure, plaintiffs' failure to serve a copy of the termination notice on McClure's successors renders the termination notice invalid. (Defs.' Obj and Response to New Arguments at 3 n.6). Because all of McClure's rights in [**146] the material were assigned to Detective Comics in 1944, and Detective Comics' successors were served with the termination notice, the Court rejects this argument.

The 1976 Copyright Act provides that the termination notice must be served upon the "grantee or the grantee's successor in title." *17 U.S.C. § 304(c)(4).* Moreover, the regulations provide that an investigation will satisfy this notice requirement in the context of termination of rights to works created before the effective date of the 1976 Act. *37 C.F.R. § 201.10(d)(2)* states that *section 304(c)(4)*'s service requirement is met if there has been a "reasonable investigation" as to the current ownership of the rights to be terminated and service has occurred on the person or entity "whom there is reason to believe" is the current owner by transfer from the grantee.

Soon after the 1976 Act became effective, courts were faced with the question of whether this provision,

stated in the disjunctive, meant that a notice served upon the immediate grantee would suffice, so that such grantee's current successor in title need not be notified of the termination of its rights; the reverse situation from that found in the present case.

In *Burroughs v. Metro-Goldwyn-Mayer, Inc., 683 F.2d 610, 633 (2d Cir. 1982),* [**147] the district court held that failure to serve the current successor in title rendered ineffective a purported termination, notwithstanding service on the original grantee. On appeal, although the Second Circuit found it unnecessary to decide that particular issue, Judge Newman addressed it in a thoughtful concurring opinion. Acknowledging that it was "not clear from the statute or the regulations who [as between the 'grantee' and 'the grantee's successor in title'] must receive notice of termination, and the legislative history offer[ed] no guidance," *id.,* Judge Newman construed the statutory provision as "sensibly read to mean that notice is to be served (a) on the grantee, if the grantee has retained all rights originally conveyed, (b) on the transferee, if the grantee has conveyed all rights to the transferee, or (c) if some rights have been conveyed, on the grantee or the transferee (or both) depending upon which rights are sought to be terminated." *Id. at 634 n.5.* In Judge Newman's view, the statute was written to require service on only those entities that currently hold a right to be terminated; it was not meant to require a mad dash to serve everyone and anyone who may have [**148] been involved in the chain of title to the copyright (but who possess no present right to the same), as suggested here by defendants. "Whatever the meaning of 'grantee' and 'successor in title' in the notice termination provision, it seems evident that their expression in the disjunctive was intended to cover various contingencies, not to afford those exercising [*1090] termination rights a choice as to whom to serve." *Id.*

As explained by Professor Nimmer, "It follows that if the grantee has transferred some but not all of the rights that he acquired under the grant, whether the original grantee, his successor with respect to some of the rights, or both, must be served will turn on which rights are purportedly terminated under the termination notice. If all rights are being terminated, all of the persons who own any portion of such rights must be served in order to effectuate the termination, as the district court concluded." 3 *NIMMER ON COPYRIGHT § 11.06[B]* at 11-40.20.

658 F. Supp. 2d 1036, *1090; 2009 U.S. Dist. LEXIS 78193, **148

The Court finds Judge Newman's concurring opinion in *Burroughs* to be persuasive, and adopts the reasoning contained therein. As summarized by Professor Nimmer, "[i]t follows, then, that service of the termination notice need [**149] only be made upon the last grantee in the chain of title of which those serving the notice are reasonably aware." 3 *NIMMER ON COPYRIGHT § 11.06[B]* at 11-40.18-11-40.21.

This is exactly what occurred here. Plaintiffs served the notice on the newspaper strips' most current owner -- Detective Comics' successors in interest, DC Comics. Defendants try to diminish the significance of the 1944 assignment from McClure to Detective Comics of all its (McClure's) rights in the newspaper strips as nothing but a meaningless gesture. [26] But if Siegel and Shuster had, in fact, assigned their copyright in the newspaper strips to McClure, then the transfer would be deeply meaningful as it is a clear and unambiguous [*1091] grant of both the initial and the not-yet-vested renewal term to the copyright in those strips, thereby rendering Detective Comics (as its immediate successor National Periodical Publications, Inc., would proclaim a few years afterwards) sole owner of the entirety in the copyright to those newspaper strips owing entirely to McClure's later assignment. Indeed, defense counsel conceded during oral argument that if McClure held the copyright to the newspaper strips in trust for Detective Comics, [**150] then it would have required a "reassignment" for the copyright to be transferred to Detective Comics. Given that Judge Hand held that the right in the material was indeed held "in trust" for Detective Comics, such an assignment was anything but a meaningless gesture.

[26]    The argument is built largely on the assumption that Detective Comics never received the ownership to the renewal term copyright by way of a "grant of a transfer or license" from McClure. *17 U.S.C. § 304(c)*. Such an argument seeks to make much of the fact that the first proviso to section 24 of the 1909 Act, provided that the right of renewal for a "periodical" work is given to "the proprietor of such copyright." Barbara A. Ringer, *Study No. 31 Renewal of Copyright* (1960), *reprinted in* 1 *Studies on Copyright* at 524. As explained by Ringer, "the 'proprietor' in this context means the owner of the copyright at the time renewal registration is made, and not the first or original proprietor. In other words, a 'proprietor' claim [to the renewal right]

follows the ownership of the copyright, and is not a personal right like the claim of an author under the second proviso." *Id.* Thus, when McClure secured the original copyright [**151] for the newspaper strips, it was the first proprietor and therefore entitled thereto to the renewal copyright in the same. Defendants argue that when ownership was transferred in this copyright from McClure to Detective Comics, that the renewal term, rather than being transferred by agreement, was transferred by way of an automatic function of the statute. (Defs.' Obj. to New Arguments at Hearing at 2 n.4). This distinction, however, is mistaken.

The second proviso to section 24 noted that "in the case of any other copyrighted work, including a contribution by an individual author to a periodical or to a cyclopedic work or other composite work, the author of such work" was entitled to the renewal term. Judge Learned Hand later defined the term, "composite work," for purposes of the first proviso in section 24, as limited to works "to which a number of authors have contributed distinguishable parts, which they have not, however, 'separately registered.'" *Shapiro, 123 F.2d at 699*. Here, however, the newspaper strips were separately registered in the name of their individual authors after the publication of the composite work in question, the newspaper. Indeed, the two weeks' worth of [**152] newspaper strips themselves bear a separate copyright notice on them. In such an instance, the author of the work was entitled to the renewal in the separately registered copyright, and hence, Detective Comics' receipt by way of assignment from McClure to said renewal term was not effectuated automatically by way of statute. *See Self-Realization Fellowship v. Ananda Church, 206 F.3d 1322, 1329 (9th Cir. 2000)* (holding that proprietor entitled to renewal term in composite work unless the individual contribution was separately registered).

No party disputes that the termination notice was served on DC Comics, the successor to Detective Comics and current holder of all the copyright in the newspaper strips. Accordingly, the termination notice complied with *section 304(c)(4)*, and is not defective based on plaintiffs' failure to serve McClure.

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 102 of 132    Page ID #:6566

Page 41

658 F. Supp. 2d 1036, *1091; 2009 U.S. Dist. LEXIS 78193, **152

### C. *Failure to Include Strips in Notice as Works Affected by Termination*

Having found that the initial two weeks' worth of newspaper strips created in the summer of 1938 were not works made for hire, having concluded that Siegel and Shuster assigned all their rights in the copyright to those two weeks' worth of strips to McClure (which later assigned [**153] all its corresponding statutorily protected copyright to Detective Comics), and having determined that plaintiffs' failure to serve McClure or its successor does not invalidate the termination notice as to these newspaper strips, the Court is confronted with one final question: Whether the failure to list in the termination notice the initial two weeks' worth of newspaper strips, first published in the *Milwaukee News Journal* in January, 1939, invalidates the termination notice as to these newspaper strips. (Decl. Michael Bergman Summ. J. Mot., Ex. X at 325 (complete termination notice reprinted)). In the end, the Court determines it does not.

A fact not lost on either party or the Court is that potentially valuable copyright elements subsist in this material, as it is the first material in which Superman's home planet of Krypton is named, Superman's Krypton name is revealed, and the circumstances surrounding Krypton's destruction are revealed. Plaintiffs, to their credit, candidly admit that the first two weeks' worth of newspaper strips are not listed in the termination notice; but they point to the fact that the notice did contain the following catch-all clause:

> This Notice of Termination [**154] applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stories, such as, without limitation, Superman, . . . the planet Krypton . . . . Every reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created. Nevertheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

(Decl. Bergman, Ex. X at 3 n.1).

Defendants, for their part, advocate a harsh rule: A mistake, even one of omission, is a mistake of consequence; where such a mistake is made, the authors and their heirs must suffer whatever consequences that flow from the resulting invalidity of the copyright notice. The Court cannot countenance such a harsh, per se rule that is divorced from the underlying facts.

[*1092] Although there is no approved form for termination notices, the Copyright Office has promulgated regulations specifying the required contents of a termination notice: It must contain a "complete and unambiguous statement of facts . . . without incorporation [**155] by reference of information in other documents or records," *37 C.F.R. § 201.10(b)(2)*, and it must include the following:

> 1. the name of each grantee whose rights are being terminated or the grantee's successor in title, and each address at which service is made;

> 2. the title and the name of at least one author of, and the date copyright was originally secured in, each work to which the notice applies (including, if available, the copyright registration number);

> 3. a brief statement reasonably identifying the grant being terminated;

> 4. the effective date of the termination; and

> 5. the name, actual signature, and address of the person executing the termination.

*37 C.F.R. §§ 201.10(b)(1)-(2), (c)(1),* and *(c)(4)*. The regulations promulgated by the Register of Copyrights also contain a safety valve that "[h]armless errors in a notice that do not materially affect the adequacy of the information required to serve the purposes of [the statute] shall not render the notice invalid." *37 C.F.R. § 201.10(e)(1)*.

In support of their position, defendants rely on *Burroughs v. Metro-Goldwyn-Mayer, Inc., 683 F.2d 610 (2d Cir. 1982)*. In that case, the author's heirs attempted

658 F. Supp. 2d 1036, *1092; 2009 U.S. Dist. LEXIS 78193, **155

to terminate the grant to the copyright [**156] in all the books written by Edgar Rice Burroughs featuring the character Tarzan. In the termination notice, however, the author's heirs mistakenly listed only 30 of the 35 Tarzan books written by Burroughs. In considering whether the termination notice was effective in recapturing the copyright in those five omitted books, the Second Circuit held that the omission, although inadvertent, rendered the termination notice invalid as to those omitted works. *Id. at 622* (noting that "the omission of the five titles" left the grant "in those five books . . . intact" and unaffected by the termination notice). In reaching this conclusion, the Second Circuit did not discuss *section 201.10(b)(1)*'s harmless error provision; rather, the court simply noted that the regulations required identification of the title and date of original copyright for each work sought to be recaptured, observed the omission in the termination notice, and held that therefore the termination notice was invalid as to the omitted works.

Defendants thus vastly overstate the holding of *Burroughs* as supporting the proposition that plaintiffs' "failure to identify [the newspaper strips] is fatal to their purported termination [**157] *and their omission cannot be mere 'harmless error.'"* (Defs.' Obj. to New Argument at Hearing at 7 (emphasis added)). Its failure to discuss the harmless error rule makes *Burroughs* of limited persuasive value to the Court's current analysis.

On this point, the Court has discovered only one court decision that considered whether omissions or defects in the termination notice were "harmless errors" such that the termination notice was effective. *See Music Sales Corp. v. Morris, 73 F. Supp. 2d 364 (S.D.N.Y. 1999)*. There, the termination notice consisted merely of a bland boilerplate statement: "Grant or transfer of copyright and the rights of copyright proprietor, including publication and recording right." Although finding that the generic statement would not "reasonably identify[] the grant," the district court nonetheless upheld its adequacy on the basis that "it appears to be boilerplate [*1093] on termination notices customarily accepted by the Register of Copyrights." *Id. at 378.*

Leading commentators have differing views on *Music Sales Corp,* and by extension, differing views on how stringent courts should be in applying the harmless error safety valve. Professor Nimmer, on one hand, is much [**158] more formalistic on this point, cautious of the proverbial slippery slope. As Professor Nimmer

explained in response to the *Music Sales* decision:

> [T]he Register of Copyrights does not pass judgment by accepting notices of termination, so that the ministerial act of filing them connotes no approval of their verbiage. On that basis, the court's citation to authority allowing agencies to interpret statutory requirements is inapposite. But the court also cites unspecified custom of the industry as validating the boilerplate approach. It remains to test what that custom might be.

3 *NIMMER ON COPYRIGHT § 11.06[B]* at 11-40.22 - 11.40.22(1).

Patry, on the other hand, praised the *Music Sales* decision as bringing the formalities contained in the regulations into conformity with the realities of how those regulations are actually administered by the agency that was charged with crafting them. *See* 3 PATRY ON COPYRIGHT § 7:45 ("In *Music Sales Corp. v. Morris,* the requirement of a 'brief statement reasonably identifying the grant to which the terminated grant applies' was reviewed, with the court wisely accepting industry custom and Copyright Office practices as indicating compliance").

The dearth of [**159] case law, along with the divergence of opinion between these two leading commentators, presents the Court with an apparent choice: On the one hand, the Nimmer approach, *i.e.,* an insistence on rigid adherence to the formalities specified in the regulations or, on the other hand, the less formalistic (but more practical), lax approach set forth in *Music Sales* and endorsed by Patry, *i.e.,* acceptance of industry and agency custom. The Court declines to choose one extreme or the other, applying instead a middle path that requires a more fact-intensive inquiry in applying the harmless error safety valve.

Here, it is clear to the Court that plaintiffs undertook enormous effort to comply with the overly formalist requirements of the termination provisions, literally providing 546 pages' worth of works subject to the termination notice. The purpose of the regulations is to give the recipient of the termination notice sufficient information to understand what rights of theirs may or may not be at stake. Here, any recipient of the

termination notice would quickly understand that the plaintiffs have sought to reclaim the copyright in any and all Superman works ever created. Indeed, any publisher [**160] receiving the notice would be foolish to believe otherwise. That the termination notice included a broad and comprehensive catch-all clause only reinforces that which the 546-page listing of titles of works subject to the notice makes painfully obvious.

This reasoning is all the more sound because what was sought to be recaptured involved the rights to works involving a particular character that has been continuously exploited for decades. It is this peculiar nature of the subject matter of the termination notice that makes rigid adherence to the regulatory formalities particularly inapt:

> In the case of works consisting of a series or containing characters requiring the terminating party to list separately each work in the series or all works in which the character appears would render the termination right meaningless. Instead, notice that reasonably puts the [*1094] terminated party on notice of the character being terminated is sufficient.

3 PATRY ON COPYRIGHT § 7:45. There is little doubt that plaintiffs' termination notice satisfies this concept of reasonable notice that the copyright in the entire body of works to the Superman character was sought to be recaptured.

The commentary accompanying [**161] adoption of the regulation buttresses this view that such a reasonable notice test is particularly apt with respect to copyrights in characters appearing in thousands of works in countless media over many decades. In that commentary, the Register of Copyrights (Barbara Ringer), observed that the Copyright Office "remained convinced that the required contents of the notice must not become unduly burdensome to grantors, authors, or their successors, and must recognize that entirely legitimate reasons may exist for gaps in their knowledge and certainty." *Termination of Transfers and Licenses Covering Extended Renewal Term,* 42 Fed. Reg. 45916, 45918 (Sept. 13, 1977).

Such a conclusion does not necessarily conflict with the Second Circuit's decision in *Burroughs.* There was a plausible evidentiary basis upon which the court in *Burroughs* could have reached the outcome it did, even with consideration of the harmless error safety valve as articulated here. There were only thirty-five Tarzan books that were possibly subject to termination. In such a case, with a more finite universe of works possibly at issue, the omission of a few of those works in the termination notice would comprise a significant [**162] level of exclusion (roughly 15%). Thus, the works' exclusion could quite legitimately be viewed as a more meaningful act by the recipient of the notice. Stated differently, in such a situation, there is simply less of a chance for a mistake or oversight occurring in identifying works in the notice, and thus more probable that the recipient would reasonably believe the omission to be intentional, thereafter acting accordingly when contracting with other parties regarding the copyrights to the omitted works. If the terminating party later declares its intention to recapture the omitted works, it is more likely that the notice's recipient will suffer some prejudice beyond the simple reclamation of the rights to the omitted works. Such a circumstance is not present in a case where, as here, there is a universe of literally thousands of possible works.

In the end, the Court finds that some consideration must be given to the nature of the copyrights sought to be recaptured. In a case involving thousands of works, to insist on literal compliance with the termination notice regulations sets up a meaningless trap for the unwary without any meaningful vindication of the purpose underlying the [**163] regulation at issue, a result that the Register expressly disavowed as the intent of the regulations. Even the most cautious cataloguer could easily overlook a stray work or two among the many thousands at issue here. The existence of the catch-all provision, while not always necessarily dispositive, clearly and expressly evinces an attempt by the authors to recapture the rights to all the Superman works they authored, and the failure to expressly list the initial two weeks' worth of newspaper strips among those works is harmless error.

Having said that, the Court does not hold that all termination notices with similar catch-all provisions will necessarily be sufficient as to inadvertently omitted works. However, when the notice evidences a demonstrable effort at cataloguing all the relevant and related works, where the universe of those works is large (and certainly larger than the universe of thirty-five works at issue in *Burroughs),* and where the number of

658 F. Supp. 2d 1036, *1094; 2009 U.S. Dist. LEXIS 78193, **163

omitted works is minute relative to the included works, the [*1095] presence of a comprehensive catch-all provision such as that found here leads to the conclusion that the relevant omission was harmless error and the termination notice [**164] should be found to be effective even as to the omitted works.

Here, the near-Herculean effort and diligence then-plaintiffs' counsel, Arthur J. Levine, placed on cataloging the works and drafting the termination notice, and the inclusion of the express catch-all provision in the termination notice, put to rest any reasonable doubt defendants may have had that plaintiffs sought to recapture all, not just some, of the copyright in the Superman character. In short, if receipt of the nearly six-pound, 546-page termination notice was not enough to convey this message, it was made plain by the explicit statement expressing plaintiffs' intent to terminate the copyrights in *all* the Superman works.

Accordingly, the Court finds that failure to list the two weeks' worth of newspaper strips was harmless error that does not effect the validity of the termination notice to the first two weeks' worth of Superman newspaper strips.

## V. CONCLUSION

At the conclusion of this final installment regarding the publication history of and the rights to the iconic comic book superhero Superman, the Court finds that plaintiffs have successfully recaptured (and are co-owners of) the rights to the following works: (1) [**165] *Action Comics* No. 1 (subject to the limitations set forth in the Court's previous Order); (2) *Action*

*Comics* No. 4; (3) *Superman* No. 1, pages three through six, and (4) the initial two weeks' worth of Superman daily newspaper strips. Ownership in the remainder of the Superman material at issue that was published from 1938 to 1943 remains solely with defendants. [27]

27    Although raised by the parties, the Court declines to address, and preserves for consideration *in limine* of trial, the remaining issues raised in the parties' briefs, including the mechanics of how such an accounting would be performed (should the concept of apportionment used in the infringement context be applied and, if so, who bears the burden of proof, and whether such apportionment should be done on a work-by-work or template basis), questions on how and to what extent to divide up profits generated from so-called "mixed use" trademark/copyright, and whether and to what extent pre-termination derivative works were published *after* the termination date into post-termination derivative works subject to an accounting of profits.

Dated: August 12, 2009

/s/ Stephen G. Larson

STEPHEN G. LARSON

UNITED STATES DISTRICT JUDGE

[*1096] [SEE [**166] ADDENDUM A IN ORIGINAL SOURCE] [*1101]

# EXHIBIT J



LEXSEE 690 F. SUPP. 2D 1048

**JOANNE SIEGEL and LAURA SIEGEL LARSON, Plaintiffs, v. WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; and DC COMICS, Defendants,**

**CASE NO. CV-04-8400-SGL (RZx)**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

*690 F. Supp. 2d 1048; 2009 U.S. Dist. LEXIS 104821*

**October 30, 2009, Decided**
**October 30, 2009, Filed**

**PRIOR HISTORY:** *Siegel v. Warner Bros. Entm't, Inc., 658 F. Supp. 2d 1036, 2009 U.S. Dist. LEXIS 78193 (C.D. Cal., Aug. 12, 2009)*

**COUNSEL:** [**1] For Joanne Siegel, an individual, Laura Siegel Larson, an individual, Plaintiffs, Counter Defendants: Keith Gregory Adams, Marc Toberoff, Nicholas Calvin Williamson, LEAD ATTORNEYS, Toberoff & Associates, P.C., Los Angeles, CA.

For Twentieth Century Fox Film Corporation, Movant: Betsy A Zedek, Fox Group Legal, Attorney does not consent to Electronic Service, Los Angeles, CA.

For Warner Bros Entertainment Inc, a corporation, Defendant: Anjani Mandavia, Michael Bergman, LEAD ATTORNEYS, Weissmann Wolff Bergman Coleman Grodin & Evall, Beverly Hills, CA; James D Weinberger, Roger L Zissu, LEAD ATTORNEYS, Fross Zelnick Lehrman & Zissu, New York, NY; Jonathan Zavin, LEAD ATTORNEY, PRO HAC VICE, Loeb & Loeb LLP, New York, NY; Patrick T Perkins, LEAD ATTORNEY, Perkins Law Offices, Cold Spring, NY; Adam Beriah Hagen, Weissmann Wolff Bertman Coleman Grodin and Evall, Beverly Hills, CA.

For Time Warner Inc, a corporation, Defendant: Anjani Mandavia, Michael Bergman, LEAD ATTORNEYS, Weissmann Wolff Bergman Coleman Grodin & Evall, Beverly Hills, CA; James D Weinberger, Roger L Zissu, LEAD ATTORNEYS, Fross Zelnick Lehrman & Zissu, New York, NY; Patrick T Perkins, LEAD ATTORNEY, Perkins Law Offices, [**2] Cold Spring, NY; Adam Beriah Hagen, Weissmann Wolff Bertman Coleman Grodin and Evall, Beverly Hills, CA.

For DC Comics, a New York General Partnership, Defendant: Anjani Mandavia, LEAD ATTORNEY, Michael Bergman, Weissmann Wolff Bergman Coleman Grodin & Evall, Beverly Hills, CA; David Aaron Grossman, LEAD ATTORNEY, Loeb & Loeb LLP, Los Angeles, CA; James D Weinberger, Roger L Zissu, LEAD ATTORNEYS, Fross Zelnick Lehrman & Zissu, New York, NY; Patrick T Perkins, LEAD ATTORNEY, Perkins Law Offices, Cold Spring, NY; Adam Beriah Hagen, Weissmann Wolff Bertman Coleman Grodin and Evall, Beverly Hills, CA.

For Does, 1-10, Defendant: Anjani Mandavia, LEAD ATTORNEY, Weissmann Wolff Bergman Coleman Grodin & Evall, Beverly Hills, CA.

For Bad Hat Harry Productions, Inc, Bryan Singer, Intervenors: Christopher G Caldwell, Michael Dietz Roth, LEAD ATTORNEYS, Caldwell Leslie and Proctor, Los Angeles, CA.

690 F. Supp. 2d 1048, *; 2009 U.S. Dist. LEXIS 104821, **2

For DC Comics, a New York General Partnership, Counter Claimant: Anjani Mandavia, Michael Bergman, LEAD ATTORNEYS, Weissmann Wolff Bergman Coleman Grodin & Evall, Beverly Hills, CA; Patrick T Perkins, LEAD ATTORNEY, Perkins Law Offices, Cold Spring, NY; David Aaron Grossman, Loeb & Loeb LLP, Los Angeles, [**3] CA; James D Weinberger, Roger L Zissu, Fross Zelnick Lehrman & Zissu, New York, NY; Jonathan Zavin, PRO HAC VICE, Loeb & Loeb LLP, New York, NY.

For Time Warner Inc, a corporation, Warner Bros Entertainment Inc, a corporation, Counter Claimants: Anjani Mandavia, Michael Bergman, LEAD ATTORNEYS, Weissmann Wolff Bergman Coleman Grodin & Evall, Beverly Hills, CA; Patrick T Perkins, LEAD ATTORNEY, Perkins Law Offices, Cold Spring, NY; David Aaron Grossman, Loeb & Loeb LLP, Los Angeles, CA; James D Weinberger, Roger L Zissu, Fross Zelnick Lehrman & Zissu, New York, NY.

**JUDGES:** STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** STEPHEN G. LARSON

**OPINION**

[*1050]    **ORDER DENYING PLAINTIFFS' MOTION FOR RECONSIDERATION; ORDER DENYING DEFENDANTS' MOTION FOR RECONSIDERATION; ORDER AMENDING COURT'S AUGUST 12, 2009, ORDER**

**DEFENDANTS' MOTION FOR RECONSIDERATION**

Despite having been passed more than thirty-three years ago, the termination provisions in the 1976 Copyright Act have been little utilized by authors or their heirs and, consequently, little explored by the courts. *See* William F. Patry, *The Failure of the American Copyright System: Protecting the Idle Rich, 72 NOTRE DAME L. REV. 907, 922 (1997)* ("by not making termination [**4] automatic and requiring authors to jump through hoops even more formidable than those renewal presented" under the 1909 Act, the consequence is that, "in practice, the termination right has" been "barely used," with "approximately 0.72% of [termination] transfers hav[ing] been recorded, as required, with the Copyright Office");

*see also* Decl. Jeremy N. Williams P 6 (noting that even for a company with as diverse and large a catalog of copyrighted properties as Warner Bros., it has only received 65 termination notices since the late 1980s, or roughly only three termination notices a year).

This is also true of the limited case law construing the regulations promulgated by the Copyright Office to govern the exercise of the statutory termination right.

It is in this context that the Court has explored the harmless error rule contained in *37 C.F.R. § 201.10(e)(1)*. This provision was promulgated by the Copyright Office to address missteps made in complying with regulatory requirements specifying the "form, content, and manner of service" for termination notices under the 1976 Copyright Act. In this case, the regulatory requirement in question is the one requiring identification of the "title, [**5] . . . the name of at least one author . . . , and the date copyright was originally secured in, each work to which the notice of termination applies; and, if possible and practicable, the original copyright registration number." *37 C.F.R. § 201.10(b)(1)(iii)*. The termination notices served by the plaintiffs, the widow and daughter to Jerome Siegel the co-creator of the iconic comic book superhero Superman, failed to provide the "title," the "name of one author," "date copyright was originally secured," or the "original copyright registration number" for the first two weeks of Superman newspaper comic strips that were published in the Milwaukee Journal beginning on January 18, 1939, and concluding on January 28, 1939. [1]

> 1   These newspaper strips first relayed the story concerning the circumstances leading to the destruction of Superman's home planet Krypton, the identity of his Kryptonian parents (Jor-L and Lora), and Superman's Kryptonian name (Kal-L). Certain aspects of the story were altered when another version of Superman was created decades later in a universe known as Earth-1 (as distinguished from the earlier version consigned to Earth-2), notably the names were changed to Jor-El, [**6] Lara, and Kal-El.

Instead, the termination notices stated that, in addition to all the other works that were so identified by title, registration number, *etc.,* (spanning some 546 pages and concerning literally tens of thousands of Superman works published from 1938 to 1997, including Superman newspaper strips published in the Milwaukee Journal

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 109 of 132    Page ID #:6573

Page 3

690 F. Supp. 2d 1048, *1050; 2009 U.S. Dist. LEXIS 104821, **6

from February 20, 1939, and onward, *see* April 30, 2007, Decl. Michael Bergman, Ex. X at 325), it also applied to:

> [*1051] [E]ach and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stories, such as, without limitation, Superman, Clark Kent, Lois Lane, Perry White, Jimmy Olsen, Superboy, Supergirl, Lana Lang, Lex Luthor, Mr. MXYZTPLK . . ., Ma and Pa Kent, Steel, the planet Krypton, Kryptonite, Metropolis, Smallville, or the Daily Planet. Every reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created. Nonetheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

*Id.* at 3 n.1.

No one disputes [**7] that such information is insufficient to meet the regulatory command to provide a "complete and unambiguous statement . . . without incorporation by reference of information in other documents or records" that clearly identifies the title, date on which copyright was originally secured, and registration number for the work in question. Although works concerning the Superman character and the planet Krypton is mentioned, no title or other concrete identifying information (such as registration numbers or date the copyright was originally secured) is provided. Thus presented for the Court was the question of whether, under these circumstances, this non-compliance with the regulatory requirements was nonetheless harmless so as not to affect the validity of plaintiffs' termination notice from applying to those first two weeks' worth of Superman newspaper strips.

In its August 12 decision, the Court answered in the affirmative. Noting that consideration of whether an error in meeting the formalities called for in the regulations is harmless is a "fact-intensive inquiry," the Court reasoned that, given the nature of the property at issue (an iconic comic book superhero character exploited [**8]

continuously in every form of media imaginable for the past seventy years), the amount of effort Siegel's heirs took in carefully cataloging and identifying the vast universe of works potentially at issue, the minuscule number of works that were not so specifically identified in the notice, and the presence of the catch-all clause itself, the error committed in this particular case, under these particular circumstances, was indeed harmless. *See Siegel v. Warner Bros. Entertainment Inc., 658 F. Supp. 2d 1036, 2009 U.S. Dist. LEXIS 78193, 2009 WL 2512842, at \*49-53 (C.D. Cal. 2009).*

After having subjected the issue through the crucible of defendants' arguments in their motion for reconsideration and further elucidation of the relevant facts both in this case and in those other cases referenced in the earlier Order, the Court reaffirms its earlier disposition of the question and finds that the error in question was in fact harmless.

Accordingly, defendants' motion for reconsideration is **DENIED**.

### A. *Construction of Relevant Statutory and Regulatory Language*

The Court begins by looking to the language in the statute and the regulation itself. *Section 304(c)* of the 1976 Copyright Act governs the termination of grants [**9] to works created under the auspices of the 1909 Copyright Act. Among the litany of provisos erected in effectuating such a termination of transfer is that a notice be prepared and served upon certain entities, during a five-year fixed window measured from the date the copyright in the work(s) in question was originally secured, and, most importantly for purposes of the present motion, that said notice must "comply, in form, content, and [*1052] manner of service, with requirements" prescribed by "the Register of Copyrights." *17 U.S.C. § 304(c)(4)(B).* The statute thus requires that a termination notice be filed that meets certain requirements as to its form, content, and service, but is silent as to what those precise requirements are, instead leaving that to be completed by the relevant agency. Toward that end, shortly after the 1976 Act's passage, the Register (Barbara Ringer) promulgated regulations seeking to fill in these gaps in how parties were to go about preparing such termination notices. Among the litany of formalities eventually required to be observed with respect to the "content" in the termination notice was that it "must include a clear identification" of the

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 110 of 132    Page ID #:6574

Page 4

690 F. Supp. 2d 1048, *1052; 2009 U.S. Dist. LEXIS 104821, **9

following:

> (I) The [**10] name of each grantee whose rights are being terminated, or the grantee's successor in title, and each address at which service of the notice is being made;

> (ii) The title and the name of at least one author of, and the date copyright was originally secured in, *each work to which the notice of termination applies;* and, if possible and practicable, the original copyright registration number;

> (iii) A brief statement reasonably identifying the grant to which the notice of termination applies;

> (iv) The effective date of termination; and

> (v) In the case of a termination of a grant executed by a person or persons other than the author, a listing of the surviving person or persons who executed the grant. In the case of a termination of a grant executed by one or more of the authors of the work where the termination is exercised by the successors of a deceased author, a listing of the names and relationships to that deceased author [and then

*37 C.F.R. § 201.10(b)(1)(I)-(v) (1977)* (emphasis added). [2]

> 2    The [**11] regulation was subsequently amended to take account of changes to the duration of copyrights and their effects on the termination right enacted by the Sonny Bono Copyright Term Extension Act of 1998.

Recognizing the intricacies of the formalities being established and the potential for gaps in the terminating parties' (especially in the case of an author's heirs) knowledge of the information sought by those formalities due to the long passage of time that may have occurred since the grant and works in question were executed and published, [3] the Register also placed a safety valve that could operate to relieve terminating parties from mistakes

or other traps for the unwary that would be created by requiring strict conformance to the regulation's requirements. *Section 201.10(e)(1)* to the regulations, titled "Harmless errors," declares that "[h]armless errors in a notice that do not materially affect the adequacy of the information required to serve the purposes of *section 304(c) of title 17, U.S.C.,* shall not render the notice invalid." Thus, by the regulation's own formulation, an error's "materiality," and hence its "harmlessness," was to be viewed through the prism of the information [**12] needed to adequately advance the purpose sought by the statutory termination provisions themselves.

> 3    *See* 42 F.R. 45916, 45917 ("Under *section 304(c)* of the Act, the preparation of notice of termination will be occurring at a time far removed from the original creation and publication of a work and, in many cases, will involve successors of original authors having little, if any, knowledge of the details of original creation or publication").

This "safety valve" also contained *subsection (e)(2)*, which provided a litany of examples of errors that the Register sought to make clear were never to be viewed as harmful so long as certain conditions [*1053] were met. *See 74 F.R. 12554, 12555* (section (e) gives "examples of forgivable, harmless error"). Specifically, "errors made in *giving* the date or registration number referred to in paragraph (b)(1)(ii), or in *complying* with the provisions of paragraph (b)(1)(v) of this section, or in *describing* the precise relationships under clause (2) of paragraph (c) of this section[, the signature provisions thereto]," were all excused so long as the commission of the error was done "in good faith and without any intention to deceive, mislead, or conceal relevant [**13] information." *37 C.F.R. § 201.10(e)(2)* (emphasis added). This subsection to the harmless error rule is the source of the first point of disagreement between the parties in terms of how to construct the more general harmless error rule set forth in (e)(1).

From the nature of the admitted "examples" set forth in *(e)(2)* and the fact that *(e)(1)* states that the errors in question must be "in a notice," defendants extrapolate that the Register sought to limit application of the general rule set forth in *(e)(1)* to the same universe of types or "kinds" of errors specified in *(e)(2)*, and even then, the errors must be ones concerning information that was actually conveyed rather than omitted. In other words,

690 F. Supp. 2d 1048, *1053; 2009 U.S. Dist. LEXIS 104821, **13

defendants' construction of the regulation posits that only scrivener or other such "typographical" errors (presumably meaning misspellings of the title to a work, mistakes as to a numeral(s) used for a registration number or a date) could ever qualify for consideration as being harmless; or, in the context of the present case, the rule would never apply unless the "work is otherwise properly identified." (Defs' Mot Recon. at 3; Defs' Reply at 2). As explained by defense counsel:

> The harmless [**14] error exception [in (e)(2)] does not provide *any* example involving an outright *omission* of the required information. Rather, it allows for *errors* within required information that has actually been provided (*e.g.,* an incorrect date, or an incorrect description of the relationship between the terminating and filing party), all of which must be accompanied by a *justifiable and legitimate explanation*. . . . [I]t cannot be disputed that on its face *section 201.10(e)(1)* makes exceptions for 'harmless errors,' not 'harmless omissions,' a distinction fully borne out by the examples in *201.10(e)(2)*.

(Defs' Sur-sur-reply at 1 (emphasis in original)).

As set forth below, defendants reading of the harmless error rule is both incomplete as a general matter, but also misdirected in terms of the specifics of this case. The harmless error rule applies to much more than simple clerical or typographical errors, but at the same time, this is *not* a case where the termination notice was completely absent of *any* information regarding the works in question.

To begin, defendants read *subsection (e)(2)* backwards. The Register made clear that the examples contained in *(e)(2)* were *not* meant to define or otherwise [**15] delimit the general class of errors to which the harmless error rule in general would apply. Instead, the Register expressly stated that the *only* reason for the inclusion of the specific examples in *(e)(2)* in the first instance was so that, by their recitation, "disputes" would be avoided that those particular errors could ever be considered harmful. *See* 42 F.R. 45916, 45919 ("the final regulation requires specific items of information that, in some cases, were not in our [initial] proposal. We do not

intend that the validity of notices of termination *should be subject to disputes* over whether errors concerning these specific items are 'harmless.' Accordingly, we have added a new *paragraph (e)(2)* to make clear that errors made in connection [*1054] with this information will not affect the validity of the notice" (emphasis added)).

Thus, *subsection (e)(2)* was meant to create a safe harbor for which no "dispute" would arise as to the harmless error rule's application, thereby staving off the need for judicial decision-making. Far from seeking to constrain application of the harmless error rule, those examples in *(e)(2)* were only meant to foreclose disputes as to a certain narrow class of errors; [**16] the inference being that the Register was cognizant that there would be occasion for further disputes concerning errors outside the kinds contained in *(e)(2)* that would be left for courts to decide in applying the general rule found in *(e)(1)*.

Lest there be any doubt on the point, the Register placed a proviso at the beginning of *subsection (e)(2)* that specifically reminds the reader that the litany of examples that followed were to be read "*without prejudice* to the general rule provided by *paragraph (e)(1)* of this section*." (emphasis added). Far from suggesting the principle of *expresio unius est exclusion alterius* ("the expression of one thing is the exclusion of another"), or that *subsection (e)(2)* somehow contained a clear and "specific rule" to be applied against the general harmless error provision found in *(e)(1)*, this proviso recognizes that the reach of the harmless error safety valve is *broader* than the specified class of examples listed in *subsection (e)(2)*. Nowhere in defendants' papers have they acknowledged, much less attempted to square, this opening proviso to *(e)(2)* with their proposed construction of the regulation.

The Court's reading is consistent with another regulation [**17] promulgated by the Register respecting content formalities for filing a notice of intent to obtain a compulsory license (sometimes referred to as a mechanical license) to reproduce non-dramatic musical works (meaning, a song's words and music) in phonorecords. *37 C.F.R. § 201.18(d)(1)(v)(A)*, like its regulatory cousin, *section 201.10(b)*, requires that the notice for a compulsory license provide a "clear statement of . . . the title of the non-dramatic musical work" affected thereby. *Section 201.18(g)* also provides a harmless error provision that, like in *201.10(e)(1)*, is

690 F. Supp. 2d 1048, *1054; 2009 U.S. Dist. LEXIS 104821, **17

keyed to whether the error in question "materially affects the adequacy of the information required to serve the purposes of" the relevant statutory section giving rise to the right to file said notice. In the accompanying commentary to the proposed regulation, the Register noted that the required information in the notice was meant to "help the copyright owner identify which of his or her works are being used under the license." *66 F.R. 45241, 45243*. Nonetheless, the Register recognized that "errors may occur," and that "potential licensees should not be denied use of the license" on account of these errors when it does [**18] "not affect the legal sufficiency of notice." *Id.* However, unlike with the termination notice regulation, the Register decided against providing a safe harbor provision, observing that "the Office does not anticipate that it will have any role in resolving disputes about whether an error in a notice is harmless." *Id.* Instead, "such disputes will have to be adjudicated in the courts." *Id.*

Thus, a general harmless error rule, unadorned, anticipates and invites disputes as to its application to arise and be resolved by the courts. This is the same principle underlying a section like *section 201.10(e)(1)*, and the proviso placed in front of the safe harbor language in *201.10(e)(2)* affirms that this general principle governs: Outside that safe harbor, the harmless error rule continues to apply, leaving it for courts to resolve any and all the other disputes, covering many different potential situations and categories of errors, that may arise.

[*1055] Having addressed the limited safe harbor provision of *(e)(2)*, the Court returns to consideration of the language set forth in the harmless error rule in *(e)(1)* to determine when an admitted error other than as listed in *(e)(2)*, is harmless. The language [**19] the Register used in *(e)(1)* expressly ties the determination of the "harmlessness" of any error in question with the adequacy of the information needed to "serve the purposes of . . . *section 304(c)*." Thus, the regulatory language directs the court to examine the purpose of the termination right contained in *section 304(c)*, and what information is needed to adequately fulfill that purpose. In short, that purpose, as set forth below, is to provide authors or their heirs a meaningful opportunity to recapture the right to the extension in the copyright term afforded to such earlier works by the 1976 Act, while at the same time ensuring that reasonable notice is given to grantees (or their successors) and to the public so as to

identify what work(s) are affected.

The termination provisions initially proposed by the Copyright Office during the 1960s revision process to the 1909 Act were much different than that which was ultimately enacted by Congress in 1976. The Office's initial proposal was that the termination of transfer right would take effect automatically, without authors being required to fulfill certain procedural steps to effectuate their right. This proposal was "strongly objected [**20] to by distributors and strongly defended by authors, and became, in the words of the Copyright Office, 'the most explosive and difficult issue in the revision process'" of the 1909 Act. Patry, *72 NOTRE DAME L. REV. at 921*. In the end, a "practical compromise" was reached by Congress that was designed to "further the objectives of the copyright law while recognizing the problems and legitimate needs of all interests involved," notably the possible disruption such exercise of the termination right might bring to long-established business dealings and the chains of title involving affected properties. *Mills Music, Inc. v. Snyder, 469 U.S. 153, 173 n.39, 105 S. Ct. 638, 83 L. Ed. 2d 556 (1985)*. Amongst the compromise reached was the deletion of the termination right's automatic nature, in favor of "the burden [being] placed on [authors or their heirs] to file a notice of intent to terminate the transfer." Patry, *72 NOTRE DAME L. REV. at 921*; *see 17 U.S.C. § 304(c)* (noting that the copyright in a pre-1978 work (other than one "made for hire"), "the exclusive or nonexclusive grant" to which (other than one made "by will") was "subject to termination" so long as certain "conditions" were met).

Thus, among the competing objectives [**21] and interests sought to be achieved through *section 304(c)* was not only affording authors or their heirs a meaningful opportunity to benefit from the newly extended copyright term, [4] but also for the [*1056] existing assignee to receive reasonable notice of what rights of theirs are being affected through the exercise of the author's (or heirs') termination right. This compromise "purpose" behind *section 304(c)* was given concrete expression by the Register in the commentary accompanying the final adoption of *201.10*, wherein it was observed that "the proposed regulation" was meant to "attempt[] to avoid the imposition of costly or burdensome requirements [on authors or their heirs], while, at the same time, giving the grantee and the public a reasonable opportunity to identify the affected grant and work from the information given in the notice." 42 F.R. 45916, 45918; *see also* 41

690 F. Supp. 2d 1048, *1056; 2009 U.S. Dist. LEXIS 104821, **21

F.R. 50300, 50300 (making the same observation as the purpose of "[t]he proposed new § 201.10"). The Register thus recognized that the grantee's and the public's need for a "reasonable" chance to identify the "grant and work" at stake (which speaks to notions of actual and constructive notice) must be balanced against [**22] ensuring that the opportunity for authors or their heirs to actually share in the new right be meaningful by avoiding needlessly burdensome requirements. In this respect, therefore, careful consideration of the nature of the property at issue is necessary to assess this balance between providing reasonable notice to the grantee (or its successors) and the public, and avoiding undue burdens on authors or their heirs.

> 4    See Classic Media, 532 F.3d at 984 ("The 1976 Act, and in particular its . . . termination of transfer provisions, were in large measure designed to assure that its new benefits would be for the authors and their heirs. . . . As stated in the 1976 Act House Report: 'The extended term represents a completely new property right, and there are strong reasons for giving the author, who is the fundamental beneficiary of copyright under the Constitution, an opportunity to share in it" (quoting H.R. Rep. No. 94-1476, at 140 (1976) reprinted in 1976 U.S.C.C.A.N. 5659, 5756)); see also Music Sales Corp. v. Morris, 73 F. Supp.2d 364, 372 (S.D.N.Y. 1999) ("The 1976 Act created an additional opportunity for the author or the author's heirs to extract the fair value of the work"); 73 F.R. 3898, 3898 [**23] (labeling "termination provisions . . . set forth in section[] 304(c)" as "hav[ing] an equitable function; they exist to allow authors or their heirs a second opportunity to share in the economic successes of their works" for that extension in the duration of the copyright to the same put into place by the 1976 Act).

**B. Was Adequate Notice Given to the Recipient of the Notice?**

To begin, the Court agrees with defendants that, for any error in question to be considered harmless, its existence must be disclosed "in the notice" itself; complete omissions without *any* other information touching on the subject matter of the error in the notice will not suffice to trigger the rule's possible application. This construction is not only found in the regulation's

command for the vast swath of information required to actually be set forth in the notice ("must include"), but also in (e)(1)'s description of the errors affected by it as those found "in a notice." The Register, when commenting upon harmless error, speaks of the "errors'" being "in a notice of termination." 42 F.R. 45916, 45919.

Such a construction is also consistent with one of the purposes underlying *section 304(c)*, which was to provide [**24] "the recipient of the termination notice [with] sufficient information to understand what rights of theirs may or may not be at stake." *Siegel,    F. Supp.2d.    , 2009 U.S. Dist. LEXIS 78193, 2009 WL 2512842, at *52*. The absence of *any* information in the notice about the work in question, for instance, would thwart a recipient's ability to be so apprised. As previously noted, the Register in her commentary accompanying the regulation, observed that § 201.10 attempts to require identification of the "the affected grant and work *from the information given in the notice.*" 41 F.R. 50300, 50300 (emphasis added). The complete lack of any information "in the notice" is not the "giving" of information.

Plaintiffs' argument that the regulation also states without equivocation that other items, other than those relating to the identification of the work, "must" also be "included" but are nonetheless found in (e)(2)'s safe harbor as errors that are subject to harmless error, misses the point. Those other examples in (e)(2) concern errors regarding the information actually *contained* in the notice. Thus, *(e)(2)* speaks of "errors made in *giving* the date or registration number" or in "*describing* the precise relationships" of [**25] the terminating parties to the author. Those are words connoting errors in information actually found within the notice. Moreover, the multiplicity of information that must be included in the notice only underscores that much information is required, not that [*1057] *complete* omissions in conveying that required information may be excused.

The Court emphasizes the word "complete," because it is also clear that, for some of the regulatory commands, more than one piece of information is called for in meeting that particular requirement. For example, with respect to the particular regulatory requirement at issue here, the regulation not only requires the title of the work at issue, but also the date that the copyright in the same was originally secured, the name of at least one of the authors of the work, and, if practical, the original registration number. Thus, there are multiple pieces of

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 114 of 132    Page ID #:6578

Page 8

690 F. Supp. 2d 1048, *1057; 2009 U.S. Dist. LEXIS 104821, **25

information that are sought by this single requirement. Omissions of some or parts of that information might still be considered harmless so long as there are other pieces of information sufficient to satisfy the particular requirement present in the notice. The pertinent question at that point would be whether [**26] that partial set of information is enough to meet the purpose sought to be filled overall by the particular requirement.

Assume, for example, that in a termination notice, for whatever reason, no title for a particular work is given, the author's name for that work is missing, and no date is provided as to when copyright in that particular work was secured, *but* a valid initial registration number for the work standing by itself is provided. [5] In such a circumstance there are clearly omissions of information required by *201.10(b)(1)(iii)*, thus creating an error in the notice; however, it can hardly be disputed that the information that is contained in the notice is nonetheless adequate for the recipient to have a "reasonable opportunity to identify the . . . work." As the Register noted, much of the litany of information called for in *(b)(1)(iii)* (notably, the registration number and the complete set of the authors to a work) was "intended to serve only as a means of possible assistance to persons receiving a notice of termination in identifying the work to which the notice applies. It is not itself a substantive condition of termination . . . ." 42 F.R. 45916, 45917. In this example, [**27] possessing the correct registration number by itself affords the recipient a "reasonable opportunity" to identify the work placed at issue by the termination notice. In contrast, where no mention of the title, the date copyright was secured, the registration number, the author's name *or anything else* about the work in question is made, no such opportunity can be said to exist. This is the circumstance that confronted the district court in *Burroughs v. Metro-Goldwyn-Mayer, Inc.* (a case discussed in more detail below) where the notice omitted altogether five Tarzan works without *any* other information respecting those works in the notice itself. In such a circumstance, it can hardly be said that the notice recipient would be given a "reasonable opportunity" to discover the work affected by the notice; the notice is completely devoid of any information disclosing that the work was ever at issue, much less providing a means upon which a recipient could begin an inquiry into identifying it.

[5]    The same example would equally apply if instead the title and author of the work are given,

but the registration number and date the copyright in the work was originially secured was omitted.

Here, however, [**28] the circumstance in the present case lies between these two examples. As in *Burroughs,* there is no mention in plaintiffs' termination notices of the initial registration number, the title, the author, or the date on which the copyright was originally secured in the first two weeks' worth of Superman newspaper strips. On the other hand, there is, as in the first example, *some* information that [*1058] points to the works in question, contained within the catch-all clause. Defendants offer scant argument about the catch-all in their briefs, instead labeling its informative value as "absurd," one that only "invites an examination of a 70-year span" of works. A more careful reading suggests otherwise.

At the outset, the Court acknowledges that the catch-all, as written, does not speak in terms of the regulation's specific litany of information for identifying works; [6] a different lexicography is used for that purpose. Instead, the catch-all was written in terms that define certain attributes in the copyright of the Superman character, including his planet of origin: "[E]ach and every work . . . that includes or embodies the character, story element or indica reasonably associated with SUPERMAN . [**29] . . such as . . . the planet Krypton . . . ." [7] No doubt utilization of a formulation based on the specific categories of information set forth in *201.10(b)(1)(iii)* would have been more useful, providing the recipient information that could be directly and readily checked against the records in the Copyright Office; the approach used instead required more familiarity by the recipient with the character itself to assist in searching the records in the Copyright Office. That said, what plaintiffs' formulation lacks in terms of the specific form of information called for in *(b)(1)(iii)*, it makes up for in more precisely identifying the particular work that is put into question by the notice.

[6]    Such would be the case, if, for instance, the catch-all was drafted to state that the termination notice applied to "each and every Superman work by Jerome Siegel and Jospeh Shuster during the five-year termination window beginning with April 18, 1938, with the title Action Comics, Superman, World Finest (Best) Comics, All-Star Comics," all the latter having been listed in the notice as actual titles to the other Superman

690 F. Supp. 2d 1048, *1058; 2009 U.S. Dist. LEXIS 104821, **29

works, including the newspaper strips (again all published under the title "Superman")).

7  To [**30] the extent it could be argued that the catch-all also applied to character attributes aside from those explicitly mentioned (notably, through its reference to "without limitation"), such an argument may well run full square into the category of complete omissions discussed earlier. Given that the catch-all is written in the language of copyright in a particular character, the mention that the notice applies to "all works" where the character appears adds nothing. The character exists and is composed of specific attributes that are delineated on a work-by-work basis. Accordingly, without mention of the specific attribute sought to be recaptured, it could be argued that the catch-all does not direct the recipient to know what in particular to look for in identifying the work(s) in question, a circumstance not all that different from when a termination notice is completely devoid of *any* information of the specific work affected. In such a circumstance, the receipient would have to hazard a guess as to what are the attributes of the character and then act accordingly. Given that this circumstance is not present in this case, the Court need not further address it.

Defendants take issue [**31] that the catch-all notifies the recipient of the heirs intent to recapture "all the works" with the "planet Krypton" unadorned with any information about the particular works put in issue, which will necessarily require them to plough through seventy years worth of Superman works, "some of which are ancient and difficult to even locate," to compile a list of all those with Krypton in it. (Defs' Mot. Recon. at 5). Defendants overstate their plight, ignoring a "basic principle" of copyright law in reviewing the catch-all clause. (Defs' Reply at 3). As ably demonstrated in defendants' own papers, and, more importantly, as explained in Judge Newman's concurring opinion in *Burroughs,* the copyrightable aspects of a character -- the thing for which a notice is designed to declare its intent to recapture -- are protected only to the extent [*1059] the work in which that particular aspect of the character was first delineated remains protected, but not in the subsequent sequels in which that attribute is later repeated or used. (*See* Defs' Reply at 3 ("copyright protection and termination only exist work-by-work and characters are protected only as delineated in specific

works"); Defs' Partial Mot. [**32] Summ. J. at 7-8 ("the presentations of Superman since 1938 . . . were not a static depiction but an ever-evolving portrayal, featuring new super powers, new villains, and new components to the Superman universe and back story. Indeed, the Superman story and characters evolved on an episode-by-episode basis," including "reference to some of the more famous story elements now associated with Superman" like "the name of Superman's home planet 'Krypton'"); *Burroughs v. Metro-Goldwyn-Mayer, Inc., 683 F.2d 610, 631 (2nd Cir. 1982)* (Newman, J., concurring) ("On the assumption that the character Tarzan is sufficiently delineated to support a copyright, there is no dispute that the delineation was complete upon the 1912 appearance of the first Tarzan title *Tarzan of the Apes.* Subsequent titles, including the omitted five, contained original exploits of Tarzan, but were not original with respect to the character itself. As to the character Tarzan, the subsequent titles were sequels, 'subsequent stories employing the same character"); *see also* 1 MELVILLE NIMMER, *NIMMER ON COPYRIGHT § 2.12* at 2-178.31 to 2-178.32 (rev. ed. 2009) ("Subsequent works in a series (or sequels) are in a sense derivative [**33] works, while the characters which appear throughout the series are a part of the underlying [initial] work upon which the later works are based. . . . So copyright in a particular work in a series will not protect the character as contained in such series if the work in the series in which the character first appeared has entered the public domain[; instead,] protection for the character extends only to those . . . elements added in" the sequel).

Thus understood, there can be only one work upon which plaintiffs could ever seek to recapture the copyright to "the planet Krypton" aspect of the "Superman character" -- the work or series in which that aspect of the character was first explored. Far from telling defendants "nothing," (Defs' Reply at 3), the catch-all, thus understood, in a very real sense, pointed them to a precise and notable work. Admittedly, this information did not also point defendants to a specific place in the Copyright Office's records to investigate that particular work, such as would be the case if they had received the title of the work where Krypton was first explored, or the date the copyright in the same was first secured, but that raises questions as to the [**34] adequacy of the information -- it cannot be said that there is a complete lack of any information being provided on the matter, as argued by defendants.

690 F. Supp. 2d 1048, *1059; 2009 U.S. Dist. LEXIS 104821, **34

This then brings to the fore whether the information that was provided in the notice -- that the termination notice applied to the work in which the "planet Krypton" aspect of the "Superman character's" copyright was first secured -- was adequate for defendants to have had a "reasonable opportunity to identify" the "work." In answering this question, the case of *Music Sales Corp. v. Morris, 73 F. Supp.2d 364 (S.D.N.Y. 1999)*, provides useful insight. In that case, which concerned the termination of the grant to various musical compositions by noted jazz composer and performer Billy Strayhorn, the question presented was whether the termination notice, whose description of the grant consisted merely of a boilerplate statement, "Grant or transfer of copyright and the rights of copyright proprietor, including publication and recording right," was sufficient to meet section 201.10(b)(iv)'s regulatory requirement [*1060] that the notice "must include . . . a brief statement reasonably identifying the grant to which the notice applies." The description [**35] of the grant was important because there were multiple potential grants to the compositions at issue. *Id. at 367-68* (noting execution of three different agreements by Strayhorn, his heirs, and/or his estate relating to assignments in the musical works in question). The district court admitted at the outset that said description in the notice did not "reasonably identify the grant," *id. at 378*, and hence an error was committed in that regard in the notice. Nonetheless, the court found the information "adequate," meaning that the admitted error was harmless, noting that "it appears to be boilerplate on termination notices customarily accepted by the Register of Copyrights." *Id.* This approach -- reference to industry and agency custom -- in judging the "adequacy" of the information provided for purposes of harmless error is the source of a dispute between the two leading commentators on copyright (Nimmer and Patry), and continues to be, viewed by this Court as overly "lax" and untethered to any consideration of the dual purposes underlying *section 304(c). See Siegel,   F. Supp.2d   , 2009 U.S. Dist. LEXIS 78193, 2009 WL 2512842, at *51*. That said, *Music Sales* remains as a beacon on the legal landscape demonstrating [**36] how little concrete information need be conveyed and yet still be considered adequate for purposes of *section 304(c)*.

Defendants understandably seek to diminish the significance of *Music Sales*, correctly noting that it concerned the adequacy of information related to the grant, not identification of the work, at issue. From there defendants note that the more forgiving result in *Music Sales* can be explained as the product of the lesser "standard of adherence" called for in the regulation for identifying the grant (the terminating party need only "reasonably identify" it), as opposed to here, where the standard of adherence for identifying works is much higher ("must identify" the title, date copyright was originally secured, *etc.*). No doubt such a difference is manifest in the regulation itself, but the problem with this argument is that it ignores that, in *Music Sales,* the district court found that the information in the termination notice did not even meet this lesser standard of adherence. That the regulation required a less specific, itemized menu of information was not a factor in the court's appraisal of adequacy of the information in the notice. Such differences in levels of [**37] adherence are taken into consideration in determining whether an error first occurred; once it is determined an error occurred, whether the information that was provided is nonetheless adequate is an altogether separate inquiry.

*Music Sales* demonstrates in broad strokes the extent to which less than precise information may nonetheless be excused through the harmless error rule. [8] Such allowance is explained in the commentary to those portions of the regulation requiring identification of both the grant and the work, in which the Register expressed her concern regarding the terminating parties' ability to access information regarding both the grant and the work. 42 F.R. at 45917 (observing in the context [*1061] of the identification of the work that "the preparation of notice of termination will be occurring at a time far removed from the original creation and publication of a work and, in many cases, will involve successors of original authors having little, if any, knowledge of the details of original creation or publication) & at 45918 (noting in context of identification of the relevant grant that "it will commonly be the case that the terminating author, or terminating renewal claimant, [**38] widow, widower, children or grandchildren of a deceased author, will not have a copy of the grant or ready access to a copy").

[8]  It should be noted that identification of the grant, however amphorously allowed under the pertinent regulatory requirement, was nonetheless something that "must be" clearly "included" and "identified" in the notice. It decidedly was not viewed as some "lesser" form of information. When speaking of what was sought to be achieved

690 F. Supp. 2d 1048, *1061; 2009 U.S. Dist. LEXIS 104821, **38

behind the regulations the Register specifically pointed to two pieces of information as lying at the center of the purpose of *section 304(c)* -- "giving the grantee and the public a reasonable opportunity to identify the affected *grant and work*." 41 F.R. at 50300 (emphasis added); 42 F.R. at 45918.

Thus, some consideration must be given to this circumstance in judging the adequacy of the information provided as to a work (or a grant), as it goes to another core purpose of *section 304(c)* -- providing authors or their heirs a meaningful opportunity to recapture the right to the newly provided extended copyright term in works which were long ago assigned away by them. This is especially true in a case such as this involving an author's [**39] heirs seeking to recapture the rights to a long-ago created character exploited in literally thousands of works (even as measured by the five-year window) in various different formats. In such circumstances more leeway should be afforded in terms of the adequacy of the information contained in the notice.

The Court is mindful that the information that was actually conveyed in the notice did not touch upon the specific types of information called for in the regulation. This fact has given the Court some pause, but in the end it is clear that recital of the precise incantation of information in *(b)(1)(iii)* is not as important as whether the information (whatever it may be) that is contained in the notice in that regard serves to apprise the recipient of the work affected. Indeed, a court would not be looking to the harmless error rule if the information recited correctly and in full the entire menu of information called for in *201.10(b)(1)(iii)*. Again, as the Register noted, much of the litany of information in *(b)(1)(iii)* was not itself considered a substantive condition of termination, but simply "as a means of possible assistance . . . in identifying the work." 42 F.R. at 45917. It is this [**40] factor -- whether the information provided is of such assistance -- that lies at the core of *(b)(1)(iii)* and forms the basis for the inquiry into the adequacy of the information provided. Indeed, the Register repeatedly recognized that there may exist good reasons for the absence of much of this litany of information in *201.10(b)(1)(iii)* concerning the identification of the work and yet said errors could still be considered harmless. *See* 42 F.R. at 45917, 45918. As the Register observed: "[W]e remain convinced that the required contents of the notice must not become unduly burdensome to grantors,

authors, or their successors, and must recognize that entirely legitimate reasons may exist for gaps in their knowledge and certainty." 42 F.R. at 45918.

Thus, in setting forth the notice's intent to recapture that portion of the Superman character's copyright concerning "the planet Krypton," the only work(s) in which such a copyright would subsist was the first one(s) in which that aspect of the character was explored. Such information is of much more assistance, as it focused defendants' inquiry to narrow and targeted work, than if the notice had instead relayed some of the menu of information [**41] in *201.10(b)(1)(iii)* by simply identifying the title and author of the strips. Literally thousands of Superman works (be it as comic books or newspaper strips) were published under the title "Superman," all of whom were created by Siegel and Shuster. With that understanding, the Court concludes that defendants were given information that the notice sought to terminate the first Superman work in which "the planet [*1062] Krypton" appears; information which was of assistance in locating the actual work itself.

The Court begins with a practical observation: Despite efforts to vouch for their inability to know what to do when in receipt of this information (defendants claim that, in the absence of the particular litany of information in *201.10(b)(1)(iii)*, they are powerless to divine on how to go forward), it is clear to the Court that a "reasonable opportunity" existed to identify a work utilizing this information. When viewed in a real world setting, a declaration that the notice applied to the first work in which the planet Krypton was featured is not as unilluminating as defendants suggest. This notice is directed to a world-famous character for which vast literature has been written concerning its [**42] publication history (as demonstrated by defendants' recital to various court cases, publications, and noted experts who understood the information as to Krypton first appearance). Add to this milieu the fact that the recipients of the notice are the ones in possession of all the information related to the character's appearance in various mediums since his first appearance in *Action Comics* No.1, and it becomes quite clear that the recipient in this case would know, fairly quickly, which work the planet Krypton first appeared in the Superman character's literary universe. Whether such identification would be sufficient in other circumstances, this Court cannot and does not say. What makes this case unique is the nature of the particular property being terminated.

690 F. Supp. 2d 1048, *1062; 2009 U.S. Dist. LEXIS 104821, **42

Defendants argue that the contents of the termination notice must be such as "to provide advance notice of each affected work without need for investigation [by the grantee]." (Defs' Mot. Recon. at 5). Such a standard asks too much from the termination notice; the Register clearly contemplated that recipients of the termination notice would conduct their own investigation based on the information contained therein. *See* 42 F.R. at 45918 [**43] ("There is no real reason to believe that recipients of termination notices will rely on such statements [concerning whether a particular work was one made for hire or that the grant in question was not made by will] rather than on their own review of the nature of the work and grant"). What is required is sufficient information to assist a grantee in having a "reasonable opportunity" to identify the work. That it is an opportunity that is called for certainly evinces an expectation that some action will be taken on the recipient's part to actually identify the work using the information relayed even after receipt of the notice.

Tellingly in this regard is the fact that, after receipt of the termination notice, defendants did in fact conduct such an investigation into the early Superman newspaper strips. (Defs' Obj. and Response to New Arguments at 6 & n.10) ("In early 2006, defendants obtained the copyright registrations for such Early Strips and compared those registrations to the works identified in the 1997 termination notices and concluded that the strips had not been identified"). Thereafter, defendants served requests for admission related to those first two weeks of newspaper [**44] strips. (Sept. 18, 2008, Decl. Michael Bergman, Ex. B). At no point did defendants seek admissions from plaintiffs for the second two weeks' worth of Superman newspaper strips (published in the Milwaukee Journal from January 30, 1939, to February 18, 1939) that likewise were not identified in the termination notice by reference to title, author, registration number or date in which the copyright was originally secured. Those strips tell an alternative version of the story from *Action Comics* No. 1 and *Superman* No. 1 about how Clark Kent came to be hired as a newspaper reporter for the Daily Star, a story [*1063] that contains *none* of the character attributes identified in the catch-all clause save for those (Lois Lane, Clark Kent, and Superman) that were developed (and the copyright for which were first secured) through earlier works.

Defendants also argue that allowing such a "catch-all" to satisfy the actual notice function, runs afoul

of the regulations' admonishment that "the information specified in paragraphs (b)(1) . . . requires a complete and unambiguous statement of facts in the notice itself, without incorporation by reference of information in other documents or records." *37 C.F.R. § 201.10(b)(3)*. [**45] But here the clause at issue does not make reference to information in other documents or records; rather, it clearly identifies, *within the notice itself,* that the terminating party seeks for the notice to apply to that work in which the "planet Krypton" aspect of the "Superman character's" copyright was first secured. Far from a reference to something else, the clause serves as a declaration within the notice of what it sought to accomplish. Again, the defect with this clause (what renders it as an error for which the "harmless error" analysis is applied) is not its attempt to include something by reference outside the notice, but in the fact that the language in the catch-all fails to specify the title, author, date copyright was secured, and registration number for the particular work it is seeking to give notice of its recapture. There is no "speculation" to be engaged in by the notice's recipient, no guessing as to what was the terminating party's "subjective intent."

### C. *Inadvertence*

Finally, defendants contend that the reason for the failure to provide the title, registration number, or date the copyright was originally secured to these first two weeks' worth of newspaper strips [**46] was *not* an inadvertent oversight on plaintiffs' part, but instead was done for some unknown "strategic reason." (Defs' Mot. Recon. at 7). They note that plaintiffs and their first attorney, Mr. George Zadorozny, were made aware of these two weeks' worth of newspapers strips when they (with their then counsel) commissioned a Thomson & Thomson copyright records search report in 1997, wherein the fact was noted that the first newspaper strip where Superman appeared was published on January 16, 1939. (Sept. 22, 2008, Decl. Marc Toberoff, Ex. A at 2 ("The character SUPERMAN made its debut as a daily comic strip on January 16, 1939, and as a Sunday strip on November 5, 1939. It was distributed by and registered for copyright in the name of the McClure Newspaper Syndicate, through September 30, 1949")). The argument does not withstand scrutiny.

At the outset the Court wishes to clear up a mistake in the prior order that was made in assigning to plaintiffs' former counsel, Mr. Arthur Levine, the credit for actually

690 F. Supp. 2d 1048, *1063; 2009 U.S. Dist. LEXIS 104821, **46

cataloguing the list of works contained in the termination notice -- such credit should instead go to Jerome Siegel's daughter, Laura Siegel Larson. As relayed in great detail in [**47] a declaration she submitted in 2007 (and which is reproduced in pertinent part hereafter) Ms. Larson tirelessly labored searching the Copyright Office's registration records located in the Los Angeles Central Library to compile said list, and then her work was later merged with information uncovered by the Thomson & Thomson copyright records search:

> In connection with the preparation of plaintiffs' notices of termination . . . regarding 'Superman,' our attorney, George Zadorozny commissioned a full Thomson & Thomson report pertaining to 'Superman' based on the records at the U.S. Copyright Office. In addition, I personally conducted extensive research and investigation regarding all 'Superman' works going [as far] back as [*1064] 1933, particularly the original 'Superman' works by Jerry Siegel and Joe Shuster.

> I conducted a very thorough search of the copyright registration records of the U.S. Copyright Office at the Los Angeles Central Library downtown. These records consist of numerous volumes titled 'Library of Congress Copyright Office -- Catalog of Copyright Entries.'

> The bound volumes were published by the Library of Congress through 1978. For registrations after 1978, the U.S. Copyright [**48] Office and Library of Congress has made this information available online.

> The copyright registration volumes are segregated by categories, such as 'Periodicals,' etc.,. Each volume bears a volume number and the year covered (either by full year or, in years with many copyright registrations, the volumes covered 6 months each).

> Different categories of items in the 'List of Works' section of the notices of termination had to be researched in separate category volumes for each and every year. For instance, the copyright date and registration number of comic books were listed in the 'Periodicals' volumes. In the 1938 volumes, comic books were listed by the TITLE of the comic book. Therefore, the research required *prior knowledge of the title of the periodical in which the 'Superman' property appeared.*

> In other words, to find the first copyrighted appearance of 'Superman' in comics I had to know the name of the comic book it appeared in. . . .

> . . . .

> There are also U.S. Copyright Office volumes for the category 'Books.' The listings (for such things as novels, coloring books, etc.,.) are arranged alphabetically by the author's last name or, if anonymous, by title. I searched such volumes under [**49] the names Jerome (or Jerry) Siegel and Joseph (and Joe) Shuster, together and separately and found a number of registrations through the years in the 'Books' catalogs.

> I also thoroughly searched additional volumes for categories such as Motion Pictures, Music, Art, etc.,. which had their own peculiarities in the ways the properties were listed.

> As one might imagine from the above description, my research literally entailed hundreds of hours and took weeks to complete. The results of my extensive investigation, complimented by the Thomson and Thomson report, are reflected in the detailed 'List of Works' contained in each of the notices of termination.

(May 29, 2007, Decl. Laura Siegel Larson PP 2-5, 7-8, 10-12 (emphasis in original)).

The termination notice lists hundreds of Superman newspaper strips, including ones from as early as February 20, 1939, published in the Milwaukee Journal. (

Case 2:10-cv-03633-ODW-RZ   Document 80-4   Filed 09/20/10   Page 120 of 132   Page ID #:6584

Page 14

690 F. Supp. 2d 1048, *1064; 2009 U.S. Dist. LEXIS 104821, **49

*See* Decl. Michael Bergman, Ex. X at 325). That such great lengths were taken to include all the other newspaper strips created only reinforces that the failure to include those strips from January, 1939, was an inadvertent oversight on their part. [9] None of these "failures" in any way [*1065] suggests that the [**50] failure to include the two weeks of newspaper strips was done other than in good faith with no intent to mislead or conceal.

> [9]   That the comic book expert (Mr. James Steranko) plaintiffs later retained *long after* the termination notices were served (and this litigation commenced) noted the existence of the January, 1939, newspaper strips in his expert report, or that there existed a Second Circuit decision from the 1950s to which Siegel and Shuster were not even a party that also mentioned the fact of these January, 1939, strips, *see National Comics Publications, Inc. v. Fawcett Publications, Inc., 191 F.2d 594 (2nd Cir. 1951)*, cannot be used to impute a finding that the strips were purposefully omitted by plaintiffs. All that these facts show is that the January, 1939, strips could have been discovered had plaintiffs interviewed Mr. Steranko during the preparation of the notices or had better researched case law beforehand.

Indeed, a plausible explanation exists for why the strips noted in the Thomson & Thomson report were not merged with Ms. Larson's voluminous compilation of works. The first two weeks of newspaper strips in question were all registered in 1944 (five years after having [**51] been published in the Milwaukee Journal beginning on January 16, 1939, through January 28, 1939) as prints or pictorial illustrations (administrative class K under the 1909 Act, *see Compendium of Copyright Office Practices* Index at 10 (July 1973 revisions)) under the title of "Superman"; the registration numbers thereto being K5-55490, K5-55491, K5-55492, K5-55493, K5-55494, K5-55495, K5-55496, K5-55497, K5-55498, K5-55499, K5-55500, and K5-55501. (Sept. 18, 2008, Decl. Michael Bergman, Ex. C). Interestingly, the remainder of the Superman newspaper strips appearing in the Milwaukee Journal and in other newspapers from February 20, 1939, going forward were all registered as either a periodical work (administrative class B under the 1909 Act, *see id.* at 10) or as a book (administrative class A under the 1909 Act, *see id.* at 5,

9). (April 30, 2007, Decl. Michael Bergman, Ex. X). This difference in the administrative class of works under which the first two weeks of the Superman newspaper strips were registered *may* explain why it was missed when Ms. Larson compiled her exhaustive list of works.

Moreover, although defendants make much of the fact that the commissioned Thomson & Thomson copyright [**52] records search report made mention of Superman's first appearance in a newspaper strip in the Milwaukee Journal on January 16, 1939, glaringly absent from that report is any mention of the registration number under which that strip (and those that immediately followed) was registered under in the Copyright Office. Removing any doubt on this point is the fact that the catch-all in the termination notice itself expressly represents that "[e]very reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created. Nevertheless, if any such work has been omitted, such omission is unintentional and involuntary."

The Court thus finds that plaintiffs' failure to specifically list the title, original registration number, or date copyright was originally secured in the first two weeks' worth of newspaper strips was indeed inadvertent and not some intentional act by plaintiffs done as part of some secret, but heretofore not understood, strategy. Although defendants have shown that discovery of this information was possible, there is simply nothing to suggest that the failure to include those strips was purposeful when the termination notices were put together. [**53] Inadvertent mistakes happen, and that is what this Court finds occurred here.

**D.** *Constructive Notice*

Finding as the Court does that the termination notice provided the recipient sufficient information upon which to have a "reasonable opportunity" to identify the work affected does not address the complementary question of whether the notice, notwithstanding the error, fulfills the other purpose of providing notice to the public. In this regard, it is important to bear in mind that, for a termination notice to be recorded against a particular work, it is the Copyright Office's practice and procedure to rely solely on the information [*1066] found in the notice. "The document, or material attached to it, must identify the work to which it pertains so that, after the document is indexed by the Copyright Office, it would be revealed by a reasonable search under the title or

690 F. Supp. 2d 1048, *1066; 2009 U.S. Dist. LEXIS 104821, **53

registration number of the work." Compendium II: Copyright Office Practice 1608.01. Because the termination notice, even with the catch-all clause, does not identify the first two weeks' worth of newspaper strips in this particular manner, the Copyright Office did not index plaintiffs' termination notice against those strips [**54] in its records. Thus, were one to search only for the records to those two weeks' worth of strips, no mention of the termination notice would appear in the Copyright Office's records for the copyright to those works. This, of course, raises concerns over the adequacy of the information in the termination notice to apprise the public that those strips were affected by the notice.

But once again, the Court must consider the *nature* of the property that is the subject of the termination notice -- the copyright to a character continuously exploited in numerous works for over seven decades. Although, as previously noted, each incremental expansion, refinement in, or further elucidation of the copyright in a character such as Superman is protected only through the copyright contained in the individual work or series in which that expansion was first relayed, the effective licensing of the character itself in the commercial setting generally requires rights to its complete library, not a discrete, narrow subpart to the same.

As plaintiffs have proffered, and which defendants have not sought to rebut, it is unlikely that these two weeks' worth of newspaper strips would be "licensed -- or even [**55] used -- separately from the remaining Superman mythos," the overwhelming majority of which works were in fact specifically listed in the termination notice in complete compliance with 201.10(b)(iii)'s requirements. (Pls' Opp. at 7 n.15). In short, plaintiffs' termination notices more or less papered over the copyright in the Superman character and the world built around him. Moreover, as plaintiffs have represented, and again as defendants have not challenged, if one were to search the records of the Copyright Office for works, such as the two weeks' worth of strips (and indeed for *all* the newspapers strips published through McClure), with the title of "Superman," one would not only come across the two weeks' worth of strips in question but also references to other Superman newspaper strips with the same title whose plaintiffs' termination notices were in fact indexed against by the Copyright Office. [10]

10    Although admitting that the notices

themselves are meant to assist the "grantee" whose rights are affected by the termination, recordation of the notice itself (as is called for in *section 304(c)(4)(A)* ("A copy of the notice shall be recorded in the Copyright Office before the effective [**56] date of termination, as a condition to its taking effect")) is also designed to "notify the public." (Mot. Reconsideration at 1 n.1 (citing *17 U.S.C. § 205(c)*). Interestingly, however, among the examples of errors that the Register already recognizes as being "harmless" are those relating to the date or registration number of the works affected by the notice itself. One would presume that if affording notice to the broader public was such an insurmountable obstacle to application of the harmless error rule, mistakes in the registration numbers given or the dates upon which the copyright was secured in said works would not be allowed as those are quite material impediments in the Copyright Office's ability to index the notice to affected works and thus undermines the public's ability to correctly identify whether a particular work was subject to separate ownership chain. Indeed, the Register recognized that the notice portion of the compromise's calculus was not to be one of absolute notice, but only sufficient information in the notice to give the public a "reasonable opportunity" to identify the work.

[*1067] This underscores and provides support for Patry's comment (and the Court's adoption [**57] thereof) that, "In the case of works consisting of a series or containing characters requiring the terminating party to list separately each work in the series or all works in which the character appears would render the termination right meaningless. Instead, notice that reasonably puts the terminated party on notice of the character being terminated is sufficient." PATRY ON COPYRIGHT § 7:45. [11] Patry's formulation is consistent with the Register's call that all the grantee and the public are entitled to is a "reasonable opportunity to identify" that which is being terminated.

11    Although defense counsel brushes aside Patry's comments as signifying nothing but some "commentator's observations," (Defs' Reply at 3), such was not counsel's assessment of Patry's work when reviewing his treatise now cited to by the Court. *See* Roger L. Zissu, Lawyer's Bookshelf,

257

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 122 of 132    Page ID #:6586

Page 16

690 F. Supp. 2d 1048, *1067; 2009 U.S. Dist. LEXIS 104821, **57

New York Law Journal (April 11, 2007) (reviewing WILLIAM F. PATRY, PATRY ON COPYRIGHT (2007) (observing that Patry "is already a legend as a prolific author and active lawyer and teacher" whose earlier copyright works are "highly regarded" and whose treatise "surpasses not only the length of the multivolume works of Nimmer and Goldstein [**58] but also their scope and is destined to join these . . . as another staple in the field")). That said, Patry's present position on this point has evolved. In a 1996 law review article, Patry advocated the position now being advanced by defendants. *See* William F. Patry, *The Copyright Term Extension Act of 1995: Or How Publishers Managed to Steal Bread from Authors, 14 CARDOZO ARTS & ENT. L.J. 661, 684 (1996)* ("In the case of works consisting of a series or containing characters, special care has to be taken to list separately each and every work in the series, or all works in which the character appears").

To require complete or perfect constructive notice (as advocated by defendants by reference to *17 U.S.C. § 205(c)*) would provide authors or their heirs an illusory "opportunity" to recapture the extended copyright to property such as Superman, whose very success has led to its consistent appearance in print and other media for seventy years, leading to the creation of a large library of works in which constructive notice would have to be given. It is in the context of such iconic characters that defendants' insistence on "certainty" and strict compliance would saddle authors and their [**59] heirs with having to conform to an overly "burdensome," "ritualistic formality" that does little, if anything, to advance the purpose of ensuring that the public (or the grantee) will receive a "reasonable opportunity" to identify the works affected "from the information given in the notice." Indeed, if perfect constructive notice was an impediment to the harmless error analysis, it is curious that among the examples found in the safe harbor at *(e)(2)*, the Register would have made allowance for mistakes as to the registration number or date on which the copyright was originally secured. Such mistakes would undermine the very notice requirements of *§ 205(c)* that defendants have held up as a reason not to find the error in this case harmless. *Cf. 17 U.S.C. § 205(c)(1)* (labeling as necessary for a "reasonable search" of the Copyright Office's records one done "under the title or registration number of the work").

To that end, this "constructive notice" effect so touted by defendants is not a concept to be bandied about in the abstract, as if it were an end unto itself. Such notice is informed largely by its purposes -- it is a means to an end. To posit that any member of the public who [**60] was interested in exploiting Superman would somehow confine their review of the lengthy registration of the works in that character in the records of the Copyright Office to but a couple weeks' worth of newspaper strips in January, 1939, is, from a practical business perspective, nonsense. [*1068] Instead it would transform the harmless error inquiry into an entirely wooden enterprise, shaped entirely by and made subservient to the formalities of the rule itself. Should any third party be interested in exploiting those original copyrightable elements found in those strips, they would have also searched other works to successfully utilize them (works that were in fact listed in the termination notices), and upon doing so discover the termination notice (and the catch-all clause contained therein), putting them on inquiry notice that the termination notice also applied to those strips. The valuable copyrightable story elements to the Superman character contained in those strips (Krypton, Jor-L, *etc.*) do not exist in a vacuum. As defendants have repeatedly noted to the Court throughout this litigation, Superman is comprised of many different elements which, but for the results of this litigation [**61] itself, are considered and marketed part of an aggregate whole, not as tiny individual copyrightable bits (a red cape here, a particular villain there, x-ray vision and the ability to fly over here, an alter ego personality to peruse around the corner, or a far away doomed planet over the horizon). The copyright in the Superman character exists as a conglomerate representing the story that has been told of him through seventy years of exploitation.

Nowhere do defendants come to grip with this fundamental quality of the copyrighted property at issue. 12 Instead, now that it does not suit them, they seek to press upon the Court that the entire argument that there is a "Superman 'mythos' or character" is but an "effort to circumvent the rules and overreach" by reference to "amorphously recaptur[d] rights." (Defs' Reply at 2). To begin, the copyrightable nature of the Superman character was long ago recognized by the Second Circuit (a panel composed of Judge Learned Hand and his cousin Augustus Hand), *see Detective Comics, Inc. v. Bruns Publications, Inc., 111 F.2d 432, 433 (2nd Cir. 1940)*, and is not some recent product of either plaintiffs or this

690 F. Supp. 2d 1048, *1068; 2009 U.S. Dist. LEXIS 104821, **61

Court. Even more glaring is the fact [**62] that, throughout this litigation, defendants themselves have spoken of the "Superman "character" and the surrounding "mythology" built around the character as being at stake in the notices filed by plaintiffs. To that end, they have sought to profit from that fact as a means to limit the scope and value of any copyrights plaintiffs eventually recaptured through the same. (Defs' Mot. Partial Summ. J. at 1, 2, 5-8).

> 12  The only concession defendants in this regard is that perhaps Patry's formulation "might be justified where an author wrote *all* works featuring a character." (Defs' Reply at 3 n.4 (emphasis in original)). Why such a variance would be justified in that particular factual circumstance, but not one where, as here, thousands of works of a character are in fact written by a single creative pair, is nowhere explained, nor does it appear to the Court to be a distinction of any substance (save for the fact that it would preclude a finding of harmless error in this case).

Richly, defendants argue that the Court must follow the regulation's formalities "strictly," and that the Court's failure to do so in the August 12 Order "allow[ed] the 'harmless error' exception to swallow them [**63] whole." (Mot. Rec. at 2). Of course, the same could be said of defendants' proposition that the Court should so narrowly interpret the harmless error rule as to render it largely meaningless. The Court, however, is mindful that the Register put the harmless error rule into the regulations when they were first promulgated -- a safety valve which has not been changed despite numerous other changes to the 1976 Act and the regulations there under. The very presence of a harmless error rule demonstrates that the formalities that defendants so desire to be strictly [*1069] enforced need not be followed to the letter; that is the very purpose for such a rule, allowing variances from otherwise mandated requirements.

However, perhaps the most puzzling aspect of defendants' position on this entire question is that not only do they fault plaintiffs for doing too little (namely, omitting the title, registration number, *etc.,* to the first two weeks' worth of newspaper strips), but, at the same time, fault them for doing too much (identifying within the notice reference to title, registration number, *etc.,* all

the Superman works, even those outside the five-year termination window). Although defendants now [**64] assert that such over-inclusion amounted to "flooding notices with irrelevant works," it is quite clear that the reason such additional works were listed in the notices was to satisfy the very constructive notice arguments defendants have now so relentlessly required be served. By having the termination notice spread over such a large number of works, plaintiffs ensured that the impact of any missing gaps that may arise would be alleviated. The fact that the defendants seek to fault plaintiffs for being overly conscientious of the constructive notice quality provided by their termination notices is simply misguided. [13]

> 13  However, picking up on defendants' suggestion to simply look to the works from the relevant five-year window that were created by Siegel and Shuster and then compare them to those Tarzan works created by Burroughs does nothing to advance their cause. As admitted in Mr. Zissu's declaration (who represented Burroughs' heirs in the 1980s Second Circuit litigation), Burroughs himself only wrote 40 books (although it is undoubtedly true that thousands of other derivative Tarzan works were created by others). On the other hand, from the Court's review of the termination notice, [**65] of the 546 pages in the notice, 94 pages were directed to over 2,959 works created by Siegel and Shuster for the five-year period from 1938 to 1943, of which, again, but 14 works (the first two weeks of Superman newspaper strips) are in question here (comprising but .47%). (April 30, 2007, Decl. Michael Bergman, Ex. X at 4-6, 24-25, 40, 71, 195-215, 222, 224-236, 325-377, 450, and 478). As a final point the Court takes exception to defendants' implicit efforts to relegate Siegel's role in the development of the Superman character to nothing more than an insignificant player who did little more after Superman's initial success in *Action Comics* No. 1: "Jerry Siegel's termination right allows recapture of only a handful out of *thousands of Superman works that he did not create to which his family has no legal right whatsoever.*" (Defs' Reply at 3 (emphasis added)). Defendants are advised that, for the period of 1938 to 1943, Siegel and Shuster *created* nearly all of the 2,959 Superman works noted by the Court (of which

Case 2:10-cv-03633-ODW-RZ    Document 80-4    Filed 09/20/10    Page 124 of 132    Page ID #:6588

Page 18

690 F. Supp. 2d 1048, *1069; 2009 U.S. Dist. LEXIS 104821, **65

over 1,100 are Superman newspaper strips, *see* SUPERMAN: THE DAILIES 1939 - 1942 at (1988) (noting that during this three-year period, "Jerry Siegel and Joe Shuster" created [**66] 966 Superman newspaper strips) and SUPERMAN: SUNDAY CLASSICS 1939 -1943 at vii - viii (1999) (noting that during this four-year period "Jerry Siegel and Joe Shuster" created 183 Sunday newspaper strips), and 85 of which were Superman comic books, *see* April 30, 2007, Decl. Michael Bergmann, Ex. X at 5-6, 24-25). Indeed, were the Court to look to the entire period in which the pair created Superman material for Detective Comics (that is, until 1947), the number of Superman works would only increase to many thousands more. Although it is true that Siegel's termination right does not extend to the overwhelming majority of these works he and Shuster in fact created, this is only so because those works were made by the pair for hire (a conclusion which the Court itself noted was a close call with respect to the newspaper strips), not because the pair did not in fact actually create them. Moreover, if anyone overstates the case it is defendants, who seek to equate the size of the universe of Tarzan works created by Burroughs as "similar" to that for Superman. (Decl. Zissu P 9). Burroughs actually only created the forty books (some of which were first printed in magazine serial form before [**67] being collected into book format); the remainder of the Tarzan works that defense counsel references, be it Tarzan movies, comic books, or newspaper strips, were not done by the hand of Mr. Burroughs but were derivative works created by others. As noted earlier, the universe of Siegel and Shuster created Superman material is "certainly larger" than that at issue in *Burroughs*.

[*1070] The Court thus concludes that the information in the catch-all was adequate to give the public a "reasonable opportunity" to identify the affected works.

### E. *Prior Case Law*

Defendants' last point is that the Court's "new rule" contradicts, misreads, and "overlooks" the case law directly on point, "judicial precedent" which defendants contend support their position. (Defs' Reply at 2). In this

Court's view, defendants continue to misread that "precedent." Only *one* other court has even touched upon application of the harmless error safety valve to errors committed in meeting 201.10(b)(1)(iii)'s requirements.

*Burroughs v. Metro-Goldwyn-Mayer, Inc.,* dealt with the status of Edgar Rice Burroughs' well-known character Tarzan, whose first appearance in print was in *Tarzan of the* Apes, published and copyrighted in 1912. Eleven [**68] years later, in 1923, Burroughs transferred all his rights in that novel and all his subsequent works to Edgar Rice Burroughs, Inc., a family corporation. In April, 1931, an agreement was executed between the corporation and MGM whereby the film studio was granted the right to make a movie, based not on any of Burroughs' literary works, but rather on its own original screenplay, employing as characters Tarzan and other creatures from Burroughs' works. The agreement also permitted MGM to remake its Tarzan film as often as it chose, provided that each remake was based substantially on the first film. In 1932, MGM released its hugely popular *Tarzan, The Ape Man* film.

During the 1970s, the Burroughs corporation licensed Warner Bros. to make a new Tarzan film to be based on the 1912 book *Tarzan of the Apes*. In order to avoid possible competition between Warner Bros.' film project and any further MGM remakes, Burroughs' heirs (Mr. Burroughs having died in 1950) served a termination notice pursuant to *section 304(c)*. The heirs, however, did not serve the notice on MGM, but only on the family corporation; they also served the notice in December, 1977, three weeks before the 1976 Act became [**69] effective. In 1980, while the Warner Bros. film was in production, MGM announced plans for yet another *Tarzan, The Ape Man* film remake. Burroughs' heirs quickly filed suit for copyright infringement against MGM, contending that the film studio's remake rights had been terminated, prompting MGM to argue that the heirs' termination notice was ineffective for a number of reasons, including one related to defects in the contents of the notice.

The district court was presented with a preliminary injunction motion by Burroughs' heirs to block the soon to be released *Tarzan* movie by MGM, arguing that such a movie would infringe the copyrights to the 35 Tarzan works which they alleged to have successfully recaptured upon the filing of a termination notice. In the course of an order denying plaintiffs' preliminary injunction, the

690 F. Supp. 2d 1048, *1070; 2009 U.S. Dist. LEXIS 104821, **69

district court proffered *five* alternative rationales, each sufficient on its own to justify the court's conclusion, for why the heirs were unlikely to prevail on the merits. Among those rationales was that the termination notice did not conform to the regulations promulgated by the Register because it failed to list five other Tarzan works (the termination notice was [**70] literally blank with regards to these works, there was no catch-all clause, no generalized reference to other works, nothing). The question was then raised whether such a complete omission was somehow salvageable by reference to the harmless error rule.

[*1071] In the course of two sentences the district court in *Burroughs* inquired into, analyzed, and concluded that it was not: "Since the Notice did not include these five titles, . . . the Notice is deficient as to these five titles. Such a deficiency is not 'harmless error'; it undoubtedly 'materially affects' the adequacy of the Notice." *491 F. Supp. 1320, 1326 (S.D.N.Y. 1980)*. Other than this singular item, nothing else exists in the case law analyzing this question concerning application of the harmless error rule with respect to 201.10(b)(1)(iii)'s regulatory requirements. This case, however, is readily distinguishable. Here, unlike in *Burroughs,* the termination notice, as set forth above, does have some information relating to the works that ultimately are at issue. This is simply not a case of complete and total absence of information, a circumstance that the Court itself has recognized as one to which consideration of harmless error is [**71] not applicable.

Defendants note that the district court's decision in *Burroughs* was affirmed by the Second Circuit. Admittedly, on appeal from the denial of the Burroughs' heirs preliminary injunction motion, the Second Circuit did affirm the district court, but it did so by way of a summary table disposition without giving any reason thereto. *See Burroughs v. Metro Goldwyn Mayer, Inc., 636 F.2d 1200(2nd Cir. 1980)* (noting only "AFFIRMED"). Given that the district court offered five different, and independently adequate reasons for the result it reached, the Second Circuit's later summary disposition cannot, with any degree of intellectual honesty, be argued as having held, adopted or otherwise incorporated the district court's "reasoning" with respect to one of those rationales.

Later, when the *Burroughs* case was before the Second Circuit for a second time in 1982 on appeal from

the district court's disposition of the case on summary judgment in favor of MGM, the court (as noted in the Court's earlier order) was not presented with, and did not engage in, an analysis regarding the harmless error rule; in fact, it did not even mention the harmless error rule, let alone incorporate it [**72] into its decision. Defendants do not dispute this. [14] Instead, the Second Circuit's 1982 decision in *Burroughs* only concerned whether the omission of the works rendered the entire notice invalid insofar as recapture of the copyright in the Tarzan character, or just invalid insofar as the omitted works were concerned. The Second Circuit considered nothing else insofar as the omission was concerned. Despite this fact (namely, the failure of the litigants to raise the issue with the Second Circuit in *Burroughs,* and that court's failure to hold one way or the other on it), it is argued by defendants as somehow proof that the court necessarily decided it, but thought the result so obvious that it decided not to state its holding: "It is so clear from the face of the regulations that the harmless error exception cannot apply to entirely omitted works, it goes -- and went -- without saying. There was no need for either court to belabor the point." (Defs' Reply at 2). In our common law system of jurisprudence, such articulation of a court's holding is absolutely necessary for it to be cited as precedent on a contested point, and its absence cannot be vouched as a substitute for it.

14    Defendants [**73] bizarrely make the supposition that the reason the Second Circuit did not refer to the harmless error rule was "because it no longer had application or relevance to the case," which only reinforces this Court earlier conclusion that the decision has "limited persuasive value to the Court's current analysis." *Siegel, F. Supp.2d , 2009 U.S. Dist. LEXIS 78193, 2009 WL 2512842, at *51.*

Nor can it be said, as argued by defendants, that the district court in *Music Sales* somehow purported to consider the [*1072] issue of harmless error in the context of 201.10(b)(1)(iii)'s requirements. The district court in *Music Sales* did note as an aside that "only the works specified in a termination notice are terminated, even where the notice purports to terminate the grant including more works than actually listed in the notice." *73 F. Supp.2d at 380.* The district court's sole citation for authority for its statement was the Second Circuit's 1982 *Burroughs* decision, which, as noted above, did not even consider application of the harmless error rule. Moreover,

690 F. Supp. 2d 1048, *1072; 2009 U.S. Dist. LEXIS 104821, **73

to the extent that *Music Sales* spoke of the question, it is a factually distinguishable circumstance given that there is absolutely no information in the notice with which to [**74] work with in identifying the work at issue. To state that the Second Circuit's decisions in *Burroughs* or that the district court's decision in *Music Sales* are "squarely on point," as defendants contend, is simply unfounded.

Far from creating a "new rule," the Court's August 12 Order constitutes the first time the harmless error rule has been actually interpreted by any court in a context even approaching that found in the current case.

### F. *Conclusion*

Although defendants understandably believe its scrivener error construction of the harmless error rule is much more "certain," easily applied and beneficial, which it most assuredly is (especially from a grantee's perspective), the Register thought otherwise when it introduced the concept of harmless error as a means to provide relief from meeting these very formalities. Although defendants may disparage such "after-the-fact" arguments, the Register clearly contemplated that, through issuance of its harmless error rule, such "disputes" would indeed occur as a result of the rule's application by the courts. It was to that end that the Register created a safe harbor in *subsection (e)(2)* for which no dispute need arise. If the Register had wished [**75] to so confine its harmless error rule to the items found in *(e)(2)*, it could have easily done so by removing the opening proviso clause to *(e)(2)* and instead closing that subsection with the provision "and other similar types of errors." It did not. The Register could have refrained from placing cautionary statements in the accompanying commentary insofar as to how rigid the formalities contained in said regulations should be applied and mistakes as to any number of the requirements (including those to identification of the works) could arise due to long passage of time that has elapsed since the underlying work in question was created and published. Again, it did not. And finally, the Register could have refrained from tying the "materiality" of an error with the "purposes" undergirding the termination provisions themselves, purposes which are most assuredly not the one-way street in favor of grantees as defendants would have the Court to so read the regulations. Defendants' suggestion that actually applying the harmless error rule in this case would lead to it

nullifying another regulation (identifying each work) is grossly overstated. The entire purpose of a harmless error rule [**76] is to excuse non-compliance with another regulation. The broader rule is not nullified, but, given the circumstances of the particular case, is found not to be sufficient to warrant invalidating the termination notice to those works in question.

The Court ends its analysis of this question much as it did previously: "In the end, the Court finds that some consideration must be given to the nature of the copyrights sought to be recaptured" the "rights to works involving a particular character that has been continuously exploited for decades. . . . [W]hen the notice evidences a demonstrable effort at cataloguing all the relevant and related works, where the universe of those works is [*1073] large" as is in the case of such a character as Superman, "and where the number of omitted works is minute relative to the included works, the presence of a comprehensive catch-all provision such as that found here leads to the conclusion that the relevant omission was harmless error and the termination notice should be found to be effective even as to the omitted works." *Siegel, F. Supp.2d , 2009 U.S. Dist. LEXIS 78193, 2009 WL 2512842, at *52, 53*. The absence of any one of these facts and the Court would not have found the error [**77] in the notice harmless. In combination, under these particular circumstances, the Court finds that the purposes of *section 304(c)* are adequately served and the error is harmless.

### PLAINTIFFS'                MOTION                FOR RECONSIDERATION

This leaves plaintiffs' motion for reconsideration. Plaintiffs' argue that Judge Learned Hand in *Fawcett Publications* made a finding regarding the non-work for hire nature of the strips Siegel and Shuster created for the newspaper syndicate because he described McClure as the "proprietor" of the strips. Admittedly, the 1909 Act in some places distinguishes the proprietor to a copyright from the author to the same, an author being a term that would include an employer of a work made for hire. However, as noted by the Court in its August 12 Order, the term "proprietor" was also used by courts under the 1909 Act in the more colloquial sense as simply indicating ownership or title to the copyright without regard to whether such ownership was by way of work for hire or assignment. Given that the work for hire nature of the creation of the strips was not presented by

690 F. Supp. 2d 1048, *1073; 2009 U.S. Dist. LEXIS 104821, **77

the parties (the artists themselves were not parties to the case), to imply Judge Hand sought to extend the reach [**78] of his ruling to questions beyond the narrow confines of the case before him to those now before this Court some fifty years later is simply misdirected.

Plaintiffs also make much of the Court's finding that the "expense" test was met. What plaintiffs fault was (ironically given the above discussion) a typographical error in the Court's order. The Court never sought to expressly make a finding one way or the other on just the expense element; instead, at the end of its analysis, the Court held that, given the totality of the circumstances, the "instance and expense" test was met. The error was subsequently located in the process of submitting the order for publication (a circumstance not altogether surprising given the length of the Order), and the corrected version of the Order appears there. To remove any discrepancies between the published order of the Court and that submitted to the parties, the Court hereby **AMENDS** its August 12 Order so as to make it consistent with that published at _F. Supp.2d_ _, 2009 U.S. Dist. LEXIS 78193, 2009 WL 2512842_.

Finally, plaintiffs reargue about the payment of royalties, joint venture, and their assertion that _Picture Music_ was simply wrongly-decided. As far as the royalties [**79] are concerned, nowhere in the case law has it ever been held that payment of royalties automatically means a given work was not made for hire. Instead, the case law speaks of that "generally" being true, or that such a fact "weighs heavily against" it being a work for hire. The form of payment an artist receives is but a proxy for trying to determine the larger question concerning the precise business relationship the parties had entered into. It is generally true that employers, especially during the time of the 1909 Act, did not pay their employees or even independent contractors a share in the royalties generated from the commercial exploitation of their work. But just because that generally was the case, and served to cause courts to pause before

finding to the contrary, does not mean that the parties' business relationship in every other measure was [*1074] inconsistent with that found in an employer-employee or commissioning party-independent contractor setting.

The various types and forms in which employment compensation is contractually provided for can oftentimes be only exceeded by the imagination of the individuals and their employers involved in the contracting process. In this [**80] sense, notions of instance and expense are but proxies for the larger overarching inquiry of what was the nature of the parties' relationship. Just as in _Picture Music,_ payment solely in the form of royalties could nonetheless still be found to be done in the context of an employment setting, so too here. Indeed, between the two, this case is much _stronger_ for a finding of work for hire than in _Picture Music._ The artist in _Picture Music_ was commissioned to create a single discrete project (writing a song), upon the completion of which she would receive thereafter royalties from the profits generated. The business relationship, insofar as the instance prong was concerned, was fairly week. Here, on the other hand, Siegel and Shuster entered into a five year contractual relationship calling for them to produce certain works, subjecting them to close editorial supervision, and giving their boss(es) the right to fire them and have them replaced by others. But for the payment in royalties, these are fairly strong hallmarks of an employment relationship.

In the end, despite the closeness of the question, the Court sees no reason to alter its decision. Plaintiffs' motion is therefore **DENIED.**

DATE:  [**81] October 30, 2009

/s/ Stephen G. Larson

STEPHEN G. LARSON

UNITED STATES DISTRICT JUDGE

# EXHIBIT K

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No.    CV 04-08400-SGL (Rzx)                                    Date: July 8, 2008

Title:    JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON; an individual -*v*-
WARNER BROS. ENTERTAINMENT INC., a corporation; TIME WARNER INC., a
corporation; DC COMICS INC., a corporation; and DOES 1-10
========================================================================
=
PRESENT:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

           Jim Holmes                                    None Present
           Courtroom Deputy Clerk                        Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:          ATTORNEYS PRESENT FOR DEFENDANTS:

None present                                None present

PROCEEDINGS:    AMENDED ORDER DENYING DEFENDANTS' MOTION FOR
                CLARIFICATION OR RECONSIDERATION; AMENDED ORDER DENYING
                PLAINTIFFS' MOTION FOR CLARIFICATION OR RECONSIDERATION

       Presently before the Court is defendants' motion for clarification or reconsideration of the
Court's March 26, 2008, Order, and plaintiffs' motion for clarification or reconsideration of the same
order.  In sum, defendants complain that the Court's March 26, 2008, Order went too far, while
plaintiffs' complain that the Court's Order did not go far enough.  As set forth below, the Court
affirms its conviction that its Order went as far as, and no further than, required by the issues
properly before it and, accordingly, denies both motions.

       To begin, defendants' motion for clarification or reconsideration is **DENIED**.  The Court's
findings concerning the scope of the copyrightable material contained in the promotional
announcements were meant to be binding and not, as suggested by defendants, merely advisory.
Defendants argument that the Court's addressing the issue went beyond the questions raised in its
motion for summary judgment is not convincing.  Although defendants originally sought for the
Court to determine that the promotional advertisements fell outside the reach of the notices of
termination, plaintiffs raised in their opposition to that issue further questions concerning the <u>scope</u>
of the copyrightable material contained in those announcements, attaching thereto the expert
reports of both sides directed to that particular question.  Defendants thereafter filed a response

MINUTES FORM 90                                              Initials of Deputy Clerk: jh
CIVIL -- GEN                              1

wherein they noted that, as the Court expressly observed in its Order, with respect to this additional question, "the ads . . . speak for themselves" and "no special 'lens' is required."

The Court took that statement as an alternative argument pressed by defendants should the Court inquire, as it did, into the additional point raised by plaintiffs in their opposition. The Court thereafter applied defendants' own line of reasoning to the additional question raised in plaintiffs' opposition. Given this procedural posture, the Court's addressing the issue over the scope of copyrightable material in the announcements themselves did not go beyond the topics raised in the parties' pleadings. See Cool Fuel, Inc. v. Connett, 685 F.2d 309, 312 (9th Cir. 1982) (noting that Court may sua sponte resolve issues outside of those contained in the pleadings so long as parties "had a full and fair opportunity to ventilate the issues involved in the motion").

Defendants' further argument that the Court's findings in this regard were made "without the benefit of further argument or the fact and expert testimony that Defendants have developed" is also mistaken. (Motion for Clarification at 1). Amongst the voluminous materials submitted by both parties in their cross-motions for partial summary judgment were each side's expert reports. The Court carefully and deliberately considered said expert reports and the documentary evidence itself (i.e., the promotional announcements) in making its decision.

Defendants' argument that the Court should reconsider its ruling because it only submitted "two low-quality photocopies of the Promotional Announcements" themselves is equally unavailing. Defendants have submitted in connection with their present motion large blow ups (almost the size of a small poster on 11"x17" paper) of the announcements, enlarging them substantially from their original actual size. Of course, the salient point is not how those announcements may have looked if blown up, but rather as they appeared to readers in the comic book itself. Though defendants promise to present "an original of one of the Promotional Announcements available for the Court's inspection at the hearing on the motion," (Motion Clarification at 8 n.2), they could have, but failed to present, "high quality photocopies" of said announcements, in their actual size, in the present motion itself or their reply. Hearings are not opportunities for presenting new or newly packaged evidence to opposing counsel or the Court; if defendants believe that the announcements in their original state (including in terms of scale) would demonstrate the presence of additional copyrightable material outside that found in the Court's Order, it should have made that part of the record for purposes of the present motion itself for both the Court and opposing counsel to view. Even at this late date, defendants have not presented any evidence of the promotional announcements in their actual state (including scale) as seen by readers. The only evidence before the Court of how the announcements themselves looked in their natural published state remains the "low quality photocopies" originally presented in the motion for summary judgment.[1]

_____

[1] Defendants argument that, by ruling on said issue, the Court robbed them of their due process rights by not providing them an opportunity to present their contrary evidence, leaving in its wake a presentation "with an unbalanced evidentiary record," is likewise unconvincing. (Motion Clarification at 14). All that defendants have submitted in connection with the present motion for clarification/reconsideration to ameliorate the "unbalanced evidentiary record" are blow ups of the

MINUTES FORM 90
CIVIL -- GEN                2                Initials of Deputy Clerk: jh

Case 2:10-cv-03633-ODW-RZ Document 80-4 Filed 09/20/10 Page 131 of 132 Page
ID #:6595
Case 2:04-cv-08400-SGL-RZ Document 331 Filed 07/08/2008 Page 3 of 4

Accordingly, the Court affirms its conclusion on the scope of the copyrightable material contained in those announcements.

Turning to plaintiffs' motion for clarification and/or reconsideration of the Court's March, 2008, Order, the Court observes that it is not so much a request for the Court to clarify or reconsider its ruling as it is an attempt to prod the Court into further exposition of issues not litigated by the parties in their cross-motions for partial summary judgment.

Undoubtedly, the Court's ruling opens up new areas of inquiry (not entirely unexpected given that the Order was on the parties' cross-motions for partial summary judgment), but that fact alone does not necessitate further clarification or reconsideration as it requires the need to resolve further issues in the case. As the Court's later March 31, 2008, Order has already established a mechanism to deal with these new areas of inquiry, proceeding by way of plaintiffs' motion is inappropriate. Should plaintiffs' wish for the Court to deal with the questions identified in their motion, they may append them to those issues identified in the March 31, 2008, Order requiring further briefing. Accordingly, the Court hereby **DENIES** plaintiffs' motion without prejudice.

IT IS SO ORDERED.

---

promotional announcements themselves. No additional probative evidence has been tendered (namely, a "higher quality" scan of the original advertisement in its original scale and size), and frankly nothing beyond that evidence could have been submitted as the reports of the experts, whose testimony comprises the main line of evidence on this point, was already presented to the Court in connection with the parties' motions for summary judgment itself. Finally, defendants seek clarification to the effect that the Court's statement that the name "Superman" was not in the promotional announcements does not imply that the name Superman, by itself, is copyrightable. (Reply at 10). The Court meant no such thing from its statement. The Court was simply observing that the promotional announcements were not geared toward turning the readers attention to the Superman character per se as his name did not appear in the announcements, but were instead meant to market the new comic Action Comics.

MINUTES FORM 90                                                    Initials of Deputy Clerk: jh
CIVIL -- GEN                                 3

**267**

CV 04-08400-SGL (RZx)
JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON; an individual v WARNER BROS.
ENTERTAINMENT INC., a corporation; TIME WARNER INC., a corporation; DC COMICS INC., a
corporation; and DOES 1-10
MINUTE ORDER of July 8, 2008