DANIEL M. PETROCELLI (S.B. #097802)
  dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
  mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
  cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067-6035
Telephone:  (310) 553-6700
Facsimile:   (310) 246-6779

PATRICK T. PERKINS (admitted *pro hac vice*)
  pperkins@ptplaw.com
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, NY 10516
Telephone:  (845) 265-2820
Facsimile:   (845) 265-2819

Attorneys for Plaintiff DC Comics

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DC COMICS,<br><br>              Plaintiff,<br><br>       v.<br><br>PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, an individual, JOANNE SIEGEL, an individual, LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive,<br><br>              Defendants. | Case No. CV 10-3633 ODW (RZx)<br><br>**PLAINTIFF DC COMICS' OPPOSITION TO DEFENDANTS JOANNE SIEGEL AND LAURA SIEGEL LARSON'S MOTION TO DISMISS AND/OR STRIKE PLAINTIFF'S FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6) (RE: THIRD AND SIXTH CLAIMS FOR RELIEF)**<br><br>Hon. Otis D. Wright II<br><br>**Hearing Date**:   October 18, 2010<br>**Hearing Time**:   1:30 p.m. |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................ 1

II.     STATEMENT OF FACTS ......................................................................... 1

III.    DEFENDANTS' UNLAWFUL AGREEMENTS VIOLATE DC COMICS' RIGHTS UNDER SECTION 304(C)(6)(D) ................................ 4

    A.    The Extent To Which Defendants' Illicit Agreements Violate DC Comics' Rights Cannot Be Resolved On A Motion To Dismiss ................................................................................................ 5

    B.    Section 304(c)(6)(D) Grants DC Comics A Competitive Advantage ......................................................................................... 7

IV.     DC COMICS' CLAIMS ARE NOT TIME-BARRED ............................... 11

V.      DEFENDANTS' UNLAWFUL AGREEMENTS CONSTITUTE UNFAIR COMPETITION .......................................................................... 13

VI.     DC COMICS' SIXTH CLAIM IS NOT PREEMPTED ............................. 15

VII.    DEFENDANTS' UNLAWFUL CONSENT AGREEMENTS ARE RIGHTFULLY A PART OF THIS CASE .................................................. 16

    A.    Defendants' Motion To Strike Presents Contested Fact Issues .......... 17

    B.    Defendants' Motion To Strike Misstates The Facts And Law .......... 17

VIII.   THE LITIGATION PRIVILEGE DOES NOT APPLY HERE ................... 24

IX.     CONCLUSION ........................................................................................... 25

1

# **TABLE OF AUTHORITIES**

2

## **CASES**

3

*Action Apartment Ass'n, Inc. v. City of Santa Monica*,
    41 Cal. 4th 1232 (2007)................................................................24, 25

4

*Altera Corp. v. Clear Logic, Inc.*,
    424 F.3d 1079 (9th Cir. 2005) ...........................................................15

5

6

*Athey v. Farmers Ins. Exch.*,
    234 F.3d 357 (8th Cir. 2000) .............................................................20

7

*Balboa Ins. Co. v. Trans Global Equities*,
    218 Cal. App. 3d 1327 (1990) ...........................................................15

8

9

*Bd. of Trs. v. Tyco Int'l, Ltd.*,
    253 F.R.D. 521 (C.D. Cal. 2008) .......................................................21

10

*Bekaert Progressive Composites Corp. v. Wave Cyber Ltd.*,
    2007 WL 1110736 (S.D. Cal. Apr. 5, 2007) .....................................15

11

12

*Benesch v. Green*,
    2009 U.S. Dist. LEXIS 117641 (N.D. Cal. Dec. 17, 2009) ..............23

13

*Betz v. Trainer Wortham & Co.*,
    236 Fed. Appx. 253 (9th Cir. May 11, 2007) ...................................12

14

*Birschtein v. New United Motor Mfg., Inc.*,
    92 Cal. App. 4th 994 (2001) ..............................................................13

15

16

*Bourne Co. v. MPL Commc'ns, Inc.*,
    675 F. Supp. 859 (S.D.N.Y. 1987) ...............................................9, 10

17

*Broberg v. Guardian Life Ins. Co. of Am.*,
    171 Cal. App. 4th 912 (2009)........................................................12, 13

18

19

*Burdick v. Union Sec. Ins. Co.*,
    2009 WL 4798873 (C.D. Cal. Dec. 9, 2009) ...................................13

20

*Bylin Heating Sys., Inc. v. M & M Gutters, LLC*,
    2008 WL 744706 (E.D. Cal. March 18, 2008)..................................25

21

22

*Campagnone v. Enjoyable Pools & Spas Serv. & Repairs, Inc.*,
    163 Cal. App. 4th 566 (2008)............................................................23

23

*Carney v. Am. Univ.*,
    151 F.3d 1090 (D.C. Cir. 1998) ........................................................20

24

25

*CBOCS West, Inc. v. Humphries*,
    553 U.S. 442 (2008) ..........................................................................11

26

*Cel-Tech Comm'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999).......................................................................14

27

28

*Del Madera Props. v. Rhodes & Gardner, Inc.*,
    820 F.2d 973 (9th Cir. 1987) ................................................................. 15, 16

*Doe 1 v. Super. Ct.*,
    132 Cal. App. 4th 1160 (2005) ....................................................................... 22

*Farmers Ins. Exch. v. Super. Ct.*,
    2 Cal. 4th 377 (1992) ..................................................................................... 13

*FDIC v. White*,
    76 F. Supp. 2d 736 (N.D. Tex. 1999) ............................................................ 21

*Flowers v. Carville*,
    310 F.3d 1118 (9th Cir. 2002) ........................................................................ 12

*Folb v. Motion Picture Indus. Pension & Health Plans*,
    16 F. Supp. 2d 1164 (C.D. Cal. 1998) ........................................................... 21

*Fox v. Ethicon Endo-Surgery, Inc.*,
    35 Cal. 4th 797 (2005) .................................................................................... 12

*Foxgate Homeowners' Assoc. v. Bramalea Cal., Inc.*,
    26 Cal. 4th 1 (2001) ....................................................................................... 23

*Grisham v. Philip Morris U.S.A., Inc.*,
    40 Cal. 4th 623 (2007) .................................................................................... 12

*Haneline Pac. Props., LLC v. May*,
    167 Cal. App. 4th 311 (2008) ......................................................................... 24

*Hartzheim v. Valley Land & Cattle Co.*,
    153 Cal. App. 4th 383 (2007) ......................................................................... 11

*Idema v. Dreamworks, Inc.*,
    162 F. Supp. 2d 1129 (C.D. Cal. 2001) .......................................................... 16

*In re Marriage of Kieturakis*,
    138 Cal. App. 4th 56 (2006) ........................................................................... 23

*In re Rubber Chems. Antitrust Litig.*,
    504 F. Supp. 2d 777 (N.D. Cal. 2007) ............................................................ 12

*Jacada, Ltd. v. Int'l Mktg. Strategies, Inc.*,
    401 F.3d 701 (6th Cir. 2005) .......................................................................... 19

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) ........................................................................ 14

*Kodadek v. MTV Networks, Inc.*,
    152 F.3d 1209 (9th Cir. 1998) ........................................................................ 16

*Kullar v. Foot Locker Retail, Inc.*,
    168 Cal. App. 4th 116 (2008) ......................................................................... 22

iii

*Laws v. Sony Music Entm't, Inc.*,
    448 F.3d 1134 (9th Cir. 2006) ................................................................ 16

*McKell v. Wash. Mut., Inc.*,
    142 Cal. App. 4th 1457 (2006) ............................................................... 13

*Milne v. Stephen Slesinger, Inc.*,
    430 F.3d 1036 (9th Cir. 2005) ......................................................... *passim*

*Molina v. Lexmark Int'l, Inc.*,
    2008 U.S. Dist. LEXIS 83014 (C.D. Cal. Sept. 30, 2008) ...................... 21

*Motown Record Corp. v. George A. Hormel & Co.*,
    657 F. Supp. 1236 (C.D. Cal. 1987) ................................................. 15, 16

*Munoz v. J.C. Penney Corp., Inc.*,
    2009 U.S. Dist. LEXIS 36362 (C.D. Cal. Apr. 9, 2009) ......................... 21

*Norgart v. Upjohn Co.*,
    21 Cal. 4th 383 (1999) ............................................................................ 12

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*,
    469 U.S. 189 (1985) ................................................................................ 10

*Perrignon v. Bergen Brunswig Corp.*,
    77 F.R.D. 455 (N.D. Cal. 1978) .............................................................. 19

*Polar Bear Prods., Inc. v. Timex Corp.*,
    384 F.3d 700 (9th Cir. 2004) .................................................................. 12

*RDF Media Ltd. v. Fox Broad. Co.*,
    372 F. Supp. 2d 556 (C.D. Cal. 2005) ............................................... 17, 23

*Religious Tech. Ctr. v. Wollersheim*,
    971 F.2d 364 (9th Cir. 1992) .................................................................. 19

*Rhoades v. Avon Prods., Inc.*,
    504 F.3d 1151 (9th Cir. 2007) ................................................................ 20

*Richards v. CH2M Hill, Inc.*,
    26 Cal. 4th 798 (2001) ............................................................................ 13

*Rojas v. Super. Ct.*,
    33 Cal. 4th 407 (2004) ............................................................................ 22

*Solid Host, NL v. Namecheap, Inc.*,
    652 F. Supp. 2d 1092 (C.D. Cal. 2009) .................................................... 6

*Sovak v. Chugai Pharm. Co.*,
    280 F.3d 1266 (9th Cir. 2002) ................................................................ 19

*Stearns v. Select Comfort Retail Corp.*,
    2010 WL 2898284 (N.D. Cal. July 21, 2010) ......................................... 13

*Stutz Motor Car of Am. v. Reebok Int'l*,
   909 F. Supp. 1353 (C.D. Cal. 1995)................................................................ 12

*Suh v. Yang*,
   987 F. Supp. 783 (N.D. Cal. 1997).......................................................... 11, 13

*Sullivan v. Little Hunting Park, Inc.*,
   396 U.S. 229 (1969) ................................................................................ 11

*Thomas v. Bible*,
   983 F.2d 152 (9th Cir. 1993) .................................................................... 24

*Touche Ross & Co. v. Redington*,
   442 U.S. 560 (1979) ................................................................................ 11

*U.S. v. Am. Trucking Ass'ns, Inc.*,
   310 U.S. 534 (1940) ................................................................................ 10

*UAS Mgmt., Inc. v. Mater Misericordiae Hosp.*,
   169 Cal. App. 4th 357 (2008) .................................................................. 14

*Uforma/Shelby Bus. Forms, Inc. v. NLRB*,
   111 F.3d 1284 (6th Cir. 1997).................................................................. 20

*United Med. Mgmt. Ltd. v. Gatto*,
   49 Cal. App. 4th 1732 (1996) .................................................................. 16

*Whittlestone, Inc. v. Handi-Craft Co.*,
   2010 WL 3222417 (9th Cir. Aug. 17, 2010) ............................................ 17

*Wimsatt v. Super. Ct.*,
   152 Cal. App. 4th 137 (2007) .................................................................. 22

*Wyatt v. Union Mortg. Co.*,
   24 Cal. 3d 773 (1979) .............................................................................. 11

## STATUTES

17 U.S.C. § 106............................................................................................ 15, 16

17 U.S.C. § 301(a) ............................................................................................ 16

17 U.S.C. § 304(c)(6)(D) ............................................................................ *passim*

CAL. BUS. & PROF. CODE § 17200 ............................................................ 12, 13, 14

CAL. EVID. CODE § 1119............................................................................ 22, 23

CAL. EVID. CODE § 1120............................................................................ 22, 23

CAL. EVID. CODE § 1121.................................................................................... 23

CAL. EVID. CODE § 703.5.................................................................................... 19

CAL. EVID. CODE §§ 1115-1128 ........................................................................ 19

N.Y. Bus. Corp. Code § 1006(b) ................................................................. 16

**RULES**

Central Dist. of Cal. Local Rule 16.15 .................................................. 19

Fed. R. Evid. 408 .......................................................................................... 20

**OTHER AUTHORITIES**

H.R. Rep. No. 90-83, 90th Cong., 1st Sess. (1965) ...................................... 8

H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. (1976) ............................. 5, 8

1 P. Goldstein, Goldstein on Copyright
§ 5.4.3 (2007) ............................................................................................ 10

3 M. B. Nimmer & D. Nimmer, Nimmer on Copyright, § 11.08[a]
(2010) ........................................................................................................... 9

3 W. Patry, Patry on Copyright
§ 7:47 (2009) ............................................................................................ 10

Register's Supp. Rep., 89th Cong., 1st Sess. (1965) ................................. 8

Second Register's Supp. Rep., 94th Cong., 1st Sess. (1975) ................. 8

18B C. Wright, Fed. Prac. and Proc.
§ 4478 (2d ed. 2002) ................................................................................ 24

PL.'S OPP'N TO DEFS.' MOT. TO DISMISS/
STRIKE THIRD & SIXTH CLAIMS

# I.    INTRODUCTION

Defendants' motion challenging DC Comics' third and sixth claims does not present legal arguments that can be resolved accepting DC Comics' allegations as true, but rather factual arguments that cannot be adjudicated on a motion to dismiss. DC Comics' claims challenge a web of illicit and collusive agreements orchestrated by self-styled "rights hunter" Marc Toberoff to violate DC Comics' rights under the Copyright Act.  While defendants now concede certain of those consent agreements violated the Copyright Act ("such transfers were void *ab initio* under § 304(c)(6)(D)," Mot. at 8), they assert—contrary to DC Comics' pleadings, and the plain terms of the agreements—that these agreements are no longer in force or effect or are shielded by the litigation privilege because they were intended to be made in connection with litigation.  These factual assertions are false, contested, and inappropriate for resolution on a Rule 12 motion.

Defendants also contend that a New York district court opinion forecloses DC Comics' claims.  Defendants not only misdescribe the ruling in this case, but they inexplicably fail to address a *binding Ninth Circuit ruling* that is directly on point and expressly refutes their argument.  Defendants' other challenges are equally without merit.  Their statute-of-limitations arguments present disputed fact issues and ignore that DC Comics' claims are based both on continuing harms for which the statutes of limitations have yet to commence and facts that were discovered only recently because of Toberoff's acts to suppress them.  Defendants' preemption arguments are entirely off-base; DC Comics is not suing defendants for *infringing* their copyrights.  Finally, defendants' motion to strike under Rule 12(f) is procedurally and substantively baseless.  DC Comics' pleadings fully respected and complied with any mediation privileges and agreements.

# II.    STATEMENT OF FACTS

<u>Pacific Pictures Agreements.</u>  In 2001, Marc Toberoff convinced Jean Peavy and Mark Peary, heirs of Superman illustrator Joe Shuster, to form a joint venture

with Toberoff's company, Pacific Pictures.  The agreement defined the Shusters' rights as all "rights, claims, copyrights, property, title and interests in and to…'SUPERMAN' [and] 'Superboy….'"  Peavy and Peary "assign[ed] to the Venture their rights, title and interests" in these purported rights.  They also agreed "in the event of termination of the Venture for any reason, *all Rights*, property or assets of the Venture will be held fifty percent (50%) by the [Shusters] and *fifty percent (50%) by* [Pacific Pictures]…."  The agreement provided that the Shusters could not enter into *any* agreement with respect to these "Rights" "without the express written consent" of Pacific Pictures.  In 2003, the Shusters entered into a nearly identical agreement with Pacific Pictures.  That same year, the Shusters served a copyright termination notice on DC Comics purporting to terminate, effective October 26, 2013, certain prior copyright grants made by Shuster to DC Comics.  The copyright termination notice that the Shusters served was invalid for numerous reasons—among them, they relinquished any claim to such rights by virtue of an agreement Peavy made with DC Comics in 1992.  First Am. Compl. ("FAC") ¶¶ 58-64, 92-95, 112-17 (all emphases added).

IP Worldwide Agreement.  In 1997, Joanne Siegel and Laura Siegel Larson, heirs of Superman writer Jerry Siegel, served a copyright termination notice on DC Comics seeking to recapture Siegel's prior grants of Superman rights.  Several years later, in October 2001, the Siegels and DC Comics reached a settlement agreement resolving the Siegels' claims.  Toberoff closely tracked the progress of the Siegels' termination attempt, and after securing the Shusters' rights for himself, sought to obtain the Siegels' rights—and thereby corner both "halves" of the Superman creators' putative copyright interests.  Toberoff formed IP Worldwide as an LLC between Pacific Pictures, Hollywood talent agent Ari Emanuel, and Emanuel's agency to, in part, acquire and exploit the Siegel rights.  FAC ¶¶ 66-74.

Toberoff began actively pursuing the Siegels' putative rights, but the Siegels' attorney, Kevin Marks, told Toberoff that the Siegels had already reached an

1  agreement with DC Comics.  Undeterred, Toberoff contacted Marks again and

2  claimed, falsely, that he had a billionaire investor willing to purchase the Siegels'

3  Superman rights for $15 million, plus generous royalty rights, and that Toberoff

4  and IP Worldwide would help the Siegels produce a movie to compete with the

5  Superman movie then in development at Warner Bros.  Marks conveyed Toberoff's

6  offer to the Siegels, but advised them they had already reached a binding agreement

7  with DC Comics and could not repudiate it.  Nonetheless, as a result of Toberoff's

8  fraudulent inducements, the Siegels repudiated their business relationship and

9  agreements with DC Comics.  FAC ¶¶ 72, 77-80.  In October 2002, the Siegels also

10  signed an agreement with Toberoff's company IP Worldwide to "negotiate the sale,

11  lease, license and all other dispositions or exploitations" of their putative Superman

12  rights.  The Siegels agreed to pay IP Worldwide 10% of the gross proceeds

13  generated by those rights.  Like the 2001 and 2003 PPC agreements, this agreement

14  provided that the Siegels could "not transfer, assign, license or in any manner

15  encumber the Rights" without IP Worldwide's consent.  FAC ¶¶ 81-83.

16      <u>Superboy Fraud.</u>  Toberoff also manipulated the Siegels and Shusters into

17  fraudulently positioning Jerry Siegel as the sole creator of Superboy.  Toberoff and

18  the Siegels served a copyright termination notice representing that Superboy was

19  created *solely* by Siegel, entitling his heirs to recapture 100% of any Superboy

20  rights.  Defendants knew these claims were false.  In their *1997* termination notice

21  (*i.e.*, before Toberoff), the Siegels identified Superboy as encompassed by their

22  Superman rights—acknowledging Superboy is not a separate work.  Defendants

23  also knew full well that Superboy was a *joint* creation by Siegel and Shuster.  For

24  six decades the Shusters and Siegels claimed Superboy was a joint work, including

25  in copyright filings in the 1970s, and in the 2001 Pacific Pictures agreement.  FAC

26  ¶¶ 86-91.  *Only* Toberoff changed that, by manipulating and re-parking the rights.

27      <u>Other Consent Agreements.</u>  Toberoff and his companies also induced the

28  Siegel and Shuster heirs to enter into various consent agreements, including the

PL.'S OPP'N TO DEFS.' MOT. TO DISMISS/
STRIKE THIRD & SIXTH CLAIMS

agreements described above, preventing the heirs from conveying rights to, or entering into other agreements with, DC Comics without the consent of Toberoff, his companies, the Siegels, and/or the Shusters.  Some or all of these consent agreements remain in effect to this day.  FAC ¶¶ 101, 170, 188; *infra* at 16-19.

Toberoff Timeline.  In December 2008, Judge Larson ordered that a letter titled "Superman – Marc Toberoff Timeline" be produced to DC Comics.  One of Toberoff's colleagues authored the Timeline—thought he won't say who—and in it disclosed Toberoff's wide-ranging unlawful activities to capture the Siegels' and Shusters' rights.  It showed how Toberoff "thwarted" the DC Comics-Siegel agreement and relationship in 2002, and acquired as "much ownership of the Superman copyright personally as he can."  The Timeline put DC Comics on notice of linchpin facts that gave rise to this suit and revealed the ways in which Toberoff concealed his illicit activities from the heirs and DC Comics.  FAC ¶¶ 102-04.

## III.    DEFENDANTS' UNLAWFUL AGREEMENTS VIOLATE DC COMICS' RIGHTS UNDER SECTION 304(c)(6)(D).

DC Comics' *third* and *sixth* claims for relief challenge the illicit web of agreements Toberoff orchestrated in violation of DC Comics' rights under section 304(c)(6)(D) of the Copyright Act.  This section of the Act establishes that, during the 10-year notice period of the Shusters' copyright termination notice (which runs from 2003 to 2013), the Shusters are barred from entering into an agreement regarding their putative Superman rights with any party other than DC Comics, the original copyright "grantee" to those rights.  17 U.S.C. § 304(c)(6)(D).

Congress struck a careful balance in enacting the termination provisions in section 304.  The prohibition against "trafficking in future [copyright] interests" set forth in section 304(c)(6)(D) was meant to protect original grantees to such copyrights, *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1047 (9th Cir. 2005)—including *DC Comics*, which in reliance on its rights spent 70 years and hundreds of millions of dollars developing and promoting Superman.  FAC ¶¶ 33-39.

PL.'S OPP'N TO DEFS.' MOT. TO DISMISS/ STRIKE THIRD & SIXTH CLAIMS

1    Defendants admit the 2001 and 2003 agreements that Toberoff induced the
2    Shusters to sign violate section 304(c)(6)(D), Mot. at 8—effectively conceding DC
3    Comics' third and sixth claims.  Defendants counter that these admittedly invalid
4    contracts no longer remain in force and effect and that, in any event, there is
5    nothing DC Comics can do about them because section 304(c)(6)(D) provides "a
6    right without a remedy."  *Id.* at 7.  Neither argument is correct, much less grounds
7    to grant defendants' Rule 12 motion.  The extent to which defendants' various
8    consent agreements violated—*and continue to violate*—DC Comics' rights is a fact
9    question that cannot be resolved now.  Moreover, as the Ninth Circuit confirmed
10   and Congress made clear, section 304(c)(6)(D) gives an original copyright
11   grantee—*i.e.*, DC Comics—a "competitive advantage over third parties" that is "in
12   the nature of *a right of 'first refusal*,'" *Milne*, 430 F.3d at 1047 (quoting H.R. REP.
13   No. 94-1476 at 127, 1976 U.S.C.C.A.N. at 5743) (emphasis added), which DC
14   Comics has every right to sue to enforce.  Defendants fail to address *Milne* in their
15   motion—although it is controlling Ninth Circuit law, and DC Comics repeatedly
16   advised defendants of its application to its claims.  *E.g.*, Docket No. 61 at 6.

17   **A.    The Extent To Which Defendants' Illicit Agreements Violate DC**
18         **Comics' Rights Cannot Be Resolved On A Motion To Dismiss.**

19   Defendants mischaracterize DC Comics' third and sixth claims in an effort to
20   argue they can be decided as a matter of law.  First, they assert that the 2001 and
21   2003 Pacific Pictures agreements do not interfere with DC Comics' period of
22   exclusivity because they were "voluntarily cancelled on September 10, 2004."
23   Mot. at 8.  But the effect of the September 2004 letter to which they refer, as clearly
24   spelled out in DC Comics' complaint, was *to transfer 50% of the Shusters' rights to*
25   *Pacific Pictures*—in clear violation of section 304(c)(6)(D) and DC Comics' rights.
26   FAC ¶¶ 99, 169.  Defendants may now assert that no one owns the Shusters' rights
27   but the Shusters themselves, but that is not what defendants' contracts say or what
28   is pled in DC Comics' complaint.  Defendants' false assertion, *at best*, raises a

PL.'S OPP'N TO DEFS.' MOT. TO DISMISS/
STRIKE THIRD & SIXTH CLAIMS

factual question that cannot be decided on motion to dismiss.  *E.g., Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1119 (C.D. Cal. 2009).

Beyond that, the 2003 Pacific Pictures agreement indisputably was in effect from October 2003 (when it was executed) through September 2004 (the date of the alleged "cancellation" letter), meaning it wrongly eliminated the first year of DC Comics' period of exclusivity—a period DC Comics seeks to restore in this case. FAC ¶ 173.  Defendants argue that DC Comics is not entitled to restore this period of exclusivity because the Shuster termination notice "could just have well have been served two years in advance" of the termination date.  Mot. at 10 n.5.  That is specious.  Section 304(c)(6)(D) creates a period of exclusivity beginning when "the notice of termination *has been served*," 17 U.S.C. § 304(c)(6)(D) (emphasis added)—not when it *could* have been served, but was not.

Second, defendants contend that because the 2001 and 2003 Pacific Pictures agreements violate section 304(c)(6)(D), they are "void *ab initio*" and thus did not interfere with DC Comics' rights.  Mot. at 8.  In making this argument, defendants notably do not explain why Toberoff—a self-professed "intellectual property expert"—drafted, signed, and induced his joint-venture partners to sign contracts he knew violated the Copyright Act.  Setting this aside, the status and current effect of the Pacific Pictures agreements, the IP Worldwide agreement, and defendants' other consent agreements are all factual questions that cannot be resolved without discovery on a Rule 12 motion.  To be clear, though Toberoff's admission that the 2001 and 2003 Pacific Pictures agreements are invalid goes a long way to proving DC Comics' right to relief, it does not end the inquiry.  DC Comics seeks a binding declaration from the Court that those contracts are void and unenforceable; that the Toberoff defendants interfered with DC Comics' rights; that any other agreement like them is void; and that the Shusters are free to negotiate and enter into any agreement they want with DC Comics—free from Toberoff's illicit restraints.  FAC ¶ 172.  Eliminating this ongoing, ever-changing, and continuing harm is required.

Third, defendants' contention that DC Comics "has not alleged and cannot allege" the various consent agreements at issue "constitute 'a further grant, or agreement to make a further grant' of the recaptured Superman copyrights, barred by § 304(c)(6)(D)," Mot. at 9, is contravened by the plain words of the complaint:

> In violation of DC Comics' statutory period of exclusivity under the copyright laws, Toberoff induced the Siegels and Shusters to enter into agreements *transferring their respective interests* to his companies and *preventing them from conveying any rights to DC Comics without each other's—and Toberoff's—consent.* As a result of these illicit agreements, DC Comics has been deprived of its ability to enter into agreements with the heirs to secure their purported termination rights, in violation of the Copyright Act ….

FAC ¶ 11 (emphasis added); *id.* ¶¶ 101, 170. DC thus alleges both that defendants' various consent agreements (1) are an improper "grant, or agreement to make a further grant"; and (2) unlawfully prevent the Shusters from entering into an agreement with DC Comics—both of which violate section 304(c)(6)(D).

### B. Section 304(c)(6)(D) Grants DC Comics A Competitive Advantage.

Section 304(c)(6)(D) establishes an exclusive period between the time a copyright termination notice is served and its ultimate effective date in which *only* an original copyright grantee can make an agreement with the terminating party. It provides: "A further grant, or agreement to make a further grant, of any right covered by a terminated grant *is valid only if* it is made *after the effective date of the termination*." 17 U.S.C. § 304(c)(6)(D). This provision not only bars third parties (like Toberoff) from trafficking in future copyright interests, it also protects original grantees (like DC Comics). It states "an agreement for such a further grant *may be made* between the author or [his heirs] and *the original grantee* or [its successor], after the notice of termination has been served." *Id.* (all emphases added)

In other words, between November 10, 2003 (when the Shuster termination notice was served) and October 26, 2013 (its effective date), DC Comics is the *only* party that may enter into an agreement with the Shusters regarding their putative Superman rights. Congress described this right in DC Comics' favor as "in the

nature of a right of 'first refusal.'"  H.R. REP. NO. 94-1476 at 127.  (These legislative reports cite section 203.  Courts rely on the history of section 203 in interpreting section 304.  *E.g.*, *Milne*, 430 F.3d at 1046 n.9.)

In fashioning the Copyright Act's termination provisions, Congress carefully struck a balance between creators and companies like DC Comics.  "[W]e have sought actively and persistently to find a basis for agreement that would be a practical benefit to authors and their families *without being unfair to publishers, film producers, and other users*.  Section [304(c)(6)(D)] represents a compromise which, we hope, will accomplish this purpose."  SUPP. REG.'S REP. ON GEN. REV'N OF U.S. COPYRIGHT LAW, 89TH CONG. 72 (1965) (emphasis added); SECOND SUPP. REG.'S REP. ON GEN. REV'N OF U.S. COPYRIGHT LAW, 94TH CONG. 304 (1975) (§ 304(c)(6)(D) "is a compromise that attempts to balance the interests of individual authors and their transferees"); *id.* at 307 ("The 'first refusal' exception was one of the compromises on which the delicate balance of section [304(c)(6)(D)] rests."); H.R. REP. NO. 90-83, at 90 (1965) ("reflects a practical compromise").

In *Milne*, 430 F.3d at 1047—which defendants indefensibly fail to cite—the Ninth Circuit cited the statutory text and legislative history above, and confirmed that section 304(c)(6)(D) "give[s] the original grantee a competitive advantage over third parties" akin to a "right of 'first refusal.'"  There, Clare Milne, an heir of the author of the Winnie the Pooh books, served a termination notice on the original grantee, SSI.  Milne then entered into an agreement with a third party regarding the Pooh rights.  SSI argued this agreement was invalid because it was executed before the effective termination date.  Looking to language and history of 304(c)(6)(D), the Ninth Circuit agreed, holding that "trafficking in future interests" runs afoul of the "'right of first refusal' in the original grantee's favor."  *Id.*  As the court reasoned:  "once a notice of termination is served, the original grantee … is the only party to whom the author (or author's heir) may promise a future grant, and [therefore has] *a competitive advantage over third parties*."  *Id.* (emphasis added).

1    Defendants argue that DC Comics has no rights to sue under 304(c)(6)(D).

2    Defendants base this remarkable assertion not on any reading of *Milne*—controlling

3    law in this circuit that defendants choose not to address—but a misreading of a

4    1987 decision from New York, which is not binding (unlike *Milne*) and, in any

5    event, confirms that section 304(c)(6)(D) creates for DC Comics "a preferred

6    competitive position." *Bourne Co. v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 864

7    (S.D.N.Y. 1987).  In *Bourne*, Ruby, an author's statutory heir, served a copyright

8    termination notice on Bourne, the original copyright grantee.  Before the effective

9    termination date, Ruby made an agreement with a third-party, MPL, purporting to

10   assign her copyrights.  Like DC Comics, Bourne sought a declaration that this

11   agreement was invalid.  The court *never ruled on this claim*, although it recognized

12   that the agreement was necessarily "invalid because MPL was not the original

13   grantee and it was executed prior to the effective date of termination." *Id.* at 861.

14   Bourne also argued that section 304(c)(6)(D) "gives rise to a private right of

15   action for damages." *Id.* at 865.  The court rejected Bourne's damages claim, ruling

16   that section 304(c)(6)(D) makes no mention of an "exclusive statutory right of first

17   refusal" on which a damages claim could be brought. *Id.* at 865-66.  The *Bourne*

18   court did not, as defendants suggest, foreclose the possibility of a declaratory relief

19   claim or suggest a copyright grantee is powerless to protect this advantage. *Id.*; 3

20   M. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT § 11.08[A] n.6 (2010) (*Bourne*

21   addressed "action for damages").  To the contrary, Bourne also sued Ruby's agent,

22   Stern, and MPL for conspiring to induce Ruby to sign the Ruby-MPL agreement.

23   *Id.* at 866.  While the court found there was "no factual support" for this claim, it

24   never indicated Bourne lacked standing to assert it. *Id.* at 866-67.  Just the

25   opposite:  the court rejected Stern's defense that the court lacked subject matter

26   jurisdiction because the only claim against her was "the alleged interference with

27   Bourne's statutory right of first refusal." *Id.* at 865  The court observed:  "This

28   argument seems incomprehensible in light of the fact that Bourne's alleged

PL.'S OPP'N TO DEFS.' MOT. TO DISMISS/
STRIKE THIRD & SIXTH CLAIMS

statutory right of first refusal, if it exists at all, arises under § 304(c)(6)(D), and, therefore, clearly raises a federal question." *Id.* at 865 n.9. Finally, even assuming *Bourne* could be read as defendants urge (and it cannot), the Ninth Circuit's decision in *Milne* rejects it and controls. 430 F.3d at 1047.

Defendants also argue that the Nimmer and Patry copyright treatises support their position. Mot. at 6-7. But neither treatise addresses *Milne*'s analysis of section 304(c)(6)(D), or *Bourne*'s recognition that the section "does give the terminated grantee a preferred competitive position," 675 F. Supp. at 865. Other commentators, moreover, have observed that this section "gives current grantees and successor grantees the first opportunity to negotiate a new grant." 1 P. GOLDSTEIN, GOLDSTEIN ON COPYRIGHT § 5.4.3, at 5:127 (2007). Defendants also fail to note that the Ninth Circuit in *Milne rejected* the Nimmer treatise's position on section 304. 430 F.3d at 1047-48. They also do not mention Patry's concession that Congress expressed a "hostility toward those [like Toberoff] who would attempt to offer the grantor a better deal" before a grantee has its chance to make a deal. 3 W. PATRY, PATRY ON COPYRIGHT § 7:47, at 7-104 n.1 (2009).

Defendants urge the Court to ignore this legislative history. Mot. at 6. *Milne* rejects that approach, 430 F.3d at 1045-47, and the very cases that defendants cite establish that courts are required to take legislative history into account where, as here, defendants' reading of the statute would contravene Congress' clear intent. *U.S. v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 543 (1940) (court should be guided by the "policy of the legislation as a whole"); *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 197-98 (1985) (while statutory construction "begin[s] with the language," courts look to legislative history to clarify Congress' intent).

Defendants finally make the unprincipled, naked assertion that DC Comics has no standing to sue even if 304(c)(6)(D) gives it a competitive advantage. Mot. at 7. Parties whose negotiation rights are aggrieved *have standing* to vindicate their interests, and such rights are "enforceable against third persons" like Toberoff.

1   *Hartzheim v. Valley Land & Cattle Co.*, 153 Cal. App. 4th 383, 389 (2007);

2   *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 239 (1969) ("The existence of a

3   statutory right implies the existence of all necessary and appropriate remedies.").

4   Where, as here, Congress has demonstrated its clear intent to create such a right,

5   *supra* at 7-10, the beneficiary of this right has standing to enforce it, *CBOCS West,*

6   *Inc. v. Humphries*, 553 U.S. 442, 457 (2008).  Congress' intent to confer such a

7   right can be inferred from "the language and focus of the statute, its legislative

8   history, and its purpose," *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575-76

9   (1979)—*all* of which supports DC Comics' third and sixth claims.  *Supra* at 7-10.

10   **IV.  DC COMICS' CLAIMS ARE NOT TIME-BARRED.**

11      <u>Third Claim.</u>  Defendants argue that DC Comics' third claim is time-barred

12   because DC Comics knew about the Pacific Pictures agreements no later than

13   November 15, 2006, yet filed suit six months after the three-year limitations period

14   ended in November 2009.  Mot. at 10.  Not only does this assertion raise factual

15   questions, defendants are mistaken on the law and in describing DC's actual claim.

16      DC Comics' third claim expressly is premised on defendants' *continuing*

17   *course of conduct*, which violated and continues to violate DC Comics' rights under

18   the Copyright Act—and will continue to harm DC Comics though 2013 and

19   beyond.  FAC ¶¶ 3, 101, 169-70.  The statute of limitation only commences when

20   such a continuing harm ceases.  *E.g., Suh v. Yang*, 987 F. Supp. 783, 795 (N.D. Cal.

21   1997) ("continuing wrong" doctrine delays accrual); *Flowers v. Carville*, 310 F.3d

22   1118, 1126 (9th Cir. 2002); *Wyatt v. Union Mort. Co.*, 24 Cal. 3d 773, 788 (1979).

23   What DC Comics seeks in this case is a declaration bringing this *course of*

24   *misconduct to a halt*—invalidating all illicit consent agreements between and

25   among the Toberoff defendants and the Siegel and Shuster heirs.  Defendants say

26   nothing about the continuing harm that DC Comics expressly alleges, FAC ¶¶ 3,

27   101, 169-70; instead, they misrepresent DC's complaint and focus exclusively on

28   the Pacific Pictures agreements, Mot. at 10.  But these agreements still affect DC

1    Comics' rights today, *supra* at 2-4, are part of a pattern of misconduct, and all such

2    agreements will continue to harm DC through 2013 unless judicially declared void.

3           In addition, as DC Comics' complaint makes clear, Toberoff's overall pattern

4    of misconduct only came to light when Judge Larson ordered the Toberoff Timeline

5    produced to DC Comics in December 2008—less than two years ago.  FAC ¶¶ 102-

6    04.  The discovery rule postpones accrual of a cause of action until the plaintiff

7    discovers the facts underlying its claims.  *E.g.*, *Polar Bear Prods., Inc. v. Timex*

8    *Corp.*, 384 F.3d 700, 707 (9th Cir. 2004); *Norgart v. Upjohn Co.*, 21 Cal. 4th 383,

9    393 (1999).  Defendants' factual assertion that DC Comics knew of its claim no

10   later than November 2006—without any explanation how DC Comics' receipt of

11   the Pacific Pictures agreements put it on notice of defendants' continuing and

12   multi-faceted course of interference—is not proper argument on a Rule 12 motion.

13   *Cf. In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007)

14   (statute-of-limitations question cannot be resolved on motion to dismiss because it

15   requires determination of fact-intensive issues); *Fox v. Ethicon Endo-Surgery, Inc.*,

16   35 Cal. 4th 797, 810 (2005) ("statute of limitations … normally a question of fact").

17   Important facts about Toberoff's misconduct only came to light as recently as this

18   year, *infra* at 16-19, and doubtless more still will be uncovered in discovery.

19          Sixth Claim.  Knowing the discovery rule is a fatal to their statute-of-

20   limitation arguments, defendants assert the rule does not apply to DC Comics' sixth

21   claim for unfair competition.  Mot. at 10.  Defendants cite *Stutz Motor Car of Am.*

22   *v. Reebok Int'l*, 909 F. Supp. 1353 (C.D. Cal. 1995), for this point, but shortly after

23   *Stutz* was decided, the California Supreme Court and Ninth Circuit both said it was

24   an open question whether the discovery rule applies.  *Grisham v. Philip Morris*

25   *U.S.A., Inc.*, 40 Cal. 4th 623, 635 n.7 (2007); *Betz v. Trainer Wortham & Co.*, 236

26   Fed. Appx. 253, 256 (9th Cir. May 11, 2007).  Since then, courts have held that the

27   discovery rule *does* apply in 17200 cases when fraud is alleged, as here.  *E.g.,*

28   *Broberg v. Guardian Life Ins. Co. of Am.*, 171 Cal. App. 4th 912, 920-21 (2009)

PL.'S OPP'N TO DEFS.' MOT. TO DISMISS/
STRIKE THIRD & SIXTH CLAIMS

("the better view is that the time to file a section 17200 cause of action starts to run only when a reasonable person would have discovered the factual basis for a claim"); *Burdick v. Union Sec. Ins. Co.*, 2009 WL 4798873, at *10 n.16 (C.D. Cal. Dec. 9, 2009); *Stearns v. Select Comfort Retail Corp.*, 2010 WL 2898284, at *17 (N.D. Cal. July 21, 2010).  Defendants mention none of these cases.

DC Comics' sixth claim seeks redress for fraudulent activities defendants long concealed.  DC Comics seeks a declaration invalidating the various consent agreements between and among defendants—all of which violate DC Comics' rights.  FAC ¶¶ 188-89.  The harm DC Comics is suffering based on defendants' "multiple, continuous acts" exists today and will extend to 2013.  *Suh*, 987 F. Supp. at 795; *Richards v. CH2M Hill, Inc.*, 26 Cal. 4th 798, 822-23 (2001); *Birschtein v. New United Motor Mfg., Inc.*, 92 Cal. App. 4th 994, 1003 (2001).  Moreover, because of defendants' fraudulent concealment of relevant facts, DC Comics was unaware of Toberoff's illicit scheme until production of the Toberoff Timeline in December 2008—at the earliest.  FAC ¶¶ 102-04.  DC Comics timely filed its complaint fewer than two years later.  *Broberg*, 171 Cal. App. 4th at 920-21.

## V.   DEFENDANTS' UNLAWFUL AGREEMENTS CONSTITUTE UNFAIR COMPETITION.

Defendants challenge DC Comics' pleading of its sixth claim, arguing none of the statutory predicates have been pled.  This is mistaken, as DC's complaint plainly alleges defendants' *unlawful*, *unfair*, and *fraudulent* conduct.  DC Comics states a valid claim under section 17200 if any *one* of these types of misconduct is alleged.  *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1471 (2006).

Unlawful.  The "unlawful" prong of section 17200 "borrows violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under 17200." *Farmers Ins. Exch. v. Super. Ct.*, 2 Cal. 4th 377, 383 (1992).  Defendants concede the Pacific Pictures agreements violate the Copyright Act, Mot. at 8—effectively admitting

DC's sixth claim.  Although they seek to minimize their violation of DC Comics' rights, Mot. at 14, defendants' convoluted arguments about alleged limitations on DC Comics' rights were rejected by the Ninth Circuit in *Milne*.  *Supra* at 7-11.  In any event, when a business practice "violates the fundamental rules of honesty and fair dealing, a court of equity is not impotent to frustrate its consummation."  *Cel-Tech Comm'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 181 (1999).

Underline.  **Unfair.**  A 17200 claim is also well pled if it alleges an unfair business practice that "significantly threatens or harms competition."  *Cel-Tech Commc'ns,* 20 Cal. 4th at 187.  Defendants' various consent agreements—which unlawfully prohibit the Shusters and Siegels from entering into agreements without approval of the other defendants—by definition, injure competition.  The agreements forbid making an agreement with a lawful competitor in the marketplace.  *UAS Mgmt., Inc. v. Mater Misericordiae Hosp.*, 169 Cal. App. 4th 357, 371 (2008) (defendants' "provider agreement" unfairly threatened competition by preventing insurers from freely negotiating with competitors).  While defendants assert the consent agreements are merely "agreements amongst [the Siegel and Shuster heirs]" setting forth a plan for negotiation, Mot. at 15, that self-serving characterization does not eradicate the violative nature of the agreements.  Plus, it is a factual assertion— contrary to DC Comics' pleading, FAC ¶¶ 101, 170, 188, supported by *no* evidence, and on which *no* discovery has been taken—meaning it is irrelevant here.

**Fraudulent.**  DC Comics alleges defendants engaged in a pattern of fraud with more than the requisite degree of particularity, Mot. at 15-16, setting forth the "'who, what, when, where, and how' of the misconduct charged," *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1124 (9th Cir. 2009).  For example:

- Toberoff falsely claimed he had found a "billionaire investor" who "would give the Siegel Heirs $15 million," and that he would "help the Siegel Heirs produce" competing Superman movie."  FAC ¶¶ 78-79.
- And "as a result of Toberoff's fraudulent inducements, the Siegel Heirs stated that they would repudiate their agreement with DC Comics."  *Id.*

PL.'S OPP'N TO DEFS.' MOT. TO DISMISS/ STRIKE THIRD & SIXTH CLAIMS

## VI.   DC COMICS' SIXTH CLAIM IS NOT PREEMPTED.

Defendants contend that DC Comics' sixth claim is preempted by copyright law, but cite no case on point for that proposition.  That is because their argument is contrary to law.  Copyright preemption is narrowly defined by statute, and only applies when a plaintiff's state-law claim is based on rights "'equivalent' to any exclusive rights of a federal copyright." *Motown Record Corp. v. George A. Hormel & Co.*, 657 F. Supp. 1236, 1238 (C.D. Cal. 1987); *Balboa Ins. Co. v. Trans Global*, 218 Cal. App. 3d 1327, 1339 (1990) (to be preempted, claim must be "infringed by the mere act of reproduction, performance, distribution, or display"). State-law claims that are *not* based solely on the rights listed in section 106 of the Copyright Act—*i.e.*, the rights to reproduce, prepare derivative works, distribute, perform, and display a copyrighted work—are not preempted.  17 U.S.C. §§ 106, 301(a).  Put another way, any state-law claim that contains an "extra element"—one separate and apart from an allegation that the foregoing rights was infringed—may proceed without creating any conflict with copyright law.  *Del Madera Props. v. Rhodes & Gardner, Inc.*, 820 F.2d 973, 977 (9th Cir. 1987).

Indeed, courts routinely reject preemption arguments in cases exactly of this sort—where copyrights generally are the subject matter of the case, but the gravamen of plaintiff's complaint is a breach or tort—*not* infringement.  *E.g.*, *Balboa*, 218 Cal. App. 3d at 1353 (claims involving fiduciary breaches and misappropriation of trade secrets not preempted); *Bekaert Progressive Composites Corp. v. Wave Cyber Ltd.*, 2007 WL 1110736, at *2-3 (S.D. Cal. Apr. 5, 2007) (same; claims based on misrepresentation and misappropriation of goodwill); *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1090 (9th Cir. 2005) (same; "use [of software] is a qualitatively different right" than reproduction right under Copyright Act).  Although its unfair-competition claim concerns copyright interests with which defendants interfered, DC Comics does *not* allege that defendants infringed or otherwise improperly reproduced or displayed its works.

1    This important limitation on copyright preemption is specifically called out

2    in the Copyright Act, yet defendants' brief ignores it.  Although 17 U.S.C. § 301(a)

3    expressly provides that the Copyright Act preempts only claims "that are equivalent

4    to any of the exclusive rights within the general scope of copyright *as specified by*

5    *section 106*," defendants omit this italicized language.  Mot. at 11.  This omission is

6    telling, because as shown above, DC Comics' sixth claim does not implicate any of

7    the exclusive rights enumerated in section 106.  Unsurprisingly, in each of the cases

8    defendants cite, *id*. at 11-13, the claims were preempted only because the state-law

9    claim was derived from one of the exclusive rights listed in section 106.[1]

10   **VII.   DEFENDANTS' UNLAWFUL CONSENT AGREEMENTS ARE**

11   **RIGHTFULLY A PART OF THIS CASE.**

12   Defendants assert that DC Comics is powerless to complain about recent

13   unlawful consent agreements into which they entered because they disclosed their

14   existence at mediations in 2008 and 2010.  This argument is irrelevant to consent

15   agreements that were disclosed in discovery and continue to violate DC Comics'

16   rights.  Moreover, neither federal nor state law permits defendants to immunize

17   evidence of misconduct merely by disclosing it during mediation.  Although

18   defendants' statements at mediation sessions may be inadmissible in certain

19   instances, one cannot forever suppress facts (*e.g.*, underlying contractual

20   agreements) by springing them on an opposing party during settlement talks.  There

---

[1] *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1143-45 (9th Cir. 2006)
(reproduction); *Kodadek v. MTV Networks*, 152 F.3d 1209, 1212 (9th Cir. 1998)
(publishing); *Motown*, 657 F. Supp. at 1239 ("unauthorized use"); *Del Madera
Props.*, 820 F.2d at 977 (state claims "part and parcel" of copyright claims); *Idema
v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1190 (C.D. Cal. 2001) (same).

Also, DC Comics' sixth claim is not mooted by defendants' assertion that
Pacific Pictures, IP Worldwide, and IPW "no longer have … any interest in
*Superman*...."  SLAPP Mot. at 24-25.  This assertion of fact is contrary to DC
Comics' complaint, FAC ¶¶ 62, 118-21, and is a contested fact issue requiring
discovery.  Equally meritless is defendants' assertion that Pacific Pictures is
dissolved and not subject to suit.  SLAPP Mot. at 24-25.  Both New York and
California law permit suits against dissolved corporations. N.Y. BUS. CORP. CODE §
1006(b); *United Med. Mgmt. Ltd. v. Gatto*, 49 Cal. App. 4th 1732, 1737-38 (1996).

1  is no merit to defendants' motion to strike allegations in DC's complaint related to

2  these offending consent agreements.  The complaint not only follows federal and

3  California law to the letter in alleging the existence of these agreements, DC

4  Comics had every right to rely on them far more expansively than it has so far.

### A.  Defendants' Motion To Strike Presents Contested Fact Issues.

6  "Motions to strike are generally disfavored because of the limited

7  importance of pleadings in federal practice and because it is usually used as a

8  delaying tactic."  *RDF Media Ltd. v. Fox Broad. Co.*, 372 F. Supp. 2d 556, 566

9  (C.D. Cal. 2005).  In considering defendants' motion, the Court must read all facts

10  in DC Comics' favor and "be convinced that there are no questions of fact, that any

11  questions of law are clear and not in dispute, and that under no set of circumstances

12  could the claim or defense succeed."  *Id.*  The origin and scope of the consent

13  agreements at issue turn on "disputed and substantial factual or legal" issues that

14  cannot be resolved on a motion to strike.  *Whittlestone, Inc. v. Handi-Craft Co.*,

15  2010 WL 3222417, at *2 (9th Cir. Aug. 17, 2010).

### B.  Defendants' Motion To Strike Misstates The Facts And Law.

17  DC Comics' complaint never refers to a single statement made by Toberoff

18  or any other party at or in connection with a mediation session.  Rather, it carefully

19  refers to specific consent agreements already produced in discovery, and refers

20  generically to other consent agreements yet to be produced.  FAC ¶¶ 101, 170, 188.

21  In their motion, defendants misrepresent what DC Comics pled, suggesting that DC

22  Comics recounted what was said at the mediation.  It did not.  It was only in

23  defendants' *unsealed, public* motion that *they* chose to disclose what they said.

24  Mot. at 20.  In doing so, defendants have waived any claim of confidentiality.

25  In addition to the consent agreements produced to DC Comics, defendants

26  admit they entered into other consent agreements—agreements that continue to

27  exist to this day, but that defendants refuse to disclose.  As discussed in defendants'

28  motion, in 2008, and before a mediation session in the *Siegel* case, DC Comics was

1  advised that the Siegels had entered into a contract with the Shusters, in which they

2  agreed that neither the Siegels nor Shusters could reach any agreement disposing of

3  the Superman copyrights without the others' consent.  Mot. at 17.  In a subsequent

4  2010 mediation session, the continued existence of such offending consent

5  agreements was confirmed, and additional details regarding their content was

6  provided.  Decl. of Daniel M. Petrocelli ¶¶ 52-53 (filed concurrently herewith).

7      These arrangements violated DC Comics' rights.  The Copyright Act bars the

8  Shusters from entering into an agreement regarding Superman with anyone other

9  than DC Comics—until 2013, when DC's period of exclusivity expires.  *Supra* at 7-

10  11.  Until then, the Shusters must remain fully free to reach an agreement with DC

11  Comics.  Toberoff's collusive agreements requiring the Shusters to procure his

12  consent and/or the Siegels' consent impose impermissible restraints on the

13  Shusters' freedom to contract.  *Id.*  What makes the consent agreements even more

14  damning are the differing and conflicting interests of the heirs, not to mention

15  Toberoff's intolerable conflict.  The manipulation of Superboy rights highlights the

16  affront to DC Comics' rights and the law.  Although Toberoff illegally parked

17  Shusters' interest in Superboy with the Siegels in order to falsely position the

18  Siegels as sole owners of all Superboy claims, *id.* at 2, DC Comics cannot enter into

19  an agreement with the Siegels regarding Superboy without the Shusters' consent—

20  and likely Toberoff's as well.  Compounding the harm, by having fraudulently

21  induced the Shusters to disclaim any interest in Superboy in their notice of

22  termination, Toberoff both disabled the Shusters from negotiating with DC Comics

23  regarding Superboy and deprived DC Comics of its period of exclusivity under the

24  Copyright Act.  Defendants cannot suppress the existence or proof of these illegal

25  agreements by invoking the mediation privilege, as explained below.

26      1.  DC Comics' Right To Assert Claims Based On The Consent Agreements.

27  In the first iteration of their rule 12(f) motion filed in August, defendants asserted

28  that DC Comics' reference to the consent agreements was "barred by the mediation

1  confidentiality privilege….." Docket No. 34 at 17-18.  That argument had no merit,

2  as DC Comics advised defendants.  In their new motion, defendants abandoned this

3  theory, claiming instead that a JAMS confidentiality agreement bars DC Comics'

4  reference to the consent agreements.  Mot. at 18-24.  This argument fares no better,

5  however, because the JAMS agreement relies on the same "federal" and "state"

6  rules with which DC Comics fully complied.  The parties' mediation sessions were

7  conducted by a JAMS mediator, and the parties signed a confidentiality agreement,

8  which provides:

9  
10         This mediation process is to be *considered settlement negotiations for the purpose of all state and federal rules* protecting disclosures made during such process from later discovery and/or use
11  in evidence.

12         The provisions of California Evidence Code §§ 1115-1128 and 703.5, attached hereto, apply to this mediation.  The provisions of the
13  Central District of California Local Rule 16.15, attached hereto, also apply to this mediation…..  THIS CONFIDENTIALITY
14  AGREEMENT ("AGREEMENT") EXTENDS TO ALL PRESENT AND FUTURE CIVIL … PROCEEDINGS…. (italics added).
15  

16  *Id.* Ex. 20.  This agreement neither permits defendants to suppress evidence of their

17  unlawful agreements, nor bars DC Comics from obtaining or presenting it.

18       Federal law governs on this motion, although, as shown below, DC Comics

19  fully complied with state law as well.  "[I]n federal question cases where pendent

20  state law claims are raised, the [federal rules] govern all claims of privilege."

21  *Perrignon v. Bergen Brunswig Corp.*, 77 F.R.D. 455, 459 (N.D. Cal. 1978);

22  *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 367 n.10 (9th Cir. 1992).

23  "[G]eneric choice-of-law provision[s]" do not "displace the federal [rules]."

24  *Jacada, Ltd. v. Int'l Mktg. Strategies, Inc.*, 401 F.3d 701, 710-12 (6th Cir. 2005);

25  *Sovak v. Chugai Pharm. Co.*, 280 F.3d 1266, 1269-70 (9th Cir. 2002).

26       *a.  DC Comics' Rights Under Federal Law.*  The federal rules fully allow DC

27  Comics to refer to the consent agreements.  These agreements are independently

28  wrongful acts that may not immunized because they were discussed in mediation.

Rule 408(a) prohibits evidence of "conduct or statements made in compromise negotiations" *only* when such evidence is offered "to prove liability, invalidity of, or amount of a claim…." Rule 408(b) expressly *permits* the use of such evidence where, as here, "the evidence is offered for purposes not prohibited by subdivision (a)." DC Comics adverts to the consent agreements *not* to prove the Siegels' liability in the *Siegel* cases. DC Comics adverts to them as evidence of independently wrongful acts in this case.

In *Carney v. Am. Univ.*, 151 F.3d 1090, 1095-96 (D.C. Cir. 1998), the court expressly permitted this use of evidence. In a settlement letter seeking to settle a racial discrimination case, a university representative threatened to fire plaintiff from his job, unless he dropped his claim. This new threat of retaliation—an independent tort—was the proper basis of additional claims plaintiff asserted, even though the threat was made in the context of settlement. *Id.*

As the Advisory Committee made clear when amending Rule 408 in 2006, Rule 408 may not be used to "immunize admissible information, such as a pre-existing document, through the pretense of disclosing it during compromise negotiations." FED. R. EVID. 408, Advisory Comm. Note. The Committee also confirmed its "intent [wa]s to retain the extensive case law finding Rule 408 inapplicable when compromise evidence is offered for a purpose other than to prove the validity, invalidity, or amount of a disputed claim." *Id.* This caselaw includes: *Uforma/Shelby Bus. Forms, Inc. v. NLRB*, 111 F.3d 1284 (6th Cir. 1997) (evidence of threats made in settlement negotiations admissible); *Athey v. Farmers Ins. Exch.*, 234 F.3d 357 (8th Cir. 2000) (evidence of settlement offer admitted to prove bad faith); *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1161 (9th Cir. 2007) (disclosure of settlement communications to satisfy jurisdictional requirements).

As for any separate claim of privilege—based on mediation, Rule 408, or otherwise—this Court has recognized that parties may advert to statements made during settlement discussions to prove facts other than liability. *Munoz v. J.C.*

PL.'S OPP'N TO DEFS.' MOT. TO DISMISS/ STRIKE THIRD & SIXTH CLAIMS

1   *Penney Corp., Inc.*, 2009 U.S. Dist. LEXIS 36362, at *8-10 (C.D. Cal. Apr. 9,

2   2009) (Wright, J.); *Bd. of Trs. v. Tyco Int'l, Ltd.*, 253 F.R.D. 521, 523 (C.D. Cal.

3   2008) ("[T]here is no federal privilege preventing the discovery of settlement

4   agreements and related documents.").  And to be clear, DC Comics' complaint does

5   not even go as far as these authorities permit.  DC Comics could have quoted from

6   Toberoff's communications describing the offending consent agreements; it did not.

7        While some courts have relied on Federal Rule of Evidence 501 to "define

8   new privileges," this Court has rightly refused to recognize any privilege beyond

9   the protection of Rule 408.  In *Munoz*, 2009 U.S. Dist. LEXIS 36362, at *7,

10  defendant sought to advert to plaintiff's settlement demands to establish the amount

11  in controversy for the purpose of establishing federal jurisdiction.  Plaintiff sought

12  to exclude this evidence on mediation-privilege grounds.  This Court observed that

13  while "[f]ederal courts are authorized to define new privileges …, [p]rivileges are

14  not lightly created." *Id.*  The Court allowed defendant to cite and rely on plaintiff's

15  mediation demands. *Id.* at *8-9; *accord FDIC v. White*, 76 F. Supp. 2d 736, 738

16  (N.D. Tex. 1999) (no federal privilege prevents parties from challenging

17  wrongdoing "under the guise of preserving the integrity of the mediation process").

18       Even in the minority of cases willing to recognize federal mediation

19  confidentiality, the rule has been applied only in cases where, unlike here, a *third

20  party* seeks disclosure of mediation communications.  *E.g.*, *Folb v. Motion Picture

21  Indus. Pension & Health Plans*, 16 F. Supp. 2d 1164, 1180-81 (C.D. Cal. 1998)

22  (preventing compelled production of mediation brief prepared by third party);

23  *Molina v. Lexmark Int'l, Inc.*, 2008 U.S. Dist. LEXIS 83014, at *25-29 (C.D. Cal.

24  Sept. 30, 2008) (strictly limiting *Folb* to its facts).  Even these cases leave room for

25  disclosure of independently discoverable facts learned in the course of mediation—

26  such as the consent agreements here.  *Cf. Folb*, 16 F. Supp. 2d at 1167.

27       *b.  DC Comics' Rights Under California Law.*  California law recognizes a

28  mediation privilege protecting statements, communications, and writings prepared

in connection with or made during a mediation proceeding. CAL. EVID. CODE § 1119. The consent agreements are not covered by section 1119, but even if they were, there are various exceptions to this rule, at least three of which apply here.

    i. Section 1120 of the California Evidence Code ensures that "[e]vidence otherwise admissible or subject to discovery outside of a mediation or a mediation consultation shall not be or become inadmissible or protected from disclosure solely by reason of its introduction or use in a mediation." CAL. EVID. CODE § 1120. The JAMS Agreement invokes section 1120. *Supra* at 19. If section 1120 did not exist, "parties could use mediation as a pretext to shield materials from disclosure." *Doe 1 v. Super. Ct.*, 132 Cal. App. 4th 1160, 1173 (2005). The law forbids this: "[F]acts do not 'become inadmissible or protected from disclosure solely by reason of [their] introduction or use in a mediation.'" *Rojas v. Super. Ct.*, 33 Cal. 4th 407, 423 n.8 (2004); *accord Wimsatt v. Super. Ct.*, 152 Cal. App. 4th 137, 161 (2007) (same); *Kullar v. Foot Locker Retail, Inc.*, 168 Cal. App. 4th 116, 132-33 (2008) (business records exchanged during mediation not protected).

    DC Comics' complaint alleges that defendants' consent agreements were prepared independently of mediation. FAC ¶ 101, 170. Defendants have represented that the consent agreements continue to exist to this day—and notably *do not dispute* this in their motion. *Compare id.* ¶ 170, *with* Mot. at 16-23. The consent agreements continue to impede DC Comics' rights, far outside the auspices of any mediation. The fact that defendants adverted to the existence of such agreements in the course of mediation does not shield them from disclosure. At a minimum, DC Comics is entitled to discovery about the scope and origin of the consent agreements, whether they remain in effect, and whether defendants' assertions about their intent for entering into them are true. Importantly, defendants offer no evidence in support of their assertions, and if they do so on reply (which would be improper), discovery would still need to be taken. *Cf. RDF Media*, 372 F. Supp. 2d at 561 (to grant Rule 12(f) motion court must "be convinced that there are

1   no questions of fact, that any questions of law are clear and not in dispute, and that

2   under no set of circumstances could the claim or defense succeed").

3       ii.  Despite the mediation privilege, courts give parties latitude to pursue

4   alternative sources of discovery to the prove existence of facts disclosed in

5   mediation.  In *Foxgate Homeowners' Assoc. v. Bramalea Cal., Inc.*, 26 Cal. 4th 1,

6   18 (2001)—cited by defendants in their original motion, Docket No. 34 at 17, but

7   absent here—the California Supreme Court vacated a sanctions award based on a

8   mediator's report disclosing an attorney's statements during mediation.  In doing

9   so, the Court made clear that plaintiff could still seek sanctions on remand based on

10  any evidence *other* than "communications made during the mediation."  *Foxgate*

11  *Homeowners' Assoc.*, 26 Cal. 4th at 18; *see also Benesch v. Green*, 2009 U.S. Dist.

12  LEXIS 117641, at *25 (N.D. Cal. Dec. 17, 2009) (denying malpractice claim based

13  on settlement document but permitting discovery to "uncover new, admissible

14  evidence … not protected by the confidentiality statutes").

15      iii.  Section 1119 does not prevent parties to a mediation from revealing or

16  reporting to a court "non-communicative," "obstructionist," sanctionable, or

17  otherwise improper "*conduct*."  *Foxgate*, 26 Cal. 4th at 13-14, 17-18 & n.14

18  (emphasis in original).  Section 1121 prohibits a mediator from disclosing such

19  misconduct, but expressly allows a party to do so.  *Id.*; *Campagnone v. Enjoyable*

20  *Pools & Spas Serv. & Repairs, Inc.*, 163 Cal. App. 4th 566, 571 (2008)

21  ("confidentiality rules do not prohibit 'a party' from 'advising the court about

22  *conduct* during mediation that might warrant sanctions.'") (emphasis in original); *In*

23  *re Marriage of Kieturakis*, 138 Cal. App. 4th 56, 80 (2006) (section 1120 "allow[s]

24  a party to reveal noncommunicative conduct").  DC Comics' complaint does not

25  make reference to any statement or communication disclosed in the course of

26  mediation; it is directed to defendants' improper *conduct* well outside of it—*i.e.*,

27  unlawful and collusive consent agreements.  FAC ¶¶ 101, 170, 188.

28

PL.'S OPP'N TO DEFS.' MOT. TO DISMISS/
STRIKE THIRD & SIXTH CLAIMS

2. Judge Larson Did Not Bar DC Comics From Referring To The Consent
Agreements Disclosed In 2008, Much Less The Ones Exposed In 2010. With no
basis in federal or state law to challenge DC Comics' references to the consent
agreements, defendants assert Judge Larson barred their use. Mot. at 21. He did
not. In 2008, DC Comics filed a motion to compel production of the consent
agreement to which Toberoff made reference to in 2008. Toberoff asserted the
contract was privileged, and Judge Larson denied DC Comics' motion on the basis
of "Toberoff's characterization of it as a privileged document, as an officer of the
court." Siegel RJN Ex. B 025:9-11. Judge Larson *never* reviewed the underlying
consent agreement or even the letter describing it, stating "I would rather not look
at this letter myself, particularly since we have a bench trial starting in a few
weeks." *Id.* at 019:17-19. Judge Larson never made any determination that the
consent agreement was confidential, privileged, or protected by federal or state law.
Any such ruling, of course, would have been contrary to federal and state law.

Nor are Judge Larson's rulings "law of the case," as defendants suggest.
Mot. at 21. His rulings do not address defendants' conduct in 2010, and law of the
case only applies where an issue "has already been decided by the same court, or a
higher court *in the identical case*." *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir.
1993) (emphasis added); 18B C. WRIGHT, FED. PRAC. AND PROC. § 4478, at 637-39
(2d ed. 2002) (Law of the case rules apply only to matters decided in "the course of
a single continuing lawsuit. They do not apply between separate actions.").

**VIII.  THE LITIGATION PRIVILEGE DOES NOT APPLY HERE.**

California's litigation privilege protects communicative conduct in ongoing
or in anticipated litigation. *Haneline Pac. Props., LLC v. May*, 167 Cal. App. 4th
311, 319 (2008). Courts look to the gravamen of a claim when assessing whether
the privilege applies. *Action Apartment Ass'n, Inc. v. City of Santa Monica*, 41 Cal.
4th 1232, 1248 (2007). When the conduct occurs prior to litigation, courts only
apply the privilege if litigation was anticipated "in good faith and under serious

PL.'S OPP'N TO DEFS.' MOT. TO DISMISS/
STRIKE THIRD & SIXTH CLAIMS

1  consideration." This inquiry into a party's intent is "an issue of fact." *Id.* at 1251.

2  DC's sixth claim for unfair competition is based in part on the illegal agreements

3  Toberoff engineered. FAC ¶¶ 187-88. Defendants assert that because DC Comics

4  learned of the consent agreements during a "Court-ordered settlement mediation"

5  on May 2, 2008, such communications are "absolutely privileged." Mot. at 17.

6      This argument fails for three reasons. <u>First</u>, defendants ignore the PPC and

7  IP Worldwide Agreements, which contain the same illicit consent provisions—and

8  were never at issue in the mediation. Thus, the sixth claim survives. *Bylin Heating*

9  *Sys., Inc. v. M & M Gutters, LLC*, 2008 WL 744706, at *5 (E.D. Cal. March 18,

10  2008) (denying Rule 12 motion when defense applied only to *part* of claim).

11     <u>Second</u>, DC Comics does not sue defendants based on their conduct at the

12  May 2008 mediation or any related communication. The gravamen of DC's claim

13  is contracts that illegally "traffic" in its rights. Because defendants are not being

14  sued for speaking words that revealed their misdeeds, their reliance on litigation-

15  privilege cases involving conduct *at settlement talks* is misplaced. Mot. at 16-18.

16     <u>Third</u>, defendants cannot immunize their consent agreements by asserting

17  they are "clearly communications made in the course of 'judicial or quasi-judicial

18  proceedings….'" Mot. at 18. The agreements are rights-impairing contracts

19  designed to harm DC's and the heirs' interests—their purpose is not to advance

20  legitimate issues of public concern or litigation objectives, no matter what

21  defendants may now say to escape liability. Defendants' assertions about their

22  intent are at best contested "issue[s] of fact," unfit for resolution now. *Supra* at 25.

23  **IX.    CONCLUSION**

24     Defendants' motion should be denied.

25  Dated: September 27, 2010              Respectfully Submitted,

26                                        By: /s/ Daniel M. Petrocelli

27

28  CC1:836954

PL.'S OPP'N TO DEFS.' MOT. TO DISMISS/
STRIKE THIRD & SIXTH CLAIMS