DANIEL M. PETROCELLI (S.B. #097802)
  dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
  mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
  cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067-6035
Telephone:   (310) 553-6700
Facsimile:    (310) 246-6779

PATRICK T. PERKINS (admitted *pro hac vice*)
  pperkins@ptplaw.com
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, NY 10516
Telephone:   (845) 265-2820
Facsimile:    (845) 265-2819

Attorneys for Plaintiff DC Comics

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DC COMICS,<br><br>       Plaintiff,<br><br>    v.<br><br>PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, an individual, JOANNE SIEGEL, an individual, LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive,<br><br>       Defendants. | Case No. CV 10-3633 ODW (RZx)<br><br>**DC COMICS' INITIAL OPPOSITION TO DEFENDANTS' MOTION TO STRIKE UNDER CALIFORNIA'S ANTI-SLAPP STATUTE**<br><br>The Hon. Otis D. Wright II<br><br>**Hearing Date**:   October 18, 2010<br>**Hearing Time**:    1:30 p.m.<br>**Complaint Filed**: May 14, 2010 |

1

# **TABLE OF CONTENTS**

2

3    I.    INTRODUCTION ........................................................................................... 1

4
5    II.    FACTUAL BACKGROUND ........................................................................ 2

6    III.    THE COURT MAY NOT HEAR OR RESOLVE THIS MOTION
        UNTIL DC COMICS TAKES DISCOVERY ............................................... 8

7
8    IV.    DEFENDANTS' SLAPP MOTION FAILS ON BOTH PRONGS ............. 11

9        A.    Defendants Fail The First Prong of the Test:  DC Comics' State
            Law Claims For Relief Are Not "Based On" Protected Speech ......... 12

10
11        B.    Defendants Fail The Second Prong of the Test:  DC Comics'
            State-Law Claims Far Exceed the "Minimal Merit" Standard .......... 22

12    V.    CONCLUSION .......................................................................................... 25

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## CASES

*Action Apartment Ass'n, Inc. v. City of Santa Monica*,
  41 Cal. 4th 1232 (2007).................................................................... 19

*Applied Bus. Software, Inc. v. Pac. Mortg. Exch., Inc.*,
  164 Cal. App. 4th 1108 (2008)......................................................... 20

*Birschtein v. New United Motor Mfg., Inc.*,
  92 Cal. App. 4th 994 (2001)....................................................... 23, 24

*Blackburn v. Brady*,
  116 Cal. App. 4th 670 (2004)...................................................... 12, 16

*Briggs v. Eden Council for Hope & Opportunity*,
  19 Cal. 4th 1106 (1999).................................................................. 11

*Bylin Heating Sys., Inc. v. M & M Gutters, LLC*,
  2008 WL 744706 (E.D. Cal. March 18, 2008)....................... 12, 16, 22

*Chevron Corp. v. Bonifaz*,
  2010 WL 1948681 (N.D. Cal. May 12, 2010) .................................. 10

*City of Cotati v. Cashman*,
  29 Cal. 4th 69 (2002)................................................................ 11, 17

*Commonwealth Energy Corp. v. Investor Data Exch., Inc.*,
  110 Cal. App. 4th 26 (2003)............................................................ 21

*Computer Xpress, Inc. v. Jackson*,
  93 Cal. App. 4th 993 (2001)............................................................ 12

*Dep't of Fair Emp't & Hous. v. 1105 Alta Loma
  Road Apartments, LLC*,
  154 Cal. App. 4th 1273 (2007)................................................... 12, 18

*Edwards v. Centex Real Estate Corp.*,
  53 Cal. App. 4th 15 (1997)........................................................ 16, 19

*Eisenberg v. Alameda Newspapers, Inc.*,
  74 Cal. App. 4th 1359 (1999)........................................................... 19

*Equilon Enters. v. Consumer Cause, Inc.*,
  29 Cal. 4th 53 (2002)...................................................................... 12

*Gallimore v. State Farm Fire & Cas. Ins. Co.*,
  102 Cal. App. 4th 1388 (2002)........................................................ 13

*GeneThera, Inc. v. Troy & Gould Prof. Corp.*,
  171 Cal. App. 4th 901 (2009)........................................................... 19

*Graffiti Protective Coatings, Inc. v. City of Pico Rivera*,
  181 Cal. App. 4th 1207 (2010)........................................................ 16

*Haneline Pac. Props., LLC v. May,*
    167 Cal. App. 4th 311 (2008) ................................................................. 14, 18, 23

*Hilton v. Hallmark Cards,*
    580 F.3d 874 (9th Cir. 2009) ......................................................................*passim*

*In re Phillips,*
    4 Cal. State Bar. Ct. Rptr. 315 (2001) ............................................................ 16

*Kajima Eng'g & Const., Inc. v. City of L.A.,*
    95 Cal. App. 4th 921 (2002) ........................................................................... 16

*Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.,*
    37 Cal. App. 4th 855 (1995) ........................................................................... 11

*Martinez v. Metabolife Int'l, Inc.,*
    113 Cal. App. 4th 181 (2003) ......................................................................... 11

*Metabolife Int'l, Inc. v. Wornick,*
    264 F.3d 832 (9th Cir. 2001) ....................................................................... 9, 10

*Milne v. Stephen Slesinger, Inc.,*
    430 F.3d 1036 (9th Cir. 2005) .................................................................. 22, 25

*Mindys Cosmetics, Inc. v. Dakar,*
    611 F.3d 590 (9th Cir. 2010) ..................................................................... 18, 19

*Moser v. Triarc Cos.,*
    2007 WL 3026425 (S.D. Cal. Oct. 16, 2007) ................................................. 10

*Navellier v. Sletten,*
    29 Cal. 4th 82 (2002) ......................................................................... 11, 12, 20

*Neville v. Chudacoff,*
    160 Cal. App. 4th 1255 (2008) ....................................................................... 19

*Newport Builders, Inc. v. N. Bay Constr. Inc.,*
    2009 WL 2083359 (N.D. Cal. July 14, 2009) ........................................... 14, 20

*Norgart v. Upjohn Co.,*
    21 Cal. 4th 383 (1999) ............................................................................ 23, 24

*Rivero v. Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO,*
    105 Cal. App. 4th 913 (2003) ......................................................................... 21

*Robles v. Chalilpoyil,*
    181 Cal. App. 4th 566 (2010) ............................................................. 13, 18, 22

*Rubin v. Green,*
    4 Cal. 4th 1187 (1993) ................................................................................... 19

*Santa Monica Rent Control Bd. v. Pearl Street, LLC,*
    109 Cal. App. 4th 1308 (2003) ....................................................................... 13

iii

*Seltzer v. Barnes*,
    182 Cal. App. 4th 953 (2010) ............................................................................. 19

*Shropshire v. Fred Rappaport Co.*,
    294 F. Supp. 2d 1085 (N.D. Cal. 2003) .............................................. 9, 10, 16, 19

*Simpson Strong-Tie Co., Inc. v. Gore*,
    49 Cal. 4th 12 (2010) ...................................................................................... 11

*Taheri Law Group v. Evans*,
    160 Cal. App. 4th 482 (2008) ......................................................................... 19

*Turner v. Vista Pointe Ridge Homeowners Ass'n*,
    180 Cal. App. 4th 676 (2009) ................................................................... 11, 17

*Violet Blue v. Johnson*,
    2008 WL 941959 (N.D. Cal. Apr. 7, 2008) ...................................................... 12

*Wang v. Wal-Mart Real Estate Bus. Trust*,
    153 Cal. App. 4th 790 (2007) ................................................................... 14, 16

*World Fin. Grp., Inc. v. HBW Ins. & Fin. Servs., Inc.*,
    172 Cal. App. 4th 1561 (2009) ......................................................... 12, 16, 21

**STATUTES**

17 U.S.C. § 304(c)(6)(D) ........................................................................................ 25

CAL. BUS. & PROF. CODE § 17200 ........................................................................ 24

CAL. CIV. PROC. CODE § 425.16 ..................................................................... 8, 21

**RULES**

CAL. RULES OF PROF'L CONDUCT R. 1-310 ....................................................... 15

FED. R. CIV. P. 56 ............................................................................................ 9, 10

DC COMICS' INITIAL OPPOSITION TO
DEFENDANTS' ANTI-SLAPP MOTION

## I.    INTRODUCTION

Marc Toberoff has said it himself:  he is an "entrepreneur" and movie "producer," though you would never know it from his SLAPP motion.  Decl. of Daniel M. Petrocelli ("Petrocelli Decl.") Ex. 1 at 23.  Indeed, Toberoff assures the public he "keeps a defined firewall between producing and legal matters."  *Id.* Ex. 4 at 37.  To avoid responsibility for illicit business dealings, defendants' SLAPP motion asserts this case is an attack on Toberoff's practice of law.  It is no such thing.  As detailed by the allegations of DC Comics' complaint and the evidence submitted herewith, DC Comics' three state-law claims do not target Toberoff's actions as a lawyer—they are aimed at Toberoff's acts of fraud and interference in pursuit of his private commercial, business interests.  No immunity exists for Toberoff just because he is a lawyer—he is accountable like any other tortfeasor.

Through various entities he created and owned, Toberoff approached the Siegel and Shuster heirs to secure a controlling interest in their putative Superman rights in derogation of DC Comics' contracts, relationships, and protectable interests under state and federal law.  The name of Toberoff's company—Pacific Pictures Corporation—definitively dispels any notion that he was acting as a lawyer.  Nor does it matter that Toberoff might have contemplated one day representing the heirs in litigation.  Under clear California law, his distinct acts of business conduct are not shielded by SLAPP or defenses like the litigation privilege.  As the courts have explained, to accept defendants' arguments would "swallow up much of the law of torts" and "provide immunity for fraud."

Defendants' SLAPP motion is particularly unwarranted in this federal case.  Under controlling Ninth Circuit law, the Court *may not rule* on this motion until DC Comics has a chance to conduct discovery into the myriad factual issues raised by defendants' motion—both those underlying their argument that the SLAPP statute applies and their contention that DC Comics' state-law claims lack evidentiary support.  As summarized in the accompanying declaration of Daniel M.

DC COMICS' INITIAL OPPOSITION TO DEFENDANTS' ANTI-SLAPP MOTION

Petrocelli, every argument of significance in defendants' motion raises contested fact issues requiring discovery. This discovery—which has been delayed for months because of defendants' objections to the initiation of discovery—is finally about to commence, following rulings last week by the Magistrate. DC Comics submits this *initial* opposition brief to identify its need for discovery to oppose defendants' motion and preliminarily to address the numerous substantive deficiencies in defendants' motion. This opposition is submitted without prejudice to DC Comics' right to supplement its opposition papers after discovery is conducted. Although this SLAPP motion can and should be denied out of hand, DC Comics alternatively asks that the Court set a status conference no sooner than 120 days from now to discuss setting a final briefing schedule and hearing date on it.

## II.    FACTUAL BACKGROUND

A. Marc Toberoff and His Companies.  Marc Toberoff is a self-described "intellectual property expert, entrepreneur and producer…." *Id.* Ex. 1 at 23. His entry on the Internet Movie Database lists 11 claimed motion-picture producer credits.   His companies, including defendants IP Worldwide LLC and IPW, LLC, also have such credits. *Id.* Ex. 2. Although Toberoff's website *today* describes just the work of his *law firm*, his website at the time of the events at issue portrayed his work quite differently. A 2006 version, for example, states that his company, defendant Intellectual Properties Worldwide, LLC, was formed in 2002 "to acquire classic films, TV shows, novels and other 'branded' intellectual property and to exploit/monetize these properties…." *Id.* Ex. 1 at 22. It further explains:

> Prior to founding IPW, Mr. Toberoff [the "Chairman and CEO" of IPW] acquired theatrical film, pay TV, merchandising and publishing rights to the classic television series: *My Favorite Martian, Fantasy Island*, *The Wild Wild West*, *I Spy*.... Mr. Toberoff's efforts led to Sony's feature film, *I SPY*, starring Eddie Murphy and Owen Wilson (2002), ***which he executive produced*** [and] Disney's feature film, *My Favorite Martian* (1998) starring Jeff Daniels, Christopher Lloyd and Elizabeth Hurley, ***which Mr. Toberoff produced….***

*Id.* (emphasis added).

DC COMICS' INITIAL OPPOSITION TO DEFENDANTS' ANTI-SLAPP MOTION

A self-described "rights hunter," Toberoff and his companies locate authors of older entertainment properties (or their heirs), enter into various types of rights agreements with these individuals, and extract money, "producing" credits, and other benefits in connection with exploitations of these works.  This is not the first time Toberoff's business activities have led to litigation.  Toberoff and his company Pacific Pictures have been sued for fraud and tortious interference in connection with other business dealings, and Toberoff's business tactics have been publicly reported and criticized.  *Id.* ¶¶ 3, 5-6.

The improper lengths to which Toberoff and his companies went in this case are described in an anonymous letter called the "Toberoff Timeline."  In the *Siegel* litigation, Judge Larson ordered production of the Timeline to DC Comics in December 2008.  Toberoff admits the Timeline was written by a lawyer formerly employed by him, but to date, has refused to disclose his identity.  *Id.* ¶ 7.  The Timeline is described in DC Comics' complaint and attached as Exhibit A.  Although defendants assert that the Timeline is an improperly obtained "hit piece," Mot. at 12, Magistrate Zarefsky ruled last week—in denying defendants' motion to bar use of the document in this case—that DC Comics is entitled to take discovery regarding the events in the Timeline without restriction.  Docket No. 74; Docket No. 42 at 4-7, 40-61.  *None* of the defendants was examined about the Timeline in the Siegel litigation, nor was any other witness.  And in the four years since this letter was sent, defendants have *never* taken public legal action against its author to challenge its veracity.  As a critical component of discovery in this case—and to fully oppose this motion—DC Comics seeks to compel Toberoff to disclose who wrote the Timeline so DC Comics may depose the author and others about the numerous activities and events catalogued in the document.  Petrocelli Decl. ¶ 7.

B.  The Shuster Rights and DC Comics' Fourth and Sixth Claims.  In 2001, in his role as movie producer, Toberoff and his production company Pacific Pictures set out to capture a portion of the Superman rights for themselves.  Joseph

DC COMICS' INITIAL OPPOSITION TO
DEFENDANTS' ANTI-SLAPP MOTION

Shuster, the original illustrator of Superman, died in 1992. *Id*. Ex. 7 at 126. When he died, he left only two siblings—his brother Frank Shuster, who died in 1996, and his sister Jean Peavy, who is still living. *Id*. Ex. 8. In 2001, Toberoff came into contact with Jean Peavy's son, Mark (who had changed the spelling of his name to "Peary"). Mot. at 6. At the time, the Shusters had *no* Superman rights. That is because in 1992, shortly after Joseph Shuster died, Peavy and Frank Shuster entered into an agreement with DC Comics relinquishing any claim to such rights. Under this 1992 agreement, Frank Shuster and Jean Peavy "fully settle[d] all claims to any payments or other rights or remedies which [they] may have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights … or other property right in any and all work created in whole or in part by [their] brother, Joseph Shuster, or any works based thereon." Petrocelli Decl. Ex. 10. They promised "not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever." And, they "grant[ed] to [DC Comics] any … copyrights … in any and all work created in whole or in part by [their] brother, Joseph Shuster, or any works based thereon." *Id*.

Toberoff tortiously interfered with this 1992 agreement by inducing Jean Peavy and her son Mark Peary to enter into a joint venture with Toberoff through his solely-owned entertainment company Pacific Pictures. In this "Joint Venture Agreement," dated November 23, 2001, Toberoff convinced Peary and Peavy to "transfer and assign to the Venture their rights, title and interests" in Joseph Shuster's purported Superman rights, *id*. Ex. 12 ¶ 2—in direct violation of Peavy and Frank Shuster's 1992 agreement with DC Comics. Faced with DC Comics' lawsuit, Toberoff now *admits* this assignment was forbidden by the Copyright Act, and was "void *ab initio*," Docket No. 78 at 8—an admission that effectively concedes the validity of DC Comics' first, third, fourth, and sixth claims for relief.

Other provisions of Toberoff's 2001 Pacific Pictures agreement violated DC Comics' rights. For example, the agreement forbade Peary and Peavy from making

4

any agreement with respect to the Superman rights "without [Pacific Pictures'] express written consent."  Petrocelli Decl. Ex. 12 ¶ 4.  This is the first known contract in a series of "consent" agreements orchestrated by Toberoff that stripped the heirs of their unfettered right and ability to abide by their existing agreements or enter into new agreements with DC Comics.  These consent agreements violate DC Comics' rights and are unlawful, as is fully explained in DC Comics' separate briefing in support of its first, third, fourth, fifth, and sixth claims.

In 2003, Toberoff and the Shuster family amended their 2001 joint-venture agreement.  The 2003 agreement also violated DC Comics' rights by assigning to Pacific Pictures putative Superman copyrights that Jean Peavy and Frank Shuster assigned to DC Comics in 1992.  The 2003 agreement—like the 2001 agreement and others still—also contains unlawful consent provisions.  Furthermore, it fraudulently parked alleged "Superboy" rights with the Siegels—rights Joe Shuster had long claimed as his own.  FAC ¶¶ 9-10, 86-91.

The Toberoff defendants claim "no harm, no foul" as to the unlawful Pacific Picture agreements because, they say, the venture was terminated a few years later.  Mot. at 24-25.  They are wrong.  The 2001 Pacific Picture agreement expressly provides that, "*in the event of termination* of the Venture *for any reason*, all Rights, property or assets of the Venture will be held fifty percent (50%) by [the Shusters] *and fifty percent (50%) by PPC [Pacific Pictures]*...."  Petrocelli Decl. Ex. 12 ¶ 8 (emphasis added).  Pacific Pictures thus owns 50% of the Shusters' claimed copyright interests—in clear violation of DC Comics' rights.  Compounding the harm, it appears Toberoff, in turn, caused Pacific Pictures to assign its rights to another of his companies, defendant IP Worldwide LLC, which then assigned its rights to yet another Toberoff company, defendant, IPW, LLC.  *Id*. ¶ 24.

Nothing about these machinations by Toberoff concerns the practice of law.  When Toberoff signed the 2001 PPC Agreement on behalf of Pacific Pictures, he did so as "Marc Toberoff, President"—not on behalf of a law firm or as "Marc

DC COMICS' INITIAL OPPOSITION TO DEFENDANTS' ANTI-SLAPP MOTION

Toberoff, Esq." *Id.* Ex. 12 at 142. While the agreement contemplates that the joint venture would "retain Marc Toberoff, Esq. to render legal services in connection with the Rights and the Venture," *id.* at 12 ¶ 7, the 2001 PPC Agreement was not itself a retention or engagement agreement. Furthermore, in the nine years since the 2001 PPC Agreement was signed, neither Peary nor Peavy ever filed *any litigation* against DC Comics concerning the Superman rights. *Id.* ¶ 26. The 2003 amendment to the PPC agreement specifically affirms that "PPC … is not a law firm," *id.* Ex. 13 ¶ 2, and, again, Toberoff signed it as *president* of Pacific Pictures, *id.* at 146.

C. The Siegel Rights and DC Comics' Fifth and Sixth Claims. Having secured half of the Shusters' putative rights, Toberoff went after rights owned by the Siegels. In 1997, prior to Toberoff's involvement, the Siegel heirs filed a copyright termination notice regarding their alleged interests in Superman. Years of negotiation with DC Comics ensued, culminating in a writing dated October 26, 2001, confirming an agreement between the parties. Petrocelli Decl. ¶¶ 32-36.

On November 29, 2001—shortly after entering into the 2001 PPC Agreement with the Shusters—Toberoff contacted Kevin Marks, the Siegels' attorney, seeking to purchase the Siegels' interests in Superman. *Id.* Ex. 14 at 85:17-87:4. Marks, who is not a litigator, did not return the call. Around February 6, 2002, Toberoff called again, this time reaching Marks and expressing an interest in the Siegels' rights. *Id.* ¶¶ 33, 42-43. Marks refused to engage with Toberoff because the Siegels had reached an agreement with DC Comics. *Id.* Ex. 24 at 151:18-153:13. Undeterred, on February 12, 2002, Toberoff and Pacific Pictures formalized an agreement with Hollywood agent Ari Emanuel, in which they formed defendant IP Worldwide. Pacific Pictures promised to contribute its "current IP business" to IP Worldwide as well as Toberoff's "contacts" and "IP hit list." Under the agreement, Toberoff was to be attached as "producer" to IP Worldwide's motion pictures and receive "screen credit and a fee" for his producing services. *Id.* ¶¶ 23, 50.

DC COMICS' INITIAL OPPOSITION TO DEFENDANTS' ANTI-SLAPP MOTION

1      Obtaining the Siegels' rights in Superman was one of IP Worldwide's

2  paramount objectives.  In the summer of 2002, Toberoff and IP Worldwide had

3  discussions with the Siegels' attorney, Kevin Marks.  *Id*. ¶¶ 44-46.  In one

4  discussion—the details of which were revealed to DC Comics only when the

5  Toberoff Timeline was ordered produced in December 2008—Toberoff and IP

6  Worldwide fraudulently represented to Marks that they had found an investor who,

7  in exchange for the Siegels' Superman rights, would give the Siegels an up-front

8  cash payment of $15 million, plus large "back-end" rights on any Superman

9  properties that were developed, including a new Superman movie they promised to

10  make to compete with one already in development at Warner Bros.  *Id.* Ex. 31 at

11  639.  Marks conveyed the offer to the Siegels, but advised them, as he had

12  Toberoff, that they had already made a binding agreement with DC Comics and that

13  Marks would be forced to testify against them if they tried to repudiate it.  *Id.*  The

14  Siegels could not resist Toberoff's inducements, however, and entered into an

15  agreement with defendant IP Worldwide in October 2002.  This agreement also

16  violates DC Comics' rights.  *Id*. Ex. 34.

17      To escape liability, defendants now claim the Siegels ended their business

18  relationship with DC Comics in a May 9, 2002 letter—*prior*, they claim, to

19  Toberoff's involvement.  Mot. at 22.  In discovery responses in the *Siegel* cases,

20  however, the Siegels took the exact opposite position—and represented the parties'

21  discussions did not cease on May 9.  *Id*. Ex. 38 at 675.  Defendants not only fail to

22  mention this discovery response, they also fail to point out that it was not until

23  September 21, 2002, that the Siegels terminated all further discussions with DC

24  Comics in a letter allegedly written by the Siegels.  *Id*. ¶¶ 48-49; Ex. 33.  By this

25  date, the Toberoff defendants indisputably were involved with the Siegels.  Only

26  discovery in this case—which defendants are determined to avoid—will reveal the

27  full nature and extent of Toberoff's activities in seducing the Siegels to break their

28  relationships with DC Comics.  To date, defendants have sought to bar DC Comics

DC COMICS' INITIAL OPPOSITION TO
DEFENDANTS' ANTI-SLAPP MOTION

1    from obtaining discovery from the heirs, but Magistrate Zarefsky rejected those

2    arguments last week and ordered depositions can commence on November 15.

3    Docket No. 74.

4         On October 23, 2002, the Siegels entered into an agreement with IP

5    Worldwide for the purpose of "negotiat[ing] the sale, lease, license and all other

6    dispositions" of the Siegels' putative Superman rights.  *Id.* Ex. 34 ¶ 1.  The Siegel

7    heirs agreed to pay IP Worldwide 10% of the gross proceeds generated by those

8    rights.  They also agreed they could "not transfer, assign, license or in any manner

9    encumber [their putative Superman] Rights … other than through or as a result of

10   IPW's exclusive representation hereunder...." *Id.* ¶ 8.  In addition to this illegal

11   consent arrangement, the deal made clear that the Siegels had not engaged IP

12   Worldwide or Toberoff to represent the Siegels *in any form of litigation*.  Paragraph

13   10 states:

> The parties understand and acknowledge that the *scope of this Agreement does not include legal services and/or expenses in connection with litigation or formal legal arbitration*, if any.  The provision of such services and advancing of such expenses, if requested and desired by [the Siegels], will be rendered and provided by Marc Toberoff, Esq., subject to good faith negotiation of a mutually acceptable agreement executed by Mr. Toberoff and [the Siegels]. (Emphasis added.)

19   Although defendants now assert "Toberoff formed an attorney-client relationship

20   with the Siegels in October 2002," Mot. at 19, they submit no evidence to support

21   this contested assertion, which must be explored in discovery, Petrocelli Decl. ¶ 54.

22   The contention is also at odds with Toberoff's assurance that he "keeps a defined

23   firewall between producing and legal matters."  *Id.* Ex. 4 at 37.

### III.    THE COURT MAY NOT HEAR OR RESOLVE THIS MOTION UNTIL DC COMICS TAKES DISCOVERY.

26        In the California state courts, the filing of a SLAPP motion stays discovery

27   until the court rules on the motion, and a plaintiff may only take discovery on a

28   showing of "good cause."  CAL. CIV. PROC. CODE § 425.16(g).  These automatic

DC COMICS' INITIAL OPPOSITION TO DEFENDANTS' ANTI-SLAPP MOTION

1   limitations on discovery do not apply in federal court.  Furthermore, SLAPP has no

2   application to federal claims and cannot bar discovery regarding them.  *Hilton v.*

3   *Hallmark Cards*, 580 F.3d 874, 881 (9th Cir. 2009) ("the anti-SLAPP statute does

4   not apply to federal law causes of action").  As to state claims, if the SLAPP motion

5   raises contested issues of fact on which discovery is required, *then discovery must*

6   *be allowed* and a ruling on the SLAPP motion must be deferred.  *Metabolife Int'l,*

7   *Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) ("Because the discovery-limiting

8   aspects of § 425.16(f) and (g) collide with the discovery-allowing aspects of Rule

9   56, these aspects of subsections (f) and (g) cannot apply in federal court.").

10        Discovery is essential here to both prongs of defendants' SLAPP motion.

11  First, as they concede, it is *defendants'* initial burden to show that each of DC

12  Comics' state-law claims arise out of protected speech.  Mot. at 13.  Defendants

13  attempt to meet their burden by saying all their conduct is protected because it was

14  undertaken in connection with litigation, for example.  *Id*. at 17.  This conclusory

15  allegation misrepresents the allegations of DC Comics' complaint, is unsupported

16  by the evidence, and reveals why discovery is essential.  *E.g.*, *infra* at 13-14;

17  Petrocelli Decl. ¶ 54.

18        Although some limited discovery was taken on related issues in the *Siegel*

19  cases, it does not remotely suffice to obviate the need for discovery in this case.

20  There are legions of unexplored factual areas presented by DC Comics' complaint

21  and this SLAPP motion, including the linchpin issue put in controversy by

22  defendants' motion—*i.e.*, whether in inducing the Shusters and Siegels to cut ties

23  with DC Comics, Toberoff acted at all times as a lawyer "in serious contemplation

24  of litigation" (as defendants allege), or as a rights-hunting entrepreneur capturing

25  rights for himself (as DC Comics alleges).  *Id.* ¶ 8.

26        Such factual disputes require federal courts to allow discovery and defer

27  ruling on a SLAPP motion.  For example, in *Shropshire v. Fred Rappaport Co.*,

28  294 F. Supp. 2d 1085 (N.D. Cal. 2003), the parties were engaged in complicated,

DC COMICS' INITIAL OPPOSITION TO
DEFENDANTS' ANTI-SLAPP MOTION

1  multi-front litigation concerning intellectual-property rights.  Plaintiff sued

2  defendant for acts of business interference.  Defendant filed a SLAPP motion,

3  arguing the conduct alleged in the complaint arose out of the parties' previous

4  litigation and was shielded by SLAPP and California's litigation privilege—*exactly*

5  *defendants' argument here*.  *Compare id.* at 1093, 1098-1100, *with* Mot. at 15-18.

6  The court deferred ruling on the SLAPP motion until summary judgment, holding:

> The Court is unable to resolve this issue at this stage of the proceeding, when no discovery has been permitted, *because the applicability of the anti-SLAPP statute turns on disputed questions of fact*….
>
> The Court does not reach whether [the caselaw that Plaintiffs or Defendant cite] is more on point because it concludes that *Defendant's anti-SLAPP motion raises factual questions that cannot be resolved [now]*.  In particular, the question of whether Plaintiffs' communications … were made in anticipation of litigation for the purpose of California's litigation privilege, and thus also for the purposes of the anti-SLAPP statute, depends upon whether Defendant's statements were made "with a good faith belief in a legally viable claim and in serious contemplation of litigation."  *This a factual question and therefore, Plaintiffs must be permitted to conduct discovery before Defendant's anti-SLAPP argument may be addressed*.

16  294 F. Supp. 2d at 1099-1100 (citing, *inter alia*, *Metabolife*; emphasis added).

17      Second, even assuming DC Comics' complaint triggers the SLAPP statute

18  (and it does *not*), defendants' motion—by its express terms—challenges the

19  allegations and evidence underlying DC Comics' state-law claims.  Mot. at 22.  The

20  rule is clear:  "[I]f a party brings an anti-SLAPP motion challenging the sufficiency

21  of the nonmoving party's evidence, the court *must allow the nonmoving party to*

22  *conduct discovery* 'sufficiently to permit summary judgment under Rule 56.'"

23  *Moser v. Triarc Cos.*, 2007 WL 3026425, at *3 (S.D. Cal. Oct. 16, 2007) (emphasis

24  added).  The Petrocelli declaration details many of the contested factual issues

25  implicated by defendants' motion.  Discovery on these issues has yet to occur, and

26  the law requires that DC Comics be permitted to take it now.  *E.g., Chevron Corp.*

27  *v. Bonifaz*, 2010 WL 1948681, at *3 (N.D. Cal. May 12, 2010).  Defendants argued

28  to Magistrate Zarefsky that *Metabolife* and other federal cases requiring discovery

10

1    in the face of a SLAPP motion are not good law.  The Magistrate rightly rejected

2    these arguments.  Docket No. 74.

3        Given the discovery that must be taken, the Court should issue an

4    order staying any resolution of defendants' SLAPP motion and setting a status

5    conference date no sooner than 120 days at which the parties and Court can discuss

6    setting a final briefing schedule and hearing date on defendants' motion.  Although

7    DC Comics cannot be required to respond to defendants' motion in the absence of

8    discovery, in an abundance of caution and reserving all rights, DC Comics

9    preliminarily addresses below why defendants' SLAPP motion has no merit.

10   **IV.    DEFENDANTS' SLAPP MOTION FAILS ON BOTH PRONGS.**

11       In 1992, the California Legislature enacted the SLAPP statute to put a check

12   on lawsuits "aimed at preventing citizens from exercising their political rights…."

13   *Simpson Strong-Tie Co., Inc. v. Gore*, 49 Cal. 4th 12, 21 (2010).  The statute

14   protects those who speak on matters of public concern—be it a protester at a rally, a

15   political commentator on television, or a lawyer or witness in court.  *E.g.*, *Briggs v.*

16   *Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1121 (1999) (testimony in

17   court proceedings); *Hilton*, 580 F.3d at 884-85 (social commentary about public

18   figure); *Lafayette Morehouse, Inc. v. Chronicle Publ'g Co*., 37 Cal. App. 4th 855,

19   863 (1995) (newspaper coverage of issue under consideration by county).

20       A SLAPP motion is analyzed in two steps.  Under the first "prong" of the

21   test, defendants bear the burden of proving that the challenged claim for relief at

22   issue is "based on" protected activity.  *Navellier v. Sletten*, 29 Cal. 4th 82, 89

23   (2002).  The "activity that gives rise to" the claim must "constitute[] protected

24   speech or petitioning" for SLAPP to apply, *Martinez v. Metabolife Int'l, Inc.*, 113

25   Cal. App. 4th 181, 187 (2003), as "the critical point is whether the *plaintiff's cause*

26   *of action itself* was *based on* an act in furtherance of the defendant's right of

27   petition or free speech," *City of Cotati v. Cashman*, 29 Cal. 4th 69, 78 (2002)

28   (emphasis added).  Defendants' "characterization" of plaintiff's claim for relief is

DC COMICS' INITIAL OPPOSITION TO
                                                 DEFENDANTS' ANTI-SLAPP MOTION

1   irrelevant—what matters is what plaintiff's complaint actually states. *Turner v.*

2   *Vista Pointe Ridge Homeowners Ass'n*, 180 Cal. App. 4th 676, 685, 688-89 (2009)

3   (courts disregard defendants' "endeavors to characterize" the complaint).

4          If the defendants cannot meet their burden under this first prong, then the

5   Court must deny the motion and need not address the second prong. *E.g.*, *Violet*

6   *Blue v. Johnson*, 2008 WL 941959, *5 (N.D. Cal. Apr. 7, 2008).  However, if

7   defendants satisfy their initial burden, the Court must evaluate whether plaintiff can

8   show a "probability" that it will prevail on its claim. *Equilon Enters. v. Consumer*

9   *Cause, Inc.*, 29 Cal. 4th 53, 67 (2002).  "This standard is 'similar to the standard

10  used in determining motions for nonsuit, directed verdict, or summary judgment,'

11  in that the court cannot weigh the evidence." *Computer Xpress, Inc. v. Jackson*, 93

12  Cal. App. 4th 993, 1010 (2001).  If the claims for relief being challenged have

13  "minimal merit," the SLAPP motion *must be denied. Navellier*, 29 Cal. 4th at 89.

14          **A.    Defendants Fail The First Prong of the Test:  DC Comics' State**

15                  **Law Claims For Relief Are Not "Based On" Protected Speech.**

16          There are important boundaries between the conduct the SLAPP statute

17  protects and does not protect:

18  • The statute offers *no* protection to wrongful courses of business conduct,

19     including efforts to obtain, control, and exploit intellectual property. *E.g.,*

20     *World Fin. Grp., Inc. v. HBW Ins. & Fin. Servs.*, *Inc.*, 172 Cal. App. 4th

21     1561, 1569 (2009) (SLAPP did not apply because "wrongful conduct and

22     speech that plaintiffs attribute to defendants was committed in a business

23     capacity"); *Bylin Heating Sys., Inc. v. M & M Gutters, LLC*, 2008 WL

24     744706, at *6 (E.D. Cal. March 18, 2008) (acts of unlawfully procuring

25     intellectual property not protected); *Blackburn v. Brady*, 116 Cal. App. 4th

26     670, 676-77 (2004) (fraudulent bidding at public auction "a purely business

27     type event or transaction and is not … protected activity" under SLAPP).

28

DC COMICS' INITIAL OPPOSITION TO
                                            DEFENDANTS' ANTI-SLAPP MOTION

- Where acts normally protected by SLAPP (*e.g.*, making legal filings) are part of an overall scheme of business interference—and are *evidence* of how the scheme unfolded—SLAPP does not shield such acts.  *E.g., Dep't of Fair Emp't & Hous. v. 1105 Alta Loma Road Apartments, LLC*, 154 Cal. App. 4th 1273, 1283-88 (2007) (protected court filings mere evidence of underlying unprotected misconduct; SLAPP did not apply); *Santa Monica Rent Control Bd. v. Pearl Street, LLC*, 109 Cal. App. 4th 1308, 1319 n.14 (2003) (same); *Gallimore v. State Farm Fire & Cas. Ins. Co.*, 102 Cal. App. 4th 1388, 1399 (2002) (same; defendant conflated "allegedly *wrongful acts* with the *evidence* that plaintiff will need to prove such misconduct").

- So long as the *gravamen* of the claim at issue challenges acts of business misconduct—and not protected speech—SLAPP does not apply.  *E.g., Robles v. Chalilpoyil*, 181 Cal. App. 4th 566, 575 (2010) ("'it is the *principal thrust* or *gravamen* of the plaintiff's cause of action that determines whether the anti-SLAPP statute applies'"; "'collateral allusions to protected activity should not subject the cause of action to the anti-SLAPP statute'").

DC Comics' complaint does not trigger the SLAPP statute.  The fourth through sixth claims are directed to illicit backroom business dealings by the Toberoff defendants in securing putative intellectual property for themselves and interfering with DC Comics' rights.  Unable to address the actual allegations in DC Comics' complaint, defendants' motion constructs a straw-man version, falsely asserting that DC Comics' state-law claims are based on Toberoff's actions as a lawyer.  A cursory review of DC's complaint shows that the state-law claims derive from Toberoff's commercial business pursuits—not the practice of law.

### 1.  The Gravamen of DC Comics' Claims

a.  DC Comics' *fourth claim* challenges agreements Toberoff made with the Shusters that interfered and continue to interfere with DC Comics' rights under its 1992 agreement with the Shusters, and which defendants *admit* violate the

1   Copyright Act.  FAC ¶¶ 174-79; Docket No. 78 at 8.  These agreements assigned

2   50% of the Shusters' putative copyright interest to Toberoff and his companies—

3   rights DC Comics already owned by contract, and rights that cannot be transferred

4   under the Copyright Act.  Toberoff did not sign these agreements in his role as a

5   lawyer—*he expressly signed them as a businessman for Pacific Pictures and his*

6   *other companies*.  *Supra* at 6.

7          There can be no credible claim that these illicit agreements engineered by

8   Toberoff promote or relate to a matter of public concern.  Nor were they

9   necessitated by litigation, actual or anticipated.  Just the opposite:  Toberoff

10  purposefully concealed his interests in the Shuster rights from the public and DC

11  Comics when he filed copyright termination notices on their behalf some two years

12  later, FAC ¶¶ 118-24, and he has never filed any lawsuit on behalf of the Shusters.

13  The SLAPP statute does not apply where the "overall thrust of the complaint

14  challenges the manner in which the parties privately dealt with one another, on both

15  contractual and tort theories, and does not principally challenge the collateral

16  activity of pursuing governmental approvals."  *Wang v. Wal-Mart Real Estate Bus.*

17  *Trust*, 153 Cal. App. 4th 790, 809 (2007).

18         While the Pacific Pictures agreements make general reference to utilizing

19  Toberoff as a lawyer in the future for the Shusters, Mot. at 17, 20, Petrocelli Decl.

20  Exs. 12 ¶ 2; 13 ¶ 1, such generic references are insufficient to trigger the SLAPP

21  statute or California's litigation privilege that mirrors it (and that defendants

22  invoke):

23         The Mays argue that "The spectre of litigation 'loomed' over the entire
           course of the parties' communications," but the same could be said of
24         nearly any high-stakes negotiation…. *Negotiations and persuasion are
           part of any business deal.  To suggest that nearly any attempt at*
25         *negotiation is covered by the privilege, especially when attorneys are
           involved, is unduly overbroad….*  Because the communications at issue
26         were not covered by the litigation privilege, *the anti-SLAPP motion
           should **not** have been granted.*

27

28

                                        14        DC COMICS' INITIAL OPPOSITION TO
                                                  DEFENDANTS' ANTI-SLAPP MOTION

1   *Haneline Pac. Props., LLC v. May*, 167 Cal. App. 4th 311, 320 (2008) (emphasis

2   added); *Newport Builders, Inc. v. N. Bay Constr., Inc.*, 2009 WL 2083359, at *4

3   (N.D. Cal. July 14, 2009) (same; SLAPP did not apply).

4        b.  DC Comics' *fifth claim* challenges acts of fraud by defendants in

5   disrupting the Siegels ongoing business relationships with DC Comics.  As alleged:

> Toberoff was well aware of the [October 2001 settlement]
> agreement between DC Comics and the Siegel Heirs…. [W]hen
> Toberoff approached the Siegel Heirs and their representatives in late
> 2001 and 2002 to express interest in purchasing their Superman rights,
> he was informed that the Siegel Heirs had already reached an
> agreement with DC Comics.
>
> Toberoff knew his actions were substantially certain to interfere
> with the Siegel Heirs' agreement and ongoing business dealings with
> DC Comics.  *Toberoff intentionally engaged in independently
> wrongful conduct to carry out his interference by, among other things:
> falsely misrepresenting to the Siegel Heirs that he had a billionaire
> investor ready to purchase their Superman rights if they repudiated
> their settlement agreement with DC Comics; falsely representing to the
> Siegels that he would help them produce a competing Superman
> motion picture; and wrongly inducing the Siegels to repudiate their
> agreement and business relationship with DC Comics.*  Toberoff
> engaged in this misconduct in his role as businessman and shareholder
> of IP Worldwide.

17  FAC ¶¶ 184-85 (emphasis added); Petrocelli Decl. ¶¶ 44-46 & Exs. 24, 31.

18       In committing these torts, Toberoff and IP Worldwide were engaged in

19  business activities aimed at securing control over the disposition of the Siegels'

20  putative Superman rights.  As his colleague described it, Toberoff "approache[d]

21  the Siegels, *not as an attorney but as a film producer*, stating that he is 'allied' with

22  [Ari] Emanuel…."  FAC Ex. A at 2.  Indeed, the contract Toberoff induced the

23  Siegels sign with IP Worldwide in October 2002 made clear they were *not* retaining

24  Toberoff to represent them in litigation.  *Supra* at 8.

25       Obviously, IP Worldwide could never lawfully agree to provide litigation

26  counsel to the Siegels—it is not a law firm or comprised of lawyers, and its three

27  owners are Pacific Pictures (Toberoff's production company), Emanuel (a talent

28  agent), and Endeavor (a talent agency).  Petrocelli Decl. ¶ 50.  If, as defendants now

DC COMICS' INITIAL OPPOSITION TO
DEFENDANTS' ANTI-SLAPP MOTION

1  assert, IP Worldwide and Toberoff were only seeking to act as the Siegels'

2  "lawyers" in the summer of 2002, Mot. at 16, then IP Worldwide and Toberoff

3  would have been violating California law. California law expressly prohibits

4  lawyers from partnering with business persons in the practice of law. *See* CAL.

5  RULES OF PROF'L CONDUCT R. 1-310; *In re Phillips*, 4 Cal. State Bar. Ct. Rptr. 315

6  (2001). And as Toberoff's website made clear, IP Worldwide was a *business*

7  partnering with other businesses—*not* a law firm: "IPW has *strategic partnership*

8  with top talent agencies and production companies that allows it to quickly package

9  [its] properties for production…." Petrocelli Decl. Ex. 1 at 24 (emphasis added).

10  Such "purely business type event[s] or transaction[s] [are] not … protected speech"

11  and are not shielded by SLAPP. *Blackburn*, 116 Cal. App. 4th at 677; *Bylin*, 2008

12  WL 744706, at *6; *Graffiti Protective Coatings, Inc. v. City of Pico Rivera*, 181

13  Cal. App. 4th 1207, 1224 (2010); *World Fin. Grp.*, 172 Cal. App. 4th at 1569;

14  *Wang*, 153 Cal. App. 4th at 809; *Kajima Eng'g & Const., Inc. v. City of L.A.*, 95

15  Cal. App. 4th 921, 929-32 (2002).

16  Nor could defendants' position ever be correct, because it would enable

17  tortfeasors to shield their misconduct merely by reciting in a document their

18  intentions to retain a lawyer. California courts have rejected such unprincipled

19  extensions of the SLAPP statute and the related litigation-privilege doctrine,

20  because they "would swallow up much of the law of torts" and "'provide immunity'

21  for fraud." *Edwards v. Centex Real Estate Corp.*, 53 Cal. App. 4th 15, 32-33

22  (1997); *see also id.* at 33-40. In any event, as these courts rightly note, the Toberoff

23  defendants' mere *assertions* about their "intent" in engaging in these activities is

24  insufficient to show their conduct was protected. At their core, such claims raise

25  "issue[s] of fact" that cannot be resolved on the pleadings, *id.* at 39, or absent

26  discovery, *Shropshire*, 294 F. Supp. 2d at 1099-1100.

27  c. DC Comics' *sixth claim* seeks a declaration that the Toberoff defendants

28  engaged in unfair competition by engineering the offending "consent agreements"

16

DC COMICS' INITIAL OPPOSITION TO
DEFENDANTS' ANTI-SLAPP MOTION

1  at issue here, which gave his companies and him rights to block any transfer of the

2  Siegels' and Shusters' putative copyright interests to DC Comics.  FAC ¶¶ 187-89.

3  Again, DC Comics' challenge to these agreements is aimed at the *rights* they

4  wrongfully vest in Toberoff and his companies and has *nothing* to do with

5  misconduct by Toberoff as a lawyer in litigation.  The consent agreements violate

6  California's unfair competition laws because, *e.g.*, they violate the Copyright Act.

7  Such business acts are not protected by SLAPP.  *Supra* at 16 (collecting cases).

8     2.  Defendants' Mischaracterization of DC Comics' Claims.  Defendants

9  assert that DC Comics' fourth claim triggers SLAPP because the complaint

10  mentions that (i) Toberoff filed termination notices for the Shusters in 2004;

11  (ii) Toberoff played a role in the "probate action" Peary filed in 2003; and

12  (iii) Toberoff eventually formed an attorney-client relationship with the Shusters.

13  Mot. at 14-18.  What matters on Prong 1 of the SLAPP test, however, is the

14  *gravamen* of DC Comics' complaint—*not* defendants' selective "endeavors to

15  characterize" them.  *Turner*, 180 Cal. App. 4th at 685.  The references defendants

16  cite do not satisfy Prong 1, because under no fair reading of DC Comics' complaint

17  can it be said that its fourth claim "itself [i]s *based on*" any of these acts.  *Cashman*,

18  29 Cal. 4th at 78 (emphasis added).

19     In its fourth claim, DC Comics does not sue defendants because the Shusters

20  filed a copyright termination notice, Peary filed a probate action, or the Shusters

21  hired Toberoff as their lawyer.  DC Comics' *first* and *second* claims—brought

22  under federal law (and not subject to SLAPP)—challenge the validity and scope of

23  the notice and Toberoff's acts of fraud in submitting it.  FAC ¶¶ 105-64.  And while

24  the probate action is relevant to DC Comics' first claim, it is *not* the basis for

25  claims four through six.  No claim in the case—none—is based on the fact that the

26  Shusters hired Toberoff as their lawyer or his actions in litigation.  DC Comics'

27  fourth claim is based on Toberoff's misconduct in inducing the Shusters to *assign*

28  *rights* to defendants in violation of DC Comics' interests.  FAC ¶¶ 175-79.  That is

17

DC COMICS' INITIAL OPPOSITION TO DEFENDANTS' ANTI-SLAPP MOTION

1  why the claim is titled "Intentional Interference with 1992 Shuster Agreement."  *Id.*

2  Defendants' argument that SLAPP protects even a non-lawyer's assistance "in the

3  litigation process" is irrelevant.  Mot. at 15.  The "litigation process" is not the

4  gravamen of DC's claims—rights trafficking is.

5       Courts follow a useful exercise to ascertain the gravamen of a claim.  As

6  illustrated by *Dep't of Fair Emp't*, 154 Cal. App. 4th at 1284-85, a claim for relief

7  is not "based on" protected activity if plaintiff could have brought the same claim

8  regardless of the activity defendants assert is protected.  Here, DC Comics' fourth

9  claim would be viable if all that was alleged was that Toberoff wrongfully induced

10 the Shusters to assign him their rights.  The few acts singled out by Toberoff (filing

11 notices, assisting in probate proceedings, or even encouraging litigiousness) are

12 evidence of his overall scheme and course of conduct—they are not the root of DC

13 Comics' claim and do *not* satisfy Prong 1.  *Id.*; *Robles*, 181 Cal. App. 4th at 574-75.

14      This important distinction also shows why defendants' cases are irrelevant.

15 Defendants cite *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 597 (9th Cir.

16 2010), for the proposition that establishing "a property right under a comprehensive

17 federal statutory scheme" is covered by SLAPP.  But they fail to point out that the

18 gravamen of the complaint in *Mindys* was defendants' violation of state law by

19 *registering* a trademark with the Trademark Office.  *Id*. at 598.  DC Comics' fourth

20 claim does not challenge the copyright termination filing the Shusters and Toberoff

21 made; nor is the claim "based on" this filing.  Cases like *Mindys* are thus inapt.

22      Defendants also assert that the PPC Agreements "clearly contemplate

23 litigation" because they discuss the future retention of Toberoff as a lawyer and

24 because Toberoff was merely soliciting legal clients.  Mot. at 17-18.  This self-

25 serving interpretation of the complaint, agreement, and facts is unsupportable, and

26 vigorously disputed.  Toberoff was not soliciting clients; he was locking up and

27 assigning to himself the heirs' copyright interests.  *Supra* at 2-8, 12-16.

28

DC COMICS' INITIAL OPPOSITION TO
DEFENDANTS' ANTI-SLAPP MOTION

1   Significantly, in the *nine years* following the 2001 PPC agreement, Toberoff
2   never filed any litigation on behalf of the Shusters.  Defendants come nowhere
3   close to meeting their burden of showing that litigation was "actually contemplated
4   in good faith and under serious consideration."  *Haneline*, 167 Cal. App. 4th at 319.

5   The cases cited by the defendants confirm this conclusion.  In each, the
6   alleged conduct for which defendants were being sued arose out of *ongoing*
7   *litigation* or litigation that *commenced within months*.  Mot. at 16-18 (citing *Seltzer*
8   *v. Barnes*, 182 Cal. App. 4th 953, 958 (2010); *GeneThera, Inc. v. Troy & Gould*
9   *Prof. Corp.*, 171 Cal. App. 4th 901 (2009); *Neville v. Chudacoff*, 160 Cal. App. 4th
10  1255, 1267 (2008); *Taheri Law Group v. Evans*, 160 Cal. App. 4th 482, 489 (2008);
11  *Rubin v. Green*, 4 Cal. 4th 1187, 1191 (1993)).  Moreover, in *none* of these cases
12  did any of the lawyers act in separate roles as business people.  Nor did they admit,
13  as Toberoff acknowledged in defendants' first SLAPP motion—conspicuously
14  edited out of this version—that he advised his co-defendants on "*business issues*."
15  Docket No. 31 at 6 (emphasis added).  Nor did the lawyers in these reported cases
16  tell the *Wall Street Journal* (as Toberoff did here) that they kept such dealings
17  separated from his legal work by a "'defined firewall.'"  *Supra* at 1 (Ex. 4 at 37).

18  Defendants' arguments that DC Comics' fifth and sixth claims are subject to
19  SLAPP similarly miss the mark.  Defendants assert that all of DC Comics' claims,
20  but particularly the fifth claim, is based on "communications ... in connection with
21  settlement negotiations and anticipated litigation" because "[l]itigation between DC
22  and the Siegels was contemplated as early as 1997, when the Siegels served their
23  initial notices of termination."  Mot. at 17, 16 (citing cases).

24  There are numerous problems with this contention.  First, whether the
25  Siegels, Shusters, or other defendants "contemplated" litigation is a contested
26  "issue of fact" that cannot be resolved without discovery—and cannot be resolved
27  based on defendants' self-serving assertions about their intent.  *Action Apartment*,
28  41 Cal. 4th 1232, 1251; *accord Eisenberg v. Alameda Newspapers, Inc.*, 74 Cal.

19

DC COMICS' INITIAL OPPOSITION TO
DEFENDANTS' ANTI-SLAPP MOTION

App. 4th 1359, 1381 (1999) (reversing summary judgment because "[i]t remain[ed] a triable issue of fact whether, at the time of the [communications], imminent litigation was seriously proposed and actually contemplated in good faith"); *Shropshire*, 294 F. Supp. 2d at 1089-92; *Edwards*, 53 Cal. App. 4th at 35 n.10.

Second, the gravamen of DC Comics' fifth claim is that in 2002 Toberoff and IP Worldwide fraudulently induced the Siegels to cut ties with DC Comics, so that Toberoff and IP Worldwide could extract a large fee in selling the Siegels' putative rights and secure control over their disposition. *Supra* at 6-8. By his own admission, Toberoff the litigator did not file suit for the Siegels *until 2004*. Mot. at 10. And it was *Kevin Marks*, the Siegels' deal lawyer at the Gang Tyre firm—*not* Toberoff—who represented the Siegels as counsel in their discussions with DC Comics from the late 1990s through September 2002. FAC ¶¶ 68-79. IP Worldwide, which signed its agreement with the Siegels in October 2002, could not possibly have been giving the Siegels litigation advice—to do so would constitute the illegal practice of law. *Supra* at 15-16. Finally, "the mere fact that [DC Comics filed this lawsuit] after [the Siegels finally filed their lawsuits in 2004] does not mean the action arose from [those lawsuits]." *Navellier*, 29 Cal. 4th at 89; *Applied Bus. Software, Inc. v. Pac. Mortg. Exch., Inc.*, 164 Cal. App. 4th 1108, 1116 (2008).

What matters for Prong 1 is the gravamen of DC Comics' fifth claim. That claim focuses on Toberoff's acts of fraud as a businessman, and such frauds are not protected. E.g., *supra* at 12-14, 16. Addressing a nearly identical situation, the court in *Newport Builders*, 2009 WL 2083359, at *4, explained:

> The record demonstrates that Defendant was merely *communicating a proposed business deal*, not an offer to settle its own claims. That the Defendant's offer was made ***while the DeAngelis Plaintiffs and the Newport Defendants were engaged in efforts to resolve their dispute does not cloak Defendant's communications under the auspices of protected activity***. Any connection between Defendant and the ongoing settlement discussions between the DeAngelis Plaintiffs and the Newport Defendants was, at best, tangential to the litigation, and otherwise too attenuated to establish that Defendant was engaged in protected activity. (Emphases added.)

20

1    With regard to the sixth cause of action, defendants assert the additional

2  argument that certain of the consent agreements referenced in the sixth claim were

3  "directly related to the settlement of ongoing litigation."  Mot. at 20 n.8.  However,

4  defendants do not present *any* evidence to support this assertion and, in fact, have

5  refused to disclose in discovery the very consent agreements implicated by this

6  argument.  Petrocelli Decl. ¶ 53.  Defendants' naked assertions about DC's claims,

7  untested by the discovery process, do not satisfy their Prong 1 burden.

8    3.  Defendants' *Hilton* Argument.  Defendants' final argument is that because

9  their alleged misconduct and this lawsuit "concerns control of the rights to the

10  iconic character *Superman*, [it] is indisputably a public issue."  Mot. at 20.  This

11  argument is frivolous.  Scores of cases are litigated each year in California alone

12  concerning rights in well-known entertainment properties, and there is no case

13  holding that SLAPP acts as a bar to such suits.

14    Defendants' two legal citations are of no help to them.  The first is to the

15  language of the SLAPP statute concerning to the "exercise of free speech in

16  connection with a public issue."  CAL. CIV. PROC. CODE § 425.16(e)(4).  That

17  language does not mean—and has never been read to mean—that all acts of

18  wrongdoing concerning high-profile events or iconic figures are protected free

19  speech.  Courts routinely refuse to apply SLAPP to claims just because the general

20  subject matter of the case is well known.  *E.g.*, *World Fin. Grp.*, 172 Cal. App. 4th

21  at 1569 (rejecting defendants' argument that since "workforce mobility and free

22  competition" are matters of public interest, their wrongful solicitation of plaintiff's

23  employees and customers was protected); *Rivero v. Am. Fed'n of State, Cnty. &*

24  *Mun. Emps., AFL-CIO*, 105 Cal. App. 4th 913, 924 (2003) (general interest in

25  "unlawful workplace activity" did not insulate private conduct); *Commonwealth*

26  *Energy Corp. v. Investor Data Exch., Inc.*, 110 Cal. App. 4th 26, 34 (2003) (sale of

27  "scam-protection" product not protected by SLAPP even though public generally

28  interested in issue of scam-protection).

21

DC COMICS' INITIAL OPPOSITION TO
DEFENDANTS' ANTI-SLAPP MOTION

1    Defendants' other citation—*Hilton*, 580 F.3d 874—is equally inapposite.  In

2  that case, SLAPP applied to a greeting card that Hallmark sold mocking the

3  celebrity Paris Hilton.  *Id.* at 884.  Here, Toberoff's illicit dealings and fraudulent

4  conduct to enrich himself at the expense of DC Comics (as well as the Shusters and

5  Siegels) do not "evince[] an intent to convey a particularized message" about

6  Superman.  *Id.*  Rather, they involve "entering into a business relationship" that is,

7  by definition, not an "exercise of free speech."  *Robles*, 181 Cal. App. 4th at 580;

8  *accord Bylin*, 2008 WL 744706, at *6 ("communications with distributors" about

9  unlawfully procuring intellectual property are not protected by SLAPP; they are

10  "non-communicative in nature").

11    **B.    Defendants Fail The Second Prong of the Test:  DC Comics' State-**

12    **Law Claims Far Exceed the "Minimal Merit" Standard.**

13    As discussed below, but detailed exhaustively in DC Comics' oppositions to

14  defendants' Rule 12 motions, none of defendants' legal challenges to DC Comics'

15  state-law claims has merit.  Like their SLAPP motion, defendants' Rule 12

16  arguments all turn on disputed facts, requiring the denial of their motions.

17    Fourth Claim.  DC Comics claims that defendants intentionally interfered

18  with its 1992 agreement and business relationship with the Shusters by wrongfully

19  inducing them to enter into the PPC Agreements.  *Supra* 3-6.  Defendants do not

20  dispute they were aware of the 1992 agreement and DC Comics' ongoing business

21  relationship with the Shusters.  They also concede the Pacific Pictures agreements

22  violate the Copyright Act.  Docket No. 78 at 8.  Nor do they challenge the factual

23  sufficiency of DC Comics' fourth claim.  Instead, defendants incorporate their Rule

24  12 arguments to address prong two of the SLAPP statute.  As DC Comics explains

25  more fully in its oppositions to defendants' Rule 12 motions, these arguments fail:

26    1.  Defendants contend the 1992 agreement is void under a Copyright Act.

27  As explained in DC Comics' Rule 12 opposition brief in support of its first claim

28  for relief, the Ninth Circuit unequivocally rejected defendants' position, confirming

22

"parties may contract, as an alternative to statutory termination," to revoke all prior

copyright grants that might otherwise be terminable—exactly as happened here in

1992.  *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1046 (9th Cir. 2005).

2.  Defendants argue DC Comics' claim is time-barred because it discovered

the PPC Agreements in 2006.  This assumes defendants' interpretation of the facts

and conclusions concerning the PPC agreements is correct, and ignores that the

PPC agreements *continue* to harm DC Comics and will do so through and including

2013, when the Shusters' termination purports to take effect.  *E.g.*, *Birschtein v.*

*New United Motor Mfg., Inc.*, 92 Cal. App. 4th 994, 1003 (2001) (continuing wrong

tolls statute of limitations until date of last injury).  Also, as is explained in DC

Comics' Rule 12 papers in support of its fourth and fifth claims, California's

"discovery rule" tolls the accrual of the statute of limitations until December 2008,

when Judge Larson ordered the Toberoff Timeline be produced.  *E.g.*, *Norgart v.*

*Upjohn Co.*, 21 Cal. 4th 383, 393 (1999).

3.  Defendants contend DC Comics' claim is barred by California's

litigation privilege, which protects communicative conduct in ongoing litigation or

in anticipation of litigation.  *See Haneline*, 167 Cal. App. 4th at 319.  Defendants'

improper *business conduct* in pursuing the Shusters' putative rights is not shielded

conduct for all the reasons discussed in the "Prong 1" SLAPP analysis above.

Fifth Claim.  DC Comics alleges that defendants intentionally interfered with

DC Comics' settlement agreement and ongoing business relationship with the

Siegels by inducing them through fraudulent representations to repudiate the

settlement agreement and enter into the IP Worldwide Agreement.  *Supra* at 6-8.

Defendants do not and cannot dispute they were aware of the settlement

agreement and relationship between the Siegels and DC Comics.  Toberoff has

admitted he tracked the Siegels' termination efforts, and when Toberoff and IP

Worldwide first approached the Siegels to express interest in purchasing their

Superman rights, the Siegels' lawyer told them the Siegels had already reached an

DC COMICS' INITIAL OPPOSITION TO
DEFENDANTS' ANTI-SLAPP MOTION

1   agreement with DC Comics.  Even so, defendants convinced the Siegels to

2   repudiate their agreement with DC Comics and do business with IP Worldwide

3   instead.  Petrocelli Decl. ¶¶ 44-51.  To this end, Toberoff, through IP Worldwide,

4   falsely misrepresented to the Siegels that he had a "billionaire investor" ready to

5   purchase their Superman rights.  *Id.* Ex. 31 at 643.  Defendants may now deny this

6   occurred, but that is a factual dispute that must be subject to discovery before the

7   Court rules on this motion.  *Supra* at 9-10.  This discovery includes investigation

8   into the Toberoff Timeline, which Magistrate Zarefsky ruled last week DC Comics

9   is fully entitled to take.  Docket No. 74.

10  Defendants suggest that DC Comics has "withdrawn" its allegation that

11  Toberoff wrongfully induced the Siegels to repudiate the settlement agreement.

12  Mot. at 23.  That is false.  DC Comics' amended complaint provided more detail to

13  demonstrate Toberoff's acts of interference, and as shown above, it is defendants

14  who have misrepresented how the Siegels and DC Comics' negotiations unfolded

15  and when and how Toberoff intervened.  *Supra* at 7-8.

16  Defendants next assert that DC Comics' fifth claim is time-barred because,

17  they contend, DC Comics discovered the IP Worldwide Agreement in 2006.

18  Again, as is explained in DC Comics' Rule 12 brief in support of its fifth claim, the

19  harm DC Comics is suffering at the hands of Toberoff continues to this day; thus,

20  the statute of limitations has yet to commence.  *E.g.*, *Birschtein*, 92 Cal. App. 4th at

21  1003.  Moreover, as a result of defendants' fraudulent concealment, DC Comics

22  was kept in the dark about Toberoff's fraud and deceit until December 2008, when

23  the Timeline was ordered produced.  *E.g.*, *Norgart*, 21 Cal.4th at 393.  Defendants'

24  final assertion—that the litigation privilege shields defendants' improper business

25  misconduct—is without basis for the reasons discussed in Section III.A, above, and

26  in DC's opposition to defendants' Rule 12 motion.

27  Sixth Claim.  DC Comics claims defendants' illicit consent agreements

28  constitute unfair competition under California Business & Professions Code §

24

1    17200.  In their motion, defendants incorporate arguments from their Rule 12

2    motion, and DC Comics answers those arguments in its Rule 12 opposition papers.

3    To briefly summarize, while defendants *admit* the PPC Agreements violate DC

4    Comics' rights under section 304(c)(6)(D) of the Copyright Act, they assert that

5    section of the Act provides "a right without a remedy."  Docket No. 78 at 4-7.  But

6    as the Ninth Circuit has confirmed, and Congress has made clear, section

7    304(c)(6)(D) gives an original copyright grantee like DC Comics a "competitive

8    advantage … in the nature of a right of 'first refusal,'" *Milne*, 430 F.3d at 1047

9    (quoting H.R. REP. NO. 94-1476 at 127), which the grantee has standing to enforce.

10          Defendants also assert that the sixth claim is time-barred and barred by the

11   litigation privilege, but those arguments are wrong for the reasons above and as

12   explained in DC Comics' Rule 12 papers on this sixth claim.  Finally, defendants

13   assert this sixth claim is preempted by the Copyright Act.  This, too, is wrong.  As

14   shown in its Rule 12 opposition, DC Comics does not sue defendants for infringing

15   its copyrights or improperly displaying or selling Superman works.  The narrowly

16   defined preemption provisions in the Copyright Act thus have no application here.

17   **V.     CONCLUSION**

18          Defendants' SLAPP motion should be denied.  Alternatively, the Court

19   should stay resolution of the motion pending discovery.

20   Dated:  September 27, 2010                    Respectfully Submitted,

21                                                By:  /s/ Daniel M. Petrocelli

22                                                      Daniel M. Petrocelli
                                                 Attorneys for Plaintiff DC Comics

23

24

25

26

27

28