# EXHIBIT 4

World ▾    U.S. ▾    New York ▾    Business ▾    Markets ▾    Tech ▾    Personal Finance ▾    Life & Culture ▾    Opinion ▾

Careers ▾

Real Estate ▾    Small Business ▾

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com

• See a sample reprint in PDF format.          • Order a reprint of this article now

# THE WALL STREET JOURNAL
WSJ.com

HOLLYWOOD REPORT  |  JULY 15, 2005

# The Rights Stuff

*'Hazzard' Legal Issues Lead To $17.5 Million Payday; Discovery on a Treadmill*

By JOHN LIPPMAN | Staff Reporter of THE WALL STREET JOURNAL

*(See Corrections & Amplifications item below.)*

For the new movie "The Dukes of Hazzard," the biggest payout didn't go to the actors or even the movie's director and producer. It went to clients of Marc Toberoff, an attorney who's made a reputation suing big studios on behalf of TV-show creators who claim they're owed money for the movie rights.

The film, which opens Aug. 5, is based on the popular 1970s-early '80s TV comedy about two Southern buddies who drive around getting into trouble and outwitting some local buffoons. It stars MTV personality Johnny Knoxville and reality-TV diva Jessica Simpson.

But before reaching the screen, the movie was tied up as a group of people who held rights related to the "Hazzard" TV show sued Warner Bros., the studio making the film. Last month, in an out-of-court settlement, the studio paid them $17.5 million, according to people familiar with the situation. It is believed to be the largest sum ever to arise out of a case involving movie rights for a TV show.


Warner Bros.

Seann William Scott, left, and Johnny Knoxville, right, in 'The Dukes of Hazzard'

It amounts to about one-third of the film's original budget. Mr. Toberoff, who usually takes his cases on a contingency-fee basis, declined to say how much he made from the "Hazzard" case. Warner Bros. declined to comment on any aspect of separated-rights issues.

For years, Hollywood has been besieged by lawsuits from people who claim studios stole their ideas. But those cases generally are about alleged copyright infringement.

This lawsuit involves the "separated rights" clause in the Writers Guild of America's contract with the Hollywood studios. (It also includes copyright-infringement claims.) The Writers Guild contract stipulates that the creator of a TV show retains the show's movie rights. A studio -- or an independent producer -- can acquire

Exhibit 4
35

those rights separately only under narrow guidelines. Separated-rights cases deal with whether a producer has the right to make the material into a movie.

## Coming to the Fore

The issue has come to the fore in recent years as studios increasingly rely on versions of popular TV shows from the 1960s and 1970s. This summer has already seen "The Honeymooners" and "Bewitched." "Miami Vice" is coming up next year, and "Father Knows Best," "The A-Team," "Magnum, P.I." and "The Man from U.N.C.L.E." are in development. It couldn't be determined whether any of those projects are facing separated-rights challenges; the Writers Guild of America says separated-rights disputes are confidential. Studios have increasingly sought safe subjects, like old hit series, because they have a track record of success and sometimes don't cost much to develop into a film script. But in some cases, the plans for saving money can backfire, and the studios have ended up paying large amounts because of litigation tied to TV-series rights.

For example, in 1999, the family of Gilbert Ralston, the creator of the 1960s TV series "The Wild, Wild West," sued Warner on a separated-rights case. (Mr. Toberoff represented them.) The studio was about to release a $150-million-budget movie based on the TV series. The suit was settled, and Warner ended up paying the Ralston family between $600,000 and $1.5 million, people involved in the case say. (The film was a disappointment at the box office.)

In the 1960s and 1970s, creators of series often sold certain TV rights to networks. But because big studios weren't generally in the market for making movies of these shows at that time, studios didn't always try to buy the movie rights. As a result, they must now go back and acquire them from the creators or their heirs -- or risk being sued. "Since the whole idea of making a movie out of a TV series was highly speculative, by and large producers and studios didn't bother to acquire the separated rights," says attorney William Grantham. He represented United Artists a few years back when the studio wanted to turn the 1960s TV series "Rat Patrol" into a movie. The Writers Guild arbitrated issues involving those rights, though the movie hasn't been made.

In the case of "Hazzard," the TV series itself was based on a 1975 United Artists movie, "Moonrunners." Producer Bob Clark acquired a script by Gy Waldron, which Mr. Waldron also directed. In 1978, Warner Bros. acquired the rights to make "Moonrunners" into the "Hazzard" TV series. But according to Mr. Clark's lawsuit, the studio never acquired the movie rights. (Mr. Clark claimed copyright issues in the lawsuit, filed in Los Angeles Superior Court last February: specifically, that the "Hazzard" movie appears to rely to a large extent on "Moonrunners." The lawsuit details 25 points in the "Hazzard" movie, from plot to characters, in which the two movies possess "glaring and substantial similarities.")

On the basis of Mr. Clark's claims, the judge issued a preliminary injunction ordering Warner to withdraw marketing materials and postpone release of the movie until the parties could settle. A big delay would have been a serious setback for the studio, since the movie cost about $53 million to make, was a major summer entry for Warner and had been widely publicized. The studio had also started rolling out its estimated $30 million advertising campaign. Within days of the judge's ruling, Warner lawyers holed up in a conference room at Mr. Toberoff's offices, and agreed to pay Mr. Clark and his partners. A settlement was reached June 21.

## 'A Market to Be Tapped'

Mr. Toberoff, who says he's never lost a case, estimates he's handled rights issues related to 10 shows on behalf of their creators when producers wanted to make them into movies. The lawyer says most of the issues involved "cleaning up" the separated rights of the shows." In only three cases, he says, has he gone to court. (Other disputes are arbitrated by the Writers Guild.)

After winning one settlement, "he was selling himself as an expert," says Grace Reiner, assistant executive director at the Writers Guild, who works on the arbitration of disputes over separated rights. "He saw a market to be tapped, and

Exhibit 4
36

he tapped it," she says. Regarding his work representing TV-show rights holders, Mr. Toberoff says, "People call me an 'ambulance chaser.' But I don't take on a case unless I believe in it."

Mr. Toberoff first got into the field of TV-series rights by way of the son of Robert Pirosh, the creator of the 1960s TV series "Combat." While on the treadmill at his health club in 1994, Mr. Toberoff read an ad, placed by the son, seeking help in sorting through his father's papers. Mr. Toberoff researched what rights had, and hadn't, been sold. When it was announced a couple of weeks later that Bruce Willis was going to star in a movie version of "Combat," Mr. Toberoff was ready to press a claim the producer did not have the movie rights to the old TV series. Mr. Toberoff says a settlement was reached, though he won't say for how much. (That movie was never made.)

Meanwhile, Mr. Toberoff has pursued another line of work: producing. His Intellectual Properties Worldwide has acquired remake rights to classics like "High Sierra" and "The Asphalt Jungle," as well as such old TV shows as "Ironside," "Police Woman," "Hart to Hart" and "F-Troop." This could theoretically put him in a delicate position, since he is representing TV-show creators suing studios, while his production company seeks the cooperation of studios that's required to fund and distribute Hollywood films. Mr. Toberoff says he is aware of this potential conflict and "keeps a defined firewall between producing and legal matters."

**Write to** John Lippman at john.lippman@wsj.com

### Corrections & Amplifications:

A lawsuit involving underlying rights to the coming movie "The Dukes of Hazzard" principally concerned a copyright-infringement claim by the producer of the film "Moonrunners." This column incorrectly said that the lawsuit was an example of a separated-rights dispute. A "separated rights" claim under the Writers Guild of America contract is reserved for the creator-writer of a TV series under the guild's jurisdiction. The suit was brought in federal court in Los Angeles and not, as the article incorrectly said, in Los Angeles Superior Court.

Printed in The Wall Street Journal, page W7

Copyright 2009 Dow Jones & Company, Inc. All Rights Reserved
This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com

Exhibit 4
37