1  KENDALL BRILL & KLIEGER LLP
   Richard B. Kendall (90072)
2   rkendall@kbkfirm.com
   Laura W. Brill (195889)
3   lbrill@kbkfirm.com
   Nicholas F Daum (236155)
4   ndaum@kbkfirm.com
   Nathalie E. Cohen (258222)
5   ncohen@kbkfirm.com
   10100 Santa Monica Blvd., Suite 1725
6  Los Angeles, California 90067
   Telephone: 310.556.2700
7  Facsimile: 310.556.2705

8  Attorneys for Defendants Marc Toberoff,
   Pacific Pictures Corporation, IP
9  Worldwide, LLC, and IPW, LLC

10

11              UNITED STATES DISTRICT COURT

12      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

13

14 | DC Comics,                          | Case No. CV 10-3633 ODW(RZx)

15 |         Plaintiff,                   | **DECLARATION OF NICHOLAS F.
   |                                      | DAUM IN SUPPORT OF
16 |    v.                                | TOBEROFF DEFENDANTS'
   |                                      | REPLY MEMORANDUM IN
17 | PACIFIC PICTURES                     | SUPPORT OF MOTION TO
   | CORPORATION, IP WORLDWIDE,           | STRIKE PLAINTIFF'S STATE
18 | LLC, IPW, LLC, MARC TOBEROFF,        | LAW CAUSES OF ACTION
   | an individual, MARK WARREN           | PURSUANT TO CALIFORNIA'S
19 | PEARY, as personal representative of | ANTI-SLAPP LAW (CAL. CODE
   | the ESTATE OF JOSEPH SHUSTER,        | CIV. PROC. § 425,16)**
20 | JOANNE SIEGEL, an individual,        |
   | LAURA SIEGEL LARSON, an              | *Filed concurrently with REPLY IN
21 | individual, and DOES 1-10, inclusive,| SUPPORT OF MOTION TO STRIKE
   |                                      | PURSUANT TO ANTI-SLAPP LAW,
22 |         Defendants.                  | DECLARATION OF KEVIN MARKS,
   |                                      | REPLY IN SUPPORT OF MOTION TO
23 |                                      | DISMISS FOURTH AND FIFTH
   |                                      | CLAIMS FOR RELIEF, PROPOSED
24 |                                      | ORDER*

25 |                                      | Hon. Otis D Wright, II

26 |                                      | Date:    October 18, 2010
   |                                      | Time:    1:30 p.m.
27

28 |                                      | Complaint Filed:    May 14. 2010

58883.1

DECLARATION OF NICHOLAS F. DAUM IN SUPPORT OF REPLY IN SUPPORT OF MOTION TO STRIKE
PURSUANT TO CALIFORNIA'S ANTI-SLAPP LAW (CAL. CODE CIV. PROC. § 425,16)

## DECLARATION OF NICHOLAS F. DAUM

I, Nicholas F. Daum, declare as follows:

1.    I am an attorney at the law firm of Kendall Brill & Klieger LLP, counsel of record for Defendants Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC, and IPW, LLC in the above-captioned action.  I am a member in good standing of the State Bar of California and am admitted to practice before this Court.  Except where otherwise stated, I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.    Attached hereto as Exhibit A is a true and correct copy of the March 26, 2007, Declaration of Wayne M. Smith is Support of Defendants' Motion to Compel Production of Whistle Blower Documents, filed in *Joanne Siegel et al. v. Warner Bros. Entertainment Inc., et al.,* USDC Case No. CV-04-8400-SGL (RZx) and *Joanne Siegel et al. v. Warner Bros. Entertainment Inc., et al.*, USDC Case No. CV 04-08776-SGL (RZx) (together, the "*Siegel* Litigation").

3.    Attached hereto as Exhibit B is a true and correct copy the May 9, 2002, letter from Joanne Siegel to Richard Parsons, which is authenticated in the deposition excerpts attached as Exhibits K, M to the September 20, 2010, Declaration of Nicholas F. Daum in Support of Motion to Strike Plaintiff's State Law Causes of Action Pursuant to California's Anti-Slapp Law (Cal. Code Civ. Proc. § 425.16) (Siegel Depo. 32:18-23; Larson Depo. 133:19-134:10).

4.    Attached hereto as Exhibit C is a true and correct copy of the May 12, 2005, letter from Marc Toberoff to Patrick T. Perkins.

5.    Attached hereto as Exhibit D is a true and correct copy of the January 24, 2006, Declaration of John M. Gatti in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Adjudication, and Exhibits H, J, K thereto, filed in *Ladd et al v. Warner Bros. Entertainment Inc., et al.,* LASC Case No. BC300043.

**Kendall Brill & Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

58883.1

1

DECLARATION OF NICHOLAS F. DAUM IN SUPPORT OF REPLY IN SUPPORT OF MOTION TO STRIKE PURSUANT TO CALIFORNIA'S ANTI-SLAPP LAW (CAL. CODE CIV. PROC. § 425,16)

6.      Attached hereto as Exhibit E is a true and correct copy of excerpts of the November 17, 2006, Deposition of Marc Toberoff in the *Siegel* Litigation.

7.      Attached hereto as Exhibit F is a true and correct copy of excerpts of the August 2, 2006, Deposition of Joanne Siegel in the *Siegel* Litigation.

8.      Attached hereto as Exhibit G is a true and correct copy of excerpts of the August 1, 2006, Deposition of Laura Siegel Larson in the *Siegel* Litigation.

9.      Attached hereto as Exhibit H is a true and correct copy of excerpts of the October 7, 2006, Deposition of Kevin Marks in the *Siegel* Litigation ("Marks Depo.").

10.      Excerpts of the above listed deposition transcripts are also attached to the September 20, 2010, Declaration of Nicholas F. Daum in Support of Motion to Strike Plaintiff's State Law Causes of Action Pursuant to California's Anti-Slapp Law (Cal. Code Civ. Proc. § 425.16).  The excerpts attached hereto as Exhibits E-H are being provided for the Court's convenience.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed October 4, 2010, at Los Angeles, California.

_____
Nicholas F Daum

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

58883.1

2

DECLARATION OF NICHOLAS F. DAUM IN SUPPORT OF REPLY IN SUPPORT OF MOTION TO STRIKE
PURSUANT TO CALIFORNIA'S ANTI-SLAPP LAW (CAL. CODE CIV. PROC. § 425,16)

# EXHIBIT A

1  WEISSMANN WOLFF BERGMAN
      COLEMAN GRODIN & EVALL LLP
2  Michael Bergman (SBN 37797)
   Anjani Mandavia (SBN 94092)
3  Adam Hagen (SBN 218021)
   9665 Wilshire Boulevard, Ninth Floor
4  Beverly Hills, California 90212
   Telephone: (310) 858-7888
5  Fax: (310) 550-7191

6  FROSS ZELNICK LEHRMAN & ZISSU, P.C.
   Roger L. Zissu (Admitted *pro hac vice*)
7  James D. Weinberger (Admitted *pro hac vice*)
   866 United Nations Plaza
8  New York, New York 10017
   Telephone: (212) 813-5900
9  Fax: (212) 813-5901

10 PERKINS LAW OFFICE, P.C.
   Patrick T. Perkins (Admitted *pro hac vice*)
11 1711 Route 9D
   Cold Spring, New York 10516
12 Telephone: (845) 265-2820
   Fax: (845) 265-2819

13

14 Attorneys for Defendants and Counterclaimant

15            **UNITED STATES DISTRICT COURT**

16           **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 17 JOANNE SIEGEL and LAURA SIEGEL LARSON,<br>18        Plaintiffs,<br>19        vs.<br>20 WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; DC COMICS; and DOES 1-10,<br>21        Defendants. | Case Nos. [Consolidated for Discovery]:<br>    CV 04-8400 SGL (RZx)<br>    CV 04-8776 SGL (RZx)<br>Hon. Steven G. Larson, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J. |
| 22 JOANNE SIEGEL and LAURA SIEGEL LARSON,<br>23        Plaintiffs,<br>        vs.<br>24 TIME WARNER INC.; WARNER COMMUNICATIONS INC.; WARNER<br>25 BROS. ENTERTAINMENT INC.; WARNER BROS. TELEVISION<br>26 PRODUCTION INC.; DC COMICS; and DOES 1-10,<br>27        Defendants.<br>28 AND RELATED COUNTERCLAIMS | **DECLARATION OF WAYNE M. SMITH IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL PRODUCTION OF WHISTLE-BLOWER DOCUMENTS**<br><br>**DISCOVERY MATTER LOCAL RULE 37**<br><br>Time: 10:00 a.m.<br>Date: April 16, 2007<br>Courtroom: 540<br>Mag. Judge Ralph Zarefsky<br>Discovery Cutoff: Nov. 17, 2006 |

{F0010672.3 }

1   I, Wayne M. Smith, declare and state as follows:

2   1. I am an attorney, admitted to practice before the Supreme Court of the

3 State of California and before this Court, and am employed by defendant Warner

4 Bros. Entertainment Inc. ("Warner Bros.") as Vice President, Senior Litigation and

5 Chief Patent Counsel. I submit this declaration in support of Defendants' Motion to

6 Compel Production of Whistle-blower Documents. I have personal knowledge of

7 the facts contained within this declaration, and, if called upon as a witness, I could

8 and would testify competently thereto.

9   2. During the afternoon of June 28, 2006, I received a telephone call from

10 John A. Schulman, General Counsel of Warner Bros., who asked that I come to his

11 office. Upon arriving at his office, Mr. Schulman advised me that a set of

12 documents (the "Superman Documents") addressed to him and apparently relating

13 to the Siegel litigation had arrived from an anonymous source at his office that day.

14 Mr. Schulman informed me that the cover letter contained with the documents

15 indicated that other executives at Warner Bros. may have received the same set of

16 documents, and that he had called the offices of those executives to see if they had

17 received anything. He further advised me that he had asked those executives to send

18 the documents to his office without reviewing them, and that one set of documents

19 had already been delivered to him. Mr. Schulman handed me the stack

20 (approximately an inch high) of Superman Documents that he had received and

21 asked me to wait outside his office while he completed a meeting, after which we

22 would discuss them. The stack did not include any envelope or packaging in which

23 the documents may have arrived. This was not unusual as it has been my experience

24 that the practice of Mr. Schulman's office staff is to dispose of envelopes and

25 packaging upon opening mail.

26   3. While I was waiting, I looked at what might be characterized as the

27 "cover letter" that came with the Superman Documents. The cover letter, which

28

{F0010672.3 }

1

1  was not signed, alleged various types of ethical misconduct on the part of the

2  Plaintiffs' counsel in connection with the Siegel litigations. The cover letter also

3  asserted ethical misconduct – violating the terms of a confidentiality agreement by

4  leaking settlement information to the press – in connection with another litigated

5  matter where Plaintiffs' counsel had also represented a party adverse to Warner

6  Bros. The letter appeared designed to right wrongs caused by Plaintiffs' counsel's

7  misconduct. The letter also referenced the documents enclosed, providing an

8  overview of their contents and their connection to Plaintiffs' counsel's alleged

9  wrongdoing. I also thumbed through the Superman Documents contained with the

10 letter, but did not read any of them in detail. Meanwhile, an assistant for another

11 Warner Bros. executive delivered what appeared to be another set of Superman

12 Documents to Mr. Schulman's office. I did not observe that any of the three sets of

13 Superman Documents – (i) the set Mr. Schulman handed to me; (ii) the other set in

14 his office; or (iii) the set that was delivered while I was waiting outside his office –

15 was contained in an envelope or other packaging.

16        4.    I then met with Mr. Schulman. I told Mr. Schulman that based on the

17 contents of the cover letter and my brief thumbing through the documents, it

18 appeared that certain of the documents in the package were privileged. I said that

19 before I looked at the documents I wanted to review the case law in the area to

20 determine what level of review, if any, of the Superman Documents was

21 appropriate. Mr. Schulman agreed with this approach, gave me one set of the

22 documents, retained the other two sets that he had received, and advised me that he

23 had only looked at the cover letter that came with the documents and would not

24 review the documents at all.

25        5.    I returned to my office with the set of documents. I initially went on

26 the internet and performed a Google search relating to the issue of what obligations,

27 if any, governed the handling of the Superman Documents we had received. My

28 initial search located an article from the June 2006 Los Angeles Lawyer magazine

1   entitled "On the Receiving End," by Kurt L. Schmalz (a true and correct copy of

2   which is attached as Exhibit "A" hereto) which was posted on the Los Angeles

3   County Bar Association web site.  The article concerns the obligations of lawyers

4   who unwittingly receive privileged documents from opposing counsel's files and

5   discusses various California cases that have dealt with the issue, including the *Rico*

6   *v. Mitsubishi Motors Corporation* case pending before the California Supreme

7   Court.

8         6.      I read the Schmalz article and then downloaded and studied the three

9   principal California cases it identifies:  *Aerojet-General Corporation v. Transport*

10  *Indemnity Insurance*, 18 Cal.App.4th 996 (1993), *State Compensation Insurance*

11  *Fund v. WPS, Inc. (State Fund)*, 70 Cal.App.4th 644 (1999) and the Court of Appeal

12  decision in the case under review, *Rico v. Mitsubishi Motors Corporation*, 116

13  Cal.App.4th 51 (2004) (*review granted* June 9, 2004).  Based on my review of the

14  relevant California authorities, it appeared that a conservative approach to handling

15  the Superman Documents was to follow the procedure laid out by the Court in *State*

16  *Fund*, specifically:  (i) to review each document but to cease the review once it

17  became apparent that the document was privileged; (ii) to contact opposing counsel

18  and advise that the documents have been received; and (iii) to refrain from using any

19  information in the documents until there was either an agreement with opposing

20  counsel, or the court had determined the documents' disposition.

21        7.      Following my review of the law, I called Mr. Schulman and advised

22  him of the results of my research.  I said that I intended to review the Superman

23  Documents in accordance with *State Fund*.  At Mr. Schulman's request I also sent

24  copies of the three key cases and the article to Mr. Schulman's office.

25        8.      That evening, I took the Superman Documents home with me and spent

26  approximately a half hour reviewing them.  Certain of the documents – such as

27  executed agreements relating to Superman and correspondence between the

28  Plaintiffs and non-lawyer third parties – did not appear subject to any applicable

{F0010672.1 }

1    privilege.  As I was going through the documents I placed them into three piles:  (i)

2    "non-privileged," (ii) "privileged," and (iii) "?" (where either I could not tell

3    whether it was privileged or I believed the document covered subject matter where

4    privilege may have been waived in the case, as explained below).  In reviewing each

5    document, where it first appeared to me that it was entirely privileged, I ceased

6    reading it, placed the document in the "privileged" pile and did not look at it further.

7    After going through the documents, I placed a post-it note on the top of each pile

8    (indicating "privileged," "non-privileged," or "?"), and fastened each pile together.

9    I did not look at the documents further.  Because I did not conduct a detailed review

10    of the Superman Documents, and because of the passage of time, I do not recall

11    their specific contents.  I do, however, recall generally the subject matter of certain

12    of the documents.

13          9.        The non-privileged pile was the second largest of the three.  It

14    contained what appeared to be agreements between, *inter alia*, the Siegels and/or

15    Shusters and various entities, as well as correspondence concerning the interest in

16    Superman that might be owned by Plaintiff Laura Siegel's estranged step-brother,

17    Michael Siegel.  To my knowledge, this last category of documents has never been

18    produced in the litigation.

19          10.       The "?" pile was the smallest.  I believe that one or two of the

20    documents in this category potentially fall within the scope of a privilege waiver

21    based Plaintiffs' reliance on an affirmative defense that their predecessor counsel

22    did not have authority to accept a settlement proposal made by Defendants.

23    Defendants position on this privilege waiver is the subject of a separate Motion to

24    Compel filed concurrently herewith.

25          11.       The pile of documents I labeled "privileged" was the largest.

26          12.       Even from the brief review made, it appeared to me that, with the

27    exception of the cover letter (which also addressed the other litigation involving

28    Plaintiffs' counsel), all of the Superman Documents related to the subject matter of

1  the instant litigation and were responsive to document requests the Defendants had

2  previously served on Plaintiffs. However, it did not appear to me at the time that

3  any of the "non-privileged" documents had been produced in the litigation.

4  Moreover, at least some (and perhaps virtually all) of the privileged documents, as

5  well as those in the "?" pile, were, to the best of my knowledge, never identified in

6  any privilege log served by the Plaintiffs.

7      13.    The next morning, June 29, 2006, I returned with the Superman

8  Documents to see Mr. Schulman in his office. Mr. Schulman and I discussed having

9  a neutral third party hold the documents pending either the parties' agreement as to

10 their disposition or order of the Court. We decided to ask John Quinn, then with

11 Arnold & Porter, and former president of the Los Angeles County Bar Association,

12 to act as the neutral based on his reputation and legal ethics experience. He agreed

13 and the following morning, June 30, 2006, the three sets of the Superman

14 Documents, including the set that I had categorized, were handed over to Mr. Quinn.

15 Out of an abundance of caution we handed over *all* the documents to Mr. Quinn, not

16 just those that were clearly or potentially privileged. Further, we have not shared

17 the contents of the Superman Documents with any of the outside counsel

18 representing the Defendants in this action, nor have we used the contents of the

19 documents in the litigation.

20     I declare under penalty of perjury of the laws of the United States of America

21 that the foregoing is true and correct.

22     Dated this 26ᵗʰ day of March 2007 at Burbank, California.

23

24

25                                    Wayne M. Smith

26

27

28

# EXHIBIT B

818 954 4768     P.02

**JOANNE SIEGEL**
13929 Marquesas Way #201-A
Marina Del Rey, CA 90292
(310) 821-5894
May 9, 2002

Richard D. Parsons
Co-Chief Operating Officer
AOL Time Warner Inc.
75 Rockefeller Plaza
New York, New York 10019

Dear Dick,

I am Joanne Siegel, widow of Superman's creator Jerry Siegel. In 1997, as Jerry's heirs, our daughter Laura and I had the unique opportunity to regain Jerry's share of the Superman copyright.

With the assistance of three attorneys, two of them copyright specialists, Laura and I successfully terminated Jerry's seven grants and our Washington, DC copyright expert sent out the Notices of Termination then filed our copyright for Superman in a timely manner. For years we had a friendly relationship with the D C Comics people and were on very friendly terms with Jerry Levin. We remained friends after the terminations were filed. They knew that we acted not out of malice but were exercising our rights granted by the U. S. Congress. Because Joe Shuster, Superman's artist, had no surviving spouse or children, his rights were not terminated but are held by D C Comics.

Every step in the termination process, the filing, the timing, were carefully researched, checked and rechecked with knowledgeable attorneys on both coasts before going ahead. We then hired two additional Beverly Hills entertainment attorneys as our negotiators. Negotiations dragged on for four difficult years. We made painful concessions assured if we did we would arrive at an agreement. When we made those difficult concessions and reluctantly accepted John Schulman's last proposal six months ago, we were stabbed in the back with a shocking contract.

Your company's unconscionable contract dated February 4, 2002 contained new, outrageous demands that were not in the proposal. The document is a heartless attempt to rewrite the history of Superman's creation and to strip Laura and me of the dignity and respect that we deserve. It attempts to discredit my late husband, Jerry Siegel, whose creations the company and its predecessors have greedily cashed in on for more than sixty four years.

Page 1

RECEIVED
MAY 1 0 2002
RICHARD D. PARSONS

GTRB 0475



That contract was sent to us three months ago. The company may think its representatives are very clever but with that contract they have sunk not only themselves and the company but you, Jerry Levin and Steve Case down to a very low level.

Granted, Jerry gave us an advance two years ago which while very much appreciated, was of short term help. But we are owed more than three years of profits accounting on Superman and related properties which has not been paid. In addition, my disabled daughter still has not received the medical coverage she and her children were promised several years ago.

As for the contract, your representatives surely know that we would never do the unethical things demanded by them. For your representatives to condition our receiving financial compensation for our rights on demands which were not in the proposal we accepted, is deceitful.

After more than half a century of D C Comics and its predecessors enjoying huge profits from my late husband's creations, while we lived in poverty for many of those years, the company is not satisfied. The beast hungers for more. Just like the Gestapo, your company wants to strip us naked of our legal rights. Is that moral? Does that contract demonstrate the company's true "core values" as stated in the Stockholders Annual Report? What about the "social responsibility" that's supposed to be the mission of the company's Values and Human Development Committee on which you serve? Is it all a lie to the stockholders and the public?

It is to the everlasting shame of everyone in leadership roles at the company that they allowed that disgraceful contract to be sent to us. There was no concern for the suffering it would cause Jerry Siegel's widow and his ailing, impoverished daughter.

This contract shows AOL Time Warner and D C Comics to be a greedy corporation without morals, ready to allow its representatives to commit an inhumane act. Are your representatives afraid if we are treated fairly other comics creators or their heirs will also want to be treated fairly in the future? Isn't it about time? Shouldn't everyone be treated fairly? Or is that not "good business" in this company?

I had hoped that Laura's and my good relationships with Jerry Levin and D C Comics would continue after we reached an agreement. When my husband died, Jerry Levin told me that my daughter and I were part of the Time Warner family, part of the company's history. They were beautiful words we appreciated. Another time, in a letter to me, he talked about honoring Jerry because of his huge

Page 2

GTRB 0476

contribution to the company. It sounded sincere. But this contract seeks to discredit Jerry Siegel and to undermine our rights, a direct contradiction to what was said.

After four years we have no deal and this contract makes an agreement impossible. Have you been aware that your representatives have gone too far? If not, you do now. They have shown you and your company in the worst possible light. Is that the reputation you want?

*Joanne Siegel*

Page 3

GTRB 0477

TOTAL P.04

# EXHIBIT C

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON

* ALSO ADMITTED IN NEW YORK

1999 AVENUE OF THE STARS, SUITE 1540
LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

**CONFIDENTIAL COMMUNICATION
FOR SETTLEMENT PURPOSES ONLY**

May 12, 2005

<u>Via Facsimile and US Mail</u>

Patrick T. Perkins
Fross Zelnick Lehrman & Zissu, P.C.
866 United Nations Plaza
New York, NY 10017

**Re: Superman / Estate of Joseph Shuster / Mark Warren Peary**

Dear Patrick:

On behalf of our clients, Warren Peary, the personal representative of the Estate of
Joseph Shuster ("Estate") and Jean Adele Peavy, this is to respond to the buy-out
proposal dated April 28, 2005 which DC Comics ("DC") sent directly to them.

While our clients certainly do appreciate DC's efforts, they are passing on DC's offer. It
is believed that the offer is extremely low and bears no relation to the net present value of
the Estate's 50% interest in *Superman* profits for the duration of copyright, commencing
2013. Nor does DC's offer reflect the considerable strategic value of the Estate's 50%
copyright interest in tandem with the Siegel's 50% copyright interest in *Superman*.

One need only to look at DC/Warner Bros.' full-blown plans to reinvigorate *Superman* as
a billion dollar film, television and merchandising franchise and to Marvel's $2.2 billion
market capitalization to understand how DC's $2 million proposal bears little or no
relation to the marketplace and the economic realities of this world famous property.

Given your firm's prior letter on DC's behalf denying our clients' termination interests
without legal grounds, my clients have requested that any further communications to
them be made through our law firm and not to them directly.

The foregoing is without prejudice to any of our clients' rights, remedies, claims or
positions at law or in equity, all of which are hereby expressly reserved.

Very truly yours,

Marc Toberoff

EXHIBIT
Shuster 11
DEAN
& ASSOCIATES

cc: Warren Peary and Jean Peavy

EXHIBIT C
Page 12

109

# EXHIBIT D

1   GREENBERG TRAURIG, LLP
      John M. Gatti (SBN 138492)
2     John J. Lucas (SBN 216236)
    2450 Colorado Avenue, Suite 400E
3   Santa Monica, California 90404
    Telephone: (310) 586-7700
4   Facsimile: (310) 586-7800
5   Attorneys for Plaintiffs Alan Ladd, Jr.,
    Jay Kanter, L-K Producers Corporation,
6   Ketram Corporation, and Kanter Corporation
7

**FILED**
LOS ANGELES SUPERIOR COURT

JAN 2 5 2006

JOHN A. CLARKE, CLERK

BY L. ZULUETA, DEPUTY

8             SUPERIOR COURT OF THE STATE OF CALIFORNIA
9         FOR THE COUNTY OF LOS ANGELES – CENTRAL DISTRICT
10

11   ALAN LADD, JR., an individual; JAY
     KANTER, an individual; L-K
12   PRODUCERS CORPORATION, a
     California corporation; KETRAM
13   CORPORATION, a California corporation;
     and KANTER CORPORATION, a
14   California corporation,
15
16              Plaintiffs,
17   vs.
18   WARNER BROS. ENTERTAINMENT
     INC., a Delaware corporation; TIME
19   WARNER INC., a Delaware corporation;
     and DOES 1 through 20, inclusive,
20
21              Defendants.
22
23
24
25
26
27   ///
28   ///

Case No. BC 300043

[Assigned to the Honorable Mary Ann Murphy,
Dept 25]

**DECLARATION OF JOHN M. GATTI IN
SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY
ADJUDICATION**

*[Plaintiffs' Opposition to Defendant's Motion
for Summary Adjudication; Plaintiffs'
Response To Warner Bros. Entertainment
Inc.'s Statement Of Undisputed Material
Facts And Plaintiffs' Additional Statement Of
Disputed Facts; Appendix of non-California
Authorities; Declaration of David L. Simon
submitted concurrently herewith]*

DATE:       February 7, 2006
TIME:       8:30 a.m.
DEPT:       25

DATE ACTION FILED:       07/31/03

LA 153448647v9 170006.010200
DECLARATION OF JOHN M. GATTI IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION

EXHIBIT D    Page 13

## DECLARATION OF JOHN M. GATTI

I, John M. Gatti, declare and state as follows:

1.      I am an attorney at law duly licensed to practice in the State of California and am an shareholder in the law firm of Greenberg Traurig, LLP, counsel of record for Plaintiffs Alan Ladd, Jr., Jay Kanter, L-K Producers Corporation, Ketram Corporation, and Kanter Corporation (collectively "Plaintiffs"). I submit this Declaration in support of Plaintiffs' Opposition to Defendant's Motion for Summary Adjudication. I am competent to testify as to the truth of the matters set forth herein and I could and would competently testify thereto from my own personal knowledge.

2.      Attached hereto as Exhibit A is a true and correct copy of documents produced by Warner Bros. ("WB"), bearing the Bates numbers WB 2554-60. It is a license agreement between WB and Turner, in which WB "added" 106 out of 182 titles to the deal. Turner is a sister company of WB, both of which are owned by Time Warner, Inc.

3.      Attached hereto as Exhibit B is a true and correct copy of documents produced by HBO at deposition in this case, bearing the Bates numbers 000011- 00013. It is a license agreement between WB and HBO, in which WB "added" 205 out of 643 titles to the deal.

4.      Attached hereto as Exhibit C is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 7932-38. It is an internal memo describing the pre-set "Volume" packages of films that WB uses to sell to buyers.

5.      Attached hereto as Exhibit D is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 7654-64. It is an internal memo describing the pre-set "Volume" packages of films that WB uses to sell to buyers.

6.      Attached hereto as Exhibit E is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 1717-19. It is an internal memo summarizing a license agreement between WB and Bravo, wherein each of the films have the exact same per-film license fee of $50,000.

7.      Attached hereto as Exhibit F is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 1932-34. It is an internal memo summarizing a license agreement between WB and FX Networks, wherein all but two (2) of the films have the exact same per-film license fee of $21,500.

DECLARATION OF JOHN M. GATTI IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY ADJUDICATION
EXHIBIT D    Page 14

8.     Attached hereto as Exhibit G is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 9900-09.  It is an international license agreement between WB and Paris Premiere, wherein all of the films have the exact same per-film license fee of $50,000 French Francs.

9.     Attached hereto as Exhibit H is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 9211-46.  It is an internal memo summarizing an international license agreement between WB and Nine Television, Australia, wherein all of the films have the exact same per-film license fee of $30,000.

10.     Attached hereto as Exhibit I is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 9954-62.  It is an international license agreement between WB and Telerey S.A. de C.V., wherein all of the films have the exact same per-film license fee of just $4,500.

11.     Attached hereto as Exhibit J is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 6902-22.  It is an international license agreement between WB and Turner Entertainment Networks International Limited, wherein all of the 121 films have the exact same per-film license fee of $35,000 in French Francs.

12.     Attached hereto as Exhibit K is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 10011-23.  It is an international license agreement between WB and Wharf Cable Ltd., wherein all of the films have the exact same per-film license fee of just $4,500.

13.     Attached hereto as Exhibit L is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 1610-11.  It is an individual license agreement between WB and USA Networks for the motion picture "Blade Runner" for $3,750,000.00.

14.     Attached hereto as Exhibit M is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 8735-41.  It is an international license agreement between WB and Canal Jimmy for a package of motion pictures, including "Blade Runner" for only $38,000.00 each in French Francs.

15.     Attached hereto as Exhibit N is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 9963-65.  It is an international license agreement between WB and Television Espanola, S.A. for a package of four (4) motion pictures, including "Police Academy" and "Police Academy 2:  Their First Assignment," each of which was licensed for $900,000.00.



16.    Attached hereto as Exhibit O is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 9949-53. It is an international license agreement between WB and Superchannel Ltd. for a package of fifty (50) motion pictures, including "Police Academy" and "Police Academy 2: Their First Assignment," each of which was licensed for only $2,500.00.

17.    Attached hereto as Exhibit P is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 2895-98. It is a cover letter and a license agreement between WB and Encore from 1996 that lists the aggregate license fees for the entire package of films in the deal, and states that "individual license fees will be forthcoming."

18.    Attached hereto as Exhibit Q is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 2941-43. It is a license agreement between WB and Encore from 1993 that lists the aggregate license fees for the entire package of films in the deal, and states that "WARNER BROS. will advise Encore of the exact per motion picture license fees at a later date."

19.    Attached hereto as Exhibit R is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 6864-75. It is a license agreement between WB and Tohokushinsha Film Corporation from September of 2002 that garnered WB more than $76,000,000.00 from the deal.

20.    Attached hereto as Exhibit S is a true and correct copy of documents produced by WB, bearing the Bates numbers LK 0282-0316. It is the May 6, 2002 audit report prepared by James Perry, C.P.A., of Hacker Douglas & Company LLP, Certified Public Accountants. On page nine of the documents (Bates number LK 0294), Mr. Perry enumerates the losses Plaintiffs' had sustained through May of 2002, due to Defendants' selling methods.

21.    Attached hereto as Exhibit T is a true and correct copy of excerpts from the "rough" transcript of the deposition of Michael Edwards, which took place on Tuesday, January 17, 2006.

22.    Attached hereto as Exhibit U is a true and correct copy of excerpts from the "rough" transcript of the deposition of Eric Frankel, which took place on Wednesday, January 18, 2006.

23.    Attached hereto as Exhibit V is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 1428-37. It is a license agreement between WB and Turner Broadcasting Systems, Inc. from June of 1995.

/ / /

DECLARATION OF JOHN M. GATTI IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION
EXHIBIT D    Page 16



24.    Attached hereto as Exhibit W is a true and correct copy of excerpts from the transcript of the deposition of Leslie Cohen, which took place on August 10 and 11, 2004.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 24th day of January 2006, at Santa Monica, California.

_____
John M. Gatti

DECLARATION OF JOHN M. GATTI IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY ADJUDICATION
EXHIBIT D    Page 17



WARNER BROS.
INTERNATIONAL
TELEVISION
DISTRIBUTION

## Inter-Office Memo

| To: | SUSIE FUNG | From | MONICA I. FIGUEIRA | Ext.: |
|---|---|---|---|---|
| Subject: | Licensee Nbr.: 050660 – NINE TELEVISION, AUSTRALIA | | | |
| Date: | November 26, 1991 | Copies to: | Those listed below | |

Enclosed please find your copies of the following fully executed Agreements.

| CONTRACT NO. | DATED | PRODUCT | AMOUNT |
|---|---|---|---|
| F028850 | 08/08/91 | WORLD ENT. REPORT | US$ 780,000 |
| F020090 | 04/30/91 | 34 FEATURES | US$12,750,000 |
| F020210 | 04/30/91 | 2 FEATURES | US$ 750,000 |
| F024620 | 07/23/91 | 14 FEATURES | US$ 1,540,000 |
| F020240 | 05/06/91 | 50 FEATURES | US$ 1,500,000 |
| F028500 | 07/29/91 | CARTOONS | US$ 364,572 |
| F029880 | 09/05/91 | UNDER COVER | US$ 334,026 |

Best regards,

Monica I. Figueira

Encl.
xc:
Australia sales office
B. Adamson
Files

NOV 2 6 1991

Ex H

WB 9211
CONFIDENTIAL






**WARNER BROS. (AUSTRALIA), PTY., LTD.**
LEVEL 22, 8-20 NAPIER STREET
NORTH SYDNEY, N.S.W., 2060, AUSTRALIA.

5800/PA2192

| CONTRACT NO. | PAGE 1 |
|---|---|
| F020240 | |

DATE   MAY 06, 1991

SALES REPRESENTATIVE
WAYNE BROUN

REFERENCE NO.   WBA2749

## INTERNATIONAL FREE TELEVISION LICENSE AGREEMENT

Subject to timely payment of the Total License Fee and due performance of all other provisions of this Agreement, Warner licenses solely to the Licensee named below, and Licensee licenses from Warner, the following Programs on the following terms and conditions:

LICENSEE
NINE TELEVISION PTY. LTD.

| ADDRESS 24 Artarmon Road, | LICENSED TERRITORY AUSTRALIA | |
|---|---|---|

| CITY & COUNTRY Willoughby, NSW, 2068 AUSTRALIA. | LICENSED STATION SEE SCHED. "A" | LICENSED LANGUAGE ENGLISH |
|---|---|---|

| PROGRAM TITLE(S) SEE SCHEDULE A | | PROGRAM(S) DURATION N/A |
|---|---|---|

| FIRST RUN N/A | RERUNS 50 | TELECASTS/REPEATS N/A | RUNS 4 | START DATE SEE SCHEDULE A | END DATE SEE SCHEDULE A |
|---|---|---|---|---|---|

| NO. OF EPISODES/TELECASTS/TITLES/HOURS 50 | LICENSE FEE US$30,000.00 | PER TITLE | TOTAL LICENSE FEE US$1,500,000.00 |
|---|---|---|---|

PAYMENT TERMS AND INVOICING INSTRUCTIONS
TO BE PAYABLE IN TEN (10) EQUAL CONSECUTIVE QUARTERLY PAYMENTS OF
US$150,000.00 EACH, COMMENCING ON JUNE 1, 1991. PAYMENTS TO BE MADE
DIRECTLY IN UNITED STATES DOLLARS TO THE AUSTRALIA AND NEW ZEALAND
BANKING GROUP LIMITED, NOTH SYDNEY, FOR DEPOSIT TO "PRIVATE U.S.
DOLLAR FOREIGN CURRENCY ACCOUNT, WARNER BROS. (AUSTRALIA) PTY.
LIMITED, ACCOUNT NUMBER 405-100" ON OR BEFORE THE DUE DATE OF
EACH RESPECTIVE INSTALLMENT.

| MATERIALS 1" 625 PAL VIDEOTAPE | MATERIALS CHARGE ON LOAN | MATERIALS TO TAPES AND PUBLICITY TO BE SUPPLIED BY WB SYDNEY OFFICE. |
|---|---|---|

| MATERIALS PAYMENT TERMS N/A | PROMO & SCRIPT TO MS. SUE WARD ABOVE ADDRESS |
|---|---|

When executed by Licensee and an authorized officer of Warner, this will constitute a binding Agreement. If Licensee's execution is by an agent, such agent represents and warrants that it is duly authorized to execute this Agreement.

THIS AGREEMENT INCLUDES ALL THE TERMS AND CONDITIONS, SCHEDULES AND EXHIBITS ATTACHED HERETO.

ACCEPTED

LICENSEE BY:

_____
SIGNATURE

_____
(PRINT OR TYPE NAME & TITLE)

WARNER BY:

_____
SIGNATURE

**WB 9212**
**CONFIDENTIAL**

AUSTRALIA

F020240
PAGE 2

SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM US DOLLARS | TOTAL LICENSE FEE US DOLLARS |
|---|---|---|---|---|---|
| ABOUT FACE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| BACKFIRE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| HEARTBEAT (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| BIG JIM MC LAIN (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| BLACK GOLD (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| BLADE RUNNER (RR) | NOV 01,1991-OCT 30,1996 | | 1 | 30,000.00 | 30,000.00 |
| BURNING HILLS, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| COOL ONES, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| CROOKED ROAD, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| D.I., THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| DOC SAVAGE...MAN OF BRONZE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| WHATS UP DOC? (RR) | FEB 01,1992-JAN 31,1997 | | 1 | 30,000.00 | 30,000.00 |
| HELL BENT FOR GLORY (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| INCREDIBLE MR. LIMPET, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| ISLAND OF LOVE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| JET OVER THE ATLANTIC (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| JUMP INTO HELL (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| JOHNNY TROUBLE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |



**WB 9213**
**CONFIDENTIAL**

AUSTRALIA

F020240
PAGE 3

SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM US DOLLARS | TOTAL LICENSE FEE US DOLLARS |
|---|---|---|---|---|---|
| LOST BOUNDARIES (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| LULLABY OF BROADWAY (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| MACOMBER AFFAIR, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| MAD MAX 2 (ROAD WARRIOR, THE) (RR) | SEP 29,1991-SEP 28,1996 | | 1 | 30,000.00 | 30,000.00 |
| MILLIONAIRE FOR CHRISTY (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| NATIONAL LAMPOON'S VACATION (RR) | JUL 01,1992-JUN 30,1997 | | 1 | 30,000.00 | 30,000.00 |
| NIGHT SHIFT (RR) | FEB 01,1992-JAN 31,1997 | | 1 | 30,000.00 | 30,000.00 |
| WORLD ACCORDING TO GARP (RR) | FEB 01,1992-JAN 31,1997 | | 1 | 30,000.00 | 30,000.00 |
| OPERATION SECRET (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| OUR MISS BROOKS (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PAINTING THE CLOUDS WITH SUNSHINE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PHYNX, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PRETTY BABY (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PRINCE OF THE CITY (RR) | AUG 01,1991-JUL 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PROMISES IN THE DARK (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| RISKY BUSINESS (RR) | JUN 01,1992-MAY 31,1997 | | 1 | 30,000.00 | 30,000.00 |
| ROLLOVER (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| SHOOT-OUT AT MEDICINE BEND (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |

WB 9214
CONFIDENTIAL



AUSTRALIA

F020240
PAGE  4

SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM US DOLLARS | TOTAL LICENSE FEE US DOLLARS |
|---|---|---|---|---|---|
| SIMON (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| SO FINE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| SO THIS IS LOVE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| STARLIFT (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| STOP THE WORLD, I WANT TO GET OFF (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| STOP, YOU'RE KILLING ME (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| TARGET ZERO (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| TOWARD THE UNKNOWN (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| WALL OF NOISE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| WHATEVER HAPPENED TO BABY JANE? (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| WOLFEN (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| TANKS ARE COMING, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| GREAT GEORGIA BANK HOAX (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| MORTADELLA (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |

TOTALS                                                        1,500,000.00

WB 9215
CONFIDENTIAL

AUSTRALIA

F020240
PAGE  5

SCHEDULE "A"

1. LICENSED STATIONS.
   The broadcast territory includes all of Australia via one television
   station in each television market in Australia, as defined by the
   Australian Broadcasting Tribunal.

2. Notwithstanding anything contrary contained in clause first of the
   agreement to which this Schedule "A" is attached, LICENSEE shall have
   the right to broadcast the pictures by use of booster stations,
   translators and community antennaes, and LICENSEE shall be entitled
   to make simultaneous network transmissions by way of microwave links
   or land lines, provided, however, that such right and/or entitlement
   shall be limited only to those instances where the foregoing devices are
   required to improve reception of the main signal of the broadcast and do
   not increase the market or markets covered by this agreement and in no
   such case shall reception by such a broadcast be subject to the payment
   of any toll, license fee, subscription fee or other like consideration.

WB 9216
CONFIDENTIAL


INTERNATIONAL FREE TELEVISION LICENSE AGREEMENT
STANDARD TERMS AND CONDITIONS
(AUSTRALIA-WARNER BROS. (AUSTRALIA) PTY. LTD.)

These Standard Terms and Conditions (the "Conditions") supplement the
terms and conditions of the International Free Television License
Agreement to which the Conditions are attached (the "License
Agreement"). The License Agreement as supplemented by the Conditions
will be referred to hereinafter as the "Agreement." All capitalized
terms in the Conditions have the same meanings as in the License
Agreement unless otherwise defined.

1.    LICENSE

Subject to LICENSEE's paying the specified License Fees and LICENSEE's
performing all of its obligations under this Agreement, WARNER grants
LICENSEE a limited license under copyright to transmit, exhibit,
telecast, exploit or broadcast ("Transmit") the Program(s) over the
facilities of the Licensed Station during the License Period(s) of the
Program(s) (as defined below) in the Licensed Language in the Licensed
Territory on a television receiver without a charge being made to the
viewer for the privilege of viewing the program(s) ("Free Television
Reception"). This is not a license to Transmit or to authorize others
to Transmit any Program over the facilities of any other station or
booster station, satellites, translators, community antennae, network
simultaneous or delayed transmission, relay broadcasts or closed
circuits, unless otherwise agreed to in a separate schedule attached
hereto and made a part hereof. Under no circumstances may the Program
be Transmitted into any place where an admission price is charged or
the reception of the Program is subject to the payment of any fee,
subscription or other consideration, excluding any governmentally
imposed television receiver taxes, levies or charges.

2.    EXCLUSIVITY

During the License Period of any Program (see definition in paragraph 3
below), WARNER will not voluntarily license such Program for Free
Television Reception in the Licensed Language over any other television
station or cable television system whose originating television
transmitter or cable system is within the Licensed Territory. WARNER
does not grant exclusivity protection for any transmission, exhibition,
telecast, broadcast or exploitation ("Transmission") of the Program not
specified herein. In particular, but without limitation, WARNER does
not grant exclusivity protection for free home television reception
within the Licensed Territory in other than the Licensed Language,
Transmission (or re-Transmission) by satellite or cable systems or
broadcast signals originating outside the Licensed Territory or,
exploitation of the Program in any other medium.

1

WB 9217
CONFIDENTIAL

3.   LICENSE PERIOD AND TERM

     a.   The License period for a Program (the "License Period") will
begin on the date such Program first becomes available to LICENSEE as
specified in the License Agreement and end on the earlier of the End
Date specified in the License Agreement or the date of the last
licensed Transmission of such Program.

     b.   The term of this Agreement (the "Term") begins on the date of
the License Agreement and ends on the last End Date of any Program
licensed hereunder unless the last licensed Transmission of any Program
licensed hereunder occurs before the last End Date of any Program
licensed hereunder in which case the term ends upon the last licensed
Transmission of any Program licensed hereunder.

4.   PAYMENT OF LICENSE FEES

     a.   As used herein, the words "payment," "pay," "payable," "paid"
or words of similar meaning when applied to obligations of LICENSEE to
WARNER mean the actual receipt by WARNER, by the date payment is to be
made, in United States dollars in the amount specified herein without
offset or recoupment, of cash, a bank transfer of unencumbered,
immediately available funds to WARNER's account, the unconditional
clearance of a check or bank draft payable to WARNER and drawn on a
United States bank, or the draw down by WARNER of a previously approved
and existing letter of credit from a United States bank pursuant to the
terms thereof.  Payment in any other manner will not be deemed made to
WARNER until the amount of United States dollars due and payable has
been received and is available for expenditure by WARNER.  LICENSEE
bears the risk that payment in any other manner will not be deemed made
to WARNER within the time periods specified herein.

     b.   In its sole and absolute discretion, WARNER may accept funds
tendered to it by LICENSEE in a currency other than United States
dollars.  Such acceptance will not constitute a waiver of WARNER's
rights under paragraph 4.a.  Payment, therefore, will not be deemed to
have been made until WARNER has converted the non-U.S. currency, net of
all costs of conversion, to the amount of United States dollars due and
payable.  LICENSEE will bear all risks associated with the conversion
including delay, costs of conversion, fluctuations in the exchange rate
and WARNER's choice of currency exchange agent.  In the event that
WARNER converts the non-U.S. currency to an amount of United States
dollars, net of all costs of conversion, in excess of the License Fee
due and payable, WARNER may keep the excess without giving any credit
to LICENSEE's account for the excess.

     c.  LICENSEE will obtain all governmental permits necessary to
make all payments to WARNER required under this Agreement.  LICENSEE
also will pay without limitation every tax, levy or charge, however
denominated, imposed or levied against LICENSEE, WARNER or any Program
by any authority having jurisdiction over LICENSEE's use of any Program
other than a tax, levy or charge based on WARNER's net income.  Such
taxes, levies or charges include, without limitation, quotas, value

2

WB 9218
CONFIDENTIAL

added taxes, so-called "remittance" and withholding taxes, licenses,
"Contingents," turnover taxes, import permits and duties, and national,
state, county, city and other taxes, however denominated, relating to
or imposed upon the License Fee or any part thereof, the license or the
Transmission of any Program, any other amounts payable to WARNER,
negatives, prints or other Material, the storage or possession of any
Program or any Material, or the right or privilege to use the same in
connection with the Programs.  LICENSEE may deduct from the License Fee
payable to WARNER taxes which are levied on WARNER's License Fee and
paid to a government authority on WARNER's behalf, only if such taxes
are levied in accordance with the income tax laws of the government
authority to which the taxes are payable and such taxes are creditable
in the United States in accordance with the income tax laws of the
United States and if, after payment of such taxes, LICENSEE promptly
provides WARNER with an official tax receipt evidencing such payment on
WARNER's behalf, or, if this is not possible due to law or regulation,
LICENSEE provides a copy of said receipt to WARNER.

        d.    All License Fees are to be paid when due without regard to
delays in the date of Transmission of any Program because of late
delivery of Materials, the unavailability of Materials, a Force Majeure
Occurrence (see definition in paragraph 13 below), the extension of
this Agreement or WARNER's exercise of any of its rights under this
Agreement.  Timely payment is of the essence.  LICENSEE's failure to
make any payments when due will constitute a material default.

        e.    If a payment is to be made by LICENSEE to WARNER pursuant to
this Agreement and is not received by WARNER within ten (10) days of
its due date then WARNER is entitled, without prejudice to its other
rights and remedies, to require the payment of interest on the sum
overdue calculated from the due date until the date of actual payment
at a rate equal to the higher of two (2) percent per annum plus the
Westpac Banking Corporation indicator rate for overdrafts in excess of
A$100,000 quoted in Sydney from time to time during that period and two
(2) percent per annum over the then current advertised prime rate at
the First National Bank of Boston.  Interest, if required, will be
compounded monthly and will continue to be required, each month, on the
unpaid balance until all such amounts are paid.

        f.    If laws or currency regulations in the Licensed Territory now
or at any time during the term of the Agreement prohibit or restrict
LICENSEE from paying any sums due WARNER, LICENSEE will advise WARNER
promptly in writing.  In any such case, upon WARNER's request, LICENSEE
will deposit to WARNER's credit in a bank or banks approved in writing
by WARNER or promptly pay to such person or persons as WARNER may
designate in writing, all sums due WARNER.  LICENSEE also will
reimburse WARNER for any costs incurred by WARNER in remitting such
funds to the United States and/or converting such funds into United
States dollars.  If LICENSEE is prohibited or restricted from making
payment of any sums due WARNER, in addition to WARNER's other rights or
remedies, WARNER may cancel and terminate this Agreement upon written
notice to LICENSEE.

3

**WB 9219
CONFIDENTIAL**

5.    DELIVERY

a.    LICENSEE may obtain for use in accordance with the terms
hereof the Materials it requires if it pays WARNER the Materials
Charges specified in the License Agreement. LICENSEE may retain
possession of the Materials of a Program until the earlier of the
expiration of the License Period of such Program, the expiration of the
Term or the termination of this Agreement by any of its terms, at which
time LICENSEE will return, ship or dispose of the Materials in
accordance with paragraph 7 below.

b.    LICENSEE will Transmit only Materials of the Programs which
it has obtained directly from WARNER or directly from a source
authorized by WARNER (including another WARNER licensee) to deliver
Materials of the Programs to LICENSEE.

c.    LICENSEE will notify WARNER of the scheduled date of
Transmission of each Program at least sixty (60) days prior thereto.
If the Materials of the Program are available for Transmission on such
scheduled date, WARNER will arrange for delivery of the Materials to
LICENSEE by air, unless otherwise instructed, f.o.b. WARNER's place of
shipment. WARNER will not be responsible for delivery on less than
sixty (60) days' notice.

d.    LICENSEE will bear all costs of transportation, customs
duties, censorship fees and any and all other charges relating to the
shipment of the Materials into the Licensed Territory or from the
Licensed Territory to WARNER, and to the storage or use of the
Materials by LICENSEE in the Licensed Territory.

6.    INSPECTION OF MATERIALS

Immediately upon delivery of any Materials, LICENSEE will examine the
Materials to determine their technical acceptability for Transmission.
Unless WARNER is notified otherwise within five (5) business days of
delivery, all Materials will be deemed acceptable to LICENSEE. If
WARNER receives timely notice of a defect in the Materials, WARNER will
remedy such defect or substitute Materials of the same Program at no
additional cost. At WARNER's election, WARNER may exercise its rights
to withdraw or substitute pursuant to paragraph 19 below.

7.    RETURN, SHIPPING OR DISPOSITION

a.    LICENSEE agrees to return the Materials of a Program to
WARNER by air freight express to such destination as WARNER directs
within three (3) business days of its receipt of WARNER's instructions
but in no event later than the earlier of the expiration of the License
Period of the Program, the expiration of the Term or the termination of
this Agreement. Return or shipment of the Materials in accordance with
WARNER's instructions is of the essence. If LICENSEE and WARNER enter
into a written agreement that the Materials may be disposed of other
than by returning them to WARNER or shipping them to a destination
fixed by WARNER, LICENSEE may dispose of the Materials in accordance
with that agreement.

4

**WB 9220**
**CONFIDENTIAL**

b.   LICENSEE will return or ship all Materials in the same condition in which they were received, normal wear and tear excepted. If Materials are lost, stolen, destroyed or damaged between the time of delivery to LICENSEE and the receipt of the Materials by WARNER or its designee, LICENSEE will pay WARNER the latter's prevailing charge for replacement of the Materials.  Such payment will not, however, transfer to LICENSEE title to any Materials.

c.   When returning or shipping Materials of a Program, LICENSEE will return to WARNER or ship to its designee in accordance with paragraph 7.a, all dubbed sound tracks, subtitled or subtitling Material, and all optical and/or magnetic sound tracks and/or Materials containing optical and/or magnetic sound tracks which were manufactured by, for or at the request of LICENSEE in connection with the Program, whether or not LICENSEE used any of said Materials in connection with the exercise of its rights hereunder and whether or not LICENSEE incurred any of the costs of manufacture.

8.   TITLE

a.   Title in and to Materials of a Program provided to LICENSEE hereunder is vested and will remain in WARNER, and title in and to any Materials of a Program created by, for or at the request of LICENSEE and all rights therein, including copyrights and all neighboring and connecting rights, will vest and remain in WARNER upon the creation thereof, subject only to LICENSEE's possession and use until the earlier of the expiration of the License Period of the Program, the expiration of the Term or the termination of this Agreement solely so that LICENSEE may exercise its rights licensed hereunder.  As between WARNER and LICENSEE, all Materials will be deemed to have been loaned to LICENSEE whether or not LICENSEE paid any of the costs of manufacture.

b.   LICENSEE will execute, acknowledge and deliver to WARNER any instruments of transfer, conveyance or assignment in or to any Materials referred to in paragraph 8.a above which are necessary or desirable to evidence or effectuate WARNER's ownership of such Materials.  LICENSEE will also execute, acknowledge and deliver to WARNER any instruments of transfer, conveyance or assignment in or to any rights in Materials of a Program which are to vest and remain in WARNER pursuant to paragraph 8.a above which instruments are necessary or desirable to evidence or effectuate the vesting for as long as is permissible of such rights in WARNER.  If LICENSEE fails or refuses to execute, acknowledge or deliver any such instrument, then WARNER will be deemed to be, and LICENSEE hereby and irrevocably appoints WARNER, its true and lawful attorney-in-fact to execute and deliver all such instruments in LICENSEE's name or otherwise, acknowledging that such power is a power coupled with an interest.

9.   ALTERATION OF PROGRAMS

a.   LICENSEE will not change, alter, modify, copy, duplicate or add to any Program without WARNER's prior written consent.

5

WB 9221
CONFIDENTIAL

b.    Notwithstanding paragraph 9.a above, LICENSEE may make minor
cuts or alterations in order to conform to the orders of any duly
authorized, legally constituted censorship authority in the Licensed
Territory if LICENSEE immediately notifies WARNER in writing of the
need for such cuts or alterations, obtains WARNER's prior written
approval thereof and, at its own expense, replaces any such cuts and
alterations so that the Materials are returned to WARNER or shipped to
WARNER's designee in the same condition in which they were originally
received by LICENSEE, normal wear and tear excepted.

c.    Notwithstanding paragraph 9.a above, LICENSEE, at its own
expense, may insert commercials in each Program at any place determined
by LICENSEE.  No commercial will be inserted in a manner which may
adversely affect the artistic or pictorial quality of the Program or
damage the Program.  All commercials must be removed from each Program,
without damage to the Program, before the Program is returned to WARNER
or shipped to its designee.  WARNER, its parents, their affiliates and
subsidiaries, and the officers, directors, agents, shareholders and
employees of any one or more of them ("WARNER et al.") will have no
liability for any commercials made or used by LICENSEE.  LICENSEE will
indemnify and hold WARNER et al. harmless from any claim, cause of
action, loss, liability, damage, cost or expense (including attorneys'
fees or costs) ("Claim") arising from any commercial inserted in any
Program.  If WARNER so requests, LICENSEE will defend WARNER et al.
against any such Claim.

d.    In no event will the copyright or trademark notice, WARNER's
presentation or advertising credit or the credits to any person, firm
or corporation appearing on any of the Materials be changed, altered or
removed.  Any breach or violation of the terms hereof will constitute a
material default entitling WARNER, at its election, to terminate this
Agreement, in whole or in part, in addition to any other rights or
remedies available to WARNER and without releasing or discharging
LICENSEE of any liability hereunder.

e.    Whenever requested by WARNER to do so, LICENSEE will change
the title of any Program licensed hereunder and will not thereafter
Transmit any such Program except under the new title.

10.  CENSORSHIP

If a Program or any episode thereof is rejected for Transmission by any
duly authorized, legally constituted government censorship authority in
the Licensed Territory and LICENSEE so notifies WARNER, LICENSEE may
elect either to accept a substitute Program or episode for the one so
withdrawn (which substitute Program or episode will be agreeable to
both WARNER and LICENSEE) or to cancel the License Fee payable to
WARNER for such withdrawn Program or episode thereof.  No cancellation
or refund will be made if the withdrawn Program or episode was
transmitted by LICENSEE.

6

WB 9222
CONFIDENTIAL

11. ADVERTISING

a.    In all advertising and publicity relating to any Program or
any Transmission thereof, LICENSEE shall comply with the advertising
and billing credit requirements of the Program as furnished by WARNER
to LICENSEE.  LICENSEE will not make or permit to be made, in any
advertising, publicity or otherwise, any statements which (a)
constitute, or may be understood to be, an endorsement of any sponsor,
product, article or service by WARNER or any person, company or
corporation connected or associated with the Program, its production or
distribution, or (b) indicate, or may be understood to indicate, that
WARNER or any such person, company or corporation is connected or
associated with any sponsor, product, article, service or advertiser.
Any advertising or publicity referring to WARNER or any such person,
company or corporation will be limited to and will indicate only that
such person, company or corporation appeared in such Program or
rendered services in connection therewith, or was the producer or
distributor thereof, as applicable.

b.    LICENSEE will not advertise or promote, in any manner or
medium, any Program withdrawn or suspended by WARNER.

c.    LICENSEE will not authorize or permit any excerpt or clip
from any Program used for promotional purposes to be in excess of two
(2) minutes in length.

d.    LICENSEE will indemnify and hold WARNER et al. harmless from
and against any and all Claims against WARNER et al. due to any actual
or alleged breach by LICENSEE of the provisions of this paragraph.  If
WARNER so requests, LICENSEE will defend WARNER et al. against such
Claims.

12. MUSIC PERFORMING RIGHTS

WARNER warrants and represents that the non-dramatic performing rights
to all musical compositions contained in the Programs or any of them
are (a) controlled by the American Society of Composers, Authors and
Publishers; Broadcast Music, Incorporated; Sesac, Incorporated; or a
performing rights society having jurisdiction; (b) in the public
domain; or (c) controlled by WARNER to the extent required for the
purposes of this Agreement.  LICENSEE will not permit any Programs to
be Transmitted without first obtaining a valid license from any
performing rights society having jurisdiction.  LICENSEE may be
required to pay a performing rights royalty or license fee to any
performing rights society having jurisdiction.  LICENSEE will be solely
responsible for the payment thereof and will indemnify and hold WARNER
et al. free and harmless therefrom.  If WARNER so requests, LICENSEE
will defend WARNER et al. from any Claim arising out of LICENSEE's
failure to pay in accordance with this paragraph for any musical
composition in any Program.

7

WB 9223
CONFIDENTIAL

13.  FORCE MAJEURE

     a.  If any Act of God, strike, labor dispute, fire, flood, delay
in or lack of transportation, public disaster, war, governmental act or
regulation, or any other cause beyond the control of WARNER and
LICENSEE ("Force Majeure Occurrence") prevents LICENSEE, without
LICENSEE's fault, from Transmitting any Program pursuant to this
Agreement for thirty (30)  or more consecutive days then LICENSEE may
request and obtain an extension of the License Period of the Program
(and of the Term, if necessary) for a period coextensive with such
Force Majeure Occurrence but in no event either for more than one
hundred eighty (180) days or beyond the expiration of WARNER's rights
in said Program.

     b.  If laboratory delay or any Force Majeure Occurrence prevents
WARNER from carrying out any provision of this Agreement, this
Agreement will not have been breached and WARNER will have no liability
therefor.  Nevertheless, the License Period of any affected Program
(and the Term, if necessary) will be extended for a period coextensive
with the delay, but in no event beyond the expiration of WARNER's
rights in said Program.

14.   REPRESENTATIONS AND WARRANTIES

     a.  WARNER warrants and represents that, as to each Program,
WARNER has or will have the right to grant the license herein contained
on or before the first licensed Transmission of such Program; that
there is no agreement with any other person, firm or corporation which
will in any way interfere with any rights granted under this Agreement
to LICENSEE; that all Programs licensed hereunder are free and clear of
all encumbrances of any kind and nature which would be inconsistent
with the rights granted to LICENSEE hereunder; and, that none of the
Programs or any material contained therein violates the rights of any
person.  WARNER further warrants and represents that it is a
corporation duly organized, validly existing and in good standing in
the jurisdiction of its incorporation; that it has full power and
authority to enter into and perform this Agreement; that the execution,
delivery and performance of this Agreement by WARNER have been duly
authorized by all requisite corporate action of WARNER; and, that this
Agreement is a valid and binding obligation of WARNER in accordance
with its terms.

     b.  WARNER will indemnify and hold LICENSEE, its officers,
directors, agents, stockholders and employees and sponsors of any
Transmission of any Program harmless from and against any and all
Claims resulting from any judgment recovered in any action or
proceeding by any third party based upon any breach of the warranties
and representations contained in para-graph 14.a, provided that
LICENSEE has given written notice to WARNER of the third party Claim
immediately after it was made, and provided that LICENSEE discontinued
Transmission of the Program(s) immediately after such Claim was made.
WARNER may assume the handling, prosecution, defense or settlement of
any Claim and any resulting litigation.  WARNER may, if necessary or

8

WB 9224
CONFIDENTIAL

desirable, join LICENSEE as a party in such action. No settlement may
be made without WARNER's written consent. If LICENSEE fails to fulfill
any of its obligations under this paragraph, then WARNER will be
excused from its obligation to indemnify LICENSEE and hold it harmless.

c.   LICENSEE warrants and represents that it is in compliance
with and in good standing under the laws of the Licensed Territory and
any subdivision thereof with which it should be in compliance and under
which it should be in good standing given the nature and scope of its
business; that it has full power and authority to enter into and
perform this Agreement in accordance with its terms; that the
execution, delivery and performance of this Agreement have been
authorized by all requisite action of LICENSEE; that this Agreement is
a valid and binding obligation of LICENSEE enforceable in accordance
with its terms; and, that LICENSEE is not required to obtain the
consent of any person or entity to enter into this Agreement. LICENSEE
further warrants and represents that there are no and never will be any
liens, charges, claims, adverse rights or interests of any kind on or
against any Materials title to which is vested in WARNER as set forth
in paragraph 8.a. LICENSEE also warrants and represents that there
will not be any restrictions that would or could prevent WARNER from
Transmitting and distributing any of the Materials referred to in
paragraph 8.a by any media or means and there will not be any payments
which must be made by WARNER to anyone or any entity including, but not
limited to, any person, union, guild or other labor organization, in
connection therewith.

d.   LICENSEE will indemnify and hold WARNER et al. harmless from
and against all Claims arising out of or relating to any breach of
warranties and representations contained in paragraph 14.c. If WARNER
so requests, LICENSEE will defend WARNER et al. against any such Claim.

15. REMEDIES FOR BREACH

a.   If LICENSEE does not pay in accordance with the terms of this
Agreement any sum when due and such default continues for ten (10)
days, or if LICENSEE is otherwise in breach of this Agreement or any
other contract or agreement with WARNER, or if LICENSEE suspends
operations, or if LICENSEE becomes insolvent or ceases to pay its
obligations when due, or if LICENSEE is adjudicated a bankrupt, files a
petition in bankruptcy, attempts to make an assignment for the benefit
of creditors, or takes advantage of the provisions of any bankruptcy or
debtor's relief act, or if an involuntary petition in bankruptcy is
filed against LICENSEE and is not vacated or discharged within thirty
(30) days, or if a receiver is appointed for a substantial portion of
LICENSEE's property and is not discharged within thirty (30) days, or
if LICENSEE loses control, for any reason, of the Licensed Station or
its interest therein or the license to operate the same, then, at the
election of WARNER, any and all sums payable under this Agreement
remaining unpaid will forthwith become due and payable to WARNER
regardless of the due date thereof, WARNER will be entitled to suspend
the delivery of any Program and/or WARNER will be entitled to the
immediate return of all Materials in LICENSEE's custody, possession or
control. In addition, and without prejudice to any of WARNER's rights

9

WB 9225
CONFIDENTIAL

or remedies at law or in equity, and without in any way releasing or
discharging LICENSEE from any of its obligations under this Agreement,
WARNER may terminate this Agreement. If WARNER pays or becomes
obligated to pay any sum of money, or does or is required to do any act
which requires the payment of monies, or expends any sums for legal
services of any kind or description by reason of any default of
LICENSEE, then the sum(s) so paid or required to be paid, with interest
thereon at the rate specified in paragraph 4.e, will be added to the
License Fees payable hereunder and will be paid by LICENSEE to WARNER
concurrently with the next installment due or, if there is no further
installment due, LICENSEE will make payment thereof upon demand.

b.  LICENSEE acknowledges that the licensing of a Program to
LICENSEE hereunder and/or the Transmission of that Program or any
episode or portion thereof makes that Program unmarketable to third
parties in the Licensed Language in the Licensed Territory until after
the date of the last licensed Transmission of that Program.
Consequently, if LICENSEE defaults under this Agreement, payment to
WARNER of all consideration payable hereunder is a reasonable estimate
of WARNER's damages as a result of such default under the circumstances
existing at the time this Agreement was made.

c.  LICENSEE acknowledges and admits that there is no adequate
remedy at law for its failure to use the rights licensed hereunder
other than in strict compliance with the terms and conditions set forth
herein. LICENSEE agrees that, in the event of such unauthorized use,
WARNER will be entitled to seek equitable relief, including injunctive
relief, and such other and further relief as any court of competent
jurisdiction may deem just and proper.

16.  RESERVED RIGHTS

The license herein granted to LICENSEE is limited to the right to
Transmit each Program in its entirety only for the purposes, in the
manner and at the times expressly provided. Any and all rights in any
Program not expressly licensed to LICENSEE herein, including but not
limited to the right to Transmit clips or segments of any Program, and
the literary and musical Materials contained in any Program or upon
which any Program may be based, are reserved to WARNER and may be
exercised, marketed and exploited by WARNER concurrently with and
throughout the Term of this Agreement.

17.  SUBLICENSE, RELICENSE AND ASSIGNMENT

a.  LICENSEE will not assign, sublicense, pledge, hypothecate,
transfer or convey this Agreement, in whole or in part, without
WARNER's prior written consent. WARNER may consent or not in its sole
and absolute discretion. LICENSEE will not sublicense or relicense any
Program for Transmission by any other person, firm, corporation or
television station nor will LICENSEE use an agent for such purpose.

b.  WARNER may assign, sublicense, pledge, hypothecate, transfer
or otherwise convey this Agreement, in whole or in part, as it deems
proper in its sole and absolute discretion, without notice to LICENSEE.

10

WB 9226
CONFIDENTIAL

18.  EFFECT OF INVALIDITY OF PROVISION

If any provision of this Agreement is contrary to any applicable law or
regulation, all other provisions of this Agreement will notwithstanding
continue in full force and effect.

19.  WITHDRAWAL OR SUSPENSION OF PROGRAMS

     a.   WARNER will have the right at any time to withdraw any
Program or episode thereof if, in WARNER's sole and absolute
discretion, the Program or episode is either unavailable for
Transmission under the terms of this Agreement or cannot, for reasons
beyond WARNER's control, or due to a Force Majeure Occurrence, be made
available to LICENSEE. WARNER reserves the right to discontinue the
production of any Program or episode thereof and to terminate this
Agreement at any time during the Term on five (5) days' written notice
to LICENSEE. Upon such withdrawal or termination, LICENSEE may elect
either to accept a substitute Program or episode thereof in place of
the Program or episode so withdrawn, which substitute Program or
episode must be agreeable to both WARNER and LICENSEE, or to cancel the
License Fee payable to WARNER for such withdrawn Program or episode
provided, however, that there will be no cancellation or refund of the
License Fee if the withdrawn Program or episode was Transmitted by
LICENSEE. LICENSEE will have no other Claim against WARNER based on
WARNER's withdrawal of a Program or episode or WARNER's termination of
this Agreement.

     b.   WARNER, in its sole and absolute discretion, may suspend
delivery of any Program or LICENSEE's Transmission of any Program,
whether or not delivered, if, in WARNER's opinion, the Program is
unavailable for Transmission under the terms of this Agreement or
cannot be made available to LICENSEE for reasons beyond the control of
WARNER, or due to a Force Majeure Occurrence. Any such suspension will
be limited to a one hundred eighty (180) day period from the date of
WARNER's notice for such Program, provided, however, that if WARNER
elects to extend the suspension for an additional period not exceeding
one hundred eighty (180) days, then the License Period for the
suspended Program (and the Term, if necessary) will be extended
day-to-day for a period which is equal to the period of such extended
suspension but in no event beyond the expiration of WARNER's rights in
said Program.

20.  TRANSMISSION REPORT

LICENSEE will deliver to Warner Bros. (Australia) Pty. Ltd., Level 22,
8-20 Napier Street., North Sydney, N.S.W. 2060, Australia, and to
Warner Bros. Television Distribution, Inc., Attention: International
Distribution Services, 4000 Warner Blvd., Burbank, California 91522,
United States, on or before the tenth (10th) day of each month during
the Term a written report signed on behalf of LICENSEE listing each
Program Transmitted during the preceding month, the date of each
Transmission, the call letters of the station over which such
Transmission was made, and the location of all Materials of the Program
delivered to or created by or for LICENSEE for such Transmission.

11

WB 9227
CONFIDENTIAL

21.  ANTI-PIRACY

LICENSEE will take all steps and pay all required fees necessary to
protect the Programs fully under the copyright, trademark and related
intellectual property laws of the Licensed Territory.  WARNER will
reasonably cooperate with LICENSEE in providing documents necessary to
secure such protection.  If LICENSEE becomes aware of any infringement
of any copyright or trademark in any Program in the Licensed Territory,
LICENSEE will immediately notify WARNER.  LICENSEE will take such
actions in cooperation with WARNER as WARNER may designate in order to
stop such piracy.  LICENSEE will employ security measures to prevent
the loss, theft, pirating, copying or unauthorized duplication of any
of the Materials in its possession, custody or control.  LICENSEE
accepts responsibility for the loss or theft of any Program or its
Materials from the time of delivery until returned to WARNER.  LICENSEE
will notify WARNER immediately if any of the Materials in its
possession is lost, stolen or destroyed.  In such event, LICENSEE will
cooperate with WARNER to the fullest extent in any attempt WARNER may
make to recover such Materials, and will indemnify WARNER et al.
against any Claims made against WARNER et al. as a result thereof.

22.  RETRANSMISSION ROYALTIES

Any fees payable by reason of government permitted or mandated
re-Transmissions in the Licensed Territory of any Transmission of a
Program, including but not limited to AGICOA royalties, are the sole
property of WARNER.  LICENSEE will cooperate with WARNER to the extent
necessary to permit WARNER to collect the maximum amount of any such
fees.

23.  NOTICES

All notices under this Agreement must be in writing and sent by first
class mail, postage prepaid, with a copy personally delivered or sent
by telegram, telex, telecopier or other facsimile machine for delivery
within twenty-four (24) hours of transmittal.  The addresses for all
notices are identified in the License Agreement. Either party may
change its address for notice by written notice to the other pursuant
to this paragraph.

24.  HEADINGS

Paragraph headings are for reference only and have no legal effect
respecting the scope, meaning or intent of any of the provisions of
this Agreement.

25.  INTEGRATION, CHOICE OF LAW AND JURISDICTION

     a.   This Agreement is complete and constitutes the entire
understanding between the parties.  All prior understandings, written
or oral, express or implied, have been merged herein.

     b.   This Agreement may not be modified or amended except by an
instrument in writing, signed by the parties hereto.

12

**WB 9228
CONFIDENTIAL**

c.   The Courts of New South Wales and the Courts of Appeal therefrom shall have nonexclusive jurisdiction over all disputes arising in connection with this Agreement.  WARNER and LICENSEE irrevocably and unconditionally submit to the jurisdiction therein. Regardless of the judicial forum, LICENSEE and WARNER waive any right each may have to a trial by jury of any cause of action in connection with this Agreement.  Without prejudice to any other mode of service, service of any legal process in any action brought in the Courts of New South Wales or Courts of Appeal therefrom may be effected on a party by being left at or sent by pre-paid ordinary post (airmail if overseas) to its address for service of notices as identified in the License Agreement.  The foregoing shall not preclude any party hereto from seeking enforcement outside New South Wales of any order or judgment rendered by any New South Wales court.

d.   This Agreement is governed by the law in force in New South Wales.

e.   A waiver by either party of any breach by the other must be in writing and may not be deemed a waiver of any other breach of the same or a different nature.

13

WB 9229
CONFIDENTIAL



WARNER BROS.
INTERNATIONAL
TELEVISION
DISTRIBUTION

## Inter-Office Memo

| To: | WAYNE BROUN | From: | MARGARET KELLY | Ext.: 6071 |
|---|---|---|---|---|

Subject: NINE TELEVISION PTY. LTD., AUSTRALIA

Date: May 8, 1991    Copies to:    THOSE LISTED BELOW

Enclosed please find 5 copies of the following Agreement recently negotiated with the above customer:

| CONTRACT NO. | PRODUCT | PRICE |
|---|---|---|
| F020240 | 50 FEATURES (Reruns) | US$1,500,000.00 |

Would you please check the enclosed very carefully and, if you find everything in good order please forward 4 copies of the Agreement to the LESSEE for signature, and once signed return all copies to my attention.  We will immediately thereafter return an executed copy of the Agreement for your files.  The extra copy of the Agreement enclosed is for your files and reference.

Thanks and regards,

*Margaret*

cc:  B. Adamson
     C. Hewitt
     Files

```
OPEN
MAY - 8 1991
ORDER
```

WB 9230
CONFIDENTIAL

cc: Jaime
CA
Pls. ck PTS ? AVAILS.
Pls. ck PTS ? AVAILS.
Pick-up and prepare contract
the CA

R E C E I V E D

APR 2 2 1991

JOHN WHITESELL

**WARNER BROS.**

DATE:

MEMO:     *April 19, 1991*

FROM:     *John Whitesell*

SUBJECT:  *Berniece Pritchard*
           050
           *AUSTRALIA – BOND TELEVISION*

COPIES:   *Jacqui Massey*

F020240

John,

Please find attached contract no. WBA 2749 – 50 RE-RUN TITLES for processing

Kind regards

*Berniece*

WB 9231
CONFIDENTIAL



**WARNER BROS. TELEVISION DISTRIBUTION INC.**
**4000 WARNER BLVD.**
**BURBANK, CALIFORNIA 91522**

DATE APRIL 19, 1991
SALES REPRESENTATIVE BRUCE BROWN
ORDER REFERENCE NO. WBA 2749

## INTERNATIONAL FREE TELEVISION LICENSE AGREEMENT ORDER

The following is a firm offer by the undersigned Licensee for below listed Program(s) upon the terms and conditions contained herein and/or in Warner's International Free Television License Agreements. Should Warner reject this offer as to any of the Program(s), such rejection shall apply to those Program(s) specified by Warner and Licensee's commitment to license the remaining Program(s) shall not be affected in any manner whatsoever.

### DEAL TERMS

LICENSEE
BOND TELEVISION PTY. LTD  0S0060                      FO20240

ADDRESS
ARTARMON ROAD
WILLOUGHBY

LICENSED TERRITORY
AUSTRALIA (SEE A BELOW)
0S0

CITY & COUNTRY
N.S.W. 2068  AUSTRALIA

LICENSED STATION
SEE A BELOW

LICENSED LANGUAGE
ENGLISH

| PROGRAM(S) | # EPS | # RUNS | # TEL | HR | START DATE | END DATE | LICENSE FEE | PER | TOTAL LICENSE FEE |
|---|---|---|---|---|---|---|---|---|---|
| A) 50 RE-RUN TITLES | 50 | 4 | | | REFER ATTACHED | SCHEDULE | US30,000 | EP | US1,500,000 |
| | | | | | | | | | |
| A: BROADCAST TERRITORY INCLUDES ALL OF AUSTRALIA VIA ONE | | | | | | | | | |
| TELEVISION STATION IN EACH TELEVISION MARKET IN AUSTRALIA | | | | | | | | | |
| AS DEFINED BY THE AUSTRALIAN BROADCASTING TRIBUNAL. | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PAYMENT TERMS AND DUE DATE
TEN (10) EQUAL QUARTERLY PAYMENT DUE JUNE 1, 1991.
SUCH PAYMENT TO BE MADE DIRECT IN UNITED STATES DOLLARS TO THE
AUSTRALIA AND NEW ZEALAND BANKING GROUP LIMITED, NORTH SYDNEY, FOR DEPOSIT
TO "PRIVATE U.S. DOLLAR FOREIGN CURRENCY ACCOUNT, WARNER BROS. (AUSTRALIA)
PTY. LIMITED ACCOUNT NUMBER: 405 100" ON OR BEFORE THE DUE DATE OF EACH
RESPECTIVE INSTALLMENT.

| MATERIALS | MATERIALS CHARGE | MATERIALS TO |
|---|---|---|
| 1" 625  TAPES | INCLUDED IN LICENSE FEE | TAPES AND PUBLICITY TO BE SUPPLIED BY SYDNEY. |

MATERIALS PAYMENT TERMS
N/A

CONTRACTS, INVOICES TO
ABOVE ADDRESS
ATTN: MR ROSS PLAPP
PROGRAM DIRECTOR

ADDITIONAL TERMS
IMPORTANT: THIS ORDER IS SUBJECT TO TERMS AND
CONDITIONS OF "OUTPUT" DEAL DATED FEBRUARY 1, 90
(WITH AMENDMENTS).  SPECIAL CONTRACT AND
ADDITIONAL CLAUSES REQUIRED REFER TO GWEN
WHITSON.

PROMO & SCRIPT TO
ABOVE ADDRESS
ATTN: MS SUE WARD

ML-1920 Rev 1/90 [37]

LICENSEE
BOND TELEVISION PTY. LTD

SIGNATURE

(PRINT OR TYPE NAME & TITLE)

The General Provisions printed on the reverse hereof apply to all product covered by this Contract Order.

WB 9232
CONFIDENTIAL

## GENERAL PROVISIONS



### TITLE

a.    Title in and to Materials of a Program provided to LICENSEE hereunder is vested and will remain in WARNER, and title in and to any Materials of a Program created by, for or at the request of LICENSEE and all rights therein, including copyrights and all neighboring and connecting rights, will vest and remain in WARNER upon the creation thereof, subject only to LICENSEE'S possession and use until the earlier of the expiration of the License Period of the Program, the expiration of the Term or the termination of this Agreement solely so that LICENSEE may exercise its rights licensed hereunder. As between WARNER and LICENSEE, all Materials will be deemed to have been loaned to LICENSEE whether or not LICENSEE paid any of the costs of manufacture.

b    LICENSEE will execute, acknowledge and deliver to WARNER any instruments of transfer, conveyance or assignment in or to any Materials referred to in paragraph (a) above which are necessary or desirable to evidence or effectuate WARNER'S ownership of such Materials. LICENSEE will also execute, acknowledge and deliver to WARNER any instruments of transfer, conveyance or assignment in or to any rights in Materials of a Program which are to vest and remain in WARNER pursuant to paragraph (a) above which instruments are necessary or desirable to evidence or effectuate the vesting for as long as is permissible of such rights in WARNER. If LICENSEE fails or refuses to execute, acknowledge or deliver any such instrument, then WARNER will be deemed to be, and LICENSEE hereby and irrevocably appoints WARNER, its true and lawful attorney-in-fact to execute and deliver all such instruments in LICENSEE'S name or otherwise, acknowledging that such power is a power coupled with an interest.

### SHIPPING CHARGES, ETC.

a.    LICENSEE will notify WARNER of he scheduled date of Transmission of each Program at least sixty (60) days prior thereto. If the Materials of the Program are available for Transmission on such scheduled date, WARNER will arrange for delivery of the Materials to LICENSEE by air, unless otherwise instructed, f.o.b. WARNER'S place of shipment. WARNER will not be responsible for delivery on less than sixty (60) days' notice.

b.    LICENSEE will bear all costs of transportation, customs duties, censorship fees and any and all other charges relating to the shipment of the Materials into the Licensed Territory or from the Licensed Te-ritory to WARNER, and to the storage or use of the Materials by LICENSEE in the Licensed Territory.

### CONTRACTS

This Contract Order will be superseded by WARNER'S Standard International Free Television License Agreement to be executed by LICENSEE and WARNER.

SML-1920 Reverse 1/90 N [37]

WB 9233
CONFIDENTIAL

Bond By 

SCHEDULE "A"

50    RE-RUN TITLES    F070840

| TITLE | START DATE | END DATE |
|---|---|---|
| ABOUT FACE 052122 | JUNE 1, 1991 | MAY 31, 1996 |
| BACKFIRE 050515 | JUNE 1, 1991 | MAY 31, 1996 |
| HEARTBEAT 049209 | JUNE 1, 1991 | MAY 31, 1996 |
| BIG JIM MCCLAIN 063201 | JUNE 1, 1991 | MAY 31, 1996 |
| BLACK GOLD 063263 | JUNE 1, 1991 | MAY 31, 1996 |
| BLADE RUNNER 082124 | NOV 1, 1991 | OCT 30, 1996 |
| THE BURNING HILLS 057701 | JUNE 1, 1991 | MAY 31, 1996 |
| THE COOL ONES 067655 | JUNE 1, 1991 | MAY 31, 1996 |
| THE CROOKED ROAD 065416 | JUNE 1, 1991 | MAY 31, 1996 |
| THE D.I. 057617 | JUNE 1, 1991 | MAY 31, 1996 |
| DOC SAVAGE, MAN OF BRONZE 015406 | JUNE 1, 1991 | MAY 31, 1996 |
| WHATS UP DOC 042110 | FEB 1, 1992 | JAN 31, 1997 |
| HELL BENT FOR GLORY 058716 | JUNE 1, 1991 | MAY 31, 1996 |
| INCREDIBLE MR. LIMPET 064359 | JUNE 1, 1991 | MAY 31, 1996 |
| ISLAND OF LOVE 063264 | JUNE 1, 1991 | MAY 31, 1996 |
| JET OVER THE ATLANTIC 360008 | JUNE 1, 1991 | MAY 31, 1996 |
| JUMP INTO HELL 055410 | JUNE 1, 1991 | MAY 31, 1996 |
| JOHNNY TROUBLE 521910 | JUNE 1, 1991 | MAY 31, 1996 |
| LOST BOUNDARIES 586960 | JUNE 1, 1991 | MAY 31, 1996 |
| LULLABY OF BROADWAY 051020 | JUNE 1, 1991 | MAY 31, 1996 |
| THE MACOMBER AFFAIR 586380 | JUNE 1, 1991 | MAY 31, 1996 |
| MAD MAX II, THE ROAD WARRIOR 082151 | SEP 29, 1991 | SEP 28, 1996 |
| MILLIONAIRE FOR CHRISTY 530240 | JUNE 1, 1991 | MAY 31, 1996 |
| NATIONAL LAMPOONS VACATION 083206 | JULY 1, ~~JUNE 1992~~ | JUN 30, ~~1997 1991~~ |
| NIGHTSHIFT 082113 | FEB 1, 1992 | JAN 31, 1997 |
| WORLD ACCORDING TO GARP 082106 | FEB 1, 1992 | JAN 31, 1997 |
| OPERATION SECRET 053205 | JUNE 1, 1991 | MAY 31, 1996 |
| OUR MISS BROOKS 056515   052105 | JUNE 1, 1991 | MAY 31, 1996 |
| PAINTING THE CLOUDS WITH SUNSHINE | JUNE 1, 1991 | MAY 31, 1996 |
| THE PHYNX 040758 | JUNE 1, 1991 | MAY 31, 1996 |
| PRETTY BABY 051904 | JUNE 1, 1991 | MAY 31, 1996 |
| PRINCE OF THE CITY 081002 | AUG 1, 1991 | JUL 31, 1996 |
| PROMISES IN THE DARK 049812 | JUNE 1, 1991 | MAY 31, 1996 |
| RISKY BUSINESS 083201 | JUNE 1, 1992 | MAY 31, 1997 |
| ROLLOVER 081013 | JUNE 1, 1991 | MAY 31, 1996 |
| SHOOTOUT AT MEDICINE BEND 057615 | JUNE 1, 1991 | MAY 31, 1996 |
| SIMON 080904 | JUNE 1, 1991 | MAY 31, 1996 |
| SO FINE 081015 | JUNE 1, 1991 | MAY 31, 1996 |
| SO THIS IS LOVE 053206 | JUNE 1, 1991 | MAY 31, 1996 |
| STARLIFT 052109    066558 | JUNE 1, 1991 | MAY 31, 1996 |
| STOP THE WORLD, I WANT TO GET OFF | JUNE 1, 1991 | MAY 31, 1996 |
| STOP, YOU'RE KILLING ME 053210 | JUNE 1, 1991 | MAY 31, 1996 |
| TARGET ZERO 056608 | JUNE 1, 1991 | MAY 31, 1996 |
| TOWARD THE UNKNOWN 057608 | JUNE 1, 1991 | MAY 31, 1996 |
| WALL OF NOISE 364351 | JUNE 1, 1991 | MAY 31, 1996 |
| WHATEVER HAPPENED TO BABY JANE 063254 | JUNE 1, 1991 | MAY 31, 1996 |
| WOLFEN 080912 | JUNE 1, 1991 | MAY 31, 1996 |
| THE TANKS ARE COMING 052108 | JUNE 1, 1991 | MAY 31, 1996 |
| GREAT GEORGIA BANK HOAX 078423 | JUNE 1, 1991 | MAY 31, 1996 |
| MORTADELLA 042160 | JUNE 1, 1991 | MAY 31, 1996 |

WB 9234
CONFIDENTIAL



**WARNER BROS. (AUSTRALIA), PTY., LTD.**
**LEVEL 22, 8-20 NAPIER STREET**
**NORTH SYDNEY, N.S.W., 2060, AUSTRALIA.**

| CONTRACT NO. | PAGE 1 |
|---|---|
| F020240 | |

DATE        MAY 06, 1991

SALES REPRESENTATIVE
WAYNE BROUN

REFERENCE NO.    WBA2749

---

## INTERNATIONAL FREE TELEVISION LICENSE AGREEMENT

Subject to timely payment of the Total License Fee and due performance of all other provisions of this Agreement, Warner licenses solely to the Licensee named below, and Licensee licenses from Warner, the following Programs on the following terms and conditions:

LICENSEE
**NINE TELEVISION PTY. LTD.**

| ADDRESS | | |
|---|---|---|
| 24 Artarmon Road, | LICENSED TERRITORY **AUSTRALIA** | |

| CITY & COUNTRY **Willoughby, NSW, 2068 AUSTRALIA.** | LICENSED STATION **SEE SCHED. "A"** | LICENSED LANGUAGE **ENGLISH** |
|---|---|---|

| PROGRAM TITLE(S) **SEE SCHEDULE A** | | PROGRAM(S) DURATION **N/A** |
|---|---|---|

| FIRST RUN **N/A** | RERUNS **50** | TELECASTS/REPEATS **N/A** | RUNS **4** | START DATE **SEE SCHEDULE A** | END DATE **SEE SCHEDULE A** |
|---|---|---|---|---|---|

| NO. OF EPISODES/TELECASTS/TITLES/HOURS **50** | LICENSE FEE **US$30,000.00** | PER **TITLE** | TOTAL LICENSE FEE **US$1,500,000.00** |
|---|---|---|---|

PAYMENT TERMS AND INVOICING INSTRUCTIONS

TO BE PAYABLE IN TEN (10) EQUAL CONSECUTIVE QUARTERLY PAYMENTS OF
US$150,000.00 EACH, COMMENCING ON JUNE 1, 1991.  PAYMENTS TO BE MADE
DIRECTLY IN UNITED STATES DOLLARS TO THE AUSTRALIA AND NEW ZEALAND
BANKING GROUP LIMITED, NOTH SYDNEY, FOR DEPOSIT TO "PRIVATE U.S.
DOLLAR FOREIGN CURRENCY ACCOUNT, WARNER BROS. (AUSTRALIA) PTY.
LIMITED, ACCOUNT NUMBER 405-100" ON OR BEFORE THE DUE DATE OF
EACH RESPECTIVE INSTALLMENT.

| MATERIALS **1" 625 PAL VIDEOTAPE** | MATERIALS CHARGE **ON LOAN** | MATERIALS TO **TAPES AND PUBLICITY TO BE SUPPLIED BY WB SYDNEY OFFICE.** |
|---|---|---|

| MATERIALS PAYMENT TERMS **N/A** | PROMO & SCRIPT TO **MS. SUE WARD ABOVE ADDRESS** |
|---|---|

When executed by Licensee and an authorized officer of Warner, this will constitute a binding Agreement. If Licensee's execution is by an agent, such agent represents and warrants that it is duly authorized to execute this Agreement.

THIS AGREEMENT INCLUDES ALL THE TERMS AND CONDITIONS, SCHEDULES AND EXHIBITS ATTACHED HERETO.

ACCEPTED

LICENSEE
BY: _____

WARNER
BY: _____

SIGNATURE _____                    SIGNATURE _____

(PRINT OR TYPE NAME & TITLE)

WB 9235
CONFIDENTIAL



AUSTRALIA

F020240
PAGE  2

SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM US DOLLARS | TOTAL LICENSE FEE US DOLLARS |
|---|---|---|---|---|---|
| ABOUT FACE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| BACKFIRE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| HEARTBEAT (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| BIG JIM MC LAIN (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| BLACK GOLD (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| BLADE RUNNER (RR) | NOV 01,1991-OCT 30,1996 | | 1 | 30,000.00 | 30,000.00 |
| BURNING HILLS, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| COOL ONES, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| CROOKED ROAD, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| D.I., THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| DOC SAVAGE...MAN OF BRONZE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| WHATS UP DOC? (RR) | FEB 01,1992-JAN 31,1997 | | 1 | 30,000.00 | 30,000.00 |
| HELL BENT FOR GLORY (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| INCREDIBLE MR. LIMPET, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| ISLAND OF LOVE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| JET OVER THE ATLANTIC (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| JUMP INTO HELL (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| JOHNNY TROUBLE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |

WB 9236
CONFIDENTIAL

AUSTRALIA

F020240
PAGE  3

SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM US DOLLARS | TOTAL LICENSE FEE US DOLLARS |
|---|---|---|---|---|---|
| LOST BOUNDARIES (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| LULLABY OF BROADWAY (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| MACOMBER AFFAIR, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| MAD MAX 2 (ROAD WARRIOR, THE) (RR) | SEP 29,1991-SEP 28,1996 | | 1 | 30,000.00 | 30,000.00 |
| MILLIONAIRE FOR CHRISTY (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| NATIONAL LAMPOON'S VACATION (RR) | JUL 01,1992-JUN 30,1997 | | 1 | 30,000.00 | 30,000.00 |
| NIGHT SHIFT (RR) | FEB 01,1992-JAN 31,1997 | | 1 | 30,000.00 | 30,000.00 |
| WORLD ACCORDING TO GARP (RR) | FEB 01,1992-JAN 31,1997 | | 1 | 30,000.00 | 30,000.00 |
| OPERATION SECRET (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| OUR MISS BROOKS (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PAINTING THE CLOUDS WITH SUNSHINE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PHYNX, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PRETTY BABY (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PRINCE OF THE CITY (RR) | AUG 01,1991-JUL 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PROMISES IN THE DARK (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| RISKY BUSINESS (RR) | JUN 01,1992-MAY 31,1997 | | 1 | 30,000.00 | 30,000.00 |
| ROLLOVER (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| SHOOT-OUT AT MEDICINE BEND (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |

WB 9237
CONFIDENTIAL



AUSTRALIA                                                                F020240
                                                                         PAGE  4

SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM US DOLLARS | TOTAL LICENSE FEE US DOLLARS |
|---|---|---|---|---|---|
| SIMON (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| SO FINE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| SO THIS IS LOVE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| STARLIFT (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| STOP THE WORLD, I WANT TO GET OFF (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| STOP, YOU'RE KILLING ME (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| TARGET ZERO (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| TOWARD THE UNKNOWN (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| WALL OF NOISE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| WHATEVER HAPPENED TO BABY JANE? (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| WOLFEN (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| TANKS ARE COMING, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| GREAT GEORGIA BANK HOAX (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| MORTADELLA (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |

                                                                       --------------
                          TOTALS                                        1,500,000.00
                                                                       ==============

WB 9238
CONFIDENTIAL

AUSTRALIA

F020240
PAGE 5

SCHEDULE "A"

1. LICENSED STATIONS.
   The broadcast territory includes all of Australia via one television
   station in each television market in Australia, as defined by the
   Australian Broadcasting Tribunal.

2. Notwithstanding anything contrary contained in clause first of the
   agreement to which this Schedule "A" is attached, LICENSEE shall have
   the right to broadcast the pictures by use of booster stations,
   translators and community antennaes, and LICENSEE shall be entitled
   to make simultaneous network transmissions by way of microwave links
   or land lines, provided, however, that such right and/or entitlement
   shall be limited only to those instances where the foregoing devices are
   required to improve reception of the main signal of the broadcast and do
   not increase the market or markets covered by this agreement and in no
   such case shall reception by such a broadcast be subject to the payment
   of any toll, license fee, subscription fee or other like consideration.

WB 9239
CONFIDENTIAL



WARNER BROS. (AUSTRALIA), PTY., LTD.
LEVEL 22, 8-20 NAPIER STREET
NORTH SYDNEY, N.S.W., 2060, AUSTRALIA.

| CONTRACT NO. | PAGE 1 |
|---|---|
| F020240 | |
| DATE | |
| MAY 06, 1991 | |
| SALES REPRESENTATIVE | |
| WAYNE BROWN | |
| REFERENCE NO.    WBA2749 | |

## INTERNATIONAL FREE TELEVISION LICENSE AGREEMENT

Subject to timely payment of the Total License Fee and due performance of all other provisions of this Agreement, Warner licenses solely to the Licensee named below, and Licensee licenses from Warner, the following Programs on the following terms and conditions:

LICENSEE
**NINE TELEVISION PTY. LTD.**

| ADDRESS | | |
|---|---|---|
| **24 Artarmon Road,** | LICENSED TERRITORY **AUSTRALIA** | |

| CITY & COUNTRY | LICENSED STATION | LICENSED LANGUAGE |
|---|---|---|
| **Willoughby, NSW, 2068 AUSTRALIA.** | **SEE SCHED. "A"** | **ENGLISH** |

| PROGRAM TITLE(S) | PROGRAM(S) DURATION |
|---|---|
| SEE SCHEDULE A | **N/A** |

| FIRST RUN | RERUNS | TELECASTS/REPEATS | RUNS | START DATE | END DATE |
|---|---|---|---|---|---|
| N/A | 50 | N/A | 4 | SEE SCHEDULE A | SEE SCHEDULE A |

| NO-OF-EPISODES/TELECASTS/TITLES/HOURS | LICENSE FEE | | TOTAL LICENSE FEE |
|---|---|---|---|
| 50 | US$30,000.00 | PER    TITLE | US$1,500,000.00 |

PAYMENT TERMS AND INVOICING INSTRUCTIONS
TO BE PAYABLE IN TEN (10) EQUAL CONSECUTIVE QUARTERLY PAYMENTS OF
US$150,000.00 EACH, COMMENCING ON JUNE 1, 1991.  PAYMENTS TO BE MADE
DIRECTLY IN UNITED STATES DOLLARS TO THE AUSTRALIA AND NEW ZEALAND
BANKING GROUP LIMITED, NOTH SYDNEY, FOR DEPOSIT TO "PRIVATE U.S.
DOLLAR FOREIGN CURRENCY ACCOUNT, WARNER BROS. (AUSTRALIA) PTY.
LIMITED, ACCOUNT NUMBER 405-100" ON OR BEFORE THE DUE DATE OF
EACH RESPECTIVE INSTALLMENT.

| MATERIALS | MATERIALS CHARGE | MATERIALS TO |
|---|---|---|
| 1" 625 PAL VIDEOTAPE | ON LOAN | TAPES AND PUBLICITY TO BE SUPPLIED BY WB SYDNEY OFFICE. |

| MATERIALS PAYMENT TERMS | PROMO & SCRIPT TO |
|---|---|
| N/A | MS. SUE WARD ABOVE ADDRESS |

When executed by Licensee and an authorized officer of Warner, this will constitute a binding Agreement. If Licensee's execution is by an agent, such agent represents and warrants that it is duly authorized to execute this Agreement.

THIS AGREEMENT INCLUDES ALL THE TERMS AND CONDITIONS, SCHEDULES AND EXHIBITS ATTACHED HERETO.

ACCEPTED

| LICENSEE BY: | WARNER BY: |
|---|---|
| _____ | _____ |
| SIGNATURE | SIGNATURE |

**WB 9240**
**CONFIDENTIAL**

AUSTRALIA

F020240
PAGE  2

SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM US DOLLARS | TOTAL LICENSE FEE US DOLLARS |
|---|---|---|---|---|---|
| ABOUT FACE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| BACKFIRE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| HEARTBEAT (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| BIG JIM MC LAIN (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| BLACK GOLD (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| BLADE RUNNER (RR) | NOV 01,1991-OCT 30,1996 | | 1 | 30,000.00 | 30,000.00 |
| BURNING HILLS, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| COOL ONES, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| CROOKED ROAD, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| D.I., THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| DOC SAVAGE...MAN OF BRONZE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| WHATS UP DOC? (RR) | FEB 01,1992-JAN 31,1997 | | 1 | 30,000.00 | 30,000.00 |
| HELL BENT FOR GLORY (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| INCREDIBLE MR. LIMPET, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| ISLAND OF LOVE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| JET OVER THE ATLANTIC (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| JUMP INTO HELL (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| JOHNNY TROUBLE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |

WB 9241
CONFIDENTIAL



AUSTRALIA

F020240
PAGE  3

SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM US DOLLARS | TOTAL LICENSE FEE US DOLLARS |
|---|---|---|---|---|---|
| LOST BOUNDARIES (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| LULLABY OF BROADWAY (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| MACOMBER AFFAIR, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| MAD MAX 2 (ROAD WARRIOR, THE) (RR) | SEP 29,1991-SEP 28,1996 | | 1 | 30,000.00 | 30,000.00 |
| MILLIONAIRE FOR CHRISTY (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| NATIONAL LAMPOON'S VACATION (RR) | JUL 01,1992-JUN 30,1997 | | 1 | 30,000.00 | 30,000.00 |
| NIGHT SHIFT (RR) | FEB 01,1992-JAN 31,1997 | | 1 | 30,000.00 | 30,000.00 |
| WORLD ACCORDING TO GARP (RR) | FEB 01,1992-JAN 31,1997 | | 1 | 30,000.00 | 30,000.00 |
| OPERATION SECRET (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| OUR MISS BROOKS (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PAINTING THE CLOUDS WITH SUNSHINE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PHYNX, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PRETTY BABY (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PRINCE OF THE CITY (RR) | AUG 01,1991-JUL 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PROMISES IN THE DARK (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| RISKY BUSINESS (RR) | JUN 01,1992-MAY 31,1997 | | 1 | 30,000.00 | 30,000.00 |
| ROLLOVER (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| SHOOT-OUT AT MEDICINE BEND (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |

WB 9242
CONFIDENTIAL

AUSTRALIA

F020240
PAGE  4

## SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM US DOLLARS | TOTAL LICENSE FEE US DOLLARS |
|---|---|---|---|---|---|
| ------- | --------------------- | -------- | -------------- | -------------- |
| SIMON (RR) | JUN 01,1991-MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| SO FINE (RR) | JUN 01,1991-MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| SO THIS IS LOVE (RR) | JUN 01,1991-MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| STARLIFT (RR) | JUN 01,1991-MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| STOP THE WORLD, I WANT TO GET OFF (RR) | JUN 01,1991-MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| STOP, YOU'RE KILLING ME (RR) | JUN 01,1991-MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| TARGET ZERO (RR) | JUN 01,1991-MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| TOWARD THE UNKNOWN (RR) | JUN 01,1991-MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| WALL OF NOISE (RR) | JUN 01,1991-MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| WHATEVER HAPPENED TO BABY JANE? (RR) | JUN 01,1991-MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| WOLFEN (RR) | JUN 01,1991-MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| TANKS ARE COMING, THE (RR) | JUN 01,1991-MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| GREAT GEORGIA BANK HOAX (RR) | JUN 01,1991-MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| MORTADELLA (RR) | JUN 01,1991-MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |

```
                                                        --------------
                      TOTALS                             1,500,000.00
                                                        ==============
```

WB 9243
CONFIDENTIAL

AUSTRALIA

F020240
PAGE  5

## SCHEDULE "A"

1.  LICENSED STATIONS.
    The broadcast territory includes all of Australia via one television
    station in each television market in Australia, as defined by the
    Australian Broadcasting Tribunal.

2.  Notwithstanding anything contrary contained in clause first of the
    agreement to which this Schedule "A" is attached, LICENSEE shall have
    the right to broadcast the pictures by use of booster stations,
    translators and community antennaes, and LICENSEE shall be entitled
    to make simultaneous network transmissions by way of microwave links
    or land lines, provided, however, that such right and/or entitlement
    shall be limited only to those instances where the foregoing devices are
    required to improve reception of the main signal of the broadcast and do
    not increase the market or markets covered by this agreement and in no
    such case shall reception by such a broadcast be subject to the payment
    of any toll, license fee, subscription fee or other like consideration.

WB 9244
CONFIDENTIAL

 


WARNER BROS. TELEVISION DISTRIBUTION INC.
4000 WARNER BLVD.
BURBANK, CALIFORNIA 91522

DATE           APRIL 19, 1991
SALES REPRESENTATIVE  WAYNE BROUN
ORDER REFERENCE NO.    WBA 2749

## INTERNATIONAL FREE TELEVISION LICENSE AGREEMENT ORDER

The following is a firm offer by the undersigned Licensee for below listed Program(s) upon the terms and conditions contained herein and/or in Warner's International Free Television License Agreements. Should Warner reject this offer as to any of the Program(s), such rejection shall apply to those Program(s) specified by Warner and Licensee's commitment to license the remaining Program(s) shall not be affected in any manner whatsoever.

### DEAL TERMS

LICENSEE
BOND TELEVISION PTY. LTD  050060                    F020240

ADDRESS
ARTARMON ROAD
WILLOUGHBY

LICENSED TERRITORY
AUSTRALIA (SEE A BELOW)
050

CITY & COUNTRY
N.S.W. 2068  AUSTRALIA

LICENSED STATION
SEE A BELOW

LICENSED LANGUAGE
ENGLISH

| PROGRAM(S) | # EPS | # RUNS | # TEL | FIRST START DATE | END DATE | LICENSE FEE | PER | TOTAL LICENSE FEE |
|---|---|---|---|---|---|---|---|---|
| A)  50 RE-RUN TITLES | 50 | 4 | | REFER ATTACHED SCHEDULE | | U$30,000 | EP | U$1,500,000 |
| | | | | | | | | |
| | | | | | | | | |
| A: BROADCAST TERRITORY INCLUDES ALL OF AUSTRALIA VIA ONE TELEVISION STATION IN EACH TELEVISION MARKET IN AUSTRALIA AS DEFINED BY THE AUSTRALIAN BROADCASTING TRIBUNAL. | | | | | | | | |

PAYMENT TERMS ("PT") "EQUAL" TEN (10) EQUAL QUARTERLY PAYMENT DUE JUNE 1, 1991.
SUCH PAYMENT TO BE MADE DIRECT IN UNITED STATES DOLLARS TO THE
AUSTRALIA AND NEW ZEALAND BANKING GROUP LIMITED, NORTH SYDNEY, FOR DEPOSIT
TO "PRIVATE U.S. DOLLAR FOREIGN CURRENCY ACCOUNT, WARNER BROS. (AUSTRALIA)
PTY. LIMITED ACCOUNT NUMBER: 405 100" ON OR BEFORE THE DUE DATE OF EACH
RESPECTIVE INSTALLMENT.

MATERIALS
1" 625  TAPES

MATERIALS CHARGE
INCLUDED IN
LICENSE FEE

MATERIALS TO
TAPES AND PUBLICITY TO
BE SUPPLIED BY SYDNEY.

MATERIALS PAYMENT TERMS
N/A

CONTRACT & INVOICES TO
ABOVE ADDRESS
ATTN: MR ROSS PLAPP
PROGRAM DIRECTOR

ADDITIONAL TERMS
IMPORTANT: THIS ORDER IS SUBJECT TO TERMS AND
CONDITIONS OF "OUTPUT" DEAL DATED FEBRUARY 1, 90
(WITH AMENDMENTS).  SPECIAL CONTRACT AND
ADDITIONAL CLAUSES REQUIRED REFER TO GWEN
WHITSON.

PROMO & SCRIPT TO
ABOVE ADDRESS
ATTN: MS SUE WARD

ML-1920 Rev 1/90 [37]

Licensee
BOND TELEVISION PTY. LTD

SIGNATURE

(PRINT OR TYPE NAME & TITLE)

The General Provisions printed on the reverse hereof apply to all product covered by this Contract Order.

WB 9245
CONFIDENTIAL



Bond TV

SCHEDULE "A"

50   RE-RUN TITLES   *F020240*



| TITLE | START DATE | END DATE |
|---|---|---|
| ABOUT FACE 052122 | JUNE 1, 1991 | MAY 31, 1996 |
| BACKFIRE 050315 | JUNE 1, 1991 | MAY 31, 1996 |
| HEARTBEAT 079809 | JUNE 1, 1991 | MAY 31, 1996 |
| BIG JIM MCCLAIN 043201 | JUNE 1, 1991 | MAY 31, 1996 |
| BLACK GOLD C63263 | JUNE 1, 1991 | MAY 31, 1996 |
| BLADE RUNNER 082104 | NOV 1, 1991 | OCT 30, 1996 |
| THE BURNING HILLS 057801 | JUNE 1, 1991 | MAY 31, 1996 |
| THE COOL ONES 067655 | JUNE 1, 1991 | MAY 31, 1996 |
| THE CROOKED ROAD 058416 | JUNE 1, 1991 | MAY 31, 1996 |
| THE D.I. 057617 | JUNE 1, 1991 | MAY 31, 1996 |
| DOC SAVAGE, MAN OF BRONZE 075406 | JUNE 1, 1991 | MAY 31, 1996 |
| WHATS UP DOC 072110 | FEB 1, 1992 | JAN 31, 1997 |
| HELL BENT FOR GLORY 058716 | JUNE 1, 1991 | MAY 31, 1996 |
| INCREDIBLE MR. LIMPET 064359 | JUNE 1, 1991 | MAY 31, 1996 |
| ISLAND OF LOVE 063264 | JUNE 1, 1991 | MAY 31, 1996 |
| JET OVER THE ATLANTIC 360008 | JUNE 1, 1991 | MAY 31, 1996 |
| JUMP INTO HELL 055410 | JUNE 1, 1991 | MAY 31, 1996 |
| JOHNNY TROUBLE 581310 | JUNE 1, 1991 | MAY 31, 1996 |
| LOST BOUNDARIES 586960 | JUNE 1, 1991 | MAY 31, 1996 |
| LULLABY OF BROADWAY 051030 | JUNE 1, 1991 | MAY 31, 1996 |
| THE MACOMBER AFFAIR 586380 | JUNE 1, 1991 | MAY 31, 1996 |
| MAD MAX II, THE ROAD WARRIOR 052151 | SEP 29, 1991 | SEP 28, 1996 |
| MILLIONAIRE FOR CHRISTY 530240 | JUNE 1, 1991 | MAY 31, 1996 |
| NATIONAL LAMPOONS VACATION 083206 | JULY 1, 1991 1992 | JUN 30, 1996 1997 |
| NIGHTSHIFT 082113 | FEB 1, 1992 | JAN 31, 1997 |
| WORLD ACCORDING TO GARP 082106 | FEB 1, 1992 | JAN 31, 1997 |
| OPERATION SECRET 053205 | JUNE 1, 1991 | MAY 31, 1996 |
| OUR MISS BROOKS 056515    052105 | JUNE 1, 1991 | MAY 31, 1996 |
| PAINTING THE CLOUDS WITH SUNSHINE | JUNE 1, 1991 | MAY 31, 1996 |
| THE PHYNX 070858 | JUNE 1, 1991 | MAY 31, 1996 |
| PRETTY BABY 051004 | JUNE 1, 1991 | MAY 31, 1996 |
| PRINCE OF THE CITY 081002 | AUG 1, 1991 | JUL 31, 1996 |
| PROMISES IN THE DARK 079812 | JUNE 1, 1991 | MAY 31, 1996 |
| RISKY BUSINESS 082201 | JUNE 1, 1992 | MAY 31, 1997 |
| ROLLOVER 081013 | JUNE 1, 1991 | MAY 31, 1996 |
| SHOOTOUT AT MEDICINE BEND 057615 | JUNE 1, 1991 | MAY 31, 1996 |
| SIMON 080904 | JUNE 1, 1991 | MAY 31, 1996 |
| SO FINE 081015 | JUNE 1, 1991 | MAY 31, 1996 |
| SO THIS IS LOVE 053226 | JUNE 1, 1991 | MAY 31, 1996 |
| STARLIFT 052109 | JUNE 1, 1991 | MAY 31, 1996 |
| STOP THE WORLD, I WANT TO GET OFF    066552 | JUNE 1, 1991 | MAY 31, 1996 |
| STOP, YOU'RE KILLING ME 053210 | JUNE 1, 1991 | MAY 31, 1996 |
| TARGET ZERO 056508 | JUNE 1, 1991 | MAY 31, 1996 |
| TOWARD THE UNKNOWN 057604 | JUNE 1, 1991 | MAY 31, 1996 |
| WALL OF NOISE 064351 | JUNE 1, 1991 | MAY 31, 1996 |
| WHATEVER HAPPENED TO BABY JANE 063252 | JUNE 1, 1991 | MAY 31, 1996 |
| WOLFEN 080912 | JUNE 1, 1991 | MAY 31, 1996 |
| THE TANKS ARE COMING 052108 | JUNE 1, 1991 | MAY 31, 1996 |
| GREAT GEORGIA BANK HOAX 078723 | JUNE 1, 1991 | MAY 31, 1996 |
| MORTADELLA 072150 | JUNE 1, 1991 | MAY 31, 1996 |

WB 9246
CONFIDENTIAL



PRODUCTIONS ET EDITIONS CINEMATOGRAPHIQUES FRANCAISES
S.A. (P.E.C.F.)
67 AVENUE DE WAGRAM, BP 653-75826
PARIS CEDEX 17, FRANCE

| CONTRACT NO. FBN229M | PAGE 1 |
|---|---|
| DATE MARCH 26, 2001 | |
| SALES REPRESENTATIVE MICHEL LECOURT | |
| REFERENCE NO. FR01-24 | |

## NON-EXCLUSIVE BASIC SUBSCRIPTION TELEVISION LICENSE AGREEMENT

Subject to timely payment of the Total License Fee and due performance of all other provisions of this Agreement, Warner licenses solely to the Licensee named below, and Licensee licenses from Warner, the following Programs on the following terms and conditions.

**LICENSEE**
TURNER ENTERTAINMENT NETWORKS INTERNATIONAL LIMITED

| ADDRESS 16 GREAT MARLBOROUGH STREET | LICENSED TERRITORY FRANCE, DOM TOM, ANDORRA, MONACO, BELGIUM SWITZERLAND | |
|---|---|---|
| CITY & COUNTRY LONDON W1V 1AF UNITED KINGDOM | LICENSED STATION TCM | LICENSED LANGUAGE ENGLISH VERSION WITH FRENCH SUBTITLES |
| PROGRAM TITLE(S) SEE SCHEDULE A | | PROGRAM(S) DURATION N/A |

| FIRST RUN 48 | RERUNS 73 | TELECASTS/REPEATS N/A | RUNS 1 | START DATE SEE SCHEDULE A | END DATE SEE SCHEDULE A |
|---|---|---|---|---|---|
| NO-OF-EPISODES/TELECASTS/TITLES/HOURS 121 | LICENSE FEE FF35,000.00 | | PER TITLE | TOTAL LICENSE FEE FF4,235,000.00 | |

**PAYMENT TERMS AND INVOICING INSTRUCTIONS**
100 % DUE ON CONTRACT SIGNATURE.
Pay to: PRODUCTIONS EF EDITIONS CINEMATOGRAPHIQUES FRANCAISES SA
C/O CREDIT LYONNAIS, Agence Champs Elysees, Code Banque 30002,
Code guichet 00574, Compte no. 000000 49 62D

690,621.59 Eu

DATE _____
USER _____
CUST # 220899
CONTRACT # FBN229M
CO # 099
ITS MO. 3/02
ITD MEMO # 5/02

| MATERIALS BETACAM DIGITAL OR BETA SP | MATERIALS CHARGE ON LOAN | MATERIALS TO TURNER CLASSIC MOVIES C/O TURNER ENTERTAINMENT NETWORK INT'L CNN HOUSE 19-22 RATHBONE PLACE LONDON, W1P 1DF UNITED KINGDOM |
|---|---|---|
| MATERIALS PAYMENT TERM N/A | | PROMO & SCRIPT TO TURNER CLASSIC MOVIES C/O TURNER ENTERTAINMENT NETWORK INT'L CNN HOUSE 19-22 RATHBONE PLACE LONDON, W1P 1DF UNITED KINGDOM |

When executed by the Licensee and an authorized officer of Warner, this will constitute a binding Agreement. If Licensee's execution is by an agent, such agent represents and warrants that it is duly authorized to execute this Agreement.

**THIS AGREEMENT INCLUDES ALL THE TERMS AND CONDITIONS, SCHEDULES AND EXHIBITS ATTACHED HERETO.**
ACCEPTED

LICENSEE
BY: _____ (SIGNATURE)
**LYNNE FRANK**
MANAGING DIRECTOR (PLEASE PRINT NAME & TITLE)
ENTERTAINMENT NETWORKS, TBS EUROPE

P.E.C.F.
BY: _____ (SIGNATURE)

**CONFIDENTIAL**

G:\USERS\CONTRACT\KSLL\CONTRACT\FBN229M.DOC12:44 PM|03/30/01

EX. J    WB 6902

FRANCE

FBN229M
PAGE  2

SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM FRENCH FRANCS | TOTAL LICENSE FEE FRENCH FRANCS |
|---|---|---|---|---|---|
| "10" | APR 01,2000 | JUN 30,2000 | 1 | 35,000.00 | 35,000.00 |
| 55 DAYS AT PEKING (RR) | JAN 01,2000 | MAR 31,2000 | 1 | 35,000.00 | 35,000.00 |
| AL CAPONE | MAR 01,2000 | MAY 31,2000 | 1 | 35,000.00 | 35,000.00 |
| ALICE DOESN'T LIVE HERE ANYMORE (RR) | MAR 01,2000 | MAY 31,2000 | 1 | 35,000.00 | 35,000.00 |
| ALONG THE GREAT DIVIDE | OCT 01,2000 | DEC 31,2000 | 1 | 35,000.00 | 35,000.00 |
| AMARCORD (IL BORGO) (RR) | MAR 01,2000 | MAY 31,2000 | 1 | 35,000.00 | 35,000.00 |
| AMERICAN FLYERS (RR) | JUL 01,2000 | SEP 30,2000 | 1 | 35,000.00 | 35,000.00 |
| AMERICAN DREAM, AN (RR) | JUN 01,2000 | AUG 31,2000 | 1 | 35,000.00 | 35,000.00 |
| APRIL IN PARIS (RR) | AUG 01,2000 | OCT 31,2000 | 1 | 35,000.00 | 35,000.00 |
| ARRANGEMENT, THE (RR) | APR 01,2000 | JUN 30,2000 | 1 | 35,000.00 | 35,000.00 |
| ARTHUR (RR) | MAR 01,2000 | MAY 31,2000 | 1 | 35,000.00 | 35,000.00 |
| BADLANDERS (RR) | JAN 01,2000 | MAR 31,2000 | 1 | 35,000.00 | 35,000.00 |
| BATTLE OF THE BULGE, THE (RR) | JAN 01,2000 | MAR 31,2000 | 1 | 35,000.00 | 35,000.00 |
| BEETLEJUICE (RR) | FEB 01,2000 | APR 30,2000 | 1 | 35,000.00 | 35,000.00 |
| BEING THERE (RR) | SEP 01,2000 | NOV 30,2000 | 1 | 35,000.00 | 35,000.00 |
| BEST FRIENDS (RR) | APR 01,2000 | JUN 30,2000 | 1 | 35,000.00 | 35,000.00 |
| BIG HAND FOR THE LITTLE LADY, A | SEP 01,2000 | NOV 30,2000 | 1 | 35,000.00 | 35,000.00 |
| BIG WEDNESDAY (RR) | AUG 01,2000 | OCT 31,2000 | 1 | 35,000.00 | 35,000.00 |
| BLAZING SADDLES (RR) | APR 01,2000 | JUN 30,2000 | 1 | 35,000.00 | 35,000.00 |
| BOBBY DEERFIELD (RR) | OCT 01,2000 | DEC 31,2000 | 1 | 35,000.00 | 35,000.00 |
| BOMBERS B-52 (RR) | OCT 01,2000 | DEC 31,2000 | 1 | 35,000.00 | 35,000.00 |
| BRONCO BILLY (RR) | SEP 01,2000 | NOV 30,2000 | 1 | 35,000.00 | 35,000.00 |
| BULLITT (RR) | SEP 01,2000 | NOV 30,2000 | 1 | 35,000.00 | 35,000.00 |
| CHARGE AT FEATHER RIVER, THE | MAY 01,2000 | JUL 31,2000 | 1 | 35,000.00 | 35,000.00 |
| CHEYENNE AUTUMN (RR) | MAR 01,2000 | MAY 31,2000 | 1 | 35,000.00 | 35,000.00 |
| COME FILL THE CUP | OCT 01,2000 | DEC 31,2000 | 1 | 35,000.00 | 35,000.00 |

**WB 6903**

CONFIDENTIAL

G:\USERS\CONTRACT\XSXL\SCHEDULE\FBN229M.DOC[4:06 PM]



FRANCE

FBN229M
PAGE  3

SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM FRENCH FRANCS | TOTAL LICENSE FEE FRENCH FRANCS |
|-------|-------|-------|-------|-------|-------|
| COOL HAND LUKE (RR) | MAR 01,2000-MAY 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| CRY IN THE NIGHT,A | MAY 01,2000-JUL 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| DALLAS (RR) | JAN 01,2000-MAR 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| DAYS OF WINE AND ROSES | SEP 01,2000-NOV 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| DEADLY FRIEND (RR) | MAY 01,2000-JUL 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| DOG DAY AFTERNOON (RR) | APR 01,2000-JUN 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| ENFORCER, THE (RR) | SEP 01,2000-NOV 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| FIVE DAYS ONE SUMMER (RR) | FEB 01,2000-APR 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| FORT APACHE, THE BRONX (RR) | OCT 01,2000-DEC 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| FORT DOBBS | APR 01,2000-JUN 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| FREEBIE AND THE BEAN (RR) | APR 01,2000-JUN 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| GREAT RACE, THE (RR) | APR 01,2000-JUN 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| GRUMPY OLD MEN (RR) | SEP 01,2000-NOV 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| GUMBALL RALLY (RR) | OCT 01,2000-DEC 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| GYPSY (1963) | MAY 01,2000-JUL 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| HAND, THE (RR) | MAY 01,2000-JUL 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| HONKYTONK MAN (RR) | JUN 01,2000-AUG 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| I DIED A THOUSAND TIMES (RR) | JAN 01,2000-MAR 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| I LOVE YOU ALICE B. TOKLAS (RR) | SEP 01,2000-NOV 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| INTERVIEW WITH THE VAMPIRE | OCT 01,2000-DEC 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| KLUTE (RR) | JAN 01,2000-MAR 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| LAND OF THE PHARAOHS (RR) | SEP 01,2000-NOV 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| LEFT-HANDED GUN, THE (RR) | MAR 01,2000-MAY 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| LOST BOYS, THE (RR) | SEP 01,2000-NOV 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| ACME ADVENTURE | FEB 01,2000-APR 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| MACKINTOSH MAN, THE (RR) | JAN 01,2000-MAR 31,2000 | | 1 | 35,000.00 | 35,000.00 |

**WB 6904**

**CONFIDENTIAL**

G:\USERS\CONTRACT\LISTA\SCHEDULE\FBN229M.DOC{4:06 PM}

FRANCE

FBN229M
PAGE  4

SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM FRENCH FRANCS | TOTAL LICENSE FEE FRENCH FRANCS |
|---|---|---|---|---|---|
| MAN BEHIND THE GUN, THE | JUL 01,2000-SEP 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| MARA MARU | OCT 01,2000-DEC 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| MASSACRE RIVER | JUN 01,2000-AUG 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| MERRILL'S MARAUDERS (RR) | JAN 01,2000-MAR 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| MIRACLE OF FATIMA, THE | APR 01,2000-JUN 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| MONTANA | JAN 01,2000-MAR 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| MORTADELLA, LA (RR) | MAR 01,2000-MAY 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| NUN'S STORY, THE (RR) | APR 01,2000-JUN 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| OLD MAN AND THE SEA, THE (RR) | FEB 01,2000-APR 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| OUTLAND (RR) | APR 01,2000-JUN 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| OUTLAW JOSEY WALES (RR) | SEP 01,2000-NOV 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| PT 109 (RR) | JAN 01,2000-MAR 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| PARRISH | FEB 01,2000-APR 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| PAY OR DIE | MAR 01,2000-MAY 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| PEE-WEE'S BIG ADVENTURE (RR) | FEB 01,2000-APR 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| POCKET MONEY (RR) | OCT 01,2000-DEC 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| PORTRAIT OF A MOBSTER | MAR 01,2000-MAY 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| PRINCE AND THE SHOWGIRL, THE (RR) | MAY 01,2000-JUL 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| RACHEL, RACHEL (RR) | OCT 01,2000-DEC 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| RETURN OF THE FRONTIERSMAN | MAY 01,2000-JUL 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| REVOLT IN THE BIG HOUSE | OCT 01,2000-DEC 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| REVOLUTION (RR) | FEB 01,2000-APR 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| RIDING SHOTGUN (RR) | MAY 01,2000-JUL 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| RISE AND FALL OF "LEGS" DIAMOND, THE | JAN 01,2000-MAR 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| ROCKY MOUNTAIN | JUL 01,2000-SEP 30,2000 | | 1 | 35,000.00 | 35,000.00 |

**WB 6905**

**CONFIDENTIAL**

G:\USERS\CONTRACT\X5X1\SCHEDULE\FBN229M.DOC(4:06 PM)



FRANCE

FBN229M
PAGE 5

SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM FRENCH FRANCS | TOTAL LICENSE FEE FRENCH FRANCS |
|---|---|---|---|---|---|
| S.O.B. (RR) | APR 01,2000-JUN 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| SEA CHASE, THE (RR) | SEP 01,2000-NOV 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| SERGEANT RUTLEDGE (RR) | FEB 01,2000-APR 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| SEX KITTENS GO TO COLLEGE | MAY 01,2000-JUL 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| SHE (RR) | FEB 01,2000-APR 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| SHE'S BACK ON BROADWAY | MAY 01,2000-JUL 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| MASKS OF DEATH, THE | JUN 01,2000-AUG 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| SHUTTERED ROOM, THE | APR 01,2000-JUN 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| SINCERELY YOURS | OCT 01,2000-DEC 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| SINS OF RACHEL CADE, THE | OCT 01,2000-DEC 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| SO BIG | MAY 01,2000-JUL 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| SPENCER'S MOUNTAIN | OCT 01,2000-DEC 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| SPLENDOR IN THE GRASS (RR) | MAR 01,2000-MAY 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| SPRINGFIELD RIFLE (RR) | MAY 01,2000-JUL 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| ST. IVES (RR) | MAY 01,2000-JUL 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| STAKEOUT ON DOPE STREET | SEP 01,2000-NOV 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| STALKING MOON, THE (RR) | JUL 01,2000-SEP 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| STAR IS BORN, A (1955) (RR) | SEP 01,2000-NOV 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| STORM WARNING | AUG 01,2000-OCT 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| STRAIGHT TIME (RR) | OCT 01,2000-DEC 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| STREETCAR NAMED DESIRE, A (RR) | MAR 01,2000-MAY 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| SUMMER PLACE, A | FEB 01,2000-APR 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| TALL MAN RIDING (RR) | JUN 01,2000-AUG 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| TEA FOR TWO | AUG 01,2000-OCT 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| THIS WOMAN IS DANGEROUS | JAN 01,2000-MAR 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| COLT .45 | MAY 01,2000-JUL 31,2000 | | 1 | 35,000.00 | 35,000.00 |

**WB 6906**

CONFIDENTIAL



G:\USEAS\CONTRACT\LEX\\SCHEDULE\FBN229M.DOC14106  rmb

FRANCE

FBN229M
PAGE  6

SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM FRENCH FRANCS | TOTAL LICENSE FEE FRENCH FRANCS |
|---|---|---|---|---|---|
| TOWARD THE UNKNOWN | SEP 01,2000-NOV 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| TOWERING INFERNO, THE (RR) | MAR 01,2000-MAY 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| TRACK OF THE CAT | MAY 01,2000-JUL 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| TRIAL BY COMBAT | SEP 01,2000-NOV 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| UP PERISCOPE | OCT 01,2000-DEC 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| VALLEY OF THE GWANGI | APR 01,2000-JUN 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| VALLEY OF THE SWORDS | APR 01,2000-JUN 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| VERDICT (RR) | JAN 01,2000-MAR 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| WESTBOUND | MAR 01,2000-MAY 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| WHAT AM I DOING IN THE MIDDLE OF THE REVOLUTION (RR) | FEB 01,2000-APR 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| WHEN TIME RAN OUT (RR) | OCT 01,2000-DEC 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| WHICH WAY TO THE FRONT? (RR) | APR 01,2000-JUN 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| WHO DARES WINS? | MAR 01,2000-MAY 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| WHO'S AFRAID OF VIRGINIA WOOLF? (RR) | MAR 01,2000-MAY 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| YELLOWSTONE KELLY (RR) | FEB 01,2000-APR 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| YOUNG PHILADELPHIANS, THE | FEB 01,2000-APR 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| ZANDY'S BRIDE | AUG 01,2000-OCT 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| ZEPPELIN (RR) | APR 01,2000-JUN 30,2000 | | 1 | 35,000.00 | 35,000.00 |

TOTALS                                    4,235,000.00

1.  One (1) multiple run equals three (3) runs within seven (7) days.

2.  The rights granted hereunder are non-exclusive to the Licensee.

**WB 6907**

**CONFIDENTIAL**

G:\USERS\CONTRACT\EXELL\SCHEDULE\FBN.DOC(4:06 PM)

FRANCE

FBN229M
PAGE   7

SCHEDULE "A"

3.  If any of the provisions of this Schedule "A" conflict with any of the provisions of the Agreement to which this Schedule "A" is attached, the provisions of this Schedule "A" shall prevail.

**WB 6908**

**CONFIDENTIAL**

G:\USERS\CONTRACT\XFXL\SCHEDULE A FRANCE.DOC(4:06 PM)

Draft 1 dated 9 November 2000
Non binding draft
Subject to contract and negotiation

## RIDER
### WARNER PRODUCT

1. The rights licensed hereunder shall expressly exclude the distribution of any Program by means of computer networks integrated through the use of any protocol now known or hereafter in existence, including, without limitation, the TCP/IP protocol or any successor or similar technology used to access such computer networks (including, without limitation, the "Internet") for display on any viewing device (including, without limitation, liquid crystal devices, plasma screens, hand held viewing devices, video display monitors, and the like) using computer or computer mediated processing units or similar technology now known or hereafter in existence ("Online Rights").

2. Licensee shall not, and shall not authorise any third party to include or employ any interactive or enhanced television technology which will result in any interactive features, metatags or additional data streams in relation to a Program, in or around any such Program or Program signal.

3. Licensee shall not, and shall not authorise or permit any third party to register, use or otherwise exploit any of Warner's Trademarks, trade names, service marks or any other proprietary marks, copyrighted materials, the name of any Program or character therein, or the name of any person or entity affiliated with any Program, as an Internet domain name or URL, or any part thereof, or in any other manner not expressly authorised herein.

4. Licensee shall not, and shall not authorise or permit any third party to use or otherwise exploit any Materials in connection with any interactive promotional, publicity or marketing campaign, without Warner's prior written approval, which approval may be withheld in Warner's sole and absolute discretion.

5. Any and all rights in any Program not expressly licensed to Licensee herein, including but not limited to, Online Rights, are reserved by Warner and may be exercised, marketed and exploited by Warner concurrently with and throughout the Term of this Agreement.

6. Licensee shall furnish to Warner, on a weekly basis and at no cost to Warner, overnight ratings information available to Licensee with respect to the Transmission of each Program on the Licensed Station during the previous week. The ratings information shall be provided to Warner by facsimile or courier to the attention of Senior Vice President, Marketing, Warner Bros. International Television Distribution.

7. To the extent this Rider is inconsistent with the License Agreement, Schedules or Additional Terms and Conditions attached hereto, this Rider shall control.

## CONFIDENTIAL

**WB 6909**



Draft 1 dated 9 November 2000
Non binding draft
Subject to contract and negotiation

## RIDER
## CARTOON CARTOONS &
## TURNER CARTOONS

1.  The rights licensed hereunder shall expressly exclude the distribution of any Program by means of computer networks integrated through the use of any protocol now known or hereafter in existence, including, without limitation, the TCP/IP protocol or any successor or similar technology used to access such computer networks (including, without limitation, the "Internet") for display on any viewing device (including, without limitation, liquid crystal devices, plasma screens, hand held viewing devices, video display monitors, and the like) using computer or computer mediated processing units or similar technology now known or hereafter in existence ("Online Rights").

2.  Licensee shall not, and shall not authorise or permit any third party to register, use or otherwise exploit any of Warner's Trademarks, trade names, service marks or any other proprietary marks, copyrighted materials, the name of any Program or character therein, or the name of any person or entity affiliated with any Program, as an Internet domain name or URL, or any part thereof, or in any other manner not expressly authorised herein.

3.  Any and all rights in any Program not expressly licensed to Licensee herein, including but not limited to, Online Rights, are reserved by Warner and may be exercised, marketed and exploited by Warner concurrently with and throughout the Term of this Agreement.

4.  Licensee shall furnish to Warner, on a weekly basis and at no cost to Warner, overnight ratings information available to Licensee with respect to the Transmission of each Program on the Licensed Station during the previous week. The ratings information shall be provided to Warner by facsimile or courier to the attention of Senior Vice President, Marketing, Warner Bros. International Television Distribution.

5.  To the extent this Rider is inconsistent with the License Agreement, Schedules or Additional Terms and Conditions attached hereto, this Rider shall control.

**CONFIDENTIAL**        **WB 6910**



**WARNER BROS. INTERNATIONAL TELEVISION DISTRIBUTION,**
**a division of Time Warner Entertainment Company, L.P.**
**BASIC SUBSCRIPTION TELEVISION LICENSE AGREEMENT**
**ADDITIONAL TERMS AND CONDITIONS**

These Additional Terms and Conditions ("Additional Terms") supplement the terms and conditions of the International Basic Subscription Television License Agreement between Warner Bros. International Television Distribution, a division of Time Warner Entertainment Company, L.P. ("WARNER") and LICENSEE to which the Additional Terms are attached (the "License Agreement"). The License Agreement as supplemented by the Additional Terms shall be referred to hereinafter as the "Agreement." Unless otherwise defined herein, all capitalized terms used in the text of the Additional Terms without definition shall have the same meanings as in the License Agreement.

**1.    DEFINITIONS**

As used in the Additional Terms, the terms listed below will have the following defined meanings:

       a.    An "Affiliated System" means a cable system, <u>UHF or VHF digital terrestrial system,</u> satellite master antenna ("SMATV") system, terrestrial microwave multipoint distribution system ("MDS" or "MMDS"), or satellite "direct-to-home" ("DTH") system, which is located entirely within the Territory and which has entered into an agreement with LICENSEE pursuant to which such entity is authorized by LICENSEE to Transmit the Licensed Service by means of Basic Subscription Television to subscribers during the License Period applicable to the Program. At WARNER's request, LICENSEE shall provide WARNER with a list of the Affiliated Systems as of the date of such request.

       b.    "Basic Subscription Television" means the Transmission of an analog <u>or digital</u> signal containing programming as part of a program service for television reception in respect of which a periodic subscription fee is charged to the subscriber for the privilege of receiving such program service together with other program services, which program service is primarily supported by advertisement revenues and sponsorships. The Transmission of programming on an advertiser-supported program service that is offered on a "stand alone" or "a la carte" basis shall not, on that basis alone, be considered as other than in the medium of Basic Subscription Television unless the wholesale fee per subscriber generally charged by such program service to its Affiliated Systems is comparable to the fee charged by Premium Subscription Television program services in the same territory. Basic Subscription Television may only be Transmitted by Encrypted satellite signals or by ~~terrestrial means of Transmission other than unencrypted Broadcast to subscribers of a program service who receive such Transmission through cable systems, SMATV systems, MDS or MMDS, or DTH systems affiliated with such program service.~~
<u>UHF or VHF terrestrial signals, SMATV, MDS, MMDS or transmission through cable systems. The broadcast or transmission of the Licensed Service must be simultaneous over all Affiliated Systems and on all means of delivery.</u>

       c.    "Encrypted" means the condition of a television signal both the audio and video portions of which have been changed, altered or encoded to prevent the reception of the Transmission of such signal without an adaptor, which is necessary to restore both the audio and video signal integrity.

       d.    "Free Television" means the Transmission of an analog signal containing programming for television reception without a charge to the viewer for the privilege of receiving such programming. For purposes of this Agreement, neither governmental television receiver assessments nor taxes shall be deemed a charge to the viewer. Free Television is Transmitted by means of "Broadcast" (consisting solely of the Transmission of standard, unencrypted, over-the-air Hertzian wave VHF, UHF or low power television signals), which Broadcast may be furthered by microwave translators or relay systems or boosters. Free Television also includes the re-Transmission by satellite or cable systems of a Broadcast.

       e.    "Premium Subscription Television" means the Transmission of a signal containing programming as part of a program service for television reception in homes or other non-public residences or dwellings in respect of which a premium subscription fee is charged to the subscriber for the privilege of receiving such program service, which is not supported, in significant measure, by advertisement revenues and sponsorships. Premium Subscription Television is Transmitted by Encrypted satellite Transmissions or by Encrypted terrestrial means of Transmission to subscribers who receive such Transmission through cable systems, SMATV systems, MDS, or MMDS, or DTH systems affiliated with such program service. For purposes of this Agreement, Premium Subscription Television does not include any arrangements whereby a program is Transmitted individually, and for a separate and distinct payment, on a pay-per-view or video-on-demand basis.

G:\USERS\SLOSIN\Contract Riders and Attachments\Warner Product ATCsRL.doc
l:agrmt/btc/basubtc.wp
Basic Subscription Terms & Conditions
11/14/96

**CONFIDENTIAL**                                    1                                    **WB 6911**

EXHIBIT D    Page 63



f.    "Satellite" means each satellite listed in Schedule A to the Agreement, it being acknowledged and agreed by LICENSEE that if such Schedule does not list any satellite, the Basic Subscription Television rights granted by this Agreement may only be exercised by terrestrial means of Transmission.

## 2.    LICENSE

Subject to LICENSEE's performance of all of its obligations under this Agreement, including but not limited to, the payment of License Fees, WARNER hereby grants LICENSEE a limited license under copyright to transmit, exhibit, telecast, exploit or broadcast ("transmit" or "Transmission") each Program in its entirety in the Licensed Language over the facilities of the Licensed Station in the Licensed Territory during the License Period for each Program in the medium of Basic Subscription Television. LICENSEE shall Transmit each Program in its entirety in a single time slot without interruption, other than for the insertion of commercials as provided in paragraph 10(d) below.

## 3.    EXCLUSIVITY

Provided the License Agreement to which these Additional Terms are attached specifies that the rights granted by WARNER to LICENSEE are exclusive, the following shall apply: during the License Period for any Program WARNER shall not voluntarily license such Program for Broadcast by Basic Subscription Television in the Licensed Language over any other television station or cable television system whose originating television transmitter or cable system is located within the Licensed Territory and the signals from which are intended for reception within the Licensed Territory; provided, however, that WARNER does not grant exclusivity protection for any Transmission of the Program not specified herein or which may be required by any applicable laws or where such laws fail to provide copyright protection in the Licensed Territory. In particular, but without limitation, WARNER does not grant exclusivity protection with respect to (i) Basic Subscription Television within the Licensed Territory in any version other than the Licensed Language version, (ii) Transmission within the Licensed Territory by any program service which is owned, managed or controlled, in whole or in part, by WARNER or any entity under common control with WARNER or which is branded in any form with the name of, or a name associated with, WARNER or any entity under common control with WARNER, (iii) Transmission (or re-Transmission) by satellite or cable systems of broadcast signals originating outside the Licensed Territory or (iv) exploitation of the Program in any other medium. In the event the License Agreement to which these Additional Terms are attached does not specify that the rights granted by WARNER to LICENSEE are exclusive, such rights shall be non-exclusive.

## 4.    LICENSE PERIOD AND TERM

a.    The license period for a Program (the "License Period") shall begin on the date such Program first becomes available to LICENSEE as specified in the License Agreement ("Start Date") and end on the earlier of: (i) the End Date specified in the License Agreement or (ii) the date of the last licensed Transmission of such Program.

b.    The term of this Agreement (the "Term") begins on the date of the License Agreement and ends on the earlier of (i) the expiration of the latest License Period to expire or (ii) the date of any earlier termination in accordance with the provisions hereof. The expiration of the Term shall be without prejudice to the accrued rights and obligations of the parties, and to the rights and obligations which expressly or by implication survive the expiration of the Term or the earlier termination of the License Agreement.

## 5.    PAYMENT OF LICENSE FEES

a.    As used herein, the words "payment," "pay," "payable," "paid" or words of similar meaning when applied to obligations of LICENSEE to WARNER mean the actual receipt by WARNER, in United States dollars in the amount specified herein without offset or recoupment, of cash, a bank transfer of unencumbered, immediately available funds to WARNER's account, the unconditional clearance of a check or bank draft payable to WARNER and drawn on a United States bank, or the draw down by WARNER of a previously approved and existing letter of credit from a United States bank pursuant to the terms thereof. Payment in any other manner shall not be deemed made to WARNER until the amount of United States dollars due and payable has been received and is available for expenditure by WARNER. LICENSEE bears the risk that payment in any other manner shall not be deemed made to WARNER within the time periods specified herein.

b.    In its sole and absolute discretion, WARNER may accept funds tendered to it by LICENSEE in a currency other than United States dollars. Such acceptance shall not constitute a waiver of WARNER's rights under paragraph 5.a. Payment, therefore, shall not be deemed to have been made until WARNER has converted the non-U.S. currency, net of all costs of conversion, to the amount of United States dollars due and payable. LICENSEE shall bear all risks associated with the conversion including delay, costs of conversion,

G:\USERS\SLOSIN\Contract Riders and Attachments\Warner Product ATCsRL.doc
I:sgnnt\Adc\bssc&c.wp
Basic Subscription Terms & Conditions
11/14/97

CONFIDENTIAL    2    WB 6912

EXHIBIT D    Page 64



fluctuations in the exchange rate and WARNER's choice of currency exchange agent. In the event that WARNER converts the non-U.S. currency to an amount of United States dollars, net of all costs of conversion, in excess of the License Fee due and payable, WARNER may keep the excess without giving any credit to LICENSEE's account for the excess.

c.      LICENSEE shall obtain all governmental permits necessary to make all payments to WARNER required under this Agreement. LICENSEE shall also pay, without limitation, every tax, levy or charge, however denominated, imposed or levied against LICENSEE, WARNER or any Program by any authority having jurisdiction over LICENSEE's use of any Program other than a tax, levy or charge based on WARNER's net income. Such taxes, levies or charges include, without limitation, quotas, value added taxes, so-called "remittance" and withholding taxes, licenses, "Contingents," turnover taxes, import permits and duties, and national, state, county, city and other taxes, however denominated, relating to or imposed upon the License Fee or any part thereof, the license or the Transmission of any Program, any other amounts payable to WARNER, negatives, prints or other Material, the storage or possession of any Program or any Material, or the right or privilege to use the same in connection with the Programs. LICENSEE may deduct from the License Fee payable to WARNER taxes which are levied on WARNER's License Fee and paid to a government authority on WARNER's behalf, only if such taxes are levied in accordance with the income tax laws of the government authority to which the taxes are payable and such taxes are creditable in the United States in accordance with the income tax laws of the United States and if, after payment of such taxes, LICENSEE promptly provides WARNER with an official tax receipt evidencing such payment on WARNER's behalf, or, if this is not possible due to law or regulation, LICENSEE provides a copy of said receipt to WARNER. Where applicable, LICENSEE shall provide an English language translation of any such tax receipt.

d.      All License Fees are to be paid when due without regard to delays in the date of Transmission of any Program because of late delivery of Materials, the unavailability of Materials, a Force Majeure Occurrence (as defined below), the extension of this Agreement or WARNER's exercise of any of its rights under this Agreement. Timely payment is of the essence of this Agreement. LICENSEE's failure to make any payments when due shall constitute a material default hereof.

e.      WARNER shall have the right to charge interest on any payment not received within ten (10) days of its due date at the rate which is the lower of two (2) percentage points over the then current advertised prime rate at the Bank of America N.T. & S.A. or the then current highest rate allowable under law for this Agreement. Interest, if charged, shall be compounded monthly retroactive to the date payment was first due and shall continue to be charged, each month, on the unpaid balance until all such amounts are paid.

f.      If laws or currency regulations now or at any time prohibit or restrict LICENSEE from paying any sums due WARNER, LICENSEE shall advise WARNER promptly in writing. In any such case, upon WARNER's request, LICENSEE shall deposit to WARNER's credit in a bank or banks approved in writing by WARNER or promptly pay to such person or persons as WARNER may designate in writing, all sums due WARNER. LICENSEE also shall reimburse WARNER for any costs incurred by WARNER in remitting such funds to the United States and/or converting such funds into United States dollars. If LICENSEE is prohibited or restricted from making payment of any sums due WARNER, in addition to WARNER's other rights and remedies, WARNER shall have the right to terminate this Agreement forthwith upon written notice to LICENSEE.

6.      **DELIVERY**

a.      LICENSEE may obtain for use in accordance with the terms hereof the transmission, advertising, promotion and related materials ("materials") specified in the License Agreement if it pays WARNER the Materials Charges specified by WARNER from time to time. Except as otherwise herein provided LICENSEE may retain possession of the Materials of or relating to a Program until the earlier of the expiration of the License Period of such Program, the expiration of the Term or the termination of this Agreement by any of its terms, at which time LICENSEE shall return, ship or dispose of the Materials in accordance with paragraph 8 below.

b.      LICENSEE shall Transmit only Materials of the Programs which it has obtained directly from WARNER or directly from a source authorized by WARNER (including another WARNER licensee) to deliver Materials of the Programs to LICENSEE.

c.      LICENSEE shall notify WARNER of the scheduled date of Transmission of each Program at least sixty (60) days prior thereto. If the Materials of the Program are available for Transmission on such scheduled date, WARNER shall arrange for delivery of the Materials to LICENSEE by air, unless otherwise instructed, f.o.b. WARNER's place of shipment. WARNER shall not be responsible for delivery on less than sixty (60) days' notice.

d.      LICENSEE shall bear all costs of transportation, customs duties, censorship fees and any and all other charges relating to the shipment of the Materials into or within the Licensed Territory or from the Licensed Territory to WARNER, and to the storage or use of the Materials by LICENSEE in the Licensed Territory.

G:\USERS\SLOSIN\Contract Riders and Attachments\Warner Product ATCsRL.doc
t:\grms\afc\basc&c.wp
Basic Subscription Terms & Conditions
11/14/97

3

**CONFIDENTIAL**

**WB 6913**

EXHIBIT D     Page 65





## 7.    INSPECTION OF MATERIALS

Immediately upon delivery of any Materials specified in the License Agreement, LICENSEE shall examine such Materials to determine their technical acceptability for transmission or other intended purposes. Unless WARNER is notified otherwise within thirty (30) days of delivery, all Materials shall be deemed acceptable to LICENSEE. If WARNER receives timely notice of a material defect in said Materials, WARNER shall remedy such defect or substitute applicable Materials of the same Program at no additional cost. At WARNER's election, WARNER may exercise its rights to withdraw the Program pursuant to paragraph 21 below.  As used herein, "delivery" and derivations thereof (such as "deliver" and "delivered") mean, as the context requires, either physical delivery of Materials or access to such Materials.

## 8.    RETURN, SHIPPING OR DISPOSITION

a.    LICENSEE agrees to return the Materials of a Program specified in the License Agreement to WARNER to such destinations as WARNER directs within five (5) business days of its receipt of WARNER's instructions but in no event later than the earlier of the expiration of the License Period applicable to the Program, the expiration of the Term or the termination of this Agreement. Any other Materials shall be returned in accordance with WARNER's written instructions.  LICENSEE's failure to return or ship the Materials in accordance with WARNER's instructions shall constitute a material default hereof. If LICENSEE and WARNER enter into a written agreement that the Materials may be disposed of other than by returning them to WARNER or shipping them to a destination fixed by WARNER, LICENSEE may dispose of the Materials in accordance with that agreement.

b.    LICENSEE shall return or ship all Materials at LICENSEE's sole cost and expense in the same condition in which they were received, normal wear and tear excepted. If Materials are lost, stolen, destroyed or damaged between the time of delivery to LICENSEE and the receipt of the Materials by WARNER or its designee, LICENSEE shall pay WARNER the latter's prevailing charge for replacement of the Materials. Such payment shall not, however, transfer to LICENSEE title to any Materials.

c.    When returning or shipping Materials of a Program specified in the License Agreement, LICENSEE shall return to WARNER or ship to its designee in accordance with paragraph 8.a. all dubbed soundtracks, subtitled or subtitling material, and all optical and/or magnetic soundtracks and such other Additional Materials (as defined in paragraph 9.a. below) with respect to such Program which have been created but not consumed in the ordinary course, whether or not LICENSEE used any of said Additional Materials in connection with the exercise of its rights hereunder and whether or not LICENSEE incurred any of the costs of manufacture. Upon request LICENSEE shall send WARNER complete copies and, where applicable, English language translations, of all agreements made with dubbing studios, authors, performers and other parties engaged for the purposes of creating any Additional Materials, together with copies of any translations created for the purposes of or in connection with any Additional Materials, and such other information as WARNER may require concerning any of the same.

## 9.    TITLE

a.    Title in and to Materials of or relating to a Program provided to LICENSEE hereunder is vested and shall remain in WARNER, and title in and to any materials of or relating to a Program or its advertising and its promotion created by, for or at the request of LICENSEE ("Additional Materials") and all rights therein, including (but not limited to) copyrights, rights of use and other rights of exploitation and all neighboring and connecting rights shall, to the fullest extent possible under applicable laws, vest and remain in and are hereby assigned to WARNER upon and as from the earlier of the creation of such Additional Materials or the inception of such rights, for the full periods thereof and for all territories, jurisdictions, methods, means and media now known or hereafter come to be known, subject only to (i) LICENSEE's possession and use until the earlier of the expiration of the License Period of the Program in question, the expiration of the Term or the termination of this Agreement, solely so that LICENSEE may exercise its rights licensed hereunder, and (ii) any inalienable rights ("Inalienable Rights") conferred on any party by applicable laws by virtue of the party being an author or performer. To the extent applicable laws may not recognize at the time the existence of certain of the rights stated to vest in and be assigned hereunder to WARNER, such rights shall vest and remain in and shall be assigned to WARNER on the terms and conditions set forth above immediately upon their recognition by applicable laws.  Notwithstanding the foregoing, LICENSEE shall grant WARNER and its designees access, free of charge, to all Materials and Additional Materials for duplication and other purposes and upon WARNER's reasonable request, LICENSEE shall deliver Materials and Additional Materials to WARNER and its designees for temporary use and return to LICENSEE. As between WARNER and LICENSEE, all Materials and, upon their creation, Additional Materials shall be deemed to have been loaned to LICENSEE by WARNER whether or not LICENSEE paid any of the costs of manufacture.

b.    LICENSEE shall execute, acknowledge and deliver to WARNER any instruments WARNER deems necessary or

G:\USERS\SLOSIN\Contract Riders and Attachments\Warner Product ATCsRL.doc
l:agmts\1tc\basca1tc.wp
Basic Subscription Terms & Conditions
11/14/97

CONFIDENTIAL                4                WB 6914

EXHIBIT D     Page 66



desirable to evidence or effectuate WARNER's ownership of all Materials. LICENSEE shall also execute, acknowledge and deliver to WARNER any instruments of transfer, conveyance or assignment in or to any title and rights in all Additional Materials of a Program which are to vest in WARNER pursuant to paragraph 9.a. above which instruments are necessary or desirable to evidence or effectuate the vesting for as long as is permissible of such rights in WARNER. If LICENSEE fails or refuses to execute, acknowledge or deliver any such instrument, then WARNER shall be deemed to be, and LICENSEE hereby and irrevocably appoints WARNER, its true and lawful attorney-in-fact to execute and deliver all such instruments in LICENSEE's name or otherwise, acknowledging that such power is a power coupled with an interest.

10.    ALTERATION OF PROGRAMS AND MATERIALS

    a.    ·    Except as otherwise set forth herein, LICENSEE shall not change, alter, modify, copy, duplicate or add to any Program or Materials in respect thereof without WARNER's prior written consent. Without limiting the generality of the foregoing, LICENSEE shall not use any Materials or Additional Materials of or relating to a Program, including clips or segments thereof, to create a separate or distinct program.

    b.    LICENSEE shall follow such policies, procedures and directions as WARNER may give LICENSEE from time to time with respect to the creation of any dubbed tracks, subtitles or other foreign language Additional Materials relating to a Program LICENSEE is authorized by WARNER to create pursuant to this Agreement. Without prejudice to the generality of the foregoing, WARNER shall be entitled to approve all creative and production elements in advance of their use and to attend key meetings, recording and other sessions relating to any such Additional Materials and their creation. LICENSEE shall not deviate from an approval once given without a further approval from WARNER.

    c.    LICENSEE may make minor cuts or alterations in a Program and relevant Materials and Additional Materials, as applicable, in order to conform to the orders of any duly authorized, legally constituted censorship authority in the Licensed Territory provided that any such cuts or alterations shall not adversely affect the artistic or pictorial quality or integrity of the Program, and provided further that prior to making same LICENSEE immediately notifies WARNER in writing of the need for such cuts or alterations, obtains WARNER's prior written approval thereof and, at its own expense, replaces any such cuts and alterations so that any applicable Materials are returned to WARNER or shipped to WARNER's designee in the same condition in which they were originally received by LICENSEE, normal wear and tear excepted.

    d.    LICENSEE, at its own expense, may insert commercials in each Program. No commercial shall be inserted in a manner which may adversely affect the artistic or pictorial quality of the Program or damage the Program. All commercials must be removed from each Program, without damage to the Program and relevant Materials or Additional Materials, as applicable, before the Program is returned to WARNER or shipped to its designee. WARNER, its partners, each of their respective affiliates, subsidiaries, parent companies and licensees and the officers, directors, representatives, agents, shareholders and employees of any one or more of them ("WARNER Indemnified Parties") shall have no liability whatsoever for any commercials made or used by LICENSEE. LICENSEE shall indemnify and hold WARNER Indemnified Parties harmless from any claim, cause of action, loss, liability, damage, cost or expense (including attorneys' fees and costs) (collectively "Claims") arising out of or in connection with any commercial inserted in any Program.

    e.    In no event shall any copyright, trade or service mark notice , WARNER's presentation or advertising credit or the credits to any person, firm or corporation appearing on any of the Materials be changed, altered or removed. Any breach or violation of the terms hereof shall constitute a material default entitling WARNER, at its election, to terminate this Agreement, in whole or in part, in addition to any other rights or remedies available to WARNER and without releasing or discharging LICENSEE of any liability hereunder.

    f.    Whenever requested by WARNER to do so, LICENSEE shall change the title of any Program licensed hereunder and shall not thereafter Transmit hereunder any such Program except under the new title.

11.    CENSORSHIP

If despite LICENSEE's compliance with paragraph 10.c. above a Program or episode thereof is rejected for Transmission by any duly authorized, legally constituted government censorship authority in the Licensed Territory and LICENSEE so notifies WARNER, such Program or episode shall be withdrawn and LICENSEE and WARNER shall agree to a comparable substitute program or episode for the one so withdrawn. In the event the parties cannot agree to a comparable substitute program or episode, or there is no comparable substitute program or episode available, the License Fee paid by LICENSEE respecting such withdrawn Program or episode shall be credited or refunded to LICENSEE, provided, however, that no credit or refund will be made if the withdrawn Program or episode was

G:\USERS\SLOSIN\Contract Riders and Attachments\Warner Product ATCsRL.doc
l:agms/rdr/basc&c.wp
Basic Subscription Terms & Conditions
11/14/97

CONFIDENTIAL

WB 6915



Transmitted, in whole or in part, by LICENSEE.

## 12.    TRADEMARKS

a.    Subject to the terms and conditions set forth herein, WARNER hereby grants to LICENSEE a non-exclusive license to use the proprietary marks (the "Trademarks") of Warner Bros. and its affiliated companies in the Licensed Territory during the Term solely in relation to the distribution, exhibition, and exploitation of the Programs hereunder. LICENSEE's use of the Trademarks shall be limited to their incidental use through distribution, exhibition or exploitation of the Programs or use of materials bearing the Trademarks provided to LICENSEE under this Agreement, and to any other use permitted hereunder subject to WARNER's prior written approval. LICENSEE shall not use the Trademarks in any other manner. LICENSEE's use of the Trademarks shall conform to all other terms and conditions of this Agreement.

b.    As between LICENSEE and WARNER, all rights in and to the Trademarks and the goodwill associated with them are owned exclusively by WARNER. All uses of the Trademarks by LICENSEE shall inure solely to WARNER's benefit, and shall remain under WARNER's exclusive control. LICENSEE shall not contest the validity of any of the Trademarks, or Warner Bros.' or any affiliated company's ownership of them. LICENSEE shall not take any action inconsistent with WARNER's, Warner Bros.' and/or any affiliated company's rights in the Trademarks.

c.    Subject always to WARNER's review and prior written approval, which approval may be withheld in WARNER's sole and absolute discretion, LICENSEE may use the trademarks "WARNER BROS." and/or the WB shield logo on LICENSEE's invoices, bills of lading, contracts and letterhead, and in advertising or promotional materials for its business solely as such business relates to the distribution, exhibition and exploitation of the Programs during the Term. Any such material shall first be submitted by LICENSEE to WARNER for WARNER's prior written approval, and LICENSEE shall indemnify and hold the WARNER Indemnified Parties harmless from and against any and all Claims resulting from LICENSEE=s use of such material. LICENSEE shall cause to be imprinted, irremovably and legibly on all advertising, promotional, publicity and display materials relating to the Programs it is authorized hereunder to create, and on all edited, dubbed, subtitled and modified versions of the Programs, appropriate copyright and trademark notices as directed and approved in advance in writing by WARNER.

d.    LICENSEE's use of the Trademarks shall conform to the quality standards required by WARNER hereunder and prescribed by WARNER from time to time during the Term. LICENSEE's use of the Trademarks shall remain at all times subject to WARNER's control and direction.

## 13.    ADVERTISING AND ACCESSORIES

a.    The creation of advertising and promotional materials by or at the request of LICENSEE shall be subject to WARNER's approval and any policies, procedures and guidelines notified by WARNER from time to time. LICENSEE may use the advertising and promotional materials referred to herein no earlier than the commencement of the License Period applicable to the Program. LICENSEE may not advertise or exhibit, in whole or in part, the Programs on the Internet or on any commercial on-line service without WARNER's prior written approval, which approval may be withheld in WARNER's sole and absolute discretion. WARNER shall furnish LICENSEE, on loan and free of charge, with a standard advertising package consisting of 35mm slides, synopses, credits, logo sheets, and where available, production notes, press releases and on-line chat session transcripts relating to a Program. Additional advertising materials including without limitation, transparencies, reproduction quality duplicates and digital archive material may be available to LICENSEE for an additional fee as specified by WARNER. LICENSEE's use of any advertising, promotional or related materials delivered by WARNER shall be in accordance with any directions given by WARNER. All materials and accessories so delivered are included, where the context so permits, in the expression "materials" when used in these Additional Terms.

b.    In all advertising and publicity relating to any Program or any Transmission thereof, LICENSEE shall comply with the advertising and billing credit requirements of the Program as furnished by WARNER to LICENSEE. LICENSEE shall not make or permit to be made, in any advertising, publicity or otherwise, any statements which (i) constitute, or may be understood to be, an endorsement of any sponsor, product, article or service by WARNER or any person, company or corporation connected or associated with the Program, its production or distribution, or (ii) indicate, or may be understood as indicating, that WARNER or any such person, company or corporation is connected or associated with any sponsor, product, article, service or advertiser. Any advertising or publicity referring to WARNER or any such person, company or corporation shall be limited to and shall indicate only that such person, company or corporation appeared in such Program or rendered services in connection therewith, or was the producer or distributor thereof, as applicable. LICENSEE shall not authorize any person or entity to sponsor any Program (as distinguished from the standard purchase of commercial advertising time) without WARNER's prior written approval, which approval may be withheld in WARNER's sole and

G:\USERS\SLOSIN\Contract Riders and Attachments\Warner Product ATCsRL.doc
Legnni/ Adc/basce&c.wp
Basic Subscription Terms & Conditions
11/14/97

CONFIDENTIAL
EXHIBIT D    Page 68

WB 6916



absolute discretion.

c.        LICENSEE shall not advertise, promote or otherwise exploit in any manner or medium, any Program withdrawn by WARNER pursuant to paragraph 21 below.

d.        LICENSEE shall not authorize or permit any excerpt or clip from any Program used for promotional purposes to be in excess of two (2) minutes in length.

e.        LICENSEE may authorize Affiliated Systems to publicize and advertise the Transmission of the Program(s) on the Licensed Service provided that each Affiliated System so authorized will be subject to the restrictions set forth herein and that any act or omission to act by any such Affiliated System in respect of such publicity and advertising will be deemed to be an act or omission to act by LICENSEE and will be subject to LICENSEE's indemnity obligations as set forth in paragraph 16.d.

## 14.    MUSIC PERFORMING RIGHTS

WARNER warrants and represents that the non-dramatic performing rights to all musical compositions contained in the Programs or any of them are (a) controlled by the American Society of Composers, Authors and Publishers; Broadcast Music, Incorporated; SESAC; or a performing rights society having jurisdiction; (b) in the public domain; or (c) controlled by WARNER to the extent required by the purposes of this Agreement. LICENSEE shall not permit any Programs to be Transmitted without first obtaining a valid license from any performing rights society having jurisdiction. As between WARNER and LICENSEE, LICENSEE shall be solely responsible for the payment of any and all royalties, license fees or other fees relating to the performance of any musical compositions and/or sound recordings embodied in the Programs, which royalties, license fees or other fees arise by virtue of LICENSEE's Transmission of the Programs hereunder.

## 15.    FORCE MAJEURE

a.        If any Act of God, strike, labor dispute, fire, flood, delay in or lack of transportation, public disaster, civil unrest, war, governmental act or regulation, or any other cause beyond the control of WARNER and LICENSEE ("Force Majeure Occurrence") prevents LICENSEE, without LICENSEE's fault, from Transmitting any Program pursuant to this Agreement for thirty (30) or more consecutive days then LICENSEE may request and obtain an extension of the License Period of the Program for a period coextensive with such Force Majeure Occurrence but in no event shall the License Period be extended for more than one hundred eighty (180) days or beyond the expiration of WARNER's rights in said Program, whichever is less.

b.        If laboratory delay or any Force Majeure Occurrence prevents WARNER from carrying out any provision of this Agreement, this Agreement shall not have been breached and WARNER shall have no liability therefor. Nevertheless, if the License Period of any Program is affected thereby, the License Period shall be extended for a period coextensive with the delay, but in no event shall the License Period be extended for more than one hundred eighty (180) days or beyond the expiration of WARNER's rights in said Program, whichever is less. LICENSEE acknowledges and agrees that, if necessary, WARNER shall have the right to delay the Start Date for any Program if an event which would constitute a Force Majeure Occurrence under this Agreement delays the start date or otherwise affects a prior license of any Program in the Territory (in the same or a different media), in which case the parties shall mutually agree upon a revised Start Date for the affected Program.

## 16.    REPRESENTATIONS, WARRANTIES AND INDEMNITIES

a.        WARNER warrants and represents that, as to each Program, WARNER has or shall have the right to grant the license herein contained on or before the first licensed Transmission of such Program, that there is no agreement with any other person, firm or corporation which shall in any way interfere with any rights granted under this Agreement to LICENSEE; that all Programs licensed hereunder are free and clear of all encumbrances of any kind and nature which would be inconsistent with the rights granted to LICENSEE hereunder; and, that none of the Programs or any materials contained therein violates the rights of any person. WARNER further warrants and represents that it is validly existing and in good standing in the jurisdiction of its organization; that it has full power and authority to enter into and perform this Agreement; that the execution, delivery and performance of this Agreement by WARNER have been duly authorized by all requisite corporate or other action of WARNER; and, that this Agreement is a valid and binding obligation of WARNER enforceable in accordance with its terms.

b.        LICENSEE warrants and represents that it is, and will be throughout the Term, in compliance with and in good standing under the laws of the Licensed Territory and of the country of its domicile (if different than the Licensed Territory), and any

G:\USERS\SLOSIN\Contract Riders and Attachments\Warner Product ATCsRL.doc
l:agmts/abc/bssctbr.wp
Basic Subscription Terms & Conditions
11/14/97

WB 6917

subdivision thereof with which it should be in compliance and under which it should be in good standing given the nature and scope of its business; that it has full power and authority to enter into and perform this Agreement in accordance with its terms; that the execution, delivery and performance of this Agreement have been authorized by all requisite action of LICENSEE; that this Agreement is a valid and binding obligation of LICENSEE enforceable in accordance with its terms; and that LICENSEE is not required to obtain the consent of any person or entity to enter into this Agreement. LICENSEE further warrants and represents that there shall not be any liens, charges, claims, adverse rights or interests of any kind on or against any Materials, title to which is vested in WARNER as set forth in paragraph 9.a., and that if the Licensed Service is offered by an Affiliated System on a tiered basis or in any other manner that causes WARNER to be required to make union or guild residual payments or music synchronization license payments that exceed the amount that WARNER would otherwise be required to pay if the Licensed Service had not been so offered, LICENSEE shall reimburse WARNER for the incremental amount of any such payments made by WARNER promptly upon WARNER's request. LICENSEE also warrants and represents that subject to any Inalienable Rights relating to any Program and notified in writing to WARNER at the end of the License Period for that Program (or notified in writing in any event upon WARNER so requesting), there shall not be any restrictions that would or could prevent WARNER or its agents, licensees, successors or assigns from using any of the materials created by or on behalf or at the request of LICENSEE in respect of such Program or its advertising and promotion in any media and as otherwise herein provided and that subject as aforesaid there shall not be any payments which must be made by WARNER or its agents, licensees, successors or assigns to anyone or any entity including, without limitation, any person, union, guild or other labor organization in connection therewith.

    c.    ~~WARNER~~Each party shall indemnify and hold harmless ~~LICENSEE,~~the other, its officers, directors, agents, shareholders and employees ("LICENSEE Indemnified Parties") from and against any and all claims, actions, losses, liabilities, damages, costs and expenses (including without limitation reasonable outside attorneys' fees and expenses) (collectively, "Claims") resulting from any final judgment recovered in any action or proceeding by any third party based upon any breach of the warranties and representations contained in paragraph 16.a. ~~In addition, where WARNER has expressly assumed an indemnity obligation elsewhere in these Additional Terms, WARNER shall indemnify LICENSEE Indemnified Parties in respect of such other Claims in accordance with this paragraph 16.c.~~

    d.    ~~d.    LICENSEE~~Each party shall indemnify and hold harmless the ~~WARNER Indemnified Parties~~other from and against any and all Claims relating to a breach or claim of breach of ~~LICENSEE's~~the other's obligations hereunder, or by reason of any Claims or action relating to any breach or failure or conduct by ~~LICENSEE~~the other resulting in a breach or claim of breach. ~~In addition, where LICENSEE has expressly assumed an indemnity obligation elsewhere in these Additional Terms, LICENSEE shall indemnify WARNER Indemnified Parties in respect of such other Claims in accordance with this paragraph 16.d.~~

    e.    If either party requests to be indemnified pursuant hereto ("Requesting Party"), it shall, upon learning of the same, promptly notify the other party in writing of the occurrence of the Claim for which indemnity is requested and, at the option of the party from whom indemnity is requested ("Requested Party"), such party may assume the defense of any such Claim, in which event the Requesting Party shall reasonably cooperate in the defense thereof. The Requested Party may, if necessary or desirable, join the Requesting Party as a party in any litigation in respect of the Claim for which indemnity is requested. No settlement or compromise of the Claim may be made by the Requesting Party without the Requested Party's prior written consent. Notwithstanding anything to the contrary contained herein, neither WARNER nor LICENSEE shall be responsible for loss of profits or consequential damages, if any, incurred by the other in respect of any Claim to which this paragraph 16 applies. If LICENSEE is the Requesting Party in respect of a Claim arising out of the Transmission of a Program, LICENSEE shall discontinue immediately Transmission of such Program until notified by WARNER to the contrary. If the Requesting Party fails to fulfill any of its obligations, the Requested Party shall be deemed excused from its obligation to indemnify and hold harmless the Requesting Party pursuant hereto.

## 17.    REMEDIES FOR BREACH

If LICENSEE does <u>not</u> pay in accordance with the terms of this Agreement any sum when due and such default continues for ~~ten (10)~~thirty (30) days after written notice thereof, or if LICENSEE is otherwise in breach of this Agreement or any other contract or agreement with WARNER which in each case has either not been remedied within thirty (30) days after notice or is not remediable, or if LICENSEE suspends operations, or if LICENSEE becomes insolvent or ceases to pay its obligations when due, or if LICENSEE is adjudicated a bankrupt, files a petition in bankruptcy, attempts to make an assignment for the benefit of creditors, or takes advantage of the provisions of any bankruptcy or debtor's relief act, or if an involuntary petition in bankruptcy is filed against LICENSEE and is not vacated or discharged within twenty-one (21) days, or if a receiver is appointed for a substantial portion of LICENSEE's property and is not discharged within twenty-one (21) days, then, at the election of WARNER, any and all sums payable under this Agreement remaining unpaid shall forthwith become due and payable to WARNER regardless of the due date thereof, WARNER shall be entitled to suspend the delivery of any Program and/or WARNER shall be entitled to the immediate return of all Materials and Additional Materials in LICENSEE's custody, possession or control. In addition, and without prejudice to any of WARNER's rights or remedies at law or in

G:\USERS\SLOSIN\Contract Riders and Attachments\Warner Product ATCsRL.doc
l:agmst\slc\bsct&c.wp
Basic Subscription Terms & Conditions
11/14/97

8





equity, and without in any way releasing or discharging LICENSEE from any of its obligations under this Agreement, WARNER may terminate this Agreement. If WARNER pays or becomes obligated to pay any sum of money, or does or is required to do any act which requires the payment of monies, or expends any sums for legal services of any kind or description by reason of any default of LICENSEE, then the sum(s) so paid or required to be paid, with interest thereon at the rate specified in paragraph 5.e., shall be added to the License Fees payable hereunder and shall be paid by LICENSEE to WARNER concurrently with the next installment due or, if there is no further installment due, LICENSEE shall make payment thereof upon demand. In the event the license granted to LICENSEE hereunder is exclusive with respect to the Licensed Language Version of the Programs, LICENSEE acknowledges that such an exclusive license makes the Licensed Language Version of the Programs unmarketable to third parties in the Territory (whether or not such Programs have been transmitted hereunder) until the License Period expires with respect to each such Program. Consequently, if LICENSEE defaults under this Agreement, in addition to any other rights or remedies WARNER may have at law or in equity, WARNER may demand and LICENSEE shall pay all consideration payable to WARNER hereunder as a reasonable estimate of WARNER's damages as a result of such default under the circumstances existing at the time this Agreement was made. LICENSEE will use reasonable efforts to ensure and monitor compliance by its Affiliated Systems with the terms and provisions of this Agreement. If LICENSEE discovers that any Affiliated System has engaged in material acts or omissions contrary to this Agreement, LICENSEE will promptly will, as soon as it discovers this act or omission, notify WARNER of such acts or omissions. If any Affiliated System does any act materially in contravention of the limitations contained herein, or which LICENSEE is not permitted to authorize, or if any Affiliated System omits to perform any material act which LICENSEE is required to perform hereunder (whether or not LICENSEE has included such limitation or requirement in LICENSEE's affiliation agreement with such Affiliated System), WARNER will consult with LICENSEE and absent a resolution reasonably satisfactory to WARNER of such Affiliated System's act or omission within five (5) business days after notice from WARNER, WARNER will have the right to direct LICENSEE to terminate the Transmission rights granted to such Affiliated System. Nothing contained in this Agreement will preclude WARNER from seeking any remedies available at law or in equity against any Affiliated System directly.

## 18.    RESERVED RIGHTS

The license herein granted to LICENSEE is limited to the right to Transmit each Program in its entirety in the Licensed Language only for the purposes, in the manner and at the times expressly provided herein. Any and all rights in any Program not expressly licensed to LICENSEE herein, including but not limited to the right to Transmit clips or segments of any Program, and the literary and musical materials contained in any Program or upon which any Program may be based, are reserved by WARNER and may be exercised, marketed and exploited by WARNER concurrently with and throughout the Term of this Agreement.

## 19.    SUBLICENSE, RELICENSE AND ASSIGNMENT

a.    This Agreement is personal to LICENSEE. LICENSEE shall not assign, sublicense, pledge, hypothecate, transfer or convey any of its rights and obligations under this Agreement, in whole or in part, without WARNER's prior written consent, which consent may be withheld by WARNER in its sole and absolute discretion. Notwithstanding the foregoing, LICENSEE may enter into agreements with Affiliated Systems granting such Affiliated Systems the right to retransmit the Programs as part of the Licensed Service to subscribers provided such agreements include provisions that are consistent with and comply with the terms of this Agreement. LICENSEE shall (subject to confidential commercially sensitive terms(eg pricing) being deleted) furnish WARNER with copies of each such agreement upon WARNER's reasonable request. In addition, LICENSEE agrees strictly to enforce against its Affiliated Systems all of the provisions which are required to be included in such agreements for the protection of WARNER; to advise WARNER of any violations thereof by Affiliated Systems, and of corrective actions taken by LICENSEE and the results thereof; and, at the request of WARNER, to terminate such an agreement with any Affiliated System which violates any of such provisions for the protection of WARNER.

b.    WARNER may assign, sublicense, pledge, hypothecate, transfer or otherwise convey any of its rights and obligations under this Agreement, in whole or in part, as it deems proper in its sole and absolute discretion, without notice to LICENSEE.

## 20.    EFFECT OF INVALIDITY OF PROVISION

Nothing contained in this Agreement shall require the commission of any act contrary to an express law or policy, or of any rule or regulation of any governmental authority. If there exists any conflict between, on the one hand, any provision of this Agreement and, on the other hand, any such applicable law, policy, rule or regulation, the latter shall prevail; and, the provision(s) of this Agreement affected shall be curtailed, limited or eliminated only to the extent necessary to remove such conflict. As so modified, this Agreement shall continue in full force and effect.

G:\USERS\SLOSIN\Contract Riders and Attachments\Warner Product ATCsRL.doc
l:\agents\&c\basst&c.wp
Basic Subscription Terms & Conditions
11/14/97

WB 6919

**CONFIDENTIAL**
EXHIBIT D    Page 71



21.    **WITHDRAWAL OR SUSPENSION OF PROGRAMS**

    a.    The parties hereto acknowledge that from time to time WARNER may deem it necessary to withdraw one or more Programs or episodes thereof from exhibition hereunder and WARNER reserves the right to withdraw any Program or episode if, in WARNER's sole and absolute discretion, the exhibition of the Program or episode hereunder could result in a claim being made against WARNER or any of its affiliated companies, the exhibition of the Program or episode is prohibited by order of a court or other governmental authority, or the Program or episode cannot, for reasons beyond WARNER's control (e.g., a Force Majeure Occurrence), be made available to LICENSEE for Transmission hereunder.  In the event of any withdrawal WARNER shall endeavor to notify LICENSEE, in writing, at least seven (7) days prior to exhibition.  Upon written notification by WARNER of the withdrawal of any Program or episode, the rights granted herein in and to such Program or episode shall terminate with respect to such Program or episode, and no further exhibitions hereunder shall be made of such Program or episode.  In the event of a withdrawal hereunder, LICENSEE and WARNER shall agree to a comparable substitute program or episode for the one so withdrawn.  In the event the parties cannot agree to a comparable substitute program or episode, or there is no comparable substitute program or episode available, a prorated portion of the License Fee paid by LICENSEE respecting such withdrawn Program or episode shall be credited or refunded to LICENSEE, based upon the number of Runs taken prior to withdrawal hereunder, with the understanding that earlier Runs shall be accorded a greater value than subsequent Runs.  LICENSEE shall have no claim against WARNER based upon WARNER's withdrawal of any Program or episode as described herein.

    b.    LICENSEE acknowledges and agrees that from time to time WARNER may deem it necessary to suspend the License Period for any Program licensed hereunder, in order to accommodate a theatrical re-release of such Program or the release of a motion picture based upon such Program.  Warner shall endeavor to give reasonable notice to Licensee, in writing, of any such suspension hereunder, and following such notice the License Period for the affected Program, and LICENSEE's rights to Transmit such Program (including advertising and promotion thereof) shall be suspended for such period of time as notified by WARNER.  In the event of a suspension hereunder, the License Period for the affected Program shall be extended for a period coextensive with such suspension, but in no event beyond the expiration of WARNER's rights in said Program.

22.    **ANTI-PIRACY**

    LICENSEE shall take all steps and pay all required fees necessary to protect fully the exhibition of the Programs by LICENSEE under the copyright, trademark and related intellectual property laws of the Licensed Territory.  WARNER shall reasonably cooperate with LICENSEE in providing documents necessary to secure such protection.  If LICENSEE becomes aware of any actual or threatened infringement of any copyright or Trademark in any Program or related Materials or Additional Materials in the Licensed Territory, LICENSEE shall immediately notify WARNER. LICENSEE shall take such actions in cooperation with WARNER as WARNER may designate in order to stop such piracy. LICENSEE shall employ security measures to prevent the loss, theft, pirating, copying or unauthorized duplication of any of the Materials in its possession, custody or control. LICENSEE accepts responsibility for the loss or theft of any Program or its Materials from the time of delivery until returned to WARNER. LICENSEE shall notify WARNER immediately if any of the Materials or Additional Materials in its possession are lost, stolen or destroyed. In such event, LICENSEE shall cooperate with WARNER to the fullest extent in any attempt WARNER may make to recover any such Materials and Additional Materials, and shall indemnify the WARNER Indemnified Parties against any Claims made against WARNER or its affiliated companies as a result thereof.

23.    **RETRANSMISSION ROYALTIES**

    As between WARNER and LICENSEE, any fees payable to the producer, distributor or copyright owner of any Program by reason of the retransmission of LICENSEE's Transmission of any Program are the sole property of WARNER.  LICENSEE shall cooperate with WARNER to the extent necessary to permit WARNER to collect the maximum amount of any such fees.

24.    **PRIVATE COPY AND BLANK VIDEO LEVIES**

    LICENSEE acknowledges that if any levy, fee or other charge is imposed in the Licensed Territory on the sale of blank video tapes, cassettes, discs or similar media, or on the sale of recording, duplicating or similar devices, for the purpose of remunerating producers, distributors or copyright owners for the unauthorized copying of their audiovisual works, then as between WARNER and LICENSEE, any and all such fees or levies that are payable to the producer, distributor or copyright owner of the audiovisual works shall belong entirely to WARNER.

25.    **NOTICES**

G:\USERS\SLOSIN\Contract Riders and Attachments\Warner Product ATCsRL.doc
l:\agtga\t&c\basct&c.wp
Basic Subscription Terms & Conditions
11/14/97

WB 6920



All notices under this Agreement must be in writing and must be sent by registered mail, postage prepaid; or personally delivered; or sent by courier, with authorized signature of recipient required; or sent by telegram, telex or electronic facsimile. Notices sent by registered mail shall be deemed received ten (10) business days after the date of the delivery to a government post office with postage prepaid; notices sent by courier shall be deemed received on the date indicated on the signed receipt; notices sent by telegram or telex shall be deemed received on the date the sending party furnishes the receiving party with appropriate proof of receipt and notices sent by electronic facsimile shall be deemed received on the date indicated on the signed receipt for an original, hard copy which shall be sent by the sending party to the receiving party by courier. The addresses for notices are identified in this Agreement. If the last date on which a notice that this Agreement requires or permits to be given falls on a Saturday, Sunday or national government holiday in the country to which such notice is sent, such last date shall be deemed postponed until the first day thereafter that is not a Saturday, Sunday or national government holiday. Courtesy copies of a notice shall be sent in the same manner as the notice. An inadvertent failure to send a courtesy copy of a notice shall not void the effectiveness of such notice. Either party may change its address for notices by giving written notice to the other pursuant to this paragraph 25.

## 26.    HEADINGS

Paragraph headings are for reference only and have no legal effect respecting the scope, meaning or intent of any of the provisions of this Agreement.

## 27.    INTEGRATION, CHOICE OF LAW AND JURISDICTION

a.       This Agreement is complete and constitutes the entire understanding between the parties. All prior understandings, written or oral, express or implied, have been merged herein.

b.       This Agreement may not be modified or amended except by an instrument in writing, signed by the parties hereto.

c.       At WARNER's option, any dispute arising in connection with this Agreement shall either be resolved judicially, as set forth in paragraph 27.d. below or pursuant to arbitration, as set forth in paragraph 27.e. below.

d.       If WARNER decides that a dispute should be resolved judicially, the state and federal courts in Los Angeles County, California, U.S.A. shall have exclusive jurisdiction over the dispute and LICENSEE submits to the jurisdiction thereof and to venue therein. Regardless of the judicial forum, LICENSEE and WARNER waive any right each may have to a trial by jury of any cause of action in connection with this Agreement. Any process served in connection with any proceeding to resolve any such dispute may be served upon the party to be served by registered or certified mail directed to the party at the address designated for notices to such party under this Agreement. Any such services shall have the same effect as personal service within the State of California. The foregoing shall not preclude any party hereto from seeking enforcement outside California of any order or judgment rendered by any California court.

e.       If WARNER decides that a dispute should be submitted to arbitration, arbitration shall be the sole and exclusive means for the resolution of the dispute and it shall be final and binding. At WARNER's option, the arbitration shall occur under the UNCITRAL Arbitration Rules or under the American Arbitration Association Rules. Regardless of the rules chosen by WARNER, the arbitration shall be held in Los Angeles, California, or New York, New York, at WARNER's sole option, and shall be conducted in English as set forth below:

i        The arbitral panel shall consist of three arbitrators, one of whom shall be appointed by LICENSEE, one of whom shall be appointed by WARNER and one of whom shall be appointed by the first two arbitrators or, in case such two arbitrators cannot agree, by the American Arbitration Association which shall administer the arbitration proceeding under its Procedure for Cases under the American Arbitration Association Rules or under the UNCITRAL Arbitration Rules, in accordance with WARNER's decision. The arbitrators shall hear and dispose of any dispute in such manner as they, in their discretion, shall determine, but in so doing they shall be required to receive the submissions of WARNER and LICENSEE with respect to the dispute. The arbitrators may, for their convenience or that of WARNER and LICENSEE, take evidence at places other than the situs of the proceedings without changing the situs of the proceedings. The arbitrators shall base their award with respect to the matter before them on the contents of this Agreement and on the governing law for this Agreement as set forth in paragraph 27.f below. The award of the arbitrators may be, alternatively or cumulatively, for monetary damages, an order requiring the performance of non-

G:\USERS\SLOSIN\Contract Riders and Attachments\Warner Product ATCsRL.doc
Lngmti/lslc/basic2c.wp
Basic Subscription Terms & Conditions
11/14/97

11

CONFIDENTIAL
EXHIBIT D    Page 73

WB 6921







monetary obligations or any other appropriate order or remedy. The arbitrators may issue interim awards. The final award shall assign costs of the arbitration to WARNER or LICENSEE, or both of them. The decision of the arbitrators shall be rendered in writing with all reasonable expeditiousness, shall set out the reasons therefor and, except as set forth below, shall be final and binding upon WARNER and LICENSEE. Except as set forth below, WARNER and LICENSEE agree to exclude any right of application or appeal to any court in connection with any award made.

ii       Any award rendered by the arbitrators shall, if so desired by WARNER or LICENSEE, be brought immediately to the attention of appropriate officers of both WARNER and LICENSEE who shall meet in Los Angeles, California, or New York, New York, at WARNER's sole option, within a period of two weeks thereafter, if either of them so requests, accompanied by such advisors as they may select, in order to attempt in good faith to settle the dispute either in accordance with the award or on another mutually acceptable basis. In the event that, within one month after such award, WARNER and LICENSEE have not found a mutually acceptable solution to the dispute, the award of the arbitrators may be entered as final in any court having jurisdiction or an application may be made to such court for a judicial acceptance and enforcement of the award, as the case may be.

f.      This Agreement shall be construed under and governed (i) by the internal laws of the State of California applicable to contracts entered into therein without giving effect to its conflicts of law provisions and (ii) by the laws of the United States of America to the extent that those laws preempt California state law.

g.      A waiver by either party of any breach by the other must be in writing and shall not be deemed a waiver of any other breach of the same or a different nature.

## 28.   CONFIDENTIALITY

LICENSEE shall not disclose the terms of this Agreement to any third party without WARNER's prior written consent, which consent shall not be unreasonably withheld, provided, however, that disclosures may be made (i) to the extent necessary to comply with government disclosure requirements or applicable laws and (ii) as may be necessary and appropriate in connection with the proper performance and enforcement of this Agreement.

G:\USERS\SLOSIN\Contract Riders and Attachments\Warner Product ATCsRL.doc
lagrm\ultc/basict&c.wp
Basic Subscription Terms & Conditions
11/14/97



PN01980
Page 1 of 4

## LICENSE AGREEMENT

Agreement dated as of the 2nd day of September, 1993, between Warner Bros. International Television Distribution, a division of Time Warner Entertainment Company, L.P. ("WARNER"), 4000 Warner Boulevard, Burbank, California 91522 and Wharf Cable Ltd. ("LICENSEE"), 40th Floor, 4-11/F Wharf Cable Tower, 9 Hoi Shing Road, Tsuen Wan, New Territories, Hong Kong.

## 1.    OBJECT OF AGREEMENT

WARNER owns or controls the exclusive pay television rights in the Territory to the English language version of the features (the "Program(s)") set forth on Schedule A attached hereto. LICENSEE desires to obtain the non-exclusive pay television rights in and to the English language version and the Cantonese language dubbed version of the Program(s) for the Territory, License Period and other terms as hereinafter defined.

## 2.    RIGHTS GRANTED

On the terms and subject to the conditions of the Agreement, WARNER hereby grants to the LICENSEE the following non-exclusive exploitation rights in and to the Program(s) for the Territory, License Period and other terms as hereinafter defined.

2.1    The right to transmit the English language version and the Cantonese language dubbed version of the Program(s) only to Wharf Cable, LICENSEE's pay television service. LICENSEE shall transmit by means of an encoded cable or MMDS signal. LICENSEE further agrees to authorize others to retransmit terrestrially within the Territory only by means of an encoded cable or MMDS signal.

2.2    LICENSEE shall not transmit or exhibit the Program(s) to non-residential establishments including, but not limited to, any location where an admission fee is charged, hospitals, nursing homes and similar institutions.

2.3    The license herein granted shall not include the right to transmit or exhibit the Program(s) herein licensed on a pay-per-view or pay-per-program basis, or a pay television system supported by commercial (paid) advertising.

2.4    LICENSEE shall not, nor authorize, permit or let any other party, delete or alter the Program(s) in any way.

2.5    WARNER warrants that, during the License Period of each Program set forth on Schedule A, WARNER will not authorize any free television exhibition of such Programs in either the English language or the Cantonese language dubbed version within the Territory.

file:\\hongkong\wharf\PN01980.RV1
06.27.94 4:07 pm

WB 10011
CONFIDENTIAL

Ex. 3

3.   **TERRITORY**

The license granted hereunder is for the country of Hong Kong (the "Territory").

4.   **LICENSE PERIOD & NUMBER OF TRANSMISSIONS**

4.1   LICENSEE shall transmit each Program licensed hereunder only between the availability date and expiration date for said Program(s) ("License Period") as set forth on Schedule A.  Each Program may be transmitted a maximum of thirteen (13) times in the Territory during the License Period.

4.2   Not later than ten (10) days prior to the first day of the month in which the first transmission of a Program licensed hereunder is scheduled, LICENSEE shall give written notice to WARNER of the dates of the scheduled transmissions of such Program.

5.   **DELIVERY OF MATERIAL**

5.1   WARNER shall deliver to LICENSEE one 625 line Betacam SP format videotape in the English language of each of the Programs licensed hereunder, free of materials charge.  LICENSEE shall produce the Cantonese language dubbed version and bear all costs to produce such dubbed version.

LICENSEE shall pay all costs (including, without limitation, all taxes, duties, shipping, and freight charges) in connection with the importation and return of the videotapes or prints into and from the Territory.

5.2   WARNER shall also deliver to LICENSEE upon request, free of charge (other than shipping costs), scripts, advertising material, posters, stills, cue sheets, color slides, all only to the extent available to WARNER and provided that WARNER shall have no obligation to create such materials.

5.3   All materials delivered hereunder shall be sent to LICENSEE in care of Ms. Lanny A. Huang.

5.4   LICENSEE shall employ security measures to prevent the loss, theft, pirating, copying or unauthorized duplication of any of the videotapes in its possession. LICENSEE accepts responsibility for the loss or theft of any Program from the time of delivery until returned to WARNER.  LICENSEE agrees to notify WARNER immediately in the event any videotape is lost, stolen or destroyed and will cooperate with WARNER to the fullest in any attempt WARNER may make to recover said videotape.

5.5   LICENSEE shall not by any of its actions permit any lien, charge, pledge, mortgage or encumbrance to attach to said videotapes.

ts:\\hongkong\wharf\PN01980.RV1
06.27.94  4:07 pm

**WB 10012**
**CONFIDENTIAL**

ID #:7711

PN01980
Page 3 of 4

5.6     For each Program licensed hereunder, as soon as practicable but not later than
        forty-five (45) days after the earlier of the end of the License Period or the final
        authorized transmission, LICENSEE shall, as instructed by WARNER, return to
        WARNER such videotapes supplied to LICENSEE.   All costs and expenses
        incurred in connection with returning the videotapes shall be borne by LICENSEE.

6.    **LICENSE FEE**

6.1     LICENSEE agrees to pay to WARNER, for all rights granted by this Agreement, a
        license fee totaling $135,000 ("License Fee(s)") as set forth on Schedule A, payable
        as follows:

|                       |           |
|-----------------------|-----------|
| June 1, 1994          | $43,875   |
| September 1, 1994     | 30,375    |
| December 1, 1994      | 30,375    |
| March 1, 1995         | 30,375    |
|                       | $135,000  |

All License Fees mentioned above and paid pursuant to this Agreement shall be in
U.S. dollars.  All payments are to be made to:

            Warner Bros. (WBITVD)
            Bank of America-Account 1257-000503
            1850 Gateway Blvd #5693
            Concord, California 94520  U.S.A.
            (Swift Code) BOFA US6S

6.2     LICENSEE shall make all payments and bear all costs and expenses which may
        become due and payable by reason of the exploitation of the Program(s) pursuant
        to this Agreement, including without limitation, payment of any and all taxes, with
        WARNER having no obligation with respect thereto.  In the event payments to any
        performing rights society are mandated by law or industry custom to be made by
        pay-television systems, LICENSEE shall make all payments and bear all costs and
        expenses with respect thereto.

7.    **REPORTS**

7.1     LICENSEE agrees to furnish to WARNER during the License Period and the month
        immediately following the License Period of each Program with monthly accounting
        statements.

        7.1.1 Said statements shall be sent, within thirty (30) days following the end of each
              calendar month during the License Period and after the month immediately
              following the License Period of each Program to WARNER to the attention of:

ta:\\hongkong\wharf\PN01980.RV1
06.27.94  4:07 pm

**WB 10013**
**CONFIDENTIAL**



PN01980
Page 4 of 4

Warner Bros. International Television Distribution
c/o Mauro A. Sardi, Vice President
4000 Warner Boulevard
Burbank, California 91522
U.S.A.

with courtesy copy to:

Warner Bros. Pty. Ltd. Television Division
c/o Greg Robertson
Level 22
8-20 Napier Street
North Sydney, N.S.W., 2060
AUSTRALIA

7.1.2 Said monthly accounting statements shall specify the Program(s) transmitted and the dates and times of all such transmissions.

7.2 LICENSEE shall promptly, upon availability, furnish to WARNER three (3) copies of all published programming schedules to be submitted to the subscribers of LICENSEE's pay television service not later than the time at which the LICENSEE furnishes such programming schedules to the subscribers.

8. This Agreement includes all the Pay or Basic Cable Television License Agreement Standard Terms and Conditions ("Terms and Conditions"), Schedules and Exhibits attached hereto. The provisions of the Terms and Conditions shall be subject to all other terms of this Agreement, which terms shall prevail over the Terms and Conditions in the event of any inconsistency.

Warner Bros. International Television Distribution,
a division of Time Warner Entertainment Company, L.P.

By: _John E. Whitrock_

Title: _Vice President_

Agreed and Accepted:

Wharf Cable Ltd.

By: _____    2 0 SEP 1994

Title: Thomas W.H. Tang
       Television Operations Director

js:\\hongkong\wharf\PN01980.RV1
06.27.94  4:07 pm

WB 10014
CONFIDENTIAL

PN01980
Page 1 of 1

## SCHEDULE A

AGREEMENT BETWEEN
WARNER BROS. INTERNATIONAL TELEVISION DISTRIBUTION,
a division of Time Warner Entertainment Company, L.P.
AND
WHARF CABLE LTD.
DATED AS OF THE 2ND DAY OF SEPTEMBER 1993

| 30 THEATRICAL FEATURE(S) | LICENSE PERIOD (Month/Day/Year) | | LICENSE FEE |
|---|---|---|---|
| | AVAILABILITY DATE | EXPIRATION DATE | |
| ALTERED STATES | 06/01/94 | 05/31/95 | $4,500 |
| AMERICAN FLYERS | 06/01/94 | 05/31/95 | 4,500 |
| BEING THERE | 06/01/94 | 05/31/95 | 4,500 |
| BODY HEAT | 06/01/94 | 05/31/95 | 4,500 |
| BULLITT | 06/01/94 | 05/31/95 | 4,500 |
| CAMELOT | 06/01/94 | 05/31/95 | 4,500 |
| COBRA | 06/01/94 | 05/31/95 | 4,500 |
| COOL HAND LUKE | 06/01/94 | 05/31/95 | 4,500 |
| DIRTY HARRY | 06/01/94 | 05/31/95 | 4,500 |
| DOG DAY AFTERNOON | 06/01/94 | 05/31/95 | 4,500 |
| EAST OF EDEN | 06/01/94 | 05/31/95 | 4,500 |
| GETAWAY, THE | 06/01/94 | 05/31/95 | 4,500 |
| GIANT | 06/01/94 | 05/31/95 | 4,500 |
| GOODBYE GIRL, THE | 06/01/94 | 05/31/95 | 4,500 |
| HELEN OF TROY | 06/01/94 | 05/31/95 | 4,500 |
| LOST IN AMERICA | 06/01/94 | 05/31/95 | 4,500 |
| PROTOCOL | 06/01/94 | 05/31/95 | 4,500 |
| REBEL WITHOUT A CAUSE | 06/01/94 | 05/31/95 | 4,500 |
| RIGHT STUFF, THE | 06/01/94 | 05/31/95 | 4,500 |
| RIO BRAVO | 06/01/94 | 05/31/95 | 4,500 |
| SEARCHERS, THE | 06/01/94 | 05/31/95 | 4,500 |
| SHARKY'S MACHINE | 06/01/94 | 05/31/95 | 4,500 |
| TIME AFTER TIME | 06/01/94 | 05/31/95 | 4,500 |
| WAIT UNTIL DARK | 06/01/94 | 05/31/95 | 4,500 |
| WHAT'S UP DOC? | 06/01/94 | 05/31/95 | 4,500 |
| WILD BUNCH, THE | 06/01/94 | 05/31/95 | 4,500 |
| WILLY WONKA AND THE CHOCOLATE FACTORY | 06/01/94 | 05/31/95 | 4,500 |
| WORLD ACCORDING TO GARP | 06/01/94 | 05/31/95 | 4,500 |
| YAKUZA | 06/01/94 | 05/31/95 | 4,500 |
| ZEPPELIN | 06/01/94 | 05/31/95 | 4,500 |
| | | TOTAL | $135,000 |

WB 10015
CONFIDENTIAL

06.27.94  4:33pm

 

**WARNER BROS. INTERNATIONAL TELEVISION DISTRIBUTION,
a division of Time Warner Entertainment Company, L.P. ("WARNER")
PAY OR BASIC CABLE TELEVISION LICENSE AGREEMENT
STANDARD TERMS AND CONDITIONS**

These Standard Terms and Conditions (the "Conditions") supplement the terms and conditions of the license agreement to which the Conditions are attached (the "License Agreement"). The License Agreement as supplemented by the Conditions will be referred to hereinafter as the "Agreement". All capitalized terms in the Conditions have the same meanings as in the License Agreement unless otherwise defined.

## 1. LICENSE PERIOD AND TERM

    a.    The license period for a Program (the "License Period") will begin on the date such Program first becomes available to LICENSEE as specified in the License Agreement and end on the earlier of the expiration date specified in the License Agreement or the date of the last licensed Transmission of such Program.

    b.    The term of this Agreement (the "Term") begins on the date of the License Agreement and ends on the expiration date of any Program licensed hereunder unless the last licensed Transmission of any Program licensed hereunder occurs before the expiration date of any Program licensed hereunder in which case the term ends upon the last licensed Transmission of any Program licensed hereunder.

## 2. PAYMENT OF LICENSE FEES

    a.    As used herein, the words "payment," "pay," "payable," "paid" or words of similar meaning when applied to obligations of LICENSEE to WARNER mean the actual receipt by WARNER, by the date payment is to be made, in United States dollars in the amount specified herein without offset or recoupment, of cash, a bank transfer of unencumbered, immediately available funds to WARNER's account, the unconditional clearance of a check or bank draft payable to WARNER and drawn on a United States bank, or the draw down by WARNER of a previously approved and existing letter of credit from a United States bank pursuant to the terms thereof. Payment in any other manner will not be deemed made to WARNER until the amount of United States dollars due and payable has been received and is available for expenditure by WARNER. LICENSEE bears the risk that payment in any other manner will not be deemed made to WARNER within the time periods specified herein.

    b.    In its sole and absolute discretion, WARNER may accept funds tendered to it by LICENSEE in a currency other than United States dollars. Such acceptance will not constitute a waiver of WARNER's rights under paragraph 2.a. Payment, therefore, will not be deemed to have been made until WARNER has converted the non-U.S. currency, net of all costs of conversion, to the amount of United States dollars due and payable. LICENSEE will bear all risks associated with the conversion including delay, costs of conversion, fluctuations in the exchange rate and WARNER's choice of currency exchange agent. In the event that WARNER converts the non-U.S. currency to an amount of United States dollars, net of all costs of conversion, in excess of the License Fee due and payable, WARNER may keep the excess without giving any credit to LICENSEE's account for the excess.

    c.    LICENSEE will obtain all governmental permits necessary to make all payments to WARNER required under this Agreement. LICENSEE also will pay without limitation every tax, levy or charge, however denominated, imposed or levied against LICENSEE, WARNER or any Program by any authority having jurisdiction over LICENSEE's use of any Program other than a tax, levy or charge based on WARNER's net income. Such taxes, levies or charges include, without limitation, quotas, value added taxes, so-called "remittance" and withholding taxes, licenses, "Contingents," turnover taxes, import permits and duties, and national, state, county, city and other taxes, however denominated, relating to or imposed upon the License Fee or any part thereof, the license or the Transmission of any Program, any other amounts payable to WARNER, negatives, prints or other Material, the storage or possession of any Program or any Material, or the right or privilege to use the same in connection with the Programs. LICENSEE may deduct from the License Fee payable to WARNER taxes which are levied on WARNER's License Fee and paid to a government authority on WARNER's behalf, only if such taxes are levied in and such taxes are creditable in the United States in accordance with the income tax laws of the United States and if, after payment of such taxes, LICENSEE promptly provides WARNER with an official tax receipt evidencing such

WB 10016
CONFIDENTIAL

 

payment on WARNER's behalf, or, if this is not possible due to law or regulation, LICENSEE provides a copy of said receipt to WARNER.

d.  All License Fees are to be paid when due without regard to delays in the date of Transmission of any Program because of late delivery of Materials, the unavailability of Materials, a Force Majeure Occurrence (see definition in paragraph 10 below), the extension of this Agreement or WARNER's exercise of any of its rights under this Agreement. Timely payment is of the essence. LICENSEE's failure to make any payments when due will constitute a material default.

e.  WARNER will have the right to charge interest on any payment not received within ten (10) days of its due date at the rate which is the lowest of two (2) percentage points over the then current advertised prime rate at First National Bank of Boston or the then current highest rate allowable under law for this Agreement. Interest, if charged, will be retroactive to the date payment was first due. Interest, if charged, will be compounded monthly and will continue to be charged, each month, on the unpaid balance until all such amounts are paid.

f.  If laws or currency regulations in the Licensed Territory now or at any time during the term of the Agreement prohibit or restrict LICENSEE from paying any sums due WARNER, LICENSEE will advise WARNER promptly in writing. In any such case, upon WARNER's request, LICENSEE will deposit to WARNER's credit in a bank or banks approved in writing by WARNER or promptly pay to such person or persons as WARNER may designate in writing, all sums due WARNER. LICENSEE also will reimburse WARNER for any costs incurred by WARNER in remitting such funds to the United States and/or converting such funds into United States dollars. If LICENSEE is prohibited or restricted from making payment of any sums due WARNER, in addition to WARNER's other rights or remedies, WARNER may cancel and terminate this Agreement upon written notice to LICENSEE.

## 3.  INSPECTION OF MATERIALS

Immediately upon delivery of any Materials, LICENSEE will examine the Materials to determine their technical acceptability for Transmission. Unless WARNER is notified otherwise within five (5) business days of delivery, all Materials will be deemed acceptable to LICENSEE. If WARNER receives timely notice of a defect in the Materials, WARNER will remedy such defect or substitute Materials of the same Program at no additional cost. At WARNER's election, WARNER may exercise its rights to withdraw or substitute pursuant to paragraph 16 below.

## 4.  RETURN, SHIPPING OR DISPOSITION

a.  LICENSEE agrees to return the Materials of a Program to WARNER by air freight express to such destination as WARNER directs within three (3) business days of its receipt of WARNER's instructions but in no event later than the earlier of the expiration of the License Period of the Program, the expiration of the Term or the termination of this Agreement. Return or shipment of the Materials in accordance with WARNER's instructions is of the essence. If LICENSEE and WARNER enter into a written agreement that the Materials may be disposed of other than by returning them to WARNER or shipping them to a destination fixed by WARNER, LICENSEE may dispose of the Materials in accordance with that agreement.

b.  LICENSEE will return or ship all Materials in the same condition in which they were received, normal wear and tear excepted. If Materials are lost, stolen, destroyed or damaged between the time of delivery to LICENSEE and the receipt of the Materials by WARNER or its designee, LICENSEE will pay WARNER the latter's prevailing charge for replacement of the Materials. Such payment will not, however, transfer to LICENSEE title to any Materials.

c.  When returning or shipping Materials of a Program, LICENSEE will return to WARNER or ship to its designee in accordance with paragraph 4.a all dubbed sound tracks, subtitled or subtitling Material, and all optical and/or magnetic sound tracks and/or Materials containing optical and/or magnetic sound tracks which were manufactured by, for or at the request of LICENSEE in connection with the Program, whether or not LICENSEE used any of said Materials in connection with the exercise of its rights hereunder and whether or not LICENSEE incurred any of the costs of manufacture.

WB 10017
CONFIDENTIAL



validly existing and in good standing in the jurisdiction of its incorporation; that it has full power and authority to enter into and perform this Agreement; that the execution, delivery and performance of this Agreement by WARNER have been duly authorized by all requisite corporate action of WARNER; and, that this Agreement is a valid and binding obligation of WARNER in accordance with its terms.

b.   WARNER will indemnify and hold LICENSEE, its officers, directors, agents, stockholders and employees and sponsors of any Transmission of any Program harmless from and against any and all Claims resulting from any judgment recovered in any action or proceeding by any third party based upon any breach of the warranties and representations contained in paragraph 11.a, provided that LICENSEE has given written notice to WARNER of the third party Claim immediately after it was made, and provided that LICENSEE discontinued Transmission of the Program(s) immediately after such Claim was made. WARNER may assume the handling, prosecution, defense or settlement of any Claim and any resulting litigation. WARNER may, if necessary or desirable, join LICENSEE as a party in such action. No settlement may be made without WARNER's written consent. If LICENSEE fails to fulfill any of its obligations under this paragraph, then WARNER will be excused from its obligation to indemnify LICENSEE and hold it harmless.

c.   LICENSEE warrants and represents that it is in compliance with and in good standing under the laws of the Licensed Territory and any subdivision thereof with which it should be in compliance and under which it should be in good standing given the nature and scope of its business; that it has full power and authority to enter into and perform this Agreement in accordance with its terms; that the execution, delivery and performance of this Agreement have been authorized by all requisite action of LICENSEE; that this Agreement is a valid and binding obligation of LICENSEE enforceable in accordance with its terms; and, that LICENSEE is not required to obtain the consent of any person or entity to enter into this Agreement. LICENSEE further warrants and represents that there are no and never will be any liens, charges, claims, adverse rights or interests of any kind on or against any Materials title to which is vested in WARNER as set forth in paragraph 5.a. LICENSEE also warrants and represents that there will not be any restrictions that would or could prevent WARNER from Transmitting and distributing any of the Materials referred to in paragraph 5.a by any media or means and there will not be any payments which must be made by WARNER to anyone or any entity including, but not limited to, any person, union, guild or other labor organization, in connection therewith.

d.   LICENSEE will indemnify and hold WARNER et al. harmless from and against all Claims arising out of or relating to any breach of warranties and representations contained in paragraph 11.c. If WARNER so requests, LICENSEE will defend WARNER et al. against any such Claim.

## 12.   REMEDIES FOR BREACH

a.   If LICENSEE does not pay in accordance with the terms of this Agreement any sum when due and such default continues for thirty (30) days after written notice thereof, or if LICENSEE is otherwise in breach of this Agreement or any other contract or agreement with WARNER, or if LICENSEE suspends operations, or if LICENSEE becomes insolvent or ceases to pay its obligations when due, or if LICENSEE is adjudicated a bankrupt, files a petition in bankruptcy, attempts to make an assignment for the benefit of creditors, or takes advantage of the provisions of any bankruptcy or debtor's relief act, or if an involuntary petition in bankruptcy is filed against LICENSEE and is not vacated or discharged within twenty-one (21) days, or if a receiver is appointed for a substantial portion of LICENSEE's property and is not discharged within twenty-one (21) days, or if LICENSEE loses control, for any reason, of the Licensed Station or its interest therein or the license to operate the same, then, at the election of WARNER, any and all sums payable under this Agreement remaining unpaid will forthwith become due and payable to WARNER regardless of the due date thereof, WARNER will be entitled to suspend the delivery of any Program and/or WARNER will be entitled to the immediate return of all Materials in LICENSEE's custody, possession or control. In addition, and without prejudice to any of WARNER's rights or remedies at law or in equity, and without in any way releasing or discharging LICENSEE from any of its obligations under this Agreement, WARNER may terminate this Agreement. If WARNER pays or becomes obligated to pay any sum of money, or does or is required to do any act which requires the payment of monies, or expends any sums for legal services of any kind or description by reason of any default of LICENSEE, then the sum(s) so paid or required to be paid, with interest thereon at the rate specified in paragraph 2.e, will be added to the License Fees payable hereunder and will be paid by LICENSEE to WARNER

WB 10018
CONFIDENTIAL

EXHIBIT D    Page 82




concurrently with the next installment due or, if there is no further installment due, LICENSEE will make payment thereof upon demand.

b.     LICENSEE acknowledges that the licensing of a Program to LICENSEE hereunder and/or the Transmission of that Program or any episode or portion thereof makes that Program unmarketable to third parties in the Licensed Language in the Licensed Territory until after the date of the last licensed Transmission of that Program. Consequently, if LICENSEE defaults under this Agreement, payment to WARNER of all consideration payable hereunder is a reasonable estimate of WARNER's damages as a result of such default under the circumstances existing at the time this Agreement was made.

## 13.  RESERVED RIGHTS

The license herein granted to LICENSEE is limited to the right to Transmit each Program in its entirety only for the purposes, in the manner and at the times expressly provided. Any and all rights in any Program not expressly licensed to LICENSEE herein, including but not limited to the right to Transmit clips or segments of any Program, and the literary and musical Materials contained in any Program or upon which any Program may be based, are reserved to WARNER and may be exercised, marketed and exploited by WARNER concurrently with and throughout the Term of this Agreement.

## 14.  SUBLICENSE, RELICENSE AND ASSIGNMENT

a.     LICENSEE will not assign, sublicense, pledge, hypothecate, transfer or convey this Agreement, in whole or in part, without WARNER's prior written consent. WARNER may consent or not in its sole and absolute discretion. LICENSEE will not sublicense or relicense any Program for Transmission by any other person, firm, corporation or television station nor will LICENSEE use an agent for such purpose, provided that this shall not prevent the LICENSEE from supplying the LICENSEE's television service to subscribers via television systems including, without limitation, cable and SMATV systems, pursuant to agreements between the LICENSEE and such systems (or directly with the subscribers).

b.     WARNER may assign, sublicense, pledge, hypothecate, transfer or otherwise convey this Agreement, in whole or in part, as it deems proper in its sole and absolute discretion, without notice to LICENSEE.

## 15.  EFFECT OF INVALIDITY OF PROVISION

If any provision of this Agreement is contrary to any applicable law or regulation, all other provisions of this Agreement will notwithstanding continue in full force and effect.

## 16.  WITHDRAWAL OR SUSPENSION OF PROGRAMS

a.     WARNER will have the right at any time to withdraw any Program or episode thereof if, in WARNER's sole and absolute discretion, the Program or episode is either unavailable for Transmission under the terms of this Agreement or cannot, for reasons beyond WARNER's control, or due to a Force Majeure Occurrence, be made available to LICENSEE. WARNER reserves the right to discontinue the production of any Program or episode thereof and to terminate this Agreement at any time during the Term on five (5) days' written notice to LICENSEE. Upon such withdrawal or termination, LICENSEE and WARNER agree to substitute Program or episode thereof in place of the Program or episode so withdrawn, which substitute Program or episode must be agreeable to both WARNER and LICENSEE.

b.     WARNER, in its sole and absolute discretion, may suspend delivery of any Program or LICENSEE's Transmission of any Program, whether or not delivered, if, in WARNER's opinion, the Program is unavailable for Transmission under the terms of this Agreement or cannot be made available to LICENSEE for reasons beyond the control of WARNER, or due to a Force Majeure Occurrence. Any such suspension will be limited to a one hundred eighty (180) day period from the date of WARNER's notice for such Program, provided, however, that if WARNER elects to extend the suspension for an additional period not exceeding one hundred eighty (180) days, then the License Period for the suspended Program (and the Term, if necessary) will be extended day-to-day for a period which is equal to the period of such extended suspension but in no event beyond the expiration of WARNER's rights in said Program.

s:\wp51\\BPLATE\STC
08.22.93   4:15 pm

**WB 10019**
**CONFIDENTIAL**




5.    **TITLE**

a.    Title in and to Materials of a Program provided to LICENSEE hereunder is vested and will remain in WARNER, and title in and to any Materials of a Program created by, for or at the request of LICENSEE and all rights therein, including copyrights and all neighboring and connecting rights, will vest and remain in WARNER upon the creation thereof, subject only to LICENSEE's possession and use until the earlier of the expiration of the License Period of the Program, the expiration of the Term or the termination of this Agreement solely so that LICENSEE may exercise its rights licensed hereunder. As between WARNER and LICENSEE, all Materials will be deemed to have been loaned to LICENSEE whether or not LICENSEE paid any of the costs of manufacture.

b.    LICENSEE will execute, acknowledge and deliver to WARNER any instruments of transfer, conveyance or assignment in or to any Materials referred to in paragraph 5.a above which are necessary or desirable to evidence or effectuate WARNER's ownership of such Materials. LICENSEE will also execute, acknowledge and deliver to WARNER any instruments of transfer, conveyance or assignment in or to any rights in Materials of a Program which are to vest and remain in WARNER pursuant to paragraph 5.a above which instruments are necessary or desirable to evidence or effectuate the vesting for as long as is permissible of such rights in WARNER. If LICENSEE fails or refuses to execute, acknowledge or deliver any such instrument, then WARNER will be deemed to be, and LICENSEE hereby and irrevocably appoints WARNER, its true and lawful attorney-in-fact to execute and deliver all such instruments in LICENSEE's name or otherwise, acknowledging that such power is a power coupled with an interest.

6.    **ALTERATION OF PROGRAMS**

a.    LICENSEE will not change, alter, modify, copy, duplicate or add to any Program without WARNER's prior written consent.

b.    Notwithstanding paragraph 6.a above, LICENSEE may make minor cuts or alterations in order to conform to the orders of any duly authorized, legally constituted censorship authority in the Licensed Territory if LICENSEE immediately notifies WARNER in writing of the need for such cuts or alterations, obtains WARNER's prior written approval thereof and, at its own expense, replaces any such cuts and alterations so that the Materials are returned to WARNER or shipped to WARNER's designee in the same condition in which they were originally received by LICENSEE, normal wear and tear excepted.

c.    In no event will the copyright or trademark notice, WARNER's presentation or advertising credit or the credits to any person, firm or corporation appearing on any of the Materials be changed, altered or removed. Any breach or violation of the terms hereof will constitute a material default entitling WARNER, at its election, to terminate this Agreement, in whole or in part, in addition to any other rights or remedies available to WARNER and without releasing or discharging LICENSEE of any liability hereunder.

d.    Whenever requested by WARNER to do so, LICENSEE will change the title of any Program licensed hereunder and will not thereafter Transmit any such Program except under the new title.

7.    **CENSORSHIP**

If a Program or any episode thereof is rejected for Transmission by any duly authorized, legally constituted government censorship authority in the Licensed Territory and LICENSEE so notifies WARNER, LICENSEE and WARNER agree to substitute Program or episode for the one so withdrawn which substitute Program or episode will be agreeable to both WARNER and LICENSEE.

8.    **ADVERTISING**

a.    LICENSEE may use the publicity materials furnished hereunder no earlier than sixty (60) days prior to the commencement of the License Period of the relevant Program; except that, LICENSEE may use publicity material for promotion in the Program Guides and in promotional spots (exhibited on the pay television service only) no earlier than forty five (45) days prior to the commencement of the License Period for the respective Program. Under no circumstances shall LICENSEE permit or allow any "preview transmissions" (as that term is commonly understood in the Television industry), of any of the Programs to any viewer at any time.

w:\wp511\BPLATE\STC
08.22.00  4:15 pm

3

**WB 10020**
**CONFIDENTIAL**

 

b.  In all advertising and publicity relating to any Program or any Transmission thereof, LICENSEE shall comply with the advertising and billing credit requirements of the Program as furnished by WARNER to LICENSEE. LICENSEE will not make or permit to be made, in any advertising, publicity or otherwise, any statements which (a) constitute, or may be understood to be, an endorsement of any sponsor, product, article or service by WARNER or any person, company or corporation connected or associated with the Program, its production or distribution, or (b) indicate, or may be understood to indicate, that WARNER or any such person, company or corporation is connected or associated with any sponsor, product, article, service or advertiser. Any advertising or publicity referring to WARNER or any such person, company or corporation will be limited to and will indicate only that such person, company or corporation appeared in such Program or rendered services in connection therewith, or was the producer or distributor thereof, as applicable.

c.  LICENSEE will not advertise or promote, in any manner or medium, any Program withdrawn or suspended by WARNER.

d.  LICENSEE will not authorize or permit any excerpt or clip from any Program used for promotional purposes to be in excess of two (2) minutes in length.

e.  LICENSEE will indemnify and hold WARNER et al. harmless from and against any and all Claims against WARNER et al. due to any actual or alleged breach by LICENSEE of the provisions of this paragraph. If WARNER so requests, LICENSEE will defend WARNER et al. against such Claims.

## 9.  MUSIC PERFORMING RIGHTS

WARNER warrants and represents that the non-dramatic performing rights to all musical compositions contained in the Programs or any of them are (a) controlled by the American Society of Composers, Authors and Publishers; Broadcast Music, Incorporated; Sesac, Incorporated; or a performing rights society having jurisdiction; (b) in the public domain; or (c) controlled by WARNER to the extent required by the purposes of this Agreement. LICENSEE will not permit any Programs to be Transmitted without first obtaining a valid license from any performing rights society having jurisdiction. LICENSEE may be required to pay a performing rights royalty or license fee to any performing rights society having jurisdiction. LICENSEE will be solely responsible for the payment thereof and will indemnify and hold WARNER et al. free and harmless therefrom. If WARNER so requests, LICENSEE will defend WARNER et al. from any Claim arising out of LICENSEE's failure to pay in accordance with this paragraph for any musical composition in any Program.

## 10.  FORCE MAJEURE

a.  If any Act of God, strike, labor dispute, fire, flood, delay in or lack of transportation, public disaster, war, governmental act or regulation, or any other cause beyond the control of WARNER and LICENSEE ("Force Majeure Occurrence") prevents LICENSEE, without LICENSEE's fault, from Transmitting any Program pursuant to this Agreement for thirty (30) or more consecutive days then LICENSEE may request and obtain an extension of the License Period of the Program (and of the Term, if necessary) for a period coextensive with such Force Majeure Occurrence but in no event either for more than one hundred eighty (180) days or beyond the expiration of WARNER's rights in said Program.

b.  If laboratory delay or any Force Majeure Occurrence prevents WARNER from carrying out any provision of this Agreement, this Agreement will not have been breached and WARNER will have no liability therefor. Nevertheless, the License Period of any affected Program (and the Term, if necessary) will be extended for a period coextensive with the delay, but in no event beyond the expiration of WARNER's rights in said Program.

## 11.  REPRESENTATIONS AND WARRANTIES

a.  WARNER warrants and represents that, as to each Program, WARNER has or will have the right to grant the license herein contained on or before the first licensed Transmission of such Program, that there is no agreement with any other person, firm or corporation which will in any way interfere with any rights granted under this Agreement to LICENSEE; that all Programs licensed hereunder are free and clear of all encumbrances of any kind and nature which would be inconsistent with the rights granted to LICENSEE hereunder; and, that none of the Programs or any materials contained therein violates the rights of any person. WARNER further warrants and represents that it is a corporation duly organized,

**WB 10021**
**CONFIDENTIAL**






## 17. ANTI-PIRACY

LICENSEE will take all steps and pay all required fees necessary to protect the Programs fully under the copyright, trademark and related intellectual property laws of the Licensed Territory. WARNER will reasonably cooperate with LICENSEE in providing documents necessary to secure such protection. If LICENSEE becomes aware of any infringement of any copyright or trademark in any Program in the Licensed Territory, LICENSEE will immediately notify WARNER. LICENSEE will take such actions in cooperation with WARNER as WARNER may designate in order to stop such piracy. LICENSEE will employ security measures to prevent the loss, theft, pirating, copying or unauthorized duplication of any of the Materials in its possession, custody or control. LICENSEE accepts responsibility for the loss or theft of any Program or its Materials from the time of delivery until returned to WARNER. LICENSEE will notify WARNER immediately if any of the Materials in its possession is lost, stolen or destroyed. In such event, LICENSEE will cooperate with WARNER to the fullest extent in any attempt WARNER may make to recover such Material, and will indemnify WARNER et al. against any Claims made against WARNER et al. as a result thereof.

## 18. RETRANSMISSION ROYALTIES

Any fees payable by reason of government permitted or mandated retransmissions in the Licensed Territory of any transmission of a Program, including but not limited to AGICOA royalties, are the sole property of WARNER. LICENSEE will cooperate with WARNER to the extent necessary to permit WARNER to collect the maximum amount of any such fees.

## 19. VIDEO LEVY

LICENSEE acknowledges that if any fee, video levy, or similar charge shall be collected in the Territory on sale of video recorders, blank video cassettes (or discs) or similar items and such levy or any part thereof shall or may become payable to the copyright owner or distributor or exhibitor of any Program in the Territory, then such amount shall belong entirely to WARNER.

## 20. NOTICES

All notices under this Agreement must be in writing and sent by first class mail, postage prepaid, with a copy personally delivered or sent by telegram, telex, telecopier or other facsimile machine for delivery within twenty-four (24) hours of transmittal. The address for all notices are identified in the License Agreement. Either party may change its address for notice by written notice to the other pursuant to this paragraph.

## 21. HEADINGS

Paragraph headings are for reference only and have no legal effect respecting the scope, meaning or intent of any of the provisions of this Agreement.

## 22. INTEGRATION, CHOICE OF LAW AND JURISDICTION

a.    This Agreement is complete and constitutes the entire understanding between the parties. All prior understandings, written or oral, express or implied, have been merged herein.

b.    This Agreement may not be modified or amended except by an instrument in writing, signed by the parties hereto.

c.    At WARNER's option, any dispute arising in connection with this Agreement shall either be resolved judicially, as set forth in paragraph 22.d below or pursuant to arbitration, as set forth in paragraph 22.e below.

d.    If WARNER decides that a dispute should be resolved judicially, the state and federal courts in Los Angeles County, California, U.S.A. shall have exclusive jurisdiction over the dispute and LICENSEE submits to the jurisdiction thereof and to venue therein. Regardless of the judicial forum, LICENSEE and WARNER waive any right each may have to a trial by jury of any cause of action in connection with this Agreement. Any process served in connection with any proceeding to resolve any such dispute may be

WB 10022
CONFIDENTIAL



served upon the party to be served by registered or certified mail directed to the party at the address designated for notices to such party under this Agreement. Any such services will have the same effect as personal service within the State of California. The foregoing shall not preclude any party hereto from seeking enforcement outside California of any order or judgment rendered by any California court.

e.    If WARNER decides that a dispute should be submitted to arbitration, arbitration shall be the sole and exclusive means for the resolution of the dispute and it shall be final and binding. At WARNER's option, the arbitration shall occur under the UNCITRAL Arbitration Rules or under the American Arbitration Association Rules. Regardless of the rules chosen by WARNER, the arbitration shall be held in Los Angeles, California, or New York, New York, at WARNER's sole option, and shall be conducted in English as set forth below.

    i.    The arbitral panel shall consist of three arbitrators, one of whom shall be appointed by LICENSEE, one of whom shall be appointed by WARNER and one of whom shall be appointed by the first two arbitrators or, in case such two arbitrators cannot agree, by the American Arbitration Association which shall administer the arbitration proceeding under its Procedure for Cases under the American Arbitration Association Rules or under the UNCITRAL Arbitration Rules, in accordance with WARNER's decision. The arbitrators shall hear and dispose of any dispute in such manner as they, in their discretion, shall determine, but in so doing they shall be required to receive the submissions of WARNER and LICENSEE with respect to the dispute. The arbitrators may, for their convenience or that of WARNER and LICENSEE, take evidence at places other than the situs of the proceedings without changing the situs of the proceedings. The arbitrators shall base their award with respect to the matter before them on the contents of the Agreement and on the governing law for this Agreement as set forth in paragraph 22.f below. The award of the arbitrators may be, alternatively or cumulatively, for monetary damages, an order requiring the performance of non-monetary obligations or any other appropriate order or remedy. The arbitrators may issue interim awards. The final award shall assign costs of the arbitration to WARNER or LICENSEE, or both of them.  The decision of the arbitrators shall be rendered in writing with all reasonable expeditiousness, shall set out the reasons therefor and, except as set forth below, shall be final and binding upon WARNER and LICENSEE. Except as set forth below, WARNER and LICENSEE agree to exclude any right of application or appeal to any court in connection with any award made.

    ii.    Any award rendered by the arbitrators shall, if so desired by WARNER or LICENSEE, be brought immediately to the attention of appropriate officers of both WARNER and LICENSEE who shall meet in Los Angeles, California, or New York, New York, at WARNER's sole option, within a period of two weeks thereafter, if either of them so requests, accompanied by such advisors as they may select, in order to attempt in good faith to settle the dispute either in accordance with the award of on another mutually acceptable basis. In the event that, within one month after such award, WARNER and LICENSEE have not found a mutually acceptable solution to the dispute, the award of the arbitrators may be entered as final in any court having jurisdiction or an application may be made to such court for a judicial acceptance and enforcement of the award, as the case may be.

f.    This Agreement will be construed under and governed (1) by the internal laws of the State of California applicable to contracts entered into therein without giving effect to its conflicts of law provisions and (2) by the laws of the United States of America to the extent that those laws preempt California state law.

g.    A waiver by either party of any breach by the other must be in writing and may not be deemed a waiver of any other breach of the same or a different nature.

w:\wo5f\\BPLATE\STC
08.22.93 .8:15 pm

**WB 10023**
**CONFIDENTIAL**