# EXHIBIT E

ORIGINAL SHIPPED    DEC 0 1 2006

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA       )
SIEGEL LARSON,                )
                             )
          Plaintiffs,         )
                             )
     vs.                      )      No. 04-8400 (RSWL)(RZx)
                             )
WARNER BROS. ENTERTAINMENT )         -and-
INC., et al.,                 )
                             )      No. 04-8776 (RSWL)(RZx)
          Defendants.         )
_____)
AND RELATED COUNTERCLAIMS.

**CERTIFIED ORIGINAL**

DEPOSITION OF MARC TOBEROFF

Beverly Hills, California

Friday, November 17, 2006

Reported by:

DAVID S. COLEMAN

CSR No. 4613

**U.S. LEGAL**
*S u p p o r t*

Certified Shorthand Reporters

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA 91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

discussion with Peavy or Peary concerning Joanne or Laura Siegel's interest?

     MR. WILLIAMSON:  Objection.  Attorney-client.

     THE WITNESS:  What are the dates?

BY MR. BERGMAN:

    Q   The end of July 2002.

    A   Can you repeat the question, please, or read it back to me?

    Q   As of the end of July 2002, had you had any discussion with Peary or Peavy concerning Joanne or Laura Siegel's interest in the Superman property?

    A   Those discussions would be privileged.  I'm not gonna answer questions about what discussions I had with the Shusters.  That's attorney-client privilege, attorney work product regarding the Siegels' interest.

     (Unanswered question.)

    Q   As of the end of July 2002?

    A   From the point I started speaking to them till the present, my discussions with them regarding the Siegels' interest, regarding their interest, regarding Superman, regarding that whole legal situation is attorney-client privileged and also protected by the work product doctrine.

    Q   Okay.  Mr. Marks went on to testify concerning a conference call that he had with you and Mr. Emanuel.

98

The date of that conference call as set by Mr. Marks with reference to his phone logs which were marked GTRB 616 was that the conversation occurred within a day or two of August 7, 2002.

Prior to the time -- you do recall having a conference call with Mr. Marks and Mr. Emanuel, don't you?

A    I do.  As far as a date, again the date -- I have a -- I originally called -- this is just commenting on the date.  I originally recall that my assistant I had mentioned before, Andrew, I had asked him to set up a conference call, and I believe that was the reference in Marks' -- the exhibit to Marks' deposition, and that was noted -- that initial referenced conference call, that's the one where he talks about it's "20," and it's crossed out and says, "5 to 10 minutes," something like that, on the exhibit.  That was Andrew calling to set up a conference call.

But I have a specific recollection that after I tried to get dates from the Marks side -- or Andrew tried to get dates from Kevin Marks' office, it was very hard to pin down Ari Emanuel for that conference call.

So just talking about the date, I know he said it would have happened one or two days after that.  I think that conference call could have happened 10 days

99

after that.

    Q   Okay.

    A   Because I remember specifically being a little frustrated with Ari Emanuel's assistant because they kept saying, "Yes, and I'll have to speak to him," and he wouldn't come back to me with a date.  So that's all.

    Q   Prior to that conference call, whether it occurred on August 7 or 10th or 15th or whenever --

    A   Right.  Let's say mid August.

    Q   Okay.

    -- had you taken any steps to place a monetary value on the Siegel interest?

    MR. WILLIAMSON:  Objection.  Vague and ambiguous, and objection on attorney-client, work product grounds.

    Instruct you not to answer.

    (Instruction not to answer.)

    THE WITNESS:  I'm going to follow that instruction.

BY MR. BERGMAN:

    Q   To your knowledge had Mr. Emanuel taken any steps to place a monetary value on the Siegel interest in Superman prior to the conference call?

    MR. WILLIAMSON:  Objection to the extent it calls for attorney work product, and objection on the

100

grounds it calls for speculation.

    THE WITNESS:  And also attorney-client privilege, because if I knew it, it would be through communications by Mr. Emanuel.

    (Unanswered question.)

BY MR. BERGMAN:

    Q   Mr. Marks testified with respect to that conference call beginning at page 168 of his deposition, line 12 -- line 11, "I think Mr." -- I had asked him what was said in the conversation.  Quote, "I think Mr. Toberoff may have very briefly referenced past conversations, and then I believe it was Mr. Emanuel who explained that either they or some other people or perhaps some members of the Endeavor Talent Agency had set up a fund or were in the process of setting up a fund to acquire intellectual property rights which they would then package with clients from the Endeavor Talent Agency."

    Do you recall Mr. Emanuel stating that in substance during the conversation?

    A   Not specifically, no.  He may have.

    Q   Okay.  Do --

    A   I recall him, you know, doing the equivalent of in a meeting what they call warming up the room where -- which he's very good at, in which he sort of just spoke

101

generally, but I don't specifically recall that.  He may have.

Q    Had you or Mr. Emanuel set up a fund to acquire intellectual property rights at that time?

MR. WILLIAMSON:  Objection.  Attorney-client privilege.  Attorney work product.

THE WITNESS:  Without a waiver of those privileges, I can speak for myself.  I had not set up a fund, no.

BY MR. BERGMAN:

Q    To your knowledge had Mr. Emanuel?

A    I believe Endeavor or Mr. Emanuel had a fund and access to a lot of financing.

Q    Continuing with Mr. Marks' testimony concerning that conference call between you and he and Mr. Emanuel, I'm at page 169 of his deposition, line 1, quote, "And I'm not sure who spoke, but they made a proposal of $15 million and what was described as a meaningful back end, which I understood to be a contingent compensation position or a royalty position in the exploitation of the property," close quote.

Did you or Mr. Emanuel propose acquiring the Siegel rights to Mr. Marks for $15 million together with a meaningful back end?

A    I wasn't the one who made that offer.

102

Mr. Emanuel made that offer, and I specifically remember that, because I remember when he was talking about the back end, I remember thinking it was just something odd, the way he had mentioned the back end.

Q    Was --

A    But I remember that he was the one who stated that.

Q    Was the offer by Mr. Emanuel for $15 million?

A    Yes.

Q    And did he mention what he had in mind with respect to the meaningful back end?

A    No.

MR. WILLIAMSON:  Objection.  Indefinite as to time and place.  Are you referring to that conversation?

MR. BERGMAN:  Yes.

MR. WILLIAMSON:  Okay.

THE WITNESS:  No.

BY MR. BERGMAN:

Q    Okay.  Do --

A    I believe the offer was that if the fixed amount was acceptable, that we would go on to work out a back end.

Q    Okay.  Mr. Marks goes on to testify -- and I am omitting some of his testimony.  I'm at line 16 on page 169 -- "And then I," Mr. Marks, "asked if this was a

103

proposal that was conditioned on their doing due diligence about the rights, and they said again in substance and effect, 'No, it's not.  We've done our due diligence already.  This is the offer.'"

Do you recall that being said during this late July or mid August telephone conversation?

A    I don't recall that specifically, but it doesn't sound like something I would say.

Q    Do you recall --

A    That sounds like an agent talking.

Q    Do you recall anything else about the conference call between you, Mr. Marks and Mr. Emanuel in mid August?

A    Not sitting here, no.

Q    Again, did you make any notes of that conversation?

A    I may have.  I don't know.  It wasn't a long conversation, nor a complicated one, so my guess is I did not make notes.  I didn't -- there weren't any in the file.

Q    Okay.  Mr. Marks testified, again utilizing his phone register at page 617, that there was a call from you subsequent to the conference call on August 29, and he couldn't recall whether or not he had responded to that call.

104

in reference to any other facts if you want.  When did you have your very first conversation with either Laura or Joanne Siegel?

A    What was the first part of the question?  In relation to what?

Q    I was suggesting that if you could answer that question with respect -- in relation to the mid August telephone conversation that you had, whether it was a month or two months afterwards, but my --

A    Are you talking about the conversation with -- the conference call with Ari Emanuel and Kevin Marks?

Q    Correct.

A    It was long after that.  I believe it was the end of October of that year.

Q    End of October 2002?

A    Yes, mid to end, sometime in October.  I'm not -- I believe it was sometime in October, and the basis of that belief is the agreement between the Siegels and IP Worldwide --

Q    Is dated October -- as of October 3.

A    Right.  And it was signed towards the end of October.  So I believe the initial contact was early October.

Sometimes when I do agreements, when they're dated as of -- when they're dated as of, I -- that's when

106

there were sort of the parties came together.  So I believe the initial conversation may have been like right at the beginning of August -- I mean, excuse me, right at the beginning of October 2003.

Q   How did that initial conversation, whenever it occurred, come about?  Who called who?

A   Joanne Siegel called me.

Q   And did she say how she had gotten your name or number?

A   Yes.  She said she had gotten it from Jean, Jean Peavy.

Q   And what in substance did Laura Siegel say to you at that time?

A   It was Joanne, actually.

Q   Oh, I'm sorry.

MR. WILLIAMSON:  Objection.  Attorney-client.

THE WITNESS:  Without waiver of the privilege, I can just tell you the introductory remarks were that she had gotten my number from Jean Peavy, something to the effect that "Jean Peavy likes you a lot and is very -- highly recommended you," something of that nature, and that she was looking for an attorney and would be interested to talk to me about representing her.  That was the sum and substance of it.

BY MR. BERGMAN:

107

MR. WILLIAMSON:  Objection.  Vague and ambiguous.

THE WITNESS:  I don't specifically recall, but it may have been that -- what was in his log where he said he didn't believe we spoke, but there was a call registered, so I may have called him for that purpose, but I don't specifically recall that phone call, probably because he didn't return it.

BY MR. BERGMAN:

Q    What else do you recall of the first conversation with Joanne Siegel?

A    That's it.

Q    How many days -- how did the conversation end?

A    I believe we set an appointment to meet.  I'm not certain, but I believe -- I have a vague recollection of meeting with Joanne and I believe Laura for lunch.

Q    Approximately --

A    We met in person.

Q    Approximately how long after that first call from Joanne?

A    Right away.

Q    Within a day or two?

A    I believe so.

Q    And where did you meet with them for lunch?

A    I don't recall.

109

Q   Would you tell me to the best of your recollection what was said by each of you at that meeting?

MR. WILLIAMSON:  Objection.  Attorney-client.

THE WITNESS:  No, I'm not going to tell you that, because after she told me she's interested in my providing legal services to her, even at that stage those conversations are protected by the attorney-client privilege.  I gave you the subject matter, but...

(Unanswered question.)

BY MR. BERGMAN:

Q   Did you at any time tell either Joanne or Laura Siegel that Mr. Emanuel had offered $15 million to acquire their rights?

A   Again, our -- those conversations at that point would be privileged.  Those communications between me and her would be privileged.

(Unanswered question.)

Q   Did you at any time disclose to either of the Siegels that you had been inquiring to purchase their rights?

A   Again, my -- you just asked me this same question, so I would say my answer is the same, but I believe, without disclosing my communications or their communications to me on that subject, I believe Mr. Marks

110

counsel in connection with this agreement?

A    I believe, yes.

Q    Who was that?

A    George -- last name starts with a Z, George Zadorozny. I'm not sure how to spell it.

Q    And did you negotiate with that lawyer?

A    I can't say for sure. I believe so, but I... I believe so. The reason I can't say for sure is I also -- when I entered into the retainer agreement with the Siegels, I specifically recall negotiating with Mr. Zadorozny, and I believe Mr. Zadorozny was involved in this agreement as well, but I don't -- I don't recall if -- I believe I did, but I don't have a specific recollection of it.

Q    And when did you enter into a retainer agreement with the Siegels?

A    Before -- definitely before we filed suit, and I believe it was... I can't give you a date.

Q    Were there any prior drafts --

A    I'd have to look at the -- I'd have to check my file.

Q    Okay. Were there any prior drafts of the October 3, '02 agreement prior to Exhibit 18?

A    Yes. It went through various drafts.

Q    And --

114

like that, no.  I recall her saying that I was highly

recommended by Jean Peavy and that she wanted to talk to

me about representing her, and that soon thereafter we

met for lunch with I believe it was her and Laura, but it

wasn't with reference to -- it was that she wanted a

lawyer.

BY MR. BERGMAN:

Q   When you got together with them at lunch --

A   It didn't appear -- I can just tell from the

context it did not appear to me that at the time we were

speaking, she was currently represented.

Q   When you met Joanne and Laura for lunch a few

days after the initial telephone conversation, did you

tell them that you had been speaking with Kevin Marks?

A   You asked me that three times already.

Q   Did you?

A   I don't believe I told them that.  I don't have

a rec- -- I don't know.  I don't have a recollection of

that, but I may have referenced it.

Q   Did you ask them if they were currently

represented by counsel?

A   I already answered that question also.  No, I

don't believe I asked them that.  I believe it was

implicit in her asking -- saying that she wanted to talk

to me about representing her or needing a lawyer that she

135

STATE OF CALIFORNIA    )
                       ) ss
COUNTY OF LOS ANGELES  )

    I, DAVID S. COLEMAN, a Certified Shorthand Reporter, do hereby certify:

    That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, nor in anywise interested in the outcome thereof.

    In witness whereof, I have hereunto subscribed my name.

Dated: __NOV 3 0 2006__

_____

DAVID S. COLEMAN
CSR No. 4613

# EXHIBIT F

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA
SIEGEL LARSON,

      Plaintiffs,

     vs.               No. 04-8400 (RSWL)(RZx)
                            -and-
WARNER BROS. ENTERTAINMENT   No. 04-8776 (RSWL)(RZx)
INC., et al.,

      Defendants.

AND RELATED COUNTERCLAIMS.

# ORIGINAL

DEPOSITION OF JOANNE SIEGEL

Beverly Hills, California

Wednesday, August 2, 2006

Reported by:
DAVID S. COLEMAN
CSR No. 4613

Job No. 1-50935



www.sarnoffcourtreporters.com

Irvine • Los Angeles • San Francisco

phone 877.955.3855 • fax 949.955.3854

EXHIBIT F

```
1          Q    Did you discuss with any lawyer --

2               MR. TOBEROFF:  Just a second.  Before we get to

3    the next question, I did not -- I do not have -- I didn't

4    realize we were going to work off the same exhibits, so I

5    don't have a set to look at.

6               MR. ZISSU:  Why don't you borrow these.  Oh, no.

7    Why don't you borrow those.  Sorry.

8               MR. TOBEROFF:  That would be great.  If I

9    could...  Sorry.

10              MR. ZISSU:  That's all right.

11              MR. TOBEROFF:  Let me just organize these for a

12   second.

13              MR. ZISSU:  They're in order.

14              MR. ZISSU:  Could you read back the last

15   question and answer?

16              (Record read as follows:

17                        "Q    Did any lawyer help you write

18              this letter?

19                   "A    No.

20                   "Q    Did you discuss with any

21              lawyer -- ")

22              THE WITNESS:  Was it about this letter?

23   BY MR. ZISSU:

24         Q    Did you discuss with any lawyer the content of

25   this letter before you sent it?
```

33

1      A    No.

2      Q    Now, if you look at the next -- the second page,

3   in the fourth paragraph down --

4      A    Yes.

5      Q    -- there is -- the second sentence reads as

6   follows:  "The beast hungers for more," and then the next

7   sentence reads, "Just like the Gestapo, your company

8   wants to strip us naked of our legal rights," close

9   quote.

10          In what way did you believe that the defendants

11  were stripping you of your legal rights?

12     A    You mean in connection with what?

13     Q    In connection with the letter you wrote.  What

14  did you mean in your letter?

15     A    Well, the February contract was so shocking that

16  we felt -- that's the way I felt.

17     Q    And in what way did you feel it was shocking?

18          MR. TOBEROFF:  Now you're getting back into the

19  same interpretation of a 56-page document.  It involves

20  the attorneys, and that contract was obviously

21  interpreted for her by her attorneys, and she can't --

22  first of all, you're not asking her to articulate that,

23  but I'm instructing her not to answer information she got

24  through discussions with her attorneys.

25          MR. ZISSU:  Well, I just want to point out two

34

1    Q    Isn't it a fact that Mr. Toberoff began

2   representing you in late 2002 or early 2003?

3    A    It was late 2002.

4    Q    And didn't he get the files, which included this

5   document, at about that time?

6    A    I don't know when he got it.

7    Q    I'm looking --

8    MR. TOBEROFF:  I can represent to you this

9   October 26 letter was not in the files that I received

10   from Kevin Marks.

11    MR. ZISSU:  I'm looking for the copy of it, the

12   October 26 letter, which was marked yesterday, I believe.

13   It's in a separate pile here somewhere.

14    Q    Were you also dealing with Bruce Ramer at the

15   Gang Tyre firm?

16    A    When?

17    Q    In the period when Kevin Marks was representing

18   you.

19    A    Oh, that's the firm.

20    Q    Yes.

21    And Bruce Ramer was also working for you then.

22    Correct?

23    A    I -- yes, I guess.

24    MR. ZISSU:  Marc, it would be really helpful if

25   you would help me so I can reduce my time looking for

41

1
2
3
4
5
6
7
8      I, JOANNE SIEGEL, do hereby declare under
9   penalty of perjury that I have read the foregoing
10   transcript; that I have made any corrections as appear
11   noted, in ink, initialed by me, or attached hereto; that
12   my testimony as contained herein, as corrected, is true
13   and correct.
14      EXECUTED this _17th_ day of __September__,
15   20_06_, at _MARINA DEL Rey_, _CA_.
                    (City)              (State)
16
17
18
19   _____
20   JOANNE SIEGEL
21
22
23
24
25

                                                    140

1

2

3

4      I, the undersigned, a Certified Shorthand

5  Reporter of the State of California, do hereby certify:

6            That the foregoing proceedings were taken

7  before me at the time and place herein set forth; that

8  any witnesses in the foregoing proceedings, prior to

9  testifying, were placed under oath; that a verbatim

10 record of the proceedings was made by me using machine

11 shorthand which was thereafter transcribed under by

12 direction; further, that the foregoing is an accurate

13 transcription thereof.

14           I further certify that I am neither

15 financially interested in the action nor a relative or

16 employee of any attorney of any of the parties.

17           IN WITNESS WHEREOF, I have this date

18 subscribed my name.

19

20 Dated: _____AUG 1 8 2006_____

21

22 _____

         DAVID S. COLEMAN, CSR NO. 4613

23

24

25

# EXHIBIT G

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA
SIEGEL LARSON,

       Plaintiffs,

    vs.               No. 04-8400 (RSWL)(RZx)

                          -and-

WARNER BROS. ENTERTAINMENT   No. 04-8776 (RSWL)(RZx)
INC., et al.,

       Defendants.

AND RELATED COUNTERCLAIMS.

# ORIGINAL

DEPOSITION OF LAURA SIEGEL LARSON

Beverly Hills, California

Tuesday, August 1, 2006

Reported by:
DAVID S. COLEMAN
CSR No. 4613

Job No. 1-50934

www.sarnoffcourtreporters.com

Irvine  •  Los Angeles  •  San Francisco

phone 877.955.3855  •  fax 949.955.3854



**SARNOFF**
*Court Reporters and
Legal Technologies*

EXHIBIT G

1    KCAL in Los Angeles, which was owned by the Disney

2    company at that time.

3         Q    And since you have been disabled, you have not

4    been employed?

5         A    Correct.

6         Q    When was the first time you had any

7    communication with Marc Toberoff?

8         A    I believe it was in late 2002.

9         Q    Okay.  And do you remember the occasion of

10   meeting him?

11        A    My mother had spoken to him on the phone.  She

12   had had a conversation with Jean Peavy, and Jean Peavy

13   recommended him, and subsequent to that we met.

14        Q    And who is Jean Peavy?

15        A    Jean Peavy is an old family friend, and she is

16   the sister of Joe Shuster.

17        Q    Do you know whether that telephone conversation

18   was initiated by Ms. Peavy or by your mother?

19        A    I don't know.

20        MR. ZISSU:  Let's mark as Defendants' Exhibit 3

21   a document entitled "Defendants'/Counterclaimant's First

22   Set of Requests for the Production of Documents and

23   Things."

24             (Defendants' Exhibit 3 marked.)

25   BY MR. ZISSU:

17

1      MR. TOBEROFF:  Calls for a narrative.

2      You can answer.

3      THE WITNESS:  We decided to enter into an

4  agreement with IP Worldwide for Mr. Emanuel to represent

5  us in negotiations for our rights.

6  BY MR. ZISSU:

7      Q    And was that agreed to in a telephone

8  conversation or another face-to-face meeting?

9      A    We discussed it, and it was probably both in a

10  face-to-face meeting and by telephone, but I don't really

11  recall.

12      Q    Did you go to his office, Mr. Emanuel's

13  office --

14      A    Yes.

15      Q    -- again?

16      A    Yes.

17      Q    And how many -- in terms of time frame, how much

18  after the first meeting did that take place?

19      MR. TOBEROFF:  Ambiguous.

20      THE WITNESS:  I believe the next meeting lasted

21  about 45 minutes.

22  BY MR. ZISSU:

23      Q    And how -- and it was -- you're not sure --

24      A    Not sure.

25      Q    -- whether it was two weeks later or a week

33

1   later?

2        A    No.

3        Q    Was it after the holidays or before?

4        A    I believe so.

5        Q    And who was at that meeting?

6        A    My mother, myself, Mr. Toberoff and Mr. Emanuel.

7        Q    And you came to some kind of an agreement?

8        A    Yes.

9        Q    And what was that agreement?

10       A    We decided that Mr. Emanuel would be a

11   negotiator for us, and Mr. Toberoff would serve as our

12   attorney.

13       Q    And when you say you decided that Mr. Emanuel

14   would serve you, did you agree that Intellectual

15   Properties Worldwide, LLC would be the entity through

16   which you would work?

17       A    Yes.

18       Q    And do you know who owns Intellectual Properties

19   Worldwide, LLC?  Today do you know?

20       A    Today I don't know.

21       Q    Did you know at the time in early 2003 or late

22   2002?

23       A    My understanding was that it was a partnership

24   between Mr. Emanuel and Mr. Toberoff.

25       Q    And do you know who J. Todd Harris is?

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT G    Page 112

1    understanding of what was stated in this opinion than you

2    have previously testified today?

3        A    No.

4        Q    Did --

5            MR. TOBEROFF:    How we doing on time?

6            MR. ZISSU:    How much do we have left on the

7    clock?

8            (Discussion held off the record.)

9            MR. ZISSU:    Defendants' Exhibit 41.

10            (Defendants' Exhibit 41 marked.)

11    BY MR. ZISSU:

12        Q    This is a letter dated from Laura Siegel Larson

13    and Joanne Siegel to Kevin Marks dated September 21,

14    2002.

15            Are you familiar with this letter?

16        A    Yes.

17        Q    In the -- I think it's the third sentence, it

18    says, "Therefore due to irreconcilable differences, after

19    four years of painful and unsatisfying negotiations, this

20    letter serves as formal notification that we are totally

21    stopping and ending all negotiations with DC Comics,

22    Inc., it's parent company AOL Time Warner and all of its

23    representatives and associates, effective immediately,"

24    and my question is, was there some prior informal

25    notification given to anyone to the same effect?

261

1      A    I don't believe so.

2      Q    Did anyone help you write this letter?

3      A    My mom and I wrote it together.

4      Q    Had you met Mr. Toberoff at this point?

5      A    No.

6      Q    And you hadn't consulted him about this letter?

7      A    No.

8      Q    So what was the answer about -- there was no

9  prior informal notification?  Was that your testimony?

10     A    I don't believe so.

11     Q    Were you repudiating the October 19, 2001

12  letter?

13          MR. TOBEROFF:  Objection.  Calls for a legal

14  conclusion.

15          THE WITNESS:  I don't know what you mean by

16  that.

17  BY MR. ZISSU:

18     Q    Well, how would you terminate what you were

19  doing in relation to the October 19, 2001 letter?

20     A    Well, the --

21          MR. TOBEROFF:  Objection.  Vague and ambiguous.

22          THE WITNESS:  The October 19th letter was no

23  longer at issue.  What was at issue was this February

24  2002 document.

25  BY MR. ZISSU:

262

1

2

3

4

5

6

7

8     I, LAURA SIEGEL LARSON, do hereby declare under

9     penalty of perjury that I have read the foregoing

10    transcript; that I have made any corrections as appear

11    noted, in ink, initialed by me, or attached hereto; that

12    my testimony as contained herein, as corrected, is true

13    and correct.

14        EXECUTED this _17th_ day of _September_,

15    20_06_, at _Playa Del Rey_, _California_.
                    (City)                    (State)

16

17

18

19    _Laura Siegel Larson_
      LAURA SIEGEL LARSON

20

21

22

23

24

25

278

1

2

3

4        I, the undersigned, a Certified Shorthand

5  Reporter of the State of California, do hereby certify:

6        That the foregoing proceedings were taken

7  before me at the time and place herein set forth; that

8  any witnesses in the foregoing proceedings, prior to

9  testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under by

12  direction; further, that the foregoing is an accurate

13  transcription thereof.

14        I further certify that I am neither

15  financially interested in the action nor a relative or

16  employee of any attorney of any of the parties.

17        IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19        AUG 1 8 2006

20  Dated: _____

21

22

      DAVID S. COLEMAN, CSR NO. 4613

23

24

25

# EXHIBIT H

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA      )
SIEGEL LARSON,               )
                             )
        Plaintiffs,          )
                             )
    vs.                      )    No. 04-8400 (RSWL)(RZx)
                             )
WARNER BROS. ENTERTAINMENT   )        -and-
INC., et al.,                )
                             )    No. 04-8776 (RSWL)(RZx)
        Defendants.          )
_____)
AND RELATED COUNTERCLAIMS.

DEPOSITION OF KEVIN S. MARKS

Beverly Hills, California

Saturday, October 7, 2006

Volume 1

Reported by:

DAVID S. COLEMAN

CSR No. 4613



A    I returned that call that day or subsequently, yes.

Q    Can you tell me to the best of your recollection what Mr. Toberoff said during that conversation and what you said?

A    Yes.  I think Mr. Toberoff started the call by saying that he had called me earlier and that I hadn't returned his call, for which I apologized, and then he introduced himself.  He said he was a lawyer and that he represented individuals that had interests in rights to movie and other properties that had come into those rights either by way of reversions under the law or reversions under Guild agreements.  I also recall him saying that he had a separate company that was in the business of acquiring intellectual property rights.  I recall him saying that he was interested in the Superman property and the Superboy property and had understood that I was representing the Siegel family interest, and he asked if he could talk to me about that.

My recollection is that my response was that we were very far along with DC Comics and at a documentation phase.  I may have said DC Comics or Warner Bros. because I do think that part of the conversation, I have a recollection of Mr. Toberoff saying that he had dealt with Warner Bros. before, the people at Warner Bros., in

152

connection with the "Wild Wild West" and rights involving

the "Wild Wild West" in which some deal had been made

that led to the making of the feature film.

Q    Do you recall anything else of that

conversation?

A    That's my best recollection as I sit here today.

Q    Do you recall telling Mr. Toberoff that you had

closed a deal with DC regarding the Siegel interest?

MR. TOBEROFF:  Leading.

THE WITNESS:  My best recollection is how I

described it, but I think I said we were in the process

of -- in the documentation phase, were trying to document

a deal.

BY MR. BERGMAN:

Q    And do you recall what response, if any,

Mr. Toberoff made?

A    I don't.

Q    And do you recall anything further about the

conversation or how it ended?

A    I don't recall how it ended.

Q    Did you as of February 6, '02 believe that you

had closed a deal with DC for the Superman interest?

MR. MARMARO:  The question is vague and

ambiguous, calls for a legal conclusion, and again I am

going to defer to Mr. Toberoff whether he has any

153

records, that what must have happened is I returned the call, didn't reach Mr. Toberoff; he called back, and we -- on the 30th, and we spoke subsequent, either on that day or subsequent to that day.

BY MR. BERGMAN:

Q    Would it be accurate to say that you do not recall speaking -- actually speaking with Mr. Toberoff twice during the last week of July '02?

A    I recall one conversation.

Q    Okay.  Can you tell me to the best of your recollection what was said by each of you and Mr. Toberoff in that conversation?

A    I think Mr. Toberoff said he was -- wanted to check in with me to see where we were in our dealings with DC Comics, and I think I told him then that -- and I may have also said it in our first conversation -- that we had a confidentiality agreement with DC Comics, and I didn't feel at liberty to discuss the status of our dealings with him.

Mr. Toberoff said, "Can you tell me what DC Comics offered you," and I said, "No.  We have a confidentiality agreement."

And I believe Mr. Toberoff said, "Would you be willing to enter into negotiations with me," and I believe I said, "Initiating negotiations, no.  That's

166

something that makes me very uncomfortable.  If you have

an offer, present it to me, and I'll present it to the

client."

Q    Do you recall what he said in response?

A    I think that was the summary of the substance of

the conversation other than goodbyes.

Q    If you turn the page to 616, you will see a

reference to a conference call, quote, "with Mark, Kevin,

and Ari Emanuel at Endeavor," close quote.  There also

appears to be a notation, "approximately 20 minutes."

Do you see that?

A    Yes, and it looks like the "20" is crossed out,

and it says "5 to 10" above it.

Q    I see.  Okay.

Off the record.

(Discussion held off the record.)

BY MR. BERGMAN:

Q    Would you describe to the best of your

recollection and as specifically as possible what was

said by each of the three of you during that

conversation?

A    I think this record may actually be setting up a

conference call rather than the conference call, but

ultimately there was a conference call at this time

period.

167

Q    I see.  Okay.

Do you recall how long after August 7 that
conference call took place?

A    Within the next day or two.

Q    I see.

Would you tell me --

A    If not on that date.

Q    -- what was involved and what was said in that
conversation?

A    Yes.  Mr. Toberoff and Mr. Emanuel both spoke.
I can't completely tell you who said what, but I think
Mr. Toberoff may have very briefly referenced past
conversations, and then I believe it was Mr. Emanuel who
explained that either they or some other people or
perhaps some members of the Endeavor Talent Agency had
set up a fund or were in the process of setting up a fund
to acquire intellectual property rights which they would
then package with clients from the Endeavor Talent
Agency, then take those to studios to exploit the
package, and they understood that the Siegel family had
an interest in the termination rights and viewed that as
perhaps the most valuable of properties and wanted to
make a proposal.

Q    Okay.  What did you say?

A    I said in substance and effect, "I'm listening."

168

And I'm not sure who spoke, but they made a proposal of $15 million and what was described as a meaningful back end, which I understood to be a contingent compensation position or a royalty position in the exploitation of the property.

Q   And was that for the entire Siegel Superman interest?  Did it include Michael's?

A   I don't think that was discussed, but that's how I understood it.

Q   Did they say -- attempt to quantify what that meaningful back end would be?

A   They did not.  I believe I asked, but they did not.

Q   And what else did you say?

A   I asked if there was anything else, and they said "No," and then I asked if this was a proposal that was conditioned on their doing due diligence about the rights, and they said again in substance and effect, "No, it's not.  We've done our due diligence already.  This is the offer."

Q   Anything else you can recall of that conversation?

A   I think I said, "Thank you, and I will communicate this to the client" or "take this back to the client."

169

Q    And did you in fact do that?

MR. MARMARO:  Before you answer the question, is there any objection to the answer?  The question calls for a communication between Mr. Marks and the clients.

MR. TOBEROFF:  Without a waiver, no, whether or not you communicated that to the client.

MR. MARMARO:  A yes or a no.

THE WITNESS:  Yes.

BY MR. BERGMAN:

Q    And was that a communication within let's say a week of the conference call?

A    Yes.

Q    Your phone register, 617, indicates a call from Mr. Toberoff on August 29.  Was that call returned?

A    I -- was it returned.  I don't know.

MR. TOBEROFF:  Which number -- Bates number?

MR. BERGMAN:  617.

Q    Do you recall having a telephone conversation with Mr. Toberoff subsequent to the conference call?

A    The best I can say is that it may be that Mr. Toberoff called to see if I had a response, and I could only have said at that time that the clients had been away, and I don't have a response.  I have -- I am not certain about that.

Q    Did there ever come a time when you communicated

170

STATE OF CALIFORNIA    )
                       ) ss
COUNTY OF LOS ANGELES  )

        I, DAVID S. COLEMAN, a Certified Shorthand

Reporter, do hereby certify:

        That prior to being examined, the witness in

the foregoing proceedings was by me duly sworn to

testify to the truth, the whole truth, and nothing

but the truth;

        That said proceedings were taken before me at

the time and place therein set forth and were taken

down by me in shorthand and thereafter transcribed

into typewriting under my direction and supervision;

        I further certify that I am neither counsel

for, nor related to, any party to said proceedings,

nor in anywise interested in the outcome thereof.

        In witness whereof, I have hereunto subscribed

my name.


Dated:    OCT 1 7 2008


                              _____
                              DAVID S. COLEMAN
                              CSR No. 4613