# EXHIBIT A

1

2                    UNITED STATES DISTRICT COURT

3                   CENTRAL DISTRICT OF CALIFORNIA
                          WESTERN DIVISION

4


5
     DC COMICS,                     )
6                                   )
                                    )
7          PLAINTIFF,               )
                                    )
8          VS.                      ) CASE NO. CV 10-03633-ODW(RZX)
                                    )
9                                   )
     PACIFIC PICTURES CORPORATION, ) LOS ANGELES, CALIFORNIA
10   IP WORLDWIDE, LLC., ET AL.,    ) SEPTEMBER 20, 2010
                                    ) (10:14 A.M. TO 11:37 A.M.)
11         DEFENDANTS.              )
     _____)
12

13                           HEARING
                  BEFORE THE HONORABLE RALPH ZAREFSKY
14                 UNITED STATES MAGISTRATE JUDGE

15


16


17
     APPEARANCES:                SEE NEXT PAGE
18
     COURT REPORTER:             RECORDED; COURT SMART
19
     COURTROOM DEPUTY:           ILENE BERNAL
20

21   TRANSCRIBER:                DOROTHY BABYKIN
                                 COURTHOUSE SERVICES
22                               1218 VALEBROOK PLACE
                                 GLENDORA, CALIFORNIA  91740
23                               (626) 963-0566

24   PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING;
     TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
25

```
 1    APPEARANCES:  (CONTINUED)
      FOR THE PLAINTIFF:        O'MELVENY & MYERS LLP
 2                              BY:  DANIEL M. PETROCELLI
                                     MATTHEW T. KLINE
 3                                   JASON TOKORO
                                     ATTORNEYS AT LAW
 4                              1999 AVENUE OF THE STARS
                                7TH FLOOR
 5                              LOS ANGELES, CALIFORNIA  90067

 6    FOR THE DEFENDANTS:       KENDALL BRILL & KLIEGER LLP
                                BY:  RICHARD B. KENDALL
 7                                   LAURA W. BRILL
                                10100 SANTA MONICA BOULEVARD
 8                              SUITE 1725
                                LOS ANGELES, CALIFORNIA  90067
 9
                                TOBEROFF & ASSOCIATES, P.C.
10                              BY:  MARC TOBEROFF
                                     ATTORNEY AT LAW
11                              2049 CENTURY PARK EAST
                                SUITE 2720
12                              LOS ANGELES, CALIFORNIA  90067

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                           I N D E X
     CASE NO. CV 10-03633-ODW(RZX)              SEPTEMBER 20, 2010
2
     HEARING:  1.  PLAINTIFF'S MOTION TO INITIATE DISCOVERY AND
3                  TAKE IMMEDIATE LIMITED DISCOVERY OF TWO ELDERLY
                   WITNESSES;
4              2.  DEFENDANTS' MOTION FOR A PROTECTIVE ORDER (RE
                   TOBEROFF TIMELINE);
5              3.  DEFENDANTS' MOTION FOR A PROTECTIVE ORDER
                   STAYING DEPOSITIONS PENDING RULINGS ON
6                  DISPOSITIVE MOTIONS AND LIMITING SCOPE AND TIME
                   OF DEPOSITIONS
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**08**

1           LOS ANGELES, CALIFORNIA; MONDAY, SEPTEMBER 20, 2010

2                         10:14 A.M.

3           THE CLERK:  ITEM NUMBER 2, CASE NUMBER

4   CV 10-03633-ODW(RZX), DC COMICS VERSUS PACIFIC PICTURES

5   CORPORATION, ET CETERA, ET AL.

6           COUNSEL, PLEASE MAKE YOUR APPEARANCES.

7           MR. PETROCELLI:  GOOD MORNING, YOUR HONOR.

8           MY NAME IS DANIEL PETROCELLI.  I'M HERE WITH

9   MATTHEW KLINE AND JASON TOKORO.  AND WE REPRESENT THE

10  PLAINTIFF DC COMICS.

11          THE COURT:  GOOD MORNING.

12          MR. KENDALL:  GOOD MORNING, YOUR HONOR.

13          RICHARD KENDALL APPEARING ON BEHALF OF THE -- WHAT

14  WE'LL CALL THE TOBEROFF DEFENDANTS.  THAT'S MARK TOBEROFF,

15  PACIFIC PICTURES, IPW AND SO FORTH -- TOGETHER WITH MY

16  PARTNER LAURA BRILL.  AND MR. TOBEROFF IS HERE ON BEHALF OF

17  CERTAIN OTHER PARTIES.

18          THE COURT:  ALL RIGHT.

19          MR. PETROCELLI:  YOUR HONOR, IS THERE A TAPE

20  RECORDING OF THIS?  IS THAT HOW IT WORKS?

21          THE COURT:  IT'S NOT TAPE, BUT IT IS THE

22  TECHNOLOGICAL ADVANCEMENT OF THAT, YES.

23          MR. PETROCELLI:  OKAY.  THANK YOU.

24          THE COURT:  MR. TOBEROFF, ARE YOU MAKING AN

25  APPEARANCE AS WELL OR JUST OBSERVING?

5

1          MR. TOBEROFF:  I WON'T BE SPEAKING, BUT I'M HERE ON

2    BEHALF OF THE SIEGELS AND THE SHUSTER PARTIES.

3          THE COURT:  ALL RIGHT.

4          WELL, I NEEDED SUPERMAN TO HELP ME BRING IN THE

5    DOCUMENTS.

6          (LAUGHTER.)

7          THE COURT:  ALL RIGHT.  THE FIRST MATTER I WANT TO

8    ADDRESS IS -- I HAVE AN APPLICATION FROM MR. TOBEROFF TO FILE

9    A NUMBER OF DOCUMENTS UNDER SEAL, FIVE DECLARATIONS.

10          IS THERE ANY OPPOSITION TO THAT, MR. PETROCELLI?

11          MR. PETROCELLI:  YOUR HONOR, IF THESE RELATE TO

12    MEDICAL ISSUES, THE ANSWER IS THERE IS NO OPPOSITION.

13          THE COURT:  OKAY.  THEN, I WILL APPROVE THAT.

14          (PAUSE IN PROCEEDINGS.)

15          THE COURT:  I SUPPOSE IT IS POSSIBLE THAT THE

16    MEDICAL CONDITION OF THESE PEOPLE MAY COME UP IN THIS

17    HEARING.  I WOULD NOT THINK IT'S NECESSARY TO SEAL THE TAPE

18    OF -- OR THE RECORDING OF THE HEARING.  BUT IF ANYBODY FEELS

19    THAT'S SO AFTERWARDS, LET ME KNOW.

20          ALL RIGHT.  WE HAVE THREE MOTIONS.  THEY'RE ALL

21    SOMEWHAT INTERRELATED IN MY VIEW.  NONE OF THEM JUSTIFIES THE

22    AMOUNT OF FILING THAT'S BEEN DONE.  I COUNTED UP.  I THINK

23    THERE'S SIX REAMS OF PAPER THAT I'VE BEEN PRESENTED WITH.

24    PROBABLY A TOTAL OF 75 PAGES WOULD HAVE DONE FOR IT ALL.

25          WHO WANTS TO BE HEARD FIRST?

1          MR. KENDALL:  DOES YOUR HONOR HAVE AN ORDER OF

2   PREFERENCE?

3          THE COURT:  IT DOESN'T MATTER.  I'LL GIVE YOU EACH

4   AS MUCH TIME AS YOU NEED, UNDERSTANDING THAT I HAVE -- I HAVE

5   LOOKED AT IT ALL, AND I AM FAMILIAR WITH THE CASE.

6          MR. KENDALL:  OKAY.

7          THE COURT:  SO, IT DOESN'T MATTER TO ME.  WHOEVER

8   -- WHOEVER IS THE BETTER ARM WRESTLER.

9          MR. KENDALL:  YOUR HONOR --

10          MR. PETROCELLI:  I CERTAINLY WOULD LOSE THAT, YOUR

11   HONOR.

12          MR. KENDALL:  MY THOUGHT IF IT'S CONSISTENT WITH

13   THE COURT'S SENSE AT THIS POINT IS IT MIGHT MAKE SENSE TO

14   TALK ABOUT THE TWO GENERAL DISCOVERY MATTERS AND THEN TO GO

15   AFTER THAT TO THE TIMELINE.  MY THOUGHT BEING THAT THOSE --

16          THE COURT:  WELL, I WOULD SAY TALK ABOUT IT ALL AT

17   ONCE.

18          MR. KENDALL:  OKAY.  THEN, YOUR HONOR --

19          THE COURT:  BUT I DON'T CARE WHO GOES FIRST.  SO,

20   YOU'RE STANDING THERE.  YOU GO AHEAD.

21          MR. KENDALL:  THANK YOU, YOUR HONOR.

22          YOUR HONOR, I AM GOING TO ADDRESS THE MOTION

23   BROUGHT BY DC TO INITIATE DISCOVERY AS WELL AS THE MOTION

24   BROUGHT BY DEFENDANTS TO STAY DISCOVERY.  AND, THEN, MY

25   PARTNER LAURA BRILL WILL DISCUSS THE TIMELINE.

1          THE COURT:  ALL RIGHT.

2          MR. KENDALL:  YOUR HONOR, THE ISSUES BEARING ON THE

3    TERMINATION OF THE SUPERMAN COPYRIGHT HAVE LARGELY BEEN

4    SETTLED IN THE SIEGEL CASE THAT WAS BEFORE JUDGE LARSON AND

5    IS BEFORE JUDGE WRIGHT.  THERE ARE SOME ISSUES RELATING

6    PRIMARILY TO DAMAGES THAT REMAIN IN THAT CASE.

7          THE COURT:  NOTHING ABOUT AN ACCOUNTING HAS BEEN

8    TRIED; IS THAT CORRECT?

9          MR. KENDALL:  CORRECT.

10          THE COURT:  ALL RIGHT.

11          MR. KENDALL:  SO, THEN --

12          THE COURT:  AND THERE WAS SOME TALK OF A RULE 54

13    APPLICATION.

14          WHERE DOES THAT STAND?

15          MR. KENDALL:  IT'S BEEN MADE, AND IT IS SCHEDULED

16    FOR A HEARING ON NEXT MONDAY, ON THE 27TH OF SEPTEMBER.

17          THE COURT:  OKAY.

18          MR. KENDALL:  SO, THOSE ISSUES HAVING BEEN LARGELY

19    SETTLED.

20          AND IT WOULD BE OUR POSITION THAT THE LAW OF THE

21    CASE DOCTRINE AND IF THE RULE 54(B) MOTION IS DECIDED, THE

22    ISSUE PRECLUSION DOCTRINE SHOULD HAVE AN EFFECT ON THE

23    DISCOVERY THAT WOULD BE TAKEN ON THE FEDERAL CLAIMS IN THIS

24    ACTION.  THOSE BEING THE FIRST, SECOND, AND THIRD CLAIMS FOR

25    RELIEF.

1          THE LAW OF THE CASE DOCTRINE IS, I'LL BE FRANK TO

2    SAY, A DICIER AND MORE DIFFICULT TO APPLY DOCTRINE THAN WOULD

3    ISSUE PRECLUSION BE.

4          BUT IN ANY EVENT, WE SHOULD KNOW A LOT MORE ABOUT

5    WHERE THOSE ISSUES STAND ON THE FEDERAL CLAIMS, THOSE FIRST

6    THREE CLAIMS FOR RELIEF AFTER JUDGE WRIGHT ADDRESSES THE RULE

7    54(B) ISSUE IN A WEEK.

8          THE COURT:  UNLESS, OF COURSE, HE TAKES IT UNDER

9    SUBMISSION.

10          MR. KENDALL:  IN WHICH CASE WE'LL KNOW IN DUE TIME.

11          IT IS THE VIEW OF THE DEFENDANTS, YOUR HONOR, THAT

12    THE PRINCIPAL, IF NOT SOLE, PURPOSE OF THIS CASE IS TO REOPEN

13    ISSUES THAT WERE DECIDED ALREADY BY JUDGE LARSON AND TO

14    REOPEN DISCOVERY INTO ISSUES THAT HAVE ALREADY BEEN

15    COMPLETELY DISCOVERED.  AND, IN FACT, THAT OCCURRED IN A

16    PERIOD THAT LARGELY CONCLUDED IN 2006.

17          SO, IT IS OUR VIEW THAT THE PRINCIPAL PURPOSE OF

18    THIS CASE BEING TO TAKE DISCOVERY IN WHAT WE BELIEVE IS A WAY

19    PROHIBITED BY THE ANTI-SLAP LAW AND, ALSO, TO BE BROUGHT

20    QUICKLY TO AN END AS FAR AS A PENDING CASE BY A MOTION TO

21    DISMISS.  IT IS OUR VIEW THAT DISCOVERY IN THESE

22    CIRCUMSTANCES SHOULD NOT PROCEED UNTIL THE THRESHOLD AND

23    CRITICAL LEGAL ISSUES HAVE BEEN DECIDED.

24          AND IN THIS PARTICULAR CASE BECAUSE IT DOES SO

25    CLEARLY PRESENT ISSUES THAT ARE ADDRESSED BY THE ANTI-SLAP

9

1   LAW, THE NORMAL BURDEN OF A PARTY RESISTING DISCOVERY IS

2   REVERSED.

3            IN THIS CASE IT IS THE DUTY OF DC COMICS TO SHOW

4   THAT DISCOVERY IS ESSENTIAL IF WE USE THE FEDERAL STANDARD,

5   OR THAT GOOD CAUSE HAS BEEN SHOWN IF WE USE THE STATE

6   ANTI-SLAP STANDARD.  AND WE CONTEND THEY HAVE NOT DONE SO.

7            NOW, A MOMENT ON THE BURDEN.  THERE'S BEEN QUITE A

8   BIT OF LITIGATION IN THE FEDERAL COURTS OVER THE EFFECT OF

9   THE ABSOLUTE STAY SUBJECT TO THE GOOD CAUSE EXCEPTION OF

10  DISCOVERY UNDER THE CALIFORNIA STATUTE WHEN A PARTY IN

11  FEDERAL COURT WISHES TO TAKE DISCOVERY DESPITE THE PENDENCY

12  OF AN ANTI-SLAP MOTION.

13           THE MOST COMPLETE ANALYSIS OF THE STANDARD THAT I'M

14  AWARE OF WAS ACTUALLY WRITTEN BY JUDGE FEESS OF THIS COURT,

15  WHO LOOKED AT THE FEDERAL STANDARD --

16           THE COURT:  I'M FAMILIAR WITH HIS DECISION.

17           MR. KENDALL:  RIGHT.

18           -- AND THE STATE STANDARD.

19           THE COURT:  THERE'S ALSO ONE BY JUDGE PREGERSON OF

20  THIS COURT.

21           MR. KENDALL:  CORRECT.

22           I THINK THAT THE SUM TOTAL IS THAT IT'S CLEAR THAT

23  THE BURDEN IS ON THE PARTY SEEKING DISCOVERY.  AND IT'S CLEAR

24  THAT UNLESS THERE IS, DEPENDING ON WHETHER YOU USE THE

25  FEDERAL FORMULATION OR THE STATE, ESSENTIAL OR GOOD CAUSE, AT

1    LEAST A VERY STRONG SHOWING OF NEED FOR DISCOVERY.  DISCOVERY

2    SIMPLY MUST AWAIT THE RESOLUTION OF THE ANTI-SLAP MOTION.

3             EVEN IF THERE WEREN'T AN ANTI-SLAP MOTION IN THIS

4    CASE, WHERE THERE ARE PENDING MOTIONS TO DISMISS THAT WOULD

5    ACCOMPLISH THE DISMISSAL OF THE ENTIRE CASE, THE RULE IN THE

6    FEDERAL COURTS IS THAT UNLESS THERE IS A REASON WHY DISCOVERY

7    IS NECESSARY IN ORDER TO OPPOSE SUCH MOTIONS, DISCOVERY

8    SHOULD ORDINARILY AWAIT THE RESOLUTION OF THOSE MOTIONS.

9             NOW, THAT CERTAINLY IS NOT AN ABSOLUTE RULE.  IT IS

10   CLEARLY SUBJECT --

11            THE COURT:  LET'S TALK ABOUT WHETHER IT'S A RULE AT

12   ALL.  ISN'T IT THE RESULT OF THE FEW DISTRICT COURT

13   DECISIONS?  I MEAN, THERE'S NO APPELLATE DECISION THAT SAYS

14   THAT, IS THERE?

15            MR. KENDALL:  YOUR HONOR, I THINK THAT THERE ARE

16   APPELLATE DECISIONS THAT HAVE UPHELD DISTRICT COURTS, THAT IN

17   THE EXERCISE OF THEIR DISCRETION -- AND IT IS CLEARLY A WIDE

18   DISCRETION -- HAVE CONCLUDED IN A VARIETY OF CIRCUMSTANCES IN

19   WHICH A PARTY HAS MOVED TO DISMISS A CASE, FOR EXAMPLE, FOR

20   WANT OF JURISDICTION OR FOR OTHER REASONS THAT APPEAR WHEN

21   THE COURT, AS HAS BEEN SAID, TAKES A PEEK AT THE MOTION TO

22   DISMISS, TO BE SUBJECT TO RESOLUTION WITHOUT THE NEED FOR A

23   FURTHER -- FOR ANY FACTUAL INQUIRY.

24            AND, OF COURSE, THE ESSENCE OF MOST -- OF A GOOD

25   MOTION TO DISMISS IS THAT THERE ARE NO FACTS THAT NEED TO BE

11

1    DETERMINED BEFORE IT CAN BE DECIDED.

2              IN THIS CASE THE --

3              THE COURT:  BUT AS I RECALL, WHEN THE FEDERAL RULES

4    WERE AMENDED BACK IN 2000 AND THEY CAME UP WITH THIS NOTION

5    OF SCHEDULING CONFERENCE AND ALL THAT SORT OF STUFF, THEY

6    SPECIFICALLY ADDRESSED WHETHER A MOTION TO DISMISS SHOULD

7    HALT THE PROCESS.

8              AND, IN FACT, DIDN'T THE ADVISORY COMMITTEE SAY,

9    NO, IT SHOULDN'T HALT THE PROCESS, THAT NOTWITHSTANDING THE

10   PENDENCY OF A MOTION TO DISMISS YOU OUGHT TO KEEP ON GOING

11   WITH DISCOVERY, RECOGNIZING THAT, OF COURSE, THE JUDGE HAS

12   THE AUTHORITY IN APPROPRIATE CIRCUMSTANCES TO CONCLUDE THAT

13   THIS IS A SITUATION IN WHICH DISCOVERY SHOULD NOT GO FORWARD.

14   AND MAYBE THIS IS ONE OF THOSE SITUATIONS.

15             BUT IN TERMS OF THERE BEING A RULE, I'M JUST NOT SO

16   SURE THAT THERE IS MUCH IN THE WAY THERE.

17             MR. KENDALL:  I THINK THAT'S FAIR, YOUR HONOR.  I

18   THINK THAT TO THE EXTENT THAT THERE'S A RULE, IT'S A RULE

19   THAT UNLESS THERE IS AN EXPECTATION THAT DISCOVERY WOULD BE

20   APPROPRIATE UNDER THE CIRCUMSTANCES, A COURT SHOULD EXERCISE

21   ITS DISCRETION TO HOLD OFF.  HERE WE'RE TALKING ABOUT A VERY

22   SHORT PERIOD OF TIME.

23             BUT I THINK IN ALL EVENTS THE CRITICAL POINT, WHICH

24   IS THE POINT THAT WE MADE IN OUR BRIEF, IS THAT WE HAVE AN

25   ANTI-SLAP MOTION.

12

```
1           NOW, ONE WORD ON THE PROCEDURAL STATUS OF THE
2   ANTI-SLAP MOTION.  THE ANTI-SLAP MOTION WAS FILED ON THE 13TH
3   OF JULY TO THE ORIGINAL COMPLAINT.  DC WAITED UNTIL THE LAST
4   POSSIBLE DAY --
5           THE COURT:  THEY AMENDED THEIR COMPLAINT.  JUDGE
6   WRIGHT SAID THAT MOOTS THE MOTION.
7           MR. KENDALL:  RIGHT.
8           THE COURT:  AND HE'S CORRECT.
9           MR. KENDALL:  ACTUALLY, WE DON'T THINK HE IS
10  CORRECT ON THAT.  AND WE INTEND TO APPEAL THAT.  IT'S FOR A
11  TECHNICAL REASON, WHICH IS --
12          THE COURT:  INTEND TO APPEAL THAT?
13          MR. KENDALL:  YES.  I'LL EXPLAIN WHY.
14          THE COURT:  ALL RIGHT.
15          MR. KENDALL:  UNDER STATE LAW THE QUESTION REMAINS
16  OF ATTORNEY'S FEES.  SO, AFTER THERE'S BEEN AN AMENDMENT --
17  SO, HERE'S THE SITUATION.  ANTI-SLAP MOTION IS FILED.  THE
18  WHOLE PURPOSE OF ANTI-SLAP MOTIONS IS TO ADDRESS THE PROBLEM
19  OF THE PUTATIVE PLAINTIFF/DEFENDANT IN RESISTING THE CASE
20  THAT HE MOVES TO STRIKE IN THE ANTI-SLAP MOTION FROM BEING
21  CHILLED IN THE EXERCISE OF CONSTITUTIONAL RIGHTS.
22          SO, UNDER STATE LAW IT'S VERY CLEAR THAT IN THE
23  PROCEDURAL CIRCUMSTANCES WE FIND OURSELVES UNDER HERE THE
24  ANTI-SLAP MOTION ATTORNEY'S FEES ISSUE IS NOT MOOT.  BECAUSE
25  UNDER STATE LAW WE WOULD BE ENTITLED TO COLLECT OUR
```

13

1    ATTORNEY'S FEES WITH RESPECT TO THE ANTI-SLAP MOTION THAT WE

2    FILED.

3            IT IS NOT SO CLEAR IN FEDERAL LAW.  IN FEDERAL LAW

4    THERE'S A POLICY GENERALLY IN FAVOR OF AMENDMENT.  AND, SO,

5    UNDER FEDERAL LAW THERE IS A QUESTION AS TO WHETHER IT'S

6    MOOT.

7            AND I THINK JUDGE WRIGHT, WHO ACTED WITHOUT ANY

8    BRIEFING ON THE SUBJECT, JUST OPERATED UNDER THE USUAL

9    FEDERAL LAW STANDARDS.

10           HOWEVER, THERE'S A RECENT CASE DECIDED BY THE

11   UNITED STATES SUPREME COURT LAST TERM, THE SHADY GROVE CASE,

12   WHICH YOU SAW SOME MENTION OF IN THE BRIEFING HERE.

13           IT'S A 5 TO 4 DECISION WHERE FIVE JUSTICES

14   DETERMINED IN A CASE INVOLVING THE TENSION BETWEEN RULE 23

15   CLASS ACTION PRACTICE AND A STATE LAW IN NEW YORK THAT

16   GOVERNED CLASS ACTION PRACTICE, THE COURT DETERMINED THAT

17   UNDER THE ERIE DOCTRINE THE SUBSTANTIVE LAW OF ESTATE NEEDS

18   TO BE RESPECTED AND THAT THE FEDERAL RULES MUST GIVE WAY --

19   FEDERAL PROCEDURAL RULES MUST GIVE WAY TO THAT SUBSTANTIVE

20   LAW PREFERENCE.  HOWEVER -- THAT IS, WITH RESPECT TO STATE

21   LAW CLAIMS.  BUT, HOWEVER, IF IT'S A PROCEDURAL RULE OF THE

22   STATE, THEN, THE FEDERAL RULES OF CIVIL PROCEDURE TRUMP.

23           THERE'S A QUESTION HERE AS TO WHETHER THE -- WHAT

24   WE CONTEND -- SUBSTANTIVE PREFERENCE OF THE STATE OF

25   CALIFORNIA WITH RESPECT TO COLLECTION OF ATTORNEY'S FEES FOR

14

1    AN ANTI-SLAP MOTION WHEN THE DEFENDANT CHOOSES NOT TO CONTEST

2    IT BUT INSTEAD AMENDS THE COMPLAINT ARE AVAILABLE.

3            AND, SO, IT'S JUST A LONG WAY I'M AFRAID OF

4    ANSWERING A SIMPLE QUESTION WHICH IS WHY WE CONTEND THAT THE

5    MOTION -- THE ANTI-SLAP MOTION IS NOT MOOT.  WE --

6            THE COURT:  ALL RIGHT.  WELL, IT'S NOT IMPORTANT TO

7    THESE PROCEEDINGS IN ANY EVENT.  I'M SORRY I RAISED IT.  IT

8    WAS JUST AN OFFHAND THOUGHT.

9            SO, LET'S GET TO THE MOTIONS HERE.

10           MR. KENDALL:  OKAY.

11           SO, THE HISTORY HERE IS THAT --

12           THE COURT:  WELL, I KNOW THE HISTORY HERE.

13           MR. KENDALL:  THE PARTIES HAVE HAD A SERIOUS

14   DISAGREEMENT ABOUT WHETHER DISCOVERY SHOULD OCCUR IN ADVANCE

15   OF JUDGE WRIGHT'S DETERMINATIONS OF THE ANTI-SLAP ISSUE AND

16   THE MOTIONS TO DISMISS.

17           THERE IS ALSO AN ISSUE --

18           THE COURT:  I TAKE IT NOBODY APPROACHED JUDGE

19   WRIGHT ON THAT ISSUE.

20           MR. KENDALL:  THAT'S CORRECT.

21           THE COURT:  DID YOU HAVE -- YOU HAD A SCHEDULING

22   CONFERENCE IN FRONT OF HIM?

23           MR. KENDALL:  THERE HAS NOT BEEN A SCHEDULING

24   CONFERENCE IN THIS CASE.

25           THE COURT:  ALL RIGHT.

15

1            MR. KENDALL:  SO, THE ISSUE THAT DIVIDES US BEGAN

2     AS AN ISSUE AS TO WHETHER DC SHOULD TAKE THE DEPOSITIONS OF

3     TWO ELDERLY WITNESSES, AS THEY PUT IT --

4            THE COURT:  NO, I KNOW.

5            MR. KENDALL: -- BY THE 30TH OF SEPTEMBER.

6            THAT MOTION TO INITIATE DISCOVERY THAT DC BROUGHT

7     WE BELIEVE IS NOW ENTIRELY MOOT.

8            THE COURT:  YES, YOU SAID THAT IN YOUR PAPERS.

9            MR. KENDALL:  RIGHT.

10           AND ONCE YOU GET PAST THE MOOTNESS ISSUE, I THINK

11    ALL OF THE OTHER ISSUES ARE BASICALLY THE SAME ISSUES IN THE

12    TWO MOTIONS RELATING TO WHAT HAPPENS WHEN DISCOVERY OCCURS,

13    IF IT DOES, AT SOME POINT AFTER SEPTEMBER 30TH.

14           NOW, AS TO THAT, THERE'S SEVERAL POINTS, YOUR

15    HONOR, THAT I'VE MADE ALREADY; NAMELY, THE FAILURE OF DC TO

16    MAKE A SHOWING AS TO WHY THIS DISCOVERY IS ESSENTIAL FOR THE

17    OPPOSITION TO THE ANTI-SLAP MOTION OR WHY IT'S APPROPRIATE TO

18    PROCEED WITH THIS DISCOVERY WITHOUT WAITING FOR JUST A FEW

19    WEEKS UNTIL AFTER JUDGE WRIGHT HAS RULED.

20           I DON'T THINK THAT THE PLAINTIFF HAS STATED WITH

21    THE REQUISITE DEGREE OF SPECIFICITY WHAT DISCOVERY IT NEEDS

22    OR HOW THAT DISCOVERY WOULD BEAR ON THIS MOTION.

23           NOW, THEY HAVE MADE THIS POINT.  THEY HAVE SAID WE

24    HAVE DISCOVERY TO TAKE ON THE FEDERAL CLAIMS.  THOSE ARE THE

25    CLAIMS RELATING TO THE -- FOR LACK OF A BETTER DESCRIPTION --

1    VALIDITY OF THE SHUSTER COPYRIGHT TERMINATION.

2           AND, SO, WE SHOULD BE ABLE TO GO FORWARD ON THOSE

3    CLAIMS AND TAKE DISCOVERY EVEN THOUGH WE MAY BE FACING AN

4    ANTI-SLAP MOTION ON THE PENDENT CLAIMS.

5           WE DON'T THINK IT'S APPROPRIATE TO GO FORWARD WITH

6    DISCOVERY JUST ON THE FEDERAL CLAIMS FOR BASICALLY TWO

7    PRINCIPAL REASONS.

8           ONE IS THE PENDENCY OF THE MOTION TO DISMISS.

9           AND SECOND IS THE DIFFICULTY OF ACTUALLY SUBJECTING

10   THE WITNESSES TO SEVERAL ROUNDS OF DEPOSITIONS, CONSIDERING

11   THEIR HEALTH AND ALSO CONSIDERING THE FACT THAT THEY HAVE

12   BEEN DEPOSED ON MANY OF THESE ISSUES ALREADY.

13          AND, THEN, LASTLY, BECAUSE IF THE LAW OF THE CASE

14   DOCTRINE OR THE RULE 54(B) MOTION RESULT IN CABINING THE

15   APPROPRIATE DISCOVERY FOR THIS CASE, THEN, THERE MAY BE NO

16   DISCOVERY TO TAKE OR MUCH MORE LIMITED DISCOVERY TO TAKE ON

17   THE FEDERAL CLAIMS.

18          AND THESE ISSUES ARE GOING TO BE HARD FOUGHT.  AND

19   WE BELIEVE JUDGE WRIGHT SHOULD DECIDE THEM.  AND THAT THERE'S

20   NOT A SIGNIFICANT PREJUDICE TO DC IN AWAITING THAT RESULT.

21   AND THERE IS SIGNIFICANT PREJUDICE TO THE WITNESSES THEY SEEK

22   TO DEPOSE.

23          NOW, WE'VE SUBMITTED THE DECLARATIONS, WHICH I'M

24   GOING TO TRY TO SPEAK ABOUT GENERALLY SO WE DON'T GET --

25          THE COURT:  I READ THE DECLARATIONS.  I READ THEM

1    ALL.

2          MR. KENDALL:  THERE ARE SIGNIFICANT HEALTH ISSUES

3    WITH RESPECT TO THREE OF THESE WITNESSES.  AND PARTICULARLY

4    GIVEN THAT --

5          THE COURT:  ALTHOUGH IT SEEMS TO ME THAT AT LEAST

6    ONE IS MORE SERIOUS THAT THE OTHERS.

7          MR. KENDALL:  I WOULD SAY TWO ARE CONSIDERABLY --

8    YOU KNOW, ARE SPECIALLY SERIOUS.  THAT THERE ARE TWO WHERE

9    THE EFFECT OF THE DEPOSITION COULD BE DANGEROUS TO AN ELDERLY

10   PERSON'S CONTINUED QUALITY OF LIFE.

11         THEN, THERE'S ONE WHERE IT'S CLEAR FROM THE

12   DEPOSITION THAT THERE IS A VERY SERIOUS LONG-TERM DISEASE AND

13   SEVERAL RELATED CONDITIONS THAT CAUSE VERY SIGNIFICANT

14   DISCOMFORT AND PAIN AND SUFFERING TO THE WITNESS.

15         IN ANY CASE, YOUR HONOR, IT SEEMS THAT THERE SHOULD

16   BE A VERY GOOD REASON TO TAX THESE WITNESSES WITH SEVERAL

17   DEPOSITIONS IF ONE WERE TO DO THAT.  AND WE DON'T BELIEVE

18   THAT THEY HAVE SHOWN A VERY GOOD REASON TO DO THAT.  IN FACT,

19   WE BELIEVE THAT FOR AT LEAST THE ISSUES THAT ARE POSED ON THE

20   FEDERAL CLAIMS, THE INFORMATION THAT THEY MIGHT SEEK IF THEY

21   MADE SUCH A SHOWING TO GET COULD BE OBTAINED BY WRITTEN

22   QUESTIONS, INTERROGATORIES, REQUESTS FOR ADMISSION, AT LEAST

23   IN THE FIRST INSTANCE.  NONE OF WHICH HAS BEEN TRIED.  NONE

24   OF WHICH HAS BEEN PROPOUNDED.

25         AND, THEN, IF IT'S NECESSARY, TAKE THE DEPOSITIONS

18

1    BUT TAKE AT THAT POINT PURSUANT TO THE FEDERAL RULES ONE

2    DEPOSITION IF IT IS ORDERED AS AN ORAL DEPOSITION.

3           AND WE WOULD EXPECT TO MEET AND CONFER AND HOPE

4    THAT ANY ORAL DEPOSITION THAT IS NECESSARY COULD BE VERY MUCH

5    LIMITED.

6           SO, IT SEEMS THAT THE PRACTICAL SOLUTION HERE IS

7    THE SOLUTION THAT CAUSES THE LEAST PREJUDICE AND IN SOME

8    CASES HEALTH DANGER TO THE WITNESSES WHILE AVERTING, AS I

9    THINK THIS WOULD, ANY SIGNIFICANT PREJUDICE TO DC COMICS FOR

10   JUST A MATTER OF A FEW WEEKS.

11          IF THE COURT WANTS TO HAVE A DISCUSSION OF HOW WE

12   GOT HERE AND THE MEET AND CONFER, WHICH I CANNOT IMAGINE THE

13   COURT DOES, I'M --

14          THE COURT:  YOUR IMAGINATION IS CORRECT.

15          MR. KENDALL: -- PREPARED TO ADDRESS IT.  BUT I

16   THINK IT'S BEST TO STAY AWAY FROM THOSE ISSUES.

17          WOULD YOU LIKE NOW TO HEAR FROM --

18          THE COURT:  IF YOU'RE DONE.

19          MR. KENDALL: -- MS. BRILL BEFORE MR. PETROCELLI

20   STANDS UP, YOUR HONOR?

21          THE COURT:  YES, IF YOU'RE DONE.

22          MR. PETROCELLI, BE ASSURED YOU WILL GET ALL THE

23   TIME YOU NEED -- UNLESS YOU START REPEATING YOURSELF.

24          MR. PETROCELLI:  I HAVE NO DOUBT THAT EITHER WILL

25   OCCUR, YOUR HONOR.

19

1          THE COURT:  AND YOU'RE GOING TO ADDRESS THE

2   SO-CALLED TOBEROFF TIMELINE.

3          MS. BRILL:  THE TIMELINE MOTION, YES, YOUR HONOR.

4          GOOD MORNING, YOUR HONOR.  LAURA BRILL ON BEHALF OF

5   MR. TOBEROFF AND THE TOBEROFF DEFENDANTS.

6          I WANTED TO ADDRESS FIRST THE LIMITED NATURE OF THE

7   PROTECTIVE ORDER THAT WE'RE SEEKING AND WHY WE THINK IT'S

8   NECESSARY ON THE VERY EXTRAORDINARY FACTS OF THE CASE.

9          ALL THAT THIS MOTION IS SEEKING TO DO IS TO STOP DC

10  COMICS FROM USING THE TIMELINE IN DISCOVERY IN THIS CASE

11  UNTIL THE QUESTION OF WHETHER IT WAS PROPERLY DISCLOSED IN

12  THE FIRST PLACE HAS BEEN DECIDED BY THE NINTH CIRCUIT.

13         AND THAT ISSUE IS EXACTLY WHAT THE UNANIMOUS MOHAWK

14  DECISION IN THE SUPREME COURT SPEAKS OF.  THE ISSUE IN THAT

15  CASE WAS WHETHER YOU COULD TAKE A COLLATERAL APPEAL FROM A

16  RULING ABOUT THE DISCLOSURE OF PRIVILEGED DOCUMENTS.  AND

17  EVERY MEMBER OF THE SUPREME COURT SAYS YOU CAN'T DO A

18  COLLATERAL APPEAL, BUT YOU CAN SEEK A PROTECTIVE ORDER TO

19  GUARD AGAINST THE SPILL-OVER EFFECTS OF CONTESTED PRIVILEGE

20  RULINGS.  AND, SO, YOU COULDN'T HAVE A MORE DIRECT RULING

21  FROM THE HIGHEST AUTHORITY.

22         NOW, WHAT'S THE SPILL-OVER EFFECT.  THE SPILL-OVER

23  EFFECT HERE IS DC COMICS HAS WHATEVER NON-PRIVILEGED MATERIAL

24  IS DISCUSSED IN THOSE -- IN THAT TIMELINE.  SO, THE ONLY

25  INCREMENTAL BENEFIT OF THE TIMELINE IS THROUGH ITS DISCLOSURE

**24**

1    OF PRIVILEGED INFORMATION.

2            AND IT'S CLEAR THAT IT SAYS REPEATEDLY, MR. MARKS,

3    AN ATTORNEY, TELLS THE SIEGELS THIS.  MR. TOBEROFF TELLS THE

4    SIEGELS THAT.  THE SIEGELS TELL THEIR LAWYERS THIS.

5            SO, IT'S RIDDLED WITH PRIVILEGED INFORMATION.  AND

6    TO THE EXTENT IT DEALS WITH ANYTHING ELSE, IT'S ALL IN THIS

7    TWISTED SPIN OF THIS ATTORNEY WHO BREACHED REALLY THE MOST

8    FUNDAMENTAL ETHICAL OBLIGATIONS THAT HE HAD WHEN HE WENT TO

9    WORK IN MR. TOBEROFF'S FIRM.  SO, HE HAS AN OBLIGATION UNDER

10   CALIFORNIA RULE OF PROFESSIONAL CONDUCT 3-100 NOT TO DISCLOSE

11   CONFIDENTIAL INFORMATION.

12           AND AN ATTORNEY IS NOT ALLOWED TO BE A

13   WHISTLEBLOWER, YOUR HONOR.  THE ONLY EXCEPTION TO DISCLOSING

14   CONFIDENTIAL INFORMATION IS IF THE LAWYER BELIEVES THAT

15   SOMEONE'S GOING TO BE KILLED IF HE DOESN'T DISCLOSE IT, OR IF

16   SUBSTANTIAL BODILY HARM IS GOING TO RESULT.  AND THAT'S NOT

17   THE CASE HERE.

18           AND HE ALSO HAD AN OBLIGATION UNDER CALIFORNIA RULE

19   3-310 TO BE A ZEALOUS ADVOCATE FOR HIS CLIENT AND NOT TO

20   REPRESENT ADVERSE INTERESTS, WHICH IS EXACTLY THE OPPOSITE OF

21   WHAT HE DID IN CREATING THIS TIMELINE AND DROPPING IT ON

22   WARNER'S DOORSTEPS.

23           AND THE ISSUE OF THE TIMELINE, YOUR HONOR, IT'S

24   VERY SEPARATE FROM ANYTHING THAT WAS BEFORE THIS COURT WHEN

25   IT MADE ITS APRIL 30TH, 2007 DETERMINATION.  AND IF DC HAD

21

1    SOUGHT THE TIMELINE IN THAT MOTION, THEN, ALL OF THESE ISSUES

2    WOULD HAVE BEEN BRIEFED AT THAT TIME.

3          AND IT'S THEIR MOTION, WARNER'S MOTION AT THE TIME

4    THAT KIND OF SET THE PARAMETERS FOR WHAT WOULD BE BRIEFED,

5    WHAT WOULD BE BEFORE YOUR HONOR, AND WHAT WOULD BE DECIDED.

6          SO, WHEN WE ASKED -- SO, THE ISSUES THAT WOULD HAVE

7    BEEN ADDRESSED WOULD HAVE BEEN DID THE SIEGELS HAVE AN

8    OBLIGATION TO LOG THE DOCUMENTS AT THE TIME.

9          WELL, NO, THEY DIDN'T BECAUSE IT WAS NEVER THEIR

10   DOCUMENT.  THEY NEVER EVEN SAW IT UNTIL THE COMPLAINT WAS

11   FILED.

12         DID MR. TOBEROFF HAVE AN OBLIGATION TO LOG IT PRIOR

13   TO APRIL 2007.  NO, HE DIDN'T BECAUSE HE HAD OBJECTED.  AND

14   THERE WAS NO OBLIGATION FOR HIM TO DO ANYTHING OTHER THAN

15   OBJECT TO THE SUBPOENA THAT WARNER HAD SERVED ON HIM IN AN

16   EFFORT TO EXPLOIT THIS THEFT.

17         AND THE COURT WOULD HAVE HAD TO DEAL WITH, YOU

18   KNOW, THE SUBSTANTIAL ISSUES OF THE PREJUDICE TO THE

19   INTEGRITY OF THE JUDICIAL PROCESS BY WHAT THIS LAWYER HAD

20   DONE IN DISCLOSING THE DOCUMENT.

21         SO, THAT WOULDN'T HAVE BEEN ENOUGH TO JUST SAY,

22   WELL, IS IT PRIVILEGED OR IS IT NOT PRIVILEGED BECAUSE IT'S A

23   SPECIAL DOCUMENT THAT DIDN'T EXIST BUT FOR THIS VERY SERIOUS

24   ETHICAL BREACH.

25         IT WASN'T LIKE THE CASE OF, WELL, THESE DOCUMENTS

1    ARE OUT THERE ANYWAY.  AND SHOULD THEY HAVE BEEN DISCLOSED OR

2    SHOULD THEY NOT HAVE BEEN DISCLOSED.  IT WAS SORT OF A SUI

3    GENERIS CATEGORY.

4          SO, WHEN DC SAYS, WELL, YES, IT WAS BEFORE THE

5    COURT IN APRIL OF 2007, WHAT IT POINTS TO IS MS. SETO'S

6    DECLARATION AT PAGES 103 AND 104.  BUT WHEN YOU LOOK AT THOSE

7    PAGES, THEY TALK ABOUT DISCLOSING THE WHISTLEBLOWER

8    DOCUMENTS.

9          AND WE GO THROUGH THIS IN SUBSTANTIAL DETAIL IN THE

10   BRIEF, BUT WHAT THE COURT DID AT THE HEARING WAS, YOU KNOW,

11   TRY TO TAKE THIS NEUTRAL TERM AND TURN WHISTLEBLOWER

12   DOCUMENTS, WHICH IS WHAT WARNER WAS USING, AND STOLEN

13   DOCUMENTS, WHICH IS WHAT MR. TOBEROFF WAS ACCURATELY USING,

14   AND SAY I'M GOING TO USE A NEUTRAL TERM AND USED THE TERM

15   "ESCROW DOCUMENTS."

16         SO, WHAT WARNER UNDERSTOOD AND WHAT THE SIEGELS AND

17   THEIR COUNSEL UNDERSTOOD WAS THAT THE MOTION CONCERNED THE

18   STOLEN DOCUMENTS.  AND, SO, THAT'S WHY THERE WAS NO BRIEFING

19   AT THE TIME ABOUT THIS VERY UNIQUE DOCUMENT.

20         ON PAGE A HUNDRED AND -- SO, 104 OF THAT SETO

21   DECLARATION IT SPECIFICALLY SAYS THEY'RE SEEKING AN ORDER AS

22   TO THE WHISTLEBLOWER DOCUMENTS.

23         AND, THEN, PAGE 108, LINES 10 TO 11, THEY SAY WE'RE

24   DEFINING THE TERM "WHISTLEBLOWER DOCUMENTS" TO BE THE SAME

25   THING AS WHAT OUR DECLARANT MR. SMITH USES FOR THE TERM

23

1    "SUPERMAN DOCUMENTS."

2            AND THAT DECLARATION, LIKE ALL OF THE BRIEFING AT

3    THE TIME, DISTINGUISHED BETWEEN THE COVER LETTER, WHICH WAS

4    THE TIMELINE, AND THE UNDERLYING DOCUMENTS.  AND, SO, THAT'S

5    HOW IT WAS BRIEFED.

6            THERE ARE MANY -- I WENT THROUGH AND LOOKED AT THE

7    RECORD, AND IT WAS MR. TOBEROFF WHO MADE CONSISTENT

8    STATEMENTS WITH THIS THROUGHOUT THE ENTIRE PROCEEDINGS.

9            SO, THERE WAS THE -- HE DID IT IN THE MARCH 3RD,

10   2007 DECLARATION AT PARAGRAPH 25 AS WELL AS PARAGRAPHS 22 AND

11   23.

12           HE DID IT IN THE MARCH 26TH JOINT STIPULATION.  FOR

13   EXAMPLE, ON PAGE 2 WHERE HE TALKS ABOUT THE MOTION BEING

14   ABOUT THE STOLEN DOCUMENTS.

15           AGAIN, ON MAY 21ST, BOTH IN HIS COVER LETTER AND IN

16   HIS DECLARATION THAT HE SUBMITTED ACCORDING TO THE COURT'S

17   ORDER, HE SAYS, I WENT THROUGH AND CATALOGUED THE STOLEN

18   DOCUMENTS.

19           AGAIN, IN SEPTEMBER, ON SEPTEMBER 17TH AND

20   SEPTEMBER 20TH OF 2007.

21           AND, THEN, AGAIN, IN MARCH OF 2009 WHEN DC MOVED

22   UNSUCCESSFULLY TO REOPEN DISCOVERY IN THE SETO ACTION.  HE

23   AGAIN BRIEFED THIS ISSUE CONSISTENTLY SAYING, YOU KNOW, WHAT

24   THE MOTION WAS CONCERNED WITH WAS THE STOLEN DOCUMENT.

25           AND THE SORT OF COUP DE --

1           THE COURT:  MS. BRILL --

2           MS. BRILL:  YES?

3           THE COURT: -- FORGIVE ME, BUT I DID READ ALL THIS.

4           MS. BRILL:  OKAY.  THANK YOU.  THANK YOU, YOUR

5     HONOR.

6           THE ESCROW ATTORNEY -- AND I KNOW YOU SAW THIS IN

7     THE PAPERS.  THE ESCROW ATTORNEY WHO WAS HIRED BY WARNER

8     BROS. AGREED AND SAID THIS WAS NOT A MATTER THAT WAS

9     PREVIOUSLY LITIGATED.  SO, WE KNOW, AND DC DOESN'T EVEN

10    CONTEST, THAT WHEN AN ISSUE IS NOT BEFORE A COURT, THE LAW OF

11    THE CASE DOCTRINE DOESN'T APPLY.

12          AND, SO, THE ESSENCE OF JUDGE LARSON'S RULING LATER

13    ON IN SEPTEMBER 2008, A YEAR -- MORE THAN A YEAR AFTER THE

14    FACT WAS POINTING TO SOME OUT-OF-CONTEXT LANGUAGE, WAS LAW OF

15    THE CASE, THIS IS ALREADY DONE.  AND THAT ISSUE HAS TO GET

16    ULTIMATELY DECIDED BY THE NINTH CIRCUIT.

17          SO --

18          THE COURT:  BUT YOU DO AGREE JUDGE LARSON DECIDED

19    IT?

20          MS. BRILL:  JUDGE LARSON -- YES, JUDGE LARSON --

21    JUDGE LARSON APPLIED THE LAW OF THE CASE DOCTRINE AND SAID

22    THE TOBEROFF TIMELINE HAD TO BE DISCLOSED.

23          AND AT THAT POINT WARNER MOVED TO REOPEN DISCOVERY.

24    MR. TOBEROFF ON BEHALF OF THE SIEGELS SUBMITTED SUBSTANTIAL

25    BRIEFING AFTER THAT AND OPPOSED REOPENING DISCOVERY.  AND

1  JUDGE LARSON RULED DISCOVERY IS CLOSED.

2         SO, TO THE EXTENT THERE WAS ANY SPILL-OVER EFFECT

3  IN THAT ACTION IT HAD BEEN TAKEN CARE OF.  RIGHT.  THERE

4  WASN'T GOING TO BE ANY DISCOVERY ON THE TIMELINE.  AND IT

5  COULDN'T HAVE BEEN -- YOU KNOW, IT COULDN'T HAVE BEEN USED IN

6  THE ACTUAL TRIAL BECAUSE IT'S TOTALLY INADMISSIBLE.  SO,

7  THERE WAS NO NEED -- THERE WAS NO NEED TO DO ANYTHING ELSE.

8  YOU DON'T HAVE TO GO AND THEN LITIGATE SOME HYPOTHETICAL

9  QUESTION OF WHAT MIGHT BE DONE WITH IT AND SOME

10  UNCONTEMPLATED ACTION IN THE FUTURE.

11         SO, THEN, AS SOON AS WE GOT TO THIS CASE, IN THE

12  VERY FIRST MEET AND CONFER IN JULY DC SAID THEY WANT TO TAKE

13  THESE DEPOSITIONS AND GO PARAGRAPH BY PARAGRAPH THROUGH THE

14  DOCUMENT WITH THE WITNESSES.  AND WE SAID, WELL, WE'RE GOING

15  TO MOVE FOR A PROTECTIVE ORDER BECAUSE WE DON'T THINK THAT'S

16  APPROPRIATE.

17         MR. PETROCELLI SENT A LETTER -- IT'S EXHIBIT 36 TO

18  MS. COHEN DECLARATION -- SAID, OH, NO, THAT'S PREMATURE.  YOU

19  CAN'T MOVE FOR A PROTECTIVE ORDER YET.  THAT WOULD BE TOO

20  EARLY BECAUSE WE HAVEN'T HAD OUR RULE 26 CONFERENCE.

21         SO, WE WERE TRYING TO MOVE FORWARD AS SOON AS --

22  YOU KNOW, AS SOON AS THE ISSUE CAME UP IN THIS CASE TO GET IT

23  RESOLVED AND GET IT BEFORE THE COURT.

24         THE ONE FURTHER ISSUE, YOUR HONOR, IS THE KIRSHNER

25  CASE FROM THE NINTH CIRCUIT THAT DC RELIES ON.  THE KIRSHNER

1    CASE IS ONLY ABOUT RULE 26 OF THE FEDERAL RULES OF CIVIL

2    PROCEDURE.  AND DC ACKNOWLEDGES THAT ON PAGE 56 OF THE JOINT

3    STIPULATION THAT WE'VE MOVED FOR A PROTECTIVE ORDER BOTH

4    UNDER RULE 26 AND PURSUANT TO THE COURT'S INHERENT AUTHORITY.

5         ALL OF THE CASES DEALING WITH THE COURT'S INHERENT

6    AUTHORITY AFFIRM THAT KIRSHNER DOESN'T LIMIT A COURT'S

7    INHERENT AUTHORITY TO CONTROL THE PROCEEDINGS BEFORE IT.  AND

8    WE CITED THE SMITH CASE FROM THE SOUTHERN DISTRICT OF

9    FLORIDA, THE LAHR CASE FROM THE NORTHERN DISTRICT OF TEXAS,

10   THE COMCO CASE FROM THIS COURT, BURT HILL FROM THE WESTERN

11   DISTRICT OF PENNSYLVANIA.

12        SO, ALL OF THE COURTS THAT LOOKED AT, YOU KNOW,

13   WHAT THE EFFECT OF KIRSHNER IS, SAY THE COURT STILL HAS AN

14   INHERENT AUTHORITY, ESPECIALLY IN A CASE WHERE THE

15   ADMINISTRATION OF JUSTICE IS AT STAKE AND THERE'S BEEN SOME

16   SERIOUS IMPROPRIETY WITH RESPECT TO THE DOCUMENTS IT'S BEING

17   ASKED TO CONTROL.

18        AND, SO, IF YOU TAKE DC'S POSITION TO ITS LOGICAL

19   CONCLUSION, WHAT THEY WOULD SAY IS, WELL, IF WE OBTAINED A

20   DOCUMENT IN DISCOVERY, THAT MEANS THAT THEIR TRIAL COUNSEL

21   CAN STAND AT A DEPOSITION, YOU KNOW, WITH A 92-YEAR-OLD

22   WITNESS, AN 89-YEAR-OLD WITNESS AND JUST REPEATEDLY ASK THEM

23   QUESTION AFTER QUESTION.  AND THIS COURT HAS NO AUTHORITY TO

24   CONTROL THAT DEPOSITION?  THAT JUST CAN'T BE RIGHT.  AND ALL

25   THESE CASES REJECT THAT POINT.

27

```
1          THE COURT:  I RATHER DOUBT MR. PETROCELLI IS GOING

2    TO STAND UP AND SAY I HAVE NO AUTHORITY TO CONTROL THAT, BUT

3    WE'LL SEE.

4          MS. BRILL:  WELL, HE DID SAY WHAT HIS GOAL IS --

5    DURING THE MEET AND CONFER WHAT HIS GOAL IS, YOUR HONOR, IS

6    TO TAKE THE DEPOSITION OF ALL OF THESE WITNESSES AND GO

7    THROUGH THE TIMELINE PARAGRAPH BY PARAGRAPH.  THAT'S EXACTLY

8    THE DISCOVERY TACTIC THAT THEY TOLD US ABOUT IN MID-JULY AND

9    WHEN WE IMMEDIATELY SAID WE'D BE MOVING FOR A PROTECTIVE

10   ORDER TO STOP IT, YOUR HONOR.

11         THE COURT:  ALL RIGHT.

12         MS. BRILL:  THANK YOU, YOUR HONOR.

13         THE COURT:  ALL RIGHT, MR. PETROCELLI.  YOU'RE ON.

14   OR ONE OF YOUR COLLEAGUES, WHOEVER IS GOING TO ARGUE.

15         MR. PETROCELLI:  YOUR HONOR, I'M GOING TO ADDRESS

16   THE MOTIONS.  IT MAY MAKE SENSE UNLESS YOUR HONOR HAS A

17   PREFERENCE IF I JUST PICKED UP WHERE MS. --

18         THE COURT:  HOWEVER YOU WANT TO ARGUE.

19         MR. PETROCELLI:  OKAY.

20         THE COURT:  IT'S UP TO YOU.

21         MR. PETROCELLI:  THANK YOU.

22         THE COURT:  I WOULD ASK YOU NOT -- I REALLY HAVE

23   READ THIS STUFF, SO.

24         MR. PETROCELLI:  I'M INCLINED TO SIT DOWN, BUT.

25         TO SOME DEGREE EVERYTHING I HAVE TO SAY HAS BEEN
```

**32**

28

1    COVERED IN THE PAPERS, BUT LET ME JUST SEE IF I CAN FOCUS A

2    BIT.

3              FIRST OF ALL, YOUR HONOR, THE ORDER THAT'S SOUGHT

4    IN THE TIMELINE MOTION IS NOT A LIMITED ORDER.  IT'S A BROAD

5    SWEEPING ORDER THAT WOULD AMOUNT TO A BLANKET STAY ON THE

6    LION SHARE OF THE FACTS IN THIS CASE, INCLUDING FACTS

7    DIRECTLY RELEVANT TO THE FEDERAL CLAIMS AS WELL AS THE STATE

8    CLAIMS.

9              IF YOU LOOK AT PAGE 1 AND PAGE 39 OF THEIR PORTION

10   OF THE JOINT STIP THEY'RE SEEKING TO PROHIBIT ALL DISCOVERY

11   CONCERNING THE DOCUMENT, ALL DISCOVERY RELATING TO THE

12   DOCUMENT.

13             THE DOCUMENT CONSISTS OF NUMEROUS PAGES CHRONICLING

14   NUMEROUS EVENTS.  AND TO ASK FOR AN ORDER BARRING DISCOVERY

15   RELATING TO THE DOCUMENT IS INCOMPREHENSIBLE.

16             AND I DON'T THINK THE COURT COULD ISSUE SUCH AN

17   ORDER.  IT WOULD NOT BE CAPABLE OF ENFORCEMENT.  I WOULDN'T

18   KNOW WHAT IT MEANT.  AND I THINK WHAT IT'S TRANSLATED TO MEAN

19   --

20             THE COURT:  UNLESS WHAT IT MEANS IS A STAY OF ALL

21   DISCOVERY.

22             MR. PETROCELLI:  PRECISELY.  THAT CLEARLY IS WHAT

23   IT MIGHT ENTAIL.  BECAUSE IN OUR VIEW TO BAR ALL DISCOVERY

24   RELATED TO THAT DOCUMENT WOULD ESSENTIALLY ENTAIL A STAY OF

25   ALL DISCOVERY.

1          THAT'S NUMBER ONE.

2          NUMBER TWO, IT IS OUR VIEW THAT THE COURT LACKS THE

3    AUTHORITY TO ISSUE THIS PROTECTIVE ORDER UNDER RULE 26(C).

4    AND THE KIRSHNER CASE IS RIGHT ON POINT IN THAT REGARD, YOUR

5    HONOR.

6          I PICKED UP THE WRONG FILE.

7          THE FACTS ARE IDENTICAL THERE, WHERE THE PARTY

8    OBTAINED DISCOVERY IN THE OTHER CASE AND SOUGHT TO USE IT IN

9    THIS CASE, AND A MOTION FOR A PROTECTIVE ORDER WAS SOUGHT.

10          AND THE COURT MADE CLEAR THAT THE RULE 26 WAS NOT

11    DESIGNED TO REGULATE THE USE OF INFORMATION THAT A PARTY

12    LAWFULLY ACQUIRED IN ANOTHER CASE.  HERE, THE DOCUMENT WAS

13    ORDERED TO BE PRODUCED TO US.

14          THE SECOND ARGUMENT IS THE INHERENT AUTHORITY

15    ARGUMENT.  AND I'M NOT HERE TO SAY THAT THE COURT DOESN'T

16    HAVE INHERENT AUTHORITY TO REGULATE DISCOVERY IN THIS CASE.

17          HOWEVER, I WILL POINT OUT -- AND I THINK THIS IS

18    CLEAR IN PARTICULAR FROM JUDGE BLOCK'S DECISION IN THE COMCO

19    CASE.  THERE'S BEEN NO CASE WHERE THE COURT HAS EXERCISED ITS

20    INHERENT AUTHORITY TO BAR USE OF A DOCUMENT OR INFORMATION OR

21    EVIDENCE PERMISSIBLY OBTAINED OUTSIDE THE DISCOVERY PROCESS

22    -- WHETHER IT'S OUTSIDE THE DISCOVERY PROCESS IN THE CASE AT

23    HAND AS WAS THE SITUATION IN COMCO WHERE THE IRS CIRCUMVENTED

24    THE DISCOVERY PROCESS TO OBTAIN PRIVILEGED DOCUMENTS.  AND

25    JUDGE BLOCK SAID YOU HAVE TO GIVE THOSE DOCUMENTS BACK, AND

1    YOU CAN'T USE THEM;

2             OR IF IT'S DISCOVERY IMPERMISSIBLY OBTAINED IN

3    ANOTHER CASE.  IMPERMISSIBLY BECAUSE YOU STOLE THE DOCUMENT

4    OR, YOU, THE PROPONENT OF THE DOCUMENT, DID SOMETHING WRONG.

5    IN OTHER WORDS, THERE'S NEVER BEEN A CASE TO OUR KNOWLEDGE,

6    AND NONE CITED BY THE DEFENDANTS, WHERE THE COURT EXERCISED

7    ITS INHERENT AUTHORITY TO BAR USE OF INFORMATION THAT WAS

8    LAWFULLY OBTAINED.

9             AND INDEED THE EXERCISE OF SUCH AUTHORITY IN THAT

10   CIRCUMSTANCE WOULD BE -- WOULD EVISCERATE THE RULE OF

11   KIRSHNER, THAT THE COURT LACKS POWER UNDER RULE 26(C) TO DO

12   PRECISELY THAT.  ALL THE CASES DEALING WITH INHERENT

13   AUTHORITY INVOLVE INAPPROPRIATE WRONGFUL CONDUCT THAT THE

14   COURT IS EFFECTIVELY SANCTIONING BY ISSUING AN APPROPRIATE

15   PROTECTIVE ORDER.

16            THE SECOND MAJOR POINT THAT I WANT TO MAKE, YOUR

17   HONOR, IS THAT EVEN IF YOU'RE -- UNDER YOUR HONOR'S INHERENT

18   AUTHORITY WANTED TO CONSIDER THE ISSUE OF THE PROPRIETY OF

19   THIS DOCUMENT AND OUR BEING ABLE TO USE THIS DOCUMENT, THE

20   RESULT WOULD HAVE TO BE THE SAME AS JUDGE LARSON FOUND.

21            AND I AM NOT GOING TO GO THROUGH THE CHRONOLOGY,

22   BUT HE SPECIFICALLY REJECTED THE VERY ARGUMENTS MADE HERE AND

23   DID THEM ON A COUPLE OF OCCASIONS.  ONE IN THE LATE PART OF

24   2008 WHEN HE ISSUED HIS ORDER, WHEN MR. TOBEROFF MADE THE

25   IDENTICAL ARGUMENTS HERE ABOUT THE MISTAKEN CONFUSION

1    REGARDING WHAT ESCROW DOCUMENTS MEANT.  ALL THAT WAS LAID

2    OUT.

3                AND JUDGE LARSON RULED IN A COURT ORDER DATED

4    SEPTEMBER 26TH, 2008 THAT THE PLAINTIFF'S POSITIONS --

5    PLAINTIFF'S NEWLY MINTED ASSERTIONS OF PRIVILEGE ARE NOT WELL

6    TAKEN.

7                AND WHEN THE PARTIES SOUGHT RECONSIDERATION OF

8    CERTAIN PARTS OF THAT ORDER MR. TOBEROFF DID NOT EVEN SEEK

9    RECONSIDERATION OF THAT PART OF IT AND NEVER SOUGHT TO

10   RECONSIDER THAT PART OF IT UNTIL MUCH LATER WHEN THE DC

11   COMICS DEFENDANTS SOUGHT TO USE THE DOCUMENT TO FILE A MOTION

12   TO REOPEN DISCOVERY.  MR. TOBEROFF CAME BACK WITH A SLEW OF

13   YET ADDITIONAL ARGUMENTS SAYING HE HAD ENCOUNTERED YET NEW

14   EVIDENCE AND ASKED SPECIFICALLY IN HIS PORTION OF THE JOINT

15   STIP FOR THE JUDGE TO PRECLUDE THE USE OF THE TIMELINE IN THE

16   SIEGEL CASE AND TO RETURN IT.

17               AND THE JUDGE DENIED THE MOTION IN ITS ENTIRETY,

18   THAT IS, IT AWARDED NO RELIEF TO DC COMICS IN ALLOWING DC TO

19   REOPEN DISCOVERY, WHICH HAD CLOSED.  AND IT DECLINED TO GRANT

20   THE RELIEF REQUESTED BY MR. TOBEROFF.

21               SO, THERE'S ABSOLUTELY NOTHING NEW HERE.  EVERY

22   ARGUMENT HAS ALREADY BEEN MADE.  EVERY ARGUMENT HAS ALREADY

23   BEEN PASSED ON.

24               THE SUPREME COURT CASE IN MOHAWK HAS NOTHING TO DO

25   WITH THIS SITUATION.  MOHAWK SIMPLY SAYS THAT IF THE COURT

32

1    ISSUES AN ORDER COMPELLING THE DISCLOSURE OF PRIVILEGED

2    INFORMATION, THAT CANNOT BE APPEALED UNDER THE COLLATERAL

3    ORDER DOCTRINE UNDER SECTION 1291 OF THE JUDICIAL CODE

4    BECAUSE THE LITIGANT IN BALANCING EVERY AND ALL THE INTERESTS

5    HAS OTHER OPPORTUNITIES, LIKE SEEKING A 1292 CERTIFICATION,

6    WHICH WAS NOT DONE; SEEKING MOTION FOR RECONSIDERATION, WHICH

7    WAS ONLY DONE BELATEDLY BUT DENIED; SEEKING A WRIT OF

8    MANDAMUS.  THAT DID NOT OCCUR.

9            AND, THEN, THERE'S A REFERENCE ABOUT THE

10   AVAILABILITY OF PROTECTIVE ORDERS IN APPROPRIATE CASES TO

11   GUARD AGAINST SPILL-OVER EFFECTS.  BUT THE COURT THERE

12   CERTAINLY WASN'T MANDATING THAT SUCH A PROTECTIVE ORDER WAS

13   ISSUED -- SHOULD ISSUE, BUT SIMPLY COMMENTING THAT PROTECTIVE

14   ORDERS ARE GENERALLY AVAILABLE.

15           AND, INDEED, THE COURT THERE IN TALKING ABOUT

16   SPILL-OVER EFFECTS WASN'T TALKING ABOUT THE USE.  SIMPLY MORE

17   LIKELY GUARDING AGAINST UNDUE PRIVACY AND CONFIDENTIALITY

18   LEAKAGES.

19           SO, THERE'S NOTHING IN THE MOHAWK DECISION WHICH

20   WOULD COMPEL THIS COURT TO HAVE TO GRANT A MOTION FOR A

21   PROTECTIVE ORDER.  THAT WOULD BE A WHOLESALE REPUDIATION OF

22   THE NINTH CIRCUIT LAW IN KIRSHNER AND THE OTHER CASES THAT

23   WE'VE DISCUSSED.

24           FINALLY, YOUR HONOR, ON THIS POINT, THE PLAINTIFF

25   HAS MADE -- EXCUSE ME -- THE DEFENDANTS HAVE MADE NO SHOWING

1    THAT --

2              THE COURT:  IT'S HARD TO THINK OF YOURSELF AS A

3    PLAINTIFF; ISN'T IT, MR. PETROCELLI?

4              MR. PETROCELLI:  YOU KNOW, NOT OFTEN.  BUT I MUST

5    TELL YOU I KIND OF LIKE IT WHEN I DO GET TO STAND ON THE

6    OTHER SIDE.  YOU GET TO BE CLOSER TO THE JURY FOR ONE THING.

7              BUT, YOUR HONOR, THERE'S NOTHING IN THIS MOTION

8    THAT ESTABLISHES THE PRIVILEGED NATURE OF THE INFORMATION IN

9    THE TIMELINE.  THE PLAINTIFFS HAVE THE BURDEN OF GOING

10   THROUGH AND IDENTIFYING EXACTLY WHAT'S PRIVILEGED AND

11   ESTABLISHING THE BASIS FOR THE PRIVILEGE.  THEY JUST ASSUME

12   IT'S PRIVILEGED -- EVEN THOUGH THERE'S BEEN A FINDING THAT

13   THE DOCUMENT -- ANY PRIVILEGE WAS WAIVED.

14             AND THERE'S NEVER BEEN A FINDING THAT THE MATERIAL

15   WAS PRIVILEGED.  AND IN HERE THEY HAD EVERY OPPORTUNITY TO GO

16   THROUGH THE TIMELINE AND IDENTIFY EVERYTHING THAT'S

17   PRIVILEGED.

18             AND, YOU KNOW, YOUR HONOR, IT'S ONE THING TO JUST

19   ASSUME THAT EVERYTHING IN THERE IS PRIVILEGED BECAUSE IT CAME

20   FROM AN ATTORNEY IN THE OFFICE WHOSE IDENTITY WE DON'T EVEN

21   KNOW AND IT HAS NOT EVEN BEEN DISCLOSED IN THIS MOTION.

22             THE COURT:  HAS THERE BEEN ANY LITIGATION ON THAT

23   PART OF IT?

24             MR. PETROCELLI:  NO, YOUR HONOR.  NO --

25             THE COURT:  ANY STATE BAR PROCEEDINGS?

34

1           MR. PETROCELLI:  NO, WE POINTED THAT OUT.  NOW, OF

2    COURSE, WE DON'T KNOW DEFINITIVELY, BUT WE POINTED TO THE

3    ABSENCE OF ANY EVIDENCE PROFFERED BY THE DEFENDANTS OF ANY

4    CRIMINAL COMPLAINTS FILED, ANY STATE BAR PROCEEDINGS, ANY

5    LAWSUITS AGAINST THE ATTORNEY.

6           BUT IF YOU GO THROUGH THE DOCUMENT, AND YOUR HONOR

7    HAS SEEN IT, IT PARADES THROUGH NUMEROUS FACTS AND EVENTS --

8           THE COURT:  WE DON'T NEED TO GO THROUGH THE

9    DOCUMENT HERE.

10           MR. PETROCELLI:  -- INCLUDING THIRD-PARTY

11    COMMUNICATIONS AND SO FORTH.

12           SO, I DON'T THINK THERE'S ANY BASIS WHATSOEVER TO

13    GRANT THE MOTION.  AND IT WOULD EFFECTIVELY AMOUNT TO A

14    COMPLETE STAY OF ALL DISCOVERY, RENDERING US UNABLE TO PROVE

15    THE CLAIMS IN OUR COMPLAINT, AND WHICH I SUGGEST IS THE

16    PURPOSE OF THAT MOTION.

17           NOW, LET ME TURN TO THE OTHER -- I'M GLAD YOUR

18    HONOR STOPPED ME BECAUSE I WOULD BARELY BE MAKING A DENT IN

19    THAT MATERIAL.

20           THE COURT:  AS I SAID, I HAVE READ ALL THIS.  AND

21    IT IS QUITE EXTENSIVE, SO.

22           MR. PETROCELLI:  YOUR HONOR, WE APOLOGIZE FOR THAT.

23    AND WE'LL TRY TO BE MINDFUL OF THE COURT'S CALENDAR AND THE

24    BURDENS ON THE COURT GOING FORWARD.

25           THE COURT:  THANK YOU.

**39**

35

```
 1          MR. PETROCELLI:  ON THE MOTIONS TO INITIATE

 2   DISCOVERY AND THE PARALLEL MOTION TO STAY THE DEPOSITIONS, IT

 3   IS TRUE THAT SUBSEQUENT EVENTS HAVE OVERTAKEN SOME OF THE

 4   ISSUES ON BOTH SIDES OF THESE MOTIONS.  FOR EXAMPLE, ALTHOUGH

 5   WE EXPERIENCED NOT INSUBSTANTIAL DELAY IN GETTING THE RULE 26

 6   CONFERENCE, THAT'S NOW BEHIND US.  AND WE SERVED THE FOUR

 7   DEPOSITION NOTICES.  JEAN PEAVY IS NOW A PARTY TO THE CASE.

 8          THE COURT:  YES.

 9          MR. PETROCELLI: -- NOT A THIRD PARTY.  SO, THAT'S

10   BEHIND US.

11          AND I AGREE WITH MR. KENDALL THAT THIS REALLY BOILS

12   DOWN TO THE ISSUE OF WHETHER THEY'RE ENTITLED TO AN

13   INDEFINITE STAY OF DISCOVERY PENDING FURTHER PROCEEDINGS,

14   INCLUDING THEIR DISPOSITIVE MOTIONS.

15          AND I SAY INDEFINITE STAY TO BE CLEAR.  HE DID NOT.

16   HE SAID THREE WEEKS' STAY.

17          I WANT TO CLARIFY PERHAPS SOME CONFUSION ABOUT OUR

18   POSITION THAT PERHAPS I MAY HAVE SOWN OR THAT MAY HAVE

19   OCCURRED IN THE BRIEFING ON THIS ABOUT WHAT OUR PLANS ARE

20   WITH RESPECT TO THESE DEPOSITIONS.

21          WHEN THE PRIOR MOTION WAS SCHEDULED TO BE HEARD --

22   THE PRIOR MOTIONS TO DISMISS IN THE SLAP MOTION THAT HAD BEEN

23   FILED BACK IN JULY OR AUGUST THEY WERE SET TO BE HEARD ON

24   OCTOBER 18TH.  AND AS YOUR HONOR KNOWS, WE AMENDED.  THE

25   COURT MOOTED THOSE MOTIONS.  WE HAVE NOT EVEN RECEIVED THE
```

36

1    NEW MOTIONS.  SO, I DON'T EVEN HAVE, AND THE COURT DOESN'T

2    HAVE IN THIS RECORD, ANY OF THESE MOTIONS TO DISMISS OR A NEW

3    SLAP MOTION.

4          I'M ASSUMING FOR THE PURPOSES OF ARGUMENT AND WHAT

5    HAS BEEN TOLD TO ME, THAT THE MOTIONS WILL BE VERY MUCH ALONG

6    THE SAME LINES AS THE PRIOR MOTIONS.  BUT THEY HAVEN'T BEEN

7    FILED YET.  I'M TOLD THEY'LL BE FILED TODAY.

8          THE COURT:  THEY PROBABLY JUST COULDN'T LIFT

9    EVERYTHING.

10          MR. PETROCELLI:  BUT TO BE CLEAR, IF THEY'RE FILED

11    TODAY, OF COURSE, THERE'S NO IDEA WHEN THOSE MOTIONS WILL

12    EVEN BE HEARD LET ALONE DECIDED.  IN FACT, IN THE OPPOSITION

13    THAT THE DEFENDANTS FILED TO OUR EX PARTE APPLICATION TO BALL

14    ALL THIS UP AND HAVE IT HEARD ON THE 25TH OF OCTOBER, THEY

15    INDICATED THAT THEY MAY SEEK AN EXTENSION OF THE SCHEDULE,

16    BOTH TO PERMIT THEM MORE TIME TO REPLY AND TO PERMIT THE

17    COURT MORE TIME TO CONSIDER THE MOTIONS.

18          IF THEY FILE THOSE MOTIONS TODAY, WHICH IS THE LAST

19    DAY, THAT LEAVES DEFENDANT -- EXCUSE ME.  MADE THE MISTAKE

20    AGAIN -- THAT LEAVES OUR SIDE, THE PLAINTIFF, WITH THE

21    ABSOLUTE MINIMUM TIME TO RESPOND TO THOSE MOTIONS, SEVEN

22    DAYS.  AND THEY COULD HAVE FILED THEM EARLIER, BUT THEY

23    WAITED TILL TODAY APPARENTLY.  AND WE'LL GET THEM LATER ON

24    TODAY.  WE HAVE SEVEN DAYS.

25          NOW, WE MAY HAVE TO SEEK AN EXTENSION BECAUSE IF

37

1   THEY'RE ANYTHING LIKE THE LAST SET OF MOTIONS, THEY WERE 100

2   PAGES AND 1,000 EXHIBITS.  AND I WAS TOLD THAT THEY'RE ADDING

3   AN ADDITIONAL ARGUMENT OR TWO.  SO, WE MAY HAVE TO GO IN AND

4   GET AN EXTENSION OF THE SCHEDULE.  INDEED, THEY HAVE ALREADY

5   INDICATED THAT THEY ARE LIKELY TO DO THAT.

6           AND, SO, THE IDEA THAT THESE MOTIONS ARE ALL GOING

7   TO BE HEARD BY A JUDGE WITH AN EXTREMELY BUSY CALENDAR,

8   WORKING THROUGH A THICKET OF ALL THESE ISSUES ON OCTOBER 18

9   IS A PIPEDREAM.  IT'S NOT GOING TO HAPPEN, YOUR HONOR.  IN

10  ANY EVENT, THERE'S NO ASSURANCE THAT IT CAN HAPPEN.

11          SO, THIS IS NOT A REQUEST TO STAY DEPOSITIONS FOR

12  THREE WEEKS.  AND IF IT WERE, I WOULD STIPULATE TO THAT AND

13  HAVE ALL BUT STIPULATED TO THAT.

14          I INDICATED I WAS PREPARED TO PUT THESE DEPOSITIONS

15  OFF UNTIL THE END OF OCTOBER, EARLY NOVEMBER BECAUSE I WANTED

16  TO WORK OUT DOCUMENT ISSUES RELATED TO THESE WITNESSES.

17          WE HAVE YET TO RECEIVE THEIR RESPONSES TO THE

18  DOCUMENT REQUEST, BUT WE'RE TOLD THEY'RE NOT LIKELY TO

19  INCLUDE ANY DOCUMENTS.  AND, SO, I WAS HOPEFUL THAT PERHAPS I

20  COULD, YOU KNOW, DEAL WITH THE DOCUMENT ISSUES TO AVOID

21  HAVING TO SEEK MULTIPLE DEPOSITIONS OF THE WITNESSES AND TAKE

22  CARE OF THAT.

23          I HAVE NO CONFIDENCE I'M GOING TO BE ABLE TO DO

24  THAT BECAUSE LIKE ANYTHING ELSE, YOUR HONOR, EVEN IF I COULD

25  GET A MOTION IN FRONT OF YOUR HONOR FORTHWITH FOLLOWING MEET

1    AND CONFER, AND YOUR HONOR ISSUES A RULING, THERE MAY BE

2    APPEALS OF THAT RULING.  SO, THERE'S NO IDEA HOW LONG IT MAY

3    TAKE TO EVEN SORT OUT THE DOCUMENT ISSUES, LET ALONE HOW LONG

4    IT'S GOING TO TAKE TO DEAL WITH THEIR DISPOSITIVE MOTIONS.

5           ALL OF WHICH MEANS, YOUR HONOR, THAT I BELIEVE THAT

6    THIS MOTION FOR A PROTECTIVE ORDER CANNOT BE GRANTED ON SOME

7    PROMISE THAT THIS IS JUST A MODEST CONTINUANCE.  IT IS NOT.

8           AND THEY HAVE DECLINED TO AGREE TO CONTINUE THOSE

9    DEPOSITIONS TO A DATE CERTAIN AT THE END OF OCTOBER OR EARLY

10   NOVEMBER.  I HAVE MADE THAT PROPOSAL, AND THEY HAVE DECLINED.

11   THEY WANT TO KEEP THE SCHEDULE OPEN AND IN FLUX UNTIL THEY'VE

12   HAD A CHANCE TO RUN THE TABLE ON ALL OF THESE MOTIONS.

13          THEY HAVE SUGGESTED THAT I HAVE SOMEHOW CONCEDED

14   THAT ALL OF THIS DISCOVERY OUGHT TO AWAIT THE RESOLUTION OF

15   THEIR MOTIONS.  I HAVE NEVER CONCEDED SUCH A THING.

16          THE COURT:  I THINK WHAT THEY SAY YOU'VE CONCEDED

17   IS THAT YOU DON'T NEED TO DO THEM BY SEPTEMBER 30TH.

18          MR. PETROCELLI:  I DON'T EVEN KNOW IF I WOULD AGREE

19   WITH THAT.  I WOULD SAY THIS MUCH.  I'VE SAID TO THEM I WOULD

20   BE WILLING TO CONTINUE THEM, BUT THAT WAS CONTINGENT UPON MY

21   TRYING TO MAKE PROGRESS ON THE DOCUMENTS, YOUR HONOR.

22          THE COURT:  I UNDERSTAND.

23          MR. PETROCELLI:  OKAY.

24          AND WHO KNOWS WHAT THAT'S GOING TO ENTAIL BECAUSE

25   WE HAVEN'T GOTTEN THE RESPONSES.  WE HAVEN'T HAD THE MEET AND

39

1    CONFER AND SO FORTH.

2            I THINK THIS IS IMPORTANT, YOUR HONOR, BECAUSE I AM

3    AN EXPERIENCED PRACTITIONER AS ARE DEFENDANTS' COUNSEL.  AND

4    I'M EXTREMELY SENSITIVE TO THE ISSUE OF HEALTH CONCERNS OF

5    SOME OF THESE WITNESSES.  THERE'S NO HEALTH CONCERN WITH

6    RESPECT TO MARK PEARY AT ALL.  AND I REALLY DON'T BELIEVE

7    THERE'S A LEGITIMATE HEALTH CONCERN WITH RESPECT TO ONE OF

8    THE -- THE THREE OTHER WITNESSES, THE YOUNGER OF THE THREE.

9            AND EVEN WITH RESPECT TO THE OTHER --

10           THE COURT:  WELL, THERE'S THE HEALTH CONCERN.

11   WHETHER IT'S INCAPACITATING IS ANOTHER QUESTION.

12           MR. PETROCELLI:  BETTER SAID, YOUR HONOR.  WHETHER

13   IT RENDERS THEM UNABLE TO PARTICIPATE IN A DEPOSITION.

14           TWO OF THE THREE WITNESSES THAT THEY CLAIM WERE

15   SUBJECT TO THAT ARE PLAINTIFFS RIGHT NOW IN THE OTHER CASES.

16   PLAINTIFFS WHO HAVE YET TO GO TO TRIAL ON ISSUES THAT REMAIN

17   IN BOTH CASES.  WE HAVE THE SUPERBOY CASE AND THE SUPERMAN

18   CASE.

19           THE COURT:  OF COURSE THEY WERE YOUNGER WHEN THEY

20   STARTED.

21           MR. PETROCELLI:  YES, TRUE.  BUT NONETHELESS

22   THEY'RE PLAINTIFFS SEEKING MANY, MANY, MANY, MANY MILLIONS OF

23   DOLLARS.  AND THEY NEED TO PARTICIPATE IN THE LITIGATION AS

24   PART OF THAT PROCESS.

25           AND HERE, THIS CLAIM IS ALSO NECESSITATED -- THE

1   LAWSUIT AGAINST THE SHUSTER FAMILY IS NECESSITATED BY THEIR

2   CLAIM FOR MANY, MANY, MANY MILLIONS OF DOLLARS.  SO, THAT'S

3   JUST PART OF THE PROCESS THAT WHEN YOU WANT TO SEEK THAT KIND

4   OF MONEY FROM SOMEONE WHO DOESN'T THINK YOU'RE ENTITLED TO

5   IT.

6           IN ANY EVENT, WE'RE SENSITIVE TO THE HEALTH ISSUE,

7   WHICH IS WHY I SOUGHT TO DEAL WITH THE DOCUMENT ISSUES ON AN

8   EXPEDITED BASIS AND TRY TO GET ALL THAT WRAPPED UP AND HAVE

9   THE DEPOSITIONS 30 DAYS AGO.

10          BUT I DON'T BELIEVE IT'S THE DEFENDANTS' OBJECTIVE

11  AT ALL, AND I THINK THEY'RE QUITE CANDID ABOUT IT, TO NOT

12  ALLOW THOSE DEPOSITIONS TO GO FORWARD 30 DAYS FROM NOW.

13          THAT'S NOT WHAT THIS IS ABOUT.  WE WOULD NEVER BE

14  IN FRONT OF THE COURT.  I WOULD NEVER HAVE ALLOWED THIS TO

15  DRAG ON LIKE THIS.

16          I'M IN THIS POSITION, YOUR HONOR, BECAUSE IF THE

17  DEFENDANTS' MOTION WERE GRANTED, THERE WOULD BE NO DISCOVERY

18  IN THIS CASE.  PERIOD.  AND BOTH MOTIONS SEEK THAT VERY

19  OBJECT.  AND WHAT THEY'RE -- WHILE THEY'RE TRYING TO LAUNCH

20  DEFINITIVE, DISPOSITIVE MOTIONS THAT RAISE NUMEROUS FACT

21  ISSUES AND AT THE SAME TIME SUGGEST THAT WE CAN'T TAKE ANY

22  DISCOVERY.

23          SO, IF MULTIPLE DEPOSITIONS ARE REQUIRED DOWN THE

24  ROAD, AND WE'RE NOT THERE NOW, THAT'S ALSO NOT OUR DOING,

25  YOUR HONOR.  THE DEFENDANTS COULD MOOT ALL THESE ISSUES BY

41

1    SIMPLY PUTTING THE WITNESSES UP FOR DEPOSITION.  AND WE COULD

2    TAKE ALL THE DEPOSITIONS NOW.

3         AND WHAT'S THE PREJUDICE TO THEM FOR THAT.  BECAUSE

4    THERE MAY BE INQUIRY INTO SOME ISSUES THAT END UP PERHAPS

5    GETTING DISMISSED DOWN THE ROAD.  THERE'S NO -- IF YOU

6    BALANCE THE INTERESTS, WE COULD LOSE PERMANENTLY THE ABILITY

7    TO TAKE THESE DEPOSITIONS.  THEIR SERIOUS HEALTH WEIGHS IN

8    FAVOR OF ALLOWING THE DEPOSITIONS BECAUSE THEY COULD DIE, OR

9    THEIR HEALTH COULD WORSEN.  AND THEY COULD BECOME SO

10   INCAPACITATED THAT WE COULD NEVER TAKE THEIR DEPOSITIONS.

11   SO, THAT'S AN ARGUMENT THAT I SUGGEST FAVORS TAKING OF THE

12   DEPOSITIONS.

13        AND THERE'S BEEN NO ATTEMPT AND NO PROOF IN THIS

14   RECORD THAT THEY'RE WILLING TO MAKE THEM AVAILABLE.  THEY SAY

15   IF THEY ARE MADE AVAILABLE IF WE GO FORWARD, THEY'RE GOING TO

16   INSTRUCT THEM NOT TO ANSWER.

17        WELL, THAT'S THEIR TACTICAL CHOICE TO INSTRUCT THEM

18   NOT TO ANSWER.  IF THEY'RE SO CONCERNED ABOUT THEIR MEDICAL

19   CONDITION, THEY SHOULDN'T INSTRUCT THEM NOT TO ANSWER,

20   ESPECIALLY WHEN THE INSTRUCTIONS ARE BASED ON THE SAME

21   GROUNDS THAT ARE IN THIS MOTION, THAT THEY SOMEHOW HAVE AN

22   ENTITLEMENT TO NOT ALLOW US TO GET INTO DISCOVERY BECAUSE

23   THEY HAVE A RULE 12 MOTION OR A SLAP MOTION.

24        AND WITHOUT REPEATING WHAT'S IN OUR PAPERS ON THOSE

25   ISSUES, THEY HAVE THE HEAVY BURDEN IN THE RULE 12 CONTEXT.

1    THAT'S THE SKELLERUP CASE AND THE GREY CASE IN ORDER TO STAY

2    DISCOVERY JUST ON THE COUNT YOU MIGHT WIN A RULE 12 MOTION.

3              AND THE COURTS SAY THAT IF THE MOTIONS -- IF IT'S

4    NOT -- THE GRAY CASE HAS SOME GOOD LANGUAGE IN IT, YOUR

5    HONOR.  IT SAYS IF IT'S NOT IMMEDIATELY APPARENT, OR THERE'S

6    A CLEAR AND IMMEDIATE POSSIBILITY THAT THE MOTIONS ARE GOING

7    TO BE GRANTED IN THEIR ENTIRETY, THEN, NO STAY IS PERMITTED.

8              AND THE COURT OBVIOUSLY CAN'T -- YOUR HONOR CAN'T

9    GO IN AND MAKE PRELIMINARY FINDINGS, BUT IT'S COMMON SENSE

10   THAT YOU CAN TAKE A LOOK AT THE MOTIONS AND SEE IF IT'S

11   INSTANTLY SELF-EVIDENT THAT THEY'RE GOING TO WIN IN THEIR

12   ENTIRETY --

13             THE COURT:  THIS IS THE SO-CALLED "TAKE A PEEK."

14             MR. PETROCELLI:  TO TAKE A PEEK.

15             AND, YOU KNOW, THERE ARE SOME --

16             THE COURT:  WHICH ALWAYS AMUSES ME.  WHAT IF YOUR

17   PEEK IS WRONG.

18             MR. PETROCELLI:  AND THERE ARE SOME CASES, YOUR

19   HONOR, WHERE I SUPPOSE YOU CAN TAKE A NEAR PERFECT PEEK.  BUT

20   THIS CASE COMES NOWHERE REMOTELY CLOSE TO THAT SITUATION.

21             THE GRAY CASE HAS SOME LANGUAGE THERE THAT IT HAS

22   TO BE UTTERLY FRIVOLOUS.  THE GRAY CASE IS A NORTHERN

23   DISTRICT CALIFORNIA CASE.  SKELLERUP IS CENTRAL DISTRICT

24   CALIFORNIA CASE.

25             AND IF YOU LOOK AT THE CLAIMS THEY'VE MADE -- AND

43

1    WE'VE BRIEFED THIS AD NAUSEAM -- THEY RAISE A VARIETY OF

2    FACTUAL ISSUES.  AND IT IS WRONG TO SUGGEST THAT THIS HAS

3    ANYTHING TO DO WITH JUDGE LARSON'S RULINGS IN THE SIEGEL CASE

4    ON THE SIEGEL TERMINATION ISSUES.

5           AMONG OTHER THINGS, MR. TOBEROFF REPRESENTED TO THE

6    COURT IN NEW MEXICO THAT THE ISSUES WERE COMPLETELY

7    DIFFERENT, THAT IS, THE SIEGEL AND THE SHUSTER TERMINATIONS.

8           THE COURT:  YES.  I SAW THAT YOU PUT THAT

9    TRANSCRIPT IN.

10          MR. PETROCELLI:  AND, ALSO, JUDGE LARSON

11   SPECIFICALLY FOUND THAT IT'S ANYTHING BUT A FORE- -- BY NO

12   MEANS A FOREGONE CONCLUSION THAT THE SHUSTERS WILL BE

13   SUCCESSFUL IN TERMINATING.

14          AND THERE'S A GOOD REASON FOR THAT, YOUR HONOR,

15   BECAUSE THE ISSUES ARE DISTINCTLY DIFFERENT.  WE HAVE IN THE

16   CASE OF THE SHUSTERS, AS ALLEGED IN OUR COMPLAINT, A PIVOTAL

17   AGREEMENT ENTERED INTO IN 1992 THAT WE CONTEND FORECLOSES

18   THEIR ABILITY TO TERMINATE.

19          NO SUCH ISSUE EVER WAS IN THE SIEGEL CASE.  THAT'S

20   GOING TO BE A FRONT AND CENTER ISSUE, AMONG OTHERS, IN THIS

21   CASE.  AND THERE'S BEEN NO DISCOVERY ON THAT ISSUE

22   WHATSOEVER.

23          AND THE DEFENDANTS ARE SUGGESTING THAT BECAUSE THEY

24   MIGHT WIN A MOTION NEXT WEEK, A MOTION THAT WE CONTEND IS

25   WITHOUT MERIT, BUT JUDGE WRIGHT WILL DECIDE THAT THEY COULD

**48**

44

1   GET A RULE 54(B) JUDGMENT ON PART OF A CLAIM.  THEY WANT A

2   JUDGMENT ON PART OF A DEC RELIEF CLAIM.

3          THE COURT:  I UNDERSTAND.

4          MR. PETROCELLI:  AND OUR POSITION IS THAT -- EVEN

5   IF THEY GET THAT, THAT'S NOT GOING TO FORECLOSE ANYTHING IN

6   THIS CASE.  AND IT'S NOT GOING TO SUGGEST A STAY IN THIS

7   CASE.  WE'RE TOLD ABOUT AN APPEAL OF AN ATTORNEY'S FEES

8   ISSUE.

9          I THINK ALL OF THESE PROMISES OF APPEALS, AND WE'VE

10  HEARD NUMEROUS SUCH PROMISES, ONLY UNDERSCORE THAT THE STAY

11  THAT THEY'RE SEEKING IS GLOBAL, COMPREHENSIVE AND INDEFINITE.

12  AND THAT THIS CASE CANNOT BE PUT ON HOLD UNTIL THE SIEGEL

13  CASE IS COMPLETELY LITIGATED THROUGH MORE TRIALS AND UP AND

14  DOWN THROUGH THE COURT OF APPEALS, WHICH IS REALLY WHAT'S

15  GOING ON HERE.

16         ON THE SLAP MOTION, YOUR HONOR, THE LAW IS CRYSTAL

17  CLEAR.  THE PARIS HILTON CASE, THE SONOMA CHEESE CASE, SLAP

18  DOES NOT APPLY TO ANY OF THE FEDERAL CLAIMS WE HAVE, AND WE

19  HAVE THREE SPECIFIC FEDERAL CLAIMS.

20         AND CONTRARY TO THE ARGUMENT, THOSE FEDERAL CLAIMS

21  IMPLICATE ALL THE SAME EVIDENCE AS THE STATE-BASED CLAIMS.

22  TAKE A LOOK AT THE THIRD CLAIM, WHICH SAYS THAT THE TEN-YEAR

23  PERIOD OF EXCLUSIVITY TO WHICH DC COMICS WAS ENTITLED AS THE

24  ORIGINAL GRANTEE UNDER THE COPYRIGHT LAWS, WAS INFRINGED, WAS

25  VIOLATED BY A SERIES OF COLLUSIVE AGREEMENTS.

 1          THAT IS EXACTLY THE KIND OF INFORMATION THAT'S, FOR

 2    EXAMPLE, SET FORTH IN THE TOBEROFF TIMELINE.  AND THAT RAISES

 3    A HOST OF FACTUAL ISSUES THAT ENCOMPASS THE SAME ISSUES THAT

 4    ARE IN THE STATE CLAIM.  A STATE -- THE STATE CLAIM -- THE

 5    ANTI-SLAP MOTION DIRECTED TO THE STATE CLAIM CANNOT FORECLOSE

 6    DISCOVERY ON THE FEDERAL CLAIMS EVEN IF IT'S THE SAME OR

 7    OVERLAPPING DISCOVERY.

 8          AND, SECONDLY, CONTRARY TO THE ATTEMPT TO MAKE NEW

 9    LAW, ON THE METABOLITE CASE, THE ROGERS CASE, AND THE MOSER

10    CASE -- ROGERS IS A CENTRAL DISTRICT CALIFORNIA 1999, MOSER

11    IS SOUTHERN DISTRICT CALIFORNIA 2007, AND METABOLITE, OF

12    COURSE, IS THE NINTH CIRCUIT CASE.  ALL THESE CASES SET FORTH

13    VERY CLEARLY WHAT THE GROUND RULES ARE.  AND THEY SAY EVEN

14    WHEN THE ANTI-SLAP MOTION IS FILED WITH RESPECT TO THE

15    STATE-BASED CLAIMS -- FORGET THE FEDERAL CLAIMS BECAUSE THOSE

16    CAN'T BE IMPAIRED AT ALL BY ANY DISCOVERY STAY.  EVEN WITH

17    RESPECT TO THE STATE CLAIMS, THE OPPOSING PARTY, IN THAT CASE

18    THE PLAINTIFF, DOES NOT HAVE A BURDEN OF SHOWING GOOD CAUSE

19    BECAUSE TO DO SO WOULD COLLIDE WITH FEDERAL JURISPRUDENCE

20    UNDER RULE 56 AND WOULD VIOLATE THE SUPREMACY CLAUSE.

21          RATHER, WHAT THESE CASES SAY IS THAT WE SIMPLY HAVE

22    TO IDENTIFY THE TYPE OF DISCOVERY THAT WE NEED TO OPPOSE THE

23    MOTION.  AND WE'VE DONE THAT IN SPADES.

24          BUT, MOREOVER, IN THE ROGERS CASE, YOUR HONOR, THE

25    COURT MAKES CLEAR THAT WHERE THE -- IF THE DEFENDANT MAKES A

1   SLAP MOTION BASED ON THE PLAINTIFF'S LACK OF EVIDENCE,

2   THERE'S NO BASIS FOR A STAY.

3        AND THE SLAP MOTION HERE -- WELL, WE DON'T HAVE IT

4   YET.  ALL I HAVE IS THE PRIOR SLAP MOTION.  BUT PAGE 22 SAYS

5   THE FIFTH CLAIM HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS

6   BECAUSE THE RECORD ESTABLISHES THAT TOBEROFF DID NOT CAUSE

7   THE SIEGELS TO END NEGOTIATIONS WITH DC.  AND DC CANNOT MEET

8   ITS EVIDENTIARY BURDEN ON THIS POINT.

9        THE MOTION EXPLICITLY RAISES THE INSUFFICIENCY OF

10  OUR PROOF AND, AT THE SAME TIME, THEY WANT TO ARGUE THAT

11  WE'RE NOT ENTITLED TO GET THAT PROOF.  AND THAT IS CONTRARY

12  TO NINTH CIRCUIT LAW AND THE LAW IN THE CENTRAL DISTRICT.

13       AND, SO, YOUR HONOR, WHAT I THINK SHOULD HAPPEN IS

14  I THINK THIS MOTION MUST BE DENIED.  AND I THINK WHAT WILL

15  THEN HAPPEN IS I WILL HAVE FOUR DEPOSITIONS UPCOMING AND

16  HOPEFULLY GET SOME DOCUMENT RESPONSES.

17       I WILL THEN HAVE TO MAKE A DECISION WHETHER I GO

18  FORWARD WITH ALL OF THOSE DEPOSITIONS OR SOME OF THOSE

19  DEPOSITIONS.  ESPECIALLY IF I'M NOT GOING TO HAVE ANY

20  DOCUMENTS IN THE NEAR FUTURE, I'M ENTITLED TO MAKE THAT

21  JUDGMENT.

22       AND IF THAT JUDGMENT HAS OTHER CONSEQUENCES AS THIS

23  LITIGATION UNFOLDS, THEN, THE PARTIES WILL BRING THAT OUT.

24       BUT THERE'S NO BASIS TO STAY THE DEPOSITIONS.  IT

25  WOULD BE MY DESIRE TO TRY TO GET ALL THE RELEVANT INFORMATION

1    AND TAKE THE DEPOSITIONS.  I HAVE A STRONG SUSPICION THAT'S

2    NOT LIKELY TO OCCUR SO I MAY HAVE TO MAKE SOME JUDGMENTS

3    ABOUT WHETHER I'M GOING TO GO FORWARD WITH THEM.

4         I'M CERTAINLY NOT GOING TO PUT ALL THESE

5    DEPOSITIONS ON HOLD INDEFINITELY.  AND THE MOST I WAS

6    PREPARED TO DO IS TO WORK IT OUT UNTIL AFTER OCTOBER 25

7    BECAUSE I ENVISIONED I COULD GET IN FRONT OF YOUR HONOR ON

8    OCTOBER 25 TO HEAR THE DOCUMENT MOTIONS.  THAT WAS CALCULATED

9    ON MY BELIEVING I WOULD GET THE RESPONSES LAST FRIDAY.

10        THE COURT:  I HAVE TO SAY ONCE I STARTED IN ON THIS

11   IT MADE NO SENSE TO ME TO STOP.  SO, THAT'S WHY I ADVANCED

12   THE MOTION AND WE'RE DOING AS MUCH AS WE CAN TODAY.

13        MR. PETROCELLI:  OKAY.

14        AND, YOUR HONOR, BECAUSE I DIDN'T GET THE RESPONSES

15   ON FRIDAY BECAUSE THEY'RE APPARENTLY NOT DUE FOR A COUPLE

16   MORE DAYS, IT'S NOT LIKELY I'M GOING TO BE ABLE TO GET A

17   DOCUMENT MOTION IN FRONT OF YOU BY OCTOBER 25TH, ALTHOUGH I'M

18   GOING TO ENDEAVOR TO DO WHATEVER WE CAN.

19        THE COURT:  I'M SURE THE PARTIES CAN WORK THINGS

20   OUT SO THAT YOU WON'T HAVE TO COME BACK IN FRONT OF ME AGAIN.

21        MR. PETROCELLI:  WELL, I THINK --

22        THE COURT:  RIGHT?

23        MR. PETROCELLI:  I WOULD HOPE SO, YOUR HONOR, BUT I

24   THINK --

25        THE COURT:  I'M NOT FORECLOSING IT.

1          MR. PETROCELLI:  AND IF I MAY --

2          THE COURT:  I'M JUST EXPRESSING THE FOND HOPE.

3          MR. PETROCELLI:  IF I MAY EXPRESS MY OWN VIEW ON

4    THAT, WHICH IS NOT REALLY A LEGAL ARGUMENT.  BUT RESPONSIVE

5    TO YOUR HONOR'S COMMENT, I THINK IF THESE MOTIONS ARE DENIED,

6    AND THE DEFENDANTS REALIZE THAT THEY DON'T HAVE SOME

7    AUTOMATIC RIGHT TO PUT ALL THIS DISCOVERY ON HOLD, THE

8    PROCESS WILL THEN CONFORM TO WHAT IS CONTEMPLATED BY THE

9    RULES.  AND WE'LL BE GOVERNED BY THE RULES.  AND EVERYBODY

10   WILL UNDERSTAND THEIR EXPECTATIONS.

11          RIGHT NOW THIS SITUATION THE DEFENDANTS ARE PUTTING

12   BEFORE THE COURT IS TO MAKE THIS CASE SOMEHOW AN EXCEPTION TO

13   THE RULES.  AND THAT'S WHAT'S CREATING THE CHAOTIC CONFUSION

14   IN THIS CASE, TO BORROW A TERM USED BY DEFENDANTS.

15          THANK YOU, YOUR HONOR.

16          THE COURT:  ALL RIGHT.

17          OKAY.  I DON'T THINK I NEED ANY FURTHER ARGUMENT.

18   I'VE READ EVERYTHING.  I'VE LISTENED TO AN HOUR OF ARGUMENT.

19          MR. KENDALL:  YOUR HONOR.

20          THE COURT:  AND I DON'T THINK MR. PETROCELLI SAID

21   ANYTHING THAT REALLY REQUIRES SOMETHING FURTHER, BUT YOU SEEM

22   TO THINK OTHERWISE.

23          MR. KENDALL:  THERE ARE JUST A FEW POINTS, YOUR

24   HONOR, WHERE I THINK THERE WAS ARGUMENT MADE THAT WE'VE NEVER

25   ADDRESSED, SOME OF IT BECAUSE IT WAS FIRST STATED BY THEM IN

49

1    THEIR SUPPLEMENTAL FILING.

2         IT IS NOT CORRECT THAT MR. TOBEROFF SAID IN THE

3    SIEGEL LITIGATION THAT THE ISSUES IN THAT LITIGATION WERE

4    COMPLETELY DIFFERENT AS MR. PETROCELLI REPRESENTED --

5         THE COURT:  MR. PETROCELLI WAS REFERENCING THE

6    TRANSCRIPT --

7         MR. KENDALL:  RIGHT.

8         THE COURT:  -- FROM THE OTHER LITIGATION, WHICH WAS

9    PRESENTED BEFORE ME.  I READ THAT TRANSCRIPT.

10        SO, YOU CAN TAKE THAT ARGUMENT AS SAYING, JUDGE,

11   WE'VE PRESENTED YOU WITH A TRANSCRIPT.

12        MR. KENDALL:  OKAY.  AND I DON'T THINK THE

13   TRANSCRIPT SAYS THAT.

14        THERE WERE A NUMBER OF OBSERVATIONS,

15   REPRESENTATIONS MADE BY MR. PETROCELLI ABOUT WHAT HIS

16   INTENTIONS ARE, WHAT HIS DESIRES ARE.  I DON'T THINK THOSE

17   ARE IN THE RECORD.

18        WE HAVE LOTS OF RESPONSES WE COULD MAKE AS TO WHY

19   WE DON'T THINK THOSE SHOULD BE RELIED UPON BY THE COURT.  BUT

20   IN THE INTEREST OF TIME I WON'T ADDRESS THEM UNLESS THE COURT

21   WOULD LIKE TO HEAR IT.  BUT I DON'T THINK THAT IT'S AT ALL

22   REALISTIC TO BELIEVE THAT IF THE MOTION TO STAY DISCOVERY IS

23   DENIED, THAT MR. PETROCELLI WILL BE RESTRAINED IN THE WAY

24   THAT HE HAS SUGGESTED.  BECAUSE WE BELIEVE THE ENTIRE POINT

25   OF THIS CASE IS TO REOPEN THOSE DEPOSITIONS.  AND THAT THEY

50

1   WILL, HAVING THE CAMEL'S TOE UNDER THE TENT, BE WALKING AS

2   QUICKLY AS THEY CAN --

3            THE COURT:  I THINK IT'S THE NOSE.

4            MR. KENDALL:  PARDON?

5            THE COURT:  I THINK IT'S THE CAMEL'S NOSE, NOT THE

6   TOE.

7            MR. KENDALL:  THAT'S THE PROBLEM WITH METAPHORS,

8   YOUR HONOR.  I STAND CORRECTED.

9            IN ANY EVENT THE TENT WILL BE GONE, AND THE

10   INHABITANTS OF THE TENT WILL BE FULLY EXPOSED TO THE CAMEL'S

11   DEPREDATIONS.  AND THAT'S WHAT WE'RE AFRAID OF.

12            THE LAST THING I DO WANT TO SAY BECAUSE I REALIZED

13   I FORGOT TO SAY THIS IN MY OPENING COMMENTS.  WE ARE FILING

14   THE ANTI-SLAP MOTION TODAY.  WE HAVE -- AND THE MOTION TO

15   DISMISS TODAY.  AND JUDGE WRIGHT'S CLERK HAS SAID THAT HE'S

16   HOLDING OPEN THE ORIGINAL DATE WHICH WAS THE 18TH OF OCTOBER

17   FOR THOSE TO BE HEARD.

18            AND WE DO NOT INTEND TO SEEK ANY EXTENSION OF TIME

19   WITH RESPECT TO THOSE MOTIONS, ASSUMING THAT MR. PETROCELLI

20   DOESN'T SEEK AN EXTENSION OF TIME.  AND IF THEY SEEK AN

21   EXTENSION OF TIME, WELL, WE'LL ADDRESS THAT WHEN WE ARE FACED

22   WITH SUCH A MOTION.  BUT THAT WOULD BE THEIR CHOICE NOT OURS.

23            WE DO NOT WANT AN INDEFINITE DELAY.  WE HAVE NOT

24   SOUGHT AN INDEFINITE DELAY OF DISCOVERY.  AND THAT

25   CHARACTERIZATION IS REALLY NOT ACCURATE.

51

1          WHAT WE DO WANT IS NOT TO HAVE TO SUBMIT TO

2    DISCOVERY IF DISCOVERY ISN'T APPROPRIATE BECAUSE THE CASE IS

3    DISMISSED OR SHARPLY CABINED.

4          WE ALSO HAVE THE 54(B) MOTION, WHICH IS IN ONLY ONE

5    WEEK.

6          YOUR HONOR, WITH RESPECT TO YOUR QUESTION AS TO

7    WHETHER THERE HAS BEEN ANY CRIMINAL COMPLAINT, THERE IS

8    SOMETHING I CAN SAY ABOUT THAT, BUT I --

9          THE COURT:  NO, I DIDN'T ASK IF THERE HAD BEEN A

10   CRIMINAL COMPLAINT.  I ASKED IF THERE HAD BEEN ANY LITIGATION

11   OVER THE SUPPOSED PURLOINING OF THE DOCUMENTS.

12         MR. KENDALL:  THERE'S BEEN NO LITIGATION.  I

13   BELIEVE THEN THERE WAS A QUESTION ABOUT BAR PROCEEDINGS AND

14   CRIMINAL COMPLAINTS.  AND I MAY BE WRONG.

15         BUT IN ANY EVENT, THERE IS SOMETHING I CAN SAY

16   ABOUT THAT IN CAMERA, BUT THERE'S NOTHING I CAN SAY ABOUT IT

17   IN A PUBLIC COURTROOM AT THIS POINT.

18         THE COURT:  OKAY.

19         MR. KENDALL:  YOUR HONOR, THE LAST THING I WILL SAY

20   IS THAT WITH RESPECT TO THE TIMELINE, RESPECTFULLY I BELIEVE

21   THAT THE POINT OF THE SUPREME COURT DECISION IN MOHAWK

22   RELATING TO PROTECTIVE ORDERS IS A WELL-TAKEN POINT ON OUR

23   SIDE.  WE'RE SUPPOSED TO SEEK A PROTECTIVE ORDER TO AVOID THE

24   SPILL-OVER EFFECT.

25         NOW, ALL OF THE ARGUMENT YOU HEARD FROM MR.

1    PETROCELLI ASSUMES THAT THE DOCUMENTS WERE LAWFULLY OBTAINED

2    BY THEM BEFORE JUDGE LARSON.  NOW, I'M THE FIRST TO AGREE

3    THAT JUDGE LARSON TOLD THEM THAT THEY COULD HAVE IT.  BUT THE

4    POINT HERE IS WHETHER THE INTERESTS OF THE DEFENDANTS,

5    INCLUDING BY THE WAY PARTIES -- THE SHUSTERS WHO WERE NOT

6    PARTIES TO THAT PRIOR CASE, SHOULD BE PRESERVED BY A

7    PROTECTIVE ORDER WHILE THE PROPRIETY OF THAT TURN-OVER ORDER

8    IS LITIGATED.

9            BECAUSE IF IT TURNS OUT THAT THE NINTH CIRCUIT'S

10   VIEW IS THAT THOSE DOCUMENTS SHOULD NOT HAVE BEEN TURNED

11   OVER, THEN I BELIEVE THE CASES THAT SAY LAWFULLY OBTAINED

12   DOCUMENTS CAN BE USED BECOME INAPPOSITE.  BECAUSE THAT WOULD

13   MEAN THAT THE DOCUMENTS WERE NOT LAWFULLY OBTAINED BECAUSE

14   THEY SHOULDN'T HAVE BEEN TURNED OVER.

15           THERE'S NO ARGUMENT THAT WE'RE MAKING THAT AT THE

16   PRESENT TIME MR. PETROCELLI IS DOING ANYTHING WRONG IN TAKING

17   HIS NOSE AND MOVING UNDER THAT TENT AS QUICKLY AND

18   AGGRESSIVELY AS HE CAN.  HOWEVER, WE SEEK A PROTECTIVE ORDER

19   TO PREVENT THE PREJUDICE FROM HIS DOING SO UNTIL THE

20   LAWFULNESS OF OBTAINING THOSE DOCUMENTS IS DETERMINED.

21           AND, THEN, JUST ONE LAST THING.  EVEN A QUICK PEEK

22   AT THE STATE LAW CLAIMS REVEALS SOMETHING VERY CLEARLY ON THE

23   FACE OF THOSE CLAIMS AND THE DOCUMENTS THAT THE COURT CAN

24   TAKE JUDICIAL NOTICE OF THAT ARE IN DISCOVERY ALREADY IN THIS

25   CASE, WHICH IS THAT ALL OF THOSE STATE CLAIMS ARE BARRED BY

1    THE STATUTE OF LIMITATIONS.

2           NOW, THERE ARE A NUMBER OF OTHER DEFICIENCIES IN

3    THOSE CLAIMS, THE LITIGATION PRIVILEGE AND SO FORTH, BUT THEY

4    ARE ALL BARRED BY THE STATUTE OF LIMITATIONS.  IT'S AN

5    EXTREMELY STRONG MOTION.

6           AND THE OTHER POINT IS THAT ON THE FIRST THREE

7    CLAIMS FOR RELIEF, ALL OF THOSE CLAIMS ARE PURELY LEGAL

8    ISSUES ABOUT THE MEANING OF THE COPYRIGHT ACT TERMINATION

9    PROVISIONS THAT ARE AT ISSUE.  THOSE ARE LEGAL QUESTIONS THAT

10   EITHER HAVE ALREADY BEEN DECIDED -- IT IS OUR CONTENTION THAT

11   THE RELEVANT ONES HAVE ALREADY BEEN DECIDED -- OR JUST

12   PRESENT QUESTIONS OF LAW.

13          NOW, IT'S EASY TO --

14          THE COURT:  SO, LET ME UNDERSTAND THIS.  IF MR.

15   PETROCELLI HADN'T BEATEN YOU TO THE PUNCH, AND YOU HAD FILED

16   AN ACTION TO TERMINATE OR TO RETURN A COPYRIGHT TO THE

17   SHUSTERS, YOU WOULD HAVE MOVED FOR SUMMARY JUDGMENT, AND YOU

18   WOULD HAVE TO ADDUCE NO EVIDENCE.  AND THE OTHER SIDE WOULD

19   HAVE BEEN ENTITLED TO DISCOVER NO EVIDENCE.  AND THE CASE

20   WOULD HAVE BEEN LOCKED UP TIGHT.

21          MR. KENDALL:  WELL, I THINK THAT'S --

22          THE COURT:  OPTIMISTIC.

23          MR. KENDALL:  -- NOT A PROPOSITION THAT I WOULD

24   ACCEPT.

25          BUT I WOULD ARGUE IT A DIFFERENT WAY, WHICH IS, IF

1   MR. PETROCELLI HAD NOT BEATEN US TO THE PUNCH, AND IF THE SIX

2   YEARS OF SIEGEL LITIGATION HAD RESULTED IN A FINAL JUDGMENT,

3   THEN, ALL THAT WOULD BE NECESSARY WOULD BE TO RESUBMIT THE

4   TERMINATIONS THAT HAVE ALREADY BEEN SUBMITTED TO THE COURT --

5   ALTHOUGH THE SIEGEL CASE DOES NOT PUT THEM AT ISSUE -- HAVE

6   ALREADY BEEN SUBMITTED TO THE COURT IN DISCOVERY BY THE

7   SHUSTERS, HAVE ALREADY BEEN THE SUBJECT -- AND I DON'T THINK

8   THERE'S ANY DISPUTE ABOUT THIS -- OF SUBSTANTIAL QUESTIONING

9   OF THE SHUSTER HEIRS.  THERE BEING NO DISPUTE ABOUT THE

10  EXISTENCE OF THOSE TERMINATIONS, THE FACT THAT THEY WERE

11  FILED.  JUDGE LARSON HAVING DECIDED WHAT HAS BEEN RECAPTURED

12  BY THE SIEGEL HEIRS HAS DECIDED FOR ISSUE PRECLUSION PURPOSES

13  EVERYTHING THAT NEEDS TO BE DECIDED AS TO WHAT'S GOING TO BE

14  RECAPTURED BY THE SHUSTER HEIRS.

15          SO, I WOULD ARGUE THAT MERELY BY SUBMITTING AGAIN

16  THE DOCUMENTS THEY'VE HAD FOR MANY, MANY YEARS THAT AFFECT

17  THE TERMINATIONS, THAT THAT WOULD BE, TOGETHER WITH WHATEVER

18  RULINGS HAVE THEIR ISSUE PRECLUSION EFFECT, THAT WOULD BE

19  CONCLUSIVE.

20          NOW, THEY WOULD HAVE VARIOUS LEGAL ARGUMENTS THAT

21  THEY HAVE MADE, SUCH AS THIS EXCLUSIVITY POINT THAT THEY DID

22  NOT PREVIOUSLY ARGUE IN THE SAME WAY.  HOWEVER, THOSE DO NOT

23  REQUIRE FACTS.  BECAUSE --

24          THE COURT:  ALL RIGHT.  ANYTHING ELSE THAT YOU NEED

25  TO TELL ME?

55

1           MR. PETROCELLI, DO YOU FEEL THE NEED TO ARGUE

2    ANYTHING FURTHER?

3           MR. PETROCELLI:  OTHER THAN TO SAY THAT THAT WHOLE

4    ARGUMENT IS BASED ON A COMPLETE --

5           THE COURT:  FROM THE MICROPHONE SO THAT WE CAN PICK

6    IT UP.

7           MR. PETROCELLI:  I'M SORRY.

8           OTHER THAN TO SAY THAT THAT WHOLE ARGUMENT IS BASED

9    ON A COMPLETE DISREGARD FOR THE ACTUAL CLAIMS THAT WE HAVE

10   FILED, WHICH WERE NOT LITIGATED IN THE SIEGEL CASE AND, I

11   MENTIONED BEFORE, THE 1992 AGREEMENT BETWEEN DC COMICS AND

12   THE SHUSTERS.  AND THE SIEGELS WERE NOT A PARTY TO THAT.

13   THAT'S A DEFINING ISSUE WITH RESPECT TO THE WHOLE SIEGEL

14   TERMINATION ISSUE.  THEY HAVE ABSOLUTELY NO ANSWER TO THAT --

15   JUST IGNORED ANY ARGUMENT ON THAT SUBJECT.

16          THANK YOU.

17          THE COURT:  ALL RIGHT.

18          ALL RIGHT.  WE'VE HAD OVER AN HOUR OF ARGUMENT.  WE

19   HAVE, AS I'VE INDICATED, 3,000 PAGES -- AND, QUITE FRANKLY, I

20   DON'T THINK THESE MOTIONS ARE ALL THAT DIFFICULT.

21          SO, LET'S START WITH THE DEFENDANTS' MOTION FOR A

22   PROTECTIVE ORDER CONCERNING THE SO-CALLED TOBEROFF TIME LINE.

23   AND THAT MOTION IS DENIED.

24          JUDGE LARSON HAS INDICATED, RULED THAT THE LETTER

25   HAD TO BE TURNED OVER.  AND I'M NOT GOING TO REVISIT THAT

56

1    RULING.  AND I'M NOT GOING TO VOICE AN OPINION AS TO WHETHER

2    I WOULD HAVE ISSUED THE SAME RULING DESPITE I THINK WHAT THE

3    PARTIES ARE TRYING TO GET ME TO DO.

4            I'M NOT GOING TO ASSUME THAT THE COURT OF APPEALS

5    WILL ULTIMATELY OVERTURN THAT RULING.  I DON'T KNOW.  BUT I

6    DO KNOW THAT ANY APPELLATE RULING IS PROBABLY SOMETIME IN THE

7    DISTANCE.  I DON'T SPECULATE ON WHEN IT WILL OCCUR OR WHAT

8    ANY OUTCOME WILL BE.

9            SO, SINCE THE TIMELINE HAS BEEN DISCLOSED, THE

10   PLAINTIFFS MAY CONDUCT DISCOVERY ABOUT IT.  AND THAT'S ALL

11   I'M INDICATING IN DENYING THIS MOTION.  I'M NOT MAKING ANY

12   FURTHER RULING WITH CONNECTION TO THAT EXCEPT TO SAY THAT THE

13   MOTION FOR A PROTECTIVE ORDER IS DENIED.

14           NOW, AS TO THE PLAINTIFF'S MOTION TO INITIATE

15   DISCOVERY AND TAKE THE IMMEDIATE LIMITED DISCOVERY OF TWO

16   ELDERLY WITNESSES, THE ACTUAL RELIEF SOUGHT IN THAT MOTION

17   WAS TWOFOLD.  FIRST, THE PLAINTIFFS REQUESTED AN ORDER

18   REQUIRING THAT DISCOVERY COMMENCE IN THIS CASE WITHOUT ANY

19   FURTHER DELAY.

20           AND, SECOND, THEY REQUESTED AN ORDER REQUIRING THAT

21   MS. SIEGEL AND PEAVY SIT FOR DEPOSITIONS AND PRODUCE

22   DOCUMENTS NOT LATER THAN SEPTEMBER 30TH.

23           NOW, AS TO THE ACTUAL RELIEF SOUGHT, THERE'S

24   NOTHING THAT PREVENTS THE PLAINTIFF FROM COMMENCING

25   DISCOVERY.  THE ONLY AUTOMATIC STAY THAT FEDERAL LAW IMPOSES

57

1   IS A STAY BEFORE THE RULE 26(F) CONFERENCE, AND THAT

2   CONFERENCE HAS TAKEN PLACE.

3            IN THE COURT'S VIEW, THE CALIFORNIA ANTI-SLAP

4   STATUTE DOES NOT GOVERN THESE FEDERAL PROCEEDINGS AND IMPOSE

5   AN AUTOMATIC STAY.  THIS IS NOT TO SAY THAT THE COURT COULD

6   NOT IN AN APPROPRIATE CIRCUMSTANCE IMPOSE SUCH A STAY, AND

7   THAT THE STATE'S STATUTE COULD NOT BE A FACTOR BECAUSE IN THE

8   COURT'S VIEW IT CAN.  BUT NO STAY EXISTS AUTOMATICALLY RIGHT

9   NOW AS A RESULT OF THE STATUTE.

10           THE DEPOSITIONS HAVE BEEN NOTICED.  AND NO CASE HAS

11  BEEN MADE THAT THE DEPOSITIONS IN THE COURT'S VIEW MUST BE

12  TAKEN BEFORE SEPTEMBER 30TH OR ON SOME FORM OF SHORTENED

13  NOTICE.  SO, THE PLAINTIFF'S MOTION TO INITIATE DISCOVERY AND

14  TAKE IMMEDIATE LIMITED DISCOVERY OF THE TWO ELDERLY WITNESSES

15  IS DENIED.

16           NOW, THAT BRINGS US TO THE ONLY REAL MOTION, WHICH

17  IS THE MOTION FOR THE PROTECTIVE ORDER FILED BY THE

18  DEFENDANTS, WHICH THE COURT ADVANCED SO IT COULD BE HEARD IN

19  CONNECTION WITH THE OTHER MOTIONS.

20           THERE ARE FOUR DEPOSITION NOTICES AT ISSUE:  THAT

21  OF MS. SIEGEL, THAT OF MS. LARSON, THAT OF MR. PEAVY AND THAT

22  OF MS. PEAVY.

23           IN MY VIEW THERE ARE BALANCES TO BE STRUCK HERE.  A

24  PARTY IS ENTITLED TO TAKE ANOTHER PARTY'S DEPOSITION.  THE

25  SCOPE OF THE EXAMINATION IS DETERMINED BY RELEVANCE, AND

1    RELEVANCE IS DETERMINED BY THE PLEADINGS.  AND A PARTY SHOULD

2    NOT HAVE TO NEEDLESSLY GO OVER MATERIAL THAT WAS PREVIOUSLY

3    TESTIFIED TO.  AND ABSENT COMPELLING CIRCUMSTANCES, A PARTY

4    SHOULD NOT HAVE TO TESTIFY MORE THAN ONCE IN A CASE.

5            AND, FINALLY, CARE SHOULD BE TAKEN IN CONNECTION

6    WITH PERSONS WHO ARE INFIRM.

7            THOSE FACTORS ARE TO SOME EXTENT IN TENSION WITH

8    ONE ANOTHER IN THIS CASE.  I'VE TRIED TO TAKE THEM ALL INTO

9    CONSIDERATION IN MAKING MY RULING.  IN BALANCING ALL THOSE

10   FACTORS, ABSENT AGREEMENT AMONG THE PARTIES, OF COURSE, I'M

11   GOING TO STAY THE DEPOSITIONS UNTIL NOVEMBER 15TH.

12           AS TO THE DEPOSITIONS OF MS. SIEGEL AND MS. LARSON,

13   I'M GOING TO ORDER THAT THOSE WHEN THEY ARE TAKEN BE TAKEN NO

14   MORE THAN 90 MINUTES AT A TIME WITHOUT BREAKS, AND BREAKS AS

15   MUCH AS THE DEPONENTS REASONABLY NEED TO COLLECT THEMSELVES

16   AND TO TAKE CARE OF THEIR HEALTH ISSUES.

17           AS TO THE DEPOSITION OF JEAN PEAVY, I'M GOING TO

18   ORDER THAT THAT BE -- THAT PROCEED EITHER BY WRITTEN

19   QUESTIONS UNDER RULE 31, WITH THE DEPONENT GIVEN AS MUCH TIME

20   AS SHE NEEDS TO RESPOND TO THE COURT REPORTER.  THAT IS, SHE

21   CAN DO IT IN INCREMENTS, FOR EXAMPLE, OF 45 MINUTES IF NEED

22   BE.

23           OR AT THE PLAINTIFF'S OPTION IN LIEU OF A

24   DEPOSITION ON WRITTEN QUESTIONS, THE PLAINTIFF WILL BE

25   RELIEVED OF THE LIMIT ON INTERROGATORIES AND CAN SERVE UP TO

59

1    75 INTERROGATORIES ON THIS DEFENDANT ONLY.

2            I SEE NO NEED TO ISSUE ANY FURTHER ORDER AS TO MR.

3    MARK PEAVY.

4            I'M NOT GOING TO IMPOSE A LIMIT ON THE SUBJECTS TO

5    BE COVERED IN THE DEPOSITIONS.  BECAUSE I THINK THAT IS

6    ESSENTIALLY UNWORKABLE AND ONLY INVITES RANCOR AT THE

7    DEPOSITIONS AND ESSENTIALLY FOR THE COURT TO BABY-SIT THE

8    DEPOSITIONS.

9            I WILL DEPEND UPON COUNSEL TO NOT NEEDLESSLY GO

10   OVER MATERIAL THAT HAS BEEN COVERED, EVEN IF IT HAS BEEN

11   COVERED IN ANOTHER CASE, AND TO FOCUS ON WHAT IS TRULY

12   NEEDED.

13           AND IT WILL NOT BE MY PRESENT EXPECTATION TO EITHER

14   ENLARGE THE AMOUNT OF TIME AVAILABLE FOR A DEPOSITION OR TO

15   ALLOW SECOND DEPOSITIONS OF THESE WITNESSES.  I'M NOT RULING

16   IT OUT, BUT IT'S NOT MY PRESENT EXPECTATION.

17           I WILL EXPECT ALL COUNSEL TO BE COOPERATIVE AND

18   NONE TO BE OBSTRUCTIVE.

19           I DON'T KNOW WHEN JUDGE WRIGHT WILL ULTIMATELY

20   RULE.  I'VE ATTEMPTED TO GIVE HIM TIME TO RULE IF HE IS SO

21   INCLINED.  AND, OF COURSE, OBVIOUSLY, HE CAN ALTER ANY

22   SCHEDULE THAT I HAVE SET.  BUT ASSUMING THAT HE DOES PROCEED

23   AS PROMPTLY AS THE DEFENDANTS BELIEVE THAT HE WILL PROCEED,

24   THIS SHOULD ALLOW TIME FOR CERTAIN ISSUES TO SHAKE OUT AND

25   FOR THE DEPOSITIONS TO TAKE PLACE AND, AT THE SAME TIME, NOT

60

1   PUT OFF THE DEPOSITIONS FOR TOO LONG A TIME.  THESE WITNESSES

2   ARE NOT GETTING ANY YOUNGER.  IT'S THE COURT'S KEEN

3   OBSERVATION THAT PEOPLE WHO ARE ELDERLY AND HAVE HEALTH

4   PROBLEMS DON'T GET ANY YOUNGER, AND THEIR HEALTH PROBLEMS

5   TEND TO NOT IMPROVE.

6          SO, I THINK THERE IS SOME URGENCY HERE, AND I'VE

7   TRIED TO TAKE THAT INTO ACCOUNT AS WELL.

8          I HESITATE TO ASK IF THERE'S ANYTHING FURTHER.  BUT

9   IT IS MY REFRAIN.

10         FROM EITHER SIDE?

11         MR. PETROCELLI:  NOT FROM US, YOUR HONOR.  THANK

12  YOU VERY MUCH.  AND, AGAIN, WE APOLOGIZE FOR THE UNDUE BURDEN

13  ON THE COURT.

14         MR. COURT:  ALL RIGHT.

15         MR. --

16         MR. KENDALL:  WE JOIN IN THOSE SENTIMENTS, YOUR

17  HONOR, AND THANK YOU.  AND NOTHING FURTHER.

18         THE COURT:  ALL RIGHT.  GOOD LUCK TO YOU.

19         WE'LL BE IN RECESS.

20         (PROCEEDINGS ADJOURNED 11:37 A.M.)

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4           I CERTIFY THAT THE FOREGOING IS A CORRECT

5    TRANSCRIPT FROM THE ELECTRONIC SOUND RECORDING OF THE

6    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

7

8

9

10   DOROTHY BABYKIN                        9/27/10

11   _____        _____

12   FEDERALLY CERTIFIED TRANSCRIBER        DATED

13   DOROTHY BABYKIN

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B



http://www.variety.com/index.asp?layout=print_story&articleid=VR1118012493&categoryid=3841

To print this page, select "PRINT" from the File Menu of your browser.

**Posted: Wed., Dec. 9, 2009, 3:44pm PT**

# Dealmakers: Lawyers

## Entertainment attorneys impact list

### By <u>VARIETY STAFF</u>

**DAN H. BLACK**
**Greenberg Traurig**

When Black entered private practice in 1990, screenwriters were still using typewriters. Today he can look back at a career that has embraced all the technical upheaval that has transformed the entertainment industry. At one point "I had the opportunity to be of service to Microsoft," he understates. "I needed to immerse myself in the client's world."
Black repped the software giant in its Hollywood deals. AEG Live retained him to help create a digital strategy. His negotiations on behalf of Belgium's XDC helped set 3D film standards.
His knowledge of digital sets Black apart from many entertainment lawyers. "It almost became part of my DNA to try to stay current," he says.
Black thinks it's essential for his clients on the digital side to have someone conversant in their vocabulary to help them navigate Hollywood. "They need someone who understands both worlds," he stresses. "And these worlds, increasingly, are beginning to intersect."
**KEY DEALS:** Repped XDC deploying 3D movie projectors throughout Europe.
**TOOL OF CHOICE:** Blackberry
**TOP CAUSE:** African Kids in Need
**ROLE MODEL:** Philip Black, father

**JOE CALABRESE**
**O'Melveny & Myers**

The economic climate has been rough on a lot of people, but Calabrese says: "Knock wood, our group has held up particularly well. Our practice has always been mostly on the company side, and that's been a good thing the past 18 months. I've read lots of articles about the talent side being hit pretty hard." Considered one of the most creative entertainment deal lawyers in Hollywood, Calabrese is known for his skill in crafting innovative, complex financial agreements.

Shine, in acquisition of Reveille.
**TECH TOOL:** Blackberry
**TOP CAUSE:** Stanford U. Law School
**ROLE MODELS:** "The lawyers who went ahead of me in this firm."

## ROBERT SCHUMER
### Paul, Weiss, Rifkind, Wharton & Garrison

Repping the Endeavor Agency in its successful merger with William Morris is the most recent highlight of Schumer's career. And, to hear him talk about, it was also a lot of fun. The parties involved in the deal "had a blast," he says. "It wasn't easy to get done, but it was done in a way that both sides felt they succeeded."
For Schumer, there's no pat formula for getting big deals done in Hollywood. The key to success is to approach the process with an outside-the-box bent and forge deals acceptable to both sides of the table.
**KEY DEALS:** Repped Endeavor in merger with William Morris, creating the new WME, which combines rosters of the two shops and stands as a rival to CAA.
**TECH TOOL:** Blackberry
**TOP CAUSE:** Ken's Kids
**ROLE MODEL:** Abraham Lincoln

## NINA L. SHAW
### Del, Shaw, Moonves, Tanaka, Finkelstein & Lezcano

The detail-oriented Shaw is intimately involved in all facets of her transactions. For example, when she set up thesp Jamie Foxx and helmer F. Gary Gray with the revenge thriller "Law Abiding Citizen," she focused on getting the best deal possible in a tough economic environment.
"The margins have been cut razor-thin," she says, "but at the end of the day you still have what you started with — people's underlying passion is what motivates them."
**KEY DEALS:** "Law Abiding Citizen" for clients Foxx and Gray; "CSI" for Laurence Fishburne.
**TECH TOOLS:** Blackberry, Facebook
**TOP CAUSE:** Independent School Alliance for Minority Affairs
**ROLE MODEL:** Partner Ernie Del, who "puts deals ahead of ego"

## MARC TOBEROFF
### Toberoff & Associates, P.C.

"I believe I'm on the side of the good guys, or people who have never gotten what was coming to them," says intellectual property litigator Toberoff, who has carved out his own niche by exploiting "termination rights," a little-noticed part of the Copyright Act that gives original content creators or their heirs the ability to claw back control after a long span of time.
A scourge to the studios, Toberoff has become a legal superhero to such clients as the heirs of Jerry Siegel and Joe Schuster, the pair who created the Superman character in 1938 and sold the rights for $130. The upshot following a cascade of favorable court decisions is that the overall copyright on the Man of Steel will revert to the two estates in 2013 — including control over new projects.
His latest legal blast is on behalf of the heirs of Jack Kirby, who played a major role in the creation of Marvel comicbook icons like X-Men, the Fantastic Four and Spider-Man. Toberoff in September sent out 45 termination of copyright notices to Disney (which is buying Marvel), Sony, Fox and Universal. He has lately turned his gaze toward music. "I'm looking to get involved in music publishing and copyrights in a big way," says the lawyer. For starters, he's repping the kids of Ray Charles.

**KEY DEALS:** Repped creators or heirs for Superman, Lassie, the Dukes of Hazzard
**TECH TOOL:** Blackberry
**TOP CAUSE:** Wants to start a foundation for artist rights
**ROLE MODEL:** Max Toberoff, father, a New York trial lawyer

## FRED TOCZEK
**Felker Toczek Gellman Suddleson**

With an eclectic clientele that includes Seth Rogen, Daniel Radcliffe and Noah Baumbach, Toczek skews to the independent and to young, up-and-coming actors. The split of the final two Potter films set a precedent, while the deal for Baumbach's upcoming "Greenberg" was on a far more modest scale.
The challenge, says Toczek, is "looking at different models in how you're going to approach a deal. If the money isn't available, then look at how you can be creative on the backend and find new and different ways for clients to taste success in a project."
Other Toczek clients: Bill Hader, Idris Elba, Judy Greer, Alice Eve, Aaron Johnson, Shailene Woodley and Jason Dolley. When the clients "don't have the leverage of a long and established career as an actor, you have to push really hard to get the deals where you want them," he says. "The next deal doesn't impact just the next deal. It impacts the next two or three."
**KEY DEALS:** Repped Radcliffe in the split of Potter films; Rogen and partner Evan Goldberg's "Green Hornet" and two Mandate Pictures projects: "I'm With Cancer" and "Jay and Seth vs. the Apocalypse," starring Rogen and Jay Baruchel.
**TECH TOOL:** Blackberry
**TOP CAUSE:** Maimonides Academy
**ROLE MODEL:** Mother: "More than anything, what matters in life is that you be a mensch."

## KEVIN YORN
**Morris Yorn Barnes & Levine**

A priority for Yorn these days is learning to exploit emerging digital distribution platforms on behalf of big-name talent. A recent example: "Plan 26: Dark Origins," a mixed-media thriller by client Anthony Zuiker, creator of the "CSI" franchise. Promoted as the first "digi-novel" by publisher Dutton, between chapters it refers readers to Web- and iPhone-borne video vignettes.
He handles transactions for Scarlett Johansson and Ellen DeGeneres, and repped the latter in her signing with Fox to become a judge on ratings behemoth "American Idol." Part of the package: an Idol-related tie-in with her syndicated talkshow, distributed by Warner Bros. "The goal is to make both deals work together," says Yorn.
Yorn repped Johansson to be the new face for Dolce & Gabbana, replacing Penelope Cruz, and as endorser for clothing line Mango. Johansson, by the way, has a new hit album, "Break Up," her second with rocker Pete Yorn — the attorney's younger brother. DeGeneres recently tweeted praise for the work.
**KEY DEALS:** Negotiations with Dutton and Apple for Zuiker's "digi-novel," first of a planned trilogy combining text with video interludes.
**TECH TOOLS:** Blackberry, iPhone, several iPods and a Kindle
**TOP CAUSE:** Cedars-Sinai Medical Center
**ROLE MODEL:** Herman Goldblatt, grandfather, 100 and still going strong

## KEN ZIFFREN
**Ziffren, Brittenham, Branca, Fischer, Gilbert-Lurie, Stiffelman, Cook, Johnson, Lande & Wolf**

**70**

# EXHIBIT C

## Film

Posted: Sun., Mar. 30, 2008, 8:00pm PT                                    Share   Print

# Warner vexed by legal Man of Steel

### Lawyer Toberoff dings Superman

By DIANE GARRETT

He's a superhero to rights holders -- but Kryptonite to studios.

Last week, attorney Marc Toberoff won a potentially costly "Superman" victory against Warner Bros. for co-creator Jerome Siegel's heirs. The federal ruling, which gives the heirs a stake in rights sold 71 years ago, could put a serious crimp on future plans for one of the studio's most enduring -- and lucrative -- franchises, especially if co-creator Joe Shuster's heirs follow suit in five years, when they are eligible to do so.

As it is, the studio has at least two Superman projects in development -- a follow-up to Bryan Singer's "Superman Returns" and "Justice League" -- and it may end up paying tens of millions from the domestic haul of "Superman Returns" to Siegel's heirs under the ruling, which applies to domestic monies for Superman projects since 1999.



'Superman Returns'

The case is Toberoff's latest -- and potentially most damaging -- claim against the studio. The dedicated copyright crusader has pursued claims involving "Wild Wild West," "Dukes of Hazzard," "Smallville" and the upcoming "Get Smart."

He has gone after other studios, including Sony, but his most high-profile cases -- and victories -- have involved Warners. The studio paid "Moonrunners" producer Robert B. Clark a $17.5 million settlement in a case about similarities between that 1974 movie and the bigscreen "The Dukes of Hazzard." And a federal judge ruled earlier in the Siegels' favor over "Smallville," although that was challenged and the case still being resolved.

The studio declined to comment on the latest ruling in favor of their legal nemesis, issuing only a statement noting that, "substantial issues relating to the accounting of profits were ruled in our favor."

Among these issues: international profits, trademark-related revs and profits stemming from Superman fare produced before 1999, when Siegel's heirs terminated the earlier copyright arrangement under a 1976 law.

To the Siegels, Toberoff's legal maneuvers are nothing short of heroic. The family had been destitute for years after Siegel sold rights to his Man of Steel to Detective Comics for $130. DC Comics had started to pony up more monies after Warners made successful movies based on the character, but Siegel had long wished to redress the fact he had gotten so little from his creation; he died in 1996.

Toberoff has set up a production company, Intellectual Properties Worldwide, to develop films around these and other titles. And he has built up a sideline business producing bigscreen adaptations of the projects whose copyright claims he pursues. He has a producing credit on "Fantasy Island," a Sony project for Eddie Murphy, as well as "Sanford and Son."

Contact the Variety newsroom at news@variety.com.

Read next article: Art Alliance picks up 'Chops'  >



Email or Share    Print
RSS Feed    Bookmark

Get Variety:
Mobile    Digital    Newsletters

Subscribe to Variety

-- Advertisement --

WE RECOMMEND...

Zack Snyder to direct 'Superman'
Judge sentences McTiernan to year in prison
Tony Gilroy to direct 'Bourne 4'
CAA looks to diversify
Screen Gems tunes up 'Instruments'
Low turnout for 'Teach' bow

Powered by newstogram

RELATED ARTICLES:

Art Alliance picks up 'Chops'
Paramount gets 'Happy'
U.K. directors forming org
Art Alliance picks up 'Chops'
72Prods. taps 'Combustion'
Fans protest TWC release

-- Advertisement --



STUDIO CANAL

WARMLY CONGRATULATES

JON FELTHEIMER

ON RECEIVING THE

PERSONALITY OF THE YEAR AWARD

AT MIPCOM 2010



VARIETY
CONFERENCES

Film Marketing Summit
October 5-6, 2010
Hilton Los Angeles,CA

Entertainment & Technology Summit
October 18, 2010
The Loews in Santa Monica, CA

Future of Film Summit
November 9, 2010

**72**

© Copyright 2010 **RBI**, a division of Reed Elsevier Inc.
Privacy Policy | Terms & Conditions | About Us | Advertise | Contact Us | Site Map | Help | Login

**Media:** LA 411 | New York 411 | Variety       **Construction:** Reed Construction Data       **Business Directory:** HotFrog

**73**

# EXHIBIT D

*The New York Times* Reprints

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.



March 20, 2010

# A Supersized Custody Battle Over Marvel Superheroes

By BROOKS BARNES and MICHAEL CIEPLY

LOS ANGELES

WHEN the Walt Disney Company agreed in August to pay $4 billion to acquire Marvel Entertainment, the comic book publisher and movie studio, it snared a company with a library that includes some of the world's best-known superheroes, including Spider-Man, the X-Men, the Incredible Hulk and the Fantastic Four.

The heirs of Jack Kirby, the legendary artist who co-created numerous Marvel mainstays, were also intrigued by the deal. Mr. Kirby's children had long harbored resentments about Marvel, believing they had been denied a share of the lush profits rolling out of the company's superheroes franchises.

They spent years preparing for a lawsuit by enlisting a Los Angeles copyright lawyer, Marc Toberoff, to represent them. When the Marvel deal was struck, Mr. Toberoff — who helped win a court ruling last year returning a share of Superman profits to heirs of one of that character's creators — sprang into action.

Pow! Wham! Another high-profile copyright fight broke out in Hollywood, and this one could be the broadest the industry has yet seen.

Last September in a prelude to a lawsuit, Mr. Toberoff — using a provision in copyright law that, under certain conditions, gives authors or their heirs the right to regain ownership of a product after a given number of years — sent 45 notices of copyright termination to Marvel, Disney and other studios. The notices expressed the family's intent to regain copyrights to some of Mr. Kirby's creations as early as 2014. By Mr. Toberoff's calculation, as much as 88 percent of Marvel's film earnings have been what he calls "Kirby related."

Marvel and Mr. Toberoff entered settlement talks. But on Jan. 8, Marvel surprised the Kirbys with a lawsuit seeking to invalidate the notices — stunning Mr. Toberoff, who figured Disney, having just written a huge check for Marvel, would settle. His foes thought otherwise.

"We took the initiative because we have a very strong legal position," said James W. Quinn, a

Marvel lawyer. "There is no question that Kirby was a great artist. But that's not the law."

The family has since filed a lawsuit against Marvel and Disney. Aside from seeking dismissal of Marvel's lawsuit, Mr. Kirby's children accuse the company of depriving the Kirby estate of credit — and thus profits — from movies like "X-Men Origins: Wolverine," which took in $373 million at the global box office. Mr. Quinn dismissed this claim as frivolous.

"The family has nothing to show for all of this," said Mr. Toberoff, as he sipped hot chocolate in the lounge of the Peninsula Hotel here last month. "They just want what is fair."

The dispute is also emblematic of a much larger conflict between intellectual property lawyers and media companies that, in Mr. Toberoff's view, have made themselves vulnerable by building franchises atop old creations. So-called branded entertainment — anything based on superheroes, comic strips, TV cartoons or classic toys — may be easier to sell to audiences, but the intellectual property may also ultimately belong in full or in part to others.

"Any young lawyer starting out today could turn what he's doing into a real profit center," Paul Goldstein, who teaches intellectual-property law at Stanford's law school, said of Mr. Toberoff's specialty.

Mr. Goldstein said cases like the one involving Marvel are only the tip of an iceberg. A new wave of copyright termination actions is expected to affect the film, music and book industries as more works reach the 56-year threshold for ending older copyrights, or a shorter period for those created under a law that took effect in 1978.

Mr. Toberoff is tackling what could be one of the most significant rights cases in Hollywood history; it's certainly the biggest involving a superhero franchise. Unlike his continuing fight with Warner Brothers over Superman, Mr. Toberoff's rights-reclamation effort against Marvel involves dozens of stories and characters from about 240 comic books.

Complicating matters are licensing agreements Marvel has made over the years with rival studios for characters Mr. Kirby helped to create. Sony holds long-term movie rights to Spider-Man; 20th Century Fox has the equivalent for the X-Men and Fantastic Four. Universal Studios holds theme park rights to Spider-Man and the Incredible Hulk. And more films stemming from Mr. Kirby's work are coming: Marvel is spending hundreds of millions to bring Thor and the Avengers to theaters.

If the Kirbys succeed in their reclamation effort — and that's still an enormous *if* — they would be entitled to a share of profits from new works based on any of the copyrighted material.

And the four Kirby heirs (Lisa, Neal, Barbara and Susan) could acquire a nonexclusive right to initiate new projects based on characters partially created by their father, as long as they

**76**

accounted to Marvel for its share in any of them.

"This is like the Superman case times five," said Mr. Toberoff, who predicts a three- to five-year court battle, including appeals, if the case proceeds.

MR. TOBEROFF, 54, could be a movie character himself. Alternately described by lawyers who have worked with him as a brilliant crusader for the little guy and a Svengali who asserts a high degree of control over clients, he has evolved from his early years as a producer of low-budget films into his job as a high-stakes litigator with multiple wins.

With the Kirbys, Mr. Toberoff will square off against a squadron of corporate lawyers that includes Mr. Quinn, whose most recent claim to fame was quashing Dan Rather's $70 million breach-of-contract suit against CBS. Disney is no stranger to intellectual property fights, having spent 18 years battling a rights-infringement case involving Winnie the Pooh and ultimately winning. The company pushed so hard for an extension of copyright terms in 1998 that the resulting law was derisively nicknamed the Mickey Mouse Protection Act.

There is nothing corporate about Mr. Toberoff. A graduate of Columbia's law school, he practiced briefly in New York before ditching the law profession to become what he describes as "a glorified go-fer" for the director Robert Altman. Mr. Toberoff got a quick education in Hollywood's rough-and-tumble ways in 1987 with "Zombie High," a horror picture he made on a minuscule budget with student labor.

"I'll cut your throat!" Mr. Toberoff recalls Aziz Ghazal, a partner on the project, screaming in one disagreement. Mr. Ghazal later became infamous, Mr. Toberoff noted, as the suspected killer of his own wife and daughter before he was found shot to death in an apparent suicide.

In 1994, Mr. Toberoff met an heir to the writer-producer Robert Pirosh. After looking through old papers with his new friend, he discovered that the Pirosh estate owned hitherto undetected movie rights to the TV series "Combat!" It was the first of about 10 old shows, including "Fantasy Island" and "My Favorite Martian," that Mr. Toberoff helped to recycle as movie projects.

A short leap later and he was back in legal practice, handling film rights cases. One included a suit in which he won an injunction blocking Warner from releasing a big-screen version of "The Dukes of Hazzard." A judge ruled in 2005 that Warner had failed to secure rights to an earlier movie, "Moonrunners," on which the new film was partly based. Warner settled for a reported $17.5 million.

Three years later, Mr. Toberoff won a ruling that allowed the heirs to Jerome Siegel, a co-creator of Superman, to reclaim their copyright from Warner and its DC Comics unit, though complex accounting issues in the case have yet to be resolved and the studio recently hired a new legal team. The heirs still haven't seen any money.

**77**

Mr. Toberoff's aggressive style has been controversial at times. Edmée Reit, the widow of Seymour Reit, a co-creator of the character Casper the Friendly Ghost, said Mr. Toberoff called her soon after her husband died to propose a rights lawsuit.

"Seymour was literally not even buried yet when this man started calling," Mrs. Reit said in an interview. "I just felt this man was really an exploiter."

Mr. Toberoff sharply disagreed with Mrs. Reit's version of events. He said he contacted her at a time when she was expected to be a witness in a court case involving Casper and told her that a rights waiver her husband had signed before his death ran counter to the law.

"I thought this was wrong and informed Mrs. Reit of her rights in the process of investigating this situation in defense of my clients," Mr. Toberoff wrote in an e-mail message last week.

Lisa Kirby said Mr. Toberoff began representing her after they were introduced by a mutual friend some years ago. She says that she is braced for a long fight, and that she believes that her father, who died in 1994, would have wanted the copyrights terminated.

"In the end, my father became consumed with the fact that he was not properly compensated or recognized for his tremendous contributions to Marvel, and sadly, he died without either," Ms. Kirby wrote.

IN many ways, the Marvel case is simple. It turns on whether Mr. Kirby was working as a hired hand or whether he was producing material on his own that he then sold to publishers. The Copyright Revision Act of 1976, which opened the door to termination attempts, bans termination for people who delivered work at the "instance and expense" of an employer.

Mr. Toberoff and Marvel disagree on the circumstances under which Mr. Kirby created or co-created the trove of characters.

Pressed by Mr. Toberoff for a settlement, Marvel got fed up and sent the first volley with its January filing against the Kirby children in Federal District Court in Manhattan, seeking to end their efforts to regain long-term rights to the various characters. "Any contributions made by Kirby to the works at issue," the complaint reads, "were works made for hire."

Case closed, as far as Marvel's lawyers were concerned.

The Kirbys fired back on March 9, filing a lawsuit with the Federal District Court in Los Angeles that argues the opposite. From 1958 to 1963, the period of Mr. Kirby's prolific career that is under scrutiny, "Kirby worked solely on a freelance basis out of his own home, with his own instruments and materials, and thereby bore the financial risk of creating his copyrighted materials," according to the lawsuit.

**78**

Mr. Toberoff is poised to argue that Mr. Kirby — and, by extension, others like him — were selling their work on a freelance basis, rather than serving as hired hands.

THE Kirby case is virtually certain to reopen the much-chewed-over history of Marvel to an examination even more intense than it has received from comic book fans. Many fans believe that Marvel and Stan Lee — who once wore varied professional hats, including editor in chief and publisher at Marvel — assigned too little credit to the contribution of an artist they like to call "King Kirby." Mr. Kirby has drawn lavish praise from such luminaries as the novelist Michael Chabon, who has described him as "the Shakespeare or Cervantes of comic books."

Mark Evanier, who worked as an assistant to Mr. Kirby and wrote the book "Kirby: King of Comics," said he expected to be called as a witness in the case and declined to comment. Mr. Evanier testified in support of the Jerome Siegel heirs in their suit against Warner.

Mr. Lee, now 87, will surely have his own version of past events and is almost certain to become a witness in the case if it goes to court. Mr. Lee — who notably fought and won a profit-participation lawsuit with Marvel a decade ago — declined to be interviewed for this article.

If Mr. Lee is called to testify about Mr. Kirby, his testimony could be complicated by an expanded business relationship with Disney. On Dec. 31, Disney announced that it had paid $2.5 million to increase an already existing stake in POW Entertainment (for Purveyors of Wonder), a company in which Mr. Lee is now a principal and the chief creative officer. POW develops new characters and stories for use in comic books, films, digital media and elsewhere. At the time, Disney said the investment was meant to obtain Mr. Lee's help in mining the Marvel library.

If Mr. Toberoff has his way, the picture painted in court will be one of chaos. He says that during Marvel's early days — when Mr. Kirby was creating his superheroes — the company was a shoestring operation that was barely afloat.

"There was no bullpen; there was a one-man office," he said, contending that an industrywide decency code put so much pressure on Marvel that few at the company were worrying about contractual niceties with artists like Mr. Kirby that would have tidied up all of the legal issues surrounding work arrangements. "It's easy to imagine that nobody at the time was thinking about work for hire."

# EXHIBIT E

**SPECIAL REPORT — POWER LAWYERS:** THR's annual list of the 100 most influential entertainment attorneys in the U.S. ▶14

# The Hollywood Reporter.

July 24-26, 2009    $5.99 (U.S.)  $8.99 (Can)  £5.50 (U.K.)  €9.25 (EU)    **INTERNATIONAL WEEKEND EDITION**   THR.com™

# 'Avatar' out of the blue

*Fox lets fans in on Cameron's magnum opus at Comic-Con*

By Steven Zeitchik and Borys Kit

SAN DIEGO — James Cameron and Fox took the wraps off "Avatar," their pricey, visually splashy 3D movie, to a deeply enthusiastic if not over-the-top hysterical crowd Thursday at Comic-Con.

Cameron warmed up the sci-fi-minded audience by asking, "Who wants to go to another planet?" before rolling nearly 25 minutes of scenes from his otherworldly tale, set on the fictional planet of Pandorum.

A few expositional scenes showing main character Sam Worthington becoming an avatar (a blue-skinned human-alien hybrid) segued into a series of jungle battle scenes — many of them striking in color and scope — in which Worthington and co-star Zoe Saldana fight prehistoric-looking creatures.



The footage showed a vividly original world complete with its own language and ecology.

"Everybody always asks, 'Where have you been?' Well, that's
continued on page 49

## MORE COMIC-COVERAGE

▲**SURPRISE GUEST:** Tim Burton brought his Mad Hatter, Johnny Depp, onstage during the "Alice in Wonderland" presentation. **PAGE 49**

▶**FOCUS:** Studios and networks are taking their products to the people in San Diego. **PAGE 50**

### THR.COM/COMIC-CON



Showtime is creating animated webisodes for the fall that will serve as a "Dexter" prequel. **Michael C. Hall** will do the voice. Read about that and the happenings in Hall H throughout the weekend with THR's team of bloggers.



**THE FACE OF THE FUTURE:** Fox unspooled nearly 25 minutes of James Cameron's epic "Avatar" in San Diego.

# Warwick stays in tune with 'Idol'

By Nellie Andreeva

One by one, Fox's "American Idol" is securing its key players.

"Idol" executive producer/showrunner Ken Warwick has inked a three-year deal with the show's co-producer, FremantleMedia North America, to remain at the helm of television's top series. The pact, said to be well into the eight-figure range, is believed the richest for a reality showrunner.



Warwick

It comes on the heels of another three-year deal — a $45 million agreement inked recently by host Ryan Seacrest with "Idol" co-producer 19 Entertainment — that broke a money record for a reality host.

FremantleMedia declined comment on Warwick's deal.

Warwick has been on "Idol," created by Simon Fuller, since the show's first episode in 2000. He was co-showrunner for the first seven seasons alongside Nigel Lythgoe and became sole showrunner when Lythgoe left last summer.

During his first solo stint at
continued on page 52



0  71896 47619  4    3 0>

81

# Power of Attorneys

*In a down economy, a tenacious Hollywood lawyer is more important than ever. Here are 100 of the best in the biz.*

"It's really rough out there." That's a top talent attorney bemoaning the economic sea changes washing over every corner of Hollywood — yes, even the lawyers are feeling the pinch. And yet, as studios squeeze star salaries and the credit crunch slows the pace of deal activity, compiling The Hollywood Reporter's third annual list of the 100 most influential entertainment lawyers in America was no easy task. From high-stakes litigation like the battle between Warner Bros. and Fox over "Watchmen" to the year-long maneuvering that paired DreamWorks with India's Reliance Big Entertainment and Disney, the industry's most compelling dramas increasingly cast lawyers in the starring roles. To put together the list, we again solicited nominations from the community on our entertainment law blog (THREsq.com), then dove into our own research on the deals closed, the cases won and the clients signed. Some attorneys are such mainstays in the business that they've made the list each year, others are appearing for the first time based on recent performance. Only U.S.-based attorneys are eligible, and



no full-time law professors or in-house studio or network lawyers are allowed — except one, Warner Bros. president of worldwide business affairs Steve Spira, who is this year's Raising the Bar Studio Lawyer Award honoree at today's Power Lawyers breakfast. To mix things up, we asked a few Power Lawyers veterans to give us some free legal advice. Read closely, this wisdom usually costs hundreds of dollars an hour. We consider this issue less a power list than a reference guide to 100 amazing entertainment attorneys. It is really rough out there. That's why you need a good lawyer.

— *Matthew Belloni*

**Illustrations by Chris Morris**

**THR.com** Full attorney profiles, coverage of today's Power Lawyers breakfast and a Web-only Q&A with NBC Universal antipiracy guru Rick Cotton at THREsq.com.

**Power Lawyers**

litigation/corporate

his idea for an Americanized version of the Eurovision Song Contest, winning a potentially influential decision allowing early dismissal of reality show lawsuits if the defendant presents good evidence of independent creation.

## Marc Toberoff
**Toberoff & Associates**

Toberoff says Hollywood operates under the incorrect assumption that if a large company controls a successful entertainment franchise, it must have cleared all the rights for future use. "I have proven time and time again that's not always the case," he says. His biggest victory came when he represented the estate of comic book artist Joe Shuster in a battle to terminate Warner Bros.' copyright to Superman. He emerged victorious on that issue, though he lost a separate trial this month over the accounting repercussions of Shuster winning his share. Meanwhile, Toberoff recently filed a $20 million breach of contract suit on behalf of a charitable trust created by "Dukes of Hazzard" creator Gy Waldron over the sequel to the movie. If the case sounds familiar, Warner Bros. paid $14 million to settle a previous case over the first "Dukes" movie after Toberoff won an injunction against its release.

## Howard Weitzman
**Kinsella Weitzman Iser Kump & Aldisert**

After 45 years in practice, Weitzman says he still loves "the challenge of solving problems." And there's plenty out there: Recent representations

**FREE ADVICE**

## Martin Singer
Lavely & Singer



### *How do I keep my sex tape off the Internet?*

Don't make one! But if you must, here are some tips on how to keep it private. The person who records the tape is the copyright owner. So you should be the camera-person and try to own or co-own the copyright because third-party distributors are less likely to touch a sex tape if there is a potential copyright claim. Even if you don't own the copyright, you also can assert claims for violation or your rights of privacy and publicity, both of which can lead to injunctions against distribution. Unless someone is on the tape telling you that the tape will be exploited, the release will violate your expectation of privacy. Plus, your name or image can't be used for commercial purposes without your consent, so you can stop the promotion of the tape if not the release itself. Finally, if you didn't know you were being taped, criminal charges might also be appropriate.

*Singer represents talent in high-stakes litigation against media companies and is currently handling three cases involving celebrity sex tapes.*

include Rande Gerber in litigation involving the Hard Rock Hotel in San Diego; Sharon Osbourne in a case brought against her by a "Rock of Love: Charm School" contestant; and a suit over an HBO Farrah Fawcett documentary. The former Universal exec vp operations also was brought in recently to handle disputes on behalf of the Michael Jackson estate.

**CORPORATE**

›› The big deals haven't disappeared, they've just gotten tougher. And they require even tougher lawyers.

## Daniel Black
**Greenberg Traurig**

Many probably wish Black hadn't done such a good job helping Heidi Montag and Spencer Pratt craft their growing cottage industry, but he treats Speidi Inc. the same as all his corporate clients. Black handles many of Microsoft's Hollywood deals and this year helped concert events powerhouse AEG craft its digital strategy. Next-generation technology has inspired him since an early visit to the World Fair, and the same sense of discovery applies to digital deal-making in an unsettled industry: "Because there's not an existing paradigm you can mirror," he says.

## P. John Burke
**Akin Gump Strauss Hauer & Feld**

"It's kind of our sweet spot," Burke says of his specialty repping the money side of film finance deals. That money isn't flowing like it once was, but Burke is stil handling Dune Capital Management's $600 million, 60-picture production and distribution deal with Fox,

and Dresdner Kleinwort's two $300 million slate financing arrangements for Spyglass Entertainment and Paramount. He also continues to oversee Comerica's $500 million credit facility for Summit Entertainment and Bank of America's $1.2 billion investment in Village Roadshow to co-finance films with Warner Bros.

## Joe Calabrese
**O'Melveny & Myers**

The credit crisis doesn't scare Calabrese. "We've seen this before, and we're prepared for it," he says. Calabrese is fighting back with unique deals, like helping the Digital Cinema Implementation Partners in its $1 billion effort to digitize movie screens across North America. He's also behind the International Olympic Committee's $100 million deal with China Central Television, and he's helping Cineworld Group to double the movie theater chain's number of digital projectors. By the deal's completion, the U.K. company will be able to show 3D films to 40,000 customers at a time.

## Robert Darwell
**Sheppard Mullin Richter & Hampton**

Darwell wanted to be an ambassador to France and even learned the language at the University of Paris. "But there's only two ways to get there," he says. "Either have a lifelong career in civil service, or wind up friends with the president. I have to work on the second one." Instead he has become a go-to lawyer for international film finance and production work on projects like "Milk" and "Che." He broke ground with a negative pickup deal for a video game adaptation and brokered remake rights for "Bienvenue Chez les Ch'tis" to Overbrook Entertainment. *Tres bien!*

## Nancy Derwin-Weiss *new*
**Wildman Harrold**

The Wildman firm is making an aggressive push into Hollywood with talented pickups like Derwin-Weiss, a marketing law specialist and veteran of Paramount's digital division. Along with recently hired colleagues Alan Friel, Carole Handler, Ken Suddleson and Fred Bernstein, Derwin-Weiss is counseling such studio clients as CBS, MGM and Summit on how far they can take their campaigns. "Marketing folks want to push the envelope," she says. "Our job is to say, 'Here are the issues, here are the potential risks, if you want to take the risk you can.'" Next on Derwin-Weiss' plate is Summit's massive push for "Twilight" sequel "New Moon."

## John Frankenheimer
**Loeb & Loeb**

Don't write off the music business just yet. "The financial community is looking more favorably at it," Frankenheimer says. Plus, the major labels are starting to get acquisitive. This year, he repped Imagem Music Group in a $250 million deal to acquire the Rodgers & Hammerstein catalog of musicals and songs, and he finished up Univision's sale of its music recording and publishing business to Universal Music Group for $153 million. Frankenheimer also reps several top acts, including Diana Ross, Vince Gill and Duncan Sheik.

## Josh Grode
**Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor**

The son of an entertainment lawyer (mom Susan has repped "The Simpsons" creator Matt Groening), Grode is carving a niche as a practical deal-closer for complex financings. He repped Union Bank and Comerica in an

# EXHIBIT F

Case 2:10-cv-03633-ODW-RZ    Document 99-2    Filed 10/04/10    Page 81 of 84    Page ID #:8116



INTERNATIONAL WEEKEND EDITION

# The Hollyʼ Reporter.

July 16-18, 2010    $5.99 (U.S.)  $8.99 (Can)    £5.50 (U.K.)  €9.25 (EU)    THR.com™

# POWER LAWYERS

**BEGINS AFTER PAGE 6**

ON THE COVER: NINA SHAW



Bruce Ramer



Michael Donaldson

# POWER LAWYERS 2010

*Don't let the smiles fool you. These are Hollywood's 100 fiercest advocates*

PORTRAITS BY DAN BUST/



Linda Lichter



Martin Singer

THE E-MAILS ARRIVE IN OUR INBOX EVERY COUPLE OF WEEKS.
Someone is desperately — *desperately!* — looking for a great Hollywood lawyer. Maybe it's an author fielding offers to turn her novel into a movie. Or a TV producer upset that a new reality show looks awfully similar to the concept he pitched a year ago. They invariably ask whether the editor of a blog devoted to entertainment law (THREsq.com) can offer a recommendation or two. Well, consider this issue to be one giant "reply all." For The Hollywood Reporter's fourth edition of Power Lawyers, we researched the biggest deals and lawsuits of the year in film, television and music to zero in on the 100 attorneys who are most influencing the entertainment business. Only outside, private prac-tice attorneys are eligible (no in-house studio, network or music-label execs), nor do we include guild or agency lawyers, professors or non-U.S. attorneys. We've broken down the list into specialties (tal-ent, litigation, corporate dealmaking and labor), hopefully creating a comprehensive resource filled only with great Hollywood lawyers. Still can't find one? Please don't shoot us an e-mail.

— *Matthew Belloni*

# Settle That Case!

*Top showbiz mediators explain how to end disputes before they spill into court*



Stanton "Larry" Stein

"I start by asking: What's the endgame? Set their expectations in reality. In entertainment cases, instead of starting out with a mediation session (of both sides together), I have an early session with individuals. I do that to make initial contact with the principals and hopefully build up some capital that I can tap back into. We settle a lot of these cases by putting principals together at the end. When the goal posts get closer, real businesspeople want to end it."

— Daniel Weinstein, JAMS

"In Hollywood, these are not one-off disputes. The parties have either been in business for a long time or they're going to be in business in the future. In one case, the two sides were actually sitting at the table negotiating their next deal while they were resolving the current dispute."

— James Mulholland, Entertainment Mediation Institute

"Can we combine the settlement with some other venture? Like, if it's an actor, let's not just decide how much money to pay him, let's come up with another project that the two sides might want to do together. This is a settlement, but it's also an investment."

— Joel Grossman, JAMS

"There are some huge personalities in Hollywood. If you are familiar with the relationships and the history, you have a far better shot of settling the dispute."

— Diane Wayne, JAMS

"On an employment case between a network and a high-level manager involving allegations of age discrimination, a highly charged issue was whether the manager was 'out of touch' with current tastes. The only way to settle the case was to change the focus of the dispute to more mundane matters. By making it a business dispute rather than a question of competence, we were able to settle."

— Robert Altman, ADR Services

"Why would you want to have 12 total strangers who have no interest being there deciding your fate? A trial is like a mediation, except you have no input in the outcome."

— Enrique Romero, ADR Services

"In a copyright case, a concession of infringement was obtained in the morning, allowing us to focus on debatable damages issues."

— John Zebrowski, ADR Services

senting "Scream" producer Cathy Konrad in a $3 million claim against the Weinstein Co. over whether she was entitled to produce sequels to the franchise. And he's also representing Patty Glaser's law firm in pursuit of $3.3 million from Rod Stewart in unpaid fees for work on at least 19 matters over 20 years.

## Gail Migdal Title
*Katten Muchin Rosenman*
Title was working in the public defender's office when she stumbled upon entertainment law. Her first firm (Rosenfeld, Meyer & Susman) gave her a shot because they liked her courtroom experience. These days, Title is adept at being relentless and paying careful attention to details, especially for her star client, NBC Universal. Last month she won an important appeals court ruling in a case brought by two individuals who claimed they conceived the Syfy hit "Ghost Hunters." She's also recently handled profit participation and copyright claims over "Hercules," "Quincy, M.E." and "The Biggest Loser." "It's amazing that when I started out, I didn't even know what entertainment law was," she says.

## Marc Toberoff
*Toberoff & Associates*
The thorn in Hollywood's side dug in even deeper this year. In addition to representing heirs of the two creators of Superman in thus-far successful attempts to wrestle back key rights, Toberoff took aim at Marvel Entertainment on behalf of the estate of comics icon Jack Kirby, trying to

terminate copyrights and gain control to such creations as "Spider-Man" and "X-Men." Toberoff estimates that the Kirby characters represent 80% of Disney-owned Marvel's revenues. In May, Warner Bros. lobbed a bombshell complaint against Toberoff personally for pursuing a "scheme" that interfered with its contracts over "Superman." Toberoff promises revenge. "After we get rid of the frivolous tortious interference claims, I am going to go personally after Warner Bros. and the individuals involved, including (litigator and fellow Power Lawyer) Dan Petrocelli, and file a malicious prosecution lawsuit," he says. "I'll knock this out even if it takes me 10 years."

## Howard Weitzman
*Kinsella Weitzman Iser Kump & Aldisert*
Weitzman has a knack for getting involved in some wacky disputes, from representing Sharon Osbourne in court to dealing with the fallout from a Farrah Fawcett documentary. This year got even weirder (and more rewarding) when Weitzman became counsel for the Michael Jackson estate. It's his job to respond to all sorts of unusual claims, from the attempts by the late singer's mother to challenge the executors of the estate to the range of demands from creditors. Not a week goes by, he says, where someone isn't claiming to be Jackson's long-lost wife or child. One woman even filed a petition to adopt Jackson's real children. "It's amazing what these people think they can get away with," he says.