# EXHIBIT A

6 of 11 DOCUMENTS

View U.S. District Court Opinion

View Original Source Image of This Document

CLARE MILNE, an individual, by and through MICHAEL JOSEPH COYNE, her RECEIVER, and DISNEY ENTERPRISES, INC. vs. STEPHEN SLESINGER, INC.. STEPHEN SLESINGER, INC. vs. DISNEY ENTERPRISES, INC.; THE WALT DISNEY COMPANY; and WALT DISNEY PRODUCTIONS

MILNE v. STEPHEN SLESINGER, INC.

Case No. 2:02-cv-08508-FMC-PLAx

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

*2002 U.S. Dist. Ct. Motions 560675; 2009 U.S. Dist. Ct. Motions LEXIS 49109*

July 6, 2009

Motion for Summary Judgment

**VIEW OTHER AVAILABLE CONTENT RELATED TO THIS DOCUMENT: U.S. District Court:** Motion(s)

**COUNSEL:** [*1] DANIEL M. PETROCELLI (S.B. #97802), ALAN RADER (S.B. #45789), JUSTIN M. GOLDSTEIN (S.B. #198858), O'MELVENY & MYERS LLP, Los Angeles, CA, Attorneys for Counter-Defendants, DISNEY ENTERPRISES, INC., THE WALT DISNEY COMPANY, AND WALT DISNEY PRODUCTIONS.

**JUDGES:** The Hon. Florence-Marie Cooper

**TITLE: Disney's Notice of Motion and Motion for Summary Judgment on SSI's Counterclaims, or in the Alternative, for Summary Adjudication**

**TEXT:** TO COUNTER-CLAIMANT AND ITS COUNSEL OF RECORD:

2002 U.S. Dist. Ct. Motions 560675; 2009 U.S. Dist. Ct. Motions LEXIS 49109, *

PLEASE TAKE NOTICE that on August 24, 2009 at 10:00 a.m., or as soon thereafter as counsel may be heard by the above-entitled court, located at 255 East Temple Street, Los Angeles, California in Courtroom 750, Counter-Defendants Disney Enterprises, Inc., The Walt Disney Company, and Walt Disney Productions (collectively, "Disney") will and hereby do move for an order pursuant to Federal Rule of Civil Procedure 56 for summary judgment, or in the alternative, for summary adjudication, of Counter-Claimant Stephen Slesinger, Inc.'s ("SSI") remaining counterclaims. n1

> n1 On May 19, 2009, this Court dismissed with prejudice SSI's Fourth Counter-claim (Breach of Contract), Fifth Counterclaim (Breach of Implied Covenant of Good Faith and Fair Dealing), Sixth Counterclaim (Fraud), and Seventh Counterclaim (Declaratory Relief re: 1983 Agreement). On March 7, 2007, this Court dismissed as moot SSI's Eighth Counterclaim (Declaratory Relief re: Invalidity of Hunt Termination Notice), Ninth Counterclaim (Declaratory Relief re: Invalidity of Reversion Agreement), and Eleventh Counterclaim (Declaratory Relief re: Limited Scope of Hunt Notice).

[*2]

Summary judgment is warranted on the grounds that those remaining counterclaims fail to establish a claim for relief, are barred by collateral estoppel, and should be dismissed to prevent a "fraud on the court." Summary adjudication is separately warranted for the same reasons as to SSI's First Counterclaim (Copyright Infringement), Second Counterclaim (Trademark Infringement), Third Counterclaim (Trade Dress Infringement), Tenth Counterclaim (Injunctive Relief), and Twelfth Counterclaim (Unfair Competition).

This Motion is made pursuant to: (1) this Court's May 19, 2009 order authorizing the parties to "file a new Motion for Summary Judgment" and (2) this Court's June 11, 2009 order extending the briefing schedule on the parties' motions.

This Motion is made following the conference of counsel pursuant to Central District Local Rule 7-3, which took place on June 8, 2009.

This Motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities, Declaration of Cassandra Seto, Declaration of Steven A. Plotkin, and Statement of Uncontroverted Facts and Conclusions of Law; all exhibits, files, and records on file in this action, matters of which [*3] judicial notice may be taken, and such additional submissions and argument as may be presented at or before the hearing on this motion.

Dated: July 7, 2009

Respectfully submitted,

O'MELVENY & MYERS LLP

2002 U.S. Dist. Ct. Motions 560675; 2009 U.S. Dist. Ct. Motions LEXIS 49109, *

By: /s/ Daniel M. Petrocelli
Daniel M. Petrocelli

Attorneys for Counter-Defendants

**DISNEY'S MOTION FOR SUMMARY JUDGMENT ON SSI'S COUNTERCLAIMS, OR IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION**

## I. INTRODUCTION.

For 13 years, SSI argued in state court that the parties' 1983 Agreement assigned to Disney all the merchandising and other rights to the Winnie the Pooh characters SSI had obtained from A.A. Milne and sought royalties based on that assertion. In 2004, SSI's misconduct in pursuing those claims resulted in the termination of its state court action. SSI then re-filed in this Court the same claims for royalties on Disney's uses of the Pooh characters-but also filed infringement claims on the antithetical premise that it had not authorized Disney to engage in those uses. The Court's May 19, 2009 Order dismissed with prejudice SSI's re-filed claims. That Order also invited Disney to renew the portion of its original summary judgment motion [*4] addressing SSI's infringement claims.

There are three independently sufficient reasons to grant summary judgment on those claims. First, the plain language of the 1983 Agreement, as underscored by SSI's conduct and admissions, establishes that SSI assigned to Disney whatever rights it received from Milne, and that there is no basis for a claim by SSI that Disney was not authorized to make full use of those rights. Second, the equitable doctrines of judicial estoppel and quasi estoppel require that SSI not be permitted to contradict in this Court its admissions in state court that it assigned to Disney all of the rights it obtained from Milne and authorized Disney's use of those rights. Third, SSI's infringement counterclaims are as irrevocably tainted by its misconduct in state court as were the contract and fraud counterclaims the Court recently dismissed. As a result, the collateral estoppel effect of the state court's findings also requires dismissal.

SSI's infringement claims are not just groundless; they are impossible. For nearly 50 years, SSI acknowledged that Disney was authorized-indeed, compelled-to zealously exploit the rights to the Pooh characters that SSI had received [*5] from Milne. It authorized Disney by signing two contracts, first in 1961 and again in 1983, pursuant to which SSI transferred all of its rights in exchange for royalty payments. It watched for decades as Disney transformed Pooh into a worldwide phenomenon while continuously accepting royalty payments from Disney-approximately $ 130 million to date. SSI never before asserted that Disney was without authority to exploit rights to Pooh. To the contrary, before this action, SSI consistently and without exception maintained that the 1961 and 1983 Agreements conveyed to Disney *all* of SSI's rights, authorized Disney to make use of those rights, and obligated Disney to pay royalties on all uses. It demanded royalty payments under the 1983

Agreement, asserting that it granted to Disney all of its rights, encompassing *every* actual and possible form of commercial exploitation by Disney, in *every* medium-an unequivocal and undeniable acknowledgment that those uses are authorized. No claim of infringement is possible in these circumstances.

## II. SSI'S INFRINGEMENT CLAIMS SHOULD BE DISMISSED.

There are several reasons why SSI does not have standing to bring an infringement [*6] action. An infringement plaintiff must demonstrate its "ownership of the allegedly infringed material" at the time of the alleged infringement. *A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1013 (9th Cir. 2001).* By the plain language of the parties' agreements, SSI "assigns" to Disney ownership of all of SSI's intellectual property rights to the Winnie the Pooh works and characters ("Pooh Rights"). Thus, SSI has no ownership interest in the Pooh Rights. That fact alone requires dismissal of SSI's infringement claims.

Moreover, SSI's course of conduct under the 1961 and 1983 Agreements establishes beyond doubt that SSI authorized every use of the Pooh characters that it now labels infringement. But an infringement claim only lies if the allegedly infringing conduct was unauthorized-*i.e.*, the defendant's use of the intellectual property was without consent. *See 15 U.S.C. § 1114*(1) (Lanham Act trademark infringement claim requires that defendant's use be "without consent"); *Los Angeles News Serv. v. Tullo, 973 F.2d 791, 800-01 (9th Cir. 1992)* (copyright infringement claim requires that defendant's use be "without [*7] [plaintiff's] consent."). That Disney was assigned all of the Pooh Rights and authorized to make full use of them is expressed in the parties' agreements and confirmed by SSI's binding and sworn statements in state court. Indeed, that was the governing premise of SSI's state court action for royalties on every Disney use of the Pooh characters.

### A. The Plain Language of the 1983 Agreement Establishes that SSI Assigned to Disney All of Its Interest in the Pooh Rights.

"Summary judgment is appropriate when the contract terms are clear and unambiguous, even if the parties disagree as to their meaning." *United States v. King Features Entm't, Inc., 843 F.2d 394, 398 (9th Cir. 1988).* The terms of the parties' 1983 Agreement are clear and unambiguous, and establish that whatever rights SSI obtained from Milne, it assigned to Disney. In 1930, A.A. Milne granted to Stephen Slesinger certain radio, television, and merchandising rights to the Pooh characters in the United States and Canada. After Slesinger's death, his company SSI assigned all of the Pooh Rights to Disney through a 1961 Agreement in return for a modest initial payment and a promise to make royalty [*8] payments. (Ex. 1.) n1

n1 As instructed in the Court's May 19, 2009 Order, Disney has not re-submitted any exhibits submitted with its earlier Motion for Summary Disposition, and therefore refers to them by their original designation (unless otherwise specified).

2002 U.S. Dist. Ct. Motions 560675; 2009 U.S. Dist. Ct. Motions LEXIS 49109, *

Specifically, paragraph 4 of the 1961 Agreement "assigns, grants, and sets over unto" Disney the radio and television rights SSI obtained from Milne, including the right "to project, exhibit and broadcast visually and audibly . . . by any process now known or hereaf[ter] devised analogous thereto." (*Ex. 1 P 4.*) In paragraph 5, SSI "assigns, grants, and sets over unto" Disney "all of the further rights in and to said 'work' which are set forth in Paragraph 3," subject to certain licenses with third parties (which are not at issue). (*Id. P 5.*) n2

n2 Throughout its litigation with Disney, SSI has advanced very broad royalty claims on the theory that the rights it transferred to Disney were all-encompassing. Disney defended on the basis that SSI's rights were narrow, and that much of the total body of Pooh-related rights had come to Disney from Milne. The parties' past disagreement is immaterial, since SSI's contract claims have been dismissed with prejudice. On this Motion, what is relevant is that whatever the scope of SSI's rights, they were conveyed to Disney in their entirety.

[*9]

That the 1961 Agreement assigned to Disney all of SSI's Pooh Rights is beyond dispute. The first recital in the parties' 1983 Agreement states that SSI "assigned those rights it had acquired from A.A. Milne to Disney by . . . the '1961 Agreement.'" (Ex. 2 at 1.) As a matter of law, "facts recited in a written instrument are conclusively presumed to be true as between the parties." CAL. EVID. CODE § 622. n3 Additionally, SSI attested in a verified interrogatory response in state court that: "Slesinger . . . licens[ed] to Disney in 1961 *all of the rights, including all 'further rights' which Slesinger held*, including rights to future means of commercial exploitation which might become viable in the future." (Ex. 23 at 5:28-6:3 (emphasis added).)

n3 Federal Rule of Evidence 302 makes this presumption applicable in this action, and federal law is to the same effect. *See, e.g., City of Chicago v. Joseph, 95 F.2d 444, 446 (7th Cir. 1938)* (recital in contract creates an estoppel); *Jackson v. Iris.com, 524 F. Supp. 2d 742, 749 (E.D. Va. 2007).*

[*10]

Nothing changed in 1983, when the parties revoked the 1961 Agreement and simultaneously entered into a re-transfer of all the same rights. As the Ninth Circuit explained, the 1983 Agreement "provided for the revocation of the 1930 and 1961 agreements in favor of the new agreement, followed by the re-granting . . . of the rights" from Milne to SSI and then from SSI to Disney. *Milne ex rel. Coyne v. Stephen Slesinger, Inc., 430 F.3d 1036, 1040 (9th Cir. 2005).* The parties ensured that the re-grant mirrored the 1961 Agreement by using the identical form and terminology. n4 For example, paragraph 7 of the 1983 Agreement-like paragraph 4 of the 1961 Agreement-"*assigns, grants, and sets over* unto Disney the sole and exclusive right in the United States and Canada to project, exhibit and broadcast

2002 U.S. Dist. Ct. Motions 560675; 2009 U.S. Dist. Ct. Motions LEXIS 49109, *

visually and audibly" by television, radio, "or by any process now known or hereafter de-vised analogous thereto." (*Ex. 2 P 7* (emphasis added); *Ex. 1 P 4.*) Paragraph 8 of the 1983 Agreement-like paragraph 5 of the 1961 Agreement-"*assigns, grants, and sets over* unto Disney *all of the further rights*" of SSI to the Pooh characters. n5 (*Ex. 2 P 8* [*11]  (empha-sis added); *Ex. 1 P 5.*) n6

n4 A side-by-side comparison of the key provisions of the 1961 and 1983 Agree-ments readily demonstrates that no change was intended. For the Court's convenience, Exhibit A to the Declaration of Cassandra Seto is a chart displaying the operative sec-tions of the two agreements. The parallel between these two agreements evidences that the parties intended both to have the same effect. *See* 2 RESTATEMENT OF CONTRACTS (SECOND) § 2.14(c) (1979) ("Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to estab-lish . . . the meaning of the writing, whether or not integrated.").

n5 Paragraph 8 contains a typographical error. In referring to SSI's "further rights," it incorrectly references Paragraph 6 instead of Paragraph 5 as the location of those "further rights." This error was corrected in an April 1, 1983 side letter. (Ex. 3.)

n6 Although not at issue, the 1961 Agreement authorized SSI to make short-term non-exclusive grants of certain rights to third parties. (*See Ex. 1 P 8* ("the seller may continue to enter into and to extend license agreements for periods of not more than two years, in the same manner as heretofore.").) There is no parallel provision in the 1983 Agreement. (*See* Ex. 2.)

[*12]

Under the plain meaning rule, the word "all" in the 1983 Agreement means "all." In *Yount v. Acuff Rose-Opryland, 103 F.3d 830, 836 (9th Cir. 1996),* the Ninth Circuit consid-ered an agreement by which songwriter Yount "assigned 'all' of his rights, title, and interest in the song." *Id.* The court held that "[t]hose terms, if read in their 'ordinary and popular sense,' would encompass *all* of Yount's royalty rights." *Id.* (original emphasis).

**B. The 1983 Agreement Was an Assignment, Not a License**.

In regard only to its trademark infringement claim, and notwithstanding the unambigu-ous meaning of "all further rights" and "assigns, grants, and sets over," SSI makes the fall-back argument that even if Disney was authorized to use Pooh trademarks under the 1983 Agreement, that authorization was through a mere license rather than an assignment of own-ership, requiring the Court to order the United States Patent and Trademark Office to trans-fer ownership of all Pooh trademarks registered in Disney's name to SSI. (*Ex. 12 P 137.*) But SSI's characterization of the 1983 Agreement as a license is directly refuted by para-graphs 7 and 8, which "assign"  [*13]  all the Pooh Rights to Disney. (Ex. 2 PP 7-8.) More-over, as "a transfer by the assignor of all rights in the property assigned to the assignee . . . [which] effects an absolute and irrevocable transfer of ownership," the 1983 Agreement

2002 U.S. Dist. Ct. Motions 560675; 2009 U.S. Dist. Ct. Motions LEXIS 49109, *

constitutes an assignment for that reason as well. *Artoc Bank & Trust, Ltd. v. Apex Oil Co.,* *975 F.2d 1365, 1369 (8th Cir. 1992).*

Indeed, the 1983 Agreement manifests an assignment by every criterion that courts employ to distinguish between assignments and licenses:

. The 1983 Agreement twice uses the term "assign." (Ex. 2 PP 7-8.) The word "license" never appears.

. The 1983 Agreement has two transfers, first from Milne to SSI (*Ex. 2 P 4),* and second from SSI to Disney. (*Id. PP 7-8.)* Both transfers use the same language. SSI nonetheless contends that while the transfer from Milne to SSI was an assignment, the exact same language did not result in an assignment from SSI to Disney. (*Ex. 12 P 69.)* That is not remotely plausible.

. The 1983 Agreement replaced the 1961 Agreement. *See Milne, 430 F.3d at* *1040.* In the 1983 Agreement, the parties refer to the 1961 [*14]  Agreement as an assignment-"Slesinger assigned those rights it had acquired." (Ex. 2 at 1.) There is nothing to suggest the parties intended to replace the assignment with a license. In fact, the 1961 Agreement refers to SSI as "*seller*" and Disney as "*purchaser.*" (Ex. 1 at 1 (emphasis added).)

. Paragraph 11 of the 1983 Agreement refers to SSI's right to "reacquire" the rights granted to Disney. (*Ex. 2 P 11.)* The language of reacquisition denotes an assignment, not a license. *See, e.g., Graham v .Comm'r, 26 T.C. 730, 735, 740* *(T.C. 1956)* (transfer of patent rights was an assignment even though contract provided for reversion of "ownership [in] the event of termination" before expiration).

Finally, the 1983 Agreement contains none of the provisions traditional to the trademark *license* SSI claims the parties intended. There is no provision for continuing quality control. *See Edwin K. Williams & Co. v. Edwin K. Williams & Co.-E., 377 F. Supp. 418, 424 (C.D.* *Cal. 1974).* There is no provision defining what rights SSI retained or resolving potential conflicts that might arise between the parties' rights. *See ICEE Distribs., Inc. v. J&J Snack* *Foods Corp., 325 F.3d 586, 598-99 (5th Cir. 2003).* [*15]  *Contra Multimin USA, Inc. v.* *Walco Int'l, Inc., 2007 WL 1686511,* at *3 (N.D. Tex. Jun. 8, 2007). There is no provision prohibiting Disney from assigning its rights. *See, e.g.*, 3 ROGER M. MILGRAM, MILGRAM ON LICENSING § 28.22 (2007) (to effectively restrict licensee's use of trademark, license agreement should contain no-assignment clause). There is no provision restricting the registration of trademarks by Disney. *Cf.* 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS § 18.64 (2008).

2002 U.S. Dist. Ct. Motions 560675; 2009 U.S. Dist. Ct. Motions LEXIS 49109, *

### C. SSI's Conduct and Binding Admissions for Nearly 50 Years Underscores the Plain Language of the 1983 Agreement and Dispositively Contradicts SSI's Current Position.

At no point since 1961 did SSI ever contest or question Disney's exercise of rights that SSI now says Disney does not have. To the contrary, SSI has consistently sought to enforce the 1983 Agreement on a clear and singular basis-that SSI obtained a broad grant of rights from Milne and, in turn, granted those rights to Disney. It was only after SSI was foreclosed from succeeding on such a claim that it reversed course and pursued an impossibly inconsistent set of allegations-that [*16] it had not, after all, assigned to Disney those very same rights. (Ex. 12 PP 118, 120, 132.)

One of the most powerful canons of contract interpretation prevents SSI's attempt to re-write its own history in this fashion. The "acts and conduct of the parties . . . is entitled to great weight . . . . The conduct of the parties . . . affords the most reliable evidence of the parties' intentions." *Employers Reins. Co. v. Super. Ct., 161 Cal. App. 4th 906, 921 (2008)* (internal citation omitted); *see also Universal Sales Corp. v. Cal. Press Mfg. Co., 20 Cal. 2d 751, 761-62 (1942).*

### 1. SSI Did Not Challenge Disney's Public Assertions of Ownership of the Pooh Trademarks and Copyrights.

During the period between the execution of the 1983 Agreement and SSI's first assertion of an ownership interest in 2006, Disney registered at least 15 trademarks based on the Pooh works in the United States. (Declaration of Steven A. Plotkin P 3, Ex. A.) SSI was on constructive notice of Disney's claim of ownership to each such trademark: "Registration of a mark on the principal register provided by this chapter . . . shall be constructive notice of the registrant's claim [*17] of ownership thereof." *15 U.S.C. § 1072; see also Dep't of Parks & Rec. for State of Cal. v. Bazaar Del Mundo Inc., 448 F.3d 1118, 1131 (9th Cir. 2006)* ("under *15 U.S.C. § 1072* registration serves as constructive notice of the registrant's claim to ownership"). SSI never objected to Disney's applications for trademark registrations until after its state court action had been dismissed. (Plotkin Decl. P 4.) Then, in a transparent attempt to lend credence to the infringement claims it filed in this Court, one month later SSI initiated a trademark cancellation proceeding before the Patent and Trademark Office against all of Disney's Pooh trademark registrations-the first such challenge it had ever made. (Seto Decl. P 3, Ex. B.)

Copyright registration also serves as constructive notice of a claim to ownership. *John-son v. Jones, 149 F.3d 494, 505 (6th Cir. 1998)* ("Constructive notice of a valid copyright is presumed upon registration."). In 2004 alone, the year SSI's state action was dismissed, Disney registered copyrights in 45 works featuring the Pooh characters, and renewed copyright registrations for [*18] an additional 14 such works, in the United States Copyright Office. (Seto Decl. P 4, Exs. C, D.) However, despite engaging in "litigation misconduct run riot" against Disney, *Stephen Slesinger, Inc. v. Walt Disney Co., 155 Cal. App. 4th 736, 741 (2007),* SSI never filed a copyright infringement action regarding Disney's use of the Pooh

2002 U.S. Dist. Ct. Motions 560675; 2009 U.S. Dist. Ct. Motions LEXIS 49109, *

Rights. Nor did SSI object to Disney's public assertions of its ownership rights in federal court infringement actions against third parties making unauthorized uses of the Pooh characters. In 2004 alone, Disney filed seven copyright and trademark infringement actions just in the Central District of California against defendants making unauthorized use of the Pooh characters. (Seto Decl. P 5, Ex. E (judgments on four of those actions were obtained in 2005).)

SSI's acceptance without objection of Disney's continuous, public assertion of ownership of the Pooh Rights cannot be reconciled with SSI's new allegation-after its state court action had been dismissed-that Disney has for decades been engaged in notorious infringement. The reason SSI never objected is that it recognized that it transferred all of its rights to Disney. In fact, SSI's [*19] state court claims were grounded on SSI's acknowledgement of that fact, as it claimed royalties on every actual or possible use by Disney of the Pooh characters.

**2. SSI's Conduct-and Admissions-in State Court Foreclose Its Claims of Infringement Here**.

SSI's entire goal in state court was to maximize its royalties under the 1983 Agreement. As a result, throughout that litigation SSI embraced the Agreement's explicit expression of a complete transfer of SSI's Pooh Rights to Disney, originally in 1961 and again in 1983. The "FACTS" section of SSI's state court complaint methodically traces the Pooh Rights' chain of title: (1) Milne executed a "written grant" to SSI in the 1930s (*Ex. 6 P 3);* (2) SSI "granted to Disney" those rights in 1961 (*id. P 5);* (3) by the 1983 Agreement, the parties "revoked" the 1930 and 1961 agreements (*id. P 7);* and (4) simultaneously, "the Milne Trust made a new 1983 grant of the Pooh Rights to Slesinger . . . and . . . Slesinger made a new grant *of those rights* to Disney." (*Id*. (emphasis added).)

In another state court pleading, SSI again confirmed that the wholesale transfer of Pooh Rights to Disney [*20] effected by the 1961 Agreement (as recounted in the binding recital in the 1983 Agreement) recurred in 1983: "SSI entered into an agreement with Disney . . . which incorporated the material terms of the 1961 Agreement between Slesinger and Disney, superseded that former agreement, and *perpetuated the relationship beyond 1983*." (Ex. 21 at 5:2-7 (emphasis added).) SSI's multiple acknowledgements that the 1961 and 1983 Agreements were an unbroken transfer of rights from Milne to SSI to Disney deserve substantial weight in the Court's consideration of summary disposition. "Pleadings in a prior case may be used as *evidentiary admissions*." *Williams v. Union Carbide Corp., 790 F.2d 552, 556 (6th Cir. 1986)* (emphasis added).

SSI made additional admissions in state court, including statements under oath, that utterly negate its last-minute infringement claims. While SSI now asserts that the 1983 Agreement reserved to it certain uses of the Pooh characters, in support of its state court claim for greater royalties, SSI took the opposite position, alleging it was entitled to royalties from Disney because it had "turned over its valuable rights to Disney . . . in exchange [*21] for a share of the receipts from exploitation of the Pooh Characters." (*Ex. 6 P 8;* Ex. 14 at 5:23-24 ("SSI regranted, licensed and assigned *all . . . acquired rights* to Disney.")

(emphasis added).) If, as SSI now contends, Disney's uses were without permission, (Ex. 12 PP 118, 120, 132), SSI would not have filed in 1991 a breach of contract action for non-payment of royalties, but rather the same infringement action it now wrongly pursues. SSI did not claim infringement before-and cannot now-because inherent in its state court contention that the 1983 Agreement required Disney to pay royalties on every use of the Pooh Rights is an inescapable acknowledgement that Disney was authorized to engage in those uses.

That the 1983 Agreement assigned to Disney every use of the Pooh Rights, and that SSI knew and admitted it, is demonstrated by the 100% match between the uses SSI now identifies as unauthorized and thus infringing and the uses it claimed in state court were royalty-bearing and thus authorized. Paragraph 132 of SSI's counterclaim lists 15 types of supposedly infringing uses (termed "mediums" by SSI), including such items as "Internet use," "advertising uses," [*22] and "Internet computer games." (*Ex. 12 P 132.*) In state court, SSI asserted a right to royalties for every one of those same "mediums" under the 1983 Agreement, thereby acknowledging Disney's right to use every one under that Agreement.

SSI made that acknowledgement in state court in both pleadings and sworn interrogatory responses. SSI's complaint alone had an exhaustive list, alleging that the "1983 Agreement requires Disney to pay Slesinger royalties" on: (1) "video cassettes, DVDs and other similar devices," (2) "revenue of [Disney's] licensees from exploitation of the Pooh Characters," (3) "any and all 'commercialization' of the Pooh Characters, which includes any and all forms of commercial exploitation of such characters," (4) "sale or other exploitation of computer software or similar products," (5) "exploitation of Pooh Characters on the internet," (6) "exploitation of items, things and services involving Pooh Characters, regardless of whether such exploitation employs some form of new technology," and (7) "all sales of Pooh Merchandise by Disney or its affiliates." (*Ex. 6 P 11.*)

This list alone covers every infringing use identified in SSI's [*23] counterclaims. For example, the first item SSI names in its counterclaims is "Internet use." (*Ex. 12 P 132.*) But as noted above, SSI's state court complaint identified the internet as a medium Disney was authorized to use and, it argued, should be royalty-bearing. Furthermore, in 1999 SSI's president, Shirley Slesinger Lasswell-who executed the 1983 Agreement on SSI's behalf-swore under oath in an interrogatory response that "SSI *granted Disney rights* which were necessary for Disney to exploit Winnie the Pooh through the use of the internet." (Ex. 57 at 17:22-24 (emphasis added).) In other interrogatory responses, SSI identified "internet uses" as a medium "Disney and its licensees are utilizing or have utilized" and for which SSI sought royalties. (*See* Seto Decl. P 6, Ex. F at 13:23.) n7

n7 Paragraph 132 also lists "advertising uses" as an infringing medium. (*Ex. 12 P 132.*) However, in support of its state court summary adjudication motion, SSI expressly recognized that it had authorized Disney to exploit advertising uses. SSI argued that it had obtained from Milne the rights to "*advertise* Winnie the Pooh . . . in

Case 2:10-cv-03633-ODW-RZ    Document 100-2    Filed 10/04/10    Page 12 of 39    Page ID #:8154

Page 11

2002 U.S. Dist. Ct. Motions 560675; 2009 U.S. Dist. Ct. Motions LEXIS 49109, *

all media. The 1983 Agreement . . . *granted those rights to Disney*." (Ex. 59 at 8:16-21 (emphases added).)

[*24]

SSI's sworn interrogatory responses bring every conceivable use of the Pooh characters into the ambit of authorized uses. Disney asked SSI to identify "all 'uses' of the POOH CHARACTERS which YOU contend are royalty-generating pursuant to the 1983 Agreement." (Seto Decl. P 6, Ex. F at 4:13-14.) SSI's response, again verified under oath by Ms. Lasswell, is encyclopedic. SSI first references the statement in paragraph 10(a) of the 1983 Agreement that "[i]n consideration of the grant [of rights to the Pooh characters]," Disney agrees to pay certain royalties. (*Id.* at 6:16-26; *see also Ex. 2 P 10*(a).) SSI then asserts its claim to those royalties "in connection with any type of use of any or all of the Pooh Characters, now known or later discovered, from which Disney receives a benefit, both monetary and non-monetary, other than those uses which are explicitly excluded pursuant to the 1983 Agreement." (Seto Decl. P 6, Ex. F at 6:22-26 (original emphasis).) Finally, SSI provides eight densely-packed pages listing hundreds of individual uses within 23 general categories, starting with "[a]ll merchandise uses and consumer and trade products," and ending with [*25] "[a]ny other commercializations or commercial exploitations of the Pooh Characters." (*Id. at 7:*6-14:11.)

That last category-"other . . . commercial exploitations"-has special import in light of SSI's argument in opposition to Disney's prior motion for summary disposition that the "further rights" referenced in paragraph 8 of the 1983 Agreement are "more circumscribed than Disney claims." (Opp. to MSD at 26:18-21.) In the state court action, Disney served an interrogatory asking SSI to identify "the 'further rights'" Disney received "pursuant to paragraph 8 of the 1983 Agreement." (Seto Decl. P 6, Ex. F at 305:18-20.) SSI admitted under oath that the reference to "further rights" in the Agreement was all-encompassing: "the grant of all 'further rights' in and to the Pooh Characters . . . is a *catch-all* designed to ensure that Slesinger was granting . . . all of the additional *commercial exploitation rights Slesinger acquired that are not specifically mentioned in the 1983 Agreement*." (*Id.* at 306:22-26 (emphases added).)

Finally, in another sworn response, SSI effectively acknowledged that every "medium" SSI now claims as infringing in its counterclaims [*26] (or may later claim in opposition to this Motion) is within the scope of Disney's authorization to use the Pooh Rights: "Any use of the Pooh Characters for which Disney receives a benefit, monetary or non-monetary, is a commercial use." (Seto Decl. P 6, Ex. F at 164:25-26.) That statement, and SSI's other sworn statements, are party-admissions under Federal Rule of Evidence Rule 801(d)(2) and may form the basis for a grant of summary judgment. *Ayuso-Figueroa v. Rivera-Gonzalez, 456 F. Supp. 2d 309, 315 (D.P.R. 2005).* Moreover, as the Supreme Court long ago recognized, when "a pleading in an action at law is sworn to by the party, it is competent evidence against him in another suit as a solemn admission by him of the truth of the facts stated." *Pope v. Allis, 115 U.S. 363, 370 (1885).*

2002 U.S. Dist. Ct. Motions 560675; 2009 U.S. Dist. Ct. Motions LEXIS 49109, *

### III. SSI IS ESTOPPED FROM REVERSING ITS POSITION CONCERNING DISNEY'S AUTHORITY TO USE THE POOH RIGHTS.

The equitable doctrines of judicial estoppel and quasi estoppel provide separate and independent grounds to grant summary judgment in Disney's favor. Under these doctrines, the Court has authority both to "protect against a litigant playing fast and loose [*27] with the courts," and to dismiss a party's claim whenever the "conscience of the court is repelled by [an] inconsistency." *Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778, 782 (9th Cir. 2001)* (internal citation omitted); *In re Guterl Special Steel Corp., 316 B.R. 843, 856 (Bankr. W.D. Pa. 2004)* (internal citation omitted). Here, SSI's total contradiction of its sworn positions during 13 years of state court litigation is not just an "inconsistency"-it is an intolerable reversal.

### A. The Court Should Invoke Judicial Estoppel to Prevent SSI from Now Claiming Disney's Uses Are Unauthorized.

Throughout the state court action, SSI argued that Disney was authorized to make all conceivable uses of the Pooh Rights in order to obtain various litigation advantages: broad discovery rights and favorable rulings from the discovery referee and the court; substantive victories; and requiring Disney to endure prolonged and expensive litigation. In successfully defending against Disney's summary adjudication motion, SSI told the state court that "Slesinger was granted all rights to any sound, word and/or picture representation" and that "Slesinger [*28] assigned these rights to Disney." (Ex. 54 at 17:8-10.) SSI also filed a cross-motion for summary adjudication in which it again affirmed that it had "granted" rights to Disney. (Ex. 59 at 8:20-21.) n8

> n8 Other examples abound of SSI's successes based on its asserted grant of all its rights to Disney and its concomitant claim of expansive royalty obligations. *See, e.g.*, Ex. 56 (denying Disney's Cross-Motion for Summary Judgment re: Videocassettes); Ex. 19 (granting SSI's request that Disney make supplemental productions); Ex. 35 (granting SSI's request that Disney respond to interrogatories); Ex. 68 (granting SSI's Motion to Compel); Ex. 77 (granting in part SSI's Motion to Compel); Ex. 83 (granting SSI's Motion to Compel Privilege Log); Ex. 81 (granting SSI's motion regarding enumerated special interrogatories); Ex. 82 (granting in part two motions to compel by SSI).

Irrespective of any advantages obtained by SSI, in the Ninth Circuit judicial estoppel may be invoked by the Court "not only to prevent a party [*29] from gaining an advantage by taking inconsistent positions, but also because of general considerations of the orderly administration of justice and regard for the dignity of judicial proceedings, and to protect against a litigant playing fast and loose with the courts." *Hamilton, 270 F.3d at 782-83* (internal citation omitted). That is because "judicial estoppel forbids use of intentional self-

Case 2:10-cv-03633-ODW-RZ    Document 100-2    Filed 10/04/10    Page 14 of 39    Page ID #:8156

Page 13

2002 U.S. Dist. Ct. Motions 560675; 2009 U.S. Dist. Ct. Motions LEXIS 49109, *

contradiction as a means of obtaining unfair advantage." *Id. at 783* (internal citation omitted); *see also United States v. Ibrahim, 522 F.3d 1003, 1009 (9th Cir. 2008)* ("judicial estoppel 'seeks to prevent the *deliberate* manipulation of the courts.'") (emphasis added) (internal citation omitted).

SSI should be judicially estopped from contradicting its admissions in state court that it transferred all of its Pooh Rights to Disney and that all of Disney's uses of those rights were authorized. SSI's current infringement claims constitute the "intentional self-contradiction" the judicial estoppel doctrine forbids. *Hamilton, 270 F.3d at 783.* Holding SSI to the position it pursued for 13 years of hotly-contested state court litigation [*30] is the only fair and just result. Judicial estoppel is properly invoked to protect the "orderly administration of justice and regard for the dignity of judicial proceedings." *Id. at 782.* "Courts uniformly recognize that the purpose of the judicial estoppel doctrine is to protect the integrity of the judicial process by prohibiting parties from changing positions as circumstances warrant." *Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc., 568 F. Supp. 2d 1152, 1160 (C.D. Cal. 2008).*

Application of the doctrine is particularly appropriate because SSI seeks to repudiate positions taken in prior litigation. "Inconsistent positions in different suits are much harder to justify" than inconsistent positions within the same suit. *Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp., 910 F.2d 1540, 1548 (7th Cir. 1990).* That is because a party "envisaging a succession of suits in which a change in position would be advantageous would have an incentive to falsify the evidence in one of the cases, since it would be difficult otherwise to maintain inconsistent positions." *Carnegie v. Household Int'l, Inc., 376 F.3d 656, 660 (7th Cir. 2004).* [*31] "In other words, 'the purpose of the doctrine . . . is to reduce fraud in the legal process by forcing a modicum of consistency on a repeating litigant.'" *Id.* (citations omitted).

### B. The Court Should Also Invoke the Doctrine of Quasi Estoppel to Prevent SSI from Claiming Disney's Uses Are Unauthorized.

Disney has spent a half-century investing its creativity and resources in developing the Pooh characters into one of the best-recognized and most valuable properties in the world. Disney did so because it rightly believed that it had the contractual right to exploit the Pooh characters-first under its separate 1961 Agreements with SSI and with Milne, and then under its 1983 Agreement with SSI-rights that SSI had never previously contested. SSI's multiple admissions in state court only reinforced Disney's reliance on the clear language of those Agreements. Thanks to Disney's efforts, SSI reaped financial rewards unimaginable in 1930 when Stephen Slesinger paid A.A. Milne $ 1,000 for the right to merchandise the Pooh characters. SSI has received approximately $ 130 million in royalties under the 1983 Agreement alone. (Plotkin Decl. P 5, Ex. B.) It would be unconscionable [*32] if SSI were able to avoid the consequences of its "breathtaking . . . pattern of misconduct" in state court, *Slesinger, 155 Cal. App. 4th at 773,* by reversing its position in that court and here contending that Disney was never authorized to make all the uses of the Pooh Rights it did for decades.

Case 2:10-cv-03633-ODW-RZ    Document 100-2    Filed 10/04/10    Page 15 of 39    Page ID #:8157

Page 14
2002 U.S. Dist. Ct. Motions 560675; 2009 U.S. Dist. Ct. Motions LEXIS 49109, *

Equity has a remedy. Where "it would be unconscionable to permit [a] party to maintain an inconsistent position from which it has already derived a benefit or in which it has acquiesced," the doctrine of quasi estoppel applies. *County Sch. Bd. of Henrico County, Va. v. RT, 433 F. Supp. 2d 692, 705 (E.D. Va. 2006).* This doctrine, which has long been recognized by the Supreme Court and other federal courts, "translates into the maxim that one cannot blow both hot and cold." *In re Guterl, 316 B.R. at 856* (internal citation omitted). It may be invoked whenever the "conscience of the court is repelled by the inconsistency." *Id.* (internal citation omitted).

Quasi estoppel has particular application in circumstances, such as these, where a party "with full knowledge or notice of his rights . . . lie[s] by for a considerable time, and knowingly [*33] permit[s] the other party to deal with the subject-matter under the belief that the transaction has been recognized." *Ritter v. Ulman, 78 F. 222, 223-24 (4th Cir. 1897).* It is a "longstanding maxim that 'it would offend every principle of equity and good morals to permit a party to a transaction to enjoy its benefits and at the same time deny its terms and qualifications.'" *Henrico County, 433 F. Supp. 2d at 706* (internal citations omitted). This is exactly what SSI should not be allowed to do with the 1983 Agreement.

## IV. BOTH THE COLLATERAL ESTOPPEL EFFECT OF THE STATE COURT FINDINGS OF MISCONDUCT AND THE NECESSITY TO PREVENT "FRAUD ON THE COURT" REQUIRE DISMISSAL.

SSI's infringement claims are directly affected by the Court's recent ruling that the state court's misconduct findings must "be given preclusive effect in this action under the doctrine of collateral estoppel." (May 19, 2009 Order at 2:21-22.) SSI's attempt to secure an unfair advantage in litigating over the parties' rights under the 1983 Agreement is what led to the termination of its state court action. As the Special Master found, "the validity of [SSI's infringement [*34] and unfair competition counterclaims] will depend in great part on SSI's ownership status, or lack thereof, under the 1983 Agreement." (Rep. & Recs. at 21:14-15.)

In this litigation, SSI concedes that its new infringement claims turn on its "ownership status, or lack thereof, under the 1983 Agreement." For example, in opposing Disney's earlier motion for summary disposition, one of SSI's primary arguments was that ownership rights were *not* transferred by that Agreement. (MSD Opp. at 23:17-19, 30:1-7.) Neither the Court nor Disney will ever know what documents and information, still undisclosed, SSI may possess bearing on SSI's ownership status. For that reason, the Court adopted the state appellate court's conclusion that "'No power the Court possesses can purge SSI's knowledge. The full extent of SSI's knowledge remains uncertain as does the potential impact of application of that knowledge to potential future litigation.'" (May 19, 2009 Order at 3:9-11.)

This action is that "future litigation." That SSI "likely still possesses additional Disney material," (Ex. 8 at 2), should be as acute a concern regarding the remaining claims as it was regarding those the Court already dismissed. [*35] In deciding to dismiss, the Court concluded that lesser sanctions would be inadequate to "protect counter-defendants." (May 19, 2009 Order at 3:6-7.) Identical concerns accompany the prospect of allowing SSI to litigate

its remaining counterclaims if this Motion is not granted. All evidence and argument submitted by SSI will be suspect. Yet because the greatest risk will come from the potential effects of knowledge that remains hidden, there will be no effective mechanism to ensure an untainted proceeding. Every motion will generate unanswerable questions about whether SSI's presentation of evidence or argument regarding the 1983 Agreement benefited from its misconduct in state court. Every deposition will provoke unresolveable disputes about the legitimacy of documents produced and questions asked.

There is only one remedy, and the law is clear. As the Court ruled, collateral estoppel bars SSI from re-litigating "the findings of the state court regarding not only the misconduct of SSI," but also the consequences of that misconduct. (May 19, 2009 Order at 2:14-3:18 (quoting Rep. & Rec. at 14).) That is why in *Synanon Church v. United States, 820 F.2d 421, 424, 427 (D.C. Cir. 1987),* [*36] a district court action was dismissed based on the collateral estoppel effect of the plaintiff's misconduct in a prior state case raising different claims, but touching on a common issue. *See also United Bus. Commc'ns, Inc v. Racal-Milgo, Inc., 591 F. Supp. 1172, 1184-87 (D. Kan. 1984)* (dismissing case based on collateral estoppel effect of plaintiff's misconduct in earlier action).

Because SSI's state and federal claims all derive from the same common denominator-the parties' rights under the 1983 Agreement-dismissal is also necessary to prevent a fraud on the court. "Once a litigant chooses to practice fraud, that misconduct infects his cause of action, in whatever guises it may subsequently appear." *Aoude v. Mobil Oil Corp., 892 F. 2d 1115, 1121 (1st Cir. 1989).* Dismissal for fraud on the court is especially appropriate when, as here, a litigant's prior "misconduct harms the integrity of the judicial process" by interfering with a subsequent court's ability to ensure a fair trial. *Dixon v. Comm'r, 316 F.3d 1041, 1046 (9th Cir. 2003); see Aoude, 892 F.2d at 1118-19; Synanon, 820 F.2d at 424, 427.* [*37]

SSI's attempt to ignore everything it said and did for decades and now claim not only an ownership interest in the Pooh Rights, but also that Disney's use of the Pooh characters was unauthorized, is precisely the type of assault on the judicial process that the Court has the authority to prevent. For example, because "[h]istory is not so glibly to be erased," the First Circuit relied on a party's misconduct in a prior action to affirm a dismissal for fraud on the court. *Aoude, 892 F. 2d at 1118.* n9

> n9 SSI's unfair competition claim also depends on SSI's claims regarding the 1983 Agreement. According to SSI, Disney's supposed participation in the Milne and Shepard heirs' service of copyright termination notices on SSI violated the provisions in the 1983 Agreement regarding the "right of termination" under the Copyright Act then in effect. (*See* Ex. 2 at 2.) Because SSI's unfair competition claim turns on the interpretation of the 1983 Agreement, it too is tainted by SSI's misconduct, and it too should be dismissed in deference to the preclusive effect of the state court's findings.

[*38]

2002 U.S. Dist. Ct. Motions 560675; 2009 U.S. Dist. Ct. Motions LEXIS 49109, *

## V. SSI'S CLAIM THAT DISNEY "ORCHESTRATED" A SCHEME TO TERMINATE ITS INTEREST IN THE POOH WORKS FAILS AS A MATTER OF LAW.

SSI's Twelfth Counterclaim for violation of California Business and Professions Code Section 17200 and a subpart of its First Counterclaim for copyright infringement depend on SSI's allegation that Disney participated in an "orchestrated plan" with the Milne and Shepard heirs to terminate SSI's rights by pursuing a statutory recapture of copyrights in the Pooh works. (Ex. 12 PP 85, 88-89, 114-17.) These claims are baseless as matter of law.

### A. The Alleged "Orchestration" Scheme Does Not Constitute Copyright Infringement.

A claim for copyright infringement requires a violation of one of "the exclusive rights" of the copyright owner or author. *17 U.S.C. § 501*(a). Those exclusive rights are the reproduction, adaptation, publication, distribution, performance, and display of a protected work. *See id*. §§ 106-22. Because the Milne and Shepard heirs' attempted statutory termination was none of those things, SSI's infringement claim is plainly invalid. *See Napster, 239 F.3d at 1013* (prima facie case of [*39] copyright infringement requires that "the alleged infringers violate at least one exclusive right . . . under *17 U.S.C. § 106*").

### B. The Alleged "Orchestration" Scheme Does Not Violate California Business and Professions Code Section 17200.

SSI's Section 17200 claim rests on two theories. The first is SSI's "unlawfulness" theory, which asserts that Disney violated *17 U.S.C. § 304*(c)(6)(D) when it entered into reversion agreements with Clare Milne and Minette Hunt. This statutory provision furthers the Congressional interest in allowing heirs to recapture copyright interests and make informed decisions about their subsequent use. Section 304(c)(6)(D), however, cannot be invoked to trigger a Section 17200 violation, because it concerns the *enforceability of contract* and not the *lawfulness of conduct*. Specifically, Section 304(c)(6)(D) declares invalid certain premature agreements concerning recaptured copyrights: "A further grant, or agreement to make a further grant, of any right covered by a terminated grant is *valid* only if it is made after the effective date of the termination." (Emphasis added). n10

n10 This distinction was explained in *Bourne Co. v. MPL Commc'ns, Inc., 675 F. Supp. 859 (S.D.N.Y. 1987)*. Section 304(c)(6)(D) of the Copyright Act "provides merely that an agreement between the terminating party and the terminated grantee prior to the effective date of termination is the only one that is *valid* and *enforceable* against the former." *Id. at 865* (emphases added). This section does not create a "right of first refusal," does not "give the terminated grantee a preferred competitive position," and it "neither *compels* the terminating party to negotiate with the terminated grantee, nor *forbids* him from negotiating with anyone else." *Id*. (emphases added).

Case 2:10-cv-03633-ODW-RZ    Document 100-2    Filed 10/04/10    Page 18 of 39    Page ID #:8160

Page 17

2002 U.S. Dist. Ct. Motions 560675; 2009 U.S. Dist. Ct. Motions LEXIS 49109, *

[*40]

Conduct that is "neither required nor proscribed by law does not constitute an 'unlawful' business activity under the unfair competition law." 61 Cal. Jur. 3d UNFAIR COMPETITION § 3 (2008); *see Smith v. State Farm Mut. Auto. Ins. Co., 93 Cal. App. 4th 700, 717-18 (2001).* Section 304(c)(6)(D) of the Copyright Act does not "require" or "proscribe" any action. Instead, in an effort to protect the heirs of creators, it merely declares that certain agreements will be treated as invalid if executed too early. There is nothing "unlawful" about entering into a contract that is invalid under Section 304(c)(6)(D), any more than anything "unlawful" occurs when a party enters into a contract without sufficient consideration, fails to properly memorialize a promise in writing, or executes a testamentary grant in violation of the rule against perpetuities.

SSI's second Section 17200 theory is "unfairness"-that it was "unfair" for Disney to induce a breach of the 1983 Agreement by Clare Milne and Minette Hunt. (Ex. 10 at 6:13-23.) This theory fails because Ms. Milne and Ms. Hunt were *not* parties to that Agreement. (*See* Ex. 2.) The only heir to sign was A.A. Milne's son [*41] Christopher. (*Id*.) Thus, even if Disney had induced Ms. Milne and Ms. Hunt to seek to recapture their rights as heirs-which it did not-neither heir would have breached any contract. Consequently, Disney could not have induced a breach and thus did not act "unfairly" under Section 17200. n11

> n11 SSI previously argued that its Section 17200 claim can also rest on supposedly incorrect public statements by Disney about the validity of the termination notices. (MSD Opp. at 39:25-40:2.) But because SSI does not own the Pooh Rights or transact business regarding those rights, it would be impossible for SSI to show it "suffered injury in fact and has lost money or property." CAL. BUS. & PROF. CODE § 17204. SSI's financial interest in the works is solely the receipt of royalties.

Finally, SSI's Twelfth Counterclaim asks for termination of the 1983 Agreement. Because this is a remedy, not a claim for relief, it fails along with the claim on which it depends. The same is true for SSI's request for injunctive relief [*42] in the Tenth Counterclaim, which is based on SSI's claim for unfair competition as well as on its now dismissed claims for fraud and breach of contract. *See McDowell v. Watson, 59 Cal. App. 4th 1155, 1159 (1997).*

## VI. CONCLUSION.

SSI has no legal basis to proceed with its counterclaims. SSI's infringement claims are defeated by its lack of standing; SSI long ago assigned to Disney any ownership it had in the Pooh Rights. By its words and conduct, SSI admitted authorizing Disney to make all possible uses of the Pooh Rights. SSI's orchestration claims, by definition, identify no actual harm and anyway are not legally cognizable. For all these reasons, Disney respectfully requests that this Court grant summary judgment on SSI's remaining counterclaims.

2002 U.S. Dist. Ct. Motions 560675; 2009 U.S. Dist. Ct. Motions LEXIS 49109, *

Dated: July 6, 2009

Respectfully submitted,

O'MELVENY & MYERS LLP

By: /s/ Daniel M. Petrocelli
Daniel M. Petrocelli
Attorneys for Counter-Defendants

### [PROPOSED] STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

After consideration of the papers in support of and in opposition to Counter-Defendants Disney Enterprises, Inc., The Walt Disney Company, and Walt Disney Productions' [*43] (collectively, "Disney") Motion for Summary Judgment on Counter-Claimant Stephen Slesinger, Inc.'s ("SSI") Counterclaims, or in the Alternative, for Summary Adjudication, and after hearing the oral argument of counsel, the Court hereby makes its findings of uncontroverted facts and conclusions of law.

### UNCONTROVERTED FACTS

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
| 1 | The 1961 Agreement between Disney and SSI provides that SSI "assigns, grants, and sets over" to Disney its broadcast rights and "all of [its] further rights" in the Winnie the Pooh works and characters. | Ex. 1 n1 PP 3-5 |
| 2 | The 1983 Agreement between Disney and SSI states that SSI "assigned those rights it had acquired from A.A. Milne to Disney by the . . . '1961 Agreement.'" | Ex. 2 at 1 |
| 3 | In the action between Disney and SSI in Los Angeles Superior Court (Case No. BC 022365) (the "State Action"), SSI filed an interrogatory response verified by Pati Slesinger that stated: "Slesinger . . . licens[ed] to Disney in 1961 all of the rights, including all 'further rights' which Slesinger held, including rights to future means of commercial exploitation which might become viable in the future." | Ex. 23 at 5:28-6:3 |
| 4 | The 1983 Agreement between Disney and SSI provides that SSI "assigns, grants, and sets over" to Disney its broadcast rights and "all of [its] further rights" in the Winnie the Pooh | Ex. 2 at Preamble, PP 4, 5, 7-8 |

2002 U.S. Dist. Ct. Motions 560675; 2009 U.S. Dist. Ct. Motions LEXIS 49109, *

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
| | works and characters. | |
| 5 | SSI's complaint in the State Action$*HEx. 6 P 7* asserts: "the Milne Trust made a new, 1983 grant of the Pooh Rights to Slesinger . . . and . . . Slesinger made a new grant of those rights to Disney." | |
| 6 | In the State Action, SSI filed a Mandatory Settlement Conference Statement asserting that, in 1983, "SSI entered into an agreement with Disney . . . which incorporated the material terms of the 1961 Agreement between Slesinger and Disney, superseded that former agreement, and perpetuated the relationship beyond 1983." | Ex. 21 at 5:2-7 |
| 7 | The 1961 and 1983 Agreements between Disney and SSI contain comparable grant language. | Compare Ex. 1 PP 3-5, 7-8 with Ex. 2 PP 5,7-8, 10-11; see also Declaration of Cassandra Seto ("Seto Decl.") P 2, Ex. A |
| 8 | Between April 1, 1983 and October 6, 2006, Disney and/or its affiliates registered with the United States Patent and Trademark Office ("USPTO") at least 15 trademarks based on the Winnie the Pooh works. | Declaration of Steven A. Plotkin ("Plotkin Decl.") P 3, Ex. A |
| 9 | Nothing in the USPTO's database with respect to the trademarks referenced in Uncontroverted Fact No. 8 indicates that SSI opposed or petitioned to cancel any of those trademark applications or registrations prior to 2006. | Plotkin Decl. P 4 |
| 10 | In 2004, Disney and/or its affiliates registered at least 45 copyrights and renewed at least an additional 14 copyrights in the United States Copyright Office relating to the Winnie the Pooh works. | Seto Decl. P 4, Exs. C, D |
| 11 | In 2004, Disney filed at least seven actions for copyright and trademark infringement relating to the Winnie the Pooh works in the United States District Court for the Central District of California. | Seto Decl. P 5, Ex. E |
| 12 | A royalty statement from Disney to SSI for the period ending March 31, 2009 identifies the "TOTAL ROYALTY EARNED" since October 1, 1982 as $ 134,426,807. | Plotkin Decl. P 5, Ex. B |
| 13 | SSI's complaint in the State Action$*HEx. 6 P 8* states that it "turned over its valuable rights to Disney for | |

2002 U.S. Dist. Ct. Motions 560675; 2009 U.S. Dist. Ct. Motions LEXIS 49109, *

| No. | Uncontroverted Fact | Evidence |
|-----|---------------------|----------|
|     | exploitation by Disney in exchange for a share of the receipts from exploitation of the Pooh Characters." | |
| 14 | SSI's complaint in the State Action states that "[t]he 1983 Agreement requires Disney to pay Slesinger royalties on the sale or other exploitation for home use of video cassettes, DVDs and other similar devices that include Pooh Characters." | HEx. 6 P 11(a) |
| 15 | SSI's complaint in the State Action states that "[t]he 1983 Agreement requires Disney to pay royalties to Slesinger based on a percentage of the gross revenue of Disney's licensees from exploitation of the Pooh Characters." | HEx. 6 P 11(b) |
| 16 | SSI's complaint in the State Action states that "[t]he 1983 Agreement requires Disney to pay a royalty on any and all 'commercialization' of the Pooh Characters, which includes any and all forms of commercial exploitation of such characters, except forms expressly excluded by the agreement." | HEx. 6 P 11(d) |
| 17 | SSI's complaint in the State Action states that "[t]he 1983 Agreement requires Disney to pay royalties with respect to the sale or other exploitation of computer software or similar products that include Pooh Characters." | HEx. 6 P 11(g) |
| 18 | SSI's complaint in the State Action states that "[t]he 1983 Agreement requires Disney to pay royalties with respect to the exploitation of Pooh Characters on the internet." | HEx. 6 P 11(h) |
| 19 | SSI's complaint in the State Action states that "[t]he 1983 Agreement requires Disney to pay Slesinger royalties on the exploitation of items, things and services involving Pooh Characters, regardless of whether such exploitation employs some form of new technology." | HEx. 6 P 11(i) |
| 20 | SSI's complaint in the State Action states that "[t]he 1983 Agreement requires Disney to pay Slesinger a royalty on all sales of Pooh Merchandise by Disney or its affiliates, including but not limited to sales at Disney Stores, Theme Parks, as well as catalogue and | HEx. 6 P 11(j) |

2002 U.S. Dist. Ct. Motions 560675; 2009 U.S. Dist. Ct. Motions LEXIS 49109, *

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
| | internet sales." | |
| 21 | In the State Action, SSI filed a response to an interrogatory requesting identification of "all 'uses' of the POOH CHARACTERS which YOU contend are royalty-generating pursuant to the 1983 Agreement," which was verified by Shirley Slesinger Lasswell, that stated: "Slesinger contends it is entitled to receive royalties in connection with any type of use of any or all of the Pooh Characters, now known or later discovered, from which Disney receives a benefit, both monetary and non-monetary, other than those uses which are explicitly excluded pursuant to the 1983 Agreement." | Seto Decl. P 6, Ex. F at 4:13-14; 6:22-26 (original emphasis) |
| 22 | In the State Action, SSI filed a response to an interrogatory requesting a statement of "each of the 'further rights' that YOU contend DISNEY received . . . pursuant to paragraph 8 of the 1983 Agreement," which was verified by Shirley Slesinger Lasswell, that stated: [T]he grant of all 'further rights' in and to the Pooh Characters pursuant to paragraph 8 of the 1983 Agreement is a catch-all designed to ensure that Slesinger was granting all of the 'further rights' set forth in paragraph 5, which include all of the additional commercial exploitation rights Slesinger acquired that are not specifically mentioned in the 1983 Agreement. | Seto Decl. P 6, Ex. F at 305:18-20; 306:22-26 |
| 23 | In the State Action, SSI filed an interrogatory response verified by Shirley Slesinger Lasswell stating: "Any use of the Pooh Characters for which Disney receives a benefit, monetary or non-monetary, is a commercial use." | Seto Decl. P 6, Ex. F at 164:25-26 |
| 24 | In the State Action, SSI filed an Opposition to Disney's Cross-Motion for Summary Adjudication re: Videocassettes, which asserted: Slesinger was granted all rights to any sound, word and/or picture representation, not only by television broadcasting, but by any "representational device" or of any | Ex. 54 at 17:8-11 |

2002 U.S. Dist. Ct. Motions 560675; 2009 U.S. Dist. Ct. Motions LEXIS 49109, *

| No. | Uncontroverted Fact | Evidence |
|-----|---------------------|----------|
| | such "future similar or allied devices." When Slesinger assigned these rights to Disney, Disney promised to pay Slesinger royalties from their exploitation. | |
| 25 | In SSI's Motion for Summary Adjudication re: Commercialization filed in the State Action, SSI asserted:<br>The 1930-32 agreements between SSI and Milne clearly established that SSI did acquire the rights to promote and advertise Winnie the Pooh directly for A.A. Milne in all media. The 1983 Agreement, in turn, confirms that SSI granted those rights to Disney. | Ex. 59 at 8:16-21 (internal citations omitted) |
| 26 | In SSI's Brief on the Issue of Disney's Obligation to Pay Agreed Percentages of Advances it Receives for Commercialization of the Pooh Work filed in the State Action, SSI asserted: "In paragraphs 7 and 8 [of the 1983 Agreement], SSI regranted, licensed and assigned all rights acquired rights [sic] to Disney." | Ex. 14 at 5:23-24 |
| 27 | In an interrogatory response filed in the State Action and verified by Shirley Slesinger Lasswell, SSI asserted: "SSI granted Disney rights which were necessary for Disney to exploit Winnie the Pooh through the use of the Internet." | Ex. 57 at 17:22-24 |
| 28 | In the State Action, SSI gained litigation advantages from its assertions. | See e.g., Ex. 56 (denying Disney's Cross-Motion for Summary Judgment re: Videocassettes); Ex. 19 (granting SSI's request that Disney make supplemental productions); Ex. 35 (granting SSI's request that Disney respond to interrogatories); Ex. 68 (granting SSI's Motion to Compel); Ex. 77 (granting in part SSI's Motion to Compel); Ex. 83 (granting SSI's Motion to Compel Privilege Log); Ex. 81 (granting SSI's motion regarding enumerated special interrogatories); Ex. 82 (granting in part two motions to compel by SSI) |

2002 U.S. Dist. Ct. Motions 560675; 2009 U.S. Dist. Ct. Motions LEXIS 49109, *

[*44]

n1 As instructed in this Court's May 19, 2009 Order, Disney has not re-submitted any exhibits submitted with its earlier Motion for Summary Disposition, and therefore refers to them by their original designation (unless otherwise specified).

**CONCLUSIONS OF LAW**

1. The 1983 Agreement between SSI and Disney assigned to Disney all of SSI's intellectual property rights in the Winnie the Pooh works and characters ("Pooh Rights").

2. SSI is not the owner of the Pooh Rights.

3. The 1983 Agreement between SSI and Disney authorized Disney to use all of SSI's Pooh Rights.

4. Judicial estoppel precludes SSI from contradicting in this action its statements in the State Action that it assigned to Disney all of its Pooh Rights, and authorized Disney to use its Pooh Rights in every conceivable manner and medium, pursuant to the 1983 Agreement.

5. Quasi estoppel precludes SSI from contradicting in this action its statements in the State Action that it assigned to Disney all of its Pooh Rights, and authorized Disney [*45] to use its Pooh Rights in every conceivable manner and medium, pursuant to the 1983 Agreement.

6. Both the collateral estoppel effect of the state court's findings regarding SSI's misconduct and the necessity to prevent a fraud on this Court require the dismissal of SSI's remaining counterclaims.

7. Disney's alleged "orchestration" of the A.A. Milne and E.H. Shepard heirs' attempt to terminate the original copyright grant to SSI, even if true, would not be unlawful or unfair under CAL. BUS. & PROF. CODE § 17200.

Dated:

Honorable Florence-Marie Cooper
Judge, United States District Court

**DECLARATION OF STEVEN A. PLOTKIN IN SUPPORT OF DISNEY'S MOTION FOR SUMMARY JUDGMENT ON SSI'S COUNTERCLAIMS, OR IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION**

**DECLARATION OF STEVEN A. PLOTKIN**

I, Steven A. Plotkin, declare and state:

1. I have personal knowledge of the matters set forth in this declaration, and if called as a witness to testify, I could and would do so competently.

2002 U.S. Dist. Ct. Motions 560675; 2009 U.S. Dist. Ct. Motions LEXIS 49109, *

2. I am a Vice President, Counsel, in the Intellectual Property Department of The Walt Disney Company ("Disney").

3. Between April 1, 1983 and October 6, 2006, Disney and/or its affiliates [*46] registered with the United States Patent and Trademark Office ("USPTO") at least 15 trademarks based on the Winnie the Pooh works. Attached hereto as Exhibit A are true and correct copies of those trademark registration certificates.

4. With the assistance of a paralegal in Disney's Intellectual Property Department, I conducted a review of the USPTO's database with respect to the trademarks referenced above. Nothing in that database indicated that Stephen Slesinger, Inc. ("SSI") opposed or petitioned to cancel any of those trademark applications or registrations prior to 2006.

5. A May 14, 2009 royalty statement from Disney to SSI for the period ending March 31, 2009 identifies the "TOTAL ROYALTY EARNED" since October 1, 1982 as $ 134,426,807. Attached hereto as Exhibit B is a true and correct copy of that royalty statement.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration is executed this 6th day of July 2009 at Los Angeles, California.

/s/ [Signature]
Steven A. Plotkin

**DECLARATION OF CASSANDRA SETO IN SUPPORT OF DISNEY'S MOTION FOR SUMMARY JUDGMENT ON SSI'S COUNTERCLAIMS, OR [*47] IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION**

**DECLARATION OF CASSANDRA SETO**

I, Cassandra Seto, declare and state:

1. I am an associate at O'Melveny & Myers LLP, counsel of record for Counter-Defendants Disney Enterprises, Inc., The Walt Disney Company, and Walt Disney Productions (collectively, "Disney") in the above-entitled action. I have personal knowledge of the matters set forth in this declaration, and if called to testify to the facts stated herein, I could and would do so competently.

2. Attached hereto as Exhibit A is a chart comparing the grant language in the 1961 and 1983 agreements between Disney and Counter-Claimant Stephen Slesinger, Inc. ("SSI").

3. Attached hereto as Exhibit B is a true and correct copy of SSI's Petition for Cancellation, dated November 30, 2006, which was filed in the United States Patent and Trademark Office.

4. In 2004, Disney and/or its affiliates registered at least 45 copyrights and renewed at least 14 copyrights in the United States Copyright Office relating to the Winnie the Pooh works ("Pooh Works"). Attached hereto as Exhibit C are true and correct copies of those

2002 U.S. Dist. Ct. Motions 560675; 2009 U.S. Dist. Ct. Motions LEXIS 49109, *

copyright registration certificates. Attached hereto as Exhibit [*48] D are true and correct copies of those copyright renewal certificates.

5. In 2004, Disney filed at least seven actions for copyright and trademark infringement relating to the Pooh Works in the United States District Court for the Central District of California. In 2004 and 2005, judgment was entered in those actions. Attached hereto as Exhibit E are true and correct copies of those judgments.

6. Attached hereto as Exhibit F is a true and correct copy of relevant excerpts from SSI's Third Supplemental Responses to Disney's Tenth Set of Special Interrogatories, dated May 16, 2002, which was filed in the state court action between Disney and SSI in Los Angeles Superior Court (Case No. BC 022365).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration is executed this 6th day of July 2009 at Los Angeles, California.

/s/ [Signature]
Cassandra Seto

# EXHIBIT B

9 of 11 DOCUMENTS

View U.S. District Court Opinion

CLARE MILNE, an individual, by and through MICHAEL JOSEPH
COYNE, her Receiver, and DISNEY ENTERPRISES, INC., Plain-
tiffs, v. STEPHEN SLESINGER, INC., Defendant.

MILNE v. SLESINGER

Case No. CV-02-08508 FMC (PLAx)

UNITED STATES DISTRICT COURT FOR THE CENTRAL
DISTRICT OF CALIFORNIA

*2002 U.S. Dist. Ct. Motions 8508; 2003 U.S. Dist. Ct. Motions
LEXIS 8195*

February 10, 2003

Motion to Dismiss

**VIEW OTHER AVAILABLE CONTENT RELATED TO THIS DOCUMENT: U.S.
District Court:** Motion(s)

**COUNSEL:** [**1]  DANIEL M. PETROCELLI (Cal. Bar No. 97802), CARLA J.
CHRISTOFFERSON (Cal. Bar No. 161111), KEVIN M. HARR (Cal. Bar No. 149572),
O'MELVENY & MYERS LLP, 1999 Avenue of the Stars, 7th Floor, Los Angeles, Califor-
nia 90067-6035, Telephone: 310-553-6700, Facsimile: 310-246-6779.

Attorneys for Plaintiff and Counter-Defendant, DISNEY ENTERPRISES, INC.

**JUDGES:** Honorable Florence Marie-Cooper

**TITLE: PLAINTIFF DISNEY ENTERPRISES, INC.'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS COUNTERCLAIMS OR,
ALTERNATIVELY, TO DISMISS FIRST COUNTERCLAIM AND REQUIRE
MORE DEFINITE STATEMENT OF SECOND COUNTERCLAIM**

**TEXT:** [*1]  [**4]  Plaintiff and counter-defendant Disney Enterprises, Inc. ("Disney")
submits this Memorandum of Law in support of its motion to dismiss the counterclaims of

2002 U.S. Dist. Ct. Motions 8508, *; 2003 U.S. Dist. Ct. Motions LEXIS 8195, **

defendant and counter-claimant Stephen Slesinger, Inc. ("SSI") pursuant to *Rules 12(b)(6) of the Federal Rules of Civil Procedure* (each, a "Rule"), or, alternatively, to dismiss SSI's first counterclaim and require a more definite statement of SSI's second counterclaim pursuant to Rule 12(e).

## SUMMARY OF ARGUMENT

SSI seeks two declarations: first, that the alleged agreement regarding certain reverted rights in copyright among Disney, plaintiff Clare Milne ("Ms. Milne") and non-party Harriet Jessie Minette Hunt ("Ms. Hunt") (the alleged "Reversion Agreement") is void because Disney is not a "successor in title" to those rights; and, second, that notwithstanding the reversion of any rights to Ms. Milne and Ms. Hunt, as alleged in Plaintiffs' Complaint, Disney will be "legally and equitably obligated to pay [SSI] the royalties provided for under the 1983 Agreement."

Both counterclaims should be dismissed. With respect to the initial counterclaim, dismissal is warranted for two reasons. First, the counterclaim should be dismissed [**5] pursuant to Rule 12(b)(6) because SSI is neither a party to, nor third-party beneficiary of, the alleged Reversion Agreement and, thus, SSI lacks standing to contest the validity of that Agreement. Second, dismissal under Rule 12(b)(6) is appropriate because SSI's conclusory legal allegation that Disney is not a "successor in title" to the 1930s Grant is not supported by the undisputed facts or the applicable law.

Regarding the second counterclaim, a dismissal pursuant to Rule 12(b)(6) will be proper because SSI has failed to specify the legal and factual allegations on which the claim is based. Although SSI alleges that it is entitled to "legal and equitable relief," SSI has not specified the legal or equitable theory on which the requested relief allegedly should be granted. Nor has SSI pled the factual [*2] assertions on which each element of that theory is based. Alternatively, even if a legal or equitable theory could be sufficiently pled to avoid dismissal, SSI should be ordered to more definitely state its second counterclaim pursuant to Rule 12(e).

## STATEMENT OF FACTS

When deciding a motion to dismiss a counterclaim pursuant to Rule 12(b)(6), the Court may consider [**6] the contents of the counterclaim, any exhibits submitted with the counterclaim, any documents not physically attached to the counterclaim but whose contents are alleged or relied on therein and whose authenticity is not questioned, and any matter that may be judicially noticed pursuant to *Federal Rule of Evidence 201. See Branch v. Tunnell, 14 F.3d 449, 453 (9th Cir. 1994); Warren v. Fox Family Worldwide, Inc., 171 F. Supp. 2d 1057, 1061 (C.D. Cal. 2001); Sony Pictures Entertainment, Inc. v. Fireworks Entertainment Group, Inc., 156 F. Supp. 2d 1148, 1153 (C.D. Cal. 2001).*

The following facts -- which are deemed to be undisputed for purposes of this motion -- are based upon the allegations in SSI's counterclaims and the contents of the 1930s Grant, the 1961 Agreement, the 1983 Agreement and the Termination Notices, which are alleged

Case 2:10-cv-03633-ODW-RZ   Document 100-2   Filed 10/04/10   Page 30 of 39   Page
ID #:8172

Page 3
2002 U.S. Dist. Ct. Motions 8508, *; 2003 U.S. Dist. Ct. Motions LEXIS 8195, **

and relied on in the counterclaim and attached to the Declaration of Kevin M. Harr ("Harr Dec.") filed in support of this motion.

### The Interested Parties

SSI is a New York corporation in the business of licensing fictional characters. (Counterclaim P 4.) Disney is a Delaware corporation and successor [**7] to Walt Disney Productions. (*Id.* PP 4, 6-7). Disney, a worldwide entertainment and media company, also is in the business of licensing fictional characters. (*Id.* P 4). Ms. Milne, a citizen and resident of the United Kingdom, is the sole grandchild of Alan Alexander Milne, author of works featuring Winnie the Pooh [*3] and other fictional characters (the "Pooh Characters"). (*Id.* P 5, 11). Because Ms. Milne is disabled, Ms. Milne's affairs are managed by her lawfully appointed receiver, Michael Joseph Coyne. (*Id.* P 5.) Ms. Hunt, a non-party, is the sole grandchild of Ernest H. Shepard ("Mr. Shepard"). (*Id.* P 8.)

### The Agreements

In the 1930s, pursuant to a written agreement, as amended, A. A. Milne granted to Stephen Slesinger, Esq. certain exclusive merchandising and other rights in the United States and Canadian copyrights pertaining to the Pooh Characters (the 1930s Grant"). (Counterclaim P 11; Harr Dec., Exs. A-C.) Mr. Slesinger subsequently assigned his entire interest in the 1930s Grant to SSI. (Counterclaim P 12.)

In 1961, SSI and Disney's predecessor in interest, Walt Disney Productions, entered into a written agreement (the "1961 Agreement") [**8] under which Disney was granted, from SSI's interest in the 1930s Grant, certain exclusive merchandising and other rights in the United States and Canadian copyrights pertaining to the Pooh Characters (the "Pooh Rights"), subject to Disney's obligation to pay SSI royalties. (*Id.* P 13; Harr Dec., Ex. D.) In 1983, the 1961 Agreement was amended by the 1983 Agreement. (Counterclaim P 15; Harr Dec., Ex. E.)

### The Termination Notices

On November 4, 2002, Ms. Milne and Ms. Hunt served notices of termination pursuant to *17 U.S.C. § 304(d)* (the "Termination Notices"). (Counterclaim P 16; Harr Dec., Exs. F-G.) Effective November 4, 2004, the Termination Notices will terminate the grant of rights that SSI had received pursuant to the 1930s Grant. (*Id.*) The Termination Notices will also extinguish the grant of the Pooh Rights from SSI to Disney (*see "The Agreements," supra*) and will end Disney's obligation to pay SSI royalties under the 1983 Agreement. (Harr Dec., Ex. E P 6(b).)

 [*4] After the Termination Notices were duly served, Disney entered into an agreement with Ms. Milne and Ms. Hunt regarding the respective rights that Ms. Milne and Ms. [**9] Hunt contend will revert to them in 2004 (the "Reversion Agreement"). n1 (Counterclaim P 17.) Thereafter, Ms. Milne and Disney brought this action seeking declarations that the Termination Notices are valid; that the Pooh Rights in the United States will terminate ef-

2002 U.S. Dist. Ct. Motions 8508, *; 2003 U.S. Dist. Ct. Motions LEXIS 8195, **

fective November 5, 2004; and that, upon termination of the Pooh Rights, the 1983 Agreement will expire and no further royalties will be payable to SSI. (*Id.* PP 9, 10.)

n1 Based on SSI's allegations, it is assumed, for purposes of this motion, that Disney has entered into a single agreement with Ms. Milne and Ms. Hunt regarding the respective rights that those heirs contend will revert to them in 2004. In fact, Disney has entered in a separate agreement with each of them.

## ARGUMENT

## I. SSI'S FIRST COUNTERCLAIM SHOULD BE DISMISSED.

### A. SSI Lacks Standing To Obtain A Declaration As To The Validity Of The Alleged Reversion Agreement.

"The jurisdiction of the federal courts is limited to the adjudication of cases or controversies. [**10] '" *Western Mining Council v. Watt, 643 F.2d 618, 623 (9th Cir. 1981).* To satisfy the "case or controversy" requirement, a claim must be justifiable and the claimant must have standing to assert it. *Id.* A claimant has standing to assert a claim only if the claimant personally "has suffered some threatened or actual injury resulting from the putatively illegal action.'" *Id.* If no "injury in fact" is alleged, the claimant has no standing and the claim must be dismissed. *Id. at 623-624, 634.* Accordingly, to survive a motion to dismiss pursuant to Rule 12(b)(6), "the facts demonstrating standing must be clearly alleged in the complaint." *Id. at 624.*

With respect to its first counterclaim, SSI clearly lacks standing. Because SSI is not a party to, or third-party beneficiary of, the Reversion Agreement, and because SSI did not, and cannot, allege any "injury in fact" resulting from that [*5] Agreement, SSI cannot seek a declaration that the Agreement is void. *See, e.g., Ponchik v. King, 957 F.2d 608, 609 (8th Cir. 1992)* (plaintiffs lacked standing to sue to void contract because plaintiffs "were not parties [**11] to the contract or third-party beneficiaries"); *In re Vic Supply Co., Inc., 227 F.3d 928, 931 (7th Cir. 2000)* ("the fact that a third party would be better off if a contract were unenforceable does not give him standing to sue to void the contract"). Accordingly, pursuant to Rule 12(b)(6), SSI's first counterclaim should be dismissed.

### B. The Undisputed Facts And Law Do Not Support SSI's Conclusory Legal Allegation That Disney Is Not A "Successor In Title" To The 1930s Grant.

Under *17 U.S.C. § 304(c)(6)(D)*, a grant of terminated rights made before the effective date of termination is valid only if the grant is between the author or the author's successors and "the original grantee or such grantee's successor in title." SSI alleges that Disney is not a "successor in title" to any grant sought to be terminated pursuant to § 304(d) and, therefore, that Disney could not validly enter into the alleged Reversion Agreement.

2002 U.S. Dist. Ct. Motions 8508, *; 2003 U.S. Dist. Ct. Motions LEXIS 8195, **

SSI's argument is unsupportable. Despite any conclusory legal allegation to the contrary, n2 SSI is not the only successor in title to the 1930s Grant and the Pooh Rights. A "successor in title" does not only mean "persons [**12] owning all rights in a copyright." *Burroughs v. Metro-Goldwyn-Mayer, Inc., 683 F.2d 610, 634 n.7 (2nd Cir. 1982)* (Newman, J., concurring). Instead, the term includes assignees, exclusive licensees and other persons who have obtained an ownership interest in the rights sought to be recaptured. *See id.* at 633-634; *Bourne Co. v.* [*6] *MPL Communications, Inc., 675 F. Supp. 859, 865-867 (S.D.N.Y. 1987); see also 37 C.F.R. § 201.10(d)(2)* (requirement of service on a "successor in title" is satisfied if a reasonable investigation of copyright "ownership" was made); *17 U.S.C. § 101* (defining "transfer of copyright ownership"); *cf In re Golden Books Family Entertainment, Inc., 269 B.R. 311, 316 (Bankr. D. Del. 2001)* ("intellectual property rights are recognized as bundles of rights, portions of which may be exclusively or nonexclusively licensed"; thus, "the fact that only certain rights are exclusively licensed does not convert [a] license to a nonexclusive license").

> n2 When testing the legal sufficiency of a counterclaim, the well-pleaded allegations of fact are generally taken to be true, but the Court "is not bound to assume the truth of legal conclusions simply because they are stated in the form of factual allegations. *Leon v. County of San Diego, 115 F. Supp. 2d 1197, 1200 (S.D. Cal. 2000).* The Court also is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint" *Steckman v. Hart Brewing, Inc., 143 F.3d 1293,*" 1295 (9th Cir, 1998); *Warren, 171 F. Supp. 2d at 1061.*

[**13]

Because Disney has succeeded to Mr. Slesinger and SSI's exclusive interests in the 1930s Grant, *see* Harr Dec., Ex. E, Disney indisputably possesses an ownership interest in those rights and, thus, is a successor in title to them. As a successor in title, Disney certainly was entitled to enter into agreements with Ms. Milne and Ms. Hunt regarding the rights that each of them has sought to recapture.

## II. SSI'S SECOND COUNTERCLAIM SHOULD BE DISMISSED OR, ALTERNATIVELY, THE COURT SHOULD REQUIRE IT TO BE STATED MORE DEFINITELY.

When considering a motion to dismiss under Rule 12(b)(6), the Court generally must accept as true all well-pleaded factual allegations and draw all reasonable inferences from them in favor of the claimant. *Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).* Nevertheless, "the admonishment to liberally construe a . . . claim" "does not relieve a [claimant] of his obligation to . . . allege more than bare assertions or legal conclusions." *Games Galore of Ohio, Inc. v. Masminster, 154 F. Supp. 2d 1292, 1298 (S.D. Ohio 2001).* A party asserting a claim must "set forth *factual allegations*, either direct or inferential, [**14] respecting *each*

2002 U.S. Dist. Ct. Motions 8508, *; 2003 U.S. Dist. Ct. Motions LEXIS 8195, **

*material element* necessary to sustain recovery under some actionable legal theory." *Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988)* (emphasis [*7] added); *MacNeill Engineering Co., Inc. v. Trisport, Ltd., 59 F. Supp. 2d 199, 201 (D. Mass. 1999)* (emphasis by court). Thus, when deciding a Rule 12(b)(6) motion, the Court initially "must determine whether allegations covering all the elements that comprise the theory for relief have been stated as required." *Dickson v. Microsoft Corp., 309 F.3d 193, 201-202 (4th Cir. 2002).*

SSI's second counterclaim seeks a declaration that, "based on applicable legal and equitable principles, even if the Termination Notices were to be held valid and [Ms.] Milne and [Ms.] Hunt purported to grant any rights terminable and terminated by such Notices to Disney to the exclusion of [SSI], Disney would remain legally equitably obligated to pay [SSI] the royalties provided for under the 1983 Agreement." (Counterclaim P 25.) This claim, however, fails not only to specifically plead the factual allegations that assertedly support each element of the theory of relief, [**15] but it fails even to identify the legal or equitable theory on which it is based. For instance, the claim does not specify whether it is based on the terms of a contract, a statute, or an equitable theory, such as *quantum meruit*. Under such circumstances, dismissal under Rule 12(b)(6) is appropriate. *See, e.g., Iodice v. U.S., 289 F.3d 270, 281 (4th Cir. 2002)* ("even in these days of notice pleadings, . . . a complaint asserting a . . . claim must disclose that each of the elements is present in order to be sufficient'"); *De Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 70 (2nd Cir. 1996)* (a complaint "which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)"); *Lucien v. Preiner, 967 F.2d 1166, 1168 (7th Cir. 1992)* (the complaint "must at least include the operative facts upon which a plaintiff bases his claims'"); *Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988)* ("more than bare assertions of legal conclusions is ordinarily required to satisfy federal notice pleading requirements"; a complaint "must contain either direct [**16] or inferential allegations respecting all of the material elements to sustain a recovery under *some* viable legal theory"); *Quality Foods de Centro Am., S.A.* [*8] *v. Latin Am. Agribusiness Dev. Corp., S.A., 711 F.2d 989, 995 (11th Cir. 1983)* (a complaint "must comprehend a so-called *prima facie* case, . . . and enough data must be pleaded so that each element of the alleged . . . [cause of action] can be properly identified"); *Nunley v. Kloehn, 158 F.R.D. 614, 616 (E.D. Wis. 1994)* (a pleading "must set forth factual allegations adequate to establish the essential elements of his or her claim").

Alternatively, even if a legal or equitable theory could be sufficiently pled to avoid a dismissal of the second counterclaim pursuant to Rule 12(b)(6), SSI nevertheless should be ordered to provide a more definite statement of the claim pursuant to Rule 12(e). Where, as here, the claim omits both the legal theory and the factual allegations upon which it is based, a counter-defendant, such as Disney, cannot be expected to identify all applicable affirmative defenses and otherwise prepare a responsive pleading. *See, e.g., MTV Networks v. Curry, 867 F. Supp. 202, 208 (S.D.N.Y. 1994);* [**17] *Kveragas v. Scottish Inns, Inc., 96 F.R.D. 425, 426 (E.D. Tenn. 1983); Arthur A. Aranson, Inc. v. Ing-Rich Metal Products Co., 12 F.R.D. 528, 530 (W.D. Penn. 1952); Marquardt-Glenn v. Lumelite Corp., 11 F.R.D. 175, 177(S.D.N.Y. 1951).*

2002 U.S. Dist. Ct. Motions 8508, *; 2003 U.S. Dist. Ct. Motions LEXIS 8195, **

**CONCLUSION**

For the foregoing reasons, the Court should enter an order dismissing SSI's counter-claims or, alternatively, dismissing SSI's first counterclaim and requiring SSI to more definitely state its second counterclaim pursuant to Rule 12(e).

Dated: February 10, 2003

    O'MELVENY & MYERS LLP

    /s

    Kevin M. Harr

    Attorneys for

    Plaintiff and Counter-Defendant

    DISNEY ENTERPRISES, INC.

# EXHIBIT C

WEISSMANN WOLFF BERGMAN
  COLEMAN GRODIN & EVALL LLP
Michael Bergman (SBN 37797)
Anjani Mandavia (SBN 94092)
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, California 90212
Telephone: 310-858-7888
Fax:        310-550-7191
Email:      mbergman@wwllp.com

FROSS ZELNICK LEHRMAN & ZISSU, P.C.
Roger L. Zissu (Admitted *pro hac vice*)
James Weinberger (Admitted *pro hac vice*)
866 United Nations Plaza
New York, New York 10017
Telephone: 212-813-5900
Fax:        212-813-5901

PERKINS LAW OFFICE, P.C.
Patrick T. Perkins (Admitted *pro hac vice*)
1711 Route 9D
Cold Spring, NY 10516
Telephone: 845-265-2820
Fax:        845-265-2819

Attorneys for Defendants and Counterclaimant

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| JOANNE SIEGEL and LAURA SIEGEL LARSON,<br><br>Plaintiffs,<br><br>vs.<br><br>TIME WARNER INC., WARNER COMMUNICATIONS INC. WARNER BROS. ENTERTAINMENT INC., WARNER BROS. TELEVISION PRODUCTION INC., DC COMICS, and DOES 1-10,<br><br>Defendants. | Case No. SA CV 04-8400 SGL (RZx)<br>Case No. SA CV 04-8776 SGL (RZx)<br><br>Hon. Stephen G. Larson, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J.<br><br>**DECLARATION OF MICHAEL BERGMAN IN RESPONSE TO THE DECLARATION OF MARC TOBEROFF FILED PURSUANT TO THE COURT'S SEPTEMBER 17, 2007 ORDER**<br><br>**DISCOVERY MATTER LOCAL RULE 37** |
| AND RELATED COUNTERCLAIMS. | |

39

I, Michael Bergman, declare under penalty of perjury:

    1.    I am a member of Weissmann Wolff Bergman Coleman Grodin & Evall LLP, counsel for Defendants.  This declaration, based upon my own personal knowledge and our office's records, is submitted in response to the Declaration of Marc Toberoff Filed Pursuant To The Court's September 17, 2007 Order.

    2.    This declaration addresses two issues.  The first issue is whether the nine Escrow Documents that "slipped through the cracks" should be withheld from production based upon Plaintiffs' and Mr. Toberoff's current assertions of the attorney-client privilege.  As explained below, each of the three categories of documents addressed in Mr. Toberoff's declaration -- the "defamatory cover letter" to the Escrow Documents, the post-litigation attorney-client communications, and Mr. Toberoff's correspondence with third party Michael Siegel's attorney Don Bulson -- should be produced to Defendants.

    3.    The second issue is how the escrow holder should handle the remaining Escrow Documents, which was not addressed in the Court's September 17, 2007 Minute Order.  To fully comply with Magistrate Judge Zarefsky's April 30, 2007 Order, the escrow holder, as the only neutral party with access to the Escrow Documents, should use Mr. Toberoff's May 21, 2007 declaration to match up the Escrow Documents with the privilege log entries and production documents listed in that declaration to ensure that he is releasing the proper documents and confirm that no additional documents have "fallen through the cracks."

## Background

    4.    Some background is necessary to place Plaintiffs' and Mr. Toberoff's current privilege claims in context.  This dispute dates back to June of 2006.  On July 5, 2006, I received a call from Wayne Smith, Vice President, Senior Litigation and Chief Patent Counsel of Warner Bros. Entertainment Inc., informing me that three Warner Bros. employees, including General Counsel John Schulman, had received packages on June 28, 2006 containing documents relating to the present

29.    The Disputed Documents containing post-litigation communications between Mr. Toberoff and his clients should be produced because they fall directly within the purview of Magistrate Judge Zarefsky's Order requiring the escrow holder to turn over any documents not previously produced or listed on any of Plaintiffs' or Mr. Toberoff's privilege logs.

30.    That Mr. Toberoff referenced these documents at Paragraph 22 to his March 23, 2007 declaration in Opposition to Defendants Motion to Compel Production of Whistle Blower Documents only further supports Defendants' position that the documents did not just "fall through the cracks." During the hearing before Magistrate Judge Zarefsky on April 30, 2007, Mr. Toberoff unequivocally stated that all of the Escrow Documents had been either produced or listed on a privilege log. His several unequivocal affirmations during the Hearing effectively prevented Magistrate Judge Zarefsky from considering whether Mr. Toberoff's failure to serve a privilege log in response to the subpoena issued to him personally (as opposed to the requests for production served on Plaintiffs) waived any assertion that the post-litigation communications could be protected by the attorney-client privilege. After all, although Defendants do not deny that they entered into an agreement with Plaintiffs regarding post-litigation attorney-client communications, that agreement was only with respect to documents on both Plaintiffs' and Defendants' privilege logs which post-dated the litigation and the disclosure of which would invade work product. Moreover, no arrangement was **ever** made with Mr. Toberoff regarding the contents of his privilege log.

**Mr. Toberoff's Correspondence With Michael Siegel's Attorney Don Bulson**

31.    The first reason the Disputed Documents concerning correspondence with third party Don Bulson should be produced to Defendants is that they fall directly within the purview of Magistrate Judge Zarefsky's Order requiring the escrow holder to turn over any documents not previously produced or listed on any of Plaintiffs' or Mr. Toberoff's privilege logs. Mr. Bulson has acted as attorney at

access to the Escrow Documents, to determine if any additional documents "fell through the cracks," or if Mr. Toberoff's has accurately represented that the remaining documents all correspond to privilege log entries. Mr. Eisen, as a neutral party with access to the Escrow Documents, is in a unique position to undertake this analysis. Moreover, Defendants have reason to believe that additional documents have indeed "slipped through the cracks." Indeed, Defendants' original concern regarding the Escrow Documents was that they included *nonprivileged*, responsive documents that had not been produced by Defendants. As mentioned above, Mr. Smith undertook an initial review of the Escrow Documents pursuant to the *State Compensation* case. During that review, he segregated the Escrow Documents into three categories: "non-privileged," "privileged," and "?" Among the "non-privileged" category of Escrow Documents was correspondence between plaintiff Laura Siegel Larson and her estranged (now deceased) step-brother, Michael Siegel, relating to Mr. Siegel's share of the termination interest at stake in the litigation. Plaintiffs have not produced any such correspondence in this litigation, and it has not been identified on any of the privilege logs. Thus, these documents would also appear to have "fallen through the cracks," yet are not among the nine documents provided by Mr. Toberoff to the Court. An actual comparison of the Escrow Documents to the allegedly corresponding privilege log entries is the only way to confirm that all non-privileged documents contained within the Escrow Documents have been produced, and we respectfully request that it be ordered to occur.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated this 25th day of September, 2007 at Beverly Hills, California.

Michael Bergman

18

42