# EXHIBIT N

DANIEL M. PETROCELLI (S.B. #97802)
  dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
  mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
  cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067-6035
Telephone:  (310) 553-6700
Facsimile:  (310) 246-6779

Attorneys for Plaintiff DC COMICS

FILED
CLERK, U.S. DISTRICT COURT

MAY 1 4 2010
/0:23 am

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

JHN Sgx

CV10 3633

| | |
|---|---|
| DC COMICS,<br><br>                    Plaintiff,<br><br>          v.<br><br>PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JOANNE SIEGEL, an individual, LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive,<br><br>                    Defendants. | Case No.<br><br>**COMPLAINT FOR**:<br><br>(1)  Declaratory Relief re: Invalidity of Copyright Termination Notice;<br><br>(2)  Declaratory Relief re: Scope of Copyright Termination Notice;<br><br>(3)  Declaratory Relief re: DC Comics Period of Exclusivity re: Shuster;<br><br>(4)  Interference with 1992 Shuster Agreement;<br><br>(5)  Interference with Prospective Economic Advantage re: Siegel-DC Comics Agreement; and<br><br>(6)  Declaratory Relief re: Invalidity of Copyright Assignment and Consent Agreements<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT

## I. **STATEMENT OF THE CASE**

1.      This lawsuit challenges a scheme by Marc Toberoff and companies under his control to violate the U.S. Copyright Act and other laws by trafficking in federal copyright interests and interfering with contractual rights and other interests of plaintiff DC Comics related to the iconic property "Superman."[1]  By this scheme, Toberoff has sought to enrich himself by wrongfully laying claim to purported rights to control the exploitation of Superman to the substantial detriment of DC Comics and in violation of rights it has held, significantly invested in, and expanded upon for over 70 years.  DC Comics brings this suit to confirm its rights to the Superman property and seek redress for the wrongful conduct of Toberoff and entities he controls.  This Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. §§ 1331, 1338, and 1367, under the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, and under the Court's supplemental jurisdiction.

2.      Under certain narrowly defined circumstances, the Copyright Act permits authors and specified heirs to terminate copyright grants and recapture those interests from the original grantees.  These provisions of the Copyright Act also protect original grantees—such as DC Comics—by confining termination rights to certain classes of individuals in a specified time frame and manner, limiting the types of works that may be terminated, and creating an exclusive statutory period during which only the original grantee may enter into new agreements with the author or heirs to continue creating new works under the recaptured copyrights.

3.      In derogation of these provisions of the Copyright Act and the rights of DC Comics, Toberoff and entities he controls orchestrated a web of collusive agreements concerning the Superman copyrights with the heirs to the co-creators of

---

[1] Throughout this introductory statement and in other parts of the Complaint, the term "DC Comics" is used as shorthand for both DC Comics and its predecessors in interest.  The specific identities of relevant corporate entities are identified *infra*.

Superman, Jerome Siegel and Joseph Shuster.  By these agreements, Toberoff purported to secure a majority and controlling financial stake in copyright interests in Superman assertedly held by the Siegel and Shuster heirs and preclude the heirs from freely entering into new agreements with DC Comics for the continued exploitation of Superman.  As detailed below, these agreements are unlawful under the copyright laws, are void as against public policy, and both violate DC Comics' rights and threaten the ongoing viability of the Superman property.

4.    During their lifetimes, Jerry Siegel and Joe Shuster—both well aware of the termination provisions in amendments to the Copyright Act—never once sought to terminate any of DC Comics' copyright interests.  Instead, Siegel and Shuster rightly honored their agreements with DC Comics, under which they and their families enjoyed lifetime compensation and other benefits.  After their deaths, Siegel and Shuster's heirs reached similar agreements with DC Comics—the Shuster heirs in 1992, and the Siegel heirs in 2001.  These agreements provided the heirs substantial compensation and fully and finally resolved any claims of termination to any rights in Superman and confirmed that DC Comics owned all right, title, and interest in and to Superman.

5.    In or about 2001, Toberoff learned of these agreements between DC Comics and the Siegel and Shuster heirs and engineered a course of conduct to induce the heirs to repudiate those agreements, file invalid and erroneous copyright termination notices, and enter into new agreements with Toberoff and his companies netting him the controlling stake in the heirs' asserted interests in Superman.

6.    Toberoff induced the Shuster heirs to repudiate their 1992 agreement with DC Comics and enter into a 50/50 joint venture with defendant Pacific Pictures Corporation, a company wholly owned and controlled by Toberoff, pursuant to which the heirs conveyed the entirety of their purported Superman copyright termination rights to the venture.  The stated purpose of the venture was

COMPLAINT

1    to secure and exploit DC Comics' copyright interest in Superman.  Toberoff

2    procured this joint-venture agreement even though he knew that the Shusters' 1992

3    agreement with DC Comics operated to grant any and all of the heirs' interest in

4    Superman to DC Comics and extinguish any termination rights the heirs might have

5    held.  Toberoff also induced the Shuster heirs to serve a notice of termination

6    purporting to terminate and recapture alleged interests they had granted to DC

7    Comics under the parties' 1992 agreement.  This termination notice was invalid:

8    among other defects, it was filed by a party lacking the necessary majority interest

9    to terminate.  Furthermore, any putative right to terminate held by Joe Shuster

10    ceased to exist when he died having elected not to exercise it during his lifetime and

11    having died without leaving a surviving spouse, child, or grandchild to inherit and

12    exercise it.

13        7.    Toberoff similarly induced the Siegel heirs to repudiate their 2001

14    agreement with DC Comics.  After years of negotiations following a termination

15    notice sent by the Siegel heirs in 1997, DC Comics and the Siegel heirs reached an

16    agreement providing that DC Comics would retain all rights to Superman and

17    entitling the Siegels to receive a significant portion of the Superman profits.

18        8.    Toberoff became aware of the existence of the 2001 agreement

19    between the Siegels and DC Comics and understood it diminished his stake in the

20    putative Superman rights held by his joint venture with the Shusters.  In pursuit of

21    his plan to corner and control all potential Superman termination rights and thereby

22    block further exploitation of the property by DC Comics, Toberoff set out to derail

23    the 2001 Siegel agreement.  Among other things, Toberoff falsely represented to

24    the Siegels that if they repudiated their agreement with DC Comics and entered into

25    an agreement with him instead, a "billionaire investor" was prepared immediately

26    to pay the Siegels $15 million for their Superman rights, plus a generous back-end

27    profit participation in any future exploitations of the Superman property.  Toberoff

28    also falsely represented that he would help the Siegels produce their own Superman

- 3 -

COMPLAINT

1    motion picture that would compete successfully with a Superman motion picture

2    that Warner Bros.—DC Comics' licensee—was then developing.  Based on

3    Toberoff's inducements, the Siegels repudiated their 2001 agreement with DC

4    Comics, terminated the employment of their then-law firm Gang, Tyre, Ramer &

5    Brown, and entered into agreements with Toberoff and defendant IP Worldwide

6    LLC, an entity controlled by Toberoff.  Under these agreements, Toberoff and his

7    company received a 45% interest in any recovery by the Siegels—an 800% increase

8    over the 5% fee in the Siegels' agreement with the Gang Tyre firm.

9        9.    As a result of his arrangements with both the Shuster and Siegel heirs,

10   Toberoff secured control of the largest financial stake in the collective, putative

11   Superman termination rights (*i.e.*, Toberoff—47.5%; Siegel heirs—27.5%; Shuster

12   heirs—25%).  Toberoff sought further control, however.  In order to assert that DC

13   Comics had *no* further rights to exploit the derivative Superman character

14   "Superboy"—including in the highly popular *Smallville* network television series—

15   Toberoff manufactured the position that Jerry Siegel *alone*—to the exclusion of

16   Shuster—was the sole creator of Superboy.  Toberoff did so with full knowledge

17   that his 2001 agreement with the Shusters explicitly confirmed the *Shusters'*

18   asserted joint rights in Superboy, consistent with the long-held view of Shuster,

19   Siegel, and their heirs that Superboy was jointly created by Shuster and Siegel.[2]

20       10.   Despite these incontestable facts concerning Superboy's creation—

21   facts which Joe Shuster, Jerry Siegel, their heirs, and even Toberoff and his

22   companies ratified and affirmed over time—Toberoff caused to be filed in 2002, on

23   behalf of the Siegels, a copyright termination notice falsely stating that Siegel was

24   the *sole* creator of Superboy.  He then induced the Shusters in 2003 to amend their

25   joint venture agreement with Pacific Pictures to *delete* all references to Superboy.

26

27       [2] As explained below, DC Comics fully agrees that Shuster and Siegel jointly
     contributed to Superboy.  It is DC Comics' position, however, that Superboy is a
28   work entirely derivative of Superman and that Superboy is not subject to
     termination under the Copyright Act's termination regime.

- 4 -
COMPLAINT

1    The deletion of Superboy was directly contrary to the Shusters' interests and

2    occurred solely to park *all* of the alleged Superboy rights with the Siegels.  Having

3    manipulated the Superboy rights in favor of the Siegels, and directly contrary to

4    copyright filings that the Siegels and Shusters had previously made, Toberoff then

5    filed a termination notice on behalf of the Shusters that purported to terminate only

6    Superman rights, leaving out all mention of Superboy.  These artifices positioned

7    the Siegels to claim 100% ownership of Superboy in order to bring a copyright

8    infringement claim against DC Comics, Warner Bros., and the *Smallville* series,

9    which they filed in 2004—and which remains pending today.

10       11.    Yet another component of Toberoff's scheme to gain complete control

11    over the heirs to the putative Superman termination rights was preventing the Siegel

12    and Shuster heirs from freely entering into agreements with DC Comics—even if it

13    was in their respective economic interest to do so.  In violation of DC Comics'

14    statutory period of exclusivity under the copyright laws, Toberoff induced the

15    Siegels and Shusters to enter into agreements transferring their respective interests

16    to his companies and preventing them from conveying any rights to DC Comics

17    without each other's—and Toberoff's—consent.  As a result of these illicit

18    agreements, DC Comics has been deprived of its ability to enter into agreements

19    with the heirs to secure their purported termination rights, in violation of the

20    Copyright Act, other laws, and public policy promoting the free and fair settlement

21    of legal claims.

22       12.    To protect its rights under the copyright laws, agreements, and

23    interests with the Siegels and Shusters and remove the cloud that Toberoff's actions

24    have unlawfully placed over the Superman property and its future, DC Comics

25    brings this action to seek declaratory judgments and other relief as set forth below.

26                          **II.  PARTIES**

27       13.    Plaintiff DC COMICS ("DC Comics") is a general partnership

28    organized and existing under the laws of the State of New York and has its

principal place of business in the State of New York.  DC Comics is the successor-in-interest to all rights, including rights under copyright, relating to the Superman works and character.

14.    Defendant PACIFIC PICTURES CORPORATION ("Pacific Pictures") is a New York corporation organized under the laws of the State of New York, and was registered as a foreign corporation doing business in the State of California, with its principal place of business in the State of California and the County of Los Angeles.  Upon information and belief, Toberoff is the sole shareholder and registered agent for service of process of Pacific Pictures.  Upon information and belief, Pacific Pictures forfeited its active status as a New York corporation and as a registered foreign corporation in California as of early 2009.

15.    Defendant IP WORLDWIDE, LLC ("IP Worldwide") is a Delaware limited liability company organized and existing under the laws of the State of Delaware, and registered as a foreign entity doing business in the State of California, which has its principal place of business in the State of California and the County of Los Angeles.  Upon information and belief, Toberoff is the managing and controlling member of IP Worldwide and owns the controlling interest therein.

16.    Defendant IPW, LLC ("IPW") is a California limited liability company organized and existing under the laws of the State of California, which has its principal place of business in the State of California and the County of Los Angeles.  Upon information and belief, Toberoff is the managing and controlling member of IPW, is its registered agent for service of process, and owns the controlling interest in IPW.  Upon information and belief, IPW is a successor-in-interest to all or part of IP Worldwide's interests.

17.    Defendant MARC TOBEROFF ("Toberoff") is an individual who resides in the County of Los Angeles in the State of California, and upon information and belief, is and at all times has been a citizen of the United States.

COMPLAINT

1    Upon information and belief, Toberoff is a shareholder and member of defendants

2    PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; and IPW, LLC.

3        18.    Defendant MARK WARREN PEARY ("Mark Peary" or "Peary") is

4    an individual who resides in the State of New Mexico and is, and at all times has

5    been, a citizen of the United States.  Peary is the nephew of Joseph Shuster, and a

6    California court appointed him as the personal representative of the Shuster Estate.

7        19.    Defendant ESTATE OF JOSEPH SHUSTER ("Shuster Estate") is a

8    probate estate established by the Los Angeles Superior Court on August 25, 2003

9    (Case No. BP-080635).

10        20.    Defendant JOANNE SIEGEL ("Joanne Siegel") is an individual who

11    resides in the County of Los Angeles in the State of California and is, and at all

12    times has been, a citizen of the United States.  Joanne Siegel is the widow of

13    Jerome Siegel.

14        21.    Defendant LAURA SIEGEL LARSON ("Laura Siegel Larson") is an

15    individual who resides in the County of Los Angeles in the State of California and

16    is, and at all times has been, a citizen of the United States.  Laura Siegel Larson is

17    the daughter of Jerome Siegel and Joanne Siegel.

18        22.    Upon information and belief, Toberoff is, and at all relevant times has

19    been, the sole shareholder and principal of Pacific Pictures and a member and

20    principal of IP Worldwide and IPW.  Upon information and belief, Toberoff is the

21    alter ego of Pacific Pictures, IP Worldwide, and IPW, in that there is, and at all

22    relevant times has been, such unity of interest between Toberoff, Pacific Pictures,

23    IP Worldwide, and IPW that any individuality and separateness between them did

24    not and does not exist, and adherence to the fiction of the independent and separate

25    existence of Pacific Pictures, IP Worldwide, and IPW distinct from each other and

26    Toberoff would promote injustice and inequity.

27        23.    Upon information and belief, the fictitiously-named DOES 1-10 are in

28    some manner responsible for the events giving rise to the claims set forth herein.

- 7 -

COMPLAINT

1    The true names and capacities of such fictitiously-named defendants, whether

2    individual, corporate, or otherwise, are presently unknown to DC Comics.  DC

3    Comics will amend this Complaint to assert the true names and capacities of such

4    fictitiously-named defendants when this information has been ascertained.  Each

5    reference herein to a named defendant shall also refer to DOES 1-10.

6    ### III.   JURISDICTION AND VENUE

7          24.    As noted, the Court has subject matter jurisdiction over the claims set

8    forth herein pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.  The Court has original

9    jurisdiction over DC Comics' claims arising under the Copyright Act and

10   supplemental jurisdiction over its related state-law claims.

11         25.    The Court has personal jurisdiction over defendants, *inter alia*,

12   because a substantial part of the events giving rise to the claims set forth herein

13   occurred in the State of California and the defendants have extensive contacts with

14   the State, including the following:

15         a.    Defendants Marc Toberoff, the Shuster Estate, and Peary

16         established a joint venture in California under California law for the

17         purpose of terminating and recapturing prior grants of the copyrights at

18         issue in this action.

19         b.    On behalf of the Shuster Estate, Peary filed a probate action in

20         Los Angeles Superior Court—which, upon information and belief,

21         remains pending—in order to effectuate the purpose of the California

22         joint venture.  A California court appointed Peary as executor of the

23         Shuster Estate, and Peary serves in that capacity as a matter of

24         California law.  In that capacity, Peary served one of the copyright

25         termination notices at issue in this action.

26         c.    Upon information and belief, defendants Pacific Pictures and IP

27         Worldwide are foreign entities registered as doing business in the State

28         of California, and they have their principal places of business and are

- 8 -                                    COMPLAINT

headquartered in the State of California and the County of Los Angeles.

     d.     Upon information and belief, defendant IPW is a California limited liability company organized and existing under the laws of the State of California and has its principal place of business and headquarters in the State of California and the County of Los Angeles.

     e.     Defendants Toberoff, Joanne Siegel, and Laura Siegel Larson reside and conduct business in the State of California and the County of Los Angeles.

     f.     Defendants Joanne Siegel and Laura Siegel Larson filed two related actions against DC Comics in this District and Court to resolve ownership of the rights in Superman and Superboy. (Case Nos. CV-04-8400 ODW, CV-04-8776 ODW).

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Defendants are subject to personal jurisdiction in this District, and a substantial part of the events giving rise to the claims set forth herein occurred in this District.

## IV.   FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.   DC Comics' Development of Superman

27.     In the 1930s, Jerome Siegel (a story writer in Cleveland) and Joseph Shuster (an illustrator, and Siegel's peer) conceived of a fictional character named "Superman," whom they originally envisioned as a criminal mastermind, and then reconceived as a hero fighting for social justice. Aside from the name, the character shared little similarity with the figure that would later become known throughout the world as Superman. Between 1933 and 1937, Siegel and Shuster submitted the Superman comic strips to a number of prospective publishers and newspaper syndicates, all of which rejected them.

28.     A company that would come to be known as DC Comics—and for whom Siegel and Shuster worked for hire developing fictional characters—would

COMPLAINT

1   eventually decide to publish a 13-page comic story featuring "Superman" in the

2   first issue of a 64-page comic book entitled "Action Comics." This original version

3   of Superman had few, limited powers, and his fictional world and back-story were

4   not well developed.

5       29.    Months before this "Action Comics" book ("Action Comics No. 1")

6   was published, Siegel and Shuster entered into, on December 4, 1937, an

7   "Agreement of Employment" with Detective Comics, Inc. ("DCI"), a predecessor-

8   in-interest to DC Comics (the "December 4, 1937 Agreement"). Siegel and Shuster

9   renewed their employment arrangement with DCI in agreements on September 22,

10   1938 (the "DCI September 22, 1938 Agreement" and "McClure September 22,

11   1938 Agreement") and December 19, 1939 (the "December 19, 1939 Agreement").

12       30.    In 1938, at the instance and expense of DCI and subject to its right of

13   control, Siegel and Shuster adapted the preexisting Superman comic strips they had

14   created and added new material to create the 13-page comic book story entitled

15   "Superman." This story—like all the Superman works that Siegel and Shuster

16   thereafter created—was created for DC Comics as a work made for hire. Moreover,

17   Siegel and Shuster only contributed to a part of this work. Upon information and

18   belief, Shuster submitted black-and-white illustrations to DCI that were later

19   colorized by printers or engravers working at DCI's direction. DCI also prepared

20   one or more cover illustrations for Action Comics No. 1, which depicted Superman

21   and was published in other comic books prior to the publication of Action Comics

22   No. 1. Action Comics No. 1 itself was published in April 1938.

23       31.    To the extent Siegel and Shuster created any copyrightable Superman-

24   related works outside their work-for-hire relationship with DC Comics, those works

25   consisted solely of certain panels and portions of the Action Comics No. 1 comic

26   book and other minor creations in the 1930s, which Siegel and Shuster conveyed to

27   DC Comics in 1937 and 1938. In an agreement dated March 1, 1938 (the "March

28   1, 1938 Agreement"), and as required by the December 4, 1937 Agreement, Siegel

- 10 -

COMPLAINT

1    and Shuster again assigned to DCI all of their rights in Superman, including "all

2    good will attached thereto and exclusive right to the use of the characters and story,

3    continuity and title of strip." Siegel and Shuster confirmed DCI's sole and

4    exclusive ownership of all Superman rights in the DCI September 22, 1938

5    Agreement and December 19, 1939 Agreement.

6         32.    The initial appearance of Superman in Action Comics No. 1 presented

7    a limited view of the character. The readers learn only that Superman was sent to

8    Earth as an infant aboard a space ship from an unnamed planet that was destroyed

9    by old age. He secretly possessed five super-human powers: the abilities to leap

10   1/8 of a mile; hurdle a twenty-story building; raise tremendous weights; run faster

11   than an express train; and repel bullets and knives by virtue of his "tough skin." In

12   his alter-ego life, Superman was depicted as Clark Kent, a mild-mannered

13   newspaper reporter for "The Daily Star," with a female co-worker named "Lois,"

14   whose last name is not mentioned. In his life as Superman, he was depicted as a

15   costumed figure who uses his super-human abilities to fight crime. In Action

16   Comics No. 1, Superman is said to have grown up in an orphanage and is depicted

17   (both in words and images) as a child with super-human strength.

18        33.    Since the publication of Action Comics No. 1 in 1938, DC Comics—

19   with its teams of work-for-hire writers and artists (including Siegel and Shuster)—

20   has added more than 70 years of material defining, updating, expanding, and

21   improving upon the Superman myth and creating a continuous flow of new exploits

22   and characters, resulting in a vast Superman "universe." DC Comics has authored,

23   published, and distributed hundreds of millions of copies of thousands of comic

24   book issues throughout the United States and abroad depicting the adventures of

25   Superman. These comic books have been authored and illustrated by dozens of DC

26   Comics' talented staff writers and artists. DC Comics has also created, developed,

27   distributed, and licensed numerous feature-length motion pictures, motion-picture

28   serials, radio serials, television shows, novels, and live theatrical presentations

- 11 -

COMPLAINT

1   based on Superman.  Indeed, the radio, television, and motion-picture projects in

2   particular—with which Siegel and Shuster had nothing or little to do—were largely

3   responsible for spreading the Superman myth and popularity and expanding the

4   Superman storyline.

5       34.   As a result of DC Comics' significant and sustained investment in and

6   stewardship of Superman—and 70-plus years of character and story development

7   by some of the most creative and talented minds in the comic-book, radio,

8   television, and motion-picture industries—Superman has remained constantly in the

9   public's eye and has become one of the most famous and beloved fictional

10  characters in the world.  Over these 70 years, Superman has evolved from the few

11  black-and-white illustrations originally drawn by Shuster into a full-blown, color

12  character inhabiting a multi-dimensional universe.

13      35.   DC Comics' development of Superman over many decades has

14  represented a continuous and ever-evolving portrayal of the character, featuring

15  new elements in the Superman back-story, new super-powers, new characters, and

16  changes in Superman's appearance.  Many of the most famous story elements and

17  characters associated with Superman were developed long after 1938 and by

18  illustrators and story writers other than Shuster and Siegel working for hire for DC

19  Comics.  These include stories about and depictions of: (a) "Smallville," the town

20  where Superman grew up; (b) "Kryptonite," or surviving fragments of the

21  destroyed planet Krypton, which have the power to harm or affect Superman;

22  (c) the "Fortress of Solitude," Superman's secret headquarters outside Metropolis

23  (traditionally located in the Arctic, but also placed in the Andes and Amazon

24  rainforest); (d) the "Daily Planet" newspaper, where Clark Kent would go to work;

25  (e) Jimmy Olsen and Perry White, Kent's co-workers at the Daily Planet; (f) love

26  interests, such as Lana Lang; (g) villains, such as Lex Luthor and Braniac;

27  (h) Superman's adoptive parents, the Kents; and (i) other allies, such as "Krypto"

28  the Superdog as well as Supergirl.  Other aspects of Superman's evolution included

- 12 -

COMPLAINT

1    the development of new super-powers, including:  (a) the ability to fly (a key

2    component, especially of the Superman motion pictures); (b) super-vision, which

3    enables him to see through walls ("X-ray" vision); (c) telescopic vision, which

4    allows him to see across great distances; (d) "heat vision," which empowers him to

5    aim rays of extreme heat with his eyes; (e) super-hearing, which enables him to

6    hear conversations at great distances; (f) invulnerability to injury; and (g) the ability

7    to survive in outer space without protective gear.  It is this constant and

8    uninterrupted evolution of the Superman mythology that allows Superman to

9    remain a force in popular consciousness decades after so many contemporary

10   characters have been forgotten or deemed old-fashioned.

11   **B.**    **Early Disputes Regarding the Superman Rights**

12        36.    Siegel and Shuster served in a work-for-hire capacity for DCI from the

13   early 1930s through the late 1940s, helping draw and write Superman comic strips

14   and comic books.  Though paid substantial sums for their work—several million

15   dollars in today's economic terms—the relationship eventually became contentious.

16        37.    In 1947, Siegel and Shuster filed an action against DCI's successor,

17   National Comics Publications, Inc. ("National"), in the New York Supreme Court

18   in Westchester County (the "Westchester Action").  In the Westchester Action,

19   Siegel and Shuster sought to invalidate the March 1, 1938 Agreement.  They also

20   sought to recapture all rights in Superman, arguing that the DCI September 22,

21   1938 Agreement was obtained by duress.  Siegel and Shuster further challenged as

22   unauthorized DCI's publication in November 1944 of a series of comic-book

23   stories entitled "Superboy," which featured the adventures of Superman as a youth.

24        38.    On November 21, 1947, a referee in the Westchester Action issued an

25   opinion after trial (the "Westchester Opinion") holding that the March 1, 1938

26   Agreement assigned "all" of the Superman rights to DCI, and that the DCI

27   September 22, 1938 Agreement was valid and not obtained under duress.  The

28   referee found that DCI had acted improperly in publishing Superboy.

- 13 -

COMPLAINT

39.    At the referee's request, the parties to the Westchester Action submitted proposed findings of fact and conclusions of law.  On April 12, 1948, the referee adopted findings of fact and conclusions of law and issued an interlocutory judgment (collectively, the "Westchester Action Interlocutory Judgment"), in which he made statements based on a script that Siegel had submitted that Siegel originated and owned the comic strip Superboy to the exclusion of DC Comics. National filed a notice of appeal, and the Westchester Action Interlocutory Judgment was stayed pending appeal.

40.    Shortly thereafter, the parties to the Westchester Action entered into two separate agreements:  (a) a stipulation dated May 19, 1948 (the "May 19, 1948 Stipulation"); and (b) a consent judgment dated May 21, 1948 (the "May 21, 1948 Consent Agreement").  Under both documents, *inter alia*, Siegel and Shuster: (a) agreed to vacate the Westchester Action Interlocutory Judgment; (b) acknowledged that, pursuant to the March 1, 1938 Agreement, they transferred to DCI all rights in and to Superman, including "the title, names, characters, concept and formula" as set forth in Action Comics No. 1; and (c) agreed that National was the sole and exclusive owner of all rights in Superman and Superboy. In exchange, Siegel and Shuster were paid nearly $900,000 in today's dollars.

41.    Following the commencement of the Westchester Action, Siegel attempted to launch a new comic book and syndicated strip feature entitled "Funnyman."  The *Funnyman* comic book, however, was cancelled after only six issues, and the syndicated *Funnyman* strip was only picked up by a few newspapers and dropped prior to the end of 1949.  By the late 1950s, Siegel was unable to find employment in the comic book field and needing to support his family, he approached DC Comics asking for work.  Despite Siegel's prior lawsuit and challenge to DC's rights in Superman, DC Comics agreed to hire Siegel and thereafter employed him continuously as a work-for-hire writer until the mid-1960s, when Siegel once again challenged DC Comics' rights to Superman.

- 14 -

COMPLAINT

42.     In April 1965, Siegel (while still working for DC Comics) and Shuster (who was being paid a monthly stipend by DC Comics) filed copyright renewal notices in their own names, claiming to own the renewal copyrights in the Superman character and in Action Comics No. 1. This was followed by a lawsuit filed by Siegel and Shuster against National in 1969 in the District Court for the Southern District of New York, seeking a declaration that they owned the "renewal" copyright terms for Superman and Action Comics No. 1. (Under the then-applicable 1909 Copyright Act, the period of copyright protection for a work included an initial term of 28 years and an optional renewal term of 28 years.) Again, Siegel and Shuster's arguments were rejected, and the federal district court held, *inter alia,* that the agreements between Siegel and Shuster, on the one hand, and DCI (later National), on the other, had assigned "all" rights in Superman to DCI and National, including all renewal copyrights. *See Siegel v. Nat'l Periodical Publ'ns, Inc.,* 364 F. Supp. 1032 (S.D.N.Y. 1973). The Court of Appeals for the Second Circuit affirmed the district court's ruling that National owned all rights in Superman. *See Siegel v. Nat'l Periodical Publ'ns, Inc.,* 508 F.2d 909 (2d Cir. 1974). Siegel and Shuster did not further appeal that ruling.

43.     Following the failure of their second lawsuit to recapture copyrights in Superman, Siegel and Shuster ran into financial difficulties. Siegel publicized their financial plight, and there were calls for companies like National (and even for Congress) to help such artists. On December 23, 1975, and despite Siegel and Shuster's two prior lawsuits against National, Warner Communications, Inc. ("WCI"), National's then-parent company, agreed to provide them financial assistance. Under an agreement entered into in 1975 (the "1975 Agreement"), Siegel and Shuster again acknowledged that DC Comics was the sole and exclusive owner of "all right, title and interest in and to the 'Superman' concept, idea, continuity, pictorial representation, formula, characters, cartoons and comic strips, title, logo, copyrights and trademarks, including any and all renewals and

- 15 -

COMPLAINT

1   extensions of such rights, in the United States and throughout the world, in any and

2   all forms of publication, reproduction and presentation, whether now in existence or

3   hereafter devised." In exchange, WCI agreed to provide Siegel and Shuster with,

4   *inter alia*, annual payments of $20,000 each (around $80,000 in current dollars),

5   annual payments to their heirs after their death, medical insurance coverage, and a

6   lump sum of $17,500 each. With respect to Shuster's heirs, WCI agreed that after

7   Shuster's death, it would make annual payments to his brother, Frank Shuster, of

8   $10,000 until December 31, 1985, and then $5,000 a year for the rest of his life.

9        44.    In the years following the 1975 Agreement, DC Comics increased the

10   annual payments to Siegel and Shuster, made periodic cost-of-living increases,

11   provided insurance, and paid special bonuses. During the last several years,

12   Siegel's widow, for example, has received $135,000 per year plus reimbursement

13   for all medical expenses. In all, DC Comics has paid Siegel, Shuster, and their

14   heirs nearly $4 million pursuant to the 1975 Agreement and other arrangements—

15   benefits that DC Comics continues to pay, and the Siegel and Shuster heirs continue

16   to accept.

17        45.    In 1976, Congress amended the Copyright Act to give authors and

18   certain of their heirs certain limited rights to terminate prior grants of copyright.

19   *See* 17 U.S.C. § 304(c) (1976). This amendment did not apply to works-made-for-

20   hire (the company paying for the production of those works would always own

21   them), and entitled authors and certain heirs to recapture copyrighted interest only

22   in works that the *author* actually created (*e.g.*, it did not entitle authors to recapture

23   derivative works the grantee may have developed pursuant to the original grant,

24   such as the original Superman radio and television shows, or Superman-related

25   characters, such as "Superboy" or "Lex Luthor"). Despite their previous legal

26   battles with National and the widespread publicity surrounding this legislation,

27   neither Jerry Siegel nor Joe Shuster ever endeavored to exercise any termination

28   rights under the statute. Instead, for the rest of their lives, Siegel and Shuster

- 16 -

COMPLAINT

1   accepted and enjoyed the benefits under the 1975 Agreement. This decision made

2   sense, given Siegel and Shuster's work-for-hire relationship with DC Comics, the

3   narrow sliver of rights (if any) to which they might claim an interest, and the

4   significant contributions made to Superman in the past 70 years to which they could

5   claim no interest. Moreover, the 1975 Agreement paid Shuster and Siegel an

6   annual pension and medical insurance for the rest of their lives and, upon their

7   death, paid annual pensions to their heirs. Although Shuster's and Siegel's

8   "window of time" in which to attempt to terminate prior grants of copyright

9   interests in Superman theoretically opened in 1984, at no time during their lives did

10  they attempt to exercise any such right.

11  **C.    Joe Shuster's Death and the Shuster Heirs' 1992 Agreement**

12        46.    Joe Shuster passed away on July 30, 1992. He was survived only by

13  his brother Frank Shuster, sister Jean Peavy, and Jean's two children, Mark Peary

14  and Dawn Peavy (the "Shuster Heirs"). (Mark Peary changed his last name from

15  "Peavy" to "Peary.") Shuster did not leave a widow and never had children or

16  grandchildren. Shuster's purported will names Jean Peavy the sole beneficiary of

17  his estate. (An alleged copy of this will surfaced and was probated in 2001, only

18  after Toberoff intervened. In addition to certain irregularities in the will, probate

19  papers filed by the Shuster Heirs falsely represented that Joe Shuster was never

20  married and omitted that Joe had a sibling, Frank, who had also survived him.)

21        47.    On August 21, 1992, Jean Peavy sent a letter to Time Warner and DC

22  Comics explaining that Shuster had "left his family with a crushing burden of

23  unpaid debts and bills and only a tiny estate." Jean stated: "It's unbelievable to me

24  that Joe could have so little considering the generosity shown by Time Warner in

25  raising the pension income of Siegel and Shuster." She also disclosed that 20% of

26  Shuster's income had been taken by Joanne Siegel, Jerome Siegel's widow, "as an

27  agent's commission for getting pay raises for Siegel and Shuster" following the

28  December 23, 1975 Agreement. Much of the remainder of Shuster's income was

COMPLAINT

1    spent by him during "compulsive buy[ing]" and "shopping sprees" and on

2    expensive stereo equipment and other personal items. As a result, Shuster had

3    accumulated "almost $20,000 in credit card debts and unpaid bills." Jean asked that

4    Time Warner and DC Comics "pay his final debts and expenses."

5        48.    In September 1992, Time Warner and DC Comics offered to pay off

6    Shuster's debts and expenses, totaling approximately $20,000, plus increase Frank

7    Shuster's annual survivor payments under the 1975 Agreement from $5,000 to

8    $25,000 per year.

9        49.    In a September 10, 1992 letter sent to DC Comics (the "September 10,

10   1992 Letter"), Frank Shuster, on behalf of himself and Jean, requested that the

11   annual payments due and owing Frank be made to Jean Peavy in order to take

12   advantage of certain tax benefits. Frank and Jean further promised that, if an

13   agreement could be reached, Jean "would not pursue the termination of the

14   Superman copyright as provided for to creators' heirs in the 1976 U.S. Copyright

15   Act."

16       50.    Based on Jean and Frank's letter and the parties' further discussions,

17   DC Comics, Jean, and Frank entered into a written agreement on October 2, 1992

18   (the "1992 Agreement"). The 1992 Agreement confirmed that it "fully settles all

19   claims to any payments or other rights or remedies which you may have under any

20   other agreement or otherwise, whether now or hereafter existing regarding the

21   copyrights, trademarks, or other property right in any and all work created in whole

22   or in part by your brother, Joseph Shuster, or any works based thereon," and that

23   the Shuster Heirs "covenant not to assert any claim of right, by suit or otherwise,

24   with respect to the above, now and forever." The 1992 Agreement operated to

25   revoke, rescind, and replace Shuster's prior copyright grants and agreements.

26       51.    After the 1992 Agreement, DC Comics and the Shuster Heirs enjoyed

27   an amicable relationship with the Shuster Heirs. To date, DC Comics and its

28   affiliates have paid the Shuster Heirs close to $500,000 under the 1992 Agreement.

1   On April 27, 1995, Jean Peavy sent a letter to DC Comics expressing gratitude for

2   their generosity and concluding: "You know we appreciate your thoughtfulness."

3   Even after Frank Shuster's death in 1996, DC Comics has continued to this day to

4   pay $25,000 per year to Jean Peavy.

5   **D.**   **Toberoff Induces the Shusters to Repudiate the 1992 Agreement with**

6   **DC Comics and Acquires a 50% Interest in the Shusters' Putative Rights**

7   52.   This state of affairs remained undisturbed for almost a decade.  In

8   2001, Toberoff and his production company, Pacific Pictures, induced the Shuster

9   Heirs to violate their 1992 Agreement and wrongfully attempt to acquire and

10   exploit future copyright interests in Superman.

11   53.   Toberoff is a self-described "intellectual property entrepreneur."  His

12   business—conducted through a variety of corporate entities like Pacific Pictures—

13   is to locate the authors of valuable copyrighted works or their heirs and acquire, or

14   prevent them from conveying to others asserted rights to present or future copyright

15   interests.  To convince these authors and heirs to go into business with him,

16   Toberoff holds himself out as a producer with the financial resources and

17   connections to exploit recaptured rights in all media in the entertainment industry.

18   54.   In or around 2001, Toberoff made contact with the Shuster Heirs and

19   embarked on a course of conduct with them to disrupt their relationship with DC

20   Comics, including DC Comics' rights under the 1992 Agreement.  On November

21   28, 2001, the Shuster Heirs formed a joint venture with Toberoff's company Pacific

22   Pictures ("2001 Pacific Pictures Agreement") for the stated "purpose of retrieving,

23   enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims,

24   copyrights, property, title and interests in and to Joe Shuster's creations."  The 2001

25   Pacific Pictures Agreement provided that this purpose would be realized "via the

26   establishment of Joe Shuster's estate" in a California probate court "and the estate's

27   termination pursuant to [17 U.S.C. § 304] of any and all grant or transfers by Joe

28   Shuster of any copyright interest in his creations."

- 19 -

COMPLAINT

55.     The 2001 Pacific Pictures Agreement defined the Shuster Heirs' rights being assigned as including all "rights, claims, title, copyrights and interests in and to each character, story element, and indicia associated with … 'SUPERMAN' [and] *Superboy*." (Italics added.)

56.     Pursuant to the 2001 Pacific Pictures Agreement, Jean and her son Mark Peary "transfer[red] and assign[ed] to the Venture their rights, title, and interest" in Shuster's Superman and Superboy rights.  The Agreement provided that "[a]ny and all moneys and proceeds [of the Venture] will be shared, divided and payable:  fifty percent (50%) to [the Shuster Heirs] and fifty percent (50%) to PPC [Pacific Pictures]," and that upon "winding-up of the Venture or in the event of termination of the Venture *for any reason*, all Rights, property or assets of the Venture will be held fifty percent (50%) by the [Shuster Heirs] and fifty percent (50%) by PPC." (Emphasis added.)

57.     The 2001 Pacific Pictures Agreement also provided that the Shuster Heirs could not enter into any agreement with respect to the Superman and Superboy rights "without the express written consent" of Pacific Pictures, an entity controlled solely by Toberoff.  The 2001 Pacific Pictures Agreement further provided that the joint venture would "retain Marc Toberoff, Esq. to render legal services in connection with the Rights and the Venture."

58.     Pursuant to the 2001 Pacific Pictures Agreement, the Shuster Heirs filed a probate action in Los Angeles Superior Court to establish the Shuster Estate. That action remains open. (*See* LASC Case No. BP-080635.)

**E.     Toberoff Induces the Siegels to Repudiate the Siegel-DC Comics Agreement and Acquires a 45% Interest in the Siegels' Putative Rights**

59.     Having orchestrated this joint venture, Toberoff used the Shuster Heirs to gain access to the heirs of Jerry Siegel, Joanne Siegel and Laura Siegel Larson (collectively, the "Siegel Heirs").  Toberoff sought to corner the other putative "half" of putative Superman termination rights.  Toberoff knew, however, that the

- 20 -

COMPLAINT

1     Siegels had reached an agreement with DC Comics in 2001 resolving their putative

2     termination claims.  Nevertheless, Toberoff and his companies set out to interfere

3     with this agreement in order to acquire a stake in the Siegel Heirs' putative

4     copyright interests in Superman.

5         60.     In 1997—and after Jerry Siegel's death in 1996—the Siegel Heirs had

6     employed counsel and served notices to terminate grants of Superman rights that

7     Siegel had conveyed to DC Comics (the "Siegel Superman Termination Notice").

8     The Siegel Superman Termination Notice, which was prepared by prior counsel,

9     listed Superboy works and elements as among the "character[s], story element[s], or

10    indicia reasonably associated with SUPERMAN," in recognition of the fact that

11    Superboy was a complete derivative of Superman rather than a stand-alone, non-

12    derivative work based upon Superman.

13        61.     The Siegel Heirs and DC Comics began negotiations, and in these

14    talks the Siegel Heirs were represented by Kevin Marks of the Gang Tyre

15    entertainment law firm.  As the parties' negotiations progressed, and as

16    expectations grew that an agreement would soon be reached, DC Comics paid the

17    Siegels a non-refundable advance of $250,000.

18        62.     On October 16, 2001, DC Comics made a proposal to the Siegel Heirs.

19    On October 19, 2001, Kevin Marks sent a letter to DC Comics confirming that the

20    Siegel Heirs "accepted D.C. Comics' offer of October 16, 2001."  On October 26,

21    2001, DC Comics sent a return letter confirming the parties' agreed-upon terms.

22    DC Comics then began drafting a long-form agreement.  DC Comics sent the Siegel

23    Heirs a copy of the long-form document on February 1, 2002.  As a result of the

24    parties' agreement (the "Siegel-DC Comics Agreement"), the Siegels were now on

25    the brink of receiving significant portions of the Superman profits—sums that

26    would immediately and dramatically change their lives.  Moreover, virtually all of

27    the money would be theirs alone to keep, as the Gang Tyre firm had agreed to

28    represent the Siegels for the standard 5% fee.

- 21 -

COMPLAINT

1    63.    Toberoff has admitted that he closely tracked the progress of the Siegel
2  Heirs' termination attempt.  On learning of the Siegel-DC Comics Agreement, he
3  knew his company's joint-venture interest in the Shuster rights was limited and that
4  he could assert greater leverage only if he could disrupt the Siegel-DC Comics
5  Agreement and corner both "halves" of the putative Superman termination rights.
6  Given that Joe Shuster and his heirs held whatever Superman copyright interests
7  they owned (*if any*) jointly with Jerome Siegel, Toberoff understood that if DC
8  Comics obtained the rights from the Siegels to exploit new Superman properties, it
9  could do so freely without any ability on the part of the Shusters to claim their
10  interests were being infringed.

11    64.    With knowledge that his actions would interfere with DC Comics'
12  actual and prospective economic advantages under the Siegel-DC Comics
13  Agreement, beginning in or around late 2001, Toberoff—identifying himself as a
14  film producer—approached the Siegel Heirs, including and/or through their
15  representative Kevin Marks, for the purpose of acquiring their rights.

16    65.    Marks informed Toberoff that the Siegel Heirs had already reached a
17  binding agreement with DC Comics, which was in the process of being further
18  documented in a long-form agreement.  Undeterred, Toberoff continued to contact
19  the Siegel Heirs and their representatives in an effort to induce them to repudiate
20  the Siegel-DC Comics Agreement and enter into a production agreement with
21  Toberoff or one of his companies.

22    66.    On May 9, 2002, as a result of Toberoff's improper interference and
23  inducements, Joanne Siegel sent a letter to DC Comics' affiliate acknowledging the
24  Siegel Heirs had accepted DC Comics' October 16, 2001 offer, but purporting to
25  object to certain unspecified portions of the long-form document.  DC Comics
26  objected to the Siegel Heirs' sudden and unfounded objections, but continued
27  working with their counsel to finalize the long-form agreement.

28

COMPLAINT

67.     In or around August 2002, as Marks was finalizing the Siegels' revisions to the long-form document, Toberoff contacted Marks again regarding the Siegel-DC Comics Agreement. Upon information and belief, Marks informed Toberoff he could not discuss the matter, including the terms of the agreement, because of a confidentiality agreement between DC Comics and the Siegel Heirs. Toberoff reiterated interest in purchasing the Siegel Heirs' Superman rights. On August 8, 2002, Toberoff conveyed an offer to Marks for presentation to the Siegels, which Marks said he would convey.

68.     Upon information and belief, Toberoff's offer stated that he had found a billionaire investor willing to purchase the Siegel Heirs' Superman rights. Toberoff claimed the investor would give the Siegel Heirs $15 million cash up front, plus generous royalty and "back-end" rights on any properties developed, including a new Superman motion picture. Upon information and belief, Toberoff also falsely offered to help the Siegel Heirs produce a movie that would compete directly with the Superman movie in development at the time at Warner Bros., DC Comics' licensee, even though he knew that the Siegels' limited rights in the recaptured copyright, if any, would make such a competing motion picture all but impossible to produce and distribute.

69.     Upon information and belief, although Marks conveyed Toberoff's offer to the Siegels, he advised them that they had already reached a binding agreement with DC Comics. Nonetheless, as a result of Toberoff's inducements, the Siegel Heirs stated that they would repudiate their agreement with DC Comics and accept Toberoff's offer.

70.     On or around September 21, 2002, the Siegel Heirs sent a letter to Marks terminating him as their attorney. On or around September 21, 2002, based on Toberoff's inducements, the Siegel Heirs sent a letter to DC Comics repudiating the Siegel-DC Comics Agreement. On October 23, 2002, the Siegel Heirs formalized an agreement with defendant IP Worldwide for the purpose of

- 23 -

COMPLAINT

1  "arrang[ing] and negotiat[ing] the sale, lease, license and all other dispositions or

2  exploitations" of the Siegel Heirs' Superman rights (the "IP Worldwide

3  Agreement").  The Siegel Heirs agreed to pay IP Worldwide a fee of 10% of the

4  gross proceeds generated by those rights.  Upon information and belief, the fee was

5  subsequently reduced to 5%.

6      71.    Upon information and belief, in or around September 2004, the Siegel

7  Heirs entered into an agreement with Toberoff granting him 40% of their Superman

8  rights and retaining him as their attorney (the "Siegel-Toberoff Agreement").

9      72.    Upon information and belief, as a result of the Siegel-Toberoff

10  Agreement and IP Worldwide Agreement, Toberoff now owns a 45% financial

11  interest in the Siegel Heirs' purported Superman rights.

12  **F.**    **Toberoff Manipulates the Siegel Heirs and Shuster Heirs into Falsely**

13        **Claiming that Superboy Was the Sole Creation of Jerry Siegel**

14      73.    After inducing the Siegel Heirs to repudiate the Siegel-DC Comics

15  Agreement, on November 8, 2002, Toberoff caused the Siegel Heirs to serve a

16  second copyright termination notice on DC Comics directed at the character

17  Superboy (the "Siegel Superboy Termination Notice").  The notice not only

18  erroneously stated that Superboy was a copyrightable work not derivative of

19  Superman, but falsely recited that Superboy was created *solely* by Siegel (without

20  contribution from Shuster), thereby entitling the Siegel Heirs to terminate and

21  recapture 100% of the putative Superboy rights.

22      74.    Defendants knew these claims were false.  To begin, in the Siegel

23  Superman Termination Notice served by the Siegel Heirs in 1997—the one served

24  prior to Toberoff's intervention—the Siegel Heirs expressly identified the Superboy

25  works and elements as among the "character[s], story element[s], or indicia

26  reasonably associated with SUPERMAN."  This earlier notice acknowledged—as is

27  in fact the case—that Superboy was a derivative work of Superman, rather than a

28  separately copyrightable work.

- 24 -

COMPLAINT

75.    As to the representation that Superboy was created solely by Jerry Siegel, defendants knew that claim was untrue as well.  Among other reasons:

- One year earlier, through defendant Pacific Pictures, Toberoff had entered into the 2001 joint venture agreement with the Shuster Heirs, specifying that the *Shuster Heirs* owned an interest in "Superboy."

- The original Superboy "script" on which the Siegel Heirs' ownership claims rely openly contains the byline: "By Jerry Siegel *and Joe Shuster*"—not just Jerry Siegel alone.  (Emphasis added.)

- In 1972 and 1973, Siegel and Shuster together filed their own copyright renewal notices with the copyright office for Superboy, in which they identified Superboy as a work that they had *jointly* created.

- And long before the alleged first publication of "Superboy" in November 1944, Shuster illustrated works for DC Comics that included various depictions of Superman as a boy, exhibiting super-human strength.  Several examples are reproduced below.  In "Action Comics No. 1," for example, Shuster drew Superman as a very young boy displaying an "astonish[ing] feat[]" of super-human strength, holding a chair above his head:



Action Comics No. 1 (1930)

COMPLAINT

EXHIBIT N
Page 270

Shuster also depicted Superman as a youth with super-powers in "Superman No. 1," a work allegedly terminated by Shuster in the notice filed by Toberoff on behalf of the Shuster heirs,



Superman No. 1 (May 1939)

as well as in a 1942 Sunday comic strip, in which Superman as a "youth" discovers that his "amazing powers" are "multiplied with the years" and that, as a boy, he could "outrace the fastest streamline train":



Superman Sunday Strip (May 31, 1942)

76.    Through Pacific Pictures, Toberoff manipulated the Siegel and Shuster Heirs into falsely positioning Siegel as the sole creator of any putative

- 26 -

COMPLAINT

1    copyrightable elements in Superboy.  They did so to enable the Siegels to claim a

2    sole ownership interest in Superboy elements allegedly subject to recapture and

3    thereby prevent DC Comics from exploiting Superboy without the Siegels'

4    authorization and without being subject to claims of copyright infringement.

5    (Again, to be clear, DC Comics disputes that Superboy is not a derivative work of

6    Superman and disputes that it is a work that Shuster and Siegel owned.)

7         77.    To manufacture this claim of sole ownership by the Siegels, Toberoff

8    (acting through Pacific Pictures) caused the *Shuster Heirs* to remove from the 2001

9    joint venture between Pacific Pictures and the Shuster Heirs all claims by the

10   Shusters to alleged rights in any and all Superboy elements.  Toberoff

11   accomplished this by creating a new joint venture agreement—signed October 30,

12   2003—that *deleted* any reference to Superboy.  Defendant Mark Peary signed this

13   agreement (the "2003 Pacific Pictures Agreement"), which omitted all references to

14   Superboy in its description of the Shuster Heirs' rights.  Toberoff induced the

15   Shuster Heirs to disclaim any interest in Superboy so that Toberoff could position

16   the Siegel Heirs to recapture 100% of these rights and assert a copyright

17   infringement action against DC Comics—and seek an injunction against the

18   television program *Smallville* on that basis.

19        78.    In October 2004, the Siegels filed two actions in this Court seeking

20   declaratory relief as to the validity of the Superman and Superboy termination

21   notices, and in April 2005, the Siegels supplemented their pleadings in the

22   Superboy action to assert copyright infringement.  (Case Nos. CV-04-8400 ODW;

23   CV-04-8776 ODW.)  Both actions remain pending before this Court.

24   **G.    The Shusters' Flawed Termination Notice**

25        79.    On November 10, 2003, one week after the 2003 Pacific Pictures

26   Agreement was signed, defendant Mark Peary served on DC Comics a "Notice of

27   Termination of Transfer Covering Extended Copyright Renewal Term of

28   'Superman'" (the "Shuster Termination Notice").

- 27 -

COMPLAINT

80.    The form submitting the Shuster Termination Notice for recordation in the U.S. Copyright Office was certified under penalty of perjury by Toberoff on behalf of "IP Worldwide/Estate of Joseph Shuster."  IP Worldwide is the Toberoff entity which, upon information and belief, holds a portion of the Siegel Heirs' Superman and Superboy rights pursuant to the IP Worldwide Agreement.

81.    The Shuster Termination Notice purports to terminate, under 17 U.S.C. § 304(d), effective October 26, 2013, the following Shuster copyright grants: (a) the December 4, 1937 Agreement; (b) the March 1, 1938 Agreement; (c) the DCI September 22, 1938 Agreement; (d) the McClure September 22, 1938 Agreement; (e) the December 19, 1939 Agreement; (f) the May 19, 1948 Stipulation; and (g) the December 23, 1975 Agreement.

82.    The Shuster Termination Notice does *not* purport to terminate the copyright grants in the May 21, 1948 Consent Agreement or, even more importantly, the 1992 Agreement between the Shuster Heirs and DC Comics.

83.    The Shuster Termination Notice purports to apply to the following works:  (a) certain unpublished material created before Action Comics No. 1; (b) Action Comics No. 1; (c) Action Comics No. 2; (d) Action Comics No. 3; (e) Action Comics No. 4; (f) Action Comics No. 5; (g) Action Comics No. 6; (h) Action Comics No. 7; (i) Superman No. 1; and (j) Superman No. 3.

84.    The Shuster Termination Notice does not purport to terminate any copyright grant in pre-Action Comics No. 1 promotional materials or any materials relating to Superboy.

85.    The Shuster Termination Notice states that defendant Mark Peary "is the person entitled to exercise Joseph Shuster's termination interest" and that the Notice was "signed by all persons whose signature is necessary to terminate."  The Notice makes no mention of the joint venture that the Shuster Heirs and Pacific Pictures formed or its putative ownership stake in the to-be terminated Superman rights.  Nor does the Notice mention Pacific Pictures or its putative ownership stake

- 28 -

COMPLAINT

in the joint venture, despite the grant of 50/50 rights in the joint venture to Pacific Pictures pursuant to Pacific Pictures' 2001 and 2003 agreements with the Shusters.

86.     On September 10, 2004, Pacific Pictures and the Shuster Heirs signed a one-page letter (the "September 10, 2004 Letter") purporting to cancel their joint venture and providing that the 2001 Pacific Pictures Agreement and 2003 Pacific Pictures Agreement "have been cancelled."  However, because the Shuster Heirs and Pacific Pictures had agreed that all rights held by their joint venture would be divided 50/50 upon termination of the joint venture "for any reason," the apparent effect of the September 10, 2004 Letter was to transfer 50% of the Shuster Heirs' purported share of Shuster's rights to Toberoff or his companies.

87.     DC Comics is informed and believes that Toberoff (or his companies) now own 50% of the Shuster Heirs' putative rights as well as the 45% share of the Siegel Heirs' putative rights.  This gives Toberoff the largest financial stake among defendants' collective asserted rights in Superman and in the pending legal disputes concerning those rights (*i.e.*, Toberoff—47.5%; Siegel Heirs—27.5%; Shuster Heirs—25%).

88.     DC Comics is also informed and believes that Toberoff, Pacific Pictures, IP Worldwide, the Siegels, and the Shusters have entered into one or more agreements preventing the Siegels or Shusters from conveying rights to DC Comics or entering into other agreements with DC Comics, including for the settlement of their putative termination claims or litigation, without the consent of other parties. For example, in the 2003 Pacific Pictures Agreement, the Shuster Heirs agreed not to settle any claims with respect to the Superman rights without Pacific Pictures' or Toberoff's consent.  Such consent agreements are void as against public policy, violate DC Comics' rights, and impede the administration of justice.

- 29 -

COMPLAINT

**H.    Toberoff's Wrongful Conduct Is Revealed to DC Comics in the Toberoff Timeline**

89.    Pursuant to federal court orders dated September 26, 2008 and December 4, 2008, Toberoff was compelled to produce to DC Comics a document titled "Superman – Marc Toberoff Timeline" ("Toberoff Timeline," attached hereto as Exhibit A), which Toberoff has acknowledged was written by an attorney he previously employed.  To prevent DC Comics from obtaining and using the document, Toberoff asserted to the federal court that it was privileged, but his position was rejected.  Toberoff produced the Toberoff Timeline to DC Comics on December 10, 2008.

90.    The Toberoff Timeline describes and discloses Toberoff's wrongful activities in pursuing the Siegel and Shuster Heirs' putative interests in the Superman rights.  It lays out Toberoff's scheme to induce the Siegel Heirs to repudiate the Siegel-DC Comics Agreement with DC Comics (*e.g.*, "It [is] clear at this juncture that [Toberoff] thwarted the earlier deal with Time Warner and DC Comics in 2002 for his own personal gain"); his efforts to acquire as "much ownership of the Superman copyright personally as he can"; and his attempt to conceal certain of his illicit activities from the Siegel and Shuster Heirs.  (Emphasis in original.)  As a result, "***the single person who would stand to gain the MOST in a settlement with Time Warner [and DC Comics] regarding the ongoing SUPERMAN legal dispute would not be the heirs themselves, but Marc Toberoff.***"  (Emphasis in original.)

91.    The Toberoff Timeline discloses many of the facts alleged herein, and concludes:  "[Toberoff] is solely motivated *at all times* not by his clients' interests, but manipulating pieces of the puzzle so that he may receive the greatest percentage from a very possible large Time Warner settlement, through part ownership and unconscionable fees."  (Emphasis in original.)  The Toberoff Timeline explains that "[a]t least 7 attorneys have come and gone at the Law Offices of Marc Toberoff,

- 30 -

COMPLAINT

and many have left due to ethical issues." Many of these and other disturbing, salient facts detailed herein have only recently come to light in the past 18 months.

# V.  CLAIMS FOR RELIEF

**A.     First Claim for Relief: Declaratory Relief re: Invalidity of Copyright Termination Notice (Against Defendants Shuster Estate and Peary)**

92.     DC Comics re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

93.     The Shuster Termination Notice is invalid, and thus ineffective, for at least five separate, independent, and alternative reasons:

### (1) There Is No Statutory Basis for the Shusters to Terminate

94.     The Copyright Act does not provide any basis for the Shuster Estate to terminate. Shuster's termination right was lost when he died in 1992 without having exercised it and without leaving a statutory heir to inherit it under the then-applicable provisions of the Copyright Act.

95.     The 1976 Copyright Act gave authors the ability to terminate certain pre-1978 copyright grants. According to the original termination provisions: "Where an author is dead, his or her termination interest is owned, and may be exercised, by his widow or her widower and his or her children or grandchildren." 17 U.S.C. § 304(c)(2) (1976). In other words, the right of termination could only be exercised by an author during his or her lifetime, or by a widow, child, or grandchild after the author's death. As the language of the statute establishes, and its legislative history confirms, the right of termination was lost if an author died without exercising it and without leaving a widow, child, or grandchild to inherit it.

96.     Shuster could have exercised his putative termination right beginning in April 1984. The 1976 Copyright Act provided that a copyright grant could be terminated 56 years after the date copyright was first secured (*i.e.*, April 1994, or 56 years after the April 1938 publication of Action Comics No. 1), and that notice of

- 31 -

COMPLAINT

1    termination could be served 10 years before the termination date (*i.e.*, April 1984,

2    or 10 years before April 1994).  17 U.S.C. § 304(c)(3)-(4).

3         97.    During his lifetime, Shuster chose not to exercise his termination right.

4    Shuster died in 1992, and did not leave a widow, child, or grandchild to succeed to

5    his termination right under section 304(c) of the 1976 Copyright Act.  As a result,

6    Shuster's termination right ceased to exist on his death.

7         98.    The 1999 Copyright Term Extension Act ("CTEA") extended the term

8    of copyright by 20 years and also provided an opportunity to authors and selected

9    heirs to terminate for this new extended time period in circumstances where the

10    "[t]ermination rights provided for in subsection (c) have expired on or before the

11    effective date of the [CTEA]," or October 27, 1998, and the "author or owner of the

12    termination right has not previously exercised such termination right."  17 U.S.C.

13    § 304(d).  Where section 304(d) applies, section 304(c)(2) provides that if an author

14    is dead, the termination right can be exercised by his widow, children, or

15    grandchildren or, "[i]n the event that the author's widow or widower, children or

16    grandchildren *are not living*, the author's executor, administrator, personal

17    representative, or trustee...."  (Emphasis added).  These are the provisions that

18    defendant Mark Peary, the executor of the Shuster Estate, purports to rely on in the

19    Shuster Termination Notice, but they have no application here.  By its own terms,

20    section 304(d) only applies where an author's window for exercising the

21    termination right opened and closed or "expired" (*not* when an author died while

22    the window was open without exercising the right or leaving any heirs to do so),

23    and where a deceased author's widow, child, or grandchild is "not living," but who

24    did at some time live.  Shuster never had a widow, child, or grandchild, and Peary,

25    acting on behalf of the Shuster Estate, has no right to file the invalid notice of

26    termination that he did.

27

28

- 32 -

### (2) The 1992 Agreement Bars the Shusters from Pursuing Termination

99.    The 1992 Agreement that Frank Shuster and Jean Peavy entered into with DC Comics bars the Shuster Estate from pursuing termination because, *inter alia*, in exchange for valuable consideration, the 1992 Agreement effected a rescission, revocation, and re-grant of all prior copyright grants, which eliminated any pre-1978 grant that could be subject to termination under section 304 of the Copyright Act.

100.    The 1992 Agreement, which was executed on October 2, 1992, provides that Shusters' heirs "fully settle[]" and forfeit any and all of rights under Joseph Shuster's prior "agreements or otherwise," thereby revoking and rescinding those prior, pre-1992 instruments.  It also "*grant[s] to us* [DC Comics] any … copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon."  (Emphasis added.)

101.    Section 304(d) of the Copyright Act only allows for termination of copyright grants "executed before January 1, 1978."  Because the 1992 Agreement left intact no pre-1978 copyright grant to terminate, section 304(d) does not apply, and the Shuster Estate has no copyright grant that it may terminate.

102.    Shuster's heirs approached DC Comics in 1992 seeking increased annual payments, certain tax benefits, and payment of Shuster's debts and expenses.  At the time, Shuster's heirs recognized the value of Superman as a property.  As the result of DC Comics' development, promotion, and exploitation of Superman from 1938 to 1992, Superman had evolved from the black-and-white figure drawn by Shuster for Action Comics No. 1 to a global, multi-media industry.  Moreover, in correspondence with DC Comics, the Shusters adverted to the termination rights provided for under the Copyright Act.  As Shuster's heirs requested, the 1992 Agreement provided that DC Comics would:  (a) increase its annual payments to the Shuster Heirs to $25,000 per year—five times higher than

1   the amount it was obligated to pay under the December 23, 1975 Agreement;

2   (b) make these annual payments to Jean Peavy for purposes of a tax benefit; and

3   (c) pay the approximately $20,000 representing Shuster's final debts and expenses.

4   DC Comics continues to make annual payments under the 1992 Agreement, and

5   has paid Shuster's heirs close to $500,000 to date.  The 1992 Agreement confirms

6   that it "fully settles *all claims to any payments or other rights or remedies* which

7   you may have under any other agreement or otherwise, *whether now or hereafter*

8   *existing* regarding the copyrights, trademarks, or other property right in any and all

9   work created in whole or in part by your brother, Joseph Shuster, or any works

10   based thereon."  (Emphasis added.)  Shuster's heirs agreed "not to assert any claim

11   of right, by suit or otherwise, with respect to the above, now and forever."

12       103.   By effectively rescinding, revoking, and re-granting any and all prior

13   grants of Joe Shuster's rights, the Shuster Heirs have no right to terminate any of

14   the Superman copyrights.

15       104.   At the very least, because of DC Comics' continued performance

16   under the 1992 Agreement, and the Shusters' continued acceptance of benefits

17   under the Agreement—even after filing the Shuster Termination Notice—the

18   Shusters are estopped from disputing that the 1992 Agreement remains in full force

19   and effect, which operates to preclude the assertion of any termination right.

20       **(3) <u>The Shusters Lack the Majority Interest Necessary to Terminate</u>**

21       105.   The Shuster Termination Notice is also invalid because the party that

22   filed it—if defendants' own contractual documents are to be believed—lacked

23   authority to do so.  Section 304(c)(1) of the Copyright Act provides that termination

24   of a grant executed by an author who is not living may be exercised only "by the

25   person or persons who … own and are entitled to exercise a total of *more than one-*

26   *half of that author's termination interest*."  17 U.S.C. § 304(c)(1) (emphasis added).

27   Copyright Office regulations require that a termination notice include "specific

28   indication of the person or persons executing the notice who constitute more than

COMPLAINT

1   one-half of that author's termination interest" and "shall be signed by the number

2   and proportion of the owners of that author's termination interest required under

3   section 304(c)."  37 C.F.R. § 201.10(b)(1)(vii), (c)(2).

4       106.   According to the Pacific Pictures agreements (to the extent they are

5   valid and enforceable), the Shuster Estate does not own—and did not own at the

6   time the Shuster Termination Notice was executed—the "more than one-half"

7   majority interest necessary to terminate under section 304(c)(1) of the Copyright

8   Act.

9       107.   Pursuant to the 2001 Pacific Pictures Agreement, defendant Mark

10  Peary and Jean Peavy "transfer[red] and assign[ed] … their rights, title, and

11  interest" in all of Shuster's copyrights and creations to their joint venture with

12  Pacific Pictures.  In the 2003 Pacific Pictures Agreement, Peary confirmed the

13  terms of the 2001 Pacific Pictures Agreement on behalf of the Shuster Estate.

14      108.   One week later, on November 10, 2003, Peary served the Shuster

15  Termination Notice on behalf of the Shuster Estate.  At the time, the Shuster Estate

16  did not own *any* of the purported termination right, as this and all other rights had

17  been transferred to the joint venture with Pacific Pictures.[3]  The Shuster

18  Termination Notice is therefore invalid under section 304(c)(1) of the Copyright

19  Act.

20      109.   The Shuster Termination Notice represents that Peary "is the person

21  entitled to exercise Joseph Shuster's termination interest" and that the Notice had

22  been "signed by all persons whose signature is necessary to terminate."  Peary's

23  _____

24      [3] At most, the Shuster Estate owned only a 50% interest in that joint venture.
    This is still the case.  As a result of the September 10, 2004 Letter purporting to

25  cancel the 2001 and 2003 Pacific Pictures Agreements and by the terms of the 2001
    and 2003 agreements themselves, any putative rights held by the joint venture

26  were split 50/50 between the Shuster Heirs and Pacific Pictures on cancellation of the
    joint venture agreement:  "[Upon] winding-up of the Venture or in the event of

27  termination of the Venture *for any reason*, *all Rights, property or assets of the
    Venture will be held* fifty percent (50%) by the [Shuster Heirs] *and fifty percent*

28  *(50%) by PPC*."  (Emphasis added.)

- 35 -                                                          COMPLAINT

1    failure to disclose that he had purported to transfer this putative termination right to

2    the joint venture with Pacific Pictures, or include a signature on behalf of the joint

3    venture or Pacific Pictures, violated 37 C.F.R. § 201.10(b)(1)(vii) and 37 C.F.R. §

4    201.10(c)(2).

5         110.   Peary's failure to disclose the requisite information in the Shuster

6    Termination Notice was not harmless.  Upon information and belief, these

7    omissions were not inadvertent, but were intended to conceal material information

8    from DC Comics, including:  (a) the various conflicts of interest arising from

9    Toberoff's and his companies' significant ownership interest in the Shuster Estate's

10   and the Siegel Heirs' purported rights; and (b) consent agreements that Toberoff

11   procured limiting the Shuster and Siegel Heirs' freedom to enter into agreements

12   with DC Comics regarding those rights.

13        111.   The Copyright Act's termination provisions were crafted to avoid the

14   trafficking in future interests by third parties like Toberoff and his companies, yet

15   that is exactly what his agreements with the Shuster and Siegel Heirs accomplish,

16   and what Toberoff and Shusters failed to disclose to DC Comics and the Copyright

17   Office by serving and filing the Shuster Termination Notice.

18        **(4) The Shusters Do Not Attempt to Terminate Certain**

19            **All-Encompassing Copyright Grants**

20        112.   The 1992 Agreement includes a "grant" by Shuster's heirs to DC

21   Comics of, *inter alia*, all "copyrights, trademarks, or other property right in any and

22   all work created in whole or in part by … Joseph Shuster, or any works based

23   thereon."  In the Shuster Termination Notice, defendants did not terminate (or even

24   mention) the 1992 Agreement.

25        113.   The May 21, 1948 Consent Agreement also includes a grant by Siegel

26   and Shuster to National, DC Comics' predecessor-in-interest, of all of Siegel and

27   Shuster's rights in Superman and Superboy.  (If the 1992 Agreement is not read as

28   a rescission, revocation, and re-grant of all prior agreements between Shuster and

- 36 -

COMPLAINT

1  DC Comics (and it should be), then the May 21, 1948 Consent Agreement remains

2  in effect.)

3      114.  Defendants do not attempt to terminate the May 21, 1948 Consent

4  Agreement, and do not identify the May 21, 1948 Consent Agreement in the

5  Shuster Termination Notice.

6      115.  As the result of defendants' failure to terminate the 1992 Agreement

7  and May 21, 1948 Consent Agreement, the grants contained therein remain in full

8  force and effect.  Thus, DC Comics is and continues to be the sole owner of all

9  rights, including rights under copyright, in Superman pursuant to the 1992

10  Agreement and May 21, 1948 Consent Agreement.

11      **(5) <u>The Doctrine of Unclean Hands Bars the Shusters from Terminating</u>**

12      116.  The doctrine of unclean hands requires that the Shuster Termination

13  Notice be deemed invalid because it contains material misrepresentations intended

14  to mislead the courts, Copyright Office, and DC Comics—all to the detriment of

15  DC Comics.

16      117.  The Shuster Heirs did not disclose Pacific Pictures' purported

17  ownership interest in the rights sought to be terminated.  Just one week before filing

18  the Shuster Termination Notice, the Shuster Estate signed the 2003 Pacific Pictures

19  Agreement, reaffirming its transfer of 100% of its rights in any Superman-related

20  copyrights to the joint venture with Pacific Pictures.  Copyright Office regulations

21  require that a termination notice include "specific indication of the person or

22  persons executing the notice who constitute more than one-half of that author's

23  termination interest" and "shall be signed by the number and proportion of the

24  owners of that author's termination interest required under section 304(c)."  37

25  C.F.R. § 201.10(b)(1)(vii), (c)(2).  Yet Pacific Pictures is conspicuously absent

26  from the Shuster Termination Notice.  This omission was not inadvertent, as

27  explained above.

28

COMPLAINT

118.   Induced by Toberoff, the Shuster Heirs also falsely disclaimed any interest in the Superboy rights in the Shuster Termination Notice.  This permitted Toberoff to assert on behalf of the Siegel heirs a baseless Superboy-related copyright infringement claim against DC Comics.  Prior to these manipulations by Toberoff, Shuster and the Shuster heirs had truthfully maintained for over 50 years that Shuster had co-created Superboy.  For example, the findings submitted by Siegel and Shuster's counsel in the 1940s Westchester Action, specified that Shuster had drawn the first "Superboy" denominated story in More Fun Comics No. 101.  Similarly, in 1972 and 1973, during the Superman renewal litigation, Siegel and Shuster jointly filed copyright renewal notices asserting joint authorship both in the Superboy character, and in More Fun Comics No. 101, which contained the first comic book story denominated "Superboy."

119.   Additionally, in the 2001 Pacific Pictures Agreement, entered into before Toberoff had secured an agreement with the Siegel Heirs, Toberoff and the Shuster Heirs expressly identified "Superboy" as among the universe of rights that Shuster had jointly created with Siegel.  Yet just two years later in 2003, and only *after* Toberoff had entered into an agreement with the Siegel Heirs securing control over their rights, did the Shuster Heirs suddenly reverse course.  The 2003 Pacific Pictures Agreement omitted all reference to Superboy, and the Shuster Termination Notice filed one week later avoided any overt mention of Superboy elements or works.[4]  But even the termination notice served by the Shuster Heirs, while carefully drafted to avoid any mention of Superboy, could not completely rewrite history.  The Shuster Termination Notice expressly identifies Action Comics No. 1 and Superman No. 1 as terminated works.  Both of these works, however, clearly depict Superman as a boy with super-powers: *i.e.*, a "Superboy."  For example,

---

[4] As noted, DC Comics maintains that Superboy is a derivative work based upon the preexisting Superman, and in any event, is owned solely and exclusively by DC Comics, *inter alia*, because it is a work-for-hire or because the script submitted by Siegel and Shuster is unpublished and, thus, is not terminable.

- 38 -

COMPLAINT

1  Action Comics No. 1 features Superman as a very young boy exhibiting super

2  strength, and Superman No. 1 depicts Superman as a youth leaping over a building.

3      120.   After the Shuster Termination Notice was filed, the Siegel Heirs

4  brought a copyright infringement claim against DC Comics on the frivolous ground

5  that Superboy was the sole creation of Siegel, entitling the Siegel Heirs to terminate

6  and recapture 100% of the Superboy rights (as opposed to the 50% share they

7  would be entitled to recapture if Superboy was a joint work).  The Siegel Heirs

8  threatened to enjoin the popular *Smallville* television series, which they wrongly

9  claimed infringed their exclusive rights in Superboy.  As a result, DC Comics has

10  incurred substantial expenses defending against the claim Toberoff manufactured

11  and the Shusters facilitated.  Defendants compromised the integrity of the

12  Copyright Office and judicial system by crafting the Shuster Termination Notice in

13  this way, and the Shuster Termination Notice should be held invalid on this and the

14  other related grounds set forth herein.

15                    *      *      *

16      121.   Each of the foregoing reasons is a separate, independent, and

17  alternative basis for declaring the Shuster Termination Notice to be invalid and thus

18  ineffective.  A declaration by this Court regarding the validity of the Shuster

19  Termination Notice is warranted under the Declaratory Judgment Act, 28 U.S.C.

20  §§ 2201 *et seq.*, to establish the parties' respective rights and obligations with

21  respect to the copyright interest in the Superman material.

22  **B.**  **Second Claim for Relief:  Declaratory Relief re: Limited Scope of**

23        **Copyright Termination Notice (Against Defendants Shuster Estate and**

24        **Peary)**

25      122.   DC Comics re-alleges and incorporates by reference each and every

26  allegation contained in the paragraphs above.

27

28

COMPLAINT

123.   This Second Claim for Relief is advanced in the alternative—*i.e.*, if the Court does not grant DC Comics' First Claim for Relief set forth above and hold that the Shuster Termination Notice is invalid.

### (1) <u>Additional Factual Background</u>

124.   Upon information and belief, in or around 1933, Siegel and Shuster began co-creating comic strips, some of which included stories featuring a character named Superman.   The materials created by Siegel and Shuster during this time are believed to include: (a) 24 days of Superman comic strips intended for newspapers; (b) a seven-page synopsis of the last 18 days (weeks two through four) of such comic strips; (c) a paragraph previewing future Superman exploits; (d) a nine-page synopsis of an additional two months of daily comic strips; and (e) 15 daily comic strips (collectively, the "Unpublished Superman Works").   None of these materials was published in its original form, most were never published at all, and some are apparently lost.

125.   Upon information and belief, between 1933 and 1937, Siegel and Shuster submitted the Unpublished Superman Works to a number of prospective publishers and newspaper syndicates, all of which rejected them.

126.   On December 4, 1937, Siegel and Shuster entered into the December 4, 1937 Agreement with DCI.   Siegel and Shuster agreed to "give their exclusive services" in producing certain comic features for a period of two years.   Siegel and Shuster were required to submit any new continuity to DCI, which reserved the right to accept or reject them for a period of sixty days.

127.   In early 1938, DCI was seeking material for use in a new comic book it was developing entitled "Action Comics."   Pursuant to the December 4, 1937 Agreement, the 24 days of Superman comic strips from the Unpublished Superman Works were provided to DCI for review.   DCI decided to publish a Superman story in Action Comics No. 1, but the materials submitted by Siegel and Shuster to DCI were neither in a form that was acceptable for publication in a comic book, nor

- 40 -

COMPLAINT

1   were they complete.  Therefore, at the instance and expense of DCI and subject to

2   its right of control, Siegel and Shuster adapted the 24 days of comic strips, and

3   added certain new material, to create a 13-page uncolored comic book story entitled

4   "Superman."  Cover art featuring Superman that was used for Action Comics No. 1

5   was thereafter created by DCI.  DCI's printers or engravers, working at the

6   direction of DCI, chose colors for the Superman character and colored the 13-page

7   story and cover.

8       128.   Siegel and Shuster assigned to DCI all of their rights in Superman in

9   the March 1, 1938 Agreement.  This included "all good will attached thereto and

10  exclusive right to the use of the characters and story, continuity and title of strip."

11  Siegel and Shuster agreed not to use Superman or any other character featured in

12  the strip "by their names contained therein."

13      129.   Before the April 1938 publication of Action Comics No. 1, which was

14  cover-dated June 1938, DCI promoted the upcoming Superman story in some of its

15  other publications, including "More Fun Comics No. 31" and "Detective Comics

16  No. 15."  These publications were cover-dated May 1938 and were published prior

17  to Action Comics No. 1.  The promotions (the "Promotions") depict Superman in

18  his costume—including a cape, boots, leotard, and inverted triangular "S" crest on

19  his chest—exhibiting his super-strength by holding a car over his head as

20  bystanders watch in awe.  The Promotions show almost the entirety of what would

21  become the cover of Action Comics No. 1 in clarity and detail.

22      130.   Action Comics No. 1 was comprised not only of the 24 days of

23  Superman comic strips from the pre-existing Unpublished Superman Works (as

24  modified and edited by Siegel and Shuster), but of additional new material created

25  by Siegel and Shuster at DCI's instance and expense and subject to its right of

26  control.

27      131.   Upon information and belief, after the publication of Action Comics

28  No. 1, Siegel and Shuster supplied further original Superman stories to DCI, at

- 41 -

COMPLAINT

1   DCI's instance and expense and subject to its right of control.  On September 22,

2   1938, Siegel and Shuster entered into another employment agreement with DCI

3   confirming that Siegel and Shuster had "been doing the art work and continuity for

4   said comics [including Superman comics] for us.  We wish you to continue to do

5   said work and hereby employ and retain you for said purposes."  The DCI

6   September 22, 1938 Agreement also contained an acknowledgement that DCI was

7   the "exclusive" owner of Superman.

8       132.   Also on September 22, 1938, Siegel and Shuster entered into the

9   McClure September 22, 1938 Agreement with DCI and the McClure Newspaper

10  Syndicate concerning the use of Superman in newspaper strips.

11      133.   All of Siegel and Shuster's contributions to Superman comic books

12  and comic strips were made pursuant to the March 1, 1938 Agreement, the DCI

13  September 22, 1938 Agreement, the McClure September 22, 1938 Agreement,

14  contemporaneous oral agreements confirmed by one or more of those agreements,

15  or certain subsequent agreements affirming those agreements, as employees of DCI

16  (or its successors) and at DCI's instance and expense and subject to its right of

17  control.  As a result, all of these materials constitute works for hire under the 1909

18  Copyright Act, and the copyrights therein are owned exclusively by DC Comics

19  and are not subject to termination under later amendments to the Copyright Act.

20      134.   On November 30, 1938, Siegel wrote a letter to DCI (the "November

21  1938 Letter") suggesting that it publish a comic book entitled "Superboy," "which

22  would relate to the adventures of Superman as a youth."  The November 30, 1938

23  Letter does not contain any discussion of plot, dialogue, appearance, or any other

24  copyrightable material relating to Superboy.  DCI decided not to publish a

25  Superboy comic book at that time, and had already published comic books,

26  discussed *supra*, that showed Superman as a young boy and exhibiting super-

27  human strength.  For example, in 1939, among the Superman material prepared by

28  Siegel and Shuster at the instance and expense of DCI and subject to its right of

- 42 -

COMPLAINT

control was Superman No. 1. In Superman No. 1, Clark Kent is depicted as a boy with super-powers.

135. On December 19, 1939, Siegel and Shuster entered into the December 19, 1939 Agreement with DCI, which modified the DCI September 22, 1938 Agreement by, *inter alia*, doubling Siegel and Shuster's compensation for Superman comic books and newspaper strips and providing for payment to Siegel and Shuster for uses of Superman in media such as radio, motion pictures, and toys. Under the December 19, 1939 Agreement, Siegel and Shuster again acknowledged DCI's sole ownership of Superman.

136. Upon information and belief, in December 1940, Siegel, on behalf of himself and Shuster, submitted to DCI a 13-page script of continuity for Superboy (the "Unpublished 1940 Superboy Script") and renewed his suggestion that DCI publish a comic book depicting Superman as a youth. The Unpublished 1940 Superboy Script, which includes the credit line "By Jerry Siegel and Joe Shuster," states: "So many faithful followers of today's leading adventure comic strip, SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth … And so here he is at last … the answer to your requests … America's outstanding boy hero: SUPERBOY!" The Unpublished 1940 Superboy Script explains that "[i]n later years [Superboy] was to become the might[y] figure known as SUPERMAN!" The Unpublished 1940 Superboy Script was derived entirely from pre-existing Superman elements and ideas that had been published by DCI as part of works for hire, and contained no original copyrightable element. Again, DCI decided not to publish a Superboy comic book at that time.

137. Upon information and belief, sometime prior to November 18, 1944, DCI published a comic book depicting the adventures of Superman as a youth, called Superboy, in "More Fun Comics No. 101," which had a cover date of January-February 1945 and was illustrated at least in part by Shuster. Upon information and belief, Siegel did not participate in the creation of this comic book

- 43 -

COMPLAINT

1   or the Superboy story it contained.  Other than retelling the Superman origin story

2   from Action Comics No. 1 and Superman No. 1, this Superboy story bore no

3   resemblance to the Unpublished 1940 Superboy Script.

4        138.   In the more than 70 years since the publication of Action Comics No.

5   1 in 1938, DC Comics has created a vast universe of Superman material spanning

6   virtually all media, including comic books, graphic novels, live action pictures,

7   feature-length motion pictures, motion picture serials, radio and television serials,

8   and live theatrical presentations.  DC Comics' extensive development and

9   exploitation of Superman has generated new characters, new super-powers, new

10   components to the Superman universe, new elements in the Superman back story,

11   and new changes in Superman's appearance.

12      **(2) Claim for Declaratory Relief re: Limited Scope of**

13              **Copyright Termination Notice**

14        139.   In the event that the Shuster Termination Notice challenged in the First

15   Claim for Relief above is deemed to be effective, the scope and reach of the Notice

16   must be declared limited in the following ways:

17            **a.  Unpublished Superman Works**

18        140.   The Shuster Termination Notice purports to terminate certain portions

19   of the Unpublished Superman Works, including:  (a) "twenty-four days … of

20   previously unpublished SUPERMAN newspaper comic strips, created c. 1934,"

21   (b) "SUPERMAN story in comic book form … created c. 1933," and (c) "15

22   SUPERMAN daily comic strips … created c. 1934."

23        141.   To the extent that any portion of the Unpublished Superman Works

24   may be considered published for purposes of the Copyright Act (and this is

25   disputed), those portions were published only as a result of their adaptation for

26   inclusion in Action Comics No. 1, which was a work made for hire.  The Copyright

27   Act expressly provides that "a work made for hire" cannot be subject to

28

COMPLAINT

1    termination.  17 U.S.C. § 304(c)-(d).  As a result, the Shuster Termination Notice is

2    ineffective as to the Unpublished Superman Works.

3    **b.  Pre-Action Comics No. 1 Promotions**

4    142.    The Shuster Termination Notice does not attempt to terminate DC

5    Comics' rights in the Promotions published before Action Comics No. 1.

6    143.    Moreover, upon information and belief, the Promotions, depicting in

7    sum and substance what was subsequently published as the cover of Action Comics

8    No. 1, were not prepared by Siegel or Shuster, but rather by others either employed

9    by DCI or at the instance and expense of DCI and subject to its right of control.  As

10    a result, the Promotions were works made for hire and any copyright therein was

11    owned by DCI *ab initio* and cannot be subject to termination.  17 U.S.C. § 304(c)-

12    (d).

13    144.    DC Comics remains the sole owner of the Promotions, all copyrights

14    therein, and the various copyrightable elements contained therein.  The Shusters

15    may not seek to terminate copyright interests comprised in the Promotions.

16    **c.  Works for Hire**

17    145.    The Shuster Termination Notice purports to recapture the rights in

18    Action Comics Nos. 1-7, Superman No. 1, and Superman No. 3 ("Superman

19    Works").  Each of the Superman Works was prepared at the instance and expense

20    of DCI and subject to its right of control.  As a result, the Superman Works were

21    works made for hire and any copyright therein was owned by DCI *ab initio* and

22    cannot be subject to termination.  17 U.S.C. § 304(c)-(d).

23    146.    DC Comics remains the sole owner of the Superman Works, all

24    copyrights therein, and the various copyrightable elements contained therein.[5]

25    ───────────────

26    [5] In the related action filed by the Siegel Heirs against DC Comics, the federal court agreed with this position almost entirely, ruling that other than a handful of pre-1938 materials authored by Siegel, all of Siegel's Superman works were created as "works for hire" on behalf of DC Comics.  The court ruled that all material created by Siegel after his 1938 employment agreement with DCI, including Action Comics Nos. 2, 3, 5-61, Superman Nos. 1-23 (other than pages 3-6 of Superman

27

28

- 45 -                                COMPLAINT

#### d. Derivative Works

147.    All Superman-related works prepared after the publication of Action Comics No. 1 were derivative works based on pre-existing copyrightable material and created under the authority of valid copyright grants (the "Derivative Works").

148.    The Derivative Works include new characters, new super-powers, new components to the Superman universe, new elements in the Superman back-story, and changes in the appearance of Superman.

149.    Regardless of whether the Shuster Termination Notice is deemed valid, DC Comics remains the sole owner of the Derivative Works and retains the continuing right to exploit the Derivative Works under section 304 of the Copyright Act, 17 U.S.C. § 304(c)(6)(A).

#### e. Scope of Shuster Notice

150.    The Shuster Termination Notice, in addition to specifying works to be terminated, also describes certain elements purportedly encompassed by the works sought to be recaptured.  Many of these elements do not appear in the specified works.  In addition to identifying elements that are not present, the Shuster Termination Notice is also notable for its failure to specify elements that are present.  For example, although both the purportedly terminated works Action Comics No. 1 and Superman No. 1 depict Superman as a boy with super-powers, the Shuster Termination Notice is silent on this element.  Accordingly, a dispute has arisen between the parties regarding the scope of the Shuster Termination Notice with respect to the elements that appear, or which do not appear, in the allegedly terminated identified in the Shuster Termination Notice, including, but not limited to, the following:

---

No. 1), and post-1938 newspaper strips, were works-for-hire and thus could not be terminated.  DC Comics reserves all rights with respect to these interim rulings in the Siegel case.

- 46 -

COMPLAINT

1    a.  Superman's "telescopic vision"

2    b.  Superman's "super hearing"

3    c.  Superman's "super ... sense of smell"

4    d.  Superman as a boy with super-powers (*i.e.*, "Superboy")

5    e.  "[D]iamond-shaped "S" insignia on [Superman's] chest"

6    f.  "[L]ove triangle between Superman, Lois Lane and Clark Kent"

7    g.  "Perry White"

8    h.   "Daily Planet newspaper"

9    i.  "Metropolis"

10    j.  "Jor L"

11    k.  "Krypton"

12    151.  A declaration by this Court regarding the scope of the Shuster

13 Termination Notice is warranted under the Declaratory Judgment Act, 28 U.S.C.

14 § 2201 *et seq.*, to establish the parties' respective rights and obligations with respect

15 to the copyright interest in the Superman material.  The Shusters may not seek to

16 terminate copyright interests owned by DC Comics, including those materials listed

17 above.

18 **C.**  <u>**Third Claim for Relief**</u>**:  Declaratory Relief re: Shuster Period of**

19     **Exclusivity (Against All Defendants)**

20    152.  DC Comics re-alleges and incorporates by reference each and every

21 allegation contained in the paragraphs above.

22    153.  This Third Claim for Relief is advanced in the alternative—*i.e.*, if the

23 Court does not grant DC Comics' First Claim for Relief set forth above and hold

24 that the Shuster Termination Notice is invalid.

25    154.  The Copyright Act establishes an exclusive period between the time a

26 copyright termination notice is served and the effective termination date in which

27 the original copyright grantee may enter into an agreement with the original

28 copyright author or their heirs regarding the rights sought to be recaptured.  Section

304(c)(6)(D) provides: "A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination." 17 U.S.C. § 304(c)(6)(D). While the statute bars third parties (like Toberoff and his companies) from trafficking in such future copyright interests during this exclusive time period, it protects the rights and interests of original grantees like DC Comics, providing that "an agreement for such a further grant may be made between the author or [his heirs] and the original grantee or [its successor (*e.g.*, DC Comics)], after the notice of termination has been served." *Id.*

155.   Section 304(c)(6)(D) of the Copyright Act establishes a right of DC Comics from November 10, 2003 (when the Shuster Heirs served the Termination Notice) until October 26, 2013 (the effective date of the Notice), during which DC Comics is the sole party that can enter into an agreement with the Shuster Heirs for the rights sought to be terminated. This right has been described by Congress, in its legislative history, and the United States Court of Appeals as a "right of first refusal." Any restriction or limitation on this period of exclusivity must be deemed unenforceable under section 304(c)(6)(D).

156.   Upon information and belief, the Shuster Heirs have entered into agreements that frustrate and impede DC Comics' period of exclusivity. For example, the 2003 Pacific Pictures Agreement grants and assigns the Shuster Heirs' putative present and future copyright interests and provides that "any and all agreements regarding any of the Rights [in Shuster's creations, including copyright] shall be subject to the express written approval" of Pacific Pictures. This improperly allowed Pacific Pictures (and Toberoff) to prevent the Shuster Heirs from entering into an agreement with DC Comics concerning their purported rights—in clear violation of section 304(c)(6)(D). Although Pacific Pictures and the Shuster Heirs purported to cancel the 2001 and 2003 Pacific Pictures Agreements in their September 10, 2004 Letter, this improper agreement was in effect at least from the time it was executed on October 30, 2003 through

- 48 -

COMPLAINT

1   September 10, 2004, which means that it improperly eliminated most of the first
2   year of DC Comics' period of exclusivity.  Moreover, the original 2001 Pacific
3   Pictures Agreement provides that if the Shusters' joint venture with Pacific Pictures
4   is terminated "for any reason," then Pacific Pictures will hold 50% of "the property
5   or assets of the Venture," including all the alleged Shuster Superman copyright
6   interests, as a "tenant[] in common," meaning that Pacific Pictures and Toberoff
7   still have improperly encumbered, to this day, DC Comics' period of exclusivity.

8        157.   Upon information and belief, Toberoff has induced the Siegel and
9   Shuster Heirs to enter into additional agreements, which prohibit either family from
10  entering into agreements conveying rights to DC Comics without the express
11  approval of all stakeholders in the heirs' rights—*i.e.*, the Siegel Heirs, Shuster
12  Heirs, and Toberoff and his companies.  These agreements and others like it that
13  may exist—which upon information and belief remain in effect to this day—violate
14  section 304(c)(6)(D) and impede DC Comics' ability to settle any and all disputes
15  with the Shusters and Siegels and lawfully pursue its business.

16       158.   The Shuster Heirs' agreements with Toberoff, his companies, and the
17  Siegels improperly interfere with DC Comics' period of exclusivity with the
18  Shuster Heirs regarding their purported Superman rights.

19       159.   A declaration by this Court is warranted under the Declaratory
20  Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, to establish the parties' respective rights
21  and obligations with respect to the copyright interest in the Superman material.
22  This declaration should establish that:  (a) DC Comics is the sole party with whom
23  the Shuster Heirs can enter into an agreement to convey their putative Superman
24  rights during the exclusivity period, through and including October 26, 2013;
25  (b) any agreement with any third party regarding those putative rights during the
26  exclusivity period is invalid and unenforceable; and (c) any agreements requiring
27  consent of other parties to settle termination claims violate the exclusivity period
28  and, therefore, are invalid and unenforceable.

- 49 -

COMPLAINT

160.    DC Comics seeks an injunction (a) barring the Shuster Heirs from entering into any agreement with any third party regarding the rights sought to be recaptured in the Shuster Termination Notice until October 26, 2013; and (b) restoring to DC Comics its 10-year period of exclusivity.

**D.    Fourth Claim for Relief:  Intentional Interference with 1992 Shuster Agreement (Against Defendants Toberoff and Pacific Pictures)**

161.    DC Comics re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

162.    In October 1992, the Shuster Heirs and DC Comics executed a final written agreement "fully settl[ing] all claims" as to "right[s] in any and all work[s] created in whole or in part by ... Joseph Shuster" (the "1992 Agreement").  Since 1992, DC Comics has paid the Shuster Heirs nearly half a million dollars under the 1992 Agreement.  To DC Comics' knowledge, the Shuster Heirs have never disputed the validity or existence of the 1992 Agreement, which operated to rescind, revoke, and re-grant all of the Shusters' prior grants of rights in the Superman properties to DC Comics.  In that 1992 Agreement, the Shuster Heirs further agreed that they would not—either then or in the future—make any claim of right to any work created in whole or part by Joe Shuster.

163.    DC Comics' 1992 Agreement with the Shuster Heirs was both a valid contract and had the probability of future economic benefit to DC Comics.  The Shuster Heirs fully relinquished their rights under any prior agreement and re-granted to DC Comics all their Superman-related rights.  This confirmation allowed DC Comics to continue freely developing and exploiting those rights without the risk of termination of the alleged Shuster rights or expensive and protracted legal disputes regarding the ownership of those rights.[6]

---

[6] DC Comics maintains that the 1992 Agreement is a binding, enforceable agreement with the Shuster Heirs.  Even assuming this agreement was deemed invalid, DC Comics also has a long-established economic relationship with the Shusters giving rise to an interference with prospective economic advantage claim.

164.   Toberoff and Pacific Pictures were aware of the 1992 Agreement and DC Comics' ongoing business relationship with the Shusters.  Toberoff knew that his actions in having his company enter into a joint venture with the Shusters for the purpose of terminating DC Comics' rights were substantially certain to interfere with DC Comics' 1992 Agreement with the Shusters.  Toberoff's ultimate purpose in approaching the Shuster Heirs was to induce them to repudiate the 1992 Agreement and attempt to terminate prior grants of Shuster's rights.  For this reason, Toberoff and the Shusters formed a joint venture with Pacific Pictures for the express purpose of "retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations" through "termination pursuant to [17 U.S.C. § 304] of any and all grant or transfers by Joe Shuster of any copyright interest in his creations."

165.   Toberoff and Pacific Pictures engaged in independently wrongful conduct to achieve this goal.  They induced the Shuster Heirs to breach the 1992 Agreement and enter into the illegal copyright-assignment and settlement-consent agreements described above.  Toberoff also induced the Shusters to manipulate claims of ownership in Superboy.

166.   As the direct result of Toberoff's and Pacific Pictures' actions, the Shuster Heirs have breached the 1992 Agreement, causing DC Comics to lose the value of the Agreement and forcing DC Comics to incur substantial attorneys' fees and costs in an amount to be proven at trial.

This relationship dates back to 1935, when DC Comics' predecessor hired the unknown artist Joseph Shuster to illustrate comic strips for its publications.  Even after their employment arrangement ended, Shuster continued to benefit from his early work on Superman under the 1975 Agreement, which provided him with an annual pension, medical insurance, and a lump-sum payment in exchange for acknowledgement of DC Comics' sole and exclusive ownership of the Superman rights.  At the time Toberoff approached the Shuster Heirs in 2001, DC Comics and the Shuster Heirs had an agreement in place for almost 10 years, which resolved all claims concerning Shuster's putative share of the Superman rights.  DC Comics' agreement with the Shusters and the economic relationship they contemplated had the probability of future economic benefit to DC Comics.

- 51 -

COMPLAINT

**E.** **Fifth Claim for Relief:** **Intentional Interference with Prospective Economic Advantage re: Siegel-DC Comics Agreement (Against Defendant Toberoff)**

167. DC Comics re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

168. DC Comics reached a binding, enforceable agreement with the Siegel Heirs. After the Siegel Heirs served the Superman Termination Notice in 1997, they engaged in negotiations with DC Comics for four years. On October 16, 2001, DC Comics made a settlement offer to the Siegel Heirs. On October 19, 2001, the Siegel Heirs' attorney at the time, Marks, sent a letter to DC Comics outlining the material terms and confirming that the Siegel Heirs "accepted D.C. Comics' offer of October 16, 2001." On October 26, 2001, DC Comics sent a return letter confirming the parties' agreed-upon terms. DC Comics then drafted a long-form contract memorializing the agreement, which it sent to the Siegel Heirs on February 1, 2002. Marks has confirmed that all parties understood that they had a binding agreement.[7]

169. Even in the event that this agreement is finally adjudicated and deemed to be invalid, DC Comics had a long-established economic relationship with the Siegel Heirs giving rise to an interference with prospective economic advantage claim. This relationship dates back as far as 1935, when DC Comics' predecessor

---

[7] The district court in the Siegel Actions determined that this agreement was not binding because there was no "meeting of the minds" between the parties. Of course, this was before the Toberoff Timeline had been produced, which confirmed, *inter alia*, that Marks—who negotiated the agreement on behalf of the Siegel Heirs—understood that the 2001 agreement was final and binding. Indeed, Marks communicated his position to the Siegel Heirs in August 2002, in an attempt to convince them to reject Toberoff's attempts at interference. DC Comics reserves all rights to challenge the district court's ruling in the Siegel Actions based on this newly discovered evidence and otherwise, and DC Comics respectfully submits that the district court's interim ruling on this issue is contrary to fact and law. If DC Comics' claims are accepted, it will amend this Complaint to include a claim for interference with contract arising out of Toberoff's tortious interference with this binding agreement.

COMPLAINT

1   hired an unknown writer named Jerome Siegel to write comic strips for its

2   publications.  Over the years, Siegel worked on-and-off as an employee of DC

3   Comics and its predecessors.  Even after the employment arrangement ended,

4   Siegel continued to benefit from his early work on Superman under the 1975

5   Agreement, which provided him and his family with an annual pension, medical

6   insurance, and lump payment in exchange for acknowledgement of DC Comics'

7   sole and exclusive ownership of the Superman rights.  When a dispute arose in

8   1997 over the Siegel Heirs' attempt to terminate prior grants of Siegel's share of

9   Superman rights, DC Comics and Siegel commenced negotiations, which lasted

10  over four years.  At the time Toberoff approached the Siegel Heirs in 2001, DC

11  Comics and the Siegel Heirs had finally reached an agreement resolving their

12  claims to the Superman and Superboy rights.

13      170.   The economic relationship that the Siegel Heirs and DC Comics had

14  contemplated and agreed to had the probability of future economic benefit to DC

15  Comics.  The Siegel Heirs recognized DC Comics' sole and exclusive ownership of

16  all rights in Superman and Superboy, allowing it to continue freely developing and

17  exploiting those rights, and avoid the possibility of an expensive and protracted

18  lawsuit regarding ownership of those rights.

19      171.   Toberoff was well aware of the agreement between DC Comics and

20  the Siegel Heirs.  Toberoff has admitted that he tracked the Siegel Heirs'

21  termination efforts through Internet reports.  Moreover, upon information and

22  belief, when Toberoff approached the Siegel Heirs and their representatives in late

23  2001 and 2002 to express interest in purchasing their Superman rights, he was

24  informed that the Siegel Heirs had already reached an agreement with DC Comics.

25      172.   Toberoff knew his actions were substantially certain to interfere with

26  the Siegel Heirs' agreement and ongoing business dealings with DC Comics.

27  Toberoff intentionally engaged in independently wrongful conduct to carry out his

28  interference by, among other things:  falsely misrepresenting to the Siegel Heirs

1     that he had a billionaire investor ready to purchase their Superman rights if they

2     repudiated their settlement agreement with DC Comics; falsely representing to the

3     Siegels that he would help them produce a competing Superman motion picture;

4     and wrongly inducing the Siegels to repudiate their agreement and business

5     relationship with DC Comics.

6        173.    As a direct result of Toberoff's misdeeds, the Siegel Heirs repudiated

7     the Siegel-DC Comics Agreement with DC Comics and ended all further

8     discussions, causing DC Comics to lose the value of the agreement, to lose their

9     ongoing business relationship with the Siegels, and to incur millions of dollars in

10    subsequent legal fees in disputes with the Siegel Heirs. DC Comics has suffered

11    actual damages in an amount to be proven at trial.

12 **G.**    **Sixth Claim for Relief: Declaratory Relief re: Invalidity of Copyright**

13       **Assignment and Consent Agreements (Against All Defendants)**

14        174.    DC Comics re-alleges and incorporates by reference each and every

15    allegation contained in the paragraphs above.

16        175.    The various copyright assignment and consent agreements between

17    Toberoff and/or his companies, the Siegel Heirs, and the Shuster Heirs are void and

18    unenforceable, including under California's unfair competition laws, e.g., CAL.

19    BUS. & PROF. CODE §§ 17200 et seq. The copyright assignments secured by

20    Toberoff and/or his companies are unlawful and violate DC Comics' rights and

21    interests for the reasons set forth above. The consent agreements Toberoff has

22    procured are void as a matter of law and public policy because they strip the Siegels

23    and Shusters of their right freely to settle their claims and violate DC Comics'

24    concomitant right freely to negotiate settlement of such claims.

25        176.    A declaration by this Court is warranted under the Declaratory

26    Judgment Act, 28 U.S.C. §§ 2201 et seq., to establish the parties' respective rights

27    and obligations with respect to the copyright interest in the Superman material.

28

- 54 -

COMPLAINT

# VI. PRAYER FOR RELIEF

WHEREFORE, DC Comics prays for judgment against defendants as follows:

177. A declaration that the Shuster Termination Notice is invalid, and thus ineffective, for one or more of the reasons set forth in DC Comics' First Claim for Relief;

178. In the event that the Shuster Termination Notice is deemed valid and effective, a declaration that the scope and effect of the Notice is limited as set forth in DC Comics' Second Claim for Relief;

179. A declaration that: (a) DC Comics was entitled to a period of exclusivity regarding the Shuster Heirs' purported Superman rights from November 10, 2003 through October 26, 2013; (b) any agreement interfering with that period of exclusivity is invalid and unenforceable; and (c) the consent agreements impermissibly interfere with DC Comics' period of exclusivity and require restoration of the 10-year period free of interference;

180. A declaration that the various consent agreements between Toberoff and/or his companies, the Siegel Heirs, and the Shuster Heirs are void and unenforceable as a matter of public policy;

181. An injunction that: (a) bars the Shuster Heirs from entering into any agreement with any third party regarding the rights sought to be recaptured in the Shuster Termination Notice until October 26, 2013; and (b) restores DC Comics' 10-year period of exclusivity with respect to the Shuster Termination Notice;

182. As to the tort claims against Toberoff and his entities as sued herein, damages in amounts to be determined at trial;

183. An award of reasonable attorneys' fees and costs; and

184. Such other and further relief as this Court deems just and proper.

- 55 -

COMPLAINT

# VII.   **DEMAND FOR JURY TRIAL**

185.   Plaintiff DC Comics hereby demands a trial by jury on all issues triable by a jury.


Dated:  May 14, 2010                    Respectfully submitted,

                                        O'MELVENY & MYERS LLP


                                        By:_____
                                            Daniel M. Petrocelli
                                        Attorneys for Plaintiff DC Comics


Of counsel:

   PATRICK T. PERKINS (*pro hac vice*
   application pending)
     pperkins@ptplaw.com
   PERKINS LAW OFFICE, P.C.
   1711 Route 9D
   Cold Spring, New York 10516
   Telephone: (845) 265-2820
   Facsimile:  (845) 265-2819

CC1:829569.6

- 56 -

COMPLAINT

# EXHIBIT A

## SUPERMAN – MARC TOBEROFF TIMELINE

*\*Please read closely. We have enclosed several supporting documents in our package to you, and very much hope you will spend some time reviewing them before you come to any potential settlement with Marc Toberoff, who represents the Siegels and the Schuster heirs in the ongoing Superman legal dispute with Time Warner and DC Comics.*

*The below information should save Time Warner potentially millions and millions of dollars, and, if you so choose, - have Marc Toberoff suspended, disgraced, --- if not ultimately disbarred --- from practicing law.*

*Toberoff being labeled as the "relentless crusader for artists' rights" is hardly that: he has devised a strategy whereas he has ultimately claimed much ownership of the Superman copyright personally as he can. And of course, he has done so without the knowledge and full disclosure to the Siegels and Schuster heirs, creators of Superman.*

*As it stands right now, the single person who would stand to gain the MOST in a settlement with Time Warner regarding the ongoing SUPERMAN legal dispute would not be the heirs themselves, but Marc Toberoff.*

*What you do with the below information is up to you. You should most certainly conduct your own investigation. We believe there are details within this timeline that will be of strong interest to you.*

*Consider it an early holiday gift.*

*(Also, please be aware that this timeline is written with the assumptions that the reader(s) are aware of the characters involved within the ongoing Superman legal dispute between Time Warner/DC Comics. The heirs to the SUPERMAN copyright are: the Siegels (Joanne, Laura & Michael), Jerry Siegel's heirs, who collectively have claims to 50% of the copyright to Superman, while the Schuster estate has claims on the other 50%.) Marc Toberoff currently represents both parties in ongoing litigation.*

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

In 2000 MT established a separate corporation entitled "Pacific Pictures Corporation" (PPC), with an address of 23852 Pacific Coast Hwy, Suite 555, Malibu, CA 90265. Tel: (310)-589-5151. You will see below that he established this business to solicit his services as an attorney.

In 2001, Marc Toberoff (MT) began researching Superman, who had rights, etc.

MT initially contacts Kevin Marks at Gang, Tyre, who represented Joanne and Laura Siegel with an offer for the Siegel rights. Marks discourages Toberoff from any advances, and does not tell Siegels initially of the interaction because he believes it is not in their best interest.

1

**Q 0001**



On Nov. 23, 2001, MT entered into a joint venture agreement between his own outside corporation Pacific Pictures Corp. (NOT a law firm), and Mark Warren Peavy, and his mother Jean Peavy, heirs to the Joe Schuster estate. For the purposes of this document, we do not know the content of that agreement.

MT and Ari Emanuel, partner and agent at Endeavor, contacts Kevin Marks at Gang, Tyrer, Ramer, & Brown again, (who represented Joanne and Laura Siegel), on August 8, 2002. MT approaches the Siegels, *not as an attorney but as a film producer*, stating that he is "allied" with Emanuel, hoping such a claim will legitimize him.

On August 8th 2002, MT tells Marks that he and Emanuel have a billionaire ready to offer $15 million dollars up-front, plus what they promise to be meaningful participation from proceeds for exploitation of the Siegels' rights to SUPERMAN and some continued royalties on an ongoing basis in all media. Kevin Marks says to the Siegels, "Don't do it." Gang, Tyrer tells the Siegels that they believe MT has brokered a confidential agreement with the Joe Schuster estate. Marks also tells the Siegels that the Schuster estate will have termination rights in approximately 2013. Schuster missed termination notices.

Within their offer, MT appeals to the Siegels' sense of ownership and encourages them to take this deal. MT says he can help them make a movie in direct competition to the one being made at Warner Brothers (MT makes this argument to Joanne and Laura, all the while knowing full well that no one would ever go near making such an attempt; no other studio would go for it because of the division of rights, and no one outside of the studio system would attempt such an endeavor for all the enormous costs attributable to the making, marketing and distribution of such a film.) In other words, MT displays "predatory intent" in his initial approach to the Siegels from the very beginning.

In their very first conversation, Kevin Marks tells MT "no go" --- that the Siegels have already reached an agreement with Time Warner and DC Comics.

Marks conveys MT's offer to the Siegels, and Marks does say to the Siegels, it is a better offer than the one you have. However, Marks also tells the Siegels that he would testify in court against the Siegels if they accepted this offer because he believes there has already been an agreement reached.

The Siegels are angry at Kevin Marks that he said he would testify against them if they took MT's offer, and relations break down between the Siegels and Gang, Tyrer. They fire Gang, Tyrer. And, because the Siegels believed that MT was sympathetic to their plight, and because MT appealed to their sense of ownership of SUPERMAN, they decide to enter into an agreement with Intellectual Properties Worldwide, otherwise known as "IPW", Marc Toberoff's film production company, for 10% for any kind of deal he got to make a movie or exploit the rights. (as you know, the Siegels submitted termination notices on the Superman copyright in 1997).

2

Q 0002

The Siegels' agreement with IPW is an agreement that mirrors the earlier Pacific Pictures agreement that MT makes with the heirs to Joe Schuster (*see more information on this below*). In other words, Marc Toberoff is named as their attorney within the agreement (which is masked as a retainer agreement) in the event that they go to litigation over anything (*please see enclosed document*). Upon the Siegels signing the agreement, MT then tells Joanne and Laura that his mysterious billionaire has decided to invest elsewhere. In other words, MT makes himself the Siegels' attorney of record while he solicited them as a film producer, violating the rule that no lawyer may directly solicit business, with the double violation of doing it under the auspices of doing separate business dealings. MT's sole intent was to become the Siegels' attorney, not to help the Siegels (as he had alleged) to make a movie in competition to *Superman Returns*, which was then in development at Warner Brothers. MT also never divulges his previous direct dealings with the Schuster heirs, and his Nov.23, 2001 joint agreement with the Peavys (the Schuster heirs) in which he is named their attorney of record.

In 2002, MT set his sights on acquiring the passive interest to Michael Siegel's rights, who, as you know, is Jerry Siegel's son from his first marriage, and is Laura's half-brother. Michael Siegel has an interest of 12.5% in SUPERMAN and SUPERBOY. The Siegels total have 50% interest (Joanne holds 50%, Laura 25%. Michael 25%). So, in essence, Joanne has 25%, Laura 12.5, Michael 12.5. MT used to his advantage the strained relationship between Joanne and Laura, and Michael; as well as strained communication with the Schusters.

Here comes Ari Emanuel, and he is going to finance the purchase of Michael Siegel's interest. But Michael Siegel turns him down flat. MT discloses the intent to purchase to Joanne and Laura, admitting it is a possible conflict of interest. MT is fully aware of what he is doing is wrong.

On December 16, 2002, there is another letter from MT and Ari Emanuel to Joanne and Laura Siegel, saying they are re-approaching Michael again about purchasing his interest. MT tells Michael Siegel that they have an investor ready to buy out his interest, though the amount is significantly less than what DC showed as his share.

March 3, 2003 – letter from Paul Levitz/DC Comics to the Siegels, and MT is messing up relationships for his own personal benefit. DC is trying to understand why they backed out of the deal. The reason is MT who is interfering in all the relationships up to this point.

May 2003 -- MT is continuing to make business arrangements with the Schuster heirs, unbeknownst to Joanne and Laura Siegel .

May 13, 2003: Michael Siegel sends a very concerned letter to Laura Siegel about Marc Toberoff's actions. *(please see enclosed letter; this letter lays out well MT's scheme)*. Among other things, Michael Siegel tells her of how Toberoff is now controlling the whole of the SUPERMAN copyright, how he may have bought a substantial portion of the Schuster interest for himself, and he brings to light MT's utter lack of opening a

3

dialogue with anyone regarding making another SUPERMAN movie, in partnership with Ari Emanuel.    Also that MT has not even made contact with Time Warner.  Lastly, Michael conveys that MT seems to have an agenda of "someone" buying him out, and that MT is pressing for an answer.

In May-June 2003. **STATUE OF LIMITATIONS is coming close on for filing of the SUPERMAN complaint. Both Joanne and Laura Siegel are now very ill.** MT starts saying to the Siegels that the statue of limitations is coming up, and they would have waived their right to sue based on the termination notices. *This is the very seed MT meant to mine all along.* He sends them the research on the statue of limitations, and concerned, the Siegels contact Art Levine in Washington, D.C. to have independent research done on the matter. The research confirms that they should file by September.

In June, Ari Emanuel through IPW is still trying to buy Michael Siegel's interest but can't come to terms on price.

End of June 2003, MT gets a law firm to represent the Schusters to assist with the SUPERMAN copyrights. They determine the value of the estate is $0, and California Probate Code will not be applicable, such that the estate attorney will not be entitled to any future settlement regarding the Superman interest.  Estate attorney is only receiving an hourly rate. MT "graciously" pays all legal fees.

In other words, MT helped probate the estate, but hired an attorney to do the dirty work. Fittingly, the Joe Schuster will was "lost", so the will had no value.  So, the court writes the will for him, and includes the rights to proceed with the termination.  And since the firm receives an hourly rate, and the estate is valued at $0, it does not effect any future settlement.  The estate attorney will thereby not be entitled to statutory compensation. Another example of showing that MT is solely motivated *at all times* not by his clients' interests, but manipulating pieces of the puzzle so that he may receive the greatest percentage from a very possible large Time Warner settlement, through part ownership and unconscionable fees (*see below*).

**Absolutely nothing is moving ahead with Siegel/Schuster rights and agreements because MT was never intending to do anything with rights other than litigate.**

July 5, 2003. Laura Siegel reveals her ignorance of Toberoff's dubious actions in her return letter back to Michael --- MT has NOT told them he is about to enter into the PPC agreement, whereby MT *personally* will have a 50% of the Schuster interest in Superman. He will shortly own equal to what Joanne owns (25% of entire copyright), and double what Laura owns, *but MT has failed to disclose this.* The Schusters – through the Pacific Pictures Corp agreement – gave MT half of what they had.  MT never had the intention to make a movie to the one at Warners – it is tantamount to throwing $$$ away, but it does appeal to the heirs' sense of lost ownership.  MT never did want to make a movie, and exploit the rights.  MT knows no one is going to invest in an outside movie project outside of Warner Brothers, though he uses Ari Emanuel, the agent, to legitimize his claims. *(please see enclosed letter)*

4

Q 0004



Also, in the letter back to Michael Siegel, that MT helped Laura Siegel draft --- in response to Michael's accusations of Toberoff, Laura clearly states that MT does *not* have a production company. (This is false – Marc Toberoff's IPW has been in existence, partly funded by Ari Emanuel, since at least 2002). In the draft of the letter, MT crossed out the statement that he does not have a production company, and writes " MT has not plans to produce a SUPERMAN movie, nor is this feasible given the division of ownership of the rights." (please see enclosed letter). **This clearly delineates that Toberoff never had the intention of making a movie, and approached the Siegels and Schusters separately ---- not for the exploitation of rights as he initially asserted,** but to gain an unconscionable fee from a very large possible settlement with Time Warner.

August 7, 2003 --- Letter from Rodi-Pollock, who is the attorney in the Schuster estate – who says the Schuster Will would be written by the court August 25, 2003, since the Schuster Will had been "lost".

Sept-Oct 2003 ---- Letter with Ari Emanuel in which he would receive $2.5 million flat fee for "negotiating services"

On October 27, 2003, MT uses PPC to enter into another agreement with the Joe Schuster's heirs: Mark Warren Peavy and Jean Peavy, in which PPC is "engaged as the Executor of the recently probated estate of Joeseph Schuster." The agreement purports that PPC is the Peavys exclusive advisor "for the purpose of retrieving, enforcing, and exploiting all of Joe Schuster's rights ....in all of his creations...". In this agreement, MT also names himself their attorney for any and all litigation or questions that should arise in regards to these Rights. MT also clearly delineates that PPC is NOT a law firm. And, lastly but most significantly, MT defines that any and all moneys and proceeds, in cash or in kind, received from the enforcement, settlement, or exploitation of any of the Rights, ....any monies would be split 50/50. **IN ESSENCE, MARC TOBEROFF NOW HAS A 25% STAKE IN SUPERMAN PERSONALLY BECAUSE OF HIS DEAL WITH THE SCHUSTERS THAT WAS MADE IN 2003. He gets – under the guise of Pacific Pictures Corp – the rights to retrieve and enforce and exploit Joe Schuster's interest in SUPERMAN.** MT's alleged "firewall" between film producing and soliciting business as an attorney comes tumbling down. (*please see enclosed signed agreement, dated October 27, 2003*).

In 2013 MT will own Schuster's side of it; but it does not matter, they will settle before.

MT inquires into the legality of entering into the Pacific Pictures Corporation agreement with the Peavys, heirs to Schuster estate, using law firm Armstrong, Hirsch, Jackoway, Tyerman, & Wertheimer. The inquiry raises strong eyebrows, and questions of legality as to MT's actions in regards to the Schusters, and strongly discourages further involvement with MT and this matter.

5

Q 0005

August 2003 – Michael Siegel wants an annuity of $200,000, which equaled $3.5 million. MT tells him that "no investor is going to go for that." MT says Warners' estimation was $2 million less; such a bad risk for an investor, MT says. MT is tenaciously going after the 12.5%, and of course, the investor MT "has" is himself.   He is trying to get Michael to lower the price.

**MT is also trying to convince Michael Siegel not to sell his interest to another outside party. MT is lying to Michael Siegel to make sure he can still draw a fee from Michael's 12.5% interest. If Michael went away, he would only draw from remaining 37.5%, instead of 50%.   In the final letter, MT tells Michael Siegel that he cannot sell without our approval because Michael did not take part in the termination, but "we will give you (Michael Siegel) approval, *if you sell it to a third party, monitored by Marc Toberoff*." MT is lying to Michael Siegel about Siegel's ability to sell his interest in the SUPERMAN copyright.**

**Significantly, MT admits to Laura Siegel that there never was a billionaire willing to invest $15 million when he first approached them. But by then the Siegels were concerned about appearing flaky for changing lawyers a few times. They decide to stick it out.**

October 2, 2004 –– MT files the complaint with the court against Time-Warner. There is disgruntlement in the Siegel camp, regarding the contingency fee.   MT pushes hard for 33.3% contingency fee to go up to 40% if it falls within 60 days of trial (which, of course, he would make sure that it would...).   In the contingency agreement they signed for SUPERMAN, IPW (Marc Toberoff's *film production company*) would have received a 10% negotiating fee (thus most likely bolstering Ari Emanuel's take in the settlement from Time Warner as well). Thus, Toberoff used the "film production arm" of his company to use as a shell to elicit larger contingency fees from his clients despite the fact that Toberoff maintains that there is a "firewall" between his law firm and his production company. (see John Lippman, *Wall Street Journal* article enclosed.)

MT "graciously" agrees to decrease IPW's take by 5%, which will be deducted from the firm's % fee, applicable to the gross proceeds of any settlement or outcome of the litigations.

****In other words, MT decreases his contingency fee by 5% -- instead of getting 50%, he will get 45%. Combined with the Schuster interest, the aggregate of any outcome in SUPERMAN litigation for Marc Toberoff *personally* becomes 47.5% of the entire Superman interest.***** It becomes clear at this juncture that MT thwarted the earlier deal with Time Warner and DC Comics in 2002 for his own personal gain.**

And lastly, on the DUKES OF HAZZARD case, MT pocketed $8.5 million personally, more than any single plaintiff involved in the case (each plaintiff pocketed around $1.7 million).   According to the settlement amount, he received an unconscionable 50% contingency fee.

6

Very strong likelihood that Marc created an entity for the purposes of the lawsuit (Moonrunners Limited, or Moonrunners LLP), which allegedly held the rights at issue and ultimately led to the injunction. Christensen-Miller, Kevin Leichter, or the like need explore in greater detail the existence of the entity in which the rights were allegedly held. It is strongly believed this entity was created only to bolster the lawsuit – that the rights were never conveyed at all.

**MT had his President of Production of IPW, J. Todd Harris, leak the confidential settlement on the DUKES OF HAZZARD case to Variety ($17.5 million). He then called Larry Greenfield, another attorney in his office at the time who has since left, to cover his tracks, "demanding" to know who leaked the amount, and to act as if he was portraying shock and dismay at the leak. MT did it himself to attract more business in town. At least 7 attorneys have come and gone at the Law Offices of Marc Toberoff, and many have left due to ethical issues.**

And lastly, MT is charging 50% in another Allison Giannini case involving real estate. The reason this fact is included is to show a history of charging unconscionable fees.

It should be noted for those at Time Warner that Marc Toberoff has still managed to set up SKYPORT as a producer at Warners, and he has a tangential hold on GILLIGAN'S ISLAND. Fyi.

*****************

cc:    Alan F. Horn
       Jeff Robinov
       John Schulman
       Patti Connolly

7

**Q 0007**

EXHIBIT A
Page 309

# EXHIBIT O

1   DANIEL M. PETROCELLI (S.B. #97802)
    dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
    mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
    cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA 90067-6035
    Telephone:  (310) 553-6700
6   Facsimile:   (310) 246-6779

7   Attorneys for Plaintiff DC COMICS
    (continued on next page)

8

9                    **UNITED STATES DISTRICT COURT**

10        **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

11

12

13   DC COMICS,                          Case No. CV 10-3633 ODW(RZx)

                     Plaintiff,          **FIRST AMENDED COMPLAINT**
14                                        **FOR:**
            v.                           (1) Declaratory Relief re: Invalidity of
15                                        Copyright Termination Notice;

16   PACIFIC PICTURES CORPORATION, IP    (2) Declaratory Relief re: Scope of Copyright
     WORLDWIDE, LLC, IPW, LLC, MARC       Termination Notice;
     TOBEROFF, an individual, MARK
17   WARREN PEARY, as personal representative  (3) Declaratory Relief re: DC Comics Period
     of the ESTATE OF JOSEPH SHUSTER,     of Exclusivity re: Shuster;
18   JOANNE SIEGEL, an individual, LAURA
     SIEGEL LARSON, an individual, and DOES  (4) Interference with 1992 Shuster Agreement;
19   1-10, inclusive,

20                   Defendants.         (5) Interference with Prospective Economic
                                          Advantage re: Siegel-DC Comics Agreement;
21                                        and

22                                       (6) Declaratory Relief re: Invalidity of
                                          Copyright Assignment and Consent
23                                        Agreements

24                                       **DEMAND FOR JURY TRIAL**

25                                       **Hon. Otis D. Wright II**

26

27

28

56899.1

FIRST AMENDED COMPLAINT

(continued from previous page)

PATRICK T. PERKINS (admitted pro hac vice)
pperkins@ptplaw.com
PERKINS LAW OFFICE, P.C.
1711 Route 90
Cold Spring, NY 10516
Telephone:    (845) 265-2820
Facsimile:     (845) 265-2819

Attorneys for Plaintiff DC COMICS

FIRST AMENDED COMPLAINT

# I. <u>STATEMENT OF THE CASE</u>

1.     This lawsuit challenges a scheme by Marc Toberoff and companies under his control to violate the U.S. Copyright Act and other laws by trafficking in federal copyright interests and interfering with contractual rights and other interests of plaintiff DC Comics related to the iconic property "Superman."[1]  By this scheme, Toberoff has sought to enrich himself by wrongfully laying claim to purported rights to control the exploitation of Superman to the substantial detriment of DC Comics and in violation of rights it has held, significantly invested in, and expanded upon for over 70 years.  DC Comics brings this suit to confirm its rights to the Superman property and seek redress for the wrongful conduct of Toberoff and entities he controls. This Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. §§ 1331, 1338, and 1367, under the Copyright Act, 17 U.S.C. §§ 101 *et seq.,* and under the Court's supplemental jurisdiction.

2.     Under certain narrowly defined circumstances, the Copyright Act permits authors and specified heirs to terminate copyright grants and recapture those interests from the original grantees.  These provisions of the Copyright Act also protect original grantees—such as DC Comics—by confining termination rights to certain classes of individuals in a specified time frame and manner, limiting the types of works that may be terminated, and creating an exclusive statutory period during which only the original grantee may enter into new agreements with the author or heirs to continue creating new works under the recaptured copyrights.

3.     In derogation of these provisions of the Copyright Act and the rights of DC Comics, Toberoff and entities he controls orchestrated a web of collusive agreements concerning the Superman copyrights with the heirs to the co-creators of Superman, Jerome Siegel and Joseph Shuster.  By these agreements, Toberoff purported to secure a majority and controlling financial stake in copyright interests in Superman assertedly held by the Siegel and Shuster heirs and to preclude the heirs from freely entering into new agreements with DC Comics for the continued

---

[1] Throughout this introductory statement and in other parts of the Complaint, the term "DC Comics" is used as shorthand for both DC Comics and its predecessors in interest.  The specific identities of relevant corporate entities are identified *infra.*

1    exploitation of Superman.  As detailed below, these agreements are unlawful under the copyright

2    laws, are void as against public policy, and both violate DC Comics' rights and threaten the

3    ongoing viability of the Superman property.

4         4.       During their lifetimes, Jerry Siegel and Joe Shuster—both well aware of the

5    termination provisions in amendments to the Copyright Act—never once sought to terminate any

6    of DC Comics' copyright interests, even though they could have attempted to do so as early as

7    1984.  Instead, Siegel and Shuster rightly  honored their agreements with DC Comics, under

8    which they and their families  enjoyed lifetimesignificant compensation, lifetime pensions, and

9    other important benefits.  After their deaths, Siegel and Shuster's heirs reached similarseparate

10   agreements with DC Comics—the Shuster heirs in 1992, and the Siegel heirs in 2001.  These

11   agreements provided the heirs substantial compensation and fully and finally resolved any claims

12   of termination to any rights in Superman and confirmed that DC Comics owned all right, title, and

13   interest in and to Superman.

14        5.       In or aboutaround 2001, Toberoff learned of these agreements between DC Comics

15   and the Siegel and Shuster heirs and engineered a course of conduct to induce the heirs to

16   repudiate those agreements, file invalid and erroneous copyright termination notices, and enter

17   into new agreements with Toberoff and his companies netting him the controlling stake in the

18   heirs' asserted interests in Superman.

19        6.       Toberoff induced the Shuster heirs to repudiate their 1992 agreement with DC

20   Comics and enter into a 50/50 joint venture with defendant Pacific Pictures Corporation, a film-

21   production company wholly owned and controlled by Toberoff, pursuant to which the heirs

22   conveyed the entirety of their purported Superman copyright termination rights to the venture.

23   The stated purpose of the venture was to secure and exploit DC Comics' copyright interest in

24   Superman.  Toberoff procured this joint-venture agreement even though he knew that the

25   Shusters' 1992 agreement with DC Comics operated to grant any and all of the heirs' interest in

26   Superman to DC Comics and extinguish any termination rights the heirs might have held.

27   Toberoff also induced the Shuster heirs to serve a notice of termination purporting to terminate

28   and recapture the same alleged interests they had granted to DC Comics under the parties' 1992

1    agreement.  This termination notice was invalid: among other defects, it was filed by a party

2    lacking the necessary majority interest to terminate.  Furthermore, any putative right to terminate

3    held by Joe Shuster ceased to exist when he died having elected not to exercise it during his

4    lifetime and having died without leaving a surviving spouse, child, or grandchild to inherit and

5    exercise it.

6        7.    Toberoff similarly induced the Siegel heirs to repudiate their 2001 agreement with

7    DC Comics.  After years of negotiations following a copyright termination notice sent by the

8    Siegel heirs in 1997, DC Comics and the Siegel heirs reached an agreement providing that DC

9    Comics would retain all rights to Superman and entitling the Siegels to receive a significant

10   portion of the Superman profits.

11       8.    Toberoff became aware of the existence of the 2001 agreement between the Siegels

12   and DC Comics and understood it diminished his stake in the putative Superman rights held by his

13   joint venture with the Shusters.  In pursuit of his plan to corner and control all potential Superman

14   termination rights and thereby block further exploitation of the property by DC Comics, Toberoff

15   set out to derail the 2001 Siegel agreement.  Among other things, Toberoff presented himself as a

16   film producer and falsely represented to the Siegels that if they repudiated their agreement with

17   DC Comics and entered into an agreement with him instead, a "billionaire investor" "was

18   prepared immediately to pay the Siegels $15 million for their Superman rights,   plus a generous

19   back-end profit participation in any future exploitations of the Superman property.  Toberoff also

20   falsely represented that he they would help the Siegels produce their own Superman motion picture

21   that would compete successfully with a Superman motion picture that Warner Bros.—DC Comics'

22   ' licensee—was then developing.  Based on Toberoff's inducements, the Siegels repudiated their

23   2001 agreement with DC Comics, terminated the employment of their then-law firm Gang, Tyre,

24   Ramer & Brown, and ultimately entered into agreements with Toberoff and defendant IP

25   Worldwide LLC, an entity controlled by Toberoff.  Under these agreements, Toberoff and his

26   company received a 45% interest in any recovery by the Siegels—an 800% increase over the 5%

27   fee in the Siegels' agreement with the Gang Tyre firm.

28

56899.1

EXHIBIT O
Page 314

FIRST AMENDED COMPLAINT

9.     As a result of his arrangements with both the Shuster and Siegel heirs, Toberoff secured control of the largest financial stake in the collective, putative Superman termination rights *(i.e.,* Toberoff—47.5%; Siegel heirs—27.5%; Shuster heirs—25%).  Toberoff sought further control, however.  In order to assert that DC Comics had *no* further rights to exploit the derivative Superman character "Superboy"—including in the highly popular *Smallville* network television series—Toberoff manufactured the position that Jerry Siegel *alone—to* the exclusion of Shuster—was the sole creator of Superboy.  Toberoff did so with full knowledge that his 2001 agreement with the Shusters explicitly confirmed the *Shusters'* asserted joint rights in Superboy, consistent with the long-held view of Shuster, Siegel, and their heirs that Superboy was jointly created by Shuster and Siegel.[2]

10.     Despite these incontestable facts concerning Superboy's creation—facts which Joe Shuster, Jerry Siegel, their heirs, and even Toberoff and his companies ratified and affirmed over time—Toberoff ~~caused to be filed in 2002, onbehalf of~~ induced the Siegels~~, a copyright termination notice and Shusters to~~ falsely ~~stating that~~position Siegel ~~was~~as the *sole* creator of Superboy.  ~~He then induced the Shusters in 2003 to amend their~~In 2002, the ~~joint venture agreement with Pacific Pictures to~~ *delete* all references to Superboy.  Siegels then filed a copyright termination notice asserting sole ownership of Superboy.  Toberoff then induced the Shusters in 2003 to amend their joint-venture agreement with Pacific Pictures to *delete* all references to Superboy.  The deletion of Superboy was directly contrary to the Shusters' interests and occurred solely to park *all* of the alleged Superboy rights with the Siegels.  Having manipulated the Superboy rights in favor of the Siegels, and directly contrary to copyright filings that the Siegels and Shusters had previously made, Toberoff then filed a termination notice on behalf of the Shusters that purported to terminate only Superman rights, leaving out all mention of Superboy.  These artifices positioned the Siegels to claim 100% ownership of Superboy in order to later bring

_____

[2] As explained ~~below~~*infra,* DC Comics fully agrees that Shuster and Siegel jointly contributed to Superboy.  It is DC Comics' position, however, that Superboy is a work entirely derivative of Superman and ~~that~~thus Superboy is not subject to termination under the Copyright Act's termination regime.

1  a copyright infringement claim against DC Comics, Warner Bros., and the *Smallville* series, That
2  case which they was filed in 2004 and which remains pending today.

3       11.    Yet another component of Toberoff's scheme to gain complete control over the
4  heirs to the putative Superman termination rights was preventing the Siegel and Shuster heirs from
5  freely entering into agreements with DC Comics—even if it was in their respective economic
6  interest to do so.  In violation of DC Comics' statutory period of exclusivity under the copyright
7  laws, Toberoff induced the Siegels and Shusters to enter into agreements transferring their
8  respective interests to his companies and preventing them from conveying any rights to DC
9  Comics without each other's—and Toberoff's—consent.  As a result of these illicit agreements,
10  DC Comics has been deprived of its ability to enter into agreements with the heirs to secure their
11  purported termination rights, in violation of the Copyright Act, other laws, and public policy
12  promoting the free and fair settlement of legal claims.

13       12.    To protect its rights under the copyright laws, agreements, and interests with the
14  Siegels and Shusters and Siegels and remove the cloud that Toberoff's actions have unlawfully
15  placed over the Superman property and its future, DC Comics brings this action to seek
16  declaratory judgments and other relief as set forth below.

17  **II.  PARTIES**

18       13.    Plaintiff DC COMICS ("DC Comics") is a general partnership organized and
19  existing under the laws of the State of New York and has its principal place of business in the
20  State of New York.  DC Comics is the successor-in-interest to all rights, including rights under
21  copyright, relating to the Superman works and character.

22       14.    Defendant PACIFIC PICTURES CORPORATION ("Pacific Pictures") is a New
23  York corporation organized under the laws of the State of New York, and was registered as a
24  foreign corporation doing business in the State of California, with its principal place of business in
25  the State of California and the County of Los Angeles.  Upon information and belief, Toberoff is
26  the sole shareholder and registered agent for service of process of Pacific Pictures.  Upon
27  information and belief, Pacific Pictures forfeited its active status as a New York corporation and as
28  a registered foreign corporation in California as of early 2009.

56899.1

15.     Defendant IP WORLDWIDE, LLC ("IP Worldwide") is a Delaware limited liability company organized and existing under the laws of the State of Delaware, and registered as a foreign entity doing business in the State of California, which has its principal place of business in the State of California and the County of Los Angeles.  Upon information and belief, Toberoff is the managing and controlling member of IP Worldwide and owns the controlling interest therein.

16.     Defendant IPW, LLC ("IPW") is a California limited liability company organized and existing under the laws of the State of California, which has its principal place of business in the State of California and the County of Los Angeles.  Upon information and belief, Toberoff is the managing and controlling member of IPW, is its registered agent for service of process, and owns the controlling interest in IPW.  Upon information and belief, IPW is a successor-in-interest to all or part of IP Worldwide's interests.

17.     Defendant MARC TOBEROFF ("Toberoff") is an individual who resides in the County of Los Angeles in the State of California, and upon information and belief, is and at all times has been a citizen of the United States.  Upon information and belief, Toberoff is a shareholder and member of defendants PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; and IPW, LLC.

18.     Defendant MARK WARREN PEARY ("Mark Peary" or "Peary") is an individual who resides in the State of New Mexico and is, and at all times has been, a citizen of the United States.  Peary is the nephew of Joseph Shuster, and a California court appointed him as the personal representative of the Shuster Estate.

19.     Defendant ESTATE OF JOSEPH SHUSTER ("Shuster Estate") is a probate estate established by the Los Angeles Superior Court on August 25, in 2003 (LASC Case No.  BP-080635).

20.     Defendant JEAN ADELE PEAVY ("Jean Peavy" or "Peavy") is an individual who resides in the State of New Mexico and, upon information and belief, is, and at all relevant times has been, a citizen of the United States.  Peavy was the sister of Joseph Shuster, and under the terms of Shuster's purported will, the sole beneficiary of the Shuster Estate.  Peavy has actively

- 6 -

FIRST AMENDED COMPLAINT

1  participated in the Shuster probate proceedings pending in Los Angeles, California, personally

2  disposed of property of the Shuster Estate in California pursuant to the provisions of the California

3  Probate Code, and is a party to certain agreements formed in California at issue in this action.

4      21.    Defendant JOANNE SIEGEL ("Joanne Siegel") is an individual who resides in the

5  County of Los Angeles in the State of California and is, and at all times has been, a citizen of the

6  United States.  Joanne Siegel is the widow of Jerome Siegel.

7      21.22.        Defendant LAURA SIEGEL LARSON ("Laura Siegel Larson") is an

8  individual who resides in the County of Los Angeles in the State of California and is, and at all

9  times has been, a citizen of the United States.  Laura Siegel Larson is the daughter of Jerome

10  Siegel and Joanne Siegel.

11      22.23.  Upon information and belief, Toberoff is, and at all relevant times has been, the

12  sole shareholder and principal of Pacific Pictures and a member and principal of IP Worldwide

13  and IPW.  Upon information and belief, Toberoff is the alter ego of Pacific Pictures, IP

14  Worldwide, and IPW, in that there is, and at all relevant times has been, such unity of interest

15  between Toberoff, Pacific Pictures, IP Worldwide, and IPW that any individuality and

16  separateness between them did not and does not exist, and adherence to the fiction of the

17  independent and separate existence of Pacific Pictures, IP Worldwide, and IPW distinct from each

18  other and Toberoff would promote injustice and inequity.

19      23.24.  Upon information and belief, the fictitiously-named DOES 1-10 are in some

20  manner responsible for the events giving rise to the claims set forth herein.  The true names and

21  capacities of such fictitiously-named defendants, whether individual, corporate, or otherwise, are

22  presently unknown to DC Comics.  DC Comics will amend this Complaint to assert the true names

23  and capacities of such fictitiously-named defendants when this information has been ascertained.

24  Each reference herein to a named defendant shall also refer to DOES 1-10.

25              **III.  JURISDICTION AND VENUE**

26      24.25.  As noted, the Court has subject matter jurisdiction over the claims set forth herein

27  pursuant to 28 U.S.C.  §§ 1331, 1338, and 1367.  The Court has original jurisdiction over DC

28

1  Comics' claims arising under the Copyright Act and supplemental jurisdiction over its related

2  state-law claims.

3       25.26.       The Court has personal jurisdiction over defendants, *inter alia,* because a

4  substantial part of the events giving rise to the claims set forth herein occurred in the State of

5  California and the defendants have extensive contacts with the State, including the following:

6       a.     Defendants Marc Toberoff, the Shuster Estate, ~~and~~ Peary, and Peavy

7  established a joint venture in California under California law for  the purpose of

8  terminating and recapturing prior grants of the  copyrights at issue in this action.

9       b.     On behalf of the ~~Shuster Estate~~joint venture, Peary ~~filed a~~ and Peavy

10  initiated a probate action in Los Angeles Superior Court—which, upon information

11  and belief, remains pending—in order to effectuate the purpose of the California

12  joint venture.  A California court appointed Peary ~~as~~ executor of the Shuster Estate,

13  and Peary serves in that capacity as a matter of California law.  In that capacity,

14  Peary served one of the copyright termination notices at issue in this action.

15       c.     Upon information and belief, defendants Pacific Pictures and IP Worldwide

16  are foreign entities registered as doing business in the State of California, and they

17  have their principal places of business and are headquartered in the State of

18  California and the County of Los Angeles.

19       d.     Upon information and belief, defendant IPW is a California limited liability

20  company organized and existing under the laws of the State of California and has

21  its principal place of business and

22  headquarters in the State of California and the County of Los Angeles.

23       e.     Defendants Toberoff, Joanne Siegel, and Laura Siegel Larson reside and

24  conduct business in the State of California and the County of Los Angeles.

25       f.     Defendants Joanne Siegel and Laura Siegel Larson filed two related actions

26  against DC Comics in this District and Court to resolve ownership of the rights in

27  Superman and Superboy.  (Case Nos.  CV- 04-8400 ODW (RZx), CV-04-8776

28  ODW (RZx)).

56899.1

FIRST AMENDED COMPLAINT

1    26.27.        Venue is proper in this District pursuant to 28 U.S.C.  § 1391(b).

2    Defendants are subject to personal jurisdiction in this District, and a substantial part of the events

3    giving rise to the claims set forth herein occurred in this District.

4    ### IV.  FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

5    **A.     DC Comics' Development of Superman**

6    27.28.  In the 1930s, Jerome Siegel (a story writer in Cleveland) and Joseph Shuster (an

7    illustrator, and Siegel's peer) conceived of a fictional character named "Superman," whom they

8    originally envisioned as a criminal mastermind, and then reconceived as a hero fighting for social

9    justice.  Aside from the name, the character shared little similarity with the figure that would later

10   become known throughout the world as Superman.  Between 1933 and 1937, Siegel and Shuster

11   submitted the Superman comic strips to a number of prospective publishers and newspaper

12   syndicates, all of which rejected them.  According to a 1941 *Saturday Evening Post* profile of the

13   pair, "by this time [Siegel and Shuster] had abandoned hope that Superman would ever amount to

14   much."

15   28.29.  A company that would come to be known as DC Comics—and for whom Siegel

16   and Shuster worked for hire developing fictional characters—would eventually decide to publish a

17   13-page comic story featuring "Superman" in the first issue of a 64-page comic book entitled

18   "Action Comics." ThisAs explained below, this original version of Superman had few, limited

19   powers, and his fictional world  and back-story were not well developed.

20   29.30.  Months before this "Action Comics" book ("Action Comics No.  1") was

21   published, Siegel and Shuster entered into, on December 4, 1937, an "Agreement of Employment"

22   with Detective Comics, Inc.  ("DCI"), a predecessor- in-interest to DC Comics (the "December 4,

23   1937 Agreement").  Siegel and Shuster renewed their employment arrangement with DCI in

24   agreements on September 22, 1938 (the "DCI September 22, 1938 Agreement" and "McClure

25   September 22, 1938 Agreement") and December 19, 1939 (the "December 19, 1939 Agreement").

26   30.31.        In 1938, at the instance and expense of DCI and subject to its right of

27   control, Siegel and Shuster adapted the preexisting Superman comic strips they had created and

28   added new material to create the 13-page comic book story entitled "Superman." This story—like

FIRST AMENDED COMPLAINT

1   all the Superman works that Siegel and Shuster thereafter created—was created for DC Comics as

2   a work made for hire.  Moreover, Siegel and Shuster only contributed to a part of this work.  Upon

3   information and belief, Shuster submitted black-and-white illustrations to DCI that were later

4   colorized by printers or engravers working at DCI's direction.  DCI also prepared one or more

5   cover illustrations for Action Comics No.  1, which depicted Superman and was published in other

6   comic books prior to the publication of Action Comics No.  1.  Action Comics No.  1 itself was

7   published in April 1938.

8       31.32.       To the extent Siegel and Shuster created any copyrightable Superman -

9   related works outside their work-for-hire relationship with DC Comics (and DC Comics has

10  disputed that they did), those works consisted solely of certain panels and portions of the Action

11  Comics No.  1 comic book and other minor creations in the 1930s, which Siegel and Shuster

12  conveyed to DC Comics in 1937 and 1938.  In an agreement dated March 1, 1938 (the "March 1,

13  1938 Agreement"), and as required by the December 4, 1937 Agreement, Siegel and Shuster again

14  assigned to  DCI all of their rights in Superman, including "all good will attached thereto and

15  exclusive right to the use of the characters and story, continuity and title of strip."  Siegel and

16  Shuster confirmed DCI's sole and exclusive ownership of all Superman rights in the DCI

17  September 22, 1938 Agreement and December 19, 1939 Agreement.

18      32.33.       The initial appearance of Superman in Action Comics No.  1 presented a

19  limited view of the character.  The readers learn only that Superman was sent to Earth as an infant

20  aboard a space ship from an unnamed planet that was destroyed by old age.  He secretly possessed

21  five super-human powers: the abilities to leap 1/8 of a mile; hurdle a twenty-story building; raise

22  tremendous weights; run faster than an express train; and repel bullets and knives by virtue of his

23  "tough skin."  In his alter-ego life, Superman was depicted as Clark Kent, a mild-mannered

24  "coward" and a newspaper "weakling" who worked as a reporter for "The Daily Star," with a

25  female co-worker named "Lois," whose last name is not mentioned.  In his life as Superman, he

26  was depicted as a costumed figurevigilante who uses his super-human abilities to fight

27  crimecriminals and mete out his own brand of justice.  In Action Comics No.  1, Superman is said

28

1    to have grown up in an orphanage and is depicted (both in words and images) as a child with

2    super-human strength.

3    ~~33.~~34.   Since the publication of Action Comics No. 1 in 1938, DC Comics—with its teams

4    of work-for-hire writers and artists (including Siegel and Shuster)—has added more than 70 years

5    of material defining, updating, expanding, and improving upon the Superman myth and creating a

6    continuous flow of new exploits and characters, resulting in a vast Superman "universe."

7    35.   DC Comics has authored, published, and distributed hundreds of millions of copies

8    of thousands of comic book issues throughout the United States and abroad depicting the

9    adventures of Superman.  These comic books have been authored and illustrated by dozens of DC

10   Comics' talented staff writers and artists, and many of most iconic images and stories of

11   Superman were created by these work-for-hire artists who reshaped his image over time.

12   36.   DC Comics has also created, developed, distributed, and licensed numerous

13   feature-length motion pictures, motion-picture serials, radio serials, television shows, novels, and

14   live theatrical presentations based on Superman.  Indeed, the radio, television, and motion-picture

15   projects in particular—with which Siegel and Shuster had nothing or little to do—were largely

16   responsible for spreading the Superman myth and popularity and expanding the Superman

17   storyline.

18   ~~34.~~37.   As a result of DC Comics' significant and sustained investment in and

19   stewardship of Superman—and 70-plus years of character and story development by some of the

20   most creative and talented minds in the comic-book, radio, television, and motion-picture

21   industries—Superman has remained constantly in the public's eye and has become one of the most

22   famous and beloved fictional characters in the world.  Over these 70 years, Superman has evolved

23   from the few black-and-white illustrations originally drawn by Shuster into a full-blown, color

24   character inhabiting a multi-dimensional universe.

25   ~~35.~~38.   DC Comics' development of Superman over many decades has represented

26   a continuous and ever-evolving portrayal of the character, featuring new elements in the Superman

27   back-story, new super-powers, new characters, and changes in Superman's appearance.  Many of

28   the most famous story elements and characters associated with Superman were developed long

1  after 1938, and by illustrators and story writers other than Shuster and Siegel working for hire for

2  DC Comics.  These include stories about and depictions of: (a) "Smallville," the town where

3  Superman grew up; (b) "Kryptonite," or surviving fragments of the destroyed planet Krypton,

4  which have the power to harm or affect Superman; (c) the "Fortress of Solitude," Superman's

5  secret headquarters outside Metropolis (traditionally located in the Arctic, but also placed in the

6  Andes and Amazon rainforest); (d) the "Daily Planet" newspaper, where Clark Kent would go to

7  work; (e) Jimmy Olsen and Perry White, Kent's co-workers at the Daily Planet; (f) love interests,

8  such as Lana Lang; (g) villains, such as Lex Luthor and Brainiac; (h) Superman's adoptive

9  parents, the Kents; and (i) other allies, such as "Krypto" the Superdog as well as Supergirl.  Other

10  aspects of Superman's evolution included the development of new super-powers, including: (a)

11  the ability to fly (a key component, especially of the Superman motion pictures); (b) super-vision,

12  which enables him to see through walls ("X-ray" vision); (c) telescopic vision, which allows him

13  to see across great distances; (d) "heat vision," which empowers him to aim rays of extreme heat

14  with his eyes; (e) super-hearing, which enables him to hear conversations at great distances; (f)

15  invulnerability to injury; and (g) the ability to survive in outer space without protective gear.  It is

16  this constant and uninterrupted evolution of the Superman mythology that allows Superman to

17  remain a force in popular consciousness decades after so many contemporary characters have been

18  forgotten or deemed old-fashioned.

19      39.    In *Superman: The Action Comics Archives, Vol.* 1 (1997), renowned comic-book

20  historian Mark Waid explained the dramatic transformation Superman underwent over the past 70

21  years and stark contrast between the Superman that Siegel and Shuster conceived in the 1930s and

22  the one the world now knows:

23        The whole world knows Superman.  He is kind, he is wise, he is gentle, he
      upholds the law and the mores of a decent society.  He is half boy scout, half

24        policeman.  In fact, here is what the citizens of 1939 Metropolis have to say about
      him:

25              "It is the devil himself!"
            "You' re breaking the law, sir!"

26              "Don't hit me again! I'll give ya anything ya want!"

27              "Hundreds of officers-all incapable of stopping the mad course of one hoodlum!"

28

I thought I knew everything about Superman.  Then I read the [early Superman stories].  Within these pages, I met a head-bashing Superman who took no prisoners, who made his own law and enforced it with his fists, who gleefully intimidated his foes with a wicked grin and a baleful glare.  A Superman who reveled in his strength, who clearly enjoyed raising a little hell and who didn't care who got in his way as he bounded through Metropolis meting out his own brand of justice ....  How could he have started out so different?

B.    **Early Disputes Regarding the Superman Rights**

36.40.  Siegel and Shuster served in a work-for-hire capacity for DCI from the early 1930s through the late 1940s, helping draw and write Superman comic strips and comic books. ThoughThey were paid substantial sums for their work—several million, and DC Comics renegotiated the pair's contract numerous times to give them greater and greater stakes in the success of Superman.  By 1940 (at the end of the Great Depression),  Siegel and Shuster were paid the equivalent of well over a million dollars in today's dollars.  The pair's earnings were even greater in 1941, exceeding $1.5 million in today's terms, and in the years that followed, Siegel and Shuster would earn the equivalent of millions more.  Yet despite the financial success shared by DC dollars in today's economic terms —Comics and Siegel and Shuster, the relationship eventually became contentious.

37.41.  In 1947, Siegel and Shuster filed an action against DCI's successor, National Comics Publications, Inc.  ("National"), in the New York Supreme Court in Westchester County (the "Westchester Action").  In the Westchester Action, Siegel and Shuster sought to invalidate the March 1, 1938 Agreement.  They also sought to recapture all rights in Superman, arguing that the DCI September 22, 1938 Agreement was obtained by duress.  Siegel and Shuster further challenged as unauthorized DCI's publication in November 1944 of a series of comic-book stories entitled "Superboy," which featured the adventures of Superman as a youth.

38.42.  On November 21,1947, a referee in the Westchester Action issued an opinion after trial (the "Westchester Opinion") holding that the March 1, 1938 Agreement assigned "all" of the Superman rights to DCI, and that the DCI September 22, 1938 Agreement was valid and not obtained under duress.  The referee found that DCI had acted improperly in publishing Superboy.

- 13 -

FIRST AMENDED COMPLAINT

1    39.43.  At the referee's request, the parties to the Westchester Action submitted proposed

2    findings of fact and conclusions of law.  On April 12, 1948, the referee adopted findings of fact

3    and conclusions of law and issued an interlocutory judgment (collectively, the "Westchester

4    Action Interlocutory Judgment"), in which he made statements based on a script that Siegel had

5    submitted that Siegel originated and owned the comic strip Superboy to the exclusion of DC

6    Comics.  National filed a notice of appeal, and the Westchester Action Interlocutory Judgment was

7    stayed pending appeal.

8    40.44.  Shortly thereafter, the parties to the Westchester Action entered into two separate

9    agreements: (a) a stipulation dated May 19, 1948 (the "May 19, 1948 Stipulation"); and (b) a

10   consent judgment dated May 21, 1948 (the "May 21, 1948 Consent Agreement").  Under both

11   documents, *inter alia,* Siegel and Shuster: (a) agreed to vacate the Westchester Action

12   Interlocutory Judgment; (b) acknowledged that, pursuant to the March 1, 1938 Agreement, they

13   transferred to DCI all rights in and to Superman, including "the title, names, characters, concept

14   and formula" as set forth in Action Comics No.  1; and (c) agreed that National was the sole and

15   exclusive owner of all rights in Superman and Superboy.  In exchange, Siegel and Shuster were

16   paid nearly $900,000 in today's dollars.

17   41.45.  Following the commencement of the Westchester Action, Siegel attempted to

18   launch a new comic book and syndicated strip feature entitled "Funnyman." The *Funnyman* comic

19   book, however, was cancelled after only six issues, and the syndicated *Funnyman* strip was only

20   picked up by a few newspapers and dropped prior to the end of 1949.  By the late 1950s, Siegel

21   was unable to find employment in the comic book field.  Having exhausted his savings and

22   needing to support his family, he approached DC Comics asking for work.  Despite Siegel's prior

23   lawsuit and challenge to DC's rights in Superman, DC Comics agreed to hire Siegel him and

24   thereafter employed himSiegel continuously as a work-for-hire writer until the mid-1960s, when

25   Siegelhe once again challenged DC Comics' rights to Superman.

26   42.46.  In April 1965, Siegel (while still working for DC Comics) and Shuster (who was

27   being paid a monthly stipend by DC Comics) filed copyright renewal notices in their own names,

28   claiming to own the renewal copyrights in the Superman character and in Action Comics No.  1.

1   This was followed by a lawsuit filed by Siegel and Shuster against National in 1969 in the District

2   Court for the Southern District of New York, seeking a declaration that they owned the "renewal"

3   copyright terms for Superman and Action Comics No. 1.  (Under the then-applicable 1909

4   Copyright Act, the period of copyright protection for a work included an initial term of 28 years

5   and an optional renewal term of 28 years.) Again, Siegel and Shuster's arguments were rejected,

6   and the federal district court held, *inter alia,* that the agreements between Siegel and Shuster, on

7   the one hand, and DCI (later National), on the other, had assigned "all" rights in Superman to DCI

8   and National, including all renewal copyrights.  *See Siegel v.  Nat'l Periodical Publ'ns, Inc.,* 364

9   F.  Supp.  1032 (S.D.N.Y.  1973).  The Court of Appeals for the Second Circuit affirmed the

10  district court's ruling that National owned all rights in Superman.  *See Siegel v.  Nat'l Periodical*

11  *Publ'ns, Inc.,* 508 F.2d 909 (2d Cir.  1974).  Siegel and Shuster did not further appeal that ruling.

12       ~~43.~~47.   Following the failure of their second lawsuit to recapture copyrights in Superman,

13  Siegel and Shuster ran into financial difficulties of their own making.  Siegel publicized their

14  financial plight, and there were calls for companies like  National (and even for Congress) to help

15  such artists.  On December 23, 1975, and  despite Siegel and Shuster's two prior lawsuits against

16  National, Warner  Communications, Inc.  ("WCI"), National's then-parent company, agreed to

17  provide them financial assistance.  Under an agreement entered into in 1975 (the "1975

18  Agreement"), Siegel and Shuster again acknowledged that DC Comics was the sole and exclusive

19  owner of "all right, title and interest in and to the 'Superman' concept, idea, continuity, pictorial

20  representation, formula, characters, cartoons and comic strips, title, logo, copyrights and

21  trademarks, including any and all renewals and extensions of such rights, in the United States and

22  throughout the world, in any and all forms of publication, reproduction and presentation, whether

23  now in existence or hereafter devised." In exchange, WCI agreed to provide Siegel and Shuster

24  with, *inter alia,* annual payments of $20,000 each (around $80,000 in current dollars), annual

25  payments to their heirs after their death, medical insurance coverage, and a lump sum of $17,500

26  each.  With respect to Shuster's heirs, WCI agreed that after Shuster's death, it would make annual

27  payments to his brother, Frank Shuster, of $10,000 until December 31, 1985, and then $5,000 a

28  year for the rest of his life.

56899.1

1    ~~44~~48.        In the years following the 1975 Agreement, DC Comics increased the

2    annual payments to Siegel and Shuster, made periodic cost-of-living increases, provided

3    insurance, and paid special bonuses.  During the last several years, Siegel's widow, for example,

4    has received $135,000 per year plus reimbursement for all medical expenses.  In all, DC Comics

5    has paid Siegel, Shuster, and their heirs nearly $4 million pursuant to the 1975 Agreement and

6    other arrangements—benefits that DC Comics continues to pay, and the Siegel and Shuster heirs

7    continue to accept.

8    ~~45~~49.        In 1976, Congress amended the Copyright Act to give authors and certain of

9    their heirs certain limited rights to terminate prior grants of copyright.  *See* 17 U.S.C. § 304(c)

10   (1976).  This amendment did not apply to works-made-for hire (the company paying for the

11   production of those works would always own them), and entitled authors and certain heirs to

12   recapture copyrighted interest only in works that the *author* actually created *(e.g.,* it did not entitle

13   authors to recapture derivative works the grantee may have developed pursuant to the original

14   grant, such as the original Superman radio and television shows, or Superman-related characters,

15   such as "Superboy" or "Lex Luthor").

16   50.        Despite their previous legal battles with National and the widespread publicity

17   surrounding this legislation, neither Jerry Siegel nor Joe Shuster ever endeavored to exercise any

18   termination rights under the statute.  Instead, for the rest of their lives, Siegel and Shuster accepted

19   and enjoyed the benefits under the 1975  Agreement.  This decision made sense, given Siegel and

20   Shuster's work-for-hire  relationship with DC Comics, the narrow sliver of rights (if any) to which

21   they might claim an interest, and the significant contributions made to Superman in the past 70

22   years to which they could claim no interest.  Moreover, the 1975 Agreement  paid Shuster and

23   Siegel an annual pension and medical insurance for the rest of  their lives and, upon their death,

24   paid annual pensions to their heirs.  Although  Shuster's and Siegel's "window of time" in which

25   to attempt to terminate prior  grants of copyright interests in Superman theoretically opened in

26   1984, at no time during their lives did they attempt to exercise any such right.

27   **C.      Joe Shuster's Death and the Shuster Heirs' 1992 Agreement**

28

1    46.51.  Joe Shuster passed away on July 30, 1992.  He was survived only by his brother

2    Frank Shuster, sister Jean Peavy, and JeanMs.  Peavy's two children, Mark  Peary and Dawn

3    Peavy (the "Shuster Heirs").  (Mark Peary changed his last name  from "Peavy" to "Peary.")

4    Shuster did not leave a widow and never had children or grandchildren.  Shuster's purported will

5    namesappoints Jean Peavy the sole beneficiary and executrix of his estate.  (An alleged copy of

6    this will surfaced and was probated  in 2001, only2003, after Toberoff intervened.  In addition to

7    certain irregularities in the will, probate papers filed by the Shuster Heirs falsely represented that

8    Joe Shuster was never married and omitted that Joe Shuster had a sibling, Frank Shuster, who had

9    also survived him.)

10    47.52.  On August 21, 1992, Jean Peavy sent a letter to Time Warner and DC Comics

11    explaining that she was the sole heir to Shuster 's estate and that Shuster had "left his family with

12    "a crushing burden of unpaid debts and bills and only a tiny estate."Jean Ms.  Peavy stated: "It's

13    unbelievable to me that Joe could have so little considering the generosity shown by Time Warner

14    in raising the pension income of Siegel and Shuster."  She also disclosed that 20% of Shuster's

15    income had been taken by Joanne Siegel, Jerome Siegel's widow, "as an agent's commission for

16    getting pay raises for Siegel and Shuster" following the December 23, 1975 Agreement.  Much of

17    the remainder of Shuster's income was spent by him during "compulsive buy[ing]" and "shopping

18    sprees" and on expensive stereo equipment and other personal items.  As a result, Shuster had

19    accumulated "almost $20,000 in credit card debts and unpaid bills."Jean that, "[a]s heir to his

20    Will, [Ms.  Peavy was] responsible for paying."  Ms. Peavy asked that Time Warner and DC

21    Comics "pay his final debts and expenses."

22    48.53.  In September 1992 Time Warner and DC Comics offered to pay off Shuster's debts

23    and expenses, totaling approximately $20,000, plus increase Frank Shuster's annual survivor

24    payments under the 1975 Agreement from $5,000 to $25,000 per year.

25    49.54.  In a September 10, 1992 letter sent to DC Comics (the "September 10, 1992

26    Letter"), Frank Shuster, on behalf of himself and Jean Peavy, requested that  the annual payments

27    due and owing Frank Shuster be made to Jean Peavy in order  to take advantage of certain tax

28    benefits.  Frank Shuster and Jean Peavy further promised that, if an agreement could be reached,

1   Jean Peavy "would not pursue the  termination of the Superman copyright as provided for to

2   creators' heirs in the 1976 U.S. Copyright Act."

3       50.55.         Based on Jean Peavy and Frank' Shuster's letter and the parties' further

4   discussions, DC Comics, Jean Peavy, and Frank Shuster entered into a written agreement on

5   October 2, 1992 (the "1992 Agreement").  The 1992 Agreement, which did not have an integration

6   clause, confirmed that it "fully settles all claims to any payments or other rights or remedies which

7   you may have under any other agreement or otherwise, whether now or hereafter existing

8   regarding the copyrights, trademarks, or other property right in any and all work created in whole

9   or in part by your brother, Joseph Shuster, or any works based thereon," and that the Shuster Heirs

10  "covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and

11  forever." The 1992 Agreement provided that the Shuster Heirs "now grant to us [DC Comics] any

12  ... copyrights, trademarks, or other  property right in any and all work created in whole or in part

13  by your brother, Joseph Shuster, or any works based thereon," and that the Shuster Heirs

14  "covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and

15  forever." The 1992 Agreement thus operated to revoke, rescind, and replace Shuster's prior

16  copyright grants and agreements.  51.  After the 1992 Agreement, DC Comics and the Shuster

17  Heirs enjoyed an amicable relationship with the  Shuster Heirs.

18         56.  On September 7, 1999, Jean Peavy sent a letter to DC Comics confirming that the

19  clear effect of the 1992 Agreement was to revoke and regrant any prior copyright grants that could

20  otherwise have been subject to termination:  "I have learned from the Internet that Joanne Siegel

21  has filed a copyright claim for SUPERMAN [i.e., the Siegel Superman Termination Notice].  I

22  want you to know that I intend to honor our pension agreement."

23         57.  To date, DC Comics and its affiliates have paid the Shuster Heirs close to $500,000

24  under the 1992 Agreement.  On April 27, 1995, Jean Peavy sent a letter to DC Comics expressing

25  gratitude for their generosity and concluding: "You know we appreciate your thoughtfulness."

26  Even after Frank Shuster's death in 1996, DC Comics has continued to this day to pay $25,000 per

27  year to Jean Peavy.

28

C.    **Toberoff Induces the Shusters to Repudiate the 1992 Agreement with DC Comics and Acquires a 50% Interest in the Shusters' Putative Rights**

52.58.  This state of affairs remained undisturbed for almost a decade.  In 2001, Toberoff and his motion-picture production company, Pacific Pictures, induced the Shuster Heirs to violate their 1992 Agreement and wrongfully attempt to acquire and exploit future copyright interests in Superman.

53.59.  Toberoff is a self-described "intellectual property entrepreneur." His business—conducted through a variety of corporate entities like Pacific Pictures—is to locate the authors of valuable copyrighted works or their heirs and acquire, or prevent them from conveying to others, asserted rights to present or future  copyright interests.  To convince these authors and heirs to go into business with him, Toberoff holds himself out as a producer with the financial resources and connections to exploit recaptured rights in all media in the entertainment industry.

54.60.  In or around 2001, Toberoff made contact with the Shuster Heirs and embarked on a course of conduct with them to disrupt their relationship with DC Comics, including DC Comics' rights under the 1992 Agreement.  On November 28, 2001, the Shuster Heirs formed a joint venture with Toberoff's company Pacific Pictures (the "2001 Pacific Pictures Agreement") for the stated "purpose of retrieving, enforcing and "exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations."—despite the fact that these rights had been granted to DC Comics in the 1992 Agreement.  The 2001 Pacific Pictures Agreement provided that this purpose would be realized in part "via the establishment of Joe Shuster's estate" in a California probate court  "… and the estate's termination pursuant to [17 U.S.C.  § 304] of any and all grant or transfers by Joe Shuster of any copyright interest in his creations."

55.61.  The 2001 Pacific Pictures Agreement defined the Shuster Heirs' rights being assigned as including all "rights, claims, title, copyrights and interests in and to each character, story element, and indicia associated with … 'SUPERMAN' [and] *Superboy*." (Italics added.)

56.62.  Pursuant to the 2001 Pacific Pictures Agreement, Jean Peavy and her son Mark Peary "transfer[ red] and assign[ed] to the Venture their rights, title, and interest" in Shuster's

- 19 -

FIRST AMENDED COMPLAINT

purported Superman and Superboy rights.  The Agreement provided that "[a ]ny and all moneys and proceeds [of the Venture] will be shared, divided and payable: fifty percent (50%) to [the Shuster Heirs] and fifty percent (50%) to PPC [Pacific Pictures]," and that upon "winding-up of the Venture or in the event of termination of the Venture *for any reason,* all Rights, property or assets of the Venture will be held fifty percent (50%) by the [Shuster Heirs] and fifty  percent (50%) by PPC." (Emphasis added.)

57.63.    The 2001 Pacific Pictures Agreement also provided that the Shuster Heirs could not enter into any agreement with respect to the Superman and Superboy rights "without the express written consent" of Pacific Pictures, an entity controlled solely by Toberoff.

64.    The 2001 Pacific Pictures Agreement furtherdid not represent a legal retainer agreement.  Rather, the Agreement provided that the joint venture would separately "retain Marc Toberoff, Esq.  to render legal services in connection with the Rights and the Venture." In a subsequent agreement in 2003, the parties confirmed that 58.  Pursuant to "PPC ... is not a law firm." Toberoff signed the 2001 Pacific Pictures Agreement, the on behalf of "Pacific Pictures Corporation" as "Marc Toberoff, President"-as opposed to "Marc Toberoff, Esq." Upon information and belief, Toberoff and the Shuster Heirs did not enter into a legal retainer agreement until 2004—*three years* after entering into the 2001 Pacific Pictures Agreement.

65.  After entering into the 2001 Pacific Pictures Agreement, the Shuster Heirs filed a probate action in Los Angeles Superior Court to establish the Shuster Estate.That action remains open (the "Probate Action").  *(See* LASC Case No.  BP-080635.)  Under the terms of Shuster's purported will, Jean Peavy was appointed the sole beneficiary and executrix of his estate.  In the Probate Action, however, the Shuster Heirs asked the Superior Court to authorize Mark Peary to serve as executor in Jean Peavy's place.  The Superior Court appointed Peary executor on October 7,2003; one month later,  Peary served a copyright termination notice on DC Comics on behalf of the newly formed Shuster Estate.

1    **D.    Toberoff Induces the Siegels to Repudiate the Siegel-DC Comics Agreement and**

2    **Acquires a 45% Interest in the Siegels' Putative Rights**

3    59.66.  Having orchestrated this joint venture with the Shuster Heirs, Toberoff used the

4    Shuster Heirs to gain access to the heirs of Jerry Siegel, Joanne Siegel and Laura Siegel Larson

5    (collectively, the "Siegel Heirs").  Toberoff sought to corner the other putative "half" of putative

6    Superman termination rights.  Toberoff knew, however, that the Siegels had reached an agreement

7    with DC Comics in 2001 resolving their putative termination claims.  Nevertheless, Toberoff and

8    his companies set out to interfere with this agreement in order to acquire a stake in the Siegel

9    Heirs' putative copyright interests in Superman.

10    60.67.  In 1997—and after Jerry Siegel's death in 1996—the Siegel Heirs had employed

11    counsel and served notices to terminate grants of Superman rights that Siegel had conveyed to DC

12    Comics (the "Siegel Superman Termination Notice").  The Siegel Superman Termination Notice,

13    which was prepared by prior counsel, listed Superboy works and elements as among the

14    "character[ s], story element[ s], or indicia reasonably associated with SUPERMAN," in

15    recognition of the fact that Superboy was a complete derivative of Superman rather than a stand-

16    alone, non-derivative work based upon Superman.

17    61.68.    The Siegel Heirs and DC Comics began negotiations, and in these talks the

18    Siegel Heirs were represented by Kevin Marks of the Gang Tyre entertainment law firm.  As the

19    parties' negotiations progressed, and as expectations grew that an agreement would soon be

20    reached, DC Comics paid the Siegels a non-refundable advance of $250,000.

21    62.69.    On October 16, 2001, DC Comics made a proposal to the Siegel Heirs.  On

22    October 19, 2001, Kevin Marks sent a letter to DC Comics confirming that the Siegel Heirs

23    "accepted D.C.  Comics' offer of October 16, 2001." On October 26, 2001, DC Comics sent a

24    return letter confirming the parties' agreed-upon terms.  DC Comics then began drafting a long-

25    form agreement.  DC Comics sent the Siegel Heirs a copy of the long-form document on February

26    1, 2002.  As a result of the parties' agreement (the "Siegel-DC Comics Agreement"), the Siegels

27    were now on the brink of receiving significant portions of the Superman profits—sums that would

28    immediately and dramatically change their lives.  Moreover, virtually all of the money would be

56899.1

EXHIBIT O
Page 332                                                                FIRST AMENDED COMPLAINT

1    theirs alone to keep, as the Gang Tyre form had agreed to represent the Siegels for the standard

2    5% fee.

3          63.70.        Toberoff has admitted that he closely tracked the progress of the Siegel

4    Heirs' termination attempt.  On learning of the Siegel-DC Comics Agreement, he knew his

5    company's joint-venture interest in the Shuster rights was limited and that he could assert greater

6    leverage only if he could disrupt the Siegel-DC Comics Agreement and corner both "halves" of

7    the putative Superman termination rights.  Given that Joe Shuster and his heirs held whatever

8    Superman copyright interests they owned *(if any)* jointly with Jerome Siegel, Toberoff understood

9    that if DC Comics obtained the rights from the Siegels to exploit new Superman properties, it

10   could do so freely without any ability on the part of the Shusters to claim their interests were being

11   infringed.

12         64.71.        With knowledge that his actions would interfere with DC Comics' actual

13   and prospective economic advantages under the Siegel-DC Comics Agreement, beginning in or

14   around late 2001,  Toberoff  on or around November 29, 2001—six days after signing the 2001

15   Pacific Pictures Agreement with the Shuster Heirs—Toberoff, identifying himself  as a film

16   producer—, approached the Siegel Heirs, including and/or through their representative Kevin

17   Marks, for the purpose of acquiring their rights.

18         65.72.        Toberoff contacted Marks again on or around February 6, 2002 regarding a

19   "potential buyout" of the Siegel Heirs' rights.  Marks informed Toberoff that the Siegel Heirs had

20   already reached a binding agreement with DC Comics, which was in the process of being further

21   documented in a long-form agreement.  Undeterred, Toberoff continued to contact the Siegel

22   Heirs and their representatives in an effort to induce them to repudiate the Siegel-DC Comics

23   Agreement and enter into a production agreement with Toberoff or one of his companies. his

24   efforts to interfere with the Siegel-DC Comics Agreement.

25         73.     On or around February 9, 2002, Toberoff approached Steven Spira, a Warner Bros.

26   Pictures executive, at a social function and told him: "You have a Superman rights problem."

27         74.     On February 12, 2002, Toberoff formed IP Worldwide as a joint venture between

28   Pacific Pictures and a well-known Hollywood talent agent.

66.  75.  On May 9, 2002, as a result of Toberoff's improper interference and inducements, While Toberoff was undertaking these activities to disrupt DC Comics' relationship and agreements with the Siegels, on May 9, 2002, Joanne Siegel sent a letter to DC Comics' affiliate acknowledging the Siegel Heirs had accepted DC Comics' October 16, 2001 offer, but purporting to object to certain unspecified portions of the long-form document.

76.  DC Comics objected to the Siegel Heirs' sudden and unfounded objections expressed in their May 9 letter, but continued working with their the Siegels' counsel (Kevin Marks) to finalize the long-form agreement.  On May 16,2002,  Marks, who had discussed the long-form agreement with the Siegel Heirs, told  Warner Bros.  general counsel John Schulman that his long-form agreement was "aggressive," but that the Siegels could "deal with it" and that it was "not contrary 67.to what had been agreed to." Throughout the summer of 2002, Marks worked on a re-draft of the February 1, 2002 long-form agreement, which he submitted to the Siegels for their approval on July 15, 2002.

77.  In or around August 2002, as Marks was finalizing the Siegels' revisions to the long-form document, Toberoff contacted Marks again regarding the Siegel-DC Comics Agreement.  Upon information and belief, Marks informed Toberoff he could not discuss the matter, including the terms of the agreement, because of a confidentiality agreement between DC Comics and the Siegel Heirs.  Toberoff reiterated interest in purchasing the Siegel Heirs' Superman rights.  On August 8, 2002, Toberoff conveyed an offer to Marks for presentation to the Siegels, which Marks said he would convey.

68.78.  Upon information and belief, Toberoff's offer stated that he had found a billionaire investor willing to purchase the Siegel Heirs' Superman rights.  Toberoff claimed the investor would give the Siegel Heirs $15 million cash up front, plus generous royalty and "back-end" rights on any properties developed,  including a new Superman motion picture Marks asked whether the offer was contingent on a due diligence investigation, and Toberoff stated that he had already conducted due diligence.  Upon information and belief, Toberoff also falsely offered to help the Siegel Heirs produce a movie that would compete directly with the Superman movie in development at the time at Warner Bros., DC Comics' licensee, even though he knew that the

1    Siegels' limited rights in the recaptured copyright, if any, would make such a competing motion

2    picture all but impossible to produce and distribute.

3    69.79.        Upon information and belief, although Marks conveyed Toberoff's offer to

4    the Siegels, he advised them that they had already reached a binding agreement with DC Comics.

5    Nonetheless, as a result of Toberoff's fraudulent inducements, the Siegel Heirs stated that they

6    would repudiate their agreement with DC Comics and accept Toberoff's offer.70.  On or around

7    September 21, 2002, the Siegel Heirs sent a letter to Marks terminating him as their attorney.

8    80.  On or around September 21, 2002, based on Toberoff's inducements and other acts of

9    interference described above, the Siegel Heirs sent a letter to DC Comics repudiating the Siegel-

10   DC Comics Agreement.  On October 28,2002, the Siegel Heirs sent a letter to DC Comics

11   confirming that the September 21, 2002 letter "totally stopped and ended negotiations with DC

12   Comics, Inc." And in a 2006 discovery response in the Siegel Actions, the Siegel Heirs denied that

13   "[b]y the May 9 Letter, [the Siegel Heirs] terminated negotiations with Defendants concerning the

14   Superman Notices."

15   81.  On October 23, 2002, the Siegel Heirs formalized an agreement with defendant IP

16   Worldwide for the purpose of "arrang[ing] and negotiat[ing] the sale, lease, license and all other

17   dispositions or exploitations" of the Siegel Heirs' Superman rights (the "IP Worldwide

18   Agreement").  The Siegel Heirs agreed to pay IP Worldwide a fee of 10% of the gross proceeds

19   generated by those rights.  Upon information and belief, the fee was subsequently reduced to 5%.

20   82.  The IP Worldwide Agreement provided that the Siegel Heirs could "not transfer,

21   assign, license or in any manner encumber the Rights ...  other than through or as a result of IPW's

22   exclusive representation thereunder."

23   83.  The IP Worldwide Agreement was not a legal retainer agreement.  It confirmed that

24   "the scope of this Agreement does not include legal services and/or expenses in connection with

25   litigation," and provided that "[t]he provision of such services and advancing of such expenses ...

26   will be rendered by Marc Toberoff, Esq., subject to good faith negotiation of a mutually

27   acceptable agreement executed by Mr. Toberoff and the Siegel Heirs.  71.  Upon information and

28   belief, in or around September 2004, the Siegelit was not until 2004-two years after entering into

1   the IP Worldwide Agreement-that the Siegel Heirs entered into an agreement with Toberoff

2   granting him 40% of their Superman rights and retaining him as their attorney (the "Siegel-

3   Toberoff Agreement").

4        72.84.   Upon information and belief, as a result of the Siegel-Toberoff Agreement and IP

5   Worldwide Agreement, Toberoff now owns a 45% financial interest in the Siegel Heirs' purported

6   Superman rights.

7        85.      Upon information and belief, Toberoff admitted to the Siegel Heirs that he misled

8   them about the existence of the billionaire investor he used as an inducement to obtain their

9   putative rights.  He also acknowledged that even if the Siegel Heirs succeeded in recapturing any

10   Superman rights, he could not follow through on his false promise to make a competing Superman

11   movie for them.  His reasons: "1.  the clout of WB Consumer Products in the licensing industry; 2,

12   perception that WB owns S[uperman] and that to understand what you own requires an

13   understanding of the nuances of copyright law; 3.  fear of being sued or embroiled in litigation."

14   **E.      F.  Toberoff Manipulates the Siegel Heirs and Shuster Heirs into Falsely Claiming**

15        **that Superboy Was the Sole Creation of Jerry Siegel**

16        73.86.   After inducingToberoff induced the Siegel Heirs to repudiate the Siegel-DC

17   Comics Agreement, on November 8, 2002, Toberoff caused the Siegel Heirs to serveserved a

18   second copyright termination notice on DC Comics directed at the character Superboy (the "Siegel

19   Superboy Termination Notice").  The notice not only erroneously stated that Superboy was a

20   copyrightable work not derivative of Superman, but falsely recited that Superboy was created

21   *solely* by Siegel (without contribution from Shuster), thereby entitling the Siegel Heirs to

22   terminate and recapture 100% of the putative Superboy rights.

23        74.87.   Defendants knew these claims were false.  To begin, in the Siegel Superman

24   Termination Notice served by the Siegel Heirs in 1997 the one served prior to Toberoff's

25   intervention—the Siegel Heirs expressly identified the Superboy works and elements as among

26   the "character[ s], story element[ s], or indicia reasonably associated with SUPERMAN." This

27   earlier notice acknowledged—as is in fact the case—that Superboy was a derivative work of

28   Superman, rather than a separately copyrightable work.

75. 88.  As to the representation that Superboy was created solely by Jerry Siegel, defendants knew that claim was untrue as well.  Among other reasons:

•       One year earlier, through defendant Pacific Pictures, Toberoff had entered into the 2001 joint -venture agreement with the Shuster Heirs, specifying that the *Shuster Heirs* owned an interest in "Superboy."

•       The original Superboy "script" on which the Siegel Heirs' ownership claims rely openly contains the byline: "By Jerry Siegel *and Joe Shuster*"—not just Jerry Siegel alone.  (Emphasis added.)

•       In 1948, a Court in Westchester, New York found that Joe Shuster provided the artwork for the Superboy story in More Fun Comics No.  101, the comic book which the Siegel Superboy Termination Notice claims is the first published Superboy work.

•       In 1972 and 1973, Siegel and Shuster together filed their own copyright renewal notices with the copyright office for Superboy, in which they identified Superboy as a work that they had *jointly* created.

•       And long before the alleged first publication of "Superboy" in November 1944, Shuster illustrated works for DC Comics that included various depictions of Superman as a boy, exhibiting super-human strength.  Several examples are reproduced below.  In "Action Comics No.  1," for example, Shuster drew Superman as a very young boy displaying an "astonish[ing] feat[]" of super-human strength, holding a chair above his head:

1
2
3
4
5
6
7



8
Action Comics No. 1 (1930)

9    Shuster also depicted Superman as a youth with super-powers in "Superman No. 1"

10   a work allegedly terminated by Shuster in the notice filed by Toberoff on behalf of

11   the Shuster heirs,



Superman No. 1 (May 1939)

18
19   as well as in a 1942 Sunday comic strip, in which Superman as a "youth" discovers

20   that his "amazing powers" are "multiplied with the years" and that, as a boy, he

21   could "outrace the fastest streamline train":

22
23
24
25
26
27
28

FIRST AMENDED COMPLAINT



Superman Sunday Strip (May 31, 1942)

76.89.    Through Pacific Pictures, Toberoff manipulated the Siegel and Shuster Heirs into falsely positioning Siegel as the sole creator of any putative copyrightable elements in Superboy.  They did so to enable the Siegels to claim a sole ownership interest in Superboy elements allegedly subject to recapture and thereby prevent DC Comics from exploiting Superboy without the Siegels' authorization and without being subject to claims of copyright infringement.  (Again, to be clear, DC Comics disputes that Superboy is not a derivative work of Superman and disputes that it is a work that Shuster and Siegel owned.)

77.90.    To manufacture this claim of sole ownership by the Siegels, Toberoff (acting through Pacific Pictures) caused the *Shuster Heirs* to remove from the 2001 joint venture between Pacific Pictures and the Shuster Heirs all claims by the Shusters to alleged rights in any and all Superboy elements.  Toberoff accomplished this by creating a new joint-venture agreement—signed October 30, 2003—that *deleted* any reference to Superboy.  Defendants Mark Peary and Jean Peavy signed this agreement (the "2003 Pacific Pictures Agreement"), which omitted all references to Superboy in its description of the Shuster Heirs' rights.  Toberoff induced the Shuster Heirs to disclaim any interest in Superboy so that Toberoff could position the Siegel Heirs to recapture 100% of these rights and assert a copyright infringement action against DC Comics—and seek an injunction against the television program *Smallville* on that basis.

FIRST AMENDED COMPLAINT

78.91.   In October 2004, the Siegels filed two actions in this Court seeking declaratory relief as to the validity of the Superman and Superboy termination notices, and in April 2005, the Siegels supplemented their pleadings in the Superboy action to assert copyright infringement (the "Siegel Actions").  (Case Nos.  CV-04-8400 ODW; CV-04-8776 ODW.) Both actions remain pending before  this Court.

**F.      The Shusters' Flawed Termination Notice**

79.92.   On November 10, 2003, one week after the 2003 Pacific Pictures Agreement was signed, defendant Mark Peary served on DC Comics a "Notice of Termination of Transfer Covering Extended Copyright Renewal Term of 'Superman'" (the "Shuster Termination Notice").

80.93.      The form submitting the Shuster Termination Notice for recordation in the U.S.  Copyright Office was certified under penalty of perjury by Toberoff on behalf of "IP Worldwide/Estate of Joseph Shuster." IP Worldwide is the Toberoff entity which, upon information and belief, holds a portion of the Siegel Heirs' Superman and Superboy rights pursuant to the IP Worldwide Agreement.

81.94.      The Shuster Termination Notice purports to terminate, under 17 U.S.C.  § 304(d), effective October 26, 2013, the following Shuster copyright grants: (a) the December 4, 1937 Agreement; (b) the March 1, 1938 Agreement; (c) the DCI September 22, 1938 Agreement; (d) the McClure September 22, 1938 Agreement; (e) the December 19, 1939 Agreement; (f) the May 19, 1948 Stipulation; and (g) the December 23, 1975 Agreement.

82.95.      The Shuster Termination Notice does *not* purport to terminate the copyright grants in the May 21, 1948 Consent Agreement or, even more importantly, the 1992 Agreement between the Shuster Heirs and DC Comics.

83.96.      The Shuster Termination Notice purports to apply to the following works: (a) certain unpublished material created before Action Comics No.  1; (b) Action Comics No.  1; (c) Action Comics No.  2; (d) Action Comics No.  3; (e) Action Comics No.  4; (f) Action Comics No.  5; (g) Action Comics No.  6; (h) Action Comics No.  7; (i) Superman No.  1; and (j) Superman No.  3.

- 29 -

FIRST AMENDED COMPLAINT

84.97.    The Shuster Termination Notice does not purport to terminate any copyright grant in pre-Action Comics No. 1 promotional materials or any materials relating to Superboy.

85.98.    The Shuster Termination Notice states that defendant Mark Peary "is the person entitled to exercise Joseph Shuster's termination interest" and that the Notice was "signed by all persons whose signature is necessary to terminate." The Notice makes no mention of the joint venture that the Shuster Heirs and Pacific Pictures formed or its putative ownership stake in the to-be terminated Superman rights. Nor does the Notice mention Pacific Pictures or its putative ownership stake in the joint venture, despite the grant of 50/50 rights in the joint venture to Pacific Pictures pursuant to Pacific Pictures' 2001 and 2003 agreements with the Shusters.

86.99.    On September 10, 2004, Pacific Pictures and the Shuster Heirs signed a one-page letter (the "September 10, 2004 Letter") purporting to cancel their joint venture and providing that the 2001 Pacific Pictures Agreement and 2003 Pacific Pictures Agreement "have been cancelled." However, because the Shuster Heirs and Pacific Pictures had agreed that all rights held by their joint venture would be divided 50/50 upon termination of the joint venture "for any reason," the apparent effect of the September 10, 2004 Letter was to transfer 50% of the Shuster Heirs' purported share of Shuster's rights to Toberoff or his companies.

87.100.    DC Comics is informed and believes that Toberoff (or his companies) now own 50% of the Shuster Heirs' putative rights as well as the 45% share of the Siegel Heirs' putative rights. This gives Toberoff the largest financial stake among defendants' collective asserted rights in Superman and in the pending legal disputes concerning those rights *(i.e.,* Toberoff—47.5%; Siegel Heirs—27.5%; Shuster Heirs—25%).

88.101.    DC Comics is also informed and believes that Toberoff, Pacific Pictures, IP Worldwide, the Siegels, and the Shusters have entered into one or more agreements preventing the Siegels or Shusters from conveying rights to DC Comics or entering into other agreements with DC Comics, including for the settlement of their putative termination claims or litigation, without the consent of other parties. For example, in the 2001 and 2003 Pacific Pictures Agreements, the Shuster Heirs  agreed not to settle any claims with respect to the Superman rights without Pacific

1  Pictures' or Toberoff's consent.  Such consent agreements are void as against public policy,

2  violate DC Comics' rights, and impede the administration of justice.

3  **G.**      **Toberoff's Wrongful Conduct Is Revealed to DC Comics in the Toberoff Timeline**

4         89.102.  Pursuant to federal court orders dated September 26, 2008 and December 4, 2008,

5  Toberoff was compelled to produce to DC Comics a document titled "Superman – Marc Toberoff

6  Timeline" (the "Toberoff Timeline," attached  hereto as Exhibit A), which Toberoff has

7  acknowledged was written by an attorney  he previously employed.  To prevent DC Comics from

8  obtaining and using the document, Toberoff asserted to the federal court that it was privileged, but

9  his position was repeatedly rejected by this Court.  The Toberoff produced the Toberoff Timeline

10 was produced to DC Comics on December 10, 2008.

11        90.103.  The Toberoff Timeline describes and discloses Toberoff's wrongful activities in

12 pursuing the Siegel and Shuster Heirs' putative interests in the Superman rights.  It lays out

13 Toberoff's scheme to induce the Siegel Heirs to repudiate the Siegel-DC Comics Agreement with

14 DC Comics (*e.g.,* "It [is] clear at this juncture that [Toberoff] thwarted the earlier deal with Time

15 Warner and DC Comics in 2002 for his own personal gain"); his efforts to acquire as "much

16 ownership of the Superman copyright personally as he can"; and his attempt to conceal certain of

17 his illicit activities from the Siegel and Shuster Heirs.  (Emphasis in original.) As a result, "***the***

18 ***single person who would stand to gain the MOST in a settlement with Time Warner [and DC***

19 ***Comics] regarding the ongoing SUPERMAN legal dispute would not be the heirs themselves,***

20 ***but Marc Toberoff.***"  (Emphasis in original.)

21        91.104.  The Toberoff Timeline discloses many of the facts alleged herein, and concludes:

22 "[Toberoff] is solely motivated *at all times* not by his clients' interests, but manipulating pieces of

23 the puzzle so that he may receive the greatest percentage from a very possible large Time Warner

24 settlement, through part ownership and  unconscionable fees." (Emphasis in original.) The

25 Toberoff Timeline explains that "[a]t least 7 attorneys have come and gone at the Law Offices of

26 Marc Toberoff, and many have left due to ethical issues." Many of these and other disturbing,

27 salient facts detailed herein have only recently come to light in the past 1820 months.

28

56899.1

FIRST AMENDED COMPLAINT

## V.    CLAIMS FOR RELIEF

**A.    First Claim for Relief: Declaratory Relief re: Invalidity of Copyright Termination Notice (Against Defendants Shuster Estate ~~and~~, Peary, and Peavy)**

~~92.~~105.  DC Comics re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

~~93.~~106.  The Shuster Termination Notice is invalid, and thus ineffective, for at least five separate, independent, and alternative reasons:

### (1)    There Is No Statutory Basis for the Shusters to Terminate

~~94.~~107.  The Copyright Act does not provide any basis for the Shuster Estate to terminate. Shuster's termination right was lost when he died in 1992 without having exercised it and without leaving a statutory heir to inherit it under the then-applicable provisions of the Copyright Act.

~~95.~~108.  The 1976 Copyright Act gave authors the ability to terminate certain pre-1978 copyright grants.  According to the original termination provisions: "Where an author is dead, his or her termination interest is owned, and may be exercised, by his widow or her widower and his or her children or grandchildren." 17 U .S.C. § 304( c )(2) (1976).  In other words, the right of termination could only be exercised by an author during his or her lifetime, or by a widow, child, or grandchild after the author's death.  As the language of the statute establishes, and its legislative history confirms, the right of termination was lost if an author died without exercising it and without leaving a widow, child, or grandchild to inherit it.

~~96.~~109.  Shuster could have exercised his putative termination right beginning in April 1984.  The 1976 Copyright Act provided that a copyright grant could be terminated 56 years after the date copyright was first secured *(i.e.,* April 1994, or 56 years after the April 1938 publication of Action Comics No. 1), and that notice of termination could be served 10 years before the termination date *(i.e.,* April 1984, or 10 years before April 1994).  17 U.S.C. § 304(c)(3)-(4).

~~97.~~110.  During his lifetime, Shuster chose not to exercise his termination right.  Shuster died in 1992, and did not leave a widow, child, or grandchild to succeed to his termination right under section 304( c) of the 1976 Copyright Act.  As a result, Shuster's termination right ceased to exist on his death.

98.111.  The 1999 Copyright Term Extension Act ("CTEA") extended the term of copyright by 20 years and also provided an opportunity to authors and selected heirs to terminate for this new extended time period in circumstances where the "[t]ermination rights provided for in subsection (c) have expired on or before the effective date of the [CTEA]," or October 27, 1998, and the "author or owner of the termination right has not previously exercised such termination right." 17 U.S.C. § 304( d).  Where section 304( d) applies, section 304( c )(2) provides that if an author is dead, the termination right can be exercised by his widow, children, or grandchildren or, "[i]n the event that the author's widow or widower, children or and grandchildren *are not living,* the author's executor, administrator, personal representative, or trustee.... .... " (Emphasis added).  These are the provisions that defendant Mark Peary, the executor of the Shuster Estate, purports to rely on in the Shuster Termination Notice, but they have no application here.  By its own terms, section 304(d) only applies where an author's window for exercising the termination right opened and closed or "expired" *(not* when an author died while the window was open without exercising the right or leaving any heirs to do so), and where a deceased author's widow, child, or grandchild is "not living," but who did at some time live.  Shuster never had a widow, child, or grandchild, and Peary, acting on behalf of the Shuster Estate, has no right to file the invalid notice of termination that he did.

**(2)      The 1992 Agreement Bars the Shusters from Pursuing Termination**

99.112.  The 1992 Agreement that Frank Shuster and Jean Peavy entered into with DC Comics bars the Shuster Estate from pursuing termination because, *inter alia,* in exchange for valuable consideration, the 1992 Agreement effected a rescission, revocation, and re-grant of all prior copyright grants, which eliminated any pre-1978 grant that could be subject to termination under section 304 of the Copyright Act.

100.113.  The 1992 Agreement, which was executed on October 2, 1992, provides that Shusters' heirs "fully settle[]" and forfeit any and all of rights under Joseph Shuster's prior "agreements or otherwise," thereby revoking and rescinding those prior, pre-1992 instruments.  It also *"grant[s] to us* [DC Comics] any…copyrights, trademarks, or other property right in any and

all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon."
(Emphasis added.)

101.114.  Section 304(d) of the Copyright Act only allows for termination of copyright grants "executed before January 1, 1978."  Because the 1992 Agreement left intact no pre-1978 copyright grant to terminate, section 304( d) does not apply, and the Shuster Estate has no copyright grant that it may terminate.

102.115.  Shuster's heirs approached DC Comics in 1992 seeking increased annual payments, certain tax benefits, and payment of Shuster's debts and expenses.  At the time, Shuster's heirs recognized the value of Superman as a property.  As the result of DC Comics' development, promotion, and exploitation of Superman from 1938 to 1992, Superman had evolved from the black-and-white figure drawn by Shuster for Action Comics No.  1 to a global, multi-media industry.  Moreover, in correspondence with DC Comics, the Shusters adverted to the termination rights provided for under the Copyright Act.  As Shuster's heirs requested, the 1992 Agreement provided that DC Comics would: (a) increase its annual payments to the Shuster Heirs to $25,000 per year—five times higher than the amount it was obligated to pay under the December 23, 1975 Agreement; (b) make these annual payments to Jean Peavy for purposes of a tax benefit; and (c) pay the approximately $20,000 representing Shuster's final debts and expenses.  DC Comics continues to make annual payments under the 1992 Agreement, and has paid Shuster's heirs close to $500,000 to date.  The 1992 Agreement confirms that it "fully settles *all claims to any payments or other rights or remedies* which you may have under any other agreement or otherwise, *whether now or hereafter existing* regarding the copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon." (Emphasis added.) Shuster's heirs agreed "not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever."

103.116.  By effectively rescinding, revoking, and re-granting any and all prior grants of Joe Shuster's rights, the Shuster Heirs have no right to terminate any of the Superman copyrights. Defendant Peavy has recognized that this was the clear effect of the 1992 Agreement; in a September 7, 1999 letter to DC Comics, she confirmed: "I have learned from the Internet that

1   Joanne Siegel has filed a copyright claim for SUPERMAN *[i.e., the Siegel Superman Termination

2   Notice].  I want you to know that I intend to honor our pension agreement.*"

3   104.117.  At the very least, because of DC Comics' continued performance under the 1992

4   Agreement, and the Shusters' continued acceptance of benefits under the Agreement—even

5   after filing the Shuster Termination Notice—the Shusters are estopped from disputing that the

6   1992 Agreement remains in full force and effect, which operates to preclude the assertion of any

7   termination right.

8   **(3)    The Shusters Lack the Majority Interest Necessary to Terminate**

9   105.118.  The Shuster Termination Notice is also invalid because the party that filed it—if

10  defendants' own contractual documents are to be believed—lacked authority to do so.  Section

11  304( c)( 1) of the Copyright Act provides that termination of a grant executed by an author who is

12  not living may be exercised only "by the person or persons who…own and are entitled to exercise

13  a total of *more than one-half of that author's termination interest*." 17 U.S.C.  § 304( c)(1)

14  (emphasis added).  Copyright Office regulations require that a termination notice include "specific

15  indication of the person or persons executing the notice who constitute more than one-half of that

16  author's termination interest" and "shall be signed by the number and proportion of the owners of

17  that author's termination interest required under section 304(c)." 37 C.F.R.  § 201.10(b) (1)(vii),

18  (c)(2).

19  106.119.  According to the Pacific Pictures agreements (to the extent they are valid and

20  enforceable), the Shuster Estate does not own—and did not own at the time the Shuster

21  Termination Notice was executed—the "more than one-half" majority interest necessary to

22  terminate under section 304( c)(1) of the Copyright Act.

23  107.120.  Pursuant to the 2001 Pacific Pictures Agreement, defendants Mark Peary and

24  Jean Peavy "transfer[ red] and assign[ ed]…their rights, title, and interest" in all of Shuster's

25  copyrights and creations to their joint venture with Pacific Pictures.  In the 2003 Pacific Pictures

26  Agreement, Peary confirmed the terms of the 2001 Pacific Pictures Agreement on behalf of the

27  Shuster Estate.

28

FIRST AMENDED COMPLAINT

108.121.  One week later, on November 10, 2003, Peary served the Shuster Termination Notice on behalf of the Shuster Estate.  At the time, the Shuster Estate did not own *any* of the purported termination right, as this and all other rights had been transferred to the joint venture with Pacific Pictures.³  The Shuster Termination Notice is therefore invalid under section 304(c)(1) of the Copyright Act.

109. 122.  The Shuster Termination Notice represents that Peary "is the person entitled to exercise Joseph Shuster's termination interest" and that the Notice had been "signed by all persons whose signature is necessary to terminate." Peary's failure to disclose that he had purported to transfer this putative termination right to the joint venture with Pacific Pictures, or include a signature on behalf of the joint venture or Pacific Pictures, violated 37 C.F.R.. § 201.10(b)(1 )(vii) and 37 C.F.R. § 201.10(c)(2).

110. 123.  Peary's failure to disclose the requisite information in the Shuster Termination Notice was not harmless.  Upon information and belief, these omissions were not inadvertent, but were intended to conceal material information from DC Comics, including: (a) the various conflicts of interest arising from Toberoff's and his companies' significant ownership interest in the Shuster Estate's and the Siegel Heirs' purported rights; and (b) consent agreements that Toberoff procured limiting the Shuster and Siegel Heirs' freedom to enter into agreements with DC Comics regarding those rights.

111. 124.  The Copyright Act's termination provisions were crafted to avoid the trafficking in future interests by third parties like Toberoff and his companies, yet that is exactly what his agreements with the Shuster and Siegel Heirs accomplish, and what Toberoff and Shusters failed to disclose to DC Comics and the Copyright Office by serving and filing the Shuster Termination Notice.

³ At most, the Shuster Estate owned only a 50% interest in that joint venture.  This is still the case. As a result of the September 10, 2004 Letter purporting to cancel the 2001 and 2003 Pacific Pictures Agreements and by the terms of the 2001 and 2003 agreements themselves, any putative rights held by the joint venture were split 50/50 between the Shuster Heirs and Pacific Pictures on cancellation of the joint venture agreement: "[Upon] winding-up of the Venture or in the event of termination of the Venture for any reason, all Rights, property or assets of the Venture will be held fifty percent (50%) by the [Shuster Heirs] and fifty percent (50%) by PPC." (Emphasis added.)

56899.1

FIRST AMENDED COMPLAINT

1    **(4)**    **The Shusters Do Not Attempt to Terminate Certain All-Encompassing**

2    **Copyright Grants**

3    ~~112.~~125.  The 1992 Agreement includes a "grant" by Shuster's heirs to DC Comics of,

4    *inter alia,* all "copyrights, trademarks, or other property right in any and all work created in whole

5    or in part by…Joseph Shuster, or any works based thereon." In the Shuster Termination Notice,

6    defendants did not terminate (or even mention) the 1992 Agreement.

7    ~~113.~~126.  The May 21, 1948 Consent Agreement also includes a grant by Siegel and

8    Shuster to National, DC Comics' predecessor-in-interest, of all of Siegel and Shuster's rights in

9    Superman and Superboy.  (If the 1992 Agreement is not read as a rescission, revocation, and re-

10   grant of all prior agreements between Shuster and DC Comics (and it should be), then the May 21,

11   1948 Consent Agreement remains in effect.)

12   ~~114.~~127.  Defendants do not attempt to terminate the May 21, 1948 Consent Agreement,

13   and do not identify the May 21, 1948 Consent Agreement in the Shuster Termination Notice.

14   ~~115.~~128.  As the result of defendants' failure to terminate the 1992 Agreement and May

15   21, 1948 Consent Agreement, the grants contained therein remain in full force and effect.  Thus,

16   DC Comics is and continues to be the sole owner of all rights, including rights under copyright, in

17   Superman pursuant to the 1992 Agreement and May 21, 1948 Consent Agreement.

18   **(5)**    **The Doctrine of Unclean Hands Bars the Shusters from Terminating**

19   ~~116.~~129.  The doctrine of unclean hands requires that the Shuster Termination Notice be

20   deemed invalid because it contains material misrepresentations intended to mislead the courts,

21   Copyright Office, and DC Comics—all to the detriment of DC Comics.

22   ~~117.~~130.  The Shuster Heirs did not disclose Pacific Pictures' purported ownership interest

23   in the rights sought to be terminated.  Just one week before filing the Shuster Termination Notice,

24   the Shuster Estate signed the 2003 Pacific Pictures Agreement, reaffirming its transfer of 100% of

25   its rights in any Superman-related copyrights to the joint venture with Pacific Pictures.  Copyright

26   Office regulations require that a termination notice include "specific indication of the person or

27   persons executing the notice who constitute more than one-half of that author's termination

28   interest" and "shall be signed by the number and proportion of the owners of that author's

56899.1

EXHIBIT O
Page 348

FIRST AMENDED COMPLAINT

1  termination interest required under section 304( c)." 37 C.F.R.  § 201.10(b)(1)(vii), (c)(2).  Yet

2  Pacific Pictures is conspicuously absent from the Shuster Termination Notice.  This omission was

3  not inadvertent, as explained above.

4  ~~118.~~131.  Induced by Toberoff, the Shuster Heirs also falsely disclaimed any interest in the

5  Superboy rights in the Shuster Termination Notice.  This permitted Toberoff to assert on behalf of

6  the Siegel heirs a baseless Superboy-related copyright infringement claim against DC Comics.

7  Prior to these manipulations by Toberoff, Shuster and the Shuster heirs had truthfully maintained

8  for over 50 years that Shuster had co-created Superboy.  For example, the findings submitted by

9  Siegel and Shuster's counsel in the 1940s Westchester Action, specified that Shuster had drawn

10 the first "Superboy" denominated story in More Fun Comics No.  101.  Similarly, in 1972 and

11 1973, during the Superman renewal litigation,  Siegel and Shuster jointly filed copyright renewal

12 notices asserting joint authorship both in the Superboy character, and in More Fun Comics No.

13 101, which contained the first comic book story denominated "Superboy."

14 ~~119.~~132.  Additionally, in the 2001 Pacific Pictures Agreement, entered into before

15 Toberoff had secured an agreement with the Siegel Heirs, Toberoff and the Shuster Heirs

16 expressly identified "Superboy" as among the universe of rights that Shuster had jointly created

17 with Siegel.  Yet just two years later in 2003, and only *after* Toberoff had entered into an

18 agreement with the Siegel Heirs securing control over their rights, did the Shuster Heirs suddenly

19 reverse course.  The 2003 Pacific Pictures Agreement omitted all reference to Superboy, and the

20 Shuster Termination Notice filed one week later avoided any overt mention of Superboy elements

21 or works.[34]  But even the termination notice served by the Shuster Heirs, while carefully drafted to

22 avoid any mention of Superboy, could not completely rewrite history.  The Shuster Termination

23 Notice expressly identifies Action Comics No.  1 and Superman No.  1 as terminated works.  Both

24 of these works, however, clearly depict Superman as a boy with super-powers: *i.e.,* a "Superboy."

25

26 _____
   [34] As noted, DC Comics maintains that Superboy is a derivative work based upon the
   preexisting Superman, and in any event, is owned solely and exclusively by DC Comics, inter alia,
27 because it is a work-for-hire and the script submitted by Siegel and Shuster is unpublished and,
   thus, is not terminable.

28

1   For example, Action Comics No. 1 features Superman as a very young boy exhibiting super

2   strength, and Superman No. 1 depicts Superman as a youth leaping over a building.

3       120.133. After the Shuster Termination Notice was filed, the Siegel Heirs brought a

4   copyright infringement claim against DC Comics on the frivolous ground that Superboy was the

5   sole creation of Siegel, entitling the Siegel Heirs to terminate and recapture 100% of the Superboy

6   rights (as opposed to the 50% share they would be entitled to recapture if Superboy was a joint

7   work). The Siegel Heirs threatened to enjoin the popular *Smallville* television series, which they

8   wrongly claimed infringed their exclusive rights in Superboy. As a result, DC Comics has

9   incurred substantial expenses defending against the claim Toberoff manufactured and the Shusters

10  facilitated. Defendants compromised the integrity of the Copyright Office and judicial system by

11  crafting the Shuster Termination Notice in this way, and the Shuster Termination Notice should be

12  held invalid on this and the other related grounds set forth herein.

13                          *       *       *

14      121.134. Each of the foregoing reasons is a separate, independent, and alternative basis for

15  declaring the Shuster Termination Notice to be invalid and thus ineffective. A declaration by this

16  Court regarding the validity of the Shuster Termination Notice is warranted under the Declaratory

17  Judgment Act, 28 U.S.C. §§ 2201 *et seq.,* to establish the parties' respective rights and obligations

18  with respect to the copyright interest in the Superman material.

19  **B.**      **Second Claim for Relief: Declaratory Relief re: Limited Scope of Copyright**

20          **Termination Notice (Against Defendants Shuster Estate and, Peary, and Peavy)**

21      122.135. DC Comics re-alleges and incorporates by reference each and every allegation

22  contained in the paragraphs above.

23      123.136. This Second Claim for Relief is advanced in the alternative—*i.e.*, if the Court

24  does not grant DC Comics' First Claim for Relief set forth above and hold that the Shuster

25  Termination Notice is invalid.

26      **(1)  Additional Factual Background**

27      124.137. Upon information and belief, in or around 1933, Siegel and Shuster began co-

28  creating comic strips, some of which included stories featuring a character named Superman. The

materials created by Siegel and Shuster during this time are believed to include: (a) 24 days of Superman comic strips intended for newspapers; (b) a seven-page synopsis of the last 18 days (weeks two through four) of such comic strips; (c) a paragraph previewing future Superman exploits; (d) a nine-page synopsis of an additional two months of daily comic strips; and (e) 15 daily comic strips (collectively, the "Unpublished Superman Works").  None of these materials was published in its original form, most were never published at all, and some are apparently lost.

125.138.  Upon information and belief, between 1933 and 1937, Siegel and Shuster submitted the Unpublished Superman Works to a number of prospective publishers and newspaper syndicates, all of which rejected them.

126.139.  On December 4, 1937, Siegel and Shuster entered into the December 4, 1937 Agreement with DCI.  Siegel and Shuster agreed to "give their exclusive services" in producing certain comic features for a period of two years.  Siegel and Shuster were required to submit any new continuity to DCI, which reserved the right to accept or reject them for a period of sixty days.

127.140.  In early 1938, DCI was seeking material for use in a new comic book it was developing entitled " Action Comics." Pursuant to the December 4, 1937 Agreement, the 24 days of Superman comic strips from the Unpublished Superman Works were provided to DCI for review.  DCI decided to publish a Superman story in Action Comics No. 1, but the materials submitted by Siegel and Shuster to DCI were neither in a form that was acceptable for publication in a comic book, nor were they complete.  Therefore, at the instance and expense of DCI and subject to its right of control, Siegel and Shuster adapted the 24 days of comic strips, and  added certain new material, to create a 13-page uncolored comic book story entitled "Superman." Cover art featuring Superman that was used for Action Comics No. 1 was thereafter created by DCI. DCI's printers or engravers, working at the direction of DCI, chose colors for the Superman character and colored the 13-page story and cover.

128.141.  Siegel and Shuster assigned to DCI all of their rights in Superman in the March 1, 1938 Agreement.  This included "all good will attached thereto and exclusive right to the use of the characters and story, continuity and title of strip."  Siegel and Shuster agreed not to use Superman or any other character featured in the strip "by their names contained therein."

1    129.142.  Before the April 1938 publication of Action Comics No. 1, which was cover-

2    dated June 1938, DCI promoted the upcoming Superman story in some of its other publications,

3    including "More Fun Comics No. 31" and "Detective Comics No. 15." These publications were

4    cover-dated May 1938 and were published prior to Action Comics No. 1.  The promotions (the

5    "Promotions") depict Superman in his costume—including a cape, boots, leotard, and inverted

6    triangular "S" crest on his chest—–exhibiting his super-strength by holding a car over his head as

7    bystanders watch in awe.  The Promotions show almost the entirety of what would become the

8    cover of Action Comics No. 1 in clarity and detail.

9    130.143.  Action Comics No. 1 was comprised not only of the 24 days of Superman comic

10   strips from the pre-existing Unpublished Superman Works (as modified and edited by Siegel and

11   Shuster), but of additional new material created by Siegel and Shuster at DCI's instance and

12   expense and subject to its right of control.

13   131.144.  Upon information and belief, after the publication of Action Comics No. 1,

14   Siegel and Shuster supplied further original Superman stories to DCI, at DCI's instance and

15   expense and subject to its right of control.  On September 22, 1938, Siegel and Shuster entered

16   into another employment agreement with DCI confirming that Siegel and Shuster had "been doing

17   the art work and continuity for said comics [including Superman comics] for us.  We wish you to

18   continue to do said work and hereby employ and retain you for said purposes." The DCI

19   September 22, 1938 Agreement also contained an acknowledgement that DCI was the "exclusive"

20   owner of Superman.

21   132.145.  Also on September 22, 1938, Siegel and Shuster entered into the McClure

22   September 22, 1938 Agreement with DCI and the McClure Newspaper Syndicate concerning the

23   use of Superman in newspaper strips.

24   133.146.  All of Siegel and Shuster's contributions to Superman comic books and comic

25   strips were made pursuant to the December 4, 1937 Agreement, March 1, 1938 Agreement, the

26   DCI September 22, 1938 Agreement, the McClure September 22, 1938 Agreement, the McClure

27   September 22, 1938 Agreement, contemporaneous oral agreements confirmed by one or more of

28   those agreements, or certain subsequent agreements affirming those agreements, as employees of

56899.1

- 41 -

FIRST AMENDED COMPLAINT

1   DCI (or its successors) and at DCI's instance and expense and subject to its right of control.  In
2   particular, upon information and belief, Shuster continued to work for DCI and/or its successors as
3   a staff artist even when Siegel did not, and therefore may have had oral or written employment
4   agreements independently of Siegel.  As a result, all of these materials constitute works for hire
5   under the 1909 Copyright Act, and the copyrights therein are owned exclusively by DC Comics
6   and are not subject to termination under later amendments to the Copyright Act.

7   134.147.  On November 30, 1938, Siegel wrote a letter to DCI (the "November 1938
8   Letter") suggesting that it publish a comic book entitled "Superboy," "which would relate to the
9   adventures of Superman as a youth."  The November 30, 1938 Letter does not contain any
10  discussion of plot, dialogue, appearance, or any other copyrightable material relating to Superboy.
11  DCI decided not to publish a Superboy comic book at that time, and had already published comic
12  books, discussed *supra,* that showed Superman as a young boy and exhibiting super-human
13  strength.  For example, in 1939, among the Superman material prepared by Siegel and Shuster at
14  the instance and expense of DCI and subject to its right of control was Superman No.  1.  In
15  Superman No.  1, Clark Kent is depicted as a boy with super-powers.

16  135.148.  On December 19, 1939, Siegel and Shuster entered into the December 19, 1939
17  Agreement with DCI, which modified the DCI September 22, 1938 Agreement by, *inter alia,*
18  doubling Siegel and Shuster's compensation for Superman comic books and newspaper strips and
19  providing for payment to Siegel and Shuster for uses of Superman in media such as radio, motion
20  pictures, and toys.  Under the December 19, 1939 Agreement, Siegel and Shuster again
21  acknowledged DCI's sole ownership of Superman.

22  136.149.  Upon information and belief, in December 1940, Siegel, on behalf of himself and
23  Shuster, submitted to DCI a 13-page script of continuity for Superboy (the "Unpublished 1940
24  Superboy Script") and renewed his suggestion that DCI publish a comic book depicting Superman
25  as a youth.  The Unpublished 1940 Superboy Script, which includes the credit line "By Jerry
26  Siegel and Joe Shuster," states: "So many faithful followers of today's leading adventure comic
27  strip, SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth…And so here he
28  is at last …the answer to your requests …America's outstanding boy hero: SUPERBOY!" The

Unpublished 1940 Superboy Script explains that "[i]n later years [Superboy] was to become the might[y] figure known as SUPERMAN!" The Unpublished 1940 Superboy Script was derived entirely from pre-existing Superman elements and ideas that had been published by DCI as part of works for hire, and contained no original copyrightable element.  Again, DCI decided not to publish a Superboy comic book at that time.

137.150.  Upon information and belief, sometime prior to November 18, 1944, DCI published a comic book depicting the adventures of Superman as a youth, called Superboy, in "More Fun Comics No. 101," which had a cover date of January-February 1945 and was illustrated at least in part by Shuster.  Upon information and belief, Siegel did not participate in the creation of this comic book or the Superboy story it contained.  Other than retelling the Superman origin story from Action Comics No.  1 and Superman No.  1, this Superboy story bore no resemblance to the Unpublished 1940 Superboy Script.

138.151.  In the more than 70 years since the publication of Action Comics No.  1 in 1938, DC Comics has created a vast universe of Superman material spanning virtually all media, including comic books, graphic novels, live action pictures, feature-length motion pictures, motion picture serials, radio and television serials, and live theatrical presentations.  DC Comics' extensive development and exploitation of Superman has generated new characters, new super-powers, new components to the Superman universe, new elements in the Superman back story, and new changes in Superman's appearance.

**(2)     Claim for Declaratory Relief re: Limited Scope of Copyright Termination Notice**

139.152.  In the event that the Shuster Termination Notice challenged in the First Claim for Relief above is deemed to be effective, the scope and reach of the Notice must be declared limited in the following ways:

**a.     Unpublished Superman Works**

140.153.  The Shuster Termination Notice purports to terminate certain portions of the Unpublished Superman Works, including: (a) "twenty-four days …of previously unpublished

1    SUPERMAN newspaper comic strips, created c. 1934," (b) "SUPERMAN story in comic book

2    form …created c. 1933," and (c) "15 SUPERMAN daily comic strips …created c. 1934."

3    141.154.  To the extent that any portion of the Unpublished Superman Works may be

4    considered published for purposes of the Copyright Act (and this is disputed), those portions were

5    published only as a result of their adaptation for inclusion in Action Comics No. 1, which was a

6    work made for hire.  The Copyright Act expressly provides that "a work made for hire" cannot be

7    subject to termination.  17 U.S.C. § 304(c)-(d).  As a result, the Shuster Termination Notice is

8    ineffective as to the Unpublished Superman Works.

9                    **b.        Pre-Action Comics No. 1 Promotions**

10    142.155.  The Shuster Termination Notice does not attempt to terminate DC Comics'

11    rights in the Promotions published before Action Comics No. 1.

12    143.156.  Moreover, upon information and belief, the Promotions, depicting in sum and

13    substance what was subsequently published as the cover of Action Comics No. 1, were not

14    prepared by Siegel or Shuster, but rather by others either employed by DCI or at the instance and

15    expense of DCI and subject to its right of control.  As a result, the Promotions were works made

16    for hire and any copyright therein was owned by DCI *ab initio* and cannot be subject to

17    termination.  17 U.S.C. § 304(c)- (d).

18    144.157.  DC Comics remains the sole owner of the Promotions, all copyrights therein, and

19    the various copyrightable elements contained therein.  The Shusters may not seek to terminate

20    copyright interests comprised in the Promotions.

21                    **c.        Works for Hire**

22    145.158.  The Shuster Termination Notice purports to recapture the rights in Action

23    Comics Nos. 1-7, Superman No. 1, and Superman No. 3 ("Superman Works").  Each of the

24    Superman Works was prepared at the instance and expense of DCI and subject to its right of

25    control.  As a result, the Superman Works were works made for hire and any copyright therein

26    was owned by DCI *ab initio* and cannot be subject to termination.  17 U.S.C. § 304(c)-(d).

27

28

1    ~~146.~~159.  DC Comics remains the sole owner of the Superman Works, all copyrights

2    therein, and the various copyrightable elements contained therein.[4] [5]

### d.    Derivative Works

4    ~~147.~~160.  All Superman-related works prepared after the publication of Action Comics No.

5    1 were derivative works based on pre-existing copyrightable material and created under the

6    authority of valid copyright grants (the "Derivative Works").

7    ~~148.~~161.  The Derivative Works include new characters, new super-powers, new

8    components to the Superman universe, new elements in the Superman back-story, and changes in

9    the appearance of Superman.

10   ~~149.~~162.  Regardless of whether the Shuster Termination Notice is deemed valid, DC

11   Comics remains the sole owner of the Derivative Works and retains the continuing right to exploit

12   the Derivative Works under section 304 of the Copyright Act, 17 U.S.C. § 304(c)(6)(A).

### e.    Scope of Shuster Notice

14   ~~150.~~163.  The Shuster Termination Notice, in addition to specifying works to be

15   terminated also describes certain elements purportedly encompassed by the works sought to be

16   recaptured.  Many of these elements do not appear in the specified works.  In addition to

17   identifying elements that are not present, the Shuster Termination Notice is also notable for its

18   failure to specify elements that are present.  For example, although both the purportedly

19   terminated  works Action Comics No. 1 and Superman No. 1 depict Superman as a boy with

20   super-powers, the Shuster Termination Notice is silent on this element.  Accordingly, a dispute has

---

[4] The court in the Siegel Action agreed with this position almost entirely, ruling that other than a handful of pre-1938 materials authored by Siegel, all of Siegel's Superman works were created as "works for hire" on behalf of DC Comics and thus could not be terminated.  DC Comics reserves all rights with respect to these interim rulings in the Siegel case.

[5] ~~In the related action filed by the Siegel Heirs against DC Comics, the federal court agreed with this position almost entirely, ruling that other than a handful of pre-1938 materials authored by Siegel, all of Siegel's Superman works were created as "works for hire" on behalf of DC Comics.  The court ruled that all material created by Siegel after his 1938 employment agreement with DCI, including Action Comics Nos. 2, 3, 5-61, Superman Nos. 1-23 (other than pages 3-6 of Superman No. 1), and post-1938 newspaper strips, were works-for-hire and thus could not be terminated.  DC Comics reserves all rights with respect to these interim rulings in the Siegel case.~~

1  arisen between the parties regarding the scope of the Shuster Termination  Notice with respect to

2  the elements that appear, or which do not appear, in the allegedly terminated  identified in the

3  Shuster Termination Notice, including, but not limited to, the following:

4      a.  Superman's "telescopic vision"

5      b.  Superman's "super hearing"

6      c.  Superman's "super…sense of smell"

7      d.  Superman as a boy with super-powers *(i.e.,* "Superboy")

8      e.  "[D]iamond-shaped "S" insignia on [Superman's] chest"

9      f.  "[L]ove triangle between Superman, Lois Lane and Clark Kent"

10     g.  "Perry White"

11     h.  "Daily Planet newspaper"

12     i.  "Metropolis"

13     j.  "Jor L"

14     k.  "Krypton"

15     151.164.  A declaration by this Court regarding the scope of the Shuster Termination

16  Notice is warranted under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.,* to establish

17  the parties' respective rights and obligations with respect to the copyright interest in the Superman

18  material.  The Shusters may not seek to terminate copyright interests owned by DC Comics,

19  including those materials listed above.

20  **C.    Third Claim for Relief: Declaratory Relief re: Shuster Period of Exclusivity (Against**

21         **All Defendants)**

22     152.165.  DC Comics re-alleges and incorporates by reference each and every allegation

23  contained in the paragraphs above.

24     153.166.  This Third Claim for Relief is advanced in the alternative—*i.e.,* if the Court does

25  not grant DC Comics' First Claim for Relief set forth above and hold that the Shuster Termination

26  Notice is invalid.

27     154.167.  The Copyright Act establishes an exclusive period between the time a copyright

28  termination notice is served and the effective termination date in which the original copyright

56899.1

EXHIBIT O
Page 357

FIRST AMENDED COMPLAINT

1   grantee may enter into an agreement with the original copyright author or their heirs regarding the

2   rights sought to be recaptured.  Section 304(c)(6)(D) provides: "A further grant, or agreement to

3   make a further grant, of any right covered by a terminated grant is valid only if it is made after the

4   effective date of the termination." 17 U.S.C. § 304(c)(6)(D).  While the statute bars third parties

5   (like Toberoff and his companies) from trafficking in such future copyright interests during this

6   exclusive time period, it protects the rights and interests of original grantees like DC Comics,

7   providing that "an agreement for such a further grant may be made between the author or [his

8   heirs] and the original grantee or [its successor *(e.g.,* DC Comics)], after the notice of termination

9   has been served." *Id.*

10   ~~155.~~168.  Section 304( c)( 6)(D) of the Copyright Act establishes a right of DC  Comics

11   from November 10, 2003 (when the Shuster Heirs served the Termination Notice) until October

12   26, 2013 (the effective date of the Notice), during which DC Comics is the sole party that can

13   enter into an agreement with the Shuster Heirs for the rights sought to be terminated.  This right

14   has been described by Congress, in its legislative history, and the United States Court of Appeals

15   as a "right of first refusal." Any restriction or limitation on this period of exclusivity must be

16   deemed unenforceable under section 304(c)(6)(D).

17   ~~156.~~169.  Upon information and belief, the Shuster Heirs have entered into agreements that

18   frustrate and impede DC Comics' period of exclusivity.  For example, the 2003 Pacific Pictures

19   Agreement grants and assigns the Shuster Heirs' putative present and future copyright interests

20   and provides that "any and all agreements regarding any of the Rights [in Shuster's creations,

21   including copyright] shall be subject to the express written approval" of Pacific Pictures.  This

22   improperly allowed Pacific Pictures (and Toberoff) to prevent the Shuster Heirs from entering into

23   an agreement with DC Comics concerning their purported rights—in clear violation of section

24   304(c)(6)(D).  Although Pacific Pictures and the Shuster Heirs purported to cancel the 2001 and

25   2003 Pacific Pictures Agreements in their September 10, 2004 Letter, this improper agreement

26   was in effect at least from the time it was executed on October 30, 2003 through September 10,

27   2004, which means that it improperly eliminated most of the first  year of DC Comics' period of

28   exclusivity.  Moreover, the original 2001 Pacific Pictures Agreement provides that if the Shusters'

1  joint venture with Pacific Pictures is terminated "for any reason," then Pacific Pictures will hold

2  50% of "the property or assets of the Venture," including all the alleged Shuster Superman

3  copyright interests, as a "tenant[] in common," meaning that Pacific Pictures and Toberoff still

4  have improperly encumbered, to this day, DC Comics' period of exclusivity.

5       157.170.  Upon information and belief, Toberoff has induced the Siegel and Shuster Heirs

6  to enter into additional agreements, which prohibit either family from entering into agreements

7  conveying rights to DC Comics without the express approval of all stakeholders in the heirs'

8  rights—*i.e.*, the Siegel Heirs, Shuster Heirs, and Toberoff and his companies.  These agreements

9  and others like it that may exist—which upon information and belief remain in effect to this day—

10  violate section 304(c)(6)(D) and impede DC Comics' ability to settle any and all disputes with the

11  Shusters and Siegels and lawfully pursue its business.

12       158.171.  The Shuster Heirs' agreements with Toberoff, his companies, and the Siegels

13  improperly interfere with DC Comics' period of exclusivity with the Shuster Heirs regarding their

14  purported Superman rights.

15       159.172.  A declaration by this Court is warranted under the Declaratory Judgment Act, 28

16  U.S.C.  §§ 2201 *et seq.,* to establish the parties' respective rights and obligations with respect to

17  the copyright interest in the Superman material.  This declaration should establish that: (a) DC

18  Comics is the sole party with whom the Shuster Heirs can enter into an agreement to convey their

19  putative Superman rights during the exclusivity period, through and including October 26, 2013;

20  (b) any agreement with any third party regarding those putative rights during the exclusivity

21  period is invalid and unenforceable; and (c) any agreements requiring consent of other parties to

22  settle termination claims violate the exclusivity period and, therefore, are invalid and

23  unenforceable.

24       160.173.  DC Comics seeks an injunction (a) barring the Shuster Heirs from entering into

25  any agreement with any third party regarding the rights sought to be recaptured in the Shuster

26  Termination Notice until October 26, 2013; and (b) restoring to DC Comics its 10-year period of

27  exclusivity.

28

FIRST AMENDED COMPLAINT

**D.**     <u>**Fourth Claim for Relief**</u>**: Intentional Interference with 1992 Shuster Agreement**

**(Against Defendants Toberoff and Pacific Pictures)**

161.174  DC Comics re-alleges and incorporates by reference each and every allegation

contained in the paragraphs above.

162.175.  In October 1992, the Shuster Heirs and DC Comics executed a final written

agreement "fully settl[ing] all claims" as to "right[s] in any and all work[s] created in whole or in

part by…Joseph Shuster" (the "1992 Agreement").  Since 1992, DC Comics has paid the Shuster

Heirs nearly half a million dollars under the 1992 Agreement.  To DC Comics' knowledge, the

Shuster Heirs have never disputed the validity or existence of the 1992 Agreement, which

operated to rescind, revoke, and re-grant all of the Shusters' prior grants of rights in the Superman

properties to DC Comics—to the contrary, the Shuster Heirs have expressly acknowledged that this

was the effect of the 1992 Agreement.  In that 1992 Agreement, the Shuster Heirs further agreed

that they would not—either then or in the future—make any claim of right to any work created in

whole or part by Joe Shuster.

163.176.  DC Comics' 1992 Agreement with the Shuster Heirs was both a valid contract

and had the probability of future economic benefit to DC Comics.  The Shuster Heirs fully

relinquished their rights under any prior agreement and re-granted to DC Comics all of their

Superman-related rights.  This confirmation allowed DC Comics to continue freely developing

and exploiting those rights without the risk of termination of the alleged Shuster rights or

expensive and protracted legal disputes regarding the ownership of those rights.[5]

---

[6][5] DC Comics maintains that the 1992 Agreement is a binding, enforceable agreement
with the Shuster Heirs.  Even assuming this agreement was deemed invalid, DC Comics also has a
long-established economic relationship with the Shusters giving rise to an interference with
prospective economic advantage claim.  This relationship dates back to 1935, when DC Comics'
predecessor hired the unknown artist Joseph Shuster to illustrate comic strips for its publications.
Even after their employment arrangement ended, Shuster continued to benefit from his early work
on Superman under the 1975 Agreement, which provided him with an annual pension, medical
insurance, and a lump-sum payment in exchange for acknowledgement of DC Comics' sole and
exclusive ownership of the Superman rights.  At the time Toberoff approached the Shuster Heirs
in 2001, DC Comics and the Shuster Heirs had an agreement in place for almost 10 years, which
resolved all claims concerning Shuster's putative share of the Superman rights.  DC Comics'

1

2      ~~164.~~ 177.  Toberoff and Pacific Pictures were aware of the 1992 Agreement and DC

3    Comics' ongoing business relationship with the Shusters.  Toberoff knew that his actions in having

4    his company enter into a joint venture with the Shusters for the purpose of terminating DC

5    Comics' rights were substantially certain to interfere with DC Comics' 1992 Agreement with the

6    Shusters.  Toberoff's ultimate purpose in approaching the Shuster Heirs was to induce them to

7    repudiate the 1992 Agreement and ~~attempt to terminate prior grants of Shuster's~~grant him the

8    rights they had already granted to DC Comics.  For  this reason, Toberoff and the Shusters formed

9    a joint venture with Pacific Pictures for the express purpose of "~~retrieving, enforcing and~~

10   exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and

11   interests in and to Joe Shuster's creations" through "termination pursuant to [17 U.S.C.  § 304] of

12   any and all grant or transfers  by Joe Shuster of any copyright interest in his creations."

13      ~~165.~~178.  Toberoff and Pacific Pictures engaged in independently wrongful conduct to

14   achieve this goal.  They induced the Shuster Heirs to breach the 1992 Agreement and enter into

15   the illegal ~~copyright assignment and settlement  consent~~joint-venture agreements described above.

16   Toberoff also induced the Shusters to manipulate claims of ownership in Superboy.  Toberoff

17   engaged in this misconduct in his role as businessman and shareholder of Pacific Pictures.

18      ~~166.~~179.  As the direct result of Toberoff's and Pacific Pictures' actions, the Shuster Heirs

19   have breached the 1992 Agreement, causing DC Comics to lose the value of the Agreement and

20   forcing DC Comics to incur substantial attorneys' fees and costs in an amount to be proven at trial.

21   **E.**      **Fifth Claim for Relief: Intentional Interference with Prospective Economic**

22             **Advantage re: Siegel-DC Comics Agreement (Against Defendant Toberoff)**

23      ~~167.~~180.  DC Comics re-alleges and incorporates by reference each and every allegation

24   contained in the paragraphs above.

25

26   _____

     (footnote continued)

27   agreement with the Shusters and the economic relationship they contemplated had the probability
     of future economic benefit to DC Comics.

28

1    ~~168.~~181.  DC Comics reached a binding, enforceable agreement with the Siegel Heirs.

2    After the Siegel Heirs served the Superman Termination Notice in 1997, they engaged in

3    negotiations with DC Comics for four years.  On October 16, 2001,  DC Comics made a

4    settlement offer to the Siegel Heirs.  On October 19, 2001, the Siegel Heirs' attorney at the time,

5    Marks, sent a letter to DC Comics outlining the material terms and confirming that the Siegel

6    Heirs "accepted D.C.  Comics' offer of October 16, 2001." On October 26, 2001, DC Comics sent

7    a return letter confirming the parties' agreed-upon terms.  DC Comics then drafted a long-form

8    contract memorializing the agreement, which it sent to the Siegel Heirs on February 1, 2002.

9    Marks has confirmed that all parties understood that they had a binding agreement.[~~7~~ 6]

10   ~~169.~~182.  Even in the event that this agreement is finally adjudicated and deemed to be

11   invalid, DC Comics had a long-established economic relationship with the Siegel Heirs giving rise

12   to an interference with prospective economic advantage claim.  This relationship dates back as far

13   as 1935, when DC Comics' predecessor hired an unknown writer named Jerome Siegel to write

14   comic strips for its publications.  Over the years, Siegel worked on-and-off as an employee of DC

15   Comics and its predecessors.  Even after the employment arrangement ended,  Siegel continued to

16   benefit from his early work on Superman under the 1975 Agreement, which provided him and his

17   family with an annual pension, medical insurance, and lump payment in exchange for

18   acknowledgement of DC Comics' sole and exclusive ownership of the Superman rights.  When a

19   dispute arose in 1997 over the Siegel Heirs' attempt to terminate prior grants of Siegel's share of

20

21   _____

22   [~~7~~ 6]The district court in the Siegel Actions determined that this agreement was not binding because
     there was no "meeting of the minds" between the parties.  Of course, this was before the Toberoff

23   Timeline had been produced, which confirmed, *inter alia,* that Marks—who negotiated the
     agreement on behalf of the Siegel Heirs—understood that the 2001 agreement was final and

24   binding.  Indeed, Marks communicated his position to the Siegel Heirs in August 2002, in an
     attempt to convince them to reject Toberoff's attempts at interference.  DC Comics reserves all

25   rights to challenge the district court's ruling in the Siegel Actions based on this newly discovered
     evidence and otherwise, and DC Comics respectfully submits that the district court's interim

26   ruling on this issue is contrary to fact and law.  If DC Comics' claims are accepted, it will amend
     this Compliant to include a claim for interference with contract arising out of Toberoff's tortious

27   interference with this binding agreement.  DC Comics contends that the district court's summary
     judgment ruling on this settlement issue also runs afoul of the Ninth Circuit's recent decision in

28   *Mattel.  Inc.  v.  MGA Entm't, Inc.,* 2010 WL 2853761 (9th Cir.  July 22, 2010).

56899.1
FIRST AMENDED COMPLAINT

1    Superman rights, DC Comics and Siegel commenced negotiations, which lasted over four years.

2    At the time Toberoff approached the Siegel Heirs in 2001, DC Comics and the Siegel Heirs had

3    finally reached an agreement resolving their claims to the Superman and Superboy rights.

4    170.183.  The economic relationship that the Siegel Heirs and DC Comics had

5    contemplated and agreed to had the probability of future economic benefit to DC Comics.  The

6    Siegel Heirs recognized DC Comics' sole and exclusive ownership of all rights in Superman and

7    Superboy, allowing it to continue freely developing and exploiting those rights, and avoid the

8    possibility of an expensive and protracted lawsuit regarding ownership of those rights.

9    171.184.  Toberoff was well aware of the agreement between DC Comics and the Siegel

10    Heirs.  Toberoff has admitted that he tracked the Siegel Heirs' termination efforts through Internet

11    reports.  Moreover, upon information and belief, when Toberoff approached the Siegel Heirs and

12    their representatives in late 2001 and 2002 to express interest in purchasing their Superman rights,

13    he was informed that the Siegel Heirs had already reached an agreement with DC Comics.

14    72.185.  Toberoff knew his actions were substantially certain to interfere with the Siegel

15    Heirs' agreement and ongoing business dealings with DC Comics.  Toberoff intentionally engaged

16    in independently wrongful conduct to carry out his interference by, among other things: falsely

17    misrepresenting to the Siegel Heirs that he had a billionaire investor ready to purchase their

18    Superman rights if they repudiated their settlement agreement with DC Comics; falsely

19    representing to the Siegels that he would help them produce a competing Superman motion

20    picture; and wrongly inducing the Siegels to repudiate their agreement and business relationship

21    with DC Comics.  Toberoff engaged in this misconduct in his role as businessman and shareholder

22    of IP Worldwide.

23    173.186.  As a direct result of Toberoff's misdeeds, the Siegel Heirs repudiated the Siegel-

24    DC Comics Agreement with DC Comics and ended all further discussions, causing DC Comics to

25    lose the value of the agreement, to lose their ongoing business relationship with the Siegels, and to

26    incur millions of dollars in subsequent legal fees in disputes with the Siegel Heirs.  DC Comics

27    has suffered actual damages in an amount to be proven at trial.

28

**F.**     **Sixth Claim for Relief**: Declaratory Relief re: Invalidity of Copyright Assignment and

Consent Agreements (Against All Defendants)

174.187.  DC Comics re-alleges and incorporates by reference each and every allegation

contained in the paragraphs above.

175.188.  The various copyright assignment and consent agreements between Toberoff

and/or his companies, the Siegel Heirs, and the Shuster Heirs are void and unenforceable,

including under California's unfair competition laws, *e.g.,* CAL BUS. & PROF. CODE §§ 17200

*et seq.*  The copyright assignments secured by Toberoff and/or his companies are unlawful and

violate DC Comics' rights and interests for the reasons set forth above.  The consent agreements

Toberoff has procured are void as a matter of law and public policy because they strip the Siegels

and Shusters of their right freely to settle their claims and violate DC Comics' concomitant right

freely to negotiate settlement of such claims.  The Pacific Pictures and IP Worldwide Agreements

secured by Toberoff and/or his companies, for example, are unlawful and unfairly violate DC

Comics' rights and interests.

176.189.  A declaration by this Court is warranted under the Declaratory Judgment Act, 28

U.S.C.  §§ 2201 *et seq.,* to establish the parties' respective rights and obligations with respect to

the copyright interest in the Superman material.

### VI.     PRAYER FOR RELIEF

WHEREFORE, DC Comics prays for judgment against defendants as follows:

177.190.  A declaration that the Shuster Termination Notice is invalid, and thus ineffective,

for one or more of the reasons set forth in DC Comics' First Claim for Relief;

178.191.  In the event that the Shuster Termination Notice is deemed valid and effective, a

declaration that the scope and effect of the Notice is limited as set forth in DC Comics' Second

Claim for Relief;

179.192.  A declaration that: (a) DC Comics was entitled to a period of exclusivity

regarding the Shuster Heirs' purported Superman rights from November 10, 2003 through October

26, 2013, (b) any agreement interfering with that period of exclusivity is invalid and

1   unenforceable; and (c) the consent agreements impermissibly interfere with DC Comics' period of

2   exclusivity and require restoration of the 10-year period free of interference;

3       ~~180.~~193.  A declaration that the various consent agreements between Toberoff and/or his

4   companies, the Siegel Heirs, and the Shuster Heirs are void and unenforceable as a matter of

5   public policy;

6       ~~181.~~194.  An injunction that: (a) bars the Shuster Heirs from entering into any agreement

7   with any third party regarding the rights sought to be recaptured in the Shuster Termination Notice

8   until October 26, 2013; and (b) restores DC Comics' 10-year period of exclusivity with respect to

9   the Shuster Termination Notice;

10      ~~182.~~195.  As to the tort claims against Toberoff and his entities as sued herein, damages in

11  amounts to be determined at trial;

12      ~~183.~~196.  An award of reasonable attorneys' fees and costs; and

13      ~~184.~~197.  Such other and further relief as this Court deems just and proper.

14                      **VII.    DEMAND FOR JURY TRIAL**

15      ~~185.~~198.  Plaintiff DC Comics hereby demands a trial by jury on all issues  triable by a

16  jury.

17

18

19

20

21

22

23

24

25

26

27

28