Marc Toberoff (State Bar No. 188547)
 mtoberoff@ipwla.com
Nicholas C. Williamson (State Bar No. 231124)
 nwilliamson@ipwla.com
Keith G. Adams (State Bar No. 240497)
 kgadams@ipwla.com
TOBEROFF & ASSOCIATES, P.C.
2049 Century Park East, Suite 2720
Los Angeles, California, 90067
Telephone:  (310) 246-3333
Fax:          (310) 246-3101

Attorneys for Defendants Mark Warren
Peary, as personal representative of the
Estate of Joseph Shuster, Jean Adele Peavy,
Joanne Siegel and Laura Siegel Larson

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

| | |
|---|---|
| DC COMICS,<br><br>              Plaintiff,<br><br>     vs.<br><br>PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF, an individual; MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER; JEAN ADELE PEAVY, an individual; JOANNE SIEGEL, an individual; LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive,<br><br>              Defendants. | Case No: CV 10-03633 ODW (RZx)<br><br>Hon. Otis D. Wright II, U.S.D.J.<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS MARK WARREN PEARY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JOSEPH SHUSTER, AND JEAN ADELE PEAVY'S RENEWED MOTION TO DISMISS AND/OR STAY PLAINTIFF'S FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)**<br><br>*Originally filed on 9/20/2010 at Docket No. 80*<br><br>Complaint filed:  May 14, 2010<br>Trial Date:  None Set<br><br>Date:      February 14, 2011<br>Time:      1:30 p.m.<br>Place:      Courtroom 11 |

# **TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................1

ARGUMENT .....................................................................................................2

I.    LEGAL STANDARD ...........................................................................2

II.   DC'S FIRST CLAIM FOR RELIEF FAILS TO STATE A CLAIM ...................................................................................................2

    A.    Shuster's Executor Holds Termination Rights Pursuant to § 304(d) ..................................................................2

        1.    An Executor Holds Termination Rights in the Absence of a Spouse, Child or Grandchild ................3

        2.    The U.S. Supreme Court's Interpretation of Parallel Sections of the Copyright Act Contradicts DC's Allegations .........................................................4

        3.    DC's Interpretation Would Lead to Absurd Results ...........................................................................5

        4.    DC's Argument Contradicts the Statute's Clear Intent ..............................................................................6

        5.    Shuster's Termination Rights Expired Under the Plain Meaning of § 304(d)..........................................7

    B.    The 1992 Agreement Was Not a Revocation and/or Regrant of Superman Copyrights and Does Not Affect Termination Rights ................................................7

        1.    The Shuster Executor Was Not a Party to the 1992 Agreement ...................................................................9

        2.    The 1992 Agreement Could Not Transfer Termination Rights.......................................................10

        3.    The 1992 Agreement Did Not Grant Superman Copyrights ...............................................................11

    C.    The Shuster Executor Was Properly the Sole Signatory to the Shuster Termination Notices ....................................13

    D.    The 1948 Consent Agreement Is Irrelevant to the Termination..........................................................................14

        1.    This Court Already Held That the Consent Judgment Was Not a Copyright Grant and Need Not Be Listed..........................................................14

2.    The Shuster Executor Was Not Required to List the May 21, 1948 Consent Agreement As It Was Not a Copyright Grant ...............................................15

E.    DC's Unclean Hands Claim Fails as a Matter of Law ........16

1.    Unclean Hands Is Not a Basis for a Claim for Relief..........................................................................16

2.    The Failure to List PPC or Superboy in the Shuster Termination Does Not Show "Unclean Hands" ...................................................................17

a.    PPC Owned No Termination Interest .............17

b.    The Shuster Executor Was Bound by a Court Order That Jerry Siegel Was the Sole Author and Owner of Superboy .....................17

c.    The Superboy Works Could Not Have Been Included in the Shuster Termination In Any Event.............................................................18

F.    The First Claim Is Barred by the Statute of Limitations .....19

III.    DC'S SECOND CAUSE OF ACTION MUST BE DISMISSED AS IT SEEKS TO RE-LITIGATE MATTERS ALREADY DECIDED........................................................................20

A.    DC Ignores the Past Six Years of Litigation in the *Siegel* Action.................................................................................20

B.    The "Law of the Case" Doctrine Bars DC's Attempt to Re-Litigate ........................................................................21

1.    Work For Hire ........................................................22

2.    Promotions..............................................................23

C.    This Action Should Be Stayed Pending the Outcome in *Siegel* .................................................................................25

CONCLUSION...............................................................................25

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                      **Pages**

*Aalmuhammed v. Lee*,
202 F.3d 1227 (9th Cir. 2000) ................................................................19

*Adler v. Fed. Republic of Nigeria*,
219 F.3d 869 (9th Cir. 2000) ..................................................................16

*Artichoke Joe's Cal. Grand Casino v. Norton*,
353 F.3d 712 (9th Cir. 2003) ....................................................................3

*Ashcroft v. Iqbal*,
129 S.Ct. 1937 (2009) ...............................................................................2

*Association of American Medical Colleges v. Princeton Review, Inc.*,
332 F. Supp. 2d 11 (D.D.C. 2004) ..........................................................17

*Carson Harbor Vill., Ltd. v. Unocal Corp.*,
270 F.3d 863 (9th Cir. 2001) ....................................................................5

*Classic Media, Inc. v. Mewborn* ("*Mewborn*"),
532 F.3d 978, 984 (9th Cir. 2008) ................................................. *passim*

*Clinton v. Jones*,
520 U.S. 681, 707 (1997) .........................................................................25

*Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.*,
819 F.2d 1519 (9th Cir. 1987) ................................................................25

*Disimone v. Browner*,
121 F.3d 1262 (9th Cir. 1997) ...........................................................21, 24

*Dunn Computer Corp. v. Loudcloud, Inc.*,
133 F. Supp. 2d 823 (E.D. Va. 2001) .....................................................17

*Fred Fisher Music Co. v. M. Witmark & Sons*,
318 U.S. 643 (1943).................................................................................10

*In re McKesson HBOC, Inc. ERISA Litig.*,
391 F. Supp. 2d 812 (N.D. Cal. 2005).....................................................16

*Marvel Characters v. Simon*,
310 F.3d 280 (2d Cir. 2002) ......................................................................9

*Mason v. Texaco, Inc.*,
741 F. Supp. 1472 (D. Kan. 1990)...........................................................21

*Mills Music, Inc. v. Snyder*,
469 U.S. 153 (1985).................................................................................11

*Miller Music Corp. v. Charles N. Daniels, Inc.*,
362 U.S. 373 (1960).............................................................................. 5-6

*Moss v. Crawford & Co.*,
201 F.R.D. 398 (W.D. Pa. 2000) ........................................................21

*Music Sales Corp. v. Morris*,
73 F. Supp. 2d 364 (S.D.N.Y. 1999) ............................................5, 16

*Ovadia v. Top Ten Jewelry Corp.*,
2005 U.S. Dist. LEXIS 16784 (S.D.N.Y. Aug. 12, 2005)................21

*Parrino v. FHP, Inc.*,
146 F.3d 699 (9th Cir. 1997) ...............................................................8

*Pelich v. INS*,
329 F.3d 1057 (9th Cir. 2003) ..........................................................16

*Public Citizen v. U.S. Dep't of Justice*,
491 U.S. 440, 455 (1991).....................................................................6

*Ridgeway v. Mont. High School Ass'n*,
858 F.2d 579 (9th Cir. 1988) ............................................................21

*Rivers v. Walt Disney Co.*,
980 F. Supp. 1358 (C.D. Cal. 1997) .................................................25

*Robi v. Five Platters, Inc.*,
838 F.2d 318 (9th Cir. 1988) ............................................................25

*Siegel v. Nat'l Periodical Publ'ns, Inc.* ("*National*"),
508 F.2d 909 (2d Cir. 1974) ...................................................... *passim*

*Siegel v. Nat'l Periodical Publications, Inc.*,
364 F. Supp. 1032 (S.D.N.Y. 1973) .................................................16

*Siegel v. Warner Bros. Ent. Inc.* ("*Siegel*"),
C.D. Cal. Case No. 04-CV-08400 ODW (RZx)............................1, 25

*Siegel v. Warner Bros. Ent. Inc.*,
542 F. Supp. 2d 1098 (C.D. Cal. 2008) ..................................... *passim*

*Siegel v. Warner Bros. Ent. Inc.*,
658 F. Supp. 2d 1036 (C.D. Cal. 2009) ..................................... *passim*

*Siegel v. Warner Bros. Ent. Inc.*,
690 F. Supp. 2d 1048 (C.D. Cal. 2009) .......................................20, 23

*Silvers v. Sony Pictures Entertainment, Inc.*,
402 F.3d 881 (9th Cir. 2005) ...........................................................5-6

*Stewart v. Abend*,
495 U.S. 207 (1990).............................................................................4

*Thomas v. Bible*,
983 F.2d 152 (9th Cir. 2003) ...............................................21-22, 24

*Venegas-Hernandez v. Asociacion de Compositores y Editores de Musica Latinoamericana*,
424 F.3d 50 (1st Cir. 2005) ............................................................5

*Zuill v. Shanahan*,
80 F.3d 1366 (9th Cir. 1996) ..................................................... 19-20

**Federal Statutes and Rules**

37 C.F.R. § 201.10 ................................................................ 14-16

67 Fed. Reg. 69134 .................................................................7, 19

F.R.C.P. 8 ...............................................................................2

F.R.C.P. 12 .............................................................................2

Pub. L. No. 94-553 ....................................................................9

Pub. L. No. 105-298 ...................................................................6

17 U.S.C. § 304 .............................................................. *passim*

17 U.S.C. § 507 .......................................................................19

H.R. Rep. No. 105-452, 105th Congress, 2d Sess. (1998) ..........................6

**State Cases**

*Estate of Simoncini*,
229 Cal. App. 3d 881 (1991) ......................................................6

**Other Authorities**

M. Nimmer & D. Nimmer,
3 *Nimmer on Copyright* ("*Nimmer*") § 11.03 ............................... 4, 6-7

3 *Nimmer* § 11.05 ....................................................................7

3 *Nimmer* § 11.08 ...................................................................13

18 Wright, Miller & Cooper,
*Federal Practice and Procedure* § 4478 (1981) .................................21

# **INTRODUCTION**

Plaintiff DC Comics' ("DC") First Claim for Relief against defendants Mark Warren Peary ("Peary"), personal representative ("Shuster Executor") of the Estate of Joseph Shuster ("Shuster" and the "Shuster Estate"), and Jean Adele Peavy ("Peavy"), seeks to invalidate the Shuster Executor's proper termination under 17 U.S.C. § 304(d) of Shuster's prior grants of copyright to DC in the world-famous comic book hero Superman, co-created by Jerry Siegel ("Siegel") and Joseph Shuster in the 1930's (the "Shuster Termination").

*Section (1) of DC's First Claim* (First Amended Complaint ("FAC"), ¶¶ 107-11) erroneously alleges that Shuster's termination rights do not vest in the executor or representative of his estate unless he had a widow, children and grandchildren who were "not living, but who did at some time live." This argument contradicts the plain language of the statute and the accepted interpretation of "not living" under the Copyright Act, as well as the legislative intent of § 304, and would lead to absurd results. *Section (2)* (FAC, ¶¶ 112-17) argues that a 1992 agreement between DC and Shuster's siblings bars the Shuster Termination. This argument fails because the 1992 agreement did not, and could not, lawfully grant any Superman copyrights. None of the parties to that agreement possessed any termination rights to grant; the Shuster Executor, the sole holder of the termination right, was not a party to the 1992 agreement; and, in any event, the agreement could not have conveyed or released the inalienable termination right as a matter of law under § 304(c)(5). *Section (3)* (FAC, ¶¶ 118-24) alleges that the Shuster Executor did not own the "majority interest necessary to terminate," but the Shuster Executor clearly held the entirety of the termination interest, because, as asserted elsewhere in the FAC, termination rights cannot be transferred prior to the effective date of termination per § 304(c)(6)(D). *Section (4)* (FAC, ¶¶ 125-28) claims that the Shuster Termination failed to terminate a May 21, 1948 consent judgment; however, this Court has already correctly decided that this consent judgment was not a copyright grant, and had no effect on the

SHUSTER DEFENDANTS MEMORANDUM IN SUPPORT OF RENEWED MOTION TO DISMISS

validity of Superman termination notices.  *Section (5)*'s "unclean hands" claim (*id.*, ¶¶ 129-33) fails because unclean hands is a *defense* that is available only against a plaintiff that seeks affirmative relief, and is not a basis for a cause of action. Moreover, the acts alleged to be "wrongful" have already been determined by a court to be proper.  DC's First Claim is also barred by the statute of limitations.

DC's Second Claim transparently attempts to re-litigate issues already decided against DC in the related Superman case, *Siegel v. Warner Bros. Ent. Inc.*, C.D. Cal. Case No. 04-08400 ODW (RZx), and is barred by the doctrine of "law of the case." To the extent any issues remain, such issues are pending in the far more advanced *Siegel* litigation, and should be stayed until resolved in *Siegel*.

## ARGUMENT

## I.    LEGAL STANDARD

Pursuant to F.R.C.P. 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  To survive a motion to dismiss under F.R.C.P. 12(b)(6), "a complaint must contain sufficient factual matter … to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quotations omitted).  Mere legal conclusions "are not entitled to an assumption of truth."  *Id.* at 1950.

## II.    DC'S FIRST CLAIM FOR RELIEF FAILS TO STATE A CLAIM

### A.    Shuster's Executor Holds Termination Rights Pursuant to § 304(d)

DC alleges in section (1) of its First Claim (FAC, ¶¶ 107-11) that Joseph Shuster's termination rights do not vest in the executor of his estate, and erroneously argue that such rights pass to an executor under § 304(c)(2)(D) only if an author's widow, children and grandchildren are "'not living,' but [] did at some time live." *Id.*, ¶ 111.  Contrary to this unsupported, counter-intuitive interpretation of the Copyright Act, the Shuster termination rights properly vested in the Shuster Executor, as Joseph Shuster had neither a widow nor children.  *Id.*, ¶ 51.  DC's argument must be rejected because it:  (i) contradicts the plain language of the

statute; (ii) ignores binding interpretations of the phrase "not living"; (iii) conflicts

with the clear Congressional intent of § 304(c)(2)(D); and (iv) leads to absurd results.

### 1.    An Executor Holds Termination Rights in the Absence of a Spouse, Child or Grandchild

The plain language of the statute bars DC's interpretation.  Section 304(c)(2)

provides that if an author dies and there is no widow, child or grandchild to exercise

the author's termination rights, such rights vest in the author's executor:

> "Where an author is dead, his or her termination interest is owned, and may be exercised, as follows: ….
> (D)    In the event that the author's widow or widower, children and grandchildren are not living, the author's executor, administrator, personal representative, or trustee shall own the author's entire termination interest."

17 U.S.C. § 304(c)(2).  Courts interpret a federal statute by looking at the "the

language of the statute," and "[w]hen the words of a statute are unambiguous, judicial

inquiry is complete."  *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712,

720 (9th Cir. 2003).  Read as a whole, § 304(c)(2) establishes four classes of

statutory heirs who may exercise termination rights:  (1) widow or widower, (2)

children, (3) grandchildren, and (4) if there is no widow or widower, children, or

grandchildren, the executor, personal representative, or another administrator of the

author's estate.  17 U.S.C. § 304(c)(2).  Accordingly, this Court has already

acknowledged that the Shuster Executor has termination rights under § 304(c)(2):

> "As executor of the Shuster estate, [Mark Warren Peary] is entitled, under changes made to the 1976 termination provisions by the 1998 … Copyright Term Extension Act, to make the same termination claims for the Superman copyright that Shuster or his heirs would have been entitled to bring beforehand.  *See* 17 U.S.C. § 304(c)(2) …."

*Siegel v. Warner Bros. Ent. Inc.* ("*Siegel* I"), 542 F. Supp. 2d 1098, 1114 n.3 (C.D.

Cal. 2008); Request for Judicial Notice ("RJN"), Ex. H.  As explained in the leading

copyright treatise, *Nimmer on Copyright*:

> "What … if, upon the death of an author … there is no surviving spouse, and no surviving children or grandchildren?  Under the 1976 Act at its passage, the result was that no one could exercise the right of termination.  That harsh result persisted for the current Act's first two decades.  Then in the [1998] Copyright Term Extension Act, Congress ameliorated that result.  Effective from October 27, 1998 onward, ***the termination right, instead of lapsing in these***

3

*circumstances, belongs to 'the author's executor, administrator, personal representative, or trustee*.'" (quoting 17 U.S.C. § 304(c)(2)(D))

M. Nimmer & D. Nimmer, 3 *Nimmer on Copyright* ("*Nimmer*") § 11.03[A][2][a] at 11-40.1-11.40.2 (emphasis added).  DC admits that Mark Warren Peary is the Court-appointed personal representative of Joseph Shuster's estate.  FAC, ¶¶ 18-19.  As such, he properly holds termination rights under § 304(c)(2)(D).

### 2.  The U.S. Supreme Court's Interpretation of Parallel Sections of the Copyright Act Contradicts DC's Allegations

DC's argument that "not living" under § 304(c)(2)(D) means 'once living, now deceased' contradicts the accepted interpretation of "not living" under the Copyright Act.  The termination provisions of §§ 304(c) and (d) provide an author or his estate with the right to recapture a copyright for its extended *renewal* term.  17 U.S.C. § 304(c) (termination "of a transfer or license of the renewal copyright"). The related sub-section dealing with those persons entitled to the *renewal* copyright, § 304(a), uses "not living" language identical to that found in § 304(c)(2)(D):

> "(a)  Copyrights in Their First Term on January 1, 1978.…..
>  (C)  In the case of any other copyrighted work.…
>      (i)  the author of such work.…
>      (ii)  the widow, widower, or children of the author.…
>      (iii)  the author's executors, if such author, widow, widower, or children *are not living*.…
> shall be entitled to a renewal and extension of the copyright.…."

17 U.S.C. § 304(a) (emphasis added).  Under DC's twisted interpretation of "not living," a renewal copyright would not vest in the executor of an estate under § 304(a)(1)(C)(iii) unless the author was first survived by a spouse or child, and both thereafter died.  Yet the courts have *consistently* held that copyrights are owned by an author's estate under § 304(a)(1)(C)(iii) (formerly §24 of 1909 Copyright Act), even if the author had *no spouse or children*.

In the landmark U.S. Supreme Court case *Stewart v. Abend*, 495 U.S. 207, 212 (1990), the renewal copyright for Cornell Woolrich's story "It Had to Be Murder" was held to have vested in the executor of the Woolrich estate, as Woolrich had no widow or children.  But under DC's statutory interpretation of "not living," the

renewal copyright in the story would not have vested in anyone. *See also Miller Music Corp. v. Charles N. Daniels, Inc*., 362 U.S. 373, 374–75 (1960) (construing the phrase "if such author, widow, widower, or children be not living" to mean "leaving no widow, widower, or children," and granting rights to the author's estate where he had no wife or children).[1]  DC's argument must be rejected, as the identical phrase "not living" in the related renewal (§ 304(a)(1)(C)(iii)) and termination (§ 304(c)(2)(D)) provisions must be interpreted consistently with one another. *See Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 880 (9th Cir. 2001) (a statute is be read as a whole, as "[n]o statutory provision is written in a vacuum").

### 3.    DC's Interpretation Would Lead to Absurd Results

DC's self-serving interpretation would lead to patently absurd results.  Section 304(c)(2)(D) plainly states that the termination right is owned by the executor "[i]n the event that the author's widow or widower, children ***and*** grandchildren are not living" (emphasis added).  DC's theory that "not living" means 'once alive but now dead' would result in the termination right vesting in an executor only if the author had a widow/widower, children ***and*** grandchildren, ***and*** all those people had died.  Thus, in DC's view, the termination right would not vest in the author's executor if: (a) the author had a spouse and children who were deceased, but the author did not have grandchildren; (b) the author had a deceased spouse, children and grandchildren, but the author's spouse died before the author, as there would be no "widow/widower"; (c) if the author had deceased children and grandchildren, but had never married; or (d) if the author had married but was subsequently divorced, as, again, there would be no "widow/widower."  As "courts will not interpret a statute in a way that results in an absurd or unreasonable result," DC's nonsensical interpretation must be rejected.  *Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 900

---

[1] *See also Venegas-Hernandez v. Asociacion de Compositores y Editores de Musica Latinoamericana*, 424 F.3d 50, 54 (1st Cir. 2005) (renewal copyrights pass to the executor under § 304(a)(1)(C)(iii) "for disposition in accordance with [the author's] will"); *Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364, 373-75 (S.D.N.Y. 1999) (rejecting argument that "not living" means "deceased," and holding that "if such author, widow, widower or children are not living" includes situations where the author never had a spouse or child).

(9th Cir. 2005).  *See Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 455 (1991) (statutory interpretation that would "'compel an odd result'" is disregarded).

### 4.    DC's Argument Contradicts the Statute's Clear Intent

DC's interpretation violates the clear legislative intent of the 1998 Copyright Term Extension Act, and leads to precisely the sort of "harsh result" that § 304(c)(2) (D) was meant to avoid.  3 *Nimmer* § 11.03 at 11-40.1.  The 1998 amendments to § 304 were intended to allow "the original authors of works and their beneficiaries to benefit from the extended [renewal] copyright protection."  H.R. Rep. No. 105-452, 105th Congress, 2d Sess. ("H.R. Rep. 105-452"), at 8 (1998).  The only reasonable interpretation of § 304(c)(2) as amended in 1998 is that Congress intended to give termination rights to widows and children and grandchildren if they existed, and to otherwise allow the author to bequeath termination rights to his estate, just as Congress had done in § 304(a) with respect to renewal copyrights.  This result accords with Congress' stated intent that an author's executor would own his termination interest.  *See* H.R. Rep. No. 105-452 at 8 (the amendments "allow[] an author's executor to receive his entire termination interest in the event that the author's widow, widower, children or grandchildren are not living").

If the executor holds the termination interest, then the author can instruct the executor to dispose of the proceeds from such interest pursuant to his estate plan.  *See Miller Music Corp.,* 362 U.S. at 376 ("[A]n executor usually takes [possession] in a representative capacity" and "represents the person of his testator."); *Estate of Simoncini*, 229 Cal. App. 3d 881, 888–89 (1991) ("The basic rule in the interpretation … of any will is that the intention of the testator must be carried out…").  DC's incorrect construction would mean that heirs of an author who happened to have no spouse or children (*e.g.,* a former spouse, a long-term but unmarried partner, a child raised but not adopted) could not benefit from the termination interest, even if the author had provided for such benefit in his will.  This must be rejected, as it contradicts the clear Congressional intent that the termination rights "were designed

to assure that its new benefits would be for the authors and their heirs." *Classic Media, Inc. v. Mewborn* ("*Mewborn*"), 532 F.3d 978, 984 (9th Cir. 2008).

### 5.    Shuster's Termination Rights Expired Under the Plain Meaning of § 304(d)

To further circumvent the Shuster Executor's termination right under § 304(d), DC engages in a linguistic sleight of hand by alleging that "Shuster's termination right ceased to exist on his death," and was "extinguished," as opposed to having "expired" – the word used in § 304(d).  FAC, ¶¶ 110-11.  DC argues that to have "expired," the termination window must have "opened and closed" while the author or his widow/ children/grandchildren were alive.  *Id.*  That is nonsense.  Shuster's termination window opened in October 1984, while he was alive, and "expired" with his death in 1992.  *Id.*, ¶¶ 109-10.  *Nimmer* agrees, stating that § 304(d) was designed to "correct the imbalance arising from the fact that the author (or his heirs) failed to terminate previously, whether through neglect *or inability*."  3 *Nimmer* § 11.05[B][2] at 11-40.12 (emphasis added).  As *Nimmer* points out, such "inability" could arise "because no one was alive to effectuate termination" and the 1998 Act "solves that latter situation, as well," through § 304(c)(2)(D).  *Id.* at n.25.[2]  *See also* 67 Fed. Reg. 69134, 69135 (the Copyright Office states, without conditions:  "the termination right will have 'expired,' see 17 U.S.C. § 304(d), 59 years after copyright was secured").

### B.    The 1992 Agreement Was Not a Revocation and/or Regrant of Superman Copyrights and Does Not Affect Termination Rights

Section (2) of DC's First Claim (FAC, ¶¶ 112-17) argues that the 1992 Agreement between DC, Frank Shuster and Jean Peavy bars termination.  However,

---

[2] Furthermore, § 304(c)(2)(D), which allows an <u>executor</u> to exercise termination rights, and § 304(d), which permits termination of grants to works copyrighted before October 1939, were both added by the 1998 Copyright Term Extension Act, and § 304(d)(1) expressly incorporates § 304(c)(2).  However, DC's interpretation would make this incorporation nearly meaningless because even though an author of a pre-1939 work, such as Superman, would likely have died prior to 1998, if he died without a widow/children/grandchildren his termination rights, according to DC, would be "extinguished," leaving his executor no rights to exercise under § 304(c)(2)(D).  Such a harsh result contravenes the clear remedial intent of the 1998 amendments.  *See* 3 *Nimmer* § 11.03 at 11-40.1; Section II.B.1, *infra*.

1  the 1992 Agreement had no effect on the Shuster Executor's termination of Joseph

2  Shuster's operative pre-1978 copyright grants to DC's predecessor.  DC's argument

3  fails for many reasons.  The one-page 1992 Agreement did not affect termination

4  rights, but instead merely purported to quitclaim to DC any rights of, and to release

5  DC from any claim by, <u>Frank Shuster or Jean Peavy</u> as to Joseph Shuster's works:

> "[T]his agreement fully settles all claims to any payments or other rights or remedies which *you* [Jean Peavy/Frank Shuster] may have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon. In any event, *you* now grant to us any such rights and release us, our licensees and all others acting with our permission, and convenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever...."

11  RJN, Ex. A (emphasis added).[3]

12      Shuster's siblings, who signed the 1992 Agreement, have never held any

13  termination rights.  FAC, ¶ 110-11.  The 1992 Agreement cannot bar the Shuster

14  Executor from exercising the termination rights that only he holds, because he was

15  not a party to the agreement, and would not even be appointed by the probate court

16  for another 11 years.  Even if the Shuster Executor had been a party to the 1992

17  Agreement, it still could not bar termination because:  (i) the agreement did not

18  mention or purport to affect termination rights; (ii) in 1992 no one held a termination

19  right regarding Shuster's copyright grants, and the executor of an estate, such as the

20  Shuster Executor, was not given termination rights until the 1998 amendment to the

21  Copyright Act; (iii) even if the 1992 Agreement had purported to waive (non-

22  existent) termination rights, it would be unenforceable under § 304(c)(5)  as an

23  "agreement to the contrary"; (iv) the narrow exception to the statutory bar on

24  "agreements to the contrary" (which applies only if the copyright owner and grantee

---

[3] On a Rule 12(b)(6) motion, it is proper for a court to take judicial notice of documents referenced in, but not attached to, the complaint.  *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-06 (9th Cir. 1997) (holding that "documents critical to plaintiff's claims, but not explicitly incorporated in his complaint" may be judicially noticed and considered on a motion to dismiss).  As both the 1992 Agreement (FAC, ¶¶ 112-17; 174-79) and the Shuster Termination (*id.*, ¶¶ 92-98, 105-64) are heavily referenced and described in the FAC, this Court may properly take judicial notice of such documents and their plain language.  RJN, Exs. A, C.

expressly revoke prior grants, and then expressly regrant the copyrights) is inapplicable, as (a) the agreement contains no language of revocation or regrant, and (b) the revocation/regrant procedure is permitted only after the 5-year termination 'window' has opened, whereas here, no termination right existed in 1992; and (v) even if the agreement had purported to convey (non-existent) termination interests, it would be void under § 304(c)(6)(B), which forbids any such conveyance before the termination interest vests via service of a notice of termination (in this case, in 2003).

## 1.    The Shuster Executor Was Not a Party to the 1992 Agreement

The parties to the 1992 Agreement are Joseph Shuster's siblings, Jean Peavy and Frank Shuster, who have never had termination rights under the Copyright Act.[4] Under § 304(c)(2) of the 1976 Copyright Act, Pub. L. No. 94-553, only an author's widow or widower, children or grandchildren held termination rights. At the time of the 1992 Agreement, Shuster was deceased, and he had no widow or children. FAC, ¶ 51. Thus, at the time of the 1992 Agreement, *no one* had termination rights with respect to Joseph Shuster's works, as conceded by DC. *Id.*, ¶¶ 110-11. The parties to the 1992 Agreement could not release a termination right or convey a termination interest that they never possessed, and that did not even exist. *See Marvel Characters v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002) (holding that a 1969 settlement agreement did not bar defendant's termination right as "neither the extended copyright term nor the termination right existed at the time"). After Frank Shuster's death in 1996, the Copyright Term Extension Act of 1998, Pub. L. No. 105-298, expanded the categories of those who possess termination rights by adding "the author's executor, administrator, personal representative, or trustee." 17 U.S.C. § 304(c)(2)(D). After Mark Warren Peary was appointed as the Shuster Executor in

---

[4] DC acknowledges, as it must, that the 1992 Agreement did *not* include Mark Peary. FAC, ¶ 55. Yet, DC purposefully obscures this fatal point, by defining the term "Shuster Heirs" to include Mark Peary, Frank Shuster and Jean Peavy (*id.*, ¶ 51), and then, throughout its complaint, it misleadingly refers to the 1992 Agreement as if it were a contract with the "Shuster Heirs." *See id.*, ¶¶ 55, 95, 175-79. DC's blatant attempt to mislead this Court is reprehensible, especially as this was expressly pointed out in the prior motion to dismiss. Docket No. 31 at 11:16-27.

2003, he became the sole holder of termination rights. The 1992 Agreement cannot bar the Shuster Executor's exercise of termination rights because, as DC acknowledged, Mr. Peary was <u>not</u> a party to the 1992 Agreement.  Moreover, the Shuster Estate was not even probated, nor was Mr. Peary appointed as the executor, solely entitled to termination rights, until 11 years later in 2003.  FAC, ¶¶ 18-19, 55.

### 2.    The 1992 Agreement Could Not Transfer Termination Rights

The 1992 Agreement does not purport to waive, transfer or release the Shuster termination rights, but even if it had, or the parties had intended that it should, such would be null and void as an "agreement to the contrary" under § 304(c)(5).  The Copyright Act's termination provisions lie in stark contrast to basic contract principles as they were designed to provide authors/ heirs with relief from one-sided, unremunerative copyright grants, in recognition of the imbalance of power between authors and publishers.  *See* 3 *Nimmer* § 11.01.  In enacting this termination right, Congress expressly sought to prevent its contractual erosion.  Thus, in abrogation of "freedom of contract" principles, Congress ensured that the termination right could not be waived, cancelled or contracted around, and that "[t]ermination of the grant may be effected ***notwithstanding any agreement to the contrary***, including an agreement to make a will or to make any future grant." 17 U.S.C. § 304(c)(5) (emphasis added).  Thus, to the extent that DC alleges that the 1992 Agreement bars the exercise of the Shuster termination rights, it is an unenforceable "agreement to the contrary."  *See Simon,* 310 F.3d at 290 (agreement that characterized a work as a non-terminable "work for hire" was an unenforceable "agreement to the contrary").

Secondly, the 1992 Agreement would be ineffective for purporting to transfer termination rights that do not vest under § 304(c)(6)(B) until exercised.  To further protect authors/heirs, Congress specified that the termination interest is inalienable and may not be transferred to the original grantee or its successor until exercised by service of a notice of termination.[5]  17 U.S.C. § 304(c)(6)(B); Section I.C, *infra*.

---

[5] Congress made the termination right inalienable to prevent a repeat of *Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643 (1943), which had frustrated the pro-author

1   Thus, even if the Shuster Executor had been a party to the 1992 Agreement, he could

2   not have transferred or released the termination interest as a matter of law, as such

3   did not vest until his service of the Shuster Termination in 2003.  FAC, ¶ 92.

4        **3.    The 1992 Agreement Did Not Grant Superman Copyrights**

5        DC will likely argue that it can avoid the Copyright Act's clear prohibition of

6   "agreements to the contrary" in § 304(c)(5) under the very narrow exception

7   established in *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005).  *Milne*

8   held that where, after January 1, 1978, a copyright grantor expressly *revoked* a pre-

9   1978 copyright assignment and *regranted* all of the rights that had been previously

10  assigned, and further expressly agreed not to exercise his termination rights, such an

11  agreement effectively might bar termination.  *Id.* at 1040-41.  The 1992 Agreement,

12  however, does not fall within the limited exception established by *Milne*.

13       The 1992 Agreement was not an operative grant of Shuster's Superman

14  copyrights, which in 1992 were already in DC's sole possession.  FAC, ¶¶ 42, 113-

15  14.  As DC acknowledges, long before the 1992 Agreement, the "agreements

16  between Siegel and Shuster, on the one hand, and [DC's predecessors], on the other,

17  had assigned 'all' rights in Superman," and DC already "owned all rights in

18  Superman" in 1992, as expressly held in *Siegel v. Nat'l  Periodical Publ'ns, Inc.*

19  ("*National*"), 508 F.2d 909 (2d Cir. 1974).  FAC, ¶ 46.  In 2003, the Shuster Executor

20  properly terminated these operative grants under the Copyright Act.  Aware of this

21  problem, DC makes the misleading, unsupported, conclusory allegation that "[t]he

22  1992 Agreement thus operated to revoke, rescind, and replace Shuster's prior

23  copyright grants," in an attempt to bring it within the *Milne* exception.  *Id.*, ¶ 55.

24       However, there is absolutely no language of *revocation* in the 1992

25  Agreement, as required.  RJN, Ex. A.  Any revocation of Joseph Shuster's operative

26  copyright grants, particularly if DC attempts to use the 1992 Agreement to argue a

27  forfeiture of statutory termination rights, would have to be clear and unmistakable.

28  _____

objectives of the renewal copyright by allowing publishers to prematurely acquire a renewal copyright before it vested.  *See Mills Music, Inc. v. Snyder*, 469 U.S. 153, 185–86 (1985).

1    *See Mewborn*, 542 F.3d at 983; *see also Simon*, 310 F.3d at 290 ("[T]he clear

2    Congressional purpose behind § 304(c) was to prevent authors from waiving their

3    termination right by contract.").  In both this action (FAC, ¶¶ 30-32, 43-48, 153-54,

4    158-59), and the related *Siegel* action (First Amended Counterclaims

5    ("Counterclaims"), *Siegel* Docket No. 42, (RJN, Ex. B) ¶¶ 10-12, 15-17, 20, 26, 29-

6    30), DC asserts and relies heavily on the effectiveness of the original Superman

7    grants, contrary to its contradictory allegation elsewhere in the FAC that the 1992

8    Agreement somehow revoked such grants.  FAC, ¶ 55.

9        Nor does the 1992 Agreement contain a regrant of any copyright interest in

10    Superman.  RJN, Ex. A.  The 1992 Agreement merely "settles all claims to any

11    payments or other rights or remedies which [Frank Shuster and Jean Peavy] may

12    have under any other agreement or otherwise … in any and all work created in whole

13    or in part by your brother [Joseph Shuster]" and provides "[Frank Shuster and Jean

14    Peavy] now grant to [DC] any such rights" that they may have had at the time.  *Id.*

15    This is a quitclaim of any rights, not a regrant of the Superman copyrights already in

16    DC's possession by virtue of Siegel and Shuster's prior operative grants.

17        Even if the 1992 Agreement had purported to regrant Shuster's previously

18    assigned copyright interests, or if the parties had so intended, this would have no

19    force or effect.  The leading Ninth Circuit decision on this issue, *Mewborn*, 532 F.3d

20    at 986, held that a post-1978 grant by an author's daughter that purported to "assign"

21    to a company *Lassie* copyrights, already assigned to it in a pre-1978 grant, was "a

22    nullity," with no effect on the daughter's right to terminate the operative pre-1978

23    grant under § 304.  The assignee in *Mewborn* made the same "revocation and

24    regrant" claim as DC makes here, and the Ninth Circuit firmly rejected it.  *Id.* at 989.

25        This situation is nearly identical.  Frank Shuster and Jean Peavy had no

26    Superman copyrights to grant to DC, as such copyrights had already been assigned

27    by Siegel and Shuster in their still operative pre-1978 grants.  FAC, ¶¶ 30-32, 43-48.

28    Shuster's unrevoked pre-1978 grants remained subject to termination by the Shuster

1    Executor. DC's bald, conclusory allegations of a "revocation and regrant" are

2    unsupported, and contradicts the record, DC's other FAC allegations, and *Mewborn*.[6]

3

4    **C.    The Shuster Executor Was Properly the Sole Signatory to the Shuster Termination Notices**

5        The Shuster Termination was served on November 10, 2003, with an effective

6    termination date of October 26, 2013.  FAC, ¶¶ 92-94.  Section (3) of DC's first

7    claim alleges that the Shuster Executor did not own the "'more than one-half'

8    majority [of the termination] interest necessary to terminate," erroneously arguing

9    that 50% of such termination interest was purportedly owned by Pacific Pictures

10   Corporation ("PPC"), pursuant to PPC's 2001 and 2003 agreements with Jean Peavy

11   and Peary.  *Id.*, ¶¶ 119-21.  However, the Shuster Executor clearly held the entirety of

12   Shuster's termination interest when the Shuster Termination was executed and served

13   in 2003, and still holds 100% of such interest.  Termination rights are held only by

14   certain classes of people defined by statute, and PPC has never been a member of any

15   such class.  17 U.S.C. § 304(c)(2)(A)–(D).  Moreover, the termination rights ***cannot***

16   be transferred prior to the effective termination date (here, 10/26/13):

17       "A further grant, or agreement to make a further grant, of any right
18       covered by a terminated grant is valid ***only if it is made after the
         effective date*** of the termination. ...."

19   17 U.S.C. § 304(c)(6)(D) (emphasis added).[7]  *See 3 Nimmer* § 11.08[A] at 11-49

20   ("Neither a further grant nor an agreement to make a further grant … will be valid

21   unless such grant or agreement is executed after the date of termination….").

22       DC's erroneous allegations that the "Pacific Pictures Agreements," executed in

---

[6] The Court should not accept as true DC's conclusory allegations that contradict both the 1992 Agreement and DC's assertion in this and the *Siegel* action that it owns all rights in Superman under operative pre-1978 grants.  *See Barnett v. Evans*, 2009 U.S. Dist. LEXIS 30388, at *13 (N.D. Cal. 2009) ("A court … is not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint."); *Young v. Mandeville*, 2006 U.S. Dist. LEXIS 63959, at *7 (E.D. Cal. 2006) ("[A] court is not required to accept … allegations that contradict facts which may be judicially noticed.").

[7] Pursuant to 17 U.S.C. § 304(c)(6)(D), the sole exception to this rule is that *after the service of a termination notice* but before the termination's effective date, "an agreement for such a further grant may be made … with the original grantee [or its successor-in-interest – *i.e.,* DC]."  FAC, ¶ 154.  PPC is not the original grantee or its successor, DC.

SHUSTER DEFENDANTS MEMORANDUM IN SUPPORT OF RENEWED MOTION TO DISMISS

2001 and 2003, and cancelled nearly six years ago in 2004, transferred the Shuster Executor's termination rights (FAC, ¶¶ 62, 99, 118-24) are disingenuous and misleading. DC itself admits elsewhere in its FAC that "[§] 304(c)(6)(D) provides: 'A further grant … of any right covered by a terminated grant is valid if it is made after the effective date of termination,'" and that "until October 26, 2013 … [DC] is the sole party that can enter into an agreement with the Shuster Heirs for the rights sought to be terminated." *Id.*, ¶¶ 167-68. Thus, *as a matter of law*, neither the PPC agreements nor the Shuster Executor could transfer his termination interest prior to the October 26, 2013 termination date. Accordingly, the Shuster Executor, the sole party entitled to exercise termination rights, retained the entire termination right, and correctly served the Shuster Termination bearing his signature. RJN, Ex. C at 9.

### D.    The 1948 Consent Agreement Is Irrelevant to the Termination

#### 1.    This Court Already Held That the Consent Judgment Was Not a Copyright Grant and Need Not Be Listed

Contrary to DC's assertions in section (4) of its First Claim (FAC, ¶¶ 125-28), the May 21, 1948 consent judgment in the Westchester Action ("May 21 Consent Judgment") has no bearing on the Shuster Termination.[8] Judge Larson has already decided that the May 21 Consent Judgment was not a copyright grant and did not affect the validity of notices terminating Siegel and Shuster's Superman copyright grants. In *Siegel*, DC made the exact same argument regarding the May 21 Consent Judgment as to the Siegel Termination, which this Court roundly rejected:

> "The consent judgment at issue did not effectuate any transfer of rights from Siegel and Shuster to Detective Comics. If any rights were transferred as a result of the Westchester action, such a transfer was effectuated by the execution of the earlier stipulated agreement of the parties, not a document created two days later which simply memorialized the transfer that the stipulation itself had accomplished. The binding nature of the transfer contained in the stipulation was completed the

---

[8] The 1992 Agreement was also excluded from the termination notices because it is ineffective as a matter of law to transfer Joseph Shuster's copyright interests already in DC's possession. *See* FAC, ¶¶ 125, 128; 37 C.F.R. § 201.10(b)(iv) (requiring termination notices to identify the grants to be terminated). *See also* FAC, ¶ 42 (the Court in the Westchester Action held "that the March 1, 1938 Agreement assigned 'all' of the Superman rights to [DC's predecessor]….").

SHUSTER DEFENDANTS MEMORANDUM IN SUPPORT OF RENEWED MOTION TO DISMISS

> moment that agreement was executed. The consent judgment, was a mere formality whose execution (or lack thereof) did not detract from the otherwise binding nature of the parties' earlier agreement. It merely parroted what was already agreed to by the parties in the stipulation itself."

542 F. Supp. 2d at 1131; RJN, Ex. H. This Court also ruled that, even if the May 21 Consent Agreement could be considered a grant, its absence was harmless error:

> "Here, viewing the issue in the light most favorable to [DC Comics and Warner], the 1948 consent judgment simply served to culminate or otherwise finalize the transfer of the Superman copyright achieved through the stipulation the parties reached two days earlier. That [the Siegels] only identified the latter rather than the former does not materially affect [DC's] understanding of the 'grant' sought to be affected…."

*Id.* at 1132. As discussed more fully below regarding DC's Second Claim, this ruling is binding on DC under the "law of the case" doctrine.

### 2. The Shuster Executor Was Not Required to List the May 21, 1948 Consent Agreement As It Was Not a Copyright Grant

A notice of termination should include "a brief statement reasonably identifying the grant to which the notice of termination applies." 37 C.F.R. § 201.10(b)(1)(iv). The Shuster Termination listed seven agreements that might be construed as grants, including a May 19, 1948 stipulation from the Westchester Action (the "May 19 Stipulation"). RJN, Ex. D. The May 19 Stipulation settled the Westchester Action, and re-acknowledged DC's predecessor's ownership of Superman. *See id.*; FAC, ¶¶ 44, 94. The May 19 Stipulation also provided for the May 21 Consent Judgment, which was entered two days later, incorporating the stipulation's terms. FAC, ¶ 44. Thus, to the questionable extent that a Superman copyright grant even occurred, it occurred in the May 19 Stipulation, clearly listed in the Shuster Termination. RJN, Ex. C at 8. Thus the May 21 Consent Judgment did not operate as a grant, transfer or conveyance of copyrights; it merely confirmed the May 19 Stipulation already entered into. *Siegel* I, 542 F. Supp. 2d at 1131.

Nor were either the May 19 Stipulation or the May 21 Consent Judgment the operative grant of Superman copyrights to DC's predecessors. A March 1, 1938 grant by Siegel and Shuster was held in the Westchester Action and the subsequent

1974 action to have conveyed all rights in Superman to DC's predecessors. *See* FAC, ¶¶ 32, 41-44; RJN, Ex. E, Conclusion of Law No. 1; *Siegel v. Nat'l Periodical Publications, Inc.*, 364 F. Supp. 1032, 1035, 1037–38 (S.D.N.Y. 1973), *aff'd* 508 F.2d 909, 911–12. As such, neither the subsequent May 19 Stipulation nor the May 21 Consent Agreement conveyed Superman copyrights already assigned by Siegel and Shuster. *See Mewborn,* 532 F.3d at 986 (holding "language in the 1978 Assignment purporting to assign the … rights is a nullity," as such rights had already been assigned in 1976). Lastly, even if the May 21 Consent Agreement could somehow be viewed as a grant of already-granted rights, the underlying May 19 Stipulation listed in the termination notice "reasonably identifies" the parallel May 21 Consent Agreement. 37 C.F.R. § 201.10(b)(1)(iv); *Siegel* I, 542 F. Supp. 2d at 1131.[9]

### E.    DC's Unclean Hands Claim Fails as a Matter of Law

#### 1.    Unclean Hands Is Not a Basis for a Cause of Action

DC's free-standing "unclean hands" claim (FAC, ¶¶ 129-33) is inappropriate because "unclean hands is an equitable defense, not a cause of action." *In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 812, 842 (N.D. Cal. 2005) (dismissing cause of action for "unclean hands"). The "unclean hands" doctrine acts as a defense against "plaintiffs seeking equitable relief" on an affirmative claim. *Adler v. Fed. Republic of Nigeria*, 219 F.3d 869, 877 (9th Cir. 2000). "The doctrine of unclean hands does not obviously apply where it is [the plaintiff], not the [defendant], who seeks relief" based on this "'defensive doctrine.'" *Pelich v. INS*, 329 F.3d 1057, 1062 (9th Cir. 2003).[10] DC's attempt to turn this equitable defense

---

[9] Further, as held by the Court in *Siegel* I, 542 F. Supp. 2d at 1132, the absence of the May 21 Consent Judgment is harmless error. "Harmless errors in a notice that do not materially affect the adequacy of the information required to serve the purposes of … section 304(c) … shall not render the notice invalid." 37 C.F.R. § 201.10(e)(1). DC had ample notice of the Shuster Executor's intention to terminate all of Shuster's prior grants, and was not prejudiced by the Shuster Executor not listing the May 21 Consent Judgment as well as the parallel May 19 Stipulation, the operative March 1, 1938 grant and other agreements. *See Music Sales Corp.,* 73 F. Supp. 2d at 378 (holding a description of a grant as simply "[g]rant or transfer of copyright and the rights of copyright proprietor, including publication and recording right," was insufficient to identify the grant, but was "harmless error").

[10] Courts have clearly held that, like "unclean hands," the closely related defense of

into an aggressive cause of action against the Shuster Executor is manifestly improper as a matter of law.

### 2. The Failure to List PPC or Superboy in the Shuster Termination Is Not "Unclean Hands"

#### a. PPC Owned No Termination Interest

The first part of DC's "unclean hands" argument is based on a failure to list "[PPC's] purported ownership interest in the rights … to be terminated."  FAC, ¶ 130.  As acknowledged by DC elsewhere (*id.*, ¶¶ 167-68), PPC had no such ownership interest.  *See* Section II.D, *supra*.  Therefore, the failure to list PPC in the Shuster Termination could not constitute "unclean hands."

#### b. The Shuster Executor Was Bound by a Court Order That Jerry Siegel Was the Sole Author and Owner of Superboy

The second part of DC's "unclean hands" claim is based on the Shuster Executor's decision not to include the separate Superboy character in his termination. DC cannot plausibly maintain its allegation that the Shuster Executor "compromised the integrity of the Copyright Office and judicial system by crafting the Shuster Termination Notice" to exclude Superboy (FAC, ¶ 133), because the Shuster Executor was bound by prior judicial determinations that Siegel was the sole author and owner of Superboy.  *Compare id.*, ¶¶ 131-33 *with National*, 508 F.2d at 913-14.

In the 1930s, Siegel and Shuster created Superman, which they ultimately sold to DC's predecessor, Detective Comics ("Detective").  *See* FAC, ¶¶ 28-32; RJN, Ex. E, Findings of Fact ("FF") and Conclusions of Law ("COL")), FF ¶¶ 9–10, 24–29, 44–45.  In 1938, Siegel, acting alone, developed the idea, conception and plan for Superboy, and submitted it to Detective, which rejected the proposed comic.  *Id.*, FF ¶¶ 156–59.  In December 1940, Siegel submitted another Superboy proposal, with a complete script containing the continuity, plan and dialogue for a Superboy comic,

---

copyright and trademark "misuse" is only a defense, not a cause of action.  *See Ass'n of American Medical Colleges v. Princeton Review, Inc.*, 332 F. Supp. 2d 11, 19 (D.D.C. 2004) ("Because …equitable doctrine of copyright misuse [is] grounded in the unclean hands doctrine, permitting copyright misuse as an independent, affirmative claim would be contrary to the ... doctrine."); *Dunn Comp. Corp. v. Loudcloud, Inc.*, 133 F. Supp. 2d 823, 830 (E.D. Va. 2001) (same re: "trademark misuse").

which Detective again rejected. *Id.*, FF ¶¶ 160-62. In 1944, while Siegel was off fighting for his country, Detective published Superboy in *More Fun Comics*, No. 101, and in subsequent comics, based on Siegel's material, but without his consent. *Id.*, FF ¶¶ 162, 164-65. In 1947, Siegel and Shuster brought the Westchester Action jointly asserting rights to Superman, but Siegel *individually* claimed that Detective had no right to publish Superboy, and that Superboy belonged to Siegel. *Id.*, COL ¶¶ 25–26. The referee found that Siegel was the sole creator of Superboy and held exclusive rights to Superboy, and enjoined Detective from publishing Superboy, as Defendants admit. *Id.*; FAC, ¶ 43 ("[The referee] made statements based on [Siegel's] script … that Siegel originated and owned the comic strip Superboy to the exclusion of DC Comics."). In the 1970s, when Siegel and Shuster brought suit against DC's predecessor, the Second Circuit treated the findings and conclusions in this Westchester Action as binding and preclusive. *National,* 508 F.2d at 913-14.

The Siegel Termination therefore credits Superboy as the sole creation of Jerry Siegel because, as held in the Westchester Action, Siegel **was** the sole author of the script that established Superboy, a script never illustrated by Shuster. Thus, the Shuster Executor did not seek to "terminate" Superboy works. As the Siegel and Shuster terminations accurately reflect the Westchester Action, found in *National*, 508 F.2d at 914, to have preclusive effect, there is no plausible legal or factual basis for DC to assert "unclean hands" for not listing Superboy in the Shuster Termination.

c.    The Superboy Works Could Not Have Been Included in the Shuster Termination In Any Event

DC's "unclean hands" claim is based on the omission of Superboy from "the Shuster Termination Notice." FAC, ¶¶ 131-33. However, the Shuster Termination was served pursuant to 17 U.S.C. § 304(d) (FAC, ¶ 94) and Superboy could not have been terminated under § 304(d) as a matter of law. As DC acknowledges, the first Superboy story was published in *More Fun Comics*, No. 101 in November 1944 (RJN, Ex. E, FF ¶ 163; FAC, ¶¶ 41-42, 131). Superboy thereby first secured a

1   statutory copyright by publication in 1944.  FAC, ¶ 88.  However, only a copyrighted

2   work "subsisting in its renewal term on the effective date of the … Copyright Term

3   Extension Act [*i.e.*, October 27, 1998] for which the termination right provided in

4   subsection (c) has expired by such date" can be terminated under 17 U.S.C. § 304(d).

5   The Copyright Office has clarified that § 304(d) thus applies only to "works for

6   which copyright was secured between January 1, 1923, and October 26, 1939."  67

7   Fed. Reg. 69134, 69135 (Nov. 15, 2002).  The Shuster Termination properly covered

8   only those works that had secured copyright within this § 304(d) termination

9   window.  *See* FAC, ¶ 96 (listing works covered by the Shuster Termination); RJN,

10  Ex. C at 6-7 (listing only works that secured copyright between 1933 and October 25,

11  1938).  Superboy, which first appeared in November **1944,** after this October 26,

12  **1939** cut-off**,** clearly fell outside the scope of works that could be terminated by the

13  Shuster Termination, in any event.  Accordingly, its omission cannot constitute

14  "unclean hands."[11]

## F.    The First Claim Is Barred by the Statute of Limitations

16      "A claim for declaratory relief is subject to a statute of limitations generally

17  applicable to civil claims."  *Zuill v. Shanahan*, 80 F.3d 1366, 1369-70 (9th Cir.

18  1996).  As Defendants insisted in *Siegel* I, and as this Court agreed, the Ninth Circuit

19  has held that a copyright ownership claim must be brought under 17 U.S.C. § 507(b)

20  "within three years after the claim accrued," and accrues when there is a "plain and

21  express repudiation" of co-ownership.  *Id.* at 1370-71; Defs. Opp. to Mot. for

22  Summary Judgment, filed May 29, 2007 (CV-04-8776; Docket No. 135, at 49:2-14)

23  (citing *Zuill*);  *Aalmuhammed v. Lee*, 202 F.3d 1227, 1231 (9th Cir. 2000) (citing

24  *Zuill*); *Siegel* I, 542 F. Supp. 2d at 1134 ("Claims of co-ownership accrue when there

25  is a 'plain and express repudiation….communicated to the claimant'") (quoting

---

[11] The Siegels had an independent right to claim sole ownership of Superboy based on the preclusive Westchester Action findings cited above.  The Siegels served their Superboy termination notice on November 8, 2002, before service of the Shuster Termination on November 10, 2003.  FAC, ¶¶ 86, 92.  Even if the Shuster Termination had included Superboy (it could not have), DC would have had to defend against the Siegels' claim.

1   *Zuill*).[12]   The Shuster Termination, served on November 10, **2003**, which like the

2   Siegel Termination seeks to terminate Shuster's Superman copyrights grants to DC

3   surely constitutes such a "plain and express repudiation," triggering the three-year

4   statute.   FAC, ¶ 92.   Moreover under 17 U.S.C. § 304(c)(6)(B), the Shuster

5   Executor's termination interest "vested on the [2003] date the notice of termination

6   ha[d] been served."   As such, DC's claims as to the supposed invalidity of the

7   Shuster Termination and DC's continued co-ownership of the Superman copyrights

8   as successor to Shuster's copyright share are clearly time-barred.  *Siegel* I, 542 F.

9   Supp. 2d at 1142 (Defendants are "a co-owner (through Shuster's share) of the

10   works").

11          This result is equitable as DC itself argued in the closely-related *Siegel*

12   litigation for the application of the 3-year statute of limitations to declaratory relief

13   claims regarding termination notices, yet for nearly 5 years since that action began

14   and 6 years since receiving the Shuster Termination, DC chose to sit on its hands.

15
16   **III.   DC'S SECOND CLAIM FOR RELIEF MUST BE DISMISSED AS IT SEEKS TO RE-LITIGATE MATTERS ALREADY DECIDED**

17          **A.      DC Ignores the Past Six Years of Litigation in the *Siegel* Action**

18          DC's Second Claim is nothing more than an attempt to re-litigate the serious

19   setbacks DC has suffered in the *Siegel* case:  the Siegel Termination has been held

20   valid as to the comic books *Action Comics*, Nos. 1, 4 and portions of *Superman*, No.

21   1, as well as the first two weeks of the *Superman* newspaper strips.  *See Siegel v.*

22   *Warner Bros. Ent. Inc.*, 542 F. Supp. 2d 1098, 658 F. Supp. 2d 1036 (C.D. Cal. 2009)

23   ("*Siegel* II") (RJN, Ex. I), 690 F. Supp. 2d 1048 (C.D. Cal. 2009) ("*Siegel* III") (RJN,

24   Ex. J).   These works comprise the essential core of the Superman mythos, and

25   include Superman's origin on Krypton, his iconic costume and super-powers, his

26   "alter ego," Clark Kent, and his relationship with feisty reporter Lois Lane.  *Siegel* I,

27   542 F. Supp. 2d at 1126; *Siegel* II, 658 F. Supp. 2d at 1063-83; RJN, Exs. H-I.

28   ────────────────
[12] In *Siegel* I, the Siegels argued that the three-year statute of limitations should not apply to disputes over notices of termination.  *See Siegel I*, Docket Nos. 161 at 42-45, 194 at 45-48.

Unhappy with having to account to the Siegels for these valuable Superman copyrights, DC ignores this Court's three published opinions in *Siegel*, and attacks the "mirror image" Shuster Termination on ***many*** of the same grounds as it unsuccessfully attacked the Siegel Termination. The FAC is a transparent effort to re-litigate issues thoroughly litigated in *Siegel*. However, DC is barred by the "law of the case" doctrine. As Siegel and Shuster co-authored the works in question, any decisions about the validity and effect of the Siegel Termination with respect to such works apply to the twin Shuster Termination. With *Siegel* largely decided, DC's FAC cannot be used to brush aside the past six years of hard-fought litigation at the expense of considerable judicial resources, or as an "appeal" at the trial court level.

**B.**    **The "Law of the Case" Doctrine Bars DC's Attempt to Re-Litigate**

DC's Second Claim is barred by the "law of the case" doctrine, which stands for the common-sense principle that the same *issue* presented a second time in the same court should lead to the same result, as to do otherwise "would create intolerable instability for the parties." *Ridgeway v. Mont. High School Ass'n*, 858 F.2d 579, 587-88 (9th Cir. 1988). Thus, "a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court." *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993). "Where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Disimone v. Browner*, 121 F.3d 1262, 1266-67 (9th Cir. 1997) (applying "law of the case" doctrine to *related* cases) (quotation omitted). The "law of the case" doctrine reflects "the respect that one judge or court owes the rulings of another judge or court in the same or closely related cases." 18 Wright, Miller & Cooper, *Federal Practice and Proced.* § 4478 at 788 (1981).[13] A court may depart from this doctrine only if "(1) the first decision was clearly erroneous; (2) an intervening change in the law has occurred; (3) the

---

[13] *See Mason v. Texaco, Inc.*, 741 F. Supp. 1472, 1492 (D. Kan. 1990) (the "law of the case" doctrine encompasses "'the rulings of another judge or court in … a closely related case'"); *Moss v. Crawford & Co.*, 201 F.R.D. 398, 401 n. 1 (W.D. Pa. 2000) (same); *Ovadia v. Top Ten Jewelry Corp.*, 2005 U.S. Dist. LEXIS 16784 at *3 (S.D.N.Y. Aug. 12, 2005) (same).

1   evidence on remand is substantially different; (4) other changed circumstances exist;

2   or (5) a manifest injustice would otherwise result." *Thomas*, 983 F.2d at 155. Absent

3   this, a failure to adhere to the "law of the case" doctrine is an abuse of discretion. *Id.*

4       This related action is plainly subject to the rulings in *Siegel* under the "law of

5   the case" doctrine. DC has conceded that these actions are *very* closely related.[14]

6       The FAC's Second Claim as to the alleged "limited scope" of the Shuster

7   Termination is nearly identical to DC's Fifth Counterclaim, for a "declaration of

8   limitations on the scope" of the Siegel Termination, in *Siegel*. *Compare* FAC, ¶¶

9   153-62 *with* Counterclaims (RJN, Ex. B), ¶¶ 106-20, 132-35. DC's Second Claim

10  tackles the same subjects addressed in DC's Fifth Counterclaim in *Siegel*, including

11  the effect of so-called "Promotional Announcements" ("Ads") and whether the

12  terminations recapture derivative works. *Compare* FAC, ¶¶ 155-56, 160-62 *with*

13  Counterclaims (RJN, Ex. B), ¶¶ 109-13, 118-20, respectively. The Court's prior

14  binding rulings in *Siegel* already thoroughly analyzed and decided the issues in the

15  Second Claim.[15]

16              **1.    Work For Hire**

17      DC's Second Claim repeats DC's losing argument that the first Superman story

18  published in *Action Comics*, No. 1 and other Superman works were "works made for

19  hire," exempt from termination (FAC, ¶¶ 153-54, 158-59), when this was heavily

20  litigated, fully considered and rejected by this Court.[16] *See Siegel* I, 542 F. Supp. 2d

---

21  [14] DC's Notice of Related Cases certifies that this case is related to *Siegel* because it "(1)
22  arise[s] in part from the same or closely related events; (2) call[s] for the determination of
    similar issues of law and fact; (3) would entail substantial duplication of labor if heard by
23  different judges; and (4) involve[s] many of the same copyrights." Docket No. 4, at 1:14-17.
    DC further admitted: "the scope and ownership of a variety of Superman-related copyrights
24  is at issue in all three actions, as are historical facts concerning the creation of Superman
    and its exploitation in a variety of media," and that "at issue in all three actions are common
25  legal theories and defenses, and overlapping issues of material fact." *Id.* at 2:3-7.

    [15] The FAC contains nearly identical factual allegations as DC's October 14, 2005 First
26  Amended Counterclaims regarding the creation of *Superman* and *Action Comics, No. 1*.
    *Compare* FAC, ¶¶ 137-50 *with* Counterclaims (RJN, Ex. B), ¶¶ 7-8, 10-18, 20-22.

27  [16] DC's tactic is laid bare by its claim that *all* of *Action Comics*, No. 1 was a "work for
    hire," whereas in *Siegel* DC claimed only minimal "Additional Action Comics No. 1
28  Materials" were "work for hire." *Compare* FAC, ¶¶ 140, 143 *with* First Amended
    Counterclaims, ¶¶ 14, 132. *See also* RJN, Ex. F at 37:13-15 ("DC is the copyright

at 1126-30; *Siegel* II, 658 F. Supp. 2d at 1063-68, 1083.

DC's claim, as before, is foreclosed by the Second Circuit's decision in *National*, 508 F.2d at 914, that *none* of *Action Comics*, No. 1 was "work for hire":

> "In the case before us Superman and his miraculous powers were completely developed long before the employment relationship was instituted. The record indicates that the revisions directed by the defendants were simply to accommodate Superman to a magazine format. We do not consider this sufficient to create the presumption that the [comic book] was a work for hire."

Moreover, this Court properly held that DC is collaterally estopped by this decision:

> "Defendants argue that portions of the copyrightable material contained in *Action Comics*, Vol. 1, are unaffected by the termination notice because those portions belong exclusively to them as "works for hire," arguing that certain material … was created by Detective Comics' in-house employees, or … was added to the underlying Superman material by Siegel and Shuster at the publisher's direction…. The thrust of defendants' argument was made and rejected by the Second Circuit in the 1970s … and is thus precluded as a matter of collateral estoppel here."

*Siegel* I, 542 F. Supp. 2d at 1127. This Court also ruled on the remaining Superman works created by Siegel and Shuster, holding that portions of *Action Comics*, No. 4 and *Superman*, No. 1, and the first two weeks of the *Superman* newspaper strips, were *not* "works for hire," but that "the remainder of the Superman material at issue … published from 1938 to 1943" were "works for hire." *Siegel* II, 658 F. Supp. 2d at 1095.[17] Both sides filed motions for reconsideration of this ruling, which were denied. *Siegel* III, 690 F. Supp. 2d 1048. These rulings are the "law of the case" as to whether the works were "made-for-hire," and are binding on the parties here.

### 2.     Promotions

DC similarly tries to re-litigate the "Promotions" ("Ads") in its FAC (¶¶ 155-57), completely ignoring that this Court has already ruled that, although the Ads were not terminated by the Siegels (*Siegel I*, 542 F. Supp. 2d at 1118-26), the scope of

---

proprietor of a portion of *Action Comics* No. 1 which was created after Siegel and Shuster's preexisting material …").

[17] DC also makes a convoluted argument that "Unpublished Superman Works," created c. 1934-35 were published as part of, and are therefore somehow themselves, "works for hire." FAC, ¶¶ 153-54. But this Court has already indisputably held that Superman material created before March 1938 was <u>not</u> work for hire. *Siegel* II, 658 F. Supp. 2d at 1061.

DC's resulting copyright interest is extremely limited, as the Ads depicted only "the image of a person with extraordinary strength who wears a black and white leotard and cape" and contained "[o]bviously nothing concerning the Superman storyline (that is, the literary elements contained in *Action Comics,* Vol. 1)… thus, Superman's name, his alter ego, his compatriots, his origins, his mission to serve as a champion of the oppressed, or his heroic abilities in general, do not remain within defendants sole possession to exploit." *Id.* at 1126. Judge Larson further limited the Ads' scope:

> "What remains of the Siegel and Shuster's Superman copyright that is still subject to termination (and, of course, what defendants truly seek) is the entire storyline from *Action Comics,* Vol. 1, Superman's distinctive blue leotard (complete with its inverted triangular crest across the chest with a red 'S' on a yellow background), a red cape and boots, and his superhuman ability to leap tall buildings, repel bullets, and run faster than a locomotive, none of which is apparent from the announcement."

*Id.* Unhappy with this ruling, DC moved for reconsideration, which was denied on July 3, 2008. RJN, Ex. K. The "Court affirm[ed] its conclusion on the scope of the copyrightable material contained in [the Ads]." *Id.* at 3-4. DC now tries for the ***third*** time to litigate the limited scope of the Ads. FAC, ¶¶ 155-57.[18]

However, these rulings are the "law of the case," which applies with equal force to this *related* case, and must not be revisited. *See Disimone*, 121 F.3d at 1266-67. The facts underlying the Shuster Termination are identical to those in *Siegel*, and concern the statutory termination of the same copyright grants to the same Superman works by Siegel and Shuster. DC has not alleged any new facts or evidence that it did not offer or could not have offered previously, as the pertinent events occurred in the 1930s. There has been no "changed circumstances" or governing law that overrides this "law of the case." *Thomas*, 983 F.2d at 155. Nor has DC alleged that the Court's exhaustive prior published opinions are "clearly erroneous," or result in a "manifest injustice." *Id.* Indeed, DC cites such rulings whenever they are in its favor. *See* FAC, ¶ 159 n.4. Accordingly, the following sub-parts of the Second

---

[18] Judge Larson also ruled that DC is entitled to continue to exploit pre-existing "unaltered derivative works" created before the effective date of termination, resolving DC's complaint as to that issue as well. *Compare* FAC, ¶¶ 160-62 *with* 542 F. Supp. 2d at 1142.

1   Claim – parts a. "Unpublished Superman Works" (*id.*, ¶¶ 153-54); b. "Promotions"

2   (*id.*, ¶¶ 155-57); c. "Works for Hire" (*id.*, ¶¶ 153-59); and d. "Derivative Works" (*id.*,

3   ¶¶ 160-62) – must be dismissed pursuant to the "law of the case" doctrine.[19]

4   ## C.    This Action Should Be Stayed Pending the Outcome in *Siegel*

5   The *Siegel* action (C.D. Cal., Case No. 04-CV-08400) commenced on October

6   8, 2004, and is in a far more advanced stage than this related action. To the extent

7   that any issues remain in DC's Second Claim[20], such shared issues should first be

8   decided in *Siegel*, and the Second Claim should be stayed.

9   A court "has broad discretion to stay proceedings as an incident to its power to

10  control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706 (1997). *See Rivers v.*

11  *Walt Disney Co.*, 980 F. Supp. 1358, 1362 (C.D. Cal. 1997) (staying action pending

12  related litigation to "serve the interests of judicial economy"). After six long years of

13  hard-fought litigation in *Siegel*, it would be highly inequitable and wasteful to permit

14  DC's redundant FAC to re-start this lengthy judicial process from scratch. In 2008,

15  this Court held that the Siegels were entitled to a co-ownership share of Superman

16  profits since April 16, 1999. The Siegels will be prejudiced if this action is used as a

17  tactic to delay, encumber or "swallow" the accounting in *Siegel*. What remains of

18  DC's new lawsuit should properly be stayed until *Siegel* is completed.

19  ## CONCLUSION

20  For the foregoing reasons, Plaintiff's First and Second Claims for Relief

21  should be dismissed with prejudice.

22

23  [19] Furthermore, if the Court grants the pending Rule 54(b) motion by plaintiffs in the *Siegel*
    litigation, DC's Second Claim would also be barred by issue preclusion. *See Continental*

24  *Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1525 (9th Cir. 1987) ("[A]
    54(b) ruling in fact has *res judicata* ramifications."). This applies as well while an appeal is

25  pending. *See Robi v. Five Platters, Inc.*, 838 F.2d 318, 327 (9th Cir. 1988) (pending appeals
    "in no way affect the 'firmness' of the decisions … for purposes of issue preclusion").

26  [20] The sole remaining issue in the Second Claim that has not already been fully adjudicated
    in *Siegel* is in sub-part "e" (FAC, ¶¶ 163-64). This issue will necessarily be decided first in

27  *Siegel*, as it concerns which Superman elements are contained in the recaptured Superman

28  works for which DC must account in *Siegel*. Such issue should be stayed here, pending its
    decision by the trier of fact in the more advanced *Siegel* case. DC will not be prejudiced, as
    DC will have the full opportunity to litigate the identical issue in *Siegel*.

1

2

DATED:  January 14, 2011          TOBEROFF & ASSOCIATES, P.C.

3

By_____

4

Marc Toberoff

5

Attorneys for Defendants Mark Warren Peary,
as personal representative of the Estate of

6

Joseph Shuster, Jean Adele Peavy, Joanne
Siegel and Laura Siegel Larson

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28