1   DANIEL M. PETROCELLI (S.B. #097802)
      dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA  90067-6035
    Telephone:  (310) 553-6700
6   Facsimile:   (310) 246-6779

7   PATRICK T. PERKINS (admitted *pro hac vice*)
      pperkins@ptplaw.com
8   PERKINS LAW OFFICE, P.C.
    1711 Route 9D
9   Cold Spring, NY 10516
    Telephone:  (845) 265-2820
10  Facsimile:   (845) 265-2819

11  Attorneys for Plaintiff DC Comics

12  (continued on next page)

13              **UNITED STATES DISTRICT COURT**

14              **CENTRAL DISTRICT OF CALIFORNIA**

15

16  DC COMICS,                              Case No. CV 10-3633 ODW (RZx)

17            Plaintiff,                     **DISCOVERY MATTER**

18        v.                                **JOINT STIPULATION
                                            REGARDING DC COMICS'
19  PACIFIC PICTURES                        MOTION TO COMPEL THE
    CORPORATION, IP WORLDWIDE,              PRODUCTION OF DOCUMENTS
    LLC, IPW, LLC, MARC TOBEROFF,           AND AMENDED PRIVILEGE
20  an individual, MARK WARREN              LOGS
    PEARY, as personal representative of
21  the ESTATE OF JOSEPH SHUSTER,           NOTICE OF MOTION AND
    JEAN ADELE PEAVY, an individual,        MOTION, DECLARATIONS OF
22  JOANNE SIEGEL, an individual,           MATTHEW T. KLINE AND MARC
    LAURA SIEGEL LARSON, an                 TOBEROFF, AND [PROPOSED]
23  individual, and DOES 1-10, inclusive,   ORDER FILED CONCURRENTLY
                                            HEREWITH
24            Defendants.
25                                          **Judge**:       Hon. Otis D. Wright II
                                            **Magistrate**:  Hon. Ralph Zarefsky
26
27                                          **Hearing Date**:  February 28, 2011
28                                          **Hearing Time**:  10:00 a.m.

(continued from previous page)

MARC TOBEROFF (S.B. #188547)
  mtoberoff@ipwla.com
NICHOLAS C. WILLIAMSON (S.B. #231124)
  nwilliamson@ipwla.com
KEITH G. ADAMS (S.B. #240497)
  kgadams@ipwla.com
TOBEROFF & ASSOCIATES, P.C.
2049 Century Park East, Suite 2720
Los Angeles, California 90067
Telephone:   (310) 246-3333
Facsimile:   (310) 246-3101

Attorneys for Defendants Mark Warren
Peary, Jean Peavy, Joanne Siegel, and
Laura Siegel Larson

RICHARD B. KENDALL (S.B. #90072)
  rkendall@kbkfirm.com
LAURA W. BRILL (S.B. #195889)
  lbrill@kbkfirm.com
NICHOLAS F. DAUM (S.B. #236155)
  ndaum@kbkfirm.com
NATHALIE E. COHEN (S.B. #258222)
  ncohen@kbkfirm.com
KENDALL BRILL & KLIEGER LLP
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067
Telephone:   (310) 556-2700
Facsimile:   (310) 556-2705

Attorneys for Defendants Marc Toberoff,
Pacific Pictures Corporation, IP
Worldwide, LLC, and IPW, LLC

1          Pursuant to Federal Rules of Civil Procedure 26, 34, and 37 and Central

2   District Local Rule 37-2, the parties respectfully submit the following Joint

3   Stipulation Regarding DC Comics' Motion to Compel the Production of

4   Documents and Amended Privilege Logs.  Pursuant to Central District Local Rule

5   37-1, the parties have attempted unsuccessfully to resolve their disputes and

6   therefore respectfully seek the assistance of the Court.

7   Dated:        February 7, 2011              Respectfully Submitted,

8                                              O'MELVENY & MYERS LLP

9

10                                             By: /s/ Daniel M. Petrocelli

11                                                 Daniel M. Petrocelli
                                                   Attorneys for Plaintiff DC Comics

12  Dated:        February 7, 2011              Respectfully Submitted,

13                                             TOBEROFF & ASSOCIATES, P.C.

14

15                                             By: /s/ Marc Toberoff

16                                                 Marc Toberoff
                                                   Attorneys for Defendants Mark
17                                                 Warren Peary, Jean Peavy, Joanne
                                                   Siegel, and Laura Siegel Larson
18

19

20

21

22

23

24

25

26

27

28

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

# TABLE OF CONTENTS

**Page**

I.      DC COMICS' INTRODUCTORY STATEMENT .......................................... 1

II.     RESPONDING DEFENDANTS' INTRODUCTORY STATEMENT ......... 3

III.    DC COMICS' POSITION .................................................................. 6

    A.      Procedural Background.............................................................. 6

    B.      DC Is Entitled To The Full Relief It Seeks In Its Proposed
        Order. .................................................................................. 11

        1.      DC Is Entitled To Discover Defendants' "Consent
             Agreements," Including All Drafts And Related
             Documents ............................................................. 11

             a.      Factual Background Related To This Issue ................... 11

             b.      Defendants' Consent Agreements And Related
                  Documents Are Relevant And Discoverable Under
                  Federal Law ................................................... 14

             c.      Defendants' Consent Agreements And Related
                  Documents Are Relevant And Discoverable Under
                  California Law ............................................... 16

             d.      None Of Defendants' Other Excuses Has Merit ........... 18

             e.      The Order DC Seeks ........................................... 26

        2.      DC Is Entitled To Copies Of Defendants' Retainer
             Agreements And Related Drafts And Documents ................... 28

        3.      Defendants Cannot Shield Non-Privileged Documents
             From Discovery Because They Shared Them With
             Counsel ................................................................. 30

        4.      Given The New and Different Claims In This Action,
             Additional Michael Siegel Documents Should Be
             Produced ............................................................... 34

        5.      Unaccounted For Documents Identified In The Toberoff
             Timeline Document Should Be Produced Or Logged............. 37

        6.      DC Is Entitled To The Dennis Larson Documents.................. 39

        7.      Defendants' Privilege Logs Omit Critical Details And
             Should Be Supplemented To Protect DC's Rights.................. 40

    C.      Conclusion ........................................................................ 44

IV.     RESPONDING DEFENDANTS' POSITION ................................................ 45

    A.      The Issues in Dispute ............................................................. 45

    B.      Factual and Procedural Background ....................................... 45

    C.      DC Should Not Be Granted the Relief It Seeks........................ 50

        1.      The "Consent Agreement" DC Seeks Is Privileged ................ 50

             a.      The "Consent Agreements" at Issue ............................. 50

**TABLE OF CONTENTS**
**(continued)**

Page

b.    The Consent Agreement Is Protected From
Disclosure under a Confidentiality Agreement and
Court Order ........................................................................... 51

(1)    The Confidentiality Agreement ............................ 51

(2)    The Disclosure of the Consent Agreement
Under Protection of the Confidentiality
Agreement ............................................................ 53

(3)    DC's Motion and Complaint Violate the
Confidentiality Agreement .................................... 54

(4)    This Issue Was Conclusively Resolved
Against DC in Siegel ............................................ 56

c.    DC's Settlement and Mediation Privilege
Arguments Are Wrongheaded ........................................ 57

d.    The Consent Agreement Remains Privileged ................ 58

(1)    Attorney-Client Privilege and Work Product
Protection Applies to the Consent Agreement ..... 58

(2)    There Has Been No Waiver of Privilege ............. 60

e.    The Court Need Not Resolve Arguments About the
"Consent Agreement" Now ............................................ 61

f.    The Consent Agreement Is Proper ................................ 62

2.    The Retainer Agreements Are Privileged ............................. 64

3.    DC's Attempt to Re-Open the Privilege Log Issue is
Improper ................................................................................. 66

4.    No Further Michael Siegel Documents Should Be
Produced ................................................................................ 68

5.    No Documents Should Be Produced Based on the
Untrustworthy Toberoff Timeline ......................................... 71

a.    The Anonymous Timeline is Unreliable and Cannot
Support a Motion to Compel ......................................... 71

b.    David Michaels Communications .................................. 72

6.    Defendants Offered to Produce the Dennis Larson
Documents .............................................................................. 74

7.    The Privilege Logs Are Proper ............................................. 74

a.    The Court Has Already Upheld Defendants' Logs ........ 74

b.    This Court Previously Upheld the Format of
Defendants' Logs Against DC's Identical
Challenge ...................................................................... 76

8.    DC Should Be Sanctioned For Its Willful Disregard of the
Confidentiality Agreement ..................................................... 78

D.    Conclusion ......................................................................................... 78

## I.    **DC COMICS' INTRODUCTORY STATEMENT**

Eight months have passed since this case commenced, and DC Comics has yet to receive essential discovery from defendants.  Instead, DC has been forced to endure and fight though a barrage of litigation tactics, all part of defendants' singular strategy of securing rulings on their case-dispositive motions without having to engage in discovery and disclose damaging evidence to DC.  This motion is necessitated by defendants' latest attempt to deny and delay such discovery.  As summarized below, after stipulating to a court order entered on December 7, 2010, compelling defendants to produce or log *all* documents responsive to DC's initial requests, defendants have impermissibly withheld numerous key documents through a combination of cryptic, indecipherable privilege logs filled with untenable sweeping claims of privilege.

*First*, defendants acknowledge the existence of agreements preventing the Siegel and Shuster defendants from freely entering into copyright agreements with DC in violation of the Copyright Act.  These "consent" agreements are indisputably relevant to DC's federal and state-law claims challenging the illicit scheme to interfere with DC's rights orchestrated by the Toberoff defendants.  Defendants refuse to produce these agreements and related documents because their existence was disclosed to DC under the cloak of two mediation sessions in 2008 and 2010 in the *Siegel* cases.  However, federal and California law do not permit defendants to suppress relevant evidence or immunize misconduct in this way.  Nor does the JAMS agreement that the parties signed.

*Second*, defendants refuse to produce retainer agreements between the Siegels, Shusters, and Toberoff.  The law is clear that such agreements are discoverable, and defendants have identified no authority to the contrary.  If and to the extent they contain privileged information, the agreements should have been produced in redacted form.

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

*Third*, defendants are withholding non-privileged documents just because they were later conveyed to an attorney, including key correspondence between two rival Siegel heirs subsequently faxed to Toberoff.  There is no support in the law for claiming privilege over such documents.

*Fourth*, defendants rely on the common-interest doctrine to claim privilege over relevant correspondence among members of the Siegel family.  In the *Siegel* litigation, an Ohio district court rejected this claim and ordered the production of 15 such communications.  In light of the new and more expansive claims in this case, at least 11 additional communications should be produced; as many as 250 other documents also should be produced or submitted for *in camera* review.

*Fifth*, defendants have not produced or logged two communications between Michael Siegel and Laura Siegel Larson identified in the Toberoff Timeline that relate directly to the Toberoff defendants' misconduct challenged in this case.  The December 7 court order required defendants to produce these responsive documents or identify them on their logs.  They did neither.

*Sixth*, responsive to DC's document requests are certain communications related to Superman between Ms. Larson and her ex-husband Dennis Larson, a lawyer who represented Ms. Larson from time to time.  Defendants have refused to produce any such documents following the couple's separation and divorce in 2000, claiming they are irrelevant.  Once again, the December 7 order requires production or identification of *all* responsive documents, and defendants have no right to withhold documents based on a relevancy objection that they expressly waived as part of the December 7 order.

*Finally*, defendants' privilege logs omit basic identifying information such as the subject matter of documents, "to," "from," and "cc" references, and whether entries are single or multiple communications in a chain.  As defendants concede, the logs make it impossible for DC to identify particular documents among the thousands of entries, such as drafts and other documents related to the consent

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1  agreements or non-privileged correspondence later conveyed to a lawyer.  Although
2  they may suffice in certain cases, such bare-bone privilege logs are wholly
3  inadequate here, where Toberoff admittedly has occupied multiple roles as
4  businessman, joint venturer, producer, and lawyer.

5     As set forth in its proposed order, DC requests that defendants be ordered to
6  produce forthwith the documents addressed herein.  At the very minimum, the
7  documents should be submitted for *in camera* review.  DC also requests that
8  defendants be required to amend their privilege logs, as discussed.

9  **II.   RESPONDING DEFENDANTS' INTRODUCTORY STATEMENT**

10     This lawsuit stems from the successful recapture by the heirs/estate ("Heirs,"
11  and, for purposes of this motion, "Defendants")[1] of Superman's co-creators (Jerry
12  Siegel and Joe Shuster) of their original Superman copyrights by exercising their
13  termination rights under the Copyright Act, 17 U.S.C. §§ 304(c) and (d).  On May
14  14, 2010, DC retaliated by suing its long-time opposing counsel, Marc Toberoff of
15  the law firm, Toberoff & Associates, who had successfully represented the Heirs in
16  filing and/or enforcing their Superman terminations, and vindicated the Siegels'
17  copyrights through years of hard-fought litigation in *Siegel v. Warner Bros. Ent.*
18  *Inc.*, 542 F. Supp. 2d 1098, 1145 (C.D. Cal. 2008).

19     Herein, DC moves to compel the production of an agreement by the Heirs,
20  which is also signed by their counsel, to collectively negotiate settlement with DC.
21  This so-called "Consent Agreement" was entered into in anticipation of a Court-
22  ordered settlement mediation and was disclosed solely in connection therewith,
23  pursuant to the parties' ironclad JAMS Confidentiality Agreement dated May 1,
24  2008 (the "Confidentiality Agreement").[2]  DC's motion to compel the Consent

---

25
26  [1] DC's motion is solely directed at discovery served on the Heirs, responding defendants Laura Siegel Larson, Joanne Siegel, Mark Warren Peary, and Jean Adele Peavy.  It does not relate to any discovery served on Marc Toberoff, Pacific
27  Pictures Corporation, IP Worldwide, LLC or IPW, LLC.  As such, the "Toberoff" defendants are not parties to this joint stipulation.
28  [2] DC's baseless claim that the Consent Agreement is somehow unlawful is the

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1    Agreement in the closely related *Siegel* case was denied by Judge Larson, who

2    ruled that it is privileged.  That decision is binding under the "law of the case"

3    doctrine.  The Consent Agreement contains the Heirs and their counsel's settlement

4    strategies and is clearly protected by the attorney-client privilege and attorney

5    work-product doctrine.  Moreover, DC's use of this document in litigation is

6    expressly barred by the Confidentiality Agreement, which specifically protects

7    disclosures well beyond the settlement and mediation privileges otherwise provided

8    by California and federal law.  DC's outrageous disclosure of the Siegels'

9    confidential settlement letters is in willful breach of the Confidentiality Agreement.

10        On other topics, DC's overzealous motion is unnecessary or misguided.  In

11   an effort to avoid burdensome motion practice, Defendants offered DC reasonable

12   compromises as to the format of privilege logs, and the production of retainer

13   agreements and the Dennis Larson documents.  DC flatly refused each offer,

14   indicated its intent to move to compel things that DC itself will not comply with

15   (*e.g.*, logging documents by specific subject matter), and now falsely paints

16   Defendants' offers of compromise as admissions.

17        DC's motion to compel "joint interest" communications between Laura and

18   Michael Siegel's counsel is also barred by the "law of the case," as the District

19   Court for the Northern District of Ohio already denied DC's motion on the same

20   subject, and the motion is largely moot in any event.  DC has similarly sought to

21   compel an alleged letter from Laura to Michael Siegel based on Warner Bros.'

22   review of the privileged documents stolen from Toberoff & Associates' legal files

23   in 2005.  In *Siegel*, DC previously challenged the Siegels' privilege logs and moved

24   to compel this alleged document, among others, several times based on the same

25   arguments it repeats here, but was rejected both by this Court and Judge Larson.

26   DC provides no basis to revisit any of these rulings against it.

27

28   subject of Defendants' pending dispositive motions.  *See* Docket No. 147 at 18-24.

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1    Lastly, DC moves to compel non-existent documents based solely on the so-called

2    "Toberoff Timeline."  This anonymous ranting "hit piece," by an ex-junior attorney

3    at Toberoff & Associates – who stole and enclosed to Warner Bros. reams of the

4    Heirs' privileged documents, in breach of his duties of loyalty and confidentiality –

5    is facially untrustworthy, grossly inaccurate and cannot serve as the basis for a

6    motion to compel.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

## III.   DC COMICS' POSITION

### A.   Procedural Background

1.  DC filed its complaint in this case on May 14, 2010, to protect its rights in the Superman property it has nurtured, developed, promoted, and funded for over 70 years.  The complaint includes six claims for relief:  three under federal law, and three under state law.  Am. Compl. (Docket No. 49).

The complaint challenges copyright termination notices served by the heirs of Joseph Shuster, the first illustrator of Superman.  *Id.* ¶¶ 105-64.  It also addresses defendants' acts of forbidden "rights trafficking" that violate DC's rights under the Copyright Act and state law.  These transfers include the illicit conveyance of the Shusters' putative rights in Superman to Toberoff, his alter-ego companies, and the Siegels.  *Id.* ¶¶ 165-73.  Defendants have been forced to concede that certain of their agreements violate federal law.  *E.g.*, Docket No. 90 at 1, 6.  Defendants also unlawfully parked alleged "Superboy" rights with the Siegels—rights Joe Shuster long claimed (and Jerry Siegel acknowledged) were his own.  Docket No. 89 at 19-20; Docket 90 at 3, 17-20.

Toberoff has sought to shield his misconduct by claiming he undertook it all as a lawyer, but Toberoff also markets himself as a motion picture *producer*.  And as he *admitted* to the *Wall Street Journal*, he "keeps a defined firewall between producing and legal matters."  Docket No. 92 at 1, 8.[3]  DC has sued Toberoff and his several entertainment companies for their acts of *business* misconduct—*not* their litigation or related activities.  *Id.* at 12-21.  The unlawful agreements that Toberoff induced the heirs to sign confirm this critical distinction; so, too, does

---

[3]  Toberoff has producing credits in numerous motion pictures including *I Spy* and *My Favorite Martian*.  Since this lawsuit was filed, DC has learned that Toberoff has attempted to pitch the Siegel's recaptured *Superman* rights to various motion picture studios, including Paramount.  Case No. CV 04-8400, Docket No. 640 at 4.

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

California law, which fully recognizes and supports DC's state-law claims. *Id*. at 13-17; Docket No. 90 at 16-25, 91 at 13-17.

2. DC informed defendants in June 2010 that it sought immediate discovery in this case from the Siegel and Shuster heirs and, in July, provided defendants with this draft discovery, at defendants' request. Decl. of Matthew T. Kline ("Kline Decl.") Ex. L. When defendants refused to respond to the discovery or even agree to a Rule 26(f) conference, DC was forced to file a motion seeking a conference in order to initiate discovery. Docket No. 45. In August, defendants acceded and participated in the Rule 26 conference, after which DC served the document requests on the Siegel and Shuster heirs that are the subject of this motion. Kline Decl. Exs. M-Q.

Defendants continued their resistance and filed two motions to block DC's discovery, seeking (a) to impose an indefinite stay of all discovery based on their Rule 12 and SLAPP motions, (b) to keep the Toberoff Timeline document and related allegations out of the case, and (c) to set other subject-matter limits on DC's discovery. Docket Nos. 42, 61. On September 20, this Court heard the parties' motions and held "there's nothing that prevents [DC] from commencing discovery," denied defendants' Toberoff Timeline motion, refused to impose subject-matter limits on discovery, and established procedures for conducting depositions of defendants Joanne Siegel, Laura Siegel Larson, and Jean Peavy. Docket No. 95 at 56:23-25; Docket No. 74.[4]

Despite these rulings—and the Court's express admonishment to counsel for both sides "to be cooperative and none to be obstructive," Docket No. 95 at 59:17-18—defendants then served over *150 pages* of blanket objections to DC's

---

[4] Defendants filed objections to this order in the District Court, challenging *only* this Court's ruling that their SLAPP motion did not bar discovery. Docket Nos. 101, 118. Defendants' waived any remaining objections, *see* Docket No. 118 at 2, FED. R. CIV. P. 72(a), C.D. CAL. L.R. 72-2.1, and since the district court has not ruled on defendants' limited objection, this Court's order remains in full force and effect, *see* C.D. L.R. 72-2.2.

1    document requests.  Docket No. 125 at 1-2.  Defendants refused to produce any

2    documents or privilege logs, basing their objections on many of the same

3    arguments this Court had just rejected.  DC promptly notified defendants it would

4    file a motion to compel, and following the ensuing "meet and confer," defendants

5    served revised objections.  They were just as long, baseless, and defiant of the

6    Court's rulings.  *Id.*  On October 11, DC was forced to serve defendants with the

7    first of three motions to compel discovery.  *Id.* Ex. R.

8       On October 7, defendants initiated the first of three appellate actions aimed at

9    derailing DC's discovery.  They challenged the clearly correct and non-appealable

10   order of the District Court mooting their first SLAPP motion in light of DC's

11   amended complaint.  Docket No. 52.  On receipt of defendants' notice of appeal,

12   the district court issued an order administratively staying the entire case, including

13   all of DC's pending discovery.  Docket No. 109.  Despite an order to show cause

14   from the Ninth Circuit why the appeal should not be dismissed for lack of

15   jurisdiction, defendants persisted with the appeal—solely to capitalize on the stay

16   order and consequent delay.  Kline Decl. Exs. EE, FF.

17       DC moved to vacate or modify the stay to allow discovery to proceed.

18   Defendants strenuously opposed and advocated the Court should maintain the

19   freeze on DC's discovery.  The District Court granted DC's motion and ordered

20   discovery to resume.  Defendants immediately countered with an *ex parte*

21   application asking the Court to stop DC's discovery pending its appeal.  The Court

22   denied the application.  Docket Nos. 110, 115, 117, 121, 124.

23       With the stay now lifted, DC served and filed a second motion to compel the

24   production of documents and privilege logs from the Siegel heirs.  Docket Nos.

25   125, 126.  Rather than oppose this motion, defendants stipulated that they would

26   produce all responsive non-privileged documents and provide privilege logs.

27

28

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1   Docket No. 132.  This Court entered an order on December 7, 2010, pursuant to the

2   terms of this stipulation.[5]

3       DC also re-noticed the deposition of Joanne Siegel for December 13, 2010.

4   Defendants refused to produce Ms. Siegel on the noticed date, and DC served

5   another motion to compel.  Kline Decl. Ex. T.  Counsel for the parties then entered

6   into an agreement whereby defendants committed to producing Ms. Siegel for her

7   deposition in mid-January.  *Id.* Ex. U.  Because of a jury duty commitment, DC's

8   counsel continued the deposition to February 1.  *Id.* Ex. XX.  This week,

9   defendants' counsel advised that Ms. Siegel's deposition will not go forward

10  because she is ill.

11      After moving the Siegel deposition from December to February, defendants

12  filed a second interlocutory appeal, as well as a petition for writ of mandamus, and

13  an "urgent" stay motion in the Ninth Circuit, all challenging the District Court's

14  orders permitting discovery and seeking to preclude Ms. Siegel's deposition and

15  alleviate defendants' responsibility to respond to pending written discovery.  *Id.*

16  Exs. U, GG at 1-3.  The Ninth Circuit rejected defendants' writ petition and stay

17  motion and dismissed their first appeal for lack of jurisdiction.  After DC moved to

18  dismiss their second appeal, defendants dismissed it.  *Id.* Exs. HH, II, JJ, KK.

19      3.  In mid-December, the Siegel and Shuster heirs finally produced

20  documents and privilege logs, as required by this Court's December 7 order.

21  Defendants' disclosures, however, were deficient in material respects.  DC met and

22      ────────────

23      [5] Docket No. 133 at 1 ("Defendants will produce … all documents and other
    materials responsive to each and every one of DC's Requests, except for documents

24  that are subject to a claim of attorney-client privilege, the attorney work-product
    doctrine or any other privilege available under law, or to a claim that such

25  responsive documents and other materials are protected under the parties' May 1,
    2008 JAMS Confidentiality Agreement. … Defendants will not refuse to produce

26  or refuse to log any documents or materials based on the objections Defendants
    previously asserted in their responses to DC's Requests. … Defendants will

27  furnish … complete Privilege logs identifying any and all Privileged documents
    and other materials for which Defendants assert a claim of Privilege in response to

28  DC's Requests.").

JOINT STIPULATION RE:
                                        DC COMICS' MOTION TO COMPEL

1  conferred with defendants by letter and telephone, but defendants either refused to

2  produce the materials required or sought to extract conditions that prejudiced DC's

3  rights.  Kline Decl. ¶ 26, Exs. X, Y, Z, AA, BB, CC.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

### B.    DC Is Entitled To The Full Relief It Seeks In Its Proposed Order.

*Issue 1:  Consent Agreements*

> ### 1.    DC Is Entitled To Discover Defendants' "Consent Agreements," Including All Drafts And Related Documents.

>> #### *a.*    **Factual Background Related To This Issue**

Starting in 2001, Toberoff and his entertainment companies entered into a series of agreements with the Shuster and Siegel heirs that forbade them from freely disposing of their putative copyright interests in Superman.  In two agreements with Toberoff's alter-ego entertainment company (Pacific Pictures), Toberoff induced the Shuster heirs to "warrant and represent that after signing this Agreement they will not without the express written consent of [Pacific Pictures] transfer, limit or encumber the Rights in any respect."  Kline Decl. Ex. LL ¶ 4 (2001 agreement); Ex. NN ¶ 4 (2003 agreement).

In these agreements, the Shusters also "transfer[red] and assign[ed]" to their new joint venture with Pacific Pictures "their rights, title, and interest" in Superman, and agreed that upon termination of the venture "for any reason, all Rights will be held fifty percent (50%) by [the Shuster heirs] and fifty percent (50%) by" Pacific Pictures.  *Id.* Exs. LL ¶ 2, NN ¶ 7.  In September 2004, Pacific Pictures and the Shusters terminated their venture, effectively transferring 50% ownership in the Shuster heirs' purported Superman rights to Pacific Pictures.  Am. Compl. ¶¶ 98-99; Kline Decl. Ex. OO.

Toberoff bound the Siegels in similar ways.  In an October 2002 agreement with his alter-ego company IP Worldwide, for example, Toberoff forced the Siegels to agree not to "transfer, assign, license or in any manner encumber [their putative Superman] Rights during the Term or extended Term other than through or as a result of IPW's exclusive representation hereunder…."  Kline Decl. Ex. MM ¶ 8.

Such consent agreements violate federal and state law.  The Copyright Act establishes that copyright grantees like DC have a statutory period of exclusivity—

1    between the filing of a copyright termination notice, and its effective date (from

2    2003 to 2013, in the Shusters' case)—in which the heirs are *barred* from entering

3    into any agreement regarding their putative Superman copyrights with *any* party

4    other than DC.  *See* 17 U.S.C. § 304(c)(6)(D).  Congress inserted section

5    304(c)(6)(D) to prevent "trafficking in future [copyright] interests," *Milne v.*

6    *Stephen Slesinger, Inc.*, 430 F.3d 1036, 1047 (9th Cir. 2005), and strike a balance

7    between the rights of authors (who created a property) and grantees like DC (who

8    spent decades and millions of dollars to develop it), *id.* (observing that section

9    304(c)(6)(D) gives grantees "a competitive advantage over third parties" that is "in

10   the nature of a right of first refusal").

11       California law is equally clear that the Shusters and Siegels must be free to

12   decide whether to "make or accept" an agreement with DC.  *Nehad v. Mukasey*, 535

13   F.3d 962, 970 (9th Cir. 2008).  Consent agreements to the contrary are "against

14   public policy and void," *Calvert v. Stoner*, 33 Cal. 2d 97, 103 (1948)—not to

15   mention the serious conflict-of-interest problems they pose, *Colyer v. Smith*, 50 F.

16   Supp. 2d 966, 967-68 (C.D. Cal. 1999); *Moreno v. Autozone*, 2007 WL 4287517, at

17   *3 (N.D. Cal. Dec. 6, 2007); *Abbott v. Kidder Peabody & Co.*, 42 F. Supp. 2d 1046,

18   1050-51 (D. Col. 1999).

19       Defendants do not dispute the Pacific Pictures agreements are unlawful.  In

20   response to this lawsuit, they have conceded that those two consent agreements

21   violate the Copyright Act.  *E.g.*, Docket Nos. 90 at 16-24, 78 at 8.  However, the

22   Pacific Pictures agreements are only the beginning of a long-running course of

23   misconduct by defendants to infringe DC's rights and suppress this misconduct

24   from fully coming to light.  *E.g.*, Docket Nos. 89 at 22-23; 90 at 11-13; 91 at 9-13;

25   92 at 23-25.  In the years since those first consent agreements were made,

26   defendants have entered into other similarly unlawful agreements that infringe

27   DC's rights and violate public policy.  For example, by their own admission,

28   defendants entered into at least one consent agreement in 2008 that bars the heirs

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1    **[REDACTED]**

2    **[REDACTED]**

3         By disclosing its existence under the auspices of mediation in the *Siegel*

4    cases, Toberoff claims this 2008 consent agreement and related documents are

5    exempt from discovery.  As shown below, federal and state law reject the notion

6    that a party may "immunize admissible information, such as a pre-existing

7    document, through the pretense of disclosing it during compromise negotiations."

8    FED. R. EVID. 408, Advisory Comm. Note; *accord* CAL. EVID. CODE § 1120; *Doe 1*

9    *v. Super. Ct.*, 132 Cal. App. 4th 1160, 1173 (2005) (If the rule were otherwise,

10   parties improperly "could use mediation as a pretext to shield materials from

11   disclosure.").

12        It is undisputed that defendants' consent agreements are highly relevant to

13   DC's federal and state-law claims.  Among other issues, they bear on:

14        •    Shusters' unclean hands (part of DC's first claim), including with respect

15             to the parking of the Superboy rights, Am. Compl. ¶¶ 86-91, 129-33;

16             Docket Nos. 89 at 19-20; 90 at 3, 17-20;

17        •    Defendants' "third-party trafficking" of future copyright interests in

18             violation of DC's rights under the Copyright Act (third claim), Am.

19             Compl. ¶¶ 165-73; Docket No. 90 at 4-11, 16-18; and

20        •    Defendants' interference with DC's contracts and economic relationships

21             (DC's state-law claims), Am. Compl. ¶¶ 58-85; Docket Nos. 90 at 13-14;

22             92 at 16-17.

23        In alleging defendants' consent agreements, DC's complaint adverts only to

24   *the existence* of these agreements—*not* to *statements* defendants made at or leading

25   up to the mediation.  Likewise, DC's discovery requests seek to elicit the

26   agreements themselves, together with related documents—*not* defendants'

27

28

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1  mediation statements.[6]  This approach fully accords with federal and California law

2  governing mediations.

3       Initially, defendants asserted that both federal and state law barred DC from

4  pursuing claims based on their knowledge of the consent agreements because their

5  existence was disclosed as part of the mediation process.  Docket No. 34 at 17-18.

6  Defendants have abandoned that position, Kline Decl. Ex. Y at 577 ¶ 8; and in any

7  event, the law directly forecloses it, as shown in subsections b and c below.

8  Defendants' other justifications for withholding these documents also are

9  unwarranted, as discussed in subsection d.

10                    *b.*       **Defendants' Consent Agreements And Related**
                               **Documents Are Relevant And Discoverable Under**
11                             **Federal Law.**

12       Federal law governs the disposition of this issue:  in "federal question cases

13  where pendent state law claims are raised, the [federal rules] govern all claims of

14  privilege."  *Perrignon v. Bergen Brunswig Corp.*, 77 F.R.D. 455, 459 (N.D. Cal.

15  1978); *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 367 n.10 (9th Cir. 1992)

16  (same); *Jacada (Europe), Ltd. v. Int'l Mktg. Strategies, Inc.*, 401 F.3d 701, 710-12

17  (6th Cir. 2005) ("generic choice-of-law provision[s]" do not "displace the federal

18  [rules]"); *Sovak v. Chugai Pharm. Co.*, 280 F.3d 1266, 1269-70 (9th Cir. 2002).

19       The federal rules fully allow DC to discover the consent agreements and

20  related negotiation and drafting history.  While Rule 408 renders inadmissible

21  _____

22       [6] *E.g.*, Kline Decl. Ex. N at 153 (Siegel Request No. 1:  "All agreements
     between or among YOU and any DEFENDANT regarding the SIEGEL HEIRS'
23  purported rights in SUPERMAN and/or SUPERBOY."); Ex. O at 163 (Larson
     Request No. 6:  "All DOCUMENTS relating to or affecting the ability of YOU or
24  the SIEGEL HEIRS to negotiate or enter into agreements regarding SUPERMAN
     and/or SUPERBOY."); Ex. P at 173 (Peary Request No. 4:  "All DOCUMENTS
25  relating to or affecting the ability of YOU or the SHUSTER HEIRS to negotiate or
     enter into agreements regarding SUPERMAN and/or SUPERBOY."); (Peavy
26  Definition No. 1:  "'DOCUMENT'… shall include, but is not limited to:  e-mail,
     … correspondence, letters, phone messages, notes, memoranda, facsimiles,
27  publications, contracts, agreements, calendars, *drafts of proposed contracts or
     agreements*, papers, and photographs.") (emphasis added).

28

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

evidence of "conduct or statements made in compromise negotiations," it excludes
such evidence *only* when offered "to prove liability, invalidity of, or amount of a
claim…." FED. R. EVID. 408(a). Rule 408(b) expressly *permits* the use of such
statements where, as here, "the evidence is offered for purposes not prohibited by
subdivision (a)." DC's complaint and discovery requests are not directed to
statements made at the mediation, but rather to the underlying motion and evidence.
Nothing in Rule 408 forbids such disclosure.

Even if DC sought to elicit defendants' statements made at the mediation in
the *Siegel* cases, Rule 408 permits such disclosure because the statements are
evidence of independently wrongful acts that are the subject of DC's claims in this
case. Cases like *Carney v. Am. Univ.*, 151 F.3d 1090, 1095-96 (D.C. Cir. 1998),
illustrate the point. In a settlement letter seeking to settle a racial discrimination
case, a university representative threatened to fire plaintiff from his job, unless he
dropped his claim. This new threat of retaliation—an independent tort—was held
to be the proper basis of additional claims plaintiff asserted, even though the threat
was made in seeking to settle the first case. *Id.*

The Advisory Committee likewise has rejected defendants' positions here.
In amending Rule 408 in 2006, it made clear that the federal rules may *not* be used
to "immunize admissible information, such as a pre-existing document, through the
pretense of disclosing it during compromise negotiations." FED. R. EVID. 408,
Advisory Comm. Note. The Committee confirmed its "intent [wa]s to retain the
extensive case law finding Rule 408 inapplicable when compromise evidence is
offered for a purpose other than to prove the validity, invalidity, or amount of a
disputed claim." *Id.* This case law includes *Carney* and: *Uforma/Shelby Bus.
Forms, Inc. v. NLRB*, 111 F.3d 1284 (6th Cir. 1997) (evidence of threats made in
settlement negotiations admissible); *Athey v. Farmers Ins. Exch.*, 234 F.3d 357 (8th
Cir. 2000) (evidence of settlement offer admitted to prove bad faith); *Rhoades v.
Avon Prods., Inc.*, 504 F.3d 1151, 1161 (9th Cir. 2007) (disclosure of settlement

- 15 -

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1   communications to satisfy jurisdictional requirements); *Munoz v. J.C. Penney*

2   *Corp., Inc.*, 2009 U.S. Dist. LEXIS 36362, at *8-10 (C.D. Cal. Apr. 9, 2009)

3   (Wright, J.); *Bd. of Trs. v. Tyco Int'l, Ltd.*, 253 F.R.D. 521, 523 (C.D. Cal. 2008)

4   ("[T]here is no federal privilege preventing the discovery of settlement agreements

5   and related documents."); *FDIC v. White*, 76 F. Supp. 2d 736, 738 (N.D. Tex.

6   1999) (no federal privilege prevents parties from challenging wrongdoing "under

7   the guise of preserving the integrity of the mediation process").

8        And again, to be clear, neither DC's complaint, nor the discovery at issue

9   here, goes as far as these binding federal authorities permit.  For example, DC's

10  complaint could have quoted Toberoff's communications describing the offending

11  **[REDACTED]** agreements; it did not.  What DC seeks are defendants' unlawful

12  consent agreements and related drafts and communications, all of which defendants

13  refuse to produce.  Kline Decl. Exs. X, Y, AA.

14                 *c.*    **Defendants' Consent Agreements And Related**
                         **Documents Are Relevant And Discoverable Under**

15                         **California Law.**

16        Though not applicable to this case, California Evidence Code section

17  1152(a)—the equivalent of Federal Rule 408, *see Monex Deposit Co. v. Gilliam*,

18  2010 U.S. Dist. LEXIS 9344, at *5 (C.D. Cal. Jan. 25, 2010)—compels the same

19  result:  the consent agreements and related documents are not exempt from

20  discovery.  While California law recognizes a mediation privilege protecting

21  communications and writings prepared in connection with or made during a

22  mediation proceeding, CAL. EVID. CODE § 1119, the consent documents are not

23  covered by section 1119; and even if they were, the many exceptions to this rule

24  that require their production.

25        i. Section 1120 of the California Evidence Code ensures that "[e]vidence

26  otherwise admissible or subject to discovery outside of a mediation or a mediation

27  consultation *shall not be or become inadmissible or protected from disclosure*

28  *solely by reason of its introduction or use in a mediation*."  CAL. EVID. CODE

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

§ 1120 (emphasis added).  If section 1120 did not exist, "parties could use mediation as a pretext to shield materials from disclosure."  *Doe 1*, 132 Cal. App. 4th at 1173.  The law forbids this:  "[F]acts do not 'become inadmissible or protected from disclosure solely by reason of [their] introduction or use in a mediation.'"  *Rojas v. Super. Ct.*, 33 Cal. 4th 407, 423 n.8 (2004); *accord Wimsatt v. Super. Ct.*, 152 Cal. App. 4th 137, 161 (2007); *Kullar v. Foot Locker Retail, Inc.*, 168 Cal. App. 4th 116, 132-33 (2008) (evidence exchanged during mediation not protected).

Defendants do not dispute that the consent agreements have continued in force and effect for at least the past two years, and well after any mediation sessions were terminated.  These agreements have impeded and continue to impede DC Comics' rights, far outside the auspices of any mediation.  Defendants cannot suppress these operative agreements because they were first mentioned in the course of mediation, as the authorities above make clear.  In addition, DC is entitled to discovery about the scope, origin, and contents of these agreements and whether defendants' assertions about their intent and purposes and effect are true.  Docket Nos. 89 at 16-25, 92 at 8-11.

ii.  California courts give parties latitude to pursue alternative sources of discovery to the prove existence of facts disclosed in mediation.  In *Foxgate Homeowners' Assoc. v. Bramalea Cal., Inc.*, 26 Cal. 4th 1, 18 (2001)—originally relied on by defendants, Docket No. 34 at 17—the California Supreme Court vacated a sanctions award based on a mediator's report disclosing an attorney's statements made during mediation.  In doing so, the Court made clear that plaintiff could still seek sanctions on remand based on any evidence *other* than "communications made during the mediation."  *Foxgate*, 26 Cal. 4th at 18; *see also Benesch v. Green*, 2009 U.S. Dist. LEXIS 117641, at *25 (N.D. Cal. Dec. 17, 2009) (denying malpractice claim based on settlement document but permitting discovery to "uncover new, admissible evidence … not protected by the confidentiality

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

statutes").  DC's discovery requests do not seek disclosure of communications made "for the purpose of" or during mediation, *cf. Cassel v. Super. Ct.*, 2011 WL 102710 (Cal. Jan. 13, 2011)—rather, they are directed to consent agreements created independently of mediation and that continue to exist to this day. Furthermore, neither the agreements themselves nor any drafts were *ever* shared with DC during or in connection with the mediation process; they are extrinsic to the mediations and discoverable.  *See id.* (citing favorably *Foxgate* and *Benesch*).

iii.  Section 1119 does not prevent parties to a mediation from revealing or reporting to a court "non-communicative," "obstructionist," sanctionable, or otherwise improper "*conduct*."  *Foxgate*, 26 Cal. 4th at 13-14, 17-18 & n.14 (emphasis in original).  Section 1121 prohibits a mediator from disclosing such misconduct, but expressly allows a party like DC to do so.  *Id.*; *Campagnone v. Enjoyable Pools & Spas Serv. & Repairs, Inc.*, 163 Cal. App. 4th 566, 571 (2008) ("confidentiality rules do not prohibit 'a party' from 'advising the court about *conduct* during mediation that might warrant sanctions.'") (emphasis in original); *In re Marriage of Kieturakis*, 138 Cal. App. 4th 56, 80 (2006) (section 1120 "allow[s] a party to reveal noncommunicative conduct").

Again, neither DC's complaint, nor the discovery it seeks, is directed at any statement or communication disclosed in the course of mediation.  DC seeks to elicit facts and evidence independent of the mediation sessions—*i.e.*, defendants' unlawful and collusive consent agreements—which by defendants' own admissions violate the Copyright Act.  Am. Compl. ¶¶ 101, 170, 188; *supra* at 6.

### d.  None Of Defendants' Other Excuses Has Merit.

Confronted with this law, defendants abandoned their reliance on federal and state law as grounds to object to DC's complaint or discovery related to their consent agreements.  *Compare* Docket No. 34 at 17-18, *with* Docket No. 78 at 18-24, *and* Kline Decl. Ex. Y at 577 ¶ 8.  Defendants now rely on other arguments for withholding such discovery; none has merit.

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

     i.  The Parties' JAMS Agreement.  The parties' mediation sessions were conducted by a JAMS mediator, pursuant to a confidentiality agreement, which provides at the outset:

> 1.  This mediation process is to be *considered settlement negotiations for the purpose of all state and federal rules* protecting disclosures made during such process *from later discovery and/or use in evidence.*

> 2.  The provisions of California Evidence Code §§ 1115-1128 and 703.5, attached hereto, apply to this mediation.  The provisions of the Central District of California Local Rule 16-15, attached hereto, also apply to this mediation.….. THIS CONFIDENTIALITY AGREEMENT ("AGREEMENT") EXTENDS TO ALL PRESENT AND FUTURE CIVIL … PROCEEDINGS.

*Id.* Ex. K (italics added).

     Contrary to defendants' claim, this agreement does not permit defendants to suppress evidence of their unlawful agreements or other conduct independent of the mediation process.  To the contrary, the JAMS agreement invokes the very "state and federal rules," *id.*, on which DC relies, and the agreement does not trump federal law in any event.  *Jacada*, 401 F.3d at 710-12 ("generic choice-of-law provision[s]" do not "displace the federal [rules]"); *Sovak*, 280 F.3d at 1269-70.

     The parties' JAMS agreement was negotiated over a period of two weeks in May 2008.  Toberoff prepared the first draft and said he modeled it after the standard "JAMS Confidentiality Agreement."  Kline Decl. Ex. J at 91.  Toberoff sent his draft to DC on April 18, and nowhere in his cover note (or elsewhere) did he state that the agreement superseded the very federal and state-law rules that the agreement—by its express terms—invoked.  *Id.* Ex. J at 91-92.  To the contrary, the Toberoff draft retained the first paragraph of the standard form, which states, "This mediation process is to be considered settlement negotiations for the purpose of all state and federal rules protecting disclosures made during such process," *id.* Ex. J at 93, and retained the first sentence of the second paragraph, which states, "The provisions of California Evidence Code §§ 1115-1128 and 703.5, attached hereto,

apply to this mediation." *Id.* (emphasis added).  Further, Toberoff added additional references to California law, *including Evidence Code § 1120*, which as shown above, expressly permits the claims DC has asserted and the discovery it seeks.  *Id.* at 94; *supra* at 16-17.

Toberoff also proposed paragraph 5, to which DC agreed.  Defendants now say paragraph 5 renders meaningless paragraphs 1, 2, and 6—which specifically invoke the federal and state law on which DC relies.  Docket No. 78 at 18-24. Defendants are mistaken; paragraph five states:

> All parties, counsel and any other persons attending any Settlement Conference shall treat *all such discussions* as strictly confidential in every respect, including without limitation, *the contents or substance of any oral or written statements made at the Settlement Conference*, and all other substantive aspects of such Settlement Conference ("Confidential Settlement Information").  Without limitation, any document that is marked "Confidential - For Settlement Purposes Only" and is disclosed or produced at or in connection with a Settlement Conference shall be treated as Confidential Settlement Information. Confidential Settlement Information shall not be disclosed to anyone other than the parties, their counsel or the mediator or used in any way, shape or form for any purpose, including impeachment, in any pending or future proceeding in any court, in whole or in part, directly or indirectly, orally or in writing, *except as set forth in paragraph 6 below*.

Kline Decl. Ex. K at 113-114 (emphasis added).

No part of this paragraph bars the discovery DC seeks.  To begin, DC does not seek to compel the production of "settlement discussions" or "oral or written statements made at the Settlement Conference."  *Id.*  Instead, it seeks the consent agreements and evidence of their drafting history, which were negotiated and executed by defendants separate and apart from the Settlement Conference and have never been *disclosed* to DC, much less in a mediation session.

Moreover, nothing in paragraph 5—or DC and Toberoff's communications regarding the JAMS agreement—supports defendants' claim that this paragraph vitiated the protections afforded DC in paragraphs 1, 2, and 6.  To the contrary, paragraph 5 specifically adverts to the application of paragraph 6, which in turn

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1    cites California Evidence Code § 1120.  *Id*.  Section 1120 ensures that "[e]vidence

2    otherwise admissible or subject to discovery outside of a mediation or a mediation

3    consultation *shall not be or become inadmissible or protected from disclosure*

4    *solely by reason of its introduction or use in a mediation*."  (emphasis added.)

5          Defendants' claim that paragraph 5 renders paragraphs 1, 2, and 6 void also

6    runs directly contrary to the bedrock rules of construction that contracts must be

7    read as a whole and each provision must be given force and effect.  *E.g.*,

8    *Brinderson-Newberg Joint Venture v. Pacific Erectors, Inc.*, 971 F.2d 272, 279 (9th

9    Cir. 1992) ("Since an agreement is interpreted as a whole, it is assumed in the first

10    instance that no part of it is superfluous.") (quoting RESTATEMENT (SECOND) OF

11    CONTRACTS § 203(a) cmt. b (1979)); *accord In re Crystal Props., Ltd.*, 268 F.3d

12    743, 748 (9th Cir. 2001); *Int'l Ins. Co. v. Imperial Cas. & Indem. Co.*, 1992 WL

13    547721, at *7 (C.D. Cal. Oct. 28, 1992).

14          ii.  The Changing Labels Defendants Affix To The Consent Agreements.

15    Defendants' description of the consent agreements has changed over time, but no

16    amount of clever labeling can defeat DC's right to such evidence.  Defendants

17    initially referred to the agreement as a **[REDACTED]**:

18          **[REDACTED]**

19

20

21

22

23

24    Kline Decl. Ex. PP.  In describing the agreement, defendants did not say it had been

25    prepared solely for purposes of the mediation or that its terms would last only as

26    long as the Siegels were in mediation with DC.  *Id.*  Nor did they suggest that the

27    agreement was attorney-client privileged or attorney work-product—just the

28

- 21 -

1  opposite, they disclosed its existence and a high-level summary of its content to

2  DC, its adversary in litigation.  *Id.*

3      After the parties' mediation efforts failed, DC sought a copy of the consent

4  agreement, *id.* Ex. QQ at 708, and defendants refused, changing their description of

5  the document:

6      **[REDACTED]**

7

8

9

10

11

12

13

14

15  *Id.* Ex. RR at 710-711.  Defendants provided no cogent explanation—nor does one

16  exist—as to how the document could be privileged, given that defendants had

17  already disclosed its terms generally to DC—a clear act of waiver.  *U.S. v. Jacobs*,

18  117 F.3d 82, 91 (2d Cir. 1991) ("[D]isclosure of the substance of a privileged

19  communication is as effective a waiver as a direct quotation since it reveals the

20  'substance' of the statement.").

21      Most recently, in October 2010, defendants affixed a new label to the consent

22  agreements.  In filing their 150-plus pages of objections to DC's discovery,

23  defendants now started calling the documents "Collective Bargaining Agreements."

24  Docket No. 125 at 14.  These labels are a shell game and do not remotely justify

25  defendants' withholding the documents from discovery.  The Copyright Act

26  imposes an exclusivity period that precluded the Shusters from transferring their

27  putative Superman rights to anyone other than DC *until 2013*.  *Supra* at 12.  DC has

28

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1   a right to obtain these infringing agreements and other related evidence—no matter

2   what they are called.

3       Moreover, a "contract providing that the client may not compromise the suit

4   without the consent of his attorney is against public policy and void." *Calvert*, 33

5   Cal. 2d at 103.  This is true even if it is only the Siegels who can bind the Shusters

6   and vice versa—and if Toberoff does not expressly have that control.  *E.g.*, *Tax*

7   *Auth., Inc. v. Jackson Hewitt, Inc.*, 898 A.2d 512, 522 (N.J. 2006); ABA Standing

8   Comm. on Ethics and Prof'l Responsibility, Formal Opinion 06-438 (2006)

9   (disclosures necessary to obtain informed consent "must be made in the context of a

10  specific offer or demand, as informed consent cannot be obtained in advance of

11  formulating the offer or demand"); CAL. RULES OF PROF'L CONDUCT R. 3-310(D)

12  (2011) ("A member who represents two or more clients shall not enter into an

13  aggregate settlement of claims of or against the clients without the informed written

14  consent of each client.").

15       The consent agreements are also not privileged.  A party asserting attorney-

16  client privilege "must identify specific communications and the grounds supporting

17  the privilege as to each piece of evidence over which privilege is asserted," as

18  generalized assertions of privilege are "extremely disfavored."  *U.S. v. Martin*, 278

19  F.3d 988, 1000 (9th Cir. 2002).  The party asserting privilege bears the burden of

20  proving every element of the test—*i.e.*, that:  (1) legal advice is being sought

21  (2) from a professional legal advisor in that capacity; (3) the communications relate

22  to that purpose, (4) are made in confidence (5) by the client and (6) are, at the

23  client's instance, permanently protected (7) from disclosure (8) unless the

24  protection is waived.  *Id.* at 999.

25       Among other reasons why defendants cannot carry their burden to meet this

26  test, the consent agreements were not "permanently protected … from disclosure,"

27  and any privilege concerning these documents was knowingly waived when

28  defendants chose to disclose the existence of the agreements to DC. *Jacobs*, 117

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1   F.3d at 91.  In addition, the agreements and related negotiations among defendants

2   are business agreements concerning the disposition of monetary interests and rights,

3   and such communications, even with a lawyer, are subject to discovery.  *E.g.*,

4   *Minebea Co., Ltd. v. Papst*, 355 F. Supp. 2d 526, 529 (D.D.C. 2005); *Martin*, 278

5   F.3d at 999; *see also In re Grand Jury Proceedings*, 33 F.3d 1060, 1063-64 (9th

6   Cir. 1994) (retainer agreements not privileged); *Montgomery Cnty. v. MicroVote*

7   *Corp.*, 175 F.3d 296, 304 (3d Cir. 1999) ("The attorney-client privilege does not

8   shield fee arrangements.").[7]  Rather than suggesting privilege, Toberoff's signature

9   on an agreement between two of his clients points to conflicts of interest and

10  impermissible constraints on a client's freedom of choice.

11      Finally, at the very least, defendants had a duty to produce redacted copies of

12  the consent agreements, excluding any privileged material—if, in fact, any exists.

13  FED. R. CIV. P. 34(b)(2)(C); *Aikens v. Deluxe Fin. Servs., Inc.*, 217 F.R.D. 533, 539

14  (D. Kan. 2003) ("the responding party still has a duty to respond *to the extent the*

15  *request is not objectionable*") (emphasis in original).  This Court could then inspect

16  the documents *in camera* to determine the propriety of the redactions.  *See In re*

17  *Grand Jury Investigation*, 974 F.2d 1068, 1074 (9th Cir. 1992).  The court in

18  *Applied Med. Res. Corp. v. Ethicon, Inc.*, 2005 U.S. Dist. LEXIS 41199, at *4

19  (C.D. Cal. May 23, 2005), discussed the minimal threshold required for *in camera*

20  review.  There, the parties disputed the claim of privilege over 400 to 450

21  documents from a privilege log containing 15,000 entries.  *Id.* at *2.  Citing *In re*

22  *Grand Jury Investigation*, the preeminent Ninth Circuit case on the matter, the court

23

24      [7] Any claims of privilege or confidentiality were also waived when defendants
    elected to disclose the existence and contents of the consent agreements in their
25  *unsealed, public* motion seeking to strike DC's complaint.  Docket No. 90 at 17.
    DC's complaint did not advert to the agreement or defendants' statements regarding
26  its terms specifically; rather, *defendants* first did this in their baseless motion that
    attacked a straw-man version of DC's complaint.  *Id.* at 5-7; Docket No. 78 at 2-3,
27  9-10, 16-24; *Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010)
    (plaintiff's disclosure of his communications with his prior attorney in opposing
28  summary judgment motion waived attorney-client privilege).

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1    found that plaintiffs had met the "minimal threshold" of a "factual basis adequate to

2    support a good faith belief by a reasonable person that the communications are not

3    privileged," *id.* at *5, in part because the court could not determine whether "a

4    document sent to an attorney as one of several recipients is an ordinary business

5    communication, to which the privilege does not apply, [or is] … part of a request

6    for legal advice, which would be protected," *id.* at *6-7.  Finding it to be the most

7    appropriate method of review for such a volume of documents, the court ordered

8    production of the documents to the Court for *in camera* review.  *Id.* at *7.

9    Defendants' indiscriminate privilege assertions raise similar issues and warrant

10   similar review by the Court.  *See infra* at 30-33.

11        iii.  Proceedings In The *Siegel* Cases.  In 2008, DC filed a motion to compel

12   production of the consent agreement to which Toberoff made reference in 2008.

13   Case No. CV 04-8400, Docket No. 395 at 1.  Toberoff asserted the contract was

14   privileged, and Judge Larson denied DC's motion on the basis of "Toberoff's

15   characterization of it as a privileged document, as an officer of the court."  Kline

16   Ex. SS at 724:9-11.  Judge Larson *never* reviewed the underlying consent

17   agreement or even the letter describing it.  Unlike here, the consent agreement was

18   not directly relevant to DC's pleadings in the *Siegel* case, and discovery was closed.

19   Docket No. 90 at 24.  As Judge Larson explained, moreover:  "I would rather not

20   look at this letter myself, particularly since we have a bench trial starting in a few

21   weeks."  Kline Decl. Ex. SS at 718:17-19.

22        Judge Larson never made any determination that the consent agreement was

23   confidential, privileged, or protected by federal or state law.  Judge Larson's rulings

24   are not "law of the case" and, contrary to defendants' suggestion, do not bind the

25   Court in this case involving new and different claims.  Docket Nos. 89 at 23-24, 90

26   at 24.  The law-of-the-case doctrine applies only to matters decided in "the course

27   of a single continuing lawsuit.  They do not apply between separate actions."  18B

28   C. WRIGHT, FED. PRAC. AND PROC. § 4478, at 637-39 (2d ed. 2002); *Thomas v.*

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1    *Bible*, 983 F.2d 152, 154 (9th Cir. 1993).  Moreover, since the change in

2    circumstances, no further basis exists to accept Toberoff's representations to Judge

3    Larson about the contents of the document—*i.e.*, that it was fully privileged.

4    Defendants now admit the agreement expressly limits the heirs' rights to settle their

5    copyright claims with DC.  Docket No. 100 at 7-8.  And, defendants have waived

6    any privilege by generally disclosing its contents to DC and to this Court.

<em>e.</em>    <strong>The Order DC Seeks</strong>

8        i.  All consent agreements and related materials should be produced to DC.

9    To the extent defendants believe any portion of certain of these documents contains

10    privileged information, defendants should be ordered to produce copies of the

11    documents to DC and redact out any purportedly privileged information.

12    Defendants should also be ordered to provide the Court, for its *in camera* review,

13    unredacted copies of the documents at issue, so that the Court can determine the

14    propriety of defendants' privilege claims.  FED. R. CIV. P. 34(b)(2)(C); *Aikens*, 217

15    F.R.D. at 539; *In re Grand Jury Investigation*, 974 F.2d at 1074.

16        ii.  DC does not request the production of communications the Siegel and

17    Shuster heirs may have had with independent counsel, other than Toberoff, who

18    would have advised them on the propriety and wisdom of such consent agreements.

19    However, DC seeks an order compelling defendants to produce any conflict

20    waivers signed in connection with the negotiation of the consent agreements, since

21    they bear directly on DC's claims that the consent agreements violate its rights.

22        iii.  Finally, defendants' descriptions and identification of the consent

23    agreements on their privilege logs should be amended.  *See infra* at 40-41.

24    Defendants advised DC that the consent agreement is a single document that

25    Toberoff prepared, and that he and the Siegel and Shuster heirs executed.  Kline

26    Decl. Ex. RR.  Defendants' privilege logs suggest there might be two consent

27    agreements.  In the Shusters' privilege log, the "Collective Bargaining Agreement"

28    is listed as entry number 27, the date of the document is April 9, 2008, and Peary is

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

identified as the "author" of the communication, and Toberoff is identified as the "recipient":

| Log # | Date of Document | Identity of Author(s) | Identity of Recipient(s) | Document Type | Privilege Claim | Present Location |
|-------|------------------|-----------------------|--------------------------|---------------|-----------------|------------------|
| 27 | 4/9/08 | Mark Warren Peary | Atty Marc Toberoff | Collective Bargaining Agreement | Atty/Client-Joint Interest; Atty Work Product; JAMS Agreement | Defendants' Counsel |

Kline Decl. Ex. V at 389.  In the Siegels' privilege log, the "Collective Bargaining Agreement" is listed as entry number 2103, the document is dated April 9, 2008, and Larson and Siegel are identified as the "authors," while Toberoff is identified as the "recipient":

| Log # | Date of Document | Identity of Author(s) | Identity of Recipient(s) | Document Type | Privilege Claim | Present Location |
|-------|------------------|-----------------------|--------------------------|---------------|-----------------|------------------|
| 2103 | 4/9/08 | Laura Siegel, Joanne Siegel [Larson] | Atty Marc Toberoff | Collective Bargaining Agreement | Atty/Client-Joint Interest; Atty Work Product; JAMS Agreement | Defendants' Counsel |

*Id.* Ex. W at 506.  Perhaps this means the Shuster and Siegel heirs faxed copies of the signature pages separately to Toberoff on the same day, but one cannot tell.

Nor, as defendants concede, can one identify the *many other documents* related to the consent agreements that defendants acknowledge are included in the logs.  *Id*. Ex. Y at 575 ¶ 5.  This is because the logs contain no subject matter descriptions and obscure which documents relate to the consent agreements. Defendants should be ordered to revise their logs to provide this and other critical information.  *See infra* at 40-42.

*Issue 2:  Retainer Agreements*

## 2.    DC Is Entitled To Copies Of Defendants' Retainer Agreements And Related Drafts And Documents.

In defending against DC's claim, and as prominently argued in their SLAPP motion, the Toberoff defendants assert that all their activities are privileged, protected, and otherwise immune from suit because they occurred in the course of Toberoff's practice of law.  For this reason, among others, defendants' various retainer agreements (and drafts and communications related to their negotiation) are relevant to, among other things, establishing when Toberoff was retained by the Shusters and Siegels and, in particular, when he actually commenced to perform legal work and on what issues.  *See* Docket Nos. 61 at 36-46, 92 at 8-11, 94 at 17-21. It is well settled that these agreements are discoverable.  *See In re Grand Jury*, 33 F.3d at 1063-64 (retainer agreements not privileged); *Montgomery*, 175 F.3d at 304 ("The attorney-client privilege does not shield fee arrangements.").  To the extent portions of the retainer agreements are privileged, the proper procedure is for defendants to produce the documents in redacted form and make the unredacted copies available for *in camera* review.  *See* Fed. R. Civ. P. 34(b)(2)(C); *Aikens*, 217 F.R.D. at 539; *In re Grand Jury Investigation*, 974 F.2d at 1074.

Recognizing the impropriety of their blanket refusal, defendants eventually said they would produce these documents *if* DC agrees to produce any retainer agreements it has with counsel of record in this case.  Kline Decl. Ex. BB at 588 ¶ 9.  Putting aside that any such agreements have no bearing on any issue in this case, defendants have no right to impose conditions on their discovery obligations.  Defendants are under a court order to produce *in December* responsive, non-privileged documents.  Docket No. 133.  This includes all or significant parts of their retainer agreements.  Moreover, whether or not defendants may be entitled to discover any retainer agreements from DC is not before the Court—indeed, defendants have served *no* discovery on DC in this action.

1          In short, DC requests that the Court order defendants to produce the retainer

2   agreements and any related documents.  If defendants redact any portion of these

3   documents, non-redacted versions should be made available to the Court for *in

4   camera* inspection.  *In re Grand Jury Investigation*, 974 F.2d at 1074; *Applied

5   Med.*, 2005 U.S. Dist. LEXIS at *4.

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

*Issue 3:  Non-Privileged Documents Conveyed to Counsel*

### 3.    Defendants Cannot Shield Non-Privileged Documents From Discovery Because They Shared Them With Counsel.

On July 11, 2003, Laura Siegel Larson sent a letter or email to her half-brother, Michael Siegel, concerning "the sale of Michael Siegel's Superman interest to Toberoff's 'investors.'"  Kline Decl. Ex. VV ¶ 7.  Defendants have never produced this clearly responsive document, and no credible claim can be made that it is privileged.  Neither Michael nor Laura is a lawyer and, at the time of the communication, Michael was feuding with Joanne Siegel (his stepmother) and believed Toberoff and his business associates were taking advantage of Joanne and Laura.  Am. Compl. Ex. A at 64-67.

Defendants claim privilege over this letter and have included it on their privilege log, apparently because Ms. Larson faxed it to Toberoff.  *Id.* Ex. Y at 576 ¶ 7.  DC believes this letter and fax cover sheet are identified at entries 715 and 716 of the Siegel privilege log.  *Id.* Ex. W at 427.  In the meet and confer process, DC's counsel asked Toberoff to confirm whether the July 11 letter is being withheld as privileged because it was later faxed to Toberoff.  Toberoff refused to confirm or deny that this was the basis for his privilege claim.  *Id.* Ex. Y at 576 ¶ 7.  If it is, the objection must be overruled, because non-privileged documents do not become privileged because they are sent to an attorney.  *E.g., U.S. v. Osborn*, 561 F.2d 1334, 1338 (9th Cir. 1977); *Suezaki v. Super. Ct.*, 58 Cal. 2d 166, 176 (1962) (mere transmission to counsel of non-privileged communication "cannot create the privilege if none, in fact, exists").[8]

---

[8] *Accord U.S. v. Ruehle*, 583 F.3d 600, 608-09 (9th Cir. 2009) (district court's presumption of privilege over all communications during attorney-client relationship was error); *U.S. v. Goldfarb*, 328 F.2d 280, 281-82 (6th Cir.), *cert. denied*, 377 U.S. 976 (1964) (attorney-client relationship does not create an automatic "cloak of protection … draped around all occurrences and conversations which have any bearing, direct or indirect, upon the relationship of the attorney with his client"); *N. Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1127 (N.D. Cal. 2003) (statements made in meeting not necessarily privileged simply

1    Furthermore, Toberoff has refused to provide *any* information about the July

2   11 letter, continuing to protest that DC has no right even to know about the letter

3   because it was among the documents provided to Warner Bros. together with the

4   Toberoff Timeline in 2006.  Toberoff's position is indefensible.  This very issue

5   was litigated in the *Siegel* cases, and in this case, and at all times the Courts rejected

6   Toberoff's contention that Warner Bros.' review of the Timeline materials was

7   impermissible.  As the Court may recall, upon receiving the package of documents

8   from the anonymous Timeline author, Warner Bros.' in-house counsel Wayne

9   Smith conducted legal research to determine the appropriate procedure for dealing

10   with the materials.  Kline Decl. Ex. TT ¶ 5.  Strictly observing—indeed,

11   exceeding—the requirements of *State Comp. Ins. Fund v. WPS, Inc.*, 70 Cal. App.

12   4th 644 (1999),  Mr. Smith reviewed the materials, and upon seeing any document

13   that appeared privileged, ceased his review of that document.  Mr. Smith then gave

14   copies of all the documents to a third-party escrow and notified opposing counsel

15   that the documents had been received.  Mr. Smith refrained from using any

16   information in the documents or discussing them with his clients or outside

17   litigation counsel until there was an agreement with opposing counsel or the Court

18   had ruled on the disposition of the documents.  *Id.* Ex. TT ¶¶ 6, 13.

19    As part of his review, Mr. Smith divided the documents in three categories:

20   "non-privileged," "privileged," and "?" (meaning it was not apparent that the

21   documents were privileged).  Kline Decl. Ex. TT ¶ 8.  The July 11 communication

22   that DC now seeks was placed in the non-privileged category, and identified by Mr.

23   Smith as "correspondence concerning the interest in Superman that might be owned

24   by Plaintiff Laura Siegel's estranged step-brother [Michael Siegel]"; nevertheless,

25   and out of an abundance of caution, Warner Bros. gave all the documents, including

26   _____

27   because legal counsel present); *Sneider v. Kimberly-Clark Corp.*, 91 F.R.D. 1, 4
   (N.D. Ill. 1980) ("Attachments which do not, by their content, fall within the realm
   of the privilege cannot become privileged by merely attaching them to a
28   communication with an attorney.").

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1   the July 11 letter, to the third-party escrow.  *Id.* ¶¶ 9, 13.  The documents remained

2   with the escrow for the next two and a half years until December 2008, when Judge

3   Larson ordered production of the Toberoff Timeline and related documents.  Case

4   No. 04-8400, Docket No. 386.  During the proceedings leading up to this December

5   2008 order, this Court stated that Mr. Smith had "acted professionally [and]

6   reasonably" in his handling the documents in question, and defendants never

7   objected to that finding, meaning, as Judge Larson held in 2008, the time for

8   objecting to any such finding "long since expired."  *Id.* Ex. UU at 760; *see also*

9   Docket No. 42 at 40-43.  In August 2010, this Court denied defendants' motion to

10  exempt the Timeline and related documents from discovery in this case.  Docket

11  Nos. 42 at 40-61, 74 at 1.

12      Therefore, Warner Bros.' legally permissible review of the Timeline provides

13  defendants no basis whatsoever to withhold the July 11 letter—DC respectfully

14  requests the following order to remedy this situation:

15      First, the July 11 letter from Laura Siegel Larson to Michael Siegel should be

16  produced; at a minimum, the Court should conduct an *in camera* inspection of the

17  documents identified as log 715 and 716 and order production of any non-

18  privileged material.  *In re Grand Jury Investigation*, 974 F.2d at 1074; *Applied*

19  *Med.*, 2005 U.S. Dist. LEXIS at *4.

20      Second, DC requests that the Court order defendants to produce any and all

21  non-privileged documents included in their privilege logs merely because such

22  documents were conveyed to a lawyer.

23      Third, because defendants' untenable claims of privilege call into question

24  numerous other entries in their privilege logs, DC requests an order requiring

25  defendants to amend their privilege logs to list attachments separately from the

26  documents to which they are attached.  As part of their burden to establish each

27  element of the test for privilege, *supra* at 23, defendants must allow DC the

28  opportunity to challenge each document—cover emails, letters, or faxes, as

- 32 -

1    compared to their attachments, separately.  *E.g.*, *Narayan v. EGL, Inc.*, 2006 WL

2    3050851, at *1 (N.D. Cal. Oct. 24, 2006) (ordering amended privilege log to

3    include separate listing for attachments); *In re Heritage Bond Litig.*, 2004 WL

4    1970058, at *5 (C.D. Cal. July 23, 2004) (same); *Mold-Masters Ltd. v. Husky*

5    *Injection Sys. Ltd.*, 2001 U.S. Dist. LEXIS 20152, at *8-9 (N.D. Ill. Dec. 5, 2001)

6    ("Since a document with an attachment constitutes two separate documents, a party

7    objecting to the disclosure of a document with an attachment must prove that both

8    the document and the attachment individually satisfy the requirements of the

9    applicable privilege or doctrine."); *see also infra* at 40-42.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

*Issue 4:  Michael Siegel Communications*

**4.      Given The New and Different Claims In This Action,
Additional Michael Siegel Documents Should Be Produced.**

At the time the Siegels' termination notices were served, Jerry Siegel had
three living heirs:  his wife Joanne, their daughter Laura, and his son Michael from
a prior marriage.  By his own admission, Michael had very little to do with Joanne
or Laura throughout his life, Kline Decl. Ex. A, and he was not a party to their
copyright termination notices, *id.* Ex. I.

The Siegel defendants tried for years to secure Michael Siegel's rights for
themselves or for mysterious, unnamed "investors" Toberoff claimed to represent.
Am. Compl. Ex. A at 64-67; Kline Decl. Ex. H.  As a result, Michael Siegel (who
lived in Ohio) and his lawyer there (Don Bulson), had numerous communications
with Toberoff, Ms. Larson, and other of defendants' associates and representatives.
Throughout the summer of 2003, Toberoff and Bulson exchanged correspondence,
in which Toberoff said he represented an unnamed "investor," who wanted to
purchase Michael Siegel's putative Superman interests, but who thought Michael
Siegel's price was too high, given, *inter alia*, the limited worth of the Superman
property and the Siegels heirs' limited rights.  *Id.* Ex. H.

In the *Siegel* cases, DC sought discovery of these communications and
argued that the admissions by Toberoff and his "investor" about the value of
Michael Siegel's rights undermined the Siegels' claim that their rights were worth
much more.  *Id.* Ex. G at 41.  The Siegel defendants objected and claimed a
common interest privilege over all communications with Michael Siegel—whether
they resided in the files of the Siegel defendants, their agents, or with Mr. Bulson in
Ohio.  Kline Decl. Exs. B, C, E, F, G.  DC, along with the other defendants in the
*Siegel* case, challenged this broad assertion of privilege.  The United States District
Court for the Northern District of Ohio conducted an *in camera* review of the
documents in questions and ordered the Siegel defendants to produce 15 documents

on the grounds that they were not privileged and were relevant to the accounting

issues in the *Siegel* case.  Kline Decl. Ex. E at 31.  The Court rejected the position

of the Siegel defendants that these documents were "clearly protected under the

doctrine of the 'common interest'" and were "classic *privileged* subject matter."  *Id.*

Ex. D at 26-27.  In its April 1, 2008 order, the district court found:

> After reviewing all of the 15 documents, and the claimed joint interest
> privilege which has been asserted, the court finds that none of the 15
> documents are subject to the attorney/client privilege based on the
> joint interest exception.  First, the court finds that none of the 15
> communications … are for the purpose of giving legal advice.  Second,
> the court finds [that 13] communications … are not made in regard to
> the joint and common legal or defense strategy relative to ongoing or
> upcoming litigation.  Finally, *the court finds that the interest of
> Michael Siegel, as reflected in the 13 communications, is separate and
> apart from those of Joanne and Laura Siegel*.  These documents relate
> to the offers back and forth between Mike [*sic*] Toberoff, on behalf of
> an investor who wishes to purchase Michael Siegel's interest and
> Bulson on behalf of Michael Siegel.

*Id.* Ex. E at 30-31 (emphasis added).

Based on this ruling, DC sought access to other documents on the privilege

log and greater specificity in the logs.  The district court denied DC's broader

request for access to the Michael Siegel documents, reasoning DC's theory of

relevance for obtaining the documents was limited to "valuation issues only," "the

substantive phase of the [*Siegel*] litigation is over" and "production of documents

will now be irrelevant for any other purpose," and that the erroneous claims of

privilege that Toberoff made were not so egregious as to question every other

privilege call.  Kline Decl. Ex. G at 42-43.

In their privilege log served in this case, Ms. Siegel and Ms. Larson list

approximately 250 Michael Siegel documents.  Kline Decl. Ex. W.[9]  Based on the

---

[9] They are entries 28, 44, 46-47, 49, 51-54, 56-59, 62-64, 66, 68-69, 72-73, 77-
80, 87-88, 98, 101-104, 114-15, 118-19, 121-23, 129-30, 136-37, 139, 142-43, 146,
160-62, 164-67, 174-75, 177, 182-84, 189, 192, 194, 197-203, 206, 208-216, 218,
221, 227-29, 231-42, 244, 247-52, 255-61, 267-70, 273-79, 281-82, 284, 290-92,
294-95, 302, 304, 307, 311, 313-17, 321, 323, 325-35, 337, 342, 356, 358-60, 362-
64,, 366, 368, 372-73, 399, 401, 406-408, 429-30, 433-34, 447-48, 460-61, 495,

1   new and more expansive claims and issues in this case, DC is not bound by the

2   restrictive relevancy ruling in the *Siegel* cases, but rather is entitled to all non-

3   privileged Michael Siegel documents that bear on the issues in this case.  Such

4   documents would include communications between Michael Siegel and Laura

5   and/or Joanne Siegel, or their respective counsel (Bulson and Toberoff), containing

6   Michael's statements that Toberoff was taking advantage of Joanne and Laura.  *Cf.*

7   Am. Compl. Ex. A at 64-65.  Though not ascertainable from the inadequate

8   descriptions, the Shuster and Siegel privilege logs identify at least 11

9   communications between Bulson and Toberoff that may contain non-privileged

10  relevant evidence.  *See id* Ex. W at Entries 687-88, 734, 805, 952, 1203-1204,

11  1360-62, 1375.

12      DC requests a court order requiring defendants to submit these 11 documents

13  for *in camera* review and to produce any of those documents the Court concludes

14  are not privileged.  DC also seeks an order compelling defendants to provide

15  greater specificity in their privilege logs with respect to the Michael Siegel-related

16  documents to enable DC to better assess defendants' claims of privilege.

17

18

19

20

21

22

23

24

25

26

---

507-509, 512, 516-19, 522-24, 530-32, 545-46, 548-51, 553, 557, 560-64, 566-69,
571, 575, 588-90, 602, 604, 611-13, 623, 629, 687-88, 704, 715-16, 720, 734, 781-
82, 805, 818-19, 952, 1048, 1127, 1203-1204, 1360-62, 1375, 1409-1412, 1661-63,
and 2135.  Kline Decl. Ex. W.

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

*Issue 5:  Documents Identified in Toberoff Timeline*

### 5.    Unaccounted For Documents Identified In The Toberoff Timeline Document Should Be Produced Or Logged.

DC identified to defendants' counsel four communications described in the Toberoff Timeline that neither appear on defendants' logs nor have been produced. Kline Decl. Ex. Y at 577 ¶ 10 & n. 1.  Defendants' counsel said that two of the four documents did not exist; as to one of these, defendants' counsel pointed out that a different document of the same date had been produced.  *Id.* Ex. Z at 581-582. Defendants' counsel provided no response about the other two communications:  a May 13, 2003, letter from Michael Siegel to Ms. Larson, and a July 5, 2003, letter from Ms. Larson to Michael Siegel.  *Id.* Ex. AA at 584 ¶ 10.  DC pressed for further answers on these two documents, but defendants' response was uninformative.  *Id.* Ex. BB at 589 ("Documents related to the potential purchase of the Michael Siegel interest were sought by DC, produced in the Ohio action, and designated by Defendants in their December 7 letter.  Defendants have duly asserted privilege as to the remaining documents.").

These May 13 and July 5 letters, as they are described in the Timeline, would obviously be relevant to DC's claims and responsive to its document requests.  The July 5 letter purportedly documents Toberoff's false promises that induced the Siegel heirs to do business with him.  Am. Compl. Ex. A at 65-66.  In the May 13 letter, Michael Siegel allegedly advised Ms. Larson of the ways in which Toberoff obtained a controlling stake in the heirs' putative Superman copyrights for himself and reneged on promises he made to Ms. Larson and her mother to market their alleged rights.  *Id.* at 64-65.

Similarly, defendants recently informed DC that David Michaels, the purported author of the Toberoff Timeline, communicated with the Siegels between November and December 2005 in an attempt to "steal" them as clients from Toberoff.  Kline Decl. Ex. DD at 598.  In verified interrogatory responses, Toberoff

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1    stated, "In follow-up e-mails, Michaels advises the Siegels to cease all

2    communication with Mr. Toberoff, and he provides them with a termination letter

3    to give to Toberoff & Associates, as well as a new retainer agreement for the

4    Siegels to hire Michaels at a reduced contingency fee." *Id.*  The Siegels neither

5    produced nor logged any of these communications with Mr. Michaels, the

6    termination letter to Toberoff & Associates, or the proposed retainer agreement

7    with Mr. Michaels.  *See id.* Exs. S, W.  The communications have now been

8    identified for the first time in the privilege log just served by the Toberoff

9    defendants, on January 24, 2011.  *Id.* Ex. YY at 912, 913, 1057.  The failure of the

10   Siegel defendants to either produce or log these obviously relevant documents

11   underscores the manipulation of the discovery process by defendants.

12        DC anticipates defendants may argue they were not required to log these

13   communications, because Mr. Michaels was identified as "defense counsel" for

14   purposes of the parties' stipulation pursuant to which the Court entered its

15   December 7 order.  That assertion is specious.  Defendants acknowledge Mr.

16   Michaels was not providing legal advice in the subject documents, but was instead

17   trying to "steal" the Siegels as clients.  Kline Decl. Ex. DD at 598; *see Martin*, 278

18   F.3d at 1000.  Moreover, defendants' interrogatory responses disclosed the contents

19   of these communications, thereby waiving any conceivable privilege.  *E.g., Jacobs*,

20   117 F.3d at 91.

21        DC requests an order compelling defendants to produce the two letters

22   between Ms. Larson and Michael Siegel, or to submit a verified response that they

23   do not exist and have never existed.  In addition, defendants should be ordered to

24   produce the communications between Mr. Michaels and the Siegels starting in

25   November 2005, when Mr. Michaels became adverse to Toberoff.

26

27

28

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

*Issue 6: Dennis Larson Documents*

### 6.    DC Is Entitled To The Dennis Larson Documents.

Laura Siegel Larson was married for many years to Dennis Larson, a lawyer. Prior to their separation and divorce in 2000, Mr. Larson represented Ms. Larson, as well as Joanne Siegel.  Defendants have asserted privilege over all responsive communications related to Mr. Larson during this period of time.  Kline Decl. Ex. Z at 579 ¶ 1.  Following Mr. Larson's separation and divorce, defendants have refused to produce, log, or even search for such documents, claiming they are irrelevant.

Defendants' position is wholly unjustified.  They are under a court order to identify or produce all responsive documents and have no right or ability to withhold any documents on the ground of relevance.  Defendants expressly waived all relevance objections in the December 7 stipulated order.  Docket No. 133 at 1:8-18.  Furthermore, communications involving Mr. Larson, his ex-wife, Joanne Siegel, and others—after they were separated and during and after their divorce proceeding—no doubt included discussion of claims to Superman rights.  Such communications are both responsive to DC's requests, *supra* n. 6, and germane to its claims.  The Court should order defendants to search for and produce or identify all responsive communications involving Mr. Larson after January 2000.

*Issue 7:  Privilege Logs*

> **7.    Defendants' Privilege Logs Omit Critical Details And
> Should Be Supplemented To Protect DC's Rights.**

A party asserting privilege bears the burden of proving that a communication
is privileged, which requires providing sufficiently detailed information "to enable
the other party to evaluate the applicability of the privilege or protection."  *Martin*,
278 F.3d at 999; *Ramirez v. Cnty. of Los Angeles*, 231 F.R.D. 407, 410 (C.D. Cal.
2005); FED. R. CIV. P. 26(b)(5).  Defendants' privilege logs obscure the issues,
blurring who wrote or received certain documents and when, and giving no
meaningful indication as to the nature or subject matter of the withheld documents.
Despite obvious and specific ways in which this prejudices DC (discussed below),
defendants refuse to amend their logs on the ground that the same general format of
logging was approved by this Court in the *Siegel* cases.  Kline Decl. Ex. Y at 575 ¶
5.  But the specific defects in these logs and the prejudice they cause DC were *not*
before the Court in *Siegel* when it addressed the logs, and the new claims and
defenses asserted in this separate case necessitate a more searching examination of
defendants' privilege calls.

a.  Defendants are required to describe the subject matter of each document
withheld.  *E.g.*, *In re CV Therapeutics*, 2006 WL 1699536, at *2.  Defendants' logs
contain a generic "Document Description" category, which in virtually every
instance, consists of a single word:  "Letter," "Facsimile," "Email," or "Notes."
*See* Kline Decl. Exs. V, W.  Such "terse, non-descriptive labels" improperly prevent
DC from testing defendants' assertion of privilege.  *Dominguez v. Schwarzenegger*,
2010 WL 3341038, at *4 (N.D. Cal. Aug. 25, 2010).  For example, defendants
admit that their logs include communications related to the "consent
agreements," but that DC cannot identify based on the meager entries in the log.
Kline Decl. Ex. BB at 588 ¶ 5.  Defendants' withholding of these and other
documents cannot fully and fairly be challenged unless the logs are amended to

provide additional descriptive subject matters—*e.g.*, "Email re: draft consent agreement."

The necessity for meaningful subject-matter identification is heightened here given Toberoff's many different roles and his blurring of the line between and among them.  DC's claims and its discovery requests are directed to Toberoff's commercial activities as an "entrepreneur," movie "producer," "rights hunter," and businessman.  Docket Nos. 90 at 24-25, 91 at 13-18, 92 at 17-21.  Toberoff has told the *Wall Street Journal* he keeps defined firewalls between the work he does as a lawyer and producer, *supra* at 6, yet the privilege logs he has provided blur these distinctions and prevent DC from challenging defendants' privilege claims.  Privilege logs must contain descriptions sufficient to establish that the document includes "communications seeking legal advice," *Dominguez*, 2010 WL 3341038, at *4; *see also Parrick v. FedEx Grounds Package Sys.*, 2010 WL 2854314, at *8 (D. Mont. July 19, 2010), and yet defendants appear to be asserting privilege virtually every time a document is exchanged between Toberoff and the Siegels and/or Shusters, which is improper.

b.  Defendants also have obscured the identity of authors and recipients of withheld documents.  A log should identify the primary addressee; "[s]econdary addressee(s); persons copied and recipient (and the relationship of that person(s) to the client and/or author)."  *Miller v. Pancucci*, 141 F.R.D. 292, 302 (C.D. Cal. 1992).  Yet, defendants' logs contain only two columns for "Author" and "Recipient," without any identification as to who was copied ("cc" or "bcc") on a particular document.

Such basic information is particularly important due to the complex relationships and agreements between and among the Siegels, the Shusters, Toberoff the businessman, and Toberoff the attorney.  Without this information, DC has no ability to determine, for example, whether:

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

(1) Toberoff the attorney was merely copied by one of the heirs on a letter relating to business matters (meaning the document would not be privileged);

(2) Toberoff sent or received the letter in his capacity as executive of one of his companies (again, not privileged); or

(3) There are three are four communications in a chain of communications under one log entry, and a lawyer was not part of the full chain (meaning some or all of the chain is likely not privileged).

Defendants cannot shield unprivileged communications merely by copying an attorney. *Suezaki*, 58 Cal. 2d at 176; *U.S. v. Osborn*, 561 F.2d at 1338. Yet, their uninformative logs prevent DC from contesting any such untenable claims of privilege, as defendants themselves concede. Kline Decl. Ex. Y. The opacity of the logs also prevents DC from determining whether defendants waived any privileges by disclosing documents to third parties. *E.g.*, *Helm v. Alderwoods Grp., Inc.*, 2010 WL 2951871, at *1-2 (N.D. Cal. July 27, 2010) (unless author and recipient are adequately identified, party cannot tell whether privilege was "waived by showing the document to a third party"); *Vieste, LLC v. Hill Redwood Dev.*, 2010 WL 4807058, at *7 (N.D. Cal. Nov. 18, 2010) ("There is no attorney-client privilege to the extent that an attorney is acting in a nonlawyer capacity, e.g., transacting business…."); *Callaway Golf Co. v. Screen Actors Guild*, 2009 WL 81387, at *2 (S.D. Cal. Jan. 12, 2009) (same).

c.  That defendants' privilege logs track the format of a boilerplate form in the Rutter treatise, Kline Decl. at Y at 575 ¶ 5, is not dispositive. The Rutter form provides a template for privilege logs in cases involving a traditional attorney-client relationship—unlike here, where the attorney concededly acts in both a legal and business capacity, and where defendants concede their logs do not allow DC to identify particular documents such as the consent agreements. Under these circumstances, there can be no presumption that defendants' form logs suffice.

For the same reasons, it is not sufficient that defendants mirrored the form logs at issue in *Dole v. Melonas*, 889 F.2d 885, 890 (9th Cir. 1989). *Dole* merely

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1  held that, under the circumstances of that case, the responding party's format was

2  appropriate; it did not adopt a blanket rule for what information must be included in

3  a privilege log or when a responding party may be required to provide additional

4  detail, and certainly did not address the heightened standard that should apply

5  where, as here, the attorney operates as both a lawyer and business partner.

6          d.  Defendants' contention that they are not required to provide additional

7  information based on rulings in the *Siegel* case is equally without basis.  In 2006,

8  DC filed a motion to compel in the *Siegel* case following the Siegels' refusal to

9  produce any documents or privilege logs.  Case No. CV 04-8400, Docket No. 53 at

10 9-10, 12-23.  Because the Siegels refused to provide DC with a log before the

11 motion was served, DC could not challenge its contents.  *Id.* Docket No. 56 at 4.  In

12 an effort to moot DC's motion, the Siegels produced logs the night before their

13 opposition was due.  *Id.*  As a result, DC was restricted to the five pages allotted for

14 supplemental memoranda to challenge the sufficiency of information in the logs.

15 *Id.* Docket No. 56.  DC argued *generally* that the logs only identified documents

16 from a four-year time period, contained no subject-matter description, and omitted

17 identifying information.  *Id.*  DC did not—and could not—raise the objections

18 asserted here, which are based on the specific claims and defenses at issue in this

19 case, including the information that has come to light in late 2008 and later

20 concerning the Toberoff defendants' misconduct.  *See* Am. Compl. ¶¶ 1-12, 58-

21 104; Kline Decl. Exs. C, E, G.

22         Nor are the Court's rulings in the *Siegel* "law of the case," as defendants

23 suggest.  Those rulings do not address defendants' discovery obligations in this

24 case, and in any event, law of the case only applies where an issue "has already

25 been decided by the same court, or a higher court *in the identical case*."  *Thomas*,

26 983 F.2d at 154 (emphasis added); 18B C. WRIGHT, FED. PRAC. AND PROC. § 4478,

27 at 637-39 (2d ed. 2002) (law of the case only applies to matters decided in "the

28 course of a single continuing lawsuit").

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1    e. Defendants should be ordered to amend the "Document Description"

2    category in their logs to provide more descriptive subject matters, and amend the

3    "Identity of Recipient(s)" category to identify who is a "to," "cc," or "bcc" to the

4    communication, or if the recipient received the communication by other means.[10]

5    **C.    Conclusion**

6    For all the foregoing reasons, DC's motion should be granted.

---

[10] Defendants again proposed an improper *quid pro quo* for complying with their basic discovery obligations—offering to amend their logs to designate documents involving the "Consent Agreement" and "Toberoff Timeline," if DC agreed to designate documents on its logs relating to topics such as "DC's decision to sue Marc Toberoff."  Kline Decl. Ex. Z at 580 ¶ 5 .  DC rightly rejected this tactic. Defendants' proposal is not ripe in any event, since they have served no discovery in this case.

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

## IV.    RESPONDING DEFENDANTS' POSITION

### A.    The Issues in Dispute

(1)    Whether DC is entitled to obtain the "Consent Agreement," even though the Court *denied* DC's same motion to compel this document in the closely related *Siegel* action, and this settlement document is protected by the attorney-client privilege, the work-product doctrine and the negotiated provisions of the parties' JAMS Confidentiality Agreement?

(2)    Whether DC is entitled to obtain privileged legal retainer agreements and drafts thereof, and, if so, whether it will be obliged to produce its own legal retainer agreements in this case?

(3)    Whether DC should be permitted to re-litigate the accuracy of an entry in Defendants' privilege logs, which issue was specifically litigated and decided against DC in *Siegel*?

(4)    Whether there is any basis to produce additional documents relating to Michael Siegel which are protected by the joint interest privilege?

(5)    Whether the anonymous "Timeline," which is manifestly unreliable, is a reasonable basis for DC's motion to compel?

(6)    Whether the Court should simply order the reasonable compromise offered by Defendants regarding "Dennis Larson" communications?

(7)    Whether the format of Defendants' privilege logs, previously challenged by DC, but expressly approved by this Court in *Siegel*, is proper?

(8)    Should DC be sanctioned for its willful failure to abide by the Confidentiality Agreement?

### B.    Factual and Procedural Background

The procedural background of this case was previously set forth in detail in several motions before this Court.  *See, e.g.,* Docket No. 42 at 7-26.  The underlying lawsuit stems from a dispute between DC and the Heirs.  DC filed the instant suit against the Heirs as well as Marc Toberoff, the Heirs' long-time

- 45 -

counsel, who represented the Heirs in filing and/or enforcing statutory terminations

under the Copyright Act of Siegel and Shuster's old Superman grants, and who

successfully vindicated the Siegels' recaptured copyrights after litigating the matter

for six years.

DC served document requests, Defendants timely served responses and

amended responses, and, before the parties could resolve their dispute as to such

responses, the entire case was stayed.  Kline Decl., Exs. M-Q; Docket No. 109.

After the stay was partially lifted, the parties met and conferred, and Defendants

agreed to the production of documents and privilege logs pursuant to a stipulation,

which was approved by the Court on December 7, 2010.  Dockets Nos. 132-33.

Defendants timely and properly produced responsive documents on December 7,

2010, and privilege logs on December 15, 2010.  *See* Kline Decl., Exs. S, V-W.

From December 20, 2010 to January 10, 2011, the parties met-and-conferred on the

topics in dispute, and eliminated or narrowed many issues.  *See* Kline Decl., ¶ 26,

Exs. X-CC. [11]  On January 10, 2011, DC abruptly ended the meet-and-confer

process to serve this motion, but, despite its claims of urgency, waited until January

28, 2011 to do so.

While the procedural posture of this motion is simple, DC's "procedural

history" is larded with irrelevant and false statements designed to illicit prejudice:

- DC's hyperbolic claims of "rights trafficking," "unlawful agreements" and

  supposed "misconduct" relate to benign agreements voluntarily produced by

---

[11] This opposition is without prejudice to Defendants' position that discovery in this
action, including the discovery that is the subject of the instant motion, should be
stayed pending resolution of Defendants' motion to strike DC's state law claims
under California's anti-SLAPP law.  Although this Court has previously indicated
that the discovery stay under California's anti-SLAPP law does not automatically
apply in federal court, two more recent cases hold that the automatic stay does
apply in federal court, and that discovery should be stayed or limited during the
pendency of an anti-SLAPP motion.  *See Godin v. Schenks*, No. 09-2324, Slip Op.
at 23-25, 2010 WL 5175180  (1st Cir. Dec. 22, 2010); *In re NCAA Student-Athlete
Name & Likeness Litigation*, No. 09-1967 CW, 2010 WL 5644656 (N.D. Cal. Dec.
17, 2010).

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1    the Heirs in *Siegel* that expired in 2004 and 2005, and are barred by the

2    statute of limitations.  *See* Kline Decl., Exs. LL-OO; Docket No. 146-1 at 18-

3    22.   As discussed below, the sole "Consent Agreement" is not "unlawful" in

4    any way.

5  •  DC's claim that it "sued Toberoff … for [] acts of *business* misconduct – *not*

6    [his] litigation or related activities" (*supra* at 6) is incorrect.  DC's Fourth

7    Claim expressly stems from Mark Peary contacting Toberoff and asking for

8    his legal assistance in 2001, and Toberoff's subsequent filing and prosecution

9    of the Shuster estate's termination under the Copyright Act.  DC's Fifth

10   Claim stems from the Siegels' refusal to settle on DC's terms, and Toberoff's

11   subsequent successful enforcement of their termination rights in *Siegel*.  *See,*

12   *e.g.,* Docket No. 49 ("FAC"), ¶¶ 177, 182, 186; No. 98 at 6-9.

13  •  DC misrepresents to the Court that "[w]hen defendants refused to … agree to

14   a Rule 26(f) conference, DC was forced to file a motion seeking a

15   conference." *Supra* at 7.  On August 5, 2010, the parties scheduled a Rule

16   26(f) conference for Monday, August 16, 2010.  *See* Docket No. 45 at 23.

17   DC served its moot motion on Friday, August 13, 2010, the eve of that

18   scheduled conference.  *Id.*

19  •  DC also misrepresents this Court's September 20, 2010 order by intentional

20   omissions.  While this Court held "there's nothing that prevents [DC] from

21   commencing discovery," it also stayed depositions for one month to permit

22   Judge Wright to rule on Defendants' dispositive motions.  Docket No. 74.

23  •  DC claims that "[s]ince this lawsuit was filed, DC has learned that Toberoff

24   has attempted to pitch the Siegel's recaptured *Superman* rights to various

25   motion picture studios." *Supra* at 6.  DC omits both that it "learned" that

26   information through the Siegels' voluntary document production, and that the

27   Siegels have every right to "pitch" or license their recaptured rights to third

28   parties, as DC admits.  *See* Toberoff Decl., Ex. K at 1576:7-11 ("[DC's

- 47 -

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1    Counsel]:  [The Siegels], as a matter of law, can fully exploit Action Comics

2    No. 1 today, or anytime in the future, and gain whatever financial benefit

3    they can from it ….")

4    •   The "October 7" appellate action was *not* "aimed at derailing DC's

5    discovery." *Supra* at 8.  It was a simple appeal to preserve Defendants'

6    rights to attorney's fees, and Defendants filed no motion to stay in

7    connection therewith; the Court, *sua sponte*, entered a stay that Defendants

8    did not seek.  Docket Nos. 104, 109.

9    •   DC pretends the December 6 stipulation was the result of DC's "second

10    motion to compel," and that Defendants stipulated "[r]ather than oppose the

11    motion." *Supra* at 8.  In fact, DC served and filed that second moot motion,

12    while the parties were in the midst of a meet-and-confer that resolved the

13    issues through stipulation.  Toberoff Decl., ¶ 13, Ex. L; Docket Nos. 132-33.

14    •   DC's claim that "Defendants refused to produce [Joanne] Siegel on the

15    noticed date" of December 13, 2010 (*supra* at 9) is incorrect.  Defendants

16    informed DC well in advance of December 13 that Joanne was not available

17    that week due to pre-planned medical appointments, in letters DC omits from

18    their motion, and offered alternate dates of availability the week of January

19    10, 2011; DC attempted to compel her deposition, and then withdrew its

20    motion.  Toberoff Decl., Exs. M-N; Kline Decl., Ex. U at 387.

21    •   DC also **had no intention of taking Joanne Siegel's deposition on**

22    **December 13**.  DC stated in one of its motions that "the scheduled

23    depositions [including Joanne's deposition] ***cannot be taken*** … unless the

24    Court grants the relief sought."  Docket No. 125 at 1 (Notice) (emphasis

25    added).  The relief was for document production on **December 22**, well after

26    the supposed date for Joanne's deposition.

27    •   DC's claim that "[a]fter moving the Joanne Siegel deposition from December

28    to February, defendants filed a second interlocutory appeal, as well as a

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1    petition for writ of mandamus" is also false.  On December 15, 2010, the

2    parties scheduled Joanne's deposition for January 12 and 14, 2011.  Kline

3    Decl., Ex. U at 387.  On December 17, 2010, Defendants filed their writ

4    petition and second appeal.  On January 6, while the writ and appeal were

5    pending, *DC* asked that Joanne's deposition be rescheduled, and Defendants

6    agreed to February 1, 2011 to accommodate DC.  Kline Decl., Ex. XX.

7  •    While DC complains that Defendants' appeals obstructed DC's discovery,

8    such appeals were filed and resolved between December 17, 2010 and

9    January 12, 2011, when they were denied or dismissed for lack of

10    jurisdiction.  During this period, Defendants:  (a) met and conferred

11    regarding this motion; (b) rescheduled DC's deposition of Joanne Siegel,

12    which Defendants had already prepared for; and (c) set a date for

13    Defendants' further discovery responses.  *See* Kline Decl., Exs. U, Z-CC,

14    XX.

15    Defendants have followed this Court's directive that it expects counsel "to be

16  cooperative and none to be obstructive" (Docket No. 95 at 59:17-18) and have done

17  their best to reasonably respond to discovery, and to offer fair compromises to

18  resolve discovery disputes as they arise – all contrary to DC's contrived claims of

19  obstruction.

20    In fact, DC's overzealous and unnecessary motions caused this Court to

21  express its dismay over the voluminous motion practice in this case:

22    We have three motions.  They're all somewhat interrelated in my view.
    None of them justifies the amount of filing that's been done.  I counted
23    up.  I think there's six reams of paper that I've been presented with.
    Probably a total of 75 pages would have done for it all.
24

25  Docket No. 95 at 5:20-24 (denying DC's motion as moot).  DC's 41-page motion,

26  with 51 supporting exhibits totaling 1,110 pages, is particularly egregious.[12]

27  ───────────────
[12] Aside from larding their motion with irrelevant prejudicial hype, DC spends 5
28  pages on federal and California law relating to a *red herring* – settlement/mediation
    privileges (*supra* at 14-18) – before acknowledging that "Defendants … rely on

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

**C.**    **DC Should Not Be Granted the Relief It Seeks**

**1.**    **The "Consent Agreement" DC Seeks Is Privileged**

*a.*    **The "Consent Agreements" at Issue**

DC paints a false picture of a web of consent agreements that somehow ensnares the Siegels and the Shusters and that "forb[ids] them from freely disposing of their putative copyright interests in Superman." *Supra* at 11.  Nothing could be further from the truth.  There is only one "consent agreement" at issue and it does no such thing.  DC alleged in its complaint that "consent agreements" existed as follows:

> DC Comics is also informed and believes that Toberoff, Pacific Pictures, IP Worldwide, the Siegels, and the Shusters have entered into one or more agreements preventing the Siegels or Shusters from conveying rights to DC Comics or entering into other agreements with DC Comics, including for the settlement of their putative termination claims or litigation, without the consent of other parties.  For example, in the 2001 and 2003 Pacific Pictures Agreements, the Shuster Heirs agreed not to settle any claims with respect to the Superman rights without Pacific Pictures' or Toberoff's consent.  Such consent agreements are void as against public policy….

FAC, ¶ 101.  The "consent agreements" fall into two categories.  The first includes the 2001 and 2003 Pacific Pictures Agreements, and the 2002 IP Worldwide Agreement alleged in DC's complaint (FAC, ¶ 169), which were **all voluntarily produced** to DC in the *Siegel* Litigations with related documents, and which **terminated or expired long ago** by their own terms.  *See, e.g.,* Docket No. 78 at 8-9.  The second category of alleged "consent agreements" is as follows:

> "**Upon information and belief**, Toberoff has induced the Siegel and Shuster Heirs **to enter into additional agreements**, which prohibit either family from entering into agreements conveying rights to DC Comics without the express approval of all stakeholders in the heirs' rights – *i.e.,* the Siegel Heirs, the Shuster Heirs, and Toberoff and his companies."

FAC, ¶ 170 (emphasis added).  To be clear, and as DC is aware, there is only **one**

---

other arguments." *Id.* at 18.  DC spends 7 more pages discussing issues where Defendants made very reasonable offers of compromise to avoid motion practice (*e.g.,* the "retainer agreements," "Dennis Larson" documents, and the format of the privilege logs).  *Supra* at 28, 39-44; *see* Kline Decl., Exs. Z, BB.

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1   such alleged "consent agreement,"[13] which Defendants have accurately

2   characterized as a "collective bargaining agreement" between the Siegels and the

3   Shusters relating to their "settlement strategy" (the "Consent Agreement").[14]

4
5           b.      **The Consent Agreement Is Protected From Disclosure
                    under a Confidentiality Agreement and Court Order**

6           The Consent Agreement was specifically entered into by the Heirs in

7   anticipation of a court-ordered mediation and to articulate a settlement strategy.

8   Once the parties had submitted cross motions for summary judgment in *Siegel*, and

9   pursuant to a scheduling order that contemplated mediation after such motions were

10  decided, the parties discussed mediating settlement before the Hon. Daniel

11  Weinstein, a JAMS mediator.  *See* Toberoff Decl., Ex. E.  After Judge Larson

12  issued his March 26, 2008 order upholding the Siegel termination, he ordered the

13  parties to participate in settlement discussions.  *Siegel,* 542 F. Supp. 2d 1098, 1145

14  (C.D. Cal. 2008) ("After seventy years, Jerome Siegel's heirs regain what he

15  granted so long ago – the copyright in the Superman materials."); Toberoff Decl.,

16  Ex. F.

17          (1)     The Confidentiality Agreement

18          In advance of the court-ordered mediation, the parties carefully negotiated

19  and executed a JAMS Confidentiality Agreement on or about May 1, 2008 (the

20  "Confidentiality Agreement").  Kline Decl., Ex. K.  The Confidentiality Agreement

21  provided that *any* disclosures made under it would be kept strictly confidential.  *Id.*,

22  Ex. K, ¶¶ 5-7.  This agreement substantially strengthened the provisions of the

23  standard "JAMS Confidentiality Agreement," and was specifically negotiated by

24  ───────────────
    [13] DC makes much of the fact that the consent agreement was listed separately on
25  the Siegels' and the Shuster Heirs' privilege logs.  There is one document, which
    was sent in separate signed parts from the Siegels and the Shuster Heirs to their
26  counsel and is thus listed twice on the privilege logs.

27  [14] DC oddly complains of such descriptions as "changing labels" and a "shell
    game" (*supra* at 21-22).  Yet, Defendants have never used such descriptions to
28  shield the Consent Agreement from discovery, and each clearly refers to the same
    Consent Agreement.

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

the parties' counsel to ensure that the parties could speak freely during settlement

discussions and to absolutely ensure that such discussions would not be used by

either side in litigation.  Paragraph 5 of the Confidentiality Agreement provides:

> All parties, counsel and any other persons attending any Settlement
> Conference shall treat all such discussions as strictly confidential in
> every respect, including without limitation, the contents or substance of
> any oral or written statements made at the Settlement Conference, and
> all other substantive aspects of such Settlement Conference
> ('Confidential Settlement Information').  ***Without limitation, any
> document that is marked 'Confidential – For Settlement Purposes
> Only' and is disclosed or produced at or in connection with a
> Settlement Conference shall be treated as Confidential Settlement
> Information.  Confidential Settlement Information shall not be***
> disclosed to anyone other than the parties, their counsel or the mediator
> or ***used in any way, shape or form for any purpose, including
> impeachment, in any pending or future proceeding in any court, in
> whole or in part, directly or indirectly***, orally or in writing, except as set
> forth in paragraph 6 below.

*Id.*, Ex. K, ¶ 5 (emphasis added).  The paragraph does not refer to or rely on the

mediation or settlement privileges that exist in any event absent an agreement.  It is

a negotiated, unambiguous, stand-alone provision that was specifically added to the

standard JAMS agreement by the Siegels' counsel, and specifically approved and

accepted by DC.  Paragraph 6 provides that information will not be considered

Confidential Settlement Information (and may be disclosed) *only* if it is:

> "Documentation or ***information*** that is (a) publicly available, (b)
> already in possession of the adverse party or their counsel prior to its
> disclosure by a party or their counsel at a Settlement Conference, or (c)
> is developed independently of any Settlement Conference and without
> reference thereto, shall not be considered as Confidential Settlement
> Information, and pursuant to California Evidence Code § 1120, the use
> of such information shall have no effect on the admissibility or
> protection from disclosure of the information or documentation …."

*Id.*, Ex. K, ¶ 6.[15]  Paragraph 7 expressly limits disclosures to the Court regarding the

parties' settlement communications.  *Id.*, Ex. K, ¶ 7.  Finally, paragraph 1 states the

---

[15] DC attempts to use the fact that Paragraph 6 "cites" California Evidence Code §
1120 as evidence that paragraph 6 is *coextensive* with §1120.  *Supra* at 20-21.  In
context, paragraph 6 clearly acts as a ***limitation*** on Evidence Code §1120, as
documentation or information must fit in one of the three listed exceptions before
§1120 applies.

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1    Confidentiality Agreement "extends to all present and future civil, judicial, quasi-

2    judicial, arbitral, administrative or other proceedings." *Id.*, Ex. K, ¶ 1.

3

4                    (2)    The Disclosure of the Consent Agreement Under
                             Protection of the Confidentiality Agreement

5            DC's arguments that it "does not seek to compel the production of

6    'settlement discussions'" (*supra* at 20) and that it only "based its claims in this case

7    on the existence of underlying consent agreements" (Kline Decl., ¶ 39) are

8    disingenuous.  DC's allegations in paragraphs 101 and 170 of its complaint and

9    DC's motion to compel the Consent Agreement clearly "use" in this litigation

10   protected information disclosed under the Confidentiality Agreement in blatant

11   violation of the Confidentiality Agreement.  By letter to DC dated May 2, 2008 and

12   marked "***Confidential – For Settlement Purposes Only***," pursuant to paragraph 5

13   of the Confidentiality Agreement, the Heirs' counsel generally disclosed the

14   Consent Agreement.  The first sentence of the May 2 letter clearly states:  "This

15   letter is sent pursuant to the executed 'JAMS Confidentiality Agreement' and solely

16   in connection with the upcoming settlement mediation sessions."  Kline Decl., Ex.

17   PP. [16]   Yet, DC and its counsel quote this protected letter and attach it to this

18   motion in willful breach of their obligations under the Confidentiality Agreement.

19   *Supra* at 13; Kline Decl., Ex. PP.  Contrary to DC's suggestions, Defendants have

20   been consistent in their description of the Consent Agreement as a "collective

21   bargaining" agreement between the Heirs regarding settlement negotiations.  *Id.*

22   ("[N]either the Siegels nor the Shuster Estate will license, assign or otherwise

23   transfer their rights and interests in 'Superman' without the written consent of the

24   other." ).  The agreement is not unlawful in any respect.

25           DC and its counsel also quote and attach a follow-up letter dated July 3, 2008

26   sent by the Heirs' counsel under the Confidentiality Agreement, which stated that

27   _____
     [16] DC falsely asserts that Defendants "did not say [the Consent Agreement] had
28   been prepared solely for purposes of the mediation." *Supra* at 21.

                                              JOINT STIPULATION RE:
                                              DC COMICS' MOTION TO COMPEL

the Heirs' agreement to collectively  bargain is a communication signed by their
counsel and protected by the attorney-client privilege, joint interest privilege, and
attorney work product doctrine, as it "necessarily reflects a joint assessment of the
risks of litigation by the Siegels and the Shuster Estate as well as other strategic
thinking regarding this litigation."  Kline Decl., Ex. RR at 710-11.[17]

> (3)    DC's Motion and Complaint Violate the
> Confidentiality Agreement

DC, shamelessly, attaches to its motion the unredacted May 2, 2008 letter
and follow-up July 3, 2008 letter, both expressly stated to be "Confidential
Settlement Information" under the Confidentiality Agreement.  Kline Decl., Exs.
PP, RR.  Whatever DC's arguments about the Consent Agreement itself, DC cannot
possibly dispute that these letters sent under the Confidentiality Agreement
regarding settlement mediation and their use in this litigation constitutes a willful
breach of the Confidentiality Agreement.  DC's wholesale disclosure is manifestly
improper.[18]

DC's allegations and motion to compel the Consent Agreement likewise
violate the parties' Confidentiality Agreement.  Defendants had no independent
obligation to produce the Consent Agreement prepared for purposes of settlement
negotiation as it is protected by the attorney-client privilege and work product
doctrine, nor were Defendants obligated to log such privileged litigation
communication due to the parties' standing agreement in *Siegel* that neither side

---

[17]  DC argues that Defendants "did [not] suggest that the agreement was attorney-client privileged or attorney work-product." *Supra* at 21.

[18]  At a January 14, 2009 hearing, DC's counsel asked the Court if it could summarize the contents of these letters, but was stopped in his tracks:

> MR. BERGMAN: Would your Honor permit me to use the one-word adjective with which Mr. Toberoff described the letter?
> ***
> THE COURT: No.

Kline Decl., Ex. SS at 11:7-16.  DC blithely ignores such admonitions now.

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1    need log such "post-litigation" communications.  *See Siegel*, Docket No. 254 at 13.

2            DC learned of the Consent Agreement, and that the Heirs had thereby agreed

3    to collectively negotiate settlement with DC, solely pursuant to Defendants'

4    voluntary disclosure in reliance on the strict protections of paragraph 6 of the

5    Confidentiality Agreement.  DC vaguely claims, based on "information and belief,"

6    that there are "additional agreements" (FAC, ¶¶ 101, 170), but there is only the

7    Consent Agreement, and the only basis for DC's "information" is the Siegels'

8    protected disclosure.[19]  The disclosure of the Consent Agreement does not qualify

9    for any of the exceptions in paragraph 6 of the Confidentiality Agreement, as it has

10   never been publicly available, was not already in DC's possession, and DC's

11   knowledge of it was not "developed independently" of the mediation.  Thus,

12   pursuant to paragraph 5, the disclosure was Confidential Settlement Information

13   which ***cannot be*** "***used in any, way shape or form for any purpose***, including

14   impeachment, ***in any pending or future proceeding in any court, in whole or in***

15   ***part, directly or indirectly***, orally or in writing."  Kline Decl., Ex. K at ¶ 6

16   (emphasis added).

17           The Siegels and their counsel expressly relied on the Confidentiality

18   Agreement.  Indeed, the purpose of the Confidentiality Agreement was to allow the

19   parties to comfortably make disclosures in the course of a mediation that they

20   would not otherwise make, including privileged or confidential information that,

21   when disclosed, might further settlement.  As shown by the "redline" of the

22   Confidentiality Agreement, the key paragraph 5 and other provisions were added by

23   Defendants with the obvious intention of strengthening the protections in the

24   standard JAMS agreement.  *See* Kline Decl., Ex. J at 98-100.  DC makes a

25   mountain out of a molehill based solely on references elsewhere in the agreement to

26

27   ───────────────────────
     [19] Defendants were also not obliged to disclose the existence of the Consent
     Agreement in *Siegel*, as discovery had closed in 2007, and, as DC now concedes,

28   "the consent agreement was not directly relevant to DC's pleadings." *Supra* at 25.

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

the settlement and mediation privilege under California and federal law, and then

devotes the bulk of its arguments to attacking this straw man. *Supra* at 18-21. It is

clear that paragraph 5 provides contractual protections above and beyond that

which already exists by law without an agreement.

(4)    This Issue Was Conclusively Resolved Against DC
       in Siegel

On December 30, 2008, in breach of the Confidentiality Agreement, DC

moved in *Siegel* to compel the production of the Consent Agreement based on the

very same arguments DC makes in this motion. Toberoff Decl., Ex. J at 5-6. In

opposition, the Siegels asserted that the Consent Agreement was protected by the

Confidentiality Agreement, the attorney-client privilege, the joint-interest privilege

and the work product doctrine. *Id.*, Ex. J at 9-15. The Court *denied* DC's motion

and found the document privileged:

> THE COURT: Part of this is motivated simply by the Court's
> commitment to maintaining the settlement privilege. It was the Court
> that encouraged you to engage in that settlement effort, and I want to
> maintain the confidences that were agreed to during that period. So
> that motion is denied.

Kline Decl., Ex. SS at 12:15-19. DC misrepresents that "Judge Larson never made

any determination that the Consent Agreement was confidential, privileged, or

protected" (*supra* at 25), when Judge Larson did exactly that.

DC is thus precluded from re-litigating the issue of the Consent Agreement

by the "law of the case" doctrine, as such was already clearly litigated and held to

be privileged. The "law of the case" doctrine stands for the common-sense

principle that the same *issue* presented a second time in the same court should lead

to the same result, as to do otherwise "would create intolerable instability for the

parties." *Ridgeway v. Mont. High School Ass'n*, 858 F.2d 579, 587-88 (9th Cir.

1988). Thus, "a court is generally precluded from reconsidering an issue that has

already been decided by the same court." *Thomas v. Bible*, 983 F.2d 152, 154 (9th

Cir. 1993).  **The law of the case doctrine applies with equal force to closely *related* cases such as these**.  *See Disimone v. Browner*, 121 F.3d 1262, 1266-67 (9th Cir. 1997) (applying "law of the case" to related cases); *Casey v. Planned Parenthood*, 14 F.3d 848, 856 (3d Cir. 1994) ("[L]aw of the case rules apply to subsequent rulings by the same judge in the same case or a closely related one.").[20] DC must not be encouraged to relitigate every ruling in *Siegel* that went against it, and Judge Larson's order that the Consent Agreement should not be produced must be respected.

### c.    DC's Settlement and Mediation Privilege Arguments Are Wrongheaded

After DC spends four pages attacking the general settlement and mediation privilege (*supra* at 15-18), it acknowledges that "Defendants … rely on other arguments."  *Id.* at 18.  Thus, DC's Sections III.B.1.b-c, *supra*, are irrelevant, and DC included them solely to set up and attack the erroneous "straw man" that Defendants seek to shield a discoverable document via disclosure in a settlement mediation.  Nonetheless, Defendants briefly address two issues.

DC complains that the Consent Agreement should not "continue[] … well after any mediation sessions were terminated."  *Supra* at 17.  The parties held settlement mediations with the Hon. Daniel Weinstein in May-June 2008, September 2009, and April 2010, and, pursuant to a Court order, the parties are currently before Judge Weinstein in the *Siegel* action.  *Siegel*, Docket No. 636.  The mediation sessions have not terminated, and in fact have periodically resumed at

---

[20] *See also U.S. v. Musick*, 534 F. Supp. 954, 957 (N.D. Cal. 1982) ("[T]he general rule is that a decision in one case is … the law of the case in a related action if it involves the same subject matter and if the points of decision and facts are identical."); *Moss v. Crawford & Co.*, 201 F.R.D. 398, 401 n.1 (W.D. Pa. 2000) (the "law of the case" doctrine applies to issues determined in "closely related" cases); *Mason v. Texaco, Inc.*, 741 F. Supp. 1472, 1492 (D. Kan. 1990) (the "law of the case doctrine 'encompasses … the rulings of another judge … [in] a closely related case.'").

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1    DC's request.  Moreover, the Confidentiality Agreement expressly states that its

2    protections "extend[] to all present and future, civil [or] judicial … proceedings."

3    Kline Decl., Ex. K, ¶¶ 1, 5.

4         DC also nonsensically complains that the Consent Agreement has "impeded

5    and continue[s] to impede DC Comics' rights, far outside the auspices of any

6    mediation."  *Supra* at 17.  The only purported "rights" DC could possibly be

7    referring to is the non-existent "right" to settle a case.  Aside from DC having no

8    such right, nothing in the Consent Agreement prevents DC from negotiating

9    settlement with the Heirs or making any settlement offers it desires.[21]

10

11            *d.*    **The Consent Agreement Remains Privileged**

12                (1)    Attorney-Client Privilege and Work Product
                        Protection Applies to the Consent Agreement
13
         In opposition to DC's prior motion to compel the Consent Agreement that
14
     was denied by Judge Larson, Defendants successfully asserted that the Consent
15
     Agreement was protected by the attorney-client privilege and attorney work product
16
     doctrine.  Toberoff Decl., Ex. J at 9-15.  The attorney-client privilege protects
17
     confidential attorney-client communications from disclosure.  *See* F.R.E. 501
18
     (applying common law of privilege to federal court proceedings); *Clarke v.*
19
     *American Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992).  The privilege
20
     encompasses documents that reveal, involve or implicate legal advice, litigation
21
     strategy or litigation motives of a party.  *Id.* at 129.  The Consent Agreement
22
     constitutes a communication among the Heirs and their counsel Mr. Toberoff, and
23
     reflects Mr. Toberoff's legal advice to his clients and legal strategies regarding
24
     settlement of their termination interests.  Accordingly, it is absolutely privileged
25

26   _____
     [21] DC cites inapplicable cases, involving unprotected misconduct during mediation,
27   such as "threats" or "wrongdoing."  *Supra* at 14-18.  *See also id.* at 18 ("Section
     1121 prohibits a mediator from disclosing such misconduct, but expressly allows a
28   party like DC to do so.").  There is no basis to allege any such misconduct by
     Defendants.

- 58 -
                                            JOINT STIPULATION RE:
                                        DC COMICS' MOTION TO COMPEL

1   and duly listed on the Heirs' privilege logs in this case.  *See United States v.*

2   *Martin*, 278 F.3d 988, 999-1000 (9th Cir. 2002); Kline Decl., Ex. V at 389, Ex. W

3   at 506.

4        It is also protected by the work product doctrine, as it "reveal[s] an attorney's

5   strategy [or] evaluation of strengths and weaknesses."  Schwarzer, *et al.*, *Fed. Civ.*

6   *Proc. Before Trial* § 11:285 (2010), *citing Hickman v. Taylor*, 329 U.S. 495, 511

7   (1947).  *See* F.R.C.P. 26(b)(3).  The Consent Agreement naturally entails and

8   reflects counsel's legal strategy for the settlement of the *Siegel* litigation, as well as

9   counsel's evaluation of the relative strengths and weaknesses of this case, and

10  discusses both subjects in detail.  This is precisely the sort of document that is to be

11  protected by the attorney work-product doctrine.

12        In opposition to this, DC argues that the Consent Agreement is a "business

13  arrangement[] concerning the disposition of monetary interests and rights, and such

14  communications, even with a lawyer, are subject to discovery."  *Supra* at 24.  No

15  case cited by DC stands for such proposition.  *See Martin*, 278 F.3d at 1000-01

16  (attorney-client privilege did not apply because there was insufficient evidence to

17  show an attorney-client relationship, no privileged communications were divulged,

18  and, if privileged communications were divulged, they were subject to the crime-

19  fraud exception); *Montgomery County v. MicroVote Corp.*, 175 F.3d 296, 304 (3d

20  Cir. 1999) ("fee arrangements" not privileged).  DC does not and cannot cite any

21  case where two clients' agreement as to a strategy to settle their dispute with a

22  common adversary, communicated through their attorney, was not protected.

23  Notably, *Minebea Co., Ltd. v. Papst,* 355 F. Supp. 2d 526, 529 (D.D.C. 2005), cited

24  by DC, points in the ***opposite*** direction.[22]

25  ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

[22]  The *Papst* Court stated, with respect to work-product:

26      "'[L]itigation need not be imminent or certain in order to satisfy the anticipation-of-litigation prong of the test, this circuit has held that 'at the

27      very least some articulable claim, likely to lead to litigation, must have arisen,' such that litigation was 'fairly foreseeable at the time' the materials

28      were prepared.'" *Id.* at 529.

1      The Ninth Circuit has expressly stated that work-product protection applies

2  "when it can fairly be said that the 'document was created because of anticipated

3  litigation, and would not have been created in substantially similar form but for the

4  prospect of that litigation.'"  *In re Grand Jury Subpoena*, 357 F.3d 900, 908 (9th

5  Cir. 2004) (citation omitted).  The Consent Agreement was prepared with respect to

6  settlement of ongoing litigation, and is by no stretch a mere "business

7  arrangement." *Supra* at 23-24.  It is clearly covered by work-product protection.

8      DC also seeks "any conflict waivers signed in connection with the [Consent

9  Agreement]." *Supra* at 26.  DC provides no support for its claim that such conflict

10  waivers are discoverable.  Like the Consent Agreement, such a conflict waiver

11  would be a privileged attorney-client communication that reflects confidential

12  advice from an attorney to his clients, and subject to work product protection as it

13  reflects detailed analysis of the case and the Consent Agreement.  *See Asset*

14  *Funding Group, LLC v. Adams & Reese, LLP*, 2008 U.S. Dist. LEXIS 116931, at

15  *5-8 (E.D. La. Sept. 20, 2008) (finding conflict waiver privileged).

16      (2)    There Has Been No Waiver of Privilege

17      Nor have Defendants waived privilege as to the Consent Agreement by

18  disclosing its existence to DC in connection with the parties' mediation and

19  pursuant to the Confidentiality Agreement.  *See* Kline Decl., Exs. PP, RR.  The

20  Confidentiality Agreement expressly states that "[t]he privileged character of any

21  information or documents is not altered by disclosure to the mediator or disclosure

22  in any Settlement Conference."  Kline Decl., Ex. K at ¶ 4.  The reason for this is

23  highlighted by DC's specious claim that "any privilege concerning [the Consent

24  Agreement] was knowingly waived when defendants chose to disclose the *existence*

25  of the agreements to DC." *Supra* at 23 (emphasis added).  The Confidentiality

26  Agreement preempts such a waiver claim.

27      Even without the Confidentiality Agreement, the disclosure that documents

28  or communications exist does not waive privilege; only the disclosure of the

1  *contents* of the communications, which did not occur here, would waive privilege.

2  *See Weil v. Investment/Indicators, Research & Management*, 647 F.2d 18, 24 (9th

3  Cir. 1981) ("[V]oluntary disclosure of the **content** of a privileged attorney

4  communication constitutes waiver of the privilege ....") (emphasis added); *Chevron*

5  *Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (noting waiver extends

6  "only [] to communications about the matter actually disclosed").

7       Nor do Defendants' motions to dismiss DC's claims regarding the Consent

8  Agreement waive privilege.  DC disingenuously claims that its "complaint did not

9  advert to the agreement or defendants' statements regarding its terms specifically"

10  (*supra* at 24), when DC specifically alleged "upon information and belief" the

11  existence of "agreements, which prohibit either family from entering into

12  agreements conveying rights to DC Comics without the express approval of all

13  stakeholders in the heirs' rights" – clearly referring to the Consent Agreement.

14  FAC, ¶¶ 101, 170.  DC then cites its **own** statements to claim that **Defendants** have

15  waived privilege.  *See supra* at 24, citing Docket No. 90.  The only statements

16  made by Defendants in their motions are at the same level of generality as found in

17  DC's Complaint, and cannot form the basis of a "waiver" claim.  *See* Docket No.

18  78 at 2-3, 9-10, 16-24; *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d

19  1322, 1326 (9th Cir. 1995) (holding that "waiver of the attorney-client privilege

20  occurs when … through [an] affirmative act [such as filing a complaint], *the*

21  *asserting party puts the privileged information at issue*….") (emphasis added).

22

23              *e.*    **The Court Need Not Resolve Arguments About the**
                        **"Consent Agreement" Now**
24

25       DC's "consent agreement" allegations are subject to Defendants' Anti-

26  SLAPP motion to strike, and Defendants' motion to dismiss DC's Third and Sixth

     Claims as a matter of law, which will be decided by Judge Wright.  *See* Docket
27
     Nos. 145-1 at 19-22, 24-25; 147-1 at 18-24.  Instead of wading into this morass,
28

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

and risking inconsistent rulings, this Court can defer its ruling until Judge Wright

determines whether the Third and Sixth Claims and DC's allegations as to "consent

agreements" should be struck.  If the claims are dismissed and/or struck, the

Consent Agreements would not be relevant to DC's other claims, and would not

need to be produced.

### f.    **The Consent Agreement Is Proper**

Lastly, DC argues that the Consent Agreement is improper.  It is not, as it is

nothing more than the Heirs' agreement to collectively bargain settlement with DC.

The Consent Agreement in no way "violates" the Copyright Act as asserted

by DC.  *See* Docket No. 147-1 at 9-10.  The section under which DC erroneously

claims "rights," 17 U.S.C. § 304(c)(6)(D), simply provides that a "further grant, or

agreement to make a further grant, of any right covered by a terminated grant is

valid only if it is made after the effective date of the termination," but that an

"agreement for such a further grant may be made between the author or [his heirs]

and the original grantee or such grantee's successor in title, after the notice of

termination has been served."  *See Bourne Co. v. MPL Commc'ns, Inc.*, 675 F.

Supp. 859, 864-65 (S.D.N.Y. 1987) (holding that "[§ 304(c)(6)(D)] does give the

terminated grantee a preferred competitive position" but that "[t]he statute neither

compels the terminating party to negotiate with the terminated grantee, nor forbids

him from negotiating with anyone else" and does not create a "right of first refusal"

or other right); 3 M. Nimmer & D. Nimmer, Nimmer § 11.08[A], n.6 (2010)

(stating that "it is inaccurate to refer to this [§ 304(c)(6)(D)] advantage as 'an

exclusive period of negotiation'").  As noted by another leading copyright

authority, a terminated grantee has "no rights under [§ 304(c)(6)(D)], cannot sue for

failure to comply, and the provision [] does not provide a basis for standing."  3 W.

Patry, *Patry on Copyright,* § 21:18.

By the Consent Agreement, the Heirs did not grant or agree to grant any right

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1  covered by a terminated grant.  DC itself alleges that the Consent Agreement

2  simply "prohibit[s] either family from entering into agreements conveying rights …

3  without the express approval of all stakeholders in the heirs' rights" (FAC, ¶ 170),

4  demonstrating that the Consent Agreement is not covered or prohibited by the plain

5  wording of § 304(c)(6)(D), as a matter of law.

6      DC's claim that the Consent Agreement is against public policy "even if it is

7  only the Siegels who can bind the Shusters and vice versa" (*supra* at 23) is

8  nonsensical.  The Heirs are free to conduct settlement negotiations with DC as they

9  see fit, and to avoid DC's divisive bargaining tactics by collectively negotiating

10  with DC.   DC's cited authorities merely recite the well-worn principles that all

11  clients must give informed consent to a settlement, and the policy that an attorney

12  cannot settle a case without his clients' consent.  *See Tax Authority, Inc. v. Jackson*

13  *Hewitt, Inc.*, 187 N.J. 4, 21 (N.J. 2006) (holding that a "majority rules" provision

14  when multiple clients are represented is invalid); Cal. Rules of Prof'l Conduct 3-

15  310(D) (2010) (requiring the "informed written consent of each client" for an

16  "aggregate settlement of claims").  The Consent Agreement requires precisely that

17  – the consent of the Siegels and Shuster Estate, ***not*** their attorney Mr. Toberoff, to a

18  settlement of their termination rights with DC.[23]

19      DC also falsely asserts that the Consent Agreement "show[s] how defendants

20  illegally parked the Shusters' interest in Superboy with the Siegels."  *Supra* at 6.

21  DC cites no evidence for its accusations, and its underlying assumption is

22  erroneous.  Due to a binding 1947 judicial determination that Siegel was the sole

23  creator of Superboy, the Shuster estate did not serve a statutory termination notice

24  with respect to Superboy.  *See* Docket No. 148-1 at 17-18.

25

26  ---
[23] As such, DC's citations to cases such as *Calvert v. Stoner*, 33 Cal. 2d 97, 103

27  (1948), which stand for little more than the proposition that a "contract providing
that the client may not compromise the suit without the consent of his attorney is

28  against public policy and void" are misplaced.  The Consent Agreement provides
no such thing.

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1       Lastly, DC falsely suggests throughout that Mr. Toberoff hypnotized the

2  Siegels and Shusters into various agreements, including the Consent Agreement.

3  *See, e.g., supra* at 11, 24 ("Toberoff induced the Shuster Heirs," "Toberoff forced

4  the Siegels," "points to conflicts of interests and impermissible constraints on a

5  client's freedom of choice").  The notion that Mr. Toberoff somehow forced his

6  clients into such agreements is rebutted by his ongoing representation of them, after

7  DC maliciously sued and maligned Mr. Toberoff in this lawsuit.  DC's tactics are

8  transparent:  interfere with Mr. Toberoff's representation of the Heirs, and "divide

9  and conquer" the Defendants, to leverage a below-market repurchase of the Heirs'

10  Superman interests.

### 2.    The Retainer Agreements Are Privileged

12       In their efforts to intrude upon Mr. Toberoff's longstanding attorney–client

13  relationship with the Heirs, DC insists on his firm's retainer agreements.  The Ninth

14  Circuit has held that, aside from an attorney's fee, which is not privileged, retainer

15  agreements which "reveal the motive of the client in seeking representation,

16  litigation strategy, or the specific nature of the services provided," are protected by

17  the attorney-client privilege.  *Clarke v. American Commerce Nat'l Bank*, 974 F.2d

18  127, 129 (9th Cir. 1992).  The Ninth Circuit clearly distinguishes between routine

19  "fee" information and more substantive information in retainer agreements that

20  constitute privileged attorney-client communications:

21        "The subpoenas quoted above demanded more than the amount of attorney
fees and manner of payment. The government sought attorney time records
22        describing the services performed by the attorneys, ***retainer agreements***,
contracts, ***letters of agreement***, and related correspondence. ***We believe this***
23        ***type of demand to be an unjustified intrusion into the attorney-client***
***relationship***.
24        ….
Accordingly, correspondence between attorney and client which reveals the
25        client's motivation for creation of the relationship or possible litigation
strategy ought to be protected. Similarly, bills, ledgers, statements, time
26        records and the like which also reveal the nature of the services provided,
such as researching particular areas of law, also should fall within the
27        privilege. On the other hand, ***a simple invoice requesting payment for***
***unspecified services rendered reveals nothing more than the amount of the***
28        ***fee and would not normally be privileged***…."

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1  *In re Grand Jury Witness*, 695 F.2d 359, 362 (9th Cir. 1982) (emphasis added).  *See*

2  *also In re Grand Jury Subpoenas*, 906 F.2d 1485, 1492 (10th Cir. 1990) (fee

3  agreements containing privileged information are privileged).

4       Defendants' cases do not stand for the proposition that it is "well settled" that

5  retainer agreements are discoverable (*supra* at 28), but rather for the proposition

6  that fee arrangements are not privileged.  *See Goodman v. United States (In re*

7  *Grand Jury Proceedings)*, 33 F.3d 1060, 1063 (9th Cir. 1994) (only "unprotected

8  fee information" was sought); *Montgomery County v. MicroVote Corp.*, 175 F.3d

9  296, 304 ("fee arrangements" not privileged).  As Defendants clearly maintained

10  their privilege objection by logging the retainer agreements, the December 7 Order,

11  which expressly permitted privileged documents to be withheld (Docket No. 133 at

12  1:10-14) did not require the production of the Retainer Agreements, as DC implies.

13       In the interests of compromise, Defendants nonetheless offered to produce

14  their retainer agreements, if DC would agree to do likewise:

15

16       DC's retainer agreements and the information therein – such as the date of
        your firm's retention, and the existence therein of indemnification provisions
        regarding your SLAPP suit and malicious prosecution of opposing counsel

17      and our potential counterclaims – will be very relevant to defendants'
        counterclaims.  Defendants remain willing to produce redacted copies of

18      their retainer agreements, if DC will agree to produce its.

19  Kline Decl., Ex. Z.  This proposal was made to avoid burdening the court with this

20  motion and a further motion to compel DC's retainer agreement.  DC insists that

21  Defendants' retainer agreements are relevant and not privileged, while arguing that

22  DC's retainer agreements are irrelevant and/or privileged.  Defendants sought to

23  pre-empt such hypocrisy.  DC's attempt to turn a reasonable compromise offer into

24  Defendants "recognizing the impropriety of their blanket refusal" (*supra* at 28) is a

25  deterrent to compromise destined to burden this Court with further motion practice.

26       Furthermore, DC cites no authority whatsoever for its claim that ***drafts*** of

27  retainer agreements are not privileged.  Such drafts would reveal and, by their

28  differences, highlight thought processes, motives and strategies held to be

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

privileged communications and, as such, would particularly be "an unjustified intrusion into the attorney-client relationship." *In re Grand Jury Witness*, 695 F.2d at 362.

### 3.  DC's Attempt to Re-Open the Privilege Log Issue is Improper

DC moves to compel production of an alleged letter from Laura Siegel to Michael Siegel (the "Alleged Letter") based on the supposed anonymous receipt and cursory review by Warner Bros.' in-house counsel, Wayne Smith ("Smith"), in June 2006, of reams of confidential and privileged documents *stolen* from Mr. Toberoff's legal files in November 2005.[24]

DC has made this exact argument no fewer than *four* times in the *Siegel* litigation, and each time was rejected by the Court:

- In support of DC's first motion to compel the production of the stolen documents in *Siegel*, Smith specifically declared that among other things, the stolen documents included un-produced correspondence between Laura Siegel and her "estranged step-brother, Michael Siegel." Kline Decl., Ex. TT, ¶ 9; Toberoff Decl., Ex. B, ¶ 3. The Siegels stated that responsive documents had either been produced or logged. On April 30, 2007, this Court ordered a simple protocol, by which the stolen documents were listed by their bates number as either being produced or on a privilege log, and that logged documents be returned to the Siegels. Kline Decl., Ex. UU. The Alleged Letter was matched up to the Siegels' "supplemental privilege log # 82." *See* Kline Decl., Ex. VV, ¶¶ 6-7. Notably, DC never moved for review of this Court's ruling pursuant to L.R. 72-2.1.

- On September 17, 2007, after the reference to this Court had been cancelled

---

[24] Even though Smith swore that he merely "thumbed through" (Kline Decl., Ex. TT, ¶ 3) the stolen documents, DC specifically identified a letter between Laura and Michael Siegel, identified it as corresponding to the bates numbers of certain stolen documents, and claimed that the letter was improperly listed on the Siegels' privilege logs. *See* Toberoff Decl., Ex. G at 4:27-5:19; Kline Decl., Ex. VV, ¶¶ 6-7.

1    in *Siegel*, DC then filed a further motion to compel regarding the stolen

2    documents. *Siegel*, Docket No. 240.  DC specifically contended that

3    "[a]mong the 'non-privileged' Escrow Documents was correspondence [the

4    Alleged Letter] concerning … Michael Siegel.  That correspondence has

5    never been produced…." *See* Toberoff Decl., Ex. C at 20:15-22:26.

6  •    After the Siegels submitted a declaration as to their compliance with this

7        Court's April 30, 2007 order, DC filed a new declaration claiming that the

8        Siegels' privilege logs were inaccurate, based, among other things, on the

9        Alleged Letter.  Toberoff Decl., Ex. D, ¶¶ 48-51.

10  •   In a later filing, DC again argued that "[o]ne of the Escrow Documents that

11       has not been produced is believed to be a communication [the Alleged Letter]

12       from plaintiff Laura Siegel Larson to Michael Siegel."  Toberoff Decl., Ex. G

13       at 5.

14       On September 26, 2008, Judge Larson rejected DC's repeated challenge to

15  the Siegels' privilege logs, including their attempt to compel the Alleged Letter.

16  The Court ruled that the April 30, 2007 order is "the law of the case," and that the

17  time to appeal it "has long since expired."  *See* Toberoff Decl., Ex. H at 5.  The

18  Court noted that DC had "sought to litigate the propriety of the invocation of

19  privilege contained in prior privilege logs," but that the Court "was not inclined to

20  entertain" further arguments on this subject.  *Id.*, Ex. H at 2-3.  The September 26,

21  2008 order considered DC's arguments as to the purported inaccuracy of the

22  Siegels' privilege logs, and upheld the "privilege log entries … in Mr. Toberoff's

23  May 21, 2007 declaration," made pursuant to this Court's April 30, 2007 order.  *Id.*,

24  Ex. H at 5.

25       Although the Court had clearly denied DC's challenge to the Siegels'

26  privilege logs based on Smith's recollection of the Alleged Letter, DC's "neutral

27  escrow" attorney wrote to the Court *ex parte* on October 16, 2008 advocating that

28  he be permitted to effectively peek beneath the logs by "matching up" privileged

1    escrow documents, listed in Mr. Toberoff's declaration, to their log entries.  *See*

2    Toberoff Decl., Ex. I at 1.  The Court rejected DC's ***fifth*** attempt to challenge the

3    privilege logs, and ended the matter on December 4, 2008, ordering the escrow

4    holder to finally disburse the stolen documents:

5         No. The escrow holder is not to compare the description of each document in
         Toberoff's declaration [listing logged documents by their Bates nos.] to the
6         corresponding escrow document to ensure the description's accuracy.

7    *Id.*, Ex. I at 4.  Thus, the Alleged Letter, and the accuracy of the Siegels' privilege

8    logs, including the Alleged Letter issue, was clearly before Judge Larson, who ruled

9    unequivocally against DC on these issues.  As this Court has already held, Judge

10   Larson's September 26 and December 4, 2008 rulings should not be revisited here:

11        "Judge Larson has indicated, ruled that the letter [that purported to describe
         privileged communications] had to be turned over.  And I'm not going to
12        revisit that ruling.  And I'm not going to voice an opinion as to whether I
         would have issued the same ruling despite [what] I think [] the parties are
13        trying to get me to do."

14   Docket No. 95 at 55:24-56:1.  Such rulings in the closely related *Siegel* case are the

15   "law of the case" here as to the same already-decided issues.  *See id.*; *Disimone*,

16   121 F.3d at 1266-67; *Casey*, 14 F.3d at 856; *Musick*, 534 F. Supp. 954.  This matter

17   was long ago disposed of in *Siegel* and there is no basis to revisit it.   DC has

18   presented no new information, and it must not be permitted or encouraged to use

19   this action to re-litigate every decision that went against it in *Siegel*.

20        **4.        No Further Michael Siegel Documents Should Be Produced**

21        In *Siegel*, DC specifically moved in 2008 in the United States District Court

22   for the Northern District of Ohio, for *in camera* review and to compel production of

23   the same communications between Michael Siegel and Laura Siegel dated "after

24   settlement negotiations broke down between [DC] and [the Siegels]," as it now

25   moves to compel, but was expressly rejected.  Kline Decl., Ex. G at 6.  DC is

26   precluded by the "law of the case" doctrine from re-litigating such issues.

27        The district court had granted a prior motion by DC as to documents

28   "relate[d] to the offers back and forth between Toberoff, on behalf of an investor

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1   who wishes to purchase Michael Siegel's interest and [Michael's attorney Don]

2   Bulson on behalf of Michael Siegel," because they did "not relate to settlement

3   offers regarding [DC] or the risk of litigation."  Kline Decl., Ex. E at 3.  DC

4   thereafter challenged the Siegels' invocation of the "joint interest" privilege as to

5   *all* communications between Laura Siegel and Michael Siegel after settlement

6   negotiations with DC had broken down.  Kline Decl., Ex. F; *see also* Toberoff

7   Decl., Ex. A at 8.  The district court rejected DC's motion to compel, finding that

8   Laura and Michael Siegel shared a joint interest in the *Siegel* litigations and stated

9   its prior rejection of joint interest as to a specific investor's buy-out offers to

10  Michael Siegel did not "cast the entire process into question."  Kline Decl., Ex. G

11  at 6.

12      Notwithstanding the above, DC seeks documents 1203-04, 1360-62, and

13  1375, which are 2006 communications between Bulson and the Siegels' counsel,

14  that relate to Bulson's response to a subpoena served by DC.  At that point in the

15  *Siegel* litigation, Michael Siegel was deceased and Laura Siegel was his sole

16  beneficiary under Ohio intestacy law.  As such, the interests of Bulson's client,

17  Michael Siegel, and those of his beneficiary, Laura Siegel, were aligned.  Such

18  communications, made for the purpose of coordinating a common legal strategy on

19  behalf of clients with a joint interest, are privileged.  *See Eisenberg v. Gagnon*, 766

20  F.2d 770, 787-788 (3d. Cir. 1985) (recognizing that "communications to an attorney

21  to establish a common defense strategy are privileged even though the attorney

22  represents another client with some adverse interests."); *U.S. v. Under Seal*, 902

23  F.2d 244, 249 (4th Cir. 1990)(collecting cases) ("[T]he rationale for the joint

24  defense rule remains unchanged: persons who share a common interest in litigation

25  should be able to communicate with their respective attorneys and with each

26  other…"); *Griffith v. Davis*, 161 F.R.D. 687, 692 n.6 (C.D. Cal. 1995) (holding that

27  the interest applies even if the parties' interests "may even be adverse in some

28

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1  respects").[25]

2      Lastly, DC's hyperbolic statement that "[t]he Siegel defendants tried for

3  years to secure Michael Siegel's rights for themselves or for mysterious unnamed

4  'investors'" (*supra* at 34) is unsupported.  The documentary evidence DC proffers

5  shows only that, in or before June 2003, Toberoff made an offer on behalf of an

6  investor to purchase Michael Siegel's interest, and that negotiations continued, off

7  

8  [25] DC's motion is also moot as to the following five documents:

| 687 | 4/29/2003 | Atty Marc Toberoff | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Defendants' Counsel |
| 688 | 4/30/2003 | Atty Marc Toberoff | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Defendants' Counsel |
| 734 | 1/17/2004 | Atty Marc Toberoff | Atty Don Bulson | E-mail | Atty/Client-Joint Interest | Defendants' Counsel |
| 805 | 8/9/2004 | Atty Don Bulson | Atty Marc Toberoff | E-mail | Atty/Client-Joint Interest | Defendants' Counsel |
| 952 | 10/12/2004 | Atty Don Bulson | Atty Marc Toberoff | E-mail | Atty/Client-Joint Interest | Defendants' Counsel |

To generate their privilege logs, Defendants reviewed their correspondence and files for documents responsive to DC's requests.  However, because DC's requests were extremely overbroad, demanding all documents "relating to" the Heirs' terminations and thus the entire *Siegel* litigation (*e.g.*, Kline Decl., Ex. O at 165, Ex. P at 175), Defendants incorporated prior logs served in *Siegel* in their new privilege logs.  Defendants re-reviewed their legal files as to the documents specified in this motion and determined the following:

- Defendants cannot locate document no. 687 (a 4/29/03 letter from Toberoff to Bulson) in either their own or Bulson's files.  It appears likely that this entry is the 4/30/03 letter from Toberoff to Bulson that was produced and is attached to DC's motion.  Ex. H at 81.

- Document No. 688 has already been produced.  *See* Ex. H at 56.

- Document No. 734 is a typo carried over from Bulson's prior logs, which listed the 1/17/0**5** e-mail from Toberoff to Bulson, as a 1/17/0**4** e-mail.  The document was produced and is attached to DC's motion.  Ex. H at 81.

- Document No. 805 was recently produced to DC, based on the rationale of the Ohio district court's order.

- Document No. 952 is a typo carried over from Bulson's prior logs, which listed the 1**1**/12/04 e-mail from Bulson to Toberoff as a 1**0**/12/04 e-mail.  Defendants cannot locate Document No. 952.  That document was produced and is attached to DC's motion.  Ex. H at 68.

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1    and on, for eighteen months until January 2005.  *See* Kline Decl., Ex. H.  Also, far

2    from being "mysterious" or "unnamed," DC previously identified that "investor" as

3    Ari Emanuel.  *See* Toberoff Decl., Ex. A at 7.

4

5         **5.    No Documents Should Be Produced Based on the
      Untrustworthy Toberoff Timeline**

6

7           *a.    **The Anonymous Timeline is Unreliable and Cannot
      Support a Motion to Compel***

8        DC also seeks the production of a purported May 13, 2003 letter from

9    Michael Siegel to Laura Siegel, and July 5, 2003 letter from Laura Siegel to

10   Michael Siegel, which they allege exist based solely on the Timeline.  Defendants

11   warned DC that "the ranting anonymous 'Timeline' was inaccurate and

12   untrustworthy" (Kline Decl., Ex. Z at 581) and that "[t]o the extent that relevant

13   documents exist, they have either been produced or designated as privileged."

14   Kline Decl., Ex. BB at 589.

15       The anonymous Timeline is a grossly inaccurate "hit piece," written by a

16   very junior attorney at Toberoff & Associates, who breached his most vital duties

17   of confidentiality and loyalty to the Siegels and Shusters by turning over their

18   privileged legal files to Warner Bros.' General Counsel in the midst of the high-

19   stakes Superman litigation.  It is an inherently untrustworthy and inadmissible

20   document; its allegations can hardly serve as grounds for a motion to compel.  For

21   example, the Timeline alleges that Toberoff misled the Siegels by representing that

22   he had a "billionaire" investor and/or that he would help produce a Superman film,

23   allegations contradicted by the sworn testimony of every percipient witness

24   involved.  *See* Docket No. 98 at 4-6.

25       The Timeline refers to numerous documents that do not exist, and were thus

26   not included in the stolen documents enclosed with the Timeline.[26]  Defendants

27   _____

     [26] *E.g.*, a purported (1) September-October 2003 letter with Ari Emanuel; (2)

28   December 16, 2002 letter from Marc Toberoff and Ari Emanuel to Joanne Siegel
     and Laura Siegel Larson; and (3) July 5, 2003 letter from Laura Siegel to Michael

1    should not be forced to keep rebutting allegations based solely on the facially

2    untrustworthy Timeline.

3                    b.        **David Michaels Communications**

4          DC also claims that communications between Laura Siegel and David

5    Michaels ("Michaels"), who Defendants believe to be the author of the Timeline,

6    must be produced.  Michaels is a former attorney at Toberoff & Associates who

7    worked on the Siegels' case.  His communications with Laura Siegel are, on their

8    face, privileged communications and no basis exists to find a waiver of privilege.

9    DC argues that, because Michaels intended to "'steal'" the Siegels as clients, the

10   communications were "not providing legal advice."  *Supra* at 38.  That makes no

11   sense.  Michaels communicated with the Siegels in connection with his further

12   representation of them, and discussed their case, based on privileged and

13   confidential information he obtained while working for Toberoff & Associates.

14         Moreover, as even "consulting" an attorney as to retention, if any, is

15   considered to entail the provision of legal advice and is protected by the attorney-

16   client privilege, there is no basis to assert that Michaels' communications with the

17   Siegels are not privileged, regardless of whether he was attempting to steal a client

18   from Toberoff & Associates.  *See Barton v. United States Dist. Court*, 410 F.3d

19   1104, 1108 (9th Cir. Cal. 2005) (holding that the attorney-client "privilege applied

20   to pre-employment communications with an attorney by a prospective client");

21   *United States v. Dennis*, 843 F.2d 652, 657 (2d Cir. 1988) ("[I]nitial statements

22   made while Pilgrim intended to employ Gerace were privileged even though the

23   employment was not accepted.").[27]

24   _____

25   Siegel.  As Defendants informed DC, they were unable to identify a document that
     matched either (1), (2) (although there was a December 16, 2002 letter from Marc

26   Toberoff to Ari Emanuel, Joanne Siegel, and Laura Siegel Larson that was long ago
     produced to DC) or (3).

27   [27] *Liu v. Real Estate Inv. Group, Inc.*, 771 F. Supp. 83, 86 (S.D.N.Y. 1991) ("[T]he
     duty to preserve confidentiality extends to preliminary consultation by a

28   prospective client even though actual employment does not result."); McCormick
     on Evidence 6th Ed. § 88 (2006) ("[C]ommunications in the course of [a]

                                    - 72 -

1    Nor was the privilege waived.  DC argues that, because the general subject

2    matter of Michaels' e-mails to the Siegels was given in interrogatory responses, the

3    "contents" of the communications were disclosed and the attorney-client privilege

4    is waived.  Such an argument is deeply hypocritical, given that DC argues

5    elsewhere that the "subject matter" of attorney-client communications was not

6    described in sufficient detail on Defendants' privilege logs.

7    Nor is the fact that the communications were not listed on the Siegels' initial

8    privilege logs a basis to waive privilege, as DC implies.  The documents were not

9    logged in response to DC's *first* set of production requests because the requests

10   were very broad, and none were directed at the Timeline, or the Siegels' contacts

11   with the Timeline's author.  On December 10, 2010 (before Defendants served their

12   privilege logs in response to these requests), DC served a *second* set of requests

13   that specifically requested documents relating to the Timeline and its author, giving

14   the clear impression that the absence of requests as to the Timeline in the first

15   requests was deliberate.  To ensure that the logs were responsive to DC's actual

16   requests, Defendants thus logged Timeline-related documents in response to the

17   second set of requests.  This attempt to reasonably line up the logs with DC's

18   requests is hardly a "manipulation of the discovery process," as DC asserts.  *Supra*

19   at 38.

20   Lastly, Defendants' request for "communications between Mr. Michaels and

21   the Siegels starting in November 2005, when Mr. Michaels became adverse to

22   Toberoff" (*supra* at 38), makes no sense.  The attorney-client privilege would be

23   held by the *Siegels* as clients and/or prospective clients, regardless of whether the

24   attorneys they communicated with were or became adverse to one another.

25

26

27   _____

28   preliminary discussion with a view to employing the lawyer are privileged though
     the employment is in the upshot not accepted.").

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

### 6.    Defendants Offered to Produce the Dennis Larson Documents

As set forth in the parties' correspondence, Defendants offered to produce the relevant communications between Laura Siegel and her ex-husband, attorney Dennis Larson ("Larson'), after their separation in 2000. Prior to their separation, Dennis Larson acted as an attorney on Laura Siegel's behalf. After DC raised the issue of their divorce proceedings, and Defendants' counsel reviewed certain relevant documents, it became apparent that Larson had claimed that he was somehow entitled to a share of Ms. Siegel's termination rights, a claim which was ultimately rejected by the California Court of Appeals. Defendants thus made an offer to compromise as to the Larson communications, which DC flatly rejected:

> Defendants' counsel can review such communications and produce any that are responsive to DC's requests by January 24, 2011. Defendants reserve their right to seek a protective order with respect to any personal information that is not pertinent to this litigation.

Kline Decl., Ex. BB at 587. DC's motion as to this issue, like their prior overzealous discovery motions, is entirely unnecessary, as Defendants' sole concern is to ensure that Ms. Siegel's personal, private information relevant to her divorce, but not to this litigation, is not publicly disclosed. Such information, in any event, is not responsive to DC's requests.

### 7.    The Privilege Logs Are Proper

#### a.    The Court Has Already Upheld Defendants' Logs

Defendants' privilege logs used the same format approved by this Court in the related *Siegel* action:

> The only remaining issue is whether the descriptions in the log are sufficient. The Court notes that the log appears to follow the form suggested in a commonly-used treatise, W. Schwarzer, W. Tashima and J. Wagstaffe, *Federal Civil Procedure Before Trial*, Form 11:A (Rutter 2006). Moreover, the log appears to have the same information which the Court found sufficient in *Dole v. Milonas*, 889 F.2d 885 (9th Cir. 1989); *see in re Grand Jury Investigation*, 974 F.2d 1068, 1071 (9th Cir. 1992). Accordingly, this Court too finds that by providing this log, the *Plaintiffs have sufficiently*

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1    *asserted the attorney-client privilege and the work product doctrine.*

2    Toberoff Decl., Ex. O at 5 (emphasis added).  Those logs included brief document

3    descriptions (*e.g.,* "Notes" or "Email"), no subject matter descriptions, and no

4    division of recipients between "to" and "cc" recipients.

5    　　DC's arguments rest on the premise that the descriptions are inadequate,

6    because when the Court approved the Siegels' privilege logs in August 2006, DC

7    "did not – and could not – raise the objections asserted here, which are based on the

8    specific claims and defenses at issue in this case." *Supra* at 43.  Specifically, DC

9    claims that the logs are inadequate "due to the complex relationships and

10    agreements between and among the Siegels, the Shusters, Toberoff the

11    businessman, and Toberoff the attorney." *Supra* at 41.

12    　　Unfortunately for DC, such supposedly "complex relationships" were also at

13    issue in the *Siegel* litigations.  In 2006, the Heirs, through their counsel Mr.

14    Toberoff, *voluntarily* produced to DC the documents that created these supposedly

15    "complex relationships" (*e.g.*, the "IP Worldwide Agreement" with the Siegels

16    (Kline Decl., Ex. MM), agreements with the Shusters (Kline Decl., Exs. LL, NN-

17    OO), and which had long ago expired.  Docket No. 147-1 at 8-9.  At this time,

18    discovery in *Siegel* was open, and DC had the Heirs' privilege logs.  DC

19    extensively deposed the Heirs on topics such as their relationship with Mr.

20    Toberoff, when they first met Mr. Toberoff, and when an attorney-client

21    relationship with Mr. Toberoff was formed.  *See* Docket No. 61 at 26-30.  While

22    discovery was still open in *Siegel*, DC had these purportedly "inadequate" privilege

23    logs.  However, after Magistrate Zarefsky upheld the logs' format in August 2006,

24    DC chose not to challenge this ruling.  DC is precluded from re-challenging the

25    format of the logs now; the time to revisit this Court's ruling has long passed under

26    F.R.C.P. 72 and Local Rule 72-2.1.

27

28

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1

2

*b.*    **This Court Previously Upheld the Format of
Defendants' Logs Against DC's Identical Challenge**

3

Subject-Matter Descriptions:  Even though the format of Defendants' logs

4

(without subject-matter descriptions) had been specifically upheld by this Court as

5

valid, Defendants were again open to compromise.  DC's insistence on "subject

6

matter" descriptions focused on documents related to the "Timeline" and "Consent

7

Agreement."  Kline Decl., Ex. Y at 575.  Defendants were concerned that the

8

overwhelming majority of attorney-client communications after the commencement

9

of the *Siegel* litigations in 2004 were routine, privileged "litigation updates," and

10

that it would be unduly burdensome to separately list the subject matter of each

11

such communication.  Defendants were also concerned that, even if they included

12

specific subject matter descriptions, DC would refuse to reciprocate when discovery

13

was shortly served on DC.  DC offered a reciprocal compromise that the parties'

14

"privilege logs in this case should include subject matter information, that

15

defendants could use a short code – *e.g.*, 'LU' for litigation updates – and more

16

complete descriptions should be used for other sorts of documents, such as

17

communications related to what DC calls the 'consent agreements' in its

18

complaint."  Ex. Y at 575.  Defendants accepted that compromise, requesting that

19

DC/Warner Bros. provide such "more complete descriptions" in its logs for

20

documents related to the Timeline /stolen documents, and the JAMS

21

Confidentiality Agreement.  Ex. BB at 588.  DC then reneged on its offer and

22

served the instant motion to compel.  Kline Decl., Exs. AA, CC.  DC reneged once

23

Defendants asked that the Timeline/stolen documents be listed in the "subject

24

matter" column of DC's logs, because Warner Bros. had represented to this Court

25

that it had received the Timeline/stolen documents in June 2006, and this

26

information in the logs would demonstrate when the stolen documents were

27

actually received.[28]

28

---

[28] Notably, the Timeline begins by stating "consider this an early Holiday present"
(Docket No. 48, Ex. A at 1), which is far more consistent with having been sent in

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1    To/cc/bcc:  Defendants' logs specifically identified **all** "recipients of

2    withheld documents."  DC's sole complaint is that Defendants did not separately

3    list "to," "cc" and "bcc" recipients.  However, the 9th Circuit has specifically

4    approved privilege logs where "to" and "cc" recipients are combined.  *See Dole v.*

5    *Milonas*, 889 F.2d 885 (9th Cir. 1989) (logs reflected "all persons or entities shown

6    on the document to have received or sent the document" without further

7    breakdown); *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 (9th Cir. 1992)

8    (approving same format).

9        DC has made no showing as to why such "to"/"cc" information is critical or

10    even useful.  Moreover, Defendants' log entries with multiple recipients almost

11    invariably involved (a) attorneys representing the same client, (b) clients

12    represented by the same attorneys, or (c) jointly-interested attorneys/clients.  The

13    basis for privilege as to such entries is clear.  Nor has DC pointed to any specific

14    entries that it is concerned with.  In short, DC asks Defendants to re-review several

15    hundred clear attorney-client communications in order to breakdown "to" and "cc"

16    recipients, without any real explanation for why it needs such information.

17        DC's statement that the Heirs "cannot shield unprivileged communications

18    merely by copying an attorney," does not make sense or relate to Defendants' logs.

19    As to DC's broad claim that privilege is waived when documents are shown to a

20    third party, Defendants are not aware of any such instance.

21        "Business Activities":  Taken as a whole, DC's motion implies that it is

22    worried that Defendants have logged communications concerning purported

23    "business activities" of Mr. Toberoff.  To be clear, the overwhelming majority of

24    listed communications between Toberoff and the Siegels/Shusters relate to their

25    legal claims regarding their statutory terminations and the ongoing litigation

26    regarding their rights under the Copyright Act.  The remaining communications

27    _____

28    December 2005, shortly after Michaels stole the documents and spoke with the
Siegels, than in June 2006.

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

relate to ancillary issues.  To the extent that there are documents regarding any old

expired "business arrangements" with the Heirs (*e.g.*, the IP Worldwide

Agreement) such were long ago ***produced*** voluntarily in the *Siegel* litigations.  *See*

Docket No. 145-1 at 10-11, 24; No. 146-1 at 18-20, 21-22.

### 8.    DC Should Be Sanctioned For Its Willful Disregard of the Confidentiality Agreement

DC, in bringing this motion, has deliberately flouted the parties'

Confidentiality Agreement, and the mediation privilege otherwise available under

the law, and abused the spirit and objectives of the Court-ordered mediation process

by attaching documents to this motion clearly disclosed for purposes of such

mediation and marked as "Confidential Settlement Information."  Sanctioning DC

for such willful misconduct is appropriate.  *See* F.R.C.P. 37(b); *Reygo Pac. Corp. v.

Johnston Pump Co.*, 680 F.2d 647, 649 (9th Cir. 1982) (absent "substantial

justification" for a party's positions, sanctions are appropriate).  DC's willful

breach of the Confidentiality Agreement, and crude disclosure of privileged

information, have an obvious chilling effect on future settlement discussions and

thus, on any prospects of settlement.

Plaintiffs respectfully request the Court to enter an order granting sanctions

in an amount sufficient to compensate Defendants for their expense in opposing

DC's motion[29] and to deter such abuse by DC and its counsel in the future.

### D.    Conclusion

As set forth above, DC's motion should be denied.

---

[29] The Federal Rules of Civil Procedure provide that the party who prevails on a
motion to compel is entitled to its expenses, including reasonable attorneys' fees,
unless the losing party was substantially justified in making the motion (or other
circumstances make such an award unjust).  *See* F.R.C.P. 37(a)(5); Schwarzer,
Tashima & Wagstaffe, CAL. PRAC. GUIDE: FED. CIV. PROC. BEFORE TRIAL (2006) §
11:1960; *State of Ohio v. Arthur Andersen & Co.*, 570 F.2d 1370, 1375 (10th Cir.
1978).

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

1

2   Dated:      February 7, 2011          Respectfully Submitted,

3                                         O'MELVENY & MYERS LLP

4
                                          By: /s/ Daniel M. Petrocelli
5                                             Daniel M. Petrocelli
                                              Attorneys for Plaintiff DC Comics
6

7   Dated:      February 7, 2011          Respectfully Submitted,

8                                         TOBEROFF & ASSOCIATES, P.C.

9
                                          By: /s/ Marc Toberoff
10                                            Marc Toberoff
                                              Attorneys for Defendants Mark
11                                            Warren Peary, Jean Peavy, Joanne
                                              Siegel, and Laura Siegel Larson
12

13      CC1:843915

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28