# EXHIBIT WW

# ARNOLD & PORTER LLP

**David S. Eisen**
David.Eisen@aporter.com

213.243.4182
213.243.4199 Fax

44th Floor
777 South Figueroa Street
Los Angeles, CA 90017-5844

December 10, 2008

### *Via Facsimile and Hand-Delivery*

Michael Bergman, Esq.
Weissmann Wolff Bergman Coleman
  Grodin & Evall, LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, CA 90212

Marc Toberoff, Esq.
Law Offices of Marc Toberoff
2049 Century Park East, Suite 2720
Los Angeles, CA 90067

Re:    <u>Siegel & Larson v. Time Warner, Inc.</u>

Gentlemen:

Pursuant to the Court's latest order, I am providing Mr. Bergman copies of the documents with Bates numbers listed below. These documents are the ones in Mr. Toberoff's declaration which are <u>not</u> identified as having been listed on a privilege log or previously produced:

1-7, 10, 25, 26, 51, 52, 278, 279-80. 281-82, 283, 284, 285-89, 290-96, 300, 314, 315, 351, 361, 550, 551-52, 553-54, 555, 556, 557--61, 562-569, 587, 588, 618, 827, 828-29, 830-31, 832, 833, 836-38, 839.

I am providing to Mr. Toberoff the originals of all of the Escrow Documents, except for the those sent to the Court, and as to those I am providing Mr. Toberoff with copies. I do not intend to retain copies of any of the documents. Mr. Toberoff, if you feel my list is inaccurate, please contact me immediately.

Please feel free to send someone to pick up your respective package from my office after noon tomorrow, December 11. I believe this terminates my activities in connection with the so-called Escrow Documents.

Sincerely,

DAVID S. EISEN

EXHIBIT WW
781

# SUPERMAN – MARC TOBEROFF TIMELINE

*\*Please read closely. We have enclosed several supporting documents in our package to you, and very much hope you will spend some time reviewing them before you come to any potential settlement with Marc Toberoff, who represents the Siegels and the Schuster heirs in the ongoing Superman legal dispute with Time Warner and DC Comics.*

*The below information should save Time Warner potentially millions and millions of dollars, and, if you so choose, - have Marc Toberoff suspended, disgraced, --- if not ultimately disbarred --- from practicing law.*

*Toberoff being labeled as the "relentless crusader for artists' rights" is hardly that: he has devised a strategy whereas he has ultimately claimed much ownership of the Superman copyright underlinepersonally as he can. And of course, he has done so without the knowledge and full disclosure to the Siegels and Schuster heirs, creators of Superman.*

**As it stands right now, the single ~~person who~~ would stand to gain the MOST in a settlement with Time Warner regarding the ongoing SUPERMAN legal dispute would not be the heirs themselves, but Marc Toberoff.**

*What you do with the below information is up to you. You should most certainly conduct your own investigation. We believe there are details within this timeline that will be of strong interest to you.*

*Consider it an early holiday gift.*

*(Also, please be aware that this timeline is written with the assumptions that the reader(s) are aware of the characters involved within the ongoing Superman legal dispute between Time Warner/DC Comics. The heirs to the SUPERMAN copyright are: the Siegels (Joanne, Laura & Michael), Jerry Siegel's heirs, who collectively have claims to 50% of the copyright to Superman, while the Schuster estate has claims on the other 50%.) Marc Toberoff currently represents both parties in ongoing litigation.*

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

In 2000 MT established a separate corporation entitled "Pacific Pictures Corporation" (PPC), with an address of 23852 Pacific Coast Hwy, Suite 555, Malibu, CA 90265. Tel: (310)-589-5151. You will see below that he established this business to solicit his services as an attorney.

In 2001, Marc Toberoff (MT) began researching Superman, who had rights, etc.

MT initially contacts Kevin Marks at Gang, Tyre, who represented Joanne and Laura Siegel with an offer for the Siegel rights. Marks discourages Toberoff from any advances, and does not tell Siegels initially of the interaction because he believes it is not in their best interest.

1

**Q 0001**

On Nov. 23, 2001, MT entered into a joint venture agreement between his own outside corporation Pacific Pictures Corp. (NOT a law firm), and Mark Warren Peavy, and his mother Jean Peavy, heirs to the Joe Schuster estate. For the purposes of this document, we do not know the content of that agreement.

MT and Ari Emanuel, partner and agent at Endeavor, contacts Kevin Marks at Gang, Tyrer, Ramer, & Brown again, (who represented Joanne and Laura Siegel), on August 8, 2002. MT approaches the Siegels, *not as an attorney but as a film producer*, stating that he is "allied" with Emanuel, hoping such a claim will legitimize him.

On August 8th 2002, MT tells Marks that he and Emanuel have a billionaire ready to offer $15 million dollars up-front, plus what they promise to be meaningful participation from proceeds for exploitation of the Siegels' rights to SUPERMAN and some continued royalties on an ongoing basis in all media. Kevin Marks says to the Siegels, "Don't do it." Gang, Tyrer tells the Siegels that they believe MT has brokered a confidential agreement with the Joe Schuster estate. Marks also tells the Siegels that the Schuster estate will have termination rights in approximately 2013. Schuster missed termination notices.

Within their offer, MT appeals to the Siegels' sense of ownership and encourages them to take this deal. MT says he can help them make a movie in direct competition to the one being made at Warner Brothers (MT makes this argument to Joanne and Laura, all the while knowing full well that no one would ever go near making such an attempt; no other studio would go for it because of the division of rights, and no one outside of the studio system would attempt such an endeavor for all the enormous costs attributable to the making, marketing and distribution of such a film.) In other words, MT displays "predatory intent" in his initial approach to the Siegels from the very beginning.

In their very first conversation, Kevin Marks tells MT "no go" --- that the Siegels have already reached an agreement with Time Warner and DC Comics.

Marks conveys MT's offer to the Siegels, and Marks does say to the Siegels, it is a better offer than the one you have. However, Marks also tells the Siegels that he would testify in court against the Siegels if they accepted this offer because he believes there has already been an agreement reached.

The Siegels are angry at Kevin Marks that he said he would testify against them if they took MT's offer, and relations break down between the Siegels and Gang, Tyrer. They fire Gang, Tyrer. And, because the Siegels believed that MT was sympathetic to their plight, and because MT appealed to their sense of ownership of SUPERMAN, they decide to enter into an agreement with Intellectual Properties Worldwide, otherwise known as "IPW", Marc Toberoff's film production company, for 10% for any kind of deal he got to make a movie or exploit the rights. (as you know, the Siegels submitted termination notices on the Superman copyright in 1997).

2

The Siegels' agreement with IPW is an agreement that mirrors the earlier Pacific Pictures agreement that MT makes with the heirs to Joe Schuster (*see more information on this below*). In other words, Marc Toberoff is named as their attorney within the agreement (which is masked as a retainer agreement) in the event that they go to litigation over anything (*please see enclosed document*). Upon the Siegels signing the agreement, MT then tells Joanne and Laura that his mysterious billionaire has decided to invest elsewhere. In other words, MT makes himself the Siegels' attorney of record while he solicited them as a film producer, violating the rule that no lawyer may directly solicit business, with the double violation of doing it under the auspices of doing separate business dealings. MT's sole intent was to become the Siegels' attorney, not to help the Siegels (as he had alleged) to make a movie in competition to *Superman Returns*, which was then in development at Warner Brothers. MT also never divulges his previous direct dealings with the Schuster heirs, and his Nov.23, 2001 joint agreement with the Peavys (the Schuster heirs) in which he is named their attorney of record.

In 2002, MT set his sights on acquiring the passive interest to Michael Siegel's rights, who, as you know, is Jerry Siegel's son from his first marriage, and is Laura's half-brother. Michael Siegel has an interest of 12.5% in SUPERMAN and SUPERBOY. The Siegels total have 50% interest (Joanne holds 50%, Laura 25%. Michael 25%). So, in essence, Joanne has 25%, Laura 12.5, Michael 12.5. MT used to his advantage the strained relationship between Joanne and Laura, and Michael; as well as strained communication with the Schusters.

Here comes Ari Emanuel, and he is going to finance the purchase of Michael Siegel's interest. But Michael Siegel turns him down flat. MT discloses the intent to purchase to Joanne and Laura, admitting it is a possible conflict of interest. MT is fully aware of what he is doing is wrong.

On December 16, 2002, there is another letter from MT and Ari Emanuel to Joanne and Laura Siegel, saying they are re-approaching Michael again about purchasing his interest. MT tells Michael Siegel that they have an investor ready to buy out his interest, though the amount is significantly less than what DC showed as his share.

March 3, 2003 – letter from Paul Levitz/DC Comics to the Siegels, and MT is messing up relationships for his own personal benefit. DC is trying to understand why they backed out of the deal. The reason is MT who is interfering in all the relationships up to this point.

May 2003 -- MT is continuing to make business arrangements with the Schuster heirs, unbeknownst to Joanne and Laura Siegel .

May 13, 2003:  Michael Siegel sends a very concerned letter to Laura Siegel about Marc Toberoff's actions. (*please see enclosed letter; this letter lays out well MT's scheme*). Among other things, Michael Siegel tells her of how Toberoff is now controlling the whole of the SUPERMAN copyright, how he may have bought a substantial portion of the Schuster interest for himself, and he brings to light MT's utter lack of opening a

3

Q 0003

dialogue with anyone regarding making another SUPERMAN movie, in partnership with Ari Emanuel.  Also that MT has not even made contact with Time Warner.  Lastly, Michael conveys that MT seems to have an agenda of "someone" buying him out, and that MT is pressing for an answer.

In May-June 2003. **STATUE OF LIMITATIONS is coming close on for filing of the SUPERMAN complaint.  Both Joanne and Laura Siegel are now very ill.**  MT starts saying to the Siegels that the statue of limitations is coming up, and they would have waived their right to sue based on the termination notices. *This is the very seed MT meant to mine all along.* He sends them the research on the statue of limitations, and concerned, the Siegels contact Art Levine in Washington, D.C. to have independent research done on the matter. The research confirms that they should file by September.

In June, Ari Emanuel through IPW is still trying to buy Michael Siegel's interest but can't come to terms on price.

End of June 2003, MT gets a law firm to represent the Schusters to assist with the SUPERMAN copyrights. They determine the value of the estate is $0, and California Probate Code will not be applicable, such that the estate attorney will not be entitled to any future settlement regarding the Superman interest.  Estate attorney is only receiving an hourly rate. MT "graciously" pays all legal fees.

In other words, MT helped probate the estate, but hired an attorney to do the dirty work. Fittingly, the Joe Schuster will was "lost", so the will had no value.  So, the court writes the will for him, and includes the rights to proceed with the termination.  And since the firm receives an hourly rate, and the estate is valued at $0, it does not effect any future settlement.  The estate attorney will thereby not be entitled to statutory compensation.
Another example of showing that MT is solely motivated *at all times* not by his clients' interests, but manipulating pieces of the puzzle so that he may receive the greatest percentage from a very possible large Time Warner settlement, through part ownership and unconscionable fees (*see below*).

**Absolutely nothing is moving ahead with Siegel/Schuster rights and agreements because MT was never intending to do anything with rights other than litigate.**

July 5, 2003. Laura Siegel reveals her ignorance of Toberoff's dubious actions in her return letter back to Michael --- MT has NOT told them he is about to enter into the PPC agreement, whereby MT *personally* will have a 50% of the Schuster interest in Superman. He will shortly own equal to what Joanne owns (25% of entire copyright), and double what Laura owns, *but MT has failed to disclose this.*  The Schusters – through the Pacific Pictures Corp agreement – gave MT half of what they had.  MT never had the intention to make a movie in competition to the one at Warners – it is tantamount to throwing $$$ away, but it does appeal to the heirs' sense of lost ownership.  MT never did want to make a movie, and exploit the rights.  MT knows no one is going to invest in an outside movie project outside of Warner Brothers, though he uses Ari Emanuel, the agent, to legitimize his claims. (*please see enclosed letter*)

4

Q 0004

Also, in the letter back to Michael Siegel, that MT helped Laura Siegel draft --- in response to Michael's accusations of Toberoff, Laura clearly states that MT does *not* have a production company. (This is false – Marc Toberoff's IPW has been in existence, partly funded by Ari Emanuel, since at least 2002). In the draft of the letter, MT crossed out the statement that he does not have a production company, and writes " MT has not plans to produce a SUPERMAN movie, nor is this feasible given the division of ownership of the rights." (please see enclosed letter). **This clearly delineates that Toberoff never had the intention of making a movie, and approached the Siegels and Schusters separately ---- not for the exploitation of rights as he initially asserted,** but to gain an unconscionable fee from a very large possible settlement with Time Warner.

August 7, 2003 --- Letter from Rodi-Pollock, who is the attorney in the Schuster estate – who says the Schuster Will would be written by the court August 25, 2003, since the Schuster Will had been "lost".

Sept-Oct 2003 ---- Letter with Ari Emanuel in which he would receive $2.5 million flat fee for "negotiating services"

On October 27, 2003, MT uses PPC to enter into another agreement with the Joe Schuster's heirs: Mark Warren Peavy and Jean Peavy, in which PPC is "engaged as the Executor of the recently probated estate of Joeseph Schuster." The agreement purports that PPC is the Peavys exclusive advisor "for the purpose of retrieving, enforcing, and exploiting all of Joe Schuster's rights ....in all of his creations...". In this agreement, MT also names himself their attorney for any and all litigation or questions that should arise in regards to these Rights. MT also clearly delineates that PPC is NOT a law firm. And, lastly but most significantly, MT defines that any and all moneys and proceeds, in cash or in kind, received from the enforcement, settlement, or exploitation of any of the Rights, ....any monies would be split 50/50. **IN ESSENCE, MARC TOBEROFF NOW HAS A 25% STAKE IN SUPERMAN PERSONALLY BECAUSE OF HIS DEAL WITH THE SCHUSTERS THAT WAS MADE IN 2003. He gets – under the guise of Pacific Pictures Corp – the rights to retrieve and enforce and exploit Joe Schuster's interest in SUPERMAN.** MT's alleged "firewall" between film producing and soliciting business as an attorney comes tumbling down. (*please see enclosed signed agreement, dated October 27, 2003*).

In 2013 MT will own Schuster's side of it; but it does not matter, they will settle before.

MT inquires into the legality of entering into the Pacific Pictures Corporation agreement with the Peavys, heirs to Schuster estate, using law firm Armstrong, Hirsch, Jackoway, Tyerman, & Wertheimer. The inquiry raises strong eyebrows, and questions of legality as to MT's actions in regards to the Schusters, and strongly discourages further involvement with MT and this matter.

5

August 2003 – Michael Siegel wants an annuity of $200,000, which equaled $3.5 million. MT tells him that "no investor is going to go for that." MT says Warners' estimation was $2 million less; such a bad risk for an investor, MT says. MT is tenaciously going after the 12.5%, and of course, the investor MT "has" is himself. He is trying to get Michael to lower the price.

**MT is also trying to convince Michael Siegel not to sell his interest to another outside party. MT is lying to Michael Siegel to make sure he can still draw a fee from Michael's 12.5% interest. If Michael went away, he would only draw from remaining 37.5%, instead of 50%. In the final letter, MT tells Michael Siegel that he cannot sell without our approval because Michael did not take part in the termination, but "we will give you (Michael Siegel) approval, if you sell it to a third party, *monitored by Marc Toberoff*." MT is lying to Michael Siegel about Siegel's ability to sell his interest in the SUPERMAN copyright.**

**Significantly, MT admits to Laura Siegel that there never was a billionaire willing to invest $15 million when he first approached them. But by then the Siegels were concerned about appearing flaky for changing lawyers a few times. They decide to stick it out.**

October 2, 2004 --- MT files the complaint with the court against Time-Warner. There is disgruntlement in the Siegel camp, regarding the contingency fee. MT pushes hard for 33.3% contingency fee to go up to 40% if it falls within 60 days of trial (which, of course, he would make sure that it would…). In the contingency agreement they signed for SUPERMAN, IPW (Marc Toberoff's *film production company*) would have received a 10% negotiating fee (thus most likely bolstering Ari Emanuel's take in the settlement from Time Warner as well). Thus, Toberoff used the "film production arm" of his company to use as a shell to elicit larger contingency fees from his clients despite the fact that Toberoff maintains that there is a "firewall" between his law firm and his production company. (see John Lippman, *Wall Street Journal* article enclosed.)

MT "graciously" agrees to decrease IPW's take by 5%, which will be deducted from the firm's % fee, applicable to the gross proceeds of any settlement or outcome of the litigations.

**\*\*\*\*In other words, MT decreases his contingency fee by 5% -- instead of getting 50%, he will get 45%. Combined with the Schuster interest, the aggregate of any outcome in SUPERMAN litigation for Marc Toberoff *personally* becomes 47.5% of the entire Superman interest.\*\*\*\*\*** It becomes clear at this juncture that MT thwarted the earlier deal with Time Warner and DC Comics in 2002 for his own personal gain.

And lastly, on the DUKES OF HAZZARD case, MT pocketed $8.5 million personally, more than any single plaintiff involved in the case (each plaintiff pocketed around $1.7 million). According to the settlement amount, he received an unconscionable 50% contingency fee.

6

Very strong likelihood that Marc <u>created an entity for the purposes of the lawsuit</u> (Moonrunners Limited, or Moonrunners LLP), which allegedly held the rights at issue and ultimately led to the injunction. Christensen-Miller, Kevin Leichter, or the like need explore in greater detail the existence of the entity in which the rights were allegedly held. It is strongly believed this entity was created only to bolster the lawsuit – that the rights were never conveyed at all.

**MT had his President of Production of IPW, J. Todd Harris, leak the confidential settlement on the DUKES OF HAZZARD case to Variety ($17.5 million). He then called Larry Greenfield, another attorney in his office at the time who has since left, to cover his tracks, "demanding" to know who leaked the amount, and to act as if he was portraying shock and dismay at the leak. MT did it himself to attract more business in town. At least 7 attorneys have come and gone at the Law Offices of Marc Toberoff, and many have left due to ethical issues.**

And lastly, MT is charging 50% in another Allison Giannini case involving real estate. The reason this fact is included is to show a history of charging unconscionable fees.

It should be noted for those at Time Warner that Marc Toberoff has still managed to set up SKYPORT as a producer at Warners, and he has a tangential hold on GILLIGAN'S ISLAND. Fyi.

<div align="center">*****************</div>

cc:    Alan F. Horn
        Jeff Robinov
        John Schulman
        Patti Connolly

7

Q 0007

EJ140635574US

Laura:

I understand…I thought it was a great strategic move, however I don't want to put too much work into this if you remain quite hesitant.

Re: licensing opportunities – although possible in the right situation with people who really "get it" I believe key licensees will be hesitant for three reasons: 1. the clout of WB Consumer Products in the licensing industry; 2. perception that WB owns S and that to understand what you own requires an understanding of the nuances of copyright law; 3. fear of being sued or embroiled in litigation.

Best,

Marc Toberoff
Law Offices of Marc Toberoff
1999 Avenue of the Stars, Suite 1540
Los Angeles, CA 90067
Tel: (310) 246-3333
Fax: (310) 246-3101

-----Original Message-----
**From:** Mistylight3@cs.com [mailto:Mistylight3@cs.com]
**Sent:** Monday, October 10, 2005 1:48 AM
**To:** MToberoff@ipwla.com
**Subject:** Inquiry

Dear Marc,
After much consideration we have decided to permit you to make inquiries of key people regarding a movie based on Action Comics #1.  However, we do not give permission for you to enter into any oral or written commitments for anyone to work on such a movie.  Please let us know who you plan to speak with before you make contact with them and inform us of all activity on this matter as it develops.  We also want to know of any publicity that may occur as a result of the inquiries, in advance, and we reserve the right to stop the inquiries at any time.  If too many people get involved, we believe it will generate more headaches than we are willing to deal with.   So to reiterate, you may proceed with a full inquiry but we do not want you to commission a script or enter into any employment agreements with anyone at this time.  After the inquiries have been made, we will evaluate what you have learned and decide how to proceed.

We are also in favor of approaching product manufacturers about merchandising deals regarding use of the names Superman, Clark Kent, Lois Lane or other elements contained in Action Comics #1 and are willing to explore other commercial possibilities that may exist in connection with our ownership rights.

Thanks for your idea.  We believe it is time for us to take matters into our own hands and to exercise the rights we obtained through the Copyright Act.  However, we want to proceed cautiously.  Please confirm whether you wish to do this or not.

Sincerely,
Joanne Siegel and Laura Siegel Larson

Q 0010

# California Business Portal

## Secretary of State BRUCE McPHERSON

SECRETARY OF STATE | ELECTIONS & VOTER INFO | POLITICAL REFORM | CA BUSINESS PORTAL | ARCHIVES & MUSEUM | SPECIAL PROGRAMS

Business Search
Corporations

Printer Friendly Page

New Search

Search Tips

Field Definitions

Status Definitions

Name Availability

Corporate Records

Business Entities
Records Order Form
  Certificates
  Copies
  Status Reports

FAQS

Corporations Main Page

Site Search

## Corporations

The Information displayed here is current as of "APR 28, 2006" and is updated weekly. It is not a complete or certified record of the Corporation.

| Corporation |
|---|
| PACIFIC PICTURES CORPORATION |
| **Number:** C2198479 \| **Date Filed:** 9/25/2000 \| **Status:** forfeited |
| **Jurisdiction:** NEW YORK |
| **Address** |
| 23852 PACIFIC COAST HWY STE 555 |
| MALIBU, CA 90265 |
| **Agent for Service of Process** |
| MARK TOBEROFF |
| 23852 PACIFIC COAST HWY STE 555 |
| MALIBU, CA 90265 |

Printer Friendly

**New Search**

- For information about certification of corporate records or for additional corporate information, please refer to **Corporate Records**.
- Blank fields indicate the information is not contained in the computer file.
- If the status of the corporation is "Surrender", the agent for service of process is automatically revoked. Please refer to California Corporations Code **Section 2114** for information relating to service upon corporations that have surrendered.

Copyright ©2001 California Secretary of State. **Privacy Statement**.

Q 0025

EXHIBIT WW

# NYS Department of State

## Division of Corporations

### Entity Information

Selected Entity Name: PACIFIC PICTURES CORPORATION

Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | PACIFIC PICTURES CORPORATION |
| **Initial DOS Filing Date:** | AUGUST 26, 1988 |
| **County:** | NEW YORK |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
% MAX TOBEROFF
330 EAST 57TH STREET
APT 34A
NEW YORK, NEW YORK, 10022

**Registered Agent**

NONE

NOTE: New York State does not issue organizational identification numbers.

Search Results          New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

Q 0026

EXHIBIT WW

791

## HOLLYWOOD REPORT / By John Lippman

# The Rights Stuff

*'Hazzard' Legal Issues Lead To $17.5 Million Payday; Discovery on a Treadmill*

FOR THE NEW MOVIE "The Dukes of Hazzard," the biggest payout didn't go to the actors or even the movie's director and producer. It went to chests of Marc Toberoff, an attorney who's made a reputation suing big studios on behalf of TV show creators who claim they're owed money for the movie rights.

The film, which opens Aug. 5, is based on the popular late early '80s TV comedy about two Southern buddies who drive around getting into trouble and outwitting some local buffoons. It stars MTV personality Johnny Knoxville and reality-TV diva Jessica Simpson.

But before reaching the screen, the movie was tied up as a group of people who held rights related to the "Hazzard" TV show sued Warner Bros., the studio making the film. Last month, in an out-of-court settlement, the studio paid them $17.5 million, according to people familiar with the situation. It is believed to be the largest sum ever to arise out of a case involving movie rights for a TV show. It amounts to about one-third of the film's original budget. Mr. Toberoff, who usually takes his cases on a contingency-fee basis, declined to say how much he made from the "Hazzard" case. Warner Bros. declined to comment on any aspect of separated-rights cases.

For years, Hollywood has been besieged by lawsuits from people who claim studios stole their ideas. But those cases generally are about alleged copyright infringement. This lawsuit involves the "separated rights" clause in the Writers Guild of America's contract with the Hollywood studios. (It also includes copyright-infringement claims.) The Writers Guild contract stipulates that the creator of a TV show retains the show's movie rights. A studio—or an independent producer—can acquire those rights separately only under narrow guidelines. Separated-rights cases deal with whether a producer has the right to make the material into a movie.



*Seann William Scott, left, and Johnny Knoxville, right, in 'The Dukes of Hazzard'*

have ended up paying large amounts because of litigation tied to TV-series rights.

For example, in 1999, the family of Gilbert Ralston, the creator of the 1960s TV series "The Wild, Wild West," sued Warner on a separated-rights case. (Mr. Toberoff represented them.) The studio was about to release a $150-million-budget movie based on the TV series. The suit was settled, and Warner ended up paying the Ralston family between $600,000 and $1.5 million, people involved in the case say. (The film was a disappointment at the box office.)

In the 1960s and 1970s, creators of series often sold certain TV rights to networks. But because big studios weren't generally in the market for making movies of these shows at that time, studios didn't always try to buy the movie rights. As a result, they must now go back and acquire them from the creators or their heirs—or risk being sued. "Since the whole idea of making a movie out of a TV series was highly speculative, by and large producers and studios didn't bother to acquire the separated rights," says attorney William Grantham. He represented United Artists a few years back when the studio wanted to turn the 1960s TV series "Rat Patrol" into a movie. The Writers Guild arbitrated issues involving those rights, though the movie hasn't been made.

In the case of "Hazzard," the TV series itself was based on a 1975 United Artists movie, "Moonrunners." Producer Bob Clark acquired a script by Gy Waldron, which Mr. Waldron also directed. In 1978, Warner Bros. acquired the rights to make "Moonrunners" into the "Hazzard" TV series. But according to Mr. Clark's lawsuit, the studio never acquired the movie rights. (Mr. Clark claimed copyright issues in the lawsuit, filed in Los Angeles Superior Court last February: specifically, that the "Hazzard" movie appears to rely to a large extent on "Moonrunners." The lawsuit details 25 points in the "Hazzard" movie, from plot to characters, in which the two movies possess "glaring and substantial similarities.")

On the basis of Mr. Clark's claims, the judge issued a preliminary injunction ordering Warner to withdraw marketing materials and postpone release of the movie until the particulars could settle. Any delay would have been a serious setback

for the studio, since the movie cost about $53 million to make, plus a major summer entry for Warner and had been widely publicized. The studio had also started rolling out its estimated $30 million advertising campaign. Within days of the judge's ruling, Warner lawyers ended up in a conference room at Mr. Toberoff's offices, and agreed to pay Mr. Clark and his partners. A settlement was reached June 21.

**'A Market to Be Tapped'**

Mr. Toberoff, who says he's never lost a case, estimates he's handled rights issues related to 10 shows on behalf of their creators when producers wanted to make them into movies. The lawyer says most of the issues involved "cleaning up" the separated rights of the shows. "In only three cases, he says, has he gone to court. (Other disputes are arbitrated by the Writers Guild.)

After winning one settlement, "he was selling himself as an expert," says Grace Reiner, assistant executive director at the Writers Guild, who works on the arbitration of disputes over separated rights. "He saw a market to be tapped, and he tapped it," she says. Regarding his work representing TV-show rights holders, Mr. Toberoff says, "People call me an 'ambulance chaser.' But I don't take on a case unless I believe in it."

Mr. Toberoff first got into the field of TV-series rights by way of the son of Robert Pirosh, the creator of the 1960s TV series "Combat." While on the treadmill at his health club in 1994, Mr. Toberoff read an ad, placed by the son, seeking help in sorting through his father's papers. Mr. Toberoff researched what rights had, and hadn't, been sold. When it was announced a couple of weeks later that Bruce Willis was going to star in a movie version of "Combat," Mr. Toberoff was ready to press a claim the producer did not have the movie rights to the old TV series. Mr. Toberoff says a settlement was reached, though he won't say for how much. (That movie was never made.)

Meanwhile, Mr. Toberoff has pursued another line of work: producing. His intellectual Properties Worldwide has acquired remake rights to classics like "High Sierra" and "The Asphalt Jungle," as well as such old TV shows as "Ironside," "Police Woman," "Hart to Hart" and "F-Troop." This could theoretically

> ## The lawyer says he isn't an 'ambulance chaser': 'I don't take on a case unless I believe in it.'

Hollywood studios.

**Coming to the Fore**

The issue has come to the fore in recent years as studios increasingly rely on versions of popular TV shows from the 1960s and 1970s. This summer has already seen "The Honeymooners" and "Bewitched." "Miami Vice" is coming up next year, and "Father Knows Best," "The A-Team," "Magnum, P.I." and "The Man From U.N.C.L.E." are in development. It couldn't be determined whether any of those projects are facing separated-rights challenges; the Writers Guild of America says separated-rights disputes are confidential. Studios have increasingly sought safe subjects, like old hit series, because they have a track record of success and sometimes don't cost much to develop into a film script. But in some cases, the plans for saving money can backfire, and the studios

**Bonhams**
& BUTTERFIELDS
AUCTIONEERS & APPRAISERS

**Fine and Rare Wines**
Saturday July 30, 9am
San Francisco
Simulcast Los Angeles

**Pre-auction Wine Tasting**
Thursday July 28, 6:30pm
Los Angeles

**Inquiries**
Frank Martell +1 (323) 436-5431
frank.martell@bonhams.com
Mariam Cebalo +1 (415) 503-3365
mariam.cebalo@bonhams.com

To attend our pre-auction wine tasting please contact:
+1 (800) 223 2854 ext. 3390
events.us@bonhams.com
*Registration fee for tasting

**Bonhams & Butterfields**
220 San Bruno Avenue
San Francisco, California 94103
www.bonhams.com/us

© 2005, Bonhams & Butterfields Auctioneers Corp.
All rights reserved. Bond No. 57BSB63233

---

**INTERESTED IN BORDEAUX FUTURES?**
You can't afford not to check out:
www.goodygoody.com



Home > Warners ponies up 'Hazzard' pay

http://www.variety.com/index.asp?layout=print_story&articleid=VR1117925363&categoryid=1236

To print this page, select "PRINT" from the File Menu of your browser.

Posted: Wed., Jun. 29, 2005, 10:00pm PT

# Warners ponies up 'Hazzard' pay

## Studio settles with producer Clark for $17.5 mil

### By CLAUDE BRODESSER

*MT received
$8 Million
dollars from
the lawsuit.*

Chalk one up for the little guy.

Warner Bros. Pictures has agreed to pay a Georgia-based producer at least $17.5 million for infringing on the copyright to his even-more-obscure 1974 United Artists film, "Moonrunners," which became the basis of the hit Warners TV skein, "The Dukes of Hazzard."

The amount paid to the producer, Robert B. Clark, is more than what the studio spent in talent salaries on the new "Hazzard" pic.

However, Warners was faced with federal judge Gary Allen Feess' preliminary injunction, which would have canceled the Aug. 13 release of Warner's new "Dukes of Hazzard" feature and seen all copies of the $55 million Johnnie Knoxville-starrer impounded by federal marshals.

What's more, the film's DVD release would have been delayed indefinitely, and its $40 million theatrical marketing budget -- much of that spent on spot TV ads -- would have gone down the drain.

Marc Toberoff, the attorney who represented Clark in U.S. District Court, would only reiterate his previous statement of last week that "the parties have reached a settlement of all claims in the litigation," adding that "the terms of that settlement are confidential." (*Daily Variety*, July 23)

Scott Rowe, a spokesman for Warner Bros. Entertainment, said on Thursday afternoon that the studio declined to comment.

In winning a preliminary injunction, Toberoff demonstrated to the judge's satisfaction that Clark was likely to win at trial and would suffer irreparable harm if the movie opened. Irreparable harm is presumed in copyright infringement cases, based on a 1999 lawsuit by Sun Microsystems against Microsoft.

Now that a settlement has been reached, Warners will premiere the new "The Dukes of Hazzard" feature July 28 at the Mann Chinese Theater on Hollywood Boulevard.

Still unclear is whether Clark will be getting an invitation.

Read the full article at:
http://www.variety.com/story.asp?l=story&a=VR1117925363&c=1236

EXHIBIT WW
793

Q 0052





## Marc Toberoff

**From:** Mistylight3@cs.com
**Sent:** Saturday, August 13, 2005 12:21 AM
**To:** MToberoff@ipwla.com
**Subject:** Burg letters

Dear Marc,
As my mom explained when she called you today, I was too ill after my extensive medical tests to call you myself. I trust the two of you have fully discussed the letters which arrived by fax this evening.

There is no need to respond to Burg further, in fact please don't, but in case it ever comes up in the future, I want to you to know that when Terry Cunningham—who was seated a few seats from my mom—leaned over in that noisy screening hall and introduced herself to my mom she said that they had met many years ago at a party that had been thrown by Jennette Kahn [the woman who used to have the job that Paul Levitz has now]. There was a lot of talking all around us and my mother couldn't hear what Ms. Cunningham said so she had to repeat that they had met years ago more than once. She still couldn't hear Ms. Cunningham so I told her what she said and even then my mom did not remember her. My mother and father attended that party more than 10 years ago at a restaurant and met many, many people that night. My mother remembered the party but did not remember Ms. Cunningham. I did not attend the party and had never met the woman before ComicCon. For Burg to make the ridiculous statement, "...Terry Cunningham with whom your client has been acquainted for 15 years" gives the impression that my mom knew who she was—(she did not)—and that she has had ongoing personal contact with her for 15 years—(again, she did not). Burg's characterization is absolutely false. Furthermore, my mother did not ask Ms. Cunningham to get Paul—she simply asked whether he was in San Diego. If Terry Cunningham decided to go and get Paul so he could say hi to my mom it was something she chose to do, not the result of a request. If she said anything to my mom before she left, my mom could not hear her and she was surprised when Paul walked up and greeted us. Now the whole thing is turning into an argument between you and Burg. I hope we will not have to deal with this matter further.

Hope your weekend is a good one.
Sincerely,
Laura

EXHIBIT WW
794

Q 0278

Aug-12-05 09:13am From-WEISSMANN WOLFF ETAL 310-550-7    T-530 P.02/03 F-840

VIA FAX: (310) 246-3101
AND FIRST CLASS MAIL

August 11, 2005

**David L. Burg**
a professional corporation
dburg@wwllp.com
310.860.3322

Marc Toberoff, Esq.
Law Offices of Marc Toberoff, PLC
1999 Avenue of the Stars
Suite 1540
Los Angeles, California  90067

Re:     Siegel v. Warner Bros. Entertainment Inc., et al.
        U.S. District Court Case Nos. 04-8400 and 04-08776 DDP (RZx)
        Our File No. 2231.611

Dear Marc:

    This responds to your unsigned letter of August 4, 2005, regarding the contacts between Mr. Levitz and your clients. We write for the sole purpose of setting the record straight based on the facts as we know them.

    The "Terry" referred to in your letter is Terri Cunningham, with whom your client has been acquainted for 15 years. At the "Superman Returns" screening at Comic-con, Joanne Siegel (who happened to be sitting a few seats away from Ms. Cunningham) asked Ms. Cunningham if Mr. Levitz was in San Diego. After being advised that he was, Mrs. Siegel then said she would like to see him. Ms. Cunningham responded that she would attempt to get Mr. Levitz after the screening. After the screening concluded, Ms. Cunningham asked Mrs. Siegel whether she should attempt to find Mr. Levitz. Mrs. Siegel responded that she should and Ms. Cunningham proceeded to find Mr. Levitz and bring him over to where Mrs. Siegel was sitting. The conversation that you have complained about then ensued.

    These are the facts as we know them, and we note that they are consistent with what you saw taking place from a "distance" of "a couple seats away." In this context, you can appreciate why we reacted the way we did to your claim

WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP
9665 WILSHIRE BLVD, NINTH FLOOR, BEVERLY HILLS, CA 90212 T. 310 858.7888 F: 310 550.7191 WWW.WWLLP.COM
LAWYERS

312348_1.DOC                                                    Q 0279

EXHIBIT WW
795

Aug-12-05  08:13am   From-WEISSMAN WOLFF ETAL          310-660-7       T-530  P.03/03  F-840

Marc Toberoff, Esq.
August 11, 2005
Page 2


that Mr. Levitz "directly approached" your clients, and your unfounded accusation that Mr. Levitz engaged in "inappropriate" conduct, as neither is true.

It certainly is your prerogative to communicate to us your clients' desire that Mr. Levitz and DC Comics not contact them directly, but not under the pretext that Mr. Levitz initiated the most recent series of contacts, when in fact he did not. This does constitute manufacturing a false dispute and we stand by that characterization.


Very truly yours,


David L. Burg


cc:    Patrick T. Perkins, Esq.
       James D. Weinberger, Esq.
         (via e-mail)


WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP

Q 0280

312348_1.DOC

EXHIBIT WW
796

VIA FAX:  (310) 246-3101
**AND FIRST CLASS MAIL**

August 11, 2005

**David L. Burg**
a professional corporation
dburg@wwlfp.com
310.860.3322

Marc Toberoff, Esq.
Law Offices of Marc Toberoff, PLC
1999 Avenue of the Stars
Suite 1540
Los Angeles, California  90067

        Re:      Siegel v. Warner Bros. Entertainment Inc., et al.
                 U.S. District Court Case Nos. 04-8400 and 04-08776 DDP (RZx)
                 Our File No. 2231.811

Dear Marc:

        This responds to your letter of August 4, 2005, regarding your unauthorized meeting with Paul Levitz, President of DC Comics, on July 16, 2005 at Comic-con in violation of California Rule of Professional Conduct 2-100.

        Your characterization of the events of July 16th does not comport with the facts. As you are aware, the conversation between you and Mr. Levitz took place at DC Comics' booth in a conference room at around 3:30 p.m. You and Mr. Levitz were alone in the conference room, although the fact that you went into the conference room alone with Mr. Levitz was witnessed by several people at the booth. This conversation went on for approximately 45 minutes and had nothing to do with speaking "in general terms with Mr. Levitz . . . in order not to appear rude." Rather, you were expressly engaged in an attempted settlement discussion with Mr. Levitz and, as such, your assertion that you have "always" refrained from discussion the "substance of the . . . litigation" directly with DC Comics is simply untrue.[1]

**WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP**
9665 WILSHIRE BLVD, NINTH FLOOR, BEVERLY HILLS, CA 90212  T. 310.858.7888 F 310.550.7191 WWW.WWLFP.COM
LAWYERS

312351_1.DOC                                                            Q 0281

Marc Toberoff, Esq.
August 11, 2005
Page 2

Please let us know whether it is your position that you did not, in fact, have a private conversation with Mr. Levitz in a conference room at DC's booth at Comic-con.

Very truly yours,

David L. Burg

cc:   Patrick T. Perkins, Esq.
      James D. Weinberger, Esq.
        (via e-mail)

WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP

Q 0282

EXHIBIT WW
798

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF*
LARRY B. GREENFIELD*
NICHOLAS C. WILLIAMSON
DAVID MICHAELS

* ALSO ADMITTED IN NEW YORK

1999 AVENUE OF THE STARS, SUITE 1540
LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

August 12, 2005

<u>Via Fax: (310) 550-7191 and U.S. Mail</u>

David L. Burg, Esq.
Weissman Wolff Bergman Coleman Grodin & Evall LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, California 90212

  Re: Siegel v. Warner Bros. Entertainment Inc. et al.
   <u>U.S. District Court Case Nos. 04-8400 and 04-8766 DDP (RZx)</u>

Dear David:

  This will acknowledge receipt of your second letter to me of August 11, 2005, in which you once again attempt to "set the record straight" regarding your client's direct solicitation of our clients. Your efforts to extend and belabor this dialogue are not welcome and ultimately not in your client's interest as your letters only serve to antagonize our clients.

  Our clients inform us that your recital of the occurrences at Comic-Con are completely false. While our clients experienced the events which occurred, you did not. Our clients were made uncomfortable by your clients' solicitous contact both during and after Comic-Con, and specifically asked me to request that your clients cease further direct contact with them. Please, there is no need to respond as you have already stated your position, twice. I assume that your clients will adhere to this request.

     Very truly yours,

     Marc Toberoff

cc:  Ms. Joanne Siegel
  Ms. Laura Siegel Larson
  James D. Weinberger, Esq.

Q 0283

EXHIBIT WW
799

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF*
LARRY B. GREENFIELD*
NICHOLAS C. WILLIAMSON
DAVID MICHAELS

* ALSO ADMITTED IN NEW YORK

1999 AVENUE OF THE STARS, SUITE 1540
LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

August 12, 2005

Via Fax: (310) 550-7191 and U.S. Mail

David L. Burg, Esq.
Weissman Wolff Bergman Coleman Grodin & Evall LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, California  90212

      Re: Siegel v. Warner Bros. Entertainment Inc. et al.
         U.S. District Court Case Nos. 04-8400 and 04-8766 DDP (RZx)

Dear David:

      This will acknowledge receipt of your letter to me of August 11, 2005, in which you continue to erroneously belabor the point about my alleged "unauthorized meeting" with Paul Levitz of DC Comics.  I dispute your self-serving characterization of events of which you have no personal knowledge.  For your edification, I did not enter into any conference room alone with Mr. Levitz.   Mr. Levitz came up to my clients and I as we were walking the Comic-Con floor.  While I was talking to Laura Siegel Larson, Mr. Levitz ushered Joanne Siegel into a DC conference room, without me. I then followed them into the room with Laura and her two boys behind me.  Laura then informed her mother that her boys wanted to attend a movie event upstairs, whereupon my clients left, leaving Mr. Levitz and me in the room.  The events have none of the insidious characteristics you try to attribute to them.

      I already previously indicated to you in writing that I will not speak directly with your client about the substance of this action.  There is nothing further that need be said on this subject.

                Very truly yours,

                Marc Toberoff

cc:  James D. Weinberger, Esq.

EXHIBIT WW
800

Q 0284

# Confirmation Report — Memory Send

Page      : 001
Date & Time: Aug-12-05  05:47pm
Line 1    :
Machine ID :

| | | |
|---|---|---|
| Job number | : | 554 |
| Date | : | Aug-12 05:46pm |
| To | : | ☎13108277227 |
| Number of pages | : | 003 |
| Start time | : | Aug-12 05:46pm |
| End time | : | Aug-12 05:47pm |
| Pages sent | : | 003 |
| Status | : | OK |

Job number    : 554          *** SEND SUCCESSFUL ***

## LAW OFFICES OF MARC TOBEROFF
A PROFESSIONAL CORPORATION
1999 AVENUE OF THE STARS, SUITE 1640
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
LAW & BARRING
LAWRENCE M. WILLIAMSON
DAVID MICHAELS §

* ALSO ADMITTED IN NEW YORK

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

### FACSIMILE COVER PAGE

| | |
|---|---|
| TO: Laura Siegel Larson | FAX: (310) 527-7227 |
| FROM: Marc Toberoff | PAGES ( including cover): 2 |
| DATE: 8/12/05 | RE: Siegel vs. Warner Bros. |

COMMENTS:

Included document:

August 11, 2005 David Burg letter that Marc responded to on August 12, 2005.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

Q 0285

# Confirmation Report – Memory Send

Page : 001
Date & Time: Aug-12-05 06:00pm
Line 1 :
Machine ID :

| | | |
|---|---|---|
| Job number | : | 557 |
| Date | : | Aug-12 05:57pm |
| To | : | ☎13108277227 |
| Number of pages | : | 008 |
| Start time | : | Aug-12 05:57pm |
| End time | : | Aug-12 06:00pm |
| Pages sent | : | 008 |
| Status | : | OK |

Job number : 557 *** SEND SUCCESSFUL ***

LAW OFFICES OF MARC TOBEROFF
A PROFESSIONAL CORPORATION
1888 AVENUE OF THE STARS, SUITE 1840
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 246-3333
FACSIMILE (310) 246-3101

FACSIMILE COVER PAGE

| | |
|---|---|
| TO: Laura Siegel Larson | FAX: (310) 827 7227 |
| FROM: Marc Toberoff | PAGES (Including cover): # 4 |
| DATE : 8/12/05 | RE: Siegel vs. Warner Bros. |

COMMENTS:

Included documents:

Two August 11, 2005 David Burg letters.

Two August 12, 2005 responses from Marc.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

Q 0286

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF*
LARRY S. GREENFIELD*
NICHOLAS C. WILLIAMSON
DAVID MICHAELS

* ALSO ADMITTED IN NEW YORK

1999 AVENUE OF THE STARS, SUITE 1540

LOS ANGELES, CALIFORNIA 90067

TELEPHON
(310) 248-33:

FACSIMIL
(310) 248-310

## FACSIMILE COVER PAGE

| **TO:** Laura Siegel Larson | **FAX:** (310) 827 7227 |
|---|---|
| **FROM:** Marc Toberoff | **PAGES** ( including cover ): # 9 |
| **DATE :** 8/12/05 | **RE:** Siegel vs. Warner Bros. |

**COMMENTS:**

    Included documents:

        Two August 11, 2005 David Burg letters.

        Two August 12, 2005 responses from Marc.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF*
LARRY S. GREENFIELD*
NICHOLAS C. WILLIAMSON
DAVID MICHAELS

* ALSO ADMITTED IN NEW YORK

1999 AVENUE OF THE STARS, SUITE 1540

LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

## FACSIMILE COVER PAGE

| TO: Joanne Siegel | FAX: (310) 821-5894 |
|---|---|
| FROM: Marc Toberoff | PAGES ( including cover ): 7 |
| DATE : 8/12/05 | RE: Siegel vs. Warner Bros. |

**COMMENTS:**

Included documents:

Two August 11, 2005 David Burg letters.

Two August 12, 2005 responses from Marc.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

EXHIBIT WW
804

Q 0288

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF*
LARRY S. GREENFIELD*
NICHOLAS C. WILLIAMSON
DAVID MICHAELS

* ALSO ADMITTED IN NEW YORK

1999 AVENUE OF THE STARS, SUITE 1540

LOS ANGELES, CALIFORNIA 90067

TELEPHON
(310) 246-333

FACSIMIL
(310) 246-310

## FACSIMILE COVER PAGE

| TO: Joanne Larson | FAX: (310) 821-5894 |
|---|---|
| FROM: Marc Toberoff | PAGES ( including cover ): 2 |
| DATE : 8/12/05 | RIE: Siegel vs. Warner Bros. |

**COMMENTS:**

Included document:

August 11, 2005 David Burg letter that Marc responded to on August 12, 2005.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

Q 0289

# SUPERMAN – MARC TOBEROFF TIMELINE

*\*Please read closely. We have enclosed several supporting documents in our package to you, and very much hope you will spend some time reviewing them before you come to any potential settlement with Marc Toberoff, who represents the Siegels and the Schuster heirs in the ongoing Superman legal dispute with Time Warner and DC Comics.*

*The below information should save Time Warner potentially millions and millions of dollars, and, if you so choose, - have Marc Toberoff suspended, disgraced, --- if not ultimately disbarred --- from practicing law.*

*Toberoff being labeled as the "relentless crusader for artists' rights" is hardly that: he has devised a strategy whereas he has ultimately claimed much ownership of the Superman copyright personally as he can. And of course, he has done so without the knowledge and full disclosure to the Siegels and Schuster heirs, creators of Superman.*

***As it stands right now, the single person who would stand to gain the MOST in a settlement with Time Warner regarding the ongoing SUPERMAN legal dispute would not be the heirs themselves, but Marc Toberoff.***

*What you do with the below information is up to you. You should most certainly conduct your own investigation. We believe there are details within this timeline that will be of strong interest to you.*

*Consider it an early holiday gift.*

*(Also, please be aware that this timeline is written with the assumptions that the reader(s) are aware of the characters involved within the ongoing Superman legal dispute between Time Warner/DC Comics. The heirs to the SUPERMAN copyright are: the Siegels (Joanne, Laura & Michael), Jerry Siegel's heirs, who collectively have claims to 50% of the copyright to Superman, while the Schuster estate has claims on the other 50%.) Marc Toberoff currently represents both parties in ongoing litigation.*

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

In 2000 MT established a separate corporation entitled "Pacific Pictures Corporation" (PPC), with an address of 23852 Pacific Coast Hwy, Suite 555, Malibu, CA 90265. Tel: (310)-589-5151. You will see below that he established this business to solicit his services as an attorney.

In 2001, Marc Toberoff (MT) began researching Superman, who had rights, etc.

MT initially contacts Kevin Marks at Gang, Tyre, who represented Joanne and Laura Siegel with an offer for the Siegel rights. Marks discourages Toberoff from any advances, and does not tell Siegels initially of the interaction because he believes it is not in their best interest.

Q 0290                    1

On Nov. 23, 2001, MT entered into a joint venture agreement between his own outside corporation Pacific Pictures Corp. (NOT a law firm), and Mark Warren Peavy, and his mother Jean Peavy, heirs to the Joe Schuster estate. For the purposes of this document, we do not know the content of that agreement.

MT and Ari Emanuel, partner and agent at Endeavor, contacts Kevin Marks at Gang, Tyrer, Ramer, & Brown again, (who represented Joanne and Laura Siegel), on August 8, 2002. MT approaches the Siegels, *not as an attorney but as a film producer*, stating that he is "allied" with Emanuel, hoping such a claim will legitimize him.

On August 8th 2002, MT tells Marks that he and Emanuel have a billionaire ready to offer $15 million dollars up-front, plus what they promise to be meaningful participation from proceeds for exploitation of the Siegels' rights to SUPERMAN and some continued royalties on an ongoing basis in all media. Kevin Marks says to the Siegels, "Don't do it." Gang, Tyrer tells the Siegels that they believe MT has brokered a confidential agreement with the Joe Schuster estate. Marks also tells the Siegels that the Schuster estate will have termination rights in approximately 2013. Schuster missed termination notices.

Within their offer, MT appeals to the Siegels' sense of ownership and encourages them to take this deal. MT says he can help them make a movie in direct competition to the one being made at Warner Brothers (MT makes this argument to Joanne and Laura, all the while knowing full well that no one would ever go near making such an attempt; no other studio would go for it because of the division of rights, and no one outside of the studio system would attempt such an endeavor for all the enormous costs attributable to the making, marketing and distribution of such a film.) In other words, MT displays "predatory intent" in his initial approach to the Siegels from the very beginning.

In their very first conversation, Kevin Marks tells MT "no go" --- that the Siegels have already reached an agreement with Time Warner and DC Comics.

Marks conveys MT's offer to the Siegels, and Marks does say to the Siegels, it is a better offer than the one you have. However, Marks also tells the Siegels that he would testify in court against the Siegels if they accepted this offer because he believes there has already been an agreement reached.

The Siegels are angry at Kevin Marks that he said he would testify against them if they took MT's offer, and relations break down between the Siegels and Gang, Tyrer. They fire Gang, Tyrer. And, because the Siegels believed that MT was sympathetic to their plight, and because MT appealed to their sense of ownership of SUPERMAN, they decide to enter into an agreement with Intellectual Properties Worldwide, otherwise known as "IPW", Marc Toberoff's film production company, for 10% for any kind of deal he got to make a movie or exploit the rights. (as you know, the Siegels submitted termination notices on the Superman copyright in 1997).

The Siegels' agreement with IPW is an agreement that mirrors the earlier Pacific Pictures agreement that MT makes with the heirs to Joe Schuster (*see more information on this below*). In other words, Marc Toberoff is named as their attorney within the agreement (which is masked as a retainer agreement) in the event that they go to litigation over anything (*please see enclosed document*). Upon the Siegels signing the agreement, MT then tells Joanne and Laura that his mysterious billionaire has decided to invest elsewhere. In other words, MT makes himself the Siegels' attorney of record while he solicited them as a film producer, violating the rule that no lawyer may directly solicit business, with the double violation of doing it under the auspices of doing separate business dealings. MT's sole intent was to become the Siegels' attorney, not to help the Siegels (as he had alleged) to make a movie in competition to *Superman Returns*, which was then in development at Warner Brothers. MT also never divulges his previous direct dealings with the Schuster heirs, and his Nov.23, 2001 joint agreement with the Peavys (the Schuster heirs) in which he is named their attorney of record.

In 2002, MT set his sights on acquiring the passive interest to Michael Siegel's rights, who, as you know, is Jerry Siegel's son from his first marriage, and is Laura's half-brother. Michael Siegel has an interest of 12.5% in SUPERMAN and SUPERBOY. The Siegels total have 50% interest (Joanne holds 50%, Laura 25%. Michael 25%). So, in essence, Joanne has 25%, Laura 12.5, Michael 12.5. MT used to his advantage the strained relationship between Joanne and Laura, and Michael; as well as strained communication with the Schusters.

Here comes Ari Emanuel, and he is going to finance the purchase of Michael Siegel's interest. But Michael Siegel turns him down flat. MT discloses the intent to purchase to Joanne and Laura, admitting it is a possible conflict of interest. MT is fully aware of what he is doing is wrong.

On December 16, 2002, there is another letter from MT and Ari Emanuel to Joanne and Laura Siegel, saying they are re-approaching Michael again about purchasing his interest. MT tells Michael Siegel that they have an investor ready to buy out his interest, though the amount is significantly less than what DC showed as his share.

March 3, 2003 – letter from Paul Levitz/DC Comics to the Siegels, and MT is messing up relationships for his own personal benefit.  DC is trying to understand why they backed out of the deal. The reason is MT who is interfering in all the relationships up to this point.

May 2003 -- MT is continuing to make business arrangements with the Schuster heirs, unbeknownst to Joanne and Laura Siegel .

May 13, 2003:  Michael Siegel sends a very concerned letter to Laura Siegel about Marc Toberoff's actions. *(please see enclosed letter; this letter lays out well MT's scheme).* Among other things, Michael Siegel tells her of how Toberoff is now controlling the whole of the SUPERMAN copyright, how he may have bought a substantial portion of the Schuster interest for himself, and he brings to light MT's utter lack of opening a

Q 0292

3

dialogue with anyone regarding making another SUPERMAN movie, in partnership with Ari Emanuel. Also that MT has not even made contact with Time Warner. Lastly, Michael conveys that MT seems to have an agenda of "someone" buying him out, and that MT is pressing for an answer.

In May-June 2003. **STATUE OF LIMITATIONS is coming close on for filing of the SUPERMAN complaint. Both Joanne and Laura Siegel are now very ill.** MT starts saying to the Siegels that the statue of limitations is coming up, and they would have waived their right to sue based on the termination notices. *This is the very seed MT meant to mine all along.* He sends them the research on the statue of limitations, and concerned, the Siegels contact Art Levine in Washington, D.C. to have independent research done on the matter. The research confirms that they should file by September.

In June, Ari Emanuel through IPW is still trying to buy Michael Siegel's interest but can't come to terms on price.

End of June 2003, MT gets a law firm to represent the Schusters to assist with the SUPERMAN copyrights. They determine the value of the estate is $0, and California Probate Code will not be applicable, such that the estate attorney will not be entitled to any future settlement regarding the Superman interest. Estate attorney is only receiving an hourly rate. MT "graciously" pays all legal fees.

In other words, MT helped probate the estate, but hired an attorney to do the dirty work. Fittingly, the Joe Schuster will was "lost", so the will had no value. So, the court writes the will for him, and includes the rights to proceed with the termination. And since the firm receives an hourly rate, and the estate is valued at $0, it does not effect any future settlement. The estate attorney will thereby not be entitled to statutory compensation. Another example of showing that MT is solely motivated *at all times* not by his clients' interests, but manipulating pieces of the puzzle so that he may receive the greatest percentage from a very possible large Time Warner settlement, through part ownership and unconscionable fees (*see below*).

**Absolutely nothing is moving ahead with Siegel/Schuster rights and agreements because MT was never intending to do anything with rights other than litigate.**

July 5, 2003. Laura Siegel reveals her ignorance of Toberoff's dubious actions in her return letter back to Michael --- MT has NOT told them he is about to enter into the PPC agreement, whereby MT *personally* will have a 50% of the Schuster interest in Superman. He will shortly own equal to what Joanne owns (25% of entire copyright), and double what Laura owns, *but MT has failed to disclose this.* The Schusters – through the Pacific Pictures Corp agreement – gave MT half of what they had. MT never had the intention to make a movie in competition to the one at Warners – it is tantamount to throwing $$$ away, but it does appeal to the heirs' sense of lost ownership. MT never did want to make a movie, and exploit the rights. MT knows no one is going to invest in an outside movie project outside of Warner Brothers, though he uses Ari Emanuel, the agent, to legitimize his claims. *(please see enclosed letter)*

4

Q 0293

Also, in the letter back to Michael Siegel, that MT helped Laura Siegel draft --- in response to Michael's accusations of Toberoff, Laura clearly states that MT does *not* have a production company. (This is false – Marc Toberoff's IPW has been in existence, partly funded by Ari Emanuel, since at least 2002). In the draft of the letter, MT crossed out the statement that he does not have a production company, and writes " MT has not plans to produce a SUPERMAN movie, nor is this feasible given the division of ownership of the rights." (please see enclosed letter). **This clearly delineates that Toberoff never had the intention of making a movie, and approached the Siegels and Schusters separately ---- not for the exploitation of rights as he initially asserted,** but to gain an unconscionable fee from a very large possible settlement with Time Warner.

August 7, 2003 --- Letter from Rodi-Pollock, who is the attorney in the Schuster estate – who says the Schuster Will would be written by the court August 25, 2003, since the Schuster Will had been "lost".

Sept-Oct 2003 ---- Letter with Ari Emanuel in which he would receive $2.5 million flat fee for "negotiating services"

On October 27, 2003, MT uses PPC to enter into another agreement with the Joe Schuster's heirs: Mark Warren Peavy and Jean Peavy, in which PPC is "engaged as the Executor of the recently probated estate of Joeseph Schuster." The agreement purports that PPC is the Peavys exclusive advisor "for the purpose of retrieving, enforcing, and exploiting all of Joe Schuster's rights ....in all of his creations...".     In this agreement, MT also names himself their attorney for any and all litigation or questions that should arise in regards to these Rights. MT also clearly delineates that PPC is NOT a law firm. And, lastly but most significantly, MT defines that any and all moneys and proceeds, in cash or in kind, received from the enforcement, settlement, or exploitation of any of the Rights, ....any monies would be split 50/50. **IN ESSENCE, MARC TOBEROFF NOW HAS A 25% STAKE IN SUPERMAN PERSONALLY BECAUSE OF HIS DEAL WITH THE SCHUSTERS THAT WAS MADE IN 2003. He gets – under the guise of Pacific Pictures Corp – the rights to retrieve and enforce and exploit Joe Schuster's interest in SUPERMAN.** MT's alleged "firewall" between film producing and soliciting business as an attorney comes tumbling down. (*please see enclosed signed agreement, dated October 27, 2003*).

In 2013 MT will own Schuster's side of it; but it does not matter, they will settle before.

MT inquires into the legality of entering into the Pacific Pictures Corporation agreement with the Peavys, heirs to Schuster estate, using law firm Armstrong, Hirsch, Jackoway, Tyerman, & Wertheimer. The inquiry raises strong eyebrows, and questions of legality as to MT's actions in regards to the Schusters, and strongly discourages further involvement with MT and this matter.

5

Q 0294

August 2003 – Michael Siegel wants an annuity of $200,000, which equaled $3.5 million. MT tells him that "no investor is going to go for that." MT says Warners' estimation was $2 million less; such a bad risk for an investor, MT says. MT is tenaciously going after the 12.5%, and of course, the investor MT "has" is himself.   He is trying to get Michael to lower the price.

**MT is also trying to convince Michael Siegel not to sell his interest to another outside party.  MT is lying to Michael Siegel to make sure he can still draw a fee from Michael's 12.5% interest. If Michael went away, he would only draw from remaining 37.5%, instead of 50%.   In the final letter, MT tells Michael Siegel that he cannot sell without our approval because Michael did not take part in the termination, but "we will give you (Michael Siegel) approval, if you sell it to a third party, *monitored by Marc Toberoff.*"  MT is lying to Michael Siegel about Siegel's ability to sell his interest in the SUPERMAN copyright.**

**Significantly, MT admits to Laura Siegel that there never was a billionaire willing to invest $15 million when he first approached them. But by then the Siegels were concerned about appearing flaky for changing lawyers a few times.  They decide to stick it out.**

October 2, 2004 --- MT files the complaint with the court against Time-Warner.  There is disgruntlement in the Siegel camp, regarding the contingency fee.   MT pushes hard for 33.3% contingency fee to go up to 40% if it falls within 60 days of trial (which, of course, he would make sure that it would...).  In the contingency agreement they signed for SUPERMAN, IPW (Marc Toberoff's *film production company*) would have received a 10% negotiating fee (thus most likely bolstering Ari Emanuel's take in the settlement from Time Warner as well).  Thus, Toberoff used the "film production arm" of his company to use as a shell to elicit larger contingency fees from his clients despite the fact that Toberoff maintains that there is a "firewall" between his law firm and his production company. (see John Lippman, *Wall Street Journal* article enclosed.)

MT "graciously" agrees to decrease IPW's take by 5%, which will be deducted from the firm's % fee, applicable to the gross proceeds of any settlement or outcome of the litigations.

**\*\*\*\*In other words, MT decreases his contingency fee by 5% -- instead of getting 50%, he will get 45%. Combined with the Schuster interest, the aggregate of any outcome in SUPERMAN litigation for Marc Toberoff *personally* becomes 47.5% of the entire Superman interest.\*\*\*\*\*** It becomes clear at this juncture that MT thwarted the earlier deal with Time Warner and DC Comics in 2002 for his own personal gain.

And lastly, on the DUKES OF HAZZARD case, MT pocketed $8.5 million personally, more than any single plaintiff involved in the case (each plaintiff pocketed around $1.7 million).   According to the settlement amount, he received an unconscionable 50% contingency fee.

Very strong likelihood that Marc created an entity for the purposes of the lawsuit (Moonrunners Limited, or Moonrunners LLP), which allegedly held the rights at issue and ultimately led to the injunction. Christensen-Miller, Kevin Leichter, or the like need explore in greater detail the existence of the entity in which the rights were allegedly held. It is strongly believed this entity was created only to bolster the lawsuit – that the rights were never conveyed at all.

**MT had his President of Production of IPW, J. Todd Harris, leak the confidential settlement on the DUKES OF HAZZARD case to Variety ($17.5 million). He then called Larry Greenfield, another attorney in his office at the time who has since left, to cover his tracks, "demanding" to know who leaked the amount, and to act as if he was portraying shock and dismay at the leak. MT did it himself to attract more business in town. At least 7 attorneys have come and gone at the Law Offices of Marc Toberoff, and many have left due to ethical issues.**

And lastly, MT is charging 50% in another Allison Giannini case involving real estate. The reason this fact is included is to show a history of charging unconscionable fees.

It should be noted for those at Time Warner that Marc Toberoff has still managed to set up SKYPORT as a producer at Warners, and he has a tangential hold on GILLIGAN'S ISLAND. Fyi.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

region in northeastern Spain. It's made    wine to give it body and color...

# HOLLYWOOD REPORT / By John Lippman

# The Rights Stuff

*'Hazzard' Legal Issues Lead To $17.5 Million Payday; Discovery on a Treadmill*

FOR THE NEW MOVIE "The Dukes of Hazzard," the biggest payout didn't go to the actors or even the movie's director and producer. It went to clouts of Marc Toberoff, an attorney who's made a reputation suing big studios on behalf of TV-show creators who claim they're owed money for the movie rights.

The film, which opens Aug. 5, is based on the popular 1970s-early '80s TV comedy about two Southern buddies who drive around getting into trouble and out-witting some local buffoons. It stars MTV personality Johnny Knoxville and reality-TV diva Jessica Simpson.

But before reaching the screen, the movie was tied up as a group of people who held rights related to the "Hazzard" TV show sued Warner Bros., the studio making the film. Last month, in an out-of-court settlement, the studio paid them $17.5 million, according to people familiar with the situation. It is believed to be the largest sum ever to arise out of a case involving movie rights for a TV show. It amounts to about one-third of the film's original budget. Mr. Toberoff, who usually takes his cases on a contingency-fee basis, declined to say how much he made from the "Hazzard" case. Warner Bros. declined to comment on any aspect of separated-rights issues.

For years, Hollywood has been besieged by lawsuits from people who claim studios stole their ideas. But those cases generally are about alleged copyright infringement. This lawsuit involves the "separated rights" clause in the Writers Guild of America's contract with the Hol-

> **The lawyer says he isn't an 'ambulance chaser': 'I don't take on a case unless I believe in it.'**

lywood studios. (It also includes copyright-infringement claims.) The Writers Guild contract stipulates that the creator of a TV show retains the show's movie rights. A studio—or an independent producer—can acquire those rights separately only under narrow guidelines. Separated-rights cases deal with whether a producer has the right to make the material into a movie.

## Coming to the Fore

The issue has come to the fore in recent years as studios increasingly rely on versions of popular TV shows from the 1960s and 1970s. This summer has already seen "The Honeymooners" and "Bewitched." "Miami Vice" is coming up next year, and "Father Knows Best," "The A-Team," "Magnum, P.I." and "The Man from U.N.C.L.E." are in development. It couldn't be determined whether any of those projects are facing separated-rights challenges. The Writers Guild of America says separated-rights disputes are confidential. Studios have increasingly sought safe subjects, like old hit series, because they have a track record of success and sometimes don't cost much to develop into a film script. But in some cases, the plans for saving

have ended up paying large amounts because of litigation tied to TV-series rights.

For example, in 1999, the family of Gilbert Ralston, the creator of the 1960s TV series "The Wild, Wild West," sued Warner on a separated-rights case. (Mr. Toberoff represented them.) The studio was about to release a $150-million-budget movie based on the TV series. The suit was settled, and Warner ended up paying the Ralston family between $600,000 and $1.5 million, people involved in the case say. (The film was a disappointment at the box office.)

In the 1960s and 1970s, creators of series often sold certain TV rights to networks. But because big studios weren't generally in the market for making movies of these shows at that time, studios didn't always try to buy the movie rights. As a result, they must now go back and acquire them from the creators or their heirs—or risk being sued. "Since the whole idea of making a movie out of a TV series was highly speculative, by and large producers and studios didn't bother to acquire the separated rights," says attorney William Graniham. He represented United Artists a few years back when the studio wanted to turn the 1960s TV series "Rat Patrol" into a movie. The Writers Guild arbitrated issues involving those rights, though the movie hasn't been made.

In the case of "Hazzard," the TV series itself was based on a 1975 United Artists movie, "Moonrunners." Producer Bob Clark acquired a script by Gy Waldron, which Mr. Waldron also directed. In 1978, Warner Bros. acquired the rights to make "Moonrunners" into the "Hazzard" TV series. But according to Mr. Clark's lawsuit, the studio never acquired the movie rights. (Mr. Clark claimed copyright issues in the lawsuit, filed in Los Angeles Superior Court last February.) Specifically, that the "Hazzard" movie appears to rely to a large extent on "Moonrunners." The lawsuit details 25 points in the "Hazzard" movie, from plot to characters, in which the two movies possess "glaring and substantial similarities.")

On the basis of Mr. Clark's claims, the judge issued a preliminary injunction ordering Warner to stop advertising materials and postpone release of the movie until the matter could settle. A tie-



*Seann William Scott, left, and Johny Knoxville, right, in 'The Dukes of Hazzard'*

for the studio, since the movie cost about $53 million to make, was a major summer entry for Warner and had been widely publicized. The studio had also started rolling out its estimated $30 million advertising campaign. Within days of the judge's ruling, Warner lawyers holed up in a conference room at Mr. Toberoff's offices, and agreed to pay Mr. Clark and his partners. A settlement was reached June 21.

## 'A Market to Be Tapped'

Mr. Toberoff, who says he's never lost a case, estimates he's handled rights issues related to 10 shows on behalf of their creators when producers wanted to make them into movies. The lawyer says most of the issues involved "cleaning up" the separated rights of the shows." In only three cases, he says, has he gone to court. (Other disputes are arbitrated by the Writers Guild.)

After winning one settlement, "he was selling himself as an expert," says Grace Reiner, assistant executive director at the Writers Guild, who works on the arbitration of disputes over separated rights. "He saw a market to be tapped, and he tapped it," she says. Regarding his work representing TV-show rights holders, Mr. Toberoff says, "People call me an 'ambulance chaser.' But I don't take on a case unless I believe in it."

Mr. Toberoff first got into the field of TV-series rights by way of the son of Robert Pirosh, the creator of the 1960s TV series "Combat." While on the treadmill at his health club in 1994, Mr. Toberoff read an ad, placed by the son, seeking help in sorting through his father's papers. Mr. Toberoff researched what rights had, and hadn't, been sold. When it was announced a couple of weeks later that Bruce Willis was going to star in a movie version of "Combat," Mr. Toberoff was ready to press a claim the producer did not have the movie rights to the old TV series. Mr. Toberoff says a settlement was reached, though he won't say for how much. (That movie was never made.)

Meanwhile, Mr. Toberoff has pursued another line of work: producing. His intellectual Properties Worldwide has acquired remake rights to classics like "High Sierra" and "The Asphalt Jungle," as well as such old TV shows as "Iron-side," "Police Woman," "Hart to Hart"

put him in a delicate position, since representing TV-show creators suits dies, while his production company the cooperation of studios that's req to fund and distribute Hollywood Mr. Toberoff says he is aware of potential conflict and "keeps a firewall between producing and matters."

# Bonhams
& BUTTERFIELDS
AUCTIONEERS SINCE 1793

## Fine and Rare Wines
Saturday July 30, 9am
San Francisco
Simulcast Los Angeles

**Pre-auction Wine Tasting**
Thursday July 28, 6:30pm
Los Angeles

**Inquiries**
Frank Martel +1 (123) 4 46 5411
frank.martel@bonhams.com
Mariam Cebalo +1 (415) 503 3365
mariam.cebalo@bonhams.com

To attend our pre-auction wine tasting please contact:
+1 (800) 223 2854 ext. 3390
events.us@bonhams.com
*Registration fee for wine tasting

Bonhams & Butterfields
220 San Bruno Avenue
San Francisco, California 94103
www.bonhams.com/us
© 2005, Bonhams & Butterfields Auctioneers Corp.
All rights reserved. Bond No. 57656624263

# INTERESTED IN BORDEAUX FUTURES?

*You can't afford not to check out:*

www.goodygoody.com

Q 0300

Case 2:10-cv-03633-ODW-RZ    Document 163-15    Filed 02/08/11    Page 35 of 72    Page
ID #:4925
California Secretary of State - California Business Search - Corporation Search Results    Page 1 of 1

# California Business Portal

**Secretary of State BRUCE McPHERSON**

SECRETARY OF STATE | ELECTIONS & VOTER INFO | POLITICAL REFORM | CA BUSINESS PORTAL | ARCHIVES & MUSEUM | SPECIAL PROGRAMS

**Business Search Corporations**

- **Printer Friendly Page**
- **New Search**
- **Search Tips**
- **Field Definitions**
- **Status Definitions**
- **Name Availability**
- **Corporate Records**
- **Business Entities Records Order Form**
  - Certificates
  - Copies
  - Status Reports
- **FAQS**
- **Corporations Main Page**
- **Site Search**

# Corporations

The information displayed here is current as of "APR 28, 2006" and is updated weekly. It is not a complete or certified record of the Corporation.

| Corporation | | |
|---|---|---|
| PACIFIC PICTURES CORPORATION | | |
| Number: C2198479 | Date Filed: 9/25/2000 | Status: forfeited |
| Jurisdiction: NEW YORK | | |
| **Address** | | |
| 23852 PACIFIC COAST HWY STE 555 | | |
| MALIBU, CA 90265 | | |
| **Agent for Service of Process** | | |
| MARK TOBEROFF | | |
| 23852 PACIFIC COAST HWY STE 555 | | |
| MALIBU, CA 90265 | | |

Printer Friendly

**New Search**

- For information about certification of corporate records or for additional corporate information, please refer to **Corporate Records**.
- Blank fields indicate the information is not contained in the computer file.
- If the status of the corporation is "Surrender", the agent for service of process is automatically revoked. Please refer to California Corporations Code **Section 2114** for information relating to service upon corporations that have surrendered.

Copyright ©2001 California Secretary of State. **Privacy Statement**.

Q 0314

# NYS Department of State

## Division of Corporations

## Entity Information

Selected Entity Name: PACIFIC PICTURES CORPORATION

Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | PACIFIC PICTURES CORPORATION |
| **Initial DOS Filing Date:** | AUGUST 26, 1988 |
| **County:** | NEW YORK |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
% MAX TOBEROFF
330 EAST 57TH STREET
APT 34A
NEW YORK, NEW YORK, 10022

**Registered Agent**
NONE

NOTE: New York State does not issue organizational identification numbers.

Search Results          New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

**Q 0315**



Home > Warners ponies up 'Hazzard' pay

http://www.variety.com/index.asp?layout=print_story&articleid=VR1117925363&categoryid=1236

To print this page, select "PRINT" from the File Menu of your browser.

Posted: Wed., Jun. 29, 2005, 10:00pm PT

# Warners ponies up 'Hazzard' pay

## Studio settles with producer Clark for $17.5 mil

### By CLAUDE BRODESSER

*MT received*
*$8 Million*
*dollars from*
*the lawsuit.*

Chalk one up for the little guy.

Warner Bros. Pictures has agreed to pay a Georgia-based producer at least $17.5 million for infringing on the copyright to his even-more-obscure 1974 United Artists film, "Moonrunners," which became the basis of the hit Warners TV skein, "The Dukes of Hazzard."

The amount paid to the producer, Robert B. Clark, is more than what the studio spent in talent salaries on the new "Hazzard" pic.

However, Warners was faced with federal judge Gary Allen Feess' preliminary injunction, which would have canceled the Aug. 13 release of Warner's new "Dukes of Hazzard" feature and seen all copies of the $55 million Johnnie Knoxville-starrer impounded by federal marshals.

What's more, the film's DVD release would have been delayed indefinitely, and its $40 million theatrical marketing budget -- much of that spent on spot TV ads -- would have gone down the drain.

Marc Toberoff, the attorney who represented Clark in U.S. District Court, would only reiterate his previous statement of last week that "the parties have reached a settlement of all claims in the litigation," adding that "the terms of that settlement are confidential." (*Daily Variety*, July 23)

Scott Rowe, a spokesman for Warner Bros. Entertainment, said on Thursday afternoon that the studio declined to comment.

In winning a preliminary injunction, Toberoff demonstrated to the judge's satisfaction that Clark was likely to win at trial and would suffer irreparable harm if the movie opened. Irreparable harm is presumed in copyright infringement cases, based on a 1999 lawsuit by Sun Microsystems against Microsoft.

Now that a settlement has been reached, Warners will premiere the new "The Dukes of Hazzard" feature July 28 at the Mann Chinese Theater on Hollywood Boulevard.

Still unclear is whether Clark will be getting an invitation.

Read the full article at:
http://www.variety.com/story.asp?l=story&a=VR1117925363&c=1236

Q 0351

1/8/06 9:13 PM

EXHIBIT WW
816

EJ140635574US

Laura:

I understand...I thought it was a great strategic move, however I don't want to put too much work into this if you remain quite hesitant.

Re: licensing opportunities – although possible in the right situation with people who really "get it" I believe key licensees will be hesitant for three reasons: 1. the clout of WB Consumer Products in the licensing industry; 2. perception that WB owns S and that to understand what you own requires an understanding of the nuances of copyright law; 3. fear of being sued or embroiled in litigation.

Best,

Marc Toberoff
Law Offices of Marc Toberoff
1999 Avenue of the Stars, Suite 1540
Los Angeles, CA 90067
Tel: (310) 246-3333
Fax: (310) 246-3101

-----Original Message-----
**From:** Mistylight3@cs.com [mailto:Mistylight3@cs.com]
**Sent:** Monday, October 10, 2005 1:48 AM
**To:** MToberoff@ipwla.com
**Subject:** Inquiry

Dear Marc,
After much consideration we have decided to permit you to make inquiries of key people regarding a movie based on Action Comics #1. However, we do not give permission for you to enter into any oral or written commitments for anyone to work on such a movie. Please let us know who you plan to speak with before you make contact with them and inform us of all activity on this matter as it develops. We also want to know of any publicity that may occur as a result of the inquiries, in advance, and we reserve the right to stop the inquiries at any time. If too many people get involved, we believe it will generate more headaches than we are willing to deal with. So to reiterate, you may proceed with a full inquiry but we do not want you to commission a script or enter into any employment agreements with anyone at this time. After the inquiries have been made, we will evaluate what you have learned and decide how to proceed.

We are also in favor of approaching product manufacturers about merchandising deals regarding use of the names Superman, Clark Kent, Lois Lane or other elements contained in Action Comics #1 and are willing to explore other commercial possibilities that may exist in connection with our ownership rights.

Thanks for your idea. We believe it is time for us to take matters into our own hands and to exercise the rights we obtained through the Copyright Act. However, we want to proceed cautiously. Please confirm whether you wish to do this or not.

Sincerely,
Joanne Siegel and Laura Siegel Larson

Q 0361

EXHIBIT WW
817



## Marc Toberoff

**From:** Mistylight3@cs.com
**Sent:** Saturday, August 13, 2005 12:21 AM
**To:** MToberoff@ipwla.com
**Subject:** Burg letters

Dear Marc,
As my mom explained when she called you today, I was too ill after my extensive medical tests to call you myself. I trust the two of you have fully discussed the letters which arrived by fax this evening.

There is no need to respond to Burg further, in fact please don't, but in case it ever comes up in the future, I want to you to know that when Terry Cunningham--who was seated a few seats from my mom--leaned over in that noisy screening hall and introduced herself to my mom she said that they had met many years ago at a party that had been thrown by Jennette Kahn [the woman who used to have the job that Paul Levitz has now]. There was a lot of talking all around us and my mother couldn't hear what Ms. Cunningham said so she had to repeat that they had met years ago more than once. She still couldn't hear Ms. Cunningham so I told her what she said and even then my mom did not remember her. My mother and father attended that party more than 10 years ago at a restaurant and met many, many people that night. My mother remembered the party but did not remember Ms. Cunningham. I did not attend the party and had never met the woman before ComicCon. For Burg to make the ridiculous statement, "...Terry Cunningham with whom your client has been acquainted for 15 years" gives the impression that my mom knew who she was--(she did not)--and that she has had ongoing personal contact with her for 15 years--(again, she did not). Burg's characterization is absolutely false. Furthermore, my mother did not ask Ms. Cunningham to get Paul--she simply asked whether he was in San Diego. If Terry Cunningham decided to go and get Paul so he could say hi to my mom it was something she chose to do, not the result of a request. If she said anything to my mom before she left, my mom could not hear her and she was surprised when Paul walked up and greeted us. Now the whole thing is turning into an argument between you and Burg. I hope we will not have to deal with this matter further.

Hope your weekend is a good one.
Sincerely,
Laura

Q 0550

WWRCGF

**VIA FAX:  (310) 246-3101
AND FIRST CLASS MAIL**

August 11, 2005

**David L. Burg**
a professional corporation
dburg@wwllp.com
310.860.3322

Marc Toberoff, Esq.
Law Offices of Marc Toberoff, PLC
1999 Avenue of the Stars
Suite 1540
Los Angeles, California  90067

    Re:    Siegel v. Warner Bros. Entertainment Inc., et al.
           U.S. District Court Case Nos. 04-8400 and 04-08776 DDP (RZx)
           <u>Our File No. 2231.811</u>

Dear Marc:

      This responds to your unsigned letter of August 4, 2005, regarding the contacts between Mr. Levitz and your clients.  We write for the sole purpose of setting the record straight based on the facts as we know them.

      The "Terry" referred to in your letter is Terri Cunningham, with whom your client has been acquainted for 15 years.  At the "Superman Returns" screening at Comic-con, Joanne Siegel (who happened to be sitting a few seats away from Ms. Cunningham) asked Ms. Cunningham if Mr. Levitz was in San Diego.  After being advised that he was, Mrs. Siegel then said she would like to see him.  Ms. Cunningham responded that she would attempt to get Mr. Levitz after the screening.  After the screening concluded, Ms. Cunningham asked Mrs. Siegel whether she should attempt to find Mr. Levitz.  Mrs. Siegel responded that she should and Ms. Cunningham proceeded to find Mr. Levitz and bring him over to where Mrs. Siegel was sitting.  The conversation that you have complained about then ensued.

      These are the facts as we know them, and we note that they are consistent with what you saw taking place from a "distance" of "a couple seats away."  In this context, you can appreciate why we reacted the way we did to your claim

**WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP**
9665 WILSHIRE BLVD. NINTH FLOOR, BEVERLY HILLS, CA 90212  T. 310 858.7888 F: 310 550.7191 WWW.WWLLP.COM
LAWYERS

312348_1.DOC

Q 0551

Aug-12-05  09:13am  From-WEISSMAN WOLFF ETAL        310-550-7[   ]        T-530  P.03/03  F-840

Marc Toberoff, Esq.
August 11, 2005
Page 2

that Mr. Levitz "directly approached" your clients, and your unfounded accusation that Mr. Levitz engaged in "inappropriate" conduct, as neither is true.

It certainly is your prerogative to communicate to us your clients' desire that Mr. Levitz and DC Comics not contact them directly, but not under the pretext that Mr. Levitz initiated the most recent series of contacts, when in fact he did not. This does constitute manufacturing a false dispute and we stand by that characterization.

Very truly yours,

David L. Burg

cc:    Patrick T. Perkins, Esq.
       James D. Weinberger, Esq.
         (via e-mail)

WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP

Q 0552

EXHIBIT WW
820

Aug-12-05  09:14am    From-WEISSMANN WOLFF ETAL          310-550-7191       T-531  P.02/03  F-841

**WWBCGE**

**VIA FAX:  (310) 246-3101**
**AND FIRST CLASS MAIL**

August 11, 2005

**David L. Burg**
a professional corporation
dburg@wwlp.com
310.860.3322

Marc Toberoff, Esq.
Law Offices of Marc Toberoff, PLC
1999 Avenue of the Stars
Suite 1540
Los Angeles, California  90067

    Re:    Siegel v. Warner Bros. Entertainment Inc., et al.
             U.S. District Court Case Nos. 04-8400 and 04-08776 DDP (RZx)
             Our File No. 2231.811

Dear Marc:

    This responds to your letter of August 4, 2005, regarding your unauthorized meeting with Paul Levitz, President of DC Comics, on July 16, 2005 at Comic-con in violation of California Rule of Professional Conduct 2-100.

    Your characterization of the events of July 16th does not comport with the facts. As you are aware, the conversation between you and Mr. Levitz took place at DC Comics' booth in a conference room at around 3:30 p.m. You and Mr. Levitz were alone in the conference room, although the fact that you went into the conference room alone with Mr. Levitz was witnessed by several people at the booth. This conversation went on for approximately 45 minutes and had nothing to do with speaking "in general terms with Mr. Levitz . . . in order not to appear rude." Rather, you were expressly engaged in an attempted settlement discussion with Mr. Levitz and, as such, your assertion that you have "always" refrained from discussion the "substance of the . . . litigation" directly with DC Comics is simply untrue.[1]

**WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP**
9665 WILSHIRE BLVD. NINTH FLOOR, BEVERLY HILLS, CA 90212  T. 310.858.7888  F. 310.550.7191  WWW.WWLP.COM
LAWYERS

312351_1.DOC

Q 0553

EXHIBIT WW
821

Marc Toberoff, Esq.
August 11, 2005
Page 2


Please let us know whether it is your position that you did not, in fact, have
a private conversation with Mr. Levitz in a conference room at DC's booth at
Comic-con.


Very truly yours,

David L. Burg


cc:    Patrick T. Perkins, Esq.
       James D. Weinberger, Esq.
          (via e-mail)


WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP

# LAW OFFICES OF MARC TOBEROFF

### A PROFESSIONAL CORPORATION

MARC TOBEROFF*
LARRY S. GREENFIELD*
NICHOLAS C. WILLIAMSON
DAVID MICHAELS

* ALSO ADMITTED IN NEW YORK

1999 AVENUE OF THE STARS, SUITE 1540
LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

August 12, 2005

<u>Via Fax: (310) 550-7191 and U.S. Mail</u>

David L. Burg, Esq.
Weissman Wolff Bergman Coleman Grodin & Evall LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, California 90212

  Re: Siegel v. Warner Bros. Entertainment Inc. et al.
   <u>U.S. District Court Case Nos. 04-8400 and 04-8766 DDP (RZx)</u>

Dear David:

  This will acknowledge receipt of your second letter to me of August 11, 2005, in which you once again attempt to "set the record straight" regarding your client's direct solicitation of our clients. Your efforts to extend and belabor this dialogue are not welcome and ultimately not in your client's interest as your letters only serve to antagonize our clients.

  Our clients inform us that your recital of the occurrences at Comic-Con are completely false. While our clients experienced the events which occurred, you did not. Our clients were made uncomfortable by your clients' solicitous contact both during and after Comic-Con, and specifically asked me to request that your clients cease further direct contact with them. Please, there is no need to respond as you have already stated your position, twice. I assume that your clients will adhere to this request.

     Very truly yours,

     Marc Toberoff

cc: Ms. Joanne Siegel
  Ms. Laura Siegel Larson
  James D. Weinberger, Esq.

Q 0555

EXHIBIT WW
823

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF*
LARRY B. GREENFIELD*
NICHOLAS C. WILLIAMSON
DAVID MICHAELS

* ALSO ADMITTED IN NEW YORK

1999 AVENUE OF THE STARS, SUITE 1540
LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

August 12, 2005

<u>Via Fax: (310) 550-7191 and U.S. Mail</u>

David L. Burg, Esq.
Weissman Wolff Bergman Coleman Grodin & Evall LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, California 90212

   Re: Siegel v. Warner Bros. Entertainment Inc. et al.
    <u>U.S. District Court Case Nos. 04-8400 and 04-8766 DDP (RZx)</u>

Dear David:

   This will acknowledge receipt of your letter to me of August 11, 2005, in which you continue to erroneously belabor the point about my alleged "unauthorized meeting" with Paul Levitz of DC Comics. I dispute your self-serving characterization of events of which you have no personal knowledge. For your edification, I did not enter into any conference room alone with Mr. Levitz. Mr. Levitz came up to my clients and I as we were walking the Comic-Con floor. While I was talking to Laura Siegel Larson, Mr. Levitz ushered Joanne Siegel into a DC conference room, without me. I then followed them into the room with Laura and her two boys behind me. Laura then informed her mother that her boys wanted to attend a movie event upstairs, whereupon my clients left, leaving Mr. Levitz and me in the room. The events have none of the insidious characteristics you try to attribute to them.

   I already previously indicated to you in writing that I will not speak directly with your client about the substance of this action. There is nothing further that need be said on this subject.

      Very truly yours,

      Marc Toberoff

cc: James D. Weinberger, Esq.

Q 0556

 

# Confirmation Report — Memory Send

```
                                        Page      : 001
                                        Date & Time: Aug-12-05   05:47pm
                                        Line 1    :
                                        Machine ID :
```

| | | |
|---|---|---|
| Job number | : | 554 |
| Date | : | Aug-12 05:46pm |
| To | : | ☎13108277227 |
| Number of pages | : | 003 |
| Start time | : | Aug-12 05:46pm |
| End time | : | Aug-12 05:47pm |
| Pages sent | : | 003 |
| Status | : | OK |
| Job number | : 554 | *** SEND SUCCESSFUL *** |

---

## LAW OFFICES OF MARC TOBEROFF
### A PROFESSIONAL CORPORATION

MARC TOBEROFF*
LARRY A. GREENFIELD*
NICHOLAS C. WILLIAMSON
DAVID MICHAELS

* ALSO ADMITTED IN NEW YORK

1999 AVENUE OF THE STARS, SUITE 1540
LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

### FACSIMILE COVER PAGE

| TO: Laura Siegel Larson | FAX: (310) 827-7227 |
|---|---|
| FROM: Marc Toberoff | PAGES ( including cover ): 2 |
| DATE : 8/12/05 | RE: Siegel vs. Warner Bros. |

**COMMENTS:**

Included document:

August 11, 2005 David Burg letter that Marc responded to on August 12, 2005.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

Q 0557

# Confirmation Report – Memory Send

Page : 001
Date & Time: Aug-12-05 06:00pm
Line 1 :
Machine ID :

| | | |
|---|---|---|
| Job number | : | 557 |
| Date | : | Aug-12 05:57pm |
| To | : | ☎13108277227 |
| Number of pages | : | 009 |
| Start time | : | Aug-12 05:57pm |
| End time | : | Aug-12 06:00pm |
| Pages sent | : | 009 |
| Status | : | OK |

Job number : 557 *** SEND SUCCESSFUL ***

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

Two August 12, 2005 responses from Marc.

Two August 11, 2005 David Burg letters.

Included documents:

COMMENTS:

| | |
|---|---|
| TO: Laura Siegel Larson | FAX: (310) 827 7227 |
| FROM: Marc Toberoff | PAGES (including cover): # 9 |
| DATE : 8/12/05 | RE: Siegel vs. Warner Bros. |

FACSIMILE COVER PAGE

MARC TOBEROFF*
LARRY S. GREENFIELD*
NICHOLAS C. WILLIAMSON
DAVID MICHAELS
*ALSO ADMITTED IN NEW YORK

1999 AVENUE OF THE STARS, SUITE 1540
LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333
FACSIMILE
(310) 246-3101

A PROFESSIONAL CORPORATION

## LAW OFFICES OF MARC TOBEROFF

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF*
LARRY S. GREENFIELD*
NICHOLAS C. WILLIAMSON
DAVID MICHAELS

* ALSO ADMITTED IN NEW YORK

1999 AVENUE OF THE STARS, SUITE 1540
LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

## FACSIMILE COVER PAGE

| TO: Laura Siegel Larson | FAX: (310) 827 7227 |
|---|---|
| FROM: Marc Toberoff | PAGES ( including cover ): 9 |
| DATE : 8/12/05 | RE: Siegel vs. Warner Bros. |

**COMMENTS:**

Included documents:

Two August 11, 2005 David Burg letters.

Two August 12, 2005 responses from Marc.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF*
LARRY S. GREENFIELD*
NICHOLAS C. WILLIAMSON
DAVID MICHAELS

* ALSO ADMITTED IN NEW YORK

1999 AVENUE OF THE STARS, SUITE 1540

LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

## FACSIMILE COVER PAGE

| TO: Joanne Siegel | FAX: (310) 821-5894 |
|---|---|
| FROM: Marc Toberoff | PAGES ( including cover ): 7 |
| DATE : 8/12/05 | RE: Siegel vs. Warner Bros. |

**COMMENTS:**

Included documents:

Two August 11, 2005 David Burg letters.

Two August 12, 2005 responses from Marc.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF*
LARRY S. GREENFIELD*
NICHOLAS C. WILLIAMSON
DAVID MICHAELS

* ALSO ADMITTED IN NEW YORK

1999 AVENUE OF THE STARS, SUITE 1540

LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

## FACSIMILE COVER PAGE

| **TO:** Joanne Larson | **FAX:** (310) 821-5894 |
|---|---|
| **FROM:** Marc Toberoff | **PAGES ( including cover ):** 2 |
| **DATE :** 8/12/05 | **RE:** Siegel vs. Warner Bros. |

**COMMENTS:**

     Included document:

          August 11, 2005 David Burg letter that Marc responded to on August 12, 2005.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

Q 0561

# SUPERMAN – MARC TOBEROFF TIMELINE

*\*Please read closely. We have enclosed several supporting documents in our package to you, and very much hope you will spend some time reviewing them before you come to any potential settlement with Marc Toberoff, who represents the Siegels and the Schuster heirs in the ongoing Superman legal dispute with Time Warner and DC Comics.*

*The below information should save Time Warner potentially millions and millions of dollars, and, if you so choose, - have Marc Toberoff suspended, disgraced, --- if not ultimately disbarred --- from practicing law.*

*Toberoff being labeled as the "relentless crusader for artists' rights" is hardly that: he has devised a strategy whereas he has ultimately claimed much ownership of the Superman copyright personally as he can. And of course, he has done so without the knowledge and full disclosure to the Siegels and Schuster heirs, creators of Superman.*

***As it stands right now, the single person who would stand to gain the MOST in a settlement with Time Warner regarding the ongoing SUPERMAN legal dispute would not be the heirs themselves, but Marc Toberoff.***

*What you do with the below information is up to you. You should most certainly conduct your own investigation. We believe there are details within this timeline that will be of strong interest to you.*

*Consider it an early holiday gift.*

*(Also, please be aware that this timeline is written with the assumptions that the reader(s) are aware of the characters involved within the ongoing Superman legal dispute between Time Warner/DC Comics. The heirs to the SUPERMAN copyright are: the Siegels (Joanne, Laura & Michael), Jerry Siegel's heirs, who collectively have claims to 50% of the copyright to Superman, while the Schuster estate has claims on the other 50%.) Marc Toberoff currently represents both parties in ongoing litigation.*

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

In 2000 MT established a separate corporation entitled "Pacific Pictures Corporation" (PPC), with an address of 23852 Pacific Coast Hwy, Suite 555, Malibu, CA 90265. Tel: (310)-589-5151. You will see below that he established this business to solicit his services as an attorney.

In 2001, Marc Toberoff (MT) began researching Superman, who had rights, etc.

MT initially contacts Kevin Marks at Gang, Tyre, who represented Joanne and Laura Siegel with an offer for the Siegel rights. Marks discourages Toberoff from any advances, and does not tell Siegels initially of the interaction because he believes it is not in their best interest.

Q 0562                                    1

On Nov. 23, 2001, MT entered into a joint venture agreement between his own outside corporation Pacific Pictures Corp. (NOT a law firm), and Mark Warren Peavy, and his mother Jean Peavy, heirs to the Joe Schuster estate. For the purposes of this document, we do not know the content of that agreement.

MT and Ari Emanuel, partner and agent at Endeavor, contacts Kevin Marks at Gang, Tyrer, Ramer, & Brown again, (who represented Joanne and Laura Siegel), on August 8, 2002. MT approaches the Siegels, *not as an attorney but as a film producer*, stating that he is "allied" with Emanuel, hoping such a claim will legitimize him.

On August 8th 2002, MT tells Marks that he and Emanuel have a billionaire ready to offer $15 million dollars up-front, plus what they promise to be meaningful participation from proceeds for exploitation of the Siegels' rights to SUPERMAN and some continued royalties on an ongoing basis in all media. Kevin Marks says to the Siegels, "Don't do it." Gang, Tyrer tells the Siegels that they believe MT has brokered a confidential agreement with the Joe Schuster estate. Marks also tells the Siegels that the Schuster estate will have termination rights in approximately 2013. Schuster missed termination notices.

Within their offer, MT appeals to the Siegels' sense of ownership and encourages them to take this deal. MT says he can help them make a movie in direct competition to the one being made at Warner Brothers (MT makes this argument to Joanne and Laura, all the while knowing full well that no one would ever go near making such an attempt; no other studio would go for it because of the division of rights, and no one outside of the studio system would attempt such an endeavor for all the enormous costs attributable to the making, marketing and distribution of such a film.) In other words, MT displays "predatory intent" in his initial approach to the Siegels from the very beginning.

In their very first conversation, Kevin Marks tells MT "no go" --- that the Siegels have already reached an agreement with Time Warner and DC Comics.

Marks conveys MT's offer to the Siegels, and Marks does say to the Siegels, it is a better offer than the one you have. However, Marks also tells the Siegels that he would testify in court against the Siegels if they accepted this offer because he believes there has already been an agreement reached.

The Siegels are angry at Kevin Marks that he said he would testify against them if they took MT's offer, and relations break down between the Siegels and Gang, Tyrer. They fire Gang, Tyrer. And, because the Siegels believed that MT was sympathetic to their plight, and because MT appealed to their sense of ownership of SUPERMAN, they decide to enter into an agreement with Intellectual Properties Worldwide, otherwise known as "IPW", Marc Toberoff's film production company, for 10% for any kind of deal he got to make a movie or exploit the rights. (as you know, the Siegels submitted termination notices on the Superman copyright in 1997).

The Siegels' agreement with IPW is an agreement that mirrors the earlier Pacific Pictures agreement that MT makes with the heirs to Joe Schuster (*see more information on this below*). In other words, Marc Toberoff is named as their attorney within the agreement (which is masked as a retainer agreement) in the event that they go to litigation over anything (*please see enclosed document*). Upon the Siegels signing the agreement, MT then tells Joanne and Laura that his mysterious billionaire has decided to invest elsewhere. In other words, MT makes himself the Siegels' attorney of record while he solicited them as a film producer, violating the rule that no lawyer may directly solicit business, with the double violation of doing it under the auspices of doing separate business dealings. MT's sole intent was to become the Siegels' attorney, not to help the Siegels (as he had alleged) to make a movie in competition to *Superman Returns*, which was then in development at Warner Brothers. MT also never divulges his previous direct dealings with the Schuster heirs, and his Nov.23, 2001 joint agreement with the Peavys (the Schuster heirs) in which he is named their attorney of record.

In 2002, MT set his sights on acquiring the passive interest to Michael Siegel's rights, who, as you know, is Jerry Siegel's son from his first marriage, and is Laura's half-brother. Michael Siegel has an interest of 12.5% in SUPERMAN and SUPERBOY. The Siegels total have 50% interest (Joanne holds 50%, Laura 25%. Michael 25%). So, in essence, Joanne has 25%, Laura 12.5, Michael 12.5. MT used to his advantage the strained relationship between Joanne and Laura, and Michael; as well as strained communication with the Schusters.

Here comes Ari Emanuel, and he is going to finance the purchase of Michael Siegel's interest. But Michael Siegel turns him down flat. MT discloses the intent to purchase to Joanne and Laura, admitting it is a possible conflict of interest. MT is fully aware of what he is doing is wrong.

On December 16, 2002, there is another letter from MT and Ari Emanuel to Joanne and Laura Siegel, saying they are re-approaching Michael again about purchasing his interest. MT tells Michael Siegel that they have an investor ready to buy out his interest, though the amount is significantly less than what DC showed as his share.

March 3, 2003 – letter from Paul Levitz/DC Comics to the Siegels, and MT is messing up relationships for his own personal benefit. DC is trying to understand why they backed out of the deal. The reason is MT who is interfering in all the relationships up to this point.

May 2003 -- MT is continuing to make business arrangements with the Schuster heirs, unbeknownst to Joanne and Laura Siegel .

May 13, 2003: Michael Siegel sends a very concerned letter to Laura Siegel about Marc Toberoff's actions. (*please see enclosed letter; this letter lays out well MT's scheme*). Among other things, Michael Siegel tells her of how Toberoff is now controlling the whole of the SUPERMAN copyright, how he may have bought a substantial portion of the Schuster interest for himself, and he brings to light MT's utter lack of opening a

dialogue with anyone regarding making another SUPERMAN movie, in partnership with Ari Emanuel. Also that MT has not even made contact with Time Warner. Lastly, Michael conveys that MT seems to have an agenda of "someone" buying him out, and that MT is pressing for an answer.

In May-June 2003. **STATUE OF LIMITATIONS is coming close on for filing of the SUPERMAN complaint. Both Joanne and Laura Siegel are now very ill.** MT starts saying to the Siegels that the statue of limitations is coming up, and they would have waived their right to sue based on the termination notices. *This is the very seed MT meant to mine all along.* He sends them the research on the statue of limitations, and concerned, the Siegels contact Art Levine in Washington, D.C. to have independent research done on the matter. The research confirms that they should file by September.

In June, Ari Emanuel through IPW is still trying to buy Michael Siegel's interest but can't come to terms on price.

End of June 2003, MT gets a law firm to represent the Schusters to assist with the SUPERMAN copyrights. They determine the value of the estate is $0, and California Probate Code will not be applicable, such that the estate attorney will not be entitled to any future settlement regarding the Superman interest. Estate attorney is only receiving an hourly rate. MT "graciously" pays all legal fees.

In other words, MT helped probate the estate, but hired an attorney to do the dirty work. Fittingly, the Joe Schuster will was "lost", so the will had no value. So, the court writes the will for him, and includes the rights to proceed with the termination. And since the firm receives an hourly rate, and the estate is valued at $0, it does not effect any future settlement. The estate attorney will thereby not be entitled to statutory compensation. Another example of showing that MT is solely motivated *at all times* not by his clients' interests, but manipulating pieces of the puzzle so that he may receive the greatest percentage from a very possible large Time Warner settlement, through part ownership and unconscionable fees (*see below*).

**Absolutely nothing is moving ahead with Siegel/Schuster rights and agreements because MT was never intending to do anything with rights other than litigate.**

July 5, 2003. Laura Siegel reveals her ignorance of Toberoff's dubious actions in her return letter back to Michael --- MT has NOT told them he is about to enter into the PPC agreement, whereby MT *personally* will have a 50% of the Schuster interest in Superman. He will shortly own equal to what Joanne owns (25% of entire copyright), and double what Laura owns, *but MT has failed to disclose this.* The Schusters – through the Pacific Pictures Corp agreement – gave MT half of what they had. MT never had the intention to make a movie in competition to the one at Warners – it is tantamount to throwing $$$ away, but it does appeal to the heirs' sense of lost ownership. MT never did want to make a movie, and exploit the rights. MT knows no one is going to invest in an outside movie project outside of Warner Brothers, though he uses Ari Emanuel, the agent, to legitimize his claims. *(please see enclosed letter)*

Also, in the letter back to Michael Siegel, that MT helped Laura Siegel draft --- in response to Michael's accusations of Toberoff, Laura clearly states that MT does *not* have a production company. (This is false – Marc Toberoff's IPW has been in existence, partly funded by Ari Emanuel, since at least 2002). In the draft of the letter, MT crossed out the statement that he does not have a production company, and writes " MT has not plans to produce a SUPERMAN movie, nor is this feasible given the division of ownership of the rights." (please see enclosed letter). **This clearly delineates that Toberoff never had the intention of making a movie, and approached the Siegels and Schusters separately ---- not for the exploitation of rights as he initially asserted,** but to gain an unconscionable fee from a very large possible settlement with Time Warner.

August 7, 2003 --- Letter from Rodi-Pollock, who is the attorney in the Schuster estate – who says the Schuster Will would be written by the court August 25, 2003, since the Schuster Will had been "lost".

Sept-Oct 2003 ---- Letter with Ari Emanuel in which he would receive $2.5 million flat fee for "negotiating services"

On October 27, 2003, MT uses PPC to enter into another agreement with the Joe Schuster's heirs: Mark Warren Peavy and Jean Peavy, in which PPC is "engaged as the Executor of the recently probated estate of Joeseph Schuster." The agreement purports that PPC is the Peavys exclusive advisor "for the purpose of retrieving, enforcing, and exploiting all of Joe Schuster's rights ….in all of his creations…". In this agreement, MT also names himself their attorney for any and all litigation or questions that should arise in regards to these Rights. MT also clearly delineates that PPC is NOT a law firm. And, lastly but most significantly, MT defines that any and all moneys and proceeds, in cash or in kind, received from the enforcement, settlement, or exploitation of any of the Rights, ….any monies would be split 50/50. **IN ESSENCE, MARC TOBEROFF NOW HAS A 25% STAKE IN SUPERMAN PERSONALLY BECAUSE OF HIS DEAL WITH THE SCHUSTERS THAT WAS MADE IN 2003. He gets – under the guise of Pacific Pictures Corp – the rights to retrieve and enforce and exploit Joe Schuster's interest in SUPERMAN.** MT's alleged "firewall" between film producing and soliciting business as an attorney comes tumbling down. (*please see enclosed signed agreement, dated October 27, 2003*).

In 2013 MT will own Schuster's side of it; but it does not matter, they will settle before.

MT inquires into the legality of entering into the Pacific Pictures Corporation agreement with the Peavys, heirs to Schuster estate, using law firm Armstrong, Hirsch, Jackoway, Tyerman, & Wertheimer. The inquiry raises strong eyebrows, and questions of legality as to MT's actions in regards to the Schusters, and strongly discourages further involvement with MT and this matter.

August 2003 – Michael Siegel wants an annuity of $200,000, which equaled $3.5 million. MT tells him that "no investor is going to go for that." MT says Warners' estimation was $2 million less; such a bad risk for an investor, MT says. MT is tenaciously going after the 12.5%, and of course, the investor MT "has" is himself. He is trying to get Michael to lower the price.

**MT is also trying to convince Michael Siegel not to sell his interest to another outside party. MT is lying to Michael Siegel to make sure he can still draw a fee from Michael's 12.5% interest. If Michael went away, he would only draw from remaining 37.5%, instead of 50%. In the final letter, MT tells Michael Siegel that he cannot sell without our approval because Michael did not take part in the termination, but "we will give you (Michael Siegel) approval, if you sell it to a third party, *monitored by Marc Toberoff*." MT is lying to Michael Siegel about Siegel's ability to sell his interest in the SUPERMAN copyright.**

**Significantly, MT admits to Laura Siegel that there never was a billionaire willing to invest $15 million when he first approached them. But by then the Siegels were concerned about appearing flaky for changing lawyers a few times. They decide to stick it out.**

October 2, 2004 --- MT files the complaint with the court against Time-Warner. There is disgruntlement in the Siegel camp, regarding the contingency fee. MT pushes hard for 33.3% contingency fee to go up to 40% if it falls within 60 days of trial (which, of course, he would make sure that it would…). In the contingency agreement they signed for SUPERMAN, IPW (Marc Toberoff's *film production company*) would have received a 10% negotiating fee (thus most likely bolstering Ari Emanuel's take in the settlement from Time Warner as well). Thus, Toberoff used the "film production arm" of his company to use as a shell to elicit larger contingency fees from his clients despite the fact that Toberoff maintains that there is a "firewall" between his law firm and his production company. (see John Lippman, *Wall Street Journal* article enclosed.)

MT "graciously" agrees to decrease IPW's take by 5%, which will be deducted from the firm's % fee, applicable to the gross proceeds of any settlement or outcome of the litigations.

****In other words, MT decreases his contingency fee by 5% -- instead of getting 50%, he will get 45%. Combined with the Schuster interest, the aggregate of any outcome in SUPERMAN litigation for Marc Toberoff *personally* becomes 47.5% of the entire Superman interest.***** It becomes clear at this juncture that MT thwarted the earlier deal with Time Warner and DC Comics in 2002 for his own personal gain.

And lastly, on the DUKES OF HAZZARD case, MT pocketed $8.5 million personally, more than any single plaintiff involved in the case (each plaintiff pocketed around $1.7 million). According to the settlement amount, he received an unconscionable 50% contingency fee.

Q 0567                                    6

Very strong likelihood that Marc <u>created an entity for the purposes of the lawsuit</u> (Moonrunners Limited, or Moonrunners LLP), which allegedly held the rights at issue and ultimately led to the injunction.  Christensen-Miller, Kevin Leichter, or the like need explore in greater detail the existence of the entity in which the rights were allegedly held.   It is strongly believed this entity was created only to bolster the lawsuit – that the rights were never conveyed at all.

**MT had his President of Production of IPW, J. Todd Harris, leak the confidential settlement on the DUKES OF HAZZARD  case to Variety ($17.5 million).  He then called Larry Greenfield, another attorney in his office at the time who has since left, to cover his tracks, "demanding" to know who leaked the amount, and to act as if he was portraying shock and dismay at the leak.  MT did it himself to attract more business in town.  At least 7 attorneys have come and gone at the Law Offices of Marc Toberoff, and many have left due to ethical issues.**

And lastly, MT is charging 50% in another Allison Giannini case involving real estate. The reason this fact is included is to show a history of charging unconscionable fees.

It should be noted for those at Time Warner that Marc Toberoff has still managed to set up SKYPORT as a producer at Warners, and he has a tangential hold on GILLIGAN'S ISLAND.  Fyi.

*****************

cc:    Alan Horn
       John Schulman
       Jeff Robinov
       Patty Connelly

Q 0568

Q 0569

EXHIBIT WW
837

# California Business Portal

## Secretary of State BRUCE McPHERSON

SECRETARY OF STATE | ELECTIONS & VOTER INFO | POLITICAL REFORM | CA BUSINESS PORTAL | ARCHIVES & MUSEUM | SPECIAL PROGRAMS

**Business Search
Corporations**

Printer Friendly Page

New Search

Search Tips

Field Definitions

Status Definitions

Name Availability

Corporate Records

**Business Entities
Records Order Form**
Certificates
Copies
Status Reports

FAQS

Corporations Main Page

Site Search

## Corporations

The information displayed here is current as of "APR 28, 2006" and is updated weekly. It is not a complete or certified record of the Corporation.

| Corporation |
| --- |
| PACIFIC PICTURES CORPORATION |

| Number: C2198479 | Date Filed: 9/25/2000 | Status: forfeited |
| --- | --- | --- |

| Jurisdiction: NEW YORK |
| --- |

| Address |
| --- |
| 23852 PACIFIC COAST HWY STE 555 |
| MALIBU, CA 90265 |

| Agent for Service of Process |
| --- |
| MARK TOBEROFF |
| 23852 PACIFIC COAST HWY STE 555 |
| MALIBU, CA 90265 |

Printer Friendly

**New Search**

- For information about certification of corporate records or for additional corporate information, please refer to **Corporate Records.**
- Blank fields indicate the information is not contained in the computer file.
- If the status of the corporation is "Surrender", the agent for service of process is automatically revoked. Please refer to California Corporations Code **Section 2114** for information relating to service upon corporations that have surrendered.

Copyright ©2001 California Secretary of State. **Privacy Statement.**

Q 0587

EXHIBIT WW

838

# NYS Department of State

## Division of Corporations

**Entity Information**

Selected Entity Name: PACIFIC PICTURES CORPORATION

Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | PACIFIC PICTURES CORPORATION |
| **Initial DOS Filing Date:** | AUGUST 26, 1988 |
| **County:** | NEW YORK |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**

% MAX TOBEROFF
330 EAST 57TH STREET
APT 34A
NEW YORK, NEW YORK, 10022

**Registered Agent**

NONE

NOTE: New York State does not issue organizational identification numbers.

Search Results                    New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

**Q 0588**

EJ140635574US

Laura:

I understand...I thought it was a great strategic move, however I don't want to put too much work into this if you remain quite hesitant.

Re: licensing opportunities – although possible in the right situation with people who really "get it" I believe key licensees will be hesitant for three reasons: 1. the clout of WB Consumer Products in the licensing industry; 2. perception that WB owns S and that to understand what you own requires an understanding of the nuances of copyright law; 3. fear of being sued or embroiled in litigation.

Best,

Marc Toberoff
Law Offices of Marc Toberoff
1999 Avenue of the Stars, Suite 1540
Los Angeles, CA 90067
Tel: (310) 246-3333
Fax: (310) 246-3101

-----Original Message-----
**From:** Mistylight3@cs.com [mailto:Mistylight3@cs.com]
**Sent:** Monday, October 10, 2005 1:48 AM
**To:** MToberoff@ipwla.com
**Subject:** Inquiry

Dear Marc,
After much consideration we have decided to permit you to make inquiries of key people regarding a movie based on Action Comics #1. However, we do not give permission for you to enter into any oral or written commitments for anyone to work on such a movie. Please let us know who you plan to speak with before you make contact with them and inform us of all activity on this matter as it develops. We also want to know of any publicity that may occur as a result of the inquiries, in advance, and we reserve the right to stop the inquiries at any time. If too many people get involved, we believe it will generate more headaches than we are willing to deal with. So to reiterate, you may proceed with a full inquiry but we do not want you to commission a script or enter into any employment agreements with anyone at this time. After the inquiries have been made, we will evaluate what you have learned and decide how to proceed.

We are also in favor of approaching product manufacturers about merchandising deals regarding use of the names Superman, Clark Kent, Lois Lane or other elements contained in Action Comics #1 and are willing to explore other commercial possibilities that may exist in connection with our ownership rights.

Thanks for your idea. We believe it is time for us to take matters into our own hands and to exercise the rights we obtained through the Copyright Act. However, we want to proceed cautiously. Please confirm whether you wish to do this or not.

Sincerely,
Joanne Siegel and Laura Siegel Larson

Q 0618

EXHIBIT WW
840

## Marc Toberoff

**From:**    Mistylight3@cs.com
**Sent:**    Saturday, August 13, 2005 12:21 AM
**To:**    MToberoff@ipwla.com
**Subject:** Burg letters

Dear Marc,
As my mom explained when she called you today, I was too ill after my extensive medical tests to call you myself. I trust the two of you have fully discussed the letters which arrived by fax this evening.

There is no need to respond to Burg further, in fact please don't, but in case it ever comes up in the future, I want to you to know that when Terry Cunningham--who was seated a few seats from my mom--leaned over in that noisy screening hall and introduced herself to my mom she said that they had met many years ago at a party that had been thrown by Jennette Kahn [the woman who used to have the job that Paul Levitz has now]. There was a lot of talking all around us and my mother couldn't hear what Ms. Cunningham said so she had to repeat that they had met years ago more than once. She still couldn't hear Ms. Cunningham so I told her what she said and even then my mom did not remember her. My mother and father attended that party more than 10 years ago at a restaurant and met many, many people that night. My mother remembered the party but did not remember Ms. Cunningham. I did not attend the party and had never met the woman before ComicCon. For Burg to make the ridiculous statement, "...Terry Cunningham with whom your client has been acquainted for 15 years" gives the impression that my mom knew who she was--(she did not)--and that she has had ongoing personal contact with her for 15 years--(again, she did not). Burg's characterization is absolutely false. Furthermore, my mother did not ask Ms. Cunningham to get Paul--she simply asked whether he was in San Diego. If Terry Cunningham decided to go and get Paul so he could say hi to my mom it was something she chose to do, not the result of a request. If she said anything to my mom before she left, my mom could not hear her and she was surprised when Paul walked up and greeted us. Now the whole thing is turning into an argument between you and Burg. I hope we will not have to deal with this matter further.

Hope your weekend is a good one.
Sincerely,
Laura

EXHIBIT WW
841

Q 0827

Aug-12-05  09:13am   From-WEISSMAN WOLFF ETAL                    310-550-7...        T-530   P.02/03   F-840

**WWBCGE**

**VIA FAX:  (310) 246-3101**
**AND FIRST CLASS MAIL**

August 11, 2005

David L. Burg
a professional corporation
dburg@wwlp.com
310.860.3322

Marc Toberoff, Esq.
Law Offices of Marc Toberoff, PLC
1999 Avenue of the Stars
Suite 1540
Los Angeles, California  90067

　　　Re:　　Siegel v. Warner Bros. Entertainment Inc., et al.
　　　　　　U.S. District Court Case Nos. 04-8400 and 04-08776 DDP (RZx)
　　　　　　Our File No. 2231.811

Dear Marc:

　　　This responds to your unsigned letter of August 4, 2005, regarding the contacts between Mr. Levitz and your clients. We write for the sole purpose of setting the record straight based on the facts as we know them.

　　　The "Terry" referred to in your letter is Terri Cunningham, with whom your client has been acquainted for 15 years. At the "Superman Returns" screening at Comic-con, Joanne Siegel (who happened to be sitting a few seats away from Ms. Cunningham) asked Ms. Cunningham if Mr. Levitz was in San Diego. After being advised that he was, Mrs. Siegel then said she would like to see him. Ms. Cunningham responded that she would attempt to get Mr. Levitz after the screening. After the screening concluded, Ms. Cunningham asked Mrs. Siegel whether she should attempt to find Mr. Levitz. Mrs. Siegel responded that she should and Ms. Cunningham proceeded to find Mr. Levitz and bring him over to where Mrs. Siegel was sitting. The conversation that you have complained about then ensued

　　　These are the facts as we know them, and we note that they are consistent with what you saw taking place from a "distance" of "a couple seats away." In this context, you can appreciate why we reacted the way we did to your claim

WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP
9665 WILSHIRE BLVD. NINTH FLOOR, BEVERLY HILLS, CA 90212 T. 310 858.7888 F: 310 550.7191 WWW.WWLP.COM
LAWYERS

312348_1.DOC                                        Q 0828

Marc Toberoff, Esq.
August 11, 2005
Page 2

that Mr. Levitz "directly approached" your clients, and your unfounded accusation that Mr. Levitz engaged in "inappropriate" conduct, as neither is true.

It certainly is your prerogative to communicate to us your clients' desire that Mr. Levitz and DC Comics not contact them directly, but not under the pretext that Mr. Levitz initiated the most recent series of contacts, when in fact he did not. This does constitute manufacturing a false dispute and we stand by that characterization.

Very truly yours,

David L. Burg

cc:    Patrick T. Perkins, Esq.
       James D. Weinberger, Esq.
        (via e-mail)

WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP

Q 0829

312348_1.DOC

EXHIBIT WW
--- -843                                                      Page 003

WWBCGE

**VIA FAX:  (310) 246-3101**
**AND FIRST CLASS MAIL**

August 11, 2005

**David L. Burg**
a professional corporation
dburg@wwlfp.com
310.860.3322

Marc Toberoff, Esq.
Law Offices of Marc Toberoff, PLC
1999 Avenue of the Stars
Suite 1540
Los Angeles, California  90067

     Re:    Siegel v. Warner Bros. Entertainment Inc., et al.
             U.S. District Court Case Nos. 04-8400 and 04-08776 DDP (RZx)
             Our File No. 2231.811

Dear Marc:

     This responds to your letter of August 4, 2005, regarding your unauthorized meeting with Paul Levitz, President of DC Comics, on July 16, 2005 at Comic-con in violation of California Rule of Professional Conduct 2-100.

     Your characterization of the events of July 16th does not comport with the facts.  As you are aware, the conversation between you and Mr. Levitz took place at DC Comics' booth in a conference room at around 3:30 p.m.  You and Mr. Levitz were alone in the conference room, although the fact that you went into the conference room alone with Mr. Levitz was witnessed by several people at the booth.  This conversation went on for approximately 45 minutes and had nothing to do with speaking "in general terms with Mr. Levitz . . . in order not to appear rude."  Rather, you were expressly engaged in an attempted settlement discussion with Mr. Levitz and, as such, your assertion that you have "always" refrained from discussion the "substance of the . . . litigation" directly with DC Comics is simply untrue.[1]

**WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP**
9665 WILSHIRE BLVD. NINTH FLOOR, BEVERLY HILLS, CA 90212  T. 310 858.7888 F. 310.550.7191 WWW.WWLFP.COM
LAWYERS

312351_1.DOC

Q 0830

EXHIBIT WW
844

Marc Toberoff, Esq.
August 11, 2005
Page 2

Please let us know whether it is your position that you did not, in fact, have a private conversation with Mr. Levitz in a conference room at DC's booth at Comic-con.

Very truly yours,

David L. Burg

cc:   Patrick T. Perkins, Esq.
      James D. Weinberger, Esq.
      (via e-mail)

WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP

Q 0831

312351_1 DOC

EXHIBIT WW
845

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF*
LARRY S. GREENFIELD*
NICHOLAS C. WILLIAMSON
DAVID MICHAELS

* ALSO ADMITTED IN NEW YORK

1999 AVENUE OF THE STARS, SUITE 1540
LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

August 12, 2005

<u>Via Fax: (310) 550-7191 and U.S. Mail</u>

David L. Burg, Esq.
Weissman Wolff Bergman Coleman Grodin & Evall LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, California 90212

  Re: Siegel v. Warner Bros. Entertainment Inc. et al.
   <u>U.S. District Court Case Nos. 04-8400 and 04-8766 DDP (RZx)</u>

Dear David:

  This will acknowledge receipt of your second letter to me of August 11, 2005, in which you once again attempt to "set the record straight" regarding your client's direct solicitation of our clients. Your efforts to extend and belabor this dialogue are not welcome and ultimately not in your client's interest as your letters only serve to antagonize our clients.

  Our clients inform us that your recital of the occurrences at Comic-Con are completely false. While our clients experienced the events which occurred, you did not. Our clients were made uncomfortable by your clients' solicitous contact both during and after Comic-Con, and specifically asked me to request that your clients cease further direct contact with them. Please, there is no need to respond as you have already stated your position, twice. I assume that your clients will adhere to this request.

      Very truly yours,

      Marc Toberoff

cc: Ms. Joanne Siegel
  Ms. Laura Siegel Larson
  James D. Weinberger, Esq.

EXHIBIT WW
846

Q 0832

# LAW OFFICES OF MARC TOBEROFF

### A PROFESSIONAL CORPORATION

MARC TOBEROFF*
LARRY S. GREENFIELD*
NICHOLAS C. WILLIAMSON
DAVID MICHAELS

* ALSO ADMITTED IN NEW YORK

1999 AVENUE OF THE STARS, SUITE 1540
LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

August 12, 2005

Via Fax: (310) 550-7191 and U.S. Mail

David L. Burg, Esq.
Weissman Wolff Bergman Coleman Grodin & Evall LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, California 90212

     Re: Siegel v. Warner Bros. Entertainment Inc. et al.
       U.S. District Court Case Nos. 04-8400 and 04-8766 DDP (RZx)

Dear David:

     This will acknowledge receipt of your letter to me of August 11, 2005, in which you continue to erroneously belabor the point about my alleged "unauthorized meeting" with Paul Levitz of DC Comics. I dispute your self-serving characterization of events of which you have no personal knowledge. For your edification, I did not enter into any conference room alone with Mr. Levitz. Mr. Levitz came up to my clients and I as we were walking the Comic-Con floor. While I was talking to Laura Siegel Larson, Mr. Levitz ushered Joanne Siegel into a DC conference room, without me. I then followed them into the room with Laura and her two boys behind me. Laura then informed her mother that her boys wanted to attend a movie event upstairs, whereupon my clients left, leaving Mr. Levitz and me in the room. The events have none of the insidious characteristics you try to attribute to them.

     I already previously indicated to you in writing that I will not speak directly with your client about the substance of this action. There is nothing further that need be said on this subject.

               Very truly yours,

               Marc Toberoff

cc: James D. Weinberger, Esq.

Q 0833

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF*
LARRY S. GREENFIELD*
NICHOLAS C. WILLIAMSON
DAVID MICHAELS

* ALSO ADMITTED IN NEW YORK

1999 AVENUE OF THE STARS, SUITE 1540

LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

## FACSIMILE COVER PAGE

| TO: Laura Siegel Larson | FAX:  (310) 827 7227 |
|---|---|
| FROM:  Marc Toberoff | PAGES  ( including cover ): 8 9 |
| DATE : 8/12/05 | RE: Siegel vs. Warner Bros. |

**COMMENTS:**

Included documents:

Two August 11, 2005 David Burg letters.

Two August 12, 2005 responses from Marc.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT  THE  ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

Q 0836

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF*
LARRY S. GREENFIELD*
NICHOLAS C. WILLIAMSON
DAVID MICHAELS

* ALSO ADMITTED IN NEW YORK

1999 AVENUE OF THE STARS, SUITE 1540

LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

## FACSIMILE COVER PAGE

| TO: Joanne Siegel | FAX: (310) 821-5894 |
| FROM: Marc Toberoff | PAGES ( including cover ): ~~4~~ ~~4~~ 7 |
| DATE : 8/12/05 | RE: Siegel vs. Warner Bros. |

**COMMENTS:**

      Included documents:

          Two August 11, 2005 David Burg letters.

          Two August 12, 2005 responses from Marc.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

Q 0837

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF*
LARRY S. GREENFIELD*
NICHOLAS C. WILLIAMSON
DAVID MICHAELS

* ALSO ADMITTED IN NEW YORK

1999 AVENUE OF THE STARS, SUITE 1540

LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

## FACSIMILE COVER PAGE

| **TO:** Joanne Larson | **FAX:** (310) 821-5894 |
|---|---|
| **FROM:** Marc Toberoff | **PAGES ( including cover ):** 2 |
| **DATE :** 8/12/05 | **RE:** Siegel vs. Warner Bros. |

**COMMENTS:**

Included document:

August 11, 2005 David Burg letter that Marc responded to on August 12, 2005.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

Q 0838

region in northeastern Spain. It's made while to step up ...

# HOLLYWOOD REPORT / By John Lippman

# The Rights Stuff

### 'Hazzard' Legal Issues Lead To $17.5 Million Payday; Discovery on a Treadmill

FOR THE NEW MOVIE "The Dukes of Hazzard," the biggest payout didn't go to the actors or even the movie's director and producer. It went to clients of Marc Toberoff, an attorney who's made a reputation suing big studios on behalf of TV-show creators who claim they're owed money for the movie rights.

The film, which opens Aug. 5, is based on the popular 1980s early '80s TV comedy about two Southern buddies who drive around getting into trouble and outwitting some local buffoons. It stars MTV personality Johnny Knoxville and reality-TV diva Jessica Simpson.

But before reaching the screen, the movie was tied up as a group of people who held rights related to the "Hazzard" TV show sued Warner Bros., the studio making the film. Last month, in an out-of-court settlement, the studio paid them $17.5 million, according to people familiar with the situation. It is believed to be the largest sum ever to arise out of a case involving movie rights for a TV show. It amounts to about one-third of the film's original budget. Mr. Toberoff, who usually takes his cases on a contingency-fee basis, declined to say how much he made from the "Hazzard" case. Warner Bros. declined to comment on any aspect of separated-rights matters.

For years, Hollywood has been besieged by lawsuits from people who claim studios stole their ideas. But those cases generally are about alleged copyright infringement. This lawsuit involves the "separated rights" clause in the Writers Guild of America's contract with the Hol-



Seann William Scott, left, and Johnny Knoxville, right, in 'The Dukes of Hazzard'

### The lawyer says he isn't an 'ambulance chaser': 'I don't take on a case unless I believe in it.'

lywood studios. (It also includes copyright-infringement claims.) The Writers Guild contract stipulates that the creator of a TV show retains the show's movie rights. A studio—or an independent producer—can acquire those rights separately only under narrow guidelines. Separated-rights cases deal with whether a producer has the right to make the material into a movie.

### Coming to the Fore

The issue has come to the fore in recent years as studios increasingly rely on versions of popular TV shows from the 1960s and 1970s. This summer has already seen "The Honeymooners" and "Bewitched." "Miami Vice" is coming up next year, and "Father Knows Best," "The A-Team," "Magnum, P.I." and "The Man from U.N.C.L.E." are in development. It couldn't be determined whether any of those projects are facing separated-rights challenges; the Writers Guild of America says separated-rights disputes are confidential. Studios have increasingly sought safe subjects, like old hit series, because they have a track record of success and sometimes don't cost much to develop into a film script. But in some cases, the plans for saving money can backfire, and the studio

have ended up paying large amounts because of litigation tied to TV-series rights.

For example, in 1999, the family of Gilbert Ralston, the creator of the 1960s TV series "The Wild, Wild West," sued Warner on a separated-rights case. (Mr. Toberoff represented them.) The studio was about to release a $150-million-budget movie based on the TV series. The suit was settled, and Warner ended up paying the Ralston family between $600,000 and $1.5 million, people involved in the case say. (The film was a disappointment at the box office.)

In the 1960s and 1970s, creators of series often sold certain TV rights to networks. But because big studios weren't generally in the market for making movies of these shows at that time, studios didn't always try to buy the movie rights. As a result, they must now go back and acquire them from the creators or their heirs—or risk being sued. "Since the whole idea of making a movie out of a TV series was highly speculative, by and large producers and studios didn't bother to acquire the separated rights," says attorney William Grantham. He represented United Artists a few years back when the studio wanted to turn the 1960s TV series "Rat Patrol" into a movie. The Writers Guild arbitrated issues involving those rights, though the movie hasn't been made.

In the case of "Hazzard," the TV series itself was based on a 1975 United Artists movie, "Moonrunners." Producer Bob Clark acquired a script by Gy Waldron, which Mr. Waldron also directed. In 1978, Warner Bros. acquired the rights to make "Moonrunners" into the "Hazzard" TV series. But according to Mr. Clark's lawsuit, the studio never acquired the movie rights. (Mr. Clark claimed copyright issues in the lawsuit, filed in Los Angeles Superior Court last February; specifically, that the "Hazzard" movie appears to rely to a large extent on "Moonrunners." The lawsuit details 25 points in the "Hazzard" movie, from plot to characters, in which the two movies possess "glaring and substantial similarities.")

On the basis of Mr. Clark's claims, the judge issued a preliminary injunction ordering Warner to withdraw marketing materials and denote if the "Hazzard" movie until the parties resolve the legal dispute. But Warner could settle. A big delay would have been a serious setback

for the studio, since the movie cost about $53 million to make, was a major summer entry for Warner and had been widely publicized. The studio had also started rolling out its estimated $30 million advertising campaign. Within days of the judge's ruling, Warner lawyers holed up in a conference room at Mr. Toberoff's offices, and agreed to pay Mr. Clark and his partners. A settlement was reached June 21.

### 'A Market to Be Tapped'

Mr. Toberoff, who says he's never lost a case, estimates he's handled rights issues related to 10 shows on behalf of their creators when producers wanted to make them into movies. The lawyer says most of the issues involved "cleaning up" the separated rights of the shows. In only three cases, he says, has he gone to court. (Other disputes are arbitrated by the Writers Guild.)

After winning one settlement, "he was selling himself as an expert," says Grace Reiner, assistant executive director of the Writers Guild, who works on the arbitration of disputes over separated rights. "He saw a market to be tapped, and he tapped it," she says. Regarding his work representing TV-show rights holders, Mr. Toberoff says, "People call me an 'ambulance chaser.' But I don't take on a case unless I believe in it."

Mr. Toberoff first got into the field of TV-series rights by way of the son of Robert Ursub, the creator of the 1960s TV series "Combat." While on the treadmill at his health club in 1994, Mr. Toberoff read an ad, placed by the son, seeking help in sorting through his father's papers. Mr. Toberoff researched what rights had, and hadn't, been sold. When it was announced a couple of weeks later that Bruce Willis was going to star in a movie version of "Combat," Mr. Toberoff was ready to press a claim the producer did not have the movie rights to the old TV series. Mr. Toberoff says a settlement was reached, though he won't say for how much. (That movie was never made.)

Meanwhile, Mr. Toberoff has pursued another line of work: producing. His intellectual-properties Worldwide has acquired remake rights to classics like "High Sierra" and "The Asphalt Jungle," as well as such old TV shows as "Ironside," "Police Woman," "Hart to Hart" and "F-Troop." This could theoretically

put him in a delicate position, since representing TV-show creators sometimes, while his production company's interest is in wanting to acquire rights to their shows, which could pit him against the studios that are his clients. Mr. Toberoff says he is aware of potential conflict and "keeps a firewall between producing and legal matters."

## Bonhams & BUTTERFIELDS
AUCTIONEERS & APPRAISERS

### Fine and Rare Wines
Saturday July 30, 9am
San Francisco
Simulcast Los Angeles

Pre-auction Wine Tasting
Thursday July 28, 6:30pm
Los Angeles

Inquiries
Frank Martell +1 (323) 436-5411
frank.martell@bonhams.com
Mariam Cebalo +1 (415) 503-3305
mariam.cebalo@bonhams.com

To attend our pre-auction wine tasting please contact:
+1 (800) 223 2854 ext. 3390
events.us@bonhams.com
*Registration fee for wine tasting

Bonhams & Butterfields
220 San Bruno Avenue
San Francisco, California 94103
www.bonhams.com/us
© 2005, Bonhams & Butterfields Auctioneers Corp. All rights reserved. Bond No. 57068621253

### INTERESTED IN BORDEAUX FUTURES?
You can't afford not to check out:
www.goodygoody.com