DANIEL M. PETROCELLI (S.B. #097802)
  dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
  mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
  cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

PATRICK T. PERKINS (admitted *pro hac vice*)
  pperkins@ptplaw.com
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, NY 10516
Telephone: (845) 265-2820
Facsimile: (845) 265-2819

Attorneys for Plaintiff DC Comics

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DC COMICS,<br><br>       Plaintiff,<br><br>       v.<br><br>PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, an individual, JOANNE SIEGEL, an individual, LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive,<br><br>       Defendants. | Case No. CV 10-3633 ODW (RZx)<br><br>**DECLARATION OF DANIEL M. PETROCELLI IN SUPPORT OF DC COMICS' RENEWED INITIAL OPPOSITION TO DEFENDANTS' RENEWED MOTIONS TO DISMISS AND TO STRIKE UNDER CALIFORNIA'S ANTI-SLAPP STATUTE (DOCKET NOS. 145-148)**<br><br>**Fed. R. Civ. P. 56(f)**<br><br>Hon. Otis D. Wright II<br><br>**Hearing Date**:    TBD<br>**Hearing Time**:    TBD |

# TABLE OF CONTENTS

| Exhibit | Description | Page |
|---|---|---|
| 1 | January 4, 2006 version of the www.ipwla.com website | 22 |
| 2 | Copy of the Internet Movie Database listings for Marc Toberoff and Intellectual Properties Worldwide as they appeared on September 26, 2010. | 25 |
| 3 | Copy of an article titled "Nastier Than a Speeding Bullet," published on profile.com and dated September 17, 2007 | 28 |
| 4 | Copy of an article titled "The Rights Stuff," published in The Wall Street Journal on July 15, 2005. | 35 |
| 5 | Copy of a complaint filed against Mr. Toberoff and Pacific Pictures Corporation in Los Angeles Superior Court on February 28, 1997 (*Alomar v. Cavana*, Case No. BC166806). | 38 |
| 6 | Copy of a complaint filed against Marc Toberoff and Intellectual Properties Worldwide in Los Angeles Superior Court on December 14, 2009 (*Leeds v. Van Leeuwan*, Case No. SC106045) | 116 |
| 7 | Copy of an Order Admitting Will To Probate, Appointing Executor and Authorizing Independent Administration of Estate with Limited Authority entered on October 7, 2003. | 125 |
| 8 | Copy of August 21, 1992 letter from Ms. Peavy to Time Warner and DC Comics. | 130 |
| 9 | Copy of a letter dated September 10, 1992 from Frank Shuster to Paul Levitz of DC Comics | 135 |
| 10 | Copy of the August 1, 1992 agreement signed by Jean Peavy, Frank Shuster, and DC Comics. | 137 |
| 11 | Copy of September 7 1999 letter from Jean Peavy to Paul Levitz, Ms. Peavy. | 138 |
| 12 | Copy of 2001 PPC Agreement dated November 23, 2001 between Ms. Peavy, Mr. Peary, and Mr. Toberoff on behalf of Pacific Pictures Corporation. | 139 |

PETROCELLI DECL. ISO DC'S RENEWED
INITIAL OPP. TO DEFS' RENEWED
MOTIONS TO DISMISS AND STRIKE

| Exhibit | Description | Page |
|---|---|---|
| 13 | Copy of the 2003 PPC Agreement | 143 |
| 14 | Correct copy the November 17, 2006 deposition of Marc Toberoff in Case Nos. 04-8400 and 04-8776. | 147 |
| 15 | Correct copy of the Notice of Termination of Transfer Covering Extended Copyright Renewal Term of "Superman" dated November 10, 2003. | 301 |
| 16 | Copy of the December 23, 1975 agreement signed by Jerry Siegel, Joseph Shuster, and Warner Communications Inc. | 314 |
| 17 | Copy of June 20, 1988 from Martin Payson of Warner Communications, Inc. to Joanne Siegel. | 329 |
| 18 | Copy of August 8, 1988 from Martin Payson of Warner Communications, Inc. to Joseph Shuster. | 330 |
| 19 | Copy of March 12, 1990 from Martin Payson of Warner Communications, Inc. to Joanne Siegel. | 331 |
| 20 | Copy of JAMS Mediation of Siegel, Joanne, et al. vs. DC Comics, et al | 332 |
| 21 | Copy of March 5, 1991 letter from Martin Payson to Joanne Siegel. | 342 |
| 22 | Copy of February 14, 1982 letter to Steven J. Ross of Warner Communications | 343 |
| 23 | Copy of a March 15, 1982 letter from Martin Payson to Joanne Siegel. | 346 |
| 24 | Copy of October 7, 2006 deposition transcript of Kevin Marks in Case No. 04-8400 and Case No. 04-8776. | 347 |
| 25 | Copy of the October 19, 2001 letter from Mr. Marks to Mr. Schulman. | 554 |
| 26 | Copy of October 26, 2001 letter from John Schulman to Kevin Marks. | 561 |

-ii-

| Exhibit | Description | Page |
|---|---|---|
| 27 | Copy of February 1, 2002 letter from Mr. Perkins to Mr. Marks. | 569 |
| 28 | Copy of May 9, 2002 letter from Joanne Siegel to Richard Parsons. | 624 |
| 29 | Copy of the Declaration of John Schulman in Opposition to Plaintiffs' Motion for Partial Summary Judgment filed in the Siegel case on May 29, 2007. | 627 |
| 30 | Copy of excerpts from Mr. Marks' call log, Mr. Toberoff called Mr. Marks again on February 6, 2002. | 636 |
| 31 | Copy of the Toberoff Timeline | 638 |
| 32 | Copy of September 21, 2002 letter from Joanne Siegel and Laura Siegel Larson to Kevin Marks. | 645 |
| 33 | Copy of September 21, 2002 letter from Joanne Siegel and Laura Siegel Larson to Paul Levitz. | 646 |
| 34 | Copy of a October 3, 2002 agreement between Joanne Siegel, Laura Siegel Larson, and IP Worldwide. | 647 |
| 35 | Copy of a September 10, 2004 letter from Mr. Toberoff to Mr. Peary and Ms. Peavy. | 651 |
| 36 | Copy of a letter signed by Joanne Siegel and Laura Siegel Larson dated October 28, 2002. | 652 |
| 37 | Copy of the May 12, 2005 letter from Marc Toberoff to Patrick Perkins. | 654 |
| 38 | Copy of Plaintiffs Joanne Siegel and Laura Siegel Larson's Responses to Defendants'/Counterclaimant's Second Set of Requests for Admission filed in the Siegel cases and dated June 7, 2006. | 655 |
| 39 | Copy of a August 16, 2010 letter from Daniel Petrocelli to Marc Toberoff and Richard Kendall. | 695 |

-iii-

## DECLARATION OF DANIEL M. PETROCELLI

I, Daniel M. Petrocelli, declare and state as follows:

1.     I am an attorney licensed to practice in the State of California and admitted to the Central District of California.  I am a partner with the law firm of O'Melveny & Myers LLP, attorneys of record for plaintiff DC Comics in the above-entitled action.  I have personal knowledge of the facts recited herein, and if called to testify thereto, I could and would do so competently.

2.     This declaration is submitted as part of DC Comics' Renewed Initial Opposition to Defendants' Renewed Motions to Dismiss and To Strike Under California's Anti-SLAPP Statute ("Opposition") to preliminarily oppose defendants' motion and, pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, to identify the discovery that is essential to submitting a full opposition to defendants' motion.

3.     The relevant procedural history is as follows.  DC Comics filed its initial complaint on May 14, 2010.  Docket No. 1.  On August 13, 2010, defendants filed three motions to dismiss and/or strike under Federal Rule of Civil Procedure 12, and a motion to strike under California's anti-SLAPP statute directed to DC Comics' fourth, fifth, and sixth claims for relief, which arise under state law ("Motion to Strike").  Docket Nos. 30-31, 33-34.  DC Comics filed its First Amended Complaint ("FAC") on September 3, 2010.  Docket No. 49.  In light of DC Comics' amendment, the Court issued an order on September 7, 2010 ruling that defendants' four motions were moot.  Docket No. 52.  On September 20, 2010, defendants filed the three pending Rule 12 motions and the Motion to Strike. Docket Nos. 75, 77-78, 80.

4.     Because defendants' Motion to Strike raises factual issues that require discovery to fully and fairly address, DC Comics requests, pursuant to Rule 56(f), that the Court either deny the motion in its entirety, but to the extent not completely denied pursuant to Rule 56(f), issue an order staying resolution of it pending the

PETROCELLI DECL. ISO DC'S RENEWED
INITIAL OPP. TO DEFS' RENEWED
MOTIONS TO DISMISS AND STRIKE

close of discovery and setting a status conference no earlier than 120 days (on or about July 18, 2011) at which the parties and Court can discuss a final briefing schedule and hearing date on defendants' Motion to Strike.

**A.    DC Comics' Efforts to Commence Discovery**

5.    DC Comics' need for discovery, in the event that motions are not fully denied, is not due to its lack of diligence.  DC Comics tried unsuccessfully for nearly two months to schedule an initial discovery conference pursuant to Rule 26(f) and to commence depositions and written discovery.  Defendants resisted, contending discovery should not commence until they filed and the Court ruled on their motions to dismiss and to strike the complaint.  Therefore, DC Comics served a motion to initiate discovery on August 13, 2010.  Docket No. 44-1 at 2-4, 8-17.

6.    The parties conducted their Rule 26(f) initial discovery conference on August 16, 2010, the earliest date defendants would agree to it.  The next day, DC Comics served deposition notices and requests for production of documents on defendants Joanne Siegel, Laura Siegel Larson, Jean Peavy, and Mark Peary.

7.    Defendants filed two motions seeking to stay and/or limit discovery. Defendants' first motion, filed at the same time as DC Comics' motion to initiate discovery, sought to bar discovery regarding an anonymous letter written by a former colleague of defendant Marc Toberoff titled "Superman – Marc Toberoff Timeline," whose identity Mr. Toberoff and his co-defendants have declined to disclose.  As alleged in DC Comics' complaint, "[t]he Toberoff Timeline describes and discloses Toberoff's wrongful activities in pursuing the Siegel and Shuster Heirs' putative interests in the Superman rights," FAC ¶ 103—conduct on which DC Comics' claims for relief are based, particularly the fourth, fifth, and sixth claims that are the subject of the Motion to Strike.  The Toberoff Timeline first surfaced during the related *Siegel* case, Case Nos. CV-04-8400, CV-04-8776.  To prevent DC Comics from obtaining and using this document, Toberoff and the Siegels asserted that it was exempt from discovery on the ground of privilege, but

1   this position was rejected by the Court and the Toberoff Timeline was ordered to be

2   produced.  The Timeline was produced to DC Comics on December 12, 2008.  In

3   their motion in this case to bar use of the Timeline, defendants repeated many of the

4   same arguments from the *Siegel* case, asserting the Timeline was privileged and DC

5   Comics was not entitled to use it in discovery.  Magistrate Zarefsky denied

6   defendants' motion on September 20, 2010, specifying:  "There shall be no limit to

7   the subject matter covered in the depositions."  Docket No. 74.  Defendants

8   admitted that the author was formerly employed at Mr. Toberoff's law firm, but

9   refused to divulge the person's identity.  Case No. 04-8400, Docket No. 477 ¶¶ 33-

10  34.  Attached hereto as Exhibit 39 is a true and correct copy of an August 16, 2010

11  letter from Daniel Petrocelli to Marc Toberoff and Richard Kendall addressing this

12  issue.  DC Comics will seek to compel defendants to disclose that information so

13  that DC Comics may depose the author and others about the numerous activities

14  and events catalogued in the document.

15       8.    Defendants' second motion sought to stay the four depositions noticed

16  by DC Comics on August 17 pending resolution of their Rule 12 motions and

17  Motion to Strike.  Defendants argued, among other things, that because Ms. Siegel,

18  Ms. Larson, Ms. Peavy, and Mr. Peary had been deposed in the *Siegel* case, their

19  depositions in this case "should be strictly limited, to avoid subjecting these

20  witnesses to duplicative questioning on the same subject matter...."  Docket No. 61

21  at 25.  As DC Comics explained in its opposition and discusses below, the

22  witnesses' limited depositions in the *Siegel* case had little relevance to the claims

23  and issues in this case.  Docket No. 61 at 5-7, 32-55.  On September 20, 2010,

24  Magistrate Zarefsky granted in part and denied in part defendants' motion, ordering

25  that the depositions would be stayed until November 15, 2010, but then could

26  commence thereafter.  Docket No. 74.  Judge Zarefsky also denied DC Comics

27  motion to initiate discovery, because by the time the motion was heard, DC Comics

28  had served the four pending deposition notices.

PETROCELLI DECL. ISO DC'S RENEWED
INITIAL OPP. TO DEFS' RENEWED
MOTIONS TO DISMISS AND STRIKE

9.    Following Magistrate Zarefsky's rulings, on September 20, 2010, defendants served over 150 pages of objections to DC Comics' document requests contained in the four notices of deposition served on August 17.  Defendants produced no documents.  DC Comics filed a motion to compel production of the requested documents on November 29, 2010.  Docket No. 125.  I anticipate discovery in this case will take at least six months.

**B.    Marc Toberoff**

10.    According to a 2006 published website for one of Mr. Toberoff's companies, "Intellectual Properties Worldwide" or "IPW":

> [Toberoff] is an *intellectual property expert, entrepreneur and producer*....  Prior to founding IPW, Mr. Toberoff acquired theatrical film, pay TV, merchandising and publishing rights to the classic television series: *My Favorite Martian*, *Fantasy Island*, *The Wild Wild West*....  Mr. Toberoff's efforts led to Sony's feature film, *I SPY*, starring Eddie Murphy and Owen Wilson (2002), which he executive produced, Disney's feature film, *My Favorite Martian* (1998) ... which Mr. Toberoff produced....

(Emphasis added.)  The website also stated:  "IPW manages an impressive library of over 250 popular literary titles.  In order to monetize these assets, IPW has strategic partnership with top talent agencies and production companies...."  Attached hereto as Exhibit 1 is a true and correct copy of a January 4, 2006 version of the www.ipwla.com website.[1]

11.    The Internet Movie Database website, IMDb.com, identifies Mr. Toberoff as a producer of 11 films and Intellectual Properties Worldwide as a production company for six films.  Attached hereto as Exhibit 2 is a true and correct copy of the Internet Movie Database listings for Marc Toberoff and Intellectual Properties Worldwide as they appeared on September 26, 2010.

---

[1] In certain instances, exhibits attached hereto have been slightly reduced in size to confirm with the Local Rules regarding format and pagination of exhibits.  *See* L.R. 11-5.2, 11-5.3, 11-5.4.  This was done solely to prevent pagination indications from overlapping with other text and to clearly differentiate the new pagination from prior document stamps.  No other changes were made to any document.

PETROCELLI DECL. ISO DC'S RENEWED INITIAL OPP. TO DEFS' RENEWED MOTIONS TO DISMISS AND STRIKE

12.     According to a published profile of Mr. Toberoff:

> Toberoff's penchant for biting the hand he hopes will feed him later—a rare duality that has *him acting as a lawyer one minute, a movie producer the next*—has made him a target for criticism. "It's a cagey thing to do, but I don't think admiration comes with it," says Karen Kehela Sherwood, who, as co-chair of Imagine Films, a division of Brian Grazer and Ron Howard's Imagine Entertainment, has been pitched by Toberoff.  "*He's not someone who hats have to go off to*."

(Emphasis added.)  Attached hereto as Exhibit 3 is a true and correct copy of an article titled "Nastier Than a Speeding Bullet," published on profile.com and dated September 17, 2007.

13.     According to a Wall Street Journal article discussing Mr. Toberoff:

> Mr. Toberoff has pursued another line of work: producing.  His Intellectual Properties Worldwide has acquired remake rights to classics like "High Sierra" and "The Asphalt Jungle...."  This could theoretically put him in a delicate position, since *he is representing TV-show creators suing studios, while his production company seeks the cooperation of studios* that's required to fund and distribute Hollywood films.  Mr. Toberoff says he is aware of this potential conflict and "*keeps a defined firewall between producing and legal matters*."

(Emphasis added.)  Attached hereto as Exhibit 4 is a true and correct copy of an article titled "The Rights Stuff," published in The Wall Street Journal on July 15, 2005.

14.     This case is not the first time Mr. Toberoff and his companies have been sued for alleged business misconduct.  Attached hereto as Exhibit 5 is a true and correct copy of a complaint filed against Mr. Toberoff and Pacific Pictures Corporation in Los Angeles Superior Court on February 28, 1997 (*Alomar v. Cavana*, Case No. BC166806).  Attached hereto as Exhibit 6 is a true and correct copy of a complaint filed against Marc Toberoff and Intellectual Properties Worldwide in Los Angeles Superior Court on December 14, 2009 (*Leeds v. Van Leeuwan*, Case No. SC106045).

PETROCELLI DECL. ISO DC'S RENEWED
INITIAL OPP. TO DEFS' RENEWED
MOTIONS TO DISMISS AND STRIKE

## C.    The Shusters

15.    Joseph Shuster, who co-created Superman with Jerome Siegel, died on July 30, 1992.  Ex. 7.  He left two siblings, Jean Peavy and Frank Shuster, Ex. 8, as well as a nephew, Mark Warren Peary, Ex. 7.  In 2003, Ms. Peavy and Mr. Peary initiated a probate action in Los Angeles Superior Court to probate Joseph Shuster's purported will.  Attached hereto as Exhibit 7 is a true and correct copy of an Order Admitting Will To Probate, Appointing Executor and Authorizing Independent Administration of Estate with Limited Authority entered on October 7, 2003 in that action.

16.    On August 21, 1992, Ms. Peavy sent a letter to Time Warner and DC Comics explaining that she was the sole heir to Shuster's estate and that Shuster had left "a crushing burden of unpaid debts and bills and only a tiny estate."  She asked that Time Warner and DC Comics "pay his final debts and expenses."  Attached hereto as Exhibit 8 is a true and correct copy of that letter.  DC Comics agreed to pay Shuster's debts and increase Frank Shuster's annual survivor payments under a 1975 agreement.

17.    On September 10, 1992, Frank Shuster sent a letter to DC Comics stating:

> [Jean] pointed out that my income tax as a single individual would be higher than hers as a married person.  She made the suggestion that if payments were made in her name, she would not pursue the termination of the Superman copyright as provided for to creators' heirs in the 1976 U.S. Copyright Act....

Attached hereto as Exhibit 9 is a true and correct copy of a letter dated September 10, 1992 from Frank Shuster to Paul Levitz of DC Comics.

18.    DC Comics entered into an agreement with Jean Peavy and Frank Shuster on August 1, 1992 ("1992 Agreement"), which provided:

> [T]his agreement fully settles all claims to any payments or other rights or remedies which you may have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights, trademarks, or other property right in any and all work

PETROCELLI DECL. ISO DC'S RENEWED
INITIAL OPP. TO DEFS' RENEWED
MOTIONS TO DISMISS AND STRIKE

created in whole or in part by your brother, Joseph Shuster, or any
works based thereon. *In any event, you now grant to us [DC Comics]
any such rights and release us, our licensees and all others acting with
our permission, and covenant not to assert any claim of right, by suit
or otherwise, with respect to the above, now and forever.*

(Emphasis added.)  Attached hereto as Exhibit 10 is a true and correct copy of the

August 1, 1992 agreement signed by Jean Peavy, Frank Shuster, and DC Comics.

19.    In a September 7, 1999 letter from Jean Peavy to Paul Levitz, Ms.

Peavy wrote, "I have learned from the Internet that Joanne Siegel has filed a

copyright claim for SUPERMAN.  I want you to know that I intend to continue to

honor our pension agreement."  Attached hereto as Exhibit 11 is a true and correct

copy of that letter.

20.    In November 2001, Mr. Toberoff's company, Pacific Pictures

Corporation, entered into an agreement with Ms. Peavy and Mr. Peary regarding

their putative Superman and Superboy rights ("2001 PPC Agreement).  Toberoff

executed the agreement as "President" of Pacific Pictures.   Attached hereto as

Exhibit 12 is a true and correct copy of this agreement dated November 23, 2001

between Ms. Peavy, Mr. Peary, and Mr. Toberoff on behalf of Pacific Pictures

Corporation.

21.    The 2001 PPC Agreement provides in part:  "[Peavy and Peary] hereby

transfer and assign to the Venture their rights, title and interests in the Rights,"

defined to include the "character, story element, and indicia associated with"

Superman and Superboy.  Ex. 12 ¶¶ 1, 2.  It also provides:

> The parties each warrant and represent that after signing this
> Agreement *they will not without the express written consent of all the
> parties transfer, limit or encumber the Rights in any respect....*
>
> Any and all moneys and proceeds received ... will be shared,
> divided and payable: fifty percent (50%) to [Peavy and Peary] and fifty
> percent (50%) to PPC.

*Id.* ¶¶ 4-5 (emphasis added).

PETROCELLI DECL. ISO DC'S RENEWED
INITIAL OPP. TO DEFS' RENEWED
MOTIONS TO DISMISS AND STRIKE

22.    On October 27, 2003, Pacific Pictures entered into another agreement
with Jean Peavy and Mark Peary ("2003 PPC Agreement"), providing that it
"supplement[ed] the joint venture agreement dated as of November 23, 2001...."
Ex. 13 at 143.  Toberoff executed the agreement as "President" of Pacific Pictures.
The 2003 PPC Agreement also stated:

> PPC ... is not a law firm....
>
> The parties each warrant and represent that after signing this
> Agreement they *will not without the express written consent of all
> parties transfer, limit or encumber the Rights in any respect*....
>
> Upon the expiration of the Term or *in the event of termination*
> by Client of this agreement for any reason, *all Rights will be held fifty
> percent* (50%) *by the Client and fifty percent (50%) by PPC* ... Client
> and *PPC will each be entitled to receive and continue to receive fifty
> percent (50%) of all Proceeds derived from the Rights after
> termination*, if any.

Ex. 13 ¶¶ 2, 4, 7 (emphasis added).  The 2003 PPC Agreement was signed by Ms.
Peavy, Mr. Peary, and "Marc Toberoff President" of Pacific Pictures Corporation.
In a September 10, 2004 letter from Mr. Toberoff to Mr. Peary and Ms. Peavy, Mr.
Toberoff "confirm[ed]" that the 2001 PPC Agreement and 2003 PPC Agreement
"have been cancelled."  Ex. 35.  Attached hereto as Exhibit 13 is a true and correct
copy of the 2003 PPC Agreement.  Attached hereto as Exhibit 35 is a true and
correct copy of the September 10, 2004 letter.

23.    According to a letter agreement dated February 2002, Pacific Pictures
promised to contribute its "current IP business" to IP Worldwide as well as
Toberoff's "contacts" and "IP hit list." Because this letter agreement was stamped
confidential, in an abundance of caution, DC Comics does not attach it hereto—
although defendants have disclosed certain of its contents in public filings.

24.    The deposition of Marc Toberoff was taken in the *Siegel* cases on
November 17, 2006.  Various paragraphs below reference portions of Mr.
Toberoff's testimony.  According to Mr. Toberoff's testimony, IP Worldwide LLC
assigned the rights from Pacific Pictures to IPW, LLC.  Ex. 14 at 191:4-15.  Exhibit

-8-

14 is a true and correct copy the November 17, 2006 deposition of Marc Toberoff in Case Nos. 04-8400 and 04-8776.

25.    On November 10, 2003, a notice of copyright termination regarding Joseph Shuster's putative interest in Superman was served on Mr. Peary's behalf. Attached hereto as Exhibit 15 is a true and correct copy of the Notice of Termination of Transfer Covering Extended Copyright Renewal Term of "Superman" dated November 10, 2003.

26.    To the best of my knowledge, since execution of the 2001 PPC Agreement, neither Jean Peavy nor Mark Peary has filed any litigation against DC Comics concerning putative Superman rights.

27.    In a letter dated May 12, 2005 from Mr. Toberoff to DC Comics' counsel Patrick Perkins, Mr. Toberoff expressed the Shusters' understanding that DC Comics had denied the validity of the Shuster Termination Notices:

> Given your firm's prior letter on DC's behalf denying our clients' termination interests without legal grounds, my clients have requested that any further communications to them be made through our law firm and not to them directly."

Ex. 37.  Attached hereto as Exhibit 37 is a true and correct copy of the May 12, 2005 letter from Marc Toberoff to Patrick Perkins.

**D.    The Siegels**

28.    In a 1975 agreement between DC Comics' affiliate Warner Communications Inc., Superman co-creator Jerome Siegel, and Joseph Shuster ("1975 Agreement"), Warner Communications agreed to pay Mr. Siegel and Mr. Shuster $20,000 per year until their deaths. Ex. 16 ¶ 5(a).  The agreement also provided medical insurance coverage, lump sum payments, and annual survivor payments to their heirs.  *Id.* ¶ 5.  Attached hereto as Exhibit 16 is a true and correct copy of the December 23, 1975 agreement signed by Jerry Siegel, Joseph Shuster, and Warner Communications Inc.

29.    According to June and August 1988 letters from Martin Payson of Warner Communications to Joseph Shuster, Warner Communications subsequently increased the annual payments to Siegel and Shuster, including an increase from $60,000 to $80,000 in 1988.  Exs. 17, 18.   Letters from March 1990 and March 1991 show that, following the 1988 increase, DC Comics made periodic "cost of living" increases to the Siegels and Shusters.  Ex. 19.  Attached hereto as Exhibits 17, 18, 19, and 21 are true and correct copies of letters from Martin Payson of Warner Communications dated June 20, 1988; August 8, 1988; March 12, 1990; and March 5, 1991.

30.    In a February 14, 1982 letter to Steven J. Ross of Warner Communications, Joanne Siegel requested an amendment to the 1975 Agreement:

> Should anything happen to Jerry, there is the problem of what's to become of me as his widow.  I'll be 65 years old this year.  And there is our daughter, Laura who would be left without any measure of security....
>
> [O]ur contract states that after Jerry's demise, should it come before 1985, I would receive only $20,000 annually, about $16,000 after taxes, or $10,000 after 1985, about $7,000 annually after taxes.  This would plunge me into an impossible financial situation without dignity nor security....
>
> *Without an amendment to the contract stating that the same income continue to me, my financial security is in jeopardy....*
>
> We are so grateful to you for all you have done for us....
>
> Fondest regards from Jerry, Joe, Laura and me.  God bless you.

Ex. 22 at 344-45 (emphasis added).  Attached hereto as Exhibit 22 is a true and correct copy of that letter.

31.    By return letter, Martin Payson informed Ms. Siegel:

> I am pleased to advise you that Warner Communications agrees that if Jerry should predecease you, *Warner Communications will continue to pay to you for the remainder of your life the same benefits which it is then paying to Jerry.*

Ex. 23.  Attached hereto as Exhibit 23 is a true and correct copy of a March 15, 1982 letter from Martin Payson to Joanne Siegel.

-10-

PETROCELLI DECL. ISO DC'S RENEWED
INITIAL OPP. TO DEFS' RENEWED
MOTIONS TO DISMISS AND STRIKE

32.    On April 3, 1997, notices of copyright termination were served by Laura Siegel Larson and Joanne Siegel on DC Comics regarding certain works depicting Superman.  Case No. 04-8400, Docket No. 293 at 20.

33.    The deposition of the Siegels' attorney Kevin Marks was taken in the *Siegel* cases on October 7, 2006.  Various paragraphs below reference portions of Mr. Marks' testimony.  A true and correct copy of the entire deposition transcript is attached hereto as Exhibit 24.  According to Mr. Marks, in 1999, the Siegels retained him to "represent the Superman termination interest."  Ex. 24 at 369:1-9. He "advise[d] them generally and [attempted] to negotiate an arrangement with Time Warner, or then AOL Time Warner."  *Id*. at 370:11-15.  At the time he was retained, Mr. Marks testified that his law firm "no longer engaged in litigation practice."  *Id.* at 370:4-6.  Attached hereto as Exhibit 24 is a true and correct copy of relevant excerpts from the October 7, 2006 deposition of Kevin Marks in Case No. 04-8400 and Case No. 04-8776.

34.    Mr. Marks testified that on October 16, 2001, John Schulman of DC Comics' affiliate Warner Bros. Pictures and he resolved the "final element" of their negotiation.  When asked at his deposition whether "that [resolution] closed the deal," Mr. Marks testified, "Yes."  Ex. 24 at 479:11-481:11.

35.    According to a letter by Mr. Marks to John Schulman of Warner Bros. dated October 19, 2001.  Mr. Marks stated:

> This is to confirm our telephone conversation of October 19, 2001.  *The Siegel Family* (through Joanne Siegel and Laura Siegel Larson, the majority owners of the terminated copyright interests) *has accepted D.C. Comics [sic] offer of October 16, 2001 in respect of the "Superman" and "Spectre" properties.*  The terms are as follows....

Ex. 25 (emphasis added).  Attached hereto as Exhibit 25 is a true and correct copy of the October 19, 2001 letter from Mr. Marks to Mr. Schulman.

PETROCELLI DECL. ISO DC'S RENEWED
INITIAL OPP. TO DEFS' RENEWED
MOTIONS TO DISMISS AND STRIKE

36.     An October 26, 2001 letter from John Schulman to Kevin Marks outlines the parties' agreed-upon terms.  Ex. 26.  Attached hereto as Exhibit 26 is a true and correct copy of that letter.

37.     In a February 1, 2002 letter, Mr. Perkins sent a letter to Mr. Marks attaching a draft long-form agreement.  Attached hereto as Exhibit 27 is a true and correct copy of that letter.

38.     On May 9, 2002, Joanne Siegel sent a letter to Richard Parsons of Time Warner, Inc. regarding the February 1, 2002 long-form agreement.  In discovery responses in the *Siegel* cases, Joanne Siegel and Laura Siegel Larson "den[ied]" that "the May 9 Letter … terminated negotiations with [DC Comics] concerning the Superman Notices."  Ex. 38 RFA 85 at 21.  Attached hereto as Exhibit 38 is a true and correct copy of that letter.  Attached hereto as Exhibit 28 is a true and correct copy of Plaintiffs Joanne Siegel and Laura Siegel Larson's Responses to Defendants'/Counterclaimant's Second Set of Requests for Admission filed in the Siegel cases and dated June 7, 2006.

39.     According to the declaration of John Schulman filed in the *Siegel* cases In Opposition to Plaintiffs' Motion for Partial Summary Judgment, on May 16, 2002, Kevin Marks had a phone conversation with John Schulman in which Mr. Marks said the long-form agreement was aggressive but "not contrary to what had been agreed to...."  Ex. 29 ¶ 11.  Attached hereto as Exhibit 29 is a true and correct copy of the Declaration of John Schulman in Opposition to Plaintiffs' Motion for Partial Summary Judgment filed in the *Siegel* case on May 29, 2007.

40.     At his deposition in the *Siegel* case, Kevin Marks testified that he prepared a new draft agreement and sent it to "the Siegels on or about July 15, 2002."  Ex. 24 at 545:25-546:3.

41.     At his deposition, Mr. Toberoff testified that he called Mr. Marks in November 2001, "shortly after I made an agreement with the Shusters," in order to "find out the status" of the Siegels' termination.  Ex. 14 at 230:17-232:4.

-12-

1   Mr. Marks testified that he never returned the November 2001 phone call.  Ex. 24 at

2   498:10-11.

3        42.    According to Mr. Marks' call log, Mr. Toberoff called Mr. Marks

4   again on February 6, 2002.  Attached hereto as Exhibit 30 is a true and correct copy

5   of relevant excerpts from Mr. Marks' call log.

6        43.    Mr. Marks testified that he subsequently returned Mr. Toberoff's

7   February 2002 phone call and described the conversation as follows:

8            I think Mr. Toberoff started the call by
     saying that he had called me earlier and that I hadn't
9    returned his call, for which I apologized, and then he
     introduced himself.  He said he was a lawyer and that he
10   represented individuals that had interests in rights to
     movie and other properties that had come into those
11   rights either by way of reversions under the law or
     reversions under Guild agreements.  *I also recall him*
12   *saying that he had a* <u>*separate company*</u> *that was in*
     *the* <u>*business of acquiring intellectual property rights*</u>*.*
13   *I recall him saying that he was* <u>*interested in the Superman*</u>
     <u>*property*</u> *and the Superboy property and had understood*
14   *that I was representing the Siegel family interest, and*
     *he asked if he could talk to me about that.*
15   ...
         I think I said we were in the process
16   of -- in the documentation phase, were trying to document
     a deal.
17

18   Ex. 24 at 498:18-500:13 (emphasis added).

19       44.    Mr. Marks also testified about his July 2002 conversation with Mr.

20   Toberoff as follows:

21            Q. Okay.  Can you tell me to the best of your
     recollection what was said by each of you and
22   Mr. Toberoff in that conversation?
     A. I think Mr. Toberoff said he was -- wanted to
23   check in with me to see where we were in our dealings
     with DC Comics, and I think I told him then that -- and I
24   may have also said it in our first conversation -- that
     we had a confidentiality agreement with DC Comics, and I
25   didn't feel at liberty to discuss the status of our
     dealings with him.

-13-

PETROCELLI DECL. ISO DC'S RENEWED
INITIAL OPP. TO DEFS' RENEWED
MOTIONS TO DISMISS AND STRIKE

1

2

> Mr. Toberoff said, "Can you tell me what DC Comics offered you," and I said "No. We have a confidentiality agreement."
>
> And I believe Mr. Toberoff said, "Would you be willing to enter into negotiations with me," and I believe I said, "Initiating negotiations, no. That's something that makes me very uncomfortable.  If you have an offer, present it to me, and I'll present it to the client."

Ex. 24 at 513:10-514:3.

45.    According to Mr. Marks' deposition testimony, on or around August 8, 2002, he had a conference call with Mr. Toberoff and talent agent Ari Emanuel that he described as follows:

> ... they understood that the Siegel family had an interest in the termination rights and viewed that as perhaps the most valuable of properties and wanted to make a proposal.
> Q. Okay. What did you say?
> A. I said in substance and effect, "I'm listening."
> And I'm not sure who spoke, but they made a proposal of $15 million and what was described as a meaningful back end, which I understood to be a contingent compensation position or a royalty position in the exploitation of the property.

*Id.* at 515:20-516:5.

46.    In the Toberoff Timeline, the author describes Mr. Toberoff's August 2002 contacts regarding the Siegels as follows:

> MT and Ari Emanuel, partner and agent at Endeavor, contacts Kevin Marks at Gang, Tyre, Ramer, & Brown again, (who represented Joanne and Laura Siegel), on August 8, 2002.  MT approaches the Siegels, *not as an attorney but as a film producer*, stating that he is "allied" with Emanuel, hoping such a claim will legitimize him.
>
> On August 8th 2002, MT tells Marks that he and Emanuel have a billionaire ready to offer $15 million dollars up-front, plus what they promise to be meaningful participation from proceeds for exploitation of the Siegels' rights to SUPERMAN and some continued royalties on an ongoing basis in all media....

-14-

PETROCELLI DECL. ISO DC'S RENEWED
INITIAL OPP. TO DEFS' RENEWED
MOTIONS TO DISMISS AND STRIKE

> Within their offer, MT appeals to the Siegels' sense of
> ownership and encourages them to take this deal. MT says he can help
> them make a movie in direct competition to the one being made at
> Warner Brothers (MT makes this argument to Joanne and Laura, all
> the while knowing full well that no one would ever go near making
> such an attempt; no other studio would go for it because of the division
> of rights, and no one outside of the studio system would attempt such
> an endeavor for all the enormous costs attributable to the making,
> marketing and distribution of such a film.)  In other words, MT
> displays "predatory intent" in his initial approach to the Siegels from
> the very beginning....
>
> Upon the Siegels signing the agreement, MT then tells Joanne
> and Laura that his mysterious billionaire has decided to invest
> elsewhere....
>
> Significantly, MT admits to Laura Siegel that there never was a
> billionaire willing to invest $15 million when he first approached
> them. But by then the Siegels were concerned about appearing flaky
> for changing lawyers a few times.  They decide to stick it out.

Ex. 31 at 639-40, 643 (emphasis in original).  Attached hereto as Exhibit 31 is a

true and correct copy of the Toberoff Timeline.

47.    To the best of my knowledge, Mr. Toberoff has not publicly identified

the author of the Toberoff Timeline or taken legal action against the author.

48.    A September 21, 2002 letter from Joanne Siegel and Laura Siegel

Larson to Kevin Marks states:

> As we previously discussed with you and hereby affirm, we
> rejected DC Comics' offer for the Siegel Family interest in Superman
> and other characters sent to us by you on February 4, 2002. We
> *similarly reject your redraft of the February 4, 2002 document which
> you sent to us on July 15, 2002.*  Therefore, due to irreconcilable
> differences, after four years of painful and unsatisfying negotiations,
> *this letter serves as formal notification that we are totally stopping and
> ending all negotiations with DC Comics, Inc.....*
>
> This letter is also notification that, effective immediately, we are
> terminating Gang, Tyre, Ramer & Brown, Inc., and all of your firm's
> partners, associates and employees as representatives of the Siegel
> Family interest regarding Superman....

Ex. 32 (emphasis added).  Attached hereto as Exhibit 32 is a true and correct copy

of that letter.

49.    In a September 21, 2002 letter from Joanne Siegel and Laura Siegel Larson to Paul Levitz of Warner Bros., the Siegels stated:

> We regret to inform you that after many years of difficult negotiations with your representatives culminating in an offer sent to us on February 4, 2002, irreconcilable differences exist that cannot be overcome. *Therefore, effective immediately, we are totally stopping and ending negotiations with DC Comics, Inc*....

Ex. 33 (emphasis added).  In a letter dated October 28, 2002, the Siegel heirs sent a letter to Lillian Laserson of DC Comics attaching the September 21, 2001 letter "which totally stopped and ended negotiations with DC Comics...."  Ex. 36. Attached hereto as Exhibit 33 is a true and correct copy of a letter signed by Joanne Siegel and Laura Siegel Larson dated September 21, 2002.  Attached hereto as Exhibit 36 is a true and correct copy of a letter signed by Joanne Siegel and Laura Siegel Larson dated October 28, 2002.

50.    According to the letter agreement dated February 2002, Mr. Toberoff and Mr. Emanuel formed IP Worldwide as a joint venture between Pacific Pictures, Mr. Emanuel, and Endeavor talent agency.  Pacific Pictures promised to contribute its "current IP business" to IP Worldwide as well as Toberoff's "contacts" and "IP hit list."  Because this letter agreement was stamped confidential, in an abundance of caution, DC Comics does not attach it hereto—although defendants have disclosed certain of its contents in public filings.

51.    In October 2002, the Siegels entered into an agreement with IP Worldwide providing:

> Owner hereby warrants and represents that Owner will not transfer, assign, license or in any manner encumber the Rights during the Term or extended Term other than through or as a result of IPW's exclusive representation hereunder, with the exception of by will, probate or pursuant to other Court order.
>
> ...
>
> The parties understand and acknowledge that the scope of this Agreement does not include legal services and/or expenses in connection with litigation or formal legal arbitration, if any.

PETROCELLI DECL. ISO DC'S RENEWED
INITIAL OPP. TO DEFS' RENEWED
MOTIONS TO DISMISS AND STRIKE

Ex. 34 ¶¶ 8, 10.  Attached hereto as Exhibit 34 is a true and correct copy of a October 3, 2002 agreement between Joanne Siegel, Laura Siegel Larson, and IP Worldwide.

**E.      Consent Agreements**

52.     As discussed in the Siegel defendants' motion to dismiss at pages 18-23, before a 2008 mediation session in the *Siegel* case, Mr. Toberoff informed DC Comics about certain arrangements between the Shusters and Siegels relevant to their entering into agreements with DC Comics.  A mediation thereafter ensued, pursuant to a JAMS Confidentiality Agreement, a copy of which is attached hereto as Exhibit 20.

53.     During a mediation session on April 26, 2010, DC Comics was informed that agreements existed between the Siegels and Shusters relevant to their entering into agreements with DC Comics.  We have sought those agreements in discovery.  Defendants have refused to produce them.

**F.      Defendants' Factual Assertions Requiring Discovery**

54.     Defendants' Motion to Strike contains a number of factual assertions and characterizations regarding DC Comics' state-law claims in its fourth, fifth, and sixth claims for relief.  Because of the factual issues raised by defendants' Motion to Strike, DC Comics requires discovery to respond to such areas.  I have identified below certain factual areas where discovery is required to oppose defendants' Motion to Strike.

1.  Shuster Agreements

        a.     The circumstances leading to formation of the 1992 Agreement between DC Comics and the Shusters;

        b.     The contractual intent of the parties to the 1992 Agreement;

        c.     The Toberoff defendants' knowledge of the 1992 Agreement;

        d.     The nature and extent of DC Comics' relationship with the Shusters;

-17-

e.   The circumstances surrounding the Toberoff defendants' initial contract with the Shusters, and the timing, nature, and extent of their subsequent contracts;

f.   The circumstances leading to formation of the 2001 PPC Agreement between PPC and the Shusters;

g.   The nature, intent, and effect of a provision in the 2001 PPC Agreement stating that the Shusters could not enter into any agreement regarding their putative rights "without the express written consent" of PPC;

h.   The relationship, if any, of the 2001 PPC Agreement to anticipated or actual litigation;

i.   The nature, intent, and effect of a provision in the 2001 PPC Agreement identifying "Superboy" as among the Shusters' putative rights;

j.   The current status and effect of the 2001 PPC Agreement;

k.   The circumstances surrounding the formation of an attorney-client relationship between Toberoff and the Shusters;

l.   The circumstances leading to formation of the 2003 PPC Agreement;

m.   The circumstances surrounding and nature, intent, and effect of a provision in the 2003 PPC Agreement stating that the Shusters could not enter into any agreement regarding their putative rights "without the express written consent" of PPC, Ex. 13 ¶ 4;

n.   The nature, intent, and effect of the 2003 PPC Agreement's deletion of "Superboy" from a list of the Shusters' putative rights, Ex. 13 ¶ 1;

o.   The current status and effect of the 2003 PPC Agreement;

p.   The circumstances leading to the September 10, 2004 letter providing that the 2001 and 2003 PPC Agreements "have been cancelled," Ex. 35;

q.   The nature, intent, and effect of the "cancellation" language in the September 10, 2004 letter;

r.   The Toberoff defendants' current interest in PPC; and

s.     Whether and to what extent any of the Toberoff defendants' contacts with the Shusters occurred in connection with anticipated litigation.

2.  Siegel Agreements

a.     The circumstances surrounding the Siegels' identification of Superboy as among the "character[s], story element[s], or indicia reasonably associated with SUPERMAN" in their 1997 copyright termination notice, Docket No. 293;

b.     The nature, intent, and effect of the Siegels' October 19, 2001 letter to DC Comics stating that the Siegels "accepted D.C. Comics' offer of October 16, 2001," Ex. 25 at 554;

c.     The circumstances leading to Joanne Siegel's May 9, 2002 letter to DC Comics regarding the long-form document;

d.     The circumstances surrounding Marks' statement "that he would testify in court against the Siegels if they accepted [Toberoff's] offer because he believes there has already been an agreement reached," as described in the Toberoff Timeline, Ex. 31 at 639;

e.     The nature and extent of DC Comics' relationship with the Siegels;

f.     The circumstances surrounding the Toberoff defendants' initial contact with the Siegels, and the timing, nature, and extent of their subsequent contacts;

g.     The circumstances surrounding the formation of IP Worldwide, LLC between PPC, talent agent Ari Emanuel, and the Endeavor talent agency;

h.     Whether and to what extent any of the Toberoff defendants' contacts with the Siegels occurred in connection with anticipated litigation;

i.     The nature, intent, and effect of the Siegels' September 21, 2002 letter to DC Comics providing:  "effective immediately, we are totally stopping and ending negotiations with DC Comics," Ex. 33 at 646;

j.     The circumstances leading to formation of the IP Worldwide Agreement between the Siegels and IP Worldwide;

k.     The nature, intent, and effect of the provision in the IP Worldwide Agreement that the Siegels could "not transfer,

PETROCELLI DECL. ISO DC'S RENEWED
INITIAL OPP. TO DEFS' RENEWED
MOTIONS TO DISMISS AND STRIKE

assign, license or in any manner encumber the Rights … other than through or as a result of IPW's exclusive representation hereunder...." Ex. 34 ¶ 8;

l.     The current status and effect of the IP Worldwide Agreement;

m.     The Toberoff defendants' current interest in IP Worldwide and IPW;

n.     The circumstances surrounding the formation of an attorney-client relationship between Toberoff and the Siegels;

o.     The circumstances surrounding the Siegels' 2002 notice of termination claiming sole ownership of alleged Superboy rights, including communications with the Shusters and others; and

p.     The events described in the Toberoff Timeline.

3.  Consent Agreements

a.     The existence and status of any agreements between or among defendants restricting the ability of the Shusters or Siegels to freely negotiate or enter into agreements with DC Comics;

b.     The circumstances leading to the formation of any such agreements;

c.     The nature, intent, and effect of any such agreements;

d.     The existence and status of any agreements between or among Toberoff and/or his companies and the Siegels, including retainer agreements, joint-venture agreements, partnership agreements, or any other business agreements;

e.     The existence and status of any agreements between or among Toberoff and/or his companies and the Shusters, including retainer agreements, joint-venture agreements, partnership agreements, or any other business agreements;

f.     The existence and status of any agreements between the Siegels and Shusters regarding the division of proceeds in the Superman and Superboy asserted rights;

g.     The existence and status of any agreements between the Siegels and Shusters regarding their putative Superman and Superboy interests;

PETROCELLI DECL. ISO DC'S RENEWED
INITIAL OPP. TO DEFS' RENEWED
MOTIONS TO DISMISS AND STRIKE

h.   The existence and status of any agreements between the Toberoff defendants and other entities or third parties, regarding Superman or Superboy; and

i.   The circumstances surrounding the Siegels' and Shusters' efforts to negotiate with third parties for the sale of their purported Superman and Superboy interests.

55.   In the event the court does not deny defendants' motion to strike in its entirety, I believe that the discovery described above is necessary to provide relevant evidence to fully and fairly oppose the motion.

56.   DC Comics' therefore requests that the Court deny defendants' Motion to Strike in its entirety or, alternatively, issue and order staying any resolution of defendants' Motion to Strike and setting a status conference no sooner than 120 days, at which the parties and Court can discuss a final briefing schedule and hearing date on defendants' Motion to Strike.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 21st day of March 2011, at Los Angeles, California.

Daniel M. Petrocelli

PETROCELLI DECL. ISO DC'S RENEWED INITIAL OPP. TO DEFS' RENEWED MOTIONS TO DISMISS AND STRIKE