# EXHIBIT 3

# Nastier Than a Speeding Bullet

by Amy Wallace Sep 17 2007

A battle for control of the Superman franchise pits Time Warner against the original Lois Lane.



Image: Josephine Schiele
**1 of 4** NEXT ›

In May 2002, Richard Parsons, then co-chief operating officer of AOL Time Warner, received a scathing letter from the widow of Jerome Siegel, the man who invented *Superman*.

"Dear Dick," wrote Joanne Siegel. "Have you been aware that your representatives have gone too far?" In the mid-1930s, when she was in her late teens, Siegel had been the sketch model for Lois Lane. Now she was accusing Parsons' company of trying to fleece her and her daughter of their share of *Superman* revenues. She called AOL Time Warner "greedy" and alleged a "heartless attempt" to rewrite history. "Just like the Gestapo, your company wants to strip us naked of our legal rights…. Is that the reputation you want?"

In the five years since Parsons received that three-page screed, Siegel's outrage has found a more formal outlet: two lawsuits, both championed by a controversial Malibu litigator named Marc Toberoff. The 52-year-old attorney has made a career of taking on big entertainment companies on behalf of creators and their heirs. He has been especially successful against what is now Time Warner. His most publicized victory came in 2005, when he persuaded a judge to enjoin Warner Bros. from releasing the movie *The Dukes of Hazzard* because it was based in part on an earlier film, *Moonrunners*. Six weeks before the *Dukes* premiere, the studio settled with the *Moonrunners* producers for $17.5 million.

In the pending cases, Toberoff is taking a different tack, asserting that the Siegel family has terminated the

Exhibit 3
28

grants to the *Superman* and *Superboy* copyrights that Jerry Siegel had bestowed in 1938 and 1948, respectively. The Siegels have exercised a clause in U.S. copyright law that gives creators or their heirs a five-year window to reclaim rights to their works 56 years after the copyright was issued. Toberoff says this entitles the Siegels to half of all *Superman*-related profits earned since the copyright termination took effect in 1999—a sum he estimates tops $50 million—as well as any future profits. He also asserts that Time Warner has infringed the Siegels' *Superboy* copyright with its *Smallville* TV series and thus owes unspecified damages.

Time Warner's lawyers dispute these claims, saying, among other things, that the Siegel heirs have reneged on a settlement hammered out before Toberoff entered the picture. The attorneys also question whether the termination papers were filed correctly and say that, even if they were, the Siegel family has vastly overstated how much it is owed.

At stake is not just money but, potentially, the very future of the franchise. If the Siegel heirs prevail in winning back their copyrights, the result could be a similar challenge by the heirs of *Superman's* co-creator, artist Joe Shuster. And if that challenge were successful, then Time Warner—which is currently developing a follow-up to last year's film *Superman Returns*—could eventually find itself out of the *Superman* business altogether. How big is that business? Only Time Warner knows for sure (and it isn't saying), but counting the *Superman*- and *Superboy*-related movies, TV shows, DVDs, books, comics, and merchandise, the conservative estimate is in the hundreds of millions of dollars. Toberoff says it's $1 billion.

As the first suit moves toward a January trial, Time Warner has retained three law firms to keep the *Man of Steel* in the fold. Overkill? Not considering how much the company stands to lose—and the fact that it has lost to Toberoff before.

Reviled by some as the Hollywood equivalent of an ambulance chaser, Toberoff specializes in helping aging writers and artists (or their heirs) reassert their claims to decades-old properties. Then, in exchange for an ownership stake in the recovered rights, Toberoff tries to get new projects produced that are based on those properties, sometimes at the very same media company with which he just did battle.

Now more than ever, risk-averse Hollywood loves remakes, which are seen as easier to market. That trend has created opportunities for Toberoff, who, despite what one executive has called "pushy and aggressive" tactics, has a knack for attaching himself to projects that studios want to make. For example, back in the mid-1990s, it occurred to Toberoff that the 1978 TV series *Fantasy Island* could be the basis for a feature film. He tracked down Gene Levitt, the series' creator, and convinced him that it would be worth his while to dig his original contract out of the basement. Toberoff then proved that Levitt (who died in 1999) owned the show's movie rights. Sony Pictures is now developing the series into a film to star Eddie Murphy. If it is made, Toberoff will collect a producing fee. (He won't say how much.)

1 of 4 NEXT »

Read more: http://www.portfolio.com/culture-lifestyle/culture-inc/arts/2007/09/17/Time-Warner-Superman-Suit#ixzz0oauqVxSU

Exhibit 3
29

# Nastier Than a Speeding Bullet

by Amy Wallace Sep 17 2007

‹PREV **2 of 4** NEXT ›

To some, Toberoff is an innovator. A few years ago, Endeavor Agency partner Ari Emanuel briefly teamed up with the lawyer, calling him "the best there is at untangling these things." (The alliance fizzled within a year, sources say, because other Endeavor agents weren't as eager to move into Toberoff 's narrow niche.) But Toberoff's penchant for biting the hand he hopes will feed him later—a rare duality that has him acting as a lawyer one minute, a movie producer the next—has made him a target for criticism. "It's a cagey thing to do, but I don't think admiration comes with it," says Karen Kehela Sherwood, who, as co-chair of Imagine Films, a division of Brian Grazer and Ron Howard's Imagine Entertainment, has been pitched by Toberoff. "He's not someone who hats have to go off to."

Even people he's made money for agree. "Let's face it—he has this way about him that people find extremely irritating. He's probably the most hated man in Hollywood," says writer-director Larry Cohen, who joined with Toberoff to reclaim the rights to his 1974 horror film *It's Alive* from Warner Bros. "I've mentioned him a couple of times in meetings. You get an immediate reaction: 'Oh God, *him!*' "

Time Warner's lawyers have made his character an issue in the current case, casting him as an opportunist. Toberoff dismisses such criticism, which he sees as an effort to prejudice the court. "Having blown the deal by their own avarice, they need to blame somebody—the greedy Marc Toberoff," he says over lunch one day. Tan and wiry, with short gray-blond hair and a toothy grimace, he defends his compensation agreements—which he says typically net him a third or less of what he wins for his clients, about the same as any lawyer working on a contingency basis—as reasonable, considering the time he invests in what he calls righteous David-and-Goliath cases.

"I'm like a pit bull with a towel in his mouth," he says. "Movie studios take legal action against 12-year-olds for downloading content off the Web. But when it comes to creators, studios fuck 'em on an everyday basis. I like to level the playing field."

No one disputes that *Superman* was born in Jerry Siegel's head. It was 1933 when the Cleveland teenager thought up the extraterrestrial champion of the oppressed and asked his buddy Joe Shuster to draw him. Shortly after graduating from high school, Shuster conceived of the cape and tight-fitting suit with an *S* emblazoned on the chest. Then, to make sure he got Lois Lane just right, he hired a teenage sketch model named Joanne Kovacs.

Joanne remembers that Shuster's mother was making chicken soup in the family's apartment the first time she reported for work. She posed on a blanket on the floor to simulate how Lois might look in *Superman's* arms. She also remembers that Jerry, whom she would marry 13 years later, greeted her for the first time by taking a flying leap across the living room like Superman. That boyish innocence, she says, would define the two men all their lives.

"Jerry and Joe didn't have much life experience," says Joanne, whose sculpted blond hair and bright eyes belie her 89 years, during an interview near her Marina del Rey, California, home. "They lived in a dream world. They thought that life was like the movies and everything would turn out okay in the end."

Exhibit 3
30

In the Depression years, newspaper strips—not comic books—were the most popular venue for cartoonists. So Siegel and Shuster created several *Superman* strips and shopped them around, to no avail. Then, in 1938, Detective Comics (now DC Comics, owned by Warner Communications) bought *Superman* for publication in Action Comics No. 1. Siegel and Shuster were paid $130—or $10 a page—to grant their copyright to the comic-book maker. Most pop-culture historians agree that *Action Comics* No. 1 marked the beginning of what is now known as the golden age of comic books. Still, for several years, Siegel and Shuster eked out only a modest living creating more *Superman* material for Detective Comics. In the 1940s, when the duo pressed for a share of the profits, they were dumped.

Siegel and Shuster spent decades living hand to mouth. In 1951, after Siegel went on a hunger strike to draw attention to his family's plight, Detective Comics began paying him $100 a week. In 1968, he gave up on comics and took a $7,000-a-year job as a typist. Then, in 1975, after comic-book aficionados helped mount a media campaign on Siegel and Shuster's behalf, DC began paying each $20,000 a year, plus health insurance. In 1981, a few years after the movie *Superman*, with Christopher Reeve, grossed $275 million, DC raised the pair's annual stipends to $30,000.

Shuster, who never married, died in 1992. Siegel died four years later, and since then his widow has received increased benefits—currently $135,000 a year, plus insurance.

One of the key issues before the court is whether the *Superman* story that appears in *Action Comics* No. 1 is composed entirely of strips Siegel and Shuster created on their own. Toberoff says it is, and that it establishes virtually all of Superman's signature elements, from his history (sent to Earth as an infant aboard a spaceship from a distant planet) to his alter ego (mild-mannered reporter Clark Kent) to his powers (able to leap tall buildings, etc.). Based on those assertions, the Siegel heirs terminated their grant of copyright, effective April 16, 1999.

Read more: http://www.portfolio.com/culture-lifestyle/culture-inc/arts/2007/09/17/Time-Warner-Superman-Suit/index1.html#ixzz0oavBsIto

Exhibit 3
31

Not so fast, Time Warner's lawyers say. In court papers, they allege that certain elements of the *Superman* story in *Action Comics* No. 1 were added by others in Detective Comics' employ. The Siegels' profit participation—if granted by the court—should be limited, the attorneys claim, because Superman has evolved during his seven decades on Earth, gaining powers such as X-ray vision that Siegel and Shuster never imagined. Moreover, the lawyers say, revenues from *Superman* materials sold outside the U.S., which Toberoff insists should be split with the Siegels, are off-limits. They also argue that the Siegels' share applies only to DC Comics' profits, not to all of Time Warner's *Superman*-related income.

Most crucially, Time Warner's lawyers allege, *Action Comics* No. 1 included material that Siegel and Shuster created at Detective Comics' request. It therefore qualifies (at least partially) as what's known as work for hire, which provides an exception to the general rule that the person who creates a work is its legally recognized author.

According to George Hedges, a specialist in entertainment law with the Los Angeles firm Quinn Emanuel Urquhart Oliver & Hedges, work for hire is the "cornerstone of the American entertainment industry." This principle allows companies that employ creators to assert ownership in perpetuity over (and to alter and expand upon) what their employees have created. Creators, then, can make no termination claims.

"Without work for hire, there would be no Warner Bros., no nothing," Hedges says. The *Superman* case is significant, he says, in part because of the "legal archaeology" that such claims require. It also promises to be a hard-fought rematch. Toberoff's bout with Warner Bros. over *The Dukes of Hazzard* was, in Hedges' view, a slam dunk.

"The judge basically told Warner, 'You brought this on yourselves,' " Hedges says of the studio's failure to secure the rights to *Moonrunners*, the earlier film, or to settle with its producers once that failure was discovered.

The lead in-house counsel in that case, Warner Bros. vice president Wayne Smith, is also heading up the *Superman* defense, which is why perusers of the case file—in which Toberoff calls Smith's assertions "highly dubious" and Smith's team accuses Toberoff of "slinging mud"—might get the impression that this is personal. Smith declined to comment on the bickering, saying, "The facts are what they are." But when a reporter noted that Toberoff has had more clashes with Warner Bros. than with any other studio, Smith snapped, "There have been others, but he's had no success against anyone else. He probably doesn't talk much about *that*."

While many in Hollywood slap Toberoff with the "ambulance chaser" moniker, he's actually more like a patent troll.

Last year, Research in Motion, a Canadian company facing an injunction on BlackBerry sales, paid $613 million to settle a lawsuit filed by the holder of several patents related to the handheld device. That action was brought by a patent troll—an individual or firm that licenses and litigates patents in hopes of piggybacking on the success of comparable products developed by others. Similarly, Toberoff milks revenue out of intellectual properties created by others. He's a copyright troll—and seemingly proud of it.

"Most people deal with I.P. [intellectual property] on a one-off basis," Toberoff says. "I see it as a business in itself." But to make that business pay, he faces several hurdles. First, he must rustle up clients, most of whom have no idea until they meet him that they may possess valuable rights. Second, because he works

Exhibit 3
32

on contingency, he must sometimes invest hundreds of hours in cases that don't pan out.

For example, last year he went after a company called Classic Media, seeking to terminate the grants of copyright for two of its properties: the 1945 film short *Casper the Friendly Ghost* and the novel *Lassie Come Home*. Classic Media's lawyer, Bonnie Eskenazi of the Los Angeles firm Greenberg Glusker, beat Toberoff in both cases, winning judgments saying his clients had no valid claim. (Toberoff is appealing one of the *Lassie* judgments.) The cases cost Toberoff more than wasted time. A Pennsylvania judge ordered him to reimburse Eskenazi $2,581 for travel expenses.

Even when Toberoff succeeds at reclaiming the rights to a property, his payday doesn't come until he finds a new way to exploit them. Buck Henry, the 76-year-old screenwriter who penned *The Graduate*, heard from Toberoff last year regarding *Get Smart*, the TV series about a bumbling secret agent that Henry and Mel Brooks wrote in 1965. Warner Bros. was working on a feature film (due out next year), and though Henry and Brooks had never previously asserted their rights as creators, Toberoff's success with *Fantasy Island* made him suspect there was money to be made.

«PREV 3 of 4 NEXT »

Read more: http://www.portfolio.com/culture-lifestyle/culture-inc/arts/2007/09/17/Time-Warner-Superman-Suit/index2.html#ixzz0oavyGtRA

Exhibit 3
33

# Nastier Than a Speeding Bullet

by Amy Wallace Sep 17 2007
‹PREV **4 of 4**

"I call him Mad Dog Toberoff," says Henry, explaining how Toberoff dug through the University of Wisconsin–Madison archives (to which David Susskind, one of *Get Smart* 's producers, had donated his papers) to find support for the claim. Henry says Warner Bros. settled with him and Brooks, though neither he nor Toberoff would say for how much, citing a confidentiality clause.

"God bless him," says Larry Cohen, the writer-director of *It's Alive*. "No one else does this. Most people don't want to alienate the studios."

Laura Siegel Larson can't remember a day that her family wasn't fighting with Time Warner. Like Lois Lane, she became an investigative journalist, winning 13 Emmys for her local television reporting before multiple sclerosis left her unable to work, in 1994.

Her reporting skills came in handy when Larson almost single-handedly gathered the documentation needed to file the *Superman* copyright-termination claims back in 1997. At the end of his life, Larson says, her father had discovered his right to file those claims; it was his dying wish that she and her mother pursue it.

"To our family, it was the height of irony that this symbol of justice and assistance for the little guy—this creation my father had come up with—ended up resulting in decades of hard times for us," Larson says. "It was wonderful that my dad, before he passed away, knew that there was hope."

Whether those hopes are fulfilled will be decided in a U.S. District Court in Riverside County, 40 miles east of Los Angeles. Currently, both sides are pressing for partial summary judgments, seeking to resolve certain issues of fact before the *Superman* case goes to trial. Toberoff says he is in no hurry; the longer the case drags on, he asserts, the more leverage he gains.

That's because in 1997, when the Siegels filed for termination, copyright law permitted only a creator's direct descendants to make such a claim. Since Shuster had no children, his estate could not file. The law has since changed. The Sonny Bono Copyright Term Extension Act of 1998 allows other heirs and executors to make claims and also gives copyright holders who miss the initial 56-year window a second chance to terminate a grant of copyright, at 75 years. This means Shuster's estate can try to reclaim its *Superman* copyrights 75 years after *Action Comics* No. 1 was published—in 2013.

Toberoff grins a cocksure grin. "Guess who represents the Shuster estate?"

Read more: http://www.portfolio.com/culture-lifestyle/culture-inc/arts/2007/09/17/Time-Warner-Superman-Suit/index3.html#ixzz0oazGZ8j6

Exhibit 3
34