# EXHIBIT 5

1  PILLSBURY MADISON & SUTRO LLP
   KENNETH R. CHIATE  #39554
2  Suite 1200
   725 South Figueroa Street
3  Los Angeles, CA 90017-5443
   Telephone:  (213) 488-7100
4
5      Attorneys for Plaintiffs
       WALID ALOMAR, an individual, ROSSCAPE-A.I.D.,
6      LTD., ROSSCAPE-A.I.D., LTD. (ISLE OF MAN),
       ROSSCAPE-A.I.D., LTD. (CALIFORNIA), ROSSCAPE,
7      INC., and PETROTEC ADVANCED PETROLEUM TECHNOLOGY
       CORPORATION.

**FILED**
LOS ANGELES SUPERIOR COURT

FEB 28 1997

JOHN A. CLARKE, **CLERK**

BY S. L. YOUNG, DEPUTY

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 COUNTY OF LOS ANGELES

10

11  _____          **BC166806**
                                    )
12  WALID ALOMAR, an individual,    )    No. _____
    ROSSCAPE-A.I.D., LTD., a joint  )
13  venture, ROSSCAPE-A.I.D., LTD.  )    COMPLAINT FOR
    (ISLE OF MAN), a foreign        )    1.  BREACH OF FIDUCIARY
14  corporation, ROSSCAPE-A.I.D., LTD. )       DUTY;
    (CALIFORNIA), a California      )    2.  NEGLIGENT
15  corporation, ROSSCAPE, INC., a  )        MISREPRESENTATION;
    California corporation, and     )    3.  FRAUD;
16  PETROTEC ADVANCED PETROLEUM     )    4.  BREACH OF IMPLIED
    TECHNOLOGY CORPORATION, a foreign )       COVENANT OF GOOD FAITH
17  corporation,                    )        AND FAIR DEALING;
                                    )    5.  INTENTIONAL INTERFERENCE
18                  Plaintiffs,     )        WITH CONTRACTUAL
                                    )        RELATIONSHIP;
19      vs.                         )    6.  BREACH OF CONTRACT;
                                    )    7.  INDUCING BREACH OF
20  PHILIP CAVANA, an individual; MARY )       CONTRACT;
    GRACE, an individual; MARC      )    8.  INTENTIONAL INTERFERENCE
21  TOBEROFF, an individual, ALAN S. )        WITH PROSPECTIVE
    GUTMAN, an individual, ASIAN    )        ECONOMIC ADVANTAGE;
22  INFRASTRUCTURE DEVELOPMENT       )    9.  DEFAMATION;
    COMPANY, LTD. (GIBRALTAR), a    )    10. DECLARATORY RELIEF; and
23  foreign corporation, PACIFIC    )    11. CONSTRUCTIVE TRUST
    PICTURES CORPORATION, a New York )
24  corporation and DOES 1 through 50, )
    inclusive,                      )
25                                  )
                                    )
26                  Defendants.     )
    _____)
27

28

21006053                    -1-

CENTRAL FILING WINDOW
OP 05 N 03 02/28/97 16:48
01228 B 601
REG OF ACT A
                    184.00

Exhibit 5
38

1      Plaintiffs, WALID ALOMAR, ROSSCAPE-A.I.D., LTD.,

2  ROSSCAPE-A.I.D., LTD. (ISLE OF MAN), ROSSCAPE-A.I.D., LTD.

3  (CALIFORNIA), ROSSCAPE, INC., and PETROTEC ADVANCED

4  PETROLEUM TECHNOLOGY CORPORATION (collectively

5  "plaintiffs"), by and through their attorneys of record,

6  hereby allege as follows:

7      1.    ASIAN AMERICAN TELECOMMUNICATIONS CORPORATION

8  ("AAT") was at all times material an entity organized under

9  the laws of the Cayman Islands with its principal place of

10 business in the State of Ohio.  The President of AAT was and

11 is Max Bobbitt.

12     2.    FAC Enterprises, Inc. ("FAC") is a corporation

13 organized under the laws of the Commonwealth of Pennsylvania

14 with its principal place of business in Montgomery County,

15 PA.  At all times material, Howard Appel was an officer and

16 director of FAC and resident of Montgomery County, PA.

17                      THE PARTIES

18     3.    Defendant PHILIP CAVANA ("Cavana") was at all

19 times material an individual who was and is a resident of

20 the State of California, and a citizen of Canada and an

21 officer, director and/or shareholder of ASIAN INFRASTRUCTURE

22 DEVELOPMENT COMPANY, LTD. (GIBRALTAR), ROSSCAPE-A.I.D, LTD.,

23 ROSSCAPE-A.I.D., LTD. (ISLE OF MAN), ROSSCAPE-A.I.D., LTD.

24 (CALIFORNIA) and ASIAN AMERICAN TELECOMMUNICATIONS

25 CORPORATION.

26     4.    Defendant MARY A. GRACE ("Grace") is an individual

27 who was at all times material a resident of the State of

28 California and an officer, director and/or shareholder of

21006053                         -2-

Exhibit 5
39

1   ASIAN INFRASTRUCTURE DEVELOPMENT COMPANY, LTD. (GIBRALTAR),

2   ROSSCAPE-A.I.D, LTD., ROSSCAPE-A.I.D. LTD. (ISLE OF MAN),

3   ROSSCAPE-A.I.D., LTD. (CALIFORNIA) and ASIAN AMERICAN

4   TELECOMMUNICATIONS CORPORATION.

5       5.    Defendant MARC TOBEROFF ("Toberoff") is an

6   individual who is a resident of the State of New York.  At

7   all times material, Toberoff was acting on his own behalf,

8   or as the agent for Grace and Cavana, or as an agent,

9   officer and/or shareholder of Pacific Pictures Corporation,

10  and/or as co-conspirator with Grace and Cavana.

11      6.    Defendant ASIAN INFRASTRUCTURE DEVELOPMENT COMPANY

12  LTD. (GIBRALTAR) ("AID") was at all times material organized

13  under the laws of Gibraltar and was engaged in the business

14  of infrastructure development in the Peoples Republic of

15  China ("PRC") with its principal place of business in the

16  State of California.  At all times material, AID was owned

17  and/or controlled by Grace and Cavana.

18      7.    Defendant ALAN S. GUTMAN ("Gutman") was at all

19  times material a resident of the State of California,

20  licensed to practice law in the State of California, an

21  attorney associated with the Law Offices of Alan S. Gutman

22  and was retained by Pacific-A.I.D. Venture, ROSSCAPE-A.I.D.,

23  LTD. (ISLE OF MAN) and ASIAN INFRASTRUCTURE DEVELOPMENT

24  COMPANY, LTD. (GIBRALTAR).

25      8.    Defendant PACIFIC PICTURES CORPORATION ("Pacific

26  Pictures") was at all times material organized under the

27  laws of the State of New York or California, and had a

28  principle place of business in California.  At all times

21006053                          -3-

1   material, Toberoff was an officer and shareholder of Pacific

2   Pictures.

3       9.    Plaintiff WALID ALOMAR ("Alomar") is an individual

4   who is a resident of the State of California and at all

5   times material, Alomar was a shareholder of ROSSCAPE, INC.,

6   ROSSCAPE-A.I.D., LTD., ROSSCAPE-A.I.D., LTD. (CALIFORNIA),

7   ROSSCAPE-A.I.D., LTD. (ISLE OF MAN) and PETROTEC ADVANCED

Exhibit 5
40

Exhibit 5
41

1  material, Toberoff was an officer and shareholder of Pacific

2  Pictures.

3       9.    Plaintiff WALID ALOMAR ("Alomar") is an individual

4  who is a resident of the State of California and at all

5  times material, Alomar was a shareholder of ROSSCAPE, INC.,

6  ROSSCAPE-A.I.D., LTD., ROSSCAPE-A.I.D., LTD. (CALIFORNIA),

7  ROSSCAPE-A.I.D., LTD. (ISLE OF MAN) and PETROTEC ADVANCED

8  PETROLEUM TECHNOLOGY CORPORATION.  At all times material,

9  Alomar was a director of AAT.  At all times material, Alomar

10 was a director and officer of ROSSCAPE, INC., ROSSCAPE-

11 A.I.D., LTD., ROSSCAPE-A.I.D., LTD. (CALIFORNIA), ROSSCAPE-

12 A.I.D., LTD. (ISLE OF MAN).

13      10.   ROSSCAPE-A.I.D., LTD. (the "JOINT VENTURE") was at

14 all times material an entity organized under the laws of the

15 State of California with its principal place of business in

16 Los Angeles.  The designated officers of the JOINT VENTURE

17 are Alomar as President and Chief Executive Officer, Cavana

18 as Chairman and Business Development and Grace as Executive

19 Vice President, Treasurer and Secretary and Karl Alomar as

20 V.P. Coordinator.

21      11.   ROSSCAPE-A.I.D., LTD. (ISLE OF MAN) ("ROSSAID-

22 MAN") was at all times material an entity organized under

23 the laws of the Isle of Man and was engaged in the business

24 of infrastructure development in the PRC with its principal

25 place of business in the State of California.

26      12.   ROSSCAPE-A.I.D., LTD. (CALIFORNIA) ("ROSSAID-CAL")

27 was at all times material an entity organized under the laws

28 of the State of California and engaged in the business of

21006053                          -4-

Exhibit 5
42

1   infrastructure development in the PRC with its principal

2   place of business in the State of California.

3       13.   Plaintiff PETROTEC ADVANCED PETROLEUM TECHNOLOGY

4   CORPORATION ("PETROTEC") was at all times material an entity

5   organized under the laws of the Isle of Man with its

6   principal place of business in the Isle of Man.

7       14.   Plaintiff ROSSCAPE, INC. ("ROSSCAPE INC.") was at

8   all times material a California business entity organized

9   under the laws of the State of California with its principal

10  place of business in California and wholly-owned by Alomar.

11                    STATEMENT OF THE CASE

12      15.   Alomar met defendants Cavana and Grace in or about

13  April of 1995 when they visited his home in Malibu,

14  California with the intention of leasing Alomar's home which

15  was placed on the rental market for $25,000 per month.

16      16.   Cavana told Alomar that he was financially able to

17  pay the monthly rental price for Alomar's home but would

18  only agree to enter into a lease for $25,000 per month with

19  an option to buy.  Alomar refused Cavana's offer.  Alomar is

20  informed and believes and thereon alleges that Cavana's

21  offer was made with the intent to deceive Alomar into

22  thinking that Cavana was a wealthy businessman.

23              CAVANA AND GRACE'S MISREPRESENTATIONS

24      17.   After meeting with Alomar and learning of Alomar's

25  plans to participate in large scale business projects,

26  Cavana and Grace embarked on a campaign of

27  misrepresentations and lies intended to deceive Alomar into

28  thinking they were wealthy and successful business persons

21006053                      -5-

Exhibit 5
43

1   so as to trick Alomar into entering into a lucrative joint

2   venture with Alomar to conduct business in China.

3       18.   Cavana and Grace met again with Alomar and

4   represented themselves as extremely wealthy and successful

5   business persons and financiers who had extensive and

6   longtime contacts with high-level Chinese government

7   officials which could be utilized to develop business in the

8   PRC through AID, a company which Cavana and Grace and their

9   associates owned and controlled.  Cavana and Grace further

10  represented to Alomar that their company, AID, was a

11  multimillion dollar company that was fully capable of

12  financing projects of any size.  To substantiate their

13  claims, Cavana and Grace represented that AID had close

14  financial relationships with a number of finance houses

15  including, but not limited to, Peregrine Investments

16  Holdings Limited ("Peregrine") and The Asian Infrastructure

17  Fund ("A.I.F.") as well as other investors.

18      19.   In an effort to further deceive Alomar into

19  entering into a joint venture with Cavana and Grace, Cavana

20  told Alomar that he and his company AID had actually

21  participated in many projects in China including a toll road

22  project, pen factory project and a housing project.  To

23  substantiate these claims, Cavana furnished to Alomar

24  written materials purporting to show a number of China

25  ventures and other projects he and his company AID had

26  participated in and numerous other written materials

27  purporting to show AID's close financial ties to the finance

28  houses Peregrine and A.I.F.

21006053                         -6-

Exhibit 5
44

1     20.  Cavana also represented to Alomar that his

2  "father" was the same Cavana who accompanied the late

3  President Richard Nixon on his historic voyage to China and

4  through family contacts Cavana enjoyed relationships with

5  high-ranking officials and, prior to his death, Chairman

6  Mao.

7     21.  Cavana further represented that, until his death

8  two years ago, Ambassador Dale was employed by Cavana to do

9  business in China, and together they achieved great success

10  by completing large contracts including, but not limited to,

11  the construction of toll road projects and a major casino.

12     22.  Grace represented to Alomar that she was the

13  president of a $400,000,000 movie fund and had several

14  movies in production.

15     23.  Grace further represented that she had the

16  necessary staff in England who were able and willing to

17  secure leasing arrangements for aircraft, refinery and other

18  expensive equipment.

19     24.  Although Alomar did not know it at the time, the

20  representations made by Cavana and Grace were, in fact,

21  grossly misleading and in many cases, utterly false.

22               **THE JOINT VENTURE**

23     25.  In or about May of 1995, AID directors Cavana and

24  Grace met with ROSSCAPE INC. President Walid Alomar and

25  Grace and Cavana proposed that AID and ROSSCAPE INC. enter

26  into a joint venture agreement for the purpose of developing

27  and securing large scale business projects in China.  Grace

28

21006053               -7-

Exhibit 5
45

1  and Cavana stated that they needed someone like Alomar, with

2  his technical knowledge, to consummate projects in China.

3      26.  On or about August 3, 1995, after successfully

4  deceiving Alomar as to Cavana's contacts in China, AID's

5  accomplishments and AID's ability to finance large scale

6  projects, Cavana and Grace persuaded ROSSCAPE INC., through

7  its President Walid Alomar, to execute a joint venture

8  agreement ("JVA").

9      27.  The JVA established a joint venture company,

10  ROSSCAPE-A.I.D, LTD. (the "JOINT VENTURE").  The JVA

11  provided that "[a]ny benefits and/or assets derived from the

12  operation of the joint venture is (sic) owned by the two

13  joint venture parties (Rosscape & A.I.D. Ltd.) equally on a

14  50-50 basis."  A copy of the Joint Venture Agreement dated

15  August 3, 1995 is attached, marked Exhibit "A" and

16  incorporated by reference.  Essentially, the two parties

17  would be equal partners; AID would receive 50% of any

18  proceeds from the JOINT VENTURE and ROSSCAPE INC. would

19  receive 50% of any proceeds.

20      28.  The JVA further provided that no party to the

21  agreement could conduct business in China outside the

22  agreement (i.e., all business must be conducted on behalf of

23  the JOINT VENTURE and for the benefit of the parties to the

24  JOINT VENTURE).  Plaintiffs are informed and believe and

25  thereon allege that Cavana, Grace and others violated the

26  JVA by purposefully deceiving plaintiffs and conspiring

27  together to secretly (independent of the JOINT VENTURE)

28  conduct business in China whereby Cavana, Grace and others

21006053                    -8-

Exhibit 5
46

1  diverted the benefits from their wrongful actions directly

2  to Grace, Cavana and AID.  At no time did the JOINT VENTURE

3  receive any income or benefits from the wrongful and

4  independent business deals Cavana, Grace and others

5  conducted.  At all material times, Alomar and ROSSCAPE INC.

6  had no knowledge of Grace and Cavana's violation of the JVA

7  or their secret business deals.

8       29.  At all times after the formation of the JOINT

9  VENTURE, Alomar faithfully and diligently carried out his

10  obligations and duties as the CEO and President of the JOINT

11  VENTURE in full compliance with the terms and conditions of

12  the JVA.

13       30.  With the assistance of ROSSCAPE, INC., a partner

14  in the JOINT VENTURE, an account at the Bank of America in

15  Beverly Hills was established pursuant to the banking

16  requirements of the JVA.  The Bank of America account was

17  operated by the two parties to the JVA, ROSSCAPE, INC. and

18  AID, and in most cases by Alomar and Grace jointly.  This

19  same account was used for all financial transactions

20  relating to the establishment of AAT.

21       31.  To facilitate the business and operations of the

22  JOINT VENTURE, ROSSCAPE INC. arranged to utilize its wholly-

23  owned dormant company, Petrotec Engineering International,

24  Inc., a California corporation, as the corporate vehicle for

25  the JOINT VENTURE to obtain a license for a power plant

26  project in Jinzou, China.  Petrotec Engineering

27  International, Inc.'s name was changed to ROSSCAPE-A.I.D.

28  LTD. (CALIFORNIA)(i.e., ROSSAID-CAL).  The directors,

21006053                           -9-

Exhibit 5
47

1  officers and the ownership interests of ROSSAID-CAL was

2  consistent in all respects with the JVA.

3      32.  On or about November 23, 1996, Grace arranged for

4  Alomar's counsel, with the approval of Alomar, to establish

5  ROSSAID-MAN to facilitate the business and operations of the

6  JOINT VENTURE.  Once again, as before, the directors,

7  officers and the ownership interests of this new entity were

8  all consistent with the original JVA.

9      33.  Mary Grace issued instructions to issue the new

10  shares of ROSSAID-MAN 50% to Alomar, 25% to Cavana and 25%

11  to Grace pursuant to the JVA.

12      34.  Both ROSSAID-MAN and ROSSAID-CAL were established

13  with the knowledge and consent of Grace and Cavana (who

14  together owned 50%) and Alomar (on behalf of ROSSCAPE INC.,

15  who owned the other 50% interest), for the sole purpose of

16  facilitating the business and operations of the JOINT

17  VENTURE.

18      35.  Within two months of the formation of the JOINT

19  VENTURE, it showed a positive cash-flow and two cash

20  distributions, one for $15,000 and one for $75,000 were made

21  to both AID and ROSSCAPE INC.

22      36.  In or about January of 1996, after substantial

23  distribution of earnings and other benefits equally to both

24  AID and ROSSCAPE INC., the JOINT VENTURE began to experience

25  a cash shortage.  Despite numerous requests to Cavana and

26  Grace to advance funds to the JOINT VENTURE account, Grace

27  and Cavana failed to deposit any funds whatsoever.  In order

28  to bridge the cash shortage, Alomar deposited funds into the

21006053                        -10-

Exhibit 5
48

1   JOINT VENTURE account at the Bank of America and advanced

2   credit to cover various bills incurred by the JOINT VENTURE.

3   **THE ESTABLISHMENT OF AAT**

4   37.   During the last quarter of 1995, Alomar through

5   his contacts introduced Max E. Bobbitt Financial Consulting

6   Services, Ltd. ("Bobbitt"), Howard Appel ("Appel"), FAC

7   Enterprises, Inc. ("FAC") and Ernest Bartlett ("Bartlett")

8   to Grace and Cavana and possible investors to assist funding

9   their projects in China.

10   38.   During a visit to China in November of 1995,

11   Alomar's associate Mr. Mahallawy introduced Mr. Wan, a well-

12   recognized and established businessman in China, to the

13   group.   Plaintiffs are informed and believe and thereon

14   allege that Cavana requested that Mr. Wan provide Cavana

15   with a UNICOM Equipment license which was sent by facsimile

16   transmission to Cavana's home in Malibu, California.   Upon

17   receipt of Wan's license, Cavana forged and/or altered the

18   license to add the JOINT VENTURE's name to the license and

19   represented to Alomar and others that he (Cavana) had in his

20   possession a UNICOM Equipment license.

21   39.   On or about December 26, 1995, Alomar negotiated

22   an agreement ("Founders Agreement") between Bobbitt, Appel,

23   FAC, Bartlett and the JOINT VENTURE to form a new entity

24   called AAT.   A copy of the Founders Agreement dated

25   December 26, 1995 is attached, marked Exhibit "B" and

26   incorporated by reference.

27   40.   The Founders Agreement provided that AAT would be

28   created to develop telecommunications business in the PRC

21006053                    -11-

Exhibit 5
49

1   and the JOINT VENTURE, Bobbitt and others would use their

2   best efforts to create AAT and have AAT enter into an

3   agreement with China United Telecommunications Corporation

4   (UNICOM) to import, construct, finance and operate

5   telecommunications systems in the PRC.

6       41.  The Founders Agreement initially provided for the

7   distribution of AAT stock with:  4 million shares of AAT

8   stock to be distributed to the JOINT VENTURE, 1 million

9   shares to be distributed to Mr. Wan for his services (to be

10  held in trust by the JOINT VENTURE), and approximately 4.5

11  million shares to be distributed to the other founders.  The

12  total number of shares under the Founders Agreement was

13  9,500,000.

14      42.  In early January of 1996, Bobbitt, President and

15  CEO of AAT, arrived in China to further pursue the AAT joint

16  venture.  During this time, Mr. Wan had arranged for several

17  meetings with UNICOM and UNICOM Equipment personnel to

18  facilitate the establishment of the AAT joint venture.  The

19  relationship between Mr. Wan and Cavana had deteriorated

20  substantially at that time, and Cavana was unable to

21  conclude any negotiated agreement with Mr. Wan or anyone

22  else in China to facilitate the business interests of AAT.

23      43.  Plaintiffs are informed and believe and thereon

24  allege that Cavana made numerous misrepresentations to

25  Bobbitt falsely alleging that:  (1) Cavana had all the

26  important contacts in China necessary to succeed; (2) Cavana

27  had the capability and know-how necessary to conclude any

28

21006053                    -12-

Exhibit 5
50

1    AAT transaction with any Chinese entity; and (3) Alomar's

2    involvement was not necessary.

3        44.   Due to the deterioration of Cavana's relationship

4    with Mr. Wan, Cavana then approached Eugene Cha, an attorney

5    in China, who was introduced to Cavana by Alomar's attorney,

6    requesting that Mr. Cha arrange a meeting with the Chairman

7    of UNICOM.  Mr. Cha, assisted by the efforts of Ms. Yang

8    Huey, eventually arranged the necessary introductions.

9        45.   During this period of time, Cavana was isolating

10   Mr. Cha from Bobbitt and was falsely representing to Bobbitt

11   that Cavana's own personal high-level contacts were

12   producing these impertinent introductions.

13       46.   On or about the January 13, 1996, Alomar traveled

14   to Beijing, China to correct the damage Cavana had created

15   and the resulting threat to AAT's success in China.  Once in

16   China, Alomar was informed of Cavana's scheme to terminate

17   AAT, which Alomar refused to accept.  Plaintiffs are

18   informed and believe and thereon allege that Cavana had

19   orchestrated various problems in order to discredit Alomar

20   and dissolve AAT with the intent of circumventing  the AAT

21   partners so that he could pursue AAT's very lucrative

22   business opportunities in China by himself.

23       47.   Through the sole efforts of Alomar, and in spite

24   of Cavana's efforts to derail AAT's business opportunities

25   in China, an agreement was eventually reached with Mr. Wan

26   to provide necessary services for AAT to pursue various

27   opportunities.

28

21006053                              -13-

Exhibit 5
51

1      48.   Bobbitt and Alomar then met with Mr. Cha during

2  which Cavana's misrepresentations and false promises to

3  Mr. Cha were completely uncovered.  It also became clear

4  that Cavana was falsifying invoices and fraudulently

5  embezzling AAT's corporate funds and diverting them for his

6  and Grace's personal use.

7      49.   Alomar and Bobbitt requested that Cavana leave

8  Beijing to allow Alomar and Bobbitt to restore order to the

9  volatile situation caused by Cavana which had jeopardized

10  AAT's business opportunities in China.  Cavana left Beijing

11  at that time.

12      50.   AAT, through Bobbitt and Alomar, began their

13  efforts to repair the damage done by Cavana and secure

14  telecommunications contracts in China.

15      51.   On or about January 16, 1996, Alomar and Bobbitt

16  met to negotiate an AAT joint venture agreement with UNICOM.

17  Minutes of the meetings were signed to reflect the progress

18  achieved.  Cavana was not involved at all in these meetings.

19  At this point, it appeared that a deal would soon be

20  negotiated between AAT and UNICOM for AAT to provide

21  telecommunications services in China.

22      52.   On or about, February of 1996, Grace wrongfully

23  and fraudulently obtained from the offices of corporate

24  counsel to the JOINT VENTURE the original AAT stock

25  certificates ("Stock Certificates") issued to the JOINT

26  VENTURE in an ill-conceived effort to convert PETROTEC's

27  shares of AAT stock to her own personal use.  Grace was not

28  authorized by the JOINT VENTURE or anyone else to take

21006053                          -14-

Exhibit 5
52

1  possession of the original Stock Certificates not belonging

2  to her.  Plaintiffs are informed and believe and thereon

3  allege that Grace's actions were part of a scheme to defraud

4  Alomar and others of their AAT stock.  When she was caught,

5  Grace returned the stock certificates and demanded Alomar

6  sign a document purporting to absolve her from bad faith

7  conduct.

8         **THE DILUTION OF THE JOINT VENTURE'S AAT STOCK**

9         53.  Plaintiffs are informed and believe and thereon

10  allege that Grace, Cavana and Toberoff conspired to damage

11  AAT, certain of its shareholders and Alomar personally by,

12  among other things, maliciously spreading misinformation and

13  concocting bold face lies about Alomar and communicating

14  them to Bobbitt and others at AAT in a deliberate effort to

15  ruin AAT (or at least get rid of Alomar so they would not

16  have to spilt proceeds), so that Cavana, Grace and Toberoff

17  could horn in on AAT's business opportunities and strike

18  their own individual deal with UNICOM.  The above-mentioned

19  lies and misinformation included, but was not limited to,

20  improprieties allegedly committed by Alomar and Alomar's

21  lack of trustworthiness.

22         54.  Plaintiffs are informed and believe and thereon

23  allege that on numerous occasions, Cavana and others

24  misappropriated AAT funds and committed other wrongful acts

25  including, but not limited to, purchasing a Rolls Royce

26  vehicle with AAT funds for his personal use, falsifying

27  accounting documents and making false and misleading

28  representations about Alomar.

21006053                          -15-

Exhibit 5
53

1      55.  Relying on Cavana, Grace and/or Toberoff's

2   misrepresentations and lies about Alomar and upon discovery

3   of false invoices, falsification of documents, improper

4   expenditures and the discovery that Cavana did not have a

5   UNICOM Equipment license as he had falsely represented,

6   Bobbitt, on January 13, 1996, proposed a written Dissolution

7   Plan for AAT.  Based on Cavana's lies and misrepresentations

8   relating to Alomar, Cavana persuaded Bobbitt to include a

9   clause giving Cavana the "right to pursue" individually a

10  joint venture agreement with UNICOM.

11     56.  Grace and Cavana supported the dissolution plan

12  based on their own self-interest and the expectation they

13  alone could then pick up where AAT left off, all the time

14  aware of the great damage a dissolution would cause to AAT

15  and its shareholders.

16     57.  Alomar vigorously opposed the dissolution of AAT

17  and was successful in defeating the demise of the company.

18     58.  Despite the best efforts of Alomar and others,

19  Cavana continued to commit wrongful acts that were not in

20  the best interests of AAT and jeopardized the success of

21  AAT.  For example, in January of 1996 Cavana submitted a

22  fraudulent statement for expenses which totaled $359,950.

23  On or about January 26, 1996 Cavana submitted yet another

24  fraudulent statement for an additional $97,000 of phoney

25  expenses.

26     59.  A substantial part of the expenses were reimbursed

27  to Cavana but it was later discovered that they were false

28  and misleading.

21006053                      -16-

Exhibit 5
54

1      60.   Upon discovery by Bobbitt and other AAT founders

2   of Cavana's false and misleading expenses and Cavana's

3   forgery of the UNICOM Equipment license, the founders became

4   enraged and threatened to cancel their funding of AAT.

5   Ultimately, due to Cavana's improper acts, Bobbitt and other

6   founders at AAT made a demand for reimbursement from the

7   JOINT VENTURE and threatened to withdraw support of AAT

8   unless an amendment to the Founders Agreement was made to

9   protect them from further improprieties by Cavana and his

10   cohorts, and which redistributed the allocation of AAT

11   stock.

12      61.   As a direct result of Cavana's improper and

13   fraudulent conduct, the Founders Agreement was amended to

14   the detriment of plaintiffs.

15      62.   On or about March 8, 1996 an amendment to the

16   Founders Agreement ("AAT Amendment") was executed which

17   substantially diluted the value of plaintiffs' AAT stock.  A

18   copy of the AAT Amendment dated March 8, 1996 is attached,

19   marked Exhibit "C" and incorporated by reference.  The AAT

20   Amendment diluted plaintiffs' stock value by increasing the

21   original distribution of stock under the Founders Agreement

22   by an additional 6,500,000 shares, thereby reducing

23   plaintiffs percentage of the total.  Under the AAT

24   Amendment, the JOINT VENTURE only received approximately

25   4,325,000 shares, or about one-quarter of the total AAT

26   stock, instead of nearly 50% as originally agreed.

27

28

21006053                           -17-

Exhibit 5
55

1              THE LAST MINUTE BLACKMAIL SCHEME

2         63.  Alomar, Bobbitt and others continued to pursue and

3    ultimately consummated joint venture agreements with the

4    Chinese government.

5         64.  Pursuant to the joint venture agreements in China,

6    negotiations to merge AAT with a larger communication firm

7    were finalized.  As directors and shareholders of AAT,

8    despite their shenanigans, Cavana and Grace were kept

9    completely informed of all potential business opportunities

10   available to AAT and all seminal information of AAT's

11   ongoing projects was reported to them including, but not

12   limited to, all merger prospects.

13        65.  Commencing sometime in early 1996, Cavana, Grace,

14   Toberoff and AID engaged in a fraudulent scheme whereby they

15   intended to either destroy AAT and steal AAT's contracts and

16   business opportunities for themselves or blackmail AAT, its

17   shareholders and Alomar personally by threatening to file a

18   frivolous lawsuit which would jeopardize the merger.  In

19   furtherance of the fraudulent and/or blackmail scheme,

20   Cavana, Grace and/or Toberoff made good on their blackmail

21   threat by doing, the following:

22             a.  On or about April 27, 1996, Cavana sent a

23   letter to AAT President Max Bobbitt offering to resign as

24   Chairman and Director of AAT and "cash out" his AAT stock

25   and sever all ties to AAT in order to carry out his

26   fraudulent scheme.

27             b.  Grace conspired with Cavana and Toberoff to

28   sever her ties with AAT by "cashing out" her AAT stock.

21006053                        -18-

Exhibit 5
56

1    Grace offered to sell her AAT stock to FAC on at least three

2    separate occasions in July, August and December of 1996 and

3    was successful in selling a major portion of her AAT stock.

4    Eventually, both Grace and Cavana with the help of Toberoff

5    sold virtually all of their shares of AAT to others.

6              c.    Before cashing out, Cavana on or about

7    June 20, 1996, attempted to fraudulently divert 500,000

8    shares of the JOINT VENTURE's AAT stock, of which 250,000

9    shares belonged to PETROTEC, by entering into an

10   unauthorized "Agreement for Compensation" and thereafter

11   drafting equally unauthorized escrow instructions with David

12   Levenson ("Levenson") instructing Levenson to distribute the

13   JOINT VENTURE's shares to Cavana.  Plaintiffs are informed

14   and believe and thereon allege that Cavana attempted to

15   fraudulently transfer these stocks for his own personal

16   gain.

17             d.    Toberoff attempted to steal PETROTEC's AAT

18   shares by a fraudulent scheme whereby Toberoff told Alomar

19   he would purchase PETROTEC's shares for $10 million if

20   Alomar would transfer the shares to ROSSAID-MAN.  Plaintiffs

21   are informed and believe and thereon allege that Toberoff

22   induced Alomar to deposit his shares in ROSSAID-MAN because

23   he (Toberoff) and others then intended to claim they alone

24   owned ROSSAID-MAN and thereby wrongfully take control of

25   PETROTEC's shares.  Although ALOMAR learned of their

26   fraudulent scheme to steal PETROTEC's shares, Toberoff and

27   others nevertheless followed through with their ill-

28

21006053                          -19-

Exhibit 5
57

1    conceived plot and now wrongfully claim sole ownership of

2    ROSSAID-MAN.

3          e.    On or about June 28, 1996, Grace and Cavana,

4    without the proper authority from the JOINT VENTURE, entered

5    into an unauthorized assignment agreement with a joint

6    venture company established by Grace, Cavana, AID and

7    Pacific Productions which wrongfully assigned valuable

8    rights and benefits of the JOINT VENTURE.

9          f.    Grace and Cavana entered into a settlement

10   agreement without the proper authority from the JOINT

11   VENTURE;

12         g.    Grace and Cavana interfered with AAT's

13   business opportunity with UNICOM, shared proprietary

14   information with third parties and competed directly against

15   AAT by conspiring with a Los Angeles-based company entitled

16   C.H.A.T. and other companies to steal and/or interfere with

17   AAT's business opportunities with UNICOM in direct violation

18   of the JVA and the Founders Agreement.

19         h.    Grace and Cavana purposefully communicated

20   damaging information about AAT to Metromedia, Inc.

21   ("Metromedia") in order to derail the AAT/Metromedia merger

22   (the "AAT/Metromedia merger") or hold the merger hostage

23   until an extortion payment was made to Cavana, Grace and

24   Toberoff in the form of a settlement.

25         i.    Sending or causing to be sent an extortion

26   letter on or about January 13, 1997, a mere few days before

27   the proposed AAT/Metromedia merger, by an attorney

28   representing Pacific A.I.D. Venture, a joint venture between

21006053                         -20-

Exhibit 5
58

1  Cavana, Grace, AID and Pacific Pictures Corporation stating

2  they intended to file a lawsuit in California "tomorrow"

3  alleging a violation of Securities Exchange Act of 1934,

4  fraud and breach of contract against AAT, Alomar, FAC,

5  Appel, Bartlett and Bobbitt, unless their demands were met.

6         j.   Filing a frivolous lawsuit against AAT,

7  Alomar, FAC, Appel, Bartlett and Bobbitt on the eve of the

8  AAT/Metromedia merger for the sole purpose of blackmailing

9  the defendants into paying a ransom demand as a condition to

10  dropping their lawsuit, a prerequisite for the

11  AAT/Metromedia merger to close.

12     66.  As the merger grew closer, AAT had arranged for a

13  $10 million credit facility with Metromedia, a multi-million

14  dollar telecommunications firm traded on the American Stock

15  Exchange.

16     67.  The credit facility transaction was part of the

17  AAT/Metromedia merger.

18     68.  It was and is the intention of Metromedia to take

19  MAC public after the merger which is expected to result in a

20  substantial increase in value of the AAT stock held by AAT

21  shareholders.

22     69.  As shareholders and directors of AAT, Cavana and

23  Grace knew of these plans well in advance and indeed the

24  credit facility and equity transactions were expressly

25  approved by Cavana and Grace on or about July 12, 1996

26  through appropriate AAT corporate resolution.  In addition,

27  Cavana and Grace received a "Confidential Offering

28

21006053                          -21-

Exhibit 5
59

1    Memorandum" and "Business Combination Agreement", setting

2    forth the proposed merger.

3                              **THE LAWSUIT**

4          70.        Defendants' frivolous blackmail inspired

5    lawsuit was filed on January 17, 1997, approximately the

6    same time the AAT/Metromedia merger was to be consummated.

7    Plaintiffs are informed and believe and thereon allege that

8    the sole motive for this lawsuit was to intimidate,

9    blackmail, threaten and force by economic coercion Alomar,

10   AAT and the other parties which stood to gain from the

11   AAT/Metromedia merger into capitulating to defendants

12   outrageous demands designed solely to unjustly enrich them

13   at the expense of AAT and its shareholders and the other

14   parties to the merger.

15         71.  At all relevant times, Grace and Cavana and

16   Toberoff knew all material information regarding AAT, which

17   had been disclosed to them, including all information

18   related to the proposed AAT/Metromedia merger, and they knew

19   full well they had no cognizable fraud or any other claims

20   against AAT, Bobbitt, FAC, Appel or any other party

21   connected with the AAT/Metromedia merger.  They knew the

22   suit was perfectly timed to maximize their leverage and

23   obtain an outrageous ransom because of the high risk that

24   not settling might cause the merger to crater.

25         72.  Such blackmail conduct by Grace, Cavana and their

26   agents is even more egregious considering that pursuant to

27   the AAT Amendment, Cavana and Grace agreed that they would

28   "use their best efforts to cause AAT to enter into a merger

21006053                        -22-

Exhibit 5
60

1  with or to be acquired by an existing corporation whose

2  stock is traded on either the NYSE, AMEX, or NASDAQ stock

3  exchange."

4      73.  During the extortion scheme, Toberoff on numerous

5  occasions made defamatory remarks to third parties about

6  plaintiff Walid Alomar including, but not limited to,

7  calling Alomar a cheat, liar, a dead beat and a sleazy

8  business operator.

9      74.  The blackmail lawsuit was alleged to be based upon

10  a contractual agreement involving the JOINT VENTURE, the

11  benefits of which Cavana and Grace apparently fraudulently

12  assigned without authorization from the JOINT VENTURE.  The

13  JOINT VENTURE never authorized an assignment of rights to

14  Pacific Productions, Pacific-A.I.D. Venture or any other

15  entity.  Therefore, any settlement obtained should have been

16  for the benefit of the JOINT VENTURE.

17      75.  Plaintiffs are informed and believe and thereon

18  allege that Pacific Productions, Gutman, AID, Grace, Cavana

19  and Toberoff settled with parties to the lawsuit without the

20  proper authority, and thereby wrongly diverted settlement

21  funds and stocks belonging to the JOINT VENTURE, including

22  but not limited to, $500,000 in cash and 1.4 million shares

23  of AAT stock (estimated by them to be worth $14 million),

24  away from the JOINT VENTURE and then divided the ill-gotten

25  booty among themselves in violation of the JVA and in a

26  manner not authorized by the JOINT VENTURE.

27      76.  Plaintiffs are informed and believe and thereon

28  allege that defendants and each of them acted in concert

21006053                    -23-

Exhibit 5
61

1  pursuant to a common plan and scheme to defraud plaintiffs

2  of their share of any settlement or other benefits flowing

3  from the JVA.

4      77.  Each defendant herein alleged to have committed

5  any affirmative act or make any material omission, did omit

6  or commit the same pursuant to a common plan and scheme

7  among all the defendants herein named and did so as the

8  agent for each and all his or her co-defendants and pursuant

9  to and in furtherance of such common plan and scheme.

10     78.  Whenever reference is made in this Complaint to

11 "defendants" doing any act or failing to do any act, such

12 allegation shall be deemed to mean the act of each defendant

13 except as to defendant Gutman, whose conduct is only as

14 specifically alleged, acting individually, jointly and

15 severally and the conspiring of those defendants to so act.

16     79.  The true name, capacities, and identities of the

17 defendants sued under the fictitious names DOE 1 through DOE

18 50 are presently unknown to plaintiffs.  Plaintiffs are

19 informed and believe and thereon allege that said DOE

20 individual defendants are California residents.  Plaintiffs

21 will seek leave to amend this Complaint to allege the true

22 names and capacities of the Doe defendants when their

23 identities are ascertained.

24     FIRST CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY

25          (Against Defendants Grace and Cavana)

26     80.  Plaintiffs reallege and incorporate herein by

27 reference each and every allegation contained in

28

21006053                          -24-

Exhibit 5
62

1    paragraphs 1 through 79, inclusive, as though fully

2    incorporated herein and made a part hereof.

3          81.   At all times mentioned herein, a fiduciary

4    relationship existed between plaintiffs and Grace and Cavana

5    by virtue of Grace and Cavana's positions as directors

6    and/or officers of AID, the JOINT VENTURE, ROSSAID-MAN,

7    ROSSAID-CAL and AAT.  Accordingly, Grace and Cavana owed

8    plaintiffs a fiduciary duty to act in the best interests of

9    AAT, the JOINT VENTURE, ROSSAID-MAN and ROSSAID-CAL and not

10   to use their fiduciary positions for their own personal gain

11   or to the detriment of AAT, the JOINT VENTURE, ROSSAID-MAN

12   and ROSSAID-CAL or their respective shareholders.

13         82.   Plaintiffs are informed and believe and thereon

14   allege that Grace and Cavana were aware at all times of

15   their fiduciary duties owed to AAT, the JOINT VENTURE,

16   ROSSAID-MAN and ROSSAID-CAL and/or their respective

17   shareholders.

18         83.   Plaintiffs are informed and believe and thereon

19   allege that Grace and Cavana and Does 1 through 50 breached

20   their fiduciary duties to plaintiffs by their acts

21   including, but not limited to:

22              (a)   Converting AAT funds to personal use;

23              (b)   Submitting fraudulent invoices and fictitious

24   receipts and forging documents;

25              (c)   Failing to make full and accurate disclosure

26   of all material facts of which Grace and Cavana had superior

27   knowledge and which they knew were neither known by nor

28   readily accessible to plaintiffs;

21006053                          -25-

Exhibit 5
63

1          (d)   Acting contrary to and assuming positions

2    inconsistent with plaintiffs' best interests and by self

3    dealing;

4          (e)   Exploiting the necessitous circumstances in

5    which defendants misconduct had placed plaintiffs;

6          (f)   Purporting to represent plaintiffs' best

7    interests in negotiations with other business entities while

8    taking actions which were inconsistent with plaintiffs' best

9    interests;

10         (g)   Attempting to induce plaintiffs to transfer

11   valuable stocks in order to further defendants' own self-

12   interest;

13         (h)   Failing to advise plaintiffs to take

14   appropriate actions which worked to the detriment of

15   plaintiffs' interests;

16         (i)   Interfering with business negotiations which

17   resulted in substantial loss of opportunity and income for

18   plaintiffs;

19         (j)   Starting or participating in a business which

20   competed  with AAT in violation of the JVA and/or the

21   Founders Agreement;

22         (k)   Representing plaintiffs' in negotiations

23   without disclosing to plaintiffs a working relationship with

24   a competitor;

25         (l)   attempting to convert plaintiffs stock to

26   their own personal use;

27         (m)   Usurping corporate opportunities belonging to

28   AAT, the JOINT VENTURE, ROSSAID-MAN and ROSSAID-CAL made

21006053                        -26-

Exhibit 5
64

1  known to them only in their capacities as fiduciaries of

2  AAT, the JOINT VENTURE, ROSSAID-MAN and ROSSAID-CAL; and

3          (n)  Otherwise failing to always act in the utmost

4  good faith towards plaintiffs;

5      84.  Grace and Cavana and Does 1 through 50 breached

6  their fiduciary duties to plaintiffs with the intent to

7  further their own self-interests and profit from plaintiffs

8  at plaintiffs' expense, to defraud and deceive plaintiffs,

9  and with the intent to induce plaintiffs to act in the

10  manner herein alleged.

11      85.  As a proximate cause of Grace and Cavana's acts

12  and the breaches alleged herein, plaintiffs have been

13  damaged in an amount not yet ascertained, but which exceeds

14  the jurisdictional limits of this Court.

15      86.  In doing the acts alleged herein, Grace and Cavana

16  and Does 1 through 50 acted fraudulently, willfully,

17  maliciously, oppressively, and with callous and intentional

18  disregard of plaintiffs' interests, and subjected plaintiffs

19  to undue hardship, knowing its conduct was substantially

20  likely to vex, annoy, and injure plaintiffs.  As a result of

21  this conduct, plaintiffs are entitled to an award of

22  punitive damages.

23      WHEREFORE, plaintiff requests judgment as set forth

24  below.

25

26

27

28

21006053                        -27-

Exhibit 5
65

1    SECOND CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION

2         (Against all Defendants Except Gutman)

3         87.  Plaintiffs reallege and incorporate herein by

4    reference each and every allegation contained in

5    paragraphs 1 through 86, inclusive, as though fully

6    incorporated herein and made a part hereof.

7         88.  The defendants, and each of them, owed plaintiffs

8    a duty to act with reasonable care in their dealings and

9    representations made to plaintiffs in that it was reasonably

10   foreseeable that plaintiffs would rely on such

11   representations.

12        89.  During the discussions and negotiations which led

13   to the JOINT VENTURE and other business dealings between

14   defendants and plaintiffs, defendants made material

15   misstatements of fact concerning plaintiff Alomar, the

16   business of the JOINT VENTURE and AAT, their business

17   relationships with foreign officials, financial assets,

18   ability to acquire financing and their ability to invest in

19   new projects.  Defendants had no reasonable grounds to

20   believe in the truth of these statements.

21        90.  Defendants, and each of them, knew or reasonably

22   should have known that plaintiffs would rely and act upon

23   the false representations which they, and/or their agents,

24   made to plaintiffs.

25        91.  Plaintiffs, at the time these materially false and

26   misleading misrepresentations were made, did not know of the

27   falsity of such representations and believed them to be

28   true.

21006053                          -28-

Exhibit 5
66

1     92.  In justifiable reliance on the misrepresentations

2   and omissions made by defendants to plaintiffs, plaintiffs

3   entered into a JOINT VENTURE and consummated other business

4   deals and made other business decisions based on defendants'

5   material misrepresentations.  Were it not for the

6   defendants' misrepresentations and omissions, plaintiffs

7   would not have entered into the JOINT VENTURE but instead

8   pursued the same project by themselves or, in any event,

9   would not have entered into a 50/50 joint venture with Grace

10  and Cavana.

11    93.  As a proximate cause of the misrepresentations of

12  defendants and the breaches alleged herein, plaintiffs have

13  been damaged in an amount not yet ascertained, but which

14  exceeds the jurisdictional limits of this Court.

15    WHEREFORE, plaintiffs request judgment against

16  defendants as set forth below.

17            THIRD CAUSE OF ACTION FOR FRAUD

18          (Against all Defendants Except Gutman)

19    94.  Plaintiffs reallege and incorporate herein by

20  reference each and every allegation contained in

21  paragraphs 1 through 93, inclusive, as though fully

22  incorporated herein and made a part hereof.

23    95.  Defendants fraudulently assigned valuable rights

24  of the JOINT VENTURE, made the aforementioned

25  misrepresentations of fact, fraudulently concealed their

26  independent business deals in the PRC, fraudulently

27  submitted invoices and expenses, fraudulently attempted to

28  transfer AAT stock and fraudulently concealed their intent

21006053                      -29-

Exhibit 5
67

1    to effect an extortion scheme against AAT by extracting

2    payment from plaintiffs with the knowledge of the false and

3    misleading character of their statements and wrongful acts

4    or with reckless disregard as to the truth or falsity

5    thereof.  Defendants' misrepresentations, omissions and

6    wrongful acts were with the intent, knowledge, and desire

7    that plaintiffs would rely on such representations and

8    wrongful acts.

9         96.  Defendants further knowingly omitted to state

10   material facts relating to their business dealing with and

11   for AAT and the JOINT VENTURE, their business contacts in

12   the PRC, their financial condition and Cavana's criminal

13   record.

14        97.  In making the aforementioned misrepresentations,

15   omitting to state the aforementioned facts, and doing the

16   aforementioned wrongful acts, defendants acted with intent

17   to defraud plaintiffs by, among other things, concealing

18   their outside profits made in the PRC, wrongfully extracting

19   payment by their extortion scheme, and inducing plaintiffs

20   to make business decisions which would not have been made

21   but for defendants' misrepresentations, omissions and

22   wrongful acts.

23        98.  Plaintiffs actually relied upon the aforementioned

24   misrepresentations, material omissions and wrongful acts of

25   defendants.

26        99.  Plaintiff's actual reliance upon the

27   aforementioned misrepresentations, omissions and wrongful

28   acts was justified.  Plaintiffs' acceptance of defendants'

21006053                              -30-

Exhibit 5
68

1  misrepresentations, omissions and wrongful acts without

2  further inquiry or investigation was reasonable in light of

3  defendants' fiduciary relationship with plaintiffs and

4  plaintiffs' lack of any contrary information.

5      100. As a proximate cause and direct result of the

6  misrepresentations, omissions and wrongful acts of

7  defendants and the breaches alleged herein, plaintiffs have

8  been damaged in an amount not yet ascertained, but which

9  exceeds the jurisdictional limits of this Court.

10     101. The above-mentioned conduct of defendants, their

11  agents, employees and servants was done with conscious

12  disregard of plaintiffs' health, rights, and feelings, and

13  was carried out by authorized individuals, employees,

14  servants, and agents acting in a deliberate, cold, callous,

15  oppressive, malicious and intentional manner as they

16  willingly and knowingly interfered and fraudulently

17  concealed information and misrepresented facts to

18  plaintiffs' and by defendants said actions and intentionally

19  injuring and damaging plaintiffs, which conduct was

20  despicable, and constituted oppression and malice as defined

21  by Cal. Civil Code ("C.C.") §3294.  In accordance with C.C.

22  §3294, plaintiffs are entitled to an award of punitive

23  damages in an amount sufficient to punish or set an example

24  of defendants, in sum to be proven at trial together with

25  prejudgment interest pursuant to Civil Code §3287.

26     WHEREFORE, plaintiffs request judgment against

27  defendants as set forth below.

28

21006053                        -31-

Exhibit 5
69

1    <u>FOURTH CAUSE OF ACTION FOR BREACH OF IMPLIED</u>

2         <u>COVENANT OF GOOD FAITH AND FAIR DEALING</u>

3           (As Against Defendants Grace, Cavana and AID)

4         102. Plaintiffs reallege and incorporate herein by

5    reference each and every allegation contained in

6    paragraphs 1 through 101, inclusive, as though fully

7    incorporated herein and made a part hereof.

8         103. As a result of the AAT Agreement[1] and the JVA,

9    and the fiduciary relationship which existed between

10   defendants and plaintiffs, defendants expressed and implied

11   promises, and the acts, conduct and communications which

12   resulted in these promises, defendants covenanted and

13   promised, and plaintiffs relied on said promises and

14   covenants, to act in good faith towards, and deal fairly

15   with plaintiffs concerning all matters related to

16   plaintiffs' contract so as to not deprive plaintiffs of or

17   injure plaintiffs' right to receive their reasonable

18   expectation of benefit flowing from their contractual

19   relationship.

20        104. Defendants, and each of them, breached said

21   promises and covenants by interfering with business

22   relationships, conducting business relationships outside the

23   JVA and/or Founders Agreement, cooperating with entities in

24   competition with AAT, misusing funds, failing to cooperate

25   with plaintiffs to effectuate the AAT/Metromedia merger and

26   not dealing with plaintiffs fairly and in good faith.

27

28   1    All references to the AAT Agreement include all
     amendments thereof.

21006053                        -32-

Exhibit 5
70

1       105. As a direct and proximate cause of the breaches by

2   defendants alleged herein, plaintiffs have been damaged in

3   an amount not yet ascertained, but which exceeds the

4   jurisdictional limits of this Court.

5       WHEREFORE, plaintiffs request judgment against

6   defendants as set forth below.

7           FIFTH CAUSE OF ACTION FOR INTENTIONAL

8           INTERFERENCE WITH CONTRACTUAL RELATIONSHIP

9           (As Against All Defendants Except Gutman)

10      106. Plaintiffs reallege and incorporate herein by

11  reference each and every allegation contained in

12  paragraphs 1 through 105, inclusive, as though fully

13  incorporated herein and made a part hereof.

14      107. Plaintiffs had a valid and existing contract with

15  various business entities in the PRC including, but not

16  limited to, UNICOM, under which AAT would provide

17  telecommunication services to the aforementioned business

18  entities in China.

19      108. Toberoff, Grace and Cavana and others knew of the

20  contracts between plaintiffs and the business entities in

21  the PRC.

22      109. Toberoff, Grace and Cavana and others

23  intentionally induced a telecommunications company in Los

24  Angeles to commit acts designed to disrupt the contracts

25  with UNICOM and others in the PRC.  Cavana and others

26  secretly worked with the Los Angeles based

27  telecommunications company to disrupt the contract UNICOM

28  had with plaintiffs by setting up a meeting between the

21006053                        -33-

Exhibit 5
71

1   competitor telecommunications company and UNICOM and

2   inducing a breach of AAT's contract with UNICOM.

3       110. As a result of defendants' intentional acts, the

4   contract between plaintiffs, and UNICOM and others was

5   disrupted.

6       111. As a direct and proximate cause of defendants'

7   intentional interference with the contract between

8   plaintiffs, and UNICOM and others as alleged herein,

9   plaintiffs have been damaged in an amount not yet

10  ascertained, but which exceeds the jurisdictional limits of

11  this Court.

12      112. The above-mentioned conduct of defendants, their

13  agents, employees and servants was done with conscious

14  disregard of plaintiffs' contract and economic relationship

15  with UNICOM and others, health, rights, and feelings, was

16  carried out by authorized individuals, employees, servants,

17  and agents acting in a deliberate, cold, callous,

18  oppressive, malicious and intentional manner as they

19  willingly and knowingly interfered with plaintiffs' economic

20  relationship with UNICOM and others and by defendants said

21  actions and intentionally injuring and damaging plaintiffs,

22  which conduct was despicable, and constituted oppression and

23  malice as defined by Cal. Civil Code §3294.  In accordance

24  with §3294, plaintiffs are entitled to an award of punitive

25  damages in an amount sufficient to punish or set an example

26  of defendants, in sum to be proven at trial together with

27  prejudgment interest pursuant to Civil Code 3287.

28

21006053                    -34-

Exhibit 5
72

1    WHEREFORE, plaintiffs request judgment against

2    defendants as set forth below.

3             SIXTH CAUSE OF ACTION FOR BREACH OF

4                  THE FOUNDERS AGREEMENT

5                (Against Grace, Cavana and AID)

6    113. Plaintiffs reallege and incorporate herein by

7    reference each and every allegation contained in

8    paragraphs 1 through 112, inclusive, as though fully

9    incorporated herein and made a part hereof.

10   114. Plaintiffs were a contractual party with

11   defendants relative to the Founders Agreement.

12   115. Plaintiffs have at all times performed all the

13   terms of the Founders Agreement in the manner specified by

14   said agreement.

15   116. Cavana, Grace, AID and/or their agents failed and

16   refused to perform consistent with duties and

17   responsibilities arising under the AAT Agreement by

18   interfering and failing to use their best efforts to cause

19   AAT to enter into a merger with or to be acquired by an

20   existing corporation whose stock is traded on either the

21   NYSE, AMEX, or NASDAQ stock exchange in violation of Section

22   6 of the AAT Amendment dated March 8, 1996.

23   117. Grace, Cavana, AID and/or their agents further

24   breached the AAT Agreement by revealing confidential and

25   proprietary information regarding AAT and its business

26   dealings in violation of section 4 of the December 26, 1995

27   Founders Agreement.

28

21006053                          -35-

Exhibit 5
73

1    118. Cavana and Grace and/or his or her agents also

2    breached the Founders Agreement by misappropriating funds

3    advanced to him or her and/or his or her agents for the sole

4    purpose of paying fees and expenses necessary to further the

5    purpose of the Founders Agreement in violation of Section 5

6    of the Founders Agreement dated December 26, 1995.

7    119. As a direct and proximate cause of defendants'

8    breaches as alleged herein, plaintiffs have been damaged in

9    an amount not yet ascertained, but which exceeds the

10    jurisdictional limits of this Court.

11    WHEREFORE, plaintiffs request judgment against

12    defendants as set forth below.

13    ### SEVENTH CAUSE OF ACTION FOR BREACH OF

14    ### THE ROSSCAPE-A.I.D./JOINT VENTURE AGREEMENT

15    (As Against Defendants Grace, Cavana and AID)

16    120. Plaintiffs reallege and incorporate herein by

17    reference each and every allegation contained in

18    paragraphs 1 through 119, inclusive, as though fully

19    incorporated herein and made a part hereof.

20    121. Plaintiffs were a contractual party with Grace,

21    Cavana, and AID relative to the JVA.

22    122. Plaintiffs have at all times performed all the

23    terms of the JVA in the manner specified by the JVA.

24    123. Cavana, Grace, AID and/or their agents failed and

25    refused to perform consistent with duties and

26    responsibilities arising under the JVA by, among other

27    things, developing business in the PRC on behalf of

28

21006053                              -36-

Exhibit 5
74

1  themselves as individuals and outside of the JVA and not for

2  the common benefit of the parties to the JVA.

3      124. Grace, Cavana, AID and/or their agents further

4  breached the JVA by revealing confidential information

5  and/or proprietary information to third parties in violation

6  of section 8 of the JVA dated August 3, 1995.

7      125. Cavana, Grace and AID further breached the JVA by

8  conducting business outside the JVA and failing to divide

9  the proceeds of said business dealings on a 50-50 basis with

10  the parties to the JVA in violation of section 7 of the JVA.

11      126. As a direct and proximate cause of Grace, Cavana

12  and AID's breaches as alleged herein, plaintiffs have been

13  damaged in an amount not yet ascertained, but which exceeds

14  the jurisdictional limits of this Court.

15      WHEREFORE, plaintiffs request judgment against

16  defendants as set forth below.

17          EIGHTH CAUSE OF ACTION FOR INDUCING

18          BREACH OF JOINT VENTURE AGREEMENT

19              (As Against All Defendants)

20      127. Plaintiffs reallege and incorporate herein by

21  reference each and every allegation contained in

22  paragraphs 1 through 126, inclusive, as though fully

23  incorporated herein and made a part hereof.

24      128. Alomar and ROSSCAPE INC. were contractual parties

25  with Grace, Cavana and AID relative to the JVA.

26      129. Alomar and ROSSCAPE INC. have at all times

27  performed the terms of the contract in the manner specified

28  by the JVA.

21006053                           -37-

Exhibit 5
75

1     130. Under the terms of the JVA, Grace and Cavana and

2    AID agreed that no single party or its members or its

3    associates could operate within the PRC outside the JVA.

4     131. Upon information and belief, Cavana met or spoke

5    with Grace, and discussed the possibility of Grace and

6    Cavana entering into a contract outside the JVA with third

7    parties inside the PRC. Cavana, knowing of the JVA between

8    Grace, Alomar and ROSSCAPE INC., encouraged and persuaded

9    Grace that it would be to Grace's advantage to breach the

10   JVA with Alomar and ROSSCAPE INC. and enter into a contract

11   with Cavana and other third parties within the PRC in

12   violation of the JVA.

13     132. Upon information and belief, Grace met or spoke

14   with Cavana, and discussed the possibility of Cavana and

15   Grace entering into a contract outside the JVA with third

16   parties inside the PRC. Grace, knowing of the JVA between

17   Cavana, Alomar and ROSSCAPE INC., encouraged and persuaded

18   Cavana that it would be to Cavana's advantage to breach the

19   JVA with Walid Alomar and ROSSCAPE INC. and enter into an

20   outside contract with Grace and other third parties within

21   the PRC.

22     133. As a direct and proximate cause of Grace and

23   Cavana's inducing breach of the JVA as alleged herein,

24   ROSSCAPE INC. and Alomar have been damaged in an amount not

25   yet ascertained, but which exceeds the jurisdictional limits

26   of this Court.

27     134. The above-mentioned conduct of defendants, their

28   agents, employees and servants was done with conscious

21006053           -38-

Exhibit 5
76

1   disregard of plaintiffs', health, rights, and feelings, and

2   was carried out by authorized individuals, employees,

3   servants, and agents acting in a deliberate, cold, callous,

4   oppressive, malicious and intentional manner as they

5   willingly and knowingly induced a breach of the JVA and by

6   defendants said actions and intentionally injuring and

7   damaging plaintiffs, which conduct was despicable, and

8   constituted oppression and malice as defined by Cal. Civil

9   Code ("C.C.") §3294.  In accordance with C.C. §3294,

10  plaintiffs are entitled to an award of punitive damages in

11  an amount sufficient to punish or set an example of

12  defendants, in sum to be proven at trial together with

13  prejudgment interest pursuant to Civil Code §3287.

14      WHEREFORE, plaintiff requests judgment against

15  defendants as set forth below.

16          NINTH CAUSE OF ACTION FOR INDUCING

17          BREACH OF THE FOUNDERS AGREEMENT

18          (As Against Defendant Marc Toberoff)

19      135. Plaintiffs reallege and incorporate herein by

20  reference each and every allegation contained in

21  paragraphs 1 through 134, inclusive, as though fully

22  incorporated herein and made a part hereof.

23      136. Alomar and ROSSCAPE INC. were contractual parties

24  with Grace and Cavana relative to the Founders Agreement.

25      137. Alomar and ROSSCAPE INC. have at all times

26  performed the terms of the Founders Agreement in the manner

27  specified by the contract. Under the terms of the Founders

28  Agreement Grace and Cavana agreed that they would use their

21006053                            -39-

Exhibit 5
77

1    best efforts to cause AAT to enter into a merger with or to

2    be acquired by an existing corporation whose stock is traded

3    on either the NYSE, AMEX, or NASDAQ stock exchange.

4        138. Upon information and belief, Toberoff met or spoke

5    with Grace and/or Cavana, and discussed the possibility of

6    Grace and/or Cavana conspiring to derail the AAT/Metromedia

7    merger by relaying false and detrimental information to

8    Metromedia about plaintiffs, threatening plaintiffs with

9    financial ruin if they did not succumb to defendant's

10   demands, and the filing a frivolous lawsuit.  Toberoff,

11   knowing of the Founders Agreement between Grace, Cavana,

12   ROSSCAPE INC. and Alomar, encouraged and persuaded Grace

13   and/or Cavana that it would be to their advantage to breach

14   the Founders Agreement by disrupting the AAT/Metromedia

15   Merger.

16       139. As a direct and proximate cause of Toberoff's

17   inducing Grace and/or Cavana to breach the Founders

18   Agreement as alleged herein, ROSSCAPE INC. and Alomar have

19   been damaged in an amount not yet ascertained, but which

20   exceeds the jurisdictional limits of this Court.

21       140. The above-mentioned conduct of defendants, their

22   agents, employees and servants was done with conscious

23   disregard of plaintiffs', health, rights, and feelings, and

24   was carried out by authorized individuals, employees,

25   servants, and agents acting in a deliberate, cold, callous,

26   oppressive, malicious and intentional manner as they

27   willingly and knowingly interfered with plaintiffs'

28   prospective economic advantage and induced a breach of the

21006053                          -40-

Exhibit 5
78

1   Founders Agreement and by defendants said actions and

2   intentionally injuring and damaging plaintiffs, which

3   conduct was despicable, and constituted oppression and

4   malice as defined by Cal. Civil Code ("C.C.") §3294.   In

5   accordance with C.C. §3294, plaintiffs are entitled to an

6   award of punitive damages in an amount sufficient to punish

7   or set an example of defendants, in sum to be proven at

8   trial together with prejudgment interest pursuant to Civil

9   Code §3287.

10       WHEREFORE, plaintiffs request judgment against

11  defendants as set forth below.

12          TENTH CAUSE OF ACTION FOR INTENTIONAL

13      INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

14              (Against all Defendants)

15       141. Plaintiffs reallege and incorporate herein by

16  reference each and every allegation contained in

17  paragraphs 1 through 140, inclusive, as though fully

18  incorporated herein and made a part hereof.

19       142. Plaintiffs were involved in a valid and existing

20  business relationship with Metromedia in that plaintiffs had

21  been negotiating with Metromedia to transfer AAT shares to a

22  wholly-owned subsidiary of Metromedia which would result in

23  a merger and later an Initial Public Offering (IPO).

24  Plaintiffs had reached an agreement with the third party

25  business as to the terms of the contract under which terms

26  plaintiffs were expected to make a profit of more than

27  $20 million.

28

21006053                    -41-

Exhibit 5
79

1      143. Defendants knew of the relationship between

2  plaintiffs and Metromedia.

3      144. Defendants intentionally disrupted the

4  relationship between plaintiffs and Metromedia by passing

5  false and malicious information to Metromedia about

6  plaintiffs which proved detrimental to plaintiffs, competing

7  directly with AAT to derail the merger, threatening Alomar

8  and others with financial ruin if they did not succumb to

9  defendants blackmail demands, and the filing of an unfounded

10  and malicious lawsuit against plaintiffs and others.

11      145. As a result of defendants' intentional acts, the

12  business relationship between plaintiff and Metromedia was

13  disrupted in that Metromedia refused to consummate the

14  original merger and threatened to break off negotiations

15  with plaintiffs unless the frivolous blackmail suit was

16  resolved to Metromedia's satisfaction.  Ultimately, the

17  merger which did take place was less profitable than

18  otherwise would have been without defendants' intentional

19  interference.

20      146. As a direct and proximate cause of defendants'

21  disruptive acts as alleged herein, plaintiffs have been

22  damaged in an amount not yet ascertained, but which exceeds

23  the jurisdictional limits of this Court.

24      147. The above-mentioned conduct of defendants, their

25  agents, employees and servants was done with conscious

26  disregard of plaintiffs' prospective economic advantage with

27  Metromedia, health, rights, and feelings, and was carried

28  out by authorized individuals, employees, servants, and

21006053                        -42-

Exhibit 5
80

1  agents acting in a deliberate, cold, callous, oppressive,

2  malicious and intentional manner as they willingly and

3  knowingly interfered with plaintiffs' prospective economic

4  advantage with Metromedia and by defendants said actions and

5  intentionally injuring and damaging plaintiffs, which

6  conduct was despicable, and constituted oppression and

7  malice as defined by Cal. Civil Code ("C.C.") §3294.   In

8  accordance with C.C. §3294, plaintiffs are entitled to an

9  award of punitive damages in an amount sufficient to punish

10  or set an example of defendants, in sum to be proven at

11  trial together with prejudgment interest pursuant to Civil

12  Code §3287.

13     WHEREFORE, plaintiffs request judgment against

14  defendants as set forth below.

15          ELEVENTH CAUSE OF ACTION FOR DEFAMATION

16          (As Against Defendant Marc Toberoff)

17     148. Plaintiffs reallege and incorporate herein by

18  reference each and every allegation contained in

19  paragraphs 1 through 147, inclusive, as though fully

20  incorporated herein and made a part hereof.

21     149. Toberoff spoke the following words about plaintiff

22  Walid Alomar:  that he was a liar, cheat, despicable human

23  being, dead beat and could not be trusted.

24     150. Toberoff's words were heard by third persons, not

25  all of whose names are known to plaintiff.

26     151. Each and every statement is false as it pertains

27  to plaintiff Walid Alomar.

28

21006053                    -43-

Exhibit 5
81



1    152. The words carry a defamatory meaning because they

2 imply that Alomar cannot be trusted in business dealings and

3 will cheat his business partners.

4    153. The words were understood by the hearers in a way

5 which defamed plaintiff Alomar.

6    154. As a direct and proximate cause of Toberoff's

7 statements as alleged herein, plaintiff Alomar has been

8 damaged in an amount not yet ascertained, but which exceeds

9 the jurisdictional limits of this Court.

10    155. The above-mentioned conduct of Toberoff was done

11 with conscious disregard of Alomar's business and personal

12 reputation, health, rights, and feelings, and was carried

13 out in a deliberate, cold, callous, oppressive, malicious

14 and intentional manner as Toberoff willingly and knowingly

15 defamed Alomar and by Toberoff's said actions and

16 intentionally injuring and damaging Alomar, which conduct

17 was despicable, and constituted oppression and malice as

18 defined by Cal. Civil Code ("C.C.") §3294.  In accordance

19 with C.C. §3294, Alomar is entitled to an award of punitive

20 damages in an amount sufficient to punish or set an example

21 of Toberoff, in sum to be proven at trial together with

22 prejudgment interest pursuant to Civil Code §3287.

23    WHEREFORE, plaintiffs request judgment against

24 defendants as set forth below.

25

26

27

28

21006053                           -44-

Exhibit 5
82

1    <u>TWELFTH CAUSE OF ACTION FOR DECLARATORY RELIEF</u>

2                   (As Against All Defendants)

3         156. Plaintiffs reallege, as though fully set forth at

4    length, and incorporate herein by this reference, all the

5    allegations of Paragraphs 1 through 155, inclusive, of this

6    Complaint.

7         157. A dispute has arisen and an actual controversy

8    exists between plaintiffs and defendants within the meaning

9    of California Code of Civil Procedure Section 1060.  As

10   such, this Court has the authority to issue a declaratory

11   judgment concerning the alleged agreement between the

12   parties contained in a letter dated January 29, 1997 to Alan

13   S. Gutman ("Gutman Letter").  Specifically, plaintiffs claim

14   that the alleged agreement in the Gutman Letter, and all the

15   obligations contained therein, is not a binding agreement

16   between the parties because: (1) there was no meeting of the

17   minds, (2) defendants misrepresented material facts in that

18   they denied having been offered 1 million shares of stock

19   (valued at $10 million) by Bobbitt, (3) there was no

20   consideration for the alleged agreement, (4) an express

21   condition precedent to the alleged agreement was the

22   successful completion of the AAT/Metromedia merger on

23   January 31, 1997 (which did not occur), (5) the alleged

24   agreement was rescinded because Cavana failed to sign and

25   execute the alleged agreement and (6) the entire alleged

26   agreement was executed by plaintiffs under duress due to

27   defendants wrongful acts and threats to derail the

28   AAT/Metromedia merger unless plaintiffs agreed to the

21006053                        -45-

Exhibit 5
83

1   demands contained in the Gutman Letter, which left

2   plaintiffs with no reasonable alternative but to succumb to

3   defendants' pressure.

4        158. Plaintiffs are informed and believe that the

5   defendants, and each of them, believe the Gutman Letter to

6   be a binding agreement.

7        159. Plaintiffs desire a judicial determination that

8   the alleged agreement between the parties contained in the

9   Gutman Letter is unenforceable as a matter of law.

10       160. Plaintiffs have no remedy at law which would be as

11  speedy or adequate as for this Court to determine the

12  validity of the alleged agreement between the parties, and

13  therefore request and demand declaratory relief.  Moreover,

14  the requested declaratory relief is necessary and

15  appropriate at this time under the circumstances in order

16  that plaintiffs may ascertain its rights, duties and

17  obligations, if any, under the Gutman Letter and because the

18  facts supporting plaintiffs' claims in this action and the

19  facts supporting their request for declaratory judgment

20  arise out of the same events and circumstances, and

21  determination of both is necessary and appropriate to avoid

22  the multiplicity of actions that would result if declaratory

23  relief was not granted.

24       THIRTEENTH CAUSE OF ACTION FOR DECLARATORY RELIEF

25          (As Against Grace, Cavana, Toberoff and Gutman)

26       161. Plaintiffs reallege, as though fully set forth at

27  length, and incorporate herein by this reference, all the

28

21006053                        -46-

Exhibit 5
84

1    allegations of Paragraphs 1 through 160, inclusive, of this

2    Complaint.

3        162. A dispute has arisen and an actual controversy now

4    exists between plaintiffs and defendants concerning their

5    respective rights, duties and obligations concerning the

6    alleged Agreement for Compensation dated May 23, 1996, the

7    alleged Escrow Instructions dated July 18, 1996 and the AAT

8    Board Resolution relating to the same in that plaintiffs

9    contend both documents are void and unenforceable because

10   they were not authorized by AAT whereas plaintiffs are

11   informed and believes that defendants dispute these

12   contentions and contends that AAT authorized the Agreement

13   for Compensation and the alleged Escrow Instructions.

14       163. Plaintiffs desire a judicial determination of the

15   parties respective rights, duties and obligations and a

16   declaration as to (1) whether or not a binding agreement was

17   formed between AAT, Cavana and Huey Yang as a result of the

18   Agreement for Compensation, (2) whether the alleged Escrow

19   Instructions are enforceable, (3) whether or not the escrow

20   agent David Levenson is obligated to transfer 500,000 shares

21   of AAT stock to Cavana as trustee, or (4) to return said

22   shares to plaintiffs.  Plaintiffs and defendants disagree as

23   to each of these issues.

24       164. A judicial determination is necessary and

25   appropriate at this time under the circumstances in order

26   that plaintiffs may ascertain the enforceability and the

27   parties' rights and duties under the agreement and related

28   escrow instructions.

21006053                      -47-

Exhibit 5
85

1       <u>FOURTEENTH CAUSE OF ACTION FOR CONSTRUCTIVE TRUST</u>

2           165. Plaintiffs reallege, as though fully set forth at

3   length, and incorporate herein by this reference, all the

4   allegations of Paragraphs 1 through 164, inclusive, of this

5   Complaint.

6           166. Grace, Toberoff, Pacific Productions, AID and

7   Gutman hold money, share certificates and property

8   rightfully belonging to plaintiffs as alleged above.

9   Accordingly, plaintiffs are entitled to a constructive trust

10  upon all such money, negotiable instruments, property, and

11  all interests and profits derived by Grace, Toberoff,

12  Pacific Productions, AID and Gutman therefrom, in whatever

13  form such interest and profits are now embodied.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21006053                                  -48-

Exhibit 5
86

1      WHEREFORE, plaintiffs demand judgment against

2  defendants for:

3      1.   General damages according to proof;

4      2.   Special damages according to proof;

5      3.   Punitive damages;

6      4.   Costs of suit;

7      5.   Such other relief as this Court may deem just and

8  proper.

9      6.   Declaratory Judgment: that this Court declare the

10 alleged agreement between the parties contained in the

11 January 29, 1997 letter to Alan S. Gutman is null and void

12 and that escrow agent Levenson be ordered to return the

13 500,000 Escrowed shares to the parties to the JOINT VENTURE

14 (as per the JVA and relevant AAT minutes) as they

15 contributed said shares into Escrow; and

16     7.   A constructive trust as alleged.

17 Dated:  February 24, 1997

18

19                              KENNETH R. CHIATE
                                PILLSBURY MADISON & SUTRO LLP

20

21

                                By
22                                 KENNETH R. CHIATE
                                Attorneys for Plaintiffs
23                              WALID ALOMAR, an individual,
                                ROSSCAPE-A.I.D., LTD.,
24                              ROSSCAPE-A.I.D. (ISLE OF MAN),
                                ROSSCAPE-A.I.D.,
25                              LTD. (CALIFORNIA), ROSSCAPE,
                                INC. and PETROTEC
26                              ADVANCED PETROLEUM TECHNOLOGY
                                CORPORATION
27

28

   21006053                     -49-

Exhibit 5
87



EXHIBIT A

Exhibit 5
88



# ROSSCAPE ~ A. I. D. LTD.
( CHINA PROJECT )

277 SOUTH SPALDING DRIVE
SUITE 102
BEVERLY HILLS, CALIFORNIA 90212

(310) 557 - 9100
FAX: (310) 557 - 0403
TELEX 414600 UN

3 August, 1995

Mr. Philip S. Cavana
Chairman of the Board
Asia Infrastructure Development Co., Ltd.
23715 W. Malibu Rd., Ste 339
Malibu, CA 90265

Dear Phil:

Further to our discussion in relation to developing joint business in China, I confirm our agreement to the following:

1.     Asian Infrastructure Development Company, Ltd. ( AID Ltd.) and Rosscape Inc. (Rosscape) agree to establish a joint venture company, Rosscape - AID Ltd. which will develop business between the People's Republic of China and the United States of America.

2.     The joint venture will have an operating Board of Directors to manage all its affairs.

3.     The Board of Directors will be made up of four members appointed, two by A.I.D. and two by Rosscape.  The initial board of directors members shall be:

Exhibit 5
89



Philip Cavana

George Lamar (Walid)

Mary Grace

Karl Al-Omar

4.      The board members will also function as officers of the joint venture in the following capacity:

Philip Cavana - Chairman and Business Development.

George Lamar - President and CEO

Mary Grace - Executive Vice President, Treasurer and Company Secretary

Karl Al-Omar - Vice President Coordinator

5.      The following issues will require unanimous approval of the Board of Directors of the joint venture company:

5.1     Business structure of each business deal.

5.2     All financial transactions to include but not limited to:

5.2.1.          Capital Contribution

5.2.2.          Investments:

5.2.3.          Borrowings:

5.2.4.          Operating Budgets:

5.2.5.          Distribution of Income:

5.3     Associations and representations of third party organizations.





Exhibit 5
90



6.    Operating officers agree to operate within the guidelines set by the Board of Directors and the terms of this agreement and/or any subsequent agreements.

7.    Any benefits and/or assets derived from the operation of the joint venture is owned by the two joint venture parties (Rosscape & A.I.D., Ltd.) equally on 50 -50 basis.

8.    All officers of the joint venture agree to keep all information confidential and for such information to be release to third parties only in the benefit of the joint venture.

9.    Both parties agree that all business developed in the People's Republic of China, in which they are involved, will be handled by the joint venture for the common benefit of the parties on exclusive basis.  No single party or its members or its associates can operate within the People's Republic of China outside this agreement.

10.    All interim expenses will be covered by each party for its own expenditures until such time that the Board of Directors approves an initial capital contribution and deposit such contribution in the joint venture bank account to established.

11.    Legal drawn agreement taking into consideration both USA and Chinese applicable laws will be drawn by the parties at a later date and will include (but not limited to):

    11.1    Termination Clauses
    11.2    Force Majeure Clauses
    11.3    Arbitration Clauses
    11.4    Applicable Laws





Exhibit 5
91



11.5        Any other aspect relevant to this agreement.

In the interim California Laws applies to this agreement.  The effective date of this agreement is *3rd August*, 1995.

Please sign below indicating your full agreement to the above.

Thank you

Sincerely yours,

**ROSSCAPE - AID**

George Lamar (Walid)

We fully agree to the above:

Philip Cavana                                  08-03-95
Philip Cavana                    Date
Chairman of Board, A.I.D., Ltd.

Mary Grace                                    08-03-95
Mary Grace                       Date
Executive V. President, A.I.D., Ltd.

George Lamar          8|3|95
George Lamar          Date
President, Rosscape Inc.

                                    08-05-95
Karl Al-Omar          Date
Business Development, Rosscape Inc.

Exhibit 5
92



EXHIBIT B

Exhibit 5
93

## AGREEMENT

This Agreement is entered into by the following parties this 26th day of December, 1995:

Max E. Bobbitt Financial Consulting Services, Ltd.
650 South Shackleford Road, Suite 400
Little Rock, Arkansas 72211
(Hereinafter referred to as BOBBITT)

ROSSCAPE-A.I.D. LTD.
277 South Spalding Drive, Suite 102
Beverly Hills, California 90212
(Hereinafter referred to as ROSSAID)

Howard M. Appel
401 City Avenue, Suite 725
Bala Cynwyd, Pennsylvania 19004

FAC Enterprises, Inc.
401 City Avenue, Suite 725
Bala Cynwyd, Pennsylvania 19004

Ernest Bartlett
24224 Kanis Road
Little Rock, Arkansas 72211

FAC Enterprises, Inc., Howard M. Appel and Ernest Bartlett are hereinafter referred to jointly as FAC/Bartlett. All obligations and rights of FAC Enterprises, Inc., Howard M. Appel and Ernest Bartlett hereunder are joint and several.

1.    **Purpose.**

The purpose of this Agreement is to create a corporation that will enter into joint venture and other agreements for the establishment and development of a telecommunications business in the People's Republic of China. The parties will use their best efforts to accomplish this by first creating a new Bermuda corporation (to be named Asian American Telecommunications Corporation, if that name is available, hereinafter referred to as AAT), cause AAT to enter into an agreement or

wpdocs\bobbitt.agt                                        1

Exhibit 5
94

agreements with China United Telecommunications Corporation or any of its subsidiaries or associates for the establishment of said business and as soon as reasonably practicable to merge AAT with VDC Corporation, Ltd., a Bermuda corporation ("VDC"), all as more fully set forth below. Other telecommunications projects in other countries can be undertaken by unanimous agreement of the parties hereto or, after consummation of the merger contemplated in Paragraph 5 below, by appropriate corporate action of the surviving corporation of the merger.

2.    **The China Joint Venture Agreement (JVA).**

ROSSAID and BOBBITT will use their best efforts to create AAT and to have AAT enter into an agreement or agreements between China United Telecommunications Corporation (UNICOM) or any of its subsidiaries or associates to enable AAT to form a Joint Venture Corporation (JVC) to import, construct, finance and operate telecommunications equipment and systems into and in the People's Republic of China; including but not limited to wireless, hard wire, fiberoptics, microwave, and satellite facilities used in providing local and long distance telecommunications services, and cable television in any or all provinces of China, and to enable a successor corporation of AAT through merger or otherwise to succeed to all rights of AAT. The parties also contemplate that additional joint venture and other agreements may be entered into by ATT and/or the JVC that are necessary or desirable to accomplish the purpose of this Agreement. The parties will use their best efforts, that are consistent with prudent management, to obtain for the JVC authority to enter into joint ventures to provide telephone services in various provinces of the People's Republic of China and to contract in the name of AAT and/or the JVC with one or more qualified companies to finance, construct and manage telephone systems within the provinces. AAT and/or the JVC will manage the activity of the joint ventures and handle all matters pertaining to the

wpdoc\bobbitt.agt                                        2

Exhibit 5
95

laws and regulations prevailing in the People's Republic of China. AAT and/or the JVC may collect initial fees and monthly management royalty on the gross revenues of the joint venture from the contracted companies. The JVA will be drafted in a manner consistent with Chinese Law and regulations, and structured to allow AAT and its successor to accomplish the objectives of this Agreement.

3.      **Representations.**

ROSSAID hereby represents that it will use its best efforts to facilitate the execution of the JVA in China in a manner consistent with this Agreement and laws and regulations prevailing in China. FAC/Bartlett hereby represent that they will use their best efforts to cause the merger described in Paragraph 5 below to be consummated. FAC/Bartlett hereby represent that they are willing and able to meet their financial obligations specified in this Agreement. BOBBITT hereby represents that Max E. Bobbitt has in depth experience in the telecommunications business as a chief operating officer and chief financial officer and is willing and able to manage the business as its president and chief executive officer.

4.      **Confidentiality.**

FAC/Bartlett and BOBBITT have entered into confidentiality and non circumvention agreements with ROSSAID.

5.      **Organization.**

### Step 1

BOBBITT will use its best efforts to incorporate AAT as a Bermuda corporation named Asian American Telecommunications Corporation, if that name is available, or another name if it is not. AAT will be created as soon as practicable. The initial capital stock of AAT shall consist of

wpdocs\bobbitn.agt                                        3

Exhibit 5
96

9,500,000 shares of common stock, with 5,000,000 of said shares being owned by ROSSAID, 2,000,000 of said shares being owned by FAC and 2,500,000 of said shares being owned by BOBBITT. ROSSAID shall be granted options by AAT to acquire 1,000,000 additional shares of AAT common stock at a price of $15.00 per share and 1,000,000 additional shares of AAT common stock at a price of $20.00 per share, said options to expire two years from the date of this Agreement. The initial board of directors of AAT shall include Max E. Bobbitt, Phillip Cavana, Walid Alomar, Howard M. Appel, and Ernest Bartlett. Initial officers of AAT shall include Phillip Cavana as Chairman, Max E. Bobbitt as President, Ernest Bartlett as Secretary, and Walid Alomar as Treasurer.

### Step 2

FAC/Bartlett shall advance $200,000.00 cash to or for AAT on December 26, 1995 by wire transfer to an account over which ROSSAID and BOBBITT have sole control. BOBBITT shall advance $100,000.00 (less $25,000.00 already paid to Ivester, Skinner & Camp, P.A. for legal fees and costs) to or for AAT on December 26, 1995 by wire transfer to said account. Said amounts shall be used to pay fees and expenses necessary or desirable to further the purpose of this Agreement, including expenditures incurred by BOBBITT prior to the date hereof. ROSSAID has incurred $200,000.00 in expenses designed to facilitate and accomplish the purpose of this Agreement. All of said amounts shall constitute loans from the respective parties that shall be non-interest bearing and that shall be repaid at the time the funds described in Step 3 below are paid to AAT.

### Step 3

By the later of January 15, 1996 or within two days after the JVA is executed, whichever is later, FAC/Bartlett shall cause VDC to lend AAT the sum of $1,500,000.00, said loan to bear no interest. This sum shall be raised by the public or private sale of 300,000 or fewer shares of VDC

windocs\bobbitt.ugt

4

Exhibit 5

97

at a price of $5.00 per share or more unless a lower price is approved by the board of directors of AAT. Alternatively, FAC/Bartlett shall have the option of causing an investor acceptable to the board of directors of AAT to privately invest $1,500,000.00 in equity in AAT in exchange for 300,000 or fewer shares of AAT common stock. The $500,000.00 in loans to AAT described in Step 2 above shall be repaid from said $1,500,000.00 and $1,000,000.00 of said funds shall be paid to ROSSAID.

## Step 4

Upon execution of the JVA, AAT shall enter into an Employment Agreement with Max E. Bobbitt that shall include the following terms:

(A)   Max E. Bobbitt shall be employed as President and Chief Executive Officer for a term to end on December 31, 2005.

(B)   The employment agreement shall include a non-termination provision which requires that AAT, and any successor of AAT, shall continue to pay Max E. Bobbitt the full compensation provided under the contract until December 31, 2005.

(C)   The base salary shall be $300,000.00 per year, payable monthly. An annual bonus shall be equal to five percent (5%) of AAT's consolidated income before applicable income taxes. The bonus payments shall be paid quarterly based upon unaudited quarterly results with final annual bonus paid based upon audited annual results.

(D)   AAT's fringe benefits to Max E. Bobbitt shall include full reimbursement for all travel, entertainment, living and housing expenses incurred for travel to and from China from his residence in Little Rock, Arkansas.

## Step 5

By no later than January 31, 1996 or within two weeks after the JVA is executed, whichever is later, FAC/Bartlett shall cause VDC to lend AAT the sum of $3,500,000.00, said loan to bear no interest. This sum shall be raised by the public or private sale of 700,000 or fewer shares of VDC

wp:pcs\bobbitt.agt                    5

Exhibit 5
98

12/20/95   13.00   4'5013'4'5550   .   IVESIER LAW FIRM   ☒007/010

at a price of $5.00 per share or more unless a lesser price is approved by the board of directors of

AAT. Alternatively, FAC/Bartlett shall have the option of causing an investor acceptable to the

board of directors of AAT to privately invest $3,500,000.00 in equity in AAT in exchange for

700,000 or fewer shares of AAT common stock. Said $3,500,000.00 shall be used to fund the

activities of AAT.

### Step 6

FAC/Bartlett shall use their best efforts to cause VDC to enter into a merger agreement with

AAT as described below and all parties shall use their best efforts to cause AAT to enter into said

merger agreement by no later than January 31, 1996. Said merger agreement shall provide for the

merger of AAT with VDC and for VDC to change its name to Asian American Telecommunications

Corporation (the "Merger"). The merger agreement shall provide for one share of VDC common

stock to be exchanged for each outstanding share of AAT common stock. Attached as Exhibit 1

hereto is a pro-forma statement of share ownership of AAT and VDC assuming the sums specified

in Steps 3 and 4 above are raised by sale of VDC shares. As set forth in Footnote A to Exhibit 1,

the shares may be issued by AAT in lieu of VDC. The "VDC Post-Merger Shares and Percent

Ownership" of VDC post-merger as set forth in Exhibit 1 will not be affected. Set forth on Exhibit

2 is the pro-forma ownership of VDC after the merger with AAT and after ROSSAID exercises its

options to acquire additional stock.

**6.     The Surviving Corporation**

The parties agree to vote their common stock in the surviving corporation and to use their

best efforts cause management of the surviving corporation to include the following:

1.       The board of directors shall consist of seven persons. Three members of the

wpdocs\bobbitt.agt                                    6

Exhibit 5
99

Dec. 26 '95 16:08
12/20/95  15:07  ☎509  3636          IVESTER LAW FIRM  ●          ⚏005/010

board of directors shall be nominated by ROSSAID, one of whom shall hold the position of Chairman; three members of the board of directors shall be nominated by FAC/Bartlett; and the seventh member of the board of directors shall be Max E. Bobbitt.

2.      Max E. Bobbitt shall serve as President and Chief Executive Officer pursuant to an employment agreement containing the terms described in Step 4 of Paragraph 5 above.

All parties agree fully to the above and attest their signature hereunder in confirmation.

FAC ENTERPRISES, Inc.

By: _____

Howard M. Appel

Date: _____12-26-95_____

Howard M. Appel                          Ernest Bartlett III

Date: __12-26-95__                       Date: __12-26-95__

Max E. Bobbitt Financial Consulting      ROSSCAPE A.I.D. Ltd.
Services LTD.

By: _____           By: _____

Max E. Bobbitt, President                Walid Alomar, President & Chief
                                         Executive Officer

                                         By: _____

                                         Phillip Cavano, Chairman

Date: __12-26-95__                       Date: __12 - 26 - 95__

7

Exhibit 5
100

15:07    5013  8538    IVESTER LAW FIRM    009/010

## EXHIBIT 1

|  | AAT Pre-Merger Shares | VDC Pre-Merger Shares | VDC Post-Merger Shares | VDC Post-Merger Ownership Percent |
|---|---|---|---|---|
| ROSSAID | 5,000,000 | - | 5,000,000 | 38.47% |
| FAC/ BARTLETT | 2,000,000 | - | 2,000,000 | 15.38% |
| BOBBITT | 2,500,000 | - | 2,500,000 | 19.23% |
| VDC Shareholders (B) | - | 2,500,000 | 2,500,000 | 19.23% |
| Shares Issued for New Equity (A) | - | 1,000,000 | 1,000,000 | 7.69% |
| Total | 9,500,000 | 3,500,000 | 13,000,000 | 100.00% |

Footnote A:
> Shares issued for $5,000,000 of new equity may either be issued by AAT or VDC before the merger of AAT and VDC is closed.

Footnote B:
> VDC should have approximately $3,000,000 cash on date of merger with AAT.

wpdocs\bobbitt.ex1

Exhibit 5

101

**EXHIBIT 2**

|  | VDC Post-Option Shares | VDC Post-Option Ownership Percent |
|---|---|---|
| ROSSAID (A) | 7,000,000 | 46.66% |
| FAC/ BARTLETT | 2,000,000 | 13.33% |
| BOBBITT | 2,500,000 | 16.67% |
| VDC Shareholders | 2,500,000 | 16.67% |
| Shares Issued for New Equity | 1,000,000 | 6.67% |
| Total | 15,000,000 | 100.00% |

Footnote A:
> Assumes ROSSAID will pay $35,000,000 cash to purchase 1,000,000 shares at $15.00 per share and 1,000,000 shares at $20.00 per share.

wpdocs\bobbitt.ex2

Exhibit 5
102



EXHIBIT C

Exhibit 5
103

SENT BY:VENABLE BAETJER HOWARD;12-15-67 ;  9:54  ;    2029628396→    CCITT G3;# 2

03/08/96    13:42   ☎5013768536    IVESTER LAW FIRM    ☎002/008

## FIRST AMENDMENT TO AGREEMENT

This First Amendment (the "First Amendment"), is made and entered into as of the ____ day of March, 1996, by and between the following parties:

        Max E. Bobbitt Financial Consulting Services, Ltd.
        650 South Shackleford Road, Suite 400
        Little Rock, Arkansas 72211
        (Hereinafter referred to as "BOBBITT")

        Rosscape - A.I.D. LTD.
        124 Lasky Drive, 2nd Floor
        Northwest Suite
        Beverly Hills, CA  90212
        (Hereinafter referred to as "ROSSAID")

        Howard M. Appel
        401 City Avenue, Suite 725
        Bala Cynwyd, Pennsylvania 19004

        FAC Enterprises, Inc.
        401 City Avenue, Suite 725
        Bala Cynwyd, Pennsylvania 19004

        Ernest Bartlett
        24224 Kanis Road
        Little Rock, Arkansas  72211

FAC Enterprises, Inc., Howard Appel and Ernest Bartlett are hereinafter referred to jointly as "FAC/Bartlett." All obligations and rights of FAC Enterprises, Inc., Howard M. Appel and Ernest Bartlett hereunder are joint and several.

## RECITALS

Whereas, the parties previously entered into that certain Agreement, dated December 26, 1995 by, between and among themselves (the "Agreement"); and,

Whereas, the parties now mutually desire to amend the Agreement as set forth in this First Amendment.

NOW, THEREFORE, in consideration of the promises, covenants and agreements of the parties and other good and valuable consideration contained herein, the parties hereto agree as follows:

1.    Section 4 of the Agreement is amended by adding the following paragraph thereto:

N:\DOBANN\EBA\11\1365.1    -1-



Exhibit 5
104

SENT BY:VENABLE BAETJER HOWARD;12-15-67 ; 9:55 ;         2029628398→         CO111 G3.# 3

03/06/96   13:43   ☎5013788536         IVESTER LAW FIRM         @003/009

"Walid Al-Omar, Mary Grace and Phillip Cavana shall enter into confidentiality and non circumvention agreements with the company that AAT. The form and content of said agreements shall be substantially similar to the confidentiality and non-circumvention agreements made and entered into by and between FAC, BARTLETT and BOBBITT with ROSSAID, which agreements ROSSAID shall and hereby does assign to AAT."

The remainder of Section 4 shall remain intact, and unaffected by this Amendment.

2.    The first paragraph of Section 5 entitled "Step 1", shall be amended by adding the following thereto:

"All parties to this Agreement shall use their best efforts to have additional non-voting stock in AAT issued as set forth below and as set forth in Exhibit "A" attached hereto:

a)   By March 8, 1996, 425,000 additional non-voting shares shall be issued to ROSSAID and 1,825,000 additional non-voting shares shall be issued to BOBBITT.

b)   As soon as practical following the execution of the JVA, AAT shall issue 1,162,500 additional non-voting shares to BOBBITT as Trustee for FAC, and 1,500,000 additional non-voting shares to third parties who have assisted AAT in obtaining the JVA, to wit its financial adviser and its legal adviser in Beijing, China, such third parties to be named by BOBBITT and ROSSAID.

ROSSAID has an agreement with WH. INVESTMENTS and SAMIR RLMORALAWY to transfer 1,000,000 shares and 100,000 shares, respectively, at the time of execution of the Joint Venture Agreement with AAT and UNICOM.

c)   As soon as practical following execution of the merger or acquisition agreement referenced in Step 7 of Section 5, and before said merger or acquisition has closed, AAT shall issue 425,000 additional non-voting shares to BOBBITT, and 1,162,500 additional non-voting shares to BOBBITT, as Trustee for FAC.

-2-

Exhibit 5
105

SENT BY:VENABLE BAETJER HOWARD;12-15-67 ;  9:55 ;          2029528998→              CC]^1 G9:# 4

03/08/96   13:43   ☎5013768538              IVESTER LAW FIRM                    ☒004/009

At the time the Acquisition Agreement is executed, all shares will become voting shares and have equal value.

(d)  Any further increase in the number of authorized shares of AAT, regardless of the class of the stock, or any act that may dilute any shareholder's equity position in AAT shall require the unanimous approval of the Board of Directors of AAT and all of its shareholders. Further, all additional shares to be issued pursuant to this First Amendment shall be non-voting, common shares of AAT. Until such time as AAT's Memorandum of Association and Articles of Association are amended to provide for this class of common stock, the "additional non-voting shares" to be issued as provided above shall have no voting rights whatsoever, notwithstanding any provisions contained or set forth elsewhere to the contrary.

3.  The second paragraph of Section 5 of the Agreement, entitled "Step 2", is hereby amended in its entirety to read as follows:

"Step 2

FAC previously has loaned $200,000.00 to AAT. In addition, FAC shall reimburse BOBBITT $250,000.00 upon execution of this Agreement, the $250,000 consisting of BOBBITT'S loan of $100,000.00 to AAT and $150,000.00 of expenses incurred by BOBBITT on behalf of AAT. This $250,000 reimbursement shall be added to the original loan to create a total loan balance due FAC by AAT of $450,000.00.

ROSSAID previously has loaned AAT $300,000.00 which loan was created by the expenses incurred by ROSSAID on behalf of AAT prior to the execution of the Agreement. Expenses submitted by ROSSAID shall be deemed correct and accepted by the Board of Directors and shareholders of AAT. ROSSAID agrees to reduce this amount by $80,000.00, whereby the total amount due and owing ROSSAID by AAT is $120,000.00. This reduction shall be effective upon execution of this First Amendment.

Notwithstanding the foregoing, AAT's $450,000 debt to FAC shall be reduced by $10,000.00,

-3-

Exhibit 5
106

which amount shall constitute paid in capital of AAT in exchange for AAT's issuance of additional AAT common stock, as set forth herein-below.

4.    The third paragraph of Section 5 of the Agreement, entitled "Step 3", is hereby amended in its entirety to read as follows:

"Step 3

FAC shall reimburse BOBBITT and AAT for all future reasonable and customary expenses incurred by BOBBITT and AAT in their efforts to consummate the contract(s) with UNICOM and to consummate a subsequent AAT merger with, or acquisition of AAT by, a publicly traded tele-communications company, which company must be listed and traded on the NYSE, AMEX, and/or NASDAQ stock exchanges.

FAC shall reimburse the parties to this First Amendment for all legal expenses incurred by said parties in connection with the negotia-tion, drafting and execution of this First Amendment.

All of FAC's reimbursements to BOBBITT and AAT shall become additional loans by FAC to AAT."

5.    The fourth paragraph of Section 5 of the Agreement, entitled "Step 4", is hereby amended in its entirety to read as follows:

"Step 4

Upon execution of the JVA, AAT shall employ Max E. Bobbitt, on the following terms and conditions:

Max E. Bobbitt shall be employed as President and Chief Executive Officer of AAT at an annual salary of $300,000.00.  The term of his employment shall be indefinite, but shall terminate upon the first to occur of the following: (i) the closing of a merger or acquisition agreement as referenced in Step 7 of this Section 5; (ii) until Bobbitt submits his written resignation; or (iii) until said services are terminated by the Board of Directors AAT.

-4-

Exhibit 5
107

6.    Section 5 of the Agreement shall be amended by adding the following paragraph thereto:

"Step 7

As an alternative to the provisions set forth in Steps 3, 4 and 5 above, the parties to this First Amendment shall use their best efforts to cause AAT to enter into a merger with or to be acquired by an existing corporation whose stock is traded on either the NYSE, AMEX or NASDAQ stock exchange.  Any such merger or acquisition shall be subject to Board of Director and shareholder approval.

All other provisions of Steps 3, 4 and 5 of the Agreement shall remain intact and unaffected by this First Amendment."

7.    The Agreement shall be amended by adding the following Section 7 thereto, as follows:

"7.    Removal of ROSSAID.

If a merger or acquisition referenced in Section 5, Step 7 of this Agreement requires, as a condition of closing, the name change removal of ROSSAID as a shareholder, and/or the removal of Walid Al-Omar, Mary Grace and Phillip Cavana as directors and/or officers of AAT are necessary, then ROSSAID, Mr. Al-Omar, Ms. Grace and/or Mr. Cavana shall take such action that is reasonable and necessary to distance themselves from AAT so as to cause said merger or acquisition to close.  Any such name change or other action shall be effective contemporaneously with the closing of a merger or acquisition and shall become null and void should any such merger or acquisition fail to close.  Until such time as the name change removal referenced above occurs, the officers and Board of Directors shall remain as is.

8.    By signing this First Amendment, the parties ratify and confirm that all acts by the parties to this First Amendment preceding execution of this First Amendment on behalf of AAT have been within the course and scope of their responsibilities to AAT.

9.    If this First Amended is not duly executed by all parties on or before March 8, 1996, then said First Amendment shall be null and void and the provisions of the Agreement shall remain in full force and effect.

-5-

PC

Exhibit 5
108

03/08/96   13:45   ☎5013768536            IVESTER LAW FIRM                       @008/009
3-08-1996 10:46AM    FROM PORTACOM WIRELESS 310 448 4141                         P.2

TOTAL P.07

10.  The Agreement, dated December 36, 1995, as amended herein, constitutes the agreement of the parties effective March 8, 1996.

11.  Except as herein modified, the Agreement is ratified and confirmed in its entirety.

DATED: _March 8___ , 1996       PAC ENTERPRISES, INC.

                                By: _____
                                    HOWARD M. APPEL
                                Title:

DATED: _March 8___ , 1996       _____
                                    HOWARD M. APPEL

                                _____
DATED: _March 8___ , 1996           ERNEST BARTLETT

DATED: _March 8___ , 1996       MAX E. BOBBITT FINANCIAL
                                CONSULTING SERVICES LTD.

                                By: _____
                                    MAX E. BOBBITT
                                Title:  President

DATED: _March 8___ , 1996       ROSSCAPE - A.F.D. LTD.

                                By: _____
                                    WALID AL-OMAR
                                Title:  President and Chief
                                        Executive Officer

                                _____
DATED: _March/8___ , 1996           PHILLIP CAVANA
                                Title:  Chairman

                        -6-

Exhibit 5
109

SENT BY:VENABLE BAETJER HOWARD;12-15-97 ; 8:57 ;                2029629398→                CU111 63.# 7

03/08/96  13:45  ☎5013768536          IVESTER LAW FIRM                    ☎008/009
                                                                          P.2

3-08-1996 10:46AM    FROM PORTACOM WIRELESS 310 448 4141

TOTAL P.87

10.  The Agreement, dated December 26, 1995, as amended herein, constitutes the agreement of the parties effective MARCH _____, 1996.

11.  Except as herein modified, the Agreement is ratified and confirmed in its entirety.

DATED: March 8 , 1996          PAC ENTERPRISES, INC.

                               By: _____
                                        HOWARD M. APPEL

                               Title: _____

DATED: March 8 , 1996          _____
                                        HOWARD M. APPEL

DATED: March 8 , 1996          _____
                                        ERNEST BARTLETT

DATED: March 8 , 1996          MAX E. BOBBITT FINANCIAL
                               CONSULTING SERVICES LTD.

                               By: _____
                                        MAX E. BOBBITT

                               Title:  President

DATED: March 8 , 1996          ROSSCAPE - A.T.D. LTD.

                               By: _____
                                        WALID AL-OMAR

                               Title:  President and Chief
                                        Executive Officer

                               _____
                                        PHILLIP CAVANA

DATED: March/8 , 1996          Title:  Chairman

-6-

Exhibit 5
110

SENT BY:VENABLE BAETJER HOWARD;12-15-87 ; 9:58 ;        2029628999→        OCITI US# 8

## EXHIBIT "A" TO FIRST AMENDMENT TO AGREEMENT

Exhibit 5
111

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| SHORT CASE TITLE | CASE NUMBER |
|---|---|
| WALID ALOMAR, et al., vs. PHILIP CAVANA, et al. | **CERTIFICATE OF ASSIGNMENT** |

### File this certificate with all cases presented for filing in all districts of the Los Angeles Superior Court.

☑ JURY TRIAL    ☐ NON–JURY TRIAL    TIME ESTIMATED FOR TRIAL **20**    ☐ HOURS / ☑ DAYS.

☐ The undersigned declares that the above entitled matter is filed for proceedings in the _____ **CENTRAL** _____ District of the Los Angeles Superior Court under Section 392 et seq., Code of Civil Procedure and Rule 2 (c) and (d) of this court for the reasons checked below. The address of the accident, performance, party, detention, place of business, or other factor which qualifies this case for filing in the above designated district is (address information not required for non-tort cases filed in Central District):

| NAME: (INDICATE TITLE OR OTHER QUALIFYING FACTOR) ASIA INFRASTRUCTURE DEVELOPMENT CO., LTD | ADDRESS: 23715 W. Malibu Road Suite 339 Malibu, CA 90265 |
|---|---|
| (CITY)            (STATE)            (ZIP CODE) | |

### CHECK ONLY ONE NATURE OF ACTION.

| NATURE OF ACTION | GROUND | NATURE OF ACTION | GROUND |
|---|---|---|---|
| ☐ A7100 Vehicle Accident | Local Rule 2 sets forth the provisions for mandatory filing in the Central District and optional filings in the Central District or District other than the Central District in "Los Angeles County." | No. of Minors Involved: _____ | One or more of the party litigants resides within the district. ** |
| ☐ A7210 Med Malpractice | | ☐ A5520 Family Law Dissolution | |
| ☐ A7200 Other Personal Inj. | | ☐ A5525 Summary Dissolution | (Not a requirement for filing in Central District— Rule 2) |
| ☐ A7220 Product Liability | | ☐ A5530 Nullity | |
| ☐ A6050 Other Malpractice | | ☐ A5510 Legal Separation | |
| ☐ A6012 Collection/Note | | ☐ A6135 Foreign Support | |
| ☐ A6040 Injunct. Relief | | ☐ A6136 Foreign Custody | |
| ☐ A6030 Declar. Relief | | ☐ A6122 Domestic Violence | |
| ☐ A6170 Late Claim Relief | | ☐ A6130 Family Law Complaint-Other | |
| ☐ A6000 Other Complaint (Specify): | If this is a Class Action, mark this box: | No. of Minors Involved: _____ | Child resides or deceased father's probate would be filed in the district. ** |
| | ☐ Class Action | ☐ A6080 Paternity | |
| ☒ A6011 Contract/Commercial | Performance in the district is expressly provided for. ** | ☐ A6131 DA Paternity (DA use only) | |
| | | ☐ A6133 DA Agreement (DA use only) | Child is held within the district. ** |
| | | ☐ A6600 Habeas Corpus Family Law | |
| ☐ A7300 Eminent Domain/ Inverse Condemnation No. of Parcels _____ | The property is located within the district. ** | ☐ A6101 Agency Adoption | Petitioner resides within the district. ** or Consent to out-of-state adoption, consentor resides within the district. ** |
| ☐ A6020 Landlord/Tenant (UD) | | ☐ A6102 Independent Adoption | |
| ☐ A6060 Real Property Rights | | ☐ A6104 Stepparent Adoption | |
| | | ☐ A6103 Adult Adoption | |
| ☐ A6140 Admin Award | The administrative tribunal is located within the district. ** | ☐ A6106 Sole Custody Petition | |
| | | ☐ A6105 Abandonment | |
| ☐ A6160 Abstract | The judgment debtor holds property within the district. ** | ☐ A6210 Probate Will-Letters Testamentary | Decedent resided within the district. ** or Decedent resided out of the district, but held property within the district. ** or Petitioner, conservatee or ward resides within this district. ** |
| ☐ A6141 Sister State Judgment | | ☐ A6211 Probate Will-Letters Administration | |
| ☐ A6107 Confession of Judgment | | ☐ A6212 Letters of Administration | |
| | | ☐ A6213 Letters of Special Administration | |
| ☐ A7221 Asbestos Pers. Inj. | Must be filed in the Central District. | ☐ A6214 Set Aside Sm. Estate (6602 PC) | |
| ☐ A6070 Asbestos Prop. Dam. | | ☐ A6215 Spousal Property | |
| ☐ A6137 RESL Initiating Petition | | ☐ A6216 Succession to Real Property | |
| ☐ A6138 RESL Responding Petition | | ☐ A6217 Summary Probate (7660 PC) | |
| ☐ A6139 RESL Reg of Foreign Support | | ☐ A6218 Real Prop./Sm. Value (13200 PC) | |
| ☐ A6111 Minor's Contract | | ☐ A6230 Conservatorship P & E | |
| ☐ A6190 Election Contest | | ☐ A6231 Conservatorship Person | |
| | | ☐ A6232 Conservatorship Estate | |
| ☐ A6110 Name Change | One or more of the party litigants resides within the district. ** | ☐ A6233 Medical Treatment without Consent | |
| ☐ A6121 Civil Harassment | | ☐ A6240 Guardianship P & E | |
| ☐ A6100 Other Petition (Specify): | | ☐ A6241 Guardianship Person | |
| | | ☐ A6242 Guardianship Estate | |
| | | ☐ A6243 Spouse Lacks Capacity | |
| ☐ A6151 Mandamus* | The defendant functions wholly within the district. ** | ☐ A6254 Trust Proceedings | |
| ☐ A6152 Prohibition* | | ☐ A6260 Comp. Minor's Claim | |
| ☐ A6150 Other Writ* (Specify): | | ☐ A6180 Petition to Establish Fact of Birth, Death or Marriage. | |
| | | ☐ A6200 Probate Other (Specify): | |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and this declaration was executed on **February 25, 1997** at **Los Angeles,** _____, California

_signature_
(SIGNATURE OF ATTORNEY/FILING PARTY)

* Perogative writs concerning a court of inferior jurisdiction shall be filed in Central District.
**Rule 2 allows optional filing in Central District.

### THE COURT MAY IMPOSE SANCTIONS OR OTHER PENALTIES FOR FAILURE TO FILE IN THE PROPER DISTRICT.

**4** 76C134
RC 013/R5-96

### CERTIFICATE OF ASSIGNMENT

RULE 2 LASCR

Exhibit 5
112

## New Civil Case Filing Instructions

Effective July 1, 1995, all persons filing new civil actions with the Los Angeles County Superior Court will be required to comply with the following procedures.

Pursuant to Superior Court Local Rules, Rule 2 (d), this **"Certificate of Assignment"** must **be completed and filed** with the Court along with the original Complaint or Petition in ALL cases filed in any district (including the Central District) of the Los Angeles County Superior Court.

---

**PLEASE HAVE THE FOLLOWING DOCUMENTS COMPLETED AND READY TO BE FILED ALONG WITH YOUR ORIGINAL CIVIL COMPLAINT OR PETITION:**

---

1. Original Complaint or Petition.

2. One copy of the *caption or front page (or as many pages as necessary) of the Complaint or Petition* to show the names of ALL the parties involved in the case.

3. This *"Certificate of Assignment"* form, completely filled out. *
   (Superior Court Form Number 4, revised 5/96)

4. Payment in full of the filing fee or an Order of the Court waiving payment of filing fees.

5. Additional copies of documents presented for endorsement.


\* With the exception of personal injury cases, and those types of actions required to be filed in the Central District by Local Court Rule 2, all civil actions may be optionally filed either in the Central District, or in whichever other district the rule would allow them to be filed. When a party elects to file an action in the Central District which would also be eligible for filing in one or more of the other districts, this form may be submitted without the name and location information completed on the reverse. In such cases, the grounds checked for filing the particular nature of action in the Central District do not apply.

Exhibit 5
113

Received Fax :       Jun 29 2009 4:51PM      Fax Station :   HP LASERJET FAX              p.   2

From:Primero Management INC.        818 225 1064        06/29/2009 16:54    #377 P.002/019

**EJ-190**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and Address):* | TEL NO.: |
| ☐ Recording requested by and return to: | 818-591-3800 |

David M. Browne, SBN 93576
23901 Calabasas Road
Suite 1064
Calabasas, CA 91302

☐ ATTORNEY FOR   ☐ JUDGMENT CREDITOR   ☑ ASSIGNEE OF RECORD

*Received Fax Filing*
*JUN 29 2009*

NAME OF COURT: LOS ANGELES COUNTY SP CT
STREET ADDRESS: 111 N. Hill St.
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

FOR RECORDER'S USE ONLY

CASE NUMBER:
BC166806

PLAINTIFF: WALID ALOMAR

DEFENDANT: PHILIP CAVANA

FOR COURT USE ONLY

**FILED**
LOS ANGELES SUPERIOR COURT
JUN 30 2009
JOHN A. CLARKE, CLERK
*J. A. Cook*
BY J.A. COOK, DEPUTY

**APPLICATION FOR AND RENEWAL OF JUDGMENT**

☐ Judgment creditor
☑ Assignee of record
applies for renewal of the judgment as follows:

1. Applicant *(name and address):*
   David M. Browne, 23901 Calabasas Road, Suite 1064, Calabasas, CA 91302

2. Judgment debtor *(name and last known address):*
   Zhi-Wei Wan, 417 McPherrin Ave., #A, Monterrey Park, CA 91754 and
   W.H. InvestmenT Group Co., Ltd., 417 McPherrin Ave., #A, Monterrey Park,
   CA 91754

3. Original judgment
   a. Case number *(specify):* BC166806
   b. Entered on *(date):* June 29, 1999
   c. Recorded: not applicable
      (1) Date:
      (2) County:
      (3) Instrument No.:

4. ☐ Judgment previously renewed *(specify each case number and date):*

5. ☑ Renewal of money judgment
   a. Total judgment . . . . . . . . . . . . . . . . . . . . . . . $ 42,083.00
   b. Costs after judgment . . . . . . . . . . . . . . . . $ none
   c. Subtotal *(add a and b)* . . . . . . . . . . . . . . $ 42,083.00
   d. Credits after judgment . . . . . . . . . . . . . . $ none
   e. Subtotal *(subtract d from c)* . . . . . . . . . $ 42,083.00
   f. Interest after judgment . . . . . . . . . . . . . . $ 42,013.99
   g. Fee for filing renewal application . . . . . . . . $ 20.00
   h. Total renewed judgment *(add e, f, and g)* . $ 84,116.99

   ☐ The amounts called for in items a – h are different for each debtor.
   These amounts are stated for each debtor on Attachment 5.

CIT/CASE: BC166806 LEN/DEFN:
RECEIPT #: LA65353201001
DATE PAID: 06/30/09
PAYMENT: $33.00
RECEIVED:      09:11:43 AM
CHECK:
CASH:        33.00
CHANGE:
CARD:

Form Approved for Optional Use
Judicial Council of California
EJ-190 [Rev. January 1, 2002]

**APPLICATION FOR AND RENEWAL OF JUDGMENT**

Code of Civil Procedure, § 683.140

American LegalNet, Inc.
www.USCourtForms.com

Exhibit 5
114

Received Fax :        Jun 29 2009 4:51PM     Fax Station :   HP LASERJET FAX          p.  3

From:Primero Management INC.        818 225 1064        06/29/2009 16:54     #377 P.003/019

| SHORT TITLE: Alomar v. Cavana | CASE NUMBER: BC166806 |
|---|---|

6. ☐ Renewal of judgment for    ☐ possession.
                                 ☐ sale.

a. ☐ If judgment was not previously renewed, terms of judgment as entered:

b. ☐ If judgment was previously renewed, terms of judgment as last renewed:

c. ☐ Terms of judgment remaining unsatisfied:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: June 23, 2009

David M. Browne
(TYPE OR PRINT NAME)

▶ _(signature)_
(SIGNATURE OF DECLARANT)

EJ-190 [Rev. January 1, 2002]        APPLICATION FOR AND RENEWAL OF JUDGMENT        Page 2 of 2

Exhibit 5
115