# EXHIBIT 14
# Part 1 of 2

ORIGINAL SHIPPED    DEC 0 1 2006

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA ) 
SIEGEL LARSON, )
 )
        Plaintiffs, )
 )
    vs. )      No. 04-8400 (RSWL)(RZx)
 )
WARNER BROS. ENTERTAINMENT )          -and-
INC., et al., )
 )      No. 04-8776 (RSWL)(RZx)
        Defendants. )
_____)
AND RELATED COUNTERCLAIMS.

**CERTIFIED COPY**

DEPOSITION OF MARC TOBEROFF

Beverly Hills, California

Friday, November 17, 2006

Reported by:

DAVID S. COLEMAN

CSR No. 4613

U.S. LEGAL Support

*Certified Shorthand Reporters*

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA 91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

s Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento . . . and across the nation

Exhibit 14
147

1              Deposition of MARC TOBEROFF, taken on

2         behalf of Defendants and Counterclaimants,

3         at 9665 Wilshire Boulevard, 9th Floor, Beverly

4         Hills, California, beginning at 1:46 PM on

5         Friday, November 17, 2006, before DAVID S.

6         COLEMAN, Certified Shorthand Reporter No. 4613.

7

8

9    APPEARANCES:

10

11   For Plaintiffs and the Witness:

12        LAW OFFICES OF MARC TOBEROFF
          BY:  MARC TOBEROFF
13             NICHOLAS C. WILLIAMSON
          Attorneys at Law
14        2049 Century Park East, Suite 2720
          Los Angeles, California 90067
15        310-246-3333

16

17   For Defendants and Counterclaimant:

18        WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
          BY:  MICHAEL BERGMAN
19             ADAM HAGEN
          Attorneys at Law
20        9665 Wilshire Boulevard, 9th Floor
          Beverly Hills, California 90212
21        310-858-7888
          mbergman@wwllp.com

22

23

24

25

                                                          2

**U.S. LEGAL SUPPORT**

Exhibit 14
148

```
1                              I N D E X

2

3

4    WITNESS                   EXAMINATION              PAGE

5    MARC TOBEROFF

6                              BY MR. BERGMAN           6

7

8                              EXHIBITS

9    DEPOSITION                                         PAGE

10   1    Subpoena to Marc Toberoff dated        7
          October 19, 2006, and attachments

11
     2    Marc Toberoff, Esq's Objections to     7
12        Defendants' Subpoena, dated November
          6, 2006
13
     3    Subpoena to Pacific Pictures Corpor-   10
14        ation dated October 19, 2006, and
          attachments
15
     4    Pacific Pictures Corporation's         10
16        Objections to Defendants' Subpoena,
          dated November 6, 2006
17
     5    Subpoena to IPW, LLC dated October     13
18        19, 2006, and attachments

19   6    IPW LLC's Objections to Defendants'    14
          Subpoena, dated November 6, 2006
20
     7    Subpoena to Marc Toberoff dated        14
21        August 10, 2006, and attachments

22   8    Internet printout on Marc Toberoff     16

23   9    Internet printout on Marc Toberoff     21

24   10   Printout from Intellectual Properties  26
          Worldwide, LLC
25
                                                            3
```

**U.S. LEGAL SUPPORT**

Exhibit 14
149

```
 1    INDEX (Continued:

 2              EXHIBITS (Continued)

 3    DEPOSITION                                    PAGE

 4    11   Internet printout on Intellectual       38
           Properties Worldwide
 5
      12   Printout from California Business        41
 6         Portal on IPW, LLC

 7    13   Joint Venture Agreement made as of       49
           November 23, 2001, by and between
 8         Pacific Pictures Corporation and
           Jean Peavy and Mark Peary
 9
      14   Letter from Marc Toberoff to Mark        68
10         Warren Peary dated October 27, 2003

11    15   Letter from Marc Toberoff to Mark        75
           Warren Peary dated September 10, 2004
12
      16   Fax from Marc Toberoff to Ariel          79
13         Emanuel dated 6-3-02

14    17   Letter from Marc Toberoff to Tom         85
           McGuire dated August 17, 2004, and
15         attachments

16    18   Letter from Marc Toberoff and Ariel      112
           Emanuel to Joanne Siegel and Laura
17         Siegel Larson dated October 3, 2002

18    19   Letter from Marc Toberoff to Joanne      121
           Siegel and Laura Siegel Larson dated
19         November 26, 2002, Bates No. 000001882

20    20   Letter from Marc Toberoff to Joanne      123
           Siegel, Laura Siegel Larson and Ariel
21         Emanuel dated December 16, 2002,
           Bates No. 000001883
22
      21   Letter from Marc Toberoff to Joanne      124
23         Siegel and Laura Siegel Larson dated
           January 21, 2002, Bates No. 000001888
24

01:16 25
                                                          4
```

**U.S. LEGAL SUPPORT**

Exhibit 14
150

1    INDEX (Continued):

2        INSTRUCTION NOT TO ANSWER/UNANSWERED QUESTIONS

3                        Page    Line

4                        53      4
                         59      19
5                        61      14
                         72      16, 23
6                        78      1
                         88      16
7                        98      16
                         100     17
8                        101     5
                         105     20
9                        110     10, 18
                         111     7
10                       118     21
                         128     2, 21
11                       130     20
                         142     19
12                       143     6
                         145     9

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    5

**U.S. LEGAL SUPPORT**

Exhibit 14
151

| | |
|---|---|
| 1 | Beverly Hills, California, Friday, November 17, 2006 |
| 2 | 1:46 PM |
| 3 | |
| 4 | MARC TOBEROFF, |
| 5 | having been first administered an oath, |
| 6 | was examined and testified as follows: |
| 7 | |
| 8 | EXAMINATION |
| 9 | BY MR. BERGMAN: |
| 01:46 10 | Q    State your full name for the record, please. |
| 01:46 11 | A    Marc Toberoff. |
| 01:46 12 | Q    Have you had your deposition taken before, |
| 01:46 13 | Mr. Toberoff? |
| 01:46 14 | A    Once. |
| 01:46 15 | Q    And when was that? |
| 01:47 16 | A    I think about nine years ago. |
| 01:47 17 | Q    Here in California? |
| 01:47 18 | A    Yes. |
| 01:47 19 | Q    In what type of a case? |
| 01:47 20 | A    It was a commercial litigation. |
| 01:47 21 | MR. BERGMAN:   Mr. Williamson, is Mr. Toberoff |
| 01:47 22 | appearing for Pacific and IPW, LLC as well as his own |
| 01:47 23 | subpoena? |
| 01:47 24 | MR. WILLIAMSON:   Yes. |
| 01:47 25 | MR. BERGMAN:   Okay. |

6

**U.S. LEGAL SUPPORT**

Exhibit 14
152

01:47 1         I am going to ask the court reporter to mark as

01:47 2  Exhibit 1 a subpoena dated October 19, 2006, to

01:47 3  Mr. Toberoff.

01:47 4        (Deposition Exhibit 1 marked.)

01:47 5  BY MR. BERGMAN:

01:47 6     Q  Do you recall receiving that subpoena,

01:47 7  Mr. Toberoff?

01:48 8     A  Yes.

01:48 9        MR. BERGMAN:  And would the reporter please mark

01:4810  as Exhibit 2 --

01:4811        THE WITNESS:  I have to say I haven't -- I've

01:4812  been handed a face page which is a subpoena.  It has

01:4813  numerous attachments.  I haven't verified whether these

01:4814  in fact attachments are the -- I would have to take the

01:4815  actual subpoena that I received and compare it to this

01:4816  subpoena to see if it's the exact same thing, but I

01:4817  presume that you're giving me the same one that I

01:4818  received.

01:4819        MR. BERGMAN:  Yes, I have.

01:4820        Would the reporter now mark as Exhibit 2 a

01:4821  document entitled "Marc Toberoff, Esq.'s Objections to

01:4822  Defendants' Subpoena" which was served on November 6,

01:4823  2006.

01:4824        (Deposition Exhibit 2 marked.)

01:4825  BY MR. BERGMAN:

7

01:49 1        Q    And would you look Exhibit 2 over, Mr. Toberoff,

01:49 2   and tell me if you recall making those objections to the

01:49 3   subpoena.

01:49 4        A    Yes.

01:49 5        Q    Now, am I correct that you have not produced any

01:49 6   documents pursuant to that subpoena?

01:49 7        A    I have not produced documents pursuant to the

01:49 8   subpoena because of the improper nature of the subpoena.

01:49 9        Q    And what do you mean by that?

01:4910        A    It's all set forth in our objections.

01:4911        Q    And you haven't produced a privilege log either

01:4912   in connection with that subpoena, have you?

01:4913        A    No, because the subpoena would essentially call

01:4914   for the production of every single document in this case,

01:4915   essentially producing back to you, first of all,

01:4916   something like 70,000 documents that you produced to us

01:5017   in this case, and doing a privilege log as to all

01:5018   communications with my clients throughout the case, which

01:5019   is wholly improper and burdensome, is a very high hurdle

01:5020   for serving opposing counsel in the case with a subpoena.

01:5021   You haven't met that hurdle.

01:5022        Q    As you'll see during this deposition,

01:5023   Mr. Toberoff, I am not taking the deposition of an

01:5024   opposing counsel.  I am taking the deposition of you as

01:5025   an intellectual property entrepreneur, as you're billed

                                                              8

                         U.S. LEGAL SUPPORT

Exhibit 14
154

01:50 1    on your website.

01:50 2         A    Not according to this particular subpoena.  The

01:50 3    subpoena of IPW is different.  This is "Marc Toberoff,

01:50 4    Law Offices of Marc Toberoff, PLC," so you're serving me

01:50 5    as an attorney in this case.

01:50 6         Q    Are you aware that rule 45(d)(2) requires a

01:51 7    person who has been subpoenaed and who is not producing

01:51 8    documents pursuant to privilege to file a privilege log?

01:51 9         A    I filed my objections.  I'll stand by the

01:5110   objections.  I am not going here to argue what would be

01:5111   argued on a motion to compel.

01:5112        Q    Are you aware of the provisions of rule

01:5113   45(d)(2)?

01:5114        A    I'm aware of the federal rules.  I don't have

01:5115   them memorized.

01:5116        Q    And despite that awareness, you've chosen not to

01:5117   file a privilege log?

01:5118        A    What I've chosen to do is set forth in the

01:5119   objections, and I've answered your question.

01:5120        Q    Your objections state with respect to numerous

01:5121   categories that you will produce all non-privileged

01:5122   documents which have not been previously produced to

01:5123   defendants in this action, if any.

01:5124             Is it your testimony that all of the non-

01:5125   privileged documents that you have in your possession

                                                                    9

                        U.S. LEGAL SUPPORT


                              Exhibit 14
                                 155

01:52  1    have been previously produced to defendants?

01:52  2        A    I believe so, yes.

01:52  3        Q    What did you do to verify that fact?

01:52  4        A    We looked through our files.  My attorney's

01:52  5    files consists of the same files that one would go

01:52  6    through in response to a production request to the

01:52  7    Siegels for documents relative -- relevant to this case.

01:52  8            MR. BERGMAN:  Would the reporter mark as Exhibit

01:52  9    3 a subpoena issued to Pacific Pictures Corporation dated

01:52 10    October 19, 2006.

01:52 11            (Deposition Exhibit 3 marked.)

01:53 12    BY MR. BERGMAN:

01:53 13        Q    Do you recall, Mr. Toberoff, being served with

01:53 14    that subpoena?

01:53 15        A    It would be the same answer as my previous

01:53 16    answer.  I recall Pacific Pictures being served with a

01:53 17    subpoena, but I would have to compare page by page --

01:53 18    page for page the subpoena that's at my office with this

01:53 19    subpoena to verify that this is the same subpoena.

01:53 20            MR. BERGMAN:  Would the court reporter mark as

01:53 21    Exhibit 4 the objections of Pacific Pictures Corporation

01:53 22    to that subpoena.

01:53 23            (Deposition Exhibit 4 marked.)

01:53 24    BY MR. BERGMAN:

01:53 25        Q    Do you recall serving that -- those objections,

                                                                    10

01:54 1    Mr. Toberoff, to the Pacific Pictures subpoena?

01:54 2        A    I recall serving objections to the subpoena.

01:54 3    I -- unless I had our objections next to me, I don't know

01:54 4    if these are the actual objections.  I recall serving a

01:54 5    set of objections.

01:54 6        Q    Would you turn, please, to page 27 and tell me

01:54 7    if that's your signature?

01:54 8        A    Yes, that is my signature.

01:54 9        Q    Okay.  Am I correct that the only documents that

01:54 10   you have produced or Pacific Pictures has produced

01:54 11   pursuant to this objection -- pursuant to the subpoena,

01:54 12   rather, were nine pages of documents which were served

01:55 13   yesterday?

01:55 14       A    I didn't -- I don't recall the number of pages.

01:55 15            MR. WILLIAMSON:  Yeah.  Objection.  Assumes

01:55 16   facts not in evidence.

01:55 17   BY MR. BERGMAN:

01:55 18       Q    Am I correct that Pacific Pictures has not

01:55 19   served a privilege log in response to that subpoena?

01:55 20       A    I believe that's correct.

01:55 21       Q    If you'll look through the privilege log, you'll

01:55 22   see that there have been numerous objections based on the

01:55 23   attorney-client and work product privilege.

01:55 24       A    Did you mean privilege log?

01:56 25       Q    Yes.

                                                                    11

U.S. LEGAL SUPPORT

Exhibit 14
157

01:56 1        A    You just said if you looked through the

01:56 2    privilege log.

01:56 3            MR. WILLIAMSON:  There is not a privilege log.

01:56 4            MR. BERGMAN:  I'm sorry.

01:56 5            Would you correct that?  Strike that question.

01:56 6        Q    If you look through the Pacific Pictures

01:56 7    Corporation's objections to the defendants' subpoena, you

01:56 8    will see that there are numerous objections based on the

01:56 9    attorney-client and work product privileges.  Just as

01:5610    examples, 13, 14, 15, 16 and so on.

01:5611            Have you served a privilege log to support those

01:5612    objections?

01:5613        A    No.  I believe these objections are that the

01:5614    question as framed could entail privileged documents.

01:5715    When I went to the files, I did not find any privileged

01:5716    documents to list on a privilege log.  Otherwise, we

01:5717    would have provided you with a privilege log in the case

01:5718    of Pacific Pictures.

01:5719        Q    So therefore are the various objections based on

01:5720    the attorney-client and work product privileges

01:5721    unfounded?

01:5722            MR. WILLIAMSON:  Objection --

01:5723            THE WITNESS:  No.  No.  And I'm not going to

01:5724    comment on the legal reasons for why objections were made

01:5725    in this document.  The document speaks for itself.

12

01:57 1          MR. BERGMAN:  Would you mark as the next exhibit

01:57 2    in order, please, a subpoena addressed to IPW, LLC dated

01:57 3    October 19, 2006.

01:57 4          (Deposition Exhibit 5 marked.)

01:58 5    BY MR. BERGMAN:

01:58 6      Q    Do you recall receiving that subpoena to IPW,

01:58 7    LLC?

01:58 8      A    It would be the same answer.  I recall receiving

01:58 9    a subpoena addressed to IPW, LLC.  I don't know if the

01:5810    subpoena that's in my office is this subpoena.  I would

01:5811    have to compare each page to see if it's the same

01:5812    document.

01:5813      Q    Am I correct that you have -- that IPW, LLC has

01:5814    produced only 16 pages of responsive documents, and that

01:5815    was served two days ago?

01:5816          MR. WILLIAMSON:  Objection.  Assumes facts not

01:5817    in evidence.

01:5818          THE WITNESS:  I don't know the number of pages.

01:5819    I don't remember the number of pages.

01:5820    BY MR. BERGMAN:

01:5821      Q    Who conducted the search of IPW, LLC's files in

01:5922    order to respond to the subpoena?

01:5923      A    I did.

01:5924          MR. BERGMAN:  Off the record.

01:5925          (Discussion held off the record.)

                                                                   13

**U.S. LEGAL SUPPORT**

Exhibit 14
159

| | |
|---|---|
| 01:59 1 | MR. BERGMAN:  Back on the record. |
| 01:59 2 | Would you mark as the next exhibit in order IPW, |
| 01:59 3 | LLC's objections to the defendants' subpoena. |
| 01:59 4 | (Deposition Exhibit 6 marked.) |
| 01:59 5 | BY MR. BERGMAN: |
| 01:59 6 | Q   Do you recall filing those objections to the |
| 01:59 7 | IPW, LLC's subpoena, Mr. Toberoff? |
| 01:59 8 | A   I recall not filing, I recall serving defendants |
| 02:00 9 | with objections, yes. |
| 02:00 10 | Q   Am I correct that you did not provide any |
| 02:00 11 | privilege log in connection with this subpoena? |
| 02:00 12 | A   That's correct.  So far, at least. |
| 02:00 13 | MR. BERGMAN:  Would the reporter please mark as |
| 02:00 14 | the next in order a subpoena addressed to Mr. Toberoff |
| 02:00 15 | and dated August 10, 2006. |
| 02:00 16 | (Deposition Exhibit 7 marked.) |
| 02:01 17 | BY MR. BERGMAN: |
| 02:01 18 | Q   Do you recall receiving that subpoena, |
| 02:01 19 | Mr. Toberoff? |
| 02:01 20 | A   No, I actually do not. |
| 02:01 21 | Q   Would you take a look at the attachment and see |
| 02:01 22 | the documents which were requested? |
| 02:01 23 | A   Let me see the difference between that subpoena |
| 02:01 24 | and the other subpoena. |
| 02:02 25 | Q   Is it correct that -- |

14

U.S. LEGAL SUPPORT

Exhibit 14
160

02:02 1          A    Was --

02:02 2          Q    Go ahead.

02:02 3               MR. WILLIAMSON:  Is there a question pending?

02:02 4               MR. BERGMAN:  Yes.

02:02 5               THE WITNESS:  What is the question pending?

02:02 6     BY MR. BERGMAN:

02:02 7          Q    Is it correct that you have not produced any

02:02 8     documents pursuant to that subpoena?

02:02 9          A    I don't recall this specific subpoena, but I do

02:02 10    see that it calls for the production of documents stolen

02:02 11    from my office and received by the defendants under very

02:03 12    dubious circumstances, and no, I did not produce those

02:03 13    stolen documents to defendants.

02:03 14         Q    And am I correct that you have not produced a

02:03 15    privilege log relating to any objections you may have to

02:03 16    that subpoena?

02:03 17         A    No.  This is the subject of a pending motion to

02:03 18    compel, which we intend to oppose.

02:03 19              I am informed that even though I don't have a

02:03 20    specific recollection of this subpoena, that we did serve

02:03 21    you with -- my office did serve you with objections to

02:03 22    this subpoena.

02:03 23         Q    That's correct.

02:03 24         A    Okay.  And by "this," I mean Exhibit 7.

02:04 25              MR. BERGMAN:  Would the reporter mark as the

                                                              15

02:04 1    next exhibit in order --

02:04 2            THE WITNESS:  8.

02:04 3            MR. BERGMAN:  -- a document downloaded from the

02:04 4    IMDb website relating to Mr. Toberoff.

02:04 5            (Deposition Exhibit 8 marked.)

02:04 6            MR. WILLIAMSON:  Can I get a copy of that,

02:04 7    please?

02:04 8            MR. BERGMAN:  Oh, I'm sorry.

02:05 9            THE WITNESS:  Excuse me.  Are you providing us

02:0510    with extra copies of these exhibits?

02:0511            MR. BERGMAN:  No, I didn't make extra copies of

02:0512    the subpoenas.  I provided your counsel with copies of

02:0513    the objections.

02:0514            THE WITNESS:  Okay.  But you do have copies of

02:0515    each exhibit?  I'd like Nicholas to be able to review it

02:0516    while -- all I see in front of me is one set, which we

02:0517    are going to leave with the reporter, so we would like an

02:0518    extra copy for Nicholas since he's representing me in the

02:0519    deposition.

02:0520            MR. BERGMAN:  Of course.

02:0521        Q    Turning now to Exhibit 8, which purports to

02:0522    describe certain production credits that you have had on

02:0523    motion pictures, would you look at this document and tell

02:0524    me if the information shown on the first page is correct?

02:0525            MR. WILLIAMSON:  Objection.  Vague and

16

02:06 1    ambiguous.

02:06 2            THE WITNESS:  When you say "correct," there's

02:06 3    all sorts of different information.  There's the title of

02:06 4    a movie.

02:06 5    BY MR. BERGMAN:

02:06 6        Q    Okay.

02:06 7        A    There is a date of the movie.

02:06 8        Q    Okay.  I'll be more specific then.

02:06 9            Did you produce a motion picture called ZOMBIE

02:0610    HIGH in or about 1987?

02:0611        A    I received producer credit on the picture.

02:0612        Q    Did you render any services in connection with

02:0613    that film?

02:0614            MR. WILLIAMSON:  Objection.  Vague and

02:0615    ambiguous.

02:0616            THE WITNESS:  That was a film -- I didn't --

02:0617    wasn't involved in the, you know, active physical

02:0618    production of the film, and I believe I helped with some

02:0719    of the setting up of the film.

02:0720    BY MR. BERGMAN:

02:0721        Q    Did you own the underlying rights to that film?

02:0722        A    No.

02:0723        Q    Pardon me?

02:0724        A    No.

02:0725        Q    Did you in fact receive producer credit on a

                                                                    17

**U.S. LEGAL SUPPORT**

Exhibit 14
163

02:07 1    film called SONS in 1989?

02:07 2         A    Yes.

02:07 3         Q    And did you render any personal services in

02:07 4    connection with that film?

02:07 5         A    Yes.

02:07 6         Q    And what did you do?

02:07 7         A    I helped with the financing of the film.

02:07 8         Q    Did you receive producer credit for the motion

02:07 9    picture MY FAVORITE MARTIAN in or about 1989?

02:0710         A    Yes.

02:0711         Q    And --

02:0712         A    I'm not sure on these dates.  I can't tell you

02:0713    that they're the correct dates or not.  I don't

02:0814    correct -- I don't remember the date that MY FAVORITE

02:0815    MARTIAN was released, SONS or ZOMBIE HIGH were released.

02:0816         Q    Okay.  And what personal services, if any, did

02:0817    you render in connection with MY FAVORITE MARTIAN?

02:0818         A    It was a rights-driven transaction in that I

02:0819    negotiated -- I...  I can't recall whether I represented

02:0920    the rights or had an interest in the rights, but my

02:0921    interest came from the underlying rights, and based upon

02:0922    that, as part of the rights transaction, I was afforded a

02:0923    producer credit.

02:0924         Q    Did you receive an executive producer credit on

02:0925    the film I SPY?

18

**U.S. LEGAL SUPPORT**

Exhibit 14
164

02:09 1      A     Yes.

02:09 2      Q     And was that also based on your ownership of the

02:09 3  underlying rights?

02:09 4      A     No, it was not ownership.  That I would describe

02:09 5  as more of a -- sort of a traditional producing function

02:09 6  in that -- not that the others weren't traditional -- I

02:10 7  actually had the idea.  I noticed they were making movies

02:10 8  based on old television series, and I had the idea that I

02:10 9  SPY would be a good underlying source material for a

02:1010  feature film.  And so I started with the idea, and then I

02:1011  contacted who I believed had the rights, and he permitted

02:1012  me to take that into the marketplace to set up a motion

02:1013  picture.

02:1014      Q     Did you receive executive producer credit on the

02:1015  film the LEGEND OF LUCY KEYES, K E Y E S?

02:1016      A     I believe so.

02:1017      Q     Okay.  And what personal services, if any, did

02:1018  you render in connection with that film?

02:1119      A     None.

02:1120      Q     And was that -- did you receive this credit

02:1121  because you controlled the underlying literary rights?

02:1122      A     No.

02:1123      Q     What was the basis of your receiving executive

02:1124  producer credit on that film?

02:1125      A     I have an arrangement with one of the producers

                                                                    19

U.S. LEGAL SUPPORT

Exhibit 14
165

02:11 1    on the film, J. Todd Harris, where I provide him with

02:11 2    overhead, and in exchange I receive a credit, executive

02:11 3    producer credit, on anything he does during the time I'm

02:11 4    providing him with overhead.

02:11 5        Q    And when you say you're providing Mr. Harris

02:11 6    with overhead, what does that consist of?

02:11 7        A    An office and overhead in connection with

02:12 8    provision of that office space.

02:12 9        Q    Did you receive credit as the executive producer

02:1210    of a film entitled BLACK IRISH?

02:1211        A    Yes.

02:1212        Q    And what personal services, if any, did you

02:1213    render in connection with that film?

02:1214        A    None.

02:1215        Q    Was that based on your control of the underlying

02:1216    literary rights?

02:1217        A    No.

02:1218        Q    What was the basis of your receiving that

02:1219    credit?

02:1220        A    It's the same answer as for the LEGEND OF LUCY

02:1221    KEYES.

02:1222        Q    I see.

02:1223            Are you currently serving as the producer of a

02:1224    film entitled PIRANHA?

02:1225        A    No.  This is incorrect.  It says "filming."

                                                                    20

02:12 1    PIRANHA is not filming.

02:12 2        Q    Is it scheduled to commence filming shortly?

02:12 3        A    It's not scheduled.

02:13 4        Q    What services, if any, are you rendering as

02:13 5    executive producer of DEVIL TO PAY?

02:13 6        A    None.

02:13 7        Q    Are you going to receive executive producer

02:13 8    credit on that film?

02:13 9        A    I don't know.

02:13 10        Q    Okay.

02:13 11        A    If I did, that would be the same as I have

02:13 12    previously described for LEGEND OF LUCY KEYES and BLACK

02:13 13    IRISH.

02:13 14        Q    And with respect to the last film shown here,

02:13 15    BLUE MOVIE, are you rendering any services as producer of

02:13 16    that film at the present time?

02:13 17        A    No.

02:13 18        Q    What is the basis of your receiving producer

02:14 19    credit on that film?

02:14 20        A    I optioned the book called BLUE MOVIE on which

02:14 21    this film would be based.

02:14 22            MR. BERGMAN:  Would the reporter mark as Exhibit

02:14 23    9 another website sheet referring to Mr. Toberoff from a

02:14 24    site called Hollywood.com.

02:14 25            (Deposition Exhibit 9 marked.)

21

02:14 1    BY MR. BERGMAN:

02:14 2       Q   This document refers to a film, the fourth one

02:14 3    from the bottom of the first page, called SUPERCROSS:

02:15 4    THE MOVIE.  Did you in fact receive executive producer

02:15 5    credit on that film?

02:15 6       A   I believe so, but I haven't -- I haven't

02:15 7    asked -- I haven't verified that by looking at it.

02:15 8       Q   And what personal services, if any, did you

02:15 9    render in connection with that film?

02:1510       A   That film was similar to the others I've

02:1511    mentioned:  LEGEND OF LUCY KEYES, BLACK IRISH.

02:1512       Q   That is, the payment of Mr. Harris' overhead?

02:1513       A   Yes.

02:1514       Q   Is Mr. Harris actually employed by any entity of

02:1515    which you have partial or complete ownership?

02:1516       A   No.

02:1517       MR. WILLIAMSON:  Objection.  Vague and

02:1518    ambiguous.

02:1519    BY MR. BERGMAN:

02:1520       Q   Are you presently rendering any services as

02:1521    co-producer of a film called THE TINY PROBLEMS OF WHITE

02:1522    PEOPLE?

02:1523       A   No.

02:1624       Q   Is that a --

02:1625       A   But I like the title.

22

U.S. LEGAL SUPPORT

Exhibit 14
168

| | |
|---|---|
| 02:16 1 | Q    I see. |
| 02:16 2 | Is that presently in development? |
| 02:16 3 | A    I don't believe so. |
| 02:16 4 | MR. WILLIAMSON:   Objection.   Calls for |
| 02:16 5 | speculation. |
| 02:16 6 | THE WITNESS:   Not to my knowledge. |
| 02:16 7 | BY MR. BERGMAN: |
| 02:16 8 | Q    Are you familiar with the film entitled THE |
| 02:16 9 | BRAVE ONE? |
| 02:16 10 | A    There was an old film entitled THE BRAVE ONE. |
| 02:16 11 | Q    To your knowledge is there presently in |
| 02:16 12 | development at Buena Vista International the film THE |
| 02:16 13 | BRAVE ONE of which you will get producer credit? |
| 02:16 14 | A    No, there is not. |
| 02:16 15 | Q    Will you be receiving producer credit if the |
| 02:16 16 | film MY BODYGUARD is made? |
| 02:17 17 | A    Yes, I believe so. |
| 02:17 18 | Q    And what personal services will you be rendering |
| 02:17 19 | on that film? |
| 02:17 20 | A    Limited to none. |
| 02:17 21 | Q    Do you control the literary rights that underlie |
| 02:17 22 | that film? |
| 02:17 23 | A    No. |
| 02:17 24 | Q    What is the basis, if there is any, for your |
| 02:17 25 | receiving producer credit on MY BODYGUARD? |

23

02:17 1        A    I originally represented the rights in trying

02:18 2    to -- with respect to trying to market the rights as the

02:18 3    basis for a remake motion picture.

02:18 4        Q    Are you familiar with a motion picture presently

02:18 5    in development called GROO, G R O O, THE WANDERER?

02:18 6        A    Yes.

02:18 7        Q    And will you be receiving producer credit if

02:18 8    that film is made?

02:18 9        A    I believe so, yes.

02:1810        Q    And is that based on your control of the

02:1811    underlying literary property?

02:1812        A    I know the rights to GROO were optioned.  I

02:1913    don't know whether I control them or not.

02:1914        Q    Okay.  Does one of the entities in which you

02:1915    have partial or complete ownership control those literary

02:1916    rights?

02:1917        MR. WILLIAMSON:  Objection.  Vague and

02:1918    ambiguous.

02:1919        THE WITNESS:  I don't know whether -- IPW may

02:1920    have some interest or some protection, but I don't know

02:1921    if IPW controls the rights.

02:1922    BY MR. BERGMAN:

02:1923        Q    And are you presently rendering any services in

02:1924    connection with a film in development entitled FANTASY

02:1925    ISLAND?

24

02:19 1              MR. WILLIAMSON:  Objection.  Assumes facts not

02:19 2     in evidence.

02:19 3              THE WITNESS:  No.

02:19 4     BY MR. BERGMAN:

02:19 5         Q   Is that film to your knowledge presently in

02:19 6     development?

02:19 7         A   It's not active.

02:20 8         Q   Do you control the underlying literary rights to

02:20 9     that potential film?

02:2010         A   I do not.

02:2011         Q   Have you ever?

02:2012             MR. WILLIAMSON:  Objection.  One second.

02:2013             Objection.  Indefinite as to time and place, and

02:2014     it's vague and ambiguous.

02:2015             THE WITNESS:  I believe with FANTASY ISLAND, it

02:2016     was similar to my answer with regard to MY BODYGUARD

02:2017     where I'm representing the rights for purposes of setting

02:2018     up a -- monetizing the rights by setting up a project at

02:2019     a motion picture studio.

02:2020     BY MR. BERGMAN:

02:2021         Q   And which of the entities with which you're

02:2022     associated, if any, control those literary rights?

02:2123             MR. WILLIAMSON:  Objection.  Vague and

02:2124     ambiguous.

02:2125             THE WITNESS:  We didn't -- I said we didn't

                                                                    25

Exhibit 14
171

02:21 1   control them.  I believe it was -- I was representing the

02:21 2   rights.

02:21 3           MR. BERGMAN:  Would you mark, please, as Exhibit

02:21 4   10 a document that relates to Intellectual Properties

02:22 5   Worldwide, LLC, another document that has been downloaded

02:22 6   from the Internet.

02:22 7           (Deposition Exhibit 10 marked.)

02:22 8   BY MR. BERGMAN:

02:22 9       Q   Am I correct, Mr. Toberoff, that Exhibit 10 is a

02:22 10  printout of the ipwla website?

02:22 11      A   That's what it appears to be, but I'm not -- I

02:22 12  have to say I'm not very familiar with this website.  At

02:22 13  one point one of my employees, who is kind of very into

02:23 14  computers and computer savvy and Internet savvy and up on

02:23 15  that, said, you know, "You should have a website," and he

02:23 16  did this, and I was not involved in overseeing it.  And I

02:23 17  see right here, for example, where it says "Intellectual

02:23 18  Properties Worldwide, LLC," that there is no such

02:23 19  company.

02:23 20      Q   What is the proper name of that company?

02:23 21      A   I would have to read this to know whether it's

02:23 22  referring to IP Worldwide, LLC or IPW, LLC.

02:23 23      Q   Okay.  Would you do so, please?

02:24 24      A   Well, I actually think the person who did this

02:24 25  kind of blended the two, because you will see it says

                                                                    26

02:24 1    here, "Intellectual Property Worldwide, LLC," again the

02:24 2    wrong name, "was formed in mid-2002," and I -- so IPW,

02:24 3    LLC was not formed in 2002.  That's closer to IP

02:24 4    Worldwide, LLC.

02:24 5         So it starts off describing what would be IP

02:24 6    Worldwide, LLC but then mentions -- and you see in the

02:24 7    second paragraph J. Todd Harris, head of production.

02:24 8    J. Todd Harris didn't begin an association until the

02:25 9    company was IPW, LLC.  J. Todd Harris didn't have any

02:25 10   association, I don't believe, with IP Worldwide, LLC.  So

02:25 11   whoever did this, the distinction -- he just blended the

02:25 12   two.

02:25 13        Q    Is it your testimony, Mr. Toberoff, that you

02:25 14   have not seen this website before?

02:25 15        A    I may -- no, that's not my testimony.  I may

02:25 16   have seen it.  I don't have a specific recollection of

02:25 17   seeing it, but I would not -- in other words, I would not

02:25 18   have -- I would have corrected this, so I don't believe

02:25 19   that I viewed this or edited it or was involved in the

02:25 20   information being put on this website.

02:26 21        Q    How many companies or limited entities have you

02:26 22   had which utilize the phrase Intellectual Properties

02:26 23   Worldwide?

02:26 24        A    I don't -- when you -- I would object that

02:26 25   that's vague and ambiguous as to what you're referring

                                                              27

02:26 1    to, but I'll try and answer as best I can.

02:26 2              I don't use -- if somebody -- let me put it this

02:26 3    way:  Normally somebody would have a company, and they

02:26 4    would call it Intellectual Properties Worldwide, and then

02:26 5    the three letter symbol would be IPW, but here the

02:26 6    company -- the new company is called IPW, LLC, and if

02:27 7    somebody said, "Well, what does that stand for," I would

02:27 8    say, "Intellectual Properties Worldwide," but there is no

02:27 9    company called Intellectual Properties Worldwide.

02:27 10        Q    Has there ever been a company called

02:27 11   Intellectual Properties Worldwide?

02:27 12        A    Never.

02:27 13        Q    Aside from IPW, LLC, have you had any company

02:27 14   that used the initials "IPW" or the phrase "IP

02:27 15   Worldwide"?

02:27 16             MR. WILLIAMSON:  Objection.  Compound.

02:27 17             THE WITNESS:  Yes.

02:27 18             MR. WILLIAMSON:  It's vague and ambiguous, too.

02:27 19             THE WITNESS:  Yes, a company called IP

02:27 20   Worldwide, LLC.

02:27 21   BY MR. BERGMAN:

02:27 22        Q    Now, is it your testimony --

02:27 23        A    Just for clarity, those are the only two.

02:27 24        Q    Okay.  Is it your testimony then that this

02:27 25   website does not relate solely to IP Worldwide, LLC, but

                                                                        28

U.S. LEGAL SUPPORT

Exhibit 14
174

```
02:28 1   is somehow a combination of the two companies IPW, LLC
02:28 2   and IP Worldwide, LLC?
02:28 3            MR. WILLIAMSON:  Objection.  Misstates prior
02:28 4   testimony.
02:28 5            THE WITNESS:  My testimony is that I didn't do
02:28 6   this, I didn't edit it, and I didn't oversee it, and I
02:28 7   can see whoever did do it, that it -- that he's kind of
02:28 8   over -- it's inaccurate because it -- so I don't know if
02:28 9   it accurately reflects both companies -- it's hard to say
02:2810   something accurately reflects both companies if it's
02:2811   something somebody is just sort of mishmoshing
02:2812   information together.
02:2813   BY MR. BERGMAN:
02:2814       Q   Which of the two entities that you have
02:2815   identified, if either, was formed in mid 2002?
02:2816       A   As I testified previously, IP Worldwide, LLC I
02:2817   believe was formed a little earlier than mid -- if mid is
02:2918   June, I think it was earlier than that, maybe March 2002
02:2919   or May.
02:2920       Q   As you will see, the last paragraph on the first
02:2921   page of Exhibit 10 begins, quote, "In just two years, IPW
02:2922   has amassed rights to over 250 popular literary titles,"
02:2923   close quote.
02:2924            Which of the two companies that you've referred
02:2925   to has acquired over 250 popular literary titles?
```

29

02:29 1          A    Well, that misstates.  Just reading, it says

02:29 2    "has amassed rights."  It doesn't say "acquired."  It's

02:29 3    an open-ended description.  I don't -- so if we use the

02:30 4    word as interests in, you know, amassed, I don't believe

02:30 5    IP Worldwide has interests in 250 properties.

02:30 6          IPW was involved in a transaction with an old

02:30 7    library which is potentially over -- it was an old

02:30 8    library of old stories published in a magazine in the

02:30 9    '30s and '40s, many of which written by famous writers

02:3010    who would do short stories for this magazine, and IP

02:3111    Worldwide was asked to represent -- excuse me -- IPW, LLC

02:3112    was asked to represent that library for purposes of

02:3113    setting up motion pictures or television series based on

02:3114    that library, and that library was probably over -- you

02:3115    know, at least according to the owners of the library, it

02:3116    was over 250 titles, so I think that's how the number --

02:3117    why that big number is there.

02:3118          Q    And in your opinion, is it accurate to refer to

02:3119    that library as containing "popular literary titles"?

02:3120          MR. WILLIAMSON:  Objection.  Vague and

02:3121    ambiguous.

02:3122          THE WITNESS:  I think that's in the eye of the

02:3123    beholder.

02:3124    BY MR. BERGMAN:

02:3125          Q    How about your eye?

30

**U.S. LEGAL SUPPORT**

Exhibit 14
176

02:31 1          A    Yes, some of the stories were by some of the

02:31 2    greatest figures in American literature.

02:32 3          Q    Okay.  Would you turn to the next page of

02:32 4    Exhibit 10, please.  Under "Company Overview" the second

02:32 5    statement, second sentence states, quote, "...IPW has

02:32 6    strategic partnership with top talent agencies and

02:32 7    production companies that allows it to quickly package

02:32 8    these classic properties for production either as

02:32 9    theatrical motion pictures or other entertainment media,"

02:3210    close quote.

02:3211          A    I'm not -- what page?  I might be on the wrong

02:3212    page.

02:3213          Q    It's the second page of Exhibit 10.

02:3214          A    Okay.

02:3215          Q    You see the heading "Company Overview"?

02:3216          A    Yes.

02:3217          Q    Okay.  My quote was from the first sentence

02:3218    under that heading.

02:3319          A    It says, "IP [sic] manages an impressive

02:3320    library" -- "IPW manages an impressive library"?

02:3321          Q    Correct.

02:3322          A    Okay.  The second sentence from the first

02:3323    paragraph?

02:3324          Q    Right.

02:3325          A    Okay, I see it.

                                                                31

                         U.S. LEGAL SUPPORT

Exhibit 14
177

02:33 1          Q    What are the top talent agencies that are

02:33 2    referred to in that sentence?

02:33 3          A    I don't know.  I didn't write this.

02:33 4          Q    Does IP Worldwide have any strategic

02:33 5    partnerships with top talent agencies?

02:33 6          A    IP Worldwide, LLC, yes.

02:33 7          Q    Okay.  And what agencies are those?

02:33 8          A    IP Worldwide, LLC is no -- it still exists, but

02:33 9    it's not active in the entertainment...

02:34 10          Q    In what area, if any, is it active?

02:34 11          A    It's not active right now.

02:34 12          Q    When IP Worldwide was active, what top talent

02:34 13    agencies did it have strategic partnerships with?

02:34 14          A    Endeavor.

02:34 15          Q    Any others?

02:34 16          A    I wouldn't call it a strategic partnership, no.

02:34 17          Q    And with what production companies did IP

02:34 18    Worldwide have strategic partnerships with?

02:34 19          A    I don't know what that means.  In other words,

02:34 20    this is -- I wouldn't have written this.  I don't know

02:34 21    what that means, a strategic partnership with a

02:34 22    production company.  It's silly.

02:34 23          Q    Do you know how long this website has been on

02:34 24    the Internet, Mr. Toberoff?

02:34 25          A    I do not.

                                                                      32

02:34 1        Q    Okay.

02:34 2        A    But now that we've focused on it, I will either

02:35 3    cancel it or make corrections.

02:35 4        Q    And your Internet address is in fact ipwla, is

02:35 5    it not?

02:35 6            MR. WILLIAMSON:  Objection.  Assumes facts not

02:35 7    in evidence.  Vague and ambiguous.  Calls for

02:35 8    speculation.

02:35 9            THE WITNESS:  Ipwwestla?

02:35 10   BY MR. BERGMAN:

02:35 11       Q    Ipwla.

02:35 12       A    I don't know what you mean by "your Internet

02:35 13   address."

02:35 14       Q    Well, when one wants on communicate with you by

02:35 15   e-mail, the URL that it is sent to is at ipwla, is it

02:35 16   not?

02:35 17       A    One -- yeah, an e-mail address that I -- one of

02:35 18   the e-mail addresses that I have is mtoberoff@ipwla.com,

02:35 19   but I don't think that has anything to do with this

02:36 20   exhibit.

02:36 21       Q    Well, you have read this exhibit before, have

02:36 22   you not?  You've read the information contained on this

02:36 23   website?

02:36 24       A    As I said before, I know there is such -- people

02:36 25   have told me that they saw an IPW website.  I haven't

33

02:36  1    focused on this, I didn't write it, nor did I edit it,

02:36  2    and I don't specifically recall going through it.  No, I

02:36  3    do not.

02:36  4        Q    Would you look at the second paragraph of

02:36  5    Exhibit 10 on page -- the second page, which begins,

02:36  6    "Currently, IPW has several"?  Do you see that?

02:36  7        A    Yes.

02:36  8        Q    Would you read that to yourself and tell me if

02:36  9    all of the information contained there is correct?

02:37 10        A    Not currently, no.  It needs to be updated.

02:37 11        Q    What information requires updating?

02:37 12        A    BLUE MOVIE is no longer split off from Steven

02:37 13    Soderbergh.

02:37 14            Ted Griffin, although originally attached to

02:37 15    write the IMMORTALS, dropped out of the project.

02:37 16            "Sanford and Son," Columbia Pictures didn't want

02:38 17    to develop it with Bernie Mac attached, even though

02:38 18    Bernie Mac wanted to be attached to the project or was

02:38 19    interested in the project, and they wanted to keep their

02:38 20    options open.  And not to say they wouldn't go to Bernie

02:38 21    Mac once a screenplay is developed.  They just didn't

02:38 22    want him to be attached at the outset.

02:38 23            Julian Fellowes wanted to write GRAND HOTEL but

02:38 24    then became very busy and was unwilling to commit to it,

02:38 25    although probably is still interested.  I don't know.

                                                              34

02:39 1        MY BODYGUARD, I don't know what the situation is

02:39 2   with Dimension Films because a deal was made with

02:39 3   Dimension Films prior to the Wein- -- Miramax -- the

02:39 4   Weinsteins splitting off from Disney, so I don't know if

02:39 5   MY BODYGUARD is at Disney or Dimension.  I'm not sure.

02:39 6        And I think that's it.

02:39 7   Q    Is "Gilligan's Island," the reality television

02:39 8   series referred to here, being developed with Turner

02:39 9   Entertainment?

02:3910   A    No.  It was produced and aired.

02:3911   Q    Did you render any personal services in

02:3912   connection with that show?

02:4013   A    I was attached as a co-executive producer.  I

02:4014   helped set it up and had the idea -- or was one of the

02:4015   people who liked to think they had the idea.

02:4016   Q    Below that paragraph there is a sentence

02:4017   reading, "The following is just a sampling of the 250+

02:4018   titles to which IPW holds remake, sequel and/or

02:4019   television rights," and then there are a number of

02:4020   properties listed.

02:4021        Does IP Worldwide presently hold remake, sequel

02:4022   or television rights to each of those properties?

02:4023   A    Okay.  You know, I'm not going to ask you how to

02:4024   ask the question, but remember there is a distinction

02:4025   between IP Worldwide and IPW?

                                                              35

U.S. LEGAL SUPPORT

Exhibit 14
181

02:40 1      Q    Yes.

02:40 2      A    So for clarity, I just want to make sure

02:41 3  you're -- because you seem to use Intellectual Properties

02:41 4  Worldwide, IP Worldwide and IPW interchangeably, and for

02:41 5  clarity I want to make sure that you're asking me IP

02:41 6  Worldwide as opposed to IPW or --

02:41 7      Q    I appreciate that.

02:41 8      A    Okay.

02:41 9      Q    Has IP Worldwide ever held the rights to those

02:41 10  properties that are listed at this part of Exhibit 10?

02:41 11      MR. WILLIAMSON:   Objection.   Vague and

02:41 12  ambiguous.

02:41 13      THE WITNESS:   I believe so.   I can't say for

02:41 14  sure whether IP Worldwide was involved with a hundred

02:41 15  percent of the titles on that list.   I believe many if

02:42 16  not most.

02:42 17  BY MR. BERGMAN:

02:42 18      Q    Now, I believe you stated that IP Worldwide was

02:42 19  presently inactive.

02:42 20      Is that correct?

02:42 21      A    Yes.

02:42 22      Q    And yet does it continue to hold these rights?

02:42 23      A    I don't believe so.

02:42 24      Q    And to whom, to what entity were those rights

02:42 25  transferred, if they were transferred?

                                                                    36

Exhibit 14
182

| | | |
|---|---|---|
| 02:42 | 1 | A    The various -- again to clarify, I don't believe |
| 02:42 | 2 | IP Worldwide necessarily held the rights.  A better |
| 02:42 | 3 | description would be had interests in rights. |
| 02:42 | 4 | Q    Okay. |
| 02:42 | 5 | A    And those interests were assigned to IPW. |
| 02:42 | 6 | Q    Would you turn the page, please, to what is the |
| 02:42 | 7 | third page of Exhibit 10?  Under the heading -- |
| 02:43 | 8 | A    And I can -- on this list, looking over this |
| 02:43 | 9 | list, I know TOUCH OF EVIL -- I don't think there is |
| 02:43 | 10 | any -- on some of these lists they're probably -- I don't |
| 02:43 | 11 | know how many titles.  Say anywhere from 20 to 25 percent |
| 02:43 | 12 | of the titles on this list, the interest may have |
| 02:43 | 13 | expired, the original IP Worldwide interest may have |
| 02:44 | 14 | expired. |
| 02:44 | 15 | Q    Have you ever asked anyone to make corrections |
| 02:44 | 16 | to this website? |
| 02:44 | 17 | A    No.  I have never focused on this website. |
| 02:44 | 18 | Q    Has J. Todd Harris ever been the president of |
| 02:44 | 19 | production of IP Worldwide, LLC? |
| 02:44 | 20 | A    Yes. |
| 02:44 | 21 | Q    And during what period of time was he president? |
| 02:44 | 22 | A    He is not -- he's never been an employee.  He |
| 02:44 | 23 | calls himself head of production for IPW. |
| 02:45 | 24 | Q    Have you called him head of production for IPW? |
| 02:45 | 25 | A    I don't believe so. |

*(handwritten annotation):* No, J. Todd Harris was not involved with IP Worldwide, LLC

37

02:45 1        Q    And am I correct that Mr. Harris has never been

02:45 2    an employee of either IP Worldwide, LLC or IPW, LLC?

02:45 3        A    Yes, that's correct.

02:45 4        Q    The Nicholas Williamson referred to here is the

02:45 5    gentleman to your left?

02:45 6        A    Yes.

02:45 7        Q    And is Mr. Williamson an employee of either IP

02:45 8    Worldwide or IPW, LLC?

02:45 9        A    I don't think so.  I'm not sure about that.

02:46 10           MR. BERGMAN:  Would you mark as Exhibit 11,

02:46 11   please, a two-page printout from IMDb referring to a

02:46 12   company called Intellectual Properties Worldwide and it

02:46 13   looks like a "(I)."

02:46 14           (Deposition Exhibit 11 marked.)

02:46 15   BY MR. BERGMAN:

02:47 16       Q    Let me refer you, Mr. Toberoff, to the

02:47 17   properties identified in Exhibit 11 under the heading

02:47 18   "Miscellaneous Company - filmography."

02:47 19           Do you see that?

02:47 20       A    Yes.

02:47 21       Q    Did either Intellectual Properties Worldwide,

02:47 22   LLC or IPW, LLC license the rights to Martin Luther King,

02:47 23   Jr.'s image for the film VANILLA SKY?

02:47 24       A    No.

02:47 25       Q    Did --

38

U.S. LEGAL SUPPORT

Exhibit 14
184

02:47 1        A    It says, "Intellectual Properties Management,

02:47 2   Atlanta, Georgia."   I think they've got the wrong

02:47 3   company.

02:47 4        Q    You have no involvement with Intellectual

02:47 5   Properties Management?

02:47 6        A    No.

02:48 7        Q    Did either IP Worldwide, LLC or IPW, LLC license

02:48 8   footage in connection with the HUEY NEWTON STORY?

02:48 9        A    No.

02:48 10       Q    Is that also to the best of your knowledge an

02:48 11  error on this IMDb?

02:48 12       A    I don't know --

02:48 13            MR. WILLIAMSON:  Objection.  "Error," it's vague

02:48 14  and ambiguous.  Error as to what?

02:48 15            THE WITNESS:  I don't know -- I can just answer

02:48 16  your question.  I don't know how it came to be placed on

02:48 17  this.  You also see that it has again the name

02:48 18  Intellectual Properties Worldwide, which is not a company

02:48 19  name.

02:49 20  BY MR. BERGMAN:

02:49 21       Q    Has FANTASY ISLAND ever been in development at

02:49 22  Sony Pictures?

02:49 23       A    Yes.  I don't know if it's Sony or Columbia

02:49 24  Pictures, which is owned by Sony.

02:49 25       Q    Are you familiar with a motion picture entitled

                                                              39

Exhibit 14
185

| 02:49 | 1 | SONS, S O N S? |
|---|---|---|
| 02:49 | 2 | A    Yes.   You asked me that earlier off of an IMDb |

02:49  3    list.

02:49  4        Q    And that was a film produced by Pacific

02:49  5    Pictures?

02:49  6        A    It wasn't really produced by Pacific Pictures.

02:49  7    Pacific Pictures Corp. was a loan-out company.

02:49  8        Q    And whose services did Pacific Pictures Corp.

02:50  9    loan out?

02:50 10        A    I believe myself.

02:50 11        Q    And --

02:50 12        A    Me.

02:50 13        Q    Are you familiar with an entity known as Pacific

02:50 14    Pictures Distribution Corporation?

02:50 15        A    No.  No.

02:50 16        Q    Who to your knowledge was the distributor of the

02:50 17    film SONS in the United States?

02:50 18        A    It didn't get distribution.

02:50 19        Q    Am I correct that Pacific Pictures Corporation

02:50 20    is a New York corporation?

02:50 21        A    Yes.

02:50 22        Q    And that it was incorporated in or about 1988?

02:51 23        A    I'm not sure of the date.

02:51 24        Q    Has Pacific Pictures Corporation been a loan-out

02:51 25    company, as you described it, from its inception?

40

**U.S. LEGAL SUPPORT**

Exhibit 14
186

02:51 1          A    I believe initially it was conceived as a

02:51 2    loan-out company.

02:52 3               MR. BERGMAN:  Would you mark as Exhibit 12,

02:52 4    please, a one-page document which is a printout from the

02:52 5    California Business Portal.

02:52 6               (Deposition Exhibit 12 marked.)

02:52 7    BY MR. BERGMAN:

02:52 8          Q    Mr. Toberoff, Exhibit 12 refers to an entity

02:52 9    called IPW, LLC and indicates that the documents for that

02:5210    LLC were filed in July of 2004.

02:5211               Is the IPW, LLC identified in Exhibit 12 the

02:5312    same IPW, LLC that you've referred to in this deposition?

02:5313          A    Yes.

02:5314          Q    Who -- does IP Worldwide, LLC presently have any

02:5315    members?

02:5316          A    Yes.

02:5317          Q    And who are they, sir?

02:5318          A    I'm a member and -- actually, I believe the --

02:5319    I'm not sure if I'm the member or Pacific Pictures

02:5320    Corporation is the member.  I think it might be Pacific

02:5321    Pictures is the member.  The other member is Ariel

02:5322    Emanuel, a person.

02:5423          Q    Didn't Mr. Emanuel and Pacific wind up IPW, LLC?

02:5424          A    We --

02:5425               MR. WILLIAMSON:  Objection.  Assumes facts not

                                                                    41

U.S. LEGAL SUPPORT

Exhibit 14
187

02:54 1    in evidence.  Vague and ambiguous.

02:54 2         THE WITNESS:  We entered into an agreement which

02:54 3    I believe was called a winding up agreement, but I

02:54 4    don't -- if there is a technic- -- if that's a term of

02:54 5    art and has a technical meaning, I don't know whether the

02:54 6    status of IP Worldwide, LLC falls into the technical

02:55 7    meaning of winding up.  The entity still exists.

02:55 8    BY MR. BERGMAN:

02:55 9         Q    What business activities has IP Worldwide been

02:5510    involved in?

02:5511         MR. WILLIAMSON:  Objection.  Vague and

02:5512    ambiguous.  Indefinite as to time and place.

02:5513         THE WITNESS:  Are you asking for a general

02:5514    description?

02:5515    BY MR. BERGMAN:

02:5516         Q    Yes.

02:5517         A    But you're not asking me to recite for you

02:5518    everything that it's ever done?

02:5519         Q    No.

02:5520         A    Okay.  The business plan of IP Worldwide, LLC

02:5521    was to obtain interests in intellectual property,

02:5622    hopefully branded titles of meaning in the entertainment

02:5623    industry, and to marry those titles with talent and

02:5624    perhaps outside financing for exploitation in the film

02:5625    and television industry.  Industries, I should say.

                                                              42

**U.S. LEGAL SUPPORT**

Exhibit 14
188

02:56  1          Q    Did IP Worldwide ever have any employees?

02:56  2          A    Yes.

02:56  3          Q    And who were they, sir?

02:56  4          A    My assistant, whose name was Andrew, and then

02:57  5    there was another gentleman whose name I don't remember.

02:57  6    We had two employees.

02:57  7          Q    And are either of them still employed by IP

02:57  8    Worldwide?

02:57  9          A    No.

02:57 10          Q    Are either of them --

02:57 11          A    And when I say that, initially that's what we

02:57 12    started with, and I'm not sure whether it was always two

02:57 13    or whether at some point we may have had three or four.

02:57 14          Q    Can you think of any other of those three or

02:57 15    four?

02:57 16          A    No.  It was primarily those two, and we would

02:57 17    have, I believe, during the summer months interns.

02:58 18          Q    Are either of those two former employees of IP

02:58 19    Worldwide presently employed by you?

02:58 20          A    No.

02:58 21          Q    Or by any other entity that you're involved

02:58 22    with?

02:58 23          A    No.

02:58 24          Q    Does IPW, LLC presently have any employees?

02:58 25          A    Yes.

43

**U.S. LEGAL SUPPORT**

Exhibit 14
189

| | | |
|---|---|---|
| 02:58 | 1 | Q   And who are they, sir? |
| 02:58 | 2 | A   Mark Perrone and Mark Marcum. |
| 02:59 | 3 | Q   And what services does Mr. Perrone render to the |
| 02:59 | 4 | IPW, LLC? |
| 02:59 | 5 | A   He's an assistant. |
| 02:59 | 6 | Q   Assistant to who? |
| 02:59 | 7 | A   Sort of an overall assistant.  Answers the phone |
| 02:59 | 8 | and keeps track of messages and... |
| 02:59 | 9 | Q   Okay.  And what services does Mr. Marcum render? |
| 02:59 | 10 | A   He's more of a development person who reads |
| 02:59 | 11 | scripts and does coverage of scripts, things of that |
| 02:59 | 12 | nature. |
| 02:59 | 13 | Q   Who are the members of IPW, LLC? |
| 02:59 | 14 | A   I'm a member, and the other member is a |
| 03:00 | 15 | gentleman by the name of Bruce Karsh. |
| 03:00 | 16 | Q   Is that spelled K A R S H? |
| 03:00 | 17 | A   I believe so, yes. |
| 03:00 | 18 | Q   And do you and Mr. Karsh hold equal interests in |
| 03:00 | 19 | IPW, LLC? |
| 03:00 | 20 | A   No. |
| 03:00 | 21 | Q   What is the respective ownership of that LLC? |
| 03:00 | 22 | A   Actually, I believe that's private information. |
| 03:00 | 23 | It has no relevance to this action. |
| 03:00 | 24 | Q   With all respect, sir, I disagree with you. |
| 03:00 | 25 | A   It's...  I don't believe it has any relevance. |

44

**U.S. LEGAL SUPPORT**

Exhibit 14
190

03:00 1    I'm the majority owner of IPW, LLC.

03:01 2        Q    Do you have any further answer to my question?

03:01 3        A    No.

03:01 4        Q    So that you decline to tell me what the relative

03:01 5    ownership interests between you and Mr. Karsh are?

03:01 6        A    IPW, LLC has very -- its only relevance to this

03:01 7    action is as is set forth in the documents that were

03:01 8    produced, which is, namely, IP Worldwide at one point had

03:01 9    an agreement with the Siegels, and that agreement has

03:0110    long ago expired, but at the time when IP Worldwide was

03:0111    wound up and its various agreements were -- or rights

03:0112    were assigned to IPW, LLC, that agreement had a few

03:0213    months left on it, and it was assigned.  So there is very

03:0214    little connection between IPW, LLC and this lawsuit.  I

03:0215    would say no connection.

03:0216        Q    Mr. Toberoff, you know as well as I do that

03:0217    there is no relevance privilege which enables a witness

03:0218    to decline to answer a question.

03:0219        A    No, but I think it has bearing on privacy issues

03:0220    and trade secret issues, and I don't believe you're

03:0221    entitled to go into every aspect, particularly financial

03:0222    aspects, of any company that I'm involved with.

03:0223        Q    And do you therefore refuse to answer that

03:0224    question?

03:0225        A    Yes.

45

03:02 1      Q    Okay.  Where does Mr. Karsh office?

03:02 2      A    Actually, I'll answer that question without

03:02 3  waiver of that objection.

03:02 4      Q    Okay.

03:03 5      A    Mr. Karsh has only 10 percent interest.

03:03 6      Q    Okay.  And does he maintain an office at the IPW

03:03 7  premises?

03:03 8      A    No.

03:03 9      Q    Where are the IPW premises?

03:03 10     A    Where -- what are premises?  What do you mean?

03:03 11     Q    Where is the company located?

03:03 12     A    The office?

03:03 13     Q    Yes.

03:03 14     A    Currently, 2049 Century Park East.

03:03 15     Q    And that is also your office address, is it not?

03:03 16     A    I have offices at that address as well.

03:03 17     Q    Okay.  And are they one and the same offices

03:03 18  physically?

03:03 19          MR. WILLIAMSON:  Objection.  Vague and

03:03 20  ambiguous.

03:03 21          THE WITNESS:  No.  There is sort of like a

03:03 22  division in the office space.

03:03 23  BY MR. BERGMAN:

03:03 24     Q    Who are the shareholders of Pacific Pictures

03:04 25  Corporation?

                                                          46

Exhibit 14
192

03:04 1          A    Marc Toberoff.

03:04 2          Q    And who are the directors?

03:04 3          A    I believe I'm the sole director.

03:04 4          Q    And are you also the sole officer?

03:04 5          A    I'm not sure.

03:04 6          Q    Are you the sole employee of Pacific Pictures

03:04 7    Corporation?

03:04 8          A    I'm not sure if I'm currently an employee of

03:04 9    Pacific Pictures Corporation.

03:0410          Q    Do you know whether there are any employees of

03:0411    Pacific Pictures Corporation?

03:0412          A    Other than my answer where I say I'm not sure

03:0413    with respect to myself, there would be no other --

03:0414    well -- no, there are no other employees.

03:0415          Q    Okay.  Is Pacific Pictures Corporation currently

03:0416    used to loan out your services?

03:0417          A    No.

03:0418          Q    When did it cease loaning out your services,

03:0519    approximately?

03:0520          A    Probably end of 2003.  Or earlier.  By the end

03:0521    of 2003.

03:0522          Q    Are you familiar with an entity known as

03:0523    Smashbox Entertainment, LLC?

03:0524          A    Actually, before we go to the next question, I

03:0525    want to think about the last answer.

                                                              47

03:05 1      Q   Okay.

03:05 2      A   My answer as to Pacific Pictures, it may be

03:05 3  earlier than the end of 2003.  I'm not sure.

03:06 4         MR. BERGMAN:  Can you repeat my last question,

03:06 5  please?

03:06 6         (Record read as follows:

03:05 7         "Q   Are you familiar with an

03:05 8         entity known as Smashbox

03:05 9         Entertainment, LLC?")

03:06 10        THE WITNESS:  Yes.

03:06 11  BY MR. BERGMAN:

03:06 12      Q   And who are the members of that LLC?

03:06 13      A   I believe I'm the sole member.  I'm not sure.  I

03:06 14  believe I'm the sole member, but I'm not positive.

03:06 15      Q   Is Smashbox Entertainment, LLC currently active

03:06 16  an organization?

03:06 17      A   Not particularly active, no.

03:06 18      Q   When it was active, what business was it engaged

03:07 19  in?

03:07 20      A   That assumes facts not in evidence.

03:07 21      Q   Was it ever active?

03:07 22      A   Not particularly.

03:07 23      Q   I notice you qualified those responses.  What

03:07 24  activities, if any --

03:07 25      A   Well, the reason I'm qualifying it by saying

48

03:07 1    "not particularly" is because the word "active" is

03:07 2    another one of these -- you know, it's a subjective, so I

03:07 3    say not particularly depending on how one defines

03:07 4    "active."

03:07 5         Q    Okay.  When to the best of your knowledge was

03:07 6    the Smashbox Entertainment, LLC formed?

03:07 7         A    I don't remember when it was formed.  I believe

03:07 8    it was about three years ago.

03:07 9         Q    And what activities, if any, has Smashbox

03:08 10   Entertainment engaged in since its formation?

03:08 11        A    I believe it was going to be the production

03:08 12   entity for a film project; I don't remember what it was,

03:08 13   and for purposes of the -- I believe one of the guilds --

03:08 14   I think the Writers Guild needed a signatory company.

03:08 15   And it may or may not have been a signatory to the

03:08 16   Writers Guild, but it was ultimately not used as the

03:08 17   production entity.

03:08 18        Q    Okay.

03:09 19        Would you mark as Exhibit 13 a document entitled

03:09 20   "Joint Venture Agreement" made as of November 23, 2001.

03:09 21        (Deposition Exhibit 13 marked.)

03:09 22        THE WITNESS:  If we are going to go into a more

03:09 23   detailed session, could I just use the restroom before we

03:09 24   do that?

03:09 25        MR. BERGMAN:  Of course.  Why don't we take a

49

U.S. LEGAL SUPPORT

Exhibit 14
195

03:09 1    five-minute break.

03:09 2              (Recess.)

03:15 3    BY MR. BERGMAN:

03:15 4        Q    Referring to the last page of Exhibit 13,

03:15 5    Mr. Toberoff, I note that this copy does not bear your

03:15 6    signature.  It bears the Peary and Peavy signatures.

03:15 7              To your recollection did you ever sign a copy of

03:16 8    Exhibit 13?

03:16 9        A    I recall a joint venture agreement that was

03:16 10   signed, I believe -- I recall because I believe that

03:16 11   document was produced, but I don't know -- I would have

03:16 12   to compare this to that document to know whether there

03:16 13   were any changes between the two.

03:16 14       Q    I know that the parties to this agreement are

03:16 15   Ms. Peavy and Mr. Peary on the one hand and Pacific

03:16 16   Pictures Corporation on the other.

03:16 17             Am I correct that you've identified Pacific

03:16 18   Pictures Corporation as a loan-out company?

03:16 19       A    I said I believe as it was initially conceived

03:16 20   in whenever it was in the '80s, that's how I conceived

03:16 21   it:  As a loan-out company.

03:16 22       Q    Well, did the nature of Pacific Pictures'

03:17 23   business ever change from being a loan-out company to

03:17 24   being something else?

03:17 25       A    To determine that, I'd have to know what the

                                                                    50

03:17 1    legal definitions of a loan-out company.  When I use the

03:17 2    term loan-out company," in the entertainment business

03:17 3    when you do -- for example, if you're serving as a

03:17 4    producer on a film or a writer, for instance, or a

03:17 5    director, most people have a company that they -- which

03:17 6    is a sole proprietorship that loans out their services,

03:17 7    and I believe that people who do that originally for tax

03:17 8    purposes.  I'm not sure what the reasons are for that.

03:17 9    So I believe when it was initially incorporated, that was

03:1710    the purpose, but then afterwards I would just use Pacific

03:1711    Pictures a lot for anything.

03:1712        Q    Anything that you personally were involved in?

03:1713        A    I would -- yeah, I would tend to use it for most

03:1714    things that I was involved in.

03:1715        Q    Okay.

03:1716        A    So I don't know if at that point it's a loan-out

03:1717    company or just a company.

03:1718        Q    And the address given here for Pacific Pictures

03:1719    Corporation, 23852 Pacific Coast Highway, does that

03:1720    continue to be the address of Pacific Pictures

03:1721    Corporation?

03:1722        A    You mean as registered with the California

03:1723    Secretary of State?

03:1724        Q    Well, as operating in actuality, does Pacific

03:1725    Pictures maintain offices?

51

03:18 1          A    It's not active since -- I think -- didn't you

03:18 2    ask me earlier about Pacific, and I said at the end of

03:19 3    2000 -- -- towards the end of 2003 I stopped using it?

03:19 4    So it doesn't -- you know, I guess there is a distinction

03:19 5    between a technical office for purposes of registration

03:19 6    with the Secretary of State and active offices.  I used

03:19 7    to work out of my home in Malibu, and this was the

03:19 8    mailing address used for myself and Pacific Pictures.

03:19 9          Q    When was your first communication with either

03:1910    Miss Peavy or Mr. Peary concerning the Joe Shuster

03:1911    interest, if any, in Superman?

03:1912          MR. WILLIAMSON:  Objection.  Assumes facts not

03:1913    in evidence.  Vague and ambiguous.

03:2014          THE WITNESS:  Sometime around mid 2001.

03:2015    BY MR. BERGMAN:

03:2016          Q    And how did that initial communication come

03:2017    about?

03:2018          A    Warren Peary -- the last name is P E A R Y --

03:2019    called me up and -- he called me up.

03:2020          Q    And what did he say?

03:2021          A    He said he wanted -- was interested in -- I

03:2022    think he said that he got my name off of some article he

03:2023    had read on the Internet and that he wanted a lawyer to

03:2024    help him to figure out what rights the Joe Shuster estate

03:2125    would have in Superman.

                                                              52

03:21 1          Q    And what did you reply?

03:21 2                MR. WILLIAMSON:  Objection.  Attorney-client

03:21 3    privilege.  Instruct you not to answer.

03:21 4                (Instruction not to answer.)

03:21 5                MR. BERGMAN:  The Joint Venture Agreement

03:21 6    between Pacific Pictures, which Mr. Toberoff has

03:21 7    testified is owned wholly by him and is basically a

03:21 8    loan-out company, and the Peavy and Peary individuals is

03:21 9    a business arrangement.  It is not a legal representation

03:2110    document.  It is on its face a joint venture agreement.

03:2111    There is no privilege applicable to that.  Mr. Toberoff

03:2112    was not retained as an attorney.  He was -- he entered

03:2113    into a joint venture for the purpose of retrieving and

03:2214    enforcing and exploiting all of Joe Shuster's and his

03:2215    estate's rights, claims and copyrights.  Certainly at

03:2216    this point in time that I'm asking Mr. Toberoff about, he

03:2217    was an entrepreneur, not an attorney.

03:2218                MR. WILLIAMSON:  Objection.  Mr. Bergman, you

03:2219    are completely misstating his testimony, the documents

03:2220    and the record before us.  Whether or not there was a

03:2221    retainer agreement between Mr. Toberoff and Mr. Peary and

03:2222    Miss Shuster is, frankly, irrelevant.  I instruct him not

03:2223    to answer.

03:2224    BY MR. BERGMAN:

03:2225          Q    Mr. Toberoff, I'll assume that when

                                                                    53

U.S. LEGAL SUPPORT

Exhibit 14
199

03:22 1    Mr. Williamson instructs you not to answer, you will

03:22 2    refuse to answer on that basis?

03:22 3         A    Generally, yes.  I -- without waiver -- again,

03:22 4    let me say in any of these areas where we may have a

03:23 5    difference of opinion as attorney-client -- obviously

03:23 6    when you are taking a deposition of an attorney, you can

03:23 7    surmise that there will be a lot of things that are

03:23 8    protected by the attorney-client privilege and by work

03:23 9    product.  To the extent -- I'd like it to be understood

03:23 10   that to the extent I am able to give you a general answer

03:23 11   to certain questions without revealing the substance of

03:23 12   attorney-client communications or work product, I don't

03:23 13   want that to be misconstrued or claimed to be a waiver at

03:23 14   any point in this deposition of attorney-client privilege

03:23 15   or work product doctrine.

03:23 16        MR. BERGMAN:  I will not assert such a waiver.

03:23 17        THE WITNESS:  So I would just answer generally

03:23 18   that Mr. Peary called me with respect to Superman rights,

03:23 19   as I already mentioned, and my response was, because it

03:24 20   was Superman, was that yes, I would be interested in

03:24 21   representing him with respect to that.

03:24 22   BY MR. BERGMAN:

03:24 23        Q    Did you tell him that you'd be interested in

03:24 24   entering into a joint venture with Peary and Peavy in

03:24 25   order to exploit their interest?

54

03:24 1          MR. WILLIAMSON:  Objection.  Attorney-client

03:24 2     privilege --

03:24 3          THE WITNESS:  No, I did not, but other than

03:24 4     giving you the basic subject matter, which I've already

03:24 5     given you, and why he was calling me, the rest of our

03:24 6     communications would be privileged, and they're

03:24 7     privileged on the basis that he was obviously seeking

03:24 8     legal advice, and I was dispensing legal advice.

03:24 9     BY MR. BERGMAN:

03:24 10     Q    And at what point in time did your activities

03:25 11     change from that of rendering legal advice to entering

03:25 12     into a joint venture with the Peary and Peavy --

03:25 13          MR. WILLIAMSON:  Objection.  Assumes facts not

03:25 14     in evidence.

03:25 15     BY MR. BERGMAN:

03:25 16     Q    -- individuals?

03:25 17     A    It didn't change.

03:25 18     Q    You did enter into a joint venture with them,

03:25 19     did you not?

03:25 20     A    I entered into a joint venture agreement with

03:25 21     them, yes.

03:25 22     Q    How many communications did you have with either

03:25 23     Peary or Peavy from the time of that first conversation

03:25 24     until November 23, 2001, the as of date of this joint

03:25 25     venture agreement?

                                                              55

03:25 1        A    I don't recall.

03:25 2        Q    What is your best estimate?

03:26 3        A    I don't -- we had at least one, we probably had

03:26 4   more than one, but other than that I don't have a basis

03:26 5   for estimating.

03:26 6        Q    Did you have any face-to-face meetings with

03:26 7   either Peavy or Peary prior to November 23, 2001?

03:26 8        A    No.

03:26 9        Q    Prior to this joint venture agreement, had you

03:26 10  ever entered into a joint venture agreement with a

03:26 11  client?

03:26 12       MR. WILLIAMSON:   Objection.   Vague and

03:26 13  ambiguous.

03:26 14       THE WITNESS:   I don't know what you mean by

03:26 15  that.

03:26 16  BY MR. BERGMAN:

03:26 17       Q    Well, you've testified that you were contacted

03:26 18  and served as a lawyer, and yet, as Exhibit 13

03:26 19  demonstrates, you entered into a joint venture agreement

03:26 20  with them under which you received 50 percent of whatever

03:26 21  their recovery might have been.

03:26 22       A    That misstates the document.

03:26 23       Q    No, it doesn't misstate the document.

03:27 24       Am I correct that paragraph 5 of the agreement

03:27 25  states that any moneys received from enforcement,

56

03:27 1    settlement or exploitation of any of the rights -- I'll

03:27 2    skip something -- will be shared, divided and payable 50

03:27 3    percent to claimants and 50 percent to PPC?

03:27 4        A    You've -- the words you've read appear there.

03:27 5    The document speaks for itself.  I'm playing both the

03:27 6    role now of the witness and to a certain extent making

03:27 7    objections to your question, but you would have to

03:27 8    take -- read the whole paragraph in context to give a

03:27 9    fair meaning as to what it says.

03:27 10       Q    Who drafted this agreement?

03:27 11       A    I drafted it.

03:27 12       Q    Okay.  Were the -- was Peary or Peavy

03:28 13   represented by an attorney in connection with the

03:28 14   negotiation of this agreement?

03:28 15       A    I don't -- I didn't deal with an attorney, but I

03:28 16   don't know whether or not they were represented by an

03:28 17   attorney, whether they sought outside legal advice

03:28 18   regarding the agreement.

03:28 19       Q    Did you suggest to them that they do obtain

03:28 20   independent legal advice before entering into the

03:28 21   agreement?

03:28 22            MR. WILLIAMSON:  Objection.  Attorney-client.

03:28 23            THE WITNESS:  Yes, I did.

03:28 24   BY MR. BERGMAN:

03:28 25       Q    Had there been any prior drafts of this

                                                              57

Exhibit 14
203

03:28 1    agreement?

03:28 2         A    I believe so, yes.

03:28 3         Q    And had Peavy or Peary requested any changes in

03:28 4    the prior draft?

03:28 5         A    I believe so, yes.

03:28 6         Q    What changes had they requested?

03:28 7         A    I don't recall the specific changes, but I

03:28 8    believe there was more than one draft, and I believe the

03:29 9    reason for that is because of comments or revisions by

03:29 10   Warren.

03:29 11        Q    And are you still in possession of those prior

03:29 12   drafts?

03:29 13        A    No.

03:29 14        Q    What happened to them?

03:29 15        A    I don't know.  I'm not in possession of them.

03:29 16   Otherwise, we would have produced them.

03:29 17        Q    Have you searched for them?

03:29 18        A    I searched the files.  I searched Pacific

03:29 19   Pictures's files for any documents regarding the

03:29 20   Shusters, yes.

03:29 21        Q    Have you asked the Peary --

03:29 22        A    I did that in response --

03:29 23        Q    -- Peary or Peavy individuals whether they had

03:29 24   any prior drafts?

03:29 25        A    Yes.

                                                                    58

                        **U.S. LEGAL SUPPORT**

Exhibit 14
204

03:29 1        Q    And am I correct that they did not and that they

03:29 2   did not produce any?

03:29 3        A    Yes.  They actually did not even have a copy of

03:29 4   the fully signed agreement.  What you're looking at -- I

03:29 5   believe they didn't.  To my recollection, I believe this

03:29 6   was the only copy that they had still retained, what is

03:29 7   Exhibit 13.  This didn't come from my files.  This came

03:29 8   from Peavy's and Peary's production in response to the

03:30 9   subpoena you served on them.

03:3010        Q    I note that in paragraph 1 of the Joint Venture

03:3011   Agreement, there is a reference to Superboy.

03:3012        Did you -- have you at any point in time

03:3013   discussed with the Shuster heirs the conflict between the

03:3014   Siegel position and the Shuster heirs' position regarding

03:3015   Superboy?

03:3016        MR. WILLIAMSON:  Objection.  Assumes facts not

03:3017   in evidence.  Attorney-client.  Instruct you not to

03:3018   answer.

03:3019        (Instruction not to answer.)

03:3020   BY MR. BERGMAN:

03:3021        Q    Did PPC in fact pay, as provided in paragraph 3,

03:3022   the legal fees and costs of setting up Joe Shuster's

03:3023   estate?

03:3024        A    I believe so, yes.

03:3125        Q    Did the Shuster heirs request that PPC receive a

59

U.S. LEGAL SUPPORT

Exhibit 14
205

03:31 1    lesser share than 50 percent of all moneys and proceeds

03:31 2    derived from the rights?

03:31 3         MR. WILLIAMSON:  Objection.  Attorney-client

03:31 4    privilege.

03:31 5         MR. BERGMAN:  That's absolutely ridiculous,

03:31 6    Mr. Williamson.  How can you say it's attorney-client

03:31 7    privilege when it's part of an agreement between two

03:31 8    parties?

03:31 9         THE WITNESS:  Okay.  Are you referring to the

03:31 10   Joint Venture Agreement?

03:31 11   BY MR. BERGMAN:

03:31 12        Q    Yes.

03:31 13        A    Okay.  I think Mr. Williamson thought -- okay.

03:31 14        Q    Paragraph 5 provides --

03:31 15        A    Can you repeat the question?  I believe I can

03:31 16   answer that.

03:31 17        Q    Yes.  It provides for a 50-50 split.  At any

03:31 18   time prior to signing this agreement, did the Shuster

03:31 19   heirs or either of them request that the percentage for

03:32 20   PPC be less than 50 percent?

03:32 21        A    They may have.

03:32 22        Q    But do you recall them doing so?

03:32 23        A    I don't have a specific recollection, but I

03:32 24   can't say they didn't.

03:32 25        Q    Did you regard 50 percent as a reasonable

60

03:32 1    interest for Pacific's services?

03:32 2        A    Of course.  Otherwise I wouldn't have put it in

03:32 3    the document.

03:32 4        Q    Did you regard 50 percent as being a reasonable

03:32 5    fee for lawyer's services?

03:32 6        A    I don't know what you're referring to.

03:32 7        Q    Well, did the -- aside from giving you or

03:32 8    Pacific Pictures 50 percent of any recovery, did the

03:32 9    Shusters additionally agree to pay you any fees as a

03:32 10   lawyer?

03:32 11       A    That's privileged.

03:32 12       Q    Does that mean you decline to answer?

03:33 13       A    Yes.

03:33 14            (Unanswered question.)

03:33 15       Q    Other than the 50 percent share that is provided

03:33 16   for in paragraph 5 of the Joint Venture Agreement, were

03:33 17   you compensated in any way by the Shuster heirs for your

03:33 18   legal services?

03:33 19       A    You mean in addition to the 50 percent?

03:33 20       Q    Correct.

03:33 21       A    No.

03:33 22       Q    In connection with this Joint Venture Agreement,

03:33 23   did either Peary --

03:33 24       A    And you used the word "compensated," because

03:33 25   this is a -- in other words, I haven't received any money

                                                              61

03:33 1  from the Shusters to date or any compensation in

03:34 2  connection with this or any other agreement.

03:34 3       Q    They have subsequent to this --

03:34 4       A    Since 2001.

03:34 5       Q    They have subsequent to this agreement retained

03:34 6  you as an attorney, have they not?

03:34 7       A    Yes.

03:34 8       Q    And when was that?

03:34 9       A    I don't -- I know it was at some time before the

03:3410  lawsuit was filed in the Siegel case.  I also know that

03:3411  this agreement was cancelled.  I am not sure when the

03:3412  legal retainer agreement was entered into, but I believe

03:3413  it was definitely entered into before this agreement was

03:3414  cancelled.

03:3415       Q    In connection with the Joint Venture Agreement,

03:3416  Exhibit 13, did either Peary or Peavy ask you whether 50

03:3517  percent was a customary amount for an entity such as PPC

03:3518  to receive?

03:3519       A    I don't recall them saying that.

03:3520       Q    Do you recall any negotiation at all about the

03:3521  50 percent?

03:3522       A    Not specifically.  I believe there was some

03:3523  negotiation or discussion regarding the fee stated in

03:3524  this agreement.

03:3525       Q    I didn't hear that last.

62

03:35 1      A    I believe there was some discussion regarding

03:35 2  the fee based in this agreement, but I can't give you --

03:35 3  I don't have a specific recollection of the negotiation,

03:36 4  as you've provided it.

03:36 5      Q    Well, in connection with the Joint Venture

03:36 6  Agreement, Exhibit 13, did you ever ask for more than 50

03:36 7  percent?

03:36 8      A    No.

03:36 9      Q    And did Peary or Peavy ever offer less than 50

03:3610  percent?

03:3611      A    I don't think -- I think the discussions were of

03:3612  an explanation as to what that would cover, what, you

03:3613  know, I would do, whether they would be responsible for

03:3614  any costs or whether I would be responsible for all

03:3615  costs, things of that nature, which had relevance to the

03:3616  50 percent.  In other words, if there were any attorneys

03:3617  involved, would they incur any additional fees, costs,

03:3618  expenses, things of that nature, and the answer to that

03:3719  was no.

03:3720      Q    Paragraph 11 states in part that "The parties

03:3721  further acknowledge that they have not signed this

03:3722  agreement in reliance on any promise or representation

03:3723  not expressly set forth in this agreement."

03:3724          Prior to their execution of this agreement, did

03:3725  you make any promise or representation to Peary and Peavy

63

U.S. LEGAL SUPPORT

Exhibit 14
209

03:37 1       that is not contained in this agreement?

03:37 2              A    I don't believe so, no.

03:37 3              Q    What did you state to them which led to the

03:37 4       formation of this joint venture?

03:37 5                   How did the relationship between the two parties

03:37 6       become that of joint venturers?

03:37 7                   MR. WILLIAMSON:  Objection.  Vague and

03:38 8       ambiguous.

03:38 9                   THE WITNESS:  I -- I don't -- I believe that

03:3810       when I did this agreement at the time in 2001, I was

03:3811       using Pacific Pictures for everything, and I was entering

03:3812       into agreements where I was -- like I described

03:3813       previously, where I was representing rights holders for

03:3814       purposes of marketing their rights, for setting up

03:3815       movies, things of that nature, and when I -- when it came

03:3816       to the Peavys, I used Pacific Pictures in a similar way,

03:3817       because very often when I entered into those agreements

03:3818       previously, I would do it -- either have some kind of

03:3819       management agreement or a loose joint venture, and so I

03:3920       used -- initially with the Peavys, I used a similar

03:3921       structure, and then in retrospect I felt it was -- that

03:3922       it would have -- it's -- it would have been a lot cleaner

03:3923       just to have a regular legal retainer agreement, and we

03:3924       entered into a legal retainer agreement.

03:3925       BY MR. BERGMAN:

                                                                    64

                        U.S. LEGAL SUPPORT

Exhibit 14
210

03:39 1      Q   Well, you testified earlier that you were

03:39 2  initially contacted in your capacity as a lawyer.

03:39 3  Somehow that shifted by November 23, 2001, to your

03:39 4  becoming a joint venturer with the Shuster heirs.

03:39 5      How did that change in the relationship evolve?

03:39 6      MR. WILLIAMSON:  Objection.  Misstates your

03:39 7  testimony.

03:39 8      THE WITNESS:  What you're saying is incorrect.

03:40 9  It didn't shift.  A lot of my work prior to this

03:40 10  agreement, particularly as I've described in the

03:40 11  entertainment industry, to varying degrees would require

03:40 12  a certain amount of legal work, legal analysis, research,

03:40 13  because it was all rights based in the entertainment

03:40 14  industry.  Rights were the platform for doing business in

03:40 15  the entertainment industry, and I -- you know, instead of

03:40 16  having two separate agreements, a legal retainer

03:40 17  agreement that covered the legal and then a business

03:40 18  arrangement to cover the aspects of making deals in the

03:40 19  entertainment industry, at least at that time I was just

03:40 20  using Pacific Pictures and I would have one agreement,

03:41 21  but that's not to say there was no legal relationship.  I

03:41 22  just didn't have a legal retainer agreement, but they

03:41 23  were definitely, and particularly in this case, seeking

03:41 24  my legal advice, giving my legal advice, doing legal

03:41 25  research.  When the Shuster estate was probated, you

65

U.S. LEGAL SUPPORT

Exhibit 14
211

03:41 1    know, arranging for an estate lawyer, overseeing that

03:41 2    lawyer.

03:41 3    BY MR. BERGMAN:

03:41 4        Q    So is it your testimony that this Joint Venture

03:41 5    Agreement was merely a disguised legal retainer

03:41 6    agreement?

03:41 7        A    No.  Those are your words.

03:41 8        Q    It was a business arrangement, was it not?

03:41 9        A    No --

03:4110        MR. WILLIAMSON:  Objection.  Misstates prior

03:4111    testimony.

03:4112        THE WITNESS:  -- as I said, can I didn't have a

03:4113    separate -- I had a joint venture agreement -- in other

03:4114    words, there is not a particular -- this is what I was

03:4215    doing with regard to other things, and I did -- that were

03:4216    probably less legal in nature, and I used the same

03:4217    general structure for the Miss Jean Peavy and Warren

03:4218    Peary -- we'll call them the Shusters -- I used the same

03:4219    general structure at that time.  And it's not that this

03:4220    is a legal retainer agreement.  It's just that I didn't

03:4221    have a separate legal retainer agreement.  And I don't

03:4222    think there is a...

03:4223    BY MR. BERGMAN:

03:4224        Q    Is it your testimony that because you didn't

03:4225    have a legal retainer agreement, you utilized this Joint

66

U.S. LEGAL SUPPORT

Exhibit 14
212

03:42 1    Venture Agreement as a substitute?

03:42 2        A    No.   I just didn't draft and draw up a separate

03:43 3    legal retainer agreement to cover my legal services.

03:43 4        Q    Do you consider a 50 percent share of any

03:43 5    recovery to be a reasonable attorney's fee?

03:43 6        A    It depends on the circumstances.   I've seen

03:43 7    agreements at 50 percent when lawyers are working on

03:43 8    contingency, which I take it you rarely, if ever, do --

03:43 9    well, you're not talking about a retainer agreement.

03:43 10   You're talking about the Joint Venture Agreement, so...

03:43 11            Are you asking me about this agreement, or are

03:43 12   you asking me separate and apart from that?

03:43 13       Q    Well, frankly, based on your testimony,

03:43 14   Mr. Toberoff, I don't understand whether you regarded

03:43 15   this as your legal retainer agreement or as a business

03:43 16   arrangement under which your company would get 50 percent

03:44 17   of any recovery.

03:44 18       A    I think I was very clear in telling you that

03:44 19   this was not a legal retainer agreement.

03:44 20       Q    Okay.   Since this was not a legal retainer

03:44 21   agreement, what is the basis of your asserting the

03:44 22   attorney-client privilege regarding it?

03:44 23       A    I've been answering your questions about this

03:44 24   agreement, if you've noticed.

03:44 25       Q    No --

                                                              67

03:44 1      A    The assertion of the attorney-client privilege

03:44 2  goes to matters where you start to ask questions that go

03:44 3  to the giving of legal advice or legal strategies, mental

03:44 4  impressions, things protected by the work product

03:44 5  doctrine.

03:44 6      Q    The record will speak for itself on that.

03:44 7           In paragraph 11 there is the sentence about four

03:44 8  lines up from the bottom of the page that begins, "The

03:44 9  parties have mutually participated in the negotiation and

03:44 10  drafting of this Agreement..."

03:45 11          Did either Peary or Peavy engage in the drafting

03:45 12  of this agreement?

03:45 13     A    Only to the extent -- remember I told you

03:45 14  earlier that I believe it went through a few drafts in

03:45 15  response to requests, revisions, comments by Warren?  So

03:45 16  to that extent, yes.

03:46 17          MR. BERGMAN:  Would you mark as Exhibit 14,

03:46 18  please, a document on Pacific Pictures Corporation

03:47 19  letterhead dated October 27, 2003?

03:47 20          (Deposition Exhibit 14 marked.)

03:47 21  BY MR. BERGMAN:

03:47 22     Q    My first question is going to be whether that

03:47 23  is your signature on the last page of Exhibit 14,

03:47 24  Mr. Toberoff.

03:47 25     A    Yes, it is.

                                                           68

U.S. LEGAL SUPPORT

Exhibit 14
214

03:47 1          Actually, looking at the date of this document,

03:47 2     I can narrow the other question you asked:  When we

03:47 3     entered into a legal or retainer agreement.  Still I

03:47 4     think it might be between the date of this and the date

03:47 5     of the cancellation of these two agreements.

03:47 6          Q    Okay.

03:47 7          A    I'm not positive, but that's...

03:48 8          Q    Am I correct that you drafted Exhibit 14?

03:48 9          MR. WILLIAMSON:  Objection.  Vague and

03:48 10    ambiguous.

03:48 11         THE WITNESS:  Yes, I did.

03:48 12    BY MR. BERGMAN:

03:48 13         Q    Were --

03:48 14         A    With input from Warren.

03:48 15         Q    What input did you receive from Mr. Peary?

03:48 16         A    I don't recall specific items, but we discussed

03:48 17    it.

03:48 18         Q    Okay.  So am I correct you formed the -- you

03:48 19    probated the estate of Joseph Shuster and then entered

03:48 20    into this agreement with the executor of his estate?

03:48 21         MR. WILLIAMSON:  Objection.  Assumes facts not

03:48 22    in evidence.  It's vague and ambiguous.

03:49 23         THE WITNESS:  What's the question?

03:49 24    BY MR. BERGMAN:

03:49 25         Q    The question is, were you involved in the

                                                              69

**U.S. LEGAL SUPPORT**

Exhibit 14
215

03:49 1    probate of Joseph Shuster's estate?

03:49 2            MR. WILLIAMSON:  Objection.  Vague and

03:49 3    ambiguous.

03:49 4            THE WITNESS:  Yes.

03:49 5    BY MR. BERGMAN:

03:49 6        Q    What was your involvement?

03:49 7        A    I arranged for a -- since trusts and estates is

03:49 8    a specialty of the law, I arranged for an attorney who's

03:49 9    a -- who does nothing but trusts and estates work to

03:4910    handle the probating of the estate.

03:4911        Q    And what was the purpose in entering into this

03:4912    October 27, 2003 agreement, Exhibit 14?

03:4913        A    I think this agreement -- I'd have to compare it

03:4914    line by line to Exhibit 13, but I think this agreement is

03:5015    very similar if not the same to Exhibit 13, but the

03:5016    purpose was to, since -- was to include the executor in

03:5017    the agreement.

03:5018        Q    Has Pacific Pictures Corporation advanced or

03:5019    loaned any money to either Peary or Peavy?

03:5020        A    You mean like a personal loan?  I don't recall

03:5021    it loaning money to the Shusters.

03:5022        Q    Or advancing any money to the Shusters?

03:5023        A    I don't recall that, no.

03:5024        Q    To the best of your recollection, did you

03:5025    personally advance or loan any money to the Shuster

70

**U.S. LEGAL SUPPORT**

Exhibit 14
216

03:50 1    heirs?

03:50 2            MR. WILLIAMSON:  Objection.  Asked and answered.

03:50 3            THE WITNESS:  I don't think so, no.

03:51 4    BY MR. BERGMAN:

03:51 5        Q    Did any other entity of which you are a member

03:51 6    or shareholder advance or loan any money to Peary or

03:51 7    Peavy?

03:51 8        A    I don't believe so.

03:51 9        Q    Paragraph 3 reads in part that "PPC has paid and

03:51 10   will continue to pay any and all costs and expenses

03:51 11   incurred by it in connection with this agreement,

03:51 12   including the legal fees and costs of setting up Joseph

03:51 13   Shuster's Estate," close quote.

03:51 14           In addition to paying the legal fees and costs

03:51 15   of setting up the Shuster estate, did PPC pay any other

03:51 16   costs or expenses in connection with its agreement with

03:51 17   Peary and Peavy?

03:52 18       A    They may have paid filing fees with the U.S.

03:52 19   Copyright Office, things of that nature, document

03:52 20   retrieval fees from the U.S. Copyright Office, things of

03:52 21   that nature.

03:52 22       Q    Did you negotiate Exhibit 14 with any attorney

03:52 23   representing either the executor of the estate or

03:52 24   Miss Peavy?

03:52 25           MR. WILLIAMSON:  Objection.  Vague and

                                                              71

U.S. LEGAL SUPPORT

Exhibit 14
217

03:52 1   ambiguous.

03:52 2         THE WITNESS:  No, I did not.

03:52 3   BY MR. BERGMAN:

03:52 4     Q    When you discussed either the original Joint

03:53 5   Venture Agreement or this Exhibit 14 with Peavy and

03:53 6   Peary, was there any discussion regarding the ownership

03:53 7   of the character Superboy?

03:53 8         MR. WILLIAMSON:  Objection.  Misstates prior

03:53 9   testimony.  Vague and ambiguous.

03:53 10         THE WITNESS:  I don't know.  I don't recall a

03:53 11   discussion of that.

03:53 12   BY MR. BERGMAN:

03:53 13     Q    Have you ever discussed ownership of the

03:53 14   character Superboy with either Peary or Peavy?

03:53 15     A    That would be privileged.

03:53 16         (Unanswered question.)

03:53 17     Q    Prior to the time that you entered into the

03:53 18   retainer agreement that you have testified to, did you

03:53 19   have any discussion with either Peary or Peavy concerning

03:53 20   the ownership of the character Superboy?

03:54 21         MR. WILLIAMSON:  Objection.  Attorney-client.

03:54 22         THE WITNESS:  That would also be privileged.

03:54 23         (Unanswered question.)

03:54 24   BY MR. BERGMAN:

03:54 25     Q    So is it your position --

72

03:54 1      A    I can just tell you, as I sit here today, I

03:54 2  don't recall, but to the extent I had discussed it, it

03:54 3  would be privileged.

03:54 4      Q    And is it your position, Mr. Toberoff, that the

03:54 5  attorney-client relationship between you and Peary and

03:54 6  Peavy resulted from the Joint Venture Agreement, Exhibit

03:54 7  13?

03:54 8      A    Absolutely not.

03:54 9      Q    Did it result -- that relationship result from

03:54 10  Exhibit 14?

03:54 11     A    No.  It didn't result from a document.  It

03:54 12  resulted from them seeking legal advice from the very

03:54 13  first call and my providing it, which established a

03:55 14  confidential relationship.

03:55 15     Q    With the exception of exhibits 13 and 14, have

03:55 16  you ever entered into a joint venture agreement with a

03:55 17  client?

03:55 18     A    I think that's --

03:55 19          MR. WILLIAMSON:  Objection.  Vague and

03:55 20  ambiguous.

03:55 21          THE WITNESS:  I think you already asked that.

03:55 22  What do you mean by that?

03:55 23  BY MR. BERGMAN:

03:55 24     Q    I think it speaks for itself.

03:55 25     A    I don't understand.  Not to me.  Clarify that.

                                                              73

03:55  1      Q    Exhibit 13 is a joint venture agreement which in

03:55  2   essence provides for a 50-50 split of proceeds between

03:55  3   your company, Pacific Pictures Corporation, and the

03:55  4   Shuster heirs.  Have you ever entered into a similar

03:56  5   joint venture agreement with any legal client?

03:56  6         MR. WILLIAMSON:  Objection.  The document speaks

03:56  7   for itself.  Vague and ambiguous.

03:56  8         THE WITNESS:  I don't know.  As I mentioned to

03:56  9   you before, there have been situations where I'm involved

03:56 10   with -- I'm trying to explain it to you.  If somebody

03:56 11   is -- normally, if someone is -- options a book and

03:56 12   simply -- and then seeks to set up a film or to monetize

03:56 13   that book by licensing film rights or producing a film,

03:56 14   it's a very simple, straightforward type of situation,

03:57 15   and when we spoke about BLUE MOVIE, for instance, you

03:57 16   asked me about that, and I said I had optioned that book.

03:57 17         But in some cases when you're dealing in rights

03:57 18   and copyrights, due to the intricasies of copyright law

03:57 19   and what's involved, there can be a business side, but

03:57 20   everything having to do with the rights and chain of

03:57 21   title and issues regarding the rights that may arise are

03:57 22   of a very legal nature, so it's very possible to have a

03:57 23   business agreement but to in fact be dealing with a lot

03:57 24   of legal issues and providing legal advice, and I believe

03:58 25   that -- I shouldn't say I believe -- I know that's the

                                                                    74

Exhibit 14
220

03:58 1    case here.

03:58 2            I would say this instance is probably, as it

03:58 3    unfolded, more of a legal nature, and that's why in

03:58 4    retrospect, and of course everyone's a genius in

03:58 5    retrospect, I decided that it should be a simple legal

03:58 6    retainer agreement, and in retrospect it would have been

03:58 7    better off just being that from the outset.  And that's

03:58 8    it.

03:58 9    BY MR. BERGMAN:

03:5810        Q    Do you believe that there is an inherent ethical

03:5811    conflict in being both a business partner and a lawyer

03:5912    for individuals regarding the same matter?

03:5913        A    It could pose potential conflicts, yes.  That's

03:5914    one of the reasons I changed it.

03:5915            MR. BERGMAN:  Would you mark as Exhibit 15,

03:5916    please, a one-page document dated September 10, 2004.

03:5917            (Deposition Exhibit 15 marked.)

03:5918    BY MR. BERGMAN:

03:5919        Q    Exhibit 15 is the cancellation agreement that

03:5920    you referred to earlier, Mr. Toberoff?

03:5921        A    I don't know if I referred to it as a

03:5922    cancellation agreement, but this Exhibit 15 is the

03:5923    document whereby we cancelled Exhibit 13 and Exhibit 14,

04:0024    yes.

04:0025        Q    What led up to the decision to cancel the

75

04:00 1    November 23, 2001 joint venture and the October 27, 2003

04:00 2    agreement?

04:00 3         A    Exactly what I have previously testified to.

04:00 4         Q    Which is what?

04:00 5         A    Which is I believe that in retrospect we should

04:00 6    have simply had a legal retainer agreement.  It would

04:00 7    have been a cleaner way to handle the relationship.

04:00 8         Q    Did this September 10, 2004 agreement, Exhibit

04:00 9    15, result in any way from your filing of the Siegel

04:00 10   actions against the DC Comics and the Warner parties?

04:00 11        MR. WILLIAMSON:  Objection.  Assumes facts not

04:00 12   in evidence.  Vague and ambiguous.

04:01 13        THE WITNESS:  I would say that's relevant to it.

04:01 14   It's not the sole reason.  But the reason I say that is

04:01 15   I'm looking at the date of this agreement, and I believe

04:01 16   this is near when -- I don't know the exact date we

04:01 17   filed, I don't recall the exact date the Siegels filed,

04:01 18   but I believe this is before that or around the same

04:01 19   time.

04:01 20   BY MR. BERGMAN:

04:01 21        Q    In what respect was this agreement related to

04:01 22   the filing of the Siegel actions?

04:01 23        A    Well, I wouldn't use the term "related."  I

04:01 24   would say it's relevant to it because the Siegel actions

04:01 25   regarded the exercise of termination rights under the

76

**U.S. LEGAL SUPPORT**

Exhibit 14
222

04:01  1    Copyright Act that the Siegels had regarding Superman,

04:02  2    and by that time the Shusters had also, I believe,

04:02  3    exercised their termination rights and served termination

04:02  4    notices.  I believe.  I'm not sure of the exact dates.

04:02  5    And the matter had gone from obviously the filing of

04:02  6    lawsuits that had taken on an even -- you know, much more

04:02  7    litigious nature and had become purely legal, I would

04:02  8    say.

04:02  9        Q    At any point in time did you discuss with the

04:02 10    Shuster heirs the conflict between the Siegel position

04:02 11    that they owned 100 percent of Superboy and what would

04:02 12    otherwise be the result for the Shuster heirs if in fact

04:03 13    they only -- if in fact the Siegels only owned 50 percent

04:03 14    of Superboy?

04:03 15            MR. WILLIAMSON:  Objection.  Assumes facts not

04:03 16    in evidence, and it violates the attorney-client

04:03 17    privilege.

04:03 18            THE WITNESS:  The substance of those

04:03 19    conversations would be privileged, but yes, I did

04:03 20    disclose the conflicts to both the Siegels and the

04:03 21    Shusters.

04:03 22    BY MR. BERGMAN:

04:03 23        Q    And did the Shuster heirs accept that conflict

04:03 24    position and tell you they had no objection to it?

04:03 25        A    Their reaction, that's privileged.

                                                                    77

Exhibit 14
223

04:03 1          (Unanswered question.)

04:03 2     Q   Who initiated the cancellation of the two prior

04:03 3  agreements with the Shuster heirs?

04:03 4     A   I did.

04:03 5     Q   And what did you tell them with respect to that,

04:03 6  why you wanted to cancel those agreements?

04:03 7     A   I don't recall.

04:04 8     Q   Did they object to the cancellation?

04:04 9     A   No.

04:04 10     Q   Are there any presently operative agreements

04:04 11  between either or both Peavy and Peary on the one hand

04:04 12  and Pacific Pictures on the other?

04:04 13     MR. WILLIAMSON:  Objection.  Vague and

04:04 14  ambiguous.

04:04 15     THE WITNESS:  Not to my knowledge.

04:04 16  BY MR. BERGMAN:

04:04 17     Q   Are there presently any operative agreements

04:04 18  between Peary --

04:04 19     A   Oh, wait.  These two agreements had been

04:04 20  cancelled, and there are no other agreements.  The only

04:04 21  agreement is a legal retainer agreement between myself

04:04 22  and the Shusters.  There are no other agreements.  And

04:04 23  the two prior agreements have been cancelled.

04:04 24     Q   Okay.  There are no other agreements between

04:04 25  them and any of your entities?

78

| | | |
|---|---|---|
| 04:05 | 1 | A    That's correct. |
| 04:05 | 2 | MR. BERGMAN:  Would you mark as Exhibit 16 a |
| 04:05 | 3 | seven-page document bearing the Bates stamp EN 1 through |
| 04:05 | 4 | EN 7. |
| 04:05 | 5 | (Deposition Exhibit 16 marked.) |
| 04:06 | 6 | BY MR. BERGMAN: |
| 04:06 | 7 | Q    Is that your signature on Bates stamp number 5? |
| 04:06 | 8 | A    Yes, it is. |
| 04:06 | 9 | Q    The joint venture which is referred to as, |
| 04:06 | 10 | quote, "Newco," close quote, at page EN 2, is that the |
| 04:06 | 11 | entity which you have described as IP Worldwide, LLC? |
| 04:06 | 12 | A    No. |
| 04:06 | 13 | Q    Is that -- |
| 04:06 | 14 | A    Oh, excuse me.  Excuse me.  That's incorrect. |
| 04:06 | 15 | Newco -- this is -- anticipates forming IP Worldwide, |
| 04:07 | 16 | LLC, so Newco would be IP Worldwide, LLC. |
| 04:07 | 17 | Q    And IP Worldwide, LLC was formed as a result of |
| 04:07 | 18 | your agreement with Mr. Emanuel? |
| 04:07 | 19 | A    It was formed after this agreement. |
| 04:07 | 20 | Q    But you'll notice that your transmittal, the |
| 04:07 | 21 | June 3, '02 transmittal of this document, refers to the |
| 04:07 | 22 | agreement as "regarding IP Worldwide, LLC." |
| 04:07 | 23 | A    Yeah.  I think by the time when this agreement |
| 04:07 | 24 | was first drafted, it hadn't yet been formed, but by the |
| 04:07 | 25 | time that it was signed, it may have been formed, because |

79

U.S. LEGAL SUPPORT

Exhibit 14
225