# EXHIBIT 14
# Part 2 of 2

04:07 1    this is in June -- see, this is transmitting it in June

04:08 2    of '02, and actually it was signed in February of '02, so

04:08 3    by June IP Worldwide had been formed.

04:08 4        Q    To the best of your recollection, was it in fact

04:08 5    transmitted on June 3, '02?  Because I note there is an

04:08 6    inconsistency between the date shown on the fax page and

04:08 7    the received stamp of Mr. McGuire, which indicates June

04:08 8    3, 2003.

04:08 9        A    There -- I would say there's several -- as you

04:0810    know from our depositions when sometimes I have trouble

04:0811    keeping track of the exhibits that I'm marking, numbers

04:0812    aren't one of my strengths, and sometimes I would use a

04:0813    form with the wrong year on it and forget to change the

04:0814    year.  So I'm -- I would -- I would just have to look at

04:0915    this and try and deduce --

04:0916        Q    I note that --

04:0917        A    Excuse me.

04:0918        Q    -- the dates next to the signatures on EN 5 are

04:0919    both February 12, '02.

04:0920        A    Right.  So this document was I believe signed

04:0921    February 12, '02.  It says here June 3, '02.  I believe

04:0922    that that should be June 3, '03.

04:0923        Q    Your transmittal?

04:0924        A    The transmittal of the executed copy.  I believe

04:0925    this was simply Ari saying, "Hey, do you have a copy of

80

U.S. LEGAL SUPPORT

Exhibit 14
226

04:09 1    our agreement," and my giving to him on June 4th '03.

04:09 2        Q    I see.  Even though the agreement had been

04:09 3    executed a year and a half earlier?

04:09 4        A    Yeah.  He -- Tom McGuire may have -- would have

04:10 5    kept Ari's copy -- my guess is or estimation is that Tom

04:10 6    McGuire would have kept the copy.  Maybe he didn't have

04:10 7    it or couldn't find it, and he asked me to send him

04:10 8    another copy at this time, but it was quite some time

04:10 9    after the agreement had been executed.

04:1010        And you see here where it says up here "To Joel

04:1011    Mandel" and it's crossed out?

04:1012        Q    Right.

04:1013        A    Joe Mandel is a business manager for Ari

04:1014    Emanuel, and so it may have been Joe Mandel wanted to see

04:1015    a copy of the agreement.  Tom either didn't have one or

04:1016    didn't want to search his files, so they just asked me to

04:1117    send it over.

04:1118        Q    Okay.  With reference then to the execution date

04:1119    of February 12, 2002, how much prior to that date did you

04:1120    have your first conversation with Mr. Emanuel regarding

04:1121    what was to become this joint venture?

04:1122        A    I don't know.  I don't know how -- it would have

04:1123    been sometime prior.

04:1124        Q    Had you known Mr. Emanuel prior to the time that

04:1125    you began discussing this agreement with him?

                                                                    81

                         U.S. LEGAL SUPPORT

Exhibit 14
227

04:11 1          A    No.

04:11 2          Q    Who proposed as between you and Mr. Emanuel that

04:11 3    the two of you enter into this joint venture agreement?

04:12 4          A    He originally sought me out and was interested

04:12 5    in forming a business relationship.

04:12 6          Q    And what did he say in that regard?

04:12 7          A    I don't remember specifically, but I can give

04:12 8    you the gist of the conversation.  He, I believe, had

04:12 9    read some -- an article or some articles on me in Variety

04:12 10   regarding high-profile intellectual property rights or

04:12 11   titles I'd been involved with, and he believed that there

04:12 12   was a synergy between the fact that he was one of the

04:13 13   founders of a very big talent agency with access to

04:13 14   talent and that I had knowledge and access to potentially

04:13 15   valuable intellectual property rights, because in the

04:13 16   entertainment industry the -- you know, the key elements

04:13 17   are intellectual property, talent and the financing.

04:13 18         Q    Prior to entering into the October -- rather,

04:13 19   the February 2, 2002 joint venture agreement with

04:13 20   Mr. Emanuel, did you tell him that you had acquired an

04:13 21   interest in the Shuster heirs' rights to Superman?

04:14 22         A    I did not.  I think that that

04:14 23   mischaracterizes -- I'm not sure if that correctly states

04:14 24   the relationship with the Shusters, but I did not mention

04:14 25   to him the Shusters.

                                                                    82

04:14 1     Q    Prior to February 2, 2002, did you have any

04:14 2     discussion with Mr. Emanuel concerning any Superman

04:14 3     rights?

04:14 4            MR. WILLIAMSON:  Objection.  Vague and

04:14 5     ambiguous.

04:14 6            THE WITNESS:  I don't believe so, and the

04:14 7     reason -- I don't have a specific recollection, but I'm

04:15 8     deducing -- when I answer, "I don't believe so," I'm

04:15 9     deducing that from if you turn to Bates stamp 7 of

04:1510     Exhibit 16, do you see where it says, "Legal

04:1511     Claims/Litigation"?

04:1512     Q    Yes.

04:1513     A    -- Appendix 1?  I believe Appendix 1, if you --

04:1514     Appendix 1 is an appendix of excluded -- things that are

04:1515     excluded from this agreement.  I'm trying to find it for

04:1516     you in the agreement.

04:1617            Yes, if you look at page 4 -- Bates stamp 4,

04:1618     it's page 3 of the agreement, Bates stamp 4, it's

04:1619     paragraph D Arabic 3 where it says, "With respect to the

04:1620     legal disputes identified in Appendix 1 C" -- that's not

04:1621     the paragraph.  There is another paragraph where I

04:1622     believe it excludes from the purview of IP Worldwide --

04:1623     Q    Are you referring to paragraph D 2 at Bates

04:1624     stamp EN 3?

04:1625     A    I don't think that -- my recollection, and I

                                                                83

U.S. LEGAL SUPPORT

Exhibit 14
229

```
04:16  1    would have to find the agreement, is that there is a

04:16  2    paragraph in the agreement that excludes certain items or

04:17  3    has special treatment for certain items listed in

04:17  4    Appendix 1, and in Appendix 1 -- in Appendix 1 C where it

04:17  5    says "Legal Claims/Litigation," the intention was to

04:17  6    exclude those things listed there from the purview of the

04:17  7    agreement, and it says "JS Claims," and that refers to

04:17  8    Joseph Shuster claims, and when you asked me whether I

04:17  9    had disclosed to Mr. Emanuel, I deduced the answer "I

04:17 10    don't believe so" because I used the initials -- it says,

04:17 11    "(initialed due to confidentiality)."  I used those

04:17 12    initials "JS" so as not to disclose the name Joseph

04:18 13    Shuster, and I believe that's further -- you know, this

04:18 14    agreement was entered into -- and it was probably

04:18 15    negotiated before that, but it was signed on February 12,

04:18 16    '02, and it is -- was certainly negotiated earlier than

04:18 17    that.  This is further indication that I regarded my

04:18 18    dealings with the Shusters as confidential, privileged

04:18 19    claims, legal claims.

04:18 20         Q    To summarize your testimony, is it your

04:18 21    testimony that the Shuster claims and whatever rights

04:18 22    specific had under the joint venture agreement were

04:19 23    expressly excluded from the operation of the February 2,

04:19 24    2002 joint venture?

04:19 25              MR. WILLIAMSON:  Objection.  Misstates the
```

                                                                    84

**U.S. LEGAL SUPPORT**

Exhibit 14
230

04:19 1    testimony.

04:19 2            THE WITNESS:  Yes, it was not part of IP

04:19 3    Worldwide.

04:19 4            If you look at on Bates -- page 1 of the

04:19 5    agreement, Bates stamp 2, I think one of the provisions

04:19 6    which talks about the appendix, it talks about the

04:19 7    contributions from PPC, and it says, "PPC's current IP

04:19 8    business," but then PPC stands for Pacific Pictures

04:20 9    Corporation, and then it says, "subject to...exclusions

04:20 10    per Appendix '1'..."

04:20 11            MR. BERGMAN:  Off the record.

04:20 12            (Discussion held off the record.)

04:28 13            (Recess.)

04:32 14            (Deposition Exhibit 17 marked.)

04:32 15            MR. BERGMAN:  Back on the record.

04:32 16    Q    I am not going to get to that right now.

04:32 17            If you recall, Mr. Toberoff, Kevin Marks

04:32 18    testified at his deposition concerning certain

04:32 19    communications that he had with you, and he -- his

04:32 20    records, and they were -- this particular call was

04:32 21    reflected on GTRB 600, reflected a call from you to

04:32 22    Mr. Marks on November 29, 2001.  Mr. Marks testified that

04:33 23    he did not return that particular call.

04:33 24            How did you know that Mr. Marks was involved in

04:33 25    the representation of the Siegel interest in Superman?

85

U.S. LEGAL SUPPORT

Exhibit 14
231

04:33 1    A    I had seen on the Internet I think it was one of

04:33 2    these comic book -- like a comic book journal had posted

04:33 3    the Siegels' termination notice or a copy of one of their

04:33 4    termination notices, and at the end of that notice the

04:33 5    name of their attorney who had done the termination

04:33 6    notice, Arthur Levine, and I believe I had his name and

04:33 7    address.  I'm not sure if the phone number was there, but

04:33 8    it may be.  And I spoke to Arthur Levine, and he in sum

04:34 9    and substance told me that he wasn't -- you know, had

04:34 10    done the termination but wasn't very active at that point

04:34 11    and said the lawyer representing the Siegels was Kevin

04:34 12    Marks.

04:34 13         Did you mention the date of that call?

04:34 14    Q    His phone log showed November 29, 2001.

04:34 15    A    I just want to check the date of my agreement

04:34 16    with the Shusters, the first one.

04:34 17    Q    That was November 23, 2001.

04:34 18    A    Yeah.

04:34 19    Q    So this came six days after --

04:34 20    A    I believe it was shortly after -- I called him

04:34 21    shortly after I made an agreement with the Shusters.

04:34 22    Q    Had you learned from the Shuster heirs that

04:35 23    there was -- that Kevin Marks represented the Siegels?

04:35 24    A    No.

04:35 25    Q    Okay.

86

U.S. LEGAL SUPPORT

Exhibit 14
232

04:35 1        A    It was from Arthur Levine.

04:35 2        Q    What was it that prompted you to call Mr. Marks?

04:35 3        A    I believe at that time I was just trying to find

04:35 4   out the status.

04:35 5        Q    Prior to the November 29, 2001 initial call to

04:35 6   Mr. Marks, had you and Mr. Emanuel discussed the Siegel

04:35 7   interest in Superman?

04:35 8             MR. WILLIAMSON:  Objection.  Attorney-client.

04:35 9             THE WITNESS:  Yeah.  Actually, at IP Worldwide I

04:35 10  was general counsel to IP Worldwide.  I handled all of

04:35 11  the contracts, anything legal, any negotiations, you

04:36 12  know, just like any other general counsel would for a

04:36 13  company, and so Ari's lawyer has asserted, and I believe

04:36 14  that's correct, that there was an attorney-client

04:36 15  relationship there and that my communications with Ari as

04:36 16  to, you know, things that he wanted to do would be

04:36 17  protected by the attorney-client privilege and attorney

04:36 18  work product.

04:36 19  BY MR. BERGMAN:

04:36 20       Q    Once again, you were a joint venturer with

04:36 21  Mr. Emanuel, were you not?

04:36 22       A    That's correct, but I was also part of the

04:36 23  company.  In other words, what I did for the company and

04:36 24  whether or not I was a joint venturer, the underlying

04:36 25  organization of those companies are different issues.

                                                              87

**U.S. LEGAL SUPPORT**

Exhibit 14
233

04:37 1          Q    Are you refusing to answer my last question

04:37 2    based on the attorney-client privilege?

04:37 3              MR. WILLIAMSON:  Which question?

04:37 4              THE WITNESS:  Which question?  I want to make

04:37 5    sure --

04:37 6              MR. BERGMAN:  Could you repeat the question?

04:37 7              THE WITNESS:  -- we are we referring to the same

04:37 8    question?

04:37 9              (Record read as follows:

04:35 10                  "Q    Prior to the November 29,

04:35 11             2001 initial call to Mr. Marks, had

04:35 12             you and Mr. Emanuel discussed the

04:35 13             Siegel interest in Superman?")

04:37 14             THE WITNESS:  That's privileged.  To answer your

04:37 15    question, yes.

04:37 16             (Unanswered question.)

04:37 17    BY MR. BERGMAN:

04:37 18         Q    That doesn't even come close to being

04:37 19    privileged.  The fact of discussing something doesn't ask

04:37 20    what you disclosed to him, what you told him, what you

04:37 21    advised him.

04:37 22         A    Normally an attorney would not disclose the

04:37 23    subject of discussions on which he's providing legal

04:37 24    advice.

04:38 25         Q    Do you stand by your refusal to answer that

                                                                    88

U.S. LEGAL SUPPORT

Exhibit 14
234

04:38 1    question?

04:38 2         A    Can you read the question back to me again?

04:38 3              (Record read as follows:

04:35 4                  "Q    Prior to the November 29,

04:35 5              2001 initial call to Mr. Marks, had

04:35 6              you and Mr. Emanuel discussed the

04:35 7              Siegel interest in Superman?")

04:38 8              THE WITNESS:  I can tell you that it's moot

04:38 9    because I don't recall a discussion with Mr. Emanuel

04:3810    regarding Superman, but if we had, the substance of those

04:3811    conversations would be privileged.

04:3812    BY MR. BERGMAN:

04:3813         Q    Mr. Marks testified that you called him again on

04:3914    or about February 6, 2002.  He pointed to a phone log

04:3915    which has been Bates stamped GTRB 604.  Mr. Marks

04:3916    testified that he returned your call that day or shortly

04:3917    afterwards.

04:3918              Can you tell me, please, to the best of your

04:3919    recollection and with as much specificity as you can what

04:3920    you said and what Mr. Marks said in that first telephone

04:3921    conversation?

04:3922              MR. WILLIAMSON:  Objection to the extent that

04:3923    he's claiming to testify as to what Mr. Marks testified

04:3924    in his deposition.

04:3925              If you have a recollection of what he's talking

                                                                        89

**U.S. LEGAL SUPPORT**

Exhibit 14
235

04:39 1    about, you can answer.

04:39 2          THE WITNESS:  Yeah, I'm not -- in -- I had the

04:39 3    opportunity to look over Mr. Marks' transcript after his

04:39 4    deposition, and there were certain -- it's not a major

04:39 5    point, but there were certain testimony as to dates where

04:40 6    he would say, "I believe we spoke one or two days after,"

04:40 7    and he would say "or subsequently," and so it wasn't

04:40 8    really -- I recall in reading his transcript that on some

04:40 9    of these conversations it was around that time, but it

04:4010    wasn't really firm.  In other words, he would start to

04:4011    give you the impression in his testimony that he spoke on

04:4012    the next day or two days after, but then he would say "or

04:4013    subsequently," so I have -- only to that extent I don't

04:4014    know if the dates are correct.

04:4015    BY MR. BERGMAN:

04:4016       Q   What do you recall being said by the two of you

04:4017    during your first telephone conversation?

04:4018       A   I -- to put it simply, he blew me off very

04:4019    politely.

04:4020       Q   What had you requested that he blew off?

04:4121       A   I don't specifically recall what I asked him,

04:4122    but it was similar to the first call where I was calling

04:4123    to know what the status was of the Siegels' rights, what

04:4124    the status was of their rights, and he politely blew me

04:4125    off, didn't want to tell me or talk to me, and got off

                                                              90

U.S. LEGAL SUPPORT

Exhibit 14
236

04:41 1    the phone.

04:41 2        Q   Did you ask him what the status of the Siegels'

04:41 3    discussions with DC Comics were?

04:41 4            MR. WILLIAMSON:  Objection.  Assumes facts not

04:41 5    in evidence.

04:41 6            THE WITNESS:  No, I don't believe I asked him

04:41 7    about that.

04:41 8    BY MR. BERGMAN:

04:41 9        Q   Do you recall Mr. Marks telling you in that

04:4110    first conversation that he was very far along with DC

04:4111    Comics and at a documentation phase?

04:4212        A   I don't recall --

04:4213            MR. WILLIAMSON:  Objection.  Marc, let me

04:4214    object.  Assumes facts not in evidence.  Vague and

04:4215    ambiguous.

04:4216            THE WITNESS:  I don't recall him -- whether or

04:4217    not he said DC Comics, and I don't recall him using those

04:4218    specific words.  He may have, but I don't recall that.  I

04:4219    don't recall the specifics of what he said, but I just

04:4220    recall the end result of him blowing me off.

04:4221    BY MR. BERGMAN:

04:4222        Q   What were the specifics of what you said?

04:4223        A   I just told you.  I was inquiring as to the

04:4224    status of the rights.  I didn't ask him about something

04:4225    specific.

                                                                91

U.S. LEGAL SUPPORT

Exhibit 14
237

04:42 1          Q    And all you can recall of that conversation is

04:42 2     that you asked him about the status of the rights?

04:42 3          A    Yes.  And he said he can't talk about that.  I

04:43 4     don't remember him saying something about -- I don't

04:43 5     recall him mentioning DC Comics specifically, the name DC

04:43 6     Comics, and I don't recall him saying those words

04:43 7     "documentation phase."  I don't recall the specifics of

04:43 8     the conversation.  I recall the result of the

04:43 9     conversation.

04:43 10         Q    Okay.  Have you told me everything you can

04:43 11    recall about your first conversation with Mr. Marks

04:43 12    concerning the Siegel interest?

04:43 13         A    Everything I can recall today, yes.

04:43 14         Q    Is there anything you could look to to refresh

04:43 15    your recollection as to what he or you said during that

04:43 16    conversation?

04:43 17         A    I don't know.  Maybe.

04:43 18         Q    Did you make any notes of the conversation?

04:43 19         A    No.

04:43 20         Q    Did you prepare a memorandum afterwards

04:43 21    reiterating what had been said?

04:43 22         A    I don't think so.

04:44 23         Q    Mr. Marks testified to having a second

04:44 24    conversation with you on or about July 30, 2002.

04:44 25              Do you recall speaking a second time with

                                                                    92

U.S. LEGAL SUPPORT

Exhibit 14
238

04:44  1    Mr. Marks?

04:44  2              MR. WILLIAMSON:  Objection to the extent it

04:44  3    misstates the record of Mr. Marks' testimony at his

04:44  4    deposition.

04:44  5              MR. BERGMAN:  What was that objection?

04:44  6              MR. WILLIAMSON:  I'm objecting to the extent

04:44  7    that it misstates the testimony of Mr. Marks at his

04:44  8    deposition.

04:44  9              MR. BERGMAN:  In what way does it misstate the

04:44 10    testimony?

04:44 11              MR. WILLIAMSON:  I don't know if it does or not.

04:44 12    We haven't seen the transcript.

04:44 13              MR. BERGMAN:  Then how can you object that it

04:44 14    misstates the testimony?

04:44 15              MR. WILLIAMSON:  Because I need to preserve it,

04:44 16    and I don't know what you are reading off of, I don't

04:44 17    know what representation you're making.  So if you want

04:44 18    to give us the deposition testimony as an exhibit, we'll

04:44 19    be happy to look at it.  To the extent you are not going

04:44 20    to, I'm going to object.

04:44 21              THE WITNESS:  Actually, again, this is one of

04:44 22    these areas where I believe his testimony is unclear as

04:44 23    to the date.  I'm not saying it's a big issue.  I'm just

04:45 24    saying it's unclear as to the date.  I'm not sure, in

04:45 25    reading his transcript, that conversation may have

                                                                      93

                        U.S. LEGAL SUPPORT


Exhibit 14
239

04:45 1    been -- what was the date you mentioned?

04:45 2    BY MR. BERGMAN:

04:45 3        Q    July 30.

04:45 4        A    May have been July 30th, or it may have been in

04:45 5    early August.

04:45 6        Q    Okay.  Whether it was --

04:45 7        A    I'm not -- I remember, in reading his

04:45 8    transcript, it was unclear to me what the dates were, and

04:45 9    I didn't have a specific recollection of the dates.

04:4510        Q    Okay.  Whether it was the last week in July or

04:4511    the first week in August, what do you recall saying and

04:4512    what do you recall Mr. Marks saying in that second phone

04:4513    conversation?

04:4514        A    I do not recall the specific words that were

04:4515    said.  I recall the substance of the conversation.

04:4516        Q    And what was the substance?

04:4517        A    And the substance or effect of the conversation

04:4518    was that whereas before he had totally, as I would say,

04:4619    blew me off, now, even though he chose his words

04:4620    carefully and was somewhat guarded, he was clearly -- his

04:4621    body language, if you will, to the extent there is body

04:4622    language in a telephone conversation, was make an offer.

04:4623    In other words, he indicated that the Siegel rights were

04:4624    available, and if there was an interest in those rights,

04:4625    you can make an offer, but he can't discuss anything with

94

04:46 1    me.  That was the sort of the substance and effect of the

04:46 2    conversation, but I don't recall the specific words used.

04:47 3        Q    At page 166 of Mr. Marks' deposition commencing

04:47 4    at line 10, I asked him the following question:

04:47 5            "Q    Can you tell me to the best of your

04:47 6    recollection what was said by each of you and Mr.

04:47 7    Toberoff in that conversation?

04:47 8            "A    I think Mr. Toberoff said he was --

04:47 9        wanted to check in with me to see where we

04:47 10       were in our dealings with DC Comics."

04:47 11           Stopping at that point, do you recall asking him

04:47 12   where he was in his dealings with DC Comics?

04:47 13       A    No, I don't recall referring to dealings.  I was

04:47 14   referring to the rights and whether those rights were

04:47 15   available.

04:47 16       Q    He goes on to say, quote, "And I think I told

04:47 17   him then that -- and I may have also said it in our first

04:47 18   conversation -- that we had a confidentiality agreement

04:47 19   with DC Comics, and I didn't feel at liberty to discuss

04:48 20   the status of our dealings with him."

04:48 21           Do you recall Mr. Marks telling you that?

04:48 22       A    I don't specifically recall him mentioning that.

04:48 23   He may have.

04:48 24       Q    Mr. Marks then goes on at line 20 of his

04:48 25   deposition at page 166, quote --

95

Exhibit 14
241

04:48 1         A    When I say, "He may have," he may have mentioned

04:48 2    to me that the reason he was -- in other words, he may

04:48 3    have said something like, "I'm not trying to be cagey,

04:48 4    but we have a confidentiality agreement," but I don't

04:48 5    specifically recall him saying that.  If he did, it was

04:48 6    in that context.

04:48 7         Q    He goes on to say, quote, line 20, page 166,

04:48 8    "Mr. Toberoff said, 'Can you tell me what DC Comics

04:48 9    offered you,' and I said, 'No.  We have a confidentiality

04:4910    agreement,'" close quote.

04:4911         Did you ask Mr. Marks in that conversation to

04:4912    tell you what DC Comics offered him?

04:4913         A    I -- again, I don't believe there were

04:4914    references to DC Comics.  I don't believe I knew at the

04:4915    time who -- I don't -- in other words, I don't believe at

04:4916    that time I knew that he was negotiating with DC Comics,

04:4917    so I don't believe there was a mention of DC Comics.

04:4918         Q    Mr. Marks' testimony goes on, line 23 of that

04:4919    same page, quote, "And I believe Mr. Toberoff said,

04:4920    'Would you be willing to enter into negotiations with

04:4921    me,' and I believe I said, 'Initiating negotiations, no.

04:5022    That's something that makes me very uncomfortable.  If

04:5023    you have an offer, present it to me, and I'll present it

04:5024    to the client,'" close quote.

04:5025         Do you recall saying to Mr. Marks whether he

                                                                96

U.S. LEGAL SUPPORT

Exhibit 14
242

04:50 1  would be willing to enter into negotiations with you?

04:50 2      A    Yeah, I don't speak that way, so I doubt that I

04:50 3  said, "Would you be willing to enter into negotiations

04:50 4  with me?"  It's just not my style.  I would speak more

04:50 5  directly.

04:50 6      Q    Well --

04:50 7      A    In other words, if you invite somebody to dance,

04:50 8  I would never say, "Would you be willing to dance with

04:50 9  me?"  I would say, "Do you want to dance?"

04:5010      Q    What did you say to Mr. Marks in substance as to

04:5011  whether he wanted to dance with you?

04:5012      A    I was using that as a metaphor.

04:5013      Q    I understand.

04:5014      A    The thrust of the conversation was I wanted to

04:5015  know -- I was interested in the rights, and I wanted to

04:5016  know if the rights were available or not, and, if they

04:5017  were available, would make an offer with respect to those

04:5018  rights, and he in essence said, "Yes, they are available.

04:5019  Make an offer."

04:5020      Q    As of July --

04:5021      A    And I may have inquired as to what his clients

04:5022  wanted for the rights or something of that nature, and he

04:5023  wouldn't give me any information.  He just said, "Make an

04:5024  offer."

04:5025      Q    As of the end of July 2002, had you had any

97

04:51 1    discussion with Peavy or Peary concerning Joanne or Laura

04:52 2    Siegel's interest?

04:52 3            MR. WILLIAMSON:  Objection.  Attorney-client.

04:52 4            THE WITNESS:  What are the dates?

04:52 5    BY MR. BERGMAN:

04:52 6        Q    The end of July 2002.

04:52 7        A    Can you repeat the question, please, or read it

04:52 8    back to me?

04:52 9        Q    As of the end of July 2002, had you had any

04:5210    discussion with Peary or Peavy concerning Joanne or Laura

04:5211    Siegel's interest in the Superman property?

04:5212        A    Those discussions would be privileged.  I'm not

04:5213    gonna answer questions about what discussions I had with

04:5214    the Shusters.  That's attorney-client privilege, attorney

04:5215    work product regarding the Siegels' interest.

04:5216            (Unanswered question.)

04:5217        Q    As of the end of July 2002?

04:5218        A    From the point I started speaking to them till

04:5319    the present, my discussions with them regarding the

04:5320    Siegels' interest, regarding their interest, regarding

04:5321    Superman, regarding that whole legal situation is

04:5322    attorney-client privileged and also protected by the work

04:5323    product doctrine.

04:5324        Q    Okay.  Mr. Marks went on to testify concerning a

04:5325    conference call that he had with you and Mr. Emanuel.

                                                                        98

04:53 1    The date of that conference call as set by Mr. Marks with

04:53 2    reference to his phone logs which were marked GTRB 616

04:53 3    was that the conversation occurred within a day or two of

04:53 4    August 7, 2002.

04:54 5          Prior to the time -- you do recall having a

04:54 6    conference call with Mr. Marks and Mr. Emanuel, don't

04:54 7    you?

04:54 8    A    I do.  As far as a date, again the date -- I

04:54 9    have a -- I originally called -- this is just commenting

04:5410    on the date.  I originally recall that my assistant I had

04:5411    mentioned before, Andrew, I had asked him to set up a

04:5412    conference call, and I believe that was the reference in

04:5413    Marks' -- the exhibit to Marks' deposition, and that was

04:5414    noted -- that initial referenced conference call, that's

04:5515    the one where he talks about it's "20," and it's crossed

04:5516    out and says, "5 to 10 minutes," something like that, on

04:5517    the exhibit.  That was Andrew calling to set up a

04:5518    conference call.

04:5519          But I have a specific recollection that after I

04:5520    tried to get dates from the Marks side -- or Andrew tried

04:5521    to get dates from Kevin Marks' office, it was very hard

04:5522    to pin down Ari Emanuel for that conference call.

04:5523          So just talking about the date, I know he said

04:5524    it would have happened one or two days after that.  I

04:5525    think that conference call could have happened 10 days

99

| | |
|---|---|
| 04:55 | 1 | after that. |
| 04:55 | 2 | Q   Okay. |
| 04:55 | 3 | A   Because I remember specifically being a little |
| 04:55 | 4 | frustrated with Ari Emanuel's assistant because they kept |
| 04:55 | 5 | saying, "Yes, and I'll have to speak to him," and he |
| 04:55 | 6 | wouldn't come back to me with a date.  So that's all. |
| 04:55 | 7 | Q   Prior to that conference call, whether it |
| 04:55 | 8 | occurred on August 7 or 10th or 15th or whenever -- |
| 04:56 | 9 | A   Right.  Let's say mid August. |
| 04:56 | 10 | Q   Okay. |
| 04:56 | 11 | -- had you taken any steps to place a monetary |
| 04:56 | 12 | value on the Siegel interest? |
| 04:56 | 13 | MR. WILLIAMSON:  Objection.  Vague and |
| 04:56 | 14 | ambiguous, and objection on attorney-client, work product |
| 04:56 | 15 | grounds. |
| 04:56 | 16 | Instruct you not to answer. |
| 04:56 | 17 | (Instruction not to answer.) |
| 04:56 | 18 | THE WITNESS:  I'm going to follow that |
| 04:56 | 19 | instruction. |
| 04:56 | 20 | BY MR. BERGMAN: |
| 04:56 | 21 | Q   To your knowledge had Mr. Emanuel taken any |
| 04:56 | 22 | steps to place a monetary value on the Siegel interest in |
| 04:56 | 23 | Superman prior to the conference call? |
| 04:56 | 24 | MR. WILLIAMSON:  Objection to the extent it |
| 04:56 | 25 | calls for attorney work product, and objection on the |

100

U.S. LEGAL SUPPORT

Exhibit 14
246

04:56 1    grounds it calls for speculation.

04:56 2           THE WITNESS:  And also attorney-client

04:56 3    privilege, because if I knew it, it would be through

04:56 4    communications by Mr. Emanuel.

04:56 5           (Unanswered question.)

04:56 6    BY MR. BERGMAN:

04:56 7      Q   Mr. Marks testified with respect to that

04:56 8    conference call beginning at page 168 of his deposition,

04:57 9    line 12 -- line 11, "I think Mr." -- I had asked him what

04:5710    was said in the conversation.  Quote, "I think

04:5711    Mr. Toberoff may have very briefly referenced past

04:5712    conversations, and then I believe it was Mr. Emanuel who

04:5713    explained that either they or some other people or

04:5714    perhaps some members of the Endeavor Talent Agency had

04:5715    set up a fund or were in the process of setting up a fund

04:5716    to acquire intellectual property rights which they would

04:5717    then package with clients from the Endeavor Talent

04:5718    Agency."

04:5719           Do you recall Mr. Emanuel stating that in

04:5720    substance during the conversation?

04:5721      A   Not specifically, no.  He may have.

04:5722      Q   Okay.  Do --

04:5823      A   I recall him, you know, doing the equivalent of

04:5824    in a meeting what they call warming up the room where --

04:5825    which he's very good at, in which he sort of just spoke

                                                              101

04:58 1    generally, but I don't specifically recall that.  He may

04:58 2    have.

04:58 3        Q    Had you or Mr. Emanuel set up a fund to acquire

04:58 4    intellectual property rights at that time?

04:58 5        MR. WILLIAMSON:  Objection.  Attorney-client

04:58 6    privilege.  Attorney work product.

04:58 7        THE WITNESS:  Without a waiver of those

04:58 8    privileges, I can speak for myself.  I had not set up a

04:58 9    fund, no.

04:5810    BY MR. BERGMAN:

04:5811        Q    To your knowledge had Mr. Emanuel?

04:5812        A    I believe Endeavor or Mr. Emanuel had a fund and

04:5913    access to a lot of financing.

04:5914        Q    Continuing with Mr. Marks' testimony concerning

04:5915    that conference call between you and he and Mr. Emanuel,

04:5916    I'm at page 169 of his deposition, line 1, quote, "And

04:5917    I'm not sure who spoke, but they made a proposal of $15

04:5918    million and what was described as a meaningful back end,

04:5919    which I understood to be a contingent compensation

04:5920    position or a royalty position in the exploitation of the

04:5921    property," close quote.

04:5922        Did you or Mr. Emanuel propose acquiring the

04:5923    Siegel rights to Mr. Marks for $15 million together with

04:5924    a meaningful back end?

04:5925        A    I wasn't the one who made that offer.

                                                                      102

U.S. LEGAL SUPPORT

Exhibit 14
248

| | |
|---|---|
| 05:00 | 1 |

Mr. Emanuel made that offer, and I specifically remember

that, because I remember when he was talking about the

back end, I remember thinking it was just something odd,

the way he had mentioned the back end.

    Q   Was --

    A   But I remember that he was the one who stated

that.

    Q   Was the offer by Mr. Emanuel for $15 million?

    A   Yes.

    Q   And did he mention what he had in mind with

respect to the meaningful back end?

    A   No.

        MR. WILLIAMSON:  Objection.  Indefinite as to

time and place.  Are you referring to that conversation?

        MR. BERGMAN:  Yes.

        MR. WILLIAMSON:  Okay.

        THE WITNESS:  No.

BY MR. BERGMAN:

    Q   Okay.  Do --

    A   I believe the offer was that if the fixed amount

was acceptable, that we would go on to work out a back

end.

    Q   Okay.  Mr. Marks goes on to testify -- and I am

omitting some of his testimony.  I'm at line 16 on page

169 -- "And then I," Mr. Marks, "asked if this was a

103

Exhibit 14
249

05:01 1  proposal that was conditioned on their doing due

05:01 2  diligence about the rights, and they said again in

05:01 3  substance and effect, 'No, it's not.  We've done our due

05:01 4  diligence already.  This is the offer.'"

05:01 5        Do you recall that being said during this late

05:01 6  July or mid August telephone conversation?

05:01 7      A   I don't recall that specifically, but it doesn't

05:01 8  sound like something I would say.

05:02 9      Q   Do you recall --

05:0210      A   That sounds like an agent talking.

05:0211      Q   Do you recall anything else about the conference

05:0212  call between you, Mr. Marks and Mr. Emanuel in mid

05:0213  August?

05:0214      A   Not sitting here, no.

05:0215      Q   Again, did you make any notes of that

05:0216  conversation?

05:0217      A   I may have.  I don't know.  It wasn't a long

05:0218  conversation, nor a complicated one, so my guess is I did

05:0219  not make notes.  I didn't -- there weren't any in the

05:0220  file.

05:0221      Q   Okay.  Mr. Marks testified, again utilizing his

05:0222  phone register at page 617, that there was a call from

05:0223  you subsequent to the conference call on August 29, and

05:0324  he couldn't recall whether or not he had responded to

05:0325  that call.

                                                              104

Exhibit 14
250

05:03 1        Do you recall calling Mr. Marks following the

05:03 2    conference call?

05:03 3        A    I don't.  When I read that in the transcript, I

05:03 4    was trying to think what that was and whether we spoke,

05:03 5    and I don't have any -- I don't have a recollection of

05:03 6    speaking to him after that.

05:03 7        Q    Okay.  He testifies that you and he did not

05:03 8    speak after that but that you had called him, according

05:03 9    to his phone logs, on August 29.

05:03 10       A    I don't have a specific recollection of calling

05:03 11   him.  I may have.

05:03 12       Q    Following the conference call -- strike that.

05:04 13            Had Mr. Emanuel discussed the $15 million figure

05:04 14   with you prior to the conference call?

05:04 15            MR. WILLIAMSON:  Objection --

05:04 16            THE WITNESS:  I --

05:04 17            MR. WILLIAMSON:  -- attorney -- objection.

05:04 18   Attorney-client privilege.  Work product.  I instruct you

05:04 19   not to answer.

05:04 20            (Instruction not to answer.)

05:04 21            THE WITNESS:  I'm going to follow that

05:04 22   instruction.

05:04 23   BY MR. BERGMAN:

05:04 24       Q    In relation to -- and you can answer this in

05:04 25   relation to the mid August conference call if you want or

105

**U.S. LEGAL SUPPORT**

Exhibit 14
251

05:04 1    in reference to any other facts if you want.  When did

05:04 2    you have your very first conversation with either Laura

05:04 3    or Joanne Siegel?

05:05 4        A    What was the first part of the question?  In

05:05 5    relation to what?

05:05 6        Q    I was suggesting that if you could answer that

05:05 7    question with respect -- in relation to the mid August

05:05 8    telephone conversation that you had, whether it was a

05:05 9    month or two months afterwards, but my --

05:05 10       A    Are you talking about the conversation with --

05:05 11   the conference call with Ari Emanuel and Kevin Marks?

05:05 12       Q    Correct.

05:05 13       A    It was long after that.  I believe it was the

05:05 14   end of October of that year.

05:05 15       Q    End of October 2002?

05:05 16       A    Yes, mid to end, sometime in October.  I'm

05:06 17   not -- I believe it was sometime in October, and the

05:06 18   basis of that belief is the agreement between the Siegels

05:06 19   and IP Worldwide --

05:06 20       Q    Is dated October -- as of October 3.

05:06 21       A    Right.  And it was signed towards the end of

05:06 22   October.  So I believe the initial contact was early

05:06 23   October.

05:06 24            Sometimes when I do agreements, when they're

05:06 25   dated as of -- when they're dated as of, I -- that's when

                                                              106

U.S. LEGAL SUPPORT

Exhibit 14
252

| | |
|---|---|
| 05:06 1 | there were sort of the parties came together.  So I |
| 05:06 2 | believe the initial conversation may have been like right |
| 05:07 3 | at the beginning of August -- I mean, excuse me, right at |
| 05:07 4 | the beginning of October 2003. |
| 05:07 5 | Q    How did that initial conversation, whenever it |
| 05:07 6 | occurred, come about?  Who called who? |
| 05:07 7 | A    Joanne Siegel called me. |
| 05:07 8 | Q    And did she say how she had gotten your name or |
| 05:07 9 | number? |
| 05:07 10 | A    Yes.  She said she had gotten it from Jean, Jean |
| 05:07 11 | Peavy. |
| 05:07 12 | Q    And what in substance did Laura Siegel say to |
| 05:07 13 | you at that time? |
| 05:07 14 | A    It was Joanne, actually. |
| 05:08 15 | Q    Oh, I'm sorry. |
| 05:08 16 | MR. WILLIAMSON:  Objection.  Attorney-client. |
| 05:08 17 | THE WITNESS:  Without waiver of the privilege, I |
| 05:08 18 | can just tell you the introductory remarks were that she |
| 05:08 19 | had gotten my number from Jean Peavy, something to the |
| 05:08 20 | effect that "Jean Peavy likes you a lot and is very -- |
| 05:08 21 | highly recommended you," something of that nature, and |
| 05:08 22 | that she was looking for an attorney and would be |
| 05:08 23 | interested to talk to me about representing her.  That |
| 05:08 24 | was the sum and substance of it. |
| 05:08 25 | BY MR. BERGMAN: |

107

**U.S. LEGAL SUPPORT**

Exhibit 14
253

05:08 1        Q    And did you tell Joanne Siegel in that

05:08 2    conversation that you had been speaking with Mr. Marks?

05:09 3        A    I don't recall whether I told her that in that

05:09 4    conversation or not.  I may have.

05:09 5        Q    Do you recall telling her in that initial

05:09 6    conversation that you had been interested in acquiring

05:09 7    her rights?

05:09 8        A    I may have.  I recall when she called me, I was

05:09 9    surprised, you know, because it's Jerry Siegel's widow

05:09 10   and because of the sort of less than enthusiastic

05:09 11   demeanor of Mr. Marks -- actually I shouldn't say -- in

05:09 12   other words, he was just very -- Mr. Marks was very

05:10 13   sparse, I should say, and polite in his communication but

05:10 14   didn't exhibit, you know -- the first conversation was he

05:10 15   was very -- like I said, he blew us off; the second

05:10 16   conversation, he was much more receptive, but all of a

05:10 17   sudden I was getting a call from Joanne Siegel.  So I may

05:10 18   have mentioned at that time that I had been in contact

05:10 19   with Kevin Marks, but I don't specifically recall.

05:10 20       Q    During the period from the conference call with

05:10 21   Mr. Emanuel and Mr. Marks until the first telephone call

05:10 22   from Joanne Siegel, had you done anything to inquire

05:10 23   about the offer which you had made to Mr. Marks or which

05:10 24   Mr. Emanuel had made to Mr. Marks?

05:11 25       A    I don't --

                                                              108

**U.S. LEGAL SUPPORT**

Exhibit 14
254

05:11 1          MR. WILLIAMSON:  Objection.  Vague and

05:11 2     ambiguous.

05:11 3          THE WITNESS:  I don't specifically recall, but

05:11 4     it may have been that -- what was in his log where he

05:11 5     said he didn't believe we spoke, but there was a call

05:11 6     registered, so I may have called him for that purpose,

05:11 7     but I don't specifically recall that phone call, probably

05:11 8     because he didn't return it.

05:11 9     BY MR. BERGMAN:

05:11 10         Q    What else do you recall of the first

05:11 11    conversation with Joanne Siegel?

05:11 12         A    That's it.

05:11 13         Q    How many days -- how did the conversation end?

05:11 14         A    I believe we set an appointment to meet.  I'm

05:11 15    not certain, but I believe -- I have a vague recollection

05:11 16    of meeting with Joanne and I believe Laura for lunch.

05:11 17         Q    Approximately --

05:11 18         A    We met in person.

05:11 19         Q    Approximately how long after that first call

05:12 20    from Joanne?

05:12 21         A    Right away.

05:12 22         Q    Within a day or two?

05:12 23         A    I believe so.

05:12 24         Q    And where did you meet with them for lunch?

05:12 25         A    I don't recall.

109

**U.S. LEGAL SUPPORT**

Exhibit 14
255

```
05:12 1        Q    Would you tell me to the best of your

05:12 2   recollection what was said by each of you at that

05:12 3   meeting?

05:12 4               MR. WILLIAMSON:  Objection.  Attorney-client.

05:12 5               THE WITNESS:  No, I'm not going to tell you

05:12 6   that, because after she told me she's interested in my

05:12 7   providing legal services to her, even at that stage those

05:12 8   conversations are protected by the attorney-client

05:12 9   privilege.  I gave you the subject matter, but...

05:1210              (Unanswered question.)

05:1211   BY MR. BERGMAN:

05:1212        Q    Did you at any time tell either Joanne or Laura

05:1213   Siegel that Mr. Emanuel had offered $15 million to

05:1214   acquire their rights?

05:1315        A    Again, our -- those conversations at that point

05:1316   would be privileged.  Those communications between me and

05:1317   her would be privileged.

05:1318              (Unanswered question.)

05:1319        Q    Did you at any time disclose to either of the

05:1320   Siegels that you had been inquiring to purchase their

05:1321   rights?

05:1322        A    Again, my -- you just asked me this same

05:1323   question, so I would say my answer is the same, but I

05:1324   believe, without disclosing my communications or their

05:1325   communications to me on that subject, I believe Mr. Marks
```

110

**U.S. LEGAL SUPPORT**

Exhibit 14
256

05:13 1    testified that he had disclosed that to them.  I believe.

05:14 2    I'd have to review his transcript.

05:14 3         Q    Okay.

05:14 4         A    So I believe they knew about that, but I'm not

05:14 5    going to disclose the substance of my communications with

05:14 6    them.

05:14 7              (Unanswered question.)

05:14 8         Q    What had occurred in the period between mid

05:14 9    August to early October which changed your intentions

05:14 10   from acquiring the Siegel interest to representing the

05:14 11   Siegel interest?

05:14 12             MR. WILLIAMSON:  Objection.  Misstates

05:14 13   testimony.

05:14 14             THE WITNESS:  Yeah, I wouldn't -- you say

05:15 15   changed my intentions.

05:15 16   BY MR. BERGMAN:

05:15 17        Q    Well --

05:15 18        A    Like I said, I received a phone call from Joanne

05:15 19   Siegel, and she was looking for new representation, and

05:15 20   it was her intention, and I agreed to represent her.

05:15 21             Off the record.

05:16 22             (Discussion off the record.)

05:16 23             MR. BERGMAN:  I previously marked a document as

05:16 24   Exhibit 17, and I will get back to it in a moment, but

05:16 25   for now I am going to ask the court reporter to mark as

111

**U.S. LEGAL SUPPORT**

Exhibit 14
257

05:16 1    Exhibit 18 the October 3, 2002 agreement between the

05:16 2    Siegels and an entity identified as IPW.

05:16 3         (Deposition Exhibit 18 marked.)

05:17 4         MR. WILLIAMSON:  I would just like to state for

05:17 5    the record that the caption on the page is actually "IP

05:17 6    Worldwide" for Exhibit 18.

05:17 7         MR. BERGMAN:  Well, that is what appears at the

05:17 8    top of the page, and the first paragraph refers to "IPW."

05:17 9    I don't know if they're the same company, and I am going

05:1710   to ask Mr. Toberoff that question in a moment.

05:1711        THE WITNESS:  Actually, the first paragraph

05:1712   says, "...agreement and understanding between you

05:1713   ('Owner') and us..."  it merely uses "IPW" as a defined

05:1714   term referring to us, and us is IP Worldwide.

05:1715   BY MR. BERGMAN:

05:1716   Q    So this agreement -- the IP party to this

05:1717   agreement is IP Worldwide, LLC --

05:1718   A    Correct.

05:1719   Q    -- as opposed to IPW, LLC.

05:1720        Is that correct?

05:1721   A    Correct.

05:1722   Q    Okay.  And that is your signature at IPW 4?

05:1823   A    Correct.

05:1824   Q    And I note that the agreement was signed by the

05:1825   Siegels on October 23, and is it your best recollection,

                                                              112

Exhibit 14
258

05:18 1    Mr. Toberoff, that within three weeks of your first

05:18 2    communication from the Siegels, you entered into this

05:18 3    agreement with them?

05:18 4            MR. WILLIAMSON:  Objection.  Misstates prior

05:18 5    testimony.

05:18 6            THE WITNESS:  I believe an agreement was -- yes,

05:18 7    I believe the agreement -- my general recollection was

05:18 8    that the time between meeting and entering into an

05:18 9    agreement was a fairly compressed time, so three weeks

05:19 10   would not surprise me.

05:19 11   BY MR. BERGMAN:

05:19 12       Q    Okay.  From the time of your lunch meeting with

05:19 13   Joanne and Laura Siegel until October 23 of 2002, did you

05:19 14   have any further meetings with them?

05:19 15       A    I may have.  I don't recall if we had further.

05:19 16   It may have been telephone conversations.

05:19 17            And when you say "meetings," I take it you mean

05:19 18   in-person meetings?

05:19 19       Q    Yes.

05:19 20       A    I don't recall.  We may have had telephone

05:19 21   conversations.

05:19 22       Q    Do you specifically recall telephone

05:19 23   conversations with them during that period?

05:19 24       A    I don't.  I don't.

05:19 25       Q    Were the Siegels represented by independent

                                                                    113

**U.S. LEGAL SUPPORT**

Exhibit 14
259

| | |
|---|---|
| 05:19 1 | counsel in connection with this agreement? |
| 05:19 2 | A  I believe, yes. |
| 05:19 3 | Q  Who was that? |
| 05:19 4 | A  George -- last name starts with a Z, George |
| 05:20 5 | Zadorozny.  I'm not sure how to spell it. |
| 05:20 6 | Q  And did you negotiate with that lawyer? |
| 05:20 7 | A  I can't say for sure.  I believe so, but I... I |
| 05:20 8 | believe so.  The reason I can't say for sure is I also -- |
| 05:20 9 | when I entered into the retainer agreement with the |
| 05:21 10 | Siegels, I specifically recall negotiating with |
| 05:21 11 | Mr. Zadorozny, and I believe Mr. Zadorozny was involved |
| 05:21 12 | in this agreement as well, but I don't -- I don't recall |
| 05:21 13 | if -- I believe I did, but I don't have a specific |
| 05:21 14 | recollection of it. |
| 05:21 15 | Q  And when did you enter into a retainer agreement |
| 05:21 16 | with the Siegels? |
| 05:21 17 | A  Before -- definitely before we filed suit, and I |
| 05:21 18 | believe it was...  I can't give you a date. |
| 05:22 19 | Q  Were there any prior drafts -- |
| 05:22 20 | A  I'd have to look at the -- I'd have to check my |
| 05:22 21 | file. |
| 05:22 22 | Q  Okay.  Were there any prior drafts of the |
| 05:22 23 | October 3, '02 agreement prior to Exhibit 18? |
| 05:22 24 | A  Yes.  It went through various drafts. |
| 05:22 25 | Q  And -- |

114

**U.S. LEGAL SUPPORT**

Exhibit 14
260

05:22 1      A   The Siegels are very specific.

05:22 2      Q   And what aspects of it were revised by the

05:22 3 Siegels?

05:22 4      A   I don't specifically remember the aspects.  I

05:22 5 just remember several drafts and several rounds of

05:22 6 comments and them being very specific and, you know,

05:22 7 focused on every word.

05:22 8      Q   And all of that occurred between the period from

05:22 9 October 3 to October 23?

05:22 10      A   Yes, I believe so.  I think it went back and

05:22 11 forth very quickly.

05:23 12      Q   Paragraph 2 of Exhibit 1 provides in part that,

05:23 13 quote, "IPW will furnish and provide the legal services

05:23 14 of Marc Toberoff Esq., and the business services of Ariel

05:23 15 Emanuel and IPW's support staff and employ its network of

05:23 16 business relationships and resources to market and

05:23 17 negotiate the sale, license," et cetera, "of the

05:23 18 rights..."

05:23 19      Who was IPW's support staff that is referred to

05:23 20 in paragraph 2 of Exhibit 18?

05:23 21      A   Okay.  When you say "IPW," you mean IP

05:23 22 Worldwide?  I think for clarity --

05:23 23      Q   I am quoting.

05:23 24      A   I know, but for a clear record you should

05:23 25 probably say IP Worldwide, because when you hear the

115

U.S. LEGAL SUPPORT

Exhibit 14
261

05:23 1    record --

05:24 2         Q    Okay.  I didn't want to modify the text of the

05:24 3    document.

05:24 4              Who was IP Worldwide's support staff at that

05:24 5    point?

05:24 6         A    As I said, we had two employees at the time, but

05:24 7    since Ari Emanuel had the entire Endeavor agency, three

05:24 8    floors of the -- of offices filled with people --

05:24 9         Q    And were --

05:24 10        A    -- even though they were not technically

05:24 11   employees of IPW -- IP Worldwide, IP Worldwide could draw

05:24 12   on that staff for support services.

05:24 13        Q    And did it in fact draw upon that staff for

05:24 14   support?

05:24 15        A    Yeah.  Yes, I should say.

05:24 16        Q    And who at Endeavor did it draw upon?

05:24 17        A    As needed, certain questions about transactional

05:25 18   things, meaning of terms.  You know, Tom McGuire was very

05:25 19   knowledgeable in making entertainment deals, a

05:25 20   transactional lawyer, their general counsel.  They had a

05:25 21   video game person.  They had a television person.  They

05:25 22   had a statistical analyst.  They had an in-house

05:25 23   investment banker.

05:25 24        Q    As of the time that you signed Exhibit 18,

05:25 25   Mr. Toberoff, had you seen Marks' October 19, 2001 letter

                                                              116

05:25 1    to John Schulman?

05:25 2             MR. WILLIAMSON:  Objection.  Assumes facts not

05:25 3    in evidence.  Lacks foundation.

05:25 4             THE WITNESS:  I hadn't seen any letters.

05:26 5             Could you repeat the question.

05:26 6    BY MR. BERGMAN:

05:26 7        Q    Yes.  As of the time that you signed this

05:26 8    agreement, which I presume was sometime after October 3

05:26 9    and prior to October 23 or around October 23, had you

05:2610    seen the letter sent by Mr. Marks to John Schulman dated

05:2611    October 19, 2001?

05:2612        A    I don't believe so.

05:2613        Q    Had you seen --

05:2614        A    And I also don't believe the Siegels -- just

05:2615    knowing the Siegels, I don't believe that they would have

05:2616    been quite so forthcoming with information prior to

05:2617    actually having a signed agreement.

05:2618        Q    So is it your best recollection that you had not

05:2619    seen the October 19th letter prior to executing Exhibit

05:2720    18?

05:2721        A    Like I said, I don't know if I did or not, but I

05:2722    don't have a recollection of it.  I'd have to --

05:2723        Q    Had you seen the --

05:2724        A    If you showed me something to refresh that

05:2725    recollection, but I don't recall seeing that.

117

**U.S. LEGAL SUPPORT**

Exhibit 14
263

05:27 1          Q    Had you --

05:27 2          A    In other words, I can't put a date -- I can't

05:27 3     put a date on when I saw that particular letter.

05:27 4          Q    Well, I'm not asking for the date.  I'm

05:27 5     asking --

05:27 6          A    No, I can't even put a general -- I would have

05:27 7     trouble nailing down the time when I first saw that

05:27 8     letter.

05:27 9          Q    Prior to the time that you executed Exhibit 18,

05:2710     had you seen any documents that had been exchanged

05:2711     between the Siegels and DC Comics?

05:2812          A    I don't recall seeing those documents.  I know

05:2813     the documents you're referring to because they're part of

05:2814     the documents in the case, in the litigation, but I don't

05:2815     recall seeing those documents, no.

05:2816          Q    Prior to the time that you executed Exhibit 18,

05:2817     had the Siegels told you what the DC Comics offer

05:2818     generally consisted of?

05:2819               MR. WILLIAMSON:  Objection.  Attorney-client.

05:2820               THE WITNESS:  That would be privileged.

05:2821               (Unanswered question.)

05:2822     BY MR. BERGMAN:

05:2823          Q    No, that wouldn't be privileged if they had told

05:2824     you what the documents consisted of, what the letter

05:2825     said.

                                                                118

05:28 1          A    I disagree.

05:28 2          Q    Okay.

05:28 3          A    Whether or not they -- the substance -- you're

05:28 4    asking a question which goes to the substance of my

05:28 5    communications with the Siegels, so I believe that would

05:28 6    be privileged.

05:28 7          Q    Has IP Worldwide advanced or loaned any funds to

05:28 8    either of the Siegels since October 3, 2002?

05:29 9              MR. WILLIAMSON:  Objection.  Vague and

05:29 10   ambiguous.

05:29 11             THE WITNESS:  No.

05:29 12   BY MR. BERGMAN:

05:29 13         Q    Had any of your other entities?

05:29 14             MR. WILLIAMSON:  Objection.  Vague and

05:29 15   ambiguous.

05:29 16             THE WITNESS:  No.

05:29 17   BY MR. BERGMAN:

05:29 18         Q    Have you personally?

05:29 19         A    No.

05:29 20         Q    Okay.  Paragraph 5 of the agreement provides for

05:29 21   an 18-month term.  Who had suggested a term of 18 months?

05:29 22         A    They did.

05:29 23         Q    Did they say why?

05:29 24         A    No.  I believe a _I requested_ longer term, and I don't recall

05:29 25   what the longer term was, but it may have been 24 months,

                                                              119

Exhibit 14
265

05:29 1    and I remember they didn't want it to be 24 months.

05:29 2         Q    Paragraph 6 provides for a 10 percent fee to IP

05:29 3    Worldwide.  Was there any negotiation of that percentage?

05:30 4         MR. WILLIAMSON:  Objection to the extent the

05:30 5    document speaks for itself, and attorney-client

05:30 6    privilege.

05:30 7         THE WITNESS:  I can answer that question.  I

05:30 8    believe -- I -- my recollection is something more than

05:30 9    that was not proposed by us.  I believe that was

05:3010    proposed, and they said okay to that.

05:3011    BY MR. BERGMAN:

05:3012         Q    Did the Siegels state in substance that that's

05:3013    twice as much as they were paying Gang, Tyre?

05:3014         A    No, but I think the rationale for that was that

05:3015    Gang, Tyre -- I don't know how they rationalized it, but

05:3016    I believe the rationale for that in this agreement was

05:3117    that there are transactional attorneys in the

05:3118    entertainment business that have a business model where

05:3119    they work on 5 percent, and they do a lot of

05:3120    entertainment transactions, and the business model of

05:3121    agencies like Endeavor is 10 percent.  So here they were

05:3122    getting both legal expertise and then Ari's dealmaking

05:3123    expertise, and it was still not greater than the 10

05:3124    percent Endeavor would or a big agency like Endeavor or

05:3125    CAA would charge them.

                                                              120

U.S. LEGAL SUPPORT

Exhibit 14
266

05:31 1          MR. BERGMAN:  Would you mark as Exhibit 19 a

05:31 2  document -- or what appears to be a draft dated November

05:32 3  26, 2002, Bates stamped 1882.

05:32 4          (Deposition Exhibit 19 marked.)

05:32 5  BY MR. BERGMAN:

05:32 6      Q    Was this draft, Exhibit 19, ever signed,

05:32 7  Mr. Toberoff?

05:32 8      A    No.

05:32 9      Q    In the first paragraph there is a statement that

05:3210  reads in part, quote, "... this is to confirm that we

05:3211  have disclosed to you and discussed the following

05:3212  proposed actions that may pose potential conflicts of

05:3213  interest or the appearance of potential conflicts of

05:3314  interest..."  It then goes on.

05:3315          What were the potential conflicts of interest

05:3316  referred to in this document?

05:3317      A    I believe that this was sort of an opening

05:3318  paragraph for what is then discussed below regarding

05:3319  Michael Siegel.

05:3320      Q    And what was the potential conflict that arose

05:3321  with IPW -- IP Worldwide entering into negotiations with

05:3322  Michael Siegel?

05:3323      A    I don't know if there was any potential -- I

05:3324  don't know if there was a actual conflict, but it

05:3325  appeared to be a subject of potential conflict, you know,

                                                              121

05:34 1    within a broad definition of potential conflict, and

05:34 2    that's why -- that was the reasoning for having this

05:34 3    disclosure and conflict waiver.

05:34 4        Q   And again, what was the potential conflict,

05:34 5    though?   What was it?

05:34 6        A   I don't know.  I'd have to analyze it, but it

05:34 7    seems to me like an area where there could be a potential

05:34 8    conflict.  If Ari Emanuel -- it seemed to me if Ari

05:34 9    Emanuel purchased Michael Siegel's interest but was also

05:34 10   representing ~~him~~ them, then he himself could have an interest

05:34 11   that could pose a potential conflict.

05:35 12       Q   Did IP Worldwide enter into negotiations with

05:35 13   Michael Siegel to acquire his 25 percent share?

05:35 14           MR. WILLIAMSON:  Objection.  Vague and

05:35 15   ambiguous.  Indefinite as to time and place as well.

05:35 16           THE WITNESS:  Not really.  What happened was

05:35 17   this was initially set forth like this, and then the

05:35 18   situation changed where it would really be Ari Emanuel

05:35 19   personally purchasing Michael Siegel's interest, not IP

05:35 20   Worldwide.  I believe the Siegels didn't want -- I'm not

05:35 21   sure about this, but I believe that maybe because the

05:35 22   Siegels didn't want IP Worldwide to hold that interest.

05:36 23   BY MR. BERGMAN:

05:36 24       Q   Were you told that by any counsel for the

05:36 25   Siegels?

                                                                    122

**U.S. LEGAL SUPPORT**

Exhibit 14
268

05:36 1          A    I don't recall counsel telling me that, but I

05:36 2     recall -- there is a document after this in which that

05:36 3     document I believe reflects -- this one says, "IPW will

05:36 4     enter into negotiations..."  Another document is very

05:36 5     specific as to Ari Emanuel I believe purchasing the

05:36 6     rights, and Ari Emanuel can't do this and he can't do

05:36 7     that.  There were a number of restrictions in the other

05:36 8     document that were insisted upon by the Siegels prior to

05:36 9     giving their consent.

05:37 10          Q    Did the Siegels say why they didn't want IP

05:37 11    Worldwide to negotiate with Siegel -- with Michael

05:37 12    Siegel?

05:37 13          A    I think the focus was less on negotiate as

05:37 14    opposed to if Michael Siegel's interest was purchased,

05:37 15    who would own it.  I think that was -- if I saw the other

05:37 16    document, I could probably speak a little more clearly

05:37 17    about it.

05:37 18          Q    Okay.

05:37 19          Well, would you mark as Exhibit 20 what appears

05:37 20    to be a further draft of this document, which is also

05:37 21    dated December 16, 2002.

05:37 22          (Deposition Exhibit 20 marked.)

05:38 23          MR. BERGMAN:  And while we are comparing these,

05:38 24    let's look at what appears to be the executed copy, which

05:38 25    is dated January 21, 2002, and I will ask the reporter to

123

Exhibit 14
269

05:38 1    mark that as Exhibit 21.

05:38 2                (Deposition Exhibit 21 marked.)

05:38 3    BY MR. BERGMAN:

05:38 4        Q    Now, do you notice that in Exhibit 20 the

05:39 5    reference to IP Worldwide entering into negotiations is

05:39 6    now changed to IP Worldwide and Ariel Emanuel entering

05:39 7    into negotiations?  Do you see that in Exhibit 20?

05:39 8                MR. WILLIAMSON:  Which document?

05:39 9                THE WITNESS:  Yes.

05:3910    BY MR. BERGMAN:

05:3911        Q    Okay.

05:3912        A    And then if you look at 21, it's now purely

05:3913    Ariel Emanuel, which reflects what I was stating earlier.

05:3914        Q    Right.

05:3915                Now, the requested revisions to this document

05:3916    were made by whom, Mr. Toberoff, who on behalf of the

05:3917    Siegels?

05:3918                MR. WILLIAMSON:  Objection.  Vague and

05:3919    ambiguous --

05:3920                THE WITNESS:  I believe --

05:3921                MR. WILLIAMSON:  -- calls for speculation.

05:3922                THE WITNESS:  I believe Laura Siegel.  I believe

05:3923    this was a highly -- the final executed document, Exhibit

05:4024    21, I remember was a highly -- highly negotiated by the

05:4025    Siegels.  They were very, very specific about it.  It

                                                                    124

**U.S. LEGAL SUPPORT**

Exhibit 14
270

05:40 1   started out as a sort of potential conflict disclosure

05:40 2   and waiver and turned into a sort of an agreement between

05:40 3   Ari Emanuel and the Siegels with all sorts of conditions

05:40 4   attached to it.

05:40 5   BY MR. BERGMAN:

05:40 6        Q    Am I correct that the correct date of October 21

05:40 7   is January 21, 2003 rather than --

05:40 8        A    Yes.

05:40 9        Q    -- '02, which is the date indicated?

05:40 10       A    This is one of those where I was using

05:40 11  stationery and neglected to change the year.

05:40 12       Q    All right.  Now, following the execution of

05:40 13  Exhibit 21, did Mr. Emanuel attempt to purchase Michael

05:40 14  Siegel's rights?

05:41 15            MR. WILLIAMSON:  Objection.  Vague and

05:41 16  ambiguous.

05:41 17            THE WITNESS:  I would say the answer to that is

05:41 18  halfheartedly.

05:41 19  BY MR. BERGMAN:

05:41 20       Q    And can you explain what you mean?

05:41 21       A    And I remember thinking that after going through

05:41 22  this highly negotiated thing with the Siegels, he didn't

05:41 23  appear that interested in pursuing it.

05:41 24       Q    To your knowledge did Mr. Emanuel take any steps

05:41 25  to enter into negotiations with Michael Siegel?

125

05:41 1                  MR. WILLIAMSON:  Objection.  Calls for

05:41 2      speculation.

05:41 3                  THE WITNESS:  I had a couple discussions with

05:42 4      Don Bulson, Michael Siegel's lawyer, on behalf of Ari

05:42 5      Emanuel, and that was the extent of it.

05:42 6      BY MR. BERGMAN:

05:42 7          Q    Did you make an offer to Mr. Bulson?

05:42 8                  MR. WILLIAMSON:  Objection.  Vague and

05:42 9      ambiguous.  Indefinite as to time and please.

05:42 10                 THE WITNESS:  I'm not sure whether it was the

05:42 11     form -- I recall discussions.  I'm not sure if it was in

05:42 12     the form of a formal offer.

05:42 13     BY MR. BERGMAN:

05:42 14         Q    What amount of money was discussed during those

05:42 15     discussions?

05:42 16                 MR. WILLIAMSON:  Objection.  Assumes facts not

05:42 17     in evidence.

05:42 18                 THE WITNESS:  The discussions that I recall

05:42 19     were -- the sum and substance of those discussions were

05:42 20     that Mr. Bulson communicated that the minimum that

05:43 21     Michael Siegel would accept for the rights would

05:43 22     essentially be what -- not a lesser amount of money than

05:43 23     what had been offered and ultimately rejected by the

05:43 24     Siegels, what had been offered by Warner Bros. and DC and

05:43 25     ultimately rejected by the Siegels.

                                                              126

                         U.S. LEGAL SUPPORT

Exhibit 14
272

| | |
|---|---|
| 05:43 1 | BY MR. BERGMAN: |
| 05:43 2 | Q   And was that with reference to 25 percent of |
| 05:43 3 | what had been offered to the Siegels? |
| 05:43 4 | MR. WILLIAMSON:  Objection.  Vague and |
| 05:43 5 | ambiguous. |
| 05:43 6 | THE WITNESS:  If that's his share. |
| 05:43 7 | BY MR. BERGMAN: |
| 05:43 8 | Q   That appears to be his share. |
| 05:43 9 | A   Yeah. |
| 05:43 10 | Q   So that Mr. Bulson in effect, in substance told |
| 05:43 11 | you that Michael Siegel wanted at least 25 percent of the |
| 05:43 12 | amount that had been offered by DC Comics -- |
| 05:43 13 | A   In other words, that would be the floor of a |
| 05:43 14 | negotiation.  In other words, he would want more than |
| 05:44 15 | that, but that would be the floor. |
| 05:44 16 | Q   Okay.  And what was your response? |
| 05:44 17 | A   I brought that back to Ari Emanuel, and he |
| 05:44 18 | didn't -- no deal was made. |
| 05:44 19 | Q   Did Mr. Emanuel say that's too much? |
| 05:44 20 | A   I can't tell you what he -- |
| 05:44 21 | MR. WILLIAMSON:  Objection.  Attorney-client. |
| 05:44 22 | THE WITNESS:  What he said to me about that |
| 05:44 23 | would be privileged.  I can't tell you what he said to |
| 05:44 24 | me, but I can tell you that it didn't go very far after |
| 05:44 25 | that, and that you can draw a reasonable conclusion from |

127

**U.S. LEGAL SUPPORT**

Exhibit 14
273

05:44 1    that.

05:44 2              (Unanswered question.)

05:44 3    BY MR. BERGMAN:

05:44 4         Q    Did you get back to Mr. Bulson and tell him that

05:44 5    that floor that he expressed to you was unacceptable?

05:45 6         A    I believe so, but it wasn't as much with

05:45 7    reference to the floor.  The way it had been communicated

05:45 8    was that since that was a floor -- in other words, he

05:45 9    didn't say, "I want that floor."  For purposes of

05:45 10   negotiations, that was the floor, so he -- the

05:45 11   implication was that he wanted something more than that

05:45 12   or considerably more than that.  So the focus wasn't on

05:45 13   the floor.  The focus was -- that was just a benchmark

05:45 14   where his lawyer was giving me an idea.

05:45 15        Q    What was unacceptable about that benchmark, that

05:45 16   floor?

05:45 17        A    I can't disclose that.  I can't disclose

05:46 18   Mr. Emanuel's conversations with me regarding that

05:46 19   negotiation.  It's protected by the attorney-client

05:46 20   privilege.

05:46 21             (Unanswered question.)

05:46 22        Q    Did Mr. Emanuel suggest that he speak with

05:46 23   Mr. Bulson?

05:46 24        A    No.

05:46 25        Q    To your knowledge, following your conversation

                                                              128

U.S. LEGAL SUPPORT

Exhibit 14
274

05:46 1   with Mr. Emanuel in which you told him about Mr. Bulson's

05:46 2   floor, was anything further done to acquire the Michael

05:46 3   Siegel interest --

05:46 4            MR. WILLIAMSON:  Objection.  Vague and

05:46 5   ambiguous.

05:46 6   BY MR. BERGMAN:

05:46 7        Q    -- by either you or Mr. Emanuel to your

05:46 8   knowledge?

05:46 9            MR. WILLIAMSON:  Same objection.

05:46 10           THE WITNESS:  I -- the only thing -- when you

05:46 11  say "anything further done," what -- I may have had

05:46 12  another conversation with Mr. Bulson.  I don't recall.

05:46 13  There were a couple conversations, and that was the sum

05:46 14  and substance of it, and it didn't really go anywhere,

05:47 15  and I do recall sort of after a -- prolonged discussions

05:47 16  with the Siegels culminating in this document dated --

05:47 17  the document, Exhibit 21, in which I had to kind of spend

05:47 18  a lot of time between the two, feeling that, you know,

05:47 19  after going through all of this, obtaining the approval

05:47 20  of the Siegels, that it was kind of a halfhearted

05:47 21  interest on the part of Mr. Emanuel that never went

05:47 22  anywhere.

05:47 23  BY MR. BERGMAN:

05:47 24       Q    Did there come a time when you communicated to

05:47 25  Mr. Bulson that there would be no further negotiation?

                                                              129

05:47 1        A    I don't believe I communicated -- I don't

05:48 2    believe that I called him up and said that there would be

05:48 3    no further negotiations.

05:48 4        Q    I note that the executed copy, Exhibit 21,

05:48 5    provides that in the event Michael Siegel agrees to that

05:48 6    purchase and settlement, that certain events will follow,

05:48 7    including in subparagraph (d) that Mr. Emanuel -- it's on

05:48 8    the second page -- that Mr. Emanuel would reimburse the

05:48 9    Siegels for 25 percent of any expenses paid by them after

05:4810   October 17, 2000.

05:4811            Was that something that the Siegels insisted on?

05:4812        A    Yes.  All of these terms are terms that the

05:4813   Siegels insisted on.

05:4814        Q    And what was the reason for even attempting to

05:4915   acquire Michael Siegel's interest?

05:4916            MR. WILLIAMSON:  Objection.  Vague and

05:4917   ambiguous.

05:4918            THE WITNESS:  Again, that would be privileged

05:4919   and work product.

05:4920            (Unanswered question.)

05:4921   BY MR. BERGMAN:

05:4922        Q    And do you therefore decline to answer that

05:4923   question?

05:4924        A    Yes.

05:4925        Q    At the time that you and Mr. Emanuel entered

                                                                 130

U.S. LEGAL SUPPORT

Exhibit 14
276

05:49 1   into Exhibit 21, had he obtained a fund from which to

05:49 2   purchase the Michael Siegel interest?

05:49 3          MR. WILLIAMSON:  Objection.  Asked and answered.

05:49 4          THE WITNESS:  Again, you're sort of treading on

05:49 5   attorney-client privilege, but I don't believe he had a

05:49 6   -- started a fund to purchase the Michael Siegel

05:50 7   interest.  Mr. Emanuel is a very wealthy man and also has

05:50 8   access to a lot of financing.

05:50 9   BY MR. BERGMAN:

05:5010      Q    When do you recall -- you've sat through a lot

05:5011   of depositions, Mr. Toberoff.  Do you remember the

05:5012   September 21, 2002 letter from Joanne and Laura Siegel to

05:5113   Kevin Marks terminating Gang, Tyre, the agreement -- the

05:5114   document that has been the subject of a couple of motions

05:5115   that we've had?

05:5116      A    I don't -- are you speaking about their letter

05:5117   notifying people that they're terminating --

05:5118      Q    Correct.

05:5119      A    I've seen the letter --

05:5120      Q    Okay.

05:5121      A    -- but I don't think it's been the subject of

05:5122   motions.

05:5123      Q    When do you recall first seeing that letter?

05:5124   It's dated September 21, 2002.

05:5125      A    I don't recall -- I recall seeing it in the

                                                              131

**U.S. LEGAL SUPPORT**

Exhibit 14
277

05:51 1    course of the litigation.  I don't recall -- I don't have

05:51 2    a specific recollection of seeing it prior to the

05:51 3    litigation.  As part of the documents in the litigation.

05:51 4         Q   As of the date that the Siegels terminated Gang,

05:51 5    Tyre and Brown, September 21, 2002, had you had any

05:52 6    communications with either Laura or Joanne Siegel?

05:52 7         A   What's the date of the letter?

05:52 8         Q   September 21, 2002.

05:52 9         A   I don't know.  That would depend on whether

05:52 10   Joanne -- when Joanne first called me, that was before

05:52 11   September 1 or -- September 21 or afterwards, and I

05:52 12   don't -- you know, I looked at the agreement with them

05:52 13   where it's signed October I think 23rd -- is that

05:52 14   correct? -- the IP Worldwide agreement, and then I looked

05:52 15   at the date as of October 3rd, and I know that often I'll

05:52 16   date an agreement as to when the sort of relationship

05:53 17   starts, which can often even mean first communications,

05:53 18   and that's why I said, you know, early October, and then

05:53 19   we entered into an agreement three weeks later.

05:53 20   That's...

05:53 21        Q   Did the Siegels --

05:53 22        A   That's the best way I can approximate the time.

05:53 23        Q   Did the Siegels confer with you prior to

05:53 24   terminating Gang, Tyre and Brown?

05:53 25             MR. WILLIAMSON:  Objection.  Asked and answered.

                                                                      132

**U.S. LEGAL SUPPORT**

Exhibit 14
278

| | |
|---|---|
| 05:53 1 | THE WITNESS:  Same answer. |
| 05:53 2 | BY MR. BERGMAN: |
| 05:53 3 | Q   Which is what? |
| 05:53 4 | A   That I don't -- |
| 05:53 5 | MR. WILLIAMSON:  You want him to read it back? |
| 05:53 6 | THE WITNESS:  It's the same answer that I just |
| 05:53 7 | gave:  That I don't know for sure, but I believe that if |
| 05:53 8 | they terminated Gang, Tyre on September -- |
| 05:53 9 | BY MR. BERGMAN: |
| 05:53 10 | Q   21. |
| 05:53 11 | A   -- and based on the dates on that agreement, |
| 05:53 12 | that probably not, and I don't recall them conferring |
| 05:54 13 | with me about terminating Gang, Tyre. |
| 05:54 14 | Q   Regardless of the date? |
| 05:54 15 | A   Regardless of the date, correct. |
| 05:54 16 | Q   Would you deny that you spoke with Joanne or |
| 05:54 17 | Laura Siegel prior to the time that they terminated Gang, |
| 05:54 18 | Tyre, Ramer & Brown? |
| 05:54 19 | MR. WILLIAMSON:  Objection.  Asked and answered. |
| 05:54 20 | THE WITNESS:  I'm gonna stick to my same answer. |
| 05:54 21 | This is the third time you're asking me the same |
| 05:54 22 | question. |
| 05:54 23 | BY MR. BERGMAN: |
| 05:54 24 | Q   Well, I'm asking you a little bit different, |
| 05:54 25 | Mr. Toberoff.  Would you deny that you conferred with |

133

U.S. LEGAL SUPPORT

Exhibit 14
279

05:54 1   them prior to the time that they terminated Gang, Tyre,

05:54 2   Ramer & Brown?

05:54 3           MR. WILLIAMSON:  Same objection.

05:54 4           THE WITNESS:  I'm going to stick to my answer.

05:54 5           You can read back my answer, Reporter.

05:54 6           I don't have any recollection of discussing

05:54 7   that.  That's my answer.

05:54 8   BY MR. BERGMAN:

05:55 9       Q   When Joanne Siegel called you for the first

05:55 10  time, did she say that she had terminated -- had

05:55 11  previously terminated her prior lawyer?

05:55 12      A   No.  She said she was looking for a lawyer, so

05:55 13  she may -- very well may have.

05:55 14      Q   Did you ask her, "Are you currently represented

05:55 15  by counsel?"

05:55 16      A   I believe it was implicit in the con- -- now

05:55 17  that you're asking the question this way, I believe it

05:55 18  was implicit in the conversation that she was looking for

05:55 19  counsel because she didn't have a lawyer, so...

05:55 20      Q   Did she say anything in that first telephone

05:55 21  conversation to indicate to you that she had not yet

05:55 22  fired Gang, Tyre, Ramer & Brown?

05:55 23      A   I don't recall --

05:55 24          MR. WILLIAMSON:  Objection.  Asked and answered.

05:55 25          THE WITNESS:  I don't recall her saying anything

                                                              134

                        U.S. LEGAL SUPPORT

Exhibit 14
280

```
05:55  1    like that, no.  I recall her saying that I was highly
05:56  2    recommended by Jean Peavy and that she wanted to talk to
05:56  3    me about representing her, and that soon thereafter we
05:56  4    met for lunch with I believe it was her and Laura, but it
05:56  5    wasn't with reference to -- it was that she wanted a
05:56  6    lawyer.
05:56  7    BY MR. BERGMAN:
05:56  8        Q    When you got together with them at lunch --
05:56  9        A    It didn't appear -- I can just tell from the
05:56 10    context it did not appear to me that at the time we were
05:56 11    speaking, she was currently represented.
05:56 12        Q    When you met Joanne and Laura for lunch a few
05:56 13    days after the initial telephone conversation, did you
05:56 14    tell them that you had been speaking with Kevin Marks?
05:56 15        A    You asked me that three times already.
05:56 16        Q    Did you?
05:56 17        A    I don't believe I told them that.  I don't have
05:56 18    a rec- -- I don't know.  I don't have a recollection of
05:57 19    that, but I may have referenced it.
05:57 20        Q    Did you ask them if they were currently
05:57 21    represented by counsel?
05:57 22        A    I already answered that question also.  No, I
05:57 23    don't believe I asked them that.  I believe it was
05:57 24    implicit in her asking -- saying that she wanted to talk
05:57 25    to me about representing her or needing a lawyer that she
```

135

05:57 1    didn't have a lawyer, so I don't think I would have said,

05:57 2    "Are you currently represented by counsel?"

05:57 3         Q    Well, weeks earlier you had been having

05:57 4    conversations with the Siegels' counsel to acquire the

05:57 5    Siegel interest.  Is it your testimony that when you met

05:57 6    with the Siegels a few weeks later, you didn't even ask

05:57 7    whether they were still represented by Gang, Tyre?

05:57 8         A    That's -- I already answered that.  I don't

05:57 9    recall a discussion about that.  I just don't.  We -- we

05:58 10   have -- I may have spoken to her that I had been in

05:58 11   contact with Kevin Marks, but I don't recall the specific

05:58 12   conversation.  That's exactly what I said to you before.

05:58 13         At some point it -- you know, I think Kevin

05:58 14   Marks testified that he had informed them about that

05:58 15   offer, and at some point it came up, but I don't -- the

05:58 16   focus when I met with them was not Kevin Marks or Gang,

05:58 17   Tyre.  The focus was on representing her and her rights

05:58 18   in Superman.

05:58 19         Q    Well, did you ask them at lunch or in that

05:58 20   initial phone conversation who had been representing

05:58 21   them?

05:58 22         MR. WILLIAMSON:  Objection.  Asked and answered.

05:59 23         THE WITNESS:  I've told you everything that I

05:59 24   recall, and I've also objected because this -- what --

05:59 25   even at that initial stage, even before retaining me,

136

U.S. LEGAL SUPPORT

Exhibit 14
282

| | | |
|---|---|---|
| 05:59 | 1 | those conversations, as you well know, are privileged, so |
| 05:59 | 2 | to go into great detail about what I said to her and what |
| 05:59 | 3 | she said to me is improper.  I've -- again, you -- |
| 05:59 | 4 | regardless of that -- |
| 05:59 | 5 | BY MR. BERGMAN: |
| 05:59 | 6 | Q    I certainly don't agree with that, Mr. Toberoff. |
| 05:59 | 7 | A    Well, regardless of that and without waiver of |
| 05:59 | 8 | the privilege, I'm giving you my best recollection of |
| 05:59 | 9 | those events. |
| 05:59 | 10 | Q    Okay.  And is your best recollection that the |
| 05:59 | 11 | Siegels had previously terminated Gang, Tyre, Ramer & |
| 05:59 | 12 | Brown before they had lunch with you? |
| 05:59 | 13 | MR. WILLIAMSON:  Objection -- |
| 05:59 | 14 | THE WITNESS:  I've already said it.  I |
| 05:59 | 15 | believe -- |
| 05:59 | 16 | MR. WILLIAMSON:  At that time? |
| 06:00 | 17 | MR. BERGMAN:  At this time. |
| 06:00 | 18 | Would you repeat my question, please? |
| 06:00 | 19 | (Record read as follows: |
| 05:59 | 20 | "Q   Okay.  And is your best |
| 05:59 | 21 | recollection that the Siegels had |
| 05:59 | 22 | previously terminated Gang, Tyre, |
| 05:59 | 23 | Ramer & Brown before they had lunch |
| 05:59 | 24 | with you?") |
| 06:00 | 25 | THE WITNESS:  Again -- |

137

U.S. LEGAL SUPPORT

Exhibit 14
283

06:00 1              MR. WILLIAMSON:  Objection.  Asked and answered.

06:00 2    Objection on attorney-client grounds.

06:00 3              THE WITNESS:  I stick by my prior answer.  I'm

06:00 4    not going to keep answering the question.

06:00 5    BY MR. BERGMAN:

06:00 6         Q    I haven't asked you that question before,

06:00 7    Mr. Toberoff, and what I'm trying to ascertain is whether

06:00 8    you knew at the time that you met with the Siegels for

06:00 9    the first time whether or not they had previously

06:0010    terminated Gang, Tyre and Brown.

06:0011              MR. WILLIAMSON:  Same objection.

06:0012              THE WITNESS:  And my answer is I don't have a

06:0013    specific recollection of a discussion regarding that or

06:0114    focus regarding that, and I -- but I can deduce from the

06:0115    context of the conversation or the asking me, i. -- you

06:0116    know, i.e., "I need a lawyer.  Will you represent me,"

06:0117    and from the dating of the IP Worldwide agreements as of

06:0118    ~~August~~ October 3 and remembering that we entered into the

06:0119    agreement fairly quickly, from all those things, it would

06:0120    be my best estimate of the situation that they had

06:0121    already terminated Gang, Tyre Brown, but I don't recall a

06:0122    specific statement to that effect, so I couldn't say for

06:0123    sure.

06:0124    BY MR. BERGMAN:

06:0125         Q    Did you draft --

                                                                      138

                         U.S. LEGAL SUPPORT

Exhibit 14
284

06:01 1          A    That's the last time I'm going to ask -- answer

06:01 2    that question.   I think I've given you a very clear

06:01 3    answer.

06:01 4          Q    Hardly.

06:01 5               Did you draft the September 21, 2002 letter by

06:01 6    which the Siegels purported to terminate Gang, Tyre,

06:02 7    Ramer & Brown's representation?

06:02 8          A    I don't recall drafting that, no.

06:02 9          Q    Would you deny drafting it, Mr. Toberoff?

06:02 10         A    I just answered your question.

06:02 11         Q    No, you didn't.

06:02 12         A    I'm standing by my answer.

06:02 13         Q    Would you deny drafting it?

06:02 14              MR. WILLIAMSON:   Objection.   Asked and answered.

06:02 15              THE WITNESS:   I can't deny it.   I don't recall

06:02 16   drafting it, so how can I deny it?   I don't recall

06:02 17   drafting it.   You asked me the question before.

06:02 18   BY MR. BERGMAN:

06:02 19         Q    Do you recall advising the Siegels as to the

06:02 20   best method by which to terminate Gang, Tyre, Ramer &

06:02 21   Brown?

06:02 22         A    No.   I recall discussions with the Siegels

06:02 23   regarding Gang, Tyre, Ramer & Brown, the substance of

06:02 24   which I'm -- are privileged.   That's all I recall.   But I

06:02 25   don't recall when those discussions took place.

                                                            139

U.S. LEGAL SUPPORT

Exhibit 14
285

| | | |
|---|---|---|
| 06:03 | 1 | Q   Do you know who Steve Spira is? |
| 06:03 | 2 | A   I think he's an attorney in the entertainment |
| 06:03 | 3 | industry.  I've heard the name.  An attorney, Steve |
| 06:03 | 4 | Spira. |
| 06:03 | 5 | Q   He's in business affairs at Warner Bros. |
| 06:03 | 6 | A   Okay. |
| 06:03 | 7 | Q   Do you recall running into Mr. Spira at an event |
| 06:03 | 8 | or party in early 2002 and stating to him in substance |
| 06:03 | 9 | that Warner had a problem with its Superman rights? |
| 06:03 | 10 | A   Not -- no, I don't.  I may have. |
| 06:03 | 11 | Q   In addition to the agreement -- |
| 06:03 | 12 | A   And they certainly do. |
| 06:03 | 13 | Q   Well, were you aware of that in early 2002? |
| 06:03 | 14 | A   In early 2002?  Yes. |
| 06:04 | 15 | Q   And how were you aware of that? |
| 06:04 | 16 | A   I was aware of that by being aware of the |
| 06:04 | 17 | Shusters' termination interest -- |
| 06:04 | 18 | Q   Yeah, but that doesn't take effect until 2013, |
| 06:04 | 19 | does it? |
| 06:04 | 20 | A   It's still a problem.  And I was aware of that |
| 06:04 | 21 | by virtue of being aware that the Siegels had |
| 06:04 | 22 | terminated -- had filed notice of termination. |
| 06:04 | 23 | Q   How did you know that? |
| 06:04 | 24 | A   It was all over the Internet. |
| 06:04 | 25 | Q   In addition to entering into an agreement with |

140

U.S. LEGAL SUPPORT

Exhibit 14
286

06:04 1    the Siegels concerning Superman, you also entered into an

06:04 2    agreement with them concerning Superboy, didn't you?

06:04 3         MR. WILLIAMSON:  Objection.  Assumes facts not

06:04 4    in evidence.

06:04 5         THE WITNESS:  When you say "you," you mean IP

06:05 6    Worldwide?

06:05 7    BY MR. BERGMAN:

06:05 8         Q    Yes, IP Worldwide.

06:05 9         A    I believe so, yes.

06:05 10        Q    That agreement has not been produced.  Do you

06:05 11   know why?

06:05 12        A    I didn't see it in my files.

06:05 13        Q    Okay.

06:05 14        A    And you also -- you asked me the question, and I

06:05 15   said I believe so, but there may not be an actual

06:05 16   agreement with IP Worldwide.

06:05 17        Q    Well, if you'll look at Exhibit 17, it's

06:05 18   scheduled on Exhibit A.

06:05 19        A    Yeah.

06:05 20        Q    There are three agreements listed.  One of them

06:05 21   is IP Worldwide and Joanne Siegel and Laura Siegel Larson

06:05 22   as of October 3, 2002, re Superboy.

06:05 23        A    Right.  Then if it's listed there, then there

06:05 24   was an agreement.  It would have been the same, using the

06:05 25   other agreement as a blueprint for that agreement.

141

**U.S. LEGAL SUPPORT**

Exhibit 14
287

06:05 1          Q    Going back to your -- the subpoena which

06:06 2     required you to produce the so-called Quinn documents,

06:06 3     the documents that you say were stolen from your office,

06:06 4     who do you believe stole them from your office?

06:06 5          A    I am -- I don't know.  I'm currently

06:06 6     investigating it.

06:06 7          Q    Have you reported the theft to the police?

06:06 8          A    No.

06:06 9          Q    Or to the state Bar?

06:0610          A    Not yet.

06:0611          Q    Or the FBI?

06:0612          A    Not yet.

06:0613          Q    Okay.  Do you have any evidence, Mr. Toberoff,

06:0614     that the documents were received by Warner Bros. prior to

06:0615     on or around June 28th of this year?

06:0716          A    Yes.

06:0717          Q    And what is that evidence?

06:0718          A    I'm not going -- that's work product.

06:0719               (Unanswered question.)

06:0720               MR. WILLIAMSON:  Yeah, objection.

06:0721               THE WITNESS:  I'm not going to disclose that.

06:0722     These stolen documents have become part of this lawsuit,

06:0723     unfortunately, and I'm not going to disclose to you what

06:0724     I -- what evidence I have of impropriety on the part of

06:0725     Warner Bros.

142

**U.S. LEGAL SUPPORT**

Exhibit 14
288

06:07 1    BY MR. BERGMAN:

06:07 2        Q    Do the documents that were the subject of the

06:07 3    subpoena include documents that are not privileged?

06:07 4        A    I'm not going to discuss with you the contents

06:07 5    of documents stolen from my office.

06:07 6            (Unanswered question.)

06:07 7        Q    On what basis are you refusing to answer that?

06:07 8        A    Because I believe Warner Bros.' behavior is

06:07 9    highly improper, and it's the subject of a pending or

06:08 10   threatened motion to compel, and it should not be the

06:08 11   subject of a deposition, nor should anything -- it's

06:08 12   highly improper for you to be questioning me as to

06:08 13   anything regarding this litigation.

06:08 14       Q    I'm simply questioning you concerning the

06:08 15   subpoena that was served on you and your failure to

06:08 16   produce documents pursuant to it.

06:08 17       A    Let me be clear --

06:08 18           MR. WILLIAMSON:  Objection.  That totally

06:08 19   mischaracterizes the situation, and you know it.

06:08 20           MR. BERGMAN:  No, I don't know that, and what

06:08 21   makes you say something like that, Mr. Williamson?  It's

06:08 22   preposterous.

06:08 23           THE WITNESS:  No.  Your conduct is preposterous.

06:08 24           MR. WILLIAMSON:  This entire line of questioning

06:08 25   is preposterous.

143

**U.S. LEGAL SUPPORT**

Exhibit 14
289

06:08 1          THE WITNESS:  Let me be clear.  You've asked me

06:08 2   numerous questions about IP Worldwide, Pacific Pictures.

06:08 3   I've answered most of your questions.  Now you're turning

06:08 4   the corner and starting to ask me questions as the lawyer

06:08 5   and lead litigator representing the Siegels in this

06:08 6   action and including subjects of pending motions to

06:09 7   compel.  This is not the proper subject of a deposition.

06:09 8   You don't depose opposing counsel and start asking him

06:09 9   about -- just like you would find it improper if I

06:09 10  started asking you questions about about why you were

06:09 11  doing certain things in this litigation.

06:09 12  BY MR. BERGMAN:

06:09 13       Q    I don't want to debate with you, Mr. Toberoff,

06:09 14  but I'm asking you --

06:09 15       A    It's not a debate.  I'm not going to answer.

06:09 16  I'm not going to engage in further colloquy of it.

06:09 17       Q    -- questions concerning a subpoena that was

06:09 18  issued to you and your lack of response to that subpoena,

06:09 19  and I am entitled to do that.

06:09 20       A    What's your question?

06:09 21       Q    My question is whether you have any evidence

06:09 22  that these documents were, as you have previously

06:09 23  alleged, delivered to Warner Bros. prior to the end of

06:09 24  June of this year.

06:09 25       A    Yes, I do, but I'm not disclosing to you what

                                                                    144

U.S. LEGAL SUPPORT

Exhibit 14
290

06:09 1    that evidence is.

06:09 2          Q    And you -- what steps have you taken to

06:10 3    ascertain who may have taken those documents from your

06:10 4    files?

06:10 5                MR. WILLIAMSON:  Objection.

06:10 6                THE WITNESS:  I am also not disclosing that to

06:10 7    you.  It's -- you've made that part of this litigation.

06:10 8    Therefore, it's work product.

06:10 9                (Unanswered question.)

06:1010    BY MR. BERGMAN:

06:1011          Q    Are you going to refuse to answer any question

06:1012    that I ask you concerning your failure to provide those

06:1013    subpoenaed documents?

06:1014          A    I don't -- it depends on what your question is.

06:1015          Q    Okay.  In conducting your various searches for

06:1016    production -- responding to production demands in this

06:1017    case, have you searched the files from which those Quinn

06:1018    documents came?

06:1019          A    Yes.

06:1020          Q    And have you produced all responsive

06:1021    non-privileged documents contained in that file?

06:1022          A    I believe so, yes.

06:1123          Q    Have --

06:1124          A    Those documents were stolen out of my regular

06:1125    legal files.

                                                              145

**U.S. LEGAL SUPPORT**

Exhibit 14
291

06:11 1          Q    Have the documents that you declined to produce

06:11 2    pursuant to subpoena been identified on privilege logs?

06:11 3          A    Privileged documents, yes.

06:11 4          Q    What privilege logs identify those privileged

06:11 5    documents?

06:11 6          A    I believe it would be a question of the subject

06:11 7    of the various stolen documents.  The stolen documents

06:11 8    were from all sorts of different files and may have

06:11 9    overlapped between the Siegels' legal files and Shuster's

06:11 10   legal files, so ones that pertain to Shuster's would have

06:12 11   been listed on the Shuster's privilege log, for instance,

06:12 12   in response to the Shuster's subpoena, and documents

06:12 13   pertaining to the Siegels that are privileged would have

06:12 14   been listed on the privilege log that they have provided

06:12 15   as a party in this case.

06:12 16         Q    Has a person by the name of Raphael Gomez

06:12 17   Cabrera ever worked for you?

06:12 18         A    Yes.

06:12 19         Q    Does he currently work for you?

06:12 20         A    No.

06:12 21         Q    Has Jeffrey Bruce Linden previously worked for

06:12 22   you?

06:12 23         A    Jeffrey Linden previously worked for me, yes.

06:12 24         Q    And is he currently working for you?

06:12 25         A    No.

146

**U.S. LEGAL SUPPORT**

Exhibit 14
292

```
06:12  1         Q    Is Larry Greenfield currently working for you?

06:12  2         A    No.

06:12  3         Q    Is David Michaels currently working for you?

06:12  4         A    No.

06:12  5         Q    Is Rex Glensy currently working for you?

06:12  6         A    No.

06:13  7              What time is it?

06:13  8              MR. WILLIAMSON:  It's after 6:00.

06:13  9              THE WITNESS:  I really have to go.

06:13 10              MR. WILLIAMSON:  6:10.

06:13 11              THE WITNESS:  I really have to go.

06:13 12              MR. BERGMAN:  I'm not quite through yet.

06:13 13              THE WITNESS:  Well, I made an arrangement.  It's

06:13 14    after 6:00.  We started at 1:30.

06:13 15              MR. BERGMAN:  We started closer to quarter to

06:13 16    2:00, but I'm not going to argue with you --

06:13 17              THE WITNESS:  We've taken very few breaks.

06:13 18    We've gone straight through.  Normally people take

06:13 19    frequent breaks.  So if you look at the amount of hours,

06:13 20    it's been quite a bit, and this was a deposition

06:13 21    scheduled for a half day.  So I mean if it's a question

06:13 22    of five more minutes, but I'm not going to stay here

06:13 23    for -- I need to go, I need to pick up my kids, and I

06:13 24    need to -- you know, I was able to push it.

06:13 25              MR. BERGMAN:  I can't hold you here,
```

147

U.S. LEGAL SUPPORT

Exhibit 14
293

06:13 1    Mr. Toberoff, so --

06:14 2            THE WITNESS:  How many more documents do you

06:14 3    have?  I'm trying to work with you, but it's becoming...

06:14 4            MR. BERGMAN:  Why don't we just end the

06:14 5    deposition here.

06:14 6            THE WITNESS:  How many documents do you have

06:14 7    left?  How much more do you think you have left?

06:14 8            MR. BERGMAN:  We'll end it here.  Have the usual

06:14 9    stipulation?

06:1410            THE WITNESS:  Yes.

06:1411            MR. WILLIAMSON:  Yeah.

06:1412            MR. BERGMAN:  Okay.  Thank you, Mr. Toberoff.

06:1413            (The following stipulation is included

06:1414            by reference:

08:4615            "MR. TOBEROFF:  Any stipulations you

08:4616            want to make regarding the transcript?

08:4617            "MR. BERGMAN:  Well, we could waive the

08:4618            notary and just have it signed under penalty

08:4619            of perjury, which is --

08:4620            "MR. ZISSU:  That's okay.

08:4621            "MR. BERGMAN:  -- pretty customary.

08:4622            "MR. TOBEROFF:  I think so.

08:4623            "MR. ZISSU:  That's okay.

08:4624            "MR. BERGMAN:  And the reporter would

08:4625            be relieved of his responsibilities and will

                                                              148

**U.S. LEGAL SUPPORT**

Exhibit 14
294

08:47 1          deliver the original directly to Mr. Marks --

08:47 2          "MR. TOBEROFF:  Toberoff.

08:47 3          "MR. BERGMAN:  Toberoff.

08:47 4          "MR. TOBEROFF:  My first name is Marc.

08:47 5          "MR. ZISSU:  All the other rules as to

08:47 6          timing and signing apply.

08:47 7          "MR. BERGMAN:  Yes.

08:47 8          "MR. TOBEROFF:  So stipulated.")

      9

      10

      11

      12

      13

      14

      15

      16

      17

      18

      19

      20

      21

      22

      23

      24

      25

                                                          149

**U.S. LEGAL SUPPORT**

Exhibit 14
295

1

2

3

4

5

6

7

8          I, MARC TOBEROFF, do hereby declare under

9    penalty of perjury that I have read the foregoing

10   transcript; that I have made any corrections as appear

11   noted, in ink, initialed by me, or attached hereto; that

12   my testimony as contained herein, as corrected, is true

13   and correct.

14          EXECUTED this _____ day of _____,

15   20_____, at _____, _____.
                        (City)                    (State)

16

17

18

19          _____

20          MARC TOBEROFF

21

22

23

24

25

                                                        150

**U.S. LEGAL SUPPORT**

Exhibit 14
296

1   STATE OF CALIFORNIA    )
                           ) ss
2   COUNTY OF LOS ANGELES  )

3

4          I, DAVID S. COLEMAN, a Certified Shorthand

5   Reporter, do hereby certify:

6          That prior to being examined, the witness in the

7   foregoing proceedings was by me duly sworn to

8   testify to the truth, the whole truth, and nothing

9   but the truth;

10   That said proceedings were taken before me at

11   the time and place therein set forth and were taken

12   down by me in shorthand and thereafter transcribed

13   into typewriting under my direction and supervision;

14   I further certify that I am neither counsel

15   for, nor related to, any party to said proceedings,

16   nor in anywise interested in the outcome thereof.

17          In witness whereof, I have hereunto subscribed

18   my name.

19

20   Dated: ___NOV 3 0 2006___

21

22          _____

23          DAVID S. COLEMAN
            CSR No. 4613

24

25

U.S. LEGAL SUPPORT

Exhibit 14
297

1

2

3

4

5

6

7

8         I, MARC TOBEROFF, do hereby declare under

9    penalty of perjury that I have read the foregoing

10   transcript; that I have made any corrections as appear

11   noted, in ink, initialed by me, or attached hereto; that

12   my testimony as contained herein, as corrected, is true

13   and correct.

14         EXECUTED this ___20ᵗʰ___ day of ___December___,

15   20_06_, at ___Los Angeles___, ___CA___.
                        (City)              (State)

16

17

18

19   ___M/M___
     _____
20   MARC TOBEROFF

21

22

23

24

25

                                                    150

U.S. LEGAL SUPPORT

Exhibit 14
298

1    Marc Toberoff (CA State Bar No. 188547)
     Nicholas C. Williamson (CA State Bar No. 231124)
2    LAW OFFICES OF MARC TOBEROFF, PLC
     2049 Century Park East, Suite 2720
3    Los Angeles, CA 90067
     Telephone: (310) 246-3333
4    Facsimile: (310) 246-3101

5    Attorneys for MARC TOBEROFF, ESQ.

6                  UNITED STATES DISTRICT COURT

7                 CENTRAL DISTRICT OF CALIFORNIA

8

9    JOANNE SIEGEL, an individual; and         Case Nos.:
     LAURA SIEGEL LARSON, an              CV 04-08400 SGL (RZx)
10   individual,                          CV 04-08776 SGL (RZx)

11                    Plaintiffs,
                                          [Honorable Stephen G. Larson]
12        vs.                             [Honorable Ralph Zaresky]

13   TIME WARNER INC., a corporation;
     WARNER COMMUNICATIONS
14   INC., a corporation; WARNER          **DECLARATION OF MARC
                                          TOBEROFF, ESQ.**
15   BROS. ENTERTAINMENT INC., a
     corporation; WARNER BROS.
16   TELEVISION PRODUCTION INC.,
     a corporation; DC COMICS, a general
17   partnership; and DOES 1-10,

18
                      Defendants.
19

20   DC COMICS,

21
                      Counterclaimant,
22        vs.

23   JOANNE SIEGEL, an individual; and
24   LAURA SIEGEL LARSON, an
     individual,
25

26                    Counterclaim Defendants.

27

28

                    Declaration Of Marc Toberoff, Esq.

Exhibit 14
299

# DECLARATION OF MARC TOBEROFF, ESQ.

I, Marc Toberoff, Esq., caused the following errata corrections to be made upon reviewing my deposition transcript:

1.    On page 37, line 20, I changed "Yes" to "No, J. Todd Harris was not involved with IP Worldwide, LLC" to reflect the correct answer as articulated on page 37, line 22.

2.    On page 90, line 5, I changed "were" to "was" to correct grammar.

3.    On page 119, line 24, I changed "I believe a longer term" to "I believe I requested a longer term" because this accurately reflects what I was trying to say.

4.    On page 122, line 10, I changed "representing him" to "representing them" because I believe this is a typo.

5.    On page 124, line 24, I changed "was a highly" to "was highly" to correct grammar.

6.    On page 132, line 10, I changed "me, that" to "me, whether that" because this accurately reflects what I was trying to say.

7.    On page 138, line 18, I changed "August" to "October" because that is the correct month.

Executed on December 20, 2006 in Los Angeles, California.

_____
Marc Toberoff

1

Declaration Of Marc Toberoff, Esq.

Exhibit 14
300