DANIEL M. PETROCELLI (S.B. #097802)
  dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
  mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
  cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067-6035
Telephone:  (310) 553-6700
Facsimile:   (310) 246-6779

PATRICK T. PERKINS (admitted *pro hac vice*)
  pperkins@ptplaw.com
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, NY 10516
Telephone:  (845) 265-2820
Facsimile:   (845) 265-2819

Attorneys for Plaintiff DC Comics

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DC COMICS,<br><br>        Plaintiff,<br><br>    v.<br><br>PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, an individual, JOANNE SIEGEL, an individual, LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive,<br><br>        Defendants. | Case No. CV 10-3633 ODW (RZx)<br><br>**PLAINTIFF DC COMICS' RENEWED OPPOSITION TO MARC TOBEROFF, PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, AND IPW, LLC'S RENEWED MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6) (DOCKET NO. 146) (RE: FOURTH AND FIFTH CLAIMS FOR RELIEF)**<br><br>Hon. Otis D. Wright II<br><br>**Hearing Date**:   TBD<br>**Hearing Time**:   TBD |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................ 1

II.   FACTUAL BACKGROUND ............................................... 3

III.  DC COMICS' CLAIMS ARE NOT TIME-BARRED ................ 8

IV.   DEFENDANTS' TORTIOUS ACTS OF BUSINESS INTERFERENCE ARE NOT SHIELDED BY THE LITIGATION PRIVILEGE ...................................................... 13

V.    DEFENDANTS INTERFERED WITH DC'S 1992 CONTRACT AND BUSINESS RELATIONSHIP WITH THE SHUSTERS ............ 17

VI.   CONCLUSION .............................................................. 18

1

## <u>TABLE OF AUTHORITIES</u>

2

### CASES

3

*Action Apartment Ass'n, Inc. v. City of Santa Monica*,
    41 Cal. 4th 1232 (2007)...................................................................... 14, 15

4

*Adobe Lumber, Inc. v. Hellman*,
    2008 WL 4615285 (E.D. Cal. Oct. 17, 2008) .................................... 11

5

6

*Alvarez v. Hill*,
    518 F.3d 1152 (9th Cir. 2008) ........................................................ 18

7

*Baker v. Beech Aircraft Corp.*,
    39 Cal. App. 3d 315 (1974).................................................. 11, 12, 13

8

9

*Birschtein v. New United Motor Mfg., Inc.*,
    92 Cal. App. 4th 994 (2001) .......................................................... 10

10

*Bylin Heating Sys., Inc. v. M & M Gutters, LLC*,
    2008 WL 744706 (E.D. Cal. March 18, 2008)........................... 16, 17

11

12

*Edwards v. Centex Real Estate Corp.*,
    53 Cal. App. 4th 15 (1997) ............................................................ 14

13

*Flowers v. Carville*,
    310 F.3d 1118 (9th Cir. 2002) .......................................................... 9

14

15

*Fox v. Ethicon Endo-Surgery, Inc.*,
    35 Cal. 4th 797 (2005)...................................................................... 9

16

*Haneline Pac. Props., LLC v. May*,
    167 Cal. App. 4th 311 (2008).................................................... 13, 14

17

18

*Hansen v. Bear Film Co.*,
    28 Cal. 2d 154 (1946) .................................................................... 12

19

*Hopkins v. Dow Corning Corp.*,
    33 F.3d 1116 (9th Cir. 1994) .......................................................... 11

20

21

*In re Grand Jury Investigation*,
    974 F.2d 1068 (9th Cir. 1992) ........................................................ 16

22

*In re Matter of Fischel*,
    557 F.2d 209 (9th Cir. 1977) .......................................................... 16

23

24

*In re Rubber Chems. Antitrust Litig.*,
    504 F. Supp. 2d 777 (N.D. Cal. 2007)........................................ 11, 12

25

*Jolly v. Eli Lilly & Co.*,
    44 Cal. 3d 1103 (1988) .................................................................. 11

26

27

*Kajima Eng'g & Constr., Inc. v. City of L.A.*,
    95 Cal. App. 4th 921 (2002) .......................................................... 16

28

ii

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003) ............................................................................ 17

*LiMandri v. Judkins*,
  52 Cal. App. 4th 326 (1997) ..................................................................... 15

*Milne v. Stephen Slesinger, Inc.*,
  430 F.3d 1036 (9th Cir. 2005) .............................................................. 2, 17

*Newport Builders, Inc. v. N. Bay Constr.*,
  2009 WL 2083359 (N.D. Cal. July 14, 2009) ..................................... 15, 16

*Norgart v. Upjohn Co.*,
  21 Cal. 4th 383 (1999) ............................................................................. 10

*Pashley v. Pac. Elec. Co.*,
  25 Cal. 2d 226 (1944) .............................................................................. 12

*Penguin Group (USA) Inc. v. Steinbeck*,
  537 F.3d 193 (2d Cir. 2008) .................................................................. 2, 17

*Polar Bear Prods., Inc. v. Timex Corp.*,
  384 F.3d 700 (9th Cir. 2004) .................................................................... 10

*Rubin v. Green*,
  4 Cal. 4th 1187 (1993) ............................................................................. 16

*Rusheen v. Cohen*,
  37 Cal. 4th 1048 (2006) ........................................................................... 13

*Shropshire v. Fred Rappaport Co.*,
  294 F. Supp. 2d 1085 (N.D. Cal. 2003) .................................................... 14

*Suh v. Yang*,
  987 F. Supp. 783 (N.D. Cal. 1997) ............................................................. 9

*Sylve v. Riley*,
  15 Cal. App. 4th 23 (1993) ....................................................................... 11

*U.S. v. Chen*,
  99 F.3d 1495 (9th Cir. 1996) .................................................................... 16

*U.S. v. Hodge & Zweig*,
  548 F.2d 1347 (9th Cir. 1977) .................................................................. 16

*Unruh-Haxton v. Regents of Univ. of Cal.*,
  162 Cal. App. 4th 343 (2008) ................................................................... 12

*Wyatt v. Union Mortg. Co.*,
  24 Cal. 3d 773 (1979) ................................................................................ 9

**STATUTES**

17 U.S.C. § 304(c)(6)(D) .......................................................................... 18

iii

1

CAL. CIV. PROC. CODE § 339(1) ............................................................... 10

2

CAL. CIV. PROC. CODE § 47 ..................................................................... 13

3

## RULES

4

FED. R. CIV. PROC. 54 ................................................................................ 5

5

FED. R. CIV. PROC. 12 .............................................................................. 13

6

7

## OTHER AUTHORITIES

8

5 WITKIN, CAL. PROC. ACTIONS, § 529 (5th Ed. 2008)........................... 11

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DC COMICS' RENEWED OPP. TO DEFS'
RENEWED MOTION TO DISMISS FOURTH
& FIFTH CLAIMS

## I.    INTRODUCTION

Many of the issues presented in defendants' Rule 12 motion challenging defendants' fourth and fifth claims are addressed in DC Comics' oppositions to defendants' three other motions.  Well aware of the burden placed on the Court and its staff by defendants' four filings—spanning some 100 pages of briefing, 71 footnotes, and 1000-plus pages of exhibits—DC Comics focuses on the primary arguments defendants advance.

Defendants assert that the litigation privilege is a complete bar to DC Comics' fourth and fifth claims.  As in their SLAPP motion, defendants' arguments rest on a false construct and have no merit.  The courts have repeatedly held that the privilege does not shield business misconduct, even if committed by a person who happens to be a lawyer.  As stated in its SLAPP opposition, DC Comics' fourth and fifth claims are focused on acts of tortious interference by self-described "producer" Marc Toberoff and his entertainment companies.  These acts of misconduct— unlawfully securing rights and engaging in outright fraud—were undertaken by Toberoff as part of his entertainment business.  Before being sued here, Toberoff professed that this business was *distinct* from his work as a lawyer and separated by a "defined firewall."  DC's SLAPP Opp. at 1.  Now that Toberoff seeks to escape liability, he falsely asserts that *all* his actions—everything alleged in DC Comics' complaint—were part of his law practice.  He says this even though the contracts he induced the Shusters and Siegels to sign were with his *entertainment companies*, and even though these contracts expressly disclaimed that the companies were law firms or would provide the Shusters or Siegels any counsel in litigation.  *Id.* at 2-8.

Try as defendants might to rewrite DC Comics' allegations, all of which must be accepted as true, DC Comics' state-law claims unmistakably and unambiguously challenge Toberoff's business practices, not his practice of law.  In its fourth claim, DC Comics explains how Toberoff and his companies wrongfully obtained copyright interests from the Shusters by way of assignments that violate

1   the Copyright Act and interfere with DC Comics' rights and interests both under

2   that Act and its 1992 contract with the Shusters.  Toberoff also engineered a series

3   of unlawful "consent agreements," which continue to this day to actively interfere

4   with DC Comics' rights.  These continuing harms—which will injure DC Comics

5   through and beyond 2013—are the subject of this suit.

6        DC Comics' fifth claim is for interference with prospective economic

7   advantage and stems from the December 2008 court-ordered disclosure of a letter—

8   the "Toberoff Timeline"—that revealed the fraudulent means Toberoff used to

9   destroy DC Comics' ongoing business relationship with Jerry Siegel's heirs.  While

10  defendants had actively suppressed lies that Toberoff told the Siegel heirs to induce

11  them to cut ties with DC Comics in September 2002, the production of the Timeline

12  in December 2008 for the first time disclosed these facts, including Toberoff's

13  efforts to conceal them.  Defendants fought for two years in the *Siegel* cases to keep

14  this document a secret, and Judge Larson rejected that position in December 2008.

15  Case No. CV 04-8400, Docket No. 386.  Again in this case, defendants sought a

16  protective order from Magistrate Zarefsky barring DC Comics from using the

17  Timeline in discovery.  Magistrate Zarefsky denied that motion, and depositions

18  will soon begin concerning this key document.  Docket No. 74.

19       Also without merit are defendants' arguments that DC Comics' fourth and

20  fifth claims are barred by the statute of limitations.  These arguments raise factual

21  issues that cannot be resolved as a matter of law and are incorrect in any event—

22  DC Comics' claims are timely under the doctrines of continuing harm, delayed

23  discovery, and fraudulent concealment.

24       Finally, defendants' 10-page argument that the Shusters' 1992 agreement

25  with DC Comics runs afoul of the Copyright Act—copied and pasted from their

26  motion to dismiss DC's first claim—was directly rejected by the courts in *Milne v.*

27  *Stephen Slesinger, Inc.*, 430 F.3d 1036, 1048 (9th Cir. 2005), and *Penguin Group*

28  *(USA) Inc. v. Steinbeck*, 537 F.3d 193, 204 (2d Cir. 2008).

- 2 -

1    **II.    FACTUAL BACKGROUND**

2    <u>A.  DC Comics' Relationships with the Siegels and Shusters.</u>  In the 1930s,

3    Jerry Siegel and Joe Shuster created the character Superman.  In the late 1930s, DC

4    Comics agreed to hire Siegel and Shuster to work on a variety of comic book

5    projects.  Eventually, DC Comics agreed to hire Siegel and Shuster to adapt and

6    expand for publication a Superman story for publication that Siegel and Shuster had

7    prepared and that every other publisher in the industry had rejected.  As employees

8    under work-for-hire agreements, Siegel and Shuster worked for DC Comics

9    through the 1940s.  After leaving DC Comics, suing it, and his efforts to launch

10    new comic-book properties failed, Siegel returned to work for DC Comics again in

11    the 1950s.  Through it all, DC Comics' relationship with these two men and their

12    families has spanned 75 years.  FAC ¶¶ 28-31, 40-45.

13    Defendants claim Siegel and Shuster were excluded from "the massive

14    profits from their creation," Mot. at 1, but this rewriting of history is untrue.  Siegel

15    and Shuster shared handsomely in royalty rights under their frequently renegotiated

16    contracts with DC Comics, and even as the country was trying to recover from the

17    Great Depression, they were paid the equivalent of millions of dollars in today's

18    terms.  Moreover, when Siegel and Shuster ran into financial difficulties in the

19    1970s, DC Comics' affiliate agreed to provide them and their families with

20    generous annual pensions, medical insurance, and bonuses—even though Siegel

21    and Shuster had sued DC Comics twice before and had been publicly critical of the

22    company.  Under their agreements with DC Comics, Siegel, Shuster, and their

23    families have been paid nearly $4 million—and continue to receive payments

24    today.  Siegel and Shuster had the opportunity to exercise any putative right of

25    termination that they may have held after Congress enacted the copyright

26    termination provisions in the Copyright Act in 1976.  They chose not to exercise

27    any such purported right during their respective lifetimes, instead rightly honoring

28    their agreements with DC Comics.  FAC ¶¶ 46-50.

DC COMICS' RENEWED OPP. TO DEFS'
RENEWED MOTION TO DISMISS FOURTH
& FIFTH CLAIMS

**B.  Toberoff Interferes with the Siegel Relationship.**  Months after Siegel died in 1996, his wife and daughter found a lawyer in Washington, D.C., and served a copyright termination notice on DC Comics seeking to terminate the many grants Siegel had made to DC Comics.  At the time, DC Comics and the Siegels still enjoyed a cordial relationship.  The Siegels retained a well-known entertainment law firm in Los Angeles (the Gang Tyre firm) to represent them in discussions with DC concerning their alleged termination rights.  Those discussions lasted several years, culminating in an agreement in October 2001.  Thereafter, the parties began work on a long-form settlement document.  FAC ¶¶ 66-69.

In November 2001, Toberoff contacted the Siegels' lawyer at the Gang Tyre firm—Kevin Marks—seeking to acquire the Siegels' Superman rights.  Marks did not return Toberoff's call.  In February 2002, Toberoff made contacts with Marks, identified himself as a film producer, and stated his interest to acquire the Siegels' rights.  Marks refused to discuss the issue because the Siegels had already reached an agreement with DC Comics.  As negotiations over the long-form settlement agreement continued through the summer of 2002, Toberoff and his company—defendant IP Worldwide, LLC—contacted Marks again and offered to buy the Siegels' rights.  Marks conveyed this communication to the Siegels.  In September 2002, the Siegels fired Marks and terminated their discussions with DC Comics.  The next month, they signed an agreement with IP Worldwide.  This October 2002 agreement provided that IP Worldwide would "negotiate the sale, lease, license and all other dispositions or exploitations" of their putative Superman rights in exchange for 10% of the proceeds.  The Siegels also agreed they would "not transfer, assign, license or in any manner encumber the Rights … other than through or as a result of IPW's exclusive representation."  In November 2002, the Siegels served DC Comics with a notice of termination as to alleged "Superboy" rights.  The notice fraudulently claimed Jerry Siegel was the sole creator of Superboy and the Siegels were the sole owner of his rights.  FAC ¶¶ 70-90.

DC COMICS' RENEWED OPP. TO DEFS'
RENEWED MOTION TO DISMISS FOURTH
& FIFTH CLAIMS

Two years later, in October 2004, the Siegels filed two lawsuits seeking
declaratory relief as to the validity of the copyright termination notices they served
regarding Superman and Superboy.  Case Nos. CV-04-8400, CV-04-8776.  While
defendants assert the *Siegel* actions have been "an enormous setback" for DC
Comics, Mot. at 2, the exact opposite is true.  Among other things, Judge Larson:

- determined that the Siegels recaptured an exceedingly limited category of
  Superman rights—specifically, materials in only three early comic books and
  two weeks of newspaper strips, Case No. CV-04-8400, Docket No. 560 at 92,
  Docket No. 602 at 13-14;
- determined that the Siegels did not recapture important first publications of
  the Superman character that pre-date these comic books and strips, Case No.
  CV-04-8400, Docket No. 293 at 39, Docket No. 602 at 8;
- rejected the Siegels' claims to many other works they sought to terminate,
  including various publications and various elements of the Superman story;
  Case No. CV-04-8400, Docket No. 560 at 45, Docket No. 602 at 13-14;
- rejected the Siegels' claims to foreign copyright interests, profits earned by
  DC Comics' affiliates, and trademark rights, Case No. CV-04-8400, Docket
  No. 293 at 66-67, Docket No. 602 at 8;
- and rejected the Siegels' contention that Superboy was a work solely created
  by Jerry Siegel that is eligible for termination by the Siegels alone and, by
  implication, rejected the Siegels' unfounded claim of copyright infringement
  in the *Smallville* television series, Case No. 04-8776 ODW (RZx), Docket
  No. 151 at 5-38, 62.

There is no better proof of how poorly these cases have gone for the Siegels—
which include a full bench trial they lost, Case No. CV-04-8400, Docket No. 554,
Docket No. 602 at 12-13—than the Rule 54(b) motion they filed in the *Siegel*
actions seeking to avoid an accounting trial, because it will expose how little they
are owed under Judge Larson's rulings.  In contrast, had the Siegels not been
induced to repudiate their 2001 settlement agreement with DC Comics, they would
have received millions of dollars by now, and kept nearly all of it.  Because of
Toberoff's actions to enrich himself, however, the Siegels have received nothing to
date and must give to Toberoff 45% of anything they may obtain.  FAC ¶¶ 66-85.

1    Another major setback defendants suffered in the *Siegel* cases occurred in

2    December 2008, when Judge Larson—after two years of litigation on the issue—

3    ordered production of the Toberoff Timeline.  Case No. CV 04-8400, Docket No.

4    386.  Defendants sought a protective order barring use of the Timeline in this case,

5    but Magistrate Zarefsky denied that motion on September 20, 2010, despite

6    defendants' (erroneous) arguments that the document was privileged and wrongly

7    obtained by DC Comics.  Docket No. 74; Docket No. 42 at 4-7, 40-61.

8    The Toberoff Timeline, for the first time, revealed the fraudulent acts the

9    Toberoff defendants employed in the summer of 2002 to cause the Siegels to sever

10   their economic relationship with DC Comics.  The letter reveals that in August

11   2002, Toberoff and his business partner contacted Kevin Marks (the Siegels'

12   attorney) and claimed falsely they had a billionaire investor ready and willing to

13   purchase the Siegels' Superman rights.  The deal the Toberoff defendants proposed

14   included paying the Siegels $15 in up-front cash, offering generous back-end

15   royalty rights on any Superman properties that the Toberoff entertainment

16   companies helped get developed, and promising development of a new Superman

17   movie, even though DC Comics' affiliate Warner Bros. was then in development

18   with a Superman film. As the Toberoff Timeline revealed, however, Toberoff's

19   deal for the Siegels was false and fraudulent.  There was no billionaire investor, and

20   Toberoff admitted that he knew that he could never produce a Superman movie in

21   view of the one Warner Bros. was developing.  FAC ¶¶ 78-85, 102-04.

22   Defendants' Rule 12 motion (like their SLAPP motion) disputes or ignores

23   these facts and many more pled in DC Comics' complaint.  Instead, they falsely

24   assert that DC Comics' business relationship ended on May 9, 2002, when Joanne

25   Siegel sent a letter to Time Warner complaining about the draft long-form

26   agreement sent by DC Comics.  Mot. at 7, 21; SLAPP Mot. at 8, 22-23.

27   Defendants' assertion on this issue critical to their motion is directly contradicted

28   not only by the express terms of DC Comics' complaint, but also discovery

DC COMICS' RENEWED OPP. TO DEFS'
RENEWED MOTION TO DISMISS FOURTH
& FIFTH CLAIMS

1    responses the Siegels *themselves* gave in the *Siegel* cases, but conspicuously do not

2    disclose here.

3         There is no excuse for the defendants not to have mentioned these facts.  The

4    allegations described above—including specific quotation of the Siegels' discovery

5    response—are all set forth in the body of DC Comics' complaint:

> DC Comics objected to [Joanne Siegel's] sudden and unfounded
> objections expressed in [her] May 9 letter, but continued working with
> the Siegels' counsel (Kevin Marks) to finalize the long-form
> agreement.  On May 16, 2002, *Marks*, who had discussed the long-
> form agreement with the Siegel Heirs, told Warner Bros. general
> counsel John Schulman … *the Siegels could "deal with it" and that it
> was "not contrary to what had been agreed to."  Throughout the
> summer of 2002, Marks worked on a re-draft of the February 1, 2002
> long-form agreement, which he submitted to the Siegels for their
> approval on July 15, 2002.*
>
> In or around August 2002, as Marks was finalizing the Siegels'
> revisions to the long-form document, Toberoff contacted Marks again
> regarding the Siegel-DC Comics Agreement.  Upon information and
> belief, Marks informed Toberoff he could not discuss the matter,
> including the terms of the agreement, because of a confidentiality
> agreement between DC Comics and the Siegel Heirs.  Toberoff
> reiterated interest in purchasing the Siegel Heirs' Superman rights.  On
> August 8, 2002, Toberoff conveyed an offer to Marks for presentation
> to the Siegels, which Marks said he would convey.
>
> Upon information and belief, Toberoff's offer stated that he had
> found a billionaire investor willing to purchase the Siegel Heirs'
> Superman rights.  Toberoff claimed the investor would give the Siegel
> Heirs $15 million cash up front, plus generous royalty and "back-end"
> rights on any properties developed, including a new Superman motion
> picture.  Marks asked whether the offer was contingent on a due
> diligence investigation, and Toberoff stated that he had already
> conducted due diligence.  Upon information and belief, Toberoff also
> falsely offered to help the Siegel Heirs produce a movie that would
> compete directly with the Superman movie in development at the time
> at Warner Bros., DC Comics' licensee, even though he knew that the
> Siegels' limited rights in the recaptured copyright, if any, would make
> such a competing motion picture all but impossible to produce and
> distribute.
>
> Upon information and belief, although Marks conveyed
> Toberoff's offer to the Siegels, he advised them that they had already
> reached a binding agreement with DC Comics.  Nonetheless, as a
> result of Toberoff's fraudulent inducements, the Siegel Heirs stated
> that they would repudiate their agreement with DC Comics and accept

DC COMICS' RENEWED OPP. TO DEFS'
RENEWED MOTION TO DISMISS FOURTH
& FIFTH CLAIMS

Toberoff's offer.  On or around September 21, 2002, the Siegel Heirs sent a letter to Marks terminating him as their attorney.

On or around September 21, 2002, based on Toberoff's inducements and other acts of interference described above, the Siegel Heirs sent a letter to DC Comics repudiating the Siegel-DC Comics Agreement.  On October 28, 2002, the Siegel Heirs sent a letter to DC Comics confirming that the September 21, 2002 letter "totally stopped and ended negotiations with DC Comics, Inc."… _[I]n a 2006 discovery response in the Siegel Actions, the Siegel Heirs denied that "[b]y the May 9 Letter, [the Siegel Heirs] terminated negotiations with Defendants concerning the Superman Notices."_

FAC ¶¶ 75-80 (emphasis added).

C.  Toberoff Traffics in the Shuster Rights.  Over the past 10 years, Toberoff has similarly induced the Shuster heirs to enter into a series of contracts among and between defendants that tortiously interfere with DC Comics' rights under contract and federal law.  These agreements, which continue to exist to this day and which interfere with DC Comics' rights under its 1992 agreement with Joe Shuster's heirs (Jean Peavy and Frank Shuster) are described in detail in DC Comics' opposition briefs to defendants' SLAPP motion, motion to dismiss DC Comics' first claim for relief, and motion to dismiss DC's third and six claims.  DC Comics will not repeat those descriptions, which are alleged in its complaint as well.  _Id._ ¶¶ 60-65, 92-100.

## III.  DC COMICS' CLAIMS ARE NOT TIME-BARRED.

A.  DC's Fourth Claim Regarding the Shusters.  DC Comics has addressed the timeliness of its fourth claim in its opposition to defendants' SLAPP motion, and its opposition to defendants' Rule 12 motion challenging DC Comics' sixth claim.  It will not repeat those arguments here in full, except to make clear that this claim is also timely under the delayed discovery and fraudulent concealment rules, and expressly permitted because DC Comics' fourth claim challenges a _continuing course of conduct_ designed to harm DC Comics through and including 2013, when the Shuster termination notice purports to take effect.  Furthermore, like the other issues in their motions, defendants' arguments raise purely factual matters that cannot possibly be decided as a matter of law in a pleading motion.

DC COMICS' RENEWED OPP. TO DEFS' RENEWED MOTION TO DISMISS FOURTH & FIFTH CLAIMS

1    DC Comics' fourth claim is based on a series of contracts Toberoff induced

2    the Shusters to sign, the latest iterations of which were only recently disclosed to

3    DC Comics and *all* of which continue to harm DC Comics' interests to this day.

4    FAC ¶¶ 174-79; SLAPP Opp. at 3-6, 22-23.  The "continuing wrong" doctrine tolls

5    all statutes of limitations where, as here, defendants are engaged in "multiple,

6    continuous acts, and some of the[] acts occurred within the limitations period."  *Suh*

7    *v. Yang*, 987 F. Supp. 783, 795 (N.D. Cal. 1997); *Wyatt v. Union Mortg. Co.*, 24

8    Cal. 3d 773, 788 (1979) (same); *cf. Flowers v. Carville*, 310 F.3d 1118, 1126 (9th

9    Cir. 2002).  DC Comics' fourth claim seeks a declaration bringing this continuing

10   harm to a halt—invalidating all unlawful consent agreements (past, present, and

11   future) that improperly restrict the Shusters' rights to negotiate with DC Comics.

12   FAC ¶ 193.  The relief DC Comics seeks will define the parties' current and future

13   business interests, and thus addresses a *present* controversy.  In such circumstances,

14   the statute of limitations is not a bar.  *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal.

15   4th 797, 806 (2005).  Defendants say *nothing* about continuing harm, even though

16   DC Comics expressly alleges its existence in its complaint.  FAC ¶¶ 3, 101, 169-70.

17   Defendants' other argument is to mischaracterize the interfering consent

18   agreements at issue in DC Comics' fourth claim as limited—they are *not*—to the

19   Pacific Pictures agreements that defendants say were produced to DC Comics in

20   2006.  Mot. at 20.  DC Comics clearly pled that these and *additional, new* consent

21   agreements "*remain in effect* to this day," FAC ¶ 170 (emphasis added), and

22   defendants do not address or dispute these allegations.  Nor can they, because they

23   must be accepted as true.  In fact, in their initial motion to strike certain paragraphs

24   from DC Comics' complaint, defendants acknowledged that such "consent

25   agreements" still exist and were not disclosed to DC Comics until 2008.  Docket

26   No. 34 at 16; *see also* Opp. to Siegel Mot. on Third and Sixth Claim at 16-23

27   (disclosures in 2008 and 2010).  Defendants' unlawful consent agreements are part

28   of an integrated scheme of misconduct that continues to violate DC Comics' rights

1   to this day.  Because these tortious agreements remain in effect and the harm to DC

2   Comics continues, the statute of limitations has not run on DC Comics' fourth

3   claim.  *E.g.*, *Birschtein v. New United Motor Mfg., Inc.*, 92 Cal. App. 4th 994, 1003

4   (2001) (where a tort involves a continuing wrong, the statute of limitations does not

5   begin to run until the date of the last injury or when the tortious acts cease).

6         <u>B.  DC's Fifth Claim Regarding the Siegels.</u>  Defendants' argument that the

7   statute of limitations bars DC Comics' fifth claim for relief is also unfounded.  DC

8   Comics clearly pled in its complaint that it did not discover the August 2002 acts of

9   fraud in which Toberoff engaged—and which are the gravamen of its fifth claim—

10   until December 2008, when the Timeline was ordered produced pursuant to Court

11   order.  FAC ¶¶ 102-04.  Defendants make no mention of these facts, the disclosure

12   of this critical document, or their discovery responses in the *Siegel* cases in which

13   they *conceded* that DC Comics and the Siegels had *not* terminated their business

14   discussions in May 2002.  *Supra* at 6-8.

15         Each of these deliberately omitted facts is fatal to defendants' motion, as the

16   "discovery rule" tolls the statute of limitation until a plaintiff discovers the facts

17   giving rise to its claims.  *E.g.*, *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d

18   700, 707 (9th Cir. 2004); *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 393 (1999)

19   (same).  The statute of limitation for tortious interference claims is two years, Cal.

20   Civ. Proc. Code § 339(1), and the Toberoff Timeline, which DC first received on

21   December 10, 2008, revealed *for the first time* that Toberoff had:

22
23       •  fraudulently represented to the Siegels there was a "billionaire waiting to
           invest $15 million" if they cut their ties to DC Comics, FAC Ex. A at 67;

24       •  falsely promised the Siegels that they would produce a competing
           Superman movie if the Siegels cut their ties with DC, *id.* at 63;

25       •  "mess[ed] up relationships for his own personal benefit", id. at 64;

26       •  "interfer[ed] in all the relationships" between DC Comics and the Shuster
           and Siegel heirs, *id.*; and

27       •  "thwarted the earlier deal with Time Warner and DC Comics in 2002 for
28          his own personal gain," *id.* at 67.

DC COMICS' RENEWED OPP. TO DEFS'
RENEWED MOTION TO DISMISS FOURTH
& FIFTH CLAIMS

1   DC Comics filed its complaint in this case on May 14, 2010—17 months after

2   receiving this letter, and well within the two-year statute.

3       A plaintiff pleads facts "necessary to invoke discovery rule" where, as here,

4   it alleges that it "never had any reason to suspect" the wrongful cause of its injury

5   until after a critical discovery was made. *Hopkins v. Dow Corning Corp.*, 33 F.3d

6   1116, 1120 (9th Cir. 1994); *Adobe Lumber, Inc. v. Hellman*, 2008 WL 4615285, at

7   *2-*4 (E.D. Cal. Oct. 17, 2008) (discovery rule applies where "facts are sufficient

8   at least to satisfy plaintiff's burden of alleging the time and manner of discovery of

9   its claims").  This inquiry turns on "question[s] of fact" that cannot be resolved on

10  the pleadings.  *Sylve v. Riley*, 15 Cal. App. 4th 23, 26 (1993).

11      While defendants may assert that DC Comics knew or should have known of

12  Toberoff's frauds earlier, that assertion is directly contradicted by DC Comics'

13  pleadings, *supra* at 4-8, and cannot conceivably be resolved on a motion to dismiss,

14  *e.g.*, *Sylve*, 15 Cal. App. 4th at 26; *Baker v. Beech Aircraft Corp.*, 39 Cal. App. 3d

15  315, 323 (1974) ("Whether appellants should have made discovery sooner in view

16  of the facts set forth, is not a question to be concluded as a matter of law."); *In re*

17  *Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007).  Indeed,

18  the author of the Timeline explains why DC Comics would not have the necessary

19  "suspicion of wrongdoing" to preclude its reliance on the discovery rule.  *Jolly v.*

20  *Eli Lilly & Co.*, 44 Cal. 3d 1103, 1110-11 (1988).  As revealed in the Timeline:

21  "DC is trying to understand why [the Siegels] backed out of the deal.  *The reason is*

22  *MT [Marc Toberoff] who is interfering in all the relationships up to this point*."

23  FAC Ex. A at 64 (emphasis added).  This brings DC Comics' claim squarely within

24  the discovery rule.  5 WITKIN, CAL. PROC. ACTIONS, § 529 (5th Ed. 2008)

25  ("[D]iscovery rule may be applied to breaches which can be, and are, committed in

26  secret and, moreover, where the harm flowing from those breaches will not be

27  reasonably discoverable by plaintiffs until a future time.").

28

DC COMICS' RENEWED OPP. TO DEFS'
RENEWED MOTION TO DISMISS FOURTH
& FIFTH CLAIMS

1   Discovery into the full depths of Toberoff's misconduct, as set forth in the

2   Timeline and yet to be uncovered, must now begin.  As noted, Magistrate Zarefsky

3   rejected defendants' efforts to bar discovery related to the Timeline in this case.

4   Docket No. 74.  In 2007, he also rejected defendants' false claims that DC Comics

5   or its litigation counsel had access to the Timeline in 2007 or before.  Docket No.

6   42 at 4-7, 40-61.  The first time DC Comics obtained the Timeline—and the date on

7   which the statute on this claim began to run—was December 10, 2008.  FAC ¶¶

8   102-04.  In ordering the document be produced then, Judge Larson held defendants

9   had waived any objections to its disclosure.  Docket No. 42 at 4-7, 40-61.

10   In addition, DC Comics' fifth claim also is not time-barred because

11   defendants fraudulently concealed Toberoff's misdeeds.  The California Supreme

12   Court established long ago that a "statute of limitations … may not [be] use[d] to

13   perpetrate a fraud upon otherwise diligent suitors." *Pashley v. Pac. Elec. Co.*, 25

14   Cal. 2d 226, 231 (1944).  Where, as here, "a defendant is guilty of fraudulent

15   concealment of the cause of action, the statute of limitation is deemed not to

16   become operative until the aggrieved party discovers the existence of the cause of

17   action." *Hansen v. Bear Film Co.*, 28 Cal. 2d 154, 178 (1946); *Unruh-Haxton v.*

18   *Regents of Univ. of Cal.*, 162 Cal. App. 4th 343, 367 (2008) (same).  The doctrine

19   of "fraudulent concealment" turns on factual questions inappropriate for

20   adjudication at the motion to dismiss stage.  *In re Rubber Chems. Antitrust Litig.*,

21   504 F. Supp. 2d at 789; *Baker*, 39 Cal. App. 3d at 323.

22   The entire purpose of the Toberoff Timeline was, according to its author, to

23   expose the facts Toberoff had fraudulently concealed for so long:

24   *Toberoff being labeled as the "relentless crusader for artists' rights"*
*is hardly that:  he has devised a strategy whereas he has ultimately*

25   *claimed much ownership of the Superman copyright <u>personally</u> as he*

26   *can ….  We believe there are details within this timeline that will be of*

27   *strong interest to you.*

28   FAC Ex. A at 62 (emphasis in original).

DC COMICS' RENEWED OPP. TO DEFS'
RENEWED MOTION TO DISMISS FOURTH
& FIFTH CLAIMS

Moreover, when defendants were examined in the *Siegel* actions, they concealed the Toberoff defendants' lies and misdeeds—which were only finally exposed in December 2008.   When the Timeline came to light, DC Comics was forced to overcome unsupportable claims of privilege lodged by defendants to bar access to the facts.  Docket No. 42 at 4-7, 40-61.  DC Comics cannot be faulted for failing to discover these facts sooner.  *Cf. Baker*, 39 Cal. App. 3d at 321 (fraudulent concealment doctrine applies where "the plaintiff was not at fault for failing to discover" the fraud).  Finally, defendants' assertion that DC Comics learned of Toberoff's fraudulent offers during Kevin Marks' deposition in 2006, SLAPP Mot. at 24, misses the mark.  Marks was not privy to Toberoff's knowledge that this offer was a false one, or to Toberoff's subsequent confession of this fact to the Siegels.  FAC Ex. A at 67.  These frauds were only exposed when the Toberoff Timeline was ordered produced in December 2008.

## IV.   DEFENDANTS' TORTIOUS ACTS OF BUSINESS INTERFERENCE ARE NOT SHIELDED BY THE LITIGATION PRIVILEGE.

This issue is more exhaustively addressed in DC Comics' opposition to defendants' SLAPP motion, but to be clear, the Toberoff defendants may not invoke California's litigation privilege (or the SLAPP statute) to immunize their unlawful *business conduct*.  SLAPP Opp. at 12-22.  Moreover, as noted in DC Comics' SLAPP briefing, whether the litigation privilege applies is an issue of fact about defendants' intent and conduct that cannot possibly be resolved on a Rule 12 motion or without complete discovery.  *Id*. at 8-10; Fed. R. Civ. P. 12(d).

California's litigation privilege set forth in section 47(b) of the Civil Code protects communicative conduct in ongoing or "reasonably anticipated" litigation.  *Haneline Pac. Props., LLC v. May*, 167 Cal. App. 4th 311, 319 (2008).  In determining whether the privilege applies, courts focus on "the gravamen" of plaintiff's claim for relief, and do not rely on defendants' characterization of the pleadings.  *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1058 (2006).  When the conduct at

issue occurs prior to litigation, a court will apply the privilege only if litigation was anticipated "in good faith and under serious consideration." *Action Apartment Ass'n, Inc. v. City of Santa Monica*, 41 Cal. 4th 1232, 1252 (2007).

Litigants before the Toberoff defendants have tried to sweep their business disputes with the compass of the litigation privilege, but the California courts consistently reject such overreaching arguments. As one court said:

> The Mays argue that "The spectre of litigation 'loomed' over the entire course of the parties' communications," but the same could be said of nearly any high-stakes negotiation …. *Negotiations and persuasion are part of any business deal. To suggest that nearly any attempt at negotiation is covered by the privilege, especially when attorneys are involved, is unduly overbroad*….

*Haneline*, 167 Cal. App. 4th at 320 (emphasis added). Given that "there is always at least the *potential* for a lawsuit any time a dispute arises between individuals or entities," courts refuse to apply the privilege in a way that "would swallow up much of the law of torts" or "provide immunity for fraud." *Edwards v. Centex Real Estate Corp.*, 53 Cal. App. 4th 15, 32, 33 (1997).

Disregarding DC Comics' well-pled allegations to the contrary, FAC ¶¶ 70-84, defendants claim all of their conduct challenged in DC Comics' fourth and fifth claims was *intended* to "achieve the objects" of "'reasonably anticipated' litigation." Mot. at 23. This conclusory assertion does not suffice to trigger the privilege; and as the California courts have made clear, such assertions present "an issue of fact" that may not be resolved without discovery on the pleadings. *Action Apartment*, 41 Cal. 4th at 1252. As one court held in a dispute much like this one:

> [W]hether Plaintiffs' communications … were made in anticipation of litigation for the purpose of California's litigation privilege … depends upon whether Defendant's statements were made "with a good faith belief in a legally viable claim and in serious contemplation of litigation." *This a factual question and therefore, Plaintiffs must be permitted to conduct discovery.…* (emphases added).

*Shropshire v. Fred Rappaport Co.*, 294 F. Supp. 2d 1085, 1100 (N.D. Cal. 2003).

- 14 -

1    In responding to DC Comics' fifth claim—which challenges Toberoff's

2  fraudulent interference with DC Comics' business relationship with the Siegels—

3  defendants assert that Toberoff's conduct was in "connection with settlement

4  negotiations with DC…." Mot. at 23.  This unsupported and contested assertion of

5  fact is irrelevant to the disposition of this motion—and also flatly false.  The

6  Siegels had legal counsel, Kevin Marks, who was representing them in negotiations

7  with DC Comics when Toberoff intervened.  When Toberoff intervened he did so

8  "as a film producer," offering to purchase or broker the Siegels' Superman rights.

9  FAC ¶¶ 68-71.  In *Newport Builders, Inc. v. N. Bay Constr.*, Inc., 2009 WL

10  2083359 (N.D. Cal. July 14, 2009), the court rejected a similar effort by defendant

11  to wrap *business* misconduct within the protections of the litigation process:

12    The record demonstrates that Defendant was merely *communicating a*
        *proposed business deal*, not an offer to settle its own claims.  That the
13    Defendant's offer was made *while the DeAngelis Plaintiffs and the*
        *Newport Defendants were engaged in efforts to resolve their dispute*
14    *does not cloak Defendant's communications under the auspices of*
        *protected activity*.  Any connection between Defendant and the ongoing
15    settlement discussions between the DeAngelis Plaintiffs and the
        Newport Defendants was, at best, tangential to the litigation, and
16    otherwise too attenuated to establish that Defendant was engaged in
17    protected activity.

18  *Id.* at *4 (emphasis added) (SLAPP case); *LiMandri v. Judkins*, 52 Cal. App. 4th

19  326, 345 (1997) (third party may not assert the litigation privilege because he was

20  not a "litigant or other participant" in the underlying action).  Here, of course,

21  litigation had not even commenced between the Siegels and DC Comics—and

22  would not commence for two years.

23    Never addressing these cases, and ignoring the gravamen of DC Comics'

24  pleading, defendants assert that DC Comics' complaint is based on Toberoff's

25  solicitation of the heirs as legal clients or inducements he made to them to litigate.

26  Mot. at 20, 23, 25.  DC Comics' complaint says no such thing and, again, this is

27  nothing more than a direct attack on the allegations of the complaint.  The cases on

28  which defendants rely would only be relevant if and when defendants' version of

DC COMICS' RENEWED OPP. TO DEFS'
RENEWED MOTION TO DISMISS FOURTH
& FIFTH CLAIMS

1   the facts are proved to a jury to be true or are unchallenged—neither of which is

2   possible on this motion to dismiss.  In *Rubin v. Green*, 4 Cal. 4th 1187, 1195 (1993)

3   (cited Mot. at 20, 23), for example, plaintiff's claim was premised on an attorney's

4   discussions about "the merits of the proposed … lawsuit[] and filing the complaint

5   and subsequent pleadings" in the course of soliciting legal clients.

6       In stark contrast, DC Comics' fifth claim is premised on lies Toberoff told

7   the Siegels in his role as movie producer and member of IP Worldwide.  The fourth

8   claim is based on agreements Toberoff engineered that assigned the Shusters'

9   putative intellectual property rights to Toberoff and his companies.  These illicit

10  acts of fraud and rights-grabbing do not constitute the provision of legal advice or

11  solicitation of clients.  They are acts meant to deceive and harm the Siegels and

12  Shusters (and DC Comics) for the Toberoff defendants' benefit.  Such acts of

13  deceit, undertaken in a business capacity, *have nothing to do with the practice of*

14  *law*.  *E.g.*, *Matter of Fischel*, 557 F.2d 209, 211 (9th Cir. 1977); *U.S. v. Chen*, 99

15  F.3d 1495, 1501 (9th Cir. 1996); *In re Grand Jury Investigation*, 974 F.2d 1068,

16  1070 (9th Cir. 1992); *U.S. v. Hodge & Zweig*, 548 F.2d 1347, 1354 (9th Cir. 1977).

17      Again, where "the gravamen" of claims for relief target business misconduct

18  or improper efforts to acquire intellectual property rights, such claims are not

19  protected by the litigation privilege or otherwise.  *E.g.*, *Bylin Heating Sys., Inc. v. M*

20  *& M Gutters, LLC*, 2008 WL 744706, at *6 (E.D. Cal. March 18, 2008)

21  ("Unlawfully procuring patent rights and attempting to create a monopoly are non-

22  communicative in nature.  Such anti-competitive conduct is not privileged….");

23  *Kajima Eng'g & Constr., Inc. v. City of L.A.*, 95 Cal. App. 4th 921, 929-32 (2002)

24  (SLAPP case; fraudulent bidding and contracting practices).  And where

25  communicative conduct that may be mentioned in a complaint (*e.g.*, the Siegels

26  later filing a lawsuit) is at best "evidence of an overall pattern and practice of

27  unlawful[]" business conduct, the privilege does not apply.  *Bylin*, 2008 WL

28

DC COMICS' RENEWED OPP. TO DEFS'
RENEWED MOTION TO DISMISS FOURTH
& FIFTH CLAIMS

744706, at *5-6.  Here, the gravamen of Toberoff's conduct is his private business misconduct to enrich himself by violating DC Comics' rights.

## V.    DEFENDANTS INTERFERED WITH DC'S 1992 CONTRACT AND BUSINESS RELATIONSHIP WITH THE SHUSTERS.

In their final challenge to DC Comics' fourth claim, defendants argue that DC Comics' 1992 agreement with Jean Peavy and Frank Shuster cannot be the basis of an interference claim because it is void under the Copyright Act.  This 10-page argument, which is copied and pasted from defendants' Rule 12 motion targeting DC Comics' first claim, is without basis.  DC Comics will not repeat its opposition arguments here, other than to incorporate them by reference.  To summarize, a binding decision that the Ninth Circuit handed down in 2005—*Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1043-48 (9th Cir. 2005)—fully confirms that the 1992 agreement is valid and its legal effect is to extinguish the Shusters' putative copyright termination rights.  Defendants' inappropriate *ad hominem* attacks on counsel and arguments about Jean Peavy and Frank Shuster lacking the authority to relinquish these rights, Mot. at 10, were rejected in *Milne* and *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200-04 (2d Cir. 2008).  They also run contrary to California probate law, which defendants fail to address.  *See* Opp. to Peary and Peavy Mot. on First and Second Claims at 5-13.  DC Comics has paid the Shusters substantial compensation under the 1992 agreement—payments the Shusters continue to receive to this day.  They never refused these payments or asserted this contract was void.  FAC ¶¶ 53, 57.  The contention is frivolous.

In the alternative to asserting a claim for tortious interference with contract, DC Comics has pled a claim for tortious interference with prospective economic advantage arising out of their relationship with the Shusters.  FAC ¶¶ 176, 176 n.5; *see Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003) (interference with prospective economic advantage claim lies where plaintiff alleges disruption of "future economic benefit").  Defendants' suggestion that

- 17 -

1    "no … probability of future economic benefit has been alleged," Mot. at 13 n.8, is

2    directly refuted by the express allegations of DC Comics' complaint, which state

3    that, absent the Toberoff defendants' acts of interference, DC Comics could

4    "continue freely developing and exploiting [its] rights…."  FAC ¶¶ 176, 176 n.5.

5        DC Comics maintained a healthy business relationship with the Shusters until

6    2001, when Toberoff induced them to sign contracts, which he now admits violated

7    the Copyright Act.  Docket No. 78 at 8 ("such transfers were void *ab initio* under §

8    304(c)(6)(D)").  Toberoff has further conceded there are other consent agreements

9    between and among the Shusters, Siegels, and Toberoff.  Docket No. 34 at 16; *see*

10   *also* Opp. to Siegel Mot. on Third and Sixth Claim at 16-23.  These arrangements

11   impede DC Comics' rights and ability to renew its business relationship with the

12   Shusters without the other defendants' consent.  DC Comics has plainly and

13   properly pled a claim for interference with prospective economic advantage.  The

14   facts alleged state all of the elements of such a claim and provide "fair notice" of

15   the claim.  *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008).

16   **VI.    CONCLUSION**

17       For the foregoing reasons, defendants' motion to dismiss should be denied.

18   Dated:  March 21, 2011                    Respectfully Submitted,

19                                             By:  /s/ Daniel M. Petrocelli

20                                                  Daniel M. Petrocelli

21   CC1:846321

22

23

24

25

26

27

28