DANIEL M. PETROCELLI (S.B. #097802)
  dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
  mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
  cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067-6035
Telephone:  (310) 553-6700
Facsimile:   (310) 246-6779

PATRICK T. PERKINS (admitted *pro hac vice*)
  pperkins@ptplaw.com
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, NY 10516
Telephone:  (845) 265-2820
Facsimile:   (845) 265-2819

Attorneys for Plaintiff DC Comics

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DC COMICS,<br><br>              Plaintiff,<br><br>       v.<br><br>PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, an individual, JOANNE SIEGEL, an individual, LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive,<br><br>              Defendants. | Case No. CV 10-3633 ODW (RZx)<br><br>**DC COMICS' RENEWED OPPOSITION TO DEFENDANTS MARK WARREN PEARY AND JEAN ADELE PEAVY'S RENEWED MOTION TO DISMISS AND/OR STAY PLAINTIFF'S FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6) (DOCKET NO. 148) (RE: FIRST AND SECOND CLAIMS FOR RELIEF)**<br><br>Hon. Otis D. Wright II<br><br>**Hearing Date**:    TBD<br>**Hearing Time**:    TBD |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................... 1

II.     FACTUAL BACKGROUND .......................................................................... 1

III.    DC COMICS' FIRST CLAIM MAY NOT BE DISMISSED ....................... 5

    A.    The First Legal Basis For DC's First Claim:  The 1992 Shuster
        Agreement Renders The Shusters' Termination Notice Invalid .......... 5

    B.    The Second Legal Basis For DC's First Claim:  Shuster's
        Putative Right of Termination Expired in 1992 ................................. 13

    C.    The Third Legal Basis For DC's First Claim:  Unclean Hands ......... 17

    D.    The Fourth Legal Basis For DC's First Claim:  The Shusters
        Lack the Majority Interest Necessary to Terminate ......................... 20

    E.    The Fifth Legal Basis For DC's First Claim:  The Shusters Did
        Not Terminate Two All-Encompassing Grants ................................. 21

    F.    DC Comics' First Claim Is Not Time-Barred .................................... 22

IV.    DC COMICS' SECOND CLAIM CANNOT BE DISMISSED ................... 23

    A.    The *Siegel* Cases Do Not Bar DC Comics' Second Claim ................ 23

    B.    There Is No Basis To Stay Resolution Of DC's Second Claim ......... 25

V.     CONCLUSION .......................................................................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

2

### CASES

3

*Adler v. Fed. Republic of Nigeria*,
4
    219 F.3d 869 (9th Cir. 2000) ................................................................... 18

*Am. Meat Inst. v. Leeman*,
5
    180 Cal. App. 4th 728 (2009) ................................................................. 18

6
*Ariz. v. Cal.*,
    460 U.S. 605 (1983) .............................................................................. 24
7

*Barry v. Donnelly*,
8
    781 F.2d 1040 (4th Cir. 1986) ............................................................... 18

9
*Burroughs v. Metro-Goldwyn-Mayer, Inc.*,
    491 F. Supp. 1320 (S.D.N.Y. 1980) ..................................................... 21
10

11
*Campbell v. PricewaterhouseCoopers*,
    2008 WL 3836972 (E.D. Cal. Aug. 14, 2008) ...................................... 24

12
*Classic Media, Inc. v. Mewborn*,
    532 F.3d 978 (9th Cir. 2008) ......................................................... 10, 11

13
*Classic Media, Inc. v. Mewborn*,
    2006 WL 3333715 (C.D. Cal. Feb. 9, 2006) ......................................... 13
14

15
*Dependable Highway Exp., Inc. v. Navigators Ins. Co.*,
    498 F.3d 1059 (9th Cir. 2007) ............................................................... 25

16
*Eazypower v. Alden Corp.*,
    2003 WL 22859492 (N.D. Ill. Dec. 2, 2003) ....................................... 18
17

18
*Estate of Molino*,
    165 Cal. App. 4th 913 (2008) ................................................................ 12

19
*Haddock v. Bd. of Dental Exam'rs of Cal.*,
    777 F.2d 462 (9th Cir. 1985) ................................................................... 5
20

21
*In re Kalt's Estate*,
    16 Cal.2d 807 (1940) ............................................................................ 12

22
*In re McKesson HBOC, Inc. ERISA Litig.*,
    391 F. Supp. 2d 812 (N.D. Cal. 2005) .................................................. 18

23
*Intamin, Ltd. v. Magnetar Techs. Corp.*,
    623 F. Supp. 2d 1055 (C.D. Cal. 2009) ................................................ 24
24

25
*Landis v. N. Am. Co.*,
    299 U.S. 248 (1936) .............................................................................. 25

26
*Linzer Prods. Corp. v. Sekar*,
    499 F. Supp. 2d 540 (S.D.N.Y. 2007) .................................................. 18

27

28

DC COMICS' RENEWED OPP. TO DEFS'
RENEWED MOTION TO DISMISS FIRST &
SECOND CLAIMS

*Lockyer v. Mirant Corp.*,
   398 F.3d 1098 (9th Cir. 2005) ........................................................................ 25

*Marvel Characters, Inc. v. Simon*,
   310 F.3d 280 (2d Cir. 2002) .................................................................. 10, 11

*Marvel Characters, Inc. v. Simon*,
   2002 U.S. Dist. LEXIS 3260 (S.D.N.Y. Feb. 27, 2002) ................................. 13

*Mattel, Inc. v. MGA Entm't, Inc.*,
   2010 WL 2853761 (9th Cir. July 22, 2010) .............................................. 9, 13

*McCormick v. Cohn*,
   1992 WL 687291 (S.D. Cal. July 31, 1999) ................................................... 19

*McCreary v. Mercury Lumber Distribs.*,
   124 Cal. App. 2d 477 (1954) .......................................................................... 9

*Miller Music Corp. v. Charles N. Daniels, Inc.*,
   362 U.S. 373 (1960) ....................................................................................... 17

*Milne v. Stephen Slesinger, Inc.*,
   430 F.3d 1036 (9th Cir. 2005) ................................................................*passim*

*Milne v. Stephen Slesinger, Inc.*,
   2003 WL 21076983 (C.D. Cal. May 8, 2003) ................................................ 13

*Music Sales Corp. v. Morris*,
   73 F. Supp. 2d 364 (S.D.N.Y. 1999) .............................................................. 17

*Orantes-Hernandez v. Gonzales*,
   504 F. Supp. 2d 825 (C.D. Cal. 2007) ........................................................... 24

*Pelich v. I.N.S.*,
   329 F.3d 1057 (9th Cir. 2003) ....................................................................... 18

*Penguin Group (USA) Inc. v. Steinbeck*,
   537 F.3d 193 (2d Cir. 2008) ...................................................................*passim*

*Shloss v. Sweeney*,
   515 F. Supp. 2d 1068 (N.D. Cal. 2007) ......................................................... 18

*Siegel v. Warner Bros. Entm't Inc.*,
   542 F. Supp. 2d 1098 (C.D. Cal. 2008) ......................................................... 22

*Steinbeck v. McIntosh & Otis, Inc.*,
   433 F. Supp. 2d 395 (S.D.N.Y. 2006) ........................................................... 13

*Stewart v. Abend*,
   495 U.S. 207 (1990) ....................................................................................... 17

*Thomas v. Bible*,
   983 F.2d 152 (9th Cir. 1993) ......................................................................... 24

*U.S. v. Hardesty*,
   977 F.2d 1347 (9th Cir. 1992) ....................................................................... 11

iii

*Wang v. Asset Acceptance, LLC*,
   681 F. Supp. 2d 1143 (N.D. Cal. 2010)................................................................. 5

## STATUTES

17 U.S.C. § 304(b) ....................................................................................... 15

17 U.S.C. § 304(c) ..................................................................................... *passim*

17 U.S.C. § 304(d) ............................................................................ 15, 16, 20

CAL. PROB. CODE § 12220 ............................................................................ 13

CAL. PROB. CODE § 13101 ............................................................................ 12

## OTHER AUTHORITIES

37 C.F.R. § 201.10 ....................................................................................... 22

Fed. Register Nov. 15, 2002, Vol. 67 .......................................................... 16

H.R. REP. NO. 60-2222, 60th Cong. 2d Sess. (1909) .................................. 17

H.R. REP. NO. 94-1476, 94th Cong., 2d Sess. (1976) ................................. 7

MERRIAN WEBSTER, http://www.merriam-webster.com/dictionary (last
   visited September 27, 2010) ............................................................... 15, 17

3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT,
   § 11.05[B][2] (2010) ................................................................................ 16

RESTATEMENT (SECOND) OF CONTRACTS (1988) ....................................... 9

S. REP. NO. 104-315 (1996) ......................................................................... 16

SUPP. REGISTER'S REP. ON THE GENERAL REVISION OF THE U.S.
   COPYRIGHT LAW (1965) ........................................................................ 14

1 B. E. WITKIN, SUMM. OF CAL. LAW: CONTRACTS (2005) ....................... 9

18 B. C. WRIGHT ET AL., FED. PRAC. AND PROC. (2d ed. 2002)............... 24

# I.    INTRODUCTION

This new lawsuit against the Shusters defendants and others—and DC Comics' first and second claims for relief—seek to resolve the following questions: (1) whether the copyright termination notice the Shusters served in 2003 is <u>valid</u>; and (2) only *if* it is valid, what is its appropriate <u>scope</u>?  Defendants' Rule 12 motion asserts that DC Comics' first and second claims may be dismissed or stayed because Judge Larson resolved them in the pending *Siegel* cases.  That contention is without basis.  As Judge Larson stated at the end of his tenure in the *Siegel* cases: "It is by no means a foregone conclusion that the Shuster estate will be successful in terminating the grant to the Superman material" that the Siegels obtained.  Case No. CV 04-8400 ODW (RZx), Docket No. 554, at 23.  Indeed, the Shusters themselves have argued: "the *Siegel Litigations* do <u>not</u> concern Shuster's copyright interests in *Superman.*…."  DC Comics' Req. Judicial Notice ("RJN") Ex. C at 13.

Defendants' Rule 12 motion suffers from other fatal defects.  It disregards and proceeds in defiance of the rule that the facts alleged in DC Comics' complaint must be accepted as true.  In addition, because the first and second claims each rest on five distinct legal theories, both claims for relief survive, if any *one* theory states a claim for relief—and all do.  With respect to DC's second claim, defendants do not even *address* one of the stated theories.  Equally erroneous is defendants' argument about the timeliness of DC Comics' first claim—their position is contrary to law and Judge Larson's rulings.  Indeed, in advancing this argument defendants effectively *concede* that summary judgment on DC Comics' first claim for relief must be entered now—in *DC Comics' favor*.

# II.    FACTUAL BACKGROUND

<u>A.  Siegel and Shuster.</u>  In the 1930s, Jerry Siegel and Joseph Shuster created a comic strip featuring the character "Superman."  Between 1933 and 1937, they submitted the strip to a number of publishers, all of whom rejected it.  In 1937, Siegel and Shuster signed employment agreements with DC Comics' predecessor.

DC COMICS' RENEWED OPP. TO DEFS'
RENEWED MOTION TO DISMISS FIRST &
SECOND CLAIMS

In 1938, they assigned all of their rights in Superman to DC Comics, and as its employees, they adapted their Superman comic strip into a 13-page comic book story entitled "Superman."  In April 1938, the "Superman" story was published as part of *Action Comics No. 1*.  First Am. Compl. ("FAC") ¶¶ 28-32.

The initial Superman character that Siegel and Shuster conceived is not the character we know today.  He was a vigilante and had only five super-powers:  he could leap 1/8 of a mile; hurdle a 20-story building; lift tremendous weights; run faster than an express train; and repel weapons with his "tough skin."  DC Comics invested hundreds of millions of dollars and countless hours over the next 70 years reshaping and expanding the Superman universe, including by publishing thousands of comic book titles, motion pictures, radio programs, and television shows.  These projects were responsible for spreading Superman's mass popularity.  The famous tagline—"Look!  Up in the sky!  It's a bird!  It's a plane!"—was first heard on the radio in 1940.  Superman first flew after "the studio that produced his cartoons said he looked silly hopping through the city like [a] kangaroo."  And many of the most well-known Superman elements were developed by DC Comics after 1938, including: "Smallville," "Kryptonite," the "Fortress of Solitude," the "Daily Planet," Jimmy Olsen, Perry White, Lana Lang, and Lex Luthor.  FAC ¶¶ 33-39.

While defendants portray Siegel and Shuster as paupers who sold their rights to Superman "for a pittance," this is untrue.  Docket No. 77 at 1.  They were paid millions of dollars over their lifetimes for their limited contributions, and they re-negotiated their contracts again and again to share in new royalty streams.  In 1941 alone Siegel and Shuster were paid the equivalent of $1.5 million in today's terms, and their compensation increased in the years that followed.  FAC ¶ 40-44.

By the 1970s, Siegel and Shuster ran into financial difficulties and, despite their litigiousness, DC Comics agreed to help.  In a 1975 agreement, Siegel and Shuster again acknowledged that DC Comics was the sole and exclusive owner of "all right, title and interest in and to … 'Superman….'"  In return, they received

DC COMICS' RENEWED OPP. TO DEFS'
RENEWED MOTION TO DISMISS FIRST &
SECOND CLAIMS

1   generous annual pensions, annual payments to their heirs, medical coverage, and

2   lump-sum cash payments.  DC Comics increased these amounts, paid special

3   bonuses, and has paid the Siegels and Shusters nearly $4 million pursuant to the

4   1975 agreement and subsequent arrangements.  FAC ¶¶ 45-48.

5          B.  Copyright Termination.  In 1976, Congress amended the Copyright Act to

6   give authors and certain of their heirs limited rights to terminate copyright grants

7   made prior to 1978.  17 U.S.C. § 304(c) (1976).  This amendment did not apply to

8   works-made-for hire (*e.g.*, materials Siegel and Shuster created as employees of DC

9   Comics) or derivative works created by a copyright grantee (*e.g.*, Superman works

10  created by DC Comics after 1938).  During their lifetimes, neither Siegel nor

11  Shuster *ever* tried to exercise any termination right—even though, if they had such

12  rights, they could have done so as early as 1984.  FAC ¶¶ 49-50.

13         Shuster passed away on July 30, 1992.  When he died, he had no wife or

14  children—he was survived by his brother, Frank Shuster, who died in 1996, and his

15  sister Jean Peavy, who is still living.  Shortly after Joe Shuster died, Peavy and

16  Frank Shuster reached an agreement with DC Comics in which they relinquished

17  any conceivable claim to their brother's rights.  In an October 1992 agreement,

18  which Peavy ratified in years subsequent, Frank Shuster and she agreed:

19             [to] fully settle all claims to any payments or other rights or remedies
               which [we] may have under any other agreement or otherwise, whether
20             now or hereafter existing regarding the copyrights, trademarks, or
               other property right in any and all work created in whole or in part by
21             [our] brother, Joseph Shuster, or any works based thereon.

22  This post-1978 agreement had the legal effect of extinguishing the very termination

23  claims the Shusters now assert.  FAC ¶¶ 51-57, 112-17; *infra* at 5-13.

24         DC Comics and the Shusters enjoyed a healthy relationship until 2001.  Late

25  that year, Marc Toberoff—a self-styled "entrepreneur" and "movie producer"—

26  interfered with this relationship and induced the Shusters to assign and his

27  companies and him the Shusters' putative Superman rights.  Some two years later,

28  in 2003, Toberoff also induced the Shusters fraudulently to disclaim interests in the

DC COMICS' RENEWED OPP. TO DEFS'
RENEWED MOTION TO DISMISS FIRST &
SECOND CLAIMS

character "Superboy"—in favor of the Siegel family, whom Toberoff also had come to control.  That same year, Toberoff prepared a fraudulent and invalid copyright termination notice on behalf of the Shusters, which was served on DC Comics in 2003 and is noticed to take effect in 2013.  FAC ¶¶ 58-65, 86-101.

C.  DC Comics' First and Second Claims for Relief.  In its *first claim*, DC Comics seeks a declaration that the Shusters' 2003 termination notice is invalid on five independent grounds:

- "(1) There Is No Statutory Basis for the Shusters to Terminate," given that he had no wife or children when he died;
- "(2) The 1992 Agreement Bars the Shusters from Pursuing Termination," because its legal effect was to eliminate any pre-1978 copyright grant that could now be terminated;
- "(3) The Shusters Lack the Majority Interest Necessary to Terminate," because they assigned 50% of their putative rights to one of Toberoff's companies (Pacific Pictures Corp.) before serving the termination notice;
- "(4) The Shusters Do Not Attempt to Terminate Certain All-Encompassing Copyright Grants," including the 1992 agreement; and
- "(5) The Doctrine of Unclean Hands Bars the Shusters from Terminating."  FAC ¶¶ 106-34.

Each of these grounds is sufficient on its own to grant DC Comics the relief it seeks on its first claim.

DC Comics' *second claim* is pled in the alternative:  if the Shusters' termination notice is valid, the termination notice is impermissibly overbroad in scope.  FAC ¶ 136.  DC Comics' complaint identifies five ways in which the termination is overbroad.  The first four are that the Shusters seek to recapture works that (1) were never published, and thus were never copyrightable; (2) were published too long ago to be recaptured; (3) were made as works made-for-hire; and (4) are derivative works DC Comics owns.  The fifth basis focuses, *inter alia*, on specific story elements the Shusters seek to recapture, including Superman's "telescopic vision"; the "diamond-shaped "S" insignia on [his] chest"; the "love

DC COMICS' RENEWED OPP. TO DEFS'
RENEWED MOTION TO DISMISS FIRST &
SECOND CLAIMS

triangle between Superman, Lois Lane and Clark Kent"; "Metropolis," and "Krypton."  The Shusters have no right to these elements because, among other reasons, they first appeared in publications that DC Comics created and owns. FAC ¶¶ 152-64.

### III.    DC COMICS' FIRST CLAIM MAY NOT BE DISMISSED.

Defendants' Rule 12 motion challenges each of the five bases for DC Comics' first claim.  The Court need not reach all of these arguments, however, because if DC Comics "states a claim under *any* legal theory," defendants' motion must be dismissed.  *Haddock v. Bd. of Dental Exam'rs of Cal.*, 777 F.2d 462, 464 (9th Cir. 1985) (emphasis added); *Wang v. Asset Acceptance, LLC*, 681 F. Supp. 2d 1143, 1145 (N.D. Cal. 2010).  Furthermore, defendants' arguments invariably challenge the facts alleged or rest on their self-serving interpretations of the facts— in both events violating the basic rule that, on this motion, all of *DC Comics' facts*, as pleaded, are deemed true, and all inferences must be drawn in DC Comics' favor.

Perhaps the best illustration of this is defendants' attack on the 1992 agreement, contending it did not extinguish the Shusters' termination rights.  This argument is not remotely amenable to a Rule 12 motion—it turns on contested fact issues, including contractual intent that cannot be resolved without discovery and the presentation of evidence.  The termination cases cited by *defendants*, by their very terms, make clear that such issues are decided once all the material facts have been litigated or are unchallenged.

### A.    The First Legal Basis For DC's First Claim:  The 1992 Shuster Agreement Renders The Shusters' Termination Notice Invalid.

The termination provisions of the Copyright Act on which the Shusters rely apply only to *pre-1978* grants of copyright interests the author or his heirs seek to recapture.  As the Ninth Circuit held in *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1048 (9th Cir. 2005), an agreement that *post-dates 1978*—and that revokes all prior copyright grants an author made and re-grants those copyright interests—

1    extinguishes any termination claim the party might later assert.  *Accord Penguin*

2    *Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 204 (2d Cir. 2008).  The 1992

3    Shuster agreement is exactly the sort of post-1978 agreement described in *Milne*.

4        1.  The Critical Case Law.  There have been few published cases defining the

5    termination provisions in the Copyright Act.  The case law that has emerged from

6    the Ninth and Second Circuit directly supports DC Comics' first claim.  The

7    leading case in the Ninth Circuit is *Milne*, 430 F.3d at 1040.  There, the court

8    considered whether a 1983 agreement precluded an heir of the author of Winnie the

9    Pooh from asserting termination claims.  In 1930 and 1961, Pooh's author, A.A.

10   Milne, granted certain copyright interests in his works to a merchandiser, SSI, in

11   exchange for royalty rights.  *Id.* at 1039-40.  In 1976, the Copyright Act was

12   amended to give specified authors and heirs the ability to terminate certain *pre-*

13   *1978* copyright grants.  *Id.* at 1041; 17 U.S.C. § 304(c) (1976).

14       A.A. Milne's heir, Christopher Milne, approached SSI to re-negotiate the

15   royalty arrangement, and in 1983, Christopher Milne and SSI entered into an

16   agreement that "provided for the revocation of the 1930 and 1961 agreements in

17   favor of the new agreement, followed by the re-granting … of the rights in the Pooh

18   works to SSI."  430 F.3d at 1040.  In exchange, Milne received a four-fold increase

19   in royalty payments.  *Id.*  Notwithstanding this 1983 agreement, in 2002,

20   Christopher Milne's daughter, Clare Milne, served a copyright termination notice

21   on SSI purporting to terminate the original 1930 grant and recapture the underlying

22   Pooh rights.  The Ninth Circuit rejected Ms. Milne's claim, holding that whatever

23   termination right she might have had was extinguished by the 1983 agreement,

24   which eliminated all pre-1978 grants subject to termination.  *Id.* at 1042-43.

25       Milne argued, as defendants do here, that the 1983 agreement was an

26   unenforceable "agreement to the contrary," under section 304(c)(5) of the

27   Copyright Act.  *Id.* at 1043.  Milne asserted that Congress intended this section "to

28   make the termination right inalienable" and to invalidate any agreement that would

- 6 -

1   eliminate that right.  *Id.*  The Ninth Circuit rejected this argument.  *Id.* at 1043-47.

2   The court reasoned that nothing in the statute's language supported Milne's

3   argument, *id.* at 1043, and the legislative history confirmed that "parties may

4   contract, as an alternative to statutory termination, to revoke a prior grant by

5   replacing it with a new one," *id.* at 1046.  Indeed, Congress expressly provided:

6   "Nothing in the Copyright Acts has altered the power of private parties to contract"

7   or "prevent[s] the parties to a transfer or license from voluntarily agreeing *at any*

8   *time* to terminate an existing grant and negotiat[e] a new one."  *Id.* at 1045 (quoting

9   H.R. REP. NO. 94-1476, at 127 (1976) (emphasis added)).

10      Defendants fail to disclose these portions of *Milne* or this legislative history.

11  They assert instead that the Act's termination provisions "abrogat[e] [parties']

12  'freedom of contract,' Mot. at 10, relying on citations to the Nimmer treatise on

13  copyright—the same treatise the Ninth Circuit *rejected* in *Milne*.  430 F.3d at 1043.

14      The only other case to consider an agreement like the 1992 Agreement—

15  *Steinbeck*, 537 F.3d at 196—similarly concluded that it barred an author's heirs

16  from terminating.  In 1938, John Steinbeck granted certain copyright interests in his

17  books to Penguin.  When Steinbeck died, he left a widow, Elaine, and two sons

18  from a different marriage, with Elaine inheriting the copyright interests by will.  *Id.*

19  However, under the Copyright Act, the termination interest was owned by Ms.

20  Steinbeck and the sons 50-50—meaning she alone lacked the "majority" (or 51%)

21  interest required to invoke these rights.  *Id.* at 203 n.5.  Nonetheless, in 1994, Ms.

22  Steinbeck, as successor by will to the copyrights, entered into "a 'new [payment]

23  agreement [with Penguin] for continued publication'" of Steinbeck's works.  *Id.* at

24  196.  This 1994 agreement provided that it would "cancel and supersede the

25  previous agreements … for the [works] covered hereunder."  *Id.*

26      In 2004, Steinbeck's son and grandson served copyright termination notices

27  on Penguin purporting to terminate Steinbeck's 1938 grant and recapture the

28  underlying rights.  *Id.* at 197.  The Second Circuit held the 2004 termination notices

- 7 -

1   were invalid, because "the 1994 Agreement terminated and superseded the 1938

2   Agreement …, leaving in effect no pre-1978 grants to which the termination rights

3   … could be applied." *Id.* at 200.  Like *Milne*, *Steinbeck* rejected the argument that

4   the 1994 agreement was a forbidden "agreement to the contrary."  *Id.* at 202-03.

5        2.  The 1992 Shuster Agreement.  The 1992 DC-Shuster agreement operates

6   the same way as the contracts in *Milne* and *Steinbeck*.  Like Elaine Steinbeck and

7   Christopher Milne, Frank Shuster and Jean Peavy approached DC Comics after Joe

8   Shuster's death.  In 1992, Frank Shuster and Peavy (as successor to Joe's copyright

9   interests) offered to grant DC Comics any and all of their or Joe's copyright

10  interests in Superman to DC, *if* DC would pay Joe Shuster's debts and expenses,

11  increase their annual pension payments five-fold, and make these pension payments

12  to Peavy to provide the heirs a tax advantage.  FAC ¶¶ 51-55.

13       In October 1992, Frank Shuster, Jean Peavy, and DC Comics entered into an

14  agreement that provided that Peavy and Frank Shuster "*now grant to us* [*i.e.*, DC

15  Comics] any … copyrights, trademarks, or other property right in any and all work

16  created in whole or in part by [Shuster]…."  FAC ¶ 55 (emphasis added).  Peavy

17  and Frank Shuster also agreed—going further than did Christopher Milne or Elaine

18  Steinbeck—that their agreement "fully settles all claims to any payments or other

19  rights or remedies which you may have … *whether now or hereafter existing*

20  regarding the copyrights, trademarks, or other property right in any and all work

21  created [by Shuster]."  *Id.* (emphasis added).  The 1992 agreement thus operated to

22  revoke, rescind, and regrant all prior grants of Shuster's rights—thereby eliminating

23  any current or future termination right, as did the contracts in *Milne* and *Steinbeck*.

24       Defendants contend the parties did not *intend* the 1992 agreement to effect a

25  "rescission" or "revocation" of the pre-1978 copyright grants, arguing those two

26  words do not appear in the document.  Mot. at 11.  Defendants' position is incorrect

27  and only highlights why this issue cannot be resolved in a pleading motion.  First,

28  the law is clear:  if two parties enter into an agreement regarding the same subject

- 8 -

1   matter as prior agreements, the prior agreement may be deemed rescinded. *See* 1 B.

2   E. WITKIN, SUMM. OF CAL. LAW: CONTRACTS § 928(3), at 1025-26 (2005).  "It is

3   not necessary that the parties say, in so many words, that they do mutually rescind

4   the contract; rescission may be proved by … negotiations for a new contract" or

5   "testimony that a new agreement was reached…." *McCreary v. Mercury Lumber*

6   *Distribs.*, 124 Cal. App. 2d 477, 486 (1954); RESTATEMENT (SECOND) OF

7   CONTRACTS § 279 (1988) (when "parties intend the new contract to replace all of

8   the provisions of the earlier contract" the new contract becomes the operative

9   agreement).  Defendants cite no authority to the contrary, and neither *Milne* nor

10  *Steinbeck* imposed a "magic words" requirement.

11       Second, the language of the 1992 agreement is sweeping.  It grants to DC

12  Comics "*any* copyrights … in *any and all work* created in whole or in part" by Joe

13  Shuster—meaning it covers all of the same territory as any and all of the pre-1992

14  agreements, swallowing them whole.  FAC ¶ 55 (emphasis added).  If there was

15  any doubt as to this intent, the contract makes clear that it "*fully settles all claims* to

16  any payments *or other rights or remedies* which you may have under ***any other***

17  ***agreement*** *or otherwise*, *whether now* or hereafter existing regarding any

18  copyrights…." *Id.* (emphasis added).  This clear reference to "other agreements"

19  "now existing"—*i.e.*, all pre-1992 agreements—being "fully settled" is clear

20  evidence of a revocation, RESTATEMENT, *supra*, § 279.  Peavy and Frank Shuster,

21  moreover, promised "not to assert any claim of right, by suit or otherwise, with

22  respect to the above, now and forever"—again relinquishing any and all rights

23  under each and every pre-1992 agreement.  FAC ¶ 55.

24       Third, while defendants *now* argue that the parties did not "intend" to

25  relinquish their rights by signing the 1992 agreement, Mot. at 12, this argument is

26  disproved by the facts, and, again, only raises fact issues that cannot be resolved

27  now. *E.g., Mattel, Inc. v. MGA Entm't, Inc.*, 2010 WL 2853761, at * 6 (9th Cir.

28  July 22, 2010) (disputed issues of contractual intent must be "submitted to the

DC COMICS' RENEWED OPP. TO DEFS'
RENEWED MOTION TO DISMISS FIRST &
SECOND CLAIMS

jury").  Moreover, defendants' current assertion of their intent in 1992 is belied by what they actually said and did in 1992 and the ensuing decade.  As alleged in DC Comics' complaint, the broad language of the 1992 agreement, the Shuster heirs' contemporaneous written statements of intent (all of which are admissible because the 1992 agreement does not contain an integration clause), and their written reaffirmations of intent made in the years that follow all confirm an express intent to relinquish *all* rights, including those that did not yet exist.  FAC ¶¶ 54-55.  As Peavy said in 1999, for example—*after* Congress amended the termination provisions in the Copyright Act—"I have learned from the Internet that Joanne Siegel has filed a copyright claim for SUPERMAN.  I want you to know that I intend to honor our [1992] pension agreement."  *Id.* ¶ 56.

### 3.  Defendants' Three Counter-Arguments

*a.  Agreement to the Contrary*.  Recycling the losing arguments from *Milne* and *Steinbeck* to assert the 1992 Agreement is a void "'agreement to the contrary,'" defendants rely on *Marvel Characters v. Simon*, 310 F.3d 280 (2d Cir. 2002), and *Classic Media, Inc. v. Mewborn*, 532 F.3d 978 (9th Cir. 2008).  As *Milne* and *Steinbeck* explained, both are easily distinguishable because *neither* involved a post-1978 contract revoking all pre-1978 grants.  In *Steinbeck*, the court addressed a 1994 agreement that had the effect of invalidating termination rights that would not be created until 1998.  It held:  "We cannot see how the 1994 Agreement could be an 'agreement to the contrary' solely because it had the effect of eliminating termination rights that did not yet exist."  537 F.3d at 202.  The same is true here.

*Marvel* dealt with an agreement, decades after the fact, to re-characterize original works of an author as "works made for hire" to circumvent the Copyright Act's termination provisions.  310 F.3d at 284-85.  The agreement did not operate to revoke pre-1978 grants or replace them with new post-1978 grants, as in *Milne*, *Steinbeck*, and here.  Thus, the Second Circuit held that Marvel "could not use such after-the-fact relabeling … to eliminate a future exercise of the author's termination

1    right." *Steinbeck*, 537 F.3d at 203.  Both *Steinbeck*, 537 F.3d at 203, and *Milne*,

2    430 F.3d at 1044, rejected *Marvel* as inapposite here.  As *Milne* explained, "[t]he

3    facts, reasoning, and holding of *Marvel* have little relevance" when "there is no

4    after-the-fact attempt to recharacterize the work," but, as here, an "agreement

5    involv[ing] contractual provisions that operated prospectively through the

6    revocation of an existing grant and the making of a new one."  *Id.*

7         *Mewborn* is equally off point—and to the extent defendants suggest it is

8    "controlling Ninth Circuit precedent," Mot. at 17, they are wrong.  *Milne*—the

9    earlier-decided opinion—"controls."  *U.S. v. Hardesty*, 977 F.2d 1347, 1348 (9th

10   Cir. 1992).  In *Mewborn*, Ms. Mewborn entered into an agreement with Classic in

11   1976, granting it copyright interests in Lassie.  In 1978, after the Copyright Act was

12   amended, Classic convinced Mewborn to sign a new agreement in exchange for

13   $3,000.  532 F.3d at 980-81.  This agreement did not "substitute[] or revoke[]" pre-

14   1978 copyright grants; it "affirm[ed]" the 1976 grant and granted "addition[al]"

15   rights.  *Id.* at 986, 989.  Mewborn was not aware she had a right of termination, and

16   discovery established that, in entering into the 1978 agreement, she had no "inten[t]

17   to waive or relinquish" that right.  *Id.* at 989.  In 1996, Mewborn served a copyright

18   termination notice seeking to terminate the 1976 agreement.  *Id.* at 981.  The Ninth

19   Circuit held that the 1978 agreement was void as an "agreement to the contrary."

20   Because Mewborn was unaware of her termination right in 1978, she had "nothing

21   in hand with which to bargain."  The court expressly distinguished the situation in

22   *Milne*, where Milne was aware of his right and used it to bargain.  *Id.* at 989-90.

23        Here, the Shusters were fully aware of the Copyright Act's termination

24   provisions and expressly invoked them in their negotiations in 1992—just as Elaine

25   Steinbeck and Christopher Milne had done.  *Compare* FAC ¶¶ 54-55 (Peavy will

26   "not pursue the termination of the Superman copyright" under 1976 Act), *with*

27   *Milne*, 430 F.3d at 1040 (Milne used "bargaining power conferred" by termination

28   right), *Steinbeck*, 537 F.3d at 196, 203 n.5 (Elaine Steinbeck "wield[ed] the threat

DC COMICS' RENEWED OPP. TO DEFS'
RENEWED MOTION TO DISMISS FIRST &
SECOND CLAIMS

of termination" even though she lacked present right).  Moreover, at the time of the 1992 Agreement, the Shusters recognized the value of the Superman property—after 50 years, Superman had become an icon. To avoid long, uncertain fights about what monies they might be able to extract in litigation or otherwise, the Shusters made an agreement that wiped out Joe Shuster's debts, earned them $500,000 to date, and bought them peace of mind until Toberoff intervened.  FAC ¶¶ 55-57.

   *b.  Peavy's Alleged Lack Of Authority.*  Defendants next argue the Shuster defendants are not bound by the 1992 Agreement because the "Shuster Executor [Mark Peary] … was not a party to the agreement, and would not even be appointed by the probate court for another 11 years."  Mot. at 8.  This argument is specious, and only exposes defendants' unclean hands in terminating the copyrights at issue.

   Joe Shuster's will—as represented to DC Comics in 1992, and admitted by the probate court in 2003—named Jean Peavy "sole beneficiary" and executrix of his estate.  FAC ¶ 51; DC Comics' RJN Ex. A at 8.  When she approached DC Comics in 1992 to negotiate the 1992 Agreement, Peavy said she was the "heir to [Shuster's] Will," and during this same time period she signed affidavits under section 13101 of the California Probate Code, representing she was the sole and exclusive heir of Joseph Shuster.  DC Comics' RJN Ex. A at 5; CAL. PROB. CODE § 13101.  As the sole heir in Shuster's will, Peavy had full authority to assign beneficial rights in his putative copyright interests.  Title to property passing by will vests in the beneficiary *at the time of the testator's death. E.g., In re Kalt's Estate*, 16 Cal.2d 807, 811 (1940).  Thus, a beneficiary may transfer its interest in an estate *prior to probate and distribution*, and such a transfer is as effective as if made after probate proceedings.  *Id.*; *Estate of Molino*, 165 Cal. App. 4th 913, 921 (2008).

   Defendants mention none of this controlling law.  Yet it shows why they are wrong in asserting that, to be effective, Mark Peary (whom they had replace Jean Peavy as executor in 2003) had to sign the 1992 agreement himself.  *Steinbeck* and *Milne* also reject defendants' argument.  Both involved situations where, as here, an

DC COMICS' RENEWED OPP. TO DEFS'
RENEWED MOTION TO DISMISS FIRST &
SECOND CLAIMS

heir entered into an agreement disposing of termination rights on behalf of all other heirs. *Steinbeck*, 537 F.3d at 204; *Milne*, 430 F.3d at 1040. Moreover, Peary has no reason to keep the probate open. The probate court *seven years ago* adjudged *Jean Peavy* to be Joe Shuster's sole heir, and the estate has but one alleged asset—the disputed copyright termination rights at issue here. DC Comics' RJN Ex. B at 18, A at 5. Other than tactically keeping open the probate to maintain defendants' current shell-game argument, there is no reason why this sole claimed asset was not distributed to Peavy *six* years ago. *Cf.* CAL. PROBATE CODE § 12220.

c. *Section 304(c)(6)(B)*. Defendants finally contend that the 1992 agreement violates section 304(c)(6)(B), because it transfers "future" copyright interests the Shusters did not presently hold. Mot. at 10. *Steinbeck* rejected this very line of argument. 537 F.3d at 202. Moreover, the argument mischaracterizes the 1992 agreement and DC Comics' claim based on it. DC Comics' alleges the 1992 agreement renders the Shusters' termination notice invalid because it effected a revocation and re-grant of Shuster's *past* copyright grants—*i.e.*, all grants *pre-dating* 1992. As *Milne* confirms, such agreements operate to preclude termination.

d. Defendants' motion on DC Comics' first claim must be denied. *At most* it posits factual questions that cannot be decided now. *Mattel*, 2010 WL 2853761, at *6. It bears repeating that in the cases defendants cite to challenge the 1992 agreement, the courts waited for discovery or full agreement on the relevant facts to address whether the disputed contracts relinquished the parties' termination rights.[1]

## B.    The Second Legal Basis For DC's First Claim:  Shuster's Putative Right of Termination Expired in 1992.

The Court need not reach any of defendants' remaining arguments on DC Comics' first claim. If it does, however, another reason the Shuster termination

---

[1] *Steinbeck v. McIntosh, Inc.*, 433 F. Supp. 2d 395, 404 (S.D.N.Y. 2006); *Classic Media, Inc. v. Mewborn*, 2006 WL 3333715, at *3-4 (C.D. Cal. Feb. 9, 2006); *Marvel Characters, Inc. v. Simon*, 2002 U.S. Dist. LEXIS 3260, at *2 (S.D.N.Y. Feb. 27, 2002); *Milne v. SSI*, 2003 WL 21076983, at *6 (C.D. Cal. May 8, 2003).

notice is invalid is that Shuster's putative termination right was lost forever when Joe Shuster died in 1992 without having exercised it during his lifetime.

1. The 1976 Termination Regime And The Effect Of Shuster's Decision Not To Exercise His Putative Rights.  In creating the termination scheme in the 1976 Copyright Act, Congress balanced between authors' rights, and protecting grantees, such as DC Comics, that had spent decades in reliance on the existing law investing in properties like Superman.  SUPP. REGISTER'S REP. ON THE GENERAL REVISION OF THE U.S. COPYRIGHT LAW, 89TH CONG. 72 (H. Comm. Print 1965).  Congress strictly limited the class of persons permitted to exercise the termination right under Section 304(c), providing that "[w]here an author is dead, his or her termination interest is owned, and may be exercised, by his widow or her widower and his or her children or grandchildren…."  The right of termination was thus lost if an author died without exercising it, and without a spouse, child, or grandchild.

The decision to limit the class of statutory heirs was deliberate.  Congress wanted "a clear[], more determinate class of beneficiaries consisting of the author's immediate family…."  SUPP. REGISTER'S REP. ON THE GENERAL REVISION OF THE U.S. COPYRIGHT LAW, 89TH CONG. 73 (H. Comm. Print 1965).  Congress "desire[d] to keep the right of reversion out of the author's estate so that it would not be subject to the claims of creditors,"  rejecting draft termination provisions that gave "rights of a dead author to his 'legal representatives, legatees, or heirs.'"  *Id.*

To the extent Shuster had a right of termination, it could only have been exercised by him while living, or by a widow, child, or grandchild upon his death. Shuster could have exercised his putative termination right beginning in April 1984. But from 1984 to 1992, when he died, Shuster never attempted to do so.  Since he died without a widow, child, or grandchild, any termination right he held while alive ceased to exist upon his death in 1992.  FAC ¶¶ 50-51.

2. The 1999 Copyright Act Did Not Revive The Shusters' Rights.  Congress enacted the 1999 Copyright Term Extension Act ("CTEA") in 1998, and in doing

1  so extended the period of copyright protection by 20 years.  17 U.S.C. § 304(b).  It

2  also allowed authors and certain statutory heirs to terminate copyright grants where

3  the "[t]ermination rights provided for" in the 1976 Act "have *expired*" and the

4  "author or owner of the termination right has not previously exercised such

5  termination right…."  *Id.* § 304(d) (emphasis added).

6      As alleged in DC Comics' first claim, the Shusters have no right terminate

7  because Joe Shuster's right to terminate did *not* "expire"—it ceased to exist when

8  he died.  The CTEA is narrow in scope and did not invite any and all heirs whose

9  predecessors "never exercised" their termination rights under the 1976 Act a second

10  bite at the apple to do so.  Rather, the CTEA again strikes a balance, using precise

11  language and limiting the class of termination rights it was reviving to a subset of

12  termination rights under the old Act that "expired" as of 1998.  *Id.* § 304(d).

13      No case has been located that directly interprets the word "expired" in this

14  context, so its plain meaning must provide a guide.  The word "expired" is defined

15  as something that has "come to an end" or "conclude[d]."  Merriam-Webster

16  Online, http://www.merriam-webster.com/dictionary/expired.  In the context of

17  section 304, "expired" logically should be read to mean that if, under the 1976 Act,

18  the window for exercising a termination right opened and then closed—*i.e.*, "came

19  to an end"—and the author or a specified heir failed to take advantage of this open

20  window, but now wishes to do so, they get a second chance.

21      Here, however, Shuster died while his window was open, and he died

22  without statutory heirs under the 1976 Act.  He never sought to exercise his alleged

23  right to terminate or even expressed an interest in doing so.  The window did not

24  open and close on him.  He merely died a man who chose not to seek termination,

25  satisfied with his contracts with DC Comics.  It makes no sense that Congress

26  would want to revive Shuster's rights here, so that an heir who never had any rights

27  under the 1976 Act could now exploit them.  Indeed, the legislative history to

28  CTEA confirms its focus was on individuals who had rights under the 1976 Act and

- 15 -

1    missed their chance, but wanted to act now.  *E.g.*, S. REP. NO. 104-315, at 18 (1996)

2    (CTEA will create "a revived power of termination for *individuals who did not*

3    *previously exercise their now-expired termination right* under section 304(c)").

4        3.  Defendants' Position.  Defendants' authorities do not support their

5    position.  First, they assert that the Nimmer treatise supports their view, contending

6    that the treatise states that "§ 304(d) was designed to '*correct the imbalance* arising

7    from the fact that the author (or his heirs) failed to terminate previously, whether

8    through neglect or inability.'"  Mot. at 7 (citing 3 Nimmer § 11.05[B][2] (emphasis

9    added)).  But the treatise says no such thing.  To the contrary, it observes that "the

10   addition of 20 more years [to the copyright term] will serve *as an additional*

11   *windfall to the transferee*, *thereby only* <u>exacerbating</u> *the imbalance* arising from the

12   fact that the author (or his heirs) failed to terminate previously, whether through

13   neglect or inability."  3 Nimmer § 11.05[B][2] (emphasis added).

14       Second, defendants rely on a single reference to the word "expired" from the

15   following passage in the Federal Register:  "in order to effect a termination, an

16   author or an author's successor must serve a notice of termination 'not less than two

17   years before' the effective date, *i.e.*, up to 59 years … after copyright was secured.

18   17 U.S.C. 304(c)(4)(a).  Therefore, the termination right will have 'expired,' *see* 17

19   U.S.C. 304(d), 59 years after copyright was secured."  Termination Notice, 67 Fed.

20   Reg. 69,134-35 (Nov. 15, 2002).  This text supports *DC Comics'* position.  Had

21   Shuster failed to act *for 59 years*, his rights would have "*expired*."  But Shuster

22   died during the 53rd year, leaving no statutory heirs to inherit his rights.  His

23   termination rights therefore did not *expire* under section 304(d) because the 59

24   years never ran.  Rather, those termination rights simply ceased to exist.

25       Third, defendants challenge DC Comics' reliance on the "are not living"

26   language in CTEA, as an independent ground to declare the Shuster termination

27   invalid.  Mot. at 5.  The CTEA requires that Shuster must have had a widow, child,

28   or grandchild for his termination rights to pass to anyone else, because it conditions

the author's executor obtaining any rights on "the event" that these heirs "are not living." 17 U.S.C. § 304(c)(2) ("[i]n the event that the author's widow or widower, children and grandchildren are not living, the author's executor … shall own the author's entire termination interest"). "Living" means "having life" or "involving living persons"—*i.e.*, having lived at a point in time. Merriam-Webster Online, http://www.merriam-webster.com<http://www.merriam-webster.com/>.

Defendants cite three cases involving the copyright *renewal* provisions to support their view. These cases are inapt. The legislative history of the 1909 Act, in which the "are not living" language appears, showed why the copyright *renewal* language (a different and more liberal rights regime) should be read more broadly. H.R. Rep. No. 60-2222, at 14-15 (1909). The first two cases defendants cite— *Miller Music* (U.S. 1960), and *Stewart* (U.S. 1990)—rely on this legislative history, but predate the 1998 Copyright Act, and contain no holding that this renewal language must read the same way in the *yet-to-be-enacted* termination context. The district court case defendants cite—*Music Sales* (S.D.N.Y. 1999)—mistakenly relies on the legislative history of the *renewal* provisions to assume that Congress intended the "are not living" language be read the same way in the termination provisions. However, the legislative history of CTEA, unlike the 1909 Act, is silent on how these words should be read. While defendants cite general legislative history showing that termination rights were added to benefit heirs, there is *abundant* history showing that the termination rights were intended to be *restrictive* in terms of who could exercise them, when, and how. *Supra* at 14, 16. In this circumstance, the Court should apply the plain meaning of CTEA to invalidate the Shuster termination notice.

**C. The Third Legal Basis For DC's First Claim: Unclean Hands**

DC Comics seeks a declaration that the Shuster termination notice is invalid under the doctrine of "unclean hands" because it contains misrepresentations intended to mislead the Court, Copyright Office, and DC Comics. FAC ¶¶ 129-33.

Defendants challenge this theory on two grounds.  <u>First</u>, they assert that "unclean

hands" is a defense that cannot be the basis for declaratory relief.  Mot. at 16-17.

Defendants notably cite no case or statute precluding such a claim.  That is because

no such bar exists and because courts allow plaintiffs in copyright cases to assert

claims for declaratory relief based on an anticipated unclean-hands defense.  *E.g.*,

*Shloss v. Sweeney*, 515 F. Supp. 2d 1068, 1081-82 (N.D. Cal. 2007) (plaintiff's

unclean-hands claim was "properly before the Court" because "if Defendants had

sued Plaintiff for copyright liability, she could have raised an unclean hands

defense").  The rule allowing a prospective unclean-hands claim make obvious

sense, since otherwise parties like DC would be confronted with "the rock-and-a-

hard-place choice to cease [its activity] or fac[e] an infringement suit" and only

then assert unclean hands as a defense.  *Linzer Prods. Corp. v. Sekar*, 499 F. Supp.

2d 540, 557 n.96 (S.D.N.Y. 2007).  "The Declaratory Judgment Act was designed

to prevent such situations."  *Id.*; *see also Barry v. Donnelly*, 781 F.2d 1040, 1043

n.8 (4th Cir. 1986) (affirmative claim based on statute-of-limitations defense); *Am.

Meat Inst. v. Leeman*, 180 Cal. App. 4th 728, 744 (2009) (same; preemption).

Here, the Shuster termination notice purports to take effect in 2013.  DC

Comics cannot wait until 2013 to determine its validity, because that would make it

impossible to conduct and plan its business.  Courts have recognized that the risk of

such economic harm is grounds for an affirmative unclean-hands claim to proceed.

*Eazypower v. Alden Corp.*, 2003 WL 22859492, at *2-3 (N.D. Ill. Dec. 2, 2003).

Defendants mention none of these cases, and the ones they do cite are

inapposite—in none of them was unclean hands presented as a prospective claim

for declaratory relief.  Mot. at 16 (*In re McKesson HBOC, Inc. ERISA Litig.*, 391 F.

Supp. 2d 812, 842 (N.D. Cal. 2005) (request for remediation); *Pelich v. I.N.S.*, 329

F.3d 1057, 1062 (9th Cir. 2003) (habeas petition); *Adler v. Fed. Republic of

Nigeria*, 219 F.3d 869, 877 (9th Cir. 2000) (unclean hands asserted as defense)).

DC COMICS' RENEWED OPP. TO DEFS'
RENEWED MOTION TO DISMISS FIRST &
SECOND CLAIMS

<u>Second</u>, defendants challenge DC Comics' unclean-hands claim on the facts—these disputes cannot be resolved now.

*i. Concealment of Pacific Pictures' Ownership.*  The Shuster termination notice fails to disclose the Shusters assigned 50% of their purported Superman copyrights to Pacific Pictures.  FAC ¶¶ 118-30.  Although defendants claim this assignment was revoked, Mot. at 17, DC's allegation is treated as true on this motion.  And, it is true:  the Pacific Pictures agreements expressly state, "in the event of termination, … 50%" of the Shusters' putative copyrights get assigned to "PPC."  FAC ¶¶ 98-99.  Defendants' never address this provision.  Their failure to list Pacific Pictures on the Shuster termination notice violated Copyright Office regulations, and was intended to conceal Pacific Pictures' unlawful interests.  FAC ¶¶ 118-30.  The unclean-hands doctrine applies when a party falsely claims ownership in such a filing.  *McCormick v. Cohn*, 1992 WL 687291, at *4 (S.D. Cal. July 31, 1999).  Defendants' concession that these agreements were "void *ab initio*" does not absolve them of liability; it *confirms it.*  Docket No. 78 at 8.

*ii. Superboy Fraud.*  From the 1940s until 2003, Joe Shuster and his family repeatedly asserted joint authorship of the character Superboy:

- The original Superboy "script"—from 1940—contains the byline: "By Jerry Siegel *and Joe Shuster*."  FAC ¶ 88.
- Shuster claims he illustrated works before and after this alleged script that clearly depict Superman as a boy with super-human strength.  *Id.*
- In 1972 and 1973, Jerry Siegel and Joe Shuster filed copyright renewal notices identifying Superboy as a work they *jointly* created.  *Id.*.
- The 2001 Pacific Pictures Agreement expressly listed *Superboy* as among the Shuster heirs' putative rights.  *Id.* ¶¶ 88, 132.

In 2003, defendants induced the Shusters to disclaim an interest in Superboy, so that the Siegels could falsely claim in a fraudulent copyright termination of their own that it was Jerry Siegel's sole work.  *Id.* ¶¶ 89-91, 131-33.  The Shusters' termination notice then misrepresented Joe Shuster's ownership interests to the Copyright Office—another act of unclean hands.  *Id.*

Defendants again argue the facts.  Mot. at 17.  They assert that in light of a 1947 ruling by a New York state-court referee Joe Shuster was barred from claiming any copyright interest in Superboy.  *Id.*  This argument is frivolous.  This ruling was later *vacated* as part of a settlement.  Moreover, the New York referee also found that *Shuster* provided the artwork for the Superboy story that Siegel claimed was the first published Superboy work.  Peary RJN Ex. E at 49.  In 1972 and 1973, Joe Shuster clearly claimed an interest in Superboy, filing copyright renewal notices on the character.  FAC ¶ 88.   And in the *Siegel* cases, Judge Larson held that the New York referee's decision did *not* establish that Superboy was a sole work created by Siegel—acknowledging the case was not about copyright ownership, but rather New York state law.  Case No. 04-8776 ODW (RZx), Docket No. 151 at 5-38.  Finally, Judge Larson also recognized that to the extent Superboy is separately copyrightable from Superman—and it is not—it was a *joint creation* of Siegel and Shuster.  *Id.* at 62.

Defendants last contend that the Shusters could not list Superboy in their termination notice due to the procedural limits of 17 U.S.C. § 304(d).  Mot. at 18.  That is wrong.  In their termination notice, the Shusters listed a Superman work— *Superman No. 1*—that Shuster claims he drew, predates the alleged Superboy script, and clearly depicts a super boy.  FAC ¶ 88.  Moreover, the Shusters could have claimed they recaptured certain Superman copyright elements, effective 2013, and to the extent Superboy was based on those elements, that they own those parts of Superboy.  Toberoff led the Shusters to sacrifice these interests for the benefit of himself and the Siegels, and the fraud that ensued amounts to unclean hands.

### D.    The Fourth Legal Basis For DC's First Claim:  The Shusters Lack the Majority Interest Necessary to Terminate.

The Copyright Act requires a party filing a copyright termination notice to have at least a 51% interest in copyright at issue.  17 U.S.C. § 304(c)(1); *Steinbeck*, 537 F.3d at 202.  The Shuster termination notice was invalid because the Shusters

1   expressly assigned 50% of whatever interests they held to Pacific Pictures, *supra* at

2   19, which in turn further trafficked in those rights.  Defendants may assert that

3   Peavy "clearly held the entirety of Shuster's termination notice" in 2003, "and still

4   holds 100% of such interest."  Mot. at 13.  But this is an open fact question that

5   cannot be resolved on this motion—much less based on defendants' assertions.

6   **E.      The Fifth Legal Basis For DC's First Claim:  The Shusters Did**

7   **Not Terminate Two All-Encompassing Grants.**

8        The Shusters' termination notice fails to seek to terminate two sweeping

9   copyright grants from Shuster to DC Comics.  The first is the 1992 Shuster

10  agreement, which grants to DC any and all rights Jean Peavy has in Superman, even

11  accepting defendants' argument that it cannot be read as a revocation and regrant.

12  FAC ¶¶ 54-55.  The Shusters also fail to list a 1948 consent agreement in which

13  Shuster granted all of his rights to DC.  Again, it is DC Comics' position that this

14  1948 agreement was revoked and replaced by the 1992 Shuster agreement, *supra* at

15  5-13, but if defendants' contrary claim were accepted, the termination notice would

16  not extend to this 1948 grant.  Defendants contend the 1948 copyright grant was

17  "ineffective" because it transferred copyright interests DC Comics already owned.

18  Mot. at 14 n.8.  But that presents a contested fact question; in any event, as *Milne*

19  makes clear, there is no rule preventing parties from entering into an agreement to

20  re-grant previously conveyed copyrights.  430 F.3d at 1040 n.4.

21       Defendants also assert that Judge Larson definitively resolved any question

22  regarding the 1948 consent agreement in the *Siegel* cases.  Mot. at 14.  But Judge

23  Larson's ruling is not a final order, and the *Shuster* notice was not before Judge

24  Larson in that case, as defendants concede, and Judge Larson noted.  *Supra* at 1.

25       Finally, defendants assert that their failure to list the 1948 and 1992 grants

26  was "harmless."  Mot. at 16 n.9.  Courts have rejected this defense when the

27  omission "'materially affect(s)' the adequacy of the Notice."  *Burroughs v. Metro-*

28  *Goldwyn-Mayer, Inc.*, 491 F. Supp. 1320, 1326 (S.D.N.Y. 1980) (invalidating

1    notices that listed 35 Tarzan works but omitted five).  While the *Siegel* court found

2    the harmless-error rule cured the Siegels' failure to list the 1948 Agreement, *Siegel*

3    *v. Warner Bros. Entm't Inc.*, 542 F. Supp. 2d 1098, 1131-32 (C.D. Cal. 2008), this

4    is a different case, involving a different notice, different parties, and defendants'

5    unclean hands bar their reliance on the harmless-error rule.  37 C.F.R. § 201.10(e).

6            **F.      DC Comics' First Claim Is Not Time-Barred.**

7            Defendants' finally argue that the first claim is time barred, contending DC

8    Comics had three years from service of the Shusters' termination notice in 2003 to

9    challenge it.  Mot. at 19.  This argument, conceived only in this new round of

10   motions and made in two, cursory paragraphs, is erroneous.  But *if it were correct*,

11   it would mean that the Shusters have *no* copyright interests in Superman at all.

12           The Shusters termination notice does not take effect until 2013.  DC Comics

13   disputes the validity of the notice and, in 2013, if it continues to exploit the

14   Superman property, will face litigation by the Shusters for infringement.  This will

15   result in substantial harm—accruing in 2013 and thereafter—in having to incur fees

16   to defend this litigation and protect DC Comics' business from damage caused by

17   such a lawsuit.  As noted, courts recognize DC Comics' right to file a claim for

18   declaratory judgment challenging a future infringement suit.  *Supra* at 18.

19           Though entitled to seek declaratory relief beforehand, the statute of

20   limitations to challenge the Shuster termination notice does not begin to run until

21   the notice becomes effective in 2013.  As Judge Larson held:  "One could quibble

22   with whether any date other than the *termination effective date itself* can serve as

23   the accrual date in a case involving the right to termination of a grant."  However,

24   "[u]nless and until that legal triggering point is passed [here, 2013], there is nothing

25   for the other co-owner to reject or challenge."  *Siegel*, 542 F. Supp. 2d at 1134 n.7.

26           Defendants' argument, moreover, is self-defeating.  They contend that a

27   claim "accrues when there is a 'plain and express repudiation' of co-ownership."

28   Mot. at 19.  On May 12, 2005—some five years ago—the Shusters acknowledged

1  that DC Comics "den[ied] [their] termination interests."  DC Comics' RJN Ex. D.

2  The Shusters have never filed suit seeking to enforce their notice—or to dispute this

3  "plain and express repudiation."  Hence, by defendants' logic, their right to file suit

4  challenging this repudiation ran in May 2008, and DC Comics now owns free and

5  clear any and all interests to which the Shusters could ever claim an entitlement.

6  **IV.    DC COMICS' SECOND CLAIM CANNOT BE DISMISSED.**

7  Even if the Shuster Termination Notice is valid, DC Comics' second claim

8  alleges that Peavy stands to recapture only a limited sliver of rights (*if any*) because

9  the works listed on the notice are, *e.g.*, non-terminable unpublished works, works-

10  for-hire, or derivative works owned by DC Comics.  FAC ¶¶ 135-64; *supra* at 4-5.

11  **A.    The *Siegel* Cases Do Not Bar DC Comics' Second Claim.**

12  Defendants contend that interlocutory rulings in the *Siegel* case are "law of

13  the case" and bar DC Comics' second claim.  Mot. at 21.  They are mistaken.

14  First, as Judge Larson recognized:  "It is by no means a foregone conclusion

15  that the Shuster estate will be successful in terminating" the same copyrights.  Case

16  No. CV 04-8400 ODW (RZx), Docket No. 554 at 23.  DC's second claim presents

17  new issues turning on contested issues of fact and requiring discovery, including:

18  • Shuster's employment status and agreements with DC Comics;

19  • The work he did for DC Comics and the manner in which he was compensated and supervised;

20  • The extent of Shuster's contributions to early Superman works; and

21  • Shuster's involvement with pre-Action Comics No. 1 promotional material.

22  These factual questions were not resolved as to Shuster in the *Siegel* cases.  Indeed,

23  the Shusters actively resisted discovery in those cases, arguing "the Siegel

24  Litigations do not concern Shuster's copyright interests in *Superman*....  [They]

25  concern *only* Jerry Siegel's copyright interests…."  DC Comics' RJN Ex. C at 34

26  (emphases in original).

27  Second, as defendants' own authority establishes, the "law of the case"

28  doctrine applies only where an issue "has already been decided by the same court,

- 23 -

1   or a higher court *in the identical case*." *Thomas v. Bible*, 983 F.2d 152, 154 (9th

2   Cir. 1993) (emphasis added).  Scores of cases confirm that the law-of-the case

3   doctrine applies to decisions only within the same case, not to "related cases." *E.g.*,

4   *Ariz. v. Cal.*, 460 U.S. 605, 618 (1983); *Intamin, Ltd. v. Magnetar Techs. Corp.*,

5   623 F. Supp. 2d 1055, 1067-68 (C.D. Cal. 2009).

6         Defendants cite an older version of Prof. Wright's treatise to support this

7   position.  Mot. at 21.  An updated version of his treatise confirms, however, that

8   law-of-the-case rules apply only to "matters once decided during the course of a

9   single continuing lawsuit.  *They do not apply between separate actions*."  18B C.

10  WRIGHT ET AL., FED. PRAC. AND PROC. § 4478, at 637-39 (2d ed. 2002) (emphasis

11  added).  Indeed, in another brief filed in *this* case, defendants concede this point.

12  Docket No. 42 at 29 ("'Law of the case' is a jurisprudential doctrine that guards

13  against relitigation of matters already decided *in the same case*.") (emphasis added).

14        Through the rubric of law of the case, what defendants actually seek to do is

15  invoke *res judicata* and collateral estoppel *without* having to satisfy those tests.

16  The "concepts differ primarily in that res judicata is typically applied to bar

17  relitigation of a claim previously litigated in *another* suit, while the 'law of the

18  case' doctrine ensures the finality of legal issues decided in an earlier proceeding in

19  the *same* suit." *Orantes-Hernandez v. Gonzales*, 504 F. Supp. 2d 825, 836 (C.D.

20  Cal. 2007); *Campbell v. PricewaterhouseCoopers*, 2008 WL 3836972, at *4 n.3

21  (E.D. Cal. Aug. 14, 2008) (party cannot "achieve through the backdoor of the law

22  of the case doctrine what it could not achieve directly through collateral estoppel").

23        Third, the fifth basis for DC Comics' second claim is not addressed in the

24  *Siegel* cases, because it is wholly a creature of the Shusters' overbroad termination

25  notice.  *Supra* at 4-5; FAC ¶ 163.  Defendants have no argument—and offer none—

26  why this independent basis for relief on DC Comics' second claim must be

27  dismissed, and their failure to address the theory is reason alone to deny their

28  motion on this claim.  *Supra* at 5.

DC COMICS' RENEWED OPP. TO DEFS'
RENEWED MOTION TO DISMISS FIRST &
SECOND CLAIMS

1

**B.    There Is No Basis To Stay Resolution Of DC's Second Claim.**

2      DC Comics filed this action to confirm its rights in the Superman property

3 and remove the cloud that the Shusters seek to place over the rights starting in

4 2013.  This cloud is already affecting DC Comics' business, since negotiating and

5 consummating the full panoply of agreements and making the arrangements

6 necessary to exploit such a property takes advance planning and requires

7 predictability.  Staying any part of this action—even just a part of the second claim,

8 as defendants request—would create chaos and other litigation inefficiencies and

9 leave the Superman business in limbo.

10      A stay must be denied where there is a "fair possibility that the stay … will

11 work [such] damage," *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936); *Dependable*

12 *Highway Exp., Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007),

13 and defendants have no compelling reason why they will be harmed if a stay is not

14 imposed.  Simply "being required to defend a suit, without more, does not

15 constitute a 'clear case of hardship or inequity….'"  *Lockyer v. Mirant Corp.*, 398

16 F.3d 1098, 1112 (9th Cir. 2005).

17      Defendants' assertion that DC Comics is using this new lawsuit "as a tactic to

18 delay, encumber or 'swallow' the accounting in *Siegel*," Mot. at 25, is false.  As

19 defendants well know, DC Comics offered *immediately* to render an accounting so

20 the *Siegel* cases could proceed, but the Siegels objected to this procedure, instead

21 filing a Rule 54(b) motion to delay the accounting trial for years in the hopes of

22 appealing the litigation setbacks they have suffered to date.

23 **V.    CONCLUSION**

24      For the foregoing reasons, defendants' motion should be denied.

25 Dated:  March 21, 2011                    Respectfully Submitted,

26                                          By:  /s/ Daniel M. Petrocelli

27                                          Daniel M. Petrocelli

28 CC1:846316

- 25 -

DC COMICS' RENEWED OPP. TO DEFS'
RENEWED MOTION TO DISMISS FIRST &
SECOND CLAIMS