KENDALL BRILL & KLIEGER LLP
Richard B. Kendall (90072)
  rkendall@kbkfirm.com
Laura W. Brill (195889)
  lbrill@kbkfirm.com
Nicholas F Daum (236155)
  ndaum@kbkfirm.com
Nathalie E. Cohen (258222)
  ncohen@kbkfirm.com
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California  90067
Telephone:  310.556.2700
Facsimile:   310.556.2705

Attorneys for Defendants Marc Toberoff,
Pacific Pictures Corporation, IP
Worldwide, LLC, and IPW, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DC Comics,<br><br>             Plaintiff,<br><br>       v.<br><br>PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JOANNE SIEGEL, an individual, LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive,<br><br>             Defendants. | Case No. CV 10-3633 ODW(RZx)<br><br>**DECLARATION OF NICHOLAS F. DAUM IN SUPPORT OF TOBEROFF DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO STRIKE PLAINTIFF'S STATE LAW CAUSES OF ACTION PURSUANT TO CALIFORNIA'S ANTI-SLAPP LAW (CAL. CODE CIV. PROC. § 425,16)**<br><br>*Re: Renewed Motion to Strike Plaintiff's State Law Causes of Action Pursuant to California's Anti-SLAPP Law (Docket No. 145), under submission per the Court's February 14, 2011 Order (Docket No. 169)*<br><br>*Reply Memorandum of Points and Authorities, Declaration of Kevin S. Marks, and [Proposed] Order filed concurrently*<br><br>Complaint filed:  May 14, 2010<br>Trial Date:  None Set |

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

79742.1

DECLARATION OF NICHOLAS F. DAUM IN SUPPORT OF REPLY IN SUPPORT OF MOTION TO STRIKE
PURSUANT TO CALIFORNIA'S ANTI-SLAPP LAW (CAL. CODE CIV. PROC. § 425,16)

## DECLARATION OF NICHOLAS F. DAUM

I, Nicholas F. Daum, declare as follows:

1.     I am an attorney at the law firm of Kendall Brill & Klieger LLP, counsel of record for Defendants Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC, and IPW, LLC in the above-captioned action.  I am a member in good standing of the State Bar of California and am admitted to practice before this Court.  Except where otherwise stated, I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.     Attached hereto as Exhibit A is a true and correct copy of the March 26, 2007, Declaration of Wayne M. Smith is Support of Defendants' Motion to Compel Production of Whistle Blower Documents, filed in *Joanne Siegel et al. v. Warner Bros. Entertainment Inc., et al.,* USDC Case No. CV-04-8400-SGL (RZx) and *Joanne Siegel et al. v. Warner Bros. Entertainment Inc., et al.*, USDC Case No. CV 04-08776-SGL (RZx) (together, the "*Siegel* Litigation").

3.     Attached hereto as Exhibit B is a true and correct copy the May 9, 2002, letter from Joanne Siegel to Richard Parsons, which is authenticated in the deposition excerpts attached as Exhibits K, M to the September 20, 2010, Declaration of Nicholas F. Daum in Support of Motion to Strike Plaintiff's State Law Causes of Action Pursuant to California's Anti-Slapp Law (Cal. Code Civ. Proc. § 425.16) (Siegel Depo. 32:18-23; Larson Depo. 133:19-134:10).

4.     Attached hereto as Exhibit C is a true and correct copy of the May 12, 2005, letter from Marc Toberoff to Patrick T. Perkins.

5.     Attached hereto as Exhibit D is a true and correct copy of the January 24, 2006, Declaration of John M. Gatti in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Adjudication, and Exhibits H, J, K thereto, filed in *Ladd et al v. Warner Bros. Entertainment Inc., et al.,* LASC Case No. BC300043.

**Kendall Brill & Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

58883.1
1
DECLARATION OF NICHOLAS F. DAUM IN SUPPORT OF REPLY IN SUPPORT OF MOTION TO STRIKE PURSUANT TO CALIFORNIA'S ANTI-SLAPP LAW (CAL. CODE CIV. PROC. § 425,16)

6.      Attached hereto as Exhibit E is a true and correct copy of excerpts of the November 17, 2006, Deposition of Marc Toberoff in the *Siegel* Litigation.

7.      Attached hereto as Exhibit F is a true and correct copy of excerpts of the August 2, 2006, Deposition of Joanne Siegel in the *Siegel* Litigation.

8.      Attached hereto as Exhibit G is a true and correct copy of excerpts of the August 1, 2006, Deposition of Laura Siegel Larson in the *Siegel* Litigation.

9.      Attached hereto as Exhibit H is a true and correct copy of excerpts of the October 7, 2006, Deposition of Kevin Marks in the *Siegel* Litigation ("Marks Depo.").

10.     Excerpts of the above listed deposition transcripts are also attached to the September 20, 2010, Declaration of Nicholas F. Daum in Support of Motion to Strike Plaintiff's State Law Causes of Action Pursuant to California's Anti-Slapp Law (Cal. Code Civ. Proc. § 425.16). The excerpts attached hereto as Exhibits E-H are being provided for the Court's convenience.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed October 4, 2010, at Los Angeles, California

Nicholas F Daum

**Kendall Brill & Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

58883.1

2

DECLARATION OF NICHOLAS F. DAUM IN SUPPORT OF REPLY IN SUPPORT OF MOTION TO STRIKE PURSUANT TO CALIFORNIA'S ANTI-SLAPP LAW (CAL. CODE CIV. PROC. § 425.16)

# EXHIBIT A

1  WEISSMANN WOLFF BERGMAN
      COLEMAN GRODIN & EVALL LLP
2  Michael Bergman (SBN 37797)
   Anjani Mandavia (SBN 94092)
3  Adam Hagen (SBN 218021)
   9665 Wilshire Boulevard, Ninth Floor
4  Beverly Hills, California 90212
   Telephone: (310) 858-7888
5  Fax: (310) 550-7191

6  FROSS ZELNICK LEHRMAN & ZISSU, P.C.
   Roger L. Zissu (Admitted *pro hac vice*)
7  James D. Weinberger (Admitted *pro hac vice*)
   866 United Nations Plaza
8  New York, New York 10017
   Telephone: (212) 813-5900
9  Fax: (212) 813-5901

10 PERKINS LAW OFFICE, P.C.
   Patrick T. Perkins (Admitted *pro hac vice*)
11 1711 Route 9D
   Cold Spring, New York 10516
12 Telephone: (845) 265-2820
   Fax: (845) 265-2819

13

14 Attorneys for Defendants and Counterclaimant

15           **UNITED STATES DISTRICT COURT**

16          **CENTRAL DISTRICT OF CALIFORNIA**

17 | JOANNE SIEGEL and LAURA          Case Nos. [Consolidated for Discovery]:
   | SIEGEL LARSON,                        CV 04-8400 SGL (RZx)
18 |                                       CV 04-8776 SGL (RZx)
   |        Plaintiffs,
19 |                                  Hon. Steven G. Larson, U.S.D.J.
   |   vs.                            Hon. Ralph Zarefsky, U.S.M.J.
20 | WARNER BROS. ENTERTAINMENT
   | INC.; TIME WARNER INC.; DC       **DECLARATION OF WAYNE M.**
21 | COMICS; and DOES 1-10,           **SMITH IN SUPPORT OF**
   |        Defendants.               **DEFENDANTS'**
22 | JOANNE SIEGEL and LAURA          **MOTION TO COMPEL**
   | SIEGEL LARSON,                   **PRODUCTION OF WHISTLE-**
23 |                                  **BLOWER DOCUMENTS**
   |        Plaintiffs,
24 |   vs.                            **DISCOVERY MATTER**
   | TIME WARNER INC.; WARNER         **LOCAL RULE 37**
25 | COMMUNICATIONS INC.; WARNER
   | BROS. ENTERTAINMENT INC.;        Time: 10:00 a.m.
26 | WARNER BROS. TELEVISION          Date: April 16, 2007
   | PRODUCTION INC.; DC COMICS;      Courtroom: 540
27 | and DOES 1-10,                   Mag. Judge Ralph Zarefsky
   |        Defendants.               Discovery Cutoff: Nov. 17, 2006
28 | AND RELATED COUNTERCLAIMS

{T0010672.3}

I, Wayne M. Smith, declare and state as follows:

1.    I am an attorney, admitted to practice before the Supreme Court of the State of California and before this Court, and am employed by defendant Warner Bros. Entertainment Inc. ("Warner Bros.") as Vice President, Senior Litigation and Chief Patent Counsel.  I submit this declaration in support of Defendants' Motion to Compel Production of Whistle-blower Documents.  I have personal knowledge of the facts contained within this declaration, and, if called upon as a witness, I could and would testify competently thereto.

2.    During the afternoon of June 28, 2006, I received a telephone call from John A. Schulman, General Counsel of Warner Bros., who asked that I come to his office.  Upon arriving at his office, Mr. Schulman advised me that a set of documents (the "Superman Documents") addressed to him and apparently relating to the Siegel litigation had arrived from an anonymous source at his office that day.  Mr. Schulman informed me that the cover letter contained with the documents indicated that other executives at Warner Bros. may have received the same set of documents, and that he had called the offices of those executives to see if they had received anything.  He further advised me that he had asked those executives to send the documents to his office without reviewing them, and that one set of documents had already been delivered to him.  Mr. Schulman handed me the stack (approximately an inch high) of Superman Documents that he had received and asked me to wait outside his office while he completed a meeting, after which we would discuss them.  The stack did not include any envelope or packaging in which the documents may have arrived.  This was not unusual as it has been my experience that the practice of Mr. Schulman's office staff is to dispose of envelopes and packaging upon opening mail.

3.    While I was waiting, I looked at what might be characterized as the "cover letter" that came with the Superman Documents.  The cover letter, which

1 was not signed, alleged various types of ethical misconduct on the part of the

2 Plaintiffs' counsel in connection with the Siegel litigations. The cover letter also

3 asserted ethical misconduct – violating the terms of a confidentiality agreement by

4 leaking settlement information to the press – in connection with another litigated

5 matter where Plaintiffs' counsel had also represented a party adverse to Warner

6 Bros. The letter appeared designed to right wrongs caused by Plaintiffs' counsel's

7 misconduct. The letter also referenced the documents enclosed, providing an

8 overview of their contents and their connection to Plaintiffs' counsel's alleged

9 wrongdoing. I also thumbed through the Superman Documents contained with the

10 letter, but did not read any of them in detail. Meanwhile, an assistant for another

11 Warner Bros. executive delivered what appeared to be another set of Superman

12 Documents to Mr. Schulman's office. I did not observe that any of the three sets of

13 Superman Documents – (i) the set Mr. Schulman handed to me; (ii) the other set in

14 his office; or (iii) the set that was delivered while I was waiting outside his office –

15 was contained in an envelope or other packaging.

16        4.      I then met with Mr. Schulman. I told Mr. Schulman that based on the

17 contents of the cover letter and my brief thumbing through the documents, it

18 appeared that certain of the documents in the package were privileged. I said that

19 before I looked at the documents I wanted to review the case law in the area to

20 determine what level of review, if any, of the Superman Documents was

21 appropriate. Mr. Schulman agreed with this approach, gave me one set of the

22 documents, retained the other two sets that he had received, and advised me that he

23 had only looked at the cover letter that came with the documents and would not

24 review the documents at all.

25        5.      I returned to my office with the set of documents. I initially went on

26 the internet and performed a Google search relating to the issue of what obligations,

27 if any, governed the handling of the Superman Documents we had received. My

28 initial search located an article from the June 2006 Los Angeles Lawyer magazine

1  entitled "On the Receiving End," by Kurt L. Schmalz (a true and correct copy of
2  which is attached as Exhibit "A" hereto) which was posted on the Los Angeles
3  County Bar Association web site. The article concerns the obligations of lawyers
4  who unwittingly receive privileged documents from opposing counsel's files and
5  discusses various California cases that have dealt with the issue, including the *Rico*
6  *v. Mitsubishi Motors Corporation* case pending before the California Supreme
7  Court.

8      6.    I read the Schmalz article and then downloaded and studied the three
9  principal California cases it identifies: *Aerojet-General Corporation v. Transport*
10 *Indemnity Insurance*, 18 Cal.App.4th 996 (1993), *State Compensation Insurance*
11 *Fund v. WPS, Inc. (State Fund)*, 70 Cal.App.4th 644 (1999) and the Court of Appeal
12 decision in the case under review, *Rico v. Mitsubishi Motors Corporation*, 116
13 Cal.App.4th 51 (2004) (*review granted* June 9, 2004). Based on my review of the
14 relevant California authorities, it appeared that a conservative approach to handling
15 the Superman Documents was to follow the procedure laid out by the Court in *State*
16 *Fund*, specifically: (i) to review each document but to cease the review once it
17 became apparent that the document was privileged; (ii) to contact opposing counsel
18 and advise that the documents have been received; and (iii) to refrain from using any
19 information in the documents until there was either an agreement with opposing
20 counsel, or the court had determined the documents' disposition.

21     7.    Following my review of the law, I called Mr. Schulman and advised
22 him of the results of my research. I said that I intended to review the Superman
23 Documents in accordance with *State Fund*. At Mr. Schulman's request I also sent
24 copies of the three key cases and the article to Mr. Schulman's office.

25     8.    That evening, I took the Superman Documents home with me and spent
26 approximately a half hour reviewing them. Certain of the documents – such as
27 executed agreements relating to Superman and correspondence between the
28 Plaintiffs and non-lawyer third parties – did not appear subject to any applicable

{F0010672.1}

EXHIBIT A
Page 6

1  privilege. As I was going through the documents I placed them into three piles: (i)

2  "non-privileged," (ii) "privileged," and (iii) "?" (where either I could not tell

3  whether it was privileged or I believed the document covered subject matter where

4  privilege may have been waived in the case, as explained below). In reviewing each

5  document, where it first appeared to me that it was entirely privileged, I ceased

6  reading it, placed the document in the "privileged" pile and did not look at it further.

7  After going through the documents, I placed a post-it note on the top of each pile

8  (indicating "privileged," "non-privileged," or "?"), and fastened each pile together.

9  I did not look at the documents further. Because I did not conduct a detailed review

10  of the Superman Documents, and because of the passage of time, I do not recall

11  their specific contents. I do, however, recall generally the subject matter of certain

12  of the documents.

13      9.    The non-privileged pile was the second largest of the three. It

14  contained what appeared to be agreements between, *inter alia*, the Siegels and/or

15  Shusters and various entities, as well as correspondence concerning the interest in

16  Superman that might be owned by Plaintiff Laura Siegel's estranged step-brother,

17  Michael Siegel. To my knowledge, this last category of documents has never been

18  produced in the litigation.

19      10.    The "?" pile was the smallest. I believe that one or two of the

20  documents in this category potentially fall within the scope of a privilege waiver

21  based Plaintiffs' reliance on an affirmative defense that their predecessor counsel

22  did not have authority to accept a settlement proposal made by Defendants.

23  Defendants position on this privilege waiver is the subject of a separate Motion to

24  Compel filed concurrently herewith.

25      11.    The pile of documents I labeled "privileged" was the largest.

26      12.    Even from the brief review made, it appeared to me that, with the

27  exception of the cover letter (which also addressed the other litigation involving

28  Plaintiffs' counsel), all of the Superman Documents related to the subject matter of

{P0010672.1}

1   the instant litigation and were responsive to document requests the Defendants had

2   previously served on Plaintiffs. However, it did not appear to me at the time that

3   any of the "non-privileged" documents had been produced in the litigation.

4   Moreover, at least some (and perhaps virtually all) of the privileged documents, as

5   well as those in the "?" pile, were, to the best of my knowledge, never identified in

6   any privilege log served by the Plaintiffs.

7        13.    The next morning, June 29, 2006, I returned with the Superman

8   Documents to see Mr. Schulman in his office. Mr. Schulman and I discussed having

9   a neutral third party hold the documents pending either the parties' agreement as to

10   their disposition or order of the Court. We decided to ask John Quinn, then with

11   Arnold & Porter, and former president of the Los Angeles County Bar Association,

12   to act as the neutral based on his reputation and legal ethics experience. He agreed

13   and the following morning, June 30, 2006, the three sets of the Superman

14   Documents, including the set that I had categorized, were handed over to Mr. Quinn.

15   Out of an abundance of caution we handed over *all* the documents to Mr. Quinn, not

16   just those that were clearly or potentially privileged. Further, we have not shared

17   the contents of the Superman Documents with any of the outside counsel

18   representing the Defendants in this action, nor have we used the contents of the

19   documents in the litigation.

20        I declare under penalty of perjury of the laws of the United States of America

21   that the foregoing is true and correct.

22        Dated this 26th day of March 2007 at Burbank, California.

23

24                         Wayne M. Smith

25

26

27

28

# EXHIBIT B

818 954 4768    P.82

(3) 777 4801

**JOANNE SIEGEL**
13929 Marquesas Way #201-A
Marina Del Rey, CA 90292
(310) 821-5894
May 9, 2002

Richard D. Parsons
Co-Chief Operating Officer
AOL Time Warner Inc.
75 Rockefeller Plaza
New York, New York 10019

Dear Dick,

I am Joanne Siegel, widow of Superman's creator Jerry Siegel. In 1997, as Jerry's heirs, our daughter Laura and I had the unique opportunity to regain Jerry's share of the Superman copyright.

With the assistance of three attorneys, two of them copyright specialists, Laura and I successfully terminated Jerry's seven grants and our Washington, DC copyright expert sent out the Notices of Termination then filed our copyright for Superman in a timely manner. For years we had a friendly relationship with the D C Comics people and were on very friendly terms with Jerry Levin. We remained friends after the terminations were filed. They knew that we acted not out of malice but were exercising our rights granted by the U. S. Congress. Because Joe Shuster, Superman's artist, had no surviving spouse or children, his rights were not terminated but are held by D C Comics.

Every step in the termination process, the filing, the timing, were carefully researched, checked and rechecked with knowledgeable attorneys on both coasts before going ahead. We then hired two additional Beverly Hills entertainment attorneys as our negotiators. Negotiations dragged on for four difficult years. We made painful concessions assured if we did we would arrive at an agreement. When we made these difficult concessions and reluctantly accepted John Schulman's last proposal six months ago, we were stabbed in the back with a shocking contract.

Your company's unconscionable contract dated February 4, 2002 contained new, outrageous demands that were not in the proposal. The document is a heartless attempt to rewrite the history of Superman's creation and to strip Laura and me of the dignity and respect that we deserve. It attempts to discredit my late husband, Jerry Siegel, whose creations the company and its predecessors have greedily cashed in on for more than sixty four years.

Page 1



GTRB 0475



That contract was sent to us three months ago. The company may think its representatives are very clever but with that contract they have sunk not only themselves and the company but you, Jerry Levin and Steve Case down to a very low level.

Granted, Jerry gave us an advance two years ago which while very much appreciated, was of short term help. But we are owed more than three years of profits accounting on Superman and related properties which has not been paid. In addition, my disabled daughter still has not received the medical coverage she and her children were promised several years ago.

As for the contract, your representatives surely know that we would never do the unethical things demanded by them. For your representatives to condition our receiving financial compensation for our rights on demands which were not in the proposal we accepted, is deceitful.

After more than half a century of D C Comics and its predecessors enjoying huge profits from my late husband's creations, while we lived in poverty for many of those years, the company is not satisfied. The beast hungers for more. Just like the Gestapo, your company wants to strip us naked of our legal rights. Is that moral? Does that contract demonstrate the company's true "core values" as stated in the Stockholders Annual Report? What about the "social responsibility" that's supposed to be the mission of the company's Values and Human Development Committee on which you serve? Is it all a lie to the stockholders and the public?

It is to the everlasting shame of everyone in leadership roles at the company that they allowed that disgraceful contract to be sent to us. There was no concern for the suffering it would cause Jerry Siegel's widow and his ailing, impoverished daughter.

This contract shows AOL Time Warner and D C Comics to be a greedy corporation without morals, ready to allow its representatives to commit an inhumane act. Are your representatives afraid if we are treated fairly other comics creators or their heirs will also want to be treated fairly in the future? Isn't it about time? Shouldn't everyone be treated fairly? Or is that not "good business" in this company?

I had hoped that Laura's and my good relationships with Jerry Levin and D C Comics would continue after we reached an agreement. When my husband died, Jerry Levin told me that my daughter and I were part of the Time Warner family, part of the company's history. They were beautiful words we appreciated. Another time, in a letter to me, he talked about honoring Jerry because of his huge

Page 2

GTRB 0476

contribution to the company. It sounded sincere. But this contract seeks to discredit Jerry Siegel and to undermine our rights, a direct contradiction to what was said.

After four years we have no deal and this contract makes an agreement impossible. Have you been aware that your representatives have gone too far? If not, you do now. They have shown you and your company in the worst possible light. Is that the reputation you want?

*Joanne*

Joanne Siegel

Page 3

GTRB 0477

TOTAL P.04

# EXHIBIT C

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON

* ALSO ADMITTED IN NEW YORK

1999 AVENUE OF THE STARS, SUITE 1540
LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

CONFIDENTIAL COMMUNICATION
FOR SETTLEMENT PURPOSES ONLY

May 12, 2005

Via Facsimile and US Mail

Patrick T. Perkins
Fross Zelnick Lehrman & Zissu, P.C.
866 United Nations Plaza
New York, NY 10017

Re: Superman / Estate of Joseph Shuster / Mark Warren Peary

Dear Patrick:

On behalf of our clients, Warren Peary, the personal representative of the Estate of Joseph Shuster ("Estate") and Jean Adele Peavy, this is to respond to the buy-out proposal dated April 28, 2005 which DC Comics ("DC") sent directly to them.

While our clients certainly do appreciate DC's efforts, they are passing on DC's offer. It is believed that the offer is extremely low and bears no relation to the net present value of the Estate's 50% interest in *Superman* profits for the duration of copyright, commencing 2013. Nor does DC's offer reflect the considerable strategic value of the Estate's 50% copyright interest in tandem with the Siegel's 50% copyright interest in *Superman*.

One need only to look at DC/Warner Bros.' full-blown plans to reinvigorate *Superman* as a billion dollar film, television and merchandising franchise and to Marvel's $2.2 billion market capitalization to understand how DC's $2 million proposal bears little or no relation to the marketplace and the economic realities of this world famous property.

Given your firm's prior letter on DC's behalf denying our clients' termination interests without legal grounds, my clients have requested that any further communications to them be made through our law firm and not to them directly.

The foregoing is without prejudice to any of our clients' rights, remedies, claims or positions at law or in equity, all of which are hereby expressly reserved.

Very truly yours,

Marc Toberoff

EXHIBIT
Shuster 11
DEAN
ASSOCIATES

cc: Warren Peary and Jean Peavy

EXHIBIT C
Page 12

109

# EXHIBIT D

1  GREENBERG TRAURIG, LLP
   John M. Gatti (SBN 138492)
2  John J. Lucas (SBN 216236)
   2450 Colorado Avenue, Suite 400E
3  Santa Monica, California 90404
   Telephone: (310) 586-7700
4  Facsimile: (310) 586-7800

5  Attorneys for Plaintiffs Alan Ladd, Jr.,
   Jay Kanter, L-K Producers Corporation,
6  Ketram Corporation, and Kanter Corporation

7

**FILED**
LOS ANGELES SUPERIOR COURT

JAN 2 5 2006

JOHN A. CLARKE, CLERK

BY L. ZULUETA, DEPUTY

8             **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9          **FOR THE COUNTY OF LOS ANGELES – CENTRAL DISTRICT**

10

| | |
|---|---|
| 11  ALAN LADD, JR., an individual; JAY KANTER, an individual; L-K PRODUCERS CORPORATION, a California corporation; KETRAM CORPORATION, a California corporation; and KANTER CORPORATION, a California corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>WARNER BROS. ENTERTAINMENT INC., a Delaware corporation; TIME WARNER INC., a Delaware corporation; and DOES 1 through 20, inclusive,<br><br>Defendants. | Case No. BC 300043<br><br>[Assigned to the Honorable Mary Ann Murphy, Dept 25]<br><br>**DECLARATION OF JOHN M. GATTI IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION**<br><br>*[Plaintiffs' Opposition to Defendant's Motion for Summary Adjudication; Plaintiffs' Response To Warner Bros. Entertainment Inc.'s Statement Of Undisputed Material Facts And Plaintiffs' Additional Statement Of Disputed Facts; Appendix of non-California Authorities; Declaration of David L. Simon submitted concurrently herewith]*<br><br>DATE:      February 7, 2006<br>TIME:      8:30 a.m.<br>DEPT:      25<br><br>DATE ACTION FILED:      07/31/03 |

/ / /

/ / /

LA-FS1\...\2006 010200
DECLARATION OF JOHN M. GATTI IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION

## DECLARATION OF JOHN M. GATTI

I, John M. Gatti, declare and state as follows:

1.    I am an attorney at law duly licensed to practice in the State of California and am an shareholder in the law firm of Greenberg Traurig, LLP, counsel of record for Plaintiffs Alan Ladd, Jr., Jay Kanter, L-K Producers Corporation, Ketram Corporation, and Kanter Corporation (collectively "Plaintiffs"). I submit this Declaration in support of Plaintiffs' Opposition to Defendant's Motion for Summary Adjudication. I am competent to testify as to the truth of the matters set forth herein and I could and would competently testify thereto from my own personal knowledge.

2.    Attached hereto as Exhibit A is a true and correct copy of documents produced by Warner Bros. ("WB"), bearing the Bates numbers WB 2554-60. It is a license agreement between WB and Turner, in which WB "added" 106 out of 182 titles to the deal. Turner is a sister company of WB, both of which are owned by Time Warner, Inc.

3.    Attached hereto as Exhibit B is a true and correct copy of documents produced by HBO at deposition in this case, bearing the Bates numbers 000011- 00013. It is a license agreement between WB and HBO, in which WB "added" 205 out of 643 titles to the deal.

4.    Attached hereto as Exhibit C is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 7932-38. It is an internal memo describing the pre-set "Volume" packages of films that WB uses to sell to buyers.

5.    Attached hereto as Exhibit D is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 7654-64. It is an internal memo describing the pre-set "Volume" packages of films that WB uses to sell to buyers.

6.    Attached hereto as Exhibit E is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 1717-19. It is an internal memo summarizing a license agreement between WB and Bravo, wherein each of the films have the exact same per-film license fee of $50,000.

7.    Attached hereto as Exhibit F is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 1932-34. It is an internal memo summarizing a license agreement between WB and FX Networks, wherein all but two (2) of the films have the exact same per-film license fee of $21,500.

LA-FS1\384547v01\75006.010200                                     2

DECLARATION OF JOHN M. GATTI IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION

EXHIBIT D    Page 14

8.    Attached hereto as Exhibit G is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 9900-09. It is an international license agreement between WB and Paris Premiere, wherein all of the films have the exact same per-film license fee of $50,000 French Francs.

9.    Attached hereto as Exhibit H is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 9211-46. It is an internal memo summarizing an international license agreement between WB and Nine Television, Australia, wherein all of the films have the exact same per-film license fee of $30,000.

10.    Attached hereto as Exhibit I is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 9954-62. It is an international license agreement between WB and Telerey S.A. de C.V., wherein all of the films have the exact same per-film license fee of just $4,500.

11.    Attached hereto as Exhibit J is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 6902-22. It is an international license agreement between WB and Turner Entertainment Networks International Limited, wherein all of the 121 films have the exact same per-film license fee of $35,000 in French Francs.

12.    Attached hereto as Exhibit K is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 10011-23. It is an international license agreement between WB and Wharf Cable Ltd., wherein all of the films have the exact same per-film license fee of just $4,500.

13.    Attached hereto as Exhibit L is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 1610-11. It is an individual license agreement between WB and USA Networks for the motion picture "Blade Runner" for $3,750,000.00.

14.    Attached hereto as Exhibit M is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 8735-41. It is an international license agreement between WB and Canal Jimmy for a package of motion pictures, including "Blade Runner" for only $38,000.00 each in French Francs.

15.    Attached hereto as Exhibit N is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 9963-65. It is an international license agreement between WB and Television Espanola, S.A. for a package of four (4) motion pictures, including "Police Academy" and "Police Academy 2: Their First Assignment," each of which was licensed for $900,000.00.

16.    Attached hereto as Exhibit O is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 9949-53. It is an international license agreement between WB and Superchannel Ltd. for a package of fifty (50) motion pictures, including "Police Academy" and "Police Academy 2: Their First Assignment," each of which was licensed for only $2,500.00.

17.    Attached hereto as Exhibit P is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 2895-98. It is a cover letter and a license agreement between WB and Encore from 1996 that lists the aggregate license fees for the entire package of films in the deal, and states that "individual license fees will be forthcoming."

18.    Attached hereto as Exhibit Q is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 2941-43. It is a license agreement between WB and Encore from 1993 that lists the aggregate license fees for the entire package of films in the deal, and states that "WARNER BROS. will advise Encore of the exact per motion picture license fees at a later date."

19.    Attached hereto as Exhibit R is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 6864-75. It is a license agreement between WB and Tohokushinsha Film Corporation from September of 2002 that garnered WB more than $76,000,000.00 from the deal.

20.    Attached hereto as Exhibit S is a true and correct copy of documents produced by WB, bearing the Bates numbers LK 0282-0316. It is the May 6, 2002 audit report prepared by James Perry, C.P.A., of Hacker Douglas & Company LLP, Certified Public Accountants. On page nine of the documents (Bates number LK 0294), Mr. Perry enumerates the losses Plaintiffs' had sustained through May of 2002, due to Defendants' selling methods.

21.    Attached hereto as Exhibit T is a true and correct copy of excerpts from the "rough" transcript of the deposition of Michael Edwards, which took place on Tuesday, January 17, 2006.

22.    Attached hereto as Exhibit U is a true and correct copy of excerpts from the "rough" transcript of the deposition of Eric Frankel, which took place on Wednesday, January 18, 2006.

23.    Attached hereto as Exhibit V is a true and correct copy of documents produced by WB, bearing the Bates numbers WB 1428-37. It is a license agreement between WB and Turner Broadcasting Systems, Inc. from June of 1995.

/ / /

DECLARATION OF JOHN M. GATTI IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION
EXHIBIT D    Page 16

1        24.      Attached hereto as Exhibit W is a true and correct copy of excerpts from the transcript of

2  the deposition of Leslie Cohen, which took place on August 10 and 11, 2004.

3        I declare under penalty of perjury under the laws of the State of California that the foregoing is

4  true and correct.

5        Executed this 24th day of January 2006, at Santa Monica, California.

John M. Gatti

LA-FS1\384547v01\75006.010200         5
DECLARATION OF JOHN M. GATTI IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY ADJUDICATION
EXHIBIT D    Page 17



WARNER BROS.
INTERNATIONAL
TELEVISION
DISTRIBUTION

## Inter-Office Memo

| | | | | |
|---|---|---|---|---|
| To: | SUSIE FUNG | From: | MONICA I. FIGUEIRA | Ext: |
| Subject: | Licensee Nbr.: 050660  - NINE TELEVISION, AUSTRALIA | | | |
| Date: | November 26, 1991 | Copies to: | Those listed below | |

Enclosed please find your copies of the following fully executed Agreements.

| CONTRACT NO. | DATED | PRODUCT | AMOUNT |
|---|---|---|---|
| F028850 | 08/08/91 | WORLD ENT. REPORT | US$   780,000 |
| F020090 | 04/30/91 | 34 FEATURES | US$12,750,000 |
| F020210 | 04/30/91 | 2 FEATURES | US$   750,000 |
| F024620 | 07/23/91 | 14 FEATURES | US$ 1,540,000 |
| F020240 | 05/06/91 | 50 FEATURES | US$ 1,500,000 |
| F028500 | 07/29/91 | CARTOONS | US$   364,572 |
| F029880 | 09/05/91 | UNDER COVER | US$   334,026 |

Best regards,

Monica I. Figueira

Encl.
xc:
Australia sales office
B. Adamson
Files



NOV 2 6 1991

EX H /

WB 9211
CONFIDENTIAL



WARNER BROS. (AUSTRALIA), PTY., LTD.
LEVEL 22, 8-20 NAPIER STREET
NORTH SYDNEY, N.S.W., 2060, AUSTRALIA.

5800/PA2192

| CONTRACT NO. | PAGE 1 |
|---|---|
| F020240 | |
| DATE | MAY 06, 1991 |
| SALES REPRESENTATIVE | |
| WAYNE BROUN | |
| REFERENCE NO. | WBA2749 |

## INTERNATIONAL FREE TELEVISION LICENSE AGREEMENT

Subject to timely payment of the Total License Fee and due performance of all other provisions of this Agreement, Warner licenses solely to the Licensee named below, and Licensee licenses from Warner, the following Programs on the following terms and conditions:

| LICENSEE | | |
|---|---|---|
| NINE TELEVISION PTY. LTD. | | |

| ADDRESS | LICENSED TERRITORY | |
|---|---|---|
| 24 Artarmon Road, | AUSTRALIA | |

| CITY & COUNTRY | LICENSED STATION | LICENSED LANGUAGE |
|---|---|---|
| Willoughby, NSW, 2068 AUSTRALIA. | SEE SCHED. "A" | ENGLISH |

| PROGRAM TITLE(S) | PROGRAM(S) DURATION |
|---|---|
| SEE SCHEDULE A | N/A |

| FIRST RUN | RERUNS | TELECASTS/REPEATS | RUNS | START DATE | END DATE |
|---|---|---|---|---|---|
| N/A | 50 | N/A | 4 | SEE SCHEDULE A | SEE SCHEDULE A |

| NO. OF EPISODES/TELECASTS/TITLES/HOURS | LICENSE FEE | PER | TOTAL LICENSE FEE |
|---|---|---|---|
| 50 | US$30,000.00 | TITLE | US$1,500,000.00 |

PAYMENT TERMS AND INVOICING INSTRUCTIONS
TO BE PAYABLE IN TEN (10) EQUAL CONSECUTIVE QUARTERLY PAYMENTS OF US$150,000.00 EACH, COMMENCING ON JUNE 1, 1991. PAYMENTS TO BE MADE DIRECTLY IN UNITED STATES DOLLARS TO THE AUSTRALIA AND NEW ZEALAND BANKING GROUP LIMITED, NOTH SYDNEY, FOR DEPOSIT TO "PRIVATE U.S. DOLLAR FOREIGN CURRENCY ACCOUNT, WARNER BROS. (AUSTRALIA) PTY. LIMITED, ACCOUNT NUMBER 405-100" ON OR BEFORE THE DUE DATE OF EACH RESPECTIVE INSTALLMENT.

| MATERIALS | MATERIALS CHARGE | MATERIALS TO |
|---|---|---|
| 1" 625 PAL VIDEOTAPE | ON LOAN | TAPES AND PUBLICITY TO BE SUPPLIED BY WB SYDNEY OFFICE. |

| MATERIALS PAYMENT TERMS | PROMO & SCRIPT TO |
|---|---|
| N/A | HS. SUE WARD ABOVE ADDRESS |

When executed by Licensee and an authorized officer of Warner, this will constitute a binding Agreement. If Licensee's execution is by an agent, such agent represents and warrants that it is duly authorized to execute this Agreement.

THIS AGREEMENT INCLUDES ALL THE TERMS AND CONDITIONS, SCHEDULES AND EXHIBITS ATTACHED HERETO.

ACCEPTED

| LICENSEE BY: | WARNER BY: |
|---|---|
| _____ SIGNATURE | _____ SIGNATURE |
| _____ (PRINT OR TYPE NAME & TITLE) | |

WB 9212
CONFIDENTIAL

AUSTRALIA

F020240
PAGE 2

## SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM US DOLLARS | TOTAL LICENSE FEE US DOLLARS |
|---|---|---|---|---|---|
| ABOUT FACE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| BACKFIRE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| HEARTBEAT (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| BIG JIM MC LAIN (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| BLACK GOLD (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| BLADE RUNNER (RR) | NOV 01,1991-OCT 30,1996 | | 1 | 30,000.00 | 30,000.00 |
| BURNING HILLS, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| COOL ONES, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| CROOKED ROAD, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| D.I., THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| DOC SAVAGE...MAN OF BRONZE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| WHATS UP DOC? (RR) | FEB 01,1992-JAN 31,1997 | | 1 | 30,000.00 | 30,000.00 |
| HELL BENT FOR GLORY (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| INCREDIBLE MR. LIMPET, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| ISLAND OF LOVE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| JET OVER THE ATLANTIC (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| JUMP INTO HELL (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| JOHNNY TROUBLE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |

**WB 9213**
**CONFIDENTIAL**



AUSTRALIA

F020240
PAGE 3

SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM US DOLLARS | TOTAL LICENSE FEE US DOLLARS |
|---|---|---|---|---|---|
| LOST BOUNDARIES (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| LULLABY OF BROADWAY (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| MACOMBER AFFAIR, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| MAD MAX 2 (ROAD WARRIOR, THE) (RR) | SEP 29,1991-SEP 28,1996 | | 1 | 30,000.00 | 30,000.00 |
| MILLIONAIRE FOR CHRISTY (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| NATIONAL LAMPOON'S VACATION (RR) | JUL 01,1992-JUN 30,1997 | | 1 | 30,000.00 | 30,000.00 |
| NIGHT SHIFT (RR) | FEB 01,1992-JAN 31,1997 | | 1 | 30,000.00 | 30,000.00 |
| WORLD ACCORDING TO GARP (RR) | FEB 01,1992-JAN 31,1997 | | 1 | 30,000.00 | 30,000.00 |
| OPERATION SECRET (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| OUR MISS BROOKS (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PAINTING THE CLOUDS WITH SUNSHINE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PHYNX, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PRETTY BABY (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PRINCE OF THE CITY (RR) | AUG 01,1991-JUL 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PROMISES IN THE DARK (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| RISKY BUSINESS (RR) | JUN 01,1992-MAY 31,1997 | | 1 | 30,000.00 | 30,000.00 |
| ROLLOVER (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| SHOOT-OUT AT MEDICINE BEND (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |

**WB 9214 CONFIDENTIAL**



AUSTRALIA                                                         F020240
                                                                 PAGE  4


                              SCHEDULE "A"


| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM US DOLLARS | TOTAL LICENSE FEE US DOLLARS |
|---|---|---|---|---|---|
| SIMON (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| SO FINE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| SO THIS IS LOVE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| STARLIFT (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| STOP THE WORLD, I WANT TO GET OFF (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| STOP, YOU'RE KILLING ME (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| TARGET ZERO (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| TOWARD THE UNKNOWN (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| WALL OF NOISE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| WHATEVER HAPPENED TO BABY JANE? (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| WOLFEN (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| TANKS ARE COMING, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| GREAT GEORGIA BANK HOAX (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| MORTADELLA (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |

                         TOTALS                                  1,500,000.00



WB 9215
CONFIDENTIAL

AUSTRALIA

F020240
PAGE 5

SCHEDULE "A"

1. LICENSED STATIONS.
   The broadcast territory includes all of Australia via one television station in each television market in Australia, as defined by the Australian Broadcasting Tribunal.

2. Notwithstanding anything contrary contained in clause first of the agreement to which this Schedule "A" is attached, LICENSEE shall have the right to broadcast the pictures by use of booster stations, translators and community antennas, and LICENSEE shall be entitled to make simultaneous network transmissions by way of microwave links or land lines, provided, however, that such right and/or entitlement shall be limited only to those instances where the foregoing devices are required to improve reception of the main signal of the broadcast and do not increase the market or markets covered by this agreement and in no such case shall reception by such a broadcast be subject to the payment of any toll, license fee, subscription fee or other like consideration.

WB 9216
CONFIDENTIAL



INTERNATIONAL FREE TELEVISION LICENSE AGREEMENT
STANDARD TERMS AND CONDITIONS
(AUSTRALIA-WARNER BROS. (AUSTRALIA) PTY. LTD.)

These Standard Terms and Conditions (the "Conditions") supplement the terms and conditions of the International Free Television License Agreement to which the Conditions are attached (the "License Agreement"). The License Agreement as supplemented by the Conditions will be referred to hereinafter as the "Agreement." All capitalized terms in the Conditions have the same meanings as in the License Agreement unless otherwise defined.

1.   LICENSE

Subject to LICENSEE's paying the specified License Fees and LICENSEE's performing all of its obligations under this Agreement, WARNER grants LICENSEE a limited license under copyright to transmit, exhibit, telecast, exploit or broadcast ("Transmit") the Program(s) over the facilities of the Licensed Station during the License Period(s) of the Program(s) (as defined below) in the Licensed Language in the Licensed Territory on a television receiver without a charge being made to the viewer for the privilege of viewing the program(s) ("Free Television Reception"). This is not a license to Transmit or to authorize others to Transmit any Program over the facilities of any other station or booster station, satellites, translators, community antennae, network simultaneous or delayed transmission, relay broadcasts or closed circuits, unless otherwise agreed to in a separate schedule attached hereto and made a part hereof. Under no circumstances may the Program be Transmitted into any place where an admission price is charged or the reception of the Program is subject to the payment of any fee, subscription or other consideration, excluding any governmentally imposed television receiver taxes, levies or charges.

2.   EXCLUSIVITY

During the License Period of any Program (see definition in paragraph 3 below), WARNER will not voluntarily license such Program for Free Television Reception in the Licensed Language over any other television station or cable television system whose originating television transmitter or cable system is within the Licensed Territory. WARNER does not grant exclusivity protection for any transmission, exhibition, telecast, broadcast or exploitation ("Transmission") of the Program not specified herein. In particular, but without limitation, WARNER does not grant exclusivity protection for free home television reception within the Licensed Territory in other than the Licensed Language, Transmission (or re-Transmission) by satellite or cable systems or broadcast signals originating outside the Licensed Territory or, exploitation of the Program in any other medium.

1

WB 9217
CONFIDENTIAL

3.   LICENSE PERIOD AND TERM

   a.  The License period for a Program (the "License Period") will begin on the date such Program first becomes available to LICENSEE as specified in the License Agreement and end on the earlier of the End Date specified in the License Agreement or the date of the last licensed Transmission of such Program.

   b.   The term of this Agreement (the "Term") begins on the date of the License Agreement and ends on the last End Date of any Program licensed hereunder unless the last licensed Transmission of any Program licensed hereunder occurs before the last End Date of any Program licensed hereunder in which case the term ends upon the last licensed Transmission of any Program licensed hereunder.

- 4.   PAYMENT OF LICENSE FEES

   a.  As used herein, the words "payment," "pay," "payable," "paid" or words of similar meaning when applied to obligations of LICENSEE to WARNER mean the actual receipt by WARNER, by the date payment is to be made, in United States dollars in the amount specified herein without offset or recoupment, of cash, a bank transfer of unencumbered, immediately available funds to WARNER's account, the unconditional clearance of a check or bank draft payable to WARNER and drawn on a United States bank, or the draw down by WARNER of a previously approved and existing letter of credit from a United States bank pursuant to the terms thereof.  Payment in any other manner will not be deemed made to WARNER until the amount of United States dollars due and payable has been received and is available for expenditure by WARNER.  LICENSEE bears the risk that payment in any other manner will not be deemed made to WARNER within the time periods specified herein.

   b.   In its sole and absolute discretion, WARNER may accept funds tendered to it by LICENSEE in a currency other than United States dollars.  Such acceptance will not constitute a waiver of WARNER's rights under paragraph 4.a.  Payment, therefore, will not be deemed to have been made until WARNER has converted the non-U.S. currency, net of all costs of conversion, to the amount of United States dollars due and payable.  LICENSEE will bear all risks associated with the conversion including delay, costs of conversion, fluctuations in the exchange rate and WARNER's choice of currency exchange agent.  In the event that WARNER converts the non-U.S. currency to an amount of United States dollars, net of all costs of conversion, in excess of the License Fee due and payable, WARNER may keep the excess without giving any credit to LICENSEE's account for the excess.

   c.  LICENSEE will obtain all governmental permits necessary to make all payments to WARNER required under this Agreement.  LICENSEE also will pay without limitation every tax, levy or charge, however denominated, imposed or levied against LICENSEE, WARNER or any Program by any authority having jurisdiction over LICENSEE's use of any Program other than a tax, levy or charge based on WARNER's net income.  Such taxes, levies or charges include, without limitation, quotas, value

2

WB 9218
CONFIDENTIAL

added taxes, so-called "remittance" and withholding taxes, licenses, "Contingents," turnover taxes, import permits and duties, and national, state, county, city and other taxes, however denominated, relating to or imposed upon the License Fee or any part thereof, the license or the Transmission of any Program, any other amounts payable to WARNER, negatives, prints or other Material, the storage or possession of any Program or any Material, or the right or privilege to use the same in connection with the Programs. LICENSEE may deduct from the License Fee payable to WARNER taxes which are levied on WARNER's License Fee and paid to a government authority on WARNER's behalf, only if such taxes are levied in accordance with the income tax laws of the government authority to which the taxes are payable and such taxes are creditable in the United States in accordance with the income tax laws of the United States and if, after payment of such taxes, LICENSEE promptly provides WARNER with an official tax receipt evidencing such payment on WARNER's behalf, or, if this is not possible due to law or regulation, LICENSEE provides a copy of said receipt to WARNER.

d.  All License Fees are to be paid when due without regard to delays in the date of Transmission of any Program because of late delivery of Materials, the unavailability of Materials, a Force Majeure Occurrence (see definition in paragraph 13 below), the extension of this Agreement or WARNER's exercise of any of its rights under this Agreement. Timely payment is of the essence. LICENSEE's failure to make any payments when due will constitute a material default.

e.  If a payment is to be made by LICENSEE to WARNER pursuant to this Agreement and is not received by WARNER within ten (10) days of its due date then WARNER is entitled, without prejudice to its other rights and remedies, to require the payment of interest on the sum overdue calculated from the due date until the date of actual payment at a rate equal to the higher of two (2) percent per annum plus the Westpac Banking Corporation indicator rate for overdrafts in excess of A$100,000 quoted in Sydney from time to time during that period and two (2) percent per annum over the then current advertised prime rate at the First National Bank of Boston. Interest, if required, will be compounded monthly and will continue to be required, each month, on the unpaid balance until all such amounts are paid.

f.  If laws or currency regulations in the Licensed Territory now or at any time during the term of the Agreement prohibit or restrict LICENSEE from paying any sums due WARNER, LICENSEE will advise WARNER promptly in writing. In any such case, upon WARNER's request, LICENSEE will deposit to WARNER's credit in a bank or banks approved in writing by WARNER or promptly pay to such person or persons as WARNER may designate in writing, all sums due WARNER. LICENSEE also will reimburse WARNER for any costs incurred by WARNER in remitting such funds to the United States and/or converting such funds into United States dollars. If LICENSEE is prohibited or restricted from making payment of any sums due WARNER, in addition to WARNER's other rights or remedies, WARNER may cancel and terminate this Agreement upon written notice to LICENSEE.

3

**WB 9219**
**CONFIDENTIAL**

5.    DELIVERY

a.    LICENSEE may obtain for use in accordance with the terms
hereof the Materials it requires if it pays WARNER the Materials
Charges specified in the License Agreement.  LICENSEE may retain
possession of the Materials of a Program until the earlier of the
expiration of the License Period of such Program, the expiration of the
Term or the termination of this Agreement by any of its terms, at which
time LICENSEE will return, ship or dispose of the Materials in
accordance with paragraph 7 below.

b.    LICENSEE will Transmit only Materials of the Programs which
it has obtained directly from WARNER or directly from a source
authorized by WARNER (including another WARNER licensee) to deliver
Materials of the Programs to LICENSEE.

c.    LICENSEE will notify WARNER of the scheduled date of
Transmission of each Program at least sixty (60) days prior thereto.
If the Materials of the Program are available for Transmission on such
scheduled date, WARNER will arrange for delivery of the Materials to
LICENSEE by air, unless otherwise instructed, f.o.b. WARNER's place of
shipment.  WARNER will not be responsible for delivery on less than
sixty (60) days' notice.

d.    LICENSEE will bear all costs of transportation, customs
duties, censorship fees and any and all other charges relating to the
shipment of the Materials into the Licensed Territory or from the
Licensed Territory to WARNER, and to the storage or use of the
Materials by LICENSEE in the Licensed Territory.

6.    INSPECTION OF MATERIALS

Immediately upon delivery of any Materials, LICENSEE will examine the
Materials to determine their technical acceptability for Transmission.
Unless WARNER is notified otherwise within five (5) business days of
delivery, all Materials will be deemed acceptable to LICENSEE.  If
WARNER receives timely notice of a defect in the Materials, WARNER will
remedy such defect or substitute Materials of the same Program at no
additional cost.  At WARNER's election, WARNER may exercise its rights
to withdraw or substitute pursuant to paragraph 19 below.

7.    RETURN, SHIPPING OR DISPOSITION

a.    LICENSEE agrees to return the Materials of a Program to
WARNER by air freight express to such destination as WARNER directs
within three (3) business days of its receipt of WARNER's instructions
but in no event later than the earlier of the expiration of the License
Period of the Program, the expiration of the Term or the termination of
this Agreement.  Return or shipment of the Materials in accordance with
WARNER's instructions is of the essence.  If LICENSEE and WARNER enter
into a written agreement that the Materials may be disposed of other
than by returning them to WARNER or shipping them to a destination
fixed by WARNER, LICENSEE may dispose of the Materials in accordance
with that agreement.

4

WB 9220
CONFIDENTIAL

b.   LICENSEE will return or ship all Materials in the same condition in which they were received, normal wear and tear excepted. If Materials are lost, stolen, destroyed or damaged between the time of delivery to LICENSEE and the receipt of the Materials by WARNER or its designee, LICENSEE will pay WARNER the latter's prevailing charge for replacement of the Materials.  Such payment will not, however, transfer to LICENSEE title to any Materials.

c.   When returning or shipping Materials of a Program, LICENSEE will return to WARNER or ship to its designee in accordance with paragraph 7.a, all dubbed sound tracks, subtitled or subtitling Material, and all optical and/or magnetic sound tracks and/or Materials containing optical and/or magnetic sound tracks which were manufactured by, for or at the request of LICENSEE in connection with the Program, whether or not LICENSEE used any of said Materials in connection with the exercise of its rights hereunder and whether or not LICENSEE incurred any of the costs of manufacture.

8.   TITLE

a.   Title in and to Materials of a Program provided to LICENSEE hereunder is vested and will remain in WARNER, and title in and to any Materials of a Program created by, for or at the request of LICENSEE and all rights therein, including copyrights and all neighboring and connecting rights, will vest and remain in WARNER upon the creation thereof, subject only to LICENSEE's possession and use until the earlier of the expiration of the License Period of the Program, the expiration of the Term or the termination of this Agreement solely so that LICENSEE may exercise its rights licensed hereunder.  As between WARNER and LICENSEE, all Materials will be deemed to have been loaned to LICENSEE whether or not LICENSEE paid any of the costs of manufacture.

b.   LICENSEE will execute, acknowledge and deliver to WARNER any instruments of transfer, conveyance or assignment in or to any Materials referred to in paragraph 8.a above which are necessary or desirable to evidence or effectuate WARNER's ownership of such Materials.  LICENSEE will also execute, acknowledge and deliver to WARNER any instruments of transfer, conveyance or assignment in or to any rights in Materials of a Program which are to vest and remain in WARNER pursuant to paragraph 8.a above which instruments are necessary or desirable to evidence or effectuate the vesting for as long as is permissible of such rights in WARNER.  If LICENSEE fails or refuses to execute, acknowledge or deliver any such instrument, then WARNER will be deemed to be, and LICENSEE hereby and irrevocably appoints WARNER, its true and lawful attorney-in-fact to execute and deliver all such instruments in LICENSEE's name or otherwise, acknowledging that such power is a power coupled with an interest.

9.   ALTERATION OF PROGRAMS

a.   LICENSEE will not change, alter, modify, copy, duplicate or add to any Program without WARNER's prior written consent.

5

WB 9221
CONFIDENTIAL

     b.   Notwithstanding paragraph 9.a above, LICENSEE may make minor cuts or alterations in order to conform to the orders of any duly authorized, legally constituted censorship authority in the Licensed Territory if LICENSEE immediately notifies WARNER in writing of the need for such cuts or alterations, obtains WARNER's prior written approval thereof and, at its own expense, replaces any such cuts and alterations so that the Materials are returned to WARNER or shipped to WARNER's designee in the same condition in which they were originally received by LICENSEE, normal wear and tear excepted.

     c.   Notwithstanding paragraph 9.a above, LICENSEE, at its own expense, may insert commercials in each Program at any place determined by LICENSEE.  No commercial will be inserted in a manner which may adversely affect the artistic or pictorial quality of the Program or damage the Program.  All commercials must be removed from each Program, without damage to the Program, before the Program is returned to WARNER or shipped to its designee.  WARNER, its parents, their affiliates and subsidiaries, and the officers, directors, agents, shareholders and employees of any one or more of them ("WARNER et al.") will have no liability for any commercials made or used by LICENSEE.  LICENSEE will indemnify and hold WARNER et al. harmless from any claim, cause of action, loss, liability, damage, cost or expense (including attorneys' fees or costs) ("Claim") arising from any commercial inserted in any Program.  If WARNER so requests, LICENSEE will defend WARNER et al. against any such Claim.

     d.   In no event will the copyright or trademark notice, WARNER's presentation or advertising credit or the credits to any person, firm or corporation appearing on any of the Materials be changed, altered or removed.  Any breach or violation of the terms hereof will constitute a material default entitling WARNER, at its election, to terminate this Agreement, in whole or in part, in addition to any other rights or remedies available to WARNER and without releasing or discharging LICENSEE of any liability hereunder.

     e.   Whenever requested by WARNER to do so, LICENSEE will change the title of any Program licensed hereunder and will not thereafter Transmit any such Program except under the new title.

10.  CENSORSHIP

If a Program or any episode thereof is rejected for Transmission by any duly authorized, legally constituted government censorship authority in the Licensed Territory and LICENSEE so notifies WARNER, LICENSEE may elect either to accept a substitute Program or episode for the one so withdrawn (which substitute Program or episode will be agreeable to both WARNER and LICENSEE) or to cancel the License Fee payable to WARNER for such withdrawn Program or episode thereof.  No cancellation or refund will be made if the withdrawn Program or episode was transmitted by LICENSEE.

6

WB 9222
CONFIDENTIAL

11.  ADVERTISING

    a.  In all advertising and publicity relating to any Program or any Transmission thereof, LICENSEE shall comply with the advertising and billing credit requirements of the Program as furnished by WARNER to LICENSEE.  LICENSEE will not make or permit to be made, in any advertising, publicity or otherwise, any statements which (a) constitute, or may be understood to be, an endorsement of any sponsor, product, article or service by WARNER or any person, company or corporation connected or associated with the Program, its production or distribution, or (b) indicate, or may be understood to indicate, that WARNER or any such person, company or corporation is connected or associated with any sponsor, product, article, service or advertiser. Any advertising or publicity referring to WARNER or any such person, company or corporation will be limited to and will indicate only that such person, company or corporation appeared in such Program or rendered services in connection therewith, or was the producer or distributor thereof, as applicable.

    b.  LICENSEE will not advertise or promote, in any manner or medium, any Program withdrawn or suspended by WARNER.

    c.  LICENSEE will not authorize or permit any excerpt or clip from any Program used for promotional purposes to be in excess of two (2) minutes in length.

    d.  LICENSEE will indemnify and hold WARNER et al. harmless from and against any and all Claims against WARNER et al. due to any actual or alleged breach by LICENSEE of the provisions of this paragraph.  If WARNER so requests, LICENSEE will defend WARNER et al. against such Claims.

12.  MUSIC PERFORMING RIGHTS

WARNER warrants and represents that the non-dramatic performing rights to all musical compositions contained in the Programs or any of them are (a) controlled by the American Society of Composers, Authors and Publishers; Broadcast Music, Incorporated; Sesac, Incorporated; or a performing rights society having jurisdiction; (b) in the public domain; or (c) controlled by WARNER to the extent required for the purposes of this Agreement.  LICENSEE will not permit any Programs to be Transmitted without first obtaining a valid license from any performing rights society having jurisdiction.  LICENSEE may be required to pay a performing rights royalty or license fee to any performing rights society having jurisdiction.  LICENSEE will be solely responsible for the payment thereof and will indemnify and hold WARNER et al. free and harmless therefrom.  If WARNER so requests, LICENSEE will defend WARNER et al. from any Claim arising out of LICENSEE's failure to pay in accordance with this paragraph for any musical composition in any Program.

7

WB 9223
CONFIDENTIAL

13.  FORCE MAJEURE

a.  If any Act of God, strike, labor dispute, fire, flood, delay in or lack of transportation, public disaster, war, governmental act or regulation, or any other cause beyond the control of WARNER and LICENSEE ("Force Majeure Occurrence") prevents LICENSEE, without LICENSEE's fault, from Transmitting any Program pursuant to this Agreement for thirty (30) or more consecutive days then LICENSEE may request and obtain an extension of the License Period of the Program (and of the Term, if necessary) for a period coextensive with such Force Majeure Occurrence but in no event either for more than one hundred eighty (180) days or beyond the expiration of WARNER's rights in said Program.

b.  If laboratory delay or any Force Majeure Occurrence prevents WARNER from carrying out any provision of this Agreement, this Agreement will not have been breached and WARNER will have no liability therefor.  Nevertheless, the License Period of any affected Program (and the Term, if necessary) will be extended for a period coextensive with the delay, but in no event beyond the expiration of WARNER's rights in said Program.

14.  REPRESENTATIONS AND WARRANTIES

a.  WARNER warrants and represents that, as to each Program, WARNER has or will have the right to grant the license herein contained on or before the first licensed Transmission of such Program; that there is no agreement with any other person, firm or corporation which will in any way interfere with any rights granted under this Agreement to LICENSEE; that all Programs licensed hereunder are free and clear of all encumbrances of any kind and nature which would be inconsistent with the rights granted to LICENSEE hereunder; and, that none of the Programs or any material contained therein violates the rights of any person.  WARNER further warrants and represents that it is a corporation duly organized, validly existing and in good standing in the jurisdiction of its incorporation; that it has full power and authority to enter into and perform this Agreement; that the execution, delivery and performance of this Agreement by WARNER have been duly authorized by all requisite corporate action of WARNER; and, that this Agreement is a valid and binding obligation of WARNER in accordance with its terms.

b.  WARNER will indemnify and hold LICENSEE, its officers, directors, agents, stockholders and employees and sponsors of any Transmission of any Program harmless from and against any and all Claims resulting from any judgment recovered in any action or proceeding by any third party based upon any breach of the warranties and representations contained in para-graph 14.a, provided that LICENSEE has given written notice to WARNER of the third party Claim immediately after it was made, and provided that LICENSEE discontinued Transmission of the Program(s) immediately after such Claim was made. WARNER may assume the handling, prosecution, defense or settlement of any Claim and any resulting litigation.  WARNER may, if necessary or

8

WB 9224
CONFIDENTIAL

desirable, join LICENSEE as a party in such action.  No settlement may be made without WARNER's written consent.  If LICENSEE fails to fulfill any of its obligations under this paragraph, then WARNER will be excused from its obligation to indemnify LICENSEE and hold it harmless.

c.  LICENSEE warrants and represents that it is in compliance with and in good standing under the laws of the Licensed Territory and any subdivision thereof with which it should be in compliance and under which it should be in good standing given the nature and scope of its business; that it has full power and authority to enter into and perform this Agreement in accordance with its terms; that the execution, delivery and performance of this Agreement have been authorized by all requisite action of LICENSEE; that this Agreement is a valid and binding obligation of LICENSEE enforceable in accordance with its terms; and, that LICENSEE is not required to obtain the consent of any person or entity to enter into this Agreement.  LICENSEE further warrants and represents that there are no and never will be any liens, charges, claims, adverse rights or interests of any kind on or against any Materials title to which is vested in WARNER as set forth in paragraph 8.a.  LICENSEE also warrants and represents that there will not be any restrictions that would or could prevent WARNER from Transmitting and distributing any of the Materials referred to in paragraph 8.a by any media or means and there will not be any payments which must be made by WARNER to anyone or any entity including, but not limited to, any person, union, guild or other labor organization, in connection therewith.

d.  LICENSEE will indemnify and hold WARNER et al. harmless from and against all Claims arising out of or relating to any breach of warranties and representations contained in paragraph 14.c.  If WARNER so requests, LICENSEE will defend WARNER et al. against any such Claim.

15.  REMEDIES FOR BREACH

a.  If LICENSEE does not pay in accordance with the terms of this Agreement any sum when due and such default continues for ten (10) days, or if LICENSEE is otherwise in breach of this Agreement or any other contract or agreement with WARNER, or if LICENSEE suspends operations, or if LICENSEE becomes insolvent or ceases to pay its obligations when due, or if LICENSEE is adjudicated a bankrupt, files a petition in bankruptcy, attempts to make an assignment for the benefit of creditors, or takes advantage of the provisions of any bankruptcy or debtor's relief act, or if an involuntary petition in bankruptcy is filed against LICENSEE and is not vacated or discharged within thirty (30) days, or if a receiver is appointed for a substantial portion of LICENSEE's property and is not discharged within thirty (30) days, or if LICENSEE loses control, for any reason, of the Licensed Station or its interest therein or the license to operate the same, then, at the election of WARNER, any and all sums payable under this Agreement remaining unpaid will forthwith become due and payable to WARNER regardless of the due date thereof, WARNER will be entitled to suspend the delivery of any Program and/or WARNER will be entitled to the immediate return of all Materials in LICENSEE's custody, possession or control.  In addition, and without prejudice to any of WARNER's rights

WB 9225
CONFIDENTIAL

or remedies at law or in equity, and without in any way releasing or discharging LICENSEE from any of its obligations under this Agreement, WARNER may terminate this Agreement. If WARNER pays or becomes obligated to pay any sum of money, or does or is required to do any act which requires the payment of monies, or expends any sums for legal services of any kind or description by reason of any default of LICENSEE, then the sum(s) so paid or required to be paid, with interest thereon at the rate specified in paragraph 4.e, will be added to the License Fees payable hereunder and will be paid by LICENSEE to WARNER concurrently with the next installment due or, if there is no further installment due, LICENSEE will make payment thereof upon demand.

b.    LICENSEE acknowledges that the licensing of a Program to LICENSEE hereunder and/or the Transmission of that Program or any episode or portion thereof makes that Program unmarketable to third parties in the Licensed Language in the Licensed Territory until after the date of the last licensed Transmission of that Program. Consequently, if LICENSEE defaults under this Agreement, payment to WARNER of all consideration payable hereunder is a reasonable estimate of WARNER's damages as a result of such default under the circumstances existing at the time this Agreement was made.

c.    LICENSEE acknowledges and admits that there is no adequate remedy at law for its failure to use the rights licensed hereunder other than in strict compliance with the terms and conditions set forth herein. LICENSEE agrees that, in the event of such unauthorized use, WARNER will be entitled to seek equitable relief, including injunctive relief, and such other and further relief as any court of competent jurisdiction may deem just and proper.

16.    RESERVED RIGHTS

The license herein granted to LICENSEE is limited to the right to Transmit each Program in its entirety only for the purposes, in the manner and at the times expressly provided. Any and all rights in any Program not expressly licensed to LICENSEE herein, including but not limited to the right to Transmit clips or segments of any Program, and the literary and musical Materials contained in any Program or upon which any Program may be based, are reserved to WARNER and may be exercised, marketed and exploited by WARNER concurrently with and throughout the Term of this Agreement.

17.    SUBLICENSE, RELICENSE AND ASSIGNMENT

a.    LICENSEE will not assign, sublicense, pledge, hypothecate, transfer or convey this Agreement, in whole or in part, without WARNER's prior written consent. WARNER may consent or not in its sole and absolute discretion. LICENSEE will not sublicense or relicense any Program for Transmission by any other person, firm, corporation or television station nor will LICENSEE use an agent for such purpose.

b.    WARNER may assign, sublicense, pledge, hypothecate, transfer or otherwise convey this Agreement, in whole or in part, as it deems proper in its sole and absolute discretion, without notice to LICENSEE.

10

WB 9226
CONFIDENTIAL

18. UNDERLINE EFFECT OF INVALIDITY OF PROVISION

If any provision of this Agreement is contrary to any applicable law or regulation, all other provisions of this Agreement will notwithstanding continue in full force and effect.

19. WITHDRAWAL OR SUSPENSION OF PROGRAMS

a.   WARNER will have the right at any time to withdraw any Program or episode thereof if, in WARNER's sole and absolute discretion, the Program or episode is either unavailable for Transmission under the terms of this Agreement or cannot, for reasons beyond WARNER's control, or due to a Force Majeure Occurrence, be made available to LICENSEE.  WARNER reserves the right to discontinue the production of any Program or episode thereof and to terminate this Agreement at any time during the Term on five (5) days' written notice to LICENSEE.  Upon such withdrawal or termination, LICENSEE may elect either to accept a substitute Program or episode thereof in place of the Program or episode so withdrawn, which substitute Program or episode must be agreeable to both WARNER and LICENSEE, or to cancel the License Fee payable to WARNER for such withdrawn Program or episode provided, however, that there will be no cancellation or refund of the License Fee if the withdrawn Program or episode was Transmitted by LICENSEE.  LICENSEE will have no other Claim against WARNER based on WARNER's withdrawal of a Program or episode or WARNER's termination of this Agreement.

b.   WARNER, in its sole and absolute discretion, may suspend delivery of any Program or LICENSEE's Transmission of any Program, whether or not delivered, if, in WARNER's opinion, the Program is unavailable for Transmission under the terms of this Agreement or cannot be made available to LICENSEE for reasons beyond the control of WARNER, or due to a Force Majeure Occurrence.  Any such suspension will be limited to a one hundred eighty (180) day period from the date of WARNER's notice for such Program, provided, however, that if WARNER elects to extend the suspension for an additional period not exceeding one hundred eighty (180) days, then the License Period for the suspended Program (and the Term, if necessary) will be extended day-to-day for a period which is equal to the period of such extended suspension but in no event beyond the expiration of WARNER's rights in said Program.

20. TRANSMISSION REPORT

LICENSEE will deliver to Warner Bros. (Australia) Pty. Ltd., Level 22, 8-20 Napier Street, North Sydney, N.S.W. 2060, Australia, and to Warner Bros. Television Distribution, Inc., Attention: International Distribution Services, 4000 Warner Blvd., Burbank, California 91522, United States, on or before the tenth (10th) day of each month during the Term a written report signed on behalf of LICENSEE listing each Program Transmitted during the preceding month, the date of each Transmission, the call letters of the station over which such Transmission was made, and the location of all Materials of the Program delivered to or created by or for LICENSEE for such Transmission.

11

WB 9227
CONFIDENTIAL

21.  ANTI-PIRACY

LICENSEE will take all steps and pay all required fees necessary to
protect the Programs fully under the copyright, trademark and related
intellectual property laws of the Licensed Territory.  WARNER will
reasonably cooperate with LICENSEE in providing documents necessary to
secure such protection.  If LICENSEE becomes aware of any infringement
of any copyright or trademark in any Program in the Licensed Territory,
LICENSEE will immediately notify WARNER.  LICENSEE will take such
actions in cooperation with WARNER as WARNER may designate in order to
stop such piracy.  LICENSEE will employ security measures to prevent
the loss, theft, pirating, copying or unauthorized duplication of any
of the Materials in its possession, custody or control.  LICENSEE
accepts responsibility for the loss or theft of any Program or its
Materials from the time of delivery until returned to WARNER.  LICENSEE
will notify WARNER immediately if any of the Materials in its
possession is lost, stolen or destroyed.  In such event, LICENSEE will
cooperate with WARNER to the fullest extent in any attempt WARNER may
make to recover such Materials, and will indemnify WARNER et al.
against any Claims made against WARNER et al. as a result thereof.

22.  RETRANSMISSION ROYALTIES

Any fees payable by reason of government permitted or mandated
re-Transmissions in the Licensed Territory of any Transmission of a
Program, including but not limited to AGICOA royalties, are the sole
property of WARNER.  LICENSEE will cooperate with WARNER to the extent
necessary to permit WARNER to collect the maximum amount of any such
fees.

23.  NOTICES

All notices under this Agreement must be in writing and sent by first
class mail, postage prepaid, with a copy personally delivered or sent
by telegram, telex, telecopier or other facsimile machine for delivery
within twenty-four (24) hours of transmittal.  The addresses for all
notices are identified in the License Agreement. Either party may
change its address for notice by written notice to the other pursuant
to this paragraph.

24.  HEADINGS

Paragraph headings are for reference only and have no legal effect
respecting the scope, meaning or intent of any of the provisions of
this Agreement.

25.  INTEGRATION, CHOICE OF LAW AND JURISDICTION

     a.   This Agreement is complete and constitutes the entire
understanding between the parties.  All prior understandings, written
or oral, express or implied, have been merged herein.

     b.   This Agreement may not be modified or amended except by an
instrument in writing, signed by the parties hereto.

12

WB 9228
CONFIDENTIAL

c.    The Courts of New South Wales and the Courts of Appeal therefrom shall have nonexclusive jurisdiction over all disputes arising in connection with this Agreement.  WARNER and LICENSEE irrevocably and unconditionally submit to the jurisdiction therein. Regardless of the judicial forum, LICENSEE and WARNER waive any right each may have to a trial by jury of any cause of action in connection with this Agreement.  Without prejudice to any other mode of service, service of any legal process in any action brought in the Courts of New South Wales or Courts of Appeal therefrom may be effected on a party by being left at or sent by pre-paid ordinary post (airmail if overseas) to its address for service of notices as identified in the License Agreement.  The foregoing shall not preclude any party hereto from seeking enforcement outside New South Wales of any order or judgment rendered by any New South Wales court.

d.    This Agreement is governed by the law in force in New South Wales.

e.    A waiver by either party of any breach by the other must be in writing and may not be deemed a waiver of any other breach of the same or a different nature.

13

WB 9229
CONFIDENTIAL



WARNER BROS.
INTERNATIONAL
TELEVISION
DISTRIBUTION

Inter-Office Memo

To:    WAYNE BROUN      From:      MARGARET KELLY  Ext.: 6071

Subject:   NINE TELEVISION PTY. LTD., AUSTRALIA

Date:    May 8, 1991      Copies to:    THOSE LISTED BELOW

Enclosed please find 5 copies of the following Agreement recently
negotiated with the above customer:

| CONTRACT NO. | PRODUCT | PRICE |
|---|---|---|
| F020240 | 50 FEATURES (Reruns) | US$1,500,000.00 |

Would you please check the enclosed very carefully and, if you find
everything in good order please forward 4 copies of the Agreement to
the LESSEE for signature, and once signed return all copies to my
attention.  We will immediately thereafter return an executed copy
of the Agreement for your files.  The extra copy of the Agreement
enclosed is for your files and reference.

Thanks and regards,

cc:  B. Adamson
     C. Hewitt
     Files

*Margaret*

OPEN
MAY - 8 1991
ORDER

WB 9230
CONFIDENTIAL

EXHIBIT D     Page 37

cc: Janine
CA
Pls. ck RTS & AVAILS.
Pick-up and prepare Contract.

RECEIVED
APR 2 2 1991
JOHN WHITESELL



**WARNER BROS.**

DATE:

MEMO:        *April 19, 1991*

FROM:        *John Whitesell*

SUBJECT:     *Berniece Pritchard*
             *050*
             *AUSTRALIA - BOND TELEVISION*

COPIES:      *Jacqui Massey*          F020240

---

John,

Please find attached contract no. WBA 2749 - 50 RE-RUN TITLES for processing

Kind regards

*Berniece*

WB 9231
CONFIDENTIAL



**WARNER BROS. TELEVISION DISTRIBUTION INC.**
4000 WARNER BLVD.
BURBANK, CALIFORNIA 91522

DATE: APRIL 19, 1991
SALES REPRESENTATIVE: WAYNE BROWN
ORDER REFERENCE TO: WBA 2749

## INTERNATIONAL FREE TELEVISION LICENSE AGREEMENT ORDER

The following is a firm offer by the undersigned Licensee for below listed Program(s) upon the terms and conditions contained herein and/or in Warner's International Free Television License Agreements. Should Warner reject this offer as to any of the Program(s), such rejection shall apply to those Program(s) specified by Warner and Licensee's commitment to license the remaining Program(s) shall not be affected in any manner whatsoever.

### DEAL TERMS

LICENSEE: BOND TELEVISION PTY. LTD  OCD660  FO20240

ADDRESS: ARTARMON ROAD WILLOUGHBY

CITY & COUNTRY: N.S.W. 2068  AUSTRALIA

LICENSED TERRITORY: AUSTRALIA (SEE A BELOW) D50

LICENSED STATION: SEE A BELOW    LICENSED LANGUAGE: ENGLISH

| PROGRAM(S) | # EPS | # RUNS | # YRS | AIR/START DATE | END DATE | LICENSE FEE | PER | TOTAL LICENSE FEE |
|---|---|---|---|---|---|---|---|---|
| A) 50 RE-RUN TITLES | 50 | 4 | | REFER ATTACHED | SCHEDULE | US$30,000 | EP | US$1,500,000 |

A: BROADCAST TERRITORY INCLUDES ALL OF AUSTRALIA VIA ONE
TELEVISION STATION IN EACH TELEVISION MARKET IN AUSTRALIA
AS DEFINED BY THE AUSTRALIAN BROADCASTING TRIBUNAL.

PAYMENT TERMS AND CONDITIONS OF LICENSE: TEN (10) EQUAL QUARTERLY PAYMENT DUE JUNE 1, 1991.
SUCH PAYMENT TO BE MADE DIRECT IN UNITED STATES DOLLARS TO THE
AUSTRALIA AND NEW ZEALAND BANKING GROUP LIMITED, NORTH SYDNEY, FOR DEPOSIT
TO "PRIVATE U.S. DOLLAR FOREIGN CURRENCY ACCOUNT, WARNER BROS. (AUSTRALIA)
PTY. LIMITED ACCOUNT NUMBER: 405 100" ON OR BEFORE THE DUE DATE OF EACH
RESPECTIVE INSTALLMENT.

MATERIALS FORMAT: 1" 625  TAPES

MATERIALS CHARGE: INCLUDED IN LICENSE FEE

MATERIALS TO: TAPES AND PUBLICITY TO BE SUPPLIED BY SYDNEY.

MATERIALS PAYMENT TERMS: N/A

CONTRACTS, INVOICES TO: ABOVE ADDRESS
ATTN: MR ROSS PLAPP
PROGRAM DIRECTOR

ADDITIONAL TERMS: IMPORTANT: THIS ORDER IS SUBJECT TO TERMS AND
CONDITIONS OF "OUTPUT" DEAL DATED FEBRUARY 1, 90
(WITH AMENDMENTS). SPECIAL CONTRACT AND
ADDITIONAL CLAUSES REQUIRED REFER TO GWEN
WHITSON.

PROMO & SCRIPT TO: ABOVE ADDRESS
ATTN: MS SUE WARD

ML-1920 Rev 1/90 [37]

Licensee: BOND TELEVISION PTY. LTD
By: _____
SIGNATURE
(PRINT OR TYPE NAME & TITLE)

The General Provisions printed on the reverse hereof apply to all product covered by this Contract Order.

WB 9232 CONFIDENTIAL

## GENERAL PROVISIONS

### TITLE

a.    Title in and to Materials of a Program provided to LICENSEE hereunder is vested and will remain in WARNER, and title in and to any Materials of a Program created by, for or at the request of LICENSEE and all rights therein, including copyrights and all neighboring and connecting rights, will vest and remain in WARNER upon the creation thereof, subject only to LICENSEE'S possession and use until the earlier of the expiration of the License Period of the Program, the expiration of the Term or the termination of this Agreement solely so that LICENSEE may exercise its rights licensed hereunder. As between WARNER and LICENSEE, all Materials will be deemed to have been loaned to LICENSEE whether or not LICENSEE paid any of the costs of manufacture.

b    LICENSEE will execute, acknowledge and deliver to WARNER any instruments of transfer, conveyance or assignment in or to any Materials referred to in paragraph (a) above which are necessary or desirable to evidence or effectuate WARNER'S ownership of such Materials. LICENSEE will also execute, acknowledge and deliver to WARNER any instruments of transfer, conveyance or assignment in or to any rights in Materials of a Program which are to vest and remain in WARNER pursuant to paragraph (a) above which instruments are necessary or desirable to evidence or effectuate the vesting for as long as is permissible of such rights in WARNER. If LICENSEE fails or refuses to execute, acknowledge or deliver any such instrument, then WARNER will be deemed to be, and LICENSEE hereby and irrevocably appoints WARNER, its true and lawful attorney-in-fact to execute and deliver all such instruments in LICENSEE'S name or otherwise, acknowledging that such power is a power coupled with an interest.

### SHIPPING CHARGES, ETC.

a.    LICENSEE will notify WARNER of he scheduled date of Transmission of each Program at least sixty (60) days prior thereto. If the Materials of the Program are available for Transmission on such scheduled date, WARNER will arrange for delivery of the Materials to LICENSEE by air, unless otherwise instructed, f.o.b. WARNER'S place of shipment. WARNER will not be responsible for delivery on less than sixty (60) days' notice.

b.    LICENSEE will bear all costs of transportation, customs duties, censorship fees and any and all other charges relating to the shipment of the Materials into the Licensed Territory or from the Licensed Territory to WARNER, and to the storage or use of the Materials by LICENSEE in the Licensed Territory.

### CONTRACTS

This Contract Order will be superseded by WARNER'S Standard International Free Television License Agreement to be executed by LICENSEE and WARNER.

IML-1920 Reverse 1/90 N [37]

WB 9233
CONFIDENTIAL

Bond TV

SCHEDULE "A"

50    RE-RUN TITLES    F070840

| TITLE | START DATE | END DATE |
|---|---|---|
| ABOUT FACE 053122 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| BACKFIRE 050915 | JUNE 1, 1991 | MAY 31, 1996 ✓ |
| HEARTBEAT 049809 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| BIG JIM MCCLAIN 063301 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| BLACK GOLD 063263 | JUNE 1, 1991 | MAY 31, 1996 ✓ |
| BLADE RUNNER 082104 | NOV 1, 1991 ✓ | OCT 30, 1996 ✓ |
| THE BURNING HILLS 057501 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| THE COOL ONES 067655 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| THE CROOKED ROAD 065496 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| THE D.I. 057617 | JUNE 1, 1991 | MAY 31, 1996 ✓ |
| DOC SAVAGE, MAN OF BRONZE 075406 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| WHATS UP DOC 072110 | FEB 1, 1992 ✓ | JAN 31, 1997 ✓ |
| HELL BENT FOR GLORY 058716 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| INCREDIBLE MR. LIMPET 064359 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| ISLAND OF LOVE 063269 | JUNE 1, 1991 | MAY 31, 1996 ✓ |
| JET OVER THE ATLANTIC 360008 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| JUMP INTO HELL 055410 | JUNE 1, 1991 | MAY 31, 1996 ✓ |
| JOHNNY TROUBLE 581910 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| LOST BOUNDARIES 586960 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| LULLABY OF BROADWAY 051020 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| THE MACOMBER AFFAIR 586380 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| MAD MAX II, THE ROAD WARRIOR 082151 | SEP 29, 1991 ✓ | SEP 28, 1996 ✓ |
| MILLIONAIRE FOR CHRISTY 530240 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| NATIONAL LAMPOONS VACATION 083206 | JULY 1, 1991 ✓ | JUN 30, 1996 ✓ |
| NIGHTSHIFT 082113 | FEB 1, 1992 ✓ | JAN 31, 1997 ✓ |
| WORLD ACCORDING TO GARP 082106 | FEB 1, 1992 ✓ | JAN 31, 1997 ✓ |
| OPERATION SECRET 053205 | JUNE 1, 1991 | MAY 31, 1996 ✓ |
| OUR MISS BROOKS 056515       052105 | JUNE 1, 1991 | MAY 31, 1996 ✓ |
| PAINTING THE CLOUDS WITH SUNSHINE | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| THE PHYNX 070958 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| PRETTY BABY 051004 | JUNE 1, 1991 | MAY 31, 1996 ✓ |
| PRINCE OF THE CITY 081002 | AUG 1, 1991 ✓ | JUL 31, 1996 ✓ |
| PROMISES IN THE DARK 049812 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| RISKY BUSINESS 083201 | JUNE 1, 1992 ✓ | MAY 31, 1997 ✓ |
| ROLLOVER 081013 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| SHOOTOUT AT MEDICINE BEND 057615 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| SIMON 080904 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| SO FINE 081015 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| SO THIS IS LOVE 053206 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| STARLIFT 052109       066558 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| STOP THE WORLD; I WANT TO GET OFF | JUNE 1, 1991 | MAY 31, 1996 ✓ |
| STOP, YOU'RE KILLING ME 053310 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| TARGET ZERO 056508 | JUNE 1, 1991 | MAY 31, 1996 ✓ |
| TOWARD THE UNKNOWN 057604 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| WALL OF NOISE 364351 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| WHATEVER HAPPENED TO BABY JANE 063252 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| WOLFEN 080912 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| THE TANKS ARE COMING 052108 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| GREAT GEORGIA BANK HOAX 078423 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |
| MORTADELLA 072160 | JUNE 1, 1991 ✓ | MAY 31, 1996 ✓ |

**WB 9234 CONFIDENTIAL**



WARNER BROS. (AUSTRALIA), PTY., LTD.
LEVEL 22, 8-20 NAPIER STREET
NORTH SYDNEY, N.S.W., 2060, AUSTRALIA.

| CONTRACT NO. | PAGE 1 |
|---|---|
| F020240 | |
| DATE | |
| MAY 06, 1991 | |
| SALES REPRESENTATIVE | |
| WAYNE BROUN | |
| REFERENCE NO. | WBA2749 |

## INTERNATIONAL FREE TELEVISION LICENSE AGREEMENT

Subject to timely payment of the Total License Fee and due performance of all other provisions of this Agreement, Warner licenses solely to the Licensee named below, and Licensee licenses from Warner, the following Programs on the following terms and conditions:

LICENSEE
NINE TELEVISION PTY. LTD.

| ADDRESS | LICENSED TERRITORY |
|---|---|
| 24 Artarmon Road, | AUSTRALIA |

| CITY & COUNTRY | LICENSED STATION | LICENSED LANGUAGE |
|---|---|---|
| Willoughby, NSW, 2068 AUSTRALIA. | SEE SCHED. "A" | ENGLISH |

| PROGRAM TITLE(S) | PROGRAM(S) DURATION |
|---|---|
| SEE SCHEDULE A | N/A |

| FIRST RUN | RERUNS | TELECASTS/REPLAYS | RUNS | START DATE | END DATE |
|---|---|---|---|---|---|
| N/A | 50 | N/A | 4 | SEE SCHEDULE A | SEE SCHEDULE A |

| NO OF EPISODES/TELECASTS/TITLES/HOURS | LICENSE FEE | | TOTAL LICENSE FEE |
|---|---|---|---|
| 50 | US$30,000.00 | PER  TITLE | US$1,500,000.00 |

PAYMENT TERMS AND INVOICING INSTRUCTIONS
TO BE PAYABLE IN TEN (10) EQUAL CONSECUTIVE QUARTERLY PAYMENTS OF US$150,000.00 EACH, COMMENCING ON JUNE 1, 1991.  PAYMENTS TO BE MADE DIRECTLY IN UNITED STATES DOLLARS TO THE AUSTRALIA AND NEW ZEALAND BANKING GROUP LIMITED, NOTH SYDNEY, FOR DEPOSIT TO "PRIVATE U.S. DOLLAR FOREIGN CURRENCY ACCOUNT, WARNER BROS. (AUSTRALIA) PTY. LIMITED, ACCOUNT NUMBER 405-100" ON OR BEFORE THE DUE DATE OF EACH RESPECTIVE INSTALLMENT.

| MATERIALS | MATERIALS CHARGE | MATERIALS TO |
|---|---|---|
| 1" 625 PAL VIDEOTAPE | ON LOAN | TAPES AND PUBLICITY TO BE SUPPLIED BY WB SYDNEY OFFICE. |

| MATERIALS PAYMENT TERMS | PROMO & SCRIPT TO |
|---|---|
| N/A | MS. SUE WARD ABOVE ADDRESS |

When executed by Licensee and an authorized officer of Warner, this will constitute a binding Agreement.  If Licensee's execution is by an agent, such agent represents and warrants that it is duly authorized to execute this Agreement.

THIS AGREEMENT INCLUDES ALL THE TERMS AND CONDITIONS, SCHEDULES AND EXHIBITS ATTACHED HERETO.

ACCEPTED

LICENSEE
BY: _____
   SIGNATURE

WARNER
BY: _____
   SIGNATURE

(PRINT OR TYPE NAME & TITLE)

**WB 9235**
**CONFIDENTIAL**

AUSTRALIA

F020240

PAGE 2

SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM US DOLLARS | TOTAL LICENSE FEE US DOLLARS |
|---|---|---|---|---|---|
| ABOUT FACE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| BACKFIRE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| HEARTBEAT (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| BIG JIM MC LAIN (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| BLACK GOLD (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| BLADE RUNNER (RR) | NOV 01,1991-OCT 30,1996 | | 1 | 30,000.00 | 30,000.00 |
| BURNING HILLS, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| COOL ONES, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| CROOKED ROAD, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| D.I., THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| DOC SAVAGE...MAN OF BRONZE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| WHATS UP DOC? (RR) | FEB 01,1992-JAN 31,1997 | | 1 | 30,000.00 | 30,000.00 |
| HELL BENT FOR GLORY (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| INCREDIBLE MR. LIMPET, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| ISLAND OF LOVE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| JET OVER THE ATLANTIC (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| JUMP INTO HELL (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| JOHNNY TROUBLE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |

WB 9236
CONFIDENTIAL

AUSTRALIA

F020240
PAGE  3

SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM US DOLLARS | TOTAL LICENSE FEE US DOLLARS |
|---|---|---|---|---|---|
| LOST BOUNDARIES (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| LULLABY OF BROADWAY (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| MACOMBER AFFAIR, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| MAD MAX 2 (ROAD WARRIOR, THE) (RR) | SEP 29,1991-SEP 28,1996 | | 1 | 30,000.00 | 30,000.00 |
| MILLIONAIRE FOR CHRISTY (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| NATIONAL LAMPOON'S VACATION (RR) | JUL 01,1992-JUN 30,1997 | | 1 | 30,000.00 | 30,000.00 |
| NIGHT SHIFT (RR) | FEB 01,1992-JAN 31,1997 | | 1 | 30,000.00 | 30,000.00 |
| WORLD ACCORDING TO GARP (RR) | FEB 01,1992-JAN 31,1997 | | 1 | 30,000.00 | 30,000.00 |
| OPERATION SECRET (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| OUR MISS BROOKS (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PAINTING THE CLOUDS WITH SUNSHINE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PHYNX, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PRETTY BABY (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PRINCE OF THE CITY (RR) | AUG 01,1991-JUL 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PROMISES IN THE DARK (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| RISKY BUSINESS (RR) | JUN 01,1992-MAY 31,1997 | | 1 | 30,000.00 | 30,000.00 |
| ROLLOVER (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| SHOOT-OUT AT MEDICINE BEND (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |

WB 9237
CONFIDENTIAL



AUSTRALIA

F020240
PAGE  4

SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM US DOLLARS | TOTAL LICENSE FEE US DOLLARS |
|---|---|---|---|---|---|
| SIMON (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| SO FINE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| SO THIS IS LOVE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| STARLIFT (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| STOP THE WORLD, I WANT TO GET OFF (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| STOP, YOU'RE KILLING ME (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| TARGET ZERO (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| TOWARD THE UNKNOWN (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| WALL OF NOISE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| WHATEVER HAPPENED TO BABY JANE? (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| WOLFEN (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| TANKS ARE COMING, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| GREAT GEORGIA BANK HOAX (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| MORTADELLA (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |

TOTALS

---------------
1,500,000.00
===============

WB 9238
CONFIDENTIAL

AUSTRALIA

F020240
PAGE 5

## SCHEDULE "A"

1. LICENSED STATIONS.
   The broadcast territory includes all of Australia via one television station in each television market in Australia, as defined by the Australian Broadcasting Tribunal.

2. Notwithstanding anything contrary contained in clause first of the agreement to which this Schedule "A" is attached, LICENSEE shall have the right to broadcast the pictures by use of booster stations, translators and community antennaes, and LICENSEE shall be entitled to make simultaneous network transmissions by way of microwave links or land lines, provided, however, that such right and/or entitlement shall be limited only to those instances where the foregoing devices are required to improve reception of the main signal of the broadcast and do not increase the market or markets covered by this agreement and in no such case shall reception by such a broadcast be subject to the payment of any toll, license fee, subscription fee or other like consideration.

WB 9239
CONFIDENTIAL





**WARNER BROS. (AUSTRALIA), PTY., LTD.**
**LEVEL 22, 8-20 NAPIER STREET**
**NORTH SYDNEY, N.S.W., 2060, AUSTRALIA.**

| CONTRACT NO. | PAGE 1 |
|---|---|
| F020240 | |

| DATE | |
|---|---|
| MAY 06, 1991 | |

SALES REPRESENTATIVE
**WAYNE BROWN**

REFERENCE NO.    **WBA2749**

## INTERNATIONAL FREE TELEVISION LICENSE AGREEMENT

Subject to timely payment of the Total License Fee and due performance of all other provisions of this Agreement, Warner licenses solely to the Licensee named below, and Licensee licenses from Warner, the following Programs on the following terms and conditions:

LICENSEE
**NINE TELEVISION PTY. LTD.**

| ADDRESS | LICENSED TERRITORY |
|---|---|
| 24 Artarmon Road, | **AUSTRALIA** |

| CITY & COUNTRY | LICENSED STATION | LICENSED LANGUAGE |
|---|---|---|
| **Willoughby, NSW, 2068 AUSTRALIA.** | **SEE SCHED. "A"** | **ENGLISH** |

| PROGRAM TITLE(S) | PROGRAM(S) DURATION! |
|---|---|
| SEE SCHEDULE A | N/A |

| FIRST RUN | RERUNS | TELECASTS/RETPEATS | RUNS | START DATE | END DATE |
|---|---|---|---|---|---|
| N/A | 50 | N/A | 4 | SEE SCHEDULE A | SEE SCHEDULE A |

| NO. OF EPISODES/TELECASTS/TITLES/HOURS | LICENSE FEE | | TOTAL LICENSE FEE |
|---|---|---|---|
| 50 | US$30,000.00 | PER TITLE | US$1,500,000.00 |

PAYMENT TERMS AND INVOICING INSTRUCTIONS
TO BE PAYABLE IN TEN (10) EQUAL CONSECUTIVE QUARTERLY PAYMENTS OF US$150,000.00 EACH, COMMENCING ON JUNE 1, 1991. PAYMENTS TO BE MADE DIRECTLY IN UNITED STATES DOLLARS TO THE AUSTRALIA AND NEW ZEALAND BANKING GROUP LIMITED, NOTH SYDNEY, FOR DEPOSIT TO "PRIVATE U.S. DOLLAR FOREIGN CURRENCY ACCOUNT, WARNER BROS. (AUSTRALIA) PTY. LIMITED, ACCOUNT NUMBER 405-100" ON OR BEFORE THE DUE DATE OF EACH RESPECTIVE INSTALLMENT.

| MATERIALS | MATERIALS CHARGE | MATERIALS TO |
|---|---|---|
| 1" 625 PAL VIDEOTAPE | ON LOAN | TAPES AND PUBLICITY TO BE SUPPLIED BY WB SYDNEY OFFICE. |

| MATERIALS PAYMENT TERMS | PROMO & SCRIPT TO |
|---|---|
| N/A | MS. SUE WARD ABOVE ADDRESS |

When executed by Licensee and an authorized officer of Warner, this will constitute a binding Agreement. If Licensee's execution is by an agent, such agent represents and warrants that it is duly authorized to execute this Agreement.

THIS AGREEMENT INCLUDES ALL THE TERMS AND CONDITIONS, SCHEDULES AND EXHIBITS ATTACHED HERETO.

ACCEPTED

LICENSEE
BY: _____

WARNER
BY: _____

SIGNATURE                                          SIGNATURE

_____

**WB 9240**
**CONFIDENTIAL**

AUSTRALIA

F020240
PAGE  2

SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM US DOLLARS | TOTAL LICENSE FEE US DOLLARS |
|---|---|---|---|---|---|
| ABOUT FACE (RR) | JUN 01,1991- | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| BACKFIRE (RR) | JUN 01,1991- | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| HEARTBEAT (RR) | JUN 01,1991- | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| BIG JIM MC LAIN (RR) | JUN 01,1991- | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| BLACK GOLD (RR) | JUN 01,1991- | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| BLADE RUNNER (RR) | NOV 01,1991- | OCT 30,1996 | 1 | 30,000.00 | 30,000.00 |
| BURNING HILLS, THE (RR) | JUN 01,1991- | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| COOL ONES, THE (RR) | JUN 01,1991- | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| CROOKED ROAD, THE (RR) | JUN 01,1991- | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| D.I., THE (RR) | JUN 01,1991- | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| DOC SAVAGE...MAN OF BRONZE (RR) | JUN 01,1991- | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| WHATS UP DOC? (RR) | FEB 01,1992- | JAN 31,1997 | 1 | 30,000.00 | 30,000.00 |
| HELL BENT FOR GLORY (RR) | JUN 01,1991- | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| INCREDIBLE MR. LIMPET, THE (RR) | JUN 01,1991- | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| ISLAND OF LOVE (RR) | JUN 01,1991- | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| JET OVER THE ATLANTIC (RR) | JUN 01,1991- | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| JUMP INTO HELL (RR) | JUN 01,1991- | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| JOHNNY TROUBLE (RR) | JUN 01,1991- | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |



**WB 9241**
**CONFIDENTIAL**

AUSTRALIA

F020240
PAGE 3

SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM US DOLLARS | TOTAL LICENSE FEE US DOLLARS |
|---|---|---|---|---|---|
| LOST BOUNDARIES (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| LULLABY OF BROADWAY (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| MACOMBER AFFAIR, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| MAD MAX 2 (ROAD WARRIOR, THE) (RR) | SEP 29,1991-SEP 28,1996 | | 1 | 30,000.00 | 30,000.00 |
| MILLIONAIRE FOR CHRISTY (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| NATIONAL LAMPOON'S VACATION (RR) | JUL 01,1992-JUN 30,1997 | | 1 | 30,000.00 | 30,000.00 |
| NIGHT SHIFT (RR) | FEB 01,1992-JAN 31,1997 | | 1 | 30,000.00 | 30,000.00 |
| WORLD ACCORDING TO GARP (RR) | FEB 01,1992-JAN 31,1997 | | 1 | 30,000.00 | 30,000.00 |
| OPERATION SECRET (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| OUR MISS BROOKS (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PAINTING THE CLOUDS WITH SUNSHINE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PHYNX, THE (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PRETTY BABY (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PRINCE OF THE CITY (RR) | AUG 01,1991-JUL 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| PROMISES IN THE DARK (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| RISKY BUSINESS (RR) | JUN 01,1992-MAY 31,1997 | | 1 | 30,000.00 | 30,000.00 |
| ROLLOVER (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |
| SHOOT-OUT AT MEDICINE BEND (RR) | JUN 01,1991-MAY 31,1996 | | 1 | 30,000.00 | 30,000.00 |

WB 9242
CONFIDENTIAL

AUSTRALIA

F020240
PAGE 4

## SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM US DOLLARS | TOTAL LICENSE FEE US DOLLARS |
|---|---|---|---|---|---|
| SIMON (RR) | JUN 01,1991 | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| SO FINE (RR) | JUN 01,1991 | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| SO THIS IS LOVE (RR) | JUN 01,1991 | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| STARLIFT (RR) | JUN 01,1991 | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| STOP THE WORLD, I WANT TO GET OFF (RR) | JUN 01,1991 | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| STOP, YOU'RE KILLING ME (RR) | JUN 01,1991 | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| TARGET ZERO (RR) | JUN 01,1991 | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| TOWARD THE UNKNOWN (RR) | JUN 01,1991 | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| WALL OF NOISE (RR) | JUN 01,1991 | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| WHATEVER HAPPENED TO BABY JANE? (RR) | JUN 01,1991 | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| WOLFEN (RR) | JUN 01,1991 | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| TANKS ARE COMING, THE (RR) | JUN 01,1991 | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| GREAT GEORGIA BANK HOAX (RR) | JUN 01,1991 | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| MORTADELLA (RR) | JUN 01,1991 | MAY 31,1996 | 1 | 30,000.00 | 30,000.00 |
| TOTALS | | | | | 1,500,000.00 |

WB 9243
CONFIDENTIAL

AUSTRALIA

F020240
PAGE 5

SCHEDULE "A"

1. LICENSED STATIONS.
   The broadcast territory includes all of Australia via one television
   station in each television market in Australia, as defined by the
   Australian Broadcasting Tribunal.

2. Notwithstanding anything contrary contained in clause first of the
   agreement to which this Schedule "A" is attached, LICENSEE shall have
   the right to broadcast the pictures by use of booster stations,
   translators and community antennaes, and LICENSEE shall be entitled
   to make simultaneous network transmissions by way of microwave links
   or land lines, provided, however, that such right and/or entitlement
   shall be limited only to those instances where the foregoing devices are
   required to improve reception of the main signal of the broadcast and do
   not increase the market or markets covered by this agreement and in no
   such case shall reception by such a broadcast be subject to the payment
   of any toll, license fee, subscription fee or other like consideration.

WB 9244
CONFIDENTIAL



...NER BROS. TELEVISION DISTRIBUTION INC.
**4000 WARNER BLVD.**
**BURBANK, CALIFORNIA 91522**

| DATE | APRIL 19, 1991 |
|---|---|
| SALES REPRESENTATIVE | WAYNE BROUN |
| ORDER REFERENCE NO. | WBA 2749 |

## INTERNATIONAL FREE TELEVISION LICENSE AGREEMENT ORDER

The following is a firm offer by the undersigned Licensee for below listed Program(s) upon the terms and conditions contained herein and/or in Warner's International Free Television License Agreements. Should Warner reject this offer as to any of the Program(s), such rejection shall apply to those Program(s) specified by Warner and Licensee's commitment to license the remaining Program(s) shall not be affected in any manner whatsoever.

### DEAL TERMS

LICENSEE
BOND TELEVISION PTY. LTD  050660                                        F020240

| ADDRESS | LICENSED TERRITORY |
|---|---|
| ARTARMON ROAD WILLOUGHBY | AUSTRALIA (SEE A BELOW) 050 |

| CITY & COUNTRY | LICENSED STATION | LICENSED LANGUAGE |
|---|---|---|
| N.S.W. 2068  AUSTRALIA | SEE A BELOW | ENGLISH |

| PROGRAM(S) | # EPS | # RUNS | # TEL | P/R | START DATE | END DATE | LICENSE FEE | PER | TOTAL LICENSE FEE |
|---|---|---|---|---|---|---|---|---|---|
| A)  50 RE-RUN TITLES | 50 | 4 | | | REFER ATTACHED | SCHEDULE | U$30,000 | EP | U$1,500,000 |

A: BROADCAST TERRITORY INCLUDES ALL OF AUSTRALIA VIA ONE
TELEVISION STATION IN EACH TELEVISION MARKET IN AUSTRALIA
AS DEFINED BY THE AUSTRALIAN BROADCASTING TRIBUNAL.

PAYMENT (TV TERMS)
TEN (10) EQUAL QUARTERLY PAYMENT DUE JUNE 1, 1991.
SUCH PAYMENT TO BE MADE DIRECT IN UNITED STATES DOLLARS TO THE
AUSTRALIA AND NEW ZEALAND BANKING GROUP LIMITED, NORTH SYDNEY, FOR DEPOSIT
TO "PRIVATE U.S. DOLLAR FOREIGN CURRENCY ACCOUNT, WARNER BROS. (AUSTRALIA)
PTY. LIMITED ACCOUNT NUMBER: 405 100" ON OR BEFORE THE DUE DATE OF EACH
RESPECTIVE INSTALLMENT.

| MATERIALS | MATERIALS CHARGE | MATERIALS TO |
|---|---|---|
| 1" 625  TAPES | INCLUDED IN LICENSE FEE | TAPES AND PUBLICITY TO BE SUPPLIED BY SYDNEY. |

| MATERIALS PAYMENT TERMS | CONTRACTS/INVOICES TO |
|---|---|
| N/A | ABOVE ADDRESS ATTN: MR ROSS PLAPP PROGRAM DIRECTOR |

| ADDITIONAL TERMS | PROMO & SCRIPT TO |
|---|---|
| IMPORTANT: THIS ORDER IS SUBJECT TO TERMS AND CONDITIONS OF "OUTPUT" DEAL DATED FEBRUARY 1, 90 (WITH AMENDMENTS).  SPECIAL CONTRACT AND ADDITIONAL CLAUSES REQUIRED REFER TO GWEN WHITSON. | ABOVE ADDRESS ATTN: MS SUE WARD |

ML-1920 Rev. 1/90 (37)

| | Licensee |
|---|---|
| | BOND TELEVISION PTY. LTD |
| | SIGNATURE |
| | (PRINT OR TYPE NAME & TITLE) |

The General Provisions printed on the reverse hereof apply to all product covered by this Contract Order.

WB 9245
CONFIDENTIAL

Bond IV

SCHEDULE "A"

50   RE-RUN TITLES   F020240



| TITLE | START DATE | END DATE |
|---|---|---|
| ABOUT FACE 052122 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| BACKFIRE 050315 | JUNE 1, 1991 | MAY 31, 1996✓ |
| HEARTBEAT 079809 | JUNE 1, 1991✓ | MAY 31, 1996 |
| BIG JIM McCLAIN 053201 | JUNE 1, 1991✓ | MAY 31, 1996 |
| BLACK GOLD C63263 | JUNE 1, 1991 | MAY 31, 1996✓ |
| BLADE RUNNER 082104 | NOV 1, 1991✓ | OCT 30, 1996✓ |
| THE BURNING HILLS 057801 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| THE COOL ONES 057655 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| THE CROOKED ROAD 058816 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| THE D.I. 057617 | JUNE 1, 1991 | MAY 31, 1996✓ |
| DOC SAVAGE, MAN OF BRONZE 075406 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| WHATS UP DOC 072110 | FEB 1, 1992✓ | JAN 31, 1997✓ |
| HELL BENT FOR GLORY 058716 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| INCREDIBLE MR. LIMPET 064359 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| ISLAND OF LOVE 063264 | JUNE 1, 1991 | MAY 31, 1996 |
| JET OVER THE ATLANTIC 360008 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| JUMP INTO HELL 056410 | JUNE 1, 1991 | MAY 31, 1996✓ |
| JOHNNY TROUBLE 581210 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| LOST BOUNDARIES 586760 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| LULLABY OF BROADWAY 051020 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| THE MACOMBER AFFAIR 586380 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| MAD MAX II, THE ROAD WARRIOR 082151 | SEP 29, 1991✓ | SEP 28, 1996✓ |
| MILLIONAIRE FOR CHRISTY 530240 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| NATIONAL LAMPOONS VACATION 083206 | JULY 1, ~~1991~~1992✓ | JUN 30, ~~1996~~1997✓ |
| NIGHTSHIFT 082113 | FEB 1, 1992✓ | JAN 31, 1997✓ |
| WORLD ACCORDING TO GARP 082106 | FEB 1, 1992✓ | JAN 31, 1997✓ |
| OPERATION SECRET 053205 | JUNE 1, 1991 | MAY 31, 1996✓ |
| OUR MISS BROOKS 056515   052105 | JUNE 1, 1991 | MAY 31, 1996✓ |
| PAINTING THE CLOUDS WITH SUNSHINE | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| THE PHYNX 070858 | JUNE 1, 1991 | MAY 31, 1996✓ |
| PRETTY BABY 051004 | JUNE 1, 1991 | MAY 31, 1996✓ |
| PRINCE OF THE CITY 081002 | AUG 1, 1991✓ | JUL 31, 1996✓ |
| PROMISES IN THE DARK 079812 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| RISKY BUSINESS 083201 | JUNE 1, 1992✓ | MAY 31, 1997✓ |
| ROLLOVER 081013 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| SHOOTOUT AT MEDICINE BEND 057615 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| SIMON 080904 | JUNE 1, 1991✓ - | MAY 31, 1996✓ |
| SO FINE 081015 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| SO THIS IS LOVE 053226 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| STARLIFT 052109      066559 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| STOP THE WORLD, I WANT TO GET OFF | JUNE 1, 1991 | MAY 31, 1996✓ |
| STOP, YOU'RE KILLING ME 053210 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| TARGET ZERO 056508 | JUNE 1, 1991 | MAY 31, 1996✓ |
| TOWARD THE UNKNOWN 057604 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| WALL OF NOISE 064351 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| WHATEVER HAPPENED TO BABY JANE 063252 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| WOLFEN 080912 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| THE TANKS ARE COMING 052108 | JUNE 1, 1991 | MAY 31, 1996✓ |
| GREAT GEORGIA BANK HOAX 078723 | JUNE 1, 1991✓ | MAY 31, 1996✓ |
| MORTADELLA 072150 | JUNE 1, 1991✓ | MAY 31, 1996✓ |

WB 9246
CONFIDENTIAL



PRODUCTIONS ET EDITIONS CINEMATOGRAPHIQUES FRANCAISES
S.A. (P.E.C.F.)
67 AVENUE DE WAGRAM, BP 653-75826
PARIS CEDEX 17, FRANCE

| | |
|---|---|
| CONTRACT NO.<br>FBN229M | PAGE.<br>1 |
| DATE<br>MARCH 26, 2001 | |
| SALES REPRESENTATIVE<br>MICHEL LECOURT | |
| REFERENCE NO.<br>FR01-24 | |

## NON-EXCLUSIVE BASIC SUBSCRIPTION TELEVISION LICENSE AGREEMENT

Subject to timely payment of the Total License Fee and due performance of all other provisions of this Agreement, Warner licenses solely to the Licensee named below, and Licensee licenses from Warner, the following Programs on the following terms and conditions.

**LICENSEE**
TURNER ENTERTAINMENT NETWORKS INTERNATIONAL LIMITED

| ADDRESS<br>16 GREAT MARLBOUROUGH STREET | LICENSED TERRITORY<br>FRANCE, DOM TOM, ANDORRA, MONACO, BELGIUM SWITZERLAND | |
|---|---|---|
| CITY & COUNTRY<br>LONDON W1V 1AF<br>UNITED KINGDOM | LICENSED STATION<br>TCM | LICENSED LANGUAGE<br>ENGLISH VERSION WITH FRENCH SUBTITLES |

| PROGRAM TITLE(S)<br>SEE SCHEDULE A | | | | | PROGRAM(S) DURATION<br>N/A |
|---|---|---|---|---|---|
| FIRST RUN<br>48 | RERUNS<br>73 | TELECASTS/REPEATS<br>N/A | RUNS<br>1 | START DATE<br>SEE SCHEDULE A | END DATE<br>SEE SCHEDULE A |
| NO-OF-EPISODES/TELECASTS/TITLES/HOURS<br>121 | LICENSE FEE<br>FF35,000.00 | | PER<br>TITLE | | TOTAL LICENSE FEE<br>FF4,235,000.00 |

**PAYMENT TERMS AND INVOICING INSTRUCTIONS**
100 % DUE ON CONTRACT SIGNATURE.
Pay to: PRODUCTIONS EF EDITIONS CINEMATOGRAPHIQUES FRANCAISES SA
C/O CREDIT LYONNAIS, Agence Champs Elysees, Code Banque 30002,
Code guichet 00574, Compte no. 000000 49 62D

*648,621.79 Eu*

DATE _____
USER _____
CUST # *220844*
CONTRACT # *FBN229M*
CO # *0974*
ITS. MO. *5/02*
ITD MEMO # *5-1/02*

| MATERIALS<br><br>BETACAM DIGITAL OR BETA SP | MATERIALS CHARGE<br>ON LOAN | MATERIALS TO<br>TURNER CLASSIC MOVIES<br>C/O TURNER ENTERTAINMENT NETWORK INT'L<br>CNN HOUSE<br>19-22 RATHBONE PLACE<br>LONDON, W1P IDF<br>UNITED KINGDOM |
|---|---|---|
| MATERIALS PAYMENT TERM<br>N/A | | PROMO & SCRIPT TO<br>TURNER CLASSIC MOVIES<br>C/O TURNER ENTERTAINMENT NETWORK INT'L<br>CNN HOUSE<br>19-22 RATHBONE PLACE<br>LONDON, W1P IDF<br>UNITED KINGDOM |

When executed by the Licensee and an authorized officer of Warner, this will constitute a binding Agreement. If Licensee's execution is by an agent, such agent represents and warrants that it is duly authorized to execute this Agreement.

THIS AGREEMENT INCLUDES ALL THE TERMS AND CONDITIONS, SCHEDULES AND EXHIBITS ATTACHED HERETO.
ACCEPTED

LICENSEE
BY: _____
*Lynne Frank*
(SIGNATURE)
**LYNNE FRANK**
MANAGING DIRECTOR (NAME & TITLE)
ENTERTAINMENT NETWORKS, TBS EUROPE

P.E.C.F.
BY: _____
SIGNATURE

G:\USERS\CONTRACT\EXEL\CONTRACT\FBN229M.DOC[12:44  PM]03/30/01

**CONFIDENTIAL**

*Gx. J*

**WB 6902**

FRANCE

FBN229M
PAGE  2

SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM FRENCH FRANCS | TOTAL LICENSE FEE FRENCH FRANCS |
|---|---|---|---|---|---|
| "10" | APR 01,2000-JUN 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| 55 DAYS AT PEKING (RR) | JAN 01,2000-MAR 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| AL CAPONE | MAR 01,2000-MAY 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| ALICE DOESN'T LIVE HERE ANYMORE (RR) | MAR 01,2000-MAY 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| ALONG THE GREAT DIVIDE | OCT 01,2000-DEC 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| AMARCORD (IL BORGO) (RR) | MAR 01,2000-MAY 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| AMERICAN FLYERS (RR) | JUL 01,2000-SEP 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| AMERICAN DREAM, AN (RR) | JUN 01,2000-AUG 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| APRIL IN PARIS (RR) | AUG 01,2000-OCT 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| ARRANGEMENT, THE (RR) | APR 01,2000-JUN 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| ARTHUR (RR) | MAR 01,2000-MAY 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| BADLANDERS (RR) | JAN 01,2000-MAR 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| BATTLE OF THE BULGE, THE (RR) | JAN 01,2000-MAR 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| BEETLEJUICE (RR) | FEB 01,2000-APR 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| BEING THERE (RR) | SEP 01,2000-NOV 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| BEST FRIENDS (RR) | APR 01,2000-JUN 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| BIG HAND FOR THE LITTLE LADY, A | SEP 01,2000-NOV 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| BIG WEDNESDAY (RR) | AUG 01,2000-OCT 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| BLAZING SADDLES (RR) | APR 01,2000-JUN 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| BOBBY DEERFIELD (RR) | OCT 01,2000-DEC 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| BOMBERS B-52 (RR) | OCT 01,2000-DEC 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| BRONCO BILLY (RR) | SEP 01,2000-NOV 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| BULLITT (RR) | SEP 01,2000-NOV 30,2000 | | 1 | 35,000.00 | 35,000.00 |
| CHARGE AT FEATHER RIVER, THE | MAY 01,2000-JUL 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| CHEYENNE AUTUMN (RR) | MAR 01,2000-MAY 31,2000 | | 1 | 35,000.00 | 35,000.00 |
| COME FILL THE CUP | OCT 01,2000-DEC 31,2000 | | 1 | 35,000.00 | 35,000.00 |

**WB 6903**

CONFIDENTIAL

G:\USERS\CONTRACTS.EXX1\SCHEDULE\FBN229M.DOC[4:06 PM]

FRANCE                                                                FBN229M
                                                                      PAGE  3

## SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM FRENCH FRANCS | TOTAL LICENSE FEE FRENCH FRANCS |
|---|---|---|---|---|---|
| COOL HAND LUKE (RR) | MAR 01,2000 | MAY 31,2000 | 1 | 35,000.00 | 35,000.00 |
| CRY IN THE NIGHT,A | MAY 01,2000 | JUL 31,2000 | 1 | 35,000.00 | 35,000.00 |
| DALLAS (RR) | JAN 01,2000 | MAR 31,2000 | 1 | 35,000.00 | 35,000.00 |
| DAYS OF WINE AND ROSES | SEP 01,2000 | NOV 30,2000 | 1 | 35,000.00 | 35,000.00 |
| DEADLY FRIEND (RR) | MAY 01,2000 | JUL 31,2000 | 1 | 35,000.00 | 35,000.00 |
| DOG DAY AFTERNOON (RR) | APR 01,2000 | JUN 30,2000 | 1 | 35,000.00 | 35,000.00 |
| ENFORCER, THE (RR) | SEP 01,2000 | NOV 30,2000 | 1 | 35,000.00 | 35,000.00 |
| FIVE DAYS ONE SUMMER (RR) | FEB 01,2000 | APR 30,2000 | 1 | 35,000.00 | 35,000.00 |
| FORT APACHE, THE BRONX (RR) | OCT 01,2000 | DEC 31,2000 | 1 | 35,000.00 | 35,000.00 |
| FORT DOBBS | APR 01,2000 | JUN 30,2000 | 1 | 35,000.00 | 35,000.00 |
| FREEBIE AND THE BEAN (RR) | APR 01,2000 | JUN 30,2000 | 1 | 35,000.00 | 35,000.00 |
| GREAT RACE, THE (RR) | APR 01,2000 | JUN 30,2000 | 1 | 35,000.00 | 35,000.00 |
| GRUMPY OLD MEN (RR) | SEP 01,2000 | NOV 30,2000 | 1 | 35,000.00 | 35,000.00 |
| GUMBALL RALLY (RR) | OCT 01,2000 | DEC 31,2000 | 1 | 35,000.00 | 35,000.00 |
| GIPSY (1963) | MAY 01,2000 | JUL 31,2000 | 1 | 35,000.00 | 35,000.00 |
| HAND, THE (RR) | MAY 01,2000 | JUL 31,2000 | 1 | 35,000.00 | 35,000.00 |
| HONKYTONK MAN (RR) | JUN 01,2000 | AUG 31,2000 | 1 | 35,000.00 | 35,000.00 |
| I DIED A THOUSAND TIMES (RR) | JAN 01,2000 | MAR 31,2000 | 1 | 35,000.00 | 35,000.00 |
| I LOVE YOU ALICE B. TOKLAS (RR) | SEP 01,2000 | NOV 30,2000 | 1 | 35,000.00 | 35,000.00 |
| INTERVIEW WITH THE VAMPIRE | OCT 01,2000 | DEC 31,2000 | 1 | 35,000.00 | 35,000.00 |
| KLUTE (RR) | JAN 01,2000 | MAR 31,2000 | 1 | 35,000.00 | 35,000.00 |
| LAND OF THE PHARAOHS (RR) | SEP 01,2000 | NOV 30,2000 | 1 | 35,000.00 | 35,000.00 |
| LEFT-HANDED GUN, THE (RR) | MAR 01,2000 | MAY 31,2000 | 1 | 35,000.00 | 35,000.00 |
| LOST BOYS, THE (RR) | SEP 01,2000 | NOV 30,2000 | 1 | 35,000.00 | 35,000.00 |
| ACME ADVENTURE | FEB 01,2000 | APR 30,2000 | 1 | 35,000.00 | 35,000.00 |
| MACKINTOSH MAN, THE (RR) | JAN 01,2000 | MAR 31,2000 | 1 | 35,000.00 | 35,000.00 |

**WB 6904**

CONFIDENTIAL

C:\USERS\CONTRACT\XXXL\SCHEDULE\FBN229M.DOC[4:06 PM]

FRANCE

FBN229M
PAGE 4

SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM FRENCH FRANCS | TOTAL LICENSE FEE FRENCH FRANCS |
|---|---|---|---|---|---|
| MAN BEHIND THE GUN, THE | JUL 01,2000-SEP 30,2000 | 1 | 35,000.00 | 35,000.00 | |
| MARA MARU | OCT 01,2000-DEC 31,2000 | 1 | 35,000.00 | 35,000.00 | |
| MASSACRE RIVER | JUN 01,2000-AUG 31,2000 | 1 | 35,000.00 | 35,000.00 | |
| MERRILL'S MARAUDERS (RR) | JAN 01,2000-MAR 31,2000 | 1 | 35,000.00 | 35,000.00 | |
| MIRACLE OF FATIMA, THE | APR 01,2000-JUN 30,2000 | 1 | 35,000.00 | 35,000.00 | |
| MONTANA | JAN 01,2000-MAR 31,2000 | 1 | 35,000.00 | 35,000.00 | |
| MORTADELLA, LA (RR) | MAR 01,2000-MAY 31,2000 | 1 | 35,000.00 | 35,000.00 | |
| NUN'S STORY, THE (RR) | APR 01,2000-JUN 30,2000 | 1 | 35,000.00 | 35,000.00 | |
| OLD MAN AND THE SEA, THE (RR) | FEB 01,2000-APR 30,2000 | 1 | 35,000.00 | 35,000.00 | |
| OUTLAND (RR) | APR 01,2000-JUN 30,2000 | 1 | 35,000.00 | 35,000.00 | |
| OUTLAW JOSEY WALES (RR) | SEP 01,2000-NOV 30,2000 | 1 | 35,000.00 | 35,000.00 | |
| PT 109 (RR) | JAN 01,2000-MAR 31,2000 | 1 | 35,000.00 | 35,000.00 | |
| PARRISH | FEB 01,2000-APR 30,2000 | 1 | 35,000.00 | 35,000.00 | |
| PAY OR DIE | MAR 01,2000-MAY 31,2000 | 1 | 35,000.00 | 35,000.00 | |
| PEE-WEE'S BIG ADVENTURE (RR) | FEB 01,2000-APR 30,2000 | 1 | 35,000.00 | 35,000.00 | |
| POCKET MONEY (RR) | OCT 01,2000-DEC 31,2000 | 1 | 35,000.00 | 35,000.00 | |
| PORTRAIT OF A MOBSTER | MAR 01,2000-MAY 31,2000 | 1 | 35,000.00 | 35,000.00 | |
| PRINCE AND THE SHOWGIRL, THE (RR) | MAY 01,2000-JUL 31,2000 | 1 | 35,000.00 | 35,000.00 | |
| RACHEL, RACHEL (RR) | OCT 01,2000-DEC 31,2000 | 1 | 35,000.00 | 35,000.00 | |
| RETURN OF THE FRONTIERSMAN | MAY 01,2000-JUL 31,2000 | 1 | 35,000.00 | 35,000.00 | |
| REVOLT IN THE BIG HOUSE | OCT 01,2000-DEC 31,2000 | 1 | 35,000.00 | 35,000.00 | |
| REVOLUTION (RR) | FEB 01,2000-APR 30,2000 | 1 | 35,000.00 | 35,000.00 | |
| RIDING SHOTGUN (RR) | MAY 01,2000-JUL 31,2000 | 1 | 35,000.00 | 35,000.00 | |
| RISE AND FALL OF "LEGS" DIAMOND, THE | JAN 01,2000-MAR 31,2000 | 1 | 35,000.00 | 35,000.00 | |
| ROCKY MOUNTAIN | JUL 01,2000-SEP 30,2000 | 1 | 35,000.00 | 35,000.00 | |

**WB 6905**

CONFIDENTIAL

G:\USERS\CONTRACT\XSXL\SCHEDULE\FBN229M.DOC(4:04 PM)

FRANCE                                                                    FBN229M
                                                                         PAGE  5

SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM FRENCH FRANCS | TOTAL LICENSE FEE FRENCH FRANCS |
|---|---|---|---|---|---|
| S.O.B. (RR) | APR 01,2000 | JUN 30,2000 | 1 | 35,000.00 | 35,000.00 |
| SEA CHASE, THE (RR) | SEP 01,2000 | NOV 30,2000 | 1 | 35,000.00 | 35,000.00 |
| SERGEANT RUTLEDGE (RR) | FEB 01,2000 | APR 30,2000 | 1 | 35,000.00 | 35,000.00 |
| SEX KITTENS GO TO COLLEGE | MAY 01,2000 | JUL 31,2000 | 1 | 35,000.00 | 35,000.00 |
| SHE (RR) | FEB 01,2000 | APR 30,2000 | 1 | 35,000.00 | 35,000.00 |
| SHE'S BACK ON BROADWAY | MAY 01,2000 | JUL 31,2000 | 1 | 35,000.00 | 35,000.00 |
| MASKS OF DEATH, THE | JUN 01,2000 | AUG 31,2000 | 1 | 35,000.00 | 35,000.00 |
| SHUTTERED ROOM, THE | APR 01,2000 | JUN 30,2000 | 1 | 35,000.00 | 35,000.00 |
| SINCERELY YOURS | OCT 01,2000 | DEC 31,2000 | 1 | 35,000.00 | 35,000.00 |
| SINS OF RACHEL CADE, THE | OCT 01,2000 | DEC 31,2000 | 1 | 35,000.00 | 35,000.00 |
| SO BIG | MAY 01,2000 | JUL 31,2000 | 1 | 35,000.00 | 35,000.00 |
| SPENCER'S MOUNTAIN | OCT 01,2000 | DEC 31,2000 | 1 | 35,000.00 | 35,000.00 |
| SPLENDOR IN THE GRASS (RR) | MAR 01,2000 | MAY 31,2000 | 1 | 35,000.00 | 35,000.00 |
| SPRINGFIELD RIFLE (RR) | MAY 01,2000 | JUL 31,2000 | 1 | 35,000.00 | 35,000.00 |
| ST. IVES (RR) | MAY 01,2000 | JUL 31,2000 | 1 | 35,000.00 | 35,000.00 |
| STAKEOUT ON DOPE STREET | SEP 01,2000 | NOV 30,2000 | 1 | 35,000.00 | 35,000.00 |
| STALKING MOON, THE (RR) | JUL 01,2000 | SEP 30,2000 | 1 | 35,000.00 | 35,000.00 |
| STAR IS BORN, A (1955) (RR) | SEP 01,2000 | NOV 30,2000 | 1 | 35,000.00 | 35,000.00 |
| STORM WARNING | AUG 01,2000 | OCT 31,2000 | 1 | 35,000.00 | 35,000.00 |
| STRAIGHT TIME (RR) | OCT 01,2000 | DEC 31,2000 | 1 | 35,000.00 | 35,000.00 |
| STREETCAR NAMED DESIRE, A (RR) | MAR 01,2000 | MAY 31,2000 | 1 | 35,000.00 | 35,000.00 |
| SUMMER PLACE, A | FEB 01,2000 | APR 30,2000 | 1 | 35,000.00 | 35,000.00 |
| TALL MAN RIDING (RR) | JUN 01,2000 | AUG 31,2000 | 1 | 35,000.00 | 35,000.00 |
| TEA FOR TWO | AUG 01,2000 | OCT 31,2000 | 1 | 35,000.00 | 35,000.00 |
| THIS WOMAN IS DANGEROUS | JAN 01,2000 | MAR 31,2000 | 1 | 35,000.00 | 35,000.00 |
| COLT .45 | MAY 01,2000 | JUL 31,2000 | 1 | 35,000.00 | 35,000.00 |

**WB 6906**

CONFIDENTIAL

G:\USEAS\CONTRACT\LICI\SCHEDULE\FBN229M.DOC14:06 PM3

FRANCE

FBN229M
PAGE  6

SCHEDULE "A"

| PRODUCT TITLE | LICENSE START DATE | LICENSE END DATE | NO. OF EPISODES/ TELECAST/ TITLES/ HOURS | PRICE PER PROGRAM FRENCH FRANCS | TOTAL LICENSE FEE FRENCH FRANCS |
|---|---|---|---|---|---|
| TOWARD THE UNKNOWN | SEP 01,2000 | NOV 30,2000 | 1 | 35,000.00 | 35,000.00 |
| TOWERING INFERNO, THE (RR) | MAR 01,2000 | MAY 31,2000 | 1 | 35,000.00 | 35,000.00 |
| TRACK OF THE CAT | MAY 01,2000 | JUL 31,2000 | 1 | 35,000.00 | 35,000.00 |
| TRIAL BY COMBAT | SEP 01,2000 | NOV 30,2000 | 1 | 35,000.00 | 35,000.00 |
| UP PERISCOPE | OCT 01,2000 | DEC 31,2000 | 1 | 35,000.00 | 35,000.00 |
| VALLEY OF THE GWANGI | APR 01,2000 | JUN 30,2000 | 1 | 35,000.00 | 35,000.00 |
| VALLEY OF THE SWORDS | APR 01,2000 | JUN 30,2000 | 1 | 35,000.00 | 35,000.00 |
| VERDICT (RR) | JAN 01,2000 | MAR 31,2000 | 1 | 35,000.00 | 35,000.00 |
| WESTBOUND | MAR 01,2000 | MAY 31,2000 | 1 | 35,000.00 | 35,000.00 |
| WHAT AM I DOING IN THE MIDDLE OF THE REVOLUTION (RR) | FEB 01,2000 | APR 30,2000 | 1 | 35,000.00 | 35,000.00 |
| WHEN TIME RAN OUT (RR) | OCT 01,2000 | DEC 31,2000 | 1 | 35,000.00 | 35,000.00 |
| WHICH WAY TO THE FRONT? (RR) | APR 01,2000 | JUN 30,2000 | 1 | 35,000.00 | 35,000.00 |
| WHO DARES WINS? | MAR 01,2000 | MAY 31,2000 | 1 | 35,000.00 | 35,000.00 |
| WHO'S AFRAID OF VIRGINIA WOOLF? (RR) | MAR 01,2000 | MAY 31,2000 | 1 | 35,000.00 | 35,000.00 |
| YELLOWSTONE KELLY (RR) | FEB 01,2000 | APR 30,2000 | 1 | 35,000.00 | 35,000.00 |
| YOUNG PHILADELPHIANS, THE | FEB 01,2000 | APR 30,2000 | 1 | 35,000.00 | 35,000.00 |
| ZANDY'S BRIDE | AUG 01,2000 | OCT 31,2000 | 1 | 35,000.00 | 35,000.00 |
| ZEPPELIN (RR) | APR 01,2000 | JUN 30,2000 | 1 | 35,000.00 | 35,000.00 |

                                                    TOTALS                4,235,000.00

1.  One (1) multiple run equals three (3) runs within seven (7) days.


2.  The rights granted hereunder are non-exclusive to the Licensee.

**WB 6907**

**CONFIDENTIAL**

G:\USERS\CONTRACT\ESSLS\FOXLEVL\FBN229M.DOC14:06 PM

FRANCE

FBN229M
PAGE 7

SCHEDULE "A"

3.  If any of the provisions of this Schedule "A" conflict with any of the provisions of the Agreement to which this Schedule "A" is attached, the provisions of this Schedule "A" shall prevail.

**WB 6908**

**CONFIDENTIAL**

G:\USERS\CONTRACT\XSXL\SCHEDULEA\FRANCEN.DOC16:06 PM