Draft 1 dated 9 November 2000
Non binding draft
Subject to contract and negotiation

## RIDER
## WARNER PRODUCT

1. The rights licensed hereunder shall expressly exclude the distribution of any Program by means of computer networks integrated through the use of any protocol now known or hereafter in existence, including, without limitation, the TCP/IP protocol or any successor or similar technology used to access such computer networks (including, without limitation, the "Internet") for display on any viewing device (including, without limitation, liquid crystal devices, plasma screens, hand held viewing devices, video display monitors, and the like) using computer or computer mediated processing units or similar technology now known or hereafter in existence ("Online Rights").

2. Licensee shall not, and shall not authorise any third party to include or employ any interactive or enhanced television technology which will result in any interactive features, metatags or additional data streams in relation to a Program, in or around any such Program or Program signal.

3. Licensee shall not, and shall not authorise or permit any third party to register, use or otherwise exploit any of Warner's Trademarks, trade names, service marks or any other proprietary marks, copyrighted materials, the name of any Program or character therein, or the name of any person or entity affiliated with any Program, as an Internet domain name or URL, or any part thereof, or in any other manner not expressly authorised herein.

4. Licensee shall not, and shall not authorise or permit any third party to use or otherwise exploit any Materials in connection with any interactive promotional, publicity or marketing campaign, without Warner's prior written approval, which approval may be withheld in Warner's sole and absolute discretion.

5. Any and all rights in any Program not expressly licensed to Licensee herein, including but not limited to, Online Rights, are reserved by Warner and may be exercised, marketed and exploited by Warner concurrently with and throughout the Term of this Agreement.

6. Licensee shall furnish to Warner, on a weekly basis and at no cost to Warner, overnight ratings information available to Licensee with respect to the Transmission of each Program on the Licensed Station during the previous week. The ratings information shall be provided to Warner by facsimile or courier to the attention of Senior Vice President, Marketing, Warner Bros. International Television Distribution.

7. To the extent this Rider is inconsistent with the License Agreement, Schedules or Additional Terms and Conditions attached hereto, this Rider shall control.

## CONFIDENTIAL

**WB 6909**

Draft 1 dated 9 November 2000
Non binding draft
Subject to contract and negotiation

## RIDER
## CARTOON CARTOONS &
## TURNER CARTOONS

1.  The rights licensed hereunder shall expressly exclude the distribution of any Program by means of computer networks integrated through the use of any protocol now known or hereafter in existence, including, without limitation, the TCP/IP protocol or any successor or similar technology used to access such computer networks (including, without limitation, the "Internet") for display on any viewing device (including, without limitation, liquid crystal devices, plasma screens, hand held viewing devices, video display monitors, and the like) using computer or computer mediated processing units or similar technology now known or hereafter in existence ("Online Rights").

2.  Licensee shall not, and shall not authorise or permit any third party to register, use or otherwise exploit any of Warner's Trademarks, trade names, service marks or any other proprietary marks, copyrighted materials, the name of any Program or character therein, or the name of any person or entity affiliated with any Program, as an Internet domain name or URL, or any part thereof, or in any other manner not expressly authorised herein.

3.  Any and all rights in any Program not expressly licensed to Licensee herein, including but not limited to, Online Rights, are reserved by Warner and may be exercised, marketed and exploited by Warner concurrently with and throughout the Term of this Agreement.

4.  Licensee shall furnish to Warner, on a weekly basis and at no cost to Warner, overnight ratings information available to Licensee with respect to the Transmission of each Program on the Licensed Station during the previous week. The ratings information shall be provided to Warner by facsimile or courier to the attention of Senior Vice President, Marketing, Warner Bros. International Television Distribution.

5.  To the extent this Rider is inconsistent with the License Agreement, Schedules or Additional Terms and Conditions attached hereto, this Rider shall control.

**CONFIDENTIAL**          **WB 6910**

**WARNER BROS. INTERNATIONAL TELEVISION DISTRIBUTION,**
**a division of Time Warner Entertainment Company, L.P.**
**BASIC SUBSCRIPTION TELEVISION LICENSE AGREEMENT**
**ADDITIONAL TERMS AND CONDITIONS**

These Additional Terms and Conditions ("Additional Terms") supplement the terms and conditions of the International Basic Subscription Television License Agreement between Warner Bros. International Television Distribution, a division of Time Warner Entertainment Company, L.P. ("WARNER") and LICENSEE to which the Additional Terms are attached (the "License Agreement"). The License Agreement as supplemented by the Additional Terms shall be referred to hereinafter as the "Agreement." Unless otherwise defined herein, all capitalized terms used in the text of the Additional Terms without definition shall have the same meanings as in the License Agreement.

**1.    DEFINITIONS**

As used in the Additional Terms, the terms listed below will have the following defined meanings:

    a.    An "Affiliated System" means a cable system, UHF or VHF digital terrestrial system, satellite master antenna ("SMATV") system, terrestrial microwave multipoint distribution system ("MDS" or "MMDS"), or satellite "direct-to-home" ("DTH") system, which is located entirely within the Territory and which has entered into an agreement with LICENSEE pursuant to which such entity is authorized by LICENSEE to Transmit the Licensed Service by means of Basic Subscription Television to subscribers during the License Period applicable to the Program. At WARNER's request, LICENSEE shall provide WARNER with a list of the Affiliated Systems as of the date of such request.

    b.    "Basic Subscription Television" means the Transmission of an analog or digital signal containing programming as part of a program service for television reception in respect of which a periodic subscription fee is charged to the subscriber for the privilege of receiving such program service together with other program services, which program service is primarily supported by advertisement revenues and sponsorships. The Transmission of programming on an advertiser-supported program service that is offered on a "stand alone" or "a la carte" basis shall not, on that basis alone, be considered as other than in the medium of Basic Subscription Television unless the wholesale fee per subscriber generally charged by such program service to its Affiliated Systems is comparable to the fee charged by Premium Subscription Television program services in the same territory. Basic Subscription Television may only be Transmitted by Encrypted satellite signals or by ~~terrestrial means of Transmission other than unencrypted Broadcast to subscribers of a program service who receive such Transmission through cable systems, SMATV systems, MDS or MMDS, or DTH systems affiliated with such program service.~~ UHF or VHF terrestrial signals, SMATV, MDS, MMDS or transmission through cable systems. The broadcast or transmission of the Licensed Service must be simultaneous over all Affiliated Systems and on all means of delivery.

    c.    "Encrypted" means the condition of a television signal both the audio and video portions of which have been changed, altered or encoded to prevent the reception of the Transmission of such signal without an adaptor, which is necessary to restore both the audio and video signal integrity.

    d.    "Free Television" means the Transmission of an analog signal containing programming for television reception without a charge to the viewer for the privilege of receiving such programming. For purposes of this Agreement, neither governmental television receiver assessments nor taxes shall be deemed a charge to the viewer. Free Television is Transmitted by means of "Broadcast" (consisting solely of the Transmission of standard, unencrypted, over-the-air Hertzian wave VHF, UHF or low power television signals), which Broadcast may be furthered by microwave translators or relay systems or boosters. Free Television also includes the re-Transmission by satellite or cable systems of a Broadcast.

    e.    "Premium Subscription Television" means the Transmission of a signal containing programming as part of a program service for television reception in homes or other non-public residences or dwellings in respect of which a premium subscription fee is charged to the subscriber for the privilege of receiving such program service, which is not supported, in significant measure, by advertisement revenues and sponsorships. Premium Subscription Television is Transmitted by Encrypted satellite Transmissions or by Encrypted terrestrial means of Transmission to subscribers who receive such Transmission through cable systems, SMATV systems, MDS or MMDS, or DTH systems affiliated with such program service. For purposes of this Agreement, Premium Subscription Television does not include any arrangements whereby a program is Transmitted individually, and for a separate and distinct payment, on a pay-per-view or video-on-demand basis.

G:\USERS\SLOSIN\Contract Riders and Attachments\Warner Product ATCsRL.doc
kagmsh/dtc/basc&tc.wp
Basic Subscription Terms & Conditions
11/14/98

1

CONFIDENTIAL                    WB 6911

EXHIBIT D    Page 63

f.    "Satellite" means each satellite listed in Schedule A to the Agreement, it being acknowledged and agreed by LICENSEE that if such Schedule does not list any satellite, the Basic Subscription Television rights granted by this Agreement may only be exercised by terrestrial means of Transmission.

## 2.    LICENSE

Subject to LICENSEE's performance of all of its obligations under this Agreement, including but not limited to, the payment of License Fees, WARNER hereby grants LICENSEE a limited license under copyright to transmit, exhibit, telecast, exploit or broadcast ("transmit" or "Transmission") each Program in its entirety in the Licensed Language over the facilities of the Licensed Station in the Licensed Territory during the License Period for each Program in the medium of Basic Subscription Television.   LICENSEE shall Transmit each Program in its entirety in a single time slot without interruption, other than for the insertion of commercials as provided in paragraph 10(d) below.

## 3.    EXCLUSIVITY

Provided the License Agreement to which these Additional Terms are attached specifies that the rights granted by WARNER to LICENSEE are exclusive, the following shall apply:  during the License Period for any Program WARNER shall not voluntarily license such Program for Broadcast by Basic Subscription Television in the Licensed Language over any other television station or cable television system whose originating television transmitter or cable system is located within the Licensed Territory and the signals from which are intended for reception within the Licensed Territory; provided, however, that  WARNER does not grant exclusivity protection for any Transmission of the Program not specified herein or which may be required by any applicable laws or where such laws fail to provide copyright protection in the Licensed Territory.   In particular, but without limitation, WARNER does not grant exclusivity protection with respect to (i) Basic Subscription Television within the Licensed Territory in any version other than the Licensed Language version, (ii) Transmission within the Licensed Territory by any program service which is owned, managed or controlled, in whole or in part, by WARNER or any entity under common control with WARNER  or which is branded in any form with the name of, or a name associated with, WARNER or any entity under common control with WARNER, (iii) Transmission (or re-Transmission) by satellite or cable systems of broadcast signals originating outside the Licensed Territory or (iv) exploitation of the Program in any other medium.  In the event the License Agreement to which these Additional Terms are attached does not specify that the rights granted by WARNER to LICENSEE are exclusive, such rights shall be non-exclusive.

## 4.    LICENSE PERIOD AND TERM

a.    The license period for a Program (the "License Period") shall begin on the date such Program first becomes available to LICENSEE as specified in the License Agreement ("Start Date") and end on the earlier of: (i) the End Date specified in the License Agreement or (ii) the date of the last licensed Transmission of such Program.

b.    The term of this Agreement (the "Term") begins on the date of the License Agreement and ends on the earlier of (i) the expiration of the latest License Period to expire or (ii) the date of any earlier termination in accordance with the provisions hereof. The expiration of the Term shall be without prejudice to the accrued rights and obligations of the parties, and to the rights and obligations which expressly or by implication survive the expiration of the Term or the earlier termination of the License Agreement.

## 5.    PAYMENT OF LICENSE FEES

a.    As used herein, the words "payment," "pay," "payable," "paid" or words of similar meaning when applied to obligations of LICENSEE to WARNER mean the actual receipt by WARNER, in United States dollars in the amount specified herein without offset or recoupment, of cash, a bank transfer of unencumbered, immediately available funds to WARNER's account, the unconditional clearance of a check or bank draft payable to WARNER and drawn on a United States bank, or the draw down by WARNER of a previously approved and existing letter of credit from a United States bank pursuant to the terms thereof. Payment in any other manner shall not be deemed made to WARNER until the amount of United States dollars due and payable has been received and is available for expenditure by WARNER. LICENSEE bears the risk that payment in any other manner shall not be deemed made to WARNER within the time periods specified herein.

b.    In its sole and absolute discretion, WARNER may accept funds tendered to it by LICENSEE in a currency other than United States dollars. Such acceptance shall not constitute a waiver of WARNER's rights under paragraph 5.a. Payment, therefore, shall not be deemed to have been made until WARNER has converted the non-U.S. currency, net of all costs of conversion, to the amount of United States dollars due and payable. LICENSEE shall bear all risks associated with the conversion including delay, costs of conversion,

G:\USERS\SLOSIN\Contract Riders and Attachments\Warner Product ATCsRL.doc
l:sgnatt/t&c/baac&c.wp
Basic Subscription Terms & Conditions
11/14/97

WB 6912



fluctuations in the exchange rate and WARNER's choice of currency exchange agent. In the event that WARNER converts the non-U.S. currency to an amount of United States dollars, net of all costs of conversion, in excess of the License Fee due and payable, WARNER may keep the excess without giving any credit to LICENSEE's account for the excess.

      c.      LICENSEE shall obtain all governmental permits necessary to make all payments to WARNER required under this Agreement. LICENSEE shall also pay, without limitation, every tax, levy or charge, however denominated, imposed or levied against LICENSEE, WARNER or any Program by any authority having jurisdiction over LICENSEE's use of any Program other than a tax, levy or charge based on WARNER's net income. Such taxes, levies or charges include, without limitation, quotas, value added taxes, so-called "remittance" and withholding taxes, licenses, "Contingents," turnover taxes, import permits and duties, and national, state, county, city and other taxes, however denominated, relating to or imposed upon the License Fee or any part thereof, the license or the Transmission of any Program, any other amounts payable to WARNER, negatives, prints or other Material, the storage or possession of any Program or any Material, or the right or privilege to use the same in connection with the Programs. LICENSEE may deduct from the License Fee payable to WARNER taxes which are levied on WARNER's License Fee and paid to a government authority on WARNER's behalf, only if such taxes are levied in accordance with the income tax laws of the government authority to which the taxes are payable and such taxes are creditable in the United States in accordance with the income tax laws of the United States and if, after payment of such taxes, LICENSEE promptly provides WARNER with an official tax receipt evidencing such payment on WARNER's behalf, or, if this is not possible due to law or regulation, LICENSEE provides a copy of said receipt to WARNER. Where applicable, LICENSEE shall provide an English language translation of any such tax receipt.

      d.      All License Fees are to be paid when due without regard to delays in the date of Transmission of any Program because of late delivery of Materials, the unavailability of Materials, a Force Majeure Occurrence (as defined below), the extension of this Agreement or WARNER's exercise of any of its rights under this Agreement. Timely payment is of the essence of this Agreement. LICENSEE's failure to make any payments when due shall constitute a material default hereof.

      e.      WARNER shall have the right to charge interest on any payment not received within ten (10) days of its due date at the rate which is the lower of two (2) percentage points over the then current advertised prime rate at the Bank of America N.T. & S.A. or the then current highest rate allowable under law for this Agreement. Interest, if charged, shall be compounded monthly retroactive to the date payment was first due and shall continue to be charged, each month, on the unpaid balance until all such amounts are paid.

      f.      If laws or currency regulations now or at any time prohibit or restrict LICENSEE from paying any sums due WARNER, LICENSEE shall advise WARNER promptly in writing. In any such case, upon WARNER's request, LICENSEE shall deposit to WARNER's credit in a bank or banks approved in writing by WARNER or promptly pay to such person or persons as WARNER may designate in writing, all sums due WARNER. LICENSEE also shall reimburse WARNER for any costs incurred by WARNER in remitting such funds to the United States and/or converting such funds into United States dollars. If LICENSEE is prohibited or restricted from making payment of any sums due WARNER, in addition to WARNER's other rights and remedies, WARNER shall have the right to terminate this Agreement forthwith upon written notice to LICENSEE.

## 6.   DELIVERY

      a.      LICENSEE may obtain for use in accordance with the terms hereof the transmission, advertising, promotion and related materials ("materials") specified in the License Agreement if it pays WARNER the Materials Charges specified by WARNER from time to time. Except as otherwise herein provided LICENSEE may retain possession of the Materials of or relating to a Program until the earlier of the expiration of the License Period of such Program, the expiration of the Term or the termination of this Agreement by any of its terms, at which time LICENSEE shall return, ship or dispose of the Materials in accordance with paragraph 8 below.

      b.      LICENSEE shall Transmit only Materials of the Programs which it has obtained directly from WARNER or directly from a source authorized by WARNER (including another WARNER licensee) to deliver Materials of the Programs to LICENSEE.

      c.      LICENSEE shall notify WARNER of the scheduled date of Transmission of each Program at least sixty (60) days prior thereto. If the Materials of the Program are available for Transmission on such scheduled date, WARNER shall arrange for delivery of the Materials to LICENSEE by air, unless otherwise instructed, f.o.b. WARNER's place of shipment. WARNER shall not be responsible for delivery on less than sixty (60) days' notice.

      d.      LICENSEE shall bear all costs of transportation, customs duties, censorship fees and any and all other charges relating to the shipment of the Materials into or within the Licensed Territory or from the Licensed Territory to WARNER, and to the storage or use of the Materials by LICENSEE in the Licensed Territory.

G:\USERS\SLOSIN\Contract Riders and Attachments\Warner Product ATCsRL.doc
Lagunas\sktc\basctac.wp
Basic Subscription Terms & Conditions
11/14/97

3

CONFIDENTIAL

WB 6913

EXHIBIT D    Page 65

## 7.    INSPECTION OF MATERIALS

Immediately upon delivery of any Materials specified in the License Agreement, LICENSEE shall examine such Materials to determine their technical acceptability for transmission or other intended purposes. Unless WARNER is notified otherwise within thirty (30) days of delivery, all Materials shall be deemed acceptable to LICENSEE. If WARNER receives timely notice of a material defect in said Materials, WARNER shall remedy such defect or substitute applicable Materials of the same Program at no additional cost. At WARNER's election, WARNER may exercise its rights to withdraw the Program pursuant to paragraph 21 below. As used herein, "delivery" and derivations thereof (such as "deliver" and "delivered") mean, as the context requires, either physical delivery of Materials or access to such Materials.

## 8.    RETURN, SHIPPING OR DISPOSITION

a.    LICENSEE agrees to return the Materials of a Program specified in the License Agreement to WARNER to such destinations as WARNER directs within five (5) business days of its receipt of WARNER's instructions but in no event later than the earlier of the expiration of the License Period applicable to the Program, the expiration of the Term or the termination of this Agreement. Any other Materials shall be returned in accordance with WARNER's written instructions. LICENSEE's failure to return or ship the Materials in accordance with WARNER's instructions shall constitute a material default hereof. If LICENSEE and WARNER enter into a written agreement that the Materials may be disposed of other than by returning them to WARNER or shipping them to a destination fixed by WARNER, LICENSEE may dispose of the Materials in accordance with that agreement.

b.    LICENSEE shall return or ship all Materials at LICENSEE's sole cost and expense in the same condition in which they were received, normal wear and tear excepted. If Materials are lost, stolen, destroyed or damaged between the time of delivery to LICENSEE and the receipt of the Materials by WARNER or its designee, LICENSEE shall pay WARNER the latter's prevailing charge for replacement of the Materials. Such payment shall not, however, transfer to LICENSEE title to any Materials.

c.    When returning or shipping Materials of a Program specified in the License Agreement, LICENSEE shall return to WARNER or ship to its designee in accordance with paragraph 8.a. all dubbed soundtracks, subtitled or subtitling material, and all optical and/or magnetic soundtracks and such other Additional Materials (as defined in paragraph 9.a. below) with respect to such Program which have been created but not consumed in the ordinary course, whether or not LICENSEE used any of said Additional Materials in connection with the exercise of its rights hereunder and whether or not LICENSEE incurred any of the costs of manufacture. Upon request LICENSEE shall send WARNER complete copies and, where applicable, English language translations, of all agreements made with dubbing studios, authors, performers and other parties engaged for the purposes of creating any Additional Materials, together with copies of any translations created for the purposes of or in connection with any Additional Materials, and such other information as WARNER may require concerning any of the same.

## 9.    TITLE

a.    Title in and to Materials of or relating to a Program provided to LICENSEE hereunder is vested and shall remain in WARNER, and title in and to any materials of or relating to a Program or its advertising and its promotion created by, for or at the request of LICENSEE ("Additional Materials") and all rights therein, including (but not limited to) copyrights, rights of use and other rights of exploitation and all neighboring and connecting rights shall, to the fullest extent possible under applicable laws, vest and remain in and are hereby assigned to WARNER upon and as from the earlier of the creation of such Additional Materials or the inception of such rights, for the full periods thereof and for all territories, jurisdictions, methods, means and media now known or hereafter come to be known, subject only to (i) LICENSEE's possession and use until the earlier of the expiration of the License Period of the Program in question, the expiration of the Term or the termination of this Agreement, solely so that LICENSEE may exercise its rights licensed hereunder, and (ii) any inalienable rights ("Inalienable Rights") conferred on any party by applicable laws by virtue of the party being an author or performer. To the extent applicable laws may not recognize at the time the existence of certain of the rights stated to vest in and be assigned hereunder to WARNER, such rights shall vest and remain in and shall be assigned to WARNER on the terms and conditions set forth above immediately upon their recognition by applicable laws. Notwithstanding the foregoing, LICENSEE shall grant WARNER and its designees access, free of charge, to all Materials and Additional Materials for duplication and other purposes and upon WARNER's reasonable request, LICENSEE shall deliver Materials and Additional Materials to WARNER and its designees for temporary use and return to LICENSEE. As between WARNER and LICENSEE, all Materials and, upon their creation, Additional Materials shall be deemed to have been loaned to LICENSEE by WARNER whether or not LICENSEE paid any of the costs of manufacture.

b.    LICENSEE shall execute, acknowledge and deliver to WARNER any instruments WARNER deems necessary or

G:\USERS\SLOSIN\Contract Riders and Attachments\Warner Product ATCsRL.doc
Lagmin9.tc/basco&c.wp
Basic Subscription Terms & Conditions
11/14/97

CONFIDENTIAL                4                WB 6914

EXHIBIT D    Page 66

desirable to evidence or effectuate WARNER's ownership of all Materials. LICENSEE shall also execute, acknowledge and deliver to WARNER any instruments of transfer, conveyance or assignment in or to any title and rights in all Additional Materials of a Program which are to vest in WARNER pursuant to paragraph 9.a. above which instruments are necessary or desirable to evidence or effectuate the vesting for as long as is permissible of such rights in WARNER. If LICENSEE fails or refuses to execute, acknowledge or deliver any such instrument, then WARNER shall be deemed to be, and LICENSEE hereby and irrevocably appoints WARNER, its true and lawful attorney-in-fact to execute and deliver all such instruments in LICENSEE's name or otherwise, acknowledging that such power is a power coupled with an interest.

10.     ALTERATION OF PROGRAMS AND MATERIALS

     a.     Except as otherwise set forth herein, LICENSEE shall not change, alter, modify, copy, duplicate or add to any Program or Materials in respect thereof without WARNER's prior written consent. Without limiting the generality of the foregoing, LICENSEE shall not use any Materials or Additional Materials of or relating to a Program, including clips or segments thereof, to create a separate or distinct program.

     b.     LICENSEE shall follow such policies, procedures and directions as WARNER may give LICENSEE from time to time with respect to the creation of any dubbed tracks, subtitles or other foreign language Additional Materials relating to a Program LICENSEE is authorized by WARNER to create pursuant to this Agreement. Without prejudice to the generality of the foregoing, WARNER shall be entitled to approve all creative and production elements in advance of their use and to attend key meetings, recording and other sessions relating to any such Additional Materials and their creation. LICENSEE shall not deviate from an approval once given without a further approval from WARNER.

     c.     LICENSEE may make minor cuts or alterations in a Program and relevant Materials and Additional Materials, as applicable, in order to conform to the orders of any duly authorized, legally constituted censorship authority in the Licensed Territory provided that any such cuts or alterations shall not adversely affect the artistic or pictorial quality or integrity of the Program, and provided further that prior to making same LICENSEE immediately notifies WARNER in writing of the need for such cuts or alterations, obtains WARNER's prior written approval thereof and, at its own expense, replaces any such cuts and alterations so that any applicable Materials are returned to WARNER or shipped to WARNER's designee in the same condition in which they were originally received by LICENSEE, normal wear and tear excepted.

     d.     LICENSEE, at its own expense, may insert commercials in each Program. No commercial shall be inserted in a manner which may adversely affect the artistic or pictorial quality of the Program or damage the Program. All commercials must be removed from each Program, without damage to the Program and relevant Materials or Additional Materials, as applicable, before the Program is returned to WARNER or shipped to its designee. WARNER, its partners, each of their respective affiliates, subsidiaries, parent companies and licensees and the officers, directors, representatives, agents, shareholders and employees of any one or more of them ("WARNER Indemnified Parties") shall have no liability whatsoever for any commercials made or used by LICENSEE. LICENSEE shall indemnify and hold WARNER Indemnified Parties harmless from any claim, cause of action, loss, liability, damage, cost or expense (including attorneys' fees and costs) (collectively "Claims") arising out of or in connection with any commercial inserted in any Program.

     e.     In no event shall any copyright, trade or service mark notice , WARNER's presentation or advertising credit or the credits to any person, firm or corporation appearing on any of the Materials be changed, altered or removed. Any breach or violation of the terms hereof shall constitute a material default entitling WARNER, at its election, to terminate this Agreement, in whole or in part, in addition to any other rights or remedies available to WARNER and without releasing or discharging LICENSEE of any liability hereunder.

     f.     Whenever requested by WARNER to do so, LICENSEE shall change the title of any Program licensed hereunder and shall not thereafter Transmit hereunder any such Program except under the new title.

11.     CENSORSHIP

If despite LICENSEE's compliance with paragraph 10.c. above a Program or episode thereof is rejected for Transmission by any duly authorized, legally constituted government censorship authority in the Licensed Territory and LICENSEE so notifies WARNER, such Program or episode shall be withdrawn and LICENSEE and WARNER shall agree to a comparable substitute program or episode for the one so withdrawn. In the event the parties cannot agree to a comparable substitute program or episode, or there is no comparable substitute program or episode available, the License Fee paid by LICENSEE respecting such withdrawn Program or episode shall be credited or refunded to LICENSEE, provided, however, that no credit or refund will be made if the withdrawn Program or episode was

G:\USERS\SLOSIN\Contract Riders and Attachments\Warner Product ATCsRL.doc
Lagena/t&p/basrt&c.wp
Basic Subscription Terms & Conditions
11/14/97

5
CONFIDENTIAL
EXHIBIT D    Page 67

WB 6915

Transmitted, in whole or in part, by LICENSEE.

## 12.    TRADEMARKS

a.    Subject to the terms and conditions set forth herein, WARNER hereby grants to LICENSEE a non-exclusive license to use the proprietary marks (the "Trademarks") of Warner Bros. and its affiliated companies in the Licensed Territory during the Term solely in relation to the distribution, exhibition, and exploitation of the Programs hereunder. LICENSEE's use of the Trademarks shall be limited to their incidental use through distribution, exhibition or exploitation of the Programs or use of materials bearing the Trademarks provided to LICENSEE under this Agreement, and to any other use permitted hereunder subject to WARNER's prior written approval. LICENSEE shall not use the Trademarks in any other manner. LICENSEE's use of the Trademarks shall conform to all other terms and conditions of this Agreement.

b.    As between LICENSEE and WARNER, all rights in and to the Trademarks and the goodwill associated with them are owned exclusively by WARNER. All uses of the Trademarks by LICENSEE shall inure solely to WARNER's benefit, and shall remain under WARNER's exclusive control. LICENSEE shall not contest the validity of any of the Trademarks, or Warner Bros.' or any affiliated company's ownership of them. LICENSEE shall not take any action inconsistent with WARNER's, Warner Bros.' and/or any affiliated company's rights in the Trademarks.

c.    Subject always to WARNER's review and prior written approval, which approval may be withheld in WARNER's sole and absolute discretion, LICENSEE may use the trademarks "WARNER BROS." and/or the WB shield logo on LICENSEE's invoices, bills of lading, contracts and letterhead, and in advertising or promotional materials for its business solely as such business relates to the distribution, exhibition and exploitation of the Programs during the Term. Any such material shall first be submitted by LICENSEE to WARNER for WARNER's prior written approval, and LICENSEE shall indemnify and hold the WARNER Indemnified Parties harmless from and against any and all Claims resulting from LICENSEE=s use of such material. LICENSEE shall cause to be imprinted, irremovably and legibly on all advertising, promotional, publicity and display materials relating to the Programs it is authorized hereunder to create, and on all edited, dubbed, subtitled and modified versions of the Programs, appropriate copyright and trademark notices as directed and approved in advance in writing by WARNER.

d.    LICENSEE's use of the Trademarks shall conform to the quality standards required by WARNER hereunder and prescribed by WARNER from time to time during the Term. LICENSEE's use of the Trademarks shall remain at all times subject to WARNER's control and direction.

## 13.    ADVERTISING AND ACCESSORIES

a.    The creation of advertising and promotional materials by or at the request of LICENSEE shall be subject to WARNER's approval and any policies, procedures and guidelines notified by WARNER from time to time. LICENSEE may use the advertising and promotional materials referred to herein no earlier than the commencement of the License Period applicable to the Program. LICENSEE may not advertise or exhibit, in whole or in part, the Programs on the Internet or on any commercial on-line service without WARNER's prior written approval, which approval may be withheld in WARNER's sole and absolute discretion. WARNER shall furnish LICENSEE, on loan and free of charge, with a standard advertising package consisting of 35mm slides, synopses, credits, logo sheets, and where available, production notes, press releases and on-line chat session transcripts relating to a Program. Additional advertising materials including without limitation, transparencies, reproduction quality duplicates and digital archive material may be available to LICENSEE for an additional fee as specified by WARNER. LICENSEE's use of any advertising, promotional or related materials delivered by WARNER shall be in accordance with any directions given by WARNER. All materials and accessories so delivered are included, where the context so permits, in the expression "materials" when used in these Additional Terms.

b.    In all advertising and publicity relating to any Program or any Transmission thereof, LICENSEE shall comply with the advertising and billing credit requirements of the Program as furnished by WARNER to LICENSEE. LICENSEE shall not make or permit to be made, in any advertising, publicity or otherwise, any statements which (i) constitute, or may be understood to be, an endorsement of any sponsor, product, article or service by WARNER or any person, company or corporation connected or associated with the Program, its production or distribution, or (ii) indicate, or may be understood as indicating, that WARNER or any such person, company or corporation is connected or associated with any sponsor, product, article, service or advertiser. Any advertising or publicity referring to WARNER or any such person, company or corporation shall be limited to and shall indicate only that such person, company or corporation appeared in such Program or rendered services in connection therewith, or was the producer or distributor thereof, as applicable. LICENSEE shall not authorize any person or entity to sponsor any Program (as distinguished from the standard purchase of commercial advertising time) without WARNER's prior written approval, which approval may be withheld in WARNER's sole and

G:\USERS\SLOSIN\Contract Riders and Attachments\Warner Product ATCsRL.doc
Legenj\Ajc\btscf&c.wp
Basic Subscription Terms & Conditions
11/11497

6

CONFIDENTIAL
EXHIBIT D    Page 68

WB 6916



absolute discretion.

    c.    LICENSEE shall not advertise, promote or otherwise exploit in any manner or medium, any Program withdrawn by WARNER pursuant to paragraph 21 below.

    d.    LICENSEE shall not authorize or permit any excerpt or clip from any Program used for promotional purposes to be in excess of two (2) minutes in length.

    e.    LICENSEE may authorize Affiliated Systems to publicize and advertise the Transmission of the Program(s) on the Licensed Service provided that each Affiliated System so authorized will be subject to the restrictions set forth herein and that any act or omission to act by any such Affiliated System in respect of such publicity and advertising will be deemed to be an act or omission to act by LICENSEE and will be subject to LICENSEE's indemnity obligations as set forth in paragraph 16.d.

## 14.    MUSIC PERFORMING RIGHTS

WARNER warrants and represents that the non-dramatic performing rights to all musical compositions contained in the Programs or any of them are (a) controlled by the American Society of Composers, Authors and Publishers; Broadcast Music, Incorporated; SESAC; or a performing rights society having jurisdiction; (b) in the public domain; or (c) controlled by WARNER to the extent required by the purposes of this Agreement. LICENSEE shall not permit any Programs to be Transmitted without first obtaining a valid license from any performing rights society having jurisdiction. As between WARNER and LICENSEE, LICENSEE shall be solely responsible for the payment of any and all royalties, license fees or other fees relating to the performance of any musical compositions and/or sound recordings embodied in the Programs, which royalties, license fees or other fees arise by virtue of LICENSEE's Transmission of the Programs hereunder.

## 15.    FORCE MAJEURE

    a.    If any Act of God, strike, labor dispute, fire, flood, delay in or lack of transportation, public disaster, civil unrest, war, governmental act or regulation, or any other cause beyond the control of WARNER and LICENSEE ("Force Majeure Occurrence") prevents LICENSEE, without LICENSEE's fault, from Transmitting any Program pursuant to this Agreement for thirty (30) or more consecutive days then LICENSEE may request and obtain an extension of the License Period of the Program for a period coextensive with such Force Majeure Occurrence but in no event shall the License Period be extended for more than one hundred eighty (180) days or beyond the expiration of WARNER's rights in said Program, whichever is less.

    b.    If laboratory delay or any Force Majeure Occurrence prevents WARNER from carrying out any provision of this Agreement, this Agreement shall not have been breached and WARNER shall have no liability therefor. Nevertheless, if the License Period of any Program is affected thereby, the License Period shall be extended for a period coextensive with the delay, but in no event shall the License Period be extended for more than one hundred eighty (180) days or beyond the expiration of WARNER's rights in said Program, whichever is less. LICENSEE acknowledges and agrees that, if necessary, WARNER shall have the right to delay the Start Date for any Program if an event which would constitute a Force Majeure Occurrence under this Agreement delays the start date or otherwise affects a prior license of any Program in the Territory (in the same or a different media), in which case the parties shall mutually agree upon a revised Start Date for the affected Program.

## 16.    REPRESENTATIONS, WARRANTIES AND INDEMNITIES

    a.    WARNER warrants and represents that, as to each Program, WARNER has or shall have the right to grant the license herein contained on or before the first licensed Transmission of such Program, that there is no agreement with any other person, firm or corporation which shall in any way interfere with any rights granted under this Agreement to LICENSEE; that all Programs licensed hereunder are free and clear of all encumbrances of any kind and nature which would be inconsistent with the rights granted to LICENSEE hereunder; and, that none of the Programs or any materials contained therein violates the rights of any person. WARNER further warrants and represents that it is validly existing and in good standing in the jurisdiction of its organization; that it has full power and authority to enter into and perform this Agreement; that the execution, delivery and performance of this Agreement by WARNER have been duly authorized by all requisite corporate or other action of WARNER; and, that this Agreement is a valid and binding obligation of WARNER enforceable in accordance with its terms.

    b.    LICENSEE warrants and represents that it is, and will be throughout the Term, in compliance with and in good standing under the laws of the Licensed Territory and of the country of its domicile (if different than the Licensed Territory), and any

G:\USERS\SLOSIN\Contract Riders and Attachments\Warner Product ATCsRL.doc
l:agree/dc/beac&tc.wp
Basic Subscription Terms & Conditions
11/14/97

WB 6917



subdivision thereof with which it should be in compliance and under which it should be in good standing given the nature and scope of its business; that it has full power and authority to enter into and perform this Agreement in accordance with its terms; that the execution, delivery and performance of this Agreement have been authorized by all requisite action of LICENSEE; that this Agreement is a valid and binding obligation of LICENSEE enforceable in accordance with its terms; and that LICENSEE is not required to obtain the consent of any person or entity to enter into this Agreement. LICENSEE further warrants and represents that there shall not be any liens, charges, claims, adverse rights or interests of any kind on or against any Materials, title to which is vested in WARNER as set forth in paragraph 9.a., and that if the Licensed Service is offered by an Affiliated System on a tiered basis or in any other manner that causes WARNER to be required to make union or guild residual payments or music synchronization license payments that exceed the amount that WARNER would otherwise be required to pay if the Licensed Service had not been so offered, LICENSEE shall reimburse WARNER for the incremental amount of any such payments made by WARNER promptly upon WARNER's request. LICENSEE also warrants and represents that subject to any Inalienable Rights relating to any Program and notified in writing to WARNER at the end of the License Period for that Program (or notified in writing in any event upon WARNER so requesting), there shall not be any restrictions that would or could prevent WARNER or its agents, licensees, successors or assigns from using any of the materials created by or on behalf or at the request of LICENSEE in respect of such Program or its advertising and promotion in any media and as otherwise herein provided and that subject as aforesaid there shall not be any payments which must be made by WARNER or its agents, licensees, successors or assigns to anyone or any entity including, without limitation, any person, union, guild or other labor organization in connection therewith.

c.      ~~WARNER~~Each party shall indemnify and hold harmless ~~LICENSEE~~the other, its officers, directors, agents, shareholders and employees ("LICENSEE Indemnified Parties") from and against any and all claims, actions, losses, liabilities, damages, costs and expenses (including without limitation reasonable outside attorneys' fees and expenses) (collectively, "Claims") resulting from any final judgment recovered in any action or proceeding by any third party based upon any breach of the warranties and representations contained in paragraph 16.a. ~~In addition, where WARNER has expressly assumed an indemnity obligation elsewhere in these Additional Terms, WARNER shall indemnify LICENSEE Indemnified Parties in respect of such other Claims in accordance with this paragraph 16.c.~~

d.      _____d.      ~~LICENSEE~~Each party shall indemnify and hold harmless the ~~WARNER Indemnified Parties~~other from and against any and all Claims relating to a breach or claim of breach of ~~LICENSEE's~~the other's obligations hereunder, or by reason of any Claims or action relating to any breach or failure or conduct by ~~LICENSEE~~the other resulting in a breach or claim of breach. ~~In addition, where LICENSEE has expressly assumed an indemnity obligation elsewhere in these Additional Terms, LICENSEE shall indemnify WARNER Indemnified Parties in respect of such other Claims in accordance with this paragraph 16.d.~~

e.      If either party requests to be indemnified pursuant hereto ("Requesting Party"), it shall, upon learning of the same, promptly notify the other party in writing of the occurrence of the Claim for which indemnity is requested and, at the option of the party from whom indemnity is requested ("Requested Party"), such party may assume the defense of any such Claim, in which event the Requesting Party shall reasonably cooperate in the defense thereof. The Requested Party may, if necessary or desirable, join the Requesting Party as a party in any litigation in respect of the Claim for which indemnity is requested. No settlement or compromise of the Claim may be made by the Requesting Party without the Requested Party's prior written consent. Notwithstanding anything to the contrary contained herein, neither WARNER nor LICENSEE shall be responsible for loss of profits or consequential damages, if any, incurred by the other in respect of any Claim to which this paragraph 16 applies. If LICENSEE is the Requesting Party in respect of a Claim arising out of the Transmission of a Program, LICENSEE shall discontinue immediately Transmission of such Program until notified by WARNER to the contrary. If the Requesting Party fails to fulfill any of its obligations, the Requested Party shall be deemed excused from its obligation to indemnify and hold harmless the Requesting Party pursuant hereto.

## 17.      REMEDIES FOR BREACH

If LICENSEE does not pay in accordance with the terms of this Agreement any sum when due and such default continues for ~~ten (10)~~thirty (30) days after written notice thereof, or if LICENSEE is otherwise in breach of this Agreement or any other contract or agreement with WARNER which in each case has either not been remedied within thirty (30) days after notice or is not remediable, or if LICENSEE suspends operations, or if LICENSEE becomes insolvent or ceases to pay its obligations when due, or if LICENSEE is adjudicated a bankrupt, files a petition in bankruptcy, attempts to make an assignment for the benefit of creditors, or takes advantage of the provisions of any bankruptcy or debtor's relief act, or if an involuntary petition in bankruptcy is filed against LICENSEE and is not vacated or discharged within twenty-one (21) days, or if a receiver is appointed for a substantial portion of LICENSEE's property and is not discharged within twenty-one (21) days, then, at the election of WARNER, any and all sums payable under this Agreement remaining unpaid shall forthwith become due and payable to WARNER regardless of the due date thereof, WARNER shall be entitled to suspend the delivery of any Program and/or WARNER shall be entitled to the immediate return of all Materials and Additional Materials in LICENSEE's custody, possession or control. In addition, and without prejudice to any of WARNER's rights or remedies at law or in

G:\USERS\SLOSIN\Contract Riders and Attachments\Warner Product ATCsRL.doc
l:agmts\altz\bascultc.wp
Basic Subscription Terms & Conditions
11/14/97

CONFIDENTIAL



equity, and without in any way releasing or discharging LICENSEE from any of its obligations under this Agreement, WARNER may terminate this Agreement. If WARNER pays or becomes obligated to pay any sum of money, or does or is required to do any act which requires the payment of monies, or expends any sums for legal services of any kind or description by reason of any default of LICENSEE, then the sum(s) so paid or required to be paid, with interest thereon at the rate specified in paragraph 5.e., shall be added to the License Fees payable hereunder and shall be paid by LICENSEE to WARNER concurrently with the next installment due or, if there is no further installment due, LICENSEE shall make payment thereof upon demand. In the event the license granted to LICENSEE hereunder is exclusive with respect to the Licensed Language Version of the Programs, LICENSEE acknowledges that such an exclusive license makes the Licensed Language Version of the Programs unmarketable to third parties in the Territory (whether or not such Programs have been transmitted hereunder) until the License Period expires with respect to each such Program. Consequently, if LICENSEE defaults under this Agreement, in addition to any other rights or remedies WARNER may have at law or in equity, WARNER may demand and LICENSEE shall pay all consideration payable to WARNER hereunder as a reasonable estimate of WARNER's damages as a result of such default under the circumstances existing at the time this Agreement was made. LICENSEE will use reasonable efforts to ensure and monitor compliance by its Affiliated Systems with the terms and provisions of this Agreement. If LICENSEE discovers that any Affiliated System has engaged in material acts or omissions contrary to this Agreement, LICENSEE ~~will promptly~~will, as soon as it discovers this act or omission, notify WARNER of such acts or omissions. If any Affiliated System does any act materially in contra- vention of the limitations contained herein, or which LICENSEE is not permitted to authorize, or if any Affiliated System omits to perform any material act which LICENSEE is required to perform hereunder (whether or not LICENSEE has included such limitation or requirement in LICENSEE's affiliation agreement with such Affiliated System), WARNER will consult with LICENSEE and absent a resolution reasonably satisfactory to WARNER of such Affiliated System's act or omission within five (5) business days after notice from WARNER, WARNER will have the right to direct LICENSEE to terminate the Transmission rights granted to such Affiliated System. Nothing contained in this Agreement will preclude WARNER from seeking any remedies available at law or in equity against any Affiliated System directly.

## 18.    RESERVED RIGHTS

The license herein granted to LICENSEE is limited to the right to Transmit each Program in its entirety in the Licensed Language only for the purposes, in the manner and at the times expressly provided herein. Any and all rights in any Program not expressly licensed to LICENSEE herein, including but not limited to the right to Transmit clips or segments of any Program, and the literary and musical materials contained in any Program or upon which any Program may be based, are reserved by WARNER and may be exercised, marketed and exploited by WARNER concurrently with and throughout the Term of this Agreement.

## 19.    SUBLICENSE, RELICENSE AND ASSIGNMENT

    a.    This Agreement is personal to LICENSEE. LICENSEE shall not assign, sublicense, pledge, hypothecate, transfer or convey any of its rights and obligations under this Agreement, in whole or in part, without WARNER's prior written consent, which consent may be withheld by WARNER in its sole and absolute discretion. Notwithstanding the foregoing, LICENSEE may enter into agreements with Affiliated Systems granting such Affiliated Systems the right to retransmit the Programs as part of the Licensed Service to subscribers provided such agreements include provisions that are consistent with and comply with the terms of this Agreement. LICENSEE shall (subject to confidential commercially sensitive terms(eg pricing) being deleted) furnish WARNER with copies of each such agreement upon WARNER's reasonable request. In addition, LICENSEE agrees strictly to enforce against its Affiliated Systems all of the provisions which are required to be included in such agreements for the protection of WARNER; to advise WARNER of any violations thereof by Affiliated Systems, and of corrective actions taken by LICENSEE and the results thereof; and, at the request of WARNER, to terminate such an agreement with any Affiliated System which violates any of such provisions for the protection of WARNER.

    b.    WARNER may assign, sublicense, pledge, hypothecate, transfer or otherwise convey any of its rights and obligations under this Agreement, in whole or in part, as it deems proper in its sole and absolute discretion, without notice to LICENSEE.

## 20.    EFFECT OF INVALIDITY OF PROVISION

Nothing contained in this Agreement shall require the commission of any act contrary to an express law or policy, or of any rule or regulation of any governmental authority. If there exists any conflict between, on the one hand, any provision of this Agreement and, on the other hand, any such applicable law, policy, rule or regulation, the latter shall prevail; and, the provision(s) of this Agreement affected shall be curtailed, limited or eliminated only to the extent necessary to remove such conflict. As so modified, this Agreement shall continue in full force and effect.

G:\USERS\SLOSIN\Contract Riders and Attachments\Warner Product ATCsRL.doc
1:agreeh&c/basct&c.wp
Basic Subscription Terms & Conditions
11/14/97

WB 6919



CONFIDENTIAL
EXHIBIT D    Page 71

21.    **WITHDRAWAL OR SUSPENSION OF PROGRAMS**

a.    The parties hereto acknowledge that from time to time WARNER may deem it necessary to withdraw one or more Programs or episodes thereof from exhibition hereunder and WARNER reserves the right to withdraw any Program or episode if, in WARNER's sole and absolute discretion, the exhibition of the Program or episode hereunder could result in a claim being made against WARNER or any of its affiliated companies, the exhibition of the Program or episode is prohibited by order of a court or other governmental authority, or the Program or episode cannot, for reasons beyond WARNER's control (e.g., a Force Majeure Occurrence), be made available to LICENSEE for Transmission hereunder. In the event of any withdrawal WARNER shall endeavor to notify LICENSEE, in writing, at least seven (7) days prior to exhibition. Upon written notification by WARNER of the withdrawal of any Program or episode, the rights granted herein in and to such Program or episode shall terminate with respect to such Program or episode, and no further exhibitions hereunder shall be made of such Program or episode. In the event of a withdrawal hereunder, LICENSEE and WARNER shall agree to a comparable substitute program or episode for the one so withdrawn. In the event the parties cannot agree to a comparable substitute program or episode, or there is no comparable substitute program or episode available, a prorated portion of the License Fee paid by LICENSEE respecting such withdrawn Program or episode shall be credited or refunded to LICENSEE, based upon the number of Runs taken prior to withdrawal hereunder, with the understanding that earlier Runs shall be accorded a greater value than subsequent Runs. LICENSEE shall have no claim against WARNER based upon WARNER's withdrawal of any Program or episode as described herein.

b.    LICENSEE acknowledges and agrees that from time to time WARNER may deem it necessary to suspend the License Period for any Program licensed hereunder, in order to accommodate a theatrical re-release of such Program or the release of a motion picture based upon such Program. Warner shall endeavor to give reasonable notice to Licensee, in writing, of any such suspension hereunder, and following such notice the License Period for the affected Program, and LICENSEE's rights to Transmit such Program (including advertising and promotion thereof) shall be suspended for such period of time as notified by WARNER. In the event of a suspension hereunder, the License Period for the affected Program shall be extended for a period coextensive with such suspension, but in no event beyond the expiration of WARNER's rights in said Program.

22.    **ANTI-PIRACY**

LICENSEE shall take all steps and pay all required fees necessary to protect fully the exhibition of the Programs by LICENSEE under the copyright, trademark and related intellectual property laws of the Licensed Territory. WARNER shall reasonably cooperate with LICENSEE in providing documents necessary to secure such protection. If LICENSEE becomes aware of any actual or threatened infringement of any copyright or Trademark in any Program or related Materials or Additional Materials in the Licensed Territory, LICENSEE shall immediately notify WARNER. LICENSEE shall take such actions in cooperation with WARNER as WARNER may designate in order to stop such piracy. LICENSEE shall employ security measures to prevent the loss, theft, pirating, copying or unauthorized duplication of any of the Materials in its possession, custody or control. LICENSEE accepts responsibility for the loss or theft of any Program or its Materials from the time of delivery until returned to WARNER. LICENSEE shall notify WARNER immediately if any of the Materials or Additional Materials in its possession are lost, stolen or destroyed. In such event, LICENSEE shall cooperate with WARNER to the fullest extent in any attempt WARNER may make to recover any such Materials and Additional Materials, and shall indemnify the WARNER Indemnified Parties against any Claims made against WARNER or its affiliated companies as a result thereof.

23.    **RETRANSMISSION ROYALTIES**

As between WARNER and LICENSEE, any fees payable to the producer, distributor or copyright owner of any Program by reason of the retransmission of LICENSEE's Transmission of any Program are the sole property of WARNER. LICENSEE shall cooperate with WARNER to the extent necessary to permit WARNER to collect the maximum amount of any such fees.

24.    **PRIVATE COPY AND BLANK VIDEO LEVIES**

LICENSEE acknowledges that if any levy, fee or other charge is imposed in the Licensed Territory on the sale of blank video tapes, cassettes, discs or similar media, or on the sale of recording, duplicating or similar devices, for the purpose of remunerating producers, distributors or copyright owners for the unauthorized copying of their audiovisual works, then as between WARNER and LICENSEE, any and all fees or levies that are payable to the producer, distributor or copyright owner of the audiovisual works shall belong entirely to WARNER.

25.    **NOTICES**

G:\USERS\SLOSIN\Contract Riders and Attachments\Warner Product ATCsRL.doc
kaptis/sbc/nxxcbc.wp
Basic Subscription Terms & Conditions
11/14/97

**CONFIDENTIAL**
EXHIBIT D    Page 72

WB 6920



All notices under this Agreement must be in writing and must be sent by registered mail, postage prepaid; or personally delivered; or sent by courier, with authorized signature of recipient required; or sent by telegram, telex or electronic facsimile. Notices sent by registered mail shall be deemed received ten (10) business days after the date of the delivery to a government post office with postage prepaid; notices sent by courier shall be deemed received on the date indicated on the signed receipt; notices sent by telegram or telex shall be deemed received on the date the sending party furnishes the receiving party with appropriate proof of receipt and notices sent by electronic facsimile shall be deemed received on the date indicated on the signed receipt for an original, hard copy which shall be sent by the sending party to the receiving party by courier. The addresses for notices are identified in this Agreement. If the last date on which a notice that this Agreement requires or permits to be given falls on a Saturday, Sunday or national government holiday in the country to which such notice is sent, such last date shall be deemed postponed until the first day thereafter that is not a Saturday, Sunday or national government holiday. Courtesy copies of a notice shall be sent in the same manner as the notice. An inadvertent failure to send a courtesy copy of a notice shall not void the effectiveness of such notice. Either party may change its address for notices by giving written notice to the other pursuant to this paragraph 25.

## 26.    HEADINGS

Paragraph headings are for reference only and have no legal effect respecting the scope, meaning or intent of any of the provisions of this Agreement.

## 27.    INTEGRATION, CHOICE OF LAW AND JURISDICTION

    a.    This Agreement is complete and constitutes the entire understanding between the parties. All prior understandings, written or oral, express or implied, have been merged herein.

    b.    This Agreement may not be modified or amended except by an instrument in writing, signed by the parties hereto.

    c.    At WARNER's option, any dispute arising in connection with this Agreement shall either be resolved judicially, as set forth in paragraph 27.d. below or pursuant to arbitration, as set forth in paragraph 27.e. below.

    d.    If WARNER decides that a dispute should be resolved judicially, the state and federal courts in Los Angeles County, California, U.S.A. shall have exclusive jurisdiction over the dispute and LICENSEE submits to the jurisdiction thereof and to venue therein. Regardless of the judicial forum, LICENSEE and WARNER waive any right each may have to a trial by jury of any cause of action in connection with this Agreement. Any process served in connection with any proceeding to resolve any such dispute may be served upon the party to be served by registered or certified mail directed to the party at the address designated for notices to such party under this Agreement. Any such services shall have the same effect as personal service within the State of California. The foregoing shall not preclude any party hereto from seeking enforcement outside California of any order or judgment rendered by any California court.

    e.    If WARNER decides that a dispute should be submitted to arbitration, arbitration shall be the sole and exclusive means for the resolution of the dispute and it shall be final and binding. At WARNER's option, the arbitration shall occur under the UNCITRAL Arbitration Rules or under the American Arbitration Association Rules. Regardless of the rules chosen by WARNER, the arbitration shall be held in Los Angeles, California, or New York, New York, at WARNER's sole option, and shall be conducted in English as set forth below:

    i    The arbitral panel shall consist of three arbitrators, one of whom shall be appointed by LICENSEE, one of whom shall be appointed by WARNER and one of whom shall be appointed by the first two arbitrators or, in case such two arbitrators cannot agree, by the American Arbitration Association which shall administer the arbitration proceeding under its Procedure for Cases under the American Arbitration Association Rules or under the UNCITRAL Arbitration Rules, in accordance with WARNER's decision. The arbitrators shall hear and dispose of any dispute in such manner as they, in their discretion, shall determine, but in so doing they shall be required to receive the submissions of WARNER and LICENSEE with respect to the dispute. The arbitrators may, for their convenience or that of WARNER and LICENSEE, take evidence at places other than the situs of the proceedings without changing the situs of the proceedings. The arbitrators shall base their award with respect to the matter before them on the contents of this Agreement and on the governing law for this Agreement as set forth in paragraph 27.f below. The award of the arbitrators may be, alternatively or cumulatively, for monetary damages, an order requiring the performance of non-

G:\USERS\SLOSIN\Contract Riders and Attachments\Warner Product ATCsRL.doc
l:agmtl\t&c\basict&c.wp
Basic Subscription Terms & Conditions
11/14/97

11

WB 6921



monetary obligations or any other appropriate order or remedy. The arbitrators may issue interim awards. The final award shall assign costs of the arbitration to WARNER or LICENSEE, or both of them. The decision of the arbitrators shall be rendered in writing with all reasonable expeditiousness, shall set out the reasons therefor and, except as set forth below, shall be final and binding upon WARNER and LICENSEE. Except as set forth below, WARNER and LICENSEE agree to exclude any right of application or appeal to any court in connection with any award made.

ii          Any award rendered by the arbitrators shall, if so desired by WARNER or LICENSEE, be brought immediately to the attention of appropriate officers of both WARNER and LICENSEE who shall meet in Los Angeles, California, or New York, New York, at WARNER's sole option, within a period of two weeks thereafter, if either of them so requests, accompanied by such advisors as they may select, in order to attempt in good faith to settle the dispute either in accordance with the award or on another mutually acceptable basis. In the event that, within one month after such award, WARNER and LICENSEE have not found a mutually acceptable solution to the dispute, the award of the arbitrators may be entered as final in any court having jurisdiction or an application may be made to such court for a judicial acceptance and enforcement of the award, as the case may be.

f.          This Agreement shall be construed under and governed (i) by the internal laws of the State of California applicable to contracts entered into therein without giving effect to its conflicts of law provisions and (ii) by the laws of the United States of America to the extent that those laws preempt California state law.

g.          A waiver by either party of any breach by the other must be in writing and shall not be deemed a waiver of any other breach of the same or a different nature.

## 28.     CONFIDENTIALITY

LICENSEE shall not disclose the terms of this Agreement to any third party without WARNER's prior written consent, which consent shall not be unreasonably withheld, provided, however, that disclosures may be made (i) to the extent necessary to comply with government disclosure requirements or applicable laws and (ii) as may be necessary and appropriate in connection with the proper performance and enforcement of this Agreement.

G:\USERS\SLOSIN\Contract Riders and Attachments\Warner Product ATCsRL.doc
l:agmt/sltc/basltltc.wp
Basic Subscription Terms & Conditions
11/14/07

12
CONFIDENTIAL
EXHIBIT D     Page 74

WB 6922



PN01980
Page 1 of 4

## LICENSE AGREEMENT

Agreement dated as of the 2nd day of September, 1993, between Warner Bros. International Television Distribution, a division of Time Warner Entertainment Company, L.P. ("WARNER"), 4000 Warner Boulevard, Burbank, California 91522 and Wharf Cable Ltd. ("LICENSEE"), 40th Floor, 4-11/F Wharf Cable Tower, 9 Hoi Shing Road, Tsuen Wan, New Territories, Hong Kong.

1.    **OBJECT OF AGREEMENT**

WARNER owns or controls the exclusive pay television rights in the Territory to the English language version of the features (the "Program(s)") set forth on Schedule A attached hereto. LICENSEE desires to obtain the non-exclusive pay television rights in and to the English language version and the Cantonese language dubbed version of the Program(s) for the Territory, License Period and other terms as hereinafter defined.

2.    **RIGHTS GRANTED**

On the terms and subject to the conditions of the Agreement, WARNER hereby grants to the LICENSEE the following non-exclusive exploitation rights in and to the Program(s) for the Territory, License Period and other terms as hereinafter defined.

2.1    The right to transmit the English language version and the Cantonese language dubbed version of the Program(s) only to Wharf Cable, LICENSEE's pay television service. LICENSEE shall transmit by means of an encoded cable or MMDS signal. LICENSEE further agrees to authorize others to retransmit terrestrially within the Territory only by means of an encoded cable or MMDS signal.

2.2    LICENSEE shall not transmit or exhibit the Program(s) to non-residential establishments including, but not limited to, any location where an admission fee is charged, hospitals, nursing homes and similar institutions.

2.3    The license herein granted shall not include the right to transmit or exhibit the Program(s) herein licensed on a pay-per-view or pay-per-program basis, or a pay television system supported by commercial (paid) advertising.

2.4    LICENSEE shall not, nor authorize, permit or let any other party, delete or alter the Program(s) in any way.

2.5    WARNER warrants that, during the License Period of each Program set forth on Schedule A, WARNER will not authorize any free television exhibition of such Programs in either the English language or the Cantonese language dubbed version within the Territory.

file:\\hongkong\wharf\PN01980.RV1
06.27.94  4:07 pm

Ex. K

**WB 10011**
**CONFIDENTIAL**

Ex. 3

3. **TERRITORY**

The license granted hereunder is for the country of Hong Kong (the "Territory").

4. **LICENSE PERIOD & NUMBER OF TRANSMISSIONS**

4.1    LICENSEE shall transmit each Program licensed hereunder only between the availability date and expiration date for said Program(s) ("License Period") as set forth on Schedule A. Each Program may be transmitted a maximum of thirteen (13) times in the Territory during the License Period.

4.2    Not later than ten (10) days prior to the first day of the month in which the first transmission of a Program licensed hereunder is scheduled, LICENSEE shall give written notice to WARNER of the dates of the scheduled transmissions of such Program.

5. **DELIVERY OF MATERIAL**

5.1    WARNER shall deliver to LICENSEE one 625 line Betacam SP format videotape in the English language of each of the Programs licensed hereunder, free of materials charge. LICENSEE shall produce the Cantonese language dubbed version and bear all costs to produce such dubbed version.

LICENSEE shall pay all costs (including, without limitation, all taxes, duties, shipping, and freight charges) in connection with the importation and return of the videotapes or prints into and from the Territory.

5.2    WARNER shall also deliver to LICENSEE upon request, free of charge (other than shipping costs), scripts, advertising material, posters, stills, cue sheets, color slides, all only to the extent available to WARNER and provided that WARNER shall have no obligation to create such materials.

5.3    All materials delivered hereunder shall be sent to LICENSEE in care of Ms. Lanny A. Huang.

5.4    LICENSEE shall employ security measures to prevent the loss, theft, pirating, copying or unauthorized duplication of any of the videotapes in its possession. LICENSEE accepts responsibility for the loss or theft of any Program from the time of delivery until returned to WARNER. LICENSEE agrees to notify WARNER immediately in the event any videotape is lost, stolen or destroyed and will cooperate with WARNER to the fullest in any attempt WARNER may make to recover said videotape.

5.5    LICENSEE shall not by any of its actions permit any lien, charge, pledge, mortgage or encumbrance to attach to said videotapes.

s:\\hongkong\wharf\PN01980.RV1
06.27.94  4:07 pm

WB 10012
CONFIDENTIAL

5.6    For each Program licensed hereunder, as soon as practicable but not later than forty-five (45) days after the earlier of the end of the License Period or the final authorized transmission, LICENSEE shall, as instructed by WARNER, return to WARNER such videotapes supplied to LICENSEE. All costs and expenses incurred in connection with returning the videotapes shall be borne by LICENSEE.

6.    **LICENSE FEE**

6.1    LICENSEE agrees to pay to WARNER, for all rights granted by this Agreement, a license fee totaling $135,000 ("License Fee(s)") as set forth on Schedule A, payable as follows:

| | |
|---|---|
| June 1, 1994 | $43,875 |
| September 1, 1994 | 30,375 |
| December 1, 1994 | 30,375 |
| March 1, 1995 | 30,375 |
| | $135,000 |

All License Fees mentioned above and paid pursuant to this Agreement shall be in U.S. dollars. All payments are to be made to:

Warner Bros. (WBITVD)
Bank of America-Account 1257-000503
1850 Gateway Blvd #5693
Concord, California 94520 U.S.A.
(Swift Code) BOFA US6S

6.2    LICENSEE shall make all payments and bear all costs and expenses which may become due and payable by reason of the exploitation of the Program(s) pursuant to this Agreement, including without limitation, payment of any and all taxes, with WARNER having no obligation with respect thereto. In the event payments to any performing rights society are mandated by law or industry custom to be made by pay-television systems, LICENSEE shall make all payments and bear all costs and expenses with respect thereto.

7.    **REPORTS**

7.1    LICENSEE agrees to furnish to WARNER during the License Period and the month immediately following the License Period of each Program with monthly accounting statements.

7.1.1    Said statements shall be sent, within thirty (30) days following the end of each calendar month during the License Period and after the month immediately following the License Period of each Program to WARNER to the attention of:

ts:\\hongkong\wharf\PN01980.RV1
06.27.94  4:97 pm

WB 10013
CONFIDENTIAL

PN01980
Page 4 of 4

Warner Bros. International Television Distribution
c/o Mauro A. Sardi, Vice President
4000 Warner Boulevard
Burbank, California 91522
U.S.A.

with courtesy copy to:

Warner Bros. Pty. Ltd. Television Division
c/o Greg Robertson
Level 22
8-20 Napier Street
North Sydney, N.S.W., 2060
AUSTRALIA

7.1.2 Said monthly accounting statements shall specify the Program(s) transmitted and the dates and times of all such transmissions.

7.2    LICENSEE shall promptly, upon availability, furnish to WARNER three (3) copies of all published programming schedules to be submitted to the subscribers of LICENSEE's pay television service not later than the time at which the LICENSEE furnishes such programming schedules to the subscribers.

8.    This Agreement includes all the Pay or Basic Cable Television License Agreement Standard Terms and Conditions ("Terms and Conditions"), Schedules and Exhibits attached hereto. The provisions of the Terms and Conditions shall be subject to all other terms of this Agreement, which terms shall prevail over the Terms and Conditions in the event of any inconsistency.

Warner Bros. International Television Distribution,
a division of Time Warner Entertainment Company, L.P.

By: _John E. Whitwell_____
Title: _Vice President_____

Agreed and Accepted:

Wharf Cable Ltd.

By: _____  2 0 SEP 1994
    Title: Thomas W.H. Tang
           Television Operations Director
fs:\hongkong\wharf\PN01960.REV1
06.27.94  4:57 pm

WB 10014
CONFIDENTIAL

PN01980
Page 1 of 1

SCHEDULE A

AGREEMENT BETWEEN

WARNER BROS. INTERNATIONAL TELEVISION DISTRIBUTION,
a division of Time Warner Entertainment Company, L.P.

AND

WHARF CABLE LTD.
DATED AS OF THE 2ND DAY OF SEPTEMBER 1993

| 30 THEATRICAL FEATURE(S) | LICENSE PERIOD (Month/Day/Year) | | LICENSE FEE |
| | AVAILABILITY DATE | EXPIRATION DATE | |
| --- | --- | --- | --- |
| ALTERED STATES | 06/01/94 | 05/31/95 | $4,500 |
| AMERICAN FLYERS | 06/01/94 | 05/31/95 | 4,500 |
| BEING THERE | 06/01/94 | 05/31/95 | 4,500 |
| BODY HEAT | 06/01/94 | 05/31/95 | 4,500 |
| BULLITT | 06/01/94 | 05/31/95 | 4,500 |
| CAMELOT | 06/01/94 | 05/31/95 | 4,500 |
| COBRA | 06/01/94 | 05/31/95 | 4,500 |
| COOL HAND LUKE | 06/01/94 | 05/31/95 | 4,500 |
| DIRTY HARRY | 06/01/94 | 05/31/95 | 4,500 |
| DOG DAY AFTERNOON | 06/01/94 | 05/31/95 | 4,500 |
| EAST OF EDEN | 06/01/94 | 05/31/95 | 4,500 |
| GETAWAY, THE | 06/01/94 | 05/31/95 | 4,500 |
| GIANT | 06/01/94 | 05/31/95 | 4,500 |
| GOODBYE GIRL, THE | 06/01/94 | 05/31/95 | 4,500 |
| HELEN OF TROY | 06/01/94 | 05/31/95 | 4,500 |
| LOST IN AMERICA | 06/01/94 | 05/31/95 | 4,500 |
| PROTOCOL | 06/01/94 | 05/31/95 | 4,500 |
| REBEL WITHOUT A CAUSE | 06/01/94 | 05/31/95 | 4,500 |
| RIGHT STUFF, THE | 06/01/94 | 05/31/95 | 4,500 |
| RIO BRAVO | 06/01/94 | 05/31/95 | 4,500 |
| SEARCHERS, THE | 06/01/94 | 05/31/95 | 4,500 |
| SHARKY'S MACHINE | 06/01/94 | 05/31/95 | 4,500 |
| TIME AFTER TIME | 06/01/94 | 05/31/95 | 4,500 |
| WAIT UNTIL DARK | 06/01/94 | 05/31/95 | 4,500 |
| WHAT'S UP DOC? | 06/01/94 | 05/31/95 | 4,500 |
| WILD BUNCH, THE | 06/01/94 | 05/31/95 | 4,500 |
| WILLY WONKA AND THE CHOCOLATE FACTORY | 06/01/94 | 05/31/95 | 4,500 |
| WORLD ACCORDING TO GARP | 06/01/94 | 05/31/95 | 4,500 |
| YAKUZA | 06/01/94 | 05/31/95 | 4,500 |
| ZEPPELIN | 06/01/94 | 05/31/95 | 4,500 |
| | | TOTAL | $135,000 |

**WB 10015**
**CONFIDENTIAL**

06.27.94  4:33pm

**WARNER BROS. INTERNATIONAL TELEVISION DISTRIBUTION,**
**a division of Time Warner Entertainment Company, L.P. ("WARNER")**
**PAY OR BASIC CABLE TELEVISION LICENSE AGREEMENT**
**STANDARD TERMS AND CONDITIONS**

These Standard Terms and Conditions (the "Conditions") supplement the terms and conditions of the license agreement to which the Conditions are attached (the "License Agreement"). The License Agreement as supplemented by the Conditions will be referred to hereinafter as the "Agreement". All capitalized terms in the Conditions have the same meanings as in the License Agreement unless otherwise defined.

**1.    LICENSE PERIOD AND TERM**

a.    The license period for a Program (the "License Period") will begin on the date such Program first becomes available to LICENSEE as specified in the License Agreement and end on the earlier of the expiration date specified in the License Agreement or the date of the last licensed Transmission of such Program.

b.    The term of this Agreement (the "Term") begins on the date of the License Agreement and ends on the expiration date of any Program licensed hereunder unless the last licensed Transmission of any Program licensed hereunder occurs before the expiration date of any Program licensed hereunder in which case the term ends upon the last licensed Transmission of any Program licensed hereunder.

**2.    PAYMENT OF LICENSE FEES**

a.    As used herein, the words "payment," "pay," "payable," "paid" or words of similar meaning when applied to obligations of LICENSEE to WARNER mean the actual receipt by WARNER, by the date payment is to be made, in United States dollars in the amount specified herein without offset or recoupment, of cash, a bank transfer of unencumbered, immediately available funds to WARNER's account, the unconditional clearance of a check or bank draft payable to WARNER and drawn on a United States bank, or the draw down by WARNER of a previously approved and existing letter of credit from a United States bank pursuant to the terms thereof. Payment in any other manner will not be deemed made to WARNER until the amount of United States dollars due and payable has been received and is available for expenditure by WARNER. LICENSEE bears the risk that payment in any other manner will not be deemed made to WARNER within the time periods specified herein.

b.    In its sole and absolute discretion, WARNER may accept funds tendered to it by LICENSEE in a currency other than United States dollars. Such acceptance will not constitute a waiver of WARNER's rights under paragraph 2.a. Payment, therefore, will not be deemed to have been made until WARNER has converted the non-U.S. currency, net of all costs of conversion, to the amount of United States dollars due and payable. LICENSEE will bear all risks associated with the conversion including delay, costs of conversion, fluctuations in the exchange rate and WARNER's choice of currency exchange agent. In the event that WARNER converts the non-U.S. currency to an amount of United States dollars, net of all costs of conversion, in excess of the License Fee due and payable, WARNER may keep the excess without giving any credit to LICENSEE's account for the excess.

c.    LICENSEE will obtain all governmental permits necessary to make all payments to WARNER required under this Agreement. LICENSEE also will pay without limitation every tax, levy or charge, however denominated, imposed or levied against LICENSEE, WARNER or any Program by any authority having jurisdiction over LICENSEE's use of any Program other than a tax, levy or charge based on WARNER's net income. Such taxes, levies or charges include, without limitation, quotas, value added taxes, so-called "remittance" and withholding taxes, licenses, "Contingents," turnover taxes, import permits and duties, and national, state, county, city and other taxes, however denominated, relating to or imposed upon the License Fee or any part thereof, the license or the Transmission of any Program, any other amounts payable to WARNER, negatives, prints or other Material, the storage or possession of any Program or any Material, or the right or privilege to use the same in connection with the Programs. LICENSEE may deduct from the License Fee payable to WARNER taxes which are levied on WARNER's License Fee and paid to a government authority on WARNER's behalf, only if such taxes are levied in and such taxes are creditable in the United States in accordance with the income tax laws of the United States and if, after payment of such taxes, LICENSEE promptly provides WARNER with an official tax receipt evidencing such

**WB 10016**
**CONFIDENTIAL**

payment on WARNER's behalf, or, if this is not possible due to law or regulation, LICENSEE provides a copy of said receipt to WARNER.

d.    All License Fees are to be paid when due without regard to delays in the date of Transmission of any Program because of late delivery of Materials, the unavailability of Materials, a Force Majeure Occurrence (see definition in paragraph 10 below), the unavailability of this Agreement or WARNER's exercise of any of its rights under this Agreement. Timely payment is of the essence. LICENSEE's failure to make any payments when due will constitute a material default.

e.    WARNER will have the right to charge interest on any payment not received within ten (10) days of its due date at the rate which is the lowest of two (2) percentage points over the then current advertised prime rate at First National Bank of Boston or the then current highest rate allowable under law for this Agreement. Interest, if charged, will be retroactive to the date payment was first due. Interest, if charged, will be compounded monthly and will continue to be charged, each month, on the unpaid balance until all such amounts are paid.

f.    If laws or currency regulations in the Licensed Territory now or at any time during the term of the Agreement prohibit or restrict LICENSEE from paying any sums due WARNER, LICENSEE will advise WARNER promptly in writing. In any such case, upon WARNER's request, LICENSEE will deposit to WARNER's credit in a bank or banks approved in writing by WARNER or promptly pay to such person or persons as WARNER may designate in writing, all sums due WARNER. LICENSEE also will reimburse WARNER for any costs incurred by WARNER in remitting such funds to the United States and/or converting such funds into United States dollars. If LICENSEE is prohibited or restricted from making payment of any sums due WARNER, in addition to WARNER's other rights or remedies, WARNER may cancel and terminate this Agreement upon written notice to LICENSEE.

## 3.    INSPECTION OF MATERIALS

Immediately upon delivery of any Materials, LICENSEE will examine the Materials to determine their technical acceptability for Transmission. Unless WARNER is notified otherwise within five (5) business days of delivery, all Materials will be deemed acceptable to LICENSEE. If WARNER receives timely notice of a defect in the Materials, WARNER will remedy such defect or substitute Materials of the same Program at no additional cost. At WARNER's election, WARNER may exercise its rights to withdraw or substitute pursuant to paragraph 16 below.

## 4.    RETURN, SHIPPING OR DISPOSITION

a.    LICENSEE agrees to return the Materials of a Program to WARNER by air freight express to such destination as WARNER directs within three (3) business days of its receipt of WARNER's instructions but in no event later than the earlier of the expiration of the License Period of the Program, the expiration of the Term or the termination of this Agreement. Return or shipment of the Materials in accordance with WARNER's instructions is of the essence. If LICENSEE and WARNER enter into a written agreement that the Materials may be disposed of other than by returning them to WARNER or shipping them to a destination fixed by WARNER, LICENSEE may dispose of the Materials in accordance with that agreement.

b.    LICENSEE will return or ship all Materials in the same condition in which they were received, normal wear and tear excepted. If Materials are lost, stolen, destroyed or damaged between the time of delivery to LICENSEE and the receipt of the Materials by WARNER or its designee, LICENSEE will pay WARNER the latter's prevailing charge for replacement of the Materials. Such payment will not, however, transfer to LICENSEE title to any Materials.

c.    When returning or shipping Materials of a Program, LICENSEE will return to WARNER or ship to its designee in accordance with paragraph 4.a all dubbed sound tracks, subtitled or subtitling Material, and all optical and/or magnetic sound tracks and/or Materials containing optical and/or magnetic sound tracks which were manufactured by, for or at the request of LICENSEE in connection with the Program, whether or not LICENSEE used any of said Materials in connection with the exercise of its rights hereunder and whether or not LICENSEE incurred any of the costs of manufacture.

ta \wp5 f\TEMPLATE\STC
08.22.93-4:15 pm

2

WB 10017
CONFIDENTIAL

validly existing and in good standing in the jurisdiction of its incorporation; that it has full power and authority to enter into and perform this Agreement; that the execution, delivery and performance of this Agreement by WARNER have been duly authorized by all requisite corporate action of WARNER; and, that this Agreement is a valid and binding obligation of WARNER in accordance with its terms.

b.    WARNER will indemnify and hold LICENSEE, its officers, directors, agents, stockholders and employees and sponsors of any Transmission of any Program harmless from and against any and all Claims resulting from any judgment recovered in any action or proceeding by any third party based upon any breach of the warranties and representations contained in paragraph 11.a, provided that LICENSEE has given written notice to WARNER of the third party Claim immediately after it was made, and provided that LICENSEE discontinued Transmission of the Program(s) immediately after such Claim was made. WARNER may assume the handling, prosecution, defense or settlement of any Claim and any resulting litigation. WARNER may, if necessary or desirable, join LICENSEE as a party in such action. No settlement may be made without WARNER's written consent. If LICENSEE fails to fulfill any of its obligations under this paragraph, then WARNER will be excused from its obligation to indemnify LICENSEE and hold it harmless.

c.    LICENSEE warrants and represents that it is in compliance with and in good standing under the laws of the Licensed Territory and any subdivision thereof with which it should be in compliance and under which it should be in good standing given the nature and scope of its business; that it has full power and authority to enter into and perform this Agreement in accordance with its terms; that the execution, delivery and performance of this Agreement have been authorized by all requisite action of LICENSEE; that this Agreement is a valid and binding obligation of LICENSEE enforceable in accordance with its terms; and, that LICENSEE is not required to obtain the consent of any person or entity to enter into this Agreement. LICENSEE further warrants and represents that there are no and never will be any liens, charges, claims, adverse rights or interests of any kind on or against any Materials title to which is vested in WARNER as set forth in paragraph 5.a. LICENSEE also warrants and represents that there will not be any restrictions that would or could prevent WARNER from Transmitting and distributing any of the Materials referred to in paragraph 5.a by any media or means and there will not be any payments which must be made by WARNER to anyone or any entity including, but not limited to, any person, union, guild or other labor organization, in connection therewith.

d.    LICENSEE will indemnify and hold WARNER et al. harmless from and against all Claims arising out of or relating to any breach of warranties and representations contained in paragraph 11.c. If WARNER so requests, LICENSEE will defend WARNER et al. against any such Claim.

## 12.  REMEDIES FOR BREACH

a.    If LICENSEE does not pay in accordance with the terms of this Agreement any sum when due and such default continues for thirty (30) days after written notice thereof, or if LICENSEE is otherwise in breach of this Agreement or any other contract or agreement with WARNER, or if LICENSEE suspends operations, or if LICENSEE becomes insolvent or ceases to pay its obligations when due, or if LICENSEE is adjudicated a bankrupt, files a petition in bankruptcy, attempts to make an assignment for the benefit of creditors, or takes advantage of the provisions of any bankruptcy or debtor's relief act, or if an involuntary petition in bankruptcy is filed against LICENSEE and is not vacated or discharged within twenty-one (21) days, or if a receiver is appointed for a substantial portion of LICENSEE's property and is not discharged within twenty-one (21) days, or if LICENSEE loses control, for any reason, of the Licensed Station or its interest therein or the license to operate the same, then, at the election of WARNER, any and all sums payable under this Agreement remaining unpaid will forthwith become due and payable to WARNER regardless of the due date thereof, WARNER will be entitled to suspend the delivery of any Program and/or WARNER will be entitled to the immediate return of all Materials in LICENSEE's custody, possession or control. In addition, and without prejudice to any of WARNER's rights or remedies at law or in equity, and without in any way releasing or discharging LICENSEE from any of its obligations under this Agreement, WARNER may terminate this Agreement. If WARNER pays or becomes obligated to pay any sum of money, or does or is required to do any act which requires the payment of monies, or expends any sums for legal services of any kind or description by reason of any default of LICENSEE, then the sum(s) so paid or required to be paid, with interest thereon at the rate specified in paragraph 2.e, will be added to the License Fees payable hereunder and will be paid by LICENSEE to WARNER

5

WB 10018
CONFIDENTIAL

concurrently with the next installment due or, if there is no further installment due, LICENSEE will make payment thereof upon demand.

b.   LICENSEE acknowledges that the licensing of a Program to LICENSEE hereunder and/or the Transmission of that Program or any episode or portion thereof makes that Program unmarketable to third parties in the Licensed Language in the Licensed Territory until after the date of the last licensed Transmission of that Program. Consequently, if LICENSEE defaults under this Agreement, payment to WARNER of all consideration payable hereunder is a reasonable estimate of WARNER's damages as a result of such default under the circumstances existing at the time this Agreement was made.

## 13.   RESERVED RIGHTS

The license herein granted to LICENSEE is limited to the right to Transmit each Program in its entirety only for the purposes, in the manner and at the times expressly provided. Any and all rights in any Program not expressly licensed to LICENSEE herein, including but not limited to the right to Transmit clips or segments of any Program, and the literary and musical Materials contained in any Program or upon which any Program may be based, are reserved to WARNER and may be exercised, marketed and exploited by WARNER concurrently with and throughout the Term of this Agreement.

## 14.   SUBLICENSE, RELICENSE AND ASSIGNMENT

a.   LICENSEE will not assign, sublicense, pledge, hypothecate, transfer or convey this Agreement, in whole or in part, without WARNER's prior written consent. WARNER may consent or not in its sole and absolute discretion. LICENSEE will not sublicense or relicense any Program for Transmission by any other person, firm, corporation or television station nor will LICENSEE use an agent for such purpose, provided that this shall not prevent the LICENSEE from supplying the LICENSEE's television service to subscribers via television systems including, without limitation, cable and SMATV systems, pursuant to agreements between the LICENSEE and such systems (or directly with the subscribers).

b.   WARNER may assign, sublicense, pledge, hypothecate, transfer or otherwise convey this Agreement, in whole or in part, as it deems proper in its sole and absolute discretion, without notice to LICENSEE.

## 15.   EFFECT OF INVALIDITY OF PROVISION

If any provision of this Agreement is contrary to any applicable law or regulation, all other provisions of this Agreement will notwithstanding continue in full force and effect.

## 16.   WITHDRAWAL OR SUSPENSION OF PROGRAMS

a.   WARNER will have the right at any time to withdraw any Program or episode thereof if, in WARNER's sole and absolute discretion, the Program or episode is either unavailable for Transmission under the terms of this Agreement or cannot, for reasons beyond WARNER's control, or due to a Force Majeure Occurrence, be made available to LICENSEE. WARNER reserves the right to discontinue the production of any Program or episode thereof and to terminate this Agreement at any time during the Term on five (5) days' written notice to LICENSEE. Upon such withdrawal or termination, LICENSEE and WARNER agree to substitute Program or episode thereof in place of the Program or episode so withdrawn, which substitute Program or episode must be agreeable to both WARNER and LICENSEE.

b.   WARNER, in its sole and absolute discretion, may suspend delivery of any Program or LICENSEE's Transmission of any Program, whether or not delivered, if, in WARNER's opinion, the Program is unavailable for Transmission under the terms of this Agreement or cannot be made available to LICENSEE for reasons beyond the control of WARNER, or due to a Force Majeure Occurrence. Any such suspension will be limited to a one hundred eighty (180) day period from the date of WARNER's notice for such Program, provided, however, that if WARNER elects to extend the suspension for an additional period not exceeding one hundred eighty (180) days, then the License Period for the suspended Program (and the Term, if necessary) will be extended day-to-day for a period which is equal to the period of such extended suspension but in no event beyond the expiration of WARNER's rights in said Program.

ls:\wp51\\BPLATE\STC
08.22.93   4:15 pm

WB 10019
CONFIDENTIAL

## 5. TITLE

a. Title in and to Materials of a Program provided to LICENSEE hereunder is vested and will remain in WARNER, and title in and to any Materials of a Program created by, for or at the request of LICENSEE and all rights therein, including copyrights and all neighboring and connecting rights, will vest and remain in WARNER upon the creation thereof, subject only to LICENSEE's possession and use until the earlier of the expiration of the License Period of the Program, the expiration of the Term or the termination of this Agreement solely so that LICENSEE may exercise its rights licensed hereunder. As between WARNER and LICENSEE, all Materials will be deemed to have been loaned to LICENSEE whether or not LICENSEE paid any of the costs of manufacture.

b. LICENSEE will execute, acknowledge and deliver to WARNER any instruments of transfer, conveyance or assignment in or to any Materials referred to in paragraph 5.a above which are necessary or desirable to evidence or effectuate WARNER's ownership of such Materials. LICENSEE will also execute, acknowledge and deliver to WARNER any instruments of transfer, conveyance or assignment in or to any rights in Materials of a Program which are to vest and remain in WARNER pursuant to paragraph 5.a above which instruments are necessary or desirable to evidence or effectuate the vesting for as long as is permissible of such rights in WARNER. If LICENSEE fails or refuses to execute, acknowledge or deliver any such instrument, then WARNER will be deemed to be, and LICENSEE hereby and irrevocably appoints WARNER, its true and lawful attorney-in-fact to execute and deliver all such instruments in LICENSEE's name or otherwise, acknowledging that such power is a power coupled with an interest.

## 6. ALTERATION OF PROGRAMS

a. LICENSEE will not change, alter, modify, copy, duplicate or add to any Program without WARNER's prior written consent.

b. Notwithstanding paragraph 6.a above, LICENSEE may make minor cuts or alterations in order to conform to the orders of any duly authorized, legally constituted censorship authority in the Licensed Territory if LICENSEE immediately notifies WARNER in writing of the need for such cuts or alterations, obtains WARNER's prior written approval thereof and, at its own expense, replaces any such cuts and alterations so that the Materials are returned to WARNER or shipped to WARNER's designee in the same condition in which they were originally received by LICENSEE, normal wear and tear excepted.

c. In no event will the copyright or trademark notice, WARNER's presentation or advertising credit or the credits to any person, firm or corporation appearing on any of the Materials be changed, altered or removed. Any breach or violation of the terms hereof will constitute a material default entitling WARNER, at its election, to terminate this Agreement, in whole or in part, in addition to any other rights or remedies available to WARNER and without releasing or discharging LICENSEE of any liability hereunder.

d. Whenever requested by WARNER to do so, LICENSEE will change the title of any Program licensed hereunder and will not thereafter Transmit any such Program except under the new title.

## 7. CENSORSHIP

If a Program or any episode thereof is rejected for Transmission by any duly authorized, legally constituted government censorship authority in the Licensed Territory and LICENSEE so notifies WARNER, LICENSEE and WARNER agree to substitute Program or episode for the one so withdrawn which substitute Program or episode will be agreeable to both WARNER and LICENSEE.

## 8. ADVERTISING

a. LICENSEE may use the publicity materials furnished hereunder no earlier than sixty (60) days prior to the commencement of the License Period of the relevant Program; except that, LICENSEE may use publicity material for promotion in the Program Guides and in promotional spots (exhibited on the pay television service only) no earlier than forty five (45) days prior to the commencement of the License Period for the respective Program. Under no circumstances shall LICENSEE permit or allow any "preview transmissions" (as that term is commonly understood in the Television industry), of any of the Programs to any viewer at any time.

ta:\wp51\\BP\LATE\STC
08.22.93  4:15 pm

3

WB 10020
CONFIDENTIAL

b.    In all advertising and publicity relating to any Program or any Transmission thereof, LICENSEE shall comply with the advertising and billing credit requirements of the Program as furnished by WARNER to LICENSEE. LICENSEE will not make or permit to be made, in any advertising, publicity or otherwise, any statements which (a) constitute, or may be understood to be, an endorsement of any sponsor, product, article or service by WARNER or any person, company or corporation connected or associated with the Program, its production or distribution, or (b) indicate, or may be understood to indicate, that WARNER or any such person, company or corporation is connected or associated with any sponsor, product, article, service or advertiser. Any advertising or publicity referring to WARNER or any such person, company or corporation will be limited to and will indicate only that such person, company or corporation appeared in such Program or rendered services in connection therewith, or was the producer or distributor thereof, as applicable.

c.    LICENSEE will not advertise or promote, in any manner or medium, any Program withdrawn or suspended by WARNER.

d.    LICENSEE will not authorize or permit any excerpt or clip from any Program used for promotional purposes to be in excess of two (2) minutes in length.

e.    LICENSEE will indemnify and hold WARNER et al. harmless from and against any and all Claims against WARNER et al. due to any actual or alleged breach by LICENSEE of the provisions of this paragraph. If WARNER so requests, LICENSEE will defend WARNER et al. against such Claims.

## 9.   MUSIC PERFORMING RIGHTS

WARNER warrants and represents that the non-dramatic performing rights to all musical compositions contained in the Programs or any of them are (a) controlled by the American Society of Composers, Authors and Publishers; Broadcast Music, Incorporated; Sesac, Incorporated; or a performing rights society having jurisdiction; (b) in the public domain; or (c) controlled by WARNER to the extent required by the purposes of this Agreement. LICENSEE will not permit any Programs to be Transmitted without first obtaining a valid license from any performing rights society having jurisdiction. LICENSEE may be required to pay a performing rights royalty or license fee to any performing rights society having jurisdiction. LICENSEE will be solely responsible for the payment thereof and will indemnify and hold WARNER et al. free and harmless therefrom. If WARNER so requests, LICENSEE will defend WARNER et al. from any Claim arising out of LICENSEE's failure to pay in accordance with this paragraph for any musical composition in any Program.

## 10.   FORCE MAJEURE

a.    If any Act of God, strike, labor dispute, fire, flood, delay in or lack of transportation, public disaster, war, governmental act or regulation, or any other cause beyond the control of WARNER and LICENSEE ("Force Majeure Occurrence") prevents LICENSEE, without LICENSEE's fault, from Transmitting any Program pursuant to this Agreement for thirty (30) or more consecutive days then LICENSEE may request and obtain an extension of the License Period of the Program (and of the Term, if necessary) for a period coextensive with such Force Majeure Occurrence but in no event either for more than one hundred eighty (180) days or beyond the expiration of WARNER's rights in said Program.

b.    If laboratory delay or any Force Majeure Occurrence prevents WARNER from carrying out any provision of this Agreement, this Agreement will not have been breached and WARNER will have no liability therefor. Nevertheless, the License Period of any affected Program (and the Term, if necessary) will be extended for a period coextensive with the delay, but in no event beyond the expiration of WARNER's rights in said Program.

## 11.   REPRESENTATIONS AND WARRANTIES

a.    WARNER warrants and represents that, as to each Program, WARNER has or will have the right to grant the license herein contained on or before the first licensed Transmission of such Program, that there is no agreement with any other person, firm or corporation which will in any way interfere with any rights granted under this Agreement to LICENSEE; that all Programs licensed hereunder are free and clear of all encumbrances of any kind and nature which would be inconsistent with the rights granted to LICENSEE hereunder; and, that none of the Programs or any materials contained therein violates the rights of any person. WARNER further warrants and represents that it is a corporation duly organized,

WB 10021
CONFIDENTIAL

## 17. ANTI-PIRACY

LICENSEE will take all steps and pay all required fees necessary to protect the Programs fully under the copyright, trademark and related intellectual property laws of the Licensed Territory. WARNER will reasonably cooperate with LICENSEE in providing documents necessary to secure such protection. If LICENSEE becomes aware of any infringement of any copyright or trademark in any Program in the Licensed Territory, LICENSEE will immediately notify WARNER. LICENSEE will take such actions in cooperation with WARNER as WARNER may designate in order to stop such piracy. LICENSEE will employ security measures to prevent the loss, theft, pirating, copying or unauthorized duplication of any of the Materials in its possession, custody or control. LICENSEE accepts responsibility for the loss or theft of any Program or its Materials from the time of delivery until returned to WARNER. LICENSEE will notify WARNER immediately if any of the Materials in its possession is lost, stolen or destroyed. In such event, LICENSEE will cooperate with WARNER to the fullest extent in any attempt WARNER may make to recover such Material, and will indemnify WARNER et al. against any Claims made against WARNER et al. as a result thereof.

## 18. RETRANSMISSION ROYALTIES

Any fees payable by reason of government permitted or mandated retransmissions in the Licensed Territory of any transmission of a Program, including but not limited to AGICOA royalties, are the sole property of WARNER. LICENSEE will cooperate with WARNER to the extent necessary to permit WARNER to collect the maximum amount of any such fees.

## 19. VIDEO LEVY

LICENSEE acknowledges that if any fee, video levy, or similar charge shall be collected in the Territory on sale of video recorders, blank video cassettes (or discs) or similar items and such levy or any part thereof shall or may become payable to the copyright owner or distributor or exhibitor of any Program in the Territory, then such amount shall belong entirely to WARNER.

## 20. NOTICES

All notices under this Agreement must be in writing and sent by first class mail, postage prepaid, with a copy personally delivered or sent by telegram, telex, telecopier or other facsimile machine for delivery within twenty-four (24) hours of transmittal. The address for all notices are identified in the License Agreement. Either party may change its address for notice by written notice to the other pursuant to this paragraph.

## 21. HEADINGS

Paragraph headings are for reference only and have no legal effect respecting the scope, meaning or intent of any of the provisions of this Agreement.

## 22. INTEGRATION, CHOICE OF LAW AND JURISDICTION

a. This Agreement is complete and constitutes the entire understanding between the parties. All prior understandings, written or oral, express or implied, have been merged herein.

b. This Agreement may not be modified or amended except by an instrument in writing, signed by the parties hereto.

c. At WARNER's option, any dispute arising in connection with this Agreement shall either be resolved judicially, as set forth in paragraph 22.d below or pursuant to arbitration, as set forth in paragraph 22.e below.

d. If WARNER decides that a dispute should be resolved judicially, the state and federal courts in Los Angeles County, California, U.S.A. shall have exclusive jurisdiction over the dispute and LICENSEE submits to the jurisdiction thereof and to venue therein. Regardless of the judicial forum, LICENSEE and WARNER waive any right each may have to a trial by jury of any cause of action in connection with this Agreement. Any process served in connection with any proceeding to resolve any such dispute may be

WB 10022
CONFIDENTIAL

served upon the party to be served by registered or certified mail directed to the party at the address designated for notices to such party under this Agreement. Any such services will have the same effect as personal service within the State of California. The foregoing shall not preclude any party hereto from seeking enforcement outside California of any order or judgment rendered by any California court.

e.   If WARNER decides that a dispute should be submitted to arbitration, arbitration shall be the sole and exclusive means for the resolution of the dispute and it shall be final and binding. At WARNER's option, the arbitration shall occur under the UNCITRAL Arbitration Rules or under the American Arbitration Association Rules. Regardless of the rules chosen by WARNER, the arbitration shall be held in Los Angeles, California, or New York, New York, at WARNER's sole option, and shall be conducted in English as set forth below.

    i.   The arbitral panel shall consist of three arbitrators, one of whom shall be appointed by LICENSEE, one of whom shall be appointed by WARNER and one of whom shall be appointed by the first two arbitrators or, in case such two arbitrators cannot agree, by the American Arbitration Association which shall administer the arbitration proceeding under its Procedure for Cases under the American Arbitration Association Rules or under the UNCITRAL Arbitration Rules, in accordance with WARNER's decision. The arbitrators shall hear and dispose of any dispute in such manner as they, in their discretion, shall determine, but in so doing they shall be required to receive the submissions of WARNER and LICENSEE with respect to the dispute. The arbitrators may, for their convenience or that of WARNER and LICENSEE, take evidence at places other than the situs of the proceedings without changing the situs of the proceedings. The arbitrators shall base their award with respect to the matter before them on the contents of the Agreement and on the governing law for this Agreement as set forth in paragraph 22.f below. The award of the arbitrators may be, alternatively or cumulatively, for monetary damages, an order requiring the performance of non-monetary obligations or any other appropriate order or remedy. The arbitrators may issue interim awards. The final award shall assign costs of the arbitration to WARNER or LICENSEE, or both of them.  The decision of the arbitrators shall be rendered in writing with all reasonable expeditiousness, shall set out the reasons therefor and, except as set forth below, shall be final and binding upon WARNER and LICENSEE. Except as set forth below, WARNER and LICENSEE agree to exclude any right of application or appeal to any court in connection with any award made.

    ii.   Any award rendered by the arbitrators shall, if so desired by WARNER or LICENSEE, be brought immediately to the attention of appropriate officers of both WARNER and LICENSEE who shall meet in Los Angeles, California, or New York, New York, at WARNER's sole option, within a period of two weeks thereafter, if either of them so requests, accompanied by such advisors as they may select, in order to attempt in good faith to settle the dispute either in accordance with the award of on another mutually acceptable basis. In the event that, within one month after such award, WARNER and LICENSEE have not found a mutually acceptable solution to the dispute, the award of the arbitrators may be entered as final in any court having jurisdiction or an application may be made to such court for a judicial acceptance and enforcement of the award, as the case may be.

f.   This Agreement will be construed under and governed (1) by the internal laws of the State of California applicable to contracts entered into therein without giving effect to its conflicts of law provisions and (2) by the laws of the United States of America to the extent that those laws preempt California state law.

g.   A waiver by either party of any breach by the other must be in writing and may not be deemed a waiver of any other breach of the same or a different nature.

w:\wb3\\BPLATE\STC
08.22.93 .8:15 pm

**WB 10023**
**CONFIDENTIAL**

# EXHIBIT E

ORIGINAL SHIPPED   DEC 0 1 2006

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA           )
SIEGEL LARSON,                    )
                                  )        **CERTIFIED**
        Plaintiffs,               )        **ORIGINAL**
                                  )
    vs.                           )   No. 04-8400 (RSWL)(RZx)
                                  )
WARNER BROS. ENTERTAINMENT )           -and-
INC., et al.,                     )
                                  )   No. 04-8776 (RSWL)(RZx)
        Defendants.               )
_____ )
AND RELATED COUNTERCLAIMS.

DEPOSITION OF MARC TOBEROFF

Beverly Hills, California

Friday, November 17, 2006

Reported by:

DAVID S. COLEMAN

CSR No. 4613

**U.S. LEGAL**

*Support*

*Certified Shorthand Reporters*

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA 91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

Los Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento . . . and across the nation

discussion with Peavy or Peary concerning Joanne or Laura Siegel's interest?

MR. WILLIAMSON: Objection. Attorney-client.

THE WITNESS: What are the dates?

BY MR. BERGMAN:

Q    The end of July 2002.

A    Can you repeat the question, please, or read it back to me?

Q    As of the end of July 2002, had you had any discussion with Peary or Peavy concerning Joanne or Laura Siegel's interest in the Superman property?

A    Those discussions would be privileged. I'm not gonna answer questions about what discussions I had with the Shusters. That's attorney-client privilege, attorney work product regarding the Siegels' interest.

(Unanswered question.)

Q    As of the end of July 2002?

A    From the point I started speaking to them till the present, my discussions with them regarding the Siegels' interest, regarding their interest, regarding Superman, regarding that whole legal situation is attorney-client privileged and also protected by the work product doctrine.

Q    Okay. Mr. Marks went on to testify concerning a conference call that he had with you and Mr. Emanuel.

98

The date of that conference call as set by Mr. Marks with reference to his phone logs which were marked GTRB 616 was that the conversation occurred within a day or two of August 7, 2002.

Prior to the time -- you do recall having a conference call with Mr. Marks and Mr. Emanuel, don't you?

A   I do.  As far as a date, again the date -- I have a -- I originally called -- this is just commenting on the date.  I originally recall that my assistant I had mentioned before, Andrew, I had asked him to set up a conference call, and I believe that was the reference in Marks' -- the exhibit to Marks' deposition, and that was noted -- that initial referenced conference call, that's the one where he talks about it's "20," and it's crossed out and says, "5 to 10 minutes," something like that, on the exhibit.  That was Andrew calling to set up a conference call.

But I have a specific recollection that after I tried to get dates from the Marks side -- or Andrew tried to get dates from Kevin Marks' office, it was very hard to pin down Ari Emanuel for that conference call.

So just talking about the date, I know he said it would have happened one or two days after that.  I think that conference call could have happened 10 days

99

after that.

    Q   Okay.

    A   Because I remember specifically being a little frustrated with Ari Emanuel's assistant because they kept saying, "Yes, and I'll have to speak to him," and he wouldn't come back to me with a date. So that's all.

    Q   Prior to that conference call, whether it occurred on August 7 or 10th or 15th or whenever --

    A   Right. Let's say mid August.

    Q   Okay.

    -- had you taken any steps to place a monetary value on the Siegel interest?

    MR. WILLIAMSON: Objection. Vague and ambiguous, and objection on attorney-client, work product grounds.

    Instruct you not to answer.

    (Instruction not to answer.)

    THE WITNESS: I'm going to follow that instruction.

BY MR. BERGMAN:

    Q   To your knowledge had Mr. Emanuel taken any steps to place a monetary value on the Siegel interest in Superman prior to the conference call?

    MR. WILLIAMSON: Objection to the extent it calls for attorney work product, and objection on the

100

grounds it calls for speculation.

THE WITNESS:  And also attorney-client privilege, because if I knew it, it would be through communications by Mr. Emanuel.

(Unanswered question.)

BY MR. BERGMAN:

Q   Mr. Marks testified with respect to that conference call beginning at page 168 of his deposition, line 12 -- line 11, "I think Mr." -- I had asked him what was said in the conversation.  Quote, "I think Mr. Toberoff may have very briefly referenced past conversations, and then I believe it was Mr. Emanuel who explained that either they or some other people or perhaps some members of the Endeavor Talent Agency had set up a fund or were in the process of setting up a fund to acquire intellectual property rights which they would then package with clients from the Endeavor Talent Agency."

Do you recall Mr. Emanuel stating that in substance during the conversation?

A   Not specifically, no.  He may have.

Q   Okay.  Do --

A   I recall him, you know, doing the equivalent of in a meeting what they call warming up the room where -- which he's very good at, in which he sort of just spoke

101

generally, but I don't specifically recall that.  He may

have.

     Q   Had you or Mr. Emanuel set up a fund to acquire

intellectual property rights at that time?

     MR. WILLIAMSON:  Objection.  Attorney-client

privilege.  Attorney work product.

     THE WITNESS:  Without a waiver of those

privileges, I can speak for myself.  I had not set up a

fund, no.

BY MR. BERGMAN:

     Q   To your knowledge had Mr. Emanuel?

     A   I believe Endeavor or Mr. Emanuel had a fund and

access to a lot of financing.

     Q   Continuing with Mr. Marks' testimony concerning

that conference call between you and he and Mr. Emanuel,

I'm at page 169 of his deposition, line 1, quote, "And

I'm not sure who spoke, but they made a proposal of $15

million and what was described as a meaningful back end,

which I understood to be a contingent compensation

position or a royalty position in the exploitation of the

property," close quote.

     Did you or Mr. Emanuel propose acquiring the

Siegel rights to Mr. Marks for $15 million together with

a meaningful back end?

     A   I wasn't the one who made that offer.

102

Mr. Emanuel made that offer, and I specifically remember

that, because I remember when he was talking about the

back end, I remember thinking it was just something odd,

the way he had mentioned the back end.

    Q  Was --

    A  But I remember that he was the one who stated

that.

    Q  Was the offer by Mr. Emanuel for $15 million?

    A  Yes.

    Q  And did he mention what he had in mind with

respect to the meaningful back end?

    A  No.

    MR. WILLIAMSON:  Objection.  Indefinite as to

time and place.  Are you referring to that conversation?

    MR. BERGMAN:  Yes.

    MR. WILLIAMSON:  Okay.

    THE WITNESS:  No.

BY MR. BERGMAN:

    Q  Okay.  Do --

    A  I believe the offer was that if the fixed amount

was acceptable, that we would go on to work out a back

end.

    Q  Okay.  Mr. Marks goes on to testify -- and I am

omitting some of his testimony.  I'm at line 16 on page

169 -- "And then I," Mr. Marks, "asked if this was a

103

proposal that was conditioned on their doing due

diligence about the rights, and they said again in

substance and effect, 'No, it's not. We've done our due

diligence already. This is the offer.'"

       Do you recall that being said during this late

July or mid August telephone conversation?

       A    I don't recall that specifically, but it doesn't

sound like something I would say.

       Q    Do you recall --

       A    That sounds like an agent talking.

       Q    Do you recall anything else about the conference

call between you, Mr. Marks and Mr. Emanuel in mid

August?

       A    Not sitting here, no.

       Q    Again, did you make any notes of that

conversation?

       A    I may have. I don't know. It wasn't a long

conversation, nor a complicated one, so my guess is I did

not make notes. I didn't -- there weren't any in the

file.

       Q    Okay. Mr. Marks testified, again utilizing his

phone register at page 617, that there was a call from

you subsequent to the conference call on August 29, and

he couldn't recall whether or not he had responded to

that call.

104

in reference to any other facts if you want.  When did you have your very first conversation with either Laura or Joanne Siegel?

A   What was the first part of the question?  In relation to what?

Q   I was suggesting that if you could answer that question with respect -- in relation to the mid August telephone conversation that you had, whether it was a month or two months afterwards, but my --

A   Are you talking about the conversation with -- the conference call with Ari Emanuel and Kevin Marks?

Q   Correct.

A   It was long after that.  I believe it was the end of October of that year.

Q   End of October 2002?

A   Yes, mid to end, sometime in October.  I'm not -- I believe it was sometime in October, and the basis of that belief is the agreement between the Siegels and IP Worldwide --

Q   Is dated October -- as of October 3.

A   Right.  And it was signed towards the end of October.  So I believe the initial contact was early October.

Sometimes when I do agreements, when they're dated as of -- when they're dated as of, I -- that's when

106

there were sort of the parties came together. So I

believe the initial conversation may have been like right

at the beginning of August -- I mean, excuse me, right at

the beginning of October 2003.

    Q  How did that initial conversation, whenever it

occurred, come about? Who called who?

    A  Joanne Siegel called me.

    Q  And did she say how she had gotten your name or

number?

    A  Yes. She said she had gotten it from Jean, Jean

Peavy.

    Q  And what in substance did Laura Siegel say to

you at that time?

    A  It was Joanne, actually.

    Q  Oh, I'm sorry.

    MR. WILLIAMSON: Objection. Attorney-client.

    THE WITNESS: Without waiver of the privilege, I

can just tell you the introductory remarks were that she

had gotten my number from Jean Peavy, something to the

effect that "Jean Peavy likes you a lot and is very --

highly recommended you," something of that nature, and

that she was looking for an attorney and would be

interested to talk to me about representing her. That

was the sum and substance of it.

BY MR. BERGMAN:

107

MR. WILLIAMSON:  Objection.  Vague and ambiguous.

THE WITNESS:  I don't specifically recall, but it may have been that -- what was in his log where he said he didn't believe we spoke, but there was a call registered, so I may have called him for that purpose, but I don't specifically recall that phone call, probably because he didn't return it.

BY MR. BERGMAN:

Q   What else do you recall of the first conversation with Joanne Siegel?

A   That's it.

Q   How many days -- how did the conversation end?

A   I believe we set an appointment to meet.  I'm not certain, but I believe -- I have a vague recollection of meeting with Joanne and I believe Laura for lunch.

Q   Approximately --

A   We met in person.

Q   Approximately how long after that first call from Joanne?

A   Right away.

Q   Within a day or two?

A   I believe so.

Q   And where did you meet with them for lunch?

A   I don't recall.

109

Q    Would you tell me to the best of your recollection what was said by each of you at that meeting?

MR. WILLIAMSON:  Objection.  Attorney-client.

THE WITNESS:  No, I'm not going to tell you that, because after she told me she's interested in my providing legal services to her, even at that stage those conversations are protected by the attorney-client privilege.  I gave you the subject matter, but...

(Unanswered question.)

BY MR. BERGMAN:

Q    Did you at any time tell either Joanne or Laura Siegel that Mr. Emanuel had offered $15 million to acquire their rights?

A    Again, our -- those conversations at that point would be privileged.  Those communications between me and her would be privileged.

(Unanswered question.)

Q    Did you at any time disclose to either of the Siegels that you had been inquiring to purchase their rights?

A    Again, my -- you just asked me this same question, so I would say my answer is the same, but I believe, without disclosing my communications or their communications to me on that subject, I believe Mr. Marks

110

counsel in connection with this agreement?

    A   I believe, yes.

    Q   Who was that?

    A   George -- last name starts with a Z, George Zadorozny.  I'm not sure how to spell it.

    Q   And did you negotiate with that lawyer?

    A   I can't say for sure.  I believe so, but I...  I believe so.  The reason I can't say for sure is I also -- when I entered into the retainer agreement with the Siegels, I specifically recall negotiating with Mr. Zadorozny, and I believe Mr. Zadorozny was involved in this agreement as well, but I don't -- I don't recall if -- I believe I did, but I don't have a specific recollection of it.

    Q   And when did you enter into a retainer agreement with the Siegels?

    A   Before -- definitely before we filed suit, and I believe it was...  I can't give you a date.

    Q   Were there any prior drafts --

    A   I'd have to look at the -- I'd have to check my file.

    Q   Okay.  Were there any prior drafts of the October 3, '02 agreement prior to Exhibit 18?

    A   Yes.  It went through various drafts.

    Q   And --

114

like that, no.  I recall her saying that I was highly

recommended by Jean Peavy and that she wanted to talk to

me about representing her, and that soon thereafter we

met for lunch with I believe it was her and Laura, but it

wasn't with reference to -- it was that she wanted a

lawyer.

BY MR. BERGMAN:

    Q   When you got together with them at lunch --

    A   It didn't appear -- I can just tell from the

context it did not appear to me that at the time we were

speaking, she was currently represented.

    Q   When you met Joanne and Laura for lunch a few

days after the initial telephone conversation, did you

tell them that you had been speaking with Kevin Marks?

    A   You asked me that three times already.

    Q   Did you?

    A   I don't believe I told them that.  I don't have

a rec- -- I don't know.  I don't have a recollection of

that, but I may have referenced it.

    Q   Did you ask them if they were currently

represented by counsel?

    A   I already answered that question also.  No, I

don't believe I asked them that.  I believe it was

implicit in her asking -- saying that she wanted to talk

to me about representing her or needing a lawyer that she

135

STATE OF CALIFORNIA      )
                         ) ss
COUNTY OF LOS ANGELES    )


I, DAVID S. COLEMAN, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, nor in anywise interested in the outcome thereof.

In witness whereof, I have hereunto subscribed my name.


Dated: ___NOV 3 0 2006___


_____
DAVID S. COLEMAN
CSR No. 4613

# EXHIBIT F

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA
SIEGEL LARSON,

      Plaintiffs,

  vs.

WARNER BROS. ENTERTAINMENT
INC., et al.,

      Defendants.

No. 04-8400 (RSWL)(RZx)
     --and--
No. 04-8776 (RSWL)(RZx)

AND RELATED COUNTERCLAIMS.

## ORIGINAL

DEPOSITION OF JOANNE SIEGEL

Beverly Hills, California

Wednesday, August 2, 2006

Reported by:
DAVID S. COLEMAN
CSR No. 4613

Job No. 1-50935

www.sarnoffcourtreporters.com

Irvine • Los Angeles • San Francisco

phone 877.955.3855 • fax 949.955.3854



SARNOFF
Court Reporters and
Legal Technologies

```
1         Q    Did you discuss with any lawyer --

2              MR. TOBEROFF:  Just a second.  Before we get to

3    the next question, I did not -- I do not have -- I didn't

4    realize we were going to work off the same exhibits, so I

5    don't have a set to look at.

6              MR. ZISSU:  Why don't you borrow these.  Oh, no.

7    Why don't you borrow those.  Sorry.

8              MR. TOBEROFF:  That would be great.  If I

9    could...  Sorry.

10             MR. ZISSU:  That's all right.

11             MR. TOBEROFF:  Let me just organize these for a

12   second.

13             MR. ZISSU:  They're in order.

14             MR. ZISSU:  Could you read back the last

15   question and answer?

16             (Record read as follows:

17             "Q    Did any lawyer help you write

18             this letter?

19             "A    No.

20             "Q    Did you discuss with any

21             lawyer -- ")

22             THE WITNESS:  Was it about this letter?

23   BY MR. ZISSU:

24        Q    Did you discuss with any lawyer the content of

25   this letter before you sent it?
```

                                                              33

1        A    No.

2        Q    Now, if you look at the next -- the second page,

3   in the fourth paragraph down --

4        A    Yes.

5        Q    -- there is -- the second sentence reads as

6   follows:  "The beast hungers for more," and then the next

7   sentence reads, "Just like the Gestapo, your company

8   wants to strip us naked of our legal rights," close

9   quote.

10            In what way did you believe that the defendants

11  were stripping you of your legal rights?

12       A    You mean in connection with what?

13       Q    In connection with the letter you wrote.  What

14  did you mean in your letter?

15       A    Well, the February contract was so shocking that

16  we felt -- that's the way I felt.

17       Q    And in what way did you feel it was shocking?

18            MR. TOBEROFF:  Now you're getting back into the

19  same interpretation of a 56-page document.  It involves

20  the attorneys, and that contract was obviously

21  interpreted for her by her attorneys, and she can't --

22  first of all, you're not asking her to articulate that,

23  but I'm instructing her not to answer information she got

24  through discussions with her attorneys.

25            MR. ZISSU:  Well, I just want to point out two

34

1    Q    Isn't it a fact that Mr. Toberoff began

2    representing you in late 2002 or early 2003?

3    A    It was late 2002.

4    Q    And didn't he get the files, which included this

5    document, at about that time?

6    A    I don't know when he got it.

7    Q    I'm looking --

8    MR. TOBEROFF: I can represent to you this

9    October 26 letter was not in the files that I received

10    from Kevin Marks.

11    MR. ZISSU: I'm looking for the copy of it, the

12    October 26 letter, which was marked yesterday, I believe.

13    It's in a separate pile here somewhere.

14    Q    Were you also dealing with Bruce Ramer at the

15    Gang Tyre firm?

16    A    When?

17    Q    In the period when Kevin Marks was representing

18    you.

19    A    Oh, that's the firm.

20    Q    Yes.

21    And Bruce Ramer was also working for you then.

22    Correct?

23    A    I -- yes, I guess.

24    MR. ZISSU: Marc, it would be really helpful if

25    you would help me so I can reduce my time looking for

41

1
2
3
4
5
6
7
8          I, JOANNE SIEGEL, do hereby declare under
9    penalty of perjury that I have read the foregoing
10   transcript; that I have made any corrections as appear
11   noted, in ink, initialed by me, or attached hereto; that
12   my testimony as contained herein, as corrected, is true
13   and correct.
14          EXECUTED this _17th_ day of _September_,
15   20_06_, at _MARINA DEL REY_, _CA_.
                    (City)                (State)
16
17
18
19   _____
     JOANNE SIEGEL
20
21
22
23
24
25

140

1

2

3

4      I, the undersigned, a Certified Shorthand

5  Reporter of the State of California, do hereby certify:

6      That the foregoing proceedings were taken

7  before me at the time and place herein set forth; that

8  any witnesses in the foregoing proceedings, prior to

9  testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under by

12  direction; further, that the foregoing is an accurate

13  transcription thereof.

14      I further certify that I am neither

15  financially interested in the action nor a relative or

16  employee of any attorney of any of the parties.

17      IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19

20  Dated: _____AUG 1 8 2006_____

21

22

     DAVID S. COLEMAN, CSR NO. 4613

23

24

25

EXHIBIT F
Page 108

# EXHIBIT G

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA
SIEGEL LARSON,

        Plaintiffs,

      vs.                No. 04-8400 (RSWL)(RZx)
                           -and-

WARNER BROS. ENTERTAINMENT    No. 04-8776 (RSWL)(RZx)
INC., et al.,

        Defendants.

AND RELATED COUNTERCLAIMS.

# ORIGINAL

DEPOSITION OF LAURA SIEGEL LARSON

Beverly Hills, California

Tuesday, August 1, 2006

Reported by:
DAVID S. COLEMAN
CSR No. 4613

Job No. 1-50934

www.sarnoffcourtreporters.com

Irvine  ·  Los Angeles  ·  San Francisco

phone 877.955.3855  ·  fax 949.955.3854

**SARNOFF**
*Court Reporters and
Legal Technologies*

EXHIBIT G

1    KCAL in Los Angeles, which was owned by the Disney

2    company at that time.

3         Q    And since you have been disabled, you have not

4    been employed?

5         A    Correct.

6         Q    When was the first time you had any

7    communication with Marc Toberoff?

8         A    I believe it was in late 2002.

9         Q    Okay.  And do you remember the occasion of

10   meeting him?

11        A    My mother had spoken to him on the phone.  She

12   had had a conversation with Jean Peavy, and Jean Peavy

13   recommended him, and subsequent to that we met.

14        Q    And who is Jean Peavy?

15        A    Jean Peavy is an old family friend, and she is

16   the sister of Joe Shuster.

17        Q    Do you know whether that telephone conversation

18   was initiated by Ms. Peavy or by your mother?

19        A    I don't know.

20        MR. ZISSU:  Let's mark as Defendants' Exhibit 3

21   a document entitled "Defendants'/Counterclaimant's First

22   Set of Requests for the Production of Documents and

23   Things."

24             (Defendants' Exhibit 3 marked.)

25   BY MR. ZISSU:

                                                              17

1          MR. TOBEROFF:  Calls for a narrative.

2          You can answer.

3          THE WITNESS:  We decided to enter into an

4   agreement with IP Worldwide for Mr. Emanuel to represent

5   us in negotiations for our rights.

6   BY MR. ZISSU:

7          Q   And was that agreed to in a telephone

8   conversation or another face-to-face meeting?

9          A   We discussed it, and it was probably both in a

10  face-to-face meeting and by telephone, but I don't really

11  recall.

12         Q   Did you go to his office, Mr. Emanuel's

13  office --

14         A   Yes.

15         Q   -- again?

16         A   Yes.

17         Q   And how many -- in terms of time frame, how much

18  after the first meeting did that take place?

19         MR. TOBEROFF:  Ambiguous.

20         THE WITNESS:  I believe the next meeting lasted

21  about 45 minutes.

22  BY MR. ZISSU:

23         Q   And how -- and it was -- you're not sure --

24         A   Not sure.

25         Q   -- whether it was two weeks later or a week

33

1    later?

2        A    No.

3        Q    Was it after the holidays or before?

4        A    I believe so.

5        Q    And who was at that meeting?

6        A    My mother, myself, Mr. Toberoff and Mr. Emanuel.

7        Q    And you came to some kind of an agreement?

8        A    Yes.

9        Q    And what was that agreement?

10       A    We decided that Mr. Emanuel would be a

11   negotiator for us, and Mr. Toberoff would serve as our

12   attorney.

13       Q    And when you say you decided that Mr. Emanuel

14   would serve you, did you agree that Intellectual

15   Properties Worldwide, LLC would be the entity through

16   which you would work?

17       A    Yes.

18       Q    And do you know who owns Intellectual Properties

19   Worldwide, LLC?  Today do you know?

20       A    Today I don't know.

21       Q    Did you know at the time in early 2003 or late

22   2002?

23       A    My understanding was that it was a partnership

24   between Mr. Emanuel and Mr. Toberoff.

25       Q    And do you know who J. Todd Harris is?

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1    understanding of what was stated in this opinion than you

2    have previously testified today?

3        A    No.

4        Q    Did --

5            MR. TOBEROFF:  How we doing on time?

6            MR. ZISSU:  How much do we have left on the

7    clock?

8            (Discussion held off the record.)

9            MR. ZISSU:  Defendants' Exhibit 41.

10            (Defendants' Exhibit 41 marked.)

11    BY MR. ZISSU:

12        Q    This is a letter dated from Laura Siegel Larson

13    and Joanne Siegel to Kevin Marks dated September 21,

14    2002.

15            Are you familiar with this letter?

16        A    Yes.

17        Q    In the -- I think it's the third sentence, it

18    says, "Therefore due to irreconcilable differences, after

19    four years of painful and unsatisfying negotiations, this

20    letter serves as formal notification that we are totally

21    stopping and ending all negotiations with DC Comics,

22    Inc., it's parent company AOL Time Warner and all of its

23    representatives and associates, effective immediately,"

24    and my question is, was there some prior informal

25    notification given to anyone to the same effect?

261

1   A I don't believe so.

2   Q Did anyone help you write this letter?

3   A My mom and I wrote it together.

4   Q Had you met Mr. Toberoff at this point?

5   A No.

6   Q And you hadn't consulted him about this letter?

7   A No.

8   Q So what was the answer about -- there was no

9 prior informal notification?  Was that your testimony?

10   A I don't believe so.

11   Q Were you repudiating the October 19, 2001

12 letter?

13    MR. TOBEROFF:  Objection.  Calls for a legal

14 conclusion.

15    THE WITNESS:  I don't know what you mean by

16 that.

17 BY MR. ZISSU:

18   Q Well, how would you terminate what you were

19 doing in relation to the October 19, 2001 letter?

20   A Well, the --

21    MR. TOBEROFF:  Objection.  Vague and ambiguous.

22    THE WITNESS:  The October 19th letter was no

23 longer at issue.  What was at issue was this February

24 2002 document.

25 BY MR. ZISSU:

262

1

2

3

4

5

6

7

8         I, LAURA SIEGEL LARSON, do hereby declare under

9    penalty of perjury that I have read the foregoing

10   transcript; that I have made any corrections as appear

11   noted, in ink, initialed by me, or attached hereto; that

12   my testimony as contained herein, as corrected, is true

13   and correct.

14         EXECUTED this _17th_ day of _September_,

15   20_06_, at _Playa Del Rey,_ , _California_ .
                         (City)                  (State)

16

17

18

19        _Laura Siegel Larson_
          LAURA SIEGEL LARSON

20

21

22

23

24

25

278

1

2

3

4          I, the undersigned, a Certified Shorthand

5   Reporter of the State of California, do hereby certify:

6          That the foregoing proceedings were taken

7   before me at the time and place herein set forth; that

8   any witnesses in the foregoing proceedings, prior to

9   testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under by

12  direction; further, that the foregoing is an accurate

13  transcription thereof.

14          I further certify that I am neither

15  financially interested in the action nor a relative or

16  employee of any attorney of any of the parties.

17          IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19          AUG 1 8 2006

20  Dated: _____

21

22

23          DAVID S. COLEMAN, CSR NO. 4613

24

25

# EXHIBIT H

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA        )
SIEGEL LARSON,                 )
                               )
          Plaintiffs,          )
                               )
     vs.                       )      No. 04-8400 (RSWL)(RZx)
                               )
WARNER BROS. ENTERTAINMENT )          -and-
INC., et al.,                  )
                               )      No. 04-8776 (RSWL)(RZx)
          Defendants.          )
_____)
AND RELATED COUNTERCLAIMS.

DEPOSITION OF KEVIN S. MARKS

Beverly Hills, California

Saturday, October 7, 2006

Volume 1

Reported by:

DAVID S. COLEMAN

CSR No. 4613



A    I returned that call that day or subsequently, yes.

Q    Can you tell me to the best of your recollection what Mr. Toberoff said during that conversation and what you said?

A    Yes. I think Mr. Toberoff started the call by saying that he had called me earlier and that I hadn't returned his call, for which I apologized, and then he introduced himself. He said he was a lawyer and that he represented individuals that had interests in rights to movie and other properties that had come into those rights either by way of reversions under the law or reversions under Guild agreements. I also recall him saying that he had a separate company that was in the business of acquiring intellectual property rights. I recall him saying that he was interested in the Superman property and the Superboy property and had understood that I was representing the Siegel family interest, and he asked if he could talk to me about that.

My recollection is that my response was that we were very far along with DC Comics and at a documentation phase. I may have said DC Comics or Warner Bros. because I do think that part of the conversation, I have a recollection of Mr. Toberoff saying that he had dealt with Warner Bros. before, the people at Warner Bros., in

152

connection with the "Wild Wild West" and rights involving the "Wild Wild West" in which some deal had been made that led to the making of the feature film.

Q   Do you recall anything else of that conversation?

A   That's my best recollection as I sit here today.

Q   Do you recall telling Mr. Toberoff that you had closed a deal with DC regarding the Siegel interest?

MR. TOBEROFF:  Leading.

THE WITNESS:  My best recollection is how I described it, but I think I said we were in the process of -- in the documentation phase, were trying to document a deal.

BY MR. BERGMAN:

Q   And do you recall what response, if any, Mr. Toberoff made?

A   I don't.

Q   And do you recall anything further about the conversation or how it ended?

A   I don't recall how it ended.

Q   Did you as of February 6, '02 believe that you had closed a deal with DC for the Superman interest?

MR. MARMARO:  The question is vague and ambiguous, calls for a legal conclusion, and again I am going to defer to Mr. Toberoff whether he has any

153

records, that what must have happened is I returned the call, didn't reach Mr. Toberoff; he called back, and we -- on the 30th, and we spoke subsequent, either on that day or subsequent to that day.

BY MR. BERGMAN:

    Q  Would it be accurate to say that you do not recall speaking -- actually speaking with Mr. Toberoff twice during the last week of July '02?

    A  I recall one conversation.

    Q  Okay. Can you tell me to the best of your recollection what was said by each of you and Mr. Toberoff in that conversation?

    A  I think Mr. Toberoff said he was -- wanted to check in with me to see where we were in our dealings with DC Comics, and I think I told him then that -- and I may have also said it in our first conversation -- that we had a confidentiality agreement with DC Comics, and I didn't feel at liberty to discuss the status of our dealings with him.

    Mr. Toberoff said, "Can you tell me what DC Comics offered you," and I said, "No. We have a confidentiality agreement."

    And I believe Mr. Toberoff said, "Would you be willing to enter into negotiations with me," and I believe I said, "Initiating negotiations, no. That's

166

something that makes me very uncomfortable.  If you have

an offer, present it to me, and I'll present it to the

client."

    Q    Do you recall what he said in response?

    A    I think that was the summary of the substance of

the conversation other than goodbyes.

    Q    If you turn the page to 616, you will see a

reference to a conference call, quote, "with Mark, Kevin,

and Ari Emanuel at Endeavor," close quote.  There also

appears to be a notation, "approximately 20 minutes."

      Do you see that?

    A    Yes, and it looks like the "20" is crossed out,

and it says "5 to 10" above it.

    Q    I see.  Okay.

      Off the record.

      (Discussion held off the record.)

BY MR. BERGMAN:

    Q    Would you describe to the best of your

recollection and as specifically as possible what was

said by each of the three of you during that

conversation?

    A    I think this record may actually be setting up a

conference call rather than the conference call, but

ultimately there was a conference call at this time

period.

                                                      167

Q    I see.  Okay.

Do you recall how long after August 7 that conference call took place?

A    Within the next day or two.

Q    I see.

Would you tell me --

A    If not on that date.

Q    -- what was involved and what was said in that conversation?

A    Yes.  Mr. Toberoff and Mr. Emanuel both spoke. I can't completely tell you who said what, but I think Mr. Toberoff may have very briefly referenced past conversations, and then I believe it was Mr. Emanuel who explained that either they or some other people or perhaps some members of the Endeavor Talent Agency had set up a fund or were in the process of setting up a fund to acquire intellectual property rights which they would then package with clients from the Endeavor Talent Agency, then take those to studios to exploit the package, and they understood that the Siegel family had an interest in the termination rights and viewed that as perhaps the most valuable of properties and wanted to make a proposal.

Q    Okay.  What did you say?

A    I said in substance and effect, "I'm listening."

168

And I'm not sure who spoke, but they made a proposal of $15 million and what was described as a meaningful back end, which I understood to be a contingent compensation position or a royalty position in the exploitation of the property.

Q    And was that for the entire Siegel Superman interest? Did it include Michael's?

A    I don't think that was discussed, but that's how I understood it.

Q    Did they say -- attempt to quantify what that meaningful back end would be?

A    They did not. I believe I asked, but they did not.

Q    And what else did you say?

A    I asked if there was anything else, and they said "No," and then I asked if this was a proposal that was conditioned on their doing due diligence about the rights, and they said again in substance and effect, "No, it's not. We've done our due diligence already. This is the offer."

Q    Anything else you can recall of that conversation?

A    I think I said, "Thank you, and I will communicate this to the client" or "take this back to the client."

169

Q    And did you in fact do that?

MR. MARMARO:  Before you answer the question, is there any objection to the answer?  The question calls for a communication between Mr. Marks and the clients.

MR. TOBEROFF:  Without a waiver, no, whether or not you communicated that to the client.

MR. MARMARO:  A yes or a no.

THE WITNESS:  Yes.

BY MR. BERGMAN:

Q    And was that a communication within let's say a week of the conference call?

A    Yes.

Q    Your phone register, 617, indicates a call from Mr. Toberoff on August 29.  Was that call returned?

A    I -- was it returned.  I don't know.

MR. TOBEROFF:  Which number -- Bates number?

MR. BERGMAN:  617.

Q    Do you recall having a telephone conversation with Mr. Toberoff subsequent to the conference call?

A    The best I can say is that it may be that Mr. Toberoff called to see if I had a response, and I could only have said at that time that the clients had been away, and I don't have a response.  I have -- I am not certain about that.

Q    Did there ever come a time when you communicated

170

STATE OF CALIFORNIA )
) ss
COUNTY OF LOS ANGELES )

I, DAVID S. COLEMAN, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, nor in anywise interested in the outcome thereof.

In witness whereof, I have hereunto subscribed my name.

Dated: **OCT 1 7 2008**

_____
DAVID S. COLEMAN
CSR No. 4613