1  KENDALL BRILL & KLIEGER LLP
   Richard B. Kendall (90072)
2     rkendall@kbkfirm.com
   Laura W. Brill (195889)
3     lbrill@kbkfirm.com
   Nicholas F. Daum (236155)
4     ndaum@kbkfirm.com
   10100 Santa Monica Blvd., Suite 1725
5  Los Angeles, California  90067
   Telephone:   310.556.2700
6  Facsimile:    310.556.2705

7  Attorneys for Defendants Marc Toberoff,
   Pacific Pictures Corporation, IP
8  Worldwide, LLC, and IPW, LLC

9              UNITED STATES DISTRICT COURT

10     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

11 DC COMICS,                          Case No: CV 10-03633 ODW (RZx)

12              Plaintiff,             **DECLARATION OF NICHOLAS
                                       F. DAUM IN OPPOSITION TO
13      vs.                            DC COMICS' MOTION TO
                                       COMPEL THE PRODUCTION
14 PACIFIC PICTURES CORPORATION;       OF DOCUMENTS AND
   IP WORLDWIDE, LLC; IPW, LLC;        FURTHER RESPONSES TO
15 MARC TOBEROFF, an individual;       INTERROGATORIES**
   MARK WARREN PEARY, as personal
16 representative of the ESTATE OF     Hon. Otis D. Wright II, U.S.D.J.
   JOSEPH SHUSTER; JEAN ADELE          Hon. Ralph Zarefsky, U.S.M.J.
17 PEAVY, an individual; JOANNE
   SIEGEL, an individual; LAURA        Complaint filed:  May 14, 2010
18 SIEGEL LARSON, an individual,       Trial Date:  None Set
   and DOES 1-10, inclusive,
19                                      Date:    April 25, 2011
                                       Time:    10:00 a.m.
20
              Defendants.
21

22

23

24

25

26

27

28

## DECLARATION OF NICHOLAS F. DAUM

I, Nicholas F. Daum, declare as follows:

1.      I am an attorney at the law firm of Kendall Brill & Klieger LLP, counsel of record for defendants Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC, and IPW, LLC in the above-captioned action.  I am a member in good standing of the State Bar of California and am admitted to practice before this Court.  Except where otherwise stated, I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.      Attached hereto as Exhibit "A" is a true and correct copy of a document subpoena from the United States Attorney's Office – Central District of California to Marc Toberoff, served on my firm.

3.      Attached hereto as Exhibit "B" is a true and correct copy of a letter dated September 10, 2011, from Brian Klein of the United States Attorney's Office for the Central District of California to defendants' counsel Richard Kendall, memorializing certain understandings of the Government related to privilege.

4.      Attached hereto as Exhibit "C" is a true and correct copy of a September 17, 2011 letter from Richard Kendall to Beong-Soo Kim, concerning privilege issues.

5.      Attached hereto as Exhibit "D" is a true and correct copy of DC Comics' Motion to Reopen Discovery, to Compel Production of Documents, and to Compel the Further Deposition of Kevin Marks, filed on March 2, 2009, in the related case of *Siegel v. Warner Bros. Ent. Inc.*, Case No. 04-8400 ODW (RZx) ("*Siegel*"), at Docket No. 476.

6.      Attached hereto as Exhibit "E" is a true and correct copy of relevant excerpts of the *Siegel* Court's Final Pre-Trial Conference Order, which denied DC Comics' Motion to Reopen Discovery, to Compel Production of Documents, and to Compel the Further Deposition of Kevin Marks, filed on March 13, 2009, in *Siegel,* at Docket No. 478.

7.      Attached hereto as Exhibit "F" is a true and correct copy of relevant excerpts of the October 6, 2006 deposition of Kevin Marks in *Siegel*.

8.      Attached hereto as Exhibit "G" is a true and correct copy of the Court's order granting Plaintiff's Motion for Entry of a Partial Judgment under Fed. R. Civ. P. 54(b) and For Stay of Remaining Claims Pending Appeal, filed on March 15, 2011 in *Siegel*, at Docket No. 659.

9.      Attached hereto as Exhibit "H" is a true and correct copy of the Judgment Pursuant to Fed. R. Civ. P. 54(b), filed on March 15, 2011 in *Siegel*, at Docket No. 660.

10.      For the convenience of the Court, attached hereto as Exhibit "I" is a true and correct copy of Defendant Marc Toberoff's Response to Plaintiff DC Comics' First Set of Interrogatories, dated January 24, 2011.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on April 11, 2011, in Los Angeles, California

By:  /s/Nicholas F. Daum

Nicholas F Daum

# EXHIBIT A



*UNITED STATES ATTORNEY'S OFFICE*
*CENTRAL DISTRICT OF CALIFORNIA*
*UNITED STATES COURTHOUSE*
*312 NORTH SPRING STREET*
*LOS ANGELES, CALIFORNIA 90012*

## FAX TRANSMISSION COVER PAGE

DATE:    September 13, 2010

FROM:    Annie L. Nelson                Richard B. Kendall
         Criminal Investigator          Kendall Brill & Kleiger LLP
         (213) 894-0762                 310-556-2705 Fax
         (213) 894-6269 fax             310-272-7900 Office

GJ Subpoena for Marc Toberoff

Pages 7

AO 110 (Rev. 04/07) Subpoena to Testify Before Grand Jury

# United States District Court

## Central District of California

TO:

Marc Toberoff

**SUBPOENA TO TESTIFY
BEFORE GRAND JURY**

**SUBPOENA FOR:**
☐ Person   ☒ Document(s) or Object(s)

☐ YOU ARE HEREBY COMMANDED to appear and testify before the Grand Jury of the United States District Court at the place, date, and time specified below.

| PLACE | COURTROOM |
|---|---|
| UNITED STATES COURTHOUSE 312 NORTH SPRING STREET LOS ANGELES, CALIFORNIA 90012 | Room 1346 13th Floor |
| | DATE AND TIME September 28, 2010 at 9:30 a.m. |

☒ YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):

## SEE ATTACHMENT

☐ Please see additional information on reverse
This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| CLERK | DATE |
|---|---|
| *Jerry Nafisi* | September 13, 2010 |
| (By) Deputy Clerk Terry Nafisi, Clerk of the Court | |

This subpoena is issued on application of the United States of America

ANDRÉ BIROTTE JR.
United States Attorney

Brian E. Klein
Assistant United States Attorney
United States Courthouse
312 North Spring Street, 11th Floor
Los Angeles, California 90012
Telephone: (213) 894-6920

"If not applicable, enter 'none'

Agent: Annie L. Nelson
Telephone:(213) 894-0762

Note: An Agent of the U.S. Department of Justice will deliver the above-mentioned document(s) to the Grand Jury should you desire to volunteer them to the Grand Jury in advance of the Grand Jury date indicated above.

## ATTACHMENT TO SUBPOENA

### Marc Toberoff

Produce the following:

The "SUPERMAN - MARC TOBEROFF TIMELINE" and its enclosures, which were provided anonymously to Warner Brothers in or about 2005-2006 and became the subject of litigation in Siegel, et al. v. Warner Bros. Entertainment Inc., et al., 04-CV-8400, and related litigation.

### Definitions and Instructions:

(1) The term "documents" means any and all writings and includes but is not limited to agreements, emails, letters, contracts, notes, memoranda, and images.

(2) If anyone has redacted any portion of any document called for by this subpoena, stamp the word "redacted" on each portion of the document that was redacted.

(3) If any otherwise responsive document was, but is no longer, in existence or in your possession, custody, or control, identify such document as completely as possible and provide the following information (if applicable):

    (a) The manner of disposal, including destruction, loss, discarding, or any other means of disposal;
    (b) The date of disposal;
    (c) The reason for disposal;
    (d) The person authorizing the disposal and person disposing of the document; and
    (e) The present custodian and location of the document.

(4) In the event that any document called for by this subpoena is to be withheld on the basis of any claim of privilege, as to each such document:

    (a) Identify the nature of the privilege which is being claimed and all facts upon which any such privilege is based; and
    (b) Provide the following information (if applicable):
        (i)  The date of the creation of the document and the date the document bears;
        (ii) The name, the present or last known home and business address, the telephone numbers, the title (or position) and the occupation of those individuals who prepared, produced, reproduced, or who were recipients of, said document;
        (iii) A description of the document sufficient to identify it without revealing the information for which the privilege is claimed, including a description of the type of document and the subject matter of the document;
        (iv) The number of pages of the document;
        (v) Each and every fact or basis upon which such privilege is claimed;
        (vi) The location of the document; and
        (vii) The custodian of the document.

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

**MT 00003**



**U. S. Department of Justice**
*United States Attorney*
*Central District of California*

*Brian E. Klein*
*Assistant United States Attorney*
*(213) 894-6920*

United States Courthouse
312 North Spring Street
Los Angeles, California

September 13, 2010

Marc Toberoff

    Re: <u>Federal Grand Jury Subpoena</u>

Dear Sir or Madam:

    The enclosed subpoena has been issued in connection with an
official criminal investigation being conducted by the **United
States Department of Justice**. The subpoena requires that a
custodian of records from your business appear before the grand
jury and produce the records described in the subpoena on the
date and at the time specified on the subpoena.

    As a convenience to you, you can produce the demanded
documents by mail or in person to **Criminal Investigator Annie
Nelson** of the **United States Department of Justice** who will
deliver the requested documents to the grand jury. If you would
like to do so in order to avoid a personal appearance, you must
(a) deliver or mail the documents so that they are received in
advance of the date specified on the subpoena; and (b) have an
appropriate custodian of records from your business fill in the
declaration enclosed with this letter. Unless you comply with
both of those requirements, a custodian of records must appear in
person to produce the documents.

    If you choose to mail the records, please send them to the
following address:

        United States Department of Justice
        U.S. Attorney's Office
        Attn: Investigator Nelson
        312 N. Spring Street, 11th Floor
        Los Angeles, CA 90012

Exhibit A
Page 6

**MT 00004**

Because this subpoena relates to an ongoing criminal
investigation, this Office requests that you not disclose the
existence of or compliance with the subpoena for an indefinite
period of time or until the Office notifies you that the
investigation has been completed or until a court orders
disclosure. Premature disclosure could impede the investigation
and interfere with the enforcement of the law. In addition, you
do not have an obligation under Right to Financial Privacy Act,
12 U.S.C. § 3401, et seq. to disclose to a customer your receipt
of or compliance with a federal grand jury subpoena for that
customer's records. We request that you give this Office advance
notice if you plan to disclose the existence of or compliance
with the subpoena.

    If you have any questions regarding compliance with this
subpoena, please call me at (213) 894-6920 or **Investigator Annie
Nelson** at **(213) 894-0762.**


Very truly yours,

ANDRÉ BIROTTE JR.
United States Attorney

$\mathcal{B}$— $\mathcal{E} \cdot \mathcal{K} \mathcal{L}$

BRIAN E. KLEIN
Assistant United States Attorney

Enclosures

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

**MT 00005**

## DECLARATION OF CUSTODIAN CERTIFYING BUSINESS RECORD
(Please type or print legibly except for signature.)

I, _____, hereby declare as follows:
          (name)

(1) I am a custodian of records for _____,
                                           (name of business or entity)

and in that capacity am knowledgeable about the matters set forth

herein.

    (a) My job title/position is:

    (b) I have been employed in this capacity for _____
                                      (duration)

and by the aforementioned business/entity for _____.
   (duration)

    (c) My job duties are:

    (d) I am knowledgeable about the matters set forth herein and the relevant record-keeping practices of the aforementioned business/entity based upon (check all that apply):

      [ ] Training.

      [ ] Familiarity with relevant policy/policies.

      [ ] Hands-on experience.

      [ ] Supervision of one or more others with hands-on experience.

      [ ] Other. Describe:

(2) Attached hereto or enclosed herewith are *originals/*
*true and correct duplicates* of a record or records of a regularly

conducted activity of the business or entity named above.

(Circle either "originals" or "true and correct duplicates" and

Exhibit A
This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com
**MT 00006**

strike out the other term.)

(3) I certify that the attached record(s):

    (a) was/were made at or near the time of the occurrence of the matters set forth therein,

    (b) was/were made by, or from information transmitted by, a person with knowledge of those matters;

    (c) was/were kept in the course of the regularly conducted activity;

    (d) was/were made by and in the course of the regularly conducted activity as a regular practice;

    (e) if not original records, are exact duplicates of original records.

    I declare under penalty of perjury that the foregoing is

true and correct. Dated _____ and
                       (date document was signed)

executed at _____
       (place document was signed)

_____
       (signature)

_____
       (typed or printed name)

Exhibit A
Page 9

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

MT 00007

# EXHIBIT B

**U. S. Department of Justice**

*United States Attorney*
*Central District of California*

---

*Beong-Soo Kim*
*Brian E. Klein*
*Assistant United States Attorneys*
*(213) 894-3868/6920*

*312 North Spring Street*
*Los Angeles, California 90012*

September 10, 2010

<u>Via E-mail</u>

Richard B. Kendall
Kendall Brill & Kleiger LLP
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California 90067

Re:    <u>Documents Delivered to Warner Brothers With</u>
<u>"SUPERMAN - MARC TOBEROFF TIMELINE"</u>

Dear Mr. Kendall:

In connection with an ongoing criminal investigation, it is the understanding of the United States Attorney's Office for the Central District of California ("the Government") that your client Marc Toberoff wishes to provide the Government with copies of the documents ("MT documents") enclosed with the "SUPERMAN - MARC TOBEROFF TIMELINE" that we understand were provided anonymously to Warner Brothers in or about 2005-2006 and became the subject of litigation in <u>Siegel, et al. v. Warner Bros. Entertainment Inc., et al.</u>, 04-CV-8400, and related litigation.

In the event that you provide these documents to the Government voluntarily, this letter will serve to memorialize the following:

First, Mr. Toberoff has obtained all relevant permissions and consents needed (if any) to provide the MT documents and related information to the Government.

Second, the Government will maintain the confidentiality of the MT documents and related information and will not provide the MT documents and related information to non-governmental third parties except as may be required by law or court order.  In addition, the Government will return the MT documents to you and your client as soon as we determine that we no longer need them.

Third, to the extent attorney work product or communications protected by the attorney-client privilege are shared with the Government pursuant to this letter agreement, Mr. Toberoff is sharing them as a selective and limited disclosure in reliance on the Government's agreement that, in recognition of his objective to preserve any and all applicable privileges, the Government

1

Letter to Richard B. Kendall
September 10, 2010

will keep them confidential and not disclose them to any non-governmental third parties (except as may be required by law or court order).

Lastly, nothing in this letter agreement or in Mr. Toberoff's disclosure of the MT documents and related information is intended to waive any applicable privilege or protection available under law.

Please let us know as soon as possible if anything in this agreement is inaccurate.  We will assume acceptance of its terms upon receipt of the MT documents.

Very truly yours,

ANDRÉ BIROTTE JR.
United States Attorney


_____
BEONG-SOO KIM
BRIAN E. KLEIN
Assistant United States Attorneys

2

# EXHIBIT C

**K** Kendall Brill Klieger

writer's direct:
310.272.7900 telephone
310.272.7936 facsimile
rkendall@kbkfirm.com

September 17, 2010

## CONFIDENTIAL COMMUNICATION

**VIA MESSENGER**

Beong-Soo Kim, Brian E. Klein
Assistant United States Attorneys
United States Attorney
Central District of California
312 N. Spring Street
Los Angeles, CA 90012
_brian.klein@usdoj.gov_

Re:    Documents Delivered to Warner Brothers with "SUPERMAN - MARC TOBEROFF TIMELINE"

Dear Mr. Klein:

We are in receipt of the Grand Jury subpoena issued by your office on September 13, 2010.  As demanded by the subpoena, and in an effort to assist the Government in its ongoing criminal investigation, Mr. Toberoff  provides hereunder the "SUPERMAN – MARC TOBEROFF TIMELINE" (the "Timeline") and its enclosures, which were provided anonymously in three different packages (Bates Nos. Q001-0289; Q0290-0561; Q0562-0839) to Warner Brothers executives in or about 2005-2006 and became the subject of litigation in *Siegel et al. c. Warner Bros. Entertainment Inc., et al.*, 04-CV-8400 (C.D. Cal.) and related litigation.

This response to the Grand Jury's subpoena is made subject to and without waiver of the attorney-client privilege, work product immunity, or any other privilege applicable to these documents.  The Timeline itself and many of the enclosed documents are clearly subject to the attorney-client privilege and/or work-product immunity, and we are providing them subject to our mutual understanding that providing such documents in response to your subpoena shall not constitute a waiver of any applicable privilege or immunity.

Moreover, the provision of these documents is expressly made in reliance upon the Government's representations, in its letter of September 10, 2010, that (i) "the Government will maintain the confidentiality of the MT documents and related information and will not provide the MT documents and related information to non-governmental third parties except as may be required by law or court order"; (ii) "the Government will return the MT documents to you and your client as soon as we determine that we no longer need them"; (iii) "to the extent attorney work product or communications protected by the attorney client privilege are shared with the Government . . . Mr. Toberoff is sharing them as a selective and limited disclosure in reliance on the Government's agreement that, in recognition of his objective to preserve any and all

**Kendall Brill & Klieger LLP**

10100 Santa Monica Blvd.   Suite 1725   Los Angeles, CA 90067   telephone 310.556.2700   facsimile 310.556.2705   www.kbkfirm.com

Exhibit C
Page 12

September 17, 2010                                   **CONFIDENTIAL COMMUNICATION**
Page 2

applicable privileges, the Government will keep them confidential and not disclose them to any non-governmental third parties (except as may be required by law or court order)"; and (iv) "nothing in Mr. Toberoff's disclosure of the MT documents and related information is intended to waive any applicable privilege or protection available under law."

Any privileged documents being produced to the Government pursuant to the subpoena are also subject to a common interest/joint prosecutorial privilege. *See Sedlacek v. Morgan Whitney Trading Group*, 795 F. Supp. 329, 330 (C.D. Cal. 1992) (communications between civil litigants and government investigating similar wrongdoing subject to joint prosecution/common interest privilege); *United States ex rel. Burroughs v. DeNardi Corp.*, 167 F.R.D. 680, 686 (S.D. Cal. 1996) (same). The privilege is particularly applicable here given Mr. Toberoff and the Government's common interest in investigating the wrong committed against Mr. Toberoff and his law firm through the theft of these documents and creation of the Timeline.

Please let us know if we may be of further assistance.

Very truly yours,

Richard B. Kendall

Enclosures

cc:    Marc Toberoff, Esq.

Exhibit C

Page 13

# EXHIBIT D

1  WEISSMANN WOLFF BERGMAN
       COLEMAN GRODIN & EVALL LLP
2  Michael Bergman (SBN 37797)
   Anjani Mandavia (SBN 94092)
3  Adam Hagen (SBN 218021)
   9665 Wilshire Boulevard, Ninth Floor
4  Beverly Hills, California 90212
   Telephone: (310) 858-7888
5  Fax: (310) 550-7191

6  FROSS ZELNICK LEHRMAN & ZISSU, P.C.
   Roger L. Zissu (Admitted *pro hac vice*)
7  James D. Weinberger (Admitted *pro hac vice*)
   866 United Nations Plaza
8  New York, New York 10017
   Telephone: (212) 813-5900
9  Fax: (212) 813-5901

10 PERKINS LAW OFFICE, P.C.
   Patrick T. Perkins (Admitted *pro hac vice*)
11 1711 Route 9D
   Cold Spring, New York 10516
12 Telephone: (845) 265-2820
   Fax: (845) 265-2819

13

14 Attorneys for Defendants and Counterclaimant

15           **UNITED STATES DISTRICT COURT**
             **CENTRAL DISTRICT OF CALIFORNIA**
16

| | |
|---|---|
| 17 JOANNE SIEGEL and LAURA SIEGEL LARSON, | Case Nos. [Consolidated for Discovery]: |
| 18              Plaintiffs, | CV 04-8400 SGL (RZx) |
| 19 vs. | CV 04-8776 SGL (RZx) |
| WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; DC COMICS; and DOES 1-10, | Hon. Steven G. Larson, U.S.D.J. |
| 20 | Hon. Ralph Zarefsky, U.S.M.J. |
|    Defendants. | |
| 21 JOANNE SIEGEL and LAURA SIEGEL LARSON, | **NOTICE OF MOTION AND JOINT STIPULATION RE: DEFENDANTS' MOTION TO REOPEN DISCOVERY, TO COMPEL PRODUCTION OF DOCUMENTS, AND TO COMPEL THE FURTHER DEPOSITION OF KEVIN MARKS** |
| 22              Plaintiffs, | |
| 23 vs. | |
| TIME WARNER INC.; WARNER COMMUNICATIONS INC.; WARNER BROS. ENTERTAINMENT INC.; WARNER BROS. TELEVISION PRODUCTION INC.; DC COMICS; and DOES 1-10, | **DISCOVERY MATTER LOCAL RULE 37** |
| 24 | |
| 25 | Time: 10:00 a.m. |
| 26 | Date: April 20, 2009 |
|    Defendants. | Courtroom: 1 |
| 27 AND RELATED COUNTERCLAIMS | Hon. Stephen G. Larson |
| 28 | Discovery Cutoff: Nov. 17, 2006 |

Case 2:10-cv-03633-ODW-RZ Document 212-4 Filed 04/11/11 Page 20 of 149 Page
Case 2:04-cv-08400-SGW-RZ Document 4 Filed 03/02/09 Page 2 of 80 Page
ID #:15158

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on April 20, 2009 or as soon thereafter as the matter may be heard in the above-entitled action before the Honorable Stephen G. Larson, United States District Judge, United States District Court for the Central District of California, Eastern Division, 3470 Twelfth Street, Riverside, California, Courtroom 1, defendants Warner Bros. Entertainment Inc., Time Warner Inc., Warner Communications Inc., Warner Bros. Television Production Inc. and defendant and counterclaimant DC Comics ("Defendants"), will and hereby do move the Court to rule on this jointly filed stipulation pursuant to Local Rule 37-3 of the Local Rules of the United States District Court for the Central District of California ("L.R."). Defendants invited counsel for Plaintiffs Joanne Siegel and Laura Siegel Larson ("Plaintiffs" or the "Siegels") to meet and confer in writing on January 14, 2009, in accordance with L.R. 37-1. By letter dated January 22, 2009, Plaintiffs' counsel rebutted Defendants' stated bases for their motion but did not provide a date to meet and confer. By e-mail dated January 23, 2009, Defendants' counsel asked whether Plaintiffs' counsel wished to meet and confer further on the topic by the deadline set by L.R. 37-1 – January 26, 2009 – but Plaintiffs' counsel did not respond.

After the close of discovery and after the Court's ruling on Plaintiffs' motion for summary judgment on Defendants' settlement defense, Plaintiffs produced a document indicating that Plaintiffs' former counsel Kevin Marks wrote to Plaintiffs and others on August 9, 2002 to indicate "that he would testify in court against the Siegels" "because he believes there has already been agreement reached." The recently-produced document is titled "Marc Toberoff Timeline," and the quoted language captures the substance of Mr. Marks' August 9, 2002 communication. By this motion, Defendants seek the actual August 9, 2002 communication as well as the further deposition of Mr. Marks.

1       The document is relevant to Defendants' settlement defense and likely

2    supports further discovery and a motion for reconsideration.  It shows that, long

3    after Plaintiffs attempted to create a dispute about settlement, the person who had

4    negotiated the settlement for Plaintiffs, Mr. Marks, still believed that a settlement

5    existed.  No matter how the Court evaluates the impact of evidence concerning

6    conduct and state of mind, the state of mind of the key negotiator on Plaintiffs' side

7    is relevant.  Nor is the newly-revealed evidence just about state of mind; it is about

8    conduct, as Mr. Marks acted on his understanding and made it clear that he would

9    testify adversely to his former clients if they were to join with new counsel to upset

10   the settlement.  Moreover, in the end the question is not just about the exact impact

11   of the August 9, 2002 communication by Mr. Marks.  The record on the settlement

12   issues should be full and complete and should include such a direct statement by a

13   key settlement negotiator, not least because he testified in his deposition that, as of

14   February 6, 2002, he believed there was not a settlement.

15       The August 9, 2002 communication was from Mr. Marks to his former

16   clients, but the attorney-client privilege does not justify keeping it out of the record.

17   First, the "Marc Toberoff Timeline" repeats the substance of the August 9, 2002

18   communication, and its production waives any privilege as to the underlying

19   document.  Second, Plaintiffs determined to let Mr. Marks testify at his deposition

20   concerning his understanding about whether there was a settlement as of February 6,

21   2002 – after controversy about whether there was a settlement had arisen – so

22   privilege has been waived as to other evidence concerning Mr. Marks'

23   understanding or state of mind regarding settlement, certainly as to a document in

24   which he so directly contradicts his deposition testimony.

25       Put simply there is now an incomplete record regarding key settlement

26   evidence – deposition testimony says one thing, and the "Marc Toberoff Timeline"

27   says another.  There is no good reason for Defendants and the Court not to have, and

28   for the record not to be completed by, Mr. Marks' August 9, 2002 communication.

1   Defendants also seek leave to further depose Mr. Marks concerning the
2   communication.
3                   This motion is made pursuant to Rules 26 and 37 of the Federal Rules
4   of Civil Procedure and L.R. 37.  Defendants contend that good cause therefore exists
5   for the discovery sought.
6
7   DATED:  March 2, 2009                FROSS ZELNICK LEHRMAN & ZISSU, P.C.
8                                        PERKINS LAW OFFICE, P.C.
9                                              -and-
10                                       WEISSMANN WOLFF BERGMAN
                                              COLEMAN GRODIN & EVALL LLP
11
12                                       By: _____
13                                           Michael Bergman
14                                       Attorneys for Defendants and Counterclaimant
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Case 2:10-cv-03633-ODW-RZ   Document 212   Filed 04/11/11   Page 23 of 149   Page
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 03/02/09   Page 9 of 80
ID #:15161

**<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES ...............................................................................v

I.      DEFENDANTS' AUTHORITIES ............................................................v

II.     PLAINTIFFS' AUTHORITIES .............................................................v

JOINT STIPULATION............................................................................... 1

I.      DEFENDANTS' INTRODUCTORY STATEMENT ............................... 1

II.     PLAINTIFFS' INTRODUCTORY STATEMENT ................................. 2

III.    DEFENDANTS' CONTENTIONS.......................................................... 6

        A.      FACTUAL AND PROCEDURAL BACKGROUND........................ 6

                1.      DC Comics' Settlement Defense In The Actions ..................... 6

                2.      Warner Bros.' Receipt Of The Escrow Documents.................... 7

                3.      Defendants' Attempts To Obtain The Escrow
                        Documents................................................................................. 8

                4.      The Toberoff Timeline ............................................................. 10

                5.      The Parties' Meet And Confer Efforts...................................... 14

        B.      LEGAL ARGUMENT ........................................................................ 14

                1.      The Newly Discovered Evidence In The "Toberoff Time
                        Line" And The Not-Yet-Discovered Evidence In The August
                        9, 2002 Communication Contain Discoverable Information
                        Which May Ultimately Support Reconsideration By The
                        Court Of Defendants' Settlement Defense. .............................. 14

                2.      The Evidence That Defendants Now Seek Is Impeachment
                        Evidence That Goes Directly to the Heart of Marks'
                        Credibility on the Settlement Issue. ........................................ 15

                3.      Plaintiffs Have Improperly Obscured The Truth Through
                        Selective Use And Waiver Of The Privilege. .......................... 16

                4.      It Is The "Law Of The Case" That Any Attorney-Client
                        Privilege Applicable To The Toberoff Timeline Has Been
                        Waived, Which In Turn Serves To Waive Any Privilege In
                        Kevin Marks' August 2002 Communication With Plaintiffs
                        Concerning Marks' Opinion That The Parties Had Reached
                        A Settlement................................................................................ 20

5.  Defendants Have Been Diligent In Seeking Discovery Of The Escrow Documents And Thus Have "Good Cause" To Reopen Discovery. ..................................................... 22

6.  The Evidence Sought By Defendants In This Motion Is Discoverable Notwithstanding The Court's Ruling On Summary Judgment ................................................... 23

7.  The Interests Of Justice And The Integrity Of The Judicial Process Strongly Favor The Relief Sought By Defendants ..... 24

IV.  PLAINTIFFS' CONTENTIONS ................................................. 25

    A.  FACTUAL AND PROCEDURAL BACKGROUND ...................... 25

        1.  The Court Properly Held on Summary Judgment That No Settlement Agreement Was Consummated By the Parties ..... 25

        2.  Defendants Improperly Seek to Exploit and Leverage the Theft of Documents from Plaintiffs' Counsel's Office ........... 29

            a.  Documents Stolen From Plaintiffs' Legal Files ............ 29

            b.  The Court's April 30, 2007 Order ................................ 31

            c.  Defendants' Second Motion to Compel ....................... 32

    B.  LEGAL ARGUMENT ....................................................... 35

        1.  Defendants Improperly Seek Reconsideration of the April 30, 2007 Order .................................................... 35

        2.  Defendants' Veiled Motion for Reconsideration Ignores Black-Letter Contract Law Upheld By The Court's Summary Judgment Order ............................................. 37

            a.  The Defamatory Letter Distorts Marks' Beliefs and Does Not Even Mention Marks' August 9 Letter to Plaintiffs ................................................................ 37

            b.  Defendants' Motion Even Mischaracterizes the Defamatory Letter and Kevin Marks' Testimony ......... 38

            c.  Marks' Subjective Opinion Is, In Any Event, Extraneous Because the Existence of a Contract Is Based Upon the Objective Manifestation of the Parties' Intent ...................................................... 41

            d.  Defendants' Arguments Based on the Parties' Subjective Understanding Have Already Been Rejected by the Court .................................................... 44

        3.  The Defamatory Letter Does Not Waive Attorney-Client Privilege ................................................................. 45

a. There Was No Voluntary Waiver of Attorney-Client
Privilege as to the August 9 Letter ................................ 45

b. There Was No Basis to List the Defamatory Letter on
a Privilege Log............................................................. 47

c. Any Failure to List the Defamatory Letter on a
Privilege Log Was Excusable Inadvertence ................. 48

d. The Cases Cited by Defendants for Waiving Privilege
Are Inapplicable............................................................ 49

4. Defendants' "Work Product" Arguments Are Both Irrelevant
to the Protection of the August 9 Letter and Unavailing ........ 50

a. As Work-Product Protection Was Not Asserted for
the August 9 Letter, Waiver of Work-Product is
Irrelevant...................................................................... 50

b. Marks' Testimony Does Not Constitute Work-Product
and Would Not Waive Work Product Protection .......... 51

c. There Is No Connection Between Marks' Testimony
and the August 9 Letter................................................. 52

5. The Court Should Reconsider Its Conclusion that the Letter
"Contains" Conduct By Plaintiffs' Counsel as the Letter is
Unethical, Anonymous, Inadmissible and Unsupported ......... 53

6. The September 26, 2008 Order Should Be Reconsidered
Because the April 30 Order Did Not Encompass the
Defamatory Letter and In Any Event Plaintiffs Had No
Opportunity to "Appeal" the April 30 Order as to this Issue... 55

a. The April 30 Order Did Not Encompass the
Defamatory Letter Because Defendants Had Not
Moved to Compel Production of the Letter................... 55

b. The Issue of Whether the Defamatory Letter Should
Be Released to Defendants Was Not Ripe for Appeal
Under Local Rule 72-2.1 .............................................. 56

7. The September 26, 2008 Order for the Production of the
Defamatory Letter Should Be Reconsidered In Light of the
Record and Defendants' Misuse of the Stolen Documents ..... 57

a. Magistrate Zarefsky's April 30 Order Was Based
on Defendants' Misrepresentation of a Sanitized
Protocol ........................................................................ 57

i. Warner Bros. Engaged in a Substantive Review
of the Privileged Stolen Documents ................... 57

          ii.     Defendants Misrepresented that They Turned
                  the Stolen Documents Over to a "Neutral" and
                  Perpetuated the Fiction that the Documents
                  Were Held by an "Escrow Agent" ...................... 62

V.    DEFENDANTS' CONCLUSION ................................................. 66

VI.   PLAINTIFFS' CONCLUSION ................................................... 66

Case 2:10-cv-03633-ODW-RZ   Document 212   Filed 04/11/11   Page 27 of 149   Page
ID #:15165
Case 2:04-cv-08400-ODW -RZ   Document 476   Filed 03/02/09   Page 9 of 80

# **TABLE OF AUTHORITIES**

## I.  **Defendants' Authorities**

### **Cases**

*Atari Corp. v. Sega of Am.*,
161 F.R.D. 417 (N.D. Cal. 1994) .......................................................... 16

*Columbia Pictures Television, Inc. v. Krypton Broadcasting of Birmingham, Inc.*,
259 F.3d 1186 (9th Cir. 2001) ............................................................... 16

*In re Kidder Peabody Sec. Litig.*,
168 F.R.D. 459 (S.D.N.Y. 1996) ........................................................... 21

*In re McKesson HBOC, Inc. Secs. Litig.*,
2005 U.S. Dist. LEXIS 7098 (N.D. Cal. Mar. 31, 2005) .......................... 16

*Johnson v. Mammoth Recreations, Inc.*,
975 F.2d 604 (9th Cir. 1992) ................................................................ 22

*Kintera, Inc. v. Convio, Inc.*,
219 F.R.D. 503 (S.D. Cal. 2003) ........................................................... 17

*Nidec Corp. v. Victor Co.*,
249 F.R.D. 575 (N.D. Cal. 2007) ...................................................... 20-21

*Noyes v. Kelly Servs.*,
488 F.3d 1163 (9th Cir. 2007) .............................................................. 22

*N.Y. Life Ins. Co. v. Morales*,
2008 U.S. Dist. LEXIS 51304 (S.D. Cal. July 1, 2008) ........................... 22

*U.S. v. Jacobs*,
117 F.3d 82 (2d Cir. 1991) ................................................................... 21

*Weil v. Investment/Indicators, Research & Mgmt., Inc.*,
647 F.2d 18 (9th Cir. 1981) .................................................................. 21

### **Other Authorities**

Fed. R. Civ. P. 16(b) ........................................................................... 16

Fed. R. Civ. P. 26(b)(1) ....................................................................... 16

1 Paul R. Rice,
Attorney-Client Privilege in the United States § 4:35 (1999 ed.) ............... 20

## II.  **Plaintiff's Authorities**

### **Federal Cases**

*Atari Corp. v. Sega of Am.*,
161 F.R.D. 417 (N.D. Cal. 1994) .......................................................... 51

Case 2:10-cv-03633-ODW-RZ    Document 212    Filed 04/11/11    Page 28 of 149   Page
Case 2:04-cv-08400-ODW -RZ    Document 476    Filed 03/02/09    Page 10 of 80   Page
ID #:15166

1   *Chevron Corp. v. Pennzoil Co.,*
    974 F.2d 1156 (9th Cir.1992).................................................................. 48
2
3   *City of L.A. v. Santa Monica BayKeeper,*
    254 F.3d 882 (9th Cir. 2001) .................................................................. 57
4   *Columbia Pictures Television, Inc. v. Krypton Broadcasting of Birmingham, Inc.,*
    259 F.3d 1186 (9th Cir. 2001) ................................................................ 51
5
6   *Cox v. Administrator U.S. Steel & Carnegie,*
    17 F.3d 1386 (11th Cir.) ..................................................................... 52-53
7   *Cunningham v. Connecticut Mut. Life Ins.,*
    845 F. Supp. 1403 (S.D. Cal. 1994) ........................................................ 48
8
9   *First Savings Bank, F.S.B. v. First Bank System, Inc.,*
    902 F. Supp. 1356 (D. Kan. 1995) .......................................................... 48
10  *Gomez v. Vernon,*
    255 F.3d 1118 (9th Cir. 2001) ................................................................ 58
11
12  *Government Guarantee Fund of Republic of Finland v. Hyatt Corp.,*
    182 F.R.D. 182 (D.V.I. 1998) ................................................................ 47
13  *Hickman v. Taylor,*
    329 U.S. 495 (1947) .............................................................................. 51
14
15  *In re Dayco Corp. Derivative Sec. Litig.,*
    102 F.R.D. 468 (S.D. Ohio 1984) ........................................................... 46
16  *In re Echostar Comms. Corp.,*
    448 F.3d 1294 (Fed. Cir. 2006)......................................................... 50-51
17
18  *In re Grand Jury Proceedings Involving Berkley and Co., Inc.,*
    466 F. Supp. 863 (D. Minn. 1979) .......................................................... 46
19  *In re Grand Jury Subpoena,*
    350 F.3d 1010 (9th Cir. 2003)................................................................ 51
20
21  *In re Kidder Peabody Sec. Litig.,*
    168 F.R.D. 459 (S.D.N.Y. 1996) ............................................................ 49
22  *In re Martin Marietta Corp.,*
    856 F.2d 619 (4th Cir. 1988).................................................................. 52
23
24  *In re McKesson HBOC, Inc. Secs. Litig.,*
    2005 U.S. Dist. LEXIS 7098 (N.D. Cal. Mar. 31, 2005)............................ 51
25  *In re Michigan Boiler & Eng'g Co.,*
    87 B.R. 465 (Bankr. E.D. Mich. 1988) .................................................... 50
26
27  *Kenyatta v. Kelly,*
    375 F. Supp. 1175 (E.D. Pa. 1974) ......................................................... 46
28

*Kintera, Inc. v. Convio, Inc.*,
219 F.R.D. 503 (S.D. Cal. 2003)..................................................................... 48, 51

*Laxalt v. McClatchy*,
116 F.R.D. 438 (D. Nev. 1987)............................................................................ 47

*Mendenhall v. Barber-Greene Co.*,
531 F. Supp. 948 (N.D. Ill. 1981) ........................................................................ 48

*Nidec Corp. v. Victor Co.*,
249 F.R.D. 575 (N.D. Cal. 2007) ......................................................................... 49

*Picard Chemical Inc. Profit Sharing v. Perrigo Co.*,
951 F. Supp. 679 (W.D. Mich. 1996) ................................................................... 50

*Resolution Trust Corp. v. Dean*,
813 F. Supp 1426 (D. Ariz. 1993)........................................................................ 46

*Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*,
32 F.3d 851 (3rd Cir. 1994) ................................................................................. 50

*Robinson v. Tex. Auto. Dealers Ass'n*,
214 F.R.D. 432 (E.D. Tex. 2003).......................................................................... 48

*Sackman v. Ligget Group, Inc.*,
173 F.R.D. 358 (E.D.N.Y. 1997) .......................................................................... 46

*Shell Oil Refinery v. Shell Oil Co.*,
143 F.R.D. 105 (E.D. La. 1992) ........................................................................... 62

*Siegel v. Warner Bros. Entertainment Inc. ("Siegel II")*,
542 F. Supp. 2d 1098 (C.D. Cal. 2008) ......................................................... *passim*

*Smith v. Armour Pharmaceutical Co.*,
838 F. Supp. 1573 (S.D. Fla. 1993) ...................................................................... 46

*Spacone v. Burke (In re Truck-A-Way)*,
300 B.R. 31 (E.D. Cal. 2003) ............................................................................... 62

*Tennenbaum v. Deloitte & Touche*,
77 F.3d 337 (9th Cir. 1996).................................................................................. 46

*Transamerica Computer Co., Inc. v. International Business Machines Corp.*,
573 F.2d 646 (9th Cir. 1978)................................................................................ 45

*United States v. Chen*,
99 F.3d 1495 (9th Cir. 1996)................................................................................ 46

*United States v. Doe*,
219 F.3d 175 (2d Cir. 1999) ................................................................................. 51

*United States v. Jacobs*,
117 F.3d 82 (2d Cir. 1997).............................................................................. 49, 51

*United States v. Nobles,*
422 U.S. 225 (1975) ........................................................................ 51

*United States ex rel. Mayman v. Martin Marietta Corp.,*
886 F. Supp. 1243 (D. Md. 1995) ................................................. 46

*Weil v. Investment/Indicators, Research and Management, Inc.,*
647 F.2d 18 (9th Cir. 1981) ...................................................... 45, 49

**State Cases**

*Apablasa v. Merritt & Co.,*
176 Cal.App.2d 719 (1959) ........................................................... 42

*Cooke v. Superior Court,*
147 Cal. Rptr. 915 (Cal. Ct. App. 1978) ..................................... 46

*Grove v. Grove Valve & Reg. Co.,*
4 Cal.App.3d 299 (1970) .............................................................. 42

*Louis Lesser Enterprises, Ltd. v. Roeder,*
209 Cal.App.2d 401 (1962) ........................................................... 43

*Meyer v. Benko,*
55 Cal.App.3d 937 (1976) ....................................................... 39, 43

*Rico v. Mitsubishi Motors Corp.,*
116 Cal. App. 4th 51 (2004) ......................................................... 62

*Rico v. Mitsubishi Motors Corp.,*
171 P.3d 1092 (2007) ................................................................... 58

*State Compensation Insurance Fund v. WPS, Inc. (State Fund),*
70 Cal.App.4th 644 (1999) ....................................................... 58-59

*Stewart v. Preston Pipeline Inc.,*
134 Cal.App.4th 1565 (2005) ....................................................... 43

*Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co.,*
27 Cal. 4th 705 (2003) ................................................................. 63

**Other Authorities**

F.R.C.P. 26 ................................................................................... 51

California Civil Code § 1585 ....................................................... 42

Local Rule 7 .......................................................................... 57, 63

Local Rule 72 ............................................................................... 56

159 *American Law Reports Federal* 153 ................................... 46

*Matthew Bender Practice Guide:*
*Federal Pretrial Civil Procedure in California* § 24.40 ............. 58

Jones, Rosen, Wegner & Jones,
Federal Civil Trials and Evidence ¶ 8:3700........................................................... 51

**JOINT STIPULATION**

1

2 **I.    DEFENDANTS' INTRODUCTORY STATEMENT**

3          As the Court is aware, in late June 2006, three separate packages of

4 documents (the "Escrow Documents") were anonymously mailed to executives of

5 Defendant Warner Bros.  As this Court observed in its Order of September 26, 2008

6 (the "September 26 Order"), the Escrow Documents "contain embarrassing and

7 potentially questionable conduct by plaintiffs' counsel in this case."  (September 26

8 Order at 1.)  Since their delivery in June 2006, Defendants have played strictly by

9 the rules in an attempt to obtain the Escrow Documents.  All the while, Plaintiffs did

10 everything in their power to block production of the embarrassing Escrow

11 Documents.  Finally, after more than a year and a half of motion practice, the Court

12 confirmed as "law of the case," the Magistrate Judge's ruling that, due to Plaintiffs'

13 counsel's failure to list certain of the Escrow Documents on a privilege log, any

14 privilege in certain of the Escrow Documents had been waived.

15          Unfortunately, Plaintiffs' obstructionist tactics were temporarily successful as

16 Defendants were prevented from seeing any of the Escrow Documents until

17 December 12, 2008 – well after the close of discovery and well after the Court had

18 ruled on motions for summary judgment.

19          When Defendants finally received the Escrow Documents, they saw that one

20 such document, the so-called "Marc Toberoff Timeline" (the "Toberoff Timeline"),

21 contained the revelation that in August 2002 Plaintiffs' former counsel, Kevin

22 Marks, had advised his clients that he believed that an enforceable settlement

23 agreement with DC Comics had been reached.  Even more significant was Kevin

24 Marks' statement that if Plaintiffs did not abide by the settlement agreement, he

25 would testify against them at a trial to enforce the agreement.  This revelation of

26 evidence came too late – *after* the October 7, 2006 deposition of Kevin Marks

27 during which Mr. Marks testified in a manner inconsistent with his prior written

28

1  statement, and *after* this Court's dismissal of Defendants' settlement defense on

2  March 26, 2008, to allow Defendants to develop a full and fair record on the

3  settlement issue.  Because the Escrow Documents were not produced until after the

4  Court had ruled, Defendants were deprived of the ability to develop the facts and to

5  put them before the Court on summary judgment.  The Court ruled without the

6  benefit of such developed evidence.

7       By this motion, Defendants seek:  (i) production of correspondence dated

8  August 9, 2002, the substance of which was revealed in the Toberoff Timeline,

9  containing the now disclosed statement of Kevin Marks that an enforceable

10  settlement had been reached; and (ii) the right to further depose Plaintiffs' former

11  counsel, Kevin Marks in view of the new evidence that has come to light and its

12  inconsistency with his deposition testimony.

13  **II.    PLAINTIFFS' INTRODUCTORY STATEMENT**

14       Defendants' baseless motion is but their latest frivolous attempt to leverage

15  the theft of privileged documents from the offices of Plaintiffs' counsel, and to bias

16  the trier of fact against Plaintiffs and their counsel through a flurry of false,

17  unsupported accusations.  Defendants erroneously claim that an unproven statement

18  in a privileged communication by Plaintiffs' former counsel to his clients is enough

19  to overturn the Court's March 26, 2008 summary judgment order, holding that no

20  enforceable agreement was reached between the parties regarding Plaintiffs'

21  recaptured Superman copyrights.  *See Siegel v. Warner Bros. Entertainment Inc.*

22  ("*Siegel II*"), 542 F. Supp. 2d 1098, 1136-1138 (C.D. Cal. 2008).

23       The facts underlying this seemingly endless matter are simple:  Plaintiffs'

24  legal files were *stolen* from the offices of Plaintiffs' counsel (the "Stolen

25  Documents") and delivered to Defendant Warner Bros. Entertainment Inc. ("Warner

26  Bros.") A majority of the documents were clearly privileged attorney-client

27  communications. Enclosed with the Stolen Documents was an anonymous,

28  unsupported, defamatory cover letter (the "Defamatory Letter").  This conspiratorial

1   rant was written by a disgruntled attorney, employed briefly at the firm of Plaintiffs'

2   counsel, who deliberately ignored his legal and ethical duties to Plaintiffs by

3   stealing their privileged legal files and handing them over to Warner Bros. in the

4   midst of this litigation.

5       We know now that Defendants misrepresented their handling of the Stolen

6   Documents to Magistrate Zarefsky and this Court to obtain approval of their

7   purported procedures and to sanitize their unseemly use of the stolen legal files.

8   Warner Bros.' in-house counsel Wayne Smith claimed to have only briefly

9   "thumbed through" the Stolen Documents to see if they were privileged.  Instead of

10  notifying Plaintiffs' counsel immediately and returning clearly privileged

11  documents, Warner Bros. purportedly arranged for a law firm to act as a "neutral"

12  "escrow holder."  It was later revealed, however, that the firm, retained and paid by

13  Defendants, was neither "neutral" nor an "escrow holder."  Moreover, it is clear

14  from Smith's repeated ability to pinpoint and describe specific documents and to

15  correlate them to specific entries on Plaintiffs' privilege logs (received long after

16  Defendants purportedly turned over all Stolen Documents to a so-called "neutral")

17  that Warner Bros. stepped way over the line in leveraging this theft and exploiting

18  clearly privileged information in this litigation.

19      On April 30, 2007, Magistrate Zarefsky ordered a simple ministerial

20  procedure to deal with the documents:  the stolen documents which were listed on

21  privilege logs should be returned to Plaintiffs, while documents not listed on

22  privilege logs should be produced to Defendants.  This led to two disputes.  The first

23  dispute concerned 9 documents (4 of which are merely fax cover or confirmation

24  sheets) of the 839 pages of the Stolen Documents that fell between the "cracks" of

25  the April 30, 2007 order, but were clearly privileged.  These documents included the

26  Defamatory Letter and post-litigation attorney-client communications.  The second

27  dispute concerned Defendants' transparent manipulation of their "escrow" protocol.

28  Instead of letting their "escrow" execute the simple disbursal ordered by Magistrate

1   Zarefsky on April 30, 2007 and again by this Court on September 26, 2008, with
2   respect to the 130 documents that remained undisputed, Defendants instructed their
3   "escrow" to retain all the documents and repeatedly attempted to have him "peek"
4   behind the logs to challenge Plaintiffs' assertion of privilege.

5       This Court again resolved the matter in its December 4, 2008 Order.  The 9
6   documents remaining in question, including the Defamatory Letter, were ordered
7   produced, and all other documents – those listed on privilege logs or already
8   produced – were finally returned to Plaintiffs.

9       Now, on the groundless basis of the Defamatory Letter, Defendants once
10  again attempt to re-open this matter and rip away the already upheld attorney-client
11  privilege protecting an August 9, 2002 letter from attorney Kevin Marks ("Marks")
12  to his clients, Laura and Joanne Siegel (the "August 9 Letter") that was among the
13  Stolen Documents.

14      The privileged August 9 Letter *was* properly listed and claimed on a privilege
15  log.  Based on no less than four Court orders, the inquiry should end there.  Ignoring
16  these fatal facts, Defendants attempt to violate the attorney-client privilege on the
17  sole basis that the anonymous, inadmissible Defamatory Letter purportedly
18  describes the privileged August 9 Letter, and that this description allegedly
19  contradicts Marks' sworn deposition testimony regarding the negotiation of a
20  settlement agreement.

21      As an initial matter, the Defamatory Letter neither mentions the August 9
22  Letter, nor any writing, in describing what Marks purportedly believed.  Defendants'
23  entire motion is falsely premised on the unproven contents of the privileged August
24  9 Letter.  Moreover, *even if* Marks subjectively believed (he did not) that a binding
25  agreement had been reached, such a belief would be extraneous because the
26  formation of a contract requires an "objective manifestation" of a "meeting of the
27  minds" on all material terms of agreement.  The Court correctly held this was
28  clearly absent in the well-documented exchange between Plaintiffs and DC of offers

Case 2:10-cv-03633-ODW-RZ   Document 212   Filed 04/11/11   Page 36 of 149   Page
ID #:15174
Case 2:04-cv-09049-ODW-RZ   Document 47   Filed 03/12/05   Page 16 of 80   Page

1  and counter-offers containing materially different terms. *See Siegel II*, 542 F. Supp.

2  2d at 1136-1139.

3      Secondly, Defendants mischaracterize both Marks' deposition testimony and

4  the Defamatory Letter to fabricate an inconsistency that, in reality, does not exist.

5  Even if the ranting Defamatory Letter were taken at face value, it simply states:

6  "Marks also tells the Siegels that he would testify in court against the Siegels if they

7  accepted this offer because he believes there has already been an agreement

8  reached." *See* Declaration of Patrick Perkins in Support of Defendants' Motion to

9  Compel ("Perkins Decl."), Ex. 1 at 1. Defendants repeatedly mischaracterize the

10  Defamatory Letter as stating an "*enforceable* agreement" had been reached, when it

11  plainly does not say this. This critical distinction is amply illustrated by Marks'

12  testimony, cited by Defendants (hence Defendants' deceptive insertion of

13  "enforceable"):

14      "A: Well, if the question is did I think at this point there was a final, binding, enforceable agreement, the answer would be no, ***but I did believe that we had***

15      ***come to an agreement back on October 19th, 2001***.... So while I thought we had an agreement on these terms, John evidently didn't, and where you don't

16      have a meeting of the minds, you don't have an agreement."

17  *See* Perkins Decl., Ex. 6 at 154:12-155:2 (emphasis added). Marks' testimony is

18  perfectly consistent with the Defamatory Letter's statement that Marks "believes

19  there has already been an agreement reached."

20      Defendants' motion is nothing more than a veiled motion for reconsideration

21  of the Court's summary judgment ruling and is built on a false pretext. Defendants'

22  continuing efforts to exploit Stolen Documents to access Plaintiffs' privileged

23  attorney-client communications taints this case. Moreover, the baseless nature of

24  Defendants' motion suggests that Defendants' real objective is to once again place

25  the Defamatory Letter before the Court to prejudice the trier of fact shortly before

26  trial. Plaintiffs respectfully request that this Court reconsider its prior September 26,

27  2008 ruling that the anonymous, inadmissible and wholly unsupported Defamatory

28  Letter "contained embarrassing and potentially questionable conduct by plaintiffs[']

Case 2:10-cv-03633-ODW-RZ Document 212-4 Filed 04/14/11 Page 37 of 149 Page
Case 2:04-cv-08400-ODW-RZ Document 476 Filed 03/12/08 Page 15 of 80 Page
ID #:15175

1 counsel in this case." Plaintiffs further request that Defendants be precluded from

2 using the Defamatory Letter in this litigation or elsewhere. This Court should close

3 this disgraceful chapter of this litigation once and for all.

4 **III.** **DEFENDANTS' CONTENTIONS**

5     **A.** **FACTUAL AND PROCEDURAL BACKGROUND**

6         **1.** **DC Comics' Settlement Defense In The Actions**

7       In response to Plaintiffs' complaints in the two related cases (the "Actions"),

8 Defendant DC Comics ("DC") filed counterclaims seeking enforcement of a prior

9 settlement agreement between the parties. DC's settlement claim was based on a

10 letter sent by Plaintiffs' prior counsel, Kevin Marks ("Marks"), on October 19,

11 2001, which unequivocally states that the Siegel Family has "accepted D.C. Comics'

12 offer of October 16, 2001" and which outlines all of the material terms of the

13 parties' agreement. (*See*, *e.g.*, Exhibit 2 to the Declaration of Patrick T. Perkins

14 submitted herewith ("Perkins Decl."), ¶¶ 47-56.)

15       In reply to DC's counterclaims, Plaintiffs denied that the parties reached any

16 valid settlement agreement. In response to Defendants' settlement defense,

17 Plaintiffs initially asserted as an affirmative defense that Marks did not have

18 authority, or exceeded the scope of his authority. (Perkins Decl. ¶ 5; Perkins Ex. 3

19 at ¶ 183.)[1] Additionally, Plaintiffs argued that the subsequent conduct of

20 Defendants after October 19, 2001, including but not limited to (i) an October 26,

21 2001 letter to Marks containing a "more fulsome" outline of the parties' agreement;

22 and (ii) a long-form agreement drafted by Defendants and submitted to Plaintiffs on

23 February 1, 2002, added to and materially changed the terms of the settlement that

24

25 [1] Defendants moved to compel production of documents and testimony regarding
Plaintiffs' counsel's lack of authority to send the October 19, 2001 letter on the basis that

26 the authority defense served as a waiver of privilege. On May 2, 2007, Magistrate Judge
Zarefsky granted Defendants' motion but allowed Plaintiffs to withdraw the defense and,

27 in effect, retract their waiver of privilege by striking the affirmative defense in lieu of
compelling Plaintiffs to produce the documents and provide further testimony. (Perkins

28 Decl. ¶ 7.)

1   they had accepted and thus justified their decision not to consummate their

2   agreement with Defendants. (Perkins Decl. ¶ 5; Perkins Ex. 3 at ¶ 53.)

3          **2.**     **Warner Bros.' Receipt Of The Escrow Documents**

4       On or around June 28, 2006, three sets of the Escrow Documents arrived at

5   the offices of Warner Bros. from an anonymous source, addressed to separate

6   Warner Bros. executives. The executives to whom the Escrow Documents were

7   sent were instructed by Warner Bros.' then General Counsel to deliver them to his

8   office without reviewing the Documents. (Declaration of Wayne M. Smith

9   submitted March 26, 2007 (the "March 2007 Smith Decl. ¶ __") ¶ 2 (attached for the

10   Court's convenience as Perkins Exhibit 4).)

11       The Escrow Documents were provided to in-house litigation counsel Wayne

12   Smith ("Smith") who, after reviewing the unsigned cover letter that accompanied

13   them and after thumbing through the Documents, determined that some of them may

14   have been privileged. (March 2007 Smith Decl. ¶ 4.)

15       Smith researched the issue of what obligations, if any, governed Defendants'

16   handling of the Escrow Documents that Warner Bros. had received. Based on his

17   review of the relevant California authorities, Defendants: (i) reviewed each

18   document but ceased the review once it became apparent that the document was

19   privileged or may have been privileged; (ii) contacted opposing counsel and advised

20   him that the documents have been received; and (iii) refrained from using any

21   information in the documents until there was either an agreement with opposing

22   counsel, or the Court had determined each document's disposition. (March 2007

23   Smith Decl. ¶ 6.) Magistrate Judge Zarefsky found the procedure exercised by Mr.

24   Smith to be appropriate and "professional." (Perkins Ex. 5 at 19:3-7.)

25       During his review, Defendants' in-house counsel identified an August 9, 2002

26   written communication from Marks to his clients (the "August 9, 2002

27   Communication"), as one that related to plaintiffs' contention that Marks lacked

28   authority to bind plaintiffs to any settlement, and he concluded that the privilege

1 attaching to the document had likely been waived. (February 19, 2009 Declaration

2 of Wayne M. Smith ("February 2009 Smith Decl. ¶__") ¶ 5.

3    On June 30, 2006, Defendants provided *all* of the Escrow Documents to an

4 escrow agent, not just those that were clearly or potentially privileged, and retained

5 no copies. (March 2007 Smith Decl. ¶ 13.) On July 18, 2006, the escrow agent

6 supplied a full copy set of the Escrow Documents to Plaintiffs' counsel. (Perkins

7 Decl. ¶ 10.) Meanwhile, neither copies nor the contents of the Escrow Documents

8 were provided to or shared with any of the outside counsel representing the

9 Defendants in this action, nor were any such documents used in the litigations unless

10 they were separately produced by Plaintiffs or by recipients of third-party

11 subpoenas. (March 2007 Smith Decl. ¶ 13.)

12    **3.    Defendants' Attempts To Obtain The Escrow**

13         **Documents.**

14    In July 2006, Defendants made multiple attempts to work out with Plaintiffs

15 voluntary production of the non-privileged Escrow Documents. When those efforts

16 failed, on August 7, 2006, Defendants served a document request on Plaintiffs, as

17 well as a subpoena *duces tecum* on Plaintiffs' counsel, Marc Toberoff, seeking a

18 copy of the Escrow Documents. (Perkins Decl. ¶ 11; September 26 Order at 2.) In

19 response, on August 23, 2006, Plaintiffs and Mr. Toberoff served a general

20 objection and refused to produce the Escrow Documents. (Perkins Decl. ¶ 12;

21 September 26 Order at 2.)

22    The objections served by Plaintiffs and Mr. Toberoff relied principally on

23 privilege objections and stated that a log identifying any item withheld on the basis

24 of privilege would be provided. However, Plaintiffs and their counsel ultimately

25 made the tactical decision not to provide the promised privilege logs in response to

26 Defendants' request and subpoena. (Perkins Decl. ¶ 12.)

27    Plaintiffs' failure to serve privilege logs addressing the Escrow Documents

28 was significant because Magistrate Judge Zarefsky had previously ordered Plaintiffs

Case 2:10-cv-03633-ODW-RZ   Document 212-4  Filed 04/11/11   Page 40 of 149   Page
Case 2:04-cv-08400-ODW -RZ   Document 476   Filed 03/02/09   Page 22 of 80   Page
ID #:15178

1    to "produce all privilege logs, including any revisions, by September 29, 2006," well

2    over a month *after* Plaintiffs and Mr. Toberoff responded to the subpoenas.  As a

3    consequence, some of the Escrow Documents, which Mr. Toberoff later claimed

4    were privileged, were not identified in any privilege log.  (*See* September 26 Order

5    at 2; Smith March 2007 Decl. ¶ 12.)

6          As a result of Plaintiffs' refusal to produce the Escrow Documents, and their

7    failure to list at least some of them on their privilege log, Defendants made a motion

8    to compel.  On April 30, 2007, Magistrate Judge Zarefsky conducted a hearing on

9    the motion.  (Perkins Decl. ¶ 13.)  At the conclusion of the hearing, Magistrate

10   Judge Zarefsky summarized his order, stating, "[p]rivileged documents get returned.

11   The privileged documents that were listed on the privilege log get returned.  The

12   others get sent to defense counsel." (Perkins Ex. 5 at 30:22-24.)

13         Notwithstanding Plaintiffs' counsel's representations at the April 2007

14   hearing that all Escrow Documents that had not been produced were listed on a

15   privilege log, Plaintiffs had not in fact listed all allegedly privileged documents on

16   their privilege log.  The declaration subsequently served by Plaintiffs' counsel in

17   response to Magistrate Judge Zarefsky's order conceded this, but Plaintiffs did not

18   produce the unlisted documents as the Magistrate Judge had ordered.  Instead,

19   Plaintiffs asserted that the unlisted documents were privileged and refused to

20   produce them.  (September 26 Order at 4.)  As a result, Defendants were required to

21   go back to Court, moving on September 17, 2007 to compel compliance with

22   Magistrate Judge Zarefsky's order.  (Perkins Decl. ¶ 14.)

23         Because Defendants' September 17, 2007, motion to compel compliance was

24   not ruled upon, Defendants filed a renewed motion on April 9, 2008, this time with

25   the District Court.  Plaintiffs' principal focus in opposing the renewed motion

26   centered on withholding the Toberoff Timeline.  Neither Plaintiffs nor Mr. Toberoff

27   had ever listed the Toberoff Timeline on any privilege logs.  (*Id.*)

28

1    On September 26, 2008, the District Court ruled on Defendants' motion to
2    enforce Plaintiffs' compliance with Magistrate Judge Zarefsky's order, a motion that
3    Defendants had filed more than a year before, on September 17, 2007.  In the
4    September 26 Order, the District Court confirmed that the Magistrate Judge's prior
5    ruling that for any potentially privileged documents not listed on Plaintiffs' privilege
6    logs, privilege as to those documents was deemed waived and was now the "law of
7    the case" due, in part, to Plaintiffs' failure to timely appeal the Magistrate Judge's
8    ruling.  (September 26 Order at 4-5.)  The District Court reiterated the Magistrate
9    Judge's finding that the waiver of privilege occurred not by the anonymous delivery
10   of the Escrow Documents to Warner Bros., but instead by virtue of Plaintiffs' failure
11   to include certain of the Escrow Documents, including the Toberoff Timeline, on a
12   privilege log.  (*Id.*)

13                    **4.    The Toberoff Timeline**

14   On December 12, 2008, more than a year and a half after first moving to
15   compel production, Defendants finally received the subset of the Escrow Documents
16   that had not been produced previously and that were not listed on a privilege log.
17   Of the Escrow Documents finally produced to Defendants, the most explosive is the
18   Toberoff Timeline.

19   The Toberoff Timeline, which was written by a former lawyer in Plaintiffs'
20   counsel's firm (Perkins Ex. 5 at 9:25-10:8), chronicles the history of Plaintiffs'
21   counsel's involvement in asserting control over the termination rights in Superman.
22   (Perkins Ex. 1.)  According to the Toberoff Timeline, which purports to draw its
23   information from other documents included among the Escrow Documents
24   delivered to Warner Bros. in 2006, Plaintiffs' counsel set in motion a plan to gain
25   control over certain copyrights related to Superman, such that the result is that
26   "**Marc Toberoff *personally* [owns] 47.5% of the entire Superman interest.**"
27   (Perkins Ex. 1 at 6; bold and italics in original.)  The Toberoff Timeline further
28   states that, in August 2002, Mr. Toberoff "approaches the Siegels [through their

Case 2:10-cv-03633-ODW-RZ — Document 212-4 Filed 04/11/11 Page 42 of 149 Page
Case 2:04-cv-08400-ODW -RZ — Document 476 Filed 03/12/05 Page 24 of 30 Page
ID #:15180

1   then counsel Kevin Mark ("Marks")], *not as an attorney but as a film producer*,

2   stating that he is 'allied' with [agent Ari] Emanuel…" and that Toberoff and

3   Emanuel "have a billionaire ready to offer $15 million dollars up front, plus what

4   they promise to be meaningful participation from proceeds for exploitation of the

5   Siegels' rights to SUPERMAN and some continued royalties on an ongoing basis in

6   all media."[2]  (*Id.* at 2; emphasis in original.)

7          The Toberoff Timeline further states that, in response to Mr. Toberoff's offer,

8   Plaintiffs' then-counsel Marks contemporaneously communicated such offer to

9   Plaintiffs but advised against accepting it, warning them that "he would testify in

10  court against the Siegels if they accepted the offer because he believes there has

11  already been an agreement reached." (*Id.*)  Defendants have concluded, based upon

12  the Toberoff Timeline, the recollection of Warner Bros. counsel Wayne Smith who

13  saw the underlying documents, and Plaintiffs' privilege logs, that this statement was

14  communicated by Marks to Plaintiffs in the August 9, 2002 Communication, which

15  Defendants still have not obtained in discovery.[3]  (February 2009 Smith Decl. ¶ 5.)

16         Although Magistrate Judge Zarefsky's order of April 30, 2007 required that

17  the Toberoff Timeline be produced in May 2007, Plaintiffs kept Defendants from

18  obtaining access to it until discovery was over and, significantly, until after the

19  motions for summary judgment had been briefed and ruled upon.  Defendants

20  respectfully but firmly believe that the statements attributed to Marks, which appear

21  in the August 9, 2002 Communication from Marks to the Siegels, is information that

22  Defendants were entitled to probe and develop during discovery.  Defendants submit

23  that such discovery and its resulting evidence would have had a material impact on

24  the Court's view of Defendants' settlement defense.

25  _____

26  [2] The Toberoff Timeline further alleges that Toberoff later admitted "to Laura Siegel that there never was a billionaire willing to invest $15 million when he first approached them." (Perkins Ex. 1 at 6.)

27  [3] Significantly, in their response to Defendants' invitation to meet and confer on this motion, Plaintiffs do not deny that the August 9, 2002 writing from Marks contains, in

28  substance, the statement set forth in the Toberoff Timeline. (Perkins Ex. 8.)

Case 2:10-cv-03633-ODW-RZ   Document 212-4   Filed 04/11/11   Page 43 of 149   Page
ID #:15181
Case 2:04-cv-08400-ODW -RZ   Document 476   Filed 03/02/09   Page 25 of 80   Page

1    Plaintiffs' failure to produce the August 9, 2002 Communication during the

2    discovery period allowed the Court to rely on Marks' uncontroverted testimony at

3    his deposition:

4    Q. [BERGMAN] Did you as of February 6, 2002
     believe that you had closed a deal with DC for the
5    Superman interest?

6    * * * *

7    [Objections Deleted]

8    A. [MARKS] Well, *if the question is did I think at
     **this point there was a final, binding, enforceable**
9    **agreement, the answer would be no,** but I did believe that
     we had come to an agreement back on October 19th, 2001,
10   that was reflected exactly in the terms that I have set out.
     At the end of that letter I wrote to John in substance and
11   effect, "John, if I've gotten anything wrong, if I've
     misstated any of these terms, please let me know." When
12   John writes back on October 26, which I see later, in effect
     his letter is yeah, you've got terms wrong. My outline of
13   the deal terms is different than your outline of the deal
     terms. So while I have thought we had an agreement on
14   these terms, John evidently didn't, and where you don't
     have a meeting of the minds, you don't have an
15   agreement.

16

17

18   (Perkins Ex. 6 at 153:21-155:2; emphasis added.)  The foregoing answer laid the

19   foundation and was the jumping off point for Marks' immediately following

20   testimony regarding the supposed many "differences" between Marks' October 19,

21   2001 acceptance letter, and Schulman's October 26, 2001 response.  (*Id.* at 155:4-

22   164:11.)  This follow-on testimony consumed eight pages of deposition transcript

23   and was extensively relied on by Plaintiffs as allegedly objective evidence of the

24   absence of a settlement agreement in seeking summary judgment.  (Pltfs' Motion for

25   Summary Judgment (Dkt # 161), at 48-57.)  Indeed, in moving for summary

26   judgment, Mr. Toberoff characterized Marks' recitation of differences as "material"

27   and claimed that these differences were evidence that "there never was a 'meeting of

28   the minds'" – precisely the words that Marks invoked in answering the question

Case 2:10-cv-03633-ODW-RZ   Document 212   Filed 04/11/11   Page 44 of 149   Page
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 03/12/05   Page 26 of 80   Page
ID #:15182

1    above. (*Id.* at 48, 58.) Defendants submit that had they been able to confront Mr.

2    Marks at deposition with his statement in the August 9, 2002 Communication, they

3    would have impeached Mr. Marks, and he might have changed his testimony.

4    Moreover, the difference between Marks' testimony at deposition and his statement

5    in the August 9, 2002 Communication would have created a fact issue on Summary

6    Judgment.

7        The Court ultimately accepted Plaintiffs' "material differences"

8    characterization – underpinned by Marks' unrebutted testimony – and found that

9    there were "numerous material differences between the terms relayed in the October

10    19 and 26, 2001, letters." (March 26, 2008 Order at p. 61:6-7.) Adopting the

11    formulations of both Marks and Plaintiff's counsel, the Court also found that "the

12    documents [including the October 19 and 26, 2001 letters] referenced above . . .

13    aptly demonstrate that there was no 'meeting of the minds' on all material terms."

14    (*Id.* at 60:23-25.) But the Court's conclusion that these differences were on

15    "material terms" was made without the benefit of Marks' subsequent advice to his

16    clients in August 2002 that he believed there was an enforceable agreement and that

17    he was prepared to testify to that fact under oath if they tried to breach that

18    agreement.

19        Thus, without the benefit of Plaintiffs' former counsel's statement that he

20    believed that an agreement was in place that was sufficiently enforceable for him to

21    testify against his own clients, the Court on summary judgment dismissed Defendant

22    DC Comics' settlement defense. (March 26, 2008 Order at 57-62.) Not only did the

23    Court rely upon the supposed "material" differences in the parties' correspondence –

24    which are completely undermined by Marks' August 2002 communication – but

25    also on the parties' "*conduct in reaction thereto*." (*Id.* at 61, emphasis added.) This

26    "conduct in reaction thereto" necessarily included Marks' now-disclosed

27    communications to his clients that an enforceable agreement had in fact been

28    reached, something that the Court never had the opportunity to consider.

Case 2:10-cv-03633-ODW-RZ   Document 212   Filed 04/14/11   Page 45 of 149   Page
ID #:15183
Case 2:04-cv-08400-ODW -RZ   Document 47   Filed 03/12/05   Page 27 of 80   Page

### 5.   The Parties' Meet And Confer Efforts

Pursuant to L.R. 37-1, on January 14, 2009, Defendants' counsel sent Plaintiffs' counsel a letter setting forth Defendants' position on the issues presented in this motion, outlining the relief sought in an attempt to avoid the need for Court intervention, and inviting Plaintiffs' counsel to confer on the issue. (Perkins Decl. ¶ 16; Ex. 7.)  By letter dated January 22, 2009, Plaintiffs' counsel rejected Defendants' position on the issues raised in this motion, but did not provide any dates on which to confer with Defendants' counsel. (*Id.* ¶ 17; Ex. 8.).  By e-mail dated January 23, 2009, Defendants' counsel confirmed receipt of Plaintiffs' counsel's letter of January 22, 2009, and confirmed that Plaintiffs considered the "meet and confer" obligation to have been satisfied. (*Id.* ¶ 18; Ex. 9.)  Plaintiffs' counsel did not respond.  Thus, the parties have not been able to resolve the dispute.

**B.**   **LEGAL ARGUMENT**

**1.**   **The Newly Discovered Evidence In The "Toberoff Time Line" And The Not-Yet-Discovered Evidence In The August 9, 2002 Communication Contain Discoverable Information Which May Ultimately Support Reconsideration By The Court Of Defendants' Settlement Defense.**

Because of the conduct of Plaintiffs and their counsel in this matter, the Court has dismissed on summary judgment a key defense – that the parties had previously reached a settlement of this dispute – on the basis of an incomplete and misleading record.  The Court in its ruling relied in part on certain evidence – Marks' deposition testimony – that we now know to be a distorted fragment of the truth because Plaintiffs and their counsel tried, and almost succeeded, in hiding contrary evidence. The full picture in fact shows that Plaintiffs' counsel, when all was said and done, months after the exchange of letters and the long form agreement that Plaintiffs contended on summary judgment demonstrated that there was no meeting of the

1  minds, wrote a letter to his client saying that a settlement had in fact been reached

2  and that he would so testify in court if necessary.

3       Because of the tactics of Plaintiffs and their counsel, the Court at the time of

4  its ruling had before it an incomplete record that still is not complete.  Fundamental

5  fairness dictates that Defendants be allowed to discover all of the relevant non-

6  privileged evidence on this issue and to consider whether to ask the Court to revise

7  its ruling on the settlement issue.  The decision on whether to move to reconsider,

8  on any motion to reconsider, or on appeal if any, ought to be made on the basis of a

9  complete record and not on the basis of potentially misleading fragments.

10  Disclosure of the contents of the August 9, 2002 Communication and further

11  discovery on this issue ought to be had.

12       **2.**     **The Evidence That Defendants Now Seek Is Impeachment**

13       **Evidence That Goes Directly to the Heart of Marks'**

14       **Credibility on the Settlement Issue.**

15       Marks testified in 2006 that no settlement had occurred in 2001, in part due to

16  certain actions by Defendants in late 2001 and early 2002.  It would have been

17  critical for Defendants' counsel to have confronted Marks at his deposition with a

18  letter written by Marks to his clients in *August 2002* and providing his then-

19  contemporaneous views and conclusions concerning the events in question, namely,

20  that there had been a settlement and that were he sworn to tell the truth, he would be

21  forced to say so.  Marks was not confronted by that letter – and indeed the Court and

22  counsel do not even today know for sure exactly what that letter contains – because

23  of Plaintiffs' multi-year effort to hide the ball.

24       The question on the settlement defense is whether the parties had a meeting of

25  the minds on the material terms of a settlement back in 2001.  No piece of evidence

26  on this question is more critical than what Marks believed back in 2001 at the time

27  that these events occurred – a subject that Plaintiffs' counsel allowed Marks to

28  testify on at his deposition, in the absence of the August 9, 2002 Communication

1   that provides the *best* evidence on this key issue. To allow the Defendants and the

2   Court to litigate these issues on the basis of Marks' characterization of the events in

3   2006, years after they occurred, when there is written evidence of what Marks

4   contemporaneously believed back in 2002 in the form of a presumably candid

5   assessment by a lawyer to his client, is to risk a substantial miscarriage of justice. In

6   Defendants' view, the Court ought to avoid that risk and allow a complete and

7   searching investigation of the facts.

8       Defendants are entitled to a full account before they are forced to decide

9   whether to ask the Court to reconsider. The Court is entitled to a full account if it is

10   asked to reconsider. And, no matter what, the parties are entitled to a complete

11   record in this case in the event that further proceedings ensue. Discovery of the

12   August 9, 2002 Communication and a resumed deposition of Marks depending on

13   what the August 9, 2002 Communication reveals are the first steps in the process of

14   undoing the damage to this case that Plaintiffs' conduct has caused.

15          **3.**    **Plaintiffs Have Improperly Obscured The Truth Through**

16                **Selective Use And Waiver Of The Privilege.**

17       Any voluntary disclosure inconsistent with the confidential nature of the work

18   product privilege waives the privilege. *Atari Corp. v. Sega of Am.*, 161 F.R.D. 417,

19   420 (N.D. Cal. 1994). "Disclosure to an actual or potential adversary waives work

20   product protection as to the material disclosed." *In re McKesson HBOC, Inc. Secs.*

21   *Litig.*, 2005 U.S. Dist. LEXIS 7098, 32-33 (N.D. Cal. Mar. 31, 2005). Moreover, a

22   waiver of the privilege may occur even if there is an agreement among parties that

23   disclosure does not constitute waiver. *Id.* Equally important in the rules governing

24   the waiver of privileges is the prevention of "prejudice to a party and distortion of

25   the judicial process by a privilege holder's selective disclosure of privileged

26   information . . . ." *Jacobs*, 117 F.3d at 89. *See also Columbia Pictures Television,*

27   *Inc. v. Krypton Broadcasting of Birmingham, Inc.*, 259 F.3d 1186, 1196 (9th Cir.

28   2001) (the attorney-client privilege and work product immunity may not be used

1  both as a sword and a shield); *Kintera, Inc. v. Convio, Inc.*, 219 F.R.D. 503, 512

2  (S.D. Cal. 2003).

3      At the deposition of Kevin Marks, Plaintiffs sought to selectively waive the

4  work-product doctrine. Specifically, Defendants' counsel asked Mr. Marks the

5  following question:

6          Q. [BERGMAN] Did you as of February 6, 2002
        believe that you had closed a deal with DC for the

7          Superman interest?

8  (Perkins Ex. 6 at 153:21-22.)

9      At this point in the deposition, Mr. Marks' counsel and Mr. Toberoff

10  interposed the following objections:

11          [MR. MARMARO] The question is vague and

12          ambiguous, calls for a legal conclusion, and again, I am
        going to defer to Mr. Toberoff whether he has any

13          objection to – subject to those objections, having Mr.
        Marks answer the question.

14

15          [MR. TOBEROFF] I object on *work product*

16          *privilege*, but I think I am not asserting that on behalf of
        the clients. I am not asserting that on behalf of the Siegels

17

18          [MR MARMARO] Mr. Marks would be prepared to

19          answer the question if the Siegels have no objection to it.

20          [MR TOBEROFF] As to your personal belief, no

21          objection.

22  (*Id.* at 153:23-154:11; emphasis added.) With the express permission of Plaintiffs'

23  counsel to testify as to his state of mind as to whether he believed there was an

24  agreement, Mr. Marks went on to testify as follows:

25          A. [MARKS] Well, if the question is did I think at

26          this point there was a final, binding, enforceable
        agreement, the answer would be no, but I did believe that

27          we had come to an agreement back on October 19th, 2001,
        that was reflected exactly in the terms that I have set out.

28          At the end of that letter I wrote to John in substance and

Case 2:10-cv-03633-ODW-RZ   Document 212   Filed 04/11/11   Page 49 of 149   Page
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 03/12/08   Page 31 of 80   Page
ID #:15187

1   effect, "John, if I've gotten anything wrong, if I've
    misstated any of these terms, please let me know." When
2   John writes back on October 26, which I see later, in effect
    his letter is yeah, you've got terms wrong. My outline of
3   the deal terms is different than your outline of the deal
    terms. So while I have thought we had an agreement on
4   these terms, John evidently didn't, and where you don't
    have a meeting of the minds, you don't have an
5   agreement.

6

7   (*Id.* at 154:12-155:2)  Of course, what Defendants did not know at the time of Mr.

8   Marks' deposition was that, in a letter in August 2002, Mr. Marks had actually

9   reached a different conclusion than that expressed at deposition.  According to the

10  Toberoff Timeline, Mr. Marks had told his clients that he believed that Plaintiffs had

11  entered into a binding agreement and that if they took Mr. Toberoff's offer, Mr.

12  Marks would testify against the Plaintiffs. (Perkins Ex. 1 at 2.)  Ironically, Mr.

13  Marks ended up testifying exactly the opposite.

14      Plaintiffs' tactic at the Marks deposition is the very kind of "sword and

15  shield" behavior that the law governing waiver of privilege was designed to

16  prevent.[4]  Mr. Marks was asked for his legal judgments formed as of February 6,

17  2002, shortly after he received Defendants' draft long form agreement. (Perkins Ex.

18  6 at 153:21-22.)  In other words, Mr. Marks was asked to disclose his mental

19  impressions formed in February 2002.  Such impressions were unquestionably

20  formed in anticipation of litigation because as Mr. Marks testified at deposition

21  "litigation was always looming" when it came to the negotiations regarding the

22  Superman termination interest. (Perkins Ex. 6 at 45:21-22.)  Plaintiffs' counsel

23  acknowledged that this question called for testimony concerning the attorney work

24  product, but then stated that he was not asserting that objection on behalf of the

25

26

27  [4] Plaintiffs' counsel and/or Mr. Marks' counsel objected on privilege grounds and
    instructed Mr. Marks not to answer on more than 15 separate occasions during the course
28  of the deposition. (Perkins Decl. ¶ 15.)

Case 2:10-cv-03633-ODW-RZ  Document 212  Filed 04/11/11  Page 50 of 149  Page
Case 2:04-cv-08400-ODW -RZ  Document 476  Filed 03/12/09  Page 92 of 80  Page
ID #:15188

1  Siegels. (Perkins Ex. 6 at 154:3-6.)[5]  Plaintiffs' counsel knew what Mr. Marks'

2  answer would be and therefore was anxious to have him answer the question.

3        Plaintiffs' counsel's selective waiver of the work-product privilege, and Mr.

4  Marks' ensuing favorable testimony for Plaintiffs, is troubling in light of the

5  apparent inconsistency between Mr. Marks' deposition testimony and the August 9,

6  2002 Communication in which Mr. Marks apparently told his clients – in writing –

7  that he believed an agreement *had* been reached, and felt sufficiently strongly about

8  this to threaten to testify under oath against Plaintiffs should they renege on the

9  agreement and instead accept Mr. Toberoff's offer. (Perkins Ex. 1 at 2.)

10  Meanwhile, when Defendants heard Mr. Marks' work product testimony, they were

11  unaware of the contents of the Toberoff Timeline or the contents of the August 9,

12  2002 Communication.  As a result, they were not able to inquire as to the

13  inconsistency in Mr. Marks' view, nor could they even move to compel production

14  of the August 9, 2002 Communication on the basis of Mr. Marks' waiver.

15        In light of what was an obvious waiver of Mr. Marks' work product – his

16  voluntary disclosure of his mental impressions as to whether he believed there was

17  an agreement between the parties in 2002 – as well as the inconsistency between

18  Mr. Marks' deposition testimony on the one hand, and content of the August 9, 2002

19  Communication on the other, the law that governs waiver and that is designed to

20  protect against prejudice to parties and to prevent the distortion of justice requires

21  that Defendants' motion be granted, that the August 9, 2002 Communication be

22  produced, and that Mr. Marks be deposed on the subject matter thereof.

23  ///

24  ///

25  ///

26

27  [5] Of course, this begs the question, on whose behalf *other than the Siegels* he could have
been asserting a work product privilege?  Of course, the answer is that it could only be the

28  Plaintiffs' privilege.

Case 2:10-cv-03633-ODW-RZ Document 212 Filed 04/11/11 Page 51 of 149 Page
Case 2:04-cv-08400-ODW -RZ Document 47 Filed 03/12/05 Page 95 of 80 Page
ID #:15189

4.      **It Is The "Law Of The Case" That Any Attorney-Client**
        **Privilege Applicable To The Toberoff Timeline Has Been**
        **Waived, Which In Turn Serves To Waive Any Privilege In**
        **Kevin Marks' August 2002 Communication With Plaintiffs**
        **Concerning Marks' Opinion That The Parties Had Reached**
        **A Settlement.**

In its September 26 Order, the District Court held:

> Pursuant to Magistrate Judge Zarefsky's order, any
> claim of privilege not previously asserted before that
> Order was deemed "waived." Although plaintiffs suggest
> that such a reading of Magistrate Judge's order as not a
> fair one and lacks common sense, the language of his
> order is clear and unambiguous: Any escrow document not
> matching up to the privilege log or the declaration's list of
> previously-produced documents was to be produced to
> defendants; any assertion of privilege to such documents
> to be produced was deemed "waived." That plaintiffs'
> counsel may have a basis to assert such privilege or
> otherwise challenge the propriety of producing such
> material on relevance grounds, etc., is inapposite. If
> plaintiffs wished to press such new claims of privilege or
> any other basis for challenging production of the same,
> Magistrate Zarefsky's Order deemed them waived. What
> plaintiffs' counsel should have done at that point to
> preserve such assertions was to appeal Magistrate Judge
> Zarefsky's Order to this Court, in particular that section of
> his Order deeming any previously un-asserted grounds of
> privilege to be "waived." Plaintiffs did not do so, and the
> time to appeal Magistrate Judge Zarefsky's Order to this
> Court has long since expired. See Local Rule 72-2.1.

Magistrate Judge Zarefsky's Order is now the law of the case in this matter.

(September 26 Order at 4-5.)

"[A]ttorney-client communications made 'in the presence of, or shared with,

third-parties destroys the confidentiality of the communications and the privilege

protection that is dependent upon that confidentiality.' 1 Paul R. Rice, Attorney-

Client Privilege in the United States § 4:35, at 195 (1999 ed.)." *Nidec Corp. v.*

1   *Victor Co.*, 249 F.R.D. 575, 578 (N.D. Cal. 2007).  Once disclosure of previously

2   privileged information occurs "it extinguishes the element of confidentiality that one

3   must show in order to claim the privilege." *Weil v. Investment/Indicators, Research*

4   *& Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981).  Similarly, "'disclosure of the

5   substance of a privileged communication is as effective a waiver as a direct

6   quotation since it reveals the "substance" of the statement.'" *U.S. v. Jacobs*, 117

7   F.3d 82, 91 (2d Cir. 1991) *quoting In re Kidder Peabody Sec. Litig.,* 168 F.R.D.

8   459, 470 (S.D.N.Y. 1996).

9        According to the Toberoff Timeline, in response to an offer from Mr.

10  Toberoff to Plaintiffs for their Superman rights, Plaintiffs' then-counsel, Kevin

11  Marks, "tells the [Plaintiffs] that he would testify in court against the [Plaintiffs] if

12  they accepted [Toberoff's] offer *because he believes there has already been an*

13  *agreement reached.*" (Perkins Ex. 1, at 2, emphasis added.)  Defendants have

14  concluded, based upon the Toberoff Timeline, the recollection of Warner Bros.

15  counsel Wayne Smith who saw the underlying documents, and Plaintiffs' privilege

16  logs, that this statement was communicated by Marks to Plaintiffs and others in the

17  August 9, 2002 Communication. (February 2009 Smith Decl. ¶ 5.)[6]  Effectively, the

18  "gist" of the August 9, 2002 Communication has already been disclosed and the

19  production of that document will "add literal meaning to that disclosure." *Jacobs*,

20  117 F.3d at 90.  Namely, the August 9. 2002 Communication will provide the full

21  context of Mr. Marks' contemporaneous view of a binding agreement and will allow

22  Defendants – and the Court – to view Mr. Marks' position in his own words.

23       As a result of the disclosure of the contents of the August 9, 2002

24  Communication through the production of the Toberoff Timeline pursuant to a

25  finding of privilege waiver which is the law of this case, the privilege in the August

26

27  [6] Significantly, in their response to Defendants' invitation to meet and confer on this
    motion, Plaintiffs do not deny that the August 9, 2002 writing from Marks contains, in
28  substance, the statement set forth in the Toberoff Timeline.  (Perkins Ex. 8.)

Case 2:10-cv-03633-ODW-RZ Document 212 Filed 04/11/11 Page 53 of 149 Page
ID #:15191
Case 2:04-cv-09049-ODW-RZ Document 47 Filed 03/02/09 Page 95 of 80 Page

1  9, 2002 Communication has been waived.  Thus, Defendants are entitled to the

2  August 9, 2002 Communication (which was called for under Defendants' Document

3  Requests (Perkins Decl. ¶ 11), as well as to depose Mr. Marks further concerning

4  the Document's contents.

5        **5.**     **Defendants Have Been Diligent In Seeking Discovery Of The**

6              **Escrow Documents And Thus Have "Good Cause" To**

7              **Reopen Discovery.**

8        "Rule 16(b) provides that a district court's scheduling order may be modified

9  upon a showing of 'good cause,' an inquiry which focuses on the reasonable

10  diligence of the moving party." *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1174 (9th Cir.

11  2007) *citing Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir.

12  1992). *See also N.Y. Life Ins. Co. v. Morales*, 2008 U.S. Dist. LEXIS 51304 (S.D.

13  Cal. July 1, 2008) (whether defendant has demonstrated good cause for reopening

14  discovery turns on when defendant learned of new deponents whether he pursued

15  discovery in a reasonably diligent manner).

16        Here, Defendants have been diligent in attempting to obtain first, the Escrow

17  Documents, and now the August 9, 2002 Communication.  Defendants began their

18  effort to receive at least some of the Escrow Documents by voluntary exchange in

19  July 2006.  When those efforts failed, Defendants served formal document requests

20  on Plaintiffs as well as a subpoena *duces tecum* on Plaintiffs' counsel on August 7,

21  2006.  (Perkins Decl. ¶ 11.)

22        After Plaintiffs refused to produce any of the Escrow Documents, and well

23  before the close of discovery, on March 26, 2007, Defendants moved to compel

24  production of some of the Escrow Documents.  On April 30, 2007, Magistrate Judge

25  Zarefsky issued an order on the record that should have resulted in Defendants

26  receiving in May 2007 the documents that were finally produced on December 12,

27  2008.  (Perkins Ex. 5 at 30:22-24.)  Instead, Plaintiffs simply refused to comply with

28  Magistrate Zarefsky's order, requiring Defendants to again move before the

Case 2:10-cv-03633-ODW-RZ   Document 212-4   Filed 04/11/11   Page 54 of 149   Page
ID #:15192
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 03/02/09   Page 96 of 80   Page

1 Magistrate Judge on September 12, 2007 prior to the close of discovery. (Perkins

2 Decl. ¶ 14.) Through no fault of Defendants, this motion was not ruled upon until

3 more than a year later, on September 26, 2008 and, because of an outstanding issue,

4 the Escrow Documents were not produced to Defendants until December 12, 2008.

5 (*Id.*)

6      Approximately one month after having received the Escrow Documents

7 (which month included the Christmas and New Year's holidays), Defendants

8 commenced the process of filing the instant motion. (*Id.* ¶ 16.)

9      In light of the foregoing, Defendants have demonstrated diligence in timely

10 seeking the evidence they seek by this Motion, thus demonstrating the "good cause"

11 necessary under Fed. R. Civ. P. 16(b).

12      **6.**    **The Evidence Sought By Defendants In This Motion Is**

13          **Discoverable Notwithstanding The Court's Ruling On**

14          **Summary Judgment.**

15      The standard for what is discoverable is very broad under Rule 26 of the

16 Federal Rules of Civil Procedure:

17          Parties may obtain discovery regarding any matter, not
         privileged, that is relevant to the claim or defense of any
18          party, including the existence, description, nature, custody,
         condition, and location of any books, documents, or other
19          tangible things and the identity and location of persons
         having knowledge of any discoverable matter. For good
20          cause, the court may order discovery of any matter
         relevant to the subject matter involved in the action.
21          Relevant information need not be admissible at the trial if
         the discovery appears reasonably calculated to lead to the
22          discovery of admissible evidence.
23

24 Fed. R. Civ. P. 26(b)(1).[7] There can be no dispute that documents and testimony

25 concerning Plaintiffs' main negotiator and attorney's contemporaneous view as to

26

[7] The Court reiterated this point at a recent hearing in ordering Defendants to supplement
27 their document production, stating "I'm sure that all counsel in this room understand the
distinction between the standard of relevancy in the discovery phase versus the standard of
28 relevancy at the trial itself. (Jan. 14, 2009 Trans. at 21:6-9.)

Case 2:10-cv-03633-ODW-RZ   Document 212   Filed 04/11/11   Page 55 of 149   Page
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 03/02/09   Page 37 of 80   Page
ID #:15193

1   whether the parties had an enforceable agreement is probative evidence itself and

2   would lead to the discovery of admissible evidence regarding Defendants'

3   settlement defense.

4        Indeed, in ruling on the settlement defense without the benefit of a letter from

5   Plaintiffs' counsel expressing his contemporaneous opinion that the parties _had_

6   reached an agreement as of August 9, 2002, the Court found that no such agreement

7   existed.  In so ruling, the Court relied on differences in the parties' correspondence

8   and on "conduct in reaction thereto."  (March 16, 2008 Order at 61.)  The impact of

9   the differences in correspondence, if there were differences, is undermined by the

10  direct evidence now available concerning the state of mind of the negotiator on the

11  Siegels' side.  It demonstrates that he believed he had a settlement notwithstanding

12  any differences in the correspondence, something the Court did not know before.

13  Moreover, Mr. Marks' decision to confront his clients and to insist that he would

14  testify to the existence of a settlement is "conduct in reaction thereto," conduct

15  about which the Court was unaware when it ruled on Summary Judgment.

16       Defendants respectfully argue that a contemporaneous letter from Plaintiffs'

17  then counsel expressing a belief that the parties had an agreement is powerful

18  evidence of the very sort of "conduct in reaction" upon which the Court indicated it

19  relied in dismissing Defendants' settlement defense, or at the very least places that

20  "conduct in reaction" under a significantly different light.  Such evidence, if

21  developed and presented on summary judgment, should have created a fact issue for

22  trial.

23       **7.    The Interests Of Justice And The Integrity Of The Judicial**

24            **Process Strongly Favor The Relief Sought By Defendants.**

25       Defendants do not, at this time or by this motion, seek reconsideration of the

26  District Court's dismissal of the settlement defense.  Rather, Defendants seek only

27  narrow relief – production of the August 9, 2002 Communication and the

28  opportunity to depose Marks thereon.  Whether Defendants decide to move for

Case 2:10-cv-03633-ODW-RZ Document 212-4 Filed 04/14/11 Page 56 of 149 Page
ID #:15194
Case 2:04-cv-08400-ODW-RZ Document 476 Filed 03/12/05 Page 98 of 80 Page

1 reconsideration will depend, in part, upon the development of the evidence.

2 However, regardless of whether Defendants seek reconsideration, fundamental

3 fairness requires that they must be permitted to develop this newly discovered

4 evidence so that they may have the option to seek reconsideration or simply to have

5 the evidence in the record on appeal at the conclusion of the case.

6   The Toberoff Timeline describes a pattern of deception by Plaintiffs' counsel

7 that has seriously tainted the process to Defendants' detriment.  Most germane to

8 this motion, Plaintiffs' improper delay in complying with Magistrate Judge

9 Zarefsky's Order of April 30, 2007, combined with delay in final decisions being

10 rendered on Defendants' motion to compel, conspired to keep powerful evidence of

11 a settlement between the parties from Defendants until after the close of discovery

12 and after the Court ruled on summary judgment.  In addition, by selectively waiving

13 the work product privilege and allowing Marks to testify in a way that appears to be

14 directly contradicted by a letter he wrote to his clients in 2002, Plaintiffs' conduct

15 has unfairly affected the merits of the case and has undermined the fundamental

16 fairness of the judicial process.  As a result, Defendants respectfully submit that the

17 Court's duty to maintain the integrity of the judicial process and fundamental

18 fairness further favor the granting of the narrow relief sought by Defendants herein.

19

20 **IV. PLAINTIFFS' CONTENTIONS**
   **A. FACTUAL AND PROCEDURAL BACKGROUND**

21
22    **1. The Court Properly Held on Summary Judgment That No
     Settlement Agreement Was Consummated By the Parties**

23   On April 30, 2007, Plaintiffs moved for partial summary judgment that no

24 settlement agreement was reached between Plaintiffs and Defendants regarding

25 Plaintiffs' Superman termination, as Defendants had alleged.  *See* Defs. First

26 Amended Answer, dated November 1, 2005, at ¶¶ 112-113; Defs. First Amended

27 Counterclaims, dated October 17, 2005, ¶¶ 47-56, 97-105.  Plaintiffs demonstrated

28 that the parties' objective manifestations of intent *clearly* indicated no "meeting of

1  the minds" on all of the material terms of a settlement agreement, as is required

2  under California law.[8]

3        Three key documents amply showed that, as a matter of law, no settlement

4  agreement was ever consummated due to their differing material terms: (1) a letter

5  dated October 19, 2001 (the "October 19, 2001 Letter"), from Plaintiffs' then

6  counsel, Kevin Marks ("Marks"), to Warner's general counsel, John Schulman

7  ("Schulman"); (2) a reply letter dated October 26, 2001, from Schulman to Marks,

8  with an outline of purported deal terms (collectively, the "October 26, 2001 Letter");

9  and (3) a proposed first draft of an agreement sent by Defendants' outside counsel to

10  Marks on February 1, 2002 (the "February 1, 2002 Draft"). *See Siegel II*, 542 F.

11  Supp. 2d at 1137.

12        In 2000 and 2001 the parties had communicated sporadically concerning the

13  potential settlement of this matter through the purchase by Defendants of Plaintiffs'

14  recaptured Superman copyrights. Plaintiffs' Motion for Partial Summary Judgment

15  (filed April 30, 2007) (Pls. MSJ) at 46:10-13.  These negotiations became

16  increasingly complex and led to an October 16, 2001 conference between Schulman

17  and Marks in which many different terms, including complicated contingent

18  compensation formulas, were discussed. *Id.*  Thereafter, Marks sent Schulman the

19  October 19, 2001 Letter, which stated as follows:

20        "The Siegel Family (through Joanne Siegel and Laura Siegel Larson, the
21        majority owners of the terminated copyright interests) has accepted D.C.
          Comics' offer of October 16, 2001 in respect of the 'Superman' and 'Spectre'
22        properties. The terms are as follows: ...."

23  Declaration of Marc Toberoff in Support of Plaintiffs' Motion for Partial Summary

24  Judgment ("Toberoff MSJ Decl."), Ex. BB at 1. The October 19, 2001 Letter set

25  forth financial and other terms and concluded by stating:

26  _____

27  [8] *See* Declaration of Marc Toberoff in Opposition to Defendants' Motion to Reopen
     Discovery ("Toberoff Decl."), Ex. A; Plaintiffs' Reply in Support of Motion for Partial
28  Summary Judgment (filed June 25, 2007) ("Pls. Reply MSJ") at 55:1- 62:8.

1     *"John [Schulman], if there is any aspect of the above that is somehow*
2     *misstated, please let me know…* I will be out of the office… for the following four weeks."

3   *Id.*, at 1-6 (emphasis added).

4         Schulman responded to Marks' October 19, 2001 Letter by his October 26,

5 2001 Letter, stating:

6     "I have received, and have finally had a chance to review, your outline
    fax of October 19… *I enclose herewith* for you and Bruce *a more*
7     *fulsome outline of what we believe the deal we've agreed to is.* We're
    working on the *draft* agreement so that by the time you [return]… we
8     will have this super-matter transaction in document form."

9   *Id.*, Ex. CC (emphasis added). Schulman's "more fulsome outline," entitled

10 "October 2001 Outline," contained new or different material terms than those

11 contained in Marks' October 19, 2001 Letter, and was therefore never accepted by

12 Marks or Plaintiffs. *Id.*

13         Defendants' outside counsel thereafter furnished to Marks the February 1,

14 2002 Draft – a first draft of a proposed agreement – along with a cover letter dated

15 February 1, 2002, which stated:

16     "I am pleased to enclose a *draft* agreement between your clients and
    DC Comics concerning the Superman property. *As our clients have*
17     *not seen this latest version of the agreement, I must reserve their*
    *right to comment.* In addition, you will note that the draft agreement
18     makes reference to certain 'Stand Alone Assignments.' We are
    finalizing those and, as soon as they are ready we will forward them to
19     you."

20   *Id.*, Ex. DD (emphasis added).

21         Defendants' February 1, 2002 Draft contained even more new or changed

22 material terms than those contained in Schulman's October 26, 2001 Letter, and

23 added "trap doors" that effectively minimized key financial terms set forth in

24 Marks' October 19, 2001 Letter. *See* Toberoff Decl., Ex. A.[9]

25         Joanne Siegel, by a letter dated May 9, 2002 to Warner Bros. CEO Richard

26

27 [9] One such "trap door" in the February 1, 2002 Draft was that Plaintiffs royalty was tied to
DC licensing revenues from *Siegel's* works, and not revenues from all derivative
28 Superman properties. *See also* Toberoff Decl., Ex. A at 48:7-19.

1  Parsons, expressed great dissatisfaction with Defendants' aggressive negotiating

2  tactics and their February 1, 2002 Draft, in the strongest of terms:

3      "Your company's unconscionable contract dated February 4, 2002 [*sic*]
4      contained new, outrageous demands that were not in the proposal.  The
       document is a heartless attempt to rewrite the history of Superman's
5      creation and to strip Laura and me of the dignity and respect that we
       deserve…. After four years we have no deal and this contract makes an
6      agreement impossible."

7  *See* Declaration of Michael Bergman in Opposition to Plaintiffs' Motion for

8  Summary Judgment ("Bergman MSJ Opp. Decl."), Ex. Z (May 9, 2002 letter).

9      Parson's response, dated May 21, 2002, *admitted* that as of that late date an

10 agreement had *not* been consummated: "John [Schulman] and Paul [Levitz] look

11 forward to meeting with your representatives, and ***we continue to hope that this***

12 ***agreement can be closed*** based upon the earlier discussions with your lawyers."

13 Bergman MSJ. Opp. Decl., Ex. AA (emphasis added).

14     Plaintiffs formally terminated settlement discussions by letter dated

15 September 21, 2002:

16     "We regret to inform you that after many years of difficult negotiations
       with your representatives culminating in an offer sent to us on February
17     4, 2002 [February 1, 2002 Draft], irreconcilable differences that cannot
       be overcome…. Putting outrageous, never discussed, unacceptable
18     demands into DC's February document made it clear that no agreement
       could ever be reached."
19

20 Bergman MSJ Opp. Decl., Ex. DD.

21     In opposition to Plaintiffs' motion, Defendants insisted that a full and final

22 agreement was reached in the October 19, 2001 Letter, and that the remaining letters

23 and drafts were mere "documentation."  The Court rejected Defendants' premise:

24     "Defendants argument to the contrary is premised on the notion that they can
       limit the scope of the legal analysis to the October 19, 2001, letter and call it a
25     contract, regardless of their materially different October 26, 2001, letter in
       reply ("I enclose…a more fulsome outline of what we believe the deal…is")
26     and their vastly different February 1, 2002 draft which were part and parcel of
       the same settlement negotiation."
27

28 *Siegel II*, 542 F. Supp. 2d at 1138 (emphasis original).  Instead, the Court analyzed

Case 2:10-cv-03633-ODW-RZ  Document 212  Filed 04/11/11  Page 60 of 149  Page
ID #:15198
Case 2:04-cv-08400-ODW -RZ  Document 47  Filed 03/12/05  Page 41 of 80  Page
ID #:15198

1   the objective manifestation of the parties' intent and granted Plaintiffs' motion:

2       "Defendants further seek to create issues of fact through *post hoc* testimony
        and rationalizations. *None of this subjective belief is sufficient to defeat the*
3       *objective manifestation of the parties' intent relayed in the documents*
        *referenced above that aptly demonstrate that there was no "meeting of the*
        *minds" on all material terms...* One need only review the language of the
4       parties' correspondence, their conduct in reaction thereto, and the numerous
        material differences between the terms relayed in the October 19 and 26, 2001
5       letters and the February 1, 2002, draft to reach the conclusion that the parties
        failed to come to an agreement on all material terms... Far from signifying
6       that the parties' "negotiations... result[ed] in a binding contract" leaving
        nothing more than the drafting of more formal documentation memorializing
7       that agreement, these submissions between the parties went far beyond that by
        adding in or further refining areas from what was contained in the October 19
8       letter... *From all of this there is no document or set of documents reflecting*
        *agreement by the parties to singular agreed terms.*"

9

10  *Id.* at 1138-1139 (internal citations omitted) (emphasis added).

11          **2.      Defendants Improperly Seek to Exploit and Leverage the**
12                   **Theft of Documents from Plaintiffs' Counsel's Office**

13                  a.      Documents Stolen From Plaintiffs' Legal Files

14          On July 5, 2006, Plaintiffs' counsel Marc Toberoff ("Toberoff") received a

15  letter from the law firm Arnold & Porter LLP ("Arnold & Porter"), notifying

16  Toberoff on behalf of Defendants, and in the vaguest of terms, that Defendants had

17  received three sets of documents from an unidentified source (the "Stolen

18  Documents"). *See* Toberoff Decl., Ex. B.  The letter stated that Arnold & Porter

19  was in possession of the documents and suggested a "protocol" for dealing with

20  them. *Id.*  Curiously, the letter did not identify the documents and omitted that the

21  documents, including *numerous privileged attorney-client communications*, had

22  obviously been *stolen* from the files of Toberoff's law firm.  Nor did the letter offer

23  to return the Stolen Documents or to permit Toberoff to review them.  *Id.*

24          Pursuant to a July 11, 2006 telephone inquiry by Toberoff, he was informed

25  by Arnold & Porter *for the first time* that the documents were from the legal files of

26  his own firm.  Toberoff Decl., Ex. M at ¶ 8.  Toberoff thereupon demanded that the

27  documents be returned immediately and rejected the "protocol" outlined in the July

28

1   5 letter as geared to exploiting the documents in this litigation. *Id.*[10]

2        By letter dated July 19, 2006 to Arnold & Porter, Toberoff reiterated his

3   demand for the return of the Stolen Documents, and requested specific information

4   as to the circumstances under which Warner had received hundreds of Stolen

5   Documents.[11] *Id.,* Ex. D. By letter dated July 20, 2006, Defendants' counsel

6   Michael Bergman ("Bergman") insisted that Arnold & Porter retain possession of

7   the Stolen Documents (as it had already done on Defendants' behalf), but

8   conspicuously ignored Plaintiffs' inquiry regarding Warner's curious receipt of the

9   Stolen Documents. *Id.*, Ex. E. By letter dated July 26, 2006, Toberoff reiterated

10  his July 19 request for information regarding Warner's mysterious receipt of the

11  bulk of Plaintiffs' legal files. *Id.*, Ex. F.

12       On July 27, 2006, Bergman finally came up with a response. *Id.*, Exs. G, T at

13  ¶¶ 11-12. He claimed that three apparently identical sets of documents addressed to

14  three highly-placed Warner executives had mysteriously arrived in envelopes on

15  June 28, 2006, that Warner purportedly did not retain any of the three envelopes (or

16  a copy of any envelopes), and that Warner purportedly had no mailroom, security or

17  executive office records, notes or logs of the three heavy packages ever being signed

18  in or received. *Id.*, Exs. G, T at ¶¶ 11-12. In short, Bergman claimed to have no

19  information whatsoever concerning the purportedly anonymous receipt by three

20  high-ranking Warner executives of substantial packages containing numerous

21  privileged documents relating to this lawsuit.

22  ---

[10] By letter dated July 13, 2006 Arnold & Porter announced that it would Bates stamp the
23  documents, send a Bates stamped copy to Plaintiffs' counsel, but, contrary to Plaintiffs'
wishes, retain the originals with a Bates stamped set. Toberoff Decl., Ex. C . On July 18,
24  2006, Arnold & Porter delivered three Bates stamped sets of the Stolen Documents,
keeping the originals. *Id.*, Ex. M, ¶ 10.

25  [11] The July 19, 2006 letter requested that Warner furnish: "(1) the date(s) each set of
26  documents was received; (2) copies of all envelopes or packages enclosing the documents;
(3) the method by which the documents were sent, and in the unlikely event the documents
27  were delivered by hand, the name of the messenger (and messenger service) logged at
Warner Bros.' security gate; and (4) any other pertinent information regarding Warner
28  Bros.' receipt of these documents." Toberoff Decl., Ex. D.

Case 2:04-cv-08400-ODW -RZ Document 47 Filed 03/12/05 Page 44 of 80 Page

1    On August 7, 2006, Defendants served a Third Set of Requests for Production

2  seeking the Stolen Documents, to which Plaintiffs objected on September 6, 2006.

3  Toberoff Decl., ¶ 30.

4              b.    The Court's April 30, 2007 Order

5    On March 23, 2007, Defendants filed a motion to compel the Stolen

6  Documents in the form of a joint stipulation, which was heard by Magistrate

7  Zarefsky on April 30, 2007. *See* Notice of Motion and Joint Stipulation re:

8  Defendants' Motion to Compel Production of Whistle-Blower Documents (filed

9  March 26, 2007) ("Defts. March 2007 Motion to Compel"). At the hearing,

10  Magistrate Zarefsky instructed Plaintiffs' counsel to submit a simple declaration that

11  would identify, by their Bates numbers, those of the Stolen Documents that had

12  been produced and those that had been listed on privilege logs. *See* Perkins Decl.,

13  Ex. 5 at 19:11-15. The Court further clarified:

14      "Then the escrow holder… is to return to plaintiffs any documents which are
15      identified in the declaration as being privileged and having been identified on
        the privilege logs. The others can be delivered to trial counsel for
16      defendants…."

        "Privilege documents get returned. The privilege documents that were listed
17      on the privilege log get returned. The others get sent to defense counsel."

18  *Id.* at 19:16- 20:3; 30:7-24.

19    On May 18, 2007, David Eisen, Esq., ("Eisen") of Arnold & Porter sent a

20  letter to the parties' counsel stating he would be serving as the custodian of the

21  "Escrow Documents." Toberoff Decl., Ex. L. On May 21, 2007, Toberoff served

22  Eisen and Defendants' counsel with his declaration ("May 21 Declaration")

23  pursuant to, and in full compliance with Magistrate Zarefsky's April 30, 2007 order

24  ("April 30 Order"). *Id.*, Ex. N. Nearly all of the Stolen Documents were either

25  privileged or had already been produced, and were designated as such in Toberoff's

26  declaration. However, nine documents (one of which is the Defamatory Letter and

27  four of which are merely fax cover or fax confirmation sheets) of the 839 pages of

28  Stolen Documents did not fit the Order and had fallen between the "cracks" of the

1   parties' joint stipulation and the hearing.[12]

2        By letter dated May 21, 2007, Plaintiffs asked Eisen *to disburse the Stolen*

3   *Documents pursuant to the April 30 Order*, but to retain the Nine Documents as they

4   were privileged and had not been addressed. *Id.*, Ex. N. However, on May 22, 2007,

5   Defendants sent Eisen a letter improperly disputing Toberoff's declaration and

6   instructing Eisen not to disburse *any* of the Stolen Documents, even those clearly

7   listed on Plaintiffs' privilege logs. *Id.*, Ex. O. Defendants also sent Eisen the

8   produced documents and privilege logs identified in Toberoff's declaration, but did

9   not furnish Plaintiffs with copies of the documents provided to Eisen, despite

10  Plaintiffs' written request for same. *See id.*, Ex. P.

11       Defendants then tried to get Eisen to "peek behind" the privilege logs, review

12  the stolen privileged documents, and search for particular documents to assist

13  Defendants with circumventing or challenging Plaintiffs' privilege logs:

14       "To assist you in your review we have compiled the documents Mr. Toberoff
         has identified in his declaration as having previously been produced, which
15       we have enclosed so that you can compare them to the Escrow Documents in
         you file. We have also enclosed the privilege logs he cites to so that you can
16       compare the privilege entries to the Escrow Documents in your file. It is
         Defendants' position that any document that does not match up exactly to an
17       identified entry on the privilege logs should not be returned to Mr. Toberoff,
         but instead should be produced to Defendants."
18

19  *See id.*, Ex. O at 2. No part of Magistrate Zarefsky's order permitted Defendants to

20  contact Eisen in this fashion – a blatant attempt to influence what Defendants had

21  previously misrepresented as a passive, neutral function. Perkins Decl., Ex. 5 at

22  19:8- 20:5.

23              c.    Defendants' Second Motion to Compel

24       After instructing Eisen not to disburse *any* of the Stolen Documents pursuant

25  _____

26  [12] These consisted of: (i) two post-litigation attorney-client communications, which,
    pursuant to the parties' standing agreement need not have been listed in a privilege log; (ii)
27  the Defamatory Letter; (iii) two letters between Toberoff and Don Bulson, the attorney for
    Michael Siegel, a statutory beneficiary of the Superman termination notices, which had
    been listed on Bulson's privilege log, and (iv) four fax cover or confirmation sheets
28  (collectively, the "Nine Documents"). Toberoff Decl., Exs. N, T at ¶ 6.

Case 2:10-cv-03633-ODW-RZ   Document 212   Filed 04/11/11   Page 64 of 149   Page
ID #:15202
Case 2:04-cv-08400-ODW-RZ   Document 47   Filed 03/02/05   Page 46 of 80   Page

1   to the April 30 Order, Defendants brought a motion to compel on September 17,

2   2007, seeking to have the "escrow agent" or the Court undertake a review of the

3   Stolen Documents so as to challenge Plaintiffs' assertion of privilege on their logs.[13]

4       The Court addressed this motion at the September 17, 2007 hearing on the

5   parties' cross-motions for summary judgment.  The Court made it abundantly clear

6   that it was not interested in re-hashing this matter with respect to all the Escrow

7   Documents, and would focus instead on the Nine Documents *remaining* at issue:

> Mr. Perkins:  "One of the things we had asked the escrow agent to do was to take Mr. Toberoff's declaration and to go document number by document number and ensure that the documents that he identified on his declaration really were what he said they were. In other words, he identifies certain ones that had already been produced."

> The Court:  ***"Let's not talk about the ones that have been done. Let's talk about the nine that we have left. I want to resolve this. We're going to move on here, counsel."***

13  *See* Toberoff Decl., Ex. R at 120:11-19.  The Court's September 17, 2007 minute

14  order described Defendants' motion to compel as "moot," and ordered Plaintiffs to

15  submit the Nine Documents for an *in camera* review, accompanied by a declaration

16  regarding "any claim of privilege relating to said documents." *Id.*, Ex. S at 2.

17      Plaintiffs submitted their declaration on September 20, 2007, arguing, *inter*

18  *alia*, that the Defamatory Letter discusses and purports to disclose privileged

19  attorney-client communications and work product contained within Plaintiffs'

20  confidential legal files, listed on Plaintiffs' and third party privilege logs, and upheld

21  by the April 30 Order.  *Id.*, Ex. T.  Neither Plaintiffs nor their counsel consented, at

22  any time, to the illicit Defamatory Letter, and, as it was sent anonymously, there

23  would have been no opportunity to list it on a privilege log.

24      On September 26, 2008, the Court ordered Eisen to produce forthwith "any

25  escrow document not previously listed in a privilege log or as having been

26

---

27  [13] *See* Joint Stipulation Re: Defendants' Motion to Compel Compliance with the Court's
     4/30/07 Order and Motion for Sanctions (filed September 17, 2007), at 20:15-22:26;
28  Toberoff Decl., Exs. O, Q.

Case 2:10-cv-03633-ODW-RZ Document 212-4 Filed 04/11/11 Page 65 of 149 Page
Case 2:04-cv-08400-ODW -RZ Document 476 Filed 03/12/09 Page 41 of 80 Page
ID #:15203

1  previously produced... [and that] the nine documents... are to be produced to

2  defendants' counsel as those documents were not previously identified in a privilege

3  log provided by plaintiffs." *Id.*, Ex. U at 5.

4        In response to the Court's September 26, 2008 order, Eisen wrote to counsel

5  on October 8, 2008, erroneously stating that he would produce to Defendants'

6  counsel: "(1) post litigation communications, (2) the undated cover letter, and (3)

7  documents identified in the privilege log of a third party." *Id.*, Ex. V.  He also

8  stated he would "compare the privilege logs to the documents, and to produce to Mr.

9  Bergman all escrow documents except those accurately described on the privilege

10  logs." *Id.*  By letter dated October 9, 2008, Plaintiffs reminded Eisen that the

11  Court's September 26, 2008 Order did not call for the release of *all* Stolen

12  Documents listed on third party privilege logs as set forth in Eisen's letter, and that

13  Eisen should not adjudicate whether the Stolen Documents were accurately

14  described in the privilege logs. *Id.*, Ex. W.  Plaintiffs reminded Eisen that as an

15  alleged "escrow agent" he owed a fiduciary duty to both parties. *Id.*

16        In response, Eisen stated:

17        "[N]either... this firm, nor I has suggested that we are formal escrow agents,
        in the legal sense of that term...we do not in my view, owe either party to this
18        litigation any legal duty. We expect to be paid for our time by defendants...."

19  Toberoff Decl., Ex. X.  By letter dated October 10, 2008, Bergman, in sync with

20  Eisen, stated: "[We] agree with your interpretation of the Court's Order regarding

21  your obligations to match-up the Escrow Documents to the pertinent privilege logs

22  entries to determine whether the description of date, sender, recipient and type of

23  document corresponds with what the document actually is." *Id.*, Ex. Y.  Moreover,

24  Bergman encouraged Eisen, over Plaintiffs' objections, to communicate *ex parte*

25  with the Court as to this matter. *Id.*

26        By letter dated October 13, 2008, Plaintiffs objected to Defendants' latest

27  attempt to have Eisen look beneath Plaintiffs' privilege logs to adjudicate their

28  sufficiency, and reminded Eisen that the Stolen Documents, with the exception of

Case 2:10-cv-03633-ODW-RZ Document 212 Filed 04/14/11 Page 66 of 149 Page
ID #:15204
Case 2:04-cv-08400-ODW -RZ Document 47 Filed 03/12/05 Page 48 of 80 Page

1  the Nine Documents remaining in dispute, should have been released immediately

2  pursuant to the April 30 Order. *Id.,* Ex. Z.  Plaintiffs pointed out that Eisen's sole

3  reason for not disbursing the documents, as ordered, was *Defendants'* insistence that

4  he engage in an improper substantive review of the Stolen Documents on their

5  behalf. *Id.*

6      Nonetheless, Eisen sent a letter to the Court on October 16, 2008 advocating

7  Defendants' desired "matching up" process. *Id.*, Ex. AA.  Plaintiffs objected on

8  October 17, 2008.  *See* Plaintiffs' Objection and Response to Attorney David S.

9  Eisen's *Ex Parte* Communication with the Court, filed October 17, 2008.  On

10  December 4, 2008, the Court issued an order denying Defendants' and Eisen's

11  request for a substantive review of the asserted privileges:

12      "The escrow holder is not to compare the description of each document to
    Toberoff's declaration to the corresponding escrow document to ensure the

13      description's accuracy.  Rather the task of matching up or review is done only
    insofar as the escrow holder is charged with carrying out the task, as set forth

14      in Magistrate Judge Zarefsky's April 30, 2007, Order, of locating (using the
    Bates stamp legend) those documents which appear on Toberoff's May 2007,

15      declaration as having previously been listed on a privilege log and turning
    them over to plaintiffs …"

16  Toberoff Decl., Ex. BB.  Eisen finally released the Stolen Documents on December

17  12, 2008, having retained Plaintiffs' privileged documents ***at Defendant's direction***

18  for over twenty months after Magistrate Zarefsky had ordered their prompt

19  disbursal. *Id.* at ¶ 31.  Over a month later, on January 14, 2009, Defendants wrote to

20  Plaintiffs and demanded to reopen discovery on the basis of the Defamatory Letter.

21  *See* Perkins Decl., Ex. 7.  By letter dated January 22, 2009, Plaintiffs pointed out

22  that Defendants' motion was baseless and moot.  *Id.*, Ex. 8.  Defendants served their

23  portion of this Joint Stipulation on February 19, 2009.

24    **B.**    **LEGAL ARGUMENT**

25        **1.**    **Defendants Improperly Seek Reconsideration of the April 30,**
             **2007 Order**

26

27      Magistrate Zarefsky's Order of August 18, 2006 upheld Plaintiffs' privilege

28  logs.  *See* Toberoff Decl., Ex. H.  The Court's Orders of April 30, 2007, September

1    26, 2008, and December 4, 2008 upheld privilege as to *all* Stolen Documents listed

2    on Plaintiffs' privilege logs. Defendants now seek to circumvent those orders and to

3    improperly challenge the privileged status of such documents, an issue the Court

4    clearly considers "closed."

5         The August 9 Letter was clearly an attorney-client communication listed on

6    Plaintiffs' privilege log, as Defendants admit, and thus falls within the scope of

7    Magistrate Zarefsky's original April 30 Order that such documents retained their

8    privileged status and should be returned to Plaintiffs. *See* Perkins Decl., Ex. 5 at

9    19:16-20:3 ("The escrow holder… is to return to the plaintiffs any documents which

10   are identified in the declaration as being privileged and having been identified on

11   the privilege log.").

12        The Court has already stated that the April 30 Order is "the law of the case in

13   this matter," and that the time to appeal it "has long since expired" under Local Rule

14   72-2.1. *See* Toberoff Decl., Ex. U at 5; L.R. 72-2.1 (allowing ten days to appeal a

15   magistrate judge's order). The Court has further stated that its orders were "meant

16   to dispose of the <u>one</u> remaining dispute [resolution of the privileged status of the

17   nine documents] between the parties concerning the escrow documents."

18   Defendants had already "sought to litigate the propriety of the invocation of

19   privilege contained in prior privilege logs," and the Court "was not inclined to

20   entertain" further arguments on this subject. *Id.* at 2-3. *See also id.*, Exs. R at

21   120:19 ("We're going to move on here, counsel"), BB.

22        The Court's September 26 and December 4, 2008 Orders also ended

23   Defendants' repeated attempts to have their purported "escrow agent" adjudicate

24   Plaintiffs' assertions of privilege on its logs under the guise of a "matching-up"

25   process. Once Defendants had obtained Magistrate Zarefsky's blessing of their

26   handling of the Stolen Documents by misrepresentations of a neutral "escrow"

27   protocol, they began to abuse it. After Toberoff submitted the May 2007

28   Declaration, per Magistrate Zarefsky's April 30 Order, Bergman instructed

36

Case 2:10-cv-03633-ODW-RZ   Document 212   Filed 04/14/11   Page 68 of 149   Page
ID #:15206
Case 2:04-cv-08400-ODW -RZ   Document 47   Filed 03/12/05   Page 90 of 180   Page

1   Defendants' "escrow" agent (an attorney retained and paid by them) to "compare the

2   privilege entries to the Escrow Documents in your file" and to produce to

3   Defendants "any document that does not match up exactly." *See* Toberoff Decl.,

4   Ex. O. Defendants then on *three* separate occasions prior to the Court's September

5   26, 2008 Order, submitted filings to the Court advocating a review of Plaintiffs'

6   privilege assertions.[14] When the Court's September 26, 2008 order clearly did not

7   envisage the re-testing of Plaintiffs' logs, Bergman, over Plaintiffs' objections, then

8   had their "escrow" attorney write to the Court *ex parte* on October 16, 2008 to

9   advocate such a process. *See* Toberoff Decl., Ex. AA. The Court finally ended the

10  matter on December 4, 2008, when it ordered the escrow agent to disburse the

11  documents, and not to adjudicate Plaintiffs' already-upheld assertions of privilege.

12  *Id.*, Ex. BB.

13          While Defendants purport to limit their claim to the August 9 Letter, the

14  implication of Defendants' position is that the unauthorized and anonymous

15  Defamatory Letter operates as a waiver of privilege as to *each and every privileged*

16  *document* referenced therein – documents already upheld as privileged and duly

17  listed on privilege logs.   This position is logically and legally incorrect.

18  Defendants' overreaching motion would have the Court override *four* prior orders

19  on this subject, and must be rejected.   Toberoff Decl., Exs. H, U, BB; Perkins Decl.,

20  Ex. 5.   Accordingly, Defendants' motion should be denied on this ground alone.

21          **2.      Defendants' Veiled Motion for Reconsideration Ignores
                Black-Letter Contract Law Upheld by the Court's Summary**
22              **Judgment Order**

23              a.      The Defamatory Letter Distorts Marks' Beliefs and Does
                        Not Even Mention Marks' August 9 Letter to Plaintiffs
24

25  _____

26  [14] *See* Notice of Motion and Joint Stipulation re: Defendants' Motion to Compel
    Compliance with the Court's 4/30/07 Order and Motion for Sanctions (dated September
    17, 2007), at 20:15-22:26; Declaration of Michael Bergman in Response to the Declaration
27  of Marc Toberoff Filed Pursuant to the Court's September 17, 2007 Order (filed
    September 25, 2007) at ¶¶ 48-51; Notice of New Evidence re: Defendants Declaration
28  Filed Pursuant to the Court's September 17, 2007 Order (filed April 9, 2008), at 5:11-19.

Case 2:10-cv-03633-ODW-RZ   Document 212   Filed 04/11/11   Page 69 of 149   Page
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 03/12/05   Page 91 of 180   Page
ID #:15207

1    As an initial matter, Defendants' argument falsely presupposes that the

2    Defamatory Letter accurately discloses the August 9 Letter, when it never even

3    mentions the August 9 Letter nor refers to a writing when describing what Marks

4    purportedly told his clients. *See* Perkins Decl., Ex. 1 at 2 ("Marks also tells the

5    Siegels that … he believes there has already been an agreement reached.").

6    Defendants oddly assume that anonymous, inadmissible third party statements in a

7    ranting Defamatory Letter are trustworthy, accurate evidence of the privileged

8    attorney-client communications discussed therein. As one might imagine, the

9    Defamatory Letter inaccurately describes both the content and meaning of the

10   August 9 Letter. The August 9 Letter reveals no inconsistency with Marks'

11   testimony regarding the settlement agreement. Toberoff Decl., ¶ 32. Yet

12   Defendants misleadingly refer to statements in the Defamatory Letter, as if such

13   were statements in the August 9 Letter itself.[15] Defendants also repeatedly refer to

14   the Defamatory Letter, as if its distorted hearsay is somehow, irrefutably, "true."

15

16   b.    Defendants' Motion Even Mischaracterizes the
           Defamatory Letter and Kevin Marks' Testimony

17   Defendants' motion is based on their calculated mischaracterization of the

18   contents of the Defamatory Letter. Defendants misleadingly and repeatedly portray

19   the Defamatory Letter as stating that Marks' August 9 Letter says that "an

20   *enforceable* settlement agreement" had been reached.[16] However, the Defamatory

21   _____

22   [15] For example, Defendants proclaim "this 'conduct in relation thereto' necessarily
     included Marks' now-disclosed communications to his clients that an enforceable

23   agreement had in fact been reached"; "[the August 9 Letter] demonstrates that he believed
     he had a settlement notwithstanding any differences in the correspondence, something the

24   Court did not know before," and the August 9 Letter shows "if Plaintiffs did not abide by
     the settlement agreement, he would testify against them at trial to enforce an agreement."

25   *Supra* at 13:25-28, 24:11-12, 1:24-25. *See also id.* at 18:8-9 ("in a letter in August 2002,
     Mr. Marks had actually reached a different conclusion than that expressed at the

26   deposition"); *Id.* at 19:17-19 ("the inconsistency between Mr. Marks' deposition testimony
     on the one hand, and the content of the August 9, 2002 Communication on the other").

27   [16] *See, e.g., supra* at 13:15-17 ("Marks' subsequent advice to his clients in August 2002
     that he believed there was an *enforceable* agreement and that he was prepared to testify to

28   that fact"); 13:19-21 ("[H]e believed that an agreement was in place that was sufficiently

1    Letter says no such thing: it merely states that "[Marks] believes there has already

2    been an agreement reached" and would testify as such. Perkins Decl., Ex. 1 at 2.[17]

3          Defendants also pretend that an inconsistency exists between the Defamatory

4    Letter and Marks' testimony regarding the settlement agreement. This, too, is false.

5    Marks clearly testified at his deposition that "*I did believe that we had come to an*

6    *agreement back on October 19th, 2001*," while testifying in the same paragraph that

7    ultimately, "a final, binding, *enforceable* agreement" was not reached as there had

8    been no "meeting of the minds" on all terms. *See* Perkins Decl., Ex. 6 at 154:13-14,

9    155:1-2 (emphasis added).[18] Despite Defendants' claims to the contrary, there is

10   simply no inconsistency between the Defamatory Letter's unsupported statement

11   that Marks would testify that an "agreement" had been reached, and Marks' actual

12   deposition testimony that an "an agreement" or deal had been reached, but that "a

13   final, binding *enforceable* agreement" had ***not*** been reached. This is also consistent

14   with the objective manifestation of the parties' intent set forth in the October 19 and

15   26, 2001, and February 1, 2002 letters, which controls. *See Siegel II*, 542 F. Supp.

16   2d at 1138, *citing Meyer v. Benko*, 55 Cal.App.3d 937, 942-43 (1976).

17        Marks, like the Court, understands the distinction between a deal or

18   "agreement," and a "final, binding, enforceable agreement," with the "meeting of

19

---

enforceable for him to testify against his own clients.").

[17] Nor are these the only intentional distortions of the record found in Defendants'
misguided motion. For example, Defendants falsely claim that "Plaintiffs' principal focus
in opposing the[ir prior] renewed motion centered on withholding the Toberoff Timeline."
*Supra* at 9:25-26. This statement is false: (1) there was no "renewed motion," merely a
"Notice of New Evidence" filed by Defendants on April 9, 2008, relating to a ruling from
the Northern District of Ohio; and (2) Plaintiffs' opposition filed on April 16, 2007,
centered on: (a) the preclusive effect of the Ohio ruling; (b) the common interest privilege;
and (c) Defendants' repeated attempts to re-argue the privilege of documents listed on
third party privilege logs. *It barely mentioned the Defamatory Letter*.

[18] Defendants outrageously imply that use by both Plaintiffs' counsel and Marks of the
common contract-law concept of "meeting of the minds" is indicative of some sort of
conspiracy among Plaintiffs and their current and former attorneys. *See supra* at 12:28
(quoting "meeting of the minds" from Plaintiffs' Motion for Summary Judgment and
claiming they were "precisely the words that Marks invoked in answering the question");
19:1-2 ("Plaintiffs' counsel knew what Mr. Marks' answer would be...").

1   the minds" on all material terms required to form a contract.  *Compare* Perkins
2   Decl., Ex. 6 at 154:12-155:2 ("Well, if the question is did I think at this point there
3   was a final, binding, enforceable agreement, the answer would be no, but I did
4   believe that we had come to an agreement back on October 19th, 2001.... So while I
5   thought we had an agreement on these terms, John evidently didn't, and where you
6   don't have a meeting of the minds, you don't have an agreement.") *with Siegel II*,
7   542 F. Supp. 2d at 1137 (The parties "found themselves in the all-too-familiar
8   situation in which verbal settlement negotiations result in *what the parties believe to*
9   *be an agreement* on all the major points of dispute but which, upon further
10  discussion, falls short of the agreement needed to resolved the dispute.") (emphasis
11  added).

12      Thus, Defendants' motion should additionally be denied, as the purported
13  evidentiary inconsistencies underpinning the motion do not exist.

14      Moreover, Defendants outrageously claim *without a shred of evidence* and
15  contrary to the record, that Kevin Marks, "Plaintiffs and their counsel tried, and
16  almost succeeded, in hiding contrary evidence." *Supra* at 14:24.[19] This purported
17  conspiracy would have required the active cooperation of Marks, a respected lawyer
18  in the firm Gang, Tyre, Ramer & Brown, who was terminated by Plaintiffs on
19  September 21, 2002, and who retained his own counsel to defend his deposition.
20  *See* Toberoff MSJ Decl., Ex. AA.  When Defendants claim that they could have
21  "impeached" Marks, they are essentially accusing him, an officer of the court, of
22  perjury, solely on the basis of *their* mischaracterization of the Defamatory Letter, a
23  document that Marks did not write and which has ***none*** of the characteristics that
24  indicate reliability in a legal proceeding.  It is not made under oath, it is anonymous,

25

26  [19] *See, e.g., supra* at 15:23 ("multi-year effort to hide the ball"), ("risk a substantial
    miscarriage of justice"); 25:6-7 ("a pattern of deception by Plaintiffs' counsel that has
27  seriously tainted the process"); 25:10-11 (Plaintiffs "conspired to keep powerful evidence
    of a settlement between the parties from Defendants"); 25:15-16 (Plaintiffs have
28  "undermined the fundamental fairness of the judicial process").

Case 2:10-cv-03633-ODW-RZ Document 212 Filed 04/11/11 Page 72 of 149 Page
ID #:15210
Case 2:04-cv-08400-ODW-RZ Document 47 Filed 03/12/05 Page 94 of 80 Page

1   it is hearsay, and it was written by a disgruntled lawyer, acting against his own

2   clients, in breach of his most fundamental ethical duties.

3         Defendants' unsupported accusation that Plaintiffs and their counsel

4   conspired to secret evidence and "hide the ball" from Defendants and the Court is

5   disgraceful. The Court should not lose sight of the fact that *Plaintiffs* were the

6   victim of a *theft*. Instead of having their documents, many of which are privileged,

7   returned immediately, they have been subjected to a sham "neutral" "escrow"

8   protocol for over two years of this litigation, with no end in sight. In response to

9   such an unspeakable violation of trust, Plaintiffs and their counsel have been

10   nothing but forthcoming. Upon finally receiving copies of the Stolen Documents,

11   they promptly compared these 839 pages to their legal files, finding that *all but two*

12   of the non-privileged documents had long ago been produced.[20] Moreover, every

13   privileged Stolen Document was accounted for on a privilege log, except the two

14   post-litigation attorney-client communications *that need not be listed on a privilege*

15   *log* per the parties' standing agreement (admitted by Defendants), and the

16   Defamatory Letter. Toberoff Decl., Ex. T at ¶¶ 19-22. It is clear that the real

17   objective of Defendants' frivolous motion is to prejudice the trier of fact prior to

18   trial by engaging in a smear campaign against Plaintiffs and their counsel.

19         c.   <u>Marks' Subjective Opinion Is, In Any Event, Extraneous</u>
<u>Because the Existence of a Contract Is Based Upon the</u>

20           <u>Objective Manifestation of the Parties' Intent</u>

21         Even if Marks had made the allegedly inconsistent statements (he did not),

22   Defendants' argument still fails, as Marks' subjective state of mind regarding the

23   settlement negotiations (to the extent revealed in the August 9 Letter) is superfluous

24   to the objective record of such negotiations, which demonstrates that a binding

25   agreement was not consummated. *See Siegel II*, 542 F. Supp. 2d at 1136-1139. The

26

27   [20]  These documents, consisting of two letters from Plaintiff Joanne Siegel to DC's
    President, Paul Levitz, were immediately produced, although already in Defendants'

28   possession. *See* Toberoff Decl., Ex. M at ¶ 22.

1   Court's order was based on an objective reading of the relevant documents – the

2   October 19, 2001 letter from Kevin Marks to John Schulman, purporting to "accept"

3   Schulman's offer, Schulman's October 26, 2001 *counteroffer* in response, and a

4   Defendants' further "long-form" counteroffer dated February 1, 2002. *Id.*[21]

5         The Court, after analyzing the documents comprising the negotiation, found

6   that such "did not result in an enforceable agreement." *Id.* The Court relied on

7   applicable California law that "[t]he failure to reach a meeting of the minds on all

8   material points prevents the formation of a contract even if the parties have orally

9   agreed upon some of the terms." *Id.* at 1137.

10         Notably, Schulman's "more fulsome outline" dated October 26, 2001,

11   responding to Marks' October 19, 2001 Letter, contained "numerous material

12   differences," constituting a counter-offer. *Id.* at 1115, 1138. As confirmed by the

13   Court, it is black-letter law that for "mutual [contractual] consent" to exist, there

14   must be an "unequivocal acceptance," and that a qualified acceptance is a counter-

15   offer ending the original offer. *Id* at 1138.[22]

16         Moreover, ***even if*** the parties "believe… an agreement" has been reached,

17   "[n]one of this subjective belief is sufficient to defeat the objective manifestation of

18   the parties' intent relayed in the documents referenced above that aptly demonstrate

19   that there was no "meeting of the minds" on all material terms." *Id.*[23] The Court

20

[21] *See also id.* at 1138 (additionally noting that Defendants reserved the right to revise their
21   February 1, 2002 Draft, the anticipated submission of related "stand alone agreements"
that had yet to be finalized, and the acknowledgement by Time-Warner's CEO that
22   "comments and questions" from Plaintiffs "would need to be resolved.").

[22] *See also* California Civil Code § 1585 ("An acceptance must be absolute and
23   unqualified, or must include in itself an acceptance of that character which the proposer
24   can separate from the rest, and which will conclude the person accepting. A qualified
acceptance is a new proposal."); *Apablasa v. Merritt & Co.*, 176 Cal.App.2d 719, 726
25   (1959) ("Terms proposed in an offer must be met exactly, precisely and unequivocally for
its acceptance to result in the formation of a binding contract; and a qualified acceptance
26   amounts to a new proposal or counter-offer putting an end to the original offer.") (citations
omitted).

27

[23] *See also Grove v. Grove Valve & Reg. Co.*, 4 Cal.App.3d 299, 312 (1970) ("The
28   California law is clear that there is no contract until there has been a meeting of the minds

Case 2:10-cv-03633-ODW-RZ   Document 212   Filed 04/11/11   Page 74 of 149   Page
ID #:15212
Case 2:04-cv-08400-ODW -RZ   Document 476   Filed 03/02/09   Page 96 of 80   Page

1  properly based its conclusion "that the parties' settlement negotiations did not result

2  in an enforceable agreement" on the parties' objective manifestations of their intent:

3  "Far from signifying that the parties' 'negotiations…result[ed] in a binding

4  contract'… these submissions between the parties went far beyond that by adding in

5  or further refining areas from what was contained in the October 19 letter… From

6  all of this there is no document or set of documents reflecting agreement by the

7  parties to singular agreed terms." *Id.* at 1139.[24]  *See also* Toberoff Decl., Ex. A.

8           Under California law and the sound logic of the Court's analysis, *even if*

9  Marks had offered testimony that he "believed" the parties had reached an

10 enforceable agreement (he did not), such subjective belief or legal conclusion would

11 be superfluous in light of the parties' "objective manifestations" of their actual

12 negotiations.[25]  As Marks' "beliefs" are not decisive or even germane to the issue

13 under California law, there are no grounds to reopen discovery or to invade the

14 attorney-client privilege, especially not on the basis of the anonymous hearsay

15 statement in the Defamatory Letter.

16

17

---

18 on all material points, despite the fact some terms have been agreed orally, or some action
   has been taken."); *Louis Lesser Enterprises, Ltd. v. Roeder*, 209 Cal.App.2d 401, 405
19 (1962) ("[T]here is no meeting of the minds of the parties while they are still negotiating
   terms.").

20
21 [24] *See also Meyer*, 55 Cal.App.3d at 942-43 (Contracts require "mutual consent…
   determined by objective rather than subjective criteria," and finding such consent based
   upon the parties agreeing upon and signing a contract.); *Stewart v. Preston Pipeline Inc.*,
22 134 Cal.App.4th 1565, 1587 (2005) (Consent "is based upon objective and outward
   manifestations of the parties," and finding such consent based upon the parties agreeing
23 upon and signing a contract.).

24 [25] Defendants, without citing any authority, repeatedly contend that Marks' subjective
   beliefs somehow constitute "conduct in relation thereto" with respect to the non-existent
25 settlement agreement, and that the Court relied on such belief in its decision. The Court
   clearly did not. Plaintiffs' motion for summary judgment and the Order relied on the
26 objective differences between the parties various proposals. *See* Toberoff Decl., Ex. A;
   *Siegel II*, 542 F. Supp. 2d at 1138 ("numerous material differences between the terms
27 relayed in the… letters"). The testimony of Marks, a seasoned entertainment transactional
   attorney, was submitted by Plaintiffs to explain and illustrate such contractual differences.
28 *Id.*

|   |   |
|---|---|
| 1 | d.   Defendants' Arguments Based on the Parties' Subjective |
| 2 |       Understanding Have Already Been Rejected by the Court |

3    Defendants have had every opportunity – through the depositions of Marks,

4  the Plaintiffs, and even Plaintiffs' current attorney, and through written discovery –

5  to develop their theory that a binding settlement agreement had supposedly been

6  reached.

7    Defendants relied heavily on Marks' letter of October 19, 2001 at summary

8  judgment.  For instance, Defendants emphasized in their opposition that Plaintiffs

9  "conceded in open court, without qualification, that the [October 19] Marks Letter

10  represented the statements of Plaintiffs themselves."  Defendants' Opposition to

11  Plaintiffs' Motion for Partial Summary Judgment (filed May 29, 2007) (Defts. MSJ

12  Opp.) at 70:11-13.  The October 19 Letter expressly stated that "the Siegel Family…

13  has accepted D.C. Comics' offer of October 16, 2001 in respect of the 'Superman'

14  and 'Specter' properties."  *Id.* at 72 n.52.  *See also id.* at 75:8-9 ("Mr. Marks, an

15  experienced transactional lawyer, carefully worded his letter to use the powerful

16  legal language of acceptance.").

17    Defendants argued that Marks' actions were "'outward manifestations' of

18  intent" that supported the purportedly "reasonable inference" that an enforceable

19  settlement agreement had been reached.  *Id.* at 79:14.  The Court therefore had

20  before it on summary judgment precisely the argument Defendants are making

21  presently:  that Plaintiffs' attorney believed that the parties had reached a binding

22  agreement.[26]

23    The Court found such subjective impressions insufficient as a matter of law.

24

---

25  [26] *See, e.g.,* Defts. MSJ Opp. at 78:22-24 (Marks "at no time expressed any concern,
disagreement, or dissatisfaction" with Defendants' counteroffer.), 79:4-6 (Marks "did not
26  challenge the [counteroffer] or seek to correct it, and did not disavow any of its terms or
dispute that an agreement had been reached."); 79:7-8 (Marks "did not protest any of its
27  provisions."); 79:11-13 (Marks even "acknowledged… that the February Draft was *not*
contrary to the parties' agreement, and undertook a rewrite.").

28

Case 2:10-cv-03633-ODW-RZ  Document 212  Filed 04/11/11  Page 76 of 149  Page
Case 2:04-cv-08400-ODW -RZ  Document 476  Filed 03/02/09  Page 98 of 80  Page
ID #:15214

1   Whatever Marks allegedly said in the privileged August 9 Letter to his clients as to

2   his *beliefs*, it will *not* materially change the "enforceable agreement" argument

3   Defendants already put before the Court, and the Court rejected.[27] *See Siegel II*, 542

4   F. Supp. 2d at 1138 ("None of this subjective *belief* is sufficient to defeat the

5   objective manifestation of the parties' intent relayed in the *documents* referenced

6   above that aptly demonstrate that there was no 'meeting of the minds' on all

7   material terms.") (emphasis added).

8            **3.**      **The Defamatory Letter Does Not Waive Attorney-Client Privilege**

9

10           a.     There Was No Voluntary Waiver of Attorney-Client Privilege as to the August 9 Letter

11       Defendants' motion completely ignores the fact that the August 9 Letter was a

12  privileged communication between an attorney and his clients, and was duly listed

13  as such on privilege log.  Toberoff Decl., Ex. N at 1:17. Plaintiffs have taken no

14  action that would waive the privilege of the August 9 Letter.  Waiver of the

15  attorney-client privilege arises *only* when the holder of the privilege takes voluntary

16  action to waive the privilege – such as by *voluntarily* disclosing the information or

17  by putting attorney-client communications at issue.  *See Transamerica Computer*

18  *Co., Inc. v. International Business Machines Corp.*, 573 F.2d 646 (9th Cir. 1978)

19  (The "general principle" is that "disclosure of confidential material constitutes a

20  waiver of the attorney-client privilege only if it is voluntary and not compelled.").[28]

21  _____

22  [27] Defendants claim that "[i]t would have been critical for Defendants' counsel to have confronted Marks at his deposition with a letter written by Marks to his clients in *August*

23  *2002* and providing his then-contemporaneous views and conclusions regarding the events in question." *Supra* at 15:16-19.  Defendants' fantasy of "confronting" Marks is based on

24  their misguided perception that they are *entitled* to privileged attorney-client communications.  Defendants imagine impeaching Marks with a privileged

25  communication that was listed on a privilege log when the deposition occurred.  The Gang, Tyre privilege log was served on September 29, 2006, prior to Marks' deposition on

26  October 7, 2006. *See* Toberoff Decl., Ex. I; Perkins Decl., Ex. 6.  Defendants would have no access whatsoever to such a document in the ordinary course of litigation.

27  [28] *See also Weil v. Investment/Indicators, Research and Management, Inc.*, 647 F.2d 18, 24 (9th Cir. 1981) ("[V]oluntary disclosure of the content of a privileged attorney

28  communication constitutes waiver of the privilege").

1    Moreover, ***unauthorized*** disclosure of protected attorney-client information

2  or documents does not waive attorney-client privilege. *See Tennenbaum v. Deloitte*

3  *& Touche*, 77 F.3d 337, 341 (9th Cir. 1996) ("[T]he focal point of privilege waiver

4  analysis should be the *holder's* disclosure of privileged communications to someone

5  outside the attorney-client relationship."); *Resolution Trust Corp. v. Dean*, 813 F.

6  Supp. 1426, 1430 (D. Ariz. 1993) (finding that, as the disclosure was unauthorized

7  and possibly criminal, the party "did not voluntarily waive any attorney-client

8  privilege it would have possessed."). Courts have consistently held that only those

9  authorized to do so may waive attorney-client privilege, and that unauthorized

10  disclosures or leaks do not waive the privilege, even when the party seeking to use

11  such evidence was "innocent" of any wrongdoing. *See, e.g., United States v. Chen*,

12  99 F.3d 1495, 1502 (9th Cir. 1996) (an ex-employee "cannot waive the

13  corporation's privilege"); *United States ex rel. Mayman v. Martin Marietta Corp.*,

14  886 F. Supp. 1243, 1246 (D. Md. 1995) (privilege not waived as to document stolen

15  by fired employee); *Sackman v. Ligget Group, Inc.*, 173 F.R.D. 358, 365 (E.D.N.Y.

16  1997) (prohibiting the deposition testimony of an expert who would base his opinion

17  on a privileged document that was stolen and disseminated to the public).[29]

18

19  _____

20  [29]  *See also In re Grand Jury Proceedings Involving Berkley and Co., Inc.*, 466 F. Supp
863, 870 (D. Minn. 1979) ("To the extent the documents can be viewed as stolen,
following the modern trend mentioned above, they should not lose the protection of the

21  privilege."); *Smith v. Armour Pharmaceutical Co.*, 838 F. Supp. 1573, 1576 (S.D. Fla.
1993) (denying use of memorandum widely distributed after its *unauthorized* release);

22  *Kenyatta v. Kelly*, 375 F. Supp. 1175 (E.D. Pa. 1974) (precluding use of documents stolen
by a third party from defendants, even though the documents had already been produced

23  by defendants to the plaintiffs); *In re Dayco Corp. Derivative Sec. Litig.*, 102 F.R.D. 468,
469-70 (S.D. Ohio 1984) (where no indication that party voluntarily gave privileged diary

24  to reporter, publication of excerpts of diary should not be considered waiver of attorney-
client privilege.); *Cooke v. Superior Court*, 147 Cal. Rptr. 915 (Cal. Ct. App. 1978)

25  (evidence excluded in divorce action when receipt of confidential information about
husband, including confidential communications between husband and his lawyer, was

26  purloined and passed to lawyer by husband's unfaithful agent without complicity of
receiving lawyer); 159 *American Law Reports Federal* 153 (Courts "will not condone

27  conduct which is condemned for public policy reasons, even if the result of judicial action
is to harm the innocent recipient of the unlawfully disclosed information. This is

28  especially so when the information is released as a result of a crime.").

1    The August 9 Letter was duly listed on a privilege log furnished to

2  Defendants on September 29, 2006.  Toberoff Decl., Ex. N at 1:17.  There was no

3  voluntary waiver of privilege as to the August 9 Letter.[30]   Lacking a valid legal

4  argument, Defendants argue that the production of the Defamatory Letter pursuant

5  to Court order somehow operates as a waiver of privilege as to the August 9 Letter.

6  However, it is well accepted and logical that disclosure of information pursuant to a

7  Court order does ***not*** operate as a *voluntary* waiver of privilege.[31]

8              b.    There Was No Basis to List the Defamatory Letter on a
9                    Privilege Log

10    Defendants erroneously argue that, because the Defamatory Letter was not

11  listed on a privilege log, not only is privilege purportedly waived as to the

12  Defamatory Letter, but also as to any attorney-client communications referenced

13  therein, including the August 9 Letter.

14    Even to the extent the Defamatory Letter purports to discuss and disclose

15  privileged attorney-client communications and attorney work product, *every one of*

16  *such  documents was appropriately listed in privilege logs and remains protected*

17  *pursuant thereto and the April 30, 2007 Order*: "The privilege documents that were

18  listed on the privilege log get returned [to Plaintiffs]."  Perkins Decl., Ex. 5 at 30:23-

19  24; Toberoff Decl., Ex. N.  Furthermore, there was little or no basis for Plaintiffs to

20  have listed the Defamatory Letter, itself, on a privilege log.  The Defamatory Letter

21  does not fit within the parameters of a privilege log:  it was not created by Plaintiffs

---

22  [30] Defendants previously brought a motion to compel challenging Plaintiffs' privilege log.
23  Magistrate Zarefsky denied Defendants' challenge and sustained the validity of Plaintiffs'
    privilege log.  See Toberoff Decl., Ex. H at 5:16-27.  Magistrate Zarefsky held that the
24  "descriptions in the log were sufficient" to assert privilege.  *Id.*  This order was never
    appealed to the Court by Defendants under L.R. 72-2.1 and thus is also the "law of the
25  case."  *See id.*, Ex. U at 5.

26  [31] *See, e.g., Government Guarantee Fund of Republic of Finland v. Hyatt Corp.*, 182
    F.R.D. 182 (D.V.I. 1998) ("The attorney-client privilege is not destroyed by disclosure of
27  protected information… which is done only under the compulsion of a court order.");
    *Laxalt v. McClatchy*, 116 F.R.D. 438, 455 (D. Nev. 1987) (Compliance with a court order
28  "will not waive the work product or attorney-client privileges.").

1   or their counsel; it is not an attorney-client communication; and is not Plaintiffs'
2   attorneys' work-product.  The unauthorized letter is written anonymously, and the
3   recipients were Warner Bros. executives.  As such, it is entirely proper that Plaintiffs
4   did not list such a peculiar document on a privilege log, especially since the
5   privileged documents referenced therein *were* all duly listed on privilege logs.

6       The "failure" to list the Defamatory Letter on a privilege log was no failure at
7   all.  There is no voluntary act Defendants can point to by which Plaintiffs waived
8   privilege as to the Defamatory Letter and to any privileged documents or
9   information illicitly referenced therein.  Even if Plaintiffs not listing the Defamatory
10  Letter on a privilege log was deemed to be the requisite voluntary act, there would
11  still be no basis to expand the scope of the waiver beyond the Defamatory Letter
12  itself to the August 9 Letter.  *See Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156,
13  1162 (9th Cir. 1992) (refusing to extend the scope of a waiver beyond the privileged
14  document actually disclosed).[32]

15
16            c.    <u>Any Failure to List the Defamatory Letter on a Privilege Log Was Excusable Inadvertence</u>

17      Even if one argues that Plaintiffs could have listed the Defamatory Letter on a
18  privilege log, despite the peculiar nature of this rogue document, Plaintiffs failure to
19  do so was "excusable inadvertence" preventing any waiver of privilege.  *See*
20  *Cunningham v. Connecticut Mut. Life Ins.*, 845 F. Supp. 1403, 1409 (S.D. Cal.
21  1994) (emphasizing "overriding issues of fairness").[33]

22  ———————————————
23  [32] *See also Kintera, Inc. v. Convio, Inc.*, 219 F.R.D. 503, 511 (S.D. Cal. 2003) ("Mere disclosure of the underlying fact would not waive the privilege or protection as to a communication containing that fact."), *citing Robinson v. Tex. Auto. Dealers Ass'n*, 214
24  F.R.D. 432, 448 (E.D. Tex. 2003); *Mendenhall v. Barber-Greene Co.*, 531 F. Supp 948 (N.D. Ill. 1981) ("The fact that some of the information is thus publicly disclosed does not
25  waive the privilege.").

26  [33] "The following factors… are applied to determine whether the failure to specifically identify a document or a claim of privilege was excusable inadvertence: (1) the precautions
27  taken to properly assert the privilege, (2) the time taken to rectify the error, (3) the scope of discovery, (4) the extent of the objection or claim of privilege, and (5) overriding issues of
28  fairness." *Id.  See also First Savings Bank, F.S.B. v. First Bank System, Inc.*, 902 F. Supp.

1       In this case, the "excusable inadvertence" factors weigh heavily in favor of

2  retaining the privilege as to the August 9 Letter.  Plaintiffs clearly took proper

3  precautions as to privileged documents.  The August 9 Letter and all other attorney-

4  client communications were properly listed in privilege logs.  In light of the April

5  30, 2007 Order, limiting the waiver of privilege to those documents not listed

6  privilege logs, it would be grossly unfair to find a waiver of privilege as to the

7  August 9 Letter that *was* listed on a privilege log – on the basis of an illicit

8  anonymous Defamatory Letter *that does not even reference the August 9 Letter*.

9  Toberoff Decl., Ex. M ¶¶ 17-20.

           d.   The Cases Cited by Defendants for Waiving Privilege Are
Inapplicable

12      The cases cited by Defendants for the proposition that Plaintiffs have waived

13  privilege as to the August 9 Letter are inapplicable, as they are all based on

14  *affirmative acts* taken by a party or its counsel that waived the privilege.  In *Weil*, an

15  appellee deliberately disclosed the content of its own privileged attorney-client

16  communication to bolster its arguments on the issue of scienter.  *Weil*, 647 F.2d at

17  23.  The Ninth Circuit ruled that the appellee could not invoke the privilege for other

18  communications on the same issue.  *Id.* at 24–25.  In *United States v. Jacobs*, 117

19  F.3d 82, 90-91 (2d Cir. 1997), the defendant knowingly made representations to

20  third parties of his communications with his attorney to further his own business

21  enterprises, and thereby voluntarily waived the privileged status of those

22  communications.  In *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 469-470

23  (S.D.N.Y. 1996), Kidder Peabody voluntarily released a report to the general public

24  and thereby waived any privilege.[34]

25

26  1356 (D. Kan. 1995) (ruling that a party's failure to assert a privilege claim was excusable
inadvertence because of the party's heavy workload, because the party took steps to rectify

27  its error once the opposing party filed a motion to compel, and because the opposing party
failed to meaningfully confer and could not show it suffered prejudice from its alleged
inability use the documents during deposition).

28  [34] *See also Nidec Corp. v. Victor Co.*, 249 F.R.D. 575, 578 (N.D. Cal. 2007) (cited by

Case 2:10-cv-03633-ODW-RZ   Document 212   Filed 04/11/11   Page 81 of 149   Page
ID #:15219
Case 2:04-cv-08400-ODW-RZ   Document 47   Filed 05/12/05   Page 85 of 80   Page

**4.    Defendants' "Work Product" Arguments Are Both
        Irrelevant to the Protection of the August 9 Letter and
        Unavailing**

      a.    <u>As Work-Product Protection Was Not Asserted for the
        August 9 Letter, Waiver of Work-Product is Irrelevant</u>

Defendants' extended discussion of the waiver of work-product protection for the August 9 Letter is no more than a "red herring," used to provide a platform for their baseless motion.  Plaintiffs and Marks asserted attorney-client privilege as to the August 9 Letter, not work-product protection, and, as discussed *supra*, the attorney-client privilege plainly remains intact as to the August 9 Letter.

Defendants' lead argument is that Plaintiffs and Marks purportedly waived work product protection of Marks' August 9 Letter based on Marks' answer to a single deposition question.  This issue is ***moot***, as the August 9 Letter is protected by the attorney-client privilege asserted in Gang, Tyre, Ramer & Brown's privilege log. *See* Toberoff Decl., Exs. I, N.   The attorney-client privilege and the attorney work-product doctrine are separate and distinct, and a purported waiver of work-product protection does not waive the attorney-client privilege. *See In re Echostar Comms. Corp.*, 448 F.3d 1294 (Fed. Cir. 2006) ("The attorney-client privilege and the work-product doctrine, though related, are two distinct concepts and waiver of one does not necessarily waive the other.").[35]

Even if work-product protection is waived, it "remains necessary to consider what [is] protected by the attorney-client privilege." *In re Michigan Boiler & Eng'g Co.*, 87 B.R. 465, 469 (Bankr. E.D. Mich. 1988).  The August 9 Letter is protected by the attorney-client privilege; whether unclaimed work product protection was

---

Defendants for the "general rule that… attorney-client communications made 'in the presence of, or shared with, third parties'" are not privileged).

[35] *See also Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 866 (3rd Cir. 1994) (With respect to the attorney-client privilege and work-product protection, the waiver of "one does not lead to the [waiver of the] other."); *Picard Chemical Inc. Profit Sharing v. Perrigo Co.*, 951 F. Supp. 679, 688 (W.D. Mich. 1996) ("Separate standards dictate the waiver of the attorney-client privilege and work product immunity.").

Case 2:10-cv-03633-ODW-RZ Document 212-4 Filed 04/11/11 Page 82 of 149 Page
Case 2:04-cv-08400-ODW-RZ Document 476 Filed 03/02/05 Page 84 of 80 Page
ID #:15220

1 somehow "waived" is irrelevant.

2         **b.**   <u>Marks' Testimony Does Not Constitute Work-Product and
3 Would Not Waive Work Product Protection</u>

     The definition of work-product is codified in the Federal Rules of Civil

4 Procedure as "*documents and tangible things* that are prepared in anticipation of

5 litigation or for trial by or for another party or its representative." F.R.C.P.

6 26(b)(3)(A) (emphasis added). *See In re Grand Jury Subpoena*, 350 F.3d 1010,

7 1015 (9th Cir. 2003) ("The work product doctrine… protects from discovery

8 *documents and tangible things* prepared… in anticipation of litigation.") (internal

9 quotation omitted) (emphasis added).[36] The work product doctrine is critical to the

10 functioning of the legal system, because it provides lawyers with an essential zone

11 of privacy to work. *Hickman v. Taylor,* 329 U.S. 495, 511 (1947).

12      An attorney or party waives work-product protection only through "a

13 deliberate decision to disclose privileged *materials* in a forum where disclosure was

14 voluntary and calculated to benefit the disclosing party." *United States v. Doe*, 219

15 F.3d 175, 184 (2d Cir. 1999) (emphasis added). This is illustrated by the cases cited

16 by Defendants regarding the waiver of work-product protection, which all involve

17 the voluntary disclosure of tangible materials or writings, not testimony.[37]

18

---

19 [36] *See also In re Echostar Communications Corp.*, 448 F.3d at 1301 ("Unlike the attorney-
client privilege, which protects all communication whether written or oral, *work-product
20 immunity protects documents and tangible things*, such as memorandums, letters, and e-
mails.") (emphasis added); Jones, Rosen, Wegner & Jones, Federal Civil Trials and
21 Evidence ¶ 8:3700 (Rutter 2008) (work product "protects *trial preparation materials* that
reveal an attorney's strategy, intended lines of proof, evaluation of strengths and
22 weaknesses, and inferences drawn from interviews.") (emphasis added).

23 [37] *See Atari Corp. v. Sega of Am.*, 161 F.R.D. 417, 418-19 (N.D. Cal. 1994) (voluntary
production of a copy of videotape with non-testifying expert consultant during discovery
24 waived work-product protection for the tape); *In re McKesson HBOC, Inc. Secs. Litig.*,
2005 U.S. Dist. LEXIS 7098 at *32-33 (N.D. Cal. Mar. 31, 2005) (voluntary disclosure of
25 attorney work-product to the SEC and the United States Attorney's Office waived
protection); *Kintera*, 219 F.R.D. at 510-11 (voluntary disclosure of the substance of
26 witness affidavits to the general public on writings on parties' own Web site waived
protection); *Columbia Pictures Television, Inc. v. Krypton Broadcasting of Birmingham,
27 Inc.*, 259 F.3d 1186, 1196 (9th Cir. 2001) (holding that a party could not introduce
attorney-client communications as evidence after asserting a privilege for the
28 communications during discovery); *Jacobs*, 117 F.3d at 90-91 (voluntary description in

Case 2:10-cv-03633-ODW-RZ  Document 212  Filed 04/11/11  Page 83 of 149  Page
Case 2:04-cv-08400-ODW -RZ  Document 47  Filed 03/12/05  Page 65 of 80  Page
ID #:15221

1   Marks' testimony that, when he sent his October 19, 2001 "acceptance" letter,

2 he believed there was an agreement, but that "a final, binding, enforceable

3 agreement" was never reached due to DC's counter-offers, did not disclose

4 information subject to work-product protection.  While summarizing the parties'

5 negotiations, it did not disclose work product materials or other tangible things

6 prepared in anticipation of litigation.  *See id.* at 191 (Testimony by an attorney as to

7 the substance of a meeting did not waive work product protection of notes regarding

8 the meeting.).

9

     c.  There Is No Connection Between Marks' Testimony and
10       the August 9 Letter

11   Even if Marks' answer to one of Defendants' deposition questions were

12 somehow held to be work product, and even if work product were relevant, the

13 August 9 Letter would remain protected as work product for two reasons.

14   Firstly, Defendants have not proved the contents of the August 9 Letter by an

15 anonymous, untrustworthy and inadmissible Defamatory Letter that does not even

16 mention the August 9 Letter.  Marks' testimony also did not discuss or disclose in

17 *any* sense the August 9 Letter.  Simply put, Defendants' waiver theory rests on the

18 contents of the August 9 Letter, which Defendants have not established.

19   Secondly, Marks' testimony constituted, at most, "opinion" work product.

20 "Opinion" work product is "materials involving pure legal theory or opinion … pure

21 mental impressions."  *In re Martin Marietta Corp.*, 856 F.2d 619, 625 (4th Cir.

22 1988).  While disclosing "fact" work product can give rise to "subject matter

23 waiver" as to documents touching on the same subject matter, the disclosure of

24 "opinion" work product does not.  *Id.* at 626 (the doctrine of subject matter waiver

25

26 writing of the content of attorney-client communications to attract investors waived
   privilege).  *See also United States v. Nobles*, 422 U.S. 225, 227-228, 239-40 (1975)
27 (voluntary use of written work-product report in conducting cross-examination waived
   privilege).

28

1 "does not apply" to opinion work product).[38] As such, Marks' opinion would not

2 provide a basis for waiving work protect protection of the August 9 Letter to the

3 extent it discussed the settlement negotiations.

### 5. The Court Should Reconsider Its Conclusion that the Letter "Contains" Conduct By Plaintiffs' Counsel as the Letter is Unethical, Anonymous, Inadmissible and Unsupported

6 Notwithstanding Defendants' insidious smear campaign and hyping of the

7 Defamatory Letter as "explosive" new evidence, a "revelation," and a

8 "whistleblower" document, it is clearly none of these things. The rant in the

9 anonymous Defamatory Letter lacks any indicia of trustworthiness. It was written

10 by an attorney who, after hours, surreptitiously photocopied Plaintiffs' entire

11 privileged legal files and privileged documents of related clients, and blithely turned

12 them all over to Defendants in the midst of this litigation. In so doing, the attorney

13 potentially harmed his clients, in violation of the attorney's most fundamental

14 ethical duties. It is hard to imagine a more despicable act by a lawyer. Moreover, to

15 anyone thoroughly familiar with the parties and the facts of this case, the

16 Defamatory Letter reads like an incoherent conspiratorial rant against Plaintiffs'

17 counsel.

18 There was nothing "whistleblower"[39] about this conduct, despite Defendants'

19 constant efforts to elevate it so as to malign Plaintiffs' counsel. If the attorney truly

20 had a shred of evidence or knowledge of *any* unethical conduct by Plaintiffs'

21 counsel, he could and would have informed the California Bar. Instead, he

22 unethically disclosed reams of his clients' privileged documents to Warner Bros.

23

24 [38] *See also Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1422 (11th Cir. 1994) ("[T]he subject-matter waiver doctrine does not extend to materials protected by the

25 opinion work product privilege."), *mod. on other grounds*, 30 F.3d 1347 (11th Cir.1994).

26 [39] In their original motion to compel before Magistrate Zarefsky, Defendants disingenuously promoted the Stolen Documents as "Whistleblower Documents." This

27 characterization was flatly rejected by Magistrate Zarefsky: "And I will say that I don't agree with the designation of these as 'whistleblower' documents either...." Perkins Decl.,

28 Ex. 5 at 18:16-18.

1    Contrary to Defendants' ridiculous allegations of a conspiratorial "cover-up"

2    by Plaintiffs, Plaintiffs' present counsel and prior counsel, Gang, Tyre, Ramer &

3    Brown, it turns out that of the 839 pages of Stolen Documents, all but two non-

4    privileged documents already in Defendants' possession had been produced and all

5    but two privileged post-litigation documents had been listed on privilege logs.[40]

6    The attorney who stole Plaintiffs' privileged files and delivered them to

7    Warner Bros. had worked at Toberoff's law firm for less than three months, without

8    any apparent problem or incident, and then one day disappeared on his lunch break

9    in November 2005 without notice.  Toberoff Decl. at ¶¶ 33-34.  The attorney did not

10   return the firm's calls.  *Id.*  He thereafter brazenly contacted Plaintiffs and other

11   clients of the firm in December 2005, and tried to convince them to terminate

12   Toberoff's firm by falsely disparaging Toberoff and offering a "better deal."  *Id.*

13   By all accounts, his motives were financial.   He was rejected by Plaintiffs and the

14   firm's other clients in December, 2005.  *Id.*  It is believed that soon thereafter he

15   communicated with Defendants and provided the privileged documents he had

16   stolen from Plaintiffs' legal files – hence, his statement in the Defamatory Letter

17   "consider it an early Holiday present."

18   In light of this unseemly and unethical behavior, and the anonymous,

19   unsupported and inadmissible nature of the letter, itself, *no credence should be given*

20   *to its statements*.

21   Therefore, Plaintiffs respectfully request that the Court reconsider the

22   conclusion in its September 26, 2008 Order that "[t]he documents in question

23   *contained* embarrassing and potentially questionable conduct by plaintiffs[']

24   counsel in this case."  *Id.*, Ex. U at 1 (emphasis added).  This statement appears to

25   accept as fact the anonymous Defamatory Letter's unsupported rant against

26   Toberoff and random characterization of documents, *not before the Court*.

27

28   [40] *See* Toberoff Decl., Exs. M at ¶ 22, T at ¶ 19.

Case 2:10-cv-03633-ODW-RZ Document 212-4 Filed 04/14/11 Page 86 of 149 Page
ID #:15224
Case 2:04-cv-08400-ODW-RZ Document 47 Filed 05/12/05 Page 63 of 80 Page

1    Defendants, not surprisingly, have seized upon the Court's statement, quoting

2    it in the second line of their motion. Encouraged, Defendants argue that the

3    Defamatory Letter is presumptively "true," and without a shred of evidence or

4    support embark on a further smear campaign in their efforts to prejudice the trier of

5    fact. Accordingly, Plaintiffs respectfully request that the condemnatory statement in

6    the Court's September 26, 2008 Order be eliminated or, in the alternative, modified

7    to reflect that the Defamatory Letter "alleges" conduct, without support.

8          **6.    The September 26, 2008 Order Should Be Reconsidered**
9                **Because the April 30 Order Did Not Encompass the**
                  **Defamatory Letter and In Any Event Plaintiffs Had No**
10               **Opportunity to "Appeal" the April 30 Order as to this Issue**

11         a.    <u>The April 30 Order Did Not Encompass the Defamatory</u>
                 <u>Letter Because Defendants Had Not Moved to Compel</u>
12               <u>Production of the Letter</u>

13    Magistrate Zarefsky's April 30, 2007 Order encompassed only those

14    documents that Defendants had moved to compel. Defendants clearly did not move

15    to compel the Defamatory Letter; they moved to compel the so-called "Whistle-

16    blower documents." *See generally* Defts. March 2007 Motion to Compel. At no

17    point did Defendants provide *any* indication that the "Whistle-blower documents"

18    included the Defamatory Letter, and expressly distinguished the Defamatory Letter

19    from the "Whistle-blower documents."[41] Because Defendants had not moved to

20    compel the Defamatory Letter, it was not discussed by *either* party at the April 30,

21    2007 hearing before Magistrate Zarefsky, nor encompassed by the April 30 Order.

22    *See* Perkins Decl., Ex. 5.

23    Production of the Defamatory Letter was not before Magistrate Zarefsky, and

24

---

25    [41] *See, e.g.,* Defts. March 2007 Motion to Compel at 2:6-14 (requesting production of the
      "Whistle-blower documents"), 6:13-14 (referring to "the cover letter contained with the
26    documents"), 6:26-27 (characterizing "the 'cover letter' that *came with* the Whistle-blower
      documents") (emphasis added); 7:9-10 (referring to "Whistle-blower Documents contained
27    with the letter"), 7:17-19 (referring to attorneys' perusal of "the contents of the cover letter
      and my brief thumbing through the documents"); and 16:17-21:28 (referring repeatedly to
28    the "Whistle-blower Documents" and never mentioning the cover letter).

1    his April 30 Order should not be misconstrued to include it.

2    ///

3    ///

b.    The Issue of Whether the Defamatory Letter Should Be
4         Released to Defendants Was Not Ripe for Appeal Under
          Local Rule 72-2.1

5

6         The Court held in the September 26, 2008 Order that Plaintiffs had "waived"

7    any opportunity to preserve privilege in the Nine Documents, because they did not

8    appeal the April 30 Order within ten days pursuant to Local Rule 72-2.1. *Id.* at 4-5.

9    However, such an appeal would not have made sense at the time the April 30 Order

10   was issued.   The April 30 Order, by its own terms, required Plaintiffs' counsel to

11   submit a declaration *twenty-one* days later on May 21, 2007.  In the process of

12   reviewing the Stolen Documents, it became apparent to Plaintiffs that the Nine

13   Documents had not been addressed by Defendants' motion, at the hearing or by the

14   Order.  Plaintiffs' counsel therefore asserted that the Nine Documents remained

15   privileged in his May 2007 Declaration. *See* Toberoff Decl., Ex. N.

16        Plaintiffs did not disagree with the straightforward April 30 Order.  Plaintiffs

17   believed that the Nine Documents had "fallen through the cracks," and that,

18   considering the transcript of the April 30, 2007 hearing and the Order, Magistrate

19   Zarefsky had not intended that privilege be waived for the Nine Documents.  In such

20   circumstances, where the issue was not ripe for appeal, an immediate appeal to this

21   Court pursuant to Local Rule 72-2.1 would have been premature.

22        By the time this issue came to a head, after meet and confer letters between

23   the parties and a round of communications with Arnold & Porter, Magistrate

24   Zarefsky suffered the tragic loss of his wife and was indisposed.  Thereafter,

25   Defendants moved to compel and challenged the privilege claims to the Nine

26   Documents asserted in the May 21 2007 declaration, resulting in the Court's

27   September 26 Order.  Ordinarily, Defendants would have brought this motion to

28   Magistrate Zarefsky.  In the unlikely event Magistrate Zarefsky had granted

Case 2:10-cv-03633-ODW-RZ Document 212 Filed 04/14/11 Page 88 of 149 Page
ID #:15226
Case 2:04-cv-08400-ODW-RZ Document 476 Filed 03/12/09 Page 20 of 80 Page

1  Defendants' motion, such would have been the order to have been appealed

2  pursuant to Local Rule 72-2.1.

3       Given the above circumstances, Plaintiffs did not waive their opportunity to

4  have Magistrate Zarefsky's Order clarified.

5       **7.  The September 26, 2008 Order for the Production of the
        Defamatory Letter Should Be Reconsidered In Light of the
6       Record and Defendants' Misuse of the Stolen Documents**

7       Defendants secured the Defamatory Letter based on their misrepresentations

8  to the Court that they followed a proper protocol in handling the Stolen Documents

9  and *immediately* turned them over to a supposed "neutral."  As neither is true, the

10 April 30, 2007 and September 26, 2008 Orders should be reconsidered, at least with

11 respect to the Defamatory Letter.   For the reasons set forth below, the Defamatory

12 Letter should be returned to Plaintiffs, and Defendants should be barred from further

13 attempting to use it in this litigation or otherwise.  *See City of L.A. v. Santa Monica*

14 *BayKeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (Courts have the "plenary power" "to

15 correct mistakes" in prior orders.); Local Rule 7-18(b).

16       a.   Magistrate Zarefsky's April 30 Order Was Based on
             Defendants' Misrepresentation of a Sanitized Protocol
17

18       Throughout this process, Defendants have used terms like "protocol,"

19 "neutral" and "escrow," all in an effort to mask the uneasy appearance of their

20 overzealous conduct.  Defendants went to great lengths to create the appearance of a

21 sanitized protocol to deal with the Stolen Documents.  However, the record of

22 evidence, which surfaced after Defendants had convinced Magistrate Zarefsky to

23 bless their supposedly "neutral" procedures, reveals their misrepresentations and

24 Defendants' objective to ride roughshod over the attorney-client privilege.

25       i.   Warner Bros. Engaged in a Substantive Review of
             the Privileged Stolen Documents

26       Defendants' misconduct began when their attorney Wayne Smith ("Smith"),

27 Warner's Senior VP, Litigation, who oversees this litigation on Defendants' behalf,

28 undertook a detailed review of Plaintiffs' privileged documents, instead of

1   immediately notifying and returning them to Plaintiffs' counsel.  A lawyer who

2   receives materials of opposing counsel that are facially privileged or otherwise

3   confidential, when the materials were not intended for the recipient, should refrain

4   from examining them, notify opposing counsel immediately, and abide by his

5   instructions.  *See Gomez v. Vernon*, 255 F.3d 1118, 1131–32 (9th Cir. 2001); 3

6   *Matthew Bender Practice Guide: Federal Pretrial Civil Procedure in California* §

7   24.40.  Defendants did none of these things – they reviewed the documents in detail,

8   failed to promptly notify Plaintiffs' counsel, and, obviously, did not comply with

9   Plaintiffs' instructions to return the Stolen Documents immediately.

10      Smith claims he relied on *State Compensation Insurance Fund v. WPS, Inc.*

11  (*State Fund*), 70 Cal.App.4th 644 (1999) in deciding how to handle the Stolen

12  Documents.  However, the protocol set forth in *State Fund* is more stringent than as

13  depicted by Smith[42]:

14          "[T]he lawyer receiving such materials should refrain from examining the
15          materials any more than is essential to ascertain if the materials are privileged,
            and shall immediately notify the sender that he or she possesses material that
16          appears to be privileged."

17  70 Cal.App.4th at 656.[43]  As demonstrated below, Smith failed to comply with the

18  *State Fund* procedures touted by Defendants to Magistrate Zarefsky and this Court.

19      It is believed from the conduct of the attorney who stole the documents

20  (sudden disappearance in early November, 2005, failed attempt to poach Plaintiffs

21  in late November, 2005) and his statements to Warner Bros. in the Defamatory

22

---

23  [42] Smith shades the *State Fund* procedures: "(i) to review each document but to cease the
    review once it became apparent that the document was privileged; (ii) to contact opposing
24  counsel and advise that the documents have been received; and (iii) to refrain from using
    any information in the documents until there was either an agreement with opposing
25  counsel, or the court had determined the documents' disposition."  Perkins Decl., Ex. 4 at ¶
    6.
26
    [43] This decision was upheld by the Supreme Court of California, which noted that it
27  comports with an attorney's "obligation not only to protect his client's interests but also to
    respect the legitimate interests of fellow members of the bar, the judiciary, and the
28  administration of justice."  *Rico v. Mitsubishi Motors Corp.*, 171 P.3d 1092, 1099 (2007).

1 Letter ("consider it an early Holiday gift") that Warner received their early

2 Christmas present in late November or early December, 2005, and waited **seven**

3 **months** before deciding whether or when to disclose this matter to Plaintiffs.[44]

4       Moreover, even if Defendants received the stolen documents in June, 2006, as

5 they say, they did not bring this to Plaintiffs' *immediate* attention as required by

6 *State Fund*. They belatedly mention the "anonymous" receipt of documents in a

7 letter dated July 5, 2006 and then in only the vaguest of terms as "certain

8 documents." Toberoff Decl., Ex. B. Plaintiffs did not learn that the documents

9 were *their* privileged documents, until July 11, 2006, and only after Plaintiffs'

10 counsel pressed Defendants. Toberoff Decl., Ex. M at ¶ 8. Plaintiffs did not receive

11 a copy of the documents until *July 18, 2006. Id.*, ¶ 10.

12       The second fiction Defendants have maintained is that Smith, pursuant to

13 *State Fund*, merely "thumbed through" or just "brief[ly]" glanced at the Stolen

14 Documents to determine their privilege status. *See* Defs. March 2007 Motion to

15 Compel at 7:9-10; Perkins Decl., Ex. 4 at ¶ 3. Smith states in his March 27, 2007

16 declaration that he placed the Stolen Documents in three piles marked "non-

17 privileged," "privileged" and "?" (when he believed privilege had been waived).

18 Perkins Decl., Ex. 4 at ¶¶ 8-12. Smith claimed "where it first appeared to me it was

19 entirely privileged, I ceased reading it, placed the document in the "privileged" pile

20 and did not look at it further." *Id.* Smith professed to have briefly skimmed the

21 documents, upon receipt, on June 28, 2006 and to have turned *all* of them over to

22

23 [44] These inferences are further supported by Defendants' evasion of Plaintiffs' requests for
information and evidence regarding their receipt of the Stolen Documents. Warner
24 claimed that three identical sets of documents addressed to three high placed Warner
executives had mysteriously arrived in envelopes on June 28, 2006, that Warner
25 purportedly did not retain any of the three envelopes (or a copy of any) despite the
unusual, sensitive and legal nature of the contents, and that Warner purportedly had no
26 mailroom, security gate, or executive office records, notes or logs of the three heavy
packages ever being signed in or received by three top executives, including Warner's
27 General Counsel, John Schulman. Toberoff Decl., Exs. D, F, T at ¶¶ 11-12. All such
information commonly kept by Studio security, mailrooms, executive offices and attorneys
28 had purportedly vanished.

Case 2:10-cv-03633-ODW-RZ   Document 212-4   Filed 04/11/11   Page 91 of 149   Page
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 03/02/09   Page 75 of 80   Page
ID #:15229

1   Arnold & Porter on June 30, 2006. *Id.*, ¶¶ 8, 13.  Smith further stated "[b]ecause I

2   did not conduct a detailed review of the Superman Documents, and because of the

3   passage of time, I do not recall their specific contents." *Id.*

4          Despite this purported very limited review of  Stolen Documents (numbering

5   839 pages), stated lack of recollection, and purported turning over of all documents

6   in two days to a "neutral" "escrow agent," Smith has repeatedly in this litigation

7   been able to selectively recall the contents of specific documents, whether they were

8   produced and whether they were listed on privilege logs.[45]

9          In support of Defendants' first motion to compel regarding the Stolen

10  Documents, Smith *falsely* stated in his March 27, 2007 declaration: that none "of the

11  'non-privileged' documents had been produced in the litigation" and that "at least

12  some (and perhaps virtually all) of the privileged documents, as well as those in the

13  "?" pile, were, to the best of my knowledge, never identified in any privilege log

14  served by Plaintiffs." Smith Decl., ¶ 12.  This statement is odd as Smith claimed to

15  have received the Stolen Documents on June 28, 2006 and to have turned them *all*

16  over to Arnold & Porter two days later. *Id.*, ¶¶ 8, 13.  Plaintiffs did not serve their

17  first privilege log until July 20, 2006 and served their supplemental privilege log on

18  September 29, 2006.[46]  Toberoff Decl., Ex. M at ¶¶ 17-18.  The privilege logs list

19  the simple information (date, sender, recipient, etc.) in the form approved by the

20  Court's August 18, 2006 order. *Id.* Ex. H.

21

22  [45]  Plaintiffs had produced nearly 2000 pages of documents at the time the Stolen
    Documents were allegedly reviewed by Smith.

23

24  [46] Plaintiffs produced documents responsive to Defendants' requests for production on
    September 29, 2005 and supplemented their production on October 6, 2006, November 6,
    2006 and November 17, 2006.  Toberoff Decl., Ex. M at ¶ 16.  The privilege log for
25  Plaintiffs' former counsel, Gang Tyre Ramer & Brown, was served on September 29,
    2006. *Id.*, Ex. I.  Documents were further produced by third parties as follows:  Jean
26  Peavy and Warren Peary (the "Shusters") on July 18, August 11 and August 14, with
    privilege logs on August 11, 2006 and October 16, 2006; IPW, LLC on November 15,
27  2006; Pacific Pictures Corporation on November 15, 2006; and Don Bulson, attorney for
    Michael Siegel, Plaintiff Laura Siegel Larson's half-brother, produced a privilege log on
28  October 23, 2006 in response to Defendants' subpoena. *Id.*, Exs. J, M at ¶¶ 19-21.

1    It is not credible that after a mere cursory review in June, 2006, Smith could

2 recall in March 2007 (or even in late July or September 2006), the dates, sender and

3 recipients of documents supposedly missing from Plaintiffs' subsequently produced

4 privilege logs (containing hundreds of entries), especially since Smith admitted

5 "because of the passage of time, I do not recall the specific documents" and declared

6 that when it first appeared that a document was privileged, "I ceased reading it,

7 placed the document in the 'privileged' pile and did not look at it further." Smith

8 Decl., ¶ 8.

9    If Smith is taken at his word, he could not possibly have concluded from such

10 a cursory review that the Stolen Documents were not included among the nearly

11 2000 documents produced by Plaintiffs or by subpoenaed third parties, nor could he

12 have reasonably compared them to the hundreds of entries on the *subsequent*

13 privilege logs of Plaintiffs and third parties.[47]

14    In Defendants' May 22, 2007 letter regarding Toberoff's May 21, 2007

15 declaration (per the April 30 Order), Smith is cited as remembering *one* piece of

16 "correspondence concerning the interest in Superman that might be owned by…

17 Michael Siegel [that] has never been produced in this litigation, and does not appear

18 to have been listed in any privilege log." Toberoff Decl., Ex. O.

19    For Defendants' latest motion, Smith's powers of recall are being utilized yet

20 again. Based upon his brief "thumbing through" 839 pages of Stolen Documents in

21 June, 2006, Smith now declares under oath: "I believe the language quoted from the

22 [Defamatory Letter] refers to and is substantially similar to statements made by Mr.

23 Marks to his clients in [the August 9 Letter]." *See* February 19, 2009 Declaration of

24 Wayne Smith, ¶ 5. Incredibly, Smith is able to take a single, unsupported statement

25 ("Marks tells the Siegels…") in the Defamatory Letter and line it up with a specific

26 document, the August 9 Letter, among the 839 pages of Stolen Documents. This is

27

---

28 [47] For instance, the privilege log of Don Bulson, Esq., the attorney of Michael Siegel, Laura Siegels' now deceased step-brother, contains 422 entries. Toberoff Decl., Ex. J.

1  all the more revealing as the Defamatory Letter does not refer to the August 9 Letter

2  or even to a writing as the basis for its statement regarding Marks. *See* Perkins

3  Decl., Ex. 1.

4       It is obvious from Smith's incredulous statements that Warner went ***far***

5  beyond the mere "sorting" of documents, as represented to Magistrate Zarefsky, and

6  engaged in a substantive analysis of documents to see how they could be exploited

7  by Defendants in this litigation, including documents that were *facially* privileged

8  attorney-client communications.[48] This is immediately apparent even from Smith's

9  testimony that he had sorted the August 9 Letter, clearly an attorney-client

10  communication, into the "?" pile on the basis that he "believed privilege likely had

11  been waived." *Id.*

12       Defendants have cultivated the appearance of acting judiciously with regards

13  to the Stolen Documents. However, it now appears that their calculated

14  representations to Magistrate Zarefsky and this Court were false and misleading.

15  Whenever it is expedient, Smith is able to pinpoint specific Stolen Documents and

16  not only purports to "recall" their contents, but their relation as well to the thousands

17  of documents produced by Plaintiffs or multiple third parties, or subsequently listed

18  on their respective privilege logs.

19
20          ii.    Defendants Misrepresented that They Turned the
                  Stolen Documents Over to a "Neutral" and
                  Perpetuated the Fiction that the Documents Were
21                    Held by an "Escrow Agent"

22       Defendants also misrepresented to Magistrate Zarefsky that they had turned

23  the documents over to a purported "neutral" who was acting as an "escrow agent"

24

---

[48] *See generally, Rico v. Mitsubishi Motors Corp.*, 116 Cal. App. 4th 51, 71 (2004)
25  (disqualification proper where counsel "studied the [privileged] document carefully, made
his own notes on it…and based his litigation strategy" on it.); *Spacone v. Burke (In re
26  Truck-A-Way)*, 300 B.R. 31, 39 (Bankr. E.D. Cal. 2003) (lawyer disqualified because,
upon discovery of an opponent's privileged documents, he conditioned the documents'
27  release upon his opponent providing a privilege log); *Shell Oil Refinery v. Shell Oil Co.*,
143 F.R.D. 105, 108 (E.D. La. 1992) (plaintiff subject to sanctions for improperly
28  obtaining proprietary documents from one of defendant corporation's employees).

1  (the law firm Arnold & Porter) in furtherance of their purported "protocol." *See*

2  Defts. March 2007 Motion to Compel at 1:16-17 ("all copies of the documents were

3  turned over to a neutral third party for preservation and identification"); 10:14-18

4  (Defendants "discussed having a neutral third party hold the documents.").[49]

5  However, as Arnold & Porter was retained and compensated by Defendants, it is not

6  a "neutral," by definition.  Moreover, Eisen has expressly *admitted* that neither his

7  law firm, nor he were acting as either a "neutral" or an escrow holder:

8      "[N]either…this firm, nor I has suggested that we are formal escrow agents,
9      in the legal sense of that term… we do not in my view, owe either party to
       this litigation any legal duty.  We expect to be paid for our time by
10     defendants…"

11  Toberoff Decl., Ex. X. *See Summit Financial Holdings, Ltd. v. Continental Lawyers*

12  *Title Co.*, 27 Cal. 4th 705, 711 (2003) ("An escrow holder is an agent and fiduciary

13  of the parties to an escrow.").   It was not until October, 2008, well *after* the April

14  30, 2007 and September 26, 2008 Orders had been issued that this fact was finally

15  admitted.  This alone justifies reconsideration. *See* Local Rule 7-18 (b) ("emergence

16  of new material facts … after the time of such decision").

17      After obtaining Magistrate Zarefsky's blessing of their "neutral" procedures

18  on false pretenses, Defendants set about mining for as much privileged information

19  as they could pry loose.  Defendants repeatedly attempted to get Mr. Eisen to "peek

20  behind" Plaintiffs' privilege logs, to review the stolen privileged documents, test the

21  sufficiency of the log descriptions, and search for particular documents "recalled"

22  _____

23  [49] Defendants also repeatedly attempted to leverage Eisen as a purported "neutral" in later
    filings. *See* Notice of Motion and Joint Stipulation re: Defendants' Motion to Compel
    Compliance with the Court's 4/30/07 Order and Motion for Sanctions at 1:11 ("Defendants

24  turned them over to a neutral third party"); 6:10-11 (Defendants "ultimately concluded that
    he should turn them over to a neutral third party"); 8:6 (the "original caretaker" of the

25  documents); 8:10 ("escrow services"); 22:10-12 ("[I]t is necessary for Mr. Eisen, in his
    capacity as a neutral third party, to compare the Escrow Documents with the listed

26  documents and privilege log entries"); and at 1:22, 2:12, 2:16, 10:16, 13:19, 13:22, 20:15
    ("escrow holder"); Declaration of Michael Bergman in Response to the Declaration of

27  Marc Toberoff Filed Pursuant to the Court's September 17, 2007 Order at 1:17-18 ("the
    only neutral party with access to the Escrow Documents").

28

Case 2:10-cv-03633-ODW-RZ   Document 212-4   Filed 04/11/11   Page 95 of 149   Page
ID #:15233
Case 2:04-cv-08400-ODW-RZ   Document 476   Filed 03/12/09   Page 91 of 130   Page

1   by Smith.  It soon became clear from Eisen's written statements to Plaintiffs and the

2   Court that Defendants had enlisted his assistance to circumvent and challenge

3   Plaintiffs' privilege logs.

4        After Plaintiffs' counsel provided his declaration on May 21, 2007 per the

5   April 30 Order, Defendants unilaterally provided Eisen with the produced

6   documents identified therein as well as copies of the referenced privilege logs.

7   Defendants instructed Eisen to "compare the privilege entries to the Escrow

8   Documents in your file… any document that does not match up exactly to an

9   identified entry on the privilege logs should not be returned to Mr. Toberoff, but

10  instead should be produced to Defendants."  *See* Toberoff Decl., Ex. O.

11       Despite the clarity of the April 30 Order ("the privilege documents that were

12  listed on the privilege log get returned. The others get sent to defense counsel"),

13  Defendants instructed Eisen not to disburse any documents.  Instead they brought

14  another motion to compel insisting that Eisen be allowed to test each claim of

15  privilege for the Stolen Documents.  The Court denied Defendants' motion to

16  compel as "moot."[50]  With the September 26, 2008 Order,  the Court ordered Eisen,

17  pursuant to the April 30, 2007 Order,  to "produce forthwith any escrow document

18  not previously listed in a privilege log or has having been previously produced… the

19  nine documents… are to be produced to defendants' counsel as those documents

20  were not previously identified in a privilege log provided by plaintiffs."  Toberoff

21  Decl., Ex. U at 5.

22       Despite the clarity of the Court's ruling and the "mootness" of Defendants'

23  "match-up" request, Eisen, at Defendants' behest, *again* did not disburse the Stolen

24  Documents.  Instead, he wrote to Plaintiffs that he would "compare the privilege

25  logs to the documents, and to produce to Mr. Bergman all escrow documents except

26

---

27  [50] "Let's not talk about the ones that have been done. Let's talk about the nine that we
    have left. I want to resolve this. We're going to move on here, counsel." Toberoff Decl.,

28  Ex. R at 120:18-19.

1   those accurately described on the privilege logs." *Id.*, Ex. V.  Not surprisingly,

2   Bergman readily approved of Eisen's plan: "Defendants agree with your

3   interpretation of the Court's Order regarding your obligations to match-up the

4   Escrow Documents to the pertinent privilege log entries to determine whether "the

5   description of date, sender, recipient and type of document" corresponds to what the

6   document actually is." *Id.*, Ex. Y.

7        Bergman further encouraged Eisen (an attorney retained by them), to contact

8   the Court *ex parte*. *Id.* ("we request that you seek guidance directly from the

9   Court").  Over Plaintiffs' objections, Eisen sent a letter to the Court on October 16,

10  2008, advocating Defendants' objectives in the form of questions:

11       "With respect to the "match up" of the relevant privilege logs and Mr.
         Toberoff's declaration, ...am I to ascertain whether the escrow document and
12       privilege log entry actually match and produce the document to defendants if
         it does not?...Suppose a series of pages among the escrow documents consists
13       of more than one document (e.g. a cover letter and an enclosed document) but
         the privilege log entry only references one of the documents. Under those
14       circumstances, is the document not referenced in the privilege log deemed to
         be included within the confines of the privilege log protection, or not?"
15

16  *Id.*, Ex. AA.  From these facts, it is more than apparent that Eisen was not "neutral"

17  in any sense, but did as his client requested:  retain the Stolen Documents, keep the

18  hopes of a full blown privilege review alive and advance Defendants' position.  In

19  the face of two successive orders clearly outlining the simple process by which he

20  was to immediately disburse the Stolen Documents, Eisen refused, instead lobbying

21  to get Defendants' "match-up" process approved, until it was specifically rejected

22  by the Court on December 4, 2008.

23       As evidenced by Defendants' latest motion, they remain committed to

24  chipping away at Plaintiffs' privileged stolen documents, this time under the

25  ridiculous pretext of the anonymous Defamatory Letter. We now know that

26  Defendants' original motion to compel the Stolen Documents was based on

27  fundamental misrepresentations to Magistrate Zarefsky: (i) that Defendants merely

28  "thumbed through" the privileged Stolen Documents and (ii) that they set up a

1  "neutral" "escrow" procedure to handle the documents.  It is obvious from the

2  record facts that this is not true.  Defendants have crossed the line by reviewing and

3  leveraging Plaintiffs' privileged information.  Accordingly, sufficient grounds exist

4  for this Court to reconsider its ruling and release of the Defamatory Letter to

5  Defendants.

6  **V.   DEFENDANTS' CONCLUSION**

7      For the reasons set forth herein, Defendants respectfully request that their

8  motion be granted.

9  **VI.   PLAINTIFFS' CONCLUSION**

10      For the reasons stated above, (i) Defendants' motion should be denied in its

11  entirety, (ii) the Court is respectfully requested to reconsider its September 26, 2008

12  order insofar as it states that the anonymous, inadmissible and wholly unsupported

13  Defamatory Letter "*contained* embarrassing and potentially questionable conduct by

14  plaintiffs['] counsel in this case," instead of "alleged" such conduct, and (iii) to

15  reconsider the release of the Defamatory Letter in light of new evidence regarding

16  Defendants' misrepresentations to Magistrate Judge Zarefsky and improper

17  exploitation of the Stolen Documents, and/or (iv) preclude the further use of the

18  Defamatory Letter by Defendants in this litigation or otherwise.

19  DATED:  March 2, 2009            FROSS ZELNICK LEHRMAN & ZISSU, P.C.

20                                  PERKINS LAW OFFICE, P.C.

21                                          -and-

22                                  WEISSMANN WOLFF BERGMAN
                                    COLEMAN GRODIN & EVALL LLP

23

24                                  By: _____

25                                      Michael Bergman

26                                  Attorneys for Defendants and Counterclaimant

27

28

Case 2:10-cv-03633-ODW-RZ Document 212-7 Filed 04/11/11 Page 98 of 149 Page
Case 2:04-cv-08400-ODW -RZ Document 476 Filed 03/02/05 Page 90 of 80 Page
ID #:15236

1   DATED: March 2, 2009          TOBEROFF & ASSOCIATES, P.C.

2

3                            By _____

4                                   Marc Toberoff

                           Attorneys for Plaintiffs/Counterclaim-

5                            Defendants

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT E

Case 2:10-cv-03633-ODW-RZ Document 212-2 Filed 04/11/11 Page 100 of 149 Page
ID #:15238
Case 2:04-cv-08400-SGL-RZ Document 478 Filed 03/13/2009 Page 1 of 15 Page

1

2

3

4

5

6

7           **UNITED STATES DISTRICT COURT**

8    **CENTRAL DISTRICT OF CALIFORNIA-EASTERN DIVISION**

| | |
|---|---|
| 9    JOANNE SIEGEL and LAURA | Case No. CV 04-8400 SGL (RZx) |
| 10    SIEGEL LARSON, |  Hon. Stephen G. Larson, U.S.D.J. |
| 11            Plaintiffs, | **FINAL PRE-TRIAL CONFERENCE ORDER** |
| 12          vs. | **Final Pre-Trial Conference** Date:  January 26, 2009 |
| 13 | Time:  11:00 a.m. Place:  Courtroom 1 |
| 14    WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; DC | **Trial** |
| 15    COMICS; and DOES 1-10, | Date:  April 21, 2009 Time: 9:30 a.m. |
| 16           Defendants. | Place:  Courtroom 1 |
| 17 | [Complaint filed: October 8, 2004] |
| 18    AND RELATED COUNTERCLAIMS | |

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

1.   Parties ........................................................................................1

2.   Jurisdiction and Venue .................................................................1

3.   Estimated Time of Trial ...............................................................2

4.   Non-Jury Trial .............................................................................2

5.   Admitted Facts .............................................................................2

6.   Facts Stipulated Without Prejudice to Evidentiary Objections............4

7.   Claims and Defenses ....................................................................7

    A. Claims To Be Tried ..................................................................7

    B.   Defenses ...............................................................................8

8.   Discovery......................................................................................8

9.   F.R.C.P. 26(a)(3) Disclosures .....................................................8

10.  Witness Lists ...............................................................................8

11.  Pending Motions..........................................................................9

12.  Bifurcation...................................................................................16

13.  Conclusion...................................................................................17

i
TABLE OF CONTENTS

**B.** **Defenses**

Defendants will not be asserting any affirmative defenses or counterclaims in this phase of the trial.

**8.** **DISCOVERY**

Discovery is complete.

Defendants' motion to reopen discovery filed March 2, 2009 is **DENIED**.

**9.** **ALL DISCLOSURES UNDER FED.R.CIV.P. 26(A)(3) HAVE BEEN MADE**

The joint exhibit list of the parties has been filed under separate cover as required by L.R. 16-6-1. Unless all parties agree that an exhibit shall be withdrawn, all exhibits will be admitted without objection at trial, except those exhibits objected to in the parties' Joint Exhibit Stipulation filed concurrently herewith.

**10.** **WITNESS LISTS OF THE PARTIES HAVE BEEN FILED WITH THE COURT**

Only the witnesses identified in the parties' joint witness list (as amended) will be permitted to testify (other than solely for impeachment).

Neither party is intending to present evidence by way of deposition testimony (other than for cross-examination or impeachment).

**11.** **THE FOLLOWING LAW AND MOTION MATTERS AND MOTIONS *IN LIMINE*, AND NO OTHERS, HAVE BEEN SUBMITTED, HEARD, AND DECIDED BY THE COURT, AS FOLLOWS:**

**Plaintiffs' Motions in Limine**

    A.    <u>Motion in Limine No. 1</u>

Case 2:10-cv-03633-ODW-RZ Document 212-78 Filed 04/11/11 Page 103 of 149 Page
ID #:15241
Case 2:04-cv-08400-ODW-RZ Document 478 Filed 03/13/2009 Page 19 of 19

**13. CONCLUSION**

The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues remaining to be litigated, this Final Pretrial Conference Order shall supersede the relevant pleadings relevant to the first phase of trial on April 21, 2009 and govern the course of such trial, unless modified to prevent manifest injustice.

Dated: March 13, 2009

UNITED STATES DISTRICT COURT JUDGE

# EXHIBIT F

ORIGINAL SHIPPED   OCT 1 7 2006

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA      )
SIEGEL LARSON,               )
                             )
        Plaintiffs,          )
                             )
    vs.                      )      No. 04-8400 (RSWL)(RZx)
                             )
WARNER BROS. ENTERTAINMENT   )          -and-
INC., et al.,                )
                             )      No. 04-8776 (RSWL)(RZx)
        Defendants.          )
_____)
AND RELATED COUNTERCLAIMS.

**CERTIFIED COPY**

DEPOSITION OF KEVIN S. MARKS

Beverly Hills, California

Saturday, October 7, 2006

Volume 1

Reported by:

DAVID S. COLEMAN

CSR No. 4613

**U.S. LEGAL** *Support*

Certified Shorthand Reporters

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA 91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

*Los Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento . . . and across the nation*

Exhibit F
Page 98

```
 1          Deposition of KEVIN S. MARKS, taken on

 2     behalf of Defendants and Counterclaimants,

 3     at 9665 Wilshire Boulevard, 9th Floor, Beverly

 4     Hills, California, beginning at 10:05 AM on

 5     Saturday, October 7, 2006, before DAVID S.

 6     COLEMAN, Certified Shorthand Reporter No. 4613.

 7

 8


 9   APPEARANCES:

10


11   For Plaintiffs:

12       LAW OFFICES OF MARC TOBEROFF
         BY:  MARC TOBEROFF
13       Attorney at Law
         2049 Century Park East, Suite 2720
14       Los Angeles, California 90067
         310-246-3333
15


16   For Defendants and Counterclaimant:

17       WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
         BY:  MICHAEL BERGMAN
18       Attorney at Law
         9665 Wilshire Boulevard, 9th Floor
19       Beverly Hills, California 90212
         310-858-7888
20       mbergman@wwllp.com

21           -and-

22       PERKINS LAW OFFICE
         BY:  PATRICK T. PERKINS
23       Attorney at Law
         1711 Route 9D
24       Cold Springs, New York 10516
         845-265-2820
25
```

                                                          2

1    APPEARANCES (Continued):

2

3    For the Witness:

4        JEFFER MANGELS BUTLER & MARMARO
         BY:  MARC MARMARO
5        Attorney at Law
         1900 Avenue of the Stars, 7th Floor
6        Los Angeles, California 90067-4308
         310-203-8080
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                            3

```
 1                         I N D E X

 2

 3

 4   WITNESS                  EXAMINATION          PAGE

 5   KEVIN S. MARKS

 6                      BY MR. BERGMAN           8

 7                      BY MR. TOBEROFF         203

 8

 9                         EXHIBITS

10

11   DEPOSITION                              PAGE

     1    First Amended Privilege Log          11
12
     2    Kevin Marks calendars, Bates Nos.    12
13        GTRB 0506 - 0514

14   3    Kevin Marks call records, Bates      12
          Nos. GTRB 0515 - 0635
15
     4    Letter from Bruce Ramer to Carol     38
16        Simkin and John Schulman dated
          April 30, 1999, Bates Nos. GTRB
17        0009 - 0010

18   5    Letter from John Schulman to Bruce   43
          Ramer dated July 7, 1999, Bates
19        Nos. GTRB 0018 - 0019

20   6    Letter from Bruce Ramer to John      44
          Schulman dated July 9, 1999, Bates
21        Nos. GTRB 0011 - 0013

22   7    Letter from John Schulman to Bruce   46
          Ramer dated July 12, 1999, Bates
23        Nos. GTRB 0016 - 0017

24

25

                                             4
```

**U.S. LEGAL SUPPORT**

INDEX (Continued):

EXHIBITS (Continued)

DEPOSITION                                              PAGE

8    Letter from Paul Levitz to Joanne          51
     Siegel and Laura Siegel Larson dated
     October 10, 1997, Bates Nos. GTRB
     0499 - 0504

9    Letter from John Schulman to Bruce         52
     Ramer dated September 13, 1999,
     Bates Nos. GTRB 0020 - 0021

10   Letter from Bruce Ramer to John            58
     Schulman dated September 28, 1999,
     Bates Nos. GTRB 0026 - 0028

11   Letter Kevin Marks to Paul Levitz          59
     dated November 3, 1999, Bates Nos.
     GTRB 0031 - 0032

12   Fax from Patrick Perkins to Kevin          67
     Marks dated January 6, 2000, Bates
     Nos. GTRB 0033 - 0042

13   Letter from Kevin Marks dated Carol        68
     Simkin dated March 7, 2000, Bates
     Nos. GTRB 0043 - 0056

14   Letter from Kevin Marks to John            90
     Schulman dated June 9, 2000, Bates
     Nos. GTRB 0124 - 0129

15   Letter from John Schulman to Kevin         92
     Marks dated July 18, 2000, Bates
     Nos. GTRB 0001 - 0006

16   Letter from Joanne Siegel to Gerald        97
     Levin dated July 24, 2000, Bates
     Nos. WB005977 - 005981

17   Letter from John Schulman to Kevin         98
     Marks dated July 26, 2000, Bates
     Nos. GTRB 0113 - 0114

5

**U.S. LEGAL SUPPORT**

Exhibit F

Page 102

1    INDEX (Continued):

2              EXHIBITS (Continued)

3    DEPOSITION                                    PAGE

4    18    Letter from Richard Parsons to        105
           Joanne Siegel dated August 22, 2000,
5          Bates No. WB005976

6    19    Letter from Joanne Siegel to Gerald   105
           Levin dated April 27, 2001, Bates
7          Nos. WB007853 - 007855

8    20    Letter from Kevin Marks to John       132
           Schulman dated October 19, 2001,
9          Bates Nos. GTRB 0302 - 0308

10   21    Letter from John Schulman to Kevin    149
           Marks dated October 26, 2001, Bates
11         Nos. GTRB 0145 - 0152

12   22    Letter from John Schulman to Bruce    176
           Ramer and Kevin Marks dated January
13         22, 2002, Bates Nos. 000000974

14   23    Letter from Patrick Perkins to Kevin  177
           Marks dated February 1, 2002, Bates
15         Nos. GTRB 0350 - 0399

16   24    Handwritten notes, Bates No. WB005972 180

17   25    Letter from Joanne Siegel to Richard  193
           Parsons dated May 9, 2002, Bates Nos.
18         000000676 - 678

19   25A   Fax from John Schulman to Kevin Marks 194
           dated 5-16-02, Bates Nos. GTRB 0474,
20         0475 and 0477

21

22

              INSTRUCTION NOT TO ANSWER
23
                  Page   Line
24
                  10      17
25                30      2, 15, 24

                                                        6

INDEX (Continued):


INSTRUCTION NOT TO ANSWER

| Page | Line |
|------|------|
| 31 | 22 |
| 32 | 24 |
| 37 | 16 |
| 38 | 23 |
| 54 | 7 |
| 56 | 16 |
| 57 | 6 |
| 63 | 12 |
| 68 | 22 |
| 93 | 9 |
| 106 | 6 |
| 127 | 23 |
| 139 | 2 |
| 141 | 15 |
| 142 | 3, 13 |
| 143 | 3 |
| 146 | 15 |
| 147 | 7 |
| 150 | 5 |
| 151 | 16 |
| 173 | 5 |
| 174 | 8 |
| 193 | 10 |
| 198 | 23 |

7

1          Beverly Hills, California, Saturday, October 7, 2006

2                         10:05 AM

3

4

5                    KEVIN S. MARKS,

6          having been first administered an oath,

7          was examined and testified as follows:

8

10:05 9                         EXAMINATION

10:05 10   BY MR. BERGMAN:

10:05 11       Q    Good morning, Mr. Marks.

10:05 12       A    Good morning.

10:05 13       Q    Would you state your full name for record,

10:05 14   please?

10:05 15       A    Kevin Stuart Marks, K E V I N, S T U A R T,

10:06 16   M A R K S.

10:06 17       Q    And am I correct, Mr. Marks, that you're a

10:06 18   partner in the firm of Gang, Tyre, Ramer & Brown?

10:06 19       A    Technically a member.  You can call me a

10:06 20   partner, yes.

10:06 21       Q    Okay.  Both you and Gang, Tyre have been served

10:06 22   with subpoenas for particular documents, and your counsel

10:06 23   has produced documents stamped GTRB 001 through 0635, and

10:06 24   we will be reviewing certain of those documents as we

10:06 25   proceed along with other documents.  You've also produced

8

04:42 1        A    I returned that call that day or subsequently,

04:42 2    yes.

04:42 3        Q    Can you tell me to the best of your recollection

04:42 4    what Mr. Toberoff said during that conversation and what

04:42 5    you said?

04:42 6        A    Yes.  I think Mr. Toberoff started the call by

04:43 7    saying that he had called me earlier and that I hadn't

04:43 8    returned his call, for which I apologized, and then he

04:43 9    introduced himself.  He said he was a lawyer and that he

04:43 10   represented individuals that had interests in rights to

04:43 11   movie and other properties that had come into those

04:43 12   rights either by way of reversions under the law or

04:43 13   reversions under Guild agreements.  I also recall him

04:43 14   saying that he had a separate company that was in the

04:43 15   business of acquiring intellectual property rights.  I

04:44 16   recall him saying that he was interested in the Superman

04:44 17   property and the Superboy property and had understood

04:44 18   that I was representing the Siegel family interest, and

04:44 19   he asked if he could talk to me about that.

04:44 20        My recollection is that my response was that we

04:44 21   were very far along with DC Comics and at a documentation

04:44 22   phase.  I may have said DC Comics or Warner Bros. because

04:45 23   I do think that part of the conversation, I have a

04:45 24   recollection of Mr. Toberoff saying that he had dealt

04:45 25   with Warner Bros. before, the people at Warner Bros., in

152

04:45 1    connection with the "Wild Wild West" and rights involving

04:45 2    the "Wild Wild West" in which some deal had been made

04:45 3    that led to the making of the feature film.

04:45 4        Q    Do you recall anything else of that

04:45 5    conversation?

04:45 6        A    That's my best recollection as I sit here today.

04:45 7        Q    Do you recall telling Mr. Toberoff that you had

04:45 8    closed a deal with DC regarding the Siegel interest?

04:45 9            MR. TOBEROFF:  Leading.

04:4510            THE WITNESS:  My best recollection is how I

04:4611    described it, but I think I said we were in the process

04:4612    of -- in the documentation phase, were trying to document

04:4613    a deal.

04:4614    BY MR. BERGMAN:

04:4615        Q    And do you recall what response, if any,

04:4616    Mr. Toberoff made?

04:4617        A    I don't.

04:4618        Q    And do you recall anything further about the

04:4619    conversation or how it ended?

04:4620        A    I don't recall how it ended.

04:4621        Q    Did you as of February 6, '02 believe that you

04:4622    had closed a deal with DC for the Superman interest?

04:4623            MR. MARMARO:  The question is vague and

04:4624    ambiguous, calls for a legal conclusion, and again I am

04:4625    going to defer to Mr. Toberoff whether he has any

153

04:47 1    objection to -- subject to those objections, having

04:47 2    Mr. Marks answer the question.

04:47 3         MR. TOBEROFF:  I object on work product

04:47 4    privilege, but I think I am not asserting that on behalf

04:47 5    of the clients.  I am not asserting that on behalf of the

04:47 6    Siegels.

04:47 7         MR. MARMARO:  Mr. Marks would be prepared to

04:47 8    answer the question if the Siegels have no objection to

04:47 9    it.

04:4710         MR. TOBEROFF:  As to your personal belief, no

04:4711    objection.

04:4712         THE WITNESS:  Well, if the question is did I

04:4713    think at this point there was a final, binding,

04:4714    enforceable agreement, the answer would be no, but I did

04:4715    believe that we had come to an agreement back on October

04:4716    19th, 2001, that was reflected exactly in the terms that

04:4817    I set out.

04:4818         At the end of that letter I wrote to John in

04:4819    substance and effect, "John, if I've gotten anything

04:4820    wrong, if I've misstated any of these terms, please let

04:4821    me know."  When John writes back on October 26, which I

04:4822    see later, in effect his letter is, "Yeah, you've got

04:4823    terms wrong.  My outline of the deal terms is different

04:4824    than your outline of the deal terms."  So while I thought

04:4825    we had an agreement on these terms, John evidently

                                                          154

04:48 1    didn't, and where you don't have a meeting of the minds,

04:48 2    you don't have an agreement.

04:48 3    BY MR. BERGMAN:

04:48 4        Q    What portion or with respect to what elements of

04:48 5    the October 19 letter did Mr. Schulman's October 26

04:49 6    letter depart from, were different from?

04:49 7        MR. MARMARO:  Again, the same -- my position is

04:49 8    the same:  Mr. Marks will answer the question as long as

04:49 9    there is no objection from Mr. Toberoff.

04:4910        MR. TOBEROFF:  Not to the extent you are

04:4911    comparing the documents.

04:4912        MR. MARMARO:  Maybe we should have the documents

04:4913    in front of us.  Do you have any objection to him looking

04:4914    at Mr. Schulman's letter?

04:4915        MR. BERGMAN:  Not at all.

04:4916        THE WITNESS:  I know that one area of difference

04:4917    was the scope of the rights granted.  In my letter it

04:4918    referred to -- very specifically to the Superman property

04:4919    and the Spectre property.  That's what we had been

04:5020    talking about the whole time of our negotiations going

04:5021    back to the first meeting in 2 -- 1999.  And, of course,

04:5022    as you see here, the consideration, at least as set forth

04:5023    in my letter, for that matter I guess in John's letter,

04:5024    is based on revenue from the Superman and Spectre

04:5025    properties, yet John's letter referred more generally to

155

STATE OF CALIFORNIA     )
                        ) ss
COUNTY OF LOS ANGELES   )


        I, DAVID S. COLEMAN, a Certified Shorthand

Reporter, do hereby certify:

        That prior to being examined, the witness in

the foregoing proceedings was by me duly sworn to

testify to the truth, the whole truth, and nothing

but the truth;

        That said proceedings were taken before me at

the time and place therein set forth and were taken

down by me in shorthand and thereafter transcribed

into typewriting under my direction and supervision;

        I further certify that I am neither counsel

for, nor related to, any party to said proceedings,

nor in anywise interested in the outcome thereof.

        In witness whereof, I have hereunto subscribed

my name.


Dated: ___OCT 1 7 2006___



                        _____
                        DAVID S. COLEMAN
                        CSR No. 4613

# EXHIBIT G

Case 2:10-cv-03633-ODW-RZ Document 212 Filed 04/11/11 Page 119 of 149 #Page
Case 2:04-cv-08400-ODW-RZ Document 689 Filed 03/11/11 Page 1 of 9 Page #:15922
ID #:15257

1

2

3 Marc Toberoff (State Bar No. 188547)
   *mtoberoff@ipwla.com*
4 Nicholas C. Williamson (State Bar No. 231124)
   *nwilliamson@ipwla.com*
5 Keith G. Adams (State Bar No. 240497)
   *kgadams@ipwla.com*
6 TOBEROFF & ASSOCIATES, P.C.
   2049 Century Park East, Suite 3630
7 Los Angeles, California, 90067
   Telephone: (310) 246-3333
8 Fax:         (310) 246-3101

9 Attorneys for Plaintiff,
   Laura Siegel Larson
10

11                 **UNITED STATES DISTRICT COURT**

12    **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

| | |
|---|---|
| 13 JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an | Case No: CV 04-8400 ODW (RZx) |
| 14 individual, | Hon. Otis D. Wright II, U.S.D.J. |
| 15          Plaintiffs, | **ORDER GRANTING MOTION FOR ENTRY OF A PARTIAL JUDGMENT UNDER FED. R. CIV. P. 54(B) AND FOR STAY OF REMAINING CLAIMS PENDING APPEAL** |
| 16     vs. | |
| 17 WARNER BROS. ENTERTAINMENT INC., a corporation; DC COMICS, a | |
| 18 general partnership; and DOES 1-10, | Complaint filed: October 8, 2004 Trial Date: None Set |
| 19 | Date: March 21, 2011 |
| 20          Defendants. | Time: 1:30 p.m. Place: Courtroom 11 |
| 21 DC COMICS, | |
| 22          Counterclaimant, | |
| 23     vs. | |
| 24 JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an | |
| 25 individual, | |
| 26 | |
| 27          Counterclaim Defendants. | |

28

1

2

3                                      **<u>ORDER</u>**

4         Federal Rule of Civil Procedure 54(b) allows a district court to certify as final

5    and immediately appealable interlocutory orders that resolve certain outstanding

6    claims in a case:

7         "When more than one claim for relief is presented in an action … or when
8         multiple parties are involved, the court may direct the entry of a final judgment
          as to one or more but fewer than all of the claims or parties only upon an
9         express determination that there is no just reason for delay and upon an
          express direction for the entry of judgment."

10   Fed. R. Civ. P. 54(b).  To be eligible for entry of judgment under Rule 54(b), the

11   order must constitute "an ultimate disposition of an individual claim entered in the

12   course of a multiple claims action," and there must be no just reason to delay

13   appellate review of the order until the conclusion of the entire case.  *Curtiss-Wright*

14   *Corp. v. General Electric Co.*, 446 U.S. 1, 7-8 (1980).  The Ninth Circuit embraces a

15   "pragmatic approach focusing on severability [of claims] and efficient judicial

16   administration" in the construction of what constitutes a claim and whether there is

17   no just reason to delay appellate review.  *Continental Airlines, Inc. v. Goodyear Tire*

18   *& Rubber Co.*, 819 F.2d 1519, 1525 (9th Cir. 1987).

19        In accordance with the Court's decisions of March 26, 2008 (Docket No. 293),

20   August 12, 2009 (Docket No. 560), and October 30, 2009 (Docket No. 595), the First

21   Claim of Plaintiffs' Third Amended Complaint and the First, Second, Third and

22   Fourth Counterclaims of Defendants' Second Amended Counterclaims have been

23   fully resolved.

24        In determining whether there is any just reason for delay, the factors to be

25   considered include "whether the nature of the claims already determined is such that

26   no appellate court would have to decide the same issues more than once, even if

27   subsequent appeals are heard," and "whether immediate appellate resolution will

28   foster settlement of the remaining claims."  *Whitney v. Wurtz*, 2007 U.S. Dist. LEXIS

1

2

3   60077, at *5 (N.D. Cal. Aug. 16, 2007).  Entry of judgment on adjudicated claims

4   under Rule 54(b) is especially appropriate where the claims determine the scope and

5   contours of trial as to the remaining issues, that trial is likely to be protracted, and the

6   Court will avoid wasting resources in a re-trial.  *See Continental Airlines*, 819 F.2d at

7   1525 (approving Rule 54(b) entry of judgment where "the district court effectively

8   narrowed the issues, shortened any subsequent trial by months, and efficiently

9   separated the legal from the factual questions").  Here, any errors in the rulings and

10  consequent determination of the severable First Claim and the First, Second, Third

11  and Fourth Counterclaims would directly impact and necessarily reverse the trial

12  court on the remaining accounting claims.  Entry of a 54(b) judgment would

13  streamline the issues, conserve judicial resources and promote settlement.  As such,

14  there is no just reason for delay entering judgment in this case.

15          Accordingly, for the reasons set forth herein and in Plaintiff's motion

16  papers, IT IS HEREBY ORDERED that:

17      1.  Plaintiffs' Motion For Entry of a Partial Judgment Under Fed. R. Civ. P.

18          54(b) and For Stay of Remaining Claims Pending Appeal is

19          GRANTED.

20      2.  Judgment in this action shall be entered on the First Claim of the Third

21          Amended Complaint, and the First, Second, Third and Fourth

22          Counterclaims of the Second Amended Counterclaims, and such Orders

23          are hereby CERTIFIED FINAL PURSUANT TO FED. R. CIV. P.

24          54(b).

25      3.  Further proceedings in this case are hereby stayed pending appeal.

26

27

28

2

1

2

3      4. Accordingly, the motion hearing and status conference scheduled for

4  March 21, 2011 at 1:30 p.m. is VACATED.

5      5. Plaintiff is ordered to file a status report on or before **Wednesday, May 18,**

6  **2011,** and every 60 days thereafter, until further order of the Court.

7  IT IS SO ORDERED.

8

9  Dated: March 15, 2011                    _____

10                                          Hon. Otis D. Wright II

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER GRANTING MOTION FOR PARTIAL FINAL JUDGMENT

# EXHIBIT H

1   Marc Toberoff (State Bar No. 188547)
      mtoberoff@ipwla.com
2   Nicholas C. Williamson (State Bar No. 231124)
      nwilliamson@ipwla.com
3   Keith G. Adams (State Bar No. 240497)
      kgadams@ipwla.com
4   TOBEROFF & ASSOCIATES, P.C.
    2049 Century Park East, Suite 3630
5   Los Angeles, California, 90067
    Telephone:  (310) 246-3333
6   Fax:         (310) 246-3101

7   Attorneys for Plaintiff,
    Laura Siegel Larson

8                 **UNITED STATES DISTRICT COURT**

9         **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

10  | JOANNE SIEGEL, an individual; and | Case No: CV 04-8400 ODW (RZx) |
11  | LAURA SIEGEL LARSON, an | |
12  | individual, | Hon. Otis D. Wright II, U.S.D.J. |

              Plaintiffs,              **JUDGMENT PURSUANT TO
13       vs.                          FED. R. CIV. P. 54(B)**

14  WARNER BROS. ENTERTAINMENT        Complaint filed:  October 8, 2004
15  INC., a corporation; DC COMICS, a  Trial Date:  None Set
16  general partnership; and DOES 1-10, Date:     March 21, 2011
                                        Time:     1:30 p.m.
17                Defendants.          Place:    Courtroom 11

18  DC COMICS,
19
                  Counterclaimant,
20       vs.
21
22  JOANNE SIEGEL, an individual; and
23  LAURA SIEGEL LARSON, an
    individual,
24
              Counterclaim Defendants.
25

26

27

28

JUDGMENT

# JUDGMENT

Based upon this Court's Orders dated March 26, 2008 (Docket No. 293), August 12, 2009 (Docket No. 560), and October 30, 2009 (Docket No. 595), and the Court's March 15, 2011 order granting Plaintiff's Motion For Entry of a Partial Judgment Under Fed. R. Civ. P. 54(b),

IT IS ORDERED AND ADJUDGED that pursuant to the Copyright Act, 17 U.S.C.§ 304(c), Plaintiffs validly terminated on April 16, 1999 all prior grants, assignments or transfers to any of the Defendants and any of their predecessors-in-interest, of the renewal copyrights in and to *Action Comics*, No. 1, as well as *Action Comics,* No. 4, *Superman,* No. 1 (pages 3-6), and the first two weeks of Superman newspaper strips, and that as of April 17, 1999, Plaintiff owned and continues to own fifty percent (50%) of the aforesaid recaptured copyrights.

IT IS FURTHER ORDERED AND ADJUDGED that counterclaimant DC Comics' First Counterclaim, which sought to invalidate the Termination, is DENIED for the reasons set forth in the Court's March 26, 2008 order.  .

IT IS FURTHER ORDERED AND ADJUDGED that the Second Counterclaim is DENIED, as Plaintiff's claims for declaratory relief were brought within the relevant statute of limitations period.

IT IS FURTHER ORDERED AND ADJUDGED that the Third and Fourth Counterclaims are DENIED, as the parties did not enter into a settlement agreement.

IT IS ORDERED AND ADJUDGED that, finding no just reason for delay, the Court's Orders dated March 26, 2008 (Docket No. 293), August 12, 2009 (Docket No. 560), and October 30, 2009 (Docket No. 595) are CERTIFIED AS FINAL, and JUDGMENT IN THIS ACTION IS HEREBY ENTERED PURSUANT TO FED. R. CIV. P. 54(b) on the First Claim of the Third Amended Complaint, and the First, Second, Third and Fourth Counterclaims of the Second Amended Counterclaims.

Dated: March 15, 2011

_____

Hon. Otis D. Wright II

# EXHIBIT I

1　KENDALL BRILL & KLIEGER LLP
　　Richard B. Kendall (90072)
2　　rkendall@kbkfirm.com
　　Laura W. Brill (195889)
3　　lbrill@kbkfirm.com
　　Nicholas F. Daum (236155)
4　　ndaum@kbkfirm.com
　　Nathalie E. Cohen (258222)
5　　ncohen@kbkfirm.com
　　10100 Santa Monica Blvd., Suite 1725
6　Los Angeles, California, 90067
　　Telephone:　310.556.2700
7　Facsimile:　310.556.2705

8　Attorneys for Defendants Marc Toberoff,
　　Pacific Pictures Corporation, IP
9　Worldwide, LL, and IPW, LLC

10　　　　　　**UNITED STATES DISTRICT COURT**

11　　　**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

| | |
|---|---|
| 12　DC COMICS, | Case No: CV 10-03633 ODW (RZx) |
| 13　　　　　　Plaintiff, | Hon. Otis D. Wright II, U.S.D.J. |
| 14　　　vs. | **DEFENDANT MARC TOBEROFF'S RESPONSE TO PLAINTIFF DC COMICS' FIRST SET OF INTERROGATORIES** |
| 15　PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; | |
| 16　MARC TOBEROFF, an individual; | |
| 17　MARK WARREN Peary, as personal representative of the ESTATE OF | Complaint Filed: May 14, 2010 Trial Date: None Set |
| 18　JOSEPH SHUSTER; JEAN ADELE | |
| 19　Peavy, an individual; JOANNE SIEGEL, an individual; LAURA SIEGEL | |
| 20　LARSON, an individual, | |
| 21　and DOES 1-10, inclusive, | |
| 22　　　　　　Defendants. | |

23

24

25

26

27

28

1    Defendant Marc Toberoff ("Toberoff"), by and through his attorneys, responds

2    as follows to the First Set of Interrogatories dated December 10, 2010 (the

3    "Interrogatories") propounded by plaintiff DC Comics ("Plaintiff" or "DC").

## I.

## GENERAL OBJECTIONS

6    Toberoff objects to the entire set of Interrogatories on each of the following

7    grounds, and incorporates by reference each of the following objections into his

8    response to each individual interrogatory within it:

9    1.    Toberoff objects to the Interrogatories generally and to each

10    interrogatory therein to the extent they relate to the Fourth through Sixth state law

11    claims for relief in DC's First Amended Complaint ("FAC"). Defendants contend

12    that their pending anti-SLAPP motion stays discovery regarding these state law

13    claims, as well as the related Third Claim for Relief. *See* Cal. Code Civ. Proc. §

14    425.16(g); *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct.

15    1431, 1452 (2010) (Stevens, J., concurring); *Batzel v. Smith*, 333 F.3d 1018, 1024

16    (9th Cir. 2003); *Godin v. Schencks*, 2010 U.S. App. LEXIS 25980 (1st Cir. Dec. 22,

17    2010).

18    2.    Toberoff objects to the Interrogatories generally and to each

19    interrogatory therein to the extent they exceed the scope of Rules 26 and 33 of the

20    Federal Rules of Civil Procedure or the Local Rules of the United States District

21    Court for the Central District of California.

22    3.    Toberoff objects to the Interrogatories generally and to each

23    interrogatory therein to the extent that they purport to demand information protected

24    from disclosure by the attorney-client privilege, joint interest privilege, attorney work

25    product doctrine or any other privileges or immunities provided by the rules of this

26    Court, statute or agreement. Inadvertent disclosure of any information subject to any

27    applicable privilege or doctrine is not intended to be and shall not operate as a waiver

28    of any such privilege or doctrine, in whole or in part; nor is any such inadvertent

disclosure intended to be, nor shall it constitute, a waiver of the right to object to any use of such information.

4.      Toberoff objects to the Interrogatories generally and to each interrogatory therein to the extent that they seek information comprising or reflecting any trade secret or other confidential or proprietary information of Toberoff or any other person or entity.

5.      Toberoff objects to the Interrogatories generally and to each interrogatory therein to the extent that they seek information which is protected from disclosure by court order, or any privacy or similar rights of any person or entity.

6.      Toberoff objects to the Interrogatories generally and to each interrogatory therein to the extent that they seek information and/or documents already in the possession of the propounding party on the grounds such interrogatories are unnecessary and unduly oppressive and burdensome.

7.      Toberoff objects generally to the definitions of the terms "YOU" and "YOUR" as vague and ambiguous, overbroad and unduly burdensome.  Toberoff will construe these terms to refer to Toberoff.

8.      Toberoff objects generally to the definitions of the terms "DEFENDANT" and "DEFENDANTS" as vague and ambiguous, overbroad and unduly burdensome.  Toberoff will construe these terms to refer only to the specific defendants in this action.

9.      Toberoff objects generally to the definitions of the term "DESCRIBE" as vague and ambiguous, overbroad and unduly burdensome.  Toberoff will construe this term only to refer to "factual information and data that are responsive to the particular request seeking such statement or description."

10.      Toberoff objects to the Interrogatories generally and to each interrogatory therein to the extent that they are vague or indefinite with respect to the information sought, or are overbroad and unduly burdensome.

11.      Toberoff objects to the Interrogatories generally and to each

interrogatory therein to the extent that they seek information which is neither relevant to the subject matter of the pending litigation nor reasonably calculated to lead to the discovery of admissible evidence.

12.    No incidental or implied admissions are intended by Toberoff's responses to the Interrogatories.  The supplying of any fact does not constitute an admission by Toberoff that such fact is relevant or admissible.  The fact that Toberoff has responded to any interrogatory is not intended to be and shall not be construed as a waiver by Toberoff of all or any part of any objection to any interrogatory.  Toberoff reserves until the time of trial all objections as the relevance or admissibility of any facts provided in his answers to the Interrogatories.

13.    The general and specific objections set forth herein are based on information now available to Toberoff and Toberoff reserves the right to revise, correct, add, clarify or supplement the general and specific objections and responses set forth herein.

## II.

## RESPONSES TO INTERROGATORIES

Subject to, and without waiving the General Objections and qualifications above, Toberoff responds to each individual Interrogatory as follows:

**Interrogatory No. 1**

IDENTIFY the TOBEROFF TIMELINE AUTHOR.

**Response to Interrogatory No. 1**

Toberoff objects to this interrogatory to the extent that it seeks information which is not reasonably calculated to lead to the discovery of relevant and admissible evidence.  Toberoff additionally objects to this interrogatory to the extent that it seeks communications or items protected by the attorney-client privilege, the attorney work product doctrine and any other privilege or immunity available under law or arising from contractual obligation.  Subject to and without waiving the foregoing general and specific objections, Toberoff responds, without limitation, as follows:

1    David Michaels. Toberoff does not have sufficient information at this time to

2    know whether or not other individuals or entities participated in the production and

3    dissemination of the "Timeline."

4    **Interrogatory No. 2**

5    DESCRIBE in detail who participated in the ALLEGED INTERNAL

6    INVESTIGATION, including participants within your law firm and outside of your

7    law firm.

8    **Response to Interrogatory No. 2**

9    Toberoff objects to this interrogatory to the extent that it is not reasonably

10    calculated to lead to the discovery of relevant and admissible evidence, as any

11    "investigation" by Toberoff or anyone else as to the author of the TOBEROFF

12    TIMELINE is not relevant to any of the claims for relief in this action.  Toberoff

13    additionally objects to this interrogatory to the extent that it seeks communications or

14    items protected by the attorney-client privilege, the attorney work product doctrine

15    and any other privilege or immunity available under law or arising from contractual

16    obligation.  Subject to and without waiving the foregoing general and specific

17    objections, Toberoff responds, without limitation, as follows:

18    Marc Toberoff, McNally Security Group.

19    **Interrogatory No. 3**

20    DESCRIBE in detail the ALLEGED INTERNAL INVESTIGATION,

21    including all steps taken by YOU and any other participants to IDENTIFY the

22    TOBEROFF TIMELINE AUTHOR and OBTAIN information regarding the

23    TOBEROFF TIMELINE AUTHOR and/or the TOBEROFF TIMELINE.

24    **Response to Interrogatory No. 3**

25    Toberoff objects to this interrogatory to the extent that it seeks information

26    which is not reasonably calculated to lead to the discovery of relevant and admissible

27    evidence, as any "investigation" by Toberoff or anyone else as to the author of the

28    TOBEROFF TIMELINE is not relevant to any of the claims for relief in this action.

Toberoff further objects to this interrogatory on the grounds that it is overbroad, burdensome and oppressive. Toberoff further objects to this interrogatory on the grounds that it is not reasonably limited in scope. Toberoff additionally objects to this interrogatory in that it seeks communications or items protected by the attorney-client privilege, and the attorney work product doctrine.

**Interrogatory No. 4**

DESCRIBE in detail any and all information revealed by the ALLEGED INTERNAL INVESTIGATION, including all information regarding the TOBEROFF TIMELINE AUTHOR and/or the TOBEROFF TIMELINE.

**Response to Interrogatory No. 4**

Toberoff objects to this interrogatory on the grounds that it is overbroad, burdensome and oppressive. Toberoff further objects to this interrogatory on the grounds that it is not reasonably limited in scope. Toberoff objects to this interrogatory to the extent that it seeks information which is not reasonably calculated to lead to the discovery of relevant and admissible evidence. Toberoff additionally objects to this interrogatory to the extent that it seeks communications or items protected by the attorney-client privilege, the attorney work product doctrine and any other privilege or immunity available under law or arising from contractual obligation. Subject to and without waiving the foregoing general and specific objections, Toberoff responds, without limitation, as follows, including, for the sake of context, information that was known prior to the investigation:

- **July 18, 2005**: The Firm hires attorney David Michaels ("Michaels") as its lowest paid junior attorney. It appears from Michaels' interview that he took the low-paying job because he was in need of money.
- **Mid-October 2005**: After just three months as an employee, and without warning or explanation, or any prior incident at work, Michaels abruptly leaves work during the middle of the day and never returns. Numerous concerned calls to Michaels are never returned.

- **November-December 2005**:  Michaels contacts the Siegels and attempts to "steal" these clients from Mr. Toberoff's firm by baselessly accusing Mr. Toberoff of purported unethical conduct, like allegedly charging the Siegels "unconscionable fees."  Under the guise of protecting the Siegels, Michaels visits them, falsely disparages Mr. Toberoff, and attempts to shepherd the Siegels to "a larger firm" (name unknown).  In follow-up e-mails, Michaels advises the Siegels to cease all communication with Mr. Toberoff, and he provides them with a termination letter to give to Toberoff & Associates, as well as a new retainer agreement for the Siegels to hire Michaels at a reduced contingency fee.  In December, 2005, the Siegels reject Michaels' attempt to take their case away from Toberoff & Associates.  During this period, Michaels also approaches another client of Toberoff & Associates, Allison Giannini.  He attempts to take that client's business as well by falsely disparaging Mr. Toberoff, but is rebuffed.

- Unbeknownst to the firm, the Siegels and/or the Shuster Estate, Michaels had secretly made copies of numerous documents, many privileged, stolen from Toberoff & Associates' legal files ("Stolen Documents"), and after Michaels' advances are rejected by the Siegels, he delivers at least three duplicate packages of the Stolen Documents to high-level Warner Bros. executives, each allegedly with the same anonymous defamatory cover letter ("Cover Letter") which he entitles "Superman -Marc Toberoff Timeline."  The Cover Letter opens with the line:  "Consider it an early Holiday gift."

- The Stolen Documents were allegedly received by mail by high-level Warner Bros. executives Alan Horn (President & COO), John Schulman (General Counsel), and Patti Connolly (Executive Vice President of Business Affairs).

- **July 5, 2006**:  Toberoff receives a vague letter from Arnold & Porter LLP,

which is retained by Warner Bros.  The firm states that it is holding three

sets of documents sent to it by Warner Bros.' General Counsel, John

Schulman.  These are eventually disclosed to be the three sets of Stolen

Documents each with the "anonymous" defamatory Cover Letter.

- Knowing that it is under a duty to immediately notify Toberoff &

   Associates of its receipt of the firm's privileged documents, Warner Bros.

   dubiously claims to have received the Stolen Documents on June 28, 2006,

   even though Michaels' Cover Letter states "*consider it an early Holiday*

   *gift*," and even though this coincides with Michael's rejection by the Siegels

   *in December, 2005*.

**Interrogatory No. 5**

DESCRIBE in detail any internal or external investigation other than the

ALLEGED INTERNAL INVESTIGATION YOU participated in regarding the

TOBEROFF TIMELINE AUTHOR and/or the TOBEROFF TIMELINE.

**Response to Interrogatory No. 5**

Toberoff objects to this interrogatory to the extent that it seeks information

which is not reasonably calculated to lead to the discovery of relevant and admissible

evidence , as any "investigation" by Toberoff or anyone else as to the author of the

TOBEROFF TIMELINE is not relevant to any of the claims for relief in this action.

Toberoff objects to this interrogatory on the grounds that it is overbroad, burdensome

and oppressive.  Toberoff further objects to this interrogatory on the grounds that it is

not reasonably limited in scope.  Toberoff objects to this interrogatory to the extent

that it seeks information which is not reasonably calculated to lead to the discovery

of relevant and admissible evidence.  Toberoff additionally objects to this

interrogatory in that it seeks communications or items protected by the attorney-client

privilege, and the attorney work product doctrine.

Subject to and without waiving the foregoing general and specific objections,

Toberoff responds, without limitation, as follows:

- In or about November 2007:  Toberoff met with Stanley Ornellas, of the Los Angeles FBI Field Office, regarding the Stolen Documents, and reported the theft.
- Summer-Fall 2010:  Toberoff conferred telephonically with Beong-Soo Kim, Deputy Chief of the Major Frauds section of the U.S. Attorney's Office, and Brian Klein, Assistant U.S. Attorney, U.S. Attorney's Office, followed by an in-person meeting regarding the Stolen Documents.
- Fall, 2010:  The U.S. Attorney's Office initiates a Grand Jury Investigation.

**Interrogatory No. 6**

DESCRIBE in detail any and all information revealed by any investigation REFERRED to in response to INTERROGATORY NO. 5.

**Response to Interrogatory No. 6**

Toberoff objects to this interrogatory on the grounds that it is overbroad, burdensome and oppressive.  Toberoff further objects to this interrogatory on the grounds that it is not reasonably limited in scope.  Toberoff objects to this interrogatory to the extent that it seeks information which is not reasonably calculated to lead to the discovery of relevant and admissible evidence.  Toberoff additionally objects to this interrogatory to the extent that it seeks communications or items protected by the attorney-client privilege, the attorney work product doctrine and any other privilege or immunity available under law or arising from contractual obligation.  Subject to and without waiving the foregoing general and specific objections, Toberoff responds, without limitation, as follows:

The investigation is ongoing.

**Interrogatory No. 7**

DESCRIBE in detail the current status of any investigation REFERRED to in response to INTERROGATORY NO. 5, including whether and when it concluded.

**Response to Interrogatory No. 7**

Toberoff objects to this interrogatory to the extent that it seeks information

DEFENDANT MARC TOBEROFF'S RESPONSE
TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
Exhibit I      Page 125

1  which is not reasonably calculated to lead to the discovery of relevant and admissible

2  evidence, as any "investigation" by Toberoff or anyone else as to the author of the

3  TOBEROFF TIMELINE is not relevant to any of the claims for relief in this action.

4  Toberoff objects to this interrogatory on the grounds that it is overbroad, burdensome

5  and oppressive.  Toberoff further objects to this interrogatory on the grounds that it is

6  not reasonably limited in scope.  Toberoff objects to this interrogatory to the extent

7  that it seeks information which is not reasonably calculated to lead to the discovery

8  of relevant and admissible evidence.  Toberoff additionally objects to this

9  interrogatory to the extent that it seeks communications or items protected by the

10  attorney-client privilege, the attorney work product doctrine and any other privilege

11  or immunity available under law or arising from contractual obligation.  Subject to

12  and without waiving the foregoing general and specific objections, Toberoff

13  responds, without limitation, as follows:

14       See Response to Interrogatory No. 6.  Toberoff awaits the results of the

15  ongoing investigation by the U.S. Attorney's Office and the Grand Jury

16  Investigation.

17  **Interrogatory No. 8**

18       In the MARCH 2009 DECLARATION, YOU state that the TOBEROFF

19  TIMELINE AUTHOR: "contacted Plaintiffs and another client of my firm and tried

20  to convince them to terminate the firm, and to retain him instead, by disparaging me

21  and by offering to work for a reduced fee.  I am advised by Plaintiffs and my other

22  client that they both rejected this attorney's overtures in early December, 2005."

23  IDENTIFY the "other client," including any and all bases for YOUR knowledge.

24  **Response to Interrogatory No. 8**

25       Toberoff objects to this interrogatory to the extent that it seeks information

26  which is not reasonably calculated to lead to the discovery of relevant and admissible

27  evidence.  Toberoff additionally objects to this interrogatory to the extent that it seeks

28  communications or items protected by the attorney-client privilege, the attorney work

product doctrine and any other privilege or immunity available under law or arising from contractual obligation.  Subject to and without waiving the foregoing general and specific objections, Toberoff responds, without limitation, as follows:  Allison Giannini, c/o Toberoff & Associates, P.C., 2049 Century Park East, Suite 2720, Los Angeles, CA 90064.

**Interrogatory No. 9**

DESCRIBE in detail any and all COMMUNICATIONS between YOU and any law enforcement official, including anyone employed by the United States Attorney's Office for the Central District of California and/or the Federal Bureau of Investigation, regarding the TOBEROFF TIMELINE AUTHOR and/or the TOBEROFF TIMELINE.

**Response to Interrogatory No. 9**

Toberoff objects to this interrogatory to the extent that it seeks information which is not reasonably calculated to lead to the discovery of relevant and admissible evidence, as any "investigation" by Toberoff or anyone else as to the author of the TOBEROFF TIMELINE is not relevant to any of the claims for relief in this action. Toberoff additionally objects to this interrogatory to the extent that it seeks communications or items protected by the attorney-client privilege, the attorney work product doctrine and any other privilege or immunity available under law or arising from contractual obligation.  Subject to and without waiving the foregoing general and specific objections, Toberoff responds, without limitation, as follows:

- In or about November 2007:  Toberoff met with Stanley Ornellas, of the Los Angeles FBI Field Office, regarding the Stolen Documents.
- Summer-Fall 2010:  Toberoff held a telephone conference with Beong-Soo Kim, Deputy Chief of the Major Frauds section of the U.S. Attorney's Office, and Brian Klein, Assistant U.S. Attorney, U.S. Attorney's Office regarding the Stolen Documents, followed by an in-person meeting with Mr.  Kim and others of the U.S. Attorneys' Office.  David Michaels was

disclosed as suspected of having stolen the Stolen Documents and thereafter furnishing attorney-client privileged information to Warner Bros.

- September 9, 2010:  Grand Jury Subpoena served on Toberoff requesting copies of the Timeline and Stolen Documents.

- September 27, 2010:  Timeline and Stolen Documents provided to U.S. Attorneys Office by Kendall, Brill & Klieger pursuant to Grand Jury Subpoena, subject to an express agreement by the U.S. Attorney's Office that the U.S. Attorney's Office would hold such material as confidential and privileged, that such provision was made in furtherance of a common interest privilege, and that such provision was without waiver of the attorney-client privilege or attorney work product doctrine.

## Interrogatory No. 10

IDENTIFY, to the best of your knowledge, any other PERSON who COMMUNICATED with any law enforcement official, including anyone employed by the United States Attorney's Office for the Central District of California and/or the Federal Bureau of Investigation, regarding the TOBEROFF TIMELINE AUTHOR and/or the TOBEROFF TIMELINE.

## Response to Interrogatory No. 10

Toberoff objects to this interrogatory to the extent that it seeks information which is not reasonably calculated to lead to the discovery of relevant and admissible evidence, as any "investigation" by Toberoff or anyone else as to the author of the TOBEROFF TIMELINE is not relevant to any of the claims for relief in this action. Toberoff additionally objects to this interrogatory to the extent that it seeks communications or items protected by the attorney-client privilege, the attorney work product doctrine and any other privilege or immunity available under law or arising from contractual obligation.  Subject to and without waiving the foregoing general and specific objections, Toberoff responds, without limitation, as follows:  Richard Kendall

**Interrogatory No. 11**

DESCRIBE in detail, to the best of YOUR knowledge, the substance of any COMMUNICATIONS REFERRED to in response to INTERROGATORY NO. 11.

**Response to Interrogatory No. 11**

Toberoff objects to this interrogatory to the extent that it seeks information which is not reasonably calculated to lead to the discovery of relevant and admissible evidence, as any "investigation" by Toberoff or anyone else as to the author of the TOBEROFF TIMELINE is not relevant to any of the claims for relief in this action. Toberoff additionally objects to this interrogatory insofar as it seeks communications or items protected by the attorney-client privilege and the attorney work product doctrine.  Subject to and without waiving the foregoing general and specific objections, Toberoff responds, without limitation: the substance of the information provided was that described in response to Interrogatory No. 4.

**Interrogatory No. 12**

In the OCTOBER 2010 DECLARATION, YOU state that:

> The theft of privileged documents from my law offices and their transmittal with an anonymous cover letter, entitled the "Toberoff Timeline," to DC's in-house legal team, as well as to other executives of DC's parent company, Warner Bros., by a former junior attorney at my firm is the subject of an ongoing grand jury investigation initiated by the United States Attorney for the Central District of California.

DESCRIBE in detail how, to the best of YOUR knowledge, "the United States Attorney for the Central District of California" or any other member of law enforcement or the federal government became aware of the TOBEROFF TIMELINE AUTHOR and/or the TOBEROFF TIMELINE, including whether YOU initiated contact with them.

**Response to Interrogatory No. 12**

Toberoff objects to this interrogatory to the extent that it seeks information which is not reasonably calculated to lead to the discovery of relevant and admissible evidence, as any "investigation" by Toberoff or anyone else as to the author of the

TOBEROFF TIMELINE is not relevant to any of the claims for relief in this action. Toberoff additionally objects to this interrogatory to the extent that it seeks communications or items protected by the attorney-client privilege, the attorney work product doctrine and any other privilege or immunity available under law or arising from contractual obligation.  Subject to and without waiving the foregoing general and specific objections, Toberoff responds, without limitation, as follows:

To the best of Toberoff's knowledge, the United States Attorney for the Central District of California became aware of the Stolen Documents, the "TIMELINE," and its author as a result of Toberoff reporting the theft of the Stolen Documents to them.

**Interrogatory No. 13**

DESCRIBE in detail who, to the best of YOUR knowledge, has participated in the ALLEGED GRAND JURY INVESTIGATION, including any PERSON who has testified or been interviewed in connection with the ALLEGED GRAND JURY INVESTIGATION.

**Response to Interrogatory No. 13**

Toberoff objects to this interrogatory to the extent that it seeks information which is not reasonably calculated to lead to the discovery of relevant and admissible evidence, as any "investigation" by Toberoff or anyone else as to the author of the TOBEROFF TIMELINE is not relevant to any of the claims for relief in this action. Toberoff additionally objects to this interrogatory to the extent that it seeks communications or items protected by the attorney-client privilege, the attorney work product doctrine and any other privilege or immunity available under law or arising from contractual obligation.  Subject to and without waiving the foregoing general and specific objections, Toberoff responds, without limitation, as follows:

Other than statements made by Toberoff to Beong-Soo Kim, Deputy Chief of the Major Frauds section of the U.S. Attorneys' Office and Brian Klein, Assistant U.S. Attorney, U.S. Attorney's Office, Toberoff is not aware of any other testimony

1  or formal statements by any individuals or entities made as part of the ongoing grand

2  jury investigation.

3  **Interrogatory No. 14**

4      DESCRIBE in detail, to the best of YOUR knowledge, the substance of any

5  testimony or statements made in connection with the ALLEGED GRAND JURY

6  INVESTIGATION.

7  **Response to Interrogatory No. 14**

8      Toberoff objects to this interrogatory to the extent that it seeks information

9  which is not reasonably calculated to lead to the discovery of relevant and admissible

10 evidence, as any "investigation" by Toberoff or anyone else as to the author of the

11 TOBEROFF TIMELINE is not relevant to any of the claims for relief in this action.

12 Toberoff additionally objects to this interrogatory to the extent that it seeks

13 communications or items protected by the attorney-client privilege, the attorney work

14 product doctrine and any other privilege or immunity available under law or arising

15 from contractual obligation.  Subject to and without waiving the foregoing general

16 and specific objections, Toberoff responds, without limitation, as follows:  see

17 Response to Interrogatory No. 13.

18 **I Interrogatory No. 15**

19      DESCRIBE in detail, to the best of YOUR knowledge, the current status of the

20 ALLEGED GRAND JURY INVESTIGATION.

21 **Response to Interrogatory No. 15**

22      Toberoff objects to this interrogatory to the extent that it seeks information

23 which is not reasonably calculated to lead to the discovery of relevant and admissible

24 evidence, as any "investigation" by Toberoff or anyone else as to the author of the

25 TOBEROFF TIMELINE is not relevant to any of the claims for relief in this action.

26 Toberoff additionally objects to this interrogatory to the extent that it seeks

27 communications or items protected by the attorney-client privilege, the attorney work

28 product doctrine and any other privilege or immunity available under law or arising

from contractual obligation.  Subject to and without waiving the foregoing general and specific objections, Toberoff responds, without limitation, as follows:

The Grand Jury Investigation is ongoing.

**Interrogatory No. 16**

DESCRIBE in detail, to the best of YOUR knowledge, whether any PERSON has been designated by the United States Attorney's Office for the Central District of California as a witness, subject, or target of the ALLEGED GRAND JURY INVESTIGATION.

**Response to Interrogatory No. 16**

Toberoff objects to this interrogatory to the extent that it seeks information which is not reasonably calculated to lead to the discovery of relevant and admissible evidence, as any "investigation" by Toberoff or anyone else as to the author of the TOBEROFF TIMELINE is not relevant to any of the claims for relief in this action. Toberoff additionally objects to this interrogatory to the extent that it seeks communications or items protected by the attorney-client privilege, the attorney work product doctrine and any other privilege or immunity available under law or arising from contractual obligation.  Subject to and without waiving the foregoing general and specific objections, Toberoff responds, without limitation, as follows:  David Michaels.

**Interrogatory No. 17**

IDENTIFY any DOCUMENTS provided by YOU in connection with the ALLEGED GRAND JURY INVESTIGATION.

**Response to Interrogatory No. 17**

Toberoff objects to this interrogatory to the extent that it seeks information which is not reasonably calculated to lead to the discovery of relevant and admissible evidence, as any "investigation" by Toberoff or anyone else as to the author of the TOBEROFF TIMELINE is not relevant to any of the claims for relief in this action. Toberoff additionally objects to this interrogatory to the extent that it seeks

communications or items protected by the attorney-client privilege, the attorney work product doctrine and any other privilege or immunity available under law or arising from contractual obligation.  Subject to and without waiving the foregoing general and specific objections, Toberoff responds, without limitation, as follows:  None.

**Interrogatory No. 18**

IDENTIFY any DOCUMENTS, to the best of YOUR knowledge, provided by any other PERSON in connection with the ALLEGED GRAND JURY INVESTIGATION.

**Response to Interrogatory No. 18**

Toberoff objects to this interrogatory to the extent that it seeks information which is not reasonably calculated to lead to the discovery of relevant and admissible evidence, as any "investigation" by Toberoff or anyone else as to the author of the TOBEROFF TIMELINE is not relevant to any of the claims for relief in this action. Toberoff additionally objects to this interrogatory to the extent that it seeks communications or items protected by the attorney-client privilege, the attorney work product doctrine and any other privilege or immunity available under law or arising from contractual obligation.  Subject to and without waiving the foregoing general and specific objections, Toberoff responds, without limitation, as follows:

The Kendall, Brill & Klieger firm provided copies of the Toberoff  Timeline and the Stolen Documents to the U.S. Attorney's Office on September 27, 2010 pursuant to a Grand Jury Subpoena dated September 13, 2010,  subject to an express agreement by the U.S. Attorney's Office that the U.S. Attorney's Office would hold such material as confidential and privileged, that such provision was made in furtherance of a common interest privilege, and that such provision was without waiver of the attorney-client privilege or attorney work product doctrine.

**Interrogatory No. 19**

DESCRIBE in detail any grand jury subpoenas that have been issued, to the best of your knowledge, in connection with the ALLEGED GRAND JURY

1   INVESTIGATION.

2   **Response to Interrogatory No. 19**

3   Toberoff objects to this interrogatory to the extent that it seeks information

4   which is not reasonably calculated to lead to the discovery of relevant and admissible

5   evidence, as any "investigation" by Toberoff or anyone else as to the author of the

6   TOBEROFF TIMELINE is not relevant to any of the claims for relief in this action.

7   Toberoff additionally objects to this interrogatory to the extent that it seeks

8   communications or items protected by the attorney-client privilege, the attorney work

9   product doctrine and any other privilege or immunity available under law or arising

10  from contractual obligation.  Subject to and without waiving the foregoing general

11  and specific objections, Toberoff responds, without limitation, as follows:

12  Toberoff's attorneys, at Kendall, Brill & Klieger, were served with a grand

13  jury subpoena on September 13, 2010, which requested copies of the Timeline and

14  Stolen Documents.

15  **Interrogatory No. 20**

16  DESCRIBE in detail how the ALLEGED DISCIPLINARY ACTION began,

17  including any and all COMMUNICATIONS YOU had with the California bar or any

18  legal, administrative, or disciplinary entity regarding the TOBEROFF TIMELINE

19  AUTHOR and/or TOBEROFF TIMELINE.

20  **Response to Interrogatory No. 20**

21  Toberoff objects to this interrogatory to the extent that it seeks information

22  which is not reasonably calculated to lead to the discovery of relevant and admissible

23  evidence, as any "investigation" by Toberoff or anyone else as to the author of the

24  TOBEROFF TIMELINE is not relevant to any of the claims for relief in this action.

25  Toberoff objects to this interrogatory on the grounds that it is overbroad, burdensome

26  and oppressive.  Toberoff further objects to this interrogatory on the grounds that it is

27  not reasonably limited in scope.  Toberoff objects to this interrogatory to the extent

28  that it seeks information which is not reasonably calculated to lead to the discovery

17

DEFENDANT MARC TOBEROFF'S RESPONSE
TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Exhibit I    Page 134

1  of relevant and admissible evidence.  Toberoff additionally objects to this

2  interrogatory to the extent that it seeks communications or items protected by the

3  attorney-client privilege, the attorney work product doctrine and any other privilege

4  or immunity available under law or arising from contractual obligation.  Subject to

5  and without waiving the foregoing general and specific objections, Toberoff

6  responds, without limitation, as follows:

7       Toberoff has no knowledge of any ALLEGED DISCIPLINARY ACTION.

8  **Interrogatory No. 21**

9       DESCRIBE in detail who, to the best of YOUR knowledge, participated in the

10 ALLEGED DISCIPLINARY ACTION.

11 **Response to Interrogatory No. 21**

12      Toberoff objects to this interrogatory to the extent that it seeks information

13 which is not reasonably calculated to lead to the discovery of relevant and admissible

14 evidence, as any "investigation" by Toberoff or anyone else as to the author of the

15 TOBEROFF TIMELINE is not relevant to any of the claims for relief in this action.

16 Toberoff additionally objects to this interrogatory to the extent that it seeks

17 communications or items protected by the attorney-client privilege, the attorney work

18 product doctrine and any other privilege or immunity available under law or arising

19 from contractual obligation.  Subject to and without waiving the foregoing general

20 and specific objections, Toberoff responds, without limitation, as follows:

21      *See* Response to Interrogatory No. 20.

22 **Interrogatory No. 22**

23      DESCRIBE in detail all information revealed by the ALLEGED

24 DISCIPLINARY ACTION, including all information regarding the TOBEROFF

25 TIMELINE AUTHOR and/or the TOBEROFF TIMELINE.

26 **Response to Interrogatory No. 22**

27      Toberoff objects to this interrogatory to the extent that it seeks information

28 which is not reasonably calculated to lead to the discovery of relevant and admissible

1  evidence, as any "investigation" by Toberoff or anyone else as to the author of the

2  TOBEROFF TIMELINE is not relevant to any of the claims for relief in this action.

3  Toberoff additionally objects to this interrogatory to the extent that it seeks

4  communications or items protected by the attorney-client privilege, the attorney work

5  product doctrine and any other privilege or immunity available under law or arising

6  from contractual obligation.  Subject to and without waiving the foregoing general

7  and specific objections, Toberoff responds, without limitation, as follows:

8       *See* Response to Interrogatory No. 20.

9  **Interrogatory No. 23**

10      DESCRIBE in detail, to the best of YOUR knowledge, the current status of the

11  ALLEGED DISCIPLINARY ACTION, including whether and when it concluded.

12  **Response to Interrogatory No. 23**

13      Toberoff objects to this interrogatory to the extent that it seeks information

14  which is not reasonably calculated to lead to the discovery of relevant and admissible

15  evidence, as any "investigation" by Toberoff or anyone else as to the author of the

16  TOBEROFF TIMELINE is not relevant to any of the claims for relief in this action.

17  Toberoff additionally objects to this interrogatory to the extent that it seeks

18  communications or items protected by the attorney-client privilege, the attorney work

19  product doctrine and any other privilege or immunity available under law or arising

20  from contractual obligation.  Subject to and without waiving the foregoing general

21  and specific objections, Toberoff responds, without limitation, as follows:

22       *See* Response to Interrogatory No. 20.

23  **Interrogatory No. 24**

24      DESCRIBE in detail any and all COMMUNICATIONS YOU have had with

25  the TOBEROFF TIMELINE AUTHOR since July 2006, including all efforts YOU

26  made to contact the TOBEROFF TIMELINE AUTHOR.

27  **Response to Interrogatory No. 24**

28      Toberoff objects to this interrogatory to the extent that it seeks information

1  which is not reasonably calculated to lead to the discovery of relevant and admissible

2  evidence, as any "investigation" by Toberoff or anyone else as to the author of the

3  TOBEROFF TIMELINE is not relevant to any of the claims for relief in this action.

4  Toberoff additionally objects to this interrogatory to the extent that it seeks

5  communications or items protected by the attorney-client privilege, the attorney work

6  product doctrine and any other privilege or immunity available under law or arising

7  from contractual obligation.  Subject to and without waiving the foregoing general

8  and specific objections, Toberoff responds, without limitation, as follows:

9      Toberoff has not had direct contact with David Michaels since July 2006.

10 **Interrogatory No. 25**

11     DESCRIBE in detail any and all COMMUNICATIONS YOU have had with

12 any PERSON other than a party to the above-entitled action RELATED to the

13 TOBEROFF TIMELINE AUTHOR and/or the TOBEROFF TIMELINE.

14 **Response to Interrogatory No. 25**

15     Toberoff objects to this interrogatory to the extent that it seeks information

16 which is not reasonably calculated to lead to the discovery of relevant and admissible

17 evidence, as any "investigation" by Toberoff or anyone else as to the author of the

18 TOBEROFF TIMELINE is not relevant to any of the claims for relief in this action.

19 Toberoff additionally objects to this interrogatory to the extent that it seeks

20 communications or items protected by the attorney-client privilege, the attorney work

21 product doctrine and any other privilege or immunity available under law or arising

22 from contractual obligation.  Subject to and without waiving the foregoing general

23 and specific objections, Toberoff responds, without limitation, as follows:

24     Toberoff has had communications with his attorneys in this action at Kendall,

25 Brill & Klieger and with the attorneys at Toberoff & Associates P.C. as well as

26 communications with Stanley Ornellas at the FBI, Beong-soo Kim, Deputy Chief of

27 the Major Frauds section at the U.S. Attorney's Office, and Brian Klein, Assistant

28 U.S. Attorney, U.S. Attorney's Office as set forth in Responses Nos. 5, 9 and 13.

20

DEFENDANT MARC TOBEROFF'S RESPONSE
TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Exhibit I        Page 137

1

2    Dated:  January 24, 2011                    KENDALL BRILL & KLIEGER LLP

3

4    _____

5                                                 Nicholas F. Daum
                                                  Attorneys for Defendants Marc Toberoff,
6                                                 Pacific Pictures Corporation, IP Worldwide,
                                                  LLC, and IPW, LLC
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>VERIFICATION</u>

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I have read the foregoing **DEFENDANT MARC TOBEROFF'S RESPONSE TO PLAINTIFF DC COMICS' FIRST SET OF INTERROGATORIES** and know its contents.

I am a party to this action.  The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

Executed on January 24, 2011, at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.


Marc M. Toberoff
Print Name of Signatory                    Signature

DEFENDANT MARC TOBEROFF'S RESPONSE
TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
Exhibit I                    Page 139