DANIEL M. PETROCELLI (S.B. #097802)
  dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
  mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
  cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067-6035
Telephone:   (310) 553-6700
Facsimile:    (310) 246-6779

PATRICK T. PERKINS (admitted *pro hac vice*)
  pperkins@ptplaw.com
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, NY 10516
Telephone:  (845) 265-2820
Facsimile:   (845) 265-2819

Attorneys for Plaintiff DC Comics

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DC COMICS,<br><br>        Plaintiff,<br><br>        v.<br><br>PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, an individual, JOANNE SIEGEL, an individual, LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive,<br><br>        Defendants. | Case No. CV 10-03633 ODW (RZx)<br><br>**[REDACTED] DC COMICS' NOTICE OF MOTION AND MOTION FOR REVIEW OF MAGISTRATE'S ORDER ON PLAINTIFF'S MOTION TO COMPEL PURSUANT TO FED. R. CIV. P. 72(A) AND L.R. 72-2.1**<br><br>**UNREDACTED VERSION SEPARATELY LODGED PROVISIONALLY UNDER SEAL**<br><br>DECLARATION OF CASSANDRA SETO AND PROPOSED ORDER FILED CONCURRENTLY HEREWITH<br><br>Hon. Otis D. Wright II<br><br>**Hearing Date**:  May 23, 2011<br>**Hearing Time**: 1:30 p.m.<br>**Courtroom**:      11 |

1    TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2           PLEASE TAKE NOTICE that on May 23, 2011, at 1:30 p.m., or as soon

3    thereafter as the matter may be heard by the above-entitled court, located at 312

4    North Spring Street, Los Angeles, California in Courtroom 11, plaintiff DC Comics

5    will and hereby does move the Court for review of certain portions of Magistrate

6    Judge Ralph Zarefsky's April 11, 2011, Order On Plaintiff's Motion To Compel.

7           This motion is made pursuant to paragraph 4 of this Court's Standing Order

8    (Docket No. 18), Central District Local Rule 72-2.1, and Federal Rule of Civil

9    Procedure 72(a) on the ground that Magistrate Zarefsky's rulings regarding

10   defendants' consent agreements (Docket No. 209 at 1:26-10:27), non-privileged

11   correspondence with Michael Siegel (*id.* at 11:11-15; 12:8-12), and privilege logs

12   (*id.* at 13:9-27, 12:1-6) are clearly erroneous and contrary to law.  Pursuant to

13   paragraph 5(b) of this Court's Standing Order Regarding Newly Assigned Cases

14   and Central District Local Rule 7-3, the parties have attempted unsuccessfully to

15   resolve their disputes and therefore respectfully seek the assistance of the Court.

16          This motion is based on this Notice of Motion and Motion; the

17   accompanying Memorandum of Points and Authorities; the concurrently-filed

18   Declaration of Cassandra Seto and exhibits in support thereof; any additional

19   briefing that may be filed; all exhibits, files, and records on file in this action;

20   matters of which judicial notice may be taken; and such additional submissions and

21   argument as may be presented at or before the hearing on this motion.

22

23   Dated:        April 25, 2011              Respectfully Submitted,

24                                             O'MELVENY & MYERS LLP

25                                             By:  /s/ Daniel M. Petrocelli

26                                                 Daniel M. Petrocelli
                                                   Attorneys for Plaintiff DC Comics
27

28

# **TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................. 1

II.     DEFENDANTS SHOULD BE COMPELLED TO PRODUCE THEIR
        UNLAWFUL 2008 CONSENT AGREEMENT. ........................................ 1

        A.    The Relevant Factual Background ........................................ 1

        B.    The Consent Agreement Should Be Ordered Produced. ...................... 4

III.    DEFENDANTS' REFUSAL TO PRODUCE RELEVANT, NON-
        PRIVILEGED DOCUMENTS OR COMPLETE PRIVILEGE LOGS
        SHOULD ALSO BE REJECTED ................................................... 13

        A.    The Relevant Factual Background ...................................... 13

        B.    Defendants' Non-Privileged Correspondence With Michael
              Siegel Should Be Ordered Produced. ................................. 15

        C.    Defendants Should Be Compelled To Amend Their Privilege
              Logs .............................................................. 17

DC COMICS' MOT. FOR REVIEW
OF MAGISTRATE'S ORDER

1

# <u>TABLE OF AUTHORITIES</u>

2

## CASES

3

*Ariz. v. Cal.*,
   460 U.S. 605 (1983) ...................................................................................5

4

*Bd. of Trs. v. Tyco Int'l, Ltd.*,
   253 F.R.D. 521 (C.D. Cal. 2008) .............................................................4

5

*Bourne Co. v. MPL Commc'ns, Inc.*,
   675 F. Supp. 859 (S.D.N.Y. 1987) ..........................................................9

6

*Calvert v. Stoner*,
   33 Cal. 2d 97 (1948) .................................................................................9

7

*Carmona v. Carmona*,
   603 F.3d 1041 (9th Cir. 2010) ..............................................................5, 6

8

*Carney v. Am. Univ.*,
   151 F.3d 1090 (D.C. Cir. 1998) ............................................................4, 9

9

*CBOCS West, Inc. v. Humphries*,
   553 U.S. 442 (2008) ...............................................................................10

10

*Clarke v. Am. Commerce Nat'l Bank*,
   974 F.2d 127 (9th Cir. 1992) .................................................................17

11

*Disimone v. Browner*,
   121 F.3d 1262 (9th Cir. 1997) .................................................................6

12

*Doe 1 v. Super. Ct.*,
   132 Cal. App. 4th 1160 (2005) ................................................................3

13

*Dole v. Melonas*,
   889 F.2d 885 (9th Cir. 1989) .................................................................19

14

*Dominguez v. Schwarzenegger*,
   2010 WL 3341038 (N.D. Cal. Aug. 25, 2010) ......................................18

15

*FDIC v. White*,
   76 F. Supp. 2d 736 (N.D. Tex. 1999) .....................................................4

16

*Hartzheim v. Valley Land & Cattle Co.*,
   153 Cal. App. 4th 383 (2007) ................................................................10

17

*In re Grand Jury Investigation*,
   974 F.2d 1068 (9th Cir. 1992) ...............................................................19

18

*In re Grand Jury Proceedings*,
   33 F.3d 1060 (9th Cir. 1994) .................................................................11

19

*Little Oil Co. v. Atlantic Richfield Co.*,
   852 F.2d 441 (9th Cir. 1988) ...................................................................5

20

*Mendenhall v. NTSB*,
   213 F.3d 464 (9th Cir. 2000) ...................................................................5

21

*Miller v. Pancucci*,
   141 F.R.D. 292 (C.D. Cal. 1992) ..........................................................19

22

*Milne v. Stephen Slesinger, Inc.*,
   430 F.3d 1036 (9th Cir. 2005) .........................................................2-3, 8-9

23

24

25

26

27

28

*Minebea Co., Ltd. v. Papst,*
  355 F. Supp. 2d 526 (D.D.C. 2005) ............................................................ 11, 18

*Montgomery Cnty. v. MicroVote Corp.,*
  175 F.3d 296 (3d Cir. 1999) ........................................................................ 11

*Munoz v. J.C. Penney Corp.,*
  2009 U.S. Dist. LEXIS 36362 (C.D. Cal. Apr. 9, 2009) .................... 1, 3-4, 9

*Parrick v. FedEx Grounds Package Sys.,*
  2010 WL 2854314 (D. Mont. July 19, 2010) ............................................... 18

*Rekhi v. Wildwood Indus., Inc.,*
  61 F.3d 1313 (7th Cir. 1995) ........................................................................ 6

*Suezaki v. Super. Ct.,*
  58 Cal. 2d 166 (1962) .................................................................................... 16

*Sullivan v. Little Hunting Park, Inc.,*
  396 U.S. 229 (1969) ...................................................................................... 10

*Tax Auth., Inc. v. Jackson Hewitt, Inc.,*
  898 A.2d 512 (N.J. 2006) .............................................................................. 9

*Tennenbaum v. Deloitte & Touche,*
  77 F.3d 337 (9th Cir. 1996) .......................................................................... 12

*Thomas v. Bible,*
  983 F.2d 152 (9th Cir. 1993) ...................................................................... 5, 6

*U.S. v. Alexander,*
  106 F.3d 874 (9th Cir. 1997) ........................................................................ 5

*U.S. v. Chen,*
  99 F.3d 1495 (9th Cir. 1996) ........................................................................ 18

*U.S. v. Hardesty,*
  977 F.2d 1347 (9th Cir. 1992) ...................................................................... 6

*U.S. v. Martin,*
  278 F.3d 988 (9th Cir. 2002) .................................................................. 11, 17

*U.S. v. Mendelsohn,*
  896 F.2d 1183 (9th Cir. 1990) ...................................................................... 12

*U.S. v. Osborn,*
  561 F.2d 1334 (9th Cir. 1977) ................................................................ 16, 19

*U.S. v. Park Place Assocs., Ltd.,*
  563 F.3d 907 (9th Cir. 2009) ........................................................................ 5

*Weil v. Inv./Indicators, Research & Mgmt., Inc.,*
  647 F.2d 18 (9th Cir. 1981) .......................................................................... 12

## STATUTES

17 U.S.C. § 304(c)(6)(D) ..........................................................................2-3, 8

28 U.S.C. § 636(b)(1)(A) ................................................................................ 8

Cal. Evid. Code § 1120 .................................................................................. 3

Fed. R. Civ. P. 26(b)(5) ................................................................................ 17

1

## OTHER AUTHORITIES

1 P. GOLDSTEIN, GOLDSTEIN ON COPYRIGHT (2007) ................................. 9

18B C. WRIGHT ET AL., FED. PRAC. & PROC.  (2d ed. 2002) .................................. 5

ABA Standing Comm. on Ethics and Prof'l Responsibility, Formal
    Opinion 06-438 (2006) ......................................................... 9

CAL. RULES OF PROF'L CONDUCT R. 3-310(D) (2011) ............................. 9

SECOND SUPP. REG.'S REP. ON GEN. REV'N OF U.S. COPYRIGHT
    LAW, 94TH CONG. 307 (1975) ............................................... 9

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DC COMICS' MOT. FOR REVIEW
OF MAGISTRATE'S ORDER

1    **I.    INTRODUCTION**

2        DC Comics respectfully asks this Court to review three discovery rulings

3    made by Magistrate Zarefsky on April 11, 2011, concerning allegedly confidential

4    and privileged documents that defendants refuse to produce.  The Magistrate's

5    ruling regarding an unlawful "consent agreement" that defendants admit they

6    signed in 2008 contravenes clear federal and California law governing mediation-

7    related communications—including this Court's leading opinion in *Munoz v. J.C.*

8    *Penney Corp.*, 2009 U.S. Dist. LEXIS 36362 (C.D. Cal. Apr. 9, 2009) (Wright, J.).

9    The Magistrate's ruling was also in error because it erroneously applied and

10   impermissibly expanded the "law of the case" doctrine beyond the limits set by the

11   Ninth Circuit.

12       The Magistrate's two other rulings on privilege issues were also in error, but

13   the primary defect with these rulings was only fully confirmed by a document that

14   defendants were ordered to produce by the Magistrate on April 18, 2011, *after* the

15   Magistrate issued his discovery ruling.  That May 13, 2003, letter—which was

16   plainly responsive to DC's discovery requests, refutes key factual assertions

17   defendants have made in this case, and yet was *never* before produced or logged—

18   confirms the Magistrate should not have relied on defendants' representations about

19   the completeness and accuracy of their privilege claims.[1]

20   **II.    DEFENDANTS SHOULD BE COMPELLED TO PRODUCE THEIR**

21         **UNLAWFUL 2008 CONSENT AGREEMENT.**

22       **A.    The Relevant Factual Background**

23       DC filed its complaint in this case in May 2010 to protect its rights in the

24   Superman property it developed and nurtured for over 70 years.  The complaint

25   _____

26       [1] By rule, DC had to file by today this motion to review the Magistrate's April
11 ruling.  Because the Magistrate was deprived of the May 13, 2003, letter in

27   making his April 11 ruling, DC will also move the Magistrate to reconsider that
order.  DC sought to file the latter motion last week.  Defendants objected, and DC,

28   consistent with the Local Rules, will file it on May 2.

DC COMICS' MOT. FOR REVIEW
OF MAGISTRATE'S ORDER

1    challenges copyright termination notices served by the heirs of Joseph Shuster, the

2    first illustrator of Superman, and also addresses defendants' acts of forbidden

3    "rights trafficking" that violate DC's rights under the Copyright Act.  These illicit

4    transfers include the conveyance of the Shusters' putative rights in Superman to

5    Marc Toberoff, his alter-ego companies, and Jerry Siegel's heirs.  Am. Compl. ¶¶

6    105-73.

7         Starting in 2001, Toberoff and his entertainment companies entered into a

8    series of transactions with the heirs that forbade them from freely disposing of their

9    putative copyright interests in Superman.  In two agreements with Toberoff's alter-

10   ego entertainment company (Pacific Pictures), Toberoff induced the Shusters to

11   "warrant and represent that after signing this Agreement they will not without the

12   express written consent of [Pacific Pictures] transfer, limit or encumber the Rights

13   in any respect."  Docket Nos. 163-4 ¶ 4; 163-6 ¶ 4.  In these contracts, the Shusters

14   "assign[ed]" to their joint venture with Pacific Pictures "their rights, title, and

15   interest" in Superman, and agreed that upon termination of the venture "all Rights

16   will be held fifty percent (50%) by [the Shusters] and fifty percent (50%) by"

17   Pacific Pictures.  Docket No. 163-4 ¶ 8; 163-6 ¶ 7.  In September 2004, Pacific

18   Pictures and the Shusters terminated their venture, effectively transferring 50%

19   ownership in the Shusters' rights to Pacific Pictures.  Am. Compl. ¶¶ 98-99.

20        *By defendants' own admission*, these consent agreements violated federal

21   law.  The Copyright Act establishes that copyright grantees like DC have a

22   statutory period of exclusivity—between the filing of a copyright termination

23   notice, and its effective date (from 2003 to 2013, in the Shusters' case)—in which

24   the heirs are *barred* from entering into any agreement regarding their putative

25   Superman copyrights with *any* party other than DC.  17 U.S.C. § 304(c)(6)(D).

26   Congress enacted 304(c)(6)(D) to prevent "trafficking in future [copyright]

27   interests," *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1047 (9th Cir. 2005),

28   and balance the rights of authors (who create a property) and grantees like DC (who

- 2 -

1  spent millions of dollars to develop it), *id.* (304(c)(6)(D) gives grantees "a

2  competitive advantage over third parties" "in the nature of a right of first refusal").

3  Defendants now *concede* the Pacific Pictures agreements violated the Copyright

4  Act.  Docket Nos. 185 at 16-24; 147-1 at 2, 8.

5       The Pacific Pictures agreements were only the start of a course of misconduct

6  engineered by Toberoff to infringe DC's rights.  For example, he bound the Siegels

7  to an October 2002 contract with his alter-ego company IP Worldwide in which

8  they agreed not to "transfer, assign, license or in any manner encumber [their

9  putative Superman] Rights…."  Docket No. 163-5 ¶ 8.  By their own admission,

10 defendants also entered into at least one more consent agreement in 2008

11      **[REDACTED]**

12      **[REDACTED]**

13 Decl. of Cassandra Seto ("Seto Decl.") Ex. A.  This 2008 consent agreement

14 violates DC's rights under section 304(c)(6)(D) of the Copyright Act—*to this day*.

15 Am. Compl. ¶ 101; Docket Nos. 182 ¶ 53; 160 at 50-51 (referring to currently-

16 existing consent agreement); 147-1 at 2 (same).

17      Toberoff only first disclosed this 2008 agreement in the days leading up to a

18 2008 mediation session that the parties held in the related *Siegel* case.  Defendants

19 refused to produce it in discovery in *Siegel* or this case, however, relying on

20 confidentiality rules governing mediations.  But both federal and California law do

21 not allow a party to "immunize admissible information, *such as a pre-existing*

22 *document*, through the pretense of disclosing it during compromise negotiations."

23 FED. R. EVID. 408, Advisory Comm. Note (emphasis added); *accord* CAL. EVID.

24 CODE § 1120; *Doe 1 v. Super. Ct.*, 132 Cal. App. 4th 1160, 1173 (2005) (if the rule

25 were otherwise, parties improperly "could use mediation as a pretext to shield

26 materials from disclosure").  As this Court made clear in *Munoz*, parties may rely

27 on proof of statements made during mediation sessions to prove underlying facts

28 (be they jurisdictional, or, as here, grounds for a second lawsuit) other than

DC COMICS' MOT. FOR REVIEW
OF MAGISTRATE'S ORDER

1    "liability, invalidity of, or amount of a claim" in the case being mediated.  *See* 2009

2    U.S. Dist. LEXIS 36362, at \*8-10; *accord Carney v. Am. Univ.*, 151 F.3d 1090,

3    1095-96 (D.C. Cir. 1998) (settlement letter threatening to retaliate against plaintiff

4    unless he dropped claim admissible as evidence of new, independent tort); *FDIC v.*

5    *White*, 76 F. Supp. 2d 736, 738 (N.D. Tex. 1999) (no federal privilege prevents

6    parties from challenging wrongdoing "under the guise of preserving the integrity of

7    the mediation process"); *Bd. of Trs. v. Tyco Int'l, Ltd.*, 253 F.R.D. 521, 523 (C.D.

8    Cal. 2008) ("[T]here is no federal privilege preventing the discovery of settlement

9    agreements and related documents.").  Consistent with *Munoz*, *Carney*, and cases

10   like them, DC seeks discovery of the 2008 consent agreement in this *Pacific*

11   *Pictures* case as evidence of claims for relief that were *never* asserted in *Siegel*—

12   which is a wholly acceptable use.  *See* Docket Nos. 160 at 11-27; 171 at 1-2.

13          **B.    The Consent Agreement Should Be Ordered Produced.**

14          In *Siegel*, Judge Larson denied DC's motion to compel production of the

15   2008 consent agreement because (1) he accepted Toberoff's representation that the

16   document was covered by the attorney-client privilege; and (2) given that he had

17   ordered the parties to mediate and was about to conduct a bench trial, he did not

18   want to review a document that Toberoff claimed was covered by mediation

19   privilege.  Docket No. 163-11 at 718:17-20, 724:9-19.  In so ruling, Judge Larson:

20          • *never* examined the 2008 consent agreement itself;

21          • *never* examined Toberoff's letter disclosing it and describing its terms;

22          • *never* had before him DC's new claims for relief at issue in this case;

23          • *never* had before him defendants' *admissions* in response to DC's new

24              claims in this case that at least two of its consent agreements were *illegal*;

25          • and *never* had before him defendants' admission that the 2008 consent

26              agreement remains in force today—years *after* the parties' mediation

27              ended.  Docket Nos. 163-11 at 722:2-10; 160 at 25-26, 50-51; 147-1 at 2.

28

DC COMICS' MOT. FOR REVIEW
OF MAGISTRATE'S ORDER

1           Citing these new facts, DC moved the Magistrate to compel the production of

2   the 2008 consent agreement and related drafts and correspondence.  The Magistrate

3   denied DC's motion, but in doing so, misapplied the law or misapprehended which

4   arguments were previously made to Judge Larson and the issues which Judge

5   Larson did and did *not* resolve.

6           1. The "Law Of The Case" Doctrine Has No Application Here.  After the

7   hearing on DC's motion, the Magistrate asked the parties to brief whether

8   "collateral estoppel"—a doctrine which may be applied across different cases—

9   controlled on this motion.  DC demonstrated that the doctrine did *not* apply, *see*

10   Docket No. 197, and instead of relying on collateral estoppel for his rulings, the

11   Magistrate held that the "law of the case" doctrine applied and bound him to treat

12   DC's pending motion like a motion for "reconsideration" of Judge Larson's ruling.

13   Docket No. 209 at 3:13-4:23.  This was legal error, as shown below; and as

14   explained in the ensuing two sections, DC should have prevailed even under the

15   Magistrate's expansive view of law of the case.

16           The Ninth Circuit repeatedly has held that the "law of the case" doctrine

17   applies only to rulings made "*in the identical case*."  *Thomas v. Bible*, 983 F.2d

18   152, 154 (9th Cir. 1993) (emphasis added); *accord Carmona v. Carmona*, 603 F.3d

19   1041, 1052 (9th Cir. 2010); *U.S. v. Park Place Assocs., Ltd.*, 563 F.3d 907, 925 (9th

20   Cir. 2009); *Mendenhall v. NTSB*, 213 F.3d 464, 469 (9th Cir. 2000); *U.S. v.*

21   *Alexander*, 106 F.3d 874, 876 (9th Cir. 1997); *Little Oil Co. v. Atlantic Richfield*

22   *Co.*, 852 F.2d 441, 447 (9th Cir. 1988); *Ariz. v. Cal.*, 460 U.S. 605, 618 (1983).

23   This is confirmed by the treatise *defendants* cited:  "Law-of-the-case rules [apply

24   to] matters once decided during the course of *a single continuing lawsuit.  They do*

25   *not apply between separate actions*."  18B C. WRIGHT ET AL., FED. PRAC. & PROC.

26   § 4478, at 637-39 (2d ed. 2002) (emphasis added) (cited Docket No. 147-1 at 22).

27           This limitation makes sense.  Res judicata and collateral estoppel define

28   when a party may be barred from litigating claims resolved in a separate case.  As

the Ninth Circuit made clear as recently as 2010, the "law of the case" doctrine is not a third bar: "Where the suit involves a new party and new claims, … it is only res judicata, and not the law of the case doctrine, that may apply." *Carmona*, 603 F.3d at 1052. It is irrelevant that this case shares commonalities with *Siegel*; even where, unlike here, a party re-files the *exact same case* in another court, it is collateral estoppel and res judicata *alone* that determine whether those claims may proceed. *E.g.*, *Rekhi v. Wildwood Indus., Inc.*, 61 F.3d 1313, 1317-18 (7th Cir. 1995) (law-of-the-case inapplicable where party "started over" by re-filing suit).

Magistrate Zarefsky relied on one case—*Disimone v. Browner*, 121 F.3d 1262 (9th Cir. 1997)—to conclude that the law-of-the-case doctrine applied to foreclose his consideration of this discovery issue in this *Pacific Pictures* case because Judge Larson has ruled on it in the *Siegel* case. In *Disimone*, however, the court concluded that collateral estoppel barred plaintiff from re-litigating issues that had been fully adjudicated and reduced to final judgment. *Id.* at 1266-67. While *Disimone* mentioned that the "atypical" facts of that case warranted application of law-of-the-case as well, this dicta (in light of its collateral estoppel holding) contravenes cases like *Thomas* (from 1993) and *Carmona* (from 2010), which confirm that law-of-the-case does not extend to other related actions. *Cf. U.S. v. Hardesty*, 977 F.2d 1347, 1347 (9th Cir. 1992) (when two Ninth Circuit "panels reach different conclusions the earlier decision [*i.e.*, *Thomas*, here] controls").

This clear legal error is reason alone to overturn the Magistrate's ruling.

2. Judge Larson Never Was Presented With Or Ruled On DC's Claim In This Case That The 2008 Consent Agreement Is "Unlawful." Starting with the erroneous premise that the law-of-the-case doctrine constrained his ability to order disclosure of the 2008 consent agreement, Magistrate Zarefsky additionally erred in deferring to rulings that Judge Larson *never* made—and *could not have made*— given the record in the *Siegel* case in contrast to the different record in this case.

DC COMICS' MOT. FOR REVIEW OF MAGISTRATE'S ORDER

1    In denying DC's motion, the Magistrate stated that DC "called the [2008
2    consent] agreement <u>unlawful</u> in *Siegel*, but did not persuade Judge Larson of that
3    fact"; held the "Court will not re-visit that issue"; and noted "simply because [DC]
4    *avers* that Defendants have entered into an illegal agreement" does not require the
5    Court to "accept the argument."  Docket No. 209 at 8:1-10 (underlining added).
6    These conclusions are incorrect:

7    • DC did *not* raise the "lawfulness" of the consent agreement in *Siegel*, nor did
8      Judge Larson ever rule on that argument.  *Cf.* Docket No. 163-11; Case No.
9      CV-04-8400, Docket No. 395.  Rather, DC argued the consent agreement
10     was responsive to document requests 59 and 63 in *Siegel* and relevant to
11     "determine the scope of Plaintiffs' right to share in the profits from their co-
12     owned share in any copyrights they have recaptured."  Case No. CV-04-
13     8400, Docket No. 395 at 5.  It was only in this case that, for the first time,
14     DC advanced its claim that the 2008 consent agreement, as well as earlier
15     ones, violated the Copyright Act and public policy.  And it was only in
16     response to these *new* claims of illegality that the Toberoff defendants—in
17     September and October *2010*—admitted the earlier Pacific Pictures consent
18     agreements "were void *ab initio*." Docket Nos. 147-1 at 2, 8; 191 at 8.

19   • DC has not merely "averred" that defendants entered into "illegal" contracts.
20     The Toberoff defendants *admitted* in response to DC's complaint in this case
21     that their earlier consent agreements with the heirs ran afoul of the Copyright
22     Act. *E.g.*, Docket Nos. 147-1 at 2, 8; 191 at 8.  Judge Larson *never* had these
23     admissions—which were made in late 2010—before him when he ruled on
24     DC's motion in early 2009.  *Cf.* Docket No. 209 at 1-10.

25   • DC was not asking the Magistrate, nor is it asking this Court, to "re-visit"
26     arguments previously made to Judge Larson.  Judge Larson never saw the
27     consent agreement; never saw the letter that disclosed its existence; and
28     never saw defendants' admissions or their briefing in this new case in which

DC COMICS' MOT. FOR REVIEW
OF MAGISTRATE'S ORDER

1    they conceded the agreement was not merely a privileged communication

2    between lawyer and client as they had asserted to Judge Larson, *see* Docket

3    No. 163-11 at 718:22-719:7, but a contract among the heirs that affected their

4    ability to freely assign their putative rights in Superman without the written

5    consent of the other. *Supra* at 3-4; *infra* at 9-10.

6    • Nor did defendants tell Judge Larson that the 2008 consent agreement would

7       bind the heirs beyond the parties' mediation—and remain in force and effect

8       to this day. *Compare* Docket No. 160 at 50-51, *with* Docket No. 163-11.

9    As Magistrate Zarefsky observed, "[o]ne cannot know with certainty what

10   the [2008] consent agreement means without seeing the agreement." Docket No.

11   209 at 8:1-2. It is for this reason that the 2008 consent agreement should have been

12   ordered produced—or, at the very minimum, examined *in camera* by the

13   Magistrate. Magistrate Zarefsky commented that it was unclear, in his view,

14   whether the Ninth Circuit would hold that the 2008 consent agreement was

15   unlawful under the Copyright Act. *See* Docket No. 209 at 7. He did not examine

16   or ask to examine the document and, therefore, did not review its contents.

17   Moreover, that issue was not before him, *see* 28 U.S.C. § 636(b)(1)(A)—it is raised

18   in pending Rule 12 motions—and the simplest and best way to answer that

19   question, in any event, is to look at the document.

20   Magistrate Zarefsky suggested that the consent agreement could possibly

21   represent "a sort of Drysdale-Koufax collective approach to negotiation" that might

22   not be unlawful. Docket No. 209 at 6:1-2. But there are at least three problems

23   with this surmise. First, as explained below, such agreements are expressly

24   prohibited under federal copyright law; section 304(c)(6)(D) of the Copyright Act

25   gives DC a "competitive advantage" and requires that the Shusters have an

26   unrestricted ability to enter into copyright agreements with DC. 17 U.S.C. §

27   304(c)(6)(D); *Milne*, 430 F.3d at 1047. Second, a factor not addressed by the

28   Magistrate, a lawyer's involvement in such consent agreements can violate state

law and public policy. *See Calvert v. Stoner*, 33 Cal. 2d 97, 103 (1948) (a "contract providing that the client may not compromise the suit without the consent of his attorney is against public policy and void"); *Tax Auth., Inc. v. Jackson Hewitt, Inc.*, 898 A.2d 512, 522 (N.J. 2006); ABA Standing Comm. on Ethics and Prof'l Responsibility, Formal Opinion 06-438 (2006); CAL. RULES OF PROF'L CONDUCT R. 3-310(D) (2011). Third, consistent with this Court's decision in *Munoz*, DC need not prove the 2008 consent agreement is on its face "unlawful"; so long as the document pertains to facts other than an admission of fault or liability in the *Siegel* case, then it is discoverable. *Supra* at 3-4.

But to be clear, even under the "unlawfulness" theory of relevance— discussed in the *Carney* case, *see id.*, and the Magistrate's opinion—the 2008 consent agreement and related documents most certainly should have been ordered produced. As DC briefed for this Court, in detail, in opposition to defendants' motion to dismiss, the 2008 consent agreement—as *defendants themselves* have described it—runs afoul of section 304(c)(6)(D). Docket No. 185 at 4-11. Congress crafted that provision to give parties like DC a "competitive advantage over third parties" like Toberoff and the Siegels, who have sought to prohibit the Shusters from dealing directly—and first—with DC. *Milne*, 430 F.3d at 1047. Both *Milne* and the legislative history it cites confirms that section 304(c)(6)(D) gives DC a right "in the nature of a right of 'first refusal.'" *Id.* (quoting H.R. REP. NO. 94-1476 at 127); *e.g.*, SECOND SUPP. REG.'S REP. ON GEN. REV'N OF U.S. COPYRIGHT LAW, 94TH CONG. 307 (1975) ("The 'first refusal' exception was one of the compromises on which the delicate balance of section [304(c)(6)(D)] rests."); *see also Bourne Co. v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 861 (S.D.N.Y. 1987) (agreement between author's heir and third party MPL was "invalid because MPL was not the original grantee and it was executed prior to the effective date of termination"); 1 P. GOLDSTEIN, GOLDSTEIN ON COPYRIGHT § 5.4.3, at 5:127 (2007) (section 304(c)(6)(D) gives "grantees the first opportunity to negotiate a new

grant"). The case law also makes clear that parties like DC have standing to sue to enforce such negotiation rights. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008) (where Congress has demonstrated its clear intent to create such a right, the beneficiary of the right has standing to enforce it); *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 239 (1969) ("The existence of a statutory right implies the existence of all necessary and appropriate remedies."); *Hartzheim v. Valley Land & Cattle Co.*, 153 Cal. App. 4th 383, 389 (2007).

Defendants' 2008 consent agreement is impeding DC's ability to reaffirm its Superman rights beyond 2013. DC is entitled to an adjudication whether the 2008 consent agreement is lawful. That agreement should be ordered produced—not kept shrouded in secret—so that DC's claim can be fully and fairly resolved.

3. Underline{Defendants Conceded Away In This Case The Privilege Claims They Made To Judge Larson}. Again relying on the law-of-the-case doctrine, the Magistrate also deferred to Judge Larson's ruling in 2009 that the 2008 consent agreement was privileged. The Magistrate said there was no reason "to rule differently now," Docket No. 209 at 2:12-3:13, but this fails to take into account evidence and circumstances that have only come to light after Judge Larson's ruling.

Indeed, defendants' admissions in briefing in this case about the contents of the 2008 consent agreement directly refute their unsupported assertion to Judge Larson in *Siegel* that the consent agreement was privileged. Judge Larson knew nothing of the nature or substance of the consent agreement—the parties referred to it only as the "Withheld Document" or the "Privileged Document." Case No. CV-04-8400, Docket No. 395 at 1. Judge Larson declined to review the "Withheld Document" or Toberoff's letter to DC describing it, explaining: "I would rather not look at this letter myself, particularly since we have a bench trial starting in a few weeks...." Docket No. 163-11 at 718:17-19. Knowing nothing about the terms of the consent agreement and making no factual findings, Judge Larson denied DC's

motion to compel on the basis of Toberoff's description of the document, *id.* at 717:16-19, and his "characterization of it as a privileged document, as an officer of the court." *Id.* at 724:9-11.

Since DC filed this lawsuit in 2010, defendants have been forced to acknowledge that the 2008 consent agreement is *not* merely a communication in which Toberoff and his clients were involved.  They concede it contains provisions requiring the joint consent of the Siegels and Shusters to enter into an agreement with DC—neither can do so without the consent of the other.  As such, the document cannot possibly qualify, in its entirety, as a privileged attorney-client communication.  *E.g., Minebea Co., Ltd. v. Papst*, 355 F. Supp. 2d 526, 529 (D.D.C. 2005); *U.S. v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002) ("The fact that a person is a lawyer does not make all communications with that person privileged."); *see also In re Grand Jury Proceedings*, 33 F.3d 1060, 1063-64 (9th Cir. 1994) (retainer agreements not privileged); *Montgomery Cnty. v. MicroVote Corp.*, 175 F.3d 296, 304 (3d Cir. 1999) ("The attorney-client privilege does not shield fee arrangements.").

For example, defendants admitted in 2010 and 2011:

- "such alleged 'consent agreements' are understandings between the Siegels and Shuster Estate regarding settlement strategy," Docket No. 147-1 at 2;
- "[T]here is only **one** such alleged 'consent agreement,' which Defendants have accurately characterized as a 'collective bargaining agreement' between the Siegels and the Shusters relating to their 'settlement strategy,'" Docket No. 160 at 50-51;
- the 2008 consent agreement "is nothing more than the Heirs' agreement to collectively bargain settlement with DC," Docket No. 160 at 62;
- "The Consent Agreement requires precisely that -- the consent of the Siegels and Shuster Estate, **not** their attorney Mr. Toberoff, to a settlement of their termination rights with DC," Docket No. 160 at 63;

- "Defendants simply and consistently characterized the Consent Agreement as an agreement between the Siegels and Shusters to jointly conduct settlement negotiations," Docket No. 170 at 4.

*None* of these admissions that the 2008 consent agreement purports to be a contract among the heirs was before Judge Larson when he ruled in 2009—and all refute Toberoff's claim in 2009 that the agreement was fully covered by attorney-client privilege. The Magistrate thus erred in deferring to Judge Larson's privilege ruling.

Defendants also waived any privilege that might otherwise have existed by selectively disclosing the existence and substance of the consent agreement in public, non-sealed filings in this action. *See* Docket Nos. 160 at 24 n.7; 147-1 at 2-3, 9-10, 16-24; 185 at 17. The Magistrate rejected DC's waiver argument on the ground that it "necessarily was implicitly rejected by Judge Larson" in *Siegel*. Docket No. 209 at 9:26-27. This does not follow, however, since DC did not make a waiver argument in *Siegel* and the relevant acts of waiver occurred in *this* case, years after Judge Larson ruled. Docket Nos. 160 at 24 n.7; 147-1 at 2-3, 9-10, 16-24; 185 at 17.

Citing no authority, the Magistrate also stated that "waiver is a matter of intent, and the Court will not infer intent" based on defendants' references to the consent agreement in public filings. Docket No. 209 at 10:4-5. This does not comport with the law, which establishes that "the focal point of privilege waiver analysis should be the holder's disclosure of privileged communications to someone outside the attorney-client relationship, *not the holder's intent to waive the privilege*." *Tennenbaum v. Deloitte & Touche*, 77 F.3d 337, 341 (9th Cir. 1996) (emphasis added); *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 25 (9th Cir. 1981) (party's "assertion that it did not subjectively intend to waive the privilege" irrelevant); *U.S. v. Mendelsohn*, 896 F.2d 1183, 1188-89 (9th Cir. 1990).

III.    **DEFENDANTS' REFUSAL TO PRODUCE RELEVANT, NON-PRIVILEGED DOCUMENTS OR COMPLETE PRIVILEGE LOGS SHOULD ALSO BE REJECTED.**

A.    **The Relevant Factual Background**

A new document that defendants produced *only after* the Magistrate issued his April 11 ruling calls into question two of the Magistrate's other rulings.

The Toberoff Timeline document—attached as Exhibit A to DC's complaint—identifies a May 13, 2003, letter from Michael Siegel to defendant Laura Siegel Larson that warns her "about [defendant] Marc Toberoff's actions" and "*lays out [his] scheme*" to take advantage of the heirs and harm DC.  Am. Compl. Ex. A at 64 (emphasis in original).  At the time the Toberoff Timeline was ordered produced in December 2008 in the *Siegel* lawsuit, defendants had neither produced the May 13 letter nor identified it on any privilege log.  In the instant case, because the May 13 letter was discussed in the Toberoff Timeline, DC requested its production in discovery served *last summer*.  Defendants refused to produce the document or even log it.  When, in meet-and-confer sessions late this fall, DC pressed the issue, defendants refused even to confirm whether the May 13 letter existed—contending, instead, that the Toberoff Timeline memorandum was untrustworthy.  Docket No. 160 at 71-72.  DC moved to compel production of the May 13 letter, and in his April 11 order, the Magistrate ordered defendants to either verify it did not exist or produce it to DC.  Docket No. 209 at 12:13-16.  Defendants finally produced the letter to DC on April 18, 2011.  Seto Decl. Ex. B.

The May 13, 2003, letter is stunning—both because of the facts it recounts, and because it reveals defendants' wholly improper approach to document production.  DC alleged in this case that Toberoff used false promises of a "billionaire investor" and a movie production deal to induce the Siegel heirs to sever their long-existing business relationship with DC and give Toberoff and his alter-ego companies an ownership interest in the Siegels' putative Superman rights.

DC COMICS' MOT. FOR REVIEW OF MAGISTRATE'S ORDER

1    Am. Compl. ¶¶ 7-8, 66-85.  In response to DC's lawsuit, defendants filed a SLAPP

2    motion last fall stating that "DC's allegation that Toberoff misled the Siegels by

3    representing that he had a 'billionaire' investor or that he would help produce a

4    Superman film" is a "mockery," "contrary to all the evidence," and "based entirely

5    on the untrustworthy, inadmissible Timeline."  Docket No. 196 at 1-5, 10.

6         The recently disclosed May 13 letter directly refutes defendants' contentions

7    in their SLAPP briefing.  For example, the May 13 letter states:

8    • "[When Toberoff] first contacted me, he wanted to buy my share of the
       copyright.  Marc had a *mysterious billionaire who wanted to invest in the*
9      *Superman copyright, put 15 million dollars up front plus participation.*
       *When you signed with Marc the billionaire invested elsewhere.  Marc has his*
10     *own production company, he was going to team with Emmanuel and make a*
       *movie.  This has not happened.*"
11

12   • "You mentioned Marc had a number of innovative, proactive ideas that could
       bring all members of the Siegel interest both justice and many times more
13     than the amount DC's representatives wanted to throw our way to get rid of
       us.  Marc has chosen not to open any dialog with Time Warner or anyone
14     else.  How can he negotiate a contact if he is not talking to anyone?"

15   Seto Decl. Ex. B at 3 (emphasis added); *see also* Docket Nos. 181 at 23-24; 201 at

16   3-7; 205 at 17-20, 215 at 8-10.

17        The revelation of this May 13 letter calls into question the completeness of

18   defendants' production and privilege logs as well as the reliability of defendants'

19   blanket assertions of privilege.  Before last week, the May 13 letter had *never* been

20   listed on a privilege log, produced to DC, or disclosed by defendants—all despite

21   DC's repeated demands for the document in requests for production,

22   interrogatories, meet-and-confer exchanges, and DC's motion to compel.  Docket

23   No. 160 at 37-38.

24        Defendants' suppression of the May 13 letter is also grounds to question

25   Magistrate Zarefsky's reliance on defendants' unsupported representations about

26   the nature and existence of other documents sought by DC.  Docket No. 209 at

27   11:19-21, 12 n.2; 2:3-4.

28

**B.**  **Defendants' Non-Privileged Correspondence With Michael Siegel**
**Should Be Ordered Produced.**

In addition to disclosing the May 13 letter, the Toberoff Timeline describes a

July 2003 letter from Laura Siegel Larson to Michael Siegel in response to his May

13 letter:

> July 5, 2003.  Laura Siegel reveals her ignorance of Toberoff's
> dubious actions in her return letter back to Michael --- MT has NOT
> told them he is about to enter into the PPC agreement, whereby MT
> *personally* will have a 50% share of the Schuster interest in Superman.
> He will shortly own equal to what Joanne owns (25% of entire
> copyright), and double what Laura owns, *but MT has failed to disclose
> this*.  Am Compl. Ex. A at 65 (emphasis in original).

Like the May 13 letter, this July 2003 correspondence refutes key, erroneous factual

assertions in defendants' SLAPP motion.  *Supra* at 13-14.  And as with the May 13

letter, defendants have repeatedly refused to produce this July 2003 letter or to

confirm or deny its existence.  *See* Docket Nos. 162-9 at 577 ¶ 10; 162-10 at 581-82

¶ 10; 162-11 at 584 ¶ 10; 162-12 at 588-89 ¶ 10.  A footnote in defendants' briefing

states that they did not "match" a "July 5, 2003 letter from Laura Siegel [Larson] to

Michael Siegel" in their files, Docket No. 160 at 71-72 n.26—which include all of

Michael Siegel's files, *e.g.*, Docket Nos. 207-9 at 233-35, 217-6 at 55—but does

not deny there was correspondence between Ms. Larson (or one of her

representatives) and Mr. Siegel during this general time period.

Entries 715 and 716 on defendants' privilege log identify a six-page

"facsimile" from Ms. Larson to Toberoff on July 11, 2003, which appears to be a

one-page fax cover sheet enclosing a five-page letter from Ms. Larson to

Mr. Siegel—the very July correspondence from Ms. Larson to her half-brother

disclosed in the Toberoff Timeline.  Docket No. 162-6 at 427.  Defendants have

refused to confirm this, and the Magistrate recognized that defendants' assertion of

privilege over entries 715 and 716—and these July communications—are "cryptic."

Docket No. 209 at 11:11.

Importantly, Judge Larson *never* ruled on the discoverability of the "July 5, 2003" and "July 11, 2003" letters in the *Siegel* case.  Judge Larson never had occasion to consider the "July 5, 2003" letter.  As for the "July 11, 2003" letter, Judge Larson never specifically ruled on the allegedly privileged status of the letter or log entries 715 and 716.  *See* Docket No. 171 at 3.  He ruled only that he would not have the "escrow agent" in *Siegel* assess the validity of Toberoff's privilege claims.  *See id.*; Case No. CV-04-8400, Docket Nos. 374, 386.  Moreover, defendants did not clearly "assert[] privilege as to the letter" in *Siegel*; they claimed privilege over the fax transmitting the letter, but did not assert that the underlying letter was privileged or log it separately.

It was therefore erroneous for the Magistrate to rely on Judge Larson's privilege "designation" in *Siegel* to excuse defendants here from producing the July 2003 documents.  Docket No. 209 at 11:11-13.  Judge Larson never ruled that the "July 11, 2003" letter was privileged, and in any event, the law-of-the-case doctrine does not apply for the reasons previously discussed *supra* at 5-6.  Nor is there any other reason to allow defendants to shield this clearly non-privileged communication from disclosure.  The "July 11, 2003" letter involves "the sale of Michael Siegel's Superman interests to Mr. Toberoff's 'investor.'"  Docket No. 163-14 at 779-80 ¶ 7.  Neither Mr. Siegel nor Ms. Larson is an attorney, and at the time the letter was sent, Mr. Siegel was actively feuding with his stepmother Joanne Siegel and believed Toberoff and his business associates were taking advantage of Ms. Siegel and Ms. Larson.  Am. Compl. Ex. A at 64-67.  That this non-privileged letter was subsequently faxed to Toberoff does not make it privileged.  *U.S. v. Osborn*, 561 F.2d 1334, 1338 (9th Cir. 1977); *Suezaki v. Super. Ct.*, 58 Cal. 2d 166, 176 (1962).

As for the "July 5, 2003" letter, the Magistrate incorrectly read the ambiguous footnote in defendants' brief as affirmatively verifying that the letter does not exist.  Docket No. 209 at 12 n.2.  The Magistrate overlooked that

1    defendants never denied the existence of this letter in the parties' meet-and-confer

2    discussions and failed to describe their method or criteria for "matching up" DC's

3    description of the letter with documents in defendants' files.  *See* Docket Nos. 162-

4    9 at 577 ¶ 10; 162-10 at 581-82 ¶ 10; 162-11 at 584 ¶ 10; 162-12 at 588-89 ¶ 10.

5         The recent revelation of the May 13 letter—which was never before Judge

6    Larson or the Magistrate—also calls into question defendants' assertions regarding

7    their July 2003 correspondence.  The existence of the May 13 letter, its contents,

8    and defendants' failure to produce or log it provide ample reason for the Court to

9    revisit the Magistrate's rulings and order defendants to produce the "July 5, 2003"

10   and "July 11, 2003" letters, submit verified discovery responses stating under oath

11   that they do not exist, or—at minimum—to produce them for *in camera* inspection.

12   (As noted at the outset, DC will seek this relief from the Magistrate on these

13   grounds as well.  *Supra* at 1 n.1)

14        **C.    Defendants Should Be Compelled To Amend Their Privilege Logs**

15        While the Magistrate agreed that the barebones descriptions in defendants'

16   privilege logs "do not tell much," he ultimately concluded that they were

17   "acceptable."  Docket No. 209 at 13:9-27, 12:1-6.  This ruling was erroneous under

18   Ninth Circuit case law establishing that a party asserting privilege bears the burden

19   of providing sufficiently detailed information "to enable the other party to evaluate

20   the applicability of the privilege or protection."  FED. R. CIV. P. 26(b)(5), Advisory

21   Comm. Note;  *Martin*, 278 F.3d at 999-1000; *see also Clarke v. Am. Commerce

22   Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992).  Defendants' logs omit critical

23   details and prevent DC from testing their assertion of privilege.

24        <u>Michael Siegel Documents.</u>  DC requested that defendants "expand on their

25   privilege log" as to certain Michael Siegel documents.  Docket No. 209 at 11:17-

26   12:6.  DC intends to move to compel production of Michael Siegel documents,

27   Docket Nos. 160 at 35-36 & n.9; 171 at 3-4; 217 at 3 n.2, but the issues will only be

28   best framed if defendants update their log entries to separate out any attachments

DC COMICS' MOT. FOR REVIEW
OF MAGISTRATE'S ORDER

1  and more clearly identify who authored, received, or was copied on transmittals of

2  documents, Docket Nos. 160 at 36, 40-44; 171 at 3-5; 177 at 24:11-30:11.

3      While the Magistrate did "not see any basis here for any further elaboration,"

4  Docket No. 209 at 12:1-6, DC submits that in light of the belated disclosure of the

5  May 13 letter—and its importance to refuting defendants' factual assertions—

6  "further elaboration" is warranted.  Defendants have not offered *any* explanation

7  why the May 13 letter was never produced, disclosed, or logged.  This significant

8  omission presents a strong basis for concern and reason to compel defendants to

9  update and expand their logs.

10     <u>Subject Matter.</u>  Defendants do not include any meaningful information

11  about the subject matter of the withheld documents.  The logs contain generic

12  descriptors such as "Letter," "Facsimile," "Email," or "Notes."  *E.g.*, Docket Nos.

13  162-5, 162-6, 162-7.  Such "terse, non-descriptive labels" are insufficient and do

14  not establish that these were "communications seeking legal advice."  *Dominguez v.*

15  *Schwarzenegger*, 2010 WL 3341038, at *4 (N.D. Cal. Aug. 25, 2010); *see also*

16  *Parrick v. FedEx Grounds Package Sys.*, 2010 WL 2854314, at *8 (D. Mont. July

17  19, 2010).

18     The necessity for clear subject-matter identification is particularly important

19  given the disclosure of the May 13, 2003, letter and that Toberoff plays different

20  roles as an attorney, "entrepreneur," movie "producer," and businessman.  *See*

21  Docket Nos. 181 at 17-21; 184 at 13-18; 185 at 24-25.  Defendants' logs blur the

22  distinctions between these roles and conceal where, for example, Toberoff is

23  communicating with the Shusters about their joint-venture agreement, which is

24  clearly not privileged.  *See U.S. v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996)

25  (privilege only applies where client seeks advice from lawyer "'*in his capacity as*

26  *such*'"—not where lawyer acts as "business agent") (emphasis in original);

27  *Minebea Co., Ltd*, 355 F. Supp. 2d at 529 ("presumption" against privilege where

28  attorney acts in business capacity).

1        <u>Authors and Recipients.</u>  Defendants' logs fail to distinguish between authors

2    and recipients of the withheld documents.  A party asserting privilege must identify

3    the primary addressee; "[s]econdary addressee(s); persons copied and recipient (and

4    the relationship of that person(s) to the client and/or author)."  *Miller v. Pancucci*,

5    141 F.R.D. 292, 302 (C.D. Cal. 1992).  Again, the need for such information is

6    heightened in light of Toberoff's dual role as attorney and business partner.  DC

7    must be able to determine, *e.g.*, whether Toberoff was merely copied by the Siegels

8    on an e-mail relating to business matters.  *See Osborn*, 561 F.2d at 1338 (9th Cir.

9    1977) (party cannot shield unprivileged communications by copying attorney).

10        The Magistrate agreed defendants' logs lack meaningful detail, but

11    erroneously concluded it was not possible to include more detail without disclosing

12    privileged information.  Docket No. 209 at 13:21-24.  What DC advocates is a

13    middle ground:  providing basic information such as who wrote and received

14    documents, when they were transmitted, and a general description of their subject

15    matter.  For example:

16
17
18

| Date | Author | Recipient | CC | Description | Privilege |
|------|--------|-----------|-----|-------------|-----------|
| 1/1/08 | Joanne Siegel | Jean Peavy | Marc Toberoff | E-mail re: draft consent agreement | Attorney-client communication |

19    This format does not disclose any privileged information and gives DC enough

20    detail to challenge the asserted privilege.  Nor is this format unduly burdensome.

21        The fact that a less detailed format was found adequate in *Dole v. Melonas*,

22    889 F.2d 885 (9th Cir. 1989), and *In re Grand Jury Investigation*, 974 F.2d 1068

23    (9th Cir. 1992), is beside the point.  Those cases involved a traditional attorney-

24    client relationship and concluded that, under the particular circumstances, the

25    responding party's privilege logs were sufficient.  They do not establish a blanket

26    rule for the level of detail a privilege log should include and do not foreclose

27    additional detail when warranted; and certainly do not address the heightened

28

DC COMICS' MOT. FOR REVIEW
OF MAGISTRATE'S ORDER

1    standard that should apply where, as here, the relevant actions of the attorney occur

2    principally in a non-lawyer business capacity.

3

4    Dated:        April 25, 2011               Respectfully Submitted,
                                                O'MELVENY & MYERS LLP
5

6                                               By: /s/ Daniel M. Petrocelli
                                                   Daniel M. Petrocelli
7                                                  Attorneys for Plaintiff DC Comics

8
     CC1:848733
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        DC COMICS' MOT. FOR REVIEW
                                        OF MAGISTRATE'S ORDER