DANIEL M. PETROCELLI (S.B. #097802)
  dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
  mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
  cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067-6035
Telephone:  (310) 553-6700
Facsimile:  (310) 246-6779

PATRICK T. PERKINS (admitted *pro hac vice*)
  pperkins@ptplaw.com
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, NY 10516
Telephone:  (845) 265-2820
Facsimile:  (845) 265-2819

Attorneys for Plaintiff DC Comics

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DC COMICS,<br><br>            Plaintiff,<br><br>     v.<br><br>PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, an individual, JOANNE SIEGEL, an individual, LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive,<br><br>            Defendants. | Case No. CV 10-3633 ODW (RZx)<br><br>**DISCOVERY MATTER**<br><br>**DC COMICS' NOTICE OF MOTION AND MOTION FOR RECONSIDERATION OF APRIL 11, 2011 ORDER**<br><br>DECLARATION OF CASSANDRA SETO AND [PROPOSED] ORDER FILED CONCURRENTLY HEREWITH<br><br>**Judge**:       Hon. Otis D. Wright II<br>**Magistrate**: Hon. Ralph Zarefsky<br><br>**Hearing Date**: June 6, 2011<br>**Hearing Time**: 10:00 a.m.<br>**Courtroom**:      540 |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................... 1

II. FACTUAL BACKGROUND ..................................................................... 1

III. THE COURT SHOULD RECONSIDER ITS APRIL 11, 2011, ORDER ......................................................................................................... 5

IV. CONCLUSION ........................................................................................ 10

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Grabkowski v. Skechers U.S.A., Inc.*,
   2011 WL 671808 (S.D. Cal. Feb. 17, 2011) ....................................................... 5

*Intamin, Ltd. v. Magnetar Techs. Corp.*,
   623 F. Supp. 2d 1055 (C.D. Cal. 2009) ............................................................. 5

*Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.*,
   568 F. Supp. 2d 1152 (C.D. Cal. 2008) ............................................................. 5

*White v. Shen*,
   2011 WL 249459 (N.D. Cal. Jan. 25, 2011) ...................................................... 5

**OTHER AUTHORITIES**

W. SCHWARZER, ET AL., RUTTER GROUP PRACTICE GUIDE: FED. CIV.
   PROC. BEFORE TRIAL § 11:1919 (2011) ............................................................. 8

**RULES**

C.D. LOCAL RULE 7-18 ................................................................................................ 5

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on June 6, 2011, at 10:00 a.m., or as soon thereafter as the matter may be heard by the above-entitled Court, located at 255 East Temple Street, Los Angeles, California, in Courtroom 540, plaintiff DC Comics will and hereby does move the Court for an order reconsidering, in part, its April 11, 2011, order, Docket No. 209, concerning DC's Motion To Compel The Production Of Documents And Amended Privilege Logs, Docket No. 160. Specifically, DC seeks reconsideration of three portions of the April 11 ruling that relate to communications involving Michael Siegel.

This motion is made pursuant to Local Rule 7-18 and the Court's inherent power to reconsider its interlocutory orders on the ground that newly discovered evidence warrants modification of certain of the Court's April 11, 2011, rulings. Pursuant to Local Rule 7-3, and as discussed in the concurrently-filed declaration from DC's counsel, DC informed defendants that it would be filing this motion on April 19 and requested a meet and confer session on April 20. During the parties' teleconference, defendants' counsel refused to address this motion or provide dates certain to do so. DC sent defendants a draft of this motion on April 20, and again asked defendants to let DC know their position. While defendants filed an *ex parte* application later that night arguing that this motion was "improper[]," Docket No. 220 at 4 n.2, and sent DC a letter objecting to DC's filing this motion before May 2, they have otherwise declined to engage with DC regarding the relief sought herein.

This motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the concurrently-filed Declaration of Cassandra Seto and exhibits in support thereof; any additional briefing that may be filed; all exhibits, files, and records on file in this action;

1  matters of which judicial notice may be taken; and such additional submissions and
2  argument as may be presented at or before the hearing on this motion.

3  Dated:     May 2, 2011                    Respectfully Submitted,

4                                            O'MELVENY & MYERS LLP

5                                            By:   /s/ Daniel M. Petrocelli
6                                                  Daniel M. Petrocelli
                                             Attorneys for Plaintiff DC Comics

- 2 -

DC'S MOT. FOR RECONSIDERATION
OF APRIL 11, 2011, ORDER

## I.   INTRODUCTION

This Court should reconsider three aspects of its April 11, 2011, discovery order based on evidence first disclosed to DC by defendants on Monday, April 18, 2011, in response to the Court's April 11 order.  Late on April 18, defendants produced to DC a document Bates stamped "LSL 00211-12."  That document is a May 13, 2003, letter from Michael Siegel to his half-sister, Laura Siegel Larson. *See* Decl. of Cassandra Seto Ex. A.  This May 13 letter provides good cause for reconsideration of the Court's rulings regarding documents related to Mr. Siegel.[1]

## II.   FACTUAL BACKGROUND

The May 13 letter—which defendants *never* logged as privileged, *never* produced to DC, and *never* disclosed as a part of the parties' meet-and-confer efforts or in response to DC's February 8, 2011 motion, Docket No. 160 at 37-38— corroborates certain of DC's key allegations in this case.  This includes DC's claim that Toberoff used false promises of a "mysterious billionaire" "investor" to induce the Siegels to end their business relationship with DC and transfer to Toberoff and his companies their putative Superman copyrights.  *Compare* Seto Decl. Ex. A ¶ 2, *with* Docket No. 49 ¶¶ 7-8, 66-85 (Am. Compl.).  In defendants' SLAPP motion filed last fall, defendants called DC's "billionaire investor" claim a "mockery" and asserted that DC had no "admissible evidence" to support it—and was irresponsibly relying on only the Toberoff Timeline as proof.  Docket No. 196 at 5, 10.

The Timeline disclosed the existence of the May 13, 2003, Michael Siegel letter, and based on this disclosure, DC asked defendants to produce it.  When they refused, DC moved to compel its production.  Docket No. 160 at 37-38. Defendants opposed, asserting the Timeline was untrustworthy.  *Id*. at 71-72.  As the Court noted in its April 11 ruling, however, defendants offered "no response" as

---

[1] By rule, DC was required to file its motion to review the April 11 order with Judge Wright on April 25, 2011.  Docket No. 225.  DC alerted Judge Wright that it would be making this motion for reconsideration as well, and would have filed this motion for reconsideration earlier, but for defendants' objections.  *See id*. at 1 n.1.

to whether the May 13 document existed. Docket No. 209 at 12:8-16. The Court ordered defendants either to verify the document did not exist (or had been produced), or to produce it to DC within seven days. *Id.*

The May 13 letter (at least the parts defendants did not improperly redact, *cf.* Seto Decl. Ex. J) states:

Michael Siegel<br>3605 Bendemeer Rd.<br>Cleveland Heights, Ohio 44118

May 13, 2003

Dear Laura,

 Thank you for your letter of November 2 of last year. I would have written sooner but I have endured much sadness. My mother passed away last year and I am particularly saddened by her not having been able to enjoy some of the money due us from DC Comics and Time Warner.

 *I really wish to discuss Marc Toberoff.* I learned from Marks and Rammer that Marc was the attorney on record for the Shuster half of the Superman copyright, has Marc ever informed you of this? Now that you have signed with him, he is in control of the whole Superman copyright. I told you when he first contacted me, he wanted to buy my share of the copyright. Marc had a mysterious billionaire who wanted to invest in the Superman copyright, put 15 million dollars up front plus participation. When you signed with Marc the billionaire invested elsewhere. Marc has his own production company, he was going to team with Emmanuel and make a movie. This has not happened. You mentioned Marc had a number of innovative, proactive ideas that could bring all members of the Siegel interest both justice and many times more than the amount DC's representatives wanted to throw our way to get rid of us. Marc has chosen not to open any dialog with Time Warner or anyone else. How can he negotiate a contact if he is not talking to anyone?*

 Marc is now the attorney for the entire Superman copyright. In 2013 under the Sunny Bono law Marc will be able to take the Superman copyright from Time Warner. Has he told you this? Do you know who owns the Shuster interest in the Superman copyright? Has Marc bought the Shuster interest himself? For a long time now, Marks and Rammer said there should be a united Siegel front. Marc is not negotiating with anyone, but he has found someone willing to buy me out. How can he find someone to buy me out and not negotiate for the entire Siegel interest? Has Marc offered to find someone to buy your interest? If I would sell my interest it would leave you with less than half of the Superman copyright and not all of

the Siegel interest in the Superman copyright. This would weaken your position? *The amount Marc's investor is offering is less than half of what DC showed as my share. There is a very real possibility I will contact Time Warner and see if they will buy me out. Marc seems to have an agenda of someone buying me out so I will have to look for the best deal I can get. Marc is really pressing for an answer to the offer his investor made.*

Am I missing something? Is it Joanne's and your intention to do nothing? You have filed letters of Termination on Superman and The Spectre, have any other letters of Termination been filed or will there by more? Regarding an old item, I would very much appreciate the release of the funds I understand are being held in escrow for me by Marc. If it turns out that we have no disagreement regarding your expenses and too much money was released, that certainly can be dealt with quickly. Last week a package of documents arrived from Marc. Don and I have not had time to review them yet.

This procedure has taken way too long. I have been on contract negotiation teams and have never seen anything like this. Your attorneys have chosen not to have any dialog with the other side for years at a time. I want a united Siegel interest, but I might be forced to act on my own. I do have something to sell independently, Marc's actions prove this.

I hope your health is getting better and that your divorce is now over.

Sincerely,

Michael

Seto Decl. Ex. A (emphasis added).

The May 13 letter is relevant to contest defendants' factual assertions made in their SLAPP briefing:

[T]o save its Fifth Claim, DC contends that Mr. Toberoff defrauded the Siegels in 2002 by stating that he had a "billionaire" investor and would help the Siegels produce a competing Superman film….

DC relies on the Timeline, an obviously inadmissible screed penned by a thief who violated fundamental duties of professional ethics and had absolutely no percipient knowledge of the events he purports to describe. *DC's allegation that Toberoff misled the Siegels by representing that he had a "billionaire" investor or that he would help produce a Superman film, the sole allegations of "wrongfulness" required for DC's Fifth Claim, is based entirely on this untrustworthy, inadmissible Timeline, and is contradicted by the sworn testimony of all percipient witnesses. First, even the Timeline does not assert that Toberoff ever told the Siegels that he had a "billionaire" investor. Its anonymous author claims, without percipient knowledge, that Toberoff told this to Kevin Marks on August 8, 2002. FAC, Ex. A 63. Second,*

| | |
|---|---|
| 1 | *each participant in this conversation has been examined in deposition. Indeed, Marks, who has no interest in this dispute, described this entire conversation at length in his 2006 deposition. Ex. H (KM Depo 166:6-170:24); see also Ex. E (MT Depo 98:25-104:14). There was absolutely no mention of a "billionaire" investor or that Toberoff would help produce a Superman film. Id. DC knows all this, yet conceals it from the Court.* |

> *each participant in this conversation has been examined in deposition. Indeed, Marks, who has no interest in this dispute, described this entire conversation at length in his 2006 deposition. Ex. H (KM Depo 166:6-170:24); see also Ex. E (MT Depo 98:25-104:14). There was absolutely no mention of a "billionaire" investor or that Toberoff would help produce a Superman film. Id. DC knows all this, yet conceals it from the Court.*
>
> …
>
> In its Fifth Claim, DC's assertion of the requisite "wrongful act" reduce to its allegations, "on information and belief," that Toberoff misled the Siegels by stating (1) that a "billionaire" investor was interested in acquiring their rights; and (2) that he was interested in making a movie based on Superman. FAC ¶ 78, 185. First, the Timeline does not even state that Toberoff spoke with the Siegels about a billionaire. The Timeline says he discussed the billionaire with their then-attorney, Kevin Marks, on August 8, 2002. FAC Ex. A 63. But Kevin Marks testified about this conversation four years ago*, and his testimony shows what a mockery DC's accusations of fraud really are…*.
>
> Lest there be any doubt, Mr. Marks submits a declaration herewith expressly confirming that the conversation did not mention either a "billionaire" or producing a competing Superman movie. Declaration of Kevin Marks ¶¶ 2-5.
>
> …
>
> DC's argues that the Fifth Claim meets the second prong of the Anti-SLAPP Law because: (1) "Toberoff, through IP Worldwide, falsely misrepresented to the Siegels that he had a 'billionaire investor' ready to purchase their Superman rights," and (2) the statute of limitations was tolled as DC's "suffering at the hands of Toberoff continues to this day" and "Toberoff's fraud and deceit" was "fraudulent[ly] conceal[ed] … until December 2008." Opp. at 24.
>
> *As demonstrated above, DC's argument that Toberoff defrauded the Siegels is utterly false, contrary to all the evidence, and DC offers no admissible evidence to support it.*

Docket No. 196 at 1-5, 10 (emphases added).

DC disputes defendants' assertions above, as explained in DC's SLAPP opposition papers, *e.g.*, Docket No. 181, its motion to strike Mr. Marks' carefully-worded declaration, *e.g.*, Docket No. 201 at 3-7, and as discussed in its pending motion to compel drafts of the Marks declaration, *e.g.*, Docket Nos. 205 at 17-20; 215 at 8-10. The May 13 letter bears directly on these issues in dispute, and defendants had no excuse for failing to produce it months—if not years—ago:

- 4 -   DC'S MOT. FOR RECONSIDERATION OF APRIL 11, 2011, ORDER

> I told you when [Toberoff] first contacted me, he wanted to buy my share of the copyright. *Marc had a mysterious billionaire who wanted to invest in the Superman copyright, put 15 million dollars up front plus participation. When you signed with Marc the billionaire invested elsewhere. Marc has his own production company, he was going to team with Emmanuel and make a movie. This has not happened.*

Seto Decl. Ex. A ¶ 2 (emphasis added); *see also id.* Ex. U at 91:17-24; 92:24-93:7 (transcript of Apr. 25, 2011, hearing at which May 13 letter was discussed).[2]

### III.   THE COURT SHOULD RECONSIDER ITS APRIL 11, 2011, ORDER.

A Court may reconsider prior rulings based on newly-discovered evidence, such as the May 13 letter.[3] The Court should reconsider three aspects of its April 11 rulings based on the revelation of the May 13 document. There is an urgency to resolve these issues now, as defendants threaten to defer depositions pending the Court's rulings on document-discovery issues. *See* Seto Decl. ¶ 7; Exs. F-I.

A.  The "July 11, 2003," Letter. In its motion that was the subject of the Court's April 11 order, DC sought the production of the "July 11, 2003," letter from Laura Siegel Larson to Michael Siegel concerning "the sale of Michael Siegel's Superman interest to Toberoff's 'investors.'" Docket No. 160 at 30; *see also* Docket No. 171 at 3 ("Despite three pages of argument on the subject, defendants *never once* dispute that entries 715 and 716 of the Siegels' privilege log identify a July 11, 2003, letter between Laura Siegel Larson and Michael Siegel— two non-lawyers."). The narrative included with entries 715 and 716 of defendants' log identifies a "facsimile" from Ms. Larson to Mr. Toberoff. But this facsimile

---

[2] In its opening line, the May 13 letter also reveals a November 2, 2002, letter to which the May 13 letter responds. Defendants have *never* produced or logged the November 2 letter either, and DC will move shortly to compel its production.

[3] *E.g.*, C.D. LOCAL RULE 7-18; *Intamin, Ltd. v. Magnetar Techs. Corp.*, 623 F. Supp. 2d 1055, 1068 (C.D. Cal. 2009); *Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.*, 568 F. Supp. 2d 1152, 1162-63 (C.D. Cal. 2008) (granting motion for reconsideration based on newly-discovered evidence); *White v. Shen*, 2011 WL 249459, at *1 (N.D. Cal. Jan. 25, 2011) (magistrate reconsidering order); *Grabkowski v. Skechers U.S.A., Inc.*, 2011 WL 671808, at *1 (S.D. Cal. Feb. 17, 2011) (magistrate granting *ex parte* motion for reconsideration of its own order).

appears to be just one page of a six-page document. Beneath the fax cover page appears to be a five-page letter from Ms. Larson to Mr. Siegel.[4]

The Court denied DC's request that it order production of the "July 11, 2003," document to DC, or order its submission to the Court for *in camera* review to evaluate defendants' privilege claim. The Court stated:

> <u>Michael Siegel documents.</u>
>
> a. July 11, 2003 letter. Although Defendants are somewhat cryptic about this letter, nevertheless the record establishes that they asserted privilege as to the letter during the prior litigation, a designation that was upheld by this Court. [DC] points to nothing to demonstrate that the prior ruling was incorrect; [DC] simply wants to see the document still. The Court sees no basis for re-visiting the prior decision.

Docket No. 209 at 11:10-15.

Ms. Larson's "July 11, 2003," letter appears to be responsive to Mr. Siegel's May 13, 2003, letter, which poses almost a dozen questions to Ms. Larson. *E.g.*, Seto Decl. Ex. A ¶ 3 ("Marc is now the attorney for the entire Superman copyright …. Has he told you this? Do you know who owns the Shuster interest in the Superman copyright? Has Marc bought the Shuster interest himself?") The May 13 letter is *new* proof that calls into question assertions of privilege related to the "July 11" letter and is evidence that was not before Judge Larson or ever considered by him in making his rulings.[5] The existence of the May 13 letter, its contents, and defendants' failure to produce or log it—despite the arguments made in their SLAPP motion—provide ample reason for this Court to re-visit the "July 11,

---

[4] DC cannot know for certain whether the underlying letter from Ms. Larson to Mr. Siegel is dated July 11, 2003. This is the date listed on defendants' log. *See* Docket No. 162-6 at 427 (Entries 715 & 716).

[5] To be clear, and as DC argued before, Judge Larson never *specifically* ruled on the privilege status of log entries 715, 716, or the July 11, 2003, letter. Docket No. 171 at 3. Rather, he ruled only that he would not have the "escrow agent" in *Siegel* assess the validity of Toberoff's privilege claims. *Id.*; *Siegel*, Docket Nos. 374, 386. Moreover, defendants did not clearly "assert[] privilege as to the letter" in *Siegel*. They claimed privilege over the facsimile transmitting the letter, but never asserted that the underlying letter itself was privileged, nor logged it on its own.

2003," letter issue, and to order its disclosure or to review it *in camera*. Again, there has never been any showing—or even argument from defendants—that the "July 11, 2003" letter is anything other than a letter between two family members, neither of whom is a lawyer, discussing matters directly relevant to this case.

B. <u>The Remaining Michael Siegel Documents</u>. As noted in the Court's April 11 order, DC "request[ed] that the Court order Defendants to expand on their privilege log as to the *other* Michael Siegel documents"—*i.e.*, documents *other* than the "July 11, 2003," letter, and the six documents that post-date Mr. Siegel's death, which the Court ordered defendants to produce *in camera*. Docket No. 209 at 11:17-12:6 (emphasis added). DC intends to move to compel production of many "other" Michael Siegel documents, Docket Nos. 160 at 35-36 & n.9; 171 at 3-4; 217 at 3 n.2, but in advance of doing so, requested that defendants fully update their privilege log entries related to Michael Siegel, separate out any attachments, and more clearly identify who authored, received, or was copied on transmittals of documents, Docket Nos. 160 at 36, 40-44; 171 at 3-5; 177 at 24:11-30:11.

The Court declined this request, reasoning: "The form of the privilege log … has been found satisfactory by the Court of Appeals, … and the Court *does not see any basis here for any further elaboration*." Docket No. 209 at 12:1-6 (emphasis added; citations omitted). DC submits that in light of the contents of the May 13, 2003, letter and its importance to refuting defendants' erroneous denials of factual assertions, "further elaboration" of defendants' logs and production—at least related to Michael Siegel—is warranted. Defendants have not offered *any* explanation why the May 13, 2003, letter was never produced or logged, including in December when DC brought the issue to their attention, *see* Seto Decl. Exs. B at 11 ¶ 10; D at 18 ¶ 10, or in February when DC filed its motion. Nor have defendants explained why the November 2, 2002, letter from Ms. Larson to Mr. Siegel identified in the May 13, 2003, letter has never been disclosed, produced, or listed on any privilege log. *Id.* Ex. A ¶ 1. These significant omissions in

defendants' productions presents a strong "basis" for concern, particularly given the arguments defendants made in their pending SLAPP briefing. *See also* W. SCHWARZER, ET AL., RUTTER GROUP PRACTICE GUIDE: FED. CIV. PROC. BEFORE TRIAL § 11:1919 (2011) ("Listing each e-mail separately is crucial where different e-mails in the strand potentially raise different privilege grounds.").

C.  <u>The "July 5, 2003," Letter Identified in the Timeline.</u>  In its April 11 order, the Court credited defendants' statement in a footnote of their opposition that the July 5, 2003, letter from Ms. Larson to Mr. Siegel could not be "identif[ied]" among defendants' files. Docket No. 209 at 12 n.2.  (As defendants concede in their privilege logs, they are in possession, custody, and control of all of Michael Siegel's files that had previously been held by Don Bulson—Mr. Siegel's former counsel in Ohio. *E.g.*, Docket No. 207-9 at 233-35 (Entries 145-84); *see also* Docket No. 217-6 at 55.)  Given that defendants did *not* deny this "July 5, 2003," document existed during the parties' meet-and-confer discussions, *see* Seto Decl. Exs. B at 11 ¶ 10; C at 15-16 ¶ 10; D at 18 ¶ 10; E at 20-21 ¶ 10, given the indirect way they addressed the issue in the footnote of their brief, given their withholding of the May 13 letter, and given the possibility that defendants used an undisclosed subjective method to "match up" or "identify" the "July 5, 2003," letter, defendants respectfully request that the Court reconsider this aspect of it's April 11 ruling.

DC requests that the Court order defendants to re-search the files in their possession, custody, or control for any un-produced communications from June or July 2003 involving Michael Siegel, Don Bulson, Laura Siegel Larson, and/or Joanne Siegel.  It may be that defendants could not find an exact match for the July 5 letter described in the Timeline because the document they possess is an e-mail, was a draft letter, was sent shortly before or after July 5, came from Ms. Larson's mother (Joanne Siegel), came from Michael Siegel, is attached to a transmittal correspondence of a different date, or was different in some other non-material way.  As set forth in DC's proposed order, the Court should order defendants either

clearly to verify that no such unproduced documents exist, or if such documents do exist, to produce them immediately. *See also* Docket No. 209 at 12:13-16.

D. Reliance on Defendants' Representations. The Court's April 11 ruling was based in part on factual assertions made in defendants' briefs, which were not supported by declarations or were opaque, at best. *E.g.*, Docket No. 209 at 11:19-21 (M. Siegel documents), 12 n.2 ("July 5" letter), 2:3-4 (consent agreement). Defendants' suppression of the May 13 letter casts significant doubt on the reliability of those representations, and the Court should take that into account in ruling on this motion and DC's two pending motions to compel argued on April 25.

While defendants have gone so far as to accuse DC and its counsel of irresponsibly relying on factual assertions in the Toberoff Timeline to prosecute this case, *e.g.*, Docket Nos. 162-10 at 581-82 ¶ 10; 160 at 71-72; 196 at 2, 10, the May 13 letter establishes that it has been defendants who have been distorting the truth:

| **May 13 Letter** (Seto Decl. Ex. A) | **Toberoff Timeline** (Docket No. 49 Ex. A) | **Defendants' Claims About The Timeline** |
|---|---|---|
| "Marc had a mysterious billionaire who wanted to invest in the Superman copyright, put 15 million dollars up front plus participation. When you signed with Marc the billionaire invested elsewhere. Marc has his own production company, he was going to team with Emmanuel and make a movie. This has not happened." | "On August 8th 2002, [Toberoff] tells Marks that he and Emanuel have a billionaire ready to offer $15 million dollars up-front, plus what they promise to be meaningful participation from proceeds for exploitation of the Siegels' rights to SUPERMAN…." *Id.* at 63. | "DC's allegation that Toberoff misled the Siegels by representing that he had a 'billionaire' investor or that he would help produce a Superman film, the sole allegations of 'wrongfulness' required for DC's Fifth Claim, is based entirely on this untrustworthy, inadmissible Timeline, and is contradicted by the sworn testimony of all percipient witnesses." Docket No. 196 at 2. |
| "Now that you have signed with [Mr. Toberoff], he is in control of the whole Superman copyright." | "Michael Siegel tells [Ms. Larson] how Toberoff is now controlling the whole of the SUPERMAN copyright." *Id.* at 64. | DC's Fifth Claim "depends on random accusations in the inadmissible Timeline, which have been refuted by the testimony of every percipient witness." *Id.* at 10. |
| "Do you know who owns | "[H]ow [Toberoff] | "[T]he ranting anonymous |

- 9 -

DC'S MOT. FOR RECONSIDERATION OF APRIL 11, 2011, ORDER

| | | |
|---|---|---|
| the Shuster interest in the Superman copyright? Has Marc bought the Shuster interest himself?" | may have bought a substantial portion of the S[h]uster interest for himself…" *Id.* | 'Timeline' was inaccurate and untrustworthy." Docket No. 162-10 at 581 ¶ 10. |
| "Marc has chosen not to open any dialog with Time Warner or anyone else." | "M[arc] T[oberoff] has not even made contact with Time Warner." *Id.* at 65. | "[W]e have repeatedly stated that the inadmissible Timeline is extremely untrustworthy." Docket No. 162-12 at 589. |
| "Marc seems to have an agenda of someone buying me out so I will have to look for the best deal I can get. Marc is really pressing for an answer to the offer his investor made." | "Michael conveys that M[arc] T[oberoff] seems to have an agenda of 'someone' buying him out, and that MT is pressing for an answer." *Id.* | The Timeline "is an inherently untrustworthy and inadmissible document; its allegations can hardly serve as grounds for a motion to compel." Docket No. 160 at 71. |

As these comparisons illustrate, the Timeline discloses underlying documents and events that defendants might now assert do not exist or did not happen, but that documents they have actively suppressed show occurred. These contradictions call into question defendants' claims that they were "unable to identify a document that matched" the "July 5, 2003" for example, Docket No. 160 at 71 & n.26—a letter the Timeline author specifically discussed and said he "*enclosed*." Docket No. 49 Ex. A at 65. They also show why defendants' representations about the July 11, 2003, letter ring hollow. In the May 13 letter, Mr. Siegel poses numerous pointed questions to his sister regarding Mr. Toberoff's actions, and the Timeline describes her July 2003 response in detail, Docket No. 49 Ex. A at 65—yet her July 2003 response *has never been* produced, and it has not even been separately logged.

## IV. CONCLUSION

DC's discovery motions should be granted.

Dated: May 2, 2011

Respectfully Submitted,
O'MELVENY & MYERS LLP

By:  /s/ Daniel M. Petrocelli
Daniel M. Petrocelli
Attorneys for Plaintiff DC Comics

CC1:848479