Marc Toberoff (State Bar No. 188547)
 *mtoberoff@ipwla.com*
Keith G. Adams (State Bar No. 240497)
 *kgadams@ipwla.com*
TOBEROFF & ASSOCIATES, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California, 90067
Telephone:  (310) 246-3333
Fax:         (310) 246-3101

Attorneys for Defendants Mark Warren
Peary, as personal representative of the
Estate of Joseph Shuster, Jean Adele Peavy
and Laura Siegel Larson

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| DC COMICS,<br><br>                    Plaintiff,<br><br>    vs.<br><br>PACIFIC PICTURES CORPORATION;<br>IP WORLDWIDE, LLC; IPW, LLC;<br>MARC TOBEROFF, an individual;<br>MARK WARREN PEARY, as personal<br>representative of the ESTATE OF<br>JOSEPH SHUSTER; JEAN ADELE<br>PEAVY, an individual; JOANNE<br>SIEGEL, an individual; LAURA<br>SIEGEL LARSON, an individual,<br>and DOES 1-10, inclusive,<br><br>                    Defendants. | Case No: CV 10-03633 ODW (RZx)<br><br>Hon. Otis D. Wright II, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J.<br><br>**DEFENDANTS' OPPOSITION TO DC COMICS' MOTION FOR REVIEW OF MAGISTRATE ZAREFSKY'S APRIL 11, 2011 ORDER ON PLAINTIFF'S MOTION TO COMPEL PURSUANT TO FED. R. CIV. P. 72(A) AND L.R. 72-2.1**<br><br>*Declaration of Keith G. Adams and [Proposed] Order filed concurrently*<br><br>Complaint filed:  May 14, 2010<br>Trial Date:        None Set<br><br>Hearing Date:  May 23, 2011<br>Hearing Time: 1:30 p.m.<br>Courtroom:      11 |

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ............................................................................................1

II.     ARGUMENT...................................................................................................3

    A.      The "Clear Error" Standard of Review .................................................3

    B.      Magistrate Zarefsky Properly Ruled That the Consent Agreement Is Privileged.............................................................................3

        1.      The Pacific Pictures and IP Worldwide Agreements ................3

        2.      The "Consent Agreement" and Its Improper Disclosure by DC in Willful Breach of a Confidentiality Agreement .........................................................4

            a.      The Consent Agreement Is Proper ..................................4

            b.      DC's Disclosure of the Consent Agreement in Willful Breach of a Negotiated JAMS Confidentiality Agreement .............................................7

            c.      DC's Motion to Compel in Siegel ...................................9

        3.      Magistrate Zarefsky Properly Rejected DC's Arguments....................................................................................10

            a.      The Law of the Case Doctrine.........................................10

            b.      DC's Arguments About Changed Circumstances Are Misleading and Irrelevant..............12

            c.      The Consent Agreement Is Privileged and Privilege Has Not Been Waived.....................................14

    C.      The Magistrate Properly Upheld Privilege on the July 2003 Letter ..................................................................................................16

        1.      The May 13 Letter Is Irrelevant, Inadmissible, and Provides No New Information....................................................16

        2.      Magistrate Zarefsky Correctly Held That DC Is Not Entitled to Any Alleged July 2003 Letter.................................19

    D.      The Magistrate Properly Upheld the Format of Defendants' Privilege Logs ....................................................................................21

III.    CONCLUSION ...............................................................................................22

1

# <u>TABLE OF AUTHORITIES</u>

2

## <u>Federal Cases</u>

3
*Arizona v. California*,
460 U.S. 605 (U.S. 1983)........................................................................11

4

5
*Bosley Med. Inst., Inc. v. Kremer*,
403 F.3d 672 (9th Cir. 2005) ....................................................................2

6
*Bourne Co. v. MPL Commc'ns, Inc.*,
675 F. Supp. 859 (S.D.N.Y. 1987) ........................................................ 5-7

7

8
*Carmona v. Carmona*,
603 F.3d 1041 (9th Cir. 2010) .................................................................11

9
*Casey v. Planned Parenthood*,
14 F.3d 848 (3d Cir. 1994) .....................................................................11

10

11
*Chappell v. Robbins*,
73 F.3d 918 (9th Cir. 1996) ......................................................................6

12
*Clarke v. American Commerce Nat'l Bank*,
974 F.2d 127 (9th Cir. 1992) ...................................................................14

13

14
*Disimone v. Browner*,
121 F.3d 1262 (9th Cir. 1997) .................................................................11

15
*Dole v. Melonas*,
889 F.2d 885 (9th Cir. 1989) ...................................................................21

16

17
*Dominguez v. Schawarzenegger*,
2010 WL 3341038 (N.D. Cal. Aug. 25, 2010) ........................................21

18
*Easley v. Cromartie*,
532 U.S. 234 (2001).................................................................................3

19

20
*Gonzaga Univ. v. Doe*,
536 U.S. 273 (2002).................................................................................6

21
*Grimes v. City and County of San Francisco*,
951 F.2d 236 (9th Cir. 1991) ....................................................................3

22

23
*Hickman v. Taylor*,
329 U.S. 495 (1947).................................................................................14

24
*Home Indem. Co. v. Lane Powell Moss & Miller*,
43 F.3d 1322 (9th Cir. 1995) ...................................................................15

25

26
*Husain v. Olympic Airways*,
316 F.3d 829 (9th Cir. 2002) ....................................................................3

27
*In re Grand Jury Investigation*,
974 F.2d 1068 (9th Cir. 1992) .................................................................21

28

*In re Grand Jury Proceedings*,
33 F.3d 1060 (9th Cir. 1994) ...................................................................15

*In re Grand Jury Subpoena*,
357 F.3d 900 (9th Cir. 2004) ...................................................................15

*Little Oil Co. v. Atlantic Richfield Co.*,
852 F.2d 441 (9th Cir. 1988) ...................................................................11

*Maisonville v. F2 America, Inc.*,
902 F.2d 746 (9th Cir. 1990) .....................................................................3

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
571 F.3d 873 (9th Cir. 2009) .....................................................................3

*Mason v. Texaco, Inc.*,
741 F. Supp. 1472 (D. Kan. 1990)...........................................................11

*Mendenhall v. NTSB*,
213 F.3d 464 (9th Cir. 2000) ...................................................................11

*Miller v. Pancucci*,
141 F.R.D. 292 (C.D. Cal. 1992) .............................................................21

*Milne v. Stephen Slesinger, Inc.*,
430 F.3d 1036 (9th Cir. 2005) ...................................................................6

*Mindys Cosmetics, Inc. v. Dakar*,
611 F.3d 590 (9th Cir. 2010) .....................................................................2

*Minebea Co., Ltd. v. Papst*,
355 F. Supp. 2d 526 (D.D.C. 2005) .........................................................15

*Montgomery County v. MicroVote Corp.*,
175 F.3d 296 (3d Cir. 1999) ....................................................................15

*Moss v. Crawford & Co.*,
201 F.R.D. 398 (W.D. Pa. 2000) .............................................................11

*Munoz v. J.C. Penney Corp.*,
2009 U.S. Dist. LEXIS 36362 (C.D. Cal. Apr. 9, 2009) ................... 13-14

*Parrick v. FedEx Grounds Package Sys.*,
2010 WL 2854314 (D. Mont. July 19, 2010) ...........................................21

*Ridgeway v. Mont. High School Ass'n*,
858 F.2d 579 (9th Cir. 1988) ...................................................................10

*Siegel v. Warner Bros. Entertainment Inc.*,
542 F. Supp. 2d 1098 (C.D. Cal. 2008) ...........................................1, 7, 17

*Thomas v. Bible*,
983 F.2d 152 (9th Cir. 1993) ...................................................................11

*United States v. Alexander,*
106 F.3d 874 (9th Cir. 1997) ................................................................11

*United States v. BNS, Inc.,*
858 F.2d 456 (9th Cir. 1988) ..................................................................3

*United States v. Martin,*
278 F.3d 988 (9th Cir. 2002) ......................................................... 14-15

*United States v. Musick,*
534 F. Supp. 954 (N.D. Cal. 1982) ......................................................11

*United States v. Park Place Assocs.,*
563 F.3d 907 (9th Cir. 2009) ................................................................11

*Waller v. Fin. Corp. of Am.,*
828 F.2d 579 (9th Cir. 1987) ..................................................................5

**Federal Statutes**

F.R.C.P. 26(b)(3) ................................................................................14

F.R.C.P. 72(a) ........................................................................................3

F.R.E. 408 .......................................................................................13-14

F.R.E. 501 ............................................................................................14

F.R.E. 801(c) ........................................................................................18

F.R.E. 803 .............................................................................................18

F.R.E. 804 .............................................................................................18

17 U.S.C. § 304(c)(6)(D) ...................................................................5-7

28 U.S.C. § 636(b)(1)(A) ......................................................................3

**State Cases**

*Calvert v. Stoner,*
33 Cal. 2d 97 (1948) ..............................................................................7

*Evans v. Unkow,*
38 Cal. App. 4th 1490 (1995) ..............................................................19

*Tax Authority, Inc. v. Jackson Hewitt, Inc.,*
187 N.J. 4 (2006) ...................................................................................7

*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.,*
106 Cal. App. 4th 1219 (2003) ....................................................... 18-19

**State Authorities**

Cal. Code of Civil Procedure § 425.16(f)-(g) ......................................2

Cal. Rules of Prof'l Conduct 3-310(D) (2010) .........................................................7

**Other Authorities**

18B C. Wright *et al.*, *Fed. Prac. & Proc.*
§ 4478, (2d ed. 2002) ............................................................................................12

§ 4478.1 (2d ed. 2002) ..........................................................................................12

Schwarzer, *et al.*, *Fed. Civ. Proc. Before Trial*
§ 11:285 (2010)......................................................................................................14

W. Schwarzer, W. Tashima, and J. Wagstaffe, *Federal Civil Procedure Before Trial* (Rutter 2006)
Form 11:A ..............................................................................................................21

3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* (2010)
§ 11.08[A], n.6 ........................................................................................................6

3 W. Patry, *Patry on Copyright,*
§ 21:18....................................................................................................................7

# I.      INTRODUCTION

Plaintiff DC Comics' ("DC") wasteful motion for review (Docket No. 225; "Motion" or "Mot.") of Magistrate Zarefsky's April 11, 2011 Order (Docket No. 209; the "Order") ignores this Court's admonition that discovery rulings are only reversed "where it has been shown that [the] order is clearly erroneous or contrary to law." Docket No. 18 at 3.  The supposed "clear errors" were correct, reasonable rulings by Magistrate Zarefsky that:  (1) the alleged "Consent Agreement" was and is privileged; (2) the alleged July 11, 2003 letter is privileged; and (3) the format of Defendants' privilege logs, approved by the Ninth Circuit, are proper.

Magistrate Zarefsky stated in the Order that the "Court will not revisit [an] issue just for the purpose of having that issue re-visited."  Order at 8.  DC's motion for review, like its underlying motion to compel, is little more than reconsideration for its own sake.  DC admits as much:  "Finally, as for DC's motion for review of the April 11 order to Judge Wright, DC will seek review of *all* rulings adverse to DC." Declaration of Keith Adams, Ex. A (emphasis added).  Incredibly, DC has also brought a simultaneous motion for reconsideration of the Order before Magistrate Zarefsky.  *See* Docket No. 330.  If that reconsideration motion is denied, DC will undoubtedly move this Court for review of that denial.

In fact, DC's complaint seeks reconsideration of numerous rulings in the closely related case of *Siegel v. Warner Bros. Entertainment Inc.*, Case No. 04-CV-8400 ODW (RZx) ("*Siegel*").  *See* Docket No. 49 (First Amended Complaint, "FAC") at 50 n.4, 57 n.6. *Compare* Docket No. 49, FAC ¶¶ 125-28 (alleging that a May 21, 1948 consent judgment was not terminated) *with Siegel v. Warner Bros. Ent. Inc.*, 542 F. Supp. 2d 1098, 1126 (C.D. Cal. 2008) (specifically rejecting that argument).  And when this Court in *Siegel* recently entered a Rule 54(b) judgment, DC immediately moved to reconsider that order as well.  *See Siegel,* Docket No. 661. In short, DC and its counsel's overzealous strategy is to endlessly re-litigate every adverse ruling, both here and in *Siegel*, without regard to the burden and waste of

judicial resources that this entails.

As Magistrate Zarefsky recognized, "[t]he central issue surrounding the controversy [here and in *Siegel*] is who controls the copyrights connected with the Superman creations and their iterations, and the various claims and counterclaims all derive from and relate to that issue." Order at 4. In this case, DC sues Marc Toberoff, the long-time attorney for Mark Warren Peary (the "Shuster Executor") as well as Laura Siegel Larson and, until her passing, Joanne Siegel (the "Siegel Heirs") (collectively, the "Heirs") for acts of purported "interference" arising out of their exercise of their statutory copyright termination rights. As set forth in Defendants' anti-SLAPP motion (Docket No. 145), this case is nothing more than a classic SLAPP suit that seeks to frustrate the exercise of such statutory rights. DC's motion desperately attempts to salvage certain of its frivolous claims: namely, its Third and Sixth Claims regarding a consent agreement between the Heirs that Magistrate Zarefsky found to be entirely proper, and its Fifth Claim for "interference" with negotiations that were over before any "interference" could possibly have occurred.

California's anti-SLAPP "statute was designed to allow courts 'to promptly expose and dismiss meritless and harassing claims seeking to chill protected expression,'" and prevent a plaintiff from coercing a defendant with abusive discovery tactics before the court has ruled on the anti-SLAPP motion. *See Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 595 (9th Cir. 2010) (citing *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 682 (9th Cir. 2005)); Cal. Code of Civil Procedure § 425.16(f)-(g). DC's endless motions for reconsideration of "all" adverse discovery rulings are precisely the sort of abusive practice that the anti-SLAPP statute was meant to prevent, and should be rejected as such. In addition, DC should be dissuaded from continuing to make such unwarranted and overzealous motions for reconsideration or review with no regard for this Court's or Magistrate Zarefsky's scarce resources or the governing standards of review.

///

## II.    ARGUMENT

### A.    The "Clear Error" Standard of Review

As stated in this Court's standing order (Docket No. 18 at 3), on a motion for review of a magistrate's discovery order, the trial court is deferential and will uphold the order unless it is "clearly erroneous or contrary to law."  Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1)(A).  *See Maisonville v. F2 America, Inc.*, 902 F.2d 746, 748 (9th Cir. 1990) (the district court reviews the magistrate's order for "clear error").  A magistrate's pretrial orders are not subject to *de novo* determination.  *Grimes v. City and County of San Francisco*, 951 F.2d 236, 241 (9th Cir. 1991).  A reviewing court does not substitute its own judgment for that of the magistrate judge.  *See United States v. BNS, Inc.*, 858 F.2d 456, 464 (9th Cir. 1988).  Rather, "[r]eview for clear error is significantly deferential and requires a 'definite and firm conviction that a mistake has been committed.'"  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878 (9th Cir. 2009) (quot'g *Easley v. Cromartie*, 532 U.S. 234, 242 (2001)).  Notably, reversal on the basis of "clear error" is inappropriate as long as the court's "'findings are plausible in light of the record viewed in its entirety.'" *Id.* (quoting *Husain v. Olympic Airways*, 316 F.3d 829, 835 (9th Cir. 2002)).

### B.    Magistrate Zarefsky Properly Ruled That the Consent Agreement Is Privileged

#### 1.    The Pacific Pictures and IP Worldwide Agreements

DC's hyperbolic and derogatory claims of "forbidden 'rights trafficking,'" "illegal" and "illicit transfers" have no basis in fact or law, and emanate entirely from DC's misreading of copyright law and misrepresentations of the record to contrive claims against Defendants.  Specifically, DC's Third and Sixth Claims concern the meritless notion that DC has an "exclusive" right under the Copyright Act to buy back the Heirs' termination interests, when none exists.  This has no basis in the text of the Copyright Act, nor in any caselaw, and Magistrate Judge Zarefsky properly rejected discovery premised on DC's rhetoric.

Here, DC begins by disparaging the 2001 and 2003 Pacific Pictures Agreements and the 2002 IP Worldwide Agreement.  Mot. at 2-3.  DC omits that these benign agreements were voluntarily produced in *Siegel* by the Heirs and expired in 2004 and 2005.  *See* Declaration of Matthew Kline (Docket Nos. 161-163; "Kline Decl."), Exs. LL-OO; Docket No. 146-1 at 18-22.  Pacific Pictures Corp. no longer even exists, and IP Worldwide, LLC has been inactive for years.  *See* Docket No. 146-2, ¶ 7; No. 145-2, Ex. B at 45:6-15; No. 145-6, Ex. CC at 6.

As DC is well aware, for nearly seven years since filing *Siegel* in 2004, Mr. Toberoff has been litigating these cases on behalf of the Heirs pursuant to ordinary legal retainer agreements that also have been produced to DC.  *See* Order at 11:1-8.[1]

Defendants have explained on no fewer than ***five*** occasions that the Pacific Pictures Agreements did not transfer the Shuster Heirs' termination interest.  *See* Docket No. 33 at 13:20-14:9 ("Thus, as a matter of law, neither the PPC agreements nor the Shuster Executor could transfer his termination interest prior to the October 26, 2013 termination date."), No. 80 at 13:22-14:11 (same), No. 148-1 at 13:22-14:11 (same), No. 103 at 8:8-22 ("[T]he Pacific Picture Agreements could not and did not transfer the Shuster Executor's termination rights or prospective termination interests."), No. 191 at 8:8-22 (same).  DC nonetheless still erroneously contends that the Pacific Pictures Agreements "effectively transferr[ed] 50% ownership in the Shusters' rights to Pacific Pictures" (Mot. at 2), and distorts Defendants' explanation of the relevant law as an "admission" that "these consent agreements violated federal law" or were somehow "illegal."  Mot. at 2, 7.

## 2.  The "Consent Agreement" and Its Improper Disclosure by DC in Willful Breach of a Confidentiality Agreement

### a.  *The Consent Agreement Is Proper*

DC then claims that Defendants "also entered into at least one more consent agreement in 2008."  Mot. at 3.  As DC is well aware, there is only one such "consent

---

[1] Defendants offered to produce these retainer agreements voluntarily, provided that DC agrees to do likewise at the appropriate juncture.  Kline Decl., Ex. Z.  DC refused.

agreement": a 2008 "collective bargaining agreement" between the Siegel and the
Shuster Heirs as to their settlement strategy (the "Consent Agreement").

Magistrate Zarefsky specifically rejected DC's argument that the Consent
Agreement was "illegal" and therefore discoverable, as "the argument is ultimately a
circular one" and "[s]imply calling it illegal does not make it so." Order at 6, 8. The
Consent Agreement was specifically and properly entered into by the Heirs in
anticipation of a Court-ordered mediation to articulate, as Magistrate Zaresky aptly
put it, a "Drysdale-Koufax collective approach to negotiation." *Id.* at 6. There is
nothing improper about this. As Magistrate Zarefsky stated, "if one party can refrain
from negotiating with the current grantee [DC], two creators can also agree to refrain
from negotiating with the current grantee, except on terms acceptable to both." *Id.* at
7. *See Waller v. Fin. Corp. of Am.*, 828 F.2d 579, 581 (9th Cir. 1987) (approving
settlement agreement providing for third-party consent); *see also* Docket No. 196-
2/3, Ex. D at Exs. H (at 9225), J (at 6918), K (at 10018) (Warner Bros.' agreements
providing that licensee may not settle claims against it without Warner's consent).

Nor does the Consent Agreement "violate" the Copyright Act, as repeatedly
asserted by DC without any basis. The statute under which DC erroneously claims
"rights," 17 U.S.C. § 304(c)(6)(D) (*see, e.g.,* Mot. at 9), provides no rights or
standing to DC. It simply states that a "further grant, or agreement to make a further
grant, of any right covered by a terminated grant is valid only if it is made after the
effective date of the termination," and that an "agreement for such a further grant
may be made between the author or [his heirs] and the original grantee or such
grantee's successor in title, after the notice of termination has been served." This, at
best, provides DC with a competitive advantage, not a "right of first refusal," "[n]or
does the statute provide for an exclusive period of negotiation." *Bourne Co. v. MPL
Commc'ns, Inc.*, 675 F. Supp. 859, 864-65 (S.D.N.Y. 1987) (rejecting arguments that
§ 304(c)(6)(D) provided an "exclusive period of negotiation" or "right of first
refusal" and holding that "[t]he statute neither compels the terminating party to

negotiate with the terminated grantee, nor forbids him from negotiating with anyone else"); 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 11.08[A], n.6 (2010) (stating that "it is inaccurate to refer to this [§ 304(c)(6)(D)] advantage as 'an exclusive period of negotiation'"). Had Congress intended to create the federal right invented by DC it would have had to do so expressly. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002) ("If Congress wishes to create new rights … it must do so in clear and unambiguous terms.").[2]

In the Consent Agreement, the Heirs did <u>not</u> "grant, or agree[] to make a further grant, of any right covered by a terminated grant" in violation of § 304(c)(6)(D). DC itself alleges that the Consent Agreement simply "prohibit[s] either family from entering into agreements conveying rights … without the express approval of all stakeholders in the heirs' rights" (FAC, ¶ 170), and such an agreement is clearly not covered or prohibited by the plain wording of § 304(c)(6)(D).

DC falsely claims that *Milne v. Stephen Slesinger, Inc.,* 430 F.3d 1036 (9th Cir. 2005) held that "§ 304(c)(6)(D) gives DC a right 'in the nature of a right of 'first refusal.'" Mot. at 9. As Magistrate Zarefsky correctly found, *Milne* establishes no such "right," and "may well foreshadow the opposite." Order at 7, quoting *Milne*, 430 F.3d at 1048 ( "[W]e note that [the terminating heir's] ability to exercise his perceived termination right gave him all the freedom he needed to refrain from entering into a new grant of copyright rights to the [terminated original grantee]."). *Milne* merely states that "section 304(c)(6)(D) … give[s] the original grantee a competitive advantage over third parties…." *Id.* at 1047-48. As Magistrate Zarefsky noted, "*Milne* does not address the situation where the original creators (or their heirs) agree to negotiate together" (Order at 7), as here.

Section 304(c)(6)(D) does not mandate that the Heirs negotiate first with DC,

---

[2] *See Chappell v. Robbins*, 73 F.3d 918, 923 (9th Cir. 1996) (a "clear statement" by Congress is required); *Milne*, 430 F.3d at 1048 ("[I]f Congress intended to require a 'moment of freedom,' it would have clearly said so."); *Bourne*, 675 F. Supp. at 865 n.11 (noting that Congress did not mandate in "the statute or the legislative history" that "a grant is valid only if *negotiated* after the termination date").

or permit DC to match their offers from third parties, which is what a "right of first refusal" entails.  DC's entire Third and Sixth Claims for relief in its complaint are erroneously premised on the false construct that § 304(c)(6)(D) provides DC with a "substantive right," which it does not.  *See Bourne*, 675 F. Supp. at 864-65.  As DC has no substantive right under § 304(c)(6)(D), there is no basis for its Third and Sixth Claims premised thereon.  *See* 3 W. Patry, *Patry on Copyright,* § 21:18 (a terminated grantee has "no rights under [§ 304(c)(6)(D)], cannot sue for failure to comply, and the provision [] does not provide a basis for standing").

Lastly, while DC argues that the Consent Agreement "violate[s] law and public policy" (Mot. at 8-9), the authorities it cited merely restate the well-worn principle that an attorney cannot settle a case without his clients' informed consent.  *See Tax Authority, Inc. v. Jackson Hewitt, Inc.*, 187 N.J. 4, 21 (2006) (holding that a "majority rules" provision when multiple clients are represented is invalid); Cal. Rules of Prof'l Conduct 3-310(D) (2010) (requiring the "informed written consent of each client" for an "aggregate settlement of claims"); *Calvert v. Stoner*, 33 Cal. 2d 97, 103 (1948) (requiring attorney's consent for settlement invalid as against public policy).  In accordance with the law the Consent Agreement does not require consent of the Heirs' attorney to any settlement with DC.  While DC tries to salvage its Third and Sixth Claims, there is nothing "unlawful" about the Consent Agreement, and no basis for its frivolous claims, or for further discovery thereof.

b.  *DC's Disclosure of the Consent Agreement in Willful Breach of a Negotiated JAMS Confidentiality Agreement*

Before the Court ruled on summary judgment in *Siegel,* the parties discussed mediating settlement before a JAMS mediator.  *See* Declaration of Marc Toberoff (Docket No. 164; "Toberoff Decl."), Ex. E.  After Judge Larson issued his order upholding the Siegel Heirs' termination, he ordered the parties to participate in settlement discussions.  *Siegel,* 542 F. Supp. 2d at 1145; Toberoff Decl., Ex. F.  In advance of the court-ordered mediation, the parties and their counsel carefully

negotiated and executed a JAMS Confidentiality Agreement on or about May 1, 2008 (the "Confidentiality Agreement").  Kline Decl., Ex. K.  The Confidentiality Agreement substantially strengthened the provisions of JAMS' standard agreement and provided that *any* disclosures made under it would not be used in any way in any legal proceeding.  *Id.*, Ex. K, ¶¶ 5-7.  Paragraph 5 provides:

> All parties, counsel and any other persons attending any Settlement Conference shall treat all such discussions as strictly confidential in every respect, including without limitation, the contents or substance of any oral or written statements made at the Settlement Conference, and all other substantive aspects of such Settlement Conference ('Confidential Settlement Information').  ***Without limitation, any document that is marked 'Confidential – For Settlement Purposes Only' and is disclosed or produced at or in connection with a Settlement Conference shall be treated as Confidential Settlement Information*.  *Confidential Settlement Information shall not be*** disclosed to anyone other than the parties, their counsel or the mediator or ***used in any way, shape or form for any purpose, including impeachment, in any pending or future proceeding in any court, in whole or in part, directly or indirectly***, orally or in writing, except as set forth in paragraph 6 below.

*Id.*, Ex. K, ¶ 5 (emphasis added).  Notably, this paragraph does not refer to or rely on the mediation or settlement privileges that exist even absent an agreement.  It is a negotiated, unambiguous, stand-alone provision that was specifically added to the standard JAMS agreement by the Siegels' counsel, and specifically approved and accepted by DC and its counsel.  Paragraph 6 provides that information will not be considered Confidential Settlement Information (and may be disclosed) *only* if it is:

> Documentation or information that is (a) publicly available, (b) already in possession of the adverse party or their counsel prior to its disclosure by a party or their counsel at a Settlement Conference, or (c) is developed independently of any Settlement Conference and without reference thereto, shall not be considered as Confidential Settlement Information ….

*Id.*, Ex. K, ¶ 6.  Paragraph 7 expressly limits disclosures to the Court regarding the parties' settlement communications.  *Id.*, Ex. K, ¶ 7.  Finally, paragraph 1 states the Confidentiality Agreement "extends to all present and future civil, judicial, quasi-judicial, arbitral, administrative or other proceedings."  *Id.*, Ex. K, ¶ 1.

In a letter to DC dated May 2, 2008, marked "***Confidential – For Settlement***

1   ***Purposes Only***" pursuant to paragraph 5 of the Confidentiality Agreement, the Heirs

2   only generally disclosed the Consent Agreement.[3]   Kline Decl., Ex. PP ("This letter is

3   sent pursuant to the executed 'JAMS Confidentiality Agreement' ….").

4        Yet, <u>in a blatant and willful breach of its Confidentiality Agreement</u>, and over

5   Defendants' objections, DC attached this letter both to this motion (*see* Seto

6   Declaration, Ex. A) and to DC's underlying motion to compel.  *See* Kline Decl., Exs.

7   PP, RR.  This is just a part of DC's pattern of highly improper conduct in this case.

8   As Magistrate Zarefsky noted, the May 2 letter was strictly protected, but

9   "[n]evertheless, it appears to be the information upon which Plaintiff alleges its belief

10  in the Complaint that Defendants have entered into a [C]onsent [A]greement."  Order

11  at 5; *see* FAC, ¶¶ 101, 170 (relating to Third and Sixth Claims).

12              c.    *DC's Motion to Compel in Siegel*

13       In breach of its Confidentiality Agreement, DC, on December 30, 2008, moved

14  in *Siegel* to compel the production of the Consent Agreement, based on the frivolous

15  arguments DC makes here:  that the Consent Agreement was "improperly concealed"

16  by disclosure in a mediation, and that "there is no basis" for a claim of privilege or

17  work product protection as to the Consent Agreement.  Toberoff Decl., Ex. J at 5-6.

18  The Siegels asserted that the Consent Agreement, which revealed their settlement

19  strategy, was protected by the Confidentiality Agreement, the attorney-client

20  privilege, the joint-interest privilege and the work product doctrine.  *Id.*, Ex. J at 9-15.

21  At the hearing on the motion, DC's counsel claimed, as here, that the Consent

22  Agreement was not protected by the attorney-client privilege because it was an

23  "agreement."  Kline Decl., Ex. SS at 11:18-22 ("[A]n agreement … [is not]

24  privileged."). The Court nonetheless denied DC's motion and found the Consent

25  Agreement to be privileged.  *Id.*, Ex. SS at 12:15-19.  As Magistrate Zarefsky stated,

26

27  ---
    [3] DC's statement that "Toberoff only first disclosed this 2008 agreement in the days leading up to a 2008 mediation session" (Mot. at 3) is disingenuous and misleading.  The Consent

28  Agreement is dated April 9, 2008 (*see* Docket No. 160 at 27), and its existence was disclosed shortly thereafter on May 2, 2008.

the Court accepted "that the consent agreement was protected by the attorney-client privilege" and "also ruled … that the consent agreement was protected as part of the mediation process." Order at 2. The Court "did not rule on the basis of simply having heard the incantation 'attorney-client privilege,'" but "after Mr. Toberoff described in some detail some facts about the consent agreement" and DC had made its arguments. Order at 8.

### 3. Magistrate Zarefsky Properly Rejected DC's Arguments

#### a. *The Law of the Case Doctrine*

The "law of the case" doctrine stands for the common-sense principle that the same *issue* presented a second time in the same court should lead to the same result, as to do otherwise "would create intolerable instability for the parties." *Ridgeway v. Mont. High School Ass'n*, 858 F.2d 579, 587-88 (9th Cir. 1988). While DC pretends that Magistrate Zarefsky felt the law of the case doctrine "bound him to treat DC's [] motion like a motion for 'reconsideration'" (Mot. at 5), in fact, the Magistrate properly exercised his discretion based on the specific nature of this case:

> From a realistic standpoint, **the present case is so closely related as to be considered properly part of the same case as *Siegel*** for purposes of application of the law of the case principles. This case has a different docket number attached to it, and it is true that DC Comics has added the Shuster defendants and Mr. Toberoff himself as a defendant, and created some new theories. But the issue has never been one of relevance, for DC Comics asserted in *Siegel* that the document was relevant to the claims there, and the additional parties here are not seeking to uncover something they did not have the opportunity to see in *Siegel*. **Thus, the new claims and new parties are not a basis for saying that automatically DC Comics is entitled to the document now when it was not entitled to it then.** The central issue surrounding the controversy is who controls the copyrights connected with the Superman creations and their iterations, and the various claims and counterclaims all derive from and relate to that issue. **The cases are all before the same judge. The claims in the present case probably could have been filed as counterclaims and cross-claims, perhaps in supplemental pleadings, in the original case.** The jockeying that led to the filing of this present separate lawsuit should not obscure the reality of these facts. **It is appropriate, under the peculiar facts of these two cases, that applicable rulings made in the original case should govern the outcome here**, unless there is some very good reason to change those rulings.

Order at 4 (emphasis added).

Thus, DC's supposed "new claims for relief" and DC's concocted arguments

based thereon (Mot. at 4), are beside the point.  Magistrate Zarefsky properly treated the cases as so closely related as to warrant application of the "law of the case" doctrine, citing *Disimone v. Browner*, 121 F.3d 1262, 1367 (9th Cir. 1997).  Order at 3-4.  In *Disimone*, the Ninth Circuit acknowledged that while "[t]ypically, the law of the case doctrine is confined to decisions in the same case as the one in which it is applied," where a case shares numerous commonalities with a prior related case, the "law of the case" doctrine can apply as well.  *Id.* at 1366-68.  Contrary to DC's argument that *Disimone* only mentioned "law of the case" in "dicta," the Ninth Circuit clearly *applied* the "law of the case" doctrine.  Such a result is well-supported by numerous other cases.  *See Casey v. Planned Parenthood*, 14 F.3d 848, 856 (3d Cir. 1994) ("[L]aw of the case rules apply to subsequent rulings by the same judge in the same case or a closely related one.").[4]

DC falsely claims that the Ninth Circuit only applies "law of the case" to "rulings made 'in the identical case,'" as shown by *Disimone*.  The cases cited by DC merely apply the doctrine in the same case and do not say this. Mot. at 5:16-17.[5]  Notably, a recent Ninth Circuit case cited by DC, *United States v. Park Place Assocs.*, 563 F.3d 907 (9th Cir. 2009), expressly applied "law of the case" to separate yet related cases.  In *Park Place*, there were prior proceedings in and decisions by the Federal Circuit.  *Id.* at 914-16.  While those proceedings were ongoing, "the United States filed its own complaint and motion in the Central District of California,"

---

[4] *See also U.S. v. Musick*, 534 F. Supp. 954, 957 (N.D. Cal. 1982) ("[T]he general rule is that a decision in one case is … the law of the case in a related action if it involves the same subject matter and if the points of decision and facts are identical."); *Moss v. Crawford & Co.*, 201 F.R.D. 398, 401 n.1 (W.D. Pa. 2000) (the "law of the case" doctrine applies to issues determined in "closely related" cases); *Mason v. Texaco, Inc.*, 741 F. Supp. 1472, 1492 (D. Kan. 1990) (the "law of the case doctrine 'encompasses … the rulings of another judge … [in] a closely related case.'").

[5] *See Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993) (applies doctrine to proceedings in same case); *Mendenhall v. NTSB*, 213 F.3d 464, 469 (9th Cir. 2000) (same); *United States v. Alexander*, 106 F.3d 874, 876-77 (9th Cir. 1997); *Little Oil Co. v. Atlantic Richfield Co.*, 852 F.2d 441 (9th Cir. 1988) (same); *Arizona v. California*, 460 U.S. 605, 618-19 (U.S. 1983) (same).  *Carmona v. Carmona*, 603 F.3d 1041, 1052 (9th Cir. 2010), also cited by DC, declined to apply law of the case where "the suit involves a new party" who, unlike DC, did not have the opportunity to litigate the prior action.

DEFENDANTS' OPPOSITION TO F.R.C.P. 72 MOTION FOR REVIEW

which was before the Ninth Circuit on appeal. *Id.* at 917. Even though the two related cases were "separate," the Ninth Circuit held that "[t]he Federal Circuit's decisions, to the extent applicable, govern as law of the case." *Id.* at 925.

Indefensibly, DC claims its erroneous statements about the "law of the case" doctrine are "confirmed by the treatise defendants cited," 18B C. Wright *et al.*, Fed. Prac. & Proc. § 4478, at 637-39 (2d ed. 2002) (Mot. at 5:23-26). However, as the Magistrate stated in his order, that treatise states that the law of the case doctrine "has also been used as a short-hand description of a trial court's desire to adhere to a ruling previously made, recognizing, of course, a trial court's ability to reconsider a ruling under appropriate circumstances" (Order at 3), citing 18B C. Wright *et al.*, Fed. Prac. & Proc. § 4478.1, at 693-94 (2d ed. 2002), exactly what occurred here.

Magistrate Zarefsky did not blindly rely on the "law of the case" doctrine; he considered the unique circumstances of this case, which is so closely related to *Siegel,* and properly applied the "law of the case" doctrine. Order at 4.

### b. *DC's Arguments About Changed Circumstances Are Misleading and Irrelevant*

Moreover, Magistrate Zarefsky did not blindly adopt Judge Larson's prior rulings. As shown by the Magistrate's detailed order, he carefully reviewed the record, including all of DC's supposed "new" arguments, and "f[ound] no error of law or misunderstanding on the [*Siegel*] Court's part" and "no reason to reconsider the prior ruling." Order at 10. DC now puts forth a grab-bag of arguments for why their motion for review should be granted, none of which withstands scrutiny:

- Magistrate Zarefsky undertook a detailed and independent review of the "lawfulness" of the Consent Agreement (Order at 6-8); thus, DC's claim that it "did *not* raise the 'lawfulness' of the consent agreement in *Siegel*; nor did Judge Larson ever rule on that argument" (Mot. at 7) is beside the point.

- As DC made *all* of its current arguments before Magistrate Zarefsky, its complaints that "Judge Larson never saw the consent agreement; never saw the

1  letter that disclosed its existence, and never saw defendants' admissions or
2  their briefing" (Mot. at 7-8) are also beside the point.

3  • DC repeatedly put the "lawfulness" of the Consent Agreement and
4  Defendants' conduct at issue in its motion (*see, e.g.,* Docket No. 160 at 15:8-
5  16, 18:8-17, 22:25-23:14); it cannot falsely complain "that [the] issue [of the
6  Consent Agreement's legality] was not before [the Magistrate]."  Mot. at 8.

7  • Defendants never "admitted" that the Pacific Pictures and IP Worldwide
8  agreements were unlawful, merely that they did not effect a transfer of
9  termination rights; thus, DC's straw man that "Judge Larson *never* had these
10  admissions" (Mot. at 7) makes no sense.

11 • Defendants have consistently claimed that the Consent Agreement is a
12  privileged attorney-client communication (*e.g.,* Docket No 160 at 58-60),
13  contrary to DC's vague argument that Defendants "conceded the agreement
14  was not merely a privileged communication."  Mot. at 8.

15 • DC's argument that Defendants did not "tell Judge Larson that the 2008
16  consent agreement would bind the heirs beyond the parties' mediation" (Mot.
17  at 8) is also irrelevant; Defendants never made any representations about the
18  duration of the Consent Agreement, merely that it was "for the purpose of
19  advancing settlement," which is true (Kline Decl., Ex. SS at 7:4-7);

20 • DC's repeated attacks on the "settlement privilege" of F.R.E. 408, which exists
21  independently of the Confidentiality Agreement, is but another straw man that
22  misses the mark.  Defendants expressly did <u>not</u> rely on F.R.E. 408, but on the
23  stringent negotiated provisions of the parties' Confidentiality Agreement. *See*
24  Docket No. 160 at 57:10-17.  Magistrate Zarefsky and Judge Larson's orders
25  rested on the general "settlement rubric" (Order at 6), which included the
26  Confidentiality Agreement.

27 • DC relies heavily on this Court's decision in *Munoz v. J.C. Penney Corp.*,
28  2009 U.S. Dist. LEXIS 36362, at *7-10 (C.D. Cal. Apr. 9, 2009), which simply

confirmed that F.R.E. 408 permits a party to use a settlement communication as a basis for removal.  Here, DC concedes that it seeks such protected information to purportedly prove "liability for" its Third and Sixth Claims – a purpose expressly barred by F.R.E. 408.  *See* Mot. at 10.

In short, none of DC's weak arguments remotely justify revisiting ***either*** Magistrate Zarefsky's or Judge Larson's upholding of privilege as to the Consent Agreement.

### c.   *The Consent Agreement Is Privileged and Privilege Has Not Been Waived*

The attorney-client privilege protects confidential attorney-client communications from disclosure.  *See* F.R.E. 501 (applying common law of privilege to federal court proceedings); *Clarke v. American Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992).  The privilege encompasses documents that reveal, involve or implicate legal advice, litigation strategy or litigation motives of a party.  *Id.* at 129.  The Consent Agreement constitutes a confidential communication among the Heirs and their counsel and reflects their counsel's legal advice to his clients and legal strategies regarding settlement of their termination interests with DC.

The Consent Agreement is also protected by the work product doctrine, as it "reveal[s] an attorney's strategy [or] evaluation of strengths and weaknesses."  Schwarzer, *et al.*, *Fed. Civ. Proc. Before Trial* § 11:285 (2010), *citing Hickman v. Taylor*, 329 U.S. 495, 511 (1947).  *See* F.R.C.P. 26(b)(3).  The Consent Agreement naturally entails, reflects and discusses counsel's legal strategy for the settlement of the *Siegel* litigation and the Superman rights, as well as counsel's evaluation of the relative strengths and weaknesses of the Heirs' position.

DC's unpersuasive arguments boil down to a claim that the Consent Agreement is not privileged because it is an "agreement," not a "communication."  Mot. at 11-12.  *First*, an agreement *is* obviously a "communication."  *Second*, no case cited by DC stands for such a proposition.[6]  DC does not and cannot cite any case

---

[6] *See United States v. Martin*, 278 F.3d 278, 988 1000-01 (9th Cir. 2002) (attorney-client privilege did not apply because there was insufficient evidence to show an attorney-client

where two clients' agreement as to a strategy to settle their dispute with a common

adversary, communicated through their attorney, was not protected.

The Ninth Circuit held that work-product protection applies "when it can fairly

be said that the 'document was created because of anticipated litigation, and would

not have been created in substantially similar form but for the prospect of that

litigation.'" *In re Grand Jury Subpoena*, 357 F.3d 900, 908 (9th Cir. 2004).  The

confidential Consent Agreement was prepared by counsel with respect to settlement

of ongoing litigation, and is thus clearly covered by work-product protection, as well.

Lastly, DC misrepresents Magistrate Zarefsky's basis for rejecting their

"waiver of privilege" arguments.  DC made two "waiver of privilege" arguments, one

based on the Siegels' confidential disclosures pursuant to the Confidentiality

Agreement in *Siegel* and another argument based on separate disclosures in this

litigation.  *See* Docket No. 160 at 22:3-20; 24:23-28.  Magistrate Zarefsky correctly

held that DC's waiver argument based on disclosures in *Siegel* "necessarily was

implicitly rejected by Judge Larson."  Order at 9.  DC omits that Magistrate Zarefsky

also rejected DC's second waiver argument as follows:

> Plaintiff also argues that by referring to the consent agreement in this litigation,
> Defendants have waived the attorney-client privilege.  Again, the Court does
> not agree.  **Plaintiff first raised the agreement in its pleading by innuendo
> and, as indicated, its knowledge appears to derive from a letter that was
> protected during the settlement negotiations.**  Defendants have thereafter
> referred to the agreement in this lawsuit.  **In the Court's view, Defendants do
> not waive privilege by defending themselves**.

Order at 10 (emphasis added).  This ruling is well-supported by Ninth Circuit

precedent, which finds a "waiver" only when "through [an] affirmative act [such as

filing a complaint], the asserting party puts the privileged information at issue."

*Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1326 (9th Cir. 1995).

---

relationship, no privileged communications were divulged, and, if divulged, were subject to
the crime-fraud exception); *Montgomery County v. MicroVote Corp.*, 175 F.3d 296, 304 (3d
Cir. 1999) ("fee arrangements" not privileged); *In re Grand Jury Proceedings*, 33 F.3d
1060, 1063-64 (9th Cir. 1994) (same); *Minebea Co., Ltd. v. Papst*, 355 F. Supp. 2d 526, 529
(D.D.C. 2005) (holding that, while "[m]aterials generated during the course of regular
business and the provision of business or technical advice are not protected," materials that
were prepared "'in anticipation of litigation'" would be) (citations omitted).

DC offers no authority for the proposition that the Consent Agreement is not protected by attorney-client privilege and work product, a claim upheld by two separate courts.  There is no "clear error," and no basis to reverse such rulings.

## C.   The Magistrate Properly Upheld Privilege on the July 2003 Letter

### 1.   The May 13 Letter Is Irrelevant, Inadmissible, and Provides No New Information

While styled as a "motion for review," DC also attempts to use it to further oppose defendants' pending anti-SLAPP motion, which should soon put an end to DC's frivolous claims.  Mot. at 13-14.  DC hypes the May 13 Letter as somehow refuting the anti-SLAPP motion or supporting the baseless allegations in DC's complaint.  It plainly does neither.  DC's complaint alleges as follows:

> 77.   *In or around August 2002*, as Marks was finalizing [Joanne and Laura] Siegels' revisions to the long-form document, Toberoff contacted Marks again regarding the Siegel-DC Comics Agreement. …. *On August 8, 2002*, Toberoff conveyed an offer to Marks for presentation to the Siegels, which Marks said he would convey.
> 78.   Upon information and belief, *Toberoff's offer stated that he had found a billionaire investor willing to purchase the Siegel Heirs' Superman rights*.  Toberoff claimed the investor would give the Siegel Heirs $15 million cash up front, plus generous royalty and "back-end" rights on any properties developed, including a new Superman motion picture
> 79.   Upon information and belief, although *Marks conveyed Toberoff's offer to the Siegels*, he advised them that they had already reached a binding agreement with DC Comics.  Nonetheless, as a result of Toberoff's fraudulent inducements, the Siegel Heirs stated that they would repudiate their agreement with DC Comics and accept Toberoff's offer. ….
> 80.   *On or around September 21, 2002, based on Toberoff's inducements* and other acts of interference described above, the Siegel Heirs sent a letter to DC Comics repudiating the Siegel-DC Comics Agreement. ….

FAC, ¶ 77-78.  DC's baseless Fifth Claim for Relief, for interference with economic advantage (FAC, ¶¶ 180-186) alleges that Mr. Toberoff, in an August 2002 phone call with Kevin Marks, fraudulently claimed he had a "billionaire investor" for Joanne and Laura Siegel's Superman rights, and that this supposedly "induced" them to repudiate a purported settlement agreement with DC on September 21, 2002.

As set forth in detail in defendants' Anti-SLAPP motion (Docket No. 145-1 at 7:1-9:20, 22:4-24:2; No. 196 at 2:15-3:6, 4:3-6:3), this contradicts all of the *evidence*

in DC's and its counsel's possession.  **First**, Joanne Siegel had made clear in a May

9, 2002 letter to Time Warner that her negotiations with DC were dead.  Docket No.

145-5, Ex. O ("After four years we have no deal and this contract makes an

agreement impossible.").  This Court held that the May 9, 2002 letter confirmed the

Siegel Heirs had "clearly and unequivocally" rejected DC's proposals. *Siegel*, 542 F.

Supp. 2d at 1139.  DC's so-called "prospective economic advantage" was at an end,

long before Mr. Toberoff had any communication with the Siegel Heirs or any

substantive communication with their then-counsel, Kevin Marks.  **Second**, there was

no mention of a "billionaire investor" in Mr. Toberoff's August 2002 conversation

with Mr. Marks, in which the talent agent, Ari Emanuel [not a mysterious

"billionaire"] offered to purchase the Siegel Heirs' rights (Docket No. 196-2, Ex. H at

166:6-170:24 (testimony of Kevin Marks), Ex. E at 98:25-104:14 (testimony of Marc

Toberoff); Docket No. 196-3 (further testimony of Kevin Marks)).  **Third**, Mr.

Toberoff had no further contact with Mr. Marks and no direct contact with the Siegel

Heirs until after they had officially terminated all negotiations with DC, and

terminated Mr. Marks by letters dated September 21, 2002.  *See* Docket No. 145, Ex.

R at 105:24-106:23 (testimony of Marc Toberoff); Docket No. 196-3, Ex. A at

169:23-170:12, 171:14-21, 172:14- 17, 174:17-21 (testimony of Kevin Marks);

Docket No. 196-2, Exs. E at 106:1-107:7 (testimony of Marc Toberoff), Ex. F at

33:17-34:1, 41:1-3 (testimony of Joanne Siegel), Ex. G at 17:6-8, 261:17-262:7

(testimony of Laura Siegel).

Thus the record evidence, ignored or undisputed by DC and its counsel,

established that Mr. Toberoff did not and could not have caused the Siegel Heirs to

end negotiations with DC.  As such, DC's Fifth Claim has no likelihood of success

on the merits and must be dismissed pursuant to the anti-SLAPP statute.

DC nonetheless hypes the May 13 Letter as a "stunning," "recent revelation"

(Mot. at 13, 17), when it is actually irrelevant to DC's claims and has no bearing on

defendants' pending anti-SLAPP motion.  DC misleadingly conflates Michael Siegel

with the defined "Siegel Heirs" – Joanne Siegel and Laura Siegel Larson (FAC, ¶ 66) – in the hope of confusing the Court.  The May 13 Letter does not address any offer to the Siegel Heirs, but rather an offer to "buy out my [Michael Siegel's] share of the copyright."  Seto Decl., Ex. B.  There is no reference whatsoever in the letter to any offer to Joanne Siegel and Laura Siegel Larson.[7]

Moreover, Defendants openly addressed DC's trumped-up mysterious "billionaire" claim in opposition to DC's motion to compel, and noted that DC itself had long ago identified the "investor" as Mr. Emanuel:

> Lastly, DC's hyperbolic statement that "[t]he Siegel defendants tried for years to secure Michael Siegel's rights for themselves or for mysterious unnamed 'investors'" is unsupported.  The documentary evidence DC proffers shows only that, in or before June 2003, Toberoff made an offer on behalf of an investor to purchase Michael Siegel's interest, and that negotiations continued, off and on, for eighteen months until January 2005.  Also, far from being "mysterious" or "unnamed," DC previously identified that "investor" as Ari Emanuel.

Docket No. 160 at 70:2-71:3 (internal citations omitted).  Defendants likewise pointed out in their anti-SLAPP motion that the August 2002 offer to the Siegels was made by Mr. Emanuel, as testified to by Mssrs. Toberoff  and Marks in 2006  *See* Docket No. 145 at 8:12-28; No. 196-2, Ex. E at 103:8-9 ("Q: Was there an offer by Mr. Emanuel for $15 million?  A:  Yes."), Docket No. 145-6, Ex. R at 168:2-169:5.

Moreover, the letter is pure inadmissible hearsay under F.R.E. 801(c), as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  The letter does not fall within any of F.R.E. 803's hearsay exceptions.  Michael Siegel is deceased and thus unavailable; however, the letter also does not fall within any of the "unavailability" exceptions of F.R.E. 804 either (*e.g.,* former testimony).  DC cannot use inadmissible evidence to defend against an anti-SLAPP motion.  *See Tuchscher*

---

[7] The Timeline's bogus reference to a supposed representation by Mr. Toberoff to Mr. Marks of a "billionaire investor" has a very obvious explanation – the Timeline author, who mentions and had access to Michael Siegel's May 13 Letter, freely adapted it to support his conspiratorial Timeline "hit piece" against Mr. Toberoff.

DEFENDANTS' OPPOSITION TO F.R.C.P. 72 MOTION FOR REVIEW

*Development Enterprises, Inc. v. San Diego Unified Port Dist.*, 106 Cal. App. 4th 1219, 1236 (2003) (opposition to anti-SLAPP motion must be based on "competent and admissible evidence"); *Evans v. Unkow*, 38 Cal. App. 4th 1490, 1497 (Cal. App. 1st Dist. 1995) ("An assessment of the probability of prevailing on the claim [pursuant to the anti-SLAPP law] looks to trial, and the evidence that will be presented at that time. Such evidence must be admissible.") (citations omitted).

DC nonetheless complains that "Defendants refused to produce the document or even log it." Mot. at 13. DC's complaint is perplexing. Magistrate Zarefsky ordered that "Defendants shall either (a) produce it to Plaintiff; or (b) submit a verified further response to Plaintiff indicating that it does exist." Order at 12. Defendants did not claim the letter was privileged, and Laura Siegel timely produced the letter in accordance with the Order, and without burdening this Court or the Magistrate with further motion practice.

### 2. Magistrate Zarefsky Correctly Held That DC Is Not Entitled to Any Alleged July 2003 Letter

DC then conflates two separate alleged letters – a July 5, 2003 letter from Laura Siegel to Michael Siegel, which does not exist but is cited in the anonymous defamatory "Timeline" (the "Alleged July 5 Letter"), and a July 11, 2003 letter which has been repeatedly held to be privileged (the "July 11 Letter"). Mot. at 15-16.

July 11, 2003 Letter: As Magistrate Zarefsky stated, "the record establishes that [defendants] asserted privilege as to the letter during the prior litigation, a designation that was upheld by the Court." Order at 11. DC does not even attempt to argue "clear error" as to this document.

DC falsely contends that there was no prior ruling as to this document, when, in fact, DC *unsuccessfully* challenged Defendants' privilege assertion as to the July 11 Letter on no fewer than *five* separate occasions. *See* Docket No. 160 at 66:10-68:14; *see also* Kline Decl., Ex. TT, ¶ 9; Toberoff Decl., Ex. B, ¶ 3; Kline Decl., Ex. UU; Toberoff Decl., Ex. C at 20:15-22:26; Toberoff Decl., Ex. D, ¶¶ 48-51; Toberoff Decl., Ex. G at 5; Kline Decl., Ex. VV, ¶¶ 6-7; Toberoff Decl., Ex. I at 1, 4.

DEFENDANTS' OPPOSITION TO F.R.C.P. 72 MOTION FOR REVIEW

On September 26, 2008, Judge Larson rejected DC's repeated challenges to "the propriety of the invocation of privilege contained in prior privilege logs," and attempt to compel the July 11 Letter, and specifically upheld the "privilege log entries … in Mr. Toberoff's May 21, 2007 declaration."  Toberoff Decl., Ex. H at 5.  *See also id.*, Ex. I at 4.

DC misrepresents this record to the Court.  This matter was long ago disposed of, and "Plaintiff points to nothing to demonstrate that the prior ruling was incorrect; Plaintiff simply wants to see the document still.  The Court sees no basis for re-visiting the prior decision."  Order at 11.  DC has presented no new information, and it must not be permitted or encouraged to use this action to re-litigate every decision that went against it in *Siegel* and here, before Magistrate Zarefsky.

July 5, 2003 Letter:  As Defendants explained, this letter does not exist.  DC claims this letter exists based solely on a passing reference in the unreliable anonymous Timeline (Mot. at 15).  As Defendants pointed out, the Timeline describes numerous documents that do not exist, including the July 5 Letter:

> *E.g.,* a purported (1) September-October 2003 letter with Ari Emanuel; (2) December 16, 2002 letter from Marc Toberoff and Ari Emanuel to Joanne Siegel and Laura Siegel Larson; and (3) July 5, 2003 letter from Laura Siegel to Michael Siegel.  As Defendants informed DC, they were unable to identify a document that matched either (1), (2) (although there was a December 16, 2002 letter from Marc Toberoff to Ari Emanuel, Joanne Siegel, and Laura Siegel Larson that was long ago produced to DC) or (3).

Docket No. 160 at 71-72, n.26.  DC oddly dismisses this as a "footnote" (Mot. at 15).

Tellingly, while DC presents the inadmissible Timeline's short purported description of the Alleged July 5 Letter as fact (*see* Mot. at 15), it offers no support for it.  In reality, the anonymous Timeline's description – that Mr. Toberoff "has NOT told [the Siegel Heirs] he is about to enter into the PPC agreement" – makes no sense and does not relate to DC's allegations.  The "PPC agreement" with the Shuster Heirs was entered into in **2001**.  FAC, ¶¶ 60.  DC fails to note that the Siegels first contacted Mr. Toberoff for legal representation in October **2002,** based on the Shusters' recommendation.  Docket No. 145-2, Ex. B at 107:8-24.

DEFENDANTS' OPPOSITION TO F.R.C.P. 72 MOTION FOR REVIEW

### D.   The Magistrate Properly Upheld the Format of Defendants' Privilege Logs

Defendants' privilege logs used the same format approved in the related *Siegel* action and were properly upheld here.  *See* Toberoff Decl., Ex. O at 5 ("[B]y providing this log, the Plaintiffs have sufficiently asserted the attorney-client privilege and the work product doctrine.").  DC attempts to claim that the upholding of Defendants' privilege logs was "clearly erroneous or contrary to law" when, as DC itself later concedes, the logs follow "a less detailed format [that] was found adequate in *Dole v. Melonas*, 889 F.2d 885 (9th Cir. 1989) and *In re Grand Jury Investigation*, 974 F.2d 1068 (9th Cir. 1992)."  Mot. at 19:21-23.[8]  This concession alone is sufficient to deny DC's motion:  upholding privilege logs that follow a format approved by the Ninth Circuit cannot be "clearly erroneous."  The format used by Defendants is also the format suggested by W. Schwarzer, W. Tashima, and J. Wagstaffe, *Federal Civil Procedure Before Trial*, Form 11:A (Rutter 2006).

Michael Siegel Documents:  DC states that it intends "to move to compel production of Michael Siegel Documents," but claims "the issues will only be best framed if defendants update their log entries."  Mot. at 17:24-28.  DC's desire to buttress yet another overzealous motion does not support its claim of "clear error."

Subject Matter/Authors and Recipient:  As stated above, the format of Defendants' logs were upheld by the Ninth Circuit.  *Dole,* 889 F.2d 885; *In re Grand Jury Investigation*, 974 F.2d at 1071.  DC proceeds to misleadingly distort the Order, claiming that Magistrate Zarefsky "agreed defendants' logs lack meaningful detail, but erroneously concluded that it was not possible to include more detail without disclosing privileged information."  Mot. at 19.  This is false.  *See* Order at 13.

DC's argument that the format it requests is not "unduly burdensome" is

---

[8] The district court cases cited by DC (*Dominguez v. Schawarzenegger*, 2010 WL 3341038 (N.D. Cal. Aug. 25, 2010); *Parrick v. FedEx Grounds Package Sys.*, 2010 WL 2854314 (D. Mont. July 19, 2010); *Miller v. Pancucci*, 141 F.R.D. 292, 302 (C.D. Cal. 1992)), where such information was either voluntarily provided or required under the specific facts of the case, cannot establish that approval of logs approved by the Ninth Circuit was "clear error."

1   hardly the basis for "clear error."  As Magistrate Zarefsky held there is "no strong

2   reason for requiring Defendants to recharacterize over 2,000 documents."  Order at

3   13.  This is especially so because most of Defendants' log entries involve (a)

4   attorneys representing the same client, (b) clients represented by the same attorneys,

5   or (c) jointly-interested attorneys/clients.  The basis for privilege is clear.

6       DC vaguely argues that the logs "blur the distinction" between Toberoff's

7   supposed "different roles as an attorney … and businessman."  Mot. at 18.  However,

8   the overwhelming majority of logged communications between Mr. Toberoff and the

9   Siegels/Shusters relate to their legal claims regarding their statutory terminations and

10  their ongoing litigation of their rights under the Copyright Act.  The remaining

11  communications relate to ancillary legal matters.  DC omits that to the extent there

12  are documents regarding any old "business arrangements" with the Heirs (*e.g.*, the

13  PPC Agreement and the IP Worldwide Agreement), such documents were long ago

14  ***produced*** voluntarily in *Siegel*.  *See* Docket No. 145-1 at 10-11, 24; No. 146-1 at 18-

15  20, 21-22.  DC's attempt to use Defendants' voluntary production of non-privileged

16  communications to pry into privileged communications cannot support any finding of

17  "clear error" as to Magistrate Zarefsky's ruling.

18      Lastly, DC's argument that the format of the privilege logs "prevent[s] DC

19  from testing [Defendants'] assertion of privilege" (Mot. at 17) is unpersuasive as

20  demonstrated by DC's past, current, and contemplated future motions, in which DC

21  repeatedly attempts to interfere and intrude upon the Heirs' relationship with their

22  attorney by challenging Defendants' assertion of privilege.

23  **III.   CONCLUSION**

24      For the reasons stated above, DC's motion should be denied.

25  ///

26  ///

27  ///

28  ///

DEFENDANTS' OPPOSITION TO F.R.C.P. 72 MOTION FOR REVIEW

1

2   Dated:  May 2, 2011                    RESPECTFULLY SUBMITTED,

3
                                           Marc Toberoff
4

5                                          TOBEROFF & ASSOCIATES, P.C.
                                           Attorneys for Defendants-Petitioners,
6                                          Mark Warren Peary, as personal
                                           representative of the Estate of Joseph
7                                          Shuster, Jean Adele Peavy, and Laura
                                           Siegel Larson
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO F.R.C.P. 72 MOTION FOR REVIEW