DANIEL M. PETROCELLI (S.B. #097802)
  dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
  mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
  cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067-6035
Telephone:  (310) 553-6700
Facsimile:   (310) 246-6779

PATRICK T. PERKINS (admitted *pro hac vice*)
  pperkins@ptplaw.com
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, NY 10516
Telephone:  (845) 265-2820
Facsimile:   (845) 265-2819

Attorneys for Plaintiff DC Comics

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DC COMICS,<br><br>　　　　　Plaintiff,<br><br>　　　v.<br><br>PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, an individual, JOANNE SIEGEL, an individual, LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive,<br><br>　　　　　Defendants. | Case No. CV 10-3633 ODW (RZx)<br><br>**DC COMICS' REPLY IN SUPPORT OF MOTION FOR REVIEW OF MAGISTRATE'S ORDER ON PLAINTIFF'S MOTION TO COMPEL PURSUANT TO FED. R. CIV. P. 72(A) AND L.R. 72-2.1**<br><br>Hon. Otis D. Wright II<br><br>**Hearing Date**: May 23, 2011<br>**Hearing Time**: 1:30 p.m.<br>**Courtroom**:　　11 |

**TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................... 1

II.  DEFENDANTS' CONSENT AGREEMENTS MUST BE PRODUCED ................................................................................................. 1

   A.  Defendants' Consent Agreements Are Unlawful And Discoverable ........................................................................................ 2

   B.  Defendants' Own Authorities Confirm That The "Law of the Case" Doctrine Does Not Apply Across Different Cases ................... 5

   C.  The 2008 Consent Agreement Cannot Be Shielded Because Its Existence Was Disclosed In Mediation ............................................. 7

   D.  There Is No Basis For Deeming An Agreement Regarding Disposition Of Parties' Copyright Interests Privileged ...................... 8

III. DEFENDANTS MUST PRODUCE MICHAEL SIEGEL LETTERS ........ 10

IV.  DEFENDANTS MUST AMEND THEIR SPARSE PRIVILEGE LOGS ............................................................................................................ 12

# TABLE OF AUTHORITIES

## CASES

*Ariz. v. Cal.*,
  460 U.S. 605 (1983) ................................................................................. 6

*Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*,
  1996 WL 71507 (S.D.N.Y. Feb. 20, 1996) ............................................. 9

*Becker v. Tidewater, Inc.*,
  586 F.3d 358 (5th Cir. 2009) .................................................................. 9

*Bourne Co. v. MPL Commc'ns, Inc.*,
  675 F. Supp. 859 (S.D.N.Y. 1987) ......................................................... 4

*Carmona v. Carmona*,
  603 F.3d 1041 (9th Cir. 2010) ................................................................ 5

*Carney v. Am. Univ.*,
  151 F.3d 1090 (D.C. Cir. 1998) ............................................................. 7

*Casey v. Planned Parenthood*,
  14 F.3d 848 (3d Cir. 1994) ..................................................................... 6

*Clarke v. Am. Commerce Nat'l Bank*,
  974 F.2d 127 (9th Cir. 1992) ................................................................ 12

*Disimone v. Browner*,
  121 F.3d 1262 (9th Cir. 1997) ................................................................ 7

*Energy Capital Corp. v. U.S.*,
  45 Fed. Cl. 481 (Fed. Cl. 2000) .............................................................. 9

*Hoot Winc, LLC v. RSM McGladrey Fin. Process Outsourcing, LLC*,
  2009 WL 3857425 (S.D. Cal. Nov. 16, 2009) ........................................ 9

*In re Grand Jury Proceedings*,
  616 F.3d 1172 (10th Cir. 2010) .............................................................. 8

*In re Oracle Sec. Litig.*,
  136 F.R.D. 639 (N.D. Cal. 1991) ........................................................... 9

*Jacada (Europe), Ltd. v. Int'l Mktg. Strategies, Inc.*,
  401 F.3d 701 (6th Cir. 2005) .................................................................. 8

*Laforest v. Honeywell Int'l Inc.*,
  2004 WL 1498916 (W.D.N.Y. July 1, 2004) ......................................... 9

*Little Oil Co. v. Atlantic Richfield Co.*,
  852 F.2d 441 (9th Cir. 1988) .................................................................. 6

*Mason v. Texaco*,
  741 F. Supp. 1472 (D. Kan. 1990) ......................................................... 7

*Mendenhall v. NTSB*,
  213 F.3d 464 (9th Cir. 2000) .................................................................. 5

*Milne v. Stephen Slesinger, Inc.*,
  430 F.3d 1036 (9th Cir. 2005) ........................................................... 4, 5

*Montgomery v. Leftwich, Moore & Douglas*,
  161 F.R.D. 224 (D.D.C. 1995) ............................................................... 9

...

*Moss v. Crawford & Co.*,
  201 F.R.D. 398 (W.D. Penn. 2000) ........................................................................... 7
*Munoz v. J.C. Penney Corp., Inc.*,
  2009 U.S. Dist. LEXIS 36362 (C.D. Cal. Apr. 9, 2009) ........................................... 7
*Pem-Am., Inc. v. Sunham Home Fashions, LLC*,
  2007 WL 3226156 (S.D.N.Y. Oct. 31, 2007) ........................................................... 9
*Quinonez v. USA Waste of Cal., Inc.*,
  2008 WL 917125 (N.D. Cal. Apr. 3, 2008) ............................................................... 9
*Rodriguez v. Gen. Dynamics Armament & Tech. Prods., Inc.*,
  2010 WL 1438918 (D. Haw. Apr. 12, 2010) ............................................................ 9
*Sovak v. Chugai Pharm. Co.*,
  280 F.3d 1266 (9th Cir. 2002) ................................................................................... 8
*Sullivan v. Little Hunting Park, Inc.*,
  396 U.S. 229 (1969) ................................................................................................... 5
*Survivor Media, Inc. v. Survivor Prods.*,
  406 F.3d 625 (9th Cir. 2005) ................................................................................... 11
*Thomas & Marker Constr., Co. v. Wal-Mart Stores, Inc.*,
  2008 WL 3200642 (S.D. Ohio Aug. 6, 2008) ........................................................... 9
*Thomas v. Bible*,
  983 F.2d 152 (9th Cir. 1993) ................................................................................. 5, 7
*U.S. v. Alexander*,
  106 F.3d 874 (9th Cir. 1997) ..................................................................................... 5
*U.S. v. Hardesty*,
  977 F.2d 1347 (9th Cir. 1992) ................................................................................... 7
*U.S. v. Martin*,
  278 F.3d 988 (9th Cir. 2002) ..................................................................................... 8
*U.S. v. Musick*,
  534 F. Supp. 954 (N.D. Cal. 1982) ............................................................................ 6
*U.S. v. Osborn*,
  561 F.2d 1334 (9th Cir. 1977) ................................................................................. 11
*U.S. v. Park Place Assocs., Ltd.*,
  563 F.3d 907 (9th Cir. 2009) ..................................................................................... 6
*Westport Ins. Corp. v. Wilkes & McHugh, P.A.*,
  264 F.R.D. 368 (W.D. Tenn. 2009) ........................................................................... 9

**STATUTES**

17 U.S.C. § 304(c)(6)(D) ............................................................................... 2, 3, 5

**RULES**

FED. R. CIV. P. 26(b) ........................................................................................... 11
FED. R. EVID. 801 ............................................................................................... 12
FED. R. EVID. 803 ............................................................................................... 12

## OTHER AUTHORITIES

3 WILLIAM PATRY, PATRY ON COPYRIGHT § 7:47 (2009) ......................................... 5

FED. R. CIV. P. 26(b)(5), Advisory Committee Note .............................................. 12

H.R. REP. NO. 94-1476, 94TH CONG., 2D SESS. (1976) ............................................ 5

SECOND SUPP. REG.'S REP. ON GEN. REV'N OF U.S. COPYRIGHT
    LAW, 94TH CONG. 307 (1975) ............................................................................ 5

W. SCHWARZER ET AL., FEDERAL CIVIL PROCEDURE BEFORE TRIAL §
    11:1919 (Rutter 2011) ....................................................................................... 12

## I. INTRODUCTION

Despite railing for pages that DC's complaint is without basis and subject to a SLAPP motion, defendants, both in the response to this lawsuit and in opposition to this motion, have been forced to make key concessions concerning several of their business agreements at issue in this case.  Nonetheless, what defendants seek to do in resisting discovery generally—and this motion, specifically—is to prevent disclosure of the remainder of their contracts and conduct that violate DC's rights under federal and state law.  The law does not allow this, and this Court should grant DC's motion for review and order defendants to produce all documents related to their unlawful consent agreements, produce all communications involving Michael Siegel, and amend their privilege logs to include meaningful detail.

## II. DEFENDANTS' CONSENT AGREEMENTS MUST BE PRODUCED.

Stripped of its rhetoric, defendants' brief boils down to a request that the Court trust their assurance that the 2008 consent agreement preventing the Siegel and Shuster heirs from freely settling their claims is not unlawful or unethical and contains no non-privileged terms.  Defendants' admissions in their opposition brief and prior filings in this case demonstrate why their request should be rejected:

- To begin, defendants do not and cannot dispute that Magistrate Zarefsky expressly held that one cannot know whether their 2008 consent agreement was unlawful without actually seeing the document.  Mot. at 8:9-16.
- Defendants do not dispute, indeed, they *admit*, two of their contracts with the Shusters are "void" and violate the Copyright Act.  *Id*. at 7; Opp. at 4:11-22.
- Defendants also do not dispute the issue of the "lawfulness" of their 2008 consent agreement was *never* before Judge Larson, Mot. at 7; Opp. at 12:23-13:2, meaning the Magistrate's deference to him on this point was clear error.
- Defendants also do not dispute that Judge Larson's rulings were not binding under *res judicata* or collateral estoppel, *cf*. Mot. at 5:6-12—and their own cases show that "law of the case" doctrine was misapplied here, *infra* at 5-7.

1 • Defendants also concede the 2008 consent agreement is a contract between the Shusters and Siegels to "jointly conduct settlement negotiations," Mot. at 12—meaning it is *not* a privileged communication, *it is a contract*, and these contractual terms, under binding law, must be disclosed to DC, *infra* at 8-9.

Given these concessions, the Court cannot accept defendants' urging to "move along, there's nothing to see here." The Court should order production of the consent agreement—either to DC, or to the Magistrate for *in camera* review—so DC may pursue full and fair discovery into defendants' misconduct.

**A. Defendants' Consent Agreements Are Unlawful And Discoverable.**

1. Defendants concede the unlawfulness of the consent agreement was *never* before Judge Larson. They argue this is "beside the point," Opp. at 12:26, but it clearly is not. A central basis of the Magistrate's ruling was his mistaken belief that DC "called the [2008 consent] agreement unlawful in *Siegel*, but did not persuade Judge Larson of that fact." Docket No. 209 at 8:1-10. This clear record error, which defendants do not dispute, is reason alone to reverse the Magistrate's ruling.

2. Defendants' 2001 and 2003 Pacific Pictures agreements state the Shusters "transfer and assign to the Venture their rights, title and interests" in Superman, and that "in the event of termination of the Venture for any reason, all Rights, property or assets of the Venture will be held fifty percent (50%) by the [Shusters] and fifty percent (50%) by [Pacific Pictures]." Docket Nos. 182-12 at 139, 141; 182-13 at 144. The agreements provide the Shusters cannot enter into *any* contract regarding those rights "without the express written consent" of Pacific Pictures. *Id.* at 140, 144. In 2004, the Pacific Pictures venture was terminated, thereby transferring 50% of the Shusters' rights to Pacific Pictures in violation of section 304(c)(6)(D) of the Copyright Act. *See* Docket Nos. 181 at 5:17-27; 160 at 11:14-21.

Defendants ask the Court to believe that these agreements do not mean what they plainly say, asserting that "the Pacific Pictures Agreements did not transfer the Shuster Heirs' Termination interest." Opp. at 4:11-2. This ignores the

unambiguous language of the contracts, which "transfer" the Shusters' rights and divide them with Pacific Pictures. Docket Nos. 182-12 at 141; 182-13 at 144.

By way of "explanation," defendants now concede that, "as a matter of law, neither the PPC agreements nor the Shuster Executor could transfer his termination interest prior to the October 26, 2013 termination date" because this would violate section 304(c)(6)(D). Opp. at 4:13-15 (quoting Docket No. 33). In other words, *defendants agree with DC's complaint in this case that the Pacific Pictures agreements are unlawful*, thus conceding liability, in part, for DC's third and sixth claims for relief, which seek a judicial declaration informing the Shusters and the world that the copyright agreements Toberoff's companies negotiated with them to restrict their freedom of choice are unlawful and invalid. Docket No. 185 at 5:1-3.

3. DC is entitled to a similar declaration concerning the 2008 consent agreement, FAC ¶ 172, which defendants hope to keep shrouded in mystery. To justify this secrecy, defendants ask the Court to "trust them; this agreement, unlike all of their others, is not unlawful." All of the evidence shows otherwise:

- Defendants admit the 2008 consent agreement requires "the consent of the Siegels" before the Shusters can enter into "a settlement of their termination rights with DC." Docket No. 160 at 63; *see also* Docket No. 160 at 24 n.7.
- They do not dispute the consent provision *remains in effect to this day*, even though the parties' mediation ended years ago and the statutory exclusivity period runs until 2013. *See* Docket Nos. 182 ¶ 53, 160 at 50-51, 147-1 at 2.
- Defendants' other agreements contain improper rights-tying provisions. The 2002 IP Worldwide contract, for example, provides the Siegels cannot "transfer, assign, license or in any manner encumber the[ir] Rights," without Toberoff's consent. Docket No. 182-35 at 649.
- And while defendants now claim (with no support) that the "Consent Agreement does not require consent of the Heirs' attorney to any settlement with DC," Opp. at 7:17-18, they notably do not state whether the agreement,

like the predecessor Pacific Pictures and IP Worldwide agreements, requires the consent of Toberoff's various alter-ego entertainment companies, *cf. id*.

The truth is that the Toberoff defendants have repeatedly induced the Siegel and Shuster heirs to enter into agreements that prevent them from freely settling their copyright claims with DC. The 2008 agreement appears to be the most recent, flagrant, and improper of all these agreements—it ties the hands of both families, violates DC's period of exclusivity with the Shusters under section 304(c)(6)(D), flouts California public policy, and makes settlement of these cases impossible. The simple solution is for defendants to produce the agreement to DC or to submit it to the Magistrate; then the parties can address its legitimacy in discovery.

4. Defendants contend that even though their agreements violate the Copyright Act, section 304(c)(6)(D) "provides no rights or standing to DC" to enforce it. Opp. at 5:18-19. Not so. Defendants rely on *Bourne Co. v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 864 (S.D.N.Y. 1987), which (aside from being outdated and non-binding), confirms that section 304(c)(6)(D) gives DC "a preferred competitive position." *Bourne* recognized that an agreement purporting to assign a copyright grantor's interests to a third party during the statutory exclusivity period was "invalid," *id.* at 861, and while the court rejected the plaintiff's *damages* claim, it did not foreclose a declaratory relief claim or suggest that a copyright grantee, like DC, is powerless to protect its competitive advantage, *id.* at 865-66. To the contrary, the court emphasized that it had jurisdiction to consider the plaintiff's claim for "interference with Bourne's statutory right of first refusal." *Id.* at 865-67; *see* Docket No. 185 at 9:17-10:4.

Defendants mischaracterize the Ninth Circuit's decision in *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005), arguing that it "merely states that 'section 304(c)(6)(D) … give[s] the original grantee a competitive advantage over third parties.'" Opp. at 6:21-22. Defendants omit the portion of *Milne* that expressly likened this competitive advantage to a "right of 'first refusal.'" 430 F.3d

at 1047. Defendants also ignore the extensive legislative history of section 304(c)(6)(D), on which *Milne* relied, which described this as a "right" running in DC's favor as well.[1] Defendants' claim that Congress did not "intend[] to create" a right on which DC could sue, Opp. at 6:4-5, is belied by both *Milne* and this legislative history—both of which say the statute afforded DC a right "in the nature of a right of 'first refusal.'" 430 F.3d at 1047. Where a statute's text, legislative history, and purpose establish such a right, the rights-holder necessarily has standing to enforce it. Docket No. 185 at 10:25-11:9 (citing, *e.g.*, *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 239 (1969) ("The existence of a statutory right implies the existence of all necessary and appropriate remedies.")). And California law, under which DC presses several of its claims, recognizes standing to sue for such negotiation rights as well. Docket No. 185 at 13:19-14:28 (collecting cases).

### B. Defendants' Own Authorities Confirm That The "Law of the Case" Doctrine Does Not Apply Across Different Cases.

Defendants do not dispute that collateral estoppel and *res judicata* have no application here. Mot. at 5. As explained in DC's motion, these two doctrines are the *only* mechanisms by which a ruling in one action is binding in another case— "law of the case" has no application across two cases. *Id.* at 5:16-6:21.[2]

---

[1] *E.g.*, H.R. REP. NO. 94-1476, 94TH CONG. 127 (1976); *see also* SECOND SUPP. REG.'S REP. ON GEN. REV'N OF U.S. COPYRIGHT LAW, 94TH CONG. 307 (1975) ("The 'first refusal' exception was one of the compromises on which the delicate balance of [§ 304(c)(6)(D)] rests."); 3 WILLIAM PATRY, PATRY ON COPYRIGHT § 7:47, at 7-104 n.1 (2009) (Congress expressed "hostility toward those who would attempt to offer the grantor a better deal" before a grantee has a chance).

[2] Defendants falsely claim that DC's cases "merely apply [law of the case] in the same case and do not say" that the doctrine applies only to "rulings made in the 'identical case.'" Opp. at 11:13-15. To begin, *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993), held that the law-of-the case doctrine precludes a court "from reconsidering an issue that has already been decided by the same court, or a higher court *in the identical case*." *Carmona v. Carmona*, 603 F.3d 1041, 1052 (9th Cir. 2010), also makes clear: "The law of the case doctrine *only applies* to successive appeals *in the same suit*. Where the suit involves a new party and new claims … *it is only res judicata* … that may apply." *Accord U.S. v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (same quote in *Thomas*); *Mendenhall v. NTSB*, 213 F.3d 464,

Defendants rely on *U.S. v. Park Place Assocs., Ltd.*, 563 F.3d 907 (9th Cir. 2009), which involved a lengthy dispute between the government and a private company. Because it was unclear which body had jurisdiction—the American Arbitration Association, the Federal Circuit, or the Central District of California—various proceedings took place in each forum. Ultimately, the AAA issued an arbitration award to Park Place, and the Central District entered judgment confirming the award. *Id.* at 917-18. On appeal, the government asserted sovereign immunity, and Park Place argued the Ninth Circuit was bound by the Federal Circuit's ruling that the government had waived it. *Id.* The Ninth Circuit disagreed that the Federal Circuit found waiver and did not apply law of the case. *Id.* at 928.

Defendants' reliance on *Park Place* is misplaced. First, *Park Place* involved the *exact same case*—same claims, issues, facts, and parties—brought in different fora by procedural necessity. Second, defendants omit the critical passage from the Ninth Circuit's opinion, stating: "The law of the case doctrine, which posits that 'when a court decides upon a rule of law, that decision should continue to govern the *same issues in subsequent stages in the same case,*' … *applies equally to decisions of coordinate appellate courts*." *Id.* at 925 (emphasis added). This case involves neither "the same case" nor "decisions of coordinate appellate courts." Two different lawsuits, with largely different parties and claims, are at issue here, and there have been no appellate court decisions to which to defer.

Defendants' other cases are equally off point. One recognizes "law of the case is not properly invoked where the case is not the same" and applied the doctrine to an "off-shoot" case that had been severed. *U.S. v. Musick*, 534 F. Supp. 954, 956-57 (N.D. Cal. 1982). The others did *not* apply law of the case or address its application across different cases: *Casey v. Planned Parenthood*, 14 F.3d 848,

---

469 (9th Cir. 2000) (law of the case applies to issues "decided by the same court or a higher court *in the same case*"); *Ariz. v. Cal.*, 460 U.S. 605, 618-19 (1983) (law of the case applies "in subsequent stages *in the same case*"); *Little Oil Co. v. Atlantic Richfield Co.*, 852 F.2d 441, 447 (9th Cir. 1988) (same). (Emphases added.)

856 n.11 (3d Cir. 1994); *Mason v. Texaco*, 741 F. Supp. 1472, 1492 (D. Kan. 1990); *Moss v. Crawford & Co.*, 201 F.R.D. 398, 401 n.1 (W.D. Penn. 2000).

*Disimone v. Browner*, 121 F.3d 1262, 1266-67 (9th Cir. 1997), is also not of any help. Describing the facts as "atypical," the court concluded that collateral estoppel *and* law of the case barred the plaintiff from re-litigating issues that (unlike those here) had been fully and finally adjudicated in a prior action. Given that the court found that collateral estoppel applied, its statements about law of the case were unnecessary dicta, and the court observed, in any event: "Typically the law of the case doctrine is confined to decisions in the same case…." *Id.* at 1266. At best for defendants, *Disimone* represents a conflict in the Ninth Circuit, including with cases that precede it like *Thomas*. *Supra* n.2. It is well settled that when two Ninth Circuit panels reach conflicting decisions, "the earlier decision [*i.e.*, *Thomas*] controls." *U.S. v. Hardesty*, 977 F.2d 1347, 1347 (9th Cir. 1992). Defendants offer no response to this rule in their 23-page brief, yet it compels this motion be granted.

### C. The 2008 Consent Agreement Cannot Be Shielded Because Its Existence Was Disclosed In Mediation.

Defendants do not dispute that federal law governing settlement talks allows disclosure and use of the consent agreement. *Cf.* Mot. at 3:17-4:12. Nor do they dispute that the same result is compelled under California law. *Id.* Indeed, they concede, as this Court recognized in *Munoz v. J.C. Penney Corp., Inc.*, 2009 U.S. Dist. LEXIS 36362 (C.D. Cal. Apr. 9, 2009), "F.R.E. 408 permits a party to use a settlement communication as a basis for removal," Opp. at 13:28-14:2—or for any purpose other than to prove liability in the case in which the communication was made. Rule 408 does not restrict DC's ability to prove its claims *in this new case* by adverting to evidence disclosed in *Siegel*. *Carney v. Am. Univ.*, 151 F.3d 1090, 1095-96 (D.C. Cir. 1998); Docket No. 185 at 19:26-21:26.

Nor does the parties' JAMS agreement in *Siegel* permit suppression of the consent agreement. Just the opposite: the agreement expressly invokes the "state

1  and federal rules" permitting DC's use of the consent agreement, providing "[t]his
2  mediation process is to be considered settlement negotiations for the purpose of all
3  state and federal rules protecting disclosures made during such process." Docket
4  No. 185 at 19:9-11.  In any event, the JAMS agreement cannot trump federal law.
5  *See Jacada (Europe), Ltd. v. Int'l Mktg. Strategies, Inc.*, 401 F.3d 701, 710-12 (6th
6  Cir. 2005) ("generic choice-of-law provision[s]" do not "displace the federal
7  [rules]"); *Sovak v. Chugai Pharm. Co.*, 280 F.3d 1266, 1269-70 (9th Cir. 2002).
8      Defendants cannot credibly claim otherwise.  Toberoff drafted the JAMS
9  agreement and never suggested it was intended to supersede the federal and state
10 law it invokes.  Docket No. 160 at 19:18-20:1.  To the contrary, he *added* a
11 reference to California Evidence Code § 1120, which provides that evidence
12 disclosed during mediation "shall not be or become inadmissible or protected from
13 disclosure…." *Id.* at 20:1-4.  The specific paragraphs of the JAMS agreement
14 defendants rely on are of no help either.  They limit disclosure of "oral or written
15 statements made at the Settlement Conference"; *nothing* in the contract bars
16 disclosure of the consent agreement or its drafting, which occurred before and
17 *outside* the *Siegel* mediation and remains in effect to this day.  *Id.* at 19-21:13.

### D. There Is No Basis For Deeming An Agreement Regarding Disposition Of Parties' Copyright Interests Privileged.

20 Setting aside that defendants have waived whatever privilege existed by
21 publicly disclosing the consent agreement's contents, Mot. at 12, there was never
22 any basis for them to characterize all of the contract as privileged.  In order to be
23 privileged, a document must communicate legal advice or analysis.  *U.S. v. Martin*,
24 278 F.3d 988, 999-1000 (9th Cir. 2002).  That an attorney negotiated, drafted, or
25 signed a document does not make it privileged.  *In re Grand Jury Proceedings*, 616
26 F.3d 1172, 1182 (10th Cir. 2010).  Otherwise, parties could shield from disclosure
27 all manner of illegal documents simply by discussing them with an attorney or
28 having him sign them.  This is not the law.  *See id.*

Defendants "characterize[] the Consent Agreement as an agreement between the Siegels and Shusters to jointly conduct settlement negotiations." Docket No. 170 at 4; Opp. at 15:2. Courts regularly order the production of such "joint settlement" and "joint litigation" contracts. In *Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*, 1996 WL 71507, at *4-5 (S.D.N.Y. Feb. 20, 1996), the court held that an agreement where parties "agree to work together" to settle and prosecute a case does not convey legal advice and is not privileged. "At best," such an contract is "akin to a retainer agreement" and "therefore shield[s] some subsequent communications in furtherance of the joint enterprise, but *does not itself attain the level of privileged communication*" itself. *Id.* at *5 (emphasis added).[3] As *Bank Brussels* observes, it is well-established that retainer agreements are not privileged, even though they are "communicated through" an attorney. *Id.*[4]

Similarly, courts have ordered the production of secret, strategic alliances among parties, known sometimes as "Mary Carter agreements." *See Becker v. Tidewater, Inc.*, 586 F.3d 358, 365 n.3 (5th Cir. 2009). Irrespective of the allied parties' intent to keep such joint litigation strategies secret, courts hold these agreements are discoverable. *E.g.*, *Westport Ins. Corp. v. Wilkes & McHugh, P.A.*, 264 F.R.D. 368, 371 (W.D. Tenn. 2009); *Thomas & Marker Constr., Co. v. Wal-Mart Stores, Inc.*, 2008 WL 3200642, at *2 (S.D. Ohio Aug. 6, 2008).[5]

---

[3] *Accord Laforest v. Honeywell Int'l Inc.*, 2004 WL 1498916, at *3-4 (W.D.N.Y. July 1, 2004) (joint defense agreement produced despite claim it "outlined common legal strategy"); *Rodriguez v. Gen. Dynamics Armament & Tech. Prods., Inc.*, 2010 WL 1438918, at *1-2 (D. Haw. Apr. 12, 2010) (same); *Pem-Am., Inc. v. Sunham Home Fashions, LLC*, 2007 WL 3226156, at *2 (S.D.N.Y. Oct. 31, 2007) (same).

[4] *Accord Hoot Winc, LLC v. RSM McGladrey Fin. Process Outsourcing, LLC*, 2009 WL 3857425, at *2 (S.D. Cal. Nov. 16, 2009) ("Ninth Circuit has repeatedly held retainer agreements are not protected by the attorney-client privilege or work product doctrine"); *In re Oracle Sec. Litig.*, 136 F.R.D. 639, 645 (N.D. Cal. 1991).

[5] *Accord Quinonez v. USA Waste of Cal., Inc.*, 2008 WL 917125, at *1 (N.D. Cal. Apr. 3, 2008) (settlement agreement not privileged); *Energy Capital Corp. v. U.S.*, 45 Fed. Cl. 481, 485 (Fed. Cl. 2000) (drafting of business agreements "concerns business—not legal—matters and therefore is not privileged"); *Montgomery v. Leftwich, Moore & Douglas*, 161 F.R.D. 224, 227 (D.D.C. 1995).

**III.   DEFENDANTS MUST PRODUCE MICHAEL SIEGEL LETTERS.**

There is no excuse for defendants' refusal to produce the July 2003 correspondence between Laura Siegel Larson and Michael Siegel:

1. Defendants' suppression of the May 13, 2003, letter casts doubt on the veracity of their claims regarding the completeness of their production. Defendants contend their withholding of the May 13 letter until April 2011 is irrelevant because they ultimately complied with the Magistrate's order to produce it, but this ignores they *actively suppressed the letter for six years* by failing to produce or log it when:

- it was clearly called for in *2005* by DC's discovery requests in *Siegel*;
- it was neither produced nor identified in any privilege log in *Siegel*;
- although identified in the Toberoff Timeline, Toberoff's court-ordered sworn declaration (from 2007) logging the Timeline documents fails to log it;
- it was responsive to discovery due in this case in December 2010; and
- DC expressly raised its omission in conferences in December 2010, and in its motion to compel filed in January 2011, *see* Docket No. 236 at 1:14-2:10.

2. In light of defendants' suppression, there is no basis to accept their claim that the July 2003 correspondence does not exist. The recently produced May 13 letter poses a dozen questions to Ms. Larson and clearly anticipates and requests a response. Docket No. 225-4. The Toberoff Timeline states that Ms. Larson wrote a reply in July 2003. FAC Ex. A at 65-66. While defendants assert the Timeline is false or untrustworthy, the revelation of the May 13 letter—which the Timeline accurately disclosed and summarized, Docket No. 230 at 9-10—proves otherwise.

By all accounts, including the sworn declaration of a Warner Bros. attorney who saw it, the "July 11, 2003," letter exists and is a non-privileged communication from Ms. Larson to her half-brother concerning "the sale of Michael Siegel's Superman interest to Mr. Toberoff's 'investor.'" Case No. CV 04-8400, Docket No. 295-2 ¶¶ 6-7. Defendants have no answer to this, or to DC's simple question: Do the two fax entries on defendants' logs dated July 11, 2003, correspond to this

1  letter?  *See U.S. v. Osborn*, 561 F.2d 1334, 1338 (9th Cir. 1977) (sending non-
2  privileged correspondence to attorney does not immunize it from production).  As
3  for the "July 5, 2003," letter the Timeline identifies, defendants never denied its
4  existence during meet-and-confer discussions or described their supposed method
5  for searching for it.  *See* Mot. at 15:11-20.  Defendants should be ordered to review
6  their files and produce all Michael Siegel-related communications from July 2003.

7    3.  Judge Larson *never* ruled on these issues; the Timeline, the May 13 letter,
8  and the "July 5" letter (first identified in the Timeline) were never before him.  Nor
9  did Judge Larson rule on the privileged status of the "July 11, 2003" letter or
10  defendants' two privilege log entries—defendants did not even "assert[] privilege
11  as to the letter" itself (as opposed to the fax transmittal).  *See* Mot. at 15:11-16:10;
12  Docket No. 171 at 3:6-18; Case No. CV-04-8400, Docket Nos. 374, 386.

13    4.  Defendants' claim that DC is misreading the May 13 letter is belied by the
14  plain language of the letter.  The letter's recounting of Toberoff's fraudulent offer
15  regarding a "mysterious billionaire" who would help the Siegels produce a
16  Superman movie is not limited to Michael Siegel—it clearly refers to "*all members
17  of the Siegel interest*" and their collective rights "*in the Superman copyright*," and
18  concludes: "When *you* [*i.e.*, Ms. Larson] signed with Marc the billionaire investor
19  invested elsewhere…."  Docket No. 225-4 at 3 (emphasis added).  The May 13
20  letter establishes a pattern and practice by Toberoff and his business partner of
21  falsely claiming to have a "billionaire investor" willing to pay the Siegels for their
22  rights and to help "make a movie" that would compete with Warner Bros.—which
23  is *precisely* what the Timeline author asserts Toberoff did.  Defendants' claim that
24  the factual claims in their SLAPP briefing are "undisputed," Opp. at 17:22, is flatly
25  false, as set forth in DC's SLAPP opposition papers.  Docket Nos. 181, 184-86.

26    Defendants' contention that the May 13 letter is "inadmissible hearsay" is not
27  well-taken either.  Admissibility is a question for trial, not discovery.  *See* FED. R.
28  CIV. P. 26(b)(1); *Survivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 635 (9th

Cir. 2005). In any event, the May 13 letter is admissible. It contains an admission by a party opponent (Toberoff), *see* FED. R. EVID. 801(d)(2), and Michael Siegel's recounting of that admission is relevant to prove notice, a non-hearsay purpose, *see* FED. R. EVID. 801(c), as well as under other exceptions, *e.g.*, *id.* 803(3), 803(21).

## IV. DEFENDANTS MUST AMEND THEIR SPARSE PRIVILEGE LOGS.

Defendants admit their privilege logs make it impossible to tell, for example, which communications relate to the consent agreement and when one log entry corresponds to an e-mail chain involving non-lawyers (meaning some or all of the chain may not be privileged). *See* Docket Nos. 162-9 ¶ 5; 162-11 ¶ 3. Defendants ignore that the very section of the treatise they rely on to justify their logs makes clear that "[l]isting each e-mail separately is crucial where different e-mails in the strand potentially raise different privilege grounds." W. SCHWARZER ET AL., FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 11:1919 (Rutter 2011).

It is irrelevant that other courts have found privilege-log formats similar to defendants' sufficient under the facts of those cases. The only bright-line rule governing privilege logs is that the party asserting privilege must provide enough detail "to enable the other party to evaluate the applicability of the privilege." FED. R. CIV. P. 26(b)(5), Advisory Comm. Note; *see also Clarke v. Am. Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992). Here, Toberoff occupies dual roles as the heirs' attorney and business partner, Mot. at 18:10-20:2, defendants deliberately blur those roles, and have suppressed key evidence. Defendants should be compelled to provide the basic information needed to test their privilege claims.

Dated:       May 9, 2011              Respectfully submitted,
                                      O'MELVENY & MYERS LLP

                                      By: /s/ Daniel M. Petrocelli
                                          Daniel M. Petrocelli
                                          Attorneys for Plaintiff DC Comics

CC1:849177