1  DANIEL M. PETROCELLI (S.B. #097802)
     dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
     mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
     cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA  90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:   (310) 246-6779

7  Attorneys for Plaintiff DC Comics

8  (continued on next page)

9            **UNITED STATES DISTRICT COURT**

10          **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 11  DC COMICS, | Case No. CV 10-3633 ODW (RZx) |
| 12           Plaintiff, | **DISCOVERY MATTER** |
| 13        v. | **JOINT STIPULATION REGARDING DC COMICS' MOTION TO COMPEL THE FURTHER PRODUCTION OF DOCUMENTS (ISSUES 12-14)** |
| 14  PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, an individual, JOANNE SIEGEL, an individual, LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive, | |
| 15 16 17 18 19 | NOTICE OF MOTION AND MOTION, DECLARATION OF JASON H. TOKORO, AND [PROPOSED] ORDER FILED CONCURRENTLY HEREWITH |
| 20           Defendants. | **Judge**:         Hon. Otis D. Wright II |
| 21 | **Magistrate**:   Hon. Ralph Zarefsky |
| 22 | **Hearing Date**:     June 20, 2011 |
| 23 | **Hearing Time**:     10:00 a.m.  **Courtroom**:        540 |
| 24 | **Discovery Cutoff**:  None Set  **Pretrial Conference**:  None Set |
| 25 | **Trial**:              None Set |
| 26 | |
| 27 | |
| 28 | |

(continued from previous page)

PATRICK T. PERKINS (admitted *pro hac vice*)
  pperkins@ptplaw.com
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, NY 10516
Telephone:  (845) 265-2820
Facsimile:    (845) 265-2819

MARC TOBEROFF (S.B. #188547)
  mtoberoff@ipwla.com
NICHOLAS C. WILLIAMSON (S.B. #231124)
  nwilliamson@ipwla.com
KEITH G. ADAMS (S.B. #240497)
  kgadams@ipwla.com
TOBEROFF & ASSOCIATES, P.C.
2049 Century Park East, Suite 2720
Los Angeles, California 90067
Telephone:  (310) 246-3333
Facsimile:    (310) 246-3101

Attorneys for Defendants Mark Warren
Peary, Jean Peavy, Joanne Siegel, and
Laura Siegel Larson

1    Pursuant to Federal Rules of Civil Procedure 26, 34, and 37 and Central

2 District Local Rule 37-2, the parties respectfully submit the following Joint

3 Stipulation Regarding DC Comics' Motion to Compel The Further Production Of

4 Documents (Issues 12-14). Pursuant to Central District Local Rule 37-1, the parties

5 have attempted unsuccessfully to resolve their disputes and therefore respectfully

6 seek the assistance of the Court.

7 Dated:        May 27, 2011                    Respectfully Submitted,

8                                               O'MELVENY & MYERS LLP

9

10                                              By: /s/ Daniel M. Petrocelli

11                                                  Daniel M. Petrocelli
                                                    Attorneys for Plaintiff DC Comics

12 Dated:        May 27, 2011                   Respectfully Submitted,

13                                              TOBEROFF & ASSOCIATES, P.C.

14

15                                              By: /s/ Marc Toberoff

16                                                  Marc Toberoff
                                                    Attorneys for Defendants Joanne
17                                                  Siegel, Laura Siegel Larson, Mark
                                                    Warren Peary, and Jean Adele Peavy
18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

**Page**

3  I.      DC COMICS' INTRODUCTORY STATEMENT .......................................1

4  II.     DEFENDANTS' INTRODUCTORY STATEMENT....................................4

5  III.    DC COMICS' STATEMENT OF ISSUES IN DISPUTE............................6

6          Issue 12: Missing Siegel Correspondence.......................................................6

7          Issue 13: Redactions To The May 13 Letter .............................................12

8          Issue 14: The Shuster And Siegel Retainer Agreements ...........................14

9          A.      Defendants' Redactions To The Shuster And Siegel Retainer

10                 Agreements Appear Overbroad ..........................................................14

11         B.      Defendants Should Produce The Unredacted Versions Of The

12                 Siegel Agreement And Amendment Lodged In Probate Court..........16

13 IV.     DEFENDANTS' STATEMENT OF ISSUES IN DISPUTE ......................18

14         A.      Issue 12: Siegel Correspondence ......................................................18

15                 1.      Factual Background re: Michael Siegel ...................................18

16                 2.      Factual Background re: DC's Discovery....................................21

17                 3.      The Alleged November 2, 2002 Letter.....................................23

18                 4.      DC's False Accusations of Discovery Misconduct.................24

19         B.      Issue 13: Redactions to the May 13 Letter .......................................26

20         C.      Issue 14: Redactions to the Retainer Agreements ............................27

21                 1.      The Temporary Confidential Lodging of Privileged

22                         Material with the Probate Court Does Not Waive

23                         Privilege ...................................................................................27

24                 2.      DC's Motion as to Redactions to the Retainer Agreements

25                         Is Improperly Based on Pure Speculation and Guesswork ......27

26

27

28

JOINT STIPULATION RE: DC'S
MOT. TO COMPEL (ISSUES 12-14)

# I.    DC COMICS' INTRODUCTORY STATEMENT

Defendants' April 18, 2011, document production—made pursuant to the April 11, 2011, order of this Court—exposes several gaps in defendants' document productions that defendants have failed to remedy.

Issue No. 12:  Missing Siegel Correspondence.  DC served document requests on August 17, 2010, seeking all documents concerning the Siegels' purported Superman rights—including the May 13, 2003, letter from Michael Siegel to Laura Siegel Larson discussing Marc Toberoff's scheme to secure a controlling share of those rights.[1]  On December 7, 2010, pursuant to the parties' stipulation, this Court entered an order compelling defendants to produce *all* responsive, non-privileged documents.  Docket No. 133 at 1.  The May 13 letter was clearly responsive and not privileged, yet defendants failed to produce or log it, in violation of the December 7 order.  Following DC's February 7, 2011, motion to compel, this Court issued a *second* order compelling the May 13 letter to be produced (or identified as previously produced or non-existent).  Docket No. 209 at 12:13-16.

Defendants finally produced the May 13 letter on April 18, 2011.  Decl. of Jason H. Tokoro ("Tokoro Decl.") ¶ 2.  Its opening line references a "November 2," 2002, letter from Ms. Larson to Mr. Siegel.  This letter was also responsive to DC's August 2010 requests and the Court's December 7, 2010 order, yet defendants never produced, logged, or even confirmed the existence of this letter.

Prior to filing this motion, we asked defendants to produce the November 2 letter.  Defendants said they are "unable to locate" it.  *Id.* Ex. E. at 18.  However,

---

[1] *E.g.*, Docket No. 161-15 at 163-65 (requesting "All DOCUMENTS relating to":  "the disposition, division, or ownership of any rights in SUPERMAN," (No. 8); "the potential sale, assignment, license, or other disposition of any rights relating to SUPERMAN …, including but not limited to any solicitation, offer…," (No. 11); and "any solicitation, offer, or option from any DEFENDANT regarding the purported rights of YOU or the SIEGEL HEIRS in SUPERMAN," (No. 23)).  The definition of "SIEGEL HEIRS" included "Michael Siegel."  *Id.* at 160 ¶ 7.

1  defendants are required to conduct a "diligent search" of all documents in their

2  possession, custody, and control—and we know Mr. Toberoff has possession of all

3  of Mr. Siegel's and Ms. Larson's records and files.  *See infra* at 9.  If defendants

4  still are unable to find the November 2 letter after conducting such a search, they

5  are obligated to explain how and when it was lost or destroyed.  *See infra* at 9.

6  When pressed by DC about the whereabouts of the November 2 letter,

7  defendants said they believed the Siegels had produced in the *Siegel* case a

8  "November 1" letter.  After checking and confirming to defendants that no such

9  letter had been produced, defendants sent us a letter dated November 1, 2002, from

10  Ms. Larson to Don Bulson, on which Mr. Siegel was copied.  Tokoro Decl. Ex. F at

11  187.  This document does not appear to be the November 2 letter referenced in the

12  May 13 letter.  Furthermore, it, too, was encompassed by DC's August 2010

13  discovery requests (as well as requests in the *Siegel* cases nearly six years ago) and

14  the Court's December 7 order, and defendants offer no justification for withholding

15  it until now.  The November 1 letter encloses and references yet *another* letter,

16  which defendants have not produced or logged.  *Id.*

17  What seems clear from all this is that defendants have not made a complete

18  production of documents in response to DC's requests and the Court's December 7

19  order.  To assure DC's right to full compliance with the Court's order, defendants

20  should be ordered specifically to conduct a diligent search of all records and files in

21  their possession, custody, or control; produce forthwith all responsive documents

22  not previously produced; and explain how and when specific missing documents

23  were lost or destroyed.

24  Issue No. 13:  Redactions To The May 13, 2003 Letter.  Defendants redacted

25  portions of the May 13 letter when they produced it to DC, contending that their

26  "only copy" contained underlining and marginalia by an unnamed attorney.  But

27  defendants were obligated to produce the May 13 letter in the *Siegel* cases—it was

28  one of the documents included with the "Whistleblower" submission; it had not

JOINT STIPULATION RE: DC'S
MOT. TO COMPEL (ISSUES 12-14)

1   previously been logged as privileged; and as Judge Larson ruled, omissions from

2   the privilege logs resulted in a waiver of privilege.  Case No. CV 04-08400, Docket

3   Nos. 374, 386; *cf. Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct.*, 408 F.3d

4   1142, 1149-50 (9th Cir. 2005).  To the extent the redacted notations were recently

5   made on a copy in counsel's possession, that should have been reflected on

6   defendants' privilege logs produced in December 2010.  *See* Docket Nos. 160 at 37-

7   38.  Nor can defendants meet their burden of establishing privilege if they do not

8   know, or are unwilling to disclose, who made the notations, or when, or why.  *E.g.*,

9   *U.S. v. Ruehle*, 583 F.3d 600, 608 (9th Cir. 2009).

10          <u>Issue No. 14:  The Shuster And Siegel Retainer Agreements</u>.  The Court

11  ordered the Siegel and Shuster heirs to produce their retainer agreements with

12  Mr. Toberoff, but permitted them to redact the agreements "insofar as the

13  description of the services to be provided *reflect [legal] advice*…." Docket No. 209

14  at 11:1-8 (emphasis added).  The versions defendants produced contain extensive

15  redactions, and while defendants have refused to provide any detail, they appear to

16  be overbroad.  DC asks the Court to review these short documents *in camera* to

17  assess defendants' privilege claims.

18          Ms. Larson recently filed in state court various documents in connection with

19  the probate of her mother's estate, including the Siegel retainer agreement and

20  amendment.  Defendants did not produce these documents until DC asked for

21  them—and even then, they excluded unredacted versions of the Siegel retainer

22  agreement and amendment, which were supposedly lodged with the probate court

23  "on a 'confidential basis,'" but *not* filed under seal, as the California Rules of Court

24  require to shield a document from public view.  Having elected to file the retainer

25  agreements without receiving a sealing order, the retainer agreement and

26  amendment should be produced without redactions.

27

28

JOINT STIPULATION RE: DC'S
MOT. TO COMPEL (ISSUES 12-14)

## II.  **DEFENDANTS' INTRODUCTORY STATEMENT**

DC's latest motion to compel makes a mountain out of a molehill.  DC's prior motions covered no fewer than eleven supposed "issues" and were, in large part, denied.  *See, e.g.,* Docket Nos. 209, 262.  DC now burdens the Court with a motion on three random issues that barely, if at all, relate to its complaint allegations.

After six and a half years of litigation and thousands of pages of document production in this case and the related case of *Siegel v. Warner Bros. Entertainment Inc.*, Case No. 04-CV-08400 ODW (RZx) ("*Siegel*"), DC's central complaint is that a single, pre-litigation document, a supposed November 2, 2002 letter from Laura Siegel to Michael Siegel (never mentioned in the "Timeline" on which DC relies), has not been located by Defendants' counsel after a diligent search and therefore was not produced.  *See* Declaration of Marc Toberoff ("Toberoff Decl."), ¶ 4.  When Defendants located a November 1, 2002 letter that had not previously been produced or logged while searching for the November 2, 2002 letter, ***that*** letter was immediately produced.  *Id.*, ¶ 5.  DC distorts this voluntary production as a supposed indication that Defendants are "secreting" documents.

DC detours into other irrelevancies, such as:  (i) the contents of the May 13, 2002 letter, which do not relate to DC's claims for relief; (ii) that Defendants awaited the resolution of DC's motion to compel this letter and many other documents (largely denied by the Court's April 11, 2011 order) and thereafter immediately produced the May 13 letter pursuant to the April 11 order; and (iii) Defendants' logging of "Timeline"- related documents in response to DC's requests for production of such documents.

The remainder of DC's motion addresses minutiae: redactions of attorney marginalia/underlining on Defendants' sole copy of the May 13 letter and redactions of privileged material from Defendants' produced retainer agreements. Defendants were under no obligation to log marginal notations on their copy of the

JOINT STIPULATION RE: DC'S
MOT. TO COMPEL (ISSUES 12-14)

1    May 13 letter pursuant to the parties' stipulation (Docket No. 133, ¶ 5), and

2    Defendants redacted privileged attorney-client communication from their retainer

3    agreements, as expressly contemplated by this Court's order.  Docket No. 209 at

4    11.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STIPULATION RE: DC'S
MOT. TO COMPEL (ISSUES 12-14)

### III.    DC COMICS' STATEMENT OF ISSUES IN DISPUTE

#### Issue 12:  Missing Siegel Correspondence

1.  Relevant Factual Background.  The Court's April 11, 2011, order compelled defendants to produce the May 13, 2003, letter from Michael Siegel to Laura Siegel Larson.  As discussed in DC's accompanying motion for reconsideration, this letter—which defendants refused to disclose or produce until required to do so by *two* court orders—corroborates DC's claims, refutes key factual assertions in defendants' prior briefing, and provides good cause for reconsidering certain aspects of the Court's April 11 order and requiring defendants to produce additional documents and information related to Mr. Siegel.  Docket No. 253.

The May 13 letter is part of a long chain of communications involving Mr. Siegel, Ms. Larson, Marc Toberoff, Don Bulson (Mr. Siegel's attorney), and others in which Mr. Toberoff and his entertainment companies and business partners sought to obtain a controlling interest in the Siegels' Superman rights.  *See* Docket No. 161-8 at 57, 61-62, 74-76, 79-80 (examples of correspondence); Tokoro Decl. Exs. F-J; *id.* ¶ 9 (table of same); Docket No. 49 at 64-67 (portions of the Toberoff Timeline discussing same).  The May 13 letter documents Mr. Siegel's complaint about empty promises Mr. Toberoff made to the Siegel family.  Defendants have refused to produce all of the correspondence in this chain—even though these documents were called for by discovery that DC served in the *Siegel* case in 2005 and by DC's requests and the Court's December 7, 2010, order in this case.  *See* Docket No. 236 at 1:16-2:10.  DC has obtained a portion of these discoverable materials by persistently challenging defendants' deficient productions and erroneous privilege claims.  For example:

- On DC's motion, an Ohio district court ordered defendants to produce 15 communications involving Mr. Toberoff and Messrs. Siegel and Bulson. Mr. Toberoff had improperly withheld these communications—in which he

pressured Mr. Siegel to sell his Superman rights to an unnamed "investor"—based on his representation that the documents were privileged. *E.g.*, Tokoro Decl. Ex. I; Docket Nos. 161-4, 161-5, 161-8.

- On DC's motion, this Court ordered defendants to produce the May 13 letter, which confirmed that Mr. Toberoff had made similar false claims to Mr. Siegel and Ms. Larson about a "mysterious billionaire" "investor" and Mr. Toberoff's ability to mount a Superman movie that would compete with one Warner Bros. was making.  Tokoro Decl. Ex. G at 189.  Mr. Toberoff refused to produce the May 13 letter even though it was responsive to discovery requests in *Siegel*, disclosed in the Toberoff Timeline, encompassed in DC's document requests served in August 2010, and ordered produced in December 2010.  *See* Docket Nos. 49 at 64; 161-15; 133 at 1.

- Even after the May 13 document was disclosed, defendants have opposed DC's requests to obtain July 2003 correspondence from Ms. Siegel—July correspondence that the Timeline discloses, purports to enclose a copy of, and says is directly responsive to Mr. Siegel's May 13 letter.  Docket Nos. 225, 236.  Defendants continue to assert the May 13 letter has nothing to do with this case and should not be considered by this Court—even though it refutes factual assertions in their pending SLAPP briefing and positions taken in discovery.  *See id.*; Docket No. 231 at 16-19; Tokoro Decl. Ex. E at 18.

This current motion is addressed to yet another document defendants have not produced:  a November 2, 2002, letter from Ms. Larson to Mr. Siegel that is disclosed in the first sentence of Mr. Siegel's May 13 letter.  Mr. Siegel began his May 13 letter:  "Thank you for your *November 2 letter of last year*.  I would have written sooner but…."  Tokoro Decl. Ex. G at 189 (emphasis added).  Defendants have never produced or logged this November 2 letter in either this case or *Siegel*, *id.* ¶ 5, and they should be ordered to do so now.

JOINT STIPULATION RE: DC'S
MOT. TO COMPEL (ISSUES 12-14)

2.  The November 2002 Letter Should Be Ordered Produced Or Defendants Must Explain What Happened To It.  DC asked defendants to produce the November 2, 2002, letter immediately after learning of its existence.  Tokoro Decl. Ex. A.  Defendants insisted on waiting the maximum number of days to meet and confer on DC's request, then asserted during the parties' May 2 conference that: (1) they could not locate the November 2 letter; and (2) they already produced a November 1, 2002, letter from Ms. Larson to Mr. Siegel and Mr. Bulson.  *Id.* ¶¶ 4-5, Ex. C.  When DC asked for the Bates number of the November 1 letter, Mr. Toberoff said he did not have it on-hand but would provide it to DC the next day, May 3.  DC searched defendants' productions and logs in this case and the *Siegel* cases and could find no November 1 or 2 letter.  *Id.* ¶ 5; Docket Nos. 162-6, 162-7.

Finally, on May 6, Mr. Toberoff sent a letter to DC enclosing a supplemental production of documents and privilege logs—among which was a copy of the November 1, 2002, letter.  Tokoro Decl. Exs. E, F.  As DC had advised defendants, the November 1 letter had never previously been produced, even though it, too, was responsive to DC's document requests in the *Siegel* cases and this case.

It is clear that the November 1 letter is *not* the letter referenced in Mr. Siegel's May 13 letter.  The November 1 letter relates to cancellation of a tolling agreement among the Siegels, Warner Bros., and DC.  Mr. Siegel's May 13 letter addresses Mr. Toberoff's efforts to control the Superman copyright interest. Mr. Toberoff now claims the November 1 letter is "non-substantive," *id.* Ex. E at 18, whereas the May 13 letter is anything but "non-substantive."  Moreover, the letter is written from both Joanne Siegel and Ms. Larson to Don Bulson, Mr. Siegel's attorney.  *Id.* Ex. F at 187.  Mr. Siegel is merely copied on the letter. Plainly, by his May 13 letter, Mr. Siegel was not responding to a "non-substantive" letter directed to his attorney—much less with the kind of detail and content contained in the May 13 letter.

1      In any event, defendants' belief about the "non-substantive" nature of the

2  November 1 letter is no excuse for not producing it, and defendants have offered no

3  reasonable explanation for their failure to produce it here or in *Siegel*. As Judge

4  Larson held, the standard of relevancy during the discovery phase is much broader

5  than at trial. Docket No. 163-11 at 733:4-13 ("I'm sure that all counsel in this room

6  understand the distinction between the standard of relevancy in the discovery phase

7  versus the standard of relevancy at the trial itself."); *accord* FED. R. CIV. P.

8  26(b)(1). Moreover, defendants waived any relevance objections through a Court-

9  approved stipulation filed last December. *See* Docket No. 133 ¶ 1 ("Defendants

10  will not refuse to produce or refuse to log any documents or materials based on the

11  objections Defendants previously asserted in their responses to DC's Requests.").

12      Defendants have not adequately explained what happened to their copy of the

13  November 2, 2002, letter. Nor have they represented that they conducted a search

14  of all relevant files and records in their possession, custody, and control. In

15  addition to their own files, defendants, through Mr. Toberoff, also have possession

16  of Mr. Siegel's files, having received them from Mr. Bulson years ago. Docket

17  Nos. 217-4; 217-6; 217-7. Defendants are obligated to conduct such a "diligent

18  search," and their counsel's failure to "to conduct a reasonable inquiry into the

19  adequacy of their client's document search and production" may be sanctionable. 3

20  RICHARD B. KENDALL ET AL., MATTHEW BENDER PRACTICE GUIDE: FEDERAL

21  PRETRIAL CIVIL PROCEDURE IN CALIF. § 23.166 (2011) (citing *Qualcomm Inc. v.*

22  *Broadcom Corp.*, 2008 US Dist LEXIS 911, at *5 (S.D. Cal. 2008)); *Waterbury v.*

23  *Scribner*, 2008 WL 2018432, at *6 (E.D. Cal. May 8, 2008).

24      If defendants are unable to find the November 2 letter after conducting the

25  required search, they are obligated to explain its absence. A responding party must

26  produce responsive documents or explain "the reason the party is unable to comply:

27  e.g., the document never existed; has been lost or stolen; was inadvertently

28  destroyed; or is not in the possession, custody, or control of the responding party."

JOINT STIPULATION RE: DC'S
MOT. TO COMPEL (ISSUES 12-14)

1   WILLIAM W. SCHWARZER ET AL., RUTTER PRACTICE GROUP: FEDERAL CIVIL

2   PROCEDURE BEFORE TRIAL § 11:1913 (2011); *see also Waterbury*, 2008 WL

3   2018432, at *6.  Moreover, there is no justification for *not* having the November 2

4   letter; the Siegels filed their lawsuits in 2004 and have been under a duty to

5   preserve evidence ever since they began contemplating litigation[2]—which they say

6   occurred as early as 2002, Docket No. 145-1 at 17-19.  As early as 2005, DC

7   propounded discovery in the *Siegel* cases clearly calling for such communications

8   with Mr. Siegel.  *See* Docket No. 236 at 1 n.2.  Importantly, the May 13 letter—

9   which refers to the November 2 letter—was included among the Toberoff Timeline

10  documents, which emerged in June 2006, Docket No. 49 at 64 ("*please see*

11  *enclosed letter*").

12      Discovery is not a game of hide-and-seek.  DC should not be put to the task

13  of having to catch defendants withholding documents, yet that is what is happening:

14  • DC propounded discovery encompassing the November 1, November 2, and

15      May 13 letters, and the Court entered an order in December 2010 requiring

16      their production, yet defendants neither produced nor logged them.  *Supra* at

17      6.

18  • When DC asked about the May 13 letter, defendants refused to confirm its

19      existence.  Docket Nos. 162-9 ¶ 10; 162-11 ¶ 10.

20  • Though never claiming privilege over the May 13 letter, defendants waited

21      for the Court to order its production, rather than produce it when DC asked

22      for it.  Tokoro Decl. ¶ 3.

23  • As part of their April 18 production, defendants failed to acknowledge the

24      November 2 letter disclosed in the May 13 letter's first sentence and only

25      claimed they could not locate it when pressed by DC.  *Id.* ¶ 4.

26

27      [2] *E.g.*, *Cyntegra, Inc. v. Idexx Labs., Inc.*, 2007 WL 5193736, at *3 (C.D. Cal.
    Sept. 21, 2007) ("A litigant has a duty to preserve evidence it knows or should
28  know is relevant to imminent litigation."); SCHWARZER, *supra*, § 11:125 (same).

JOINT STIPULATION RE: DC'S
MOT. TO COMPEL (ISSUES 12-14)

- In discussions about the November 2 letter, defendants mentioned the November 1 letter, another letter never logged or produced in this or the *Siegel* cases. *Supra* at 7.

- And when they finally responded to DC's requests for the November 1 letter, defendants failed to produce the attached letter it references. *See* Tokoro Decl. Ex. F at 187.

Additionally, defendants recently produced a supplemental privilege log that included *20 additional pages* of communications over which defendants now assert privilege. *Id.* Ex. L. These logs suffer the same deficiencies as defendants' previous logs, Docket No. 225 at 17-20, and it is unclear why certain of these documents are only now being logged. Six entire pages include communications pre-dating defendants' December 2010 production, and defendants offer no explanation for their failure to log these documents earlier in response to the Court's December 2010 order. Docket No. 133 ¶ 2 ("By 6:00 p.m. PST on December 15, 2010, Defendants will furnish … complete Privilege logs identifying any and all Privileged documents….").

In light of these events, there is more than reasonable doubt that defendants have fully complied with their discovery obligations. Therefore, DC requests that this Court issue an order:

- Requiring defendants immediately to produce all November 2002 correspondence involving the Siegel heirs, including the November 2, 2002, communication addressed above;

- Requiring defendants, if they assert that no such November 2 letter exists, to disclose whether, how, and when the document was lost or destroyed; and

- Requiring defendants, within 30 days, to update their document productions and privilege logs in this case to produce all responsive documents and identify any and all documents over which they assert privilege—in whole or in part.

JOINT STIPULATION RE: DC'S
MOT. TO COMPEL (ISSUES 12-14)

1

***Issue 13:  Redactions To The May 13 Letter***

2    The Court's April 11 ruling ordered defendants either to produce the May 13

3    letter or verify it did not exist.  Docket No. 209 at 12:13-16.  Defendants produced

4    the letter on April 18, but redacted unidentified portions of it without explaining

5    what had been redacted or why.  The Court's order did not invite defendants to

6    redact the May 13 letter, in contrast to other instances where it authorized such

7    redactions explicitly.  *Compare id.* at 11:7-8 ("Toberoff may submit redacted copies

8    of his retainer agreements"), *with id.* at 12:13-14 (May 13 letter: "produce it").

9    Defendants have waived any privilege that might otherwise have existed.  In

10    the *Siegel* cases, Judge Larson ordered the Siegels to produce all documents

11    attached to the Toberoff Timeline that had not already been listed on a privilege

12    log.  Case No. CV 04-08400, Docket Nos. 374, 386.  The Siegels did not produce

13    the May 13 letter or list it on a privilege log (at least not in an identifiable way)—

14    meaning they not only violated Judge Larson's order, they waived privilege over

15    any notations in the May 13 letter.  *E.g.*, *Burlington N. & Santa Fe Ry. Co. v. U.S.*

16    *Dist. Ct.*, 408 F.3d 1142, 1149-50 (9th Cir. 2005); *Vieste, LLC v. Hill Redwood*

17    *Dev.*, 2010 WL 4807058, at *9 (N.D. Cal. Nov. 18, 2010); SCHWARZER, *supra*,

18    § 11:1918.1; Docket No. 125 at 17-19.  To the extent the notations were made on a

19    recent copy in this case, defendants were required to include the document on a

20    privilege log in December 2010.  Defendants have never included the May 13

21    letter—with or without notations—on any privilege log; hence, any assertion of

22    privilege has been waived.

23    In any event, defendants cannot meet their burden of proving the elements of

24    a privilege claim, given, as they claim, they do not know who made the redacted

25    notations, or when, or why.  *See U.S. v. Ruehle*, 583 F.3d 600, 608 (9th Cir. 2009)

26    ("The party asserting the privilege bears the burden of proving each essential

27    element."); *U.S. v. Martin*, 278 F.3d 988, 999-1000 (9th Cir. 2002) (laying out

28    elements); *Williams v. Adams*, 2009 WL 1220311, at *7 (E.D. Cal. May 4, 2009)

- 12 -

JOINT STIPULATION RE: DC'S
MOT. TO COMPEL (ISSUES 12-14)

("bare assertion of privilege does not suffice to claim privilege"). When DC asked defendants to clarify the scope and basis for their redactions, defendants would say only that the redacted material consisted of marginalia and underlining by an unnamed attorney. Docket No. 230-1 ¶ 18. The Court should order defendants to produce an unredacted copy of the May 13, 2003, letter.

JOINT STIPULATION RE: DC'S
MOT. TO COMPEL (ISSUES 12-14)

*Issue 14: The Shuster And Siegel Retainer Agreements*

A.    **Defendants' Redactions To The Shuster And Siegel Retainer Agreements Appear Overbroad.**

The Court ordered defendants to produce the Siegels' and Shusters' retainer agreements with Mr. Toberoff, permitting redactions only "insofar as the description of the services to be provided reflect [legal] advice given" to the heirs. Docket No. 209 at 11:1-8. The agreements produced by defendants contain extensive redactions. Tokoro Decl. Ex. G at 191-96 (Siegel agreement); *id.* Ex. K at 249-52 (Shuster agreement); *see also id.* Ex. G at 197-98 (Siegel amendment). DC believes the redactions are overbroad.

The Siegel and Shuster agreements are similar to the boilerplate form in *Rutter.  See* PAUL W. VAPNEK ET AL., CALIFORNIA PRACTICE GUIDE:  PROFESSIONAL RESPONSIBILITY Form 5:C (2010) (a copy of which is included in "Appendix A"). For example:

- The first paragraph of the *Rutter* form is titled "Conditions" and contains specific language defining preconditions to representation, while the second paragraph of the Siegel agreement is titled "Conditions Precedent" and contains nearly identical language. *Compare* Appendix A at 30 *with* Tokoro Decl. Ex. G ¶ 2.

- The second paragraph of the *Rutter* form covers "Scope of Services"; the Siegel agreement's first paragraph covers "Scope of Engagement." *Compare* Appendix A at 30 *with* Tokoro Decl. Ex. G ¶ 1.

- The third paragraphs of the *Rutter* form and Siegel agreement define "Responsibilities of the Parties" and "General Responsibilities of Attorney and Client," respectively. *Compare* Appendix A at 30 *with* Tokoro Decl. Ex. G ¶ 3.

- The remainder of the Siegel agreement contains several other sections and clauses matching the *Rutter* form. *E.g.*, *compare* Appendix A at 32, 34-35 *with* Tokoro Decl. Ex. G ¶¶ 5, 7-8.

- The *Rutter* form contains a paragraph regarding settlement of claims.[3] Because the unredacted portion of the Siegel agreement contains no corresponding provision, DC can only assume this paragraph was entirely redacted.

During the parties' May 2 meet-and-confer discussion, DC asked Mr. Toberoff whether he used the *Rutter* form as a model for the Siegel and Shuster agreements, but he declined to answer. Tokoro Decl. ¶ 8. DC asked whether Mr. Toberoff would identify the headings or general subject matter of the paragraphs that were redacted in their entirety, but he again declined, stating only that if DC believed the agreements tracked the *Rutter* form, they should know what was redacted. *Id.* Defendants' counsel also confirmed that they stamped "REDACTED" on every page of a redacted document, regardless of whether that page was itself redacted—thus further obscuring the redacted content. *See id.* Ex. K at 252.

Assuming that the redacted portions generally correspond to the boilerplate *Rutter* form, they would appear to be overbroad. In particular, there is no basis for redacting the entire paragraph governing settlement of claims; such provisions typically do not "reflect advice given" by an attorney, but set forth contractual provisions discussing the respective rights of clients and counsel. *See Martin*, 278 F.3d at 999-1000 (retainer agreements not privileged unless they actually reflect legal advice). To the extent the redacted material includes provisions between the Siegels and Shusters, as well as their counsel, setting forth arrangements or

---

[3] *See* Appendix A at 34 ("Attorney will not make any settlement or compromise of Client's claims without Client's prior approval. Client retains the right to accept or reject any opposing party settlement offer. Client agrees not to make any settlement or compromise of Client's claims without prior notice to Attorney.").

JOINT STIPULATION RE: DC'S
MOT. TO COMPEL (ISSUES 12-14)

1  agreements regarding settlement, such material should not have been redacted—

2  such contractual arrangements are not privileged and are directly relevant to DC's

3  claims in this case.  *See* Docket No. 160 at 11:27-12:18; *Calvert v. Stoner*, 33 Cal.

4  2d 97, 103 (1948) (agreement preventing settlement without attorney consent void);

5  *Nehad v. Mukasey*, 535 F.3d 962, 970 (9th Cir. 2008) ("Only the client … may

6  decide whether to make or accept an offer of settlement.").

7  DC requests that the Court review *in camera* the Siegel and Shuster

8  agreements and Siegel amendment to verify the propriety of defendants' privilege

9  claims.  If the redacted contents do not reflect legal "advice given," but rather

10  contractual arrangements, limitations on settlement, or other non-privileged

11  material, such material should be ordered produced to DC.

12  **B.**    **Defendants Should Produce The Unredacted Versions Of The**

13  **Siegel Agreement And Amendment Lodged In Probate Court.**

14  Ms. Larson has filed a number of documents in state court in connection with

15  the probate of her mother's estate.  Despite defendants' ongoing obligation to

16  produce such materials—without the need for DC to "re-request" such information,

17  FED. R. CIV. P. 26(e)(1); SCHWARZER, *supra*, § 11:1240—defendants failed to

18  produce these probate documents.  Tokoro Decl. ¶ 7.  DC raised this issue with

19  defendants before and during the parties' May 2 meet-and-confer call, asking that

20  all such documents be produced.  On May 6, Mr. Toberoff produced a collection of

21  probate documents in response to DC's discovery requests.  *Id.*

22  From these documents, DC discovered that Ms. Larson "confidential[ly]"

23  lodged copies of the Siegel agreement and amendment in the probate action.

24  Tokoro Decl. Ex. F at 68.  Defendants did not produce complete copies of these

25  documents to DC, only the redacted versions described above.  However, if

26  defendants wanted to keep those allegedly privileged agreements protected from

27  public disclosure, they were required by the California Rules of Court to file them

28  under seal and move the state court for an order deeming them sealed.  *Cf.* CAL. R.

- 16 -

CT. 2.551(a)-(b) ("A record must not be filed under seal without a court order.…"). The probate case docket reflects no such motion or order.  *See* Tokoro Decl. ¶ 7; Ex. F.  Having filed these documents without obtaining a sealing order, DC believes there is no basis to assert privilege over the agreement or amendment. Therefore, DC submits that unredacted versions of the agreement and amendment should be produced.

JOINT STIPULATION RE: DC'S
MOT. TO COMPEL (ISSUES 12-14)

1    **IV.    DEFENDANTS' STATEMENT OF ISSUES IN DISPUTE**

2        **A.    Issue 12:  Siegel Correspondence**

3            1.    Factual Background re: Michael Siegel

4        DC's motion on this issue is based almost entirely on misrepresenting the

5    May 13, 2003 letter from Michael Siegel (now deceased) to Laura Siegel Larson

6    (the "May 13 letter").  First, the May 13 letter is pure inadmissible hearsay under

7    F.R.E. 801(c), and does not fall within any of F.R.E. 803's hearsay exceptions.

8    Second, the May 13 letter, contrary to DC's hyperbole, concerns an offer on behalf

9    of the talent agent Ari Emanuel to buy ***Michael Siegel's*** limited Superman interest,

10   as DC long ago acknowledged.  *See* Docket No. 160 at 70-71; No. 164, Ex. A at 7.

11   The offer was the subject of extensive discovery in the *Siegel* case and is irrelevant

12   to DC's claims for relief in this case.  *See* Docket No. 160 at 35-36 (describing the

13   production of 15 documents relating to such offer to Michael Siegel); Declaration

14   of Jason Tokoro ("Tokoro Decl."), Ex. G at 189-90 (May 13 letter).  Despite the

15   fact that DC possessed numerous documents relating to this "Michael Siegel" offer

16   when it filed its complaint, this offer does not form the basis of <u>any</u> of DC's claims

17   for relief.  In fact, Michael Siegel is nowhere even mentioned in DC's Complaint.

18   Docket No. 49 ("FAC"), ¶¶ 1-198.

19       DC's actual allegations relate to an August 2002 offer by Ari Emanuel to buy

20   the interest of ***Joanne and Laura Siegel*** for $15 million, a proper offer which was

21   also the subject of extensive testimony and discovery in *Siegel* that DC disregarded

22   in crafting its Fifth Claim for Relief.  That baseless Fifth Claim for interference

23   with economic advantage (FAC, ¶¶ 77-80, 180-186) alleges that Mr. Toberoff, in an

24   August 2002 conversation with Joanne and Laura Siegel's then-counsel, Kevin

25   Marks, purportedly misrepresented that he had an "investor" for Superman rights

26   (an offer which Joanne and Laura never accepted even by DC's account, *see* FAC,

27   ¶¶ 78, 81), and that this offer "induced" them to repudiate a purported settlement

28   agreement with DC on September 21, 2002.

- 18 -

As set forth in Defendants' *Anti-SLAPP* motion (Docket No. 145-1 at 7:1-9:20, 22:4-24:2; No. 196 at 2:15-3:6, 4:3-6:3), and in greater detail in Defendants' opposition to DC's concurrent "motion for reconsideration," DC's claim contradicts all of the admissible evidence in DC's and its counsel's possession when they filed their retaliatory complaint:

- Joanne Siegel had made clear in a May 9, 2002 letter to Time Warner that her negotiations with DC were moribund. *See* Docket No. 145-5, Ex. O. Judge Larson held that the May 9, 2002 letter confirmed the Siegel Heirs had "clearly and unequivocally" rejected DC's proposals, and that no agreement had been reached. *Siegel*, 542 F. Supp. 2d 1098, 1139 (C.D. Cal. 2008). DC's purported "prospective economic advantage" was thus at an end long before Mr. Toberoff had substantive communication with the Siegels or Mr. Marks.

- There was no mention of a "billionaire investor" in Mr. Toberoff's August 2002 conversation with Mr. Marks, in which the talent agent, Ari Emanuel [not a "mysterious billionaire"] offered to purchase Joanne and Laura Siegel's rights for $15 million plus a participation interest. *See* Docket No. 196-2, Ex. H at 166:6-170:24 (testimony of Mr. Marks), Ex. E at 98:25-104:14 (testimony of Mr. Toberoff); Docket No. 196-3 (further testimony of Mr. Marks).[4]

- Defendants long ago pointed out that the August 2002 offer was made by Mr. Emanuel, as clearly testified to in 2006. *See* Docket No. 145 at 8:12-28;

---

[4] Notably, while DC brought its baseless claims against Mr. Toberoff (as well as two elderly women), DC conspicuously did ***not*** bring any claims against Mr. Emanuel, the influential head of the William Morris-Endeavor talent agency, even though the anonymous Timeline on which DC purports to rely implicates Mr. Emanuel in the same alleged conduct. The obvious reason is that DC's baseless SLAPP suit was solely designed to leverage its position in financial negotiations with the Siegels and Shusters by forcing their attorney, Mr. Toberoff, to incur considerable legal fees to defend against such suit, and by attempting to undermine and interfere with their successful attorney-client relationship.

No. 196-2, Ex. E at 103:8-9, Docket No. 145-6, Ex. R at 168:2-169:5.  DC itself also long ago identified the "investor" behind the offer to Michael Siegel as Mr. Emanuel.  Docket No. 160 at 70:2-71:3.

- • The sworn testimony of every pertinent witness was that Mr. Toberoff had no further contact with Mr. Marks and no direct contact with Joanne and Laura Siegel until after they had officially terminated negotiations with DC and terminated Mr. Marks on September 21, 2002.  *See* Docket No. 145, Ex. R at 105:24-106:23 (testimony of Mr. Toberoff); Docket No. 196-3, Ex. A at 169:23-170:12, 171:14-21, 172:14-17, 174:17-21 (testimony of Mr. Marks); Docket No. 196-2, Ex. E at 106:1-107:7 (testimony of Mr. Toberoff), Ex. F at 33:17-34:1, 41:1-3 (testimony of Joanne Siegel), Ex. G at 17:6-8, 261:17-262:7 (testimony of Laura Siegel).

The overwhelming evidence establishes that Mr. Toberoff did not and could not have caused the Siegels to end negotiations with DC.  In the face of this admissible evidence, DC argues that the inadmissible May 13 letter "corroborates DC's claims."  *Supra* at 6.  It does not. The May 13 letter does not relate to any offer to the "Siegel Heirs" (defined in FAC ¶ 66 as Laura Siegel Larson and Joanne Siegel), but rather an offer to "buy out my [*i.e.,* Michael Siegel's] share of the copyright."  Tokoro Decl., Ex. G at 189.  In short, DC attempts to fit a round peg (the May 13 letter) into a square hole (DC's Claims for Relief).

Such manipulation of the record characterizes DC's practices throughout this case.  For example, in the instant motion, DC misleadingly distorts Defendants' stipulation to a schedule for the production of documents and privilege logs (Docket Nos. 132-133) to argue that the Court "ordered produced in December 2010" specific documents, such as the May 13 letter.  *Supra* at 7.  DC falsely claimed in its original complaint that Joanne Siegel's May 9, 2002 letter (unequivocally rejecting DC's proposals and negotiation tactics) was made "as a result of Toberoff's improper interference and inducements."  Docket No. 1, ¶ 66.

1  DC withdrew this baseless allegation only after Defendants pointed out that "all of

2  the witnesses with knowledge of the facts have spoken under oath … that there is

3  no factual basis for [such] statement."  *See* Toberoff Decl., Ex. A.

4      DC similarly adopted the anonymous "Timeline's" allegations as fact, while

5  omitting that this obvious "hit piece" was written by a thief and served as a cover

6  letter for reams of privileged documents stolen from Mr. Toberoff's law firm.

7  FAC, ¶ 106.  DC has also repeatedly accused Mr. Toberoff of fraud, without any

8  basis or specificity, when such allegations are repeatedly contradicted by the record

9  and the sworn testimony of every relevant witness.  *See, e.g.,* Docket No. 89 at

10  3:28-4:1, 4:2-3, and 20:22-23; No. 90 at 3:7-9 and 3:16-1; No. 91 at 1:14-16, 2:8-9,

11  6:8-10, and 6:18-19; Docket No. 92 at 1:10-11, 15:4-5, 17:22-23, 20:19-20, and

12  22:3-4.

13      2.    Factual Background re: DC's Discovery

14      DC further claims that there is a "long chain of communications involving

15  Mr. Siegel, Ms. Larson, Marc Toberoff, Don Bulson (Mr. Siegel's attorney), and

16  others." (*supra* at 6), but neglects to mention that this supposed "chain" of

17  communications, set forth in Mr. Tokoro's declaration, consists almost entirely of

18  already-produced documents.  In fact, the only purported documents DC claims that

19  it does not have are a November 2, 2002 letter referred to in Michael Siegel's

20  May 13 letter, a July 5, 2003 letter as described in the anonymous Timeline, and a

21  July 11, 2003 letter that is the subject of DC's pending motion for reconsideration.

22  *See* Tokoro Decl., ¶ 9, pgs. 4-6; Docket No. 209 at 11, 12 n.2.

23      Moreover, while DC complains that it had to file motions to compel to secure

24  certain documents, DC neglects to mention its long history of meritless motions to

25  compel in this case and in *Siegel*:

26  • In *Siegel,* on April 24, 2006, DC filed a motion that sought a broad privilege

27      waiver of attorney-client communications relating to 2001-2002 settlement

28      negotiations between the Siegels and DC Comics; on August 18, 2006, this

JOINT STIPULATION RE: DC'S
MOT. TO COMPEL (ISSUES 12-14)

1  Court denied DC's motion, with the exception of a single letter that had
2  already been sent to DC.  *Siegel*, Docket Nos. 53, 58.

3  • On September 1, 2006, DC then filed a motion for reconsideration of the
4  August 18, 2006 order that was also denied.  *Siegel*, Docket Nos. 60, 67.

5  • On October 13, 2006, DC filed a motion to compel second depositions of
6  Laura Siegel Larson and Joanne Siegel which was denied on November 8,
7  2006 by this Court.  *Siegel*, Docket Nos. 77, 91.

8  • On March 26, 2007, DC filed a motion to (a) compel Laura Siegel Larson
9  and her former attorney Kevin Marks to re-appear for deposition; and (b) to
10  produce additional attorney-client privileged documents; on May 2, 2007,
11  this Court denied both motions.  *Siegel,* Docket Nos. 104, 110, 159.

12  • On December 4, 2008, Judge Larson in *Siegel* denied the request of the
13  "escrow agent" retained by DC to "match up" the "Stolen Documents,"
14  despite DC's claims that Defendants were somehow concealing documents.
15  *Siegel*, Docket No. 388.

16  • On December 30, 2008, DC filed a motion to compel the production of the
17  Consent Agreement; Judge Larson denied that motion on January 14, 2009.
18  *Siegel*, Docket Nos. 394, 442.

19  • On March 2, 2009, DC filed a motion to reopen discovery in *Siegel* based on
20  the "Timeline"; on March 13, 2009, Judge Larson denied DC's motion.
21  *Siegel*, Docket Nos. 476, 478.

22  • In this case, DC filed a motion to "initiate discovery," *after* discovery had
23  already been initiated; the Court denied DC's motion as moot.  Docket
24  Nos. 44, 74.

25  • On November 29, 2010, DC filed a "motion to compel" the production of
26  documents and privilege logs when Defendants had already agreed to
27  produce the same; that motion was resolved and withdrawn pursuant to a
28  stipulation of the parties.  Docket Nos. 125, 132-33.

JOINT STIPULATION RE: DC'S
MOT. TO COMPEL (ISSUES 12-14)

- On February 7, 2011, DC filed a "motion to compel" seeking, *inter alia*, the production of the Consent Agreement; on April 11, 2011, the Court denied, in large part, DC's motion.  Docket Nos. 159, 209.  On May 5, 2011, the Court further denied DC's motion and upheld Defendants' assertions of privilege as to Don Bulson/Marc Toberoff communications.  *See* Docket No. 239.

- DC then sought review of this Court's April 11, 2011 order; Judge Wright denied DC's motion, twice.  *See* Docket Nos. 225, 248, 252.  Notwithstanding this, on May 23, 2011, DC filed a motion for reconsideration of the April 11 order.  Docket No. 253.

In short, DC has consistently claimed that Defendants have withheld relevant, non-privileged documents, and such claims have been repeatedly rejected.

DC cites Judge Larson's statement in *Siegel* that "the standard or relevancy during the discovery phase is much broader than at trial" (*supra* at 9), but ignores that Judge Larson made this comment in response to DC's willful refusal to abide by its discovery agreements and consistent disregard of its discovery obligations.  *Siegel*, Docket No.  390-391.   The *Siegel* Court noted DC's "equivocation" (Toberoff Decl., Ex. B at 20:7-8), and ordered DC to fully supplement its production.  *Id.*, Ex. B at 19:23-25 ("[The Court]:  You're [DC's counsel] doing it again what you did in the papers, and that's really causing me to think that you have not done what I asked."); *Siegel*, Docket No. 442.

### 3.    The Alleged November 2, 2002 Letter

DC's motion with respect to a purported November 2, 2002 letter from Laura Siegel to Michael Siegel is moot as Defendants were unable to find such November 2 letter.  Toberoff Decl., ¶ 4.  DC nonetheless continues to complain based on a number of misleading assumptions.

*First*, DC assumes that a November 2, 2002 letter from Laura Siegel to Michael Siegel exists based solely on a single reference by Michael Siegel in the

- 23 -

1    May 13 letter, when there are any number of alternative explanations (*e.g.*, a simple

2    typo).

3          *Second*, DC erroneously assumes that the May 13 letter responds to a

4    substantive letter regarding "Superman." However, it seems from the May 13 letter

5    that, to the extent it was responding to a November 2, 2002 letter, such a

6    November 2 letter was likely addressed to personal matters, as the May 13 letter

7    opens with comments about family matters and only then changes the subject.

8    Tokoro Decl., Ex. G at 189. *Third*, DC falsely assumes that Defendants have

9    "conceal[ed]" or "lost or destroyed" the November 2 letter. *Supra* at 2. People,

10   including Laura Siegel, often send letters, holiday cards and notes, particularly to

11   family members, and do not keep copies of them. While a party contemplating

12   litigation is under a duty "to preserve evidence it knows … is relevant to imminent

13   litigation'" (*supra* at 10, n.2), there is no evidence that random pieces of familial

14   correspondence from Laura Siegel to Michael Siegel would be relevant "evidence"

15   of anything.

16         Notably, DC elsewhere relies heavily on documents "identified" in the

17   "Timeline" (*see, e.g.,* Tokoro Decl. at ¶ 9, pgs. 4-6), which purports to discuss

18   enclosed documents illicitly copied and stolen from the files of Mr. Toberoff's firm.

19   The Timeline makes no mention of any November 2, 2002 letter, nor was such a

20   letter included in the stolen documents, further indicating that it was never in

21   Defendants' possession.

22         4.    DC's False Accusations of Discovery Misconduct

23         DC attempts to distract and prejudice the Court with arguments regarding the

24   May 13 letter, Defendants' privilege logs, and the November 1, 2002 letter:

25         May 13 Letter:  DC acknowledges that Defendants never denied the

26   existence of the May 13 letter, as the Court's April 11 order also noted.  Docket

27   No. 209 at 12.  DC's sole complaint is that "defendants waited for the Court to

28   order its production, rather than produce it when DC asked for it."  *Supra* at 10.

JOINT STIPULATION RE: DC'S
MOT. TO COMPEL (ISSUES 12-14)

Given DC's overzealous and often unsuccessful motions to compel, Defendants awaited the results of DC's motion, which was, for the most part, denied in the April 11 order.  *See* Tokoro Decl., ¶ 3.  However, as the Court ordered Defendants to "either (a) produce [the May 13 letter] to Plaintiff; or (b) submit a verified further response to Plaintiff indicating that it does not exist" (Docket No. 209 at 12), Defendants promptly produced the document, as DC itself acknowledges.  *Id.*, ¶ 2.

Privilege Logs:  DC complains that Defendants served a "supplemental privilege log" where "[s]ix entire pages include communications pre-dating defendants' December 2010 production," (*supra* at 11) and falsely argue that Defendants "offer no explanation for their failure to log these documents earlier." *Supra* at 11.  In fact, Defendants explained exactly why they did not log such communications in their December 2010 logs:

> Nor is the fact that the communications were not listed on the Siegels' initial privilege logs a basis to waive privilege, as DC implies.  The documents were not logged in response to DC's ***first*** set of production requests because the requests were very broad, and none were directed at the Timeline, or the Siegels' contacts with the Timeline's author. On December 10, 2010 (before Defendants served their privilege logs in response to these requests), DC served a ***second*** set of requests that specifically requested documents relating to the Timeline and its author, giving the clear impression that the absence of requests as to the Timeline in the first requests was deliberate.  To ensure that the logs were responsive to DC's actual requests, Defendants thus logged Timeline-related documents in response to the second set of requests.

Docket No. 160 at 73.

November 1, 2002 Letter:  When DC requested a November 2, 2002 letter, Defendants re-checked their files.  Toberoff Decl., ¶ 4.  In this search, Defendants found a November 1, 2002 letter, from Joanne and Laura Siegel to Michael Siegel and Don Bulson, which merely attached an October 28, 2002 letter from Joanne and Laura Siegel to DC's general counsel Lillian Laserson that was already in DC's possession.  *See Id.*, ¶ 5; Tokoro Decl., Ex. F at 187.  Defendants promptly and voluntarily brought the November 1 letter to DC's attention and produced it after they verified that it had not been previously produced or logged.  Contrary to DC's

1   false assertions, Defendants never refused to produce the November 1 letter on the

2   grounds of relevancy or that it was "non-substantive." *Supra* at 8-9.

3   **B.    Issue 13:  Redactions to the May 13 Letter**

4   DC's motion on the issue of "redactions" to the May 13 letter is again "much

5   ado about nothing." *See* Docket No. 239.  Defendants did not "redact[] unidentified

6   portions" of the May 13 letter, as DC misleadingly argues. *Supra* at 12.  As

7   Defendants clearly stated to DC, the "redactions" were of an attorney's very limited

8   marginalia and underlines on the sole copy of the May 13 letter that Defendants'

9   counsel located in its legal files. *See* Docket No. 230-1, ¶ 18; Tokoro Decl., ¶ 6.  It

10  is clear on the face of the produced May 13 letter that the letter itself is complete

11  and has not been redacted.  Tokoro Decl., Ex. G at 189-90.

12  Pursuant to the parties' December 6, 2010 stipulation, which DC repeatedly

13  refers to as an independent "court order," Defendants were and are under no

14  obligation to "log" such redactions. *See* Docket No. 133, ¶ 5 ("The parties are not

15  required to list on their respective privilege logs any Privileged documents created

16  on or after May 14, 2010.  As to Privileged documents created prior to May 14,

17  2010:  (a) Defendants and their counsel need not log internal communications

18  solely between or among Defendants' counsel … in either this case or the *Siegel*

19  Cases.").  Pursuant to that agreement, Defendants did not log this internal attorney

20  work-product or any other internal attorney communications on their privilege logs.

21  *See, e.g.,* Tokoro Decl., Ex. L.  Despite DC's possession of Defendants' logs for

22  months, DC's multiple motions to compel in the interim, and the "court order" that

23  "[b]y 6:00 p.m. PST on December 20, 2010, DC will inform Defendants in writing

24  of any issues DC has regarding Defendants' Privilege logs" (Docket No. 133, ¶ 6),

25  DC never once complained about the omission of this type of material, as such

26  omission comports with the parties' agreement.

27

28

**C.    Issue 14:  Redactions to the Retainer Agreements**

    1.    <u>The Temporary Confidential Lodging of Privileged Material</u>
<u>with the Probate Court Does Not Waive Privilege</u>

DC argues that privilege was somehow waived with respect to the Siegel retainer agreement due to the probate proceedings in the Los Angeles Superior Court.  As was clear from Defendants' production of the probate documents to DC, the retainer agreement was "'confidentially' lodged" with the probate court.  *Supra* at 16.  The retainer agreement was never "filed"; rather, it was briefly lodged on a confidential basis with the probate court in support of an *ex parte* application to appoint Laura Siegel as special administrator of her mother's estate, pending her appointment as personal representative, and was returned to Ms. Siegel's estate attorney less than two hours later.  *See* Declaration of Gary Ruttenberg, ¶ 2.  DC cites California Rule of Court 2.551(a)-(b), which requires a court order for records to be ***filed*** under seal, but does not address documents that are temporarily lodged with the Court on a confidential basis, rather than filed, and which are not part of the public case file.  DC can cite no authority whatsoever for the proposition that such a brief confidential lodging waives privilege.

    2.    <u>DC's Motion as to Redactions to the Retainer Agreements Is</u>
<u>Improperly Based on Pure Speculation and Guesswork</u>

The Siegel and Shuster retainer agreements that were produced to DC were properly redacted pursuant to this Court's April 11 Order, which expressly states that "insofar as the description of the services to be provided reflect advice given, the descriptions are privileged," and that Defendants "may submit redacted copies of [the] retainer agreements, redacting privileged information."  Docket No. 209 at 11. Defendants redacted attorney work product and attorney-client communications regarding, *inter alia,* the scope of retention and potential litigation outcomes.

DC's motion regarding redactions from the produced Siegel and Shuster retainer agreements is improperly based on pure speculation.  While DC attaches to

its motion a "form" agreement from the Rutter Group to purportedly enhance its guesswork, the Rutter form does not "track" the Siegel or the Shuster retainer agreements.  For example:

- The Rutter form refers to "Scope of Services" in paragraph 2; the Siegel and Shuster retainers refer to "Scope of Engagement" in paragraph 1;

- The Rutter form includes several paragraphs referring to the "Negotiability of Fees," "Deposit," "Monthly Billing Statements," "Settlement," "Conclusion of Services," "Choice of Law," *etc.*, that have no counterpart in either the Siegel or the Shuster retainers.

- The Siegel and Shuster retainers include sections related to "Payment and Notices" and "Miscellaneous" that have no counterparts in the Rutter form.

The language of the Siegel and Shuster retainers also differs significantly from the language in the Rutter form, and any similarities are a function of the common purpose of a retainer agreement.

Based on DC's unsupported speculation, it claims that the redactions "appear to be overbroad" and theorizes that the redacted paragraphs refer to "contractual arrangements [between the Siegels and Shusters], limitations on settlement, or other non-privileged privileged material."  *Supra* at 16.  Mindful of this Court's comments that "by being more specific, [descriptions] may well in fact disclose privileged material" (Docket No. 209 at 13), Defendants can still safely say that the redactions do <u>not</u> concern any arrangements between the Siegels and the Shusters, or any limitations on settlement as hypothesized by DC.

JOINT STIPULATION RE: DC'S
MOT. TO COMPEL (ISSUES 12-14)

1

2    Dated:      May 27, 2011                    Respectfully Submitted,

3                                               O'MELVENY & MYERS LLP

4
                                               By: /s/ Daniel M. Petrocelli
5                                                   Daniel M. Petrocelli
                                                    Attorneys for Plaintiff DC Comics
6

7    Dated:      May 27, 2011                    Respectfully Submitted,

8                                               TOBEROFF & ASSOCIATES, P.C.

9
                                               By: /s/ Marc Toberoff
10                                                  Marc Toberoff
                                                    Attorneys for Defendants Joanne
11                                                  Siegel, Laura Siegel Larson, Mark
                                                    Warren Peary, and Jean Adele Peavy
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STIPULATION RE: DC'S
MOT. TO COMPEL (ISSUES 12-14)

# APPENDIX A

PAUL W. VAPNEK ET AL., CALIFORNIA PRACTICE GUIDE: PROFESSIONAL

RESPONSIBILITY Form 5:C (2010)

This is the written fee agreement ("Agreement") that California law requires attorneys to have with their clients. We, ........ *(name of attorney/law firm)*, (hereafter Attorney) will provide legal services to ...... *(name of client)* (hereafter Client) on the terms set forth below.

1. **CONDITIONS.** This Agreement will not take effect, and Attorney will have no obligation to provide legal services, until Client returns a signed copy of this Agreement *(and pays the initial deposit called for under Paragraph 7).*

2. **SCOPE OF SERVICES.** Client retains Attorney to represent Client in connection with Client's claims against ......... *(opposing party)* (and possibly others as future investigation may indicate), arising out of ........... *(describe incident or transaction)*, which occurred on or about ........ *(date).*

If a court action is filed, Attorney will represent Client until settlement or judgment, by way of arbitration or trial, is reached. Attorney will oppose any motion for new trial or any other post-trial motions filed by an opposing party, and/or will make any appropriate post-trial motion on Client's behalf. Attorney will not represent Client on any appeal after judgment or in any proceeding designed to execute on the judgment without such additional compensation as may be agreed upon between Attorney and Client in a separate Agreement.

3. **RESPONSIBILITIES OF THE PARTIES.** Attorney will provide those legal services reasonably required to represent Client in prosecuting the claims described in Paragraph 2 and will take reasonable steps to keep Client informed of significant developments, and to respond promptly to Client's inquires and communications. Client agrees to be truthful with Attorney, to keep Attorney informed of any information and developments which come to Client's attention, to abide by this Agreement, to pay Attorney's bills and costs on time and to keep Attorney advised of Client's address, telephone number(s) and whereabouts. Client agrees to appear at all legal proceedings Attorney deems necessary and to cooperate fully with Attorney on all matters related to the investigation, preparation and presentation of Client's claims.

4. **LEGAL FEES.** Attorney will only be compensated for legal services rendered if a recovery is obtained for Client. If no recovery is obtained, Client will be obligated to pay only for costs, disbursements and expenses, as described in Paragraph 6.

The fees to be paid Attorney will be a percentage of the "net recovery," depending on the stage at which settlement or judgment is reached. The term "net recovery" means (a) the total amounts received by settlement, arbitration award or judgment, including any award of attorney fees (b) minus all costs and disbursements set forth in Paragraph 6. "Net recovery" shall also include the reasonable value of any nonmonetary recovery.

Attorney fees shall be calculated as follows:

(a) If the matter is resolved before filing of a lawsuit or initiation of other formal proceedings, the fee shall be ...... percent ( ..... %) of the net recovery.

(b) If the matter is resolved prior to ..... days before the date initially set for the trial or arbitration of the matter, the fee shall be ..... percent ( ..... %) of the net recovery.

In the event of Attorney's discharge or withdrawal as provided in Paragraph 11, Client agrees that, upon payment of the settlement, arbitration award or judgment in Client's favor in this matter, Attorney shall be entitled to be paid a reasonable fee for the legal services rendered. Such fee shall be determined by considering the following factors:

(a) The actual number of hours expended by Attorney in performing legal services for Client;

(b) Attorney's hourly rate;

(c) The extent to which Attorney's services have contributed to the result obtained;

(d) The amount of the fee in proportion to the value of the services performed;

(e) The amount of recovery obtained;

(f) The time limitations imposed on Attorney by Client or by the circumstances; and

(g) The experience, reputation and ability of personnel performing the services.

In the event recovery consists of payments to be made over a period of time, or noncash equivalent property, the contingency fee shall be based on the present cash value of the net recovery as determined by generally recognized accounting and appraisal standards. The contingency fee shall be paid out of the first funds or property received by Client.

(*Alternative A:* Monetary sanctions awarded to Attorney during the course of this engagement shall not be considered part of the Client's recovery and shall belong to Attorney as additional compensation for extraordinary time and effort.)

(*Alternative B:* Monetary sanctions awarded to Attorney during this engagement shall be considered part of Client's recovery, unless the sanctions award includes an item of costs, in which case the cost item shall be credited to Client's cost account.)

If an award of fees and/or costs to be paid by a third party is obtained on Client's behalf in this action, such award shall belong to ........ (*client or attorney*). Client understands that the court's order awarding fees and/or costs will not affect Client's obligation to pay Attorney fees and/or costs under this Agreement. Client agrees that notwithstanding a court award of fees and/or costs in Client's case, Client will remain responsible for payment in full of attorney fees and costs in accordance with this Agreement. However, any payment of court-awarded fees and/or costs amount by a third party will be credited against the amount of fees and/or costs owed by Client under this Agreement.

5. **NEGOTIABILITY OF FEES.** The fees set forth above are not set by law, but are negotiated between attorney and client.

6. **COSTS AND LITIGATION EXPENSES.** Attorney will incur various costs and expenses in performing legal services under this Agreement. Client agrees to pay for all costs and expenses paid or owed by Client in connection with this matter, or which have been advanced by Attorney on Client's behalf and which have not been previously paid or reimbursed to Attorney. Costs and litigation expenses commonly include court fees, jury fees, service of process charges, court and deposition reporters' fees, photocopying and reproduction costs, notary fees, long distance telephone charges, messenger and other delivery fees, postage, deposition costs, travel costs including parking, travel and lodging expenses, investigation expenses, consultant and expert witness fees and expenses, mediation, arbitration and special master fees and expenses, and other similar items.

All costs and expenses will be charged at our costs, including in-office

JOINT STIPULATION RE: DC'S
MOT. TO COMPEL (ISSUES 12-14)

photocopying at $ ..... per page, mileage at $.... per mile, and ........ *(add other cost items).*

Attorney will select expert witnesses, consultants and investigators that in Attorney's judgment are necessary to aid in the preparation of Client's case and will inform Client of the persons selected and their charges. Client authorizes Attorney to incur all reasonable costs and to hire such experts, consultants and investigators.

*(Alternative A:* Attorney shall obtain Client's consent before retaining outside investigators, consultants or expert witnesses.)

*(Alternative B:* Attorney shall obtain Client's consent before incurring any costs in excess of $ ....... )

Client acknowledges that if Client's case proceeds to court action or arbitration, Client may be required to pay fees and/or costs to other parties in the action. Any such award shall be entirely Client's responsibility.

7. **DEPOSIT.** Client agrees to pay Attorney an initial deposit for costs of $ ........ , to be returned with this signed Agreement. Attorney will hold this initial deposit in a client trust account. Client hereby authorizes Attorney to use the deposit to pay costs and other expenses incurred under this Agreement.

When Client's initial deposit is exhausted, Attorney reserves the right to demand additional deposits, each up to a maximum of $ ...... Once a trial or arbitration date is set, Attorney will require Client to pay all sums then owing, and to deposit the cost Attorney estimates will be incurred in preparing for and completing the trial or arbitration, including the jury fees or arbitration fees likely to be assessed. Those sums may exceed the maximum deposit.

Client agrees to pay all deposits required under this Agreement within ten (10) days of Attorney's demand. Any deposit that is not used will be refunded at the conclusion of this Agreement.

*(ALTERNATIVE:* Attorney agrees to advance all reasonable costs on behalf of Client in this matter. Client shall *(or shall not)* be responsible for reimbursing all costs advanced on Client's behalf at the conclusion of the matter regardless of whether a recovery is obtained for Client.)

8. **MONTHLY BILLING STATEMENTS.** Attorney will send Client monthly billing statements for costs and other expenses incurred in this matter. Client agrees

- 33 -

to pay each statement in full within ...... days after the date of such statement.

9. **SERVICES NOT COVERED BY THIS AGREEMENT.** This Agreement does not cover other related claims that may arise and may require legal services. (*For example:* workers' comp claims, disputes with Client's insurance company regarding coverage or amount of loss or reimbursement for benefits paid, disputes with health care providers regarding amounts owed or reimbursement of benefits provided.)

If additional services are necessary in connection with Client's claims and Client requests Attorney to perform such services, an additional fee arrangement must be made between Attorney and Client in writing. Such additional services may be required, for example, in defense of a lawsuit, cross-complaint or other cross demand filed against Client in connection with the above-referenced matter.

10. **SETTLEMENT.** Attorney will not make any settlement or compromise of Client's claims without Client's prior approval. Client retains the right to accept or reject any opposing party settlement offer. Client agrees not to make any settlement or compromise of Client's claims without prior notice to Attorney.

11. **DISCHARGE AND WITHDRAWAL.** Client may discharge Attorney at any time, upon written notice to Attorney. Attorney may withdraw from representation of Client (a) with Client's consent, (b) upon court approval, or (c) if no court action is filed, for good cause upon reasonable notice to Client. Good cause includes Client's breach of this Agreement, Client's refusal to cooperate with Attorney or to follow Attorney's advice on a material matter, or any other fact or circumstance that would render Attorney's continuing representation unlawful or unethical. If a court action, arbitration or other judicial proceeding has been filed on Client's behalf, Client shall promptly deliver to Attorney a signed substitution of counsel form at Attorney's request.

12. **CONCLUSION OF SERVICES.** When Attorney's services conclude, whether by completing the terms of this Agreement or by discharge or withdrawal under Paragraph 11, all unpaid charges will immediately become due and payable. Attorney is authorized to use any funds held in Attorney's trust account as a deposit against costs to apply to such unpaid charges. After Attorney's services conclude and upon Client's request, Attorney will deliver Client's file and property to Client whether or not Client has paid any fees and/or costs owed to Attorney. If Client does not request the return of Client's file, Attorney will retain Client's file for five (5) years, after which time Attorney may have Client's file destroyed. If Client desires to have Client's file maintained beyond the five (5) years after Client's

matter has concluded, separate arrangements with Attorney must be made.

13. **LIEN.** Client hereby grants Attorney a lien on any and all claims or causes of action that are the subject of Attorney's representation under this Agreement. Attorney's lien will be for any sums owing to Attorney for any unpaid costs or fees at the conclusion of Attorney's services. The lien will attach to any recovery Client may obtain, whether by arbitration award, judgment, settlement or otherwise. By signing this Agreement, Client acknowledges having been advised that Client may seek the advice of an independent lawyer of Client's choice regarding the fairness of this lien and of this Agreement, and that Client must be given a reasonable opportunity to seek such advice. (*)

14. **DISCLAIMER OF GUARANTEE.** Nothing in this Agreement and nothing in Attorney's statements to Client may be construed as a promise or guarantee about the outcome of this matter. Attorney makes no such promises or guarantees. There can be no assurance that Client will recover any sum or sums in this matter. Attorney's comments about the outcome of this matter are expressions of opinion

only. Client acknowledges that Attorney has made no promise or guarantee about the outcome of this matter.

15. *(IF APPLICABLE)* **NO MALPRACTICE INSURANCE.** Pursuant to California Rule of Professional Conduct 3–410, Attorney hereby informs Client that Attorney does not have professional liability (malpractice) insurance.

16. **CHOICE OF LAW.** This Agreement shall be governed by and construed under the law of the State of California.

17. **ENTIRE AGREEMENT.** This Agreement contains the entire agreement of the parties. No other agreement, statement or promise made on or before the effective date of this Agreement will be binding on the parties. This Agreement may be modified by subsequent agreement of the parties only by an instrument in writing signed by both of them. This Agreement will govern all legal services performed by Attorney on behalf of Client commencing with the date Attorney first performed services.

THE PARTIES HAVE READ AND UNDERSTAND THE FOREGOING TERMS AND AGREE TO THEM AS OF THE DATE ATTORNEY FIRST PROVIDED SERVICES. IF MORE THAN ONE CLIENT SIGNS BELOW, EACH AGREES TO BE LIABLE JOINTLY AND SEVERALLY FOR ALL OBLIGATIONS UNDER THIS AGREEMENT. THE CLIENT(S) SHALL RECEIVE A FULLY

JOINT STIPULATION RE: DC'S
MOT. TO COMPEL (ISSUES 12-14)

1

EXECUTED DUPLICATE OF THIS AGREEMENT.

2

3

DATED:_____

4

(Client)

5

DATED:_____

6

7

(Attorney)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STIPULATION RE: DC'S
MOT. TO COMPEL (ISSUES 12-14)