# EXHIBIT A

# O'MELVENY & MYERS LLP

| | | |
|---|---|---|
| BEIJING | 1999 Avenue of the Stars, 7th Floor | SAN FRANCISCO |
| BRUSSELS | Los Angeles, California 90067-6035 | SHANGHAI |
| HONG KONG | | SILICON VALLEY |
| LONDON | TELEPHONE (310) 553-6700 | SINGAPORE |
| LOS ANGELES | FACSIMILE (310) 246-6779 | TOKYO |
| NEWPORT BEACH | www.omm.com | WASHINGTON, D.C. |
| NEW YORK | | |

July 25, 2011

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6840

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
mkline@omm.com

Re: *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Marc:

      We write concerning Laura Siegel Larson's admissions during her July 22, 2011, deposition that: (1) she gave you correspondence between her and Michael Siegel—including letters from Ms. Larson to Mr. Siegel sent on or around November 2, 2002, and July 5, 2003—which have never been produced, despite DC's outstanding document requests and prior motions seeking such documents; and (2) she has entire "boxes" full of documents relevant to this case and/or the *Siegel* litigation that have never even been reviewed, much less produced.

      There is no excuse for defendants' continued suppression of correspondence between Ms. Larson and Mr. Siegel. DC served document requests on August 17, 2010—almost one year ago—seeking all documents concerning the Siegels' Superman rights, which would include all Superman-related correspondence between Ms. Larson and Mr. Siegel.[1] On December 7, 2010, Magistrate Zarefsky entered a stipulated order compelling defendants to produce or list on a privilege log all responsive documents. Docket No. 133 at 1. Since then, defendants have repeatedly represented that "[t]o the extent that relevant documents exist, they have either been produced or designated as privileged." Docket No. 253-6 at 3; *see also id.* (chastising DC for its "overzealous quest to find non-existent documents").

---

[1] *E.g.*, Docket No. 161-15 at 163-65 (requesting "All DOCUMENTS relating to": "the disposition, division, or ownership of any rights in SUPERMAN," (No. 8); "the potential sale, assignment, license, or other disposition of any rights relating to SUPERMAN …, including but not limited to any solicitation, offer…." (No. 11); and "any solicitation, offer, or option from any DEFENDANT regarding the purported rights of YOU or the SIEGEL HEIRS in SUPERMAN," (No. 23)). The definition of "SIEGEL HEIRS" included "Michael Siegel." *Id.* at 160 ¶ 7.

EXHIBIT A
2

O'MELVENY & MYERS LLP
July 25, 2011 - Page 2

      Only after Magistrate Zarefsky issued a second order specifically compelling defendants to produce the May 13, 2003, letter from Mr. Siegel to Ms. Larson (or identify it as non-existent or previously produced), Docket No. 209 at 12, did defendants produce that letter for the first time.  Defendants' unjustified withholding of the May 13 letter forced DC to file motions seeking production of the November 2, 2002, letter from Ms. Larson to Mr. Siegel referenced in the May 13 letter; Ms. Larson's response to the May 13 letter (which appeared to be in a letter dated on or around July 5, 2003, or July 11, 2003); and all other correspondence between Ms. Larson and Mr. Siegel that defendants had withheld.  *See* Docket Nos. 253, 274, 267-1, 275.  Defendants asserted that they "were unable to find such November 2 letter," Docket No. 267-1 at 23; claimed that the "purported July 5 letter from Laura Siegel to Michael Siegel *does not exist*" and refused to confirm whether any such response letter was ever sent, Docket No. 269 at 12-15 (emphasis added); and represented that "DC has all of the non-privileged documents it sought," *id.* at 15.

      However, Ms. Larson's testimony proves these assertions were false.  She admits that:

- she sent Mr. Siegel a letter on November 2, 2002, *see* Rough Tr. of July 22, 2011, Dep. of Laura Larson ("Tr.") at 267 (Question:  "This letter [(the May 13 letter)] starts out thank you for your letter of November 2 of last year.  What letter was that?"  Answer:  "A letter I sent him on November 2.");

- she sent Mr. Siegel a response to his May 13 letter, *see id.* at 267 (Question:  "Did you respond to [the May 13 letter]?"  Answer:  "I'm sure I did.");

- Ms. Larson's response to the May 13 letter may have been sent on or around July 5, 2003, *see id.* at 277 (Question:  "[D]oes July 5, 2003, sound right to you as around the time that you responded to the May 13, 2003 letter?"  Answer:  "It could have been.");

- Ms. Larson sent you a copy of her response to the May 13 letter, and you proposed changes to it, *see id.* at 275 (Question:  ("Did you have Mr. Toberoff assist in any way in the response that you prepared?"  Answer:  "I believe I had him look at it."); *id.* at 279 (Ms. Larson:  "[Mr. Toberoff] made suggestions of changes in the wording of certain areas, and, you know, I retyped the letter, sent some of the things that he said and didn't use some other suggestions that he made."  Question:  "How did he convey his suggestions to you?"  Answer:  "…He wrote it on that letter that's being discussed here and faxed it back to me.");

- there is more correspondence between Ms. Larson and Mr. Siegel in your possession, *see id.* at 245 (Question:  "You said I haven't seen those documents in a long time.  What are those documents?"  Answer:  "Any letters between myself and Michael."  Question:  "Where are they?"  Answer:  "I turned them over to my attorney …. [A]nything I found I turned over to my attorney.  I said that if there's anything else it would be in my apartment."); *id.* at 65 (Question:  "Since May, 2010 have you turned over to Mr. Toberoff any of your correspondence with Michael Siegel that was in your home?"

EXHIBIT A
3

O'MELVENY & MYERS LLP
July 25, 2011 - Page 3

Answer: "Probably."); *id.* at 243 (Question: "Did you write any letter to [Mr. Siegel] him advising him that … you had approved Ari Emanuel purchasing his termination interest?" Answer: "I believe that he wrote to me and … mentioned it to me and I responded and said if he wanted to do it I would not stand in his way."); and

- there are yet more documents in Ms. Larson's possession that have never been reviewed by you or any other lawyer, as detailed below.

There is no conceivable basis for withholding non-privileged communications between Ms. Larson and her brother, both non-lawyers. *See U.S. v. Osborn*, 561 F.2d 1334, 1338 (9th Cir. 1977) (document does not become privileged because it was sent to lawyer); *Suezaki v. Super. Ct.*, 58 Cal. 2d 166, 176 (1962) (same). Nor is there any justification for your false representations that such documents did not exist.

The federal discovery rules require defendants to conduct a "diligent search" for responsive documents in *all* records and files in their possession, custody, or control. 3 RICHARD B. KENDALL ET AL., MATTHEW BENDER PRACTICE GUIDE: FEDERAL PRETRIAL CIVIL PROCEDURE IN PROCEDURE IN CALIFORNIA § 23.166 (2011) (citing *Qualcomm Inc. v. Broadcom Corp.*, 2008 US Dist LEXIS 911, at *5 (S.D. Cal. 2008)). According to a practice guide co-authored by your own counsel, failure by a party's attorney "to conduct a reasonable inquiry into the adequacy of their client's document search and production" may be sanctionable. *Id.*; *accord Waterbury v. Scribner*, 2008 WL 2018432, at *6 (E.D. Cal. May 8, 2008).

You have repeatedly represented, both to DC and to the Court, that defendants conducted such a "diligent search" and produced all responsive documents. *E.g.*, Docket No. 267-1 at 4 ("a supposed November 2, 2002 letter … has not been located by Defendants' counsel after a diligent search"); Docket No. 267-16 ¶ 4 ("I caused my office to re-check our relevant case files…."). During the June 20, 2011 hearing on DC's motion to compel, you represented to Magistrate Zarefsky that "we did perform a diligent search of our records, *all of our records*," for responsive documents (including the November 2, 2002, letter at issue in DC's motion) and "we also, of course, asked our client whether she had a copy and to *research her records*." June 20, 2011 Hr'g Tr. at 38:23-39:1, 39:8-10 (emphasis added).

During her testimony on Friday, however, Ms. Larson admitted that she has "various boxes that relate to the case" at her home, Tr. at 64, and that you have *never* reviewed those documents, *id.* at 70 (Question: "[S]ince the filing of this lawsuit in May, 2010, has anyone other than you searched the papers in your home related to this case?" Answer: "No.").

Ms. Larson also testified that several key documents exist that have never been produced, including an agreement to extend the IP Worldwide agreement, *see* Tr. at 51-52 (Question: "Do you recall having signed an amendment to [the IP Worldwide agreement] extending the term till I think you said 2005?" Answer: Yes." … Mr. Petrocelli: "Marc, have you produced that?" … Mr. Toberoff: "I should say if it exists and we have it, we will produce it."); and correspondence between Ms. Larson and George Zadorozny, *see id.* at 9 (Question: "Did you send [Mr. Zadorozny] a copy of the lawsuit in this case?" Answer: "Yes."); *id.* at 14-15 (Question: "Did

EXHIBIT A
4

O'MELVENY & MYERS LLP

July 25, 2011 - Page 4

Mr. [Zadorozny] to your knowledge review [the consent agreement]?"  Answer:  "Yes." … Question:  "Did you send him a copy of it before signing it?"  Answer:  "Yes."); *id.* at 67-68 (Question:  "How do you send things to George?"  Answer:  "Well, sometimes by mail."  Question:  "In 2010 how did you send [the conflict document] to George?"  Answer:  "If it was sent to me in electronic form, then …. I could e-mail him.");  *id.* at 12-13, 27, 67 (discussing Mr. Zadorozny's review of documents).

\*     \*     \*

Please confirm that, by no later than July 29, 2011, you will:  (1) produce all correspondence between Mr. Siegel and Ms. Larson, including Ms. Larson's November 2, 2002, letter to Mr. Siegel and Ms. Larson's response to the May 13 letter; (2) confirm that you have conducted a diligent and thorough review of all documents in Ms. Larson's possession, custody, and control—including any and all documents in her home, in storage, or in her attorneys' files, and any and all documents formerly belonging to Joanne Siegel; and (3) produce all responsive documents.  If you decline to do so, please provide us with the earliest possible date this week you are available to meet and confer on these issues, as DC intends to file a motion with the Court addressing these violations of your discovery obligations.

Very truly yours,

/s/ Matthew T. Kline

Matthew T. Kline

EXHIBIT A

5