1  DANIEL M. PETROCELLI (S.B. #097802)
     dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
     mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
     cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA  90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:   (310) 246-6779

7  PATRICK T. PERKINS (admitted *pro hac vice*)
     pperkins@ptplaw.com
8  PERKINS LAW OFFICE, P.C.
9  1711 Route 9D
   Cold Spring, NY 10516
10 Telephone:  (845) 265-2820
   Facsimile:   (845) 265-2819
11
12 Attorneys for Plaintiff DC Comics

13            **UNITED STATES DISTRICT COURT**

14            **CENTRAL DISTRICT OF CALIFORNIA**

15

16 DC COMICS,                           Case No. CV 10-3633 ODW (RZx)

17            Plaintiff,                 **DC COMICS' UPDATED, INITIAL**
                                         **OPPOSITION TO DEFENDANTS'**
18       v.                              **MOTION TO STRIKE UNDER**
                                         **CALIFORNIA'S ANTI-SLAPP**
19 PACIFIC PICTURES                      **STATUTE**
   CORPORATION, IP WORLDWIDE,
20 LLC, IPW, LLC, MARC TOBEROFF,         The Hon. Otis D. Wright II
   an individual, MARK WARREN
21 PEARY, as personal representative of  **Complaint Filed**: May 14, 2010
   the ESTATE OF JOSEPH SHUSTER,
22 JEAN ADELE PEAVY, an individual,
   LAURA SIEGEL LARSON, an
23 individual and as personal
   representative of the ESTATE OF
24 JOANNE SIEGEL, and DOES 1-10,
   inclusive,
25
             Defendants.
26

27

28

# TABLE OF CONTENTS

I.     INTRODUCTION .............................................................................. 1

II.    THE APPLICABLE LEGAL FRAMEWORK ................................. 3

III.   DC'S STATE-LAW CLAIMS AND EVIDENCE .......................... 5

       A.    Marc Toberoff's Business Activities ..................................... 5

       B.    Toberoff's Dealings With The Shusters Heirs ....................... 6

       C.    Toberoff's Dealings With The Siegel Heirs .......................... 9

IV.    DEFENDANTS' SLAPP MOTION FAILS ON BOTH PRONGS ............. 13

       A.    Defendants Fail The First Prong of the SLAPP Test:  DC's State
             Law Claims For Relief Are Not "Based On" Protected Speech ........ 13

             1.    The Gravamen of DC's State-Law Claims Is Business
                   Misconduct ................................................................ 13

             2.    Defendants' Mischaracterizations of DC's Claims Do Not
                   Trigger SLAPP ........................................................ 17

             3.    Defendants' *Hilton* Argument To Invoke SLAPP Is
                   Without Basis ............................................................ 21

       B.    Defendants Fail The Second Prong of the SLAPP Test:  DC's
             State-Law Claims Far Exceed the "Minimal Merit" Standard .......... 22

V.     CONCLUSION ............................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*Action Apt. Ass'n, Inc. v. City of Santa Monica*,
    41 Cal. App. 4th 1232 (2007)................................................................20

*Applied Bus. Software, Inc. v. Pac. Mortg. Exch., Inc.*,
    164 Cal. App. 4th 1108 (2008)..............................................................20

*Birschtein v. New United Motor Mfg., Inc.*,
    92 Cal. App. 4th 994 (2001)..................................................................23

*Blackburn v. Brady*,
    116 Cal. App. 4th 670 (2004)............................................................3, 16

*Briggs v. Eden Council for Hope & Opportunity*,
    19 Cal. 4th 1106 (1999)...........................................................................3

*Bylin Heating Sys., Inc. v. M & M Gutters, LLC*,
    2008 WL 744706 (E.D. Cal. Mar. 18, 2008) ...........................3, 16, 22

*Chevron Corp. v. Bonifaz*,
    2010 WL 1948681 (N.D. Cal. May 12, 2010) .......................................5

*City of Cotati v. Cashman*,
    29 Cal. 4th 69 (2002)................................................................18, 20, 25

*Computer Xpress, Inc. v. Jackson*,
    93 Cal. App. 4th 993 (2001)....................................................................4

*Dep't of Fair Emp't & Hous. v. 1105 Alta Loma Road Apts., LLC*,
    154 Cal. App. 4th 1273 (2007).........................................................3, 18

*Edwards v. Centex Real Estate Corp.*,
    53 Cal. App. 4th 15 (1997).............................................................17, 20

*Eisenberg v. Alameda Newspapers, Inc.*,
    74 Cal. App. 4th 1359 (1999)................................................................20

*Equilon Enters. v. Consumer Cause, Inc.*,
    29 Cal. 4th 53 (2002)...............................................................................4

*Gallimore v. State Farm Fire & Cas. Ins. Co.*,
    102 Cal. App. 4th 1388 (2002)..........................................................4, 19

DC'S UPDATED, INITIAL OPPOSITION TO
DEFENDANTS' ANTI-SLAPP MOTION

*GeneThera, Inc. v. Troy & Gould Prof. Corp.*,
   171 Cal. App. 4th 901 (2009) ............................................................ 15

*Graffiti Protective Coatings, Inc. v. City of Pico Rivera*,
   181 Cal. App. 4th 1207 (2010) .......................................................... 16

*Grant v. Aurora Loan Servs.*,
   736 F. Supp. 2d 1257 (C.D. Cal. 2010) ............................................ 19

*Haneline Pac. Props., LLC v. May*,
   167 Cal. App. 4th 311 (2008) ...................................................... 14, 15

*Hilton v. Hallmark Cards*,
   580 F.3d 874 (9th Cir. 2009) ....................................................... 18, 22

*In re Phillips*,
   4 Cal. State Bar Ct. Rptr. 315 (2001) .............................................. 16

*Kajima Eng'g & Const., Inc. v. City of L.A.*,
   95 Cal. App. 4th 921 (2002) ............................................................ 16

*Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.*,
   37 Cal. App. 4th 855 (1995) .......................................................... 3, 5

*Maston v. Miller, King & James, LLP*,
   2011 WL 193410 (Cal. Ct. App. Jan. 21, 2011) ................. 19, 21, 25

*Metabolife Int'l, Inc. v. Wornick*,
   264 F.3d 832 (9th Cir. 2001) ............................................................ 5

*Milne v. Stephen Slesinger, Inc.*,
   430 F.3d 1036 (9th Cir. 2005) ......................................................... 23

*Mindys Cosmetics, Inc. v. Dakar*,
   611 F.3d 590 (9th Cir. 2010) ...................................................... 19, 20

*Moser v. Triarc Cos.*,
   2007 WL 3026425 (S.D. Cal. Oct. 16, 2007) .................................... 5

*Munoz v. JC Penney Corp.*,
   2009 U.S. Dist. LEXIS 36362 (C.D. Cal. Apr. 9, 2009) ................. 21

*Navellier v. Sletten*,
   29 Cal. 4th 82 (2002) ......................................................... 4, 20, 24

iii

*Neville v. Chudacoff*,
  160 Cal. App. 4th 1255 (2008) ....................................................................... 15

*Newport Builders, Inc. v. N. Bay Constr., Inc.*,
  2009 WL 2083359 (N.D. Cal. July 14, 2009) ....................................... 14, 21, 24

*Robles v. Chalilpoyil*,
  181 Cal. App. 4th 566 (2010) ............................................................. 4, 19, 20, 22

*Rubin v. Green*,
  4 Cal. 4th 1187 (1993) ..................................................................................... 15

*Seltzer v. Barnes*,
  182 Cal. App. 4th 953 (2010) ......................................................................... 15

*Shropshire v. Fred Rappoport Co.*,
  294 F. Supp. 2d 1085 (N.D. Cal. 2003) ............................................. 5, 6, 15, 17

*Simpson Strong-Tie Co., Inc. v. Gore*,
  49 Cal. 4th 12 (2010) ......................................................................................... 3

*Smith v. Adventist Health System/West*,
  190 Cal. App. 4th 40 (2010) ........................................................................... 23

*Sycamore Ridge Apts., LLC v. Naumann*,
  157 Cal. App. 4th 1385 (2007) ..................................................................... 4, 24

*Taheri Law Group v. Evans*,
  160 Cal. App. 4th 482 (2008) ......................................................................... 15

*Turner v. Vista Pointe Ridge Homeowners Ass'n*,
  180 Cal. App. 4th 676 (2009) ....................................................................... 4, 18

*Violet Blue v. Johnson*,
  2008 WL 941959 (N.D. Cal. Apr. 7, 2008) ....................................................... 4

*Wang v. Wal-Mart Real Estate Bus. Trust*,
  153 Cal. App. 4th 790 (2007) ..................................................................... 14, 16

*World Fin. Grp., Inc. v. HBW Ins. & Fin. Servs., Inc.*,
  172 Cal. App. 4th 1561 (2009) ............................................................... 3, 16, 22

**STATUTES**

17 U.S.C. § 204(a) ............................................................................................... 9

17 U.S.C. § 304(c)(6)(D) ................................................................................... 24, 25

CAL. BUS. & PROF. CODE § 17200 ......................................................................... 25

CAL. CIV. PROC. CODE § 425.16 ............................................................................. 22

# OTHER AUTHORITIES

BALLENTINE'S LAW DICTIONARY (3d ed. 2010) ......................................................... 9

v

## I.    INTRODUCTION

Contrary to the central position of defendants Pacific Pictures Corporation, IP Worldwide, LLC, IPW, LLC, and Marc Toberoff, California's anti-SLAPP statute, does not apply to—and certainly does not bar—DC's Fourth, Fifth, and Sixth claims for relief.  As detailed in DC's complaint and corroborated by its discovery to date, DC's state-law claims do not arise out of Toberoff's allegedly protected activities as a lawyer.  Rather, they are based on defendants' joint-venture and other business agreements with the Shuster and Siegel heirs to exploit rights in Superman, starting *years* before Toberoff was retained to engage in any litigation.

Consistent with his business activities in the entertainment industry, Toberoff has publicly described himself not merely as a lawyer, but as an "intellectual property expert, entrepreneur and producer," and as "Chairman & CEO" of his companies.  Daniel M. Petrocelli Decl. ("PD") Ex. 1.  Defendant IP Worldwide's website advertised that it "was formed in mid-2002 [when key events at issue here occurred] to acquire classic films, TV shows, novels and other branded intellectual property and to exploit/monetize these properties," and it "manages an impressive library of over 250 popular literary titles."  *Id.*  (Toberoff has since taken down this version of the website.)  When questioned whether his multiple roles and activities present conflicts, Toberoff told the *Wall Street Journal* he "keeps a defined firewall between producing and legal matters."  *Id*. Ex. 4.  As is plain from the complaint, DC's claims concern the "producing," non-legal side of Toberoff's firewall.

On behalf of his entertainment companies, Toberoff negotiated and entered into business deals with the Siegel and Shuster heirs to secure and exploit a controlling interest in their putative Superman rights—transactions that violated DC's contracts, relationships, and protectable interests under state and federal law.  The contracting parties used by Toberoff (*i.e.*, defendants Pacific Pictures Corp. and IP Worldwide), Toberoff's business partners (*i.e.*, a talent agent), the capacity in which Toberoff entered into the contracts at issue (*i.e.*, as "President" of his

company), and the consideration he received (*i.e.*, "agent's fees" and assignments of copyrights) all dispel any notion that Toberoff was acting as a lawyer.

Toberoff says one purpose of his dealings with the heirs was, if necessary, to engage in litigation with DC if a business resolution over the parties' rights could not be reached. Even if true, this does not immunize Toberoff's business dealings. Courts rightly refuse to apply the SLAPP statute or litigation privilege because the "spectre of litigation 'loomed' [over] high-stakes negotiations" and "attorneys were involved." Moreover, and as they admitted in their recent depositions, the heirs did not enter into litigation retainer agreements with Toberoff—much less engage in litigation—until late 2004, well *after* Toberoff tortiously interfered. Importantly, the Toberoff defendants and heirs now *concede* their initial business contracts—the very agreements that interfered with DC's rights—were *unlawful*.

Defendants' motion, laced with rhetoric and invective, tries to mask these key facts and admissions because they demonstrate the motion is unfounded and that DC is entitled to the declaration of rights requested, for example, in its Sixth Claim. Defendants' assertion that there is no need to take discovery is equally wrong. Though not complete, DC's discovery to date has revealed important new evidence in support of its claims, and significant additional evidence is anticipated. As one example, Magistrate Zarefsky recently overruled defendants' privilege objections and ordered the production of the source documents for the "Toberoff Timeline." After this Court denied defendants' motion to overturn this ruling, defendants filed a petition for writ of mandamus in the Ninth Circuit; pursuant to a stay granted by the Magistrate, pending these writ proceedings, the documents have yet to be produced. Today, the Magistrate ordered defendants to produce additional related documents, the production of which is also stayed pending the writ petition. If and when defendants' writ petition is denied, these key documents will be turned over and DC can proceed to complete its discovery, including depositions of Mr. Toberoff, among others. DC diligently has pursued discovery since the outset

DC'S UPDATED, INITIAL OPPOSITION TO DEFENDANTS' ANTI-SLAPP MOTION

1    of this case and hopes its discovery will be concluded by year end.

2          In sum, defendants enjoy no immunity from liability—under the SLAPP

3    statute, litigation privilege, or otherwise—just because Toberoff is a lawyer.  Nor

4    can they hide behind Toberoff's "legal" firewall to avoid responsibility for tortious

5    business activities.  Defendants' SLAPP motion is without merit and should be

6    denied; alternatively, the Court can defer ruling until the close of DC's discovery.

7    **II.    THE APPLICABLE LEGAL FRAMEWORK**

8          The California Legislature enacted the SLAPP statute to curtail lawsuits

9    "aimed at preventing citizens from exercising their *political rights*…."  *Simpson*

10   *Strong-Tie Co., Inc. v. Gore*, 49 Cal. 4th 12, 21 (2010) (emphasis added).  The

11   statute protects those who speak on matters of public concern—be it a protester at a

12   rally, a political commentator on television, or a lawyer or witness in litigation.

13   *E.g.*, *Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1121

14   (1999) (testimony in court case); *Lafayette Morehouse, Inc. v. Chronicle Publ'g*

15   *Co*., 37 Cal. App. 4th 855, 863 (1995) (newspaper coverage of public issue).

16         There are important boundaries between what conduct the statute protects

17   and does not protect.  First, it offers *no* protection to wrongful courses of business

18   conduct, including efforts to obtain, control, and exploit intellectual property.  *E.g.,*

19   *World Fin. Grp., Inc. v. HBW Ins. & Fin. Servs.*, *Inc.*, 172 Cal. App. 4th 1561, 1569

20   (2009) (SLAPP inapplicable because "wrongful conduct and speech that plaintiffs

21   attribute to defendants was committed in a business capacity"); *Bylin Heating Sys.,*

22   *Inc. v. M & M Gutters, LLC*, 2008 WL 744706, at *6 (E.D. Cal. Mar. 18, 2008)

23   (acts of unlawfully procuring intellectual property not protected); *Blackburn v.*

24   *Brady*, 116 Cal. App. 4th 670, 676-77 (2004) (fraudulent bidding at public auction

25   "a purely business type event or transaction and is not … protected activity").

26         Second, where acts normally protected by SLAPP (*e.g.*, making legal filings)

27   are part of an overall scheme of business interference and help prove the scheme,

28   SLAPP does not apply.  *E.g.*, *Dep't of Fair Emp't & Hous. v. 1105 Alta Loma Road*

DC'S UPDATED, INITIAL OPPOSITION TO
DEFENDANTS' ANTI-SLAPP MOTION

1    *Apts., LLC*, 154 Cal. App. 4th 1273, 1283-88 (2007) (protected court filings

2    *evidence* of misconduct; SLAPP inapplicable); *Gallimore v. State Farm Fire &*

3    *Cas. Ins. Co*., 102 Cal. App. 4th 1388, 1399 (2002) (same; defendant conflated

4    "*wrongful acts* with the *evidence* that plaintiff will need to prove" them).  "[I]t is

5    the *principal thrust or gravamen* of the plaintiff's cause of action that determines

6    whether the anti-SLAPP statute applies"; "collateral allusions to protected activity"

7    do not trigger the statute.  *Robles v. Chalilpoyil*, 181 Cal. App. 4th 566, 575 (2010).

8         A SLAPP motion is analyzed in two steps.  Under the first prong of the test,

9    defendants must prove that DC's Fourth, Fifth, and Sixth claims are "based on"

10   protected activity.  *Navellier v. Sletten*, 29 Cal. 4th 82, 89 (2002).  Defendants'

11   "characterization" of DC's claims is irrelevant; what matters is what DC's

12   complaint actually states.  *Turner v. Vista Pointe Ridge Homeowners Ass'n*, 180

13   Cal. App. 4th 676, 685, 688-89 (2009).  If the defendants cannot meet their burden

14   under the first prong of the test, the Court must deny the SLAPP motion outright.

15   *E.g.*, *Violet Blue v. Johnson*, 2008 WL 941959, at *5 (N.D. Cal. Apr. 7, 2008).

16        Only if defendants carry their initial burden does the Court evaluate the

17   second prong—*i.e.*, whether DC can show a "probability" of success on its state-

18   law claims.  *Equilon Enters. v. Consumer Cause, Inc.*, 29 Cal. 4th 53, 67 (2002).

19   "This standard is 'similar to the standard used in determining motions for nonsuit,

20   directed verdict, or summary judgment,' in that the court cannot weigh the

21   evidence."  *Computer Xpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 1010 (2001).

22   In applying this test, "the court's responsibility is to accept as true the evidence

23   favorable to the plaintiff."  *Sycamore Ridge Apts., LLC v. Naumann*, 157 Cal. App.

24   4th 1385, 1397 (2007).  If DC's claims have even "minimal merit"—and they far

25   exceed this test—the SLAPP motion must be denied.  *Navellier*, 29 Cal. 4th at 89.

26        As Magistrate Zarefsky and this Court ruled last year, Docket Nos. 74, 110,

27   117—and the Ninth Circuit refused to overturn in denying defendants' writ petition,

28   PD Ex. 57—DC is entitled to full and fair discovery to oppose defendants' SLAPP

DC'S UPDATED, INITIAL OPPOSITION TO
                    DEFENDANTS' ANTI-SLAPP MOTION

1    motion and contest the fact issues raised.  *Metabolife Int'l, Inc. v. Wornick*, 264

2    F.3d 832, 846 (9th Cir. 2001); *Moser v. Triarc Cos.*, 2007 WL 3026425, at *3 (S.D.

3    Cal. Oct. 16, 2007) (if SLAPP motion challenges "sufficiency of the … evidence,

4    the court must allow the nonmoving party to conduct discovery"); *Chevron Corp. v.*

5    *Bonifaz*, 2010 WL 1948681, at *3 (N.D. Cal. May 12, 2010).

6           Moreover, this Court has the discretion to defer hearing and ruling upon

7    defendants' SLAPP motion until after discovery is closed or any later date it deems

8    appropriate.  *See Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.*, 37 Cal. App.

9    4th 855, 868 (1995) (nothing in SLAPP statute "prevents *the court* from continuing

10   the hearing to a later date so that the discovery it authorized can be completed");

11   *Shropshire v. Fred Rappoport Co.*, 294 F. Supp. 2d 1085, 1100 (N.D. Cal. 2003)

12   (deferring ruling until summary judgment because "SLAPP motion [and litigation-

13   privilege] raises factual questions that cannot be resolved" without discovery).

14   **III.    DC'S STATE-LAW CLAIMS AND EVIDENCE**

15          A. Marc Toberoff's Business Activities.  A self-styled rights hunter, Toberoff

16   locates authors of entertainment properties (or their heirs), enters into joint ventures

17   or other business agreements with them, and extracts money, producing credits, and

18   other benefits for exploiting their properties.  His Internet Movie Database entry

19   (like those of his companies) claims motion-picture *producer* credits.  PD Ex. 2.

20   Corporate formation documents for his companies say their stated purpose is work

21   in the "Media and Entertainment" business—they make no mention of the practice

22   of law.  *Id.* Ex. 46.  Although Toberoff has since changed his website to describe

23   only the work of his law firm, IP Worldwide's 2006 website explained:

24          Prior to founding IPW, Mr. Toberoff [the "Chairman and CEO"]
             acquired theatrical film, pay TV, merchandising and publishing rights
25          to the classic television series....  Mr. Toberoff's efforts led to Sony's
             feature film, *I SPY*… (2002), ***which he executive produced***….
26

27   *Id.* (emphasis added).  This lawsuit is not the first time Toberoff's business

28   activities have led to litigation or been questioned.  *Id.* Exs. 5-6.

1    The improper lengths to which Toberoff and his companies went in trying to

2    obtain Superman copyrights in derogation of DC's interests first surfaced in a letter

3    produced to DC in late 2008 called the "Toberoff Timeline," authored by one of

4    Toberoff's former colleagues.  Defendants moved at the start of the case to preclude

5    all discovery related to the Timeline, but that motion was denied.  Docket No. 74.

6    While defendants dismiss the document as an "inaccurate" "hit piece," Docket No.

7    160 at 5, discovery has confirmed many of its key claims, PD Appendix A at 63-65.

8    B.  Toberoff's Dealings With The Shusters Heirs.  In 2001, Toberoff and his

9    company Pacific Pictures tried to capture claimed Superman rights for themselves.

10   Joe Shuster, the original illustrator of Superman, died in 1992, and when he passed,

11   his family lost any right to terminate any copyright grants he made to DC.  Docket

12   No. 186 at 14.  Joe's brother (Frank) and sister (Jean Peavy) nonetheless asked DC

13   to provide them with lifetime pension payments and other benefits.  DC agreed,

14   and, in October 1992, Frank, Jean, and DC entered a written contract providing the

15   Shusters the requested benefits.  In return, the Shusters relinquished any copyright

16   interests in Superman by, among other things, effectively revoking and replacing

17   any possibly terminable copyright grants.  *Id.* Exs. 28-36; Docket No. 186 at 5-13.

18   From 1992 to 1999 Jean enjoyed good relations with DC, obtained additional

19   compensation from it, and, in 1999, specifically affirmed the validity of the 1992

20   agreement in lieu of any copyright termination claim.  *Id.*; Docket No. 61-10.  After

21   Frank died and Jean became aged, her adult son Mark Peary came to live with her.

22   As confirmed at his recent deposition, Peary, *without Jean's knowledge*, began

23   looking for ways to claim copyright interests in Superman.  PD Ex. 37 at 1113:4-

24   1117:6, 1209:24-1210:7, 1266:16-1267:21.  Peary contacted Toberoff, and

25   Toberoff spearheaded a tortious scheme to interfere with Jean's contract with DC.

26   A key component of this scheme was a "Joint Venture Agreement," dated

27   November 23, 2001, between the Shusters and Toberoff's company Pacific Pictures

28   whereby the heirs "transfer[ed] and assign[ed] to the Venture their rights, title and

- 6 -

DC'S UPDATED, INITIAL OPPOSITION TO
DEFENDANTS' ANTI-SLAPP MOTION

1    interests" in Joe Shuster's purported Superman rights.  *Id.* Ex 54.  The joint venture

2    agreement, together with defendants' subsequent contracts and conduct, interfered

3    with DC's 1992 agreement with the Shuster heirs.  Docket No. 184 at 8-10, 17-18.

4          Toberoff entered into and signed the 2001 agreement on behalf of Pacific

5    Pictures as "Marc Toberoff, President"—not "Marc Toberoff, Esq." or for a law

6    firm.  PD Ex. 54 at 2069.  While the contract contemplates the Venture will "retain

7    Marc Toberoff, Esq. to render legal services in connection with the Rights and the

8    Venture," *id.* at 2067, it was *not* a retention agreement, as a 2003 amendment to the

9    agreement explicitly confirms:  "PPC … is not a law firm," *id.* Ex. 55 at 2010.

10   Peary testified he knew Pacific Pictures was "one of Marc Toberoff's businesses,"

11   *id*. Ex. 51 at 1703:1-4, and the Shusters did not enter into a legal retainer agreement

12   with Toberoff until 2004, *id.* Ex. 37 at 1300:7-13.  Toberoff never initiated

13   litigation against DC in connection with the Venture or the Shusters' claimed rights

14   to Superman; it was not until DC commenced this case that litigation began.

15         As alleged in DC's complaint—and now admitted by defendants in briefing,

16   Docket Nos. 147-1 at 2, 8; 191 at 8, and by Peary in his deposition, PD Ex. 37 at

17   1310:1-1314:3, 1325:9-1337:1—the 2001 and 2003 PPC agreements were "void"

18   and "not lawful" because they (1) assign copyright interests to Pacific Pictures that

19   may not be assigned under the Copyright Act, FAC ¶¶ 165-173; Docket No. 185 at

20   4-11, and (2) prevented Peary and Jean from making an agreement concerning their

21   alleged Superman rights "without [Pacific Pictures'] express written consent," PD

22   Ex. 54 at 2067; Docket No. 185 at 4-11.  Although Toberoff and the heirs amended

23   their joint-venture agreement in 2003, it contains the same infirm provisions. *E.g.*,

24   *id*. Ex. 55 ¶  4, 7.  Peary admitted that Toberoff later told him these agreements

25   were "not lawful." *Id.* Ex. 37 at 1310:1-1314:3, 1325:9-1337:1.

26         The 2003 Pacific Pictures amendment also documents another violation of

27   DC's rights in the character Superboy.  Even though (1) Joe Shuster, while working

28   for DC illustrated the first images of Superboy, (2) Shuster's name appears in the

DC'S UPDATED, INITIAL OPPOSITION TO
DEFENDANTS' ANTI-SLAPP MOTION

by-line of the first Superboy script, (3) Shuster made Copyright Office filings with Jerry Siegel claiming to be the "co-author" of "Superboy," and (4) the 2001 Pacific Pictures Joint Venture Agreement includes a claimed interest by the Shusters in "Superboy," the *2003* amendment to the Joint Venture deleted all references to Superboy.  PD Ex. 37 at 1272:4-19, 1389:5-1431:12; *id.* at 1193:6-19, 1200:11-1204:5; PD Appendix A at 44-47.  As DC's complaint explains, Toberoff induced the Shusters to disavow any interest in Superboy in order to "park" 100% of the heirs' claimed rights in Superboy with his other venture partners, the Siegel heirs, and position them to assert greater leverage over DC.  FAC ¶¶ 86-91; Docket No. 186 at 19-20.  This manipulation of history and trafficking in copyright interests was unlawful and undertaken to frustrate interfere with DC's rights.

Defendants say there was nothing improper in the Shusters' giving up rights in Superboy, arguing a 1947 court decision held Jerry Siegel solely owned it.  Docket No. 148-1 at 18.  But this specious claim is belied by Shuster and Siegel's long-acknowledged history of co-authorship, including their joint Copyright filings in the 1970s.  Judge Larson also refuted it, saying it "denigrat[ed]" Shuster's "contribution" to Superboy.  Case No. 04-8776, Docket No. 151 at 62; PD Ex. 58.

Likewise, though admitting the Pacific Pictures joint-venture agreements were void under copyright law, defendants claim "no harm, no foul" because, they say, the venture was "cancelled" in 2004.  Mot. at 24.  They are wrong.  In the first place, the illegality existed for three years before the joint venture was "cancelled" and directly infringed DC's rights during this time.  Second, the 2004 cancellation did not cure the illegality.  The 2001 and 2003 agreements provide, "*in the event of termination* of the Venture *for any reason*, all Rights, property or assets of the Venture *will be held* fifty percent (50%) by [the Shusters] *and fifty percent (50%) by [Pacific Pictures]*."  PD Ex. 54 at 2068 (emphasis added).  By contract, Pacific Pictures thus owns 50% of the Shusters' putative rights, in violation of DC's rights.  Compounding the harm, it appears Pacific Pictures assigned its rights to another

1   Toberoff company, IP Worldwide, which assigned its rights to IPW.  PD ¶¶ 23-24.

2   Defendants try to explain this away, saying that because the 2001 and 2003

3   agreements were "cancelled," not "terminated," 50% of the Venture's rights did not

4   pass to Pacific Pictures.  *Id.* Ex. 37 at 1440:6-1442:14.  The law does not support

5   such word play.  *E.g.*, BALLENTINE'S LAW DICTIONARY (3d ed. 2010) ("A claim that

6   a contract has been cancelled is an admission that it was terminated.").  Equally

7   unavailing is defendants' assertion that the 2001 and 2003 agreements were

8   "supplanted by [a 2004] legal retainer."  PD Ex. 37 at 1440:6-21.  Pacific Pictures

9   is *not* a party to the 2004 agreement, and no provision in the retainer agreement

10  says Pacific Pictures is bound by its terms.  *Id*. at 1439:24-1440:24.  Defendants

11  have suggested there was an oral understanding that Pacific Pictures relinquished it

12  rights as part of the retainer agreement, *id.* at 1440:25-1442:18, but the retainer

13  expressly disclaims such oral "promise[s]," *id*. Ex. 40 ¶ 9, and the Copyright Act

14  does not allow them, 17 U.S.C. § 204(a).  DC's rights were and are being violated.

15  C.  Toberoff's Dealings With The Siegel Heirs.  After Jerry Siegel died, his

16  wife Joanne Siegel and daughter Laura Siegel Larson filed a copyright termination

17  notice seeking to recapture Superman copyrights.  Years of negotiation between the

18  heirs and DC ensued, during which the Siegels were represented by attorney Kevin

19  Marks and the Gang Tyre firm.  DC and the Siegels reached a settlement in October

20  2001, as confirmed by their correspondence.  FAC ¶¶ 66-69; PD Exs. 15-16.

21  The Toberoff defendants interfered with this settlement and DC's economic

22  interests and relationship with the Siegels.  FAC ¶¶ 70-85.  On November 29, 2001,

23  shortly after entering into his 2001 Pacific Pictures agreement with the Shusters,

24  Toberoff contacted Marks to inquire about the Siegels' interests in Superman.  PD

25  ¶ 19.  Marks did not return Toberoff's call.  On February 6, 2002, Toberoff called

26  again and spoke to Marks.  Marks testified Toberoff told him "he had a *separate*

27  *company that was in the business of acquiring intellectual property rights*.  I recall

28  him saying that he was interested in the Superman property and the Superboy

DC'S UPDATED, INITIAL OPPOSITION TO
DEFENDANTS' ANTI-SLAPP MOTION

property and had understood that I was representing the Siegel family interest, and he asked if he could talk to me about that." Marks refused to engage with Toberoff because the Siegels had an agreement with DC. *Id.* ¶¶ 21-22; Ex. 14 at 359.

Undeterred, on February 12, Toberoff and Pacific Pictures signed a contract with talent agent Ari Emanuel in which they formed the company IP Worldwide. Pacific Pictures promised to contribute its "current IP business" to IP Worldwide as well as Toberoff's "contacts" and "IP hit list." *Id.* Ex. 20. Under the agreement, Toberoff was to be attached as "producer" to IP Worldwide's motion pictures and receive "screen credit and a fee" for his producing work. *Id.* at 670. Obtaining the Siegels' Superman termination rights was one of IP Worldwide's prime objectives.

In the summer of 2002, Toberoff and IP Worldwide again reached out to Marks about the Siegels' rights. Marks testified that Toberoff probed about what he knew were "confidential[]" discussions between DC and the Siegels, which made Marks "uncomfortable." *Id.* ¶ 28. In a later discussion—the details of which were revealed to DC when the Toberoff Timeline was produced in 2008—Toberoff and his partner represented to Marks that they had a wealthy or "billionaire" investor who would pay the Siegels $15 million cash for their Superman rights, plus a large back-end on new Superman properties, including a new Superman movie. FAC Ex. A at 63. Marks conveyed the offer to the Siegels in a letter, PD Ex. 24 at 843:6-844:15, but, according to the Timeline, advised the Siegels, as he had Toberoff, that they had already an agreement with DC. *Id.* ¶¶ 29-31.[1]

As subsequent events revealed and as is recited in the Timeline, Toberoff's representations to Marks were false: there was no wealthy investor; there was no offer for $15 million cash, plus a back-end; and there was no offer to produce a

---

[1] The Timeline says Marks' letter angered the Siegels. *Id.* The letter is among the materials the Magistrate ordered defendants to produce to DC. Marks submitted a declaration in support of defendants' SLAPP reply disputing certain parts of the Timeline. Docket No. 196-3. DC moved to strike it, Docket No. 201, and hopes to depose Marks on this and other matters when the Ninth Circuit rules on defendants' writ. *Id.* ¶ 102. Marks has declined to be interviewed by DC. *Id.*

DC'S UPDATED, INITIAL OPPOSITION TO
                DEFENDANTS' ANTI-SLAPP MOTION

1  competing Superman movie.  These misrepresentations were made solely to induce

2  the Siegels from continuing their relationship with DC.  And it worked.  Through

3  Jean Peavy, Toberoff was introduced to the Siegels, met with them, and convinced

4  them to sign with his company, IP Worldwide.  *Id.* Exs. 37 at 1211:15-25; 59 at

5  2110:24-2111:15; 24 at 825:8-826:16.  On September 21, 2002, the Siegels served

6  written notice, effective immediately, that they were terminating Marks' services

7  and ending all further discussions with DC.  *Id.* Exs. 23, 25; Docket No. 207-1.

8        In an effort to break the chain of causation, defendants argue in their motion

9  that the Siegels ended their relationship with DC in May 2002, supposedly before

10  Toberoff fully intervened.  Mot. at 22.  But this is demonstrably refuted by the

11  Siegels' written correspondence in September 2002.  Furthermore, in discovery

12  responses in the *Siegel* case, the Siegels swore their negotiations with DC *did not*

13  end in May, but continued until September.  PD Ex. 21 at 694.  In her deposition in

14  this case, Laura Siegel Larson conceded the Siegels "did not cut off negotiations"

15  with DC until September 2002.  *Id.* Ex. 24 at 867:17-20.

16        Defendants dispute that they made false representations to the Siegels or their

17  counsel, Kevin Marks.  Docket No. 196 at 2, 10.  Yet a May 13, 2003, letter from

18  Michael Siegel to his half-sister Laura Siegel Larson—which defendants were

19  ordered to produce and first produced to DC in April 2011, PD ¶ 85—

20  contemporaneously corroborates the misrepresentations.  As Michael Siegel wrote:

21      I told you when [Toberoff] first contacted me, he wanted to buy my
22  share of the copyright.  *Marc had a mysterious billionaire who wanted
    to invest in the Superman copyright, put 15 million dollars up front plus
23  participation.  When you signed with Marc the billionaire invested
    elsewhere.  Marc has his own production company, he was going to
24  team with Emmanuel and make a movie.  This has not happened.*  You
    mentioned Marc had a number of innovative, proactive ideas that could
25  bring all members of the Siegel interest both justice and *many times
    more than the amount DC's representatives wanted to throw our way to
26  get rid of us.*  Marc has chosen not to open any dialog with Time
    Warner or anyone else.  Docket No. 225-4 (emphasis added).
27

28

DC'S UPDATED, INITIAL OPPOSITION TO
DEFENDANTS' ANTI-SLAPP MOTION

1    Importantly, Laura admitted in her deposition she wrote back to Michael—yet

2    defendants refuse to produce her response or even acknowledge that it exists.[2]

3         Confronted with the May 13 letter, Laura sought to discredit her deceased

4    half-brother, saying he was "confused."  PD Ex. 24 at 986:6-19.  But as her

5    testimony showed, Larson was estranged from Michael—she *never* even met or

6    spoke with him—and secretly collaborated with Toberoff and defendant IP

7    Worldwide to facilitate a buy-out of his rights.  *Id*. Ex. at 969:7-970:4; Ex. 52 at

8    1856:11-1860:5, 1869:19-1875:8.  Although defendants claim Michael's May 13

9    letter is not admissible and shows, at most, misrepresentations to Michael (not

10   Joanne or Laura), Docket No. 243 at 11-12, these erroneous arguments, *id.*, only

11   serve to highlight the factual disputes underlying this motion and why it should be

12   denied or deferred until DC's discovery is complete, *supra* at 4-5.

13        What is not in dispute, however, and plainly shows Toberoff's interference,

14   is that after Toberoff intervened and after the Siegels terminated their dealings with

15   DC, the Siegels and Toberoff's company, IP Worldwide, promptly entered into an

16   agreement of their own, dated October 23, 2002.  Like Toberoff's joint-venture

17   agreement with the Shusters, the IP Worldwide agreement restricted the Siegels'

18   rights and ability to enter into any agreement with DC.  It provided the Siegels

19   could "not transfer, assign, license or in any manner encumber [their alleged

20   Superman] Rights … other than through or as a result of IPW's exclusive

21   representation...."  PD Ex. 56 at 2076.  An amendment to this contract, produced to

22   DC for the first time just weeks ago, *id.* ¶ 110, extended its term to April 2005.

23        And like Toberoff's Joint Venture Agreement with the Shusters, the IP

24   Worldwide contracts were not legal retainer agreements, but documented business

25        [2] PD ¶¶ 83-85.  Defendants may be withholding the letter as privileged on the

26   (untenable) basis that Laura sent a copy to Toberoff, but so far, DC has been unable to challenge any such assertion.  That is because defendants' privilege logs list

27   documents in the most general terms and DC cannot tell whether any of the listings include Laura's letter to Michael.  To date, DC has been unsuccessful in obtaining

28   an order requiring a more detailed privilege log from defendants.  *Id.*

- 12 -    DC'S UPDATED, INITIAL OPPOSITION TO DEFENDANTS' ANTI-SLAPP MOTION

1   arrangements whereby IP Worldwide agreed to "negotiate the sale, lease, license
2   and all other dispositions" of the Siegels' rights in exchange for 10% of the gross
3   proceeds generated—consideration that Laura testified was like "an agent's fee."
4   *Id.* ¶ 38; Ex. 24 at 760:12-18. The agreements were also clear the Siegels had *not*
5   engaged IP Worldwide or Toberoff to represent them *in litigation*:

> [T]his Agreement does **not** include legal services and/or expenses in
> connection with litigation or formal legal arbitration, if any. The
> provision of such services…, if requested and desired by [the Siegels],
> will be rendered and provided by Marc Toberoff, Esq., subject to good
> faith negotiation of a mutually acceptable agreement executed by
> Mr. Toberoff and [the Siegels]. *Id.* Ex. 56 at 2076 (emphases added).

10   As Laura admitted at her deposition, she did not sign a litigation retainer
11   agreement with Toberoff—a contract she called her "litigation agreement"—until
12   2004. *Id.* Ex. 24 at 730:23-731:5, 768:19-22. She affirmed there was "no
13   agreement between any member of the Siegel family and the law offices of Marc
14   Toberoff in 2002," *id.* at 765:21-24, when the tortious interference occurred.

15   **IV.    DEFENDANTS' SLAPP MOTION FAILS ON BOTH PRONGS.**

16   Defendants cannot meet their burden to prove that DC's Fourth through Sixth
17   Claims trigger the SLAPP statute. Unable to address the actual substance of these
18   claims, which target illicit business dealings by the Toberoff defendants, defendants
19   construct a straw man, asserting DC's claims are based on Toberoff's actions as a
20   lawyer in connection with litigation. This is belied by any fair review of DC's
21   complaint and the evidence disclosed to date.

22   **A.    Defendants Fail The First Prong of the SLAPP Test:  DC's State-**
23   **Law Claims For Relief Are Not "Based On" Protected Speech.**

24   1. <u>The Gravamen of DC's State-Law Claims Is Business Misconduct.</u>

25   a. DC's Fourth Claim challenges Toberoff's deals with the Shusters that
26   interfere with DC's rights under its prior agreements with the Shusters. The 2001
27   and 2003 Joint Venture agreements between Pacific Pictures and the Shusters,
28   which defendants admit were unlawful, assign 50% of the Shusters' putative

DC'S UPDATED, INITIAL OPPOSITION TO
DEFENDANTS' ANTI-SLAPP MOTION

1  copyrights to Pacific Pictures—rights DC already owned by contract, and rights

2  that cannot be transferred under the Copyright Act.  The agreements also lock up

3  the Shusters' rights and prevent them from making any agreement with DC without

4  the consent of Pacific Pictures—*i.e.*, Marc Toberoff.  FAC 58-65; *supra* at 6-9.

5       These agreements unlawfully traffic in copyright interests, do not relate to a

6  matter of public concern, were not necessitated by litigation (actual or anticipated),

7  and, thus, do not trigger the SLAPP statute.  *See Haneline Pac. Props., LLC v. May*,

8  167 Cal. App. 4th 311, 320 (2008); *Newport Builders, Inc. v. N. Bay Constr., Inc.*,

9  2009 WL 2083359, at *4 (N.D. Cal. July 14, 2009).  The statute does not apply

10  where the "overall thrust of the complaint challenges the manner in which the

11  parties privately dealt with one another…."  *Wang v. Wal-Mart Real Estate Bus.*

12  *Trust*, 153 Cal. App. 4th 790, 809 (2007); *supra* at 3.

13       Defendants say their conduct is shielded because the contracts were "entered

14  into during a clear climate of anticipated litigation," Docket No. 192 at 6, and the

15  Pacific Pictures agreements allude to using Toberoff's services as a lawyer for the

16  "Venture," Mot. at 6.  Such rhetorical characterizations do not trigger the SLAPP

17  statute or litigation-privilege, as case like *Haneline*, 167 Cal. App. at 320, explain:

18  >    The Mays argue that "The spectre of litigation 'loomed' over the entire
19  >    course of the parties' communications," but the same could be said of
     >    nearly any high-stakes negotiation…. *Negotiations and persuasion*
20  >    *are part of any business deal.  To suggest that nearly any attempt at*
     >    *negotiation is covered by the privilege, especially when attorneys are*
21  >    *involved, is unduly overbroad*….  Because the communications at
     >    issue were not covered by the litigation privilege, *the anti-SLAPP*
22  >    *motion should **not** have been granted.*  (Emphasis added.)

23       Furthermore, the evidence establishes that Toberoff did not enter his legal

24  retainer agreement with the Shusters *until 2004*, PD ¶¶ 55-56, and Peary admitted

25  the 2004 "legal retainer" he signed was the first contract the Shusters signed with

26  Toberoff the attorney, *id.* Ex. 37 at 1300:7-13.  Moreover, it was through his

27  company—not a law firm—that Toberoff procured a share of the Shuster heirs'

28  copyright interests.  He did so to exploit those rights as a co-venturer and principal,

DC'S UPDATED, INITIAL OPPOSITION TO
DEFENDANTS' ANTI-SLAPP MOTION

1  not for a lawyer's fee.  In the *10 years* following the 2001 Pacific Pictures

2  agreement, Toberoff still has never filed any litigation on behalf of the Shusters.

3  On these facts, defendants come nowhere close to meeting their burden of showing

4  litigation was "actually contemplated in good faith and under serious consideration"

5  when the offending agreements were signed.  *Haneline*, 167 Cal. App. 4th at 319.

6      The cases cited by defendants confirm this conclusion—in each, the alleged

7  conduct for which defendant was sued arose out of *ongoing litigation* or litigation

8  that *commenced within months*.  Mot. at 16-18 (citing *Seltzer v. Barnes*, 182 Cal.

9  App. 4th 953 (2010); *GeneThera, Inc. v. Troy & Gould Prof. Corp.*, 171 Cal. App.

10  4th 901 (2009); *Neville v. Chudacoff*, 160 Cal. App. 4th 1255 (2008); *Taheri Law*

11  *Group v. Evans*, 160 Cal. App. 4th 482 (2008); *Rubin v. Green*, 4 Cal. 4th 1187

12  (1993)).  In *none*, did the lawyers act in separate roles as business persons, let alone

13  claim they separated their business and legal work with a "defined firewall."  Nor

14  did they admit, as Toberoff did in defendants' first SLAPP motion—conspicuously

15  edited out now—that he also advised the heirs on "business issues."  Docket No. 31

16  at 6.  In short, defendants' motion presents no basis to strike DC's Fourth Claim; at

17  best, it raises factual disputes to be decided only *after* full discovery.  *E.g.*,

18  *Shropshire*, 294 F. Supp. 2d at 1099-1100.

19      b. DC's Fifth Claim is based on defendants' acts in disrupting DC's ongoing

20  business relationship with the Siegels.  As alleged in DC's complaint, ¶¶ 184-85:

21      Toberoff was well aware of the [settlement] agreement between
    [DC] and the Siegel Heirs…. when he approached the Siegel Heirs and
22      their representatives in late 2001 and 2002 to express interest in
    purchasing their Superman rights….
23      Toberoff knew his actions were substantially certain to interfere with
24      the Siegel Heirs' agreement and ongoing business dealings with [DC].
    Toberoff intentionally engaged in independently wrongful conduct to
25      carry out his interference by … falsely misrepresenting to the Siegel
    Heirs that he had a billionaire investor ready to purchase their Superman
26      rights if they repudiated their settlement agreement with [DC]; falsely
    representing to the Siegels that he would help them produce a
27      competing Superman motion picture; and wrongly inducing the Siegels
    to repudiate their agreement and business relationship with [DC].
28

- 15 -                    DC'S UPDATED, INITIAL OPPOSITION TO
                          DEFENDANTS' ANTI-SLAPP MOTION

As discovery has corroborated, Toberoff and IP Worldwide engaged in business activities aimed at securing control over the disposition of the Siegels' putative rights. As stated in the Timeline, Toberoff "approache[d] the Siegels, _not as an attorney but as a film producer_, stating that he is 'allied' with Emanuel…." *Id.* Ex. A at 63. The October 2002 contract the Siegels were induced to sign with IP Worldwide made clear they were "not" retaining Toberoff to represent them in "connection with litigation." *Supra* at 13. Nor could they have made such an agreement. IP Worldwide is not a law firm; its principals are business parties— Pacific Pictures (a production company); Emanuel (a talent agent); and Endeavor (a talent agency), PD Ex. 20; and it could not legally agree to render litigation services to the Siegels. California law prohibits lawyers from partnering with business persons to practice law. *In re Phillips*, 4 Cal. State Bar. Ct. Rptr. 315 (2001).

As its website made clear, IP Worldwide was, in fact, a *business* partnering with other businesses, *not* a law firm: "IPW has strategic partnership with top talent agencies and production companies that allows it to quickly package properties for production." PD Ex. 1. Such *business* conduct is not protected by SLAPP. *Blackburn*, 116 Cal. App. 4th at 677; *Graffiti Protective Coatings, Inc. v. City of Pico Rivera*, 181 Cal. App. 4th 1207, 1224 (2010); *World Fin.*, 172 Cal. App. 4th at 1569; *Wang*, 153 Cal. App. 4th at 809; *Kajima Eng'g & Const., Inc. v. City of L.A.*, 95 Cal. App. 4th 921, 929-32 (2002); *Bylin*, 2008 WL 744706, at *6. The argument that SLAPP protects non-lawyer's assistance "in the litigation process" is irrelevant. Mot. at 15. The "litigation process" did not begin in the *Siegel* case until 2004—over two years *after* Toberoff intervened. The Siegels did not sign a retainer agreement until 2004. Moreover, litigation conduct is *not* the gravamen of DC's claims; tortious business misrepresentations and interference are.

While defendants argue SLAPP should apply any time the underlying facts of a case involve the possibility of litigation, courts have rejected this extreme view. Such an extension of the law would make no sense because it would enable

DC'S UPDATED, INITIAL OPPOSITION TO DEFENDANTS' ANTI-SLAPP MOTION

1   tortfeasors to shield their misconduct merely by partnering with lawyers or

2   referencing in their agreements that they intend to retain counsel or engage in

3   litigation.  Defendants' unprincipled readings of the SLAPP statute and litigation-

4   privilege "swallow up much of the law of torts," "'provide immunity' for fraud,"

5   and must be rejected.  *Edwards v. Centex Real Estate Corp.*, 53 Cal. App. 4th 15,

6   32-33 (1997); *id.* at 33-40.  In any event, defendants' self-serving assertions about

7   their "intent" in engaging in the business activities challenged in this case do not

8   trump contrary evidence or trigger SLAPP protection; at most, they raise "issue[s]

9   of fact," *id.* at 39, that must be tested in discovery, *supra* at 4.

10       c.  DC's Sixth Claim seeks a declaration that the Toberoff defendants

11  engaged in unfair competition by engineering offending "consent agreements" that

12  gave his companies or the heirs rights to block transfers of copyright interests to

13  DC.  In addition to the Pacific Pictures agreements, Mark Peary admitted in his

14  deposition that an agreement he made in 2008, in advance of a mediation with DC

15  in the *Siegel* litigation, continues in effect to this day and bars him from making any

16  contracts with DC without the Siegels' consent, even though the mediation ended

17  years ago.  PD ¶ 59.  Apart from any litigation, these consent agreements violate

18  California's unfair competition laws because they limit the heirs' freedom of choice

19  required by California law, in addition to violating the Copyright Act.  Such rights-

20  impeding, business dealings—which existed separate and apart from any litigation

21  that the Shusters ever filed (*because they filed none*), and that continue to interfere

22  with DC's rights to this day—are not protected by SLAPP.  *Supra* at 3-4, 14-16.

23       2. Defendants' Mischaracterizations of DC's Claims Do Not Trigger SLAPP.

24       a.  Defendants assert that DC's Fourth Claim triggers SLAPP because DC's

25  complaint recounts that Toberoff (i) filed termination notices for the Shusters in

26  2003; (ii) played a role in the "probate action" Peary filed in 2003; and (iii) formed

27  an attorney-client relationship with the Shusters.  Mot. at 14-19.  What matters on

28  "Prong 1" of the SLAPP test, however, is the *gravamen* of DC's complaint—*not*

- 17 -                    DC'S UPDATED, INITIAL OPPOSITION TO
                          DEFENDANTS' ANTI-SLAPP MOTION

1   defendants' selective "endeavors to characterize" the complaint or to cherry pick

2   certain facts out of context. *Turner*, 180 Cal. App. 4th at 685; *supra* at 3.

3       DC's Fourth Claim plainly is not "*based on*" any of these acts. *Cashman*, 29

4   Cal. 4th at 78 (emphasis added). It is DC's First and Second Claims—brought

5   under federal law (and not subject to SLAPP, *see Hilton v. Hallmark Cards*, 580

6   F.3d 874, 881 (9th Cir. 2009))—that challenge the validity, scope, and propriety of

7   the Shuster's termination notice. FAC ¶¶ 105-64. Likewise, while the probate

8   action and improprieties therein are relevant to DC's First Claim, they are *not* the

9   basis for Claims Four through Six. No claim in the case is based Toberoff's

10  retention as a lawyer or his actions in litigation. DC's state-law claims are based on

11  defendants' misconduct in inducing the heirs to enter into agreements and transfer

12  rights in derogation of DC's interests. As titled, DC's Fourth Claim is specifically

13  for "Intentional Interference with 1992 Shuster Agreement." FAC ¶¶ 175-79.

14      Courts follow a useful exercise to ascertain the "gravamen" of a claim. As

15  illustrated by *Dep't of Fair Emp't*, 154 Cal. App. 4th at 1285, a claim for relief is

16  not "based on" protected SLAPP activity if plaintiff could bring it regardless of the

17  alleged protected activity at issue. Here, DC's Fourth Claim would be viable if all

18  it alleged was that defendants wrongfully induced the Shusters to sign the Pacific

19  Pictures agreements. Even if the subsequent acts singled out in defendants' motion

20  (filing notices, assisting in a probate case, or even encouraging litigiousness) might

21  help evidence the overall scheme, they are not the root of DC's claims and do not

22  trigger SLAPP. *See id.* "[C]ollateral allusions to protected activity" do *not* trigger

23  the statute, *Robles*, 181 Cal. 4th at 575, and like defendant in *Gallimore*, 102 Cal.

24  App. 4th 1388, 1399, whose SLAPP motion rightly was denied, the defendants here

25  wrongly conflate the "allegedly *wrongful acts* [DC challenges in its state-law

26  claims for relief] with the *evidence* [that DC] will need to prove such misconduct."

27      Recent case law confirms this. In *Maston v. Miller, King & James, LLP*,

28  2011 WL 193410 (Cal. Ct. App. Jan. 21, 2011), a law firm sued its former client,

- 18 -

1  alleging he misrepresented key facts to the firm, causing it to work for months on a

2  meritless case.  The client's SLAPP motion argued the firm's claims arose "entirely

3  out of petitioning activity," because the parties' relationship was premised on and

4  resulted in litigation.  *Id.* at *1.  The trial court denied the client's SLAPP motion,

5  and the appellate court affirmed, because "the principal thrust" of the firm's claims

6  arose out of a "contractual relationship"—a lawyer-client agreement—and was

7  "based on the duties and responsibilities of the parties in carrying out that

8  relationship"—*e.g.*, being truthful.  *Id.* at *6.  That the client filed litigation (a

9  protected speech act) *after* he misled his lawyers about the bases for the suit did not

10 "mean the [firm's case] arose from [projected] activity.  *Id.* at *3; *Grant v. Aurora

11 Loan Servs.*, 736 F. Supp. 2d 1257, 1272 & n.53 (C.D. Cal. 2010) (unpublished

12 state-court opinion with reasoned analysis may be used as persuasive authority).

13      Here, too, Toberoff might have wanted to represent the Shusters in a suit

14 against DC at some point, but that is immaterial to DC's Fourth Claim.  What *is*

15 material are the joint-venture agreements between Pacific Pictures and the Shusters

16 that contravened DC's longstanding agreement and relationship with the Shusters

17 and that impermissibly assigned rights and restricted the Shusters' ability to

18 contract with DC—conduct not protected by the SLAPP statute.  *See id.*

19      These distinctions show why defendants' cited cases are inapposite.  They

20 cite *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590 (9th Cir. 2010), as holding that

21 establishing "a property right under a comprehensive federal statutory scheme" is

22 covered by SLAPP.  But they fail to disclose that the gravamen of the complaint in

23 *Mindys* was defendants' alleged violation of state law by *registering* a trademark

24 with the Trademark Office.  *Id.* at 598.  DC's Fourth Claim does not challenge the

25 copyright termination filing the Shusters made, nor is it "based on" this filing.  The

26 termination is merely a "collateral" fact in the case.  *Robles*, 181 Cal. 4th at 575.

27      b. Defendants' SLAPP arguments about DC's Fifth and Sixth Claims

28 similarly miss the mark.  They assert DC's claims are based on "communications ...

DC'S UPDATED, INITIAL OPPOSITION TO
DEFENDANTS' ANTI-SLAPP MOTION

1    in connection with settlement negotiations and anticipated litigation" because

2    "[l]itigation between DC and the Siegels was contemplated as early as 1997, when

3    the Siegels served their initial notices of termination." Mot. at 17, 16 (citing cases).

4           There are numerous problems with this contention. First, whether the Siegels

5    or other defendants "contemplated" litigation is a contested "issue of fact" that can

6    not be resolved without discovery—and cannot be decided based on defendants'

7    self-serving assertions about their intent. *Action Apartment*, 41 Cal. 4th 1232,

8    1251; *Eisenberg v. Alameda Newspapers, Inc*., 74 Cal. App. 4th 1359, 1381 (1999)

9    (reversing summary judgment because it "remain[ed] a triable issue of fact whether,

10   at the time of the [communications], imminent litigation was seriously proposed

11   and actually contemplated in good faith"); *Edwards*, 53 Cal. App. 4th at 35 n.10.

12          Second, the gravamen of DC's Fifth Claim is that *in 2002*, Toberoff and IP

13   Worldwide employed misrepresentations to induce the Siegels to cut ties with DC

14   so they could enter into an agreement among themselves—which is exactly what

15   they did. False representations to induce an exclusive marketing deal, restrictions

16   on transfers of rights, and a 10% "agent's" fee, cannot be recast into "settlement"

17   and "litigation" advice. *City of Cotati v. Cashman*, 29 Cal. 4th 69, 78 (2002). The

18   IP Worldwide contract itself says Toberoff was *not* thereby providing litigation

19   advice, and Laura Siegel Larson admitted she did not sign a "litigation agreement"

20   with Toberoff until 2004, when Toberoff the litigator filed suit for the Siegels.

21          Third, just because DC filed this case in 2010—after the Siegels filed suit in

22   2004—"does not mean the action arose from" that litigation. *Navellier*, 29 Cal. 4th

23   at 89; *Applied Bus. Software, Inc. v. Pac. Mortg. Exch., Inc*., 164 Cal. App. 4th

24   1108, 1116 (2008). Nor does it change the gravamen of DC's Fifth (or any other)

25   Claim—*i.e.*, defendants' *business* misconduct. *Maston*, 2011 WL 193410 at *3-6.

26          Addressing a nearly identical situation, the court in *Newport*, 2009 WL

27   2083359, at *4, rejected defendants' arguments, explaining:

28

DC'S UPDATED, INITIAL OPPOSITION TO
                                                     DEFENDANTS' ANTI-SLAPP MOTION

Defendant [like Toberoff and IP Worldwide] was merely *communicating a proposed business deal*, not an offer to settle [any] claims [in litigation]. That the Defendant's offer was made *while the DeAngelis Plaintiffs and the Newport Defendants were engaged in efforts to resolve their dispute does not cloak Defendant's communications under the auspices of protected activity*. Any connection between Defendant and the ongoing settlement discussions between the DeAngelis Plaintiffs and the Newport Defendants was, at best, tangential to the litigation…. (Italics added.)

As to DC's Sixth Claim, defendants argue the 2008 consent agreement "relate[s] to the settlement of ongoing litigation." Mot. at 20 n.8. But as Peary admitted, that agreement remains in effect today; did not expire when mediation efforts failed; and currently operates impermissibly to prevent or restrict the Shusters and Siegels from entering into an agreement with DC without the consent of the others—and perhaps Toberoff's consent as well. PD Ex. 37 at 1158:19-1159:4, 1167:15-25, 1174:5-7. Furthermore, given that defendants refuse to produce the consent agreement, drafts of it, or to allow full testimony as to its substance and making, they cannot advance self-serving arguments about their intentions in making the agreement to meet their SLAPP burden.[3]

### 3. Defendants' *Hilton* Argument To Invoke SLAPP Is Without Basis.

Defendants' final argument to trigger SLAPP is that since this case "concerns control of the rights to the iconic character *Superman*, [it] is indisputably a public issue." Mot. at 20. This argument is frivolous. Scores of cases are litigated each

---

[3] Based on Judge Larson's rulings in the *Siegel* case about mediation and other privileges, the Magistrate ordered that DC was not entitled to the production of the written 2008 consent agreement, a ruling this Court declined to overturn. Docket Nos. 209,248. That ruling was made before DC obtained deposition testimony that the consent agreement remains in effect to this day, long after the parties' 2008 mediation. PD ¶¶ 5-9. As an operative agreement that remains in effect independent of the prior mediation, defendants cannot employ the mediation privilege or confidentiality agreements categorically to bar disclosure and use of such independent facts. *E.g.*, *Munoz v. JC Penney Corp.*, 2009 U.S. Dist. LEXIS 36362, at *8-10 (C.D. Cal. Apr. 9, 2009) (Wright, J.). DC is seeking additional discovery orders relating to this consent agreement. PD Ex. 43.

DC'S UPDATED, INITIAL OPPOSITION TO DEFENDANTS' ANTI-SLAPP MOTION

1    year in California alone concerning rights in well-known entertainment properties,

2    and there is no case holding that SLAPP acts as a bar to all such suits.

3    　　　Defendants' two legal citations are of no help.  The first is to the language of

4    the SLAPP statute concerning the "exercise of free speech in connection with a

5    public issue."  CAL. CIV. PROC. CODE § 425.16(e)(4).  That language does not

6    mean—and has never been read to mean—that all acts of wrongdoing concerning

7    high-profile issues are protected speech.  Courts routinely refuse to apply SLAPP

8    just because the general subject matter of the case is well known.  *E.g.*, *World Fin.*,

9    172 Cal. App. 4th at 1569 (rejecting argument that since "workforce mobility" is

10   matter of public interest wrongful solicitation of plaintiff's employees is protected).

11   Defendants' other citation, *Hilton*, 580 F.3d at 884, involved speech—a Hallmark

12   greeting card that mocked Paris Hilton.  Here, defendants' illicit dealings and

13   conduct to enrich themselves at the expense of DC do not "evince[] an intent to

14   convey a particularized message" about Superman.  *Id.*  Rather, they involve

15   "entering into a business relationship" that is, by definition, not an "exercise of free

16   speech."  *Robles*, 181 Cal. App. 4th at 580.  "[C]ommunications" about unlawfully

17   procuring intellectual property are not protected.  *Bylin*, 2008 WL 744706, at *6.

18   **B.    Defendants Fail The Second Prong of the SLAPP Test:  DC's**

19   **State-Law Claims Far Exceed the "Minimal Merit" Standard.**

20   　　　Because defendants cannot trigger the SLAPP statute, the Court need not

21   reach the second part of the SLAPP test.  *Supra* at 4.  As DC showed in opposing

22   defendants' Rule 12 motions and in its other filings in the case, none of defendants'

23   challenges to DC's state-law claims has merit—be they litigation-privilege, statute-

24   of-limitations, or other defenses.  Docket Nos. 181-86.  Like their Rule 12 motions,

25   defendants' SLAPP motion, *at best*, turns on disputed factual questions, are the

26   subject of ongoing discovery, and cannot be decided now.  *Id.*

27   　　　<u>Fourth Claim.</u>  As established in discovery, defendants do not dispute the

28   invalidity of their Pacific Pictures agreements.  Nor do they contest the factual

DC'S UPDATED, INITIAL OPPOSITION TO
DEFENDANTS' ANTI-SLAPP MOTION

1    sufficiency of DC's Fourth Claim.  Rather, they incorporate their Rule 12

2    arguments to contest this claim.  As detailed in our opposition to defendants' Rule

3    12 motion, these challenges fail:

4        1. Defendants assert DC's 1992 agreement with Jean Peavy violates the

5    Copyright Act.  However, the Ninth Circuit has ruled that "parties may contract, as

6    an alternative to statutory termination," to revoke all prior, terminable copyright

7    grants—just as DC and Peavy did here.  *Milne v. Stephen Slesinger, Inc.*, 430 F.3d

8    1036, 1046 (9th Cir. 2005); Docket No. 186 at 6-7.  The 1992 contract affords DC

9    valuable rights with which Toberoff directly and unlawfully interfered.

10        2.  Defendants argue DC's claim is time-barred because it discovered the

11   Pacific Pictures agreements in 2006.  This ignores that the agreements *continue* to

12   harm DC, *supra* at 6-9, and will do so well beyond 2013 when the Shusters' alleged

13   termination takes effect.  *E.g.*, *Birschtein v. New United Motor Mfg., Inc.*, 92 Cal.

14   App. 4th 994, 1003 (2001) (continuing wrong tolls statute until date of last injury).

15   Moreover, the Shusters' 2008 consent agreement continues in effect to this day.

16        3.  Defendants erroneously assert that DC's claim is barred by the litigation

17   privilege.  Defendants' improper *business acts* in pursuing the Shusters and

18   restraining their freedom of choice are not shielded by the litigation privilege—a

19   defense on which defendants bear the burden of proof.  *Supra* at 14-21; Docket No.

20   184 at 13-17; *Smith v. Adventist Health System/West*, 190 Cal. App. 4th 40, 60-61

21   (2010) (rejecting privilege even when SLAPP applied).

22        Fifth Claim.  Defendants challenge the factual sufficiency of DC's claims

23   that they intentionally interfered with DC's settlement agreement and ongoing

24   relationship with the Siegels.  Defendants misstate or ignore the evidence.

25        1.  Defendants concede they were aware of DC's settlement agreement and

26   relationship with the Siegels.  Toberoff admits he tracked the Siegels' termination

27   efforts.  PD ¶ 22.  When Toberoff and IP Worldwide approached the Siegels to

28   express an interest in purchasing their rights, Marks told them the Siegels had made

DC'S UPDATED, INITIAL OPPOSITION TO
                                       DEFENDANTS' ANTI-SLAPP MOTION

a deal with DC. *Id.* ¶¶ 21-22. To induce the Siegels to sever its relations with DC, defendants falsely represented they had a wealthy investor ready to purchase their rights and they would market their rights and help make competing Superman properties. *Id.* ¶¶ 28-31. Defendants dispute this, but Michael Siegel's May 13 letter is proof that such misrepresentations were made. *Id.* ¶ 89. Key, undisputed facts support DC's claims, including that, after Toberoff intervened and made misrepresentations to the Siegels via their lawyer Kevin Marks, the Siegels fired Marks, terminated their relationship with DC and entered into the October 2002 agreement with Toberoff's company IP Worldwide. *Id.* ¶¶ 29-32.[4]

The Court must "accept as true the evidence favorable to" DC as well as draw all inferences in its favor. *Sycamore*, 157 Cal. App. 4th at 1397; *Navellier*, 29 Cal. 4th at 89. Furthermore, were the Court to consider defendants' factual challenges, DC must be permitted to conclude discovery, especially in light of the Magistrate's orders compelling defendants to produce the source documents for the Toberoff Timeline and related correspondence. *Supra* at 4 (cases requiring such discovery); PD ¶ 94 (discussing the Magistrate's rulings).

2. Defendants argue the Fifth Claim is time-barred because DC discovered the IP Worldwide agreement in 2006. Again, DC's continuing harms refute this defense and, in any event, defendants' concealments kept DC in the dark until late 2008, when the Timeline was produced, *Norgart*, 21 Cal.4th at 393, and, thereafter, when evidence like the May 13 letter finally emerged in this case, PD ¶ 89.

4. Defendants' litigation-privilege defense fails for all the reasons above. *E.g., Newport*, 2009 WL 2083359, at *4.

Sixth Claim. DC claims defendants' illicit consent agreements constitute unfair competition under CAL. BUS. & PROF. CODE § 17200.

_____

[4] Defendants say DC "withdr[ew]" its claim that Toberoff wrongfully induced the Siegels to repudiate the settlement agreement. Mot. at 23. That is false. DC's amended complaint provided more detail to demonstrate Toberoff's misconduct.

DC'S UPDATED, INITIAL OPPOSITION TO
DEFENDANTS' ANTI-SLAPP MOTION

1.  As set forth in the parties' Rule 12 papers, while defendants *admit* the Pacific Pictures agreements violate § 304(c)(6)(D) of the Copyright Act, they assert that section of the Act provides a right without a remedy.  Docket No. 78 at 4-7. But as the Ninth Circuit confirmed, and Congress made clear, § 304(c)(6)(D) gives an original copyright grantee like DC a "competitive advantage … in the nature of a right of 'first refusal.'"  Docket No. 185 at 5; *see also id*. at 4-11.  DC is engaged in discovery proceedings right now to obtain additional information about this agreement.  PD Decl. ¶ 91.  Defendants' arguments are not ripe.

2.  Defendants assert the Sixth Claim is time-barred and barred by the litigation privilege, but those arguments are wrong for the reasons above and as explained in DC's Rule 12 papers.  Docket No. 185 at 11-13, 24-25.  The harms that defendants' consent agreements are causing are ongoing and exist and arise independent of any litigation.  *Supra* at 6-9, 21; *Cotati*, 29 Cal. 4th at 76-81 (claims in second lawsuit did not arise from underlying litigation; rather, they challenged independent misconduct); *Maston*, 2011 WL 193410 at *3-6 (same).

3.  Finally, defendants assert the Sixth Claim is preempted by the Copyright Act, but as shown in its Rule 12 papers, DC does not sue defendants for improperly infringing, selling, or displaying Superman works.  The Copyright Act's narrowly defined preemption provisions do not apply.  Docket No. 185 at 15-16.

## V.    CONCLUSION

Defendants' SLAPP motion should be denied.  Alternatively, the Court should defer ruling on the motion until the close of DC's discovery.

Dated:  August 8, 2011

Respectfully Submitted,

By:    /s/ Daniel M. Petrocelli
Daniel M. Petrocelli
Attorneys for Plaintiff DC Comics

CC1:854751

DC'S UPDATED, INITIAL OPPOSITION TO DEFENDANTS' ANTI-SLAPP MOTION