# EXHIBIT 14

ORIGINAL SHIPPED   OCT 1 7 2006

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JOANNE SIEGEL and LAURA SIEGEL LARSON, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 04-8400 (RSWL)(RZx) |
| WARNER BROS. ENTERTAINMENT INC., et al., | ) ) ) | -and- |
| Defendants. | ) ) ) | No. 04-8776 (RSWL)(RZx) |
| AND RELATED COUNTERCLAIMS. | ) | |

**CERTIFIED COPY**

DEPOSITION OF KEVIN S. MARKS

Beverly Hills, California

Saturday, October 7, 2006

Volume 1

Reported by:

DAVID S. COLEMAN

CSR No. 4613

**U.S. LEGAL**

*Support*

*Certified Shorthand Reporters*

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA 91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

*Los Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento . . . and across the nation*

EXHIBIT 14
207

**Page 1**

09:58

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


JOANNE SIEGEL and LAURA     )
SIEGEL LARSON,              )
                            )
            Plaintiffs,     )
                            )
      vs.                   )     No. 04-8400 (RSWL)(RZx)
                            )
WARNER BROS. ENTERTAINMENT )            -and-
INC., et al.,               )
                            )     No. 04-8776 (RSWL)(RZx)
            Defendants.     )
_____)
AND RELATED COUNTERCLAIMS.


DEPOSITION OF KEVIN S. MARKS

Beverly Hills, California

Saturday, October 7, 2006

Volume 1


Reported by:

DAVID S. COLEMAN

CSR No. 4613


**U.S. LEGAL SUPPORT**

EXHIBIT 14
208

```
1            Deposition of KEVIN S. MARKS, taken on

2       behalf of Defendants and Counterclaimants,

3       at 9665 Wilshire Boulevard, 9th Floor, Beverly

4       Hills, California, beginning at 10:05 AM on

5       Saturday, October 7, 2006, before DAVID S.

6       COLEMAN, Certified Shorthand Reporter No. 4613.

7

8

9   APPEARANCES:

10

11  For Plaintiffs:

12       LAW OFFICES OF MARC TOBEROFF
         BY:  MARC TOBEROFF
13       Attorney at Law
         2049 Century Park East, Suite 2720
14       Los Angeles, California 90067
         310-246-3333
15

16  For Defendants and Counterclaimant:

17       WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
         BY:  MICHAEL BERGMAN
18       Attorney at Law
         9665 Wilshire Boulevard, 9th Floor
19       Beverly Hills, California 90212
         310-858-7888
20       mbergman@wwllp.com

21           -and-

22       PERKINS LAW OFFICE
         BY:  PATRICK T. PERKINS
23       Attorney at Law
         1711 Route 9D
24       Cold Springs, New York 10516
         845-265-2820

25
```
2

**U.S. LEGAL SUPPORT**

EXHIBIT 14
209

```
 1    APPEARANCES (Continued):

 2


 3    For the Witness:

 4          JEFFER MANGELS BUTLER & MARMARO
            BY:  MARC MARMARO
 5          Attorney at Law
            1900 Avenue of the Stars, 7th Floor
 6          Los Angeles, California 90067-4308
            310-203-8080
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                          3
```

**U.S. LEGAL SUPPORT**

EXHIBIT 14

210

1                         I N D E X

2

3

4   WITNESS                 EXAMINATION          PAGE

5   KEVIN S. MARKS

6                      BY MR. BERGMAN           8

7                      BY MR. TOBEROFF          203

8

9                         EXHIBITS

10

11  DEPOSITION                                  PAGE

12  1    First Amended Privilege Log            11

13  2    Kevin Marks calendars, Bates Nos.      12
         GTRB 0506 - 0514

14  3    Kevin Marks call records, Bates        12
         Nos. GTRB 0515 - 0635

15
16  4    Letter from Bruce Ramer to Carol       38
         Simkin and John Schulman dated
17       April 30, 1999, Bates Nos. GTRB
         0009 - 0010

18  5    Letter from John Schulman to Bruce     43
         Ramer dated July 7, 1999, Bates
19       Nos. GTRB 0018 - 0019

20  6    Letter from Bruce Ramer to John        44
         Schulman dated July 9, 1999, Bates
21       Nos. GTRB 0011 - 0013

22  7    Letter from John Schulman to Bruce     46
         Ramer dated July 12, 1999, Bates
23       Nos. GTRB 0016 - 0017

24

25

                                                     4

**U.S. LEGAL SUPPORT**

EXHIBIT 14
211

INDEX (Continued):

EXHIBITS (Continued)

DEPOSITION                                                    PAGE

8    Letter from Paul Levitz to Joanne              51
     Siegel and Laura Siegel Larson dated
     October 10, 1997, Bates Nos. GTRB
     0499 - 0504

9    Letter from John Schulman to Bruce             52
     Ramer dated September 13, 1999,
     Bates Nos. GTRB 0020 - 0021

10   Letter from Bruce Ramer to John                58
     Schulman dated September 28, 1999,
     Bates Nos. GTRB 0026 - 0028

11   Letter Kevin Marks to Paul Levitz              59
     dated November 3, 1999, Bates Nos.
     GTRB 0031 - 0032

12   Fax from Patrick Perkins to Kevin              67
     Marks dated January 6, 2000, Bates
     Nos. GTRB 0033 - 0042

13   Letter from Kevin Marks dated Carol            68
     Simkin dated March 7, 2000, Bates
     Nos. GTRB 0043 - 0056

14   Letter from Kevin Marks to John                90
     Schulman dated June 9, 2000, Bates
     Nos. GTRB 0124 - 0129

15   Letter from John Schulman to Kevin             92
     Marks dated July 18, 2000, Bates
     Nos. GTRB 0001 - 0006

16   Letter from Joanne Siegel to Gerald            97
     Levin dated July 24, 2000, Bates
     Nos. WB005977 - 005981

17   Letter from John Schulman to Kevin             98
     Marks dated July 26, 2000, Bates
     Nos. GTRB 0113 - 0114

5

**U.S. LEGAL SUPPORT**

EXHIBIT 14

212

```
1    INDEX (Continued):

2              EXHIBITS (Continued)

3    DEPOSITION                                    PAGE

4    18    Letter from Richard Parsons to         105
           Joanne Siegel dated August 22, 2000,
5          Bates No. WB005976

6    19    Letter from Joanne Siegel to Gerald    105
           Levin dated April 27, 2001, Bates
7          Nos. WB007853 - 007855

8    20    Letter from Kevin Marks to John        132
           Schulman dated October 19, 2001,
9          Bates Nos. GTRB 0302 - 0308

10   21    Letter from John Schulman to Kevin     149
           Marks dated October 26, 2001, Bates
11         Nos. GTRB 0145 - 0152

12   22    Letter from John Schulman to Bruce     176
           Ramer and Kevin Marks dated January
13         22, 2002, Bates Nos. 000000974

14   23    Letter from Patrick Perkins to Kevin   177
           Marks dated February 1, 2002, Bates
15         Nos. GTRB 0350 - 0399

16   24    Handwritten notes, Bates No. WB005972  180

17   25    Letter from Joanne Siegel to Richard   193
           Parsons dated May 9, 2002, Bates Nos.
18         000000676 - 678

19   25A   Fax from John Schulman to Kevin Marks  194
           dated 5-16-02, Bates Nos. GTRB 0474,
20         0475 and 0477

21

22

                  INSTRUCTION NOT TO ANSWER
23

                      Page   Line
24
                      10     17
25                    30     2, 15, 24

                                                          6
```

EXHIBIT 14

213

1    INDEX (Continued):

2

3              INSTRUCTION NOT TO ANSWER

4                   Page   Line

5                    31     22
                     32     24
6                    37     16
                     38     23
7                    54     7
                     56     16
8                    57     6
                     63     12
9                    68     22
                     93     9
10                  106     6
                    127     23
11                  139     2
                    141     15
12                  142     3, 13
                    143     3
13                  146     15
                    147     7
14                  150     5
                    151     16
15                  173     5
                    174     8
16                  193     10
                    198     23

17

18

19

20

21

22

23

24

25

                                                    7

**U.S. LEGAL SUPPORT**

EXHIBIT 14
214

| | |
|---|---|
| 1 | Beverly Hills, California, Saturday, October 7, 2006 |
| 2 | 10:05 AM |
| 3 | |
| 4 | |
| 5 | KEVIN S. MARKS, |
| 6 | having been first administered an oath, |
| 7 | was examined and testified as follows: |
| 8 | |
| 10:05 9 | EXAMINATION |
| 10:05 10 | BY MR. BERGMAN: |
| 10:05 11 | Q   Good morning, Mr. Marks. |
| 10:05 12 | A   Good morning. |
| 10:05 13 | Q   Would you state your full name for record, |
| 10:05 14 | please? |
| 10:05 15 | A   Kevin Stuart Marks, K E V I N, S T U A R T, |
| 10:06 16 | M A R K S. |
| 10:06 17 | Q   And am I correct, Mr. Marks, that you're a |
| 10:06 18 | partner in the firm of Gang, Tyre, Ramer & Brown? |
| 10:06 19 | A   Technically a member.  You can call me a |
| 10:06 20 | partner, yes. |
| 10:06 21 | Q   Okay.  Both you and Gang, Tyre have been served |
| 10:06 22 | with subpoenas for particular documents, and your counsel |
| 10:06 23 | has produced documents stamped GTRB 001 through 0635, and |
| 10:06 24 | we will be reviewing certain of those documents as we |
| 10:06 25 | proceed along with other documents.  You've also produced |

8

**U.S. LEGAL SUPPORT**

EXHIBIT 14
215

10:06 1    a first amended privilege log of documents that have not

10:06 2    been produced, and we will be looking at that as well.

10:06 3        Having recently reread the Danjaq opinion, I

10:06 4    know that at one point you did some litigation.  How many

10:06 5    years did you do litigation for?

10:07 6        A    At Gang, Tyre?

10:07 7        Q    Yes.

10:07 8        A    Four and a half years.

10:07 9        Q    And before Gang, Tyre?

10:0710        A    Approximately six years.

10:0711        Q    Okay.

10:0712        A    Over -- let me say over a period of six years.

10:0713        Q    Okay.  And what firm was that at?

10:0714        A    Arnold & Porter.

10:0715        Q    Okay.  And am I correct that given your

10:0716    background in litigation, I can forego the usual

10:0717    admonitions and instructions given to a deponent at the

10:0718    outset of a deposition?

10:0719        A    I'm comfortable waiving admonitions if my

10:0720    counsel is.

10:0721        MR. MARMARO:  I think you can proceed.

10:0722        MR. BERGMAN:  Okay, fine.

10:0723        MR. MARMARO:  And I will just note that in

10:0724    addition to the documents that were produced and the

10:0725    privilege log and the amended privilege log we produced,

9

EXHIBIT 14
216

10:07 1   we also served a written response to both subpoenas.

10:07 2         MR. BERGMAN:  That is correct.

10:07 3     Q    And just to ask one common question, sir, are

10:07 4   you free this Saturday morning of any medication or

10:07 5   anything else that might affect your memory?

10:07 6     A    I am free of such things.

10:08 7     Q    Okay.  Have you, Mr. Marks, within the past

10:08 8   couple of weeks read any of the documents that have been

10:08 9   produced by you and the firm Gang, Tyre?

10:0810         MR. MARMARO:  Let me object to the question.  I

10:0811   think that invades the attorney-client, attorney work

10:0812   product privilege in terms of any documents that he read

10:0813   at the request or with counsel, so I am going to object

10:0814   and instruct him not to answer that question.  I think

10:0815   there are questions that are related that you can ask but

10:0816   not that one.

10:0817        (Instruction not to answer.)

10:0818         MR. BERGMAN:  Okay.

10:0819     Q    Just to make the record complete, have you read

10:0820   any of the documents that have not been produced and are

10:0821   listed in the privilege log?

10:0822         MR. MARMARO:  You can answer.

10:0823         THE WITNESS:  May I answer that?

10:0824         MR. MARMARO:  Yes.

10:0825         THE WITNESS:  No.

         10

10:08 1    BY MR. BERGMAN:

10:08 2         Q    Okay.  Have you spoken concerning this matter

10:08 3    with Mr. Toberoff within the past couple of weeks?

10:09 4         A    No.

10:09 5              MR. BERGMAN:  Okay.  Before we go any further,

10:09 6    let me mark some of the documents that we will be

10:09 7    referring to.  The first one is your first amended

10:09 8    privilege log, and I would ask the reporter to mark that

10:09 9    as Exhibit 1.

10:0910              (Deposition Exhibit 1 marked.)

10:0911              MR. BERGMAN:  Next I will ask the reporter --

10:0912              THE WITNESS:  Can I?

10:0913              MR. MARMARO:  May we go off the record?

10:1014              MR. BERGMAN:  Of course.

10:1015              (Recess.)

10:1016              MR. MARMARO:  There is one clarification that

10:1017    Mr. Marks wants to give to a prior answer.

10:1018    BY MR. BERGMAN:

10:1019         Q    Go ahead, sir.

10:1020         A    Mr. Bergman, you previously asked if I had

10:1121    reviewed any of the documents on the privilege log, and I

10:1122    said no, but as I look at this, the answer is yes, I

10:1123    reviewed the documents that are described at the very end

10:1124    of the privilege log as "telephone log."

10:1125         Q    Very well.  Thank you for that.

                                                          11

**U.S. LEGAL SUPPORT**

EXHIBIT 14
218

10:11 1        Next I would like the reporter to mark documents

10:11 2   which have been Bates stamped GTRB 0506 through 0514.

10:11 3        (Deposition Exhibit 2 marked.)

10:12 4   BY MR. BERGMAN:

10:12 5        Q   Mr. Marks, are the documents contained in

10:12 6   Exhibit 2 copies of your desk calendar for the respective

10:12 7   years?

10:12 8        A   It's -- yes, they are excerpts from my desk

10:12 9   calendar for the years noted on the cover page.

10:1210        Q   Yes.

10:1211            To your knowledge, during the period from 1999

10:1212   to 2002, did Mr. Ramer maintain desk calendars?

10:1213        A   Not to my knowledge.

10:1214        MR. BERGMAN:  Okay.  Now I will ask the reporter

10:1215   to mark as Exhibit 3 a series of phone call registers

10:1216   which are marked GTRB 0515 through 0635.

10:1317        (Deposition Exhibit 3 marked.)

10:1318   BY MR. BERGMAN:

10:1319        Q   Before I go to Exhibit 3, Mr. Marks, on Exhibit

10:1320   2 there are certain handwritten notations.  Are those

10:1321   each in your hand?

10:1422        A   Yes.

10:1423        Q   Okay.  And do you maintain these desk calendars

10:1424   in the normal course of your business?

10:1425        A   Yes.

                                                                12

**U.S. LEGAL SUPPORT**

EXHIBIT 14
219

10:14 1     Q    And to the best of your knowledge, are the

10:14 2  handwritten entries correct?  Do they actually reflect

10:14 3  meetings at the designated times and dates?

10:14 4          MR. MARMARO:  Each and every one?

10:14 5          MR. BERGMAN:  Yes.

10:14 6          MR. MARMARO:  Take a moment to look through them

10:14 7  and review it.

10:14 8          THE WITNESS:  The answer is I don't know.

10:14 9  BY MR. BERGMAN:

10:1410     Q    Okay.  With respect to Exhibit 3, are these

10:1411  telephone call registers which reflect calls received and

10:1412  placed by you?  And when I say "by you," I mean to

10:1513  distinguish you from Mr. Ramer.

10:1514          MR. MARMARO:  The question is vague.

10:1515          THE WITNESS:  Well --

10:1516  BY MR. BERGMAN:

10:1517     Q    Let's take it --

10:1518     A    May I ask -- I have to ask a question.

10:1519     Q    Surely.

10:1520     A    This is what I was handed as Exhibit 3, GTRB

10:1521  0515 through 0625 and GTRB 0626 through GTRB 0635.  These

10:1522  are different types of documents.  So it may be easier to

10:1523  actually have these as separate exhibits to respond to

10:1524  the question, but if you would -- but I think for the

10:1625  pending question, these documents both reflect calls made

                           13

**U.S. LEGAL SUPPORT**

EXHIBIT 14
220

10:16 1    to me and calls made or placed by Bruce Ramer.

10:16 2        Q    Okay.  Then as they were produced, they were

10:16 3    stapled together, and let me go through them one by one

10:16 4    as I received them.  Okay?

10:16 5            The first package that I received was 0515

10:16 6    through 0522.  Could you tell me, please, whether that

10:16 7    reflects calls involving you or to your knowledge

10:16 8    Mr. Ramer?

10:16 9        A    These involve calls to me.

10:1610        Q    The second grouping I received is marked GTRB

10:1611    0523 through 530.  Are those -- does that reflect your

10:1712    calls or Mr. Ramer's?

10:1713        A    This reflects calls to me.

10:1714        Q    The next grouping is Bates stamped 0531 through

10:1715    0549.  Does this reflect calls to and from you or to and

10:1716    from Mr. Ramer?

10:1717        A    This reflects calls to me.

10:1718        Q    The next grouping is Bates stamped 0550 through

10:1719    566.  The same question, sir.

10:1720        A    Same answer.

10:1721        Q    The next grouping is 0567 through 0588.  Are

10:1822    these your calls or Mr. Ramer's?

10:1823        A    These reflect calls to me.

10:1824        Q    The next is 0589 through 0597.  Are these your

10:1825    registers or Mr. Ramer's?

                                                              14

EXHIBIT 14
221

10:18 1     A   These are mine.

10:18 2     Q   The next grouping is 0598 through 0605.  Are

10:18 3  these your registers or Mr. Ramer's?

10:18 4     A   These are mine.

10:18 5     Q   The next grouping is 0606 through 0625.  Are

10:19 6  these your registers or Mr. Ramer's?

10:19 7     A   These are mine.

10:19 8     Q   And the final grouping, if I may reach over,

10:19 9  0626 through 0634.  As I see from the top --

10:1910       MR. MARMARO:  35, I think.

10:1911       MR. TOBEROFF:  25.  Which one are we looking at?

10:1912       MR. BERGMAN:  35.  0626 through 0635.

10:1913     Q   And I notice on 0626 the name Bruce Ramer.  Do

10:1914  those reflect Mr. Ramer's calls?

10:1915     A   Yes.

10:1916       MR. TOBEROFF:  The last one, I don't have a copy

10:1917  of.

10:1918       MR. MARMARO:  I'm sorry?

10:1919       MR. TOBEROFF:  Do you have an extra copy of this

10:1920  for me?

10:1921       MR. BERGMAN:  No, I... Excuse me.  Off the

10:2022  record one moment.

10:2023      (Pause in the deposition.)

10:2124  BY MR. BERGMAN:

10:2125     Q   With respect to the documents of Exhibit 3 which

15

**U.S. LEGAL SUPPORT**

EXHIBIT 14
222

10:21 1    you indicated were your phone registers, by whom are

10:21 2    those maintained?  Are they maintained by your assistant

10:21 3    or by yourself?

10:21 4        A    There are two different types of documents

10:21 5    reflected in this package.  One type is maintained by me,

10:21 6    and one type is maintained by my assistant.

10:21 7        Q    Okay.  Which type is maintained by you?

10:22 8        A    The type reflected in GTRB 0515 through 0521 --

10:22 9    excuse me -- 0522.

10:2210        Q    And the -- I'm sorry.  The writings contained on

10:2211    those documents, is that your handwriting?

10:2212        A    Yes.

10:2213        Q    Now, is it true that the balance of the

10:2214    documents that reflect your calls are maintained by your

10:2215    assistant?

10:2216        A    Yes.

10:2217        Q    I notice that, as is customary, it contains --

10:2218    each document contains a call completed column, some of

10:2319    which reflect check marks, some of which do not.

10:2320            In your experience, does the lack of a check

10:2321    mark invariably indicate that the call was not completed?

10:2322            MR. MARMARO:  The question lacks foundation.

10:2323            THE WITNESS:  May I answer?

10:2324            MR. MARMARO:  Yes, go ahead.

10:2325            THE WITNESS:  I believe the lack of a check mark

                                                                    16

**U.S. LEGAL SUPPORT**

EXHIBIT 14
223

10:23 1    does not necessarily reflect that the call was not

10:23 2    completed.

10:23 3    BY MR. BERGMAN:

10:23 4        Q    Okay.  And are each of these registers, both

10:23 5    those that you handle yourself and those that are done by

10:23 6    your assistant, are they kept in the normal course of

10:23 7    your business?

10:23 8        A    Yes.

10:23 9        Q    Okay.  If I may, I'd like to go into your

10:2410    background a little bit.  Can you describe your

10:2411    educational background?

10:2412        A    Yes.  Graduated from Stanford University, 1978.

10:2413    Graduated from Boalt School of Law, 1982.

10:2414        Q    Am I correct that while at Boalt, you were an

10:2415    editor on the law review?

10:2416        A    I was.

10:2417        Q    And also --

10:2418        A    I was the projects editor.

10:2419        Q    I see.

10:2420             I also recall seeing in Martindale that you were

10:2421    the first prize winner of the Nathaniel Burken contest.

10:2422             What was the subject of that paper?

10:2423        A    First national prize.  The subject of the paper

10:2424    was right of publicity.

10:2525        Q    And following your graduation from Boalt in '82,

                                                                    17

10:25 1    what was your first employment?

10:25 2        A    Arnold & Porter.

10:25 3        Q    And you were at Arnold & Porter until when, sir?

10:25 4        A    Till summer 1988.

10:25 5        Q    And in what areas did you practice while at

10:25 6    Arnold & Porter?

10:25 7        A    Copyright, trademark, federal litigation,

10:25 8    government investigations.

10:25 9        Q    Your practice while at Arnold & Porter that

10:2610    related to copyright and trademark law, was that in a

10:2611    transactional capacity, or was it in a litigation

10:2612    capacity?

10:2613        A    It was in a litigation capacity and an advisory

10:2614    capacity.

10:2615        Q    Following Arnold & Porter, by whom were you

10:2616    employed?

10:2617        A    Gang, Tyre, Ramer & Brown.

10:2618        Q    Did that commence relatively quickly after your

10:2619    summer of '88 departure from Arnold?

10:2620        A    September 1988.

10:2721        Q    And was there a period of time while you were at

10:2722    Gang, Tyre that you were doing litigation?

10:2723        A    Yes.

10:2724        Q    And what period of time was that, sir?

10:2725        A    September 1988 through approximately the next

                                                                    18

**U.S. LEGAL SUPPORT**

EXHIBIT 14
225

10:27 1    four and a half years.

10:27 2         Q    And in what primary areas was your litigation

10:27 3    work?

10:27 4         A    Litigation work was whatever litigation or

10:27 5    disputes or dispute resolutions were at that -- that

10:27 6    clients of the firm were involved in.  Frequently it

10:27 7    involved matters of rights, frequently it involved

10:28 8    matters of agreements, but it was various.

10:28 9         Q    Okay.  Copyright work as well?

10:2810         A    Yes, some.

10:2811         Q    One of them being the Danjaq case.

10:2812              Right?

10:2813         A    Which one?

10:2814         Q    The District Court action?

10:2815         A    Which one?

10:2816         Q    Okay.  MGM/UA?

10:2817              Was there more than one?

10:2818         A    Yes.  Yes.

10:2819         Q    There is a Danjaq case that I'm familiar with

10:2820    that dealt in part with the question of the application

10:2821    of U.S. copyright laws to foreign revenues.

10:2922              Do you remember that case?

10:2923         A    Well, I certainly recall a case where Danjaq was

10:2924    a plaintiff and MGM/UA and a number of others were

10:2925    defendants, and the triggering event of the litigation

                                                              19

**U.S. LEGAL SUPPORT**

EXHIBIT 14
226

10:29 1    involved foreign licenses of rights under James Bond

10:29 2    films that we contended violated certain rights of

10:29 3    Danjaq.

10:29 4        Q    Okay.   Subsequent to sometime in 1992 when you

10:29 5    ceased doing litigation, what became your primary

10:30 6    practice area at the Gang, Tyre firm?

10:30 7        A    Transactional.

10:30 8        Q    And for the record, can you describe what you

10:30 9    mean by "transactional"?

10:3010        A    Yes.   That refers to advising clients in

10:3011    connection with their agreements for services and rights.

10:3012        Q    Without getting into or identifying any specific

10:3013    clients, can you indicate the types of clients whom you

10:3014    represented in a transactional capacity from 1992 on?

10:3015        A    Yes.   Largely in the film and television

10:3016    industries, producers, writers, directors, actors.

10:3017        Q    As a transactional lawyer, were you involved in

10:3118    negotiations to acquire film rights in literary

10:3119    properties?

10:3120        A    Yes.

10:3121        Q    Do you have any estimate of how many separate

10:3122    negotiations you've conducted since that time relating to

10:3123    the acquisition of film rights in motion picture -- in

10:3124    literary properties?

10:3125            MR. MARMARO:   Up to the present?

                                                                    20

**U.S. LEGAL SUPPORT**

EXHIBIT 14
227

10:31 1          MR. BERGMAN:  Yes, sir.

10:31 2     Q    Just an estimate.

10:31 3     A    More than 10.

10:31 4     Q    Would it be much more than 10?

10:31 5     A    It's genuinely hard for me to say.

10:31 6     Q    Okay.  In connection -- strike that.

10:32 7          You also practice, at least according to

10:32 8     Martindale-Hubbell, in the intellectual property area.

10:32 9          Is that correct?

10:3210     A    Yes, that's right.

10:3211     Q    And what does that work entail?

10:3212     A    Advising clients about principally copyright

10:3213     rights and sometimes trademark rights.

10:3214     Q    Would you look, please, Mr. Marks, at Exhibit 1,

10:3215     which is the privilege log, and I'm -- I would appreciate

10:3216     it if you could by looking at this document estimate for

10:3217     me approximately when you first became involved in the

10:3318     matter that we're here to discuss today; namely, the

10:3319     Siegel interest in the Superman property.

10:3320     A    I can respond to that question without referring

10:3321     to the privilege log.

10:3322     Q    Very well.

10:3323     A    I recall we became involved a few weeks before

10:3324     the Superman terminations became effective.

10:3325     Q    And do you recall that approximate date?

                                                            21

**U.S. LEGAL SUPPORT**

EXHIBIT 14
228

10:33 1      A    The effective date was approximately April 15,

10:33 2    1999.  So representation began a month or two before

10:33 3    that.

10:34 4      Q    And am I correct that when the firm was

10:34 5    retained, it was retained by two individuals, that is,

10:34 6    Joanne Siegel and her daughter Laura Siegel Larson?

10:34 7      A    The firm was retained to represent the Superman

10:34 8    termination interest, and Joanne Siegel and Laura Siegel

10:34 9    Larson represented the majority holders of that interest.

10:3410      Q    Well, was your firm engaged to also represent

10:3411    Michael Siegel?

10:3412      A    During the course of the representation, in

10:3413    representing the complete interest, we did effectively

10:3514    represent Michael Siegel, at least vis-a-vis DC Comics.

10:3515      Q    So that in your mind Mr. Siegel, Michael Siegel,

10:3516    was a client of the firm in connection with this matter?

10:3517      A    The client was really the Superman termination

10:3518    interest.  That's who the client was.

10:3519      Q    Were there any other individuals, other than

10:3520    Joanne, Laura and Michael Siegel, who held an interest to

10:3521    your knowledge in the Superman termination interest?

10:3522      A    Not the one that we represented.

10:3523      Q    Was there a termination interest other than the

10:3624    one you represented?

10:3625      A    The -- my understanding is that there is a --

22

**U.S. LEGAL SUPPORT**

EXHIBIT 14
229

10:36 1    there was at the time and still is a nascent termination

10:36 2    interest in the Shuster family or the Shuster estate,

10:36 3    which we did not represent.

10:36 4        Q    Okay.  Am I correct that by 1999 your firm was

10:36 5    no longer engaged in a litigation practice?

10:36 6        A    That is correct.

10:36 7        Q    So that your retention related to the potential

10:36 8    negotiation of an agreement with DC Comics?

10:36 9            MR. MARMARO:  The question is vague.

10:3610            MR. BERGMAN:  Okay.

10:3611        Q    What specific activities was your firm engaged

10:3712    by the Siegel termination interest to participate in?

10:3713        A    To advise them generally and to attempt to

10:3714    negotiate an arrangement with Time Warner, or then AOL

10:3715    Time Warner.

10:3716        Q    Okay.  Am I correct that the copyright interest

10:3717    that was the subject of the termination notices was a

10:3718    series of copyrights held by DC Comics?

10:3719        A    DC Comics or its predecessors that had been

10:3720    transferred up to DC Comics over the years.  That's my

10:3721    understanding.

10:3722        Q    Okay.  Was there a written retainer agreement

10:3823    between your firm and the Superman termination interest?

10:3824        A    Yes.

10:3825        Q    And is that document identified on the privilege

23

**U.S. LEGAL SUPPORT**

EXHIBIT 14
230

10:38 1    log, Exhibit 1?

10:38 2        A    I don't know.

10:38 3        Q    Okay.  Could you take a quick look and let me

10:38 4    know?

10:38 5        A    I do not know if it is referred to in these

10:38 6    entries on the privilege log.

10:39 7            MR. MARMARO:  And I will just note that without

10:39 8    looking at the subpoena, I don't know whether that

10:39 9    document would have been within the call of any of the

10:3910    requests in the subpoena.

10:3911            MR. BERGMAN:  Okay.  I understand.

10:3912            MR. MARMARO:  And if it was not, it would

10:3913    certainly not be on the log.

10:3914    BY MR. BERGMAN:

10:3915        Q    Aside from Mr. Ramer and yourself, Mr. Marks,

10:3916    was any other Gang, Tyre attorney involved in the

10:3917    representation of the Superman termination interest?

10:3918        A    No.

10:3919        Q    And were both you and Mr. Ramer generally

10:3920    involved in all aspects of that representation?

10:3921            MR. MARMARO:  The question is vague, overbroad.

10:3922            THE WITNESS:  How I understand "all aspects," I

10:3923    would have to say no.  As the matter progressed, I

10:4024    believe that I was the person who was, if you will, the

10:4025    point person and the one principally involved.

                                                              24

**U.S. LEGAL SUPPORT**

EXHIBIT 14
231

BY MR. BERGMAN:

Q   Is there a particular time period you could estimate for me when that evolution occurred, that is, when you became the primary attorney representing the interest?

A   It was -- I recall there being what was a second meeting at Warner Bros., a second in-person meeting at Warner Bros. that I attended and Bruce did not, and I really believe that that -- by that time I was, if you will, the principal point person on this matter.

Q   It's correct, though, isn't it, that after that second meeting Mr. Ramer did attend at least some meetings with the DC representatives?

A   I'm not sure.

Q   Okay.  At the point that you became the lead counsel for your client, did you thereafter confer with Mr. Ramer from time to time regarding the progress of the matter?

A   Yes.

Q   And, incidentally, in preparation for the deposition, did you speak with Mr. Ramer concerning this matter?

A   I -- yes, I did.

MR. MARMARO:  Michael, when you reach a convenient breaking point, could we just quickly break?

25

**U.S. LEGAL SUPPORT**

EXHIBIT 14
232

| | | |
|---|---|---|
| 10:42 | 1 | MR. BERGMAN:  Why don't we do it now. |
| 10:42 | 2 | MR. MARMARO:  Okay. |
| 10:42 | 3 | (Recess.) |
| 10:45 | 4 | MR. BERGMAN:  Back on the record. |
| 10:45 | 5 | Q   Do you recall who signed the retainer agreement |
| 10:45 | 6 | on behalf of what you characterize as the Superman |
| 10:45 | 7 | termination interest? |
| 10:45 | 8 | A   I believe -- well, can I answer that question? |
| 10:45 | 9 | MR. MARMARO:  The answer is a yes or no |
| 10:45 | 10 | question. |
| 10:45 | 11 | THE WITNESS:  Do I recall?  The answer is in |
| 10:45 | 12 | part. |
| 10:45 | 13 | BY MR. BERGMAN: |
| 10:45 | 14 | Q   Okay.  To the extent of your knowledge, who |
| 10:45 | 15 | signed it? |
| 10:45 | 16 | MR. MARMARO:  As long as counsel for the Siegels |
| 10:45 | 17 | doesn't have an objection, I don't have an objection. |
| 10:45 | 18 | It's just identifying the person. |
| 10:45 | 19 | MR. TOBEROFF:  That's fine. |
| 10:45 | 20 | THE WITNESS:  I recall that Joanne Siegel signed |
| 10:45 | 21 | it, and I believe but I am not certain that Laura Siegel |
| 10:46 | 22 | Larson signed it as well. |
| 10:46 | 23 | BY MR. BERGMAN: |
| 10:46 | 24 | Q   Okay.  Did Michael Siegel sign it? |
| 10:46 | 25 | A   No. |

26

**U.S. LEGAL SUPPORT**

EXHIBIT 14
233

10:46 1    Q    At the point in time that you became retained,

10:46 2  as you put it, by the interest, was there to your

10:46 3  knowledge any written agreement between Joanne and Laura

10:46 4  Siegel on the one hand and Michael Siegel on the other

10:46 5  concerning their respective interests in the termination

10:46 6  right?

10:46 7            THE WITNESS:  May I answer that question?

10:46 8            MR. MARMARO:  Yes.

10:46 9            THE WITNESS:  To my knowledge was there an

10:4610  agreement, no.

10:4611  BY MR. BERGMAN:

10:4612    Q    And there certainly was no entity that had been

10:4613  formed called the "Superman Termination Interest," had

10:4614  there?

10:4615    A    There was no entity, correct.

10:4716    Q    The documents reflect the names of some other

10:4717  attorneys outside of Gang, Tyre, and I'd like to ask you

10:4718  a few questions about them.

10:4719            First of all, there is Arthur Levine.  Can you

10:4720  identify who Mr. Levine was?

10:4721    A    Yes.  Arthur Levine --

10:4722    Q    I'm sorry.

10:4723    A    -- is a Washington, D.C.-based copyright

10:4724  attorney.

10:4725    Q    And was Mr. Levine the attorney who actually

27

**U.S. LEGAL SUPPORT**

EXHIBIT 14
234

10:47 1    filed the termination notices?

10:47 2        A    I believe so.

10:47 3        Q    And am I correct that Mr. Levine remained

10:47 4    involved in the representation of the Siegels subsequent

10:47 5    to Gang Tyre's retention?

10:48 6            MR. MARMARO:  It's a yes or no question.

10:48 7            THE WITNESS:  Yes.

10:48 8    BY MR. BERGMAN:

10:48 9        Q    And did he -- did there come a point in time

10:4810    when Mr. Levine no longer acted in that capacity?

10:4811            MR. MARMARO:  That question lacks foundation.

10:4812            THE WITNESS:  I don't know that his capacity

10:4813    ever changed.  I do know that there did come a point in

10:4814    time where I was no longer speaking with him.

10:4815    BY MR. BERGMAN:

10:4816        Q    Okay.  In my review of the privilege log,

10:4817    Exhibit 1, I noted that the last entry referring to

10:4818    Mr. Levine was in May 2001.  That is number 489 if you

10:4919    care to look.

10:4920            MR. MARMARO:  Would you like him to look?

10:4921            MR. BERGMAN:  No.

10:4922            MR. MARMARO:  Okay.

10:4923    BY MR. BERGMAN:

10:4924        Q    Does that generally coincide with your

10:4925    recollection as to the period of time in which you were

                                                              28

10:49 1  no longer consulting with Mr. Levine?

10:49 2      A    I don't have a good idea of when my

10:49 3  communications or my regular communications with

10:49 4  Mr. Levine dwindled down or stopped.

10:49 5      Q    How regular were your communications with

10:49 6  Mr. Levine?

10:49 7      A    There was a period where they were regular and a

10:49 8  period where they were less and then a period where they

10:49 9  were not at all.

10:4910      Q    Okay.  Can you give me the approximate inclusive

10:5011  dates of the first period that you referred to?

10:5012      A    I would be speculating.  The best estimate I

10:5013  could give is the period of three or four months

10:5014  following our engagement.

10:5015      Q    And the next period which you described as

10:5016  communicating intermittently or less than regularly, how

10:5017  long did that period last?

10:5018      A    I really can't.say.

10:5019      Q    Okay.  During the first period that you

10:5020  indicated when you were conferring with Mr. Levine

10:5021  regularly, was there some agreed-upon division of labor

10:5022  between the Gang, Tyre attorneys on the one hand and

10:5023  Mr. Levine on the other?

10:5124      MR. MARMARO:  I believe that question invades

10:5125  the attorney-client and attorney work product privilege.

29

**U.S. LEGAL SUPPORT**

EXHIBIT 14
236

10:51 1    I object and instruct on that basis.

10:51 2            (Instruction not to answer.)

10:51 3            MR. TOBEROFF:  I concur.

10:51 4    BY MR. BERGMAN:

10:51 5        Q    During the first period that you indicated when

10:51 6    you were regularly communicating with Mr. Levine, what

10:51 7    activities to your knowledge was he responsible for

10:51 8    regarding the representation of this interest?

10:51 9            MR. MARMARO:  As phrased, I believe the question

10:5110    has the same problems as the prior question, so I will

10:5111    object and instruct on the same basis.  That doesn't mean

10:5112    to say that you couldn't frame questions in this area

10:5113    that would call for non-privileged information, but I

10:5114    believe the last two did.

10:5115            (Instruction not to answer.)

10:5116            MR. TOBEROFF:  I concur.

10:5117            MR. BERGMAN:  Okay.

10:5118        Q    During the period of time that you were

10:5119    regularly communicating with Mr. Levine, was he

10:5220    conducting any research regarding the interests of the

10:5221    termination interest to your knowledge?

10:5222            MR. MARMARO:  I believe -- same objection.  Same

10:5223    instruction.

10:5224            (Instruction not to answer.)

10:5225            MR. TOBEROFF:  I concur.

                                                                30

**U.S. LEGAL SUPPORT**

EXHIBIT 14
237

10:52 1  BY MR. BERGMAN:

10:52 2      Q    During that first period, was he to your

10:52 3  knowledge communicating with DC or any of its

10:52 4  representatives?

10:52 5          MR. MARMARO:  You can answer that question.

10:52 6          THE WITNESS:  I can answer that question?

10:52 7          MR. MARMARO:  Again, subject to any issues that

10:52 8  Mr. Toberoff may have with the question.  We would follow

10:52 9  his lead.  If he has an issue.

10:5210          MR. TOBEROFF:  You can answer.

10:5211          THE WITNESS:  Not to my knowledge.

10:5212  BY MR. BERGMAN:

10:5313      Q    What were the circumstances to your knowledge

10:5314  under which -- which resulted in Mr. Levine becoming less

10:5315  involved in the representation of the termination

10:5316  interest?

10:5317          MR. MARMARO:  I'm going to object to the

10:5318  question as calling for attorney-client and attorney work

10:5319  product protected communications and instruct the witness

10:5320  not to answer on that basis, again unless Mr. Toberoff

10:5321  has a contrary view.

10:5322          (Instruction not to answer.)

10:5323          MR. TOBEROFF:  I concur.

10:5324  BY MR. BERGMAN:

10:5325      Q    Am I correct, Mr. Marks, that Mr. Levine

                                                              31

10:53 1    conducted certain early negotiations with DC concerning

10:53 2    the Siegel interest?

10:53 3            THE WITNESS:  I can answer that?

10:53 4            MR. MARMARO:  You can answer that question.

10:53 5            THE WITNESS:  Yes, I -- at the time we became

10:54 6    involved, I was -- I became aware of communications to

10:54 7    Mr. Levine in connection with a possible transaction

10:54 8    involving the termination interest, the Superman

10:54 9    termination interest.

10:5410    BY MR. BERGMAN:

10:5411        Q    And was it your understanding that subsequent to

10:5412    Gang, Tyre's involvement, Mr. Levine would no longer be

10:5413    engaged in any settlement negotiations with DC Comics?

10:5414            MR. MARMARO:  Unless Mr. Toberoff has an

10:5415    objection, the witness could answer that question.

10:5416            MR. TOBEROFF:  Could you repeat the question --

10:5417    read the question, please?

10:5418            MR. BERGMAN:  Could you?

10:5419            (Record read.)

10:5520            MR. TOBEROFF:  I object.  Attorney-client

10:5521    privilege.  Attorney work product.

10:5522            MR. MARMARO:  Then I instruct the witness not to

10:5523    answer on those grounds.

10:5524            (Instruction not to answer.)

10:5525            MR. BERGMAN:  Okay.  And, Mr. Marmaro, is your

32

**U.S. LEGAL SUPPORT**

EXHIBIT 14
239

```
10:55  1    instruction based on the fact that Mr. Toberoff is

10:55  2    objecting?

10:55  3         MR. MARMARO:  Well, it's my judgment that that

10:55  4    question potentially invades the attorney-client and

10:55  5    attorney work product.  Mr. Marks is not the holder of

10:55  6    the attorney-client privilege, certainly, and so if

10:55  7    Mr. Toberoff raises an objection, we intend to follow

10:55  8    that instruction, at least until a court tells us

10:55  9    otherwise.

10:55 10         MR. BERGMAN:  I understand.

10:55 11         MR. MARMARO:  It's not our intention to waive

10:55 12    any privileges here today or in the production of any

10:55 13    documents, and from time to time I may seek guidance from

10:55 14    Mr. Toberoff on something that I might have a question

10:55 15    about in my own mind.

10:56 16         MR. BERGMAN:  Okay.  And I certainly have no

10:56 17    intention of engaging in any colloquy concerning that.  I

10:56 18    do want to note and advise you that Mr. Toberoff and we

10:56 19    have a very distinct difference of opinion concerning the

10:56 20    extent and reach of the attorney-client privilege and

10:56 21    that there are presently pending in the District Court

10:56 22    motions with respect to that.  I don't want to

10:56 23    inconvenience Mr. Marks, but it may become necessary

10:56 24    following the resolution of those motions to reconvene,

10:56 25    and I just say that to inform you of the present status
```

                                                             33

**U.S.  LEGAL SUPPORT**

EXHIBIT 14
240

10:56 1    of the matter.

10:56 2            MR. MARMARO:  We understand your position, and

10:56 3    Mr. Marks intends to be fully cooperative today to the

10:56 4    extent he can be.  If there is any disagreement between

10:56 5    the parties to this litigation, then when that

10:56 6    disagreement is resolved, of course Mr. Marks will

10:57 7    testify.

10:57 8            MR. BERGMAN:  Thank you.

10:57 9            MR. TOBEROFF:  I would like to note, since you

10:57 10   commented on the motions, that the first such motion

10:57 11   regarding the attorney-client privilege that was made by

10:57 12   defendants and counterclaimants in this case was denied,

10:57 13   as was a subsequent motion for reconsideration.

10:57 14   BY MR. BERGMAN:

10:57 15       Q    Another name that frequently appears in the

10:57 16   documents, Mr. Marks, is Dennis Larson.  Am I correct

10:57 17   that Mr. Larson was an attorney who, during most of your

10:57 18   representation of the interest, was the husband of Laura

10:57 19   Siegel?

10:57 20       A    Yes.

10:57 21       Q    And there appear from the documents that you've

10:57 22   produced to be numerous communications with Dennis

10:57 23   Larson.  Were your contacts with him in his capacity as

10:58 24   an attorney or as the husband of Laura Siegel?

10:58 25       A    In his capacity as an attorney.

                                                                        34

10:58 1     Q   And who was Mr. Larson to your knowledge

10:58 2  representing?

10:58 3     A   The same Superman termination interest.

10:58 4     Q   Am I correct then that during a substantial

10:58 5  portion of your representation, and by "your" I mean your

10:58 6  firm's representation, that the termination interest was

10:58 7  represented by three different firms:  Gang, Tyre,

10:58 8  Mr. Levine's firm and Mr. Larson?

10:59 9     A  I don't think so.

10:59 10     Q   In what respect is that incorrect?

10:59 11     A   I think it's incorrect as to "substantial."

10:59 12     Q   I'm sorry, I don't understand.  What do you mean

10:59 13  by that?

10:59 14     A   I think my view is that the substantial part of

10:59 15  the representation, at least during the course of our

10:59 16  engagement, was Gang, Tyre, Ramer & Brown without the

10:59 17  assistance of Mr. Levine and without the assistance of

10:59 18  Mr. Larson.

10:59 19     Q   Okay.  Would you identify who Don Bulson,

10:59 20  B U L S O N, is?

10:59 21     A   Yes.  Mr. Bulson is a Cleveland-based attorney.

10:59 22     Q   Okay.  And his name appears frequently

11:00 23  throughout the papers.  Who, if anyone, was he

11:00 24  representing in connection with the Superman termination

11:00 25  interest?

35

11:00 1          A    Mr. Bulson represented Michael Siegel.

11:00 2          Q    Did he represent only Michael Siegel, or was he

11:00 3     also representing what you refer to as the "Superman

11:00 4     termination interest"?

11:00 5          A    He represented Michael Siegel.  He did

11:00 6     participate in meetings or conference calls with DC

11:00 7     Comics and Warner Bros., and in some way I viewed him as

11:00 8     a co-counsel on the matter.

11:01 9          Q    A name that appeared a couple of times was

11:0110     George Zadorozny, Z A D O R O Z N Y.  Are you familiar

11:0111     with that gentleman?

11:0112          A    I'm familiar with the name.

11:0113          Q    In what capacity, if any, was he involved in

11:0114     connection with the Superman termination interest?

11:0115          A    I do not recall.

11:0116          Q    Do you recall any communications that you had

11:0117     with that gentleman?

11:0118          A    There may have been communications, but I do not

11:0119     recall them.

11:0120          Q    Did you consider Mr. Zadorozny to be a

11:0121     co-counsel of the termination interest?

11:0222          A    My recollection is that there were very few

11:0223     communications with him and that he was not involved in

11:0224     the negotiations with DC Comics, Warner Bros. and Time

11:0225     Warner.

                                                                    36

**U.S. LEGAL SUPPORT**

EXHIBIT 14
243

11:02 1      Q    To your knowledge did Mr. Zadorozny represent

11:02 2  either Joanne, Laura or Michael Siegel?

11:02 3      A    In any capacity?

11:02 4      Q    In any capacity.

11:02 5      A    My understanding is that prior to our engagement

11:02 6  he had advised Joanne and Laura.

11:03 7      Q    And subsequent to Gang, Tyre's retention, are

11:03 8  you aware that he continued to communicate with Laura or

11:03 9  Joanne concerning the termination interest?

11:03 10         MR. MARMARO:  The question lacks foundation.

11:03 11         You can answer.

11:03 12         THE WITNESS:  I think that answer would divulge

11:03 13  privileged communications.

11:03 14         MR. MARMARO:  Then I instruct you not to answer.

11:03 15  Object and instruct.

11:03 16         (Instruction not to answer.)

11:03 17  BY MR. BERGMAN:

11:03 18      Q    Okay.  There are also references to an attorney

11:03 19  by the name of Jennifer Harding.  Could you identify who

11:03 20  she was?

11:03 21      A    Yes.  Jennifer Harding is a Los Angeles-based

11:03 22  family law attorney.

11:03 23      Q    And was Ms. Harding to your knowledge

11:03 24  representing Laura Siegel in connection with the

11:04 25  dissolution proceedings between her and Dennis Larson?

37

**U.S. LEGAL SUPPORT**

EXHIBIT 14
244

11:04 1          A   Yes.

11:04 2                MR. TOBEROFF:  Lacks foundation.

11:04 3                THE WITNESS:  Oh.

11:04 4                MR. TOBEROFF:  It's okay.

11:04 5                MR. BERGMAN:  I'd like the reporter to mark as

11:04 6      the next exhibit in order, which would be 4, a letter

11:04 7      dated April 30, 1999, Bates stamped 009 and 10.

11:04 8                (Deposition Exhibit 4 marked.)

11:05 9      BY MR. BERGMAN:

11:05 10         Q   You are shown as receiving a copy of Exhibit 4.

11:05 11     Do you recall receiving a copy of this?

11:05 12         A   Yes.

11:05 13         Q   Okay.  Now, in the intervening time between your

11:05 14     retention -- between the retention of Gang, Tyre, Brown

11:05 15     and April 30, 1999, were you generally involved in

11:05 16     familiarizing yourself with what had previously

11:06 17     transpired in connection with the termination interest?

11:06 18               MR. MARMARO:  I think that that question calls

11:06 19     for the witness to divulge attorney-client and attorney

11:06 20     work product protected communications, so I will object

11:06 21     and instruct as presently phrased.  You're asking him the

11:06 22     work that he did.

11:06 23               (Instruction not to answer.)

11:06 24     BY MR. BERGMAN:

11:06 25         Q   Bear in mind, Mr. Marks, I'm not asking you for

                                                                    38

11:06 1    specific activities that you engaged in.  My question

11:06 2    relates to whether you were, for example, reviewing prior

11:06 3    communications between DC and the Siegels during this

11:06 4    period of time.

11:06 5            MR. MARMARO:  If the question is limited to

11:06 6    whether he reviewed third-party communications, I think

11:06 7    it's a closer issue, and I would defer to Mr. Toberoff.

11:07 8            MR. TOBEROFF:  I think it's work product, but I

11:07 9    wouldn't -- I'm not objecting on the basis of attorney-

11:0710    client privilege.

11:0711            MR. MARMARO:  I think the problem is whenever

11:0712    you ask an attorney to say what he chose to do in a

11:0713    matter, you're asking for an attorney to divulge his

11:0714    judgment.  I'm not sure that that's what you're really

11:0715    after, but I don't want to be in a situation where we

11:0716    answer one question and then face an argument that we've

11:0717    engaged in a waiver.  So I will object and instruct as to

11:0718    the question unless you tell me that if he answers this

11:0719    question, it will not be a waiver as to any other

11:0720    question.

11:0721            MR. BERGMAN:  It will not be.

11:0722            MR. MARMARO:  Then you can answer the question.

11:0723            THE WITNESS:  Perhaps the court reporter could

11:0724    read the last pending question again?

11:0725            (Record read as follows:

                                                                    39

**U.S. LEGAL SUPPORT**

EXHIBIT 14
246

11:06 1     "Q Bear in mind, Mr. Marks, I'm

11:06 2   not asking you for specific activities

11:06 3   that you engaged in.  My question

11:06 4   relates to whether you were, for

11:06 5   example, reviewing prior communi-

11:06 6   cations between DC and the Siegels

11:06 7   during this period of time.")

11:08 8   THE WITNESS:  I reviewed prior communications

11:08 9 between DC and their representatives and the Siegels

11:0810 and/or their representatives.

11:0811 BY MR. BERGMAN:

11:0812  Q And during the period of time from your

11:0813 retention through the date of Exhibit 4, were you

11:0814 accumulating documentation which related to the prior

11:0815 activities of Mr. Levine?

11:0916   MR. MARMARO:  The question is vague and

11:0917 ambiguous.  Again, this potentially calls for the witness

11:0918 to divulge attorney-client, attorney work product

11:0919 communications.  I'll permit him to answer unless

11:0920 Mr. Toberoff has an objection if you agree -- and maybe

11:0921 for the sake of efficiency, we can agree that the answer

11:0922 to no one question will be a waiver as to anything else

11:0923 as well.

11:0924   MR. BERGMAN:  We can certainly agree to that,

11:0925 and I do.

                  40

**U.S. LEGAL SUPPORT**

EXHIBIT 14
247

11:09 1          MR. MARMARO:  Thank you.

11:09 2          MR. MARMARO:  And again, unless Mr. Toberoff --

11:09 3          MR. TOBEROFF:  I just need the question read

11:09 4   back.

11:09 5       (Record read as follows:

11:08 6         "Q   And during the period of time

11:08 7        from your retention through the date

11:08 8        of Exhibit 4, were you accumulating

11:08 9        documentation which related to the

11:0810        prior activities of Mr. Levine?")

11:0911       THE WITNESS:  Yes.

11:0912       MR. TOBEROFF:  Maybe to simplify the objections,

11:0913   when Mr. Marmaro objects as to form, can we agree that I

11:1014   am also making the same objections so that I don't have

11:1015   to repeat the objection?

11:1016       MR. BERGMAN:  Well, without wanting to

11:1017   inconvenience you, I do think that the objection should

11:1018   be stated separately, Mr. Toberoff.

11:1019       MR. TOBEROFF:  That means if he says, "Vague and

11:1020   ambiguous," then I would --

11:1021       MR. BERGMAN:  There will be no need for you to

11:1022   make the identical objection.  If you have any further

11:1023   objection --

11:1024       MR. TOBEROFF:  No.  I'm saying if he says,

11:1025   "Vague and ambiguous," what I am asking for is rather

41

EXHIBIT 14
248

| | |
|---|---|
| 11:10 1 | than me repeat, "Vague and ambiguous," I've made the |
| 11:10 2 | same -- I'm concurring in that objection unless I |
| 11:10 3 | specifically say that I don't have that objection. |
| 11:10 4 | MR. BERGMAN:  That's agreeable. |
| 11:10 5 | MR. TOBEROFF:  Okay.  But if I have any |
| 11:10 6 | additional objections, I would make them. |
| 11:10 7 | MR. BERGMAN:  Okay. |
| 11:10 8 | Q   Prior to the date of Exhibit 4, April 30th, |
| 11:10 9 | 1999, had you had any prior communications with Carol |
| 11:11 10 | Simkin? |
| 11:11 11 | MR. MARMARO:  On any subject? |
| 11:11 12 | MR. BERGMAN:  On any subject. |
| 11:11 13 | THE WITNESS:  Not to my knowledge. |
| 11:11 14 | BY MR. BERGMAN: |
| 11:11 15 | Q   Had you had any prior communications on any |
| 11:11 16 | subject with John Schulman? |
| 11:11 17 | A   Yes. |
| 11:11 18 | Q   Over the years had you negotiated agreements |
| 11:11 19 | with Mr. Schulman? |
| 11:11 20 | A   I don't think so. |
| 11:11 21 | Q   Were you acquainted with Mr. Schulman socially? |
| 11:11 22 | A   Yes. |
| 11:11 23 | Q   Can you tell me approximately when that social |
| 11:11 24 | relationship began? |
| 11:11 25 | MR. MARMARO:  Well, that's a different question, |

42

**U.S. LEGAL SUPPORT**

EXHIBIT 14
249

11:11 1    a social relationship as opposed to acquainted with him

11:11 2    socially.

11:11 3    BY MR. BERGMAN:

11:11 4        Q    Let's change "relationship" to "acquaintance"

11:12 5    and when that social acquaintance began.

11:12 6        A    My first acquaintance with John Schulman was in

11:12 7    a professional capacity.  As we've discussed, in the

11:12 8    first four and a half years of my being at Gang, Tyre, I

11:12 9    was a litigator, and I do recall meeting Mr. Schulman at

11:1210    a time when I was litigating, and so it was -- my first

11:1211    acquaintance was professional, and that is how I came to

11:1212    know John Schulman.  Over the years I have seen him on

11:1213    occasion in non-work settings.

11:1214        Q    Thank you.

11:1315        Mr. Coleman, would you mark as Exhibit 5 a

11:1316    letter dated July 7, 1999, from Mr. Schulman to

11:1317    Mr. Ramer, Bates stamped GTRB 18 and 19.

11:1418        (Deposition Exhibit 5 marked.)

11:1419        MR. BERGMAN:  And would you...

11:1420        Q    Mr. Schulman refers in the first sentence that

11:1421    he is writing "in anticipation of our meeting next week

11:1422    regarding the Siegels' claims."

11:1423        Am I correct that was the first meeting that you

11:1424    had with Mr. Schulman on that subject?

11:1425        A    A meeting the following week in June --

43

U.S. LEGAL SUPPORT

EXHIBIT 14
250

11:14 1          MR. MARMARO:  July.

11:14 2          THE WITNESS:  In July?  I'm sorry.

11:15 3   BY MR. BERGMAN:

11:15 4      Q   Yes.

11:15 5      A   Yes, that was the first meeting.

11:15 6          MR. BERGMAN:  Would you now mark as Exhibit 6 a

11:15 7   letter dated July 9, 1999, from Mr. Ramer to

11:15 8   Mr. Schulman, Bates stamped number 11 through 13.

11:15 9          (Deposition Exhibit 6 marked.)

11:1510   BY MR. BERGMAN:

11:1511      Q   Do you recall receiving a copy of this letter on

11:1512   or about the date it bears?

11:1513      A   Yes.

11:1514      Q   My primary purpose in showing this letter to you

11:1615   is to address item number 3 that Mr. Ramer states -- and

11:1616   to assure you that as we go through these documents and

11:1617   as I intend on going through the documents, I have no

11:1618   intention of using them or attempting to use them later

11:1619   in violation of Evidence Code 1152.  I am simply trying

11:1620   to record the nature and extent of what I think was a

11:1621   rather long negotiation that followed.

11:1622          Do you understand that, sir?

11:1623          MR. MARMARO:  I don't.

11:1624          MR. BERGMAN:  Okay.

11:1625          MR. MARMARO:  I don't know that a response is --

                                                              44

EXHIBIT 14
251

11:16 1    I'm not sure exactly what you're asking, so I'll object

11:17 2    to the question, but I appreciate your comment.

11:17 3             MR. BERGMAN:  Then I'll -- okay.

11:17 4        Q    What, if anything, did you understand Mr. Ramer

11:17 5    to mean by the sentence that reads, quote, "The scope of

11:17 6    any evidentiary privilege is no more and no less than

11:17 7    that embodied in California Evidence Code 1152," close

11:17 8    quote?

11:17 9             MR. MARMARO:  Unless Mr. Toberoff has an

11:1710    objection, I'll let the witness answer that question.

11:1711            MR. TOBEROFF:  I'm okay with it.

11:1712            THE WITNESS:  The context for Mr. Ramer's

11:1713    response to Mr. Schulman is, of course, Exhibit 5,

11:1714    Mr. Schulman's letter saying that our -- in general

11:1715    fashion, we'd like an agreement that our communications

11:1716    are confidential.

11:1717            The reference to California Evidence Code 1152

11:1818    is, as I recall, a provision of the Evidence Code which

11:1819    generally states that communications of parties in the

11:1820    course of settlement discussions can't be used as

11:1821    admissible evidence in legal proceedings, and in this

11:1822    matter litigation was always looming over it and always

11:1823    looming in the horizon, and -- from the beginning, and

11:1824    what this section 3 is saying is that to the extent that

11:1825    settlement discussions are accorded confidentiality, the

                                                              45

**U.S. LEGAL SUPPORT**

EXHIBIT 14
252

11:18 1    scope of that confidentiality is defined by this

11:18 2    provision of the Evidence Code.  It's not more; it's not

11:18 3    less, and, for example, if this does turn into a matter

11:18 4    that's litigated, our confidentiality agreement wouldn't

11:19 5    in any way impinge upon the Siegels' discovery process.

11:19 6    BY MR. BERGMAN:

11:19 7        Q    Am I correct that Mr. Schulman agreed to that

11:19 8    concept as expressed in Exhibit 6, that he manifested his

11:19 9    agreement?

11:1910       A    I recall that he did.

11:1911            MR. BERGMAN:  Just so the record is clear, let

11:1912    me ask the reporter to mark as Exhibit 7 GTRB 16 and 17.

11:1913            (Deposition Exhibit 7 marked.)

11:1914    BY MR. BERGMAN:

11:1915        Q    Do you recall receiving a copy of this letter?

11:2016        A    Yes, I do.

11:2017        Q    Okay.

11:2018        A    Although it was not addressed to me.

11:2019        Q    I understand.

11:2020            In fact, your counsel produced three copies of

11:2021    that letter, 16, 17 -- two copies.  I'm sorry.

11:2022            Did the meeting, the first meeting between you,

11:2023    Mr. Ramer and Mr. Schulman, take place on July 12th,

11:2024    1999?

11:2025        A    This letter leads me to believe that the meeting

                                                              46

**U.S. LEGAL SUPPORT**

EXHIBIT 14
253

11:20  1    did take place on that date.

11:20  2         Q    To your recollection did anyone other than

11:20  3    Mr. Ramer, yourself and Mr. Schulman attend that meeting?

11:20  4         A    Yes.

11:20  5         Q    Who was that, sir?

11:20  6         A    Dennis Larson attended, as I recall, I recall

11:21  7    Paul Levitz attended, I recall Carol Simkin attended, and

11:21  8    I believe Lillian Laserson attended.

11:21  9         Q    The meeting took place at Warner Bros.?

11:2110          A    Yes.

11:2111          Q    Do you recall approximately how long the meeting

11:2112     was?

11:2113          A    I would say that it was more than an hour and

11:2114     less than two and a half hours.

11:2215          Q    Can you recall how the meeting began, who said

11:2216     what?

11:2217          A    Yes.

11:2218          Q    Would you tell us, please?

11:2219          A    Well, there were introductions, and I recall

11:2220     Bruce and John having an exchange about Mickey Rooney,

11:2221     who was ill at the time.  I recall John telling a story

11:2222     about Mickey Rooney, and I remember Paul Levitz talking

11:2323     about his new neighbors, the Clintons.

11:2324          Q    Okay.  Very good.

11:2325               Once those introductory remarks were made, what

                                                                        47

**U.S. LEGAL SUPPORT**

EXHIBIT 14
254

11:23 1   do you next recall being said with respect to the

11:23 2   Superman termination interest?

11:23 3        A   Well, at some point in this meeting we made a

11:23 4   proposal on behalf of the Siegel interest in respect to

11:23 5   the Superman termination interest.

11:23 6        Q   And was that proposal made orally or in writing?

11:23 7        A   Orally, as I recall.

11:23 8        Q   To the best of your recollection and as

11:23 9   specifically as your recollection will permit, what was

11:23 10  that proposal?

11:24 11       A   I do not recall all of the components of that

11:24 12  proposal.  I recall that it had a large payment up front,

11:24 13  something on the order of $10 million, and a 50 percent

11:24 14  interest in DC Comics' revenues arising from -- DC

11:24 15  Comics' worldwide revenues arising from the exploitation

11:24 16  of the Superman property.

11:24 17       Q   Any other aspect of that proposal that you can

11:24 18  recall?

11:25 19       A   Actually, there was some element that there

11:25 20  would be a grant of rights for some period of exclusivity

11:25 21  but not in perpetuity and that there would be for -- to

11:25 22  extend the exclusivity period, there would be further

11:25 23  payments.

11:25 24       Q   Anything else you can remember about the

11:25 25  proposal?

                                                              48

**U.S. LEGAL SUPPORT**

EXHIBIT 14
255

11:25 1      A   I think there was a discussion about the Siegels

11:25 2   being fully indemnified.  We covered an errors and

11:25 3   omissions insurance.  There was discussion about coverage

11:25 4   of the Siegel family members, medical and dental

11:25 5   coverage.  And there may have been -- well, I think there

11:26 6   was also discussion about annual payments as well.

11:26 7      Q   Any discussion at that point in time as to

11:26 8   whether the annual payments would be recoupable,

11:26 9   refundable?  Did you get into that degree of detail?

11:2610      A   I believe in our opening offer, the annual

11:2611   payments would be non-recoupable.  I believe they were

11:2612   also -- preceding our involvement, DC's proposal had

11:2713   involved a royalty arising -- a royalty on revenues

11:2714   stemming from media and licensing by DC Comics and also

11:2715   publications, and I believe our proposal also dealt

11:2716   separately with media and licensing as well as

11:2717   publications.

11:2718      Q   Who do you recall first responding to that offer

11:2719   among the various representatives of DC?

11:2720         MR. MARMARO:  The precise question is who spoke

11:2721   first on the DC side?

11:2722         THE WITNESS:  I don't recall.

11:2723   BY MR. BERGMAN:

11:2724      Q   Okay.  What do you recall Mr. Schulman

11:2825   responding to the offer you've just discussed?

                                                              49

**U.S. LEGAL SUPPORT**

EXHIBIT 14
256

11:28 1         A   I don't recall the words, but the sense of the

11:28 2   response was that the proposal was greeted sourly.

11:28 3         Q   While I understand that general description, did

11:28 4   Mr. Schulman address, for example, the $10 million

11:28 5   upfront payment?

11:28 6         A   The -- I don't recall Mr. Schulman or anyone

11:28 7   else dissecting the proposal.  The substance of the

11:29 8   response from John, and Paul Levitz and Carol Simkin may

11:29 9   have joined, was this is too much.

11:2910         Q   Was there any response from the DC

11:2911   representatives concerning the proposed 50 percent

11:2912   interest in DC Comics' revenues?

11:2913         A   As I said, it would be the same answer:  I don't

11:2914   recall a dissection of a proposal.  I do recall generally

11:2915   that they -- that the view was this was too much in all

11:2916   respects.

11:2917         Q   Okay.

11:2918         A   More in most respects.

11:3019         Q   Was there any specific response to the request

11:3020   that the interest would be in DC Comics' worldwide

11:3021   revenues?

11:3022         A   I don't think there was any push back on that.

11:3023         Q   While I appreciate your testimony about the lack

11:3024   of dissection, do you recall any DC representative

11:3025   addressing any specific aspect of the proposal that you

50

**U.S. LEGAL SUPPORT**

EXHIBIT 14
257

11:30 1   and Mr. Ramer advanced that day?

11:30 2         MR. MARMARO:  Can I have that question read

11:30 3   back, please.

11:30 4         (Question read.)

11:31 5         MR. MARMARO:  Addressing in what respect?  It's

11:31 6   vague.  Commenting on that one --

11:31 7         MR. BERGMAN:  Commenting upon it, agreeing,

11:31 8   disagreeing.

11:31 9         MR. MARMARO:  You can answer.

11:3110         THE WITNESS:  I don't recall.

11:3111   BY MR. BERGMAN:

11:3112    Q  Okay.  Other than what you've testified to, do

11:3113   you recall any other subjects that were discussed at this

11:3114   first meeting?

11:3115    A  I think the meeting ended with, if you will, a

11:3116   next steps conversation, which is I think John saying,

11:3117   "We will discuss this among ourselves, amongst ourselves,

11:3218   and get back to you."

11:3219    Q  Okay.

11:3220         Off the record.

11:3221         (Recess.)

11:3722         MR. BERGMAN:  Mr. Coleman, would you mark as

11:3723   Exhibit 8, I believe, a document consisting of pages 0499

11:3724   through 0504.

11:3725         (Deposition Exhibit 8 marked.)

51

11:38 1    BY MR. BERGMAN:

11:38 2        Q   Do you recall seeing this letter before,

11:38 3    Mr. Marks?

11:38 4        A   Yes.

11:38 5        Q   And during the course of your description of the

11:38 6    July meeting with Mr. Schulman, you referred to an

11:38 7    earlier offer, I believe, and did that reference refer to

11:38 8    the offer contained in Exhibit 8?

11:38 9        A   In part.

11:3810        Q   To your knowledge had that offer been changed in

11:3811    any way from the time it was advanced to Mr. Levine in

11:3812    October '97 until the time of your July '99 meeting?

11:3813        A   This is an offer advanced to Joanne and Laura

11:3814    Siegel Larson.

11:3915        Q   I see.

11:3916        A   But subject to that correction, if you will, I

11:3917    was not aware of any different proposal by DC Comics.

11:3918        MR. BERGMAN:   Would you mark as Exhibit 9,

11:3919    please, a letter dated September 13, 1999, Bates stamped

11:3920    GTRB 20 and 21.

11:3921        (Deposition Exhibit 9 marked.)

11:3922    BY MR. BERGMAN:

11:3923        Q   You're not shown as receiving a copy of this

11:4024    letter, Mr. Marks, but do you in fact recall receiving a

11:4025    copy on or about the date it bears?

                                                              52

**U.S. LEGAL SUPPORT**

EXHIBIT 14
259

11:40 1        A    Yes.

11:40 2        Q    Had there been any communication between you and

11:40 3   Mr. Schulman in the two months intervening since the July

11:40 4   meeting concerning this matter?

11:40 5        A    I don't recall.

11:40 6        Q    To your knowledge were there any communications

11:40 7   that Mr. Ramer had with Mr. Schulman during that

11:40 8   intervening period of time?

11:40 9        A    I think so.

11:40 10            May I reference a prior exhibit?

11:40 11       Q    Certainly, sir.

11:41 12       A    Documents GTRB 0627 through 0633 represent

11:41 13   excerpts from phone logs which appear to be

11:42 14   communications or attempted communications between Bruce

11:42 15   Ramer and John Schulman.

11:42 16       Q    In the second paragraph of paragraph 9 -- of

11:42 17   Exhibit 9, Mr. Schulman makes reference -- the quote is,

11:42 18   quote, "First, we find your offer, both as I commented to

11:42 19   you at the meeting and as you recognized in our recent

11:42 20   discussion, far off what we would find acceptable," close

11:42 21   quote.

11:42 22            Did you participate in what Mr. Schulman refers

11:42 23   to as, quote, "our recent discussion"?

11:42 24       A    Not that I recall.

11:42 25       Q    To your recollection did Mr. Ramer convey to you

                                                                    53

**U.S. LEGAL SUPPORT**

EXHIBIT 14
260

11:42 1    anything that Mr. Schulman had said during that

11:43 2    conversation?

11:43 3          MR. MARMARO:  I'm going to object to the

11:43 4    question as calling for the witness to divulge attorney-

11:43 5    client and attorney work product communications and

11:43 6    instruct on that basis.

11:43 7          (Instruction not to answer.)

11:43 8    BY MR. BERGMAN:

11:43 9      Q   Limiting yourself, Mr. Marks, to anything that

11:4310    Mr. Ramer told you he had been told by Mr. Schulman

11:4311    during that discussion, do you recall any such comments

11:4312    that Mr. Schulman made?

11:4313      A   When you say "any," any comments --

11:4314      Q   Yes.

11:4315      A   -- or any such comments?

11:4316      Q   What I'm asking you is, did Mr. Ramer tell you

11:4317    anything that Mr. Schulman told Mr. Ramer during the,

11:4318    quote, "recent discussion" referred to in this document?

11:4419      A   I believe so.

11:4420      Q   Okay.  And what was that, sir?

11:4421          THE WITNESS: May I say?

11:4422          MR. MARMARO:  Unless Mr. Toberoff has an

11:4423    objection and subject to our stipulation that no one

11:4424    answer will waive the -- be used as an argument to waive

11:4425    any other subject matter or any other question.

                                                        54

**U.S. LEGAL SUPPORT**

EXHIBIT 14
261

11:44 1          MR. BERGMAN:  Yes, that does continue to be our

11:44 2    stipulation.  And will be.

11:44 3          MR. MARMARO:  You can answer.

11:44 4          THE WITNESS:  "We'll get back to you after Labor

11:44 5    Day."

11:44 6    BY MR. BERGMAN:

11:44 7      Q   In the third paragraph of Exhibit 9, there is

11:44 8    contained the statement, quote, "...I invite you to meet

11:44 9    and/or send Kevin and/or others of your colleagues to

11:4410    visit and/or consult with Paul Levitz and appropriate

11:4411    designees in New York," close quote.

11:4512          Did there come a time when Mr. Ramer or yourself

11:4513    took advantage of that invitation and met with Mr. Levitz

11:4514    and others in New York?

11:4515      A   Yes.

11:4516      Q   Do you recall approximately how long after

11:4517    September 1999 that meeting occurred?

11:4518      A   The New York meeting?

11:4519      Q   Yes.

11:4520      A   It was certainly 2000, I think, midyear 2000

11:4521    approximately.

11:4522      Q   Okay.  And in the last paragraph of Exhibit 9,

11:4523    Mr. Schulman states that he renews his request "that you

11:4524    let us know the priority your clients attach to each of

11:4625    the elements of compensation or benefits under

                                                              55

**U.S. LEGAL SUPPORT**

EXHIBIT 14
262

11:46 1    negotiation."

11:46 2            Did there come a time when you prioritized any

11:46 3    elements of your proposal concerning the Superman

11:46 4    interest?

11:46 5        A    Not that I recall.

11:46 6        Q    Okay.  There were, however, were there not,

11:46 7    certain elements of the proposal that were more important

11:46 8    than others.

11:46 9            Correct?

11:46 10           MR. MARMARO:  Well, to the extent he

11:46 11   communicated that to a third party, I'd let Mr. Marks

11:46 12   answer.  To the extent your question -- and as phrased I

11:46 13   think it does -- calls for Mr. Marks to divulge attorney-

11:46 14   client protected communications, I would object and

11:46 15   instruct.

11:46 16           (Instruction not to answer.)

11:46 17   BY MR. BERGMAN:

11:46 18       Q    Okay.  In any of the subsequent meetings and

11:46 19   conversations which you participated in with DC

11:47 20   representatives, did you express to them that certain of

11:47 21   the elements of your proposal or your then-existing

11:47 22   proposals were more important than others?

11:47 23       A    I don't recall doing that.

11:47 24       Q    Without telling me what they were, is it

11:47 25   accurate to say that there were certain aspects that were

                                                              56

**U.S.  LEGAL  SUPPORT**

EXHIBIT 14
263

11:47 1    more important to the Siegel interests than others?

11:47 2         MR. MARMARO:  I think that question calls for

11:47 3    divulging attorney-client information and information

11:47 4    protected by the attorney-client privilege, and I'll

11:47 5    object and instruct on that basis.

11:47 6         (Instruction not to answer.)

11:47 7    BY MR. BERGMAN:

11:47 8    Q    Okay.  What element of the proposals that were

11:47 9    advanced by you and Mr. Ramer on behalf of the

11:4710    termination interest were given the most attention and

11:4811    negotiation in your various discussions with the DC

11:4812    representatives?

11:4813         MR. MARMARO:  That question is vague and

11:4814    ambiguous, and I'd like you to clarify it.

11:4815         MR. BERGMAN:  Okay.

11:4816    Q    In your discussions with the DC representatives,

11:4817    did you devote more time and attention to discussions of

11:4818    the advance payments than you did to the credit to be

11:4819    afforded to the Siegel family?

11:4820         MR. TOBEROFF:  Lacks foundation.

11:4821         MR. MARMARO:  It's also vague and ambiguous.

11:4922         THE WITNESS:  To answer that specific question,

11:4923    I think that at an earlier point in time there was an

11:4924    understanding or an acceptable position on credit, if you

11:4925    will, source credit to Jerry Siegel and Joe Shuster.  At

57

**U.S. LEGAL SUPPORT**

EXHIBIT 14
264

11:49 1    that time because of that, there did not need to be

11:49 2    further discussion.  It was a very important point, but

11:49 3    that point seems to have been resolved.  But at that

11:49 4    point of time there were still open points on other

11:49 5    things, so discussion continued on other things.

11:49 6            So the answer to the question is really a

11:49 7    function on where on the timeline did something appear to

11:50 8    get resolved, because that tells you how much time, but

11:50 9    it doesn't necessarily tell you how important the point

11:5010    was.

11:5011            MR. BERGMAN:  Okay.  I...

11:5012            Would you mark as Exhibit 10 a letter dated

11:5013    September 28, 1999, Bates stamped GTRB 26 through 28.

11:5014            (Deposition Exhibit 10 marked.)

11:5115    BY MR. BERGMAN:

11:5116        Q    Do you recall receiving a copy of Exhibit 10,

11:5117    Mr. Marks?

11:5118        A    Yes.

11:5119        Q    Following this letter, did Mr. Schulman confirm,

11:5120    as you requested in the second sentence, that DC Comics

11:5121    would make available its books and records relating to

11:5122    Superman income?

11:5123        A    Not to my knowledge.

11:5124        Q    Did DC at any time during the course of the

11:5225    negotiations make such records available to you?

                                                              58

**U.S. LEGAL SUPPORT**

EXHIBIT 14
265

11:52 1          A    DC at no time opened up its books and records,

11:52 2     if you will, but I recall at some point they provided

11:52 3     some summary information.

11:52 4          Q    Do you recall what that summary information

11:52 5     consisted of?

11:52 6          A    I believe revenues for prior years, for one or

11:52 7     more prior years.

11:53 8               MR. BERGMAN:  Would you mark as Exhibit 11 a

11:53 9     letter dated November 3, 1999, GTRB 31 and 32.

11:53 10              (Deposition Exhibit 11 marked.)

11:53 11    BY MR. BERGMAN:

11:53 12         Q    Do you recall sending this letter, sir?

11:53 13         A    Yes.

11:53 14         Q    In the second sentence you state, quote, "I

11:53 15    understand that you will be providing us with five years

11:53 16    of financial information in respect of the exploitation

11:53 17    of the 'Superman' property."

11:54 18              From whom did you obtain that understanding?

11:54 19         A    I don't recall.

11:54 20         Q    Do you recall the November 17 meeting that is --

11:54 21    first of all, did the meeting referred to in this letter

11:54 22    take place on November 17?

11:54 23         A    There was a meeting in this time period.  I'm

11:54 24    not sure of the date, but there was a -- what would be

11:54 25    the second meeting.

                                                              59

**U.S. LEGAL SUPPORT**

EXHIBIT 14
266

11:54 1        Q    And could you tell me where you recall that

11:55 2    second meeting occurring?

11:55 3        A    At Warner Bros.

11:55 4        Q    Okay.  And who do you recall being in

11:55 5    attendance?

11:55 6        A    In addition to myself, Don Bulson, I believe,

11:55 7    Paul Levitz, John Schulman, and I believe Carol Simkin.

11:55 8        Q    How do you recall that meeting beginning?

11:55 9        A    With introductions and pleasantries.

11:5510        Q    Okay.  But putting aside the pleasantries, what

11:5511    do you recall as the first substantive subject that was

11:5512    discussed?

11:5513        A    I don't have a recollection of what the first

11:5514    substantive subject was.

11:5615        Q    Then would you tell me what subjects you do

11:5616    recall being discussed at that November 17 meeting?

11:5617             MR. MARMARO:  Well, the implication of your

11:5618    question was that he didn't have a recollection.  He told

11:5619    you he didn't remember the precisely first substantive

11:5620    discussion.

11:5621             MR. BERGMAN:  I understood that.

11:5622             THE WITNESS:  Yes.  Yes, I recall that Paul

11:5623    Levitz brought props, and that is to say examples of

11:5624    Superman licensed product which he wanted to show as

11:5625    exemplars of the type of licensing that DC Comics did,

                                                                    60

EXHIBIT 14
267

11:57 1   and using some of those items as springboards, Paul and

11:57 2   Carol Simkin began to make arguments as to why there are

11:57 3   factors that were designed to whittle down the proposal

11:57 4   we made as to what the Siegels' share of DC Comics'

11:57 5   revenues should be.

11:57 6   BY MR. BERGMAN:

11:57 7       Q   Okay.  And what factors do you recall them

11:57 8   listing or speaking of in that regard?

11:57 9       A   Yes.  They talked about the trademark, and they

11:5710   said that the "S" that everybody recognizes as emblazoned

11:5811   on Superman's chest is a DC Comics trademark, and some

11:5812   portion of their merchandise is -- that is the indicia

11:5813   for the licensed material on the merchandise, including

11:5814   apparel and the like.

11:5815       I also recall -- now, this is -- is the question

11:5816   what they said?

11:5817       Q   Yes.

11:5818       A   Okay.  I recall a discussion also about DC

11:5819   Comics contributing in very substantial fashion to the

11:5820   development of the Superman character in adding many

11:5921   elements over the years that are or were -- reflected

11:5922   added material to the original Superman character as

11:5923   first embodied in Action Comics No. 1.

11:5924       Q   Okay.

11:5925       A   I further recall there being a discussion about

61

EXHIBIT 14
268

11:59 1    foreign revenues and -- from the property and Warner

11:59 2    Bros. and DC Comics taking the position that under U.S.

11:59 3    copyright law, in no circumstance would the Siegels be

11:59 4    entitled to revenues from the exploitation of the

12:00 5    property in any country outside the United States.

12:00 6        Q    Okay.  Any other factor that you can recall them

12:00 7    addressing with respect to the diminished value of the

12:00 8    Superman termination interest?

12:00 9        A    Well, I think it was noted, of course, that

12:0010    because Superman was jointly created by Jerry Siegel and

12:0011    Joe Shuster and that we were representing the Siegel

12:0012    interest alone, as I alluded to earlier, that DC Comics

12:0013    maintained, if you will, the ownership of the Shuster

12:0114    interest, which was a factor too.

12:0115        Q    With respect to the statements made by the DC

12:0116    representatives concerning the trademark, did you or

12:0117    Mr. Bulson have any response to that or state anything

12:0118    with respect to that issue?

12:0119        A    I did.

12:0120        Q    If so, what?

12:0121        A    I recall saying, "Look at Action Comics No. 1.

12:0122    That's where the trademark is.  That's where it's from.

12:0123    The "S" that you're saying is so valuable is in Action

12:0124    Comics No. 1."

12:0125        Q    Has it always been your understanding that that

                                                                        62

12:01 1   was the first appearance of the "S" in a crest, that is,

12:01 2   in Action Comics No. 1?

12:02 3       A   I'm not sure that I understand the question.

12:02 4   Could you please rephrase it?

12:02 5       Q   Yes.  Was it then your understanding that the

12:02 6   very first public appearance of the "S" in a crest that

12:02 7   we've all come to associate with Superman appeared in

12:02 8   Action Comics No. 1?

12:02 9           MR. TOBEROFF:  I believe that's privileged.

12:02 10          MR. MARMARO:  Then I will instruct him not to

12:02 11  answer.  I'll object and instruct him not to answer.

12:02 12          (Instruction not to answer.)

12:02 13          MR. BERGMAN:  On work product?

12:02 14          MR. TOBEROFF:  It's work product.

12:02 15          MR. MARMARO:  On attorney-client, attorney work

12:02 16  product privilege grounds, what his understanding is and

12:02 17  how he obtained it.

12:02 18  BY MR. BERGMAN:

12:02 19      Q   Did you in fact express at that meeting in

12:02 20  substance that the "S" in a crest first appeared in

12:02 21  Action Comics No. 1?

12:03 22      A   I don't recall whether I said it first appeared,

12:03 23  but I said it certainly appeared.

12:03 24      Q   Okay.

12:03 25      A   I do recall that "Superman," the word

63

**U.S. LEGAL SUPPORT**

EXHIBIT 14
270

12:03 1    S U P E R M A N, had appeared in distinctive, fanciful

12:03 2    format, and I observed I believe at that meeting that

12:03 3    that is also found in Action Comics No. 1.

12:03 4        Q    Did you state at that meeting whether that

12:03 5    fanciful depiction of the "Superman" name first appeared

12:04 6    in Action Comics No. 1?

12:04 7        A    I don't recall.

12:04 8        Q    Okay.  The issue that you described the DC

12:04 9    representatives addressing, that is, the development of

12:0410    the Superman character over the years, that came to be

12:0411    addressed by a shorthand reference called, quote,

12:0412    "apportionment," close quote.

12:0413            Correct?

12:0414            MR. MARMARO:  At the meeting?

12:0415            MR. BERGMAN:  No.  In subsequent communications

12:0416    between the parties.

12:0417            THE WITNESS:  Yes, there is a -- there would

12:0418    come to be an exchange of letters between Carol Simkin

12:0419    and myself, and we addressed that as the "apportionment

12:0420    issue."  I'm not sure that we used that shorthand at the

12:0421    meeting.

12:0422    BY MR. BERGMAN:

12:0423        Q    Okay.  Do you recall any additional substantive

12:0524    matters that were discussed at the November 17 meeting?

12:0525        A    Yes.

64

**U.S. LEGAL SUPPORT**

EXHIBIT 14
271

12:05 1        Q    What were they, sir?

12:05 2        A    Well, I do recall my response to the DC position

12:05 3   on what you've described as the "apportionment issue."

12:05 4        Q    Okay.  And could you tell us to the best of your

12:05 5   recollection what you said in that respect?

12:05 6        A    I recall saying that the core elements of

12:05 7   Superman both in terms of the look and, if you will, the

12:05 8   story and the value of the character are all in Action

12:06 9   Comics No. 1, so I pointed to a person -- or a character

12:0610   or hero with superhuman strength, a character who fights

12:0611   for justice, a character who has a cape, a character who

12:0612   has an "S," a character who has an alter ego of a

12:0613   newspaper reporter called Clark Kent who reports to an

12:0614   editor, a character who has an affection for a certain

12:0615   character named Lois, and I believe the back story of

12:0616   having come from another planet.

12:0617        Then I specifically do recall saying, among

12:0618   other things, in Action Comics No. 1 he flies, and Paul

12:0719   said -- either Paul or Carol or Beth said, "No, he

12:0720   doesn't," and in Action Comics No. 1 it looks to me as he

12:0721   flies over a 20-story building that he is flying, and I

12:0722   remember DC Comics in very excited -- or the

12:0723   representatives, I'm sorry, Carol or Paul or both,

12:0724   saying, "Actually, he doesn't fly till later.  He's not

12:0725   flying.  He's leaping."  I recall that discussion.

65

**U.S. LEGAL SUPPORT**

EXHIBIT 14
272

12:07 1          Q    Do you recall anything that you expressed at the

12:07 2    November 17th meeting concerning the foreign revenue

12:07 3    issue?

12:07 4          A    Yes.

12:07 5          Q    And what was that, sir?

12:07 6          A    I do recall saying that I did not agree with

12:08 7    their analysis that under no circumstance would the

12:08 8    holder of the termination interest or -- well, the holder

12:08 9    of this termination interest not be entitled to foreign

12:0810    revenues and that I believed under the copyright law

12:0811    there were certainly circumstances where for goods

12:0812    developed and produced in the United States and where the

12:0813    overall activity in connection with the development,

12:0814    production and marketing of a good takes place in the

12:0815    United States, that that entitles in those circumstances

12:0816    foreign revenues would attach to those goods and ought to

12:0817    be considered in the revenue stream.

12:0918          Q    Did Miss Simkin have a response to that?

12:0919          A    You're right, the dialogue on that point was

12:0920    mostly between myself and Carol Simkin, and Miss Simkin

12:0921    disagreed.

12:0922          Q    Do you recall anything else that you haven't

12:0923    responded to my prior questions regarding anything else

12:0924    that was said at that meeting?

12:0925          A    I think that at that meeting we felt that there

66

EXHIBIT 14
273

12:09  1    was a sense in the room that the foreign revenue issue

12:09  2    was important and that, if you will, the parties -- we

12:10  3    would go back and each prepare letters, memoranda

12:10  4    outlining our positions so that each side better

12:10  5    understood what the other's point of view was.

12:10  6        Q    Aside from that point, was there any discussion

12:10  7    as to what would next happen in the process of

12:10  8    negotiation?

12:10  9        A    I think the next step may have been the letters

12:10 10    on the foreign revenue issue.

12:11 11             Well, if I can amend my answer --

12:11 12        Q    Sure.

12:11 13        A    -- a bit, it was either that we would have

12:11 14    letters on the issue or that at least I would continue a

12:11 15    discussion with Carol Simkin on this issue.  I'm not

12:11 16    certain that at that meeting we decided that we would

12:11 17    prepare letters, but we were going to continue the

12:11 18    discussion.

12:11 19        Q    Okay.

12:11 20             I'll ask the reporter to mark as Exhibit 12 a

12:12 21    fax transmission of a January 6, 2000 letter, Bates

12:12 22    stamped GTRB 33 through 42.

12:12 23             (Deposition Exhibit 12 marked.)

12:12 24    BY MR. BERGMAN:

12:12 25        Q    Do you recall receiving this letter, Mr. Marks?

                                                                    67

**U.S. LEGAL SUPPORT**

EXHIBIT 14
274

12:12 1     A   Yes.

12:12 2     Q   Am I correct that this is the letter that

12:12 3  addressed the two issues of the foreign revenues and the

12:12 4  apportionment issue?

12:12 5     A   This is the letter from Carol Simkin on that

12:12 6  issue -- on those issues.

12:13 7       MR. BERGMAN:  Would you mark as Exhibit 13 a

12:13 8  letter to Miss Simkin from Mr. Marks, Bates stamped 0043

12:13 9  through 56.

12:13 10       (Deposition Exhibit 13 marked.)

12:13 11  BY MR. BERGMAN:

12:13 12     Q   Do you recall writing that letter, Mr. Marks?

12:13 13     A   Yes.

12:13 14     Q   And once again am I correct that this letter

12:14 15  addressed itself to the foreign revenue and apportionment

12:14 16  issues?

12:14 17     A   That is correct.

12:14 18     Q   Okay.  Did you draft this letter?

12:14 19       MR. MARMARO:  That may invade the attorney work

12:14 20  product privilege, so I'm going to object and instruct on

12:14 21  that basis.

12:14 22       (Instruction not to answer.)

12:14 23  BY MR. BERGMAN:

12:14 24     Q   Did any attorney other than yourself participate

12:14 25  in the preparation of Exhibit 13?

68

**U.S. LEGAL SUPPORT**

EXHIBIT 14
275

12:14 1          MR. MARMARO:  Same objection.  Same instruction.

12:14 2          THE WITNESS:  Can I ask a quick question off the

12:14 3     record of counsel?

12:15 4          MR. MARMARO:  Sure.

12:15 5          MR. BERGMAN:  Of course.

12:15 6          (Recess.)

12:15 7          MR. MARMARO:  I'm going to withdraw my objection

12:15 8     to the last question and allow the witness to answer,

12:15 9     subject to Mr. Toberoff's agreement that that's okay.

12:1510          MR. BERGMAN:  Fine.

12:1511          MR. TOBEROFF:  It's okay.

12:1512          THE WITNESS:  And I take it subject to the

12:1513     agreement that it's not a waiver of any other privilege?

12:1514     BY MR. BERGMAN:

12:1515     Q    It's going to continue throughout our entire

12:1516     deposition.

12:1517     A    I was the only attorney who wrote and

12:1518     participated in the writing of this letter.

12:1519     Q    Okay.  Do you recall, Mr. Marks, that the next

12:1620     meeting between the parties occurred on January 19th of

12:1621     2000?

12:1622     A    I don't have a specific recollection as to any

12:1623     date.

12:1624     Q    Okay.  Do you recall what was the next meeting

12:1625     that the parties had following the November 17, 1999

                                                                    69

**U.S. LEGAL SUPPORT**

EXHIBIT 14
276

12:16 1    meeting?

12:17 2        A    I think I had -- I may have had a meeting with

12:17 3    Carol Simkin on these issues during the time frame of the

12:17 4    exchange of letters on the subject of the letters.

12:17 5        Q    Okay.  Do you recall where that meeting took

12:17 6    place?

12:17 7        A    No.

12:17 8        Q    And bearing in mind that Exhibit 13, which was

12:17 9    your response on these two issues, is dated March 7,

12:1710    2000, do you have any recollection of when after that

12:1811    date this meeting with Miss Simkin may have occurred?

12:1812        A    It may have occurred before.

12:1813        Q    Before?

12:1814        A    Yeah.

12:1815        Q    I see.

12:1816        A    This letter may have grown out of that meeting

12:1817    or communication.

12:1818        Q    I see.

12:1819            And was that meeting between just you and

12:1820    Miss Simkin?

12:1821        A    I don't have a strong recollection of the

12:1822    meeting.

12:1823        Q    Okay.  Aside from the fact that the meeting

12:1824    discussed the issues addressed in exhibits 12 and 13, do

12:1825    you recall anything else being discussed at that meeting

70

12:18 1     that you had with Miss Simkin?

12:18 2              MR. MARMARO:  Any other subjects?

12:18 3              MR. BERGMAN:  Any other subjects.

12:18 4              THE WITNESS:  I don't, although I know there was

12:18 5     not a counterproposal.

12:18 6     BY MR. BERGMAN:

12:19 7          Q    A counterproposal by who, sir?

12:19 8          A    DC Comics/Time Warner.

12:19 9          Q    Subsequent to the meeting that you had with

12:1910     Miss Simkin that you've just testified to, what is the

12:1911     next meeting between representatives of DC and the

12:1912     termination interest that you can recall?

12:1913          A    The next meeting I recall is a meeting in New

12:1914     York at DC Comics' offices.

12:1915          Q    And do you recall approximately when that

12:1916     meeting took place?

12:2017          A    I would say summer 2000.

12:2018          Q    Could you refer, please, to Exhibit 2 and, in

12:2019     particular, the page Bates stamped 509.

12:2020          A    Okay.

12:2021          Q    There appears to be a reference to a January 19,

12:2022     2000 Siegel meeting.

12:2023              Do you see that, sir?

12:2024          A    Yes.

12:2025          Q    To the best of your recollection, was that the

71

**U.S. LEGAL SUPPORT**

EXHIBIT 14
278

12:21 1    meeting in New York --

12:21 2         A    No.

12:21 3         Q    -- or was it some other meeting?

12:21 4         A    No.

12:21 5         Q    Was that the meeting with Miss Simkin?

12:21 6         A    I believe so.

12:21 7         Q    And if you would turn the page to 510, there is

12:21 8    an indication of an April 27 meeting at DC Comics.

12:21 9              Is that the New York meeting --

12:2110         A    Yes, it is.

12:2111         Q    -- that you referred to?

12:2112         A    Yes, it is.

12:2113              MR. TOBEROFF:  What page is that on?

12:2114              MR. BERGMAN:  That is 510, Mr. Toberoff.

12:2115              MR. MARMARO:  510.

12:2116              THE WITNESS:  Yes, this meeting -- reviewing my

12:2117    desk calendar refreshes my recollection that the meeting

12:2118    at DC Comics was April 27, 2000.

12:2119    BY MR. BERGMAN:

12:2120         Q    Aside from the meeting that you've testified to

12:2121    with Miss Simkin, do you recall having any

12:2222    communications, whether by phone or otherwise, with any

12:2223    DC representative from the time of the prior multi-party

12:2224    meeting until this April 27 meeting in New York?

12:2225         A    I'm sorry.  Could you repeat the question?

                                                              72

**U.S. LEGAL SUPPORT**

EXHIBIT 14
279

12:22 1      Q   Yes.  You've previously testified to a meeting

12:22 2  that took place on November 17, 1999.  You've also spoken

12:22 3  about this meeting that you had with Miss Simkin.

12:22 4          Other than the meeting with Miss Simkin, do you

12:22 5  recall any communications from mid November 1999 until

12:22 6  April 27 with any representative of DC concerning the

12:22 7  termination interest?

12:22 8      A   Yes.

12:22 9      Q   And what communications do you recall during

12:23 10 that period?

12:23 11     A   I just recall communications that would have

12:23 12 made arrangements for having the meeting in New York that

12:23 13 we did.

12:23 14     Q   In other words, to the best of your recollection

12:23 15 there were no substantive communications between you and

12:23 16 DC during that period?

12:23 17     A   Not that I recall.

12:23 18     Q   Okay.

12:23 19     A   May we take another very short break?

12:23 20     Q   Certainly.

12:23 21         (Recess.)

12:27 22         MR. BERGMAN:  Back on the record.

12:27 23     Q   Before we get to the April 27 meeting, am I

12:27 24 correct that there came a point where the parties agreed

12:27 25 to execute a tolling agreement, given the passage of time

73

**U.S. LEGAL SUPPORT**

EXHIBIT 14
280

```
12:27 1    that was -- that had occurred since the termination

12:28 2    notices became effective?

12:28 3        A    Yes.

12:28 4        Q    And there was some negotiation back and forth

12:28 5    and letters exchanged between you and Miss Simkin

12:28 6    concerning the precise wording of that tolling agreement?

12:28 7        A    Yes, although I believe there was also

12:28 8    communications with Roger Zissu, and at some point in

12:28 9    this process I met Mr. Zissu.  Perhaps it was at the

12:2810    January 2000 meeting that we talked about.  But yes,

12:2811    there were some communications with Mr. Zissu.

12:2812        Q    So that your recollection is that Mr. Zissu may

12:2813    have been present at your meeting with Miss Simkin?

12:2914        A    My recollection is I recall meeting him in

12:2915    person at one point.

12:2916        Q    Okay.  Who do you recall being present at the

12:2917    April 27 meeting, sir?

12:2918        A    In addition to myself, Don Bulson was there.

12:2919    Paul Levitz was there.  I believe I saw Lillian Laserson.

12:2920    And it was an all-day meeting, and at various parts of

12:3021    the day different people from DC Comics came in, met with

12:3022    us and made presentations.

12:3023        Q    Okay.  And what types of presentations were

12:3024    made?  I mean, are you referring to negotiations or

12:3025    actual presentations of the character or what had been
```

74

12:30 1    done with the character?

12:30 2        A    I am not referring to negotiations.  There were

12:30 3    presentations designed to give myself and, for that

12:30 4    matter, Mr. Bulson information that DC Comics wanted us

12:31 5    to have about, one, its role in monetizing the Superman

12:31 6    property and the different types of exploitation and the

12:31 7    development of the Superman character, among other

12:31 8    things, and there was also some analysis of the proposal

12:31 9    that we had made way back in our -- in the first meeting

12:31 10   we talked about.  But through all of that there was not a

12:31 11   counterproposal made by DC Comics.

12:31 12       Q    Okay.  Let's discuss for a moment what you've

12:32 13   characterized as the analysis of the proposal that you

12:32 14   had made.  Who made that analysis?  Who discussed that

12:32 15   subject?

12:32 16       A    I believe it was presented by Paul in a

12:32 17   PowerPoint presentation.

12:32 18       Q    And do you recall what aspects of the -- of your

12:32 19   prior proposal were addressed by Mr. Levitz in this

12:32 20   presentation?

12:32 21       A    Yes.

12:32 22       Q    Okay.  Could you identify what they were, sir?

12:32 23       A    Principally the royalty.  And principally the

12:32 24   media and merchandising royalty.

12:33 25       Q    And what do you recall Mr. Levitz saying or

75

12:33 1    demonstrating with respect to that element?

12:33 2        A    I recall in general fashion that he argued that

12:33 3    our proposal was for a disproportionately large share of

12:33 4    the Superman revenues or the revenues generated by the

12:33 5    exploitation of the Superman property worldwide, and

12:33 6    picking up on themes that had been started at I believe

12:33 7    it was the meeting in the fall of 1999, our proposal did

12:33 8    not take into account in their view the lack of

12:34 9    entitlement to foreign revenues, did not take into

12:34 10   account that merchandising media in their mind were --

12:34 11   and certainly merchandise was driven by exploitation of

12:34 12   trademarks at least in part, which their position were

12:34 13   wholly owned by DC Comics, did not take into account the

12:34 14   very substantial contributions of the Superman character

12:34 15   and Superman comics by DC Comics over 60 years -- there

12:34 16   was a lot of discussion of that -- and did not take into

12:34 17   account the -- what DC Comics perceived was its right

12:35 18   entitlement to a share of revenues for all that DC Comics

12:35 19   did to manage and carefully exploit the property, and

12:35 20   that's something that Paul described as the licensor's

12:35 21   share.

12:35 22       Q    Do you recall any comments that you may have

12:35 23   made with respect to foreign revenue at that meeting?

12:35 24       A    I do.

12:35 25       Q    And what were they, sir?

76

**U.S. LEGAL SUPPORT**

EXHIBIT 14
283

12:35 1      A   I do.  I recall an exchange with Paul on the

12:35 2   subject, and I believe I said that it was in the context

12:36 3   of the DC position being that the holder of the

12:36 4   termination interest would not be entitled to foreign

12:36 5   revenues at all, and I said, "Well, we've exchanged

12:36 6   letters with Carol Simkin, and I continue to believe that

12:36 7   in circumstances where DC Comics develops and manages a

12:36 8   property and exploits -- in the United States and

12:36 9   exploits it outside the United States, that revenues from

12:3610   that exploitation are under the law attributable to the

12:3611   acts in the United States and must be or ought to be

12:3612   taken into account in valuing this interest," and I

12:3713   recall Paul saying, "Well, you know, Carol disagrees, and

12:3714   Carol's a great -- a fine lawyer who we rely on," and

12:3715   then saying further, "If you're right, we'll just move

12:3716   our offices out of the United States and offshore so we

12:3717   don't have to pay you foreign revenues."

12:3718      Q   Did you have any response to that?

12:3719      A   I was dumbfounded.  I don't recall a response.

12:3720      Q   Was that statement ever repeated during the

12:3721   course of subsequent negotiations?

12:3722      A   I don't recall.

12:3723      Q   What, if anything, did you say during the course

12:3724   of the meeting with respect to the apportionment element?

12:3825      A   On the apportionment issue -- I need to back up

                                                              77

12:38 1    a step.

12:38 2        Q    Sure.

12:38 3        A    Because before I get to what I said, I think I

12:38 4    need to put it in the context of what the presentation

12:38 5    was.

12:38 6        Q    Okay.

12:38 7        A    And it was an extensive presentation, including

12:38 8    showing a short movie that I think was -- had been

12:38 9    prepared for the 50th anniversary of Superman and then

12:3910    descriptions as to, again, the development of the

12:3911    Superman character, I think a reiteration that in their

12:3912    view Superman doesn't fly in Action Comics No. 1 and how

12:3913    different artists over a period of time had their own

12:3914    takes on Superman.

12:3915        And so, for example, they presented different

12:3916    renditions of Superman over the period.  I specifically

12:3917    recall them mentioning an artist named Curt Shaw because

12:3918    there was an American Express campaign with Jerry

12:3919    Seinfeld and Superman, and they wanted to make the point

12:3920    that Jerry Seinfeld wanted to do or would only do the

12:4021    campaign with the Curt Shaw character because he was a

12:4022    Superman aficionado, and he wanted the Curt Shaw version

12:4023    of Superman in the commercial.

12:4024        And so there was a presentation of, if you will,

12:4025    their view of iterations of the character, and I

78

**U.S. LEGAL SUPPORT**

EXHIBIT 14
285

12:40 1   explained that with all these iterations, the core

12:40 2   elements are still in Action Comics No. 1, and I remember

12:40 3   making the point that for purposes of post-termination

12:40 4   works any embellishments that take place by other authors

12:40 5   or by DC Comics over the period of 60 years actually

12:40 6   don't count in the analysis because what you look at --

12:41 7   or what you ought to properly look at is what is the

12:41 8   newly added material to the works from the date of the

12:41 9   effective terminations going forward.  So that is to say,

12:41 10  if a comic book writer had created a villain in 1945, and

12:41 11  that villain has no appearance in post-termination works,

12:41 12  it's irrelevant.

12:41 13        So I made that point, and I recall Paul's

12:41 14  response.  Paul's response was, "That may be right, but

12:41 15  the addition of elements over time in the past is a

12:41 16  predictor that there will be additional elements in the

12:41 17  future."

12:41 18     Q   Okay.  Can you recall any other subjects being

12:42 19  discussed at this April 27 meeting?

12:42 20     A   Yes.

12:42 21     Q   What were they, sir?

12:42 22     A   I recall -- well, I recall a number of things,

12:42 23  albeit perhaps in fragments.  I remember them saying that

12:42 24  the low point in the development of the Superman property

12:42 25  was a television project called Superpup.  It was said

79

EXHIBIT 14
286

12:42 1    with a sense of humor.

12:42 2          I recall there being discussion by Paul and I

12:43 3    believe Janet Kahn, who I understood to be editor in

12:43 4    chief or certainly a senior executive at DC Comics, about

12:43 5    DC Comics' role in development of motion pictures and

12:43 6    television programs based on Superman and how DC Comics

12:43 7    was very much involved in what was then an ongoing

12:43 8    process at Warner Bros. to come up with a new Superman

12:43 9    movie.

12:43 10          I recall a presentation about putting the

12:43 11   Superman character on various consumer products.  I

12:44 12   recall Kraft Macaroni, and they showed us the macaroni

12:44 13   box, and I also recall some discussion about licensing

12:44 14   Supercar in connection with NASCAR racing.

12:44 15      Q    Okay.  Any other subjects you can recall being

12:44 16   discussed?

12:44 17      A    Paul and others really said in substance that

12:44 18   they wanted us to understand and appreciate the approach

12:45 19   that DC Comics has had to exploiting Superman and the

12:45 20   great job that they thought they have done.

12:45 21      Q    Okay.  You indicated earlier, and I'm not

12:45 22   purporting to paraphrase your testimony, but this

12:45 23   negotiation, like most negotiations, goes forward

12:45 24   incrementally.  There are various points involved and

12:45 25   discussions.

                                                              80

EXHIBIT 14
287

12:45 1          Did this meeting in New York bring any aspect of

12:45 2    the negotiation closer, whether it was credit or the

12:45 3    widow's benefit or any of the elements that you were

12:45 4    discussing?  Was there any positive movement towards

12:45 5    resolution at that meeting of any of those points?

12:46 6          MR. MARMARO:  The question is vague and

12:46 7    ambiguous.  Compound also.

12:46 8          You can answer.

12:46 9          THE WITNESS:  Yes and no.

12:46 10   BY MR. BERGMAN:

12:46 11       Q    Okay.  Can you explain what you mean by that?

12:46 12       A    Yes.  The no part of it is there was no

12:46 13   counterproposal made by DC Comics and no discussion of

12:46 14   the elements made by DC Comics.  The yes of it was that I

12:46 15   think there was a sense that no proposal would be

12:46 16   forthcoming until we had a meeting with them in New York,

12:46 17   and so we had to touch that base in order for a proposal

12:46 18   to thereafter come.

12:47 19       Q    If you look at Exhibit 2, page 511 -- again,

12:47 20   this is the calendar -- it indicates a May 10 Siegel

12:47 21   meeting.

12:47 22          Do you recall that meeting?

12:47 23       A    This is 2000.

12:47 24          Correct?

12:47 25       Q    Yes, sir.

                                                              81

**U.S. LEGAL SUPPORT**

EXHIBIT 14
288

12:48 1        A    Just at this moment I don't recall what this

12:48 2    meeting is.

12:48 3        Q    Would it refresh your recollection if I gave you

12:48 4    my understanding, which is that this was a meeting

12:48 5    attended by John Schulman, Patrick Perkins, Carol Simkin,

12:48 6    yourself, Bruce Ramer and Don Bulson participating by

12:48 7    telephone?

12:48 8            MR. TOBEROFF:  Assumes facts not in evidence.

12:48 9            MR. MARMARO:  Is your question --

12:48 10   BY MR. BERGMAN:

12:49 11       Q    Does that group of attendees refresh your

12:49 12   recollection as to there being such a meeting?

12:49 13           MR. MARMARO:  Well, he didn't testify that he

12:49 14   didn't recall a meeting with that group of attendees.

12:49 15   You asked him whether there was a meeting on a specific

12:49 16   date, which he didn't recall.  Those are different

12:49 17   things.

12:49 18           MR. BERGMAN:  Okay.  I'm not contradicting him

12:49 19   or anything.

12:49 20           MR. MARMARO:  So I guess what I'm saying is

12:49 21   there is no foundation that his recollection needs to be

12:49 22   refreshed as to a meeting with those participants.

12:49 23   BY MR. BERGMAN:

12:49 24       Q    Do you recall meeting with those individuals at

12:49 25   some time in 2000?

                                                              82

**U.S. LEGAL SUPPORT**

EXHIBIT 14
289

12:49 1        A    I recall sometime following the New York

12:49 2    meeting, probably within a month, that there was a

12:49 3    meeting I believe at Warner Bros.  I do recall Mr. Bulson

12:49 4    participating by phone.  I must say I don't recall

12:49 5    Mr. Perkins being present.

12:50 6        Q    Okay.  Do you recall that at that meeting,

12:50 7    whatever may have been its date, that there were actual

12:50 8    proposals, albeit, you know, some more precise than

12:50 9    others, being made by each of the parties; that is, DC

12:5010    made certain proposals on certain elements of the

12:5011    problem, and you made certain proposals?

12:5012            Do you recall that generally?

12:5013            MR. TOBEROFF:  Compound and leading.

12:5014            MR. MARMARO:  Agree.  Join.

12:5015            You can answer to the extent that you understand

12:5016    it.

12:5017            THE WITNESS:  My recollection of the meeting was

12:5018    that after the Siegels had made, you know, their offer

12:5019    and proposal in 1999, summer 1999, we're now almost a

12:5120    year later -- less than a year but almost a year later,

12:5121    and we finally get a counterproposal from DC Comics.

12:5122    That's what I recall, that there was a counterproposal

12:5123    from DC Comics.

12:5124    BY MR. BERGMAN:

12:5125        Q    And could you tell me what you do recall of that

                                                                    83

**U.S. LEGAL SUPPORT**

EXHIBIT 14
290

12:51 1    counterproposal?

12:51 2        A    I think it was a proposal that no longer

12:51 3    included what we had called the Superman library, which

12:51 4    were works up until the date of termination, the sort of

12:52 5    the body of works, the 60 years that Paul Levitz and

12:52 6    Janet Kahn, you know, so thoroughly and deeply described

12:52 7    in our New York meeting.  They took revenues from those

12:52 8    works off the table and made a proposal that was based on

12:52 9    revenues from the Superman property on a going-forward

12:5210    basis, that is, from and after the date that the

12:5211    terminations became effective.

12:5212        Q    Okay.  Do you recall any other elements of the

12:5213    proposal advanced by DC at that meeting?

12:5214        A    Well, there was a royalty attached to the

12:5215    revenues from, if you will, the post -- the exploitation

12:5316    of the Superman property post-termination, and I think

12:5317    there was a escalating revenue scheme, but I don't

12:5318    remember what the details were.  And while I don't

12:5319    specifically recall it, I think there was -- a component

12:5320    of it was a continued royalty on publications as well.

12:5321        Q    Anything else you can recall about what was

12:5322    proposed at that meeting by DC?

12:5323        A    Well, I do believe it was a full response and

12:5424    would have included credit issues, would have said that

12:5425    there's a transfer of all rights, and consistent with the

84

**U.S. LEGAL SUPPORT**

EXHIBIT 14
291

12:54 1    structure of the past -- the initial proposal by DC

12:54 2    Comics prior to our representation, I believe that there

12:54 3    may have been provision made for annual guaranteed

12:54 4    amounts.

12:54 5        Q    Anything else you can recall concerning the

12:54 6    proposal?

12:54 7        A    I'm reasonably certain there were more elements,

12:54 8    but that's the best I recall right now.

12:55 9        Q    Do you recall that DC -- DC's proposal included

12:5510    a complete regrant of the property as opposed to the

12:5511    concept of a license from the Siegel interest?

12:5512    A    Yes.  I thought I testified a moment ago that it

12:5513    would be a transfer of interest to DC Comics, yes.

12:5514    Q    Did the proposal contain the amount of the

12:5515    advances that would be offered by DC?

12:5516    A    I don't recall there being advances in the

12:5517    proposal.

12:5518    Q    There was a discussion, was there not, with

12:5519    respect to the proposal concerning certain safe harbors

12:5620    for intercompany arrangements?

12:5621    A    During the negotiation there was certainly

12:5622    discussion about intercompany arrangements, and while I

12:5623    don't specifically recall when and at what meeting that

12:5624    was discussed, I certainly do recall discussions on that

12:5625    subject.

85

EXHIBIT 14
292

12:56 1     Q   Okay.  Am I correct that that was one element

12:56 2   that seemed to be accepted by both parties from almost

12:56 3   the beginning of the discussions?

12:56 4        MR. MARMARO:  Vague and ambiguous.

12:56 5        MR. TOBEROFF:  Leading and vague.

12:56 6   BY MR. BERGMAN:

12:56 7     Q   Was there any dispute that you can recall in the

12:57 8   meetings that you had with the DC representatives

12:57 9   concerning whether or not the agreement you were

12:57 10  negotiating would contain certain safe harbors for

12:57 11  intercompany arrangements?

12:57 12       MR. MARMARO:  Vague --

12:57 13       MR. TOBEROFF:  Vague and ambiguous.

12:57 14       MR. MARMARO:  You can answer.

12:57 15       THE WITNESS:  There -- on this point we

12:57 16  identified a problem, which was, I think, a problem very

12:57 17  much on people's minds throughout the entertainment

12:57 18  industry, litigators and transactional lawyers alike,

12:57 19  which is in intercompany dealings the concern that the

12:57 20  licensor would license a property to a related licensee

12:57 21  and not get full market value because ultimately the

12:58 22  money stays in the company, and a lesser license fee

12:58 23  means a lesser participation paid to the participants.

12:58 24       And in response to that, someone on the DC

12:58 25  Comics side or Warner Bros. side said, "Well, we do have

86

EXHIBIT 14
293

12:58 1    some indicia of fair market dealings," and they pointed

12:58 2    to the Salkind license for the Superman movie -- or the

12:58 3    Superman movies with Christopher Reeve; they pointed to

12:58 4    the "Lois and Clark" license; there was a discussion of

12:58 5    an animated television license with WBTV, which is a

12:59 6    related entity, but the terms were disclosed to us, and

12:59 7    there was a discussion of the arrangement with the Warner

12:59 8    Bros. licensing arm, which I think is called Licensing

12:59 9    Corporation of America, LCA, which took a 25 percent fee.

12:59 10   Those specific -- four specific instances were disclosed

12:59 11   to us.

12:59 12        We reviewed it and ultimately agreed that if

12:59 13   there is a license within those terms, that that license

12:59 14   would not be challenged as an unfair intercompany deal or

12:59 15   vertical integration.  So we discussed and at some point

12:59 16   in this process agreed that we would treat those four,

01:00 17   but only those four, as the safe harbors for intercompany

01:00 18   dealings.

01:00 19        We also discussed and agreed earlier in the

01:00 20   process than at some later points that if there was a

01:00 21   transaction outside those safe harbors, that rather than

01:00 22   the Siegels suing, that we would agree on an expedited

01:00 23   dispute resolution procedure.

01:00 24   BY MR. BERGMAN:

01:00 25        Q    Okay.  Do you recall that the proposal

87

**U.S. LEGAL SUPPORT**

EXHIBIT 14
294

01:00 1    contained -- and I think you indicated that it was --

01:00 2    with respect to the royalty rate, was a graduated rate.

01:00 3         Do you recall that the proposal commenced with a

01:01 4    7 percent royalty up to I believe $7 million and then

01:01 5    graduated to 10 percent after a higher figure?

01:01 6         A    I don't recall the specifics, but -- and I think

01:01 7    there may have been more than one escalation point in the

01:01 8    proposal, but I do recall a proposal.  Whether it opened

01:01 9    at 7 percent or 7.5 percent or a lesser amount, I'm not

01:0110    sure, and I do recall that -- at least having an

01:0111    impression that it might be very difficult to reach the

01:0112    escalated royalties.

01:0213    Q    Okay.  Do you recall suggesting at this meeting

01:0214    what you thought a reasonable range for the royalty would

01:0215    be?

01:0216    A    Well, I guess I have a question about that

01:0217    because I don't know what royalty base you might be

01:0218    referring to.

01:0319    Q    Do you recall suggesting, and I'm not suggesting

01:0320    what the base was, but do you recall suggesting a 17 to

01:0321    24 percent royalty rate?

01:0322    A    At this moment I don't have a specific

01:0323    recollection of that.

01:0324    Q    Okay.  Do you recall any other aspects of the DC

01:0325    proposal that was advanced at this meeting other than

                                                                      88

**U.S. LEGAL SUPPORT**

EXHIBIT 14
295

01:03 1    those that you've already testified to?

01:04 2        A    I do have a recollection, and it seems tied to

01:04 3    this meeting, of on a going-forward basis our thinking

01:04 4    about adding a new element to the discussions, which

01:04 5    would be bonuses triggered by the exploitation of

01:04 6    Superman in a major media work, and I recall John

01:05 7    being -- saying that he was open to that idea, and I

01:05 8    think we subsequently made a proposal that indeed

01:05 9    introduced that element to the discussions, but I think

01:0510    we had a discussion about that as a concept for purposes

01:0511    of the negotiations.

01:0512        Q    Okay.  Is there anything further, any other

01:0513    subject matters that you can recall being discussed at

01:0514    this meeting?

01:0515        A    Not at this moment.

01:0516        Q    Okay.  Was it your custom and practice at this

01:0517    point in time to make notes of what the person on the

01:0518    other side of the table was proposing?

01:0619        A    I -- I -- it was my usual practice to make notes

01:0620    when proposals are being made.

01:0621        Q    To your recollection did you prepare any notes

01:0622    of the proposal that was made at this meeting that we've

01:0623    just been discussing?

01:0624        A    I don't specifically recall.

01:0625        Q    Do you recall Mr. Ramer being present at this

89

**U.S. LEGAL SUPPORT**

EXHIBIT 14
296

01:06 1    meeting?

01:06 2         A    Only vaguely, but yes, but vaguely.

01:06 3              MR. BERGMAN:  Let's go off the record, if we

01:06 4    may.

01:06 5              MR. MARMARO:  Sure.

01:06 6              (Discussion held off the record.)

01:15 7              (Recess.)

01:15 8              MR. BERGMAN:  I am going to ask the reporter to

01:16 9    mark as Exhibit 14 a June 9, 2000 letter Bates stamped

01:1610    0124 through 129.

01:1611              (Deposition Exhibit 14 marked.)

01:1612    BY MR. BERGMAN:

01:1613         Q    The first question is whether you recall sending

01:1614    this letter, Mr. Marks.

01:1615         A    Yes, I do.

01:1616         Q    The reference to a conversation with

01:1617    Mr. Schulman moments ago, was that -- could you tell me

01:1618    why you can recall that being?

01:1719              MR. MARMARO:  The conversation?

01:1720              MR. BERGMAN:  Yes.

01:1721              THE WITNESS:  I believe it would have been a

01:1722    conversation outlining the proposal that's reflected in

01:1723    the attachment.

01:1724    BY MR. BERGMAN:

01:1725         Q    And did you and Mr. Schulman during that

                                                                      90

**U.S. LEGAL SUPPORT**

EXHIBIT 14
297

01:17 1    conversation actually discuss the terms contained in the

01:17 2    proposal, or was it more a call saying you're going to be

01:17 3    getting a letter containing our counter?

01:17 4        A    I think as a courtesy, I would have said, "I'm

01:17 5    sending you a letter," but I certainly would not be

01:17 6    surprised if in the call I outlined the proposal in full

01:17 7    or in large part and said, "I have it written.  I'll send

01:17 8    it to you."

01:17 9        Q    Do you have any recollection as you sit here of

01:1710    any comments that Mr. Schulman may have made to you

01:1711    concerning any of these proposals before he actually

01:1712    received the letter?

01:1813        MR. MARMARO:  Can you read that back to me,

01:1814    please?  I missed one word of it.

01:1815        (Question read.)

01:1816        MR. MARMARO:  You mean --

01:1817        MR. BERGMAN:  In other words, during the phone

01:1818    conversation.

01:1819        MR. MARMARO:  You mean did make to him.

01:1820        MR. BERGMAN:  Yes.

01:1821        THE WITNESS:  I don't, but I don't believe the

01:1822    conversation was a negotiating session.  It was for me a

01:1823    presentation session and for John I believe at least in

01:1824    large part a receiving or listening call.

01:1825    BY MR. BERGMAN:

91

**U.S. LEGAL SUPPORT**

EXHIBIT 14
298

01:18 1        Q    Okay.  And it's denominated as a counteroffer.

01:18 2    Was it a counteroffer to the proposal made at the meeting

01:18 3    that we were discussing before our break?

01:19 4        A    Yes.

01:19 5            MR. BERGMAN:  Would you mark as Exhibit 15 a

01:20 6    letter dated July 18, 2000, Bates stamped GTRB 1 through

01:20 7    6.

01:20 8            (Deposition Exhibit 15 marked.)

01:20 9    BY MR. BERGMAN:

01:2010        Q    Do you recall receiving a copy of Exhibit 15 on

01:2011    or about its date, Mr. Marks?

01:2012        A    Yes.

01:2013        Q    And as Mr. Schulman indicates in his first

01:2014    sentence, he's writing in response to the June 9

01:2015    counterproposal.

01:2016            Do you recall during the period from June 9 to

01:2017    the date of Exhibit 15, the approximate month, having any

01:2018    conversations with Mr. Schulman concerning the

01:2119    counterproposal?

01:2120        A    I have no recollections one way or the other

01:2121    about conversations in this time period about the

01:2122    counterproposal.

01:2223        Q    Did you believe as of the date of this letter

01:2224    that the parties were, at the very least, narrowing the

01:2225    gaps between them on most of the issues?

                                                                    92

**U.S. LEGAL SUPPORT**

EXHIBIT 14
299

01:22 1          MR. MARMARO:  I object to the question as

01:22 2    calling for Mr. Marks' internal subjective beliefs, which

01:22 3    would be work product.

01:22 4          MR. TOBEROFF:  I object as vague and ambiguous.

01:22 5          MR. MARMARO:  That too.  And instruct on that

01:22 6    basis.  Now, if you want to ask him questions about

01:22 7    whether he expressed opinions -- whether he expressed

01:22 8    views to the parties, that's perfectly fine.

01:22 9          (Instruction not to answer.)

01:22 10         MR. BERGMAN:  Okay.

01:22 11    Q    Did you after -- let me ask you this:  What do

01:23 12    you recall being your next communication with

01:23 13    Mr. Schulman following your receipt of Exhibit 15?

01:23 14    A    Just at this moment I do not recall when the

01:23 15    next communication is or what the substance of that

01:23 16    communication was.

01:24 17    Q    To your recollection did you respond in writing

01:24 18    to the proposal advanced by Mr. Schulman in Exhibit 15?

01:25 19    A    At some point I did have a written

01:25 20    counterproposal to this, but just at this moment and

01:25 21    without having my recollection refreshed, I don't know if

01:25 22    that was the next counterproposal or conversation on the

01:25 23    subject matter.

01:25 24    Q    Okay.  Do you have -- what is your recollection

01:25 25    as you sit here now, Mr. Marks, of what was your next

                                                            93

01:25 1    conversation with Mr. Schulman concerning this matter?

01:26 2            MR. MARMARO:  Just to be clear, the question is

01:26 3    exactly what you asked, which is what is his very next

01:26 4    conversation as opposed to -- so if he doesn't remember

01:26 5    exactly what the next conversation was, you don't want

01:26 6    him to testify --

01:26 7            MR. BERGMAN:  Okay.

01:26 8        Q    In the continuum of conversations, Mr. Marks,

01:26 9    and the letter writing and telephone calls, what do you

01:26 10   recall as next occurring after this July 18th, 2000

01:26 11   letter?

01:26 12       A    It might refresh my recollection if I could look

01:26 13   at the phone logs that we've identified earlier.

01:26 14       Q    Please do.  And you can look at them at any

01:26 15   point during the deposition that you want to.

01:28 16       A    I do recall discussion of two related matters, I

01:28 17   do recall the sequence of those matters, but my reviewing

01:28 18   the phone logs does not refresh my recollection as to how

01:28 19   those matters -- when those matters came up in relation

01:28 20   to this July 2000 date.

01:28 21       Q    Okay.  What are those two matters that come to

01:29 22   mind?

01:29 23       A    There came a time when Jerry Levine, who was the

01:29 24   president of I think what was AOL at the time, AOL Time

01:29 25   Warner, very graciously offered to advance the Siegels

94

**U.S. LEGAL SUPPORT**

EXHIBIT 14
301

01:29 1  $250,000, and there was some discussion with John and

01:29 2  with Carol Simkin and with Patrick Perkins about

01:29 3  documenting the release, if you will, of the $250,000.

01:29 4      Q   Okay.  Those are the two --

01:29 5      A   No.  That's one.

01:29 6      Q   Okay.

01:29 7      A   That's one.

01:29 8      Q   And what was the second?

01:30 9      A   The second, which was certainly after the first

01:30 10 that I've just described and indeed some time after, is I

01:30 11 do recall a conversation with John where he called and he

01:30 12 said, "We have some litigation pending, and our New

01:30 13 York -- in New York.  Our counsel suggested we would very

01:30 14 much like a license from the Siegel family or a grant

01:30 15 from the Siegel family for a one-year period, and we're

01:30 16 prepared to pay you another -- or prepared to pay them

01:30 17 another $250,000, and this offer is open for 36 hours."

01:30 18     Q   Was that the Kryptonite matter?

01:31 19     A   Yes, that was in connection with the Kryptonite

01:31 20 matter, which my sense is after this, maybe even well

01:31 21 after this.

01:31 22     Q   But while we are on the subject, what was the

01:31 23 nature of the license that Mr. Schulman requested?

01:31 24     A   I think he asked for a one-year license on a no

01:31 25 prejudice basis.  I think in this Kryptonite litigation,

95

**U.S. LEGAL SUPPORT**

EXHIBIT 14
302

01:31 1    the defendant was making an attack or attempting to

01:31 2    attack DC Comics' chain of title on its rights in --

01:32 3    copyright rights and/or trademark rights in the Superman

01:32 4    property and Kryptonite in particular, and so in

01:32 5    defending that attack the view was if we can quickly for

01:32 6    a limited period but without prejudice to the rest of the

01:32 7    deal get a one-year license, that would equip us to

01:32 8    dispose of this argument being made by the Kryptonite

01:32 9    people.

01:32 10        Q    And was that license issued?

01:32 11        A    No.

01:32 12        Q    And did you in substance tell Mr. Schulman that

01:32 13    you refused or declined to grant that license?

01:32 14        A    I recall telling him that "If we grant a one-

01:33 15    year license, all our discussions are going to grind to a

01:33 16    halt for the next year.  I don't think that's a very good

01:33 17    idea for us," and I think John said, "Okay.  Six months."

01:33 18        Q    And what was your response to that?

01:33 19        A    Ultimately, we did not grant any license for any

01:33 20    period, but we did work out a different arrangement to

01:33 21    try to assist DC Comics in its litigation in that

01:33 22    Kryptonite case.

01:33 23        Q    And what was the nature of that arrangement?

01:33 24        A    We -- well, I believe it was with Mr. Perkins.

01:34 25    We negotiated a short statement that was presented to the

96

**U.S. LEGAL SUPPORT**

EXHIBIT 14
303

01:34 1    court which said in substance and effect that the parties

01:34 2    are engaged in confidential negotiations, and the Siegel

01:34 3    family does not object to or, perhaps even stronger,

01:34 4    supports DC Comics in this litigation.  But there was no

01:34 5    license granted and no consideration exchanged.

01:34 6        Q    Okay.

01:34 7            Would you mark as Exhibit 16 a letter dated July

01:34 8    24, 2000, from Joanne Siegel to Gerald Levin which is

01:35 9    Bates stamped WB 005977 through 005981.

01:35 10           (Deposition Exhibit 16 marked.)

01:35 11   BY MR. BERGMAN:

01:35 12       Q    As you are reading it, Mr. Marks, my first

01:35 13   question is going to be whether you've ever seen this

01:35 14   letter before.

01:35 15       A    I need to look it over, please.

01:35 16       Q    Very well, sir.

01:37 17       A    I believe I saw this letter at some time.

01:37 18       Q    Do you believe that you saw it on or about July

01:37 19   24, 2000?

01:37 20       A    No.

01:37 21       Q    Had you prior to July 24, 2000, seen a draft of

01:37 22   this letter?

01:37 23       A    I think to answer that question might invade the

01:37 24   attorney-client privilege.

01:37 25           MR. MARMARO:  I'll object and instruct.

97

**U.S. LEGAL SUPPORT**

EXHIBIT 14
304

01:37 1          THE WITNESS:  Can I take 30 seconds?

01:37 2          MR. BERGMAN:  Certainly can.

01:37 3          (Recess.)

01:38 4          MR. MARMARO:  We can go back on record, and the

01:38 5   witness can answer the question.

01:38 6          THE WITNESS:  Subject to if Mr. Toberoff permits

01:38 7   me to answer the question.

01:38 8          MR. TOBEROFF:  I wouldn't like you to answer the

01:38 9   question as to (unintelligible).

01:3810          THE REPORTER:  I can't hear you, Counsel.

01:3811          MR. MARMARO:  The question was whether before

01:3812   this date he saw a draft.  He's prepared to answer

01:3813   whether he saw a draft of this agreement before it went

01:3814   out, before this date.

01:3815          MR. TOBEROFF:  Well, that divulges a...  I'll

01:3916   allow it.

01:3917          THE WITNESS:  No.

01:3918          MR. BERGMAN:  Would you mark as Exhibit 17 a

01:3919   letter dated July 26, 2000, Bates stamped GTRB 113 and

01:3920   114.

01:3921          (Deposition Exhibit 17 marked.)

01:4022   BY MR. BERGMAN:

01:4023      Q   Do you recall receiving a copy of this letter on

01:4024   or about this date, Mr. Marks?

01:4025      A   Yes.

                                                            98

**U.S. LEGAL SUPPORT**

EXHIBIT 14
305

01:40 1      Q    In the second sentence of the first paragraph,

01:40 2  Mr. Schulman states, quote, "We share your hope that the

01:40 3  Siegel family and DC Comics reach a settlement agreement

01:40 4  in the near term, an agreement which is in all of our

01:40 5  interests to reach."

01:41 6      Had you previously expressed to Mr. Schulman the

01:41 7  hope that the parties reach a settlement agreement?

01:41 8      A    I think the purposes of our discussions from the

01:41 9  outset were to see if we could come to an agreement that

01:41 10 would be acceptable to the Siegel family and acceptable

01:41 11 to DC Comics.

01:41 12     Q    And --

01:41 13     A    If I might say --

01:41 14     Q    Sure.

01:41 15     A    -- reading the first sentence of this letter

01:41 16 refreshes my recollection and helps answer maybe a

01:41 17 previous question, which is I think when John sent the

01:41 18 letter on July 18, we crossed letters in the mail, and I

01:41 19 think at that time I sent a letter nudging for a

01:42 20 response, if you will, and also making a reference to the

01:42 21 past weekend's box office performance, which I think was

01:42 22 in reference to a very strong opening of the movie X MEN,

01:42 23 which was also a comic book property.

01:42 24     Q    You're correct.

01:42 25     A    Okay.

99

**U.S. LEGAL SUPPORT**

EXHIBIT 14
306

01:42 1          MR. MARMARO:  Thank you.

01:42 2   BY MR. BERGMAN:

01:42 3       Q    In terms of the tenor of the negotiation,

01:42 4   Mr. Marks, would you agree that the parties were

01:42 5   conducting the negotiations in a cordial manner?

01:43 6          MR. MARMARO:  Vague and ambiguous.

01:43 7          THE WITNESS:  It's -- the question is really too

01:43 8   general to answer.  The tenor changed over the course of

01:43 9   the negotiation, and at some times the tenor changed

01:4310   phone call to phone call.

01:4311   BY MR. BERGMAN:

01:4312       Q    Did you ever in the course of this negotiation

01:4313   have a conversation with Mr. Schulman in which one of you

01:4314   abruptly terminated the conversation, hung up?

01:4315          MR. MARMARO:  Ever throughout the entire

01:4316   process?

01:4317          MR. BERGMAN:  Yes, sir.

01:4318          THE WITNESS:  Well, if the question is did John

01:4419   Schulman ever hang up on me, no, he did not, but I do

01:4420   recall a phone conversation where he said, "Okay, this

01:4421   negotiation's over," and that was an abrupt statement,

01:4422   and that did terminate the negotiations at least for the

01:4423   next 15 seconds.

01:4424   BY MR. BERGMAN:

01:4425       Q    And how did it resume?

                                                            100

**U.S. LEGAL SUPPORT**

EXHIBIT 14
307

01:44 1      A   I think we continued to have a discussion.

01:44 2      Q   In any of the meetings that you participated in,

01:44 3   did anyone on either side act rudely or intemperately

01:44 4   toward the other?

01:44 5      A   No.  To go back to a question that you posed, I

01:45 6   think the parties conducted themselves professionally and

01:45 7   with courtesy.

01:45 8      Q   And would you agree that both parties were

01:45 9   conducting themselves in a way to facilitate rather than

01:45 10  hinder reaching an agreement?

01:45 11         MR. MARMARO:  That calls for speculation.

01:45 12  You're asking him to read Time Warner's mind.

01:45 13         MR. BERGMAN:  No.  Just to view their conduct.

01:45 14         MR. TOBEROFF:  It's also --

01:45 15         MR. MARMARO:  It's vague and ambiguous.

01:45 16         MR. TOBEROFF:  -- vague and leading.

01:45 17  BY MR. BERGMAN:

01:45 18     Q   Well, in terms of how the parties expressed

01:45 19  themselves during meetings, did they do so in a manner

01:45 20  that was designed to facilitate or hinder reaching an

01:45 21  agreement?

01:45 22         MR. MARMARO:  My problem with the question is

01:45 23  the word "designed."  If you're -- he can't possibly know

01:46 24  what was the design of the other side of the negotiation.

01:46 25         MR. BERGMAN:  Okay.

                                                            101

**U.S. LEGAL SUPPORT**

EXHIBIT 14
308

01:46 1        Q    Looking to the objective manifestations of the

01:46 2    people who were negotiating this agreement, did those

01:46 3    manifestations hinder or encourage reaching an agreement?

01:46 4            MR. MARMARO:  Vague, ambiguous, speculation.

01:46 5            You can answer.

01:46 6            MR. TOBEROFF:  I concur in the objection.

01:46 7            THE WITNESS:  The -- I think I can answer it

01:46 8    this way:  In terms of the tone of the discussion and,

01:46 9    indeed, in statements made that I'll call in the nature

01:4610    of window dressing but not meaning to demean it, there

01:4711    were occasions where Paul and others were respectful of

01:4712    Jerry Siegel and did note and in fact went out of their

01:4713    way to note his very important contributions not only to

01:4714    the Superman character, but with a view that perhaps but

01:4715    for Jerry Siegel there would be no DC Comics at all, and

01:4716    there would be no comic book industry as we know it.  So

01:4717    they -- I can recall instances where I think they went to

01:4718    pains to make sure that over the course of this

01:4819    discussion we did not think that they were besmirching

01:4820    the contribution of Jerry Siegel to the Superman

01:4821    character.  Having said all that, I think ultimately what

01:4822    would advance or hinder the discussions were the

01:4823    substantive elements of the proposals.

01:4824    BY MR. BERGMAN:

01:4825        Q    At page -- the second page of Exhibit 17,

                                                                    102

**U.S. LEGAL SUPPORT**

EXHIBIT 14
309

01:48 1    Mr. Schulman makes reference to the fact that "...if

01:48 2    Joanne or her family are having any financial

01:48 3    difficulties...which we may be unaware of, please let me

01:49 4    know, and we will consider addressing the situation, as

01:49 5    we have in the past."

01:49 6         You made reference earlier to a $250,000

01:49 7    payment.  Did that payment arise out of this invitation

01:49 8    that Mr. Schulman gave you in Exhibit 17?

01:49 9         A    I have a sense that the payment came from Jerry

01:4910    Levine, Jerry Levine's authorization.  I think he

01:4911    communicated back to Joanne rather than from John.

01:4912         Q    To the best of your recollection then, you did

01:4913    not advise Mr. Schulman at any point after receiving his

01:4914    July 26 letter that it would be helpful if moneys were

01:4915    paid to Joanne on an interim basis?

01:5016         A    In that vein I think there were two different

01:5017    discussions that happened, some of which might have

01:5018    preceded this, and certainly others followed.

01:5019         Q    And what were those discussions, sir?

01:5020         A    Well, there was -- I think certainly subsequent

01:5021    to this there was time spent trying to provide or

01:5022    reimburse Laura Siegel Larson and Michael Siegel for

01:5023    medical and dental -- or, well, at least medical

01:5024    insurance, and in Laura's case medical insurance for her

01:5125    and her sons, who were minorities, so that may have

103

**U.S. LEGAL SUPPORT**

EXHIBIT 14
310

01:51 1  been -- that -- well, let's just say I do recall those

01:51 2  discussions, and -- in terms of finalizing that, which

01:51 3  actually took a long time, and I was communicating

01:51 4  directly with Mr. Perkins.  That was one of the veins I

01:51 5  referenced.

01:51 6      The other was that from prior to our

01:51 7  representation and in fact dating back many years, Time

01:51 8  Warner or DC Comics had been paying Joanne an annual

01:51 9  widow's benefit, and from time to time John said that the

01:52 10  benefit, as reflected in the letter that first offered

01:52 11  it, was contingent on the Siegels not challenging DC

01:52 12  Comics' rights, and now that they had -- were terminating

01:52 13  the interest, DC did feel it was within their rights to

01:52 14  terminate those benefits and reserved its right to

01:52 15  terminate those benefits.

01:52 16      Q    Did DC ever exercise that right?

01:52 17      A    I don't think so, at least not during the course

01:52 18  of my representation.  But more than once John said that

01:52 19  they might have to consider that.

01:52 20      Q    How many times do you recall John saying that?

01:52 21      A    Well, I said more than once --

01:52 22          MR. MARMARO:  Asked and answered.

01:53 23          THE WITNESS:  More than once, but I don't know

01:53 24  how many times.

01:53 25  BY MR. BERGMAN:

104

EXHIBIT 14
311

| | |
|---|---|
| 01:53 1 | Q   More than twice? |
| 01:53 2 | A   I don't know. |
| 01:53 3 | MR. BERGMAN:  Would you mark as Exhibit 18 a |
| 01:53 4 | one-page letter dated August 22, 2000, marked WB 5976. |
| 01:53 5 | (Deposition Exhibit 18 marked.) |
| 01:54 6 | BY MR. BERGMAN: |
| 01:54 7 | Q   Do you recall receiving at any time a copy of |
| 01:54 8 | this letter? |
| 01:54 9 | A   No.  Excuse me.  Let me read it again. |
| 01:54 10 | As I sit here, I don't recall receiving this |
| 01:54 11 | letter. |
| 01:54 12 | MR. BERGMAN:  Okay.  Off the record. |
| 01:55 13 | (Lunch recess from 1:55 PM to 2:57 PM.) |
| 01:55 14 | MR. BERGMAN:  Back on the record. |
| 02:58 15 | Would you mark as Exhibit 19 a letter dated |
| 02:58 16 | April 27, 2001, Bates stamped WB 7853 through 55. |
| 02:58 17 | (Deposition Exhibit 19 marked.) |
| 02:58 18 | |
| 03:00 19 | EXAMINATION (Resumed) |
| 03:00 20 | BY MR. BERGMAN: |
| 03:00 21 | Q   Have you ever received a copy of this letter |
| 03:00 22 | before? |
| 03:00 23 | A   I don't recall receiving a copy of this letter. |
| 03:00 24 | Q   By the way, in the first sentence of her letter, |
| 03:00 25 | Miss Siegel refers to a "5% commission to our |

105

**U.S. LEGAL SUPPORT**

EXHIBIT 14
312

| | |
|---|---|
| 03:00 1 | representatives."  Was that the basis on which your firm |
| 03:00 2 | was representing the termination interest? |
| 03:00 3 | MR. MARMARO:  I think that's privileged and |
| 03:01 4 | confidential, the fee arrangement, and I'll instruct -- |
| 03:01 5 | object and instruct him. |
| 03:01 6 | (Instruction not to answer.) |
| 03:01 7 | MR. BERGMAN:  Okay. |
| 03:01 8 | Q   Is it correct, Mr. Marks, that you had a series |
| 03:01 9 | of telephone conversations with John Schulman beginning |
| 03:0110 | in late April but becoming more intense in the summer and |
| 03:0111 | early fall of 2001 in which you had made considerable |
| 03:0112 | progress in narrowing the gap between your respective |
| 03:0113 | positions? |
| 03:0114 | MR. MARMARO:  I'm going to object to the form of |
| 03:0115 | the question as being vague, ambiguous and compound. |
| 03:0116 | MR. TOBEROFF:  Concur. |
| 03:0117 | THE WITNESS:  Well, if "intense" means more |
| 03:0218 | frequent -- |
| 03:0219 | BY MR. BERGMAN: |
| 03:0220 | Q   Yes. |
| 03:0221 | A   -- then yes, over that period there were a |
| 03:0222 | series of phone calls from that summer into the fall.  In |
| 03:0223 | my own mind I in some way think of the starting point as |
| 03:0224 | an in-person meeting in John Schulman's office in the |
| 03:0225 | summer of 2001, which of course is not a phone call, but |

106

**U.S. LEGAL SUPPORT**

EXHIBIT 14
313

03:02 1      from that point forward I think there were -- the

03:02 2      communications were more frequent and certainly more

03:02 3      frequent than they had been.

03:02 4          Q   Was that meeting with John Schulman in the

03:02 5      summer attended by anyone other than the two of you?

03:03 6          A   No.

03:03 7          Q   Can you tell me as best as you can recall and

03:03 8      with as much specificity as you can what subjects were

03:03 9      discussed at that meeting?

03:03 10             MR. MARMARO:  The subject as opposed to the

03:03 11     content?

03:03 12             MR. BERGMAN:  First I'll get the subjects.

03:03 13             THE WITNESS:  Yes.  At that meeting I made a

03:03 14     further proposal or a counterproposal on behalf of the

03:03 15     Siegel interest to John, a proposal I know was -- I

03:03 16     believe was reflected in a writing, an outline of the

03:03 17     proposal that I left with John, and we reviewed that

03:03 18     proposal at the meeting, but in the course of the meeting

03:03 19     I think we discussed other things and areas where the

03:04 20     parties differed.

03:04 21     BY MR. BERGMAN:

03:04 22         Q   And to the best of your recollection, what did

03:04 23     the proposal or counterproposal consist of that you

03:04 24     advanced?

03:04 25         A   The elements were a signing bonus, an advance, a

                                                              107

**U.S. LEGAL SUPPORT**

EXHIBIT 14
314

03:04 1    royalty applied against DC Comics worldwide, media and

03:04 2    merchandising revenues, an annual guarantee for a period

03:04 3    of time followed by a formula for determining annual

03:04 4    guarantees following the period of time, a publication

03:05 5    royalty based on a percentage of the retail cover price

03:05 6    of DC Comics publications.  We talked about a -- I

03:05 7    believe a transfer of -- just a moment -- a transfer of

03:05 8    90 percent of the Siegel interest outright coupled with a

03:05 9    license of the remaining -- an exclusive license of the

03:06 10   remaining 10 percent of the interest.  Talked about that

03:06 11   on the copyright notice, in relation -- anytime there was

03:06 12   a copyright notice for the Superman property, that the

03:06 13   copyright would read after the circle and the "c" and the

03:06 14   year "DC Comics and the Siegel family."  We talked about

03:06 15   credit to the creators, Jerry Siegel and Joe Shuster, in

03:06 16   motion pictures and television and other exploitations.

03:06 17   Talked about medical insurance for Joanne Siegel, Laura

03:07 18   Siegel Larson, her two sons, Michael Siegel.  The

03:07 19   proposal contained again a full indemnity by Warner Bros.

03:07 20   and E&O insurance.  The proposal had in it the point we

03:07 21   discussed about how to handle intercompany dealings and

03:07 22   there being four safe harbor areas and expedited dispute

03:07 23   resolution for intercompany arrangements which were

03:07 24   outside those four safe harbors.

03:08 25        I think those are some, if not most, of the

                                                              108

**U.S. LEGAL SUPPORT**

EXHIBIT 14
315

03:08 1    elements of the proposal, but I recall, as we discussed

03:08 2    it, we would touch on some other things as well.

03:08 3        Q    Okay.  I want to obviously go further into that,

03:08 4    but I'd like to try and fix the date if we possibly can.

03:09 5            You referenced the summer of 2001 for this

03:09 6    meeting.  Is it possible that the meeting occurred in mid

03:09 7    September, September 17?

03:09 8        A    I don't believe so.  Just a minute.

03:09 9            Well, my recollection is summer.

03:09 10       Q    Okay.  With respect to the items that you've

03:09 11   just identified -- let's take, for example, the signing

03:09 12   bonus.  What did you propose to Mr. Schulman regarding

03:09 13   the signing bonus at this meeting?

03:10 14       A    Well, I must say whatever is in the written

03:10 15   proposal that I left with him of course governs, but I

03:10 16   recall that I believe that the signing bonus and the

03:10 17   advance combined were $3 million, some of which would be

03:10 18   recoupable, and some of which would be non-recoupable.

03:10 19       Q    Okay.  Can we go off the record just for a

03:10 20   minute?

03:10 21           (Recess.)

03:14 22           MR. BERGMAN:  Back on the record.

03:14 23       Q    In looking at your calendar for 2001, I notice

03:14 24   that at 513 there is a reference to a July 12 meeting

03:15 25   with Schulman.  Is that the meeting to which you refer?

                                                              109

**U.S. LEGAL SUPPORT**

EXHIBIT 14
316

03:15 1      A   Well, while it doesn't say "meeting," I believe

03:15 2   that's right.  That's what I believe I was referring to:

03:15 3   July 12, 2001.

03:15 4      Q   And it was at that meeting that you recall

03:15 5   leaving John with a written proposal or counterproposal?

03:15 6      A   Yes, I recall having a written proposal and

03:15 7   leaving it with him and presenting it on a reading off of

03:15 8   the proposal, which, if you will, was the springboard for

03:15 9   our discussion.

03:1510      Q   And to the best of your recollection, was that

03:1511   written proposal contained in the materials that you

03:1512   forwarded to Mr. Toberoff when your retention was over?

03:1513      A   I believe so.

03:1614      Q   Okay.  Before the break you had indicated

03:1615   that --

03:1616          MR. TOBEROFF:  Did you mean -- you said

03:1617   "forwarded to Mr. Toberoff when the meeting was over"?

03:1618          MR. BERGMAN:  "When your retention was over."

03:1619          MR. TOBEROFF:  Oh, sorry.

03:1620   BY MR. BERGMAN:

03:1621      Q   You had indicated before we took that brief

03:1622   break that you recall the payment -- the initial payments

03:1623   together totaling $3 million.

03:1624          Is that correct?

03:1625      A   I believe so.  I would need to see the document

110

EXHIBIT 14
317

03:16 1    to refresh my recollection.

03:16 2        Q    And do you recall, sir, whether one was 2

03:16 3    million and one was 1 million?

03:16 4        A    I think so, yes.

03:16 5        Q    And in that proposal was the $2 million

03:16 6    recoupable?

03:17 7        A    Absent seeing the document, I'm not sure whether

03:17 8    the 1 million was non-recoupable or recoupable or whether

03:17 9    the 2 million was recoupable or non-recoupable.

03:1710        Q    As you might have gathered, I'm flying blind

03:1711    here because I don't believe -- and perhaps,

03:1712    Mr. Toberoff, you could check your file -- I don't

03:1713    believe that document has been produced.

03:1714        MR. TOBEROFF:  Well, wouldn't you have it if he

03:1715    left it with John Schulman, aside from whether or not

03:1716    it's been produced?

03:1717        MR. BERGMAN:  Well, all I can say is I haven't

03:1718    seen the agreement, and I've reviewed --

03:1719        MR. TOBEROFF:  You mean the proposal?

03:1720        MR. BERGMAN:  The proposal.  And I've reviewed

03:1721    the Warner files fairly carefully.

03:1722        Q    Do you recall that the $1 million portion of the

03:1823    advance was non-recoupable?

03:1824        A    I think it was -- I think there was a

03:1825    designation of one of the items as a signing bonus and

                                                                    111

**U.S. LEGAL SUPPORT**

EXHIBIT 14
318

03:18 1    one of the items -- which was non-recoupable, and one of

03:18 2    the items as an advance, which was recoupable.

03:18 3        Q    Another item that you mentioned as being

03:18 4    contained in that proposal was a worldwide royalty.

03:18 5            Do you recall what that royalty was?

03:18 6        A    I think it was 6 percent.

03:18 7        Q    And what was the proposal concerning other media

03:19 8    and merchandising?

03:19 9        A    6 percent.

03:1910        Q    Did the proposal indicate what the royalty would

03:1911    be on DC Comics?

03:1912        A    Yes.

03:1913        Q    What was that, sir?

03:1914        A    I think 2 percent, but again the written

03:1915    proposal would govern.

03:1916        Q    By the way, do you retain a copy of that

03:1917    proposal at this point in time?

03:1918        A    Do I have a copy of it?

03:1919        Q    Does the firm have a copy?

03:1920        A    I believe so.

03:1921            MR. BERGMAN:  Off the record.

03:1922            (Discussion held off the record.)

03:2023    BY MR. BERGMAN:

03:2024        Q    Could you look at the privilege log, Exhibit 1,

03:2025    and tell me whether that document is listed on the

                                                            112

**U.S. LEGAL SUPPORT**

EXHIBIT 14
319

03:20 1    privilege log?

03:20 2            MR. MARMARO:  Let's go off the record for one

03:20 3    minute, if I might.

03:20 4            MR. BERGMAN:  Sure.

03:20 5            (Recess.)

03:21 6            MR. BERGMAN:  Back on the record.

03:21 7            MR. MARMARO:  We believe that the enclosure to

03:21 8    No. 547 on the log would be that document, and Mr. Marks

03:21 9    is not the holder of any privilege, so he is not

03:2110    empowered to waive any privilege that might attach to

03:2111    that, and so he is obligated to take that privilege.

03:2212            MR. BERGMAN:  And I don't mean to quarrel with

03:2213    you, Mr. Marmaro, but if the document was prepared to be

03:2214    communicated to Schulman and was in fact communicated to

03:2215    Schulman, wouldn't that eliminate any privilege?

03:2216            MR. MARMARO:  I'm not going to give a legal

03:2217    opinion on that.  All I'm saying is he's not authorized

03:2218    to do that.  I think that's a matter between you and the

03:2219    plaintiffs in this lawsuit to resolve, and, of course, if

03:2220    the two of you resolve it, that document would be

03:2221    produced.  But as I understand it, it wasn't produced by

03:2222    Time Warner, indicating that perhaps it might not have

03:2223    been left.

03:2224            MR. BERGMAN:  Okay.  Indeed.

03:2225            MR. MARMARO:  And therefore --

113

U.S. LEGAL SUPPORT

EXHIBIT 14
320

03:22 1          MR. BERGMAN:  But, of course --

03:22 2          MR. MARMARO:  -- that leaves some uncertainty,

03:22 3  but we are obligated as we sit here today not to waive

03:22 4  anything, but it is that item, and if the parties to this

03:22 5  litigation work it out or if a court resolves it as

03:22 6  between them, we certainly don't -- we will follow

03:22 7  whatever instructions we're told to follow.

03:22 8          MR. BERGMAN:  Okay.

03:22 9      Q   Is it your best recollection, Mr. Marks, that

03:23 10  you left a copy of that document with John Schulman?

03:23 11     A   It is.

03:23 12     Q   Okay.  And am I correct, sir, that it was

03:23 13  created for the purpose of communicating it to

03:23 14  Mr. Schulman?

03:23 15     A   Yes, it was a proposal that I believe I brought

03:23 16  with me, reviewed orally, and my best recollection is I

03:23 17  left it with him for his benefit.

03:23 18     Q   Okay.  Thank you.

03:23 19          Did the proposal provide for the forgiveness of

03:23 20  the $250,000 advance that had been made to Joanne?

03:23 21     A   I believe that it did.

03:23 22          MR. MARMARO:  Can I ask just a question?

03:23 23          MR. BERGMAN:  Sure.

03:23 24          MR. MARMARO:  Is it correct that Time Warner has

03:23 25  not produced that in this litigation?

114

**U.S. LEGAL SUPPORT**

EXHIBIT 14
321

03:23 1          MR. BERGMAN:  It is -- well, we produced 60,000

03:24 2     pages, so it's --

03:24 3          MR. MARMARO:  To the best of your knowledge.

03:24 4          MR. BERGMAN:  To the best of my knowledge, we

03:24 5     haven't.  To the best of my knowledge, I have never seen

03:24 6     the document and have attempted to make a thorough review

03:24 7     of the client's documents.

03:24 8          MR. TOBEROFF:  In the review of the I think it's

03:24 9     50,000 documents, but it could be more, in the review of

03:2410     that I did not see such a proposal.

03:2411     BY MR. BERGMAN:

03:2412          Q    You referred, Mr. Marks, to the proposal as

03:2413     providing for a guarantee for a period of time.  What was

03:2414     the period of time to your recollection?

03:2515          A    I believe it was the later of 12 years or --

03:2516     well, 12 years or continuing for so long as DC Comics was

03:2517     in a recouped position.

03:2518          Q    During the course of that meeting, did

03:2519     Mr. Schulman respond to any of the -- any elements of the

03:2520     proposal?

03:2521          A    Yes.

03:2522          Q    With respect to the advance and the signing

03:2523     bonus or however you want to describe the two payments

03:2624     totaling $3 million, what did Mr. Schulman say?

03:2625          A    I don't recall.

                                                              115

**U.S. LEGAL SUPPORT**

EXHIBIT 14
322

03:26 1      Q   With respect to the 6 percent of the worldwide

03:26 2   royalty, do you recall what Mr. Schulman's response was?

03:26 3      A   I generally recall him saying that this was

03:26 4   positive movement and helpful movement in our

03:26 5   discussions.

03:26 6      Q   What was his, Mr. Schulman's response, if you

03:26 7   can recall, to the 12-year period of time continuing as

03:26 8   you've just testified?

03:26 9      A   I do recall a discussion on this issue, and I

03:27 10  believe it was discussion at this meeting.  John's

03:27 11  position was that the annual guarantee should be for a

03:27 12  shorter period, and on a related topic which I recall

03:27 13  discussion on, he was of a view that there would be no

03:27 14  further annual guarantees if DC Comics was in an

03:27 15  unrecouped position, and that he felt that if after the

03:27 16  period of time, whatever it might be, whether it's 10 or

03:27 17  12 years, if DC Comics was unrecouped, that there should

03:27 18  be no entitlement to guaranteed payments, and we had, I

03:28 19  thought, a productive discussion on that topic.

03:28 20     Q   As for the amount of the guaranteed annual

03:28 21  payment, what did the proposal provide for?

03:28 22     A   I believe it was $500,000.

03:28 23     Q   And what was Mr. Schulman's response to that?

03:28 24     A   I don't think he quarrelled with the amount.

03:28 25  He -- the discussion was really what happens if after the

116

**U.S. LEGAL SUPPORT**

EXHIBIT 14
323

03:28 1    end of whatever period of time DC Comics is unrecouped,

03:28 2    and just to join the issue, I said that it was very

03:28 3    important from the Siegel perspective that there be

03:28 4    continuing payments whether DC was recouped or not.

03:29 5        Q    What was Mr. Schulman's response, if you can

03:29 6    recall, to the notion of a transfer of 90 percent and an

03:29 7    exclusive license of 10 percent of the interest?

03:29 8        A    I do recall John's response was that Time

03:29 9    Warner/DC Comics were insistent on there being a transfer

03:2910    of 100 percent of the interest.

03:2911        Q    And what was his response with respect to the

03:2912    proposed copyright notice in the name of both DC and the

03:2913    Siegel family?

03:2914        A    We did have discussion about that point, which

03:3015    again I characterized as an important point, and whether

03:3016    it was at that meeting or subsequently, we moved to a

03:3017    position that if there were not a transfer -- excuse

03:3018    me -- if there were a transfer of a hundred percent

03:3019    interest and there was no identification of the Siegel

03:3020    family on the copyright notice, that wherever there was a

03:3021    copyright notice, there would be or at least best efforts

03:3022    to be further notice that says to the effect, "By special

03:3023    arrangement with the Jerry Siegel family."

03:3024        Q    Okay.  In the proposal that you advanced during

03:3125    this meeting, the royalty of 6 percent, did that apply

117

**U.S. LEGAL SUPPORT**

EXHIBIT 14
324

03:31 1      to, as you've characterized it before, the Superman

03:31 2      library?

03:31 3          A    Yes, the entire Superman property.

03:31 4          Q    Okay.  So that it wasn't limited to the post-

03:31 5      termination?

03:31 6          A    That is correct.  It was worldwide revenues for

03:31 7      the entire Superman property pre-termination and

03:31 8      post-termination.

03:31 9          Q    And it was DC's worldwide revenues.

03:3110          Correct?

03:3111          A    Correct.

03:3112              I should also add that at this stage, but I

03:3113      believe earlier, that the discussion also included not

03:3114      only the Superman property, but the Spectre property,

03:3115      which was the subject of separate termination notices

03:3116      that had been filed, which terminations my recollection

03:3117      is had yet to become effective.  So the financial

03:3218      arrangement that we discussed vis-a-vis the Superman

03:3219      property applied equally to the Spectre property.

03:3220          Q    The question of full indemnity and E&O coverage,

03:3221      what was Mr. Schulman's reaction to that?

03:3222          A    I don't recall discussion on it -- on that

03:3223      subject.  That point appeared to be non-controversial.

03:3324          Q    Do you recall anything else that was said by

03:3325      either you or Mr. Schulman during that July meeting?

                                                                    118

**U.S. LEGAL SUPPORT**

EXHIBIT 14
325

03:33 1       A   Yes.

03:33 2       Q   What was that, sir?

03:33 3       A   In connection with our discussion about the

03:33 4   nature of the transfer, whether it be a hundred percent,

03:33 5   as John was quite clear his company would insist on or DC

03:34 6   Comics would insist on, or any other arrangement, I began

03:34 7   thinking about warranties and representations that

03:34 8   typically accompanied transfers of rights, and I said to

03:34 9   John, "In connection with this transaction, particularly

03:34 10  in circumstances or where you've disputed the

03:34 11  terminations in the rights, the Siegels -- I'm not

03:34 12  going -- I won't have the Siegels making any warranties

03:34 13  or representations about the nature of the rights or the

03:34 14  scope of the rights.  The -- I will make the -- I will

03:34 15  recommend making the following representation:  They have

03:34 16  not transferred what rights they have to any other party,

03:35 17  but other than that no other warranties or

03:35 18  representations."

03:35 19      Q   And what was Mr. Schulman's response, if any you

03:35 20  can recall, to that?

03:35 21      A   Well, he seemed agreeable to that.

03:35 22      Q   What warranties or representations other than

03:35 23  the fact that the property hasn't been transferred would

03:35 24  customarily be made in that situation?

03:35 25      MR. TOBEROFF:  Vague and ambiguous.

                                                              119

**U.S. LEGAL SUPPORT**

EXHIBIT 14
326

03:35 1          MR. MARMARO:  Calls for a legal conclusion and

03:35 2   is also vague and ambiguous and lacks foundation.

03:35 3          MR. TOBEROFF:  Concur in that objection.

03:35 4          MR. MARMARO:  You can answer as long as it

03:35 5   doesn't divulge privileged information.

03:35 6          THE WITNESS:  The answer is it depends.  If

03:35 7   you -- in my experience, if you are a studio transferring

03:36 8   rights to another party, those are in the form of a

03:36 9   quitclaim, and the only warranties or representations you

03:3610   will make are that it hasn't been transferred to

03:3611   somebody -- to another party and that you wouldn't be

03:3612   making any warranties or representations about the nature

03:3613   and the scope of the rights.

03:3614          On the other hand, if you are a party that is

03:3615   assigning rights to a studio, frequently they ask for, if

03:3616   not require outright, that you represent that you own the

03:3617   rights and that the rights don't contain any infringing

03:3618   material, that the rights don't invade any personality

03:3619   rights, publicity rights, privacy rights, that the rights

03:3720   are not subject to any pending litigation or threatened

03:3721   litigation, that you don't know of any facts and

03:3722   circumstances that might give rise to a claim, and that

03:3723   you've not transferred the rights to any other party.

03:3724   BY MR. BERGMAN:

03:3725      Q    Okay.  And if I understand your testimony

                                                              120

**U.S. LEGAL SUPPORT**

EXHIBIT 14
327

03:37 1    correctly, it was all those other warranties and

03:37 2    representations, other than the non-transfer, that you

03:37 3    had told Mr. Schulman you would not grant?

03:37 4        A    I didn't say -- I didn't give him the list and

03:37 5    say -- run through that list and say those would not be

03:37 6    there.  I said the only warranty and representation we

03:37 7    would make is that the Siegels have not transferred

03:37 8    rights to a third party.

03:37 9        Q    Anything else you can recall about that July 12

03:3710    meeting with Mr. Schulman?

03:3811        A    As I sit here now, that's my best recollection

03:3812    of what was discussed.

03:3813        Q    Thank you.

03:3814            Did there come a time when Mr. Schulman gave you

03:3815    a -- whether you want to call it a counter-counter-

03:3816    proposal, did there come a time when he went down the

03:3817    items which were contained in the July 12 proposal and

03:3818    said yea or nay or made a revision?

03:3919        A    Yes.

03:3920        Q    And when did that occur, sir?

03:3921        A    I believe that occurred reasonably shortly after

03:3922    that July meeting.  Mind you, in the context of this

03:3923    negotiation, reasonably shortly might not be days.  It

03:3924    might be weeks.

03:3925        Q    I understand.

121

**U.S. LEGAL SUPPORT**

EXHIBIT 14
328

```
03:39  1          Do you recall having a conversation with
03:39  2   Mr. Schulman on July -- pardon me -- September 17 of 2001
03:39  3   concerning the very same elements that you've just
03:40  4   referred to or the majority of them?
03:40  5          MR. TOBEROFF:  Vague, ambiguous.
03:40  6          THE WITNESS:  I don't have a recollection for
03:40  7   the reason that the question is date specific, and I
03:40  8   don't have in mind a specific conversation on a specific
03:40  9   date.
03:4010   BY MR. BERGMAN:
03:4011       Q   Do you recall making a proposal to Mr. Schulman
03:4012   in mid September, September 17 precisely, which included
03:4013   the following elements -- we can go one at a time -- one,
03:4114   a non-returnable recoupable payment of $2 million to be
03:4115   applied to the period starting in the second quarter of
03:4116   1999?
03:4117       A   That rings a bell.
03:4118       Q   Okay.  A $1 million non-returnable,
03:4119   non-recoupable payment?
03:4120       A   At some time we made that proposal, and indeed
03:4121   it may have been as early as July 12th.
03:4122       Q   Forgiveness of the $250,000 advance?
03:4123       A   Correct.
03:4124       Q   The continuation of the widow's benefit of
03:4125   $135,000 per year for Joanne's life?
```

                                                        122

**U.S. LEGAL SUPPORT**

EXHIBIT 14
329

03:41 1    A   Yes.  And now that you've mentioned it, I

03:41 2  believe a discussion of the widow's benefit was also part

03:42 3  of our July 12th discussion.

03:42 4    Q   And that proposal that was made to Mr. Schulman

03:42 5  also provided for the forgiveness of any right to recoup

03:42 6  any past widow's benefit payments.

03:42 7       Correct?

03:42 8    A   The widow's benefit going in the future and in

03:42 9  the past were all non-recoupable.

03:4210    Q   An annual guaranteed payment of $500,000 per

03:4211  year for 10 years.  Do you recall at some point in the

03:4212  fall --

03:4213    A   Yes.

03:4214    Q   -- making that?

03:4215       And did the offer also provide that at the end

03:4216  of 10 years there would be annualized payments in a

03:4217  continually adjusting sum equal to 90 percent of the

03:4318  average of the past three years' royalties, to continue

03:4319  whether or not net royalty payment account is in deficit

03:4320  and for so long as DC Comics receives any revenue from

03:4321  the Superman properties?

03:4322    A   While I don't think I would have used the

03:4323  language about net and deficit, yes, I recall a proposal

03:4324  where the substance was after the 10 years the annual

03:4325  guarantee would be based on a percentage of the revenues

123

EXHIBIT 14
330

03:43 1    for the following three year -- for the preceding three

03:43 2    years.

03:43 3        Q   Okay.  As to -- strike that.

03:43 4            Do you also recall an offer being made on or

03:43 5    about September 17 which provided for a 6 percent royalty

03:44 6    of licensing, merchandising and audiovisual rights?

03:44 7            MR. TOBEROFF:  Excuse me.  I just want --

03:44 8            MR. MARMARO:  The question is vague.

03:44 9            MR. TOBEROFF:  Are you saying offer from

03:4410    Schulman or from him?

03:4411            MR. BERGMAN:  No.  Offer from Mr. Marks.

03:4412            MR. MARMARO:  The word "offer" is vague in the

03:4413    context of the question.

03:4414    BY MR. BERGMAN:

03:4415        Q   Your answer, sir?

03:4416        A   I do recall making a proposal, the proposal

03:4417    being an entire package and this being an element of it,

03:4418    and I would describe it as 6 percent of DC Comics'

03:4419    worldwide gross revenues for exploitation of the Superman

03:4420    property and the Spectre property in all media and in

03:4421    merchandising and any other licensing.

03:4522        Q   Was it to be reducible only on merchandising and

03:4523    licensing to a floor of 3 percent?

03:4524        A   At some point we talked about reducing the

03:4525    royalty, yes, to a floor of 3 percent in circumstances

                                                          124

**U.S. LEGAL SUPPORT**

EXHIBIT 14
331

03:45 1    where the Superman property and the Spectre property were

03:45 2    commingled with other DC Comics properties.

03:45 3        Q   Was another component of the offer that you made

03:45 4    to Mr. Schulman that all advances were to be interest-

03:45 5    free?

03:45 6        A   I recall at least at some point having that --

03:45 7    that being a component of an offer we made.

03:46 8        Q   With respect to the elements of an offer that

03:46 9    I've just been asking about, did Mr. Schulman in mid

03:46 10   September respond negatively to any of those elements?

03:47 11       A   At some point in this time period I recall a

03:47 12   negative response to an element of the proposal but not

03:47 13   these elements.

03:47 14       Q   Do you recall what element that was, sir, and if

03:47 15   so, what was it?

03:47 16       A   Well, excepting the generality of the question,

03:47 17   at some point I think we continued to propose a transfer

03:47 18   of 90 percent of the rights and holding back 10 percent

03:47 19   of the rights and then licensing it exclusively to DC

03:48 20   Comics, and John would have responded negatively to that.

03:48 21   There came a time in the discussions after September

03:48 22   where we did have discussion about another issue that

03:48 23   John responded -- John's response was negative.

03:48 24       Q   And what was that issue, sir?

03:48 25       A   The issue was that -- I think I first need to

                                                                    125

**U.S. LEGAL SUPPORT**

EXHIBIT 14
332

03:48 1    give some context for this.  In our proposals I think

03:48 2    going back from the beginning and probably continuing

03:49 3    through the summer, our proposal was to have the royalty

03:49 4    attach to the DC Comics worldwide gross revenues for so

03:49 5    long as DC Comics received revenues.  So if in a hundred

03:49 6    years there were still revenues coming in to DC Comics

03:49 7    from the exploitation of Superman, the Siegel family and

03:49 8    their heirs and whoever is the Siegel family at that time

03:49 9    would still receive a royalty.

03:4910         The DC Comics position was different.  The DC

03:4911    Comics' position was that royalties would terminate at

03:4912    such time as Action Comics 1 went into the public domain.

03:4913    That was DC's position.

03:5014         With that context in mind, I recall that in our

03:5015    discussions in October I made the point to John that we

03:5016    would -- should provide that when Action Comics No. 1

03:5017    does go into the public domain, the Siegels would have

03:5018    the same rights that any member of the public has in

03:5019    regards to exploitation, which is to say that if

03:5020    copyrighted material is in the public domain, anybody can

03:5021    exploit it, people at this table and complete strangers.

03:5022         I raised that term, trying to be careful, and in

03:5023    fact have used a customary term in my experience defined

03:5024    in rights agreements, and I recall John saying he would

03:5025    have to get back to me.

126

**U.S. LEGAL SUPPORT**

EXHIBIT 14
333

03:50 1          He did.  The DC response was, "No.  If we're

03:51 2     paying you all this money," and I really believe those

03:51 3     are the words John used, "then the family cannot ever

03:51 4     exploit the Superman property."

03:51 5          I said to John, "Anybody else in the world can,"

03:51 6     and he said, "That may be, but the Siegels can't."

03:51 7      Q    How was that point ultimately resolved?

03:51 8          MR. MARMARO:  Assumes facts not in evidence, and

03:51 9     it's vague and ambiguous in terms of the word "resolved."

03:5110          MR. TOBEROFF:  Concur.

03:5111          THE WITNESS:  On that particular issue, the

03:5112     Siegels relented.

03:5113     BY MR. BERGMAN:

03:5214      Q    Before I go into the balance of the October

03:5215     conversations, Mr. Marks, did you ever attempt or did

03:5216     anyone at Gang, Tyre attempt to place a valuation, a

03:5217     dollar valuation on what it contended to be the Siegel

03:5218     interest?

03:5219          MR. MARMARO:  Excuse me.  The question calls for

03:5220     the invasion of the attorney-client and attorney work

03:5221     product privilege, and I will object and instruct the

03:5222     witness not to answer.

03:5223          (Instruction not to answer.)

03:5224          MR. BERGMAN:  I am not asking what it was.  I

03:5225     think I am asking whether it was done.

                                                                  127

**U.S. LEGAL SUPPORT**

EXHIBIT 14
334

03:52 1          MR. MARMARO:  I think if an attorney chooses to

03:52 2     do something and that doesn't get communicated, that's

03:52 3     the attorney's work product, so I will object on that

03:52 4     basis, which is part of my original objection.

03:52 5          MR. BERGMAN:  Thank you.

03:52 6      Q   I noticed in the privilege log, which is Exhibit

03:53 7     1, at page 30, item 426, there is a reference to a fax

03:53 8     being created by Donald Moore described as an accountant

03:53 9     working with GTRB.

03:53 10         Was Mr. Moore retained to render services of

03:53 11    some kind in connection with this matter?

03:53 12     A   Was Mr. Moore retained by --

03:53 13     Q   By Gang, Tyre.

03:53 14         MR. MARMARO:  I am going to object to your

03:53 15    question as calling for attorney-client, attorney work

03:53 16    product information.

03:53 17         Again, I'll ask Mr. Toberoff if his position is

03:53 18    the question can be answered, in which case it will.

03:53 19         MR. BERGMAN:  Mr. Toberoff?

03:53 20         MR. TOBEROFF:  You are asking whether -- you are

03:53 21    referring to a communication on privilege and asking

03:54 22    whether this person was retained, period?

03:54 23         MR. BERGMAN:  Yes.  I'm -- no.  My question

03:54 24    related to whether Mr. Moore was retained by Gang, Tyre

03:54 25    to render services in connection with this matter.

                                                              128

**U.S. LEGAL SUPPORT**

EXHIBIT 14
335

03:54 1          MR. TOBEROFF:  Without -- and also when I'm

03:54 2    agreeing on these things that are kind of borderline, I

03:54 3    don't want it to be taken as a waiver.  Does that

03:54 4    agreement apply to me as well in this deposition?

03:54 5          MR. MARMARO:  I think it has all day.

03:54 6          MR. BERGMAN:  Oh, yes, of course.

03:54 7          MR. TOBEROFF:  So with regard to that narrow

03:54 8    question, we are not asserting the attorney-client

03:54 9    privilege.

03:5410          THE WITNESS:  No.

03:5511          MR. MARMARO:  At some point if we could take a

03:5512    break --

03:5513          MR. BERGMAN:  This would be fine right now.

03:5514          (Recess.)

04:0015          MR. BERGMAN:  Back on the record now.

04:0016      Q    As you recall, Mr. Marks, did you have several

04:0017    conversations with Mr. Schulman on the telephone in early

04:0018    October, including October 3, October 4, October 9?  I

04:0019    will represent to you that none of these dates appear on

04:0020    the phone log, but I have reason to believe that there

04:0021    were calls between you and Mr. Schulman on those days.

04:0022          Do you recall a series of calls during early

04:0023    October?

04:0024          MR. MARMARO:  That question has gone on so long

04:0025    as to be confusing.  Are you asking, as you said at the

                                                                    129

**U.S. LEGAL SUPPORT**

EXHIBIT 14
336

04:00 1    end, a series of calls in early October, or are you

04:01 2    talking about the dates you mentioned?

04:01 3         MR. BERGMAN:  I'll rephrase it.

04:01 4    Q    Do you recall having several telephone

04:01 5    conversations with Mr. Schulman during the first 10 days

04:01 6    of October relating to this matter?

04:01 7    A    Well, I can't pin it to even the first 10 days

04:01 8    of October.  I do recall in October telephone

04:01 9    communications which were much more frequent, spaced

04:01 10   apart by a day or several days.

04:01 11   Q    Your phone log does reflect that there was --

04:01 12   there were two calls outgoing from your office to

04:01 13   Mr. Schulman on the 16th of October.  That's at page 599.

04:02 14   A    Actually, it doesn't.

04:02 15   Q    What do you mean by that?

04:02 16   A    We haven't discussed before how these phone logs

04:02 17   are kept.

04:02 18   Q    Okay.  Could you explain that, please?

04:02 19   A    Yes.  These phone logs are a spiral notebook

04:02 20   where on one side of the page there is a title that says

04:02 21   "Incoming Calls," and on the other side of the page there

04:02 22   is -- or on the other page, side to side, is a title that

04:03 23   says "Outgoing Calls."  Notwithstanding those titles, the

04:03 24   calls on this list do not reflect outgoing calls at all.

04:03 25        What happens is my assistants keep a phone log

                                                              130

**U.S. LEGAL SUPPORT**

EXHIBIT 14
337

04:03 1    of incoming calls and will fill up a page for one day and

04:03 2    then move to the next page even if that page says

04:03 3    "Outgoing Calls."  So what would be reflected here on

04:03 4    this document is actually not an outgoing call to John

04:03 5    Schulman but an incalling call --

04:03 6            MR. MARMARO:  Incoming, I think you meant.

04:03 7            THE WITNESS:  Excuse me.  This would be two

04:03 8    incoming calls from Mr. Schulman.

04:03 9    BY MR. BERGMAN:

04:03 10       Q   I see.

04:03 11           And where does your assistant maintain the list

04:04 12   of outgoing calls?

04:04 13       A   My assistant doesn't.

04:04 14       Q   I see.  I see.

04:04 15           So all of the calls that are identified in these

04:04 16   registers are incoming calls?

04:04 17       A   They are all incoming calls.

04:04 18       Q   I see.  Okay.

04:04 19           And I notice again that the Call Completed

04:04 20   column is not checked on either of these calls.  Does

04:04 21   that reflect that you didn't actually speak with

04:04 22   Mr. Schulman?

04:04 23       A   No, it does not reflect that.

04:04 24       Q   As a matter of custom and practice, does your

04:04 25   assistant check that box after the call is connected to

131

04:04 1    you?

04:04 2        A   No.   Unlike perhaps many attorneys, I make most

04:04 3    of my phone calls.

04:04 4        Q   I see.   Okay.

04:05 5            MR. TOBEROFF:   Good for you.

04:05 6            MR. BERGMAN:   Let's mark as Exhibit 20 a letter

04:05 7    dated October 19, 2001, from Mr. Marks to Mr. Schulman,

04:05 8    GTRB 302 through 308.

04:05 9            (Deposition Exhibit 20 marked.)

04:05 10   BY MR. BERGMAN:

04:05 11       Q   To begin with, your letter, Exhibit 20, makes

04:05 12   reference to an offer of October 16.

04:05 13           Was that offer made over the phone?

04:05 14       A   Yes.

04:05 15       Q   Can you tell me to the best of your recollection

04:06 16   what that offer was?

04:06 17       A   Well, in the phone call my recollection is we

04:06 18   discussed what at the time I believe was the last open

04:06 19   point.

04:06 20       Q   I see.

04:06 21       A   The last open point was the public domain issue

04:06 22   that I referred to a few minutes ago, and John held very

04:06 23   firm to the DC position that once the Superman

04:06 24   property -- excuse me -- Action Comics 1 went into the

04:06 25   public domain or, frankly, any element of the Superman

                                                              132

**U.S. LEGAL SUPPORT**

EXHIBIT 14
339

04:06 1    property went into the public domain, the Siegels would

04:07 2    be prohibited from using the property in a way that any

04:07 3    other member of the public could.  That was DC Comics'

04:07 4    final, unflinching position.

04:07 5        Q    Would it be correct then to say that with the

04:07 6    exception of that position, the other elements of the

04:07 7    proposal that are listed in the October 19 letter had

04:07 8    previously been agreed upon between you and Mr. Schulman?

04:07 9        A    Well --

04:0710        MR. MARMARO:  The question lacks foundation, and

04:0711    it's vague and ambiguous and calls for a legal

04:0712    conclusion.

04:0713        MR. TOBEROFF:  Concur.

04:0714        THE WITNESS:  I mean the other items that were

04:0715    reflected in the October 19th letter were no longer open

04:0816    items, but as I said before, this was an entire package,

04:0817    so there wasn't a sense that you would have a deal until

04:0818    you had, if you will, an understanding that all the terms

04:0819    of that package were acceptable.

04:0820    BY MR. BERGMAN:

04:0821        Q    And when you say, Mr. Marks, that there were no

04:0822    longer open points, by that you mean that you and

04:0823    Mr. Schulman had previously agreed upon them?

04:0824        MR. MARMARO:  Same objections.

04:0825        THE WITNESS:  We had come to an understanding

                                                              133

EXHIBIT 14
340

04:08 1   that on that point, that would be the basis of the

04:08 2   resolution.   That was the resolution of that particular

04:08 3   component in the overall deal, yes.

04:09 4   BY MR. BERGMAN:

04:09 5        Q    And when the final element of the public domain

04:09 6   point that you've been referring to was resolved, that

04:09 7   that closed the deal?

04:09 8        MR. MARMARO:  The question is vague and

04:09 9   ambiguous, assumes facts not in evidence.

04:09 10       You can answer subject to those objections.

04:09 11       THE WITNESS:  Yes.

04:09 12        MR. BERGMAN:  Okay.

04:09 13       THE WITNESS:  May we go off the record for just

04:09 14   a moment?

04:09 15       MR. BERGMAN:  We certainly can.

04:10 16       (Recess.)

04:14 17       MR. BERGMAN:  Back on the record.

04:14 18   BY MR. BERGMAN:

04:14 19       Q    Referring to Exhibit 20, the first sentence

04:14 20   states, "This is to confirm our telephone conversation of

04:14 21   October 19, 2001."

04:14 22       Can you tell me as best as you can recall,

04:14 23   Mr. Marks, what was said by each of you and Mr. Schulman

04:14 24   in that phone conversation?

04:14 25       A    Yes.  I recall calling John and saying to him

                                                              134

**U.S. LEGAL SUPPORT**

EXHIBIT 14
341

04:15 1    words in substance and effect, "We are closed."  I told

04:15 2    John I would send to him a confirming letter which set

04:15 3    forth the terms.  John said that he would get me a long

04:15 4    form that would be ready when I returned, because John

04:15 5    knew I would be away for a period of time.

04:15 6         And then I made one other point, and I said,

04:15 7    "While it's not a part of the deal, John, you should know

04:15 8    that after all this time this negotiation has ended on a

04:15 9    very bitter note.  The public domain issue and the DC

04:1610    position was very difficult, problematic and emotional

04:1611    for my clients, and my suggestion to you outside the deal

04:1612    is to make some gesture of some sort to help take away

04:1613    that very bitter taste."

04:1614         Q    Okay.  And what did Mr. Schulman say?

04:1615         A    You know, I don't recall him specifically

04:1616    responding.

04:1617         Q    The next sentence of the letter states, quote,

04:1618    "The Siegel Family (through Joanne Siegel and Laura

04:1619    Siegel Larson, the majority owners of the terminated

04:1620    copyright interests) has accepted D.C. Comics offer of

04:1621    October 16, 2001 in respect of the 'Superman' and

04:1722    'Spectre' properties," close quote.

04:1723         Prior to the time, Mr. Marks, that you sent this

04:1724    letter to Mr. Schulman, had Laura and Joanne Siegel

04:1725    authorized you to communicate to John Schulman the fact,

                                                              135

**U.S. LEGAL SUPPORT**

EXHIBIT 14
342

as you state in your letter, that, quote, "The Siegel

Family (through Joanne Siegel and Laura Siegel Larson,

the majority owners of the terminated copyright interests

has accepted DC Comics offer of October 16, 2001..."?

          MR. MARMARO:  Because you framed the question in

terms of a calling for a communication between Mr. Marks

and his clients, I'm just going to ask Mr. Toberoff if he

has any objection.

          MR. TOBEROFF:  The way you phrased that, you're

asking for -- directly asking for a communication from a

client to Mr. Marks.

          MR. BERGMAN:  What I'm asking for, gentlemen, is

what the cases say is clearly not privileged.  I'm asking

whether the Siegels told Mr. Marks to communicate a

certain fact to Mr. Schulman.  That is simply not

privileged.  It was intended to be communicated, and

therefore it is not privileged, and I am going to -- I am

very conscious of the attorney-client privilege,

Mr. Toberoff.  I've couched that question very carefully,

and I urge you gentlemen to consider it, because I can

give you a half a dozen cases that say that communication

was never privileged.

          MR. TOBEROFF:  Could you give me a half a dozen

cases?

          MR. BERGMAN:  Yes, sir.  Grand Lake Drive-In vs.

                                                            136

04:19 1   Superior Court, 179 Cal.App.2d 122.  Price -- strike

04:19 2   "Price."  Griffith v. Davis, 164 --

04:19 3        MR. TOBEROFF:  Sorry.

04:19 4        MR. BERGMAN:  164 FRD 687, Central District of

04:19 5   California case where the court says, quote, "Courts have

04:19 6   consistently refused to apply the privilege to

04:19 7   information that the client intends or understands may be

04:19 8   conveyed to others."

04:19 9        Willard Beach Airbrush Company vs. General

04:19 10  Motors, which states that "the privilege does not extend

04:19 11  to the client's grant of authority to the attorney to

04:20 12  settle, since this must be communicated to the other

04:20 13  party of the settlement and is thus not confidential."

04:20 14        Peters v. Wallach, 321 NE2d.  Quote, "The

04:20 15  client's grant of authority to settle must be

04:20 16  communicated to the other party to the settlement and is

04:20 17  thus not confidential."

04:20 18        Several other cases.  Walsh v. Barcelona, 476

04:20 19  NE2d 1090.  Quote, "By its very nature, a communication

04:20 20  from a client to his attorney conveying authority to the

04:20 21  other attorney to act on his behalf in entering into an

04:20 22  agreement with the opposing party is a communication

04:20 23  which is intended to be communicated to the opposing

04:20 24  party.  Because such a conversation is not intended to be

04:20 25  confidential, it is not privileged."

137

**U.S. LEGAL SUPPORT**

EXHIBIT 14
344

04:21 1         I'm simply asking whether the client told

04:21 2  Mr. Marks to tell Mr. Schulman that the offer has been

04:21 3  accepted.  It is not a privileged communication, and I

04:21 4  don't want to have to reconvene.  I urge you to

04:21 5  reconsider.

04:21 6        MR. TOBEROFF:  If I may, what you're asking or

04:21 7  what you say those cases say are two different things.

04:21 8  You're not asking whether the clients authorized you to

04:21 9  enter into these settlement negotiations or whether this

04:21 10  was within the scope of your authority from the clients,

04:21 11  any of the things that comport with those cases.  You're

04:21 12  saying did the clients tell you.

04:21 13        MR. BERGMAN:  Precisely.

04:21 14        MR. TOBEROFF:  This falls within the privilege,

04:21 15  and I don't believe those cases -- and I believe if I got

04:21 16  into those cases and a lineage of those cases, that would

04:21 17  bear out the objection.  If you want to ask the question

04:21 18  some other way, but that question I would assert the

04:22 19  attorney-client privilege.

04:22 20        MR. MARMARO:  Based on that position, we have no

04:22 21  choice but to object and instruct, but I want to make

04:22 22  sure it's real clear.  Mr. Marks is not the holder of

04:22 23  that privilege and has no power to waive it.  The

04:22 24  privilege has been asserted by the current counsel for

04:22 25  the client, and I feel that he has no choice but to agree

138

EXHIBIT 14
345

04:22 1    at this point to not answer that question on that basis.

04:22 2        (Instruction not to answer.)

04:22 3        MR. BERGMAN:  I understand your position, of

04:22 4    course.

04:22 5        Just so Mr. Toberoff has one more opportunity to

04:22 6    reconsider, would you repeat the question as I posed

04:22 7    it --

04:22 8        MR. TOBEROFF:  You don't need to repeat it.  I

04:22 9    know what it said.  But I would suggest you try to ask it

04:22 10   a different way.

04:22 11       MR. BERGMAN:  I don't want to ask it a different

04:22 12   way.  I want to ask it precisely as I did.

04:22 13       MR. TOBEROFF:  The objection stands.  I remember

04:22 14   the question.

04:22 15       MR. BERGMAN:  Would you repeat the question,

04:22 16   please.

04:22 17       (Record read as follows:

04:16 18           "Q   The next sentence of the

04:16 19           letter states, quote, 'The Siegel

04:16 20           Family (through Joanne Siegel and

04:16 21           Laura Siegel Larson, the majority

04:16 22           owners of the terminated copyright

04:16 23           interests) has accepted D.C. Comics

04:16 24           offer of October 16, 2001 in respect

04:17 25           of the 'Superman' and 'Spectre'

                                                            139

04:17 1          properties,' close quote.

04:17 2              "Prior to the time, Mr. Marks,

04:17 3          that you sent this letter to Mr.

04:17 4          Schulman, had Laura and Joanne Siegel

04:17 5          authorized you to communicate to John

04:17 6          Schulman the fact, as you state in

04:17 7          your letter, that, quote, 'The Siegel

04:17 8          Family (through Joanne Siegel and

04:17 9          Laura Siegel Larson, the majority

04:1710          owners of the terminated copyright

04:1711          interests has accepted DC Comics offer

04:1712          of October 16, 2001...'?")

04:2313          MR. BERGMAN:  Any change, Mr. Toberoff?

04:2314          MR. TOBEROFF:  It's even worse than I thought.

04:2315  Same objection.

04:2316          MR. BERGMAN:  Okay.

04:2317          MR. TOBEROFF:  And objection.  Vague and

04:2418  ambiguous as to "DC's offer of October 16," as to in fact

04:2419  what is being accepted.  It's vague and ambiguous.

04:2420  BY MR. BERGMAN:

04:2421      Q    Between October 16 and October 19, did Joanne

04:2422  and Laura Siegel authorize you to communicate to John

04:2423  Schulman that, quote, "The Siegel Family (through Joanne

04:2424  Siegel and Laura Siegel Larson, the majority owners of

04:2425  the terminated copyright interests) has accepted DC

                                                              140

EXHIBIT 14
347

04:24 1     Comics offer of October 16, 2001..."?

04:24 2              MR. MARMARO:  Again, I'm going to have to ask

04:24 3     Mr. Toberoff whether he wishes Mr. Marks not to answer

04:25 4     that question.

04:25 5              MR. TOBEROFF:  I hate to just repeat it.  It's

04:25 6     the same question.  The same objection.

04:25 7              MR. MARMARO:  Based on that, I will also object

04:25 8     and instruct him --

04:25 9              MR. BERGMAN:  Okay.

04:25 10             MR. MARMARO:  -- with the same statement that I

04:25 11    made before --

04:25 12             MR. BERGMAN:  I understand.

04:25 13             MR. MARMARO:  -- which is we are not of the

04:25 14    holder of a claimed privilege.

04:25 15             (Instruction not to answer.)

04:25 16    BY MR. BERGMAN:

04:25 17        Q    Between October 16 and October 19, Mr. Marks,

04:25 18    did your clients instruct you to convey to Mr. Schulman

04:25 19    any additional terms, other than those set forth in your

04:25 20    October 19 letter to Mr. Schulman, upon which their

04:25 21    acceptance of the October 16th offer was conditioned?

04:25 22             MR. TOBEROFF:  Objection.  Vague and ambiguous

04:25 23    as to what is the October 16th offer, and attorney-client

04:25 24    privileged communication as to the instructions from the

04:25 25    client.

                                                             141

**U.S. LEGAL SUPPORT**

EXHIBIT 14
348

04:25 1          MR. MARMARO:  And based on that objection, we

04:26 2     also object and instruct.

04:26 3          (Instruction not to answer.)

04:26 4     BY MR. BERGMAN:

04:26 5     Q    Between October 16 and 19, did Laura Siegel and

04:26 6     Joanne Siegel instruct you to convey to Mr. Schulman any

04:26 7     limitations other than those set forth in your October 19

04:26 8     letter to Mr. Schulman upon which their acceptance of the

04:26 9     October 16 offer was conditioned?

04:26 10         MR. TOBEROFF:  Same objections.

04:26 11         MR. MARMARO:  For the same reasons I'll join in

04:26 12    those objections and instruct.

04:26 13         (Instruction not to answer.)

04:26 14    BY MR. BERGMAN:

04:26 15    Q    Between October 16 and October 19, did your

04:26 16    clients instruct you to convey to Mr. Schulman any

04:26 17    conditions subsequent, other than those set forth in your

04:26 18    October 19 letter to Mr. Schulman, upon the occurrence of

04:27 19    which their acceptance of the October 16 offer would be

04:27 20    negated?

04:27 21         MR. TOBEROFF:  Same objection, and I will add

04:27 22    vague and ambiguous and compound.

04:27 23         MR. MARMARO:  It also calls for a legal

04:27 24    conclusion, but based on the objections, which I

04:27 25    understand include the attorney-client being asserted by

                                                              142

**U.S. LEGAL SUPPORT**

EXHIBIT 14
349

```
04:27  1    the holder -- counsel for the holder of the privilege,

04:27  2    I'll object and instruct.

04:27  3            (Instruction not to answer.)

04:27  4            MR. BERGMAN:  Okay.

04:27  5        Q   Mr. Marks, during the fall of 2002 did you have

04:27  6    a custom and practice with respect to accepting offers on

04:27  7    behalf of your clients?

04:27  8            MR. MARMARO:  Are you asking about the fall of

04:27  9    2002?

04:27 10            MR. BERGMAN:  Pardon me?

04:27 11            MR. MARMARO:  You're asking about the fall of

04:27 12    2002?

04:27 13            MR. BERGMAN:  Oh, I'm sorry.  2001.

04:27 14            THE WITNESS:  No.

04:27 15            MR. TOBEROFF:  Vague and ambiguous.

04:28 16            MR. MARMARO:  I'll join in that objection,

04:28 17    but --

04:28 18            THE WITNESS:  If I may answer, no.

04:28 19    BY MR. BERGMAN:

04:28 20        Q   Putting aside this action, have you ever

04:28 21    accepted an offer on behalf of a client without first

04:28 22    receiving your client's authority to do so?

04:28 23            MR. TOBEROFF:  Vague and ambiguous.

04:28 24            MR. MARMARO:  Yeah.

04:28 25            THE WITNESS:  May I answer?
```

                                                          143

**U.S. LEGAL SUPPORT**

EXHIBIT 14
350

04:28 1              MR. MARMARO:  Sure.

04:28 2              THE WITNESS:  No.

04:28 3    BY MR. BERGMAN:

04:28 4        Q    Did you do so in this case?

04:28 5              MR. MARMARO:  Hold on.

04:28 6              MR. TOBEROFF:  Objection.  Same objection.  If

04:28 7    you're -- what is the question?  Can you repeat the

04:28 8    question?  Did you do what in this case?

04:28 9              MR. BERGMAN:  Well, the first question had been

04:2810    whether he had ever accepted an offer on behalf of a

04:2911    client without being authorized by the client, and the

04:2912    second question was whether he did so in this case.

04:2913              MR. TOBEROFF:  I'm thinking.

04:2914              MR. MARMARO:  While Mr. Toberoff is thinking

04:2915    about his position on the privilege issue, I'll say it

04:2916    calls for a legal conclusion and assert that objection

04:2917    subject to perhaps certain other objections.

04:2918              MR. TOBEROFF:  Can you just repeat that again

04:2919    for me, please?

04:2920          (Record read as follows:

04:2821            "MR. BERGMAN:  Well, the first

04:2822            question had been whether he had ever

04:2823            accepted an offer on behalf of a

04:2924            client without being authorized by the

04:2925            client, and the second question was

                                                              144

                         **U.S. LEGAL SUPPORT**

EXHIBIT 14
351

04:29 1          whether he did so in this case.")

04:30 2          MR. TOBEROFF:  I'll object on the basis that

04:30 3    "offer" is -- that he's asking for a legal conclusion and

04:30 4    that "offer" is vague and ambiguous as to what offer was

04:30 5    being accepted, but other than that I'll allow that.  It

04:30 6    just barely makes it under the line, in my opinion.

04:30 7          MR. MARMARO:  If you have the question in mind

04:30 8    after the colloquy, go ahead and answer it.  If you would

04:30 9    like it reread...

04:3010          THE WITNESS:  If you could, there are one or

04:3011    more negatives in that question, so I would like to be

04:3012    clear.

04:3013          MR. TOBEROFF:  And I'll add vague and ambiguous

04:3014    to my objections.

04:3015          (Record read as follows:

04:2816          "Q   Putting aside this action,

04:2817          have you ever accepted an offer on

04:2818          behalf of a client without first

04:2819          receiving your client's authority to

04:2820          do so?

04:2821              "MR. TOBEROFF:  Vague and ambiguous.

04:2822              "MR. MARMARO:  Yeah.

04:2823              "THE WITNESS:  May I answer?

04:2824              "MR. MARMARO:  Sure.

04:2825              "THE WITNESS:  No.

                                                      145

**U.S. LEGAL SUPPORT**

EXHIBIT 14
352

04:28 1          "BY MR. BERGMAN:

04:28 2                "Q   Did you do so in this case?")

04:31 3          THE WITNESS:  If I understand the question, and

04:31 4     now that I am permitted to answer it, no.

04:31 5     BY MR. BERGMAN:

04:31 6          Q   Okay.  Had you in fact been authorized to accept

04:31 7     the October 16 offer?

04:31 8          MR. TOBEROFF:  Objection --

04:31 9          MR. MARMARO:  On the basis of privilege?

04:3110          MR. TOBEROFF:  Yes.  And same objections as to

04:3111     the word "offer."  Vague and ambiguous.

04:3112          MR. MARMARO:  And calls for a legal conclusion.

04:3113     And then based on Mr. Toberoff's privilege objection, I

04:3114     will also object and instruct on that ground.

04:3115          (Instruction not to answer.)

04:3116     BY MR. BERGMAN:

04:3117          Q   Mr. Marks, do you have an understanding of what

04:3118     the October 16, 2001 offer was?

04:3219          A   It is -- my understanding is exactly as set

04:3220     forth in this letter.

04:3221          Q   Prior to sending this letter, had you been

04:3222     authorized by your clients to communicate their

04:3223     acceptance of the October 16, 2001 offer?

04:3224          MR. TOBEROFF:  Same objection.  Asked and

04:3225     answered.  Same objection.  Vague and ambiguous.

                                                              146

**U.S. LEGAL SUPPORT**

EXHIBIT 14
353

04:32 1    Attorney-client privilege --

04:32 2        MR. MARMARO:  Based --

04:32 3        MR. TOBEROFF:  -- it calls for a legal

04:32 4    conclusion.

04:32 5        MR. MARMARO:  Based on that, we will also

04:32 6    object, and I will instruct.

04:32 7        (Instruction not to answer.)

04:32 8        MR. BERGMAN:  And, Mr. Toberoff, you were asking

04:32 9    for an instruction to the witness not to answer that

04:32 10    question?

04:32 11        MR. TOBEROFF:  Yes.

04:32 12        MR. MARMARO:  I am assuming that's been true

04:32 13    with the entire line of questions.

04:32 14        MR. BERGMAN:  I am too.  I just wanted to make

04:32 15    it clear.

04:33 16    Q    You were about to leave on an extended trip at

04:33 17    the time you wrote this October 19 letter, weren't you?

04:33 18    A    Yes.

04:33 19    Q    And your letter states on its last page, page 6,

04:33 20    that you would be out of the office for four weeks

04:33 21    following that time.

04:33 22        Do you recall approximately when you returned?

04:33 23    A    I believe my first day back in the office was

04:33 24    Thanksgiving week.

04:33 25    Q    And your letter closes with the statement,

147

EXHIBIT 14
354

04:33 1   quote, "Many thanks for help and patience in reaching

04:33 2   this monumental accord," close quote.

04:33 3        What monumental accord were you referring to?

04:33 4        A   The terms set forth in the October 19, 2001

04:34 5   letter.

04:34 6        Q   And at the time that you wrote that letter, was

04:34 7   it your belief that the monumental accord had in fact

04:34 8   been reached?

04:34 9        MR. MARMARO:  The question is vague and

04:3410   ambiguous, calls for a legal conclusion.

04:3411        MR. TOBEROFF:  Concur.

04:3412        THE WITNESS:  I had -- I believed that an accord

04:3413   had been reached on the terms exactly set forth in this

04:3414   letter.

04:3415   BY MR. BERGMAN:

04:3416        Q   I notice in the logs, Mr. Marks, that during

04:3517   your absence there were certain documents -- I think

04:3518   they're items 618 through 629 -- which were authored by

04:3519   Lisa Liebman, who is identified as an assistant at your

04:3520   firm.

04:3521        Was Ms. Liebman at the time your assistant?

04:3522        A   Yes.

04:3523        Q   And the log also -- and is Miss Liebman still

04:3524   employed by the firm?

04:3525        A   Yes.

148

**U.S. LEGAL SUPPORT**

EXHIBIT 14
355

04:35 1      Q    Still your assistant?

04:35 2      A    Yes.

04:35 3      Q    The log also refers at items 630 through -32 to

04:35 4  a paralegal at your firm by the name of Hillel Elkins.

04:35 5           Is Mr. Elkins still employed by the firm?

04:35 6      A    No.

04:35 7      Q    Do you know where he is presently employed?

04:35 8      A    I don't.

04:36 9           MR. BERGMAN:  Will you then mark as Exhibit 21

04:36 10  an October 26 letter from Mr. Schulman to Mr. Marks, GTRB

04:36 11  145 through 152.

04:36 12          (Deposition Exhibit 21 marked.)

04:36 13  BY MR. BERGMAN:

04:36 14     Q    Had you left the office, Mr. Marks, by the time

04:36 15  this October 26 letter was faxed?

04:37 16     A    Yes.

04:37 17     Q    And when you returned to the office around

04:37 18  Thanksgiving, as you stated, in 2001, how soon after your

04:37 19  return do you believe you reviewed the October 26th

04:37 20  letter?

04:37 21     A    I don't specifically recall, but it would have

04:37 22  either been that week or certainly the following week.

04:37 23     Q    After you reviewed the letter, did you discuss

04:37 24  it with Mr. Ramer?

04:37 25          MR. MARMARO:  I think -- I was going to say the

                                                                149

**U.S. LEGAL SUPPORT**

EXHIBIT 14
356

04:37 1    nature of the question, even though it's phrased as a yes

04:37 2    or no question, calls for the witness to divulge work

04:37 3    product information which is to discuss matters with, and

04:38 4    I would object and instruct on that basis.

04:38 5              (Instruction not to answer.)

04:38 6         MR. BERGMAN:  Okay.

04:38 7    Q    After you reviewed this October 26 letter, did

04:38 8    you compare the terms set forth in the letter with those

04:38 9    set forth in your October 19 letter?

04:3810             THE WITNESS:  Can I answer that?

04:3811             MR. MARMARO:  Yes, unless Mr. Toberoff has an

04:3812    issue with it.

04:3813             MR. TOBEROFF:  I'm not going to object.  It's

04:3914    work product, but I think it's yours.

04:3915             MR. MARMARO:  As long as you have no objection,

04:3916    he can answer the question.

04:3917             THE WITNESS:  I was even a month or five or six

04:3918    weeks after the fact of the October 19th letter pretty

04:3919    familiar with the terms that set -- that were set forth

04:3920    in that letter, so on first read I didn't -- I don't

04:3921    believe I did a line-by-line comparison, but I believe I

04:3922    later did.

04:3923    BY MR. BERGMAN:

04:3924    Q    Okay.  Did you at any time after that line-by-

04:3925    line comparison advise Mr. Schulman that there was any

                                                           150

**U.S. LEGAL SUPPORT**

EXHIBIT 14
357

04:40 1    inconsistency between your October 19 letter and his

04:40 2    October 26 letter?

04:40 3        A    I don't believe so.

04:40 4        Q    Your incoming phone log at GTRB 600 reflects a

04:40 5    call from Mark Toberoff on November 29, 2001.

04:40 6            MR. TOBEROFF:  What page is that on?

04:41 7            MR. BERGMAN:  600.

04:41 8        Q    Was that call completed?

04:41 9        A    No.

04:41 10        Q    Did you at any time return that call?

04:41 11        A    No.

04:41 12        Q    May I ask why?

04:41 13            MR. MARMARO:  I think you're going to be

04:41 14    invading his mental processes and work product, and I'll

04:41 15    object and instruct on that basis.

04:41 16            (Instruction not to answer.)

04:41 17            MR. BERGMAN:  Okay.

04:41 18        Q    If you would turn, please, Mr. Marks, to GTRB

04:41 19    604, that reflects a call from Mark Toberoff, quote, "Re:

04:42 20    Superman - potential buyout (end of November)."

04:42 21            Did you speak with Mr. Toberoff on that day?

04:42 22        A    I don't know if I spoke with Mr. Toberoff that

04:42 23    day.

04:42 24        Q    Did you return that call at some subsequent

04:42 25    time?

                                                              151

04:42 1        A   I returned that call that day or subsequently,

04:42 2    yes.

04:42 3        Q   Can you tell me to the best of your recollection

04:42 4    what Mr. Toberoff said during that conversation and what

04:42 5    you said?

04:42 6        A   Yes.  I think Mr. Toberoff started the call by

04:43 7    saying that he had called me earlier and that I hadn't

04:43 8    returned his call, for which I apologized, and then he

04:43 9    introduced himself.  He said he was a lawyer and that he

04:43 10   represented individuals that had interests in rights to

04:43 11   movie and other properties that had come into those

04:43 12   rights either by way of reversions under the law or

04:43 13   reversions under Guild agreements.  I also recall him

04:43 14   saying that he had a separate company that was in the

04:43 15   business of acquiring intellectual property rights.  I

04:44 16   recall him saying that he was interested in the Superman

04:44 17   property and the Superboy property and had understood

04:44 18   that I was representing the Siegel family interest, and

04:44 19   he asked if he could talk to me about that.

04:44 20        My recollection is that my response was that we

04:44 21   were very far along with DC Comics and at a documentation

04:44 22   phase.  I may have said DC Comics or Warner Bros. because

04:45 23   I do think that part of the conversation, I have a

04:45 24   recollection of Mr. Toberoff saying that he had dealt

04:45 25   with Warner Bros. before, the people at Warner Bros., in

                                                                  152

**U.S. LEGAL SUPPORT**

EXHIBIT 14
359

04:45 1  connection with the "Wild Wild West" and rights involving

04:45 2  the "Wild Wild West" in which some deal had been made

04:45 3  that led to the making of the feature film.

04:45 4      Q   Do you recall anything else of that

04:45 5  conversation?

04:45 6      A   That's my best recollection as I sit here today.

04:45 7      Q   Do you recall telling Mr. Toberoff that you had

04:45 8  closed a deal with DC regarding the Siegel interest?

04:45 9          MR. TOBEROFF:  Leading.

04:4510          THE WITNESS:  My best recollection is how I

04:4611  described it, but I think I said we were in the process

04:4612  of -- in the documentation phase, were trying to document

04:4613  a deal.

04:4614  BY MR. BERGMAN:

04:4615      Q   And do you recall what response, if any,

04:4616  Mr. Toberoff made?

04:4617      A   I don't.

04:4618      Q   And do you recall anything further about the

04:4619  conversation or how it ended?

04:4620      A   I don't recall how it ended.

04:4621      Q   Did you as of February 6, '02 believe that you

04:4622  had closed a deal with DC for the Superman interest?

04:4623          MR. MARMARO:  The question is vague and

04:4624  ambiguous, calls for a legal conclusion, and again I am

04:4625  going to defer to Mr. Toberoff whether he has any

153

**U.S. LEGAL SUPPORT**

EXHIBIT 14
360

04:47 1    objection to -- subject to those objections, having

04:47 2    Mr. Marks answer the question.

04:47 3         MR. TOBEROFF:  I object on work product

04:47 4    privilege, but I think I am not asserting that on behalf

04:47 5    of the clients.  I am not asserting that on behalf of the

04:47 6    Siegels.

04:47 7         MR. MARMARO:  Mr. Marks would be prepared to

04:47 8    answer the question if the Siegels have no objection to

04:47 9    it.

04:4710         MR. TOBEROFF:  As to your personal belief, no

04:4711    objection.

04:4712         THE WITNESS:  Well, if the question is did I

04:4713    think at this point there was a final, binding,

04:4714    enforceable agreement, the answer would be no, but I did

04:4715    believe that we had come to an agreement back on October

04:4716    19th, 2001, that was reflected exactly in the terms that

04:4817    I set out.

04:4818         At the end of that letter I wrote to John in

04:4819    substance and effect, "John, if I've gotten anything

04:4820    wrong, if I've misstated any of these terms, please let

04:4821    me know."  When John writes back on October 26, which I

04:4822    see later, in effect his letter is, "Yeah, you've got

04:4823    terms wrong.  My outline of the deal terms is different

04:4824    than your outline of the deal terms."  So while I thought

04:4825    we had an agreement on these terms, John evidently

                                                              154

**U.S. LEGAL SUPPORT**

EXHIBIT 14
361

04:48 1    didn't, and where you don't have a meeting of the minds,

04:48 2    you don't have an agreement.

04:48 3    BY MR. BERGMAN:

04:48 4        Q    What portion or with respect to what elements of

04:48 5    the October 19 letter did Mr. Schulman's October 26

04:49 6    letter depart from, were different from?

04:49 7        MR. MARMARO:  Again, the same -- my position is

04:49 8    the same:  Mr. Marks will answer the question as long as

04:49 9    there is no objection from Mr. Toberoff.

04:4910        MR. TOBEROFF:  Not to the extent you are

04:4911    comparing the documents.

04:4912        MR. MARMARO:  Maybe we should have the documents

04:4913    in front of us.  Do you have any objection to him looking

04:4914    at Mr. Schulman's letter?

04:4915        MR. BERGMAN:  Not at all.

04:4916        THE WITNESS:  I know that one area of difference

04:4917    was the scope of the rights granted.  In my letter it

04:4918    referred to -- very specifically to the Superman property

04:4919    and the Spectre property.  That's what we had been

04:5020    talking about the whole time of our negotiations going

04:5021    back to the first meeting in 2 -- 1999.  And, of course,

04:5022    as you see here, the consideration, at least as set forth

04:5023    in my letter, for that matter I guess in John's letter,

04:5024    is based on revenue from the Superman and Spectre

04:5025    properties, yet John's letter referred more generally to

155

**U.S. LEGAL SUPPORT**

EXHIBIT 14
362

04:50 1    all properties authored by Siegel for DC Comics and was

04:50 2    not limited to the Superman and Spectre properties that

04:50 3    we had been talking about.

04:50 4          Another area where it differed involved

04:50 5    warranties and representations and, in turn, indemnities.

04:50 6    If you recall, we spoke earlier about the view that the

04:51 7    only warranty and representation the Siegel family would

04:51 8    make would be that they have not transferred rights to

04:51 9    any other party, and in John's letter there are broader

04:51 10   warranties than that, warranties that go beyond that.

04:51 11         Oh, and by the way, that is also reflected in

04:51 12   the October 19th letter.  John's warranties go beyond

04:51 13   that, and so too in his letter he would have the Siegels

04:51 14   indemnifying for areas that were not agreed and, indeed,

04:51 15   not even discussed.  So there's broader warranties and

04:51 16   representations and, as a result, broader indemnities,

04:51 17   and in fact there are additional indemnities added; for

04:52 18   example, indemnifying for any claims brought by Dennis

04:52 19   Larson.

04:52 20         There is, I recall, a provision that talks about

04:52 21   furnishing DC Comics with historical information about

04:52 22   the properties and rights information about the

04:52 23   properties, and I felt from my representation of the

04:52 24   client that that was going to be problematic, in fact I

04:52 25   knew it was problematic, and it was not a point that had

156

**U.S. LEGAL SUPPORT**

EXHIBIT 14
363

04:52 1    been discussed before, it was not a point that had been

04:52 2    agreed before, and it was not a point that was in my

04:52 3    letter.

04:52 4         I know that there was a right of first

04:52 5    negotiation for any biographical material outlined in

04:52 6    John's letter.  Again, I don't recall ever discussing

04:53 7    that point before, much less agreeing to that point, and

04:53 8    it was not reflected in my letter.

04:53 9         When you get to elsewhere in John's letter, I

04:53 10   know he refers to an affirmative obligation on the part

04:53 11   of the Siegels to positively publicize the property and

04:53 12   to make themselves available or reasonably available for

04:53 13   travel, and what John and I had discussed and I had

04:53 14   believed agreed was that there would be mutual

04:53 15   non-disparagement, neither party would say anything bad

04:53 16   about the other, but we had not discussed and we had not

04:53 17   agreed about an affirmative obligation on the part of the

04:54 18   Siegels to positively publicize.

04:54 19        And in terms of the travel, I thought that was a

04:54 20   problem because we were dealing with a woman of advanced

04:54 21   years and a woman who was ill, and travel on them could

04:54 22   be a burden, notwithstanding that I think there was a

04:54 23   carve-out for -- subject to their health and

04:54 24   availability.  I wouldn't have wanted there to be any

04:54 25   dispute that they were not fulfilling an obligation about

                                                                 157

**U.S. LEGAL SUPPORT**

EXHIBIT 14
364

04:54 1    going to travel to an event and that the failing to

04:54 2    travel to an event being the basis for claiming breach

04:54 3    and withholding royalty payments and the like.

04:54 4        I recall in this document new terms concerning

04:54 5    how the royalty could be reduced.  My understanding of

04:54 6    our agreement, what I set forth in the October 19th

04:55 7    letter, was that on media and merchandising licenses the

04:55 8    royalty was 6 percent.  If the other DC Comics characters

04:55 9    appeared in the media program or in licensing or

04:55 10   merchandising, that royalty could be reduced to a floor

04:55 11   of 3 percent.

04:55 12        And in our October telephone conversations this

04:55 13   issue was the subject of conversation, and John brought

04:55 14   up two other instances that would give rise to further

04:56 15   reductions of the royalty, and I know those instances

04:56 16   were specifically the use of Superman in conjunction with

04:56 17   properties called The Justice League, Superfriends and

04:56 18   Superheroes.  I recall that John initially said it should

04:56 19   go down to 1 percent, and we agreed that in fact the

04:56 20   floor in that specific instance would be 1.5 percent.

04:56 21        And also in this October period John brought up

04:56 22   a further area where he said sometimes there are very

04:56 23   extraordinary licenses where the Time Warner licenses DC

04:56 24   properties, and, for example, Looney Tunes properties,

04:56 25   and he spoke specifically about Six Flags Magic Mountain

                                                    158

**U.S. LEGAL SUPPORT**

EXHIBIT 14
365

04:56 1    amusement park, where there are strolling characters and

04:57 2    signage and the like that use numerous characters, and he

04:57 3    suggested that the royalty should be further reduced in

04:57 4    that case to 1 percent, which we came to an understanding

04:57 5    on that.

04:57 6         In the October 19th letter there are broader

04:57 7    categories where the royalty --

04:57 8         MR. MARMARO:  Do you mean the October 19th

04:57 9    letter?

04:5710        THE WITNESS:  I'm sorry.  The October 26th

04:5711    letter.  The categories where the 3 percent can be

04:5712    further reduced are broadened.

04:5713        I know we've talked today about intercompany

04:5714    deals and safe harbors as one of the points throughout

04:5715    the discussion, and as I think I testified to earlier, we

04:5816    had agreed, I thought, that -- and I think it's reflected

04:5817    in John's letter, that if the Siegels were to challenge

04:5818    an intercompany deal that was outside a safe harbor,

04:5819    there would be an expedited dispute resolution procedure.

04:5820    That was the only discussion we had about alternative

04:5821    dispute resolution.  We never discussed arbitration in

04:5822    general applying to all of this, and yet John's letter

04:5823    provided for arbitration of disputes.  My letter did not.

04:5824        We talked earlier about the issue about for how

04:5825    long would the 6 percent royalty run and there being

159

04:58 1    disagreement on the parties as to the length of time.

04:59 2    The DC Comics position was the royalty would terminate

04:59 3    when Action Comics No. 1 went into the public domain, and

04:59 4    I believe it was at that July 12th meeting, 2001 meeting

04:59 5    that we sat at John's table and discussed what happens if

04:59 6    a Superman movie, SUPERMAN 18, comes out a year before

04:59 7    Action Comics No. 1 goes into the public domain; there

04:59 8    should be a tail on that, to which John agreed.

04:59 9        So we agreed upon a tail where there was a movie

04:5910    that was released close to the end of the period that

04:5911    Action Comics No. 1 was still in copyright.  We agreed

04:5912    that there would be a tail for television, and we had

04:5913    agreed that there would be a tail -- at least my

04:5914    understanding was we'd agreed that there would be a tail

05:0015    for other substantial projects.  After all, 10 years from

05:0016    now, 20 years from now it's not clear what media -- in

05:0017    what media contents will be exploited, so I wanted to be

05:0018    able to cover that.  John did not include that other

05:0019    area, other substantial projects in the tail, as I

05:0020    recall.

05:0021        We had talked about throughout a full indemnity,

05:0022    and E&O insurance.  I think the E&O insurance wasn't in

05:0023    John's letter, and I think the indemnity proposed here

05:0024    was a partial, what I considered to be a partial

05:0125    indemnity.

160

**U.S. LEGAL SUPPORT**

EXHIBIT 14
367

05:01 1        On the credit point --

05:01 2   BY MR. BERGMAN:

05:01 3        Q   Before you get to that one, Mr. Marks --

05:01 4        MR. MARMARO:  Can I just interject, because I

05:01 5   think I may have placed a possible ambiguity in the

05:01 6   record when I mentioned before Mr. Marks went into this

05:01 7   explanation of the differences that the letters be placed

05:01 8   before him, and until this very last point he has not

05:01 9   been testifying from the letter.  I just wanted to note

05:0110   that for the record in case -- well, I just wanted to

05:0111   note that for the record.

05:0112        THE WITNESS:  In terms of the credit to be

05:0113   accorded Siegel and Shuster, which was a point that I had

05:0114   as my point C.4, a point that I thought had long been

05:0215   agreed, that there would be a credit in paid ads of

05:0216   motion pictures, which is certainly in my experience is

05:0217   something that's very important to clients.  They want to

05:0218   see the credit in the full-page ads in newspapers and

05:0219   posters, movie theaters and the like, and John's letter

05:0220   provided for credit on screen only and not in paid ads.

05:0221   BY MR. BERGMAN:

05:0222        Q   If I could just ask you a question about that,

05:0223   and I am going, with your indulgence, to go back to some

05:0224   of these --

05:0225        A   Yes.

                                                              161

**U.S. LEGAL SUPPORT**

EXHIBIT 14
368

05:02 1      Q   -- but I'm looking at C.4, the specific item you

05:02 2  indicated in the October 19, and it -- I see what you're

05:02 3  referring to.  You're referring to the paid ads.

05:02 4      A   Correct.  I mean it's two words, but it's two

05:03 5  meaningful words.

05:03 6      Q   Okay.

05:03 7      A   Again, Mr. Marmaro said I hadn't gone -- I

05:03 8  hadn't reviewed this for purposes of testifying now going

05:03 9  line by line, but those are to me the major areas, but

05:03 10 they may not be the exclusive points.

05:03 11     Q   Let me -- before turning to a closer examination

05:03 12 of those, let me ask you this:  Here you've been

05:03 13 negotiating an agreement for two and a half years, and

05:03 14 you leave on vacation and you believe that it's been

05:03 15 resolved, and you review the October 26 letter, and it

05:04 16 appears to have differences, as you've recounted them.

05:04 17          Given what had transpired in the past in your

05:04 18 relationship with Mr. Schulman, was there a reason why

05:04 19 you didn't call him and sit down with him and say,

05:04 20 "Look," in essence, "we have an inconsistency here, and

05:04 21 let's try to resolve it"?

05:04 22          MR. MARMARO:  As with the other questions, if

05:04 23 Mr. Toberoff has no issue with the response, then

05:04 24 Mr. Marks would be willing to respond.

05:04 25          MR. TOBEROFF:  I don't.

162

**U.S. LEGAL SUPPORT**

EXHIBIT 14
369

05:04 1          THE WITNESS:  John's letter -- cover letter that

05:04 2   attaches the outline says, "We're working on the draft

05:04 3   agreement so that by the time you have accomplished

05:04 4   something of truly momentous import, we will have the

05:04 5   super-matter transaction in document form," and I very

05:05 6   much took that to mean that by the time you get back,

05:05 7   you'll have a long-form agreement that we can work off

05:05 8   of, and I wanted to see that long-form agreement.

05:05 9   BY MR. BERGMAN:

05:05 10     Q    I see.  And anticipated that the disparities

05:05 11  between the two short forms to be resolved in the long

05:05 12  form?

05:05 13          MR. MARMARO:  I'm going to object to the form of

05:05 14  the question.  Vague and ambiguous and -- well, vague and

05:05 15  ambiguous.

05:05 16          MR. TOBEROFF:  Same objection and leading.

05:05 17          MR. MARMARO:  You're asking if that was the

05:05 18  reason?

05:05 19          Go ahead, you can answer subject to the

05:05 20  objections.

05:05 21          THE WITNESS:  I hope I'm answering the question.

05:05 22  I thought it would be a good thing for the process to get

05:05 23  the long form to move it forward rather than bring it to

05:05 24  a screeching halt at this point, so I wanted to allow

05:06 25  this process to move forward.  My thought was let's raise

                                                                    163

**U.S. LEGAL SUPPORT**

EXHIBIT 14
370

05:06 1    these issues in the context of the long form.

05:06 2            MR. BERGMAN:  I see.

05:06 3            Why don't we take a five-minute break.

05:06 4            MR. MARMARO:  Sure.

05:06 5            (Recess.)

05:13 6            MR. BERGMAN:  Back on the record.

05:13 7        Q    Just to complete this question of the two

05:13 8    letters, Mr. Marks, when you prepared your October 19

05:13 9    letter, did you believe that you accurately recorded the

05:14 10   deal as Mr. Schulman had offered it to you?

05:14 11       A    I believe that I had accurately recorded the

05:14 12   deal that was negotiated between the parties.

05:14 13       Q    Okay.

05:14 14       A    Mr. Bergman, I do want to be clear, on October

05:14 15   16 I don't recall the conversation as being a recitation

05:14 16   of each term.  The October 16th conversation was focused

05:14 17   on the one open item.  That's my recollection.

05:14 18       Q    I understand that.  I appreciate it.

05:14 19       A    But I -- to answer your question, yes, I believe

05:15 20   I at this confirmation letter set forth the terms as

05:15 21   agreed.  Of course, I invited John to tell me if I had

05:15 22   misstated it in any way.

05:15 23       Q    Okay.  And at no time until you had reviewed the

05:15 24   long-form agreement did you have any discussion with

05:15 25   Mr. Schulman concerning any disparity that might exist

                                                            164

05:15 1  between the two letters?

05:15 2          MR. MARMARO:  Do you mean the draft long form?

05:15 3          MR. BERGMAN:  Yes.

05:15 4          THE WITNESS:  I did put a call in to

05:15 5  Mr. Schulman during this time period, but I don't recall

05:15 6  that we spoke.  I found out he was on vacation.  Or I

05:16 7  would later learn he was on vacation.

05:16 8  BY MR. BERGMAN:

05:16 9      Q    Returning to your phone register at page 614 --

05:1610      A    One moment, please.

05:1611      Q    There is a reference to a phone call from

05:1612  Mr. Toberoff at 6:09.  Was that call completed that day?

05:1613  Did you return it?

05:1614      A    I don't know if it was completed that day.

05:1615      Q    Did you return it at some point?

05:1616      A    Yes, I believe so.

05:1717      Q    Before I get into that, let me just make sure.

05:1718  If you look at page 615, you'll see another reference to

05:1719  a phone call from Mr. Toberoff.

05:1720          Was your reply to the phone call that you

05:1721  received on the 24th made prior to the 30th, or was it

05:1722  after the 30th?

05:1723          MR. MARMARO:  30th of July?

05:1724          MR. BERGMAN:  Yes.

05:1725          THE WITNESS:  I believe, looking at these

                                                          165

**U.S. LEGAL SUPPORT**

EXHIBIT 14
372

05:17 1    records, that what must have happened is I returned the

05:17 2    call, didn't reach Mr. Toberoff; he called back, and

05:17 3    we -- on the 30th, and we spoke subsequent, either on

05:17 4    that day or subsequent to that day.

05:17 5    BY MR. BERGMAN:

05:17 6        Q    Would it be accurate to say that you do not

05:18 7    recall speaking -- actually speaking with Mr. Toberoff

05:18 8    twice during the last week of July '02?

05:18 9        A    I recall one conversation.

05:1810        Q    Okay.  Can you tell me to the best of your

05:1811    recollection what was said by each of you and

05:1812    Mr. Toberoff in that conversation?

05:1813        A    I think Mr. Toberoff said he was -- wanted to

05:1814    check in with me to see where we were in our dealings

05:1815    with DC Comics, and I think I told him then that -- and I

05:1816    may have also said it in our first conversation -- that

05:1817    we had a confidentiality agreement with DC Comics, and I

05:1918    didn't feel at liberty to discuss the status of our

05:1919    dealings with him.

05:1920            Mr. Toberoff said, "Can you tell me what DC

05:1921    Comics offered you," and I said, "No.  We have a

05:1922    confidentiality agreement."

05:1923            And I believe Mr. Toberoff said, "Would you be

05:1924    willing to enter into negotiations with me," and I

05:1925    believe I said, "Initiating negotiations, no.  That's

166

EXHIBIT 14
373

05:19 1    something that makes me very uncomfortable.  If you have

05:19 2    an offer, present it to me, and I'll present it to the

05:19 3    client."

05:19 4        Q    Do you recall what he said in response?

05:20 5        A    I think that was the summary of the substance of

05:20 6    the conversation other than goodbyes.

05:20 7        Q    If you turn the page to 616, you will see a

05:20 8    reference to a conference call, quote, "with Mark, Kevin,

05:20 9    and Ari Emanuel at Endeavor," close quote.  There also

05:2010    appears to be a notation, "approximately 20 minutes."

05:2011        Do you see that?

05:2012        A    Yes, and it looks like the "20" is crossed out,

05:2013    and it says "5 to 10" above it.

05:2014        Q    I see.  Okay.

05:2015        Off the record.

05:2016        (Discussion held off the record.)

05:2017    BY MR. BERGMAN:

05:2018        Q    Would you describe to the best of your

05:2119    recollection and as specifically as possible what was

05:2120    said by each of the three of you during that

05:2121    conversation?

05:2122        A    I think this record may actually be setting up a

05:2123    conference call rather than the conference call, but

05:2124    ultimately there was a conference call at this time

05:2125    period.

167

**U.S. LEGAL SUPPORT**

EXHIBIT 14
374

05:21 1  Q I see. Okay.

05:21 2    Do you recall how long after August 7 that

05:21 3 conference call took place?

05:21 4  A Within the next day or two.

05:21 5  Q I see.

05:21 6    Would you tell me --

05:21 7  A If not on that date.

05:21 8  Q -- what was involved and what was said in that

05:21 9 conversation?

05:21 10  A Yes. Mr. Toberoff and Mr. Emanuel both spoke.

05:22 11 I can't completely tell you who said what, but I think

05:22 12 Mr. Toberoff may have very briefly referenced past

05:22 13 conversations, and then I believe it was Mr. Emanuel who

05:22 14 explained that either they or some other people or

05:22 15 perhaps some members of the Endeavor Talent Agency had

05:22 16 set up a fund or were in the process of setting up a fund

05:22 17 to acquire intellectual property rights which they would

05:22 18 then package with clients from the Endeavor Talent

05:23 19 Agency, then take those to studios to exploit the

05:23 20 package, and they understood that the Siegel family had

05:23 21 an interest in the termination rights and viewed that as

05:23 22 perhaps the most valuable of properties and wanted to

05:23 23 make a proposal.

05:23 24  Q Okay. What did you say?

05:23 25  A I said in substance and effect, "I'm listening."

168

**U.S. LEGAL SUPPORT**

EXHIBIT 14
375

05:23 1    And I'm not sure who spoke, but they made a proposal of

05:23 2    $15 million and what was described as a meaningful back

05:23 3    end, which I understood to be a contingent compensation

05:23 4    position or a royalty position in the exploitation of the

05:23 5    property.

05:24 6        Q    And was that for the entire Siegel Superman

05:24 7    interest?  Did it include Michael's?

05:24 8        A    I don't think that was discussed, but that's how

05:24 9    I understood it.

05:24 10        Q    Did they say -- attempt to quantify what that

05:24 11    meaningful back end would be?

05:24 12        A    They did not.  I believe I asked, but they did

05:24 13    not.

05:24 14        Q    And what else did you say?

05:24 15        A    I asked if there was anything else, and they

05:24 16    said "No," and then I asked if this was a proposal that

05:24 17    was conditioned on their doing due diligence about the

05:24 18    rights, and they said again in substance and effect, "No,

05:25 19    it's not.  We've done our due diligence already.  This is

05:25 20    the offer."

05:25 21        Q    Anything else you can recall of that

05:25 22    conversation?

05:25 23        A    I think I said, "Thank you, and I will

05:25 24    communicate this to the client" or "take this back to the

05:25 25    client."

                                                              169

**U.S. LEGAL SUPPORT**

EXHIBIT 14
376

05:25 1        Q    And did you in fact do that?

05:25 2             MR. MARMARO:  Before you answer the question, is

05:25 3    there any objection to the answer?  The question calls

05:25 4    for a communication between Mr. Marks and the clients.

05:25 5             MR. TOBEROFF:  Without a waiver, no, whether or

05:25 6    not you communicated that to the client.

05:25 7             MR. MARMARO:  A yes or a no.

05:25 8             THE WITNESS:  Yes.

05:25 9    BY MR. BERGMAN:

05:2510        Q    And was that a communication within let's say a

05:2511    week of the conference call?

05:2512        A    Yes.

05:2513        Q    Your phone register, 617, indicates a call from

05:2614    Mr. Toberoff on August 29.  Was that call returned?

05:2615        A    I -- was it returned.  I don't know.

05:2616             MR. TOBEROFF:  Which number -- Bates number?

05:2617             MR. BERGMAN:  617.

05:2618        Q    Do you recall having a telephone conversation

05:2619    with Mr. Toberoff subsequent to the conference call?

05:2620        A    The best I can say is that it may be that

05:2621    Mr. Toberoff called to see if I had a response, and I

05:2622    could only have said at that time that the clients had

05:2723    been away, and I don't have a response.  I have -- I am

05:2724    not certain about that.

05:2725        Q    Did there ever come a time when you communicated

                                                                    170

**U.S. LEGAL SUPPORT**

EXHIBIT 14
377

05:27 1    to Mr. Toberoff either your clients' acceptance,

05:27 2    rejection or comments upon the offer that had been made?

05:27 3         MR. MARMARO:  Is your question limited to the

05:27 4    time when Mr. Marks was acting as counsel for the

05:27 5    Siegels?

05:27 6         MR. BERGMAN:  No.

05:27 7         MR. MARMARO:  Even after that time?

05:27 8         MR. BERGMAN:  At any time.

05:27 9         MR. MARMARO:  That potentially calls for the

05:27 10   invasion of attorney-client communications if it's at a

05:27 11   time when Mr. Toberoff was representing the clients.

05:27 12        MR. BERGMAN:  Okay.  Then let me reframe the

05:27 13   question.

05:27 14    Q   Did you, prior to the time that Mr. Toberoff

05:27 15   undertook his representation of the Siegels, communicate

05:28 16   to him either your client, the Siegels' acceptance,

05:28 17   rejection or comments upon the offer?

05:28 18        THE WITNESS:  May I answer?

05:28 19        MR. MARMARO:  I assume so.  I am hearing no

05:28 20   objection from Mr. Toberoff.

05:28 21        THE WITNESS:  No.

05:28 22   BY MR. BERGMAN:

05:28 23    Q   Up until the time that your -- the

05:28 24   representation of Gang, Tyre was terminated, did you ever

05:28 25   learn from any source that Mr. Toberoff had spoken

171

**U.S. LEGAL SUPPORT**

EXHIBIT 14
378

05:28 1    directly with either Joanne or Laura Siegel?

05:28 2            MR. MARMARO:  I think you misspoke in the

05:28 3    question.  Let me hear the question again.  I think you

05:28 4    said representation of Gang, Tyre, but maybe I misheard.

05:29 5            (Record read.)

05:29 6            MR. MARMARO:  I'm sorry.  Was it "your represent

05:29 7    of Gang, Tyre"?

05:29 8            THE REPORTER:  There is a dash.  "Your" and then

05:29 9    dash "the representation."

05:29 10           MR. MARMARO:  Okay.  As long as you can answer

05:29 11   this question without divulging attorney-client

05:29 12   information, you can answer it as far as I'm concerned.

05:29 13   If you can't, then I would object and instruct.

05:29 14           THE WITNESS:  I did not hear from any source

05:29 15   that Mr. Toberoff had spoken directly to Joanne Siegel

05:29 16   and/or Laura Larson -- Laura Siegel Larson up until the

05:29 17   time of Gang, Tyre's termination.

05:29 18   BY MR. BERGMAN:

05:29 19       Q    Thank you.

05:29 20            Did you learn at any time prior to the

05:30 21   termination of Gang, Tyre's representation of the Siegels

05:30 22   that Mr. Toberoff had spoken directly with Michael

05:30 23   Siegel?

05:30 24           MR. MARMARO:  Again, if you can answer that

05:30 25   question without divulging attorney-client information,

                                                                172

**U.S. LEGAL SUPPORT**

EXHIBIT 14
379

05:30 1    you may answer it.  If it calls for you to divulge

05:30 2    information protected by the attorney-client privilege,

05:30 3    I'll object to that extent and instruct you not to

05:30 4    answer.

05:30 5            (Instruction not to answer.)

05:30 6            THE WITNESS:  I think I cannot answer that

05:30 7    question in view of Mr. Marmaro's instruction.

05:30 8    BY MR. BERGMAN:

05:30 9       Q    Okay.  Did you communicate to Mr. Bulson the

05:3010    offer that Mr. Emanuel and Mr. Toberoff had made to you?

05:3111            MR. MARMARO:  I am going to again ask

05:3112    Mr. Toberoff whether he objects to that question being

05:3113    answered because Mr. Bulson, based on the prior

05:3114    testimony, would be in the zone of somebody whose

05:3115    communications between Mr. Marks and Mr. Bulson would be

05:3116    covered by the attorney-client privilege.  So you asked

05:3117    for a communication, so I am going to pass to

05:3118    Mr. Toberoff.

05:3119            MR. TOBEROFF:  I'll allow it.

05:3120            THE WITNESS:  Yes.

05:3121    BY MR. BERGMAN:

05:3122       Q    Did Mr. Bulson at any time prior to the

05:3123    termination of Gang, Tyre communicate to you that he had

05:3124    in turn communicated to Mr. Siegel, Michael Siegel, the

05:3125    offer made by Mr. Toberoff?

                                                              173

**U.S. LEGAL SUPPORT**

EXHIBIT 14
380

05:31 1          MR. MARMARO:  Again, I'm going to make the same

05:31 2    objection.  You are asking for a communication by

05:31 3    Mr. Bulson to Mr. Marks.  If Mr. Toberoff has no -- well,

05:32 4    I think Mr. Bulson may have an objection.

05:32 5          THE WITNESS:  It's Michael Siegel's privilege.

05:32 6          MR. MARMARO:  Yes, it's Michael Siegel's

05:32 7    privilege.  I am going to object and instruct.

05:32 8          (Instruction not to answer.)

05:32 9          THE WITNESS:  Mr. Bulson was representing

05:3210    Michael Siegel, so I don't think anybody in this room can

05:3211    actually waive that privilege.

05:3212          MR. BERGMAN:  Off the record.

05:3213          (Discussion held off the record.)

05:3214    BY MR. BERGMAN:

05:3315      Q    Looking again at your phone logs, there are

05:3316    calls indicated from Mr. Schulman -- no.  Strike that.

05:3317          Aside from the conference call that you've

05:3318    described with Mr. Emanuel and Mr. Toberoff, did you have

05:3319    any other communications with Mr. Emanuel regarding the

05:3420    Siegel interest?

05:3421      A    No.

05:3422      Q    Did you have any communication -- prior to early

05:3423    February when you actually received the proposed long

05:3424    form, did you have any communication with anyone at the

05:3425    Fross Zelnick firm concerning the long form or any other

                                                                174

**U.S. LEGAL SUPPORT**

EXHIBIT 14
381

05:34 1    aspect of the Siegel matter?

05:34 2         MR. MARMARO:  The question is compound.

05:35 3         MR. TOBEROFF:  Objection --

05:35 4         THE WITNESS:  I --

05:35 5         MR. TOBEROFF:  Wait.  Objection.  Compound.

05:35 6    Also vague and ambiguous as to the February long form.

05:35 7         MR. BERGMAN:  Okay.

05:35 8         MR. TOBEROFF:  Maybe you can specify.

05:35 9    BY MR. BERGMAN:

05:3510    Q    Am I correct that you received a long-form

05:3511    agreement from the Fross Zelnick firm in early February

05:3512    of 2002?

05:3513         MR. MARMARO:  Draft long-form agreement?

05:3514         MR. BERGMAN:  Yes.

05:3515         THE WITNESS:  Yes.

05:3516    BY MR. BERGMAN:

05:3517    Q    Prior to your receipt of that draft of the long-

05:3518    form agreement, had you had any conversations with anyone

05:3519    at the Fross Zelnick firm concerning when you would be

05:3520    getting the draft long form?

05:3521    A    No.  In fact I did not know that they were the

05:3522    ones that were preparing it.

05:3523    Q    Okay.  Did you -- and forgive me if I've asked

05:3524    you this before.  At any time prior to your receipt of

05:3525    the draft long form, did you have any conversations with

175

**U.S. LEGAL SUPPORT**

EXHIBIT 14
382

05:36 1    Mr. Schulman as to when you would be receiving the

05:36 2    agreement that he referred to in his October 26 letter?

05:36 3         MR. MARMARO:  The draft agreement?

05:36 4         MR. BERGMAN:  Yes.

05:36 5         THE WITNESS:  Communications and attempted

05:36 6    communications, yes.  Conversations, no.

05:36 7         MR. BERGMAN:  Would you mark as Exhibit 22 a

05:36 8    one-page document which doesn't bear initials, which

05:36 9    means it was produced by Warner Bros., 974.

05:3610         (Deposition Exhibit 22 marked.)

05:3711    BY MR. BERGMAN:

05:3712         Q   Am I correct that in the salutation and the

05:3713    first paragraph, Mr. Schulman was congratulating

05:3714    Mr. Ramer upon becoming a grandfather and you upon

05:3715    becoming a father?

05:3716         A   Yes, that is correct.

05:3717         Q   Had you since you returned from your trip in

05:3718    late November spoken with Mr. Schulman and told him of

05:3719    your successful adoption?

05:3720         MR. TOBEROFF:  Lacks foundation.

05:3721         MR. MARMARO:  It's also asked and answered,

05:3722    given the prior testimony, but go ahead, you can answer

05:3723    it again.

05:3724         THE WITNESS:  I don't recall speaking with John

05:3725    in that interim period.

                                                          176

**U.S. LEGAL SUPPORT**

EXHIBIT 14
383

05:37 1    BY MR. BERGMAN:

05:37 2        Q    Okay.   In response to the second paragraph of

05:37 3    this letter, did you make any attempt to telephone

05:38 4    Mr. Schulman and tell him in substance that there were

05:38 5    disparities between the October 19 and 26 letters?

05:38 6            MR. MARMARO:   Let me have that question read

05:38 7    back, please.

05:38 8            (Record read.)

05:38 9            THE WITNESS:   I had made an attempt before this

05:3810    letter, but I don't recall making an attempt after this

05:3811    letter.

05:3912            MR. BERGMAN:   Would you mark as Exhibit 23 a

05:3913    letter dated February 1, 2002, with an attachment, a

05:3914    draft long-form agreement, Bates stamped GTRB 350 through

05:3915    399.

05:3916            (Deposition Exhibit 23 marked.)

05:4017    BY MR. BERGMAN:

05:4018        Q    Am I correct, Mr. Marks, that Exhibit 23 is a

05:4019    copy of the long-form agreement that you received in

05:4020    early February?

05:4021        A    Yes.

05:4022        Q    Did there come a time following your receipt of

05:4023    this agreement when you began a redraft of the agreement?

05:4024            MR. MARMARO:   The question is vague and

05:4025    ambiguous, and again I am going to...   I'm going to state

                                                                        177

**U.S. LEGAL SUPPORT**

EXHIBIT 14
384

05:40 1    that if Mr. Toberoff has an objection to Mr. Marks

05:40 2    answering this question, I'd like to know about it.  If

05:41 3    not, Mr. Marks will answer.

05:41 4        MR. TOBEROFF:  As to the fact of your attempting

05:41 5    a redraft and the date, I don't mind you testifying

05:41 6    because that's already been disclosed, I believe, in a

05:41 7    letter to a third party, but other than that, as to any

05:41 8    other substantive questions on that redraft, we object to

05:41 9    that as attorney-client privilege and attorney work

05:41 10   product from the clients' points of view.

05:41 11       MR. MARMARO:  We will follow that objection and

05:41 12   instruct on that basis.

05:41 13       MR. BERGMAN:  As to yes or no --

05:41 14       MR. MARMARO:  I think he said no.  I'm going to

05:41 15   let Mr. Toberoff talk.  I had understood he said

05:41 16   Mr. Marks can answer that question yes or no but not

05:42 17   beyond that.

05:42 18       MR. BERGMAN:  Oh.

05:42 19       MR. TOBEROFF:  Right.  And also the date if he

05:42 20   wants.

05:42 21       THE WITNESS:  There came a time where I began to

05:42 22   prepare a completely new draft, as opposed to a redraft,

05:42 23   of what I had understood the terms had been reached by

05:42 24   the parties back in October.

05:42 25   BY MR. BERGMAN:

178

**U.S. LEGAL SUPPORT**

EXHIBIT 14
385

05:42 1        Q   Can you tell us approximately when you commenced

05:42 2    that redraft?

05:42 3           MR. MARMARO:  Object to the use of the word

05:42 4    "redraft."

05:42 5           MR. TOBEROFF:  Object as well.

05:42 6           THE WITNESS:  I do not recall approximately when

05:42 7    I began the draft agreement.

05:43 8    BY MR. BERGMAN:

05:43 9        Q   Do you recall speaking with Mr. Schulman on May

05:43 10   16, '02, and I refer you to your privilege -- to your

05:43 11   telephone register, 608, which indicates a call from

05:43 12   Mr. Schulman?

05:43 13          MR. TOBEROFF:  I am sorry.  What was the Bates

05:43 14   number?

05:43 15          THE REPORTER:  608.

05:43 16   BY MR. BERGMAN:

05:43 17       Q   Do you recall that, sir?

05:43 18       A   Yes.

05:43 19       Q   And did you in fact speak with Mr. Schulman on

05:43 20   the 16th?

05:43 21       A   I believe I spoke with Mr. Schulman at least

05:43 22   once on or around the 16th.

05:44 23          MR. BERGMAN:  I'm going to ask the reporter to

05:44 24   mark as Exhibit 24 a one-page handwritten document Bates

05:44 25   stamped WB 005972.

                                                            179

**U.S. LEGAL SUPPORT**

EXHIBIT 14
386

05:44 1              (Deposition Exhibit 24 marked.)

05:44 2    BY MR. BERGMAN:

05:44 3        Q    Mr. Marks, let me tell you that Mr. Schulman has

05:44 4    not yet been deposed in connection with this matter, but

05:44 5    I will represent to you that, if and when deposed, will

05:45 6    identify this document as notes of a conversation that he

05:45 7    took with you and -- on May 16 of statements that you had

05:45 8    made to him with respect to the draft long-form

05:45 9    agreement.

05:4510        The first purported quotation by Mr. Schulman

05:4511    is, quote, "'not expect contract like that,'" close

05:4512    quote.

05:4513        Do you recall stating in substance to

05:4514    Mr. Schulman with respect to the draft long form that you

05:4515    did not expect a contract like that?

05:4516        A    While I don't have a specific recollection of

05:4617    this statement, it is in fact the case that I did not

05:4618    expect a draft like the one that came in early February.

05:4619        Q    Okay.  The next statement attributed to you is,

05:4620    quote, "'very aggressive 1st draft,'" close quote.

05:4621        Do you recall stating that in substance to

05:4622    Mr. Schulman?

05:4623        A    Yes.

05:4624        Q    The next statement attributed to you is, quote,

05:4625    "'can deal with it,'" close quote.

                                                                  180

EXHIBIT 14
387

05:46 1        Do you recall stating that to Mr. Schulman with

05:46 2  respect to the draft long form?

05:46 3     A   Not with respect to the draft long form.

05:46 4     Q   Okay.  Do you recall during that conversation

05:46 5  stating to Mr. Schulman anything to the effect of "can

05:46 6  deal with it"?

05:47 7        MR. MARMARO:  The question is vague in the --

05:47 8  well, the question is vague and ambiguous, but go ahead

05:47 9  and answer.

05:47 10       THE WITNESS:  Yes, but some context is required

05:47 11  here.

05:47 12  BY MR. BERGMAN:

05:47 13     Q   Please give me the context.

05:47 14     A   In this time period I believe there are two

05:47 15  calls.  The first call, John calls me and says -- said,

05:47 16  "Did you know that your client had written to Dick

05:47 17  Parsons and accused the Time Warner people of acting like

05:47 18  Gestapo," and I said "No."

05:47 19        He said, "Well, I've just received a letter."

05:47 20        I said, "Could you send it to me?"  John asked

05:47 21  for my fax number, and he sent it to me.

05:48 22        And I read the letter, and I think I called him

05:48 23  back and said, "As you're presenting it to me, I knew

05:48 24  nothing about this."

05:48 25        And I think John would have in the letter, among

181

EXHIBIT 14
388

05:48 1    other things -- it was a letter from Joanne Siegel -- was

05:48 2    critical of the draft document that had been sent, and I

05:48 3    think John was asking me what I thought about it.

05:48 4         And now to get to your question, my -- I think

05:48 5    my comment goes to I can deal with the process of it.  I

05:48 6    think by this time I had formed an opinion that I could

05:48 7    not deal with that draft itself, but I could deal with

05:48 8    the process of moving forward on a long form.  I don't

05:49 9    think that long form.  At least that's how I felt at the

05:49 10   time.

05:49 11       Q   Okay.  The next statement attributed to you in

05:49 12   Exhibit 24 is, quote, "'contains a lot of sep,'" which I

05:49 13   take to mean separate, "'docs,'" which I am assuming

05:49 14   documents; that is, it would read, quote, "'contains a

05:49 15   lot of separate documents,'" close quote.

05:49 16       MR. MARMARO:  Is that what you're representing

05:49 17   Mr. Schulman -- because that's not my reading of it.

05:49 18       THE WITNESS:  I read it differently as well.

05:49 19       MR. BERGMAN:  Then I may be wrong.

05:49 20       MR. MARMARO:  But if you're representing

05:49 21   that's --

05:49 22       MR. BERGMAN:  No, I am not.  I am representing

05:49 23   that that is how I read what Mr. Schulman states are his

05:49 24   notes.

05:49 25       Q   How do you read that phrase?

                                                              182

**U.S. LEGAL SUPPORT**

EXHIBIT 14
389

05:49 1      A   Well, with the qualification that I am not an

05:50 2   expert in reading John's handwriting, I believe this

05:50 3   says, "'contains a lot of trap doors,'" which I would

05:50 4   have said because it is how I felt.

05:50 5      Q   Can you explain what you meant by that?

05:50 6      A   Yes, if I could do so with reference to the

05:50 7   document.

05:50 8      Q   You certainly could, sir.

05:50 9      MR. MARMARO:  And again assuming there is no

05:5010   objection from Mr. Toberoff to this.

05:5011   BY MR. BERGMAN:

05:5012      Q   Incidentally, before you begin reviewing that, I

05:5013   should make note of the fact that this copy which I've

05:5014   introduced and was produced by you is missing a few

05:5015   pages, 13, 20 and 42.

05:5016      MR. MARMARO:  The first I've heard of it.  If

05:5117   you had called me before the deposition, I would have

05:5118   looked into it.

05:5119      MR. TOBEROFF:  This particular copy or --

05:5120      MR. BERGMAN:  That particular copy -- if you

05:5121   gentlemen would like, I can -- or if the witness would

05:5122   like, I have another copy which contains --

05:5123      MR. MARMARO:  Because they're consecutively

05:5124   Bates stamped, which would indicate to me that there is a

05:5125   copying issue at our end or maybe how we -- how the

183

**U.S. LEGAL SUPPORT**

EXHIBIT 14
390

05:51 1    document was maintained.

05:51 2             MR. BERGMAN:  Why don't we see if the witness

05:51 3    can proceed.  Meanwhile, I will have --

05:51 4             MR. TOBEROFF:  Can you just repeat those

05:51 5    numbers, by the way?

05:51 6             MR. BERGMAN:  13, 20, 42.

05:51 7             MR. TOBEROFF:  Thank you.

05:51 8             MR. BERGMAN:  You're welcome.

05:52 9    Q    You were looking at the agreement to --

05:52 10   A    I was -- can we wait a moment?

05:52 11            MR. MARMARO:  Off the record.

05:52 12            (Discussion held off the record.)

05:52 13            THE WITNESS:  In my October 19, 2001 letter,

05:53 14   "The Property" was defined quite specifically to mean

05:53 15   "all Superman, Superboy and related properties

05:53 16   (including, for example, Supergirl, Steel, Lois & Clark

05:53 17   and Smallville), and the Spectre property, and includes

05:53 18   all pre- and post-termination works (including the

05:53 19   so-called Superman library), characters, names and

05:53 20   trademarks relating to the Property," and that's what we

05:53 21   had discussed throughout the negotiation.

05:53 22            I recall there was one time where DC made a

05:53 23   proposal to have a royalty attach only on post-

05:53 24   termination works, which was rejected by the Siegels.  In

05:53 25   the conversations the negotiations was to a royalty that

                                                              184

EXHIBIT 14
391

05:54 1    covered all the works.

05:54 2         In this agreement at page 9 there is a

05:54 3    definition of "Revenues." It's paragraph 24. The

05:54 4    revenues -- "The term 'Revenues' is hereinafter defined

05:54 5    as all amounts actually received by DC COMICS in the

05:54 6    United States [sic] from the licensing of the rights in

05:54 7    the SUPERMAN property" --

05:54 8         MR. MARMARO: "In United States Dollars."

05:54 9         THE WITNESS: Excuse me. Thank you.

05:5410         -- "in United States Dollars from the Licensing"

05:5411    with a capital L "of rights in the SUPERMAN Property and

05:5412    the SPECTRE Property," and the sentence and indeed the

05:5413    paragraph continues.

05:5414         In paragraph 23 it says, "The terms 'Licensing'"

05:5415    with a capital L and "'Licenses'" with a capital L "refer

05:5416    to DC COMICS authorizing any third party to commercially

05:5417    exploit the SUPERMAN Property and the SPECTRE Property."

05:5418         So now we have to look to find the definition of

05:5519    "SUPERMAN Property" and "SPECTRE Property." Superman --

05:5520    that definition is at page 4, paragraph 9. That says,

05:5521    "The term super property -- [sic] 'SUPERMAN Property',"

05:5522    in quotes, "is hereinafter defined to mean the following:

05:5523    (i) each of the pre-existing characters and elements

05:5524    which first appeared in the SUPERMAN Works; and (ii) such

05:5525    other characters and/or elements, if any, that may be

185

05:55 1    hereafter -- [sic] that may be created hereafter and meet

05:55 2    the following criteria," and then there is an extensive

05:55 3    definition of criteria.

05:55 4         So subpart 2 is the definition of "SUPERMAN

05:56 5    Property" includes some, but not all, works created from

05:56 6    and after the date of the agreement, and what is defined

05:56 7    as the "SUPERMAN Works." So then we go to the definition

05:56 8    of "SUPERMAN Works."

05:56 9         That definition is at page 3 -- No, I'm sorry,

05:5610    page 2, paragraph 3, and if you parse through the

05:5611    language, it says, quote, "The phrase 'SUPERMAN Works' is

05:5612    hereinafter defined collectively and individually as

05:5613    follows," and rather than -- if you would like me to read

05:5614    it into the record, I can, but notably it continues,

05:5615    "...that in any manner depict, include, embody, refer to,

05:5716    describe, relate to, concern, are associated with, or

05:5717    preceded, lead to and/or contributed in any manner to the

05:5718    development of, or derive from, are based upon and arise

05:5719    out of SUPERMAN, that were ever created (in whole, in

05:5720    part or jointly) by JEROME SIEGEL." So "SUPERMAN Works"

05:5721    refer to work created by Jerome Siegel.

05:5722         In this document at paragraph 7, page 3, there

05:5723    is a definition of yet another category of works which is

05:5724    called the "SUPERMAN Derivative Works," and to summarize,

05:5725    those are works relating to the Superman character and

                                                                    186

**U.S. LEGAL SUPPORT**

EXHIBIT 14
393

05:57 1     the like that are created by persons other than Jerome

05:57 2     Siegel.

05:57 3          So when you put this together, this document is

05:58 4     purporting to say or at least raise the problem that

05:58 5     licensing revenues would not include that body of 60

05:58 6     years of derivative works that the people that DC Comics,

05:58 7     Paul Levitz and others, made such an impression upon us

05:58 8     as being so different from the original work and was the

05:58 9     basis of the Superman library, which was contrary to what

05:5810    was agreed.  The whole idea was to pick up all works and

05:5811    not to exclude works created by other people.

05:5812          I mentioned that at the DC Comics meeting there

05:5813    was a specific discussion about an American Express ad

05:5814    campaign where Jerry Seinfeld, who was in that campaign,

05:5915    specifically requested that the Curt Shaw version of

05:5916    Superman be used in the campaign.  Under this draft the

05:5917    proceeds of that campaign would be excluded, or at least

05:5918    there was an argument that they would be excluded, and

05:5919    that wasn't the intent.  To parse through that language

05:5920    and to get there is very difficult, and I found -- I

05:5921    considered that deceptive drafting and a trap door and

05:5922    highly, highly problematic.

05:5923    BY MR. BERGMAN:

05:5924         Q    I understand the "problematic" part.

05:5925          Did you believe at the time that it was

                                                                    187

EXHIBIT 14
394

05:59 1    purposely drafted that way or that it was, you know, a

05:59 2    trap door that existed due to inadvertence or drafting

05:59 3    rather than an intentional attempt to deprive the Siegels

06:00 4    of something?

06:00 5         A    Well, I know from the cover letter there were

06:00 6    multiple versions of this internally, because what

06:00 7    Mr. Perkins transmitted was what he described as the

06:00 8    latest version of the work, so that suggested to me that

06:00 9    this had been -- and this is the first version that I

06:0010    ever saw, so that suggested to me that there had been at

06:0011    least one and perhaps more versions of the work that had

06:0012    been vetted, and this looked to me to be an agreement

06:0013    that -- a document that had been very purposefully

06:0014    drafted.  That was my take away from it.

06:0015         I have another example too.

06:0016    Q    Please let me hear it.

06:0117    A    Returning to page 9, paragraph 24, the second

06:0118    sentence, "Revenues shall not include any sums received

06:0119    by DC Comics for providing any services or materials in

06:0120    connection with the licensing of rights in the SUPERMAN

06:0121    Property and SPECTRE Property."  Well, what this

06:0122    suggested to me was that there would be or could be or

06:0123    could arguably be a deduction from revenues for services

06:0124    attributable to DC Comics or materials supplied by DC

06:0125    Comics.

188

**U.S. LEGAL SUPPORT**

EXHIBIT 14
395

06:01 1          Going back to our meeting -- second meeting with

06:02 2     Paul Levitz at Warner Bros. and our meeting in DC Comics,

06:02 3     one of the points that Paul made in connection with what

06:02 4     he described as the licensor share was that DC

06:02 5     contributes a lot in the management, in the exploitation

06:02 6     of the property, and that's a reason why any royalty to

06:02 7     the Siegels should be further reduced, because there

06:02 8     should be some of that pot attributable to DC Comics'

06:02 9     efforts.

06:02 10         I read this and viewed this as a double dip,

06:02 11    because that had already been accounted for in arriving

06:02 12    at the 6 percent, and I was very concerned that this

06:02 13    could be used to further reduce the ultimate royalty.

06:03 14    Q    Again, did you attribute that to an intentional

06:03 15    attempt to, as you have put it, double dip or just to,

06:03 16    with all due respect to the drafters of the agreement,

06:03 17    sloppy drafting?

06:03 18    A    Well, as I read this, this had the earmarks of

06:03 19    very studied, careful, intentional drafting.  I could not

06:03 20    go so far as to know with certainty what the intention of

06:03 21    any or -- of all or any of the people on the DC team was,

06:03 22    but when I told John there are trap doors in it, these

06:03 23    are the trap doors.  I mean, bear in mind this is an

06:03 24    agreement that took a long time to produce, and that also

06:04 25    led me to believe that it had been at least carefully

189

EXHIBIT 14
396

06:04 1    drafted, and at a minimum this raised concerns for me and

06:04 2    red flags for me.

06:04 3        Q    When you stated to Mr. Schulman that there were

06:04 4    trap doors in the agreement, did he ask you what you

06:04 5    meant, or did he ask you for an example?

06:04 6        A    I don't believe he did.

06:04 7        Q    Applying that term as you have, it's true, isn't

06:04 8    it, that those kind of problems or, as you put it, trap

06:04 9    doors can exist without intentional acts, just through

06:0410    the -- not being able to clearly think through a problem

06:0411    and properly document it?

06:0412            Hasn't that been your experience?

06:0513            MR. MARMARO:  Calls for speculation.

06:0514            MR. TOBEROFF:  I was going to make that

06:0515    objection.  It's also vague and ambiguous, leading.

06:0516            THE WITNESS:  It can be true that drafters make

06:0517    mistakes in drafting that are consequential, adversely

06:0518    consequential.

06:0519    BY MR. BERGMAN:

06:0520        Q    When you spoke with John Schulman, did you

06:0521    indicate to him that you felt that those trap doors were

06:0522    purposely created or that it was inadvertent, or did you

06:0523    say nothing in that regard?

06:0524        A    I don't recall that I said they were purposeful,

06:0525    and I don't recall that I said they were inadvertent.  I

                                                                    190

**U.S. LEGAL SUPPORT**

EXHIBIT 14
397

06:05 1    just recall saying that they were there.

06:05 2        Q    Okay.  As I read the notes of Mr. Schulman, the

06:06 3    next item says, "'could have been 20, not 60 pages.'"

06:06 4            Do you recall saying that in substance to

06:06 5    Mr. Schulman?

06:06 6        A    Yes.

06:06 7        Q    The next purported statement is, "contains stuff

06:06 8    not agreed to," and I don't know if the last item is a

06:06 9    continuation of that or not, but let me stop there.

06:0610            Did you tell Mr. Schulman that the draft

06:0611    contains stuff not agreed to?

06:0612            MR. MARMARO:  I don't have an objection to the

06:0613    question, but I have an observation which I think is

06:0614    important --

06:0615            MR. BERGMAN:  Please.

06:0616            MR. MARMARO:  -- to place the question in

06:0617    context.  The five statements that you just read all

06:0618    purport to have quote marks around them.  The statement

06:0619    you just read does not, and you did not indicate that in

06:0720    your question, but I think the record should indicate

06:0721    that.

06:0722            MR. BERGMAN:  Okay.

06:0723            MR. TOBEROFF:  And my objection is it misstates

06:0724    the evidence.

06:0725    BY MR. BERGMAN:

                                                               191

**U.S. LEGAL SUPPORT**

EXHIBIT 14
398

06:07 1        Q   As you'll observe, Mr. Marks, as your client --

06:07 2    as your attorney has pointed out, the phrase "contains

06:07 3    stuff not agreed to" is not incorporated within quotation

06:07 4    marks.

06:07 5            Do you recall saying that in substance to

06:07 6    Mr. Schulman?

06:07 7        A   I recall saying in substance yes, there were

06:07 8    many things not agreed to.

06:07 9        Q   The last sentence, which also lacks quotation

06:0710    marks, says, "not contrary to what agreed to."

06:0811            Do you recall saying that in substance to

06:0812    Mr. Schulman?

06:0813        A   I recall saying, as I said before, it contained

06:0814    many additional terms that were not agreed to, not even

06:0815    discussed, and John saying something like, "Anything

06:0816    contrary?" with a question mark at the end of the

06:0817    sentence, and I have a recollection or a sense of saying,

06:0818    "Not as to the money terms, the 1 million, the 2 million,

06:0819    the 500,000, that's right."

06:0820        Q   Okay.  When you redrafted the long form, was it

06:0821    more than 20 pages?

06:0822            MR. TOBEROFF:  Objection --

06:0823            MR. MARMARO:  Let me just hear Mr. Toberoff's

06:0924    objections.

06:0925            MR. TOBEROFF:  I don't want you talking about

                                                           192

**U.S. LEGAL SUPPORT**

EXHIBIT 14
399

06:09 1    the substance of that redraft, which was specifically not

06:09 2    given Warner Bros.

06:09 3         MR. MARMARO:  And that would include a reference

06:09 4    to the page numbers?

06:09 5         MR. TOBEROFF:  Yes.

06:09 6         MR. MARMARO:  So I'll object.  I assume -- I'll

06:09 7    object on the grounds of attorney-client and attorney

06:09 8    work product and instruct the witness not to answer based

06:09 9    on Mr. Toberoff's comment and objection.

06:09 10        (Instruction not to answer.)

06:10 11        MR. BERGMAN:  Would you mark as 25 a letter

06:10 12   dated May 9, 2002, which bears a Bates stamp indicating

06:11 13   it was produced by Warner Bros., of 676 through 678.

06:11 14        (Deposition Exhibit 25 marked.)

06:11 15   BY MR. BERGMAN:

06:11 16        Q   In your earlier testimony you made reference to

06:11 17   Mr. Schulman asking you if you received a particular

06:11 18   letter sent by Joanne Siegel.  Is Exhibit 25 a copy of

06:11 19   that letter?

06:11 20        A   Yes, it appears to be, although I note that this

06:11 21   is unsigned, and I don't know if -- I don't have a

06:12 22   recollection if the letter was signed.

06:12 23        Q   Well, it's signed by Joanne, isn't it?

06:12 24        A   Mine has no signature.

06:12 25        MR. TOBEROFF:  Mine doesn't have a signature

193

**U.S. LEGAL SUPPORT**

EXHIBIT 14
400

06:12 1    either.

06:12 2            MR. BERGMAN:  Okay, guys.  Let me then, in order

06:12 3    to partially clarify the record because the production

06:12 4    copy that I have of the letter, and I'm not sure whether

06:12 5    it's my error or at the time it was xeroxed, only

06:13 6    contains pages 1 and 3 of that letter, but page 3 does in

06:13 7    fact have a signature on it, so why don't we mark as 25A

06:13 8    a copy of a document bearing Bates stamp GTRB 0474

06:13 9    through 477.

06:13 10           (Deposition Exhibit 25A marked.)

06:13 11           MR. BERGMAN:  And I am going to ask you

06:13 12   gentlemen to circulate that because I don't have a copy.

06:13 13           MR. MARMARO:  I think it's adjoined because

06:13 14   there is a missing Bates stamp page.  Page 476 is

06:13 15   missing --

06:13 16           MR. BERGMAN:  Right.

06:13 17           MR. MARMARO:  -- which would be some

06:13 18   indication --

06:13 19           MR. BERGMAN:  It indicates there was a signature

06:13 20   to it.

06:13 21           MR. TOBEROFF:  Should we make copies of this

06:13 22   so --

06:13 23           MR. BERGMAN:  Of course.

06:13 24           MR. MARMARO:  In the interests of moving

06:13 25   along --

                                                              194

**U.S. LEGAL SUPPORT**

EXHIBIT 14
401

06:13 1          MR. BERGMAN:  Yeah, we will just move along.

06:14 2      Q    I take it from your prior testimony you had not

06:14 3  seen a copy of the Exhibit 25 prior to the time

06:14 4  Mr. Schulman sent it to you.

06:14 5          Correct?

06:14 6      A    Yes.

06:14 7      Q    Did you discuss with Mr. Schulman, when you and

06:14 8  he discussed this letter, the let's say strong language

06:14 9  utilized by Miss Siegel in connection with that letter?

06:1410          I think you made reference to the Gestapo, but

06:1411  as you'll see from the letter, she speaks of being

06:1412  stabbed in the back and the document containing

06:1413  outrageous demands, unethical things demanded, being

06:1514  stripped naked of legal rights, disgraceful contract,

06:1515  greedy corporation without morals, seeks to discredit

06:1516  Jerry Siegel.  Did you ever discuss those

06:1517  characterizations with Mr. Schulman?

06:1518          MR. MARMARO:  All of them, any of them

06:1519  specifically?

06:1520          MR. BERGMAN:  The nature, the tenor of the

06:1521  letter.

06:1522          THE WITNESS:  I don't recall discussing that

06:1523  with Mr. Schulman, although, as I said in the

06:1524  conversation where he brought it up, he referred to the

06:1525  reference of -- a reference to the Gestapo, and I'm

                                                              195

**U.S. LEGAL SUPPORT**

EXHIBIT 14
402

06:15 1    certain I expressed some surprise.

06:16 2    BY MR. BERGMAN:

06:16 3        Q    Okay.  In your practice, Mr. Marks, when you

06:16 4    reach some understanding -- I won't use the term

06:16 5    "agreement" -- with another party and it's embodied in a

06:16 6    letter or something like a short agreement, and then

06:16 7    you're submitted a long-form agreement which contains

06:16 8    terms that are not consistent, perhaps even trap doors,

06:16 9    it's your custom and practice to comment upon those and

06:1610    revise them or seek to eliminate them, isn't it?

06:1611        MR. MARMARO:  The question is compound, vague

06:1612    and ambiguous and -- well, I'll stick with those.

06:1713        MR. TOBEROFF:  And leading.

06:1714        MR. MARMARO:  And assumes facts not in evidence.

06:1715        Go ahead.

06:1716        THE WITNESS:  Yes, but I formed a view that I

06:1717    could not do that here.

06:1718    BY MR. BERGMAN:

06:1719        Q    When did you form that view?

06:1720        MR. TOBEROFF:  You can answer.

06:1721        THE WITNESS:  Not immediately.  I read the

06:1722    document several times with a view to going through the

06:1723    process that you described of marking it up, making

06:1724    comments, suggesting inserts, deleting various

06:1725    provisions, but I found the document highly problematic,

196

**U.S. LEGAL SUPPORT**

EXHIBIT 14
403

06:17 1   that among other things it introduced many new material

06:18 2   terms that were not reflected in the October 19th letter,

06:18 3   that had terms that were inconsistent with the October

06:18 4   19th letter in what I thought the agreement had been, and

06:18 5   beyond that, as I said, I had a problem with trap doors,

06:18 6   without regard to whether they were intentional or

06:18 7   inadvertent, and I also found it to be a very

06:18 8   difficult -- convoluted, difficult document to understand

06:18 9   and read, and I formed the view that no matter how hard I

06:1810   tried, this document was going to be a problem in respect

06:1811   of advancing this documentation phase of the deal, and so

06:1812   I formed a view that I should do something that I don't

06:1913   recall doing before, which is effectively dispense with

06:1914   the document and start over and draft the document from

06:1915   scratch myself.

06:1916   BY MR. BERGMAN:

06:1917       Q   Okay.  And am I correct that you did in fact

06:1918   redraft the agreement and send it to the Siegels on or

06:1919   about July 15, 2002?

06:1920           And before there is an objection, I think, as

06:1921   Mr. Toberoff noted earlier, there has been produced a

06:1922   letter dated September 21, 2002, whereby the services of

06:1923   Gang, Tyre were terminated, and in the letter the Siegels

06:2024   state that they similarly reject your redraft of the

06:2025   February 2002 document which you sent to us on July 15,

197

EXHIBIT 14
404

06:20 1    2002.  So to the extent the question might otherwise have

06:20 2    been privileged, it's --

06:20 3         MR. TOBEROFF:  I'll allow him to confirm that he

06:20 4    sent a redraft -- a brand-new draft to the client.

06:20 5         THE WITNESS:  Could I just have the question

06:20 6    part of that read again, please?

06:20 7         MR. BERGMAN:  Let me --

06:20 8         THE WITNESS:  I appreciate --

06:20 9         MR. MARMARO:  The speech part.

06:2010        THE WITNESS:  The contextual part.  I need the

06:2011    question part.

06:2012    BY MR. BERGMAN:

06:2013        Q    Okay.  Did you create and send to the Siegels on

06:2014    or about July 15, 2002, a redrafted long-form agreement

06:2015    embodying the October 19 letter terms?

06:2116        MR. TOBEROFF:  Objection as to the last part as

06:2117    to what it embodied.

06:2118        MR. MARMARO:  Objection and instruction?

06:2119        MR. TOBEROFF:  Yes, as to the last part.

06:2120        If you hadn't asked that -- if you hadn't put

06:2121    that tail on it, there would not have been an objection

06:2122    based on that letter.

06:2123        (Instruction not to answer.)

06:2124        MR. BERGMAN:  I'll never learn.

06:2125        Q    Let me reask the question of you.  Did you

                                                              198

**U.S. LEGAL SUPPORT**

EXHIBIT 14
405

06:21 1    prepare a new draft of the long-form agreement and send

06:21 2    it to the Siegels on or about July 15, 2002?

06:21 3        A    Yes.

06:21 4            MR. MARMARO:  Let's go off the record for a

06:21 5    moment.

06:21 6            (Discussion held off the record.)

06:22 7            (Recess.)

06:29 8    BY MR. BERGMAN:

06:29 9        Q    Do you recall speaking with Mr. Perkins in July,

06:29 10   approximately July 18, concerning certain discovery

06:29 11   issues which had arisen in the dissolution proceeding

06:29 12   between Laura and Dennis Larson?

06:29 13       A    I don't have a recollection of the date, but I

06:29 14   do have a recollection of one or more conversations with

06:30 15   Mr. Perkins on that subject.

06:30 16       Q    Do you recall during one of those conversations

06:30 17   Mr. Perkins asking you what the status of the agreement

06:30 18   was?

06:30 19       A    As I've thought about it, it seems like I had or

06:30 20   must have had a conversation with Mr. Perkins along those

06:30 21   lines, but I don't specifically recall.  I don't

06:30 22   specifically recall it.

06:30 23       Q    Do you recall telling him that your proposed

06:30 24   draft was with your client and that you now had to

06:30 25   negotiate with them?

199

**U.S. LEGAL SUPPORT**

EXHIBIT 14
406

```
06:30 1        A   What date is this?

06:30 2        Q   July 18, '02.

06:30 3        A   Well, it's true the draft was with the client at

06:30 4    that time.  I don't specifically recall any of the

06:31 5    conversation with Mr. Perkins on that point.

06:31 6        Q   We previously referred to this letter.  Let me

06:31 7    just make it part of our record.

06:31 8            Am I correct that on September 21 you received a

06:31 9    letter from Joanne and Laura stating that they were

06:32 10   terminating the law firm and instructing you not to take

06:32 11   any further action?

06:32 12       A   I don't recall what date the letter was

06:32 13   received, but it was received sometime after the letter

06:32 14   was dated.

06:32 15       Q   The letter begins, and you will forgive me, I

06:32 16   don't have --

06:32 17       A   A copy of it?

06:32 18       Q   -- a copy of it.  I can take two minutes and

06:32 19   make a copy of it, but --

06:32 20       A   Okay.

06:32 21       Q   Here, let me show it to you -- no, I can't.

06:32 22   Strike that.

06:32 23           When do you recall...

06:32 24           MR. MARMARO:  It doesn't appear to be a

06:32 25   controversial point in the case, and it's late.  Just
```

                                                        200

**U.S. LEGAL SUPPORT**

EXHIBIT 14
407

06:33 1     give the date of the letter.

06:33 2            MR. BERGMAN:  The date of the letter is

06:33 3     September 21.  It was produced as GTRB 0321.

06:33 4        Q    The letter begins, and I will quote it to you

06:33 5     accurately, "Dear Kevin and Bruce," quote, "As we

06:33 6     previously discussed with you and hereby affirm," close

06:33 7     quote, and they go on to terminate your services.

06:33 8            How long prior to the date of September 21, the

06:33 9     date that the letter bears, had they advised you of that

06:33 10    fact?

06:33 11           MR. MARMARO:  Let me stop and make sure there is

06:33 12    no objection from Mr. Toberoff to that question.  It just

06:34 13    seeks a time for a communication.

06:34 14           MR. TOBEROFF:  You can answer as to the time as

06:34 15    long as not the substance of the communication.

06:34 16           THE WITNESS:  This letter was the first time I

06:34 17    had heard our services had been terminated, and there was

06:34 18    no prior telephone conversation.

06:34 19    BY MR. BERGMAN:

06:34 20       Q    Okay.  Your call register at page 624 indicates

06:34 21    a phone call from Mr. Schulman on September 25, '02.

06:35 22           MR. TOBEROFF:  What Bates number?

06:35 23           MR. BERGMAN:  624.

06:35 24       Q    You see that?

06:35 25       A    Yes.

                                                              201

EXHIBIT 14
408

06:35 1      Q    And as you may or may not know, a copy of the

06:35 2  September 21 letter was sent to Paul Levitz and, in turn,

06:35 3  brought to Mr. Schulman's attention.

06:35 4           When he called you on the 25th, did the two of

06:35 5  you actually speak?

06:35 6      A    I again don't know the precise date, but I did

06:35 7  have a conversation with Mr. Schulman.

06:35 8      Q    Did he ask you in substance what happened?

06:35 9      A    No.

06:3510      Q    What do you recall him saying at that time?

06:3511      A    I recall calling John, and I believe he must

06:3612  have called me back, and saying, "You have likely seen it

06:3613  already because Paul Levitz was copied, but we've been

06:3614  terminated from representing the Siegel interests, and we

06:3615  won't be speaking anymore."

06:3616      Q    Okay.

06:3617      A    And he said he had not seen the letter or heard

06:3618  about it.

06:3619      Q    Did he say anything else?

06:3620      A    He did not ask why --

06:3621           MR. MARMARO:  The question was did he say

06:3622  anything else.

06:3623           THE WITNESS:  Oh, did he say anything else?

06:3624  Other than a cordial and professional thank you and

06:3625  goodbye, that was it.  It was a short conversation.

                                                              202

**U.S. LEGAL SUPPORT**

EXHIBIT 14
409

06:37 1        MR. BERGMAN:  Okay.  I have nothing further of

06:37 2   you, sir.  Thank you.

06:37 3        THE WITNESS:  Thank you.

06:37 4        MR. BERGMAN:  Mr. Toberoff, may we stipulate --

06:37 5        MR. TOBEROFF:  I just have one quick question.

06:37 6        MR. BERGMAN:  Oh.

06:37 7

06:37 8                    EXAMINATION

06:37 9   BY MR. TOBEROFF:

06:3710        Q   It's with reference to Exhibit 21, an October

06:3711   26, 2001 letter from John Schulman to Kevin Marks.

06:3712        My question is did you at any time furnish a

06:3713   copy of that letter to Laura Siegel and/or Joanne Siegel?

06:3714        A   No.

06:3715        MR. TOBEROFF:  I have no further questions.

06:3716        MR. BERGMAN:  Okay.  Shall we stipulate that the

06:3717   court reporter will be relieved of his statutory

06:3818   obligations and that the transcript of Mr. Marks'

06:3819   deposition will be delivered to his counsel and will be

06:3820   signed by Mr. Marks under penalty of perjury and that

06:3821   this will be accomplished within 30 days?

06:3822        MR. MARMARO:  30 days of receipt, yes.

06:3823        MR. TOBEROFF:  That's fine.  So stipulated.

06:3824        MR. BERGMAN:  Thank you.

06:3825        THE REPORTER:  Mr. Toberoff, do you want a copy

                                                              203

**U.S. LEGAL SUPPORT**

EXHIBIT 14
410

06:38 1    of the transcript?

06:38 2              MR. TOBEROFF:  Yes, I want a copy.   Thanks.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

204

**U.S. LEGAL SUPPORT**

EXHIBIT 14
411

1

2

3

4

5

6

7

8         I, KEVIN S. MARKS, do hereby declare under

9    penalty of perjury that I have read the foregoing

10   transcript; that I have made any corrections as appear

11   noted, in ink, initialed by me, or attached hereto; that

12   my testimony as contained herein, as corrected, is true

13   and correct.

14         EXECUTED this _____ day of _____,

15   20____, at _____, _____.
                            (City)              (State)

16

17

18

19         _____

20         KEVIN S. MARKS

21

22

23

24

25

                                                           205

**U.S. LEGAL SUPPORT**

EXHIBIT 14
412

```
1    STATE OF CALIFORNIA      )
                              ) ss
2    COUNTY OF LOS ANGELES    )

3

4            I, DAVID S. COLEMAN, a Certified Shorthand

5    Reporter, do hereby certify:

6            That prior to being examined, the witness in

7    the foregoing proceedings was by me duly sworn to

8    testify to the truth, the whole truth, and nothing

9    but the truth;

10           That said proceedings were taken before me at

11   the time and place therein set forth and were taken

12   down by me in shorthand and thereafter transcribed

13   into typewriting under my direction and supervision;

14           I further certify that I am neither counsel

15   for, nor related to, any party to said proceedings,

16   nor in anywise interested in the outcome thereof.

17           In witness whereof, I have hereunto subscribed

18   my name.

19

20   Dated:  OCT 1 7 2006

21

22

23   _____
     DAVID S. COLEMAN
24   CSR No. 4613

25
```

EXHIBIT 14
413