# EXHIBIT 17

ORIGINAL SHIPPED   DEC 0 1 2006

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CERTIFIED COPY**

JOANNE SIEGEL and LAURA )
SIEGEL LARSON, )
                    )
        Plaintiffs, )
                    )
    vs. )                No. 04-8400 (RSWL)(RZx)
                    )
WARNER BROS. ENTERTAINMENT )       -and-
INC., et al., )
                    )       No. 04-8776 (RSWL)(RZx)
        Defendants. )
_____)
AND RELATED COUNTERCLAIMS.

DEPOSITION OF MARC TOBEROFF

Beverly Hills, California

Friday, November 17, 2006

Reported by:

DAVID S. COLEMAN

CSR No. 4613

**U.S. LEGAL**
*Support*

*Certified Shorthand Reporters*

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA 91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

*Los Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento . . . and across the nation*

EXHIBIT 17
429

1          Deposition of MARC TOBEROFF, taken on

2       behalf of Defendants and Counterclaimants,

3       at 9665 Wilshire Boulevard, 9th Floor, Beverly

4       Hills, California, beginning at 1:46 PM on

5       Friday, November 17, 2006, before DAVID S.

6       COLEMAN, Certified Shorthand Reporter No. 4613.

7

8

9    APPEARANCES:

10

11   For Plaintiffs and the Witness:

12        LAW OFFICES OF MARC TOBEROFF
          BY:  MARC TOBEROFF
13             NICHOLAS C. WILLIAMSON
          Attorneys at Law
14        2049 Century Park East, Suite 2720
          Los Angeles, California 90067
15        310-246-3333

16

17   For Defendants and Counterclaimant:

18        WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
          BY:  MICHAEL BERGMAN
19             ADAM HAGEN
          Attorneys at Law
20        9665 Wilshire Boulevard, 9th Floor
          Beverly Hills, California 90212
21        310-858-7888
          mbergman@wwllp.com
22

23

24

25

                                                            2

**U.S. LEGAL SUPPORT**

EXHIBIT 17
430

```
1                          I N D E X

2

3

4    WITNESS                 EXAMINATION            PAGE

5    MARC TOBEROFF

6                            BY MR. BERGMAN         6

7

8                            EXHIBITS

9    DEPOSITION                                     PAGE

10   1    Subpoena to Marc Toberoff dated         7
          October 19, 2006, and attachments
11
     2    Marc Toberoff, Esq's Objections to      7
12        Defendants' Subpoena, dated November
          6, 2006
13
     3    Subpoena to Pacific Pictures Corpor-    10
14        ation dated October 19, 2006, and
          attachments
15
     4    Pacific Pictures Corporation's         10
16        Objections to Defendants' Subpoena,
          dated November 6, 2006
17
     5    Subpoena to IPW, LLC dated October     13
18        19, 2006, and attachments

19   6    IPW LLC's Objections to Defendants'    14
          Subpoena, dated November 6, 2006
20
     7    Subpoena to Marc Toberoff dated        14
21        August 10, 2006, and attachments

22   8    Internet printout on Marc Toberoff     16

23   9    Internet printout on Marc Toberoff     21

24   10   Printout from Intellectual Properties  26
          Worldwide, LLC
25
                                                       3
```

```
 1    INDEX (Continued:

 2              EXHIBITS (Continued)

 3    DEPOSITION                                    PAGE

 4    11    Internet printout on Intellectual      38
            Properties Worldwide
 5
      12    Printout from California Business       41
 6          Portal on IPW, LLC

 7    13    Joint Venture Agreement made as of      49
            November 23, 2001, by and between
 8          Pacific Pictures Corporation and
            Jean Peavy and Mark Peary
 9
      14    Letter from Marc Toberoff to Mark       68
10          Warren Peary dated October 27, 2003

11    15    Letter from Marc Toberoff to Mark       75
            Warren Peary dated September 10, 2004
12
      16    Fax from Marc Toberoff to Ariel         79
13          Emanuel dated 6-3-02

14    17    Letter from Marc Toberoff to Tom        85
            McGuire dated August 17, 2004, and
15          attachments

16    18    Letter from Marc Toberoff and Ariel     112
            Emanuel to Joanne Siegel and Laura
17          Siegel Larson dated October 3, 2002

18    19    Letter from Marc Toberoff to Joanne     121
            Siegel and Laura Siegel Larson dated
19          November 26, 2002, Bates No. 000001882

20    20    Letter from Marc Toberoff to Joanne     123
            Siegel, Laura Siegel Larson and Ariel
21          Emanuel dated December 16, 2002,
            Bates No. 000001883
22
      21    Letter from Marc Toberoff to Joanne     124
23          Siegel and Laura Siegel Larson dated
            January 21, 2002, Bates No. 000001888
24

01:16 25
```

**U.S. LEGAL SUPPORT**

EXHIBIT 17
432

INDEX (Continued):

INSTRUCTION NOT TO ANSWER/UNANSWERED QUESTIONS

| Page | Line |
|------|------|
| 53 | 4 |
| 59 | 19 |
| 61 | 14 |
| 72 | 16, 23 |
| 78 | 1 |
| 88 | 16 |
| 98 | 16 |
| 100 | 17 |
| 101 | 5 |
| 105 | 20 |
| 110 | 10, 18 |
| 111 | 7 |
| 118 | 21 |
| 128 | 2, 21 |
| 130 | 20 |
| 142 | 19 |
| 143 | 6 |
| 145 | 9 |

5

EXHIBIT 17
433

```
 1          Beverly Hills, California, Friday, November 17, 2006

 2                          1:46 PM

 3

 4                       MARC TOBEROFF,

 5          having been first administered an oath,

 6          was examined and testified as follows:

 7

 8                       EXAMINATION

 9     BY MR. BERGMAN:

01:46 10        Q    State your full name for the record, please.

01:46 11        A    Marc Toberoff.

01:46 12        Q    Have you had your deposition taken before,

01:46 13   Mr. Toberoff?

01:46 14        A    Once.

01:46 15        Q    And when was that?

01:47 16        A    I think about nine years ago.

01:47 17        Q    Here in California?

01:47 18        A    Yes.

01:47 19        Q    In what type of a case?

01:47 20        A    It was a commercial litigation.

01:47 21        MR. BERGMAN:  Mr. Williamson, is Mr. Toberoff

01:47 22   appearing for Pacific and IPW, LLC as well as his own

01:47 23   subpoena?

01:47 24        MR. WILLIAMSON:  Yes.

01:47 25        MR. BERGMAN:  Okay.
```

6

**U.S. LEGAL SUPPORT**

EXHIBIT 17
434

01:47 1           I am going to ask the court reporter to mark as

01:47 2     Exhibit 1 a subpoena dated October 19, 2006, to

01:47 3     Mr. Toberoff.

01:47 4           (Deposition Exhibit 1 marked.)

01:47 5     BY MR. BERGMAN:

01:47 6       Q   Do you recall receiving that subpoena,

01:47 7     Mr. Toberoff?

01:48 8       A   Yes.

01:48 9           MR. BERGMAN:  And would the reporter please mark

01:4810     as Exhibit 2 --

01:4811           THE WITNESS:  I have to say I haven't -- I've

01:4812     been handed a face page which is a subpoena.  It has

01:4813     numerous attachments.  I haven't verified whether these

01:4814     in fact attachments are the -- I would have to take the

01:4815     actual subpoena that I received and compare it to this

01:4816     subpoena to see if it's the exact same thing, but I

01:4817     presume that you're giving me the same one that I

01:4818     received.

01:4819           MR. BERGMAN:  Yes, I have.

01:4820           Would the reporter now mark as Exhibit 2 a

01:4821     document entitled "Marc Toberoff, Esq.'s Objections to

01:4822     Defendants' Subpoena" which was served on November 6,

01:4823     2006.

01:4824           (Deposition Exhibit 2 marked.)

01:4825     BY MR. BERGMAN:

                                                              7

01:49 1      Q    And would you look Exhibit 2 over, Mr. Toberoff,

01:49 2  and tell me if you recall making those objections to the

01:49 3  subpoena.

01:49 4      A    Yes.

01:49 5      Q    Now, am I correct that you have not produced any

01:49 6  documents pursuant to that subpoena?

01:49 7      A    I have not produced documents pursuant to the

01:49 8  subpoena because of the improper nature of the subpoena.

01:49 9      Q    And what do you mean by that?

01:49 10     A    It's all set forth in our objections.

01:49 11     Q    And you haven't produced a privilege log either

01:49 12 in connection with that subpoena, have you?

01:49 13     A    No, because the subpoena would essentially call

01:49 14 for the production of every single document in this case,

01:49 15 essentially producing back to you, first of all,

01:49 16 something like 70,000 documents that you produced to us

01:50 17 in this case, and doing a privilege log as to all

01:50 18 communications with my clients throughout the case, which

01:50 19 is wholly improper and burdensome, is a very high hurdle

01:50 20 for serving opposing counsel in the case with a subpoena.

01:50 21 You haven't met that hurdle.

01:50 22     Q    As you'll see during this deposition,

01:50 23 Mr. Toberoff, I am not taking the deposition of an

01:50 24 opposing counsel.  I am taking the deposition of you as

01:50 25 an intellectual property entrepreneur, as you're billed

8

01:50 1    on your website.

01:50 2        A    Not according to this particular subpoena.    The

01:50 3    subpoena of IPW is different.    This is "Marc Toberoff,

01:50 4    Law Offices of Marc Toberoff, PLC," so you're serving me

01:50 5    as an attorney in this case.

01:50 6        Q    Are you aware that rule 45(d)(2) requires a

01:51 7    person who has been subpoenaed and who is not producing

01:51 8    documents pursuant to privilege to file a privilege log?

01:51 9        A    I filed my objections.    I'll stand by the

01:5110    objections.    I am not going here to argue what would be

01:5111    argued on a motion to compel.

01:5112        Q    Are you aware of the provisions of rule

01:5113    45(d)(2)?

01:5114        A    I'm aware of the federal rules.    I don't have

01:5115    them memorized.

01:5116        Q    And despite that awareness, you've chosen not to

01:5117    file a privilege log?

01:5118        A    What I've chosen to do is set forth in the

01:5119    objections, and I've answered your question.

01:5120        Q    Your objections state with respect to numerous

01:5121    categories that you will produce all non-privileged

01:5122    documents which have not been previously produced to

01:5123    defendants in this action, if any.

01:5124        Is it your testimony that all of the non-

01:5125    privileged documents that you have in your possession

9

01:52 1    have been previously produced to defendants?

01:52 2        A    I believe so, yes.

01:52 3        Q    What did you do to verify that fact?

01:52 4        A    We looked through our files.  My attorney's

01:52 5    files consists of the same files that one would go

01:52 6    through in response to a production request to the

01:52 7    Siegels for documents relative -- relevant to this case.

01:52 8            MR. BERGMAN:  Would the reporter mark as Exhibit

01:52 9    3 a subpoena issued to Pacific Pictures Corporation dated

01:52 10   October 19, 2006.

01:52 11           (Deposition Exhibit 3 marked.)

01:53 12   BY MR. BERGMAN:

01:53 13       Q    Do you recall, Mr. Toberoff, being served with

01:53 14   that subpoena?

01:53 15       A    It would be the same answer as my previous

01:53 16   answer.  I recall Pacific Pictures being served with a

01:53 17   subpoena, but I would have to compare page by page --

01:53 18   page for page the subpoena that's at my office with this

01:53 19   subpoena to verify that this is the same subpoena.

01:53 20           MR. BERGMAN:  Would the court reporter mark as

01:53 21   Exhibit 4 the objections of Pacific Pictures Corporation

01:53 22   to that subpoena.

01:53 23           (Deposition Exhibit 4 marked.)

01:53 24   BY MR. BERGMAN:

01:53 25       Q    Do you recall serving that -- those objections,

                                                                    10

U.S. LEGAL SUPPORT

EXHIBIT 17
438

01:54 1    Mr. Toberoff, to the Pacific Pictures subpoena?

01:54 2         A   I recall serving objections to the subpoena.

01:54 3    I -- unless I had our objections next to me, I don't know

01:54 4    if these are the actual objections.  I recall serving a

01:54 5    set of objections.

01:54 6         Q   Would you turn, please, to page 27 and tell me

01:54 7    if that's your signature?

01:54 8         A   Yes, that is my signature.

01:54 9         Q   Okay.  Am I correct that the only documents that

01:5410   you have produced or Pacific Pictures has produced

01:5411   pursuant to this objection -- pursuant to the subpoena,

01:5412   rather, were nine pages of documents which were served

01:5513   yesterday?

01:5514        A   I didn't -- I don't recall the number of pages.

01:5515            MR. WILLIAMSON:  Yeah.  Objection.  Assumes

01:5516   facts not in evidence.

01:5517   BY MR. BERGMAN:

01:5518        Q   Am I correct that Pacific Pictures has not

01:5519   served a privilege log in response to that subpoena?

01:5520        A   I believe that's correct.

01:5521        Q   If you'll look through the privilege log, you'll

01:5522   see that there have been numerous objections based on the

01:5523   attorney-client and work product privilege.

01:5524        A   Did you mean privilege log?

01:5625        Q   Yes.

                                                              11

**U.S. LEGAL SUPPORT**

EXHIBIT 17
439

01:56 1          A    You just said if you looked through the

01:56 2    privilege log.

01:56 3               MR. WILLIAMSON:  There is not a privilege log.

01:56 4               MR. BERGMAN:  I'm sorry.

01:56 5               Would you correct that?  Strike that question.

01:56 6          Q    If you look through the Pacific Pictures

01:56 7    Corporation's objections to the defendants' subpoena, you

01:56 8    will see that there are numerous objections based on the

01:56 9    attorney-client and work product privileges.  Just as

01:5610    examples, 13, 14, 15, 16 and so on.

01:5611              Have you served a privilege log to support those

01:5612    objections?

01:5613          A    No.  I believe these objections are that the

01:5614    question as framed could entail privileged documents.

01:5715    When I went to the files, I did not find any privileged

01:5716    documents to list on a privilege log.  Otherwise, we

01:5717    would have provided you with a privilege log in the case

01:5718    of Pacific Pictures.

01:5719          Q    So therefore are the various objections based on

01:5720    the attorney-client and work product privileges

01:5721    unfounded?

01:5722              MR. WILLIAMSON:  Objection --

01:5723              THE WITNESS:  No.  No.  And I'm not going to

01:5724    comment on the legal reasons for why objections were made

01:5725    in this document.  The document speaks for itself.

                                                                    12

**U.S. LEGAL SUPPORT**

EXHIBIT 17
440

01:57 1                MR. BERGMAN:  Would you mark as the next exhibit

01:57 2     in order, please, a subpoena addressed to IPW, LLC dated

01:57 3     October 19, 2006.

01:57 4                (Deposition Exhibit 5 marked.)

01:58 5     BY MR. BERGMAN:

01:58 6         Q    Do you recall receiving that subpoena to IPW,

01:58 7     LLC?

01:58 8         A    It would be the same answer.  I recall receiving

01:58 9     a subpoena addressed to IPW, LLC.  I don't know if the

01:5810     subpoena that's in my office is this subpoena.  I would

01:5811     have to compare each page to see if it's the same

01:5812     document.

01:5813         Q    Am I correct that you have -- that IPW, LLC has

01:5814     produced only 16 pages of responsive documents, and that

01:5815     was served two days ago?

01:5816                MR. WILLIAMSON:  Objection.  Assumes facts not

01:5817     in evidence.

01:5818                THE WITNESS:  I don't know the number of pages.

01:5819     I don't remember the number of pages.

01:5820     BY MR. BERGMAN:

01:5821         Q    Who conducted the search of IPW, LLC's files in

01:5922     order to respond to the subpoena?

01:5923         A    I did.

01:5924                MR. BERGMAN:  Off the record.

01:5925                (Discussion held off the record.)

13

EXHIBIT 17
441

| | |
|---|---|
| 01:59 1 | MR. BERGMAN:  Back on the record. |
| 01:59 2 | Would you mark as the next exhibit in order IPW, |
| 01:59 3 | LLC's objections to the defendants' subpoena. |
| 01:59 4 | (Deposition Exhibit 6 marked.) |
| 01:59 5 | BY MR. BERGMAN: |
| 01:59 6 | Q   Do you recall filing those objections to the |
| 01:59 7 | IPW, LLC's subpoena, Mr. Toberoff? |
| 01:59 8 | A   I recall not filing, I recall serving defendants |
| 02:00 9 | with objections, yes. |
| 02:00 10 | Q   Am I correct that you did not provide any |
| 02:00 11 | privilege log in connection with this subpoena? |
| 02:00 12 | A   That's correct.  So far, at least. |
| 02:00 13 | MR. BERGMAN:  Would the reporter please mark as |
| 02:00 14 | the next in order a subpoena addressed to Mr. Toberoff |
| 02:00 15 | and dated August 10, 2006. |
| 02:00 16 | (Deposition Exhibit 7 marked.) |
| 02:01 17 | BY MR. BERGMAN: |
| 02:01 18 | Q   Do you recall receiving that subpoena, |
| 02:01 19 | Mr. Toberoff? |
| 02:01 20 | A   No, I actually do not. |
| 02:01 21 | Q   Would you take a look at the attachment and see |
| 02:01 22 | the documents which were requested? |
| 02:01 23 | A   Let me see the difference between that subpoena |
| 02:01 24 | and the other subpoena. |
| 02:02 25 | Q   Is it correct that -- |

14

**U.S. LEGAL SUPPORT**

EXHIBIT 17
442

02:02 1          A    Was --

02:02 2          Q    Go ahead.

02:02 3              MR. WILLIAMSON:  Is there a question pending?

02:02 4              MR. BERGMAN:  Yes.

02:02 5              THE WITNESS:  What is the question pending?

02:02 6     BY MR. BERGMAN:

02:02 7          Q    Is it correct that you have not produced any

02:02 8     documents pursuant to that subpoena?

02:02 9          A    I don't recall this specific subpoena, but I do

02:02 10    see that it calls for the production of documents stolen

02:02 11    from my office and received by the defendants under very

02:03 12    dubious circumstances, and no, I did not produce those

02:03 13    stolen documents to defendants.

02:03 14         Q    And am I correct that you have not produced a

02:03 15    privilege log relating to any objections you may have to

02:03 16    that subpoena?

02:03 17         A    No.  This is the subject of a pending motion to

02:03 18    compel, which we intend to oppose.

02:03 19             I am informed that even though I don't have a

02:03 20    specific recollection of this subpoena, that we did serve

02:03 21    you with -- my office did serve you with objections to

02:03 22    this subpoena.

02:03 23         Q    That's correct.

02:03 24         A    Okay.  And by "this," I mean Exhibit 7.

02:04 25             MR. BERGMAN:  Would the reporter mark as the

                                                                          15

EXHIBIT 17
443

02:04 1   next exhibit in order --

02:04 2             THE WITNESS:  8.

02:04 3             MR. BERGMAN:  -- a document downloaded from the

02:04 4   IMDb website relating to Mr. Toberoff.

02:04 5             (Deposition Exhibit 8 marked.)

02:04 6             MR. WILLIAMSON:  Can I get a copy of that,

02:04 7   please?

02:04 8             MR. BERGMAN:  Oh, I'm sorry.

02:05 9             THE WITNESS:  Excuse me.  Are you providing us

02:05 10  with extra copies of these exhibits?

02:05 11            MR. BERGMAN:  No, I didn't make extra copies of

02:05 12  the subpoenas.  I provided your counsel with copies of

02:05 13  the objections.

02:05 14            THE WITNESS:  Okay.  But you do have copies of

02:05 15  each exhibit?  I'd like Nicholas to be able to review it

02:05 16  while -- all I see in front of me is one set, which we

02:05 17  are going to leave with the reporter, so we would like an

02:05 18  extra copy for Nicholas since he's representing me in the

02:05 19  deposition.

02:05 20            MR. BERGMAN:  Of course.

02:05 21       Q   Turning now to Exhibit 8, which purports to

02:05 22  describe certain production credits that you have had on

02:05 23  motion pictures, would you look at this document and tell

02:05 24  me if the information shown on the first page is correct?

02:05 25            MR. WILLIAMSON:  Objection.  Vague and

16

02:06 1    ambiguous.

02:06 2            THE WITNESS:  When you say "correct," there's

02:06 3    all sorts of different information.  There's the title of

02:06 4    a movie.

02:06 5    BY MR. BERGMAN:

02:06 6        Q    Okay.

02:06 7        A    There is a date of the movie.

02:06 8        Q    Okay.  I'll be more specific then.

02:06 9            Did you produce a motion picture called ZOMBIE

02:0610    HIGH in or about 1987?

02:0611        A    I received producer credit on the picture.

02:0612        Q    Did you render any services in connection with

02:0613    that film?

02:0614            MR. WILLIAMSON:  Objection.  Vague and

02:0615    ambiguous.

02:0616            THE WITNESS:  That was a film -- I didn't --

02:0617    wasn't involved in the, you know, active physical

02:0618    production of the film, and I believe I helped with some

02:0719    of the setting up of the film.

02:0720    BY MR. BERGMAN:

02:0721        Q    Did you own the underlying rights to that film?

02:0722        A    No.

02:0723        Q    Pardon me?

02:0724        A    No.

02:0725        Q    Did you in fact receive producer credit on a

                                                                  17

02:07 1    film called SONS in 1989?

02:07 2        A    Yes.

02:07 3        Q    And did you render any personal services in

02:07 4    connection with that film?

02:07 5        A    Yes.

02:07 6        Q    And what did you do?

02:07 7        A    I helped with the financing of the film.

02:07 8        Q    Did you receive producer credit for the motion

02:07 9    picture MY FAVORITE MARTIAN in or about 1989?

02:07 10       A    Yes.

02:07 11       Q    And --

02:07 12       A    I'm not sure on these dates.  I can't tell you

02:07 13   that they're the correct dates or not.  I don't

02:08 14   correct -- I don't remember the date that MY FAVORITE

02:08 15   MARTIAN was released, SONS or ZOMBIE HIGH were released.

02:08 16       Q    Okay.  And what personal services, if any, did

02:08 17   you render in connection with MY FAVORITE MARTIAN?

02:08 18       A    It was a rights-driven transaction in that I

02:08 19   negotiated -- I...  I can't recall whether I represented

02:09 20   the rights or had an interest in the rights, but my

02:09 21   interest came from the underlying rights, and based upon

02:09 22   that, as part of the rights transaction, I was afforded a

02:09 23   producer credit.

02:09 24       Q    Did you receive an executive producer credit on

02:09 25   the film I SPY?

18

02:09 1        A    Yes.

02:09 2        Q    And was that also based on your ownership of the

02:09 3    underlying rights?

02:09 4        A    No, it was not ownership.  That I would describe

02:09 5    as more of a -- sort of a traditional producing function

02:09 6    in that -- not that the others weren't traditional -- I

02:10 7    actually had the idea.  I noticed they were making movies

02:10 8    based on old television series, and I had the idea that I

02:10 9    SPY would be a good underlying source material for a

02:1010    feature film.  And so I started with the idea, and then I

02:1011    contacted who I believed had the rights, and he permitted

02:1012    me to take that into the marketplace to set up a motion

02:1013    picture.

02:1014        Q    Did you receive executive producer credit on the

02:1015    film the LEGEND OF LUCY KEYES, K E Y E S?

02:1016        A    I believe so.

02:1017        Q    Okay.  And what personal services, if any, did

02:1018    you render in connection with that film?

02:1119        A    None.

02:1120        Q    And was that -- did you receive this credit

02:1121    because you controlled the underlying literary rights?

02:1122        A    No.

02:1123        Q    What was the basis of your receiving executive

02:1124    producer credit on that film?

02:1125        A    I have an arrangement with one of the producers

                                                                    19

U.S. LEGAL SUPPORT

EXHIBIT 17
447

02:11 1    on the film, J. Todd Harris, where I provide him with

02:11 2    overhead, and in exchange I receive a credit, executive

02:11 3    producer credit, on anything he does during the time I'm

02:11 4    providing him with overhead.

02:11 5        Q    And when you say you're providing Mr. Harris

02:11 6    with overhead, what does that consist of?

02:11 7        A    An office and overhead in connection with

02:12 8    provision of that office space.

02:12 9        Q    Did you receive credit as the executive producer

02:12 10   of a film entitled BLACK IRISH?

02:12 11       A    Yes.

02:12 12       Q    And what personal services, if any, did you

02:12 13   render in connection with that film?

02:12 14       A    None.

02:12 15       Q    Was that based on your control of the underlying

02:12 16   literary rights?

02:12 17       A    No.

02:12 18       Q    What was the basis of your receiving that

02:12 19   credit?

02:12 20       A    It's the same answer as for the LEGEND OF LUCY

02:12 21   KEYES.

02:12 22       Q    I see.

02:12 23            Are you currently serving as the producer of a

02:12 24   film entitled PIRANHA?

02:12 25       A    No.  This is incorrect.  It says "filming."

                                                                    20

EXHIBIT 17
448

```
02:12  1    PIRANHA is not filming.

02:12  2         Q    Is it scheduled to commence filming shortly?

02:12  3         A    It's not scheduled.

02:13  4         Q    What services, if any, are you rendering as

02:13  5    executive producer of DEVIL TO PAY?

02:13  6         A    None.

02:13  7         Q    Are you going to receive executive producer

02:13  8    credit on that film?

02:13  9         A    I don't know.

02:13 10         Q    Okay.

02:13 11         A    If I did, that would be the same as I have

02:13 12    previously described for LEGEND OF LUCY KEYES and BLACK

02:13 13    IRISH.

02:13 14         Q    And with respect to the last film shown here,

02:13 15    BLUE MOVIE, are you rendering any services as producer of

02:13 16    that film at the present time?

02:13 17         A    No.

02:13 18         Q    What is the basis of your receiving producer

02:14 19    credit on that film?

02:14 20         A    I optioned the book called BLUE MOVIE on which

02:14 21    this film would be based.

02:14 22              MR. BERGMAN:  Would the reporter mark as Exhibit

02:14 23    9 another website sheet referring to Mr. Toberoff from a

02:14 24    site called Hollywood.com.

02:14 25              (Deposition Exhibit 9 marked.)
```

                                                                    21

02:14 1    BY MR. BERGMAN:

02:14 2        Q    This document refers to a film, the fourth one

02:14 3    from the bottom of the first page, called SUPERCROSS:

02:15 4    THE MOVIE.  Did you in fact receive executive producer

02:15 5    credit on that film?

02:15 6        A    I believe so, but I haven't -- I haven't

02:15 7    asked -- I haven't verified that by looking at it.

02:15 8        Q    And what personal services, if any, did you

02:15 9    render in connection with that film?

02:1510        A    That film was similar to the others I've

02:1511    mentioned:  LEGEND OF LUCY KEYES, BLACK IRISH.

02:1512        Q    That is, the payment of Mr. Harris' overhead?

02:1513        A    Yes.

02:1514        Q    Is Mr. Harris actually employed by any entity of

02:1515    which you have partial or complete ownership?

02:1516        A    No.

02:1517            MR. WILLIAMSON:  Objection.  Vague and

02:1518    ambiguous.

02:1519    BY MR. BERGMAN:

02:1520        Q    Are you presently rendering any services as

02:1521    co-producer of a film called THE TINY PROBLEMS OF WHITE

02:1522    PEOPLE?

02:1523        A    No.

02:1624        Q    Is that a --

02:1625        A    But I like the title.

                                                              22

02:16 1      Q    I see.

02:16 2           Is that presently in development?

02:16 3      A    I don't believe so.

02:16 4           MR. WILLIAMSON:  Objection.  Calls for

02:16 5   speculation.

02:16 6           THE WITNESS:  Not to my knowledge.

02:16 7   BY MR. BERGMAN:

02:16 8      Q    Are you familiar with the film entitled THE

02:16 9   BRAVE ONE?

02:1610      A    There was an old film entitled THE BRAVE ONE.

02:1611      Q    To your knowledge is there presently in

02:1612   development at Buena Vista International the film THE

02:1613   BRAVE ONE of which you will get producer credit?

02:1614      A    No, there is not.

02:1615      Q    Will you be receiving producer credit if the

02:1616   film MY BODYGUARD is made?

02:1717      A    Yes, I believe so.

02:1718      Q    And what personal services will you be rendering

02:1719   on that film?

02:1720      A    Limited to none.

02:1721      Q    Do you control the literary rights that underlie

02:1722   that film?

02:1723      A    No.

02:1724      Q    What is the basis, if there is any, for your

02:1725   receiving producer credit on MY BODYGUARD?

                                                              23

**U.S. LEGAL SUPPORT**

EXHIBIT 17
451

02:17 1        A    I originally represented the rights in trying

02:18 2    to -- with respect to trying to market the rights as the

02:18 3    basis for a remake motion picture.

02:18 4        Q    Are you familiar with a motion picture presently

02:18 5    in development called GROO, G R O O, THE WANDERER?

02:18 6        A    Yes.

02:18 7        Q    And will you be receiving producer credit if

02:18 8    that film is made?

02:18 9        A    I believe so, yes.

02:1810        Q    And is that based on your control of the

02:1811    underlying literary property?

02:1812        A    I know the rights to GROO were optioned.  I

02:1913    don't know whether I control them or not.

02:1914        Q    Okay.  Does one of the entities in which you

02:1915    have partial or complete ownership control those literary

02:1916    rights?

02:1917            MR. WILLIAMSON:  Objection.  Vague and

02:1918    ambiguous.

02:1919            THE WITNESS:  I don't know whether -- IPW may

02:1920    have some interest or some protection, but I don't know

02:1921    if IPW controls the rights.

02:1922    BY MR. BERGMAN:

02:1923        Q    And are you presently rendering any services in

02:1924    connection with a film in development entitled FANTASY

02:1925    ISLAND?

                                                              24

EXHIBIT 17
452

02:19 1          MR. WILLIAMSON:  Objection.  Assumes facts not

02:19 2   in evidence.

02:19 3          THE WITNESS:  No.

02:19 4   BY MR. BERGMAN:

02:19 5       Q   Is that film to your knowledge presently in

02:19 6   development?

02:19 7       A   It's not active.

02:20 8       Q   Do you control the underlying literary rights to

02:20 9   that potential film?

02:2010       A   I do not.

02:2011       Q   Have you ever?

02:2012          MR. WILLIAMSON:  Objection.  One second.

02:2013          Objection.  Indefinite as to time and place, and

02:2014   it's vague and ambiguous.

02:2015          THE WITNESS:  I believe with FANTASY ISLAND, it

02:2016   was similar to my answer with regard to MY BODYGUARD

02:2017   where I'm representing the rights for purposes of setting

02:2018   up a -- monetizing the rights by setting up a project at

02:2019   a motion picture studio.

02:2020   BY MR. BERGMAN:

02:2021       Q   And which of the entities with which you're

02:2022   associated, if any, control those literary rights?

02:2123          MR. WILLIAMSON:  Objection.  Vague and

02:2124   ambiguous.

02:2125          THE WITNESS:  We didn't -- I said we didn't

                                                              25

**U.S. LEGAL SUPPORT**

EXHIBIT 17
453

02:21 1    control them.  I believe it was -- I was representing the

02:21 2    rights.

02:21 3              MR. BERGMAN:  Would you mark, please, as Exhibit

02:21 4    10 a document that relates to Intellectual Properties

02:22 5    Worldwide, LLC, another document that has been downloaded

02:22 6    from the Internet.

02:22 7              (Deposition Exhibit 10 marked.)

02:22 8    BY MR. BERGMAN:

02:22 9        Q    Am I correct, Mr. Toberoff, that Exhibit 10 is a

02:22 10   printout of the ipwla website?

02:22 11       A    That's what it appears to be, but I'm not -- I

02:22 12   have to say I'm not very familiar with this website.  At

02:22 13   one point one of my employees, who is kind of very into

02:23 14   computers and computer savvy and Internet savvy and up on

02:23 15   that, said, you know, "You should have a website," and he

02:23 16   did this, and I was not involved in overseeing it.  And I

02:23 17   see right here, for example, where it says "Intellectual

02:23 18   Properties Worldwide, LLC," that there is no such

02:23 19   company.

02:23 20       Q    What is the proper name of that company?

02:23 21       A    I would have to read this to know whether it's

02:23 22   referring to IP Worldwide, LLC or IPW, LLC.

02:23 23       Q    Okay.  Would you do so, please?

02:24 24       A    Well, I actually think the person who did this

02:24 25   kind of blended the two, because you will see it says

26

02:24 1   here, "Intellectual Property Worldwide, LLC," again the

02:24 2   wrong name, "was formed in mid-2002," and I -- so IPW,

02:24 3   LLC was not formed in 2002.  That's closer to IP

02:24 4   Worldwide, LLC.

02:24 5        So it starts off describing what would be IP

02:24 6   Worldwide, LLC but then mentions -- and you see in the

02:24 7   second paragraph J. Todd Harris, head of production.

02:24 8   J. Todd Harris didn't begin an association until the

02:25 9   company was IPW, LLC.  J. Todd Harris didn't have any

02:25 10  association, I don't believe, with IP Worldwide, LLC.  So

02:25 11  whoever did this, the distinction -- he just blended the

02:25 12  two.

02:25 13       Q   Is it your testimony, Mr. Toberoff, that you

02:25 14  have not seen this website before?

02:25 15       A   I may -- no, that's not my testimony.  I may

02:25 16  have seen it.  I don't have a specific recollection of

02:25 17  seeing it, but I would not -- in other words, I would not

02:25 18  have -- I would have corrected this, so I don't believe

02:25 19  that I viewed this or edited it or was involved in the

02:25 20  information being put on this website.

02:26 21       Q   How many companies or limited entities have you

02:26 22  had which utilize the phrase Intellectual Properties

02:26 23  Worldwide?

02:26 24       A   I don't -- when you -- I would object that

02:26 25  that's vague and ambiguous as to what you're referring

27

02:26 1    to, but I'll try and answer as best I can.

02:26 2              I don't use -- if somebody -- let me put it this

02:26 3    way:  Normally somebody would have a company, and they

02:26 4    would call it Intellectual Properties Worldwide, and then

02:26 5    the three letter symbol would be IPW, but here the

02:26 6    company -- the new company is called IPW, LLC, and if

02:27 7    somebody said, "Well, what does that stand for," I would

02:27 8    say, "Intellectual Properties Worldwide," but there is no

02:27 9    company called Intellectual Properties Worldwide.

02:2710        Q   Has there ever been a company called

02:2711    Intellectual Properties Worldwide?

02:2712        A   Never.

02:2713        Q   Aside from IPW, LLC, have you had any company

02:2714    that used the initials "IPW" or the phrase "IP

02:2715    Worldwide"?

02:2716            MR. WILLIAMSON:  Objection.  Compound.

02:2717            THE WITNESS:  Yes.

02:2718            MR. WILLIAMSON:  It's vague and ambiguous, too.

02:2719            THE WITNESS:  Yes, a company called IP

02:2720    Worldwide, LLC.

02:2721    BY MR. BERGMAN:

02:2722        Q   Now, is it your testimony --

02:2723        A   Just for clarity, those are the only two.

02:2724        Q   Okay.  Is it your testimony then that this

02:2725    website does not relate solely to IP Worldwide, LLC, but

                                                                   28

02:28 1    is somehow a combination of the two companies IPW, LLC

02:28 2    and IP Worldwide, LLC?

02:28 3              MR. WILLIAMSON:  Objection.  Misstates prior

02:28 4    testimony.

02:28 5              THE WITNESS:  My testimony is that I didn't do

02:28 6    this, I didn't edit it, and I didn't oversee it, and I

02:28 7    can see whoever did do it, that it -- that he's kind of

02:28 8    over -- it's inaccurate because it -- so I don't know if

02:28 9    it accurately reflects both companies -- it's hard to say

02:28 10   something accurately reflects both companies if it's

02:28 11   something somebody is just sort of mishmoshing

02:28 12   information together.

02:28 13   BY MR. BERGMAN:

02:28 14        Q   Which of the two entities that you have

02:28 15   identified, if either, was formed in mid 2002?

02:28 16        A   As I testified previously, IP Worldwide, LLC I

02:28 17   believe was formed a little earlier than mid -- if mid is

02:29 18   June, I think it was earlier than that, maybe March 2002

02:29 19   or May.

02:29 20        Q   As you will see, the last paragraph on the first

02:29 21   page of Exhibit 10 begins, quote, "In just two years, IPW

02:29 22   has amassed rights to over 250 popular literary titles,"

02:29 23   close quote.

02:29 24              Which of the two companies that you've referred

02:29 25   to has acquired over 250 popular literary titles?

29

02:29 1          A    Well, that misstates.  Just reading, it says

02:29 2     "has amassed rights."  It doesn't say "acquired."  It's

02:29 3     an open-ended description.  I don't -- so if we use the

02:30 4     word as interests in, you know, amassed, I don't believe

02:30 5     IP Worldwide has interests in 250 properties.

02:30 6          IPW was involved in a transaction with an old

02:30 7     library which is potentially over -- it was an old

02:30 8     library of old stories published in a magazine in the

02:30 9     '30s and '40s, many of which written by famous writers

02:3010     who would do short stories for this magazine, and IP

02:3111     Worldwide was asked to represent -- excuse me -- IPW, LLC

02:3112     was asked to represent that library for purposes of

02:3113     setting up motion pictures or television series based on

02:3114     that library, and that library was probably over -- you

02:3115     know, at least according to the owners of the library, it

02:3116     was over 250 titles, so I think that's how the number --

02:3117     why that big number is there.

02:3118          Q    And in your opinion, is it accurate to refer to

02:3119     that library as containing "popular literary titles"?

02:3120          MR. WILLIAMSON:  Objection.  Vague and

02:3121     ambiguous.

02:3122          THE WITNESS:  I think that's in the eye of the

02:3123     beholder.

02:3124     BY MR. BERGMAN:

02:3125          Q    How about your eye?

                                                            30

U.S. LEGAL SUPPORT

EXHIBIT 17
458

02:31 1        A   Yes, some of the stories were by some of the

02:31 2   greatest figures in American literature.

02:32 3        Q   Okay.  Would you turn to the next page of

02:32 4   Exhibit 10, please.  Under "Company Overview" the second

02:32 5   statement, second sentence states, quote, "...IPW has

02:32 6   strategic partnership with top talent agencies and

02:32 7   production companies that allows it to quickly package

02:32 8   these classic properties for production either as

02:32 9   theatrical motion pictures or other entertainment media,"

02:32 10  close quote.

02:32 11       A   I'm not -- what page?  I might be on the wrong

02:32 12  page.

02:32 13       Q   It's the second page of Exhibit 10.

02:32 14       A   Okay.

02:32 15       Q   You see the heading "Company Overview"?

02:32 16       A   Yes.

02:32 17       Q   Okay.  My quote was from the first sentence

02:32 18  under that heading.

02:33 19       A   It says, "IP [sic] manages an impressive

02:33 20  library" -- "IPW manages an impressive library"?

02:33 21       Q   Correct.

02:33 22       A   Okay.  The second sentence from the first

02:33 23  paragraph?

02:33 24       Q   Right.

02:33 25       A   Okay, I see it.

31

02:33 1          Q    What are the top talent agencies that are

02:33 2     referred to in that sentence?

02:33 3          A    I don't know.  I didn't write this.

02:33 4          Q    Does IP Worldwide have any strategic

02:33 5     partnerships with top talent agencies?

02:33 6          A    IP Worldwide, LLC, yes.

02:33 7          Q    Okay.  And what agencies are those?

02:33 8          A    IP Worldwide, LLC is no -- it still exists, but

02:33 9     it's not active in the entertainment...

02:3410          Q    In what area, if any, is it active?

02:3411          A    It's not active right now.

02:3412          Q    When IP Worldwide was active, what top talent

02:3413     agencies did it have strategic partnerships with?

02:3414          A    Endeavor.

02:3415          Q    Any others?

02:3416          A    I wouldn't call it a strategic partnership, no.

02:3417          Q    And with what production companies did IP

02:3418     Worldwide have strategic partnerships with?

02:3419          A    I don't know what that means.  In other words,

02:3420     this is -- I wouldn't have written this.  I don't know

02:3421     what that means, a strategic partnership with a

02:3422     production company.  It's silly.

02:3423          Q    Do you know how long this website has been on

02:3424     the Internet, Mr. Toberoff?

02:3425          A    I do not.

                                                               32

02:34 1        Q    Okay.

02:34 2        A    But now that we've focused on it, I will either

02:35 3    cancel it or make corrections.

02:35 4        Q    And your Internet address is in fact ipwla, is

02:35 5    it not?

02:35 6             MR. WILLIAMSON:  Objection.  Assumes facts not

02:35 7    in evidence.  Vague and ambiguous.  Calls for

02:35 8    speculation.

02:35 9             THE WITNESS:  Ipwwestla?

02:3510    BY MR. BERGMAN:

02:3511        Q    Ipwla.

02:3512        A    I don't know what you mean by "your Internet

02:3513    address."

02:3514        Q    Well, when one wants on communicate with you by

02:3515    e-mail, the URL that it is sent to is at ipwla, is it

02:3516    not?

02:3517        A    One -- yeah, an e-mail address that I -- one of

02:3518    the e-mail addresses that I have is mtoberoff@ipwla.com,

02:3519    but I don't think that has anything to do with this

02:3620    exhibit.

02:3621        Q    Well, you have read this exhibit before, have

02:3622    you not?  You've read the information contained on this

02:3623    website?

02:3624        A    As I said before, I know there is such -- people

02:3625    have told me that they saw an IPW website.  I haven't

                                                            33

02:36 1    focused on this, I didn't write it, nor did I edit it,

02:36 2    and I don't specifically recall going through it.  No, I

02:36 3    do not.

02:36 4        Q    Would you look at the second paragraph of

02:36 5    Exhibit 10 on page -- the second page, which begins,

02:36 6    "Currently, IPW has several"?  Do you see that?

02:36 7        A    Yes.

02:36 8        Q    Would you read that to yourself and tell me if

02:36 9    all of the information contained there is correct?

02:3710        A    Not currently, no.  It needs to be updated.

02:3711        Q    What information requires updating?

02:3712        A    BLUE MOVIE is no longer split off from Steven

02:3713    Soderbergh.

02:3714            Ted Griffin, although originally attached to

02:3715    write the IMMORTALS, dropped out of the project.

02:3716            "Sanford and Son," Columbia Pictures didn't want

02:3817    to develop it with Bernie Mac attached, even though

02:3818    Bernie Mac wanted to be attached to the project or was

02:3819    interested in the project, and they wanted to keep their

02:3820    options open.  And not to say they wouldn't go to Bernie

02:3821    Mac once a screenplay is developed.  They just didn't

02:3822    want him to be attached at the outset.

02:3823            Julian Fellowes wanted to write GRAND HOTEL but

02:3824    then became very busy and was unwilling to commit to it,

02:3825    although probably is still interested.  I don't know.

34

02:39 1          MY BODYGUARD, I don't know what the situation is

02:39 2     with Dimension Films because a deal was made with

02:39 3     Dimension Films prior to the Wein- -- Miramax -- the

02:39 4     Weinsteins splitting off from Disney, so I don't know if

02:39 5     MY BODYGUARD is at Disney or Dimension.  I'm not sure.

02:39 6          And I think that's it.

02:39 7     Q    Is "Gilligan's Island," the reality television

02:39 8     series referred to here, being developed with Turner

02:39 9     Entertainment?

02:3910     A    No.  It was produced and aired.

02:3911     Q    Did you render any personal services in

02:3912     connection with that show?

02:4013     A    I was attached as a co-executive producer.  I

02:4014     helped set it up and had the idea -- or was one of the

02:4015     people who liked to think they had the idea.

02:4016     Q    Below that paragraph there is a sentence

02:4017     reading, "The following is just a sampling of the 250+

02:4018     titles to which IPW holds remake, sequel and/or

02:4019     television rights," and then there are a number of

02:4020     properties listed.

02:4021          Does IP Worldwide presently hold remake, sequel

02:4022     or television rights to each of those properties?

02:4023     A    Okay.  You know, I'm not going to ask you how to

02:4024     ask the question, but remember there is a distinction

02:4025     between IP Worldwide and IPW?

                                                                    35

EXHIBIT 17
463

| | |
|---|---|
| 02:40 1 | Q   Yes. |
| 02:40 2 | A   So for clarity, I just want to make sure |
| 02:41 3 | you're -- because you seem to use Intellectual Properties |
| 02:41 4 | Worldwide, IP Worldwide and IPW interchangeably, and for |
| 02:41 5 | clarity I want to make sure that you're asking me IP |
| 02:41 6 | Worldwide as opposed to IPW or -- |
| 02:41 7 | Q   I appreciate that. |
| 02:41 8 | A   Okay. |
| 02:41 9 | Q   Has IP Worldwide ever held the rights to those |
| 02:41 10 | properties that are listed at this part of Exhibit 10? |
| 02:41 11 | MR. WILLIAMSON:  Objection.  Vague and |
| 02:41 12 | ambiguous. |
| 02:41 13 | THE WITNESS:  I believe so.  I can't say for |
| 02:41 14 | sure whether IP Worldwide was involved with a hundred |
| 02:41 15 | percent of the titles on that list.  I believe many if |
| 02:42 16 | not most. |
| 02:42 17 | BY MR. BERGMAN: |
| 02:42 18 | Q   Now, I believe you stated that IP Worldwide was |
| 02:42 19 | presently inactive. |
| 02:42 20 | Is that correct? |
| 02:42 21 | A   Yes. |
| 02:42 22 | Q   And yet does it continue to hold these rights? |
| 02:42 23 | A   I don't believe so. |
| 02:42 24 | Q   And to whom, to what entity were those rights |
| 02:42 25 | transferred, if they were transferred? |

36

```
02:42  1        A    The various -- again to clarify, I don't believe
02:42  2   IP Worldwide necessarily held the rights.  A better
02:42  3   description would be had interests in rights.
02:42  4        Q    Okay.
02:42  5        A    And those interests were assigned to IPW.
02:42  6        Q    Would you turn the page, please, to what is the
02:42  7   third page of Exhibit 10?  Under the heading --
02:43  8        A    And I can -- on this list, looking over this
02:43  9   list, I know TOUCH OF EVIL -- I don't think there is
02:43 10   any -- on some of these lists they're probably -- I don't
02:43 11   know how many titles.  Say anywhere from 20 to 25 percent
02:43 12   of the titles on this list, the interest may have
02:43 13   expired, the original IP Worldwide interest may have
02:44 14   expired.
02:44 15        Q    Have you ever asked anyone to make corrections
02:44 16   to this website?
02:44 17        A    No.  I have never focused on this website.
02:44 18        Q    Has J. Todd Harris ever been the president of
02:44 19   production of IP Worldwide, LLC? .
02:44 20        A    Yes.
02:44 21        Q    And during what period of time was he president?
02:44 22        A    He is not -- he's never been an employee.  He
02:44 23   calls himself head of production for IPW.
02:45 24        Q    Have you called him head of production for IPW?
02:45 25        A    I don't believe so.
```

*No, J. Todd Harris was not involved with IP Worldwide, LLC.*

37

02:45 1        Q    And am I correct that Mr. Harris has never been

02:45 2    an employee of either IP Worldwide, LLC or IPW, LLC?

02:45 3        A    Yes, that's correct.

02:45 4        Q    The Nicholas Williamson referred to here is the

02:45 5    gentleman to your left?

02:45 6        A    Yes.

02:45 7        Q    And is Mr. Williamson an employee of either IP

02:45 8    Worldwide or IPW, LLC?

02:45 9        A    I don't think so.  I'm not sure about that.

02:46 10           MR. BERGMAN:  Would you mark as Exhibit 11,

02:46 11   please, a two-page printout from IMDb referring to a

02:46 12   company called Intellectual Properties Worldwide and it

02:46 13   looks like a "(I)."

02:46 14           (Deposition Exhibit 11 marked.)

02:46 15   BY MR. BERGMAN:

02:47 16       Q    Let me refer you, Mr. Toberoff, to the

02:47 17   properties identified in Exhibit 11 under the heading

02:47 18   "Miscellaneous Company - filmography."

02:47 19           Do you see that?

02:47 20       A    Yes.

02:47 21       Q    Did either Intellectual Properties Worldwide,

02:47 22   LLC or IPW, LLC license the rights to Martin Luther King,

02:47 23   Jr.'s image for the film VANILLA SKY?

02:47 24       A    No.

02:47 25       Q    Did --

                                                                38

02:47 1        A    It says, "Intellectual Properties Management,

02:47 2    Atlanta, Georgia."    I think they've got the wrong

02:47 3    company.

02:47 4        Q    You have no involvement with Intellectual

02:47 5    Properties Management?

02:47 6        A    No.

02:48 7        Q    Did either IP Worldwide, LLC or IPW, LLC license

02:48 8    footage in connection with the HUEY NEWTON STORY?

02:48 9        A    No.

02:48 10       Q    Is that also to the best of your knowledge an

02:48 11   error on this IMDb?

02:48 12       A    I don't know --

02:48 13            MR. WILLIAMSON:    Objection.    "Error," it's vague

02:48 14   and ambiguous.    Error as to what?

02:48 15            THE WITNESS:    I don't know -- I can just answer

02:48 16   your question.    I don't know how it came to be placed on

02:48 17   this.    You also see that it has again the name

02:48 18   Intellectual Properties Worldwide, which is not a company

02:48 19   name.

02:49 20   BY MR. BERGMAN:

02:49 21       Q    Has FANTASY ISLAND ever been in development at

02:49 22   Sony Pictures?

02:49 23       A    Yes.    I don't know if it's Sony or Columbia

02:49 24   Pictures, which is owned by Sony.

02:49 25       Q    Are you familiar with a motion picture entitled

                                                                    39

U.S. LEGAL SUPPORT

EXHIBIT 17
467

```
02:49  1    SONS, S O N S?

02:49  2         A    Yes.  You asked me that earlier off of an IMDb

02:49  3    list.

02:49  4         Q    And that was a film produced by Pacific

02:49  5    Pictures?

02:49  6         A    It wasn't really produced by Pacific Pictures.

02:49  7    Pacific Pictures Corp. was a loan-out company.

02:49  8         Q    And whose services did Pacific Pictures Corp.

02:50  9    loan out?

02:50 10         A    I believe myself.

02:50 11         Q    And --

02:50 12         A    Me.

02:50 13         Q    Are you familiar with an entity known as Pacific

02:50 14    Pictures Distribution Corporation?

02:50 15         A    No.  No.

02:50 16         Q    Who to your knowledge was the distributor of the

02:50 17    film SONS in the United States?

02:50 18         A    It didn't get distribution.

02:50 19         Q    Am I correct that Pacific Pictures Corporation

02:50 20    is a New York corporation?

02:50 21         A    Yes.

02:50 22         Q    And that it was incorporated in or about 1988?

02:51 23         A    I'm not sure of the date.

02:51 24         Q    Has Pacific Pictures Corporation been a loan-out

02:51 25    company, as you described it, from its inception?
```

                                                                    40

**U.S. LEGAL SUPPORT**

EXHIBIT 17
468

02:51 1        A    I believe initially it was conceived as a

02:51 2    loan-out company.

02:52 3            MR. BERGMAN:  Would you mark as Exhibit 12,

02:52 4    please, a one-page document which is a printout from the

02:52 5    California Business Portal.

02:52 6            (Deposition Exhibit 12 marked.)

02:52 7    BY MR. BERGMAN:

02:52 8        Q    Mr. Toberoff, Exhibit 12 refers to an entity

02:52 9    called IPW, LLC and indicates that the documents for that

02:52 10   LLC were filed in July of 2004.

02:52 11           Is the IPW, LLC identified in Exhibit 12 the

02:53 12   same IPW, LLC that you've referred to in this deposition?

02:53 13       A    Yes.

02:53 14       Q    Who -- does IP Worldwide, LLC presently have any

02:53 15   members?

02:53 16       A    Yes.

02:53 17       Q    And who are they, sir?

02:53 18       A    I'm a member and -- actually, I believe the --

02:53 19   I'm not sure if I'm the member or Pacific Pictures

02:53 20   Corporation is the member.  I think it might be Pacific

02:53 21   Pictures is the member.  The other member is Ariel

02:53 22   Emanuel, a person.

02:54 23       Q    Didn't Mr. Emanuel and Pacific wind up IPW, LLC?

02:54 24       A    We --

02:54 25           MR. WILLIAMSON:  Objection.  Assumes facts not

                                                              41

02:54 1    in evidence.  Vague and ambiguous.

02:54 2         THE WITNESS:  We entered into an agreement which

02:54 3    I believe was called a winding up agreement, but I

02:54 4    don't -- if there is a technic- -- if that's a term of

02:54 5    art and has a technical meaning, I don't know whether the

02:54 6    status of IP Worldwide, LLC falls into the technical

02:55 7    meaning of winding up.  The entity still exists.

02:55 8    BY MR. BERGMAN:

02:55 9         Q    What business activities has IP Worldwide been

02:5510    involved in?

02:5511         MR. WILLIAMSON:  Objection.  Vague and

02:5512    ambiguous.  Indefinite as to time and place.

02:5513         THE WITNESS:  Are you asking for a general

02:5514    description?

02:5515    BY MR. BERGMAN:

02:5516         Q    Yes.

02:5517         A    But you're not asking me to recite for you

02:5518    everything that it's ever done?

02:5519         Q    No.

02:5520         A    Okay.  The business plan of IP Worldwide, LLC

02:5521    was to obtain interests in intellectual property,

02:5622    hopefully branded titles of meaning in the entertainment

02:5623    industry, and to marry those titles with talent and

02:5624    perhaps outside financing for exploitation in the film

02:5625    and television industry.  Industries, I should say.

                                                            42

02:56 1        Q    Did IP Worldwide ever have any employees?

02:56 2        A    Yes.

02:56 3        Q    And who were they, sir?

02:56 4        A    My assistant, whose name was Andrew, and then

02:57 5    there was another gentleman whose name I don't remember.

02:57 6    We had two employees.

02:57 7        Q    And are either of them still employed by IP

02:57 8    Worldwide?

02:57 9        A    No.

02:57 10       Q    Are either of them --

02:57 11       A    And when I say that, initially that's what we

02:57 12   started with, and I'm not sure whether it was always two

02:57 13   or whether at some point we may have had three or four.

02:57 14       Q    Can you think of any other of those three or

02:57 15   four?

02:57 16       A    No.  It was primarily those two, and we would

02:57 17   have, I believe, during the summer months interns.

02:58 18       Q    Are either of those two former employees of IP

02:58 19   Worldwide presently employed by you?

02:58 20       A    No.

02:58 21       Q    Or by any other entity that you're involved

02:58 22   with?

02:58 23       A    No.

02:58 24       Q    Does IPW, LLC presently have any employees?

02:58 25       A    Yes.

43

EXHIBIT 17
471

02:58 1        Q    And who are they, sir?

02:58 2        A    Mark Perrone and Mark Marcum.

02:59 3        Q    And what services does Mr. Perrone render to the

02:59 4    IPW, LLC?

02:59 5        A    He's an assistant.

02:59 6        Q    Assistant to who?

02:59 7        A    Sort of an overall assistant.  Answers the phone

02:59 8    and keeps track of messages and...

02:59 9        Q    Okay.  And what services does Mr. Marcum render?

02:59 10       A    He's more of a development person who reads

02:59 11   scripts and does coverage of scripts, things of that

02:59 12   nature.

02:59 13       Q    Who are the members of IPW, LLC?

02:59 14       A    I'm a member, and the other member is a

03:00 15   gentleman by the name of Bruce Karsh.

03:00 16       Q    Is that spelled K A R S H?

03:00 17       A    I believe so, yes.

03:00 18       Q    And do you and Mr. Karsh hold equal interests in

03:00 19   IPW, LLC?

03:00 20       A    No.

03:00 21       Q    What is the respective ownership of that LLC?

03:00 22       A    Actually, I believe that's private information.

03:00 23   It has no relevance to this action.

03:00 24       Q    With all respect, sir, I disagree with you.

03:00 25       A    It's...  I don't believe it has any relevance.

                                                              44

03:00 1     I'm the majority owner of IPW, LLC.

03:01 2         Q   Do you have any further answer to my question?

03:01 3         A   No.

03:01 4         Q   So that you decline to tell me what the relative

03:01 5     ownership interests between you and Mr. Karsh are?

03:01 6         A   IPW, LLC has very -- its only relevance to this

03:01 7     action is as is set forth in the documents that were

03:01 8     produced, which is, namely, IP Worldwide at one point had

03:01 9     an agreement with the Siegels, and that agreement has

03:01 10    long ago expired, but at the time when IP Worldwide was

03:01 11    wound up and its various agreements were -- or rights

03:01 12    were assigned to IPW, LLC, that agreement had a few

03:02 13    months left on it, and it was assigned.  So there is very

03:02 14    little connection between IPW, LLC and this lawsuit.  I

03:02 15    would say no connection.

03:02 16        Q   Mr. Toberoff, you know as well as I do that

03:02 17    there is no relevance privilege which enables a witness

03:02 18    to decline to answer a question.

03:02 19        A   No, but I think it has bearing on privacy issues

03:02 20    and trade secret issues, and I don't believe you're

03:02 21    entitled to go into every aspect, particularly financial

03:02 22    aspects, of any company that I'm involved with.

03:02 23        Q   And do you therefore refuse to answer that

03:02 24    question?

03:02 25        A   Yes.

                                                                    45

**U.S. LEGAL SUPPORT**

EXHIBIT 17
473

03:02 1        Q    Okay.  Where does Mr. Karsh office?

03:02 2        A    Actually, I'll answer that question without

03:02 3    waiver of that objection.

03:02 4        Q    Okay.

03:03 5        A    Mr. Karsh has only 10 percent interest.

03:03 6        Q    Okay.  And does he maintain an office at the IPW

03:03 7    premises?

03:03 8        A    No.

03:03 9        Q    Where are the IPW premises?

03:03 10       A    Where -- what are premises?  What do you mean?

03:03 11       Q    Where is the company located?

03:03 12       A    The office?

03:03 13       Q    Yes.

03:03 14       A    Currently, 2049 Century Park East.

03:03 15       Q    And that is also your office address, is it not?

03:03 16       A    I have offices at that address as well.

03:03 17       Q    Okay.  And are they one and the same offices

03:03 18    physically?

03:03 19            MR. WILLIAMSON:  Objection.  Vague and

03:03 20    ambiguous.

03:03 21            THE WITNESS:  No.  There is sort of like a

03:03 22    division in the office space.

03:03 23    BY MR. BERGMAN:

03:03 24       Q    Who are the shareholders of Pacific Pictures

03:04 25    Corporation?

46

U.S. LEGAL SUPPORT

EXHIBIT 17
474

| | | |
|---|---|---|
| 03:04 | 1 | A    Marc Toberoff. |
| 03:04 | 2 | Q    And who are the directors? |
| 03:04 | 3 | A    I believe I'm the sole director. |
| 03:04 | 4 | Q    And are you also the sole officer? |
| 03:04 | 5 | A    I'm not sure. |
| 03:04 | 6 | Q    Are you the sole employee of Pacific Pictures |
| 03:04 | 7 | Corporation? |
| 03:04 | 8 | A    I'm not sure if I'm currently an employee of |
| 03:04 | 9 | Pacific Pictures Corporation. |
| 03:04 | 10 | Q    Do you know whether there are any employees of |
| 03:04 | 11 | Pacific Pictures Corporation? |
| 03:04 | 12 | A    Other than my answer where I say I'm not sure |
| 03:04 | 13 | with respect to myself, there would be no other -- |
| 03:04 | 14 | well -- no, there are no other employees. |
| 03:04 | 15 | Q    Okay.  Is Pacific Pictures Corporation currently |
| 03:04 | 16 | used to loan out your services? |
| 03:04 | 17 | A    No. |
| 03:04 | 18 | Q    When did it cease loaning out your services, |
| 03:05 | 19 | approximately? |
| 03:05 | 20 | A    Probably end of 2003.  Or earlier.  By the end |
| 03:05 | 21 | of 2003. |
| 03:05 | 22 | Q    Are you familiar with an entity known as |
| 03:05 | 23 | Smashbox Entertainment, LLC? |
| 03:05 | 24 | A    Actually, before we go to the next question, I |
| 03:05 | 25 | want to think about the last answer. |

47

03:05  1          Q    Okay.

03:05  2          A    My answer as to Pacific Pictures, it may be

03:05  3    earlier than the end of 2003.  I'm not sure.

03:06  4              MR. BERGMAN:  Can you repeat my last question,

03:06  5    please?

03:06  6              (Record read as follows:

03:05  7                  "Q    Are you familiar with an

03:05  8              entity known as Smashbox

03:05  9              Entertainment, LLC?")

03:0610              THE WITNESS:  Yes.

03:0611    BY MR. BERGMAN:

03:0612          Q    And who are the members of that LLC?

03:0613          A    I believe I'm the sole member.  I'm not sure.  I

03:0614    believe I'm the sole member, but I'm not positive.

03:0615          Q    Is Smashbox Entertainment, LLC currently active

03:0616    an organization?

03:0617          A    Not particularly active, no.

03:0618          Q    When it was active, what business was it engaged

03:0719    in?

03:0720          A    That assumes facts not in evidence.

03:0721          Q    Was it ever active?

03:0722          A    Not particularly.

03:0723          Q    I notice you qualified those responses.  What

03:0724    activities, if any --

03:0725          A    Well, the reason I'm qualifying it by saying

                                                                48

EXHIBIT 17
476

03:07 1     "not particularly" is because the word "active" is

03:07 2     another one of these -- you know, it's a subjective, so I

03:07 3     say not particularly depending on how one defines

03:07 4     "active."

03:07 5         Q    Okay.  When to the best of your knowledge was

03:07 6     the Smashbox Entertainment, LLC formed?

03:07 7         A    I don't remember when it was formed.  I believe

03:07 8     it was about three years ago.

03:07 9         Q    And what activities, if any, has Smashbox

03:08 10    Entertainment engaged in since its formation?

03:08 11        A    I believe it was going to be the production

03:08 12    entity for a film project; I don't remember what it was,

03:08 13    and for purposes of the -- I believe one of the guilds --

03:08 14    I think the Writers Guild needed a signatory company.

03:08 15    And it may or may not have been a signatory to the

03:08 16    Writers Guild, but it was ultimately not used as the

03:08 17    production entity.

03:08 18        Q    Okay.

03:09 19             Would you mark as Exhibit 13 a document entitled

03:09 20    "Joint Venture Agreement" made as of November 23, 2001.

03:09 21             (Deposition Exhibit 13 marked.)

03:09 22             THE WITNESS:  If we are going to go into a more

03:09 23    detailed session, could I just use the restroom before we

03:09 24    do that?

03:09 25             MR. BERGMAN:  Of course.  Why don't we take a

                                                                        49

03:09  1    five-minute break.

03:09  2            (Recess.)

03:15  3    BY MR. BERGMAN:

03:15  4        Q    Referring to the last page of Exhibit 13,

03:15  5    Mr. Toberoff, I note that this copy does not bear your

03:15  6    signature.  It bears the Peary and Peavy signatures.

03:15  7            To your recollection did you ever sign a copy of

03:16  8    Exhibit 13?

03:16  9        A    I recall a joint venture agreement that was

03:16 10    signed, I believe -- I recall because I believe that

03:16 11    document was produced, but I don't know -- I would have

03:16 12    to compare this to that document to know whether there

03:16 13    were any changes between the two.

03:16 14        Q    I know that the parties to this agreement are

03:16 15    Ms. Peavy and Mr. Peary on the one hand and Pacific

03:16 16    Pictures Corporation on the other.

03:16 17            Am I correct that you've identified Pacific

03:16 18    Pictures Corporation as a loan-out company?

03:16 19        A    I said I believe as it was initially conceived

03:16 20    in whenever it was in the '80s, that's how I conceived

03:16 21    it:  As a loan-out company.

03:16 22        Q    Well, did the nature of Pacific Pictures'

03:17 23    business ever change from being a loan-out company to

03:17 24    being something else?

03:17 25        A    To determine that, I'd have to know what the

                                                        50

03:17 1    legal definitions of a loan-out company.  When I use the

03:17 2    term loan-out company," in the entertainment business

03:17 3    when you do -- for example, if you're serving as a

03:17 4    producer on a film or a writer, for instance, or a

03:17 5    director, most people have a company that they -- which

03:17 6    is a sole proprietorship that loans out their services,

03:17 7    and I believe that people who do that originally for tax

03:17 8    purposes.  I'm not sure what the reasons are for that.

03:17 9    So I believe when it was initially incorporated, that was

03:1710    the purpose, but then afterwards I would just use Pacific

03:1811    Pictures a lot for anything.

03:1812        Q    Anything that you personally were involved in?

03:1813        A    I would -- yeah, I would tend to use it for most

03:1814    things that I was involved in.

03:1815        Q    Okay.

03:1816        A    So I don't know if at that point it's a loan-out

03:1817    company or just a company.

03:1818        Q    And the address given here for Pacific Pictures

03:1819    Corporation, 23852 Pacific Coast Highway, does that

03:1820    continue to be the address of Pacific Pictures

03:1821    Corporation?

03:1822        A    You mean as registered with the California

03:1823    Secretary of State?

03:1824        Q    Well, as operating in actuality, does Pacific

03:1825    Pictures maintain offices?

51

03:18 1      A   It's not active since -- I think -- didn't you

03:18 2   ask me earlier about Pacific, and I said at the end of

03:19 3   2000 -- -- towards the end of 2003 I stopped using it?

03:19 4   So it doesn't -- you know, I guess there is a distinction

03:19 5   between a technical office for purposes of registration

03:19 6   with the Secretary of State and active offices.  I used

03:19 7   to work out of my home in Malibu, and this was the

03:19 8   mailing address used for myself and Pacific Pictures.

03:19 9      Q   When was your first communication with either

03:19 10  Miss Peavy or Mr. Peary concerning the Joe Shuster

03:19 11  interest, if any, in Superman?

03:19 12         MR. WILLIAMSON:  Objection.  Assumes facts not

03:19 13  in evidence.  Vague and ambiguous.

03:20 14         THE WITNESS:  Sometime around mid 2001.

03:20 15  BY MR. BERGMAN:

03:20 16     Q   And how did that initial communication come

03:20 17  about?

03:20 18     A   Warren Peary -- the last name is P E A R Y --

03:20 19  called me up and -- he called me up.

03:20 20     Q   And what did he say?

03:20 21     A   He said he wanted -- was interested in -- I

03:20 22  think he said that he got my name off of some article he

03:20 23  had read on the Internet and that he wanted a lawyer to

03:20 24  help him to figure out what rights the Joe Shuster estate

03:21 25  would have in Superman.

52

**U.S. LEGAL SUPPORT**

EXHIBIT 17
480

03:21 1        Q    And what did you reply?

03:21 2           MR. WILLIAMSON: Objection. Attorney-client

03:21 3 privilege. Instruct you not to answer.

03:21 4           (Instruction not to answer.)

03:21 5           MR. BERGMAN: The Joint Venture Agreement

03:21 6 between Pacific Pictures, which Mr. Toberoff has

03:21 7 testified is owned wholly by him and is basically a

03:21 8 loan-out company, and the Peavy and Peary individuals is

03:21 9 a business arrangement. It is not a legal representation

03:21 10 document. It is on its face a joint venture agreement.

03:21 11 There is no privilege applicable to that. Mr. Toberoff

03:21 12 was not retained as an attorney. He was -- he entered

03:21 13 into a joint venture for the purpose of retrieving and

03:22 14 enforcing and exploiting all of Joe Shuster's and his

03:22 15 estate's rights, claims and copyrights. Certainly at

03:22 16 this point in time that I'm asking Mr. Toberoff about, he

03:22 17 was an entrepreneur, not an attorney.

03:22 18           MR. WILLIAMSON: Objection. Mr. Bergman, you

03:22 19 are completely misstating his testimony, the documents

03:22 20 and the record before us. Whether or not there was a

03:22 21 retainer agreement between Mr. Toberoff and Mr. Peary and

03:22 22 Miss Shuster is, frankly, irrelevant. I instruct him not

03:22 23 to answer.

03:22 24 BY MR. BERGMAN:

03:22 25        Q   Mr. Toberoff, I'll assume that when

53

03:22 1    Mr. Williamson instructs you not to answer, you will

03:22 2    refuse to answer on that basis?

03:22 3        A    Generally, yes.  I -- without waiver -- again,

03:22 4    let me say in any of these areas where we may have a

03:23 5    difference of opinion as attorney-client -- obviously

03:23 6    when you are taking a deposition of an attorney, you can

03:23 7    surmise that there will be a lot of things that are

03:23 8    protected by the attorney-client privilege and by work

03:23 9    product.  To the extent -- I'd like it to be understood

03:23 10   that to the extent I am able to give you a general answer

03:23 11   to certain questions without revealing the substance of

03:23 12   attorney-client communications or work product, I don't

03:23 13   want that to be misconstrued or claimed to be a waiver at

03:23 14   any point in this deposition of attorney-client privilege

03:23 15   or work product doctrine.

03:23 16           MR. BERGMAN:  I will not assert such a waiver.

03:23 17           THE WITNESS:  So I would just answer generally

03:23 18   that Mr. Peary called me with respect to Superman rights,

03:23 19   as I already mentioned, and my response was, because it

03:24 20   was Superman, was that yes, I would be interested in

03:24 21   representing him with respect to that.

03:24 22   BY MR. BERGMAN:

03:24 23       Q    Did you tell him that you'd be interested in

03:24 24   entering into a joint venture with Peary and Peavy in

03:24 25   order to exploit their interest?

54

U.S. LEGAL SUPPORT

EXHIBIT 17
482

```
03:24  1              MR. WILLIAMSON:  Objection.  Attorney-client

03:24  2    privilege --

03:24  3              THE WITNESS:  No, I did not, but other than

03:24  4    giving you the basic subject matter, which I've already

03:24  5    given you, and why he was calling me, the rest of our

03:24  6    communications would be privileged, and they're

03:24  7    privileged on the basis that he was obviously seeking

03:24  8    legal advice, and I was dispensing legal advice.

03:24  9    BY MR. BERGMAN:

03:24 10         Q   And at what point in time did your activities

03:25 11    change from that of rendering legal advice to entering

03:25 12    into a joint venture with the Peary and Peavy --

03:25 13              MR. WILLIAMSON:  Objection.  Assumes facts not

03:25 14    in evidence.

03:25 15    BY MR. BERGMAN:

03:25 16         Q   -- individuals?

03:25 17         A   It didn't change.

03:25 18         Q   You did enter into a joint venture with them,

03:25 19    did you not?

03:25 20         A   I entered into a joint venture agreement with

03:25 21    them, yes.

03:25 22         Q   How many communications did you have with either

03:25 23    Peary or Peavy from the time of that first conversation

03:25 24    until November 23, 2001, the as of date of this joint

03:25 25    venture agreement?
```

                                                                55

**U.S. LEGAL SUPPORT**

EXHIBIT 17
483

03:25 1        A    I don't recall.

03:25 2        Q    What is your best estimate?

03:26 3        A    I don't -- we had at least one, we probably had

03:26 4    more than one, but other than that I don't have a basis

03:26 5    for estimating.

03:26 6        Q    Did you have any face-to-face meetings with

03:26 7    either Peavy or Peary prior to November 23, 2001?

03:26 8        A    No.

03:26 9        Q    Prior to this joint venture agreement, had you

03:2610    ever entered into a joint venture agreement with a

03:2611    client?

03:2612        MR. WILLIAMSON:  Objection.  Vague and

03:2613    ambiguous.

03:2614        THE WITNESS:  I don't know what you mean by

03:2615    that.

03:2616    BY MR. BERGMAN:

03:2617        Q    Well, you've testified that you were contacted

03:2618    and served as a lawyer, and yet, as Exhibit 13

03:2619    demonstrates, you entered into a joint venture agreement

03:2620    with them under which you received 50 percent of whatever

03:2621    their recovery might have been.

03:2622        A    That misstates the document.

03:2623        Q    No, it doesn't misstate the document.

03:2724        Am I correct that paragraph 5 of the agreement

03:2725    states that any moneys received from enforcement,

56

```
03:27 1    settlement or exploitation of any of the rights -- I'll

03:27 2    skip something -- will be shared, divided and payable 50

03:27 3    percent to claimants and 50 percent to PPC?

03:27 4         A    You've -- the words you've read appear there.

03:27 5    The document speaks for itself.  I'm playing both the

03:27 6    role now of the witness and to a certain extent making

03:27 7    objections to your question, but you would have to

03:27 8    take -- read the whole paragraph in context to give a

03:27 9    fair meaning as to what it says.

03:27 10        Q    Who drafted this agreement?

03:27 11        A    I drafted it.

03:27 12        Q    Okay.  Were the -- was Peary or Peavy

03:28 13   represented by an attorney in connection with the

03:28 14   negotiation of this agreement?

03:28 15        A    I don't -- I didn't deal with an attorney, but I

03:28 16   don't know whether or not they were represented by an

03:28 17   attorney, whether they sought outside legal advice

03:28 18   regarding the agreement.

03:28 19        Q    Did you suggest to them that they do obtain

03:28 20   independent legal advice before entering into the

03:28 21   agreement?

03:28 22             MR. WILLIAMSON:  Objection.  Attorney-client.

03:28 23             THE WITNESS:  Yes, I did.

03:28 24   BY MR. BERGMAN:

03:28 25        Q    Had there been any prior drafts of this
```

57

U.S. LEGAL SUPPORT

EXHIBIT 17
485

```
03:28 1    agreement?
03:28 2        A    I believe so, yes.
03:28 3        Q    And had Peavy or Peary requested any changes in
03:28 4    the prior draft?
03:28 5        A    I believe so, yes.
03:28 6        Q    What changes had they requested?
03:28 7        A    I don't recall the specific changes, but I
03:28 8    believe there was more than one draft, and I believe the
03:29 9    reason for that is because of comments or revisions by
03:29 10   Warren.
03:29 11       Q    And are you still in possession of those prior
03:29 12   drafts?
03:29 13       A    No.
03:29 14       Q    What happened to them?
03:29 15       A    I don't know.  I'm not in possession of them.
03:29 16   Otherwise, we would have produced them.
03:29 17       Q    Have you searched for them?
03:29 18       A    I searched the files.  I searched Pacific
03:29 19   Pictures's files for any documents regarding the
03:29 20   Shusters, yes.
03:29 21       Q    Have you asked the Peary --
03:29 22       A    I did that in response --
03:29 23       Q    -- Peary or Peavy individuals whether they had
03:29 24   any prior drafts?
03:29 25       A    Yes.
```

58

03:29 1        Q    And am I correct that they did not and that they

03:29 2    did not produce any?

03:29 3        A    Yes.  They actually did not even have a copy of

03:29 4    the fully signed agreement.  What you're looking at -- I

03:29 5    believe they didn't.  To my recollection, I believe this

03:29 6    was the only copy that they had still retained, what is

03:29 7    Exhibit 13.  This didn't come from my files.  This came

03:29 8    from Peavy's and Peary's production in response to the

03:30 9    subpoena you served on them.

03:3010        Q    I note that in paragraph 1 of the Joint Venture

03:3011    Agreement, there is a reference to Superboy.

03:3012             Did you -- have you at any point in time

03:3013    discussed with the Shuster heirs the conflict between the

03:3014    Siegel position and the Shuster heirs' position regarding

03:3015    Superboy?

03:3016             MR. WILLIAMSON:  Objection.  Assumes facts not

03:3017    in evidence.  Attorney-client.  Instruct you not to

03:3018    answer.

03:3019             (Instruction not to answer.)

03:3020    BY MR. BERGMAN:

03:3021        Q    Did PPC in fact pay, as provided in paragraph 3,

03:3022    the legal fees and costs of setting up Joe Shuster's

03:3023    estate?

03:3024        A    I believe so, yes.

03:3125        Q    Did the Shuster heirs request that PPC receive a

59

U.S. LEGAL SUPPORT

EXHIBIT 17
487

03:31 1     lesser share than 50 percent of all moneys and proceeds

03:31 2     derived from the rights?

03:31 3              MR. WILLIAMSON:  Objection.  Attorney-client

03:31 4     privilege.

03:31 5              MR. BERGMAN:  That's absolutely ridiculous,

03:31 6     Mr. Williamson.  How can you say it's attorney-client

03:31 7     privilege when it's part of an agreement between two

03:31 8     parties?

03:31 9              THE WITNESS:  Okay.  Are you referring to the

03:31 10    Joint Venture Agreement?

03:31 11    BY MR. BERGMAN:

03:31 12        Q    Yes.

03:31 13        A    Okay.  I think Mr. Williamson thought -- okay.

03:31 14        Q    Paragraph 5 provides --

03:31 15        A    Can you repeat the question?  I believe I can

03:31 16    answer that.

03:31 17        Q    Yes.  It provides for a 50-50 split.  At any

03:31 18    time prior to signing this agreement, did the Shuster

03:31 19    heirs or either of them request that the percentage for

03:32 20    PPC be less than 50 percent?

03:32 21        A    They may have.

03:32 22        Q    But do you recall them doing so?

03:32 23        A    I don't have a specific recollection, but I

03:32 24    can't say they didn't.

03:32 25        Q    Did you regard 50 percent as a reasonable

                                                                    60

03:32 1    interest for Pacific's services?

03:32 2        A   Of course.  Otherwise I wouldn't have put it in

03:32 3    the document.

03:32 4        Q   Did you regard 50 percent as being a reasonable

03:32 5    fee for lawyer's services?

03:32 6        A   I don't know what you're referring to.

03:32 7        Q   Well, did the -- aside from giving you or

03:32 8    Pacific Pictures 50 percent of any recovery, did the

03:32 9    Shusters additionally agree to pay you any fees as a

03:32 10   lawyer?

03:32 11       A   That's privileged.

03:32 12       Q   Does that mean you decline to answer?

03:33 13       A   Yes.

03:33 14           (Unanswered question.)

03:33 15       Q   Other than the 50 percent share that is provided

03:33 16   for in paragraph 5 of the Joint Venture Agreement, were

03:33 17   you compensated in any way by the Shuster heirs for your

03:33 18   legal services?

03:33 19       A   You mean in addition to the 50 percent?

03:33 20       Q   Correct.

03:33 21       A   No.

03:33 22       Q   In connection with this Joint Venture Agreement,

03:33 23   did either Peary --

03:33 24       A   And you used the word "compensated," because

03:33 25   this is a -- in other words, I haven't received any money

                                                                    61

03:33 1   from the Shusters to date or any compensation in

03:34 2   connection with this or any other agreement.

03:34 3        Q   They have subsequent to this --

03:34 4        A   Since 2001.

03:34 5        Q   They have subsequent to this agreement retained

03:34 6   you as an attorney, have they not?

03:34 7        A   Yes.

03:34 8        Q   And when was that?

03:34 9        A   I don't -- I know it was at some time before the

03:3410   lawsuit was filed in the Siegel case.  I also know that

03:3411   this agreement was cancelled.  I am not sure when the

03:3412   legal retainer agreement was entered into, but I believe

03:3413   it was definitely entered into before this agreement was

03:3414   cancelled.

03:3415        Q   In connection with the Joint Venture Agreement,

03:3416   Exhibit 13, did either Peary or Peavy ask you whether 50

03:3517   percent was a customary amount for an entity such as PPC

03:3518   to receive?

03:3519        A   I don't recall them saying that.

03:3520        Q   Do you recall any negotiation at all about the

03:3521   50 percent?

03:3522        A   Not specifically.  I believe there was some

03:3523   negotiation or discussion regarding the fee stated in

03:3524   this agreement.

03:3525        Q   I didn't hear that last.

62

```
03:35 1        A    I believe there was some discussion regarding

03:35 2   the fee based in this agreement, but I can't give you --

03:35 3   I don't have a specific recollection of the negotiation,

03:36 4   as you've provided it.

03:36 5        Q    Well, in connection with the Joint Venture

03:36 6   Agreement, Exhibit 13, did you ever ask for more than 50

03:36 7   percent?

03:36 8        A    No.

03:36 9        Q    And did Peary or Peavy ever offer less than 50

03:3610   percent?

03:3611        A    I don't think -- I think the discussions were of

03:3612   an explanation as to what that would cover, what, you

03:3613   know, I would do, whether they would be responsible for

03:3614   any costs or whether I would be responsible for all

03:3615   costs, things of that nature, which had relevance to the

03:3616   50 percent.  In other words, if there were any attorneys

03:3617   involved, would they incur any additional fees, costs,

03:3618   expenses, things of that nature, and the answer to that

03:3719   was no.

03:3720        Q    Paragraph 11 states in part that "The parties

03:3721   further acknowledge that they have not signed this

03:3722   agreement in reliance on any promise or representation

03:3723   not expressly set forth in this agreement."

03:3724             Prior to their execution of this agreement, did

03:3725   you make any promise or representation to Peary and Peavy
```

                                                                    63

03:37 1    that is not contained in this agreement?

03:37 2        A    I don't believe so, no.

03:37 3        Q    What did you state to them which led to the

03:37 4    formation of this joint venture?

03:37 5            How did the relationship between the two parties

03:37 6    become that of joint venturers?

03:37 7            MR. WILLIAMSON:  Objection.  Vague and

03:38 8    ambiguous.

03:38 9            THE WITNESS:  I -- I don't -- I believe that

03:3810    when I did this agreement at the time in 2001, I was

03:3811    using Pacific Pictures for everything, and I was entering

03:3812    into agreements where I was -- like I described

03:3813    previously, where I was representing rights holders for

03:3814    purposes of marketing their rights, for setting up

03:3815    movies, things of that nature, and when I -- when it came

03:3816    to the Peavys, I used Pacific Pictures in a similar way,

03:3817    because very often when I entered into those agreements

03:3818    previously, I would do it -- either have some kind of

03:3819    management agreement or a loose joint venture, and so I

03:3920    used -- initially with the Peavys, I used a similar

03:3921    structure, and then in retrospect I felt it was -- that

03:3922    it would have -- it's -- it would have been a lot cleaner

03:3923    just to have a regular legal retainer agreement, and we

03:3924    entered into a legal retainer agreement.

03:3925    BY MR. BERGMAN:

                                                            64

EXHIBIT 17
492

03:39 1        Q   Well, you testified earlier that you were

03:39 2   initially contacted in your capacity as a lawyer.

03:39 3   Somehow that shifted by November 23, 2001, to your

03:39 4   becoming a joint venturer with the Shuster heirs.

03:39 5            How did that change in the relationship evolve?

03:39 6            MR. WILLIAMSON:  Objection.  Misstates your

03:39 7   testimony.

03:39 8            THE WITNESS:  What you're saying is incorrect.

03:40 9   It didn't shift.  A lot of my work prior to this

03:40 10  agreement, particularly as I've described in the

03:40 11  entertainment industry, to varying degrees would require

03:40 12  a certain amount of legal work, legal analysis, research,

03:40 13  because it was all rights based in the entertainment

03:40 14  industry.  Rights were the platform for doing business in

03:40 15  the entertainment industry, and I -- you know, instead of

03:40 16  having two separate agreements, a legal retainer

03:40 17  agreement that covered the legal and then a business

03:40 18  arrangement to cover the aspects of making deals in the

03:40 19  entertainment industry, at least at that time I was just

03:40 20  using Pacific Pictures and I would have one agreement,

03:41 21  but that's not to say there was no legal relationship.  I

03:41 22  just didn't have a legal retainer agreement, but they

03:41 23  were definitely, and particularly in this case, seeking

03:41 24  my legal advice, giving my legal advice, doing legal

03:41 25  research.  When the Shuster estate was probated, you

65

EXHIBIT 17
493

```
03:41 1    know, arranging for an estate lawyer, overseeing that

03:41 2    lawyer.

03:41 3    BY MR. BERGMAN:

03:41 4        Q   So is it your testimony that this Joint Venture

03:41 5    Agreement was merely a disguised legal retainer

03:41 6    agreement?

03:41 7        A   No.  Those are your words.

03:41 8        Q   It was a business arrangement, was it not?

03:41 9        A   No --

03:41 10       MR. WILLIAMSON:  Objection.  Misstates prior

03:41 11   testimony.

03:41 12       THE WITNESS:  -- as I said, can I didn't have a

03:41 13   separate -- I had a joint venture agreement -- in other

03:41 14   words, there is not a particular -- this is what I was

03:42 15   doing with regard to other things, and I did -- that were

03:42 16   probably less legal in nature, and I used the same

03:42 17   general structure for the Miss Jean Peavy and Warren

03:42 18   Peary -- we'll call them the Shusters -- I used the same

03:42 19   general structure at that time.  And it's not that this

03:42 20   is a legal retainer agreement.  It's just that I didn't

03:42 21   have a separate legal retainer agreement.  And I don't

03:42 22   think there is a...

03:42 23   BY MR. BERGMAN:

03:42 24       Q   Is it your testimony that because you didn't

03:42 25   have a legal retainer agreement, you utilized this Joint
```

66

03:42 1    Venture Agreement as a substitute?

03:42 2        A    No.  I just didn't draft and draw up a separate

03:43 3    legal retainer agreement to cover my legal services.

03:43 4        Q    Do you consider a 50 percent share of any

03:43 5    recovery to be a reasonable attorney's fee?

03:43 6        A    It depends on the circumstances.  I've seen

03:43 7    agreements at 50 percent when lawyers are working on

03:43 8    contingency, which I take it you rarely, if ever, do --

03:43 9    well, you're not talking about a retainer agreement.

03:43 10   You're talking about the Joint Venture Agreement, so...

03:43 11        Are you asking me about this agreement, or are

03:43 12   you asking me separate and apart from that?

03:43 13       Q    Well, frankly, based on your testimony,

03:43 14   Mr. Toberoff, I don't understand whether you regarded

03:43 15   this as your legal retainer agreement or as a business

03:43 16   arrangement under which your company would get 50 percent

03:44 17   of any recovery.

03:44 18       A    I think I was very clear in telling you that

03:44 19   this was not a legal retainer agreement.

03:44 20       Q    Okay.  Since this was not a legal retainer

03:44 21   agreement, what is the basis of your asserting the

03:44 22   attorney-client privilege regarding it?

03:44 23       A    I've been answering your questions about this

03:44 24   agreement, if you've noticed.

03:44 25       Q    No --

67

03:44 1      A   The assertion of the attorney-client privilege

03:44 2  goes to matters where you start to ask questions that go

03:44 3  to the giving of legal advice or legal strategies, mental

03:44 4  impressions, things protected by the work product

03:44 5  doctrine.

03:44 6      Q   The record will speak for itself on that.

03:44 7       In paragraph 11 there is the sentence about four

03:44 8  lines up from the bottom of the page that begins, "The

03:44 9  parties have mutually participated in the negotiation and

03:44 10  drafting of this Agreement..."

03:45 11      Did either Peary or Peavy engage in the drafting

03:45 12  of this agreement?

03:45 13      A   Only to the extent -- remember I told you

03:45 14  earlier that I believe it went through a few drafts in

03:45 15  response to requests, revisions, comments by Warren?  So

03:45 16  to that extent, yes.

03:46 17      MR. BERGMAN:  Would you mark as Exhibit 14,

03:46 18  please, a document on Pacific Pictures Corporation

03:47 19  letterhead dated October 27, 2003?

03:47 20      (Deposition Exhibit 14 marked.)

03:47 21  BY MR. BERGMAN:

03:47 22      Q   My first question is going to be whether that

03:47 23  is your signature on the last page of Exhibit 14,

03:47 24  Mr. Toberoff.

03:47 25      A   Yes, it is.

68

03:47 1          Actually, looking at the date of this document,

03:47 2   I can narrow the other question you asked:  When we

03:47 3   entered into a legal or retainer agreement.  Still I

03:47 4   think it might be between the date of this and the date

03:47 5   of the cancellation of these two agreements.

03:47 6          Q    Okay.

03:47 7          A    I'm not positive, but that's...

03:48 8          Q    Am I correct that you drafted Exhibit 14?

03:48 9          MR. WILLIAMSON:  Objection.  Vague and

03:4810   ambiguous.

03:4811          THE WITNESS:  Yes, I did.

03:4812   BY MR. BERGMAN:

03:4813          Q    Were --

03:4814          A    With input from Warren.

03:4815          Q    What input did you receive from Mr. Peary?

03:4816          A    I don't recall specific items, but we discussed

03:4817   it.

03:4818          Q    Okay.  So am I correct you formed the -- you

03:4819   probated the estate of Joseph Shuster and then entered

03:4820   into this agreement with the executor of his estate?

03:4821          MR. WILLIAMSON:  Objection.  Assumes facts not

03:4822   in evidence.  It's vague and ambiguous.

03:4923          THE WITNESS:  What's the question?

03:4924   BY MR. BERGMAN:

03:4925          Q    The question is, were you involved in the

                                                              69

U.S. LEGAL SUPPORT

EXHIBIT 17
497

03:49 1    probate of Joseph Shuster's estate?

03:49 2         MR. WILLIAMSON:  Objection.  Vague and

03:49 3    ambiguous.

03:49 4         THE WITNESS:  Yes.

03:49 5    BY MR. BERGMAN:

03:49 6         Q    What was your involvement?

03:49 7         A    I arranged for a -- since trusts and estates is

03:49 8    a specialty of the law, I arranged for an attorney who's

03:49 9    a -- who does nothing but trusts and estates work to

03:4910    handle the probating of the estate.

03:4911        Q    And what was the purpose in entering into this

03:4912    October 27, 2003 agreement, Exhibit 14?

03:4913        A    I think this agreement -- I'd have to compare it

03:4914    line by line to Exhibit 13, but I think this agreement is

03:5015    very similar if not the same to Exhibit 13, but the

03:5016    purpose was to, since -- was to include the executor in

03:5017    the agreement.

03:5018        Q    Has Pacific Pictures Corporation advanced or

03:5019    loaned any money to either Peary or Peavy?

03:5020        A    You mean like a personal loan?  I don't recall

03:5021    it loaning money to the Shusters.

03:5022        Q    Or advancing any money to the Shusters?

03:5023        A    I don't recall that, no.

03:5024        Q    To the best of your recollection, did you

03:5025    personally advance or loan any money to the Shuster

70

**U.S. LEGAL SUPPORT**

EXHIBIT 17
498

03:50 1    heirs?

03:50 2            MR. WILLIAMSON:  Objection.  Asked and answered.

03:50 3            THE WITNESS:  I don't think so, no.

03:51 4    BY MR. BERGMAN:

03:51 5        Q    Did any other entity of which you are a member

03:51 6    or shareholder advance or loan any money to Peary or

03:51 7    Peavy?

03:51 8        A    I don't believe so.

03:51 9        Q    Paragraph 3 reads in part that "PPC has paid and

03:5110    will continue to pay any and all costs and expenses

03:5111    incurred by it in connection with this agreement,

03:5112    including the legal fees and costs of setting up Joseph

03:5113    Shuster's Estate," close quote.

03:5114            In addition to paying the legal fees and costs

03:5115    of setting up the Shuster estate, did PPC pay any other

03:5116    costs or expenses in connection with its agreement with

03:5117    Peary and Peavy?

03:5218        A    They may have paid filing fees with the U.S.

03:5219    Copyright Office, things of that nature, document

03:5220    retrieval fees from the U.S. Copyright Office, things of

03:5221    that nature.

03:5222        Q    Did you negotiate Exhibit 14 with any attorney

03:5223    representing either the executor of the estate or

03:5224    Miss Peavy?

03:5225            MR. WILLIAMSON:  Objection.  Vague and

                                                                    71

**U.S. LEGAL SUPPORT**

EXHIBIT 17
499

03:52 1   ambiguous.

03:52 2        THE WITNESS:  No, I did not.

03:52 3   BY MR. BERGMAN:

03:52 4     Q   When you discussed either the original Joint

03:53 5   Venture Agreement or this Exhibit 14 with Peavy and

03:53 6   Peary, was there any discussion regarding the ownership

03:53 7   of the character Superboy?

03:53 8        MR. WILLIAMSON:  Objection.  Misstates prior

03:53 9   testimony.  Vague and ambiguous.

03:53 10        THE WITNESS:  I don't know.  I don't recall a

03:53 11   discussion of that.

03:53 12   BY MR. BERGMAN:

03:53 13     Q   Have you ever discussed ownership of the

03:53 14   character Superboy with either Peary or Peavy?

03:53 15     A   That would be privileged.

03:53 16        (Unanswered question.)

03:53 17     Q   Prior to the time that you entered into the

03:53 18   retainer agreement that you have testified to, did you

03:53 19   have any discussion with either Peary or Peavy concerning

03:53 20   the ownership of the character Superboy?

03:54 21        MR. WILLIAMSON:  Objection.  Attorney-client.

03:54 22        THE WITNESS:  That would also be privileged.

03:54 23        (Unanswered question.)

03:54 24   BY MR. BERGMAN:

03:54 25     Q   So is it your position --

72

EXHIBIT 17
500

03:54 1        A    I can just tell you, as I sit here today, I

03:54 2    don't recall, but to the extent I had discussed it, it

03:54 3    would be privileged.

03:54 4        Q    And is it your position, Mr. Toberoff, that the

03:54 5    attorney-client relationship between you and Peary and

03:54 6    Peavy resulted from the Joint Venture Agreement, Exhibit

03:54 7    13?

03:54 8        A    Absolutely not.

03:54 9        Q    Did it result -- that relationship result from

03:54 10   Exhibit 14?

03:54 11       A    No.  It didn't result from a document.  It

03:54 12   resulted from them seeking legal advice from the very

03:54 13   first call and my providing it, which established a

03:55 14   confidential relationship.

03:55 15       Q    With the exception of exhibits 13 and 14, have

03:55 16   you ever entered into a joint venture agreement with a

03:55 17   client?

03:55 18       A    I think that's --

03:55 19            MR. WILLIAMSON:  Objection.  Vague and

03:55 20   ambiguous.

03:55 21            THE WITNESS:  I think you already asked that.

03:55 22   What do you mean by that?

03:55 23   BY MR. BERGMAN:

03:55 24       Q    I think it speaks for itself.

03:55 25       A    I don't understand.  Not to me.  Clarify that.

73

**U.S. LEGAL SUPPORT**

**EXHIBIT 17**
501

03:55 1      Q    Exhibit 13 is a joint venture agreement which in

03:55 2    essence provides for a 50-50 split of proceeds between

03:55 3    your company, Pacific Pictures Corporation, and the

03:55 4    Shuster heirs.   Have you ever entered into a similar

03:56 5    joint venture agreement with any legal client?

03:56 6           MR. WILLIAMSON:   Objection.   The document speaks

03:56 7    for itself.   Vague and ambiguous.

03:56 8           THE WITNESS:   I don't know.   As I mentioned to

03:56 9    you before, there have been situations where I'm involved

03:56 10   with -- I'm trying to explain it to you.   If somebody

03:56 11   is -- normally, if someone is -- options a book and

03:56 12   simply -- and then seeks to set up a film or to monetize

03:56 13   that book by licensing film rights or producing a film,

03:56 14   it's a very simple, straightforward type of situation,

03:57 15   and when we spoke about BLUE MOVIE, for instance, you

03:57 16   asked me about that, and I said I had optioned that book.

03:57 17           But in some cases when you're dealing in rights

03:57 18   and copyrights, due to the intricasies of copyright law

03:57 19   and what's involved, there can be a business side, but

03:57 20   everything having to do with the rights and chain of

03:57 21   title and issues regarding the rights that may arise are

03:57 22   of a very legal nature, so it's very possible to have a

03:57 23   business agreement but to in fact be dealing with a lot

03:57 24   of legal issues and providing legal advice, and I believe

03:58 25   that -- I shouldn't say I believe -- I know that's the

                                                                   74

EXHIBIT 17
502

03:58 1    case here.

03:58 2            I would say this instance is probably, as it

03:58 3    unfolded, more of a legal nature, and that's why in

03:58 4    retrospect, and of course everyone's a genius in

03:58 5    retrospect, I decided that it should be a simple legal

03:58 6    retainer agreement, and in retrospect it would have been

03:58 7    better off just being that from the outset.  And that's

03:58 8    it.

03:58 9    BY MR. BERGMAN:

03:58 10       Q   Do you believe that there is an inherent ethical

03:58 11   conflict in being both a business partner and a lawyer

03:59 12   for individuals regarding the same matter?

03:59 13       A   It could pose potential conflicts, yes.  That's

03:59 14   one of the reasons I changed it.

03:59 15           MR. BERGMAN:  Would you mark as Exhibit 15,

03:59 16   please, a one-page document dated September 10, 2004.

03:59 17           (Deposition Exhibit 15 marked.)

03:59 18   BY MR. BERGMAN:

03:59 19       Q   Exhibit 15 is the cancellation agreement that

03:59 20   you referred to earlier, Mr. Toberoff?

03:59 21       A   I don't know if I referred to it as a

03:59 22   cancellation agreement, but this Exhibit 15 is the

03:59 23   document whereby we cancelled Exhibit 13 and Exhibit 14,

04:00 24   yes.

04:00 25       Q   What led up to the decision to cancel the

75

EXHIBIT 17
503

04:00 1    November 23, 2001 joint venture and the October 27, 2003

04:00 2    agreement?

04:00 3        A    Exactly what I have previously testified to.

04:00 4        Q    Which is what?

04:00 5        A    Which is I believe that in retrospect we should

04:00 6    have simply had a legal retainer agreement.  It would

04:00 7    have been a cleaner way to handle the relationship.

04:00 8        Q    Did this September 10, 2004 agreement, Exhibit

04:00 9    15, result in any way from your filing of the Siegel

04:0010    actions against the DC Comics and the Warner parties?

04:0011        MR. WILLIAMSON:  Objection.  Assumes facts not

04:0012    in evidence.  Vague and ambiguous.

04:0113        THE WITNESS:  I would say that's relevant to it.

04:0114    It's not the sole reason.  But the reason I say that is

04:0115    I'm looking at the date of this agreement, and I believe

04:0116    this is near when -- I don't know the exact date we

04:0117    filed, I don't recall the exact date the Siegels filed,

04:0118    but I believe this is before that or around the same

04:0119    time.

04:0120    BY MR. BERGMAN:

04:0121        Q    In what respect was this agreement related to

04:0122    the filing of the Siegel actions?

04:0123        A    Well, I wouldn't use the term "related."  I

04:0124    would say it's relevant to it because the Siegel actions

04:0125    regarded the exercise of termination rights under the

76

EXHIBIT 17
504

04:01 1    Copyright Act that the Siegels had regarding Superman,

04:02 2    and by that time the Shusters had also, I believe,

04:02 3    exercised their termination rights and served termination

04:02 4    notices.  I believe.  I'm not sure of the exact dates.

04:02 5    And the matter had gone from obviously the filing of

04:02 6    lawsuits that had taken on an even -- you know, much more

04:02 7    litigious nature and had become purely legal, I would

04:02 8    say.

04:02 9        Q    At any point in time did you discuss with the

04:02 10   Shuster heirs the conflict between the Siegel position

04:02 11   that they owned 100 percent of Superboy and what would

04:02 12   otherwise be the result for the Shuster heirs if in fact

04:03 13   they only -- if in fact the Siegels only owned 50 percent

04:03 14   of Superboy?

04:03 15        MR. WILLIAMSON:  Objection.  Assumes facts not

04:03 16   in evidence, and it violates the attorney-client

04:03 17   privilege.

04:03 18        THE WITNESS:  The substance of those

04:03 19   conversations would be privileged, but yes, I did

04:03 20   disclose the conflicts to both the Siegels and the

04:03 21   Shusters.

04:03 22   BY MR. BERGMAN:

04:03 23        Q    And did the Shuster heirs accept that conflict

04:03 24   position and tell you they had no objection to it?

04:03 25        A    Their reaction, that's privileged.

77

U.S. LEGAL SUPPORT

EXHIBIT 17
505

04:03 1          (Unanswered question.)

04:03 2      Q    Who initiated the cancellation of the two prior

04:03 3  agreements with the Shuster heirs?

04:03 4      A    I did.

04:03 5      Q    And what did you tell them with respect to that,

04:03 6  why you wanted to cancel those agreements?

04:03 7      A    I don't recall.

04:04 8      Q    Did they object to the cancellation?

04:04 9      A    No.

04:04 10     Q    Are there any presently operative agreements

04:04 11 between either or both Peavy and Peary on the one hand

04:04 12 and Pacific Pictures on the other?

04:04 13         MR. WILLIAMSON:  Objection.  Vague and

04:04 14 ambiguous.

04:04 15         THE WITNESS:  Not to my knowledge.

04:04 16 BY MR. BERGMAN:

04:04 17     Q    Are there presently any operative agreements

04:04 18 between Peary --

04:04 19     A    Oh, wait.  These two agreements had been

04:04 20 cancelled, and there are no other agreements.  The only

04:04 21 agreement is a legal retainer agreement between myself

04:04 22 and the Shusters.  There are no other agreements.  And

04:04 23 the two prior agreements have been cancelled.

04:04 24     Q    Okay.  There are no other agreements between

04:04 25 them and any of your entities?

                                                              78

EXHIBIT 17
506

04:05 1       A    That's correct.

04:05 2            MR. BERGMAN:  Would you mark as Exhibit 16 a

04:05 3   seven-page document bearing the Bates stamp EN 1 through

04:05 4   EN 7.

04:05 5            (Deposition Exhibit 16 marked.)

04:06 6   BY MR. BERGMAN:

04:06 7       Q    Is that your signature on Bates stamp number 5?

04:06 8       A    Yes, it is.

04:06 9       Q    The joint venture which is referred to as,

04:06 10  quote, "Newco," close quote, at page EN 2, is that the

04:06 11  entity which you have described as IP Worldwide, LLC?

04:06 12      A    No.

04:06 13      Q    Is that --

04:06 14      A    Oh, excuse me.  Excuse me.  That's incorrect.

04:06 15  Newco -- this is -- anticipates forming IP Worldwide,

04:07 16  LLC, so Newco would be IP Worldwide, LLC.

04:07 17      Q    And IP Worldwide, LLC was formed as a result of

04:07 18  your agreement with Mr. Emanuel?

04:07 19      A    It was formed after this agreement.

04:07 20      Q    But you'll notice that your transmittal, the

04:07 21  June 3, '02 transmittal of this document, refers to the

04:07 22  agreement as "regarding IP Worldwide, LLC."

04:07 23      A    Yeah.  I think by the time when this agreement

04:07 24  was first drafted, it hadn't yet been formed, but by the

04:07 25  time that it was signed, it may have been formed, because

                                                               79

EXHIBIT 17
507

04:07 1    this is in June -- see, this is transmitting it in June

04:08 2    of '02, and actually it was signed in February of '02, so

04:08 3    by June IP Worldwide had been formed.

04:08 4        Q    To the best of your recollection, was it in fact

04:08 5    transmitted on June 3, '02?  Because I note there is an

04:08 6    inconsistency between the date shown on the fax page and

04:08 7    the received stamp of Mr. McGuire, which indicates June

04:08 8    3, 2003.

04:08 9        A    There -- I would say there's several -- as you

04:0810    know from our depositions when sometimes I have trouble

04:0811    keeping track of the exhibits that I'm marking, numbers

04:0812    aren't one of my strengths, and sometimes I would use a

04:0813    form with the wrong year on it and forget to change the

04:0814    year.  So I'm -- I would -- I would just have to look at

04:0915    this and try and deduce --

04:0916        Q    I note that --

04:0917        A    Excuse me.

04:0918        Q    -- the dates next to the signatures on EN 5 are

04:0919    both February 12, '02.

04:0920        A    Right.  So this document was I believe signed

04:0921    February 12, '02.  It says here June 3, '02.  I believe

04:0922    that that should be June 3, '03.

04:0923        Q    Your transmittal?

04:0924        A    The transmittal of the executed copy.  I believe

04:0925    this was simply Ari saying, "Hey, do you have a copy of

80

EXHIBIT 17
508

04:09 1    our agreement," and my giving to him on June 4th '03.

04:09 2        Q    I see.  Even though the agreement had been

04:09 3    executed a year and a half earlier?

04:09 4        A    Yeah.  He -- Tom McGuire may have -- would have

04:10 5    kept Ari's copy -- my guess is or estimation is that Tom

04:10 6    McGuire would have kept the copy.  Maybe he didn't have

04:10 7    it or couldn't find it, and he asked me to send him

04:10 8    another copy at this time, but it was quite some time

04:10 9    after the agreement had been executed.

04:10 10       And you see here where it says up here "To Joel

04:10 11   Mandel" and it's crossed out?

04:10 12       Q    Right.

04:10 13       A    Joe Mandel is a business manager for Ari

04:10 14   Emanuel, and so it may have been Joe Mandel wanted to see

04:10 15   a copy of the agreement.  Tom either didn't have one or

04:10 16   didn't want to search his files, so they just asked me to

04:11 17   send it over.

04:11 18       Q    Okay.  With reference then to the execution date

04:11 19   of February 12, 2002, how much prior to that date did you

04:11 20   have your first conversation with Mr. Emanuel regarding

04:11 21   what was to become this joint venture?

04:11 22       A    I don't know.  I don't know how -- it would have

04:11 23   been sometime prior.

04:11 24       Q    Had you known Mr. Emanuel prior to the time that

04:11 25   you began discussing this agreement with him?

81

04:11 1          A    No.

04:11 2          Q    Who proposed as between you and Mr. Emanuel that

04:11 3    the two of you enter into this joint venture agreement?

04:12 4          A    He originally sought me out and was interested

04:12 5    in forming a business relationship.

04:12 6          Q    And what did he say in that regard?

04:12 7          A    I don't remember specifically, but I can give

04:12 8    you the gist of the conversation.  He, I believe, had

04:12 9    read some -- an article or some articles on me in Variety

04:12 10   regarding high-profile intellectual property rights or

04:12 11   titles I'd been involved with, and he believed that there

04:12 12   was a synergy between the fact that he was one of the

04:13 13   founders of a very big talent agency with access to

04:13 14   talent and that I had knowledge and access to potentially

04:13 15   valuable intellectual property rights, because in the

04:13 16   entertainment industry the -- you know, the key elements

04:13 17   are intellectual property, talent and the financing.

04:13 18         Q    Prior to entering into the October -- rather,

04:13 19   the February 2, 2002 joint venture agreement with

04:13 20   Mr. Emanuel, did you tell him that you had acquired an

04:13 21   interest in the Shuster heirs' rights to Superman?

04:14 22         A    I did not.  I think that that

04:14 23   mischaracterizes -- I'm not sure if that correctly states

04:14 24   the relationship with the Shusters, but I did not mention

04:14 25   to him the Shusters.

                                                                    82

04:14 1          Q    Prior to February 2, 2002, did you have any

04:14 2    discussion with Mr. Emanuel concerning any Superman

04:14 3    rights?

04:14 4               MR. WILLIAMSON:  Objection.  Vague and

04:14 5    ambiguous.

04:14 6               THE WITNESS:  I don't believe so, and the

04:14 7    reason -- I don't have a specific recollection, but I'm

04:15 8    deducing -- when I answer, "I don't believe so," I'm

04:15 9    deducing that from if you turn to Bates stamp 7 of

04:15 10   Exhibit 16, do you see where it says, "Legal

04:15 11   Claims/Litigation"?

04:15 12         Q    Yes.

04:15 13         A    -- Appendix 1?  I believe Appendix 1, if you  --

04:15 14   Appendix 1 is an appendix of excluded -- things that are

04:15 15   excluded from this agreement.  I'm trying to find it for

04:15 16   you in the agreement.

04:16 17              Yes, if you look at page 4 -- Bates stamp 4,

04:16 18   it's page 3 of the agreement, Bates stamp 4, it's

04:16 19   paragraph D Arabic 3 where it says, "With respect to the

04:16 20   legal disputes identified in Appendix 1 C" -- that's not

04:16 21   the paragraph.  There is another paragraph where I

04:16 22   believe it excludes from the purview of IP Worldwide --

04:16 23         Q    Are you referring to paragraph D 2 at Bates

04:16 24   stamp EN 3?

04:16 25         A    I don't think that -- my recollection, and I

                                                                    83

04:16 1    would have to find the agreement, is that there is a

04:16 2    paragraph in the agreement that excludes certain items or

04:17 3    has special treatment for certain items listed in

04:17 4    Appendix 1, and in Appendix 1 -- in Appendix 1 C where it

04:17 5    says "Legal Claims/Litigation," the intention was to

04:17 6    exclude those things listed there from the purview of the

04:17 7    agreement, and it says "JS Claims," and that refers to

04:17 8    Joseph Shuster claims, and when you asked me whether I

04:17 9    had disclosed to Mr. Emanuel, I deduced the answer "I

04:17 10   don't believe so" because I used the initials -- it says,

04:17 11   "(initialed due to confidentiality)." I used those

04:17 12   initials "JS" so as not to disclose the name Joseph

04:18 13   Shuster, and I believe that's further -- you know, this

04:18 14   agreement was entered into -- and it was probably

04:18 15   negotiated before that, but it was signed on February 12,

04:18 16   '02, and it is -- was certainly negotiated earlier than

04:18 17   that. This is further indication that I regarded my

04:18 18   dealings with the Shusters as confidential, privileged

04:18 19   claims, legal claims.

04:18 20        Q   To summarize your testimony, is it your

04:18 21   testimony that the Shuster claims and whatever rights

04:18 22   specific had under the joint venture agreement were

04:19 23   expressly excluded from the operation of the February 2,

04:19 24   2002 joint venture?

04:19 25        MR. WILLIAMSON:  Objection.  Misstates the

                                                                    84

04:19 1    testimony.

04:19 2              THE WITNESS:  Yes, it was not part of IP

04:19 3    Worldwide.

04:19 4              If you look at on Bates -- page 1 of the

04:19 5    agreement, Bates stamp 2, I think one of the provisions

04:19 6    which talks about the appendix, it talks about the

04:19 7    contributions from PPC, and it says, "PPC's current IP

04:19 8    business," but then PPC stands for Pacific Pictures

04:20 9    Corporation, and then it says, "subject to...exclusions

04:20 10   per Appendix '1'..."

04:20 11             MR. BERGMAN:  Off the record.

04:20 12             (Discussion held off the record.)

04:28 13             (Recess.)

04:32 14             (Deposition Exhibit 17 marked.)

04:32 15             MR. BERGMAN:  Back on the record.

04:32 16        Q    I am not going to get to that right now.

04:32 17             If you recall, Mr. Toberoff, Kevin Marks

04:32 18   testified at his deposition concerning certain

04:32 19   communications that he had with you, and he -- his

04:32 20   records, and they were -- this particular call was

04:32 21   reflected on GTRB 600, reflected a call from you to

04:32 22   Mr. Marks on November 29, 2001.  Mr. Marks testified that

04:33 23   he did not return that particular call.

04:33 24             How did you know that Mr. Marks was involved in

04:33 25   the representation of the Siegel interest in Superman?

                                                              85

**U.S. LEGAL SUPPORT**

**EXHIBIT 17**
513

04:33 1      A   I had seen on the Internet I think it was one of

04:33 2    these comic book -- like a comic book journal had posted

04:33 3    the Siegels' termination notice or a copy of one of their

04:33 4    termination notices, and at the end of that notice the

04:33 5    name of their attorney who had done the termination

04:33 6    notice, Arthur Levine, and I believe I had his name and

04:33 7    address.  I'm not sure if the phone number was there, but

04:33 8    it may be.  And I spoke to Arthur Levine, and he in sum

04:34 9    and substance told me that he wasn't -- you know, had

04:34 10   done the termination but wasn't very active at that point

04:34 11   and said the lawyer representing the Siegels was Kevin

04:34 12   Marks.

04:34 13         Did you mention the date of that call?

04:34 14      Q   His phone log showed November 29, 2001.

04:34 15      A   I just want to check the date of my agreement

04:34 16   with the Shusters, the first one.

04:34 17      Q   That was November 23, 2001.

04:34 18      A   Yeah.

04:34 19      Q   So this came six days after --

04:34 20      A   I believe it was shortly after -- I called him

04:34 21   shortly after I made an agreement with the Shusters.

04:34 22      Q   Had you learned from the Shuster heirs that

04:35 23   there was -- that Kevin Marks represented the Siegels?

04:35 24      A   No.

04:35 25      Q   Okay.

                                                                    86

U.S. LEGAL SUPPORT

EXHIBIT 17
514

04:35 1        A    It was from Arthur Levine.

04:35 2        Q    What was it that prompted you to call Mr. Marks?

04:35 3        A    I believe at that time I was just trying to find

04:35 4    out the status.

04:35 5        Q    Prior to the November 29, 2001 initial call to

04:35 6    Mr. Marks, had you and Mr. Emanuel discussed the Siegel

04:35 7    interest in Superman?

04:35 8            MR. WILLIAMSON:  Objection.  Attorney-client.

04:35 9            THE WITNESS:  Yeah.  Actually, at IP Worldwide I

04:3510    was general counsel to IP Worldwide.  I handled all of

04:3511    the contracts, anything legal, any negotiations, you

04:3612    know, just like any other general counsel would for a

04:3613    company, and so Ari's lawyer has asserted, and I believe

04:3614    that's correct, that there was an attorney-client

04:3615    relationship there and that my communications with Ari as

04:3616    to, you know, things that he wanted to do would be

04:3617    protected by the attorney-client privilege and attorney

04:3618    work product.

04:3619    BY MR. BERGMAN:

04:3620        Q    Once again, you were a joint venturer with

04:3621    Mr. Emanuel, were you not?

04:3622        A    That's correct, but I was also part of the

04:3623    company.  In other words, what I did for the company and

04:3624    whether or not I was a joint venturer, the underlying

04:3625    organization of those companies are different issues.

                                                                      87

04:37 1          Q    Are you refusing to answer my last question

04:37 2    based on the attorney-client privilege?

04:37 3          MR. WILLIAMSON:  Which question?

04:37 4          THE WITNESS:  Which question?  I want to make

04:37 5    sure --

04:37 6          MR. BERGMAN:  Could you repeat the question?

04:37 7          THE WITNESS:  -- we are we referring to the same

04:37 8    question?

04:37 9          (Record read as follows:

04:35 10          "Q    Prior to the November 29,

04:35 11          2001 initial call to Mr. Marks, had

04:35 12          you and Mr. Emanuel discussed the

04:35 13          Siegel interest in Superman?")

04:37 14          THE WITNESS:  That's privileged.  To answer your

04:37 15    question, yes.

04:37 16          (Unanswered question.)

04:37 17    BY MR. BERGMAN:

04:37 18          Q    That doesn't even come close to being

04:37 19    privileged.  The fact of discussing something doesn't ask

04:37 20    what you disclosed to him, what you told him, what you

04:37 21    advised him.

04:37 22          A    Normally an attorney would not disclose the

04:37 23    subject of discussions on which he's providing legal

04:37 24    advice.

04:38 25          Q    Do you stand by your refusal to answer that

                                                              88

04:38 1    question?

04:38 2        A    Can you read the question back to me again?

04:38 3            (Record read as follows:

04:35 4                "Q    Prior to the November 29,

04:35 5            2001 initial call to Mr. Marks, had

04:35 6            you and Mr. Emanuel discussed the

04:35 7            Siegel interest in Superman?")

04:38 8            THE WITNESS:   I can tell you that it's moot

04:38 9    because I don't recall a discussion with Mr. Emanuel

04:3810    regarding Superman, but if we had, the substance of those

04:3811    conversations would be privileged.

04:3812    BY MR. BERGMAN:

04:3813        Q    Mr. Marks testified that you called him again on

04:3914    or about February 6, 2002.  He pointed to a phone log

04:3915    which has been Bates stamped GTRB 604.  Mr. Marks

04:3916    testified that he returned your call that day or shortly

04:3917    afterwards.

04:3918            Can you tell me, please, to the best of your

04:3919    recollection and with as much specificity as you can what

04:3920    you said and what Mr. Marks said in that first telephone

04:3921    conversation?

04:3922            MR. WILLIAMSON:   Objection to the extent that

04:3923    he's claiming to testify as to what Mr. Marks testified

04:3924    in his deposition.

04:3925            If you have a recollection of what he's talking

                                                                    89

04:39 1    about, you can answer.

04:39 2         THE WITNESS:  Yeah, I'm not -- in -- I had the

04:39 3    opportunity to look over Mr. Marks' transcript after his

04:39 4    deposition, and there were certain -- it's not a major

04:39 5    point, but there were [was] certain testimony as to dates where

04:40 6    he would say, "I believe we spoke one or two days after,"

04:40 7    and he would say "or subsequently," and so it wasn't

04:40 8    really -- I recall in reading his transcript that on some

04:40 9    of these conversations it was around that time, but it

04:40 10   wasn't really firm.  In other words, he would start to

04:40 11   give you the impression in his testimony that he spoke on

04:40 12   the next day or two days after, but then he would say "or

04:40 13   subsequently," so I have -- only to that extent I don't

04:40 14   know if the dates are correct.

04:40 15   BY MR. BERGMAN:

04:40 16      Q    What do you recall being said by the two of you

04:40 17   during your first telephone conversation?

04:40 18      A    I -- to put it simply, he blew me off very

04:40 19   politely.

04:40 20      Q    What had you requested that he blew off?

04:41 21      A    I don't specifically recall what I asked him,

04:41 22   but it was similar to the first call where I was calling

04:41 23   to know what the status was of the Siegels' rights, what

04:41 24   the status was of their rights, and he politely blew me

04:41 25   off, didn't want to tell me or talk to me, and got off

90

04:41 1   the phone.

04:41 2       Q   Did you ask him what the status of the Siegels'

04:41 3   discussions with DC Comics were?

04:41 4           MR. WILLIAMSON:  Objection.  Assumes facts not

04:41 5   in evidence.

04:41 6           THE WITNESS:  No, I don't believe I asked him

04:41 7   about that.

04:41 8   BY MR. BERGMAN:

04:41 9       Q   Do you recall Mr. Marks telling you in that

04:41 10  first conversation that he was very far along with DC

04:41 11  Comics and at a documentation phase?

04:41 12      A   I don't recall --

04:41 13          MR. WILLIAMSON:  Objection.  Marc, let me

04:41 14  object.  Assumes facts not in evidence.  Vague and

04:41 15  ambiguous.

04:41 16          THE WITNESS:  I don't recall him -- whether or

04:41 17  not he said DC Comics, and I don't recall him using those

04:41 18  specific words.  He may have, but I don't recall that.  I

04:41 19  don't recall the specifics of what he said, but I just

04:41 20  recall the end result of him blowing me off.

04:41 21  BY MR. BERGMAN:

04:41 22      Q   What were the specifics of what you said?

04:41 23      A   I just told you.  I was inquiring as to the

04:41 24  status of the rights.  I didn't ask him about something

04:41 25  specific.

91

EXHIBIT 17
519

04:42 1       Q    And all you can recall of that conversation is

04:42 2   that you asked him about the status of the rights?

04:42 3       A    Yes.  And he said he can't talk about that.  I

04:43 4   don't remember him saying something about -- I don't

04:43 5   recall him mentioning DC Comics specifically, the name DC

04:43 6   Comics, and I don't recall him saying those words

04:43 7   "documentation phase."  I don't recall the specifics of

04:43 8   the conversation.  I recall the result of the

04:43 9   conversation.

04:43 10      Q    Okay.  Have you told me everything you can

04:43 11  recall about your first conversation with Mr. Marks

04:43 12  concerning the Siegel interest?

04:43 13      A    Everything I can recall today, yes.

04:43 14      Q    Is there anything you could look to to refresh

04:43 15  your recollection as to what he or you said during that

04:43 16  conversation?

04:43 17      A    I don't know.  Maybe.

04:43 18      Q    Did you make any notes of the conversation?

04:43 19      A    No.

04:43 20      Q    Did you prepare a memorandum afterwards

04:43 21  reiterating what had been said?

04:43 22      A    I don't think so.

04:44 23      Q    Mr. Marks testified to having a second

04:44 24  conversation with you on or about July 30, 2002.

04:44 25           Do you recall speaking a second time with

                                                            92

04:44 1    Mr. Marks?

04:44 2         MR. WILLIAMSON:  Objection to the extent it

04:44 3    misstates the record of Mr. Marks' testimony at his

04:44 4    deposition.

04:44 5         MR. BERGMAN:  What was that objection?

04:44 6         MR. WILLIAMSON:  I'm objecting to the extent

04:44 7    that it misstates the testimony of Mr. Marks at his

04:44 8    deposition.

04:44 9         MR. BERGMAN:  In what way does it misstate the

04:4410    testimony?

04:4411         MR. WILLIAMSON:  I don't know if it does or not.

04:4412    We haven't seen the transcript.

04:4413         MR. BERGMAN:  Then how can you object that it

04:4414    misstates the testimony?

04:4415         MR. WILLIAMSON:  Because I need to preserve it,

04:4416    and I don't know what you are reading off of, I don't

04:4417    know what representation you're making.  So if you want

04:4418    to give us the deposition testimony as an exhibit, we'll

04:4419    be happy to look at it.  To the extent you are not going

04:4420    to, I'm going to object.

04:4421         THE WITNESS:  Actually, again, this is one of

04:4422    these areas where I believe his testimony is unclear as

04:4423    to the date.  I'm not saying it's a big issue.  I'm just

04:4524    saying it's unclear as to the date.  I'm not sure, in

04:4525    reading his transcript, that conversation may have

                                                          93

EXHIBIT 17
521

04:45 1    been -- what was the date you mentioned?

04:45 2    BY MR. BERGMAN:

04:45 3        Q    July 30.

04:45 4        A    May have been July 30th, or it may have been in

04:45 5    early August.

04:45 6        Q    Okay.  Whether it was --

04:45 7        A    I'm not -- I remember, in reading his

04:45 8    transcript, it was unclear to me what the dates were, and

04:45 9    I didn't have a specific recollection of the dates.

04:4510        Q    Okay.  Whether it was the last week in July or

04:4511    the first week in August, what do you recall saying and

04:4512    what do you recall Mr. Marks saying in that second phone

04:4513    conversation?

04:4514        A    I do not recall the specific words that were

04:4515    said.  I recall the substance of the conversation.

04:4516        Q    And what was the substance?

04:4517        A    And the substance or effect of the conversation

04:4518    was that whereas before he had totally, as I would say,

04:4619    blew me off, now, even though he chose his words

04:4620    carefully and was somewhat guarded, he was clearly -- his

04:4621    body language, if you will, to the extent there is body

04:4622    language in a telephone conversation, was make an offer.

04:4623    In other words, he indicated that the Siegel rights were

04:4624    available, and if there was an interest in those rights,

04:4625    you can make an offer, but he can't discuss anything with

94

04:46  1    me.  That was the sort of the substance and effect of the

04:46  2    conversation, but I don't recall the specific words used.

04:46  3        Q    At page 166 of Mr. Marks' deposition commencing

04:47  4    at line 10, I asked him the following question:

04:47  5        "Q    Can you tell me to the best of your

04:47  6    recollection what was said by each of you and Mr.

04:47  7    Toberoff in that conversation?

04:47  8        "A    I think Mr. Toberoff said he was --

04:47  9        wanted to check in with me to see where we

04:4710        were in our dealings with DC Comics."

04:4711        Stopping at that point, do you recall asking him

04:4712    where he was in his dealings with DC Comics?

04:4713        A    No, I don't recall referring to dealings.  I was

04:4714    referring to the rights and whether those rights were

04:4715    available.

04:4716        Q    He goes on to say, quote, "And I think I told

04:4717    him then that -- and I may have also said it in our first

04:4718    conversation -- that we had a confidentiality agreement

04:4719    with DC Comics, and I didn't feel at liberty to discuss

04:4820    the status of our dealings with him."

04:4821        Do you recall Mr. Marks telling you that?

04:4822        A    I don't specifically recall him mentioning that.

04:4823    He may have.

04:4824        Q    Mr. Marks then goes on at line 20 of his

04:4825    deposition at page 166, quote --

95

04:48 1      A   When I say, "He may have," he may have mentioned

04:48 2   to me that the reason he was -- in other words, he may

04:48 3   have said something like, "I'm not trying to be cagey,

04:48 4   but we have a confidentiality agreement," but I don't

04:48 5   specifically recall him saying that.  If he did, it was

04:48 6   in that context.

04:48 7      Q   He goes on to say, quote, line 20, page 166,

04:48 8   "Mr. Toberoff said, 'Can you tell me what DC Comics

04:48 9   offered you,' and I said, 'No.  We have a confidentiality

04:49 10  agreement,'" close quote.

04:49 11      Did you ask Mr. Marks in that conversation to

04:49 12  tell you what DC Comics offered him?

04:49 13      A   I -- again, I don't believe there were

04:49 14  references to DC Comics.  I don't believe I knew at the

04:49 15  time who -- I don't -- in other words, I don't believe at

04:49 16  that time I knew that he was negotiating with DC Comics,

04:49 17  so I don't believe there was a mention of DC Comics.

04:49 18      Q   Mr. Marks' testimony goes on, line 23 of that

04:49 19  same page, quote, "And I believe Mr. Toberoff said,

04:49 20  'Would you be willing to enter into negotiations with

04:49 21  me,' and I believe I said, 'Initiating negotiations, no.

04:50 22  That's something that makes me very uncomfortable.  If

04:50 23  you have an offer, present it to me, and I'll present it

04:50 24  to the client,'" close quote.

04:50 25      Do you recall saying to Mr. Marks whether he

                                                                    96

EXHIBIT 17
524

04:50 1    would be willing to enter into negotiations with you?

04:50 2        A    Yeah, I don't speak that way, so I doubt that I

04:50 3    said, "Would you be willing to enter into negotiations

04:50 4    with me?"  It's just not my style.  I would speak more

04:50 5    directly.

04:50 6        Q    Well --

04:50 7        A    In other words, if you invite somebody to dance,

04:50 8    I would never say, "Would you be willing to dance with

04:50 9    me?"  I would say, "Do you want to dance?"

04:5010        Q    What did you say to Mr. Marks in substance as to

04:5011    whether he wanted to dance with you?

04:5012        A    I was using that as a metaphor.

04:5113        Q    I understand.

04:5114        A    The thrust of the conversation was I wanted to

04:5115    know -- I was interested in the rights, and I wanted to

04:5116    know if the rights were available or not, and, if they

04:5117    were available, would make an offer with respect to those

04:5118    rights, and he in essence said, "Yes, they are available.

04:5119    Make an offer."

04:5120        Q    As of July --

04:5121        A    And I may have inquired as to what his clients

04:5122    wanted for the rights or something of that nature, and he

04:5123    wouldn't give me any information.  He just said, "Make an

04:5124    offer."

04:5125        Q    As of the end of July 2002, had you had any

                                                                      97

EXHIBIT 17
525

04:51 1    discussion with Peavy or Peary concerning Joanne or Laura

04:52 2    Siegel's interest?

04:52 3            MR. WILLIAMSON:  Objection.  Attorney-client.

04:52 4            THE WITNESS:  What are the dates?

04:52 5    BY MR. BERGMAN:

04:52 6        Q    The end of July 2002.

04:52 7        A    Can you repeat the question, please, or read it

04:52 8    back to me?

04:52 9        Q    As of the end of July 2002, had you had any

04:52 10   discussion with Peary or Peavy concerning Joanne or Laura

04:52 11   Siegel's interest in the Superman property?

04:52 12       A    Those discussions would be privileged.  I'm not

04:52 13   gonna answer questions about what discussions I had with

04:52 14   the Shusters.  That's attorney-client privilege, attorney

04:52 15   work product regarding the Siegels' interest.

04:52 16           (Unanswered question.)

04:52 17       Q    As of the end of July 2002?

04:52 18       A    From the point I started speaking to them till

04:53 19   the present, my discussions with them regarding the

04:53 20   Siegels' interest, regarding their interest, regarding

04:53 21   Superman, regarding that whole legal situation is

04:53 22   attorney-client privileged and also protected by the work

04:53 23   product doctrine.

04:53 24       Q    Okay.  Mr. Marks went on to testify concerning a

04:53 25   conference call that he had with you and Mr. Emanuel.

                                                                      98

04:53 1    The date of that conference call as set by Mr. Marks with

04:53 2    reference to his phone logs which were marked GTRB 616

04:53 3    was that the conversation occurred within a day or two of

04:53 4    August 7, 2002.

04:54 5         Prior to the time -- you do recall having a

04:54 6    conference call with Mr. Marks and Mr. Emanuel, don't

04:54 7    you?

04:54 8    A    I do.  As far as a date, again the date -- I

04:54 9    have a -- I originally called -- this is just commenting

04:54 10   on the date.  I originally recall that my assistant I had

04:54 11   mentioned before, Andrew, I had asked him to set up a

04:54 12   conference call, and I believe that was the reference in

04:54 13   Marks' -- the exhibit to Marks' deposition, and that was

04:54 14   noted -- that initial referenced conference call, that's

04:55 15   the one where he talks about it's "20," and it's crossed

04:55 16   out and says, "5 to 10 minutes," something like that, on

04:55 17   the exhibit.  That was Andrew calling to set up a

04:55 18   conference call.

04:55 19        But I have a specific recollection that after I

04:55 20   tried to get dates from the Marks side -- or Andrew tried

04:55 21   to get dates from Kevin Marks' office, it was very hard

04:55 22   to pin down Ari Emanuel for that conference call.

04:55 23        So just talking about the date, I know he said

04:55 24   it would have happened one or two days after that.  I

04:55 25   think that conference call could have happened 10 days

99

04:55 1     after that.

04:55 2          Q   Okay.

04:55 3          A   Because I remember specifically being a little

04:55 4     frustrated with Ari Emanuel's assistant because they kept

04:55 5     saying, "Yes, and I'll have to speak to him," and he

04:55 6     wouldn't come back to me with a date.  So that's all.

04:55 7          Q   Prior to that conference call, whether it

04:55 8     occurred on August 7 or 10th or 15th or whenever --

04:56 9          A   Right.  Let's say mid August.

04:5610          Q   Okay.

04:5611              -- had you taken any steps to place a monetary

04:5612     value on the Siegel interest?

04:5613              MR. WILLIAMSON:  Objection.  Vague and

04:5614     ambiguous, and objection on attorney-client, work product

04:5615     grounds.

04:5616              Instruct you not to answer.

04:5617              (Instruction not to answer.)

04:5618              THE WITNESS:  I'm going to follow that

04:5619     instruction.

04:5620     BY MR. BERGMAN:

04:5621          Q   To your knowledge had Mr. Emanuel taken any

04:5622     steps to place a monetary value on the Siegel interest in

04:5623     Superman prior to the conference call?

04:5624              MR. WILLIAMSON:  Objection to the extent it

04:5625     calls for attorney work product, and objection on the

                                                              100

04:56 1    grounds it calls for speculation.

04:56 2            THE WITNESS:  And also attorney-client

04:56 3    privilege, because if I knew it, it would be through

04:56 4    communications by Mr. Emanuel.

04:56 5            (Unanswered question.)

04:56 6    BY MR. BERGMAN:

04:56 7        Q   Mr. Marks testified with respect to that

04:56 8    conference call beginning at page 168 of his deposition,

04:57 9    line 12 -- line 11, "I think Mr." -- I had asked him what

04:57 10   was said in the conversation.  Quote, "I think

04:57 11   Mr. Toberoff may have very briefly referenced past

04:57 12   conversations, and then I believe it was Mr. Emanuel who

04:57 13   explained that either they or some other people or

04:57 14   perhaps some members of the Endeavor Talent Agency had

04:57 15   set up a fund or were in the process of setting up a fund

04:57 16   to acquire intellectual property rights which they would

04:57 17   then package with clients from the Endeavor Talent

04:57 18   Agency."

04:57 19           Do you recall Mr. Emanuel stating that in

04:57 20   substance during the conversation?

04:57 21       A   Not specifically, no.  He may have.

04:57 22       Q   Okay.  Do --

04:58 23       A   I recall him, you know, doing the equivalent of

04:58 24   in a meeting what they call warming up the room where --

04:58 25   which he's very good at, in which he sort of just spoke

                                                              101

04:58 1    generally, but I don't specifically recall that.  He may

04:58 2    have.

04:58 3        Q    Had you or Mr. Emanuel set up a fund to acquire

04:58 4    intellectual property rights at that time?

04:58 5            MR. WILLIAMSON:  Objection.  Attorney-client

04:58 6    privilege.  Attorney work product.

04:58 7            THE WITNESS:  Without a waiver of those

04:58 8    privileges, I can speak for myself.  I had not set up a

04:58 9    fund, no.

04:5810    BY MR. BERGMAN:

04:5811        Q    To your knowledge had Mr. Emanuel?

04:5812        A    I believe Endeavor or Mr. Emanuel had a fund and

04:5913    access to a lot of financing.

04:5914        Q    Continuing with Mr. Marks' testimony concerning

04:5915    that conference call between you and he and Mr. Emanuel,

04:5916    I'm at page 169 of his deposition, line 1, quote, "And

04:5917    I'm not sure who spoke, but they made a proposal of $15

04:5918    million and what was described as a meaningful back end,

04:5919    which I understood to be a contingent compensation

04:5920    position or a royalty position in the exploitation of the

04:5921    property," close quote.

04:5922            Did you or Mr. Emanuel propose acquiring the

04:5923    Siegel rights to Mr. Marks for $15 million together with

04:5924    a meaningful back end?

04:5925        A    I wasn't the one who made that offer.

                                                                    102

EXHIBIT 17
530

05:00 1     Mr. Emanuel made that offer, and I specifically remember

05:00 2     that, because I remember when he was talking about the

05:00 3     back end, I remember thinking it was just something odd,

05:00 4     the way he had mentioned the back end.

05:00 5          Q    Was --

05:00 6          A    But I remember that he was the one who stated

05:00 7     that.

05:00 8          Q    Was the offer by Mr. Emanuel for $15 million?

05:00 9          A    Yes.

05:0010          Q    And did he mention what he had in mind with

05:0011     respect to the meaningful back end?

05:0012          A    No.

05:0013          MR. WILLIAMSON:  Objection.  Indefinite as to

05:0014     time and place.  Are you referring to that conversation?

05:0015          MR. BERGMAN:  Yes.

05:0016          MR. WILLIAMSON:  Okay.

05:0017          THE WITNESS:  No.

05:0018     BY MR. BERGMAN:

05:0019          Q    Okay.  Do --

05:0020          A    I believe the offer was that if the fixed amount

05:0121     was acceptable, that we would go on to work out a back

05:0122     end.

05:0123          Q    Okay.  Mr. Marks goes on to testify -- and I am

05:0124     omitting some of his testimony.  I'm at line 16 on page

05:0125     169 -- "And then I," Mr. Marks, "asked if this was a

                                                              103

EXHIBIT 17
531

05:01 1    proposal that was conditioned on their doing due

05:01 2    diligence about the rights, and they said again in

05:01 3    substance and effect, 'No, it's not.  We've done our due

05:01 4    diligence already.  This is the offer.'"

05:01 5         Do you recall that being said during this late

05:01 6    July or mid August telephone conversation?

05:01 7         A    I don't recall that specifically, but it doesn't

05:01 8    sound like something I would say.

05:02 9         Q    Do you recall --

05:02 10        A    That sounds like an agent talking.

05:02 11        Q    Do you recall anything else about the conference

05:02 12   call between you, Mr. Marks and Mr. Emanuel in mid

05:02 13   August?

05:02 14        A    Not sitting here, no.

05:02 15        Q    Again, did you make any notes of that

05:02 16   conversation?

05:02 17        A    I may have.  I don't know.  It wasn't a long

05:02 18   conversation, nor a complicated one, so my guess is I did

05:02 19   not make notes.  I didn't -- there weren't any in the

05:02 20   file.

05:02 21        Q    Okay.  Mr. Marks testified, again utilizing his

05:02 22   phone register at page 617, that there was a call from

05:02 23   you subsequent to the conference call on August 29, and

05:03 24   he couldn't recall whether or not he had responded to

05:03 25   that call.

                                                                104

05:03 1          Do you recall calling Mr. Marks following the

05:03 2    conference call?

05:03 3      A    I don't.  When I read that in the transcript, I

05:03 4    was trying to think what that was and whether we spoke,

05:03 5    and I don't have any -- I don't have a recollection of

05:03 6    speaking to him after that.

05:03 7      Q    Okay.  He testifies that you and he did not

05:03 8    speak after that but that you had called him, according

05:03 9    to his phone logs, on August 29.

05:0310      A    I don't have a specific recollection of calling

05:0311    him.  I may have.

05:0312      Q    Following the conference call -- strike that.

05:0413          Had Mr. Emanuel discussed the $15 million figure

05:0414    with you prior to the conference call?

05:0415          MR. WILLIAMSON:  Objection --

05:0416          THE WITNESS:  I --

05:0417          MR. WILLIAMSON:  -- attorney -- objection.

05:0418    Attorney-client privilege.  Work product.  I instruct you

05:0419    not to answer.

05:0420          (Instruction not to answer.)

05:0421          THE WITNESS:  I'm going to follow that

05:0422    instruction.

05:0423    BY MR. BERGMAN:

05:0424      Q    In relation to -- and you can answer this in

05:0425    relation to the mid August conference call if you want or

105

**U.S. LEGAL SUPPORT**

EXHIBIT 17
533

05:04 1    in reference to any other facts if you want.  When did

05:04 2    you have your very first conversation with either Laura

05:04 3    or Joanne Siegel?

05:05 4        A   What was the first part of the question?  In

05:05 5    relation to what?

05:05 6        Q   I was suggesting that if you could answer that

05:05 7    question with respect -- in relation to the mid August

05:05 8    telephone conversation that you had, whether it was a

05:05 9    month or two months afterwards, but my --

05:05 10       A   Are you talking about the conversation with --

05:05 11   the conference call with Ari Emanuel and Kevin Marks?

05:05 12       Q   Correct.

05:05 13       A   It was long after that.  I believe it was the

05:05 14   end of October of that year.

05:05 15       Q   End of October 2002?

05:05 16       A   Yes, mid to end, sometime in October.  I'm

05:06 17   not -- I believe it was sometime in October, and the

05:06 18   basis of that belief is the agreement between the Siegels

05:06 19   and IP Worldwide --

05:06 20       Q   Is dated October -- as of October 3.

05:06 21       A   Right.  And it was signed towards the end of

05:06 22   October.  So I believe the initial contact was early

05:06 23   October.

05:06 24           Sometimes when I do agreements, when they're

05:06 25   dated as of -- when they're dated as of, I -- that's when

106

EXHIBIT 17
534

```
05:06  1    there were sort of the parties came together.  So I
05:06  2    believe the initial conversation may have been like right
05:07  3    at the beginning of August -- I mean, excuse me, right at
05:07  4    the beginning of October 2003.
05:07  5        Q   How did that initial conversation, whenever it
05:07  6    occurred, come about?  Who called who?
05:07  7        A   Joanne Siegel called me.
05:07  8        Q   And did she say how she had gotten your name or
05:07  9    number?
05:07 10        A   Yes.  She said she had gotten it from Jean, Jean
05:07 11    Peavy.
05:07 12        Q   And what in substance did Laura Siegel say to
05:07 13    you at that time?
05:07 14        A   It was Joanne, actually.
05:08 15        Q   Oh, I'm sorry.
05:08 16            MR. WILLIAMSON:  Objection.  Attorney-client.
05:08 17            THE WITNESS:  Without waiver of the privilege, I
05:08 18    can just tell you the introductory remarks were that she
05:08 19    had gotten my number from Jean Peavy, something to the
05:08 20    effect that "Jean Peavy likes you a lot and is very --
05:08 21    highly recommended you," something of that nature, and
05:08 22    that she was looking for an attorney and would be
05:08 23    interested to talk to me about representing her.  That
05:08 24    was the sum and substance of it.
05:08 25    BY MR. BERGMAN:
```

107

05:08 1        Q    And did you tell Joanne Siegel in that

05:08 2    conversation that you had been speaking with Mr. Marks?

05:09 3        A    I don't recall whether I told her that in that

05:09 4    conversation or not.  I may have.

05:09 5        Q    Do you recall telling her in that initial

05:09 6    conversation that you had been interested in acquiring

05:09 7    her rights?

05:09 8        A    I may have.  I recall when she called me, I was

05:09 9    surprised, you know, because it's Jerry Siegel's widow

05:0910    and because of the sort of less than enthusiastic

05:0911    demeanor of Mr. Marks -- actually I shouldn't say -- in

05:0912    other words, he was just very -- Mr. Marks was very

05:1013    sparse, I should say, and polite in his communication but

05:1014    didn't exhibit, you know -- the first conversation was he

05:1015    was very -- like I said, he blew us off; the second

05:1016    conversation, he was much more receptive, but all of a

05:1017    sudden I was getting a call from Joanne Siegel.  So I may

05:1018    have mentioned at that time that I had been in contact

05:1019    with Kevin Marks, but I don't specifically recall.

05:1020        Q    During the period from the conference call with

05:1021    Mr. Emanuel and Mr. Marks until the first telephone call

05:1022    from Joanne Siegel, had you done anything to inquire

05:1023    about the offer which you had made to Mr. Marks or which

05:1024    Mr. Emanuel had made to Mr. Marks?

05:1125        A    I don't --

108

EXHIBIT 17
536

05:11 1          MR. WILLIAMSON:  Objection.  Vague and

05:11 2   ambiguous.

05:11 3          THE WITNESS:  I don't specifically recall, but

05:11 4   it may have been that -- what was in his log where he

05:11 5   said he didn't believe we spoke, but there was a call

05:11 6   registered, so I may have called him for that purpose,

05:11 7   but I don't specifically recall that phone call, probably

05:11 8   because he didn't return it.

05:11 9   BY MR. BERGMAN:

05:11 10      Q    What else do you recall of the first

05:11 11  conversation with Joanne Siegel?

05:11 12      A    That's it.

05:11 13      Q    How many days -- how did the conversation end?

05:11 14      A    I believe we set an appointment to meet.  I'm

05:11 15  not certain, but I believe -- I have a vague recollection

05:11 16  of meeting with Joanne and I believe Laura for lunch.

05:11 17      Q    Approximately --

05:11 18      A    We met in person.

05:11 19      Q    Approximately how long after that first call

05:12 20  from Joanne?

05:12 21      A    Right away.

05:12 22      Q    Within a day or two?

05:12 23      A    I believe so.

05:12 24      Q    And where did you meet with them for lunch?

05:12 25      A    I don't recall.

109

05:12 1          Q    Would you tell me to the best of your

05:12 2    recollection what was said by each of you at that

05:12 3    meeting?

05:12 4               MR. WILLIAMSON:  Objection.  Attorney-client.

05:12 5               THE WITNESS:  No, I'm not going to tell you

05:12 6    that, because after she told me she's interested in my

05:12 7    providing legal services to her, even at that stage those

05:12 8    conversations are protected by the attorney-client

05:12 9    privilege.  I gave you the subject matter, but...

05:12 10              (Unanswered question.)

05:12 11   BY MR. BERGMAN:

05:12 12         Q    Did you at any time tell either Joanne or Laura

05:12 13   Siegel that Mr. Emanuel had offered $15 million to

05:12 14   acquire their rights?

05:13 15         A    Again, our -- those conversations at that point

05:13 16   would be privileged.  Those communications between me and

05:13 17   her would be privileged.

05:13 18              (Unanswered question.)

05:13 19         Q    Did you at any time disclose to either of the

05:13 20   Siegels that you had been inquiring to purchase their

05:13 21   rights?

05:13 22         A    Again, my -- you just asked me this same

05:13 23   question, so I would say my answer is the same, but I

05:13 24   believe, without disclosing my communications or their

05:13 25   communications to me on that subject, I believe Mr. Marks

                                                              110

05:13 1    testified that he had disclosed that to them.  I believe.

05:14 2    I'd have to review his transcript.

05:14 3        Q    Okay.

05:14 4        A    So I believe they knew about that, but I'm not

05:14 5    going to disclose the substance of my communications with

05:14 6    them.

05:14 7            (Unanswered question.)

05:14 8        Q    What had occurred in the period between mid

05:14 9    August to early October which changed your intentions

05:14 10   from acquiring the Siegel interest to representing the

05:14 11   Siegel interest?

05:14 12           MR. WILLIAMSON:  Objection.  Misstates

05:14 13   testimony.

05:14 14           THE WITNESS:  Yeah, I wouldn't -- you say

05:15 15   changed my intentions.

05:15 16   BY MR. BERGMAN:

05:15 17       Q    Well --

05:15 18       A    Like I said, I received a phone call from Joanne

05:15 19   Siegel, and she was looking for new representation, and

05:15 20   it was her intention, and I agreed to represent her.

05:15 21           Off the record.

05:16 22           (Discussion off the record.)

05:16 23           MR. BERGMAN:  I previously marked a document as

05:16 24   Exhibit 17, and I will get back to it in a moment, but

05:16 25   for now I am going to ask the court reporter to mark as

111

05:16 1   Exhibit 18 the October 3, 2002 agreement between the

05:16 2   Siegels and an entity identified as IPW.

05:16 3           (Deposition Exhibit 18 marked.)

05:17 4           MR. WILLIAMSON:  I would just like to state for

05:17 5   the record that the caption on the page is actually "IP

05:17 6   Worldwide" for Exhibit 18.

05:17 7           MR. BERGMAN:  Well, that is what appears at the

05:17 8   top of the page, and the first paragraph refers to "IPW."

05:17 9   I don't know if they're the same company, and I am going

05:1710   to ask Mr. Toberoff that question in a moment.

05:1711           THE WITNESS:  Actually, the first paragraph

05:1712   says, "...agreement and understanding between you

05:1713   ('Owner') and us..."  it merely uses "IPW" as a defined

05:1714   term referring to us, and us is IP Worldwide.

05:1715   BY MR. BERGMAN:

05:1716      Q   So this agreement -- the IP party to this

05:1717   agreement is IP Worldwide, LLC --

05:1718      A   Correct.

05:1719      Q   -- as opposed to IPW, LLC.

05:1720          Is that correct?

05:1721      A   Correct.

05:1722      Q   Okay.  And that is your signature at IPW 4?

05:1823      A   Correct.

05:1824      Q   And I note that the agreement was signed by the

05:1825   Siegels on October 23, and is it your best recollection,

                                                              112

05:18 1    Mr. Toberoff, that within three weeks of your first

05:18 2    communication from the Siegels, you entered into this

05:18 3    agreement with them?

05:18 4           MR. WILLIAMSON:  Objection.  Misstates prior

05:18 5    testimony.

05:18 6           THE WITNESS:  I believe an agreement was -- yes,

05:18 7    I believe the agreement -- my general recollection was

05:18 8    that the time between meeting and entering into an

05:18 9    agreement was a fairly compressed time, so three weeks

05:19 10   would not surprise me.

05:19 11   BY MR. BERGMAN:

05:19 12       Q   Okay.  From the time of your lunch meeting with

05:19 13   Joanne and Laura Siegel until October 23 of 2002, did you

05:19 14   have any further meetings with them?

05:19 15       A   I may have.  I don't recall if we had further.

05:19 16   It may have been telephone conversations.

05:19 17           And when you say "meetings," I take it you mean

05:19 18   in-person meetings?

05:19 19       Q   Yes.

05:19 20       A   I don't recall.  We may have had telephone

05:19 21   conversations.

05:19 22       Q   Do you specifically recall telephone

05:19 23   conversations with them during that period?

05:19 24       A   I don't.  I don't.

05:19 25       Q   Were the Siegels represented by independent

                                                                    113

05:19 1      counsel in connection with this agreement?

05:19 2          A    I believe, yes.

05:19 3          Q    Who was that?

05:19 4          A    George -- last name starts with a Z, George

05:20 5      Zadorozny.  I'm not sure how to spell it.

05:20 6          Q    And did you negotiate with that lawyer?

05:20 7          A    I can't say for sure.  I believe so, but I...  I

05:20 8      believe so.  The reason I can't say for sure is I also --

05:20 9      when I entered into the retainer agreement with the

05:2110      Siegels, I specifically recall negotiating with

05:2111      Mr. Zadorozny, and I believe Mr. Zadorozny was involved

05:2112      in this agreement as well, but I don't -- I don't recall

05:2113      if -- I believe I did, but I don't have a specific

05:2114      recollection of it.

05:2115          Q    And when did you enter into a retainer agreement

05:2116      with the Siegels?

05:2117          A    Before -- definitely before we filed suit, and I

05:2118      believe it was...  I can't give you a date.

05:2219          Q    Were there any prior drafts --

05:2220          A    I'd have to look at the -- I'd have to check my

05:2221      file.

05:2222          Q    Okay.  Were there any prior drafts of the

05:2223      October 3, '02 agreement prior to Exhibit 18?

05:2224          A    Yes.  It went through various drafts.

05:2225          Q    And --

                                                              114

05:22 1        A    The Siegels are very specific.

05:22 2        Q    And what aspects of it were revised by the

05:22 3   Siegels?

05:22 4        A    I don't specifically remember the aspects.  I

05:22 5   just remember several drafts and several rounds of

05:22 6   comments and them being very specific and, you know,

05:22 7   focused on every word.

05:22 8        Q    And all of that occurred between the period from

05:22 9   October 3 to October 23?

05:22 10       A    Yes, I believe so.  I think it went back and

05:22 11  forth very quickly.

05:23 12       Q    Paragraph 2 of Exhibit 1 provides in part that,

05:23 13  quote, "IPW will furnish and provide the legal services

05:23 14  of Marc Toberoff Esq., and the business services of Ariel

05:23 15  Emanuel and IPW's support staff and employ its network of

05:23 16  business relationships and resources to market and

05:23 17  negotiate the sale, license," et cetera, "of the

05:23 18  rights..."

05:23 19            Who was IPW's support staff that is referred to

05:23 20  in paragraph 2 of Exhibit 18?

05:23 21       A    Okay.  When you say "IPW," you mean IP

05:23 22  Worldwide?  I think for clarity --

05:23 23       Q    I am quoting.

05:23 24       A    I know, but for a clear record you should

05:23 25  probably say IP Worldwide, because when you hear the

                                                             115

05:23 1    record --

05:24 2        Q    Okay.  I didn't want to modify the text of the

05:24 3    document.

05:24 4             Who was IP Worldwide's support staff at that

05:24 5    point?

05:24 6        A    As I said, we had two employees at the time, but

05:24 7    since Ari Emanuel had the entire Endeavor agency, three

05:24 8    floors of the -- of offices filled with people --

05:24 9        Q    And were --

05:24 10       A    -- even though they were not technically

05:24 11   employees of IPW -- IP Worldwide, IP Worldwide could draw

05:24 12   on that staff for support services.

05:24 13       Q    And did it in fact draw upon that staff for

05:24 14   support?

05:24 15       A    Yeah.  Yes, I should say.

05:24 16       Q    And who at Endeavor did it draw upon?

05:24 17       A    As needed, certain questions about transactional

05:25 18   things, meaning of terms.  You know, Tom McGuire was very

05:25 19   knowledgeable in making entertainment deals, a

05:25 20   transactional lawyer, their general counsel.  They had a

05:25 21   video game person.  They had a television person.  They

05:25 22   had a statistical analyst.  They had an in-house

05:25 23   investment banker.

05:25 24       Q    As of the time that you signed Exhibit 18,

05:25 25   Mr. Toberoff, had you seen Marks' October 19, 2001 letter

116

U.S. LEGAL SUPPORT

EXHIBIT 17
544

05:25 1    to John Schulman?

05:25 2              MR. WILLIAMSON:  Objection.  Assumes facts not

05:25 3    in evidence.  Lacks foundation.

05:25 4              THE WITNESS:  I hadn't seen any letters.

05:26 5              Could you repeat the question.

05:26 6    BY MR. BERGMAN:

05:26 7        Q    Yes.  As of the time that you signed this

05:26 8    agreement, which I presume was sometime after October 3

05:26 9    and prior to October 23 or around October 23, had you

05:26 10   seen the letter sent by Mr. Marks to John Schulman dated

05:26 11   October 19, 2001?

05:26 12       A    I don't believe so.

05:26 13       Q    Had you seen --

05:26 14       A    And I also don't believe the Siegels -- just

05:26 15   knowing the Siegels, I don't believe that they would have

05:26 16   been quite so forthcoming with information prior to

05:26 17   actually having a signed agreement.

05:26 18       Q    So is it your best recollection that you had not

05:26 19   seen the October 19th letter prior to executing Exhibit

05:27 20   18?

05:27 21       A    Like I said, I don't know if I did or not, but I

05:27 22   don't have a recollection of it.  I'd have to --

05:27 23       Q    Had you seen the --

05:27 24       A    If you showed me something to refresh that

05:27 25   recollection, but I don't recall seeing that.

                                                              117

05:27 1       Q   Had you --

05:27 2       A   In other words, I can't put a date -- I can't

05:27 3   put a date on when I saw that particular letter.

05:27 4       Q   Well, I'm not asking for the date.  I'm

05:27 5   asking --

05:27 6       A   No, I can't even put a general -- I would have

05:27 7   trouble nailing down the time when I first saw that

05:27 8   letter.

05:27 9       Q   Prior to the time that you executed Exhibit 18,

05:27 10  had you seen any documents that had been exchanged

05:27 11  between the Siegels and DC Comics?

05:28 12      A   I don't recall seeing those documents.  I know

05:28 13  the documents you're referring to because they're part of

05:28 14  the documents in the case, in the litigation, but I don't

05:28 15  recall seeing those documents, no.

05:28 16      Q   Prior to the time that you executed Exhibit 18,

05:28 17  had the Siegels told you what the DC Comics offer

05:28 18  generally consisted of?

05:28 19          MR. WILLIAMSON:  Objection.  Attorney-client.

05:28 20          THE WITNESS:  That would be privileged.

05:28 21          (Unanswered question.)

05:28 22  BY MR. BERGMAN:

05:28 23      Q   No, that wouldn't be privileged if they had told

05:28 24  you what the documents consisted of, what the letter

05:28 25  said.

                                                              118

**U.S. LEGAL SUPPORT**

EXHIBIT 17
546

05:28 1        A    I disagree.

05:28 2        Q    Okay.

05:28 3        A    Whether or not they -- the substance -- you're

05:28 4    asking a question which goes to the substance of my

05:28 5    communications with the Siegels, so I believe that would

05:28 6    be privileged.

05:28 7        Q    Has IP Worldwide advanced or loaned any funds to

05:28 8    either of the Siegels since October 3, 2002?

05:29 9            MR. WILLIAMSON:  Objection.  Vague and

05:2910    ambiguous.

05:2911            THE WITNESS:  No.

05:2912    BY MR. BERGMAN:

05:2913        Q    Had any of your other entities?

05:2914            MR. WILLIAMSON:  Objection.  Vague and

05:2915    ambiguous.

05:2916            THE WITNESS:  No.

05:2917    BY MR. BERGMAN:

05:2918        Q    Have you personally?

05:2919        A    No.

05:2920        Q    Okay.  Paragraph 5 of the agreement provides for

05:2921    an 18-month term.  Who had suggested a term of 18 months?

05:2922        A    They did.

05:2923        Q    Did they say why?

05:2924        A    No.  I believe␣*I requested* a longer term, and I don't recall

05:2925    what the longer term was, but it may have been 24 months,

                                                                    119

U.S. LEGAL SUPPORT

EXHIBIT 17
547

05:29 1    and I remember they didn't want it to be 24 months.

05:29 2        Q    Paragraph 6 provides for a 10 percent fee to IP

05:29 3    Worldwide.  Was there any negotiation of that percentage?

05:30 4            MR. WILLIAMSON:  Objection to the extent the

05:30 5    document speaks for itself, and attorney-client

05:30 6    privilege.

05:30 7            THE WITNESS:  I can answer that question.  I

05:30 8    believe -- I -- my recollection is something more than

05:30 9    that was not proposed by us.  I believe that was

05:3010    proposed, and they said okay to that.

05:3011    BY MR. BERGMAN:

05:3012        Q    Did the Siegels state in substance that that's

05:3013    twice as much as they were paying Gang, Tyre?

05:3014        A    No, but I think the rationale for that was that

05:3015    Gang, Tyre -- I don't know how they rationalized it, but

05:3016    I believe the rationale for that in this agreement was

05:3117    that there are transactional attorneys in the

05:3118    entertainment business that have a business model where

05:3119    they work on 5 percent, and they do a lot of

05:3120    entertainment transactions, and the business model of

05:3121    agencies like Endeavor is 10 percent.  So here they were

05:3122    getting both legal expertise and then Ari's dealmaking

05:3123    expertise, and it was still not greater than the 10

05:3124    percent Endeavor would or a big agency like Endeavor or

05:3125    CAA would charge them.

                                                            120

05:31 1             MR. BERGMAN:  Would you mark as Exhibit 19 a

05:31 2    document -- or what appears to be a draft dated November

05:32 3    26, 2002, Bates stamped 1882.

05:32 4             (Deposition Exhibit 19 marked.)

05:32 5    BY MR. BERGMAN:

05:32 6        Q    Was this draft, Exhibit 19, ever signed,

05:32 7    Mr. Toberoff?

05:32 8        A    No.

05:32 9        Q    In the first paragraph there is a statement that

05:32 10   reads in part, quote, "... this is to confirm that we

05:32 11   have disclosed to you and discussed the following

05:32 12   proposed actions that may pose potential conflicts of

05:32 13   interest or the appearance of potential conflicts of

05:33 14   interest..."  It then goes on.

05:33 15            What were the potential conflicts of interest

05:33 16   referred to in this document?

05:33 17       A    I believe that this was sort of an opening

05:33 18   paragraph for what is then discussed below regarding

05:33 19   Michael Siegel.

05:33 20       Q    And what was the potential conflict that arose

05:33 21   with IPW -- IP Worldwide entering into negotiations with

05:33 22   Michael Siegel?

05:33 23       A    I don't know if there was any potential -- I

05:33 24   don't know if there was a actual conflict, but it

05:33 25   appeared to be a subject of potential conflict, you know,

                                                                    121

U.S. LEGAL SUPPORT

EXHIBIT 17
549

05:34 1    within a broad definition of potential conflict, and

05:34 2    that's why -- that was the reasoning for having this

05:34 3    disclosure and conflict waiver.

05:34 4        Q    And again, what was the potential conflict,

05:34 5    though?  What was it?

05:34 6        A    I don't know.  I'd have to analyze it, but it

05:34 7    seems to me like an area where there could be a potential

05:34 8    conflict.  If Ari Emanuel -- it seemed to me if Ari

05:34 9    Emanuel purchased Michael Siegel's interest but was also

05:34 10   representing them, then he himself could have an interest

05:34 11   that could pose a potential conflict.

05:35 12       Q    Did IP Worldwide enter into negotiations with

05:35 13   Michael Siegel to acquire his 25 percent share?

05:35 14            MR. WILLIAMSON:  Objection.  Vague and

05:35 15   ambiguous.  Indefinite as to time and place as well.

05:35 16            THE WITNESS:  Not really.  What happened was

05:35 17   this was initially set forth like this, and then the

05:35 18   situation changed where it would really be Ari Emanuel

05:35 19   personally purchasing Michael Siegel's interest, not IP

05:35 20   Worldwide.  I believe the Siegels didn't want -- I'm not

05:35 21   sure about this, but I believe that maybe because the

05:35 22   Siegels didn't want IP Worldwide to hold that interest.

05:36 23   BY MR. BERGMAN:

05:36 24       Q    Were you told that by any counsel for the

05:36 25   Siegels?

                                                                    122

05:36 1      A   I don't recall counsel telling me that, but I

05:36 2   recall -- there is a document after this in which that

05:36 3   document I believe reflects -- this one says, "IPW will

05:36 4   enter into negotiations..."  Another document is very

05:36 5   specific as to Ari Emanuel I believe purchasing the

05:36 6   rights, and Ari Emanuel can't do this and he can't do

05:36 7   that.  There were a number of restrictions in the other

05:36 8   document that were insisted upon by the Siegels prior to

05:36 9   giving their consent.

05:3710      Q   Did the Siegels say why they didn't want IP

05:3711   Worldwide to negotiate with Siegel -- with Michael

05:3712   Siegel?

05:3713      A   I think the focus was less on negotiate as

05:3714   opposed to if Michael Siegel's interest was purchased,

05:3715   who would own it.  I think that was -- if I saw the other

05:3716   document, I could probably speak a little more clearly

05:3717   about it.

05:3718      Q   Okay.

05:3719          Well, would you mark as Exhibit 20 what appears

05:3720   to be a further draft of this document, which is also

05:3721   dated December 16, 2002.

05:3722          (Deposition Exhibit 20 marked.)

05:3823          MR. BERGMAN:  And while we are comparing these,

05:3824   let's look at what appears to be the executed copy, which

05:3825   is dated January 21, 2002, and I will ask the reporter to

                                                             123

05:38 1    mark that as Exhibit 21.

05:38 2             (Deposition Exhibit 21 marked.)

05:38 3    BY MR. BERGMAN:

05:38 4        Q   Now, do you notice that in Exhibit 20 the

05:39 5    reference to IP Worldwide entering into negotiations is

05:39 6    now changed to IP Worldwide and Ariel Emanuel entering

05:39 7    into negotiations?  Do you see that in Exhibit 20?

05:39 8             MR. WILLIAMSON:  Which document?

05:39 9             THE WITNESS:  Yes.

05:3910    BY MR. BERGMAN:

05:3911        Q   Okay.

05:3912        A   And then if you look at 21, it's now purely

05:3913    Ariel Emanuel, which reflects what I was stating earlier.

05:3914        Q   Right.

05:3915             Now, the requested revisions to this document

05:3916    were made by whom, Mr. Toberoff, who on behalf of the

05:3917    Siegels?

05:3918             MR. WILLIAMSON:  Objection.  Vague and

05:3919    ambiguous --

05:3920             THE WITNESS:  I believe --

05:3921             MR. WILLIAMSON:  -- calls for speculation.

05:3922             THE WITNESS:  I believe Laura Siegel.  I believe

05:3923    this was a highly -- the final executed document, Exhibit

05:4024    21, I remember was highly -- highly negotiated by the

05:4025    Siegels.  They were very, very specific about it.  It

                                                          124

05:40 1    started out as a sort of potential conflict disclosure

05:40 2    and waiver and turned into a sort of an agreement between

05:40 3    Ari Emanuel and the Siegels with all sorts of conditions

05:40 4    attached to it.

05:40 5    BY MR. BERGMAN:

05:40 6        Q    Am I correct that the correct date of October 21

05:40 7    is January 21, 2003 rather than --

05:40 8        A    Yes.

05:40 9        Q    -- '02, which is the date indicated?

05:40 10       A    This is one of those where I was using

05:40 11   stationery and neglected to change the year.

05:40 12       Q    All right.  Now, following the execution of

05:40 13   Exhibit 21, did Mr. Emanuel attempt to purchase Michael

05:40 14   Siegel's rights?

05:41 15       MR. WILLIAMSON:  Objection.  Vague and

05:41 16   ambiguous.

05:41 17       THE WITNESS:  I would say the answer to that is

05:41 18   halfheartedly.

05:41 19   BY MR. BERGMAN:

05:41 20       Q    And can you explain what you mean?

05:41 21       A    And I remember thinking that after going through

05:41 22   this highly negotiated thing with the Siegels, he didn't

05:41 23   appear that interested in pursuing it.

05:41 24       Q    To your knowledge did Mr. Emanuel take any steps

05:41 25   to enter into negotiations with Michael Siegel?

125

05:41 1          MR. WILLIAMSON:  Objection.  Calls for

05:41 2    speculation.

05:41 3          THE WITNESS:  I had a couple discussions with

05:42 4    Don Bulson, Michael Siegel's lawyer, on behalf of Ari

05:42 5    Emanuel, and that was the extent of it.

05:42 6    BY MR. BERGMAN:

05:42 7       Q   Did you make an offer to Mr. Bulson?

05:42 8          MR. WILLIAMSON:  Objection.  Vague and

05:42 9    ambiguous.  Indefinite as to time and please.

05:42 10         THE WITNESS:  I'm not sure whether it was the

05:42 11   form -- I recall discussions.  I'm not sure if it was in

05:42 12   the form of a formal offer.

05:42 13   BY MR. BERGMAN:

05:42 14      Q   What amount of money was discussed during those

05:42 15   discussions?

05:42 16         MR. WILLIAMSON:  Objection.  Assumes facts not

05:42 17   in evidence.

05:42 18         THE WITNESS:  The discussions that I recall

05:42 19   were -- the sum and substance of those discussions were

05:42 20   that Mr. Bulson communicated that the minimum that

05:43 21   Michael Siegel would accept for the rights would

05:43 22   essentially be what -- not a lesser amount of money than

05:43 23   what had been offered and ultimately rejected by the

05:43 24   Siegels, what had been offered by Warner Bros. and DC and

05:43 25   ultimately rejected by the Siegels.

                                                              126

BY MR. BERGMAN:

    Q   And was that with reference to 25 percent of what had been offered to the Siegels?

        MR. WILLIAMSON:  Objection.  Vague and ambiguous.

        THE WITNESS:  If that's his share.

BY MR. BERGMAN:

    Q   That appears to be his share.

    A   Yeah.

    Q   So that Mr. Bulson in effect, in substance told you that Michael Siegel wanted at least 25 percent of the amount that had been offered by DC Comics --

    A   In other words, that would be the floor of a negotiation.  In other words, he would want more than that, but that would be the floor.

    Q   Okay.  And what was your response?

    A   I brought that back to Ari Emanuel, and he didn't -- no deal was made.

    Q   Did Mr. Emanuel say that's too much?

    A   I can't tell you what he --

        MR. WILLIAMSON:  Objection.  Attorney-client.

        THE WITNESS:  What he said to me about that would be privileged.  I can't tell you what he said to me, but I can tell you that it didn't go very far after that, and that you can draw a reasonable conclusion from

127

EXHIBIT 17
555

05:44 1    that.

05:44 2            (Unanswered question.)

05:44 3    BY MR. BERGMAN:

05:44 4        Q    Did you get back to Mr. Bulson and tell him that

05:44 5    that floor that he expressed to you was unacceptable?

05:45 6        A    I believe so, but it wasn't as much with

05:45 7    reference to the floor.  The way it had been communicated

05:45 8    was that since that was a floor -- in other words, he

05:45 9    didn't say, "I want that floor."  For purposes of

05:45 10   negotiations, that was the floor, so he -- the

05:45 11   implication was that he wanted something more than that

05:45 12   or considerably more than that.  So the focus wasn't on

05:45 13   the floor.  The focus was -- that was just a benchmark

05:45 14   where his lawyer was giving me an idea.

05:45 15       Q    What was unacceptable about that benchmark, that

05:45 16   floor?

05:45 17       A    I can't disclose that.  I can't disclose

05:46 18   Mr. Emanuel's conversations with me regarding that

05:46 19   negotiation.  It's protected by the attorney-client

05:46 20   privilege.

05:46 21           (Unanswered question.)

05:46 22       Q    Did Mr. Emanuel suggest that he speak with

05:46 23   Mr. Bulson?

05:46 24       A    No.

05:46 25       Q    To your knowledge, following your conversation

                                                              128

EXHIBIT 17
556

05:46 1  with Mr. Emanuel in which you told him about Mr. Bulson's

05:46 2  floor, was anything further done to acquire the Michael

05:46 3  Siegel interest --

05:46 4          MR. WILLIAMSON:  Objection.  Vague and

05:46 5  ambiguous.

05:46 6  BY MR. BERGMAN:

05:46 7      Q   -- by either you or Mr. Emanuel to your

05:46 8  knowledge?

05:46 9          MR. WILLIAMSON:  Same objection.

05:4610         THE WITNESS:  I -- the only thing -- when you

05:4611  say "anything further done," what -- I may have had

05:4612  another conversation with Mr. Bulson.  I don't recall.

05:4613  There were a couple conversations, and that was the sum

05:4614  and substance of it, and it didn't really go anywhere,

05:4715  and I do recall sort of after a -- prolonged discussions

05:4716  with the Siegels culminating in this document dated --

05:4717  the document, Exhibit 21, in which I had to kind of spend

05:4718  a lot of time between the two, feeling that, you know,

05:4719  after going through all of this, obtaining the approval

05:4720  of the Siegels, that it was kind of a halfhearted

05:4721  interest on the part of Mr. Emanuel that never went

05:4722  anywhere.

05:4723  BY MR. BERGMAN:

05:4724      Q   Did there come a time when you communicated to

05:4725  Mr. Bulson that there would be no further negotiation?

                                                            129

05:47 1        A    I don't believe I communicated -- I don't

05:48 2    believe that I called him up and said that there would be

05:48 3    no further negotiations.

05:48 4        Q    I note that the executed copy, Exhibit 21,

05:48 5    provides that in the event Michael Siegel agrees to that

05:48 6    purchase and settlement, that certain events will follow,

05:48 7    including in subparagraph (d) that Mr. Emanuel -- it's on

05:48 8    the second page -- that Mr. Emanuel would reimburse the

05:48 9    Siegels for 25 percent of any expenses paid by them after

05:4810    October 17, 2000.

05:4811            Was that something that the Siegels insisted on?

05:4812        A    Yes.  All of these terms are terms that the

05:4813    Siegels insisted on.

05:4814        Q    And what was the reason for even attempting to

05:4915    acquire Michael Siegel's interest?

05:4916            MR. WILLIAMSON:  Objection.  Vague and

05:4917    ambiguous.

05:4918            THE WITNESS:  Again, that would be privileged

05:4919    and work product.

05:4920            (Unanswered question.)

05:4921    BY MR. BERGMAN:

05:4922        Q    And do you therefore decline to answer that

05:4923    question?

05:4924        A    Yes.

05:4925        Q    At the time that you and Mr. Emanuel entered

                                                            130

U.S. LEGAL SUPPORT

EXHIBIT 17
558

05:49 1     into Exhibit 21, had he obtained a fund from which to

05:49 2     purchase the Michael Siegel interest?

05:49 3              MR. WILLIAMSON:  Objection.  Asked and answered.

05:49 4              THE WITNESS:  Again, you're sort of treading on

05:49 5     attorney-client privilege, but I don't believe he had a

05:49 6     -- started a fund to purchase the Michael Siegel

05:50 7     interest.  Mr. Emanuel is a very wealthy man and also has

05:50 8     access to a lot of financing.

05:50 9     BY MR. BERGMAN:

05:50 10        Q   When do you recall -- you've sat through a lot

05:50 11    of depositions, Mr. Toberoff.  Do you remember the

05:50 12    September 21, 2002 letter from Joanne and Laura Siegel to

05:51 13    Kevin Marks terminating Gang, Tyre, the agreement -- the

05:51 14    document that has been the subject of a couple of motions

05:51 15    that we've had?

05:51 16        A   I don't -- are you speaking about their letter

05:51 17    notifying people that they're terminating --

05:51 18        Q   Correct.

05:51 19        A   I've seen the letter --

05:51 20        Q   Okay.

05:51 21        A   -- but I don't think it's been the subject of

05:51 22    motions.

05:51 23        Q   When do you recall first seeing that letter?

05:51 24    It's dated September 21, 2002.

05:51 25        A   I don't recall -- I recall seeing it in the

                                                                 131

05:51 1    course of the litigation.  I don't recall -- I don't have

05:51 2    a specific recollection of seeing it prior to the

05:51 3    litigation.  As part of the documents in the litigation.

05:51 4        Q   As of the date that the Siegels terminated Gang,

05:51 5    Tyre and Brown, September 21, 2002, had you had any

05:52 6    communications with either Laura or Joanne Siegel?

05:52 7        A   What's the date of the letter?

05:52 8        Q   September 21, 2002.

05:52 9        A   I don't know.  That would depend on whether

05:52 10   Joanne -- when Joanne first called me, that was before

05:52 11   September 1 or -- September 21 or afterwards, and I

05:52 12   don't -- you know, I looked at the agreement with them

05:52 13   where it's signed October I think 23rd -- is that

05:52 14   correct? -- the IP Worldwide agreement, and then I looked

05:52 15   at the date as of October 3rd, and I know that often I'll

05:52 16   date an agreement as to when the sort of relationship

05:53 17   starts, which can often even mean first communications,

05:53 18   and that's why I said, you know, early October, and then

05:53 19   we entered into an agreement three weeks later.

05:53 20   That's...

05:53 21       Q   Did the Siegels --

05:53 22       A   That's the best way I can approximate the time.

05:53 23       Q   Did the Siegels confer with you prior to

05:53 24   terminating Gang, Tyre and Brown?

05:53 25           MR. WILLIAMSON:  Objection.  Asked and answered.

                                                                    132

U.S. LEGAL SUPPORT

EXHIBIT 17
560

05:53 1            THE WITNESS:  Same answer.

05:53 2    BY MR. BERGMAN:

05:53 3        Q    Which is what?

05:53 4        A    That I don't --

05:53 5            MR. WILLIAMSON:  You want him to read it back?

05:53 6            THE WITNESS:  It's the same answer that I just

05:53 7    gave:  That I don't know for sure, but I believe that if

05:53 8    they terminated Gang, Tyre on September --

05:53 9    BY MR. BERGMAN:

05:53 10       Q    21.

05:53 11       A    -- and based on the dates on that agreement,

05:53 12   that probably not, and I don't recall them conferring

05:54 13   with me about terminating Gang, Tyre.

05:54 14       Q    Regardless of the date?

05:54 15       A    Regardless of the date, correct.

05:54 16       Q    Would you deny that you spoke with Joanne or

05:54 17   Laura Siegel prior to the time that they terminated Gang,

05:54 18   Tyre, Ramer & Brown?

05:54 19           MR. WILLIAMSON:  Objection.  Asked and answered.

05:54 20           THE WITNESS:  I'm gonna stick to my same answer.

05:54 21   This is the third time you're asking me the same

05:54 22   question.

05:54 23   BY MR. BERGMAN:

05:54 24       Q    Well, I'm asking you a little bit different,

05:54 25   Mr. Toberoff.  Would you deny that you conferred with

133

U.S. LEGAL SUPPORT

EXHIBIT 17
561

05:54 1    them prior to the time that they terminated Gang, Tyre,

05:54 2    Ramer & Brown?

05:54 3              MR. WILLIAMSON:  Same objection.

05:54 4              THE WITNESS:  I'm going to stick to my answer.

05:54 5          You can read back my answer, Reporter.

05:54 6          I don't have any recollection of discussing

05:54 7    that.  That's my answer.

05:54 8    BY MR. BERGMAN:

05:55 9        Q    When Joanne Siegel called you for the first

05:5510    time, did she say that she had terminated -- had

05:5511    previously terminated her prior lawyer?

05:5512        A    No.  She said she was looking for a lawyer, so

05:5513    she may -- very well may have.

05:5514        Q    Did you ask her, "Are you currently represented

05:5515    by counsel?"

05:5516        A    I believe it was implicit in the con- -- now

05:5517    that you're asking the question this way, I believe it

05:5518    was implicit in the conversation that she was looking for

05:5519    counsel because she didn't have a lawyer, so...

05:5520        Q    Did she say anything in that first telephone

05:5521    conversation to indicate to you that she had not yet

05:5522    fired Gang, Tyre, Ramer & Brown?

05:5523        A    I don't recall --

05:5524              MR. WILLIAMSON:  Objection.  Asked and answered.

05:5525              THE WITNESS:  I don't recall her saying anything

                                                                    134

EXHIBIT 17
562

05:55 1    like that, no.  I recall her saying that I was highly

05:56 2    recommended by Jean Peavy and that she wanted to talk to

05:56 3    me about representing her, and that soon thereafter we

05:56 4    met for lunch with I believe it was her and Laura, but it

05:56 5    wasn't with reference to -- it was that she wanted a

05:56 6    lawyer.

05:56 7    BY MR. BERGMAN:

05:56 8        Q    When you got together with them at lunch --

05:56 9        A    It didn't appear -- I can just tell from the

05:5610   context it did not appear to me that at the time we were

05:5611   speaking, she was currently represented.

05:5612       Q    When you met Joanne and Laura for lunch a few

05:5613   days after the initial telephone conversation, did you

05:5614   tell them that you had been speaking with Kevin Marks?

05:5615       A    You asked me that three times already.

05:5616       Q    Did you?

05:5617       A    I don't believe I told them that.  I don't have

05:5618   a rec- -- I don't know.  I don't have a recollection of

05:5719   that, but I may have referenced it.

05:5720       Q    Did you ask them if they were currently

05:5721   represented by counsel?

05:5722       A    I already answered that question also.  No, I

05:5723   don't believe I asked them that.  I believe it was

05:5724   implicit in her asking -- saying that she wanted to talk

05:5725   to me about representing her or needing a lawyer that she

135

U.S. LEGAL SUPPORT

EXHIBIT 17
563

05:57 1    didn't have a lawyer, so I don't think I would have said,

05:57 2    "Are you currently represented by counsel?"

05:57 3        Q    Well, weeks earlier you had been having

05:57 4    conversations with the Siegels' counsel to acquire the

05:57 5    Siegel interest.  Is it your testimony that when you met

05:57 6    with the Siegels a few weeks later, you didn't even ask

05:57 7    whether they were still represented by Gang, Tyre?

05:57 8        A    That's -- I already answered that.  I don't

05:57 9    recall a discussion about that.  I just don't.  We -- we

05:58 10   have -- I may have spoken to her that I had been in

05:58 11   contact with Kevin Marks, but I don't recall the specific

05:58 12   conversation.  That's exactly what I said to you before.

05:58 13        At some point it -- you know, I think Kevin

05:58 14   Marks testified that he had informed them about that

05:58 15   offer, and at some point it came up, but I don't -- the

05:58 16   focus when I met with them was not Kevin Marks or Gang,

05:58 17   Tyre.  The focus was on representing her and her rights

05:58 18   in Superman.

05:58 19        Q    Well, did you ask them at lunch or in that

05:58 20   initial phone conversation who had been representing

05:58 21   them?

05:58 22        MR. WILLIAMSON:  Objection.  Asked and answered.

05:59 23        THE WITNESS:  I've told you everything that I

05:59 24   recall, and I've also objected because this -- what --

05:59 25   even at that initial stage, even before retaining me,

136

05:59 1    those conversations, as you well know, are privileged, so

05:59 2    to go into great detail about what I said to her and what

05:59 3    she said to me is improper.  I've -- again, you --

05:59 4    regardless of that --

05:59 5    BY MR. BERGMAN:

05:59 6        Q    I certainly don't agree with that, Mr. Toberoff.

05:59 7        A    Well, regardless of that and without waiver of

05:59 8    the privilege, I'm giving you my best recollection of

05:59 9    those events.

05:59 10       Q    Okay.  And is your best recollection that the

05:59 11   Siegels had previously terminated Gang, Tyre, Ramer &

05:59 12   Brown before they had lunch with you?

05:59 13            MR. WILLIAMSON:  Objection --

05:59 14            THE WITNESS:  I've already said it.  I

05:59 15   believe --

05:59 16            MR. WILLIAMSON:  At that time?

06:00 17            MR. BERGMAN:  At this time.

06:00 18            Would you repeat my question, please?

06:00 19            (Record read as follows:

05:59 20            "Q    Okay.  And is your best

05:59 21            recollection that the Siegels had

05:59 22            previously terminated Gang, Tyre,

05:59 23            Ramer & Brown before they had lunch

05:59 24            with you?")

06:00 25            THE WITNESS:  Again --

                                                                    137

06:00 1          MR. WILLIAMSON:  Objection.  Asked and answered.

06:00 2  Objection on attorney-client grounds.

06:00 3          THE WITNESS:  I stick by my prior answer.  I'm

06:00 4  not going to keep answering the question.

06:00 5  BY MR. BERGMAN:

06:00 6      Q   I haven't asked you that question before,

06:00 7  Mr. Toberoff, and what I'm trying to ascertain is whether

06:00 8  you knew at the time that you met with the Siegels for

06:00 9  the first time whether or not they had previously

06:0010  terminated Gang, Tyre and Brown.

06:0011          MR. WILLIAMSON:  Same objection.

06:0012          THE WITNESS:  And my answer is I don't have a

06:0013  specific recollection of a discussion regarding that or

06:0114  focus regarding that, and I -- but I can deduce from the

06:0115  context of the conversation or the asking me, i. -- you

06:0116  know, i.e., "I need a lawyer.  Will you represent me,"

06:0117  and from the dating of the IP Worldwide agreements as of
         ~~October~~
06:0118  ~~August~~ 3 and remembering that we entered into the

06:0119  agreement fairly quickly, from all those things, it would

06:0120  be my best estimate of the situation that they had

06:0121  already terminated Gang, Tyre Brown, but I don't recall a

06:0122  specific statement to that effect, so I couldn't say for

06:0123  sure.

06:0124  BY MR. BERGMAN:

06:0125      Q   Did you draft --

138

EXHIBIT 17
566

06:01 1          A    That's the last time I'm going to ask -- answer

06:01 2     that question.  I think I've given you a very clear

06:01 3     answer.

06:01 4          Q    Hardly.

06:01 5               Did you draft the September 21, 2002 letter by

06:01 6     which the Siegels purported to terminate Gang, Tyre,

06:02 7     Ramer & Brown's representation?

06:02 8          A    I don't recall drafting that, no.

06:02 9          Q    Would you deny drafting it, Mr. Toberoff?

06:0210          A    I just answered your question.

06:0211          Q    No, you didn't.

06:0212          A    I'm standing by my answer.

06:0213          Q    Would you deny drafting it?

06:0214               MR. WILLIAMSON:  Objection.  Asked and answered.

06:0215               THE WITNESS:  I can't deny it.  I don't recall

06:0216     drafting it, so how can I deny it?  I don't recall

06:0217     drafting it.  You asked me the question before.

06:0218     BY MR. BERGMAN:

06:0219          Q    Do you recall advising the Siegels as to the

06:0220     best method by which to terminate Gang, Tyre, Ramer &

06:0221     Brown?

06:0222          A    No.  I recall discussions with the Siegels

06:0223     regarding Gang, Tyre, Ramer & Brown, the substance of

06:0224     which I'm -- are privileged.  That's all I recall.  But I

06:0225     don't recall when those discussions took place.

                                                              139

06:03 1          Q    Do you know who Steve Spira is?

06:03 2          A    I think he's an attorney in the entertainment

06:03 3     industry.  I've heard the name.  An attorney, Steve

06:03 4     Spira.

06:03 5          Q    He's in business affairs at Warner Bros.

06:03 6          A    Okay.

06:03 7          Q    Do you recall running into Mr. Spira at an event

06:03 8     or party in early 2002 and stating to him in substance

06:03 9     that Warner had a problem with its Superman rights?

06:03 10         A    Not -- no, I don't.  I may have.

06:03 11         Q    In addition to the agreement --

06:03 12         A    And they certainly do.

06:03 13         Q    Well, were you aware of that in early 2002?

06:03 14         A    In early 2002?  Yes.

06:04 15         Q    And how were you aware of that?

06:04 16         A    I was aware of that by being aware of the

06:04 17     Shusters' termination interest --

06:04 18         Q    Yeah, but that doesn't take effect until 2013,

06:04 19     does it?

06:04 20         A    It's still a problem.  And I was aware of that

06:04 21     by virtue of being aware that the Siegels had

06:04 22     terminated -- had filed notice of termination.

06:04 23         Q    How did you know that?

06:04 24         A    It was all over the Internet.

06:04 25         Q    In addition to entering into an agreement with

                                                              140

06:04 1    the Siegels concerning Superman, you also entered into an

06:04 2    agreement with them concerning Superboy, didn't you?

06:04 3         MR. WILLIAMSON:  Objection.  Assumes facts not

06:04 4    in evidence.

06:04 5         THE WITNESS:  When you say "you," you mean IP

06:05 6    Worldwide?

06:05 7    BY MR. BERGMAN:

06:05 8         Q    Yes, IP Worldwide.

06:05 9         A    I believe so, yes.

06:05 10        Q    That agreement has not been produced.  Do you

06:05 11   know why?

06:05 12        A    I didn't see it in my files.

06:05 13        Q    Okay.

06:05 14        A    And you also -- you asked me the question, and I

06:05 15   said I believe so, but there may not be an actual

06:05 16   agreement with IP Worldwide.

06:05 17        Q    Well, if you'll look at Exhibit 17, it's

06:05 18   scheduled on Exhibit A.

06:05 19        A    Yeah.

06:05 20        Q    There are three agreements listed.  One of them

06:05 21   is IP Worldwide and Joanne Siegel and Laura Siegel Larson

06:05 22   as of October 3, 2002, re Superboy.

06:05 23        A    Right.  Then if it's listed there, then there

06:05 24   was an agreement.  It would have been the same, using the

06:05 25   other agreement as a blueprint for that agreement.

141

06:05 1          Q   Going back to your -- the subpoena which

06:06 2    required you to produce the so-called Quinn documents,

06:06 3    the documents that you say were stolen from your office,

06:06 4    who do you believe stole them from your office?

06:06 5          A   I am -- I don't know.  I'm currently

06:06 6    investigating it.

06:06 7          Q   Have you reported the theft to the police?

06:06 8          A   No.

06:06 9          Q   Or to the state Bar?

06:0610          A   Not yet.

06:0611          Q   Or the FBI?

06:0612          A   Not yet.

06:0613          Q   Okay.  Do you have any evidence, Mr. Toberoff,

06:0614    that the documents were received by Warner Bros. prior to

06:0615    on or around June 28th of this year?

06:0716          A   Yes.

06:0717          Q   And what is that evidence?

06:0718          A   I'm not going -- that's work product.

06:0719              (Unanswered question.)

06:0720              MR. WILLIAMSON:  Yeah, objection.

06:0721              THE WITNESS:  I'm not going to disclose that.

06:0722    These stolen documents have become part of this lawsuit,

06:0723    unfortunately, and I'm not going to disclose to you what

06:0724    I -- what evidence I have of impropriety on the part of

06:0725    Warner Bros.

                                                              142

**U.S. LEGAL SUPPORT**

EXHIBIT 17
570

06:07 1    BY MR. BERGMAN:

06:07 2        Q    Do the documents that were the subject of the

06:07 3    subpoena include documents that are not privileged?

06:07 4        A    I'm not going to discuss with you the contents

06:07 5    of documents stolen from my office.

06:07 6            (Unanswered question.)

06:07 7        Q    On what basis are you refusing to answer that?

06:07 8        A    Because I believe Warner Bros.' behavior is

06:07 9    highly improper, and it's the subject of a pending or

06:0810    threatened motion to compel, and it should not be the

06:0811    subject of a deposition, nor should anything -- it's

06:0812    highly improper for you to be questioning me as to

06:0813    anything regarding this litigation.

06:0814        Q    I'm simply questioning you concerning the

06:0815    subpoena that was served on you and your failure to

06:0816    produce documents pursuant to it.

06:0817        A    Let me be clear --

06:0818            MR. WILLIAMSON:  Objection.  That totally

06:0819    mischaracterizes the situation, and you know it.

06:0820            MR. BERGMAN:  No, I don't know that, and what

06:0821    makes you say something like that, Mr. Williamson?  It's

06:0822    preposterous.

06:0823            THE WITNESS:  No.  Your conduct is preposterous.

06:0824            MR. WILLIAMSON:  This entire line of questioning

06:0825    is preposterous.

143

EXHIBIT 17
571

06:08 1          THE WITNESS:  Let me be clear.  You've asked me

06:08 2    numerous questions about IP Worldwide, Pacific Pictures.

06:08 3    I've answered most of your questions.  Now you're turning

06:08 4    the corner and starting to ask me questions as the lawyer

06:08 5    and lead litigator representing the Siegels in this

06:08 6    action and including subjects of pending motions to

06:09 7    compel.  This is not the proper subject of a deposition.

06:09 8    You don't depose opposing counsel and start asking him

06:09 9    about -- just like you would find it improper if I

06:09 10   started asking you questions about about why you were

06:09 11   doing certain things in this litigation.

06:09 12   BY MR. BERGMAN:

06:09 13       Q   I don't want to debate with you, Mr. Toberoff,

06:09 14   but I'm asking you --

06:09 15       A   It's not a debate.  I'm not going to answer.

06:09 16   I'm not going to engage in further colloquy of it.

06:09 17       Q   -- questions concerning a subpoena that was

06:09 18   issued to you and your lack of response to that subpoena,

06:09 19   and I am entitled to do that.

06:09 20       A   What's your question?

06:09 21       Q   My question is whether you have any evidence

06:09 22   that these documents were, as you have previously

06:09 23   alleged, delivered to Warner Bros. prior to the end of

06:09 24   June of this year.

06:09 25       A   Yes, I do, but I'm not disclosing to you what

                                                              144

EXHIBIT 17
572

06:09 1      that evidence is.

06:09 2           Q    And you -- what steps have you taken to

06:10 3      ascertain who may have taken those documents from your

06:10 4      files?

06:10 5                MR. WILLIAMSON:  Objection.

06:10 6                THE WITNESS:  I am also not disclosing that to

06:10 7      you.  It's -- you've made that part of this litigation.

06:10 8      Therefore, it's work product.

06:10 9                (Unanswered question.)

06:1010      BY MR. BERGMAN:

06:1011           Q    Are you going to refuse to answer any question

06:1012      that I ask you concerning your failure to provide those

06:1013      subpoenaed documents?

06:1014           A    I don't -- it depends on what your question is.

06:1015           Q    Okay.  In conducting your various searches for

06:1016      production -- responding to production demands in this

06:1017      case, have you searched the files from which those Quinn

06:1018      documents came?

06:1019           A    Yes.

06:1020           Q    And have you produced all responsive

06:1021      non-privileged documents contained in that file?

06:1022           A    I believe so, yes.

06:1123           Q    Have --

06:1124           A    Those documents were stolen out of my regular

06:1125      legal files.

                                                              145

06:11 1        Q    Have the documents that you declined to produce

06:11 2    pursuant to subpoena been identified on privilege logs?

06:11 3        A    Privileged documents, yes.

06:11 4        Q    What privilege logs identify those privileged

06:11 5    documents?

06:11 6        A    I believe it would be a question of the subject

06:11 7    of the various stolen documents.  The stolen documents

06:11 8    were from all sorts of different files and may have

06:11 9    overlapped between the Siegels' legal files and Shuster's

06:1110    legal files, so ones that pertain to Shuster's would have

06:1211    been listed on the Shuster's privilege log, for instance,

06:1212    in response to the Shuster's subpoena, and documents

06:1213    pertaining to the Siegels that are privileged would have

06:1214    been listed on the privilege log that they have provided

06:1215    as a party in this case.

06:1216        Q    Has a person by the name of Raphael Gomez

06:1217    Cabrera ever worked for you?

06:1218        A    Yes.

06:1219        Q    Does he currently work for you?

06:1220        A    No.

06:1221        Q    Has Jeffrey Bruce Linden previously worked for

06:1222    you?

06:1223        A    Jeffrey Linden previously worked for me, yes.

06:1224        Q    And is he currently working for you?

06:1225        A    No.

                                                              146

```
06:12  1        Q   Is Larry Greenfield currently working for you?

06:12  2        A   No.

06:12  3        Q   Is David Michaels currently working for you?

06:12  4        A   No.

06:12  5        Q   Is Rex Glensy currently working for you?

06:12  6        A   No.

06:13  7            What time is it?

06:13  8        MR. WILLIAMSON:  It's after 6:00.

06:13  9        THE WITNESS:  I really have to go.

06:13 10        MR. WILLIAMSON:  6:10.

06:13 11        THE WITNESS:  I really have to go.

06:13 12        MR. BERGMAN:  I'm not quite through yet.

06:13 13        THE WITNESS:  Well, I made an arrangement.  It's

06:13 14   after 6:00.  We started at 1:30.

06:13 15        MR. BERGMAN:  We started closer to quarter to

06:13 16   2:00, but I'm not going to argue with you --

06:13 17        THE WITNESS:  We've taken very few breaks.

06:13 18   We've gone straight through.  Normally people take

06:13 19   frequent breaks.  So if you look at the amount of hours,

06:13 20   it's been quite a bit, and this was a deposition

06:13 21   scheduled for a half day.  So I mean if it's a question

06:13 22   of five more minutes, but I'm not going to stay here

06:13 23   for -- I need to go, I need to pick up my kids, and I

06:13 24   need to -- you know, I was able to push it.

06:13 25        MR. BERGMAN:  I can't hold you here,
```

147

U.S. LEGAL SUPPORT

EXHIBIT 17
575

```
06:13  1    Mr. Toberoff, so --
06:14  2            THE WITNESS:  How many more documents do you
06:14  3    have?  I'm trying to work with you, but it's becoming...
06:14  4            MR. BERGMAN:  Why don't we just end the
06:14  5    deposition here.
06:14  6            THE WITNESS:  How many documents do you have
06:14  7    left?  How much more do you think you have left?
06:14  8            MR. BERGMAN:  We'll end it here.  Have the usual
06:14  9    stipulation?
06:14 10            THE WITNESS:  Yes.
06:14 11            MR. WILLIAMSON:  Yeah.
06:14 12            MR. BERGMAN:  Okay.  Thank you, Mr. Toberoff.
06:14 13            (The following stipulation is included
06:14 14            by reference:
08:46 15               "MR. TOBEROFF:  Any stipulations you
08:46 16            want to make regarding the transcript?
08:46 17               "MR. BERGMAN:  Well, we could waive the
08:46 18            notary and just have it signed under penalty
08:46 19            of perjury, which is --
08:46 20               "MR. ZISSU:  That's okay.
08:46 21               "MR. BERGMAN:  -- pretty customary.
08:46 22               "MR. TOBEROFF:  I think so.
08:46 23               "MR. ZISSU:  That's okay.
08:46 24               "MR. BERGMAN:  And the reporter would
08:46 25            be relieved of his responsibilities and will
```

148

U.S. LEGAL SUPPORT

EXHIBIT 17
576

```
08:47  1          deliver the original directly to Mr. Marks --

08:47  2          "MR. TOBEROFF:  Toberoff.

08:47  3          "MR. BERGMAN:  Toberoff.

08:47  4          "MR. TOBEROFF:  My first name is Marc.

08:47  5          "MR. ZISSU:  All the other rules as to

08:47  6          timing and signing apply.

08:47  7          "MR. BERGMAN:  Yes.

08:47  8          "MR. TOBEROFF:  So stipulated.")

       9

      10

      11

      12

      13

      14

      15

      16

      17

      18

      19

      20

      21

      22

      23

      24

      25
```

149

**U.S. LEGAL SUPPORT**

EXHIBIT 17
577

Dec-20-06   07:40pm   From-                                    T-171   P.003/005   F-206

1

2

3

4

5

6

7

8          I, MARC TOBEROFF, do hereby declare under

9    penalty of perjury that I have read the foregoing

10   transcript; that I have made any corrections as appear

11   noted, in ink, initialed by me, or attached hereto; that

12   my testimony as contained herein, as corrected, is true

13   and correct.

14          EXECUTED this  *20ᵗʰ* day of  *December* ,

15   20 *06* , at  *Los Angeles*  ,  *CA* .
                       (City)              (State)

16

17

18

19          *M/Th*
     _____
          MARC TOBEROFF

20

21

22

23

24

25

                                                        150

                    U.S. LEGAL SUPPORT

EXHIBIT 17
578

```
 1    STATE OF CALIFORNIA     )
                              ) ss
 2    COUNTY OF LOS ANGELES   )

 3

 4          I, DAVID S. COLEMAN, a Certified Shorthand

 5    Reporter, do hereby certify:

 6          That prior to being examined, the witness in the

 7    foregoing proceedings was by me duly sworn to

 8    testify to the truth, the whole truth, and nothing

 9    but the truth;

10    That said proceedings were taken before me at

11    the time and place therein set forth and were taken

12    down by me in shorthand and thereafter transcribed

13    into typewriting under my direction and supervision;

14    I further certify that I am neither counsel

15    for, nor related to, any party to said proceedings,

16    nor in anywise interested in the outcome thereof.

17          In witness whereof, I have hereunto subscribed

18    my name.

19

20    Dated:  __NOV 3 0 2006__

21

22

23    _____
      DAVID S. COLEMAN
24    CSR No. 4613

25
```

**U.S. LEGAL SUPPORT**

EXHIBIT 17
579

Dec-20-06   07:40pm   From-                                      T-171   P.004/005   F-206

1 | Marc Toberoff (CA State Bar No. 188547)
  | Nicholas C. Williamson (CA State Bar No. 231124)
2 | LAW OFFICES OF MARC TOBEROFF, PLC
  | 2049 Century Park East, Suite 2720
3 | Los Angeles, CA 90067
  | Telephone: (310) 246-3333
4 | Facsimile: (310) 246-3101

5 | Attorneys for MARC TOBEROFF, ESQ.

6 | **UNITED STATES DISTRICT COURT**

7 | **CENTRAL DISTRICT OF CALIFORNIA**

8 |

9 | JOANNE SIEGEL, an individual; and       Case Nos.:
  | LAURA SIEGEL LARSON, an                  CV 04-08400 SGL (RZx)
10 | individual,                             CV 04-08776 SGL (RZx)
   |                Plaintiffs,
11 |      vs.                                [Honorable Stephen G. Larson]
   |                                         [Honorable Ralph Zaresky]
12 |
13 | TIME WARNER INC., a corporation;
   | WARNER COMMUNICATIONS            **DECLARATION OF MARC**
14 | INC., a corporation; WARNER       **TOBEROFF, ESQ.**
   | BROS. ENTERTAINMENT INC., a
15 | corporation; WARNER BROS.
   | TELEVISION PRODUCTION INC.,
16 | a corporation; DC COMICS, a general
17 | partnership; and DOES 1-10,
18 |
   |                Defendants.
19 |
20 | DC COMICS,
21 |
   |                Counterclaimant,
22 |      vs.
23 |
   | JOANNE SIEGEL, an individual; and
24 | LAURA SIEGEL LARSON, an
   | individual,
25 |
26 |                Counterclaim Defendants.
27 |
28 |

Declaration Of Marc Toberoff, Esq.

EXHIBIT 17
580

Dec-20-06  07:40pm  From-        T-171  P.005/005  F-206

# DECLARATION OF MARC TOBEROFF, ESQ.

I, Marc Toberoff, Esq., caused the following errata corrections to be made upon reviewing my deposition transcript:

1.    On page 37, line 20, I changed "Yes" to "No, J. Todd Harris was not involved with IP Worldwide, LLC" to reflect the correct answer as articulated on page 37, line 22.

2.    On page 90, line 5, I changed "were" to "was" to correct grammar.

3.    On page 119, line 24, I changed "I believe a longer term" to "I believe I requested a longer term" because this accurately reflects what I was trying to say.

4.    On page 122, line 10, I changed "representing him" to "representing them" because I believe this is a typo.

5.    On page 124, line 24, I changed "was a highly" to "was highly" to correct grammar.

6.    On page 132, line 10, I changed "me, that" to "me, whether that" because this accurately reflects what I was trying to say.

7.    On page 138, line 18, I changed "August" to "October" because that is the correct month.

Executed on December 20, 2006 in Los Angeles, California.

_____
Marc Toberoff

1

Declaration Of Marc Toberoff, Esq.

EXHIBIT 17
581