# EXHIBIT 24

CERTIFIED COPY

# In The Matter Of:

*DC COMICS*

*v.*

*PACIFIC PICTURES CORPORATION*

---

*LARSON, LAURA SIEGEL - Vol. 1*

*July 22, 2011*

---

MERRILL CORPORATION
LegaLink, Inc.
20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

LAURA SIEGEL LARSON - 7/22/2011

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DC COMICS,

Plaintiff,

vs.

PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, an individual, JOANNE SIEGEL, an individual, LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive,

Defendants.

Case No. CV-10-3633 ODW (RZx)

DEPOSITION OF:

LAURA SIEGEL LARSON

FRIDAY, JULY 22, 2011

9:45 A.M.

Reported by:

Kathleen E. McCarthy

CSR No. 4483

Deposition of LAURA SIEGEL LARSON, the witness, taken on behalf of the Plaintiff, on Friday, July 22, 2011, 9:45 a.m., at 1999 Avenue of the Stars, Sixteenth Floor, Los Angeles, California, before Kathleen E. McCarthy, CSR No. 4483.

APPEARANCES OF COUNSEL:

FOR PLAINTIFF:

O'MELVENY & MYERS LLP
BY: DANIEL M. PETROCELLI, ESQ.
MATTHEW T. KLINE, ESQ.
JASON TOKORO, ESQ.
CASSANDRA L. SETO, ATTORNEY AT LAW
1999 Avenue of the Stars
Seventh Floor
Los Angeles, California 90067-6035
(310) 553-6700

FOR DEFENDANTS:

TOBEROFF & ASSOCIATES
BY: MARC TOBEROFF, ESQ.
2049 Century Park East
Suite 3630
Los Angeles, California 90067
(310) 246-3333

APPEARANCES (Continued):

ALSO PRESENT: FRITZ SPERBERG, VIDEOGRAPHER

INDEX

| WITNESS | EXAMINATION | PAGE |
| --- | --- | --- |
| LAURA SIEGEL LARSON | | |
| | Mr. Petrocelli | 10 |

EXHIBITS

| NO. | PAGE | DESCRIPTION |
| --- | --- | --- |
| Exhibit 55 | 13 | Last Will of Joanne Siegel; Durable Power of Attorney for Management of Property and Personal Affairs (LSL 00414 - 00428 and LSL 00430 - 00450) |
| Exhibit 56 | 110 | Letter to Paul Levitz from Joanne Siegel and Laura Siegel Larson dated September 21, 2002 (WB006022) |
| Exhibit 57 | 177 | Siegel Privilege Log |
| Exhibit 58 | 196 | Superman -- Marc Toberoff Timeline (Q 0001 - Q 0007) |
| Exhibit 59 | 211 | First Amended Complaint dated September 3, 2010 |
| Exhibit 60 | 234 | Facsimile Cover Page to Ariel Z. Emanuel from Marc Toberoff dated 6-3-02; Memorandum of Agreement (EN00001 - 00007) |

INDEX (Continued)

EXHIBITS

| NO. | PAGE | DESCRIPTION |
|---|---|---|
| Exhibit 61 | 236 | Letter to Richard D. Parsons from Joanne Siegel dated May 9, 2002 (000000676 - 000000678) |
| Exhibit 62 | 253 | Letter to Lillian J. Laserson from Joanne Siegel and Laura Siegel Larson dated October 28, 2002 (000001299 - 000001300) |
| Exhibit 63 | 260 | Letter to Don W. Bulson from Joanne Siegel and Laura Siegel Larson dated November 1, 2002 (LSL 00451) |
| Exhibit 64 | 285 | Letter to Joanne Siegel and Laura Siegel Larson from Marc Toberoff dated November 26, 2002 (000001894) |
| Exhibit 65 | 289 | Letter to Joanne Siegel, Laura Siegel Larson, and Ariel Emanuel from Marc Toberoff dated December 16, 2002 (000001883 - 000001884) |

INDEX (Continued)

PREVIOUSLY MARKED EXHIBITS

| NO. | PAGE | DESCRIPTION |
|---|---|---|
| Exhibit 45 | 60 | Letter to Joanne Siegel and Laura Siegel Larson from Marc Toberoff and Ariel Emanuel dated as of October 3, 2022 (000001878 - 000001881) |
| Exhibit 48 | 108 | Letter to John A. Schulman from Kevin S. Marks dated October 19, 2001; Transmission Report (GTRB 0302 - 0308) |
| Exhibit 10 | 212 | Joint Venture Agreement made as of November 23, 2001 (134 - 137) |
| Exhibit 17 | 220 | Renewal Registrations |
| Exhibit 18 | 220 | U.S. Copyright Office certificate; Application for Registration of a Claim to Renewal Copyright |
| Exhibit 19 | 221 | List of books |
| Exhibit 13 | 226 | Letter to Mark Warren Peary from Marc Toberoff dated October 27, 2003 (125 - 128) |

INDEX (Continued)

PREVIOUSLY MARKED EXHIBITS

| NO. | PAGE | DESCRIPTION |
|---|---|---|
| Exhibit 54 | 243 | Letter to Kevin S. Marks and Bruce M. Ramer from Joanne Siegel and Laura Siegel Larson dated September 21, 2002; Transmission Report (GTRB 0321 - 0322) |
| Exhibit 46 | 293 | Letter to Joanne Siegel and Laura Siegel Larson from Marc Toberoff dated January 21, 2002 (000001888 - 000001890) |
| Exhibit 30 | 298 | Letter to Laura from Michael Siegel dated May 13, 2003 (LSL 00211 - 00212) |

INDEX (Continued)

INSTRUCTIONS NOT TO ANSWER

| PAGE | LINE | PAGE | LINE | PAGE | LINE |
|---|---|---|---|---|---|
| 27 | 4 | 106 | 1 | 323 | 3 |
| 27 | 12 | 106 | 9 | 324 | 12 |
| 28 | 3 | 147 | 8 | 325 | 13 |
| 28 | 11 | 147 | 17 | 326 | 10 |
| 33 | 13 | 147 | 22 | 326 | 13 |
| 34 | 11 | 148 | 4 | 327 | 15 |
| 41 | 13 | 148 | 10 | 327 | 24 |
| 41 | 19 | 148 | 15 | 328 | 7 |
| 42 | 1 | 156 | 16 | 328 | 17 |
| 42 | 23 | 156 | 23 | 328 | 22 |
| 44 | 13 | 186 | 1 | 329 | 1 |
| 45 | 1 | 219 | 24 | 329 | 23 |
| 46 | 1 | 258 | 4 | 330 | 7 |
| 46 | 9 | 260 | 4 | 330 | 17 |
| 48 | 7 | 266 | 9 | 332 | 10 |
| 50 | 17 | 266 | 19 | 333 | 1 |
| 101 | 5 | 268 | 6 | | |
| 103 | 25 | 268 | 15 | | |
| 105 | 21 | 322 | 14 | | |

LOS ANGELES, CALIFORNIA; FRIDAY, JULY 22, 2011

9:45 A.M.

08:45:40

THE VIDEOGRAPHER: Good morning. This marks the beginning of Volume 1, videotape number one, in the deposition of Laura Siegel in the matter entitled DC Comics versus Pacific Pictures Corporation, et al., filed in the United States District Court for the Central District of California. This is Case No. CV-10-3633 ODW (RZx)

Today's date is July 22, 2011, and the time on the video monitor is 9:45 a.m.

The video operator today is Fritz Sperberg, a notary public contracted by Merrill Legal Solutions at 20750 Ventura Boulevard, Woodland Hills, California.

This video deposition is taking place at 1999 Avenue of the Stars in Los Angeles and was noticed by Daniel Petrocelli of O'Melveny & Myers.

Counsel, please identify yourselves and state whom you represent.

MR. PETROCELLI: Dan Petrocelli for DC Comics.

MR. TOBEROFF: Mark Toberoff for Laura Siegel Larson and Warren Peavy -- Peary and Jean Peavy.

MR. PETROCELLI: We also have Jason Tokoro

09:45:27 09:45:29 09:45:32 09:45:36 09:45:40 09:45:42 09:45:45 09:45:51 09:45:53 09:45:57 09:46:01 09:46:03 09:46:08 09:46:12 09:46:15 09:46:17 09:46:18 09:46:20 09:46:24 09:46:25 09:46:28 09:46:35

and Matt Kline of O'Melveny here as well. 09:46:36

THE WITNESS: Excuse me. Which is Matt and which is -- 09:46:41 09:46:42

MR. PETROCELLI: Jason -- 09:46:43

THE WITNESS: Jason, and Matt -- 09:46:44

MR. PETROCELLI: -- is to my right -- 09:46:45

THE WITNESS: Okay. 09:46:45

MR. PETROCELLI: -- and then Matt is down at the end there. 09:46:45 09:46:48

THE WITNESS: All right. Thank you. 09:46:48

THE VIDEOGRAPHER: The court reporter today is Kathy McCarthy of Merrill. 09:46:48 09:46:50

Would the reporter please swear in the witness. 09:46:50 09:46:52

09:46:52

LAURA SIEGEL LARSON,

having been first duly sworn, was

examined and testified as follows:

09:47:02

THE VIDEOGRAPHER: You may begin. 09:47:02

EXAMINATION 09:47:03

BY MR. PETROCELLI:

Q. Could you please state your full name. 09:47:04

A. Laura Siegel Larson. 09:47:07

Q. And shall I call you Ms. Larson? 09:47:08
A. That's fine. 09:47:10
Q. Thank you. 09:47:11
Ms. Larson, first of all, let me express our condolences of the passing of your mother earlier this year, and we're sorry about that. And I understand also that you may have some need for a rest or breaks during the course of the day. 09:47:13 09:47:17 09:47:21 09:47:29 09:47:34
A. Yes. 09:47:35
Q. And please let us know whenever you need to take a break because you're not feeling well or you're tired. Just say so and we'll stop. Okay? 09:47:36 09:47:43 09:47:45
A. All right. 09:47:48
Q. Okay. Let me just begin by saying you understand that we're taking this deposition in a case filed by DC Comics? 09:47:51 09:47:55 09:47:58
A. Yes. 09:47:59
Q. Okay. And you have previously been deposed in the lawsuit that you filed a few years back. You recall that? 09:47:59 09:48:05 09:48:10
A. Yes. 09:48:10
Q. I want you to know that I have reviewed your testimony in your deposition, and I will endeavor not to go over or repeat things you have already said. To be sure, though, there will be overlap, and I will be 09:48:12 09:48:16 09:48:21 09:48:24

mindful, though, of not wasting your time or my time by asking you things we already know. 09:48:28 09:48:32

A. Good. 09:48:33

Q. You are the executrix of your mother's estate? 09:48:37 09:48:42

A. That's correct. 09:48:42

MR. PETROCELLI: Okay. Let me show you as the first deposition exhibit -- 09:48:43 09:48:47

And forgive me. What is the convention that we're using here? 09:48:50 09:48:51

MR. TOKORO: We're continuing the exhibit numbers from the last time. 09:48:55 09:48:57

MR. PETROCELLI: Okay. I'm told we're continuing exhibit numbers from when we last left off. 09:48:58 09:48:59

So what is the next in order? 09:49:02

MR. TOKORO: This is going to be number 53. 09:49:04

MR. PETROCELLI: So we're going to mark as -- 09:49:07

MR. TOKORO: 55. I'm sorry. 55. 09:49:10

MR. PETROCELLI: -- 55 your mother's Last Will and a Durable Power of Attorney as one document. I just have a couple questions about them. 09:49:12 09:49:16 09:49:19

THE WITNESS: Thank you. Let me just ask, could you speak up just a little bit more because I also have a hearing impairment, so it would help. 09:49:31 09:49:32 09:49:35

MR. PETROCELLI: Sure. It's important that 09:49:38

you hear me. 09:49:39

THE WITNESS: Yes. 09:49:41

MR. PETROCELLI: So I'm glad you pointed that out. 09:49:41 09:49:43

(Whereupon, Plaintiff's Exhibit 55 was marked for identification.) 09:49:49

BY MR. PETROCELLI:

Q. These two documents, your mother's Last Will and the Durable Power of Attorney, were executed in November of 2000, according to the documents, November 14, 2000. To your knowledge, these are the last time your mother executed a Will and Power of Attorney? 09:49:49 09:49:52 09:49:58 09:50:01 09:50:06

A. Yes, that's correct. 09:50:09

Q. And you were appointed as the person who would have power of attorney over her affairs -- 09:50:11 09:50:16

A. Yes. 09:50:21

Q. -- in the year 2000? 09:50:22

A. I think there were some limitations to that, though. 09:50:23 09:50:25

Q. Based on what the document says? 09:50:26

A. Yes. 09:50:27

Q. And in the year 2000 was your mother of sound mind and health? 09:50:28 09:50:32

A. Oh, yes, of course. 09:50:33

Q. Did there come a time since 2000 to the 09:50:50

present when she exhibited symptoms of dementia? 09:50:54
A. No. 09:51:02
Q. So until she passed away, she was of sound mind? 09:51:02 09:51:05
A. Oh, absolutely. 09:51:05
Q. On page 2 of the will, there are different beneficiaries named. Michael Larson and James Larson are your two children? 09:51:08 09:51:16 09:51:19
A. That's correct. 09:51:20
Q. And those are the only grandchildren of your mother? 09:51:20 09:51:23
A. Yes. 09:51:23
Q. And Sophie Halko, H-a-l-k-o, that's your mom's sister, your aunt? 09:51:25 09:51:29
A. It's her only surviving sister, yes. 09:51:30
Q. Only surviving sibling? 09:51:33
A. Yes. 09:51:36
Q. Where does she live? 09:51:37
A. In Ohio, Cleveland, Ohio. 09:51:37
Q. Has lived there her whole life? 09:51:41
A. Yes. 09:51:43
Q. Okay. And how old is she? 09:51:43
A. She's in her eighties. 09:51:46
Q. And does she live alone, or is she married? 09:51:48
A. No. She's living with her son. 09:51:51

Q. Son. Okay. What's his name? 09:51:53
A. Gregory -- well, she has more than one son, but Gregory is living with her now. 09:51:55 09:51:58
Q. Gregory Halko? 09:52:00
A. Yes. 09:52:01
Q. And who is, finally, George Zadrozny, Esq. of -- 09:52:02 09:52:08
A. Yes. He's -- 09:52:08
Q. -- Timber Bay Circle, Oldsman, Florida? 09:52:09
A. He's a long-time friend and also served as an attorney for us in the early days of the terminations. 09:52:13 09:52:17
Q. What do you consider the early days of the termination? 09:52:23 09:52:26
A. Well, it was prior to my father's death. So he was a -- he was a consultant helping, you know, my mother and father learn about the -- about the copyright law. 09:52:26 09:52:30 09:52:35 09:52:38
Q. Your father passed in 1996? 09:52:40
A. Correct. 09:52:42
Q. Okay. Did there come a time when Mr. Zadrozny stopped rendering services as a lawyer to any member of your family? 09:52:43 09:52:49 09:52:52
A. No. I mean he's -- you know, he's on an as-needed basis. 09:52:54 09:53:00
Q. Has he continued to render services to this 09:53:00

day? 09:53:03

A. When needed. 09:53:05

Q. When is the last time he has been called upon to give any advice? 09:53:06 09:53:10

A. I really don't remember, but, you know, it was fairly recently. 09:53:16 09:53:21

Q. In connection with Superman? 09:53:24

A. I -- I don't remember if the last time that I spoke to him was about Superman or whether it had to do with my mother's estate. 09:53:27 09:53:31 09:53:34

Q. Has he provided advice regarding Superman since the time that you retained Mr. Toberoff? 09:53:41 09:53:52

A. Regarding -- could you clarify your question? 09:53:58

Q. Yeah. I'm trying to deliberately be very vague -- not vague, but broad -- 09:54:00 09:54:03

A. It is broad. 09:54:06

Q. -- because I want to stay away from privilege issues, so I'm not asking you, at least right now, about any specific subject matter. I'm just trying to generally understand if this person is a relevant witness to anything. And so the question I'm putting to you is whether since the time that you first entered into a relationship with Mr. Toberoff back in 2002, since that time to the present, has Mr. Zadrozny rendered any legal advice regarding Superman? 09:54:07 09:54:09 09:54:12 09:54:16 09:54:19 09:54:22 09:54:27 09:54:33 09:54:40

A. Yes. 09:54:42
Q. And when is the last time that he has done so? 09:54:43
A. As I said, I can't recall, but I would be guessing. 09:54:47
Q. Has he done so since your mother passed away? 09:54:52
A. Not regarding Superman. 09:54:55
Q. Not regarding. And prior to your mom's passing, you don't remember the last time? 09:54:57
A. No. 09:55:03
Q. Did you send him a copy of the lawsuit in this case? 09:55:03
A. Yes. 09:55:08
Q. Okay. And without getting into the details, have you had discussions -- 09:55:10
A. Oh, I'm sorry. When you say in this case, you're talking about the current -- the current one that we're discussing. 09:55:16
Q. The DC Comics case, correct. 09:55:22
A. That I don't recall. 09:55:23
Q. But the other case you did. 09:55:24
A. Yes. 09:55:25
Q. The one you filed. 09:55:25
A. Yes. 09:55:26
Q. Okay. Is he -- how old is Mr. Zadrozny? Do 09:55:30

you know? 09:55:36
A. I would say he's probably somewhere between 58 and 62. 09:55:39 09:55:43
Q. And he's still an active member of the bar? 09:55:44
A. Yes. 09:55:46
Q. Does he work with a firm? 09:55:49
A. No. He works independently. 09:55:51
Q. If you go to page 15 of the will, there are two witnesses who attested to the will. I just want to make sure we know who they are. The first one looks like to be the signature of the lawyer who prepared the document, Gary Ruttenberg; is that correct? 09:56:03 09:56:08 09:56:14 09:56:17 09:56:20
A. Yes. 09:56:24
Q. And the second person is his legal assistant, Mary Carrier? 09:56:24 09:56:27
A. That's true. 09:56:27
Q. And how long have Mr. Ruttenberg -- how long has Mr. Ruttenberg been a lawyer for your family? 09:56:29 09:56:31
A. Probably -- well, the only -- only thing that he ever dealt with was, you know, wills. You know, I mean he had nothing to do with any other legal matters. So if we needed something having to do with a will, I believe that -- that that would be 19 -- about 1995. 09:56:38 09:56:43 09:56:46 09:56:49 09:56:52 09:57:06

Q. That had to do with a prior will? 09:57:11
A. No, had to do with my father's will. 09:57:14
Q. Your father's will. Okay. And since 2000 when he prepared your mother's will until your mom passed earlier this year, did you have any interaction with him at all regarding Superman? 09:57:16 09:57:21 09:57:25 09:57:29
A. No. 09:57:31
Q. Or did your mother, to your knowledge? 09:57:31
A. No. 09:57:33
Q. Has Mr. Zadrozny, to your knowledge, reviewed any of the -- any agreements relating in any way to Superman? 09:57:34 09:57:39 09:57:47
A. Could you be more specific? 09:57:48
Q. H'm. The notice of termination that you served in 1997, did he have anything to do with its preparation? 09:57:51 09:57:56 09:58:01
A. He was a consultant for us at that time. 09:58:01
Q. Was he at all involved in any way regarding your negotiations and discussions with Warner Bros. or DC Comics prior to your relationship with Mr. Toberoff? 09:58:05 09:58:13 09:58:16 09:58:19
A. You know, he was not a negotiator. 09:58:19
Q. Was he consulted from time to time in regard to those matters? 09:58:21 09:58:23
A. As a friend, perhaps. 09:58:26

Q. Okay. 09:58:29
A. I don't -- I don't really -- 09:58:30
Q. So, for example -- 09:58:32
A. May I just clarify? 09:58:33
Q. Sure. 09:58:34
A. My mother really communicated with him far more than I did, so I really couldn't be exactly sure of the answer to that. 09:58:35 09:58:40 09:58:42
Q. Okay. Did you ever communicate with him during the time when there were discussions with Warner Bros. let's say from 1997 until the time that you started your relationship with Mr. Toberoff, let's say during that five-, six-year period of time? You recall there were lots of discussions and negotiations with DC Comics and Warner Bros.? 09:58:50 09:58:53 09:58:57 09:58:59 09:59:02 09:59:06 09:59:09
A. Um-hum. Yes. 09:59:10
Q. You have to answer audibly. 09:59:12
A. Yes. 09:59:13
Q. At some point in time you were represented, your family was, by -- is it George Levine? Arthur Levine. Excuse me. 09:59:16 09:59:18
A. Arthur Levine.
Q. And then Kevin Marks and Bruce Ramer of the Gang Tyre firm. 09:59:22 09:59:27
A. Yes. 09:59:27

MR. TOBEROFF: Wait until he finishes the question. 09:59:27 09:59:30

THE WITNESS: I'm sorry. 09:59:30

MR. TOBEROFF: And you need to give me time in case I want to object. 09:59:31 09:59:33

BY MR. PETROCELLI:

Q. And prior to Mr. Toberoff, were you represented by any other lawyer, you or any member of your family, regarding Superman besides Arthur Levine and besides the Gang Tyre law firm? 09:59:34 09:59:39 09:59:40 09:59:47

A. No. 10:00:02

Q. Okay. 10:00:11

Did Mr. -- to your knowledge, did Mr. Zadrozny review any agreements that you or members of your family entered into with Mr. Toberoff? 10:00:12 10:00:16 10:00:21

A. Yes. 10:00:24

Q. Which agreements? 10:00:26

A. The original documents when we were retaining his legal services in 2002 and also when we entered into a litigation agreement with him in -- I believe that was 2004. 10:00:28 10:00:35 10:00:43 10:00:48

Q. And "with him," you meant with Mr. Toberoff. 10:00:50

A. Correct. 10:00:53

Q. Do you know whether Mr. Zadrozny charged your family for any legal fees for reviewing those 10:00:55 10:01:00

documents? 10:01:04
A. Yes. 10:01:05
Q. How do you know that? 10:01:05
A. My mother told me. 10:01:07
Q. Do you know how much he charged? 10:01:10
A. It was a very low hourly rate. 10:01:12
Q. After this litigation document in 2004 that you entered into -- when I say "you," you know I'm talking about really you and your mother. 10:01:17 10:01:22 10:01:24
A. Correct. 10:01:28
Q. Joanne Siegel. 10:01:29
A. Us as the Siegels. 10:01:30
Q. But I'm not talking about Michael Siegel. 10:01:31
A. No, no. He wasn't -- he had nothing to do with that. 10:01:33 10:01:36
Q. We'll deal with him separately. 10:01:37
MR. TOBEROFF: I just want to for clarity, when "you" does not refer to her and her mother and refers just to her, you need to tell her. 10:01:39 10:01:41 10:01:45
MR. PETROCELLI: Fair enough. Fair enough. I will try to be clear. 10:01:47 10:01:50
I forgot what I was asking. So it was a clever device by good lawyers to get you off track. 10:01:55 10:01:59
What was I asking? Senior moment here. 10:02:06
(The record was read.) 10:02:22

MR. PETROCELLI: Okay. There you go. 10:02:22
THE WITNESS: Okay. 10:02:24
BY MR. PETROCELLI:
Q. So after the litigation document that you and your family entered into with Mr. Toberoff in 2004, were there any other documents, to your knowledge, that were sent to Mr. Zadrozny for his review related to Superman? 10:02:25 10:02:27 10:02:31 10:02:34 10:02:40
A. I don't recall. 10:02:41
Q. You signed a document sometime in or about 2008 that the Shusters also signed, some agreement; correct? 10:02:44 10:02:49 10:02:52
A. Yes. 10:02:53
Q. And Mr. Toberoff also signed that; correct? 10:02:54
A. Yes. 10:02:57
Q. Did Mr. Zadrozny, to your knowledge, review that document? 10:02:59 10:03:05
A. Yes. 10:03:05
Q. Did he review that document prior to the time you signed it? 10:03:07 10:03:10
A. Yes. 10:03:11
Q. How do you know he reviewed it? 10:03:14
A. Because he and I spoke about it. 10:03:20
Q. How long before you signed it -- withdrawn. 10:03:27
Did you send him a copy of it before signing 10:03:33

it? 10:03:35
A. Yes. 10:03:36
Q. Was he here in town with you or -- 10:03:37
A. No. 10:03:40
Q. He was living in Florida? 10:03:40
A. Yes. 10:03:42
Q. Has he lived in Florida the whole time you've been dealing with him? 10:03:42 10:03:45
A. Yes. 10:03:45
Q. Okay. Did any other attorney besides Mr. Zadrozny review that document, to your knowledge, before you or your mother signed it? 10:03:51 10:03:53 10:03:57
A. Which document are you speaking of? 10:03:58
Q. This 2008 -- we've been calling it a consent agreement. 10:04:00 10:04:04
A. Oh. The -- no. 10:04:05
Q. How many documents have you or your mother signed that the Shusters also signed, one or more Shuster people? 10:04:11 10:04:15 10:04:19
A. Only one. 10:04:20
Q. Was the 2008 consent agreement the last document you asked or your mother asked, to your knowledge, Mr. Zadrozny to review related to Superman? 10:04:32 10:04:41 10:04:44
A. I believe so. 10:04:49
Q. Have you signed any other documents related 10:04:52

to Superman after the 2008 consent agreement that you signed together with the Shusters and Mr. Toberoff and your mother? 10:04:56 10:05:02 10:05:05

A. I don't remember any other document. 10:05:07

Q. How did you obtain a copy -- withdrawn. 10:05:22

Did you or your mother send the draft of the 2008 consent agreement to Mr. Zadrozny, or did someone else send it on your behalf? 10:05:26 10:05:29 10:05:33

A. I believe my mother sent it. 10:05:36

Q. And do you know how long before your signing it your mother sent it to him? 10:05:40 10:05:48

A. I don't know. I would be guessing, but, you know -- 10:05:52 10:05:54

MR. TOBEROFF: Don't guess. 10:05:55

THE WITNESS: You know. 10:05:56

BY MR. PETROCELLI:

Q. On the subject of guessing, your lawyer said don't guess, and I concur with that except that you need to understand that there's a wild guess, which we don't want to know about. Wild speculation we don't want to know about. But if you have some basis to estimate something or approximate something based on your overall knowledge, we are entitled to that, just so you keep that in mind. Okay? 10:05:57 10:06:00 10:06:02 10:06:06 10:06:08 10:06:12 10:06:14 10:06:19

A. Um-hum. Yes. You pointed -- 10:06:22

Q. Yeah. 10:06:24
A. Pointing reminder. 10:06:26
Q. The pointing is not to be rude at all. It's just that -- 10:06:27
A. I understand. 10:06:31
Q. -- to make sure that you answer audibly. 10:06:31
MR. TOBEROFF: Give me time to object. 10:06:33
MR. PETROCELLI: Mr. Toberoff does like to object, so we don't want -- we don't want to take away that pleasure. 10:06:38
MR. TOBEROFF: I like to have something to do at deposition. 10:06:45
MR. PETROCELLI: You don't need to be here, you know. 10:06:47
THE WITNESS: Yes, he does. I would miss him if he wasn't here. 10:06:50
BY MR. PETROCELLI:
Q. Did -- do you remember if there were any changes made to the consent agreement after Mr. Zadrozny reviewed it? 10:06:55
A. I don't remember. 10:07:08
Q. Did you discuss it with him? 10:07:13
A. Yes. 10:07:15
Q. What did you and he discuss about it? 10:07:17
MR. TOBEROFF: Actually, you can't disclose 10:07:22

that. 10:07:24

THE WITNESS: I didn't think I could. 10:07:24

MR. TOBEROFF: Attorney-client privilege, and I instruct you not to answer. 10:07:26 10:07:27

BY MR. PETROCELLI:

Q. Did you discuss with your mother what you and Mr. Zadrozny talked about? 10:07:29 10:07:35

A. Probably. 10:07:42

Q. As best as you can remember, what did you and your mom say to each other in that regard? 10:07:45 10:07:48

MR. TOBEROFF: Joint client privilege. Instruct you not to answer. 10:07:53 10:07:54

BY MR. PETROCELLI:

Q. I'm referring to discussions that the two of you had privately, not with Mr. Zadrozny in the room or on the phone. You understand that? 10:07:55 10:07:57 10:08:01

A. I hear what you're saying. 10:08:04

Q. Okay. And I'm asking you to tell me what you discussed with your mother regarding what Mr. Zadrozny did or said. 10:08:06 10:08:08 10:08:13

MR. TOBEROFF: You can answer so long as your answer doesn't disclose the substance of conversations that you had with Mr. Zadrozny. 10:08:15 10:08:17 10:08:21

THE WITNESS: Um-hum. 10:08:23

That we were grateful for his input. 10:08:26

BY MR. PETROCELLI: 10:08:29
Q. What was his input? 10:08:29
MR. TOBEROFF: I instruct you not to answer. Attorney-client privilege. 10:08:32 10:08:35
BY MR. PETROCELLI:
Q. You and your mother discussed his input? 10:08:37
A. Yes. 10:08:40
Q. What did the two of you discuss about his input? 10:08:41 10:08:44
MR. TOBEROFF: Attorney-client privilege. Joint client privilege. I instruct you not to answer. 10:08:44 10:08:46
BY MR. PETROCELLI:
Q. Did he provide any input to you or your mother in writing? 10:08:48 10:08:53
A. I don't believe so. 10:08:56
Q. Did he mark up a document and send you some revisions or tell you -- send you some revisions in writing? 10:08:57 10:09:01 10:09:05
A. I don't recall that. 10:09:06
Q. Were there any -- did you e-mail him at all? 10:09:06
A. Well, on other occasions, but, you know, not regarding this. 10:09:10 10:09:13
Q. Did you meet with him in person regarding the 2008 consent agreement? 10:09:16 10:09:19
A. No. 10:09:20

Q. Did you meet with him in person regarding the 2004 litigation agreement with Mr. Toberoff? 10:09:20 10:09:24
A. No. 10:09:28
Q. And did you meet with him in person regarding the 2002 agreement with Mr. Toberoff? 10:09:28 10:09:31
A. No. 10:09:41
Q. And to be clear, Mr. Zadrozny is the only lawyer to review your agreements with Mr. Toberoff? 10:09:41 10:09:48
A. No, that's not correct. 10:09:52
Q. Okay. Is he the only lawyer to review the 2008 consent agreement? 10:09:54 10:09:57
A. I believe so. 10:10:02
Q. Okay. And with respect to the 2002 agreement, the first agreement with Mr. Toberoff, who reviewed that agreement, if anyone, other than Mr. Zadrozny? 10:10:06 10:10:12 10:10:12 10:10:15
A. I believe Arthur Levine looked at it, if I'm recalling correctly. 10:10:16 10:10:20
Q. During the time that you were working with Gang Tyre, Bruce Ramer and Kevin Marks of Gang Tyre, you were still calling on Mr. Levine from time to time -- 10:10:23 10:10:26 10:10:29 10:10:31
A. Yes. 10:10:32
Q. -- with regard to Superman? 10:10:32
A. Yes. 10:10:34

Q. And have you continued to do so even after your relationship with Mr. Toberoff began? 10:10:34 10:10:37
A. Yes. 10:10:42
Q. And to the present? 10:10:43
A. Well, I haven't talked to Arthur in a really long time. 10:10:47 10:10:50
Q. When is the last time that you or your mother consulted with Mr. Levine regarding Superman? 10:10:50 10:10:54
A. I don't remember. I couldn't give you a date. 10:11:04 10:11:07
Q. Would it be within the last five years? 10:11:07
A. Possibly. 10:11:14
Q. Did Mr. Levine review the 2004 litigation agreement with Mr. Toberoff? 10:11:16 10:11:22
A. Yes, he did. 10:11:23
Q. Did any other lawyer besides Mr. Levine and Mr. Zadrozny review the 2002 agreement with Mr. Toberoff, to your knowledge? 10:11:25 10:11:29 10:11:31
A. Are you saying, you know, on my behalf? 10:11:36
Q. Or your mother's behalf, yes. 10:11:39
A. No. 10:11:42
Q. The same question for the 2004 litigation agreement. 10:11:43 10:11:46
A. No other lawyer besides Arthur and George. 10:11:47
Q. Okay. Arthur Levine and George Zadrozny. 10:11:50

A. Correct. 10:11:55
Q. And the 2008 consent agreement was just George, not Arthur. 10:11:56 10:11:59
A. I believe so. I -- I don't remember talking to Arthur about it, but I might have, but I really think it was just George. 10:12:00 10:12:05 10:12:09
Q. Do you know whether the Shusters had any lawyer review the 2008 consent agreement? 10:12:12 10:12:18
A. I have no idea. 10:12:22
Q. Do you recall that Mr. Toberoff sent you some letters regarding a potential conflict of interest with respect to acquiring Michael Siegel's termination interest? 10:12:31 10:12:41 10:12:46 10:12:53
A. I believe he did, yes. 10:12:54
Q. And I'll show them to you as we get into it. 10:12:56
Do you know whether any lawyer for you or your mother reviewed those documents? 10:12:59 10:13:02
A. I'm -- probably -- I'm guessing, but I probably would have had George look at that also. 10:13:06 10:13:11
Q. You're not -- 10:13:18
A. Zadrozny.
Q. -- sure, is it fair to say? 10:13:18
A. I'm not sure, but I -- I would say probably. 10:13:20
Q. The record will show that those consent -- excuse me -- those disclosure -- withdrawn. 10:13:31 10:13:35

The record will show that those conflict of interest letters were sent to you --

What year was that?

MR. TOKORO: 2002, 2003.

BY MR. PETROCELLI:

Q. -- 2002, 2003, that general time frame. And I'll show them to you when we get to them, but for now -- and again, I'm trying to get a broad picture of who is involved in all this.

Have you received any conflict of interest letters from Mr. Toberoff since those ones in 2002 and 2003 related to Michael Siegel?

MR. TOBEROFF: Vague and -- are you asking whether any other conflict of interest letters, period, or any other conflict of interest letters relating to Michael Siegel?

MR. PETROCELLI: Let me clarify.

Q. Other than conflict of interest letters related to Michael Siegel --

A. Yes.

Q. -- have you received any conflict of interest letters from Mr. Toberoff in the course of your relationship with him?

A. Well, every time there was any sort of agreement that we were entering into with

10:13:38 10:13:40 10:13:44 10:13:48 10:13:49 10:13:52 10:13:55 10:13:58 10:14:04 10:14:10 10:14:15 10:14:21 10:14:23 10:14:27 10:14:30 10:14:33 10:14:37 10:14:40 10:14:42 10:14:43 10:14:46 10:14:49 10:14:51 10:14:56

Mr. Toberoff, he would disclose to us any conflicts of interest that he had in writing. 10:14:58 10:15:02

Q. Which -- can you give -- can you be more specific? 10:15:06 10:15:11

A. For the 2002 agreement. 10:15:12

Q. There's a letter he sent to you disclosing conflicts of interest? 10:15:16 10:15:19

A. I believe so. 10:15:20

Q. And what do you -- what do you understand the potential conflict of interest to have been that he was disclosing to you? 10:15:22 10:15:25 10:15:27

MR. TOBEROFF: Attorney-client privilege. I instruct you not to answer. 10:15:29 10:15:30

BY MR. PETROCELLI:

Q. Was that conflict of interest -- do you know who it is? 10:15:39 10:15:42

A. Do I know who what is? 10:15:44

Q. Bad question. 10:15:45

As you sit here now, do you remember the subject matter of the conflict of interest letter that you received from Mr. Toberoff at the time that you entered into the first agreement with him in 2002? 10:15:46 10:15:49 10:15:52 10:15:55

A. I don't -- 10:15:59

MR. TOBEROFF: You can answer. 10:16:00

THE WITNESS: I don't remember details. 10:16:01

BY MR. PETROCELLI: 10:16:04

Q. Are you certain that you received in writing a conflict of interest letter when you entered into the written agreement with Mr. Toberoff in 2002? 10:16:04 10:16:11 10:16:17

MR. TOBEROFF: Asked and answered. 10:16:21

THE WITNESS: Yes. 10:16:24

BY MR. PETROCELLI:

Q. Did that conflict of interest letter pertain in any way to Mr. Toberoff's relationship with the Shusters? 10:16:29 10:16:32 10:16:38

MR. TOBEROFF: I instruct you not to answer as to the contents of any conflict of interest waivers based on the attorney-client privilege, attorney work product. 10:16:39 10:16:41 10:16:48 10:16:51

BY MR. PETROCELLI:

Q. Did you sign any document relating to a conflict of interest that you received from Mr. Toberoff at the time you signed your first agreement with him in 2002? 10:16:52 10:16:59 10:17:03 10:17:07

A. Yes. 10:17:10

Q. And who else, to your knowledge, signed such a document? 10:17:12 10:17:15

A. My mother. 10:17:19

Q. Were there any other signatories to such a document? 10:17:19 10:17:22

A. Mr. Toberoff. 10:17:22

Q. Were there any other signatories? 10:17:23

A. I don't believe so. 10:17:25

Q. This is in 2002 now. 10:17:25

A. Yeah. 10:17:27

Q. Okay. 10:17:29

A. I'm trying to follow that. Yes. No other -- 10:17:29

Q. Like did the Shusters sign the document? 10:17:33

A. No. 10:17:35

Q. Okay. 10:17:36

Is the next conflict of interest document that you recall receiving from Mr. Shuster -- from Mr. Toberoff, again, unrelated to Michael Siegel, in 2004 when you signed the litigation agreement with him? 10:17:42 10:17:45 10:17:49 10:17:54 10:17:57

A. Yes. 10:17:57

Q. Okay. And you are certain that you received and signed such a document? 10:17:58 10:18:02

A. Yes. 10:18:04

Q. Have you reviewed either the 2002 conflict document that you signed or the 2004 conflict document that you signed recently? 10:18:08 10:18:13 10:18:16

A. No, not for a long time. 10:18:19

Q. Do you remember who the signatories are to the 2004 conflict document that you signed? 10:18:23 10:18:26

A. It would have been my mother and me and Mr. Toberoff. 10:18:31 10:18:33

Q. Do you know if that document was reviewed by Mr. Zadrozny? 10:18:38 10:18:42

A. I believe it was. 10:18:42

Q. Was it reviewed by anyone else? 10:18:45

A. I believe it was reviewed by Arthur Levine. 10:18:48

Q. Is 2004 the last time that you received a conflict of interest document from Mr. Toberoff? 10:18:53 10:18:59

A. No. 10:19:02

Q. When is the last time -- let me ask it this way. When is the next time after the 2004 litigation agreement? 10:19:03 10:19:05 10:19:12

A. Well, I know we received one in 2008. 10:19:12

Q. Is the conflict of interest document that you received in 2008 one that you also signed? 10:19:18 10:19:20

A. Yes. 10:19:26

Q. Your mother signed it? 10:19:28

A. Yes. 10:19:30

Q. And who else signed it? 10:19:30

A. Mr. Toberoff, Warren Peary, and Jean Shuster Peavy. 10:19:35 10:19:44

MR. PETROCELLI: Peary is P-a-e-r-y. 10:19:44

THE WITNESS: Yes. 10:19:47

BY MR. PETROCELLI:

Q. Okay. Did you have someone review that 2008 conflict document that you received from Mr. Toberoff? 10:19:49 10:19:54
A. Yes. 10:19:56
Q. And who reviewed it? 10:19:57
A. George Zadrozny and -- yes, I believe it was just George. As I said, I don't remember whether or not Arthur was involved with that. 10:19:59 10:20:02 10:20:06
Q. Okay. Do you know whether any lawyer reviewed it on behalf of the Shuster family? 10:20:11 10:20:14
A. I have no idea. 10:20:16
Q. Is the 2008 conflict document that you reviewed and signed a separate document from the 2008 consent agreement that you signed? 10:20:18 10:20:23 10:20:29
A. Yes. I believe they were two separate documents. 10:20:32 10:20:34
Q. So there are actually two documents, then, that bear your signature and a signature of a member of the Shuster family related to Superman. 10:20:34 10:20:37 10:20:42
A. Well, they were in essence all the, you know, the same issue. It was all, you know, all at one time. 10:20:45 10:20:49 10:20:53
Q. I understand that. 10:20:53
A. They were given to us. 10:20:55
Q. Two separate documents, though. 10:20:56
A. Two separate documents, I believe. 10:20:57

Q. Okay. And is that the last time in 2008 that you signed a conflict of interest document received from Mr. Toberoff? 10:20:58 10:21:05 10:21:08

A. I believe so. 10:21:09

Q. Is that the last time in 2008 that you received a conflict of interest document from Mr. Toberoff? 10:21:11 10:21:14 10:21:15

A. Yes. 10:21:17

Q. And are you certain that you have signed no other conflict of interest documents or any other documents with the Shuster family other than the 2008 consent agreement and the related conflict document? 10:21:19 10:21:26 10:21:30 10:21:34

A. Those were the only occasions on which we signed a document that the Shusters also signed. 10:21:40 10:21:44

Q. And even with respect to that issue in 2008, were there any other documents that you recall having signed together with the Shusters? 10:21:49 10:21:51 10:21:54

A. I'm sorry. Could you repeat that? 10:21:56

Q. Were there any other documents that you recall having signed with the Shusters other than those two documents, the 2008 consent agreement and the related conflict document? 10:21:58 10:21:59 10:22:02 10:22:06

A. No. 10:22:08

Q. Okay. 10:22:15

Did you have any discussions with either Jean 10:22:16

Peavy or Warren Peary about the 2008 consent agreement? 10:22:22 10:22:31

A. No, we did not. 10:22:32

Q. To your knowledge, did your mother? 10:22:34

A. I don't believe so. 10:22:36

Q. Have you ever had any discussion with any member of the Shuster family regarding the 2008 consent agreement? 10:22:48 10:22:52 10:22:58

A. I can't recall any discussion that we had. 10:23:02

Q. Have you ever -- you understand that in this lawsuit DC is alleging certain issues with respect to that document? 10:23:08 10:23:14 10:23:18

A. I think, you know, that's one of several things in that lawsuit. 10:23:21 10:23:24

Q. Have you read the lawsuit? 10:23:25

A. Yes. Not recently, but I've read it. 10:23:26

Q. After this lawsuit was filed, which you believe was on or about May 14 of 2010, did you have any discussion with either Jean Peavy or Warren Peary about the lawsuit? 10:23:32 10:23:34 10:23:38 10:23:43

A. No. 10:23:50

Q. Did you talk to your mother about the lawsuit? 10:23:50 10:23:54

A. Yes. 10:23:54

Q. Did you talk to your mother about the consent 10:23:58

agreement after the filing of the lawsuit? 10:24:01

A. The consent -- the consent agreement from 2008 after the lawsuit was filed in 2010? 10:24:10 10:24:13

Q. Exactly. You're very good. 10:24:16

A. Have to try and follow this. 10:24:22

Q. You're following it perfectly. 10:24:22

A. You're throwing a lot of dates at me here. 10:24:23

I don't remember any particular conversation that we had. 10:24:28 10:24:31

Q. Okay. 10:24:32

Have you signed any conflict document since the filing of this lawsuit in May, 2010? 10:24:38 10:24:45

A. I don't believe so. 10:24:51

Q. And have you signed any agreements at all with Mr. Toberoff since the filing of this lawsuit in May, 2010? 10:24:55 10:25:00 10:25:06

A. No. 10:25:09

Q. And to your knowledge, your mother didn't either; correct? 10:25:09 10:25:12

A. No. 10:25:12

Q. Is that correct? 10:25:13

A. Correct. She did not. 10:25:13

Q. Okay. Do you have any agreements with any member of the Shuster family regarding Superman other than the 2008 consent agreement or the conflict 10:25:15 10:25:43 10:25:53

document related to it? 10:25:58
A. No. 10:26:06
Q. Do you have any arrangements with the Shuster family to share in any monies that either the Shusters or the Siegels receive for the sale of their Superman rights, including in settlement of litigation? 10:26:06 10:26:13 10:26:17 10:26:24
MR. TOBEROFF: Excuse me. Could you read back that question for me? 10:26:28 10:26:30
(The record was read.) 10:26:51
MR. TOBEROFF: To the extent any part of that question reveals the substance of -- any part of it reveals the substance of the consent agreement, which was held to be privileged twice, I would instruct you not to answer. 10:26:51 10:26:56 10:27:00 10:27:02 10:27:05
BY MR. PETROCELLI:
Q. Do you have any arrangement to share with the Shusters any monies that the Siegel family might receive with respect to their accounting on Superman? 10:27:15 10:27:25 10:27:33
MR. TOBEROFF: Same instruction. Same basis. 10:27:40
BY MR. PETROCELLI:
Q. Do you have any arrangements with the Shusters to share in any money that the Siegel family might receive with respect to the disposition of Superboy rights or settlement of litigation regarding Superboy? 10:27:43 10:27:46 10:27:51 10:27:58 10:28:02

MR. TOBEROFF: Same instruction. We made an exception with respect to Warren Peary based on an agreement that that exception would not constitute a waiver of privilege. If we had the same agreement with respect to Laura Siegel, I will let her answer that question. Otherwise I have to instruct her not to answer. 10:28:02 10:28:07 10:28:12 10:28:14 10:28:16 10:28:19 10:28:21

MR. PETROCELLI: Well, you know, it's a bit unprincipled to be selectively waiving, but for the purpose of this question, I'll make that agreement. 10:28:24 10:28:29 10:28:35

MR. TOBEROFF: You can answer. 10:28:43

THE WITNESS: Could you -- 10:28:45

MR. TOBEROFF: Read back the question? 10:28:46

THE WITNESS: Yeah. Would you ask the question again, please? 10:28:48 10:28:49

MR. PETROCELLI: Please repeat it. 10:28:50

(The record was read.) 10:29:08

THE WITNESS: No. 10:29:09

BY MR. PETROCELLI:

Q. Does the consent agreement that you signed with the Shusters make any reference at all to Superboy? 10:29:11 10:29:16 10:29:22

MR. TOBEROFF: I instruct you not to answer based on the consent agreement being held to be privileged, not disclose the substance. 10:29:24 10:29:27 10:29:31

MR. PETROCELLI: And to be clear, with respect to the last several questions on which you have instructed, you decline to allow the witness to answer even were I to agree that it would not constitute a waiver of any privilege? 10:29:38 10:29:40 10:29:45 10:29:52 10:29:55

MR. TOBEROFF: If you would agree -- in some instances if you agree that it doesn't constitute a waiver of privilege, I could allow her to answer certain questions. 10:29:59 10:30:02 10:30:04 10:30:10

MR. PETROCELLI: Okay. 10:30:11

MR. TOBEROFF: But -- 10:30:12

MR. PETROCELLI: I notice you didn't extend the offer with respect to some of those questions, but you did on the Superboy, so -- 10:30:12 10:30:14 10:30:16

MR. TOBEROFF: You know, there are a number of issues here surrounding, you know -- also, you know, when the answer to something is no, you're not revealing the content, so it wouldn't actually be privileged, but I don't necessarily know how the witnesses is going to answer. 10:30:18 10:30:20 10:30:25 10:30:27 10:30:30 10:30:34

MR. PETROCELLI: Okay. Well, with respect to -- with respect to my question, then, about arrangements that you have with the Shusters regarding the sharing in any Superman recoveries or proceeds, I would like the witness to answer, and I will agree 10:30:35 10:30:38 10:30:40 10:30:43 10:30:49

that her answer is not a waiver of any privilege. 10:30:52

MR. TOBEROFF: She already answered that question. She said no. 10:30:54 10:30:55

MR. PETROCELLI: Not with respect to Superman. She did with respect to Superboy. 10:30:57 10:30:58

MR. TOBEROFF: I thought you said -- 10:31:01

MR. PETROCELLI: Did I misspeak? 10:31:02

THE WITNESS: I kind of lost track for a minute. 10:31:03 10:31:06

MR. PETROCELLI: Let me put it again for the record, then. 10:31:06 10:31:08

MR. TOBEROFF: As to that question, we are asserting privilege, and I'm instructing her not to answer. 10:31:08 10:31:11 10:31:13

MR. PETROCELLI: Okay. So even though I would agree that the answer would not affect the waiver. 10:31:13 10:31:15 10:31:17

MR. TOBEROFF: Yes. 10:31:18

MR. PETROCELLI: Okay. 10:31:19

Q. And does the -- did you discuss with your mother at any time whether or not to enter into an agreement with the Shusters regarding the sharing of recoveries or proceeds from Superman? 10:31:51 10:31:55 10:32:04 10:32:09

A. I believe we talked about it. 10:32:18

Q. Can you relate that discussion to me? 10:32:21

MR. TOBEROFF: I instruct you not to answer based on the attorney-client privilege, joint client privilege. 10:32:23 10:32:25 10:32:28

BY MR. PETROCELLI:

Q. And these were conversations just between your mother and you; is that correct? 10:32:30 10:32:32

A. Yes. 10:32:33

Excuse me. May I take a bathroom break for a moment? 10:32:41 10:32:43

MR. PETROCELLI: Sure. Let's stop right now. 10:32:44

THE VIDEOGRAPHER: Off the record. The time is 10:32. 10:32:48 10:32:48

(A recess was taken.) 10:33:54

THE VIDEOGRAPHER: We're back on the record at 10:46. 10:46:52 10:46:54

BY MR. PETROCELLI:

Q. I just want to follow up a bit on that last area that we covered about the consent agreements and the arrangements with the Shusters. Does -- do the consent agreements -- I may have asked you this already, but let me ask you again. Do the consent agreement documents -- does the consent agreement document make any reference at all to Superboy? 10:46:57 10:47:01 10:47:04 10:47:10 10:47:17 10:47:22 10:47:25

A. You did ask me that. 10:47:31

MR. TOBEROFF: Asked and answered. And I 10:47:32

instruct you not to answer. 10:47:34

MR. PETROCELLI: If I agree that it's not a waiver, do you continue to instruct on that? 10:47:37 10:47:39

MR. TOBEROFF: Yes. 10:47:41

MR. PETROCELLI: Okay. 10:47:42

Q. Are you currently able to enter into an agreement with DC Comics without the consent of the Shuster side, the Shuster family? 10:47:59 10:48:04 10:48:15

MR. TOBEROFF: I instruct you not to answer that. 10:48:22 10:48:25

MR. PETROCELLI: Same objection? Privilege? 10:48:25

MR. TOBEROFF: Same objection. Privilege. 10:48:30

BY MR. PETROCELLI:

Q. Have you had any discussions with any member of the Shuster family since 2008 when the both of you signed the consent agreement about the marketing of the Superman rights? 10:48:35 10:48:38 10:48:45 10:48:50

A. I can't recall any discussion. 10:48:54

Q. Are -- have any efforts been made on your behalf or your family's behalf to market the Superman rights since 2008? 10:49:02 10:49:05 10:49:10

MR. TOBEROFF: You can -- you could answer that yes or no, a yes or no question, and you can also answer it to the extent your knowledge does not reveal the substance of your communications with counsel. 10:49:15 10:49:23 10:49:28 10:49:31

THE WITNESS: Okay. 10:49:35

MR. TOBEROFF: So -- 10:49:37

MR. PETROCELLI: To be clear, Marc, and we're not going to settle this on the record, but I do want to make clear that I disagree that all conversations with you are privileged. They have to involve the rendition of legal advice at the very minimum. 10:49:39 10:49:41 10:49:43 10:49:46 10:49:48

MR. TOBEROFF: Well, the marketing of her -- the subject of a litigation for the past six now going to the seventh year of rights wouldn't necessarily entail legal advice. 10:49:51 10:49:55 10:49:58 10:50:01

MR. PETROCELLI: If you meet with Paramount Pictures about the sale of Superman or you go to Fox and you then report on the meeting, that's hardly the rendition of legal advice. 10:50:03 10:50:05 10:50:08 10:50:11

MR. TOBEROFF: It's totally intertwined with legal advice. Any studio would want to know the state of the litigation, the odds of the litigation, the odds on appeal. There's so much going on in this case that would be relevant to the status of those rights and which would -- it's just very closely intertwined. If she has knowledge of that independent of her discussions with me, I will allow her to answer. 10:50:12 10:50:15 10:50:18 10:50:21 10:50:25 10:50:28 10:50:34 10:50:37

Otherwise I would instruct you not to answer. 10:50:38

MR. PETROCELLI: It seems like it's 10:50:40

impossible for her to have any knowledge independent of you. 10:50:41 10:50:44

MR. TOBEROFF: Certainly when it regards legal matters, that would be the case. 10:50:45 10:50:48

MR. PETROCELLI: This is a business question about selling the rights. 10:50:50 10:50:51

MR. TOBEROFF: Same instruction. 10:50:55

BY MR. PETROCELLI:

Q. Have you -- let me ask the question so we have a record here. 10:50:56 10:51:00

Do you -- are you aware of any efforts made on your behalf to market your Superman rights since 2008? 10:51:02 10:51:04 10:51:10

MR. TOBEROFF: You could just answer that yes or no. 10:51:10 10:51:12

Laura? 10:51:16

THE WITNESS: I'm thinking. 10:51:17

MR. TOBEROFF: Okay. 10:51:18

THE WITNESS: There's -- there's so much to remember in this -- 10:51:21 10:51:22

MR. PETROCELLI: That's like -- 10:51:23

THE WITNESS: -- situation.

MR. PETROCELLI: -- the old Jack Benny joke. "Your money or your life," and he goes "I'm thinking! I'm thinking!" 10:51:24 10:51:26 10:51:30

THE WITNESS: I know the joke. 10:51:30
MR. PETROCELLI: Marc, you're still smiling. 10:51:37
You appreciate that, I know. 10:51:39
THE WITNESS: That's a good joke. That's a 10:51:41
good joke. 10:51:43
MR. PETROCELLI: I used to love Jack Benny. 10:51:44
THE WITNESS: I know. I did too. 10:51:46
MR. PETROCELLI: We're telling our age. 10:51:50
THE WITNESS: I don't believe so. 10:51:51
MR. TOBEROFF: As to showing your age or the 10:51:52
question? 10:51:54
MR. PETROCELLI: We will get back on track 10:51:54
here. It's really my fault. 10:51:56
Q. You're not aware of any efforts to market the 10:51:58
Superman rights since 2008; is that correct? 10:52:03
A. I don't recall any. 10:52:05
Q. Are you aware of any discussions that were 10:52:06
had on your behalf with representatives of Paramount 10:52:11
Pictures or the Paramount Studio? 10:52:17
A. I don't remember a time frame. I believe 10:52:21
that may have occurred, but -- 10:52:24
Q. Why do you believe it may have occurred? 10:52:27
A. I'm just trying to draw on my memory here. 10:52:29
Was it Paramount? Yeah. I guess it was Paramount. 10:52:37
Q. And are you aware of any efforts to market 10:52:41

the property to anyone other than Paramount? 10:52:43

A. I can't recall any right now. 10:52:49

Q. What came of the Paramount marketing effort? 10:52:52

A. I don't believe -- 10:52:58

MR. TOBEROFF: I instruct you not to -- you know, again, we have to be careful here because when -- you object to my instruction based on privilege, and then when I let her answer, you claim a broad waiver of privilege. So it's almost a self-fulfilling prophecy to a certain extent. 10:52:59 10:53:00 10:53:04 10:53:06 10:53:08 10:53:14

MR. PETROCELLI: You act as though I'm taking some kind of inappropriate position, Marc. I have to follow the rules and we have to abide by the consequences. 10:53:16 10:53:19 10:53:22 10:53:24

MR. TOBEROFF: We have different views clearly as to what's appropriate. 10:53:26 10:53:27

So I'm instructing you not to answer as to the marketing of or whatever his question regarding the marketing of your rights to the extent your knowledge of the details come only through me. If you have independent knowledge of that, then you can discuss that. 10:53:30 10:53:35 10:53:40 10:53:45 10:53:48 10:53:52

THE WITNESS: Okay. 10:53:53

BY MR. PETROCELLI:

Q. Is everything you know about the marketing of 10:53:56

the Superman rights information you learned from Marc Toberoff? 10:53:58 10:54:05
A. Yes. 10:54:05
Q. In every single discussion you had with Marc Toberoff, you are receiving legal advice? 10:54:06 10:54:10
A. Yes. 10:54:13
Q. And you believe that when he's reporting on a meeting that he had with third parties, that's legal advice? 10:54:14 10:54:17 10:54:21
A. Yes. 10:54:21
Q. Why? 10:54:23
A. He's my lawyer. 10:54:24
Q. You also know that he's an entrepreneur in the motion picture industry; correct? 10:54:26 10:54:30
A. It has nothing to do with me. 10:54:33
MR. TOBEROFF: Vague and ambiguous. 10:54:35
BY MR. PETROCELLI:
Q. I didn't ask you that question; right? I simply asked you whether you were aware of that. 10:54:35 10:54:37
MR. TOBEROFF: Just focus on his question. 10:54:40
THE WITNESS: I am not aware of him having any current activities. 10:54:45 10:54:47
BY MR. PETROCELLI:
Q. I didn't ask that question either. You are aware -- 10:54:48 10:54:53

MR. TOBEROFF: Just wait. Wait. Wait. I just want to instruct -- 10:54:53 10:54:55

THE WITNESS: Okay. Okay. I'm reading too much into what you're saying. 10:54:57 10:54:59

MR. PETROCELLI: I think you are. I think you are, because you're -- 10:55:00 10:55:01

MR. TOBEROFF: Wait. Wait. I'd just like to talk to my client. 10:55:03 10:55:04

Just try and -- first of all, I want to slow it down so I have time to object. Just try and focus on his question. Don't try and think of where he's going with the question. Just focus on the question and answer the question. 10:55:06 10:55:09 10:55:11 10:55:14 10:55:16

THE WITNESS: Um-hum. Okay. 10:55:17

MR. PETROCELLI: I concur. 10:55:18

Q. You are aware based on your knowledge of Mr. Toberoff from the first time you ever heard his name until today that he has been involved in various business activities in the entertainment industry; correct? 10:55:24 10:55:29 10:55:32 10:55:39 10:55:42

A. Yes. 10:55:42

Q. And that he has been involved in the acquisition of various literary properties; correct? 10:55:43 10:55:47

A. Acquisition? 10:55:54

Q. Yes. 10:55:55

A. Do you want to define "acquisition" for me? 10:55:56
Q. To acquire rights to sell or produce various properties in the entertainment business. 10:55:58 10:56:02
A. Yes. 10:56:04
Q. And you are aware that he had a business collaboration with Ari Emanuel in connection with the acquisition of various entertainment properties; correct? 10:56:09 10:56:21 10:56:27 10:56:31
A. Yes. 10:56:31
Q. And you were aware that he had that collaboration when you first became acquainted with Mr. Toberoff; correct? 10:56:32 10:56:35 10:56:39
A. Yes. 10:56:40
Q. And when you entered into your first agreement with Mr. Toberoff, part of that agreement involved services to be rendered by Mr. Toberoff and Mr. Emanuel for a 10 percent representation fee; correct? 10:56:42 10:56:46 10:56:49 10:56:55 10:57:03
A. Yes. 10:57:04
Q. That would be like an agent's fee; correct? 10:57:04
A. Yes. 10:57:07
Q. And you understood that Mr. Toberoff would share in that agent's fee of 10 percent; correct? 10:57:07 10:57:10
MR. TOBEROFF: I object. Objection. Vague and ambiguous. 10:57:13 10:57:20

BY MR. PETROCELLI: 10:57:20
Q. You may answer. 10:57:20
A. Well, the -- the -- could you reask the question so I'm sure that I'm answering it correctly, you know? I do not want to read into what you're saying. 10:57:24 10:57:35 10:57:38 10:57:42
Q. With respect to the 10 percent representation or agent's fee that you agreed to pay in connection with the efforts of Mr. Emanuel and Mr. Toberoff, you understood that Mr. Toberoff would share in part of that 10 percent fee; correct? 10:57:42 10:57:45 10:57:52 10:58:00 10:58:04
MR. TOBEROFF: Vague and ambiguous. 10:58:06
BY MR. PETROCELLI:
Q. Yes or no? 10:58:07
A. I would like to go back and say that when you refer to it as an agent's fee, I didn't -- I didn't understand, you know, exactly what you were referring to. Mr. Toberoff did not act as an agent. 10:58:09 10:58:12 10:58:17 10:58:20
Q. Well, when you signed an agreement in 2002 -- 10:58:24
A. Yes. 10:58:28
Q. -- you didn't sign it personally with Mr. Toberoff. You signed it with an entity called IP Worldwide; is that correct? 10:58:28 10:58:30 10:58:36
A. That's correct. 10:58:37
Q. And that was a company, to your knowledge, at 10:58:39

EXHIBIT 24

the time that consisted of Mr. Toberoff and Mr. Emanuel; correct? 10:58:43 10:58:48
A. Yes. 10:58:50
Q. And the fee that you agreed to pay to employ Mr. Toberoff and Mr. Emanuel was 10 percent of the proceeds that they would generate with respect to the sale of your Superman rights; correct? 10:58:52 10:58:59 10:59:06 10:59:09
A. I don't believe "sale" is the correct word to use. 10:59:15 10:59:18
Q. What is the correct word? 10:59:18
A. Negotiations on representation. 10:59:21
Q. Okay. 10:59:26
A. Exploring, you know, different avenues of, you know, how, you know, our rights could be marketed. 10:59:26 10:59:30
Q. But the 10 percent fee would not be payable until and unless their efforts to exploit and negotiate and market resulted in a transaction that generated proceeds; correct? 10:59:34 10:59:37 10:59:42 10:59:45
A. Correct. 10:59:46
Q. Okay. And with respect to that 10 percent that you agreed to pay if the transaction was consummated that generated proceeds, did you have any understanding as to how that money would be split up as between Mr. Toberoff and Mr. Emanuel? 10:59:47 10:59:52 10:59:56 11:00:00 11:00:03
A. No. 11:00:10

Q. Were you made aware of the joint venture agreement between the two of them that created IP Worldwide? 11:00:10 11:00:17 11:00:23

A. Could you define "made aware"? 11:00:23

Q. Did you ever see it? 11:00:25

A. No. 11:00:27

Q. Have you ever seen it? 11:00:30

A. No. 11:00:33

Q. Did they describe it to you? 11:00:33

A. Well, Mr. Toberoff was acting as my attorney, so I'm not sure whether -- 11:00:38 11:00:42

Q. Okay. Well, you're not responding to my question -- 11:00:44 11:00:46

A. No. 11:00:47

Q. -- but I don't want to interrupt you, so complete the answer. Normally when a witness doesn't respond to a lawyer, at least a good lawyer moves to strike as nonresponsive. I'm trying not to do that -- 11:00:47 11:00:49 11:00:51 11:00:53

A. Um-hum. 11:00:56

Q. -- because I want to accommodate you, but it would be helpful if you tried to just respond to my question. 11:00:57 11:00:59 11:01:03

A. Okay. So could you -- could I have the question again, please? 11:01:04 11:01:07

MR. TOBEROFF: Who's here to hear your motion

to strike as nonresponsive? 11:01:11

MR. PETROCELLI: It's only for the purpose of preserving it for the record so when we're in trial, I can seek to have that excluded from the record. 11:01:12 11:01:14 11:01:16

Q. Did Mr. Emanuel or Mr. Toberoff describe to you the terms of their arrangement prior to the time you retained them in 2002? 11:01:30 11:01:33 11:01:37

A. Yes. 11:01:39

Q. What did they say to you? 11:01:41

A. That they had a company together. 11:01:43

Q. Okay. And did they tell you about their track record as a company together? 11:01:46 11:01:51

A. Yes. 11:01:55

Q. And did they tell you about prior successes that they had achieved together? 11:01:56 11:02:02

A. I remember Mr. Toberoff's achievements. 11:02:05

Q. Did they tell you about prior transactions that they, "they" being Mr. Emanuel and Mr. Toberoff through their company, had accomplished prior to your retaining them? Did they say, for example, "We did a similar transaction for" this person or that person. "We can do the same for you"? 11:02:10 11:02:16 11:02:20 11:02:26 11:02:30 11:02:34

A. As a company, no. 11:02:36

Q. Okay. Was it your understanding that the arrangement with you that IP Worldwide made was the 11:02:40 11:02:46

first business dealing of this new company, of this company, IP Worldwide? 11:02:49 11:02:55

A. I had no knowledge of that. 11:02:57

Q. Did you have any knowledge how old the company was? 11:02:59 11:03:01

A. I believe it was -- it was a fairly new company. 11:03:03 11:03:06

Q. And again, did you believe that yours was the first transaction the company entered into? 11:03:07 11:03:10

A. I don't have any recollection of it being a first. 11:03:14 11:03:17

Q. Did you do any research on the company? 11:03:18

A. I did research on Mr. Toberoff and on Mr. Emanuel. 11:03:21 11:03:25

Q. And did you do any research on IP Worldwide? 11:03:25

A. I don't recall anything specific. 11:03:32

Q. Now, at the time you knew that Mr. Toberoff also was a lawyer; right? 11:03:33 11:03:37

A. Yes. 11:03:39

Q. Okay. And you knew that Mr. Emanuel was a talent agent; correct? 11:03:40 11:03:44

A. Correct. 11:03:45

Q. And you knew that Mr. Emanuel was a partner at an agency called Endeavor; correct? 11:03:45 11:03:49

A. Correct. 11:03:52

Q. We're now talking 2002; right? 11:03:52
A. Yes. 11:03:54
Q. And you knew Mr. Toberoff had a law firm; correct? 11:03:55 11:03:59
A. Correct. 11:04:00
Q. Did you know the name of his law firm? 11:04:00
A. Law Offices of Marc Toberoff. 11:04:04
Q. Okay. You did not enter into an agreement with The Law Offices of Marc Toberoff in 2002; is that correct? 11:04:07 11:04:09 11:04:15
A. Not that name, no. 11:04:15
Q. There is no agreement between any member of the Siegel family and The Law Offices of Marc Toberoff in 2002; correct? 11:04:18 11:04:22 11:04:27
A. Correct. 11:04:28
Q. And there is no agreement between any member of the Siegel family and the Endeavor talent agency in 2002; correct? 11:04:29 11:04:33 11:04:37
A. Correct. 11:04:37
Q. The only agreement that you entered into for the services of Mr. Emanuel and Mr. Toberoff was the IP Worldwide agreement; is that right? 11:04:38 11:04:41 11:04:45
A. Correct. 11:04:46
Q. The 10 percent -- let me ask you this question. The record will reflect that that agreement 11:04:58 11:05:01

is dated as of October 3, 2002. In fact, let me just show you a copy of it. 11:05:04 11:05:12

A. Okay. 11:05:14

Q. It's been previously marked as Plaintiff's Exhibit 45. 11:05:14 11:05:17

A. Thank you. 11:05:18

(Whereupon, Plaintiff's Exhibit 45 was placed before the witness.) 11:05:29

BY MR. PETROCELLI: 11:05:31

Q. And you'll see at the last page it bears your -- 11:05:31 11:05:32

A. It's a bad copy. 11:05:33

Q. It's the best copy we have. 11:05:34

A. Okay. 11:05:36

Q. You'll see on the last page it bears your signature? 11:05:36 11:05:41

A. Yes. 11:05:41

Q. And the signature of your mother, Joanne Siegel? 11:05:41 11:05:45

A. Yes. 11:05:45

Q. And Mr. Toberoff? 11:05:46

A. Yes. 11:05:47

Q. And Mr. Emanuel. 11:05:48

A. Yes. 11:05:52

Q. You'll see that in paragraph 6 there's a 11:06:01

provision for a 10 percent payment to IP Worldwide, based on any gross proceeds that they generate. And I'm simplifying it. I don't want to read that whole paragraph. Do you see that? 11:06:06 11:06:13 11:06:18 11:06:22

A. I'm reading it. 11:06:24

Okay. I'm sorry. Your question? 11:06:54

Q. You see that paragraph 6 provides for the compensation of 10 percent to IP Worldwide for the rendition of their services? 11:06:57 11:07:00 11:07:03

A. Yes. 11:07:04

Q. Do you know if this agreement still exists? 11:07:29

A. It does not. 11:07:35

Q. When did it end? 11:07:39

A. It expired, I believe, early 2005. I believe it was 2005. 11:07:42 11:07:52

Q. And what about 2005 causes you to believe that it expired? 11:07:54 11:07:57

A. Well, because we had an end date for it. 11:07:58

Q. Where is the end date indicated? 11:08:02

A. It's not in this document. 11:08:04

Q. Is it in another document? 11:08:06

A. Yes, it is. 11:08:07

Q. What's the other document? 11:08:09

A. There was a -- we extended this for a limited period of time, and there was an end date stated in 11:08:10 11:08:17

that document. 11:08:21

MR. PETROCELLI: Bear with me. 11:08:25

This is a better copy. 11:08:33

Q. Can you take a look at paragraph 10 of Exhibit 45? 11:08:43 11:08:50

A. Yes. 11:08:50

Q. It states: 11:08:51

"The parties understand and acknowledge that the scope of this Agreement does not include legal services and/or expenses in connection with litigation or formal legal arbitration, if any. The provision of such services and advancing of such expenses, is requested and desired by Owner" -- excuse me -- "if requested and desired by Owner, will be rendered and provided by Marc Toberoff, Esq., subject to good faith negotiation of mutually acceptable" -- "of a mutually acceptable agreement executed by Mr. Toberoff and Owner," end of quotes. 11:08:52 11:08:56 11:08:57 11:09:00 11:09:04 11:09:06 11:09:09 11:09:13 11:09:15 11:09:18 11:09:20 11:09:22 11:09:27 11:09:30 11:09:32 11:09:33 11:09:36

And you agreed to that provision when you 11:09:38

signed Exhibit 45; correct? 11:09:40
A. Yes, regarding litigation. 11:09:42
Q. Right. And it wasn't until I believe you said 2004 that you entered into the litigation agreement -- entered into a litigation agreement with Mr. Toberoff; is that correct? 11:09:44 11:09:51 11:09:56 11:09:59
A. Correct. 11:10:00
Q. And between the signing of Exhibit 45 as of October 3, 2002, and the signing of the litigation agreement in 2004, you signed no agreements with Mr. Toberoff for the rendition of litigation services; correct? 11:10:07 11:10:13 11:10:18 11:10:22 11:10:29
A. Not for litigation, correct. I don't know if I answered yes or no to that the way it's phrased. That's why I'm trying to clarify. 11:10:30 11:10:35 11:10:39
Q. Let me repeat it -- 11:10:40
A. Okay. 11:10:42
Q. -- because I think if you had said yes, we would be in agreement with each other. 11:10:42 11:10:44
A. Oh. 11:10:47
Q. From the time that you signed Exhibit 45 as of October 3, 2002, until the time that you signed the litigation agreement with Mr. Toberoff in 2004, neither you nor your mom signed an agreement with Mr. Toberoff calling for him to render litigation 11:10:48 11:10:50 11:10:56 11:11:02 11:11:05

services; correct? 11:11:08

A. Correct. 11:11:09

Q. Do you recall having signed an amendment to this Exhibit 45 extending the term till, I think you said, 2005? 11:11:24 11:11:29 11:11:34

A. Yes. 11:11:35

Q. What can you tell me about that document? I don't believe we have it. 11:11:38 11:11:40

A. It was very short, and I believe it just referenced this document, and the only thing that was different about it was it said that we were extending the terms of this contract through a particular date. 11:11:43 11:11:50 11:11:54 11:11:58

MR. PETROCELLI: Marc, have you produced that? I mean we may have overlooked it. 11:12:03 11:12:04

MR. TOBEROFF: I can't say off the top of my head. We can -- 11:12:09 11:12:10

MR. PETROCELLI: Can you please check? 11:12:11

MR. TOBEROFF: -- see if we have it. We will look for it and produce it. 11:12:13 11:12:16

MR. PETROCELLI: Thank you. 11:12:18

Q. Is it -- in two thousand -- 11:12:21

MR. TOBEROFF: I should say if it exists and we have it, we will produce it. 11:12:27 11:12:29

BY MR. PETROCELLI:

Q. Do you have a copy? 11:12:32

A. I -- I don't know what I -- what I have. 11:12:34

Q. Where do you -- where do you have your documents related to this whole Superman saga? 11:12:38 11:12:41

A. All over the place. I'm not very organized. 11:12:46

Q. There's a black cabinet that contained a lot of these documents; right? 11:12:54 11:12:56

A. No. There was a black cabinet that my ex-husband had that contained some of his things. 11:13:00 11:13:02

Q. Was that a black cabinet that was in the home that you shared with your husband before the two of you separated? 11:13:06 11:13:10 11:13:12

A. Yes, yes. 11:13:13

Q. Okay. And was that the same cabinet that you shared your materials while you were married with him related to this case? 11:13:13 11:13:18 11:13:21

A. No. That was strictly his. 11:13:22

Q. What color was your cabinet? 11:13:24

A. I don't have a cabinet. No, it's -- you know, I mean I have boxes. 11:13:27 11:13:31

Q. What was the address where you lived with your husband before your separation in 2000? 11:13:34 11:13:37

A. The same address I have now. 11:13:41

Q. Which is what? 11:13:43

A. 6400 Pacific Avenue, Playa del Rey, California. 11:13:44 11:13:48

Q. And is there a space in your home where you keep your papers related to this matter, "this matter" being going back to the serving of the termination notices to the present? 11:13:48 11:13:54 11:13:56 11:13:59

A. Well, I have -- I have them throughout the place. There isn't one place. Throughout my condominium. 11:14:00 11:14:05 11:14:10

Q. Is there a room where you have most of the papers? 11:14:10 11:14:14

A. I wish I could say yes. The answer is no. 11:14:15

Q. Do you have filing cabinets where you keep them? 11:14:17 11:14:21

A. No. 11:14:22

Q. Do you just put them on the floor in boxes? 11:14:22

A. They are in boxes. 11:14:25

Q. Okay. About how many boxes do you have? 11:14:26

A. Well, some are in boxes and some are in furniture where I had to put them because I can't live with that many boxes. 11:14:32 11:14:36 11:14:38

Q. What kind of furniture? 11:14:39

A. It's just a large -- I used to have records in there, but now I have no space for the records because I put papers in there. 11:14:40 11:14:44 11:14:47

Q. And -- 11:14:50

A. It's just a couple of shelves. 11:14:51

Q. When your husband left the home, he took his black cabinet with him? 11:14:52 11:14:55

A. No, he did not. 11:14:56

Q. He left it there, but he took the papers out of it? 11:14:58 11:15:00

A. Yes. 11:15:00

Q. When Michael Siegel -- he's your stepbrother. He was your stepbrother? 11:15:04 11:15:07

A. Half brother. 11:15:09

Q. Half brother. Excuse me. He died in what year? 2006? 11:15:10 11:15:14

A. Yes. 11:15:16

Q. After his death, did you receive any papers from him or his estate or related to Superman in any way, any correspondence, any letters, anything like that? 11:15:17 11:15:23 11:15:28 11:15:33

A. I can't recall any after his death, no. 11:15:33

Q. Who took possession of his papers, if you know? 11:15:37 11:15:41

A. Well, I hired somebody to go in and to help me clear out the place. 11:15:42 11:15:47

Q. Who was that? 11:15:48

A. My cousin. 11:15:50

Q. Who is your cousin? 11:15:51

A. Michele Innenberg. 11:15:52

Q. Where does Michele live? 11:15:54
A. In Cleveland. 11:15:56
Q. How is she your cousin? Through what relationship? 11:15:57
A. She -- like a second cousin. She's the daughter of one of my cousins. 11:15:59
Q. What town does she live in? 11:16:07
A. Cleveland. 11:16:09
Q. Cleveland? 11:16:10
A. Um-hum. 11:16:11
Q. And was -- now, is she related to Michael? 11:16:11
A. No. She's related to me through my father's side of the family. 11:16:15
Q. Okay. Did Michael -- well, that's the same side that -- 11:16:20
A. It has nothing -- it wasn't -- 11:16:24
Q. Okay. Michael's father was Jerome Siegel, your father; right? 11:16:27
A. Yes. 11:16:35
Q. Okay. Who was Michael's mother? 11:16:35
A. Bella Siegel. 11:16:39
Q. When did she -- is she alive? 11:16:40
A. No. 11:16:41
Q. When did she pass? 11:16:41
A. Maybe about a year before Michael. 11:16:47

Q. Okay. And did Michael have any other -- so your dad was married to Bella before your dad married Joanne? 11:16:50 11:16:57 11:17:00
A. Correct. 11:17:01
Q. Did they have any children other than Michael? 11:17:01 11:17:06
A. There -- there was a child that died at birth. 11:17:07 11:17:10
Q. Okay. And was Michael ever married? 11:17:10
A. No. He lived with his mother his whole life. 11:17:13
Q. How old was Michael when he died? 11:17:19
A. In his sixties. 11:17:21
Q. And he had had heart problems? 11:17:25
A. He had a lot of health problems. 11:17:27
Q. Did Michele know Michael? 11:17:31
A. No. I should actually clarify. Michele's role was to help with furniture and to help clear out, you know, certain -- certain things that I wanted. So she boxed them up. 11:17:33 11:17:45 11:17:52 11:17:58
Q. Did -- what did you want? 11:18:01
A. Oh, there was a saxophone. There were pictures of Michael as a kid, things like that. 11:18:04 11:18:08
Q. Did you receive from Michael after his death through Michele or through anyone else any materials of any kind related to Superman? 11:18:13 11:18:17 11:18:20

A. He had some Superman books and pins and things like that. 11:18:23 11:18:29
Q. What about any papers, letters, things like that? 11:18:30 11:18:35
A. No, I don't recall any. 11:18:35
Q. Letters to you, for example? 11:18:37
A. I don't recall any. 11:18:39
Q. Okay. You and he corresponded from time to time in writing about Superman; correct? 11:18:41 11:18:47
A. Every so often. 11:18:49
Q. And there were some letters, in fact, about Mr. Toberoff; correct? 11:18:50 11:18:53
A. He mentioned him. It wasn't, you know, all he would talk about. 11:18:56 11:18:59
Q. No, I'm not saying that's all he would talk about, but there was correspondence that you and he exchanged, prior to his death, of course, about Mr. Toberoff; correct? 11:19:00 11:19:04 11:19:06 11:19:09
A. Yes. 11:19:10
Q. Including his expressing his concern to you about Mr. Toberoff; correct? 11:19:10 11:19:14
A. Yes. 11:19:16
Q. Have you reviewed any of that correspondence recently? 11:19:17 11:19:20
A. Not recently. 11:19:21

Q. You met with Mr. Toberoff yesterday? 11:19:22
A. Yes. 11:19:25
Q. Who else was present? 11:19:26
A. Just Mr. Toberoff. 11:19:28
Q. At his office? 11:19:30
A. Yes. 11:19:30
Q. How long did you meet? 11:19:31
A. A couple of hours, maybe two and a half. 11:19:33
Q. Prior to yesterday did you have any discussions with him about the deposition other than scheduling it? 11:19:35 11:19:38 11:19:43
A. Just scheduling. 11:19:43
Q. Did you review any documents, see any documents, look at any documents yesterday? 11:19:45 11:19:48
A. I looked at my former depositions. 11:19:52
(Whereupon, Ms. Seto entered the room.) 11:19:55
BY MR. PETROCELLI: 11:19:58
Q. Besides your former depositions? 11:19:58
A. No. 11:20:01
Q. Okay. Were you shown any letters, any agreements, anything at all in your meeting yesterday? 11:20:01 11:20:03
A. No. 11:20:10
Q. Have you looked at any materials in the last couple of weeks, except your deposition, related to this case? 11:20:13 11:20:13 11:20:19

A. I don't think so. 11:20:23

Q. What happened to Michael's correspondence, to your knowledge, after his death? 11:20:31 11:20:35

MR. TOBEROFF: Vague and ambiguous. 11:20:38

BY MR. PETROCELLI:

Q. About Superman. 11:20:39

A. Well -- 11:20:42

MR. TOBEROFF: Still vague and ambiguous. Lacks foundation. 11:20:44 11:20:45

THE WITNESS: Some -- somewhere I have the copies of the things that he sent to me. 11:20:48 11:20:50

BY MR. PETROCELLI:

Q. And that's somewhere in your home? 11:20:54

A. I would -- yes. 11:20:57

Q. Okay. Where did your mom live before she died? 11:20:59 11:21:10

A. In Marina del Rey. 11:21:10

Q. In a different place than you? 11:21:11

A. Yes. 11:21:13

Q. Did she live alone? 11:21:14

A. Yes. 11:21:15

Q. All the way into the very end? 11:21:16

A. Yes. 11:21:17

Q. What was the address, if you remember? 11:21:20

A. 13929 Marquesas Way in Marina Del Rey. 11:21:24

Q. Was she renting? 11:21:30
A. Yes. 11:21:31
Q. And so now someone else has that place? 11:21:32
A. Yes. 11:21:35
Q. Okay. And did you help clean it out after she passed? 11:21:35 11:21:39
A. Yes. 11:21:40
MR. PETROCELLI: I was told I'm a little bit too close to the camera, so it was picking up my hand. I have now moved away. Thank you for letting me know. 11:21:46 11:21:49 11:21:52
Q. Your mother kept papers in her home related to Superman? 11:21:58 11:22:02
A. Yes. 11:22:03
Q. Including letters and agreements and memorabilia, all sorts of things? 11:22:05 11:22:10
A. That's right. 11:22:11
Q. And did she also have them all over the place, to use your expression? 11:22:12 11:22:16
A. Yes. 11:22:18
Q. She did not have like an office or a filing cabinet where she kept the materials? 11:22:18 11:22:22
A. She didn't keep an office. 11:22:24
Q. Okay. Now, did your mother have a typewriter or computer in her home? 11:22:28 11:22:32
A. She didn't -- no. She had a computer, but 11:22:34

she never figured out how to use it. 11:22:36
Q. And she didn't have a typewriter; right? 11:22:39
A. She gave up using that years ago. 11:22:42
Q. Now, you have a computer in your home? 11:22:45
A. Yes. 11:22:48
Q. And what kind of computer do you have? 11:22:49
A. I have a laptop. 11:22:51
Q. What -- how long have you had it? 11:22:57
A. I think two years. 11:23:04
Q. And before the laptop, what did you have? 11:23:05
A. I had a PC that died. 11:23:09
Q. How long did you have the PC? 11:23:12
A. Several years. 11:23:15
Q. Would -- let's say starting in 2000 -- 2000, what equipment did you have in your home that you would use to type or create letters or other documents? 11:23:18 11:23:26 11:23:30 11:23:36
A. A computer. 11:23:36
Q. Okay. You're a former journalist; right? 11:23:37
A. Yes. 11:23:40
Q. You retired in the mid eighties? 11:23:40
A. No, 1994. 11:23:43
Q. 1994. And you were a broadcast journalist? 11:23:44
A. Yes. 11:23:48
Q. For CNN and some other organizations? 11:23:49

A. CNN, CBS, KCAL. 11:23:51
Q. On camera? 11:23:55
A. On camera and also as an executive producer and producer and writer. 11:23:56 11:24:00
Q. Was it a network program, or was it a local program? 11:24:02 11:24:05
A. Some of my things were carried on the network. Of course on CNN it was carried on the network. 11:24:05 11:24:08 11:24:11
Q. Right. 11:24:11
A. And some of my CBS programming was carried on ESPN, and also they would pick up things sometimes on the CBS network. 11:24:13 11:24:19 11:24:22
Q. And you wrote a lot of your own scripts and stories? 11:24:24 11:24:27
A. Oh, yes. 11:24:27
Q. So let's go back to the equipment in your place. 11:24:36 11:24:42
First of all, you have had no office outside of your home since the year 2000 to the present? 11:24:42 11:24:44
A. No. 11:24:47
Q. So the only place that you would create documents like letters would be in your house? 11:24:48 11:24:52
A. Correct. 11:24:55
Q. Did you ever create any documents or letters 11:24:56

related to Superman in your mother's home? 11:24:59
A. No. 11:25:05
Q. Okay. And to your knowledge, your mother never typed out or caused to be printed on a computer a letter or a document related to Superman; correct? 11:25:05 11:25:11 11:25:16
A. Well, she wrote tons of things longhand, and there were times when she would type a few things up on her old typewriter until that, you know, wasn't working any longer. 11:25:20 11:25:26 11:25:31 11:25:35
Q. That would be before year 2000; right? 11:25:35
A. You know, I don't know whether it was before or after 2000. 11:25:38 11:25:40
Q. That she would work on a typewriter? 11:25:42
A. Yes. I don't know for sure. 11:25:44
Q. Did you retrieve the typewriter when she passed away? 11:25:48 11:25:50
A. Yes. 11:25:51
Q. You still have it? 11:25:51
A. Yes. 11:25:52
Q. Where is it? 11:25:52
A. I put it with her other furniture that I currently have just put in storage until I figure out what to do with it. 11:25:54 11:25:58 11:26:02
Q. What's the storage facility? 11:26:03
A. It's called Public Storage. 11:26:05

Q. The one -- is there one in Marina nearby? 11:26:07
A. Yes. 11:26:11
Q. The Superman papers and materials that you collected from your mother's home -- 11:26:12 11:26:15
A. Um-hum. 11:26:17
Q. -- did you put those in Public Storage? 11:26:18
A. Well, I brought a lot of them home. I'm currently trying to go through things. So at the moment my place is almost unlivable because I have, you know, my stuff and her stuff, and, you know, it's unbelievable. 11:26:21 11:26:26 11:26:30 11:26:33 11:26:40
Q. And again, I'm only focused on Superman materials. But between your Superman papers, files, and materials and your mother's -- 11:26:40 11:26:46 11:26:50
A. Yes. 11:26:52
Q. -- can you somehow in your own way approximate the volume? Let's say boxes. If you put it all in the bankers boxes, how many boxes would there be? Ten boxes? 11:26:52 11:26:55 11:27:00 11:27:02
A. I couldn't guess at that because there were a lot of things that -- there are many different things in any one given box, these things that I haven't gone through yet. So there could be a box that has one paper relating to Superman or there could be many papers. 11:27:06 11:27:08 11:27:12 11:27:16 11:27:19 11:27:28

Q. Like, for example, the letters that you exchanged with Michael Siegel that you said are in your home, where in your home are those letters? 11:27:28 11:27:31 11:27:34

MR. TOBEROFF: Lacks foundation. 11:27:37

THE WITNESS: Well, anything that I had, you know, is also mixed in with papers. I mean I have -- I have various boxes that relate to the case. I have other boxes that relate to my divorce. I've got a lot of different things. 11:27:40 11:27:44 11:27:51 11:27:56 11:28:01

BY MR. PETROCELLI:

Q. Have you -- since this lawsuit was filed in May, 2010, have you gone and searched for and given to someone else your Michael Siegel correspondence? 11:28:02 11:28:05 11:28:13

A. Well, whenever I find anything that I think relates to the case, I turn it over to Mr. Toberoff. 11:28:20 11:28:24

Q. Since May, 2010, have you turned over to Mr. Toberoff any of your correspondence with Michael Siegel that was in your home? 11:28:28 11:28:31 11:28:36

A. Probably. 11:28:39

Q. Okay. 11:28:40

A. Oh, excuse me. May I say something about 2010? 11:28:42 11:28:46

Q. You may. 11:28:47

A. I believe that you -- I believe that you asked me earlier about documents from 2010, around 11:28:49 11:28:52

that time. We were talking about different agreements and we were talking about in connection with when this lawsuit had been filed. 11:29:00 11:29:03 11:29:08

Q. Proceed. 11:29:09

A. Okay. I believe that I misstated something. I -- after this lawsuit was filed, Mr. Toberoff did send me another -- what was it called? -- conflict, another, you know, delineating, you know, potential conflicts, a document regarding conflicts, and I don't -- I don't believe I mentioned that earlier. You were asking me different ones for different dates. 11:29:10 11:29:16 11:29:20 11:29:29 11:29:33 11:29:36 11:29:38

Q. And your recollection about that was prompted as a result of Mr. Toberoff mentioning it to you during a break? 11:29:41 11:29:43 11:29:45

A. Well, I went to the bathroom. It was cooler. I was -- 11:29:46 11:29:49

MR. TOBEROFF: You can -- you can -- you can -- you can answer that you recalled that during the break. 11:29:50 11:29:55 11:29:58

THE WITNESS: Yeah, I recalled it during the break. 11:30:00 11:30:03

BY MR. PETROCELLI:

Q. And as a result of talking to Mr. Toberoff? 11:30:04

MR. TOBEROFF: Well, you can't -- you can't talk about your conversations with me. 11:30:06 11:30:09

BY MR. PETROCELLI: 11:30:10
Q. Did you talk to Mr. Toberoff about anything during the break? 11:30:10 11:30:12
MR. TOBEROFF: You can answer that. 11:30:14
BY MR. PETROCELLI:
Q. Yes or no? 11:30:15
A. Yes. 11:30:16
Q. Okay. And you remembered this new document that I will now ask you about after talking to Mr. Toberoff during the break. 11:30:19 11:30:25 11:30:28
A. Yes. 11:30:33
Q. Okay. 11:30:34
A. While I was in the restroom. 11:30:34
Q. Well, so tell me more about this document. What is it and -- 11:30:38 11:30:42
A. No, I just remember that -- that he wanted to make sure that -- 11:30:45 11:30:51
MR. TOBEROFF: Don't -- don't talk about the contents of the document. You can talk about whether or not you signed it. 11:30:53 11:30:55 11:30:57
THE WITNESS: Right. 11:30:59
MR. TOBEROFF: Another conflict waiver. 11:31:00
THE WITNESS: Right. He wanted to make sure that I signed, you know, this document that he felt was warranted. 11:31:01 11:31:03 11:31:08

BY MR. PETROCELLI:

Q. What was the subject matter of the document? 11:31:10

A. As I said, it was a conflict disclosure. 11:31:15

Q. Did it relate to this new case that DC filed? 11:31:18

A. It was as a result of this case. 11:31:22

Q. Did anybody else sign it besides you and -- I presume Mr. Toberoff signed it? 11:31:25 11:31:30

A. I believe my mother signed it. 11:31:31

Q. Anyone else? 11:31:33

A. I don't think so. 11:31:34

Q. Did anybody review it on your behalf? 11:31:35

A. I'm sure George did, George Zadrozny. 11:31:40

Q. You remember that he did? 11:31:48

A. I believe that he did. 11:31:49

Q. Did you send it to him before signing it? 11:31:51

A. I believe so. 11:31:55

Q. How do you send things to George? 11:31:56

A. Well, sometimes by mail. 11:32:00

Q. In 2010 how did you send this document to George? 11:32:03 11:32:07

A. If it was sent to me in electronic form, then -- 11:32:07 11:32:12

Q. E-mailed? 11:32:13

A. -- then I could e-mail him. I don't recall whether this one was sent to me or, you know -- 11:32:14 11:32:16

Q. You would forward the e-mail. 11:32:19
A. A copy, right. If I get something that's 11:32:21
papers, then I can fax it, but, you know -- 11:32:25
Q. What is your e-mail address? 11:32:27
A. Mistylight3@cs.com. 11:32:29
Q. What is George's e-mail address? 11:32:33
MR. TOBEROFF: I would just like to say in 11:32:35
terms of her home address and her e-mail address, I 11:32:36
want to keep that private on the record -- 11:32:39
MR. PETROCELLI: That's fine. 11:32:42
MR. TOBEROFF: -- to disclose documents, 11:32:43
because there's so many -- so much commentary and fans 11:32:44
that are interested in this Superman case. 11:32:48
MR. PETROCELLI: We have no interest at all 11:32:50
in publicizing it. We may use it for purposes of the 11:32:53
lawsuit, but -- 11:32:58
MR. TOBEROFF: But when it's used for 11:32:58
purposes of the lawsuit, I don't want her address and 11:32:58
her personal e-mail to be disclosed. I want it to 11:33:00
be -- 11:33:05
MR. PETROCELLI: Well, I want to work with 11:33:05
you on that because we have no interest in causing any 11:33:06
unwarranted invasion of her privacy, but the details 11:33:10
of that we will have to work out. Okay? Because I 11:33:13
don't know exactly what that means. We're not going 11:33:15

to negotiation a protective order right now on the record. 11:33:17 11:33:20

MR. TOBEROFF: No. What I'm saying is we've talked at times about having a protective order in this case. 11:33:20 11:33:21 11:33:23

MR. PETROCELLI: Okay. 11:33:23

MR. TOBEROFF: And I'm sure your client is going to want a protective order when it comes to discovery of its materials, and that day is coming, that we -- this information should be subject to that protective order. 11:33:24 11:33:25 11:33:30 11:33:32 11:33:37

MR. PETROCELLI: I understand you would like to designate this as confidential. Okay. 11:33:38 11:33:39

Q. What is George's e-mail address? 11:33:42

A. I don't have it off the top of my head. 11:33:44

Q. Did your mother have an e-mail address? 11:33:47

A. No. 11:33:57

Q. So before you remembered this document, we were talking about documents in general, and I want to go back to that. Okay? 11:33:57 11:34:00 11:34:04

A. Okay. 11:34:05

Q. You said you -- when you gave Mr. Toberoff documents related to this case -- 11:34:08 11:34:18

A. Yes. 11:34:19

Q. -- did you keep copies for yourself? 11:34:22

A. No. When I gave them to him, I gave them to him. 11:34:29 11:34:32

Q. When your mom passed and you took some -- you took all of her files and papers, did you turn any of that material over to Mr. Toberoff? 11:34:33 11:34:35 11:34:38

A. Yes. I found something that I -- 11:34:42

Q. What did you find? 11:34:45

A. I found a file that she had about a lawyer that we had been talking about potentially hiring. 11:34:46 11:34:50

Q. Is that Gerry Spence? 11:34:53

A. Gerry Spence, yes. 11:34:55

Q. And you just turned that over to him when? 11:34:58

A. Just a couple of days ago. 11:35:01

Q. Okay. So what caused you a couple of days ago to come across that file? Were you looking for materials related to this case? 11:35:03 11:35:06 11:35:09

A. No. I was going -- going through a box of her papers, and it happened to be in there. 11:35:11 11:35:14

Q. Has anyone other than you -- since the filing of this lawsuit in May, 2010, has anyone other than you searched the papers in your home related to this case? 11:35:17 11:35:22 11:35:26 11:35:32

MR. TOBEROFF: At her home? 11:35:32

MR. PETROCELLI: Yes. 11:35:33

THE WITNESS: No. 11:35:36

BY MR. PETROCELLI: 11:35:36

Q. For example, did Mr. Toberoff come to your house and search through your files or a member of his law firm? 11:35:37 11:35:40 11:35:43

A. No. 11:35:44

Q. Okay. Since the filing of this case, have you provided Mr. Toberoff with any materials other than that Gerry Spence file you just found? 11:35:47 11:35:57 11:36:02

A. Yes. 11:36:08

Q. What did you give? 11:36:08

A. Papers relating to my divorce. 11:36:13

Q. When was that? 11:36:18

A. There was a document request from, I believe, your office, and in response to that, I produce those. 11:36:21 11:36:25

Q. Anything other than the divorce file -- that's from your former husband, Dennis Larson; correct? 11:36:30 11:36:34 11:36:37

A. Yes. 11:36:38

Q. And the Gerry Spence file. Anything else since the filing of this lawsuit that you gave to Mr. Toberoff from your home? 11:36:38 11:36:43 11:36:43

A. Since the filing of this lawsuit. I don't recall anything specific. 11:36:43 11:36:47

Q. Okay. Now, why -- how was it that you came across the Gerry Spence file a couple of days ago? 11:36:52 11:36:59

MR. TOBEROFF: Asked and answered. 11:37:01
You can answer. 11:37:02
BY MR. PETROCELLI:
Q. You were looking -- 11:37:03
A. I was -- I wasn't looking for it, but I was going through, you know, one of the boxes of my mom's papers, and it was in there. 11:37:04 11:37:06 11:37:10
Q. Okay. Have you provided any papers in your home since the filing of this lawsuit to anyone other than Mr. Toberoff? 11:37:11 11:37:17 11:37:21
A. No. 11:37:24
Q. Has any other lawyer seen any materials in your home or have you given them any materials? 11:37:24 11:37:28
A. No. 11:37:38
Q. When you collected the papers from your mother's place, how did you collect them? You just put them in a box or a couple of boxes? 11:37:38 11:37:42 11:37:44
A. Well, she had a lot of boxes already, and she had -- you know, there were bags. There were boxes. There were a lot of -- a lot of different things that were already, you know -- what can I call them? They were in containers of one sort or another. 11:37:46 11:37:51 11:37:54 11:37:58 11:38:04
Q. Paper containers? 11:38:06
A. Well, when I say container -- 11:38:08
Q. What kind of -- cardboard containers? 11:38:10

A. No, no. I'm using the term generically for both bags and boxes. 11:38:11 11:38:14

Q. I see. Like those big trash bags? 11:38:15

A. No. Oftentimes they were like Ralphs bags. 11:38:18

Q. Okay. 11:38:23

A. Things like that, you know, so I -- you know, in the interest of time I couldn't go through everything. So, you know, I packed those things, you know, into my car, took them to the place where I live, and then there were other things that I had a professional mover when he moved the furniture also moved some additional boxes for me because it was just too much stuff for me to transport. 11:38:24 11:38:27 11:38:31 11:38:34 11:38:39 11:38:43 11:38:46 11:38:49

Q. I was going to ask you that. Who helped you move these containers of papers and Superman-related materials from your mother's home to your home? 11:38:51 11:38:53 11:38:57

A. Well, my sons helped me, and it was just my sons and me and then professional movers. 11:39:03 11:39:04

Q. What was the moving company you used? 11:39:08

A. Starving Students. 11:39:12

Q. How old are your children? 11:39:15

A. 20 and 23 years old. 11:39:18

Q. The 20-year-old is whom? 11:39:21

A. Michael -- no, no. James. James is 20. 11:39:22

Q. And Michael is how old? 11:39:25

A. 23. 11:39:27
Q. Do they live with you? 11:39:28
A. Some of the time, not really anymore. 11:39:30
Q. Okay. Now, with respect to the typing or computer equipment in your home since 2000, and you said you did take possession of your mother's typewriter, and remind me. Did she or did she not have an old computer there as well? 11:39:36 11:39:41 11:39:45 11:39:48 11:39:52
A. She had a laptop that my sons tried to teach her how to use, but it was unused. 11:39:53 11:39:57
Q. Where is that laptop now? 11:40:00
A. I have it. 11:40:01
Q. In your home? 11:40:03
A. Yes. 11:40:04
Q. Okay. And with respect to the computer equipment going back to 2000 that you used -- 11:40:05 11:40:08
A. Um-hum. 11:40:11
Q. -- why don't you just bring me up to date on that. What did you use going back to 2000 to today? 11:40:12 11:40:16
A. Well, I had -- you know, I had a PC, as I explained before. 11:40:19 11:40:23
Q. What kind of PC? Do you remember? 11:40:24
A. It was a Hewlett Packard or something. 11:40:28
Q. Do you have a printer in your home? 11:40:30
A. Yes. I've had -- you know, they die, you 11:40:32

know, periodically, you know, so I had printers that I had to throw away and replace, and I currently have an all in one. It's an all in one. You know, it's both a fax machine and a -- 11:40:36 11:40:42 11:40:46 11:40:49

Q. Right. 11:40:50

A. -- printer. 11:40:51

Q. What's the name of the laptop that you now use? What's the model? 11:40:51 11:40:54

A. Toshiba. 11:40:55

Q. Are you a pretty good typist? 11:40:57

A. I'm okay. 11:41:00

Q. And you typed letters for your mother related to this case? 11:41:02 11:41:06

A. Yes. 11:41:07

Q. Okay. 11:41:17

What were the reasons why you decided not to extend your business arrangement with IP Worldwide calling for the payment of a 10 percent commission? 11:41:31 11:41:38 11:41:42

A. It became unnecessary because we were entering into litigation. 11:41:46 11:41:48

Q. And that was about the late 2004 and early 2005 time period? 11:41:52 11:41:55

A. Yes. 11:41:57

Q. Any -- is it your understanding, then, that -- well, before I go there, prior to the time 11:42:04 11:42:06

that you decided not to extend the IP Worldwide business arrangement, was the commission still 10 percent, or had that number been modified in some way? 11:42:11 11:42:16 11:42:23

A. You mean just this document itself, or are you talking about services? I -- 11:42:28 11:42:33

Q. I'm not sure why you're asking me those questions, so -- 11:42:35 11:42:38

A. I'm not understanding your question. 11:42:40

Q. Well, in paragraph 6 of this agreement -- 11:42:41

A. Yes. 11:42:43

Q. -- Exhibit 45, there's a 10 percent commission. 11:42:44 11:42:45

A. Yes. 11:42:46

Q. When this agreement was no longer in effect sometime in early 2005, as you said -- 11:42:47 11:42:52

A. Yes. 11:42:55

Q. -- was the commission still 10 percent at that moment in time? 11:42:56 11:42:59

A. No. 11:43:02

Q. What was it? 11:43:02

A. It -- once the -- once the litigation agreement went into effect, it was reduced because Mr. Toberoff was not going to receive any -- any percentage under the IP Worldwide. 11:43:05 11:43:08 11:43:12 11:43:19

Q. And it was reduced -- 11:43:22

A. So it was reduced to 5 percent for Mr. Emanuel only. 11:43:24 11:43:29

Q. I see. So that any money that Mr. Toberoff would get he would get pursuant to the litigation agreement which had shortly before been executed. 11:43:29 11:43:32 11:43:34

A. Correct. 11:43:38

Q. Okay. And so for a period of time, then, you had in effect a litigation agreement with Mr. Toberoff calling for a particular percentage, and then you had an IP Worldwide agreement that the commission of which in paragraph 6 was reduced from 6 -- from 10 to 5 percent; correct? 11:43:39 11:43:45 11:43:50 11:43:54 11:43:58 11:44:02

A. Correct. 11:44:03

Q. Okay. Now, was there a document that reflected the reduction of the commission from 10 percent to 5 percent for IP Worldwide? 11:44:03 11:44:06 11:44:10

A. It was -- it was reflected in the litigation agreement. 11:44:15 11:44:22

Q. So the litigation agreement contains a reference that the IP Worldwide commission is dropping from 10 to 5. 11:44:23 11:44:26 11:44:29

A. I can't remember the exact details. 11:44:32

Q. Okay. You indicated that there was a document that you recall having signed that extended the IP Worldwide agreement. Do you remember that 11:44:36 11:44:38 11:44:41

testimony? 11:44:44

A. Yes. 11:44:44

Q. Was there one extension that you signed or more than one? 11:44:45 11:44:48

A. There may have been more than one. 11:44:53

Q. And did any of those extensions that you signed also address the reduction of the commission from 10 to 5? 11:44:55 11:44:58 11:45:00

A. No. 11:45:07

Q. Now, when -- given that you had for at least a period of time two agreements in effect, one for the litigation with Mr. Toberoff and then the IP Worldwide agreement at 5 percent, why did you then decide to stop the 5 percent agreement? 11:45:07 11:45:15 11:45:19 11:45:22 11:45:27

A. Well, Mr. Emanuel's services were not needed. 11:45:31

Q. Well, why were Mr. Emanuel's services needed the moment you signed the litigation agreement with Mr. Toberoff? 11:45:36 11:45:39 11:45:43

MR. TOBEROFF: You mean not needed? You said "needed." 11:45:44 11:45:46

MR. PETROCELLI: No. I meant "needed." 11:45:47

MR. TOBEROFF: Oh. 11:45:50

MR. PETROCELLI: Let me go back. 11:45:50

THE WITNESS: Okay. 11:45:51

BY MR. PETROCELLI:

Q. First of all, the percentage in the litigation agreement with Mr. Toberoff ranged from 33 percent to 40 percent; correct? 11:45:52 11:45:55 11:45:59

A. Yes. 11:46:01

Q. Okay. Is that still the current arrangement? 11:46:02

A. Yes. 11:46:05

MR. TOBEROFF: Okay. I just want to -- before we ask more questions regarding the retainer agreement, I just want you to be aware that certain portions of the retainer agreement have been redacted as privileged. 11:46:06 11:46:08 11:46:10 11:46:13 11:46:16

THE WITNESS: Okay. 11:46:17

MR. TOBEROFF: They made a motion to compel, and a redaction was upheld by the court. So I need you to pause and particularly when they start asking you questions about what's in the retainer agreement so I can instruct you -- 11:46:18 11:46:19 11:46:22 11:46:25 11:46:27

THE WITNESS: All right. 11:46:29

MR. TOBEROFF: -- accordingly. 11:46:30

BY MR. PETROCELLI:

Q. After the -- you signed the 33 to 40 percent litigation agreement with Mr. Toberoff, you determined you would still have an arrangement with IP Worldwide for Mr. Emanuel's services, but that was reduced to 5 percent; correct? 11:46:32 11:46:37 11:46:41 11:46:46 11:46:50

MR. TOBEROFF: Misstates her testimony. 11:46:51

MR. PETROCELLI: I didn't misstate anything. 11:46:54
It's not even a proper objection. 11:46:56

But go ahead. 11:46:58

MR. TOBEROFF: Misstates the record. 11:46:59

MR. PETROCELLI: Nor is that. 11:47:01

THE WITNESS: I'm lost. 11:47:04

MR. TOBEROFF: Misstates the -- 11:47:05

BY MR. PETROCELLI:

Q. When you -- you indicated that there was -- 11:47:09
at the time of the litigation agreement with 11:47:12
Mr. Toberoff which called for a percentage to 11:47:15
Mr. Toberoff of 33 to 40 percent, that there was a 11:47:19
simultaneous reduction of the IPW commission, IP 11:47:23
Worldwide commission, from 10 percent to 5 percent. 11:47:28
Do you recall that? 11:47:31

A. Yes. 11:47:31

Q. In fact, you said it was in the same document 11:47:32
that that occurred, the litigation document; right? 11:47:34

A. Yes. 11:47:37

Q. Okay. Why did you retain Mr. Emanuel once 11:47:37
you had signed the litigation agreement with 11:47:42
Mr. Toberoff? 11:47:46

MR. TOBEROFF: Assumes facts. Lacks 11:47:46
foundation. 11:47:48

THE WITNESS: There was a -- 11:47:49

BY MR. PETROCELLI:

Q. Why did you continue the services of Mr. Emanuel at 5 percent after having entered into the litigation agreement with Mr. Toberoff? 11:47:51 11:47:53 11:47:57

MR. TOBEROFF: Objection. Assumes facts. Lacks foundation. 11:47:59 11:48:01

BY MR. PETROCELLI:

Q. You may answer. 11:48:01

A. There was a very short period of time. The litigation had not actually begun yet. There was a possibility that Mr. Emanuel's services prior to the initiation of the actual litigation might be needed. 11:48:03 11:48:08 11:48:13 11:48:17

MR. PETROCELLI: Okay. We have to stop now because he needs to change the tape. 11:48:21 11:48:23

THE WITNESS: Okay. 11:48:24

MR. PETROCELLI: So we'll take a short break. 11:48:25

THE WITNESS: Okay. Good. 11:48:28

THE VIDEOGRAPHER: This will mark the end of Volume 1, tape number one, in the deposition of Laura Siegel. Going off the record. The time is 11:48. 11:48:29 11:48:30

(A recess was taken.) 11:59:45

THE VIDEOGRAPHER: We're back on the record, and this marks the beginning of Volume 1, tape number two, in the deposition of Laura Siegel. The time is 11:59:48 11:59:51 11:59:53

11:59. Go ahead. 11:59:56

BY MR. PETROCELLI:

Q. When is the last -- after the end of the IPW -- IP Worldwide agreement in early 2005, as you said, when litigation began, you said it became unnecessary; right? 12:00:03 12:00:10 12:00:15 12:00:18

A. Correct. 12:00:19

Q. Okay. From that point on until today, have you had any contact at all with Ari Emanuel? 12:00:21 12:00:25

A. No. 12:00:30

Q. Has your mother? Did your mother, to your knowledge, prior to her death? 12:00:30 12:00:34

A. I don't believe so. 12:00:36

Q. Are you aware of any ongoing role that Ari Emanuel plays -- 12:00:37 12:00:44

A. I'm not -- 12:00:46

Q. -- with respect to your Superman rights? 12:00:47

A. I'm not aware of that. 12:00:50

Q. Are you aware of any financial arrangement that may exist with respect to the services of Ari Emanuel regarding any transaction for your Superman rights? 12:00:52 12:00:57 12:01:03 12:01:07

A. I'm not aware of anything like that. 12:01:08

Q. So for example, if your Superman rights were sold in a transaction to Paramount Pictures, to your 12:01:10 12:01:15

knowledge, would Ari Emanuel receive a fee of any kind? 12:01:21 12:01:25

A. I don't believe so. 12:01:25

Q. It's your view that you have no current agreements with him at all; is that right? 12:01:28 12:01:30

A. I believe so, yes. 12:01:33

Q. Based on the totality of your financial arrangements, if you entered into a transaction to sell your Superman rights today, what would be the percentage of the gross proceeds that you would be obligated to pay? 12:01:35 12:01:41 12:01:46 12:01:55 12:01:58

MR. TOBEROFF: Wait. If you can answer that without revealing the contents of the consent agreement, I would allow you to answer that question if you know the answer. Otherwise I instruct you not to answer. 12:01:59 12:02:07 12:02:11 12:02:14 12:02:16

THE WITNESS: You know, I really don't know exactly what it is. 12:02:21 12:02:24

BY MR. PETROCELLI:

Q. Well, you do know; right? I mean you do know the terms that you have with Mr. Toberoff; correct? 12:02:29 12:02:32

A. Not separately from the instruction that I received. 12:02:37 12:02:41

Q. Well, the instruction had to do with the consent agreement. The financial terms, at least some 12:02:41 12:02:43

of them, have already been disclosed to us with respect to the litigation retainer agreement. 12:02:48 12:02:51

A. Oh, okay. Sometimes it gets confusing because we're talking about so many agreements, you know. 12:02:53 12:02:55 12:02:57

Q. Okay. So let me see if I can break it down for you. 12:02:58 12:03:00

A. All right. 12:03:00

Q. If there were a transaction today for the sale of your Superman rights, you would have to pay Mr. Toberoff 33 to 40 percent based on your agreement; is that correct? 12:03:01 12:03:03 12:03:10

A. I believe so. 12:03:14

Q. And would that be 33 or 40 percent? Do you know? What range applies as of today? 12:03:15 12:03:21

A. I believe because we had an initial trial before -- was that considered a trial with Judge Larson? 12:03:36 12:03:45 12:03:50

Q. Well, Mr. Toberoff has -- would certainly suggest that it was. 12:03:51 12:03:55

A. I mean, you know, what's the definition of a trial, yes. Okay. 12:03:57 12:04:00

Q. So an argument could be made that the current percentage of 40 percent is owed; correct? If that were a trial? 12:04:02 12:04:05 12:04:10

A. If it were a trial, yes. 12:04:10

Q. Okay. So besides that 40 percent to Mr. Toberoff, is there any other percent that would have to be paid to Mr. Toberoff? 12:04:12 12:04:22 12:04:26

A. No. 12:04:31

Q. Is there any other fee that would have to be paid to Mr. Toberoff? 12:04:32 12:04:35

A. No. I can't think of any. 12:04:38

Q. Any other type of remuneration of any kind that would be paid to Mr. Toberoff? 12:04:39 12:04:42

A. You know, I think that there were some -- some costs that were advanced. 12:04:44 12:04:47

Q. Besides that. 12:04:49

A. Other than costs, no. 12:04:50

Q. Okay. Is there anything in the 2008 consent agreement that would trigger additional remuneration to Mr. Toberoff based on a transaction of the Siegel rights? 12:04:51 12:04:56 12:05:01 12:05:05

MR. TOBEROFF: I -- I will allow you to answer as to -- because what is not in the agreement would not be privileged. Did I say that right? 12:05:06 12:05:09 12:05:13

MR. PETROCELLI: You did. 12:05:18

MR. TOBEROFF: Some things not in the agreement we are not asserting privilege. We are asserting privilege to what is in the agreement. So 12:05:18 12:05:20 12:05:24

to that extent, you can answer the question. 12:05:25

THE WITNESS: Well, there's no -- I can never say the word. What is it? Remuneration? There's no -- you know what I'm talking about. There's no additional percentage. 12:05:27 12:05:28 12:05:33 12:05:35

BY MR. PETROCELLI:

Q. To Mr. Toberoff. 12:05:38

A. To Mr. Toberoff. 12:05:39

Q. As a result of anything in the consent agreement. 12:05:40 12:05:42

A. Correct. 12:05:43

Q. Correct? 12:05:43

A. Correct. 12:05:45

Q. Okay. And to your knowledge, would there be any percentage -- in addition to the 40 to Mr. Toberoff, would there be any percentage or any fee payable to Ari Emanuel or any of his companies? 12:05:46 12:05:50 12:05:56 12:05:59

A. No. 12:06:05

Q. So to your knowledge, he would not participate at all in any current transaction. 12:06:06 12:06:08

MR. TOBEROFF: Asked and answered. 12:06:12

BY MR. PETROCELLI:

Q. Is that correct? 12:06:13

A. Correct. 12:06:13

Q. Out of the 60 percent or other proceeds that 12:06:18

you would receive, putting aside Mr. Toberoff's 40 percent, would you have to share any of those proceeds with anyone else as a result of any contractual arrangements that you currently have? 12:06:22 12:06:27 12:06:31 12:06:34

MR. TOBEROFF: I instruct you not to answer to the extent your answer would necessarily reveal the substance of the consent agreement held to be privileged. 12:06:36 12:06:38 12:06:45 12:06:48

MR. PETROCELLI: May I just take one shot at you on this, Marc, because what the court held was that a particular document, at least on that record, was not discoverable at this time. But the court did not hold that any and all financial arrangements or contractual arrangements between the parties or between witnesses, and these parties are also witnesses, are barred from discovery. It goes directly, among other things, to motive and -- 12:06:50 12:06:51 12:06:56 12:07:03 12:07:07 12:07:11 12:07:18 12:07:22 12:07:26

MR. TOBEROFF: I think -- 12:07:31

MR. PETROCELLI: -- a host of other credibility issues. 12:07:32 12:07:33

MR. TOBEROFF: I think I stated my instruction, and if I wasn't clear -- I thought it was clear. 12:07:34 12:07:36 12:07:38

MR. PETROCELLI: The existence of those arrangements are relevant and would be discoverable in 12:07:39 12:07:41

any case. 12:07:45

MR. TOBEROFF: I said she can't disclose to the extent there is another agreement out there in which she's sharing her proceeds. Other than anything that speaks to that in the consent agreement she can testify. 12:07:47 12:07:49 12:07:54 12:07:59 12:08:02

MR. PETROCELLI: I'm suggesting to you that the court did not issue an order categorically ruling that we are unable to discover financial or contractual arrangements between the parties even if reflected in the consent agreement. 12:08:02 12:08:03 12:08:15 12:08:19 12:08:25

MR. TOBEROFF: I -- the court doesn't have to use those exact words. 12:08:28 12:08:29

MR. PETROCELLI: I didn't say it had to use those exact words, but that's the essence of your position. 12:08:31 12:08:32 12:08:34

MR. TOBEROFF: I disagree. There are certain -- the court held that the contents of that document are privileged, and that therefore, if your question by necessity requires her to divulge -- or it may or may not, but to the extent it requires her to divulge contents of the consent agreement, I'm instructing her not to answer. 12:08:35 12:08:37 12:08:40 12:08:44 12:08:48 12:08:52 12:08:55

MR. PETROCELLI: Okay. Well, to the extent -- 12:09:04 12:09:04

MR. TOBEROFF: Well, if she answers in the negative where she's not implicating any of the contents of the consent agreement, I'm -- there's no intention, to the extent I let her answer questions, to waive the privilege as to the consent agreement. 12:09:04 12:09:06 12:09:10 12:09:13 12:09:15

MR. PETROCELLI: I understand that's your position, but, you know, we will obviously have to litigate this issue before the court. 12:09:17 12:09:19 12:09:23

MR. TOBEROFF: In other words, I don't believe that you can, if there's a ruling that the document is privileged, you can get around the ruling by asking questions that unearth the contents of the privileged documents. 12:09:30 12:09:31 12:09:33 12:09:36 12:09:40

MR. PETROCELLI: I think you've misapprehended the court's ruling, and the record now is different in any event. But I think we've discussed it sufficient to persuade me you're not going to change your mind at this deposition. So we will just proceed. 12:09:41 12:09:43 12:09:46 12:09:50 12:09:54 12:09:56

Q. Are you aware of any other piece of paper of any kind other than the consent agreement document that expresses or reflects any arrangement between the Siegels and the Shusters regarding the sharing of proceeds? 12:10:02 12:10:10 12:10:18 12:10:25 12:10:29

MR. TOBEROFF: I instruct you not to answer 12:10:30

to the extent that question implies the contents of the consent agreement, but you can -- you can answer whether there's any other document other than -- there's a document -- excluding the consent agreement, is there another document that provides for you to share proceeds, you can answer that question. 12:10:33 12:10:36 12:10:39 12:10:42 12:10:45 12:10:48

BY MR. PETROCELLI:

Q. Or that just discusses it or references or mentions. It's not that it has to be a contract in and of itself. Any piece of paper. 12:10:50 12:10:53 12:10:55

A. I can't think of any. 12:10:59

Q. Did you -- did you engage in any negotiations with anyone regarding the terms of the consent agreement? 12:11:01 12:11:09 12:11:16

A. Could you -- could you explain that a little bit better? I don't quite understand what you mean. 12:11:16 12:11:20

Q. Yeah. 12:11:23

Who created the terms in the consent document? 12:11:23 12:11:28

MR. TOBEROFF: Vague and ambiguous as to "created." 12:11:29 12:11:31

BY MR. PETROCELLI:

Q. Who came up with them? 12:11:32

A. You mean who -- who wrote the document? 12:11:35

Q. Not who was the scrivener who put the words 12:11:39

on the paper, but who conceived and who came up with the terms that are subsequently put down in the paper? 12:11:42 12:11:47

A. I think it evolved out of conversations that my mother and I had with Mr. Toberoff and perhaps conversations that the Shusters had with Mr. Toberoff. 12:11:53 12:11:58 12:12:04

Q. Okay. And do you recall that you wanted to have particular provisions as part of the arrangement that the Shusters had a different view about and that there was kind of a back-and-forth exchange? 12:12:11 12:12:18 12:12:23 12:12:28

A. I -- the way I recall it, there was -- 12:12:32

MR. TOBEROFF: Wait. Wait. Wait. Wait. I'm not going to allow questions as to -- the consent agreement is held to be privileged. There's a joint interest privilege between my representation of the Siegels and my representation of the Shusters, the Shusters we'll call them, and I'm not going to allow questions as to characterizing conversations that are privileged. 12:12:34 12:12:35 12:12:40 12:12:42 12:12:45 12:12:50 12:12:53 12:13:03

MR. PETROCELLI: Are you instructing not to answer on that question? 12:13:03 12:13:05

MR. TOBEROFF: Yes. 12:13:06

BY MR. PETROCELLI:

Q. Did you agree to share in any of your proceeds for this -- the disposition or sale or settlement of the Siegel rights with the Shusters? 12:13:15 12:13:21 12:13:24

MR. TOBEROFF: I instruct you not to answer that question to the extent that the question implicates the contents of the consent agreement.

BY MR. PETROCELLI:

Q. Right now do you have an agreement in place to share with the Shusters with respect to any sale or disposition or settlement regarding the Siegel rights?

MR. TOBEROFF: Same -- asked and answered. Same instruction based on attorney-client privilege, joint interest.

MR. PETROCELLI: You know what? This is probably a good time to break.

THE WITNESS: Okay.

MR. PETROCELLI: We'll make it like 30 minutes or 45 minutes.

MR. TOBEROFF: Same objection. Same instruction. Just kidding.

MR. PETROCELLI: You're on a roll, Marc. By the way, that's not much different than your other instructions.

THE VIDEOGRAPHER: Off the record. The time is 12:14.

(Lunch recess taken at 12:14 p.m.)

12:13:31 12:13:32 12:13:35 12:13:38 12:13:41 12:13:45 12:13:50 12:13:51 12:13:55 12:14:07 12:14:09 12:14:10 12:14:11 12:14:13 12:14:15 12:14:17 12:14:18 12:14:21 12:14:23 12:14:24 12:14:25 12:14:27

LOS ANGELES, CALIFORNIA; FRIDAY, JULY 22, 2011

1:29 P.M.

(Whereupon, Ms. Seto was not present.) 12:15:00

THE VIDEOGRAPHER: We are back on the record at 1:29. 13:29:24 13:29:26

EXAMINATION (Resumed) 13:29:27

BY MR. PETROCELLI:

Q. Ms. Siegel, we took a longer break than I had expected only because I understand and was told that you needed to rest, and again, that's fine, and if you continue to need to rest, just let us know. All right? 13:29:27 13:29:32 13:29:34 13:29:39 13:29:41

A. Thank you. 13:29:42

Q. And we did find an office here for you that had a couch to accommodate you. 13:29:43 13:29:48

A. Good. 13:29:50

Q. Okay. Sorry we didn't have room service, but maybe -- maybe next time. 13:29:51 13:29:55

A. Not necessary. 13:29:56

Q. Okay. So what I would like to do is I want to go back to a point in time when for point of reference you had been working with the lawyers at Gang Tyre in conducting negotiations with Warner Bros. and DC Comics, and for point of reference, let me show 13:29:58 13:30:06 13:30:14 13:30:23 13:30:26

you Exhibit 48, which is a letter dated October 19, 2001, from Kevin Marks to John Schulman. 13:30:32 13:30:40

(Whereupon, Plaintiff's Exhibit 48 was placed before the witness.) 13:30:47

BY MR. PETROCELLI:

Q. And you have already testified about this letter, I believe, and I'm not going to go into it, but I just want to orient you regarding the time period. 13:30:48 13:30:50 13:30:54 13:30:59

A. Okay. 13:31:00

Q. So you recall that in or about October of 2001 this correspondence occurred regarding your negotiations with Superman -- with Warner Bros. regarding Superman and receiving a copy of your lawyer's letter to Mr. Schulman that's been marked as Exhibit 48; right? 13:31:00 13:31:07 13:31:16 13:31:20 13:31:24 13:31:27

A. Yes. 13:31:28

Q. Indicating that your family had accepted DC Comics' offer based on the terms set forth in the document; correct? 13:31:30 13:31:35 13:31:37

A. Yeah, it was a provisional acceptance. 13:31:39

Q. Okay. And I don't want to go through that. The word "provisional" isn't in there, but you testified to that in your previous deposition. 13:31:42 13:31:45 13:31:49

Now, as of this point in time, October 19, 13:31:51

2001, is it fair to say that through different lawyers you had been in discussions and negotiations with Warner Bros. and DC Comics for a number of years? Correct? 13:31:55 13:32:00 13:32:04 13:32:08

A. A long time. 13:32:08

Q. Going back to when -- even before the notices of termination were served in 1997; right? 13:32:11 13:32:14

A. No. There were no negotiations before 1997. 13:32:18

Q. But shortly -- but upon issuance of the notice of termination, is that when the negotiations began initially with Arthur Levine? Correct? 13:32:21 13:32:24 13:32:27

A. Yes, sometime during 1997. 13:32:30

Q. Okay. And they had been going on all the way through October 19, 2001; correct? 13:32:33 13:32:36

A. Yes. 13:32:39

Q. Okay. And they actually continued after October 19, 2001. This is not the last document in the exchange; correct? 13:32:40 13:32:44 13:32:47

A. Correct. 13:32:49

Q. And you formally -- withdrawn. 13:32:51

You notified DC Comics at some point in time that you were cutting off any further negotiations; correct? 13:32:55 13:32:59 13:33:03

A. Correct. 13:33:03

Q. And you did so in writing; correct? 13:33:04

A. Correct. 13:33:05

Q. And you notified DC Comics for the first time that you were cutting off negotiations in a document sent to them in October, 2001; is that correct? 13:33:07 13:33:10 13:33:13

A. No. 13:33:30

Q. Excuse me. Let me withdraw the question. 13:33:30

First of all, let me find the document so I'm not guessing on the dates. I'm a year off. 13:33:33 13:33:35

The first time that you notified DC Comics or Warner Bros. that you were cutting off negotiations towards an agreement with him to sell your Superman rights was when you sent your letter dated September 21, 2002, that you signed together with your mother; correct? 13:33:54 13:34:00 13:34:04 13:34:07 13:34:11 13:34:15

A. Yes, that's correct. 13:34:16

Q. Let me show you a copy of that letter. That is Exhibit 56. 13:34:17 13:34:21

(Whereupon, Plaintiff's Exhibit 56 was marked for identification.) 13:34:45

MR. TOBEROFF: Did you say -- did you date this letter in the last question? 13:34:46 13:34:47

MR. PETROCELLI: Yes, I'll follow up on it. The date was in the question, but it's also in the exhibit number. We have an exhibit number. We have a specific document, and the document is dated September 13:34:50 13:34:52 13:34:56 13:35:02

21, 2002. So let me just -- 13:35:04

MR. TOBEROFF: I thought you had said 2001. Maybe I heard it wrong. 13:35:07 13:35:10

MR. PETROCELLI: Okay. Let's start all over again. 13:35:13

What's the exhibit number? 13:35:13

MR. TOKORO: 56. 13:35:15

BY MR. PETROCELLI:

Q. You have Exhibit 56 in front of you, which is the letter that you and your mother sent to DC Comics dated September 21, 2002, when you for the first time cut off negotiations with them; correct? 13:35:15 13:35:17 13:35:21 13:35:25

A. Yes. 13:35:27

Q. Now, when -- did you write this letter yourself? 13:35:28 13:35:33

A. No. 13:35:34

Q. Who wrote it? 13:35:35

A. My mother with some input from me. 13:35:36

Q. Well, your mother didn't type. 13:35:40

A. Well, she wrote it. She wrote it out in longhand. 13:35:42 13:35:46

Q. How do you know? 13:35:46

A. How do I know? 13:35:47

Q. Yeah. 13:35:48

A. She gave it to me. 13:35:50

Q. Where is the -- you have the paper that she gave you? 13:35:50 13:35:55
A. I don't know. 13:35:56
Q. What did she write it on? 13:35:57
A. A piece of paper this big. Sometimes she would write -- I don't remember this specific one. Sometimes she would write on a yellow pad. Sometimes she would write on a white pad. 13:36:04 13:36:07 13:36:10 13:36:13
Q. Did you type it? 13:36:15
A. Yes. 13:36:17
Q. Where did you type it? 13:36:17
A. I typed it on my computer. 13:36:19
Q. Your computer at your home? 13:36:21
A. Yes. 13:36:23
Q. That was which computer? The PC that you said you had? 13:36:24 13:36:30
A. Yes. 13:36:30
Q. Did you show this letter to anybody after typing it before it went out? 13:36:34 13:36:38
A. No. Just my mother and I saw it. 13:36:40
Q. Well, I'm curious about that. You had Mr. Levine. You had Mr. -- what's George's last name? 13:36:42 13:36:46
A. Zadrozny. 13:36:52
Q. Zadrozny. 13:36:53
A. You pronounced it correctly. 13:36:54

Q. You had Mr. Zadrozny. You didn't have him take a look at this before it went out?
A. I don't recall us having them look at it.
Q. And you had certainly been in touch with Mr. Toberoff by this time, September 21, 2002.
A. We had only learned of his existence at a point shortly before this, but he -- you know, he didn't see this, if that's what you're asking me.
Q. How do you know he didn't see it? You didn't show it to him. Is that what you're saying?
A. Correct.
Q. You said it was shortly before this letter, Exhibit 56, which is dated September 21, 2002, that you first interacted with Mr. Toberoff?
MR. TOBEROFF: Misstates her testimony.
BY MR. PETROCELLI:
Q. That you first interacted with Mr. Toberoff?
MR. TOBEROFF: Misstates the testimony.
THE WITNESS: No, that we were first informed of him.
BY MR. PETROCELLI:
Q. Is it your testimony that you never spoke to Mr. Toberoff prior to September 21, 2002?
A. I don't recall speaking with him before then.
Q. Can you say so with certainty?

13:36:56 13:36:59 13:37:01 13:37:04 13:37:06 13:37:14 13:37:23 13:37:29 13:37:33 13:37:35 13:37:37 13:37:44 13:37:48 13:37:52 13:37:57 13:37:59 13:38:02 13:38:03 13:38:06 13:38:08 13:38:13 13:38:17 13:38:19

A. I can't say so with absolute certainty. 13:38:23

Q. Okay. And do you have any way of refreshing your recollection as to the exact date that you first spoke to Mr. Toberoff? 13:38:27 13:38:33 13:38:36

A. Well, my mother first spoke to Mr. Toberoff, so -- 13:38:41 13:38:46

Q. Before you did? 13:38:46

A. Yes. 13:38:47

Q. Do you know with certainty the date your mother first spoke to Mr. Toberoff? 13:38:50 13:38:53

A. No, I don't. 13:38:54

Q. Do you know whether it was -- well, it was certainly before September 21, 2002; correct? 13:38:56 13:39:02

A. No. I said I don't know when it was. 13:39:05

Q. Nor do you know when your mother first spoke with Mr. Toberoff; is that correct? 13:39:08 13:39:12

A. Yes. I don't know when she spoke to him. 13:39:13

Q. Okay. And you have no way of dating when your mother first spoke with Mr. Toberoff just like you don't have any way of dating when you did; correct? 13:39:16 13:39:19 13:39:21 13:39:23

A. Yes. 13:39:23

Q. Okay. Did you keep a calendar of appointments, you know, like a daily reminder book or anything else in which you made appointments? 13:39:24 13:39:29 13:39:32

A. No, not really. 13:39:34
Q. Or did you do so on your computer? 13:39:35
A. No. 13:39:39
Q. Did your mother? 13:39:39
A. No. 13:39:40
Q. Not on the computer, but let's say some kind of appointment book? Did she keep anything like that? 13:39:41 13:39:44
A. Not that I'm aware of. 13:39:46
Q. You had -- by the way, when your -- how did you find out about your mother's first contact with Mr. Toberoff? 13:39:59 13:40:05 13:40:11
A. Well, she told me. 13:40:11
Q. Did she tell you before she spoke with him or after she spoke with him? 13:40:13 13:40:16
A. No. She was -- she -- we had been looking for attorneys, and we had been talking to, you know, different people. I had been doing research to try and -- you know, like the Gerry Spence research that I was doing. We were -- but it wasn't an easy process trying to find, you know, an attorney that would be willing to on a contingency fee -- excuse me -- on a contingency fee that did not have a conflict with Warner Bros. to, you know, to find additional representation. 13:40:18 13:40:23 13:40:27 13:40:29 13:40:33 13:40:36 13:40:40 13:40:46 13:40:52 13:40:57
Q. Did you talk to Gerry Spence or your mother 13:40:58

talk to Gerry Spence or communicate with Gerry Spence in some way in 2002?
A. Yes.
Q. Is that the only time you communicated with him?
A. Yes, because he appeared to have a conflict of interest.
Q. And that was the end of it?
A. Yes.
Q. Okay. The -- did you -- your mother found out about Mr. Toberoff from whom?
A. From Jean Peavy.
Q. And then she informed you, your mother did.
A. Yes.
Q. You were not on the call with --
A. No.
Q. Okay. And do you know from the time she told you about Mr. Toberoff how long it was thereafter that she met with Mr. Toberoff or spoke with him, "she" being your mother?
A. I don't really know.
Q. In other words, did your mother come to you and say, "Hey, there's some person named Marc Toberoff that Jean Peavy told me about. I would like you to do some research into him or check into him"? Did she

13:41:01
13:41:03
13:41:08
13:41:08
13:41:10
13:41:10
13:41:12
13:41:13
13:41:15
13:41:16
13:41:35
13:41:36
13:41:38
13:41:44
13:41:44
13:41:46
13:41:46
13:41:51
13:41:59
13:42:02
13:42:03
13:42:04
13:42:07
13:42:10
13:42:12

have that kind of conversation with you? 13:42:16

A. She said, "It sounds interesting. You know, we should probably look into this some more." 13:42:18 13:42:21

Q. And what did you do to look into it? 13:42:24

A. I'm trying to remember. I think -- I think I searched his name on the Internet, you know, to see if there was any information on him. 13:42:32 13:42:37 13:42:41

Q. What did you find out from the Internet search? 13:42:43 13:42:47

A. I -- it's hard to remember. It's a long time ago, but I think that there was like a press article or something about his involvement in some intellectual property rights cases in which he was protecting the interests of authors and creators. 13:42:47 13:42:50 13:42:55 13:42:59 13:43:02

Q. Did you print that material? 13:43:06

A. I did at the time, yeah. 13:43:08

Q. And did you keep a copy of it? 13:43:09

A. I did at that time, yeah, and I shared it with my mother. 13:43:12 13:43:16

Q. Do you still have it in your papers at home? 13:43:18

A. I doubt it -- 13:43:20

Q. You kept -- 13:43:22

A. -- because I've been -- 13:43:23

Q. -- the Gerry Spence material, but you didn't keep the Marc Toberoff material? 13:43:24 13:43:27

A. I didn't keep the Gerry Spence material. My mom did. It was among her things. 13:43:27 13:43:31
Q. But you gave it to her because you downloaded it from the computer; right? 13:43:35 13:43:35
A. Yes, yes. 13:43:37
Q. And did you find the materials that you downloaded about Mr. Toberoff when you went through your mom's files? 13:43:37 13:43:38 13:43:42
A. I have not found it. 13:43:44
Q. Have you gone through everything yet? 13:43:46
A. No. 13:43:49
Q. Okay. You're still working through it? 13:43:49
A. Yes. 13:43:50
Q. Other than the Internet search, did you do anything else to research Mr. Toberoff? 13:43:54 13:43:57
A. Well, my mother did. 13:44:00
Q. How do you know that? 13:44:02
A. She told me. 13:44:03
Q. And what did she tell you? 13:44:05
A. She told me that she -- and this was at the point when she called Mr. Toberoff and said that she had gotten his name from Jean Peavy and she was interested in knowing, you know, who he had represented and, you know, what his attitude was towards -- towards intellectual property. So they had 13:44:06 13:44:11 13:44:15 13:44:19 13:44:22 13:44:26

a conversation. 13:44:30

Q. You're now reporting what your mother told you about her first conversation with Mr. Toberoff; right? 13:44:30 13:44:33 13:44:35

A. Yes. 13:44:35

Q. But before that first conversation, before Mr. Toberoff -- before she called Mr. Toberoff -- well, let me ask you that question. We lawyers shouldn't assume anything, so forgive me for having to ask so many questions. 13:44:36 13:44:39 13:44:44 13:44:48 13:44:51

Did she call Mr. Toberoff first, or did he call her based on, you know, some reference that he had been given? 13:44:53 13:44:57 13:45:01

A. No. Jean Peavy gave his phone number to my mom, and my mom called him. 13:45:02 13:45:04

Q. Okay. And before your mom called Mr. Toberoff, you had already given your mom the downloaded commuter material about him? 13:45:07 13:45:10 13:45:14

A. No. No. 13:45:16

Q. No. So the sequence of events was Jean Peavy told your mother about Mr. Toberoff, and without consulting you, your mother then called Mr. Toberoff and then reported the conversation to you? 13:45:17 13:45:21 13:45:23 13:45:27

A. No. I think -- well, you know, I'm trying to remember it. I think -- I think she had the 13:45:29 13:45:32

conversation with Jean. She told me about it, and then she said, you know, "We should be looking" -- "We should look into this," and probably around that time I started looking up things on the Internet, and she placed a call to him because she had gotten his phone number from Jean. 13:45:36 13:45:40 13:45:44 13:45:48 13:45:51 13:45:54

Q. And you don't know whether you had given her the Internet materials before or after her phone call with Mr. Toberoff? 13:45:56 13:45:59 13:46:03

A. No, I don't remember. 13:46:05

Q. Okay. And so after the first phone call that she reported to you -- 13:46:06 13:46:10

A. Um-hum. 13:46:10

Q. -- what was the next thing that happened? 13:46:11

A. Well, she had asked for him to -- 13:46:13

MR. TOBEROFF: Okay. I just want to say that -- 13:46:15 13:46:17

THE WITNESS: Yeah. 13:46:17

MR. TOBEROFF: -- when it comes to general subject matter of a conversation in these conversations, you can disclose it, but I don't want you to disclose what your mother said I said to her or she said to me -- 13:46:18 13:46:22 13:46:25 13:46:28 13:46:31

THE WITNESS: Okay. 13:46:33

MR. TOBEROFF: -- because that would be 13:46:34

privileged. 13:46:35

MR. PETROCELLI: Well, I disagree. 13:46:36

MR. TOBEROFF: Even if she had not yet retained me. 13:46:38

MR. PETROCELLI: But we're going to have to make a record here. So if your lawyer instructs you not to answer, that's one thing, but I don't want you to answer my questions in a misleading way. So I'll just ask the questions, and either you'll answer or he will instruct you not to answer. 13:46:39

THE WITNESS: Um-hum. Um-hum. 13:46:54

MR. PETROCELLI: Okay. 13:46:56

Q. So I think my question was after this initial phone call and you downloaded the material on Mr. Toberoff, what was the next step in terms of any further contacts with Mr. Toberoff? 13:46:56

A. Well, my mother wanted references, you know, of other people that he had represented so that she could, you know, interview them and get a feel for what they thought of him and his work. 13:47:13

Q. Your mother wanted references? 13:47:30

A. Yes. 13:47:31

Q. And then she asked you to go and get them? 13:47:32

A. No. She obtained them. 13:47:36

Q. How do you know that? 13:47:38

By the way, I have to keep asking you that because your mom is not here to testify. 13:47:41 13:47:43

A. I understand. 13:47:45

Q. Okay. 13:47:46

A. No. She gave me a copy of the printout of the names and phone numbers of the people. 13:47:47 13:47:50

Q. Do you still have a copy of the printout? 13:47:53

A. I don't know. 13:47:55

Q. Okay. When you say a printout, what do you mean by that? 13:47:57 13:48:02

A. Well, I remember it was typed, but, you know, I don't -- I don't know whether it came by -- by e-mail or whether it was mailed to her. That part I don't remember. 13:48:03 13:48:07 13:48:11 13:48:14

Q. How would it have come -- it wouldn't have come from your mother to you by e-mail; right? 13:48:14 13:48:17

A. No, that's true. That's true, because she didn't get it by e-mail. So she must have -- it could have been faxed to her because she had a fax machine, so it was either faxed to her or it was mailed to her. 13:48:20 13:48:22 13:48:26 13:48:29

Q. And do you know who gave it to her, this list? 13:48:32 13:48:35

A. Mr. Toberoff. 13:48:35

Q. I see. Do you know any of the names on the list? 13:48:37 13:48:44

EXHIBIT 24

A. Oh, I can't remember exactly. 13:48:44
Q. Did you contact any of the people? 13:48:49
A. My mother did. My mother -- I was very involved in something at that time, so -- 13:48:51 13:48:55
Q. That was your divorce? 13:48:57
A. It -- yeah. 13:49:00
Q. Your divorce was around 2000; right? 13:49:00
A. No. We separated in 2000, and I was heavily involved in divorce matters until -- it was either -- I think it was 2005 when things finally wrapped up. 13:49:03 13:49:05 13:49:08
Q. When you said you were involved with something in 2002 around this time period -- 13:49:13 13:49:16
A. Um-hum 13:49:19
Q. -- that we're discussing, what were you involved in? 13:49:19 13:49:22
A. It could very well have been my divorce, or it could have been illness on my part because my multiple sclerosis and other illnesses that I have. 13:49:22 13:49:25 13:49:29
Q. When -- 13:49:32
A. But she took the initiative to make the phone calls, and this is what I'm saying. 13:49:32 13:49:35
Q. Okay. And she contacted the references? You didn't contact any of them; is that right? 13:49:37 13:49:40
A. I think I did contact one of them. 13:49:44
Q. Who did you contact? 13:49:46

A. I don't know. Maybe if I have some more time to think about it, maybe it will come back to me. 13:49:54 13:49:56

Q. You'll -- 13:49:58

A. I'll think about it. 13:49:59

Q. You'll let me know. Okay? 13:50:01

A. Yeah. Yeah. I mean I'll try and remember. 13:50:02

Q. Do you remember any of the names your mom contacted? 13:50:12 13:50:19

A. Right here today at this minute, no. I have a mental picture of the page and with things typed on it, but it's not clear enough for me to focus on, you know, the names that were on it. 13:50:21 13:50:28 13:50:32 13:50:35

Q. And you think it was a page that came from Mr. Toberoff's office? 13:50:37 13:50:40

A. Yes. 13:50:40

Q. And it had several names on it? 13:50:42

A. I -- I think it had at least three. There may have been more. 13:50:45 13:50:48

Q. When is the last time you saw that piece of paper? 13:51:00 13:51:03

A. It's been a number of years. 13:51:03

Q. After you and/or your mom made the phone calls, did you and she discuss what you had learned? 13:51:10 13:51:16

A. Yes. 13:51:19

Q. Okay. And you received, I assume, favorable 13:51:20

reports? 13:51:25

A. Yes. She -- very favorable. 13:51:25

Q. What was the next thing that then happened in terms of contacting Mr. Toberoff? 13:51:29 13:51:32

A. I think -- I think my mother said, you know, "Maybe we should -- we should talk to him in person and, you know, see if we like him." 13:51:39 13:51:46 13:51:49

Q. And did that happen? 13:51:54

A. Yes. 13:51:55

Q. Who met with him? 13:51:56

A. My mother and I. 13:51:58

Q. And anyone else present? 13:52:02

A. No. 13:52:04

Q. Just you, your mother, and Mr. Toberoff? 13:52:04

A. That's right. 13:52:07

Q. And where was that meeting? 13:52:07

A. It was in Beverly Hills. 13:52:09

Q. At his -- 13:52:12

A. An office in Beverly Hills. 13:52:12

Q. His office? 13:52:14

A. That first meeting I think we went to a restaurant. But -- no, no, no. I think we met at the Endeavor offices in a conference room. 13:52:17 13:52:20 13:52:24

Q. Was Mr. Emanuel present at all? 13:52:28

A. No, he was not. 13:52:31

Q. Did you -- when you were at the offices of Endeavor meeting Mr. Toberoff, that was your first time meeting with him; right? 13:52:31 13:52:37 13:52:39

A. That's right. 13:52:40

Q. And you had heard of Mr. Emanuel by then; correct? 13:52:41 13:52:55

A. No, we had not. 13:52:55

Q. Did you ask why -- 13:52:57

A. Oh, wait, wait, wait. I'm sorry. Yes, we did. 13:52:58 13:53:00

Q. Yeah, you were meeting in his firm; right? 13:53:00

A. Yeah, but it wasn't -- he wasn't a part of the discussion. 13:53:02 13:53:05

Q. Did you ask why you were meeting in his office? 13:53:08 13:53:11

A. I think -- 13:53:11

MR. TOBEROFF: Vague and ambiguous. 13:53:14

THE WITNESS: We weren't meeting in his office. We were meeting in a conference room, and, you know, there was no meeting with Mr. Emanuel. 13:53:16 13:53:18 13:53:22

BY MR. PETROCELLI:

Q. You said you had heard of him by then. 13:53:28

A. I'm sorry. Had heard of Mr. -- 13:53:31

Q. Thank you. You said you had heard of Mr. Emanuel -- 13:53:32 13:53:35

A. Okay. 13:53:35
Q. -- as of the date that you were meeting with Mr. Toberoff and your mother in the conference room at Endeavor. 13:53:35 13:53:38 13:53:41
A. Yes. 13:53:41
Q. Okay. That was on -- Endeavor's offices are in Beverly Hills I think on Camden; is that correct? 13:53:42 13:53:47
A. Probably. 13:53:51
Q. Okay. And how had you heard of Mr. Emanuel? 13:53:51
A. Well, he was in Variety and in The Hollywood Reporter, and, you know, he had a, you know, a high profile as, you know, as an agent. 13:53:57 13:54:01 13:54:06
Q. But you had also heard of him in connection with Mr. Toberoff; correct? By the time you were meeting with Mr. Toberoff in the Endeavor office? 13:54:09 13:54:13 13:54:15
A. Yes. 13:54:18
Q. Okay. And is that something your mother learned in her conversations with Mr. Toberoff that she reported to you? 13:54:19 13:54:22 13:54:27
A. She may have mentioned that. 13:54:30
Q. Did you uncover any of that in your research at all? 13:54:31 13:54:34
A. I -- I think there may have been one -- one article. I mean there were certainly, you know, things on the Internet about Emanuel that I read at 13:54:36 13:54:40 13:54:43

one point or another, but what the sequence was in time, I can't recall. 13:54:47 13:54:50

Q. After that -- were there any documents displayed or used or exchanged at that first meeting with Mr. Toberoff? 13:54:52 13:55:01 13:55:06

A. No. It was really a -- pretty much a casual meet and greet kind of thing, just "Hi," you know. 13:55:08 13:55:13

Q. Before entering into the first agreement with Mr. Toberoff and Mr. Emanuel in October of 2002, the one that we just saw -- 13:55:19 13:55:22 13:55:25

A. Um-hum. 13:55:27

Q. Actually, it says "as of October, 2002," had you interviewed any other people to assist in connection with your Superman issues? 13:55:28 13:55:33 13:55:39

A. I -- 13:55:43

MR. TOBEROFF: Vague. 13:55:45

THE WITNESS: In what time frame are you talking about? 13:55:47 13:55:49

BY MR. PETROCELLI:

Q. Oh, in 2002. 13:55:51

A. 2002, I believe I spoke to some people on the phone, you know, following things that I found on the Internet to try and see whether, you know, whether the firm was taking on new clients or something like that. 13:55:55 13:56:00 13:56:03 13:56:06

Q. Who did you speak to? 13:56:08

A. You know, I would have to see whether I can remember that. You know, this period of time is not all that easy for me to recall. 13:56:10 13:56:16 13:56:18

Q. You did speak to some lawyers? 13:56:20

A. I don't know whether I spoke directly to like the lawyer or whether I was speaking to an associate. I really don't remember. 13:56:23 13:56:26 13:56:30

Q. Did you speak to any -- 13:56:32

A. But I wasn't particularly interested in them, so it didn't kind of lodge itself in my memory. 13:56:33 13:56:35

Q. Why did you call them if you weren't interested in them? 13:56:38 13:56:40

A. No. I mean after talking and, you know, just getting a feel for, you know, it was a company that did have a conflict of interest or they were closely aligned with a lot of studios, and it just didn't seem to feel like a good fit for us. 13:56:41 13:56:44 13:56:47 13:56:50 13:56:54

Q. Is it fair to say that you contacted entertainment lawyers in town? 13:56:56 13:57:00

A. Yes. 13:57:02

Q. Okay. And you obtained their names from Internet work that you did? 13:57:02 13:57:08

A. Well, you know, I had interviewed a lot of entertainment attorneys prior to retaining Gang Tyre, so I had already talked to and eliminated a number of 13:57:09 13:57:15 13:57:21

people a couple of years before this. So, you know, during -- from that search I already had knowledge of people not to bother to contact this time. 13:57:25 13:57:30 13:57:34

Q. You didn't go back to the people you had eliminated; right? 13:57:36 13:57:38

A. No, no, because at that time we interviewed a lot of people. 13:57:40 13:57:43

Q. Can you remember the names of any of the firms that you contacted? 13:57:44 13:57:47

A. Yeah. There was somebody at William Morris. There were some -- God, what was the -- I remember the office. There was an office on Olympic where there was a fairly large firm. 13:57:48 13:57:52 13:57:57 13:58:00

Q. Is that Mitchell, Silberberg & Knupp? 13:58:02

A. It could have been. It could have been. I think there was somebody in that office. My ex-husband had been asking around. He's an attorney, so he asked some people for referrals. 13:58:05 13:58:07 13:58:10 13:58:13

Q. We're now talking about 2002. 13:58:16

A. No. I'm talking about prior to retaining Gang Tyre in 1999. 13:58:18 13:58:22

Q. Those are the folks that you contacted and eliminated. 13:58:24 13:58:28

A. Correct. 13:58:28

Q. Someone at William Morris and someone -- 13:58:29

A. There were probably at least five to seven. Oh, what was the name of that guy? We talked to Joel Gotler. 13:58:32 13:58:37 13:58:43

Q. Again, in '97? 13:58:43

A. No. '99. 13:58:45

Q. '99. Excuse me. Right. 13:58:46

A. Yeah. I know we talked -- we met quite a bit with Joel Gotler several times but ultimately decided not to hire him and went with Gang Tyre. 13:58:48 13:58:52 13:58:55

Q. Now going to 2002, other than Mr. Toberoff, can you search your memory and tell me the names of any firm or person that you contacted? 13:58:58 13:59:04 13:59:08

A. I can think about it, but right now I can't remember specifically. 13:59:10 13:59:13

Q. Do you have some notes at home about this? 13:59:16

A. Possibly. 13:59:21

Q. Do you remember whether you actually met anyone in person other than Mr. Toberoff? 13:59:22 13:59:25

A. I don't think so. 13:59:28

Q. Do you know whether your mother spoke to other people other than Mr. Toberoff in 2002? 13:59:30 13:59:33

A. I don't remember her mentioning anyone specific. 13:59:40 13:59:48

Q. What happened after the discussion with Mr. Toberoff at the offices of Endeavor? What was the 13:59:49 13:59:55

next thing that happened regarding your entering into an agreement with Mr. Toberoff and Mr. Emanuel? 13:59:58 14:00:00

A. Well, we were -- we were very impressed with Mr. Toberoff's history of commitment to helping authors and his, you know, knowledge of intellectual property issues, and we found a rapport with him that we hadn't found with people that we had historically spoken to, whether it was in 1999 or whenever, you know. So it felt -- it felt comfortable. 14:00:05 14:00:11 14:00:20 14:00:24 14:00:30 14:00:33 14:00:36

Q. So what was the next step then after the discussion at Endeavor? 14:00:41 14:00:46

A. Well, it was a discussion with my mom about, you know, what was our comfort level. 14:00:47 14:00:50

Q. I see. 14:00:52

A. And so after that, I think we got back to him and we asked to -- oh, yeah. This is when we asked to see copies of briefs, things that he had done for other clients, because we wanted to get a feel for the quality of his work, his legal work. 14:00:53 14:00:59 14:01:03 14:01:08 14:01:13

Q. Did you get them? 14:01:16

A. Yes. 14:01:16

Q. What were they? Do you remember? 14:01:16

A. Well, they were specific to cases that he had handled, and we liked them. 14:01:18 14:01:25

Q. How did you request them? 14:01:27

A. A verbal request. 14:01:31

Q. Over the telephone? 14:01:33

A. I think we asked him in that -- in that meeting, either in that meeting or over the telephone. 14:01:34 14:01:37

Q. How long thereafter did you receive these materials? 14:01:40 14:01:43

A. Very quickly. 14:01:43

Q. How did you receive them? 14:01:45

A. Well, there was a big stack of them, so I think they came in the mail. 14:01:48 14:01:51

Q. And did you read them? 14:01:55

A. Yes. 14:01:57

Q. Did you have anyone else take a look at them? 14:02:00

A. My mother looked at them. 14:02:02

Q. Did you have anyone else like Mr. Levine or Mr. -- 14:02:05 14:02:09

A. George might have looked at them. 14:02:09

Q. George. 14:02:11

A. George might have looked at them. 14:02:12

Q. You would have e-mailed them to him? 14:02:14

A. No, because they didn't have it in electronic form. You know, if there -- if there was something that I had a question about, I may have faxed, you know, one of the briefs to him or something. 14:02:17 14:02:19 14:02:22 14:02:26

Q. Do you remember what the specific documents 14:02:31

were that you received and reviewed? 14:02:33

A. Are you asking me what the cases were? 14:02:38

Q. Or anything you can recall about them. 14:02:40

A. I -- I believe that one of them was -- maybe it was a motion for summary judgment, and there were -- there were -- you know, there were various briefs. They weren't all the same type of brief, which was kind of, you know, reassuring because I think my mom and I both wanted to get an idea for how his -- how his mind worked, and so this told us, you know, his approach and how he argues things having to do with intellectual property. 14:02:42 14:02:46 14:02:50 14:02:53 14:02:55 14:02:58 14:03:03 14:03:07 14:03:11

Q. Did you -- were they copyright termination cases on behalf of similarly situated authors or heirs? 14:03:13 14:03:17 14:03:22

A. I don't think they were copyright termination. 14:03:22 14:03:26

Q. You still have those papers at your home? 14:03:27

A. Could be. 14:03:29

Q. Okay. What was the next thing that happened after you reviewed those materials that he sent you? 14:03:32 14:03:34

A. We called him back and -- 14:03:38

Q. A telephone call? 14:03:42

A. Meaning my mother and I, yes. I don't know whether we were both on the phone or what, but, you 14:03:43 14:03:47

know, either one or both of us said that we were, you know, interested in him representing us. 14:03:50 14:03:55

Q. What happened next? 14:03:59

A. I think, you know, he said he was delighted, and, you know, beyond that, I think we got into discussing matters relating to our case. 14:04:02 14:04:07 14:04:10

Q. What happened next? 14:04:14

A. We formalized our arrangement. 14:04:18

Q. And then you signed what we previously saw as Exhibit 45? 14:04:21

A. Was that the -- 14:04:28

Q. Is that 46? What's the exhibit number? 14:04:29

A. This one? 14:04:31

Q. Let me see. 14:04:32

A. 45. 14:04:33

Q. 45. Okay. 14:04:34

A. Yes. 14:04:37

Q. Which is the document that's dated as of October 3, 2002; correct? 14:04:39 14:04:43

A. Correct. 14:04:47

Q. Now -- 14:04:50

A. But the -- you know -- well -- 14:04:50

MR. TOBEROFF: Wait for the question. 14:04:53

THE WITNESS: I was just going to say -- 14:04:55

MR. TOBEROFF: Wait. 14:04:56

BY MR. PETROCELLI: 14:04:57

Q. Now, prior to your getting this document, you had to have some discussion about the role of Ari Emanuel. 14:04:58 14:05:04 14:05:08

A. Yes. 14:05:09

Q. Given that you're not -- you were not given a litigation retainer agreement of the sort that you filed in 2004, but you're given a -- 14:05:09 14:05:13 14:05:15

MR. TOBEROFF: Signed. 14:05:19

BY MR. PETROCELLI:

Q. -- representation -- 14:05:20

Excuse me? 14:05:21

MR. TOBEROFF: You said "filed" in -- 14:05:22

MR. PETROCELLI: Thank you. 14:05:24

Q. Given that you did not receive and then sign a litigation agreement in 2002, but instead received and ended up signing this particular agreement, Exhibit 45 -- 14:05:25 14:05:28 14:05:33 14:05:37

A. Yes. 14:05:37

Q. -- with a company called IP Worldwide signed by Mr. Emanuel and Mr. Toberoff, at some point in your chronology -- 14:05:38 14:05:42 14:05:50

A. Um-hum. 14:05:50

Q. -- there had to have been some discussion about Mr. Emanuel; is that right? 14:05:51 14:05:54

A. Yes. 14:05:56

Q. Okay. And prior to signing this document, Exhibit 45, did you meet Mr. Emanuel? 14:05:57 14:06:02

A. I believe we did. 14:06:04

Q. Okay. And did your mother meet him? 14:06:06

A. Yes. 14:06:08

Q. Where did you meet him? 14:06:09

A. At Endeavor. 14:06:10

Q. Again, before signing Exhibit 45; right? 14:06:12

A. I believe so. 14:06:15

Q. Okay. And who else was present at that meeting? 14:06:16 14:06:18

A. My mother, I was there, Mr. Emanuel, and Mr. Toberoff. 14:06:20 14:06:25

Q. Okay. And this is the first time you met Mr. Emanuel? 14:06:25 14:06:29

A. Yes. 14:06:30

Q. And did you have a draft of this agreement, Exhibit 45, as of the date of your meeting with Mr. Emanuel? 14:06:31 14:06:38 14:06:41

A. I don't believe so. 14:06:42

Q. And what was discussed at that meeting? 14:06:44

A. Well, since that was the first time we were meeting Mr. Emanuel, we wanted to know what his vision was of the character and what he thought he might, you 14:06:53 14:06:57 14:07:01

know, bring to us as a representative.

Q. Did you ask Mr. Emanuel about the nature of his relationship with Mr. Toberoff and their business, IPW, and what work they had done together or whether this was their maiden voyage and, you know, things like that?

A. No, because we knew that Ari's reputation was huge. He had, you know, a long -- a long-term, you know -- what am I trying to say? He had a long-term high profile in the entertainment industry, and, you know, that was -- those were his credentials. We had researched Mr. Toberoff's credentials. We were looking at them as two individuals who would be serving different functions for us, but they were united, so we were kind of getting a two for one in the deal in a sense.

Q. A dynamic duo.

A. Yes.

Q. Okay.

A. You could say that.

Q. Now, as of the time --

MR. TOBEROFF: That's a competing property.

MR. PETROCELLI: I understand.

THE WITNESS: I know. You know, dynamic duo. I hear that.

14:07:06
14:07:10
14:07:16
14:07:19
14:07:22
14:07:25
14:07:26
14:07:33
14:07:38
14:07:42
14:07:46
14:07:52
14:07:55
14:07:59
14:08:02
14:08:05
14:08:06
14:08:08
14:08:10
14:08:10
14:08:13
14:08:17
14:08:20
14:08:21
14:08:22

MR. PETROCELLI: Or we could go Clark Kent, Superman, you know, either way. 14:08:25 14:08:26

Q. From the time that you first met Mr. Toberoff until the meeting with Mr. Toberoff and Mr. Emanuel -- 14:08:28 14:08:32

A. Um-hum. 14:08:35

Q. -- what's a -- how long did that take in between? 14:08:36 14:08:40

A. Not very long. 14:08:40

Q. A week? 14:08:41

A. Possibly. 14:08:43

Q. Okay. And again, that was also at the offices of Endeavor? 14:08:44 14:08:48

A. Correct. 14:08:49

Q. And no one else was there except the four of you; right? 14:08:49 14:08:53

A. No, because we went in at this -- for that meeting we went into Mr. Emanuel's office. It wasn't in a conference room. It was in Mr. Emanuel's office. 14:08:53 14:08:56 14:09:01

Q. But did anybody else participate at all in any part of the meeting? 14:09:04 14:09:06

A. No. 14:09:08

Q. Like anybody else from his agency come in? 14:09:08

A. No. 14:09:11

Q. Okay. Now, did you understand that you were doing this deal with Mr. Emanuel as part of IP 14:09:11 14:09:17

Worldwide or Mr. Emanuel as part of Endeavor or both? 14:09:23

A. No. By that time, you know, we understood that, you know, that the intellectual property aspects that we were interested in, you know, was under this heading of IP Worldwide. 14:09:27 14:09:31 14:09:36 14:09:40

Q. Okay. Did you understand that Endeavor, the talent agency, was somehow involved in your agreement with IP Worldwide, or was it just Ari Emanuel and Mr. Toberoff? 14:09:44 14:09:47 14:09:52 14:09:58

A. I believe that Endeavor was going to supply some support services, but, you know, it was Ari Emanuel that we were interested in. We weren't interested in Endeavor. 14:09:59 14:10:01 14:10:09 14:10:11

Q. Okay. 14:10:16

Now, by the time of this meeting, and indeed by the time of your first meeting with Mr. Toberoff -- 14:10:17 14:10:20

A. Um-hum. 14:10:24

Q. -- you had already heard that Mr. Toberoff and Mr. Emanuel had presented an offer to your prior counsel, Mr. Marks; right? 14:10:26 14:10:29 14:10:38

A. Yes. 14:10:40

Q. Okay. And an offer to acquire the property; correct? 14:10:43 14:10:45

A. It was an offer to -- I believe to market the property. 14:10:48 14:11:01

Q. An offer to market the property to whom? 14:11:01
A. You know, I mean I don't have, you know, 14:11:06
anything in front of me right now. I'm trying to 14:11:09
recall the exact terminology, but to represent -- to 14:11:12
represent us concerning our rights. 14:11:18
Q. Now, when you heard that Ari Emanuel and Marc 14:11:21
Toberoff had approached Kevin Marks, it was -- 14:11:26
correct? 14:11:31
A. Yes. 14:11:31
Q. When you learned that Ari Emanuel and Marc 14:11:32
Toberoff had approached Kevin Marks about, as you just 14:11:37
put it, representing the property for purposes of 14:11:40
marketing it, was that before or after Jean Peavy gave 14:11:46
your mother the name of Marc Toberoff? 14:11:55
A. I don't recall exactly, but it must have been 14:12:03
kind of like all around the same time. 14:12:08
Q. Well, if Jean Peavy is giving the name of 14:12:11
Marc -- 14:12:14
A. No, no, no. It had to be after. 14:12:15
Q. So Jean Peavy -- just to get the sequence 14:12:17
straight, Jean Peavy gives the name of Marc Toberoff 14:12:21
to your mother. You and your mother then do some due 14:12:23
diligence on Marc Toberoff. 14:12:29
A. Right. 14:12:30
Q. And right around that same period of time 14:12:30

when you're doing this due diligence about Marc Toberoff, you suddenly hear that Marc Toberoff and Ari Emanuel have contacted Kevin Marks? 14:12:33 14:12:39 14:12:44

A. No, no. That's why I said, after you said that, that it had to have -- we -- we did not know of Marc Toberoff, to my recollection, of Marc Toberoff or Ari Emanuel independently of the information that we were given by Kevin Marks. We were in the process of looking for other attorneys during that period of time. 14:12:46 14:12:48 14:12:54 14:12:59 14:13:01 14:13:06 14:13:10

Q. So -- 14:13:10

A. So we had already -- you know, in March we had contacted Gerry Spence. We were looking at various people. 14:13:11 14:13:13 14:13:16

Q. And you said March because you saw the file recently. 14:13:16 14:13:19

A. A couple of days ago. 14:13:20

Q. That had the date on it. You would never have remembered that; correct? 14:13:21 14:13:25

A. No, I would not have remembered it. 14:13:27

Q. So in March you contacted Gerry Spence. He had a conflict. So continue. 14:13:29 14:13:33

A. Yeah. So we were thinking about other attorneys. At what point my mom revealed to Jean that we were looking for other attorneys and she mentioned 14:13:33 14:13:37 14:13:39

his name, I'm not sure. However, logic tells me that it must have been after it was -- it was already mentioned to us, you know, that Kevin Marks had received contact from them because the name didn't ring a bell. You know, it just -- 14:13:43 14:13:52 14:13:57 14:14:00 14:14:03

Q. I'm getting confused about the sequence, and I want to be clear about this. 14:14:07 14:14:09

A. Well, I'm confused about the sequence too. 14:14:10

Q. Okay. Well, maybe we can see if we can do the best we can to get the best recollection you have on this. 14:14:13 14:14:15 14:14:18

A. Um-hum. 14:14:18

Q. What happened first is the question -- okay? -- your learning about Marc Toberoff from your mother and your mother calling him up and you're checking him out on the Internet or your learning about Marc Toberoff and Ari Emanuel from Kevin Marks? 14:14:21 14:14:23 14:14:31 14:14:35 14:14:40

A. I would be guessing. I can't -- I can't 100 percent say. But -- 14:14:48 14:14:57

Q. Well, when you had -- if Jean Peavy had told your mother about a guy named Marc Toberoff -- 14:15:00 14:15:11

A. Well, she said "I've got a lawyer." 14:15:15

Q. -- you would have said, "Oh, that's the same guy that Mark -- Kevin Marks just told us about, and he's with Ari Emanuel," and you would have made that 14:15:17 14:15:19 14:15:24

connection; correct? 14:15:28

A. It sounds that way. I don't remember it that way, but as I said, logic sort of says that that would probably be the case. 14:15:28 14:15:31 14:15:33

Q. So then did you ask yourself why is a guy that we're thinking about hiring as a lawyer calling Kevin Marks and presenting himself as a person who will market a property? 14:15:34 14:15:37 14:15:42 14:15:45

A. You know, what Kevin Marks told us was that Marc Toberoff was a lawyer, you know, who was partnered with a Hollywood agent. You know, it didn't seem to us that he was recommending him as anything. He wasn't recommending him at all. You know, he was simply relaying to us that there was an intellectual property lawyer named Marc Toberoff who was partnered with a Hollywood agent, you know, named Ari Emanuel. 14:15:48 14:15:53 14:15:57 14:16:00 14:16:06 14:16:09 14:16:14 14:16:16

Q. And that they had called him to -- 14:16:21

A. They had called him to see what the status was of the Superman. 14:16:23 14:16:25

Q. Well, let's be clear. Mr. Marks -- Mr. Marks didn't tell you that Marc Toberoff called him and said, "Hey, Mr. Marks, I'm a lawyer, and I want to take your client away from you." 14:16:28 14:16:32 14:16:35 14:16:38

A. He didn't -- 14:16:40

MR. TOBEROFF: Wait a second. 14:16:41

BY MR. PETROCELLI: 14:16:41
Q. He didn't say that to you; right? 14:16:42
A. Yes, that's right. 14:16:43
MR. TOBEROFF: I don't want you getting into --
THE WITNESS: I shouldn't be talking about -- 14:16:44
MR. TOBEROFF: -- the disclosure about what Mr. Marks said to you or didn't say other than broad subjects. 14:16:45 14:16:47 14:16:51
THE WITNESS: Okay. 14:16:52
BY MR. PETROCELLI:
Q. But you have already testified that what Mr. Marks told you is that these were two people who were calling about marketing the property; correct? 14:16:52 14:16:56 14:16:58
A. He didn't tell us anything. He wrote something to us in the mail. 14:17:02 14:17:06
Q. Okay. You received that by way of a written communication. 14:17:08 14:17:10
A. Correct. 14:17:10
Q. A letter? 14:17:11
A. Yes. 14:17:12
Q. Okay. Do you have a copy of it? 14:17:14
A. I believe so. 14:17:18
Q. When is the last time you saw it? 14:17:19
A. It's been quite a while. 14:17:21

EXHIBIT 24

Q. And did Mr. Marks convey to you -- by the way, to whom was the letter addressed? 14:17:23 14:17:33

A. To my mother and to me. 14:17:35

Q. And so he would have mailed -- he mailed two copies, one to you and one to your mother at the separate addresses? 14:17:37 14:17:41 14:17:44

A. Yeah, I would think so. 14:17:45

Q. Okay. 14:18:03

Hold on one second. 14:18:04

(Pause in proceedings.) 14:18:23

BY MR. PETROCELLI:

Q. Did -- 14:18:25

So I'm sorry. I'm trying to get some information from my colleagues so I can frame my next question. 14:18:26 14:18:29 14:18:33

Did -- I apologize for asking you again, but did you say you received a copy at your home and your mother also received a copy? 14:18:36 14:18:38 14:18:42

A. Yes. 14:18:43

Q. Okay. 14:18:44

A. However, my mother -- 14:18:52

MR. TOBEROFF: Hey, there's no question pending. 14:18:53 14:18:54

THE WITNESS: Okay. 14:18:55

BY MR. PETROCELLI:

Q. Did you -- have you seen that letter in the last week? 14:18:57 14:18:59

A. No. 14:18:59

MR. TOBEROFF: Asked and answered. 14:19:00

BY MR. PETROCELLI:

Q. Now, the letter said that an offer had been made? 14:19:01 14:19:11

MR. TOBEROFF: I instruct you not to answer as to the contents of the attorney-client communication. I allowed you to broadly speak about the subject matter. 14:19:11 14:19:13 14:19:17 14:19:20

BY MR. PETROCELLI:

Q. Did the letter state that Mr. Toberoff and Mr. Emanuel were themselves seeking to acquire the interest in your Superman rights? 14:19:21 14:19:28 14:19:36

MR. TOBEROFF: Attorney-client privilege. Instruct you not to answer. 14:19:38 14:19:39

BY MR. PETROCELLI:

Q. Did the letter say that Mr. Toberoff and Mr. Emanuel had a wealthy investor who might be interested in acquiring your rights? 14:19:41 14:19:49 14:19:56

MR. TOBEROFF: Same instruction and objection. 14:19:58 14:20:00

BY MR. PETROCELLI:

Q. Did the letter indicate that such an investor 14:20:01

was willing to pay much more money than the last offer Warner Bros. and DC Comics had made to you? 14:20:04 14:20:11

MR. TOBEROFF: Same objection. Same instruction. 14:20:16 14:20:16

BY MR. PETROCELLI:

Q. Did the letter indicate that such an investor or party was interested in paying as much as $15 million -- 14:20:16 14:20:22 14:20:27

MR. TOBEROFF: Same objection. Same instruction. 14:20:27 14:20:29

BY MR. PETROCELLI:

Q. -- plus additional terms including a back end if a movie was made? 14:20:29 14:20:31

MR. TOBEROFF: Same objection. Same instruction. 14:20:33 14:20:39

BY MR. PETROCELLI:

Q. What did you do after you got the letter? 14:20:39

MR. TOBEROFF: Vague as to -- calls for a narrative. 14:20:45 14:20:48

BY MR. PETROCELLI: 14:20:50

Q. You understand what I'm asking you; right? It's not like did you go get a cup of coffee. What did you do in reference to the letter? 14:20:50 14:20:52 14:20:55

A. My mother got it several days before I did because I was out of town. 14:20:57 14:20:59

Q. Okay. Did she discuss it with you? 14:21:00
A. When I was back, yes. 14:21:03
Q. What did she say to you? 14:21:04
MR. TOBEROFF: You can only talk about that discussion to the extent you're not revealing the contents of Mr. Marks' communication considering you were both represented by the same attorney. 14:21:07 14:21:09 14:21:12 14:21:18
BY MR. PETROCELLI:
Q. What did she say to you? 14:21:19
A. She was surprised. 14:21:21
MR. TOBEROFF: Object -- oh, you're answering subject to my instruction; correct? 14:21:23 14:21:24
THE WITNESS: Yes. 14:21:26
MR. TOBEROFF: Okay. Go ahead. 14:21:27
BY MR. PETROCELLI:
Q. And did -- what was she surprised about? 14:21:29
A. She was surprised to receive this information. 14:21:38 14:21:42
Q. What about the information surprised her? 14:21:43
MR. TOBEROFF: You can answer so long as you're not divulging the contents of the attorney-client communication. 14:21:49 14:21:51 14:21:55
THE WITNESS: I know. Well, I'm thinking about it. 14:21:56 14:21:57
I don't think there's anything that I could 14:22:03

say that would not divulge attorney-client privilege. 14:22:05
BY MR. PETROCELLI:
Q. There was no attorney present during that 14:22:09
conversation with your mother. 14:22:11
A. No, but -- okay. Maybe I'm -- 14:22:13
MR. TOBEROFF: She's following my 14:22:15
instruction. 14:22:16
MR. PETROCELLI: Okay. I just want the 14:22:16
record to be clear that -- 14:22:19
THE WITNESS: I don't want to -- I maybe used 14:22:21
the wrong term. 14:22:23
BY MR. PETROCELLI:
Q. This is just you and your mom talking; right? 14:22:24
A. Yes. 14:22:26
Q. When you got the letter, had you already by 14:22:38
that time heard of Mr. Toberoff? 14:22:44
MR. TOBEROFF: Asked and answered. 14:22:46
MR. PETROCELLI: It was not asked and 14:22:49
answered. It doesn't matter. 14:22:50
THE WITNESS: I don't believe so. But as I 14:22:53
said, that particular time for me, you know, what the 14:22:56
sequence of events was, I don't recall exactly. 14:23:00
BY MR. PETROCELLI: 14:23:05
Q. So in your view, was it a complete 14:23:05
coincidence that you got a letter about a man named 14:23:10

Toberoff who was interested in marketing the property and then around the same time your mother gets a call from Jean Peavy about a man named Toberoff? 14:23:14 14:23:19 14:23:23

MR. TOBEROFF: Misstates the record and lacks foundation. 14:23:26 14:23:29

THE WITNESS: If I had heard of Toberoff previous -- you know, prior to any communication, it was only when I was doing kind of generic research of who were lawyers who specialized in intellectual property. So it wasn't -- it wasn't as if I was, you know, I was looking for research on Marc Toberoff at that point. If you go to Martindale Hubbell or something and you type in a specialty and you look to see what lawyers are available, that's the kind of research that I was initially doing. 14:23:31 14:23:34 14:23:38 14:23:42 14:23:46 14:23:49 14:23:56 14:23:59 14:24:01 14:24:06

BY MR. PETROCELLI:

Q. So you would have done that research, then, prior to having received this letter mentioning the name Marc Toberoff. 14:24:09 14:24:12 14:24:15

A. Generic research I would have done prior to. 14:24:16

Q. Which meant that your mother would have received the call about Toberoff, again, prior to your having gotten this letter. 14:24:19 14:24:21 14:24:25

A. No, not necessarily. What I was saying is that as far back as when I was contacting Gerry 14:24:26 14:24:30

Spence, I was researching to see what types of lawyers who, you know, might be able to help us existed generically. You know, I wasn't looking up Mr. Toberoff. And so I think your question was asking me was I looking for Mr. Toberoff because Jean Peavy had mentioned his name.

Q. No. I think you misunderstood my question.

A. Okay.

Q. And/or I miscommunicated it, so I apologize.

When you did your Internet search on Mr. Toberoff, that wasn't because you were searching entertainment lawyers and his named popped up. That was because your mother had mentioned that Jean had given her that name and you were specifically looking into that person; correct?

A. When I looked specifically for him.

Q. Okay. And when you had done your generic search that yielded the name Gerry Spence, for example --

A. Um-hum.

Q. -- you hadn't come across Mr. Toberoff's name at that point in time; correct?

A. I may have in terms of lawyers in the Los Angeles area that handled intellectual property.

Q. But you don't specifically recall having done

14:24:33 14:24:37 14:24:43 14:24:46 14:24:50 14:24:53 14:24:54 14:24:56 14:24:57 14:24:59 14:25:02 14:25:06 14:25:08 14:25:11 14:25:14 14:25:15 14:25:18 14:25:22 14:25:25 14:25:25 14:25:26 14:25:29 14:25:30 14:25:34 14:25:36

so, and if you did, you didn't follow up on it; correct? 14:25:38 14:25:41

A. Yeah. I didn't put a gold star next to his name and immediately do something, you know. 14:25:42 14:25:44

Q. But you did put a gold star next to Gerry Spence's name. 14:25:46 14:25:51

A. Yes, but my mom put a gold star next to Gerry Spence's name. 14:25:51 14:25:53

MR. TOBEROFF: They liked the jacket. 14:25:53

THE WITNESS: Yep. Well, my mom had seen him like on CNN or something, and, you know -- 14:25:55 14:25:57

MR. TOBEROFF: He's got the gift. 14:26:02

MR. PETROCELLI: I won't comment. 14:26:05

THE WITNESS: I can read into that. 14:26:08

BY MR. PETROCELLI:

Q. Now, when you did your search, by the way, back in '99 and interviewed all those lawyers, Marc Toberoff wasn't one of them; correct? 14:26:15 14:26:20 14:26:24

A. No. 14:26:25

Q. In fact, his name didn't even come up; right? 14:26:25

A. No. 14:26:28

Q. Is that correct? 14:26:28

A. That's correct. 14:26:28

Q. Okay. So getting back to the sequence here, you -- by the time you had first spoken to your 14:26:37 14:26:47

mother -- excuse me. You received this letter from Kevin Marks mentioning Marc Toberoff and Ari Emanuel after your mother had told you the name Marc Toberoff that she had received from Jean Peavy; correct? 14:26:51 14:26:56 14:27:01 14:27:05

A. As I said, I can't testify for sure. 14:27:07

Q. Do you know the date of the letter that you received from Mr. Marks that mentioned Mr. Toberoff? 14:27:27 14:27:31

A. I haven't seen it in a long time. 14:27:34

Q. Now, again -- 14:27:36

A. No. The answer is no. 14:27:40

Q. -- I'm trying to press your recollection on this. But when you first saw the letter or heard about it from your mother that mentioned Mr. Toberoff and Mr. Emanuel, do you have a state of mind or did you have a state of mind at the time that this is the same person that you had already looked into and indeed had already contacted? 14:27:41 14:27:44 14:27:49 14:27:51 14:27:55 14:27:59 14:28:02

A. No. As I said, there may have been some generic information. 14:28:04 14:28:11

Q. So by the time that Jean Peavy gave your mother the name of Marc Toberoff, you would have associated it with the same name you had seen in Mr. Marks' letter; right? 14:28:12 14:28:16 14:28:22 14:28:27

A. I really don't recall. 14:28:28

Q. Did you -- you said your mother was surprised 14:28:48

when she got the letter. 14:28:59

A. Um-hum. 14:29:01

Q. What -- what did you do next with respect to the letter? So, for example, did you contact Mr. Marks? 14:29:02 14:29:07 14:29:16

A. Possibly. 14:29:16

Q. Were you interested in pursuing the Toberoff/Emanuel proposal or introduction that was set forth in the letter? 14:29:21 14:29:33 14:29:36

MR. TOBEROFF: When they first -- 14:29:39

BY MR. PETROCELLI:

Q. Yeah. You saw the letter. The letter says, you know, "These people called me and they're interested in" whatever it is they said, and were you and your mom interested in pursuing it? 14:29:41 14:29:44 14:29:45 14:29:50

A. We wanted to know what it was all about. 14:29:53

Q. Okay. And did you find out what it was all about? 14:29:57 14:30:00

A. Eventually. 14:30:00

Q. How did you find out? 14:30:01

A. Through the contact that we had with Mr. -- Mr. Toberoff and then Mr. Emanuel when my mother placed a call to him and began to ask him some questions. 14:30:04 14:30:11 14:30:16 14:30:18

Q. So by the time that your mother placed that 14:30:18

call, you had already had the letter from Mr. Marks and were able to follow up on it? 14:30:21 14:30:24

A. I don't know whether it was following up on that. I'm just -- you asked me how I got information about them, and I'm just talking in general terms. 14:30:26 14:30:28 14:30:32

Q. Did you get any information from Mr. Marks beyond that letter? 14:30:34 14:30:39

A. I can't recall any. 14:30:43

Q. Did you have -- did you give Mr. Marks any directions or instructions with respect to that letter? 14:30:48 14:30:55 14:31:01

A. No. 14:31:03

Q. Did you -- did Mr. Marks tell you that if you pursued any arrangement with Mr. Toberoff or Mr. Emanuel, that it posed any legal risk to you? 14:31:04 14:31:26 14:31:30

MR. TOBEROFF: Excuse me. I instruct you not to answer. Attorney-client privilege. 14:31:34 14:31:36

BY MR. PETROCELLI:

Q. Did he tell you that he might be called upon to testify and might have to testify in a way that was not helpful to you? 14:31:38 14:31:41 14:31:45

MR. TOBEROFF: Same objection. Same instruction. 14:31:46 14:31:49

BY MR. PETROCELLI:

Q. After receiving that letter did you 14:31:49

immediately fire Mr. Marks? 14:31:52

MR. TOBEROFF: Which letter? 14:31:54

MR. PETROCELLI: The letter that she received, that your mother received, talking about Mr. Toberoff and Mr. Emanuel. 14:31:55 14:31:57 14:31:59

THE WITNESS: Not immediately. 14:32:01

BY MR. PETROCELLI:

Q. Did you receive any other letters from Mr. Marks regarding Mr. Toberoff and Mr. Emanuel except that one that you have already described? 14:32:03 14:32:09 14:32:12

A. I don't believe so. 14:32:14

Q. Did you have any meetings with Mr. Marks following your receipt of that letter, a copy of which your mother also received? 14:32:17 14:32:22 14:32:26

A. I'm trying to reconstruct the time frame. 14:32:30

I don't remember whether we had a meeting with him. 14:32:46 14:32:48

Q. Or with Mr. Ramer? Do you remember that? 14:32:50

A. We almost never saw Mr. Ramer, so I know it wouldn't have been with Mr. Ramer. 14:32:53 14:32:57

Q. Mr. Marks by then was your lead lawyer? 14:32:58

A. Yes. 14:33:01

Q. Okay. Did you discuss the letter with anyone -- with anyone after you received it other than your mother? 14:33:06 14:33:12 14:33:14

A. We may have discussed it with George. 14:33:23
Q. Did you send George a copy of the letter? 14:33:27
A. I don't recall. 14:33:29
Q. Did you discuss it with Jean Peavy? 14:33:36
A. No. 14:33:43
Q. You had learned at some point that Jean Peavy had retained Mr. Toberoff at an earlier point in time; correct? 14:33:43 14:33:46 14:33:50
A. Yes. When my mom had the conversation with Jean, Mr. Toberoff was already her attorney. 14:33:51 14:33:54
Q. Did Mr. -- did Ms. Peavy tell you that she had entered into a joint venture agreement with Mr. Toberoff's company, Pacific Pictures Corporation? 14:33:58 14:34:03 14:34:06
A. No. 14:34:12
Q. Did she share any of her agreements with you or your mother? 14:34:12 14:34:16
A. No. 14:34:17
Q. Her agreements with Mr. Toberoff's company? 14:34:18
A. No. 14:34:28
Q. When did you first -- so when you first contacted Mr. Toberoff, it was your belief that he was already a lawyer working with the Shusters? 14:34:28 14:34:36 14:34:42
A. Yes. I -- you know, if that's the correct sequence. I'm trying to remember. 14:34:45 14:34:52
Q. You're not sure of the exact sequence. 14:34:54

A. I'm not sure, no. 14:34:57

Q. Okay. I appreciate that. 14:34:57

A. In general, you know. 14:34:59

Q. Did you sign any conflict documents in 2002 having to do with Mr. Toberoff's relationship with the Shusters? 14:35:05 14:35:08 14:35:18

MR. TOBEROFF: Don't discuss the contents of the conflict waivers. 14:35:18 14:35:20

BY MR. PETROCELLI:

Q. You can answer that question. 14:35:25

A. Well, no, I'm trying to remember. There -- you know, since this was 2002 and there was a conflict waiver that accompanied this, so yes, we did sign a conflict waiver in 2002. 14:35:26 14:35:30 14:35:35 14:35:39

Q. And did that conflict waiver that you signed in 2002, was that a conflict waiver with IP Worldwide or with The Law Offices of Marc Toberoff, or do you not remember? 14:35:41 14:35:43 14:35:48 14:35:51

A. I don't remember. 14:35:52

Q. Okay. And did it have anything to do with the Shusters? 14:35:56 14:36:01

A. I -- well, I don't remember. 14:36:01

MR. TOBEROFF: Don't discuss what the conflict waiver -- excuse me. Don't discuss the substance of the conflict waiver. It's privileged. 14:36:03 14:36:06 14:36:08

THE WITNESS: Besides, I don't remember. 14:36:10

MR. TOBEROFF: It's moot. 14:36:16

BY MR. PETROCELLI:

Q. Were you ever shown a copy of Mr. Toberoff's agreements with the Shuster family? 14:36:27 14:36:33

A. No. 14:36:38

Q. Was your mother? 14:36:38

A. No. 14:36:41

Q. Do you know whether you requested that such agreements be made available to any other counsel on your behalf, like Arthur Levine or George? 14:36:41 14:36:44 14:36:48

A. No. 14:36:57

Q. Were you -- did you ever become aware that Mr. Toberoff owned a company called Pacific Pictures? 14:36:58 14:37:05

A. Not until your lawsuit. 14:37:09

Q. Prior to my lawsuit did you become aware that Mr. Toberoff through a company by whatever name entered into a joint venture where his company acquired 50 percent of the Shusters' termination interests? 14:37:13 14:37:20 14:37:23 14:37:26 14:37:29

A. No. 14:37:37

Q. Prior to reading our lawsuit did you ever become aware that the agreement Mr. Toberoff entered into with the Shuster family was void under the copyright statute? 14:37:38 14:37:45 14:37:53 14:37:59

A. I don't understand the question. 14:38:01
Q. That he had entered into an agreement with the Shuster family that violated a copyright statute? 14:38:05 14:38:07
A. I have no knowledge of anything like that. 14:38:13
Q. Are you aware that Mr. Toberoff has conceded in this case that his Pacific Pictures agreement with the Shuster family did not comply with the copyright statute? 14:38:20 14:38:24 14:38:30 14:38:36
A. No, I'm not aware of that. 14:38:36
Q. Did anything about -- were you aware prior to the filing of our lawsuit that Mr. Toberoff's Pacific Pictures agreement with the Shusters concerned Superboy as well as Superman? 14:38:53 14:39:04 14:39:12 14:39:21
A. I wasn't -- 14:39:22
MR. TOBEROFF: Wait. Lacks foundation. Assumes facts. 14:39:24 14:39:26
THE WITNESS: I wasn't conscious of any agreement. 14:39:27 14:39:31
BY MR. PETROCELLI:
Q. Since this lawsuit have you seen the written agreement that Mr. Toberoff's Pacific Pictures company entered into with the Shusters in 2001 relating to both Superman and Superboy? 14:39:31 14:39:38 14:39:43 14:39:47
A. I don't remember exactly what exhibits were shown to me in my previous depositions. So, you know, 14:39:51 14:39:54

I remember that there was some document that was shown to me, but exactly what it was, I really don't recall, but I -- you know, so I can't really answer your question. 14:40:00 14:40:05 14:40:10 14:40:14

Q. Okay. Was there anything about Mr. Marks' letter to you that discussed Mr. Toberoff and Mr. Emanuel that angered you or your mother? 14:40:17 14:40:21 14:40:26

MR. TOBEROFF: You can answer whether the letter angered you or your mother. 14:40:32 14:40:34

BY MR. PETROCELLI:

Q. Or upset you in some way. 14:40:36

MR. TOBEROFF: You can answer that. 14:40:38

THE WITNESS: We were kind of upset. 14:40:42

BY MR. PETROCELLI:

Q. Okay. How long after you received the letter that kind of upset you did you terminate Mr. Marks? 14:40:53 14:40:59

A. Well, I don't recall the date of his letter, so I can't really answer that. 14:41:07 14:41:10

Q. I appreciate you don't know the dates, but in terms of the passage of time, was it a day? Was it two days? Was it two months? Can you estimate for me? 14:41:12 14:41:15 14:41:18 14:41:22

A. I would say weeks, but I don't know how many weeks. 14:41:23 14:41:39

Q. Given that Mr. Marks' letter informed you 14:41:40

that Mr. Emanuel and Mr. Toberoff had an interest in marketing the property, I assume you discussed with both of Mr. Emanuel and Mr. Toberoff when you met with them both what that interest was? 14:41:45 14:41:50 14:41:57 14:42:01

A. Yes. 14:42:04

Q. Okay. And in that discussion did you inquire whether they had an investor who was interested in acquiring the property? 14:42:04 14:42:09 14:42:15

MR. TOBEROFF: You can answer as to your discussions with Mr. Emanuel. 14:42:16 14:42:18

THE WITNESS: Um-hum. 14:42:20

Ari gave us information, you know, relating to his offer, and, you know, I mean he, you know, he's a rich guy. He's got rich friends and you know, so he, you know, had -- had good connections, and it was interesting, but, you know -- 14:42:26 14:42:34 14:42:41 14:42:46 14:42:53

BY MR. PETROCELLI:

Q. Well, what did he say about his offer? What did you mean by "his offer"? 14:42:57 14:43:03

A. Well, he -- he offered to put a substantial amount of money up front and, you know, if he was able to negotiate, you know, a good deal for us, that we would have meaningful participation, and it sounded interesting. 14:43:04 14:43:09 14:43:15 14:43:23 14:43:32

Q. Let's be clear. This would be a deal whereby 14:43:32

EXHIBIT 24

you and your mom would sell your interest to Mr. Emanuel. 14:43:32 14:43:36

A. I don't believe we were selling our interest to him. 14:43:37 14:43:39

Q. What were you doing, then? Partnering with him? 14:43:40 14:43:45

A. That's more the feel that I got from it. 14:43:45

Q. Okay. So it wasn't like you were going to give up all your Superman interests and he would now own them. It was that there would be some business arrangement between the two of you where you would mutually exploit the property; correct? 14:43:48 14:43:50 14:43:53 14:43:56 14:43:59

A. Mutually benefit from it, I believe was the gist of it. 14:44:00 14:44:03

Q. And how much did Mr. Emanuel say that he would be willing to invest? 14:44:06 14:44:09

A. Well, I think it was in the range of 15 million. 14:44:14 14:44:17

Q. Okay. And did he identify anyone else who might co-invest with him? You said he had a lot of rich friends. 14:44:18 14:44:24 14:44:27

A. Um-hum. Well, he didn't give us specific names. 14:44:28 14:44:34

Q. Did he identify any other -- did he say anything about a Superman movie to you? 14:44:34 14:44:39

A. No, there was no mention of a movie. 14:44:41
Q. But if there were a movie that could be produced, then you might share in the exploitation of it? 14:44:43 14:44:46 14:44:49
A. On down the line if there was a movie. 14:44:50
Q. Okay. 14:44:52
MR. TOBEROFF: Are you referring to her understanding of what a deal would be with Mr. Emanuel or as to a conversation? 14:44:53 14:45:01 14:45:04
MR. PETROCELLI: I'm talking about the information she got from Mr. Emanuel at this meeting, her conversation. 14:45:07 14:45:08 14:45:12
Q. What happened -- 14:45:19
MR. TOBEROFF: Well, then vague as to that. 14:45:20
BY MR. PETROCELLI: 14:45:22
Q. What happened -- did you pursue with Mr. Emanuel this interest that he expressed? 14:45:22 14:45:35
A. My mother and I discussed it, and our feeling was that if he was willing to come up with 15 -- he or a group of people were willing to come up with $15 million, that that told us that the property was worth a lot more than that because why would he be willing to pay full value for it? And so in thinking about how we wanted to proceed, we thought that it would be better for us to simply have an arrangement 14:45:38 14:45:43 14:45:49 14:45:52 14:45:57 14:46:01 14:46:06 14:46:10

with him in which he would for a 10 percent or an agent's fee negotiate these things for us, you know, because his 10 percent of a much larger figure would be better for us in the long run financially. 14:46:14 14:46:20 14:46:23 14:46:28

Q. Did you then tell him at some point that you were not interested in doing an arrangement with him for the 15 million where he was a direct participant? 14:46:31 14:46:34 14:46:40

A. Yes. 14:46:44

Q. Was it at that meeting, or was it at a subsequent meeting? 14:46:44 14:46:48

A. I believe it was at a subsequent meeting. 14:46:48

Q. And did you inform him of your decision and your mother's decision not to do a deal with him where he was a principal as opposed to an agent prior to signing Exhibit 45, the IPW -- IP Worldwide agreement? 14:46:50 14:46:55 14:46:58 14:47:02

A. Yes. 14:47:08

Q. When you had this discussion with Mr. Emanuel in his office at Endeavor together with your mother -- I think you said Mr. Toberoff also was there? 14:47:13 14:47:17 14:47:21

A. Um-hum. 14:47:23

Q. -- did he confirm to you that he had presented this same proposal to Mr. Marks sometime before? 14:47:27 14:47:33 14:47:38

A. I believe he did. 14:47:38

Q. Okay. And did he tell you whether or not he 14:47:40

had ever heard back from Mr. Marks? 14:47:43
A. I don't recall him talking about it. 14:47:48
Q. Did you tell him that you had instructed Mr. Marks not to get back to him? 14:47:49 14:47:54
A. No. 14:48:02
Q. By the time of this meeting with Mr. Emanuel in his office talking about this arrangement, had you already terminated Mr. Marks? 14:48:03 14:48:09 14:48:12
A. Yes. 14:48:16
Q. Are you certain? 14:48:17
A. I believe so. It was -- it was right around the same time, because we're talking about September, you know, so sometime in September. 14:48:19 14:48:22 14:48:26
Q. Was $15 million the number that Mr. Emanuel mentioned to you more than any offer that DC Comics or Warner Bros. had previously presented to you? 14:48:32 14:48:37 14:48:44
A. Yes, I believe it was. 14:48:47
Q. Did Mr. Emanuel identify any other investors besides himself? 14:48:56 14:49:05
MR. TOBEROFF: Asked and answered. 14:49:06
You can answer. 14:49:08
THE WITNESS: No. 14:49:15
BY MR. PETROCELLI:
Q. Did you have an understanding that Mr. Emanuel -- from Mr. Emanuel's proposal about 14:49:16 14:49:21

$15 million and whatever other terms there were whether that would include some participation by Mr. Toberoff? 14:49:24 14:49:32 14:49:37

MR. TOBEROFF: Vague and ambiguous as to -- 14:49:38

THE WITNESS: I -- I don't recall any mention of that. 14:49:40 14:49:42

BY MR. PETROCELLI:

Q. Okay. Was there any discussion at this meeting about Michael Siegel's 25 percent ownership of the Siegel termination interests? 14:49:46 14:49:49 14:49:57

A. I don't -- I don't believe that it was discussed except to the extent of making him realize that there was a Michael Siegel and that there was a passive interest involved. 14:50:01 14:50:05 14:50:09 14:50:14

Q. Was there any discussion that the $15 million would also involve the exploitation of Superboy rights? 14:50:18 14:50:23 14:50:29

A. I think only Superman was mentioned. 14:50:29

Q. Did -- was there any discussion at this meeting with Mr. Emanuel about the fact that DC Comics would hold the remaining 50 percent of the copyright interest for an extended period of time? 14:50:34 14:50:38 14:50:48 14:50:55

A. He was aware of that. 14:50:58

THE REPORTER: Was that "50"?

MR. PETROCELLI: Fifty, yes. 14:51:02

Q. At least until 2013; right? 14:51:02
A. He was aware of that. 14:51:05
Q. And did he indicate whether that would necessitate trying to reengage with DC comics or Warner Bros. to do a deal? 14:51:06 14:51:14 14:51:19
A. Well, he felt that they were the likely purchaser if there was going to be a purchaser or, you know, that a license agreement, you know, could be entered into with them. 14:51:21 14:51:26 14:51:29 14:51:33
Q. Did you -- when you got back to him and told him that you preferred to work with him as an agent, not as a business partner -- 14:51:37 14:51:41 14:51:44
A. Um-hum. 14:51:46
Q. -- did you and he have discussion then about reengaging with Warner Bros. and DC Comics along the lines that you had previously discussed? 14:51:47 14:51:51 14:51:54
A. Yes. 14:51:56
Q. And did he still agree that that was a logical thing to do? 14:51:57 14:52:01
A. Yes. 14:52:02
Q. Okay. Then he underwent -- undertook to do that? 14:52:03 14:52:07
A. At some point, yes. 14:52:08
MR. PETROCELLI: Okay. And why don't we stop right now and take a short break. We've been going 14:52:10 14:52:15

for a bit. 14:52:17

THE VIDEOGRAPHER: This will mark the end of Volume 1, tape number two, in the deposition of Laura Siegel. Going off the record. The time is 2:52. 14:52:19 14:52:20 14:52:23

(A recess was taken.) 14:52:44

THE VIDEOGRAPHER: We are back on the record, and this marks the beginning of Volume 1, tape number three, of the deposition of Laura Siegel. The time is 3:22. 15:22:09 15:22:11 15:22:13 15:22:17

BY MR. PETROCELLI:

Q. Was -- going back to your discussion with Mr. Emanuel -- this was in his office -- Mr. Toberoff, you, and your mother and Mr. Emanuel -- 15:22:35 15:22:40 15:22:49

A. Um-hum. 15:22:52

Q. Remember we were talking about that before the break? 15:22:54 15:22:56

A. Yes. 15:22:57

Q. Did -- I think you said you were not sure whether you had already terminated the services of Mr. Marks as of the time of this discussion; correct? 15:22:58 15:23:02 15:23:06

A. You know, the time frame is difficult to remember, but -- no, no, no, no. Wait. What am I saying? No. We had -- we definitely had. I mean back as far as May, you know, we were like 95 percent there. We were, you know, going to cut off 15:23:12 15:23:15 15:23:20 15:23:24 15:23:28

negotiations and everything, you know, so we were really, really close to doing it early on. 15:23:30 15:23:35

Q. Now, this idea about cutting off negotiations in May, is that something that you and Mr. Toberoff discussed during the break? 15:23:38 15:23:41 15:23:45

A. No. 15:23:47

Q. Is it something that you have had some -- 15:23:47

A. It was that I didn't -- 15:23:50

Q. -- some recollection about or something? 15:23:51

A. Well, like, you know, I didn't have an opportunity really to clarify it before. 15:23:53 15:23:56

Q. The truth of the matter is you did not cut off negotiations with Warner Bros. until the date you sent your letter; correct? 15:23:57 15:24:00 15:24:04

A. Correct. 15:24:05

Q. Okay. 15:24:06

A. Yeah. But we were contemplating it, was all I was saying. 15:24:07 15:24:10

Q. I didn't ask you about cutting off negotiations, and I noticed that you injected that into your testimony, and I would appreciate it if you could just try to answer my questions. 15:24:10 15:24:13 15:24:16 15:24:18

A. What was your question? 15:24:20

Q. My question was about the discharge of Mr. Marks. 15:24:21 15:24:28

A. Yes. 15:24:28

Q. You had not discharged Mr. Marks as of the time of that meeting with Mr. Emanuel; correct? 15:24:37 15:24:39

A. No, that's not correct. 15:24:43

Q. Had you written Mr. Marks the letter terminating him? 15:24:44 15:24:48

A. Yes. 15:24:48

Q. Prior to the meeting? 15:24:48

A. Yes. 15:24:50

Q. Okay. And why is it that you, given your inability to recall with precision any of these other dates, you remember that clearly or definitely, as you said? 15:24:50 15:24:54 15:24:57 15:25:01

A. Well, because you're pressing me on it now. 15:25:01

Q. I've been pressing you on the sequence of events throughout the day. 15:25:04 15:25:07

A. Yeah. 15:25:08

Q. But that one you know for sure. 15:25:08

A. I just had a break and I had some water, and I feel a little bit better. 15:25:10 15:25:12

Q. So what is the date, then, of your meeting with Mr. Emanuel? 15:25:15 15:25:17

A. The date I couldn't tell you for sure, but, you know, I knew that we felt that we were, you know, completely free and clear of the Gang, you know, Tyre 15:25:21 15:25:24 15:25:28

group before we had a meeting.

Q. I didn't ask if you felt you were free and clear. I've asked whether you were a hundred -- I'll ask it to you this way. Are you 100 percent certain that the date you met with Mr. Emanuel that you've been testifying about with Mr. Toberoff and your mother, by that date you had already sent your letter terminating Mr. Marks?

MR. TOBEROFF: Asked and answered.

THE WITNESS: To the best of my recollection, yes.

BY MR. PETROCELLI:

Q. Okay. So you're not a hundred percent certain; correct?

A. Correct.

Q. Okay. Now, do you have any way of establishing the date of your meeting with Mr. Emanuel?

A. With Mr. --

Q. Emanuel.

A. The exact date?

Q. Yes.

A. No.

Q. Do you have any way of refreshing your recollection about the date?

15:25:32 15:25:34 15:25:37 15:25:40 15:25:46 15:25:48 15:25:54 15:25:58 15:26:00 15:26:00 15:26:01 15:26:03 15:26:05 15:26:05 15:26:08 15:26:13 15:26:15 15:26:19 15:26:20 15:26:22 15:26:24 15:26:24 15:26:25 15:26:27

A. I can keep trying to remember. I can keep trying to think about it. 15:26:28 15:26:31

Q. Is there any document or anything that would refresh your memory that you're aware of? 15:26:32 15:26:35

A. No, there are no documents. 15:26:43

Q. Is there any document or anything that would refresh your memory about the first time you met Mr. Toberoff before the Mr. Emanuel meeting? 15:26:45 15:26:47 15:26:52

A. No, there are no documents. 15:26:55

Q. Is there anything else that would refresh your recollection as to the date of that meeting? 15:26:56 15:26:58

A. No, I don't think so. 15:27:00

Q. When you met with Mr. Emanuel, did you and -- was there any discussion in that meeting about the fact that Kevin Marks might have to testify in a way that was not helpful to you? 15:27:04 15:27:09 15:27:12 15:27:18

A. In which meeting? 15:27:20

Q. The meeting with Mr. Emanuel. 15:27:22

MR. TOBEROFF: Excuse me. Lacks foundation. Assumes facts. 15:27:23 15:27:25

THE WITNESS: I -- I don't recall any discussion of that. 15:27:28 15:27:30

BY MR. PETROCELLI:

Q. Was there any discussion that if -- that Warner Bros. or DC Comics may sue for interference? 15:27:31 15:27:43

A. With -- have a discussion with whom? 15:27:47
Q. With Mr. Emanuel. 15:27:51
A. No. 15:28:03
Q. You understand that Warner Bros. in this case is suing Mr. -- excuse me -- DC Comics in this case is suing Mr. Toberoff and certain of his entities for interfering with rights stemming from the negotiations and discussions with you and your mother to acquire the Siegel interest; correct? 15:28:03 15:28:11 15:28:15 15:28:22 15:28:30 15:28:35
A. Yes. 15:28:37
MR. TOBEROFF: Misstates your own Complaint, but that's okay. 15:28:38 15:28:40
BY MR. PETROCELLI:
Q. And you understand that we contend that Mr. Toberoff's and Mr. Emanuel's proposal to Mr. Marks and then to you about a $15 million investment was designed to break off your dealings with DC Comics and Warner Bros. You understand that's our contention; correct? 15:28:41 15:28:55 15:29:03 15:29:12 15:29:18 15:29:21
A. That's your contention. 15:29:22
Q. How do you know that's our contention? 15:29:23
A. From -- from the Complaint in this action. 15:29:26
Q. Okay. And when you just gave your answer a few minutes ago after the break -- by the way, you spoke to Mr. Toberoff during break; correct? 15:29:29 15:29:35 15:29:39

A. Yes. He accompanied me to the restroom. 15:29:40

Q. After the break -- after coming back from the break and after speaking to Mr. Toberoff, you gave an answer that was not responsive to my question about being 95 percent sure that you were going to break off dealings with DC as early as May. Do you recall that? 15:29:46 15:29:51 15:29:57 15:30:01 15:30:06

A. Yes, I do. 15:30:09

Q. And you understood in giving that answer that that would be helpful to Mr. Toberoff because it would help establish that Mr. Toberoff did not interfere with DC Comics' rights; correct? 15:30:10 15:30:12 15:30:20 15:30:25

A. I was simply telling the truth. 15:30:28

Q. I didn't ask you that question. But you understood that that answer was helpful to Mr. Toberoff; correct? 15:30:30 15:30:32 15:30:35

A. I wasn't thinking about that. 15:30:36

Q. You have -- you understood that we were making the interference claim; correct? You said you read the lawsuit; right? 15:30:38 15:30:44 15:30:48

A. I did read the lawsuit. 15:30:50

Q. And you were trying to help Mr. Toberoff because he told you to give that answer and to work that into one of your answers when you came back after a break; correct? 15:30:52 15:30:57 15:31:00 15:31:03

A. No. No, that's not correct. 15:31:04

Q. Fortunately we have documents. 15:31:08
Speaking of which -- 15:31:15
MR. TOBEROFF: Is that a question? 15:31:17
MR. PETROCELLI: It is. It is a prelude to a question. 15:31:19 15:31:21
Q. Mr. Marks sent you this document that you've described in which Mr. Toberoff appeared on the scene with Mr. Emanuel talking about a $15 million investment, much greater than any offer Warner Bros. or DC had ever made in mid August, 2002; correct? 15:31:25 15:31:30 15:31:36 15:31:41 15:31:43
A. Well, as I said, I don't recall the date. 15:31:49
Q. Okay. Well, take a look at this privilege log which we will mark as Exhibit 57. 15:31:51 15:31:55
(Whereupon, Plaintiff's Exhibit 57 was marked for identification.) 15:32:16
THE WITNESS: Is there a page you want me to look at? 15:32:17 15:32:18
BY MR. PETROCELLI:
Q. Yes. Take a look at item number -- take a look at the page that starts with or that ends with item 628. 15:32:21 15:32:29 15:32:34
A. Okay. 15:32:39
MR. TOBEROFF: You got there pretty quickly. 15:32:44
THE WITNESS: I got lucky. 15:32:46
MR. TOBEROFF: Wait a second. I need to turn 15:32:47

to this. 15:32:48

Okay. 15:32:51

BY MR. PETROCELLI:

Q. Now, you see the entry for 623? 15:33:01

A. Yes. 15:33:06

Q. Does Attorney Kevin Marks' letter to Joanne, Laura Siegel -- Joanne is your mother; right? 15:33:07 15:33:11

A. Correct. 15:33:14

Q. -- Attorney Don Bulson and Attorney Bruce Ramer. Do you see that? 15:33:15 15:33:20

A. Yes. 15:33:22

Q. Do you remember whether the letter you received and that your mother received in which Mr. Marks discussed the Toberoff/Emanuel proposal was -- also included Mr. Bulson on it? 15:33:23 15:33:24 15:33:27 15:33:31

A. I don't remember. 15:33:35

Q. Okay. Did you discuss the letter with Michael Siegel or Mr. Bulson? 15:33:36 15:33:39

A. I don't remember doing that. 15:33:43

Q. Mr. Bulson you understood to be Mr. Michael Siegel's lawyer? 15:33:43 15:33:49

A. Correct. 15:33:49

Q. And you will see that was item number 623 on this privilege log which has been marked as Exhibit -- 15:33:49 15:33:52

What? 15:33:54

MR. TOKORO: 57. 15:33:55

MR. PETROCELLI: 57. 15:33:56

Q. And now we go to item 624, and that's a document dated August 12, 2002, which is a letter to you and your mother. Do you see that? 15:34:02 15:34:06 15:34:11

A. Yes. 15:34:12

Q. And then if you skip down, there's a document dated August 20, 2002, a letter to you, your mother, with a copy to Bruce Ramer. That's Mr. Marks' partner; right? 15:34:14 15:34:17 15:34:21 15:34:27

A. Yes. 15:34:28

Q. Is it your recollection that the letter you received occurred in or about August, 2002? Does that sound right timewise? 15:34:51 15:34:55 15:35:00

A. I have no way of knowing whether it was back here in July or if it was in August. 15:35:01 15:35:04

Q. Okay. 15:35:07

You did not notify DC that you were cutting off negotiations until after you heard about the Toberoff/Emanuel offer from Kevin Marks; correct? 15:35:22 15:35:29 15:35:37

A. Could have been. 15:35:45

Q. Well, we saw that you cut off the -- 15:35:46

A. In September. 15:35:49

Q. Correct. And that was after you had already heard about the Toberoff/Emanuel proposal from 15:35:51 15:35:53

Mr. Marks; correct? 15:35:58
A. It seems that way. 15:36:00
Q. Okay. 15:36:22
Did you discuss with Mr. Emanuel in the 15:36:22
meeting that we've been talking about, the date of 15:36:26
which you can't give us -- 15:36:30
A. Um-hum. 15:36:31
Q. -- that Mr. Marks might take the position 15:36:32
that you already had reached an agreement with 15:36:46
Time-Warner and DC Comics? 15:36:49
MR. TOBEROFF: Asked and answered. 15:36:51
THE WITNESS: No. I think you asked me. I 15:36:52
said no. 15:36:55
BY MR. PETROCELLI:
Q. I didn't ask you that. I asked you about 15:36:55
whether he would testify adversely to you. This is a 15:36:58
different question. 15:37:02
A. The answer is still no. 15:37:03
Q. Okay. You don't recall, or it's definitively 15:37:04
no? 15:37:07
A. Well, I don't remember talking to Mr. Emanuel 15:37:08
about that subject. 15:37:10
Q. This is in the group meeting now we're 15:37:11
talking about. 15:37:13
A. Yeah, you're talking about with Mr. Emanuel 15:37:18

and my mother. 15:37:21
Q. Right. Did you have any discussion in that meeting that Warner Bros. or DC Comics might take that position, that there was already an agreement reached and you're not going to be able to get out of it? 15:37:22 15:37:24 15:37:28 15:37:30
A. I don't believe so. I think we were looking forward, not backward. 15:37:34 15:37:36
Q. But you had to appreciate that DC Comics and Warner Bros. might have a different view than you; right? That they might say you had no right to just terminate a deal? 15:37:37 15:37:41 15:37:44 15:37:48
A. Everybody -- they could take that position if they chose to. 15:37:49 15:37:52
Q. Correct, and what I'm asking you is whether you discussed that with the folks at this meeting. 15:37:53 15:37:55
A. I don't remember discussing that. 15:38:00
Q. Okay. And you said you were looking forward, meaning your focus was looking forward in making a new deal. 15:38:02 15:38:07 15:38:11
A. Yes. 15:38:11
Q. Does the name David Michaels mean anything to you? 15:38:26 15:38:28
A. Yes. 15:38:28
Q. Who is he, or how do you know him? 15:38:31
A. He was a guy who worked for a short amount of 15:38:34

time in Mr. Toberoff's office. 15:38:37
Q. And how do you know that? 15:38:40
A. Because when my mother and I went for, you know, a meeting or two with Mr. Toberoff, he was there, and I was introduced to him. 15:38:42 15:38:45 15:38:49
Q. Do you know what year it was? 15:38:55
A. What year was that? I don't know. Maybe around 2004, 2005, in there somewhere. 15:39:02 15:39:08
Q. Did you interact with him at all? 15:39:13
A. You know, "Hello. How are you." You know, he said, you know, he was excited to be working on Superman. 15:39:16 15:39:21 15:39:30
Q. When is the last time you had any interaction with him of any kind or the last time your mother did, to your knowledge? 15:39:30 15:39:34 15:39:38
A. Yeah, it was -- it was late in -- I think it was 2005. Yeah, I think it was late in 2005. 15:39:39 15:39:46
Q. What was the nature of that interaction? 15:39:53
A. He contacted me and said he had some information for my mother and me about our case. 15:39:56 15:40:00
Q. Was he still working for Mr. Toberoff at that time? 15:40:04 15:40:07
A. It wasn't really clear to me. 15:40:08
Q. What else was discussed? 15:40:14
A. Other than -- are you talking about when he 15:40:19

first contacted me? 15:40:21
Q. I thought I asked you when you and he last interacted. 15:40:22
A. Yes. 15:40:28
Q. Was that the occasion? 15:40:28
MR. TOBEROFF: She was -- I think she -- at least I thought and she thought you were asking about when he first contacted her. 15:40:29
MR. PETROCELLI: Okay. Let me rewind this a bit. 15:40:38
THE WITNESS: Okay. 15:40:41
BY MR. PETROCELLI:
Q. Is the last time -- when is the last time you had any communication with David Michaels? 15:40:42
A. Late in -- as I said, I believe it was 2005. 15:40:49
Q. And that is because you received a telephone call from him? 15:40:52
A. A telephone call, and then he followed -- followed that up with a meeting with my mom and me. 15:40:55
Q. Okay. And where did the meeting take place? 15:41:02
A. At my condominium. 15:41:07
Q. Did you tell Mr. Toberoff about this meeting? 15:41:11
A. Later. 15:41:13
Q. Not at the time. 15:41:15
A. Not at the time. 15:41:18

Q. And that was a deliberate choice on your part not to mention to Mr. Toberoff that you were having a meeting with someone who used to work for him; correct? 15:41:18

A. Well, yeah, it was kind of an embarrassing situation, but, you know, we were curious. We wanted to know what this guy had to say. 15:41:27

Q. Okay. And how long -- what -- how long was it between the time he called you and the time that you folks met at your home? What was the -- a day? A couple of days? 15:41:40

A. A few days. 15:41:54

Q. Prior to the time that he called you, you said you think it was maybe late '05? 15:42:00

A. I think so. 15:42:07

Q. What was the last time before then that you had any kind of communication with him? 15:42:08

A. It was, I guess, a couple of months before that when I had seen him at Mr. Toberoff's office. 15:42:14

Q. Okay. And when he spoke to you on the phone and said he had information for you, did he say he wanted to meet you? 15:42:24

A. Yes. 15:42:32

Q. Okay. And you agreed? 15:42:32

A. Well, I said, "What is this about," you know, 15:42:36

and he said, "I really don't want to talk about it on the phone. You know, is it okay if I come by?" 15:42:38 15:42:42

Q. Okay. Did he tell you what the nature of the information was? 15:42:45 15:42:48

A. No, he did not, not on the phone. 15:42:48

Q. So when you met with him, what did he tell you? 15:42:50 15:42:52

MR. TOBEROFF: Okay. We have asserted privilege between your conversation with David Michaels other than pleasantries or saying "I want to speak to you." As to your actual conversation, those are privileged. 15:42:52 15:42:55 15:42:57 15:43:00 15:43:04

BY MR. PETROCELLI:

Q. Did -- did he give you legal advice at this meeting -- 15:43:07 15:43:14

MR. TOBEROFF: Don't -- don't -- 15:43:14

BY MR. PETROCELLI:

Q. -- at a meeting that you secreted from your lawyer? 15:43:15 15:43:18

MR. TOBEROFF: Don't -- 15:43:19

THE WITNESS: No, he was a lawyer. 15:43:19

MR. TOBEROFF: Wait. Wait. Wait. Don't -- 15:43:21

BY MR. PETROCELLI:

Q. I know Mr. Michaels is a lawyer, but he did not give you legal advice at this meeting; correct? 15:43:22 15:43:29

MR. TOBEROFF: Okay. I instruct you not to answer as to the legal conclusion as to whether it's legal advice, not legal advice. We have already litigated this, and those communications were upheld as privileged. 15:43:32 15:43:34 15:43:39 15:43:42 15:43:45

THE WITNESS: Okay. 15:43:46

MR. TOBEROFF: So we're going to follow the court's ruling. 15:43:46 15:43:48

MR. PETROCELLI: You know, Marc, you have a way of misstating the record. What the court ruled on were certain written communications. As you know, there has been no record put in front of the judge about these conversations. So you can take the position that the same reasoning and ruling would apply, but I do object to your overstating the record. 15:43:49 15:43:52 15:43:56 15:44:00 15:44:03 15:44:06 15:44:09

MR. TOBEROFF: And I object to you accusing me of misstating the record when I'm not. 15:44:12 15:44:14

MR. PETROCELLI: Okay, but you are misstating it. 15:44:17 15:44:19

MR. TOBEROFF: No, I'm not. The whole lawsuit that you designed and filed is designed to improperly interfere with the attorney-client relationship. So I have no doubt that you will continue that attempt at interference at every chance you get, try and learn every single privileged 15:44:19 15:44:22 15:44:24 15:44:26 15:44:28 15:44:32

communication you can possibly learn, and I object to that. And the process, we have a lengthy list of written communications from you and your cohorts at your firm almost pathologically misstating the record. 15:44:34 15:44:37 15:44:40 15:44:44

MR. PETROCELLI: And -- 15:44:49

MR. TOBEROFF: So we can cross swords on -- 15:44:49

MR. PETROCELLI: Just -- 15:44:51

MR. TOBEROFF: If we had a score board as to characterizing the record -- mischaracterizing the record, I think you're way ahead of me. 15:44:52 15:44:54 15:44:59

MR. PETROCELLI: I doubt it. And I think you are the lawyer who identified as privileged 15 communications that a judge found to be bogus 15 out of 15 times. 15:45:00 15:45:02 15:45:06 15:45:10

MR. TOBEROFF: He didn't find them bogus, but you also challenged all the communications. So it was something like 15 out of 150 that were found to be privileged -- 15:45:11 15:45:13 15:45:16 15:45:21

MR. PETROCELLI: Irrelevant, because they did not relate to the accounting issues. 15:45:21 15:45:22

MR. TOBEROFF: And you said none of them were privileged. 15:45:23 15:45:25

MR. PETROCELLI: So let's get back on track here. You -- 15:45:26 15:45:28

MR. TOBEROFF: And in fact, you're seeking -- 15:45:29

your whole lawsuit is based on privileged documents stolen from my law firm that your client held onto for about five months, illegally stolen property without even letting us know. 15:45:30 15:45:34 15:45:39 15:45:42

MR. PETROCELLI: As far as I'm concerned, there's zero evidence -- 15:45:43 15:45:44

MR. TOBEROFF: There's zero evidence? Consider this an early holiday gift and an enclosing document and your client said they got it in June or July? 15:45:45 15:45:45 15:45:48 15:45:51

MR. PETROCELLI: Well, if you were right -- 15:45:52

MR. TOBEROFF: What holiday are you taking about? July 4th? 15:45:53 15:45:55

MR. PETROCELLI: If you were right, then such a person would be behind bars, would have been criminally convicted, and no judge would have ever ordered the production of those documents. 15:45:56 15:45:57 15:46:00 15:46:02

MR. TOBEROFF: Not necessarily, as we'll see. 15:46:05

MR. PETROCELLI: So I guess it's not as clear cut as you're suggesting. 15:46:06 15:46:08

MR. TOBEROFF: We asked your client for -- it's a studio that keeps track of everything going in and out of that studio 18 different ways from Sunday, and they didn't have a single record of three packages of documents in the middle of a litigation that the 15:46:10 15:46:12 15:46:15 15:46:18 15:46:22

general counsel to Alan Horn, the president or CEO -- I forget which -- and the head of production, they didn't have a single corroborating piece of evidence as to when these three huge packages of documents arrived at their firm, arrived at their studio.

MR. PETROCELLI: Just like you mysteriously don't have any evidence to date the contacts that you made when you interfered with my client's rights?

MR. TOBEROFF: I interfered with your client's rights?

MR. PETROCELLI: We'll get there.

MR. TOBEROFF: This is something spun out of whole cloth in order to try and leverage a settlement, and we all know it.

MR. PETROCELLI: We'll get there.

MR. TOBEROFF: You will not get there.

MR. PETROCELLI: It may take time, but there's no quickness.

MR. TOBEROFF: You don't have a prayer, and you know it.

MR. PETROCELLI: I don't need prayers.

MR. TOBEROFF: You don't have a -- as -- if -- I could use an expression from my father, but I probably shouldn't.

MR. PETROCELLI: No, you shouldn't. You

15:46:24
15:46:29
15:46:34
15:46:34
15:46:40
15:46:40
15:46:41
15:46:43
15:46:46
15:46:48
15:46:48
15:46:50
15:46:52
15:46:55
15:46:55
15:46:56
15:46:58
15:47:00
15:47:01
15:47:02
15:47:04
15:47:06
15:47:11
15:47:15
15:47:16

shouldn't invoke your dad. Okay? 15:47:17

Q. Ms. Siegel, when you met with Mr. Michaels -- first of all, did you take any notes? 15:47:20 15:47:30

A. No, I don't believe so. 15:47:32

Q. Did your mother? 15:47:33

A. No. 15:47:35

Q. What happened with respect to your interaction with Mr. Michaels after he left? Anything? 15:47:39 15:47:42 15:47:46

A. After he left? 15:47:47

Q. Yes, after the meeting was over. 15:47:47

A. He sent -- he sent me a follow-up e-mail. 15:47:50

Q. So you got just one e-mail from him? 15:47:57

A. I'm remembering one in particular right now. May have received more than one. 15:48:02 15:48:06

Q. And did you respond to the e-mails? 15:48:07

A. Yes, I did. 15:48:10

Q. Did you basically tell him not to contact you again? 15:48:16 15:48:19

A. You bet. 15:48:19

Q. Okay. So after you responded to his e-mail, did he respond to you again or communicate in any way with you again, or your mother, for that matter? 15:48:20 15:48:27 15:48:32

A. Yeah, I think he sent an e-mail apologizing for trying to -- 15:48:34 15:48:38

MR. TOBEROFF: Don't -- don't discuss the substance. 15:48:39

THE WITNESS: Okay. 15:48:41

BY MR. PETROCELLI:

Q. Apologizing? 15:48:42

A. Apologizing to my mom and me. 15:48:43

Q. Okay. And when is the last time you saw those e-mails? 15:48:48 15:48:50

A. It's been a long time. I don't know. 15:48:52

Q. What was he apologizing for? 15:48:54

A. For something that was discussed that it seems to me that I cannot reveal. 15:48:57 15:49:02

Q. Do you remember what you and he discussed? 15:49:06

A. Yes. 15:49:09

Q. Okay. And I think I've asked you this, and I think you have instructed. But did he give you legal advice in that meeting? 15:49:10 15:49:17 15:49:19

MR. TOBEROFF: Calls for a legal conclusion. 15:49:23

THE WITNESS: May I answer that question? 15:49:27

MR. TOBEROFF: No, I don't think you can answer that question, characterizing his communications. There's been certain limited disclosure as to David Michaels which was held not to be a waiver of the privilege, and I don't want you to go beyond that. 15:49:33 15:49:35 15:49:39 15:49:42 15:49:46 15:49:53

THE WITNESS: Okay.

BY MR. PETROCELLI:

Q. Did -- well, certainly when Mr. Michaels apologized to you, he wasn't giving you legal advice, was he?

A. No. It was at -- the apology was based on something that had previously occurred.

Q. And did -- do you know -- did Mr. -- to your knowledge, did Mr. Michaels learn anything at the meeting that caused him later to apologize?

A. No. It's not something that he learned. It's -- he was apologizing for something that he did.

Q. To you and your mother?

MR. TOBEROFF: I will allow you to testify as to what he apologized -- you know, I think we're -- you characterize as an apology broadly because I believe it was disclosed previously and held not to be a waiver of the privilege. So you can testify generally as to what he was apologizing for.

THE WITNESS: It became very clear when he was -- when he was at the meeting and then in this follow-up e-mail that he sent to us that it was a bold attempt on his part to steal my mom and I away from Mr. Toberoff as clients, and he wanted us to sign with him for him to be our attorney.

15:49:54
15:49:59
15:50:06
15:50:10
15:50:12
15:50:16
15:50:20
15:50:24
15:50:29
15:50:34
15:50:36
15:50:40
15:50:43
15:50:45
15:50:51
15:50:57
15:51:00
15:51:03
15:51:07
15:51:10
15:51:13
15:51:17
15:51:22
15:51:26

BY MR. PETROCELLI:

Q. And why would he apologize for that, to your knowledge?

A. Because we let him know that we were outraged --

Q. Okay.

A. -- that he would do that.

Q. When did you let him know that?

A. By e-mail.

Q. You didn't tell him at the meeting?

A. We told him that -- you know, we didn't --

MR. TOBEROFF: Wait.

BY MR. PETROCELLI:

Q. Did you kick him out of your house and say "What are you doing here?"

A. Let me put it this way. All of his motives were not revealed in our meeting. It became much -- it became clearer, you know, after the meeting when he sent follow-up e-mails what his actual intention was.

Q. After the meeting and before you received the e-mails -- well, after he left the meeting with you, did you have a belief that he was interested in having you sign with him?

A. On his way out the door he turned and said, "I've got an idea. You know, why don't you guys just,

15:51:29
15:51:29
15:51:33
15:51:34
15:51:39
15:51:39
15:51:40
15:51:41
15:51:43
15:51:44
15:51:48
15:51:52
15:51:52
15:51:56
15:51:58
15:52:03
15:52:08
15:52:13
15:52:21
15:52:27
15:52:30
15:52:35
15:52:37
15:52:41

you know, come with me and I'll introduce you to another firm." 15:52:44 15:52:47

Q. Did he identify the firm? 15:52:49

A. No. I think he was looking for a job at the time. 15:52:52 15:52:56

Q. Okay. Had he been fired? 15:52:58

A. I don't -- I don't know. 15:53:02

Q. Did he tell you what his employment status was? 15:53:02 15:53:05

A. I think he said he was looking for a job. 15:53:05

Q. And then when he said that to you as he was going out the door, what did you or your mother say to him? "Don't waste your time" or you're not interested, or what do you recall saying? 15:53:12 15:53:15 15:53:19 15:53:22

A. It was -- it was like -- first of all, we were shocked because we thought it was pretty outrageous, and, you know, we felt that he had, you know, come -- come in to talk to us under false pretenses. But he was -- he was on the way out the door, and my mom and I, you know, didn't have to kick him out because he was already leaving, but, you know, we wanted to talk about it afterwards and figure out what had just happened. 15:53:24 15:53:28 15:53:32 15:53:35 15:53:42 15:53:45 15:53:47 15:53:51 15:53:54

Q. So after he left, what did you and your mother discuss that you would do with this encounter 15:53:58 15:54:01

that you just had? 15:54:03
A. My mom and I said we didn't have a good feeling about it, you know, but we just -- we wanted to, you know, to kind of think, just as we do about everything, think about things, talk about things, and what could this guy's motivations possibly be. 15:54:06 15:54:08 15:54:12 15:54:15 15:54:18
Q. Did he provide you any documents? 15:54:22
A. He had documents with him, but he didn't really provide them to me. 15:54:25 15:54:27
Q. Did he show them to you? 15:54:29
A. He was waving stuff around. 15:54:30
Q. What was he waving? Can you tell me the best as you can recall any of the documents that he was waving around? 15:54:32 15:54:35 15:54:37
A. I did not see them enough to be able to read them, so I couldn't identify them. 15:54:39 15:54:44
Q. Well, when he was waving them around, he was identifying them; right? 15:54:47 15:54:51
A. He said, "I've got some stuff here and" -- 15:54:52
Q. Did it relate to your case? 15:54:55
A. He said -- he said it did. 15:54:57
Q. Had he written this -- do you think he's the author of this timeline document? Are you familiar with the timeline document? 15:55:01 15:55:03 15:55:06
A. I saw it in your Complaint. 15:55:08

Q. Okay. And you had not seen it prior to seeing it in our Complaint? 15:55:09 15:55:19

A. No. I don't recall ever seeing it before your Complaint. 15:55:21 15:55:23

Q. You had not -- you had not heard about the litigation regarding it in your case back in 2006, '7, and '8? 15:55:24 15:55:32 15:55:37

A. Oh, well, I'm sorry. I'm sorry. I guess you're right. I guess it was before then. 15:55:38 15:55:41

Q. Was this encounter with Mr. Michaels before or after he sent -- withdrawn. 15:55:44 15:55:47

Do you believe he's the person who wrote this timeline document? 15:55:51 15:55:54

A. Yes, I do. 15:55:54

Q. How do you know he wrote it? 15:55:55

A. It sounds like him. 15:55:58

Q. Let me make sure I put the document in front of you just so we have a record. 15:56:01 15:56:04

A. Okay. 15:56:05

MR. PETROCELLI: This is Exhibit 58. 15:56:09

THE WITNESS: Thank you. 15:56:10

(Whereupon, Plaintiff's Exhibit 58 was marked for identification.) 15:56:16

BY MR. PETROCELLI:

Q. Did you first learn of Exhibit 58, what we've 15:56:17

been calling the Toberoff timeline, before or after your encounter with Mr. Michaels at your home? 15:56:20 15:56:23

A. After. 15:56:25

Q. Okay. Was it shortly after or long after? Can you estimate the time interval? 15:56:26 15:56:31

A. I -- I think it was long after, but it depends what you mean by long. 15:56:36 15:56:39

Q. Months? Years? 15:56:41

A. It wasn't years. 15:56:42

Q. Was -- so it's now your recollection that you first saw this timeline document when the issues surfaced in the case you brought? 15:56:47 15:56:53 15:56:57

A. Well, whenever it was first produced for whatever case that was, that was when I saw it. What -- which case it was, there's so many different cases and motions and things like that, I mean I can't -- I can't remember exactly which one, but whenever it was first presented, that -- in a legal forum, that was the first time I saw it. 15:57:01 15:57:06 15:57:11 15:57:14 15:57:16 15:57:19 15:57:23

Q. At some point in time you learned that Warner Bros. had received and notified Mr. Toberoff that it had received an anonymous submission regarding your case; correct? 15:57:26 15:57:30 15:57:34 15:57:40

A. Yes. 15:57:41

MR. TOBEROFF: Anonymous submission. I like 15:57:43

that. 15:57:47

BY MR. PETROCELLI:

Q. And at that time did you have an occasion to see the document or the documents that Warner Bros. had received? Were they shown to you by Mr. Toberoff or anyone else? 15:57:48 15:58:00 15:58:05 15:58:09

A. I -- I don't remember when it was that I first saw it. 15:58:12 15:58:14

Q. When you saw the document for the first time, that is, Exhibit 56 -- 15:58:15 15:58:17

Jason? 15:58:21

THE WITNESS: 58. 15:58:23

MR. TOKORO: 58. 15:58:24

MR. PETROCELLI: 58? Okay. 15:58:24

Q. When you saw Exhibit 58, did it discuss matters similar to what had been discussed in the meeting that Mr. Michaels had with you? 15:58:25 15:58:30 15:58:35

A. Yes. 15:58:37

Q. Okay. 15:58:39

A. Because he was talking about unconscionable fees, unconscionable fees. 15:58:39 15:58:42

Q. And did you -- after the meeting that you had with Mr. Michaels, did you relate the contents of the meeting to Mr. Toberoff? 15:58:50 15:58:53 15:58:59

A. Yes, at a certain point I did, yes. 15:59:03

Q. Did you do that before the e-mail exchange or right after Mr. Michaels left your home? 15:59:08 15:59:12
A. No. It was after the e-mail exchange. 15:59:15
Q. So even though I think you said you were outraged by his suggestion as he left the door, it wasn't until after this e-mail exchange that you first mentioned it to Mr. -- Mr. Toberoff; right? 15:59:17 15:59:21 15:59:25 15:59:28
A. Right. 15:59:31
Q. Did you relate that discussion that you had with Mr. Michaels to anybody else in order to see if there was any, you know, anything to it? 15:59:35 15:59:38 15:59:43
A. No. 15:59:46
Q. Like, for example, George? 15:59:46
A. No. 15:59:48
Q. Or Arthur? 15:59:48
A. No. 15:59:50
Q. Arthur Levine I'm talking about. 15:59:51
A. Correct. 15:59:53
Q. The unconscionable fee, is that -- what was the unconscionable fee? The 40 percent fee? 16:00:03 16:00:06
A. Yeah. 16:00:10
Q. The document that you received and the e-mail from Mr. Michaels following your meeting with him was what? A proposed engagement agreement? 16:00:20 16:00:24 16:00:28
MR. TOBEROFF: You can answer that. 16:00:31

THE WITNESS: Yes. 16:00:32

BY MR. PETROCELLI:

Q. And on the stationery of or letterhead of what firm? 16:00:34 16:00:37

A. His -- his own, his home address. 16:00:38

Q. Okay. And did you ask for it? 16:00:41

A. Absolutely not. 16:00:46

Q. So it was unsolicited? 16:00:47

A. Unsolicited. 16:00:49

Q. What did you do with it? 16:00:51

A. Well, I discussed it with my mother, and we wrote a response telling him, you know, that we had absolutely no interest in that or in discussing anything with him further. 16:00:53 16:00:58 16:01:02 16:01:06

Q. And then he wrote back saying "I'm sorry"? 16:01:08

A. Yeah, "Didn't want to offend you." 16:01:11

Q. And that's where it was left, with his apology? 16:01:15 16:01:18

A. Yes. 16:01:18

Q. Okay. And what did his document provide? 16:01:21

A. What do you mean? 16:01:24

Q. What did it say, his unsolicited agreement or proposed agreement? 16:01:26 16:01:31

A. Well, he actually sent two documents. 16:01:31

Q. What were the two documents? 16:01:34

A. One was his draft of an unsolicited, you know, agreement retaining him as our attorney at a -- at a lower percentage than the one that Mr. Toberoff had in our litigation agreement with him. 16:01:36 16:01:43 16:01:48 16:01:55
Q. What was the percentage? 16:01:57
A. I really don't -- I don't remember right now. 16:01:58
Q. But you do remember it was lower. 16:02:00
A. Yes. Yes. 16:02:02
Q. What was the other document? 16:02:04
A. The other document was an unsolicited draft that he had put together that he wanted us to sign terminating -- 16:02:05 16:02:09 16:02:15
Q. Mr. Toberoff? 16:02:15
A. -- Mr. Toberoff. 16:02:17
Q. Okay. And you didn't ask for any of those documents; right? 16:02:17 16:02:19
A. No. 16:02:20
Q. And there was no discussion at the meeting that he was going to send you those documents? 16:02:20 16:02:22
A. No. 16:02:24
Q. That was a complete surprise to you; right? 16:02:24
A. Yes. It really pissed us off. 16:02:26
Q. Okay. And you -- what did the -- did the letter terminating Mr. Toberoff -- Mr. Toberoff give a reason for his termination? 16:02:30 16:02:36 16:02:39

A. No, I don't think so. I think it was just, you know, "We no longer want your services" or something like that, and we had never said anything like that to him. In fact, we were very happy with Mr. Toberoff. 16:02:41 16:02:45 16:02:48 16:02:52 16:02:56

Q. Did Mr. Michaels explain to you why he thought you should fire Mr. Toberoff? 16:02:57 16:03:02

A. Because he said that he was charging us unconscionable fees. 16:03:05 16:03:08

Q. Did you do any diligence or checking into the reasonableness of the fee after that discussion? 16:03:10 16:03:17

A. No. 16:03:24

Q. Did he explain to you why he thought it was unconscionable? 16:03:25 16:03:29

A. His discussion was -- it seemed to be coming from a very confused person. He was talking all over the place and not very clear about what he was trying to express, so it was very hard to follow what he was saying. 16:03:30 16:03:35 16:03:38 16:03:41 16:03:46

Q. Did he seem to you like he was not of sound mind? 16:03:46 16:03:52

A. He seemed extremely nervous and very, very skittish about everything. 16:03:52 16:03:58

Q. Did you think he was ill? 16:04:01

A. He didn't look like he was ill. It just 16:04:04

looked like he was -- 16:04:07

Q. Mentally imbalanced? 16:04:08

A. I don't know whether it was -- it's like he knew he was doing something wrong and that -- that he felt guilty about it and he was trying to kind of cover his tracks or something. 16:04:10 16:04:14 16:04:17 16:04:21

Q. Did he explain to you why he would care if Mr. Toberoff was charging you an unconscionable fee? 16:04:23 16:04:30

A. That's what didn't make sense to us at all. You know, that's -- you know, it was like, you know, "It hurts me to see this happening to you," you know. So when the pitch came at the end for "Hey, I can do this for you for less," it started, you know -- 16:04:34 16:04:37 16:04:41 16:04:45 16:04:48

Q. Well, you said before that it was kind of a passing comment as he walked out the door. "Hey, I've got an idea. You can hire me." Do you recall that? 16:04:52 16:04:57 16:04:59

A. Yes. 16:05:02

Q. When he said that, did you tell him "I have no interest in hiring you," or I think you said you didn't and that's why he followed up with those e-mails; right? 16:05:05 16:05:09 16:05:12 16:05:14

A. Yeah. We just -- you know, it's like "Bye." 16:05:15

Q. Well, when he was explaining this story to you about unconscionable fees and all, did you ask him, "Why are you telling us this? What's your 16:05:20 16:05:28 16:05:28

purpose? Why are you here? What is the reason why you're sharing this with us?"

A. Because he --

Q. Did you ask him those questions?

A. Well, as I said before, you know, he was volunteering that out of the goodness of his heart. You know, he felt that, you know, he as an attorney had a -- what was it? He had the responsibility to talk to us about this.

Q. Did he tell you that he had had some kind of dispute or disagreement with Mr. Toberoff?

A. No. I don't recall him saying anything like that.

Q. Did he tell you that he had been fired?

A. I think he just -- you know, I don't -- I don't remember how he explained it. I think he just said, you know, "I'm no longer with the firm." I think that was it.

Q. Okay. And now, given this bizarre discussion about a person who seemed skittish to you, talking about unconscionable fees, kind of not making sense, going outside, you know, and as he leaves he said "Hey, I'll represent you," why didn't you immediately call up Mr. Toberoff and say, "What's the story with this guy?"

16:05:31 16:05:34 16:05:36 16:05:38 16:05:39 16:05:42 16:05:44 16:05:49 16:05:55 16:05:59 16:06:03 16:06:06 16:06:07 16:06:08 16:06:14 16:06:21 16:06:25 16:06:28 16:06:29 16:06:36 16:06:41 16:06:45 16:06:48 16:06:52 16:06:55

A. I don't know. You know, it just -- we felt -- we felt uncomfortable about the whole thing, and in a way we kind of felt sorry for the guy, you know, because I mean here's this young guy. You know, he's out of work. He said he was trying to do something to help us. It turned out that he wasn't, but, you know, we thought, you know, he'll just go away.

Q. Why do you say it turned out that he wasn't?

A. No, I don't know why I said that. No, I just mean that at that moment he didn't appear threatening to us. You know, when we were right there, it wasn't as if we felt we were physically in danger or anything, but we became more concerned, you know, when we started getting these e-mails, and fortunately, you know, he wasn't in our presence, but, you know, I started really getting concerned at that point about, you know, what's going on with this guy?

Q. Did you forward the e-mails to Mr. Toberoff?

A. I did eventually, yes.

Q. Have you forwarded them to anyone else?

A. I don't believe so.

Q. Did he discuss with you other -- besides the unconscionable fees, did he discuss with you other matters of the sort set forth in Exhibit 58, the

16:06:57
16:07:01
16:07:03
16:07:06
16:07:11
16:07:14
16:07:19
16:07:23
16:07:23
16:07:29
16:07:31
16:07:34
16:07:39
16:07:43
16:07:45
16:07:49
16:07:53
16:07:55
16:07:58
16:08:03
16:08:07
16:08:09
16:08:19
16:08:23
16:08:28

Superman Marc Toberoff timeline? 16:08:32

A. Well, you know, I know he said something to us to the effect of "Did you know that Marc represents the Shusters?" Of course we knew that. You know, I mean he acted like that was, you know, a big disclosure, that it was something that we didn't know and that it was something -- that there was something wrong with that. And of course, you know, we knew that because Jean Peavy had recommended Marc Toberoff. So he kept, you know, trying to, you know, stir the pot. 16:08:36 16:08:38 16:08:42 16:08:44 16:08:47 16:08:50 16:08:53 16:08:56 16:09:03 16:09:08

Q. Did he discuss with you the idea that Marc Toberoff together with Ari Emanuel claimed to have had a billionaire, a mysterious billionaire investor as a way of getting in the door with you? 16:09:09 16:09:21 16:09:27 16:09:34

A. Yeah, well, he said a lot of things that we thought was a lot of crap. 16:09:35 16:09:38

Q. Was that one of them? 16:09:40

A. That was one of them. 16:09:41

Q. He said that at the meeting, or are you just remembering what you think he wrote in the document? 16:09:42 16:09:47

A. I don't know. It could be that the document is influencing me. But I know that he, you know, he was just constantly saying -- saying things that in his mind he thought would shock us. 16:09:49 16:09:52 16:09:59 16:10:04

Q. Did -- when he discussed -- when he discussed the issue of the Shusters with you, did he talk about issues related to Superboy? 16:10:07 16:10:13 16:10:21

A. I don't recall that coming up. 16:10:25

Q. Did he discuss with you that when Mr. Toberoff first began to work with the Shusters, that the Shusters claimed that Joe Shuster had been a co-creator of Superboy and they were seeking rights to Superboy? 16:10:27 16:10:35 16:10:40 16:10:48 16:10:51

MR. TOBEROFF: Misstates the record and the evidence. 16:10:52 16:10:55

MR. PETROCELLI: I'm not purporting to state anything. 16:10:55 16:10:58

MR. TOBEROFF: The way you're phrasing it. 16:10:58

MR. PETROCELLI: I'm asking a question. 16:10:59

MR. TOBEROFF: The way -- you had said "discussed his claim that." You stated it as a fact almost. 16:11:00 16:11:02 16:11:08

MR. PETROCELLI: It's called coaching the witness. 16:11:08 16:11:10

Q. Can you answer that question? 16:11:11

A. Well, I believe you're asking me whether he discussed Superboy with us? 16:11:13 16:11:16

Q. Generally, but I was asking for specifically whether he discussed the idea that the Shuster family 16:11:18 16:11:20

asserted that Joe Shuster was a co-creator of Superboy and on that basis the Shusters were claiming copyright termination interests. 16:11:25 16:11:32 16:11:37

A. I -- 16:11:37

MR. TOBEROFF: Wait. Same objection. Lacks foundation. Assumes facts. 16:11:39 16:11:40

THE WITNESS: No, I don't recall that being discussed. 16:11:41 16:11:45

BY MR. PETROCELLI:

Q. Did he discuss with you that after or as part of working with the Siegel family, Mr. Toberoff caused the Shusters to disavow any interest in Superboy? 16:11:46 16:11:54 16:12:01

A. No, he did not discuss that with us. 16:12:04

Q. You're aware that the Shusters when they initially began working with Mr. Toberoff asserted an interest in Superboy. 16:12:13 16:12:21 16:12:25

A. Well, I really don't know much about the Shuster case because that's their business. 16:12:27 16:12:29

Q. Well, you were aware from reading our lawsuit; right? 16:12:32 16:12:35

A. From reading your lawsuit. 16:12:35

Q. Right. And you're aware from reading our lawsuit that when Mr. Toberoff started working with you and your mom, he then entered into a new arrangement with the Shusters whereby they disavowed 16:12:37 16:12:41 16:12:46 16:12:51

any interest in Superboy. 16:12:55
A. I don't know anything about his arrangements with the Shusters. 16:12:57 16:12:58
Q. Have you ever inquired of anybody why the Shusters would give up their entire interest in Superboy that they were asserting at one point in time? 16:13:00 16:13:04 16:13:07 16:13:10
MR. TOBEROFF: Assumes facts. Lacks foundation. 16:13:10 16:13:12
THE WITNESS: I think they -- they found out by reading more carefully the 1947 ruling. 16:13:12 16:13:16
BY MR. PETROCELLI:
Q. Well, that's an interesting point. It's not what I asked you. That's your speculation; right? 16:13:21 16:13:23
A. That's my speculation. 16:13:28
Q. And you know there's a lot of documents after 1947 that they could have read that would have informed them that Joe Shuster was a co-creator of Superboy; correct? 16:13:30 16:13:32 16:13:36 16:13:41
A. I don't know that. 16:13:41
Q. I know that you picked the 1947 ruling because that's the one Mr. Toberoff likes to talk about; right? 16:13:42 16:13:44 16:13:46
A. No. That's the one that my father told me about my entire life. 16:13:48 16:13:51

Q. But that's not the last word on the subject; right?

A. I don't know that that's the last word on the subject.

Q. And you're aware that there are documents that both Joe Shuster and your dad caused to be filed in which they claimed co-credit for Superboy; correct?

A. I do not know that.

Q. And you have seen those copyright certifications.

A. I don't recall anything like that.

Q. Copyright registration documents; correct?

MR. TOBEROFF: Just slow it down. Let him finish the question. What's your answer?

THE WITNESS: My answer is I have not seen those. I have not seen what you're referring to.

BY MR. PETROCELLI:

Q. But I had asked you not to surmise that the Shusters must have read some opinion back in 1947. I had asked you if you had ever discussed with anyone why they would disavow on the interest in Superboy that they previously had --

A. Okay.

Q. -- claimed.

A. I didn't understand that that was your

16:13:52 16:13:54 16:13:54 16:13:56 16:13:57 16:13:58 16:14:03 16:14:06 16:14:07 16:14:10 16:14:10 16:14:11 16:14:15 16:14:18 16:14:20 16:14:21 16:14:24 16:14:29 16:14:32 16:14:36 16:14:42 16:14:43 16:14:44 16:14:45

question. The answer to that is no. 16:14:46

Q. Okay. Do you have a copy of our Complaint there just while we're on this subject? 16:15:06 16:15:14

A. No, I don't. 16:15:18

Q. You are aware that in Action Comics No. 1, Mr. Shuster did the illustrations or worked on the illustrations; correct? 16:15:34 16:15:39 16:15:43

A. Yes. 16:15:44

Q. And there's some depiction of Superman as a youth with super powers; correct -- not in Action Comics No. 1. Excuse me. In Superman No. 1. 16:15:44 16:15:51 16:15:54

A. I haven't seen it for a long time. 16:15:58

Q. Okay. Well, rather than put you through a memory test, can you take a look at our Complaint which has been marked as Exhibit 59. Turn to page 29, paragraph 88. 16:16:01 16:16:03 16:16:07 16:16:12

(Whereupon, Plaintiff's Exhibit 59 was marked for identification.) 16:16:16

THE WITNESS: 29, paragraph 88, yes. 16:16:17

MR. PETROCELLI: Yes. 16:16:18

Q. When you read paragraph 88 and you saw the first bullet under paragraph 88 which states that, in part, "Toberoff had entered into the 2001 joint-venture agreement with the Shuster Heirs, specifying that the Shuster Heirs owned an interest in 16:16:21 16:16:26 16:16:33 16:16:37 16:16:40

'Superboy,'" do you see that? 16:16:42

A. I see that. 16:16:43

Q. Was that the first time you had learned that? 16:16:44

A. Yes, I believe so. I don't recall, you know, any -- any previous discussion. 16:16:46 16:16:52

Q. Okay. 16:16:54

MR. TOBEROFF: I object to the question to the extent that you're characterizing allegations as fact. 16:16:55 16:16:58 16:17:11

MR. PETROCELLI: Can you get me the 2001. 16:17:11

Q. Take a look at Exhibit 10, please. 16:17:20

(Whereupon, Plaintiff's Exhibit 10 was placed before the witness.) 16:17:23

THE WITNESS: Thank you. 16:17:23

BY MR. PETROCELLI:

Q. This is an agreement by Pacific Pictures Corporation through its president, Marc Toberoff, and Jean Peavy and Warren Peary dated as of November 23, 2001. This has previously been marked as Exhibit 10. Do you see that? 16:17:31 16:17:37 16:17:42 16:17:48 16:17:50

A. Yes, I do. 16:17:51

Q. Okay. And you will see that in the first paragraph it's discussing formation of a joint venture with respect to Mr. Shuster's claimed copyright interest. Do you see that? 16:17:53 16:18:00 16:18:04 16:18:07

A. Well, I see it, but I'm not fully reading it. Do you want me to spend the time to read it? 16:18:08 16:18:11
Q. Not really just because I don't want to pass the time. 16:18:16 16:18:18
Take paragraph 1, and you might read paragraph 1 to yourself. 16:18:18 16:18:22
MR. TOBEROFF: Before answering any questions regarding this agreement, if there is a question as opposed to a rhetorical statement, then I would like you to please read whatever he's asking you very carefully. 16:18:25 16:18:26 16:18:29 16:18:32 16:19:05
BY MR. PETROCELLI:
Q. You do see the reference there that the rights that are the subject of this agreement include Superboy and Smallville; correct? 16:19:06 16:19:11 16:19:21
A. I see that it's written there. 16:19:22
Q. Okay. Was this shown to you at the time that you entered into your first agreement with Mr. Toberoff? 16:19:28 16:19:31 16:19:36
A. No, it was not. 16:19:36
Q. When you signed your agreement with Mr. Toberoff in August, 2002 -- excuse me -- in October, 2002, the one with IP Worldwide -- 16:19:40 16:19:43 16:19:46
A. Yeah, the end of October. 16:19:49
Q. The end -- whenever it was -- 16:19:51

A. Yeah. 16:19:53

Q. -- were you aware that as of that point in time that Mr. Toberoff had entered into a joint venture through his company, Pacific Pictures, with the Shusters regarding Superman rights that included, without limitation, Superboy? 16:19:53 16:19:58 16:20:02 16:20:06 16:20:09

MR. TOBEROFF: Misstates the paragraph 1. 16:20:11

BY MR. PETROCELLI:

Q. You can answer. 16:20:15

A. The information that we had from Jean Peavy was that Mr. Toberoff was her attorney, and she didn't supply us with any agreements or any more details than that. 16:20:17 16:20:20 16:20:25 16:20:29

Q. You didn't even know that Mr. Toberoff had entered into a joint venture through his company, Pacific Pictures? 16:20:29 16:20:32 16:20:36

A. We knew that he was their attorney. 16:20:37

Q. No, you're not answering my question. 16:20:39

A. No, I'm trying to. I'm sorry. 16:20:41

Q. No. What you're doing is you're continuing to assert that Mr. Toberoff's your attorney because you believe that it is important to his case and your case to say that. 16:20:43 16:20:45 16:20:49 16:20:53

MR. TOBEROFF: Please don't argue with the witness. 16:20:54 16:20:55

THE WITNESS: No, I'm not. 16:20:55

MR. TOBEROFF: Wait a second. Ask your question. Don't argue with her. 16:20:57 16:20:59

BY MR. PETROCELLI:

Q. I'm capable of asking a question that will elicit that answer, but frankly, you know, we have somewhat limited time. I'm not asking that question, so please bear with me. 16:20:59 16:21:02 16:21:05 16:21:08

Can you read my question back? I move to strike that answer as nonresponsive. 16:21:10 16:21:12

THE WITNESS: Okay. I just wanted to say I'm sorry. That's just the way I express myself sometimes. I'll try and listen more closely to your question. 16:21:14 16:21:16 16:21:19 16:21:21

MR. TOBEROFF: And I would advise you don't let Mr. Petrocelli browbeat you with his argumentative statements. You answer the questions as you see fit. 16:21:22 16:21:25 16:21:29

THE WITNESS: Um-hum. 16:21:32

(The record was read.) 16:21:51

THE WITNESS: The answer is no. 16:21:51

MR. PETROCELLI: Let me sharpen my question a bit. 16:21:54 16:21:56

Q. As of the time you had entered into the first agreement with Mr. Toberoff, the IP Worldwide agreement in October of 2002 or as of October, 2002, 16:21:56 16:21:59 16:22:02

were you aware that he, through Pacific Pictures or any other entity, had entered into a joint venture agreement with the Shusters regarding Superboy or Superman? 16:22:07 16:22:10 16:22:16 16:22:19

A. Would you speak up just a little bit? I think I got what you said, but I'd appreciate it if maybe she could read it back. 16:22:19 16:22:22 16:22:24

MR. PETROCELLI: Definitely I will try to speak up. 16:22:27 16:22:28

THE WITNESS: Thank you. 16:22:29

(The record was read.)

THE WITNESS: No, I was not aware of that. 16:22:52

BY MR. PETROCELLI:

Q. Were you aware of that as of the time that you entered into what you call the litigation agreement with Mr. Toberoff sometime in 2004? 16:22:54 16:22:57 16:22:59

A. You're asking the same question about if I knew about this? 16:23:05 16:23:07

Q. Yes. 16:23:08

A. No, I don't believe so. 16:23:09

Q. And to your knowledge, your mother was not aware of it either; correct? 16:23:15 16:23:16

A. Except it's possible, because I have not read it in a really long time, but it's possible that it was disclosed in one of the -- one of the -- what was 16:23:19 16:23:24 16:23:26

it called? The conflict. It might have been disclosed in the conflict document. 16:23:31 16:23:38

Q. Are you saying that it was? 16:23:39

A. I'm saying -- 16:23:40

MR. TOBEROFF: Don't discuss the content of conflict letter. 16:23:41 16:23:45

THE WITNESS: Okay. I'm saying I don't know. 16:23:45

BY MR. PETROCELLI:

Q. Okay. So let's go back to paragraph 88 of the Complaint, which is paragraph 59. The second bullet states "The original Superboy 'script' on which the Siegel Heirs' ownership claims rely openly contains the byline: By Jerry Siegel and Joe Shuster." Do you see that? 16:23:54 16:23:58 16:24:01 16:24:04 16:24:07 16:24:10

A. I do see that. 16:24:12

Q. Were you aware of Superboy scripts -- prior to reading this Complaint, were you aware that there were Superboy scripts that contained a byline that included Joe Shuster as well as Jerry Siegel? 16:24:13 16:24:17 16:24:19 16:24:23

A. I -- I saw a script that had that written, typed on it. 16:24:26 16:24:31

Q. Just one. 16:24:31

A. Well, I only believe there was one. I can't remember more than one. 16:24:33 16:24:35

Q. Okay. And you had seen that prior to reading 16:24:36

this lawsuit; is that right? 16:24:42

A. I saw that a long time ago. 16:24:43

Q. A long time ago. And the next bullet talks about "In 1948, a Court in Westchester, New York found that Joe Shuster provided the artwork for the Superboy story and More Fun Comics No. 101." Were you aware of that? 16:24:45 16:24:49 16:24:55 16:24:58 16:25:04

A. Yes. 16:25:04

Q. Okay. And the next bullet says "In 1972 and 1973, Siegel and Shuster together filed their own copyright renewal notices with the copyright office for Superboy, in which they identified Superboy as a work that they had jointly created." Were you aware of that? 16:25:04 16:25:06 16:25:10 16:25:12 16:25:15 16:25:17

A. I'm not aware of that. 16:25:18

Q. When you read this, did you inquire of anyone whether that was true or not? 16:25:19 16:25:25

A. Well, I was surprised by it, and no, I didn't inquire about it. 16:25:27 16:25:33

Q. Well, given you were surprised by it, do you mean it was not consistent with what you believed to be true? 16:25:34 16:25:36 16:25:39

A. Was this consistent? 16:25:39

Q. This was inconsistent with what you believed to be true; correct? 16:25:40 16:25:43

A. Could you ask that in another way? I'm not following you. 16:25:44

Q. You said you were surprised by it. Why were you surprised by it? 16:25:47 16:25:49

A. I was surprised that this, what you're saying here, occurred in 1972 and 1973. 16:25:50 16:25:56

Q. Why were you surprised? 16:25:58

A. Because I was not aware of it. 16:26:00

Q. Okay. And did you disbelieve it when you read it? 16:26:03 16:26:05

A. I questioned whether it was true or not. 16:26:10

Q. And have you since found out whether or not it's true? 16:26:13 16:26:16

A. I believe that it falls under a discussion that I had with Mr. Toberoff. 16:26:18 16:26:24

Q. Okay. Did you have that discussion after reading it in the lawsuit that we filed in May, 2010, the one that you just described? 16:26:28 16:26:31 16:26:35

A. I believe so. 16:26:37

Q. Okay. Did Mr. Toberoff show you the copyright renewal forms or the copyright registration forms? 16:26:38 16:26:47 16:26:50

MR. TOBEROFF: Attorney-client privilege. Instruct you not to answer. 16:26:50 16:26:51

BY MR. PETROCELLI:

Q. Have you ever seen those forms, the ones referenced in paragraph 88 of our lawsuit? 16:26:52 16:26:56
A. I don't remember ever seeing them. 16:26:58
Q. Take a look at Exhibit 17. 16:27:01
(Whereupon, Plaintiff's Exhibit 17 was placed before the witness.) 16:27:09
THE WITNESS: Thank you. 16:27:10
BY MR. PETROCELLI:
Q. This is for the year 1972 listing of renewal registrations from the copyright office. The year "1972" is in the top-left corner. And -- well, first of all, have you ever seen this document before? 16:27:16 16:27:20 16:27:23 16:27:28
A. I've seen similar documents. I can't tell you whether I saw this page or not. 16:27:32 16:27:36
Q. Well, have you ever seen a document which identified the name Joe Shuster and Superboy? 16:27:38 16:27:40
A. I don't recall that, no. 16:27:44
Q. I'll show you one more for 1973. Okay. I'll show you another one I forgot to include. This is Exhibit 18. 16:27:51 16:27:56 16:28:00
(Whereupon, Plaintiff's Exhibit 18 was placed before the witness.) 16:28:02
THE WITNESS: Excuse me. May I just have a minute because I'm having trouble with this small print. 16:28:02 16:28:04 16:28:07

BY MR. PETROCELLI: 16:28:24

Q. Take a look at Exhibit 18, which is a November 15, 1972, certification of a copyright registration for Superboy. 16:28:25 16:28:29 16:28:36

A. Okay. 16:28:40

Q. And you will see on the second page that the two claimants are Jerome Siegel -- that's your father -- as an author and Joe Shuster as an author for the title "Superboy." Do you see that? 16:28:41 16:28:47 16:28:51 16:28:56

A. Yes. 16:29:01

Q. And is this the first time you've seen this document? 16:29:02 16:29:04

A. Yes. 16:29:04

Q. And finally, take a look at Exhibit 19, which is a listing of registrations for the year 1973. 16:29:08

(Whereupon, Plaintiff's Exhibit 19 was placed before the witness.) 16:29:25

BY MR. PETROCELLI:

Q. And you'll see a reference to "Superboy." 16:29:26

A. I see "Superman." 16:29:38

Q. You see under the name "Jerome Siegel" it says "Superboy. By Jerome Siegel"? 16:29:48 16:29:52

A. This one entry, yeah. All of these others are Superman. I see. 16:29:54 16:29:56

Q. Do you see the one for Superboy where it says 16:29:57

"By Jerome Siegel & Joe Shuster"? 16:30:00

A. In More Fun Comics? 16:30:02

Q. Yes. Is that the first time you've seen this document? 16:30:04 16:30:11

A. Yeah, I believe so. 16:30:11

Q. Okay. Are you aware, going down to the next bullet of paragraph 88, that in Action Comics No. 1, Joe Shuster drew Superman as a very young boy displaying a chair being held over his head? 16:30:21 16:30:25 16:30:29 16:30:34

A. Yes. You mean that one -- that one -- if I'm recalling correctly, there's one panel. 16:30:40 16:30:43

Q. If you turn the page -- 16:30:46

A. That's the panel. 16:30:49

Q. -- that's the panel that you're referring to? 16:30:51

MR. TOBEROFF: Superbaby. 16:30:53

THE WITNESS: As a baby, right. 16:30:54

BY MR. PETROCELLI:

Q. "Action Comics No. 1 (1930)." Do you see that? 16:30:55

A. Yes. 16:30:58

Q. And you understood that Joe Shuster had illustrated that; correct? 16:30:58 16:31:01

A. Yes, he did. 16:31:02

Q. And in the next panel on page 30 of the Complaint, which is part of paragraph 88, were you aware that Mr. Shuster had illustrated a -- Superman 16:31:06 16:31:10 16:31:17

as a youth in Superman No. 1 in May of 1939? 16:31:24

A. Well, this says it's from Superman No. 1, and, you know, I don't recall it being, but I recognize this panel. So yes, this one panel I do recognize. 16:31:30 16:31:34 16:31:38 16:31:42

Q. Okay. And then also comic strips in 1942 depicting Superman as a youth as shown in the Superman Sunday Strip, May 31, 1942, depicted on page 31 of our Complaint, have you seen that panel before? 16:31:43 16:31:53 16:32:01 16:32:01

A. No, I haven't seen that one before. I don't recall that one. 16:32:02 16:32:04

Q. Now, given that Joe -- given this body of evidence that Joe Shuster was a co-creator of Superboy, are you aware of any reason why -- withdrawn. 16:32:05 16:32:15 16:32:24

Given this body of evidence regarding Joe Shuster's role in the creation of Superboy, including illustrating Superboy and filing the copyright registrations in his name and so forth -- 16:32:30 16:32:39 16:32:44 16:32:48

MR. TOBEROFF: Assumes facts. Lacks foundation. 16:32:50 16:32:52

BY MR. PETROCELLI:

Q. -- are you -- did you ever have any discussion with anyone about why the Shusters two years after entering into that agreement with 16:32:53 16:32:57 16:33:05

Mr. Toberoff's company in which they included as one of the claimed rights -- rights to Superboy would then disavow such rights? 16:33:07 16:33:11 16:33:15

MR. TOBEROFF: Assumes facts. Lacks foundation. Misstates the record. 16:33:17 16:33:19

And you could answer excluding your conversations with your attorneys. 16:33:24 16:33:29

THE WITNESS: And the question was did I discuss this with anyone? 16:33:31 16:33:33

MR. PETROCELLI: Yes. 16:33:34

THE WITNESS: No one other than my attorney. 16:33:39

BY MR. PETROCELLI:

Q. And who is your attorney? 16:33:41

A. Marc Toberoff. 16:33:43

Q. And you discussed with your attorney -- 16:33:45

MR. TOBEROFF: Excuse me. Excuse me. I want to make sure when you're answering these privileged questions not to answer the question -- the questions that invade the privilege, when I say to you you can only answer to the extent of conversations excluding your conversations with me, that means if you have a conversation with somebody outside of your conversations with me and they're not an attorney, you can answer the question. Otherwise, you don't answer the question. 16:33:48 16:33:51 16:33:54 16:33:58 16:34:02 16:34:05 16:34:08 16:34:10 16:34:12 16:34:14

THE WITNESS: Oh, oh. Okay. I'm sorry. I didn't -- 16:34:15 16:34:17

MR. TOBEROFF: Don't answer the question in such a way that by inference you're disclosing the substance of your conversations with me. 16:34:18 16:34:19 16:34:22

THE WITNESS: Okay. I was confused. 16:34:24

MR. TOBEROFF: It's tricky. It can be tricky. 16:34:26 16:34:27

THE WITNESS: Yeah. 16:34:28

BY MR. PETROCELLI:

Q. Did you ever discuss this with your mother? 16:34:29

MR. TOBEROFF: Discuss what? 16:34:34

BY MR. PETROCELLI:

Q. The issue that I've been talking about, why -- why on the one hand the Shusters would claim an interest in Superboy, particularly given some of the evidence that I have discussed with you, and then on the other hand relinquish any interest in Superboy two years later. 16:34:35 16:34:39 16:34:43 16:34:49 16:34:52 16:34:55

MR. TOBEROFF: Mis- -- lacks foundation. Assumes facts. Misstates the record. 16:34:57 16:34:59

You can answer. 16:35:01

THE WITNESS: I don't -- I don't believe that I -- that I discussed the way you asked the question. 16:35:03 16:35:04

BY MR. PETROCELLI:

Q. Well, did you discuss with your mother -- 16:35:10
MR. TOBEROFF: You can say no. Don't -- 16:35:16
BY MR. PETROCELLI:
Q. -- any issue relating to the relinquishment of the Superboy interest or any claim to a Superboy interest by the Shuster family? 16:35:17 16:35:23 16:35:27
A. No. 16:35:31
MR. TOBEROFF: Same -- you answered for me too quickly for me to object. 16:35:31 16:35:34
BY MR. PETROCELLI:
Q. Were --
MR. TOBEROFF: Excuse me. Same objection. 16:35:35
BY MR. PETROCELLI:
Q. Were you aware prior to reading our lawsuit that after Mr. Toberoff's agreement with you in October, 2002, he entered into a new agreement with the Shusters which deleted Superboy from the definition of rights in their joint venture? 16:35:43 16:35:55 16:36:01 16:36:10 16:36:14
A. No. 16:36:18
Q. Take a look at Exhibit 13. 16:36:18
(Whereupon, Plaintiff's Exhibit 13 was placed before the witness.) 16:36:28
BY MR. PETROCELLI:
Q. Now, what's the other one? Exhibit -- I want you to put Exhibit 10 and Exhibit 13 next to each 16:36:29 16:36:38

other.

A. What is 10? What am I looking for?

Q. I'll straighten this all out for you once you get 10.

A. Oh, I didn't get it yet. That's why. There's a copy here?

Q. Yes.

A. Do you want this back? Do you need it, Marc?

MR. TOBEROFF: I already have it.

THE WITNESS: Okay.

BY MR. PETROCELLI:

Q. So just to make sure that we're oriented correctly, Exhibit 10 is the first Joint Venture Agreement between Mr. Toberoff's company and the Shusters dated as of November 23, 2001, and Exhibit 13 is the change or supplement to that joint venture dated as of -- dated as of October 27, 2003, some two years later. Okay?

A. Uh-huh.

Q. And you will see in paragraph 1 of Exhibit 10 where it discusses the rights, it references the Superboy and Smallville. I've already showed that to you; right? In Exhibit 10?

A. Yes, I saw Exhibit 10.

Q. And now if you go to Exhibit 13 where there's

16:36:41
16:36:43
16:36:46
16:36:49
16:36:50
16:36:54
16:36:55
16:37:01
16:37:05
16:37:07
16:37:07
16:37:10
16:37:14
16:37:17
16:37:30
16:37:36
16:37:42
16:37:43
16:37:44
16:37:49
16:37:52
16:37:55
16:37:57
16:37:59

a discussion of Superman in paragraph 1, you'll see the word "Rights" in capital letter "R" is defined in the first sentence of paragraph 1. Do you see that?

A. Yes, I see it.

Q. And then if you read the rest of that paragraph you'll see a reference to "all rights to proceeds from 'SUPERMAN,' or the 'SUPERMAN' stories in comic books, including, without limitation, Client's copyright termination interest in 'SUPERMAN.'" Do you see that?

A. Yes, I do.

Q. And you do not see any reference in paragraph 1 to Superboy or Smallville; is that correct?

MR. TOBEROFF: Before you answer the question, since he's asking you to compare these paragraphs, I would like you to read the sentences he's referring to carefully before you answer any questions about it.

THE WITNESS: Um-hum.

And your question was?

MR. TOBEROFF: And read the other one he's asking you to compare it to as well.

THE WITNESS: Yeah, I did just read that. Thank you.

BY MR. PETROCELLI:

16:38:03 16:38:13 16:38:16 16:38:19 16:38:20 16:38:23 16:38:26 16:38:32 16:38:36 16:38:40 16:38:40 16:38:43 16:38:46 16:38:47 16:38:48 16:38:50 16:38:52 16:38:54 16:38:56 16:39:12 16:39:14 16:39:15 16:39:17 16:39:19

Q. And you would agree with me you see no reference to Superboy or Smallville in the discussion of the rights in paragraph 1 of Exhibit 13, the 2003 agreement; correct? 16:39:19 16:39:22 16:39:24 16:39:29

A. Yes. 16:39:29

Q. And in between these two joint venture agreements, 2001 and 2003, that Mr. Toberoff entered into with the Shusters is when he and you joined up and signed your agreement in October of 2002; correct? 16:39:30 16:39:34 16:39:38 16:39:45

A. Yes. 16:39:50

Q. And when you signed this agreement with Mr. Toberoff and Mr. Emanuel in October of 2002, you were asserting a 100 percent interest to Superboy on the ground that your father, Jerome Siegel, was the sole creator of Superboy; correct? 16:39:52 16:39:58 16:40:03 16:40:07 16:40:12

MR. TOBEROFF: Vague and ambiguous. Where in the agreement? Just in general? 16:40:15 16:40:18

MR. PETROCELLI: Just in general. 16:40:20

THE WITNESS: In general that our -- 16:40:21

BY MR. PETROCELLI:

Q. That was your point of view.

A. You said that our belief, our point of view was that -- yes. 16:40:24 16:40:27

Q. And you expressed that point of view to Mr. Emanuel and Mr. Toberoff, that your father was the 16:40:28 16:40:31

sole creator of Superboy and you were claiming a hundred percent termination interest to Superboy; correct? 16:40:34 16:40:37 16:40:41

MR. TOBEROFF: Vague as to time. 16:40:41

BY MR. PETROCELLI:

Q. Correct? 16:40:44

A. Are you saying at the time in 2002? 16:40:44

Q. Yes. 16:40:47

A. Yes. 16:40:48

Q. And it was shortly -- a very short time after you signed the agreement with Mr. Emanuel and Mr. Toberoff in October, 2002, that your family issued a notice of termination with respect to Superboy; correct? 16:40:48 16:40:52 16:40:57 16:41:03 16:41:05

A. Yes. 16:41:06

Q. That was, in fact, the next month, in November; correct? 16:41:06 16:41:09

A. It could have been November. 16:41:11

Q. And that notice of termination for Superboy that your family filed or that was filed on behalf of your family asserted that your father, Mr. Siegel, was the sole creator of Superboy and you were claiming a hundred percent termination interest, not 50 percent; correct? 16:41:12 16:41:15 16:41:18 16:41:22 16:41:25 16:41:28

MR. TOBEROFF: Okay. Wait. I would like to 16:41:28

slow this down. I need time to object. Okay? So after he asks the question, count to 5 or 10 so I have time to object even if I don't object. Okay? 16:41:30 16:41:34 16:41:37

MR. PETROCELLI: I don't think it's reasonable to count to 5 to 10. 16:41:40 16:41:41

MR. TOBEROFF: Count to 5. 16:41:44

MR. PETROCELLI: You just need to pause. 16:41:45

MR. TOBEROFF: I'm happy with 5. 16:41:47

MR. PETROCELLI: Just be reasonable.

Can we repeat the question, please? 16:41:49

MR. TOBEROFF: It's a common instruction. You say count to 10 knowing no one is going to count to 10 and you end up with 2. 16:41:51 16:41:52 16:41:56

(The record was read.) 16:42:23

THE WITNESS: Yes. 16:42:24

BY MR. PETROCELLI:

Q. And at the time that you authorized the filing of that hundred percent Superboy termination notice in November of 2002, were you aware that Mr. Toberoff through his company, Pacific Pictures, had entered into a joint venture agreement with the Shusters in which they included among the rights of the joint venture references to Superboy? 16:42:25 16:42:26 16:42:29 16:42:38 16:42:41 16:42:46 16:42:50

A. No, we were not aware of that. 16:43:00

MR. PETROCELLI: Okay. We'll take your break 16:43:02

now.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: Off the record. The time is 4:43.

(A recess was taken.)

THE VIDEOGRAPHER: We're back on the record, and this marks the beginning of tape number four in the deposition of Laura Siegel. The time is 5 o'clock.

BY MR. PETROCELLI:

Q. Ms. Siegel, were you aware that in -- that after Mr. Toberoff entered into his first agreement with the Shusters in November, 2001, that around that same period of time, I should say, that he contacted Kevin Marks or left a voicemail for Kevin Marks --

A. I -- no.

Q. -- on November 29, 2001?

A. 2001, no.

Q. Did you learn about that contact from Mr. Marks at that time?

A. No.

Q. And are you aware that in February, 2002, February 6, to be exact, that Mr. Toberoff contacted Kevin Marks again?

A. No.

16:43:04 16:43:04 16:43:05 16:43:08 17:00:12 17:00:20 17:00:22 17:00:26 17:00:28 17:00:28 17:00:34 17:00:37 17:00:43 17:00:48 17:00:54 17:00:54 17:00:57 17:00:58 17:01:02 17:01:07 17:01:08 17:01:14 17:01:19 17:01:23

MR. TOBEROFF: What date? 17:01:23

MR. PETROCELLI: February 6, 2002. 17:01:25

Q. And are you aware -- and I'm basing these questions off of, I'll tell you, the testimony of Kevin Marks -- 17:01:27 17:01:32 17:01:35

A. Okay. 17:01:35

Q. -- in the case that you filed. 17:01:35

A. Um-hum. 17:01:37

Q. Are you aware -- 17:01:39

MR. TOBEROFF: Allegedly. 17:01:40

BY MR. PETROCELLI:

Q. -- that Mr. Marks said or -- are you aware that Mr. Toberoff told Mr. Marks that he was interested in the Superman property and the Superboy property when he called him and spoke to him for the first time in February of 2002? 17:01:41 17:01:45 17:01:47 17:01:51 17:01:53

A. 2000 -- I can't hear you. 17:01:56

Q. February, 2002. Were you aware that Mr. Toberoff told Mr. Marks that he was interested in the Superman property and the Superboy property? 17:02:01 17:02:01 17:02:03

A. No, I was not. 17:02:06

Q. Mr. Marks did not convey that to you? 17:02:07

A. No, he did not. 17:02:09

Q. And are you aware that Mr. Marks told Mr. Toberoff on that occasion that the Siegels were 17:02:13 17:02:18

very far along with DC Comics and at a documentation phase? 17:02:22 17:02:26

A. Well, I don't know that he had the conversation. 17:02:27 17:02:28

Q. Okay. Were you aware that three days later on February 9, 2002, Mr. Toberoff approached Steve Spira, an executive at Warner Bros., at an event and said that Warner Bros. had a Superman rights problem? 17:02:30 17:02:33 17:02:38 17:02:42

A. No, I did not know that. 17:02:46

Q. Take a look at the next exhibit in order, which is Exhibit 60. And this is an agreement -- excuse me. This is a document between Mr. Emanuel and Mr. Toberoff dated June 3. 17:02:48 17:02:50 17:03:08 17:03:11

A. Thank you. 17:03:15

(Whereupon, Plaintiff's Exhibit 60 was marked for identification.) 17:03:24

THE WITNESS: June 3. 17:03:24

MR. PETROCELLI: Excuse me. Exhibit 60 is a redacted agreement, redacted meaning that we don't have the whole agreement, just parts of it, signed between Mr. Emanuel and Mr. Toberoff on or about February 12, 2002. 17:03:42 17:03:45 17:03:48 17:03:52 17:03:57

Q. Have you ever seen this document before -- or have you ever seen the agreement in its entirety? 17:03:59 17:04:04

A. No. 17:04:11

Q. And were you aware that IP Worldwide was created as a combination between Mr. Emanuel and Mr. Toberoff's company, Pacific Pictures Corporation? 17:04:11 17:04:20 17:04:24

A. No. 17:04:40

MR. TOBEROFF: I just want to object. This document is stamped "Confidential," and I believe it was stamped -- I believe by the Bates number this is a document produced by Endeavor. 17:04:41 17:04:44 17:04:47 17:04:53

MR. PETROCELLI: In the Siegel case. 17:05:00

MR. TOBEROFF: In the Siegel case, and I believe it was stamped "Confidential" pursuant to and under a protective order in that case, and I'm just objecting on that basis and not waiving any objections to the use of this document in this deposition, and at a minimum it should be subject to that protective order because I believe the protective order extends beyond the Siegel case. 17:05:01 17:05:02 17:05:06 17:05:09 17:05:17 17:05:22 17:05:29 17:05:32

MR. PETROCELLI: Okay. Well, we're willing to treat it as such until we work this out. 17:05:32 17:05:37

Okay. I'm told that it was reproduced in this case in the absence of any protective order. But look, I'm not going to argue about that, so we'll figure it out. 17:05:43 17:05:46 17:05:50 17:05:52

Next is a document dated May 9, 2002 -- 17:05:55

MR. TOKORO: Exhibit 61. 17:06:06

MR. PETROCELLI: -- which will be Exhibit 61. It's a letter from -- from Joanne Siegel to Richard Parsons. 17:06:07 17:06:08 17:06:19

(Whereupon, Plaintiff's Exhibit 61 was marked for identification.) 17:06:19

BY MR. PETROCELLI:

Q. You testified about this letter in your prior deposition in the Siegel case. A couple of follow-up questions. 17:06:23 17:06:26 17:06:32

Did you type this letter? 17:06:32

A. Yes, I typed it. 17:06:34

Q. And you typed it at your home? 17:06:36

A. Yes. 17:06:37

Q. Did you assist in drafting it? 17:06:38

A. If I'm recalling correctly, my mom said "Don't change one word." She was pretty insistent, so no, I did not make changes to it. 17:06:42 17:06:46 17:06:50

Q. Did you show it to anybody before it went out? 17:06:52 17:06:54

A. No. 17:06:54

Q. Did you discuss -- do you know if your attorneys knew it had gone out, Mr. Marks? 17:06:54 17:07:02

A. No. 17:07:06

Q. They did not know? 17:07:06

A. They did not know. 17:07:07

Q. Now, in this letter you say -- it states at the very end -- 17:07:24 17:07:40

A. You mean she says? 17:07:43

Q. She says, correct -- that -- part of the last paragraph "Have you been aware that your representatives have gone too far? If not, you do now." Were you -- was your mother concerned as far as you knew that the lawyers were taking positions that the company wasn't aware? 17:07:44 17:07:50 17:07:52 17:07:57 17:08:02 17:08:06

A. Yes. I believe that's what she was expressing here. 17:08:09 17:08:11

Q. Was there a response received to this letter? 17:08:12

A. Oh. Perhaps, but I don't know for sure. 17:08:16

Q. Okay. 17:08:27

MR. TOBEROFF: A response from Dick Parsons? 17:08:28

THE WITNESS: That's what I assumed you meant. 17:08:30 17:08:32

MR. PETROCELLI: I did mean that, right. 17:08:32

THE WITNESS: Dick Parsons' response. 17:08:34

BY MR. PETROCELLI:

Q. And the answer is you don't know. 17:08:35

A. I don't know. 17:08:37

Q. And do you know whether anyone else responded to this letter? 17:08:37 17:08:40

A. I don't -- I don't recall. 17:08:40

Q. Okay. 17:08:42
Now, did at some point you make your lawyers aware that your mother had sent this letter? 17:09:04 17:09:08
A. Actually, they found out, and then my mother and I discussed it with them. 17:09:11 17:09:15
Q. How did they find out? From Warner Bros.? 17:09:16
A. Yes. 17:09:19
Q. And you wrote this letter on May 9, 2002. 17:09:23
A. No, I didn't write it. My mother did. 17:09:27
Q. Excuse me. You typed it for your mother? 17:09:29
A. Yes. 17:09:31
Q. And is it your testimony that every single word was drafted by your mother and no one else? 17:09:31 17:09:33
A. That's correct. 17:09:36
Q. Including some of the legal-sounding sentences? 17:09:40 17:09:46
A. That's right. She -- she was a hell of a writer. 17:09:47 17:09:54
Q. Did she have a writing background? 17:09:54
A. She had written, yes. 17:09:57
Q. What had she written? 17:10:01
A. Well, she didn't -- she didn't get to sell them, but she had written several books, and, you know, she was constantly writing and drafting things for my father through the years. 17:10:01 17:10:04 17:10:08 17:10:11

Q. What kind of books had she written? 17:10:13
A. Well, she wrote a children's book. She wrote, you know, just things that moved her, memories that she had from her youth. 17:10:16 17:10:18 17:10:24
Q. Did she ever write anything regarding Superman or her husband's role in Superman? 17:10:25 17:10:28
A. No. 17:10:41
Q. And again, you sent this -- this letter was sent by your mother on May 9, 2002, but it was not until September 21, 2002, that DC was informed that negotiations were being stopped; correct? 17:10:41 17:10:46 17:10:50 17:10:55
A. Yes. I mean we -- you know, by that time we reached our decision, and that was it. 17:10:58 17:11:01
Q. By that time, meaning September 21, 2002? 17:11:05
A. By September 21, right. 17:11:08
Q. 2002. 17:11:10
A. 2002. 17:11:11
Q. Okay. Thank you. 17:11:12
At some point -- the reaction expressed in this letter was to the -- a proposed agreement that was sent to your lawyer by the folks at Warner Bros. and DC Comics; is that correct? 17:11:28 17:11:33 17:11:43 17:11:46
A. You're talking about the February -- 17:11:48
Q. Yes. 17:11:50
A. -- 2002 one? Yes. 17:11:50

Q. And after that, your lawyer, Mr. Marks, undertook to prepare a redraft of that document; correct? 17:11:53 17:11:56 17:11:59

A. After a long period of time he suggested that he might do that. 17:11:59 17:12:03

Q. Okay. And you saw that redraft; right? 17:12:04

A. Yes, I did. 17:12:08

MR. TOBEROFF: Okay. Try and stay away from -- give ballpark things, but try and stay away from the substance of your conversations with your attorney, what he said, what you said. 17:12:09 17:12:14 17:12:16 17:12:18

THE WITNESS: Right. 17:12:21

MR. TOBEROFF: Don't try and stay away from it. Stay away from it. 17:12:22 17:12:25

BY MR. PETROCELLI:

Q. And did you ever have an occasion to see the redraft that he prepared? 17:12:32 17:12:35

A. That Kevin Marks prepared? 17:12:37

Q. Yes. 17:12:39

A. Yes. 17:12:40

MR. TOBEROFF: I just want to tell you because I don't want to read your work product, but on the back of that thing you're holding up there's language. There's writing. 17:12:40 17:12:41 17:12:43 17:12:47

MR. PETROCELLI: It's about Woody Harrelson 17:12:52

being a big Oscar nominee. 17:12:54

THE WITNESS: How did it get in my file? 17:12:58
Tell Woody I said hi. 17:13:01

BY MR. PETROCELLI: 17:13:03

Q. And you're aware that the date of that 17:13:04
redrafted long-form agreement was July 15, 2002? 17:13:08

A. Sounds about right. 17:13:12

Q. Shortly after the redraft was created, are 17:13:50
you aware that Mr. Toberoff called Mr. Marks to try to 17:13:55
set up a meeting with Mr. Toberoff and Mr. Emanuel? 17:14:03

A. Set up a meeting with whom? 17:14:09

Q. With Mr. Toberoff and Mr. Emanuel. 17:14:12

A. No, no, no. You're saying he called and 17:14:14
wanted to set up a meeting with Kevin Marks? 17:14:16

Q. Or another -- Mr. Toberoff calls Mr. Marks to 17:14:19
try to arrange a meeting or a conference call with 17:14:21
Toberoff, Marks, and Emanuel. 17:14:26

A. No, I was not aware of that. 17:14:29

Q. Okay. Then that -- according to Mr. Marks' 17:14:31
call logs, Mr. Toberoff made that contact on July 24, 17:14:35
2002. Do you have any recollection of Mr. Marks 17:14:41
having conveyed that to you? 17:14:43

A. Mr. Marks did not. 17:14:44

Q. Why are you -- are you certain he didn't? 17:14:52

A. I'm very certain that he didn't. 17:14:54

Q. Why is that?
A. Because when we -- we finally received communication from Mr. Marks that he had been contacted by -- by Mr. Toberoff, it was later than that. So, you know, he didn't specify the date on which -- on which he contacted him, but when did you say that was? July what?
Q. 24th.
A. Yeah, I think it was shortly thereafter that we found out about it, but he never referenced any phone call in July, is what I'm trying to --
Q. I see.
A. He didn't convey it to us.
Q. When you say you shortly found out about it, meaning you shortly found out about the Toberoff/Emanuel contact when you received the letter from Mr. Marks.
A. I believe so, yes.
Q. That's the first time you found out from Mr. Marks that Mr. Toberoff had contacted him; is that right?
A. That's correct.
Q. And Mr. Marks had not told you about the February contact.
A. No.

17:14:55 17:14:57 17:15:01 17:15:05 17:15:11 17:15:16 17:15:19 17:15:21 17:15:21 17:15:24 17:15:28 17:15:30 17:15:31 17:15:32 17:15:35 17:15:42 17:15:43 17:15:46 17:15:48 17:15:52 17:15:55 17:15:55 17:15:58 17:16:01 17:16:02

Q. Or that Mr. Toberoff had called him in November of '01. 17:16:02 17:16:04

A. No. 17:16:25

Q. Now, when Mr. -- according to Mr. Marks' testimony, on August 8, 2002, there was a conference call with Mr. Emanuel and Mr. Marks and Mr. Toberoff in which Mr. Emanuel and Mr. Toberoff expressed their interest in pursuing the property. Did Mr. Marks convey to you what had transpired in that call prior to your receiving the letter from him about it? 17:16:25 17:16:31 17:16:36 17:16:41 17:16:45 17:16:51 17:16:56

A. No, he did not. 17:16:59

Q. Okay. Take a look at Exhibit 54. 17:17:14

MR. TOBEROFF: What was the number of the Parsons letter? 17:17:25 17:17:26

THE WITNESS: That's 61. 17:17:28

MR. TOKORO: 61. 17:17:29

MR. TOBEROFF: Thank you. 17:17:30

(Whereupon, Plaintiff's Exhibit 54 was placed before the witness.) 17:17:32

BY MR. PETROCELLI:

Q. Exhibit -- excuse me. Exhibit 54 is a letter from your mother and you to Mr. Marks and Mr. Ramer of Gang Tyre dated September 21, 2002 -- 17:17:33 17:17:38 17:17:47

A. Um-hum. 17:17:47

Q. -- stating that you had rejected the DC 17:17:51

Comics offer sent to you on February 4, 2002, as well as Mr. Marks' redraft which was sent to you on July 15, 2002. Do you see that? 17:17:55 17:18:01 17:18:07

A. Yes, I do. 17:18:08

Q. And then you say due to irreconcilable differences and so forth, that you're terminating Mr. Marks' firm's services effective, I guess -- well, immediately; right? 17:18:10 17:18:13 17:18:18 17:18:25

A. That's right. 17:18:26

Q. As of September 21, 2002; correct? 17:18:28

A. Yes. 17:18:32

Q. Now, you copied Michael Siegel on this as well as his lawyer, Don Bulson. As of this point in time, September 21, 2002, you had heard about the Toberoff/Emanuel discussion with Mr. Marks through his letter to you. You had now terminated Mr. Marks. 17:18:32 17:18:34 17:18:42 17:18:51 17:18:56

A. Um-hum. 17:19:04

Q. On the same date, September 21, 2002, you advised DC that you were terminating negotiations with them as well as with Warner Bros.; correct? 17:19:06 17:19:10 17:19:14

A. Correct. 17:19:16

Q. You copied Michael Siegel and Mr. Bulson on these various letters. Had you had conversations with Michael as of this point in time about what you were doing? 17:19:18 17:19:21 17:19:26 17:19:30

A. We were -- we were frustrated because we felt that the Ramer firm had really done as much as they could do, and from -- okay. I won't say what. 17:19:30 17:19:42 17:19:46

MR. TOBEROFF: I want you to focus on his question. 17:19:50 17:19:52

THE WITNESS: Okay. I'm sorry. What was your question? 17:19:52 17:19:54

BY MR. PETROCELLI:

Q. My question was given that you had copied Mr. Siegel and his lawyer, Don Bulson, in these important notifications that you sent out on September 21, 2002, whether and to what extent you had communicated with Mr. Siegel about these plans and these activities. 17:19:55 17:19:59 17:20:06 17:20:09 17:20:14 17:20:17

A. Oh. No. We didn't talk about them beforehand. We were -- 17:20:18 17:20:22

Q. Just out of the clear blue you sent him a copy of your letters? 17:20:23 17:20:26

A. Yes. That's the way I remember it. 17:20:27

Q. Do you recall any discussion with him or his lawyer, Mr. Bulson? 17:20:31 17:20:35

A. You know, we didn't really communicate very much. 17:20:38 17:20:41

Q. Okay. Why did you copy him? 17:20:41

A. Because his attorney would on occasion 17:20:48

communicate with Kevin Marks, and we wanted to let them know that that was no longer appropriate, that they were no longer representing us. 17:20:54 17:20:57 17:20:59

Q. When you were -- you hadn't paid Kevin Marks any fee because their firm was charging 5 percent of whatever settlement might occur; right? 17:21:03 17:21:08 17:21:11

A. We made regular payments on costs. 17:21:14

Q. Costs. 17:21:16

A. Only. 17:21:16

Q. Was Mr. Siegel, Michael Siegel, sharing in those costs? 17:21:17 17:21:20

A. We asked him to, and there was an ongoing dispute over that. 17:21:21 17:21:26

Q. And had you asked him to share in those costs all the way back to the beginning, starting with the termination notice with Mr. Levine and then going forward through the Marks firm? 17:21:27 17:21:29 17:21:33 17:21:35

A. We requested that. 17:21:37

Q. And did you bill him for it? 17:21:40

A. Yes, we billed him for it. 17:21:42

Q. Who prepared the bills? 17:21:44

A. My mother and I did. 17:21:45

Q. Who would you send the bills to? 17:21:47

A. We sent -- we sent -- well, when you say bills -- 17:21:49 17:21:51

Q. Or statements or requests for his share of the costs. 17:21:51 17:21:55

A. I believe we gave that to Kevin Marks, and Kevin Marks submitted it on our behalf. 17:21:56 17:22:01

Q. What did you charge him? 25 percent of the total costs? 17:22:02 17:22:06

A. That -- that was what we asked for. 17:22:07

Q. Or actually was it more than that? Was it a third? How did you do the math? 17:22:09 17:22:12

A. No, it was 25 percent. I mean under copyright law it was 50 percent for my mother, 25 percent for me, 25 percent for Michael. And so, you know, we felt it was appropriate for him to have a corresponding responsibility for costs. 17:22:14 17:22:17 17:22:20 17:22:23 17:22:27

Q. When Mr. Ramer was doing the negotiations -- Mr. Marks or Mr. Ramer, the Gang Tyre firm, with Warner Bros. and DC Comics, was that on behalf of the entire hundred percent Siegel interest, including Michael's 25 percent? 17:22:29 17:22:34 17:22:39 17:22:42 17:22:45

A. Yes, it was. 17:22:46

Q. Had Michael entered into an engagement letter with the Gang Tyre firm, to your knowledge? 17:22:48 17:22:51

A. I don't believe he did. 17:22:55

Q. Did Bulson and -- did Kevin Marks ever meet Michael Siegel, to your knowledge? 17:23:06 17:23:14

A. I -- not to my knowledge. 17:23:15
Q. Were there ever any joint meetings with all of you together and Kevin Marks or Bruce Ramer? 17:23:17 17:23:20
A. Not -- not all of us together, but I know that Don Bulson, you know, did meet up with Kevin Marks at one point. 17:23:23 17:23:27 17:23:31
Q. When you sent out the -- excuse me. When your mother wrote out and you typed out and you sent to Warner Bros. and DC Comics the letter in May expressing your upset about the February -- 17:23:32 17:23:35 17:23:39 17:23:44
A. This one? Yeah. 17:23:44
Q. -- long form agreement -- 17:23:47
A. Um-hum. 17:23:50
Q. -- did you first clear that with Michael Siegel or Don Bulson? 17:23:50 17:23:50
A. No. 17:23:53
Q. Did you send them a copy of it? 17:23:53
A. That I don't remember. 17:23:57
Q. Oh. Why was there a dispute between you and your mother on the one hand and Michael Siegel on the other hand regarding this issue prior -- yes, as of September 21, 2002? 17:24:08 17:24:13 17:24:16 17:24:22
A. You're talking about costs. 17:24:23
Q. Was that the subject of the dispute, the costs? 17:24:24 17:24:26

A. Yes. 17:24:26
Q. And why was there a dispute about the costs? 17:24:27
A. Michael was the child of a very upsetting divorce, and he -- you know, it hurts me to have to say this, but, you know, he was a very kind of confused guy and he really kind of couldn't keep things straight. It was very difficult to communicate with him, and it was very upsetting to receive communications from him that were kind of all over the place, things that didn't really make any sense, and he was very secretive, and he just couldn't really grasp legal principles. So discussions with -- directly with him really didn't work. It really required attorneys to explain things to him, and that's why he had his own attorney, who was, of course, interpreting things, you know, for Michael and explaining things to him. But he didn't -- he didn't have any -- any background in understanding the history of, you know, the Superman litigations or -- you know. 17:24:33 17:24:39 17:24:44 17:24:48 17:24:50 17:24:54 17:25:04 17:25:08 17:25:14 17:25:20 17:25:24 17:25:32 17:25:34 17:25:38 17:25:42 17:25:46 17:25:50 17:25:54
Q. What did he do for a living? 17:25:54
A. He was a plumber. 17:25:55
Q. And so you didn't grow up close at all. 17:26:00
A. I never met him. 17:26:06
Q. Ever? 17:26:07

A. Ever. And he wouldn't send me any photographs of himself. 17:26:07 17:26:12
Q. He did or did not? 17:26:13
A. Did not. I sent him photographs of myself and my children and asked him to reciprocate, and he refused to do that. So the first time I ever saw what my brother looked like was after he died and I went to the home that he had shared with his mother, and, you know, found things like a dog dish, you know, in the kitchen, and I said, "Where's the dog?" And they said, you know, the dog -- when I say "they," a friend told me that the dog had died years before and -- you know, but I found photographs of him in his home. 17:26:14 17:26:17 17:26:23 17:26:27 17:26:31 17:26:35 17:26:38 17:26:41 17:26:45 17:26:48
Q. Your children never met with him either? 17:26:52
A. No. 17:26:54
Q. Did your mom ever meet him? 17:26:54
A. No, I don't believe so. He was -- he was very young when the divorce occurred. 17:26:56 17:27:01
Q. How old was he? 17:27:04
A. 5 or 6, I think. 17:27:06
Q. What year was it that your dad divorced his mom? 17:27:08 17:27:11
A. It was in the 1940s. 17:27:11
Q. And when did your mother and your father marry? 17:27:13 17:27:16

A. In 1948. 17:27:16

Q. How did you first get in touch with Michael Siegel about this termination issue going back to 1997? 17:27:27 17:27:31 17:27:37

A. Well, my husband, who was an attorney -- excuse me -- and also, you know, kind of helped us with things, phoned -- phoned Michael and informed him that, you know, he had a passive interest and, you know, that he wanted to let him know about that, and, you know, after -- after that, Michael retained an attorney in Cleveland. 17:27:37 17:27:41 17:27:44 17:27:50 17:27:54 17:28:00 17:28:04

Q. Did you ever meet Mr. Bulson? 17:28:06

A. I did after Michael died. 17:28:08

Q. Are you aware that Michael wanted to have a will made out but never got -- 17:28:17 17:28:21

A. He never did it. 17:28:25

Q. Did you ever see what his wishes were? 17:28:27

A. He had some kind of rambling communications with his attorney. 17:28:31 17:28:33

Q. To the effect that he did not want either you or your mother to share in anything? 17:28:35 17:28:38

A. He stated that in an e-mail, but the court ruled otherwise. Not for my mother, but for me. 17:28:40 17:28:44

Q. The next exhibit is -- 17:29:00

Make sure we did. 17:29:06

MR. TOKORO: It's 56. 17:29:15
MR. PETROCELLI: Are you sure? 17:29:17
MR. TOKORO: Yes. 17:29:18
MR. PETROCELLI: I thought he did multiple. 17:29:22
Q. Going back to Exhibit 56 for a second, which is your notification to DC Comics that you were terminating negotiations dated September 21, 2002 -- 17:29:32 17:29:35 17:29:39
A. Is it 54? I have 54. 17:29:43
Q. Can I see that? 17:29:46
A. Yes. I think that's only the Ramer and Marks one. 17:29:47 17:29:51
Q. Yes, this is the termination of the Gang Tyre firm. 17:29:52 17:29:55
A. I don't have that yet unless it's stapled to this. 17:29:55 17:30:01
MR. TOKORO: It was one of the early ones. 17:30:01
MR. PETROCELLI: I showed it to you earlier on, all the way on the bottom. He'll fish it out for you. 17:30:03 17:30:05 17:30:08
THE WITNESS: Okay. 17:30:09
Oh, thank you. 17:30:12
BY MR. PETROCELLI:
Q. So you have in front of you now Exhibit 56? 17:30:13
A. Um-hum. 17:30:16
Q. And you will see that you're advising DC 17:30:17

about the termination of the Gang Tyre firm and that you have instructed the Gang Tyre firm to take no further actions on your behalf. Do you see that? 17:30:22 17:30:25 17:30:28

A. Yes, I do. 17:30:32

Q. And September 21, 2002, is the first time that you so advised DC Comics that you were terminating the Gang Tyre firm and that they were to take no further actions on your behalf; correct? 17:30:32 17:30:38 17:30:39 17:30:42

A. Yes. 17:30:45

Q. And that's the first time that you also advised the Gang Tyre firm that they were to take no further actions on your behalf; correct? 17:30:45 17:30:47 17:30:50

A. Yes, that's correct. 17:30:52

Q. Okay. 17:31:36

Okay. Let me mark as the -- 17:31:36

MR. TOKORO: 62. 17:31:39

MR. PETROCELLI: -- next exhibit in order, Exhibit 62, a letter to DC Comics by your mother and you dated October 28, 2002 -- 17:31:40 17:31:46 17:31:51

(Whereupon, Plaintiff's Exhibit 62 was marked for identification.) 17:32:00

MR. PETROCELLI: -- giving notice of the cancellation of a tolling period under a tolling agreement. 17:32:00 17:32:05 17:32:08

Q. Do you see that? 17:32:09

A. Yes, I do. 17:32:09
Q. Now, did you type this document? 17:32:11
A. Yes, I did. 17:32:13
Q. Who drafted this document? 17:32:17
A. My mother and I did. 17:32:19
Q. Did you have the assistance of a lawyer? 17:32:22
A. No. 17:32:25
Q. Are you sure? 17:32:25
A. I'm pretty sure. I don't recall. 17:32:27
Q. Even though you had already retained 17:32:29
Mr. Emanuel and Mr. Toberoff? 17:32:33
A. Without revealing the communication between 17:32:39
my former attorney and me, I will say that we were 17:32:44
informed by the Gang Tyre firm that we needed to pay 17:32:50
attention to the wording in the tolling agreement. 17:32:56
Q. Why -- 17:33:01
A. So as a result of reading the tolling 17:33:02
agreement and seeing that notification was necessary 17:33:04
to certain people under the tolling agreement, we went 17:33:07
ahead, my mother and I, and drafted this. 17:33:11
Q. Did you run it by a lawyer first? 17:33:14
A. I -- I don't remember. 17:33:17
Q. Even though you were now working with 17:33:20
Mr. Toberoff, you didn't -- 17:33:22
A. Oh -- 17:33:24

Q. -- show it to him? 17:33:25
A. Well, actually -- 17:33:27
Q. And it's in a totally different type face -- 17:33:29
A. Possibly -- 17:33:31
Q. -- than the prior document. 17:33:32
A. That doesn't mean anything. That's because, you know, my computers were always on the fritz. 17:33:33 17:33:36
Q. It's kind of -- 17:33:43
A. No. It's -- well, we had been talking to Mr. Toberoff since the beginning of October about retaining him. We did not actually sign with him until the end of October. So we had not signed and fully retained him at the time when my mother and I were drafting this, because when you showed me -- you showed me the -- our agreement earlier, I looked at the back and the signature page said October 28. 17:33:44 17:33:48 17:33:51 17:33:54 17:33:58 17:34:02 17:34:08 17:34:11
Q. No. I think -- take a look at it again, Exhibit 45. 17:34:15 17:34:28
A. These are all mixed up. 17:34:28
Oh, 23. I'm sorry. I'm sorry. The "3" looked like an "8" to me when I looked at the Xerox because it's not a great Xerox. 17:34:43 17:34:46 17:34:49
Q. So now you're seeing more clearly that it was as of October 23, 2002, that you had signed the IP Worldwide agreement with Mr. Emanuel and Mr. Toberoff. 17:34:52 17:34:57 17:35:01

A. Yes. 17:35:03

MR. TOBEROFF: Objection to "as of." Otherwise -- 17:35:04 17:35:06

THE WITNESS: We had just finalized our agreement. 17:35:07 17:35:11

BY MR. PETROCELLI:

Q. And now does that cause you to believe that you had some assistance in the preparation of the tolling agreement? 17:35:12 17:35:13 17:35:16

A. Well, we weren't advised to do it by Mr. Toberoff. He may have looked at the draft just to make sure that the language was correct. 17:35:19 17:35:22 17:35:25

Q. Well, why wouldn't you have him do it? Why are you -- 17:35:28 17:35:31

A. You asked me if I remembered it. 17:35:31

Q. You don't remember. 17:35:33

A. Okay. I'm trying to answer your question. 17:35:35

Q. Before you answered with some degree of certainty that you and your mother wrote this document, which I must say seems implausible to me. It's a -- it's a technical legal document that your prior counsel had advised you was important for you to pay attention to. 17:35:37 17:35:39 17:35:41 17:35:44 17:35:49 17:35:52

A. Uh-huh. 17:35:53

Q. And I'm just pressing you now on whether you 17:35:53

LAURA SIEGEL LARSON 7/22/2011

actually remember or you're just trying to surmise that you prepared this document. 17:35:56 17:36:00

A. I'm trying to surmise. 17:36:03

Q. Okay. Is it fair to say -- 17:36:08

A. No, no. Excuse me. I don't think I really answered -- you're saying do I think I prepared it? 17:36:09 17:36:13

Q. Do you -- 17:36:19

A. Or do I think somebody else prepared it? 17:36:20

Q. Do you know whether, even though it went out on your letterhead -- 17:36:22 17:36:25

A. Yes. 17:36:25

Q. -- do you know whether this was prepared by a lawyer for you to send out? 17:36:26 17:36:29

A. Oh. It -- we did a draft -- my mother and I did a draft, and to the best of my recollection, we probably ran it by Mr. Toberoff. 17:36:31 17:36:34 17:36:39

Q. Did you run it by Arthur or George, the other lawyers? 17:36:44 17:36:48

A. We might have. 17:36:48

Q. When you were told by Gang Tyre to pay attention to this, some concern was expressed to you that deadlines might run? 17:36:55 17:36:58 17:37:02

MR. TOBEROFF: Don't talk any more of substance than he advised you to draw your attention to the tolling agreement. 17:37:05 17:37:07 17:37:10

THE WITNESS: Yeah. I mean that's really -- 17:37:11
BY MR. PETROCELLI:
Q. Why did you send this out to DC Comics? 17:37:14
MR. TOBEROFF: Privileged. I instruct you not to answer. 17:37:16 17:37:19
BY MR. PETROCELLI:
Q. Privilege with whom? Who is the lawyer that you're asserting your privilege with? 17:37:19 17:37:22
MR. TOBEROFF: I'm going to -- 17:37:22
MR. PETROCELLI: I'm asking her, not you. 17:37:23
MR. TOBEROFF: I'm asserting it on her behalf. 17:37:25 17:37:27
MR. PETROCELLI: I know, but I'm asking her. 17:37:28
Q. With whom did you have an attorney-client -- who were the attorneys with whom you received legal advice, if any, about the -- about this tolling agreement, Exhibit 62? 17:37:28 17:37:31 17:37:34 17:37:38
A. Well, as I testified before, I don't remember exactly which attorneys we shared this with, but any attorney that is in our employ I have an attorney-client privilege with. So -- 17:37:40 17:37:43 17:37:49 17:37:52
MR. TOBEROFF: And -- 17:37:54
MR. PETROCELLI: I know, but I'm asking you. 17:37:54
MR. TOBEROFF: I'm asserting the attorney-client privilege on your behalf with respect 17:37:56 17:37:57

to Kevin Marks even though he has been terminated since the subject of the communication is a tolling agreement that was entered into that he negotiated and entered into as part of his legal representation of you. 17:37:58 17:38:01 17:38:04 17:38:08 17:38:10

BY MR. PETROCELLI:

Q. Did -- 17:38:12

MR. TOBEROFF: Clearly privileged. 17:38:14

BY MR. PETROCELLI:

Q. With what lawyers specifically do you remember discussing this tolling agreement with prior -- this tolling notice, Exhibit 62, prior to your sending it out? 17:38:15 17:38:17 17:38:20 17:38:24

A. As I testified before, I don't recall. 17:38:24

Q. And do you recall discussing it with any lawyer? 17:38:30 17:38:33

A. With my mother. 17:38:33

Q. Any lawyer I said. 17:38:35

A. I don't recall. 17:38:37

Q. Okay. Why did you send it out? 17:38:40

A. Because in reading the tolling -- 17:38:44

MR. TOBEROFF: Wait, wait, wait. You've testified that you received advice -- 17:38:46 17:38:52

MR. PETROCELLI: Marc -- 17:38:55

MR. TOBEROFF: Excuse me. 17:38:55

MR. PETROCELLI: -- you're just coaching the witness. 17:38:56 17:38:58

MR. TOBEROFF: I'm not coaching the witness. Attorney-client privilege. Instruct you not to answer. I'm not going to explain it. 17:38:58 17:39:00 17:39:01

THE WITNESS: Okay. 17:39:04

MR. TOBEROFF: Is that better? 17:39:05

MR. PETROCELLI: I can't control what you do. I'm not here to critique you. 17:39:08 17:39:11

MR. TOBEROFF: What exhibit number is this one? 17:39:14 17:39:16

THE WITNESS: That was 62. This one you mean; right? 17:39:16 17:39:19

MR. TOBEROFF: Right. 17:39:21

THE WITNESS: Yeah. 17:39:21

MR. PETROCELLI: Let's look at the next document, which is what? 17:39:53 17:39:54

MR. TOKORO: 63. 17:39:56

MR. PETROCELLI: Exhibit 63? 17:39:57

MR. TOKORO: 63. 17:39:59

(Whereupon, Plaintiff's Exhibit 63 was marked for identification.) 17:40:10

THE WITNESS: Thank you. 17:40:11

BY MR. PETROCELLI:

Q. This is a letter to Mr. Bulson with a copy to 17:40:14

Michael Siegel by you and your mother. Do you see that? 17:40:17 17:40:22

A. Yes. 17:40:22

Q. Enclosing your letter? 17:40:23

A. Excuse me. This? 17:40:30

Q. Which was the prior exhibit, apparently; right? 17:40:31 17:40:34

A. Yes, it looks that way. 17:40:34

Q. About the tolling agreement; correct? 17:40:37

A. It looks that way. 17:40:38

Q. It states notifying DC "that under the terms of the April 6, 2000 Tolling Agreement, and due to our written notification to DC Comics on September 21, 2002 which totally stopped and ended negotiations with that company, its parent company and all its representatives, the Tolling Period has been canceled." Why did you send this to Michael Siegel's lawyer? 17:40:40 17:40:42 17:40:46 17:40:51 17:40:54 17:40:58 17:41:02 17:41:05

A. To keep him informed. 17:41:05

Q. Did you get a response from Michael Siegel or his lawyer to your letter in September when you sent him copies of the September 21 letters? Did you hear from him at that time as to what's going on? 17:41:13 17:41:16 17:41:20 17:41:24

A. I could have. 17:41:26

Q. Do you remember? 17:41:27

A. I don't remember specifically. 17:41:28
Q. Do you remember any communication with him about why you're changing representatives? 17:41:30 17:41:33
A. There probably -- there probably was, but I can't remember specifically when it was. 17:41:39 17:41:43
Q. Given your testimony that you never met him, did you ever speak to him? 17:41:47 17:41:52
A. No. 17:41:57
Q. And to your knowledge, did your mother ever speak to him? 17:41:58 17:42:00
A. I think -- no, I don't think she even spoke to him when he was a child. 17:42:01 17:42:06
Q. So the only type of communication that you actually had with Michael Siegel was in writing directly to him or to Mr. Bulson; correct? 17:42:08 17:42:11 17:42:18
A. It -- it was more often through his attorney. It was occasionally directly with Michael. But he was sick for like long periods of time, so, you know, long periods would go by and I wouldn't hear from him, and then all of a sudden a letter would pop up. 17:42:21 17:42:26 17:42:31 17:42:37 17:42:40
Q. And the only way that you would hear from him was through a letter; right? 17:42:42 17:42:47
A. Yes. 17:42:48
Q. Did you have his phone number? 17:42:48
A. I did not have his phone number. 17:42:49

Q. Did you give him your phone number? 17:42:51

A. I don't remember whether I did or not. 17:42:55

Q. Did you give him your e-mail address? 17:42:57

A. We never communicated by e-mail, so I probably did not. 17:43:03 17:43:05

Q. Can you go to the next exhibit, which is the Superboy termination notice that was sent out on your behalf on November 8, 2002. 17:43:17 17:43:19 17:43:26

A. Thank you. 17:43:31

Q. Why didn't you send this out sooner? 17:43:39

MR. TOBEROFF: You can answer except I wouldn't go into anything that implicates communication with an attorney. 17:43:53 17:43:56 17:43:59

THE WITNESS: We had our hands full. We had a lot of -- a lot of things that were going on in the case and trying to find a new attorney after we were dissatisfied with the February offer from DC. We spent a long period of time just trying to decide what to do with what was already before us, and once we figured that out, then we turned our attention to Superboy. 17:44:02 17:44:04 17:44:08 17:44:15 17:44:20 17:44:23 17:44:29 17:44:35

BY MR. PETROCELLI:

Q. Do you know when the earliest time was when you could have sent out a notice of termination for Superboy? 17:44:35 17:44:37 17:44:39

EXHIBIT 24

A. No, I really don't. 17:44:39
Q. Do you know whether you were bumping up against a deadline to send out the Superboy notice? 17:44:42 17:44:44
A. I think we were getting close to a deadline, I think more in terms of end date than beginning date. 17:44:48 17:44:50
Q. Did you have any discussions with any member of the Shuster family that you were going to be sending out the Superboy notice -- 17:44:55 17:45:03 17:45:06
A. No. 17:45:09
Q. -- claiming a hundred percent termination interest? 17:45:10 17:45:12
A. No, we did not. 17:45:12
Q. Did you and your mother discuss whether you should do so beforehand? 17:45:14 17:45:16
A. Whether we should what? 17:45:18
Q. Contact them beforehand and let them know. 17:45:19
A. No. 17:45:26
Q. Did you have any idea what their view was about Mr. Shuster's termination interest with respect to Superboy? 17:45:27 17:45:33 17:45:37
A. We didn't talk to them about Superboy. 17:45:39
Q. Well, were you not concerned that they might protest or contest the assertion by the Siegel family that Jerome Siegel was the sole creator and the sole person entitled to claim a termination interest? 17:45:43 17:45:48 17:45:53 17:45:57

A. No. 17:45:59
Q. Why not? 17:46:02
A. Because we were, you know, relying on the Westchester decision. 17:46:05 17:46:08
Q. In 1947? 17:46:10
A. Yes, correct. 17:46:11
Q. But -- 17:46:12
A. '47, '48, whenever it was. 17:46:13
Q. How did you know they were aware of it? 17:46:15
A. We weren't trying to get inside their minds. We were doing what we thought, you know, we had rights to. 17:46:17 17:46:20 17:46:25
Q. But what if -- but did you discuss with your mother the possibility that you may now be entering into an area in which they might contest your position? Did that thought ever occur to you? 17:46:26 17:46:30 17:46:33 17:46:43
A. We felt perfectly confident that we were within our rights. 17:46:45 17:46:47
Q. I understand that you made a judgment that you were within your rights, but did you give some consideration to the idea that the family of Joe Shuster might have a different view and might dispute this in some way? 17:46:48 17:46:49 17:46:52 17:46:58 17:47:01
A. I don't recall that being a concern. 17:47:05
Q. Never even occurred to you? 17:47:07

A. I don't think so. 17:47:08
Q. And you knew that their lawyer was your lawyer; right? 17:47:13 17:47:17
A. Correct. 17:47:17
Q. Did you ask your lawyer? 17:47:17
A. Do we -- 17:47:20
MR. TOBEROFF: Don't disclose -- 17:47:21
MR. PETROCELLI: Yes. 17:47:23
MR. TOBEROFF: Don't disclose -- I instruct you not to answer. 17:47:24 17:47:26
THE WITNESS: Okay. 17:47:27
BY MR. PETROCELLI:
Q. Did you ask Mr. Toberoff in his -- 17:47:28
MR. TOBEROFF: Privilege. Excuse me.
BY MR. PETROCELLI:
Q. Did you ask Mr. Toberoff in his capacity as a lawyer for the Shusters what their view of the Superboy issue was? 17:47:31 17:47:35 17:47:39
MR. TOBEROFF: Privileged. Instruct you not to answer. 17:47:41 17:47:42
BY MR. PETROCELLI:
Q. I'm not asking about any conversations with you as their lawyer, but with you as the Shuster lawyer. 17:47:42 17:47:46 17:47:50
MR. TOBEROFF: You know -- 17:47:51

BY MR. PETROCELLI: 17:47:52

Q. Did you understand my question? 17:47:52

MR. TOBEROFF: Dan, you can't have it both ways. You can't ask me to keep my objections short and accuse me of coaching and then when I keep it short you engage me in conversations which makes me defensive the next time I object so I explain my objections. 17:47:54 17:47:56 17:47:58 17:48:00 17:48:03 17:48:05

MR. PETROCELLI: Okay. I just want to make sure, though, based on your objections that you understood and more importantly that the witness understood. So let me -- because I don't want to argue with you, and I regret the few instances in which we have and apologize if I said anything in temper. 17:48:05 17:48:06 17:48:08 17:48:10 17:48:13 17:48:18 17:48:25

MR. TOBEROFF: I accept your apology in this limited instance. 17:48:25 17:48:27

MR. PETROCELLI: And I accept yours. 17:48:30

MR. TOBEROFF: I didn't apologize. 17:48:32

MR. PETROCELLI: Noted. 17:48:34

THE WITNESS: You guys. 17:48:36

BY MR. PETROCELLI:

Q. Did -- did you, knowing that a lawyer with whom you were dealing, Marc Toberoff, was also a person who represented the Shusters -- 17:48:40 17:48:44 17:48:50

A. Um-hum. 17:48:53
Q. -- did you ask Mr. Toberoff with his Shuster lawyer hat on, not the Siegel lawyer hat on, to discuss with you what the Shuster position was on Superboy? 17:48:54 17:48:59 17:49:03 17:49:10
MR. TOBEROFF: Instruct you not to answer. Privilege. 17:49:10 17:49:14
BY MR. PETROCELLI:
Q. Did you have any discussions with Mr. Toberoff in his capacity as a lawyer for the Shusters -- 17:49:17 17:49:23 17:49:29
MR. TOBEROFF: Same. 17:49:30
THE WITNESS: You can't separate them out, though. 17:49:30 17:49:33
MR. TOBEROFF: Same instruction. 17:49:33
THE WITNESS: I couldn't separate them out. 17:49:34
MR. TOBEROFF: Same instruction. 17:49:36
BY MR. PETROCELLI:
Q. Can you answer that question for me? 17:49:41
A. I think I've been instructed not to. 17:49:43
Q. Okay. And did you have any conversations with your mother about what the Shuster position is or might be regarding your issuance of a notice of termination claiming a hundred percent of the termination interest to Superboy? 17:49:49 17:49:51 17:49:59 17:50:03 17:50:06

A. I don't believe we did. 17:50:07
Q. And even though Ms. Peary had been kind enough to refer Mr. Toberoff to your family -- 17:50:11 17:50:20
A. Um-hum. 17:50:23
Q. -- it didn't occur to you that you might want to check with the Peary family or the Peavy family on what their view is on Superboy before you filed a notice claiming a hundred percent of the termination interest? 17:50:24 17:50:27 17:50:32 17:50:36 17:50:39
A. I can't -- I can't testify as to what my mother may or may not have done. 17:50:40 17:50:44
Q. Well, what about you? 17:50:44
A. I did not. 17:50:53
Q. Okay. Did you tell your mother it might be a good thing as a courtesy to let Ms. Peavy know? 17:50:53 17:50:53
A. I don't recall. 17:50:57
Q. You didn't give your mother that advice? 17:50:57
A. I don't remember giving her advice. 17:51:00
Q. Did your mother -- you certainly understood how proud Jean Peavy was of her husband's contributions -- 17:51:02 17:51:07 17:51:13
A. Her brother. 17:51:13
Q. -- her brother's contributions to Superman? 17:51:14
A. Of course. 17:51:17
Q. And the whole Superman history; correct? 17:51:18

A. Of course. 17:51:23

Q. And you knew your father felt that way also; right? 17:51:25 17:51:28

A. Yes. 17:51:28

Q. And your mother felt that way; correct? 17:51:29

A. We all did. 17:51:31

Q. And do you think that -- did it occur to you that Jean Peavy might have some feelings about her brother's getting credit for Superboy when you now were claiming sole credit? 17:51:32 17:51:35 17:51:40 17:51:45

A. To the best of my recollection, it wasn't -- it wasn't anything that we were concerned about or worried about. We thought that they shared the same view that we had. 17:51:46 17:51:51 17:51:54 17:51:58

Q. You had no basis to think that. What was your basis? 17:51:59 17:52:02

A. I'm -- 17:52:03

Q. Some opinion in 1947 that you don't even know that they were aware of? 17:52:04 17:52:07

A. Just discussions that I had had with my father during his lifetime. 17:52:08 17:52:10

Q. Did you ever at any time have a discussion with someone in the Shuster family about whether they agreed with that position? 17:52:14 17:52:17 17:52:21

A. I did not. 17:52:22

Q. Do you know if your mother did? 17:52:22

A. She may have. 17:52:25

Q. Do you know if she did? 17:52:25

A. I do not know whether she did. 17:52:27

Q. Did you inform the Peary or Peavy family after you served the notice of termination claiming a hundred percent termination interest for Superboy that you had done so? 17:52:42 17:52:52 17:52:56 17:52:58

A. Yes, I believe we did. 17:52:59

Q. Who did so? 17:53:01

A. I think my mother did. 17:53:03

Q. How do you know she did? 17:53:06

A. Well, just every so often she would talk to Jean on the phone. I mean they had a very friendly relationship, and I think she brought it up. 17:53:08 17:53:11 17:53:14

Q. She said, "Hey, Jean, just want you to know we filed a notice of termination claiming a hundred percent on Superboy"? 17:53:16 17:53:19 17:53:21

A. Possibly. I wasn't on the phone. 17:53:24

Q. Are you speculating or do you know for a fact that she told that to Ms. Peavy? 17:53:25 17:53:27

A. I'm speculating what she said. 17:53:30

Q. Okay. Well, that's -- that's of no help to us. 17:53:32 17:53:35

Okay. Let's take a look at the next exhibit. 17:53:49

At some point in time did Mr. Emanuel and Mr. Toberoff approach you about their wanting to pursue Michael Siegel's termination interest? 17:53:55 17:54:00 17:54:07

A. Yes. 17:54:11

Q. And that they were going to purchase it themselves? 17:54:12 17:54:16

A. That -- they -- it was Ari who was going to purchase it. 17:54:17 17:54:21

Q. Did Ari ask your permission? 17:54:27

A. Yes, he did. 17:54:29

Q. Okay. Did you give it to him? 17:54:31

A. Yes, we did. 17:54:33

Q. Did you discuss the price that he would pay? 17:54:35

A. No. 17:54:44

Q. He said to you, "I want to buy Michael Siegel's termination interest," and you said, "Fine"? 17:54:44 17:54:47

A. Well, it wasn't only the word "fine." We talked about it a little bit more than that, but -- 17:54:53 17:54:56

Q. Tell me what you said, and what did you guys talk about in that regard? 17:54:58 17:55:01

A. It was just that, you know, Michael was kind of a loose cannon. He was, you know -- he was difficult to deal with. At times he perfectly understood that, you know, we should have a united family front, and at other times he was, you know, 17:55:03 17:55:07 17:55:11 17:55:17 17:55:20

kind of off the beam, and so it became increasingly difficult to deal with him. So it seemed that it might be a good idea to have somebody who was friendly to us acquire his rights. 17:55:27 17:55:34 17:55:39 17:55:44

Q. Did you tell Michael that you were involved in Ari, in the decision to have Ari Emanuel acquire his termination interests? 17:55:49 17:55:58 17:56:03

A. I don't believe we discussed it. 17:56:05

Q. Well, you never had a conversation with him. 17:56:06

A. No. 17:56:09

Q. Okay. And did you write him a letter saying, "Michael, I want you to understand that I'm having Ari Emanuel approach you to buy your interest because you're out of control and this will be in my best interest if I have this happen"? Did you write that kind of a letter to him? 17:56:12 17:56:14 17:56:17 17:56:20 17:56:23 17:56:26

A. I did not write it in the words that you used. 17:56:27 17:56:28

Q. Did you write any letter to him advising him that Michael -- that you were giving -- you had approved Ari Emanuel purchasing his termination interest? 17:56:29 17:56:32 17:56:38 17:56:41

A. I believe that he wrote to me and had mentioned it to me, and I responded and said if he wanted to do it, I would not stand in his way. 17:56:41 17:56:47 17:56:50

Q. Did he write to you saying what? 17:56:53
A. He said he was in need of immediate cash. 17:56:55
Q. He happened to write to you just at the same time that -- withdrawn. 17:57:00 17:57:04
When did he write this letter to you? 17:57:06
A. It had to have been after an offer was made to him because he was telling me about an offer. 17:57:09 17:57:14
Q. Okay. But when you -- you initially spoke with Mr. Emanuel about his purchasing the interest because you thought that would be beneficial to you and your mother's interest; correct? 17:57:17 17:57:21 17:57:27 17:57:30
A. And to Michael because he was looking for money. 17:57:33 17:57:35
Q. Well, I didn't ask you about that -- 17:57:36
A. Sorry. 17:57:38
Q. -- because you didn't know that Michael was looking for money at the time. He told you afterwards. 17:57:38 17:57:40 17:57:42
A. No. I'm sorry. He was always saying that he needed money. 17:57:43 17:57:45
Q. But he didn't call you up and say, "Look, I'm looking for money," and it was for that reason that you and Ari first had your discussion about his buying the Super- -- about his buying Michael's interest. 17:57:46 17:57:48 17:57:51 17:57:55 17:57:56

A. No, he never called me. 17:57:56
Q. Okay. So you had no communication with Michael that he wanted to sell his Superman interest which led you to then authorize Ari to go ahead and do it. That's not what happened; correct? 17:57:58 17:57:59 17:58:03 17:58:06
A. Could you ask it again? I'm a little confused. 17:58:08 17:58:13
Q. You did not receive the communication from Michael Siegel saying he needed money, he wanted to sell his Superman interest, and for that reason you then went to Ari and said, "Here, go buy it. My brother needs money." There's no such document; correct? 17:58:13 17:58:15 17:58:17 17:58:19 17:58:23 17:58:26
A. It was -- is there a document. I haven't seen those documents in a really long time. I can't really answer your question. 17:58:26 17:58:29 17:58:32
Q. Where are those documents? 17:58:33
A. Whatever documents that -- 17:58:35
MR. TOBEROFF: What documents are you referring to? 17:58:36 17:58:37
BY MR. PETROCELLI:
Q. You said "I haven't seen those documents in a long time." Where are those documents? 17:58:38 17:58:41
A. Any letters between myself and Michael. 17:58:42
Q. Where are they? 17:58:45

A. I turned them over to my attorney. 17:58:45
Q. You said you had letters in your apartment, in your condominium. 17:58:47 17:58:50
A. Well, anything that I found I turned over to my attorney. I said that if there's anything else, it would be in my apartment. 17:58:52 17:58:55 17:58:58
Q. When you turned those letters over to your attorney, do you mean Marc Toberoff? 17:58:59 17:59:02
A. Yes. 17:59:03
Q. How did you turn your letters with Michael Siegel over to Marc Toberoff? 17:59:03 17:59:05
A. Well, in a general request for production of documents. 17:59:07 17:59:11
Q. How did you give them to Mr. Toberoff? 17:59:12
MR. TOBEROFF: He's talking about -- 17:59:15
BY MR. PETROCELLI:
Q. How did you transmit them to Mr. Toberoff? 17:59:16
MR. TOBEROFF: Mail it? 17:59:18
THE WITNESS: In a box. 17:59:20
BY MR. PETROCELLI:
Q. Did you ever fax any to Mr. Toberoff? 17:59:20
A. I don't recall any faxes. 17:59:23
Q. You have a fax machine; right? 17:59:25
A. Yes, I do. 17:59:27
Q. Okay. Is it fair to say that Mr. Toberoff 17:59:31

has a copy of every single letter that you exchanged with Michael Siegel -- 17:59:34 17:59:40
A. What I -- 17:59:44
Q. -- regarding Superman? 17:59:45
A. Whatever I have found that pertains to the case I have turned over to him. 17:59:47 17:59:50
Q. Okay. And when is the last time that you gave Mr. Toberoff or any member of his firm a -- any correspondence with Michael Siegel? 17:59:54 17:59:59 18:00:05
A. Oh. 18:00:07
Q. When is the last time that you located such a document and gave it to him? 18:00:08 18:00:10
A. Well, that's hard to answer because, you know, I -- I don't necessarily just find something of Michael's separately from finding other things. 18:00:14 18:00:17 18:00:21
Q. So I didn't mean to suggest -- 18:00:24
A. No, I'm just trying -- I know I'm not answering your question. I'm trying to reconstruct in my mind. 18:00:26 18:00:27 18:00:30
Q. Okay. I'm just saying when is the last time you recall coming across a Michael Siegel letter and giving it to Mr. Toberoff? 18:00:31 18:00:32 18:00:36
A. I don't know. It could have been a few months ago. 18:00:39 18:00:41
Q. What was the letter that you found? 18:00:41

MR. TOBEROFF: Misstates. Okay. 18:00:43

BY MR. PETROCELLI:

Q. What was the letter that you came across a few months ago and gave to Mr. Toberoff? 18:00:46 18:00:50

MR. TOBEROFF: Misstates her testimony. 18:00:52

I just want to instruct you when he's asking you these questions, just focus on the question, and this isn't a memory test. If you know the answer, let him know. If you can recall, recall. But you don't have to feel constrained to put something together if you don't remember. Just let him know what you remember. 18:00:53 18:00:55 18:00:59 18:01:01 18:01:05 18:01:09 18:01:12

MR. PETROCELLI: You know, to the extent your lawyer is telling you to say you don't recall, it's really not appropriate. 18:01:12 18:01:14 18:01:17

MR. TOBEROFF: I'm not -- I'm not saying that. 18:01:18 18:01:18

THE WITNESS: No, I don't -- 18:01:19

MR. PETROCELLI: We've gone over this, and it's really late in the day to be talking about this now. You just have to give me your very, very best recollection even if it's a faint recollection. I don't want you speculating wildly. 18:01:21 18:01:21 18:01:25 18:01:26

MR. TOBEROFF: Excuse me. I object to the implication I'm telling her not to recall. She 18:01:27 18:01:29

started saying things that were unresponsive, and then she said she's just trying to put it together and by vocalizing various things, and I said look, it's not a memory test. Try and remember. If you can remember, give it to him. If you don't, don't. That's not coaching her not to recall, and I take object -- you know, that's a snotty comment, and I object to it. 18:01:30 18:01:34 18:01:38 18:01:40 18:01:42 18:01:45 18:01:47

MR. PETROCELLI: We better change the tape. 18:01:52

THE VIDEOGRAPHER: Okay. This will mark the end of Volume -- sorry -- Volume 1, tape number four, in the deposition of Laura Siegel. Going off the record. The time is 6:02. 18:01:54 18:01:55 18:01:58 18:02:04

(A recess was taken.) 18:08:07

THE VIDEOGRAPHER: We are back on the record. This marks the beginning of Volume 1, tape number five, in the deposition of Laura Siegel. The time is 6:08. 18:08:15 18:08:17 18:08:19 18:08:23

BY MR. PETROCELLI:

Q. I want to get back to these questions about Mr. Emanuel purchasing the interest of Mr. Siegel. 18:08:24 18:08:32

Now, first of all, were you aware that Mr. Toberoff would be assisting Mr. Emanuel in acquiring Mr. Michael Siegel's termination interest? 18:08:37 18:08:40 18:08:45

A. What do you mean by assisting? 18:08:49

Q. Working with him in some way. 18:08:52

A. I believe that he was communicating with Michael Siegel or with Don Bulson. 18:08:56 18:09:00
Q. Mr. Toberoff was? 18:09:03
A. Mr. Toberoff. 18:09:04
Q. On behalf of whom? 18:09:05
A. On behalf of Mr. Emanuel. 18:09:07
Q. Okay. And how do you know that? 18:09:08
A. It was a discussion. 18:09:13
Q. Mr. Emanuel told you that, that he would be working with Mr. Toberoff in connection with his activities with Mr. Siegel and Mr. Bulson? 18:09:16 18:09:18 18:09:21
A. Yes. 18:09:24
Q. Okay. Did you and Mr. Emanuel discuss price? 18:09:24
A. No, we did not. 18:09:40
MR. TOBEROFF: Asked and answered. 18:09:41
BY MR. PETROCELLI:
Q. Were you made aware at any time of any of the offers going back and forth? 18:09:41 18:09:45
A. No. 18:09:49
Q. Are you certain? 18:09:50
A. Not the amount of the offers. I was aware that offers were going back and forth. 18:09:50 18:09:53
Q. Were you aware generally of the nature of the offers that were going back and forth? 18:09:55 18:09:59
MR. TOBEROFF: Vague and ambiguous. 18:10:01

THE WITNESS: I don't believe that there was a number ever mentioned. 18:10:03 18:10:05

BY MR. PETROCELLI:

Q. But you were being kept apprised of what was happening on a general basis; is that right? 18:10:07 18:10:11

A. Yes, correct. 18:10:13

Q. Was it your view that it would be advantageous to have the Michael Siegel interest purchased and getting a maximum price for your interest and your mother's interest in your dealings with Warner Bros. or DC? 18:10:19 18:10:25 18:10:34 18:10:36 18:10:38

A. I'm not sure I understand the question. 18:10:41

Q. Did you believe that if Mr. Emanuel purchased the Michael Siegel interest, that would facilitate discussions that you and your mother would have to transact your interest? 18:10:44 18:10:49 18:10:53 18:10:56

A. Yes. 18:10:58

Q. Did you think it was important for Michael Siegel, your stepbrother, to know that it was Ari Emanuel, a person with whom you were doing business, who was seeking to purchase his interest? 18:11:02 18:11:05 18:11:11 18:11:14

A. First of all, he was my half brother, but -- 18:11:18

Q. Half brother. Forgive me. 18:11:21

Did you think it was important for your half brother, Michael Siegel, to know that the person who 18:11:25 18:11:27

was seeking to acquire his termination interest was Ari Emanuel, the same person with whom you were doing business? 18:11:31 18:11:37 18:11:40

A. No, I didn't think that was important. 18:11:41

Q. And you did not ever communicate to your brother that it was Ari Emanuel who was this investor; correct? 18:11:44 18:11:47 18:11:53

A. I don't recall doing that. 18:11:54

Q. And you know that your brother -- excuse me. You know that Michael Siegel was never told that Ari Emanuel was the person who was interested in purchasing his termination interest; correct? 18:11:56 18:12:00 18:12:03 18:12:09

MR. TOBEROFF: Vague as to time. 18:12:11

THE WITNESS: Well, I do not know that. 18:12:12

BY MR. PETROCELLI: 18:12:14

Q. You know that in the correspondence and the communications with Michael Siegel and his lawyer, Don Bulson, the purchaser was never named; correct? 18:12:16 18:12:18 18:12:21

A. I -- I think -- I think that I heard that. 18:12:26

Q. What was the strategy behind not telling Michael Siegel that it was Ari Emanuel? 18:12:31 18:12:35

A. I don't know that there was a strategy. 18:12:41

Q. You didn't want Mr. Siegel to know that it was Ari Emanuel; correct? 18:12:43 18:12:46

A. I didn't have any feelings about it one way 18:12:47

or another. 18:12:49

Q. But you never felt that you should tell him; right? 18:12:50 18:12:54

A. No. 18:13:00

Q. And you had rejected selling your interest to Ari Emanuel because you thought that he wasn't offering enough money; right? 18:13:00 18:13:04 18:13:09

A. No. 18:13:13

Q. You said that he offered you 15 million and that why would he ever pay full value, so it must be worth a lot more than that. Do you recall that? 18:13:14 18:13:18 18:13:21

A. We preferred to have him negotiate for us than make a purchase. 18:13:23 18:13:26

Q. Did you make a counteroffer to him and say, "You know, Ari, a guy like you would never offer 15 if it's worth 15, so it must be worth 30 or 40 or 50 or a hundred, so I'm going to counter at a much higher number"? Did you ever have that kind of discussion with Mr. Emanuel? 18:13:26 18:13:29 18:13:34 18:13:38 18:13:40 18:13:42

A. No. 18:13:43

Q. Did you ever make any counterproposal to his $15 million proposal? 18:13:43 18:13:46

A. Yeah. The counter was "Why don't you represent us." 18:13:47 18:13:50

Q. A counter to do a deal with him, I meant, 18:13:50

other than an agency deal. 18:13:53
A. No. 18:14:01
Q. Why didn't you suggest to Mr. Emanuel that he represent Michael Siegel just like he was representing you to try to sell Michael Siegel's interest as an agent rather than as a principal? 18:14:01 18:14:05 18:14:09 18:14:12
A. He didn't express any interest in doing that. 18:14:14
Q. Did you try to persuade him to doing so, into doing that? 18:14:16 18:14:23
A. We may have discussed it, but he didn't ever show any interest in doing that. 18:14:23 18:14:25
Q. Did you have a point of view about that? Did you have a preference? 18:14:25 18:14:30
A. Not really. 18:14:31
Q. Did you have any issue with the fact that the person that you thought was your lawyer was now acting in an adverse capacity to your stepbrother? 18:14:46 18:14:51 18:14:54
A. I don't think we considered it an adverse capacity. 18:15:00 18:15:03
Q. You don't believe that Mr. Toberoff representing Ari Emanuel in trying to provide the lowest price to Michael Siegel to acquire his interest was adverse to Michael Siegel? 18:15:03 18:15:06 18:15:14 18:15:19
A. We had knowledge of the fact that Michael wanted to speed up the process. He really didn't want 18:15:23 18:15:25

to wait things out. He wasn't interested in prolonging anything and wanted some money. So it seemed as if it was going to be to his advantage.

Q. Why didn't you buy it?

A. Didn't have the money.

Q. Why didn't you try to borrow the money?

A. Hey, I'm disabled. I live on a disability income. There's no way that I could borrow any kind of money for that.

Q. Why didn't you ask Ari Emanuel to put up the funds on your behalf?

A. I just didn't think of it.

Q. Nobody suggested that to you?

A. No.

Q. Did you tell -- since you never spoke to Michael Siegel, did you communicate with Michael Siegel that -- did you ask Michael Siegel in writing whether he had any issue with your lawyer, Marc Toberoff, representing this purchaser of his interest?

A. I never asked him that.

Q. Take a look at the next exhibit.

MR. TOKORO: 64.

(Whereupon, Plaintiff's Exhibit 64 was marked for identification.)

THE WITNESS: Thank you.

18:15:27 18:15:33 18:15:37 18:15:40 18:15:41 18:15:42 18:15:47 18:15:51 18:15:53 18:15:54 18:15:58 18:15:59 18:16:00 18:16:07 18:16:07 18:16:12 18:16:16 18:16:29 18:16:34 18:16:40 18:16:54 18:16:59 18:17:08

BY MR. PETROCELLI:

Q. This is a document sent to you and your mother on the letterhead of IP Worldwide dated November 26, 2002, with respect to the purchase of Michael Siegel's termination interest by Ari Emanuel.

A. I'm reading it, so I'm sorry. If you could give me a few minutes.

Q. Tell me when you're ready.

A. Okay. I've read it.

Q. What were the potential conflicts of interest that you understood related to this document?

A. I don't recall because it's not in this document.

Q. What's not in this document?

A. Potential conflicts of interest. It's not -- it's not explained in the document, so I don't recall something that was discussed in 2002 that's not in front of me.

Q. Right now as you sit here, you have no idea what the potential conflicts of interest were?

A. May I read that paragraph again?

Q. Please.

A. It doesn't refresh my memory by reading it.

Q. Now, you see it's on the stationery or letterhead of IP Worldwide. Do you see that?

18:17:08
18:17:08
18:17:10
18:17:15
18:17:27
18:17:33
18:17:37
18:17:56
18:18:19
18:18:21
18:18:27
18:18:35
18:18:38
18:18:38
18:18:40
18:18:44
18:18:49
18:18:52
18:18:53
18:18:56
18:18:58
18:19:00
18:19:32
18:19:35
18:19:41

A. Yes. 18:19:43

Q. Go to the beginning of the second paragraph. It says "IPW will enter into negotiations." Do you see that? 18:19:43 18:19:46 18:19:52

A. Yes, I do. 18:19:52

Q. What did you understand IPW to be? 18:19:53

A. IP Worldwide. 18:19:55

Q. Tell me -- so then it was IP Worldwide that was going to acquire the Michael Siegel interests; correct? 18:19:58 18:20:00 18:20:04

A. No. It says it will be directly financed by Ari Emanuel. 18:20:06 18:20:08

Q. Financed by, but the acquisition is to occur by IPW; correct? 18:20:09 18:20:13

A. My understanding of that was that IP Worldwide, meaning as a lawyer, Mr. Toberoff was going to conduct the negotiations. 18:20:15 18:20:20 18:20:24

Q. If IPW acquired the termination interest of Michael Siegel, a company in which Mr. Toberoff had an ownership interest, you would have had no objection to that; correct? 18:20:28 18:20:33 18:20:36 18:20:38

MR. TOBEROFF: I just want to make -- when we're speaking -- you're saying I, because there is a company called IPW. 18:20:39 18:20:40

MR. PETROCELLI: I know, but not at this

point in time.

MR. TOBEROFF: You're talking about IP Worldwide; correct? 18:20:44 18:20:45

MR. PETROCELLI: Yes. I'm using "IPW" because as the witness said, she understood it to mean IP Worldwide as used in this letter. 18:20:46 18:20:48 18:20:52

MR. TOBEROFF: Okay. 18:20:53

THE WITNESS: And the question? 18:20:54

BY MR. PETROCELLI:

Q. You would have had no objection to Michael Siegel's interests being purchased in the name of IP Worldwide, a company in which Mr. Toberoff had an ownership interest; correct? 18:20:55 18:20:58 18:21:01 18:21:04

A. Correct. 18:21:05

Q. And again, you can't recall any of the conflicts over the subject of this document. 18:21:13 18:21:16

A. No. Sorry. I can't. 18:21:18

MR. PETROCELLI: What exhibit number is this? 18:21:21

MR. TOKORO: 64. 18:21:23

MR. PETROCELLI: Go to the next one. 18:21:29

MR. TOBEROFF: I would like you to read me -- she asked a question, and you said "correct," and you said "correct." Can you read me that question, please? 18:21:30 18:21:32 18:21:34 18:21:37

(The record was read.) 18:21:51

MR. TOBEROFF: Okay. Thank you. 18:21:51
MR. PETROCELLI: Next is Exhibit 65, which is another draft of this document dated December 16, 2002, which contains more terms. 18:21:55 18:21:58 18:22:02
(Whereupon, Plaintiff's Exhibit 65 was marked for identification.) 18:22:11
BY MR. PETROCELLI:
Q. Were you negotiating this document with Mr. Emanuel? 18:22:12 18:22:17
A. May I read it first? 18:22:18
Q. Sure. 18:22:20
A. Thank you. 18:22:21
MR. TOBEROFF: Do you have a signed -- you're showing her documents that are unsigned. Do you have a signed document? 18:22:45 18:22:47 18:22:50
MR. PETROCELLI: No. You didn't produce it. 18:22:58
Q. You do recall signing a version of this document; is that right? 18:23:19 18:23:19
A. A version. I can't say this was the final. 18:23:19
MR. TOBEROFF: I think there was a signed document that was produced. 18:23:20 18:23:22
MR. PETROCELLI: Well, I don't have it here, and it's certainly possible. 18:23:24 18:23:28
THE WITNESS: Okay. I'm ready for your question. 18:23:55 18:23:58

MR. PETROCELLI: Oh. So you did find one. Let me see it. 18:23:58 18:24:03

We're going to get to a signed version. 18:24:17

THE WITNESS: Okay. 18:24:19

MR. PETROCELLI: But it's not -- we're going to stay with this document first. 18:24:20 18:24:22

THE WITNESS: All right. 18:24:24

BY MR. PETROCELLI: 18:24:32

Q. This is Exhibit 65. Who was negotiating the terms of this document? 18:24:32 18:24:37

A. My mother and I. 18:24:39

Q. And who were you negotiating with? 18:24:42

A. Ari. 18:24:47

Q. How? Over the phone? In person? Through Mr. Toberoff? All the above? 18:24:49 18:24:52

A. All the above. 18:24:53

Q. Was anybody other than Mr. Toberoff working with you on the negotiations? 18:24:58 18:25:02

A. No. 18:25:10

Q. You -- you were the one insisting that if Michael Siegel sold this interest to IPW and/or Ari Emanuel, that they in turn, that is, IPW and/or Ari Emanuel, would only sell the Michael Siegel interest to a third party in connection with the sale of your interest; correct? 18:25:11 18:25:19 18:25:26 18:25:35 18:25:39 18:25:43

A. Can you show me where in the document it says that? 18:25:45 18:25:47
Q. 3(a). 18:25:48
A. If this was the final version, then that's what we agreed to. 18:25:58 18:26:01
Q. But that's -- I'm not asking right now whether you agreed to it, but that's something you wanted; right? 18:26:02 18:26:05 18:26:07
A. Yes. 18:26:07
Q. And you wanted the complete decision making authority with respect to the disposition of not only your interest, but the Michael Siegel interest; correct? 18:26:08 18:26:12 18:26:15 18:26:17
A. That's correct. 18:26:17
Q. So you were basically using Ari Emanuel and IPW as a front to acquire this interest that you would ultimately control without telling your stepbrother; correct? 18:26:18 18:26:22 18:26:27 18:26:29
A. No. 18:26:30
Q. And you did not tell your stepbrother that it was you who was going to have complete control over his interest; correct? 18:26:30 18:26:32 18:26:35
A. I didn't discuss the details with him. 18:26:36
Q. Well, you didn't tell him anything, did you? 18:26:39
A. I don't recall. 18:26:41

Q. You never spoke to him, you said. 18:26:41
A. No, I didn't. 18:26:44
Q. You never wrote to him about any of this; right? 18:26:45 18:26:47
A. I said I didn't remember whether I wrote to him about this. 18:26:48 18:26:50
Q. You remember, and you did not advise Michael Siegel that you were negotiating against him through Ari Emanuel; correct? 18:26:53 18:26:57 18:27:00
MR. TOBEROFF: Argumentative. 18:27:02
THE WITNESS: I don't think you can read my mind, with all due respect. 18:27:03 18:27:05
BY MR. PETROCELLI:
Q. Well, are you saying you did make this full disclosure to him about what your demands were of Mr. Ari Emanuel, that you wanted to control the disposition of the Michael Siegel interests, that it could only be sold in connection with your interest? Are you telling me that you told that to your half brother in writing? 18:27:07 18:27:09 18:27:14 18:27:17 18:27:19 18:27:22 18:27:25
A. I don't -- I don't remember what we discussed in writing. 18:27:28 18:27:31
Q. Did you have a single communication with him in writing on this subject? 18:27:32 18:27:34
A. I do not recall. 18:27:36

Q. In paragraph (c) here of this draft it says that Mr. Emanuel is going to indemnify you in case there is any litigation arising out of your -- arising out of the purchase of the Michael Siegel interests. Why do you want an indemnification from Mr. Emanuel? What kind of litigation were you concerned about? 18:27:43 18:27:47 18:27:51 18:27:54 18:27:56 18:28:00

A. We had no idea what might occur in the future. 18:28:02 18:28:16

Q. How were you communicating your demands and your positions such that they were being embodied in these drafts? Were you doing it orally, or were you like typing things out and sending it to Mr. Toberoff or Mr. Emanuel? 18:28:16 18:28:20 18:28:25 18:28:29 18:28:33

A. Oh, you're saying the negotiation over -- 18:28:34

Q. Yes. 18:28:36

A. -- over this document? 18:28:37

Q. Yes. 18:28:38

A. I think we did it in conversation. 18:28:41

Q. Okay. Take a look at the next document. This is Exhibit 46. 18:28:47 18:28:51

(Whereupon, Plaintiff's Exhibit 46 was placed before the witness.) 18:28:59

BY MR. PETROCELLI:

Q. Now, it says that it's dated January 21, 2002. I'm assuming that's a typo. That must be 2003. 18:28:59 18:29:03

A. Yeah, because it's -- 18:29:07

Q. The sequence of time here. Does that make sense to you? 18:29:09 18:29:11

A. It's signed on 2003. 18:29:11

Q. Well, Exhibit 46 is not signed. You're looking at the wrong exhibit. 18:29:13 18:29:15

A. 46. 18:29:18

MR. TOBEROFF: Signed. 18:29:20

THE WITNESS: Is signed. 18:29:20

MR. PETROCELLI: Time out. Time out. Time out. Time out. 18:29:23 18:29:25

Q. You have Exhibit 46 in front of you? 18:29:55

A. Yes, I do. 18:29:57

Q. And that is a signed version? 18:29:57

A. Yes. 18:29:59

Q. Okay. And you will see in paragraph 2 -- in paragraph 1 we're dealing with Mr. Siegel's interests, Michael Siegel's interest in Superman, Superboy, and The Spectre. Do you see that? 18:30:08 18:30:21 18:30:26 18:30:29

A. Yes, I do. 18:30:30

Q. What's The Spectre? 18:30:31

A. That's another character that my father co-created. 18:30:32 18:30:39

Q. And you wanted to have Mr. Emanuel acquire Michael Siegel's interest in that character as well? 18:30:39 18:30:42

A. Yes. 18:30:45

Q. So at the end of the day, you wanted to obtain everything Michael Siegel might own with respect to your father's creations; correct? 18:30:45 18:30:50 18:30:53

MR. TOBEROFF: Misstates the document and the record. Assumes facts. Lacks foundation. 18:30:56 18:30:58

MR. PETROCELLI: Repeat the question because I made a mistake in it. 18:31:02 18:31:04

Q. You wanted Mr. Emanuel and negotiated and contracted with Mr. Emanuel that he would acquire all copyright termination interests that Michael Siegel might hold with respect to your father's creations; correct? 18:31:05 18:31:09 18:31:15 18:31:17 18:31:20

A. These Superman, Superboy, and The Spectre were the only properties that had at this point been terminated. There is always the possibility that there are additional characters created by my father that would be terminated in the future. 18:31:22 18:31:25 18:31:30 18:31:32 18:31:36

Q. Were you -- 18:31:39

A. This agreement didn't apply to anything except for the specific characters. 18:31:40 18:31:43

Q. What were the other characters that you were leaving available for Michael Siegel to exercise copyright termination interests over? 18:31:43 18:31:46 18:31:48

A. Anything that came -- because of the calendar 18:31:50

of the way copyright terminations go, there are -- you know, there are different dates of publication, and, you know, the window for termination for each character is different. 18:31:53 18:31:57 18:32:01 18:32:04

Q. Well, were you aware of any other windows of termination for any other characters that were coming up? 18:32:05 18:32:08 18:32:11

A. There were some, but they were way down the road. 18:32:11 18:32:14

Q. What were they? 18:32:14

A. Oh, you would ask me that. At this moment I can't recall. 18:32:15 18:32:30

Q. Well, as of January 21, 2003, you were authorizing Ari Emanuel to purchase all existing termination interests of Michael Siegel in your father's creations; is that correct? 18:32:30 18:32:37 18:32:42 18:32:46

A. That were -- that were in effect or had been terminated at that point. 18:32:48 18:32:51

Q. And this is the document you did sign; right? 18:32:56

A. Yes. 18:33:02

Q. Which sets forth the condition that the Michael Siegel interests so acquired by Mr. Emanuel could only be sold to a third party in conjunction with the sale of the Siegel interests, your interests; correct? 18:33:03 18:33:10 18:33:12 18:33:17 18:33:20

A. Correct. 18:33:20
Q. And that you and your mother would retain full and complete decision making authority with respect to such a disposition; correct? 18:33:21 18:33:24 18:33:26
A. Where is that, please? I didn't have a chance to read the entire document. 18:33:29 18:33:31
Q. 3(b). 18:33:33
A. Correct. 18:33:39
Q. 3(c) is the indemnity that you're getting from Mr. Emanuel in case there's any litigation arising out of the purchase of the Michael Siegel interest; correct? 18:33:40 18:33:43 18:33:46 18:33:49
A. Correct. 18:33:49
Q. And you understood that might apply if Michael Siegel himself filed suit against you; correct? 18:33:49 18:33:52 18:33:54
A. I believe so. 18:33:54
Q. In paragraph 3(d) you ask Mr. Emanuel to reimburse you for the Michael Siegel 25 percent share of the expenses that you had been advancing; correct? 18:34:03 18:34:08 18:34:13
A. That we advanced on behalf of the entire interest. 18:34:19 18:34:37
Q. In the first paragraph of this document, Exhibit 46, again it makes reference to various risks and potential problems regarding Michael Siegel and 18:34:37 18:34:42 18:34:48

the mitigation of possible conflicts of interest with respect to the following proposed remedial actions. What were the risks, the potential problems, and the possible conflicts? 18:34:52 18:34:56 18:35:00 18:35:05

A. I really don't recall. 18:35:07

Q. You can't remember a single thing about that? 18:35:08

A. Not today. 18:35:11

Q. Take a look at the next document in order, Exhibit 30. 18:35:56 18:36:03

(Whereupon, Plaintiff's Exhibit 30 was placed before the witness.)

BY MR. PETROCELLI:

Q. This is a letter from Michael Siegel to you dated May 13; is that correct? 18:36:12 18:36:15

A. Yes. 18:36:19

Q. When is the last time you saw this document? 18:36:22

A. It's been quite a while. 18:36:25

Q. When you received documents -- well, withdrawn. 18:36:34 18:36:37

A. I'm sorry. What was -- 18:36:38

Q. Withdrawn. Let me start all over again. 18:36:40

When did you first give a copy of this document to Mr. Toberoff? 18:36:42 18:36:45

A. Whenever there was a request for the production of documents, whenever that was. 18:36:50 18:36:53

Q. In what case? 18:36:56
A. Good question. There's just so many cases. You know, they're all kind of running together for me, so I don't remember. 18:36:59 18:37:04 18:37:06
Q. When you provided documents from time to time to Mr. Toberoff, did you maintain copies for yourself? 18:37:12 18:37:15
A. No. 18:37:20
Q. Never? 18:37:21
A. I don't -- I don't believe so. 18:37:21
Q. Even letters with your stepbrother? 18:37:23
A. Well, I knew that he had them, and if I needed them, I could always get a copy from him. 18:37:26 18:37:28
Q. This letter starts out "Thank you for your letter of November 2 of last year." What letter was that? 18:37:42 18:37:44 18:37:49
A. A letter I sent him on November 2. 18:37:49
Q. Do you have any idea what you wrote in that letter? 18:37:51 18:37:53
A. No, I don't. 18:37:54
Q. Now, you see -- you recall receiving this letter? 18:38:01 18:38:05
A. Well, the part that I remember is when he told me that his mother passed away. 18:38:05 18:38:07
Q. That's in the second sentence. 18:38:11
A. That's right. 18:38:13

Q. And then the rest of this letter goes on to discuss his concerns about Mr. Toberoff, and are you suggesting that none of that was important to you? 18:38:13 18:38:17 18:38:21

A. I didn't say it wasn't important to me. I just said that the thing that made me remember this letter was the fact that he said that his mother passed away. 18:38:27 18:38:31 18:38:34 18:38:34

Q. Do you know what prompted his sending this letter to you? 18:38:50 18:38:52

A. I don't know. 18:38:54

Q. Did you respond to it? 18:38:59

A. I'm sure I did. 18:39:02

Q. What did you say? 18:39:05

A. I'm sorry, but I don't recall. 18:39:08

Q. He said here in the -- directing your attention to the second paragraph, okay -- 18:39:14 18:39:18

A. Um-hum. 18:39:21

Q. -- it starts out "I really wish to discuss Marc Toberoff." And it says in the third sentence: 18:39:22 18:39:26

"I told you when he first contacted me, he wanted to buy my share of the copyright. Marc had a mysterious billionaire who wanted to invest in the Superman copyright, put 15 million dollars up front plus 18:39:37 18:39:41 18:39:47 18:39:51 18:39:52 18:39:54

participation. When you signed with Marc the billionaire invested elsewhere."

Do you know where he got that information?

A. I have no idea.

Q. You don't think he made it up, do you?

A. You know, Michael was a very confused guy, on a lot of medication, and when he would write things to me, such as asking me did I know that Marc was the attorney for the Shusters, well, of course I did, and, you know --

Q. He's telling you that Marc Toberoff contacted him and said he had a mysterious billionaire.

A. Yeah. Well, I don't know where that came from.

Q. Did you think your brother -- your stepbrother was lying?

A. I don't -- I don't know that he came up with the wording himself. You know, I mean it -- I had never heard this referred to in any way other than in this letter, "mysterious billionaire." I don't know what that means.

Q. Put $15 million up front, plus participation, that happened to be exactly the same number that Mr. Emanuel had offered you; correct?

18:39:57 18:40:01 18:40:04 18:40:08 18:40:10 18:40:11 18:40:14 18:40:21 18:40:25 18:40:29 18:40:33 18:40:35 18:40:38 18:40:43 18:40:45 18:40:46 18:40:48 18:40:49 18:40:57 18:41:01 18:41:04 18:41:08 18:41:12 18:41:15 18:41:19

A. That was interesting, and that caught my eye. 18:41:21
Q. Mr. Toberoff had told you that he knew billionaire investors; correct? 18:41:27 18:41:32
A. No, he never used that term. 18:41:33
Q. Well, he used terms similar, like he knew very wealthy investors and people in the entertainment industry who had money and would buy properties; correct? 18:41:34 18:41:39 18:41:41 18:41:43
A. No. The offer came from -- directly from Ari Emanuel. 18:41:44 18:41:46
Q. What offer? 18:41:47
A. Well, Ari Emanuel was involved in that proposal of the $15 million. 18:41:49 18:41:53
Q. Was involved with Mr. Toberoff. 18:41:56
A. No, was -- it was going to be Ari Emanuel putting up the $15 million in that discussion, the initial discussion that apparently happened with Kevin Marks. 18:41:58 18:42:02 18:42:07 18:42:11
Q. How do you know that it was so specific that it was only going to be Ari Emanuel acquiring the interest and not IPW or an entity with which Mr. Toberoff had an interest? 18:42:11 18:42:13 18:42:17 18:42:23
A. It wasn't mentioned to me. 18:42:24
Q. It was not. 18:42:25
A. No. 18:42:26

Q. Okay. 18:42:26
A. Not that I recall. 18:42:31
Q. Then you're basing that off of your recollection of the letter, what you just told me? 18:42:33 18:42:35
MR. TOBEROFF: What letter? What letter? 18:42:38
THE WITNESS: Yeah. 18:42:40
BY MR. PETROCELLI:
Q. The letter you got from Mr. Marks that advised you about the approach by Mr. Emanuel and -- 18:42:40 18:42:43
A. I believe that -- 18:42:46
MR. TOBEROFF: Wait a second. You can answer -- let me slow this down for a second. 18:42:47 18:42:49
THE WITNESS: Of course. 18:42:52
MR. TOBEROFF: You can answer not in such a way that discloses the substance of the letter from Kevin Marks advising you that there had been a $15 million offer. 18:42:53 18:42:55 18:42:58 18:43:02
THE WITNESS: Um-hum. 18:43:03
BY MR. PETROCELLI:
Q. You just gave some testimony -- 18:43:04
MR. TOBEROFF: And make sure when you're answering, you keep your parties straight. 18:43:05 18:43:06
THE WITNESS: Yes. 18:43:09
BY MR. PETROCELLI:
Q. You just gave some testimony about the 18:43:09

$15 million was to be from Ari Emanuel, and then I pressed you about, well, maybe Mr. Toberoff would have had a piece of it through IPW, and you said, well, you're not sure, okay, words to that effect. When you gave that answer about the $15 million coming from Ari, was that based on your recollection of the letter from Kevin Marks? 18:43:11 18:43:15 18:43:18 18:43:22 18:43:25 18:43:28 18:43:31

A. It -- I believe it was based not only on the letter, but on a subsequent conversation with Kevin Marks and also with Ari Emanuel. 18:43:34 18:43:36 18:43:41

Q. Where they said that Mr. Emanuel was going to fund the $15 million? 18:43:44 18:43:47

MR. TOBEROFF: You can answer only with respect to the conversation with Ari Emanuel. 18:43:48 18:43:50

THE WITNESS: Yeah. Well, you know, it may not have solely been Ari, but, you know, he was obviously the driving force in it. 18:43:52 18:43:55 18:43:59

BY MR. PETROCELLI:

Q. Yes, and again, you had no issue whatsoever if Ari was funding an investment through IPW in which Mr. Toberoff -- IP Worldwide in which Mr. Toberoff had an interest; correct? 18:44:02 18:44:06 18:44:15 18:44:18

A. At that point I wasn't aware of IP Worldwide, if you're talking -- if you're talking about when Kevin Marks first mentioned it. 18:44:19 18:44:24 18:44:27

Q. Later on when you had your meeting with Mr. Emanuel and again he discussed the $15 million offer and you said ultimately "No, I want you to be an agent, not a business partner" --

A. Um-hum.

Q. -- had you done a deal for $15 million or whatever with Mr. Emanuel, you would have had no objection to doing it with IP Worldwide and Mr. Toberoff participating; correct?

MR. TOBEROFF: Incomplete hypothetical.

THE WITNESS: Well, we didn't proceed with it, so we weren't -- you know, it wasn't that we were in favor of it. We were not in favor of it because we didn't do it.

BY MR. PETROCELLI:

Q. I understand, but you didn't have some hard and fast rule that in no circumstance could Marc Toberoff participate in the acquisition of any interest that you would sell.

MR. TOBEROFF: Same objection.

BY MR. PETROCELLI:

Q. Correct?

THE WITNESS: What was the objection?

MR. TOBEROFF: It's okay.

MR. PETROCELLI: He doesn't even remember.

18:44:28 18:44:31 18:44:35 18:44:38 18:44:41 18:44:41 18:44:52 18:44:52 18:44:52 18:44:54 18:44:55 18:44:57 18:45:00 18:45:03 18:45:03 18:45:06 18:45:10 18:45:12 18:45:13 18:45:14 18:45:15 18:45:17 18:45:18

MR. TOBEROFF: I remember. Incomplete hypothetical. 18:45:20 18:45:23

BY MR. PETROCELLI:

Q. In other words, you understand my question. You had no hard and fast rule that if you were going to sell your interest to IP Worldwide or Mr. Emanuel, that Mr. Toberoff was not to participate economically; correct? 18:45:24 18:45:27 18:45:29 18:45:33 18:45:36

A. It was never discussed. 18:45:37

MR. TOBEROFF: Same objection. 18:45:39

BY MR. PETROCELLI:

Q. I understand it wasn't discussed, but you didn't have the state of mind that you were going to be adamantly opposed to it; correct? 18:45:40 18:45:42 18:45:43

MR. TOBEROFF: Incomplete hypothetical. 18:45:46

THE WITNESS: I didn't form an opinion. 18:45:47

BY MR. PETROCELLI:

Q. Never; right? One way or the other; correct? 18:45:49

A. Not that I can recall. 18:45:51

Q. One way or the other; correct? 18:45:52

A. Correct. 18:45:54

Q. Okay. 18:45:55

A. I think, if I'm following that. 18:45:55

Q. By the way, when you wrote your stepbrother back, did you straighten him out on things that you 18:46:18 18:46:21

think he had wrong in his letter to you of May 13? 18:46:24
A. I did my best to. 18:46:27
Q. Can you explain to me as best as you can, for example, what you said about the billionaire, the mysterious billionaire? 18:46:29 18:46:32 18:46:36
A. You know, I don't remember how I put it to him, but I, you know, I tried to in as simple a manner as possible explain what he had wrong in this letter. Regarding specifically the billionaire, I really don't recall what I said. 18:46:37 18:46:39 18:46:46 18:46:51 18:46:54
Q. Did you type the letter yourself? 18:46:55
A. Yes, I did.
Q. Did your mother help you prepare it? 18:46:59
A. I think she had input. 18:47:01
Q. Now, did you explain to him the situation with the Shusters? 18:47:02 18:47:05
A. Well, I cleared up some of his misconceptions about the Shusters. 18:47:09 18:47:13
Q. How did you clear them up? In other words, just generally what did you say? 18:47:14 18:47:16
A. Once again, you're asking me to answer something that I really can't recall. I'm sorry. 18:47:19 18:47:22
Q. When you said you cleared up the Shuster issue for him, did you explain to him that you were aware that Mr. Toberoff was working with the Shusters? 18:47:25 18:47:27 18:47:29

A. I'm sure I did. 18:47:33
Q. Do you know when you wrote your responsive letter back to this May 13 letter? 18:47:36 18:47:39
A. I don't know exactly. 18:47:41
Q. Did you have Mr. Toberoff assist in any way in the response that you prepared? 18:47:43 18:47:48
A. I believe I had him look at it. 18:47:51
Q. And before you sent it to Mr. -- 18:47:53
A. Yes. 18:47:55
Q. And why did you have him look at it? 18:47:56
A. Well, you know, it was dealing with issues that had to do with legal matters, and I didn't want to misstate something that basically would, you know, come back and bite me in the butt later. So I just wanted -- wanted to make sure that I was as a civilian expressing myself properly. 18:47:58 18:48:04 18:48:07 18:48:11 18:48:15 18:48:19
Q. And in order for Mr. Toberoff to assist or review the letter that you drafted, you would have sent him Mr. Michael Siegel's May 13 letter so he could have both letters. 18:48:21 18:48:27 18:48:30 18:48:35
A. This letter? 18:48:36
Q. Correct. 18:48:37
A. Probably. 18:48:37
Q. Okay. And take a look at the Toberoff timeline for a second, please, which is Exhibit 58. 18:48:39 18:48:42

A. I already have that, don't I? 18:48:45
Q. Yes. 18:48:49
MR. PETROCELLI: Can you fish that out for her, Jason? Thank you. 18:48:49 18:48:51
THE WITNESS: Thank you. 18:48:53
BY MR. PETROCELLI:
Q. I'd like to direct your attention --
THE WITNESS: Do I still need this one? 18:48:54
MR. PETROCELLI: Yeah, leave it there. 18:48:56
THE WITNESS: Okay. Thank you. 18:49:10
MR. TOBEROFF: I can help explain it.
MR. KLINE: Are you reading our notes, Marc?
THE WITNESS: Thank you.
MR. TOBEROFF: No, because I haven't gotten a package -- duplicate packages with your notes. 18:49:17 18:49:17
MR. KLINE: Oh, no. Did you read this note? 18:49:22
MR. PETROCELLI: Okay. So you have them.
MR. KLINE: Please don't -- 18:49:24
MR. TOBEROFF: Of course not. I'm making a joke. Lighten up. 18:49:25 18:49:28
BY MR. PETROCELLI:
Q. So you have the Superman -- you have the Marc Toberoff timeline, Exhibit 58, in front of you? 18:49:29 18:49:32
A. Yes. 18:49:33
Q. And you also have Exhibit 30, the Michael 18:49:33

Siegel letter to you dated May 13, 2003? 18:49:37

A. Yes, I do. 18:49:39

Q. Now, go to the end of the fourth page as Q 0004 and you'll see a reference to a July 5, 2003 -- first of all, go to the prior page of this Exhibit 58. 18:49:40 18:49:46 18:50:02

A. Okay. 18:50:06

Q. And you'll see that the author of this document is identifying Michael Siegel's May 13, 2003, letter, the one that you have in front of you as Exhibit 30. Do you see that? 18:50:06 18:50:09 18:50:15 18:50:18

A. I do. 18:50:19

Q. And then he is -- he or she is purporting to state some of the contents of that letter. Do you see that? 18:50:19 18:50:23 18:50:26

A. I see a paragraph about it. 18:50:26

Q. Okay. And now dropping down to the end of the next page with the Bates label Q 0004, the reference to the July 5, 2003, date, do you see that? 18:50:29 18:50:32 18:50:43

A. Yes, I do. 18:50:43

Q. It says "Laura Siegel reveals her ignorance of Toberoff's dubious actions in her return letter back to Michael." Putting aside the characterization of your ignorance, does July 5, 2003, sound right to you as around the time that you responded to the May 13, 2003, letter? 18:50:43 18:50:52 18:50:52 18:50:54 18:50:58 18:51:01

A. It could have been. 18:51:04
Q. Okay. Is it fair to say that your letter back to Mr. Michael Siegel did not agree with any of his criticisms of Mr. Toberoff's actions and Mr. Toberoff generally? 18:51:11 18:51:16 18:51:24 18:51:29
A. Well, whoever stole this document, you know, is doing his version of what he's reading into whatever the letter said. 18:51:32 18:51:36 18:51:40
Q. You're not following my question. 18:51:42
A. Well, I haven't read the letter in a long time. 18:51:44 18:51:51
Q. My question to you is when you wrote back to Michael -- 18:51:51 18:51:54
A. Yes. 18:51:54
Q. -- in response to his May 13, 2003, letter, is it fair to say that you expressed no agreement with any of his criticisms of Mr. Toberoff? 18:51:56 18:51:59 18:52:04
A. I would say that's probably safe to say. 18:52:08
Q. Did you tell Michael Siegel in your response letter back that Mr. Toberoff does not have a production company? 18:52:19 18:52:26 18:52:31
A. Yes, I believe I did. 18:52:32
Q. And you will see on the next page of this document, Exhibit 58, in the description of the entry July 5, 2003 -- 18:52:35 18:52:39 18:52:45

A. I'm sorry. You're saying continuation on the top of the page? 18:52:47 18:52:50

Q. Yes. It says "Also, in the letter back to Michael Siegel, that MT helped Laura Siegel draft -- in response to Michael's accusations of Toberoff, Laura clearly states that MT does not have a production company." And that was your belief at the time; correct? 18:52:51 18:52:53 18:52:57 18:53:00 18:53:06 18:53:08

A. Correct. 18:53:10

Q. And it goes on to say that, in parentheses: 18:53:11

"(This is false -- Marc Toberoff's IPW has been in existence, partly funded by Ari Emanuel, since at least 2002). In the draft of the letter, MT crossed out the statement that he does not have a production company, and writes," quote, "'MT has not plans to produce a SUPERMAN movie, nor is this feasible given the division of ownership of the rights,'" end of quotes. 18:53:17 18:53:19 18:53:21 18:53:21 18:53:26 18:53:27 18:53:29 18:53:33 18:53:36 18:53:38 18:53:41

Now, does that -- is that consistent with your recollection that your statement that Mr. Toberoff did not have a production company was crossed out by Mr. Toberoff in the final draft and 18:53:43 18:53:47 18:53:51 18:53:54

replaced with the quoted language that I just read? 18:53:57

A. It could have been. 18:53:59

Q. And when Mr. Toberoff made his changes to the letter and returned it to you, did you review it and sign it before you sent it out as your response letter back to Michael? 18:54:03 18:54:07 18:54:11 18:54:15

A. Well, he made suggestions of changes in the wording of certain areas, and, you know, I retyped the letter, accepted some of the things that he said and didn't use some other suggestions that he made. 18:54:16 18:54:22 18:54:28 18:54:30

Q. How did he convey his suggestions to you? 18:54:33

A. He wrote it on -- he wrote it on this letter -- no, not this letter. He wrote it on that letter that's being discussed here and faxed it back to me. 18:54:36 18:54:39 18:54:43 18:54:46

Q. Okay. So you did engage in faxed communication with Mr. Toberoff from time to time. 18:54:47 18:54:50

A. Yes. 18:54:51

Q. Okay. Including with respect to this very correspondence that we're discussing. 18:54:53 18:54:55

A. I believe so. 18:54:56

Q. Okay. 18:54:58

Now, did you show him the final draft before you sent it out? 18:54:59 18:55:03

A. I believe I did. 18:55:05

Q. And which of the changes did you reject? 18:55:07

A. I don't remember. I just remember the process, but I don't remember the contents. 18:55:16 18:55:18

Q. Now, by the time you received this letter, Mr. Emanuel was -- 18:55:37 18:55:43

A. I'm sorry. You're talking about the May 13 letter? 18:55:44 18:55:47

Q. Thank you. 18:55:47

By the time you received the May 13, 2003, letter, Exhibit 30, and then responded with your letter that you've been describing, during that period of time, that's when you knew that Mr. Emanuel was secretly attempting to purchase Michael Siegel's interest; correct? 18:55:48 18:55:50 18:55:53 18:55:58 18:56:07 18:56:09

MR. TOBEROFF: Misstates the record. 18:56:11

THE WITNESS: I -- you know, I wouldn't use the word "secretly," but I believe an offer -- an offer may have been made during that period. 18:56:13 18:56:16 18:56:20

BY MR. PETROCELLI:

Q. You said you wouldn't use the word "secretly," but you knew that Mr. Michael Siegel did not know that it was Mr. Emanuel who was the prospective purchaser. We've discussed that already; correct? 18:56:21 18:56:24 18:56:26 18:56:29 18:56:31

A. Yes, we did. 18:56:31

EXHIBIT 24

Q. And you did not tell Michael Siegel in your response letter back that Mr. Emanuel was indeed the very person with your full knowledge and blessing who was attempting to acquire his interest. 18:56:32 18:56:39 18:56:46 18:56:48

MR. TOBEROFF: Asked and answered. 18:56:51

THE WITNESS: No, I did not mention that. 18:56:52

BY MR. PETROCELLI:

Q. And your letter back to Mr. Michael Siegel does in fact mention Mr. Emanuel; correct? 18:56:56 18:56:59

A. I'm sorry. Does or does not? 18:57:01

Q. Does. 18:57:03

A. Does mention Mr. Emanuel? 18:57:05

Q. Yes. 18:57:07

A. I don't -- I don't recall. 18:57:07

Q. Have you given any consideration to the idea that is being stated in these documents that Mr. Toberoff is going to end up with the lion's share of the money with respect to any disposition of the termination interests of the -- stemming from Superman both from the Siegel side and the Shuster side? 18:57:16 18:57:27 18:57:30 18:57:32 18:57:39 18:57:42

A. Well, I disagree with your characterization of lion's share. 18:57:44 18:57:49

Q. Well, let's -- 18:57:52

A. I mean he has a contingency agreement with me and with my mom, and he had a contingency agreement 18:57:52 18:57:56

with the Shusters. 18:57:59

Q. So when you do the math, though, as was pointed out in some of these documents, he ends up with the biggest percentage, bigger than what you would receive and bigger than what the Shuster side would receive; right? 18:58:00 18:58:03 18:58:05 18:58:09 18:58:13

A. He was being compensated for at this point nearly ten years of work. 18:58:14 18:58:16

Q. But when you made these deals, there wasn't ten years of work; correct? 18:58:18 18:58:20

A. No, but we had no idea how long or how much or how expensive it was all going to be. 18:58:22 18:58:24

Q. So you understood that at the end of the day Mr. Toberoff might end up with 45 percent or so of the total proceeds with you and your mother's side, Michael Siegel's side 27 and a half percent and the Shuster side 25 percent; correct? 18:58:26 18:58:30 18:58:36 18:58:42 18:58:46

A. You know, I'm sorry, but you're throwing around percentages, and that's not correct. 18:58:48 18:58:51

Q. But you have fully appreciated that at the end of the day Mr. Toberoff would have the biggest stake in the proceeds. 18:58:52 18:58:55 18:59:01

A. My only concerns -- excuse me. Were you finished? I didn't want to interrupt you. 18:59:03 18:59:06

Q. I want to make sure you understand what I'm 18:59:07

asking you, that you have understood and understand to this day that given his agreements with the Shuster family, given his agreements with you and your mother, given the fact that you succeeded to your half brother's rights, that Mr. Toberoff's aggregate share in any proceeds from the disposition of all these Shuster and Siegel interests is greater than your interest and greater than the Shuster interest; correct? 18:59:10 18:59:15 18:59:19 18:59:23 18:59:28 18:59:37 18:59:40 18:59:44 18:59:46

A. I was only concerned with my interest. I did not even know what his percentage was with the Shusters. 18:59:46 18:59:50 18:59:53

Q. But you certainly became aware of it when you read it in the timeline document; correct? 18:59:53 18:59:56

A. Well, I didn't get this timeline until much -- a long time afterward, and, you know -- 18:59:59 19:00:03

Q. Well, when you saw -- take a look at the timeline. That's Exhibit 58 -- bear with me. I'm looking for -- 19:00:06 19:00:09 19:00:37

Here it is. 19:00:52

When you were meeting with David Michaels, by the way, did he run through these different numbers in the way that I just did in describing to you that Mr. Toberoff would end up with the biggest share? 19:01:02 19:01:04 19:01:08 19:01:10

A. He ran some numbers by us, but, you know, he 19:01:14

offered no proof. 19:01:17

Q. Well, you knew what your agreements were, and he was aware of them as well. 19:01:20 19:01:22

A. He was actually mischaracterizing to us what our agreement was. 19:01:24 19:01:26

Q. You mean the percentages? 19:01:27

A. Correct. 19:01:28

Q. In what way did he mischaracterize it? 19:01:29

A. He was inflating it. 19:01:32

Q. It was 40 percent; right? 19:01:33

A. It was 40 percent, but he was claiming something much larger than that. 19:01:35 19:01:37

Q. He was claiming an additional 5 or 10 percent that you thought no longer applied? 19:01:39 19:01:42

A. Well, that I knew no longer applied. 19:01:44

Q. Okay. 19:01:55

Can you turn to page 6 of Exhibit 58. 19:02:00

A. Yeah. 19:02:15

Q. First of all, on page 1 it states: 19:02:21

"As it stands right now, the single person who would stand to gain the MOST in a settlement with Time Warner regarding the ongoing SUPERMAN legal dispute would not be the heirs themselves, but Marc 19:02:25 19:02:27 19:02:28 19:02:30 19:02:33 19:02:34

Toberoff." 19:02:36
Now, when you read that, did you agree with that statement? 19:02:37 19:02:39
A. No. 19:02:40
Q. But it is factually true that in terms of the division of the proceeds, he would receive the largest share; correct? 19:02:41 19:02:43 19:02:47
A. What I objected to was the -- was the way this was -- the way that this was presented. 19:02:48 19:02:51
Q. Putting this aside, though, in terms of the mathematical division of the shares, the Toberoff share is the biggest share. It's 45 or 40 -- in excess of 45 percent; correct? 19:02:54 19:02:56 19:03:01 19:03:05
A. Well, it's not bigger than my share now. 19:03:08
Q. Why is that? 19:03:10
A. Well, I inherited my mother's, I inherited Michael's, and I have my own. 19:03:12 19:03:16
Q. But if you take all of that, Mr. Toberoff gets 40 percent of that; right? 19:03:17 19:03:21
A. He gets 40 percent. I get 60 percent. 19:03:22
Q. And then he gets 40 percent of your piece, which is half, with the Shusters owning the other half; correct? 19:03:25 19:03:29 19:03:33
A. You're not saying that he gets half of mine. You're saying that my share of the overall Superman 19:03:33 19:03:36

copyright is 50 percent? 19:03:39
Q. Correct. And he gets 40 percent of your 50 percent; correct? 19:03:41 19:03:47
A. Correct. 19:03:47
Q. And he gets 50 percent of the Shuster 50 percent; right? 19:03:47 19:03:49
A. If he does. 19:03:49
Q. Well, you saw that referenced in the timeline document; right? 19:03:53 19:03:54
A. Yeah, but there are errors in this timeline, so I don't know if that's correct. 19:03:55 19:03:58
Q. You don't know that it's incorrect, do you? 19:03:59
A. No. 19:04:01
Q. The bottom line is you are aware that there's a possibility that he could end up as the biggest financial recipient of proceeds among you and the Shuster family and him; correct? 19:04:01 19:04:04 19:04:07 19:04:11
A. Look -- 19:04:13
Q. Are you aware of that? 19:04:14
A. It may be possible. I'm not doing the math today. 19:04:16 19:04:28
Q. Have you ever calculated how much you would have received today had you accepted the proposal that DC had made back in 2001, 2002? 19:04:29 19:04:33 19:04:45
A. At the time it was offered -- 19:04:49

MR. TOBEROFF: Again, objection. Compound. Which are you referring to, the February, 2002, draft or the Kevin Marks letter in October of 2001? 19:04:50 19:04:53 19:04:56

MR. PETROCELLI: Either one. 19:05:04

Q. Have you ever done the -- 19:05:05

MR. TOBEROFF: Compound. 19:05:06

BY MR. PETROCELLI:

Q. Have you ever done the calculation of what dollars would have been received by you and your mother? 19:05:07 19:05:10 19:05:13

A. Well, you're talking about two different calculations. 19:05:14 19:05:17

Q. Have you done the calculations for both of them? 19:05:17 19:05:19

A. You say ever. At one time when it was initially offered, you know, we did a projection on it. I haven't done it recently. 19:05:19 19:05:22 19:05:27

Q. Do you have any -- 19:05:31

A. We just knew a lot of money had already been owed to us, which was the basis of the accounting claim. 19:05:32 19:05:35 19:05:41

Q. How is it -- 19:05:41

A. That lawsuit. 19:05:41

Q. How is it that you think that you can financially benefit from now having, like you said, a 19:05:42 19:05:45

hundred percent of 50 percent of the copyright subject to Mr. Toberoff's share? How is it that you can financially benefit from the termination interests that you believe you have recaptured and that you -- that you believe you have recaptured? 19:05:50 19:05:55 19:05:58 19:06:00 19:06:04

MR. TOBEROFF: Objection. Vague and ambiguous. 19:06:06 19:06:08

BY MR. PETROCELLI:

Q. You can answer. 19:06:09

A. It's so broad, I don't understand. 19:06:10

Q. Well, what are the ways in which you believe that you can turn your termination interest into money? 19:06:12 19:06:13 19:06:16

MR. TOBEROFF: I instruct you not to answer to the extent your answer reveals communications with your attorney, either with me or with your former attorney, Kevin Marks. 19:06:16 19:06:18 19:06:27 19:06:30

BY MR. PETROCELLI:

Q. I don't believe you need to rely on attorney-client discussions to answer this question. I'm asking you, an extremely intelligent person who has been involved with this for many years. 19:06:32 19:06:36 19:06:38 19:06:41

MR. TOBEROFF: Excuse me. 19:06:44

BY MR. PETROCELLI:

Q. In what ways have you considered that you 19:06:45

might be able to turn your termination interest, whatever it is and whenever it's final, into money? 19:06:47 19:06:51

MR. TOBEROFF: I instruct you not to answer to the extent your answer reveals the contents of attorney-client communications. If you can answer without divulging the substance of attorney-client communications, then you can only answer to that extent. 19:06:56 19:06:59 19:07:08 19:07:14 19:07:18 19:07:20

THE WITNESS: Yeah. 19:07:21

My answer is that's the subject of litigation. 19:07:21 19:07:25

BY MR. PETROCELLI:

Q. What's the subject of litigation? 19:07:26

A. You know, what -- what my rights were and potentially what the value of the rights are. 19:07:28 19:07:32

Q. But you understand that -- you're talking about the lawsuit that you filed on your termination interest? 19:07:33 19:07:35 19:07:37

A. Yes. 19:07:38

Q. Okay. Now, you understand, though, that as a result of that lawsuit, and let's say you're completely successful in every respect after all appeals and so forth, the only compensation you would receive as a result of the lawsuit is an accounting from 1999 to 2013; correct? 19:07:38 19:07:41 19:07:45 19:07:48 19:07:51 19:07:55

A. Not necessarily. 19:07:58
Q. What other compensation do you believe in terms of money that would -- can be awarded to you by way of a lawsuit? 19:07:59 19:08:02 19:08:07
A. I believe it depends on the court ruling. 19:08:08
Q. How so? 19:08:10
MR. TOBEROFF: I again -- 19:08:12
BY MR. PETROCELLI:
Q. How so do you -- 19:08:14
MR. TOBEROFF: If you have any understanding of those things that are independent of the advice of counsel, you can answer. If you don't, I instruct you not to answer. 19:08:15 19:08:16 19:08:19 19:08:21
BY MR. PETROCELLI:
Q. I'm not asking about your legal advice. I'm asking about you as a plaintiff in that -- 19:08:22 19:08:24
MR. TOBEROFF: That's not the instruction. 19:08:25
BY MR. PETROCELLI:
Q. -- in that, and you can disregard whatever Mr. Toberoff and you have discussed. But do you have an understanding that you have a claim for money in that case other than the accounting claim? 19:08:26 19:08:28 19:08:31 19:08:36
A. Well, I believe that there are numerous appeals. There are numerous issues that are still going to be examined in a court of law that could 19:08:42 19:08:46 19:08:48

directly affect, you know, my income going forward. 19:08:52

Q. Well, is it your -- but isn't your understanding that the only way -- the only possible money that you can recover from your lawsuit is whatever the court finally determines is the amount that DC was required to account and pay to you for the years 1999 through 2013 for the works in which the court finds you had an interest? 19:08:58 19:09:02 19:09:08 19:09:13 19:09:17 19:09:22 19:09:28

MR. TOBEROFF: Again, my instruction is if you can answer that question on your own and not based on any advice or discussions with counsel, you can answer the question. If your answer is based on your discussions with counsel, then I instruct you not to answer. 19:09:30 19:09:32 19:09:35 19:09:38 19:09:41 19:09:46

THE WITNESS: Going beyond the lawsuit, there are always possibilities. 19:09:48 19:09:52

BY MR. PETROCELLI:

Q. I was just focused on the lawsuit, that the only -- that you have an understanding that the only money that you can recover from your lawsuit is the accounting money for the period 1999 to 2013. Are you aware of that? 19:09:52 19:09:54 19:09:56 19:10:00 19:10:05

A. Yes. 19:10:06

Q. Okay. And in terms of getting any other money in respect of your termination interest, you 19:10:07 19:10:13

understand that that would require some kind of business transaction? 19:10:16 19:10:17

A. Yes, that's correct. 19:10:18

Q. Okay. A business transaction in which you would partner up with someone or license someone or sell your interest; correct? 19:10:19 19:10:22 19:10:26

A. Correct. 19:10:27

Q. When do you believe that you will be able to do so? 19:10:33 19:10:35

MR. TOBEROFF: I'm instructing you not to answer unless you can answer independent of any advice of counsel, if you can answer. If your answer implicates advice of counsel, I instruct you not to answer the question. 19:10:37 19:10:39 19:10:43 19:10:48 19:10:50

THE WITNESS: Yeah, I mean -- 19:10:51

MR. TOBEROFF: You don't -- do you understand the instruction? 19:10:53 19:10:55

THE WITNESS: I do. 19:10:55

MR. TOBEROFF: Okay. 19:10:56

THE WITNESS: I do. 19:10:57

I'm not able to say anything, you know, specific because it all involves discussions with my attorney regarding legal matters. 19:10:57 19:11:01 19:11:06

MR. PETROCELLI: Well, that doesn't necess- arily mean you can't answer the question. Let me -- 19:11:08 19:11:09

THE WITNESS: In my mind it does. 19:11:12
MR. PETROCELLI: Let me try again. 19:11:13
Q. Do you have an understanding -- 19:11:15
MR. TOBEROFF: It does pursuant to my instruction. 19:11:17 19:11:21
BY MR. PETROCELLI:
Q. Do you have an understanding that -- withdrawn. 19:11:21 19:11:31
Do you have a plan or intent to enter into a business transaction regarding your Superman rights? 19:11:31 19:11:36
A. I believe I have very valuable rights and that at some point I will be able to profit from them. 19:11:39 19:11:43
Q. Do -- what are the ways in which you believe you can profit from them? 19:11:48 19:11:50
MR. TOBEROFF: Same instruction. 19:11:52
THE WITNESS: That's something that I really can't respond to. 19:11:55 19:11:56
BY MR. PETROCELLI:
Q. Well, you just said "I believe they're valuable." Why do you believe they're valuable? 19:11:58 19:12:00
A. Because it's Superman. 19:12:02
Q. Do you believe that you'll have the ability to sell them? 19:12:04 19:12:06
MR. TOBEROFF: Same instruction. Same instruction. 19:12:08 19:12:11

THE WITNESS: I can't respond to that. 19:12:11
BY MR. PETROCELLI:
Q. Have you ever attempted to find out, other than through talking to Marc Toberoff, what kind of value there is in these Superman rights for which you have been involved for 15 years or so? 19:12:15 19:12:19 19:12:23 19:12:26
MR. TOBEROFF: Same instruction, and that instruction doesn't just implicate talking to Marc Toberoff. It implicates things that Marc Toberoff has done on your behalf and my work product. 19:12:29 19:12:31 19:12:34 19:12:37
THE WITNESS: It's all intertwined with matters that are of a legal nature, so I can't answer that question. 19:12:40 19:12:44 19:12:47
BY MR. PETROCELLI:
Q. Have you identified in your own mind or thinking any prospective purchasers of your rights? 19:12:49 19:12:51
MR. TOBEROFF: Same instruction. 19:12:56
THE WITNESS: No one specific. 19:12:58
BY MR. PETROCELLI:
Q. Have you given some thought to how much you would sell your rights for? 19:13:00 19:13:06
MR. TOBEROFF: Same instruction. 19:13:09
THE WITNESS: I don't have a clear number. 19:13:11
BY MR. PETROCELLI:
Q. A range. 19:13:14

MR. TOBEROFF: Same instruction. 19:13:17

THE WITNESS: Sitting here today, no. 19:13:18

MR. TOBEROFF: Not -- and if you did, you could only disclose that to the extent that it's not the product of your conversations with your attorney or the analysis done by your attorneys on your behalf. You understand that? You understand that? 19:13:21 19:13:24 19:13:26 19:13:29 19:13:32

THE WITNESS: Yes, I do. That goes without saying. 19:13:33 19:13:35

BY MR. PETROCELLI:

Q. Do you have a belief that DC Comics or Warner Bros. is a potential purchaser of your rights? 19:13:35 19:13:43

A. Of course. 19:13:48

Q. Why do you believe that? 19:13:49

A. Well, they're one of many studios, and I believe that they would have -- it would be in their best interest to try to, you know, make a reasonable deal with me. When I say reasonable, I mean, you know, something that would be completely acceptable to me. 19:13:51 19:13:55 19:13:58 19:14:02 19:14:06 19:14:09

Q. Do you know what that is? 19:14:10

A. Sitting here -- 19:14:12

MR. TOBEROFF: Same instruction. 19:14:13

THE WITNESS: Sitting here today, I cannot give you an answer to that. 19:14:14 19:14:15

BY MR. PETROCELLI: 19:14:19

Q. Do you believe that because the Shusters have asserted that their termination interest becomes effective in 2013, that that will somehow enhance the value of your Superman rights? 19:14:20 19:14:26 19:14:30 19:14:36

A. Yes. 19:14:39

MR. TOBEROFF: Same instruction. You can only answer that if you formed a belief as to that independent of your advice of counsel. 19:14:40 19:14:41 19:14:44

THE WITNESS: Yes, I do. 19:14:46

BY MR. PETROCELLI:

Q. Why do you believe that? 19:14:49

A. Well -- 19:14:50

MR. TOBEROFF: I -- if you want -- don't venture into this territory unless your answer to his question is independent of any advice of counsel, and if you can't separate the two, then I instruct you not to answer. 19:14:53 19:14:56 19:14:59 19:15:02 19:15:04

THE WITNESS: Just very simply, I think that a whole is always more valuable than part, than a part. 19:15:06 19:15:11 19:15:14

BY MR. PETROCELLI:

Q. Do you believe that between the Shuster interest if and when it were to become effective and the interests that you own, that that is the entirety 19:15:15 19:15:19 19:15:22

of the Superman interest? 19:15:26

A. I'm sorry? 19:15:28

Q. Do you believe that the Shuster interest and the Siegel interest -- you said a whole is better than a part or words to that effect. Do you believe that the Siegel termination interest and the Shuster termination interest constitute 100 percent of the interest in Superman? 19:15:29 19:15:31 19:15:34 19:15:37 19:15:41 19:15:43

MR. TOBEROFF: Vague and ambiguous as to -- vague and ambiguous. 19:15:46 19:15:50

THE WITNESS: It depends on the time frame that you're talking about. 19:15:50 19:15:59

BY MR. PETROCELLI:

Q. Well, do you understand that DC Comics owns Superman rights that you don't have the ability to recapture? 19:15:59 19:16:00 19:16:03

A. As of today. That may change. 19:16:04

Q. As of any day. 19:16:07

A. That may change. 19:16:08

Q. How? 19:16:09

A. There are court decisions that are yet to come. 19:16:10 19:16:12

Q. Assuming you win every single court decision and assuming the Shusters win every single court decision, is it your belief that the Shusters and the 19:16:12 19:16:15 19:16:18

Siegels collectively could end up with every single right associated with Superman? 19:16:21 19:16:25

MR. TOBEROFF: Vague and ambiguous. Again, you're getting into legal territory here. 19:16:28 19:16:29

He's asking you for legal conclusions, and if you can form an opinion independent of your advice of counsel, you can only answer to that limited extent. But if you can't or your opinions are so intertwined with the advice of counsel that you can't, then I'm instructing you not to answer. 19:16:32 19:16:35 19:16:38 19:16:40 19:16:44 19:16:47

MR. PETROCELLI: Do you want to hear the question back? 19:16:49 19:16:50

THE WITNESS: No, I don't need to hear the question. 19:16:51 19:16:52

You know, I really don't think that it's appropriate for me to answer that. 19:16:53 19:16:55

BY MR. PETROCELLI:

Q. Why is that? 19:16:56

A. Because it's too enmeshed in years of discussions with legal counsel. 19:16:57 19:17:02

Q. Are you aware that there are rights that DC Comics and or Warner Bros. has that are not subject to termination or recapture at all? Is it your belief that there are such Superman rights or Superboy rights? 19:17:04 19:17:11 19:17:15 19:17:20 19:17:23

MR. TOBEROFF: Same -- same instruction. I'm instructing you not to answer that question because it calls for a legal conclusion. So I don't have to ask you whether it's unrelated to advise of counsel 19:17:23 19:17:25 19:17:27 19:17:30

MR. PETROCELLI: I didn't ask you for a legal conclusion. I asked for your belief and understanding in that regard. 19:17:34 19:17:34 19:17:36

MR. TOBEROFF: I'm instructing you not to answer. It divulges attorney-client communications. 19:17:37 19:17:39

MR. PETROCELLI: You know, we're going to stop right now. I have a ton more of documents, as you can see, in front of you. 19:17:42 19:17:43 19:17:45

THE WITNESS: I'm begging you not to stop. 19:17:47

MR. PETROCELLI: I understand, but we can't go any further. It's past quarter after 7:00, and I have accommodated your schedule and your situation, and I'm not being disrespectful, but there's no way we're going to finish, and so we'll just have to fight about it another day. 19:17:49 19:17:51 19:17:53 19:17:58 19:18:02 19:18:05

MR. TOBEROFF: I would like to know -- wait a second. I would like to know how much time we have been on the record. 19:18:06 19:18:07 19:18:09

THE VIDEOGRAPHER: At this point you're a minute or two shy of seven hours. 19:18:11 19:18:15

MR. PETROCELLI: There you go. 19:18:17

MR. TOBEROFF: So you're stopping a minute or two shy of seven hours and you're not finishing the deposition when you -- 19:18:18 19:18:20 19:18:22

MR. PETROCELLI: As you know, I made my statement without having any knowledge of the time. 19:18:24 19:18:26

MR. TOBEROFF: Okay. Well, now you have -- 19:18:28

MR. PETROCELLI: I don't have an internal clock.

MR. TOBEROFF: Now you have the knowledge of the time, so -- and please let me finish. I didn't interrupt you when you were speaking. 19:18:29 19:18:30 19:18:33

MR. PETROCELLI: Sure. You can finish.

MR. TOBEROFF: You're not stopping as a strategic effort a minute or two before seven hours to continue the deposition. And you're smiling. It's clear that that's what you're doing. So -- 19:18:35 19:18:38 19:18:41 19:18:43

MR. PETROCELLI: You are joking; right? 19:18:46

MR. TOBEROFF: Am I joking? It's obvious -- excuse me. I'm allowed to speak. I'm not joking. 19:18:47 19:18:49

MR. PETROCELLI: You're going to embarrass yourself. 19:18:52 19:18:54

THE WITNESS: You have one day of seven hours of Ms. Siegel. She wants to continue to complete her deposition. You refuse to do that even though she's the one with M.S. and you're perfectly happy -- 19:18:54 19:18:56 19:19:00 19:19:02

perfectly capable of finishing the deposition, but you're choosing not to and choosing not to close the deposition. This deposition is going to close after today, and we will vigorously oppose you dragging her back in here for more time because you have two minutes left on your seven hours. 19:19:06 19:19:09 19:19:13 19:19:15 19:19:19 19:19:22

MR. PETROCELLI: You know, I will respond. Okay? 19:19:25 19:19:26

I think your comments are disgraceful especially in reference to the witness' condition because I have done everything, frankly, beyond the call of duty, to accommodate her, her illness, her schedule, finding an office with a sofa so she can lie down, in every -- 19:19:28 19:19:31 19:19:34 19:19:39 19:19:43 19:19:47

MR. TOBEROFF: No one -- no one --

MR. PETROCELLI: Excuse me. I'm not finished. 19:19:47 19:19:48

MR. TOBEROFF: I wasn't referring to that. 19:19:49

MR. PETROCELLI: Excuse me -- in every one of the requests, and I have made it perfectly clear on the record throughout that she is entitled to take as many and as lengthy breaks as she wants knowing that it was going to require us to work far, far later than a normal schedule would. So I really find that distasteful. 19:19:51 19:19:51 19:19:52 19:19:57 19:20:00 19:20:05

Secondly -- 19:20:11

MR. TOBEROFF: I'm referring to the couple minutes short of the seven hours, not to be providing -- 19:20:11 19:20:12

MR. PETROCELLI: Time out. Don't --

MR. TOBEROFF: -- for a room to lie down, and -- 19:20:13

MR. PETROCELLI: I'm not finished.

MR. TOBEROFF: -- I thanked you for that. 19:20:14

MR. PETROCELLI: I'm not finished with my statement. 19:20:16 19:20:19

Secondly, as you well know, I indicated that we were stopping because the court reporter told me we had three minutes and two minutes on the tape, and I knew I wasn't going to possibly finish the deposition. I had no idea whatsoever, of course, and you know I didn't, that there was two minutes left to go to complete seven hours. And for you to accuse me of trying to make some kind of tactic about that, I want to be real clear about that. I will cede the two minutes to you. 19:20:19 19:20:22 19:20:28 19:20:33 19:20:36 19:20:39 19:20:42 19:20:46 19:20:51 19:20:54

MR. TOBEROFF: Okay. If you're ceding the two minutes to me, then the deposition is over. 19:20:54 19:20:58

MR. PETROCELLI: No, it is not. 19:20:58

MR. TOBEROFF: Because you have seven hours 19:20:58

of deposition. 19:20:59

MR. PETROCELLI: I understand your position, but, Marc, that's really quite sophomoric of you. You don't decide when depositions are over. Courts decide that. So I understand your position that you want to resist this deposition from being continued to a later date, but that's what I'm doing.

MR. TOBEROFF: Okay.

MR. PETROCELLI: And you obviously will disagree about it, and we'll go to court about it. I just want to be clear that I'm not going to make an argument that I'm entitled to more time because apparently there were one or two minutes left before the seven hours. It's because I have not had enough within seven hours to complete the examination given the importance of this witness --

MR. TOBEROFF: Just so --

MR. PETROCELLI: -- and we will argue about it another day.

MR. TOBEROFF: Just to be clear, my reference to tactics doesn't refer to the two minutes left on the seven hours. It refers -- because I said the same exact thing to you when you told me you were going to stop at 6:00. I objected at that point. And this isn't state court, and I think you're confusing the

19:20:59 19:21:01 19:21:05 19:21:09 19:21:15 19:21:21 19:21:23 19:21:23 19:21:26 19:21:28 19:21:31 19:21:34 19:21:37 19:21:41 19:21:44 19:21:46 19:21:47 19:21:48 19:21:49 19:21:52 19:21:56 19:21:59 19:22:02 19:22:06

two. This is federal court. In federal court you have one day of seven hours. You don't continue from day to day until you're finished. 19:22:08 19:22:11 19:22:14

MR. PETROCELLI: Marc, you -- 19:22:15

MR. TOBEROFF: So we will vigorously oppose -- oppose, and Laura stated on the record that she would like you to continue rather than have to come back for yet another deposition. This is now her third deposition. 19:22:17 19:22:19 19:22:22 19:22:26 19:22:29

MR. PETROCELLI: Wait a second. There's nothing to continue. Are you telling me that you're going to make her available tonight beyond seven hours? 19:22:30 19:22:31 19:22:33 19:22:36

MR. TOBEROFF: No. I'm telling you -- 19:22:36

MR. PETROCELLI: Okay. 19:22:37

MR. TOBEROFF: -- you can finish her seven-hour deposition. 19:22:38 19:22:40

MR. PETROCELLI: It's done. I told you I'm giving up the last one or two minutes just to make the point to you. But to be clear, you're not willing tonight to have the witness stay beyond seven hours of testimony. 19:22:41 19:22:43 19:22:46 19:22:48 19:22:51

MR. TOBEROFF: I don't think you're entitled to more than one day of seven hours. 19:22:51 19:22:52

MR. PETROCELLI: That's my point. Because I 19:22:54

believe that I am entitled to more than seven hours, I will have to go to court and seek the court's intervention. 19:22:55 19:22:58 19:23:01

MR. TOBEROFF: That's your -- you can do -- you can always make a motion to the court. 19:23:01 19:23:02

MR. PETROCELLI: Let's have a stipulation on the record as we had before that the witness will have within 30 days of your receipt to advise us of any corrections to the deposition transcript, but bearing in mind, Ms. Siegel -- Ms. Larson, of course, that if you do make any changes of substance, it can be commented upon as affecting your credibility. The court reporter's transcript can be signed under penalty of perjury, and the court reporter is otherwise relieved of her duties under the Code. So stipulated? 19:23:04 19:23:06 19:23:10 19:23:15 19:23:19 19:23:23 19:23:26 19:23:31 19:23:34 19:23:36 19:23:38

MR. TOBEROFF: So stipulated. 19:23:38

THE REPORTER: Where is the original to go, please? 19:23:41 19:23:42

MR. PETROCELLI: The original should go to, I guess -- 19:23:43 19:23:46

What did we do last time? 19:23:46

MR. TOKORO: The original to them and a copy to us. 19:23:49 19:23:51

THE VIDEOGRAPHER: That will then mark the 19:23:51

end of Volume 1, tape number five, in the deposition of Laura Siegel. Going off the record. The time is 7:24. 19:23:53 19:23:55

(The deposition was concluded at 7:24 p.m.) 19:24:01

STATE OF CALIFORNIA )
) ss.
COUNTY OF LOS ANGELES )

I, LAURA SIEGEL LARSON, declare under the penalties of perjury under the laws of the United States that the foregoing is true and correct.

Executed this day of , 2011, at , California.

LAURA SIEGEL LARSON

STATE OF CALIFORNIA )

) ss.

COUNTY OF LOS ANGELES )

I, Kathleen E. McCarthy, Certified Shorthand Reporter No. 4483 for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was duly sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced by me to typewritten form and that the same is a true, correct, and complete transcript of said proceedings.

Before completion of the deposition, review of the transcript [ ] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not interested in the outcome of the action.

Witness my hand this 3rd day of August, 2011.

[signature]

Kathleen E. McCarthy, CSR No. 4483