# EXHIBIT 43

# O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
HONG KONG
LONDON
LOS ANGELES
NEWPORT BEACH
NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO
SHANGHAI
SILICON VALLEY
SINGAPORE
TOKYO
WASHINGTON, D.C.

July 11, 2011

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6850

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Laura Brill
Kendall Brill & Klieger LLP
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California 90067

Re:   *DC Comics v. Pacific Pictures Corp. et al.*, **CV-10-3633 (ODW) (RZx)**

Dear Counsel:

We write pursuant to Local Rule 37 concerning counsel's persistent instructions to defendant Mark Peary not to respond to key lines of questioning during his June 29, 2011, deposition. For the reasons discussed below, there was no basis for these objections and Mr. Peary's wholesale refusal to testify on these topics. As a result, DC wrongfully has been denied critical evidence to support its claims and refute the factual assertions in defendants' Rule 12 and SLAPP briefing. Unless defendants agree to allow Mr. Peary to testify on these topics, DC will file a motion to compel the relevant testimony.

**I.    CONSENT AGREEMENT**

Defense counsel instructed Mr. Peary "not to answer any questions regarding the substance of the consent agreement" between the Siegel and Shuster heirs that prohibits either family from entering into an agreement with DC without the consent of the other. *See* Rough Tr. of June 29, 2011, Peary Dep. ("Tr.") at 62. The lines of inquiry blocked included:

- why Mr. Peary entered into the consent agreement, *see id.* at 58-65[1];

---

[1] Appendix A to this letter highlights deposition questions and answers to which DC would seek to compel answers, as well as the right to ask related follow-up questions.

EXHIBIT 43
1500

O'MELVENY & MYERS LLP

July 11, 2011 - Page 2

- whether Mr. Peary believes the consent agreement harms or benefits the Shuster heirs, *see id.* at 78;

- Mr. Peary's understanding of how the consent provision works, *see id.* at 79-81; and

- whether any other side deal exists by which the Shuster heirs may claim a share of profits the Siegel heirs receive from DC, *see id.* at 167-68.[2]

Defense counsel objected that the consent agreement "has been [held] to be privileged and off limits" by Magistrate Zarefsky, and also asserted attorney-client and work-product privilege. *See id.* at 62-65. These objections are overbroad and not well taken.

### A. Magistrate Zarefsky's Ruling

Magistrate Zarefsky denied DC's motion to compel production of the consent agreement based on his application of law-of-the-case doctrine to the *Siegel* court's ruling that the agreement was entered into in connection with mediation. Docket No. 209 at 2-10. While this ruling (which DC has disputed) prevented DC from obtaining the document itself, it in no way bars DC from acquiring independent evidence of the nature and substance of the consent agreement. Courts have established that parties can pursue alternative sources of discovery to prove the existence of facts disclosed during mediation—parties must be given an opportunity to "uncover new, admissible evidence … not protected by the confidentiality statutes." *Benesch v. Green*, 2009 U.S. Dist. LEXIS 117641, at *12-13 (N.D. Cal. Dec. 17, 2009); *see also Foxgate v. Homeowners' Assoc.*, 26 Cal. 4th 1, 17-18 (2001) (allowing plaintiff to seek sanctions based on "assertion and evidence" other than "communications made during the mediation"); *Cassel v. Super. Ct.*, 2011 WL 102710 (Cal. Jan. 13, 2011) (citing *Benesch* and *Foxgate* favorably).

Moreover, Mr. Peary's testimony is new evidence confirming that the consent agreement is itself discoverable because it exists separate and apart from any mediation or settlement discussions. Mr. Peary admitted that the consent agreement remains in effect to this day, Tr. at 64—and therefore continues to violate DC's rights long after the parties' 2008 mediation in *Siegel* was terminated. Mr. Peary also testified that the "consent agreement," *e.g.*, Tr. at 47—his

---

[2] Notably, Mr. Toberoff allowed Mr. Peary to answer a similar question during his 2006 deposition in the *Siegel* case without objection. *Compare* Tr. of Nov. 11, 2006 Peary Dep. ("2006 Tr.") at 47 (Question: "And if [the Siegels] were to settle and receive money from DC Comics, is there any arrangement by which you would receive any of that money?" Response: "No."), *with* Tr. at 167 (Question: "Do you have any agreement to share in any accounting recovery that the Siegels might obtain in their case against DC or Warner Bros.?" Mr. Toberoff: "I instruct you not to answer because that delves into the potential substance of the consent agreement."). He also allowed Laura Siegel Larson to answer a similar question in 2006—again with no objection. Tr. of Aug. 1, 2006 Larson Dep. at 20 (Question: "Is there any agreement you're aware of between your mother and yourself on the one hand and any representative or heir of Joseph Shuster on the other hand?" Response: "No.").

EXHIBIT 43
1501

O'MELVENY & MYERS LLP

July 11, 2011 - Page 3

word for the document—is titled "Superman agreement," *id.* at 59—not "Mediation Agreement," "Settlement Strategy," or the like. Federal Rule of Evidence 408 confirms that the consent agreement is discoverable as evidence of independently wrongful acts that are the subject of DC's claims in this case. The "Superman agreement" is not a mediation communication; it is an illicit and unlawful contractual restraint.[3] Defendants cannot shield such evidence from discovery "through the pretense of disclosing it during compromise negotiations." FED. R. EVID. 408, Advisory Comm. Note; *see also Carney v. Am. Univ.*, 151 F.3d 1090, 1095-96 (D.C. Cir. 1998); *Uforma/Shelby Bus. Forms, Inc. v. NLRB*, 111 F.3d 1284, 1293-94 (6th Cir. 1997); *Athey v. Farmers Ins. Exch.*, 234 F.3d 357, 362 (8th Cir. 2000); *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1161 (9th Cir. 2007); *Munoz v. J.C. Penney Corp., Inc.*, 2009 U.S. Dist. LEXIS 36362, at *8-10 (C.D. Cal. Apr. 9, 2009) (Wright, J.); *Bd. of Trs. v. Tyco Int'l, Ltd.*, 253 F.R.D. 521, 523 (C.D. Cal. 2008); *FDIC v. White*, 76 F. Supp. 2d 736, 738 (N.D. Tex. 1999); *accord* CAL. EVID. CODE § 1120 ("Evidence otherwise admissible or subject to discovery outside of a mediation or a mediation consultation shall not be or become inadmissible or protected from disclosure solely by reason of its introduction or use in a mediation."); *Rojas v. Super. Ct.*, 33 Cal. 4th 407, 423 n.8 (2004); *Kullar v. Foot Locker Retail, Inc.*, 168 Cal. App. 4th 116, 132-33 (2008). Moreover, Mr. Peary's Rule 12 motion asserts—incorrectly—that the consent agreement was entered into "solely for purposes of the parties' settlement mediation, which commenced on May 8, 2008." Docket No. 148 at 20. Mr. Peary cannot make such an assertion in briefing but cut off a complete inquiry in discovery.

### B. Attorney-Client And Work-Product Privilege

Mr. Peary refused to answer DC's questions on the ground that his understanding of the consent agreement was "bound up" with privileged communications with Mr. Toberoff. *E.g.*, Tr.

---

[3] To be clear, DC is entitled to discovery regarding the consent agreement without first having to prove its unlawfulness—an ultimate fact for trial. *Cf. Munoz v. J.C. Penney Corp.*, 2009 U.S. Dist. LEXIS 36362, at *7-10 (C.D. Cal. Apr. 9, 2009) (mediation communication discoverable so long as it pertains to facts other than an admission of fault or liability in underlying case). In any event, the agreement is unlawful under section 304(c)(6)(D) of the Copyright Act, which gives DC a "competitive advantage" and requires that the Shuster heirs remain free to enter into copyright agreements with DC until the effective termination date in 2013. *See* 17 U.S.C. § 304(c)(6)(D); *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1047 (9th Cir. 2005). Moreover, Mr. Toberoff's involvement in the consent agreement appears to violate state law and public policy. *See Calvert v. Stoner*, 33 Cal. 2d 97, 103 (1948); *Tax Auth., Inc. v. Jackson Hewitt, Inc.*, 898 A.2d 512, 522 (N.J. 2006); ABA Standing Comm. on Ethics and Prof'l Responsibility, Formal Opinion 06-438 (2006); CAL. RULES OF PROF'L CONDUCT R. 3-310(D) (2011); *Fair v. Bakhtiari*, 2011 WL 1991999 (Cal. Ct. App. May 24, 2011). Indeed, Magistrate Zarefsky recognized that "[o]ne cannot know with certainty what the [2008] consent agreement means without seeing the agreement." Docket No. 209 at 8:1-2. It is for this reason that questions concerning its terms should be compelled (and the document itself should be produced); the mediation ended long ago, *see* Docket No. 171-4 Ex. 3, and there is no basis to shield a consent agreement that admittedly exists independent of it, Tr. at 64, from disclosure.

EXHIBIT 43
1502

O'MELVENY & MYERS LLP
July 11, 2011 - Page 4

at 59-61, 85-86, 91-92. To clarify, we asked: "In your role as executor of the estate, is it your testimony that you have been able to -- you can't do anything or even think of anything that doesn't involve the legal advice of Marc Toberoff?" *Id.* at 338. Mr. Peary responded: "That's correct." *Id.* We asked: "You don't have any judgment or any ideas or any thoughts other than what Toberoff discusses with you?" *Id.* at 339. Mr. Peary confirmed again: "That's correct." *Id.* This position is untenable.

First, as a factual matter, DC's questions did not call for the divulgence of *any* privileged information—to the contrary, they were directed to Mr. Peary's reasons for entering into the consent agreement on behalf of the Shuster estate and his understanding of the effect of the agreement on the estate's rights. As the named executor of the Estate of Joseph Shuster, Mr. Peary has a fiduciary duty to make informed, good faith decisions in furtherance of the Estate's interests. *E.g.*, CAL. PROB. CODE § 9600(a) ("The personal representative has the management and control of the estate and, in managing and controlling the estate, shall use ordinary care and diligence."); *Estate of Sanders*, 40 Cal. 3d 607, 616 (1985) ("An executor is an officer of the court and occupies a fiduciary relation toward all parties having an interest in the estate."). Mr. Peary was therefore obligated to exercise some degree of sound, independent judgment even if Mr. Toberoff advised him on whether to enter into the consent agreement. *See id.* Moreover, defendants have asserted that the Siegel and Shuster heirs are the only parties to the consent agreement, meaning it is a contractual restraint among non-lawyers. There is no basis for asserting privilege over such business arrangements. *E.g.*, *U.S. v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996) (privilege only applies where client seeks advice from lawyer "'*in his capacity as such*'"—not where lawyer acts as "business agent"); *Minebea Co., Ltd. v. Papst*, 355 F. Supp. 2d 526, 529 (D.D.C. 2005) (business agreements and communications between attorney and client not privileged); *U.S. v. Davis*, 636 F.2d 1028, 1043 (5th Cir. 1981) (where services primarily non-legal in nature, "communications relating to that service should therefore not be privileged, even though performed by a lawyer"); *Marten v. Yellow Freight Sys.*, 1998 U.S. Dist. LEXIS 268, at *18 (D. Kan. Jan. 6, 1998) (recognizing that "when the legal advice is merely incidental to business advice, the privilege does not apply").

Second, Mr. Peary waived whatever privilege might otherwise have existed by selectively and strategically disclosing certain facts about the consent agreement. Counsel allowed Mr. Peary to provide testimony that he apparently believed would be helpful to defendants, including when the agreement was signed; its signatories; its title; its continued existence; and the fact that it purportedly does not entitle the Shusters to share in any profits concerning Superboy or the Superboy case the Siegels are pursuing. *See* Tr. at 48-50, 58-59, 65, 75, 81-83. While defense counsel allowed this testimony, which apparently counsel found helpful, it shut off all inquiry into questions concerning, for example, the Shusters' entitlement to money from the *Siegel* accounting case that is also proceeding before Judge Wright.[4] Promises

---

[4] *Compare* Tr. at 81-82 (Question: "Do you have any current arrangement for the consent agreement or otherwise whereby the Shuster interests share in any proceeds or recovery attributable to Superboy?" [No objection.] Response: "No."), *with id.* at 167 (Question: "Do you have any agreement to share in any accounting recovery that the Siegels might obtain in

EXHIBIT 43
1503

O'MELVENY & MYERS LLP
July 11, 2011 - Page 5

the Siegels made to the Shusters to share in monies from court cases in which the Shusters are not parties are relevant to DC's unclean hands claims in this case, and also prove the consent agreement is *not* a Drysdale-Koufax agreement, which is an inapt analogy in any event, given the prohibitions on rights-trafficking found in the Copyright Act. Counsel also blocked our efforts to test the factual assertions in defendants' Rule 12 briefing concerning the nature and substance of the consent agreement—including, for example, that the agreement does not "constitute 'a further grant, or agreement to make a further grant' of the recaptured Superman copyrights," Docket No. 148 at 9; reflects "understandings between the Siegels and the Shuster Estate regarding settlement strategy," *id.* at 2; was entered into "solely for purposes of the parties' settlement mediation" in 2008, *id.* at 20; and was intended to "'achieve the objects of the litigation,'" *id*. at 17; *see also* Docket No. 182 at 17-21 (listing, by way of illustration, fact issues raised in defendants' SLAPP motion).

   The Ninth Circuit has rejected such efforts to simultaneously disclose some facts while withholding others—a privilege holder "cannot be allowed, after disclosing as much as he pleases, to withhold the remainder. He may elect to withhold or disclose, but after a certain point his election must remain final." *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981); *Fort James Corp. v. Solo Cup. Co.*, 412 F.3d 1340, 1349-51 (Fed. Cir. 2005).

   <u>Third</u>, Mr. Peary also waived privilege by putting at issue Mr. Toberoff's advice concerning the lawfulness of the consent agreement. Defendants, including Mr. Peary, have repeatedly asserted that the consent agreement "is not unlawful in any respect" and "does not require consent of the Heirs' attorney to any settlement with DC." Docket No. 160 at 53; Docket No. 231 at 7; *see also* Docket No. 170 at 5 ("DC's argument that the Consent Agreement is 'unlawful' or improper is also false and unsupported."). By refusing to answer DC's questions regarding the basis for such assertions, Mr. Peary wrongfully has denied DC an opportunity to test defendants' characterization of the agreement. Courts have established that "the attorney-client privilege cannot at once be used as a shield and a sword." *U.S. v. Bilzerian*, 926 F.2d 1285, 1291-94 (2d Cir. 1991). In *Bilzerian*, the court found that a defendant charged with securities fraud and making false statements to the government placed at issue conversations with his counsel by claiming that he "thought his actions were legal." *Id.* at 1292. The court ruled that privilege as to those conversations was waived because the defendant "put his knowledge of the law and the basis for his understanding of what the law required in issue" and "fairness require[d] examination of protected communications." *Id.* Similarly, by stating that all of his actions have been predicated on Mr. Toberoff's advice, Mr. Peary has put these communications at issue and cannot refuse to testify about them. *See id.*; *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162-63 (9th Cir. 1992).

---

their case against DC or Warner Bros.?" Instruction: "I instruct you not to answer that because it delves into the potential substance of the consent agreements.").

EXHIBIT 43
1504

O'MELVENY & MYERS LLP
July 11, 2011 - Page 6

## II. PACIFIC PICTURES AGREEMENTS

Defense counsel improperly barred Mr. Peary from answering questions concerning the agreements between the Shuster heirs and Pacific Pictures Corporation, including:

- why the Shuster heirs entered into the Pacific Pictures agreements, *see* Tr. at 176-77, 204-05, 211-12;

- whether the Shuster heirs believed that litigation with DC was likely at the time they entered into the Pacific Pictures agreements, *see id.* at 211-13;

- why the Shuster heirs agreed to transfer their putative rights to the Pacific Pictures joint venture, *see id.* at 194-99;

- why the 2001 Pacific Pictures agreement identified Superboy as among the Shuster heirs' rights and the 2003 agreement deleted all reference to Superboy, *see id.* at 278-79, 305-10;

- Mr. Peary's awareness of the unlawfulness of certain provisions in the Pacific Pictures agreements, *see id.* at 260-61;

- the purpose and effect of the 2004 letter purporting to "cancel" the Pacific Pictures joint venture, *see id.* at 324-27;

- Mr. Peary's reason for executing a legal retainer agreement after cancelling the Pacific Pictures agreements, *see id.* at 220; and

- Mr. Peary's awareness of efforts by Mr. Toberoff and/or Pacific Pictures to market the Shuster heirs' rights pursuant to the joint venture, *see id.* at 330-38.

At defense counsel's prompting, Mr. Peary asserted that his knowledge on these subjects was inextricably bound with privileged conversations with Mr. Toberoff. *E.g.*, *id.* at 176-77, 279, 305-07, 335-36. Notably, defense counsel allowed Mr. Peary to answer questions on the same topics during his 2006 *Siegel* deposition. *E.g.*, 2006 Tr. at 33 (Question: "What -- what was your understanding of what would happen to the rights that are at issue in this agreement in the event that this agreement was terminated? … I'm asking you, Mr. Peary, what your understanding was of what would happen to the rights if the agreement was terminated at the time that you signed the agreement?" [No objection.] Response: "The rights would be split 50 percent.").

These instructions not to testify are not well taken. The Pacific Pictures agreements are business contracts regarding the disposition of the Shuster heirs' monetary interests and rights—they are *not* privileged communications, attorney retainer agreements or otherwise. They are signed by Mr. Toberoff in his business capacity (as President of Pacific Pictures), and Mr. Peary negotiated and executed these agreements in his role as executor of the Estate of Joseph Shuster,

EXHIBIT 43
1505

O'MELVENY & MYERS LLP

July 11, 2011 - Page 7

which required him to exercise independent business judgment. *See* CAL. PROB. CODE § 9600(a); *Estate of Sanders*, 40 Cal. 3d at 616. Defendants notably have failed to produce the drafts of these agreements that Mr. Peary testified were exchanged. Tr. at 100.

While defendants seek to cloak the negotiations of these agreements in privilege, the fact that Mr. Toberoff is a lawyer—in addition to being the President of Pacific Pictures—does not make business negotiations concerning these business contracts privileged. *See Chen*, 99 F.3d at 1501 (privilege cannot apply where attorney acting primarily in business role); *accord Minebea*, 355 F. Supp. 2d at 529; *Davis*, 636 F.2d 1028, 1043. Moreover, defendants waived any claims of privilege concerning these negotiations by selectively disclosing certain facts surrounding the negotiation and effect of the Pacific Pictures agreements, including:

- the discussions "back and forth" between Mr. Peary and Mr. Toberoff concerning "what would be involved on Marc Toberoff's part, the work involved, the cost he would bear," *see* Tr. at 197-98;

- Mr. Peary's awareness that the 2001 Pacific Pictures agreement listed Superboy as among the Shuster heirs' rights, *see id.* at 198-99;

- Mr. Peary's understanding, based in part on his discussions with Mr. Toberoff, of the reversion clause in the 2001 and 2003 Pacific Pictures agreements providing that "if [the venture] were ever terminated for any reason Pacific Pictures would own half the rights forever," *see id.* at 209-10;

- Mr. Peary's belief that Mr. Toberoff "was going to see this case through no matter what and … there would be no reason [the joint venture] would be canceled or terminated until the rights had been pursued," *see id.* at 210-11;

- Mr. Peary's belief that it was not "unreasonable" that he "could not enter into a contract with DC Comics no matter how badly [he] wanted unless Marc Toberoff consented," *see id.* at 214-15; and

- Mr. Peary's recently formed understanding, in part through discussions with Mr. Toberoff, that the Pacific Pictures agreements he negotiated and signed were void under the Copyright Act, *see id.* at 203, 218, 223-24.

Mr. Peary "cannot be allowed, after disclosing as much as he pleases, to withhold the remainder" of information about the Pacific Pictures agreements. *Weil*, 647 F.2d at 24; *see also Fort James Corp.*, 412 F.3d at 1349-51. This is particularly true given that defendants have made factual assertions in their Rule 12 and SLAPP briefing concerning the status and effect of the Pacific Pictures agreements, yet have denied DC any opportunity to confirm or disprove those assertions. *See, e.g.*, Docket No. 148-1 at 17 ("PPC had no … ownership interest" in the Shusters' putative rights); Docket No. 147-1 at 8 (the Pacific Pictures agreements are "moot, as such were duly and voluntarily cancelled on September 10, 2004"). Similarly, defendants' SLAPP briefing depends in large part on their contention that the Pacific Pictures "Agreements

EXHIBIT 43
1506

O'MELVENY & MYERS LLP
July 11, 2011 - Page 8

… clearly contemplate litigation related to the termination of Joseph Shuster's copyright grants" and are thus protected under California's SLAPP statute. Docket No. 145-1 at 17; *see also, e.g.*, *id.* at 16-17 (agreements "were plainly related to contemplated litigation and settlement"). Defendants, however, shut down every one of our questions seeking to test this assertion. *E.g.*, Tr. at 211-13 (Question: The Pacific Pictures agreement "states there that the venture will retain Toberoff to render legal services including in connection with legal disputes and litigation …. Legal disputes and litigation with whom?" (Instruction not to answer.) Question: "Well, it's fair to say that you understood when you signed this that there was a prospect of litigation with DC Comics or some Time-Warner company, correct?" (Instruction not to answer.) Question: "You understood … that when you signed this there was some appreciation that you would be in litigation?" (Instruction not to answer.) Question: "So you shouldn't have been surprised when you read the lawsuit that DC filed since you contemplated litigation as early as 2001, correct?" (Instruction not to answer.) Question: "When you saw the lawsuit from DC Comics …, that's something that you understood could happen as early as 2001 when you signed this joint venture agreement, correct?" (Instruction not to answer.)). Defendants cannot have it both ways; having opted to make factual assertions in their briefing and allow Mr. Peary to testify in support of those assertions, they also must give DC an opportunity to test those claims.

### III. MR. PEARY'S ROLE AS EXECUTOR OF THE SHUSTER ESTATE

At Mr. Toberoff's instruction, Mr. Peary refused to answer questions concerning his role and responsibilities as the named executor of the Estate of Joseph Shuster, including his efforts to determine the value of rights purportedly held by the Estate, his decision to execute a copyright termination notice on behalf of the Estate, and his opinion as to whether the Estate can sell its rights without making an agreement with DC. *See* Tr. at 74, 191-92, 342-43. Mr. Peary stated that he had no understanding of these important issues aside from what he was told by his attorney. *See id.* at 338-39. As discussed above, Mr. Peary had a fiduciary duty to exercise judgment independent of what he was told by his attorney, *see* CAL. PROB. CODE § 9600(a); *Estate of Sanders*, 40 Cal. 3d at 616—and DC is entitled to seek testimony on the nature and scope of Mr. Peary's judgment.

Moreover, Mr. Toberoff has always played a dual role in his dealings with Mr. Peary. As their contracts state—and as Mr. Toberoff has touted on his website and in press interviews—he is a movie producer. DC is entitled to know what Mr. Toberoff told Mr. Peary and others in that role. Indeed, the consideration for the Pacific Pictures agreements—*i.e.*, that the Shusters would give *50% of their rights* to Mr. Toberoff's company—was predicated on Mr. Toberoff helping exploit and market their putative rights as a movie producer. *See* Nov. 23, 2001 Pacific Pictures Agreement at 1 (transferring Shusters' putative rights to Pacific Pictures joint venture "to investigate, retrieve, enforce and exploit" the rights).

In addition, Mr. Peary's Rule 12 briefing makes factual assertions concerning his authority to exercise the Estate's purported termination rights—despite the 1992 agreement signed by the Estate's sole beneficiary, Jean Peavy, extinguishing all such rights—which DC is entitled to test in discovery. *See, e.g.*, Docket No. 148 at 7-14 (Mr. Peary only person with

EXHIBIT 43
1507

O'MELVENY & MYERS LLP
July 11, 2011 - Page 9

standing to terminate and other Shuster heirs did not intend to "waive, transfer or release the Shuster termination rights" in entering into the 1992 agreement).

## IV. CONFLICTS OF INTEREST

Mr. Peary followed counsel's instructions not to answer questions concerning the conflict of interest arising out of Mr. Toberoff's concurrent representation of the Siegel and Shuster heirs (and, *inter alia*, the Shusters' abdication of Superboy rights in favor of the Siegels), including:

- Mr. Peary's understanding of this conflict of interest, *see* Tr. at 85-86, 227-29;

- whether Mr. Peary agreed to waive the conflict, *see id.* at 241;

- the alleged conflict waiver Mr. Peary claims to have signed in 2010 (but has never produced), *see id.* at 91-93; and

- the connection between the alleged conflict waiver and the 2008 consent agreement or this lawsuit, *see id.* at 92-93;

Defense counsel objected that these questions implicated privileged attorney-client communications. *E.g., id.* at 85-86, 91-93, 227-28. Under California law, Mr. Toberoff was required to disclose the conflict to Mr. Peary in writing, recommend that he seek independent legal advice, and obtain a written waiver before proceeding with representation. *See* CAL. RULES OF PROF'L CONDUCT R. 3-310; *Flatt v. Super. Ct.*, 9 Cal. 4th 275, 284-86 (1994) (same). Such communications are "not protected by the attorney-client privilege or work product doctrine." *E. Maine Baptist Church v. Regions Bank*, 2007 WL 1445257, at *2-3 (E.D. Mo. May 10, 2007); *see also Chevron USA Inc. v. Peuler*, 2004 WL 224579, at *3 (E.D. La. Feb. 3, 2004). Moreover, Mr. Peary waived whatever privilege might otherwise have existed by selectively disclosing the existence of a waiver document allegedly signed in 2010—which defendants have improperly withheld from production. *See Weil*, 647 F.2d at 24; *Fort James Corp.*, 412 F.3d at 1349-51. Defendants should produce to DC entries 44 (Apr. 17, 2010 e-mail from Mr. Peary to Mr. Toberoff) and 47 (Dec. 6, 2010 e-mail from Mr. Peary to Mr. Toberoff) on Mr. Peary's privilege log or confirm which entry—if either—corresponds to the purported conflict waiver.

## V. OTHER ISSUES

Mr. Peary refused to answer several other questions on the basis that he had no knowledge independent of his privileged communications with Mr. Toberoff. *E.g.*, Tr. at 243, 245-46, 330-31. None of these subjects implicated the conveyance of legal advice.

<u>First</u>, we asked questions concerning Mr. Peary's understanding of why and how Mr. Toberoff initially approached the Siegel heirs. *See* Tr. at 241-42. Mr. Toberoff approached the Siegels not in his capacity as an attorney—let alone an attorney acting on behalf of the Shuster heirs' legal interests—but as a businessman and movie producer. *E.g.*, Docket No. 49 Ex. A at 63 ("MT approaches the Siegels, *not as an attorney but as a film producer*…."); Oct.

EXHIBIT 43
1508

O'MELVENY & MYERS LLP
July 11, 2011 - Page 10

23, 2002 IP Worldwide agreement ¶¶ 1, 10 (providing that IP Worldwide would "negotiate the sale, lease, license and all other dispositions" of the Siegels' putative rights and confirming "the scope of this Agreement does not include legal services and/or expenses in connection with litigation"); May 13, 2003 Letter from Michael Siegel to Laura Larson at 1 ("I told you when [Toberoff] first contacted me, he wanted to buy my share of the copyright …. Marc has his own production company, he was going to team with [Ari Emanuel] and make a movie.")  Any communications between Mr. Toberoff and Mr. Peary on this topic would have been non-privileged business communications.  *See Chen*, 99 F.3d at 1501; *Minebea*, 355 F. Supp. 2d at 529; *Davis*, 636 F.2d at 1043.  Moreover, it defies credulity that Mr. Peary's knowledge of Mr. Toberoff's introduction to the Siegels was based solely on his communications with Mr. Toberoff.  Mr. Peary admitted that he and his mother, Jean Peavy, were in regular contact with the Siegels and claimed that it was Ms. Peavy who suggested they meet with Mr. Toberoff.  *See* Tr. at 252.

Second, we asked questions about Mr. Peary's awareness of and involvement in the alleged grand jury investigation concerning the Toberoff Timeline.  *See* Tr. at 245-46.  This investigation is a factual matter separate and apart from Mr. Toberoff's representation of Mr. Peary.  That Mr. Peary may have learned about it from his attorney does not necessarily make this entire topic immune from discovery.  *See U.S. v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002) ("The fact that a person is a lawyer does not make all communications with that person privileged.").

Third, we asked questions regarding Mr. Peary's understanding of the Shuster heirs' retainer agreement with Mr. Toberoff based on his review of that document and the consent agreement in preparation for the deposition.  *See* Tr. at 328-29.  As Magistrate Zarefsky has recognized, retainer agreements are not privileged, except to the extent certain provisions convey legal advice.  Docket No. 209 at 11; *see also In re Grand Jury Proceedings*, 33 F.3d 1060, 1063-64 (9th Cir. 1994); *Montgomery Cnty. v. MicroVote Corp.*, 175 F.3d 296, 304 (3d Cir. 1999).  Mr. Peary's knowledge of whether the agreement refers to the Siegels and Superboy, *see* Tr. at 329, has nothing to do with the conveyance of legal advice, and Mr. Peary admitted during the deposition that his review of the consent agreement and retainer agreement refreshed his recollection.  *E.g.*, Tr. at 51 ("Question:  "What did you bring with you?"  Response:  "I brought a copy of the legal retainer as of 2001 and I brought a -- a copy of the first page of the consent agreement with a cover letter …, just to jog my memory."); *id.* at 53 (Question:  "And were you shown any documents yesterday when you met with Mr. Toberoff?"  Response:  "We … reviewed our agreements."  Question:  "What agreements?"  Response:  "The legal retainer and the -- the complaint from DC and the supporting legal documents…."  Question:  "Did you also show Mr. Toberoff the consent agreement pages that you had taken with you?"  Response:  "Yes, just the -- the copy that I brought to jog my memory.").  Because these documents refreshed his recollection, they must be produced.  *See Heron Interact, Inc. v. Guidelines, Inc.*, 244 F.R.D. 75, 78 (D. Mass. 2007) (documents used by deponent to refresh recollection of events subject to discovery under Federal Rule of Evidence 612); *In re Comair Air Disaster Litig.*, 100 F.R.D. 350, 353 (D.C. Ky. 1983) (same); *Derderian v. Polaroid Corp.*, 121 F.R.D. 13, 15 (D. Mass.

EXHIBIT 43
1509

O'MELVENY & MYERS LLP

July 11, 2011 - Page 11

1988) ("By using a document to refresh recollection in connection with testimony at deposition, a privilege or protection which previously attached to the document may be waived.").

\* \* \*

Please let us know when you are available to meet and confer on these issues.

    Very truly yours,

    /s/ Daniel M. Petrocelli

    Daniel M. Petrocelli
    of O'MELVENY & MYERS LLP

CC1:852626

EXHIBIT 43
1510