# EXHIBIT 52

**CERTIFIED COPY**

# In The Matter Of:

*DC COMICS*

*v.*

*PACIFIC PICTURES CORPORATION*

---

## BULSON, DON - Vol. 1

*July 19, 2011*

---

**MERRILL CORPORATION**

LegaLink, Inc.

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

EXHIBIT 52
1772

**CERTIFIED COPY**

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

DC COMICS,                          )
                                    )
                    Plaintiff,      )
                                    )
vs.                                 ) No.CV-10-3633 ODW
                                    )
PACIFIC PICTURES                    )
CORPORATION, et al.,                )
                                    )
                    Defendants.     )

- - - - -

THE VIDEOTAPE DEPOSITION OF DON BULSON
TUESDAY, JULY 19, 2011

- - - - -

The videotape deposition of DON BULSON,

called by the Plaintiff for examination pursuant

to the Federal Rules of Civil Procedure, taken

before me, the undersigned, Michelle M. Lewis, a

Registered Professional Reporter and Notary

Public within and for the State of Ohio, taken at

the offices of Renner Otto Boisselle & Sklar,

1621 Euclid Avenue, Suite 1900, Cleveland, Ohio,

commencing at 9:18 a.m., the day and date above

set forth.

EXHIBIT 52
1773

DON BULSON - 7/19/2011

```
 1      APPEARANCES:

 2
                On behalf of the Plaintiff:
 3
                    Matthew T. Kline, Esq.
 4                  Jason Tokoro, Esq.
                    O'Melveny & Myers
 5                  1999 Avenue of the Stars
                    Suite 700
 6                  Los Angeles, California  90067-6035
                    310.553.6700
 7                  mkline@omm.com

 8              On behalf of the Defendant The Estate of
                Michael Siegel:
 9
                    Gerald A. Berk, Esq.
10                  Steuer Escovar Berk Brown
                    55 Public Square
11                  Suite 1475
                    Cleveland, Ohio  44113
12                  216.771.8121
                    gberk@sebblaw.com
13
                On behalf of the Defendants:
14
                    Marc Toberoff, Esq.
15                  Toberoff & Associates
                    2049 Century Park East
16                  Suite 2720
                    Los Angeles, California  90067
17                  310.246.3333

18              On behalf of the Witness:

19                  Joshua M. Ryland, Esq.
                    Renner Otto Boisselle & Sklar
20                  1621 Euclid Avenue
                    Suite 1900
21                  Cleveland, Ohio  44115
                    216.621.1113
22                  jryland@rennerotto.com

23      ALSO PRESENT:

24          Alex Cook, Video Technician

25
```

EXHIBIT 52
1774

```
 1              DON BULSON DEPOSITION INDEX

 2

 3    EXAMINATION BY:                       PAGE NO.

 4    Mr. Kline                                 7

 5

 6    EXHIBIT NO.                          PAGE NO.

 7    Exhibit 27    Subpoena for deposition and    8

 8                  production of documents served

 9                  upon Don Bulson

10    Exhibit 28    Subpoena for deposition served 10

11                  upon Don Bulson

12    Exhibit 29    Cuyahoga County Common Pleas   16

13                  docket entry

14    Exhibit 30    May 13, 2003 letter from       29

15                  Michael Siegel to Laura Siegel

16    Exhibit 31    Order of the court             39

17    Exhibit 32    April 1, 2008 order of the     39

18                  court

19    Exhibit 34    June 18, 2003 letter from Mr.  53

20                  Bulson to Mr. Toberoff

21    Exhibit 35    July 16, 2003 letter from Mr.  53

22                  Toberoff to Mr. Bulson

23    Exhibit 36    August 6, 2003 letter from Mr. 53

24                  Toberoff to Mr. Bulson

25    Exhibit 37    November 12, 2004 email from   53
```

DON BULSON — 7/19/2011

Page 4

| 1  |             | Mr. Bulson to Mr. Toberoff              |     |
| 2  | Exhibit 38  | November 17, 2004 email from            | 53  |
| 3  |             | Mr. Toberoff to Mr. Bulson              |     |
| 4  | Exhibit 39  | November 12, 2004 email chain           | 53  |
| 5  | Exhibit 40  | November 24, 2004 email from            | 53  |
| 6  |             | Mr. Bulson to Mr. Toberoff              |     |
| 7  | Exhibit 41  | November 29, 2004 email from            | 53  |
| 8  |             | Mr. Toberoff to Mr. Bulson              |     |
| 9  | Exhibit 42  | January 17, 2005 email                  | 53  |
| 10 | Exhibit 43  | Discovery brief                         | 89  |
| 11 | Exhibit 44  | No description, rescinded               | 95  |
| 12 | Exhibit 45  | October 3, 2002 retainer                | 102 |
| 13 |             | agreement                               |     |
| 14 | Exhibit 46  | January 21, 2002 retainer               | 102 |
| 15 |             | agreement                               |     |
| 16 | Exhibit 47  | April 28, 2005 letter from              | 133 |
| 17 |             | Paul Levitz to Jean Adele               |     |
| 18 |             | Peavy and Mark Warren Peary             |     |
| 19 | Exhibit 48  | October 19, 2001 letter from            | 139 |
| 20 |             | Kevin Marks to John Schulman            |     |
| 21 | Exhibit 49  | October 26, 2001 letter from            | 139 |
| 22 |             | John Schulman to Kevin Marks            |     |
| 23 | Exhibit 50  | February 1, 2002 cover letter           | 139 |
| 24 |             | from Patrick Perkins to Kevin           |     |
| 25 |             | Marks attaching draft                   |     |

EXHIBIT 52

1776

DON BULSON - 7/19/2011

```
 1                    agreement
 2      Exhibit 51    Retainer agreement          158
 3      Exhibit 52    May 12, 2005 document        146
 4      Exhibit 53    Privilege log                167
 5      Exhibit 54    September 21, 2002 letter    180
 6                    from Joanne Siegel and Laura
 7                    Siegel Larson to Kevin Marks
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT 52
1777

DON BULSON - 7/19/2011

Page 6

```
 1                    VIDEO TECHNICIAN:  This begins

 2       Volume No. 1, Videotape No. 1, in the

 3       deposition of Don Bulson in the matter of DC

 4       Comics versus Pacific Pictures Corporation,

 5       et al., in the United States District Court,

 6       Central District of California, Western

 7       Division.  The case number is CV-10-03633.

 8       Today's date is July 19th, 2011.  The time on

 9       the video monitor is 9:18.

10            Would counsel please voice identify

11       yourselves and state who you represent?

12                    MR. KLINE:       Matt Kline and

13       Jason Tokoro from O'Melveny & Myers on behalf

14       of Plaintiff DC Comics.

15                    MR. TOBEROFF:   Marc Toberoff.

16       I'm here on behalf of the defendants in this

17       action, and also the Estate of Michael

18       Siegel.

19                    MR. BERK:       Gerald Berk, B

20       E R K.  I represent the -- on behalf of the

21       Estate of Michael Siegel.

22                    MR. RYLAND:     Josh Ryland,

23       Renner Otto Boisselle & Sklar in Cleveland,

24       Ohio, here representing third-party witness

25       Don Bulson.
```

EXHIBIT 52
1778

DON BULSON - 7/19/2011

Page 7

```
1              VIDEO TECHNICIAN:  Will the
2      court reporter please swear in the witness?
3                    DON BULSON
4      of lawful age, called by the Plaintiff for
5      examination pursuant by the Federal Rules of
6      Civil Procedure, having been first duly sworn, as
7      hereinafter certified, was examined and testified
8      as follows:
9              EXAMINATION OF DON BULSON
10     BY MR. KLINE:
11     Q   Mr. Bulson, good morning.
12     A   Good morning.
13                    MR. BERK:       Excuse me.
14         Before we start, on behalf of the Estate of
15         Michael Siegel, I would like to voice my
16         objection to any matters that concern the
17         Estate of Michael Siegel that Mr. Bulson will
18         testify to, and we want to raise privilege,
19         our privilege of any matters concerning his
20         representation of Michael Siegel.
21                    MR. KLINE:       Understood.
22         Why don't you just -- why don't we take the
23         questions as they're asked and deal with them
24         one by one.
25                    MR. RYLAND:       I'm going to
```

EXHIBIT 52
1779

DON BULSON - 7/19/2011

Page 8

1      propose this before.  Do you want to

2      establish a protocol for the objections or do

3      you want to take them as they come, because

4      there could be the potential for a lot of

5      speaking on your record, and I'm trying to --

6                   MR. KLINE:        Let's take

7      them as they come, and if we need to, we can

8      take a break and set up a protocol.  But my

9      hope is to get through as much testimony

10     today as we can.

11  Q  Mr. Bulson, we've never met before, have we?

12  A  Not to my knowledge.

13  Q  Okay.  And you understand, and I'm going to

14     ask Jason to pass this around, that DC Comics

15     subpoenaed you to testify in this case?

16  A  Yes.

17  Q  Marked as exhibit, Plaintiff's Exhibit 27,

18     I'd ask you to take a look at it, we'll give

19     copies to counsel, is a copy of that

20     subpoena.

21                   - - - - -

22        (Plaintiff's Exhibit 27 was marked.)

23                   - - - - -

24  Q  Are you familiar with that document, sir?

25  A  I believe I am.  The original one that was

EXHIBIT 52
1780

DON BULSON - 7/19/2011

Page 9

```
 1        served, allegedly served on me I never

 2        received, but I think there was a follow-up

 3        that was sent.

 4    Q   Okay.  Great.  And so this both calls for a

 5        deposition and a production of documents,

 6        correct?

 7    A   Uh-huh.

 8    Q   And working with Mr. Ryland, who's here

 9        representing you today, you produced a few

10        documents to DC, correct?

11    A   Well, this is the document production

12        subpoena.

13    Q   Yes.

14              MR. KLINE:      And Jason, do

15        you have the --

16    A   This I did receive.

17    Q   Okay.  You did receive this?

18    A   Yes.

19    Q   And we're obviously here for your deposition

20        today, so you received the deposition notice

21        as well?

22    A   Whether or not --

23    Q   At some point, at some point we worked that

24        out.

25              But working with Mr. Ryland, do you
```

EXHIBIT 52
1781

DON BULSON - 7/19/2011

Page 10

1      understand you made a production of a few

2      documents in this case?

3   A   We identified documents to be produced, yes,

4      or potentially produced.

5   Q   And Exhibit 28 is just a copy of your

6      deposition subpoena that I think we all

7      agree --

8   A   I think I got it.

9   Q   -- got you here today?

10  A   Yep.

11                   - - - - -

12          (Plaintiff's Exhibit 28 was marked.)

13                   - - - - -

14              MR. KLINE:       As I

15      understand it, we still don't have your

16      firm's formal objections to those document

17      requests.

18              MR. RYLAND:      That's

19      correct.  I mean, if we're going to -- we can

20      put it on the record or off the record, but I

21      got your responsive email to our letter.

22              MR. KLINE:       Okay.

23              MR. RYLAND:      And I think

24      that we obviously have more parties concerned

25      than just us with that production, so I was

EXHIBIT 52
1782

DON BULSON – 7/19/2011

```
 1        hoping we could talk through how to best --
 2                   MR. KLINE:       Maybe over the
 3        lunch hour we can do that.  And unfortunately
 4        given that we don't have all the documents
 5        that I think we need, we may need to reserve
 6        some time to come back and see you again, but
 7        I'm sure the parties have their different
 8        positions on that.
 9                   MR. RYLAND:      Yeah.  I mean,
10        we would object to that, but I understand
11        certainly why you would say that and put it
12        on the record.
13  Q     Okay.  Mr. Bulson, have you seen a copy of
14        the complaint in this case?
15  A     I don't recall.
16                   MR. KLINE:       Jason, may I
17        have a copy of it, please?  And we'll mark
18        this Exhibit 29, or actually, you know, it's
19        premarked as Exhibit 1 from the Peary
20        deposition.
21  Q     Handing you a copy, Mr. Bulson.
22                   MR. RYLAND:      Do you have
23        another copy?
24  A     This is missing -- oh, no.  Yeah, you're
25        missing pages here.
```

EXHIBIT 52
1783

DON BULSON - 7/19/2011

Page 12

```
 1                    MR. KLINE:      Do you have a
 2          copy that -- that one starts on Page 2,
 3          Jason.  Do you have one that has all of the
 4          pages on it?
 5                    MR. RYLAND:      Counselor,
 6          this one's fine.
 7                    MR. KLINE:      Oh, okay.
 8     A    I can't recall if I've read this or not.
 9     Q    Okay.
10     A    I was aware there was a lawsuit.
11     Q    Okay.  So I take it you didn't read that
12          complaint in preparing for your deposition
13          today?
14     A    Oh, no.  I can say that.
15     Q    Can you describe for me what you did to
16          prepare for today's deposition?
17     A    Just --
18                    MR. RYLAND:      I'll caution
19          the witness that any communications that you
20          and I had related to the deposition would be
21          attorney-client privilege, but if you can
22          answer without violating the privilege. . .
23     A    Just the mechanics of today's deposition.
24     Q    Did you have any meetings or discussions with
25          Mr. Toberoff?
```

EXHIBIT 52
1784

DON BULSON - 7/19/2011

Page 13

```
 1    A    I did not.

 2    Q    Did you have any meetings or discussions with

 3         Mr. Berk?

 4    A    I did not.

 5    Q    Did you review your deposition that you gave

 6         in the Siegel action in 2008?

 7    A    I did not.

 8    Q    Did you review any of the exhibits that were

 9         used that -- the underlying documents?

10    A    No.

11    Q    Did you review any of your case files?

12    A    No.

13    Q    Did you review any calendars that you have?

14         Do you have calendars or call log sheets that

15         show when you spoke to people?

16    A    No.

17    Q    Time entries that show when you would have

18         spoken to somebody?

19    A    No.

20    Q    Do you understand that your law firm has

21         filed a claim against the Estate of Michael

22         Siegel, correct?

23    A    Correct.

24    Q    And that's a matter of public record?

25    A    That's correct.
```

EXHIBIT 52
1785

DON BULSON - 7/19/2011

```
 1    Q    And as I understand it, and we were given a
 2         copy of this document by Ms. Siegel, I
 3         believe, on September 17th, 2010, the state
 4         court judge in that case granted defendant's
 5         motion for partial summary judgment.  Are you
 6         aware of that ruling?
 7    A    That's correct.  I don't recall the date, but
 8         there was a. . .
 9    Q    And it says that plaintiffs -- I'm just
10         reading from the docket sheet, and we'll put
11         it into the record.  And we would, if a
12         separate order exists other than this docket
13         entry, we'd request that all parties in the
14         case produce a copy of that order, because
15         we've not seen one or been able to get one
16         from the public record.  But the docket entry
17         says, plaintiff's recovery for its attorneys'
18         fees must be based on quantum meruit.  Do you
19         remember that ruling?
20    A    Yep, uh-huh.
21    Q    Has your law firm made any submission
22         documenting what its fees are or what it
23         would be entitled to on a quantum meruit
24         basis?
25    A    Yes.  Yes.
```

EXHIBIT 52
1786

DON BULSON - 7/19/2011

Page 15

```
 1   Q    Has that been -- do you know if that's

 2        been -- we've not seen a copy of it, so we'd

 3        obviously want to see that produced in this

 4        case as it might bear on when you did certain

 5        work, the amount of work that you did.

 6                  MR. RYLAND:      Duly noted.

 7   A    Is there a question?

 8                  MR. RYLAND:      Duly noted.

 9   Q    Did you help prepare that document?

10   A    Yes.

11   Q    Does that document recount the number of

12        hours that you spent working on the Siegel

13        matter?

14   A    I think it does.

15   Q    Does that document include dates on which you

16        would have had conversations with

17        Mr. Toberoff concerning negotiations?

18   A    I think it does.

19                  MR. KLINE:      For that

20        reason, we'd very much like to get a copy of

21        that document.  The timeline here is

22        critical.  And if we could get a copy of it

23        on the lunch break, I could try to ask some

24        questions about it.  But if we can't, we may

25        have to come back.
```

EXHIBIT 52
1787

DON BULSON - 7/19/2011

Page 16

1   A   Should be a public record.

2   Q   You think it's one of the public filings in

3       the case?

4   A   Uh-huh.

5   Q   Okay.  Let's mark as Exhibit 29, this was

6       just the docket entry that I was reading

7       from.  The first one on the first page there.

8                   - - - - -

9           (Plaintiff's Exhibit 29 was marked.)

10                  - - - - -

11  Q   Are you familiar with this docket entry, sir?

12  A   No.

13  Q   Okay.

14  A   I mean, the substance I'm familiar with, but

15      I haven't seen the docket entry.

16  Q   That specifically.  Okay.

17          And as I understand it, no further

18      action has been taken in the case, but the

19      parties are contemplating taking some sort of

20      appeal from that ruling?

21  A   Correct.

22  Q   And the Estate of Michael Siegel has not paid

23      this firm any money, correct?

24  A   Correct.  No, I take that back, that's not

25      correct.

EXHIBIT 52
1788

DON BULSON - 7/19/2011

Page 17

1    Q    How much money has been paid, do you know?

2    A    I don't recall.

3    Q    More than a few thousand dollars?

4    A    Yes.

5    Q    More than $50,000?

6    A    No.

7    Q    Okay.  What is the amount of money that the

8         law firm is claiming is still owed under this

9         quantum meruit theory?

10   A    I believe it's around $136,000, somewhere in

11        that ballpark.

12   Q    Okay.  Okay.

13             I also understand that the law firm

14        sent Mr. Siegel's hard copy files to the

15        lawyers representing Mr. Siegel's estate in

16        the probate action in this case, correct?

17   A    We turned -- we turned custody of the files

18        over to the estate.

19   Q    Okay.  And I also understand that the firm

20        maintains an electronic database of its files

21        that it keeps for itself that it did not turn

22        over to the estate; is that correct?

23   A    I don't know if that's correct or not.  I did

24        not understand the question completely.

25   Q    I'll represent that in my conversations with

Merrill  Corporation  -  Los Angeles
800-826-0277                    www.merillcorp.com/law

EXHIBIT 52
1789

DON BULSON - 7/19/2011

Page 18

```
 1        your partner and in communications with

 2        Mr. Toberoff it's been revealed to us that

 3        your law firm not only had a paper copy of

 4        the files that it turned over, I believe, to

 5        Mr. Berk's firm --

 6                    MR. KLINE:       Are you with

 7        the Banchek firm, sir, are you --

 8                    MR. BERK:       No.  I

 9        represent Mr. Banchek as administrator.

10                    MR. KLINE:       Understood.

11   Q    So my understanding is that you had physical

12        hard copies of what we'll call the Michael

13        Siegel file.  You gave the Michael Siegel

14        file, the physical hard copies, to the

15        Banchek firm, correct?

16   A    Correct.

17                    MR. TOBEROFF:    Objection.  I

18        don't believe I've had any conversations or

19        correspondence with you regarding these

20        files.

21                    MR. KLINE:       I believe you

22        wrote me a letter on Friday talking about the

23        screen shot of this electronic database, and

24        we can pull that out and put it in evidence.

25                    MR. TOBEROFF:    No.  I wrote
```

EXHIBIT 52
1790

DON BULSON - 7/19/2011

Page 19

1          that to Josh, Mr. Ryland.

2                    MR. KLINE:        Which was

3          forwarded to me and you were copied on.

4                    MR. TOBEROFF:      But you have

5          no correspondence from me.

6                    MR. KLINE:        Okay.

7     Q    So Mr. Toberoff sent me a letter on Friday in

8          response to a letter from your partner.  Did

9          you see this correspondence, Mr. Bulson?

10    A    No.

11    Q    We'll get a copy of that on one of the

12         breaks.

13              You do a lot of patent work, correct,

14         sir?

15    A    Yes.

16    Q    And some of the patent work you do involves

17         computers?

18    A    Yes.

19    Q    And you have an electrical engineering

20         degree?

21    A    No, I do not.

22    Q    Mechanical engineering degree?

23    A    That's correct.

24    Q    Okay.  And you're familiar that law firms

25         have databases like a concordance database in

EXHIBIT 52
1791

DON BULSON - 7/19/2011

Page 20

```
 1        which they keep files electronically at
 2        times, .pdfs, .tiff images, .jpegs?
 3   A    We do have an electronic files, yes.
 4   Q    My understanding is that the firm has
 5        maintained an electronic copy of the Michael
 6        Siegel files; is that correct?
 7   A    We have found an archived copy of the files
 8        that were transferred.
 9   Q    Okay.  And my understanding is that archive
10        copy contains an index of the materials
11        contained therein; is that correct?
12   A    No.  My recollection of that archive file is
13        there is, the file names are -- if you did a
14        directory, you would see a number of file
15        names.
16   Q    Can you give me an example of what a file
17        name would be like?  Don't give me the
18        substance, but, you know, would it be letter
19        from blank to blank on a certain day, is that
20        how it's kept in the file entries?
21   A    No.  This would have been, in this case, I
22        think it was logged in by our file number.
23   Q    So if there was something like a March 1st
24        letter, would there be any indication --
25   A    No.
```

EXHIBIT 52
1792

DON BULSON - 7/19/2011

Page 21

```
 1    Q    -- on the log of when the letter --

 2    A    No.

 3    Q    What information, if any, could you glean

 4         about the date or substance of the

 5         communications from that index?

 6    A    You could get to some extent a timing,

 7         because of the file name included our file

 8         number and also a reference to the content.

 9         And if you correlate our file name to the

10         content, it's assuming that our file names

11         were numbered numerically, there could be

12         some timing.

13    Q    Okay.  Okay.  And by the content, what do you

14         mean by that?

15    A    Like it might have listed communications

16         with -- I think a simple one would be --

17         well, I don't remember the names of the

18         files --

19    Q    But when you --

20    A    -- the content.  But by way of example, it

21         might say communications with Michael Siegel.

22    Q    Okay.  Understood.

23    A    Which would obviously we would have files of

24         that sort.

25    Q    Many, many.
```

EXHIBIT 52
1793

DON BULSON - 7/19/2011

Page 22

| | | |
|---|---|---|
| 1 | | If he sent you, say, a copy that |
| 2 | | his -- of a letter that his sister sent to |
| 3 | | him, might it say letter from sister to |
| 4 | | Michael Siegel or letter from Laura to |
| 5 | | Michael Siegel in those content descriptions? |
| 6 | A | No.  I don't believe so. |
| 7 | Q | Why is that? |
| 8 | A | I just don't believe so.  I haven't looked at |
| 9 | | it lately, but I don't recall -- |
| 10 | Q | Are you certain that -- |
| 11 | A | -- seeing something that specific. |
| 12 | Q | Okay.  Would it say something like -- I mean, |
| 13 | | if he sent you some underlying case |
| 14 | | materials, how would that be logged?  If he |
| 15 | | sent you underlying correspondence that he |
| 16 | | had himself. |
| 17 | A | It wouldn't be logged in the file name of the |
| 18 | | archive file.  We're just talking about |
| 19 | | archive files where we transferred custody of |
| 20 | | a paper file, which might be this thick or |
| 21 | | this thick -- |
| 22 | Q | Okay. |
| 23 | A | -- to the estate.  And it just was a scan of |
| 24 | | the file. |
| 25 | Q | A scan of the whole file? |

EXHIBIT 52
1794

DON BULSON - 7/19/2011

Page 23

```
 1    A    Uh-huh.  There was no breakdown by the letter
 2         to who, letter to who, or anything like that.
 3    Q    But to be clear, the scan contains everything
 4         that you turned over to Mr. Banchek's firm?
 5    A    That's my understanding.
 6    Q    Okay.  In .pdf format?
 7    A    I believe it is in .pdf format.
 8    Q    Okay.  Do you know if it was OCR'd such that
 9         it's searchable?
10    A    I doubt it.
11    Q    Do you keep a daily calendar, sir?
12    A    Want to be more specific?
13    Q    If you have a scheduled appointment, do you
14         log that in a computer calendar or paper
15         calendar or a conference call?
16    A    I have a computer calendar now.
17    Q    Going back to the 2003 to 2005 time period,
18         did you have a computer calendar?
19    A    I don't recall.
20    Q    Did you have a paper calendar?
21    A    No.
22    Q    If you made certain calls during the day,
23         spoke to another lawyer or spoke to a
24         business person on a matter, would your time
25         entries for the day reflect that?
```

EXHIBIT 52
1795

DON BULSON - 7/19/2011

Page 24

1   A   Yes, in many instances.

2   Q   Okay.

3   A   Not always, but --

4   Q   Of course.

5              And would you note that on the

6       calendar or just in your daily time entries?

7   A   My electronic time book.

8   Q   Okay.  And is that electronic time book

9       maintained by the law firm here?

10  A   I maintain it.

11  Q   Is that a searchable database of information?

12  A   It would be searchable.

13  Q   So if we asked you, for example, to search

14      for the word "Toberoff" in there, you could

15      probably find that?

16  A   No, you wouldn't find it.

17  Q   Why is that?

18  A   Because my electronic calendar doesn't go

19      back that far.

20  Q   Okay.  Time entries that you kept in the

21      2003 to 2005 time period --

22  A   No.

23              MR. TOBEROFF:    Could you

24      speak a little louder?  I'm having trouble

25      hearing you.

DON BULSON - 7/19/2011

Page 25

| | | |
|---|---|---|
| 1 | A | It would not be in there. |
| 2 | Q | How did you keep your time from 2003 to 2005? |
| 3 | A | Those files, those time files I don't have |
| 4 | | anymore. |
| 5 | Q | How did you prepare the submission you made |
| 6 | | in the lawsuit against -- |
| 7 | A | From our billing records. |
| 8 | Q | So the billing records reflect that? |
| 9 | A | (Nods head.) |
| 10 | Q | And the actual bills would say spoke to so |
| 11 | | and so on such and such date? |
| 12 | A | That would often be the case. |
| 13 | Q | Okay. |

14                    MR. RYLAND:        Counsel, is

15       there a -- I assume there's a protective

16       order entered in this case already?

17                    MR. KLINE:        There is not.

18                    MR. RYLAND:        There is not.

19       Okay.  To the extent that they're getting

20       into our -- you know, how we conduct our

21       business, we would like to maintain this

22       attorneys' eyes only.  And, you know, if

23       there's no protocol for doing it, then we're

24       going to either have to move to protect

25       what's in this transcript or suspend the

EXHIBIT 52
1797

DON BULSON - 7/19/2011

1    deposition until we can resolve some way to

2    do that.

3                    MR. KLINE:        I have no --

4                    MR. RYLAND:        I appreciate

5    why you're asking questions, the questions.

6    The problem that I have is we obviously

7    wouldn't want our business practices to be

8    public record, so. . .

9                    · MR. KLINE:        And what we've

10   done, just as an example, we filed a

11   discovery motion yesterday, and we have been

12   filing motion to seal orders that

13   Mr. Toberoff has either objected to or not

14   objected to.

15                   MR. RYLAND:        Okay.

16                   MR. KLINE:        And we would

17   have no objection to keeping any portion of

18   this deposition transcript under seal that

19   you would want to.

20                   MR. RYLAND:        Yeah.  I'm

21   going to make a blanket statement right now,

22   just we can review if there's -- but I would

23   like to designate the entire deposition

24   attorneys' eyes only.  And to the extent that

25   needs to be peeled off, let me know.

DON BULSON - 7/19/2011

Page 27

1              MR. KLINE:        Yeah.  We can

2     talk about that.  I do think just to be clear

3     we're going to want to see these time entries

4     to help piece together the timeline for us.

5              MR. RYLAND:       I understand

6     the request.  It's duly noted.  I'm also

7     subject to what the wishes of the estate are.

8     We can't waive anything that would be

9     considered privilege within time records with

10    respect to either the work product doctrine

11    or attorney-client privilege, because it's

12    not ours to --

13             MR. KLINE:        No, I

14    understand.  But I think the representation

15    was made that it was already filed in the

16    public record as part of this quantum meruit

17    scenario.  I could be wrong.

18             THE WITNESS:      Am I correct

19    on that?  I don't remember.

20             MR. BERK:         My

21    recollection was that --

22             THE WITNESS:      I'm talking

23    about the expert's opinion.

24             MR. BERK:         Yeah,

25    you're --

EXHIBIT 52
1799

DON BULSON - 7/19/2011

Page 28

```
1                    MR. RYLAND:       Hold on.  Can
2    we go off the record for a second?
3                    VIDEO TECHNICIAN:  We're off
4    the record.  The time is 9:39.
5        (Discussion held off the record.)
6                    VIDEO TECHNICIAN:  We're back
7    on the record.  The time is 9:40.
8                    MR. KLINE:       So just to be
9    clear, we respect your request to protect the
10   privacy of this deposition.
11                   MR. RYLAND:       I appreciate
12   that.
13                   MR. KLINE:       Understand
14   that when it comes to the billing records,
15   there may be other subject matters that we
16   wouldn't agreed to completely blanket
17   request.  You know about our pending
18   discovery questions and issues.  We'll take
19   try to work them out the best we can.
20                   MR. RYLAND:       No, I
21   understand that.  And just to -- we went off
22   the record.  The off-the-record discussion
23   was that the request is being made to see the
24   billing records that were submitted in
25   conjunction with Renner Otto's lawsuit
```

EXHIBIT 52
1800

DON BULSON - 7/19/2011

Page 29

1           against the Estate of Michael Siegel.  The

2           firm is represented by separate counsel.  I

3           would have to check with separate counsel

4           before I could make any determination that

5           way, and that's it.

6                       MR. KLINE:      And that's

7           fine.

8                       - - - -

9           (Plaintiff's Exhibit 30 was marked.)

10                      - - - -

11   BY MR. KLINE:

12   Q   Mr. Bulson, I'm handing you Exhibit 30 which

13       is a May 13th, 2003 letter from your former

14       client Michael Siegel to Laura Siegel his

15       sister, and ask you to read the letter if you

16       could.

17                      MR. KLINE:      Can we go off

18       the record while we finish that?  Very sorry.

19                      VIDEO TECHNICIAN:  We're off

20       the record at 9:42.

21           (Recess from 9:42 a.m. to 9:43 a.m.)

22                      VIDEO TECHNICIAN:  We're back

23       .on the record.  The time is 9:43.

24                      MR. TOBEROFF:    What exhibit

25       number is this?

EXHIBIT 52
1801

DON BULSON – 7/19/2011

Page 30

```
 1                    MR. KLINE:        This is
 2        Exhibit 30.  Just want to give Josh a chance
 3        to finish it.
 4                    MR. RYLAND:        Go ahead,
 5        Counselor.
 6    BY MR. KLINE:
 7    Q    Have you seen this letter before, sir?
 8                    MR. BERK:         Objection.
 9        This would be privileged, unless he was to
10        get this from Laura Siegel or somebody else.
11        But if he got this from Michael Siegel, it
12        would be part of -- be a privileged document
13        as to Mr. Bulson.
14                    MR. KLINE:        Sharing a
15        nonprivileged document with your attorney
16        does not make that document privileged.  I'm
17        fully entitled to ask him --
18                    MR. BERK:         It's
19        privileged between Michael and him, but it's
20        not privileged from Laura to Michael.
21                    MR. KLINE:        I'm fully
22        entitled to ask him if he's seen this
23        document before.  Are you instructing him not
24        to answer that question?
25                    MR. BERK:         I'm
```

EXHIBIT 52
1802

DON BULSON - 7/19/2011

Page 31

```
 1          instructing him not to answer that question.
 2                     MR. RYLAND:     Counsel, I
 3          have no choice.  We can not either assert or
 4          waive the attorney-client privilege, so. . .
 5                     MR. KLINE:      We're just
 6          going to be back here for a second day.  If,
 7          I mean, the communication -- I mean, the Ohio
 8          courts have held the following:  Mere
 9          relation of attorney and client does not
10          raise a presumption of confidentiality of all
11          communications made between them.  I've not
12          asked for anything Michael said about the
13          document, I've not asked for anything Don
14          Bulson said to Michael about the document.
15          I'm asking him if he's ever seen the
16          document, whether he's perceived the document
17          before.  And you're instructing him not to
18          answer that question?
19                     MR. BERK:       I'm saying he
20          can answer the question if Michael did not
21          give him the document.
22                     MR. RYLAND:     I -- you know
23          our position, Counsel.  I can't waive --
24     A    I don't know how I can answer the question.
25     Q    Independent of Michael giving you this
```

EXHIBIT 52
1803

DON BULSON - 7/19/2011

Page 32

```
 1          document, have you ever seen it?
 2   A     No.
 3                  MR. KLINE:      Okay.  And
 4      Mr. Berk, we just met.
 5                  MR. BERK:      Uh-huh.
 6                  MR. KLINE:      I
 7      unfortunately think we're going to be here a
 8      second day.  I'm not aware of any case
 9      authority that says if you give a
10      nonprivileged document to your attorney --
11      you can issue such an instruction or can you
12      cite such an authority that says that in
13      Ohio?  I just -- I'm not aware of a case that
14      says that.
15                  MR. TOBEROFF:    Counsel.
16                  MR. KLINE:      I'm asking
17      you, Mr. Berk.
18                  MR. TOBEROFF:    Excuse me.
19      You've often said in your depositions that
20      you don't want to engage in colloquy.  This
21      colloquy is pointless.  He's entitled to
22      instruct as he sees fit.  You can ask your
23      questions as you see fit.  Let's move on with
24      the deposition.
25                  MR. KLINE:      I'm not going
```

EXHIBIT 52
1804

DON BULSON - 7/19/2011

Page 33

```
 1        to move on, because we're going to have to
 2        come back here a second time --
 3                     MR. TOBEROFF:    This is not a
 4        hearing.
 5                     MR. KLINE:    We're going to
 6        have to come back here a second time.
 7                     MR. TOBEROFF:    You threaten
 8        that in every deposition.
 9                     MR. KLINE:    We're going to
10        have to come back.  I just want to know, are
11        you aware of any -- I just never heard of an
12        authority that says you can't ask a witness
13        if they've seen a document before.
14                     MR. BERK:       If the
15        document was given by Michael Siegel to
16        Mr. Bulson it becomes part of his file, it
17        also becomes part of the privileged file and
18        part of the litigation or representation by
19        Mr. Bulson of Michael Siegel, and therefore
20        is privileged.
21                     MR. KLINE:    Are you aware
22        of any case authority that supports that
23        proposition?
24                     MR. BERK:       It's basic
25        privilege.  It's a part of the file.
```

EXHIBIT 52
1805

DON BULSON - 7/19/2011

Page 34

1                MR. KLINE:       And are you

2     invoking Ohio law here, federal law here?

3                MR. BERK:       I'm invoking

4     any law that applies to this deposition.

5                MR. KLINE:       And what is

6     your submission as to what law applies?

7                MR. BERK:       I don't think

8     I have to give you my submission to what law

9     applies.  It is privilege.  It is privilege

10    in Ohio, it is privilege under federal, it is

11    still privileged.  And I believe it is

12    privileged under both because it becomes part

13    of the work product of his representation of

14    Michael Siegel.

15               MR. KLINE:       So just so I

16    understand your position clearly, you're not

17    going to let him answer the following

18    question, just so we have a clean Q and A.

19               MR. TOBEROFF:     You already

20    had a clean Q and A.  Let's move on,

21    Counselor.

22               MR. KLINE:       It's my

23    deposition.

24    Q   Mr. Bulson, have you ever seen this document

25        before?

Merrill  Corporation  -  Los Angeles

EXHIBIT 52
1806

DON BULSON - 7/19/2011

```
 1              MR. RYLAND:      I think that
 2    he's asserted the privilege.  I'm not going
 3    to allow my client to answer something that
 4    the estate has objected to and instructed him
 5    not to answer simply because I can't.  It's
 6    not Renner Otto's or Mr. Bulson's privilege
 7    to waive.  So to the extent that you're going
 8    to ask him the same question that he's been
 9    instructed to waive, I'll object that it's
10    been asked and answered.
11              MR. KLINE:      And it's your
12    instruction for him not to answer that
13    question --
14              MR. RYLAND:      When you say
15    your --
16              MR. KLINE:      -- Mr. Berk?
17              MR. RYLAND:      Thank you.
18              MR. BERK:      I've already
19    answered that question.
20              MR. KLINE:      And the answer
21    is yes?
22              MR. BERK:      I've
23    instructed him not to answer that question as
24    it relates to Michael Siegel and the
25    privilege that we have raised.
```

EXHIBIT 52
1807

DON BULSON - 7/19/2011

Page 36

1              MR. KLINE:        Okay.  Thank

2      you.

3   Q  Mr. Bulson, did you ever discuss this letter

4      with Mr. Toberoff?

5              THE WITNESS:      I don't

6      think -- you've instructed me not to answer

7      the earlier question.  If I answer that

8      question --

9              MR. BERK:        I would agree

10     that if you spoke to Mr. Toberoff in

11     relationship to your representation of

12     Michael Siegel, it is also a privileged

13     conversation.  It may not be to Mr. Toberoff.

14     I mean, I can't have any privilege --

15     exercise any privilege of his conversation,

16     but as it pertains to Mr. Bulson, I -- it

17     would be privileged.

18              MR. KLINE:        You understand

19     that an Ohio court ruled that 15 emails in

20     which these two gentlemen negotiated for a

21     possible purchase of Mr. Siegel's interests

22     were not privileged communications and had to

23     be produced to DC, correct?

24              MR. BERK:        No, I do not

25     know that.

EXHIBIT 52
1808

DON BULSON - 7/19/2011

Page 37

```
 1                    MR. KLINE:         Okay.  We'll
 2       show you a copy of that order, and we'll show
 3       you a copy of an order in which Mr. -- the
 4       court found that Mr. Toberoff both
 5       misdescribed those documents and erroneously
 6       asserted the privilege.  So I'll represent to
 7       you, if you want to take a break to talk to
 8       him about it, that their negotiations
 9       concerning the Michael Siegel interests, and
10       I know Mr. Ryland's aware of this, were not
11       privileged conversations.  So I think I'm
12       fully entitled to ask about his discussions
13       with Mr. Toberoff on this issue.
14                    MR. TOBEROFF:      I object to
15       you mischaracterization of the Ohio order.
16                    MR. KLINE:         Can I get the
17       Ohio order?
18                    MR. TOBEROFF:      Warner
19       Brothers and DC moved for the entire -- all
20       Michael Siegel communications.  The vast bulk
21       of that for which a privilege was asserted,
22       the vast bulk was upheld by the Ohio court
23       with the sole exception of a sliver of emails
24       which concerned the negotiation between
25       myself and Mr. Bulson regarding the potential
```

EXHIBIT 52
1809

DON BULSON - 7/19/2011

Page 38

1          purchase of Michael Siegel's interest.  And
2          the court did not hold that the privilege log
3          had wrongly described something.
4                          MR. KLINE:       I'll read from
5          the order.
6                          MR. TOBEROFF:     That's your
7          editorializing.
8                          MR. KLINE:       While it is
9          true --
10                         MR. BERK:       Before you
11         read from the order, could you bring the --
12         read the case, what case citation is this
13         from?  I mean, what lawsuit?  Is it this
14         particular lawsuit here?
15                         MR. KLINE:       This is from
16         In re:  Subpoena duces tecum issued by the
17         U.S. District Court for the Northern District
18         of Ohio in the matter of Joanne Siegel versus
19         Warner Brothers Entertainment.
20                         MR. BERK:       Okay.  This
21         isn't this case.
22                         MR. KLINE:       Judge Solomon
23         Oliver held the following:  While it's true
24         that counsel for Bulson, this is Mr.
25         Toberoff, did not accurately characterize

EXHIBIT 52
1810

DON BULSON - 7/19/2011

Page 39

1       some of the documents and was incorrect

2       regarding his claims of privilege, the court

3       does not find that the circumstances herein

4       are such as to cast the entire process into

5       question.  That's what Mr. Toberoff's talking

6       about when he says --

7                       MR. BERK:       Wait.  Wait.

8       Wait.

9                       MR. KLINE:       -- every

10      single document in the case need not be

11      produced.  But he also says in the same

12      order, this is his order of August 14th,

13      2008 -- I need the other order, Jason, the

14      earlier order as well.

15                      MR. TOBEROFF:    Is this an

16      exhibit?

17                      MR. KLINE:       Yeah.  We're

18      going to mark two exhibits here.

19                      - - - - -

20      (Plaintiff's Exhibits 31 and 32 were marked.)

21                      - - - - -

22                      MR. KLINE:       No. 32 is the

23      first order.  I'll put it in front of

24      Mr. Bulson.

25  Q   Mr. Bulson, do you remember these orders

EXHIBIT 52
1811

DON BULSON - 7/19/2011

Page 40

```
 1          concerning document requests made on you and

 2          your firm?

 3   A      Vaguely.

 4                    MR. RYLAND:      Thanks.

 5                    MR. KLINE:       So the first

 6          order which is the April 1st, 2008 order --

 7          and you've not seen these, Mr. Berk?

 8                    MR. BERK:        I've never

 9          seen them.  We were not a part of any of this

10          action at that particular time.

11                    MR. KLINE:       Well, here's

12          what I'd like to do.  I'd like to take a

13          brief break so that you can review these

14          orders, and hopefully they can inform some of

15          the privilege objections you're making.  And

16          otherwise we're just going to waste our time

17          here today.

18                    MR. BERK:        Well, I don't

19          want you to waste your time, but this is a

20          totally different case than this case.

21                    MR. KLINE:       Why don't you

22          take --

23                    MR. BERK:        Wait a minute.

24          We were not a part of it, and I'm not sure it

25          has any relevance whatsoever, because we have
```

Merrill  Corporation  -  Los Angeles
800-826-0277                          www.merillcorp.com/law

EXHIBIT 52
1812

DON BULSON - 7/19/2011

Page 41

1        different -- a different situation here.

2                MR. KLINE:        That may be

3        your ultimate position.  I want to take a

4        five minute break so you can read the orders

5        and we can figure out what the protocol is

6        going to be.

7                MR. BERK:        Take as many

8        breaks as you want.

9                MR. TOBEROFF:    I don't -- you

10       know, they said they have to leave here at

11       5:00 o'clock, and we got a late start, and

12       it's a burden to fly out here from Los

13       Angeles, so I don't -- these breaks during

14       the deposition to read things you could have

15       provided beforehand --

16               MR. KLINE:        Mr. Toberoff,

17       your co-counsel here is making one objection

18       after another.  So we're going to take a

19       break, review the orders.  If you want to

20       keep on making the objections, that's fine.

21       Let's go off the record.

22               MR. TOBEROFF:    So it

23       shouldn't come as a surprise to you,

24       Mr. Kline, that when you're taking the

25       deposition of an attorney regarding their

EXHIBIT 52
1813

DON BULSON - 7/19/2011

Page 42

```
1        attorney-client relationship, that objections
2        as to privilege are going to be made.
3                    MR. KLINE:       Let's go off
4        the record.
5                    MR. TOBEROFF:    In fact, this
6        whole lawsuit is an invasion of the
7        attorney-client relationship, so you
8        shouldn't be shocked or surprised when
9        privilege objections are being made or
10       instructions are duly given.
11                   MR. BERK:        On top of
12       that, Mr. Toberoff, I don't believe, was a
13       party to this lawsuit at that time.
14                   MR. KLINE:       We're going
15       off the record.  You guys can read these and
16       then we'll come back on, and we'll see what
17       objections you'll make going forward.  Thank
18       you.
19                   VIDEO TECHNICIAN:  We're off
20       the record.  The time is 9:54.
21       (Recess from 9:54 a.m. to 10:05 a.m. )
22                   VIDEO TECHNICIAN:  We're back
23       on the record.  The time is 10:05.
24   BY MR. KLINE:
25   Q   So Mr. Bulson, bringing -- I just want to
```

DON BULSON - 7/19/2011

Page 43

```
 1        make sure the record's clear.  I put in front
 2        of you Exhibits 31 and 32, which are the two
 3        orders issued by the judge in Cleveland
 4        concerning document production in the Siegel
 5        case.  Do you see both of those?
 6   A    I do.
 7   Q    And Mr. Toberoff was representing you in
 8        connection with that motion practice,
 9        correct, along with Mr. Ryland here?
10   A    I don't recall at the moment, that may be the
11        case.  I don't recall.
12   Q    You do recall that he had kind of collected
13        documents for you, prepared a privileged log
14        for you, produced documents in that case?
15   A    I believe that's true.
16   Q    And he asserted in that case that he
17        represented Michael Siegel's interests,
18        correct?
19   A    I believe that is true.
20   Q    Thank you.
21            Bringing your attention back to --
22                MR. KLINE:      What did we
23        mark this, Jason?
24   Q    I'm going to turn back to Exhibit 30 here in
25        front of you, Mr. Bulson.  This is the letter
```

EXHIBIT 52
1815

DON BULSON - 7/19/2011

Page 44

1      from Michael Siegel to Laura Siegel his

2      sister, and I want to ask you the following

3      question:  In connection with the

4      negotiations that you had with Mr. Toberoff

5      concerning Michael Siegel's putative Superman

6      interests, did you and he ever discuss this

7      letter?

8                     MR. TOBEROFF:    Objection.

9                     MR. BERK:       I object as

10     well, because if he discussed any -- this

11     letter with Mr. Toberoff, he did so

12     concerning his representation of Michael

13     Siegel, and is therefore as to Michael Siegel

14     it is privileged.

15                    MR. TOBEROFF:    I object

16     because the question lacks foundation.

17  Q  Okay.  Let's take a look at Exhibits 34 to 41

18     of your last deposition, actually, to 42.

19     And I'll represent to you and to Mr. Berk

20     that these were letters and emails that you

21     exchanged with Mr. Toberoff concerning a

22     potential investor's desire to purchase

23     Mr. Siegel's interest in Superman.  Do you

24     remember the letters and emails from

25     Mr. Toberoff in the 2003 time period to

EXHIBIT 52
1816

DON BULSON - 7/19/2011

Page 45

```
 1        2005 concerning those negotiations?
 2              MR. BERK:        I object
 3   again, because any reference to his
 4   representation of Michael Siegel, and any
 5   conversations that he might have had with
 6   Mr. Toberoff concerning that, is privileged
 7   as to Michael Siegel.
 8              MR. KLINE:       These were
 9   exhibits used at his last deposition.
10              MR. BERK:        I mean, that's
11   fine, but we're in a different lawsuit
12   altogether.  I was not a party to or was I
13   there or had anything to do with exercising
14   the privilege rights of the estate of Michael
15   Siegel.
16              MR. KLINE:       And you
17   understand that Mr. Toberoff, your co-counsel
18   here today, who says he represented, at the
19   very beginning of this deposition, said he
20   was here representing Michael Siegel,
21   appeared at that deposition and made numerous
22   objections on behalf of the Siegel, Michael
23   Siegel estate.
24              MR. BERK:        I have no idea
25   when that was taken.  I don't know if Michael
```

EXHIBIT 52
1817

DON BULSON - 7/19/2011

Page 46

1       Siegel was alive or dead at that time.  But

2       as far as the estate of Michael Siegel and my

3       representation of the Estate of Michael

4       Siegel and exercising the privilege that

5       we're entitled to, I maintain that these are

6       privileged documents as to this deposition in

7       this lawsuit and my representation and being

8       here.

9                   MR. KLINE:       So you didn't

10      read this deposition before?

11                  MR. BERK:        I absolutely

12      did not.  I had nothing to do with that case.

13                  MR. KLINE:       This

14      deposition was taken in 2008 when he was

15      dead, and your co-counsel here today made

16      numerous objections on behalf of the estate

17      of Michael Siegel.

18                  MR. BERK:        I mean, that

19      may be true.  I have no knowledge of that.

20                  MR. KLINE:       And yet you're

21      instructing him --

22                  MR. BERK:        As far as I'm

23      concerned, my representation of the Estate of

24      Michael Siegel and the question that you

25      asked concerning this letter and concerning

EXHIBIT 52
1818

DON BULSON — 7/19/2011

Page 47

| | | |
|---|---|---|
| 1 | | his representation of the Estate of Michael |
| 2 | | Siegel is privileged. |
| 3 | | MR. KLINE:        Okay. |
| 4 | | MR. BERK:         It may not |
| 5 | | have been privileged in that case, but it is |
| 6 | | privileged here. |
| 7 | | MR. KLINE:        Let's look at |
| 8 | | the letters -- |
| 9 | Q | Mr. Bulson -- |
| 10 | | MR. KLINE:        Is it your |
| 11 | | position, sir, that any of his communications |
| 12 | | with Mr. Toberoff concerning these |
| 13 | | negotiations are privileged? |
| 14 | | MR. BERK:         My position is |
| 15 | | that any conversations, any letters, or any |
| 16 | | documents concerning his representation of |
| 17 | | Michael Siegel and his conversations that he |
| 18 | | had with anyone else concerning his |
| 19 | | representation of Michael Siegel is |
| 20 | | privileged.  I don't know what his |
| 21 | | conversations were with Mr. Toberoff and to |
| 22 | | what extent they were made.  But if they were |
| 23 | | made with the representation of Michael |
| 24 | | Siegel, they are privileged.  If he had other |
| 25 | | conversations with Mr. Toberoff not |

EXHIBIT 52
1819

DON BULSON - 7/19/2011

Page 48

```
 1        concerning his representation of Michael

 2        Siegel, then that is his to determine whether

 3        they were privileged or not.

 4                    MR. KLINE:        And you read

 5        the order in there where he says he's having

 6        negotiations with Mr. Toberoff concerning a

 7        potential purchase of Michael Siegel's

 8        rights?

 9                    MR. BERK:        I read an

10        order in another case, not concerning me or

11        the Estate of Michael Siegel, and it's not in

12        detail.  I have no idea what the documents

13        were or how the decision was made.  But we're

14        in a completely different case here.  And I

15        maintain that any communications that

16        Mr. Bulson had with anyone is privileged.

17                    MR. KLINE:        Okay.

18                    MR. BERK:        As long as it

19        was in the representation of Michael Siegel.

20   Q    Mr. Bulson, between June 2003 and

21        January 2005 did you negotiate with

22        Mr. Toberoff concerning the potential

23        purchase of Michael Siegel's putative

24        Superman interests by a potential investor?

25                    THE WITNESS:      Am I okay to
```

EXHIBIT 52
1820

DON BULSON - 7/19/2011

Page 49

1     answer?

2                    MR. BERK:        You can answer

3     that you had those conversations, but you can

4     not answer as to the -- what the negotiation

5     process was.

6   A   I had conversations, but I can't attest to

7     the timeframe.  I don't recall the timeframe.

8   Q   Okay.  And you made offers, for example, on

9     June 18th, 2003, that Michael would be

10    willing to entertain an offer that will pay

11    him $200,000 a year for the rest of his life

12    with a guaranteed minimum of 10 years.  Do

13    you remember --

14                   MR. BERK:        I would object

15    to that.

16                   MR. KLINE:       Can I at least

17    finish the question for the record?

18                   MR. BERK:        I thought you

19    were through.

20                   MR. KLINE:       If that's

21    okay?

22  Q   Do you remember making offers of that sort to

23    Mr. Toberoff on behalf of Mr. Siegel?

24                   MR. BERK:        I will object

25    to that being that would be privileged and

EXHIBIT 52
1821

DON BULSON — 7/19/2011

Page 50

```
 1        made in the context of representation of

 2        Michael Siegel.

 3                    MR. KLINE:        And are you

 4        instructing him not to answer that question?

 5                    MR. BERK:         Correct.

 6                    MR. RYLAND:       Are you

 7        instructing him not to answer?

 8                    MR. BERK:         Correct.

 9                    MR. RYLAND:       Yeah.  Thank

10        you.

11                    MR. KLINE:        I'm going to

12        take a five minute break, because these are

13        literally questions that went -- that were

14        gone over for 20, 30 pages of his last

15        deposition.  And if you're not going to let

16        me answer these basic questions about those

17        negotiations and related correspondence like

18        Exhibit 30, we may have to go to a judge to

19        get some guidance on this.

20                    MR. BERK:         Okay.  But my

21        position is, if you have testimony in another

22        matter, then I think you have the right to

23        attempt to introduce it into this matter, and

24        then we would have the right to object to it

25        as far as being privileged and not being part
```

DON BULSON – 7/19/2011

Page 51

1          of that previous matter.

2                    MR. KLINE:        Well, what I

3          really want to do is start asking him about

4          Exhibit 30, which is this Michael Siegel

5          letter.  And every question that I've tried

6          to ask I believe you've instructed him not to

7          answer.

8                    MR. BERK:        Correct.

9                    MR. KLINE:        And so I'm

10         worried about us wasting our seven hours, us

11         wasting our day here.  I understand your

12         position.

13                    MR. BERK:        Okay.

14                    MR. KLINE:        We obviously

15         disagree with it and respectfully disagree

16         with it.

17                    MR. BERK:        Uh-huh.

18                    MR. KLINE:        I just wonder

19         if our time might be better served getting a

20         judge to rule on this issue and then coming

21         back here.  So what I want to do is I want to

22         take about five minutes to try to go figure

23         out the answer to that question, because I

24         was not prepared for you to make objections

25         that Mr. Toberoff did not make in the Siegel

EXHIBIT 52
1823

DON BULSON - 7/19/2011

Page 52

1         case to the same sorts of questions.  So

2         let's go off the record.

3                   MR. BERK:      But in the

4         Siegel case he was not representing -- or

5         were you representing Michael Siegel?  I

6         don't know that.

7                   MR. TOBEROFF:    I'd have to go

8         back and look at the deposition.

9                   MR. BERK:      I mean, I

10        haven't seen the full case, so I don't even

11        know if Michael Siegel was a plaintiff.

12                  MR. KLINE:      He was not a

13        party to that action.

14                  MR. BERK:      So he had

15        nothing to do with this, so therefore his

16        privilege objections would not, as a --

17        wouldn't have been entered as a party.

18                  MR. KLINE:      No,

19        Mr. Toberoff purported to represent his

20        interests, and instructed Mr. Bulson

21        repeatedly not to answer questions on the

22        grounds that he represented Michael Siegel,

23        and yet he let him answer questions about the

24        very document you just told him not to answer

25        questions about.  Okay.  Let's go off --

EXHIBIT 52
1824

DON BULSON - 7/19/2011

```
 1                    MR. BERK:      Mr. Toberoff
 2       and I have a difference of opinion --
 3                    MR. KLINE:     You do.
 4                    MR. BERK:      -- as to
 5       whether this is a privilege or not.
 6                    MR. KLINE:     So let's go
 7       off the record for five minutes.
 8                    VIDEO TECHNICIAN:  We're off
 9       the record.  The time is 10:16.
10        (Recess from 10:16 a.m. to 10:32 a.m. )
11                    VIDEO TECHNICIAN:  We're back
12       on the record.  The time is 10:32.
13                    - - - - -
14       (Plaintiff's Exhibits 34 to 42 were marked.)
15                    - - - - -
16    BY MR. KLINE:
17    Q    Okay.  So I had Mr. Tokoro mark on the break
18         Exhibits 34 through 42 from your last
19         deposition as reflected by the B-34 through
20         42 Defendant's Exhibit at the bottom of these
21         exhibits.  At the top of the exhibits, and I
22         don't know how Jason got the numbers to work
23         out perfectly, they're marked Plaintiff's
24         Exhibits 34 through 42.  I just want to show
25         you these exhibits, Mr. Bulson, and we'll
```

EXHIBIT 52
1825

DON BULSON - 7/19/2011

Page 54

1         give copies to counsel.  I think they're in

2         front of you there.  And Mr. Bulson, could

3         you please flip through those documents and

4         confirm that you were deposed on them back in

5         2008?

6                         MR. RYLAND:       Objection.

7         Vague.

8    A    I don't recall, but I take it on your

9         representation if it is part of the

10        deposition and transcript, then I presumably

11        was deposed with respect to these documents.

12   Q    And in flipping through them, do you

13        recognize several of them as letters to you

14        from Mr. Toberoff conveying offers and him

15        responding in kind to you?

16                        MR. BERK:       I'm going to

17        throw the ball ostensibly to Mr. Bulson.  If

18        he feels that these items are a privilege in

19        his representation of Michael Siegel, he may

20        make that determination on his own.

21                        MR. RYLAND:       We can't --

22                        MR. BERK:       I will not

23        instruct him not to answer, and I'll let him

24        make his determination whether he feels that

25        it's privileged.

EXHIBIT 52
1826

DON BULSON – 7/19/2011

```
1              MR. RYLAND:      We're not

2    going to continue the deposition under that

3    basis.

4              MR. BERK:       Okay.

5              MR. KLINE:      It's your

6    position that you represent the estate of

7    Michael Siegel, the holder of the privilege,

8    correct?

9              MR. BERK:       Correct.

10             MR. KLINE:      And yet you're

11   saying that --

12             MR. BERK:       And we would

13   want the full extent of our privilege in the

14   deposition of Mr. Bulson.

15             MR. KLINE:      Are you

16   disputing --

17             MR. BERK:       I'm not a

18   hundred percent sure how this letter came to

19   be, how he got it, and what discussions he

20   might have had, but as far as his

21   representation of Michael Siegel, we feel

22   that we want the full extent of the privilege

23   that we're entitled to, and Mr. Bulson can

24   make a determination as to whether it

25   violates privilege or not.  I'm not going to
```

EXHIBIT 52
1827

DON BULSON - 7/19/2011

Page 56

1        instruct him not to answer.

2                    MR. TOBEROFF:    Which

3        question?  I think --

4                    MR. BERK:        And that was

5        the last question concerning validity or

6        about this having this letter.

7                    MR. KLINE:       No, I asked

8        him about Exhibits 34 to 42, which he was

9        asked about at his last deposition, and I

10       asked -- the last question was --

11                   MR. BERK:        I don't have

12       an objection to him answering questions

13       concerning a prior deposition and exhibits

14       that were in that deposition.

15                   MR. KLINE:       Before the

16       break you said he couldn't answer any

17       questions concerning those documents.  Have

18       you changed your position?

19                   MR. BERK:        I don't know

20       which documents you're referring to.

21                   MR. KLINE:       The ones

22       marked 34 to 42 right here in front of you.

23                   MR. BERK:        He can answer

24       questions concerning whether he sent these

25       documents, but any conversations he had with

EXHIBIT 52
1828

DON BULSON - 7/19/2011

Page 57

1          Michael Siegel concerning these documents are

2          privileged, and we feel he should not discuss

3          any conversations that he had with Michael

4          Siegel concerning them.

5                    MR. KLINE:        And that

6          doesn't -- that's no matter what question I

7          ask about these conversations?

8                    MR. BERK:        If it's

9          conversations between Mr. Bulson and Michael

10         Siegel, it's a privilege.

11                   MR. KLINE:        Okay.  But I

12         wasn't asking about his conversations with

13         Mr. Siegel.

14                   MR. BERK:        I understand

15         that.

16                   MR. KLINE:        Before the

17         break you said I couldn't ask him any

18         questions about his conversation was

19         Mr. Toberoff.  Are you changing that

20         position?

21                   MR. BERK:        My position is

22         that Mr. Bulson can make that determination.

23                   MR. RYLAND:       No.  Let me

24         clarify as counsel for Mr. Bulson.  We will

25         not under any circumstances make a judgment

EXHIBIT 52
1829

DON BULSON - 7/19/2011

Page 58

```
 1        call with respect to the attorney-client
 2        privilege that is held by the estate of
 3        Michael Siegel.  We no longer represent
 4        Michael Siegel, nor do we represent the
 5        Estate of Michael Siegel, and we're going to
 6        defer to the estate which holds the privilege
 7        either to waive or assert it.  If we're told
 8        that the privilege is waived, Mr. Bulson can
 9        testify, we'll do so.  If we're told the
10        privilege is asserted and the estate
11        instructs us not to answer, then we will not
12        answer.  Beyond that we will not --
13        unequivocally will not make any
14        determinations with respect to privilege on
15        our own judgment, because we do not hold the
16        privilege, nor can we assert or waive it.
17               MR. TOBEROFF:    Let me try to
18        put some clarity into this.  What I think
19        Mr. Berk is saying is that he would allow
20        Mr. Bulson to answer questions about whether
21        he sent this letter or whether he received a
22        letter from me, but to the extent any
23        questioning regarding these letters
24        implicates knowledge or conversations that he
25        had with Michael Siegel, Mr. Berk on behalf
```

EXHIBIT 52
1830

DON BULSON – 7/19/2011

Page 59

```
1        of the estate would instruct him not to

2        answer; is that correct?

3                    MR. BERK:        That is

4        correct.

5                    MR. KLINE:        And Mike,

6        before the break I asked --

7   Q    Let me get back to my questions, because

8        maybe this will crystallize this.  Looking at

9        Exhibit 30, which is the May 13, 2003 letter,

10       did you ever discuss that letter with

11       Mr. Toberoff?

12                   THE WITNESS:        Answer?  Am I

13       allowed to answer that question?

14                   MR. BERK:        You can answer

15       the question whether you discussed the letter

16       with Mr. Toberoff, but not as --

17                   MR. RYLAND:        Is that a yes?

18                   MR. BERK:        You can answer

19       that question.

20                   THE WITNESS:        So --

21                   MR. RYLAND:        You can

22       answer.

23                   THE WITNESS:        This would be

24       a waiver of privilege of the first question.

25                   MR. RYLAND:        Which was the
```

EXHIBIT 52
1831

DON BULSON - 7/19/2011

Page 60

```
 1        first question that you're referring to?
 2                    THE WITNESS:    Did I ever
 3        discuss this -- have I ever seen this letter.
 4        Or was this letter, you know --
 5                    MR. BERK:      Is this the
 6        letter we're referring to?
 7                    MR. KLINE:     May 13th,
 8        2003.
 9                    MR. TOBEROFF:   He thought you
10        were referring to these letters.  You're
11        jumping.
12                    MR. KLINE:     I said
13        Exhibit 30, right here, May 13th,
14        2003 letter.
15                    MR. BERK:      Okay.  This is
16        Exhibit 30.
17                    MR. TOBEROFF:   I think he
18        believed you were speaking about --
19                    MR. KLINE:     That's fine.
20        Let's T it up.  Let's get a clear Q and A on
21        this.
22    Q   Mr. Bulson, pointing you to Exhibit 30, did
23        you ever discuss this letter with
24        Mr. Toberoff?
25                    MR. BERK:      I still stand
```

EXHIBIT 52
1832

DON BULSON - 7/19/2011

Page 61

1       by my objection to this particular letter as

2       far as letters sent to Mr. Toberoff.  He can

3       answer as to whether he sent them.

4                    MR. KLINE:       So are you

5       instructing him not to answer my question?

6                    MR. BERK:        Correct.

7                    MR. KLINE:       Did you get

8       that?

9                    COURT REPORTER:  (Nods head.)

10  Q   Putting aside any conversations you had with

11      Michael Siegel and focusing on the time

12      period covered in Exhibits 34 to 42, when you

13      and Mr. Toberoff were negotiating the

14      potential purchase of Mr. Siegel's Superman

15      interests, did you and Mr. Toberoff ever

16      discuss, Mr. Bulson, Exhibit 30, which is

17      this May 13th, 2003 letter from Michael

18      Siegel to his sister Laura Siegel?

19                   MR. TOBEROFF:    Lacks

20      foundation.  Asked and answered.  The same

21      question he just answered.

22                   MR. KLINE:       May he answer

23      that question?

24                   MR. TOBEROFF:    It's the same

25      question you instructed him not to answer.

EXHIBIT 52
1833

DON BULSON - 7/19/2011

Page 62

1            MR. BERK:        Yeah.  Right.

2     No.

3  Q  Mr. Bulson, do you know whether this document

4     exists in your law firm's files?

5  A  What document?

6  Q  The May 13th, 2003 letter, Plaintiff's

7     Exhibit 30?

8            MR. BERK:        I'm going to

9     object to that as well, because first of all,

10    if it exists and it's in his file, it becomes

11    a privilege, and therefore not discoverable.

12            MR. KLINE:       So just so I

13    understand your position, I can't ask him

14    whether he discussed this letter with

15    Mr. Toberoff, correct?

16            MR. BERK:        If he

17    discussed this letter with Mr. Toberoff

18    concerning his representation of Michael

19    Siegel or the Estate of Michael Siegel, it is

20    privileged.

21            MR. KLINE:       Okay.

22  Q  Turning your attention to the second

23    paragraph of this letter, Mr. Bulson.

24            MR. RYLAND:      You mean

25    Exhibit 30, Counsel?

EXHIBIT 52
1834

DON BULSON - 7/19/2011

Page 63

```
 1                    MR. KLINE:        Exhibit 30.

 2      Thank you, Josh.

 3   Q  During your communications with Mr. Toberoff

 4      in 2003, 2004, 2005, did he mention to you

 5      the mysterious billionaire averted to ·in the

 6      second paragraph of this letter?

 7                    MR. BERK:        Who's he?

 8                    MR. KLINE:        Mr. Toberoff.

 9                    MR. BERK:        Oh, did

10      Mr. Toberoff represent to him?

11                    MR. KLINE:        In your

12      discussions and negotiations with

13      Mr. Toberoff in 2003 and 2005, did he make

14      reference to --

15   A  Can you fill in the he's?

16   Q  Did Mr. Toberoff make a reference to a,

17      quote, mysterious billionaire who wanted to

18      invest in the Superman copyright?

19                    MR. TOBEROFF:        Lacks

20      foundation.

21                    MR. RYLAND:        Are we okay

22      with him answering that?

23                    MR. BERK:        Yeah.  I think

24      he can answer as to the -- that question.

25   A  In that timeframe Mr. Toberoff did mention, I
```

EXHIBIT 52
1835

DON BULSON - 7/19/2011

Page 64

```
 1           don't believe he used words like "mysterious
 2           billionaire."  So I guess the answer would be
 3           no.
 4      Q    Did he make reference to a billionaire
 5           investor?
 6      A    He may have.
 7      Q    You don't recall one way or the other?
 8      A    Not right now, no.
 9      Q    Did he tell you that he owned his own -- did
10           Mr. Toberoff during this 2003 and 2005 time
11           period tell you that he owned his own
12           production company?
13                    MR. RYLAND:     Are you okay
14           with the estate?
15                    MR. BERK:       Yeah.
16      A    I don't recall.
17      Q    During the 2003 to 2005 time period did
18           Mr. Toberoff tell you that he was going to
19           team with Ari Emanuel to make a Superman
20           movie?
21      A    I don't recall.
22      Q    Do you know whether Michael Siegel had
23           communications with Mr. Toberoff --
24                    MR. BERK:       I'm going to
25           object to that.
```

EXHIBIT 52
1836

DON BULSON - 7/19/2011

Page 65

1    Q    -- on or before May 13th, 2003?

2                      MR. TOBEROFF:    You're

3         objecting and instructing?

4                      MR. BERK:    Yes.

5    Q    Was Mr. Toberoff acting, to your knowledge,

6         2003 to 2000 -- or in May 2003 or before as

7         Michael Siegel's attorney to your knowledge?

8                      THE WITNESS:    Can I answer?

9                      MR. BERK:    Yeah.    That

10        has nothing to do with your representation.

11   A    Repeat the question specifically.

12                     MR. BERK:    To your

13        knowledge.

14   Q    On or around May 13, 2003, do you know

15        whether Mr. Toberoff was representing Michael

16        Siegel as his attorney?

17   A    I -- that's an unclear question.  I know the

18        answer to that.

19   Q    What is it?

20   A    I mean, to my knowledge he was not

21        representing Michael Siegel.

22   Q    Okay.  Based on that answer I'm going to ask

23        my question again.  You previously instructed

24        him not to answer.  Do you know whether prior

25        to May 13th, 2003, Michael Siegel had

EXHIBIT 52
1837

DON BULSON - 7/19/2011

Page 66

1              communications with Marc Toberoff?

2                          MR. BERK:      I would -- if

3        he found out about any facts concerning this

4        while his -- with the communications between

5        Michael Siegel and Don Bulson, that those

6        communications between the two, two of them,

7        are privileged as --

8                          MR. TOBEROFF:    Let me

9        rephrase that.  He can only answer the

10       question insofar that it doesn't implicate

11       conversations with Michael Siegel.  If he has

12       some independent knowledge outside his

13       conversations with Michael Siegel as to what

14       transpired between Michael Siegel and me, if

15       anything, then he could answer.

16                         MR. BERK:      Yes.

17                         MR. TOBEROFF:    Otherwise --

18                         MR. KLINE:      So you're

19       instructing him not to answer?

20                         MR. BERK:      To that -- on

21       those parameters.

22                         MR. KLINE:      It's your

23       position that if Michael Siegel --

24                         MR. BERK:      Told him.

25                         MR. KLINE:      -- conveyed

EXHIBIT 52
1838

DON BULSON - 7/19/2011

Page 67

```
 1         the basic fact I talked to Marc Toberoff

 2         yesterday, that's a privilege and I can't ask

 3         questions about that?

 4                    MR. BERK:        Correct.

 5                    MR. KLINE:       And you're

 6         instructing him not to answer any questions

 7         on that ground?

 8                    MR. BERK:        I'm

 9         instructing him not to answer any

10         communications he had between himself and

11         Michael Siegel, concerning his representation

12         of Michael Siegel are privileged.

13                    MR. KLINE:       Even if it's

14         just conveying basic facts like I spoke to so

15         and so today?

16                    MR. BERK:        Well, I can't

17         make that determination on whether that was

18         part of his representation.  Mr. Bulson knows

19         better than I do.  But as far as it pertains

20         to his representation of Michael Siegel, it

21         is privileged.

22                    MR. KLINE:       Okay.  So I

23         just want to have a clear record on this.

24    Q    In this letter in the third sentence it says

25         in the -- I'm sorry, referring your attention
```

EXHIBIT 52
1839

DON BULSON - 7/19/2011

Page 68

| | |
|---|---|
| 1 | to Exhibit 30, May 13th, 2003 letter, I |
| 2 | really wish to discuss Marc Toberoff, and |
| 3 | then two sentences later, I told you when he |
| 4 | first contacted me he wanted to buy my share |
| 5 | of the copyright.  Marc had a mysterious |
| 6 | billionaire who wanted to invest in the |
| 7 | Superman copyright plus $15 million up front, |
| 8 | plus participation.  Do you know when Marc |
| 9 | Toberoff first contacted Michael Siegel? |
| 10 | MR. TOBEROFF:     You just asked |
| 11 | that question. |
| 12 | MR. BERK:       If he found |
| 13 | this out from Mike Siegel, I would say that's |
| 14 | privileged.  If he knows outside of that from |
| 15 | other -- other than his conversations with |
| 16 | Michael Siegel, he can answer.  But if he |
| 17 | only knows it because of his conversations |
| 18 | with Mike Siegel, it's part of his |
| 19 | conversations with Mike Siegel and his |
| 20 | representation of Mike Siegel, and we assert |
| 21 | the privilege and instruct him not to answer. |
| 22 | Q   With that instruction can you provide an |
| 23 | answer? |
| 24 | MR. RYLAND:       Hold on a |
| 25 | second.  Are you instructing him not to |

EXHIBIT 52
1840

DON BULSON - 7/19/2011

Page 69

```
 1        answer to the extent if he learned of the

 2        answer to that question from Michael Siegel?

 3                  MR. BERK:        Correct.

 4                  MR. RYLAND:      Mr. Bulson, if

 5        you can answer that question within the

 6        confines of that question.

 7   A    There's a foundation issue.  So to the extent

 8        I have any information regarding that

 9        question, it would not have arrived from

10        other means than Michael Siegel.

11   Q    Did Mr. Toberoff in your discussions with him

12        ever tell you that he had conversations, he

13        being Marc Toberoff, had conversations with

14        Michael Siegel?

15                  MR. TOBEROFF:    You can answer

16        that.

17                  MR. BERK:        Yeah.

18   A    I don't recall.

19   Q    Did Michael Siegel share with you or provide

20        to you his communications, these written

21        communications such as Exhibit 30 that he had

22        with his sister Laura Siegel?

23                  MR. BERK:        I don't

24        understand the question.  Repeat it, please.

25   Q    Did Michael Siegel provide to you or share
```

EXHIBIT 52
1841

DON BULSON - 7/19/2011

Page 70

```
 1        with you written communications that he had
 2        with his sister such as Exhibit 30?
 3                    MR. BERK:        Again, that's
 4        part of his representation of Michael Siegel,
 5        and if Michael Siegel gave it to him in
 6        conjunction with his representation of
 7        Michael Siegel, it is privileged, and I
 8        instruct him not to divulge anything
 9        concerning that.
10   Q    In your law firm's files do you have copies
11        of correspondence between Michael Siegel and
12        his sister Laura Siegel?
13                    MR. BERK:        I think you
14        can answer that.
15   A    The question again?
16   Q    In your law firm's files do you have copies
17        of correspondence between Michael Siegel and
18        his sister Laura Siegel?
19                    MR. BERK:        I'm going to
20        raise my objection on that.
21                    MR. RYLAND:        Are you
22        objecting or --
23                    MR. BERK:        I'm going to
24        object to it.
25                    MR. KLINE:        Understood.
```

EXHIBIT 52
1842

DON BULSON - 7/19/2011

Page 71

1          Can you say I instruct him not to answer?

2                    MR. BERK:        I instruct him

3      not to answer.

4                    MR. KLINE:       So that's your

5      position, you instruct him not to answer?

6                    MR. BERK:        Right.

7   Q   References made at this top of this letter,

8      Exhibit 30 to Laura's letter of November 2nd

9      of last year, presumably November 2nd of

10     2002, does your law firm have a copy of that

11     November 2nd, 2002 letter?

12                   MR. BERK:        And I object

13     as to being part of the work product of

14     Michael Siegel representation and instruct

15     him not to answer.

16  Q   Can you take a look at the complaint again?

17     It's Exhibit 1 in front of you.

18  A   Uh-huh.

19  Q   And look at Exhibit A.  It's way towards the

20     end.  It's Exhibit A, 65 at the very bottom,

21     so two pages later.

22                   MR. BERK:        What are you

23     referring to?  I'm sorry.

24                   MR. KLINE:       Exhibit A to

25     the complaint, Page 65 at the very bottom

EXHIBIT 52
1843

DON BULSON - 7/19/2011

Page 72

```
 1        there.
 2   Q    And I'd ask you to read the last paragraph of
 3        that page, starting July 5th, 2003.
 4                  MR. RYLAND:      By the way, I
 5        think we're missing a page in this one too.
 6                  MR. KLINE:      But do you
 7        have a Page 65?
 8                  MR. RYLAND:      Yeah, we've
 9        got it.  I'm just letting you know in this
10        exhibit --
11                  MR. KLINE:      Terrific.
12        Terrific.
13   Q    Your copy has a Page 65, Mr. Bulson?
14   A    I have a Page 65, yes, that's starts July 5,
15        2002.
16   Q    Correct.
17                  MR. TOBEROFF:      The copy I
18        have of this complaint, Exhibit A, is
19        incomplete.  I'm not sure whether he has a
20        complete copy.  I would also like to note for
21        the record that Exhibit A is an anonymous
22        letter enclosing privileged documents stolen
23        from my law firm by, we believe, a junior
24        attorney who took a job and left after three
25        months and stole our legal files and
```

EXHIBIT 52
1844

DON BULSON - 7/19/2011

Page 73

```
 1        delivered them over to Warner Brothers'
 2        general counsel in the winter, and -- excuse
 3        me, in December, and that they held onto them
 4        for months without reporting the theft or
 5        receipts of privilege material on top of
 6        that --
 7                    MR. KLINE:      Mr. Toberoff,
 8        speaking objections are not allowed.
 9                    MR. TOBEROFF:   Don't
10        object -- don't interrupt me.
11                    MR. KLINE:      I know, but
12        speaking -- we'll go off the record.
13        Speaking objections are not permitted.
14                    MR. TOBEROFF:   Don't
15        interrupt me.  I'm going to finish.  We're
16        not going off the record.  We're staying on
17        this record.
18                    MR. KLINE:      Then we're
19        going to charge your time, because this is an
20        improper speaking objection.
21                    MR. TOBEROFF:   You can do
22        allege what you see fit.  You're asking
23        questions about an exhibit that's an
24        anonymous document.
25                    MR. KLINE:      I'm not asking
```

EXHIBIT 52
1845

DON BULSON - 7/19/2011

Page 74

1        any questions.  I asked him to read a

2        paragraph.

3                    MR. TOBEROFF:    You're not

4        telling him what the document was.  You're

5        giving me an incomplete document, and I'm

6        stating for the record so the witness knows

7        what this document actually is.

8                    MR. KLINE:       That's called

9        a speaking objection.

10                    MR. TOBEROFF:    Okay.

11   Q   Mr. Bulson --

12                    MR. TOBEROFF:    I'm not

13        finished.  I'm going to go back.

14                    MR. KLINE:       Then we're

15        just going to charge you for the time.

16                    MR. TOBEROFF:    I'm going to

17        repeat -- no, you're not.  I'm going to

18        repeat what I said.  And every time you

19        interrupt me, I'm going to go back and repeat

20        it.

21                    MR. KLINE:       We'll charge

22        you for that time.

23                    MR. TOBEROFF:    Well, not

24        successfully, because you interrupted me.  So

25        this is an anonymous letter enclosing

EXHIBIT 52
1846

DON BULSON - 7/19/2011

Page 75

```
 1          privileged legal files stolen from our law
 2          firm, delivered to Warner Brothers' general
 3          counsel in the midst of the Siegel
 4          litigation.  It says consider this an early
 5          holiday gift on the front page, which is
 6          omitted from my copy of this exhibit.  We
 7          believe Warner Brothers received these
 8          documents in the winter and held onto them
 9          for months until they finally disclosed that
10          they had these privileged documents of ours.
11          And we believe this letter was written by a
12          young attorney, who not only stole the
13          documents, broke the law, but broke every
14          oath of an attorney in revealing privileged,
15          to the extent things here aren't made up, but
16          many things are, he's revealing privileged
17          information of Laura Siegel, potentially
18          Michael Siegel, and Joanne Siegel.
19     Q    So my question is, and by the way, a judge
20          ruled that Warner Brothers acted completely
21          appropriately, and we can use this document
22          in this case.
23                    MR. TOBEROFF:    And we'll be
24          appealing those rulings, and we'll be
25          investigating in counterclaims of Warner
```

EXHIBIT 52
1847

DON BULSON — 7/19/2011

Page 76

1        Brothers holding onto stolen material for

2        months at a time.

3    Q   Okay.  So referring to the first sentence of

4        this paragraph, July 5th, 2003, Laura Siegel

5        reseals her ignorance of Toberoff's dubious

6        actions in her return left back to Michael.

7        My question for you, sir, is are you aware of

8        a July 5th, 2003 letter from Laura to

9        Michael?

10                MR. BERK:        My -- I object

11       if you got this information from Michael

12       Siegel.

13                MR. KLINE:        And --

14                MR. RYLAND:        Are you -- are

15       you instructing him not to answer?

16                MR. BERK:        If he got the

17       information from Michael Siegel, it's

18       privileged and I would instruct him not to

19       answer.  If he got it from Laura Siegel, then

20       that would be --

21   Q   Did you get a copy of that letter from Laura

22       Siegel?

23                MR. TOBEROFF:        Lacks

24       foundation.  Could I have a copy of -- a

25       complete copy of this, because I'd like to

EXHIBIT 52
1848

DON BULSON - 7/19/2011

Page 77

```
 1        know what you're reading off of when you're
 2        asking the questions.
 3                    MR. KLINE:      Your
 4        co-counsel has one right there, I believe.
 5                    MR. BERK:      I only have --
 6        I don't have Page 66.
 7                    MR. KLINE:      I'm reading
 8        from Page 65.
 9                    MR. BERK:      Is that the
10        end, is that the complete?   It looks like it
11        goes on.
12                    MR. RYLAND:      I think we're
13        just missing the evens.
14                    MR. KLINE:      So, can you
15        read my question back, please?
16                    (Record read.)
17    A   I do not recall receiving from Laura Siegel a
18        letter dated July 5, 2003.
19    Q   Did you receive any letters from Laura
20        Siegel?
21                    MR. BERK:      I object if he
22        received the letters from Michael Siegel,
23        and --
24                    MR. TOBEROFF:      If you're
25        asking questions about letters from Laura
```

EXHIBIT 52
1849

DON BULSON - 7/19/2011

Page 78

```
 1        Siegel regarding their joint termination
 2        interest, there is a joint interest that
 3        applies to that as upheld by the Ohio court.
 4        With the exception of negotiations between
 5        myself and Mr. Bulson regarding the potential
 6        purchase of Michael Siegel's termi -- share
 7        of the termination interest, the Ohio court
 8        said conversations between me or my client
 9        and Mr. Bulson are protected by joint
10        interest privilege.
11    Q   Did you receive any letters from Laura
12        Siegel?
13                    MR. TOBEROFF:    You could
14        answer generally.
15                    MR. BERK:       You can answer
16        generally.
17    A   I don't recall.
18    Q   Did you receive copies of any letters from
19        Laura Siegel?
20                    MR. TOBEROFF:    Asked and
21        answered.  You can answer.
22    A   I don't recall.
23    Q   In your law firm's files are there any
24        letters from Laura Siegel to Michael Siegel?
25                    MR. BERK:       I would object
```

EXHIBIT 52
1850

DON BULSON - 7/19/2011

Page 79

```
1        if it's concerning part of the representation

2        of Michael Siegel.  Any letters that he would

3        have concerning that representation would be

4        privileged.

5                    MR. RYLAND:      Are you

6        instructing --

7                    MR. KLINE:      Are you

8        instructing him not to answer?

9                    MR. BERK:       If it's

10       privileged.

11                   THE WITNESS:    No, no, no.

12                   MR. RYLAND:     You can't say

13       if it's privileged.

14                   MR. BERK:       I mean, I

15       don't know where he got the letters.

16                   MR. KLINE:      Does your

17       law --

18                   MR. BERK:        If he got the

19       letter from Laura Siegel, that's one thing.

20       But if he got the letter from Michael Siegel,

21       then it's privileged.

22                   MR. KLINE:      So are you

23       instructing him not to answer or not?

24                   MR. BERK:       To the extent

25       that he received the letters from Michael
```

EXHIBIT 52
1851

DON BULSON - 7/19/2011

Page 80

```
 1        Siegel and it becomes part of the -- his
 2        representation of Michael Siegel, I instruct
 3        him not to answer.
 4                    MR. RYLAND:    Mr. Bulson, if
 5        you can answer that question, if you can
 6        satisfy --
 7                    THE WITNESS:    Read that
 8        question back.
 9                    MR. RYLAND:    -- the
10        preconditions put on by the Estate of
11        Mr. Siegel.
12   A    What was the question again?
13   Q    Does your law firm have any copies of letters
14        from Laura Siegel to Michael Siegel?
15                    THE WITNESS:    And you have
16        no objection if the letters came from Laura
17        Siegel?
18                    MR. BERK:    Laura Siegel.
19        To you.
20   A    If I received a letter from Laura Siegel to
21        me, a copy would be in our -- in the files
22        that were turned over to the estate.
23   Q    And if Michael Siegel received a letter from
24        his sister pertaining to these Superman
25        negotiations, would copies of those letters
```

EXHIBIT 52
1852

DON BULSON - 7/19/2011

Page 81

```
 1          be in your law firm's files as well?
 2                    MR. BERK:       I don't
 3          understand the question.  If he received them
 4          from Michael Siegel, we object and indicate
 5          that -- and I've said this all along, that
 6          it's privileged.
 7                    MR. KLINE:      So you're
 8          instructing him not to answer that question?
 9                    MR. BERK:       If he received
10          it from Michael Siegel.
11                    MR. RYLAND:     Are you
12          instructing him not to answer the question
13          whether he received the letters from Michael?
14                    MR. BERK:       Yes.
15      Q   Okay.  Let me ask it again, and I -- it might
16          go smoother, and I'm going to have to start
17          charging you guys time for the long
18          objections.  If you're going to say I
19          instruct you not to answer, you should just
20          make that instruction.  Because you're making
21          objections and I think it's leaving everybody
22          up in the air about is an instruction being
23          made or not.  So here's my question --
24                    MR. RYLAND:     So to that
25          point, Counsel, we just need a definitive
```

EXHIBIT 52
1853

DON BULSON - 7/19/2011

Page 82

```
 1        instruction from -- as Mr. Bulson's counsel,
 2        I need a definitive instruction either way.
 3                  MR. KLINE:       So do I for my
 4        record, because I think that we obviously
 5        disagree with the objections and the
 6        instructions.
 7    Q   If Michael Siegel received letters from Laura
 8        Siegel concerning his Superman rights in
 9        these negotiations with Mr. Toberoff, would
10        such letters be kept in your law firm's
11        files?
12                  MR. TOBEROFF:      Vague and
13        ambiguous as to these negotiations with
14        Mr. Toberoff.
15                  MR. BERK:        I don't have
16        any objection to him answering the question
17        that if he did somehow receive these
18        documents whether they would be in that file,
19        which is privileged.
20                  MR. TOBEROFF:      Okay.  So you
21        can answer that question.
22    A   If I received letters from Michael Siegel,
23        they would be in our files.
24    Q   Did Michael Siegel share letters with you
25        that he received from his sister Laura?
```

EXHIBIT 52
1854

DON  BULSON  -  7/19/2011

Page 83

```
 1                    MR. BERK:        That's

 2      privileged, and I object to that and instruct

 3      you not to answer.

 4                    MR. KLINE:        So any

 5      communication you're saying, anything that he

 6      communicates to him, even a nonprivileged

 7      letter, you're instructing him not to answer?

 8                    MR. TOBEROFF:      Excuse me.

 9      Excuse me.  I want to object here.  You just

10      launched into a speech about how you're going

11      to clock us with our time -- don't interrupt

12      me -- because he isn't making his

13      instructions clearly.  Yet when he makes his

14      instruction clearly, you engage in a long

15      colloquy testing his instruction, asking him

16      questions about it, and then repeating the

17      same question again to Mr. Bulson.

18                    MR. KLINE:        I was actually

19      going to see if we could --

20                    MR. TOBEROFF:      So our time is

21      valuable also.

22                    MR. KLINE:        In the

23      beginning of the discussion --

24                    MR. TOBEROFF:      After you ask

25      the question and he makes the instruction,
```

EXHIBIT 52
1855

DON BULSON - 7/19/2011

Page 84

1    move on, Counselor.  Don't ask the same thing

2    again and don't engage me in colloquy.

3              MR. KLINE:       Marc, it's my

4    deposition.  I was going to see if we could

5    expedite things by having an agreement that

6    it's your position that any communication

7    between -- we disagree with this position.  I

8    mean, let's just stipulate.

9              MR. BERK:        I'll state it

10    very clearly.

11              MR. KLINE:       Any

12    conversation from Michael to Don --

13              MR. BERK:        -- is

14    privileged, and I instruct him not to answer

15    as to any communications he had in the

16    representation of Michael Siegel, I instruct

17    him not to answer concerning any of those

18    communications.

19         Any documents he received in the

20    representation --

21              MR. KLINE:       Being Don

22    Bulson is the "he" in that sentence?

23              MR. BERK:        Any documents

24    Mr. Bulson received concerning his

25    representation of Michael Siegel is

EXHIBIT 52
1856

DON BULSON - 7/19/2011

Page 85

1      privileged, and I instruct him not to answer

2      concerning those.

3                    MR. KLINE:      And just to

4      give two examples, if -- and we've covered

5      one, which is if Laura Siegel sends a letter

6      to Michael, Michael hands it to Mr. Bulson,

7      you're saying I can't ask questions about his

8      firm's possession of that document?

9                    MR. BERK:       I'm saying

10     that any letter that he received from Michael

11     Siegel is privileged.  I don't care where it

12     came from or whatever, it's privileged as to

13     Michael Siegel and him.

14                    MR. KLINE:      Okay.

15                    MR. BERK:       And whether

16     you can get this -- the questions answered

17     some other way, that's fine.  But as far as

18     him receiving it concerning his

19     representation of Michael Siegel, it is

20     privileged.

21                    MR. KLINE:      Okay.  And --

22                    MR. BERK:       I don't care

23     if it's out there somewhere else, that's

24     fine.

25                    MR. KLINE:      Understood.

EXHIBIT 52
1857

1          So just -- so any letter that Mr. Bulson is

2     handed by Michael Siegel, no matter the

3     content, you're taking the position I can't

4     ask questions about it?

5               MR. BERK:       I'm saying

6     it's privileged as to his representation of

7     Michael Siegel.

8               MR. KLINE:       Understood.

9     And so to go beyond documents, if Michael

10    Siegel received a telephone call from Marc

11    Toberoff, and Marc Toberoff made an offer,

12    and I'm not saying you agree that that

13    happened, but if he made an offer for his

14    Superman rights, you're not going to let --

15              MR. BERK:       I'm saying if

16    he communicates it to Mr. Bulson, that is

17    privileged.

18              MR. KLINE:       Just the mere

19    fact of, hey, I got a call.  Here's what he

20    offered.

21              MR. BERK:       Right.  First

22    of all you get into hearsay-type things.  But

23    as far as his representation of Michael

24    Siegel, any conversations that he had with

25    Michael Siegel concerning his representation

EXHIBIT 52
1858

DON BULSON - 7/19/2011

Page 87

1         is privileged as to Michael Siegel.

2                    MR. KLINE:       That's your

3         position, and you'll instruct him to

4         answer -- not answer questions on this topics

5         all day long?

6                    MR. BERK:       Correct.

7         Correct.

8                    MR. KLINE:       And it's

9         our -- we respectfully disagree, and we're

10        going to take that issue up with the judge.

11                   MR. BERK:       Okay.

12                   MR. KLINE:       I just don't

13        want to spend five hours asking all of these

14        questions and having you have to make the

15        instruction again and again and again.    I

16        just wanted -- I was actually trying to save

17        us a bunch of time, Mr. Toberoff, and maybe

18        get us on an earlier plane.

19             So I think I understand your position.

20        And you understand my position, I want to ask

21        him a whole host of questions and whole host

22        of topics, but you've kind of cut off these

23        avenues of discussion.

24                   MR. BERK:       And I wish to

25        apologize, but I was not consulted concerning

EXHIBIT 52
1859

DON BULSON - 7/19/2011

Page 88

```
 1          the setting of this deposition at all.  I

 2          found out about it very recently.  And as far

 3          as my representation of the Estate of Michael

 4          Siegel, we strictly want to make our

 5          objections known as to the privilege.

 6                     MR. KLINE:        Understood.

 7          And I appreciate you doing that.

 8                     VIDEO TECHNICIAN:  Sir, you

 9          have four minutes left on this tape.

10                     MR. KLINE:        Why don't we

11          stop there.

12                     VIDEO TECHNICIAN:  We're off

13          the record.  This ends Tape No. 1 in the

14          deposition of Don Bulson.  The time is 11:09.

15          (Recess from 11:09 a.m. to 11:19 a.m. )

16                     VIDEO TECHNICIAN:  We're back

17          on the record at 11:19.

18    BY MR. KLINE:

19    Q     Okay.  I'm going to refer you to Pages 163 to

20          165 of your prior deposition.

21                     MR. RYLAND:       Mind if I pull

22          them and hand them to him, Counsel?

23                     MR. KLINE:        Not at all.

24    Q     And I'd asked you to start on Page 162 at

25          Line 20 where Mr. Weinberger avers to
```

EXHIBIT 52
1860

DON BULSON - 7/19/2011

Page 89

```
 1          Exhibit 37, and read down to Page 164 where

 2          Exhibit 38 is marked.  Mr. Bulson, if you

 3          don't mind, can you take a look at Exhibit 37

 4          which is also in front of you, which is a

 5          November 12th, 2004 email from you to Marc

 6          Toberoff that begins, Marc, I have now had

 7          the opportunity to meet with Mike Siegel and

 8          discuss your, quote, investor's, end quote,

 9          latest proposal.  Do you see that email?

10     A    Yes.

11                     - - - - -

12          (Plaintiff's Exhibit 43 was marked.)

13                     - - - - -

14     Q    And I'm going to give you what is marked

15          Exhibit No. 43, and ask you to -- and this is

16          a brief, a discovery brief that was filed in

17          this case, and I'd ask you to look at

18          Page 18, Lines 7 through 8.  And I'll

19          represent to you, Mr. Bulson, that defendants

20          have taken a position in this case that the

21          quote, unquote, investor referred to in

22          Exhibit 37 of your -- of your prior

23          deposition, and discussed at Pages 162

24          through 164 of your prior deposition, this

25          investor was a fellow named Ari Emanuel who
```

EXHIBIT 52
1861

DON BULSON - 7/19/2011

Page 90

```
 1            is a talent agent in Los Angeles.  And I just
 2            wanted to confirm a couple things.  One,
 3            Mr. Toberoff never told you that the quote,
 4            unquote, investor was Ari Emanuel, correct?
 5                     MR. BERK:        I believe that
 6            was already asked and answered before as
 7            either he didn't remember or he didn't know
 8            or he doesn't remember him saying that.
 9                     MR. KLINE:        Well, let me
10            give an answer to the question, because
11            you've just given three versions of that.
12      Q     Do you remember Mr. Toberoff telling you that
13            the, quote, unquote, investor was Ari
14            Emanuel?
15                     MR. TOBEROFF:     Before you
16            answer, I'd just like to object.  You
17            mischaracterized, Mr. Emanuel is not simply a
18            talent agent, he was the founder of Endeavor,
19            which is now William Morris Endeavor, the
20            second largest agency in all -- in show
21            business?
22                     MR. KLINE:        And is the
23            subject of the character Ari on Entourage,
24            and his brother was the former chief of staff
25            of the president of the United States.  He's
```

EXHIBIT 52
1862

DON BULSON - 7/19/2011

Page 91

```
 1        one of the most powerful men in all of

 2        Hollywood.

 3                    MR. TOBEROFF:    That's why you

 4        can't taken his deposition, right?

 5   Q    Mr. Bulson, did Mr. Toberoff ever tell you

 6        that the investor was Ari Emanuel?

 7                    THE WITNESS:    Is it okay to

 8        answer?

 9                    MR. TOBEROFF:    You already

10        answered, but you can answer again.

11   A    He never told me that.

12   Q    Did Mr. Toberoff tell you that as of --

13                    MR. BERK:    Are you

14        through with this document?

15                    MR. KLINE:    For the

16        moment.

17                    MR. BERK:    Okay.

18   Q    Did Mr. Toberoff tell you that as of

19        February 12th, 2002, he had a joint venture

20        with Mr. Ari Emanuel?

21                    THE WITNESS:    Okay to

22        answer?

23                    MR. BERK:    Yeah.

24   A    He never told me that.

25   Q    Did Mr. Toberoff tell you that as a part of
```

EXHIBIT 52
1863

DON BULSON - 7/19/2011

Page 92

```
 1          this joint venture with Mr. Emanuel, had the,

 2          quote, unquote, investor referenced in

 3          Exhibit 37 purchased Michael Siegel's

 4          interests, Mr. Toberoff himself would have

 5          had an ownership interest in Michael Siegel's

 6          interests?

 7                     THE WITNESS:    Okay to answer

 8          it?

 9                     MR. BERK:       (Nods head.)

10    A     He never told me that.

11    Q     Is that information --

12                     MR. KLINE:      Lacks

13          foundation and I believe misstates the

14          record.

15    Q     Is that information you would have wanted to

16          know in your negotiations with Mr. Toberoff?

17                     MR. BERK:       I object.

18          Instruct him not to answer, because it would

19          concern his representation of Michael Siegel.

20    Q     Is that information that you would normally

21          expect someone to disclose to you if they

22          were referring to a third-party unnamed

23          investor that they themselves would have had

24          an ownership interest in the transaction that

25          they were proposing?
```

Merrill  Corporation  -  Los Angeles
800-826-0277                          www.merillcorp.com/law

EXHIBIT 52
1864

DON BULSON - 7/19/2011

Page 93

```
 1                    MR. TOBEROFF:   Objection.

 2        Lacks foundation.  Assumes facts not in

 3        evidence.

 4                    MR. BERK:        Speculative.

 5        I object as well.  Since if he would -- if it

 6        would concern the representation of the

 7        estate.

 8                    MR. TOBEROFF:   Are you

 9        instructing him --

10                    MR. BERK:         Instruct not

11        to answer.  How's that?

12   Q    It says here on Page 164 that you pushed

13        Mr. Toberoff to tell you who the investor

14        was.  Do you see your testimony there, sir?

15        It's Page 164, Lines 5 through 6?

16                    MR. RYLAND:     Counsel, I'll

17        show him mine.

18                    MR. KLINE:        Please,

19        Mr. Ryland.

20   A    I see that.

21   Q    And yet he never told you that, A,

22        Mr. Emanuel was the investor or, B, that

23        Mr. Toberoff himself had a business deal with

24        Mr. Emanuel, correct?

25                    MR. BERK:        I think we
```

EXHIBIT 52
1865

DON BULSON - 7/19/2011

1        already covered that.

2                    MR. TOBEROFF:    Asked and

3        answered.    Is there a jury in this room?

4   A    Are there two questions there?    Can you

5        repeat the question?

6                    MR. KLINE:        Would you mind

7        reading it back, please?

8                    MR. RYLAND:        I think the

9        question is just compound.

10  A    Why don't you split it up into two parts,

11       then I can -- first part -- well, you ask the

12       question.

13  Q    You pushed for an answer who is the investor,

14       correct?

15                   MR. TOBEROFF:    Assumes facts.

16       Lacks foundation.

17  A    That is what was in the testimony here, yes.

18  Q    And he didn't tell you that it was Ari

19       Emanuel, correct?

20  A    That is correct.

21  Q    And he didn't disclose to you, he being

22       Mr. Toberoff, that he had a business deal

23       with Mr. Emanuel dating back to 2002,

24       correct?

25                   MR. TOBEROFF:    Assumes facts.

EXHIBIT 52
1866

DON BULSON - 7/19/2011

```
 1        Lacks foundation.  Compound.

 2   A    That's correct.

 3   Q    Let's take a look at Exhibit No. 44.

 4                   - - - - -

 5        (Plaintiff's Exhibit No. 44 was marked.)

 6                   - - - - -

 7   Q    Just take a chance to go through this

 8        document if you would, Mr. Bulson.

 9                   MR. TOBEROFF:    This document

10        is, I believe is subject to a protective

11        order and was produced in the Siegel case

12        marked confidential, so it would be -- cannot

13        be used by DC publicly in this case.  That

14        protective order would still pertain.

15                   MR. KLINE:      So you're just

16        requesting that if we use the document in the

17        case we --

18                   MR. TOBEROFF:    If you file

19        any portion of the transcript pertaining to

20        this or any information in it, it has to be

21        filed under seal.

22                   MR. KLINE:      Duly noted.

23   A    Should I not be looking at this?

24   Q    No, you absolutely can look at it.

25                   MR. TOBEROFF:    Actually, you
```

EXHIBIT 52
1867

DON BULSON - 7/19/2011

Page 96

```
 1        just actually breached the protective order

 2        by giving him a copy of it.

 3                  MR. KLINE:      By showing a

 4        witness in this case?

 5                  MR. TOBEROFF:    Yeah, he's a

 6        third party.

 7                  MR. KLINE:      And you

 8        produced this in this case.

 9                  MR. TOBEROFF:    Subject to a

10        protective order, which means it can't be

11        disclosed to third parties.  That's why it

12        has a big confidential stamp on the top.

13                  MR. KLINE:      That's your

14        position.  I can't even show him this

15        document?

16                  MR. TOBEROFF:    What do you

17        mean show him?  You're disclosing the

18        document and the contents to him.

19                  MR. KLINE:      You're taking

20        the position, even though there's no

21        protective order in this case, and you

22        produced this document in this case --

23                  MR. TOBEROFF:    Yes, because

24        your client DC who is the plaintiff in this

25        case signed a protective order in the other
```

EXHIBIT 52
1868

DON BULSON - 7/19/2011

Page 97

```
 1    case which pertains to this document.

 2              MR. KLINE:     You reproduced

 3    this document in this case without any

 4    protective order.

 5              MR. TOBEROFF:    It's subject

 6    to the protective order from the prior case.

 7              MR. KLINE:     Where does it

 8    say that in your production?

 9              MR. TOBEROFF:    The protective

10    order doesn't just pertain to that particular

11    case.  Anyway, you can't show him this

12    document.  It's subject to protective order.

13              MR. KLINE:     So I'll

14    assume -- I'm going to ask him one question

15    about the document.  Don't look at its

16    contents?

17              MR. TOBEROFF:    Actually, I'd

18    like you to give the document back to him.

19  Q  Did Mr. Toberoff ever share with you his

20    business agreements with Mr. Emanuel?

21              MR. TOBEROFF:    You can answer

22    that.

23  A  No.

24              MR. KLINE:     And is it your

25    representation, Mr. Toberoff, that in
```

EXHIBIT 52
1869

DON BULSON - 7/19/2011

Page 98

1    producing this document in this case by

2    averting the Bates numbers and lines numbers

3    you specifically said and we want it treated

4    confidential and subject to the protective

5    order?

6              MR. TOBEROFF:   We're not

7    canceling a protective order that pertains to

8    DC in the prior case.

9              MR. KLINE:      You're not

10   answering my question.

11             MR. TOBEROFF:   I'm not going

12   to answer it your way, I'm going to answer it

13   my way since it's not my deposition.

14             MR. KLINE:      Okay, we may

15   have to come back.

16             MR. TOBEROFF:   I'm asserting

17   to confidentiality agreement which pertains

18   to your client.

19             MR. KLINE:      So you're

20   refusing to --

21             MR. TOBEROFF:   I'm not only

22   refusing you.  I believe you just breached

23   that agreement.

24             MR. KLINE:      I don't think

25   we did at all, number one; and number two,

EXHIBIT 52
1870

DON BULSON - 7/19/2011

Page 99

1       what I'm asking you is, can we ask him

2       questions about this document so we don't

3       have to come back here and do this a second

4       time?

5                    MR. TOBEROFF:    About the

6       document, no.  You can't show him the

7       document.  The document is subject to a

8       protective order.

9                    MR. KLINE:    I don't

10      believe it was produced pursuant to a

11      protective order in this case.  We'll table

12      that for a later debate, I'm just telling you

13      right now; I wish we could expedite this, ask

14      our questions, and not have to come back and

15      ask on this.  But I understand your position.

16                   MR. TOBEROFF:    Trying to file

17      a duplicative action does not vitiate the

18      protective order that binds your client from

19      the prior case.  That's our position.  And

20      it's not a position, it's clear.

21                   MR. KLINE:    I understand

22      your objection.  We'll keep moving along.

23   Q  Did Mr. Toberoff in the negotiations with you

24      concerning the, quote, unquote, investor's

25      interest in purchasing Michael Siegel's Peter

EXHIBIT 52
1871

DON BULSON - 7/19/2011

Page 100

1        the Superman interest disclose to you that he

2        and Mr. Emanuel had signed an October 2002,

3        an as of dated October 2002 contract with the

4        Siegels that entitled them --

5                    MR. TOBEROFF:    Objection.   If

6        you're disclosing another confidential

7        document of substance --

8                    MR. KLINE:    There's

9        nothing marked confidential in this document.

10                   MR. TOBEROFF:    What are you

11       reading from?

12                   MR. KLINE:       I'm reading

13       from the IP Worldwide agreement that has no

14       confidential markings on it with Laura Siegel

15       and Joanne Siegel and you.  It has not a

16       single confidential marking on it.

17                   MR. TOBEROFF:    Can I see

18       that?

19                   MR. KLINE:    Jason give

20       Mr. Toberoff a copy, please.  And at his last

21       deposition Mr. Bulson was shown agreements

22       between you, Mr. Emanuel, the Siegels and

23       you, and you made no such objections.

24                   MR. TOBEROFF:    Show me.

25                   MR. KLINE:       I refer you to

EXHIBIT 52
1872

DON BULSON - 7/19/2011

1          Exhibit -- Exhibit 30 of Mr. Bulson's prior

2     deposition is an IP Worldwide agreement

3     between Joanne Siegel, Laura Siegel, Ari --

4     Ariel Emanuel and yourself dated 1-22-2003.

5                    MR. TOBEROFF:    This agreement

6     that's marked confidential is not a part of

7     one of these exhibits, correct, for which he

8     testified?

9                    MR. KLINE:      Correct.

10                   MR. TOBEROFF:    Okay.

11   Q   So --

12                   MR. TOBEROFF:    I need to find

13     out whether these were -- whether these were

14     marked as confidential in the other case.

15                   MR. KLINE:      They're not so

16     marked.

17                   MR. TOBEROFF:    Well, I don't

18     know whether you redacted them or not.

19                   MR. KLINE:      And one of

20     these IP Worldwide agreements was used in his

21     last deposition over no objection by you.

22                   MR. TOBEROFF:    Could I see

23     that?

24                   MR. KLINE:      You can't see

25     my copy, but we'll give you a copy of Bulson

EXHIBIT 52
1873

DON BULSON - 7/19/2011

Page 102

1          Exhibit 30 from the last deposition.  And

2          we'll go off the record while we clarify

3          these issues.

4                    VIDEO TECHNICIAN:  We're off

5          the record.  The time is 11:35.

6                    MR. TOBEROFF:    Actually,

7          before we go off the record --

8                    MR. RYLAND:     He's off.

9                    MR. TOBEROFF:    You need to

10         ask -- in the future you need to ask me if we

11         can go off the record.

12          (Recess from 11:35 a.m. to 11:48 a.m. )

13                    VIDEO TECHNICIAN:  We're back

14         on the record, the time is 11:48.

15    BY MR. KLINE:

16    Q   Giving you Exhibits 45 and 46, Mr. Bulson,

17         which were previously marked as Exhibits 30

18         and 31 in your last deposition.

19                    - - - - -

20     (Plaintiff's Exhibits 45 and 46 were marked.)

21                    - - - - -

22    Q   Just take a second to peruse them if you

23         don't mind.

24    A   I have skimmed it.

25    Q   Mr. Bulson, just to reconfirm, Mr. Toberoff

EXHIBIT 52
1874

DON BULSON - 7/19/2011

Page 103

```
 1          didn't provide you these documents in

 2          connection with the negotiations you and he

 3          were having in 2003, 2004, 2005 regarding

 4          the, quote, unquote, investor, correct?

 5                    THE WITNESS:     Okay to

 6          answer?

 7                    MR. TOBEROFF:     Yes.

 8    A     That's correct.

 9    Q     Nor did he disclose that as of January -- or

10          in a document dated January 21st, 2002, and

11          now I'm referring to what we've marked as new

12          Exhibit 46, that's old Exhibit 30 in

13          Paragraph No. 1, that Ari Emanuel will

14          attempt to purchase all of Michael Siegel's

15          rights, title, and interest in Superman,

16          Superboy, and Specter to be financed by AA,

17          correct?

18    A     What was the question?

19    Q     He didn't disclose that Ari Emanuel will

20          attempt to purchase all of Michael

21          Siegel's --

22    A     That's correct.

23                    MR. TOBEROFF:     What is the

24          Exhibit 31 in this --

25                    MR. KLINE:      It's 45 in
```

EXHIBIT 52
1875

DON BULSON - 7/19/2011

Page 104

1      this case.

2                    MR. RYLAND:      And 30 is 46.

3                    MR. KLINE:      Correct.

4                    MR. RYLAND:      Thanks.

5   Q   Turning to Exhibit 31, from the old

6       deposition which is 45 in this new

7       deposition, Paragraph 6, which is on a page

8       marked IPW 00002, did Mr. Toberoff disclose

9       to you that he and Mr. Emanuel's company

10      IPW --

11                   MR. TOBEROFF:    It's IP

12      Worldwide is the name of the company.

13                   MR. KLINE:      IP Worldwide,

14      pardon me.

15  Q   -- was entitled to a fee of 10 percent of any

16      and all gross compensation in connection with

17      their services under the agreement?

18  A   That was not disclosed to me.

19  Q   Turning to Paragraph 8, did Mr. Toberoff

20      disclose to you that the Siegels, who are

21      referred to as owner in this agreement,

22      capital O, warranted and represented that

23      they would not transfer, assign, license, or

24      in any manner encumber the rights, the

25      Superman rights and Specter rights, during

EXHIBIT 52
1876

DON BULSON - 7/19/2011

Page 105

```
 1          the term or extended term other than through

 2          or as a result of IPW it says here, but it's

 3          IP Worldwide according to Mr. Toberoff,

 4          exclusive representation hereunder?

 5     A    Assuming that the owner was Joanne or Laura

 6          Siegel, then that was not disclosed to me.

 7     Q    And I think if you look at the first page of

 8          the first -- of the document, it says, this

 9          letter shall confirm the agreement and

10          understanding between you, owner, and us,

11          IPW, do you see that?

12     A    I see that.

13               VIDEO TECHNICIAN:   Excuse me,

14          sir.  You're coming through a little faint.

15          Is your mic on?

16               MR. KLINE:      I'm sorry.

17          It's over here.

18              Now, I asked a question like this

19          before.  You instructed him not to answer,

20          I'll -- let me know.

21     Q    Is this information you would have liked to

22          have known from Mr. Toberoff given you were

23          pushing him to tell you who the investor was?

24               MR. BERK:       That's an

25          interesting speculative question.  You know,
```

EXHIBIT 52
1877

DON BULSON - 7/19/2011

Page 106

1          I really don't have any objection to the

2          answer other than in a speculative way.

3     A    I would like to have known that information.

4     Q    Given that you were pushing Mr. Toberoff to

5          tell you who the investor was, would it have

6          been important to you to know that he had his

7          own pecuniary interest in these Superman

8          rights?

9                    MR. TOBEROFF:    Lacks

10         foundation.  Misstates the -- misstates the

11         documents.

12                   MR. BERK:       You could --

13         if it was important to you, you could answer

14         that.

15    A    It may have been important.

16    Q    Why?

17    A    I haven't thought about it, because -- I'd

18         always like to know the parties.  If I'm

19         entering into negotiations, I always like to

20         know who I'm negotiating with.

21    Q    And you asked him and he didn't tell you,

22         correct?

23                   MR. TOBEROFF:    Misstates his

24         testimony.

25    A    He did not tell me who the so-called investor

EXHIBIT 52
1878

DON BULSON - 7/19/2011

Page 107

```
 1        is.

 2   Q    And he referred to him in emails as if it was

 3        a third person, correct?

 4                  MR. BERK:        What emails

 5        are you referring to?

 6                  MR. KLINE:        Exhibits 34

 7        through 42.

 8   Q    Let's take a look at an example.  Let's look

 9        at Exhibit 36.  This is an August 6th,

10        2003 letter from the law offices of Marc

11        Toberoff to you, Mr. Bulson, correct?

12   A    That appears to be the case, yes.

13   Q    And if you look one, two, three, four, five

14        paragraphs down, can you read that paragraph,

15        please?

16   A    It was not therefore not -- it was therefore

17        not surprising that the investor rejected

18        your counteroffer as unrealistic.  The

19        counteroffer was high, was so high that it

20        may have scared away a strong, potential

21        investor.  Exactly what I mentioned when I

22        asked you whether you were sure that I should

23        communicate such a high counteroffer.

24   Q    And Mr. Toberoff in writing that paragraph

25        didn't disclose to you that his business
```

EXHIBIT 52
1879

DON BULSON - 7/19/2011

Page 108

| 1 | | partner, Mr. Ari Emanuel, was that investor, |
|---|---|---|
| 2 | | correct? |
| 3 | A | That's stating the obvious. |
| 4 | | MR. TOBEROFF:    Asked and |
| 5 | | answered. |
| 6 | Q | And why would it be important for you to know |
| 7 | | when reading a paragraph like this that he |
| 8 | | himself, Mr. Toberoff, is a business partner |
| 9 | | with the, quote, unquote, investor? |
| 10 | | MR. TOBEROFF:    Are you asking |
| 11 | | for his mental impressions as an attorney? |
| 12 | | That's work product, but it's not for me to |
| 13 | | assert. |
| 14 | | MR. BERK:        Would you |
| 15 | | repeat the question?  I'm sorry.  Read back. |
| 16 | | (Record read.) |
| 17 | | MR. BERK:        You can |
| 18 | | answer. |
| 19 | A | I would like to know everything about the |
| 20 | | parties involved in the transaction as a |
| 21 | | general rule. |
| 22 | Q | Is it common in your experience -- strike |
| 23 | | that. |
| 24 | | Did Mr. Toberoff disclose to you that |
| 25 | | another of his companies, Pacific Pictures, |

DON BULSON - 7/19/2011

Page 109

```
 1        as of the date of this letter, August 6th,

 2        2003, had acquired a 50 percent interest of

 3        the Shuster family's putative copyright

 4        interests in Superman?

 5                    MR. BERK:      You may

 6        answer.

 7    A   Not to my recollection.

 8    Q   Let me show you a few documents and see if he

 9        shared them with you.

10                    MR. RYLAND:      Can we catch a

11        break over the next 15?

12                    MR. KLINE:      Yeah,

13        absolutely.  And what do you guys want to do

14        with lunch?

15                    MR. RYLAND:      We're happy to

16        go through if we can get this thing done.

17                    MR. KLINE:      I don't think

18        so.

19                    MR. RYLAND:      What do you

20        mean you don't think so?

21                    MR. KLINE:      I think we

22        should take a lunch break.

23                    MR. RYLAND:      How long do

24        you think we'll go?

25                    MR. KLINE:      I don't have
```

EXHIBIT 52
1881

DON BULSON - 7/19/2011

Page 110

```
 1          an estimate right now, because I'm not sure
 2          what areas they're going to let me ask
 3          questions or not.  I wish I did.
 4                    MR. RYLAND:     We still have
 5          our obligations this afternoon.
 6                    MR. KLINE:      Completely
 7          understood.  And then you saw my email
 8          reserving rights, that, hey, we need our full
 9          time.
10                    MR. RYLAND:     Does 12:15
11          work for a break?  I don't know what your
12          line of questioning is like.
13                    MR. KLINE:      Why don't you
14          take a break right now.  We'll get our ducks
15          in a row in terms of the documents.
16                    MR. RYLAND:     Okay.
17                    MR. KLINE:      And then maybe
18          like 20 minutes of testimony, take a really
19          quick lunch, and then get back in.
20                    MR. RYLAND:     Okay.  Sounds
21          good.
22                    THE WITNESS:    So we're
23          convening when or we're continuing?
24                    MR. RYLAND:     Yeah, we're
25          going off the record.
```

EXHIBIT 52
1882

DON BULSON - 7/19/2011

Page 111

```
 1                    VIDEO TECHNICIAN:  We're off
 2      the record.
 3        (Recess from 12:01 p.m. to 12:16 p.m. )
 4                    VIDEO TECHNICIAN:  We're back
 5      on the record.  The time is 12:16.
 6   BY MR. KLINE:
 7   Q   Here you go, Mr. Bulson.  These were
 8       Exhibits 10 and 13 to the Peary deposition
 9       that took place a couple weeks ago.  And I
10       just wanted to confirm that Mr. Toberoff
11       never shared these joint venture agreements
12       between Pacific Pictures Corporation and the
13       Shuster/Peary family with you, correct?
14                    THE WITNESS:      Okay to
15       answer?
16                    MR. BERK:      Yeah.
17   A   That's correct.
18   Q   And turning to Paragraph 8 of Exhibit 10 for
19       a moment.
20                    MR. TOBEROFF:      Are you
21       marking these in this --
22                    MR. KLINE:      I'm just going
23       to use the ones from Peary.
24   Q   Looking at Paragraph 8 of Exhibit 10, did he
25       disclose, for example, that upon the
```

EXHIBIT 52
1883

DON BULSON - 7/19/2011

Page 112

```
 1        termination of this venture for any reason,

 2        the venture would hold 50 percent of the

 3        Shuster's Superman rights, and the Shusters

 4        would hold the other 50 percent?

 5                    MR. TOBEROFF:    You're reading

 6        from an agreement dated 2001, and this

 7        agreement was terminated, so I don't know why

 8        you're reading from this agreement.  It's a

 9        long-term -- this was terminated, I believe,

10        in 2003.

11   Q    Mr. Bulson, did he represent --

12                    MR. KLINE:      That's a

13        speaking objection and argument.

14   Q    Mr. Bulson, did he represent to you that he

15        had signed, his company Pacific Pictures, had

16        signed -- Mr. Toberoff disclose to you that

17        his company Pacific Pictures in

18        November 2001 had signed an agreement in

19        which -- let's look at Paragraph 5 for

20        example.

21   A    I prefer you didn't use, for example.

22   Q    Okay.  Let's look at Paragraph 5.  Did he

23        disclose to you that he had made a deal with

24        the Shuster family that Pacific Pictures,

25        Mr. Toberoff's company, would be entitled to
```

EXHIBIT 52
1884

DON BULSON - 7/19/2011

Page 113

```
 1        50 percent of the Shuster estate -- in the

 2        Shuster Superman copyright interest and the

 3        Shusters would have the other half?

 4                    MR. TOBEROFF:    Objection.

 5        Assumes facts and lacks foundation.

 6                    MR. BERK:        I don't have

 7        any problem with it.

 8   A    No such disclosure was made to me.

 9   Q    Did he disclose as set forth in Paragraph 2

10        of Exhibit 10, looking at the penultimate

11        sentence, the consideration from PPC's

12        contributions to the venture and mutual

13        covenants contained herein, claimants, and

14        they're defined as --

15   A    Wait a minute.  I'm not with you.

16   Q    Second-to-the-last sentence of Paragraph 2.

17   A    Okay.  Let's find the first one.  In

18        consideration, that's the one you're

19        referring to there?

20   Q    Yep.  And claimants if you'll note is defined

21        up top here as Mark Peary f/k/a Mark Warren

22        Peary, and also Jean Peavy, do you see that?

23   A    I see Jean and Mark, yes.

24   Q    And it says, the purposes of forming this

25        joint venture are retrieving, enforcing,
```

EXHIBIT 52
1885

DON BULSON - 7/19/2011

Page 114

```
 1          exploiting all of Joe Shusters' and his

 2          estate's rights, claims, copyrights,

 3          property, title, and interest in and to Joe

 4          Shuster's creations, do you see that there?

 5     A    Uh-huh, I see that.

 6     Q    And in Paragraph No. 1, the rights shall

 7          include without limitation all current and

 8          future rights, claims, title, copyrights,

 9          skipping a few words, and all rights to

10          proceeds from Superman?

11     A    I see that paragraph, yes.

12     Q    Or Superman stories.  And at the end there it

13          includes Superboy and Smallville, do you see

14          that?

15     A    I see that.

16     Q    And then going down to Paragraph 2 the

17          sentence says, I'm having you focus on, it

18          says, in consideration for PPC's

19          contributions to the venture, and the mutual

20          covenants contained herein, claimants hereby

21          transfer and assign to the venture their

22          rights, titles, and interest in the rights,

23          do you see that?

24     A    Uh-huh.

25     Q    Did you Mr. Toberoff disclose these terms to
```

EXHIBIT 52
1886

DON BULSON - 7/19/2011

Page 115

```
 1          you when you were having your negotiations in

 2          2003, 2004, and 2005?

 3                    MR. BERK:        You can

 4          answer.

 5     A    These terms as specified in Paragraphs 1 and

 6          2, no.

 7     Q    And you'll notice on the last page of this

 8          document, it says 137 on the bottom right,

 9          it's signed by Marc Toberoff, President of

10          Pacific Pictures Corporation, November 28th,

11          2001, do you see that?

12     A    I see that.

13     Q    Did he disclose to you that he had a separate

14          company that he was the president of called

15          Pacific Pictures?

16     A    Not to my recollection.

17     Q    Did he disclose to you that he had a separate

18          company that was purchasing other Superman

19          rights other than Mr. Siegel's?

20                    MR. TOBEROFF:      Objection.

21          Vague.  Unless you are speaking about the

22          negotiations with Don Bulson in or about

23          August of 2003 regarding Michael Siegel's

24          interest.  Is that what you're speaking

25          about?
```

EXHIBIT 52
1887

DON BULSON - 7/19/2011

Page 116

```
 1    Q    I'm talking about in the course of your

 2         negotiations with Mr. --

 3                    MR. TOBEROFF:    In 2003?

 4    Q    In 2003, 2004, 2005, did Mr. Toberoff ever

 5         disclose to you that he had a separate

 6         company --

 7                    MR. TOBEROFF:    In 2001?

 8    Q    -- that had gone out and purchased?

 9                    MR. KLINE:      At anytime.

10    Q    Had gone out and purchased Superman rights

11         from the Shusters?

12    A    Not to my recollection.

13                    MR. TOBEROFF:    Misstates the

14         document.  There's no purchase stated in that

15         document.

16    Q    Same question using the word "assignment,"

17         that he had obtained an assignment?

18    A    Not to my recollection.

19                    MR. TOBEROFF:    Misstates the

20         document.

21    Q    Same question using the word hereby transfer

22         and assign to the venture their rights, title

23         and interest in the rights?

24    A    Not to my recollection.

25    Q    Did Mr. Toberoff disclose to you Exhibit 13,
```

EXHIBIT 52
1888

DON BULSON - 7/19/2011

Page 117

```
 1        which is dated October 27th, 2003, at any
 2        point in your negotiations between 2003 and
 3        2005?
 4   A    I don't recall ever seeing this letter.
 5   Q    And I'll confirm for you, Mr. Bul -- let's
 6        just take a quick look at this agreement.
 7        You see that it is signed as Marc Toberoff,
 8        President on the last page there,
 9        October 27th, 2003?
10   A    I see that.
11   Q    Now, taking a quick look at Exhibit 10 again,
12        which is dated November 23rd, 2001, can you
13        take a quick look at that?
14                    MR. RYLAND:      This one.   10?
15                    MR. KLINE:       10.
16   A    Oh.
17   Q    Okay.  And then I want you to take a look.
18        I'm going to go through with you Exhibits 34,
19        35, 36, all the way through No. 42, so
20        there's a stack of those.
21                    MR. BERK:        Is this the 10
22        you're referring to, joint venture agreement?
23                    MR. KLINE:       It is,
24        correct.
25                    MR. BERK:        Okay.
```

EXHIBIT 52
1889

DON BULSON - 7/19/2011

Page 118

1          MR. RYLAND:     Which

2     documents are you asking him about?

3          MR. KLINE:     I'm going to

4     ask him about 34 and 10 right now.

5          MR. RYLAND:     34 and 10.

6          MR. KLINE:     And maybe

7     Jason can help clean up some of the exhibits

8     we're not asking about, just so they're out

9     of your way and not confusing matters.

10         MR. BERK:     Is this 34?

11         MR. KLINE:     It sure is.

12         MR. BERK:     Okay.

13   Q    So 34 is a June 18th letter from you,

14        Mr. Bulson, June 18th, 2003, to Marc

15        Toberoff, correct?

16   A    Uh-huh, that's what it appears to be.

17   Q    And it says, I have discussed with Michael

18        the offer you passed on from a potential

19        investor who is interested in purchasing

20        Michael's interest in the Superman copyright.

21        And you say the amount offer is not

22        acceptable to Michael, do you see that?

23   A    Uh-huh.

24   Q    And that letter postdates Exhibit 10, which

25        is a November 23, 2001 agreement, correct?

EXHIBIT 52
1890

DON BULSON - 7/19/2011

Page 119

```
 1   A   That would appear to be correct.

 2   Q   Would you have wanted to know when

 3       Mr. Toberoff was trying to purchase

 4       Mr. Siegel's rights on behalf of this unnamed

 5       potential investor, that Mr. Toberoff had a

 6       company named Pacific Pictures that had

 7       created a joint venture in which the Shusters

 8       had put half -- had put all of their Superman

 9       interests?

10               MR. TOBEROFF:    Calls for --

11               MR. BERK:        I mean, you

12       can answer it.  I don't know --

13   A   Run that by me again.

14   Q   When you began your -- when you're engaged in

15       these negotiations, summer of 2003, would you

16       have liked to know that Mr. Toberoff was the

17       president of the company called Pacific

18       Pictures that had signed these two joint

19       venture agreements with the Shusters,

20       Exhibits 10 and 3?

21   A   As I mentioned earlier, as a general rule I

22       would like to know everything I can about the

23       particular transaction or the parties

24       involved.

25   Q   Okay.  Let's take a look at Exhibit No. 36,
```

EXHIBIT 52
1891

DON BULSON - 7/19/2011

Page 120

```
 1        please, which is a August 6th, 2003 letter
 2        from Mr. Toberoff to you.  I want to focus
 3        your attention on numbered Paragraph 2, risks
 4        associated with no control over the Siegel
 5        termination interests, do you see that?
 6    A   I see that.
 7    Q   Let's take a quick look at Exhibit 45, which
 8        you were looking at earlier, and I want you
 9        to look at Paragraph 10 I believe it is --
10        no, sorry, 8.
11                    MR. BERK:        Now I'm lost.
12        Which is 45?
13                    MR. KLINE:       It's numbered
14        31 in the original deposition.
15                    MR. BERK:        Okay, 31.
16        That's fine.
17    Q   Look at Paragraph 8.  Now, Mr. Toberoff
18        represents to you in his August 6th,
19        2003 letter that to the extent you and
20        Michael are not already aware of this, any
21        investor will view the risks as follow:
22        Risks associated with no control over the
23        Siegel termination interest.  Michael's
24        interest unfortunately is a passive
25        25 percent interest in what Joanne and Laura
```

EXHIBIT 52
1892

DON BULSON - 7/19/2011

```
 1        Siegel negotiate and receive, and therefore

 2        there are major risks associated with this

 3        lack of control, a good reason why Michael

 4        may be interested in an investor in the first

 5        place.  Let's either compare that statement,

 6        Mr. Bulson, with Paragraph 8 of Exhibit 45

 7        that gave Mr. Toberoff and Mr. Emanuel the

 8        following right, owner, who we established

 9        was Laura Siegel and her mother Joanne,

10        hereby warrants and represents that owner

11        will not transfer, assign, license, or in any

12        manner encumber the rights during the term or

13        extended term other than through or as a

14        result of IPW's exclusive representation

15        hereunder, with the exception of by will,

16        probate, or pursuant to other court order.

17        Would you have liked to know when

18        Mr. Toberoff is telling you that the investor

19        is concerned about risks if he purchases the

20        Michael Siegel interest, that he won't have

21        control over the overall Siegel interest,

22        that in fact the investor, Ari Emanuel and

23        his business partner Marc Toberoff, had

24        obtained this control set forth in

25        Paragraph 8 of Exhibit 45?
```

EXHIBIT 52
1893

DON BULSON - 7/19/2011

Page 122

```
 1                  MR. TOBEROFF:    Objection.

 2       Misstates the documents, they speak for

 3       themselves in the record in this case.

 4   A   I'm having trouble with that question,

 5       because I don't see where they have the

 6       control in Paragraph 8.

 7   Q   Do you think the Siegels, as you read

 8       Paragraph 8, can do anything with their

 9       rights in terms of assigning, selling them,

10       or otherwise without the approval of IPW,

11       which at that point I'll represent to you is

12       Ari Emanuel and Marc Toberoff?

13                  MR. TOBEROFF:    Are you asking

14       for his legal opinion as to the meaning of

15       this document?

16                  MR. KLINE:    I'm following

17       up on his last question to me.

18   A   I'm not in a position to answer that

19       question.  I would have to study the

20       agreement.

21   Q   Would you have liked to have access to an

22       agreement like this?

23   A   As I said before, generally speaking, I like

24       to get all of the information I can.

25   Q   Do you think it was a misrepresentation that
```

EXHIBIT 52
1894

DON BULSON - 7/19/2011

Page 123

| | | |
|---|---|---|
| 1 | | Mr. Toberoff is talking about risks |
| 2 | | associated with no control, when in fact he |
| 3 | | has those tie-up agreements with the Siegels, |
| 4 | | Joanne and Laura? |
| 5 | | MR. TOBEROFF:    Misstates the |
| 6 | | objective.   Tie-up agreement misstates the |
| 7 | | record and mischaracterizes the record. |
| 8 | A | And I think I'm better off not answering that |
| 9 | | without studying the full impact of this |
| 10 | | agreement and any other agreements that might |
| 11 | | be relevant to that.   I just don't know the |
| 12 | | answer. |
| 13 | Q | You're telling me you don't know one way or |
| 14 | | the other -- I think you've said, just so |
| 15 | | we're clear, that you would have wanted to |
| 16 | | know about the existence of this IP Worldwide |
| 17 | | agreement with Laura and Joanne Siegel, |
| 18 | | correct? |
| 19 | | MR. TOBEROFF:    Misstates his |
| 20 | | testimony.   He said generally I like to know |
| 21 | | as much as I possibly can. |
| 22 | Q | Specifically would you have liked to have |
| 23 | | known about this in June 2003, this document? |
| 24 | A | Since it's part of -- since it's relevant to |
| 25 | | the transactions that were being discussed at |

EXHIBIT 52
1895

DON BULSON - 7/19/2011

Page 124

1       that point in time, yeah.

2  Q  And you were pushing him to tell you who the

3       investor was, correct?

4  A  I was requesting the name of the investor,

5       right.

6  Q  And he's making affirmative representations

7       to you about no control over the Siegel

8       termination interest.  You would agree, would

9       you not, that Paragraph 8 has something to do

10      with the control of the disposition of Laura

11      Siegel and Joanne Siegel's rights, correct?

12  A  Well, again, I'm looking at only Paragraph 8,

13      and I can't necessarily see.  It just says,

14      as I interpret Claim 8, Paragraph 8, is they

15      have to negotiate through, as J -- IPW.

16  Q  And if you go to Page 1, look at the

17      definition of who IPW is.  What does it say?

18  A  I'm seeing Page 1, but I don't -- us.  IPW is

19      us.

20  Q  Okay.  Let's look at the last page, and look

21      who signs yours sincerely?

22  A  So this would be Marc Toberoff and Ari

23      Emanuel?

24  Q  Authorized signatories for IPW?

25           MR. TOBEROFF:   For IP

EXHIBIT 52
1896

DON BULSON - 7/19/2011

Page 125

```
 1              Worldwide.  Us is IP Worldwide.
 2    A   For IPW.
 3    Q   IPW is a defined term in the document.  Did
 4        they sign on that, correct?
 5                    MR. TOBEROFF:    Us is IP
 6        Worldwide.  We signed on behalf of IP
 7        Worldwide.  It's obvious from the document.
 8    A   The letter's being written on stationery that
 9        says IP Worldwide, and they're signing on
10        behalf of presumably IP Worldwide.
11    Q   Okay.  And let's go back to Paragraph 8 for a
12        second.  And you would agree that the Siegels
13        are agreeing, and by the Siegels I mean Laura
14        Siegel and her mother Joanne, that they won't
15        transfer, assign, license, or in any manner
16        encumber the rights during the term or
17        extended term other than through as a result
18        of IPW's exclusive representation agreement,
19        correct?
20    A   That's what it says.
21    Q   Would you have liked to know that Marc
22        Toberoff and Ari Emanuel, the unnamed
23        investor, had this right vis-a-vis the
24        Siegels?
25    A   As I mentioned before, I would have liked to
```

EXHIBIT 52
1897

DON BULSON - 7/19/2011

Page 126

```
 1           know all the information I could gather with
 2           respect to anything involving the
 3           transaction.
 4      Q    And isn't it the case that it's misleading in
 5           Paragraph 2 of the August 6th, 2003 letter
 6           for Mr. Toberoff to say the investor will
 7           view the risks as follows:  Risks associated
 8           with no control over the Siegel termination
 9           interest, when in fact the investor, i.e.,
10           Ari Emanuel and his business partner Marc
11           Toberoff, had obtained this right set forth
12           in Paragraph 8?
13                     MR. TOBEROFF:    Misstates the
14           record.
15      A    I don't see --
16                     MR. BERK:      If you're
17           reading from a document --
18      A    I'm sorry.  I mean, I see this as an
19           exclusive representation agreement, so the
20           decision makers are still going to be Laura
21           and Joanne Siegel.  They just have to deal
22           exclusively, unless I'm misunderstanding the
23           import of this clause.
24      Q    You don't think they have any control over
25           the disposition of the Siegel rights?
```

EXHIBIT 52
1898

DON BULSON - 7/19/2011

Page 127

```
 1    A    And from that paragraph alone, it says their

 2         exclusive representation.  That's what I see.

 3    Q    Could Laura Siegel and Joanne Siegel go out

 4         and make their own deal exclusive of IP

 5         Worldwide, let's say with DC Comics --

 6    A    Not without violating Paragraph 8.

 7                   MR. TOBEROFF:    By the way,

 8         you're talking about violation of the IP

 9         Worldwide exhibit.

10                   MR. KLINE:    Marc, you

11         can't make speaking objections or testifying.

12                   MR. TOBEROFF:    Excuse me.

13         I'm talking.  It's not a speaking objection.

14                   MR. KLINE:    No, your

15         testifying for the record.

16                   MR. TOBEROFF:    You're

17         misstating the record.

18                   MR. KLINE:    You can object

19         to questions.  You can ask your own questions

20         of the witness.

21                   MR. TOBEROFF:    Stop talking

22         over me.  I'm in the middle of speaking.

23         You're talking over me.

24                   MR. KLINE:    No, you're not

25         making speaking objections or coaching the
```

EXHIBIT 52
1899

DON BULSON - 7/19/2011

Page 128

```
 1        witness.  Nope.

 2                    MR. TOBEROFF:    You're not

 3        going to talk over me.  It's your time.  I'm

 4        going to speak.  You're not talking over me.

 5        You're not going to muzzle me by talking over

 6        me.  Now that you're finished, I'm going to

 7        continue what I'm saying.  If you talk over

 8        me, I'm going to wait until you're finished

 9        then I'm going to again speak on your time.

10                    MR. KLINE:       And we're

11        going to charge you for the time.

12                    MR. TOBEROFF:    You can't

13        charge me for the time.  You're talking about

14        a --

15                    MR. KLINE:       It's an

16        improper speaking objection.  I'll go to the

17        court.

18                    MR. TOBEROFF:    You're

19        speaking over me again.  You're speaking over

20        me again.  It's an improper -- you're asking

21        him about whether a document dated

22        October 3rd -- strike that.

23             My eyesight's -- I missed the date.

24                    MR. KLINE:       Thank you.

25        And we will charge you for that time.
```

EXHIBIT 52
1900

DON BULSON - 7/19/2011

Page 129

1    Q    Mr. Bulson --

2                    MR. TOBEROFF:    You'll also

3         charge your client.

4    Q    -- did he disclose in this letter to you when

5         he's talking about risks associated with no

6         control, that he, Marc Toberoff, had taken

7         the rights that Pacific Pictures had held and

8         given them -- and put them in this new

9         company that he formed with Ari Emanuel?

10   A    No.

11                   MR. TOBEROFF:    Misstates the

12        record.

13   Q    Did he disclose to you that he and his

14        business partner Ari Emanuel had not only

15        obtained the rights set forth in Paragraph 8

16        of the IP Worldwide exhibit that we've been

17        discussing, but also half of the Shuster

18        copyrights through these Pacific Pictures

19        agreements?

20   A    No such disclosure was made.

21                   MR. TOBEROFF:    Lacks

22        foundation and misstates the record.

23   Q    Do you have a character -- or strike that.

24            Do you have an opinion about

25        Mr. Toberoff's character for candor and full

EXHIBIT 52
1901

DON BULSON - 7/19/2011

Page 130

1      disclosure?

2   A   Do I have an opinion?  No, not really.

3   Q   Do you have an opinion about his

4      truthfulness?

5   A   I've not formulated an opinion.

6   Q   About his honesty?

7   A   I've not formulated an opinion.

8   Q   Let's take a look at Exhibit 38.

9              MR. BERK:      Help me, where

10     is Exhibit 38?

11             MR. KLINE:      It will say

12     Exhibit 38.

13             MR. BERK:      Is this from

14     the deposition?

15             MR. KLINE:      Twice, it will

16     be --

17             MR. BERK:      Okay.  I've

18     got it.

19  Q   This is an email from Mr. Toberoff to you

20     dated November 17th, 2004, correct?

21  A   Uh-huh, yes.

22  Q   Can you explain to me, he says in the

23     beginning of the third paragraph, in addition

24     to your two proposals still amount to

25     25 percent of Warner Brothers' offer two

EXHIBIT 52
1902

DON BULSON - 7/19/2011

Page 131

1       years ago.  Do you see that sentence there?

2   A   Uh-huh.

3   Q   And did you understand him to be saying that

4       the offer you were making was objectionable

5       because it's unclear that Warner Brothers

6       would ever offer that much money again?  I'm

7       trying to understand why, if you're willing

8       to settle for 25 percent of Warner Brothers'

9       best offer, why that would be unacceptable to

10      him?

11                  MR. TOBEROFF:    It calls for

12      speculation as to what I was thinking.

13  Q   Did you ever discuss that with him?

14  A   To discuss?

15  Q   With Mr. Toberoff.

16  A   The 25 percent?  I don't recall.  Probably we

17      talked about that.

18  Q   Why did you think it was fair, and if you --

19      only if you articulated this to Mr. Toberoff,

20      because I don't want to get into what you

21      discussed with Mr. Siegel.  Why did you think

22      it was fair to ask for 25 percent of what

23      Warner Brothers had offered two years ago?

24  A   I don't know.

25  Q   Did you know whether Warner Brothers was

EXHIBIT 52
1903

DON BULSON ~ 7/19/2011

Page 132

```
 1        still willing to pay Michael Siegel or the

 2        Siegels or the Shusters on the same terms?

 3   A    At this point in time, I don't recall.  I

 4        don't -- the timeline is not clear in my

 5        head.

 6   Q    Did Mr. Toberoff share offers with you that

 7        DC Comics made in 2005 just a few months

 8        after this email to the Shuster family to

 9        settle their claims?

10   A    Read that again.  Say that again.

11   Q    This is a November 17th, 2004 email.

12   A    Uh-huh.

13   Q    Do you recall Mr. Toberoff disclosing to you

14        that in early 2005 DC or Warner Brothers made

15        a settlement offer to the Shuster family for

16        them to settle their claims?

17   A    I don't recall.

18                   MR. TOBEROFF:    Objection.

19        Assumes facts not in evidence.

20   A    I don't know.

21                   MR. TOBEROFF:    And lacks

22        foundation.

23   Q    Well, let's take a look at a letter that was

24        sent to the Shusters dated April 28th, 2005?

25                   MR. BERK:    Is this in the
```

EXHIBIT 52
1904

DON BULSON - 7/19/2011

Page 133

1       depo?

2                       MR. KLINE:        No, this is a

3       new exhibit.

4                       MR. BERK:         It's a new

5       exhibit.  Okay.

6                       MR. RYLAND:       We've got to

7       catch a break here too.

8                       MR. KLINE:        That's fine.

9       We'll ask a little bit about this document.

10                      MR. RYLAND:       Sure.

11                      - - - - -

12      (Plaintiff's Exhibit 47 was marked.)

13                      - - - - -

14  Q   Putting in front of you Exhibit 47, an

15      April 28th, 2005 letter from Paul Levitz to

16      Jean Adele Peavy as sole heir to Joseph

17      Shuster and Mark Warren Peary as personal

18      representative of the estate of Joe Shuster,

19      do you see that on the first page,

20      Mr. Bulson?

21  A   What was that I was skimming?

22  Q   I was reading the from Paul Levitz at DC

23      Comics to Jean Adele Peavy and Mark Warren

24      Peary.

25  A   Okay.  I see that.

EXHIBIT 52
1905

DON BULSON - 7/19/2011

Page 134

1    Q    And you know them to be the heirs and

2         personal representatives?

3    A    Actually, I do not know that, but I assume

4         that to be the case here.

5    Q    Okay.  Did Mr. Toberoff ever share this

6         letter with you, to your knowledge?

7    A    I don't recall seeing this letter.

8    Q    Directing your attention to pages 3, 4, 5, a

9         second, if you have to -- I think you and

10        your counsel need to run for a phone call.

11        If you want to take a quick look at this over

12        the break, can we do it that way?

13             MR. RYLAND:    Are we going

14        to catch a lunch break here?

15             MR. KLINE:    Absolutely

16        catch a lunch break.

17   Q    If you just want to scan it.  After I'm just

18        going to ask you if Mr. Toberoff communicated

19        to you that DC Comics had made this offer to

20        the Shuster family during this time period?

21   A    I don't recall.

22   Q    And I'm going to ask you when we come back or

23        now to compare this to the offers that DC

24        Comics was making to your client Michael

25        Siegel a couple years earlier.  Would it be

EXHIBIT 52
1906

DON BULSON - 7/19/2011

Page 135

1        easier if I gave you the documents now or --

2                    MR. TOBEROFF:    I'd like to

3        object.  And first of all, you have seven

4        hours to take his deposition, and you keep

5        talking about running the clock and charging

6        time.  So if you want him to look at

7        something, it's during the deposition time.

8        You can't preload exhibits and have him

9        review them on his own time and then ask him

10       questions.

11                   MR. KLINE:      That's the

12       witness' choice, so I'll defer to Mr. Ryland.

13                   MR. TOBEROFF:    I object to

14       that, and I suggest you don't follow that,

15       because he's going to use it as a basis to

16       take 10 hours of your deposition.

17                   THE WITNESS:    Well, put it

18       here on the table, and we'll see how the time

19       goes.

20    Q  Giving you the last back and forth with DC,

21       and then we'll just follow up from there.

22            But just so we close the loop on this,

23       as I understand it, Mr. Toberoff never shared

24       this letter with you?

25    A  All I'm going to be able to tell you from a

EXHIBIT 52
1907

DON BULSON – 7/19/2011

Page 136

```
 1        comparison is what the documents speak for
 2        themselves.  So whatever that offer was, it
 3        was; whatever this offer was, it is.  I don't
 4        know -- I can't -- I don't see my having
 5        anything to add.
 6   Q    But let's turn back to Exhibit 38, and this
 7        is what I'm trying to get at.  Is
 8        Mr. Toberoff's telling you on Wednesday,
 9        November 17th, 2004, that he's objecting to
10        your proposal because they still amount to
11        25 percent of Warner Brothers' offer two
12        years ago, you see that, right?
13   A    Uh-huh.
14   Q    And he doesn't disclose to you that DC makes
15        this offer in April 2005 to the Shusters,
16        correct?
17   A    That's correct.
18   Q    And around this time you've shared with
19        Mr. Toberoff that Michael Siegel is old, he's
20        around 59 years old, correct?
21   A    I forget what his age -- he was in his 50s.
22   Q    That he was not in good health?
23   A    Well --
24                  MR. TOBEROFF:   Are you asking
25        a question whether he told me that?
```

EXHIBIT 52
1908

DON BULSON - 7/19/2011

Page 137

1    Q    Yes, you told him he was not of good health,

2         correct?

3    A    I probably did.

4    Q    And you told him that he very much wanted to

5         settle this claim and settle his claims to

6         rights, and would even do so at a discount

7         given the position that he was in?

8    A    I can't characterize it that way.

9    Q    Okay.  Well, we'll go back to the letters

10        after lunch, but I do want to explore that

11        area of testimony.

12                  MR. KLINE:     So we'll go

13        off the record.

14                  MR. RYLAND:     Sounds good.

15                  VIDEO TECHNICIAN:  We're off

16        the record.  The time is 12:46.

17    (Lunch recess from 12:46 p.m. to 2:00 p.m. )

18                  VIDEO TECHNICIAN:  The time is

19        2:00 o'clock.  We're going back on the

20        record.

21                  MR. KLINE:     So we entered

22        an agreement to all be back at 1:30.  I

23        understand that Mr. Ryland had some other

24        commitments, and Mr. Toberoff, lunch took a

25        little bit longer.  But it's now 2:00

EXHIBIT 52
1909

DON BULSON - 7/19/2011

Page 138

```
 1        o'clock, and I understand you have a hard

 2        stop at 5:00, so we'll do as much -- get as

 3        much testimony as we can.  Probably be back

 4        here a second day.  I understand that

 5        Mr. Toberoff objects to that.

 6                   MR. RYLAND:    We will too.

 7        I'll be perfectly clear.  We will object --

 8        if we're going to go a full day today.

 9                   MR. KLINE:     We're not

10        going to get anywhere close to the seven

11        hours we're entitled to under the rules,

12        so --

13                   MR. RYLAND:    Mostly because

14        the attorneys have been talking back and

15        forth.  Mr. Bulson and I have not, so. . .

16                   MR. TOBEROFF:    And you've

17        been taking numerous breaks off the record.

18                   MR. RYLAND:    My point is

19        that if we go a full day, we will object to a

20        second day of depositions.  It's okay.  I

21        mean, you do what you have to do.  I'm just

22        telling you --

23                   MR. KLINE:     Okay.  But we

24        still don't have the documents we need.  I'd

25        rather reach an agreement and avoid --
```

EXHIBIT 52
1910

DON BULSON - 7/19/2011

Page 139

```
 1                    MR. RYLAND:    We're not
 2        going to.  Just to be a hundred percent
 3        clear, we can't do anything about the
 4        documents, which you know.  That has to be
 5        settled by the estate of Michael Siegel.  So
 6        that is what it is.  And as far as taking
 7        another day of deposition, we're a third
 8        party in this.  There's no dog in the fight.
 9        If you want to do another one, you can move
10        for it.  We're going to object.
11                    MR. TOBEROFF:    Plus you've
12        already taken the deposition in the closely
13        related Siegel action for hours and hours.
14        You're going over similar territory.
15                    MR. KLINE:    So why don't
16        we jump in and see what we can do.  We all
17        understand we disagree about this, and we'll
18        move forward.
19                    - - - - -
20        (Plaintiff's Exhibits 48 through 50 were marked.)
21                    - - - - -
22    BY MR. KLINE:
23    Q    I'm going to place in front of you
24        Exhibits 48, 49, and 50, Mr. Bulson, and I'll
25        represent to you that Exhibit 48 is an
```

EXHIBIT 52
1911

DON BULSON - 7/19/2011

Page 140

1        October 19th, 2001 letter from Kevin Marks to

2        John Schulman.  And you've seen this letter

3        before, correct?

4    A   I think so.

5    Q   And Exhibit 49 is a letter from John Schulman

6        to Kevin Marks, October 26, 2001, correct?

7    A   Yeah, it's to Marks from John Schulman, yes.

8    Q   And you've seen this letter as well, correct?

9    A   I may have, but -- there's a good chance I

10       did.

11   Q   And Exhibit 50 is a cover letter from Patrick

12       Perkins to Kevin Marks dated February 1st,

13       2002, attaching a draft agreement between the

14       Siegels and DC Comics concerning the Superman

15       property, correct?

16   A   Yes.

17   Q   And if you look at the very end here,

18       Page 52, it's a couple pages from the back,

19       there's a signature, a proposed signature

20       line for Michael Siegel, correct?

21   A   Yes.

22   Q   Your client?

23   A   Uh-huh, yes.

24   Q   Now, when Mr. -- when you and Mr. Toberoff

25       were exchanging your communications in 2003,

EXHIBIT 52
1912

DON BULSON - 7/19/2011

Page 141

```
 1            2004, and he refers to the WB offer, do you

 2            understand him to be referring to Exhibit 49

 3            or 50 or the same thing?

 4    A       That's probably the case.

 5    Q       And if you look at Exhibit 48, which I hope

 6            is still in front of you?

 7    A       Yes.

 8    Q       And it says, in addition your proposals still

 9            amount to 25 percent of Warner Brothers'

10            offer two years ago.  You understand him to

11            be referring to Exhibits 49 and 50?

12    A       Probably.  I mean. . . I haven't looked at

13            these in a long, long time, but that's

14            probably what's being referenced.  It was

15            the -- what's reflected in that

16            October '01 letter.

17    Q       Can you take a quick look at Exhibit 40,

18            which is an email from you to Marc Toberoff

19            dated November 24th, 2004?

20    A       Yes.  As soon as I find it.

21    Q       Do you mind reading the first paragraph into

22            the record, please?

23    A       Of Exhibit 40?

24    Q       Yes, please.

25    A       I appreciate your efforts to put together a
```

EXHIBIT 52
1913

DON BULSON - 7/19/2011

```
 1          deal acceptable to your investor.  Michael

 2          has considered your comments and he considers

 3          his last offer a fair offer given the

 4          potential for substantial income to be

 5          generated by the Superman property.  The

 6          Warner Brothers' offer was basically a

 7          6 percent deal, as I recall.  The base for

 8          the royalty included all worldwide revenue

 9          paid to or derived by DC Comics from the

10          Superman property.  My calculations of the

11          value with Warner Brothers' last offer were

12          based on numbers provided by Warner Brothers

13          for a five-year period that did not include

14          any revenue booster like a movie.  Since then

15          the Lois and Clark television series has gone

16          into syndication and the Smallville

17          television series has now entered

18          syndication.  According to comments you have

19          previously made, a television property starts

20          generating significant profits when it goes

21          into syndication.

22     Q    So when you refer to the Warner Brothers'

23          last offer, are you referring to exhibit --

24          and in referring to the sentence in this

25          paragraph it begins my calculations?  When
```

EXHIBIT 52
1914

DON BULSON - 7/19/2011 .

Page 143

1           you refer to Warner Brothers' last offer, are

2           you referring to Exhibits 49 and 50?

3     A     I think so.

4     Q     Okay.  Let's take a look at Exhibit 41.  It

5           should be the next in your stack there.

6     A     Yeah, they're all jumbled now.  There we go.

7     Q     And this is an email dated five days later,

8           November 29th, 2004 from Mr. Toberoff to you,

9           correct?

10    A     Yes.

11    Q     If you look at the second paragraph from the

12          bottom of the page, the last full paragraph,

13          can you read that into the record, please?

14    A     I have fully informed the investor, and he is

15          well aware of all of the developments you

16          mentioned regarding Superman, Smallville, et

17          cetera; however, the investor is also

18          conservative, experienced, and cynical with

19          regard to the entertainment industry and

20          studio accounting and knows the following.

21          Do you want me to go on?

22    Q     I actually wanted you to read, if you go down

23          to the bottom of the page, in hard business

24          terms?

25    A     Oh.

EXHIBIT 52
1915

DON BULSON - 7/19/2011

Page 144

```
 1    Q    If you can read that paragraph.

 2    A    In hard business terms, although this is

 3         Superman and there's only one Superman, this

 4         is not the rosy, sexy picture one might

 5         think.  Yes, they will likely produce a

 6         Superman movie or movies; yes, they have

 7         syndicated Smallville, but DC doesn't

 8         participate in a big way in this.  WB/DC have

 9         refuted the termination interest, and

10         stonewalled any accounting or payments for

11         over five-and-a-half years.

12    Q    Okay.  And then let's take a look at

13         Exhibit 42.  It's a January 17th, 2005 email.

14         And I believe the top email, would you agree

15         says, to make anything happen, I need a

16         little more leeway, please see --

17    A    That's not what my Exhibit 42 says.

18    Q    Don, I'm referring to the -- Don, I haven't

19         heard from you since my last email

20         November 2004, which I recopied below.  As

21         expected I can't sell your proposals.  I wish

22         I could, since they are too close to the

23         exact MPV of the old WB deal and don't take

24         into account the passivity of the investment

25         and the significant risks involved.  To make
```

EXHIBIT 52
1916

DON BULSON - 7/19/2011

Page 145

```
 1        anything happen, I need a little more leeway.
 2        Please see our last proposal, which is not so
 3        far off from what your client wants.  Do you
 4        see that?
 5   A    Uh-huh.
 6   Q    And obviously when Mr. Toberoff says in the
 7        second sentence here, I can't sell your
 8        proposals, I wish I could, he didn't disclose
 9        to you at this time period that the investor
10        was Ari Emanuel, correct?
11   A    That's correct.
12   Q    And he didn't disclose to you that he had a
13        joint venture agreement with Mr. Emanuel,
14        correct?
15                MR. TOBEROFF:    Asked and
16        answered.
17   A    That's correct.
18   Q    And in this offer that he republishes below,
19        that top email there, the email that says,
20        Don, thank you for your counteroffer.  He
21        says in addition your two proposals still
22        amount to 25 percent of the Warner Brother
23        offer two years ago, correct?
24   A    That's what it says.
25   Q    If you take a look at Exhibit 47, Mr. Bulson,
```

EXHIBIT 52
1917

DON BULSON - 7/19/2011

```
 1          it says DC on the top there?
 2    A     Yeah.
 3    Q     Just to reconfirm, Mr. Toberoff never shared
 4          this offer with you, correct?
 5    A     Not to my recollection.
 6    Q     That DC made with the Shusters?
 7                    MR. TOBEROFF:    Asked and
 8          answered.
 9                     - - - - -
10          (Plaintiff's Exhibit 52 was marked.)
11                     - - - - -
12    Q     I'm going to hand you Exhibit No. 52.  Did
13          Mr. Toberoff share this communication with
14          you at any point in time?
15    A     Not that I recall.
16    Q     Did Mr. Toberoff tell you that he rejected
17          DC's offer to the Shusters on behalf of them?
18    A     Not that I recall.
19    Q     This document's dated May 12th, 2005,
20          correct?
21    A     Yes.
22    Q     Can you read the second and third paragraph,
23          please, into the record?
24    A     While our clients certainly do appreciate
25          DC's efforts, they are passing on DC's offer.
```

EXHIBIT 52
1918

DON BULSON - 7/19/2011

Page 147

```
 1        It is believed that the offer is extremely
 2    low and bears no relation to the net present
 3    value of the estate's 50 percent interest in
 4    Superman profits for the duration of
 5    copyright commencing 2013.  Nor does DC's
 6    offer reflect a considerable strategic value
 7    of the estates's 50 percent copyright
 8    interest in tandem with the Siegel's
 9    50 percent copyright interest in Superman.
10    One need only to look at DC/Warner Brothers'
11    full-blown plans to reinvigorate Superman as
12    a billion dollar film, television, and
13    merchandising franchise and to Marvel's 2.5
14    billion market capitalization to understand
15    how DC's $2 million proposal bears little or
16    no relation to the marketplace and the
17    economic realities of this world famous
18    property.
19              MR. TOBEROFF:    I object to
20    your use in this deposition this exhibit.
21    It's marked confidential.  We had a
22    protective order at the time with DC which
23    would apply to this document as well.  You
24    shouldn't be giving it to Mr. Bulson and
25    making it part of a public transcript.
```

EXHIBIT 52
1919

DON BULSON - 7/19/2011

1              Also, I object to the fact that you're

2       dealing on top of that with settlement

3       negotiations which should not be used or

4       disclosed in litigation.

5                    MR. KLINE:      Disagree with

6       both of your points.  We'll move forward.

7                    MR. TOBEROFF:    Well, you're

8       in breach of the protective order and we'll

9       hold you and your client accountable for

10      that.  That's it.

11                   MR. KLINE:      Where is it

12      marked confidential when it was produced on

13      the bottom?

14                   MR. TOBEROFF:    Can you read?

15                   MR. KLINE:      On the Bates

16      stamp at the bottom of the page --

17                   MR. TOBEROFF:    It says

18      confidential communication?

19                   MR. KLINE:      It's your

20      position that --

21                   MR. TOBEROFF:    Yes, it is.  I

22      just stated my position.

23                   MR. KLINE:      That's fine.

24      Understood.

25   Q   Turning your attention to that letter,

EXHIBIT 52
1920

DON BULSON - 7/19/2011

Page 149

```
 1        Mr. Bulson.  On November 29th, 2004, if you
 2        look at Exhibit 41, Mr. Toberoff is telling
 3        you that in hard business terms, although
 4        it's Superman and there's only one Superman,
 5        this is not the rosy, sexy picture one might
 6        think, correct?
 7    A   Where is that, where do I look in the
 8        document?
 9    Q   Bottom of the first page in Defense Exhibit B
10        41?
11    A   In hard business terms, yes.  I see that.
12    Q   It's not the sexy picture.  At the same time
13        he's telling -- not at the same time.  A few
14        months later he tells DC Comics that one need
15        only to look at DC/Warner Brothers'
16        full-blown plans to reinvigorate Superman as
17        a billion dollar film, correct?
18    A   Uh-huh, yes.
19    Q   And he never shared this point of view with
20        you, correct, during his negotiations with
21        you?
22    A   To my recollection, he did not.
23    Q   In fact, he told you the opposite, correct?
24    A   He told me what's stated in that email.
25    Q   He also told you that DC -- he told DC Comics
```

EXHIBIT 52
1921

DON BULSON - 7/19/2011

Page 150

1          in the May 12th, 2005 letter that the offer

2          is extremely low and bears no relation to the

3          net present value of the estate's 50 percent

4          interest in Superman profits, correct?

5                        MR. TOBEROFF:    Document

6          speaks for itself.

7      A   That's what it says, yes.

8      Q   And yet he told you in Exhibit 42, his

9          January 17th, 2005 email that he couldn't

10         sell your proposal because they're too close

11         to the exact net present value of the old

12         Warner Brothers' deal, correct?

13     A   That's what it says.

14     Q   In taking a look at Exhibit 39, and looking

15         at the first email in the chain.

16     A   I see the -- oh, the first email in the

17         chain.

18     Q   So if you look at the second and third page

19         of the document?

20     A   Uh-huh.

21     Q   Marked DV 30 -- DV 038 at the bottom?

22     A   Yes.  Okay.  Got it.

23     Q   Marc -- it's a November 12th, 2004 email from

24         you.  Marc, I've now -- I've now had the

25         opportunity to meet with Mike Siegel and

EXHIBIT 52
1922

DON BULSON - 7/19/2011

Page 151

1          discuss your investor's latest proposal.

2          Summarizing our past discussion, Mike

3          originally proposed an initial payment of

4          $300,000, annual payments of $123,000 for 20

5          years.  As understood the investor countered

6          with initial payment of $200,000, annual

7          payments of $100,000 for that 20 years.

8          Investor's recoupment of one-half of any

9          monies paid.  If aversion occurs, a follow-up

10         to some of above, the investor indicated he

11         would consider some participation.  In

12         return, Mike Siegel would be amenable to

13         initial payments of $250,000, annual payments

14         of $112,000 for 25 years, investor's

15         recoupment of one-half monies pad if aversion

16         occurs, subject to appropriate payback

17         schedule for proceeds received by Mike

18         Siegel, participation at 10 percent.  Do you

19         see that offer you conveyed to Mr. Toberoff?

20    A    Uh-huh, yes.

21    Q    And in his email above that in the chain

22         November 17th, 2004, Mr. Toberoff rejects

23         that, correct?

24    A    Yes.

25    Q    Mr. Toberoff says in his email rejecting the

EXHIBIT 52
1923

DON BULSON - 7/19/2011

Page 152

```
 1        offer, I'm really trying, but I need some

 2        help from your end if your client wants to do

 3        that, do you see that?

 4     A  Yep, yes.

 5     Q  And on May 12th, 2005, Exhibit 52,

 6        Mr. Toberoff rejects DC's 2 million-dollar

 7        proposal saying it bears little or no

 8        relation to the marketplace and the economic

 9        realities of this world-famous property.  Do

10        you see that?  End of the third paragraph I

11        had you read, Exhibit 52.

12     A  Okay.  Yes, I see that.

13               MR. TOBEROFF:    2 million

14        dollar proposal to the Shusters.

15     Q  Is it your testimony, sir, that Mr. Toberoff

16        was dealing with you fully and fairly and

17        providing you the necessary information as

18        part of these negotiations that you conducted

19        on behalf of Mr. Siegel or Michael Siegel?

20     A  I don't believe I testified to that.

21     Q  Do you have a view on that question?

22               MR. TOBEROFF:    Asked and

23        answered.

24     A  No.  There was a lot -- there was information

25        that I was not privy to during those
```

Merrill  Corporation  -  Los Angeles

EXHIBIT 52
1924

DON BULSON - 7/19/2011

Page 153

1          negotiations, yes.

2     Q    In your experiences, and I understand that

3          you were the president of the IP Lawyers

4          Association in Cleveland for a number of

5          years, correct?

6     A    That's -- for a year.

7     Q    Okay.  Have you ever had an experience like

8          this where a lawyer on the other side turns

9          out claiming to be representing an investor,

10         is actually -- wants to make the investment

11         themselves or has these joint venture

12         agreements where they have separate ownership

13         interests through separate companies, have

14         you ever seen something like that?

15                   MR. TOBEROFF:    Misstates the

16         record.  There's no investment in the record

17         by me.

18    A    From -- based on my -- this is relatively

19         unique.

20    Q    Have you ever had somebody consistently refer

21         to somebody in a series of correspondence

22         with you to a third-party that they refused

23         to tell you who they are, when in fact it

24         turns out that they have a business

25         relationship with that unnamed investor?

EXHIBIT 52
1925

DON BULSON - 7/19/2011

Page 154

```
 1   A    I don't recall other instances, no.

 2   Q    You represented Michael Siegel who, I think

 3        you testified earlier, at this point in his

 4        life was close to 60 years old, not healthy,

 5        looking to resolve these issues so he could

 6        get some money in his pocket, correct?

 7              MR. BERK:        I would object

 8        to that and instruct him not to answer.

 9              THE WITNESS:      Just making

10        sure.

11   Q    Did you communicate to Mr. Toberoff as part

12        of these negotiations that Michael Siegel was

13        in his late 50s?

14   A    I believe so.

15   Q    Did you communicate to him that he was not

16        healthy?

17   A    I believe so.

18   Q    Did you communicate to him that he very much

19        wanted to settle this so he could settle

20        this -- or sell his rights so that he could

21        enjoy during his lifetime some of the fruits

22        of that?

23   A    I don't think I said that.

24   Q    Why were you willing to offer 25 percent, a

25        deal in which Michael Siegel would sell his
```

EXHIBIT 52
1926

DON BULSON - 7/19/2011

Page 155

```
 1        interests to this unnamed investor for

 2        25 percent of Warner Brothers' last offer?

 3    A   I believe the answer to that would go into

 4        privileged information.

 5                    MR. BERK:        Yeah, right.

 6                    THE WITNESS:     But I defer to

 7        you.

 8                    MR. BERK:        Okay.  I was

 9        about to say it was a -- it's privileged and

10        I instruct you not to answer.

11    Q   But in fact that's the case, you made an

12        offer that was 25 percent of what Warner

13        Brothers was willing to pay for these rights,

14        correct?

15    A   I don't remember the math right now.  I

16        thought we today saw it was an equal deal at

17        the present market value, but I don't

18        remember the numbers, whether it was 25.  I

19        mean, I saw it today in correspondence,

20        25 percent, and then I saw there was other

21        references to it being the same as the DC

22        Comics' deal, proposal.

23    Q   Do you remember one way or the other?

24    A   No.

25    Q   Take a look at Exhibit 37 again quickly.  I'm
```

EXHIBIT 52
1927

DON BULSON - 7/19/2011

Page 156

```
 1         sorry, 38, Mr. Bulson.  My apologies.  Do you

 2         see Mr. Toberoff in that third paragraph of

 3         his email, November 17th, 2004, in addition,

 4         your two proposals still amount to 25 percent

 5         of Warner Brothers' offer two years ago?

 6    A    Right.  But didn't we see somewhere else

 7         where the offer was essentially equal to the

 8         Warner Brothers' offer, and that 25 percent

 9         might have been -- I -- I mean, we saw it

10         earlier here in one of these other documents,

11         a reference was made to it being equal what

12         was being offered, but I forget where we saw

13         it.

14    Q    Take a look at Exhibit 41, November 29th

15         email from Marc Toberoff to you, top of the

16         second -- I think you're referring to the

17         paragraph that -- the last paragraph in the

18         first page.  It goes on to the second page.

19    A    Yeah, yeah, that's what I was referring to.

20                   MR. TOBEROFF:    Where are you,

21         please?

22                   MR. KLINE:      Exhibit 41.

23    A    Here it says, it's characterizing the

24         proposal and the offer as the same as the

25         Warner Brothers' 2002 offer.  And this letter
```

EXHIBIT 52
1928

DON BULSON - 7/19/2011

Page 157

```
 1        from -- this email from Marc Toberoff was

 2        referring to 25 percent of the Warner

 3        Brothers' proposal.

 4    Q   But you don't remember which one it was?

 5    A   Did I write either one?

 6    Q   No.  Mr. Toberoff wrote those.

 7                    MR. RYLAND:        Objection.

 8        Assumes facts.

 9    A   I don't know of -- I don't recall the -- what

10        the present market values of the two offers

11        were.

12    Q   Let's take a -- holding on to Exhibit 38 for

13        a second, this is a November 17th follow-up

14        email, 2004, 3:06 p.m. from Marc Toberoff to

15        you.  In the second paragraph he says, in

16        addition there is a legal cost to make Warner

17        Brothers pay up, for instance, with a

18        contingency lawyer at least 33.33 percent to

19        40 percent would be taken off the top, plus

20        costs and disbursements, do you see that?

21    A   Uh-huh, I see that.

22    Q   Did he tell you who that contingency lawyer

23        would be?

24    A   I don't recall.

25                        - - - - -
```

EXHIBIT 52
1929

DON BULSON - 7/19/2011

Page 158

1                  (Plaintiff's Exhibit 51 was marked.)

2                       - - - - -

3     Q    This is Exhibit 51.

4                       MR. TOBEROFF:    I object to

5          use of this exhibit.  It's marked

6          confidential pursuant to, I believe, a

7          protective order or a representation that the

8          parties intend to enter into a protective

9          order.  You can't be showing this document to

10         third parties.

11                      MR. KLINE:    So --

12                      MR. TOBEROFF:    You just heard

13         me.  That's my objection.  You should take it

14         back and you shouldn't show this retainer

15         agreement to third parties that's marked

16         confidential, pursuant -- I believe we

17         represented -- this was produced in this

18         case?

19                      MR. KLINE:    Correct.

20         Pursuant to a court order.

21                      MR. TOBEROFF:    We represented

22         that the parties intend to enter into a

23         protective order at some point in this

24         litigation, or we may have a protective order

25         in this case, otherwise we wouldn't have

EXHIBIT 52
1930

DON BULSON - 7/19/2011

Page 159

1        marked it confidential.

2                MR. KLINE:        My

3        understanding, Mr. Toberoff, is this is part

4        of the same ruling in which you were also

5        ordered to produce the Dennis Larson

6        documents, and the Judge Larson -- I'm sorry

7        Judge Zarefsky said those would be kept

8        confidential, filed under seal.  But when he

9        compelled you to produce this document, he

10       made no such statement.

11               MR. TOBEROFF:    I believe we

12       represented to the court at one point in this

13       litigation that although we didn't yet have a

14       protective order, we intended to have a

15       protective order.

16               MR. KLINE:        Who is we by

17       the way in that?

18               MR. TOBEROFF:    Both sides.

19               MR. KLINE:        Okay.  So let

20       me just -- just so we're clear, you're not

21       going to let me ask questions about this

22       document?

23               MR. TOBEROFF:    No.  It's

24       marked confidential.  It should be subject to

25       our protective order, and you shouldn't be

EXHIBIT 52
1931

DON BULSON - 7/19/2011

Page 160

```
 1        passing around a retainer agreement of other

 2        parties.

 3                    MR. KLINE:      We disagree

 4        that it's subject to any protective order.

 5        We understand your position.  This is going

 6        to be another reason why we may have to take

 7        the deposition another day.

 8   Q    Did Mr. Toberoff disclose to you that he

 9        signed a attorney-client contingency fee?

10   A    Oh, you're -- start again.

11   Q    Back to you, Mr. Bulson.  I want to --

12        around, looking at Exhibit 38, it's

13        November 2004, Mr. Toberoff is referring to

14        for instance with a contingency lawyer at

15        least 33 percent to 40 percent, see that

16        there?

17   A    Uh-huh.

18   Q    Did Mr. Toberoff disclose to you that a

19        month-and-a-half earlier he had signed an

20        agreement with Joanne Siegel and Laura Siegel

21        in which he himself became that contingency

22        lawyer and was entitled to a 33 to 40 percent

23        contingency?

24                    MR. TOBEROFF:     I object to

25        your -- I object to you -- you're just
```

EXHIBIT 52
1932

DON BULSON - 7/19/2011

1          violating the protective order and the

2          confidentiality by disclosing rather than

3          giving him the document to read, disclosing

4          information in that document.

5                    MR. KLINE:      I'm asking if

6          you disclosed that.

7                    MR. TOBEROFF:    You're

8          violating the confidentiality of doing that.

9                    MR. KLINE:      I completely

10         disagree.  I'm asking if you disclosed that

11         to him.

12                    MR. TOBEROFF:    I'm going to

13         ask you again, please don't violate the

14         confidentiality agreement in this case, in

15         the Siegel case.  Warner Brothers and DC have

16         marked thousands of documents confidential

17         with all sorts of financial information.  And

18         if DC is not abiding by when we mark things

19         confidential and abiding by the protective

20         order, we're not going to abide by that order

21         either.

22                    MR. KLINE:      There is no

23         order in this case.

24                    MR. TOBEROFF:    There is no

25         confidentiality agreement if you keep

EXHIBIT 52
1933

DON BULSON – 7/19/2011

Page 162

1    breaching it.

2              MR. KLINE:      Mr.

3    Toberoff --

4              MR. TOBEROFF:    Do you

5    understand that?  So you breach it at the

6    risk -- I'm talking.  You breaching that

7    protective order and confidentiality

8    agreement.  And you're smirking, for the

9    record, you're smirking while I'm talking.

10   You're breaching a very important protective

11   order and confidentiality agreement between

12   the parties.  We will then not hold all the

13   information that DC has given to us

14   confidential, since you're breaching the

15   essence of that agreement.

16             MR. KLINE:      We

17   completely dis --

18             MR. TOBEROFF:    So I advise

19   you not to keep disclosing the terms of that

20   agreement.

21             MR. KLINE:      My term to

22   talk, Mr. Toberoff.

23             MR. TOBEROFF:    Go ahead.

24             MR. KLINE:      We completely

25   dispute your position.  There is no

EXHIBIT 52
1934

DON BULSON - 7/19/2011

Page 163

1          protective order in this case.  You were

2          ordered by court order to produce this

3          document.  Before producing it, you did not

4          ask us to sign a stipulation or protective

5          order that would given this document.  My

6          question asked about whether a fact was

7          disclosed to Mr. Bulson.  I did not

8          represent --

9                    MR. TOBEROFF:    You are

10         reading -- you were holding the agreement up

11         visibly to Mr. Bulson.  You were reading from

12         the agreement, and you were disclosing our

13         fee structure on the agreement exactly as

14         it's set forth in the agreement, exactly what

15         you did.  That was the implication of your

16         actions.

17    Q    Going back to my question, and we obviously

18         disagree on this.

19              Going back to my question, in his --

20         in or around November 17th, 2004, did

21         Mr. Toberoff disclose to you that he had

22         entered into a contingency fee arrangement

23         with Joanne and Laura Siegel?

24                    MR. TOBEROFF:    Asked and

25         answered.

EXHIBIT 52
1935

DON BULSON - 7/19/2011

Page 164

| 1 | A | Not that I recall. |
|---|---|---|

1   A   Not that I recall.

2   Q   Did he disclose to you that he was, quote,

3       the -- a contingency lawyer referred to in

4       the email?

5   A   Not that I recall.

6   Q   Did he tell you at any point in time that he

7       had a contingency fee arrangement with the

8       Siegels of at least 33 percent to 40 percent?

9               MR. TOBEROFF:    Same

10      objection.

11  A   At any point in time?

12              MR. KLINE:      Correct.

13  A   I don't know.  I can't recall.

14              MR. TOBEROFF:    Same objection

15      to your disclosure.

16  Q   Mr. Bulson, looking back over these emails

17      and letters that you've exchanged with

18      Mr. Toberoff in the 2003 to 2005 time period,

19      do you feel that Mr. Toberoff omitted

20      material facts from his communications with

21      you?

22              MR. TOBEROFF:    Asked and

23      answered.  You've asked that question five

24      times.

25              MR. RYLAND:     Objection.

EXHIBIT 52
1936

DON BULSON - 7/19/2011

Page 165

```
 1   A    I don't know how to answer that.
 2               MR. RYLAND:     I'll object to
 3        the extent that it calls for a legal
 4        conclusion.
 5   Q    During --
 6   A    I haven't formulated an opinion on that.  I
 7        mean, this is the first time I'm seeing many
 8        of these documents.  As I stated earlier, I
 9        would have liked to have known about it.
10        Whether they're -- we probably have
11        mischaracterizations here.
12   Q    By Mr. Toberoff?
13   A    Well, let's just say the complete picture
14        wasn't communicated.
15   Q    And you asked for the complete picture, you
16        said, please tell me who the investor is,
17        correct?
18   A    I did ask who the -- who was the investor?
19   Q    And he not only refused to tell you, but he
20        made misleading statements in these
21        documents, correct?
22               MR. TOBEROFF:     Misstates the
23        documents.
24               MR. RYLAND:     Object to the
25        extent that it calls for a legal conclusion.
```

Merrill  Corporation  -  Los Angeles

EXHIBIT 52
1937

DON BULSON - 7/19/2011

Page 166

```
 1    A   I'm not in a position at this point in time
 2        to answer that question.
 3    Q   Mr. Bulson, have you ever shared with
 4        anybody --
 5                    MR. TOBEROFF:    Could you
 6        speak up?  I can't hear you.
 7    Q   Mr. Bulson, have you ever shared with
 8        anybody, and I'm not referring to Mr. Ryland
 9        as your attorney, have you ever shared with
10        anybody your opinions about Mr. Toberoff's
11        character for truthfulness?
12    A   I haven't formulated opinions regarding
13        Mr. Toberoff's character or truthfulness.
14    Q   So you never told anybody other than
15        Mr. Siegel or Mr. Ryland, I don't think he's
16        an honest guy, or something along those
17        lines?
18                    MR. BERK:        I'm going to
19        object to anything he might have told to
20        Mr. Siegel as being privileged.  I instruct
21        him not to answer.  But if he wants to speak
22        to telling anybody else other than Mr. --
23        Michael Siegel, he may answer.
24                    MR. KLINE:       And my
25        question said other than Mr. Siegel, other
```

EXHIBIT 52
1938

DON BULSON - 7/19/2011

Page 167

```
 1        than Mr. Ryland.
 2                   MR. BERK:        I'm sorry.   I
 3        did not hear that.
 4                   MR. KLINE:        That's fine.
 5    Q   Other than Mr. Siegel, other than Mr. Ryland,
 6        have you said in words or in substance to
 7        anyone, I don't think Mr. Toberoff is an
 8        honest person?
 9    A   Any words of that import would have, positive
10        or negative, would have most likely just been
11        made internally to my colleagues.
12    Q   So you don't remember any other instances?
13    A   No, I don't recall.
14    Q   I noticed on your privilege log, and I've
15        asked Jason to pull this out, and hand around
16        as an exhibit, it's going to be No. 53.  Oh
17        it's Exhibit 3 to your prior deposition.   My
18        apologies.
19                      - - - - -
20        (Plaintiff's Exhibit 53 was marked.)
21                      - - - - -
22    Q   Can you turn to privilege log entries 366 and
23        367?
24                   MR. TOBEROFF:    You just -- I
25        just have to take a bathroom break.  It will
```

EXHIBIT 52
1939

DON BULSON - 7/19/2011

Page 168

1    take me two seconds.  Can we just go off the

2    record?

3                    MR. KLINE:       That's fine.

4    Absolutely.

5                    VIDEO TECHNICIAN:  We're off

6    the record.  The time is 2:38.

7       (Recess from 2:38 p.m. to 3:05 p.m. )

8                    VIDEO TECHNICIAN:  We're back

9    on record at 3:05.

10                    MR. KLINE:       That's fine.

11    But if you clarify them now and require me to

12    go ask three hours of questions on them, it's

13    sandbagging me at the end of the day.  So you

14    can say whatever you want to say.  Back on

15    the record.

16                    MR. TOBEROFF:    Thanks for

17    your permission.

18                    MR. KLINE:       As I've asked

19    the videographer to kind of tell us where

20    things stand, we only are at two hours and 59

21    minutes of on-tape testimony for the day,

22    well short of what we're permitted under the

23    federal rules.  I also understand that,

24    Mr. Ryland, you have a hard stop at 5:00 p.m.

25    today.

EXHIBIT 52
1940

DON BULSON - 7/19/2011

```
 1                    MR. RYLAND:      And Mr. Bulson
 2      has interviews for the U.S. PTO, and would
 3      need to prepare for this evening, because
 4      they begin tomorrow morning.
 5                    MR. KLINE:      So that's an
 6      hour and 50 minutes.  We're not going to
 7      finish the amount of time that we're
 8      permitted under the federal rules today.
 9      We've been discussing the following protocol
10      to kind of deal with where things stand.
11      Number one, we would come back here, a day
12      hopefully in the early fall, to complete the
13      deposition.  And at that deposition we'd get
14      two-and-a-half hours of on-tape time, not to
15      exceed four hours overall of Mr. Bulson's
16      testimony.  We DC if there was some
17      obstreperous conduct, some other unforeseen
18      circumstances, a series of fire alarms or the
19      like, we'd want to be able to work with you
20      in good faith and within reason to slightly
21      modify those schedules.
22           In interim we would want to file a
23      motion on the privilege claims that have been
24      asserted in this deposition.  We'd want to
25      sort out with Mr. Toberoff his claims that
```

EXHIBIT 52
1941

DON BULSON - 7/19/2011

1    protective orders cover certain documents or

2    not.  We would also want to meet and confer

3    with you and your colleagues and really the

4    Michael Siegel camp as well about getting

5    certain documents, one of them is a court

6    order, another of them is a certain expert

7    submission that it sounds like was made in

8    your law firm's case against the Siegel

9    estate, and some other document issues.  Our

10   hope would be to get rulings on the privilege

11   issues from the California, or some other

12   court, maybe it's an Ohio court if it's a

13   more expeditious basis to do it.  Sort out of

14   document issues hopefully by mutual agreement

15   rather than motion and practice, and then

16   come back here and complete the deposition.

17       And at the deposition I would do two

18   things.  One, I would cover the ground that I

19   wasn't able to cover this morning because of

20   the objections, and number two, I would

21   finish my examination.  I'm probably, I don't

22   know, two-thirds of the way through the

23   examination.  I have a third left.  But I

24   would be confined to that time period that we

25   agreed to.  We would very much like

EXHIBIT 52
1942

DON BULSON - 7/19/2011

Page 171

1          Mr. Toberoff to agree to this protocol,

2          because we think in any instance we have the

3          right to get our full seven-and-a-half hours,

4          and we're not going to get that done today.

5          Our understanding is from you, Mr. Ryland,

6          that your firm would not object to a

7          deposition on these terms.

8                    MR. RYLAND:        It's just me.

9          It's not my firm.

10                   MR. KLINE:        You and

11         Mr. Bulson, the witness.

12                   MR. RYLAND:        Mr. Bulson

13         will agree to, you know, not file a motion to

14         quash, and will agree to sit for a second

15         portion of the deposition as long as it's

16         two-and-a-half hours of tape time, not to

17         exceed four hours total of deposition.  Two,

18         that the privilege issues and confidentiality

19         issues with respect to documents that you

20         plan to use in the deposition are resolved

21         ahead of time.

22                   MR. KLINE:        Okay.

23                   MR. RYLAND:        Whether that

24         is by court order or by party agreement, we

25         don't mind.  We just don't want to have to

EXHIBIT 52
1943

DON BULSON - 7/19/2011

Page 172

```
 1     endure what we endured today, which is

 2     clearly unresolved document issues.  And

 3     three, if possible, and how we do this is

 4     something I'm willing to negotiate on, but we

 5     either have a magistrate in California, a

 6     magistrate in Cleveland, or an Article 3

 7     judge prepared to weigh in if we reach

 8     impasse, so we can resolve the issue before

 9     we would have to require anybody else to

10     travel again or Mr. Bulson to change his

11     schedule to sit for any additional deposition

12     time.

13              MR. KLINE:      How about a

14     private discovery referee from like a JAMS

15     panel or any other?

16              MR. RYLAND:      I'm happy to

17     do that as long as Mr. Bulson doesn't bear

18     the cost of the private discovery mediator, I

19     guess.

20              MR. KLINE:      Okay.  Okay.

21              MR. TOBEROFF:      I don't

22     understand, when you say two-and-a-half hours

23     of tape time, four hours of deposition time,

24     what is that extra one-and-a-half hour mean?

25              MR. RYLAND:      If we started
```

EXHIBIT 52
1944

DON BULSON - 7/19/2011

Page 173

1       the deposition at 8:00 a.m., my understanding

2       of that, Counselor, is we started at 8:00

3       a.m., the deposition would be over by noon

4       regardless of how much --

5                       MR. TOBEROFF:    So you're

6       leaving an hour and a half for breaks.

7                       MR. RYLAND:    I'm building

8       in some fudge factor understanding there are

9       probably still going to be some lingering

10      objections and both of you guys have a lot of

11      words.   That's okay.

12                      MR. TOBEROFF:    So I think you

13      wanted to state something about as your

14      earlier objections?

15                      MR. BERK:    I would just

16      like to state that I'm not a hundred percent

17      sure all my earlier objections, but as many

18      of these documents have come in as to

19      negotiations between Mr. Toberoff and

20      Mr. Bulson, though they may be part of his

21      work product, I will not have an objection to

22      them as far as communications between

23      Mr. Toberoff and Mr. Bulson.

24                      MR. KLINE:    Terrific.  And

25      so one of the ways we can sort these issues

EXHIBIT 52
1945

DON BULSON - 7/19/2011

```
 1      out before the next deposition is we can give

 2      you a copy of the transcript, and you can

 3      tell us which ones you're withdrawing, and

 4      that way we wouldn't have to file a motion on

 5      it.

 6                  MR. BERK:        Okay.  We can

 7      do that.

 8                  MR. KLINE:       Great.

 9                  MR. BERK:        And I will

10      still have objections to any conversations

11      between Mr. Bulson and Mr. Siegel, Michael

12      Siegel.

13                  MR. KLINE:       Including if

14      Mr. -- Michael Siegel gives a letter to

15      Mr. Bulson that was sent to him by Laura

16      Siegel, you still would object to him

17      answering questions about that?

18                  MR. BERK:        If you asked

19      him questions of a letter that you got

20      independently of him getting it from Michael

21      Siegel, and you have it somewhere else, I

22      don't have a problem with that.  I have

23      a problem --

24                  MR. RYLAND:      This is

25      exactly what we mean by --
```

EXHIBIT 52
1946

DON BULSON – 7/19/2011

Page 175

```
 1                    THE WITNESS:     Why don't you
 2      do this as part of your resolving.
 3                    MR. KLINE:     Understood.
 4      So Mr. Toberoff, are you amenable to those
 5      conditions?
 6                    MR. TOBEROFF:     We're
 7      reserving our rights to object to having to
 8      travel to Cleveland now for yet a third
 9      deposition of Don Bulson, a third party, on
10      things that are absolutely marginal, of
11      marginal relevance.  You've taken now his
12      depositions twice.  You're seeking to take it
13      a third time.  You're all over the documents.
14      You're showing him is the name Ari Emanuel,
15      who is in Los Angeles, and you haven't once
16      in this case noticed his deposition, even
17      attempted to take his deposition.  Yet
18      Mr. Bulson is being subjected to a third
19      deposition testimony by your firm.  And also
20      the nature of the questions that you've asked
21      him and their marginal relevance to any
22      cognizable claim or a basis for us to, so
23      we're reserving our objections, and we're not
24      at this time agreeing to any sort of deal to
25      have to fly across country again for the
```

EXHIBIT 52
1947

DON BULSON - 7/19/2011

Page 176

1       third time for Mr. Bulson's deposition.

2                    MR. KLINE:       Okay.  As I

3       understand it, we'll notice the deposition,

4       Mr. Bulson will appear for the deposition.

5                    MR. RYLAND:       Subject to

6       those conditions.

7                    MR. KLINE:       And

8       Mr. Toberoff can either appear or not appear.

9                    MR. TOBEROFF:    Or move --

10                   MR. RYLAND:      And not to

11      change the terms of the underlying deal, but

12      I'm hoping that we can at least get a

13      gentlemen's agreement here that there's going

14      to be some sort of protective order in place.

15                   MR. KLINE:       Absolutely.

16                   MR. RYLAND:       That was

17      another -- we marked the whole thing

18      attorneys eyes only.  I trust all of the

19      attorneys in this room not to cause a problem

20      with that, but we're hoping at some point we

21      can rely on a protective order as a third

22      party to --

23                   MR. KLINE:       We will reach

24      an agreement with you immediately to

25      designate --

EXHIBIT 52
1948

DON BULSON – 7/19/2011

```
 1                    MR. RYLAND:      That's fine.
 2                    MR. KLINE:       -- any portion
 3      of this that you want protected, protected.
 4                    MR. RYLAND:      I think that's
 5      fine.  No problem.  I just wanted to make
 6      sure we're clear on that, because I know
 7      we're going to get into, or at least you've
 8      touched on elements of Don's practice.
 9                    MR. KLINE:       Understood.
10                    MR. RYLAND:      And objections
11      are going to be resolved and --
12                    MR. KLINE:       So my
13      understanding of this is we're going to
14      litigate whatever we litigate, work out
15      whatever we can work out with them, and at
16      some point we're going to notice a deposition
17      here, and you guys will appear for that.
18      Mr. Toberoff may say, hey, I'm not flying
19      out, or he may try to go file a protective
20      order motion, but it's not going to be
21      incumbent upon us to compel Mr. Bulson's
22      testimony.
23                    MR. RYLAND:      As long as we
24      agree that it's subject to those conditions
25      that I set forth, then we're fine.
```

EXHIBIT 52
1949

DON BULSON - 7/19/2011

Page 178

1                    MR. KLINE:      That's fine

2      with us.  Now, as I did mention, I wanted to

3      ask about five or six more questions if we

4      can do that.  It will be quick.

5                    MR. TOBEROFF:    I don't think

6      you should.  You're now going on your 5:00

7      o'clock.

8                    MR. KLINE:      It's literally

9      five or six questions?

10                   MR. RYLAND:      Is it

11     literally 15 minutes?

12                   THE WITNESS:    Five minutes,

13     right?

14                   MR. KLINE:      Five minutes?

15                   THE WITNESS:    Okay.

16  Q   Mr. Tokoro was good enough to give you this

17     exhibit, what exhibit number, it's No. 3 from

18     your first deposition.  It's 53 in this

19     deposition.

20  A   Yes.

21  Q   Okay.  If you look at privilege logs entries

22     356, 357, 366, and 367, do you see those,

23     sir?

24  A   I see 356 and other ones following it.

25  Q   And the second, the column that has Attorney

EXHIBIT 52
1950

DON BULSON - 7/19/2011

Page 179

| | | |
|---|---|---|
| 1 | | Kevin Marks in it, and then next to it |
| 2 | | Attorney Don Bulson, and then it says email |
| 3 | | attorney, do you see those different lines |
| 4 | | there? |
| 5 | A | Uh-huh, yes, yes. |
| 6 | Q | In June of 2004, and then in August of |
| 7 | | 2004 when these communications are taking |
| 8 | | place, it's your understanding that Kevin |
| 9 | | Marks had been terminated as the Siegel's |
| 10 | | attorney by then, correct? |
| 11 | A | I don't recall. |
| 12 | Q | You didn't receive a letter in October of |
| 13 | | 2001 -- |
| 14 | A | I know he was terminated.  I don't remember |
| 15 | | the timing. |
| 16 | Q | In October of 2001 you received a letter from |
| 17 | | the -- Mrs. -- from Joanne and Laura Siegel |
| 18 | | saying we have terminated Mr. Marks and |
| 19 | | terminated our discussions with Warner |
| 20 | | Brothers, correct? |
| 21 | A | I don't remember. |
| 22 | Q | Do you remember why it is that you were |
| 23 | | talking to Mr. Marks in June and August of |
| 24 | | 2004? |
| 25 | A | No. |

EXHIBIT 52
1951

DON BULSON - 7/19/2011

Page 180

```
 1   Q   After he was terminated as their attorney,

 2       what other occasion, if you remember any, did

 3       you have to speak to Mr. Marks?

 4   A   I don't remember.

 5   Q   Did you retain him at any point to help you

 6       in your representation of Michael Siegel?

 7   A   I don't believe so.

 8                   - - - - -

 9       (Plaintiff's Exhibit 54 was marked.)

10                   - - - - -

11   Q   Just marking very quickly Plaintiff's Exhibit

12       54, and I misspoke as to the date.  This is a

13       September 21, 2002 letter from Joanne Siegel

14       and Laura Siegel Larson, copying you and

15       Michael Siegel to Kevin Marks terminating

16       him.

17   A   I see the letter.

18   Q   So the privilege log entry is 356, 357, 366,

19       and 367 post date that termination by about

20       two years, correct?

21   A   Yes.

22   Q   Can you remember any attorney-client joint

23       interest agreement that you and Mr. Marks had

24       made that would cover communications in June

25       or August of 2004?
```

EXHIBIT 52
1952

DON BULSON - 7/19/2011

Page 181

```
 1    A    I don't remember.

 2    Q    Were you doing any other work with Mr. Marks

 3         on any other client matters?

 4    A    No.

 5    Q    Do you remember reaching any agreements with

 6         Mr. Marks about attorney-client joint

 7         interest?

 8    A    Yes.

 9    Q    And when were those agreements made?

10    A    Back during our initial discussions.

11    Q    2000, 2001?

12    A    Might be ballpark.

13    Q    But in 2004 he had been fired as the Siegels'

14         attorney, correct?

15    A    I believe so.

16              MR. KLINE:        Okay.  I think

17         reserving our rights to come back here and

18         take a second deposition under the conditions

19         we've talked about, and reserving our rights

20         to move to compel answers on the

21         conditions -- or on the bases that we'll have

22         to brief for the court, and it sounds like

23         you're going to withdraw some of those

24         objections soon, which would help narrow the

25         issues, thank you for your time, Mr. Bulson,
```

EXHIBIT 52
1953

DON BULSON - 7/19/2011

Page 182

1     and thank you for your time, Mr. Ryland, and

2     counsel for the Michael Siegel Estate, we

3     thank you for your time as well.

4            We don't have a stipulation in terms

5     of what the court reporter -- relieving her

6     of her duties.  I would ask if okay with you

7     that you be given an original copy of the

8     deposition, along with the exhibits, you

9     being Mr. Bulson.  That Mr. Bulson within 30

10    to 60 days, whatever is reasonable for you

11    and Mr. Ryland, you give us any corrections

12    to the deposition.

13           MR. RYLAND:     Yeah, agree to

14    read and sign.

15           MR. KLINE:     And you've

16    gone through this.  We can examine you on any

17    of those corrections and the like.

18           MR. TOBEROFF:    And we reserve

19    our objections if you intend to take a third

20    deposition of Mr. Bulson.

21           MR. KLINE:     Understood.

22    And I understood that the procedure that

23    you'll pursue those objections is via a

24    protective order motion?

25           MR. TOBEROFF:    We haven't

EXHIBIT 52
1954

DON BULSON - 7/19/2011

Page 183

1         decided yet what procedure we'll employ.

2                     MR. BERK:        Would you do

3         me the courtesy of calling me on the date?

4                     MR. KLINE:       We'll notice

5         you of the deposition.

6                     MR. BERK:        I mean before

7         you notice.

8                     MR. KLINE:       Oh,

9         absolutely.

10                    MR. BERK:        Because I do

11        spend a lot of time in Florida where my wife

12        is.

13                    MR. KLINE:       Happy to do

14        that.

15                    MR. BERK:        I'd just like

16        to work that out.

17                    MR. KLINE:       Happy to do

18        that.

19                    VIDEO TECHNICIAN:  We're off

20        the record.   The time is 3:20.

21           (Deposition adjourned at 3:20 p.m.)

22

23

24

25

EXHIBIT 52
1955

184

THE STATE OF OHIO,    )    SS:
COUNTY OF CUYAHOGA. )

I, Michelle M. Lewis, a Notary Public within
and for the State of Ohio, duly commissioned and
qualified, do hereby certify that DON BULSON, was
first duly sworn to testify the truth, the whole
truth and nothing but the truth in the cause
aforesaid; that the testimony then given by him
was by me reduced to stenotypy in the presence of
said witness, afterwards transcribed on a
computer/printer, and that the foregoing is a
true and correct transcript of the testimony so
given by him, as aforesaid.

I do further certify that this deposition
was taken at the time and place in the foregoing
caption specified.  I do further certify that I
am not a relative, counsel or attorney of either
party, or otherwise interested in the event of
this action.

IN WITNESS WHEREOF, I have hereunto set my
hand and affixed my seal of office at Cleveland,
Ohio, on this 27th day of July, 2011.

Michelle M. Lewis, Notary Public
within and for the State of Ohio
My Commission expires January 9, 2014.

EXHIBIT 52
1956

DON BULSON – 7/19/2011

Page 185

```
 1    STATE OF _____)
                          )  SS:
 2    COUNTY OF_____)

 3

 4

 5         Before me, a Notary Public in and for said

 6    state and county, personally appeared the

 7    above-named DON BULSON, who acknowledges that he

 8    did sign the foregoing transcript and that the

 9    same is a true and correct transcript of the

10    testimony so given.

11         IN TESTIMONY WHEREOF, I have hereunto

12    affixed my name and official seal at

13    _____this _____day of

14    _____, 2011.

15

16

17

18         _____
                DON BULSON
19

20

21         _____
                Notary Public
22

23    My Commission expires:_____

24

25
```

EXHIBIT 52
1957