# EXHIBIT 53

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 4

MR. KLINE:  Can I just clarify one thing? We did give notice to the other defense counsel and I assume they chose not to attend today.

MR. TOBEROFF:  Yes.  And I'm also here representing Dawn Peavy for purposes of her deposition.

DAWN PEAVY,

after having been first duly sworn under oath, was questioned, and testified as follows:

EXAMINATION

BY MR. KLINE:

Q.   Good morning, Ms. Peavy.  Thank you for meeting with us here today.  Have you ever been deposed before?

A.   No.

Q.   This is kind of a formal proceeding, so I want to go over a few of the ground rules with you, if that's okay.  We can take breaks throughout the day if you're tired, obviously have to go to the restroom, feeling hungry, want to address something like a hang nail.  If for any reason you want to take a break, you can take a break.  I would just ask not to do it in a middle of a line of questions or in the middle of a question.  If you don't understand any of my questions, I would like you to

Merrill  Corporation  -  Los Angeles

800-826-0277                          www.merillcorp.com/law

EXHIBIT 53
1958

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 5

1    say, "I don't understand your question, can you

2    please re-ask that."  Can you do that?

3        A.    (Witness nods.)

4        Q.    And one of the ground rules here today is,

5    I need you to say "yes" or "no" in response to

6    questions, because our fine court reporter here is

7    taking down your responses, and if you nod or shake

8    your head or say "uh-huh" or "huh-uh," there could

9    be a dispute later on about what you meant.  So do

10   you mind giving me answers "yes" or "no," if you

11   could?

12       A.    I will.

13           MR. TOBEROFF:  That assumes the question

14   can be answered yes or no.

15           MR. KLINE:  Of course.

16       Q.    (By Mr. Kline) And you understand that

17   you're testifying under oath today under the penalty

18   of perjury?

19       A.    Yes.

20       Q.    Okay.  Are there any medications you're on

21   today that would impact your ability to give

22   truthful and complete and honest testimony?

23       A.    No.

24       Q.    Any medical issues that you have that

25   would interfere with your ability to give complete

**ROUGH - DRAFT - DAWN PEAVY - 8/3/2011**

Page 6

1    and honest testimony?

2        A.    No.

3        Q.    I don't want you to give any speculative

4    answers today, or wild guesses, but if I do ask you

5    for a question for your best estimate, I'm entitled

6    to that.  So I don't want you to speculate as to

7    answers, but if you can estimate or give a best

8    estimate, I will ask you to do that today.  Okay?

9        A.    Yes.

10        MR. TOBEROFF:  That's so long as you have

11    a basis for making an estimation.

12        Q.    I'm not certain how long we'll go today,

13    but obviously, if we come to the lunch hour, we'll

14    probably take a short lunch break and then resume

15    afterwards.

16        I just want to talk a little bit about any

17    preparation you did in advance of your deposition

18    today.  Did you talk to anybody about coming here

19    for your deposition?

20        A.    No.

21        Q.    You didn't talk to your brother at all

22    about today's deposition?

23        A.    Well, yes.  My brother.  I spoke to him.

24        Q.    And what did you talk about with Mark

25    about the deposition today?

**Merrill  Corporation  -  Los Angeles**

800-826-0277                    www.merillcorp.com/law

EXHIBIT 53
1960

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 7

1      A.    Just that I was coming to the deposition.

2      Q.    Did he give you any advice on the

3  deposition?

4      A.    No.

5            THE REPORTER:  I'm sorry?

6      A.    Not really.  No.

7      Q.    Did he talk to you about the lawyers

8  involved in the case?

9      A.    No.

10     Q.    Did he talk to you about the claims

11  involved in the case?

12     A.    No.

13     Q.    Did you talk to your mother about coming

14  here for today's deposition?

15     A.    I told her that I was coming, but she --

16  she doesn't speak real well.  I mean, you can't...

17     Q.    And I know this is a hard subject to talk

18  about.  Your mother's health is not good right now;

19  correct?

20     A.    No.

21     Q.    She's 90 years old?

22     A.    (Witness nods.)

23     Q.    Okay.  And again, if there's something

24  that is a bothersome area of testimony and you want

25  to take a break and not talk about it, you know, for

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 8

1    a while, I'm happy to do that.  I know your mother

2    had a stroke a couple of years ago and has been

3    pretty sick.

4         A.    (Witness nods.)

5         Q.    So just let me know if you want to take a

6    break to do that.  Okay?

7         A.    Okay.

8         Q.    Did you meet with Mr. Toberoff at all

9    about today's deposition?

10        A.    Yes.

11        Q.    When was that?

12        A.    Last night.

13        Q.    Where did you meet?

14        A.    Hotel Santa Fe.

15        Q.    Okay.  How long did you meet with him?

16        A.    About an hour.

17        Q.    Did you review any documents with him?

18        A.    Other than the deposition papers, nothing.

19        Q.    That was it?

20        A.    The one that --

21              THE REPORTER:  I'm sorry, the one --

22        A.    The deposition papers, right?  Oh, I guess

23    the paper that --

24        Q.    Was it a document --

25        A.    Not only --

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 9

1    Q.   -- saying you need to come appear for this

2  deposition?

3    A.   Yes, the same one that -- yes.

4    Q.   Did you review a list of requests that you

5  produce documents to DC in this case?

6    A.   Yes.

7    Q.   And you went through each one of those

8  requests?

9    A.   Yes.

10    Q.   Did you search your home and personal

11  files for those -- for documents responsive to those

12  requests?

13    A.   I don't have any personal documents.

14    Q.   What do you mean by that answer?

15    A.   I don't have any documents that would be

16  of use.

17    Q.   Okay.  But you do keep personal documents

18  at home?

19    A.   My insurance, yes.

20    Q.   Do you have an e-mail account?

21    A.   Yes.

22    Q.   And do you save e-mails that you send and

23  receive?

24    A.   No, not really.

25    Q.   What is your e-mail address?

Merrill   Corporation   -   Los Angeles

800-826-0277                          www.merillcorp.com/law

EXHIBIT 53
1963

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 10

1      A.    DawnPeavy@gmail.com.

2      Q.    No dot between Dawn Peavy?

3      A.    (Witness shakes head.)

4      Q.    And do you have a Facebook account, a

5    Twitter account, anything like that?

6      A.    Facebook.

7      Q.    Okay.  Was yesterday at the Hotel Santa Fe

8    the first time you spoke to Mr. Toberoff about this

9    deposition?

10      A.    I'm sorry?

11      Q.    You met with Mr. Toberoff yesterday, you

12    said, at his hotel, I believe; is that correct?

13      A.    Correct.

14      Q.    Was that the first time you spoke to him

15    about this deposition?

16      A.    Yes.

17      Q.    You didn't speak to him by phone at all?

18      A.    Yes, I did talk to him by phone, to tell

19    me when it was.

20      Q.    But you didn't in any way prepare for the

21    deposition during those conversations?

22      A.    No.

23      Q.    Did you talk to Keith Adams in his office

24    at all about this deposition?

25      A.    I don't know who Keith Adams is.

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 11

1      Q.   Did you talk to any other lawyers that
2   you're aware of about this deposition?
3      A.   No.
4      Q.   You obviously told your employer that
5   you'd be here today; correct?
6      A.   Uh-huh.
7      Q.   So that's another person you told about
8   the deposition?
9      A.   No, I didn't tell him.  Sick day.  I can't
10   take -- I wouldn't -- I'd have to take a vacation
11   day.
12      Q.   And I apologize we had to do that.  We
13   tried to get this done on a Sunday, but we couldn't
14   agree on a date.  So I apologize you had to take a
15   sick day today.
16          Did you review any documents on your own
17   in preparing for today's deposition?
18      A.   No.
19      Q.   You didn't review the complaint in this
20   case that DC Comics has filed?
21      A.   No.
22      Q.   Have you ever seen the complaint in this
23   case --
24      A.   No.
25      Q.   -- that DC Comics has filed?  Now,

Merrill  Corporation  -  Los Angeles

**ROUGH - DRAFT - DAWN PEAVY - 8/3/2011**

Page 12

1    Mr. Toberoff said at the start of the deposition

2    that he represents you for purposes of today's

3    deposition; is that correct?

4        A.    Yes.

5        Q.    Are you paying him to do that?

6             MR. TOBEROFF:  You can answer the

7    question.

8        A.    I don't think so.  I don't know.  I don't

9    know.  I don't know.

10       Q.    So you don't --

11       A.    We haven't discussed that.

12       Q.    Okay.  You don't have any formal written

13   agreement with him about his provision of services

14   to you today?

15       A.    No.

16       Q.    And the issue of fees that he would charge

17   you for his representation today never came up?

18       A.    No.

19       Q.    Did he disclose to you any potential

20   conflicts of interest that he may have --

21       A.    No.

22       Q.    -- in representing you?

23       A.    (Witness shakes head.)

24       Q.    Do you understand he also represents the

25   Siegel heirs --

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 13

1       A.    Yes.

2       Q.    -- against DC?  And you understand that he

3   represents your brother and mother?

4       A.    Yes.

5       Q.    Okay.  I want to talk a little bit about

6   your background just briefly.  Where were you born?

7       A.    Sacramento, California.

8       Q.    Okay.  And is that where you grow up and

9   went to high school?

10      A.    No.

11      Q.    Where did you grow up and go to high

12  school?

13      A.    El Paso, Texas.

14      Q.    Okay.  Did you graduate from high school?

15      A.    Yes.

16      Q.    Did you attend any college?

17      A.    No.  Well, community college.

18      Q.    Where did you -- what was the name of your

19  high school, by the way?

20      A.    Andress.

21      Q.    How do you spell that?

22      A.    A-N-D-R-E-S-S.

23      Q.    Okay.  And the community college that you

24  attended -- you didn't get your AA degree there;

25  correct?

**ROUGH - DRAFT - DAWN PEAVY - 8/3/2011**

Page 14

1       A.    I only went one semester.

2       Q.    Which community college --

3       A.    TVI, in Albuquerque.

4       Q.    I'm sorry?

5       A.    In Albuquerque.

6       Q.    Okay.  And after your time at community

7   college, can you just walk me through your

8   employment history, different jobs you have held

9   over the years, and the names of the different

10  companies you have worked for, or individuals?

11      A.    I worked for Wal-Mart and then I worked

12  for El Paso -- well, no, Vista Hills Country Club,

13  in El Paso.

14            THE REPORTER:  I'm sorry --

15      A.    Vista Hills Country Club in El Paso.

16      Q.    Was the Wal-Mart in El Paso or

17  Albuquerque?

18      A.    El Paso and Albuquerque.

19      Q.    Okay.

20      A.    And Bennigan's Restaurant.  Quinco Sales,

21  Sysco Foods, and now I work for Zanios Labatt Foods.

22      Q.    What do you do in your current job?

23      A.    Sales representative.

24      Q.    Do you travel around the country

25  selling --

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 15

1      A.    No.

2      Q.    What's your geography that you focus on?

3      A.    Santa Fe and a little north.

4      Q.    And what type of food products do you

5    sell?

6      A.    Full-line distributor.

7      Q.    Okay.  To hotels and restaurants?

8      A.    Yes.

9      Q.    Do you sell up in Taos, as well?

10     A.    No.

11     Q.    Okay.  And how long have you worked there

12   for?

13     A.    Seven years.

14     Q.    In that job role, do you work with

15   lawyers?

16     A.    No.

17     Q.    How do you communicate with your

18   customers?  On the phone?

19     A.    In person, on phone.

20     Q.    E-mails?

21     A.    Maybe a few.  I mean, I guess at some

22   point, yes.

23     Q.    But mainly on the phone or in person?

24     A.    Yes.  In person, mainly.

25     Q.    And where do you live right now?

EXHIBIT 53
1969

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 16

1       A.    51 Camino Cabo.

2       Q.    And that's where your brother and mother

3   reside, as well?

4       A.    Yes.

5       Q.    Okay.  And I attended his deposition, and

6   he says that your youngest child, I believe,

7   occasionally stays with you there, as well?

8       A.    Yes.

9       Q.    Okay.  And your other children live in

10  Denver and El Paso?

11      A.    Yes.

12      Q.    Okay.  How big is your family home that

13  you live in now?

14      A.    I don't know.

15      Q.    Is it -- how many bedrooms?

16      A.    Four.

17      Q.    Okay.  And do you spend a lot of time

18  interacting with your mother and brother at home?

19      A.    Yes.

20      Q.    Good close relationships with them?

21      A.    Yes.

22      Q.    Is Mark your older brother or --

23      A.    Yes.

24      Q.    -- your younger brother?

25      A.    Yes.

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 17

1          (A discussion was held off the record.)

2      Q.    And what do you understand Mark does to

3    make a living right now?

4      A.    A writer and an investor.

5      Q.    What does he write?

6      A.    Books.

7      Q.    He writes scripts, as well; correct?

8      A.    Yes.

9      Q.    Have you read his two scripts about Joseph

10   Shuster --

11     A.    No.

12     Q.    -- and his life?  You're aware that he

13   wrote two scripts, though, about his life --

14     A.    Yes.

15     Q.    -- correct?

16          MR. TOBEROFF:  Assumes facts.  Assumes

17   facts.

18          Give me a second to object when we start

19   getting into more substantive questions.

20     Q.    You wrote a letter to a blogger named

21   Mr. Sim, correct, and talked about the fact that

22   Mark had written a screenplay, and it had been

23   optioned by Ilya Salkind; correct?

24     A.    No, not that I know of.

25     Q.    Okay.

**Merrill  Corporation  -  Los Angeles**

800-826-0277                    **www.merillcorp.com/law**

EXHIBIT 53
1971

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 18

1        MR. TOBEROFF:  Counsel, can we have that

2    as an exhibit, please?

3        MS. SETO:   24.

4        (Exhibit 24, previously marked.)

5        Q.   (By Mr. Kline)  This is Exhibit 24.  We

6    showed it to your brother at his recent deposition,

7    if you could take a look at it.  And I'll ask you to

8    look at the second and third pages.  One more page,

9    please.  I'm sorry.  The picture gets cut off.

10        And I'm going to show you and

11    Mr. Toberoff, just from here, my copy that's in

12    color.  These are pictures of you, your brother, and

13    your mother at the "Superman Returns" premiere;

14    correct?

15        A.   Correct.

16        Q.   And going back to the second page of this

17    blog, do you know who Dave Sim is, at all?

18        A.   Yes, I met him once.

19        Q.   Okay.  Do you see here, about three or

20    four paragraphs down, it says, "Oh, here's a great

21    one, a letter from Jean and Dawn and Warren Shuster

22    Peavy/Peary"?

23        MR. TOBEROFF:  What page are you on?

24    A.   That's my mom.

25        MR. KLINE:  The second page.

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 19

1      Q.   (By Mr. Kline)  Oh, so your mom wrote this

2   letter?

3      A.   Yeah.

4           MR. TOBEROFF:  Do you know, one way or

5   another?

6           THE WITNESS:  I think.  I believe.

7           MR. TOBEROFF:  Don't -- if you know,

8   testify.  Do you know one way or another what

9   they're talking about?

10           THE WITNESS:  I didn't write the letter.

11      Q.   (By Mr. Kline)  Did you know that your

12   mom -- or somebody had sent a letter purporting to

13   be from you, your mother, and your brother, to

14   Mr. Sims, including these copies of pictures?

15      A.   I don't know who wrote the letter.

16      Q.   But do you know that someone wrote a

17   letter to him purporting to come from you, your

18   mother --

19      A.   Well, just from reading this, I would

20   assume it was my mom, nutritional consultant--

21           MR. TOBEROFF:  Don't make assumptions.

22   You're not here to make assumptions.  You're here to

23   testify as to what you know or don't know.

24      A.   Okay.  I don't.  I don't know.  I did not

25   see a letter, so...

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 20

1      Q.   I'm going to give you another letter.  I'm

2   going to mark it as Exhibit 66.

3          (Exhibit 66 marked.)

4      Q.   Ms. Peavy, it's actually marked a new

5   exhibit there, marked as Exhibit 66.

6          MR. TOBEROFF:  I want to instruct my

7   client for a second.  Before you -- when you answer

8   questions, you're here to testify as to what you

9   know.

10          THE WITNESS:  Know.

11          MR. TOBEROFF:  The facts.  Not to

12   speculate, not to guess, and not to make any

13   assumptions.  That's all I want you to testify.

14      Q.   (By Mr. Kline)  I'm showing you another

15   letter that we have marked as Exhibit 66.  It's

16   dated February 9, 2008.  Do you see that at the top

17   there?

18      A.   The date?

19      Q.   Yes.

20      A.   Yes.

21      Q.   And do you see at the end of the second

22   page it says, "Love from the Joe Shuster family,

23   Jean, Dawn, and Warren"?

24      A.   Yes.

25      Q.   Have you seen this letter before?

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 21

1        A.    No.

2        Q.    I know your mom had a stroke in -- I think

3    it was 2008; correct?

4        A.    Correct.

5        Q.    Was it later than February 9, 2008?

6        A.    Yes.

7        Q.    Before then, did she have a computer that

8    she typed letters on?

9        A.    No.

10       Q.    Did she have a typewriter that she typed

11   letters on?

12       A.    Yes.

13       Q.    Would you or your brother help her type

14   those letters?

15       A.    No.

16       Q.    She did it on her own?

17       A.    Yes.

18       Q.    Do you know if she kept copies of the

19   letters that she wrote?

20       A.    No.

21       Q.    Did she ever talk to you about letters

22   that she was sending to Dave Sim?

23       A.    No.

24       Q.    When did you meet Dave Sim?

25       A.    I don't recall.

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 22

1      Q.    You said you did meet him, though;
2  correct?
3      A.    Yes.
4      Q.    Was it at the "Superman" premiere?
5      A.    No.
6      Q.    Was it at the Toronto Comic Con?
7      A.    Yes.
8      Q.    Does that sound familiar?  So you have
9  attended "Superman" related events with your mother
10  in recent years; correct?
11      A.    One.
12      Q.    Well --
13      A.    Or two.
14      Q.    You went to the premiere in Los Angeles;
15  correct?
16      A.    (Witness nods.)
17      Q.    Yes?
18      A.    Yes.
19      Q.    And you went to the Toronto Comic Con --
20      A.    Yes.
21      Q.    -- correct?  Did you also go to Cleveland
22  at any point in time --
23      A.    Yes.
24      Q.    -- for a celebration of Joe Schuster's
25  life?  So that's three; correct?

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 23

1      A.    Yes.

2      Q.    Do you also ever speak with -- do you know

3   who Mike Catron is, C-A-T-R-O-N?

4      A.    I met him once.

5      Q.    And who is he?

6      A.    A friend of my mother's.

7      Q.    Where did you meet him?

8      A.    I don't remember.

9      Q.    Are you aware that he helped your family

10   go to the "Superman Returns" premiere?

11     A.    No.

12           MR. TOBEROFF:  Vague.

13     Q.    Do you know if -- does your mother have an

14   e-mail account, by the way?

15     A.    No.

16     Q.    Has she ever, to your knowledge?

17     A.    No.

18     Q.    If she wants to find something on the

19   Internet, would she ask you or your brother for help

20   doing that?

21     A.    No.

22     Q.    Has she ever asked you for help --

23     A.    No.

24     Q.    -- finding something on the Internet?

25     A.    She's not on the computer, doesn't...

**ROUGH - DRAFT - DAWN PEAVY - 8/3/2011**

Page 24

1     Q.   Have you ever heard her ask your brother
2   for help using the Internet or finding something on
3   the Internet?
4     A.   No.
5     Q.   Are you aware that she's written letters
6   to Paul Levitz at DC Comics saying she found
7   something on the Internet or heard about something
8   on the Internet?
9     A.   No.
10     Q.   Would that surprise you, that she would
11   say she had heard about it that way?
12     A.   Yeah.  Well, no, because she might hear it
13   from a friend or somebody else, you know.  So I
14   can't say -- I mean, she's heard of the Internet.
15   It's not like she's oblivious to it.
16     Q.   But you have never seen her use the
17   Internet on her own?
18     A.   On her own, no.
19     Q.   Have you ever seen her sit down with Mark
20   and --
21     A.   No.
22     Q.   -- look for things on the Internet with
23   him?
24     A.   No.
25     Q.   Does Mark -- do you have a computer in the

**Merrill   Corporation   -   Los Angeles**

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 25

1    family home?

2         A.    No.

3         Q.    Does your brother, Mark?

4         A.    Yes.

5         Q.    What type of computer does he have?  Is it

6    a desktop or a laptop?

7         A.    Desktop.

8         Q.    Okay.  Do you know if it's an IBM type

9    computer, or a Macintosh type computer?  Apple?  You

10   don't know?

11        A.    Old.

12        Q.    It's old?

13        A.    (Witness nods.)

14        Q.    But he does have Internet access; correct?

15        A.    Yes.

16        Q.    Do you use his computer to monitor your

17   Facebook account?

18        A.    No.

19        Q.    Where do you do that?

20        A.    Usually my work laptop, if I do get on it,

21   or I'll use someone else's.

22        Q.    Are you able to bring your work laptop

23   home?

24        A.    Yes.

25        Q.    Okay.  And that's where you also use your

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 26

1    Gmail account?

2        A.    No.  My BlackBerry.

3        Q.    You have a BlackBerry, as well?  And do

4    you send and receive text messages on your

5    BlackBerry?

6        A.    Yes.

7        Q.    Okay.  Have you ever corresponded with

8    Dave Sim via e-mail?

9        A.    Not that I recall.

10       Q.    How about Mike Catron?

11       A.    No, not that I recall.

12       Q.    Have you spoken to either of them on the

13   phone?

14       A.    No.  I don't think so.

15       Q.    I'm going to mark a new exhibit, Exhibit

16   67.

17           (Exhibit 67 marked.)

18       A.    Other than maybe when we went to Canada, I

19   talked to him, I mean, to pick us up or something.

20       Q.    Okay.

21       A.    To Dave Sim, the first time I met him.

22       Q.    You met him up in Canada?

23       A.    Right.

24       Q.    But you can't remember where you met Mike

25   Catron?

**Merrill  Corporation  -  Los Angeles**

800-826-0277                    www.merillcorp.com/law

EXHIBIT 53
1980

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 27

1      A.   No.

2      Q.   You know, did you ever go to -- can you

3  take a look at Exhibit 24 again, at the Dave Sim --

4  I wanted to have you look at the pages.  It's

5  numbered 5 of 7 in the bottom left-hand corner.  The

6  first full paragraph there, it says, "When I did an

7  interview with Tina for CBC" -- and then there's a

8  bracket there, presumably for Mr. Sim saying "this

9  would be Jean asking" -- "do you know if that

10 program was ever on any TV schedule?  It would be

11 fun for me to have a copy if it was ever shown."

12      Do you see that paragraph there?

13     A.   No.  Where is it?  Very bottom?  Oh, okay.

14     Q.   Have you seen videotapes in your home or

15 video recordings in your home of your mother giving

16 TV interviews about Joe Shuster?

17     A.   No.

18     Q.   Have you seen a videotape recording of her

19 speaking on a panel at Comic Con in San Diego?

20     A.   No.

21     Q.   She's never showed you those videos?

22     A.   No.

23          MR. TOBEROFF:  Assumes facts.

24     Q.   And you're not aware that she has any such

25 videos?

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 28

1        A.    No.

2        Q.    In your family home, does your mother

3    have, you know, VHS tapes?

4        A.    Yes.

5        Q.    Does she have DVDs?

6        A.    Yes.

7        Q.    And have you gone through those

8    collections, ever?

9        A.    No.

10        Q.    Has your brother or your mother ever

11    spoken to you about tape-recordings of interviews of

12    your mother regarding Joe Shuster or "Superman"?

13        A.    I'm sorry, say that again?

14        Q.    Has your mother ever spoken to you about

15    tape-recorded interviews that she gave?

16        A.    She might have mentioned it.

17        Q.    I mean, you were on this Canada trip;

18    correct?

19        A.    Correct.

20        Q.    And were you aware that she gave an

21    interview to a woman named Tina from the Canadian

22    Broadcasting Company while she was on that trip?

23        A.    Yes.

24        MR. TOBEROFF:  Assumes facts.

25        Q.    You're aware that happened; correct?

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 29

1        A.    Yes.

2        Q.    Were you in the room when the interview

3    occurred?

4        A.    Not in the exact room, no.

5        Q.    Where were you physically situated when

6    that interview occurred?

7        A.    At the Comic Con.

8        Q.    Okay.  And your mom went off on her own to

9    give the interview?

10       A.    Uh-huh.  I don't recall.  I don't

11   remember.  That was years.  It's been, you know --

12       Q.    But you do remember she gave an interview

13   to Canadian television; correct?

14       A.    (Witness nods.)  Yes.

15       Q.    When you accompanied her to the "Superman

16   Returns" premiere in Los Angeles, you and your

17   brother, you remember that; correct?

18       A.    Uh-huh, yes.

19       Q.    And that was a fun and proud time for the

20   family, I assume?

21       A.    Yes.

22       Q.    Did any of you give press interviews?

23       A.    I don't recall.

24       Q.    You don't recall your mother giving a

25   press interview?

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 30

1          THE REPORTER:  Is that a no?

2     A.    No.

3     Q.    I'm going to give you Exhibit 67.

4          (A discussion was held off the record.)

5     Q.    This is a February 23, 2006, e-mail from

6     Michael Catron to Paul Levitz.  Do you know who Paul

7     Levitz is, Ms. Peavy?

8     A.    Something to do with DC.

9     Q.    And the subject is Jean Shuster Peavy and

10    "Superman Returns."  "Dear Paul, how are you?  I am

11    writing to you as the representative of Jean Shuster

12    Peavy.  As you may recall, Jean and Joe attended the

13    world premiere of 'Superman the Movie' at the

14    Kennedy Center in Washington, D.C., in 1978.  (I was

15    there, too.  It was a benefit for the Special

16    Olympics.)  Jean is now interested in also attending

17    the world premiere of 'Superman Returns' or perhaps

18    the Los Angeles premiere.  She would be pleased if

19    DC or Warner would arrange for her and her immediate

20    family, son, daughter, and two grandchildren's

21    expenses and would be willing, if asked, to do an

22    interview or two with the press.  Seems likely at

23    this point that I will be escorting her, so perhaps

24    my expenses could be included as well."

25          Did you ever see this e-mail before?

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 31

1       A.    No.

2       Q.    Did your children attend the premiere with

3   you?

4       A.    No.

5       Q.    Did Michael Catron attend the premiere

6   with you and escort your mother?

7       A.    No, not that I recall.

8       Q.    Does this refresh your recollection at all

9   whether your mother gave press interviews at the

10  premiere?

11      A.    I don't remember.

12      Q.    Did you know that Michael Catron was

13  holding himself out as the representative for Jean

14  Shuster Peavy in 2006?

15      A.    No.

16      Q.    Did your mother tell you that Michael

17  Catron was arranging for your family to attend the

18  premiere in 2006?

19      A.    No.

20      Q.    How did you come to learn that you were

21  going to go attend the premiere?  Did your mother

22  tell you?

23      A.    Yes.

24      Q.    And what did she say?

25      A.    I don't recall word for word.  I mean,

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

```
                                                      Page 32
 1    that we were -- you know, that we were invited to go

 2    to the premiere.

 3         Q.   Were you excited about that?

 4         A.   Yes, very much so.

 5         Q.   And why is that?

 6         A.   Because it's a creation of my uncle.

 7         Q.   Any other reasons?

 8         A.   No.  It's in honor of him.

 9         Q.   It was a fun event?

10         A.   Uh-huh, yes.

11         Q.   Are you interested in his creation?  I

12    mean, are you a "Superman" fan?

13         A.   Yes.

14         Q.   And do you follow the progression of the

15    character, and do you read the comic books, ever?

16         A.   No.

17         Q.   Do you read stories about new movies that

18    might be made about it?

19         A.   No.

20         Q.   Do you ever talk to your brother or mother

21    about those things?

22         A.   No.

23         Q.   Are you aware that Warner Brothers is

24    thinking about making a new "Superman" movie?

25         A.   Yes.
```

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 33

1      Q.   Are you aware that Christopher Nolan, who
2   was involved with "Batman" and "Inception" is
3   involved with that project?
4      A.   No.
5      Q.   How did you come to learn that Warner
6   Brothers is making a new "Superman" movie?
7      A.   A friend told me.
8      Q.   Have you ever discussed that with your
9   brother?
10     A.   No.
11     Q.   Do you ever talk to your brother about
12  Superman-related issues?
13     A.   Not really.
14     Q.   Why is that?
15     A.   I'm very busy.  I don't -- that's his -- I
16  mean, that's -- I don't know.
17     Q.   Do you eat dinner together at night?
18     A.   Nope.
19     Q.   Breakfast in the morning?
20     A.   No.
21     Q.   Do you see him when you're at home?
22     A.   Yes.
23     Q.   Do you speak to him when you're at home?
24     A.   Yes.
25     Q.   And the subject of "Superman" just never

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 34

1    comes up?

2          A.    I mean, no.  We talk about -- I don't

3    understand the question.  I mean, we talk just like

4    brother and sister, but we don't talk in depth

5    about -- I'm very busy.  I work a lot.  So I mean,

6    when I get home, it's mainly focused on my mom.

7          Q.    Taking care of her; right?

8          A.    Yes.  It's her time.

9          Q.    You understand, though, that your

10   brother -- you understand that your lawyer here

11   today, Mr. Toberoff, and your brother are seeking to

12   get millions of dollars for your family based on the

13   alleged "Superman" rights that your family holds;

14   correct?

15         A.    Yes.

16               MR. TOBEROFF:  Assumes facts.

17         Q.    You understand that; correct?

18         A.    Yes.

19         Q.    And you also understand that you and your

20   brother split the proceeds of your mother's estate

21   50/50 in her will; correct?

22         A.    Yes.

23         Q.    And it would be a significant change in

24   your life, would it not, if their efforts were

25   successful and millions of dollars were obtained for

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 35

1    your family; correct?

2        A.   I don't understand "change," what you mean

3    by...

4        Q.   What don't you understand about that?

5        MR. TOBEROFF:   What's the question?

6        Q.   What don't you understand about -- is it

7    the word "change" that you don't understand?

8        A.   Yes.

9        Q.   How do you define that word?

10       A.   I don't know.  Depends on who's asking it,

11   what, I mean...

12       Q.   I assume your mother has significant

13   medical bills?

14       A.   I don't know.

15       Q.   Who handles those --

16       A.   My brother.

17       Q.   If your mother or your family recovered

18   the millions of dollars they're claiming an

19   entitlement to --

20       MR. TOBEROFF:   Assumes facts, misstates

21   the record.

22       MR. KLINE:  You need to let me finish my

23   questions, Marc.

24       MR. TOBEROFF:   I thought you were

25   finished.

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 36

1      Q.    (By Mr. Kline)  If your family recovered

2   the millions of dollars they say they're entitled

3   to, do you think it would have an impact on your

4   life?

5           MR. TOBEROFF:  Assumes facts.  Misstates

6   the record.  There has been no claim by the Shuster

7   family to millions of dollars.

8           You can answer the question.

9           Vague and ambiguous.

10     A.    Okay, repeat the question.

11     Q.    If your family recovered the millions of

12  dollars they say they're entitled to, do you think

13  it would have an impact on your life?

14          MR. TOBEROFF:  Same objections.

15          You can answer.

16     A.    Yes.

17     Q.    And what would that impact be?

18     A.    I don't know how to answer that question.

19     Q.    Would you have to work less hard,

20  potentially?

21     A.    No, I'd probably still work just as hard.

22     Q.    Could you provide more for your children?

23          MR. TOBEROFF:  Matt, these questions are

24  ridiculous.

25          THE WITNESS:  Yeah.

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 37

1      MR. TOBEROFF:  She's here to testify as to
2  what she knows or doesn't know, not these rhetorical
3  questions about whether millions of dollars could
4  benefit her and how.  This is ridiculous.
5      MR. KLINE:  Marc, the speaking objection
6  is inappropriate.  I'm trying to figure out --
7      MR. TOBEROFF:  These questions are
8  inappropriate and ridiculous.  Ask her factual
9  speeches.
10     MR. KLINE:  Stop your speeches.
11     Q.  (By Mr. Kline)  I'm trying to figure out
12  why is it you say you never speak to your brother
13  about "Superman," when your family is claiming that
14  it's entitled to a lot of money from Warner
15  Brothers, and I find it hard to believe that --
16     A.  Well, I don't speak --
17     Q.  -- you never talked to him about it.
18     MR. TOBEROFF:  Wait.
19     Q.  So that's what I'm pursuing.  I'm trying
20  to find out why it is you would never talk to your
21  brother about this if this could have a dramatic
22  impact on your family, the rights that you're
23  claiming that -- the rights that your brother is
24  claiming that your family has, why you would never
25  talk about that.  Why is that?

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 38

1          MR. TOBEROFF:  Objection, misstates the

2     record.  There has been no claim from the Shuster

3     family to millions of dollars.  They have exercised

4     their termination rights under the Copyright Act.

5          (A discussion was held off the record.)

6          Q.   Why is it you never speak to your brother

7     about "Superman"?

8          A.   I don't speak to him about anything of the

9     legal fight, other than -- I mean, I talk to him

10    about "Superman," or -- but I don't ask what's going

11    on, or -- I don't -- I mean, that's -- he's doing it

12    for the -- he's doing it for our -- for the estate

13    and for our family.  I mean, I trust whatever he's

14    doing, you know.  I don't know.

15         Q.   Okay.  Now, when you do talk about

16    "Superman," what do you talk about, if you don't

17    talk about the legal stuff?

18         A.   Just mention to him, did he know that

19    there was another "Superman" movie coming out.

20         Q.   And what did he say?

21         A.   He said yeah, he knew about it.

22         Q.   Do you know that your brother, on behalf

23    of your family, through your attorney, has made

24    specific settlement demands on my client for money,

25    millions of dollars?

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 39

1          MR. TOBEROFF:  You're not free to discuss

2     settlement demands in a deposition that are

3     confidential.  You're bound by a confidentiality

4     agreement.

5          Q.   Are you aware that your family and your

6     brother have made settlement demands on my client to

7     settle their claims?

8          A.   I don't understand the question.

9     "Settlement."  I don't --

10         Q.   Do you know that your brother traveled to

11    Los Angeles about a year and a half ago to go to a

12    settlement mediation in this case?

13         A.   I didn't know what the term was of it.  I

14    just know he went to California for something to do

15    with "Superman."

16         Q.   Okay.  And are you aware that DC Comics

17    has made settlement offers to your family over the

18    years?

19         A.   No.

20         Q.   He's never disclosed that to you?

21         A.   (Witness shakes head.)  I'm sure he's

22    doing the right thing.

23         Q.   Has he ever discussed it in front of your

24    mother -- with your mother in front of you?

25         A.   No.

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 40

1       Q.    Have you ever been with him when he

2   discusses this case with your mother?

3       A.    No.

4       Q.    Have you ever heard your mother ask

5   questions about this case?

6       A.    No.  Their time is during the day, so I

7   mean...

8       Q.    That's when she's doing --

9       A.    Yeah, when I come home, it's me and my

10  mom.  I mean, we don't sit around and -- we make

11  dinner, you know...

12      Q.    So other than the one conversation where

13  you talked about the new "Superman Returns" movie,

14  do you have any recollection of conversations with

15  your brother about "Superman" in the last, say,

16  year?

17      A.    No.

18      Q.    Are you saying that such conversations

19  didn't take place, or that you can't recall?

20      A.    I can't recall.  I'm sure we talked, but

21  just -- I don't -- I don't really understand why I'm

22  here.  I don't have any -- you know, this is my

23  brother's -- I'm very busy.  I have my work I got to

24  focus on, and I don't -- I mean, it's in good hands.

25  I trust my brother.  I love my brother.  I love my

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

**ROUGH - DRAFT - DAWN PEAVY - 8/3/2011**

Page 41

1    family.  I trust Marc.  I don't understand why I'm

2    here.

3         Q.    When did you first meet Marc?

4         A.    The "Superman" premiere.

5         Q.    That was in what year?

6         A.    I don't remember.

7               THE WITNESS:  2006, was it?

8         Q.    Do you ever speak with him on the phone?

9         A.    No.

10        Q.    Do you ever e-mail with him?

11        A.    No.

12        Q.    So other than meeting him at the

13   "Superman" premiere and meeting with him last night,

14   have you ever met with him other than that?

15        A.    I talked to him on the phone once, I mean,

16   to set this up, or maybe twice.  I think it was

17   twice.

18        Q.    So other than those three times, have you

19   ever talked to him?

20        A.    Not that I recall.  I told you, that's my

21   brother.  That's my brother's business, he needs --

22   I got too much going on in my business.

23        Q.    So you trust Mr. Toberoff based on --

24        A.    Yes.

25        Q.    -- what your brother has told you about

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 42

1    him?

2         A.    Yes.  Well, yes.

3         Q.    And what has your brother told you about

4    Mr. Toberoff?

5         A.    That he's representing us.

6         Q.    And that he's trustworthy?

7         A.    Yes.

8         Q.    Has your brother told you that on behalf

9    of the family, he entered into business transactions

10   with one of Mr. Toberoff's entertainment companies,

11   Pacific Pictures Corporation?

12        A.    No.

13        Q.    Has he told you that Mr. Toberoff has

14   admitted in this lawsuit that that agreement was

15   void under the Copyright Act?

16        MR. TOBEROFF:  Totally misstates the

17   record.

18        Q.    Has he told you that?

19        A.    No.

20        MR. TOBEROFF:  Matt, I just want to tell

21   you that you're here to ask her -- and don't

22   interrupt me, please.  You're here to ask her

23   questions as a percipient witness, what she knows,

24   what she doesn't know.  You're not here to make your

25   case and to tarnish me.  So if that becomes what

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 43

1    this deposition is about, I'm going to shut it down.

2    You're on notice.  That's it.

3            MR. KLINE:  Okay, that's an improper

4    objection and an improper speaking objection.

5            MR. TOBEROFF:  We'll see.

6        Q.    (By Mr. Kline) I'd like you to look at

7    Exhibit 68, which is a brief filed on behalf of

8    defendants Warren -- Mark Warren Peary, as personal

9    representative of the Estate of Joseph Shuster, and

10   Jean Adele Peavy's reply in support of renewed

11   motion to dismiss and/or stay plaintiff's first

12   amended complaint pursuant to Federal Rule of Civil

13   Procedure 12(B)(6).

14            And I'd like you to read this paragraph

15   right here, paragraph 8, please, on page 8, please.

16            (Exhibit 68 marked.)

17            MR. TOBEROFF:  May I have a copy to show

18   the witness?

19            MR. KLINE:  Of course.

20       A.    This first part?

21       Q.    Letter C, paragraph C, starts about

22   line...

23            Are you done reading the paragraph?

24       A.    Yes.

25       Q.    Does Mr. -- has your brother shared any

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 44

1    legal briefs with you that are --

2        A.    No.

3        Q.    -- filed in the case?  And he hasn't told

4    you that Mr. Toberoff has admitted in the case that

5    the business arrangements that Mr. Toberoff set up

6    between his company, Pacific Pictures, and your

7    family were void under the Copyright Act?

8        A.    No.

9            MR. TOBEROFF:  Misstates the brief,

10   misstates the record.

11       Q.    I'm going to give you a copy of your

12   brother's deposition.  Have you read that

13   deposition?

14       A.    No.

15       Q.    Did he talk to you about the deposition

16   that he gave?

17       A.    No.

18       Q.    Nothing about it?

19       A.    (Witness shakes head.)  Other than I asked

20   him if it went well.

21       Q.    What did he say?

22       A.    "Okay."  I mean, I really don't...

23       Q.    Anything else?

24       A.    Huh-uh.

25       Q.    I know he had a hard time catching his

**ROUGH - DRAFT - DAWN PEAVY - 8/3/2011**

Page 45

1    flight.  He didn't talk about that?

2         A.    Yeah, but what does that have to do with

3    it?

4         Q.    Well, see, what I'm entitled here today is

5    just a full and complete answer of what you talked

6    about, and I want to get through the day.  I know

7    you're a very busy person, and so I'm going to try

8    to ask the questions.  If you can just give me a

9    full and complete answer, we'll move on a lot --

10           MR. TOBEROFF:  She has been.  Why are you

11    asking her whether her brother asked her whether she

12    had trouble catching his flight?  It's totally

13    irrelevant to this case.  You're just billing your

14    client and you're wasting our time.

15           MR. KLINE:  Marc, under the federal rules

16    you're not entitled to make these speeches.

17           MR. TOBEROFF:  You're not entitled to ask

18    questions like that.

19           MR. KLINE:  You can make objections.

20           MR. TOBEROFF:  It's abusive.

21           THE REPORTER:  I'm sorry, gentlemen.  One

22    at a time, please.

23         Q.    (By Mr. Kline)  What else did you and your

24    brother talk about, about the deposition?

25         A.    Nothing.

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 46

1    Q.   So he talked about he thought it went

2  well?

3    A.   I don't know about well.  He just said it

4  was okay.  You know...

5    Q.   And he talked about some flight logistics,

6  but that's it?

7    A.   Not flight.  Just told me he had to rush

8  to get to the airport, I think.

9    Q.   And you don't remember anything else?

10    A.   (Witness shakes head.)

11    Q.   But you do know that he gave a deposition

12  in this case pretty recently; correct?

13    A.   Yes.

14    Q.   Okay.  I'm going to give you and

15  Mr. Toberoff a copy of his deposition.  We'll mark

16  your copy.  What are we up to?  We'll give

17  Mr. Toberoff a copy also.  And I apologize, to save

18  some trees, we've printed it out four to a page.  If

19  you have any trouble reading it, let me know.  And I

20  want you to read page 233 right here, if you could.

21        MR. TOBEROFF:  What page are you on?

22        MS. SETO:  Page 233.

23    Q.   (By Mr. Kline)  Just 233, that bottom

24  right-hand page.

25        Are you done with that page?  Can you just

EXHIBIT 53
2000
247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 47

1  read a little bit of page 234, through line 4?

2  Actually, through line 11, please.

3      A.   All the way to line what?

4      Q.   Eleven, please.

5      A.   Oh, okay.

6      Q.   Now, I just want to confirm.  Your

7  brother's never told you that Mr. Toberoff admitted

8  that these original agreements he secured would

9  work; correct?

10      MR. TOBEROFF:  Asked and answered.

11  Misstates the record.

12      Q.   Correct?

13      MR. TOBEROFF:  You can answer.  You asked

14  that question three times.

15      A.   I have never talked about any of this.  I

16  don't even understand this part.

17      Q.   You understand that your brother has

18  testified in this case that he is your fiduciary, he

19  has fiduciary duties in his role as the executor of

20  your mother's estate; correct?

21      MR. TOBEROFF:  Assumes facts.

22      Only answer --

23      A.   What's "fiduciary"?  I don't even know

24  what that is.  What's "fiduciary"?

25      Q.   It means that he owes you legal duties, as

EXHIBIT 53
2001

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 48

1    somebody looking out for your interest.  You say you

2    trust him; correct?

3        A.    Yes.

4        Q.    And he owes you legal duties to protect

5    your mother's interests and your interests as the

6    beneficiary of her will; correct?

7        A.    Yes.

8        Q.    And have you discussed that with him, that

9    he owes you --

10       A.    You're talking about my brother; correct?

11       Q.    Yes, your brother, Mark Peary.

12       A.    Yes.

13           MR. TOBEROFF:  He's asking you whether you

14    ever discussed with --

15           MR. KLINE:  Marc, that's completely

16    inappropriate --

17           MR. TOBEROFF:  Don't interrupt me when

18    I'm --

19           THE REPORTER:  Gentlemen, please.  One at

20    a time.

21           MR. TOBEROFF:  The court reporter can't

22    take it down when you're talking over me.  You have

23    to stop doing that.  Now, please --

24           THE WITNESS:  Okay, can you repeat the

25    question?

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 49

1          MR. TOBEROFF:  Wait, wait.  Please don't.

2     I would like you just to testify as to what you

3     know, what you don't know, what you perceived, what

4     you saw, what you smell, what you heard.  But other

5     than that, don't assume something if you don't know

6     it.  That's all I'm asking.  You're here to testify

7     as to what you know.

8          MR. KLINE:  Okay.  That's another

9     inappropriate objection, and I'm going to ask you to

10    stop spending the time on the record make speeches.

11         MR. TOBEROFF:  I want to make sure you

12    have testimony as to what she knows.

13    Q.    (By Mr. Kline) Have you seen a copy of

14    your mother's will?

15    A.    No.

16    Q.    Do you know that it names you as a

17    beneficiary?

18    A.    Yes.

19    Q.    How do you know that?

20    A.    They told me.

21    Q.    Who is "they"?

22    A.    My brother and her.

23    Q.    Did they keep a copy of it in the house;

24    do you know?

25    A.    I don't know.

**ROUGH - DRAFT - DAWN PEAVY - 8/3/2011**

Page 50

1      Q.   Do you know if that will names any of your
2   children as beneficiaries?
3      A.   No.
4      Q.   You don't know, one way or the other,
5   or --
6      A.   No.
7      Q.   Okay.  Do you think that it does, or you
8   just don't know at all?
9      A.   Don't know.
10     Q.   Have you discussed with your brother and
11  your mother setting up a trust that would receive
12  the benefits of your mother's estate, and that trust
13  would pay out monies to you and your brother?
14     A.   Yes.
15     Q.   Can you describe those discussions,
16  please?
17     A.   I asked my brother -- or he told me, I
18  guess, I didn't ask him -- that the estate is set
19  up, and that there will be a trust in both of our
20  names.  That's about it.  And I did ask.
21     Q.   And you say this is a conversation you
22  think he prompted?
23     A.   No, maybe I asked what was -- how it was
24  going to work out.
25     Q.   Do you know if those trusts, formal

EXHIBIT 53
2004

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 51

1    documents, have been set up and signed?

2          A.    No.

3          Q.    Do you know if your mother -- I mean, is

4    your mother in a state right now where she could be

5    signing legal documents like that?

6          A.    She can sign her name.

7          Q.    But she has a hard time communicating with

8    you verbally?

9          A.    Yes.

10         Q.    Does she have a hard time understanding

11   things?

12         A.    (Witness nods.)

13         Q.    Again I'm sorry, I know this is a --

14         A.    I don't want to talk about my mom.

15         Q.    I know.  And I want to make this as brief

16   as possible, and I think you nodded yes.  You want

17   to take a break?

18         A.    (Witness nods.)

19               (Recess from 10:02 a.m. to 10:11 a.m.)

20               (Exhibit 12, previously marked.)

21         Q.    Ms. Peavy, I'm going to switch topics for

22   a moment, because talking about your mom is tough.

23   What I have put in front of you is Exhibit 12, which

24   was used at your brother's deposition.  And

25   unfortunately, this is not a consecutively paginated

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 52

1    document, but if you look about, I don't know, 15

2    pages in, there's a document that you signed called

3    "Waiver of notice and consent, petition for probate

4    of (lost) will."  I think if you turn to the page

5    with your signature on it --

6            MR. TOBEROFF:  Assumes facts.

7        Q.   -- is that your signature, Ms. Peavy?

8        A.   Yes.

9        Q.   And do you remember in 2003 signing this

10   document?

11           THE VIDEOGRAPHER:  Pardon me,

12   Mr. Toberoff.  Your microphone is currently off.

13       A.   I guess I don't remember when, but I guess

14   I signed it.  It's my signature.

15       Q.   Do you have any recollection -- it says,

16   "Signed, executed this 20th day of August, 2003, in

17   Santa Fe, New Mexico."  Were you living in Santa Fe

18   at the time?

19       A.   In August?  No.

20       Q.   You were not?

21       A.   No, I don't think I was living here.

22       Q.   Do you remember receiving and signing this

23   document?

24       A.   I don't remember.  I don't remember.

25       Q.   Do you remember being presented documents

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 53

1    to sign in connection with the probate of Joseph

2    Shuster's estate?

3         A.   I don't remember.  I mean, it's been eight

4    years.  I guess I'm...

5         Q.   But you have no recollection, as you sit

6    here today, eight years after August 21, 2003, of

7    signing this document; is that correct?

8         A.   No.

9         Q.   Do you remember signing a separate

10   document that would entitle your brother to act as

11   the administrator of the Joseph Shuster estate?

12        A.   No.

13        Q.   And I think I was imprecise in my

14   language.  Do you remember signing a separate

15   document that would entitle him to act as personal

16   representative of the estate of Joseph Shuster?

17        A.   No.

18        Q.   Do you remember signing a document saying

19   that he could act as the executor of the estate of

20   Joseph Shuster?  Is the answer no?

21        A.   No.

22        Q.   Do you know that Joseph Shuster's will, or

23   at least the copy that we've been given, says that

24   your mother would act as the executor of the estate?

25   Were you aware of that?

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 54

1       A.    No.

2       Q.    Are you aware that your brother was

3   substituted in as the executor instead of her?

4       A.    I know he's the executor of the estate.

5       Q.    Okay.  And you don't remember signing

6   documents waiving any right for you, yourself, to

7   serve as the executor?

8       A.    No.

9       Q.    Have you done anything to track your

10  brother's work as executor of Joseph Shuster's

11  estate?

12      A.    No.

13      Q.    And this is because you trust him to

14  represent your mother and your interests?

15      A.    Yes.

16      Q.    And he's told you he would do that?

17      A.    Yes.

18      Q.    Do you understand that he has certain

19  duties and liabilities as the executor of her

20  estate?

21      A.    I don't understand the question.

22      Q.    Well, I'm going to show you a document

23  that was filed in Los Angeles superior court in

24  October of 2003.

25            (Exhibit 70 marked.)

Merrill  Corporation  -  Los Angeles
800-826-0277                          www.merillcorp.com/law

EXHIBIT 53
2008

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 55

1    Q.   I'm going to mark it as Exhibit 70.  I'll

2    give Mr. Toberoff a copy, also.

3         Do you see -- can you turn to the second

4    page, please, of this document?  See where it says

5    September 30, 2003, at the bottom there?  And the

6    name Mark Warren Peary is typed, and there's a

7    signature to the right of it?

8    A.   Yes.

9    Q.   Do you recognize that to be your brother's

10   signature?

11   A.   Yes.

12   Q.   I want to turn your attention to page 2 --

13   I'm sorry, to page 1.  And at the bottom there it

14   says, "Number 2," and this is in all caps,

15   "Inventory of estate property."  Do you see that,

16   this part?

17   A.   Oh, yeah.

18   Q.   And do you see letter C below there?

19   A.   Yes.

20   Q.   "File and inventory appraisal"?  Can you

21   just read into the record what it says there?

22   A.   "Within four months after letters are

23   first issued to you as personal representatives, you

24   must file with the Court an inventory and appraisal

25   of all the assets in the estate."

Merrill   Corporation   -   Los Angeles

800-826-0277                         www.merillcorp.com/law

EXHIBIT 53
2009

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 56

1      Q.    Do you know if your brother has ever filed
2  such an inventory?
3      A.    I don't even understand what that means.
4  I don't understand legal.
5      Q.    Has he ever told you -- and I'm not asking
6  you to understand legal.  Has he ever told you that
7  he has never filed such an inventory, though?
8      A.    I don't know what inventory -- I don't
9  understand the question.
10     Q.    So I want to be as clear as I possibly
11 can.  Has Mark ever said to you, "Dawn" -- and I'm
12 just going to use your first name for this
13 example -- in words or effect, "Dawn, I have chosen
14 not to file an inventory in the probate action in
15 California"?
16     A.    No.  I don't -- we don't talk about that.
17     Q.    So you don't know, one way or another,
18 whether such an inventory has been filed?
19     A.    I don't even know what you mean by
20 "inventory."  I don't understand the question.  I
21 don't -- he's never talked to me about that.
22     Q.    Okay.  And just because you're saying you
23 don't understand the question, I'm sorry if I'm
24 being imprecise, but I just want to understand this.
25 He's never discussed the issue of filings he has

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 57

1    made or has not made in the probate action with you?

2        A.    No.

3        Q.    Okay.  So I'm trying to kind of figure out

4    a way to kind of know what he has told you and not

5    told you.  It's your testimony he's never told you

6    about anything he's doing in the probate action?

7        A.    No.

8        Q.    Okay.  Can you turn to page 2?

9        A.    Am I supposed to be reading this?

10       Q.    No, you're just waiting for a lawyer who's

11   looking to formulate a question, and I apologize for

12   that.

13             On number 3, and I think your previous

14   answer answers this, but do you see notice to

15   creditors at the top there?

16       A.    Yes.

17       Q.    Has he ever discussed with you whether

18   he's served such notices or not?

19       A.    No.

20       Q.    On number 5, the record-keeping, do you

21   see that word, those two words, "record-keeping"

22   there?

23       A.    Yes.

24       Q.    Has he ever discussed with you what

25   record-keeping he's done?

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 58

1       A.    No.

2       Q.    Number 6.  Can you read that, what it says

3    below, "Consulting an attorney"?

4       A.    "If you have an attorney, you should

5    cooperate with the attorney at all times.  You and

6    your attorney are responsible for completing the

7    estate administration as promptly as possible.  When

8    in doubt, contact your attorney."

9       Q.    Did your brother tell you that as of this

10   2006 deposition, he had never spoken directly to his

11   probate attorney about these proceedings?

12      A.    No.  No.

13            MR. KLINE:  Can we get a copy of

14   Mr. Peary's first deposition, please?

15            I'm going to mark this as Exhibit 71.

16            (Exhibit 71 marked.)

17      Q.    If you could just read page 38, please.

18            Are you all done?

19      A.    Uh-huh.

20      Q.    Do you know who John Pettker is?

21      A.    No.

22      Q.    Has your brother Mark ever talked to you

23   about his probate attorney in Los Angeles?

24      A.    No.

25      Q.    He's never discussed any of his

EXHIBIT 53
2012

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

**ROUGH - DRAFT - DAWN PEAVY - 8/3/2011**

Page 59

1    interactions with him with you?

2         A.    No.

3         Q.    Can you take a look at the last exhibit I

4    gave you, which is 70?  And I want to focus your

5    attention on the part of paragraph 6 that you read,

6    "You and your attorney are responsible for

7    completing the estate administration as promptly as

8    possible."

9         A.    Are you reading that?

10        Q.    Under "Consulting an attorney."

11        A.    On the second page?

12        Q.    Yes, on the second page.  I'm sorry.

13   Under number 6.

14        A.    Okay, say -- repeat that.

15        Q.    The second sentence, "You and your

16   attorney are responsible for completing the estate

17   administration as promptly as possible.  When in

18   doubt, contact your attorney."

19             Do you see that?

20        A.    Yes.

21        Q.    Do you -- has Mark, your brother, Mark,

22   and I'm only using this for shorthand, and I'll use

23   "Mr. Peary" if you'd like me to -- has your brother

24   told you that that probate case remains open?

25        A.    No.

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 60

1    Q.    Has he told you that the assets of the
2    estate have not been distributed to your mother yet?
3    A.    No.
4    Q.    Can you look down here on -- there's a box
5    and it says "Notice."  Can you read number 2 for me,
6    please?
7    A.    "If you fail to perform your duties or to
8    meet the deadlines, the Court may reduce your
9    compensation, remove you from office, and impose
10   other sanctions."
11   Q.    Has Mark, your brother, Mr. Peary,
12   discussed with you that there's a requirement under
13   California law that he close the estate and
14   distribute the assets to your mother in a timely
15   manner?
16   A.    No.
17   Q.    And do you know that the estate has
18   remained open for several years and not been closed?
19   A.    No.
20   Q.    He hasn't discussed that with you at all?
21   A.    No.
22   MR. TOBEROFF:  May I make --
23   Q.    Have you heard him discuss this with your
24   mother?
25   A.    No.

**ROUGH - DRAFT - DAWN PEAVY - 8/3/2011**

Page 61

1     Q.   Have you heard him talk to your mother

2   about John Pettker?

3     A.   No.

4     Q.   Have you heard him talk to your mother

5   about a separate probate lawyer in California who's

6   going to help the family out?

7     A.   No.

8     Q.   Have you heard him talk to your mother

9   about inventory of estate property?

10     A.   No.

11     Q.   Have you heard him talk to your mother

12   about the need within four months after letters are

13   first issued to you as personal representative, you

14   must file with the Court an inventory and appraisal

15   of all the assets in the estate?

16     A.   No.  We don't talk about this.  I already

17   told you.  I don't understand.  I mean, I trust him.

18   He's doing what's right for the family, and

19   that's -- I mean, that's basically what I know.  I

20   mean, I love my brother and I trust him.

21     Q.   But he's making all the decisions without

22   consultation with you.

23     A.   Right.

24     MR. TOBEROFF:  May I make a suggestion?

25   When you refer to her brother, to avoid confusion,

**ROUGH - DRAFT - DAWN PEAVY - 8/3/2011**

Page 62

1    since my name is also Marc, I would say "Warren,"

2    because he goes -- is Mark Warren Peary, and he

3    actually goes by the name Warren.

4           MR. KLINE:  I'm happy to do that.  I just

5    didn't want to be disrespectful.  I'll actually call

6    him Mr. Peary.  I'm just trying to --

7           MR. TOBEROFF:  I think Warren is good.

8       A.    You can call him Warren.

9           MR. TOBEROFF:  Good shorthand.

10          MR. KLINE:  Okay.

11      Q.    (By Mr. Kline)  Did your brother tell you

12   that he and your mother had been sued in this

13   lawsuit?

14      A.    No.

15      Q.    You understand that a complaint has been

16   filed against him and your mother; correct?

17      A.    No.

18      Q.    You have never seen the complaint in this

19   case?

20      A.    No.

21      Q.    Okay.  And he's not told you that DC

22   Comics has filed a lawsuit challenging whether your

23   family has any rights to terminate copyright

24   interests?

25      A.    No.

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 63

1      Q.   Did he tell you that as early as 2005, if

2   not well before, DC Comics was challenging your

3   family's claim to copyright termination interests?

4      A.   No.

5      Q.   Did he tell you that despite DC

6   challenging that -- the copyright termination

7   interests, he never filed any lawsuit seeking to

8   protect your family's rights?

9      A.   No.

10      Q.   Did you ever hear him discuss any of these

11   issues with your mother?

12      A.   Not that I paid attention, no.  I don't

13   know.  No.

14      Q.   Did he ever talk to you about how the

15   statute of limitations might run on any claims your

16   family might have?

17      A.   No.  I already told you, we don't talk

18   about this.

19      Q.   I know.  I know.  And I'm just trying to

20   kind of get a complete record here.

21      A.   Okay.

22      Q.   Did you ever hear him talk to your mother

23   about a statute of limitations running --

24      A.   No.

25      Q.   -- on any claims your family might have?

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 64

1    Are you aware that your mother and her brother --
2    you know your Uncle Frank -- you remember him?
3        A.    Yes.
4        Q.    Are you aware that your mother and your
5    Uncle Frank signed a contract with DC in 1992?
6        A.    No.
7        Q.    Are you aware that your mother has sent
8    letters to DC Comics over the years?
9        A.    No.
10       Q.    Are you aware that she receives a pension
11   payment --
12       A.    Yes.
13       Q.    -- from DC Comics?  How are you aware of
14   that?
15       A.    Because of source of income.  We need to
16   know a source of income for her.
17       Q.    So has she ever told you why she gets that
18   payment?
19       A.    No.  Not really, no.  Has to do with my
20   uncle.
21       Q.    Has your brother told you -- strike that.
22            Are you aware that on occasion, she has
23   asked for and received special bonuses or special
24   payments from DC Comics over the years?
25       A.    No.

EXHIBIT 53
2018

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 65

1      Q.   Who helps your mother handle her financial

2   issues?  I think you said it was your brother,

3   Warren?

4      A.   My brother.

5      Q.   And so you have no involvement in that?

6      A.   No.  His side.

7           (Exhibit 47, previously marked.)

8      Q.   Okay.  I'm going to show you an exhibit

9   marked as Plaintiff's Exhibit 47 in your brother's

10   deposition.  I'd ask you to take the time to read

11   the letter, please.

12      A.   You want me to read the whole thing?

13      Q.   Sure.  Take your time.

14           MR. TOBEROFF:  Objection.  This is a

15   seven-page single-spaced letter.  She's not going to

16   sit here and read this entire letter.  For what

17   purpose?  Why are you asking her to read a

18   seven-page single-spaced letter in the middle of the

19   deposition?

20      Q.   Please read the letter.

21           MR. TOBEROFF:  Why are you asking her to

22   read a single-spaced --

23           MR. KLINE:  I'm not going to engage you,

24   Marc.

25           MR. TOBEROFF:  I object to having her have

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 66

1    to read this letter.

2              MR. KLINE:  Okay.

3              MR. TOBEROFF:  You better have substantive

4    questions around the substance of this letter, after

5    making her read the entire letter.

6         A.   I'm a slow reader.

7         Q.   (By Mr. Kline)  That's fine.  Take your

8    time.

9              When you get to page 4, if you don't mind,

10   just let me know.

11        A.   Okay.  Three, you said?

12        Q.   Yes, just through the first paragraph of

13   page 4.

14        A.   Okay.

15        Q.   Were you living with your mother and

16   brother in April of 2005?

17        A.   Yes.

18        Q.   Did you see a copy of this letter?

19        A.   No.

20        Q.   Were you part of any discussions regarding

21   this letter?

22        A.   No.

23        Q.   Do you remember overhearing your brother

24   and mother discussing DC's offer to settle its

25   claims with your family?

EXHIBIT 53
2020

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 67

1      A.    No.

2      Q.    Did your brother tell you that DC offered

3   your family a settlement in which there would be a

4   certain upfront cash component and then these

5   royalties on future "Superman" products?

6      A.    No.

7      Q.    Did he tell you that the upfront cash

8   component would be paid right away, and not in 2013,

9   when the purported termination takes effect?

10          MR. TOBEROFF:  Asked and answered.  She

11   just said she had no discussions about the document.

12   Why are you asking her separate little questions?

13   She already said she had no --

14          MR. KLINE:  Marc, your objections are

15   improper.  You can't make speeches.

16      A.    No.

17      Q.    (By Mr. Kline)  That didn't come up?

18      A.    No.

19      Q.    Do you know that this offer was rejected

20   by your brother?

21      A.    No.

22      Q.    Have you had any discussions with your

23   brother about the Kirby lawsuit that's pending in

24   New York by the Kirby heirs?

25      A.    No.

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 68

1      Q.   Do you know who Jack Kirby is, the comic

2   book author?

3      A.   No.

4          MR. TOBEROFF:  Objection, I want to object

5   to having you having wasted our time having her read

6   a single-spaced seven-page letter where you could

7   have first asked her whether she has any knowledge

8   of this letter.

9          The purpose of this deposition is not to

10  impart information to Dawn Peavy.  The purpose of

11  the deposition is to get information that she knows

12  to her -- that she's aware of.  If you improperly

13  use this deposition, continue to do so, like you

14  have done at other depositions, I will shut it down.

15  You're not entitled to use depositions to impart

16  information to people.  Ask her questions as a

17  percipient witness.  That's it.

18         MR. KLINE:  Marc, your objections are

19  completely inappropriate.  They violate the federal

20  rules, and I am entitled to show her a document --

21         MR. TOBEROFF:  You're violating the

22  federal rules.

23         THE REPORTER:  I'm sorry, gentlemen, one

24  at a time, please.

25         MR. KLINE:  -- refresh her recollection

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 69

1    and ask her if certain facts are conveyed to her.

2            MR. TOBEROFF:  We both know you're not

3    doing that.

4            MR. KLINE:  You need to stop making

5    speaking objections.

6            MR. TOBEROFF:  We both know you're --

7            MR. KLINE:  You're violating the federal

8    rules in doing do.

9            MR. TOBEROFF:  And I believe you're being

10   disingenuous.

11       Q.    (By Mr. Kline)  Putting this 2005 episode

12   aside, have you had any other discussions with your

13   mother or brother concerning a settlement with DC?

14       A.    No.

15       Q.    You have never discussed the issue with

16   either of them?

17       A.    This issue, no.

18       Q.    And by "this issue," I want to be clear.

19   I'm not just talking about this 2005 letter.  I'm

20   talking about, in general, any settlement of the

21   claims your family is asserting, their a copyright

22   interest in "Superman."  You have never had any

23   discussions with your mother or brother about that?

24       A.    All I know is, they're working on it.  My

25   brother is working on it.

**ROUGH - DRAFT - DAWN PEAVY - 8/3/2011**

Page 70

1        Q.    How do you know that?

2        A.    Because it's not done yet.

3        Q.    Now, do you know -- I just want to parse

4   that a little bit.  You understand that your brother

5   filed a copyright termination notice that's supposed

6   to take effect in 2013?

7        A.    No.

8        Q.    When you say your brother is working on

9   it, what do you mean by that?

10       A.    Whatever is going on with this case.

11       Q.    And what case do you think there is?

12       A.    The case of the estate against DC Comics.

13       Q.    Okay.  And you think that your family

14   initiated that lawsuit, or that DC initiated the

15   lawsuit, or do you know, one way or the other?

16       A.    I don't know.  I never asked.

17       Q.    When your brother has said he's working on

18   it, what does he say that he's working on?

19       A.    He doesn't say he's working on it.  I know

20   he's working on it.

21       Q.    How do you know that?

22       A.    Well, let's see.  He went to the

23   deposition last month for it.  And now I'm coming.

24       Q.    Did your mom ever discuss with you her

25   relationship with DC Comics?

**Merrill  Corporation  -  Los Angeles**

800-826-0277                    www.merillcorp.com/law

EXHIBIT 53
2024

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 71

1      A.   No.

2      Q.   You're aware, though, that your mom

3   started receiving a pension payment from DC Comics

4   in the 1990s; correct?

5      A.   Yes.  Didn't know when.

6      Q.   Okay.  And she never said anything to you

7   about how she felt about DC or people there?

8      A.   No.

9      Q.   She never mentioned anybody like Paul

10  Levitz?

11     A.   No.

12     Q.   Did you meet anybody either at the Toronto

13  Comic Con or at the 2006 film premiere or when you

14  went to Cleveland for the "Superman" celebration --

15  did you meet anybody from DC Comics?

16     A.   No.

17     Q.   Do you remember your mom meeting with

18  anybody from DC Comics?

19     A.   Not that I recall.

20     Q.   Do you remember your mother traveling to

21  New York in 1994 to meet with DC Comics along with

22  her brother Frank?

23     A.   No.

24     Q.   Do you recall her doing the same in 1992?

25     A.   No.

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 72

1      Q.   Does your mom -- in the last few years,
2  does she talk about her brother Joe and his
3  contributions to "Superman"?
4      A.   Repeat the question?
5      Q.   In the years that you have been living
6  with your mother, is her brother Joe and his
7  contributions to "Superman" -- is that a topic of
8  discussion in the house?
9      A.   Well, we're very proud of it, if that's
10 what you're asking.
11     Q.   During those discussions, has Mark -- I'm
12 sorry, Warren, your brother -- ever commented on DC
13 Comics?
14     A.   No.
15     Q.   Or Warner Brothers?
16     A.   No.
17     Q.   Do you know that in the scripts that he
18 wrote, the final act, as it were, of the scripts is
19 that your Uncle Joe and Jerry Siegel enter into
20 pension agreements with Warner Brothers that take
21 care of them and their families?  Are you aware of
22 that?
23         MR. TOBEROFF:  Assumes facts not in
24 evidence.  Lacks foundation.
25     A.   Ask the question again.

Merrill   Corporation   -   Los Angeles
800-826-0277                          www.merillcorp.com/law

EXHIBIT 53
2026

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 73

1      Q.   Do you know that in the final act or the
2   final part of these movie scripts your brother has
3   written, that your -- it recounts your Uncle Joe and
4   Jerry Siegel entering into pension agreements with
5   Warner Brothers that provide money and health care
6   benefits to them and their families?
7           MR. TOBEROFF:  Same objections.
8      A.   No.
9      Q.   Do you know if your brother keeps copies
10  of those scripts?
11     A.   I don't know.  I have never seen them, so
12  I don't know.
13     Q.   Have you ever, to your knowledge,
14  received -- you or your family ever received any
15  money from Marc Toberoff or one of his film
16  production companies?
17     A.   No.
18          MR. TOBEROFF:  Lacks foundation.
19     Q.   I'm going to show you two letters that
20  were used as exhibits at your brother's deposition,
21  previously marked as Exhibit 7 and 8 in this case,
22  and ask you to read them, please.  That's 7 and 8,
23  I'll give Mr. Toberoff his copies.
24          (Exhibits 7 and 8, previously marked.)
25     A.   What do you want me to do?  Just read

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 74

1    this?

2           Q.    Yes, read those two letters, please.

3           A.    Okay.

4           Q.    Have you had a chance to read these,

5    Ms. Peavy?

6           A.    Yes.

7           Q.    Have you seen these before?

8           A.    No.

9           Q.    Does reading -- can you turn to Exhibit 8

10   for a second?  It's the longer letter of the two.

11   Does reading the first paragraph there refresh your

12   recollection at all about Mike Catron sending your

13   mother a video he made of a panel on which she

14   participated?

15          A.    No.

16          Q.    You have never seen her watching such a

17   video?

18          A.    No.

19          Q.    Turning to the second paragraph there, the

20   last sentence, the last two sentences, "I think back

21   of the 30 years in which they," I think she means

22   Joe Shuster and Jerry Siegel, "suffered in poverty

23   and my brother Frank and I supporting Joe.  We're

24   all glad that a new generation of true comic book

25   enthusiasts took over DC Comics."

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 75

1        Did you ever have any discussions with
2   your mother about those types of sentiments?
3        A.    Where are you reading that?
4        Q.    End of the second paragraph in Exhibit 8.
5        A.    Oh, okay.  Now, what was the question
6   again?
7        Q.    Your mom says here, "I think back of the
8   30 years in which they," meaning Joe and Jerry,
9   "suffered in poverty, and my brother Frank and I
10  supported Joe.  We're all glad that a new generation
11  of true comic book enthusiasts took over DC Comics."
12        Do you recall your mother discussing those
13  types of sentiments with you?
14        A.    No.
15        Q.    This is the reason I asked the Internet
16  question at the start of the day.  In the last
17  paragraph, do you see her, "I have learned from the
18  Internet that Joanne Siegel has filed a copyright
19  claim for 'Superman.'"
20        Do you see that?
21        A.    Uh-huh.
22        Q.    And then your mother says, "I want you to
23  know that I intend to continue to honor our pension
24  agreement.  I would, however, appreciate a generous
25  bonus for this year, as you have done many times in

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 76

1    the past."

2           Does this refresh your recollection at all

3    about your mother receiving bonuses from DC?

4        A.   No.

5        Q.   Did she ever talk to you about the

6    generous bonuses she received from DC?

7        A.   No.

8        Q.   Did she ever talk to you about the Siegel

9    family filing a copyright claim, copyright

10   termination claim?

11       A.   No.

12       Q.   Have you and your brother ever talked

13   about the Siegel family filing a copyright

14   termination claim?

15       A.   No.

16       Q.   I thought you said earlier that you

17   understood that Mr. Toberoff also represents the

18   Siegels in their case against DC.

19       A.   Yes.

20       Q.   How did you come to learn that?

21       A.   That he's representing both of us.

22       Q.   Who told you that?

23       A.   Probably my brother.  I don't recall who.

24   I'm sure it was my brother.  My mom.  I don't...

25       Q.   But isn't it part -- I mean, wouldn't you

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 77

1   have also had to discuss with them, the Siegels,

2   were filing their own copyright termination claim,

3   as well?

4        A.   I don't understand all the legal.  I just

5   know that he represents both the families.

6        Q.   Do you remember when you learned that?

7        A.   No.

8        Q.   Were you living with your brother and

9   mother at the time?

10       A.   Probably not.  I don't -- I'm sure it

11  was -- I don't remember when it was, whether it was

12  early 200s, or -- I don't know.  Then no.  I didn't

13  start living with her until 2004.

14       Q.   Can you walk me through the chronology --

15  and I don't need to know addresses or anything like

16  that -- just the different cities you were living

17  in, let's say, from the early 1990s up to the

18  present.

19       A.   In El Paso, and then Santa Fe.

20       Q.   And you were in El Paso from about when to

21  when?

22       A.   I guess 1990 or 1991 until 2003.

23       Q.   Okay.

24       A.   Or the beginning of...

25       Q.   And did you ever live in Albuquerque, or

EXHIBIT 53
2031

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

**ROUGH - DRAFT - DAWN PEAVY - 8/3/2011**

Page 78

1    always just El Paso and --

2        A.    Yes.

3        Q.    Okay.  When was that?  Was that before?

4        A.    That was in 1988.

5        Q.    Okay.  Great.  Can you look at Exhibit 7?

6    It's the shorter letter of the two.  Have you seen

7    "The Adventures of Superman" book in your home by

8    this gentleman Lowther?

9        A.    It's probably on my mom's "Superman"

10   bookcase.  I don't know.  I don't know about that

11   title.  She has her books on a bookcase.

12       Q.    She has a special bookcase devoted to

13   "Superman" stuff?

14       A.    Yes.

15       Q.    Does your brother have a similar bookcase,

16   or --

17       A.    Well, I guess it's both of theirs.  It's

18   everybody's.  It's the family's.

19       Q.    Do you remember receiving or them

20   receiving gifts over the years from DC Comics of

21   books or --

22       A.    I didn't know they were from DC.  I mean,

23   I see books that come in that are given to my

24   mother.  I don't know who they came from.

25       Q.    Did she tell you -- do you remember

**Merrill   Corporation   -   Los Angeles**

800-826-0277                         www.merillcorp.com/law

EXHIBIT 53
2032

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 79

1    discussing with her in the '90s that DC was

2    thoughtful and was sending these types of materials?

3         A.   No.  I was very busy.  I had a career and

4    young children.

5         Q.   But she conversely never said to you,

6    "Gosh, I hate those guys at DC Comics"?

7         A.   Not that -- no.  I didn't really -- we

8    didn't talk about DC Comics.  I mean...

9         Q.   Same for Warner Brothers?

10        A.   Yeah, we talked about personal things, you

11   know.

12             MR. KLINE:  Okay.  I'm going to take a

13   quick break now, if you don't mind, and try to

14   figure out how I can sharpen this up the best I can

15   and finish as early as we can today.  So maybe take

16   about a ten-minute break, if that's okay.

17             MR. TOBEROFF:  Sure.

18             (Recess from 10:58 a.m. to 11:33 a.m.)

19        Q.   (By Mr. Kline)  Are you okay to continue,

20   Ms. Peavy?

21        A.   Yes.

22             (Exhibit 5, previously marked.)

23        Q.   Great.  Thank you.  I'm going to put in

24   front of you what was marked as Exhibit 5 at your

25   brother's deposition.  It's a 1992 agreement between

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 80

1    your Uncle Frank, your mother, and DC Comics.  Just

2    take a minute to take a look at it, please.

3            Have you had a chance to read the

4    document?

5        A.    Yes.

6        Q.    Have you seen this document before?

7        A.    No.

8        Q.    Have you ever discussed this 1992

9    agreement with your brother, Warren?

10       A.    No.

11       Q.    With your mother, Jean?

12       A.    No.

13       Q.    By the way, in any of our breaks, have you

14   called your brother to talk to him about the

15   deposition?

16       A.    No.

17             (Exhibit 59, previously marked.)

18       Q.    The next exhibit was marked as Exhibit 59

19   at your brother's deposition, I believe.

20             MR. KLINE:  Is that correct?

21             MS. SETO:  Yes.

22       Q.    (By Mr. Kline)  It's marked as Exhibit 59

23   at some deposition.  It's marked as Exhibit 59 here.

24   And I will not ask you to read this whole document.

25   This is the complaint that DC Comics filed.  It's

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 81

1    actually the first amended complaint.  The first
2    complaint was filed in May of 2010, and then an
3    amended complaint was filed in September of 2010.
4              And I just want to confirm your testimony
5    from earlier.  You were not aware that DC Comics
6    filed a lawsuit in Los Angeles against your brother
7    and mother?
8         A.   No.
9         Q.   And have you ever seen this document lying
10   around your house?
11        A.   No.
12        Q.   If you turn to the back of this document,
13   it's a document starting Exhibit A, and it's
14   probably a few pages before where you are.  It's
15   titled "Superman, Marc Toberoff timeline."  Do you
16   ever remember seeing this document?
17        A.   No.
18        Q.   Do you remember discussing it with your
19   brother?
20        A.   No.
21        Q.   Do you remember discussing with your
22   brother that an anonymous individual made certain
23   allegations against Mr. Toberoff?
24        A.   No.
25        Q.   Do you remember discussing that with your

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 82

1    mother?

2        A.   No.

3        Q.   Do you remember discussing that with

4    anybody?

5        A.   No.

6        Q.   Are you aware -- that's it for that.  This

7    is going to be new Exhibit 72.

8            (Exhibit 72 marked.)

9        Q.   And a bit earlier, I referred to a Kirby

10   lawsuit and asked you if you and your brother had

11   had any discussions about that.  Do you remember

12   those questions?

13       A.   Yes.

14       Q.   And your answer was you don't remember any

15   discussions.

16       A.   I don't know who Kirby is.

17       Q.   Okay.  And so your brother has not

18   discussed the fact that the Kirbys filed a lawsuit

19   and lost that lawsuit recently?

20       A.   Nope.

21       Q.   And you have not discussed with him that

22   they turned down a settlement offer before

23   litigation commenced?

24       A.   No.

25           MR. TOBEROFF:  Misstates the facts,

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 83

1    assumes facts not in evidence, and lacks foundation.

2         Q.   And so you have never reviewed this legal

3    opinion concerning the Kirbys' rights?

4         A.   No.

5         Q.   And you don't remember your brother

6    discussing that with your mother?

7         A.   No.

8         Q.   Or with anybody else?

9         A.   No.

10        Q.   I want to talk a little bit about your

11   relationship with your Uncle Joe, or Joseph.  What

12   did you call him?

13        A.   Uncle Joe.

14        Q.   Can you describe your interactions with

15   him?

16        A.   He was my uncle.  I mean --

17        Q.   You lived in different cities; right?

18        A.   Yeah.

19        Q.   Would he come to visit you and --

20        A.   We'd go see him.

21        Q.   Where would you go see him?

22        A.   In -- well, the last time I saw him, I

23   guess he was in San Diego or Brentwood or...

24        Q.   Out in California?

25        A.   Yeah, in California.

EXHIBIT 53
2037

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 84

1      Q.    And was he living with anybody?

2      A.    No, not that I know of.

3      Q.    Your brother testified that he had a lady

4   friend and -- who had a son who was a psychologist.

5   Do you remember meeting them?

6      A.    No.

7      Q.    When you saw your uncle, would you talk

8   about "Superman"?

9      A.    I don't remember.  It's been many years.

10  I don't recall.  I mean, probably not.  I mean, he

11  was my uncle.

12     Q.    Do you remember him having a lot of

13  "Superman" memorabilia in his apartment?

14     A.    Not really.  A few things.

15     Q.    Your mother has said that his apartment

16  was filled with a lot of stereo equipment.  Do you

17  remember that?

18     A.    Uh-huh.

19     Q.    He was a kind of audiophile, I guess?

20     A.    I just remember drawing tables and stereo

21  equipment.  I don't remember.

22     Q.    But you don't remember any specific

23  discussions about "Superman"?

24     A.    No.

25     Q.    Did he talk to you at all, to your

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 85

1    recollection, about his relationship with Warner

2    Brothers or DC Comics?

3        A.    No.

4        Q.    Ever talk to you about copyright issues?

5        A.    No.

6        Q.    Ever talk to you about contract issues?

7        A.    No.

8        Q.    Do you remember how old you were when

9    you -- the last time you saw him?

10       A.    Early 30s, maybe?  I don't know exact.

11       Q.    Would you ever talk to him on the phone?

12       A.    Maybe when I was younger, yeah.  When I

13   would call him to tell him we were going to go visit

14   him or something.

15       Q.    But you didn't have a relationship where

16   you and he would kind of have separate conversations

17   from your mom?

18       A.    No.

19       Q.    Did he ever say to you anything about,

20   "Hey, you know, I feel aggrieved by DC Comics or

21   Warner Brothers"?

22       A.    No.

23       Q.    What about your Uncle Frank?  Can you

24   describe your relationship with him?  Was it any

25   closer?  Did you see him more frequently?

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 86

1        A.    No, because he lived in New York.  Less.
2    I didn't see him as much as Joe.
3        Q.    Do you remember the last time seeing your
4    Uncle Frank?
5        A.    No.
6        Q.    What decade, even?
7        A.    Huh-uh.  I was young.
8        Q.    Like under 18?
9        A.    I don't recall.
10        Q.    You do know your mom traveled to New York
11    a couple of times in the 1990s to visit with him and
12    with DC Comics.  We talked about that; right?
13        A.    I don't think about DC Comics.  I know she
14    went to visit my uncle.
15        Q.    Okay.  And you didn't accompany her on
16    those trips?
17        A.    No.
18        Q.    Did your brother, Warren, to your
19    knowledge?
20        A.    I don't know.
21        Q.    Did your dad; do you know?
22        A.    I don't know.
23        Q.    Have you ever spoken to Jerry Siegel?
24        A.    No, not that -- I mean -- no.  Maybe when
25    I was a kid.  I don't really recall.  I mean --

**Merrill  Corporation  -  Los Angeles**

800-826-0277                    www.merillcorp.com/law

EXHIBIT 53
2040

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 87

1    Q.    Okay.  What about his wife for many years,

2    Joanne Siegel?

3    A.    Yes.

4    Q.    Can you describe those communications?

5    A.    Well, I would see her at the events.

6    Q.    What type of events?

7    A.    The last one was the Cleveland one.

8    Q.    And what would you talk about at those

9    events?

10    A.    How my mom is basically doing, I guess,

11    the last time I saw Joanne.

12    Q.    Did the legal issues, as you call them,

13    ever come up in those conversations?

14    A.    No.

15    Q.    Did you ever discuss Mr. Toberoff's

16    representation --

17    A.    No.

18    Q.    -- of your family and them?  Would you

19    ever speak to Joanne Siegel on the phone?

20    A.    Other than to answer the phone when she

21    was calling to talk to my mom or something, no.

22    Q.    Did she call your mom frequently?

23    A.    They'd talk.

24    Q.    How often?

25    A.    Oh, I don't know, because I'm not there

EXHIBIT 53
2041

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 88

1    all the time.  I'm at work.

2         Q.   Did you get a sense, from when you were

3    there, that they talked once a month, every couple

4    of weeks?

5         A.   I can't answer that question.

6         Q.   You just don't know?

7         A.   I know they'd talk.

8         Q.   How about her daughter, Laura Siegel

9    Larson?  Do you talk to her at all?

10        A.   Not since she called to say her mother

11   passed.

12        Q.   Had you -- but you talked to her before

13   then?

14        A.   Other than answering the phone and she's

15   calling to talk to my mom.  Basically it.  And then

16   at the event.

17        Q.   So the two of you have no personal

18   friendship?

19        A.   Well, we're friends.  I don't know what --

20        Q.   But you don't talk on the phone

21   regularly --

22        A.   No.

23        Q.   -- or e-mail?

24        A.   No.

25        Q.   Do you know if she and your brother talk

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 89

1    on the phone?

2         A.    No.

3         Q.    You just don't know, one way or the other?

4         A.    Huh-uh, I don't know, either way.  I never

5    asked that question, so I don't know the answer.

6         Q.    And he's never described his relationship

7    with them to you?

8         A.    We're all friends.  I mean, we've known

9    each other all our lives, or all my life.

10        Q.    Would you go on vacations together --

11        A.    No.

12        Q.    -- or hang out together?  You just would

13   see each other at kind of Superman-related events?

14        A.    Uh-huh.

15        Q.    And is this going back before these recent

16   celebrations, like into the '70s and '80s?  Or has

17   it been more of a -- these events have happened more

18   recently?  I'm just trying to figure that out.

19        A.    No, I think we've always been -- I can

20   probably remember when we go to California, go visit

21   them...

22        Q.    So when you'd go see your uncle, you'd try

23   to stop by and see the Siegels also?

24        A.    Uh-huh.

25        Q.    Do you remember talking with any of your

**Merrill   Corporation   -   Los Angeles**

EXHIBIT 53
2043

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 90

1    family members about the "Superboy" character?

2          A.    No.

3          Q.    Do you know who "Superboy" is?

4          A.    Other than what I just read in here, no.

5    I mean -- well, I know who he is, from TV.

6          Q.    What did you read in there about

7    "Superboy"?

8          A.    He had that -- whatever you made me read

9    about that "Superboy" -- the Siegel thing, one of

10   those papers.

11         Q.    Okay.  So you don't know him as an

12   independent character?

13         A.    Besides TV.  I mean, I know there was

14   "Superboy" on the TV.

15         Q.    Okay.  Are you talking about "Smallville,"

16   or --

17         A.    No, wasn't there -- like when he was

18   younger, when they -- probably a video or something.

19   I don't know.  In "Smallville," I mean to me, that's

20   "Superman," but...

21         Q.    Okay.  Have you ever talked to the Siegels

22   about "Superboy"?

23         A.    No.

24         Q.    Has your brother disclosed to you -- and

25   I'll do you first and then your mother in your

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 91

1    presence -- has your brother disclosed to you that

2    as part of this copyright termination notice he

3    filed, he gave up any claims to "Superboy" in favor

4    of the Siegels?

5        A.    No.

6        Q.    Have you heard him talk about that with

7    your brother?

8        A.    Who?

9        Q.    I'm sorry.  I apologize.  Have you heard

10   your brother talk about that issue with your mother?

11       A.    Oh, no.

12       Q.    I'd like you to take a look at this new

13   exhibit.

14            (Exhibit 73 marked.)

15       Q.    And I'll represent to you that these are

16   excerpts of legal rulings.

17       A.    What's an excerpt or whatever?

18       Q.    It's like a quote from -- it's not the

19   whole legal ruling.  It's just a part of legal

20   rulings in the Siegel case.

21       A.    Okay.

22       Q.    And I just want you to take a look at

23   these, and I'm going to ask you some questions about

24   them after you read them, please.

25            MR. TOBEROFF:  I object to this exhibit,

Merrill   Corporation   -   Los Angeles

800-826-0277                    www.merillcorp.com/law

EXHIBIT 53
2045

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 92

1    taking statements out of context.  You can present

2    the document itself.

3        A.    Okay.

4        Q.    Have you ever discussed the proceedings in

5    the Siegel case with your brother?

6        A.    No.

7        Q.    Do you know if your brother follows those

8    proceedings?

9        A.    No.

10        Q.    Has he ever told you about these rulings

11    by Judge Larson in the Siegel case concerning your

12    uncle's contributions to the "Superboy" character?

13        A.    No.

14        Q.    Has he told you that in his -- the

15    original contract he signed on behalf of your family

16    with Mr. Toberoff's film production company, that

17    "Superboy" was listed as one of the rights or

18    interests your family possessed?

19            MR. TOBEROFF:  Misstates the record as to

20    the nature of Pacific Pictures Corporation.

21        Q.    Has he told you that in the 2001 agreement

22    with Pacific Pictures Corporation that "Superboy"

23    was listed as part of your family's rights?

24        A.    No.

25        Q.    Has he told you that in a subsequent

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 93

1   amendment, they eliminated any reference to

2   "Superboy"?

3        A.   No.

4        Q.   Has he told you that the Siegels had filed

5   a lawsuit concerning "Superboy" specifically?

6        A.   No.

7        Q.   Or that they're seeking millions of

8   dollars in that case based on the "Superboy" rights?

9        A.   No.

10          MR. TOBEROFF:  Misstates the record.

11       Q.   Has he told you that the sole and only

12   basis -- and this is what he testified to -- for

13   giving up the "Superboy" rights was conversations

14   with Mr. Toberoff?

15       A.   I don't know.  I don't know anything about

16   "Superboy."

17       Q.   He didn't disclose that to you, though?

18       A.   Disclose what?  Anything about "Superboy"?

19   No.

20       Q.   Did he disclose to you that he never

21   sought a second opinion from another attorney as to

22   whether your family had rights in "Superboy"?

23          MR. TOBEROFF:  Okay, objection, again.

24   You're using improperly -- my objection is as

25   follows.  You're improperly using the deposition as

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 94

1  an excuse to try and impart information to Ms. Peavy

2  as opposed to discovering information from him

3  (sic).  She said she had no conversations with her

4  brother regarding "Superboy."  From that, you break

5  down and start -- you're telling her things, you're

6  not asking her questions.  Under the guise of asking

7  whether her brother told you, you're trying to

8  impart information, which is improper use of a

9  deposition process.  If she says that she's had no

10 discussions with her brother about any "Superboy,"

11 then she couldn't possibly have had a detailed

12 discussion regarding some aspect of "Superboy."

13      Q.    (By Mr. Kline) Ms. Peavy, did he disclose

14 to you that he never sought a second opinion from

15 another attorney as to whether your family had a

16 right in "Superboy"?

17          MR. TOBEROFF:  Objection, misuse of the

18 discovery process.

19      Q.    Did he disclose that to you?

20      A.    No.

21      Q.    As I understand it, your brother's doing

22 all the work on these legal issues on behalf of your

23 family; correct?

24      A.    My brother and Marc -- I mean, and

25 Toberoff are the ones working on it.

EXHIBIT 53
2048
247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 95

1      Q.    And you have also testified that you and

2   your brother, Warren, share 50/50 under your

3   mother's will; correct?

4      A.    Yes.

5      Q.    Do you and your brother, Warren, have any

6   agreement by which he would be compensated for the

7   work that your brother, Warren, is doing on these

8   legal matters?

9      A.    No.  The agreement is, it's an estate

10  that's set up for both of us to share.

11     Q.    And so you don't have some agreement that,

12  "Hey, I'm going to record the time that I spend on

13  this matter and I'll charge some hourly rate to the

14  estate"?

15     A.    No.  We're family.  We do everything

16  together.

17     Q.    Okay.  Just wanted to confirm that.  And

18  it's never been discussed?

19     A.    No.

20     Q.    Okay.  Has he disclosed to you that

21  Mr. Toberoff's contingency fee for his work on

22  behalf of your family is 50 percent of any recovery

23  you obtain?

24     A.    I know that.

25     Q.    How do you know that?

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 96

1        A.    I think my mom told me that.

2        Q.    When did your mom tell you that?

3        A.    Yesterday, when I asked.

4        Q.    Okay.  So you did talk to her a little bit

5    about the lawsuit yesterday?

6        A.    I don't know about the lawsuit.  I just

7    told her, you know -- I told her I visited with

8    Mark.  My mom showed up for a little while to say

9    hello and give him a hug.  I mean, we were all...

10       Q.    Were there any other questions you asked

11   your mom about Mr. Toberoff?

12       A.    No.

13       Q.    Any other discussions with her about this

14   case?

15       A.    No.

16       Q.    Have you discussed with your mom or your

17   brother the fact that your family can't reach an

18   agreement with Warner Brothers to settle their

19   claims, or DC Comics to settle their claims, without

20   the consent of the Siegel family?

21       A.    No.

22       Q.    Have you discussed with your brother or

23   mother any agreements that your family has entered

24   into with the Siegel family?

25       A.    No.

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 97

1          THE VIDEOGRAPHER:  Mr. Kline, I'll need to

2    change the DVD in a minute.

3          MR. KLINE:  Okay.  Why don't we do it now?

4          (Recess from 11:57 a.m. to 12:00 p.m.)

5          MR. KLINE:  The next exhibit?

6          (Exhibit 74 marked.)

7      Q.  Handing you Exhibit 74, which was

8    Plaintiff DC Comics' notice of deposition on Dawn

9    Peavy and request for production of documents, is

10   this -- if you could just look through this quickly,

11   or take as much time as you like, is this the

12   document request that you reviewed with Mr. Toberoff

13   yesterday?

14     A.  Yes.

15     Q.  And focusing your attention on pages 5 to

16   6, titled document -- starting at the line 14

17   document requests, do you see that there?

18     A.  Which one?  Five?

19     Q.  Page 5, line 14.

20     A.  Oh.  Yes.

21     Q.  What is the first time you saw this

22   document?  Was it yesterday?

23     A.  No.  They e-mailed it before that.

24     Q.  And did you go through each one of these

25   numbered requests and look for documents --

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 98

1    A.    I don't have any documents.

2    Q.    -- responsive to that?

3          MR. TOBEROFF:  Asked and answered.

4    Q.    Well, take a look at number 4.  "All

5    documents relating to the disposition, division, or

6    ownership of any rights in 'Superman' and/or

7    'Superboy.'"  Do you see that one?

8    A.    Uh-huh.  Yes.

9    Q.    You're aware that there's a will, correct,

10   that provides that you get 50 percent of your

11   mother's estate --

12   A.    Yes.

13   Q.    -- on her passing?  And you understand

14   that the most significant asset in that estate will

15   probably be whatever purported "Superman" copyright

16   interests she has?

17         MR. TOBEROFF:  Misstates the record.  The

18   mom doesn't have "Superman" copyright interest.

19   A.    I don't understand that question.

20   Q.    Well, you understand that there is -- what

21   do you understand -- you understand that your family

22   has claimed an interest in certain "Superman"

23   copyrights; correct?

24         MR. TOBEROFF:  Misstates the record.

25   A.    I don't -- I don't -- I mean -- what was

**ROUGH - DRAFT - DAWN PEAVY - 8/3/2011**

Page 99

1   the question again?

2        Q.   I'm just -- I'm trying to get at something

3   pretty simple.  As I understand it, you and your

4   brother are going to receive 50/50 of the proceeds

5   under your mother's will; correct?

6        A.   Correct.

7        Q.   And that may happen through a trust; it

8   may not.  That hasn't been documented yet; correct?

9        A.   You mean written down?  It's an estate

10  that's set up, it's going to be a trust for me and

11  my brother.

12       Q.   And your understanding is that the trust

13  part of it has not been documented yet; correct?

14       A.   I don't know what you mean by

15  "documented."

16       Q.   Reduced to a written agreement or writing.

17       A.   Oh, anything between my brother and I?

18  No.  I don't have -- is that what you're asking?

19       Q.   Not that.  Has any official trust -- has

20  your brother worked -- has your mother worked with a

21  lawyer to set up trust documents?

22       A.   No.

23       Q.   I don't want to get into your mother's

24  other assets.  I mean, I know you have a home and

25  probably other bank accounts and things like that.

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 100

1   Do you understand that if and when she passes away,

2   one of the assets you and your brother might be

3   entitled to are these "Superman" copyright

4   interests?

5        A.   I understand that for the whole family.  I

6   don't understand -- I mean, you said it's a simple

7   question, but I still don't understand the question.

8        Q.   For the whole family -- it's you and your

9   brother.

10       A.   Correct.

11       Q.   Do you understand that one of the assets

12  that you would be sharing in 50/50 under your

13  mother's will would be "Superman" copyright

14  interests?

15       A.   I don't understand.

16       Q.   Help me ask a better question.  Is there

17  particular word you don't understand, a

18  particular --

19       A.   Yeah, "copyright."  I don't understand.  I

20  don't -- I mean, I don't know much, so I don't

21  know -- I don't understand what you mean by

22  "copyright" and I don't want to say anything wrong

23  because I don't understand it.

24       Q.   Understood.  You understand that your

25  family is claiming an interest in certain rights --

**Merrill   Corporation   -   Los Angeles**

800-826-0277                    www.merillcorp.com/law

EXHIBIT 53
2054

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

**ROUGH - DRAFT - DAWN PEAVY - 8/3/2011**

Page 101

1        A.    Correct.  I understand that.

2        Q.    -- related to "Superman."  You understand

3    that; correct?

4        A.    Yes.

5        Q.    And those rights come from the fact that

6    your Uncle Joe Shuster was the original illustrator;

7    correct?

8        A.    Correct.

9        Q.    And when your brother shares 50/50 under

10    your mother's will, is it your expectation that

11    whatever those rights are -- and I know they're a

12    legal definition -- that's one of the assets?

13        A.    That we'll split 50/50, yes.

14        Q.    Okay.

15        A.    Is that the question you're trying to --

16        Q.    It is.

17        A.    -- get at?

18        Q.    It is.  And obviously, you hadn't thought

19    this -- or at least on my level -- all the way

20    through when you're looking at number 4.  But there

21    is a written will that your family possesses for

22    your mother; correct?

23        A.    I was told there's a will.  And I'm on it.

24        Q.    And it's a written document, as far as you

25    understand?

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 102

1      A.    I would assume that's what a will is, yes.
2  I have never seen it.
3      Q.    You have never seen it?
4      A.    No.
5      Q.    And your brother -- neither your brother
6  nor your mother has told you where it is?
7      A.    No.  It's probably in the safety-deposit
8  box, I'm sure.  I don't know.
9      Q.    Okay.
10     A.    My mom might have mentioned -- this was --
11  you know, this has been years back when she told --
12  she told me that.
13     Q.    Okay.  But more recently, you and your
14  brother have discussed this trust concept?
15     A.    Yes.
16     Q.    And in those discussions, has he ever made
17  reference of a written will?
18     A.    No.
19     Q.    Do you know if he's seen the written will?
20     A.    I'm sure.  He's the one that holds all the
21  documents and stuff.  That's his deal.
22     Q.    Okay.  Now, I wanted to ask you a
23  question.  On the first page of this document -- can
24  you go back to the first page?  Do you see that
25  caption at the bottom left there, DC Comics,

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 103

1    plaintiff, v. Pacific Pictures Corporation, IP

2    Worldwide, LLC, IPW, LLC, Marc Toberoff, an

3    individual, Mark Warren Peary, as personal

4    representative of the estate of Joseph Shuster, and

5    some other names following along after that?  Do you

6    see that part of that first page?

7         A.   My mother's name?  I don't see my mother's

8    name.

9         Q.   This is an old caption, apparently.  If

10   you could look back at the amended complaint that I

11   showed you a couple of documents ago.

12        A.   Oh.

13        Q.   Do you see her name there?

14        A.   Yeah.

15        Q.   Did you have any occasion when you

16   received this document or discussed it with

17   Mr. Toberoff to take a look at the first page here?

18        A.   I looked at it when it was given to me.

19        Q.   You testified earlier that you weren't

20   aware that DC Comics had filed a lawsuit against

21   your family.  I'm just wondering if that didn't

22   occur to you when you saw this document saying that

23   DC Comics is a plaintiff.

24        A.   No.  I don't -- I don't understand legal

25   stuff.  That's my brother's part.  That's why I'm

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 104

1    probably not involved at all.

2         MR. KLINE:  Well, why don't we take

3    another quick break, and we'll either go to lunch --

4    so let's just take two, three minutes.  We'll either

5    go to lunch or we might even end things.  So I'll

6    just kind of review my notes, and we may be done

7    soon.

8         THE WITNESS:  Okay.

9         MR. TOBEROFF:  Okay.

10        (Recess from 12:09 p.m. to 12:18 p.m.)

11    Q.   (By Mr. Kline)  Are you ready to proceed?

12    A.   Yes.

13    Q.   I think we'll just be a few minutes and be

14    all done.

15        Have you ever had any conversations with

16    an attorney or any of your friends other than Mark

17    Toberoff, other than your brother, other than your

18    mother, have you ever had any conversations with --

19    let's start with another attorney concerning your

20    family's "Superman" rights?

21    A.   Another attorney, no.  Not that...

22    Q.   Anybody at work?

23    A.   Okay, what question are you asking, again?

24    Q.   Have you ever had a conversation with

25    anybody at work concerning your family's "Superman"

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 105

1    rights?

2        A.    I mean, they know I'm tied in with

3    "Superman," I mean, so yeah, I guess the answer

4    would be yes.

5        Q.    Anything about your claimed rights that,

6    you know, starting in 2013 you'll recapture certain

7    copyrights?

8        A.    Probably.  Yes.  I mean...

9        Q.    So have you talked a little bit about the

10   legal proceedings with some friends at work?

11       A.    I don't know if it's legal proceedings.

12   They know more than me, mostly, from reading off the

13   Internet, I guess, asking me questions.

14       Q.    Any friends beyond work that you have

15   talked with this about?

16       A.    Beyond work?  I don't recall.

17       Q.    Who are the friends at work that you

18   talked about it with?  Do you remember?

19       A.    Probably Chaz, close colleague.

20       Q.    Who is Chaz?

21       A.    My close colleague.

22       Q.    What's his full name, please?

23       A.    DeMott.

24       Q.    Can you spell that for the court reporter?

25       A.    D-E-M-O-T-T.

**ROUGH - DRAFT - DAWN PEAVY - 8/3/2011**

Page 106

1    Q.   You have been a little bit involved in

2    New Mexico politics; is that correct?

3    A.   Correct.

4    Q.   Have you discussed the same "Superman"

5    rights issues with any of the people in that world?

6    Representative Lujan?  Anybody else?

7    A.   Yes.

8    Q.   With Representative Lujan?

9    A.   Yes.

10   Q.   Have you ever sought independent advice

11   and counsel from him about the legal case?

12   A.   No.

13   Q.   Have you ever encouraged your brother to

14   do so?

15   A.   No.  What do you mean by "independent"?

16   Q.   I mean, you understand that your family is

17   working with Mr. Toberoff; correct?

18   A.   Correct.

19   Q.   And you understand -- or maybe you don't

20   understand -- that Mr. Toberoff at times has

21   encouraged your brother to seek independent legal

22   counsel.  Do you have any knowledge of that?

23   A.   I remember we talked about it before.

24   Q.   You and your brother?

25   A.   Yes.

**Merrill  Corporation  -  Los Angeles**

EXHIBIT 53
2060

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 107

1          Q.    And what did he say?

2          A.    Just asking -- he just asked me if I knew

3     any attorneys, basically.

4          Q.    When was this?

5          A.    I don't recall.

6          Q.    In the last --

7          A.    A few months back, maybe.  A year ago,

8     maybe.  Maybe a year.

9          Q.    Okay.  Did you give him any names?

10         A.    No.

11         Q.    And you didn't refer him to your colleague

12    Chaz or --

13         A.    No.

14         Q.    -- the congressman?

15         A.    Why would I -- no.

16         Q.    When your brother asked for this advice or

17    asked this question -- I don't want to characterize

18    it.  Let me ask this question.  Did he tell you that

19    Mr. Toberoff was asking him to sign a conflict

20    waiver?

21         A.    I don't know.  I don't know the answer to

22    that.

23         Q.    You just don't remember, one way or the

24    other?

25         A.    I don't -- no, no.  I guess the answer

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 108

1    would be no.

2         Q.   He didn't talk about it --

3         A.   Mention it.

4         Q.   Okay.  Did he give you any reason why he

5    was asking that question?

6         A.   No.

7         Q.   Was he there yesterday when you prepared

8    with Mr. Toberoff?

9         A.   He came for a little bit with my mom.

10        Q.   Did he give you any advice on how to --

11        A.   No.

12        Q.   -- do this deposition today?

13        A.   Be strong.

14        Q.   Anything else?

15        A.   (Witness shakes head.)

16        Q.   Does your family, to your knowledge, have

17   any affiliation with a group called Aquarian

18   Perspectives Inter-Planetary Mission?

19        A.   I don't know.  Never heard of it.

20        Q.   Are you aware that your mother is a

21   reverend?

22        A.   Used to be.

23        Q.   With that group, or you just don't know,

24   one way or another?

25        A.   I don't know the group.

ROUGH - DRAFT - DAWN PEAVY - 8/3/2011

Page 109

1          Q.    Okay.  Or a website called Stardoves?

2          A.    Never heard of it.

3          MR. KLINE:  Well, here's what I'd like to

4     do.  A couple of things.  We'll end the deposition

5     now.  Mr. Toberoff and I will no doubt disagree on

6     this.  If we discover new documents, if new

7     testimony comes out, if for any other reason we

8     think we need to take your deposition again, we are

9     reserving our right to do so.

10          And Mr. Toberoff, I'm assuming you

11    disagree, or --

12          MR. TOBEROFF:  We disagree.  You have one

13    day of seven hours.  Today is your day.  Ask her

14    everything you need to ask her.  You should have

15    completed whatever discovery you thought was

16    necessary prior to her deposition.  You have had

17    over a year to do so.  So you can say anything you

18    want, but we will vigorously oppose you taking

19    Ms. Peavy's deposition again.

20          MR. KLINE:  So safe to say, you're aware

21    that the parties disagree about that.

22          You do have one duty that you do have to

23    comply with.  The court reporter's going to send you

24    a copy of the transcript of this deposition and the

25    exhibits, and it's your duty within the next 30 days

**ROUGH - DRAFT - DAWN PEAVY - 8/3/2011**

Page 110

1   to review that transcript and make any corrections.

2   And I'll advise you that if you make any corrections

3   of substance to the deposition, we have a right to

4   impeach your credibility based on those corrections,

5   and even potentially ask you further questions about

6   it.  And we can either send you the deposition

7   transcript and exhibits through Mr. Toberoff, or

8   directly to you.  Do you have a preference?

9           THE WITNESS:  Through him.

10          MR. TOBEROFF:  Send it to me, and I'll

11  send it.

12          MR. KLINE:  We'll send it on.

13          THE WITNESS:  I don't understand why we

14  can't finish everything today.  It's hard for me the

15  take off work.  I mean, I had to arrange -- plus,

16  you know, manipulate --

17          MR. TOBEROFF:  We have finished it today.

18  They're not going to be able to take your deposition

19  twice.

20          MR. KLINE:  I'll just explain it to you.

21  There's a lot of documents we want to get our hands

22  on, including a big discovery ruling that we won

23  that Mr. Toberoff's appealing.  And if we win that

24  discovery ruling and documents come out that mention

25  or discuss you or raise issues related to your

**Merrill  Corporation  -  Los Angeles**

EXHIBIT 53
2064

247c5a0c-0aa7-4dd7-ad4a-9f031521954e

**ROUGH - DRAFT - DAWN PEAVY - 8/3/2011**

Page 111

1    testimony, we may or may not pursue your testimony

2    again.

3              And it sounds like, no matter what, he'll

4    disagree with that.  But I don't think -- it's not

5    right before us right now.  Right now we're going to

6    end the deposition for today, and I thank you for

7    your time.

8              Marc, you want to use the normal

9    stipulation we've been using?

10             MR. TOBEROFF:  Yes.

11             MR. KLINE:  Okay.  And we'll supply that

12   to the court reporter and the videographer.  And

13   thank you very much for your time today.

14             (A discussion was held off the record.)

15             (Off the videotaped record, the following

16   stipulations were entered into by counsel.  The

17   witness will have 30 days to review the transcript

18   and advise of any corrections.  It shall be signed

19   under penalty of perjury, and if not signed, it may

20   be used as though signed.  The court reporter is

21   relieved of her duties.  A signature copy will be

22   sent directly to the witness via Federal Express.)

23             (The deposition concluded at 12:26 p.m.)

24

25