# EXHIBIT B

1    DANIEL M. PETROCELLI (S.B. #097802)
       dpetrocelli@omm.com
2    MATTHEW T. KLINE (S.B. #211640)
       mkline@omm.com
3    CASSANDRA L. SETO (S.B. #246608)
       cseto@omm.com
4    O'MELVENY & MYERS LLP
     1999 Avenue of the Stars, 7th Floor
5    Los Angeles, CA  90067-6035
     Telephone:  (310) 553-6700
6    Facsimile:   (310) 246-6779

7    PATRICK T. PERKINS (admitted *pro hac vice*)
       pperkins@ptplaw.com
8    PERKINS LAW OFFICE, P.C.
     1711 Route 9D
9    Cold Spring, NY 10516
     Telephone:  (845) 265-2820
10   Facsimile:   (845) 265-2819

11   Attorneys for Plaintiff DC Comics

12                    **UNITED STATES DISTRICT COURT**

13                    **CENTRAL DISTRICT OF CALIFORNIA**

14

15   DC COMICS,                          | Case No. CV 10-3633 ODW (RZx)

16              Plaintiff,

17        v.                             | **DECLARATION OF DANIEL M.**
                                         | **PETROCELLI IN SUPPORT OF**
18   PACIFIC PICTURES                    | **DC COMICS' UPDATED, INITIAL**
     CORPORATION, IP WORLDWIDE,          | **OPPOSITION TO DEFENDANTS'**
19   LLC, IPW, LLC, MARC TOBEROFF,       | **MOTION TO STRIKE UNDER**
     an individual, MARK WARREN          | **CALIFORNIA'S ANTI-SLAPP**
20   PEARY, as personal representative of | **STATUTE**
     the ESTATE OF JOSEPH SHUSTER,
21   JEAN ADELE PEAVY, an individual,    | **Fed. R. Civ. P. 56(d)**
     LAURA SIEGEL LARSON, an
22   individual and as personal          | Hon. Otis D. Wright II
     representative of the ESTATE OF
23   JOANNE SIEGEL, and DOES 1-10,
     inclusive,                          | **Courtroom**:            540
24                                       | **Discovery Cutoff**:     None Set
                Defendants.              | **Pretrial Conference**:  None Set
25                                       | **Trial**:                None Set

26

27

28

1

# **TABLE OF CONTENTS**

2

3

| Exhibit | Description | Page |
|---|---|---|
| 1 | January 4, 2006 version of the www.ipwla.com website | 76 |
| 2 | Copy of the Internet Movie Database listings for Marc Toberoff and Intellectual Properties Worldwide as they appeared on September 26, 2010 | 79 |
| 3 | Article titled "Nastier Than a Speeding Bullet," published on profile.com and dated September 17, 2007 | 82 |
| 4 | Article titled "The Rights Stuff," published in The Wall Street Journal on July 15, 2005 | 89 |
| 5 | Complaint filed against Mr. Toberoff and Pacific Pictures Corporation in Los Angeles Superior Court on February 28, 1997 (*Alomar v. Cavana*, Case No. BC166806) | 92 |
| 6 | Complaint filed against Marc Toberoff and Intellectual Properties Worldwide in Los Angeles Superior Court on December 14, 2009 (*Leeds v. Van Leeuwan*, Case No. SC106045) | 170 |
| 7 | December 23, 1975 agreement signed by Jerry Siegel, Joseph Shuster, and Warner Communications Inc. | 179 |
| 8 | February 14, 1982 letter to Steven J. Ross of Warner Communications | 194 |
| 9 | March 15, 1982 letter from Martin Payson to Joanne Siegel | 202 |
| 10 | June 20, 1988 from Martin Payson of Warner Communications, Inc. to Joanne Siegel | 203 |
| 11 | August 8, 1988 from Martin Payson of Warner Communications, Inc. to Joseph Shuster | 204 |
| 12 | March 12, 1990 from Martin Payson of Warner Communications, Inc. to Joanne Siegel | 205 |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

| Exhibit | Description | Page |
|---------|-------------|------|
| 13 | March 5, 1991 letter from Martin Payson to Joanne Siegel | 206 |
| 14 | October 7, 2006 deposition transcript of Kevin Marks in the related *Siegel* cases, Case Nos. CV-04-8400 and CV-04-8776 | 207 |
| 15 | October 19, 2001 letter from Mr. Marks to Mr. Schulman | 414 |
| 16 | October 26, 2001 letter from John Schulman to Kevin Marks | 421 |
| 17 | November 17, 2006 deposition transcript of Marc Toberoff in the related *Siegel* cases, Case Nos. CV-04-8400 and CV-04-8776 | 429 |
| 18 | Excerpts from Kevin Marks' call log | 582 |
| 19 | February 1, 2002 letter from Mr. Perkins to Mr. Marks | 610 |
| 20 | February 12, 2002 letter agreement between Mr. Toberoff and Ari Emanuel | 667 |
| 21 | Plaintiffs Joanne Siegel and Laura Siegel Larson's Responses to Defendants'/Counterclaimant's Second Set of Requests for Admission filed in the *Siegel* cases and dated June 7, 2006 | 674 |
| 22 | May 9, 2002 letter from Joanne Siegel to Richard Parsons | 714 |
| 23 | September 21, 2002 letter from Joanne Siegel and Laura Siegel Larson to Paul Levitz | 717 |
| 24 | July 22, 2011 deposition transcript of Laura Siegel Larson | 718 |
| 25 | Letter signed by Joanne Siegel and Laura Siegel Larson dated October 28, 2002 | 1061 |
| 26 | October 3, 2004 Letter agreement between Joanne Siegel, Laura Larson and Mark Toberoff | 1063 |

| Exhibit | Description | Page |
|---------|-------------|------|
| 27 | October 17, 2004 Letter agreement between Joanne Siegel, Laura Larson and Mark Toberoff | 1069 |
| 28 | August 21, 1992 letter from Ms. Peavy to Time Warner and DC Comics | 1071 |
| 29 | August 1, 1992 agreement signed by Jean Peavy, Frank Shuster, and DC Comics | 1088 |
| 30 | September 8, 1992 letter from Paul Levitz to Frank Shuster | 1089 |
| 31 | September 8, 1992 letter from Martin Payson of Time Warner to Jean Peavy | 1090 |
| 32 | September 7, 1993 from Paul Levitz to Jean Peavy | 1091 |
| 33 | September 14, 1993 letter from Jean Peavy to Paul Levitz | 1094 |
| 34 | April 15, 1994 letter from Jean Peavy to Paul Levitz | 1095 |
| 35 | July 11, 1994 letter from Paul Levitz to Jean Peavy and Frank Shuster | 1098 |
| 36 | July 9, 1998 letter from Paul Levitz to Jean Peavy | 1100 |
| 37 | June 29, 2011 deposition transcript of Mark Warren Peary | 1102 |
| 38 | Notice of Termination of Transfer Covering Extended Copyright Renewal Term of "Superman" dated November 10, 2003 | 1466 |
| 39 | Defendant Mark Warren Peary's Response to Plaintiff DC Comics' Second Set of Interrogatories dated June 2, 2011 | 1479 |
| 40 | September 10, 2004 Warren Peary and Jean Peavy engagement letter dated as of November 23, 2001 | 1488 |
| 41 | Plaintiff DC Comics' Amended Notice of Deposition of Defendant Joanne Siegel dated November 22, 2010 | 1492 |

-iii-

| Exhibit | Description | Page |
|---|---|---|
| 42 | July 18, 2011 email chain between plaintiff's counsel and Susan Allison | 1494 |
| 43 | July 11, 2011 letter from Daniel Petrocelli to Marc Toberoff and Laura Brill | 1500 |
| 44 | July 7, 2011 letter from Matthew Kline to Marc Toberoff and Laura Brill | 1511 |
| 45 | July 15, 2011 email from Keith Adams to Cassandra Seto, Daniel Petrocelli and Matthew Kline with attachments | 1541 |
| 46 | July 28, 2011 from Keith Adams to Matthew Kline with enclosures | 1586 |
| 47 | July 29, 2011 letter from Matthew Kline to Keith Adams | 1606 |
| 48 | July 15, 2011 letter from Joshua Ryland to Matthew Kline and Jason Tokoro | 1608 |
| 49 | Interrogatory Responses dated August 1, 2011 | 1650 |
| 50 | August 3, 2011 letter from Matthew Kline to Marc Toberoff with enclosures | 1674 |
| 51 | November 11, 2006 deposition transcript of Mark Warren Peary in the related *Siegel* cases, Case Nos. CV-04-8400 and CV-04-8776 | 1684 |
| 52 | July 19, 2011 deposition transcript of Don Bulson | 1772 |
| 53 | August 3, 2011 deposition transcript of Dawn Peavy | 1958 |
| 54 | 2001 PPC Agreement | 2066 |
| 55 | 2003 PPC Agreement | 2070 |
| 56 | 2002 IPW Agreement | 2074 |
| 57 | January 7, 2011 Order in Appeal 73851 | 2078 |

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

1

| Exhibit | Description | Page |
|---------|-------------|------|
| 58 | Superboy Chart | 2079 |
| 59 | November 11, 2006 deposition transcript of Jean Peavy in the related *Siegel* cases, Case Nos. CV-04-8400 and CV-04-8776 | 2080 |

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

## DECLARATION OF DANIEL M. PETROCELLI

I, Daniel M. Petrocelli, declare and state as follows:

1.      I am an attorney licensed to practice in the State of California and admitted to the Central District of California.  I am a partner with the law firm of O'Melveny & Myers LLP, attorneys of record for plaintiff DC Comics in the above-entitled action.  I am lead counsel for DC Comics in this action, and I have personal knowledge of the matters discussed herein.

2.      This declaration is submitted as part of DC Comics' Updated, Initial Opposition To Defendants' Motion To Strike Under California's Anti-SLAPP Statute to preliminarily oppose defendants' motion and identify the discovery that is essential to submitting a full opposition to defendants' motion, pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, CAL. CIV. PROC. CODE § 425.16(g), and *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001); *Moser v. Triarc Cos.*, 2007 WL 3026425, at *3 (S.D. Cal. Oct. 16, 2007); *Chevron Corp. v. Bonifaz*, 2010 WL 1948681, at *3 (N.D. Cal. May 12, 2010); *Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.*, 37 Cal. App. 4th 855, 868 (1995); *Shropshire v. Fred Rappoport Co.*, 294 F. Supp. 2d 1085, 1099-1100 (N.D. Cal. 2003).

3.      In Part I of this declaration, I describe certain evidence relevant to DC's claims in this case and defendants' SLAPP motion.  In Part II, I summarize DC's discovery efforts to date in this case.  Defendants have yet to conduct any discovery.

4.      In the course of my work on this case, I have reviewed true and correct copies of the documents described below.  These documents are among the evidence that DC will seek to offer at trial in support of its complaint in this case.  I have reviewed true and correct copies of the transcripts of the deposition testimony described below.  This testimony, either through deposition or live witness testimony, is among the evidence that DC will seek to offer at trial.  I have

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

summarized below salient parts of the documents and testimony that pertain to the issues raised by defendants' motion.

## I.    Certain Evidence Relevant to DC's Third Through Sixth Claims

### A.    Marc Toberoff

5.    According to a 2006 published website for one of Mr. Toberoff's companies, "Intellectual Properties Worldwide" or "IPW":

> [Toberoff] is an *intellectual property expert, entrepreneur and producer*.... Prior to founding IPW, Mr. Toberoff acquired theatrical film, pay TV, merchandising and publishing rights to the classic television series: *My Favorite Martian*, *Fantasy Island*, *The Wild Wild West*.... Mr. Toberoff's efforts led to Sony's feature film, *I SPY*, starring Eddie Murphy and Owen Wilson (2002), which he executive produced, Disney's feature film, *My Favorite Martian* (1998) ... which Mr. Toberoff produced....

(Emphasis added.) The website also states: "IPW manages an impressive library of over 250 popular literary titles. In order to monetize these assets, IPW has strategic partnership with top talent agencies and production companies...." Attached hereto as Exhibit 1 is a true and correct copy of a January 4, 2006 version of the www.ipwla.com website.[1]

6.    The Internet Movie Database website, IMDb.com, identifies Mr. Toberoff as a producer of 11 films and Intellectual Properties Worldwide as a production company for six films. Attached hereto as Exhibit 2 is a true and correct copy of the Internet Movie Database listings for Marc Toberoff and Intellectual Properties Worldwide as they appeared on September 26, 2010.

7.    According to a published profile of Mr. Toberoff:

> Toberoff's penchant for biting the hand he hopes will feed him later—a rare duality that has *him acting as a lawyer one minute, a movie producer the next*—has made him a target for criticism. "It's a

---

[1] In certain instances, exhibits attached hereto have been slightly reduced in size to confirm with the Local Rules regarding format and pagination of exhibits. *See* L.R. 11-5.2, 11-5.3, 11-5.4. This was done solely to prevent pagination indications from overlapping with other text and to clearly differentiate the new pagination from prior document stamps. No other changes were made to any document.

cagey thing to do, but I don't think admiration comes with it," says Karen Kehela Sherwood, who, as co-chair of Imagine Films, a division of Brian Grazer and Ron Howard's Imagine Entertainment, has been pitched by Toberoff.  *"He's not someone who hats have to go off to.*"

(Emphasis added.)  Attached hereto as Exhibit 3 is a true and correct copy of an article titled "Nastier Than a Speeding Bullet," published on profile.com and dated September 17, 2007.

8.    According to a *Wall Street Journal* article discussing Mr. Toberoff:

*Mr. Toberoff has pursued another line of work: producing.*  His Intellectual Properties Worldwide has acquired remake rights to classics like "High Sierra" and "The Asphalt Jungle...."  This could theoretically put him in a delicate position, since *he is representing TV-show creators suing studios, while his production company seeks the cooperation of studios* that's required to fund and distribute Hollywood films.  Mr. Toberoff says he is aware of this potential conflict and "*keeps a defined firewall between producing and legal matters.*"

(Emphasis added.)  Attached hereto as Exhibit 4 is a true and correct copy of an article titled "The Rights Stuff," published in The Wall Street Journal on July 15, 2005.

9.    This case is not the first time Mr. Toberoff and certain of his companies have been sued for alleged business activities.  Attached hereto as Exhibit 5 is a true and correct copy of a complaint filed against Mr. Toberoff and Pacific Pictures Corporation in Los Angeles Superior Court on February 28, 1997 (*Alomar v. Cavana*, Case No. BC166806).  Attached hereto as Exhibit 6 is a true and correct copy of a complaint filed against Marc Toberoff and Intellectual Properties Worldwide in Los Angeles Superior Court on December 14, 2009 (*Leeds v. Van Leeuwan*, Case No. SC106045).  This evidence is offered not for the truth of the allegations, but to show that Mr. Toberoff has engaged in business activities in the entertainment industry with one or more of the entities named here as defendants.

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

### C.    The Siegels

10.    In a 1975 agreement between DC's affiliate Warner Communications Inc., Superman co-creator Jerome Siegel, and Joseph Shuster ("1975 Agreement"), Warner Communications agreed to pay Mr. Siegel and Mr. Shuster $20,000 per year until their deaths.  Ex. 7 ¶ 5(a).  The agreement also provided medical insurance coverage, lump sum payments, and annual survivor payments to their heirs.  *Id.* ¶ 5.  Attached hereto as Exhibit 7 is a true and correct copy of the December 23, 1975 agreement signed by Jerry Siegel, Joseph Shuster, and Warner Communications Inc.

11.    In a February 14, 1982 letter to Steven J. Ross of Warner Communications, Joanne Siegel requested an amendment to the 1975 Agreement:

> Should anything happen to Jerry, there is the problem of what's to become of me as his widow.  I'll be 65 years old this year.  And there is our daughter, Laura who would be left without any measure of security....
>
> [O]ur contract states that after Jerry's demise, should it come before 1985, I would receive only $20,000 annually, about $16,000 after taxes, or $10,000 after 1985, about $7,000 annually after taxes.  This would plunge me into an impossible financial situation without dignity nor security....
>
> *Without an amendment to the contract stating that the same income continue to me, my financial security is in jeopardy....*
>
> We are so grateful to you for all you have done for us....
>
> Fondest regards from Jerry, Joe, Laura and me.  God bless you.

Ex. 8 at 195-96 (emphasis added).  Attached hereto as Exhibit 8 is a true and correct copy of that letter.

12.    By return letter, Martin Payson of Warner Communications Inc. informed Ms. Siegel:

> I am pleased to advise you that Warner Communications agrees that if Jerry should predecease you, *Warner Communications will continue to pay to you for the remainder of your life the same benefits which it is then paying to Jerry.*

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

Ex. 9.  Attached hereto as Exhibit 9 is a true and correct copy of a March 15, 1982 letter from Martin Payson to Joanne Siegel.

13.    According to June and August 1988 letters from Mr. Payson to Joanne Siegel and Joseph Shuster, respectively, Warner Communications subsequently increased the annual payments to Siegel and Shuster, including an increase from $60,000 to $80,000 in 1988.  Exs. 10, 11.  Letters from March 1990 and March 1991 show that, following the 1988 increase, DC made periodic "cost of living" increases to the Siegels and Shusters.  Exs. 12, 13.  Attached hereto as Exhibits 10, 11, 12, and 13 are true and correct copies of letters from Mr. Payson dated June 20, 1988; August 8, 1988; March 12, 1990; and March 5, 1991.

14.    On April 3, 1997, notices of copyright termination were served by Laura Siegel Larson and Joanne Siegel on DC regarding certain works depicting Superman.  Case No. 04-8400, Docket No. 293 at 20.

15.    The deposition of Kevin Marks, the Siegels' attorney prior to Mr. Toberoff, was taken in the related action filed by the Siegels against DC and others in 2004 ("*Siegel* case").  Mr. Marks testified that in 1999, the Siegels retained Marks to "represent the Superman termination interest."  Ex. 14 at 369:1-9.  He "advise[d] them generally and [attempted] to negotiate an arrangement with Time Warner, or then AOL Time Warner."  *Id.* at 370:11-15.  At the time he was retained, Mr. Marks testified that his law firm "no longer engaged in a litigation practice."  *Id.* at 370:4-6.

16.    Mr. Marks testified in the *Siegel* case that on October 16, 2001, John Schulman of DC's affiliate Warner Bros. Pictures and he resolved the "final element" of their negotiation.  When asked at his deposition whether "that [resolution] closed the deal," Mr. Marks testified, "Yes."  *Id.* at 479:11-481:11.

17.    According to a letter by Mr. Marks to John Schulman dated October 19, 2001, Mr. Marks stated:

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

This is to confirm our telephone conversation of October 19, 2001. *The Siegel Family* (through Joanne Siegel and Laura Siegel Larson, the majority owners of the terminated copyright interests) *has accepted D.C. Comics [sic] offer of October 16, 2001 in respect of the "Superman" and "Spectre" properties.* The terms are as follows....

Ex. 15 at 414 (emphasis added).  Attached hereto as Exhibit 15 is a true and correct copy of the October 19, 2001 letter from Mr. Marks to Mr. Schulman.

18.   An October 26, 2001 letter from Mr. Schulman to Mr. Marks outlines the parties' agreed-upon terms.  Attached hereto as Exhibit 16 is a true and correct copy of that letter.

19.   At his deposition in the *Siegel* case, Mr. Toberoff testified that he called Mr. Marks in November 2001, "shortly after I made an agreement with the Shusters," in order to "find out the status" of the Siegels' termination.  Ex. 17 at ~~230~~513:17-~~232~~515:4.  Mr. Marks testified that he never returned the November 2001 phone call.  Ex. 14 at ~~498~~358:10-11.  Attached hereto as Exhibit 18 is a true and correct copy of relevant excerpts from Mr. Marks' call log.

20.   In a February 1, 2002 letter, Patrick Perkins, counsel for Warner Bros. and DC Comics, sent a letter to Mr. Marks attaching a draft long-form agreement.  Attached hereto as Exhibit 19 is a true and correct copy of that letter.

21.   According to Mr. Marks' call log, Mr. Toberoff called Mr. Marks again on February 6, 2002.  Ex. 18 at 588.

22.   Mr. Marks testified in the *Siegel* case that he subsequently returned Mr. Toberoff's February 2002 phone call and described the conversation as follows:

I think Mr. Toberoff started the call by saying that he had called me earlier and that I hadn't returned his call, for which I apologized, and then he introduced himself.  He said he was a lawyer and that he represented individuals that had interests in rights to movie and other properties that had come into those rights either by way of reversions under the law or reversions under Guild agreements.  *I also recall him saying that he had a <u>separate company</u> that was in the <u>business of acquiring intellectual property rights</u>. I recall him saying that he was <u>interested in the Superman</u>*

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

*property* and the Superboy property and had understood
that I was representing the Siegel family interest, and
he asked if he could talk to me about that.
...
     I think I said we were in the process
of -- in the documentation phase, were trying to document
a deal.

Ex. 14 at 498359:186-500360:13 (emphasis added).

23.   Pursuant to letter agreement dated February 12, 2002, Mr. Toberoff and Ari Emanuel, a Hollywood talent agent, formed IP Worldwide, LLC as a joint venture between Pacific Pictures, Mr. Emanuel, and Endeavor talent agency. Pacific Pictures promised to contribute its "current IP business" to IP Worldwide as well as Mr. Toberoff's "contacts" and "IP hit list." The agreement also provided for Mr. Toberoff to "personally receive screen credit and a fee" for his services as a "Producer" to IP Worldwide's intellectual property. Attached hereto as Exhibit 20 is a true and correct copy of the February 12, 2002, letter agreement.

24.   According to Mr. Toberoff's testimony, IP Worldwide, LLC assigned the rights from Pacific Pictures to IPW, LLC. Ex. 17 at 191473:4-15.

25.   On May 9, 2002, Joanne Siegel sent a letter to Richard Parsons of Time Warner Inc. regarding the February 1, 2002, long-form agreement. In discovery responses in the *Siegel* cases, Joanne Siegel and Laura Siegel Larson "den[ied]" that "the May 9 Letter … terminated negotiations with [DC] concerning the Superman Notices." Ex. 21 at 694 (RFA 85). Attached hereto as Exhibit 22 is a true and correct copy of Ms. Siegel's May 9, 2002, letter. Attached hereto as Exhibit 21 is a true and correct copy of Plaintiffs Joanne Siegel And Laura Siegel Larson's Responses To Defendants'/Counterclaimant's Second Set Of Requests For Admission filed in the *Siegel* cases and dated June 7, 2006.

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

26. According to the declaration of Mr. Schulman filed in the *Siegel* case in opposition to Plaintiffs' Motion for Partial Summary Judgment, Mr. Marks had a phone conversation with Mr. Schulman on May 16, 2002, in which Mr. Marks said the February 1 long-form agreement was aggressive but "not contrary to what had been agreed to...." Case No. CV-04-8400, Docket No. 183 ¶ 11.

27. At his deposition in the *Siegel* case, Mr. Marks testified that he prepared a new draft agreement and sent it to "the Siegels on or about July 15, 2002." Ex. 14 at ~~545~~405:25-~~546~~406:3.

28. Mr. Marks also testified at his deposition in the *Siegel* case that he spoke with Mr. Toberoff in July 2002 and described that telephone conversation as follows:

> Q. Okay. Can you tell me to the best of your
> recollection what was said by each of you and
> Mr. Toberoff in that conversation?
> A. I think Mr. Toberoff said he was -- wanted to
> check in with me to see where we were in our dealings
> with DC Comics, and I think I told him then that -- and I
> may have also said it in our first conversation -- that
> we had a confidentiality agreement with DC Comics, and I
> didn't feel at liberty to discuss the status of our
> dealings with him.
>      Mr. Toberoff said, "Can you tell me what DC
> Comics offered you," and I said "No. We have a
> confidentiality agreement."
>      And I believe Mr. Toberoff said, "Would you be
> willing to enter into negotiations with me," and I
> believe I said, "Initiating negotiations, no. That's
> something that makes me very uncomfortable. If you have
> an offer, present it to me, and I'll present it to the
> client."

Ex. 14 at ~~513~~373:10-~~514~~374:3.

29. According to Mr. Marks' deposition testimony in the *Siegel* case, on or around August 8, 2002, he had a conference call with Mr. Toberoff and Mr. Emanuel that he described as follows:

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

1
2
3
4
5
6
7

> ... they understood that the Siegel family had
> an interest in the termination rights and viewed that as
> perhaps the most valuable of properties and wanted to
> make a proposal.
> Q. Okay. What did you say?
> A. I said in substance and effect, "I'm listening."
> And I'm not sure who spoke, but they made a proposal of
> $15 million and what was described as a meaningful back
> end, which I understood to be a contingent compensation
> position or a royalty position in the exploitation of the
> property.

8

*Id*. at ~~515~~375:20-~~516~~376:5.

9

10

11

30.    In the Toberoff Timeline, attached to DC's First Amended Complaint as Exhibit A, the author describes Mr. Toberoff's August 2002 contacts regarding the Siegels as follows:

12
13
14
15

> MT and Ari Emanuel, partner and agent at Endeavor, contacts
> Kevin Marks at Gang, Tyre, Ramer, & Brown again, (who represented
> Joanne and Laura Siegel), on August 8, 2002.  MT approaches the
> Siegels, *not as an attorney but as a film producer*, stating that he is
> "allied" with Emanuel, hoping such a claim will legitimize him.

16
17
18

> On August 8th 2002, MT tells Marks that he and Emanuel have a
> billionaire ready to offer $15 million dollars up-front, plus what they
> promise to be meaningful participation from proceeds for exploitation
> of the Siegels' rights to SUPERMAN and some continued royalties on
> an ongoing basis in all media....

19
20
21
22
23
24
25

> Within their offer, MT appeals to the Siegels' sense of
> ownership and encourages them to take this deal. MT says he can help
> them make a movie in direct competition to the one being made at
> Warner Brothers (MT makes this argument to Joanne and Laura, all
> the while knowing full well that no one would ever go near making
> such an attempt; no other studio would go for it because of the division
> of rights, and no one outside of the studio system would attempt such
> an endeavor for all the enormous costs attributable to the making,
> marketing and distribution of such a film.)  In other words, MT
> displays "predatory intent" in his initial approach to the Siegels from
> the very beginning....

26
27

> Upon the Siegels signing the agreement, MT then tells Joanne
> and Laura that his mysterious billionaire has decided to invest
> elsewhere....

28

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

**Significantly, MT admits to Laura Siegel that there never was a billionaire willing to invest $15 million when he first approached them. But by then the Siegels were concerned about appearing flaky for changing lawyers a few times. They decide to stick it out.**

FAC Ex. A at 63-64, 67. (emphasis in original).

31.  Mr. Marks testified in the *Siegel* case that he conveyed Mr. Toberoff and Mr. Emanuel's offer to the Siegels shortly thereafter.  Ex. 14 at ~~169:21-170~~376:23-377:8.  According to the Toberoff Timeline:

Marks conveys MT's offer to the Siegels, and Marks does say to the Siegels, it is better than the one you have.  However, Marks also tells the Siegels that he would testify in court against the Siegels if they accepted this offer because he believes there has already been an agreement reached [with Time Warner and DC Comics].

FAC Ex. A at 63.

32.  A September 21, 2002 letter from Joanne Siegel and Laura Siegel Larson to Mr. Marks states:

As we previously discussed with you and hereby affirm, we rejected DC Comics' offer for the Siegel Family interest in Superman and other characters sent to us by you on February 4, 2002. We *similarly reject your redraft of the February 4, 2002 document which you sent to us on July 15, 2002.*  Therefore, due to irreconcilable differences, after four years of painful and unsatisfying negotiations, *this letter serves as formal notification that we are totally stopping and ending all negotiations with DC Comics, Inc.....*

This letter is also notification that, effective immediately, we are terminating Gang, Tyre, Ramer & Brown, Inc., and all of your firm's partners, associates and employees as representatives of the Siegel Family interest regarding Superman....

(emphasis added).  Docket No. 207-1.

33.  In a September 21, 2002, letter from Joanne Siegel and Laura Siegel Larson to Paul Levitz of DC Comics, the Siegels stated:

We regret to inform you that after many years of difficult negotiations with your representatives culminating in an offer sent to us on February 4, 2002, irreconcilable differences exist that cannot be

10

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

overcome. *Therefore, effective immediately, we are totally stopping and ending negotiations with DC Comics, Inc....*

(emphasis added). Attached hereto as Exhibit 23 is a true and correct copy of that letter. Ms. Larson testified at her deposition in this case that until this letter was sent on September 21, negotiations with DC had not been terminated. Ex. 24 at ~~149~~889:~~17~~12-~~20~~15; ~~211:20-212:4.~~957:8-17.

34.    Ms. Larson testified in this case that after initially contacting Mr. Toberoff, a meeting was held at the offices of the Endeavor Talent Agency, and was attended by Ms. Larson, Ms. Siegel, and Mr. Toberoff. Ms. Larson described this as an initial "meet-and-greet" with Mr. Toberoff. Ex. 24 at ~~107~~843:~~14-110:10.~~3-846:7.

35.    Ms. Larson testified that shortly thereafter, a second meeting was held between Ms. Larson, Ms. Siegel, Mr. Toberoff, and Mr. Emanuel, in Mr. Emanuel's office at the Endeavor Talent Agency. Ms. Larson testified that this was the first time they met Mr. Emanuel and they "wanted to know what his vision was of the [Superman] character and what he thought he might … bring to [the Siegels] as a representative." *Id.* at ~~118:16-121:9.~~854:15-857:23. During this meeting, Ms. Larson understood that the discussions were taking place "under this heading of IP Worldwide." *Id.* at ~~121~~858:~~13~~2-~~16.~~5. Ms. Larson testified that at the meeting, the Siegels discussed the August 2002 offer to acquire their interests in the Superman termination notice conveyed to Mr. Marks by Mr. Toberoff and Mr. Emanuel. Mr. Emanuel gave the Siegels information relating to his offer, including that he was a "rich guy," he was willing "to put a substantial amount of money up front and, … if he was able to negotiate … a good deal for [the Siegels], that [they] would have meaningful participation." The upfront money was "in the range of 15 million [dollars]." *Id.* at ~~142:1-143:21.~~880:25-883:5.

36.    Ms. Larson testified that at the time of the meeting with Mr. Toberoff and Mr. Emanuel, negotiations with DC had <u>not</u> been terminated. According to

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

Ms. Larson, at the time of the discussion the Siegels "were like 95 percent there. We were, you know, going to cutoff negotiations and everything, you know, so we were really really close to doing it early on." *Id.* at ~~148:24-149:7~~ 888:18-889:2.

37.   Ms. Larson testified that both of these meetings occurred prior to the Siegels entering into their agreement with IP Worldwide. *Id.* at ~~118:16-121:9~~ 854:15-857:23.

38.   In October 2002, the Siegels entered into an agreement with IP Worldwide providing:

> Owner hereby warrants and represents that Owner will not transfer, assign, license or in any manner encumber the Rights during the Term or extended Term other than through or as a result of IPW's exclusive representation hereunder, with the exception of by will, probate or pursuant to other Court order.
>
> ...
>
> The parties understand and acknowledge that the scope of this Agreement does not include legal services and/or expenses in connection with litigation or formal legal arbitration, if any.

Ex. 56 ¶¶ 8, 10.  Attached hereto as Exhibit 56 is a true and correct copy of that agreement.  The agreement also provided for a fee of "ten percent (10%) of any and all gross compensation payable including, without limitation, option, quitclaim or licensing fees, purchase price, settlement amounts, advances, dispute resolution, settlement or otherwise." *Id.* ¶ 6.  Ms. Larson testified that she understood the ten percent fee to IP Worldwide, which included Mr. Toberoff and Mr. Emanuel, was "like an agent's fee."  Ex. 24 at ~~[42~~771:5-~~18]~~.19.

39.   Ms. Larson testified that there was "no agreement between any member of the Siegel family and the law offices of Marc Toberoff in 2002."  Ex. 24 at ~~47~~777:~~18~~8-~~24~~.15.  According to Ms. Larson, in 2002, "[t]he only agreement that [the Siegels] entered into for the services of … Mr. Toberoff was the IP Worldwide agreement." *Id.* at ~~48~~777:~~3~~20-~~6~~.23.

40.   In a letter dated October 28, 2002 from Joanne Siegel and Laura Siegel Larson to Lillian Laserson of DC Comics, the Siegels attached their September 21,

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

2002 "notice to DC Comics … which totally stopped and ended negotiations with DC Comics...."  Attached hereto as Exhibit 25 is a true and correct copy that October 28, 2002, letter.

41.   On October 3, 2004, Ms. Siegel and Ms. Larson executed a legal retainer agreement with the Law Offices of Marc Toberoff.  The agreement provides Mr. Toberoff with a fee of "forty (40%)" of "any and all gross sums of money or other consideration recovered, confirmed or awarded" to the Siegels.  Ex. 26 ¶ 5(a).  Attached hereto as Exhibit 26 is a true and correct copy of that October 3, 2004, agreement.  Mr. Toberoff and the Siegels amended the legal retainer agreement on October 17, 2004.  Attached hereto as Exhibit 27 is a true and correct copy of the October 17, 2004, amendment.

### B.   The Shusters

42.   Joseph Shuster, who co-created Superman with Jerome Siegel, died on July 30, 1992.  He left two siblings, Jean Peavy and Frank Shuster, as well as a nephew, Mark Warren Peary.

43.   On August 21, 1992, Ms. Peavy sent a letter to Time Warner and DC explaining that she was the sole heir to Shuster's estate and that Shuster had left "a crushing burden of unpaid debts and bills and only a tiny estate."  She asked that Time Warner and DC Comics "pay his final debts and expenses."  Attached hereto as Exhibit 28 is a true and correct copy of that letter.  DC Comics agreed to pay Shuster's debts and increase Frank Shuster's annual survivor payments under the 1975 agreement.

44.   On September 10, 1992, Frank Shuster sent a letter to DC stating:

> [Jean] pointed out that my income tax as a single individual would be higher than hers as a married person.  She made the suggestion that if payments were made in her name, she would not pursue the termination of the Superman copyright as provided for to creators' heirs in the 1976 U.S. Copyright Act....

Docket No. 61-8.

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

45.   DC entered into an agreement with Jean Peavy and Frank Shuster on August 1, 1992 ("1992 Agreement"), which provided:

> [T]his agreement fully settles all claims to any payments or other rights or remedies which you may have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon. *In any event, you now grant to us [DC] any such rights and release us, our licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever.*

(Emphasis added.)  Attached hereto as Exhibit 29 is a true and correct copy of the August 1, 1992 agreement signed by Ms. Peavy, Frank Shuster, and DC.

46.   Between 1992 and 1999, Ms. Peavy sent letters to DC on several occasions expressing her gratitude to DC for the benefits provided by the 1992 Agreement and other actions the company took on her behalf.  Attached hereto as Exhibits 31-36 are true and correct copies of correspondence between Ms. Peavy and DC Comics from 1992 through 1999.  Attached hereto as Exhibit 30 is a letter dated September 8, 1992 from DC Comics to Frank Shuster.

47.   In a September 7, 1999 letter to Paul Levitz of DC, Ms. Peavy wrote, "I have learned from the Internet that Joanne Siegel has filed a copyright claim for SUPERMAN.  I want you to know that I intend to continue to honor our pension agreement."  Docket No. 61-10.

48.   In November 2001, Mr. Toberoff's company, Pacific Pictures Corporation, entered into an agreement with Ms. Peavy and Mr. Peary regarding their putative Superman and Superboy rights ("2001 PPC Agreement").  Toberoff executed the agreement as "President" of Pacific Pictures.   Attached hereto as Exhibit 54 is a true and correct copy of the 2001 PPC Agreement.

49.   The 2001 PPC Agreement provides in part:  "[Peavy and Peary] hereby transfer and assign to the Venture their rights, title and interests in the Rights,"

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

defined to include the "character, story element, and indicia associated with" Superman and Superboy.  Ex. 54 ¶¶ 1, 2.  It goes on to state:

> The parties each warrant and represent that after signing this Agreement *they will not without the express written consent of all the parties transfer, limit or encumber the Rights in any respect....*

> Any and all moneys and proceeds received ... will be shared, divided and payable: fifty percent (50%) to [Peavy and Peary] and fifty percent (50%) to PPC.

*Id.* ¶¶ 4-5 (emphasis added).  In addition, the agreement provides for the separate retention of Mr. Toberoff:

> The Venture and/or the Estate of Joe Shuster (to be established hereunder) will retainer Marc Toberoff, Esq. to render legal services in connection with the Rights and the Venture, including in connection with all legal disputes, litigation, arbitration and/or mediation regarding the Rights; to implement, enforce and prosecute the Rights; and to handle the negotiation of any contracts regarding exploitation of the rights.

*Id.* ¶ 7.  Mr. Peary testified at his deposition in this case that the Shusters did not enter into a "legal retainer" agreement with Mr. Toberoff until 2004—*three years* after the 2001 agreement.  Ex. 37 at ~~198~~1300:7-13.  Finally, the agreement states:

> Upon the expiration of the Term and the winding-up of the Venture or in the event of termination of the Venture for any reason, *all Rights, property or assets of the Venture will be held fifty percent (50%) by the Claimants and fifty percent (50%) by PPC* … Claimants and PPC will each be entitled to receive and continue to receive fifty percent (50%) of all Proceeds derived from the Rights after termination of the Venture.

Docket No. 61-11 ¶ 8 (emphasis added).  Mr. Peary testified that he understood paragraph 8 to mean that if the joint venture were terminated for any reason, the "interest in proceeds coming from the [Superman] rights" would be held fifty percent by the Shusters and fifty percent by Pacific Pictures Corporation.  Ex. 37 at ~~208~~1310:3-~~210~~1312:5.

50.  In October 2003, Ms. Peavy and Mr. Peary initiated a probate action in Los Angeles Superior Court to probate Joseph Shuster's purported will.  Although

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

she was appointed executrix in Mr. Shuster's will, Ms. Peavy declined to act in that capacity and Mr. Peary was appointed executor of the estate.  Docket No. 183-2.

51.   On October 27, 2003, Pacific Pictures entered into another agreement with Ms. Peavy and Mr. Peary ("2003 PPC Agreement"), providing that it "supplement[ed] the joint venture agreement dated as of November 23, 2001...." Attached hereto as Exhibit 55 is a true and correct copy of that agreement. Toberoff executed the agreement as "President" of Pacific Pictures.  The 2003 PPC Agreement also stated:

> PPC ... is not a law firm....
>
> The parties each warrant and represent that after signing this Agreement they *will not without the express written consent of all parties transfer, limit or encumber the Rights in any respect*....
>
> Upon the expiration of the Term or *in the event of termination* by Client of this agreement for any reason, *all Rights will be held fifty percent* (50%) by the Client and fifty percent (50%) by PPC ... Client and *PPC* will each be entitled to receive and *continue to receive fifty percent (50%) of all Proceeds derived from the Rights after termination*, if any.

*Id.* ¶¶ 2, 4, 7 (emphasis added).

52.   On November 10, 2003, a notice of copyright termination regarding Joseph Shuster's putative interest in Superman was served on Mr. Peary's behalf. Attached hereto as Exhibit 38 is a true and correct copy of the Notice of Termination of Transfer Covering Extended Copyright Renewal Term of "Superman" dated November 10, 2003.

53.   To the best of my knowledge, since execution of the 2001 PPC Agreement, neither Jean Peavy nor Mark Warren Peary has filed any litigation against DC Comics concerning putative Superman rights.

54.   In a September 10, 2004, letter from Mr. Toberoff to Mr. Peary and Ms. Peavy, Mr. Toberoff "confirm[ed]" that the 2001 PPC Agreement and 2003 PPC Agreement "have been cancelled."  Docket No. 163-7.

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

55.    On or about September 10, 2004, Mr. Peary and Ms. Peavy executed a legal retainer agreement with the Law Offices of Marc Toberoff, dated "As of November 23, 2001." Ex. 39 at 1483.  The agreement provides Mr. Toberoff with a fee of "fifty (50%) … or any and all gross sums of money or other compensation recovered, confirmed or awarded" to the Shusters.  Ex. 40 ¶ 4.  Attached hereto as Exhibit 40 is a true and correct copy of the September 10, 2004, legal retainer agreement.  Attached hereto as Exhibit 39 is a true and correct copy Of Defendant Mark Warren Peary's Response To Plaintiff DC Comics' Second Set Of Interrogatories dated June 2, 2011.

56.    According to Mr. Peary's testimony in this case, the first time the Shusters ever signed an agreement with Mr. Toberoff as a lawyer was in 2004.  Ex. 37 at ~~198~~1300:3-13.

57.    In a letter dated May 12, 2005, from Mr. Toberoff to Patrick Perkins, Mr. Toberoff expressed the Shusters' understanding that DC had denied the validity of the Shuster Termination Notices:

> Given your firm's prior letter on DC's behalf denying our clients' termination interests without legal grounds, my clients have requested that any further communications to them be made through our law firm and not to them directly."

Docket No. 183-4.

**D.    Consent Agreement**

58.    Before a 2008 mediation session in the *Siegel* case, Mr. Toberoff informed DC Comics about certain arrangements between the Shusters and Siegels relevant to their entering into agreements with DC.  *See* Docket No. 147-1 at 18-23. A mediation thereafter ensued, pursuant to a JAMS Confidentiality Agreement. Docket No. 126-23.  It did not result in a settlement~~.~~.

59.    According to Mr. Peary's deposition testimony in this case, the 2008 consent agreement was signed by the Shusters, Siegels, and Mr. Toberoff and

remains currently effective.  Ex. 37 at 561158:14-57:7, 651159:-9, 1167:15-25, 721174:5-7.  According to Mr. Peary's deposition testimony, the consent agreement requires the Shusters to obtain the Siegels' consent in order to enter into an agreement with DC.  *Id.* at 82:22-83:8.

## II.     Discovery

60.   Although this case was initially filed over one year ago and discovery has commenced, DC's need for additional discovery, in the event that defendants' motions are not fully denied, is not due to its lack of diligence.  Since the start of this case, DC has endeavored to take discovery in support of its claims.  Defendants have asserted in their motion that "there is no need for discovery" here because "DC has already taken discovery during the six-year *Siegel I* litigation."  Docket No. 196 at 12.  However, new evidence has emerged—and continues to emerge— that relates to DC's claims in this case, including its oppositions to defendants' three motions to dismiss and/or strike under Federal Rule of Civil Procedure 12 ("Rule 12 Motions"), and motion to strike under California's anti-SLAPP statute directed at DC's Fourth, Fifth, and Sixth claims for relief, which arise under state law ("Motion to Strike").

### A.     Initial Efforts to Conduct Discovery

61.   DC filed its initial complaint on May 14, 2010.  Docket No. 1.  On August 13, 2010, defendants filed their first set of Rule 12 Motions and Motion to Strike.  Docket Nos. 30-31, 33-34.  Shortly after DC filed its complaint, a dispute arose between the parties regarding scheduling an initial Rule 26(f) discovery conference to commence depositions and written discovery.  Defendants contended that discovery should not commence until the Court ruled on their Rule 12 Motions, Motion to Strike, and Rule 54(b) motion in the *Siege**Siegel* case.  *See, e.g.,* Docket No. 44-1 at 4-7.  Unable to reach a compromise, DC served a motion to initiate discovery on August 13, 2010.  Docket No. 44-1 at 2-4, 8-17.

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

62.   In response to DC's motion to initiate discovery, defendants agreed to participate in the initial conference.  The parties conducted their Rule 26(f) discovery conference on August 16, 2010, the earliest date defendants would agree to it.  The next day, DC served deposition notices and requests for production of documents on defendants Joanne Siegel, Laura Siegel Larson, Jean Peavy, and Mark Peary.  Docket No. 61-20 at 137.

63.   Defendants filed two motions seeking to stay and/or limit all discovery. Defendants' first motion, filed at the same time as DC's motion to initiate discovery, sought to bar discovery regarding an anonymous letter written by a former colleague of defendant Marc Toberoff titled "Superman – Marc Toberoff Timeline."  Docket No. 42.  Defendants' second motion sought to stay the four depositions noticed by DC on August 17 pending resolution of their Rule 12 Motions and Motion to Strike.  Docket No. 61.

64.   Magistrate Zarefsky ruled on all three discovery motions on September 20, 2010.  Docket No. 74.  The Magistrate denied DC's motion to initiate discovery because, as he stated at the hearing, DC had already initiated discovery by serving the deposition notices at issue, and denied defendants' motion for a protective order regarding the Toberoff Timeline.  *Id.*  The Magistrate granted in part and denied in part defendants' motion for a protective order to stay depositions pending rulings on dispositive motions and limiting the scope and time of depositions.  He ordered that the depositions would be stayed until November 15, 2010, but could commence thereafter, *id.*, and held:

> [T]here's nothing that prevents [DC] from commencing discovery.  The only automatic stay that federal law imposes is a stay before the Rule 26(f) conference, and that conference has taken place.
>
> In the Court's view, the California anti-SLAP statute does not govern these federal proceedings and impose an automatic stay.  This is not to say that the Court could not in an appropriate circumstance impose such a stay, and that the state's statute could not be a factor because in the Court's view it can.  But no stay exists automatically right now as a result of the statute.

19

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

Docket No. 95 at 56:23-57:9.  The Magistrate further specified:  "There shall be no limit to the subject matter covered in the depositions."  Docket No. 74.

### B.    Defendants' First Appeal and DC's First Motion to Compel

65.    DC filed its First Amended Complaint ("FAC") on September 3, 2010. Docket No. 49.  In light of DC's amendment, the Court issued an administrative order on September 7, vacating defendants' Rule 12 Motions and Motion to Strike as moot.  Docket No. 52.  On September 20, defendants filed three new Rule 12 Motions and a new Motion to Strike, all aimed at DC's FAC.  Docket Nos. 75, 77-78, 80; *see also* Docket Nos. 89-92, 98, 100, 102-03.

66.    On the same day defendants filed their dispositive motions, the Siegel and Shuster defendants served their initial responses to DC's August 17 document requests.  DC disputed the adequacy of defendants' responses, which asserted (i) boilerplate objections that, under the law, amount to no objection at all; (ii) non-specific privilege claims that prevent DC from challenging them; and (iii) the very same objections the Magistrate rejected in denying defendants' motion for a protective order—*e.g.,* that their Motion to Strike barred discovery and that "discovery should be stayed" until the Court ruled on their Rule 12 Motions, Motion to Strike, and Rule 54(b) motion.  Defendants produced no documents or privilege logs.  Docket No. 125 at 1.

67.    DC exchanged numerous correspondence with defendants, participated in a conference with defendants, and allowed defendants to serve amended responses.  Defendants continued to assert the same objections and refused to produce any documents or privilege logs.   On October 11, DC served its portion of a joint stipulation regarding its motion to compel production of documents.  Docket No. 162-1.

68.    On October 7, defendants filed their first of various interlocutory appellate actions.  Docket No. 104.  Defendants appealed this Court's September 7 order vacating as moot defendants' initial dispositive motions.  *Id.*

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

69.    In light of defendants' appeal, on October 14, the Court vacated defendants' second set of dispositive motions and administratively stayed the case pending the outcome of their appeal.  Docket No. 109.

70.    On October 21, the Ninth Circuit issued an order compelling defendants to "move for voluntary dismissal of the[ir] appeal or show cause why it should not be dismissed for lack of jurisdiction." Appellate Case No. 10-56594, Docket No. 4. Defendants submitted their response to the Court's order on November 12, followed by DC's opposition on November 24.  *Id.* Docket Nos, 5-1, 7-1.

71.    While defendants attempted to show cause why the Ninth Circuit had jurisdiction to entertain their interlocutory appeal, DC moved to modify the Court's October 14 stay order to permit DC to take full discovery in this case on November 1.  Docket No. 110.  On November 16, the Court granted DC's motion, ruling:

> Good cause appearing, IT IS HEREBY ORDERED that plaintiff DC Comics' Motion to Modify the Court's October 15, 2010 Administrative Order Staying Action Pending Outcome of Appeal is GRANTED; and:
>
> The stay imposed in the Court's October 15, 2010 order is hereby modified to allow DC Comics to take full discovery related to its federal claims;
>
> The stay imposed in the Court's October 15, 2010 order is hereby modified to allow DC Comics to take full discovery related to its state-law claims; and,
>
> The stay imposed in the Court's October 15, 2010 order is hereby modified to allow DC Comics to proceed with full and complete discovery of Joanne Siegel, Laura Siegel Larson, Jean Peavy, and Mark Peary.

Docket No. 117.

72.    The next day, DC informed defendants of its intention to proceed with its motion to compel the production of documents in order to avoid further delay of discovery.  Docket No. 128-1.

73.    On November 22, defendants sought *ex parte* relief to reinstate their dispositive motions and requested another 30-day stay of discovery to allow the

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

Court to resolve the motions.  Docket No. 119.  Two days later, the Court denied defendants' *ex parte* application.  Docket No. 124.

74.    After unsuccessful negotiations on a stipulation regarding defendants' production of documents, DC filed its motion to compel on November 22.  Docket No. 125.  On the day their opposition was due, defendants agreed to a stipulation to a court order requiring them to produce or log all responsive documents.  Docket No. 132 ¶ 1.

75.    On December 7, the Court entered an order granting the parties' stipulation regarding defendants' production of documents and privilege logs. Docket No. 133.  The order states:

> (1) By 6:00 p.m. PST on December 7, 2010, Defendants will produce, by personal service on DC's counsel at its Century City offices, all documents and other materials responsive to each and every one of DC's Requests, except for documents that are subject to a claim of attorney-client privilege, the attorney work-product doctrine or any other privilege available under law, or to a claim that such responsive documents and other materials are protected under the parties' May 1, 2008 JAMS Confidentiality Agreement (collectively, "Privilege" of "Privileged").  Aside from documents and materials subject to a claim of Privilege or falling under the except set in sections (4) and (5) below, Defendants will not refuse to produce or refuse to log any documents or materials based on the objections Defendants previously asserted in their responses to DC's Requests.

> (2) By 6:00 p.m. PST on December 15, 2010, Defendants will furnish, by personal service on DC's counsel at its Century City offices, complete Privilege logs identifying any and all Privileged documents and other materials for which Defendants assert a claim of Privilege in response to DC's Requests.

*Id.* at 1.

76.    In January, the Ninth Circuit dismissed defendants' first appeal, finding that it "lack[ed] jurisdiction to review the district court's September 7, 2010 order because the order is not a final appealable decision."  Appellate Case No. 10-56594, Docket No. 15.

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

### C.    Joanne Siegel Deposition; Defendants' Second Appeal; and Defendants' First Ninth Circuit Writ

77.    DC originally noticed the deposition of Joanne Siegel for October 5, 2010.  Docket No. 61-21.  Following the Court's modification of its administrative stay order, on November 22, 2010, DC served an amended notice setting Ms. Siegel's deposition for December 13.  Attached hereto as Exhibit 41 is a true and correct copy of that amended notice.  On December 2, defendants sent a letter stating that Ms. Siegel would not appear for her deposition on that date and was not available until January 10 at the earliest.  Docket No. 164-3 at 161.  In subsequent discussions, the parties could not agree on a date certain for Ms. Siegel's deposition, culminating in DC serving defendants with its portion of a motion to compel the deposition of Ms. Siegel.  Docket No. 162-3.  Two days before their opposition was due, defendants agreed to produce Ms. Siegel for deposition on January 12, 2011, and, if necessary, on January 14 for any carry-over.  Docket Nos. 162-4 at 384-87; 281-1 at 3.  As a result, DC did not proceed with its motion to compel.  DC later rescheduled the deposition for two weeks later, on account of a jury service summons I received that conflicted with Ms. Siegel's deposition. Shortly thereafter, Ms. Siegel passed away, before DC could depose her.

78.    On December 16, defendants noticed a second appeal to the Ninth Circuit and filed a petition for writ of mandamus challenging this Court's rulings permitting DC to take discovery and deferring ruling defendants' Rule 12 Motions and Motion to Strike.  Docket No. 134; Appellate Case No. 10-73851, Docket No. 1-3.  In their writ, defendants asked the Ninth Circuit to "direct the district court to: (1) vacate its orders of November 16 and 24, 2010; (2) reinstate, promptly set for hearing and decide Defendants' dispositive motions; and (3) stay discovery until ~~Decembers~~Defendants' anti-SLAPP motion is decided absent a showing of particularized need by DC."  Appellate Case No. 10-73851, Docket No. 1-3 at 30. On December 20, as part of its writ proceeding, defendants filed an "urgent" motion

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

to stay discovery in the district court pending resolution of their writ petition. *Id.* Docket No. 5-1.

79.   DC filed its opposition to defendants' Ninth Circuit stay motion and its motion to dismiss defendants' second appeal, filed December 23 and 30, respectively.  Appellate Case No. 10-73851, Docket No. 6-1; Appellate Case No. 10-56980, Docket No. 4-1.

80.   On January 4, 2011, the Ninth Circuit again issued an order for defendants to "move for voluntary dismissal of the appeal or show cause why it should not be dismissed for lack of jurisdiction."  Appellate Case No. 10-56980, Docket No. 6.

81.   The Ninth Circuit rejected defendants' arguments for a stay of discovery and dismissed their writ petition and accompanying stay motion on January 7. Appellate Case. No. 10-73851, Docket No. 13.  Defendants' second appeal was dismissed on January 19.  Appellate Case No. 10-56980, Docket No. 13.

82.   On January 14, 2011, defendants unilaterally re-filed their Rule 12 Motions and Motion to Strike and set them for hearing on February 14.  Docket Nos. 145-148.

**D.    DC's Second Motion to Compel Siegel and Shuster Defendants**

83.   In mid-December 2010, the Siegel and Shuster heirs produced documents and privilege logs, as required by this Court's December 7 order. Docket Nos. 162-2, 162-5-162-7.  DC again disputed the completeness of defendants' responses; after meeting and conferring, DC filed a motion to compel the production of documents and privilege logs from the Siegel and Shuster defendants on February 8.  Docket No. 160.

84.   On February 11, this Court vacated the February 14 hearing on defendants' Rule 12 Motions and Motion to Strike.  Docket No. 169.  On March 9, the Court issued an order "request[ing] that the parties file anew their respective [Rule 12 and Motion to Strike] briefs, specifically identifying which brief

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

corresponds to which motion.  Plaintiffs' oppositions shall be filed on or before **March 21, 2001** and Defendants' replies on or before **March 30, 2011**."  Docket No. 179.  Both DC and defendants filed their renewed oppositions and replies as instructed.  Docket Nos. 181, 184-86, 191-92, 195-96.

85.   In an order dated April 11, 2011, Magistrate Zarefsky ruled on DC's motion to compel:

    a.  Denied DC's request for production of the 2008 consent agreement by applying the "law of the case" doctrine.  Docket No. 209 at 8-10.

    b.  Granted DC's request for production of defendants[2] retainer agreements, subject to redaction by defendants.  *Id.* at 11.

    c.  Denied DC's request for production of the July 11, 2003, letter from Ms. Larson to Mr. Siegel.  While describing defendants' as being "cryptic about this letter," the Court held that defendants' privilege assertions over the letter were upheld in the *Siegel* case, and that ruling would not be reconsidered.  *Id.* at 11.

    d.  Granted DC's request that defendants produce for *in camera* review 11 identified documents between counsel for Mr. Siegel and Mr. Toberoff.  *Id.* at 11.

    e.  Denied DC's request for production of the July 5, 2003, letter from Ms. Larson to Mr. Siegel, relying on defendants' representation that the documents does not exist.  Since defendants provided no response regarding the May 13, 2003, letter, the Court ordered defendants to "either (a) produce it to [DC]; or (b) submit a verified further response to [DC] indicating that it does not exist or, if it already has been produced, identifying it by Bates number or other identifying mark." *Id.* at 12.

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

f. Granted DC's request for production of documents related to communications between Ms. Larson and Dennis Larson starting in January 2000. *Id.* at 12-13.

g. Denied DC's request that defendants be ordered to amend their privilege logs. *Id.* at 13.

86.   Magistrate Zarefsky's April 11 ruling, however, has been and continues to be subject to further examination and possible reconsideration based on discovery obtained from defendants since the order issued.

### 1.   2008 Consent Agreements

87.   Magistrate Zarefsky stated in his April order that the legality of the consent agreement cannot be determined "with certainty … without seeing the agreement." *Id.* at 8.  Given Mr. Peary's testimony—after the Magistrate's ruling—that the consent agreement remains in effect and precludes the Shusters from entering into an agreement with DC without the consent of the Siegels,  DC is currently pursuing discovery to determine the substance of the consent agreement.

### 2.   July 2003 Correspondence

88.   On April 18, pursuant to the Magistrate's April 11 order, defendants produced a May 13, 2003, letter from Mr. Siegel to Ms. Larson.  Docket No. 225-4.

89.   The May 13 letter states:

> Michael Siegel
> 3605 Bendemeer Rd.
> Cleveland Heights, Ohio 44118
>
> May 13, 2003
>
> Dear Laura,
>
> Thank you for your letter of November 2 of last year.  I would have written sooner but I have endured much sadness.  My mother passed away last year and I am particularly saddened by her not having been able to enjoy some of the money due us from DC Comics and Time Warner.
>
> I really wish to discuss Marc Toberoff.  I learned from Marks and Rammer that Marc was the attorney on record for the Shuster half

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

of the Superman copyright, has Marc ever informed you of this? Now that you have signed with him, he is in control of the whole Superman copyright. I told you when he first contacted me, he wanted to buy my share of the copyright. Marc had a mysterious billionaire who wanted to invest in the Superman copyright, put 15 million dollars up front plus participation. When you signed with Marc the billionaire invested elsewhere. Marc has his own production company, he was going to team with Emmanuel and make a movie. This has not happened. You mentioned Marc had a number of innovative, proactive ideas that could bring all members of the Siegel interest both justice and many times more than the amount DC's representatives wanted to throw our way to get rid of us. Marc has chosen not to open any dialog with Time Warner or anyone else. How can he negotiate a contact if he is not talking to anyone?

Marc is now the attorney for the entire Superman copyright. In 2013 under the Sunny Bono law Marc will be able to take the Superman copyright from Time Warner. Has he told you this? Do you know who owns the Shuster interest in the Superman copyright? Has Marc bought the Shuster interest himself? For a long time now, Marks and Rammer said there should be a united Siegel front. Marc is not negotiating with anyone, but he has found someone willing to buy me out. How can he find someone to buy me out and not negotiate for the entire Siegel interest? Has Marc offered to find someone to buy your interest? If I would sell my interest it would leave you with less than half of the Superman copyright and not all of the Siegel interest in the Superman copyright. This would weaken your position? The amount Marc's investor is offering is less than half of what DC showed as my share. There is a very real possibility I will contact Time Warner and see if they will buy me out. Marc seems to have an agenda of someone buying me out so I will have to look for the best deal I can get. Marc is really pressing for an answer to the offer his investor made.

Am I missing something? Is it Joanne's and your intention to do nothing? You have filed letters of Termination on Superman and The Spectre, have any other letters of Termination been filed or will there by more? Regarding an old item, I would very much appreciate the release of the funds I understand are being held in escrow for me by Marc. If it turns out that we have no disagreement regarding your expenses and too much money was released, that certainly can be dealt with quickly. Last week a package of documents arrived from Marc. Don and I have not had time to review them yet.

This procedure has taken way too long. I have been on contract negotiation teams and have never seen anything like this. Your attorneys have chosen not to have any dialog with the other side for

27

years at a time.  I want a united Siegel interest, but I might be forced to act on my own.  I do have something to sell independently, Marc's actions prove this.

I hope your health is getting better and that your divorce is now over.

Sincerely,

Michael

Docket No. 225-4 at 3.

90.   In response to defendants' production of the May 13 letter, and in order to obtain a copy of a letter that DC believed Laura Siegel Larson sent to Michael Siegel in response to his May 13 letter, DC filed a motion for review of the April 11 order with the District Court and a motion for reconsideration with Magistrate Zarefsky.  Docket Nos. 225, 253.  The Court denied both motions.  Docket No. 248, 285.

91.   Thereafter, Ms. Larson testified at her deposition that (1) she responded to Michael's May 13 letter; (2) she gave correspondence between Michael Siegel and her to Mr. Toberoff; and (3) she has entire "boxes" full of documents that have never been reviewed.  Ex. 24 at ~~63:17-65:4, 70:19-24, 242:25-248:2, 277:3-281~~795:3-796:19, 802:19-25, 991:5-996:18, 1028:7-1033:14.  Based on this new evidence, DC intends to initiate additional efforts to obtain Ms. Larson's response to Michael's letter and additional relevant documents that have yet to be produced.

## E.    DC's Motions to Compel Toberoff Defendants Production of Documents and Interrogatory Responses

92.   In January 2011, a dispute arose regarding the Toberoff defendants' responses to DC's document requests propounded in December 2010.  On January 24, defendants produced only one new document and re-served the same objections to DC's document requests and privilege logs that led to DC's motion to compel the Siegel and Shuster defendants.  Docket No. 207-9.  In addition,  the Toberoff

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

defendants stated in January 24 interrogatory responses that, during the summer and fall of 2010, Toberoff conferred with prosecutors of the U.S. Attorney's Office in Los Angeles regarding the circumstances surrounding the creation of the Toberoff Timeline, and that the USAO initiated a related grand jury investigation.  Docket No. 162-14 at 599-600.  Mr. Toberoff further noted that his attorneys sent the Toberoff Timeline, and documents enclosed therewith, to the USAO on September 27, 2010.  *Id.* at 608.  Finally, Mr. Toberoff identified David Michaels as the purported author of the Toberoff Timeline, after months of DC requesting the information from defendants.  *Id.* at 596.

93.   After the parties were unable to come to an informal resolution, DC filed two motions to compel on April 4 seeking additional discovery responses, particularly with respect to the documents given to the USAO.  Docket Nos. 205, 206, 208.

94.   In an order dated May 25, Magistrate Zarefsky ruled on the motion as follows:

   a.      Granted DC's request for production of the documents enclosed with the Toberoff Timeline that defendants produced to the U.S. Attorney's Office.  Following the majority rule among the federal circuits, Magistrate Zarefsky found that defendants waived any attorney-client privileges by disclosing the documents to the government and there was "no merit to Defendants' argument that they enjoyed a joint prosecution privilege with the United States."  He stayed this part of the order subject to defendants' seeking review.  Docket No. 262 at 2-4.

   b.      Denied DC's requests for production of the communications involving David Michaels.  *Id.* at 4.

   c.      Denied DC's request for production of documents relating to Mr. Marks' October 4, 2010, declaration.  *Id.* at 4-5.

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

d.      Denied DC's request to overrule defendants' boilerplate objections to every document request. Magistrate Zarefsky stated that "this issue suffers greatly from the fact that the parties have not prepared a Joint Stipulation," and "[t]he Court is loath to issue a blanket order, without understanding the particular requests and the particular objections." *Id.* at 5.

e.      Denied DC's requests for more complete answers to Interrogatory Numbers 9, 13-15, and 17-18. *Id.* at 6.

**F.     DC's Motion to Compel the Further Production of Documents**

95.   In response to the documents DC received from defendants on April 18, pursuant to the Court's April 11 order, DC filed a motion to compel the further production of documents on May 27. DC requested an order compelling defendants to: (1) "conduct a diligent search of all records and files in their possession, custody, or control; produce forthwith all responsive documents not previously provided; and explain how and when specific missing documents were lost or destroyed; (2) ~~production~~produce of the November 2, 2002, letter from Ms. Larson to Mr. Siegel; (3) produce an unredacted version of the May 13, 2003, letter from Mr. Siegel to Ms. Larson; and (4) provide unredacted versions of the Siegel and Shuster retainer agreements for *in camera* review. Docket No. 267-1. Magistrate Zarefsky denied DC's motion on June 20. Docket No. 288 at 44:21.

**G.     August 8 Deadline For DC To Supplement SLAPP Opposition**

96.   DC filed a brief report on May 26 apprising the Court of the status of discovery relevant to the pending Motion to Strike, among other issues. DC said it intended to seek leave to supplement its initial opposition with evidence since obtained in discovery. Docket No. 263. In response to DC's status report, on June 1 the Court vacated the opposition and reply briefing to defendants' Rule 12 Motions and Motion to Strike, and ordered DC to file updated oppositions on

30

August 8, followed by defendants' updated replies.  The Court said it would not permit further supplemental filings.  Docket No. 270.

97.   Defendants moved for reconsideration of the Court's June 1 order as to the portion striking the opposition and reply briefing concerning their Rule 12 Motions.  Docket No. 282.  The Court granted defendants' motion and limited DC's updated opposition to the pending Motion to Strike.  Docket No. 292.

98.   On July 11, defendants filed a motion seeking to refer the dispositive motions to Magistrate Zarefsky for a report and recommendation.  Docket No. 293. This Court denied defendants' motion on July 13.  Docket No. 294.

## H.   Defendants' Writ Petition Regarding the Toberoff Timeline Documents

99.   When Magistrate Zarefsky issued his May 25 order compelling defendants to produce the documents they shared with the USAO, including the documents enclosed with the Toberoff Timeline, he stayed his ruling "to allow Defendants to seek review before the District Judge.  If the Defendants seek such review, the stay shall continue in effect until all review is exhausted of the District Judge rules to the contrary on the matter."  Docket No. 262 at 4.  On June 27, 2011, in response to DC's application, the Magistrate clarified that this stay extends to defendants' pending writ proceedings.  Docket No. 287 at 3.

100. On June 7, defendants filed a motion for review of the May 25 order, Docket No. 276, which this Court denied.  Docket No. 279.

101. On June 30, 2011, defendants filed another interlocutory appeal, petitioning the Ninth Circuit for a writ of mandamus to overturn Magistrate Zarefsky's May 25 ruling that defendants waived privilege as to the documents shared with the USAO.  Appellate Case No. 11-71844, Docket No. 1-1.  At present, the Ninth Circuit has issued no rulings with respect to defendants' petition.

102. Given the importance of the documents and the desire of witnesses to avoid multiple deposition sessions, DC has temporarily deferred the depositions of

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

key witnesses, including Toberoff, Kevin Marks, and David Michaels pending a ruling on defendants' writ petition.  If a ruling is not issued within another 30 days, DC will have no choice but to commence the remaining depositions and seek to ~~compete~~complete them if and when the documents become available.

### I.    Depositions of Laura Siegel Larson and Mark Warren Peary

103.  On May 11, one week before Mr. Peary's May 18 deposition, defendants sent a letter stating that his deposition, along with Ms. Peary's that was scheduled for May 20, should be postponed due to DC's pending discovery motions.  Docket No. 254-6.  Although no agreement was reached to postpone the depositions, neither defendant appeared.  *See* Docket 254-10.

104.  On May 23, DC sought *ex parte* relief to compel the appearance of Mr. Peary and Ms. Larson.  Docket No. 254.  The next day, defendants agreed to a stipulation setting Mr. Peary's deposition for June 29 and Ms. Larson's for July 1.  Docket No. 260.  Magistrate Zarefsky issued an order adopting this proposed timeframe on June 1.  Docket No. 270.

105.  On June 13, defendants filed a motion for protective order requesting that the Court postpone the depositions "in tandem with the stay under the May 25 Order; *i.e.*, until seven days (7) 'after review of this Court's May 25 Order is exhausted or the District Judge rules to the contrary on the matter."  Docket No. 278-1.  Magistrate Zarefsky denied defendants' motion.  Docket No. 285.

106.  On June 29, 2011, I took the deposition of Mr. Peary, the first deposition to be taken in this case.  Ex. 37.  Because of numerous privilege objections and instructions, DC is in the process of meeting and conferring in support of a motion to compel additional testimony.  Attached hereto as Exhibit 43 is a true and correct copy of a letter from D. Petrocelli to Mr. Toberoff dated July 11, 2011.

107.  Ms. Larson was deposed on July 21.  Ex. 24.  Because of numerous privilege objections and instructions at her deposition, DC anticipates a motion to

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

compel may be necessary to obtain additional testimony as well as documents. *See* Docket No. 301-2.

### J.    DC's Three Motions to Compel

108. On August 8, Magistrate Zarefsky heard DC's three motions to compel the production of: (1) all communications between defendants and the U.S. Attorney's office concerning the Toberoff Timeline; (2) all copies of the May 13, 2003, letter from Mr. Siegel to Ms. Larson, including the "Q" Bates stamped versions; and (3) documents relating to the Siegels' Superman rights contained in Laura Siegel Larson's divorce files. Docket Nos. 296-1, 297-1, 298-1. Magistrate Zarefsky granted DC's motion to compel the production of the USAO communications, though stayed the order pending defendants' Ninth Circuit writ petition, and denied DC's other two motions.

### K.    DC's Requests for Production of Documents

109. In light of Magistrate Zarefsky's May 25 order, DC has conferred with defendants on narrowing the scope of various pending requests to avoid objection and cause defendants to produce ~~al~~all responsive documents. DC sent defendants a letter on June 1 proposing revised versions of the requests, Docket No. 298-4, followed by a 30-page letter on July 7. Attached hereto as Exhibit 44 is a true and correct copy of a letter from Mr. Kline to Mr. Toberoff dated July 7, 2011.

110. The Toberoff defendants' latest production includes documents relevant to DC's claims and its oppositions to defendants Rule 12 Motions and Motion to Strike:

- Defendants produced corporate formation documents for defendants Pacific Pictures Corporation, IP Worldwide LLC, and IPW, LLC, true and correct copies of which are attached hereto as Exhibit 46. These documents show that defendant IP Worldwide LLC's stated business purpose is "~~entertainment~~Media and ~~media~~Entertainment," not the

provision of legal services.  None of the documents mentions of the companies being engaged in the practice of law.

- Defendant IP Worldwide produced a March 29, 2004, letter from Mr. Toberoff to Ms. Siegel and Ms. Larson, which "confirm[s]" their understanding that the 2002 IPW Agreement "is reinstated and that the Term of the Agreement is extended until April 23, 2005." *Id.* at 1598. This agreement shows that the separate business relationship between Mr. Toberoff and the Siegels continued through 2005.

### L.    Don Bulson Deposition

111. DC took the deposition of Don Bulson, who was counsel for Michael Siegel.  Michael passed away in 2006.  Prior to Mr. Bulson's deposition on July 19, DC was advised by counsel for Mr. Bulson that he would not be producing certain documents in response to DC's requests at the instruction of Mr. Toberoff. Attached hereto as Exhibit 48 is a true and correct copy of a letter from Joshua Ryland to Matthew T. Kline dated July 15, 2011.

112. Several disputes arose during Mr. Bulson's deposition, so on August 3, DC sent Mr. Toberoff and Gerald Berk, attorney for the Estate of Michael Siegel, a letter requesting a meet and confer concerning those issues.  In the letter, DC:  (1) addressed Mr. Berk's refusal to allow Mr. Bulson to answer questions regarding non-privileged documents or information conveyed to Mr. Bulson by Mr. Siegel; (2) requested production of non-privileged portions of calendars and billings entries maintained by Mr. Bulson, in addition to an expert report submitted by Renner Otto in the litigation against the Michael Siegel Estate; and (3) proposed a method for logging documents located in Renner Otto's digital copy of the Michael Siegel file. DC is awaiting a response.

### M.    Toberoff Corporate Defendants' Interrogatory Responses

113. Defendants Pacific Pictures Corporation, IP Worldwide LLC, and IPW, LLC responded on August 1 to DC's first set of interrogatories to each company.

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

The responses state that none of the companies made efforts to market the Siegels' or Shusters' purported rights in the Superman termination. Attached hereto as Exhibit 49 are true and correct copies of the companies' interrogatory responses. From documents produced, DC is aware that Mr. Toberoff communicated with Paramount Pictures and Fox concerning the Siegels' and Shusters' termination rights, and has served Mr. Toberoff with additional interrogatories to clarify defendants' prior responses. Attached hereto as Exhibit 50 is a true and correct copy of a letter from Mr. Kline to Mr. Toberoff dated August 3, 2011, with enclosures.

## III.    Remaining Discovery

114. DC has acted diligently in seeking to take the discovery necessary to properly oppose defendants' Motion to Strike. However, as described above, several discovery issues remain unresolved.

115. DC plans to depose Mr. Toberoff, the Rule 30(b)(6) designees for the defendant entities, the author of the Toberoff Timeline, and Ari Emanuel, among others.

116. DC plans to serve requests for production of non-privileged documents on certain third parties, including David Michaels, the author of the Toberoff Timeline; representatives of Michael Siegel's Estate; Arthur Levine, prior counsel to the Siegel heirs who prepared and served the 1997 Superman termination notice; and George Zadorozny, among others.

117. DC also anticipates propounding additional interrogatories and requests for production as the need arises, including with respect to any issues crystallized by the pending discovery motions described above.

118. Resolution of DC's pending and intended discovery motions may necessitate further deposition testimony from Ms. Larson, Mr. Peary, and Ms. Peavy. DC will address those issues as they arise.

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

## IV.    Defendants' Factual Assertions Requiring Discovery

119. Defendants' Motion to Strike contains a number of factual assertions and characterizations regarding DC's state-law claims in its fourth, fifth, and sixth claims for relief.  Because of the factual issues raised by defendants' Motion to Strike, DC requires discovery to respond.  I have identified below certain factual areas where discovery is still required to oppose defendants' Motion to Strike.

120. Attached as Appendix A to this declaration is a chart identifying contested fact assertions in defendants' Motion to Strike, certain discovery obtained by DC thus far, and key discovery DC is pursuing.

1. Shuster Agreements

    a.    The circumstances leading to formation of the 1992 Agreement between DC and the Shusters;

    b.    The contractual intent of the parties to the 1992 Agreement;

    c.    The Toberoff defendants' knowledge of the 1992 Agreement;

    d.    The nature and extent of DC's relationship with the Shusters;

    e.    The circumstances surrounding the Toberoff defendants' initial contract with the Shusters, and the timing, nature, and extent of their subsequent contracts;

    f.    The circumstances leading to formation of the 2001 PPC Agreement between PPC and the Shusters;

    g.    The nature, intent, and effect of a provision in the 2001 PPC Agreement stating that the Shusters could not enter into any agreement regarding their putative rights "without the express written consent" of PPC;

    h.    The relationship, if any, of the 2001 PPC Agreement to anticipated or actual litigation;

    i.    The nature, intent, and effect of a provision in the 2001 PPC Agreement identifying "Superboy" as among the Shusters' putative rights;

    j.    The current status and effect of the 2001 PPC Agreement;

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

k. The circumstances surrounding the formation of an attorney-client relationship between Toberoff and the Shusters;

l. The circumstances leading to formation of the 2003 PPC Agreement;

m. The circumstances surrounding and nature, intent, and effect of a provision in the 2003 PPC Agreement stating that the Shusters could not enter into any agreement regarding their putative rights "without the express written consent" of PPC, Ex. 55 ¶ 4;

n. The nature, intent, and effect of the 2003 PPC Agreement's deletion of "Superboy" from a list of the Shusters' putative rights, *id.* ¶ 1;

o. The current status and effect of the 2003 PPC Agreement;

p. The circumstances leading to the September 10, 2004 letter providing that the 2001 and 2003 PPC Agreements "have been cancelled," Docket No. 163-7;

q. The nature, intent, and effect of the "cancellation" language in the September 10, 2004 letter;

r. The Toberoff defendants' current interest in PPC; and

s. Whether and to what extent any of the Toberoff defendants' contacts with the Shusters occurred in connection with anticipated litigation.

2. Siegel Agreements

a. The circumstances surrounding the Siegels' identification of Superboy as among the "character[s], story element[s], or indicia reasonably associated with SUPERMAN" in their 1997 copyright termination notice, Docket No. 293;

b. The nature, intent, and effect of the Siegels' October 19, 2001 letter to DC stating that the Siegels "accepted D.C. Comics' offer of October 16, 2001," Ex. 15;

c. The circumstances leading to Joanne Siegel's May 9, 2002 letter to DC regarding the long-form document;

d. The circumstances surrounding Marks' statement "that he would testify in court against the Siegels if they accepted [Toberoff's] offer because he believes there has already been an agreement reached," as described in the Toberoff Timeline, FAC Ex. A 63;

37

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

e.   The nature and extent of DC Comics' relationship with the Siegels;

f.   The circumstances surrounding the Toberoff defendants' initial contact with the Siegels, and the timing, nature, and extent of their subsequent contacts;

g.   The circumstances surrounding the formation of IP Worldwide, LLC between PPC, talent agent Ari Emanuel, and the Endeavor talent agency;

h.   Whether and to what extent any of the Toberoff defendants' contacts with the Siegels occurred in connection with anticipated litigation;

i.   The nature, intent, and effect of the Siegels' September 21, 2002 letter to DC providing: "effective immediately, we are totally stopping and ending negotiations with DC Comics," Ex. 23;

j.   The circumstances leading to formation of the IP Worldwide Agreement between the Siegels and IP Worldwide;

k.   The nature, intent, and effect of the provision in the IP Worldwide Agreement that the Siegels could "not transfer, assign, license or in any manner encumber the Rights … other than through or as a result of IPW's exclusive representation hereunder...." Ex. 56 ¶ 8;

l.   The current status and effect of the IP Worldwide Agreement;

m.   The Toberoff defendants' current interest in IP Worldwide and IPW;

n.   The circumstances surrounding the formation of an attorney-client relationship between Toberoff and the Siegels;

o.   The circumstances surrounding the Siegels' 2002 notice of termination claiming sole ownership of alleged Superboy rights, including communications with the Shusters and others

p.   The circumstances surrounding IP Worldwide's efforts to acquire Michael Siegel's interest in the Superman termination notice;

q.   The circumstances surrounding the agreements between the Siegels and IP Worldwide concerning its efforts to acquire Michael Siegel's interest in the Superman termination;

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

r.   Correspondence between Michael Siegel, Laura Siegel Larson, and Joanne Siegel concerning the Superman termination notice and the Siegels' involvement with Mr. Toberoff, Mr. Emanuel, and IP Worldwide; and

s.   The events described in the Toberoff Timeline.

3.   Consent Agreements

a.   The existence and status of any agreements between or among defendants restricting the ability of the Shusters or Siegels to freely negotiate or enter into agreements with DC;

b.   The circumstances leading to the formation of any such agreements;

c.   The nature, intent, and effect of any such agreements;

d.   The existence and status of any agreements between or among Toberoff and/or his companies and the Siegels, including retainer agreements, joint-venture agreements, partnership agreements, or any other business agreements;

e.   The existence and status of any agreements between or among Toberoff and/or his companies and the Shusters, including retainer agreements, joint-venture agreements, partnership agreements, or any other business agreements;

f.   The existence and status of any agreements between the Siegels and Shusters regarding the division of proceeds in the Superman and Superboy asserted rights;

g.   The existence and status of any agreements between the Siegels and Shusters regarding their putative Superman and Superboy interests;

h.   The existence and status of any agreements between the Toberoff defendants and other entities or third parties, regarding Superman or Superboy; and

i.   The circumstances surrounding the Siegels' and Shusters' efforts to negotiate with third parties for the sale of their purported Superman and Superboy interests.

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

121. In the event the court does not deny defendants' motion to strike in its entirety, I believe that the discovery described above is necessary to provide relevant evidence to fully and fairly oppose the motion.

122. DC therefore requests that the Court deny defendants' Motion to Strike in its entirety or, alternatively, issue an order staying any resolution of defendants' Motion to Strike pending the close of discovery.

## V.    Deposition Transcripts & Various Exhibits

123. To avoid any claims that it is selectively excerpting deposition testimony, DC has attached full and complete deposition transcripts.

124. The deposition of Kevin Marks, the Siegels' attorney prior to Mr. Toberoff, was taken in the related *Siegel* cases, Case Nos. CV-04-8400 and CV-04-8776, on October 7, 2006. A true and correct copy of the entire transcript from the deposition is attached hereto as Exhibit 14.

125. The deposition of defendant Mr. Peary was taken in the related *Siegel* cases on November 11, 2006. A true and correct copy of the entire transcript from the deposition is attached hereto as Exhibit 51.

126. The deposition of defendant Marc Toberoff was taken in the related *Siegel* cases on November 17, 2006. A true and correct copy of the entire transcript from the deposition is attached hereto as Exhibit 17.

127. The deposition of defendant Mark Warren Peary was taken in this case on June 29, 2011. A true and correct copy of the entire transcript from the deposition is attached hereto as Exhibit 37.

128. The deposition of Don Bulson, attorney for Michael Siegel during his lifetime, was taken in this case on July 19, 2011. A true and correct copy of the entire transcript from the deposition is attached hereto as Exhibit 52. The transcript is still under review by Mr. Bulson under Federal Rule of Civil Procedure 30(e)(1), and Mr. Bulson and his counsel reserve all rights to (a) make changes under Rule

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

30(e)(1) or (b) request further protection of Mr. Bulson's testimony pursuant to any future protective order(s) entered by this or any other Court.

129. The deposition of defendant Laura Siegel Larson was taken in this case on July 22, 2011. A true and correct copy of the entire transcript from the deposition is attached hereto as Exhibit 24.

130. The deposition of Dawn Peavy, the daughter of defendant Jean Peavy and sister of defendant Mr. Peary, was taken in this case on August 3, 2011. A true and correct copy of the entire transcript from the deposition is attached hereto as Exhibit 53.

131. Attached hereto as Exhibit 57 is a true and correct copy of an order issued by the Ninth Circuit in Appellate Case No. 10-73851, dated January 7, 2011.

132. Attached hereto as Exhibit 58 is a true and correct copy of Exhibit 73 to the deposition of Dawn Peavy.

133. Attached hereto as Exhibit 59 is a true and correct copy of the November 11, 2006 deposition of Jean Peavy in the *Siegel* case.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 8th day of August 2011, at Los Angeles, California.


                                        /s/ Daniel M. Petrocelli
                                        Daniel M. Petrocelli

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

## APPENDIX A

| No. | Examples of Contested Factual Assertions In Defendants' SLAPP Briefing | Examples Of What Discovery Has Revealed | Examples Of Key Discovery DC Is Still In The Process Of Taking & Completing |
|---|---|---|---|
| 1. | "DC's contentions [in its Fourth and Sixth Claims] that [the Pacific Pictures agreements] 'violate' the Copyright Act are wrong." Docket No. 196 at 4 n.3. | Admissions that the Pacific Pictures agreements are not valid:<br><br>a. Peary admitted that the Pacific Pictures agreements "do not comply" with the Copyright Act:<br><br>Q. Are you aware that Mr. Toberoff has stated in papers filed with the court that these Pacific Picture agreements were void?<br>A. Yes.<br>…<br>Q. Are you aware that Mr. Toberoff has acknowledged that the Pacific Pictures agreements did not comply with the copyright laws?<br>A. Yes.<br><br>Decl. of Daniel M. Petrocelli ("PD") Ex. 37 at 1335:10-13; ~~1337~~1336:1-~~11.~~4.<br><br>b. Defendants admitted in briefing that the Pacific Pictures agreements were "void *ab initio*":<br><br>"DC argues that two sets of agreements violate its supposed 'right': (1) agreements between defendant Pacific Pictures Corporation and the Shuster Executor (FAC, ¶ 169), which, as DC is aware, were *cancelled six years ago* (*id.*, ¶ 99) and which were void *ab initio* under § 304(c)(6)(D) as elsewhere alleged in DC's | Peary testified that there are "drafts" of the Pacific Pictures agreements.  PD Ex. 37 at 1209:7-11.  These documents have not been produced.  DC will serve shortly a motion to compel production of these drafts and all relevant correspondence ("RFP Motion to Compel"). *Id.* ¶ 109-10.<br><br>DC has yet to depose key witnesses on this issue, including Toberoff and Pacific Pictures. |

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

| | | | |
|---|---|---|---|
| 1 | | | FAC (*id.*, ¶167)…." |
| 2 | | | Docket No. 147-1 at 2 (underlining added). |
| 3 | | | "[T]he Pacific Pictures Agreements could not and did not transfer the Shuster Executor's termination rights or prospective termination interests.  As such transfers were void *ab initio*, they also cannot support DC's 'unclean hands' claim." |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | Docket No. 191 at 8 (underlining added). |
| 9 | | | *See also:* |
| 10 | | | c.  Peary admitted that restrictions in the Pacific Pictures agreements are impermissible: |
| 11 | | | |
| 12 | | | |
| 13 | | | Q.  Did you think -- did you think that it was  proper for lawyers to impose that -- to have such  a -- an agreement with a client that the client can't settle without the lawyer's consent no matter how much the client wants to settle? |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | A.  At the time I didn't consider it unreasonable. |
| 18 | | | … |
| 19 | | | Q.  Were you aware that it's not lawful for a lawyer to have such a -- an agreement with a client? |
| 20 | | | |
| 21 | | | A.  Not at the time. Q.  Have you since become aware of that? |
| 22 | | | A.  Yes. Q.  When? |
| 23 | | | A.  Sometime 2003. Q.  How? |
| 24 | | | A.  Discussions with Marc Toberoff. |
| 25 | | | PD Ex. 37 at 1326:16-22; 1327:5-13. |
| 26 | | | |
| 27 | | | |
| 28 | 2. | DC's Fourth Claim fails | Deposition testimony in | The RFP Motion to |

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

| | | |
|---|---|---|
| in part because defendants did not have a scheme to park Superboy rights with the Siegels.<br><br>a. "DC's Fourth Claim alleges: … Toberoff 'manipulated' the Shuster estate to not claim rights in Superboy. None of these allegations pleads any fraud with particularity, or, for that matter, any fraud at all." Docket No. 145-1 at 4.<br><br>b. "As to Superboy (Opp. at 5), a court had already ruled that Siegel created it independently." *Id.* at 4 n.3. | this case confirms that the Shusters disclaimed any rights in Superboy.<br><br>a. The 2001 Pacific Pictures agreement contained a reference to the Shusters' rights in Superboy, but the 2003 agreement removed that reference:<br><br>Q. Do you have [the 2001 Pacific Pictures Agreement] and you see the reference to Superboy and Smallville? What paragraph is it contained in [the 2001 Pacific Pictures Agreement]?<br>A. 1.<br>Q. And in paragraph 1 of [the 2003 Pacific Pictures agreement] there's no reference to Superboy or Smallville. Is that correct?<br>A. Yes.<br><br>PD Ex. 37 at 1391:5-12.<br><br>b. Peary was not made aware of all of the evidence establishing Joe Shuster's contributions to Superboy, including:<br><br>• The 1940 Superboy script that the Siegels claim establish their rights in Superboy—and includes Shuster's name in the by-line:<br><br>Q. At the time that Mr. Toberoff gave you advice that the estate had no claim to Superboy, did Mr. Toberoff show you Exhibit 15?<br>… 15 is a 1940 Superboy script.<br>Q. Have you seen this document before?<br>A. No, I don't think so.<br>Q. Okay. And so I take it from your answer that prior to serving the notice of | Compel will seek drafts of Pacific Pictures agreements that Peary admits were created.<br><br>DC will serve shortly a motion to compel Peary to respond to key lines of inquiry blocked by his counsel during deposition—including questions concerning Superboy ("Peary Motion to Compel"). *See* PD ¶ 106. As one example:<br><br>Q. And in paragraph 1 of [the 2003 Pacific Pictures agreement] there's no reference to Superboy or Smallville. Is that correct?<br><br>A. Yes.<br><br>Q. Okay. And that was the result of the advice given to you that the Shuster estate had no interest in Superboy?<br><br>MR. TOBEROFF: I instruct you not to answer….<br><br>Q. When you signed this, you understood that Superboy was not part of the agreement, correct?<br><br>MR. TOBEROFF: Instruct you not to answer….<br><br>PD Ex. 37 at 1391:9-25.<br><br>DC also intends to serve a motion to compel Larson to respond to questions barred by her counsel during deposition—including questions concerning Superboy ("Motion to Compel Larson Testimony"). *See* PD ¶ 107. For example:<br><br>Q. Does the consent |

| | | | |
|---|---|---|---|
| 1 | | termination, Exhibit 14, you were not aware of this document. Is that correct? | agreement that you signed with the Shusters make any reference at all to Superboy? |
| 2 | | A. Yes. | MR. TOBEROFF:  I instruct you not to answer…. |
| 3 | | *Id.* at 1405:22-1406:10. | PD Ex. 24 at 760:20-25. |
| 4 | | Were you aware of the existence of this script by which Joe Shuster was identified as one of the two by-line people? | |
| 5 | | | |
| 6 | | … | Defendants have been ordered to turn over documents originally enclosed with the Toberoff Timeline ("Timeline Documents"), which discuss the relationships between and among Toberoff, the Siegels, and the Shusters.  PD ¶¶ 92-94; Docket No. 262 at 2-4.  Defendants will not produce the Timeline Documents until the Ninth Circuit has ruled on their pending writ petition.  I ¶¶ 99-102. |
| 7 | | THE WITNESS:  I haven't seen this before. | |
| 8 | | *Id.* at 1406:18-22. | |
| 9 | | • *More Fun Comics No. 101*, which Shuster helped illustrate and the Siegels claim contains the first appearance of Superboy: | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | Q.  Do you have Exhibit 16? Prior to serving the notice of termination, Exhibit 14, were you aware of Exhibit 16? Exhibit 16 is More -- a copy of parts of More Fun Comics number 101. | |
| 14 | | | |
| 15 | | | |
| 16 | | A.  Are you asking me if I've ever seen this before? | DC has yet to depose key witnesses on this issue, including Toberoff, Pacific Pictures, IP Worldwide, IPW, and Ari Emanuel. |
| 17 | | Q.  Yes. | |
| 18 | | A.  I don't recognize this first page specifically showing Superboy, no. | |
| 19 | | | |
| 20 | | Q.  You're referring to page -- the second page of this exhibit -- | |
| 21 | | A.  Yes. | |
| 22 | | Q.  -- that has the picture of Superboy on it? | |
| 23 | | A.  Yes. | |
| 24 | | *Id.* at 1407:5-19. | |
| 25 | | • Copyright renewal notices for Superboy from the 1970s listing Joe Shuster and Jerry Siegel as co-creators and co-authors of Superboy: | |
| 26 | | | |
| 27 | | | |
| 28 | | | |

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

Q. Okay. Take a look at Exhibit 17. Do you see the reference -- I'll represent to you this is a listing of the copyright renewal registrations and do you see the name Joe Shuster?

…

Q. It says "Superboy by Jerome Siegel and Joe Shuster in More Fun Comics, January to February 1945," copyright sign, "18 November 1944, Jerome Siegel and Joe Shuster" and then there's some other -- other data. Were you aware of such copyright registration filings when you agreed to remove Superboy from your joint venture agreement?

A. No.

Q. When you served the termination notice without reference to Superboy?

A. No.

Q. Did Mr. Toberoff provide these -- any of these documents to you, Exhibits 15, 16 and 17 that I've just gone through with you?

A. I don't believe so.

*Id.* at 1409:18-~~1411~~1410:~~1.~~21.

*See also*:

### d.  Judge Larson discussed evidence that Joe Shuster was a co-creator of Superboy:

[T]here are indications that, when Siegel created the Superboy submissions, he envisioned those submissions as part of a unitary comic strip incorporating Shuster's artwork.  The proposed script Siegel submitted for the Superboy comic itself, in the same way as all the other Siegel and Shuster comics were presented, contained the by-line crediting its authorship to 'Jerry Siegel

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

| | | | | |
|---|---|---|---|---|
| 1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 | | | and Joe Shuster.'  Such shared billing in Siegel's submission is strong evidence of the intent to create a joint work. Case No. 04-8776, Docket No. 151 at 56. Superboy's appeal to the public was not only in reading the harrowing tales of the superhero's exploits but also in the colorful imagery Shuster provided to grip the reader's imagination. … This evidence also supports a conclusion that Superboy is a joint work. *Id.* at 56-57. [W]ere the Court to hold that Siegel alone is entitled to the copyright to and all the profits realized from Superboy because of Detective Comic's 'theft' from Shuster, the Court would be placing Siegel—the party whose copyright rights were unaffected by the publisher's contract—in a superior position than that which even he envisioned to possess, all to the denigration of the contribution (and the rights thereto) Shuster supplied to the joint work. *Id.* at 62. | |
| 21 22 23 24 25 26 27 | 3. | DC's Fifth Claim fails because the Siegels ended settlement negotiations with DC in *May 2002*—before Toberoff intervened. a.  "The Fifth Claim has no likelihood of success on the merits because the record establishes that Toberoff did not cause the Siegels to end negotiations with DC." | The Siegels did not end settlement negotiations with DC until *September* 2002—*after* Toberoff made a proposal to the Siegels via their lawyer. a.  Larson confirmed at her deposition that the Siegels did not cut off negotiations with DC and Warner Bros. until September 2002: | DC awaits production of the Timeline Documents, including a letter from the Siegels' former counsel, Kevin Marks, which DC believes advised the Siegels of Toberoff's offer and that Marks might be required to testify that they had reached an agreement with DC.  PD ¶¶ 99-102. |
| 28 | | | | |

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

| | | | |
|---|---|---|---|
| 1 | Docket No. 145-1 at 22. | Q. You have Exhibit 56 in front of you which is the letter that you and your mother sent to DC Comics dated September 21, 2002 when you for the first time cutoff negotiations with them; correct? | The RFP Motion to Compel will seek drafts of agreements between defendants, including a July 2002 draft if a settlement agreement that Marks prepared after Joanne Siegel's May 2002 letter. *Id.* ¶¶ 109-10. |
| 2 | b.  "[I]t is a matter of record that prior to Mr. Toberoff's first substantive conversation with Kevin Marks in August 2002, Joanne Siegel had clearly stated in her May 9, 2002 letter that 'after four years, we have no deal and this contract makes an agreement impossible,' obliterating the causal prong of DC's Fifth Claim."  Docket No. 203 at 7. | | |
| 3 | | | |
| 4 | | A. Yes. | |
| 5 | | … | |
| 6 | | Q. The truth of the matter is you did not cut off negotiations with Warner Bros. until the date you sent your [September 21] letter correct? | |
| 7 | | | DC will soon serve a motion to compel Larson to produce documents that she testified during deposition were in her possession but have not yet been reviewed, including relevant, non-privileged correspondence ("Motion to Compel Larson Documents"). PD ¶ 107. |
| 8 | | | |
| 9 | | A. Correct. | |
| 10 | c.  There is "no evidence that DC had any 'prospective economic advantage'" after May 2002.  *Id.* at 23-24. | … | |
| 11 | | Q. And again, you sent this -- this letter was sent by your mother on May 9, 2002, but it was not until September 21, 2002, that DC was informed that negotiations were being stopped; correct? | |
| 12 | | | |
| 13 | | | |
| 14 | | A. Yes. I mean we -- you know, by that time we reached our decision and that was it. | |
| 15 | | Q. By that time meaning September 21, 2002? | DC intends to depose key witnesses on this issue, including Marks, Toberoff, Emanuel, IP Worldwide, IPW, and the author of the Toberoff Timeline (who according to defendants is David Michaels). |
| 16 | | A. By September 21, right. | |
| 17 | | Q. 2002. | |
| 18 | | A. 2002. | |
| 19 | | PD Ex. 24 at ~~812:19-23; 867:17-20; 929:20-930:4~~ 829:9-13; 889:12-15; 957:8-17. | |
| 20 | | | |
| 21 | | b.  Larson testified that the Siegels received a letter from Marks with a proposal from Toberoff and Emanuel before they cut off negotiations in September 2002: | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | Q. But you have already testified that what Mr. Marks told you is that these were two people who were calling about marketing the property; correct? | |
| 26 | | | |
| 27 | | | |
| 28 | | | |

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

| | | A. He didn't tell us anything. He wrote something to us in the mail. <br> … <br> Q. A letter? <br> A. Yes. <br> … <br> Q. Is it your recollection that the letter you received occurred in or about August, 2002? Does take sound right ~~time wise~~timewise? <br> A. I have no way of knowing whether it was back here in July or if it was in August. <br> Q. Okay. <br> You did not notify DC that you were cutting off negotiations until after you heard about the Toberoff Emanuel offer from Kevin Marks; correct? <br> A. Could have been. <br> Q. Well, we saw that you cutoff that? <br> A. In September. <br> Q. Correct. And that was after you had already heard about the Toberoff Emanuel proposal from Mr. Marks; correct? <br> A. It seems that way. <br><br> *Id.* Ex. 24 at ~~844~~863:~~6–15, 875:7~~12–21, 897:12–~~21~~898:2. | |
|---|---|---|---|
| 4. | DC's Sixth Claim fails because the consent agreement between the Siegels and Shusters amounts to protected activity. <br><br> a. The consent agreement is "directly related to the settlement of ongoing litigation." Docket No. 145-1 at 20 n.8. <br><br> b. "There is nothing improper about such 'consent agreements,' which are commonplace | The 2008 consent agreement is a document by which the Siegels and Shusters agreed not to enter into an agreement with DC without the consent of the other family. <br><br> a. Peary admitted that the agreement is still in effect—even though the mediation session it allegedly concerned occurred in 2008: <br><br> Q. Is the consent agreement that you signed in 2008 still | The Peary Motion to Compel will seek responses to DC's questions to Peary concerning, *inter alia*, the consent agreement. *See* PD ¶ 106. Some examples: <br><br> Q. When you signed the 2008 consent agreement, did you -- what did you understand the purpose of that agreement to be? Why were you signing it? <br> MR. TOBEROFF: You can only answer that -- actually, I instruct you not to answer because the sole -- your sole |

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

in commercial agreements that include provisions addressing litigation and settlement…." *Id.* at 11.

in effect?
A. Yes.

*Id.* at 1174:5-7.

b. Peary testified that, under the consent agreement, the Shusters may not make any agreement with DC without the Siegels' approval:

> Q. Did you tell your mother in your conversations over the years, and in particular about the consent agreement, that any agreement with DC or settlement with DC requires the consent of the Siegels?
> A. Yes.

PD Ex. 37 at 1185:1-8.

c. Peary testified that the consent agreement is called the "Superman Agreement"—not the "Settlement Strategy" or "Collective Bargaining Agreement," as defendants' briefing in this case has described it:

> Q. You identified the document that the Siegels and you signed as a consent agreement. Is the word -- is that the title of the document?
> …
> THE WITNESS: I recall the title says "Superman Agreement."

*Id.* at 1167:15-25.

understanding is through communications with me.
(Unanswered question.)
Q. You read the document before you signed it, didn't you?
A. Yes, but I'll have to follow my attorney's advice.
Q. Well, based on your reading of the document, what did you understand the purpose of your signing it to be?
MR. TOBEROFF: I instruct you not to answer if you -- put it this way: You can only answer the question if you have an understanding independent of your conversations with me.
THE WITNESS: Well, all my understanding is based on my communication with my attorney, so I can't say anything.
(Unanswered question.)
Q. Are you saying that when -- when you read the document, you derived absolutely no understanding from reading the words?
A. My understanding is intricately bound with my communications with Marc Toberoff.
Q. Can you answer my question?
…
Q. Did you understand that the agreement that you were entering into required that you could not settle any claim with DC Comics without the consent of the Siegels?
MR. TOBEROFF: I instruct you not to answer. The document has been held to be privileged and off limits and they can't ask you questions about the contents of the document. Instruct you not to answer.
(Unanswered question.)
PD Ex. 37 at

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

| | | | | 1168:15-1171:20. |
|---|---|---|---|---|
| | | | | The Motion to Compel Larson Testimony will seek responses to DC's questions to Larson concerning the consent agreement. Some examples:<br><br>Q. Does the consent agreement that you signed with the Shusters make any reference at all to Superboy? MR. TOBEROFF: I instruct you not to answer based on the consent agreement being held to be privileged, not disclose the substance.<br><br>*Id.* Ex. 24 at ~~750:12-16.~~760:20-25.<br><br>Q. And does the -- did you discuss with your mother at any time whether or not to enter into an agreement with the Shusters regarding the sharing of recoveries or proceeds from Superman? A. I believe we talked about it. Q. Can you relate that discussion to me? MR. TOBEROFF: I instruct you not to answer based on the attorney-client privilege, joint client privilege. Q. And these were conversations just between your mother and you; is that correct? A. Yes.<br><br>*Id.* at ~~752:6-17.~~762:20-763:3.<br><br>DC has yet to depose Toberoff, a key witness on this topic. |
| 5. | DC's Sixth Claim is moot because Toberoff's companies no longer have interest in the heirs' | The Toberoff defendants have an interest in this action. | | The RFP Motion to Compel will seek correspondence related to the Toberoff |

putative rights.

a. "PPC, IP Worldwide and IPW ... either no longer have, or never had, any interest in *Superman*, and accordingly, a claim for declaratory relief against these entities is moot." Docket No. 145-1 at 24.

b. "The only interest that IP Worldwide and PPC ever had in any *Superman* rights derived from agreements that have expired or have been cancelled." *Id.* at 24-25.

a.  Peary admitted his understanding that, upon termination of the Pacific Pictures agreements, 50% of the Shusters' alleged Superman rights would be transferred to Pacific Pictures:

> Q. I want to go back to where I was before, then, paragraph 8, and you -- when you signed this, you understood that in the event that this venture was terminated for any reason, that PPC would own 50 percent of the rights as a tenant in common with Jean and you, correct?
>
> A. Yes.

PD Ex. 37 at 1316:9-15.

b.  Peary conceded that the September 10, 2004, cancellation letter does not state that Pacific Pictures will obtain no rights:

> Q. Okay. Now, are you aware of any document at the time you executed Exhibit 20, which is the December -- December -- excuse me, the September 10, 2004 document, that states that the rights do not go 50 percent to the estate and 50 percent to PPC in the event of a termination?
> A. Not in that document, no.
> Q. It's not in Exhibit 20, correct?
> A. That's correct.

*Id.* at 1435:14-22; *see also id.* at 1440:6-24.

c.  Peary testified that Pacific Pictures is not a party to the 2004 legal retainer agreement that he said stripped Pacific

defendants' efforts (if any) to market the heirs' rights, along with documents related to the status of Toberoff's business entities and any Superman-related interest they hold.  *See* PD ¶¶ 109-10.

DC has yet to depose key witnesses on this issue, including Toberoff, Emanuel, PPC, IP Worldwide, and IPW.

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

| | | Pictures of its rights: |
|---|---|---|
| | | Q. Your understanding that Pacific Pictures Corporation was a party to this retainer agreement? A. No. *Id.* at 1439:24-1440:1. |

| 6. | Toberoff represented the Shusters as an attorney—and that is what DC's complaint targets. a. "DC['s] … contentions are purely retaliatory." Docket No. 196 at 4. b. "Immediately after he was contacted by Peary in mid-2001, Toberoff entered into an attorney-client relationship with, and began providing legal advice to, Peary and Peavy." Docket No. 145-1 at 18-19. | Peary did not sign a legal retainer agreement with Toberoff until 2004—*three years* after the misconduct at issue. a. Peary testified that the Shusters did not have *any* legal agreement with Toberoff until 2004: Q. And the first time you signed any agreement with him where he signed as a lawyer was in 2004, correct? A. Yes. Q. That's what you've been calling the legal retainer agreement, right? A. Yes. PD Ex. 37 at 1300:7-13. b. Peary admitted that he understood Toberoff signed the Pacific Pictures agreements as "President" of Pacific Pictures, not as "Marc Toberoff, Esquire": Q. And you -- and then you see that Mr. Toberoff signed [the 2001 Pacific Pictures Agreement] as president of Pacific Pictures on November 28, 2001, correct? A. Yes. … Q. And you signed another agreement with him in 2003, also as president of Pacific Pictures, correct? A. Yes. … | The Peary Motion to Compel will seek responses to DC's questions concerning the Pacific Pictures agreements, the Shusters' retainer agreement with Toberoff, and Toberoff's relationship with the Shusters. *See* PD ¶ 106. For example: Q. Why did you agree in lieu of entering into a traditional lawyer-client agreement to hire the services of a lawyer? Whether it's on a contingent fee or an hourly fee, why did you agree to enter into a joint venture with Pacific Pictures, a company that is not a law firm? MR. TOBEROFF: You can't -- unless you can answer that question independent of your discussions with me, I instruct you not to answer. THE WITNESS: Okay. I'll have to follow your advice. (Unanswered question.) PD Ex. 37 at 1286:13-24. Q. Okay. Tell me how [the 2003 Pacific Pictures agreement] wasn't the best structure. A. We needed to have a standard legal retainer. Q. Why? A. Because that was the best structure. Q. Why? Why was it best? In what way was it |

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

Q.  And [the 2003 Pacific Pictures Agreement is] signed by Mr. Toberoff as president of PPC, correct?
A.  Yes.
Q.  Okay.  And you do see in paragraph 2 here that it states PPC is not a law firm, right?
A.  Yes.
Q.  Okay.  And you understood that when you signed it, right?
A.  Yes.
Q.  And you -- and the first paragraph -- and you read this carefully before signing it and you understood it when you signed it, right? "It" being Exhibit 13?
A.  Yes.

*Id.* at 1299:18-21; 1300:3-6; 1389:16-~~130~~1390:4.

c.  Peary admitted in interrogatory responses that the Shusters' retainer agreement with Toberoff was signed "[o]n or about September 10, 2004." *Id.* Ex. 39 at 1483.

d.  Peary produced (in heavily redacted form) the Shusters' September 10, 2004 retainer agreement. *Id.* Ex. 40.

e.  Peary testified that Toberoff described his work as a producer in the entertainment field:

Q.  When you -- when you were doing the research on Mr. Toberoff, did you come to learn that in addition to being an experienced entertainment attorney, that he was also a producer of literary properties, including motion pictures and other popular titles?
A.  Yes.

better?
MR. TOBEROFF: The "whys" get into his conversations with me. And so you can't get into that.
Q. You understood when you changed this structure or at least attempted to change the structure that the Pacific Picture agreements constituted a violation of the copyright laws, correct? Did you have that understanding at that time?
A. At that time -- at that time, no.
Q. Did you come to that understanding afterwards?
MR. TOBEROFF: You can't answer that without divulging attorney-client communications. Instruct you not to answer.
(Unanswered question.)

*Id.* at 1332:2-1333:1.

Q. Right. So you're saying that -- who told you that the word "canceled" means that the termination provisions of the joint venture agreements no longer apply?
…
A. That's my understanding of it.
…
Q. No one told you that, in other words, right? That's something you've come up with on your own?
A. We have a clear -- a clear understanding when we switched from the joint venture to the legal retainer. We clearly understood each other.
Q. Who is "we"?
A. Me and Marc Toberoff.
Q. How do you know that?
A. Because we discussed it.
Q. What did you -- what did you and he discuss in that regard?
…
MR. TOBEROFF: Okay.

54

| | | | Q.  And how did you come to learn that?<br>A.  In our discussions.<br>*Id.* Ex. 37 at 1278:14-22. | Then I instruct you not to answer with our discussions.<br>(Unanswered question.)<br>*Id.* at 1440:25-1442:15.<br><br>Q. Did Mr. Toberoff discuss with you that there was a -- that he was approaching the Siegels not to represent them as a lawyer but to do a business transaction with them?<br>MR. TOBEROFF: Assumes facts. Lacks foundation. Instruct you not to answer as to the substance of our conversations.<br>(Unanswered question.)<br>Q. Did he discuss that he was aware of an investor, very wealthy investor, maybe even a billionaire investor who wanted to do a deal for the Superman rights?<br>MR. TOBEROFF: Same instruction --<br>(Unanswered question.)<br>…<br>Q. Did he discuss with you that he was going to approach the Siegels about such an investor?<br>MR. TOBEROFF: Same instruction.<br>(Unanswered question.)<br>*Id.* at 1354:10-1355:8.<br><br>The RFP Motion to Compel will seek drafts of all agreements between Toberoff and the Shusters, as well as relevant correspondence. *Id.* ¶¶ 109-10.<br><br>DC has yet to depose key witnesses, including Toberoff and Pacific Pictures. |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

| 7. | The Siegels approached Toberoff as an attorney and he has acted as their counsel "ever since." | The Siegels' initial discussions in 2002 were with Toberoff and Emanuel. A legal retainer agreement with Toberoff was not signed until 2004. | The Motion to Compel Larson Testimony will seek responses to DC's questions related to the Siegels' relationship with Toberoff. *See* PD ¶ 107. Some examples: |
|---|---|---|---|

The Siegels approached Toberoff as an attorney and he has acted as their counsel "ever since."

a. "Toberoff formed an attorney-client relationship with the Siegels in October 2002, immediately after Joanne Siegel contacted him, and he has represented the Siegels ever since." Docket No. 145-1 at 19.

b. "In early October 2002, Joanne Siegel contacted Toberoff …. The Siegels thereafter formed an attorney-client relationship with Toberoff." *Id.* at 9.

c. "[T]he Siegels have repeatedly testified that they entered into an attorney-client relationship with Toberoff from the outset." Docket No. 196 at 6.

The Siegels' initial discussions in 2002 were with Toberoff and Emanuel. A legal retainer agreement with Toberoff was not signed until 2004.

a. Larson testified that the Siegels' initial meetings with Toberoff all took place at Emanuel's talent agency, Endeavor:

Q. What was the next thing that then happened in terms of contacting Mr. Toberoff?
A. I think -- I think my mother said, you know, maybe we should -- we should talk to him in person and, you know, see if we like him.
…
Q. And where was that meeting?
…
A. That first meeting. I think we went to a restaurant. But no no no. I think we met at the endeavor offices in a conference room.

PD Ex. 24 at 825:14-826:9. 843:3-23.

Q. Where did you meet [Emanuel]?
A. At endeavor.
…
Q. Okay. And who else was present at that meeting?
A. My mother, I was there, Mr. Emanuel, and Mr. Toberoff.
Q. Okay. And this is the first time met Mr. Emanuel?
A. Yes.
…
Q. From the time that you first met Mr. Toberoff until the meeting with will Toberoff and Mr. Emanuel?
A. Um-hum.
Q. What's a -- how long did

The Motion to Compel Larson Testimony will seek responses to DC's questions related to the Siegels' relationship with Toberoff. *See* PD ¶ 107. Some examples:

Q. But you have already testified that what Mr. Marks told you is that these were two people who were calling about marketing the property; correct?
A. He didn't tell us anything. He wrote something to us in the mail.
…
Q. Did the letter say that Mr. Toberoff and Mr. Emanuel had a wealthy investor who might be interested in acquiring your rights?
MR. TOBEROFF: Same instruction. And objection.
Q. Did the letter indicate that such an investor was willing to pay much more money than the last offer Warner Bros. and DC Comics had made to you?
MR. TOBEROFF: Same objection. Same instruction.
Q. Did the letter indicate that such an investor or party was interested in paying as much as 15 million dollars?
MR. TOBEROFF: Same objection. Same instruction.
Q. Plus additional terms including a back ends if a movie was made?
MR. TOBEROFF: Same objection. Same instruction.

PD Ex. 24 at 844863:612-1021; 846:8-24865:19-866:15.

DC still awaits production of the Timeline Documents, which relate to

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

| | | | that take in between? A. Not very long. Q. A week? A. Possibly. Q. Okay. And again that was also at the offices of [Endeavor]? A. Correct. Q. Good no one else was there except the four of you right? A. No, because we went in at this -- for that meeting we went in to Mr. Emanuel's office. It wasn't in a conference room. It was in Mr. Emanuel's office. | Toberoff's initial relationship with the Siegels. *Id.* ¶¶ 99-102. DC will seek an unredacted copy of the agreement through which Toberoff and Emanuel formed IP Worldwide. *Id.* Ex. 20. DC has yet to depose key witnesses, including Toberoff, Emanuel, IP Worldwide, Marks, Michaels, and Jean Peavy, who allegedly provided the Siegels with Toberoff's contact information. DC will depose these witnesses after it receives the Timeline Documents and pending discovery issues are resolved. |

*Id.* at ~~836855~~:~~8-839:9~~:~~7-857:18.~~

b. Larson testified that, until 2004, the Siegels' *only* agreement with Toberoff was the IP Worldwide agreement, which provided an "agent's fee" in exchange for business services:

> Q. From the time that you signed Exhibit 45 as of October 3, 2002, until the time that you signed the litigation agreement with Mr. Toberoff in 2004, neither you nor your mom signed an agreement with Mr. Toberoff calling for him to render litigation services; correct?
> A. Correct.

*Id.* at ~~769:10-18.~~ 781:21-782:2.

> Q. And when you entered into your first agreement with Mr. Toberoff, part of that agreement involved services to be rendered by Mr. Toberoff and Mr. Emanuel for a 10 percent representation fee; correct?
> A. Yes.
> Q. That would be like an agents fee; correct?

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

| | | A. Yes.<br><br>*Id.* at ~~760:12-18~~ 771:14-21.<br><br>Q. Can you take a look at paragraph 10 of Exhibit 45?<br>A. Yes.<br>Q. It states the parties understand and acknowledge that the scope of this agreement does not include legal services and/or expenses in connection with litigation or formal legal arbitration, if any .... And you agreed to that provision when you signed Exhibit 45; correct?<br>A. Yes, regarding litigation.<br>Q. Right. And it wasn't until I believe you said 2004 that you entered into the litigation agreement -- entered into a litigation agreement with Mr. Toberoff; is that correct?<br>A. Correct.<br><br>*Id.* at ~~768:5-22~~ 780:4-781:7.<br><br>c. Larson produced the Siegels' retainer agreement with Toberoff (in heavily redacted form), which is dated "October 3, 2004." *Id.* Ex. 26 at 1063. | |
| 8. | The Siegels contemplated litigation at the time they met Toberoff.<br><br>a. "[I]t is ... clear that Toberoff's communications with the Siegels occurred in connection with settlement negotiations and anticipated litigation." Docket No. 145-1 at 17. | There was *no* agreement to retain Toberoff for litigation services when the Siegels entered into the October 2002 agreement with IP Worldwide.<br><br>a. Larson testified that the Siegels entered into their "litigation agreement" with Toberoff in 2004. PD Ex. 24 at ~~768:19-22~~ 739:18-21.<br><br>b. Larson testified that there was "no | The Motion to Compel Larson Testimony will seek responses to DC's questions concerning when the Siegels contemplated litigation. PD ¶ 107.<br><br>DC awaits production of the Timeline Documents, including a letter from Marks to the Siegels confirming that they had reached a settlement with DC at the time Toberoff intervened. *Id.* ¶¶ 99- |

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

| | | agreement between any member of the Siegel family and the law offices of Marc Toberoff in 2002." *Id.* at ~~763:21-24.~~777:16-19. | 102. |
|---|---|---|---|
| | | **c.** Larson testified that the Siegels extended their agreement with IP Worldwide through 2005: | DC has yet to depose key witnesses, including Toberoff, Emanuel, IP Worldwide, Marks, and Michaels. |
| | | Q. Do you recall having signed an amendment to this [IP Worldwide Agreement] extending the term till I think you said 2005? A. Yes. Q. What can you tell me about that document [since] I don't believe we have it. A. It was very short, and I believe it just referenced this document, and the only thing that was different about it was it said that we were extending the terms of this contract through a particular date. | |
| | | *Id.* at ~~767~~782:~~163~~-~~24.~~12. | |
| | | **d.** After Larson's deposition, defendants produced agreements showing that the Siegels extended their agreement with IP Worldwide through April 23, 2005. *Id.* Ex. 46 at 1598. | |
| **9.** | The Shusters contemplated litigation at the time they met Toberoff. **a.** "The 2001 and 2003 Pacific Pictures agreements between Toberoff and the Shusters clearly contemplate litigation related to the termination of Joseph Shuster's | There was *no* agreement to retain Toberoff for litigation services when the Shusters entered into their joint-venture agreement with Pacific Pictures in November 2001. **a.** Peary admitted that the Shusters had no legal retainer agreement | The Peary Motion to Compel will seek to responses to questions regarding the Shusters' contemplation of litigation, which Peary was instructed not to answer. PD ¶ 106. Some examples: Q. Okay. Take a look at paragraph 7. It states there that the venture will retain Toberoff to |

| | | | |
|---|---|---|---|
| | copyright grants." Docket No. 145-1 at 17.<br><br>b. "The entire process surrounding the Shuster Termination was conducted in the arena of threatened litigation and settlement, which brings the Fourth Claim squarely within the Anti-SLAPP law." *Id.*<br><br>c. The Shusters' termination notice was "a prelude to litigation." *Id.* at 16. | until 2004:<br><br>Q. And the first time you signed any agreement with him where he signed as a lawyer was in 2004, correct?<br>A. Yes.<br>Q. That's what you've been calling the legal retainer agreement, right?<br>A. Yes.<br>PD Ex. 37 at 1300:7-13.<br><br>b. Interrogatory responses show that agreement was signed "[o]n or about September 10, 2004." *Id.* Ex. 39 at 1483.<br><br>c. Peary admitted that he understood at the time of signing the Pacific Pictures agreements that Pacific Pictures was not a law firm:<br><br>Q. And [the 2003 Pacific Pictures Agreement is] signed by Mr. Toberoff as president of PPC, correct?<br>A. Yes.<br>Q. Okay. And you do see in paragraph 2 here that it states PPC is not a law firm, right?<br>A. Yes.<br>Q. Okay. And you understood that when you signed it, right?<br>A. Yes.<br>Q. And you -- and the first paragraph -- and you read this carefully before signing it and you understood it when you signed it, right? "It" being Exhibit 13?<br>A. Yes.<br>*Id.* Ex. 37 at 1389:16-1390:4. | render legal services including in connection with legal disputes and litigation.<br>Do you see that?<br>A. Yes.<br>Q. Legal disputes and litigation with whom?<br>MR. TOBEROFF: I instruct you not to answer. This obviously deals with discussions with counsel regarding potential litigation.<br>(Unanswered question.)<br>Q. Well, it's fair to say that you understood when you signed this that there was a prospect of litigation with DC Comics or some Time-Warner company, correct?<br>MR. TOBEROFF: Instruct you not to answer. It implicates attorney-client communications.<br>(Unanswered question.)<br>Q. You didn't -- you didn't need a lawyer to tell you that, right?<br>MR. TOBEROFF: Instruct you not to answer.<br>(Unanswered question.)<br>…<br>Q. You understood -- you understood that when you signed this there was some appreciation that you would be in litigation?<br>MR. TOBEROFF: Instruction. Same instruction.<br>(Unanswered question.)<br>*Id.* Ex. 37 at 1322:16-1323:14; 1324:2-7.<br><br>DC has yet to depose Toberoff and Pacific Pictures, key witnesses regarding any contemplation of litigation by the Shusters. |
| 10. | DC's allegation that Toberoff induced the Siegels to sever their relationship with DC | Evidence supporting these allegations:<br><br>a. Michael Siegel's | Because defendants asserted privilege and instructed Bulson not to answer questions, |

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

| | | |
|---|---|---|
| based on fraudulent promises of a "billionaire investor" and competing Superman movie is "utterly false" and a "mockery." | May 13, 2003, letter to Laura Siegel Larson confirms: | Bulson and DC agreed to continue that deposition to this Fall, once those objections have been resolved.  PD ¶¶ 111-12. |
| a.  "DC's argument that Toberoff defrauded the Siegels is utterly false, contrary to all the evidence, and DC offers no admissible evidence to support it."  Docket No. 196 at 10. | • Toberoff represented that he "had a *mysterious billionaire* who wanted to invest in the Superman copyright," | DC awaits the resolution of defendants' Ninth Circuit writ and the production of the Timeline Documents, including the letter from Marks to the Siegels describing Toberoff's representations.  *Id.* ¶¶ 99-102. |
| b.  "Each of these allegations has been conclusively disproven by documents and sworn depositions provided in 2006, and none can be cured by further discovery."  *Id.* at 1. | • Toberoff said "he was going to *team with [agent Ari] Emmanuel and make a movie*," and<br>• The "billionaire investor" never materialized and a competing Superman movie "has not happened."  Docket No. 225-4 at 3. | The Motion to Compel Larson Documents will seek production of Larson's response to Michael's May 13 letter, as well as other correspondence.  *Id.* ¶ 107. |
| c.  "DC's allegation that Toberoff misled the Siegels … is based entirely on this untrustworthy, inadmissible Timeline, and is contradicted by the sworn testimony of all percipient witnesses …. DC knows all this, yet conceals it from the Court."  *Id.* at 2-3. | b.  Larson admitted that she responded to Michael's letter:<br><br>Q. Did you respond to [the May 13 letter]?<br>A. I'm sure I did. ~~986:24-25~~ 1018:11-12.<br><br>*Id.* Ex. 24 at ~~986:24-25~~ 1018:11-12. | DC has yet to depose key witnesses on this issue, including Toberoff, Emanuel, Marks, Michaels, and IP Worldwide. |
| d.  "[T]he Timeline does not even state that Toberoff spoke with the Siegels about a billionaire.  The Timeline says he discussed the billionaire with their then-attorney, Kevin Marks, on August 8, 2002.  FAC Ex. A 63.  But Kevin Marks testified about this conversation four years ago, and his testimony shows what a mockery DC's accusations of fraud really are…."  *Id.* at 4-5. | c.  Larson has attempted to characterize her half-brother as "confused," *id.* at 987:6-19, but discovery shows that defendants withheld key facts from Michael in their efforts to purchase his Superman interest:<br><br>Q.  Do you remember whether the letter you received and that your mother received in which Mr. Marks discussed the Toberoff/Emanuel proposal was -- also included Mr. Bulson on it? | |

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

e. "Marks' declaration merely confirms what he already testified to in 2006, and what every witness who has been deposed on the subject has testified to: the alleged 'wrongful' acts in August 2002 that form the basis of DC's Fifth Claim *did not take place*." Docket No. 203 at 7.

f. "At no time during that conversation [on or around August 7, 2002] did either Mr. Toberoff or Mr. Emanuel say anything about a 'billionaire investor.' The word 'billionaire' was never used in the conversation by any of its participants. There was discussion by Mr. Emanuel concerning actual or prospective investors." Docket No. 196-3 ¶ 4.

g. "At no time during that conversation [on or around August 7, 2002] did either Mr. Toberoff or Mr. Emanuel say anything about helping the Siegels to produce their own 'Superman' motion picture, nor did either Mr. Toberoff or Mr. Emanuel say anything about producing a 'Superman' motion picture that would compete with a 'Superman' motion picture being developed by Warner Bros. or DC Comics." *Id.* ¶ 5.

h. DC's allegations amount to "tactical character assassination" and "flagrantly violate the basic rules of

A. I don't remember.
Q. Okay. Did you discuss the letter with Michael Siegel or Mr. Bulson?
A. I don't remember doing that.

*Id.* at 896:12-19

Q. Did you tell Michael that you were involved in Ari, in the decision to have Ari Emanuel acquire his termination interests?
A. I don't believe we discussed it.

*Id.* at 991:5-8

Q. … Did you think it was important for your half brother, Michael Siegel, to know that the person who was seeking to acquire his termination interest was Ari Emanuel, the same person with whom you were doing business?
A. No, I didn't think that was important.
Q. And you did not ever communicate to your brother that it was Ari Emanuel who was this investor; correct?
A. I don't recall doing that.

*Id.* at 999:24-1000:8

Q. And you did not tell Michael Siegel in your response letter [to the May 13 letter] that Mr. Emanuel was indeed the very person with your full knowledge and blessing who was attempting to acquire his interest.
MR. TOBEROFF: Asked and answered.
THE WITNESS: No, I did not mention that.

*Id.* at 1033:1-6

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

| | | | |
|---|---|---|---|
| | evidence, privilege, and common decency." Docket No. 193 at 2-3. | | |
| 11. | The assertions in the Toberoff Timeline are completely inaccurate. <br><br> a. The Timeline is "screed penned by a thief who … had absolutely no percipient knowledge of the events he purports to describe," "mud-slinging," "untrustworthy," and contains "random accusations … which have been refuted by the testimony of every percipient witness." Docket No. 196 at 1, 2, 10. <br><br> b. "The inadmissible [Timeline] is set up as an obvious 'hit piece' against Toberoff, and purports to discuss the stolen privileged documents the attorney handed over to Warner Bros." Docket No. 145-1 at 12. <br><br> c. "DC continues to provide ***no admissible evidence whatsoever*** to support its claims, and admits that it has no such evidence and is relying instead on the inadmissible 'Toberoff Timeline,' the hearsay statement of a belligerent thief, currently under grand jury investigation, which contradicts the sworn deposition testimony of everyone with knowledge on the subject." Docket No. 203 at 4. | Many of the assertions in the Timeline have proven to be accurate in discovery. <br><br> a. The Timeline correctly described the Siegels' contingency arrangement with Toberoff, identifying its "33.3% contingency fee to go up to 40% if it falls within 60 days of trial." FAC Ex. A at 67; *compare* PD Ex. 26 ¶ 5(a) (specifying "33.33%" fee and providing "Sixty (60) days before trial the Firm's one-third Percentage Fee shall increase to forty percent (40%)"). <br><br> b. The Timeline accurately quotes and summarizes Michael Siegel's May 13, 2003, letter to Larson almost verbatim: <br><br> • The Timeline states: <br><br> Among other things, Michael Siegel tells [Larson] of how Toberoff is now controlling the whole of the SUPERMAN copyright, how he may have bought a substantial portion of the Schuster interest himself, and be brings to light MT's utter lack of opening a dialogue with anyone regarding making another SUPERMAN movie, in partnership with Are Emanuel. Also that MT has not even made contact with Time Warner. Lastly, Michael conveys that MT seems to have an agenda of "someone" buying him out, and that MT is pressing for | The Motion to Compel Larson Documents will seek Larson's response to Michael's May 13 letter, as well as other relevant correspondence. PD ¶ 107. <br><br> DC still awaits production of the Timeline Documents, which it expects will confirm other allegations in the Timeline. *Id.* ¶¶ 99-102. Today, Magistrate Zarefsky granted DC's motion to compel defendants to produce their communications with the U.S. Attorney's Office concerning the Timeline. *Id.* ¶ 108. <br><br> After resolving the privilege assertions at Bulson's deposition, DC will seek to depose Bulson on the content and accuracy of the Timeline. <br><br> DC has yet to depose key witnesses on this issue, including Toberoff and Michaels. |

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

an answer.

FAC Ex. A. at 64-65.

- The May 13 letter confirms:

  Now that you have signed with him, he is in control of the whole Superman copyright.  Marc has chosen not to open any dialog with Time Warner or anyone else.

  …

  Do you know who owns the Shuster interest in the Superman copyright?  Has Marc bought the Shuster interest himself?

  …

  Marc seems to have an agenda of someone buying me out so I will have to look for the best deal I can get. Marc is really pressing for an answer to the offer his investor made.

Docket No. 225-4 at 3.

c.  The Timeline identifies and describes Larson's response to Michael's May 13, 2003 letter, which Larson confirmed:

- The Timeline says:

  Laura Siegel reveals her ignorance of Toberoff's dubious actions in her return letter back to Michael.

  …

  Also, in the letter back to Michael Siegel, that MT helped Laura Siegel draft --- in response to Michael's accusations of Toberoff, Laura clearly states that MT does *not* have a production company.  (This is false - Marc Toberoff's IPW has been in existence, partly funded by Ari Emanuel, since

64

at least 2002).

FAC Ex. A at 65-66.

• Larson testified that she sent a response to the May 13 letter, as summarized in the Timeline:

Q. Did you respond to [the May 13 letter]?
A. I'm sure I did.

…

Q. Okay. And now dropping down to the end of the next 11 page with the Bates labeled Q 0004, the reference to the July 5, 2003 date, do you see that?
A. Yes, I do.
Q. It says Laura Siegel reveals her ignorance of Toberoff's dubious actions and her return letter back to Michael putting aside the characterization of your ignorance does July 5, 2003, sound right to you as around the time that 18 you responded to the May 13, 2003 letter?
A. It could have been.

…

Q. Did you tell Michael Siegel in your response letter back that Mr. Toberoff does not have a production company?
A. Yes, I believe I did.

PD Ex. 24 at ~~985:24-25; 986:10-19; 987:10~~1018:11-12; 1028:16-1029:1; 1029:19~~-12.~~22.

PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

1

2

3

4

5

6

7

8                    THIS PAGE INTENTIONALLY LEFT BLANK

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

THIS PAGE INTENTIONALLY LEFT BLANK

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

THIS PAGE INTENTIONALLY LEFT BLANK

THIS PAGE INTENTIONALLY LEFT BLANK

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

THIS PAGE INTENTIONALLY LEFT BLANK

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

THIS PAGE INTENTIONALLY LEFT BLANK

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

THIS PAGE INTENTIONALLY LEFT BLANK

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

THIS PAGE INTENTIONALLY LEFT BLANK

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

THIS PAGE INTENTIONALLY LEFT BLANK

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

THIS PAGE INTENTIONALLY LEFT BLANK

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PETROCELLI DECL. ISO DC'S UPDATED
INITIAL OPP. TO DEFS' MOTION TO STRIKE

Document comparison by Workshare Professional on Tuesday, August 09, 2011 6:16:41 PM

| Input: | |
|---|---|
| Document 1 ID | pcdocs://cc1/854763/3 |
| Description | #854763 v3 - NEW VERSION 2 (shortened) Petrocelli Decl ISO SLAPP Opp |
| Document 2 ID | pcdocs://cc1/854763/4 |
| Description | #854763 v4 - NEW VERSION 2 (shortened) Petrocelli Decl ISO SLAPP Opp |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 84 |
| Deletions | 84 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 168 |