KENDALL BRILL & KLIEGER LLP
Richard B. Kendall (90072)
  *rkendall@kbkfirm.com*
Laura W. Brill (195889)
  *lbrill@kbkfirm.com*
Nicholas F. Daum (236155)
  *ndaum@kbkfirm.com*
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California  90067
Telephone:  310.556.2700
Facsimile:  310.556.2705

Attorneys for Defendants Marc Toberoff,
Pacific Pictures Corporation, IP Worldwide,
LLC, and IPW, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DC COMICS,<br><br>          Plaintiff,<br><br>          v.<br><br>PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, an individual, LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, and DOES 1-10, inclusive,<br><br>          Defendants. | Case No. CV 10-CV-03633 ODW (RZx)<br><br>Hon. Otis D Wright, II, U.S.D.J.<br><br>**TOBEROFF DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO STRIKE PLAINTIFF'S STATE LAW CAUSES OF ACTION PURSUANT TO CALIFORNIA'S ANTI-SLAPP LAW (CAL. CODE CIV. PROC. § 425.16)**<br><br>*Re: Anti-SLAPP Motion to Strike (Docket No. 145) Pursuant to the Court's June 1, 2011 Order (Docket No. 270)*<br><br>*Declaration of Marc Toberoff, Declaration of Kevin Marks, Objections to the Declaration of Daniel Petrocelli and [Proposed] Order filed concurrently*<br><br>Complaint Filed:    May 14, 2010<br>Discovery Cut-Off:  None Set<br>Trial Date:              None Set |

1

## <u>TABLE OF CONTENTS</u>

2   I.   INTRODUCTION ..................................................................................1

3   II.   ARGUMENT .......................................................................................3

4        A.   DC's State Law Claims Clearly Fall Within the Anti-SLAPP
             Statute.........................................................................................3

5
             *Fourth Claim* ..............................................................................4
6
             *Fifth Claim* .................................................................................6
7
             *Sixth Claim* .................................................................................7
8
         B.   DC's Claims Have No "Reasonable Probability of Success" .........7
9
             *Fourth Claim* ..............................................................................7
10
             *Fifth Claim* .................................................................................8
11
             *Sixth Claim* ...............................................................................11
12
         C.   DC Is Not Entitled to Further Discovery .....................................12

13  III.   CONCLUSION .................................................................................12

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLES OF CONTENTS AND AUTHORITIES**

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Federal Cases</u>                                                                                      **Pages**

3

4   *Batzel v. Smith*,
    333 F.3d 1018 (9th Cir. 2003) ................................................................. 7

5   *Chevron Corp. v. Bonifaz*,
    2010 U.S. Dist. LEXIS 55459 (N.D. Cal. May 12, 2010)................................ 12

6
    *Eagle Precision Technologies, Inc. v. Eaton Leonard Robolix, Inc.*,
7   2006 WL 6544087, No. 03CV352-BEN (WMc) (S.D. Cal. 2006)...................... 8

8   *Forcier v. Microsoft Corp.*,
    123 F. Supp. 2d 520 (N.D. Cal. 2000)...................................................... 8
9
    *Hilton v. Hallmark Cards*,
10  580 F.3d 874 (9th Cir. 2009) ................................................................. 3

11  *Mindys Cosmetics, Inc. v. Dakar*,
    611 F.3d 590 (9th Cir. 2010) ............................................................... 4-5
12
    *Moser v. Triarc Cos.*,
13  2007 WL 3026425 (S.D. Cal. Oct. 16, 2007).............................................. 12

14  *Newport Builders, Inc. v. N. Bay Constr. Inc.*,
    2009 WL 2083359 (N.D. Cal. July 14, 2009) .............................................. 6
15
    *Penguin Group (USA) Inc v. Steinbeck*,
16  537 F.3d 193 (2d Cir. 2008) ................................................................. 8

17  *Siegel v. Warner Bros. Ent. Inc.*,
    542 F. Supp. 2d 1098 (C.D. Cal. 2008) .............................................. 3, 7, 10
18
    *Shropshire v. Fred Rappoport Co.*,
19  294 F. Supp. 2d 1085 (N.D. Cal. 2003)................................................... 12

20  *United States v. Lockheed Missiles Space Co.*,
    190 F.3d 963 (9th Cir. 1999) ................................................................. 3
21
    *Waller v. Fin. Corp. of Am.*,
22  828 F.2d 579 (9th Cir. 1987) ............................................................... 12

23  <u>Federal Statutes and Rules</u>

24  17 U.S.C. § 304(c) ............................................................................ 8

25  Pub. L. 105-298 (1998)........................................................................ 8

26  <u>State Cases</u>

27  *Briggs v. Eden Council for Hope and Opportunity*,
    19 Cal. 4th 1106 (1999)........................................................................ 5
28
    *Evans v. Unkow*,
    38 Cal. App. 4th 1490 (1995) ........................................................... 9-10

*Haneline Pacific Props. LLC v. May,*
167 Cal. App. 4th 311 (2008) ................................................................6

*Kashian v. Harriman,*
98 Cal. App. 4th 892 (2002) .................................................................4

*Korea Supply Co. v. Lockheed Martin Corp.,*
29 Cal. 4th 1134 (2003) ........................................................................3

*Macias v. Hartwell,*
55 Cal. App. 4th 669 (1997) .................................................................1

*Neville v. Chudacoff,*
160 Cal. App. 4th 1255 (2008) .............................................................4

*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.,*
20 Cal. 4th 1135 (1999) ........................................................................5

*Robles v. Chalilpoyil,*
181 Cal. App. 4th 566 (2010) ...............................................................4

*Rubin v. Green,*
4 Cal. 4th 1187 (1993) ........................................................................11

*Seltzer v. Barnes,*
182 Cal. App. 4th 953 (2010) ...............................................................4

*Taheri Law Group v. Evans,*
160 Cal. App. 4th 482 (2008) ...............................................................7

*Trembath v. Digardi,*
43 Cal. App. 3d 834 (2000) ..................................................................8

*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.,*
106 Cal. App. 4th 1219 (2003) .............................................................9

*Youst v. Longo,*
43 Cal. 3d 64, 71 (1987) .....................................................................10

*1-800 Contacts, Inc. v. Steinberg,*
107 Cal. App. 4th 568 (2003) .............................................................12

**State Statutes and Rules**

Cal. Civil Code § 47 ...........................................................................11

Cal. Code of Civ. Proc. § 426.16..................................................... 3-4

**TABLES OF CONTENTS AND AUTHORITIES**

## I.     INTRODUCTION

Defendants' Anti-SLAPP motion (Docket No. 145-1; "Motion") should be granted because (1) the allegations in DC's Fourth, Fifth and Sixth Claims clearly bring them within the Anti-SLAPP statute, and (2) despite extensive discovery, DC fails to present "competent and admissible evidence, that [it] would probably prevail" at trial on such claims. *Macias v. Hartwell*, 55 Cal. App. 4th 669, 675 (1997). Instead, DC tries to sidetrack the legal issues and drown the Court with an "updated, initial opposition" (Docket No. 307; "Opp.") and a 65-page supplemental brief in the guise of an attorney's declaration (Docket No. 308; "DP Decl."), which trample the Rules of Evidence, mischaracterize the record, and ignore DC's own pleadings.

DC's clear objective, as in all such SLAPP suits, is to drive up defendants' litigation costs to obtain economic leverage over them.  DC's unbridled discovery on unwinnable claims is not a means to an end, but an end in itself.  In this case, DC burdened the Court and defendants with 14 discovery motions covering 29 issues, and has lost or withdrawn 23 of them. *See* Objection to DP Decl., ¶ 8.  To delay the inevitable, DC argues, after a year of discovery here and six years of similar discovery in the *Siegel* cases, that it is entitled to even more discovery on its contrived claims.

DC's argument that the Anti-SLAPP law does not apply does not comport with its own allegations.  The harm alleged in DC's First Amended Complaint (Docket No. 49; "FAC") is based on activity protected by the Anti-SLAPP law, specifically, Mr. Toberoff's support of the Siegels' and the Shusters' termination rights under the Copyright Act.  The damage as alleged in DC's Fourth Claim for "interference" with DC's 1992 Agreement stems from defendant Peary contacting Mr. Toberoff for his legal assistance, and Mr. Toberoff's subsequently drafting and filing the executor's termination notices with the U.S. Copyright Office. *See* FAC ¶¶ 174-79.  The damage as alleged in DC's Fifth Claim for "interference" with a (non-existent) settlement agreement, stems from:  (i) the Siegels' refusal to settle their termination claims on DC's terms, well before Mr. Toberoff's involvement, and (ii) Mr. Toberoff's

subsequent enforcement of their claims in Court.  *See* FAC ¶¶ 180-85.  The damage as alleged in DC's Sixth Claim arises from the same acts, and an agreement between the Siegels and Shusters to jointly negotiate settlement in the *Siegel* litigation.  FAC ¶¶ 187-89.  DC's FAC allegations unquestionably relate to petition and litigation activity protected by the Anti-SLAPP law, not to unrelated "business" activities as DC argues.

DC cannot show a "probability of success" on its claims, which are barred as a matter of law, irrespective of their frivolous content.  DC's Fourth and Fifth Claims, brought in 2010, are barred by the applicable *two-year* statute of limitations, which ran from the date DC had inquiry notice of its alleged injury.  *See* Docket No. 146 at 12. As to its Fourth Claim, DC knew *in 2003* of the alleged breach of its 1992 Agreement, when it was served with the Shuster estate's notice of termination.  DC then received, *in 2006*, the 2001 and 2003 Pacific Pictures Agreements ("PPC Agreements") that it concedes form the basis of its claim.  *See* Opp. at 18; Docket No. 146-1, ¶ 10; FAC ¶ 86, 92.  As to its Fifth Claim, DC knew *in 2006* from the testimony of every percipient witness of the $15 million August 2002 offer to Kevin Marks (the Siegels' prior counsel) that allegedly "interfered" with its settlement negotiations; *and* DC received *in 2006* a copy of the IP Worldwide Agreement it purports to rely on.  Exs.[1] B, K, M, R (MT Depo 106:1-107:7, 135:1-6; JS Depo 33:17-34:1, 41:1-3; 2006 LSL Depo 17:6-8, 261:17-262:7; KM Depo 166:6-170:24).  Even if the Court credits DC's dubious argument that it became aware of its Fifth Claim from the anonymous "Timeline," the in-house counsel who managed the *Siegel* litigation for DC read the Timeline *in 2006*.  Declaration of Marc Toberoff ("Tob. Decl."), Ex. A, ¶¶ 3, 4.  ***No discovery can save these claims from the statute of limitations, which ran in 2008.***

DC's Fourth, Fifth and Sixth Claims, alleging damage from litigation related activity (*e.g.*, interference with settlement), are also barred by the litigation privilege.

[1] References herein to "Ex." are references to Docket Nos. 145-2 – 145-6, the January 14, 2010 Declaration of Nicholas F. Daum filed in support of the Motion to Strike Pursuant to the Anti-SLAPP Law.  References to "MT Depo," "2006 LSL Depo," "JS Depo," and "KM Depo" are references to the 2006 Depositions of Marc Toberoff, Laura Siegel Larson, Joanne Siegel, and Kevin Marks, respectively,  which are exhibits to that declaration.

Since May 2010, DC has proceeded on these barred and baseless claims. The Court has given DC every opportunity to take discovery, in addition to its extensive discovery in *Siegel*, and even to file an updated opposition to this motion.  Yet DC has consistently failed to present any admissible evidence to support its concocted claims. DC's Fourth Claim alleges that the Shuster estate's notice of termination tortiously interfered with a 1992 Agreement that is completely irrelevant to termination under the Copyright Act as a matter of law.  DC's Fifth Claim for tortious interference with prospective economic advantage requires a "wrongful act" and a "reasonable probability of economic advantage," neither of which DC can show.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1154 (2003).

After extensive discovery, DC has ***no*** evidence whatsoever to support its vague speculations of conspiratorial fraud based on the rantings of an anonymous Timeline; written by a disgruntled former counsel of the defendants that stole their privileged documents and handed them to DC's counsel, who try to capitalize on this theft.  DC's reckless FAC allegations contradict the sworn testimony of every percipient witness and Judge Larson's finding that the Siegels had "clearly and unequivocally" rejected DC's one-sided proposals in May 2002, well before any involvement of Mr. Toberoff in August 2002.  *Siegel v. Warner Bros. Ent. Inc.,* 542 F. Supp. 2d 1098, 1139 (C.D. Cal. 2008).  The time has come to put an end to DC's three-ring circus.  DC's concocted claims should be struck pursuant to the anti-SLAPP statute.

## II.  ARGUMENT

### A.    DC's State Law Claims Clearly Fall Within the Anti-SLAPP Statute

California's Anti-SLAPP law, CCP § 426.16, must be "construed broadly." *Hilton v. Hallmark Cards*, 580 F.3d 874, 882-83 (9th Cir. 2009).  "The hallmark of a SLAPP suit is that it lacks merit and is brought with the goals of obtaining an economic advantage over a citizen party by increasing the cost of litigation…." *United States v. Lockheed Missiles Space Co.*, 190 F.3d 963, 970-71 (9th Cir. 1999). The Anti-SLAPP law protects communications with government offices, such as

1  defendants' filing of notices of termination with the U.S. Copyright Office.  *See*

2  *Mindys Cosmetics, Inc. v. Dakar* ("*Mindys*"), 611 F.3d 590, 597 (9th Cir. 2010).  It

3  also applies to communications in contemplation of litigation, and courts take a very

4  "expansive view of what constitutes litigation-related activities."  *Kashian v.*

5  *Harriman*, 98 Cal. App. 4th 892, 908 (2002).  Statements that "concern the subject of

6  [a] dispute" fall squarely within CCP § 426.16(e).  *Neville v. Chudacoff*, 160 Cal.

7  App. 4th 1255, 1268 (2008).  Moreover, even if a claim also alleges unprotected

8  activity, the law applies if the protected activity is not "merely incidental" to the

9  unprotected conduct.  *Seltzer v. Barnes*, 182 Cal. App. 4th 953, 962-963 (2010).

10      **Fourth Claim**:  DC's effort to recharacterize its Fourth Claim as outside the

11  Anti-SLAPP law is unpersuasive, as shown by DC's own FAC:

12  •   "Toberoff also ***induced the Shuster heirs to serve a notice of termination*** ..."
    FAC ¶¶ 6 (emphases added).

13
14  •   "***Toberoff then filed a termination notice on behalf of the Shusters*** that
    purported to terminate only Superman Rights, leaving out all mention of
    Superboy."  *Id.* ¶10 (emphases added).

15
16  •   "Toberoff knew that his actions in having his company enter into a joint
    venture with the Shusters ***for the purpose of terminating DC Comics' rights***
    were substantially certain to interfere with DC Comics' 1992 Agreement with
17      the Shusters…."  *Id.* ¶ 177 (emphases added).

18      DC's Fourth Claim hinges on its allegations that Mr. Toberoff "interfered" with

19  its 1992 Agreement by causing the Shuster estate to be probated and thereafter

20  drafting, serving and filing termination notices.  *See* FAC ¶¶ 175-179.  As DC

21  concedes, "'it is the principal thrust or gravamen of the plaintiff's cause of action that

22  determines whether the Anti-SLAPP statute applies'" and "what matters is what DC's

23  complaint actually states."  Opp. at 4, *citing Robles v. Chalilpoyil*, 181 Cal. App. 4th

24  566, 575 (2010).  Yet DC evades what its "complaint actually states" by arguing that

25  its Fourth Claim "would be viable if all it alleged was that defendants wrongfully

26  induced the Shusters to sign the [PPC Agreements]."  Opp. at 18.  This makes no

27  sense, as all of DC's alleged damages stem from the Shuster estate's exercise of its

28  statutory termination rights by filing a notice with the U.S. Copyright Office,

triggering litigation with DC.  FAC ¶¶ 177-179.  The Anti-SLAPP law squarely protects Mr. Toberoff's assistance in exercising the Shuster estate's statutory rights. *Mindys,* 611 F.3d at 597.  The PPC Agreements could not otherwise harm DC.  DC's straw man that Mr. Toberoff did not sign the PPC Agreements as a lawyer (Opp. at 7, 14-15) is irrelevant, as non-lawyers who support the exercise of legal rights are protected by the Anti-SLAPP law, just as lawyers are.  *See Briggs v. Eden Council for Hope and Opportunity*, 19 Cal. 4th 1106, 1110, 1115 (1999); Motion at 15.

Notwithstanding this, the PPC Agreements clearly state that Mr. Toberoff would "furnish directly to the [Shusters] all legal services required by the [Shusters] in connection with the rights" (Ex. H at 86), and he acted as an attorney in drafting, serving and filing the Shuster executor's notice of termination, signed by "Marc Toberoff, Esq., Counsel for the Estate of Joseph Shuster."  FAC ¶ 93; Daum Decl., Ex. H at 86; Motion at 16-18.  DC argues that because Mr. Toberoff's formal legal retainer agreement, dated as of November 23, 2001, was not signed until 2004, he did not act as counsel before then.  Opp. at 14.  But a retainer agreement is not required for an attorney-client relationship.  *See People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.*, 20 Cal. 4th 1135, 1147 (1999).  Mr. Peary clearly testified that he understood Mr. Toberoff to be acting as his attorney when their relationship began in 2001.  *See* DP Decl., Ex. 51 at 23:18-24:3.

DC's attempt to distinguish the cases cited in defendants' Motion as concerning lawsuits that "commenced within months" is also meritless.  DC itself alleges that the very first step was Mr. Toberoff's commencement of legal proceedings to probate the Shuster estate, and that, once the Shuster executor was appointed by the court, Mr. Toberoff filed statutory termination notices with the U.S. Copyright Office.  *See* FAC ¶¶ 65, 92-93.  *See Mindys*, 611 F.3d at 596-97 (registrations with the Trademark Office covered by the Anti-SLAPP law); Motion at 14-16.   Such protected actions also set the stage for litigation with DC or settlement.  *See* Motion at 16-17; Ex. J (letter from DC to the Shusters regarding their termination referencing the *Siegel*

1  litigation and suggesting settlement as an alternative to litigation).[2]

2      **Fifth Claim:** DC's Fifth Claim is premised on allegations of interference with

3  settlement negotiations over the Siegels' termination rights and resulting litigation:

4  • ***When a dispute arose in 1997 over the Siegel Heir's attempt to terminate prior grants of Siegel's share of Superman rights, DC Comics and Siegel [sic]***

5  ***commenced negotiations***…resolving their claims to the Superman and Superboy rights.  FAC ¶ 182 (emphasis added).

6  • As a direct result of Toberoff's misdeeds, the Siegel Heirs… ended all further

7  discussions, causing DC Comics … ***to incur millions of dollars in subsequent legal fees in disputes with the Siegel heirs***.  *Id.* ¶ 186 (emphasis added).

8  Mr. Toberoff's / IP Worldwide's subsequent representation of the Siegels as to

9  settlement of their claims with Warner prior to litigation also clearly falls under the

10  SLAPP law.  DP Decl., Ex. 49 at 1669 (Toberoff settlement meeting with Warner's

11  General Counsel); *Seltzer,* 182 Cal. App. 4th at 963 ("[S]ettlement negotiations are an

12  exercise of the right to petition and statements made as part of such negotiations are in

13  connection with the underlying lawsuit for purposes of [§425.16(e)(2)]").

14      DC solely argues that Mr. Toberoff functioned in a business capacity, not as a

15  lawyer.  Opp. at 15-17, 19-20.  This argument fails for many reasons.  *First*, the

16  purported distinction is irrelevant because Mr. Toberoff's support, in either capacity,

17  of the Siegels' efforts to vindicate their termination rights (via settlement or litigation)

18  is clearly protected by the Anti-SLAPP law.  *See* Motion at 15-19.  *Second*, the

19  Siegels repeatedly testified that they entered into an attorney-client relationship with

20  Mr. Toberoff from the outset (Exs. B, K, M (JS Depo 41:1-3; 2006 LSL Depo 17:6-

21  13; MT Depo 106:1-107:7, 109:14-110:9, 135:1-6).  *Third*, the IP Worldwide

22  Agreement itself (which was quickly replaced by a legal retainer agreement) states

23  that Toberoff would serve as legal counsel to the Siegels (Ex. F ¶ 2), in a provision

24  that DC conspicuously ignores.  *Fourth*, there was no need for the Siegels to file their

25

26  _____

27  [2] This case is a far cry from the "business" cases DC relies on. *See Haneline Pacific Props. LLC v. May*, 167 Cal. App. 4th 311, 319-20 (2008) (litigation never contemplated; no demand letter, "tone of … cooperat[ion],"); *Newport Builders, Inc. v. N. Bay Constr. Inc.*,

28  2009 WL 2083359, *4 (N.D. Cal. July 14, 2009) (non-settlement business deal communicated during the settlement negotiations of third parties).

1   claims in late 2002, as there was a tolling agreement between the parties that gave the

2   Siegels until at least October 2004 to file.  *See Siegel*, 542 F. Supp. 2d at 1134-36.

3   *Fifth*, DC's allegations amount to improper solicitation of the Siegels (FAC ¶ 186),

4   and the Courts have clearly held that "it is difficult to conjure a clearer scenario" of

5   activity protected by the Anti-SLAPP law than allegations of "improper solicitation"

6   by an attorney.  *Taheri Law Group v. Evans*, 160 Cal. App. 4th 482, 489 (2008).

7        **Sixth Claim:**  DC's Sixth Claim also concerns activity protected by the Anti-

8   SLAPP law, as it alleges that agreements between the Defendants impede DC's

9   ***settlement*** negotiations with the Siegels and Shusters.  FAC ¶ 188.  DC's claim, based

10  on a "[consent] agreement [the Siegels and the Shusters] made in 2008, in advance of

11  a mediation with DC in the *Siegel* litigation" (Opp. at 17), on its face challenges

12  protected settlement activity that took place during litigation.

13        **B.    DC's Claims Have No "Reasonable Probability of Success"**

14        Once it is established that activity falls within the Anti-SLAPP law, "[t]he

15  burden then shifts to the plaintiff to establish a reasonable probability that the plaintiff

16  will prevail on his or her [] claim."  *Batzel v. Smith*, 333 F.3d 1018, 1024 (9th Cir.

17  2003).  DC does not even come close to meeting this burden.  As shown in

18  Defendants' motions to dismiss, DC's Fourth, Fifth and Sixth Claims are barred by the

19  statute of limitations and the litigation privilege, and suffer many other infirmities.

20        **Fourth Claim**:  It is undisputed that DC was fully aware by ***2006*** of the

21  conduct on which its Fourth Claim is based, because the 2001 and 2003 PPC

22  Agreements were voluntarily produced in *Siegel* in 2006, and DC was served with the

23  Shuster termination notice in 2003.  *See* FAC ¶¶ 177-179; Docket No. 146-1 at 20;

24  No. 146-2, ¶¶ 4-5, 10; No. 146-3, Exs. D-E, J.  Mr. Toberoff, Pacific Pictures and Mr.

25  Peary have all ***repeatedly*** confirmed that Pacific Pictures has no continuing interest in

26  the Shuster termination.  *See* Ex. E; Tob. Decl., Ex. D.  Contrary to DC's suggestion

27  (Opp. at 23), the 2008 consent agreement is not at issue in its Fourth Claim.

28        DC strains to evade the two year statute of limitations barring its Fourth Claim

1    by claiming "continuing harm" from the PPC Agreements, but DC's arguments have

2    no basis in California law.  Opp. at 23.  DC's Fourth Claim alleges interference

3    leading to an alleged **breach** in 2003 of the 1992 Agreement (FAC ¶ 177); under

4    California law such claims must be brought within two years of the breach, and

5    California courts do not apply the "continuing harm" doctrine to interference claims.

6    *See Trembath v. Digardi*, 43 Cal. App. 3d 834, 836 (2000) ("[T]he accrual date could

7    not be later than the actual breach of the contract by the party who was wrongfully

8    induced to breach.");  *Eagle Precision Technologies, Inc. v. Eaton Leonard Robolix,*

9    *Inc.*, 2006 WL 6544087, No. 03CV352-BEN (WMc) (S.D. Cal. 2006) (interference

10   claim accrued at breach, even though ongoing harm continued); *Forcier v. Microsoft*

11   *Corp.*, 123 F. Supp. 2d 520, 530 (N.D. Cal. 2000) (same); Docket No. 195 at 4-7.

12        As shown in Defendants' motion to dismiss, the Fourth Claim is likewise barred

13   by the litigation privilege because litigation was reasonably contemplated by the

14   Shuster notice of termination and DC alleges damages from the litigation that ensued

15   regarding such termination.  *See* FAC ¶ 177; Docket No. 146-1 at 20, 22-25.[3]

16        As also shown in Defendants' motion to dismiss, DC's premise that the 1992

17   Agreement "affords DC valuable rights" (Opp. at 23) interfered with by the Shuster

18   estate's termination is erroneous as a matter of law.  *See* Docket No. 146-1 at 9-13.[4]

19        **<u>Fifth Claim</u>**:   This claim is likewise barred by the statute of limitations.  It is

20

21   [3] DC's claim also contradicts all the evidence.  DC itself states that defendant Peary (later appointed executor) contacted Mr. Toberoff to determine if the Shusters had termination rights.  Opp. at 6.  DC's Fourth Claim spins the Shuster estate's proper exercise of its rights under the Copyright Act, instigated by Mr. Peary, into a "tortious scheme" by Mr. Toberoff.

22

23   [4] The 1992 agreement conveyed no rights and was not "interfered" with because: (i) Shuster's siblings who signed the agreement did not own the Superman copyrights, long ago assigned to DC by Siegel and Shuster; (ii) such siblings have no termination rights and are statutorily irrelevant to termination (*see* 17 U.S.C. §§ 304(c)(2)(A)-(D)); (iii) the Shuster estate had no termination rights until 1998, when the Sonny Bono Copyright Act, Pub. L. 105-298 (1998) was enacted; (iv) termination rights cannot be contractually waived or circumvented in any event. 17 U.S.C. § 304(c)(5); and (v) DC's argument that the 1992 Agreement "effectively revok[ed] and replac[ed] any possible terminable copyright grants" has no basis in the plain language of the casual 1992 Agreement, and is barred by governing New York law, which requires an express "revocation and regrant."  *Penguin Group (USA) Inc. v. Steinbeck,* 537 F.3d 193, 200 (2d Cir. 2008); Docket Nos. 148-1 at 11-13; 191 at 4-6.

24

25

26

27

28

8

1  undisputed that in **2006** DC had all the information underlying its Fifth Claim – the

2  agreements between Toberoff and the Siegels, and testimony as to the Siegels'

3  retention of Toberoff – through discovery in *Siegel*.  In opposition, DC argues its

4  "continuing harm" theory, which is inapplicable as shown above.  DC also claims that

5  it was "in the dark" "until late 2008, when the Timeline was produced."  Opp. at 24.

6  However, DC admitted four years ago that its in-house legal team reviewed the

7  Timeline **in 2006**, placing it on inquiry notice at that time.  Tob. Decl., Ex. A, ¶ 3 ("I

8  [Wayne Smith, Warner's in-house counsel] looked at what might be characterized as

9  the 'cover letter' that came with the Superman Documents."), ¶ 4 ("[Warner's General

10  Counsel] … advised me that he had only looked at the cover letter [Timeline] ….").

11  After extensive discovery, DC unsurprisingly has no admissible evidence to

12  support the frivolous allegations in its Fifth Claim that, in August 2002, "Toberoff and

13  his partner [Ari Emanuel, now head of the William Morris Endeavor Agency]

14  [mis]represented to Marks that they had a wealthy or 'billionaire' investor who would

15  pay the Siegels $15 million cash for their Superman rights … [and would produce] a

16  new Superman movie."  Opp. at 10; *see also* FAC ¶¶ 77-78.  DC has long been aware

17  that Mr. Emanuel was the investor.  *See, e.g.,* Docket No. 196-2, Ex. H at 166:6-

18  170:24 (testimony of Kevin Marks), Ex. E at 98:25-104:14 (testimony of Marc

19  Toberoff).  As Mr. Marks also clearly testified, there was no mention of a "billionaire

20  investor" or producing a Superman movie.  *See* Declaration of Kevin Marks, ¶¶ 2-5.[5]

21  Outside the inadmissible anonymous Timeline, the only purported "evidence"

22  DC cites are inadmissible hearsay speculations in a May 13, 2003 letter by Michael

23  Siegel to his half-sister Laura Siegel Larson.  Opp. at 11.  Such inadmissible material

24  is irrelevant to an Anti-SLAPP motion.  *See Tuchscher Development Enterprises, Inc.*

25  *v. San Diego Unified Port Dist.*, 106 Cal. App. 4th 1219, 1236 (2003) (opposition to

26  Anti-SLAPP motion must be based on "competent and admissible evidence"); *Evans*

27

28
---
[5] If Mr. Toberoff had made the misrepresentations to the Siegels alleged by DC, it would
make no sense for the Siegels to have freely chosen Mr. Toberoff as their counsel and to
have remained with him for **nine years**, including after DC filed its inflammatory claims.

**MEMO OF Ps & As IN SUPPORT OF MOTION TO STRIKE PURSUANT TO ANTI-SLAPP LAW**

1   *v. Unkow*, 38 Cal. App. 4th 1490, 1497 (1995) ("An assessment of the probability of

2   prevailing on the claim [under the Anti-SLAPP law] looks to trial, and the evidence

3   that will be presented at that time.  Such evidence must be admissible.").  Even were it

4   admissible, the May 13 letter addresses an offer to "buy out my [Michael Siegel's]

5   share of the copyright" (Opp. at 11), and does not refer to any statements to Joanne

6   and Laura Siegel, in August 2002 or otherwise. DC's FAC nowhere even mentions

7   Michael Siegel or a buy-out of his interest.  A letter written nine months after the

8   events in question, by an individual who did not witness or address them, does *not*

9   "contemporaneously corroborate[]" (Opp. at 11) DC's frivolous allegations.[6]

10      DC cannot show that the highly successful Mr. Emanuel was not sincere or

11  capable of offering $15 million for the Siegels' Superman copyrights.  Nor does DC

12  even attempt to show that the Siegels relied in any way on this offer or that it caused

13  the Siegels to end their already moribund negotiations with DC.

14      DC cannot prove by admissible evidence that it was "reasonably probable that

15  [its] prospective economic advantage would have been realized but for the defendant's

16  interference" – an essential element of its claim.  *Youst v. Longo,* 43 Cal. 3d 64, 71

17  (1987).  DC cannot possibly show that its negotiations with the Siegels would have

18  resulted in settlement or non-speculative damages (*i.e.*, what that settlement would

19  have been).  Judge Larson held, based on DC's October 26, 2001 and February 2002

20  counter-offers, that no settlement was reached after four years of negotiation, as

21  confirmed by this Court's judgment.  *Siegel,* 542 F. Supp. 2d at 1139; Docket No.

22  669. The Siegels looked for new counsel to replace Mr. Marks in March 2002, well

23  before any contact with Mr. Toberoff.  Tob. Decl., Ex. B; DP Decl. Ex. 24 at 142:4-

24  17.  Joanne Siegel's May 9, 2002 letter to Time Warner "clearly and unequivocally"

25  rejected DC's proposals, as Judge Larson held (*Siegel,* 542 F. Supp. 2d at 1139), and

26

27  ───────────────
    [6] Nor can DC point to commonalities between the Timeline and the May 13 letter as
    independent support for its allegations.  The Timeline's author, who stole the May 13 Letter
28  from Mr. Toberoff's legal files, mimicked and freely adapted the letter to contrive the
    inadmissible Timeline, an anonymous "hit piece" designed to smear Mr. Toberoff.

made clear that her negotiations with DC were moribund, even if they had not been formally ended.  Docket No. 145-5, Ex. O ("After four years we have no deal and this contract makes an agreement impossible.").  DC's purported "reasonable probability of future economic benefit" (FAC ¶ 183) was at an end long before Mr. Toberoff had any substantive communication with the Siegels' attorney, Marks, in August 2002.

Lastly, the California Supreme Court has clearly held that a lawyer's "alleged misrepresentations" related to "discussions [over] the possibility of being retained" cannot be the basis of a lawsuit by anyone other than the client, as such claims are barred by Civil Code § 47(b).  *Rubin v. Green*, 4 Cal. 4th 1187, 1196-98.

From every possible angle, DC's Fifth Claim is barred, meritless and unsupported by admissible evidence.  Tellingly, while Mr. Emanuel is at the core of DC's frivolous allegations and is implicated by the anonymous Timeline on which DC relies, DC did not bring any claim against him, nor even notice his deposition.  The reason is simple.  This is a classic SLAPP suit with no probability or expectation of success; its sole purpose is to intimidate the Siegels, Shusters and their counsel, interfere with their relationships and drive up their costs for economic leverage.

**Sixth Claim**:  *First*, DC's Sixth Claim fails to state any claim under the UCL. *See* Docket No. 147 at 7-8.  *Second*, the Sixth Claim is barred by the applicable four-year statute of limitations (Docket No. 147-1 at 10-11) to the extent it is based on the 2001-2003 PPC Agreements and IP Worldwide Agreement (FAC ¶ 101), and is barred by the litigation privilege to the extent that it is based on a 2008 "consent agreement" entered into in connection with settlement mediation in *Siegel*.  Docket No. 147-1 at 16-18.  *Third*, Magistrate Zarefsky rejected DC's arguments that the consent agreement is "an independent wrong [that] violates the Copyright Act."  *See* Docket No. 209 at 1-10 (noting that it is simply a "Drysdale-Koufax collective approach to negotiation.").  DC alleges no basis, and cites no authority, for its argument that agreements among allied parties to jointly negotiate settlement are "void as a matter of law and public policy."  FAC ¶ 188.  Such "consent agreements"

1   are common and Warner Bros. (DC's parent) uses them freely.[7]

2   ### C.   DC Is Not Entitled to Further Discovery

3   After more than a year of discovery in this case, and substantial discovery in

4   seven years of litigating *Siegel*, DC has no admissible evidence to support its frivolous

5   claims.  DC's reckless pleadings, reliance on an anonymous inadmissible Timeline

6   written by a thief, and disregard for the sworn testimony of every percipient witness

7   underscore the frivolous nature of DC's claims.  As increasing defendants' litigation

8   costs is a prime objective of DC's SLAPP suit, DC asks the Court to indefinitely

9   "defer ruling on the motion until the close of DC's discovery" (Docket No. 304 at

10  25),[8] with no discovery cut-off set in this case.  There is no basis to delay ruling on the

11  Anti-SLAPP motion so that DC can conduct more discovery because (1) the bulk of

12  the motion is directed at the FAC's ***legal*** deficiencies; (2) DC cannot articulate how

13  any supposed factual issues would refute defendants' dispositive legal defenses (*e.g.*,

14  statute of limitations); and (3) after lengthy discovery, DC can cite no admissible,

15  relevant evidence to support its dubious claims.  *See Chevron Corp. v. Bonifaz*, 2010

16  U.S. Dist. LEXIS 55459, at *30-*31 (N.D. Cal. May 12, 2010) (refusing discovery

17  where "no discovery on [the crucial issue] could change this determination" that the

18  claims lacked merit, and plaintiff "[fails to] identify specific facts that it hopes to

19  uncover during discovery that would show" merit); *Moser v. Triarc Cos.*, 2007 WL

20  3026425, at *2-4 (S.D. Cal. Oct. 16, 2007) (same); *1-800 Contacts, Inc. v. Steinberg*,

21  107 Cal. App. 4th 568, 594 (2003) (same; "information[] had already been adduced").

22  ## III.   CONCLUSION

23  For the reasons set forth above and in defendants' pending motions to dismiss,

24  DC's Fourth, Fifth and Sixth Claims should be stricken under the anti-SLAPP statute.

25

26  ───────────────
    [7] *See, e.g.,* Tob. Decl. Ex. C (Warner Bros. agreements providing that licensee may not
27  settle any claims against it without Warner's consent); *Waller v. Fin. Corp. of Am.*, 828
    F.2d 579, 581 (9th Cir. 1987) (approving settlement providing for third-party consents).

28  [8] DC miscites *Shropshire v. Fred Rappoport Co.*, 294 F. Supp. 2d 1085, 1099 (N.D. Cal.
    2003), where the court delayed ruling because *no* discovery had yet occurred.

1    Dated:  August 29, 2011              KENDALL BRILL & KLIEGER LLP

2                                         By   /s/ Laura Brill
                                          _____
3                                         Attorneys for Defendants Marc Toberoff,
                                          Pacific Pictures Corporation, IP Worldwide,
4                                         LLC, and IPW, LLC

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMO OF Ps & As IN SUPPORT OF MOTION TO STRIKE PURSUANT TO ANTI-SLAPP LAW**