1  KENDALL BRILL & KLIEGER LLP
   Richard B. Kendall (90072)
2    rkendall@kbkfirm.com
   Laura W. Brill (195889)
3    lbrill@kbkfirm.com
   Nicholas F Daum (236155)
4    ndaum@kbkfirm.com
   Nathalie E. Cohen (258222)
5    ncohen@kbkfirm.com
   10100 Santa Monica Blvd., Suite 1725
6  Los Angeles, California 90067
   Telephone: 310.556.2700
7  Facsimile: 310.556.2705

8  Attorneys for Defendants Marc Toberoff,
   Pacific Pictures Corporation, IP
9  Worldwide, LLC, and IPW, LLC

10

11            **UNITED STATES DISTRICT COURT**

12    **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

13

| 14 | DC Comics, | Case No. CV 10-3633 ODW(RZx) |
|---|---|---|
| 15 | Plaintiff, | **DECLARATION OF KEVIN S MARKS IN SUPPORT OF TOBEROFF DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO STRIKE PLAINTIFF'S STATE LAW CAUSES OF ACTION PURSUANT TO CALIFORNIA'S ANTI-SLAPP LAW (CAL. CODE CIV. PROC. § 425,16)** |
| 16 | v. | |
| 17 | PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, an individual, JOANNE SIEGEL, an individual, LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive, | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | *Re: Anti-SLAPP Motion to Strike (Docket No. 145) Pursuant to the Court's June 1, 2011 Order (Docket No. 270)* |
| 22 | Defendants. | |
| 23 | | *Reply Brief and Declarations of Marc Toberoff filed concurrently* |
| 24 | | |
| 25 | | Complaint Filed: May 14, 2010 |
| 26 | | Discovery Cut-Off: None Set |
| | | Trial Date: None Set |

27

28

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

# DECLARATION OF KEVIN S. MARKS

I, Kevin S. Marks, declare as follows:

1. I am a member of the law firm known as Gang, Tyre, Ramer & Brown, Inc. I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true. If called as a witness, I could and would competently testify to the matters stated herein.

2. On October 7, 2006, I provided my deposition in the case entitled *Siegel et al. v. Warner Bros. Entertainment et al., Nos. 04-8400 and 04-8776 (RSWL)(RZx)*. Attached as Exhibit "A" is a true and correct copy of the deposition transcript containing my testimony.

3. From page 168, line 2 through page 171, line 8, I was asked questions and testified about a conversation that occurred on or around August 7, 2002, among Marc Toberoff, Ari Emanuel and me. During that testimony, I testified to my entire recollection of that conversation.

4. At no time during that conversation did either Mr. Toberoff or Mr. Emanuel say anything about a "billionaire investor." The word "billionaire" was never used in the conversation by any of its participants. There was discussion by Mr. Emanuel concerning actual or prospective investors. I stated my best recollection of that portion of the conversation during my deposition, at page 168, at lines 10-23, where I stated:

> "Mr. Toberoff and Mr. Emanuel both spoke. I can't
> completely tell you who said what, but I think
> Mr. Toberoff may have very briefly referenced past
> conversations, and then I believe it was Mr. Emanuel who
> explained that either they or some other people or
> perhaps some members of the Endeavor Talent Agency
> had set up a fund or were in the process of setting up a

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

58579.1

1                     fund to acquire intellectual property rights which they

2                     would then package with clients from the Endeavor Talent

3                     Agency, then take those to studios to exploit the package,

4                     and they understood that the Siegel family had

5                     an interest in the termination rights and viewed that as

6                     perhaps the most valuable of properties and wanted to

7                     make a proposal."

8       5.     At no time during that conversation did either Mr. Toberoff or Mr.

9 Emanuel say anything about helping the Siegels to produce their own "Superman"

10 motion picture, nor did either Mr. Toberoff or Mr. Emanuel say anything about

11 producing a "Superman" motion picture that would compete with a "Superman"

12 motion picture being developed by Warner Bros. or DC Comics.

13       I declare under penalty of perjury under the laws of the United States of

14 America that the foregoing is true and correct.

15       Executed October ___, 2010, at Beverly Hills, California.

16

17

                                     Kevin S. Marks

18

19

20

21

22

23

24

25

26

27

28

**Kendall Brill
& Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

58579.1                         2

# EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JOANNE SIEGEL and LAURA SIEGEL LARSON, | ) ) ) | **CERTIFIED COPY** |
| Plaintiffs, | ) ) | |
| vs. | ) | No. 04-8400 (RSWL)(RZx) |
| WARNER BROS. ENTERTAINMENT INC., et al., | ) ) ) | -and- |
| Defendants. | ) ) ) | No. 04-8776 (RSWL)(RZx) |

AND RELATED COUNTERCLAIMS.

DEPOSITION OF KEVIN S. MARKS

Beverly Hills, California

Saturday, October 7, 2006

Volume 1

Reported by:

DAVID S. COLEMAN

CSR No. 4613

**U.S. LEGAL**

*Support*

Certified Shorthand Reporters

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA  91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

*Los Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento . . . and across the nation*

EXHIBIT A
Page 3

```
 1           Deposition of KEVIN S. MARKS, taken on

 2       behalf of Defendants and Counterclaimants,

 3       at 9665 Wilshire Boulevard, 9th Floor, Beverly

 4       Hills, California, beginning at 10:05 AM on

 5       Saturday, October 7, 2006, before DAVID S.

 6       COLEMAN, Certified Shorthand Reporter No. 4613.

 7

 8

 9   APPEARANCES:

10

11   For Plaintiffs:

12       LAW OFFICES OF MARC TOBEROFF
         BY:  MARC TOBEROFF
13       Attorney at Law
         2049 Century Park East, Suite 2720
14       Los Angeles, California 90067
         310-246-3333
15

16   For Defendants and Counterclaimant:

17       WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
         BY:  MICHAEL BERGMAN
18       Attorney at Law
         9665 Wilshire Boulevard, 9th Floor
19       Beverly Hills, California 90212
         310-858-7888
20       mbergman@wwllp.com

21          -and-

22       PERKINS LAW OFFICE
         BY:  PATRICK T. PERKINS
23       Attorney at Law
         1711 Route 9D
24       Cold Springs, New York 10516
         845-265-2820
25
```

                                                        2

APPEARANCES (Continued):


For the Witness:

      JEFFER MANGELS BUTLER & MARMARO
      BY:   MARC MARMARO
      Attorney at Law
      1900 Avenue of the Stars, 7th Floor
      Los Angeles, California 90067-4308
      310-203-8080

3

EXHIBIT A
Page 5

```
                        I N D E X



WITNESS                  EXAMINATION           PAGE

KEVIN S. MARKS

                   BY MR. BERGMAN         8

                   BY MR. TOBEROFF        203



                        EXHIBITS


DEPOSITION                                     PAGE

1     First Amended Privilege Log        11

2     Kevin Marks calendars, Bates Nos.  12
      GTRB 0506 - 0514

3     Kevin Marks call records, Bates    12
      Nos. GTRB 0515 - 0635

4     Letter from Bruce Ramer to Carol   38
      Simkin and John Schulman dated
      April 30, 1999, Bates Nos. GTRB
      0009 - 0010

5     Letter from John Schulman to Bruce 43
      Ramer dated July 7, 1999, Bates
      Nos. GTRB 0018 - 0019

6     Letter from Bruce Ramer to John    44
      Schulman dated July 9, 1999, Bates
      Nos. GTRB 0011 - 0013

7     Letter from John Schulman to Bruce 46
      Ramer dated July 12, 1999, Bates
      Nos. GTRB 0016 - 0017
```

4

INDEX (Continued):

EXHIBITS (Continued)

DEPOSITION                                                    PAGE

8    Letter from Paul Levitz to Joanne         51
     Siegel and Laura Siegel Larson dated
     October 10, 1997, Bates Nos. GTRB
     0499 - 0504

9    Letter from John Schulman to Bruce        52
     Ramer dated September 13, 1999,
     Bates Nos. GTRB 0020 - 0021

10   Letter from Bruce Ramer to John           58
     Schulman dated September 28, 1999,
     Bates Nos. GTRB 0026 - 0028

11   Letter Kevin Marks to Paul Levitz         59
     dated November 3, 1999, Bates Nos.
     GTRB 0031 - 0032

12   Fax from Patrick Perkins to Kevin         67
     Marks dated January 6, 2000, Bates
     Nos. GTRB 0033 - 0042

13   Letter from Kevin Marks dated Carol       68
     Simkin dated March 7, 2000, Bates
     Nos. GTRB 0043 - 0056

14   Letter from Kevin Marks to John           90
     Schulman dated June 9, 2000, Bates
     Nos. GTRB 0124 - 0129

15   Letter from John Schulman to Kevin        92
     Marks dated July 18, 2000, Bates
     Nos. GTRB 0001 - 0006

16   Letter from Joanne Siegel to Gerald       97
     Levin dated July 24, 2000, Bates
     Nos. WB005977 - 005981

17   Letter from John Schulman to Kevin        98
     Marks dated July 26, 2000, Bates
     Nos. GTRB 0113 - 0114

5

1    INDEX (Continued):

2              EXHIBITS (Continued)

3    DEPOSITION                                    PAGE

4    18   Letter from Richard Parsons to          105
         Joanne Siegel dated August 22, 2000,
5        Bates No. WB005976

6    19   Letter from Joanne Siegel to Gerald      105
         Levin dated April 27, 2001, Bates
7        Nos. WB007853 - 007855

8    20   Letter from Kevin Marks to John          132
         Schulman dated October 19, 2001,
9        Bates Nos. GTRB 0302 - 0308

10   21   Letter from John Schulman to Kevin       149
         Marks dated October 26, 2001, Bates
11       Nos. GTRB 0145 - 0152

12   22   Letter from John Schulman to Bruce       176
         Ramer and Kevin Marks dated January
13       22, 2002, Bates Nos. 000000974

14   23   Letter from Patrick Perkins to Kevin     177
         Marks dated February 1, 2002, Bates
15       Nos. GTRB 0350 - 0399

16   24   Handwritten notes, Bates No. WB005972   180

17   25   Letter from Joanne Siegel to Richard     193
         Parsons dated May 9, 2002, Bates Nos.
18       000000676 - 678

19   25A  Fax from John Schulman to Kevin Marks    194
         dated 5-16-02, Bates Nos. GTRB 0474,
20       0475 and 0477

21

22

                  INSTRUCTION NOT TO ANSWER
23

                     Page   Line
24

                     10      17
25                   30      2, 15, 24

                                                        6

1    INDEX (Continued):


3              INSTRUCTION NOT TO ANSWER

4                    Page   Line

5                     31     22
                      32     24
6                     37     16
                      38     23
7                     54     7
                      56     16
8                     57     6
                      63     12
9                     68     22
                      93     9
10                   106     6
                     127     23
11                   139     2
                     141     15
12                   142     3, 13
                     143     3
13                   146     15
                     147     7
14                   150     5
                     151     16
15                   173     5
                     174     8
16                   193     10
                     198     23

17

18

19

20

21

22

23

24

25

                                                           7

1
2
3
4
5
6
7
8
10:05 9
10:05 10
10:05 11
10:05 12
10:05 13
10:05 14
10:05 15
10:06 16
10:06 17
10:06 18
10:06 19
10:06 20
10:06 21
10:06 22
10:06 23
10:06 24
10:06 25

Beverly Hills, California, Saturday, October 7, 2006

10:05 AM


KEVIN S. MARKS,

having been first administered an oath,

was examined and testified as follows:


EXAMINATION

BY MR. BERGMAN:

Q   Good morning, Mr. Marks.

A   Good morning.

Q   Would you state your full name for record,

please?

A   Kevin Stuart Marks, K E V I N, S T U A R T,

M A R K S.

Q   And am I correct, Mr. Marks, that you're a

partner in the firm of Gang, Tyre, Ramer & Brown?

A   Technically a member.  You can call me a

partner, yes.

Q   Okay.  Both you and Gang, Tyre have been served

with subpoenas for particular documents, and your counsel

has produced documents stamped GTRB 001 through 0635, and

we will be reviewing certain of those documents as we

proceed along with other documents.  You've also produced

8

| | |
|---|---|
| 10:06 1 | a first amended privilege log of documents that have not |
| 10:06 2 | been produced, and we will be looking at that as well. |
| 10:06 3 | Having recently reread the Danjaq opinion, I |
| 10:06 4 | know that at one point you did some litigation.  How many |
| 10:06 5 | years did you do litigation for? |
| 10:07 6 | A    At Gang, Tyre? |
| 10:07 7 | Q    Yes. |
| 10:07 8 | A    Four and a half years. |
| 10:07 9 | Q    And before Gang, Tyre? |
| 10:0710 | A    Approximately six years. |
| 10:0711 | Q    Okay. |
| 10:0712 | A    Over -- let me say over a period of six years. |
| 10:0713 | Q    Okay.  And what firm was that at? |
| 10:0714 | A    Arnold & Porter. |
| 10:0715 | Q    Okay.  And am I correct that given your |
| 10:0716 | background in litigation, I can forego the usual |
| 10:0717 | admonitions and instructions given to a deponent at the |
| 10:0718 | outset of a deposition? |
| 10:0719 | A    I'm comfortable waiving admonitions if my |
| 10:0720 | counsel is. |
| 10:0721 | MR. MARMARO:  I think you can proceed. |
| 10:0722 | MR. BERGMAN:  Okay, fine. |
| 10:0723 | MR. MARMARO:  And I will just note that in |
| 10:0724 | addition to the documents that were produced and the |
| 10:0725 | privilege log and the amended privilege log we produced, |

9

we also served a written response to both subpoenas.

MR. BERGMAN:  That is correct.

Q    And just to ask one common question, sir, are

you free this Saturday morning of any medication or

anything else that might affect your memory?

A    I am free of such things.

Q    Okay.  Have you, Mr. Marks, within the past

couple of weeks read any of the documents that have been

produced by you and the firm Gang, Tyre?

MR. MARMARO:  Let me object to the question.  I

think that invades the attorney-client, attorney work

product privilege in terms of any documents that he read

at the request or with counsel, so I am going to object

and instruct him not to answer that question.  I think

there are questions that are related that you can ask but

not that one.

(Instruction not to answer.)

MR. BERGMAN:  Okay.

Q    Just to make the record complete, have you read

any of the documents that have not been produced and are

listed in the privilege log?

MR. MARMARO:  You can answer.

THE WITNESS:  May I answer that?

MR. MARMARO:  Yes.

THE WITNESS:  No.

                                                    10

BY MR. BERGMAN:

    Q   Okay.  Have you spoken concerning this matter with Mr. Toberoff within the past couple of weeks?

    A   No.

    MR. BERGMAN:  Okay.  Before we go any further, let me mark some of the documents that we will be referring to.  The first one is your first amended privilege log, and I would ask the reporter to mark that as Exhibit 1.

    (Deposition Exhibit 1 marked.)

    MR. BERGMAN:  Next I will ask the reporter --

    THE WITNESS:  Can I?

    MR. MARMARO:  May we go off the record?

    MR. BERGMAN:  Of course.

    (Recess.)

    MR. MARMARO:  There is one clarification that Mr. Marks wants to give to a prior answer.

BY MR. BERGMAN:

    Q  Go ahead, sir.

    A   Mr. Bergman, you previously asked if I had reviewed any of the documents on the privilege log, and I said no, but as I look at this, the answer is yes, I reviewed the documents that are described at the very end of the privilege log as "telephone log."

    Q   Very well.  Thank you for that.

11

| | |
|---|---|
| 10:11 1 | Next I would like the reporter to mark documents |
| 10:11 2 | which have been Bates stamped GTRB 0506 through 0514. |
| 10:11 3 | (Deposition Exhibit 2 marked.) |
| 10:12 4 | BY MR. BERGMAN: |
| 10:12 5 | Q   Mr. Marks, are the documents contained in |
| 10:12 6 | Exhibit 2 copies of your desk calendar for the respective |
| 10:12 7 | years? |
| 10:12 8 | A   It's -- yes, they are excerpts from my desk |
| 10:12 9 | calendar for the years noted on the cover page. |
| 10:12 10 | Q   Yes. |
| 10:12 11 | To your knowledge, during the period from 1999 |
| 10:12 12 | to 2002, did Mr. Ramer maintain desk calendars? |
| 10:12 13 | A   Not to my knowledge. |
| 10:12 14 | MR. BERGMAN:  Okay.  Now I will ask the reporter |
| 10:12 15 | to mark as Exhibit 3 a series of phone call registers |
| 10:12 16 | which are marked GTRB 0515 through 0635. |
| 10:13 17 | (Deposition Exhibit 3 marked.) |
| 10:13 18 | BY MR. BERGMAN: |
| 10:13 19 | Q   Before I go to Exhibit 3, Mr. Marks, on Exhibit |
| 10:13 20 | 2 there are certain handwritten notations.  Are those |
| 10:13 21 | each in your hand? |
| 10:14 22 | A   Yes. |
| 10:14 23 | Q   Okay.  And do you maintain these desk calendars |
| 10:14 24 | in the normal course of your business? |
| 10:14 25 | A   Yes. |

12

|          |                                                                  |
|----------|------------------------------------------------------------------|
| 10:14 1  | Q    And to the best of your knowledge, are the                  |
| 10:14 2  | handwritten entries correct?  Do they actually reflect           |
| 10:14 3  | meetings at the designated times and dates?                      |
| 10:14 4  | MR. MARMARO:  Each and every one?                                |
| 10:14 5  | MR. BERGMAN:  Yes.                                               |
| 10:14 6  | MR. MARMARO:  Take a moment to look through them                 |
| 10:14 7  | and review it.                                                   |
| 10:14 8  | THE WITNESS:  The answer is I don't know.                        |
| 10:14 9  | BY MR. BERGMAN:                                                  |
| 10:14 10 | Q    Okay.  With respect to Exhibit 3, are these                 |
| 10:14 11 | telephone call registers which reflect calls received and        |
| 10:14 12 | placed by you?  And when I say "by you," I mean to               |
| 10:15 13 | distinguish you from Mr. Ramer.                                 |
| 10:15 14 | MR. MARMARO:  The question is vague.                             |
| 10:15 15 | THE WITNESS:  Well --                                            |
| 10:15 16 | BY MR. BERGMAN:                                                  |
| 10:15 17 | Q    Let's take it --                                            |
| 10:15 18 | A    May I ask -- I have to ask a question.                      |
| 10:15 19 | Q    Surely.                                                     |
| 10:15 20 | A    This is what I was handed as Exhibit 3, GTRB               |
| 10:15 21 | 0515 through 0625 and GTRB 0626 through GTRB 0635.  These        |
| 10:15 22 | are different types of documents.  So it may be easier to        |
| 10:15 23 | actually have these as separate exhibits to respond to           |
| 10:15 24 | the question, but if you would -- but I think for the            |
| 10:16 25 | pending question, these documents both reflect calls made        |

13

10:16 1    to me and calls made or placed by Bruce Ramer.

10:16 2        Q    Okay.  Then as they were produced, they were

10:16 3    stapled together, and let me go through them one by one

10:16 4    as I received them.  Okay?

10:16 5        The first package that I received was 0515

10:16 6    through 0522.  Could you tell me, please, whether that

10:16 7    reflects calls involving you or to your knowledge

10:16 8    Mr. Ramer?

10:16 9        A    These involve calls to me.

10:1610        Q    The second grouping I received is marked GTRB

10:1611    0523 through 530.  Are those -- does that reflect your

10:1712    calls or Mr. Ramer's?

10:1713        A    This reflects calls to me.

10:1714        Q    The next grouping is Bates stamped 0531 through

10:1715    0549.  Does this reflect calls to and from you or to and

10:1716    from Mr. Ramer?

10:1717        A    This reflects calls to me.

10:1718        Q    The next grouping is Bates stamped 0550 through

10:1719    566.  The same question, sir.

10:1720        A    Same answer.

10:1721        Q    The next grouping is 0567 through 0588.  Are

10:1822    these your calls or Mr. Ramer's?

10:1823        A    These reflect calls to me.

10:1824        Q    The next is 0589 through 0597.  Are these your

10:1825    registers or Mr. Ramer's?

                                                                14

A   These are mine.

10:18 2   Q   The next grouping is 0598 through 0605.  Are

10:18 3 these your registers or Mr. Ramer's?

10:18 4   A   These are mine.

10:18 5   Q   The next grouping is 0606 through 0625.  Are

10:19 6 these your registers or Mr. Ramer's?

10:19 7   A   These are mine.

10:19 8   Q   And the final grouping, if I may reach over,

10:19 9 0626 through 0634.  As I see from the top --

10:1910        MR. MARMARO:  35, I think.

10:1911        MR. TOBEROFF:  25.  Which one are we looking at?

10:1912        MR. BERGMAN:  35.  0626 through 0635.

10:1913   Q   And I notice on 0626 the name Bruce Ramer.  Do

10:1914 those reflect Mr. Ramer's calls?

10:1915   A   Yes.

10:1916        MR. TOBEROFF:  The last one, I don't have a copy

10:1917 of.

10:1918        MR. MARMARO:  I'm sorry?

10:1919        MR. TOBEROFF:  Do you have an extra copy of this

10:1920 for me?

10:1921        MR. BERGMAN:  No, I...  Excuse me.  Off the

10:2022 record one moment.

10:2023        (Pause in the deposition.)

10:2124 BY MR. BERGMAN:

10:2125   Q   With respect to the documents of Exhibit 3 which

15

| | |
|---|---|
| 10:21 1 | you indicated were your phone registers, by whom are |
| 10:21 2 | those maintained?  Are they maintained by your assistant |
| 10:21 3 | or by yourself? |
| 10:21 4 | A   There are two different types of documents |
| 10:21 5 | reflected in this package.  One type is maintained by me, |
| 10:21 6 | and one type is maintained by my assistant. |
| 10:21 7 | Q   Okay.  Which type is maintained by you? |
| 10:22 8 | A   The type reflected in GTRB 0515 through 0521 -- |
| 10:22 9 | excuse me -- 0522. |
| 10:22 10 | Q   And the -- I'm sorry.  The writings contained on |
| 10:22 11 | those documents, is that your handwriting? |
| 10:22 12 | A   Yes. |
| 10:22 13 | Q   Now, is it true that the balance of the |
| 10:22 14 | documents that reflect your calls are maintained by your |
| 10:22 15 | assistant? |
| 10:22 16 | A   Yes. |
| 10:22 17 | Q   I notice that, as is customary, it contains -- |
| 10:22 18 | each document contains a call completed column, some of |
| 10:23 19 | which reflect check marks, some of which do not. |
| 10:23 20 | In your experience, does the lack of a check |
| 10:23 21 | mark invariably indicate that the call was not completed? |
| 10:23 22 | MR. MARMARO:  The question lacks foundation. |
| 10:23 23 | THE WITNESS:  May I answer? |
| 10:23 24 | MR. MARMARO:  Yes, go ahead. |
| 10:23 25 | THE WITNESS:  I believe the lack of a check mark |

16

does not necessarily reflect that the call was not

10:23 2 completed.

10:23 3 BY MR. BERGMAN:

10:23 4    Q   Okay.  And are each of these registers, both

10:23 5 those that you handle yourself and those that are done by

10:23 6 your assistant, are they kept in the normal course of

10:23 7 your business?

10:23 8    A   Yes.

10:23 9    Q   Okay.  If I may, I'd like to go into your

10:24 10 background a little bit.  Can you describe your

10:24 11 educational background?

10:24 12    A   Yes.  Graduated from Stanford University, 1978.

10:24 13 Graduated from Boalt School of Law, 1982.

10:24 14    Q   Am I correct that while at Boalt, you were an

10:24 15 editor on the law review?

10:24 16    A   I was.

10:24 17    Q   And also --

10:24 18    A   I was the projects editor.

10:24 19    Q   I see.

10:24 20    I also recall seeing in Martindale that you were

10:24 21 the first prize winner of the Nathaniel Burken contest.

10:24 22    What was the subject of that paper?

10:24 23    A   First national prize.  The subject of the paper

10:24 24 was right of publicity.

10:25 25    Q   And following your graduation from Boalt in '82,

17

```
10:25 1    what was your first employment?

10:25 2         A    Arnold & Porter.

10:25 3         Q    And you were at Arnold & Porter until when, sir?

10:25 4         A    Till summer 1988.

10:25 5         Q    And in what areas did you practice while at

10:25 6    Arnold & Porter?

10:25 7         A    Copyright, trademark, federal litigation,

10:25 8    government investigations.

10:25 9         Q    Your practice while at Arnold & Porter that

10:26 10   related to copyright and trademark law, was that in a

10:26 11   transactional capacity, or was it in a litigation

10:26 12   capacity?

10:26 13        A    It was in a litigation capacity and an advisory

10:26 14   capacity.

10:26 15        Q    Following Arnold & Porter, by whom were you

10:26 16   employed?

10:26 17        A    Gang, Tyre, Ramer & Brown.

10:26 18        Q    Did that commence relatively quickly after your

10:26 19   summer of '88 departure from Arnold?

10:26 20        A    September 1988.

10:27 21        Q    And was there a period of time while you were at

10:27 22   Gang, Tyre that you were doing litigation?

10:27 23        A    Yes.

10:27 24        Q    And what period of time was that, sir?

10:27 25        A    September 1988 through approximately the next
```

18

| | |
|---|---|
| 10:27 1 | four and a half years. |
| 10:27 2 | Q    And in what primary areas was your litigation |
| 10:27 3 | work? |
| 10:27 4 | A    Litigation work was whatever litigation or |
| 10:27 5 | disputes or dispute resolutions were at that -- that |
| 10:27 6 | clients of the firm were involved in.  Frequently it |
| 10:27 7 | involved matters of rights, frequently it involved |
| 10:28 8 | matters of agreements, but it was various. |
| 10:28 9 | Q    Okay.  Copyright work as well? |
| 10:28 10 | A    Yes, some. |
| 10:28 11 | Q    One of them being the Danjaq case. |
| 10:28 12 | Right? |
| 10:28 13 | A    Which one? |
| 10:28 14 | Q    The District Court action? |
| 10:28 15 | A    Which one? |
| 10:28 16 | Q    Okay.  MGM/UA? |
| 10:28 17 | Was there more than one? |
| 10:28 18 | A    Yes.  Yes. |
| 10:28 19 | Q    There is a Danjaq case that I'm familiar with |
| 10:28 20 | that dealt in part with the question of the application |
| 10:28 21 | of U.S. copyright laws to foreign revenues. |
| 10:29 22 | Do you remember that case? |
| 10:29 23 | A    Well, I certainly recall a case where Danjaq was |
| 10:29 24 | a plaintiff and MGM/UA and a number of others were |
| 10:29 25 | defendants, and the triggering event of the litigation |

19

10:29 1    involved foreign licenses of rights under James Bond

10:29 2    films that we contended violated certain rights of

10:29 3    Danjaq.

10:29 4        Q   Okay.  Subsequent to sometime in 1992 when you

10:29 5    ceased doing litigation, what became your primary

10:30 6    practice area at the Gang, Tyre firm?

10:30 7        A   Transactional.

10:30 8        Q   And for the record, can you describe what you

10:30 9    mean by "transactional"?

10:30 10       A   Yes.  That refers to advising clients in

10:30 11    connection with their agreements for services and rights.

10:30 12       Q   Without getting into or identifying any specific

10:30 13    clients, can you indicate the types of clients whom you

10:30 14    represented in a transactional capacity from 1992 on?

10:30 15       A   Yes.  Largely in the film and television

10:30 16    industries, producers, writers, directors, actors.

10:30 17       Q   As a transactional lawyer, were you involved in

10:31 18    negotiations to acquire film rights in literary

10:31 19    properties?

10:31 20       A   Yes.

10:31 21       Q   Do you have any estimate of how many separate

10:31 22    negotiations you've conducted since that time relating to

10:31 23    the acquisition of film rights in motion picture -- in

10:31 24    literary properties?

10:31 25         MR. MARMARO:  Up to the present?

20

| | | |
|---|---|---|
| 10:31 1 | | MR. BERGMAN:  Yes, sir. |
| 10:31 2 | Q | Just an estimate. |
| 10:31 3 | A | More than 10. |
| 10:31 4 | Q | Would it be much more than 10? |
| 10:31 5 | A | It's genuinely hard for me to say. |
| 10:31 6 | Q | Okay.  In connection -- strike that. |
| 10:32 7 | | You also practice, at least according to |
| 10:32 8 | | Martindale-Hubbell, in the intellectual property area. |
| 10:32 9 | | Is that correct? |
| 10:32 10 | A | Yes, that's right. |
| 10:32 11 | Q | And what does that work entail? |
| 10:32 12 | A | Advising clients about principally copyright |
| 10:32 13 | | rights and sometimes trademark rights. |
| 10:32 14 | Q | Would you look, please, Mr. Marks, at Exhibit 1, |
| 10:32 15 | | which is the privilege log, and I'm -- I would appreciate |
| 10:32 16 | | it if you could by looking at this document estimate for |
| 10:32 17 | | me approximately when you first became involved in the |
| 10:33 18 | | matter that we're here to discuss today; namely, the |
| 10:33 19 | | Siegel interest in the Superman property. |
| 10:33 20 | A | I can respond to that question without referring |
| 10:33 21 | | to the privilege log. |
| 10:33 22 | Q | Very well. |
| 10:33 23 | A | I recall we became involved a few weeks before |
| 10:33 24 | | the Superman terminations became effective. |
| 10:33 25 | Q | And do you recall that approximate date? |

21

A   The effective date was approximately April 15,

10:33 2   1999.  So representation began a month or two before

10:33 3   that.

10:34 4       Q   And am I correct that when the firm was

10:34 5   retained, it was retained by two individuals, that is,

10:34 6   Joanne Siegel and her daughter Laura Siegel Larson?

10:34 7       A   The firm was retained to represent the Superman

10:34 8   termination interest, and Joanne Siegel and Laura Siegel

10:34 9   Larson represented the majority holders of that interest.

10:3410       Q   Well, was your firm engaged to also represent

10:3411   Michael Siegel?

10:3412       A   During the course of the representation, in

10:3413   representing the complete interest, we did effectively

10:3514   represent Michael Siegel, at least vis-a-vis DC Comics.

10:3515       Q   So that in your mind Mr. Siegel, Michael Siegel,

10:3516   was a client of the firm in connection with this matter?

10:3517       A   The client was really the Superman termination

10:3518   interest.  That's who the client was.

10:3519       Q   Were there any other individuals, other than

10:3520   Joanne, Laura and Michael Siegel, who held an interest to

10:3521   your knowledge in the Superman termination interest?

10:3522       A   Not the one that we represented.

10:3523       Q   Was there a termination interest other than the

10:3624   one you represented?

10:3625       A   The -- my understanding is that there is a --

                                                              22

there was at the time and still is a nascent termination

10:36 2 interest in the Shuster family or the Shuster estate,

10:36 3 which we did not represent.

10:36 4     Q   Okay. Am I correct that by 1999 your firm was

10:36 5 no longer engaged in a litigation practice?

10:36 6     A   That is correct.

10:36 7     Q   So that your retention related to the potential

10:36 8 negotiation of an agreement with DC Comics?

10:36 9        MR. MARMARO:  The question is vague.

10:3610        MR. BERGMAN:  Okay.

10:3611     Q   What specific activities was your firm engaged

10:3712 by the Siegel termination interest to participate in?

10:3713     A   To advise them generally and to attempt to

10:3714 negotiate an arrangement with Time Warner, or then AOL

10:3715 Time Warner.

10:3716     Q   Okay. Am I correct that the copyright interest

10:3717 that was the subject of the termination notices was a

10:3718 series of copyrights held by DC Comics?

10:3719     A   DC Comics or its predecessors that had been

10:3720 transferred up to DC Comics over the years. That's my

10:3721 understanding.

10:3722     Q   Okay. Was there a written retainer agreement

10:3823 between your firm and the Superman termination interest?

10:3824     A   Yes.

10:3825     Q   And is that document identified on the privilege

10:38 1 log, Exhibit 1?

10:38 2      A    I don't know.

10:38 3      Q    Okay.  Could you take a quick look and let me

10:38 4 know?

10:38 5      A    I do not know if it is referred to in these

10:38 6 entries on the privilege log.

10:39 7           MR. MARMARO:  And I will just note that without

10:39 8 looking at the subpoena, I don't know whether that

10:39 9 document would have been within the call of any of the

10:3910 requests in the subpoena.

10:3911           MR. BERGMAN:  Okay.  I understand.

10:3912           MR. MARMARO:  And if it was not, it would

10:3913 certainly not be on the log.

10:3914 BY MR. BERGMAN:

10:3915      Q    Aside from Mr. Ramer and yourself, Mr. Marks,

10:3916 was any other Gang, Tyre attorney involved in the

10:3917 representation of the Superman termination interest?

10:3918      A    No.

10:3919      Q    And were both you and Mr. Ramer generally

10:3920 involved in all aspects of that representation?

10:3921           MR. MARMARO:  The question is vague, overbroad.

10:3922           THE WITNESS:  How I understand "all aspects," I

10:3923 would have to say no.  As the matter progressed, I

10:4024 believe that I was the person who was, if you will, the

10:4025 point person and the one principally involved.

                                                              24

BY MR. BERGMAN:

10:40 2       Q   Is there a particular time period you could

10:40 3   estimate for me when that evolution occurred, that is,

10:40 4   when you became the primary attorney representing the

10:40 5   interest?

10:40 6       A   It was -- I recall there being what was a second

10:40 7   meeting at Warner Bros., a second in-person meeting at

10:40 8   Warner Bros. that I attended and Bruce did not, and I

10:40 9   really believe that that -- by that time I was, if you

10:4010   will, the principal point person on this matter.

10:4111       Q   It's correct, though, isn't it, that after that

10:4112   second meeting Mr. Ramer did attend at least some

10:4113   meetings with the DC representatives?

10:4114       A   I'm not sure.

10:4115       Q   Okay.  At the point that you became the lead

10:4116   counsel for your client, did you thereafter confer with

10:4117   Mr. Ramer from time to time regarding the progress of the

10:4118   matter?

10:4119       A   Yes.

10:4120       Q   And, incidentally, in preparation for the

10:4121   deposition, did you speak with Mr. Ramer concerning this

10:4122   matter?

10:4123       A   I -- yes, I did.

10:4224       MR. MARMARO:  Michael, when you reach a

10:4225   convenient breaking point, could we just quickly break?

                                                          25

```
10:42  1              MR. BERGMAN:  Why don't we do it now.

10:42  2              MR. MARMARO:  Okay.

10:42  3              (Recess.)

10:45  4              MR. BERGMAN:  Back on the record.

10:45  5         Q    Do you recall who signed the retainer agreement

10:45  6     on behalf of what you characterize as the Superman

10:45  7     termination interest?

10:45  8         A    I believe -- well, can I answer that question?

10:45  9              MR. MARMARO:  The answer is a yes or no

10:45 10     question.

10:45 11              THE WITNESS:  Do I recall?  The answer is in

10:45 12     part.

10:45 13     BY MR. BERGMAN:

10:45 14         Q    Okay.  To the extent of your knowledge, who

10:45 15     signed it?

10:45 16              MR. MARMARO:  As long as counsel for the Siegels

10:45 17     doesn't have an objection, I don't have an objection.

10:45 18     It's just identifying the person.

10:45 19              MR. TOBEROFF:  That's fine.

10:45 20              THE WITNESS:  I recall that Joanne Siegel signed

10:45 21     it, and I believe but I am not certain that Laura Siegel

10:46 22     Larson signed it as well.

10:46 23     BY MR. BERGMAN:

10:46 24         Q    Okay.  Did Michael Siegel sign it?

10:46 25         A    No.
```

                                                                    26

| | |
|---|---|
| 10:46 1 | Q   At the point in time that you became retained, |
| 10:46 2 | as you put it, by the interest, was there to your |
| 10:46 3 | knowledge any written agreement between Joanne and Laura |
| 10:46 4 | Siegel on the one hand and Michael Siegel on the other |
| 10:46 5 | concerning their respective interests in the termination |
| 10:46 6 | right? |
| 10:46 7 | THE WITNESS:  May I answer that question? |
| 10:46 8 | MR. MARMARO:  Yes. |
| 10:46 9 | THE WITNESS:  To my knowledge was there an |
| 10:46 10 | agreement, no. |
| 10:46 11 | BY MR. BERGMAN: |
| 10:46 12 | Q   And there certainly was no entity that had been |
| 10:46 13 | formed called the "Superman Termination Interest," had |
| 10:46 14 | there? |
| 10:46 15 | A   There was no entity, correct. |
| 10:47 16 | Q   The documents reflect the names of some other |
| 10:47 17 | attorneys outside of Gang, Tyre, and I'd like to ask you |
| 10:47 18 | a few questions about them. |
| 10:47 19 | First of all, there is Arthur Levine.  Can you |
| 10:47 20 | identify who Mr. Levine was? |
| 10:47 21 | A   Yes.  Arthur Levine -- |
| 10:47 22 | Q   I'm sorry. |
| 10:47 23 | A   -- is a Washington, D.C.-based copyright |
| 10:47 24 | attorney. |
| 10:47 25 | Q   And was Mr. Levine the attorney who actually |

27

filed the termination notices?

A   I believe so.

Q   And am I correct that Mr. Levine remained

involved in the representation of the Siegels subsequent

to Gang Tyre's retention?

MR. MARMARO:  It's a yes or no question.

THE WITNESS:  Yes.

BY MR. BERGMAN:

Q   And did he -- did there come a point in time

when Mr. Levine no longer acted in that capacity?

MR. MARMARO:  That question lacks foundation.

THE WITNESS:  I don't know that his capacity

ever changed.  I do know that there did come a point in

time where I was no longer speaking with him.

BY MR. BERGMAN:

Q   Okay.  In my review of the privilege log,

Exhibit 1, I noted that the last entry referring to

Mr. Levine was in May 2001.  That is number 489 if you

care to look.

MR. MARMARO:  Would you like him to look?

MR. BERGMAN:  No.

MR. MARMARO:  Okay.

BY MR. BERGMAN:

Q   Does that generally coincide with your

recollection as to the period of time in which you were

| | |
|---|---|
| 10:49 1 | no longer consulting with Mr. Levine? |
| 10:49 2 | A   I don't have a good idea of when my |
| 10:49 3 | communications or my regular communications with |
| 10:49 4 | Mr. Levine dwindled down or stopped. |
| 10:49 5 | Q   How regular were your communications with |
| 10:49 6 | Mr. Levine? |
| 10:49 7 | A   There was a period where they were regular and a |
| 10:49 8 | period where they were less and then a period where they |
| 10:49 9 | were not at all. |
| 10:4910 | Q   Okay.  Can you give me the approximate inclusive |
| 10:5011 | dates of the first period that you referred to? |
| 10:5012 | A   I would be speculating.  The best estimate I |
| 10:5013 | could give is the period of three or four months |
| 10:5014 | following our engagement. |
| 10:5015 | Q   And the next period which you described as |
| 10:5016 | communicating intermittently or less than regularly, how |
| 10:5017 | long did that period last? |
| 10:5018 | A   I really can't say. |
| 10:5019 | Q   Okay.  During the first period that you |
| 10:5020 | indicated when you were conferring with Mr. Levine |
| 10:5021 | regularly, was there some agreed-upon division of labor |
| 10:5022 | between the Gang, Tyre attorneys on the one hand and |
| 10:5023 | Mr. Levine on the other? |
| 10:5124 | MR. MARMARO:  I believe that question invades |
| 10:5125 | the attorney-client and attorney work product privilege. |

29

I object and instruct on that basis.

10:51 2          (Instruction not to answer.)

10:51 3          MR. TOBEROFF:  I concur.

10:51 4   BY MR. BERGMAN:

10:51 5      Q   During the first period that you indicated when

10:51 6   you were regularly communicating with Mr. Levine, what

10:51 7   activities to your knowledge was he responsible for

10:51 8   regarding the representation of this interest?

10:51 9          MR. MARMARO:  As phrased, I believe the question

10:5110   has the same problems as the prior question, so I will

10:5111   object and instruct on the same basis.  That doesn't mean

10:5112   to say that you couldn't frame questions in this area

10:5113   that would call for non-privileged information, but I

10:5114   believe the last two did.

10:5115          (Instruction not to answer.)

10:5116          MR. TOBEROFF:  I concur.

10:5117          MR. BERGMAN:  Okay.

10:5118      Q   During the period of time that you were

10:5119   regularly communicating with Mr. Levine, was he

10:5220   conducting any research regarding the interests of the

10:5221   termination interest to your knowledge?

10:5222          MR. MARMARO:  I believe -- same objection.  Same

10:5223   instruction.

10:5224          (Instruction not to answer.)

10:5225          MR. TOBEROFF:  I concur.

                                                        30

BY MR. BERGMAN:

    Q   During that first period, was he to your knowledge communicating with DC or any of its representatives?

       MR. MARMARO:  You can answer that question.

       THE WITNESS:  I can answer that question?

       MR. MARMARO:  Again, subject to any issues that Mr. Toberoff may have with the question.  We would follow his lead.  If he has an issue.

       MR. TOBEROFF:  You can answer.

       THE WITNESS:  Not to my knowledge.

BY MR. BERGMAN:

    Q   What were the circumstances to your knowledge under which -- which resulted in Mr. Levine becoming less involved in the representation of the termination interest?

       MR. MARMARO:  I'm going to object to the question as calling for attorney-client and attorney work product protected communications and instruct the witness not to answer on that basis, again unless Mr. Toberoff has a contrary view.

       (Instruction not to answer.)

       MR. TOBEROFF:  I concur.

BY MR. BERGMAN:

    Q   Am I correct, Mr. Marks, that Mr. Levine

31

| | |
|---|---|
| 10:53 1 | conducted certain early negotiations with DC concerning |
| 10:53 2 | the Siegel interest? |
| 10:53 3 | THE WITNESS: I can answer that? |
| 10:53 4 | MR. MARMARO: You can answer that question. |
| 10:53 5 | THE WITNESS: Yes, I -- at the time we became |
| 10:54 6 | involved, I was -- I became aware of communications to |
| 10:54 7 | Mr. Levine in connection with a possible transaction |
| 10:54 8 | involving the termination interest, the Superman |
| 10:54 9 | termination interest. |
| 10:54 10 | BY MR. BERGMAN: |
| 10:54 11 | Q    And was it your understanding that subsequent to |
| 10:54 12 | Gang, Tyre's involvement, Mr. Levine would no longer be |
| 10:54 13 | engaged in any settlement negotiations with DC Comics? |
| 10:54 14 | MR. MARMARO: Unless Mr. Toberoff has an |
| 10:54 15 | objection, the witness could answer that question. |
| 10:54 16 | MR. TOBEROFF: Could you repeat the question -- |
| 10:54 17 | read the question, please? |
| 10:54 18 | MR. BERGMAN: Could you? |
| 10:54 19 | (Record read.) |
| 10:55 20 | MR. TOBEROFF: I object. Attorney-client |
| 10:55 21 | privilege. Attorney work product. |
| 10:55 22 | MR. MARMARO: Then I instruct the witness not to |
| 10:55 23 | answer on those grounds. |
| 10:55 24 | (Instruction not to answer.) |
| 10:55 25 | MR. BERGMAN: Okay. And, Mr. Marmaro, is your |

32

instruction based on the fact that Mr. Toberoff is

10:55 2 objecting?

10:55 3      MR. MARMARO: Well, it's my judgment that that

10:55 4 question potentially invades the attorney-client and

10:55 5 attorney work product. Mr. Marks is not the holder of

10:55 6 the attorney-client privilege, certainly, and so if

10:55 7 Mr. Toberoff raises an objection, we intend to follow

10:55 8 that instruction, at least until a court tells us

10:55 9 otherwise.

10:55 10      MR. BERGMAN: I understand.

10:55 11      MR. MARMARO: It's not our intention to waive

10:55 12 any privileges here today or in the production of any

10:55 13 documents, and from time to time I may seek guidance from

10:55 14 Mr. Toberoff on something that I might have a question

10:55 15 about in my own mind.

10:56 16      MR. BERGMAN: Okay. And I certainly have no

10:56 17 intention of engaging in any colloquy concerning that. I

10:56 18 do want to note and advise you that Mr. Toberoff and we

10:56 19 have a very distinct difference of opinion concerning the

10:56 20 extent and reach of the attorney-client privilege and

10:56 21 that there are presently pending in the District Court

10:56 22 motions with respect to that. I don't want to

10:56 23 inconvenience Mr. Marks, but it may become necessary

10:56 24 following the resolution of those motions to reconvene,

10:56 25 and I just say that to inform you of the present status

33

10:56 1    of the matter.

10:56 2          MR. MARMARO:  We understand your position, and

10:56 3    Mr. Marks intends to be fully cooperative today to the

10:56 4    extent he can be.  If there is any disagreement between

10:56 5    the parties to this litigation, then when that

10:56 6    disagreement is resolved, of course Mr. Marks will

10:57 7    testify.

10:57 8          MR. BERGMAN:  Thank you.

10:57 9          MR. TOBEROFF:  I would like to note, since you

10:5710    commented on the motions, that the first such motion

10:5711    regarding the attorney-client privilege that was made by

10:5712    defendants and counterclaimants in this case was denied,

10:5713    as was a subsequent motion for reconsideration.

10:5714    BY MR. BERGMAN:

10:5715       Q    Another name that frequently appears in the

10:5716    documents, Mr. Marks, is Dennis Larson.  Am I correct

10:5717    that Mr. Larson was an attorney who, during most of your

10:5718    representation of the interest, was the husband of Laura

10:5719    Siegel?

10:5720       A    Yes.

10:5721       Q    And there appear from the documents that you've

10:5722    produced to be numerous communications with Dennis

10:5723    Larson.  Were your contacts with him in his capacity as

10:5824    an attorney or as the husband of Laura Siegel?

10:5825       A    In his capacity as an attorney.

                                                              34

Q    And who was Mr. Larson to your knowledge

representing?

A    The same Superman termination interest.

Q    Am I correct then that during a substantial

portion of your representation, and by "your" I mean your

firm's representation, that the termination interest was

represented by three different firms:  Gang, Tyre,

Mr. Levine's firm and Mr. Larson?

A    I don't think so.

Q    In what respect is that incorrect?

A    I think it's incorrect as to "substantial."

Q    I'm sorry, I don't understand.  What do you mean

by that?

A    I think my view is that the substantial part of

the representation, at least during the course of our

engagement, was Gang, Tyre, Ramer & Brown without the

assistance of Mr. Levine and without the assistance of

Mr. Larson.

Q    Okay.  Would you identify who Don Bulson,

B U L S O N, is?

A    Yes.  Mr. Bulson is a Cleveland-based attorney.

Q    Okay.  And his name appears frequently

throughout the papers.  Who, if anyone, was he

representing in connection with the Superman termination

interest?

35

**U.S. LEGAL SUPPORT**

| | | |
|---|---|---|
| 11:00 | 1 | A   Mr. Bulson represented Michael Siegel. |
| 11:00 | 2 | Q   Did he represent only Michael Siegel, or was he |
| 11:00 | 3 | also representing what you refer to as the "Superman |
| 11:00 | 4 | termination interest"? |
| 11:00 | 5 | A   He represented Michael Siegel.  He did |
| 11:00 | 6 | participate in meetings or conference calls with DC |
| 11:00 | 7 | Comics and Warner Bros., and in some way I viewed him as |
| 11:00 | 8 | a co-counsel on the matter. |
| 11:01 | 9 | Q   A name that appeared a couple of times was |
| 11:01 | 10 | George Zadorozny, Z A D O R O Z N Y.  Are you familiar |
| 11:01 | 11 | with that gentleman? |
| 11:01 | 12 | A   I'm familiar with the name. |
| 11:01 | 13 | Q   In what capacity, if any, was he involved in |
| 11:01 | 14 | connection with the Superman termination interest? |
| 11:01 | 15 | A   I do not recall. |
| 11:01 | 16 | Q   Do you recall any communications that you had |
| 11:01 | 17 | with that gentleman? |
| 11:01 | 18 | A   There may have been communications, but I do not |
| 11:01 | 19 | recall them. |
| 11:01 | 20 | Q   Did you consider Mr. Zadorozny to be a |
| 11:01 | 21 | co-counsel of the termination interest? |
| 11:02 | 22 | A   My recollection is that there were very few |
| 11:02 | 23 | communications with him and that he was not involved in |
| 11:02 | 24 | the negotiations with DC Comics, Warner Bros. and Time |
| 11:02 | 25 | Warner. |

36

| | | |
|---|---|---|
| 11:02 | 1 | Q   To your knowledge did Mr. Zadorozny represent |
| 11:02 | 2 | either Joanne, Laura or Michael Siegel? |
| 11:02 | 3 | A   In any capacity? |
| 11:02 | 4 | Q   In any capacity. |
| 11:02 | 5 | A   My understanding is that prior to our engagement |
| 11:02 | 6 | he had advised Joanne and Laura. |
| 11:03 | 7 | Q   And subsequent to Gang, Tyre's retention, are |
| 11:03 | 8 | you aware that he continued to communicate with Laura or |
| 11:03 | 9 | Joanne concerning the termination interest? |
| 11:03 | 10 | MR. MARMARO:  The question lacks foundation. |
| 11:03 | 11 | You can answer. |
| 11:03 | 12 | THE WITNESS:  I think that answer would divulge |
| 11:03 | 13 | privileged communications. |
| 11:03 | 14 | MR. MARMARO:  Then I instruct you not to answer. |
| 11:03 | 15 | Object and instruct. |
| 11:03 | 16 | (Instruction not to answer.) |
| 11:03 | 17 | BY MR. BERGMAN: |
| 11:03 | 18 | Q   Okay.  There are also references to an attorney |
| 11:03 | 19 | by the name of Jennifer Harding.  Could you identify who |
| 11:03 | 20 | she was? |
| 11:03 | 21 | A   Yes.  Jennifer Harding is a Los Angeles-based |
| 11:03 | 22 | family law attorney. |
| 11:03 | 23 | Q   And was Ms. Harding to your knowledge |
| 11:03 | 24 | representing Laura Siegel in connection with the |
| 11:04 | 25 | dissolution proceedings between her and Dennis Larson? |

37

| | |
|---|---|
| 11:04 1 | A    Yes. |
| 11:04 2 | MR. TOBEROFF:  Lacks foundation. |
| 11:04 3 | THE WITNESS:  Oh. |
| 11:04 4 | MR. TOBEROFF:  It's okay. |
| 11:04 5 | MR. BERGMAN:  I'd like the reporter to mark as |
| 11:04 6 | the next exhibit in order, which would be 4, a letter |
| 11:04 7 | dated April 30, 1999, Bates stamped 009 and 10. |
| 11:04 8 | (Deposition Exhibit 4 marked.) |
| 11:05 9 | BY MR. BERGMAN: |
| 11:05 10 | Q    You are shown as receiving a copy of Exhibit 4. |
| 11:05 11 | Do you recall receiving a copy of this? |
| 11:05 12 | A    Yes. |
| 11:05 13 | Q    Okay.  Now, in the intervening time between your |
| 11:05 14 | retention -- between the retention of Gang, Tyre, Brown |
| 11:05 15 | and April 30, 1999, were you generally involved in |
| 11:05 16 | familiarizing yourself with what had previously |
| 11:06 17 | transpired in connection with the termination interest? |
| 11:06 18 | MR. MARMARO:  I think that that question calls |
| 11:06 19 | for the witness to divulge attorney-client and attorney |
| 11:06 20 | work product protected communications, so I will object |
| 11:06 21 | and instruct as presently phrased.  You're asking him the |
| 11:06 22 | work that he did. |
| 11:06 23 | (Instruction not to answer.) |
| 11:06 24 | BY MR. BERGMAN: |
| 11:06 25 | Q    Bear in mind, Mr. Marks, I'm not asking you for |

38

11:06 1  specific activities that you engaged in.  My question

11:06 2  relates to whether you were, for example, reviewing prior

11:06 3  communications between DC and the Siegels during this

11:06 4  period of time.

11:06 5      MR. MARMARO:  If the question is limited to

11:06 6  whether he reviewed third-party communications, I think

11:06 7  it's a closer issue, and I would defer to Mr. Toberoff.

11:07 8      MR. TOBEROFF:  I think it's work product, but I

11:07 9  wouldn't -- I'm not objecting on the basis of attorney-

11:07 10  client privilege.

11:07 11      MR. MARMARO:  I think the problem is whenever

11:07 12  you ask an attorney to say what he chose to do in a

11:07 13  matter, you're asking for an attorney to divulge his

11:07 14  judgment.  I'm not sure that that's what you're really

11:07 15  after, but I don't want to be in a situation where we

11:07 16  answer one question and then face an argument that we've

11:07 17  engaged in a waiver.  So I will object and instruct as to

11:07 18  the question unless you tell me that if he answers this

11:07 19  question, it will not be a waiver as to any other

11:07 20  question.

11:07 21      MR. BERGMAN:  It will not be.

11:07 22      MR. MARMARO:  Then you can answer the question.

11:07 23      THE WITNESS:  Perhaps the court reporter could

11:07 24  read the last pending question again?

11:07 25      (Record read as follows:

39

11:06 1
11:06 2
11:06 3
11:06 4
11:06 5
11:06 6
11:06 7
11:08 8
11:08 9
11:0810
11:0811
11:0812
11:0813
11:0814
11:0815
11:0916
11:0917
11:0918
11:0919
11:0920
11:0921
11:0922
11:0923
11:0924
11:0925

"Q   Bear in mind, Mr. Marks, I'm

not asking you for specific activities

that you engaged in.  My question

relates to whether you were, for

example, reviewing prior communi-

cations between DC and the Siegels

during this period of time.")

THE WITNESS:  I reviewed prior communications

between DC and their representatives and the Siegels

and/or their representatives.

BY MR. BERGMAN:

Q   And during the period of time from your

retention through the date of Exhibit 4, were you

accumulating documentation which related to the prior

activities of Mr. Levine?

MR. MARMARO:  The question is vague and

ambiguous.  Again, this potentially calls for the witness

to divulge attorney-client, attorney work product

communications.  I'll permit him to answer unless

Mr. Toberoff has an objection if you agree -- and maybe

for the sake of efficiency, we can agree that the answer

to no one question will be a waiver as to anything else

as well.

MR. BERGMAN:  We can certainly agree to that,

and I do.

40

**U.S. LEGAL SUPPORT**

| | |
|---|---|
| 11:09 1 | MR. MARMARO:  Thank you. |
| 11:09 2 | MR. MARMARO:  And again, unless Mr. Toberoff -- |
| 11:09 3 | MR. TOBEROFF:  I just need the question read |
| 11:09 4 | back. |
| 11:09 5 | (Record read as follows: |
| 11:08 6 | "Q  And during the period of time |
| 11:08 7 | from your retention through the date |
| 11:08 8 | of Exhibit 4, were you accumulating |
| 11:08 9 | documentation which related to the |
| 11:0810 | prior activities of Mr. Levine?") |
| 11:0911 | THE WITNESS:  Yes. |
| 11:0912 | MR. TOBEROFF:  Maybe to simplify the objections, |
| 11:0913 | when Mr. Marmaro objects as to form, can we agree that I |
| 11:1014 | am also making the same objections so that I don't have |
| 11:1015 | to repeat the objection? |
| 11:1016 | MR. BERGMAN:  Well, without wanting to |
| 11:1017 | inconvenience you, I do think that the objection should |
| 11:1018 | be stated separately, Mr. Toberoff. |
| 11:1019 | MR. TOBEROFF:  That means if he says, "Vague and |
| 11:1020 | ambiguous," then I would -- |
| 11:1021 | MR. BERGMAN:  There will be no need for you to |
| 11:1022 | make the identical objection.  If you have any further |
| 11:1023 | objection -- |
| 11:1024 | MR. TOBEROFF:  No.  I'm saying if he says, |
| 11:1025 | "Vague and ambiguous," what I am asking for is rather |

41

| | |
|---|---|
| 11:10 1 | than me repeat, "Vague and ambiguous," I've made the |
| 11:10 2 | same -- I'm concurring in that objection unless I |
| 11:10 3 | specifically say that I don't have that objection. |
| 11:10 4 | MR. BERGMAN: That's agreeable. |
| 11:10 5 | MR. TOBEROFF: Okay. But if I have any |
| 11:10 6 | additional objections, I would make them. |
| 11:10 7 | MR. BERGMAN: Okay. |
| 11:10 8 | Q Prior to the date of Exhibit 4, April 30th, |
| 11:10 9 | 1999, had you had any prior communications with Carol |
| 11:11 10 | Simkin? |
| 11:11 11 | MR. MARMARO: On any subject? |
| 11:11 12 | MR. BERGMAN: On any subject. |
| 11:11 13 | THE WITNESS: Not to my knowledge. |
| 11:11 14 | BY MR. BERGMAN: |
| 11:11 15 | Q Had you had any prior communications on any |
| 11:11 16 | subject with John Schulman? |
| 11:11 17 | A Yes. |
| 11:11 18 | Q Over the years had you negotiated agreements |
| 11:11 19 | with Mr. Schulman? |
| 11:11 20 | A I don't think so. |
| 11:11 21 | Q Were you acquainted with Mr. Schulman socially? |
| 11:11 22 | A Yes. |
| 11:11 23 | Q Can you tell me approximately when that social |
| 11:11 24 | relationship began? |
| 11:11 25 | MR. MARMARO: Well, that's a different question, |

42

11:11 1   a social relationship as opposed to acquainted with him

11:11 2   socially.

11:11 3   BY MR. BERGMAN:

11:11 4       Q   Let's change "relationship" to "acquaintance"

11:12 5   and when that social acquaintance began.

11:12 6       A   My first acquaintance with John Schulman was in

11:12 7   a professional capacity.  As we've discussed, in the

11:12 8   first four and a half years of my being at Gang, Tyre, I

11:12 9   was a litigator, and I do recall meeting Mr. Schulman at

11:1210  a time when I was litigating, and so it was -- my first

11:1211  acquaintance was professional, and that is how I came to

11:1212  know John Schulman.  Over the years I have seen him on

11:1213  occasion in non-work settings.

11:1214      Q   Thank you.

11:1315      Mr. Coleman, would you mark as Exhibit 5 a

11:1316  letter dated July 7, 1999, from Mr. Schulman to

11:1317  Mr. Ramer, Bates stamped GTRB 18 and 19.

11:1418      (Deposition Exhibit 5 marked.)

11:1419      MR. BERGMAN:  And would you...

11:1420      Q   Mr. Schulman refers in the first sentence that

11:1421  he is writing "in anticipation of our meeting next week

11:1422  regarding the Siegels' claims."

11:1423      Am I correct that was the first meeting that you

11:1424  had with Mr. Schulman on that subject?

11:1425      A   A meeting the following week in June --

43

11:14 1        MR. MARMARO:  July.

11:14 2        THE WITNESS:  In July?  I'm sorry.

11:15 3   BY MR. BERGMAN:

11:15 4        Q    Yes.

11:15 5        A    Yes, that was the first meeting.

11:15 6        MR. BERGMAN:  Would you now mark as Exhibit 6 a

11:15 7   letter dated July 9, 1999, from Mr. Ramer to

11:15 8   Mr. Schulman, Bates stamped number 11 through 13.

11:15 9        (Deposition Exhibit 6 marked.)

11:1510   BY MR. BERGMAN:

11:1511        Q    Do you recall receiving a copy of this letter on

11:1512   or about the date it bears?

11:1513        A    Yes.

11:1514        Q    My primary purpose in showing this letter to you

11:1615   is to address item number 3 that Mr. Ramer states -- and

11:1616   to assure you that as we go through these documents and

11:1617   as I intend on going through the documents, I have no

11:1618   intention of using them or attempting to use them later

11:1619   in violation of Evidence Code 1152.  I am simply trying

11:1620   to record the nature and extent of what I think was a

11:1621   rather long negotiation that followed.

11:1622        Do you understand that, sir?

11:1623        MR. MARMARO:  I don't.

11:1624        MR. BERGMAN:  Okay.

11:1625        MR. MARMARO:  I don't know that a response is --

                                                            44

11:16 1  I'm not sure exactly what you're asking, so I'll object

11:17 2  to the question, but I appreciate your comment.

11:17 3       MR. BERGMAN:  Then I'll -- okay.

11:17 4       Q   What, if anything, did you understand Mr. Ramer

11:17 5  to mean by the sentence that reads, quote, "The scope of

11:17 6  any evidentiary privilege is no more and no less than

11:17 7  that embodied in California Evidence Code 1152," close

11:17 8  quote?

11:17 9       MR. MARMARO:  Unless Mr. Toberoff has an

11:17 10 objection, I'll let the witness answer that question.

11:17 11      MR. TOBEROFF:  I'm okay with it.

11:17 12      THE WITNESS:  The context for Mr. Ramer's

11:17 13 response to Mr. Schulman is, of course, Exhibit 5,

11:17 14 Mr. Schulman's letter saying that our -- in general

11:17 15 fashion, we'd like an agreement that our communications

11:17 16 are confidential.

11:17 17      The reference to California Evidence Code 1152

11:18 18 is, as I recall, a provision of the Evidence Code which

11:18 19 generally states that communications of parties in the

11:18 20 course of settlement discussions can't be used as

11:18 21 admissible evidence in legal proceedings, and in this

11:18 22 matter litigation was always looming over it and always

11:18 23 looming in the horizon, and -- from the beginning, and

11:18 24 what this section 3 is saying is that to the extent that

11:18 25 settlement discussions are accorded confidentiality, the

45

scope of that confidentiality is defined by this

11:18 2 provision of the Evidence Code.  It's not more; it's not

11:18 3 less, and, for example, if this does turn into a matter

11:18 4 that's litigated, our confidentiality agreement wouldn't

11:19 5 in any way impinge upon the Siegels' discovery process.

11:19 6 BY MR. BERGMAN:

11:19 7     Q    Am I correct that Mr. Schulman agreed to that

11:19 8 concept as expressed in Exhibit 6, that he manifested his

11:19 9 agreement?

11:19 10     A    I recall that he did.

11:19 11         MR. BERGMAN:  Just so the record is clear, let

11:19 12 me ask the reporter to mark as Exhibit 7 GTRB 16 and 17.

11:19 13         (Deposition Exhibit 7 marked.)

11:19 14 BY MR. BERGMAN:

11:19 15     Q    Do you recall receiving a copy of this letter?

11:20 16     A    Yes, I do.

11:20 17     Q    Okay.

11:20 18     A    Although it was not addressed to me.

11:20 19     Q    I understand.

11:20 20         In fact, your counsel produced three copies of

11:20 21 that letter, 16, 17 -- two copies.  I'm sorry.

11:20 22         Did the meeting, the first meeting between you,

11:20 23 Mr. Ramer and Mr. Schulman, take place on July 12th,

11:20 24 1999?

11:20 25     A    This letter leads me to believe that the meeting

46

U.S. LEGAL SUPPORT

11:20 1    did take place on that date.

11:20 2        Q    To your recollection did anyone other than

11:20 3    Mr. Ramer, yourself and Mr. Schulman attend that meeting?

11:20 4        A    Yes.

11:20 5        Q    Who was that, sir?

11:20 6        A    Dennis Larson attended, as I recall, I recall

11:21 7    Paul Levitz attended, I recall Carol Simkin attended, and

11:21 8    I believe Lillian Laserson attended.

11:21 9        Q    The meeting took place at Warner Bros.?

11:21 10       A    Yes.

11:21 11       Q    Do you recall approximately how long the meeting

11:21 12   was?

11:21 13       A    I would say that it was more than an hour and

11:21 14   less than two and a half hours.

11:22 15       Q    Can you recall how the meeting began, who said

11:22 16   what?

11:22 17       A    Yes.

11:22 18       Q    Would you tell us, please?

11:22 19       A    Well, there were introductions, and I recall

11:22 20   Bruce and John having an exchange about Mickey Rooney,

11:22 21   who was ill at the time.  I recall John telling a story

11:22 22   about Mickey Rooney, and I remember Paul Levitz talking

11:23 23   about his new neighbors, the Clintons.

11:23 24       Q    Okay.  Very good.

11:23 25            Once those introductory remarks were made, what

                                                              47

11:23 1  do you next recall being said with respect to the

11:23 2  Superman termination interest?

11:23 3      A   Well, at some point in this meeting we made a

11:23 4  proposal on behalf of the Siegel interest in respect to

11:23 5  the Superman termination interest.

11:23 6      Q   And was that proposal made orally or in writing?

11:23 7      A   Orally, as I recall.

11:23 8      Q   To the best of your recollection and as

11:23 9  specifically as your recollection will permit, what was

11:23 10  that proposal?

11:24 11      A   I do not recall all of the components of that

11:24 12  proposal.  I recall that it had a large payment up front,

11:24 13  something on the order of $10 million, and a 50 percent

11:24 14  interest in DC Comics' revenues arising from -- DC

11:24 15  Comics' worldwide revenues arising from the exploitation

11:24 16  of the Superman property.

11:24 17      Q   Any other aspect of that proposal that you can

11:24 18  recall?

11:25 19      A   Actually, there was some element that there

11:25 20  would be a grant of rights for some period of exclusivity

11:25 21  but not in perpetuity and that there would be for -- to

11:25 22  extend the exclusivity period, there would be further

11:25 23  payments.

11:25 24      Q   Anything else you can remember about the

11:25 25  proposal?

48

```
11:25 1        A    I think there was a discussion about the Siegels

11:25 2   being fully indemnified.  We covered an errors and

11:25 3   omissions insurance.  There was discussion about coverage

11:25 4   of the Siegel family members, medical and dental

11:25 5   coverage.  And there may have been -- well, I think there

11:26 6   was also discussion about annual payments as well.

11:26 7        Q    Any discussion at that point in time as to

11:26 8   whether the annual payments would be recoupable,

11:26 9   refundable?  Did you get into that degree of detail?

11:26 10       A    I believe in our opening offer, the annual

11:26 11  payments would be non-recoupable.  I believe they were

11:26 12  also -- preceding our involvement, DC's proposal had

11:27 13  involved a royalty arising -- a royalty on revenues

11:27 14  stemming from media and licensing by DC Comics and also

11:27 15  publications, and I believe our proposal also dealt

11:27 16  separately with media and licensing as well as

11:27 17  publications.

11:27 18       Q    Who do you recall first responding to that offer

11:27 19  among the various representatives of DC?

11:27 20            MR. MARMARO:  The precise question is who spoke

11:27 21  first on the DC side?

11:27 22            THE WITNESS:  I don't recall.

11:27 23  BY MR. BERGMAN:

11:27 24       Q    Okay.  What do you recall Mr. Schulman

11:28 25  responding to the offer you've just discussed?
```

49

A    I don't recall the words, but the sense of the

response was that the proposal was greeted sourly.

Q    While I understand that general description, did

Mr. Schulman address, for example, the $10 million

upfront payment?

A    The -- I don't recall Mr. Schulman or anyone

else dissecting the proposal.  The substance of the

response from John, and Paul Levitz and Carol Simkin may

have joined, was this is too much.

Q    Was there any response from the DC

representatives concerning the proposed 50 percent

interest in DC Comics' revenues?

A    As I said, it would be the same answer:  I don't

recall a dissection of a proposal.  I do recall generally

that they -- that the view was this was too much in all

respects.

Q    Okay.

A    More in most respects.

Q    Was there any specific response to the request

that the interest would be in DC Comics' worldwide

revenues?

A    I don't think there was any push back on that.

Q    While I appreciate your testimony about the lack

of dissection, do you recall any DC representative

addressing any specific aspect of the proposal that you

50

| | |
|---|---|
| 11:30 1 | and Mr. Ramer advanced that day? |
| 11:30 2 | MR. MARMARO: Can I have that question read |
| 11:30 3 | back, please. |
| 11:30 4 | (Question read.) |
| 11:31 5 | MR. MARMARO: Addressing in what respect? It's |
| 11:31 6 | vague. Commenting on that one -- |
| 11:31 7 | MR. BERGMAN: Commenting upon it, agreeing, |
| 11:31 8 | disagreeing. |
| 11:31 9 | MR. MARMARO: You can answer. |
| 11:31 10 | THE WITNESS: I don't recall. |
| 11:31 11 | BY MR. BERGMAN: |
| 11:31 12 | Q   Okay.  Other than what you've testified to, do |
| 11:31 13 | you recall any other subjects that were discussed at this |
| 11:31 14 | first meeting? |
| 11:31 15 | A   I think the meeting ended with, if you will, a |
| 11:31 16 | next steps conversation, which is I think John saying, |
| 11:31 17 | "We will discuss this among ourselves, amongst ourselves, |
| 11:32 18 | and get back to you." |
| 11:32 19 | Q   Okay. |
| 11:32 20 | Off the record. |
| 11:32 21 | (Recess.) |
| 11:37 22 | MR. BERGMAN:  Mr. Coleman, would you mark as |
| 11:37 23 | Exhibit 8, I believe, a document consisting of pages 0499 |
| 11:37 24 | through 0504. |
| 11:37 25 | (Deposition Exhibit 8 marked.) |

51

(

BY MR. BERGMAN:

    Q   Do you recall seeing this letter before,
Mr. Marks?

    A   Yes.

    Q   And during the course of your description of the
July meeting with Mr. Schulman, you referred to an
earlier offer, I believe, and did that reference refer to
the offer contained in Exhibit 8?

    A   In part.

    Q   To your knowledge had that offer been changed in
any way from the time it was advanced to Mr. Levine in
October '97 until the time of your July '99 meeting?

    A   This is an offer advanced to Joanne and Laura
Siegel Larson.

    Q   I see.

    A   But subject to that correction, if you will, I
was not aware of any different proposal by DC Comics.

    MR. BERGMAN:  Would you mark as Exhibit 9,
please, a letter dated September 13, 1999, Bates stamped
GTRB 20 and 21.

    (Deposition Exhibit 9 marked.)

BY MR. BERGMAN:

    Q   You're not shown as receiving a copy of this
letter, Mr. Marks, but do you in fact recall receiving a
copy on or about the date it bears?

| | |
|---|---|
| 11:40 1 | A   Yes. |
| 11:40 2 | Q   Had there been any communication between you and |
| 11:40 3 | Mr. Schulman in the two months intervening since the July |
| 11:40 4 | meeting concerning this matter? |
| 11:40 5 | A   I don't recall. |
| 11:40 6 | Q   To your knowledge were there any communications |
| 11:40 7 | that Mr. Ramer had with Mr. Schulman during that |
| 11:40 8 | intervening period of time? |
| 11:40 9 | A   I think so. |
| 11:40 10 | May I reference a prior exhibit? |
| 11:40 11 | Q   Certainly, sir. |
| 11:41 12 | A   Documents GTRB 0627 through 0633 represent |
| 11:41 13 | excerpts from phone logs which appear to be |
| 11:42 14 | communications or attempted communications between Bruce |
| 11:42 15 | Ramer and John Schulman. |
| 11:42 16 | Q   In the second paragraph of paragraph 9 -- of |
| 11:42 17 | Exhibit 9, Mr. Schulman makes reference -- the quote is, |
| 11:42 18 | quote, "First, we find your offer, both as I commented to |
| 11:42 19 | you at the meeting and as you recognized in our recent |
| 11:42 20 | discussion, far off what we would find acceptable," close |
| 11:42 21 | quote. |
| 11:42 22 | Did you participate in what Mr. Schulman refers |
| 11:42 23 | to as, quote, "our recent discussion"? |
| 11:42 24 | A   Not that I recall. |
| 11:42 25 | Q   To your recollection did Mr. Ramer convey to you |

53

11:42 1 anything that Mr. Schulman had said during that

11:43 2 conversation?

11:43 3      MR. MARMARO: I'm going to object to the

11:43 4 question as calling for the witness to divulge attorney-

11:43 5 client and attorney work product communications and

11:43 6 instruct on that basis.

11:43 7      (Instruction not to answer.)

11:43 8 BY MR. BERGMAN:

11:43 9    Q  Limiting yourself, Mr. Marks, to anything that

11:43 10 Mr. Ramer told you he had been told by Mr. Schulman

11:43 11 during that discussion, do you recall any such comments

11:43 12 that Mr. Schulman made?

11:43 13    A  When you say "any," any comments --

11:43 14    Q  Yes.

11:43 15    A  -- or any such comments?

11:43 16    Q  What I'm asking you is, did Mr. Ramer tell you

11:43 17 anything that Mr. Schulman told Mr. Ramer during the,

11:43 18 quote, "recent discussion" referred to in this document?

11:44 19    A  I believe so.

11:44 20    Q  Okay. And what was that, sir?

11:44 21      THE WITNESS: May I say?

11:44 22      MR. MARMARO: Unless Mr. Toberoff has an

11:44 23 objection and subject to our stipulation that no one

11:44 24 answer will waive the -- be used as an argument to waive

11:44 25 any other subject matter or any other question.

MR. BERGMAN:  Yes, that does continue to be our

stipulation.  And will be.

MR. MARMARO:  You can answer.

THE WITNESS:  "We'll get back to you after Labor

Day."

BY MR. BERGMAN:

Q   In the third paragraph of Exhibit 9, there is

contained the statement, quote, "...I invite you to meet

and/or send Kevin and/or others of your colleagues to

visit and/or consult with Paul Levitz and appropriate

designees in New York," close quote.

Did there come a time when Mr. Ramer or yourself

took advantage of that invitation and met with Mr. Levitz

and others in New York?

A   Yes.

Q   Do you recall approximately how long after

September 1999 that meeting occurred?

A   The New York meeting?

Q   Yes.

A   It was certainly 2000, I think, midyear 2000

approximately.

Q   Okay.  And in the last paragraph of Exhibit 9,

Mr. Schulman states that he renews his request "that you

let us know the priority your clients attach to each of

the elements of compensation or benefits under

11:46 1  negotiation."

11:46 2          Did there come a time when you prioritized any

11:46 3  elements of your proposal concerning the Superman

11:46 4  interest?

11:46 5      A    Not that I recall.

11:46 6      Q    Okay.  There were, however, were there not,

11:46 7  certain elements of the proposal that were more important

11:46 8  than others.

11:46 9          Correct?

11:4610          MR. MARMARO:  Well, to the extent he

11:4611  communicated that to a third party, I'd let Mr. Marks

11:4612  answer.  To the extent your question -- and as phrased I

11:4613  think it does -- calls for Mr. Marks to divulge attorney-

11:4614  client protected communications, I would object and

11:4615  instruct.

11:4616          (Instruction not to answer.)

11:4617  BY MR. BERGMAN:

11:4618      Q    Okay.  In any of the subsequent meetings and

11:4619  conversations which you participated in with DC

11:4720  representatives, did you express to them that certain of

11:4721  the elements of your proposal or your then-existing

11:4722  proposals were more important than others?

11:4723      A    I don't recall doing that.

11:4724      Q    Without telling me what they were, is it

11:4725  accurate to say that there were certain aspects that were

                                                              56

11:47 1  more important to the Siegel interests than others?

11:47 2       MR. MARMARO:  I think that question calls for

11:47 3  divulging attorney-client information and information

11:47 4  protected by the attorney-client privilege, and I'll

11:47 5  object and instruct on that basis.

11:47 6       (Instruction not to answer.)

11:47 7  BY MR. BERGMAN:

11:47 8    Q   Okay.  What element of the proposals that were

11:47 9  advanced by you and Mr. Ramer on behalf of the

11:47 10 termination interest were given the most attention and

11:48 11 negotiation in your various discussions with the DC

11:48 12 representatives?

11:48 13      MR. MARMARO:  That question is vague and

11:48 14 ambiguous, and I'd like you to clarify it.

11:48 15      MR. BERGMAN:  Okay.

11:48 16   Q   In your discussions with the DC representatives,

11:48 17 did you devote more time and attention to discussions of

11:48 18 the advance payments than you did to the credit to be

11:48 19 afforded to the Siegel family?

11:48 20      MR. TOBEROFF:  Lacks foundation.

11:48 21      MR. MARMARO:  It's also vague and ambiguous.

11:49 22      THE WITNESS:  To answer that specific question,

11:49 23 I think that at an earlier point in time there was an

11:49 24 understanding or an acceptable position on credit, if you

11:49 25 will, source credit to Jerry Siegel and Joe Shuster.  At

                                                              57

that time because of that, there did not need to be

11:49 2 further discussion. It was a very important point, but

11:49 3 that point seems to have been resolved. But at that

11:49 4 point of time there were still open points on other

11:49 5 things, so discussion continued on other things.

11:49 6 So the answer to the question is really a

11:49 7 function on where on the timeline did something appear to

11:50 8 get resolved, because that tells you how much time, but

11:50 9 it doesn't necessarily tell you how important the point

11:50 10 was.

11:50 11 MR. BERGMAN: Okay. I...

11:50 12 Would you mark as Exhibit 10 a letter dated

11:50 13 September 28, 1999, Bates stamped GTRB 26 through 28.

11:50 14 (Deposition Exhibit 10 marked.)

11:51 15 BY MR. BERGMAN:

11:51 16 Q  Do you recall receiving a copy of Exhibit 10,

11:51 17 Mr. Marks?

11:51 18 A  Yes.

11:51 19 Q  Following this letter, did Mr. Schulman confirm,

11:51 20 as you requested in the second sentence, that DC Comics

11:51 21 would make available its books and records relating to

11:51 22 Superman income?

11:51 23 A  Not to my knowledge.

11:51 24 Q  Did DC at any time during the course of the

11:52 25 negotiations make such records available to you?

58

A    DC at no time opened up its books and records,

if you will, but I recall at some point they provided

some summary information.

     Q    Do you recall what that summary information

consisted of?

     A    I believe revenues for prior years, for one or

more prior years.

     MR. BERGMAN:  Would you mark as Exhibit 11 a

letter dated November 3, 1999, GTRB 31 and 32.

     (Deposition Exhibit 11 marked.)

BY MR. BERGMAN:

     Q    Do you recall sending this letter, sir?

     A    Yes.

     Q    In the second sentence you state, quote, "I

understand that you will be providing us with five years

of financial information in respect of the exploitation

of the 'Superman' property."

     From whom did you obtain that understanding?

     A    I don't recall.

     Q    Do you recall the November 17 meeting that is --

first of all, did the meeting referred to in this letter

take place on November 17?

     A    There was a meeting in this time period.  I'm

not sure of the date, but there was a -- what would be

the second meeting.

59

Q   And could you tell me where you recall that

11:55 2   second meeting occurring?

11:55 3     A   At Warner Bros.

11:55 4     Q   Okay.  And who do you recall being in

11:55 5   attendance?

11:55 6     A   In addition to myself, Don Bulson, I believe,

11:55 7   Paul Levitz, John Schulman, and I believe Carol Simkin.

11:55 8     Q   How do you recall that meeting beginning?

11:55 9     A   With introductions and pleasantries.

11:55 10     Q   Okay.  But putting aside the pleasantries, what

11:55 11   do you recall as the first substantive subject that was

11:55 12   discussed?

11:55 13     A   I don't have a recollection of what the first

11:55 14   substantive subject was.

11:56 15     Q   Then would you tell me what subjects you do

11:56 16   recall being discussed at that November 17 meeting?

11:56 17     MR. MARMARO:  Well, the implication of your

11:56 18   question was that he didn't have a recollection.  He told

11:56 19   you he didn't remember the precisely first substantive

11:56 20   discussion.

11:56 21     MR. BERGMAN:  I understood that.

11:56 22     THE WITNESS:  Yes.  Yes, I recall that Paul

11:56 23   Levitz brought props, and that is to say examples of

11:56 24   Superman licensed product which he wanted to show as

11:56 25   exemplars of the type of licensing that DC Comics did,

11:57 1 and using some of those items as springboards, Paul and

11:57 2 Carol Simkin began to make arguments as to why there are

11:57 3 factors that were designed to whittle down the proposal

11:57 4 we made as to what the Siegels' share of DC Comics'

11:57 5 revenues should be.

11:57 6 BY MR. BERGMAN:

11:57 7    Q   Okay.  And what factors do you recall them

11:57 8 listing or speaking of in that regard?

11:57 9    A   Yes.  They talked about the trademark, and they

11:5710 said that the "S" that everybody recognizes as emblazoned

11:5811 on Superman's chest is a DC Comics trademark, and some

11:5812 portion of their merchandise is -- that is the indicia

11:5813 for the licensed material on the merchandise, including

11:5814 apparel and the like.

11:5815      I also recall -- now, this is -- is the question

11:5816 what they said?

11:5817    Q   Yes.

11:5818    A   Okay.  I recall a discussion also about DC

11:5819 Comics contributing in very substantial fashion to the

11:5820 development of the Superman character in adding many

11:5921 elements over the years that are or were -- reflected

11:5922 added material to the original Superman character as

11:5923 first embodied in Action Comics No. 1.

11:5924    Q   Okay.

11:5925    A   I further recall there being a discussion about

61

11:59 1 foreign revenues and -- from the property and Warner

11:59 2 Bros. and DC Comics taking the position that under U.S.

11:59 3 copyright law, in no circumstance would the Siegels be

11:59 4 entitled to revenues from the exploitation of the

12:00 5 property in any country outside the United States.

12:00 6 Q    Okay.  Any other factor that you can recall them

12:00 7 addressing with respect to the diminished value of the

12:00 8 Superman termination interest?

12:00 9 A    Well, I think it was noted, of course, that

12:0010 because Superman was jointly created by Jerry Siegel and

12:0011 Joe Shuster and that we were representing the Siegel

12:0012 interest alone, as I alluded to earlier, that DC Comics

12:0013 maintained, if you will, the ownership of the Shuster

12:0114 interest, which was a factor too.

12:0115 Q    With respect to the statements made by the DC

12:0116 representatives concerning the trademark, did you or

12:0117 Mr. Bulson have any response to that or state anything

12:0118 with respect to that issue?

12:0119 A    I did.

12:0120 Q    If so, what?

12:0121 A    I recall saying, "Look at Action Comics No. 1.

12:0122 That's where the trademark is.  That's where it's from.

12:0123 The "S" that you're saying is so valuable is in Action

12:0124 Comics No. 1."

12:0125 Q    Has it always been your understanding that that

62

was the first appearance of the "S" in a crest, that is,

12:01 2  in Action Comics No. 1?

12:02 3      A   I'm not sure that I understand the question.

12:02 4  Could you please rephrase it?

12:02 5      Q   Yes.  Was it then your understanding that the

12:02 6  very first public appearance of the "S" in a crest that

12:02 7  we've all come to associate with Superman appeared in

12:02 8  Action Comics No. 1?

12:02 9          MR. TOBEROFF:  I believe that's privileged.

12:0210          MR. MARMARO:  Then I will instruct him not to

12:0211  answer.  I'll object and instruct him not to answer.

12:0212          (Instruction not to answer.)

12:0213          MR. BERGMAN:  On work product?

12:0214          MR. TOBEROFF:  It's work product.

12:0215          MR. MARMARO:  On attorney-client, attorney work

12:0216  product privilege grounds, what his understanding is and

12:0217  how he obtained it.

12:0218  BY MR. BERGMAN:

12:0219      Q   Did you in fact express at that meeting in

12:0220  substance that the "S" in a crest first appeared in

12:0221  Action Comics No. 1?

12:0322      A   I don't recall whether I said it first appeared,

12:0323  but I said it certainly appeared.

12:0324      Q   Okay.

12:0325      A   I do recall that "Superman," the word

63

12:03 1 S U P E R M A N, had appeared in distinctive, fanciful

12:03 2 format, and I observed I believe at that meeting that

12:03 3 that is also found in Action Comics No. 1.

12:03 4     Q   Did you state at that meeting whether that

12:03 5 fanciful depiction of the "Superman" name first appeared

12:04 6 in Action Comics No. 1?

12:04 7     A   I don't recall.

12:04 8     Q   Okay.  The issue that you described the DC

12:04 9 representatives addressing, that is, the development of

12:04 10 the Superman character over the years, that came to be

12:04 11 addressed by a shorthand reference called, quote,

12:04 12 "apportionment," close quote.

12:04 13       Correct?

12:04 14       MR. MARMARO:  At the meeting?

12:04 15       MR. BERGMAN:  No.  In subsequent communications

12:04 16 between the parties.

12:04 17       THE WITNESS:  Yes, there is a -- there would

12:04 18 come to be an exchange of letters between Carol Simkin

12:04 19 and myself, and we addressed that as the "apportionment

12:04 20 issue."  I'm not sure that we used that shorthand at the

12:04 21 meeting.

12:04 22 BY MR. BERGMAN:

12:04 23     Q   Okay.  Do you recall any additional substantive

12:05 24 matters that were discussed at the November 17 meeting?

12:05 25     A   Yes.

64

Q   What were they, sir?

A   Well, I do recall my response to the DC position

on what you've described as the "apportionment issue."

Q   Okay.  And could you tell us to the best of your

recollection what you said in that respect?

A   I recall saying that the core elements of

Superman both in terms of the look and, if you will, the

story and the value of the character are all in Action

Comics No. 1, so I pointed to a person -- or a character

or hero with superhuman strength, a character who fights

for justice, a character who has a cape, a character who

has an "S," a character who has an alter ego of a

newspaper reporter called Clark Kent who reports to an

editor, a character who has an affection for a certain

character named Lois, and I believe the back story of

having come from another planet.

Then I specifically do recall saying, among

other things, in Action Comics No. 1 he flies, and Paul

said -- either Paul or Carol or Beth said, "No, he

doesn't," and in Action Comics No. 1 it looks to me as he

flies over a 20-story building that he is flying, and I

remember DC Comics in very excited -- or the

representatives, I'm sorry, Carol or Paul or both,

saying, "Actually, he doesn't fly till later.  He's not

flying.  He's leaping."  I recall that discussion.

                                                              65

```
12:07 1      Q    Do you recall anything that you expressed at the

12:07 2    November 17th meeting concerning the foreign revenue

12:07 3    issue?

12:07 4      A    Yes.

12:07 5      Q    And what was that, sir?

12:07 6      A    I do recall saying that I did not agree with

12:08 7    their analysis that under no circumstance would the

12:08 8    holder of the termination interest or -- well, the holder

12:08 9    of this termination interest not be entitled to foreign

12:0810    revenues and that I believed under the copyright law

12:0811    there were certainly circumstances where for goods

12:0812    developed and produced in the United States and where the

12:0813    overall activity in connection with the development,

12:0814    production and marketing of a good takes place in the

12:0815    United States, that that entitles in those circumstances

12:0816    foreign revenues would attach to those goods and ought to

12:0817    be considered in the revenue stream.

12:0918    Q    Did Miss Simkin have a response to that?

12:0919    A    You're right, the dialogue on that point was

12:0920   mostly between myself and Carol Simkin, and Miss Simkin

12:0921   disagreed.

12:0922    Q    Do you recall anything else that you haven't

12:0923   responded to my prior questions regarding anything else

12:0924   that was said at that meeting?

12:0925    A    I think that at that meeting we felt that there
```

66

was a sense in the room that the foreign revenue issue

was important and that, if you will, the parties -- we

would go back and each prepare letters, memoranda

outlining our positions so that each side better

understood what the other's point of view was.

    Q   Aside from that point, was there any discussion

as to what would next happen in the process of

negotiation?

    A   I think the next step may have been the letters

on the foreign revenue issue.

       Well, if I can amend my answer --

    Q   Sure.

    A   -- a bit, it was either that we would have

letters on the issue or that at least I would continue a

discussion with Carol Simkin on this issue.  I'm not

certain that at that meeting we decided that we would

prepare letters, but we were going to continue the

discussion.

    Q   Okay.

       I'll ask the reporter to mark as Exhibit 12 a

fax transmission of a January 6, 2000 letter, Bates

stamped GTRB 33 through 42.

       (Deposition Exhibit 12 marked.)

BY MR. BERGMAN:

    Q   Do you recall receiving this letter, Mr. Marks?

| | |
|---|---|
| 12:12 1 | A    Yes. |
| 12:12 2 | Q    Am I correct that this is the letter that |
| 12:12 3 | addressed the two issues of the foreign revenues and the |
| 12:12 4 | apportionment issue? |
| 12:12 5 | A    This is the letter from Carol Simkin on that |
| 12:12 6 | issue -- on those issues. |
| 12:13 7 | MR. BERGMAN:  Would you mark as Exhibit 13 a |
| 12:13 8 | letter to Miss Simkin from Mr. Marks, Bates stamped 0043 |
| 12:13 9 | through 56. |
| 12:13 10 | (Deposition Exhibit 13 marked.) |
| 12:13 11 | BY MR. BERGMAN: |
| 12:13 12 | Q    Do you recall writing that letter, Mr. Marks? |
| 12:13 13 | A    Yes. |
| 12:13 14 | Q    And once again am I correct that this letter |
| 12:14 15 | addressed itself to the foreign revenue and apportionment |
| 12:14 16 | issues? |
| 12:14 17 | A    That is correct. |
| 12:14 18 | Q    Okay.  Did you draft this letter? |
| 12:14 19 | MR. MARMARO:  That may invade the attorney work |
| 12:14 20 | product privilege, so I'm going to object and instruct on |
| 12:14 21 | that basis. |
| 12:14 22 | (Instruction not to answer.) |
| 12:14 23 | BY MR. BERGMAN: |
| 12:14 24 | Q    Did any attorney other than yourself participate |
| 12:14 25 | in the preparation of Exhibit 13? |

68

MR. MARMARO:  Same objection.  Same instruction.

THE WITNESS:  Can I ask a quick question off the

record of counsel?

MR. MARMARO:  Sure.

MR. BERGMAN:  Of course.

(Recess.)

MR. MARMARO:  I'm going to withdraw my objection

to the last question and allow the witness to answer,

subject to Mr. Toberoff's agreement that that's okay.

MR. BERGMAN:  Fine.

MR. TOBEROFF:  It's okay.

THE WITNESS:  And I take it subject to the

agreement that it's not a waiver of any other privilege?

BY MR. BERGMAN:

Q    It's going to continue throughout our entire

deposition.

A    I was the only attorney who wrote and

participated in the writing of this letter.

Q    Okay.  Do you recall, Mr. Marks, that the next

meeting between the parties occurred on January 19th of

2000?

A    I don't have a specific recollection as to any

date.

Q    Okay.  Do you recall what was the next meeting

that the parties had following the November 17, 1999

                                                          69

| | | |
|---|---|---|
| 12:16 1 | meeting? |
| 12:17 2 | A    I think I had -- I may have had a meeting with |
| 12:17 3 | Carol Simkin on these issues during the time frame of the |
| 12:17 4 | exchange of letters on the subject of the letters. |
| 12:17 5 | Q    Okay.  Do you recall where that meeting took |
| 12:17 6 | place? |
| 12:17 7 | A    No. |
| 12:17 8 | Q    And bearing in mind that Exhibit 13, which was |
| 12:17 9 | your response on these two issues, is dated March 7, |
| 12:17 10 | 2000, do you have any recollection of when after that |
| 12:18 11 | date this meeting with Miss Simkin may have occurred? |
| 12:18 12 | A    It may have occurred before. |
| 12:18 13 | Q    Before? |
| 12:18 14 | A    Yeah. |
| 12:18 15 | Q    I see. |
| 12:18 16 | A    This letter may have grown out of that meeting |
| 12:18 17 | or communication. |
| 12:18 18 | Q    I see. |
| 12:18 19 |      And was that meeting between just you and |
| 12:18 20 | Miss Simkin? |
| 12:18 21 | A    I don't have a strong recollection of the |
| 12:18 22 | meeting. |
| 12:18 23 | Q    Okay.  Aside from the fact that the meeting |
| 12:18 24 | discussed the issues addressed in exhibits 12 and 13, do |
| 12:18 25 | you recall anything else being discussed at that meeting |

70

that you had with Miss Simkin?

MR. MARMARO:  Any other subjects?

MR. BERGMAN:  Any other subjects.

THE WITNESS:  I don't, although I know there was

not a counterproposal.

BY MR. BERGMAN:

Q    A counterproposal by who, sir?

A    DC Comics/Time Warner.

Q    Subsequent to the meeting that you had with

Miss Simkin that you've just testified to, what is the

next meeting between representatives of DC and the

termination interest that you can recall?

A    The next meeting I recall is a meeting in New

York at DC Comics' offices.

Q    And do you recall approximately when that

meeting took place?

A    I would say summer 2000.

Q    Could you refer, please, to Exhibit 2 and, in

particular, the page Bates stamped 509.

A    Okay.

Q    There appears to be a reference to a January 19,

2000 Siegel meeting.

Do you see that, sir?

A    Yes.

Q    To the best of your recollection, was that the

                                                          71

meeting in New York --

12:21 2     A   No.

12:21 3     Q  -- or was it some other meeting?

12:21 4     A   No.

12:21 5     Q   Was that the meeting with Miss Simkin?

12:21 6     A   I believe so.

12:21 7     Q   And if you would turn the page to 510, there is

12:21 8 an indication of an April 27 meeting at DC Comics.

12:21 9       Is that the New York meeting --

12:2110    A   Yes, it is.

12:2111    Q  -- that you referred to?

12:2112    A   Yes, it is.

12:2113      MR. TOBEROFF:  What page is that on?

12:2114      MR. BERGMAN:  That is 510, Mr. Toberoff.

12:2115      MR. MARMARO:  510.

12:2116      THE WITNESS:  Yes, this meeting -- reviewing my

12:2117 desk calendar refreshes my recollection that the meeting

12:2118 at DC Comics was April 27, 2000.

12:2119 BY MR. BERGMAN:

12:2120    Q   Aside from the meeting that you've testified to

12:2121 with Miss Simkin, do you recall having any

12:2222 communications, whether by phone or otherwise, with any

12:2223 DC representative from the time of the prior multi-party

12:2224 meeting until this April 27 meeting in New York?

12:2225    A   I'm sorry.  Could you repeat the question?

72

12:22 1    Q   Yes.  You've previously testified to a meeting

12:22 2    that took place on November 17, 1999.  You've also spoken

12:22 3    about this meeting that you had with Miss Simkin.

12:22 4         Other than the meeting with Miss Simkin, do you

12:22 5    recall any communications from mid November 1999 until

12:22 6    April 27 with any representative of DC concerning the

12:22 7    termination interest?

12:22 8    A   Yes.

12:22 9    Q   And what communications do you recall during

12:23 10   that period?

12:23 11   A   I just recall communications that would have

12:23 12   made arrangements for having the meeting in New York that

12:23 13   we did.

12:23 14   Q   In other words, to the best of your recollection

12:23 15   there were no substantive communications between you and

12:23 16   DC during that period?

12:23 17   A   Not that I recall.

12:23 18   Q   Okay.

12:23 19   A   May we take another very short break?

12:23 20   Q   Certainly.

12:23 21        (Recess.)

12:27 22        MR. BERGMAN:  Back on the record.

12:27 23   Q   Before we get to the April 27 meeting, am I

12:27 24   correct that there came a point where the parties agreed

12:27 25   to execute a tolling agreement, given the passage of time

                                                              73

that was -- that had occurred since the termination

notices became effective?

A    Yes.

Q    And there was some negotiation back and forth

and letters exchanged between you and Miss Simkin

concerning the precise wording of that tolling agreement?

A    Yes, although I believe there was also

communications with Roger Zissu, and at some point in

this process I met Mr. Zissu.  Perhaps it was at the

January 2000 meeting that we talked about.  But yes,

there were some communications with Mr. Zissu.

Q    So that your recollection is that Mr. Zissu may

have been present at your meeting with Miss Simkin?

A    My recollection is I recall meeting him in

person at one point.

Q    Okay.  Who do you recall being present at the

April 27 meeting, sir?

A    In addition to myself, Don Bulson was there.

Paul Levitz was there.  I believe I saw Lillian Laserson.

And it was an all-day meeting, and at various parts of

the day different people from DC Comics came in, met with

us and made presentations.

Q    Okay.  And what types of presentations were

made?  I mean, are you referring to negotiations or

actual presentations of the character or what had been

74

| | |
|---|---|
| 12:30 1 | done with the character? |
| 12:30 2 | A    I am not referring to negotiations.  There were |
| 12:30 3 | presentations designed to give myself and, for that |
| 12:30 4 | matter, Mr. Bulson information that DC Comics wanted us |
| 12:31 5 | to have about, one, its role in monetizing the Superman |
| 12:31 6 | property and the different types of exploitation and the |
| 12:31 7 | development of the Superman character, among other |
| 12:31 8 | things, and there was also some analysis of the proposal |
| 12:31 9 | that we had made way back in our -- in the first meeting |
| 12:31 10 | we talked about.  But through all of that there was not a |
| 12:31 11 | counterproposal made by DC Comics. |
| 12:31 12 | Q    Okay.  Let's discuss for a moment what you've |
| 12:32 13 | characterized as the analysis of the proposal that you |
| 12:32 14 | had made.  Who made that analysis?  Who discussed that |
| 12:32 15 | subject? |
| 12:32 16 | A    I believe it was presented by Paul in a |
| 12:32 17 | PowerPoint presentation. |
| 12:32 18 | Q    And do you recall what aspects of the -- of your |
| 12:32 19 | prior proposal were addressed by Mr. Levitz in this |
| 12:32 20 | presentation? |
| 12:32 21 | A    Yes. |
| 12:32 22 | Q    Okay.  Could you identify what they were, sir? |
| 12:32 23 | A    Principally the royalty.  And principally the |
| 12:32 24 | media and merchandising royalty. |
| 12:33 25 | Q    And what do you recall Mr. Levitz saying or |

75

demonstrating with respect to that element?

12:33 2     A   I recall in general fashion that he argued that

12:33 3 our proposal was for a disproportionately large share of

12:33 4 the Superman revenues or the revenues generated by the

12:33 5 exploitation of the Superman property worldwide, and

12:33 6 picking up on themes that had been started at I believe

12:33 7 it was the meeting in the fall of 1999, our proposal did

12:33 8 not take into account in their view the lack of

12:34 9 entitlement to foreign revenues, did not take into

12:34 10 account that merchandising media in their mind were --

12:34 11 and certainly merchandise was driven by exploitation of

12:34 12 trademarks at least in part, which their position were

12:34 13 wholly owned by DC Comics, did not take into account the

12:34 14 very substantial contributions of the Superman character

12:34 15 and Superman comics by DC Comics over 60 years -- there

12:34 16 was a lot of discussion of that -- and did not take into

12:34 17 account the -- what DC Comics perceived was its right

12:35 18 entitlement to a share of revenues for all that DC Comics

12:35 19 did to manage and carefully exploit the property, and

12:35 20 that's something that Paul described as the licensor's

12:35 21 share.

12:35 22     Q   Do you recall any comments that you may have

12:35 23 made with respect to foreign revenue at that meeting?

12:35 24     A   I do.

12:35 25     Q   And what were they, sir?

76

| | |
|---|---|
| 12:35 1 | A    I do.  I recall an exchange with Paul on the |
| 12:35 2 | subject, and I believe I said that it was in the context |
| 12:36 3 | of the DC position being that the holder of the |
| 12:36 4 | termination interest would not be entitled to foreign |
| 12:36 5 | revenues at all, and I said, "Well, we've exchanged |
| 12:36 6 | letters with Carol Simkin, and I continue to believe that |
| 12:36 7 | in circumstances where DC Comics develops and manages a |
| 12:36 8 | property and exploits -- in the United States and |
| 12:36 9 | exploits it outside the United States, that revenues from |
| 12:36 10 | that exploitation are under the law attributable to the |
| 12:36 11 | acts in the United States and must be or ought to be |
| 12:36 12 | taken into account in valuing this interest," and I |
| 12:37 13 | recall Paul saying, "Well, you know, Carol disagrees, and |
| 12:37 14 | Carol's a great -- a fine lawyer who we rely on," and |
| 12:37 15 | then saying further, "If you're right, we'll just move |
| 12:37 16 | our offices out of the United States and offshore so we |
| 12:37 17 | don't have to pay you foreign revenues." |
| 12:37 18 | Q    Did you have any response to that? |
| 12:37 19 | A    I was dumbfounded.  I don't recall a response. |
| 12:37 20 | Q    Was that statement ever repeated during the |
| 12:37 21 | course of subsequent negotiations? |
| 12:37 22 | A    I don't recall. |
| 12:37 23 | Q    What, if anything, did you say during the course |
| 12:37 24 | of the meeting with respect to the apportionment element? |
| 12:38 25 | A    On the apportionment issue -- I need to back up |

77

a step.

    Q   Sure.

    A   Because before I get to what I said, I think I

need to put it in the context of what the presentation

was.

    Q   Okay.

    A   And it was an extensive presentation, including

showing a short movie that I think was -- had been

prepared for the 50th anniversary of Superman and then

descriptions as to, again, the development of the

Superman character, I think a reiteration that in their

view Superman doesn't fly in Action Comics No. 1 and how

different artists over a period of time had their own

takes on Superman.

    And so, for example, they presented different

renditions of Superman over the period.  I specifically

recall them mentioning an artist named Curt Shaw because

there was an American Express campaign with Jerry

Seinfeld and Superman, and they wanted to make the point

that Jerry Seinfeld wanted to do or would only do the

campaign with the Curt Shaw character because he was a

Superman aficionado, and he wanted the Curt Shaw version

of Superman in the commercial.

    And so there was a presentation of, if you will,

their view of iterations of the character, and I

78

| | |
|---|---|
| 12:40 1 | explained that with all these iterations, the core |
| 12:40 2 | elements are still in Action Comics No. 1, and I remember |
| 12:40 3 | making the point that for purposes of post-termination |
| 12:40 4 | works any embellishments that take place by other authors |
| 12:40 5 | or by DC Comics over the period of 60 years actually |
| 12:40 6 | don't count in the analysis because what you look at -- |
| 12:41 7 | or what you ought to properly look at is what is the |
| 12:41 8 | newly added material to the works from the date of the |
| 12:41 9 | effective terminations going forward. So that is to say, |
| 12:41 10 | if a comic book writer had created a villain in 1945, and |
| 12:41 11 | that villain has no appearance in post-termination works, |
| 12:41 12 | it's irrelevant. |
| 12:41 13 | So I made that point, and I recall Paul's |
| 12:41 14 | response. Paul's response was, "That may be right, but |
| 12:41 15 | the addition of elements over time in the past is a |
| 12:41 16 | predictor that there will be additional elements in the |
| 12:41 17 | future." |
| 12:41 18 | Q Okay. Can you recall any other subjects being |
| 12:42 19 | discussed at this April 27 meeting? |
| 12:42 20 | A Yes. |
| 12:42 21 | Q What were they, sir? |
| 12:42 22 | A I recall -- well, I recall a number of things, |
| 12:42 23 | albeit perhaps in fragments. I remember them saying that |
| 12:42 24 | the low point in the development of the Superman property |
| 12:42 25 | was a television project called Superpup. It was said |

79

12:42 1    with a sense of humor.

12:42 2         I recall there being discussion by Paul and I

12:43 3    believe Janet Kahn, who I understood to be editor in

12:43 4    chief or certainly a senior executive at DC Comics, about

12:43 5    DC Comics' role in development of motion pictures and

12:43 6    television programs based on Superman and how DC Comics

12:43 7    was very much involved in what was then an ongoing

12:43 8    process at Warner Bros. to come up with a new Superman

12:43 9    movie.

12:43 10        I recall a presentation about putting the

12:43 11   Superman character on various consumer products.  I

12:44 12   recall Kraft Macaroni, and they showed us the macaroni

12:44 13   box, and I also recall some discussion about licensing

12:44 14   Supercar in connection with NASCAR racing.

12:44 15        Q   Okay.  Any other subjects you can recall being

12:44 16   discussed?

12:44 17        A   Paul and others really said in substance that

12:44 18   they wanted us to understand and appreciate the approach

12:45 19   that DC Comics has had to exploiting Superman and the

12:45 20   great job that they thought they have done.

12:45 21        Q   Okay.  You indicated earlier, and I'm not

12:45 22   purporting to paraphrase your testimony, but this

12:45 23   negotiation, like most negotiations, goes forward

12:45 24   incrementally.  There are various points involved and

12:45 25   discussions.

                                                        80

Did this meeting in New York bring any aspect of

12:45 2  the negotiation closer, whether it was credit or the

12:45 3  widow's benefit or any of the elements that you were

12:45 4  discussing?  Was there any positive movement towards

12:45 5  resolution at that meeting of any of those points?

12:46 6        MR. MARMARO:  The question is vague and

12:46 7  ambiguous.  Compound also.

12:46 8        You can answer.

12:46 9        THE WITNESS:  Yes and no.

12:46 10  BY MR. BERGMAN:

12:46 11      Q    Okay.  Can you explain what you mean by that?

12:46 12      A    Yes.  The no part of it is there was no

12:46 13  counterproposal made by DC Comics and no discussion of

12:46 14  the elements made by DC Comics.  The yes of it was that I

12:46 15  think there was a sense that no proposal would be

12:46 16  forthcoming until we had a meeting with them in New York,

12:46 17  and so we had to touch that base in order for a proposal

12:46 18  to thereafter come.

12:47 19      Q    If you look at Exhibit 2, page 511 -- again,

12:47 20  this is the calendar -- it indicates a May 10 Siegel

12:47 21  meeting.

12:47 22        Do you recall that meeting?

12:47 23      A    This is 2000.

12:47 24        Correct?

12:47 25      Q    Yes, sir.

81

```
12:48 1        A    Just at this moment I don't recall what this

12:48 2    meeting is.

12:48 3        Q    Would it refresh your recollection if I gave you

12:48 4    my understanding, which is that this was a meeting

12:48 5    attended by John Schulman, Patrick Perkins, Carol Simkin,

12:48 6    yourself, Bruce Ramer and Don Bulson participating by

12:48 7    telephone?

12:48 8             MR. TOBEROFF:  Assumes facts not in evidence.

12:48 9             MR. MARMARO:  Is your question --

12:4810    BY MR. BERGMAN:

12:4911        Q    Does that group of attendees refresh your

12:4912    recollection as to there being such a meeting?

12:4913             MR. MARMARO:  Well, he didn't testify that he

12:4914    didn't recall a meeting with that group of attendees.

12:4915    You asked him whether there was a meeting on a specific

12:4916    date, which he didn't recall.  Those are different

12:4917    things.

12:4918             MR. BERGMAN:  Okay.  I'm not contradicting him

12:4919    or anything.

12:4920             MR. MARMARO:  So I guess what I'm saying is

12:4921    there is no foundation that his recollection needs to be

12:4922    refreshed as to a meeting with those participants.

12:4923    BY MR. BERGMAN:

12:4924        Q    Do you recall meeting with those individuals at

12:4925    some time in 2000?
```

82

**U.S. LEGAL SUPPORT**

12:49 1
12:49 2
12:49 3
12:49 4
12:49 5
12:50 6
12:50 7
12:50 8
12:50 9
12:5010
12:5011
12:5012
12:5013
12:5014
12:5015
12:5016
12:5017
12:5018
12:5019
12:5120
12:5121
12:5122
12:5123
12:5124
12:5125

A    I recall sometime following the New York

meeting, probably within a month, that there was a

meeting I believe at Warner Bros.  I do recall Mr. Bulson

participating by phone.  I must say I don't recall

Mr. Perkins being present.

Q    Okay.  Do you recall that at that meeting,

whatever may have been its date, that there were actual

proposals, albeit, you know, some more precise than

others, being made by each of the parties; that is, DC

made certain proposals on certain elements of the

problem, and you made certain proposals?

Do you recall that generally?

MR. TOBEROFF:  Compound and leading.

MR. MARMARO:  Agree.  Join.

You can answer to the extent that you understand

it.

THE WITNESS:  My recollection of the meeting was

that after the Siegels had made, you know, their offer

and proposal in 1999, summer 1999, we're now almost a

year later -- less than a year but almost a year later,

and we finally get a counterproposal from DC Comics.

That's what I recall, that there was a counterproposal

from DC Comics.

BY MR. BERGMAN:

Q    And could you tell me what you do recall of that

83

12:51 1
12:51 2
12:51 3
12:51 4
12:52 5
12:52 6
12:52 7
12:52 8
12:52 9
12:5210
12:5211
12:5212
12:5213
12:5214
12:5215
12:5316
12:5317
12:5318
12:5319
12:5320
12:5321
12:5322
12:5323
12:5424
12:5425

counterproposal?

A   I think it was a proposal that no longer included what we had called the Superman library, which were works up until the date of termination, the sort of the body of works, the 60 years that Paul Levitz and Janet Kahn, you know, so thoroughly and deeply described in our New York meeting.  They took revenues from those works off the table and made a proposal that was based on revenues from the Superman property on a going-forward basis, that is, from and after the date that the terminations became effective.

Q   Okay.  Do you recall any other elements of the proposal advanced by DC at that meeting?

A   Well, there was a royalty attached to the revenues from, if you will, the post -- the exploitation of the Superman property post-termination, and I think there was a escalating revenue scheme, but I don't remember what the details were.  And while I don't specifically recall it, I think there was -- a component of it was a continued royalty on publications as well.

Q   Anything else you can recall about what was proposed at that meeting by DC?

A   Well, I do believe it was a full response and would have included credit issues, would have said that there's a transfer of all rights, and consistent with the

84

| | |
|---|---|
| 12:54 1 | structure of the past -- the initial proposal by DC |
| 12:54 2 | Comics prior to our representation, I believe that there |
| 12:54 3 | may have been provision made for annual guaranteed |
| 12:54 4 | amounts. |
| 12:54 5 | Q   Anything else you can recall concerning the |
| 12:54 6 | proposal? |
| 12:54 7 | A   I'm reasonably certain there were more elements, |
| 12:54 8 | but that's the best I recall right now. |
| 12:55 9 | Q   Do you recall that DC -- DC's proposal included |
| 12:5510 | a complete regrant of the property as opposed to the |
| 12:5511 | concept of a license from the Siegel interest? |
| 12:5512 | A   Yes.  I thought I testified a moment ago that it |
| 12:5513 | would be a transfer of interest to DC Comics, yes. |
| 12:5514 | Q   Did the proposal contain the amount of the |
| 12:5515 | advances that would be offered by DC? |
| 12:5516 | A   I don't recall there being advances in the |
| 12:5517 | proposal. |
| 12:5518 | Q   There was a discussion, was there not, with |
| 12:5519 | respect to the proposal concerning certain safe harbors |
| 12:5620 | for intercompany arrangements? |
| 12:5621 | A   During the negotiation there was certainly |
| 12:5622 | discussion about intercompany arrangements, and while I |
| 12:5623 | don't specifically recall when and at what meeting that |
| 12:5624 | was discussed, I certainly do recall discussions on that |
| 12:5625 | subject. |

85

Q   Okay.  Am I correct that that was one element

12:56 2   that seemed to be accepted by both parties from almost

12:56 3   the beginning of the discussions?

12:56 4          MR. MARMARO:  Vague and ambiguous.

12:56 5          MR. TOBEROFF:  Leading and vague.

12:56 6   BY MR. BERGMAN:

12:56 7     Q   Was there any dispute that you can recall in the

12:57 8   meetings that you had with the DC representatives

12:57 9   concerning whether or not the agreement you were

12:5710   negotiating would contain certain safe harbors for

12:5711   intercompany arrangements?

12:5712          MR. MARMARO:  Vague --

12:5713          MR. TOBEROFF:  Vague and ambiguous.

12:5714          MR. MARMARO:  You can answer.

12:5715          THE WITNESS:  There -- on this point we

12:5716   identified a problem, which was, I think, a problem very

12:5717   much on people's minds throughout the entertainment

12:5718   industry, litigators and transactional lawyers alike,

12:5719   which is in intercompany dealings the concern that the

12:5720   licensor would license a property to a related licensee

12:5721   and not get full market value because ultimately the

12:5822   money stays in the company, and a lesser license fee

12:5823   means a lesser participation paid to the participants.

12:5824          And in response to that, someone on the DC

12:5825   Comics side or Warner Bros. side said, "Well, we do have

                                                          86

some indicia of fair market dealings," and they pointed

to the Salkind license for the Superman movie -- or the

Superman movies with Christopher Reeve; they pointed to

the "Lois and Clark" license; there was a discussion of

an animated television license with WBTV, which is a

related entity, but the terms were disclosed to us, and

there was a discussion of the arrangement with the Warner

Bros. licensing arm, which I think is called Licensing

Corporation of America, LCA, which took a 25 percent fee.

Those specific -- four specific instances were disclosed

to us.

We reviewed it and ultimately agreed that if

there is a license within those terms, that that license

would not be challenged as an unfair intercompany deal or

vertical integration. So we discussed and at some point

in this process agreed that we would treat those four,

but only those four, as the safe harbors for intercompany

dealings.

We also discussed and agreed earlier in the

process than at some later points that if there was a

transaction outside those safe harbors, that rather than

the Siegels suing, that we would agree on an expedited

dispute resolution procedure.

BY MR. BERGMAN:

Q    Okay.  Do you recall that the proposal

87

**U.S. LEGAL SUPPORT**

contained -- and I think you indicated that it was --

01:00 2  with respect to the royalty rate, was a graduated rate.

01:00 3  Do you recall that the proposal commenced with a

01:01 4  7 percent royalty up to I believe $7 million and then

01:01 5  graduated to 10 percent after a higher figure?

01:01 6  A  I don't recall the specifics, but -- and I think

01:01 7  there may have been more than one escalation point in the

01:01 8  proposal, but I do recall a proposal.  Whether it opened

01:01 9  at 7 percent or 7.5 percent or a lesser amount, I'm not

01:01 10  sure, and I do recall that -- at least having an

01:01 11  impression that it might be very difficult to reach the

01:01 12  escalated royalties.

01:02 13  Q  Okay.  Do you recall suggesting at this meeting

01:02 14  what you thought a reasonable range for the royalty would

01:02 15  be?

01:02 16  A  Well, I guess I have a question about that

01:02 17  because I don't know what royalty base you might be

01:02 18  referring to.

01:03 19  Q  Do you recall suggesting, and I'm not suggesting

01:03 20  what the base was, but do you recall suggesting a 17 to

01:03 21  24 percent royalty rate?

01:03 22  A  At this moment I don't have a specific

01:03 23  recollection of that.

01:03 24  Q  Okay.  Do you recall any other aspects of the DC

01:03 25  proposal that was advanced at this meeting other than

88

those that you've already testified to?

01:04 2      A    I do have a recollection, and it seems tied to

01:04 3 this meeting, of on a going-forward basis our thinking

01:04 4 about adding a new element to the discussions, which

01:04 5 would be bonuses triggered by the exploitation of

01:04 6 Superman in a major media work, and I recall John

01:05 7 being -- saying that he was open to that idea, and I

01:05 8 think we subsequently made a proposal that indeed

01:05 9 introduced that element to the discussions, but I think

01:0510 we had a discussion about that as a concept for purposes

01:0511 of the negotiations.

01:0512      Q    Okay.  Is there anything further, any other

01:0513 subject matters that you can recall being discussed at

01:0514 this meeting?

01:0515      A    Not at this moment.

01:0516      Q    Okay.  Was it your custom and practice at this

01:0517 point in time to make notes of what the person on the

01:0518 other side of the table was proposing?

01:0619      A    I -- I -- it was my usual practice to make notes

01:0620 when proposals are being made.

01:0621      Q    To your recollection did you prepare any notes

01:0622 of the proposal that was made at this meeting that we've

01:0623 just been discussing?

01:0624      A    I don't specifically recall.

01:0625      Q    Do you recall Mr. Ramer being present at this

01:06 1    meeting?

01:06 2         A    Only vaguely, but yes, but vaguely.

01:06 3              MR. BERGMAN:    Let's go off the record, if we

01:06 4    may.

01:06 5              MR. MARMARO:    Sure.

01:06 6              (Discussion held off the record.)

01:15 7              (Recess.)

01:15 8              MR. BERGMAN:    I am going to ask the reporter to

01:16 9    mark as Exhibit 14 a June 9, 2000 letter Bates stamped

01:1610    0124 through 129.

01:1611             (Deposition Exhibit 14 marked.)

01:1612    BY MR. BERGMAN:

01:1613        Q    The first question is whether you recall sending

01:1614    this letter, Mr. Marks.

01:1615        A    Yes, I do.

01:1616        Q    The reference to a conversation with

01:1617    Mr. Schulman moments ago, was that -- could you tell me

01:1618    why you can recall that being?

01:1719             MR. MARMARO:    The conversation?

01:1720             MR. BERGMAN:    Yes.

01:1721             THE WITNESS:    I believe it would have been a

01:1722    conversation outlining the proposal that's reflected in

01:1723    the attachment.

01:1724    BY MR. BERGMAN:

01:1725        Q    And did you and Mr. Schulman during that

                                                                    90

01:17 1   conversation actually discuss the terms contained in the

01:17 2   proposal, or was it more a call saying you're going to be

01:17 3   getting a letter containing our counter?

01:17 4        A   I think as a courtesy, I would have said, "I'm

01:17 5   sending you a letter," but I certainly would not be

01:17 6   surprised if in the call I outlined the proposal in full

01:17 7   or in large part and said, "I have it written.  I'll send

01:17 8   it to you."

01:17 9        Q   Do you have any recollection as you sit here of

01:1710   any comments that Mr. Schulman may have made to you

01:1711   concerning any of these proposals before he actually

01:1712   received the letter?

01:1813        MR. MARMARO:  Can you read that back to me,

01:1814   please?  I missed one word of it.

01:1815        (Question read.)

01:1816        MR. MARMARO:  You mean --

01:1817        MR. BERGMAN:  In other words, during the phone

01:1818   conversation.

01:1819        MR. MARMARO:  You mean did make to him.

01:1820        MR. BERGMAN:  Yes.

01:1821        THE WITNESS:  I don't, but I don't believe the

01:1822   conversation was a negotiating session.  It was for me a

01:1823   presentation session and for John I believe at least in

01:1824   large part a receiving or listening call.

01:1825   BY MR. BERGMAN:

91

Q   Okay.  And it's denominated as a counteroffer.

Was it a counteroffer to the proposal made at the meeting

that we were discussing before our break?

A   Yes.

MR. BERGMAN:  Would you mark as Exhibit 15 a

letter dated July 18, 2000, Bates stamped GTRB 1 through

6.

(Deposition Exhibit 15 marked.)

BY MR. BERGMAN:

Q   Do you recall receiving a copy of Exhibit 15 on

or about its date, Mr. Marks?

A   Yes.

Q   And as Mr. Schulman indicates in his first

sentence, he's writing in response to the June 9

counterproposal.

Do you recall during the period from June 9 to

the date of Exhibit 15, the approximate month, having any

conversations with Mr. Schulman concerning the

counterproposal?

A   I have no recollections one way or the other

about conversations in this time period about the

counterproposal.

Q   Did you believe as of the date of this letter

that the parties were, at the very least, narrowing the

gaps between them on most of the issues?

                                                        92

01:22 1          MR. MARMARO:  I object to the question as

01:22 2    calling for Mr. Marks' internal subjective beliefs, which

01:22 3    would be work product.

01:22 4          MR. TOBEROFF:  I object as vague and ambiguous.

01:22 5          MR. MARMARO:  That too.  And instruct on that

01:22 6    basis.  Now, if you want to ask him questions about

01:22 7    whether he expressed opinions -- whether he expressed

01:22 8    views to the parties, that's perfectly fine.

01:22 9          (Instruction not to answer.)

01:2210          MR. BERGMAN:  Okay.

01:2211      Q   Did you after -- let me ask you this:  What do

01:2312    you recall being your next communication with

01:2313    Mr. Schulman following your receipt of Exhibit 15?

01:2314      A   Just at this moment I do not recall when the

01:2315    next communication is or what the substance of that

01:2316    communication was.

01:2417      Q   To your recollection did you respond in writing

01:2418    to the proposal advanced by Mr. Schulman in Exhibit 15?

01:2519      A   At some point I did have a written

01:2520    counterproposal to this, but just at this moment and

01:2521    without having my recollection refreshed, I don't know if

01:2522    that was the next counterproposal or conversation on the

01:2523    subject matter.

01:2524      Q   Okay.  Do you have -- what is your recollection

01:2525    as you sit here now, Mr. Marks, of what was your next

                                                              93

01:25 1   conversation with Mr. Schulman concerning this matter?

01:26 2        MR. MARMARO:  Just to be clear, the question is

01:26 3   exactly what you asked, which is what is his very next

01:26 4   conversation as opposed to -- so if he doesn't remember

01:26 5   exactly what the next conversation was, you don't want

01:26 6   him to testify --

01:26 7        MR. BERGMAN:  Okay.

01:26 8    Q   In the continuum of conversations, Mr. Marks,

01:26 9   and the letter writing and telephone calls, what do you

01:26 10  recall as next occurring after this July 18th, 2000

01:26 11  letter?

01:26 12    A   It might refresh my recollection if I could look

01:26 13  at the phone logs that we've identified earlier.

01:26 14    Q   Please do.  And you can look at them at any

01:26 15  point during the deposition that you want to.

01:28 16    A   I do recall discussion of two related matters, I

01:28 17  do recall the sequence of those matters, but my reviewing

01:28 18  the phone logs does not refresh my recollection as to how

01:28 19  those matters -- when those matters came up in relation

01:28 20  to this July 2000 date.

01:28 21    Q   Okay.  What are those two matters that come to

01:29 22  mind?

01:29 23    A   There came a time when Jerry Levine, who was the

01:29 24  president of I think what was AOL at the time, AOL Time

01:29 25  Warner, very graciously offered to advance the Siegels

94

01:29 1    $250,000, and there was some discussion with John and

01:29 2    with Carol Simkin and with Patrick Perkins about

01:29 3    documenting the release, if you will, of the $250,000.

01:29 4        Q    Okay.  Those are the two --

01:29 5        A    No.  That's one.

01:29 6        Q    Okay.

01:29 7        A    That's one.

01:29 8        Q    And what was the second?

01:30 9        A    The second, which was certainly after the first

01:3010    that I've just described and indeed some time after, is I

01:3011    do recall a conversation with John where he called and he

01:3012    said, "We have some litigation pending, and our New

01:3013    York -- in New York.  Our counsel suggested we would very

01:3014    much like a license from the Siegel family or a grant

01:3015    from the Siegel family for a one-year period, and we're

01:3016    prepared to pay you another -- or prepared to pay them

01:3017    another $250,000, and this offer is open for 36 hours."

01:3018        Q    Was that the Kryptonite matter?

01:3119        A    Yes, that was in connection with the Kryptonite

01:3120    matter, which my sense is after this, maybe even well

01:3121    after this.

01:3122        Q    But while we are on the subject, what was the

01:3123    nature of the license that Mr. Schulman requested?

01:3124        A    I think he asked for a one-year license on a no

01:3125    prejudice basis.  I think in this Kryptonite litigation,

                                                              95

the defendant was making an attack or attempting to

01:31 2 attack DC Comics' chain of title on its rights in --

01:32 3 copyright rights and/or trademark rights in the Superman

01:32 4 property and Kryptonite in particular, and so in

01:32 5 defending that attack the view was if we can quickly for

01:32 6 a limited period but without prejudice to the rest of the

01:32 7 deal get a one-year license, that would equip us to

01:32 8 dispose of this argument being made by the Kryptonite

01:32 9 people.

01:3210     Q   And was that license issued?

01:3211     A   No.

01:3212     Q   And did you in substance tell Mr. Schulman that

01:3213 you refused or declined to grant that license?

01:3214     A   I recall telling him that "If we grant a one-

01:3315 year license, all our discussions are going to grind to a

01:3316 halt for the next year. I don't think that's a very good

01:3317 idea for us," and I think John said, "Okay. Six months."

01:3318     Q   And what was your response to that?

01:3319     A   Ultimately, we did not grant any license for any

01:3320 period, but we did work out a different arrangement to

01:3321 try to assist DC Comics in its litigation in that

01:3322 Kryptonite case.

01:3323     Q   And what was the nature of that arrangement?

01:3324     A   We -- well, I believe it was with Mr. Perkins.

01:3425 We negotiated a short statement that was presented to the

96

01:34 1   court which said in substance and effect that the parties

01:34 2   are engaged in confidential negotiations, and the Siegel

01:34 3   family does not object to or, perhaps even stronger,

01:34 4   supports DC Comics in this litigation.  But there was no

01:34 5   license granted and no consideration exchanged.

01:34 6       Q   Okay.

01:34 7       Would you mark as Exhibit 16 a letter dated July

01:34 8   24, 2000, from Joanne Siegel to Gerald Levin which is

01:35 9   Bates stamped WB 005977 through 005981.

01:35 10       (Deposition Exhibit 16 marked.)

01:35 11   BY MR. BERGMAN:

01:35 12       Q   As you are reading it, Mr. Marks, my first

01:35 13   question is going to be whether you've ever seen this

01:35 14   letter before.

01:35 15       A   I need to look it over, please.

01:35 16       Q   Very well, sir.

01:37 17       A   I believe I saw this letter at some time.

01:37 18       Q   Do you believe that you saw it on or about July

01:37 19   24, 2000?

01:37 20       A   No.

01:37 21       Q   Had you prior to July 24, 2000, seen a draft of

01:37 22   this letter?

01:37 23       A   I think to answer that question might invade the

01:37 24   attorney-client privilege.

01:37 25       MR. MARMARO:  I'll object and instruct.

97

THE WITNESS:  Can I take 30 seconds?

MR. BERGMAN:  Certainly can.

(Recess.)

MR. MARMARO:  We can go back on record, and the

witness can answer the question.

THE WITNESS:  Subject to if Mr. Toberoff permits

me to answer the question.

MR. TOBEROFF:  I wouldn't like you to answer the

question as to (unintelligible).

THE REPORTER:  I can't hear you, Counsel.

MR. MARMARO:  The question was whether before

this date he saw a draft.  He's prepared to answer

whether he saw a draft of this agreement before it went

out, before this date.

MR. TOBEROFF:  Well, that divulges a...  I'll

allow it.

THE WITNESS:  No.

MR. BERGMAN:  Would you mark as Exhibit 17 a

letter dated July 26, 2000, Bates stamped GTRB 113 and

114.

(Deposition Exhibit 17 marked.)

BY MR. BERGMAN:

Q   Do you recall receiving a copy of this letter on

or about this date, Mr. Marks?

A   Yes.

                                                          98

01:40 1    Q   In the second sentence of the first paragraph,

01:40 2    Mr. Schulman states, quote, "We share your hope that the

01:40 3    Siegel family and DC Comics reach a settlement agreement

01:40 4    in the near term, an agreement which is in all of our

01:40 5    interests to reach."

01:41 6        Had you previously expressed to Mr. Schulman the

01:41 7    hope that the parties reach a settlement agreement?

01:41 8    A   I think the purposes of our discussions from the

01:41 9    outset were to see if we could come to an agreement that

01:41 10   would be acceptable to the Siegel family and acceptable

01:41 11   to DC Comics.

01:41 12   Q   And --

01:41 13   A   If I might say --

01:41 14   Q   Sure.

01:41 15   A   -- reading the first sentence of this letter

01:41 16   refreshes my recollection and helps answer maybe a

01:41 17   previous question, which is I think when John sent the

01:41 18   letter on July 18, we crossed letters in the mail, and I

01:41 19   think at that time I sent a letter nudging for a

01:42 20   response, if you will, and also making a reference to the

01:42 21   past weekend's box office performance, which I think was

01:42 22   in reference to a very strong opening of the movie X MEN,

01:42 23   which was also a comic book property.

01:42 24   Q   You're correct.

01:42 25   A   Okay.

99

MR. MARMARO:  Thank you.

01:42 2   BY MR. BERGMAN:

01:42 3       Q   In terms of the tenor of the negotiation,

01:42 4   Mr. Marks, would you agree that the parties were

01:42 5   conducting the negotiations in a cordial manner?

01:43 6           MR. MARMARO:  Vague and ambiguous.

01:43 7           THE WITNESS:  It's -- the question is really too

01:43 8   general to answer.  The tenor changed over the course of

01:43 9   the negotiation, and at some times the tenor changed

01:4310   phone call to phone call.

01:4311   BY MR. BERGMAN:

01:4312       Q   Did you ever in the course of this negotiation

01:4313   have a conversation with Mr. Schulman in which one of you

01:4314   abruptly terminated the conversation, hung up?

01:4315           MR. MARMARO:  Ever throughout the entire

01:4316   process?

01:4317           MR. BERGMAN:  Yes, sir.

01:4318           THE WITNESS:  Well, if the question is did John

01:4419   Schulman ever hang up on me, no, he did not, but I do

01:4420   recall a phone conversation where he said, "Okay, this

01:4421   negotiation's over," and that was an abrupt statement,

01:4422   and that did terminate the negotiations at least for the

01:4423   next 15 seconds.

01:4424   BY MR. BERGMAN:

01:4425       Q   And how did it resume?

                                                             100

01:44 1
01:44 2
01:44 3
01:44 4
01:44 5
01:45 6
01:45 7
01:45 8
01:45 9
01:4510
01:4511
01:4512
01:4513
01:4514
01:4515
01:4516
01:4517
01:4518
01:4519
01:4520
01:4521
01:4522
01:4523
01:4624
01:4625

    A    I think we continued to have a discussion.

    Q    In any of the meetings that you participated in, did anyone on either side act rudely or intemperately toward the other?

    A    No.  To go back to a question that you posed, I think the parties conducted themselves professionally and with courtesy.

    Q    And would you agree that both parties were conducting themselves in a way to facilitate rather than hinder reaching an agreement?

    MR. MARMARO:  That calls for speculation. You're asking him to read Time Warner's mind.

    MR. BERGMAN:  No.  Just to view their conduct.

    MR. TOBEROFF:  It's also --

    MR. MARMARO:  It's vague and ambiguous.

    MR. TOBEROFF:  -- vague and leading.

BY MR. BERGMAN:

    Q    Well, in terms of how the parties expressed themselves during meetings, did they do so in a manner that was designed to facilitate or hinder reaching an agreement?

    MR. MARMARO:  My problem with the question is the word "designed."  If you're -- he can't possibly know what was the design of the other side of the negotiation.

    MR. BERGMAN:  Okay.

101

Q    Looking to the objective manifestations of the

01:46 2    people who were negotiating this agreement, did those

01:46 3    manifestations hinder or encourage reaching an agreement?

01:46 4            MR. MARMARO:  Vague, ambiguous, speculation.

01:46 5            You can answer.

01:46 6            MR. TOBEROFF:  I concur in the objection.

01:46 7            THE WITNESS:  The -- I think I can answer it

01:46 8    this way:  In terms of the tone of the discussion and,

01:46 9    indeed, in statements made that I'll call in the nature

01:4610    of window dressing but not meaning to demean it, there

01:4711    were occasions where Paul and others were respectful of

01:4712    Jerry Siegel and did note and in fact went out of their

01:4713    way to note his very important contributions not only to

01:4714    the Superman character, but with a view that perhaps but

01:4715    for Jerry Siegel there would be no DC Comics at all, and

01:4716    there would be no comic book industry as we know it.  So

01:4717    they -- I can recall instances where I think they went to

01:4718    pains to make sure that over the course of this

01:4819    discussion we did not think that they were besmirching

01:4820    the contribution of Jerry Siegel to the Superman

01:4821    character.  Having said all that, I think ultimately what

01:4822    would advance or hinder the discussions were the

01:4823    substantive elements of the proposals.

01:4824    BY MR. BERGMAN:

01:4825        Q    At page -- the second page of Exhibit 17,

                                                                  102

Mr. Schulman makes reference to the fact that "...if
Joanne or her family are having any financial
difficulties...which we may be unaware of, please let me
know, and we will consider addressing the situation, as
we have in the past."

You made reference earlier to a $250,000
payment. Did that payment arise out of this invitation
that Mr. Schulman gave you in Exhibit 17?

A    I have a sense that the payment came from Jerry
Levine, Jerry Levine's authorization. I think he
communicated back to Joanne rather than from John.

Q    To the best of your recollection then, you did
not advise Mr. Schulman at any point after receiving his
July 26 letter that it would be helpful if moneys were
paid to Joanne on an interim basis?

A    In that vein I think there were two different
discussions that happened, some of which might have
preceded this, and certainly others followed.

Q    And what were those discussions, sir?

A    Well, there was -- I think certainly subsequent
to this there was time spent trying to provide or
reimburse Laura Siegel Larson and Michael Siegel for
medical and dental -- or, well, at least medical
insurance, and in Laura's case medical insurance for her
and her sons, who were minorities, so that may have

103

been -- that -- well, let's just say I do recall those

01:51 2 discussions, and -- in terms of finalizing that, which

01:51 3 actually took a long time, and I was communicating

01:51 4 directly with Mr. Perkins. That was one of the veins I

01:51 5 referenced.

01:51 6      The other was that from prior to our

01:51 7 representation and in fact dating back many years, Time

01:51 8 Warner or DC Comics had been paying Joanne an annual

01:51 9 widow's benefit, and from time to time John said that the

01:52 10 benefit, as reflected in the letter that first offered

01:52 11 it, was contingent on the Siegels not challenging DC

01:52 12 Comics' rights, and now that they had -- were terminating

01:52 13 the interest, DC did feel it was within their rights to

01:52 14 terminate those benefits and reserved its right to

01:52 15 terminate those benefits.

01:52 16     Q  Did DC ever exercise that right?

01:52 17     A  I don't think so, at least not during the course

01:52 18 of my representation. But more than once John said that

01:52 19 they might have to consider that.

01:52 20     Q  How many times do you recall John saying that?

01:52 21     A  Well, I said more than once --

01:52 22     MR. MARMARO:  Asked and answered.

01:53 23     THE WITNESS:  More than once, but I don't know

01:53 24 how many times.

01:53 25 BY MR. BERGMAN:

104

Q   More than twice?

A   I don't know.

MR. BERGMAN:  Would you mark as Exhibit 18 a

one-page letter dated August 22, 2000, marked WB 5976.

(Deposition Exhibit 18 marked.)

BY MR. BERGMAN:

Q   Do you recall receiving at any time a copy of

this letter?

A   No.  Excuse me.  Let me read it again.

As I sit here, I don't recall receiving this

letter.

MR. BERGMAN:  Okay.  Off the record.

(Lunch recess from 1:55 PM to 2:57 PM.)

MR. BERGMAN:  Back on the record.

Would you mark as Exhibit 19 a letter dated

April 27, 2001, Bates stamped WB 7853 through 55.

(Deposition Exhibit 19 marked.)

EXAMINATION (Resumed)

BY MR. BERGMAN:

Q   Have you ever received a copy of this letter

before?

A   I don't recall receiving a copy of this letter.

Q   By the way, in the first sentence of her letter,

Miss Siegel refers to a "5% commission to our

                                                    105

03:00 1    representatives."  Was that the basis on which your firm

03:00 2    was representing the termination interest?

03:00 3         MR. MARMARO:  I think that's privileged and

03:01 4    confidential, the fee arrangement, and I'll instruct --

03:01 5    object and instruct him.

03:01 6         (Instruction not to answer.)

03:01 7         MR. BERGMAN:  Okay.

03:01 8    Q    Is it correct, Mr. Marks, that you had a series

03:01 9    of telephone conversations with John Schulman beginning

03:0110    in late April but becoming more intense in the summer and

03:0111    early fall of 2001 in which you had made considerable

03:0112    progress in narrowing the gap between your respective

03:0113    positions?

03:0114         MR. MARMARO:  I'm going to object to the form of

03:0115    the question as being vague, ambiguous and compound.

03:0116         MR. TOBEROFF:  Concur.

03:0117         THE WITNESS:  Well, if "intense" means more

03:0218    frequent --

03:0219    BY MR. BERGMAN:

03:0220    Q    Yes.

03:0221    A    -- then yes, over that period there were a

03:0222    series of phone calls from that summer into the fall.  In

03:0223    my own mind I in some way think of the starting point as

03:0224    an in-person meeting in John Schulman's office in the

03:0225    summer of 2001, which of course is not a phone call, but

                                                              106

03:02 1 from that point forward I think there were -- the

03:02 2 communications were more frequent and certainly more

03:02 3 frequent than they had been.

03:02 4     Q    Was that meeting with John Schulman in the

03:02 5 summer attended by anyone other than the two of you?

03:03 6     A    No.

03:03 7     Q    Can you tell me as best as you can recall and

03:03 8 with as much specificity as you can what subjects were

03:03 9 discussed at that meeting?

03:0310         MR. MARMARO:  The subject as opposed to the

03:0311 content?

03:0312         MR. BERGMAN:  First I'll get the subjects.

03:0313         THE WITNESS:  Yes.  At that meeting I made a

03:0314 further proposal or a counterproposal on behalf of the

03:0315 Siegel interest to John, a proposal I know was -- I

03:0316 believe was reflected in a writing, an outline of the

03:0317 proposal that I left with John, and we reviewed that

03:0318 proposal at the meeting, but in the course of the meeting

03:0319 I think we discussed other things and areas where the

03:0420 parties differed.

03:0421 BY MR. BERGMAN:

03:0422     Q    And to the best of your recollection, what did

03:0423 the proposal or counterproposal consist of that you

03:0424 advanced?

03:0425     A    The elements were a signing bonus, an advance, a

107

03:04 1
03:04 2
03:04 3
03:04 4
03:05 5
03:05 6
03:05 7
03:05 8
03:05 9
03:0610
03:0611
03:0612
03:0613
03:0614
03:0615
03:0616
03:0617
03:0718
03:0719
03:0720
03:0721
03:0722
03:0723
03:0724
03:0825

royalty applied against DC Comics worldwide, media and merchandising revenues, an annual guarantee for a period of time followed by a formula for determining annual guarantees following the period of time, a publication royalty based on a percentage of the retail cover price of DC Comics publications. We talked about a -- I believe a transfer of -- just a moment -- a transfer of 90 percent of the Siegel interest outright coupled with a license of the remaining -- an exclusive license of the remaining 10 percent of the interest. Talked about that on the copyright notice, in relation -- anytime there was a copyright notice for the Superman property, that the copyright would read after the circle and the "c" and the year "DC Comics and the Siegel family." We talked about credit to the creators, Jerry Siegel and Joe Shuster, in motion pictures and television and other exploitations. Talked about medical insurance for Joanne Siegel, Laura Siegel Larson, her two sons, Michael Siegel. The proposal contained again a full indemnity by Warner Bros. and E&O insurance. The proposal had in it the point we discussed about how to handle intercompany dealings and there being four safe harbor areas and expedited dispute resolution for intercompany arrangements which were outside those four safe harbors.

     I think those are some, if not most, of the

108

03:08 1  elements of the proposal, but I recall, as we discussed
03:08 2  it, we would touch on some other things as well.
03:08 3      Q   Okay.  I want to obviously go further into that,
03:08 4  but I'd like to try and fix the date if we possibly can.
03:09 5          You referenced the summer of 2001 for this
03:09 6  meeting.  Is it possible that the meeting occurred in mid
03:09 7  September, September 17?
03:09 8      A   I don't believe so.  Just a minute.
03:09 9          Well, my recollection is summer.
03:09 10     Q   Okay.  With respect to the items that you've
03:09 11 just identified -- let's take, for example, the signing
03:09 12 bonus.  What did you propose to Mr. Schulman regarding
03:09 13 the signing bonus at this meeting?
03:10 14     A   Well, I must say whatever is in the written
03:10 15 proposal that I left with him of course governs, but I
03:10 16 recall that I believe that the signing bonus and the
03:10 17 advance combined were $3 million, some of which would be
03:10 18 recoupable, and some of which would be non-recoupable.
03:10 19     Q   Okay.  Can we go off the record just for a
03:10 20 minute?
03:10 21         (Recess.)
03:14 22         MR. BERGMAN:  Back on the record.
03:14 23     Q   In looking at your calendar for 2001, I notice
03:14 24 that at 513 there is a reference to a July 12 meeting
03:15 25 with Schulman.  Is that the meeting to which you refer?

                                                              109

A    Well, while it doesn't say "meeting," I believe

03:15 2  that's right.  That's what I believe I was referring to:

03:15 3  July 12, 2001.

03:15 4     Q    And it was at that meeting that you recall

03:15 5  leaving John with a written proposal or counterproposal?

03:15 6     A    Yes, I recall having a written proposal and

03:15 7  leaving it with him and presenting it on a reading off of

03:15 8  the proposal, which, if you will, was the springboard for

03:15 9  our discussion.

03:15 10    Q    And to the best of your recollection, was that

03:15 11 written proposal contained in the materials that you

03:15 12 forwarded to Mr. Toberoff when your retention was over?

03:15 13    A    I believe so.

03:16 14    Q    Okay.  Before the break you had indicated

03:16 15 that --

03:16 16       MR. TOBEROFF:  Did you mean -- you said

03:16 17 "forwarded to Mr. Toberoff when the meeting was over"?

03:16 18       MR. BERGMAN:  "When your retention was over."

03:16 19       MR. TOBEROFF:  Oh, sorry.

03:16 20 BY MR. BERGMAN:

03:16 21    Q    You had indicated before we took that brief

03:16 22 break that you recall the payment -- the initial payments

03:16 23 together totaling $3 million.

03:16 24       Is that correct?

03:16 25    A    I believe so.  I would need to see the document

110

to refresh my recollection.

03:16 2      Q   And do you recall, sir, whether one was 2

03:16 3 million and one was 1 million?

03:16 4      A   I think so, yes.

03:16 5      Q   And in that proposal was the $2 million

03:16 6 recoupable?

03:17 7      A   Absent seeing the document, I'm not sure whether

03:17 8 the 1 million was non-recoupable or recoupable or whether

03:17 9 the 2 million was recoupable or non-recoupable.

03:1710      Q   As you might have gathered, I'm flying blind

03:1711 here because I don't believe -- and perhaps,

03:1712 Mr. Toberoff, you could check your file -- I don't

03:1713 believe that document has been produced.

03:1714      MR. TOBEROFF:  Well, wouldn't you have it if he

03:1715 left it with John Schulman, aside from whether or not

03:1716 it's been produced?

03:1717      MR. BERGMAN:  Well, all I can say is I haven't

03:1718 seen the agreement, and I've reviewed --

03:1719      MR. TOBEROFF:  You mean the proposal?

03:1720      MR. BERGMAN:  The proposal.  And I've reviewed

03:1721 the Warner files fairly carefully.

03:1722      Q   Do you recall that the $1 million portion of the

03:1823 advance was non-recoupable?

03:1824      A   I think it was -- I think there was a

03:1825 designation of one of the items as a signing bonus and

111

03:18 1  one of the items -- which was non-recoupable, and one of

03:18 2  the items as an advance, which was recoupable.

03:18 3      Q    Another item that you mentioned as being

03:18 4  contained in that proposal was a worldwide royalty.

03:18 5          Do you recall what that royalty was?

03:18 6      A    I think it was 6 percent.

03:18 7      Q    And what was the proposal concerning other media

03:19 8  and merchandising?

03:19 9      A    6 percent.

03:19 10     Q    Did the proposal indicate what the royalty would

03:19 11 be on DC Comics?

03:19 12     A    Yes.

03:19 13     Q    What was that, sir?

03:19 14     A    I think 2 percent, but again the written

03:19 15 proposal would govern.

03:19 16     Q    By the way, do you retain a copy of that

03:19 17 proposal at this point in time?

03:19 18     A    Do I have a copy of it?

03:19 19     Q    Does the firm have a copy?

03:19 20     A    I believe so.

03:19 21          MR. BERGMAN:  Off the record.

03:19 22          (Discussion held off the record.)

03:20 23 BY MR. BERGMAN:

03:20 24     Q    Could you look at the privilege log, Exhibit 1,

03:20 25 and tell me whether that document is listed on the

                                                          112

privilege log?

MR. MARMARO:  Let's go off the record for one

minute, if I might.

MR. BERGMAN:  Sure.

(Recess.)

MR. BERGMAN:  Back on the record.

MR. MARMARO:  We believe that the enclosure to

No. 547 on the log would be that document, and Mr. Marks

is not the holder of any privilege, so he is not

empowered to waive any privilege that might attach to

that, and so he is obligated to take that privilege.

MR. BERGMAN:  And I don't mean to quarrel with

you, Mr. Marmaro, but if the document was prepared to be

communicated to Schulman and was in fact communicated to

Schulman, wouldn't that eliminate any privilege?

MR. MARMARO:  I'm not going to give a legal

opinion on that.  All I'm saying is he's not authorized

to do that.  I think that's a matter between you and the

plaintiffs in this lawsuit to resolve, and, of course, if

the two of you resolve it, that document would be

produced.  But as I understand it, it wasn't produced by

Time Warner, indicating that perhaps it might not have

been left.

MR. BERGMAN:  Okay.  Indeed.

MR. MARMARO:  And therefore --

                                                         113

**U.S. LEGAL SUPPORT**

MR. BERGMAN:  But, of course --

03:22 2          MR. MARMARO:  -- that leaves some uncertainty,

03:22 3   but we are obligated as we sit here today not to waive

03:22 4   anything, but it is that item, and if the parties to this

03:22 5   litigation work it out or if a court resolves it as

03:22 6   between them, we certainly don't -- we will follow

03:22 7   whatever instructions we're told to follow.

03:22 8          MR. BERGMAN:  Okay.

03:22 9      Q   Is it your best recollection, Mr. Marks, that

03:23 10  you left a copy of that document with John Schulman?

03:23 11     A   It is.

03:23 12     Q   Okay.  And am I correct, sir, that it was

03:23 13  created for the purpose of communicating it to

03:23 14  Mr. Schulman?

03:23 15     A   Yes, it was a proposal that I believe I brought

03:23 16  with me, reviewed orally, and my best recollection is I

03:23 17  left it with him for his benefit.

03:23 18     Q   Okay.  Thank you.

03:23 19          Did the proposal provide for the forgiveness of

03:23 20  the $250,000 advance that had been made to Joanne?

03:23 21     A   I believe that it did.

03:23 22          MR. MARMARO:  Can I ask just a question?

03:23 23          MR. BERGMAN:  Sure.

03:23 24          MR. MARMARO:  Is it correct that Time Warner has

03:23 25  not produced that in this litigation?

                                                          114

**U.S. LEGAL SUPPORT**

MR. BERGMAN:  It is -- well, we produced 60,000

03:24 2    pages, so it's --

03:24 3          MR. MARMARO:  To the best of your knowledge.

03:24 4          MR. BERGMAN:  To the best of my knowledge, we

03:24 5    haven't.  To the best of my knowledge, I have never seen

03:24 6    the document and have attempted to make a thorough review

03:24 7    of the client's documents.

03:24 8          MR. TOBEROFF:  In the review of the I think it's

03:24 9    50,000 documents, but it could be more, in the review of

03:2410    that I did not see such a proposal.

03:2411    BY MR. BERGMAN:

03:2412          Q    You referred, Mr. Marks, to the proposal as

03:2413    providing for a guarantee for a period of time.  What was

03:2414    the period of time to your recollection?

03:2515          A    I believe it was the later of 12 years or --

03:2516    well, 12 years or continuing for so long as DC Comics was

03:2517    in a recouped position.

03:2518          Q    During the course of that meeting, did

03:2519    Mr. Schulman respond to any of the -- any elements of the

03:2520    proposal?

03:2521          A    Yes.

03:2522          Q    With respect to the advance and the signing

03:2523    bonus or however you want to describe the two payments

03:2624    totaling $3 million, what did Mr. Schulman say?

03:2625          A    I don't recall.

                                                          115

Q   With respect to the 6 percent of the worldwide

03:26 2   royalty, do you recall what Mr. Schulman's response was?

03:26 3       A   I generally recall him saying that this was

03:26 4   positive movement and helpful movement in our

03:26 5   discussions.

03:26 6       Q   What was his, Mr. Schulman's response, if you

03:26 7   can recall, to the 12-year period of time continuing as

03:26 8   you've just testified?

03:26 9       A   I do recall a discussion on this issue, and I

03:2710   believe it was discussion at this meeting.  John's

03:2711   position was that the annual guarantee should be for a

03:2712   shorter period, and on a related topic which I recall

03:2713   discussion on, he was of a view that there would be no

03:2714   further annual guarantees if DC Comics was in an

03:2715   unrecouped position, and that he felt that if after the

03:2716   period of time, whatever it might be, whether it's 10 or

03:2717   12 years, if DC Comics was unrecouped, that there should

03:2718   be no entitlement to guaranteed payments, and we had, I

03:2819   thought, a productive discussion on that topic.

03:2820       Q   As for the amount of the guaranteed annual

03:2821   payment, what did the proposal provide for?

03:2822       A   I believe it was $500,000.

03:2823       Q   And what was Mr. Schulman's response to that?

03:2824       A   I don't think he quarrelled with the amount.

03:2825   He -- the discussion was really what happens if after the

                                                              116

end of whatever period of time DC Comics is unrecouped,

03:28 2 and just to join the issue, I said that it was very

03:28 3 important from the Siegel perspective that there be

03:28 4 continuing payments whether DC was recouped or not.

03:29 5     Q   What was Mr. Schulman's response, if you can

03:29 6 recall, to the notion of a transfer of 90 percent and an

03:29 7 exclusive license of 10 percent of the interest?

03:29 8     A   I do recall John's response was that Time

03:29 9 Warner/DC Comics were insistent on there being a transfer

03:29 10 of 100 percent of the interest.

03:29 11     Q   And what was his response with respect to the

03:29 12 proposed copyright notice in the name of both DC and the

03:29 13 Siegel family?

03:29 14     A   We did have discussion about that point, which

03:30 15 again I characterized as an important point, and whether

03:30 16 it was at that meeting or subsequently, we moved to a

03:30 17 position that if there were not a transfer -- excuse

03:30 18 me -- if there were a transfer of a hundred percent

03:30 19 interest and there was no identification of the Siegel

03:30 20 family on the copyright notice, that wherever there was a

03:30 21 copyright notice, there would be or at least best efforts

03:30 22 to be further notice that says to the effect, "By special

03:30 23 arrangement with the Jerry Siegel family."

03:30 24     Q   Okay.  In the proposal that you advanced during

03:31 25 this meeting, the royalty of 6 percent, did that apply

117

to, as you've characterized it before, the Superman

library?

A    Yes, the entire Superman property.

Q    Okay.  So that it wasn't limited to the post-

termination?

A    That is correct.  It was worldwide revenues for

the entire Superman property pre-termination and

post-termination.

Q    And it was DC's worldwide revenues.

Correct?

A    Correct.

I should also add that at this stage, but I

believe earlier, that the discussion also included not

only the Superman property, but the Spectre property,

which was the subject of separate termination notices

that had been filed, which terminations my recollection

is had yet to become effective.  So the financial

arrangement that we discussed vis-a-vis the Superman

property applied equally to the Spectre property.

Q    The question of full indemnity and E&O coverage,

what was Mr. Schulman's reaction to that?

A    I don't recall discussion on it -- on that

subject.  That point appeared to be non-controversial.

Q    Do you recall anything else that was said by

either you or Mr. Schulman during that July meeting?

                                                            118

03:33 1
03:33 2
03:33 3
03:34 4
03:33 5
03:34 6
03:34 7
03:34 8
03:34 9
03:3410
03:3411
03:3412
03:3413
03:3414
03:3415
03:3416
03:3517
03:3518
03:3519
03:3520
03:3521
03:3522
03:3523
03:3524
03:3525

A   Yes.

Q   What was that, sir?

A   In connection with our discussion about the
nature of the transfer, whether it be a hundred percent,
as John was quite clear his company would insist on or DC
Comics would insist on, or any other arrangement, I began
thinking about warranties and representations that
typically accompanied transfers of rights, and I said to
John, "In connection with this transaction, particularly
in circumstances or where you've disputed the
terminations in the rights, the Siegels -- I'm not
going -- I won't have the Siegels making any warranties
or representations about the nature of the rights or the
scope of the rights.  The -- I will make the -- I will
recommend making the following representation:  They have
not transferred what rights they have to any other party,
but other than that no other warranties or
representations."

Q   And what was Mr. Schulman's response, if any you
can recall, to that?

A   Well, he seemed agreeable to that.

Q   What warranties or representations other than
the fact that the property hasn't been transferred would
customarily be made in that situation?

MR. TOBEROFF:  Vague and ambiguous.

119

**U.S. LEGAL SUPPORT**

03:35 1          MR. MARMARO:  Calls for a legal conclusion and

03:35 2     is also vague and ambiguous and lacks foundation.

03:35 3          MR. TOBEROFF:  Concur in that objection.

03:35 4          MR. MARMARO:  You can answer as long as it

03:35 5     doesn't divulge privileged information.

03:35 6          THE WITNESS:  The answer is it depends.  If

03:35 7     you -- in my experience, if you are a studio transferring

03:36 8     rights to another party, those are in the form of a

03:36 9     quitclaim, and the only warranties or representations you

03:3610     will make are that it hasn't been transferred to

03:3611     somebody -- to another party and that you wouldn't be

03:3612     making any warranties or representations about the nature

03:3613     and the scope of the rights.

03:3614          On the other hand, if you are a party that is

03:3615     assigning rights to a studio, frequently they ask for, if

03:3616     not require outright, that you represent that you own the

03:3617     rights and that the rights don't contain any infringing

03:3618     material, that the rights don't invade any personality

03:3619     rights, publicity rights, privacy rights, that the rights

03:3720     are not subject to any pending litigation or threatened

03:3721     litigation, that you don't know of any facts and

03:3722     circumstances that might give rise to a claim, and that

03:3723     you've not transferred the rights to any other party.

03:3724     BY MR. BERGMAN:

03:3725          Q    Okay.  And if I understand your testimony

                                                                   120

03:37 1 correctly, it was all those other warranties and

03:37 2 representations, other than the non-transfer, that you

03:37 3 had told Mr. Schulman you would not grant?

03:37 4     A   I didn't say -- I didn't give him the list and

03:37 5 say -- run through that list and say those would not be

03:37 6 there. I said the only warranty and representation we

03:37 7 would make is that the Siegels have not transferred

03:37 8 rights to a third party.

03:37 9     Q   Anything else you can recall about that July 12

03:37 10 meeting with Mr. Schulman?

03:38 11     A   As I sit here now, that's my best recollection

03:38 12 of what was discussed.

03:38 13     Q   Thank you.

03:38 14     Did there come a time when Mr. Schulman gave you

03:38 15 a -- whether you want to call it a counter-counter-

03:38 16 proposal, did there come a time when he went down the

03:38 17 items which were contained in the July 12 proposal and

03:38 18 said yea or nay or made a revision?

03:39 19     A   Yes.

03:39 20     Q   And when did that occur, sir?

03:39 21     A   I believe that occurred reasonably shortly after

03:39 22 that July meeting. Mind you, in the context of this

03:39 23 negotiation, reasonably shortly might not be days. It

03:39 24 might be weeks.

03:39 25     Q   I understand.

121

Do you recall having a conversation with

Mr. Schulman on July -- pardon me -- September 17 of 2001

concerning the very same elements that you've just

referred to or the majority of them?

          MR. TOBEROFF:  Vague, ambiguous.

          THE WITNESS:  I don't have a recollection for

the reason that the question is date specific, and I

don't have in mind a specific conversation on a specific

date.

BY MR. BERGMAN:

     Q    Do you recall making a proposal to Mr. Schulman

in mid September, September 17 precisely, which included

the following elements -- we can go one at a time -- one,

a non-returnable recoupable payment of $2 million to be

applied to the period starting in the second quarter of

1999?

     A    That rings a bell.

     Q    Okay.  A $1 million non-returnable,

non-recoupable payment?

     A    At some time we made that proposal, and indeed

it may have been as early as July 12th.

     Q    Forgiveness of the $250,000 advance?

     A    Correct.

     Q    The continuation of the widow's benefit of

$135,000 per year for Joanne's life?

                                                      122

A    Yes.  And now that you've mentioned it, I

believe a discussion of the widow's benefit was also part

of our July 12th discussion.

Q    And that proposal that was made to Mr. Schulman

also provided for the forgiveness of any right to recoup

any past widow's benefit payments.

Correct?

A    The widow's benefit going in the future and in

the past were all non-recoupable.

Q    An annual guaranteed payment of $500,000 per

year for 10 years.  Do you recall at some point in the

fall --

A    Yes.

Q    -- making that?

And did the offer also provide that at the end

of 10 years there would be annualized payments in a

continually adjusting sum equal to 90 percent of the

average of the past three years' royalties, to continue

whether or not net royalty payment account is in deficit

and for so long as DC Comics receives any revenue from

the Superman properties?

A    While I don't think I would have used the

language about net and deficit, yes, I recall a proposal

where the substance was after the 10 years the annual

guarantee would be based on a percentage of the revenues

                                                        123

for the following three year -- for the preceding three

years.

    Q   Okay.  As to -- strike that.

        Do you also recall an offer being made on or

about September 17 which provided for a 6 percent royalty

of licensing, merchandising and audiovisual rights?

        MR. TOBEROFF:  Excuse me.  I just want --

        MR. MARMARO:  The question is vague.

        MR. TOBEROFF:  Are you saying offer from

Schulman or from him?

        MR. BERGMAN:  No.  Offer from Mr. Marks.

        MR. MARMARO:  The word "offer" is vague in the

context of the question.

BY MR. BERGMAN:

    Q   Your answer, sir?

    A   I do recall making a proposal, the proposal

being an entire package and this being an element of it,

and I would describe it as 6 percent of DC Comics'

worldwide gross revenues for exploitation of the Superman

property and the Spectre property in all media and in

merchandising and any other licensing.

    Q   Was it to be reducible only on merchandising and

licensing to a floor of 3 percent?

    A   At some point we talked about reducing the

royalty, yes, to a floor of 3 percent in circumstances

124

where the Superman property and the Spectre property were

commingled with other DC Comics properties.

Q   Was another component of the offer that you made

to Mr. Schulman that all advances were to be interest-

free?

A   I recall at least at some point having that --

that being a component of an offer we made.

Q   With respect to the elements of an offer that

I've just been asking about, did Mr. Schulman in mid

September respond negatively to any of those elements?

A   At some point in this time period I recall a

negative response to an element of the proposal but not

these elements.

Q   Do you recall what element that was, sir, and if

so, what was it?

A   Well, excepting the generality of the question,

at some point I think I continued to propose a transfer

of 90 percent of the rights and holding back 10 percent

of the rights and then licensing it exclusively to DC

Comics, and John would have responded negatively to that.

There came a time in the discussions after September

where we did have discussion about another issue that

John responded -- John's response was negative.

Q   And what was that issue, sir?

A   The issue was that -- I think I first need to

125

give some context for this.  In our proposals I think

going back from the beginning and probably continuing

through the summer, our proposal was to have the royalty

attach to the DC Comics worldwide gross revenues for so

long as DC Comics received revenues.  So if in a hundred

years there were still revenues coming in to DC Comics

from the exploitation of Superman, the Siegel family and

their heirs and whoever is the Siegel family at that time

would still receive a royalty.

The DC Comics position was different.  The DC

Comics' position was that royalties would terminate at

such time as Action Comics 1 went into the public domain.

That was DC's position.

With that context in mind, I recall that in our

discussions in October I made the point to John that we

would -- should provide that when Action Comics No. 1

does go into the public domain, the Siegels would have

the same rights that any member of the public has in

regards to exploitation, which is to say that if

copyrighted material is in the public domain, anybody can

exploit it, people at this table and complete strangers.

I raised that term, trying to be careful, and in

fact have used a customary term in my experience defined

in rights agreements, and I recall John saying he would

have to get back to me.

                                                             126

03:50 1      He did.  The DC response was, "No.  If we're

03:51 2  paying you all this money," and I really believe those

03:51 3  are the words John used, "then the family cannot ever

03:51 4  exploit the Superman property."

03:51 5      I said to John, "Anybody else in the world can,"

03:51 6  and he said, "That may be, but the Siegels can't."

03:51 7      Q    How was that point ultimately resolved?

03:51 8      MR. MARMARO:  Assumes facts not in evidence, and

03:51 9  it's vague and ambiguous in terms of the word "resolved."

03:5110      MR. TOBEROFF:  Concur.

03:5111      THE WITNESS:  On that particular issue, the

03:5112  Siegels relented.

03:5113  BY MR. BERGMAN:

03:5214      Q    Before I go into the balance of the October

03:5215  conversations, Mr. Marks, did you ever attempt or did

03:5216  anyone at Gang, Tyre attempt to place a valuation, a

03:5217  dollar valuation on what it contended to be the Siegel

03:5218  interest?

03:5219      MR. MARMARO:  Excuse me.  The question calls for

03:5220  the invasion of the attorney-client and attorney work

03:5221  product privilege, and I will object and instruct the

03:5222  witness not to answer.

03:5223      (Instruction not to answer.)

03:5224      MR. BERGMAN:  I am not asking what it was.  I

03:5225  think I am asking whether it was done.

                                                      127

MR. MARMARO:  I think if an attorney chooses to

03:52 2    do something and that doesn't get communicated, that's

03:52 3    the attorney's work product, so I will object on that

03:52 4    basis, which is part of my original objection.

03:52 5          MR. BERGMAN:  Thank you.

03:52 6      Q    I noticed in the privilege log, which is Exhibit

03:53 7    1, at page 30, item 426, there is a reference to a fax

03:53 8    being created by Donald Moore described as an accountant

03:53 9    working with GTRB.

03:53 10          Was Mr. Moore retained to render services of

03:53 11    some kind in connection with this matter?

03:53 12      A    Was Mr. Moore retained by --

03:53 13      Q    By Gang, Tyre.

03:53 14          MR. MARMARO:  I am going to object to your

03:53 15    question as calling for attorney-client, attorney work

03:53 16    product information.

03:53 17          Again, I'll ask Mr. Toberoff if his position is

03:53 18    the question can be answered, in which case it will.

03:53 19          MR. BERGMAN:  Mr. Toberoff?

03:53 20          MR. TOBEROFF:  You are asking whether -- you are

03:53 21    referring to a communication on privilege and asking

03:54 22    whether this person was retained, period?

03:54 23          MR. BERGMAN:  Yes.  I'm -- no.  My question

03:54 24    related to whether Mr. Moore was retained by Gang, Tyre

03:54 25    to render services in connection with this matter.

                                                      128

MR. TOBEROFF:  Without -- and also when I'm

03:54 2 agreeing on these things that are kind of borderline, I

03:54 3 don't want it to be taken as a waiver.  Does that

03:54 4 agreement apply to me as well in this deposition?

03:54 5      MR. MARMARO:  I think it has all day.

03:54 6      MR. BERGMAN:  Oh, yes, of course.

03:54 7      MR. TOBEROFF:  So with regard to that narrow

03:54 8 question, we are not asserting the attorney-client

03:54 9 privilege.

03:5410      THE WITNESS:  No.

03:5511      MR. MARMARO:  At some point if we could take a

03:5512 break --

03:5513      MR. BERGMAN:  This would be fine right now.

03:5514      (Recess.)

04:0015      MR. BERGMAN:  Back on the record now.

04:0016  Q   As you recall, Mr. Marks, did you have several

04:0017 conversations with Mr. Schulman on the telephone in early

04:0018 October, including October 3, October 4, October 9?  I

04:0019 will represent to you that none of these dates appear on

04:0020 the phone log, but I have reason to believe that there

04:0021 were calls between you and Mr. Schulman on those days.

04:0022      Do you recall a series of calls during early

04:0023 October?

04:0024      MR. MARMARO:  That question has gone on so long

04:0025 as to be confusing.  Are you asking, as you said at the

129

end, a series of calls in early October, or are you

04:01 2 talking about the dates you mentioned?

04:01 3       MR. BERGMAN:  I'll rephrase it.

04:01 4    Q    Do you recall having several telephone

04:01 5 conversations with Mr. Schulman during the first 10 days

04:01 6 of October relating to this matter?

04:01 7    A    Well, I can't pin it to even the first 10 days

04:01 8 of October.  I do recall in October telephone

04:01 9 communications which were much more frequent, spaced

04:0110 apart by a day or several days.

04:0111    Q    Your phone log does reflect that there was --

04:0112 there were two calls outgoing from your office to

04:0113 Mr. Schulman on the 16th of October.  That's at page 599.

04:0214    A    Actually, it doesn't.

04:0215    Q    What do you mean by that?

04:0216    A    We haven't discussed before how these phone logs

04:0217 are kept.

04:0218    Q    Okay.  Could you explain that, please?

04:0219    A    Yes.  These phone logs are a spiral notebook

04:0220 where on one side of the page there is a title that says

04:0221 "Incoming Calls," and on the other side of the page there

04:0222 is -- or on the other page, side to side, is a title that

04:0323 says "Outgoing Calls."  Notwithstanding those titles, the

04:0324 calls on this list do not reflect outgoing calls at all.

04:0325       What happens is my assistants keep a phone log

130

| | |
|---|---|
| 04:03 1 | of incoming calls and will fill up a page for one day and |
| 04:03 2 | then move to the next page even if that page says |
| 04:03 3 | "Outgoing Calls." So what would be reflected here on |
| 04:03 4 | this document is actually not an outgoing call to John |
| 04:03 5 | Schulman but an incalling call -- |
| 04:03 6 | MR. MARMARO: Incoming, I think you meant. |
| 04:03 7 | THE WITNESS: Excuse me. This would be two |
| 04:03 8 | incoming calls from Mr. Schulman. |
| 04:03 9 | BY MR. BERGMAN: |
| 04:03 10 | Q I see. |
| 04:03 11 | And where does your assistant maintain the list |
| 04:04 12 | of outgoing calls? |
| 04:04 13 | A My assistant doesn't. |
| 04:04 14 | Q I see. I see. |
| 04:04 15 | So all of the calls that are identified in these |
| 04:04 16 | registers are incoming calls? |
| 04:04 17 | A They are all incoming calls. |
| 04:04 18 | Q I see. Okay. |
| 04:04 19 | And I notice again that the Call Completed |
| 04:04 20 | column is not checked on either of these calls. Does |
| 04:04 21 | that reflect that you didn't actually speak with |
| 04:04 22 | Mr. Schulman? |
| 04:04 23 | A No, it does not reflect that. |
| 04:04 24 | Q As a matter of custom and practice, does your |
| 04:04 25 | assistant check that box after the call is connected to |

131

04:04 1   you?

04:04 2      A   No.   Unlike perhaps many attorneys, I make most

04:04 3   of my phone calls.

04:04 4      Q   I see.   Okay.

04:05 5        MR. TOBEROFF:   Good for you.

04:05 6        MR. BERGMAN:   Let's mark as Exhibit 20 a letter

04:05 7   dated October 19, 2001, from Mr. Marks to Mr. Schulman,

04:05 8   GTRB 302 through 308.

04:05 9        (Deposition Exhibit 20 marked.)

04:05 10  BY MR. BERGMAN:

04:05 11      Q   To begin with, your letter, Exhibit 20, makes

04:05 12   reference to an offer of October 16.

04:05 13        Was that offer made over the phone?

04:05 14      A   Yes.

04:05 15      Q   Can you tell me to the best of your recollection

04:06 16   what that offer was?

04:06 17      A   Well, in the phone call my recollection is we

04:06 18   discussed what at the time I believe was the last open

04:06 19   point.

04:06 20      Q   I see.

04:06 21      A   The last open point was the public domain issue

04:06 22   that I referred to a few minutes ago, and John held very

04:06 23   firm to the DC position that once the Superman

04:06 24   property -- excuse me -- Action Comics 1 went into the

04:06 25   public domain or, frankly, any element of the Superman

property went into the public domain, the Siegels would

04:07 2 be prohibited from using the property in a way that any

04:07 3 other member of the public could.  That was DC Comics'

04:07 4 final, unflinching position.

04:07 5     Q   Would it be correct then to say that with the

04:07 6 exception of that position, the other elements of the

04:07 7 proposal that are listed in the October 19 letter had

04:07 8 previously been agreed upon between you and Mr. Schulman?

04:07 9     A   Well --

04:07 10     MR. MARMARO:  The question lacks foundation, and

04:07 11 it's vague and ambiguous and calls for a legal

04:07 12 conclusion.

04:07 13     MR. TOBEROFF:  Concur.

04:07 14     THE WITNESS:  I mean the other items that were

04:07 15 reflected in the October 19th letter were no longer open

04:08 16 items, but as I said before, this was an entire package,

04:08 17 so there wasn't a sense that you would have a deal until

04:08 18 you had, if you will, an understanding that all the terms

04:08 19 of that package were acceptable.

04:08 20 BY MR. BERGMAN:

04:08 21     Q   And when you say, Mr. Marks, that there were no

04:08 22 longer open points, by that you mean that you and

04:08 23 Mr. Schulman had previously agreed upon them?

04:08 24     MR. MARMARO:  Same objections.

04:08 25     THE WITNESS:  We had come to an understanding

133

that on that point, that would be the basis of the

resolution.  That was the resolution of that particular

component in the overall deal, yes.

BY MR. BERGMAN:

Q    And when the final element of the public domain

point that you've been referring to was resolved, that

that closed the deal?

MR. MARMARO:  The question is vague and

ambiguous, assumes facts not in evidence.

You can answer subject to those objections.

THE WITNESS:  Yes.

MR. BERGMAN:  Okay.

THE WITNESS:  May we go off the record for just

a moment?

MR. BERGMAN:  We certainly can.

(Recess.)

MR. BERGMAN:  Back on the record.

BY MR. BERGMAN:

Q    Referring to Exhibit 20, the first sentence

states, "This is to confirm our telephone conversation of

October 19, 2001."

Can you tell me as best as you can recall,

Mr. Marks, what was said by each of you and Mr. Schulman

in that phone conversation?

A    Yes.  I recall calling John and saying to him

                                                          134

04:15 1
04:15 2
04:15 3
04:15 4
04:15 5
04:15 6
04:15 7
04:15 8
04:15 9
04:16 10
04:16 11
04:16 12
04:16 13
04:16 14
04:16 15
04:16 16
04:16 17
04:16 18
04:16 19
04:16 20
04:16 21
04:17 22
04:17 23
04:17 24
04:17 25

words in substance and effect, "We are closed."  I told John I would send to him a confirming letter which set forth the terms.  John said that he would get me a long form that would be ready when I returned, because John knew I would be away for a period of time.

And then I made one other point, and I said, "While it's not a part of the deal, John, you should know that after all this time this negotiation has ended on a very bitter note.  The public domain issue and the DC position was very difficult, problematic and emotional for my clients, and my suggestion to you outside the deal is to make some gesture of some sort to help take away that very bitter taste."

Q    Okay.  And what did Mr. Schulman say?

A    You know, I don't recall him specifically responding.

Q    The next sentence of the letter states, quote, "The Siegel Family (through Joanne Siegel and Laura Siegel Larson, the majority owners of the terminated copyright interests) has accepted D.C. Comics offer of October 16, 2001 in respect of the 'Superman' and 'Spectre' properties," close quote.

Prior to the time, Mr. Marks, that you sent this letter to Mr. Schulman, had Laura and Joanne Siegel authorized you to communicate to John Schulman the fact,

135

04:17 1
04:17 2
04:17 3
04:17 4
04:17 5
04:17 6
04:17 7
04:17 8
04:17 9
04:1710
04:1711
04:1812
04:1813
04:1814
04:1815
04:1816
04:1817
04:1818
04:1819
04:1820
04:1821
04:1822
04:1823
04:1824
04:1825

as you state in your letter, that, quote, "The Siegel

Family (through Joanne Siegel and Laura Siegel Larson,

the majority owners of the terminated copyright interests

has accepted DC Comics offer of October 16, 2001..."?

MR. MARMARO: Because you framed the question in

terms of a calling for a communication between Mr. Marks

and his clients, I'm just going to ask Mr. Toberoff if he

has any objection.

MR. TOBEROFF: The way you phrased that, you're

asking for -- directly asking for a communication from a

client to Mr. Marks.

MR. BERGMAN: What I'm asking for, gentlemen, is

what the cases say is clearly not privileged. I'm asking

whether the Siegels told Mr. Marks to communicate a

certain fact to Mr. Schulman. That is simply not

privileged. It was intended to be communicated, and

therefore it is not privileged, and I am going to -- I am

very conscious of the attorney-client privilege,

Mr. Toberoff. I've couched that question very carefully,

and I urge you gentlemen to consider it, because I can

give you a half a dozen cases that say that communication

was never privileged.

MR. TOBEROFF: Could you give me a half a dozen

cases?

MR. BERGMAN: Yes, sir. Grand Lake Drive-In vs.

136

| 04:19 1 | Superior Court, 179 Cal.App.2d 122. Price -- strike |
| 04:19 2 | "Price." Griffith v. Davis, 164 -- |
| 04:19 3 | MR. TOBEROFF: Sorry. |
| 04:19 4 | MR. BERGMAN: 164 FRD 687, Central District of |
| 04:19 5 | California case where the court says, quote, "Courts have |
| 04:19 6 | consistently refused to apply the privilege to |
| 04:19 7 | information that the client intends or understands may be |
| 04:19 8 | conveyed to others." |
| 04:19 9 | Willard Beach Airbrush Company vs. General |
| 04:19 10 | Motors, which states that "the privilege does not extend |
| 04:19 11 | to the client's grant of authority to the attorney to |
| 04:20 12 | settle, since this must be communicated to the other |
| 04:20 13 | party of the settlement and is thus not confidential." |
| 04:20 14 | Peters v. Wallach, 321 NE2d. Quote, "The |
| 04:20 15 | client's grant of authority to settle must be |
| 04:20 16 | communicated to the other party to the settlement and is |
| 04:20 17 | thus not confidential." |
| 04:20 18 | Several other cases. Walsh v. Barcelona, 476 |
| 04:20 19 | NE2d 1090. Quote, "By its very nature, a communication |
| 04:20 20 | from a client to his attorney conveying authority to the |
| 04:20 21 | other attorney to act on his behalf in entering into an |
| 04:20 22 | agreement with the opposing party is a communication |
| 04:20 23 | which is intended to be communicated to the opposing |
| 04:20 24 | party. Because such a conversation is not intended to be |
| 04:20 25 | confidential, it is not privileged." |

137

EXHIBIT A
Page 139

I'm simply asking whether the client told

Mr. Marks to tell Mr. Schulman that the offer has been

accepted.  It is not a privileged communication, and I

don't want to have to reconvene.  I urge you to

reconsider.

MR. TOBEROFF:  If I may, what you're asking or

what you say those cases say are two different things.

You're not asking whether the clients authorized you to

enter into these settlement negotiations or whether this

was within the scope of your authority from the clients,

any of the things that comport with those cases.  You're

saying did the clients tell you.

MR. BERGMAN:  Precisely.

MR. TOBEROFF:  This falls within the privilege,

and I don't believe those cases -- and I believe if I got

into those cases and a lineage of those cases, that would

bear out the objection.  If you want to ask the question

some other way, but that question I would assert the

attorney-client privilege.

MR. MARMARO:  Based on that position, we have no

choice but to object and instruct, but I want to make

sure it's real clear.  Mr. Marks is not the holder of

that privilege and has no power to waive it.  The

privilege has been asserted by the current counsel for

the client, and I feel that he has no choice but to agree

04:22 1    at this point to not answer that question on that basis.

04:22 2                 (Instruction not to answer.)

04:22 3                 MR. BERGMAN:  I understand your position, of

04:22 4    course.

04:22 5                 Just so Mr. Toberoff has one more opportunity to

04:22 6    reconsider, would you repeat the question as I posed

04:22 7    it --

04:22 8                 MR. TOBEROFF:  You don't need to repeat it.  I

04:22 9    know what it said.  But I would suggest you try to ask it

04:2210    a different way.

04:2211                 MR. BERGMAN:  I don't want to ask it a different

04:2212    way.  I want to ask it precisely as I did.

04:2213                 MR. TOBEROFF:  The objection stands.  I remember

04:2214    the question.

04:2215                 MR. BERGMAN:  Would you repeat the question,

04:2216    please.

04:2217                 (Record read as follows:

04:1618                     "Q   The next sentence of the

04:1619                 letter states, quote, 'The Siegel

04:1620                 Family (through Joanne Siegel and

04:1621                 Laura Siegel Larson, the majority

04:1622                 owners of the terminated copyright

04:1623                 interests) has accepted D.C. Comics

04:1624                 offer of October 16, 2001 in respect

04:1725                 of the 'Superman' and 'Spectre'

                                                              139

| | |
|---|---|
| 04:17 1 | properties,' close quote. |
| 04:17 2 | "Prior to the time, Mr. Marks, |
| 04:17 3 | that you sent this letter to Mr. |
| 04:17 4 | Schulman, had Laura and Joanne Siegel |
| 04:17 5 | authorized you to communicate to John |
| 04:17 6 | Schulman the fact, as you state in |
| 04:17 7 | your letter, that, quote, 'The Siegel |
| 04:17 8 | Family (through Joanne Siegel and |
| 04:17 9 | Laura Siegel Larson, the majority |
| 04:17 10 | owners of the terminated copyright |
| 04:17 11 | interests has accepted DC Comics offer |
| 04:17 12 | of October 16, 2001...'?") |
| 04:23 13 | MR. BERGMAN: Any change, Mr. Toberoff? |
| 04:23 14 | MR. TOBEROFF: It's even worse than I thought. |
| 04:23 15 | Same objection. |
| 04:23 16 | MR. BERGMAN: Okay. |
| 04:23 17 | MR. TOBEROFF: And objection. Vague and |
| 04:24 18 | ambiguous as to "DC's offer of October 16," as to in fact |
| 04:24 19 | what is being accepted. It's vague and ambiguous. |
| 04:24 20 | BY MR. BERGMAN: |
| 04:24 21 | Q Between October 16 and October 19, did Joanne |
| 04:24 22 | and Laura Siegel authorize you to communicate to John |
| 04:24 23 | Schulman that, quote, "The Siegel Family (through Joanne |
| 04:24 24 | Siegel and Laura Siegel Larson, the majority owners of |
| 04:24 25 | the terminated copyright interests) has accepted DC |

140

04:24 1    Comics offer of October 16, 2001..."?

04:24 2         MR. MARMARO:  Again, I'm going to have to ask

04:24 3    Mr. Toberoff whether he wishes Mr. Marks not to answer

04:25 4    that question.

04:25 5         MR. TOBEROFF:  I hate to just repeat it.  It's

04:25 6    the same question.  The same objection.

04:25 7         MR. MARMARO:  Based on that, I will also object

04:25 8    and instruct him --

04:25 9         MR. BERGMAN:  Okay.

04:2510         MR. MARMARO:  -- with the same statement that I

04:2511    made before --

04:2512         MR. BERGMAN:  I understand.

04:2513         MR. MARMARO:  -- which is we are not of the

04:2514    holder of a claimed privilege.

04:2515         (Instruction not to answer.)

04:2516    BY MR. BERGMAN:

04:2517    Q    Between October 16 and October 19, Mr. Marks,

04:2518    did your clients instruct you to convey to Mr. Schulman

04:2519    any additional terms, other than those set forth in your

04:2520    October 19 letter to Mr. Schulman, upon which their

04:2521    acceptance of the October 16th offer was conditioned?

04:2522         MR. TOBEROFF:  Objection.  Vague and ambiguous

04:2523    as to what is the October 16th offer, and attorney-client

04:2524    privileged communication as to the instructions from the

04:2525    client.

                                                            141

```
04:25  1          MR. MARMARO:  And based on that objection, we

04:26  2    also object and instruct.

04:26  3          (Instruction not to answer.)

04:26  4    BY MR. BERGMAN:

04:26  5      Q    Between October 16 and 19, did Laura Siegel and

04:26  6    Joanne Siegel instruct you to convey to Mr. Schulman any

04:26  7    limitations other than those set forth in your October 19

04:26  8    letter to Mr. Schulman upon which their acceptance of the

04:26  9    October 16 offer was conditioned?

04:26 10          MR. TOBEROFF:  Same objections.

04:26 11          MR. MARMARO:  For the same reasons I'll join in

04:26 12    those objections and instruct.

04:26 13          (Instruction not to answer.)

04:26 14    BY MR. BERGMAN:

04:26 15      Q    Between October 16 and October 19, did your

04:26 16    clients instruct you to convey to Mr. Schulman any

04:26 17    conditions subsequent, other than those set forth in your

04:26 18    October 19 letter to Mr. Schulman, upon the occurrence of

04:27 19    which their acceptance of the October 16 offer would be

04:27 20    negated?

04:27 21          MR. TOBEROFF:  Same objection, and I will add

04:27 22    vague and ambiguous and compound.

04:27 23          MR. MARMARO:  It also calls for a legal

04:27 24    conclusion, but based on the objections, which I

04:27 25    understand include the attorney-client being asserted by
```

                                                                142

04:27 1
04:27 2
04:27 3
04:27 4
04:27 5
04:27 6
04:27 7
04:27 8
04:27 9
04:2710
04:2711
04:2712
04:2713
04:2714
04:2715
04:2816
04:2817
04:2818
04:2819
04:2820
04:2821
04:2822
04:2823
04:2824
04:2825

the holder -- counsel for the holder of the privilege,

I'll object and instruct.

(Instruction not to answer.)

MR. BERGMAN:  Okay.

Q    Mr. Marks, during the fall of 2002 did you have

a custom and practice with respect to accepting offers on

behalf of your clients?

MR. MARMARO:  Are you asking about the fall of

2002?

MR. BERGMAN:  Pardon me?

MR. MARMARO:  You're asking about the fall of

2002?

MR. BERGMAN:  Oh, I'm sorry.  2001.

THE WITNESS:  No.

MR. TOBEROFF:  Vague and ambiguous.

MR. MARMARO:  I'll join in that objection,

but --

THE WITNESS:  If I may answer, no.

BY MR. BERGMAN:

Q    Putting aside this action, have you ever

accepted an offer on behalf of a client without first

receiving your client's authority to do so?

MR. TOBEROFF:  Vague and ambiguous.

MR. MARMARO:  Yeah.

THE WITNESS:  May I answer?

143

04:28 1          MR. MARMARO:  Sure.

04:28 2          THE WITNESS:  No.

04:28 3     BY MR. BERGMAN:

04:28 4          Q    Did you do so in this case?

04:28 5          MR. MARMARO:  Hold on.

04:28 6          MR. TOBEROFF:  Objection.  Same objection.  If

04:28 7     you're -- what is the question?  Can you repeat the

04:28 8     question?  Did you do what in this case?

04:28 9          MR. BERGMAN:  Well, the first question had been

04:2810     whether he had ever accepted an offer on behalf of a

04:2911     client without being authorized by the client, and the

04:2912     second question was whether he did so in this case.

04:2913          MR. TOBEROFF:  I'm thinking.

04:2914          MR. MARMARO:  While Mr. Toberoff is thinking

04:2915     about his position on the privilege issue, I'll say it

04:2916     calls for a legal conclusion and assert that objection

04:2917     subject to perhaps certain other objections.

04:2918          MR. TOBEROFF:  Can you just repeat that again

04:2919     for me, please?

04:2920          (Record read as follows:

04:2821           "MR. BERGMAN:  Well, the first

04:2822           question had been whether he had ever

04:2823           accepted an offer on behalf of a

04:2924           client without being authorized by the

04:2925           client, and the second question was

                                                              144

04:29 1          whether he did so in this case.")

04:30 2          MR. TOBEROFF:  I'll object on the basis that

04:30 3    "offer" is -- that he's asking for a legal conclusion and

04:30 4    that "offer" is vague and ambiguous as to what offer was

04:30 5    being accepted, but other than that I'll allow that.  It

04:30 6    just barely makes it under the line, in my opinion.

04:30 7          MR. MARMARO:  If you have the question in mind

04:30 8    after the colloquy, go ahead and answer it.  If you would

04:30 9    like it reread...

04:30 10         THE WITNESS:  If you could, there are one or

04:30 11   more negatives in that question, so I would like to be

04:30 12   clear.

04:30 13         MR. TOBEROFF:  And I'll add vague and ambiguous

04:30 14   to my objections.

04:30 15         (Record read as follows:

04:28 16             "Q    Putting aside this action,

04:28 17          have you ever accepted an offer on

04:28 18          behalf of a client without first

04:28 19          receiving your client's authority to

04:28 20          do so?

04:28 21             "MR. TOBEROFF:  Vague and ambiguous.

04:28 22             "MR. MARMARO:  Yeah.

04:28 23             "THE WITNESS:  May I answer?

04:28 24             "MR. MARMARO:  Sure.

04:28 25             "THE WITNESS:  No.

                                                    145

| | | |
|---|---|---|
| 04:28 1 | | "BY MR. BERGMAN: |
| 04:28 2 | | "Q   Did you do so in this case?") |
| 04:31 3 | | THE WITNESS:  If I understand the question, and |
| 04:31 4 | | now that I am permitted to answer it, no. |
| 04:31 5 | | BY MR. BERGMAN: |
| 04:31 6 | | Q   Okay.  Had you in fact been authorized to accept |
| 04:31 7 | | the October 16 offer? |
| 04:31 8 | | MR. TOBEROFF:  Objection -- |
| 04:31 9 | | MR. MARMARO:  On the basis of privilege? |
| 04:31 10 | | MR. TOBEROFF:  Yes.  And same objections as to |
| 04:31 11 | | the word "offer."  Vague and ambiguous. |
| 04:31 12 | | MR. MARMARO:  And calls for a legal conclusion. |
| 04:31 13 | | And then based on Mr. Toberoff's privilege objection, I |
| 04:31 14 | | will also object and instruct on that ground. |
| 04:31 15 | | (Instruction not to answer.) |
| 04:31 16 | | BY MR. BERGMAN: |
| 04:31 17 | | Q   Mr. Marks, do you have an understanding of what |
| 04:31 18 | | the October 16, 2001 offer was? |
| 04:32 19 | | A   It is -- my understanding is exactly as set |
| 04:32 20 | | forth in this letter. |
| 04:32 21 | | Q   Prior to sending this letter, had you been |
| 04:32 22 | | authorized by your clients to communicate their |
| 04:32 23 | | acceptance of the October 16, 2001 offer? |
| 04:32 24 | | MR. TOBEROFF:  Same objection.  Asked and |
| 04:32 25 | | answered.  Same objection.  Vague and ambiguous. |

146

**U.S. LEGAL SUPPORT**

Attorney-client privilege --

04:32 2          MR. MARMARO:  Based --

04:32 3          MR. TOBEROFF:  -- it calls for a legal

04:32 4 conclusion.

04:32 5          MR. MARMARO:  Based on that, we will also

04:32 6 object, and I will instruct.

04:32 7          (Instruction not to answer.)

04:32 8          MR. BERGMAN:  And, Mr. Toberoff, you were asking

04:32 9 for an instruction to the witness not to answer that

04:32 10 question?

04:32 11          MR. TOBEROFF:  Yes.

04:32 12          MR. MARMARO:  I am assuming that's been true

04:32 13 with the entire line of questions.

04:32 14          MR. BERGMAN:  I am too.  I just wanted to make

04:32 15 it clear.

04:33 16     Q    You were about to leave on an extended trip at

04:33 17 the time you wrote this October 19 letter, weren't you?

04:33 18     A    Yes.

04:33 19     Q    And your letter states on its last page, page 6,

04:33 20 that you would be out of the office for four weeks

04:33 21 following that time.

04:33 22          Do you recall approximately when you returned?

04:33 23     A    I believe my first day back in the office was

04:33 24 Thanksgiving week.

04:33 25     Q    And your letter closes with the statement,

                                                              147

quote, "Many thanks for help and patience in reaching

04:33 2    this monumental accord," close quote.

04:33 3         What monumental accord were you referring to?

04:33 4    A    The terms set forth in the October 19, 2001

04:34 5    letter.

04:34 6    Q    And at the time that you wrote that letter, was

04:34 7    it your belief that the monumental accord had in fact

04:34 8    been reached?

04:34 9         MR. MARMARO:  The question is vague and

04:3410    ambiguous, calls for a legal conclusion.

04:3411         MR. TOBEROFF:  Concur.

04:3412         THE WITNESS:  I had -- I believed that an accord

04:3413    had been reached on the terms exactly set forth in this

04:3414    letter.

04:3415    BY MR. BERGMAN:

04:3416    Q    I notice in the logs, Mr. Marks, that during

04:3517    your absence there were certain documents -- I think

04:3518    they're items 618 through 629 -- which were authored by

04:3519    Lisa Liebman, who is identified as an assistant at your

04:3520    firm.

04:3521         Was Ms. Liebman at the time your assistant?

04:3522    A    Yes.

04:3523    Q    And the log also -- and is Miss Liebman still

04:3524    employed by the firm?

04:3525    A    Yes.

Q   Still your assistant?

04:35 2     A   Yes.

04:35 3     Q   The log also refers at items 630 through -32 to

04:35 4   a paralegal at your firm by the name of Hillel Elkins.

04:35 5         Is Mr. Elkins still employed by the firm?

04:35 6     A   No.

04:35 7     Q   Do you know where he is presently employed?

04:35 8     A   I don't.

04:36 9         MR. BERGMAN:  Will you then mark as Exhibit 21

04:36 10  an October 26 letter from Mr. Schulman to Mr. Marks, GTRB

04:36 11  145 through 152.

04:36 12        (Deposition Exhibit 21 marked.)

04:36 13  BY MR. BERGMAN:

04:36 14    Q   Had you left the office, Mr. Marks, by the time

04:36 15  this October 26 letter was faxed?

04:37 16    A   Yes.

04:37 17    Q   And when you returned to the office around

04:37 18  Thanksgiving, as you stated, in 2001, how soon after your

04:37 19  return do you believe you reviewed the October 26th

04:37 20  letter?

04:37 21    A   I don't specifically recall, but it would have

04:37 22  either been that week or certainly the following week.

04:37 23    Q   After you reviewed the letter, did you discuss

04:37 24  it with Mr. Ramer?

04:37 25        MR. MARMARO:  I think -- I was going to say the

                                                              149

04:37 1  nature of the question, even though it's phrased as a yes

04:37 2  or no question, calls for the witness to divulge work

04:37 3  product information which is to discuss matters with, and

04:38 4  I would object and instruct on that basis.

04:38 5          (Instruction not to answer.)

04:38 6          MR. BERGMAN:  Okay.

04:38 7      Q   After you reviewed this October 26 letter, did

04:38 8  you compare the terms set forth in the letter with those

04:38 9  set forth in your October 19 letter?

04:3810         THE WITNESS:  Can I answer that?

04:3811         MR. MARMARO:  Yes, unless Mr. Toberoff has an

04:3812  issue with it.

04:3813         MR. TOBEROFF:  I'm not going to object.  It's

04:3914  work product, but I think it's yours.

04:3915         MR. MARMARO:  As long as you have no objection,

04:3916  he can answer the question.

04:3917         THE WITNESS:  I was even a month or five or six

04:3918  weeks after the fact of the October 19th letter pretty

04:3919  familiar with the terms that set -- that were set forth

04:3920  in that letter, so on first read I didn't -- I don't

04:3921  believe I did a line-by-line comparison, but I believe I

04:3922  later did.

04:3923  BY MR. BERGMAN:

04:3924      Q   Okay.  Did you at any time after that line-by-

04:3925  line comparison advise Mr. Schulman that there was any

                                                              150

inconsistency between your October 19 letter and his

October 26 letter?

A    I don't believe so.

Q    Your incoming phone log at GTRB 600 reflects a

call from Mark Toberoff on November 29, 2001.

MR. TOBEROFF:   What page is that on?

MR. BERGMAN:   600.

Q    Was that call completed?

A    No.

Q    Did you at any time return that call?

A    No.

Q    May I ask why?

MR. MARMARO:   I think you're going to be

invading his mental processes and work product, and I'll

object and instruct on that basis.

(Instruction not to answer.)

MR. BERGMAN:   Okay.

Q    If you would turn, please, Mr. Marks, to GTRB

604, that reflects a call from Mark Toberoff, quote, "Re:

Superman - potential buyout (end of November)."

Did you speak with Mr. Toberoff on that day?

A    I don't know if I spoke with Mr. Toberoff that

day.

Q    Did you return that call at some subsequent

time?

                                                      151

A    I returned that call that day or subsequently,

yes.

Q    Can you tell me to the best of your recollection

what Mr. Toberoff said during that conversation and what

you said?

A    Yes.    I think Mr. Toberoff started the call by

saying that he had called me earlier and that I hadn't

returned his call, for which I apologized, and then he

introduced himself.  He said he was a lawyer and that he

represented individuals that had interests in rights to

movie and other properties that had come into those

rights either by way of reversions under the law or

reversions under Guild agreements.  I also recall him

saying that he had a separate company that was in the

business of acquiring intellectual property rights.  I

recall him saying that he was interested in the Superman

property and the Superboy property and had understood

that I was representing the Siegel family interest, and

he asked if he could talk to me about that.

My recollection is that my response was that we

were very far along with DC Comics and at a documentation

phase.  I may have said DC Comics or Warner Bros. because

I do think that part of the conversation, I have a

recollection of Mr. Toberoff saying that he had dealt

with Warner Bros. before, the people at Warner Bros., in

04:45 1     connection with the "Wild Wild West" and rights involving

04:45 2     the "Wild Wild West" in which some deal had been made

04:45 3     that led to the making of the feature film.

04:45 4         Q   Do you recall anything else of that

04:45 5     conversation?

04:45 6         A   That's my best recollection as I sit here today.

04:45 7         Q   Do you recall telling Mr. Toberoff that you had

04:45 8     closed a deal with DC regarding the Siegel interest?

04:45 9         MR. TOBEROFF:  Leading.

04:46 10         THE WITNESS:  My best recollection is how I

04:46 11     described it, but I think I said we were in the process

04:46 12     of -- in the documentation phase, were trying to document

04:46 13     a deal.

04:46 14     BY MR. BERGMAN:

04:46 15         Q   And do you recall what response, if any,

04:46 16     Mr. Toberoff made?

04:46 17         A   I don't.

04:46 18         Q   And do you recall anything further about the

04:46 19     conversation or how it ended?

04:46 20         A   I don't recall how it ended.

04:46 21         Q   Did you as of February 6, '02 believe that you

04:46 22     had closed a deal with DC for the Superman interest?

04:46 23         MR. MARMARO:  The question is vague and

04:46 24     ambiguous, calls for a legal conclusion, and again I am

04:46 25     going to defer to Mr. Toberoff whether he has any

153

```
04:47 1    objection to -- subject to those objections, having
04:47 2    Mr. Marks answer the question.
04:47 3          MR. TOBEROFF:  I object on work product
04:47 4    privilege, but I think I am not asserting that on behalf
04:47 5    of the clients.  I am not asserting that on behalf of the
04:47 6    Siegels.
04:47 7          MR. MARMARO:  Mr. Marks would be prepared to
04:47 8    answer the question if the Siegels have no objection to
04:47 9    it.
04:4710          MR. TOBEROFF:  As to your personal belief, no
04:4711    objection.
04:4712          THE WITNESS:  Well, if the question is did I
04:4713    think at this point there was a final, binding,
04:4714    enforceable agreement, the answer would be no, but I did
04:4715    believe that we had come to an agreement back on October
04:4716    19th, 2001, that was reflected exactly in the terms that
04:4817    I set out.
04:4818          At the end of that letter I wrote to John in
04:4819    substance and effect, "John, if I've gotten anything
04:4820    wrong, if I've misstated any of these terms, please let
04:4821    me know."  When John writes back on October 26, which I
04:4822    see later, in effect his letter is, "Yeah, you've got
04:4823    terms wrong.  My outline of the deal terms is different
04:4824    than your outline of the deal terms."  So while I thought
04:4825    we had an agreement on these terms, John evidently
```

154

04:48 1    didn't, and where you don't have a meeting of the minds,

04:48 2    you don't have an agreement.

04:48 3    BY MR. BERGMAN:

04:48 4       Q   What portion or with respect to what elements of

04:48 5    the October 19 letter did Mr. Schulman's October 26

04:49 6    letter depart from, were different from?

04:49 7       MR. MARMARO:  Again, the same -- my position is

04:49 8    the same:  Mr. Marks will answer the question as long as

04:49 9    there is no objection from Mr. Toberoff.

04:49 10       MR. TOBEROFF:  Not to the extent you are

04:49 11    comparing the documents.

04:49 12       MR. MARMARO:  Maybe we should have the documents

04:49 13    in front of us.  Do you have any objection to him looking

04:49 14    at Mr. Schulman's letter?

04:49 15       MR. BERGMAN:  Not at all.

04:49 16       THE WITNESS:  I know that one area of difference

04:49 17    was the scope of the rights granted.  In my letter it

04:49 18    referred to -- very specifically to the Superman property

04:49 19    and the Spectre property.  That's what we had been

04:50 20    talking about the whole time of our negotiations going

04:50 21    back to the first meeting in 2 -- 1999.  And, of course,

04:50 22    as you see here, the consideration, at least as set forth

04:50 23    in my letter, for that matter I guess in John's letter,

04:50 24    is based on revenue from the Superman and Spectre

04:50 25    properties, yet John's letter referred more generally to

155

04:50 1    all properties authored by Siegel for DC Comics and was

04:50 2    not limited to the Superman and Spectre properties that

04:50 3    we had been talking about.

04:50 4        Another area where it differed involved

04:50 5    warranties and representations and, in turn, indemnities.

04:50 6    If you recall, we spoke earlier about the view that the

04:51 7    only warranty and representation the Siegel family would

04:51 8    make would be that they have not transferred rights to

04:51 9    any other party, and in John's letter there are broader

04:51 10   warranties than that, warranties that go beyond that.

04:51 11         Oh, and by the way, that is also reflected in

04:51 12   the October 19th letter. John's warranties go beyond

04:51 13   that, and so too in his letter he would have the Siegels

04:51 14   indemnifying for areas that were not agreed and, indeed,

04:51 15   not even discussed. So there's broader warranties and

04:51 16   representations and, as a result, broader indemnities,

04:51 17   and in fact there are additional indemnities added; for

04:52 18   example, indemnifying for any claims brought by Dennis

04:52 19   Larson.

04:52 20         There is, I recall, a provision that talks about

04:52 21   furnishing DC Comics with historical information about

04:52 22   the properties and rights information about the

04:52 23   properties, and I felt from my representation of the

04:52 24   client that that was going to be problematic, in fact I

04:52 25   knew it was problematic, and it was not a point that had

156

been discussed before, it was not a point that had been

04:52 2 agreed before, and it was not a point that was in my

04:52 3 letter.

04:52 4     I know that there was a right of first

04:52 5 negotiation for any biographical material outlined in

04:52 6 John's letter.  Again, I don't recall ever discussing

04:53 7 that point before, much less agreeing to that point, and

04:53 8 it was not reflected in my letter.

04:53 9     When you get to elsewhere in John's letter, I

04:53 10 know he refers to an affirmative obligation on the part

04:53 11 of the Siegels to positively publicize the property and

04:53 12 to make themselves available or reasonably available for

04:53 13 travel, and what John and I had discussed and I had

04:53 14 believed agreed was that there would be mutual

04:53 15 non-disparagement, neither party would say anything bad

04:53 16 about the other, but we had not discussed and we had not

04:53 17 agreed about an affirmative obligation on the part of the

04:54 18 Siegels to positively publicize.

04:54 19     And in terms of the travel, I thought that was a

04:54 20 problem because we were dealing with a woman of advanced

04:54 21 years and a woman who was ill, and travel on them could

04:54 22 be a burden, notwithstanding that I think there was a

04:54 23 carve-out for -- subject to their health and

04:54 24 availability.  I wouldn't have wanted there to be any

04:54 25 dispute that they were not fulfilling an obligation about

157

going to travel to an event and that the failing to

travel to an event being the basis for claiming breach

and withholding royalty payments and the like.

　　　　I recall in this document new terms concerning

how the royalty could be reduced.  My understanding of

our agreement, what I set forth in the October 19th

letter, was that on media and merchandising licenses the

royalty was 6 percent.  If the other DC Comics characters

appeared in the media program or in licensing or

merchandising, that royalty could be reduced to a floor

of 3 percent.

　　　　And in our October telephone conversations this

issue was the subject of conversation, and John brought

up two other instances that would give rise to further

reductions of the royalty, and I know those instances

were specifically the use of Superman in conjunction with

properties called The Justice League, Superfriends and

Superheroes.  I recall that John initially said it should

go down to 1 percent, and we agreed that in fact the

floor in that specific instance would be 1.5 percent.

　　　　And also in this October period John brought up

a further area where he said sometimes there are very

extraordinary licenses where the Time Warner licenses DC

properties, and, for example, Looney Tunes properties,

and he spoke specifically about Six Flags Magic Mountain

158

04:56 1    amusement park, where there are strolling characters and
04:57 2    signage and the like that use numerous characters, and he
04:57 3    suggested that the royalty should be further reduced in
04:57 4    that case to 1 percent, which we came to an understanding
04:57 5    on that.
04:57 6          In the October 19th letter there are broader
04:57 7    categories where the royalty --
04:57 8          MR. MARMARO:  Do you mean the October 19th
04:57 9    letter?
04:5710         THE WITNESS:  I'm sorry.  The October 26th
04:5711    letter.  The categories where the 3 percent can be
04:5712    further reduced are broadened.
04:5713         I know we've talked today about intercompany
04:5714    deals and safe harbors as one of the points throughout
04:5715    the discussion, and as I think I testified to earlier, we
04:5816    had agreed, I thought, that -- and I think it's reflected
04:5817    in John's letter, that if the Siegels were to challenge
04:5818    an intercompany deal that was outside a safe harbor,
04:5819    there would be an expedited dispute resolution procedure.
04:5820    That was the only discussion we had about alternative
04:5821    dispute resolution.  We never discussed arbitration in
04:5822    general applying to all of this, and yet John's letter
04:5823    provided for arbitration of disputes.  My letter did not.
04:5824         We talked earlier about the issue about for how
04:5825    long would the 6 percent royalty run and there being

                                                                  159

disagreement on the parties as to the length of time.

04:59 2 The DC Comics position was the royalty would terminate

04:59 3 when Action Comics No. 1 went into the public domain, and

04:59 4 I believe it was at that July 12th meeting, 2001 meeting

04:59 5 that we sat at John's table and discussed what happens if

04:59 6 a Superman movie, SUPERMAN 18, comes out a year before

04:59 7 Action Comics No. 1 goes into the public domain; there

04:59 8 should be a tail on that, to which John agreed.

04:59 9 So we agreed upon a tail where there was a movie

04:59 10 that was released close to the end of the period that

04:59 11 Action Comics No. 1 was still in copyright. We agreed

04:59 12 that there would be a tail for television, and we had

04:59 13 agreed that there would be a tail -- at least my

04:59 14 understanding was we'd agreed that there would be a tail

05:00 15 for other substantial projects. After all, 10 years from

05:00 16 now, 20 years from now it's not clear what media -- in

05:00 17 what media contents will be exploited, so I wanted to be

05:00 18 able to cover that. John did not include that other

05:00 19 area, other substantial projects in the tail, as I

05:00 20 recall.

05:00 21 We had talked about throughout a full indemnity,

05:00 22 and E&O insurance. I think the E&O insurance wasn't in

05:00 23 John's letter, and I think the indemnity proposed here

05:00 24 was a partial, what I considered to be a partial

05:01 25 indemnity.

160

05:01 1          On the credit point --

05:01 2    BY MR. BERGMAN:

05:01 3        Q    Before you get to that one, Mr. Marks --

05:01 4          MR. MARMARO:  Can I just interject, because I

05:01 5    think I may have placed a possible ambiguity in the

05:01 6    record when I mentioned before Mr. Marks went into this

05:01 7    explanation of the differences that the letters be placed

05:01 8    before him, and until this very last point he has not

05:01 9    been testifying from the letter.  I just wanted to note

05:0110    that for the record in case -- well, I just wanted to

05:0111    note that for the record.

05:0112          THE WITNESS:  In terms of the credit to be

05:0113    accorded Siegel and Shuster, which was a point that I had

05:0114    as my point C.4, a point that I thought had long been

05:0215    agreed, that there would be a credit in paid ads of

05:0216    motion pictures, which is certainly in my experience is

05:0217    something that's very important to clients.  They want to

05:0218    see the credit in the full-page ads in newspapers and

05:0219    posters, movie theaters and the like, and John's letter

05:0220    provided for credit on screen only and not in paid ads.

05:0221    BY MR. BERGMAN:

05:0222        Q    If I could just ask you a question about that,

05:0223    and I am going, with your indulgence, to go back to some

05:0224    of these --

05:0225        A    Yes.

                                                        161

```
05:02 1        Q    -- but I'm looking at C.4, the specific item you

05:02 2   indicated in the October 19, and it -- I see what you're

05:02 3   referring to.  You're referring to the paid ads.

05:02 4        A    Correct.  I mean it's two words, but it's two

05:03 5   meaningful words.

05:03 6        Q    Okay.

05:03 7        A    Again, Mr. Marmaro said I hadn't gone -- I

05:03 8   hadn't reviewed this for purposes of testifying now going

05:03 9   line by line, but those are to me the major areas, but

05:0310   they may not be the exclusive points.

05:0311        Q    Let me -- before turning to a closer examination

05:0312   of those, let me ask you this:  Here you've been

05:0313   negotiating an agreement for two and a half years, and

05:0314   you leave on vacation and you believe that it's been

05:0315   resolved, and you review the October 26 letter, and it

05:0416   appears to have differences, as you've recounted them.

05:0417             Given what had transpired in the past in your

05:0418   relationship with Mr. Schulman, was there a reason why

05:0419   you didn't call him and sit down with him and say,

05:0420   "Look," in essence, "we have an inconsistency here, and

05:0421   let's try to resolve it"?

05:0422             MR. MARMARO:  As with the other questions, if

05:0423   Mr. Toberoff has no issue with the response, then

05:0424   Mr. Marks would be willing to respond.

05:0425             MR. TOBEROFF:  I don't.
```

162

THE WITNESS:  John's letter -- cover letter that

attaches the outline says, "We're working on the draft

agreement so that by the time you have accomplished

something of truly momentous import, we will have the

super-matter transaction in document form," and I very

much took that to mean that by the time you get back,

you'll have a long-form agreement that we can work off

of, and I wanted to see that long-form agreement.

BY MR. BERGMAN:

Q   I see.  And anticipated that the disparities

between the two short forms to be resolved in the long

form?

MR. MARMARO:  I'm going to object to the form of

the question.  Vague and ambiguous and -- well, vague and

ambiguous.

MR. TOBEROFF:  Same objection and leading.

MR. MARMARO:  You're asking if that was the

reason?

Go ahead, you can answer subject to the

objections.

THE WITNESS:  I hope I'm answering the question.

I thought it would be a good thing for the process to get

the long form to move it forward rather than bring it to

a screeching halt at this point, so I wanted to allow

this process to move forward.  My thought was let's raise

163

05:06 1    these issues in the context of the long form.

05:06 2            MR. BERGMAN:  I see.

05:06 3            Why don't we take a five-minute break.

05:06 4            MR. MARMARO:  Sure.

05:06 5            (Recess.)

05:13 6            MR. BERGMAN:  Back on the record.

05:13 7       Q    Just to complete this question of the two

05:13 8    letters, Mr. Marks, when you prepared your October 19

05:13 9    letter, did you believe that you accurately recorded the

05:1410    deal as Mr. Schulman had offered it to you?

05:1411       A    I believe that I had accurately recorded the

05:1412    deal that was negotiated between the parties.

05:1413       Q    Okay.

05:1414       A    Mr. Bergman, I do want to be clear, on October

05:1415    16 I don't recall the conversation as being a recitation

05:1416    of each term.  The October 16th conversation was focused

05:1417    on the one open item.  That's my recollection.

05:1418       Q    I understand that.  I appreciate it.

05:1419       A    But I -- to answer your question, yes, I believe

05:1520    I at this confirmation letter set forth the terms as

05:1521    agreed.  Of course, I invited John to tell me if I had

05:1522    misstated it in any way.

05:1523       Q    Okay.  And at no time until you had reviewed the

05:1524    long-form agreement did you have any discussion with

05:1525    Mr. Schulman concerning any disparity that might exist

                                                              164

between the two letters?

MR. MARMARO:  Do you mean the draft long form?

MR. BERGMAN:  Yes.

THE WITNESS:  I did put a call in to

Mr. Schulman during this time period, but I don't recall

that we spoke.  I found out he was on vacation.  Or I

would later learn he was on vacation.

BY MR. BERGMAN:

Q    Returning to your phone register at page 614 --

A    One moment, please.

Q    There is a reference to a phone call from

Mr. Toberoff at 6:09.  Was that call completed that day?

Did you return it?

A    I don't know if it was completed that day.

Q    Did you return it at some point?

A    Yes, I believe so.

Q    Before I get into that, let me just make sure.

If you look at page 615, you'll see another reference to

a phone call from Mr. Toberoff.

Was your reply to the phone call that you

received on the 24th made prior to the 30th, or was it

after the 30th?

MR. MARMARO:  30th of July?

MR. BERGMAN:  Yes.

THE WITNESS:  I believe, looking at these

records, that what must have happened is I returned the

05:17 2 call, didn't reach Mr. Toberoff; he called back, and

05:17 3 we -- on the 30th, and we spoke subsequent, either on

05:17 4 that day or subsequent to that day.

05:17 5 BY MR. BERGMAN:

05:17 6     Q   Would it be accurate to say that you do not

05:18 7 recall speaking -- actually speaking with Mr. Toberoff

05:18 8 twice during the last week of July '02?

05:18 9     A   I recall one conversation.

05:1810     Q   Okay. Can you tell me to the best of your

05:1811 recollection what was said by each of you and

05:1812 Mr. Toberoff in that conversation?

05:1813     A   I think Mr. Toberoff said he was -- wanted to

05:1814 check in with me to see where we were in our dealings

05:1815 with DC Comics, and I think I told him then that -- and I

05:1816 may have also said it in our first conversation -- that

05:1817 we had a confidentiality agreement with DC Comics, and I

05:1918 didn't feel at liberty to discuss the status of our

05:1919 dealings with him.

05:1920     Mr. Toberoff said, "Can you tell me what DC

05:1921 Comics offered you," and I said, "No. We have a

05:1922 confidentiality agreement."

05:1923     And I believe Mr. Toberoff said, "Would you be

05:1924 willing to enter into negotiations with me," and I

05:1925 believe I said, "Initiating negotiations, no. That's

166

something that makes me very uncomfortable. If you have

05:19 2 an offer, present it to me, and I'll present it to the

05:19 3 client."

05:19 4     Q  Do you recall what he said in response?

05:20 5     A  I think that was the summary of the substance of

05:20 6 the conversation other than goodbyes.

05:20 7     Q  If you turn the page to 616, you will see a

05:20 8 reference to a conference call, quote, "with Mark, Kevin,

05:20 9 and Ari Emanuel at Endeavor," close quote. There also

05:2010 appears to be a notation, "approximately 20 minutes."

05:2011     Do you see that?

05:2012     A  Yes, and it looks like the "20" is crossed out,

05:2013 and it says "5 to 10" above it.

05:2014     Q  I see. Okay.

05:2015     Off the record.

05:2016     (Discussion held off the record.)

05:2017 BY MR. BERGMAN:

05:2018     Q  Would you describe to the best of your

05:2119 recollection and as specifically as possible what was

05:2120 said by each of the three of you during that

05:2121 conversation?

05:2122     A  I think this record may actually be setting up a

05:2123 conference call rather than the conference call, but

05:2124 ultimately there was a conference call at this time

05:2125 period.

```
05:21 1        Q    I see.  Okay.

05:21 2             Do you recall how long after August 7 that

05:21 3   conference call took place?

05:21 4        A    Within the next day or two.

05:21 5        Q    I see.

05:21 6             Would you tell me --

05:21 7        A    If not on that date.

05:21 8        Q    -- what was involved and what was said in that

05:21 9   conversation?

05:2110        A    Yes.  Mr. Toberoff and Mr. Emanuel both spoke.

05:2211   I can't completely tell you who said what, but I think

05:2212   Mr. Toberoff may have very briefly referenced past

05:2213   conversations, and then I believe it was Mr. Emanuel who

05:2214   explained that either they or some other people or

05:2215   perhaps some members of the Endeavor Talent Agency had

05:2216   set up a fund or were in the process of setting up a fund

05:2217   to acquire intellectual property rights which they would

05:2218   then package with clients from the Endeavor Talent

05:2319   Agency, then take those to studios to exploit the

05:2320   package, and they understood that the Siegel family had

05:2321   an interest in the termination rights and viewed that as

05:2322   perhaps the most valuable of properties and wanted to

05:2323   make a proposal.

05:2324        Q    Okay.  What did you say?

05:2325        A    I said in substance and effect, "I'm listening."
```

                                                                168

| | | |
|---|---|---|
| 05:23 | 1 | And I'm not sure who spoke, but they made a proposal of |
| 05:23 | 2 | $15 million and what was described as a meaningful back |
| 05:23 | 3 | end, which I understood to be a contingent compensation |
| 05:23 | 4 | position or a royalty position in the exploitation of the |
| 05:23 | 5 | property. |
| 05:24 | 6 |     Q   And was that for the entire Siegel Superman |
| 05:24 | 7 | interest?  Did it include Michael's? |
| 05:24 | 8 |     A   I don't think that was discussed, but that's how |
| 05:24 | 9 | I understood it. |
| 05:24 | 10 |     Q   Did they say -- attempt to quantify what that |
| 05:24 | 11 | meaningful back end would be? |
| 05:24 | 12 |     A   They did not.  I believe I asked, but they did |
| 05:24 | 13 | not. |
| 05:24 | 14 |     Q   And what else did you say? |
| 05:24 | 15 |     A   I asked if there was anything else, and they |
| 05:24 | 16 | said "No," and then I asked if this was a proposal that |
| 05:24 | 17 | was conditioned on their doing due diligence about the |
| 05:24 | 18 | rights, and they said again in substance and effect, "No, |
| 05:25 | 19 | it's not.  We've done our due diligence already.  This is |
| 05:25 | 20 | the offer." |
| 05:25 | 21 |     Q   Anything else you can recall of that |
| 05:25 | 22 | conversation? |
| 05:25 | 23 |     A   I think I said, "Thank you, and I will |
| 05:25 | 24 | communicate this to the client" or "take this back to the |
| 05:25 | 25 | client." |

169

Q    And did you in fact do that?

05:25 2         MR. MARMARO:  Before you answer the question, is

05:25 3    there any objection to the answer?  The question calls

05:25 4    for a communication between Mr. Marks and the clients.

05:25 5         MR. TOBEROFF:  Without a waiver, no, whether or

05:25 6    not you communicated that to the client.

05:25 7         MR. MARMARO:  A yes or a no.

05:25 8         THE WITNESS:  Yes.

05:25 9    BY MR. BERGMAN:

05:2510    Q    And was that a communication within let's say a

05:2511    week of the conference call?

05:2512    A    Yes.

05:2513    Q    Your phone register, 617, indicates a call from

05:2614    Mr. Toberoff on August 29.  Was that call returned?

05:2615    A    I -- was it returned.  I don't know.

05:2616         MR. TOBEROFF:  Which number -- Bates number?

05:2617         MR. BERGMAN:  617.

05:2618    Q    Do you recall having a telephone conversation

05:2619    with Mr. Toberoff subsequent to the conference call?

05:2620    A    The best I can say is that it may be that

05:2621    Mr. Toberoff called to see if I had a response, and I

05:2622    could only have said at that time that the clients had

05:2723    been away, and I don't have a response.  I have -- I am

05:2724    not certain about that.

05:2725    Q    Did there ever come a time when you communicated

                                                          170

**U.S. LEGAL SUPPORT**

05:27 1   to Mr. Toberoff either your clients' acceptance,

05:27 2   rejection or comments upon the offer that had been made?

05:27 3         MR. MARMARO:  Is your question limited to the

05:27 4   time when Mr. Marks was acting as counsel for the

05:27 5   Siegels?

05:27 6         MR. BERGMAN:  No.

05:27 7         MR. MARMARO:  Even after that time?

05:27 8         MR. BERGMAN:  At any time.

05:27 9         MR. MARMARO:  That potentially calls for the

05:27 10  invasion of attorney-client communications if it's at a

05:27 11  time when Mr. Toberoff was representing the clients.

05:27 12         MR. BERGMAN:  Okay.  Then let me reframe the

05:27 13  question.

05:27 14    Q   Did you, prior to the time that Mr. Toberoff

05:27 15  undertook his representation of the Siegels, communicate

05:28 16  to him either your client, the Siegels' acceptance,

05:28 17  rejection or comments upon the offer?

05:28 18         THE WITNESS:  May I answer?

05:28 19         MR. MARMARO:  I assume so.  I am hearing no

05:28 20  objection from Mr. Toberoff.

05:28 21         THE WITNESS:  No.

05:28 22  BY MR. BERGMAN:

05:28 23    Q   Up until the time that your -- the

05:28 24  representation of Gang, Tyre was terminated, did you ever

05:28 25  learn from any source that Mr. Toberoff had spoken

                                               171

directly with either Joanne or Laura Siegel?

05:28 2      MR. MARMARO:  I think you misspoke in the

05:28 3 question.  Let me hear the question again.  I think you

05:28 4 said representation of Gang, Tyre, but maybe I misheard.

05:29 5      (Record read.)

05:29 6      MR. MARMARO:  I'm sorry.  Was it "your represent

05:29 7 of Gang, Tyre"?

05:29 8      THE REPORTER:  There is a dash.  "Your" and then

05:29 9 dash "the representation."

05:2910      MR. MARMARO:  Okay.  As long as you can answer

05:2911 this question without divulging attorney-client

05:2912 information, you can answer it as far as I'm concerned.

05:2913 If you can't, then I would object and instruct.

05:2914      THE WITNESS:  I did not hear from any source

05:2915 that Mr. Toberoff had spoken directly to Joanne Siegel

05:2916 and/or Laura Larson -- Laura Siegel Larson up until the

05:2917 time of Gang, Tyre's termination.

05:2918 BY MR. BERGMAN:

05:2919      Q    Thank you.

05:2920      Did you learn at any time prior to the

05:3021 termination of Gang, Tyre's representation of the Siegels

05:3022 that Mr. Toberoff had spoken directly with Michael

05:3023 Siegel?

05:3024      MR. MARMARO:  Again, if you can answer that

05:3025 question without divulging attorney-client information,

172

you may answer it.  If it calls for you to divulge

05:30 2 information protected by the attorney-client privilege,

05:30 3 I'll object to that extent and instruct you not to

05:30 4 answer.

05:30 5       (Instruction not to answer.)

05:30 6       THE WITNESS:  I think I cannot answer that

05:30 7 question in view of Mr. Marmaro's instruction.

05:30 8 BY MR. BERGMAN:

05:30 9    Q   Okay.  Did you communicate to Mr. Bulson the

05:3010 offer that Mr. Emanuel and Mr. Toberoff had made to you?

05:3111       MR. MARMARO:  I am going to again ask

05:3112 Mr. Toberoff whether he objects to that question being

05:3113 answered because Mr. Bulson, based on the prior

05:3114 testimony, would be in the zone of somebody whose

05:3115 communications between Mr. Marks and Mr. Bulson would be

05:3116 covered by the attorney-client privilege.  So you asked

05:3117 for a communication, so I am going to pass to

05:3118 Mr. Toberoff.

05:3119       MR. TOBEROFF:  I'll allow it.

05:3120       THE WITNESS:  Yes.

05:3121 BY MR. BERGMAN:

05:3122    Q   Did Mr. Bulson at any time prior to the

05:3123 termination of Gang, Tyre communicate to you that he had

05:3124 in turn communicated to Mr. Siegel, Michael Siegel, the

05:3125 offer made by Mr. Toberoff?

173

05:31 1          MR. MARMARO:  Again, I'm going to make the same

05:31 2    objection.  You are asking for a communication by

05:31 3    Mr. Bulson to Mr. Marks.  If Mr. Toberoff has no -- well,

05:32 4    I think Mr. Bulson may have an objection.

05:32 5          THE WITNESS:  It's Michael Siegel's privilege.

05:32 6          MR. MARMARO:  Yes, it's Michael Siegel's

05:32 7    privilege.  I am going to object and instruct.

05:32 8          (Instruction not to answer.)

05:32 9          THE WITNESS:  Mr. Bulson was representing

05:32 10   Michael Siegel, so I don't think anybody in this room can

05:32 11   actually waive that privilege.

05:32 12         MR. BERGMAN:  Off the record.

05:32 13         (Discussion held off the record.)

05:32 14   BY MR. BERGMAN:

05:33 15     Q   Looking again at your phone logs, there are

05:33 16   calls indicated from Mr. Schulman -- no.  Strike that.

05:33 17         Aside from the conference call that you've

05:33 18   described with Mr. Emanuel and Mr. Toberoff, did you have

05:33 19   any other communications with Mr. Emanuel regarding the

05:34 20   Siegel interest?

05:34 21     A   No.

05:34 22     Q   Did you have any communication -- prior to early

05:34 23   February when you actually received the proposed long

05:34 24   form, did you have any communication with anyone at the

05:34 25   Fross Zelnick firm concerning the long form or any other

                                                          174

aspect of the Siegel matter?

05:34 2          MR. MARMARO:  The question is compound.

05:35 3          MR. TOBEROFF:  Objection --

05:35 4          THE WITNESS:  I --

05:35 5          MR. TOBEROFF:  Wait.  Objection.  Compound.

05:35 6  Also vague and ambiguous as to the February long form.

05:35 7          MR. BERGMAN:  Okay.

05:35 8          MR. TOBEROFF:  Maybe you can specify.

05:35 9  BY MR. BERGMAN:

05:35 10     Q   Am I correct that you received a long-form

05:35 11  agreement from the Fross Zelnick firm in early February

05:35 12  of 2002?

05:35 13         MR. MARMARO:  Draft long-form agreement?

05:35 14         MR. BERGMAN:  Yes.

05:35 15         THE WITNESS:  Yes.

05:35 16  BY MR. BERGMAN:

05:35 17     Q   Prior to your receipt of that draft of the long-

05:35 18  form agreement, had you had any conversations with anyone

05:35 19  at the Fross Zelnick firm concerning when you would be

05:35 20  getting the draft long form?

05:35 21     A   No.  In fact I did not know that they were the

05:35 22  ones that were preparing it.

05:35 23     Q   Okay.  Did you -- and forgive me if I've asked

05:35 24  you this before.  At any time prior to your receipt of

05:35 25  the draft long form, did you have any conversations with

175

05:36 1 Mr. Schulman as to when you would be receiving the

05:36 2 agreement that he referred to in his October 26 letter?

05:36 3           MR. MARMARO:  The draft agreement?

05:36 4           MR. BERGMAN:  Yes.

05:36 5           THE WITNESS:  Communications and attempted

05:36 6 communications, yes.  Conversations, no.

05:36 7           MR. BERGMAN:  Would you mark as Exhibit 22 a

05:36 8 one-page document which doesn't bear initials, which

05:36 9 means it was produced by Warner Bros., 974.

05:3610        (Deposition Exhibit 22 marked.)

05:3711 BY MR. BERGMAN:

05:3712    Q   Am I correct that in the salutation and the

05:3713 first paragraph, Mr. Schulman was congratulating

05:3714 Mr. Ramer upon becoming a grandfather and you upon

05:3715 becoming a father?

05:3716    A   Yes, that is correct.

05:3717    Q   Had you since you returned from your trip in

05:3718 late November spoken with Mr. Schulman and told him of

05:3719 your successful adoption?

05:3720           MR. TOBEROFF:  Lacks foundation.

05:3721           MR. MARMARO:  It's also asked and answered,

05:3722 given the prior testimony, but go ahead, you can answer

05:3723 it again.

05:3724           THE WITNESS:  I don't recall speaking with John

05:3725 in that interim period.

**U.S. LEGAL SUPPORT**

BY MR. BERGMAN:

    Q   Okay.  In response to the second paragraph of this letter, did you make any attempt to telephone Mr. Schulman and tell him in substance that there were disparities between the October 19 and 26 letters?

    MR. MARMARO:  Let me have that question read back, please.

    (Record read.)

    THE WITNESS:  I had made an attempt before this letter, but I don't recall making an attempt after this letter.

    MR. BERGMAN:  Would you mark as Exhibit 23 a letter dated February 1, 2002, with an attachment, a draft long-form agreement, Bates stamped GTRB 350 through 399.

    (Deposition Exhibit 23 marked.)

BY MR. BERGMAN:

    Q  Am I correct, Mr. Marks, that Exhibit 23 is a copy of the long-form agreement that you received in early February?

    A  Yes.

    Q  Did there come a time following your receipt of this agreement when you began a redraft of the agreement?

    MR. MARMARO:  The question is vague and ambiguous, and again I am going to... I'm going to state

177

| | |
|---|---|
| 05:40 1 | that if Mr. Toberoff has an objection to Mr. Marks |
| 05:40 2 | answering this question, I'd like to know about it.  If |
| 05:41 3 | not, Mr. Marks will answer. |
| 05:41 4 | MR. TOBEROFF:  As to the fact of your attempting |
| 05:41 5 | a redraft and the date, I don't mind you testifying |
| 05:41 6 | because that's already been disclosed, I believe, in a |
| 05:41 7 | letter to a third party, but other than that, as to any |
| 05:41 8 | other substantive questions on that redraft, we object to |
| 05:41 9 | that as attorney-client privilege and attorney work |
| 05:4110 | product from the clients' points of view. |
| 05:4111 | MR. MARMARO:  We will follow that objection and |
| 05:4112 | instruct on that basis. |
| 05:4113 | MR. BERGMAN:  As to yes or no -- |
| 05:4114 | MR. MARMARO:  I think he said no.  I'm going to |
| 05:4115 | let Mr. Toberoff talk.  I had understood he said |
| 05:4116 | Mr. Marks can answer that question yes or no but not |
| 05:4217 | beyond that. |
| 05:4218 | MR. BERGMAN:  Oh. |
| 05:4219 | MR. TOBEROFF:  Right.  And also the date if he |
| 05:4220 | wants. |
| 05:4221 | THE WITNESS:  There came a time where I began to |
| 05:4222 | prepare a completely new draft, as opposed to a redraft, |
| 05:4223 | of what I had understood the terms had been reached by |
| 05:4224 | the parties back in October. |
| 05:4225 | BY MR. BERGMAN: |

178

　　　　Q　Can you tell us approximately when you commenced

that redraft?

　　　　MR. MARMARO:　Object to the use of the word

"redraft."

　　　　MR. TOBEROFF:　Object as well.

　　　　THE WITNESS:　I do not recall approximately when

I began the draft agreement.

BY MR. BERGMAN:

　　　　Q　Do you recall speaking with Mr. Schulman on May

16, '02, and I refer you to your privilege -- to your

telephone register, 608, which indicates a call from

Mr. Schulman?

　　　　MR. TOBEROFF:　I am sorry.　What was the Bates

number?

　　　　THE REPORTER:　608.

BY MR. BERGMAN:

　　　　Q　Do you recall that, sir?

　　　　A　Yes.

　　　　Q　And did you in fact speak with Mr. Schulman on

the 16th?

　　　　A　I believe I spoke with Mr. Schulman at least

once on or around the 16th.

　　　　MR. BERGMAN:　I'm going to ask the reporter to

mark as Exhibit 24 a one-page handwritten document Bates

stamped WB 005972.

179

05:44 1          (Deposition Exhibit 24 marked.)

05:44 2   BY MR. BERGMAN:

05:44 3       Q   Mr. Marks, let me tell you that Mr. Schulman has

05:44 4   not yet been deposed in connection with this matter, but

05:44 5   I will represent to you that, if and when deposed, will

05:45 6   identify this document as notes of a conversation that he

05:45 7   took with you and -- on May 16 of statements that you had

05:45 8   made to him with respect to the draft long-form

05:45 9   agreement.

05:45 10      The first purported quotation by Mr. Schulman

05:45 11  is, quote, "'not expect contract like that,'" close

05:45 12  quote.

05:45 13      Do you recall stating in substance to

05:45 14  Mr. Schulman with respect to the draft long form that you

05:45 15  did not expect a contract like that?

05:46 16      A   While I don't have a specific recollection of

05:46 17  this statement, it is in fact the case that I did not

05:46 18  expect a draft like the one that came in early February.

05:46 19      Q   Okay.   The next statement attributed to you is,

05:46 20  quote, "'very aggressive 1st draft,'" close quote.

05:46 21      Do you recall stating that in substance to

05:46 22  Mr. Schulman?

05:46 23      A   Yes.

05:46 24      Q   The next statement attributed to you is, quote,

05:46 25  "'can deal with it,'" close quote.

                                                          180

05:46 1          Do you recall stating that to Mr. Schulman with

05:46 2   respect to the draft long form?

05:46 3        A    Not with respect to the draft long form.

05:46 4        Q    Okay.  Do you recall during that conversation

05:46 5   stating to Mr. Schulman anything to the effect of "can

05:46 6   deal with it"?

05:47 7          MR. MARMARO:  The question is vague in the --

05:47 8   well, the question is vague and ambiguous, but go ahead

05:47 9   and answer.

05:47 10         THE WITNESS:  Yes, but some context is required

05:47 11  here.

05:47 12  BY MR. BERGMAN:

05:47 13       Q    Please give me the context.

05:47 14       A    In this time period I believe there are two

05:47 15  calls.  The first call, John calls me and says -- said,

05:47 16  "Did you know that your client had written to Dick

05:47 17  Parsons and accused the Time Warner people of acting like

05:47 18  Gestapo," and I said "No."

05:47 19         He said, "Well, I've just received a letter."

05:47 20         I said, "Could you send it to me?"  John asked

05:47 21  for my fax number, and he sent it to me.

05:48 22         And I read the letter, and I think I called him

05:48 23  back and said, "As you're presenting it to me, I knew

05:48 24  nothing about this."

05:48 25         And I think John would have in the letter, among

                                                                181

                         **U.S. LEGAL SUPPORT**

other things -- it was a letter from Joanne Siegel -- was

critical of the draft document that had been sent, and I

think John was asking me what I thought about it.

　　　　　And now to get to your question, my -- I think

my comment goes to I can deal with the process of it.  I

think by this time I had formed an opinion that I could

not deal with that draft itself, but I could deal with

the process of moving forward on a long form.  I don't

think that long form.  At least that's how I felt at the

time.

　　Q　Okay.  The next statement attributed to you in

Exhibit 24 is, quote, "'contains a lot of sep,'" which I

take to mean separate, "'docs,'" which I am assuming

documents; that is, it would read, quote, "'contains a

lot of separate documents,'" close quote.

　　　　　MR. MARMARO:  Is that what you're representing

Mr. Schulman -- because that's not my reading of it.

　　　　　THE WITNESS:  I read it differently as well.

　　　　　MR. BERGMAN:  Then I may be wrong.

　　　　　MR. MARMARO:  But if you're representing

that's --

　　　　　MR. BERGMAN:  No, I am not.  I am representing

that that is how I read what Mr. Schulman states are his

notes.

　　Q　How do you read that phrase?

A    Well, with the qualification that I am not an

expert in reading John's handwriting, I believe this

says, "'contains a lot of trap doors,'" which I would

have said because it is how I felt.

Q    Can you explain what you meant by that?

A    Yes, if I could do so with reference to the

document.

Q    You certainly could, sir.

MR. MARMARO:  And again assuming there is no

objection from Mr. Toberoff to this.

BY MR. BERGMAN:

Q    Incidentally, before you begin reviewing that, I

should make note of the fact that this copy which I've

introduced and was produced by you is missing a few

pages, 13, 20 and 42.

MR. MARMARO:  The first I've heard of it.  If

you had called me before the deposition, I would have

looked into it.

MR. TOBEROFF:  This particular copy or --

MR. BERGMAN:  That particular copy -- if you

gentlemen would like, I can -- or if the witness would

like, I have another copy which contains --

MR. MARMARO:  Because they're consecutively

Bates stamped, which would indicate to me that there is a

copying issue at our end or maybe how we -- how the

183

document was maintained.

        MR. BERGMAN:  Why don't we see if the witness
can proceed.  Meanwhile, I will have --

        MR. TOBEROFF:  Can you just repeat those
numbers, by the way?

        MR. BERGMAN:  13, 20, 42.

        MR. TOBEROFF:  Thank you.

        MR. BERGMAN:  You're welcome.

Q   You were looking at the agreement to --

A   I was -- can we wait a moment?

        MR. MARMARO:  Off the record.

        (Discussion held off the record.)

        THE WITNESS:  In my October 19, 2001 letter,
"The Property" was defined quite specifically to mean
"all Superman, Superboy and related properties
(including, for example, Supergirl, Steel, Lois & Clark
and Smallville), and the Spectre property, and includes
all pre- and post-termination works (including the
so-called Superman library), characters, names and
trademarks relating to the Property," and that's what we
had discussed throughout the negotiation.

        I recall there was one time where DC made a
proposal to have a royalty attach only on post-
termination works, which was rejected by the Siegels.  In
the conversations the negotiations was to a royalty that

184

covered all the works.

05:54 2          In this agreement at page 9 there is a

05:54 3 definition of "Revenues." It's paragraph 24. The

05:54 4 revenues -- "The term 'Revenues' is hereinafter defined

05:54 5 as all amounts actually received by DC COMICS in the

05:54 6 United States [sic] from the licensing of the rights in

05:54 7 the SUPERMAN property" --

05:54 8          MR. MARMARO: "In United States Dollars."

05:54 9          THE WITNESS: Excuse me. Thank you.

05:5410          -- "in United States Dollars from the Licensing"

05:5411 with a capital L "of rights in the SUPERMAN Property and

05:5412 the SPECTRE Property," and the sentence and indeed the

05:5413 paragraph continues.

05:5414          In paragraph 23 it says, "The terms 'Licensing'"

05:5415 with a capital L and "'Licenses'" with a capital L "refer

05:5416 to DC COMICS authorizing any third party to commercially

05:5417 exploit the SUPERMAN Property and the SPECTRE Property."

05:5418          So now we have to look to find the definition of

05:5519 "SUPERMAN Property" and "SPECTRE Property." Superman --

05:5520 that definition is at page 4, paragraph 9. That says,

05:5521 "The term super property -- [sic] 'SUPERMAN Property',"

05:5522 in quotes, "is hereinafter defined to mean the following:

05:5523 (i) each of the pre-existing characters and elements

05:5524 which first appeared in the SUPERMAN Works; and (ii) such

05:5525 other characters and/or elements, if any, that may be

05:55 1
05:55 2
05:55 3
05:55 4
05:56 5
05:56 6
05:56 7
05:56 8
05:56 9
05:5610
05:5611
05:5612
05:5613
05:5614
05:5615
05:5716
05:5717
05:5718
05:5719
05:5720
05:5721
05:5722
05:5723
05:5724
05:5725

hereafter -- [sic] that may be created hereafter and meet the following criteria," and then there is an extensive definition of criteria.

So subpart 2 is the definition of "SUPERMAN Property" includes some, but not all, works created from and after the date of the agreement, and what is defined as the "SUPERMAN Works." So then we go to the definition of "SUPERMAN Works."

That definition is at page 3 -- No, I'm sorry, page 2, paragraph 3, and if you parse through the language, it says, quote, "The phrase 'SUPERMAN Works' is hereinafter defined collectively and individually as follows," and rather than -- if you would like me to read it into the record, I can, but notably it continues, "...that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and arise out of SUPERMAN, that were ever created (in whole, in part or jointly) by JEROME SIEGEL." So "SUPERMAN Works" refer to work created by Jerome Siegel.

In this document at paragraph 7, page 3, there is a definition of yet another category of works which is called the "SUPERMAN Derivative Works," and to summarize, those are works relating to the Superman character and

186

the like that are created by persons other than Jerome

05:57 2 Siegel.

05:57 3    So when you put this together, this document is

05:58 4 purporting to say or at least raise the problem that

05:58 5 licensing revenues would not include that body of 60

05:58 6 years of derivative works that the people that DC Comics,

05:58 7 Paul Levitz and others, made such an impression upon us

05:58 8 as being so different from the original work and was the

05:58 9 basis of the Superman library, which was contrary to what

05:58 10 was agreed.  The whole idea was to pick up all works and

05:58 11 not to exclude works created by other people.

05:58 12    I mentioned that at the DC Comics meeting there

05:58 13 was a specific discussion about an American Express ad

05:58 14 campaign where Jerry Seinfeld, who was in that campaign,

05:59 15 specifically requested that the Curt Shaw version of

05:59 16 Superman be used in the campaign.  Under this draft the

05:59 17 proceeds of that campaign would be excluded, or at least

05:59 18 there was an argument that they would be excluded, and

05:59 19 that wasn't the intent.  To parse through that language

05:59 20 and to get there is very difficult, and I found -- I

05:59 21 considered that deceptive drafting and a trap door and

05:59 22 highly, highly problematic.

05:59 23 BY MR. BERGMAN:

05:59 24    Q    I understand the "problematic" part.

05:59 25        Did you believe at the time that it was

                                                                    187

**U.S. LEGAL SUPPORT**

05:59 1    purposely drafted that way or that it was, you know, a

05:59 2    trap door that existed due to inadvertence or drafting

05:59 3    rather than an intentional attempt to deprive the Siegels

06:00 4    of something?

06:00 5       A    Well, I know from the cover letter there were

06:00 6    multiple versions of this internally, because what

06:00 7    Mr. Perkins transmitted was what he described as the

06:00 8    latest version of the work, so that suggested to me that

06:00 9    this had been -- and this is the first version that I

06:00 10   ever saw, so that suggested to me that there had been at

06:00 11   least one and perhaps more versions of the work that had

06:00 12   been vetted, and this looked to me to be an agreement

06:00 13   that -- a document that had been very purposefully

06:00 14   drafted.  That was my take away from it.

06:00 15          I have another example too.

06:00 16      Q    Please let me hear it.

06:01 17      A    Returning to page 9, paragraph 24, the second

06:01 18   sentence, "Revenues shall not include any sums received

06:01 19   by DC Comics for providing any services or materials in

06:01 20   connection with the licensing of rights in the SUPERMAN

06:01 21   Property and SPECTRE Property."  Well, what this

06:01 22   suggested to me was that there would be or could be or

06:01 23   could arguably be a deduction from revenues for services

06:01 24   attributable to DC Comics or materials supplied by DC

06:01 25   Comics.

                                                                  188

06:01 1        Going back to our meeting -- second meeting with

06:02 2    Paul Levitz at Warner Bros. and our meeting in DC Comics,

06:02 3    one of the points that Paul made in connection with what

06:02 4    he described as the licensor share was that DC

06:02 5    contributes a lot in the management, in the exploitation

06:02 6    of the property, and that's a reason why any royalty to

06:02 7    the Siegels should be further reduced, because there

06:02 8    should be some of that pot attributable to DC Comics'

06:02 9    efforts.

06:02 10        I read this and viewed this as a double dip,

06:02 11    because that had already been accounted for in arriving

06:02 12    at the 6 percent, and I was very concerned that this

06:02 13    could be used to further reduce the ultimate royalty.

06:03 14        Q   Again, did you attribute that to an intentional

06:03 15    attempt to, as you have put it, double dip or just to,

06:03 16    with all due respect to the drafters of the agreement,

06:03 17    sloppy drafting?

06:03 18        A   Well, as I read this, this had the earmarks of

06:03 19    very studied, careful, intentional drafting.  I could not

06:03 20    go so far as to know with certainty what the intention of

06:03 21    any or -- of all or any of the people on the DC team was,

06:03 22    but when I told John there are trap doors in it, these

06:03 23    are the trap doors.  I mean, bear in mind this is an

06:03 24    agreement that took a long time to produce, and that also

06:04 25    led me to believe that it had been at least carefully

                                                              189

drafted, and at a minimum this raised concerns for me and

06:04 2 red flags for me.

06:04 3     Q    When you stated to Mr. Schulman that there were

06:04 4 trap doors in the agreement, did he ask you what you

06:04 5 meant, or did he ask you for an example?

06:04 6     A    I don't believe he did.

06:04 7     Q    Applying that term as you have, it's true, isn't

06:04 8 it, that those kind of problems or, as you put it, trap

06:04 9 doors can exist without intentional acts, just through

06:0410 the -- not being able to clearly think through a problem

06:0411 and properly document it?

06:0412          Hasn't that been your experience?

06:0513          MR. MARMARO:  Calls for speculation.

06:0514          MR. TOBEROFF:  I was going to make that

06:0515 objection.  It's also vague and ambiguous, leading.

06:0516          THE WITNESS:  It can be true that drafters make

06:0517 mistakes in drafting that are consequential, adversely

06:0518 consequential.

06:0519 BY MR. BERGMAN:

06:0520     Q    When you spoke with John Schulman, did you

06:0521 indicate to him that you felt that those trap doors were

06:0522 purposely created or that it was inadvertent, or did you

06:0523 say nothing in that regard?

06:0524     A    I don't recall that I said they were purposeful,

06:0525 and I don't recall that I said they were inadvertent.  I

190

just recall saying that they were there.

Q    Okay.  As I read the notes of Mr. Schulman, the

next item says, "'could have been 20, not 60 pages.'"

Do you recall saying that in substance to

Mr. Schulman?

A    Yes.

Q    The next purported statement is, "contains stuff

not agreed to," and I don't know if the last item is a

continuation of that or not, but let me stop there.

Did you tell Mr. Schulman that the draft

contains stuff not agreed to?

MR. MARMARO:  I don't have an objection to the

question, but I have an observation which I think is

important --

MR. BERGMAN:  Please.

MR. MARMARO:  -- to place the question in

context.  The five statements that you just read all

purport to have quote marks around them.  The statement

you just read does not, and you did not indicate that in

your question, but I think the record should indicate

that.

MR. BERGMAN:  Okay.

MR. TOBEROFF:  And my objection is it misstates

the evidence.

BY MR. BERGMAN:

                                                         191

Q   As you'll observe, Mr. Marks, as your client --

06:07 2   as your attorney has pointed out, the phrase "contains

06:07 3   stuff not agreed to" is not incorporated within quotation

06:07 4   marks.

06:07 5       Do you recall saying that in substance to

06:07 6   Mr. Schulman?

06:07 7     A   I recall saying in substance yes, there were

06:07 8   many things not agreed to.

06:07 9     Q   The last sentence, which also lacks quotation

06:0710   marks, says, "not contrary to what agreed to."

06:0811       Do you recall saying that in substance to

06:0812   Mr. Schulman?

06:0813     A   I recall saying, as I said before, it contained

06:0814   many additional terms that were not agreed to, not even

06:0815   discussed, and John saying something like, "Anything

06:0816   contrary?" with a question mark at the end of the

06:0817   sentence, and I have a recollection or a sense of saying,

06:0818   "Not as to the money terms, the 1 million, the 2 million,

06:0819   the 500,000, that's right."

06:0820     Q   Okay.  When you redrafted the long form, was it

06:0821   more than 20 pages?

06:0822       MR. TOBEROFF:  Objection --

06:0823       MR. MARMARO:  Let me just hear Mr. Toberoff's

06:0924   objections.

06:0925       MR. TOBEROFF:  I don't want you talking about

                                                              192

**U.S. LEGAL SUPPORT**

the substance of that redraft, which was specifically not

06:09 2 given Warner Bros.

06:09 3       MR. MARMARO: And that would include a reference

06:09 4 to the page numbers?

06:09 5       MR. TOBEROFF: Yes.

06:09 6       MR. MARMARO: So I'll object. I assume -- I'll

06:09 7 object on the grounds of attorney-client and attorney

06:09 8 work product and instruct the witness not to answer based

06:09 9 on Mr. Toberoff's comment and objection.

06:09 10       (Instruction not to answer.)

06:10 11       MR. BERGMAN: Would you mark as 25 a letter

06:10 12 dated May 9, 2002, which bears a Bates stamp indicating

06:11 13 it was produced by Warner Bros., of 676 through 678.

06:11 14       (Deposition Exhibit 25 marked.)

06:11 15 BY MR. BERGMAN:

06:11 16     Q   In your earlier testimony you made reference to

06:11 17 Mr. Schulman asking you if you received a particular

06:11 18 letter sent by Joanne Siegel. Is Exhibit 25 a copy of

06:11 19 that letter?

06:11 20     A   Yes, it appears to be, although I note that this

06:11 21 is unsigned, and I don't know if -- I don't have a

06:12 22 recollection if the letter was signed.

06:12 23     Q   Well, it's signed by Joanne, isn't it?

06:12 24     A   Mine has no signature.

06:12 25       MR. TOBEROFF: Mine doesn't have a signature

193

either.

MR. BERGMAN:  Okay, guys.  Let me then, in order

to partially clarify the record because the production

copy that I have of the letter, and I'm not sure whether

it's my error or at the time it was xeroxed, only

contains pages 1 and 3 of that letter, but page 3 does in

fact have a signature on it, so why don't we mark as 25A

a copy of a document bearing Bates stamp GTRB 0474

through 477.

(Deposition Exhibit 25A marked.)

MR. BERGMAN:  And I am going to ask you

gentlemen to circulate that because I don't have a copy.

MR. MARMARO:  I think it's adjoined because

there is a missing Bates stamp page.  Page 476 is

missing --

MR. BERGMAN:  Right.

MR. MARMARO:  -- which would be some

indication --

MR. BERGMAN:  It indicates there was a signature

to it.

MR. TOBEROFF:  Should we make copies of this

so --

MR. BERGMAN:  Of course.

MR. MARMARO:  In the interests of moving

along --

                                                            194

06:13 1          MR. BERGMAN:  Yeah, we will just move along.

06:14 2      Q   I take it from your prior testimony you had not

06:14 3  seen a copy of the Exhibit 25 prior to the time

06:14 4  Mr. Schulman sent it to you.

06:14 5          Correct?

06:14 6      A   Yes.

06:14 7      Q   Did you discuss with Mr. Schulman, when you and

06:14 8  he discussed this letter, the let's say strong language

06:14 9  utilized by Miss Siegel in connection with that letter?

06:14 10         I think you made reference to the Gestapo, but

06:14 11 as you'll see from the letter, she speaks of being

06:14 12 stabbed in the back and the document containing

06:14 13 outrageous demands, unethical things demanded, being

06:15 14 stripped naked of legal rights, disgraceful contract,

06:15 15 greedy corporation without morals, seeks to discredit

06:15 16 Jerry Siegel.  Did you ever discuss those

06:15 17 characterizations with Mr. Schulman?

06:15 18         MR. MARMARO:  All of them, any of them

06:15 19 specifically?

06:15 20         MR. BERGMAN:  The nature, the tenor of the

06:15 21 letter.

06:15 22         THE WITNESS:  I don't recall discussing that

06:15 23 with Mr. Schulman, although, as I said in the

06:15 24 conversation where he brought it up, he referred to the

06:15 25 reference of -- a reference to the Gestapo, and I'm

                                                          195

06:15 1    certain I expressed some surprise.

06:16 2    BY MR. BERGMAN:

06:16 3        Q    Okay.  In your practice, Mr. Marks, when you

06:16 4    reach some understanding -- I won't use the term

06:16 5    "agreement" -- with another party and it's embodied in a

06:16 6    letter or something like a short agreement, and then

06:16 7    you're submitted a long-form agreement which contains

06:16 8    terms that are not consistent, perhaps even trap doors,

06:16 9    it's your custom and practice to comment upon those and

06:16 10   revise them or seek to eliminate them, isn't it?

06:16 11           MR. MARMARO:  The question is compound, vague

06:16 12   and ambiguous and -- well, I'll stick with those.

06:17 13           MR. TOBEROFF:  And leading.

06:17 14           MR. MARMARO:  And assumes facts not in evidence.

06:17 15           Go ahead.

06:17 16           THE WITNESS:  Yes, but I formed a view that I

06:17 17   could not do that here.

06:17 18   BY MR. BERGMAN:

06:17 19       Q    When did you form that view?

06:17 20           MR. TOBEROFF:  You can answer.

06:17 21           THE WITNESS:  Not immediately.  I read the

06:17 22   document several times with a view to going through the

06:17 23   process that you described of marking it up, making

06:17 24   comments, suggesting inserts, deleting various

06:17 25   provisions, but I found the document highly problematic,

                                                                196