# EXHIBIT C

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

* ALSO ADMITTED IN NEW YORK

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

February 19, 2008

Via Federal Express

The Honorable Solomon Oliver, Jr.
United States District Court Judge
Carl B. Stokes United States Court House
801 West Superior Avenue
Cleveland, Ohio 44113-1838

Re: *Joanne Siegel, et al. v. Warner Bros. Entertainment Inc., et al.*
U.S. District Court for the Northern District of Ohio, Case No. 1:06-MC-99-SO

Dear Judge Oliver:

In compliance with Your Honor's February 6, 2008 order in the above-captioned matter, enclosed please find the 15 privileged communications (bates numbered DB001-DB044) which Movants still insist must be inspected *in camera*.

Joanne Siegel and Laura Siegel Larson ("Plaintiffs") are the widow and daughter, respectively, of Jerome Siegel, the co-author of the world renowned comic book hero, "Superman," and the sole author of "Superboy." Plaintiffs initiated two civil actions in the United States District Court for the Central District of California ("Siegel Actions") regarding their proper exercise, under section 304(c) of the Copyright Act, 17 U.S.C. § 304(c), of their right to recapture Jerome Siegel's original copyrights in "Superman" and "Superboy" by serving statutory termination notices on the Defendants, Warner Bros. and DC Comics, on April 3, 1997, and March 8, 2002, respectively terminating Jerome Siegel's prior grant(s) of "Superman" and "Superboy" to Defendants' predecessor(s).

Prior to initiating the actions and shortly thereafter, Plaintiffs entered into privileged communications with Michael Siegel, who was Jerome Siegel's son from his first marriage. With the exception of one letter from the Plaintiffs, all privileged communications were made between myself, on behalf of the Plaintiffs, and Michael Siegel's counsel, Ohio attorney Don W. Bulson, Esq. While Michael Siegel was not a party to the Siegel Actions, as the son of author Jerome Siegel he was a member of the statutory class entitled to participate in any proceeds from Jerome Siegel's recaptured

EXHIBIT C
12

**LAW OFFICES OF MARC TOBEROFF**

The Honorable Solomon Oliver, Jr.
February 19, 2008
Page 2

copyrights and thus any settlement or other proceeds from the Siegel Actions. Sadly, Michael Siegel passed away on January 17, 2006. The Probate Court of Cuyahoga County, Ohio recognized Laura Siegel Larson as the sole beneficiary of Michael Siegel's estate.

In the Siegel Actions Defendants served Mr. Bulson with a subpoena duces tecum on August 11, 2006. Mr. Bulson filed timely objections to the subpoena, and a privilege log was submitted soon thereafter. As noted by Your Honor's February 6, 2008 order ("Order"), Defendants' subpoena was "extremely broad." The Order nonetheless required by February 11 a revised privilege log with respect to 15 entries, describing in greater detail the privileged nature of the communications. Plaintiffs and Mr. Bulson furnished the revised log to Defendants on February 11. The Order further required Defendants to assess the revised log and to meet and confer with Plaintiffs regarding any outstanding issues. However, Defendants made no attempt to meet and confer, instead sending on February 15 only an e-mail rejection of the *revised* privilege log on the purported basis of unspecified arguments made in their Reply brief before the privilege log had been revised in an effort to resolve this matter. Nevertheless, Plaintiffs, in accordance with the Order, hereby submit the 15 privileged communications and the revised privilege log in the event that the Court still finds *in camera* review to be appropriate.

The 15 communications are clearly protected under the doctrine of the "common interest" attorney-client privilege. As Section 76(1) of the Restatement (Third) of the Law Governing Lawyers provides, two persons with separate attorneys and a common interest in a litigated or non-litigated matter can exchange information about the matter themselves or through their attorneys, and the communications will remain privileged against third parties.

This bedrock principle has been recognized by U.S. District Courts in the Sixth Circuit, including *Fresenius Med. Care Holdings, Inc. v. Roxane Labs., Inc.*, 2007 WL 895059, at *2–*4 (S.D.Ohio 2007) and *Travelers Cas. & Sur. Co. v. Excess Ins. Co. Ltd.*, 197 F.R.D. 601, 606–07 (S.D.Ohio 2000)("The rule applies when the parties have a 'common litigation opponent'…or when information is exchanged between 'friendly litigants' with similar interests.")(internal citations omitted). The principle also has been recognized in other Circuits, including *U.S. v. Under Seal*, 902 F.2d 244, 249 (4th Cir. 1990)(collecting cases)("[T]he rationale for the joint defense rule remains unchanged: persons who share a common interest in litigation should be able to communicate with their respective attorneys and with each other…"); *U.S. v. American Tel. & Tel. Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980)(Common interest exception applies to attorney work product doctrine); *U.S. v. Schwimmer*, 892 F.2d 237, 243-44 (2d Cir.1989); *In re Regents of Univ. of Cal.*, 101 F.3d 1386, 1389 (Fed. Cir. 1996); *Hunydee v. U.S.*, 355 F.2d 183, 185 (9th Cir. 1965). *See also Griffith v. Davis*, 161 F.R.D. 687, 692 n.6 (C.D.Cal. 1995); *Sedlacek v. Morgan Whitney Trading Group, Inc.*, 795 F.Supp. 329, 331 (C.D.Cal. 1992).

EXHIBIT C
13

**LAW OFFICES OF MARC TOBEROFF**

The Honorable Solomon Oliver, Jr.
February 19, 2008
Page 3

As noted on Mr. Bulson's revised privilege log, and as is readily apparent on the face of the 15 communications, Plaintiffs' and Michael Siegel's attorneys discussed and considered in these communications Defendants' settlement proposals and the economic risks of litigation with Defendants -- classic *privileged* subject matter. Without question, Plaintiffs and Michael Siegel held a "common interest" in such settlement discussions and in the Siegel Actions of which they were both beneficiaries. To the extent any of these communications, as argued by Defendants, may contain negotiations regarding a purchase of Michael Siegel's interest, that was technically "adversarial" in nature, this would not alter the privileged status of the communications. *Hunydee*, 355 F.2d at 185 (applying the common interest doctrine to statements concerning a matter of common concern, even though co-defendants generally had a significant conflict of interest); *Eisenberg v. Gagnon*, 766 F.2d 770, 787-788 (3d. Cir. 1985)(recognizing that "communications to an attorney to establish a common defense strategy are privileged even though the attorney represents another client with some adverse interests"). *Vis a vis* Defendants, the Siegel family remained squarely aligned in interest even to the extent of such discussions, and in reliance on the common interest privilege *all* of their communications were made in confidence.

In the context of settlement discussions and litigation, financial offers and counter-offers regarding the termination interest, if any, would necessarily reflect an assessment of litigation risk and other strategic thinking protected by the attorney work product doctrine and attorney-client privilege. Such discussions would necessarily also reflect an assessment of the Joanne, Laura and Michael Siegel's relative financial condition and their ability to weather prolonged litigation against a large corporation, both of which are likewise confidential and privileged. Additionally, any consolidation of the termination interest with the plaintiffs in anticipated litigation would, in itself, also be strategic, and thus reasonably protected by the privilege.

The privileged and confidential nature of the communications amongst the Siegel family is surely not outweighed by their dubious relevance to the issues in the Siegel Actions. F.R.C.P. 26(b)(3). The sole rationale floated by Defendants for the production of these sensitive documents is that they may be relevant to a damages valuation "for which they [Plaintiffs] are seeking an accounting in the actions." Mot. Compel 8. However, this is completely without merit. Pursuant to their Section 304(c) terminations, Plaintiffs recaptured on April 16, 1999, Jerry Siegel's 50% joint copyright interest in *Superman*. Under copyright law, this entitles Plaintiffs to an accounting from the Movants, *Superman's* other joint owner, for 50% of the Movants' *actual profits* from their exploitation of *Superman* on and after April 16, 1999. *See generally*, *Nimmer on Copyright* § 6.12 (joint owner's duty to account); *Oddo v. Ries*, 743 F.2d 630, 633 (9th Cir. 1984); *Nimmer on Copyright* §§ 11.03, 11.04 (statutory termination of copyright transfers). Under the Copyright Act, an accounting is based on actual profits from the exploitation of a copyright, not a subjective or even a market "valuation" of the copyright. To the extent, if any, that Michael Siegel engaged in negotiations with

EXHIBIT C
14

**LAW OFFICES OF MARC TOBEROFF**

The Honorable Solomon Oliver, Jr.
February 19, 2008
Page 4

Plaintiffs regarding his interest in *Superman*, this has no bearing on Plaintiffs' right to their requisite share of *actual profits* as joint copyright owners. In all probability Movants seek these privileged communications to prejudice a proper damage analysis based on actual profits. To the extent, if any, that the communications reflect personal valuations in light of prior settlement offers, the risks of litigation and notorious "Studio accounting" practices, this only underscores their privileged status.

At no time did Plaintiffs or Michael Siegel waive their attorney-client privilege or work product protection with regard to these communications and have otherwise maintained the privilege by keeping the documents confidential from third parties. Additionally, these documents maintain their privileged status because Laura Siegel Larson occupies the position of Michael Siegel as his sole heir and the successor to his statutory termination interest. The attorney-client privilege survives the client's death. *See Swidler & Berlin v. U.S.*, 524 U.S. 399, 403, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998), *Ohio v. Doe*, 433 F.3d 502, 504 (6th Cir. 2006); *Taylor v. Sheldon*, 172 Ohio St. 118, 122 (Oh. 1961). As Michael Siegel's heir and successor, Laura Siegel Larson appropriately holds Michael Siegel's attorney-client privilege in this matter. *See* Ohio Revised Code § 2317.02(A)(1); *Taylor v. Sheldon*, 172 Ohio St. 118, 122 (1961) (construing Ohio R.C. § 2317.02).

Very truly yours,

*/s/ Marc Toberoff*

Marc Toberoff

cc: James Weinberger, Esq. (Letter w/o enclosures via Facsimile and U.S. mail)
    Meggan A. Rawlin, Esq. (Letter w/o enclosures via Facsimile and U.S. mail)
    Michael Bergman, Esq. (Letter w/o enclosures via Facsimile)
    Patrick Perkins, Esq. (Letter w/o enclosures via Facsimile)

EXHIBIT C
15